Exhibit 4

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

ePLUS, INC.,                              )
                                          )
                                          )   CIVIL ACTION NO. 3:05cv281
                 Plaintiff,               )
                                          )
         v.                               )
                                          )
SAP AMERICA, INC.,                        )
and SAP AG,                               )
                                          )
                 Defendants.              )


PLAINTIFF ePLUS, INC.'S BRIEF IN SUPPORT OF
ITS CLAIM CONSTRUCTION STATEMENT

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ...................................................................................................1

II.  BACKGROUND OF THE TECHNOLOGY .......................................................1

III.  GENERAL CLAIM CONSTRUCTION PRINCIPLES.......................................3

    A.  The Court Should Consider As Instructive Its Prior Construction Of The Claims Of The Patents in suit...................................................................................................3

    B.  The Federal Circuit Has Reaffirmed The Paramount Importance Of Intrinsic Evidence.................................................................................................................4

    C.  The Claim Language Defines The Metes And Bounds Of The Inventions.............5

    D.  Claim Terms Generally Should Be Given Their Ordinary And Customary Meaning ................................................................................................................6

    E.  The Claims Must Be Read In View Of The Specification.....................................7

    F.  Limitations May Not Be Read From The Specification Into The Claims ...............7

    G.  The Prosecution History May Be Helpful In Construing Claims............................9

    H.  Extrinsic Evidence, Including Expert And Inventor Testimony, Is Less Significant Than Intrinsic Evidence In Construing The Claims .............................................10

    I.  Means-Plus-Function Claim Construction Principles...........................................11

IV.  THE PROPER CONSTRUCTION OF THE PATENTS IN SUIT ...................13

    A.  The Claim Element "Catalog" Needs No Further Elucidation By The Court .......13

    B.  The Claim Element "Database" Should Be Construed To Have Its Ordinary And Customary Meaning, Without Recitation Of Specific Examples From The Specification .......................................................................................................14

    C.  The Claim Element "Electronic Sourcing System" Should Be Given Its Ordinary Meaning, Without Incorporation Of Inappropriate And Inaccurate Limitations Selectively Drawn From Other Claims................................................................15

    D.  The Claim Element "Generally Equivalent" Need Not Be Explained To The Jury At All ...................................................................................................................17

    E.  The Element "Purchase Order" Need Not Be Defined Further, And Defendants' Proposal To Incorporate Findings Into The Definition Should Be Rejected........18

    F.  The Term "Requisition" Is Used With Its Ordinary Meaning...............................18

    G.  The Court Should Reject Defendants' Request To Make Findings As To What Constitutes A "Source" ......................................................................................19

    H.  The Disputed Means-Plus-Function Limitations ..................................................19

V.  CONCLUSION....................................................................................................26

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abtox, Inc. v. Exitron Corp.,*
   122 F.3d 1019 (Fed. Cir. 1997) ............................................................................ 6

*Budde v. Harley-Davidson, Inc.,*
   250 F.3d 1369 (Fed. Cir. 2001) .......................................................................... 20

*Cardiac Pacemarkers, Inc. v. St. Jude Med., Inc.,*
   296 F.3d 1106 (Fed. Cir. 2002) .......................................................................... 12

*Catalina M'ktg Int'l, Inc. v. Coolsavings.com, Inc.,*
   289 F.3d 801 (Fed. Cir. 2002) ...................................................................... 13, 16

*CCS Fitness, Inc. v. Brunswick Corp.,*
   288 F.3d 1359 (Fed. Cir. 2002) ........................................................................ 8, 9

*Dow Chem. Co. v. U.S.,*
   226 F.3d 1334 (Fed. Cir. 2000) ............................................................................ 6

*Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.,*
   381 F.3d 1111 (Fed. Cir. 2004) .................................................................. *passim*

*Interactive Gift Express, Inc. v. Compuserve, Inc.,*
   256 F.3d 1323 (Fed. Cir. 2001) ............................................................................ 8

*Kim v. The Earthgrains Co.,*
   2005 W.L. 66071 (N.D. Ill. Jan. 11, 2005) .......................................................... 4

*Lampi Corp. v. Am. Power Prods., Inc.,*
   228 F.3d 1365 (Fed. Cir. 2000) ............................................................................ 9

*Markman v. Westview Instruments, Inc.,*
   517 U.S. 370, 390 (1996) ..................................................................................... 4

*Markman v. Westview Instruments, Inc.,*
   52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd,* 517 U.S. 370 (1996) ................ *passim*

*McCarty v. Lehigh Valley R.R. Co.,*
   160 U.S. 110 (1895) ......................................................................................... 6, 8

*Medical Instrumentation and Diagnostics Corp. v. Elekta A.B.,*
   344 F.3d 1205 (Fed. Cir. 2003) .......................................................................... 21

*Merrill v. Yeomans,*
   94 U.S. 568 (1876) ............................................................................................... 5

*Micro Chemical, Inc. v. Great Plains Chemical Co., Inc.,*
   194 F.3d 1250 (Fed. Cir. 199) ...................................................................... 12, 22

*Mycogen Plant Science, Inc. v. Monsanto Co.,*
   243 F.3d 1316 (Fed. Cir. 2001) ............................................................................ 6

*N. Am. Vaccine, Inc. v. Am. Cyanamid Co.,*
   7 F.3d 1571 (Fed. Cir. 1993) .................................................................................. 20

*Nazomi Communications, Inc. v. ARM Holdings, PLC,*
   403 F.3d 1364 (Fed. Cir. 2005) ............................................................................... 9

*Nilssen v. Motorola, Inc.,*
   80 F. Supp.2d 921 (N.D. Ill. 2000) .......................................................................... 4

*Northrop Grumman Corp. v. Intel Corporation,*
   325 F.3d 1346 (Fed. Cir. 2003) ............................................................................. 12

*Phillips v. AWH Corp.,*
   415 F.3d 1303 (Fed. Cir. 2005) ...................................................................... *passim*

*Process Control Corp. v. HydReclaim Corp.,*
   190 F.3d 1350 (Fed. Cir. 1999) ............................................................................... 8

*Rodime PLC v. Seagate Tech., Inc.,*
   174 F.3d 1294 (Fed. Cir. 1999) ............................................................................. 12

*Scanner Technologies Corp. v. ICOS Vision Sys. Corp.,*
   365 F.3d 1299 (Fed. Cir. 2004) ............................................................................. 16

*Serrano v. Telular Corp.,*
   111 F.3d 1578 (Fed. Cir. 1997). ............................................................................ 12

*Teleflex, Inc. v. Ficosa North Am. Corp.,*
   299 F.3d 1313 (Fed. Cir. 2002) ........................................................................... 8, 9

*Texas Instruments, Inc. v. Linear Technologies Corp.,*
   182 F. Supp.2d 580 (E.D. Tex. 2002) ...................................................................... 4

*Vitronics Corp. v. Conceptronics Inc.,*
   90 F.3d 1576 (Fed. Cir. 1996) ........................................................................ *passim*

*Vivid Technologies, Inc. v. American Science and Engineering, Inc.,*
   200 F.3d 795 (Fed. Cir. 1999) ............................................................................... 13

*WMS Gaming Inc. v. Int'l Game Tech.,*
   184 F.3d 1339 (Fed. Cir. 1999) ............................................................................. 20

**Statutes**

35 U.S.C. § 112, ¶6 ............................................................................. 1, 12, 20, 23

**Other Authorities**

Webster's II New Riverside University Dictionary (1988) .................................. 14, 19

Webster's New World Computer Dictionary (9th ed.) (2001) ..................................... 15

## I.      INTRODUCTION

Plaintiff, *e*Plus, Inc. ("*e*Plus"), submits this memorandum in support of its Claim

Construction Statement for United States Patent Nos. 6,023,683 ("the '683 Patent"), 6,055,516

("the '516 Patent") and 6,505,172 ("the '172 Patent") (collectively, "the patents in suit").[1]  *e*Plus

relies upon the intrinsic evidence, including the claims and common specification to the patents

in suit, to support its constructions for the disputed claim terms.  In addition, ePlus relies upon

the Declaration of Alfred C. Weaver, Ph. D., a professor of computer science for the University

of Virginia, who provides expert testimony from the perspective of a person  of ordinary skill in

the art, which is required for the construction of the means-plus-function claim elements,

pursuant to 35 U.S.C. § 112, ¶6.

## II.     BACKGROUND OF THE TECHNOLOGY

*e*Plus and SAP directly compete in the sale of electronic sourcing and procurement

systems and services to large and mid-sized corporate customers.  The electronic sourcing and

procurement systems automate internal corporate purchasing processes, resulting in enormous

savings in time and expense.  Corporate customer users may search for items for sale from

multiple selected electronic catalogs, view inventory availability information for those items,

find related items available from other suppliers, and requisition desired goods or services.  The

system then generates electronic orders to each different supplier for approved requisitions.

Prior to the inventions in the patents, procuring products for large corporations could

involve several manual, paper-based operations coupled with awkward automated electronic

processes.  *See, e.g.,* '683 Patent, Col. 1:11-Col. 2:18.  A company might be able to access a

---

[1] The '683, '516 and '172 Patents are attached hereto as Exhibits 1, 2 and 3, respectively.

system to type information into an electronic requisition or submit an electronic order from hard-copy catalogs. *See id.* at Col. 1:36-59. Alternatively, a company might be able to view items from a single electronic catalog from a compact disc, for example. *See id.* at Col. 2:3-12. However, these systems provided only limited improvements in the corporate procurement processes.

The inventors of the *e*Plus patents recognized that significant efficiencies could be realized by enabling users to make purchasing decisions based on price, item availability and product comparison.[2] Thus, they detailed in the patent specification systems and methods that:

- "search[] a database containing data (including product/vendor identification and other product information) relating to items available from at least two vendor product catalogs" ('683 Patent, Col. 2:49-52) (thereby enabling product comparison)

- "transfer[] the product information for desired catalog items obtained as a result of the search to a requisition/purchasing system for use in generating a requisition including entries for the desired catalog items " ('683 Patent, Col. 2:53-56) (thereby automating the flow of information from an electronic catalog into an electronic requisition/purchase order)

- "check[] the availability in one or more inventory locations" ('683 Patent, Col. 3:19-22) (thereby avoiding delays in delivery of items)

- "cross-reference[] from the [one catalog item] … to similar corresponding catalog numbers of other vendors (suppliers or distributors) for the same Product" ('683 Patent, Col. 3:19-22) (thereby making comparison shopping easier and more efficient)

---

[2] The four inventors were computer engineers from Fisher Scientific, Inc. ("Fisher"), a distributor of laboratory equipment. Once Fisher realized the potential for software of this type, it created a division called Fisher Technology Group ("FTG") to enter the market as a software vendor. FTG was soon spun off by Fisher and renamed ProcureNet. *e*Plus — which had long sought to enter the electronic sourcing market –– purchased ProcureNet's technology assets, including the patents in suit, in May of 2001. Since then, *e*Plus's software business has grown dramatically.

Each claim of the patents recites one or more of these functions performed by the structural elements (for the system claims) or steps (for the method claims) recited.

Claim 1 of the '683 Patent is representative:

1. An electronic sourcing system comprising:

at least two product catalogs containing data relating to items associated with the respective sources;

means for selecting the product catalogs to search;

means for searching for matching items among the selected product catalogs;

means for building a requisition using data relating to selected matching items and their associated source(s);

means for processing the requisition to generate one or more purchase orders for the selected matching items; and

means for determining whether a selected matching item is available in inventory.

## III.    GENERAL CLAIM CONSTRUCTION PRINCIPLES

### A.    The Court Should Consider As Instructive Its Prior Construction Of The Claims Of The Patents in suit

This Court, with United States District Judge Leonie M. Brinkema presiding, previously construed claims of the three patents in suit in *e*Plus's prior litigation against Ariba, Inc.  Judge Brinkema instructed the jury as to the meaning of all of the means-plus-function elements recited in eight representative claims that were presented at trial, and in the course of considering summary judgment motions she also rendered an opinion construing a number of other claim elements disputed by the parties.  *See* Exhibit 4 (Mem. Op. of The Honorable United States District Judge Leonie M. Brinkema in Civil Action No. 1:04cv612); Exhibit 5 (Final Claim Construction Jury Instructions in *ePlus v. Ariba*, Civil Action No. 1:04cv612).

Federal courts have differed as to the amount of deference that should be accorded to a prior claim construction of the same patents.  However, the most appropriate approach — and

3

apparently the most common — is that this Court should consider and accord deference to Judge Brinkema's prior claim construction rulings, without deeming those rulings to have preclusive effect. *See, e.g., Kim v. The Earthgrains Co.*, 2005 W.L. 66071, ** 10-11 (N.D. Ill. Jan. 11, 2005) ("while stopping short of according a preclusive effect to [the prior] claim construction, the court will bear [the prior] interpretations in mind as instructive ...."); *Texas Instruments, Inc. v. Linear Technologies Corp.*, 182 F. Supp.2d 580 (E.D. Tex. 2002) (finding that a court may defer to prior construction, but is not bound by it); *Nilssen v. Motorola, Inc.*, 80 F. Supp.2d 921, 924 n.4 (N.D. Ill. 2000) (respect accorded prior construction, but prior construction not deemed preclusive).

Where, as here, another judge of this same Court has already rendered a thoughtful opinion on the matter, that opinion is due some deference. Moreover, the goal articulated by the Supreme Court in its seminal *Markman* decision — to establish uniformity in the treatment of a patent by tasking judges with deciding claim construction questions as a matter of law — is served by deferring to prior claim construction rulings absent some compelling reason to depart from them. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390 (1996).

## B. The Federal Circuit Has Reaffirmed The Paramount Importance Of Intrinsic Evidence

Several months ago, in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*), the Federal Circuit revisited the applicable principles of claim construction. The *en banc* decision expressly reaffirmed the court's previous holdings in *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996), *Vitronics Corp. v. Conceptronics Inc.*, 90 F.3d 1576 (Fed. Cir. 1996), and *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111 (Fed. Cir. 2004). *Phillips*, 415 F.3d at 1312 ("What we said in those cases bears restating, for the basic principles of claim construction

outlined there are still applicable, and we reaffirm them today."); *see also id.* at 1324 ("Today, we adhere to that approach and reaffirm the approach to claim construction outlined in that case [*Vitronics*], in *Markman*, and in *Innova*.").

The *Phillips* court confirmed that the most probative evidence of the meaning of a patent claim term is to be found primarily in the intrinsic record, *i.e.*, the claims themselves, the specification, and to a lesser extent, the prosecution history. *See id.* at 1312-17. Extrinsic evidence, such as dictionaries and treatises, may still be considered, but are generally disfavored as a means of interpreting claim terms. *See id.* at 1317-19. Furthermore, the court reaffirmed those holdings admonishing against any claim construction that attempts to limit the scope of the claims by the number of embodiments described in the specification. *See id.* at 1323-24.

## C.     The Claim Language Defines The Metes And Bounds Of The Inventions

The Federal Circuit in *Phillips* set forth a very clear blueprint for a district court to follow:  claim construction analysis begins with the words of the claim. *Id. at* 1312 ("It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude.") (citing *Innova*, 381 F.3d at 1115); *see also Vitronics*, 90 F.3d at 1582 ("we look to the words of the claims themselves ... to define the scope of the patented invention"); *Markman*, 52 F.3d at 980 ("The written description part of the specification itself does not delimit the right to exclude.  That is the function and purpose of claims.").

Relying upon Supreme Court precedent, *Phillips* emphasized the "primary importance" of the claims in determining "precisely what it is that is patented." *Phillips*, 415 F.3d at 1312 (citing *Merrill v. Yeomans*, 94 U.S. 568, 570 (1876)).  "Because the patentee is required to define precisely what his invention is," the court explained, "it is unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms." *Id.* at 1312 (citing *White v. Dunbar*, 119 U.S. 47, 52 (1886); also citing *McCarty v. Lehigh Valley R.R.*

*Co.*, 160 U.S. 110, 116 (1895) ("if we once begin to include elements not mentioned in the claim, in order to limit such claim ... , we should never know where to stop")); *see also Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1023 (Fed. Cir. 1997) ("the language of the claim frames and ultimately resolves all issues of claim interpretation.").

### D.   Claim Terms Generally Should Be Given Their Ordinary And Customary Meaning

The Court in *Phillips* reaffirmed that "the words of a claim are generally given their ordinary and customary meaning," *i.e.*, "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1312-13 (citing *Vitronics*, 90 F.3d at 1582; *Innova*, 381 F.3d at 1116). A person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the other claims and the specification. *Id.* at 1313. The Court continued:

> Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term. Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims. Differences among claims can also be a useful guide in understanding the meaning of particular claim terms. For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim.[3]

*Id.* at 1314-15 (citations omitted).

---

[3] This doctrine, known as the doctrine of claim differentiation, is a canon of claim construction that holds that a broader scope should be given to a claim that uses a more general term than a dependent claim using a more specific term; otherwise, such a dependant claim would be superfluous. *See generally Mycogen Plant Science, Inc. v. Monsanto Co.*, 243 F.3d 1316, 1329 (Fed. Cir. 2001); *Dow Chem. Co. v. U.S.*, 226 F.3d 1334, 1341-42 (Fed. Cir. 2000). In other words, limitations from dependent claims should generally not be read into independent claims.

### E.   The Claims Must Be Read In View Of The Specification

After stressing the "primary importance" of the claims themselves, *Phillips* added that

"[t]he claims, of course, do not stand alone"; rather they "must be read in view of the

specification, of which they are a part." *Id.* at 1315 (citing *Markman*, 52 F.3d at 978). "[T]he

specification is 'highly relevant to the claim construction analysis. Usually, it is dispositive; it is

the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics*, 90 F.3d at

1582). The court added:

> Consistent with that principle, our cases recognize that the
> specification may reveal a special definition given to a claim term
> by the patentee that differs from the meaning it would otherwise
> possess. In such cases, the inventor's lexicography governs. In
> other cases, the specification may reveal an intentional disclaimer,
> or disavowal, of claim scope by the inventor. In that instance as
> well, the inventor has dictated the correct claim scope, and the
> inventor's intention, as expressed in the specification, is regarded
> as dispositive.

*Id.* at 1316 (citations omitted) (emphasis added).

### F.   Limitations May Not Be Read From The Specification Into The Claims

While emphasizing the importance of the specification in claim construction, *Phillips*

warned against the "danger of reading limitations from the specification into the claim." *See id.*

at 1323. Indeed, the Federal Circuit has repeatedly cautioned courts not to use the specification

to construe the claims in a manner inconsistent with their plain language. As the court explained

in *Innova*:

> Some persons seem to suppose that a claim in a patent is like a
> nose of wax which may be turned and twisted in any direction, by
> merely referring to the specification, so as to make it include
> something more than, or something different from, what its words
> express. The context may, undoubtedly, be resorted to, and often is
> resorted to, for the purpose of better understanding the meaning of
> the claim; but not for the purpose of changing it, and making it
> different from what it is. ***The claim is a statutory requirement,
> prescribed for the very purpose of making the patentee define***

> *precisely what his invention is; and it is unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms.* This has been so often expressed in the opinions of this court that it is unnecessary to pursue the subject further.

*Innova*, 381 F.3d at 1117 (quoting *White*, 119 U.S. at 51-52) (emphasis added); *see also Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1333-44 (Fed. Cir. 2001) (reversing various claim constructions of district court for importing limitations from specification into patent claims); *Process Control Corp. v. HydReclaim Corp.*, 190 F.3d 1350, 1357 (Fed. Cir. 1999) ("we do not permit courts to redraft claims"); *Markman*, 52 F.3d at 980 ("The written description part of the specification itself does not delimit the right to exclude. That is the function and purpose of claims."). Indeed, this has been the law for more than one hundred years. *See, e.g., McCarty,* 160 U.S. at 116 ("We know of no principle of law which would authorize us to read into a claim an element which is not present ... The difficulty is that if we once begin to include elements not mentioned in the claim in order to limit such claim ..., we should never know where to stop.").

The Federal Circuit has also repeatedly admonished against any claim construction exercise that attempts to limit the scope of the claims by the number of embodiments described in the specification. As the court explained in *Teleflex*:

> In sum, the number of embodiments disclosed in the specification is not determinative of the meaning of disputed claim terms. As we explained in *CCS Fitness*, an accused infringer cannot overcome the "heavy presumption" that a claim term takes on its ordinary meaning simply by pointing to the preferred embodiment or other structures or steps disclosed in the specification or prosecution history. We hold that claim terms take on their ordinary and accustomed meanings unless the patentee demonstrated an intent to deviate from the ordinary and accustomed meaning of a claim term by redefining the term or by characterizing the invention in the intrinsic record using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope.

*Teleflex, Inc. v. Ficosa North Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002) (emphasis

added); *Nazomi Communications, Inc. v. ARM Holdings, PLC*, 403 F.3d 1364, 1369 (Fed. Cir.

2005) (claims may embrace "different subject matter than is illustrated in the specific

embodiments in the specification"); *Innova*, 381 F.3d at 1117 ("even where a patent describes

only a single embodiment, claims will not be read restrictively unless the patentee has

demonstrated a clear intention to limit the claim scope using words or expressions of manifest

exclusion or restriction."); *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359 at 1366 (Fed.

Cir. 2002) (accused infringer may not narrow claim term's ordinary meaning "simply by

pointing to the preferred embodiment or other structures or steps disclosed in the specification or

prosecution history"); *Lampi Corp. v. Am. Power Prods., Inc.*, 228 F.3d 1365, 1378 (Fed. Cir.

2000) ("[i]t is a familiar principle of patent law that a claim need not be limited to a preferred

embodiment").

 The *Phillips* court reaffirmed this basic tenet of claim construction. *Phillips*, 415 F.3d at

1323 ("[W]e have expressly rejected the contention that if a patent describes only a single

embodiment, the claims of the patent must be construed as being limited to that embodiment.").

**G.**  **The Prosecution History May Be Helpful In Construing Claims**

 In addition to consulting the specification, *Phillips* instructs that a court "should also

consider the patent's prosecution history, if it is in evidence."[4] *Id.* at 1317 (citing *Markman*, 52

F.3d at 980). "[T]he prosecution history can often inform the meaning of the claim language by

demonstrating how the inventor understood the invention and whether the inventor limited the

invention in the course of prosecution, making the claim scope narrower than it would otherwise

---

 [4] The prosecution history consists of the complete record of the proceedings before the
PTO and includes the prior art cited during the examination of the patent. *See Phillips*, *supra* at
1317.

be." *Id.* at 1317 (citations omitted). The Court cautioned, however, against relying too heavily on the prosecution history: "[B]ecause the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* at 1317 (citing *Inverness Med. Switz. GmbH v. Warner Lambert Co.*, 309 F.3d 1373, 1380-82 (Fed. Cir. 2002)) (the ambiguity of the prosecution history made it less relevant to claim construction).

## H. Extrinsic Evidence, Including Expert And Inventor Testimony, Is Less Significant Than Intrinsic Evidence In Construing The Claims

Importantly, *Phillips* signaled a shift away from excessive reliance on the extrinsic record, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id.* at 1317. The court explained, "while extrinsic evidence can shed useful light on the relevant art, we have explained that it is less significant than the intrinsic record in determining the legally operative meaning of claim language." *Id.* at 1317 (citations omitted). The court listed a number of reasons why extrinsic evidence in general is less reliable than the intrinsic record in construing claim terms. *Id.* at 1318-19. In particular, the court highlighted the dangers inherent in placing too much emphasis on dictionaries and treatises to construe claim terms:

> The main problem with elevating the dictionary to such prominence is that it focuses the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent. Properly viewed, the "ordinary meaning" of a claim term is its meaning to the ordinary artisan after reading the entire patent. Yet heavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification.

*Id.* at 1321. The court concluded, "In sum, extrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1319.

These concerns apply with equal force to inventor testimony, which also constitutes extrinsic evidence. *Vitronics,* 90 F.3d at 1583-85. An inventor's subjective intent as to claim scope, when unexpressed in the patent documents, has no effect on claim construction. *Id.* at 1584. This holds true "whether it is the patentee or the alleged infringer who seeks to alter the scope of the claims [through extrinsic evidence]." *Id.* at 1583. Thus, an inventor's testimony may not be used to vary or contradict claim language. *Id.* at 1585. As the Federal Circuit stated in *Vitronics*:

Such testimony may only be relied upon if the patent documents, taken as a whole, are insufficient to enable the court to construe disputed claim terms. Such instances will rarely, if ever, occur. Even in those rare instances, prior art documents and dictionaries, although to a lesser extent, are more objective and reliable guides. *Id.; see also Markman,* 52 F.3d at 983 ("the testimony of [the patentee] and his patent attorney on the proper construction of the claims, is entitled to no deference ....").

## I.      Means-Plus-Function Claim Construction Principles

Many of the claims of the patents in suit contain elements written in means-plus-function format pursuant to 35 U.S.C. § 112, ¶6 (2000). That paragraph states:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

Application of § 112, ¶6 requires identification of the structure, material, and acts in the specification which perform the recited function. *See Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294, 1302 (Fed. Cir. 1999). Therefore, § 112, ¶6 requires both identification of the claimed function and identification of the structure in the written description necessary to perform that function. The statute does not permit limitation of a means-plus-function claim by adopting a function different from that explicitly recited in the claim. *Micro Chemical, Inc. v. Great Plains Chemical Co., Inc.*, 194 F.3d 1250, 1257-58 (Fed. Cir. 199). "Nor does the statute permit incorporation of structure from the written description ***beyond that necessary to perform the claimed function***." *Id.* at 1258 (emphasis added).

After identifying the function of the means-plus-function element, the court must look to the written description to identify the structure corresponding to that function. *Id.* Identification of corresponding structure may embrace more than the preferred embodiment. A means-plus-function claim encompasses all structure in the specification corresponding to that element and equivalent structures. *Id.* Thus, when multiple embodiments in the specification correspond to the claimed function, proper application of § 112, ¶6 reads the claim element to embrace each of those embodiments. *See Serrano v. Telular Corp.*, 111 F.3d 1578, 1583 (Fed. Cir. 1997).

Furthermore, a court may not import into the claim features that are unnecessary to perform the claimed function. *Northrop Grumman Corp. v. Intel* Corporation, 325 F.3d 1346, 1352 (Fed. Cir. 2003). Features that do not perform the recited function do not constitute corresponding structure and thus do not serve as claim limitations. *See Cardiac Pacemarkers, Inc. v. St. Jude Med., Inc.,* 296 F.3d 1106, 1116 (Fed. Cir. 2002).

Absent a clear disclaimer of particular subject matter, the fact that the inventor may have anticipated that the invention would be used in a particular way does not mean that the scope of

the patent is limited to that context. *Catalina M'ktg Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 809 (Fed. Cir. 2002).

Finally, the law is clear that a patent specification need not include subject matter that is known in the field of the invention and is in the prior art, for patents are written for persons experienced in the field of the invention. *See Vivid Technologies, Inc. v. American Science and Engineering, Inc.*, 200 F.3d 795, 804 (Fed. Cir. 1999) ("patents are written by and for skilled artisans").

## IV.     THE PROPER CONSTRUCTION OF THE PATENTS IN SUIT

The parties have identified a number of claim terms in dispute. As set forth below, the Court must construe the means-plus-function elements in order to determine the functions and structures that perform the functions covered by these claim elements. However, with respect to the claim elements not written in means-plus-function format, for nearly of all of these basic terms, the most accurate construction the Court could provide is to simply read the claim elements to the jury to be accorded their ordinary and customary meanings. Instead, for several of these terms Defendants have proposed results-oriented constructions that are not appropriate. Several of Defendants' proposed constructions either suggest specialized meanings for these terms, or incorporate "findings" that a particular apparatus will satisfy such a claim element. This approach is improper, and should be rejected.

### A.     The Claim Element "Catalog" Needs No Further Elucidation By The Court

*e*Plus believes that the claim element "catalog" is a plain term having a plain and ordinary meaning and is consistently used with its ordinary meaning in the claims, and therefore

requires no explanation from the Court to the jury.[5] *See* '683 Patent, Claim 1 ("[a]n electronic sourcing system comprising:  [*inter alia*] … at least two product catalogs containing data relating to items associated with the respective sources …."); Col. 4:38-42 ("[t]he catalogs … preferably include such information as part number, price, catalog number, vendor name or I.D., and vendor catalog number, as well as textual information and images of or relating to the catalog products."); *compare* Webster's II New Riverside University Dictionary, 236 (1988) ("[a] systematized list, often featuring descriptions of the listed items").[6] *See* '683 Patent, Col. 4:38-42.

To the extent the Court believes any explanation should be provided to the jury, *e*Plus suggests that the term be given the explanation provided by the specification, consistent with the dictionary definition:  "an organized collection of items and associated information which can include, for example, a part number, price, catalog number, vendor name, vendor I.D., a textual description of an item, and images of or relating to the item."  *See* '683 Patent, Col. 4:38-42.

**B.      The Claim Element "Database" Should Be Construed To Have Its Ordinary And Customary Meaning, Without Recitation Of Specific Examples From The Specification**

It appears that Defendants dispute the meaning of the claim element "database," as they suggest that the construction of the term must include a substantial recitation of specific

---

[5] The term "catalog" appears in numerous claims of the patents in suit.  *See, e.g.,* '683 Patent Claim 1 ("at least two product catalogs containing data relating to items associated with the respective sources").

[6] *See* Exhibit 6, attached hereto, containing a compendium of dictionary definitions for various claim terms.

examples from the specification.[7] Thus, Defendants contend that the construction of this ordinary element should include specific examples of databases, and propose that "database" be construed as "A collection of related information organized in a useful manner, including the databases disclosed in the patent specification, such as RIMS Databases (42), Catalog Database (36), and Host Pricing and Inventory Databases (11)." In contrast, *e*Plus asks that the Court simply construe the claim to have its ordinary meaning as "a collection of related information stored on a computer system organized in a useful manner that provides a base or foundation for procedures, such as retrieving information." This definition is consistent with the inventors' use of the term in the patents, and with the dictionary definition of the term. *See, e.g.*, Webster's New World Computer Dictionary (9th ed.) 100 (2001) ("[a] collection of related information about a subject organized in a useful manner that provides a base or foundation for procedures, such as retrieving information, drawing conclusions, and making decisions."). *See* Exhibit 6.

Defendants do not dispute that "database" is used in the claims in any way other than its ordinary and customary usage. Their proposed inclusion of specific examples from the specification as defining the claim element is unnecessary, improperly imports selective embodiments from the specification, and could confuse a jury into focusing improperly on only these examples.

### C.   The Claim Element "Electronic Sourcing System" Should Be Given Its Ordinary Meaning, Without Incorporation Of Inappropriate And Inaccurate Limitations Selectively Drawn From Other Claims

*e*Plus believes that the element "electronic sourcing system," which appears as a preamble to many but not all claims of the patents in suit constitutes a claim limitation. *See*

---

[7] "Database" likewise appears in multiple claims. *See, e.g.*, '683 Patent, Claim 6 ("[a]n electronic sourcing system comprising *[inter alia]* a database containing data relating to items associated with at least two sources...").

15

*Catalina M'ktg,* 289 F.3d at 808 ("[i]n general, a preamble limits the invention if it recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim"). In this case, the intrinsic evidence demonstrates that the inventions claimed are "electronic sourcing systems" where that limitation appears, and, moreover, the term provides an antecedent basis for some of the claim terms that follow. *See, e.g.,* '683 Patent, Claim 1 ("[a]n electronic sourcing system comprising: [*inter alia*] at least two product catalogs containing data relating to items associated with the respective sources ... [and] means for building a requisition using data relating to selected matching items and their associated source(s)...."); *Catalina M'ktg,* 289 F.3d at 808 ("dependence on a particular disputed preamble phrase for antecedent basis may limit claim scope because it indicates a reliance on both the preamble and claim body to define the claimed invention."). However, the use of the word "comprising" following "electronic sourcing system" means that the covered systems include, ***but are not limited to,*** the recited elements that follow. *Scanner Technologies Corp. v. ICOS Vision Sys. Corp.,* 365 F.3d 1299 (Fed. Cir. 2004) ("[t]he use of the transitional phrase 'comprising' itself indicates that the elements or steps following the transition may be supplemented by additional elements or steps and still fall within the scope of the claim"). Moreover, the sourcing system is "electronic," *i.e.,* implemented on a computer system. *See, e.g.,* '683 Patent, Col. 3:3-24.

Defendants appear to agree that the "electronic sourcing system" preamble constitutes a claim limitation. However, Defendants propose a construction of this claim element that incorporates several additional limitations that are neither necessary nor appropriate. Defendants propose that the simple three-word phrase "electronic sourcing system" be construed to mean "A requisition/purchasing program, a catalog search program, and an interface between catalog search program and requisition/purchasing program, each of which runs on a local computer that

has input and display capabilities for both the catalog search and the requisition/purchasing program, and a catalog database." Yet some of the electronic sourcing system claims of the patents in suit do not even recite "catalogs," even though Defendants apparently propose to read catalogs into every claim. Other claims do not recite "requisitions" or "purchase orders." Defendants' proposal also incorporates limitations that appear elsewhere in many of the claims, rendering those limitations superfluous when they appear elsewhere.

In contrast, *e*Plus proposes that the term be construed simply as "an electronic system for use by a prospective buyer to locate and find items to purchase from sources, suppliers or vendors." The particulars of the claimed electronic sourcing systems are, of course, supplied by the additional elements of the claims in which this element appears. These particular elements need not and should not be restated or read into the construction of "electronic sourcing system."

### D.   The Claim Element "Generally Equivalent" Need Not Be Explained To The Jury At All

The claim element "generally equivalent" should be given its ordinary and customary meaning; indeed, the Court need not define these basic, easily understandable words at all.[8] Defendants, however, seek to alter the meaning of these words in that they ask the Court to define the phrase as meaning "an acceptable substitute." It is difficult to see how "acceptable substitute" has any more explanatory value to a jury than does "generally equivalent," but moreover Defendants' suggestion improperly redefines the term. It does not necessarily follow that something that is an acceptable substitute for something else is therefore generally equivalent. In ordinary parlance, for example, one might find a glass of water to be an

---

[8] This element appears in, *e.g.*, '516 Patent, Claim 9 ("[a]n electronic sourcing system comprising [*inter alia*] ... "a second identification code associated with a second item in a second catalog, said first item and said second item being generally equivalent....").

acceptable substitute for a bottle of juice, but it does not follow that the two are generally equivalent.

The Court should simply provide this claim term to the jury without attempting any further explication of the phrase. To the extent the Court feels the need to provide a definition, Plaintiff would suggest the term should be construed as "substantially similar."

### E.   The Element "Purchase Order" Need Not Be Defined Further, And Defendants' Proposal To Incorporate Findings Into The Definition Should Be Rejected

For the "purchase order" element, Defendants seek to improperly incorporate a specific finding into the construction of the term. They propose not only that the element be construed as "an authorization to supply," but moreover that the construction include a finding that a purchase order "include[es] internal inventory transfer orders."

The role of the Court in a *Markman* determination is to construe the meaning of the claim elements, not to make findings as to whether specific examples or instances meet the claim elements. The term "purchase order" is an easily understood term used with its ordinary meaning in the patents in suit. *See, e.g.,* '683 Patent, Claim 1 ("[a]n electronic sourcing system comprising: [*inter alia*] ... means for processing the requisition to generate one or more purchase orders for the selected matching items...."). To the extent the Court determines the term needs any further definition, it should be construed as "a commission or instruction to buy something," without any findings as to whether specific examples or instances are covered by that element. The latter determination is a factual issue, not a matter of claim construction.

### F.   The Term "Requisition" Is Used With Its Ordinary Meaning

Again, *ePlus* believes that the term "requisition" is used in the patents with its ordinary meaning. *See, e.g.,* '683 Patent, Claim 1 ("[a]n electronic sourcing system comprising: [*inter alia*] means for building a requisition using data relating to selected matching items and their

18

associated source(s)").  In this instance, because this phrase may not be something the jurors are

familiar with on an everyday basis, some definition of this word would likely be helpful to the

jury.  *e*Plus suggests that because the term is used in the patents consistent with its dictionary

definition, it would be appropriate to provide the following definition to the jury:  "a formal

request to purchase something needed."  *Compare* Webster's II New Riverside University

Dictionary, 999 (1988) ("[a] formal written request for something needed").  *See* Exhibit 6.

### G.   The Court Should Reject Defendants' Request To Make Findings As To What Constitutes A "Source"

As with the term "purchase order," Defendants ask the Court to make a finding in the

context of defining the ordinary word "source."[9]  Specifically, they propose that their suggested

definition of "sources" as "different suppliers" include "as well as different warehouse locations

of a supplier."  Again, it is not the role of the Court under *Markman* to make findings as to

whether a specific example or instance is covered by the construed term.

"Source" is an ordinary term, easily understood by the jury, and not used in any

unordinary context within the claims.  The Court need not define it further.  To the extent the

Court believes any further definition necessary, *e*Plus suggests the following definition:  "source,

when used as a noun, means a supplier, vendor or distributor of products or services."

### H.   The Disputed Means-Plus-Function Limitations

The parties agree that the claim elements of the patents in suit that recite a "means" for

performing a specified function are subject to the statutory requirements of 35 U.S.C. § 112, ¶6.

---

[9] The term "source(s)" likewise appears throughout the claims of the patents in suit. *See, e.g.,* '683 Patent, Claim 1 ("[a]n electronic sourcing system comprising:  [*inter alia*] at least two product catalogs containing data relating to items associated with the respective sources ... [and] means for building a requisition using data relating to selected matching items and their associated source(s)....").

As noted above, in construing these means-plus-function claim limitations, a court must first define the particular function claimed. *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1376 (Fed. Cir. 2001). Thereafter, the court must identify "the corresponding structure, material, or acts described in the specification." *Id.* The structure corresponding to the claimed function necessitates consideration of that disclosure from the viewpoint of one skilled in the art. *See N. Am. Vaccine, Inc. v. Am. Cyanamid Co.*, 7 F.3d 1571, 1579 (Fed. Cir. 1993).

The "sourcing system" described and claimed in the patents in suit is an "electronic" sourcing system, *i.e.*, it is implemented on a computer system. Accordingly, the means-plus-function elements recited in the claims are typically software programs or modules operating on a computer system. *See* Declaration of Alfred C. Weaver, Ph.D. ("Weaver Dec.") ¶¶34-39.

"A general purpose computer, or microprocessor, programmed to carry out an algorithm creates 'a new machine, because a general purpose computer in effect becomes a special purpose computer once it is programmed to perform particular functions pursuant to instructions from program software.'" *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1348 (Fed. Cir. 1999).[10]

In a means-plus-function claim in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is the special purpose computer programmed to perform the disclosed algorithm. *Id.* at 1349. Defendants suggest therefore that the inventors were required to disclose specific software code for the supporting structures. The Federal Circuit has found, however, that "there would be no need for a disclosure of the specific program code if ... one skilled in the art would know the kind of

---

[10] An "algorithm" is simply "a logical procedure for solving a problem." *See* Webster's New World Computer Dictionary (9th ed. 2001) at 17. *See* Exhibit 6.

program to use." *Medical Instrumentation and Diagnostics Corp. v. Elekta A.B.*, 344 F.3d 1205, 1214 (Fed. Cir. 2003).

The software programs recited and claimed in the patents in suit, in and of themselves, are not the point of novelty of the claimed inventions. Those software programs used in performing the recited functions were known in the art in the 1993-95 timeframe. Weaver Dec., ¶39. It is the new and useful combination of the variously claimed elements that is patentable.

Thus, for example, search engines for performing searches of a database based on keyword entries were familiar to persons of ordinary skill in the art at that time, including the inventors. *Id.* Indeed, Mr. Kinross, one of the inventors of the patents in suit, tasked with designing the "search" functionality, was aware of several search engines suitable to their needs. *See* Deposition of Robert Kinross, attached at Exhibit 7 at 66-69. The team of inventors eventually settled on a commercially-available, "off the shelf" search engine available from IBM, known as TV/2, for incorporation into their sourcing system. *Id.* at 62-65. This software program, discussed repeatedly throughout the specification, satisfied the requirements for the search functionality. Other search engines, however, as noted in the specification, would be suitable. *See, e.g.*, '683 Patent, Col. 4:3-7. Accordingly, it is not only a particular commercially-available software program or module — such as the TV/2 — that constitutes the disclosed structure, just as it is not the particular commercial "embodiment" developed by the inventors and disclosed in the specification, that constitutes the structure for performing the functions recited.[11]

---

[11] As the inventors determined that the TV/2 search engine was suitable to their needs and constituted the best mode of the invention, they were obligated to disclose that in their specification. It does not mean, however, that the inventions are limited, or proscribed, by this disclosed embodiment.

Indeed, as noted above, the statute does not permit incorporation of structure from the written description beyond that necessary to perform the claimed function. *Micro Chemical*, 194 F.3d at 1258. Under the circumstances, therefore, a person of ordinary skill in the art would understand, for example, that the "means for searching for matching items among selected product catalogs," as recited in Claims 1 and 3 of the '683 Patent, would include the exemplary corresponding structure, material and/or acts as: search programs and modules operating on a computer system with access to item data in a database or other file system; and their equivalents. Weaver Dec., ¶¶45-47. No additional structure is necessary to perform the function, and that structure is disclosed in the specification. *See id.*[12]

Under the same rationale, Plaintiff respectfully requests that the Court should construe these means-plus-function software components in a simple and straightforward matter. Thus, for example, the structures for the "means for selecting the product catalogs to search,"[13] may be simply construed as:

> *Exemplary corresponding structure, material and acts:* a user interface that allows the user to select a catalog; a catalog software module or program that selects product catalogs based on preferences or histories; a catalog search software module or

---

Moreover, it is the functional "structure" of the disclosed search program, not its commercial brand name which controls, as should be readily apparent.

[12] Plaintiff has provided an Appendix of all of the proper constructions for the means-plus-function elements in the patents in suit. The construction for these claim elements provided herein is the same instruction given by the Honorable Leonie M. Brinkema as jury instructions in *ePlus v. Ariba, Inc.*, Civil Action No. 1:04CV612. Weaver Dec., ¶¶44, 46, 56, 59, 61, 65, 72, 77, 79, 81, 83 and 85.

As noted above, although this ruling as a matter of law does not bind Defendants under the doctrine of collateral estoppel, it is nonetheless entitled to deference.

[13] *See* Claims 1, 3 of the '683 Patent.

> program that identifies and selects product catalogs or a
> combination thereof; and their equivalents.

Similarly, the structures for the "means for building a requisition using data relating to selected matching items and their associated source(s),"[14] can be construed as:

> *Exemplary corresponding structure, material and acts:* a
> requisition software module or program operating on a computer
> system having access to data in a database; and their equivalents.

In stark contrast, Defendants have again urged a "results oriented" construction that does violence to the statutory requirements of § 112, ¶6. Thus, for example, Defendants' construction for this simple element for "building a requisition," is as follows:

> A requisition building means initiated from Requisition/Purchasing
> Program (40) running on Local Computer (20 or 220) that also
> utilizes Interface (60) and Catalog Search Program (50) running on
> Local Computer (20 or 220), including the steps of:[15]
>
> a.   entering via Order Header data screen (100) (Appendix I)
> certain fields of information (e.g. account number, requisition
> number, stock number) regarding the item(s) to be sourced (6:44-
> 47; 6:54-65);
>
> b.   storing the information entered via Order Header screen
> (100) in local Requisition Database (42A) (6:47-53; 7:20-28);

---

[14] *See, e.g.,* Claims 1, 3, 6 and 14 of the '683 Patent.

[15] Each of SAP's proposed constructions for the means-plus-function elements seek to have the Court import a limitation that would require that the recited function be executing on a "local computer." Such a construction would be entirely improper because the express language of the claim elements do not require such a limitation and, moreover, the patent specification describes embodiments in which the software program for performing the claimed function is not executing on a local computer but, rather, is executing on a networked server accessible by many users or the software program is executing on a remote host computer which is connected to a local computer over a public communications network. *See, e.g.,* FIG. 1B and Col. 16:66-Col. 19:6 (describing server-based embodiment); and Col. 4:61-Col. 5:17 (describing host computer 10 which includes pricing and inventory databases and which is linked to local computer 20 via a point-to-point connection or over a public communications network); and Col. 14:4-11 (indicating that the inventory determination function is performed on both local computer 20 and host computer 10).

c.      passing   certain   information   (e.g.   account   number, requisition number) from Order Header screen (100) via REQI program (44A) for display in Requisition Management data screen (110) (7:51-60);

d.      entering via Requisition Management data screen (110) (Appendix II, VIII, IX) certain additional fields of information (e.g. catalog or part number, quantity, partial text) regarding the items(s) to be sourced (7:18-25; 7:48-51; 7:61-8:8; 8:15-26);

e.      searching   and   retrieving   from   local   database   (42) information for certain additional fields (e.g., vendor name, vendor number,  product  description)  regarding  an  item  selected  on Requisition Management data screen (110) (6:6-13);

f.      storing the information entered in Requisition Management screen (110) in Requisition Item Table (46) (7:25-35);

g.      if a matching item is located from the search of database (42), then data fields in pending Requisition Item Table (46) are updated, and no data is passed via Interface (60) to Catalog Search Program (50 or 250) (6:6-10; 7:36-38);

h.      if not, then passing certain fields of information regarding an item to be sourced from Requisition Item Table (46) to Catalog Search Program (50 or 250); via DDE protocol through Interface (60) (8:37-9:8);

i.      displaying via Catalog Search Program (50 or 250) a Hit List screen (47) representing limited data about all matching items located in Catalog Database (36) (Appendix III) (9:39-45);

j.      selecting via Hit List (47) one or more items to be requisitioned (10:21-24, 11:30-38);

k.      generating in Shell (52) via a hypertext link an Order List (48) containing certain fields of information (e.g. vendor name, vendor number, vendor part (catalog) number, product description, list price, page number, quantity, unit and catalog text) regarding items selected from Hit List (47) (10:21-39; 11:30-38; 11:62-66);

l.      displaying   Items   Selected   screen   (Appendix   VI) representing items collected in Order List (48) (11:38-43; 12:38-40);

m.      transmitting from Order List (47) to REQI program (44A) via  DDE  protocol  through  Interface  (60)  certain  fields  of information (e.g., catalog (part) number, vendor identification, list

price) regarding selected items (10:30-43; 11:50-54; 12:48-53; 13:1-21; 13:32);

n.     updating the data fields in pending Requisition Item Table (46) with the information received via Interface (60) from Order List (47) (11:50-55; 12:56-67); and

o.     once the last item is completed, Interface (60) passes control to REQI, which displays Requisition Management screen (110), reflecting all changes made to Requisition Item Table (46) associated with that requisition (13:44-49).

Such a construction for this simple claim element fails as a matter of law.[16] *First*, it is hopelessly complex, unworkable, and undoubtedly designed to simply confuse the jury in an effort to obtain a finding of noninfringement. *Second*, it incorporates unnecessary structure for performing the function; indeed, it purports to incorporate the very commercial embodiment designed by the inventors down to the particular aesthetics of the "screen shots" of the computer monitor. Weaver Dec., ¶52. Such a level of detail and complexity is not required under the statute. Indeed, under the Defendants' approach, the patents in suit could never cover any system other than the original commercial embodiment, which undoubtedly is the intent.

Thus, not only is the Defendants' proposed construction overinclusive, by their own logic, it is also underinclusive. The specification also recites additional structure available as part of the "requisition" function claimed in the patents. *See, e.g.*, Col. 5:32-39; Col. 7:3-11; and Col. 18:48-52. That structure, however, for whatever reason, is not included in Defendants' proposed construction.

By way of further example, Defendants, under the guise of creating a purported "algorithm," have entirely rewritten the element "means for building a requisition," by

---

[16] Defendants' constructions for the other means-plus-function elements are similarly complex and contorted. *See, e.g.*, Weaver Dec., ¶49.

haphazardly cobbling together a compendium of more than 15 separate "steps" for this function. The individual "steps" however, appear to be assembled in an entirely random fashion. So, for example, step "d" relies on various disclosures from Column 7 and 8 in the Patent, then step "e" reverts to Column 6. Step "l" relies on various passages from Columns 11 and 12, while step "m" reverts back to Column 10, as well as including other disclosure from Column 13. It is evident that Defendants have simply reassembled these disparate elements in an effort to rewrite the claim in a manner that never could be satisfied. Defendants' "algorithm," therefore, is not an algorithm at all, but rather a ***new claim*** created from whole cloth.

This approach to construing structures for the means-plus-function elements appears throughout Defendants' proposed constructions. The Court should not adopt such an approach, which is contrary to the statute, illogical in its reasoning, and flawed as a matter of law.[17]

## V.   CONCLUSION

Plaintiffs respectfully request that the Court adopt in its entirety the claim constructions Plaintiffs have proffered in its separate Claim Construction Statement, submitted herewith. Further, the Court should reject Defendants' strained constructions which improperly seek to import limitations from the patent specifications into the claims. Defendants' claim constructions are the product of a results-oriented approach which find no basis in the law, and are intended solely for the purpose of escaping the consequences of their obvious infringement.

---

[17] For ease of analysis of the parties' respective proposed claim constructions, *e*Plus has provided herewith a chart (Exhibit 8) containing a side-by-side comparison of those claim interpretations.

Respectfully submitted,

Dated:  November 7, 2005

_____

Maya M. Eckstein (VSB #41413)
**HUNTON & WILLIAMS LLP**
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219-4074

Scott L. Robertson
Jennifer A. Albert
Yisun Song (VSB #45881)
**HUNTON & WILLIAMS LLP**
1900 K Street, N.W.
Washington, DC  20006-1109
Telephone:  (202) 955-1500
Facsimile:  (202) 778-2201

Thomas J. Cawley (VSB # 04612)
David M. Young (VSB #35997)
**HUNTON & WILLIAMS LLP**
1751 Pinnacle Drive, Suite 1700
McLean, VA  22102
Telephone:  (703) 714-7400
Facsimile:  (703) 714-7410

Attorneys for Plaintiff
ePlus, Inc.

## **CERTIFICATE OF SERVICE**

I certify that on this 7th day of November, 2005, a copy of the foregoing **PLAINTIFF ePLUS, INC.'S BRIEF IN SUPPORT OF ITS CLAIM CONSTRUCTION STATEMENT** was delivered:

Via hand delivery and via email transmission to:

Dabney J. Carr, IV, Esq.
Robert A. Angle, Esq.
TROUTMAN SANDERS LLP
Troutman Sanders Building
1001 Haxall Point
Richmond, Virginia 23219

Via overnight courier and via email transmission to:

Lloyd R. Day, Jr., Esq.
Robert M. Galvin, Esq.
Christopher E. Stretch, Esq.
Julie S. Turner, Esq.
DAY CASEBEER MADRID & BATCHELDER LLP
20300 Stevens Creek Blvd., Suite 400
Cupertino, CA 95014

Counsel for Defendants SAP America, Inc.
and SAP AG