Exhibit 6

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| ePLUS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:05cv281 |
| | ) | |
| SAP AMERICA, INC., | ) | |
| and SAP AG, | ) | |
| | ) | |
| Defendants. | ) | |

**SAP AMERICA, INC. AND SAP AG'S MEMORANDUM
IN SUPPORT OF PROPOSED CLAIM CONSTRUCTION**

239577_1.doc

## TABLE OF CONTENTS

PAGE NO.

I.      INTRODUCTION ................................................................................................ 1

II.     BACKGROUND OF THE CLAIMED INVENTIONS ...................................... 3

        A.      Prior Art .................................................................................................. 3

        B.      The Electronic Sourcing System Described in the Specification ........... 6

        C.      Representative Claims ............................................................................. 8

III.    SAP'S PROPOSED CLAIM CONSTRUCTION SHOULD BE ADOPTED .................. 8

        A.      General Principles of Claim Construction .............................................. 8

        B.      Construction of "Means-Plus-Function" Limitations Under § 112, ¶ 6 .............. 10

        C.      ePlus's Proposed Claim Construction Fails to Comply With the Law
                Regarding § 112, ¶ 6 Claims ................................................................. 13

        D.      SAP's Proposed Claim Construction for Representative Claims ........... 15

                1.      Agreed Constructions for Key Claim Terms ............................... 15

                2.      Disputed Constructions for Key Claim Terms ............................. 15

                3.      '683 Claim 1 ................................................................................ 18

                4.      '683 Claim 6 ................................................................................ 23

                5.      '683 Claim 45 .............................................................................. 26

                6.      '516 Claim 17 .............................................................................. 26

                7.      '172 Claim 1 ................................................................................ 28

# TABLE OF AUTHORITIES

PAGE NO.

CASES

*Apple Computer, Inc. v. Articulate Sys., Inc.*,
   234 F.3d 14, 22 (Fed. Cir. 2000) ................................................................. 18

*Arthur A. Collins, Inc. v. Northern Telecom Ltd.*,
   216 F.3d 1042 (Fed. Cir. 2000) ................................................................. 10

*Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*,
   412 F.3d 1291 (Fed. Cir. 2005) ................................................................. 11

*Gobeli Research Ltd., v. Apple Computer, Inc.*,
   384 F. Supp. 2d 1016 (E.D. Tex. 2005) ..................................................... 14

*Harris Corp. v. Ericsson, Inc.*,
   417 F.3d 1241 (Fed. Cir. 2005) ........................................................... passim

*Kahn v. Gen. Motors Corp.*,
   135 F.3d 1472 (Fed. Cir. 1998) ................................................................. 11

*Kemco Sales, Inc. v. Control Papers Co., Inc.*,
   208 F.3d 1352 (Fed. Cir. 2000) ................................................................. 11

*Key Pharms. v. Hercon Labs. Corp.*,
   161 F.3d 709 (Fed. Cir. 1998) ................................................................... 10

*Kumar v. Ovonic Battery Co., Inc.*,
   351 F.3d 1364 (Fed. Cir. 2003) ................................................................. 10

*Liquid Dynamics Corp. v. Vaughan Co., Inc.*,
   355 F.3d 1361 (Fed. Cir. 2004) ................................................................... 9

*Medtronic, Inc. v. Guidant Corp.*,
   No. 00-2503, 2004 U.S. Dist. LEXIS 10020 (D. Minn. May 25, 2004) ................... 12

*Micro Chem., Inc. v. Great Plains Chem. Co., Inc.*,
   194 F.3d 1250 (Fed. Cir. 1999) ................................................................. 11

*Phillips v. AWH Corp.*,
   415 F.3d 1303, 1313 (Fed. Cir. 2005) (*en banc*) ................................... 9, 10

*Southwall Techs., Inc. v. Cardinal IG Co.*,
   54 F.3d 1570 (Fed. Cir. 1995) ................................................................... 10

*Tehrani v. Hamilton Med., Inc.*,
   331 F.3d 1355 (Fed. Cir. 2003) ................................................................. 12

## TABLE OF AUTHORITIES (CONT'D)

PAGE NO.

*Vitronics Corp. v. Conceptronic, Inc.,*
  90 F.3d 1576 (Fed. Cir. 1996) ................................................................. 9, 10

*WMS Gaming, Inc. v. Int'l Game Tech.,*
  184 F.3d 1339 (Fed. Cir. 1999) ............................................... 11, 12, 13, 14

**STATUTES**

35 U.S.C. § 112 ........................................................................... passim

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| CSR | Customer Service Representative |
| DDE | Dynamic Data Exchange |
| Johnson Tr. | 10/19/05 Deposition Transcript of James M. Johnson |
| Kinross Tr. | 11/2/05 Deposition Transcript of Robert P. Kinross |
| Menascé Decl. | Declaration of Daniel Menascé |
| Momyer Tr. | 10/17/05 Deposition Transcript of Douglas Momyer |
| RIMS | Fisher Scientific's Requisition and Inventory Management System |
| SAP | SAP America, Inc. and SAP AG |
| TV/2 | IBM's Technical Viewer 2 |

## I.    INTRODUCTION

ePlus, Inc. has sued SAP America, Inc. and SAP AG ("SAP") for infringement of three patents.[1]  The patents-in-suit describe an electronic sourcing system that combined a known requisition/purchasing system with a known catalog search program.  The resulting electronic sourcing system could perform a number of useful business functions such as searching a database of product catalogs to identify products or services from multiple sources, building requisitions of items selected from search results, checking inventory availability and price for such items, converting items from one source to another, and generating purchase orders.

The named inventors of the patents-in-suit, however, were not the first to invent requisition/purchasing systems capable of performing such business functions.  They were not the first to invent catalog search programs.  Nor were they even the first to suggest the combination of a requisition/purchasing system with a catalog search program.  At best, the patents-in-suit describe a very specific and modest contribution to the art – a particular mechanism for transferring information between a requisition/purchasing system and a catalog search program.

During the prosecution history and a prior lawsuit against Ariba, ePlus and the inventors have sought to re-cast their inventions by focusing on certain features, such as the ability to search across multiple catalogs, the ability to check inventory, and the ability to convert items from one source to another source.  The inventors' admissions establish that those features were old and previously known.  ePlus cannot recast the clear meaning and import of the inventions actually described in the specification, or escape the inventors' unambiguous admissions about what was already known and available in the prior art.

The specification plays a particularly critical role in this case because the inventors chose to frame most of their claims with means-plus-function limitations.  Under 35 U.S.C. § 112, ¶ 6, a claim limitation can be expressed as a means for performing a specified function (*e.g.*, "means for searching" or "means for building a requisition"), but only if the means for performing the

---

[1] The three patents-in-suit are U.S. Patent Nos. 6,023,683 (the "'683 patent") (Exhibit B), 6,055,516 (the "'516 patent") (Exhibit C), and 6,505,172 (the "'172 patent") (Exhibit D).

recited function are clearly described in the specification. A means-plus-function limitation does not include every means for performing the specified function; it covers only those corresponding structures, material, and acts described in the specification for performing that function and their equivalents. Thus, to construe a means-plus-function limitation, it is necessary not only to construe the meaning of the recited functions, but also to identify with particularity the structures disclosed in the specification for performing those functions.

Some of the means-plus-function claims in suit were previously construed by Judge Brinkema in a prior action, *ePlus, Inc. v. Ariba, Inc.* SAP expects that ePlus will ask this Court to adopt all or substantially all of those prior constructions. The Court should reject ePlus's request. First, since SAP was not a party to the prior lawsuit, it is entitled to address these issues without preclusion by a prior result. Second, the *Ariba* court did not conduct a *Markman* hearing. While the *Ariba* court did address certain claim construction issues in the context of denying cross-motions for summary judgment relating to infringement and in its instructions to the jury, the court did not have the benefit of briefs directed solely to claim construction, or issue an opinion construing the claim limitations in accordance with § 112, ¶ 6. Third, after the *Ariba* case, the Federal Circuit's decision in *Harris Corp. v. Ericsson, Inc.*,[2] clarified the law relating to the identification of corresponding structures for computer-implemented means-plus-function limitations, thus mandating constructions that differ from those in the *Ariba* case.

SAP has repeatedly asked ePlus to meet and confer in advance of this hearing to limit the claims and the claim terms that the Court will be asked to construe. ePlus has declined to do so.[3] In this brief, SAP will focus on five of the 79 patent claims asserted by ePlus. SAP believes these five claims are representative of most of the key claim construction issues in dispute.[4]

To provide the context in which the claimed inventions were made, SAP will provide a

---

[2] 417 F.3d 1241 (Fed. Cir. 2005).

[3] Exh. S (10/23/05 Letter from Day to Robertson); Exh. T (10/31/05 Letter from Day to Robertson); and Exh. U (11/1/05 Letter from Day to Robertson).

[4] SAP's proposed claim construction for all 79 of ePlus's asserted claims can be found in the chart attached as Exhibit A.

brief overview of the prior art discussed in the specification as well as a discussion of the particular embodiments described in the specification. Each of the limitations of the representative claims will then be discussed in light of the claim language, specification, and prosecution history. Because it is necessary to identify the corresponding structures in the specification for performing the recited functions, SAP additionally has submitted an expert declaration from Dr. Daniel Menascé, Professor of Computer Science at George Mason University, as well as deposition testimony from the named inventors, to aid the Court in determining how, as of 1994, one skilled in the art would have understood certain software structures described in the specification and their correspondence to the claimed functions. After reviewing the patents' intrinsic record and, where necessary, relevant extrinsic evidence, SAP offers proposed constructions for each of the representative claims.

## II.    BACKGROUND OF THE CLAIMED INVENTIONS

### A.    PRIOR ART

The three patents-in-suit are each directed to an "electronic sourcing system" and arise from a common patent application filed on August 10, 1994.

As the named inventors readily admit, they were not the first to invent requisition/purchasing systems.[5] In fact, the specification acknowledges that many different electronic requisition/purchasing systems existed prior to the filing date for the patents-in-suit.[6] The inventors' own employer, Fisher Scientific, developed several electronic requisition/ purchasing systems prior to the patents-in-suit. One of those prior art systems was RIMS.[7] The patents-in-suit describe RIMS as the preferred requisition/purchasing system of the invention.[8] RIMS could search a database containing product information from multiple vendors based on a

---

[5] Exh. E (Momyer Tr. at 83:25-84:18) and Exh. F (Kinross Tr. at 96:10-15).

[6] Col. 1:10-59 (*e.g.*, Fisher Scientific's RIMS and Lightning software, Johnson & Johnson's Nova software, Baxter's ASAP system, General Electric's EDI Express software). For convenience, all specification citations are to the '683 patent, which is attached at Exhibit B.

[7] Exh. B at Col. 1:13-17.

[8] Exh. B at Col. 4:1-3.

part number, build requisitions, check inventory, convert items from one source to another source, determine prices, and generate purchase orders to multiple vendors from one requisition.[9] Since RIMS was itself prior art to the patents-in-suit, the features and functions of RIMS recited above cannot, by themselves, distinguish the claimed inventions over the prior art.

As the named inventors also admit, they were not the first to invent a search program capable of searching a catalog database.[10]  In fact, the specification acknowledges that computer systems capable of searching databases containing a vendor's product catalog were known prior to the claimed invention.[11]  The specification describes one such program, IBM's TV/2 search program, as the preferred search program of the invention.[12]  TV/2 was available for sale by at least 1991.[13]  The TV/2 manual specifically taught that the program could be used to display parts in a catalog:  "[I]nformation providers (such as manufacturers) can use the program to make parts catalogs and service manuals available to users (for example, their sales and service agents) in an electronic (*online*) format."[14] TV/2 also provided a search facility that could locate every occurrence of a word or phrase in a selected topic, a list of selected topics, a complete document, or in other documents.[15]

Since the patents-in-suit were not the first to describe a requisition/purchasing system or a catalog search program, ePlus may contend that the named inventors were the first to describe and claim an electronic sourcing system that ***combined*** a requisition/purchasing system with a catalog search program.[16] But again, that is simply not the case.  IBM's 1991 TV/2 manual specifically

---

[9] Exh. E (Momyer Tr. at 45:6-22, 64:13-22, 65:11-17, 69:10-23, 83:25-84:16, 216:23-217:16, 281:15-282:18; Exh. F (Kinross Tr. at 34:10-41:1, 43:12-45:13, 47:17-48:7, 54:8-56:10) and Exh. Q (RK000001).

[10] Exh. E (Momyer Tr. at 83:18-23).

[11] Exh. B at Col. 2:3-6.

[12] Exh. B at Col. 4:5-7.

[13] Exh. G (EPFS000075-91).

[14] Exh. G at EPFS000082.

[15] Exh. G at EPFS000086.

[16] Exh. E (Momyer Tr. at 84:19-24; 87:17-23).

taught the combination of a catalog search program and a requisition/purchasing program:

> "Technical Viewer/2 enables information providers to develop applications around the information to give added value to the user. For example, in addition to finding a part number from a parts catalog, users can extract that information and transfer it electronically to their data processing system. They can then make immediate online requests for stock availability and price information."[17]

This key teaching from IBM's 1991 TV/2 manual, however, apparently was not submitted to the Patent Office during the prosecution of the patents-in-suit, since the TV/2 manual in the Patent Office's files is missing a number of pages, including the very page quoted above.[18]

IBM's suggestion to combine TV/2 with a requisition/purchasing system is not the only example of a prior art system that combined both requisition/purchasing functions and catalog search functions. For more than a decade before the filing date of the patents-in-suit, SAP made and sold computer systems that could perform, among other things, requisition/purchasing functions and catalog search functions. SAP's R/2 product, first released in 1981, was an enterprise resource planning ("ERP") system that automated financial, accounting, human resources, sales, procurement, and manufacturing functions. SAP R/2, and its successor, SAP R/3 (which also pre-dates the patents-in-suit by more than one year), provided extensive capabilities for searching databases of product information from vendor catalogs, building requisitions for needed items, checking inventory, converting items from one source to another source, determining prices, and generating purchase orders.[19] Many other products with similar capabilities were also well known in the market long prior to August 1994.

Given the systems and methods that preceded the patents-in-suit, if there is any novel aspect of the claimed electronic sourcing system, it cannot reside in the described requisition/purchasing system, catalog search program, or the mere idea of combining such

---

[17] Exh. G at EPFS000083. *See also* Exh. H at EPFS000017 ("Technical Viewer 2 is suitable for a whole range of uses and industries in which information is supplied in large quantities and updated regularly, and where users need fast access to precise details. Potential uses include: … Integrating parts catalogues with dealers' computer systems such as order entry, inventory management and customer records.")

[18] Exh. E (Momyer Tr. at 164:22-165:7).

[19] Exh. R (Menascé Decl., ¶ 20).

programs. The only portion of the specification which purports to describe something new is the particular means described for transferring information (i.e., the interface) between the prior art requisition/purchasing system and the prior art catalog search program.

## B.   THE ELECTRONIC SOURCING SYSTEM DESCRIBED IN THE SPECIFICATION

The specification of the patents-in-suit begins with the following description of the invention: "This invention relates to systems and methods for interfacing product information, such as is typically found in vendor catalogs that are provided to customers, and requisition/purchasing systems and methods that may use the results of searches of product information."[20] The "Summary of the Invention" makes clear that the patents are directed to the means for transferring information between a catalog search program and a requisition/purchasing system. Three "objects of this invention" are described:

- "provide an electronic sourcing method and system that provides a user with the capability of searching a database containing data (including product/vendor identification, and other product information) relating to items available from at least two product catalogs, and the capability of *transferring the product information for desired catalog items obtained as a result of the search to a requisition/purchasing system* for use in generating a requisition including entries for the desired catalog items" (Col. 2:41-56)

- "provide an electronic sourcing system that provides a *means for bi-directionally transferring information between a requisition/purchasing system* that may use the results of a search of such product information, *and a means for searching* large volumes of product information such as would be included in a vendor product catalog." (Col. 2:57-63)

- "provide an electronic sourcing system capable of creating an order list including desired catalog items located as a result of such a database search, and *transferring that order list to a requisition/purchasing system* for generating a requisition including entries for the desired catalog items." (Col. 2:64-3:2).[21]

The specification goes on to describe two embodiments of the invention depicted in Figures 1A and 1B respectively, both of which utilize the same interface means for transferring information between the requisition/purchasing system and a catalog search program.[22] In the

---

[20] Exh. B at Col. 1:5-9.

[21] *See also* Exh. F (Kinross Tr. at 104:9-105:7).

[22] Exh. B at Col. 3:49-50.

Figure 1A embodiment described at columns 3 through 16 of the specification, local computer (20) contains, among other things,

- requisition/purchasing system (40);
- catalog search program (50); and
- interface (60), which communicates data between the requisition/purchasing system and search program.

As shown in Figure 1A, both requisition/purchasing system (40) and catalog search program (50) are installed on and run on the same local computer (20).[23] Interface (60) "communicates shared data between requisition/purchasing system 40 and search program 50" using "the dynamic data exchange ('DDE') protocol" provided by the operating system on local computer (20).[24] The DDE protocol provides a means to communicate information between programs running on the same computer; it cannot be used to communicate information between programs running on different computers.[25] The specification does not describe any means other than DDE to implement interface (60).[26]

The Figure 1B embodiment described at columns 16-19 of the specification also uses the same DDE interface to communicate information between the requisition/purchasing system and the catalog search program.[27] In the Figure 1B embodiment, requisition/purchasing system (240) is installed and runs on local computer (220).[28] While catalog search program (250) is depicted as stored on server computer (200), one skilled in the art would have understood that catalog search program (250) does not run on server (200), but must instead – as James Kinross, a named inventor testified – be downloaded to and run on local computer (220), using the DDE interface to communicate with requisition/purchasing system (240).[29]

---

[23] Exh. B at Col. 4:7-9.

[24] Exh. B at Col. 5:19-33; Exh. R (Menascé Decl., ¶¶ 24-25).

[25] Exh. F (Kinross Tr. at 82:15-84:6); Exh. R (Menascé Decl. ¶ 25).

[26] Exh. R (Menascé Decl. ¶¶ 25, 27-29).

[27] Exh. F (Kinross Tr. at 137:11-138:4); Exh. R (Menascé Decl. ¶ 26).

[28] Exh. B at Fig. 1B and Col. 17:12-15; Exh. R (Menascé Decl., ¶ 26).

[29] Exh. F (Kinross Tr. at 31:22-33:24, 129:6-138:4); Exh. R (Menascé Decl., ¶ 26).

The specification does not describe or illustrate any means by which the requisition/ purchasing system can run on one computer, yet communicate with a catalog search program running on a different, separate computer.[30]  Nor does the specification describe or illustrate any means by which a requisition/purchasing system and catalog search program can both run on one computer (*e.g.*, a server computer), yet communicate with an end user who is using a different computer (*e.g.*, a local computer).[31]  Nor does the specification describe any network protocols or means for achieving communications between a requisition/purchasing system running on one computer and a search program running on a different computer.[32]  The DDE communication protocol used for the interface between the requisition/purchasing system and the catalog search program necessarily required both programs to be running on the same local computer, accessible by the end user, in order to provide the communications and perform the functions required by the claims of the invention.[33]

### C.    REPRESENTATIVE CLAIMS

ePlus has asserted all 79 claims from the three patents-in-suit, and refuses to narrow the set of asserted claims.  In light of the space limitations of the brief, SAP's brief will focus on five representative claims and nine key terms that SAP believes reflect the critical claim construction issues in dispute.[34]  The representative claims are '683 claims 1, 6, and 45, '516 claim 17, and '172 claim 1.

## III.   SAP'S PROPOSED CLAIM CONSTRUCTION SHOULD BE ADOPTED

### A.    GENERAL PRINCIPLES OF CLAIM CONSTRUCTION

A patent is a bargain between the inventor and the public.  In exchange for a limited monopoly to the claimed invention, an inventor must fully describe the inventions claimed, must

---

[30] Exh. F (Kinross Tr. at 108:7-113:25, 124:11-22); *see also* Exh. R (Menascé Decl., ¶ 27).

[31] Exh. F (Kinross Tr. at 201:1-20); *see also* Exh. R (Menascé Decl., ¶ 29).

[32] Exh. R (Menascé Decl., ¶ 27).

[33] Exh. R (Menascé Decl., ¶ 28).

[34] SAP's proposed claim construction for all 79 of ePlus's asserted claims can be found in the claim construction chart attached hereto as Exhibit A.

teach skilled artisans how to make and use each invention claimed, and must reveal the best mode of practicing the claimed inventions.[35]

To construe patent claims, courts look primarily to the public record (the "intrinsic evidence") that was generated when the patent issued. "In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term."[36] There are three kinds of intrinsic evidence: the words of the claims themselves, the specification, and the prosecution history of the patent.[37]

Claim construction is a decision about the meaning of the claims to a person of ordinary skill in the art at the time of invention, so the analysis necessarily begins with the very words used to claim the invention.[38] But the court's inquiry into the meaning of claim language does not proceed in a vacuum.[39] The first and most important source of intrinsic evidence to which the court must look in construing disputed claim terms is the written description of the patent.[40] The specification "contains a written description of the invention which must be clear and complete enough to enable those of ordinary skill in the art to make and use it."[41] For purposes of claim construction, a "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."[42] As such, "the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."[43]

---

[35] 35 U.S.C. § 112 (1) & (2).

[36] *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996).

[37] *Id.* at 1582-83.

[38] *Id.* at 1582.

[39] *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (*en banc*).

[40] *Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 355 F.3d 1361, 1367 (Fed. Cir. 2004).

[41] *Vitronics,* 90 F.3d at 1582.

[42] *Phillips*, 415 F.3d at 1313.

[43] *Vitronics,* 90 F.3d at 1582.

In addition to the claim language and the specification, the prosecution history may contain "express representations made by the applicant regarding the scope of the claims. As such, "[it] is often of critical significance in determining the meaning of the claims."[44]  The prosecution history will limit the meaning of claim terms "so as to exclude any interpretation that was disclaimed during prosecution."[45]

The prior art cited in the patent or during prosecution also forms an important part of the intrinsic evidence that informs claim construction.[46]  When "prior art that sheds light on the meaning of a term is cited by the patentee, it can have particular value as a guide to the proper construction of the term, because it may indicate not only the meaning of the term to persons skilled in the art, but also that the patentee intended to adopt that meaning."[47]

In exercise of its "sound discretion," a district court may properly admit and consider extrinsic evidence such as expert technology tutorials, the testimony of the inventors, or technical treatises.[48]  This is "because extrinsic evidence can help educate the court regarding the field of the invention and can help the court determine what a person of ordinary skill in the art would understand claim terms to mean," so long as that extrinsic evidence is "considered in the context of the intrinsic evidence."[49]  Dictionary definitions may be considered, but they should not be followed if they are at odds with the specification and prosecution history.[50]

## B.     CONSTRUCTION OF "MEANS-PLUS-FUNCTION" LIMITATIONS UNDER § 112, ¶ 6

Pursuant to 35 U.S.C. § 112, ¶ 6, an element in a claim for a combination may be

---

[44] *Id.*

[45] *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995).

[46] *See Kumar v. Ovonic Battery Co., Inc.*, 351 F.3d 1364, 1368 (Fed. Cir. 2003) ("prior art cited in a patent or cited in the prosecution history of the patent constitutes intrinsic evidence.").

[47] *Arthur A. Collins, Inc. v. Northern Telecom Ltd.*, 216 F.3d 1042, 1044-45 (Fed. Cir. 2000) (rejecting district court's claim construction, which "declined to consider the teachings of [prior art referenced in the patent] to ascertain the meaning" of a disputed claim term).

[48] *Key Pharms. v. Hercon Labs. Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998).

[49] *Phillips*, 415 F.3d at 1319.

[50] *Id.* at 1320.

expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof. However, such claims "are limited to the structure, material, or acts disclosed in the specification and their equivalents."[51]

In construing means-plus-function claim language, a court must first identify the stated function of the claim element, then identify the specific structure, material or acts in the patent specification that perform the claimed function.[52] Since this analysis requires the court to ask what a person of ordinary skill in the art would have understood the patent specification to have described (if anything) as the structure, material or acts that correspond to the claimed function, expert testimony may be considered as an aid in identifying the specific structure(s) in a patent specification that correspond to the means-plus-function elements of a claim.[53] "A structure disclosed in the specification is only deemed to be 'corresponding structure' if the specification clearly links or associates that structure to the function recited in the claim."[54] "The duty to link or associate structure in the specification with the function is the *quid pro quo* for the convenience of employing § 112 ¶ 6."[55] If the patent fails to do that, the claim is invalid, because the patentee has failed to point out and distinctly claim the invention.[56]

For means-plus-function claims involving computer software, the corresponding structure for purposes of § 112, ¶ 6 is not simply any computer software that performs the claimed function.[57] The scope of computer-implemented means-plus-function claims is "limited to the corresponding structure disclosed in the specification and equivalents thereof, and the ***corresponding structure is the algorithm***."[58] This fundamental principle, first articulated by the

---

[51] *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1348 (Fed. Cir. 1999).

[52] *Micro Chem., Inc. v. Great Plains Chem. Co., Inc.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999).

[53] *See, e.g., Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1302 (Fed. Cir. 2005).

[54] *Kahn v. Gen. Motors Corp.*, 135 F.3d 1472, 1476 (Fed. Cir. 1998).

[55] *Id.*

[56] *Kemco Sales, Inc. v. Control Papers Co., Inc.*, 208 F.3d 1352, 1360-61 (Fed. Cir. 2000).

[57] *WMS Gaming*, 184 F.3d at 1349.

[58] *Harris Corp. v. Ericsson, Inc.*, 417 F.3d 1241, 1253 (Fed. Cir. 2005) (emphasis added).

11

Federal Circuit in *WMS Gaming*, and clarified this summer in *Harris Corp. v. Ericsson, Inc.* requires the court to identify the specific steps of the algorithms executed by the software, as described and set forth in the specification, as the structure corresponding to a software-related means-plus-function element.[59]

In *WMS Gaming*, the Federal Circuit rejected the district court's identification of "an algorithm executed by a computer" as the corresponding structure to a computer-implemented means-plus-function claim.[60]  Rather, the court held that the "disclosed structure" is "the special purpose computer programmed to perform the disclosed algorithm" that results from the combination of general-purpose computer hardware with the specific software algorithms disclosed in the specification.[61]  The reasoning underlying *WMS Gaming* rests on the *quid pro quo* at the core of means-plus-function claiming:  patentees may use this form of claiming, but only because "the claims are limited to the structure, material, or acts disclosed in the specification and their equivalents."[62]  Otherwise, the claim limitation devolves into a purely functional claim, one that takes on an impermissibly broad scope far beyond what was ever contemplated by the Patent Office when the claim was allowed.[63]

In *Harris*, the Federal Circuit held that computer-implemented means-plus-function claims must be construed in light of the specific algorithms disclosed in the specification for performing the claimed function.  The Federal Circuit rejected the lower court's construction of a "time domain processing means" as "merely a 'symbol processor,'" because that construction did "not incorporate any disclosed algorithm."[64]  Rather, the court held that "the corresponding

---

[59] *Id.; see also Tehrani v. Hamilton Med., Inc.*, 331 F.3d 1355, 1361-62 (Fed. Cir. 2003) (error for the district court not to determine "the precise algorithm that is part of the recited structure" from the specification).

[60] *WMS Gaming*, 184 F.3d at 1349.

[61] *Id.*

[62] *Id.* at 1348.

[63] *See* Exh. P (*Medtronic, Inc. v. Guidant Corp.*, No. 00-2503, 2004 U.S. Dist. LEXIS 10020, at *30 (D. Minn. May 25, 2004)).

[64] *Harris*, 417 F.3d at 1254.

structure for the 'time domain processing means' is a microprocessor programmed to carry out a two-step algorithm in which the processor calculates generally nondiscrete estimates and then selects the discrete value closest to each estimate"[65] because these were the two steps disclosed in the specification.

In reaching this result, the Federal Circuit rejected the argument "that *WMS Gaming* only establishes that the corresponding structure of a computer-implemented function must include those features of the algorithm that are necessary to the performance of the recited function – not that every detail of the specification's algorithm is a limitation on the claimed invention...."[66] The district court had instructed the jury that the claim covered a one-step or two-step process, even though the specification described only a two-step process. On appeal, the patentee argued that the instruction was consistent with *WMS Gaming* because the disclosed two-step process was "merely an optional feature of the invention, an example of how to implement the claimed function."[67] The Federal Circuit rejected that argument because the exemplified algorithm as disclosed in the specification entailed two steps, not one.[68] The patentee could not ignore the one means described in the patent by asserting that it was merely "exemplary."

### C.   ePLUS'S PROPOSED CLAIM CONSTRUCTION FAILS TO COMPLY WITH THE LAW REGARDING § 112, ¶ 6 CLAIMS

Under the legal standard articulated by *WMS Gaming* and *Harris*, ePlus's proposed constructions are fundamentally flawed because they do not limit the claimed means to the particular structures and algorithms described in the specification for performing the claimed functions. For example, in Claim 1 of the '683 patent, ePlus identifies the "means for searching for matching items among the selected product catalogs" as merely

> "search programs and modules operating on a computer system with access to data in a database or other file system; and their equivalents,"[69]

---

[65] *Id.*

[66] *Id.* at 1249.

[67] *Id.* at 1249-50.

[68] *Id.* at 1254.

[69] In addition, there is no reference in the specification to a "file system," making it wholly

followed by

> *See, e.g.,* '683 Patent, Col . 4:1-Col. 6:38; Col. 7:61 - Col. 12:37; Figs. 1-2; Appendices III-V and VII (describing local computer 20, search program 50, TV/2, and search program 250).[70]

This generic identification of structure is factually inaccurate and legally insufficient. Merely identifying – as ePlus does – generic software modules "operating on a computer system," followed by a series of string cites to multiple columns in the specification is insufficient as a matter of law.[71] For example, the two means for searching described in the specification require a requisition/purchasing system (40) and a catalog search program (50) both running on the same local computer (20 or 220).[72] In addition, the specification plainly discloses an algorithm for prioritizing search criteria in which the search program stops searching at the highest priority search criteria resulting in a match.[73] ePlus simply ignores these disclosed structures and instead proffers a construction no different than the "algorithm executed by a computer" or "symbol processor" constructions specifically rejected by the Federal Circuit in *WMS Gaming* and *Harris* as legally insufficient.

The constructions proffered by ePlus for other means elements fare no better under the law. For example, its identification of corresponding structure for the "means for building a requisition using data relating to selected matching items and their associated source(s)" in Claim 1 of the '683 patent is nothing more than "a requisition software module operating on a computer system having access to data in the database; and their equivalents."[74] Acceptance of ePlus's proposed generic identifications of corresponding structure would impermissibly

---

inappropriate as part of a proper claim construction of the disclosed structure.

[70] Exh. J (Appendix A at 1).

[71] Indeed, in *Gobeli Research Ltd., v. Apple Computer, Inc.,* 384 F. Supp. 2d 1016 (E.D. Tex. 2005), the court not only rejected an attempt to construe a software means as "a microprocessor running a procedure call that sets aside resources, such as a memory area" as legally insufficient, but went on to hold the claim invalid for lack of any description in the specification of the algorithm that performs the claimed function. *Id.* at 1022-23.

[72] *See infra* pp. 20-22.

[73] Exh. B at Col. 6:14-22.

[74] Exh. J (Appendix A at 1).

transform its issued claims to functional limitations only and constitute legal error. The Court cannot permit ePlus to avoid the limiting structures described in the specification for performing the functions claimed.

### D.   SAP'S PROPOSED CLAIM CONSTRUCTION FOR REPRESENTATIVE CLAIMS

#### 1.   Agreed Constructions for Key Claim Terms

The representative claims of the patents-in-suit selected by SAP share many common terms. Because these terms are present in so many of the claims, it is essential to define these terms in order to properly construe the limitations in which they appear.

ePlus has agreed to the following constructions proposed by SAP:[75]

- **"items"** means **"products or services"**

- **"matching items"** means **"search results"**

- **"selected matching items"** means **"items in search results that have been selected for inclusion in a requisition"**

SAP agrees with the following constructions proposed by ePlus:[76]

- **"database"** means **"a collection of related information organized in a useful manner that provides a base or foundation for procedures, such as retrieving information"**

- **"vendor"** means **"a seller of a product or service"**

#### 2.   Disputed Constructions for Key Claim Terms

Although ePlus's position is not entirely clear, the parties appear to dispute the meaning of the following claim terms.

##### a.   "product catalogs" means "lists containing identification and descriptive information for goods or services"

The term "product catalogs" is not expressly defined in the specification or the prosecution history. However, its proper meaning can reasonably be derived from the specification. The specification refers to "catalog database of data including product information

---

[75] Exh. K (11/1/05 Letter from Robertson to Day).

[76] Exh. J at 10, 14.

(such as product identification information and descriptive information) relating to catalog items available from vendor product catalogs."[77]  The specification further states:  "Catalogs, and hence, catalog database 36, *preferably* include such information as part number, price, catalog number, vendor number, or I.D., and vendor catalog number, as well as textual information and images of or relating to the catalog products."[78]  Apart from this single description, the specification does not further describe the data format or data structures of the information contained in a "product catalog."[79]  As the specification makes plain and the inventors have acknowledged, a "product catalog" need not contain all of the categories of information listed above (*e.g.*, vendor number or images) to be considered a "product catalog."[80]  ePlus previously proposed the following dictionary definition of "product catalog":  "a systemized list, often featuring descriptions of the listed items."[81]  The inventors and ePlus's own expert have testified that "product catalogs" include information for both goods and services.[82]  Based on the usage in the specification and the undisputed testimony regarding the understanding of those skilled in the art, the term "product catalogs" should be construed to mean "lists containing identification and descriptive information for goods or services."

>    b.  **"sources" means "different suppliers as well as different warehouse locations from the same supplier, including internal warehouse locations"**

Although the term "sources" is not expressly defined in the specification, its meaning was clearly defined in the prosecution history.  In its April 8, 1998 response to the Patent Office, the applicants explained that they had "amended the claims using the following terminology:  . . . "'associated vendor' is the vendor or source (*e.g.*, different warehouses operated by one vendor)

---

[77] Exh. B at Col. 3:5-9.

[78] Exh. B at Col. 4:38-42 (emphasis added).

[79] Menasce Decl. ¶ 30.

[80] Exh. E (Momyer Tr. at 228:18-231:4, 236:7-237:24).

[81] Exh. J at 9.

[82] Exh. I (Johnson Tr. at 31:18-34:10); Exh. E (Momyer Tr. at 238:10-239:12); *see also* Exh. L (10/6/04 Weaver Decl. at 14 ("'Catalog' can mean, for example, a publication containing a systemized list of products or services for sale that features detailed descriptions of the items.")).

associated with a selected matching item."[83]   In a later submission, the applicants

> "clarified the above claims by *amending 'vendor' to read 'source.'*  As
> Applicants explained in response to the first Office Action, the term 'vendor'
> *includes different suppliers and different sources from the same supplier, e.g.,*
> *different warehouse locations.*  Applicants believe that the use of the term
> "sources" in place of "vendor" more distinctly claims what they regard as their
> invention."[84]

The term "sources" thus means different suppliers as well as different warehouse locations from

the same supplier.  Suppliers can be outside suppliers like vendors/distributors as well as internal

suppliers like a customer-owned warehouse location.[85]

### c.   "requisition" means "list of needed items"

Although the term "requisition" is not expressly defined in the specification, the

applicants clarified the meaning of the term in the prosecution history:

> "[A] requisition and a purchase order are terms of art and refer to a listing of
> required items and an order to purchase one or more items. ... The requisition
> identifies needed items and candidate vendors/suppliers...."[86]

ePlus's proposed definition of "requisition" as "a request or instruction for something needed" is

very similar to SAP's proposed construction.[87]  SAP believes that "list of needed items" is more

consistent with the intrinsic record of the patents-in-suit.

### d.   "purchase order" means "an authorization to supply, including internal inventory transfer orders"

As noted above, during the prosecution history, applicants explained that a "purchase

order authorizes a single vendor/supplier to provide one or more items, usually at a pre-

determined price. . . . [T]he purchase order authorizes a vendor/supplier to supply an item and

satisfy a need."[88]  This "authorization to supply" includes internal inventory transfer orders

within the ordering company because the specification describes an order "from on-site

---

[83] Exh. M ('683 File History (4/8/98 Response at 11)).

[84] Exh. N ('683 File History (9/14/98 Response at 13-14)).

[85] Exh. B at Col. 14:8-10; 14:46-65.

[86] Exh. O ('172 File History (7/25/01 Response at EP092806)).

[87] Exh. J at 12.

[88] Exh. O ('172 File History (7/25/01 Response at EP092806)).

customer-owned inventory (a transfer internal to the customer)" as a "purchase order."[89] Testimony from the inventors confirms this construction.[90]  ePlus's proposed construction – "a commission or instruction  to buy something"[91] – fails to account for the particular way that the inventors described "purchase orders" in the specification.

### 3.  '683 Claim 1

Claim 1 of the '683 patent is a system claim with means-plus-function limitations.

#### a.  "an electronic sourcing system comprising"

Like many of the claims, the preamble of '683 claim 1 contains the phrase "an electronic sourcing system comprising."  "Language in a claim preamble, however, acts as a claim limitation only when such language serves to give meaning to a claim and properly define the invention, not when the preamble merely states a purpose or intended use of the invention."[92] Here, "electronic sourcing system" is a statement of purpose or intended use.  The Court should therefore rule that the phrase is not a limitation on the scope of the claim.

If, however, the Court concludes that "electronic sourcing system" gives meaning to the claim and defines the invention – as ePlus appears to contend – the phrase must be construed in a manner consistent with the statements in the specification defining "electronic sourcing system." The specification states that Figures 1A and 1B "show preferred embodiments of the electronic sourcing system 5 of the present invention."[93]  The specification further states:

> "Electronic sourcing system 5 also includes a requisition/purchasing system 40, preferably but not necessarily the Fisher RIMS system, and a search program 50 that is capable of searching through large volumes of information quickly and accurately.  Preferably but not necessarily, the Technical Viewer 2 search program ("TV/2"), available from IBM, is used as search program 50.  As shown in the embodiment of FIG. 1A, Fisher RIMS 40 and TV/2 search program 50 are

---

[89] Exh. B. at Col. 15:22-44.

[90] Exh. E (Momyer Tr. at 271:16-19; 272:19-273:11); Exh. I (Johnson Tr. at 196:12-198:4).

[91] Exh. J at 13.

[92] *Apple Computer, Inc. v. Articulate Sys., Inc.*, 234 F.3d 14, 22 (Fed. Cir. 2000) (internal quotations omitted).

[93] Exh. B. at Col. 3:49-50.

run by local computer 20."[94]
The specification further specifies, "As shown in FIGS. 1C and 2, interface 60 is also a part of electronic sourcing interface system 5."[95]  In addition, the "Summary of the Invention" demonstrates that the requisition/purchasing system, search program, and interface are required components of the "electronic sourcing system" of the invention.[96]

The specification thus makes clear that certain described elements are necessary to the "electronic sourcing system," while other elements are merely preferred.  For example, a requisition/purchasing system is a necessary element of the claimed "electronic sourcing system," but use of RIMS is not.  Testimony from the inventors confirms this reading of the specification.[97]  Therefore, if the Court concludes "electronic sourcing system" is not just a preamble, but instead is a claim limitation, the Court should construe "electronic sourcing system" to mean "(a) a requisition/purchasing system, (b) a search program, and (c) an interface between the requisition/purchasing system and search program."

      b.  "at least two product catalogs containing data relating to items associated with the respective sources"

Subject to the definitions above, "at least two product catalogs containing data relating to items associated with the respective sources" requires no special construction.[98]

      c.  "means for selecting the product catalogs to search"

This limitation is in the means-plus-function format of § 112, ¶ 6, and thus must be construed in light of the particular structures and algorithms disclosed in the specification for performing the recited function.[99]  The recited function should be construed as "selecting more

---

[94] Exh. B. at Col. 4:1-9.

[95] Exh. B. at Col. 5:18-19.

[96] Exh. B. at Col. 2:45-3:2.

[97] Exh. I (Johnson Tr. at 8:16-9:16); Exh. F (Kinross Tr. at 126:22-128:3).

[98] In the following sections, terms that are subject to special definitions discussed above are bolded for ease of reference.

[99] For each of the following means-plus-function limitations, the Declaration of Dr. Menascé provides an analysis of the corresponding structures disclosed in the specification for performing the recited functions.  *See* Exh. R (Menascé Decl., ¶ 33 & Exh. B).

than one product catalog to search." The plain language of the claim as well as the inventors' own testimony makes clear that more than one catalog must be selected to search.[100]

The specification discloses two alternative means for selecting product catalogs to search. One selecting means is initiated from catalog search program (50 or 250) running on local computer (20 or 220). As shown above, the catalog search program must run on the local computer because interface (60) requires both programs to run on the same computer, and because the specification does not describe any means by which an end user of the local computer may interact with the catalog search program if the catalog search program runs on a different computer. The first selecting means consists of two steps performed by catalog search program (50 or 250):

(1) selecting more than one product catalog from a list of available catalogs ('683 Col. 9:52-67);[101]

(2) concatenating (*i.e.*, joining together) the selected product catalogs to be searched (9:67-10:4).

A second means for selecting product catalogs to search is initiated from requisition/purchasing system (40 or 240) also running on local computer (20 or 220). The second selecting means consists of the following steps:

(1) entering vendor identification into requisition/purchasing system (40 or 240) ('683 Col. 10:8-11);

(2) communicating vendor identification information from the requisition/purchasing system (40 or 240) to the catalog search program (50 or 250) running on the same local computer via the DDE protocol of interface (60) (10:8-20);

(3) concatenating (*i.e.*, joining together) the selected product catalogs to be searched by the catalog search program based upon the received vendor identification (9:67-10:4).

The "means for selecting" limitation of '683 claim 1 should be construed to require these two disclosed algorithms or their equivalents.

---

[100] Exh. E (Momyer Tr. at 264:21-266:8).

[101] All references are to the '683 patent specification.

### d. "means for searching for matching items among the selected product catalogs"

The recited function is "searching for matching items among the selected product catalogs." Two alternative means for performing this function are disclosed. One means is initiated from requisition/purchasing system (40 or 240) running on local computer (20 or 220), and consists of the following steps:

(1)   entering certain search criteria (*e.g.*, catalog number, part number, or partial text) relating to item(s) to be searched into requisition/purchasing system (40 or 240) ('683 Cols. 7:48-55; 7:61-8:2; 8:22-26);

(2)   communicating the search criteria from requisition/purchasing system (40 or 240) to catalog search program (50 or 250) running on the same local computer via the DDE protocol of interface (60) (8:37-9:8);

(3)   searching catalog database (36 or 236) via catalog search program (50 or 250) based on the search criteria received from requisition/purchasing system (9:34-37);

(4)   if more than one search criteria is received, catalog search program prioritizes the search as follows: (a) part (catalog) number, (b) keyword, and (c) page number, stopping at highest priority search criteria resulting in a match (6:14-22);[102]

(5)   displaying via catalog search program a hit list of search results (9:39-45).

A second search means is initiated from shell program (52 or 252) running on local computer (20 or 220), and consists of the following steps:

(1)   displaying a search screen on the monitor of local computer (20 or 220) ('683 Col. 12:4-12; Appendix VII);

(2)   entering search criteria (*e.g.*, catalog page number, keyword, part number) relating to an item to be searched (9:12-14; 12:12-24);

(3)   searching catalog database (36 or 236) via catalog search program (50 or 250) running on the local computer based on search criteria received from shell program (52) (9:34-37);

(4)   if more than one search criteria is received, catalog search program prioritizes the search as follows: (a) part (catalog) number, (b) keyword, and (c) page number, stopping at highest priority search criteria resulting in a match (6:14-22);[103]

(5)   displaying via catalog search program a hit list (47) of search results (9:39-45; 12:27-29; Appendix III).

The "means for searching" limitation of '683 claim 1 should be construed to require these

---

[102] Exh. F (Kinross Tr. 138:16-140:12, 143:17-145:19).

[103] *Id.*

two disclosed algorithms or their equivalents.

### e.   "means for building a requisition using data relating to selected matching items and their associated source(s)"

The recited function of this limitation is "building a requisition using data relating to selected matching items and their associated sources."  The specification discloses one means for performing this function.  The requisition building means is initiated from requisition/purchasing system (40 or 240) running on local computer (20 or 220) and consists of the following steps:

(1)   entering certain data (*e.g.*, account number, requisition number) in requisition/purchasing system (40) to create requisition tables stored in requisition database (42A) ('683 Col. 6:44-65; 7:20-28);

(2)   initiating search for matching item(s) in catalog database (36 or 236) from either requisition/purchasing system (40 or 240) or catalog search program (50 or 250) running on local computer (20 or 220) via two search means described above (8:15-32);

(3)   displaying via catalog search program a hit list (47) of search results (9:39-45; 12:27-29; Appendix III);

(4)   selecting one or more items to be requisitioned (10:21-24; 11:30-38);

(5)   generating an order list (48) in shell (52 or 252) and catalog search program (50 or 250) containing data relating to selected items (*e.g.*, vendor name, product description, list price) (11:20-38; 11:62-66);

(6)   displaying data relating to selected items in order list (48) (11:38-43; 12:38-40; Appendix VI);

(7)   transmitting data from order list (48) to requisition/purchasing system running on same local computer (20 or 220) via the DDE protocol of interface (60) (11:50-54; 12:48-53; 13:1-21); and

(8)   updating requisition tables in requisition database (42A) with data received from order list (48) via interface (60).

The "means for building a requisition" limitation of '683 claim 1 should be construed to require this disclosed algorithm or its equivalents.

### f.   "means for processing the requisition to generate one or more purchase orders for the selected matching items"

The recited function of this limitation is "processing the requisition to generate one or more purchase orders for the selected matching items."  The specification discloses one means for performing this function, which is initiated from the requisition/purchasing system (40) running on local computer (20 or 220), and includes the steps of:

(1)   accepting/approving the requisition ('683 Col. 15:20-26); and

22

(2)   generating a separate purchase order for each inventory location from which a selected matching item has been sourced (15:26-49).

The "means for processing" limitation of '683 claim 1 should be construed to require this disclosed algorithm or its equivalents.

### g.   "means for determining whether a selected matching item is available in inventory"

The recited function of this limitation is "determining whether a selected matching item is available in inventory." The specification discloses two means for performing this function.

One means is initiated from requisition/purchasing system (40 or 240) running on local computer (20 or 220), and includes the steps of:

(1)   maintaining a local inventory database (42B) on local computer (20 or 220) (14:16-20);

(2)   initiating via requisition/purchasing system (40 or 240) searches of local inventory database to determine availability of selected matching items in local inventory ('683 Col. 14:12-16);

(3)   displaying via requisition/purchasing system (40 or 240) the availability and quantity of inventory for the selected matching items in local inventory (14:26-32).

A second means is initiated from requisition/purchasing system (40 or 240) running on local computer (20 or 220), and includes the steps of:

(1)   maintaining a remote inventory database (11) on host computer (10) ('683 Col. 14:21-25);

(2)   initiating via requisition/purchasing system (40 or 240) searches of remote inventory database to determine availability of selected matching items in remote inventory (14:12-16);

(3)   displaying via requisition/purchasing system (40 or 240) the availability and quantity of inventory for the selected matching items in local inventory (14:26-32).

The "means for determining" limitation of '683 claim 1 should be construed to require these two disclosed algorithms or their equivalents.

### 4.   '683 Claim 6

Claim 6 of the '683 is a system claim. Although it shares some similar limitations with claim 1, there are important differences. In the following sections, SAP will discuss only the points of difference between the representative claims. Where limitations are identical (*e.g.*,

"means for building a requisition"), the previously discussed constructions should also apply.

### a. "a database containing data relating to items associated with at least two sources"

Unlike '683 claim 1, claim 6 is not limited to a system with "at least two product catalogs." Instead, this limitation reads on *any* **database** that contains data relating to items associated with at least two sources (*e.g.*, RIMS databases (42)).

### b. "means for searching for matching items in the database"

Unlike '683 claim 1, claim 6 is not limited to "searching for matching items among the selected product catalogs." The recited function of this limitation is "searching for matching items in the database." The specification discloses two means for performing this function.

One search means is initiated from requisition/purchasing system (40 or 240) running on local computer (20 or 220) and consists of the following steps:

(1) entering search criteria (*e.g.*, catalog number, part number, or partial text) relating to item(s) to be searched into requisition/purchasing system (40 or 240) ('683 Col. 7:48-55; 7:61-8:2; 8:22-26);

(2) searching local RIMS databases (42) based on search criteria, and if found, search is complete (4:20-23; 6:6-8; 7:36-38);

(3) if items are not found based on search of RIMS databases (42), communicating search criteria from requisition/purchasing system (40 or 240) to catalog search program (50 or 250) running on same local computer via the DDE protocol of interface (60) (8:37-9:8);

(4) searching catalog database (36 or 236) via catalog search program based on search criteria received from requisition/purchasing system (40 or 240) (9:34-37);

(5) if more than one search criteria is received, catalog search program (50 or 250) prioritizes search as follows: (a) part (catalog) number, (b) keyword, and (c) page number, stopping at highest priority search criteria resulting in match (6:14-22);

(6) displaying via catalog search program a hit list of search results (9:39-45).

A second search means is initiated from shell program (52 or 252) running on local computer (20 or 220), and is identical to the second means discussed above for the "means for searching" limitation of '683 claim 1. (*Supra* at 21).

The "means for searching" limitation of '683 claim 6 should be construed to require these two disclosed algorithms or their equivalents.

### c. "means for converting data relating to a selected matching item and an associated source to data relating to an item and a different source"

The recited function for this limitation is "converting data relating to a selected matching item and an associated source to data relating to an item from a different source." According to the inventors, the "means for converting" limitation entailed the use of a cross-reference table to identify, for a selected matching item in a requisition, an item from a different source that was a "like or exact replacement" for the selected matching item.[104]

The specification discloses one means for performing this function that is automatically initiated by host pricing and inventory databases (11) running on host computer (10) in response to a sourcing request initiated by requisition/purchasing system (40 or 240), and includes the steps of:

(1) maintaining host pricing and inventory databases (11) with cross-references from distributor's catalog number to corresponding catalog numbers of other vendors for the same product ( '683 Col. 4:63-5:8);

(2) transmitting data for selected matching items in a requisition from requisition/purchasing system (40 or 240) running on local computer (20 or 220) to host pricing and inventory databases (11) running on host computer (10) (14:12-25);

(3) automatically recognizing that the catalog number for selected matching item in the requisition corresponds to a catalog number for the same or similar item in another catalog (4:66-5:8; 10:43-48);

(4) substituting and transmitting back to requisition/purchasing system (40) the name, contract price, and availability for the corresponding cross-referenced item (10:48-52).

In its interrogatory response, ePlus, like the *Ariba* court, has cited a passage at Col. 17:19-54 of the specification as corresponding structure for the claimed "means for converting."[105] The quoted passage, however, describes a customer service representative ("CSR") receiving a telephone call from a customer who asks for a product by a manufacturer part number or competitor's catalog number.[106] The CSR can identify the appropriate product from the Distributor's catalog because the CSR has "access to cross-reference files."[107] This

---

[104] Exh. E (Momyer Tr. at 281:15-283:4).

[105] Exh. J (Appendix A at 2).

[106] Exh. B at Col. 17:1-3; 17:29-31.

[107] Exh. B at Col. 17:31-32.

passage, however, relates to searching for matching items, not converting selected matching items (*i.e.*, items for search results included in a requisition). The claim is directed to an "electronic sourcing system." The fact that a CSR could manually examine a look-up table to identify potential substitutes is not a "means for converting…" in an electronic sourcing system.

### 5. '683 Claim 45

Claim 45 is a method claim. Because the claim does not contain any means-plus-function limitations, § 112, ¶ 6 does not apply.

#### a. "maintaining a database containing data relating to items associated with at least two vendors whereby selected portions of the database may be searched separately"

Subject to the defined terms, this limitation requires no other special construction.

#### b. "searching for matching items in the selected portions of the database"

The meaning of this limitation is also clear, requiring the step of "searching for items whose data fields match a search criterion in selected portions of the *database*."

#### c. "building a requisition that includes selected matching items"

This limitation requires the step of "building a requisition that includes selected matching items."

#### d. "processing the requisition to generate purchase orders for selected matching items."

This limitation requires the step of "processing the requisition to generate purchase orders for selected matching items."

### 6. '516 Claim 17

'516 Claim 17 is a dependent claim of Claim 16. It claims an "electronic sourcing system" with certain means-plus-function limitations:

#### a. "at least two product catalogs containing data relating to items such that an item in a first catalog is generally equivalent with an item in a second catalog"

The "at least two product catalogs containing data" segment of this limitation is the same as described with respect to '683 claim 1, discussed *supra*.

Nowhere in the specification is the term "*generally equivalent*" used. However, the

26

evident meaning of the term, in the context of the claims, is "an acceptable substitute."  The phrase appears in claims that include a "converting" step, such as here, where the claimed electronic sourcing system recognizes that a requisitioned item is the "same item available from"[108] another catalog, or has a cross-reference from one catalog to "corresponding catalog numbers of other vendors . . . for the same Product."[109]  According to the inventors, the "means for converting" limitation referred to the use of a cross-reference table to convert a selected matching item in a requisition from one source to a selected matching item from another source that was a "like or exact replacement."[110]

Accordingly, "at least two product catalogs containing data relating to items such that an item in a first catalog is generally equivalent with an item in a second catalog" should be construed to mean "at least two product catalogs such that an item in a first catalog and an item in a second catalog are generally equivalent."

### b.  "converting means for converting data relating to said item from said first catalog to data relating to said item from said second catalog"

The function for this limitation is "converting data relating to the item in the first catalog to data relating to a generally equivalent item from the second catalog."  The specification discloses one means for performing this function on a local computer, which is recounted *supra* at p. 25 for the converting means of Claim 6 of the '683 patent.

### c.  "wherein at least one catalog database contains said data from each of said catalogs, and"

The '516 specification specifically identifies a "catalog database" (36) located on a local computer, which is "comprised preferably of at least two vendor product catalogs."[111]  The use of "said" before "data" and "catalogs," respectively, means that "said catalogs" refers to the two catalogs identified in step a, *supra*, that each catalog contains an item that is generally equivalent

---

[108] Exh. B at Col. 10:46-9.

[109] Exh. B at Col 5:10-12.

[110] Exh. E (Momyer Tr. at 281:15-283:4).

[111] Exh. B at Col. 4:41-3.

with an item in the other catalog.  Accordingly, "wherein at least one catalog database contains said data from each of said catalogs" should be construed to require "at least one catalog database that contains the data relating to two generally equivalent items from at least two product catalogs."

> **d.  "said converting means includes a non-catalog database containing a cross-reference table such that use of a reference code corresponding to an entry in said cross-reference table links said item from said first catalog to data relating to said item from said second catalog"**

The specification discloses one means for performing this function, which is recounted *supra* at p. 25 for the converting means of Claim 6 of the '683 patent.  This limitation adds to those means "a non-catalog database containing a cross-reference table."  This term refers to a cross-reference table in a database other than catalog database (36).  The '516 specification identifies "host pricing and inventory databases (11)," located on a remote computer, as a non-catalog database containing "cross-references."[112]  The term "reference code" is not specifically defined in the specification, but evidently refers to a code utilized in the process by which the claimed system transmits data for selected matching items in a requisition from requisition/ purchasing system (40) running on local computer (20) to host pricing and inventory databases (11) running on host computer (10) in order to identify the same or similar item in another catalog.[113]

Accordingly, this limitation of '516 claim 17 should be construed to require "a non-catalog database containing a cross-reference table such that use of a code corresponding to an entry in that cross-reference table links the item from the first catalog to data relating to the generally equivalent item from the second catalog."

### 7.  '172 Claim 1

'172 claim 1 is a claim to an "electronic sourcing system" with certain means-plus-function limitations.

---

[112] Exh. B at Col. 5:4-13.

[113] Exh. B at Col. 14:12-25.

**a. "a database containing data relating to items associated with at least two vendors maintained so that selected portions of the database may be searched separately"**

This limitation is virtually identical to the first limitation of '698 claim 45 and should be given the same construction. (*Supra* at p. 26).

**b. "means for entering product information that at least partially describes at least one desired item"**

The recited function is "entering product information that at least partially describes at least one desired item." The specification discloses two means for performing this function.

One means is initiated from requisition/purchasing system (40) running on local computer (20 or 220), and consists of the following step:

(1) entering in requisition/purchasing system (40) certain fields of information (*e.g.*, catalog number, part number, or partial text) that partially describe an item ('683 Col. 7:48-55, 7:61-8:2; 8:22-26).

A second means is initiated from shell program (52 or 252) running on local computer (20 or 220), and consists of the following steps:

(1) displaying a search screen on the monitor of local computer ('683 Col. 12:4-12; Appendix VII);

(2) entering search criteria (*e.g.*, catalog page number, keyword, part number) for item to be searched (9:12-14; 12:12-24).

The "means for entering" limitation of '172 claim 1 should be construed to require these two disclosed algorithms or their equivalents.

**c. "means for searching for matching items that match the entered product information in the selected portions of the database"**

The recited function is "searching for matching items that match the entered product information only in the selected portions of the database." The specification discloses two means for performing this function. The two means are described above in connection with the "means for searching" limitation of '683 claim 6. (*Supra* at pp. 24-25)

**d. "means for generating an order list that includes at least one matching item selected by said means for searching"**

The recited function is "generating an order list that includes at least one **matching item** [search result] selected by the above means for searching." The specification discloses a single means for performing this function utilizing shell program (52 or 252) and catalog search

29

program (50 or 250), both running on local computer (20 or 220), and consisting of the following steps:

(1) displaying via catalog search program (50 or 250) a hit list (47) of search results ('683 Col. 9:39-45; 12:27-29; Appendix III);

(2) selecting one or more items to be requisitioned (10:21-24; 11:30-38);

(3) generating an order list (48) in shell (52 or 252) and catalog search program (50 or 250) containing data relating to selected items (*e.g.*, vendor name, product description, list price) (11:20-38; 11:62-66).

The "means for generating" limitation of '172 claim 1 should be construed to require this algorithm or its equivalents.

### e. "means for building a requisition that uses data obtained from said database relating to selected matching items on said order list"

The recited function of this limitation is "building a requisition that uses data obtained from said database related to selected matching items on said order list." The specification discloses a single means for performing this function that is identical to the means described for the "means for building a requisition" limitation of '683 claim 1. (*Supra* at p. 22)

### f. "means for processing said requisition to generate purchase orders for said selected matching items"

The recited function of this limitation is "processing said requisition to generate purchase order for said selected matching items." The specification discloses a single means for performing this function, which is identical to the structures and steps described for the "means for processing" limitation of '683 claim 1. (*Supra* at pp. 22-23)

SAP AMERICA, INC. and SAP AG

By _____
        Of Counsel

Lloyd R. Day, Jr. (*admitted pro hac vice*)
Robert M. Galvin (*admitted pro hac vice*)
Christopher E. Stretch (*admitted pro hac vice*)
Julie S. Turner (*admitted pro hac vice*)
DAY CASEBEER MADRID & BATCHELDER LLP
20300 Stevens Creek Blvd., Suite 400
Cupertino, CA 95014
Tel: (408) 873-0110
Fax: (408) 873-0220

Dabney J. Carr, IV (VSB # 28679)
Robert A. Angle (VSB # 37691)
TROUTMAN SANDERS LLP
Troutman Sanders Building
1001 Haxall Point
Richmond, Virginia 23219
Tel: (804) 697-1200
Fax: (804) 697-1339

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused a true copy of the foregoing to be sent by hand and by e-mail to:

        Maya M. Eckstein, Esquire
        HUNTON & WILLIAMS LLP
        Riverfront Plaza, East Tower
        951 East Byrd Street
        Richmond, Virginia 23219-4074

and by e-mail and overnight mail to:

        Scott L. Robertson, Esquire
        HUNTON & WILLIAMS LLP
        1900 K Street, N.W.
        Washington, D.C. 20006-1109
        Counsel for ePlus, Inc.

this 7th day of November, 2005.