```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF VIRGINIA
 2                      Richmond Division

 3

 4

 5         ePlus, Inc.,

 6                              Plaintiff,

 7            VERSUS                    3:08CR438

 8         Perfect Commerce, Inc., et al.,

 9                              Defendants.

10

11

12

13         Before:  HONORABLE ROBERT E. PAYNE
                     United States District Judge
14

15         Pre-Trial Conference in chambers

16               November 13, 2009

17               Richmond, Virginia

18

19               Rush Transcript

20

21

22

23              Gilbert Frank Halasz, RMR
                  Official Court Reporter
24                 U. S. Courthouse
                 1000 East Main Street
25                 Richmond, Virginia
                   (804) 916-2248
```

```
 1
 2                        APPERANCES
 3
 4              CHRISTIAN & BARTON
 5          by: CRAIG THOMAS MERRITT, ESQ.
 6
 7              GOODWIN PROCTER
 8          by:  SCOTT LYNN ROBERTSON, ESQ.
 9
10
11              MERCHANT & GOULD
12          by:  DANIEL WILLIAM McDONALD, ESQ.
13
14              TROUTMAN SANDERS
15          by: DABNEY JEFFERSON CARR, IV, ESQ.
16
17
18
19
20
21
22
23
24
25
```

```
1              THE COURT:  All right.

2          MR. MERRITT:  Good morning, Your Honor.

3      Craig Merritt with Christian Barton law firm.  I

4      am here as local counsel for ePlus, Inc., the

5      plaintiff.

6          MR. ROBERTSON:  My name is Scott Robertson

7      from Goodwin Procter, counsel for the plaintiff,

8      ePlus.

9          MR. McDONALD:  Good morning, Your Honor.

10          Daniel McDonald with Merchant and Gould in

11     Minneapolis.  I represent the defendant Lawson

12     Software.

13          MR. CARR:  Dabney Carr for them as well.

14          THE COURT:  Do we need to plug in Noonan by

15     phone, or is he still in the case?

16          MR. McDONALD:  I talked yesterday.  He will

17     no longer be in the case.  It will be Dabney Carr

18     and his firm.

19          THE COURT:  He is not?

20          MR. McDONALD:  That's correct.  I just talked

21     to him yesterday afternoon about this.

22          THE COURT:  That is all right.  I just want

23     to -- I noticed he is in the pleadings.

24          What a pleasure this has been to read last

25     night and for the last couple of days.  I have
```

1       concluded as a result of it that Twombly needs to

2       apply to patent cases.  That the patent complaints

3       in patent cases offends the basic precept of

4       Twombly.  And I wonder whether this is the time

5       that we ought to go ahead and have that done,

6       because then we will know at the outset of the

7       case every product, every claim, and every patent

8       that is alleged to be infringed.  And perhaps that

9       will solve some of the problems that we have.

10           I find -- I don't know how long this case has

11      been going, but we are pretty far down the road.

12      And from what I see in the resolution, the papers

13      relating to the discovery motion -- which appears

14      largely to have been resolved -- we still don't

15      know what patents or what claims of what patents

16      are infringed by what products.

17           When did this case get filed?

18           THE CLERK:  May 19 of this year.

19           THE COURT:  Thank you, Mr. Neal.

20           What is the answer to that?

21           MR. ROBERTSON:  Sorry?

22           THE COURT:  What is the answer to that

23      question?

24           MR. ROBERTSON:  I think we made significant

25      strides, Your Honor.  We moved forward on

```
1        discovery.  The plaintiff produced more than two

2        million pages of documents in the last 14 days to

3        a month.  The defendant produced 2 point 8 million

4        pages of documents.  We have had several 30 (b)

5        6 --

6            THE COURT:  Supplemented interrogatories?

7            MR. ROBERTSON:  And provided 120 pages of

8        claim charts identifying all of the claims that

9        are at issue, deposition testimony that supports

10       our position, and documents that support the

11       infringement.

12           THE COURT:  When was that all done?

13           MR. ROBERTSON:  Supplemental interrogatories

14       I think went out about two weeks ago.

15           Dan?

16           MR. McDONALD:  I think still in November.

17           THE COURT:  But in order that -- you all

18       tendered this proposed order.  You don't propose

19       to fish or cut bait on the claims until what, 90

20       days before trial, or something like that?  That

21       is something you ought to do when you file a law

22       suit.

23           MR. ROBERTSON:  Your Honor --

24           THE COURT:  I mean, as far as I am concerned

25       this process of patent litigation is ended.  This
```

1      case illustrates why it needs to be.

2           MR. ROBERTSON:  We have no intention of

3      trying all 79 claims.

4           THE COURT:  I know.

5           MR. ROBERTSON:  We haven't done it before in

6      front of Judge Brinkema and not in front of Judge

7      Spencer.

8           THE COURT:  Why should discovery proceed in

9      the case measured against a universe of 79 claims

10     when in fact you are not going forward with but a

11     few of them?  Because that complicates discovery.

12     It affects every component of the case, summary

13     judgment defenses.  And, in fact, it certainly is

14     important, I think, in respect of the request to

15     stay these proceedings pending the re-examination.

16     So why is it that you all can't decide which

17     claims you are going forward on, which patents,

18     say within two weeks or three weeks or something

19     like that?  Why can't that be done?

20          MR. ROBERTSON:  Judge, I mean we have been

21     forthcoming in our identifying all of the claims

22     we think are infringed and the evidence we think

23     infringes.  We haven't gotten positions from the

24     defendants on a number of the claims.  We would

25     like discovery developed a little bit further

1    before we have to make that decision.

2         THE COURT:  Why?  How long have you been at

3    this?  You have been at each other throats for how

4    long?

5         MR. ROBERTSON:  Not that long, Your Honor.  I

6    think we just started depositions in October.

7         THE COURT:  But you have been in discussion

8    since before the suit was filed, according to the

9    papers, it sounds to me like.

10        MR. ROBERTSON:  No.

11        THE COURT:  Maybe not with this defendant.

12   With the other defendants.

13        MR. ROBERTSON:  Settled with the three or

14   four defendants, Your Honor.  And we -- those

15   matters we haven't been able to resolve the law

16   suit.  If The Court would like, we are perfectly

17   willing to narrow the claims to a reasonable

18   number.  We would like to get some invalidity

19   positions from the defendants.

20        THE COURT:  What pertinence are invalidity

21   positions to your decision which claims are

22   offended by which products?

23        MR. ROBERTSON:  Well, to move forward on the

24   best case, quite candidly.  And we would like to

25   know the invalidity case, be given that on all 79

1    claims.  It is not like we have been not been

2    forthcoming in identifying both the documents that

3    were produced to us at the time and the deposition

4    testimony we obtained as to why we think those

5    claims are infringed.

6        You know, can I -- nowhere in the universe,

7    absolutely, have I done that before in Judge

8    Brinkema and Judge Spencer's.  Quite definitely.

9        THE COURT:  You didn't do it until the end of

10   the day.  That flips the whole concept of one of

11   the reasons of Twombly on its head.  The basic

12   method is you ought to have a claim to go forward

13   on before anybody has to go through the burden of

14   discovery, and it ought to be a plausibly-stated

15   claim.  So it troubles me that we are at this

16   point.  How many were the same patents that aren't

17   at issue in the Brinkema case?

18       MR. ROBERTSON:  Same exact?

19       THE COURT:  All of them, or two of them?

20       MR. ROBERTSON:  All three.

21       THE COURT:  Well then, tell me what they do,

22   these people do, that offends your patents, do you

23   think?

24       MR. ROBERTSON:  Sure, Your Honor.  In fact

25   there is an entire industry built up now around

1   patented technology.  My client is a competitor in

2   the market place that offers software systems that

3   perform what is called corporate electronic

4   systems and methods defined in the claims in which

5   you can search multiple catalogs of vendor items

6   that are for sale.  Select those items, build

7   requisitions, purchase orders, check inventory.

8       THE COURT:  For commercial people, or do you

9   mean it is software that I would use when I go to

10  the Joseph A. Banks and want to buy a shirt of a

11  certain kind?

12      MR. ROBERTSON:  It is not.  More like a

13  corporate procurement for typically mid cap to

14  large cap companies.

15      THE COURT:  They need to buy --

16      MR. ROBERTSON:  -- supplies.

17      THE COURT:  -- office supplies or furniture?

18      MR. ROBERTSON:  Or lap tops.  Have five

19  thousand in sales information.

20      THE COURT:  Software enables them to get

21  comparative prices for the products that you are

22  looking for, say lap tops, from different vendors?

23      MR. ROBERTSON:  Managing the purchase

24  procurement process for large companies is what it

25  is directed to.  There are lots of players in the

```
 1      market place now.  Ariba was one, which was in the

 2      case.

 3           THE COURT:  That is Judge Brinkema?

 4           MR. ROBERTSON:  SAP before Judge Spencer.

 5      There were a number of others that were named in

 6      this litigation that we resolved our differences

 7      with.  And there is Lawson.  There are probably

 8      more out there on the market place, Your Honor,

 9      that we have looked at and that we are in

10      discussions with.

11           You know --

12           THE COURT:  Well, surely you have talked to

13      these people before you sued them.

14           MR. ROBERTSON:  In some instances, yes, Your

15      Honor.  Not in all.

16           THE COURT:  But you didn't tell Lawson --

17           MR. ROBERTSON:  No, sir.  The concern was

18      that we are a relatively small, Herndon, Virginia

19      company.  The concern was if we get sued in forums

20      far, far away from our home -- that is where we

21      wanted to be, particularly with the the precedent

22      that has been established, the success we have had

23      in the past here.  So we filed in Alexandria.  We

24      got transferred to Judge Morgan, which happens.

25      We are proceeding in front of Judge Morgan.  And
```

1      got sent up here.  And then over to you.

2           So, you know, Judge, I hear you.  I am

3      willing to narrow the claims.  I just like, you

4      know, a reasonable opportunity to see what some of

5      the invalidity positions are.

6           THE COURT:  When is that to be done?

7           MR. MERRITT:  Could I offer a thought on the

8      sequencing?

9           THE COURT:  Sure.

10          MR. MERRITT:  It may tie in with something on

11     the scheduling order that the parties filed

12     yesterday.  It is at page eight.  There is a

13     critical place where the parties have a

14     difference.

15          THE COURT:  Page?

16          MR. MERRITT:  Eight of the scheduling order.

17          Pretrial schedule A, page eight to the

18     scheduling order.

19          THE COURT:  You mean the Markman hearing?  It

20     starts?

21          MR. MERRITT:  Starts with the Markman hearing

22     under item I 3.  You see that the parties have

23     laid out their different positions on the

24     defendant's contentions their affirmative

25     defenses.  Apropos your comments about Twombly,

1      there is no question that ePlus bears the burden

2      on proving its infringement and disclosing it.

3      And maybe post Twombly world it's something

4      equivalent of the claim chart should be attached

5      to a complaint.  Now I'm not sure how that would

6      work, but by the same token a defendant bears its

7      burden on its affirmative defenses.  As they are

8      pled there should be some way of identifying what

9      those are and fleshing those out so the parties

10     have an initial exchange by way of that type of

11     disclosure that would help them shape discovery.

12          One of the things we are concerned about here

13     is that the narrowing to what is going to be tried

14     as opposed to what potential inference is being

15     pressed by the defendant.  At the same time it is

16     trying not to make the equivalent on its

17     affirmative burden of disclosures until such time

18     in January.  And our thought on the sequencing is

19     if they would do the equivalent for their

20     affirmative defenses of what we have done with the

21     claim art, we could put the two side by side, do

22     some narrowing, and use that as a basis for

23     discovery.  But we are concerned that making a

24     decision on what to try at this stage without

25     having better disclosure of affirmative defenses

1    puts the plaintiff at something of a disadvantage

2    because it as shot in the dark as to which of

3    those defenses might be stronger or weaker.

4         THE COURT:  What is the difference?  I mean,

5    the way the federal system works every plaintiff

6    in every case faces that very issue before they

7    file the complaint.  And under Twombly you are

8    supposed to make that decision and fire that shot

9    in an informed way so that the process begins.

10   And then they of course have their obligation to

11   plead affirmatively any defenses.  And then

12   discovery is to go forward on that basis.  You

13   don't typically have the advantage of a discovery

14   on the defendant's affirmative defenses before you

15   file a complaint unless you have conducted, as you

16   should have before filing lawsuits, discovery -- I

17   mean discussions with each other.

18        MR. MERRITT:  The only point -- and I want to

19   be sure I am articulating it clearly -- is that

20   the filing of the affirmative defense presumably

21   is based on that same level of inquiry as the

22   filing of the initial pleading so some disclosure

23   of the thinking behind or elaboration on that

24   affirmative defense would be helpful before either

25   of the parties are asked to narrow down what they

```
1      are going to try or which claims are going to go

2      to trial.

3           THE COURT:  Agree.

4           MR. MERRITT:  So it is question of

5      sequencing, really.

6           THE COURT:  Agree.  But the way that is

7      accomplished under the federal rules, Rule 26

8      disclosures, and in patent cases, it is not

9      unreasonable to require that the disclosures when

10     they encompass claim charts and prior art listings

11     and all of that that usually accompanies the

12     defenses.

13          MR. ROBERTSON:  Your Honor --

14          THE COURT:  But you have had two cases

15     involving this in this district.  Have you had any

16     elsewhere?

17          MR. ROBERTSON:  No, sir.

18          THE COURT:  Okay.  So, there has been claim

19     constructions made by two courts, correct?

20          MR. ROBERTSON:  Yes, sir.

21          THE COURT:  And have those claims

22     constructions been consistent?

23          MR. ROBERTSON:  In some ways, yes; and some

24     ways, no.

25          THE COURT:  All right.
```

1           I don't see any point in another court in

2       this district going through another drill on claim

3       construction where they have, two of them have

4       reached the same results.  And I don't -- I mean

5       the odds of those two judges being wrong on what

6       that claim means and of the issues being litigated

7       to get to a claim construction seem to me to be

8       likely to be the same.  I realize that it is not

9       an estoppel situation because they weren't -- you

10      weren't parties to it, but, goodness, it seems to

11      me we need to figure out some way to get to cut to

12      the chase here in this case.

13          MR. ROBERTSON:  Your Honor, I don't disagree

14      as to that.  Where Judge Brinkema and Spencer were

15      consistent, I think it should be consistently

16      applied, and we can direct you to that.  I think

17      it might not even be controversial once we have

18      discussion with the defendant and it is mapped

19      out.

20          Let me address the point, prior point, one

21      second about Twombly and narrowing claims and

22      being able to identify the infringing systems

23      prior to filing a complaint.  We absolutely did

24      pre-filing investigation with all due available

25      information we could obtain.  A lot of that was

1       from publicly-held documents from the defendant's

2       web site, but part of the difference between this

3       patent case and maybe another typical patent case

4       is that a lot of the stuff is not available to

5       conduct analysis until you have discovery.  Why is

6       that?  Because it is software, Your Honor,

7       because, first, it is not something I can go down

8       and buy off the shelf.  Mr. McDonald and I

9       actually were co-counsel ten years ago involving a

10      Porter, a biscuit cutter.  And I could go down to

11      Home Depot and buy that and take it apart and see

12      exactly how it infringed or didn't infringe.  And

13      I could prepare a complaint identifying why it

14      did.  I can't do that in the software case.  I

15      don't have the source code, which is not made

16      available to me.  I don't have the demo models,

17      which aren't made available.  I don't have the

18      guidelines, the manuals which I have to get

19      through discovery.  We have now obtained in large

20      part all of that, and we have been, as I say, very

21      forthcoming in identifying and marshaling the

22      evidence that we have that infringes.  And as of

23      Wednesday they wrote me and said they wanted

24      further supplementation the following morning.  I

25      said I would supplement again by December 18 after

1          I have been able to process the two point

2     eight million pages of documents that have just

3     come in over the last three weeks.  I think we

4     have been about as forthcoming as we can as early

5     on as we can with the the information that we

6     have.  As I say, it is not a widget I can buy off

7     the shelf.  And the nature of software is the

8     complicating factor in this -- in this case.

9          THE COURT:  Well, but what you are arguing

10     for is an exception from Twombly for software

11     cases.  I don't think any such basis for that

12     exists.  The simple answer to that to me is that

13     you have experts in the field who can analyze what

14     actually is done, what you can get to.  And they

15     can give you an analysis of whether there is a

16     likelihood of infringement or not and why.  And I

17     can't imagine that you didn't do that before you

18     filed the complaint.

19          MR. ROBERTSON:  We did all that.

20          THE COURT:  So, do you have a way of

21     specifying what it is you think is infringed?  And

22     then when you get the discovery in the ordinary

23     course you can move to amend if you need to?

24     That -- I think it is time that the patent, the

25     world of patent lawyers, need to accept that

```
1     patent law is no different than any other law in

2     the way that the rules are of procedure apply.

3     The Supreme Court has told the federal circuit

4     that twice now within the last three years.  And

5     the patent bar doesn't seem to have gotten it.

6     What is more, I haven't seen but one case where

7     anybody even asserted Twombly as to test the

8     validity of a patent claim.  So what has happened

9     is as a consequence patent litigation gets started

10    in May and here we are in November and we haven't

11    really gotten anywhere in the way of really

12    defining what it is that is going to be tried.

13          How many claims did you -- all of that is

14    simply because everybody has proceeded in a lock

15    step not paying a bit of attention to the Supreme

16    Court's instruction in Twombly in patent cases.

17    That is my view.

18          So, how many claims did you actually try in

19    the Ariba case?

20          MR. ROBERTSON:  Eight, Your Honor.

21          THE COURT:  How many claims did you actually

22    try in the SAP case?

23          MR. ROBERTSON:  13, Your Honor.

24          THE COURT:  Were the eight and the 13, was

25    there an overlap between the eight and the 13?
```

1          MR. ROBERTSON:  You are testing my memory.  I

2     suspect there were.  But I need to go back and

3     confirm that.  But I suspect there were at least a

4     few.

5          THE COURT:  Do you know?

6          MR. McDONALD:  I don't know for sure.  My

7     recollection is there were some overlap.

8          THE COURT:  All right.

9          The other thing that the patent bar needs to

10     learn is not every conceivable patent defense

11     applies in every case.  And it is time that we

12     brought that to a halt.  And only the ones, only

13     the ones that truly have some merit based upon an

14     investigation ought to be presented.

15          Which ones do you intend to present, sir?

16          MR. McDONALD:  I intend to bring two defenses

17     there within the four corners of the patent, that

18     is section 101 of the Patent Act, there is not

19     patentable subject matter, and also section 112,

20     which is lack of written description and lack of

21     adequate support in the specification.  There is

22     some good case law specific to software cases

23     which calls for things like, you have to tell us

24     the algorithm, if you call, for example, that

25     search engine, how does it search?  What is the

1     process for that?  There is a lot of missing

2     pieces in these patents.

3          THE COURT:  Who says you have to tell you

4     that?

5          MR. McDONALD:  There is some case law I got

6     from the patent office board of appeals that cites

7     other cases.

8          THE COURT:  Where does it have to be told?

9          MR. McDONALD:  In the specification of the

10    patent itself.  They have to explain how it works.

11    If it is not there for at least one element of

12    number of claims --

13         THE COURT:  In order to have an adequate

14    patent in a software case, you have to articulate

15    the algorithm.

16         MR. McDONALD:  It is not enough to have a

17    box.

18         THE COURT:  If you don't articulate the

19    algorithm you don't have a valid patent because

20    you haven't adequately circumscribed what you are

21    claiming.

22         MR. McDONALD:  Claiming.

23         THE COURT:  All right.

24         MR. McDONALD:  And then we have prior art

25    defenses.  We have been very detailed about eight

1      specific prior art references we have gone through

2      element by element, cross linked it.  We have also

3      incorporated the re-exams now, three that have

4      been filed yesterday.  We went out the door three.

5      Number one is subject of --

6            THE COURT:  You mean 516 patent?

7            MR. McDONALD:  683, subject of panel

8      rejection.  Two had office action.  First office

9      action this week rejecting each and every claim to

10     have that 172.  Third one filed yesterday.

11           THE COURT:  You filed -- your original filing

12     of the 172 was rejected, according to the papers

13     that I have.

14           MR. McDONALD:  That was corrected just this

15     week.

16           THE COURT:  When was that re-filed?  When was

17     the correction filed?

18           MR. McDONALD:  I think several weeks ago.

19           THE COURT:  So that is not reflected in the,

20     any of papers that I remember reading.

21           MR. McDONALD:  We have not updated our --

22     that is probably in the motion for stay.  There

23     are new facts.

24           THE COURT:  And so, what was the office

25     action in the 172?

1              MR. McDONALD:  Rejecting all claims.

2              THE COURT:  What?

3              MR. McDONALD:  Rejecting every claim in the

4       patent based on prior art.  Several combinations

5       of prior art as set forth.

6              THE COURT:  And then what happens now?

7              MR. McDONALD:  They get a chance to respond.

8       That is just the first action, first office.  That

9       is bar from recovery, that is the first, as prior

10      art.  Relied on the prior art.  Third one that we

11      had, we have gone in each and every claim.  We

12      have all three of those patents now in the

13      process, different stages, but in the process on

14      the re-exams.  Those all have to do with prior

15      art.  You can't bring up the 102 issue.  The

16      patent subject matter issue, you can't -- I cannot

17      bring up the 112 issue in a re-exam.  That is

18      really based on printed publications, very

19      specific types of prior art.  So we have to kind

20      of put these in different boxes.  But certainly we

21      have some excellent prior art here as these, I

22      think, re-exams validate, that either anticipate

23      or render obvious in combination of these claims.

24      And the law of obviousness has gotten more common

25      sense here with the KFR decision from the Supreme

1   Court.  There is art here where it has got prior

2   art, number one has everything; but two, number

3   two the elements claim, the idea of combining

4   things.  This one with the electronic sourcing

5   systems.  Like that.  It is a very common sense,

6   obviousness story here.

7        THE COURT:  What defenses do you --

8        MR. McDONALD:  Don't anticipate any other

9   than those.

10        THE COURT:  Now, you know them.

11        Let me ask you.  This may not be the proper

12   way to ask it.  But, you can help me reframe the

13   question if it is not.

14        What is your product?

15        MR. McDONALD:  Our product is, it is software

16   that helps people order and buy products.

17        THE COURT:  Is the one product an iteration

18   of software, or lots of different iterations?

19        MR. McDONALD:  There is a suite of products

20   we have.  I think what is relevant is two versions

21   of it.  I think that the main one that I think got

22   dragged in to this case is an extension of our

23   product that has this feature called punch out.

24   Punch out means -- the Lawson product doesn't

25   allow you to do something with it, so we allow you

1    to punch out on the internet and you can go to a

2    site like --

3         THE COURT:  Lawson's product doesn't what?

4         MR. McDONALD:  Certain things it doesn't do.

5    One things it doesn't do is provide you access to

6    vendor catalogs that are published catalogs.

7    Lawson provides this punch out option where the

8    user of the Lawson system is given this

9    opportunity to go out on the internet.  And they

10   go to a Dell site that is set up so I can buy

11   stuff at Dell or Office Max.  And then other ones

12   called catalog aggregators like Ariba, like

13   Seiquest, one of the co-defendants.  Those

14   companies actually set up a portal out there where

15   they will aggregate several catalogs and provide

16   access to that.  Our product links like a truck

17   and trailer.  And so we were sued together with

18   Seiquest because with the punch out we got this

19   way to go to somebody else's site where they have

20   all of these catalogs.  Well, they joined with

21   Seiquest, they took a license.  We don't do the

22   catalogs, we simply gave the customers a way to

23   pick up the phone and call, in effect, these other

24   systems that do have actual catalogs.

25        THE COURT:  Assume these patents are valid.

1     What is your position on infringement?

2         MR. McDONALD:  We don't because we don't have

3     these multiple catalogs you need for these claims.

4     Now, there is precedent claims.  I can't give you

5     a short answer.

6         THE COURT:  You have looked at 79 claims

7     since May.

8         MR. McDONALD:  Right.  The vast majority of

9     them involve multiple catalogs, being able to

10    search a sub-set of multiple catalogs.  We

11    don't -- we don't need a system to do this.  We

12    don't do that.  We allow them to punch out to

13    somebody else's site where they are licensed any

14    way.  In case -- I don't see how they get paid

15    twice for the truck hooking to the trailer that

16    has already been licensed.  So those, that is part

17    of it, the catalogs.

18        The searching, they have to search a sub-set

19    of catalogs in many of these claims.  We don't

20    provide a way to do that.  In our stand-alone

21    system we have what is called an item master list.

22    That is the list of product that it lists, that

23    the customer basically puts together themselves.

24    They pick what they want to have on, in a sense,

25    their shopping list.  So it is not bringing in a

1        Sears catalog and Montgomery Wards and so on

2        searching those independently, which is what the

3        patent talks about.  This as their invention.  We

4        are doing what is right on top of it, the prior,

5        that gave you a product list to search through and

6        you go ahead and requisition from those.  It

7        didn't have, according to their own patent, this

8        ability to make specific --

9            THE COURT:  You want a desk, computer, and a

10       chair.  You have software.  I say I want a desk.

11       Could you purchase a chair and desk and order from

12       the list the customer pre-populated?  Then what do

13       you do since you can't under your system?  Is that

14       where your punch out, you hit punch out and it

15       goes to somebody who offers desks, somebody who

16       offers chairs, and somebody who offers computers?

17           MR. McDONALD:  Well, I think their product is

18       really designed for -- well, I have got the list

19       of maybe a hundred or thousand products that I buy

20       all the time.  What if I need something else that

21       might be in a big catalog, Fisher Scientific?

22       Fills these computer tents.  They have a huge

23       catalog known as the Fisher Scientific catalog.

24       They would love for shoppers to see that whole big

25       thing.  Don't want them back in with a list of 50

1        things they always buy.  They want them to see the

2        big thing.  That is what is missing.  Give you a

3        shopping list, but not a way to look at that whole

4        big catalog.

5            THE COURT:  What other defenses do you have

6        in the case?

7            MR. McDONALD:  There are defenses relating to

8        inducement claims.  That is part of the punch out.

9        I think even part of the other claims because many

10       other claims --

11           THE COURT:  What do you mean inducement?

12           MR. McDONALD:  We don't make, sell, or use a

13       system that actually infringes s directly a claim.

14           THE COURT:  How about here?

15           MR. McDONALD:  Couple things inducing

16       customers, in essence, to infringe because we aid

17       and abet them to populate a product list, and we

18       give them that punch out.  We give them the way to

19       call out on to the internet and interact with the

20       other systems.  So they are saying that we are

21       aiding and abetting both versions of that

22       infringement for that.  There is a number of

23       additional defenses that are specific to induce,

24       inducement unlike the regular specific intent

25       tort.  We have to not only know about the patent,

1     which we did not, as you heard about before the

2     law suit, but have to have a client who

3     specifically intended to cause infringement of

4     claims of that with the actions that they took.

5          Advice of counsel is a defense to that.  And,

6     also, lack of knowledge of this thing.  Certainly

7     that is kind of, I think as a summary judgment

8     type issue, how could you have specific intent to

9     cause infringement if you didn't even know about

10    the patent?  There is good case law on that.

11         And I think the licensing also is a good

12    defense given that our system punches out to their

13    own licensees.  Why is it the fact that we simply

14    allow them to punch out is something that they

15    could infer we are trying to do is infringement?

16    We are trying to punch out to their own partner.

17         THE COURT:  That is another component --

18         MR. McDONALD:  Specific intent.

19         THE COURT:  -- of the inducement issue.

20         MR. McDONALD:  Right.  Although it applies

21    to, I think, either way because certainly if they

22    have already been paid once, it is an authorized

23    system, and I don't think they get paid twice

24    for --

25         THE COURT:  Any other defenses?

1          I mean that you have not -- that are

2    available.  It is time for the patent bar to quit

3    thinking in laundry list terms.  And I think the

4    time for tolerating that in the judiciary has to

5    be over because it is killing the process.  Not

6    every case has everything in it.

7          MR. McDONALD:  Right.  I think you know --

8    let me clarify one thing.  I think Mr. Robertson

9    might note there is from predecessor counsel some

10   allegation and some interrogatory answers

11   regarding inequitable conduct.  I don't think we

12   are going to pursue that.  We are going to drop

13   that.

14         THE COURT:  That makes things different.  I

15   think it changes the way the case goes, too.

16         All right.  What else?

17         When are you going to -- what invalidity

18   positions do you need stated before you fish or

19   cut bait on what you are going to try?

20         MR. ROBERTSON:  I would like, Your Honor, to

21   find out what are the -- if he wants to narrow the

22   universe of prior art and tell us exactly how they

23   invalidate, I would appreciate that.

24         THE COURT:  How did they not do that in all

25   of the things they have already filed in the

1      patent office that you have access to?

2           MR. ROBERTSON:  First of all, Your Honor,

3      that has not been their consistent position in the

4      litigation.  Same things raised in every

5      examination, every judge and jury who every looked

6      at these patents found them not to be invalid in

7      some prior art raised before the pre-examination

8      and before the judges and the juries.

9           THE COURT:  In every instance you have judges

10     and juries that have gone one way, you have a

11     patent examiner that has gone the same way, and

12     then you have the PTO on re-examination going

13     exactly the opposite to that?  Is that basically

14     what happened here?

15          MR. ROBERTSON:  Yes.  In SAP no determination

16     was made by the jury, but it didn't -- the jury

17     after hearing the evidence, shortly after that the

18     case settled through the good offices of

19     Magistrate Judge Dohnal.  But, what particularly

20     happens in the patent office -- and quite frankly

21     this is criminal at this stage -- is you pay your

22     fee, you get your re-examination, particularly if

23     the case is in litigation.  I think we put in the

24     payers an affidavit of the former commissioner of

25     the patent office who said that the wheels have

```
 1      fallen off the wagon.

 2          THE COURT:  Judge Michelle said the same

 3      thing.  That is ridiculous that you could have a

 4      jury say something is valid and at the same time

 5      you have the patent office, which previously

 6      couldn't have issued a patent in the first

 7      instance, without making a judgment that is valid,

 8      re-examining the whole thing, and having a

 9      different view.  What are they doing, hiring

10      people up who don't know what they are doing?

11          MR. ROBERTSON:  What they do is after they

12      take the fee, give you a patent, put in the

13      familiar language, we issue it for ten years.  In

14      this examination that has been filed there has not

15      been one re-examination that has gone all the way

16      to the federal circuit in the ten years that the

17      statute has been on the book.  I mean, that is a

18      problem.  So it essentially puts you into

19      hyperspace without any ability to enforce your

20      patent, protect your market space when you are a

21      competitor.  That is where we stand on

22      reexamination, quite frankly.  I think events

23      superseding those, we were well in to the

24      litigation.  You noted we have got depositions of

25      inventors coming up in the next three weeks.  We
```

1    would like them -- we are happy to narrow the

2    issues in the case.  You asked specifically the

3    problem we have with some of the invalidity

4    contentions.  I mean just --

5         THE COURT:  I wanted to know what invalidity

6    contention do you need to know?  What is it you

7    say you need to know before you can fish or cut

8    bait on what you are going to -- what you are

9    going to pursue in this case.

10        MR. ROBERTSON:  I would like to know what the

11   principal places of prior art they are relying on,

12   and what elements of them invalidate the patents.

13   When I mentioned the claims, let me give you a

14   short summary of the claims.  We are talking about

15   different components that are well-recognized in

16   the sense, you know, in isolation.  A catalog's

17   searching capability of requisitions, built-in

18   capability.  A purchase order generating

19   capability.  The ability to check inventory of

20   product that you selected.  If they want to show

21   us on an element-by-element basis where that is in

22   prior art and somehow should be combined, that is

23   what we are looking for.  They are looking for the

24   same from us on the infringement contention.

25   Where is this in the software systems?  And we are

1      providing that based on the discovery that we have

2      had to date.  We would like to see --

3          THE COURT:  You ought to provide that in the

4      complaint.  You ought to provide it in the claim

5      chart.

6          MR. ROBERTSON:  As I said --

7          THE COURT:  What you are doing, you are

8      putting -- you are putting the discovery as the

9      vehicle to do what actually is contemplated to be

10     done by the complaint and the disclosures.  And

11     you have gotten the cart before the horse in many

12     respects.

13         Now, you have got, each of you producing two

14     million documents and you don't know what you are

15     producing about.  Or, I guess you do.  I mean, you

16     are competent lawyers, so you do have some idea of

17     what you are doing, but you are generating a lot

18     of waste, I think.  I don't want it to happen in

19     the litigation.

20         When are you going to be prepared to fish or

21     cut bait about -- you have done all this stuff for

22     the patent re-exam, why can't you do it?

23         MR. McDONALD:  We can.

24         THE COURT:  Well, do it.

25         MR. McDONALD:  I thought we had already

```
 1     done -- what we have done is 78 specific, we have

 2     have filed re-exams.  There are some other prior

 3     art.  We chose another 32 pieces of prior art.

 4     They said you haven't charged those out yet.  I

 5     don't think if the patent office, the judge and

 6     jury don't buy prior art one through eight, I'm

 7     pretty sure they won't buy number nine.  I mean by

 8     Monday I will figure out, whether I have a number

 9     nine or ten.  You know, number eleven there is no

10     point to it.

11         THE COURT:  All right.  This is Friday.  I

12     don't know it can be done by Monday.

13         MR. McDONALD:  I got excited.

14         THE COURT:  To do it right, I don't want to

15     say you forgot it.

16         MR. McDONALD:  Next week is reasonable.  I

17     think we basically will say we will stick with

18     what we have got.

19         THE COURT:  All right.  Then you will provide

20     all of your prior art invalidity positions by next

21     week.

22         MR. McDONALD:  Yes.  You know, we have

23     already done that.  We will keep it, say we won't

24     do any more.  It kind of confuses me.  We did do

25     it for all 79 claims, you know.  We had to keep it
```

1        moving.

2             THE COURT:  I have to tell you, ePlus has

3        this thing backwards.  I think it is time for you

4        to fish or cut bait.  And you are going to do it,

5        and do it the right way, because it is going to

6        change the way the whole litigation is conducted.

7             MR. ROBERTSON:  I understand.  That message

8        came across.  We do claim charts before we filed

9        this complaint.  We went through it in detail and

10       got as much information as we could.  I mean, we

11       can't do industrial espionage and steal the

12       software.

13            THE COURT:  Why not?  Everybody else does.

14       Because you don't want to do it and get caught and

15       go to jail.

16            MR. McDONALD:  After they sentenced someone

17       to 30 years this morning, I don't want get in that

18       area.

19            I won't blame you for that one.

20            THE COURT:  Well, I understand that, that you

21       can't do industrial espionage, and I don't want

22       anything I say to be construed as you should do

23       that.  I think what -- why don't we do this?  Why

24       don't you identify the claims of each patent on

25       which you believe, based on what you know now, you

1     are going forward on.

2          Then you identify your invalidity defenses

3     immediately after that.  If you need to change

4     anything, you have five days to change it.

5          MR. ROBERTSON:  Understood, Your Honor.

6          THE COURT:  I think they need to know what

7     you are shooting at, why you are shooting at them.

8     Otherwise, what we are doing is turning the whole

9     pleading process on its head.

10         So any reason you can't stake out your claim

11    by Wednesday, which claims of which patents you

12    are going for?  Just a list we intend to go

13    forward with the these claims of this patent.

14         MR. ROBERTSON:  Yes, Your Honor.  May I make

15    a suggestion?  Could I do it with the subset of 20

16    right now from 79 down to 20?

17         THE COURT:  No.  I want you to take it to the

18    ones that you are going to.  I want you to go to

19    the ones that you really are going to.  Because

20    you went with the eight with Judge Brinkema, why

21    can't you get it down in that sum?  I see the 20,

22    what you have done, and fighting over that in the

23    pretrial order.  But that is just gamesmanship.

24         MR. ROBERTSON:  To be fair, I anticipate at

25    some point it will be a Markman ruling in this

1     case, and that could impact on what claims, you

2     know, would be asserted depends on the ruling.

3          Now, clearly, it would need to be narrowed

4     for The Court to determine what terms are in

5     dispute if there are genuine disputes.  There are

6     eight or ten, as I recall, overlapping claim terms

7     that Judge Brinkema and Judge Spencer construed

8     consistently.  Judge Spencer after the trial was

9     over vacated his Markman ruling upon motion.  And

10    I think he vacated it -- it was argued and agreed

11    on that he made certain errors after hearing the

12    evidence as to what specific rulings he admitted.

13    In fact, they were concerning these algorithm

14    claims Mr. McDonald raised with Your Honor.  And I

15    think the Judge realized that he made a mistake

16    when he identified what the algorithm was.

17         Excuse me.

18         But my suggestion would be this, Your Honor.

19    I will narrow them significantly.  I would propose

20    initially we go down to 20 by Friday.

21    Mr. McDonald -- and I would be given another week

22    to respond to those on his invalidity contentions

23    so that would narrow the universe for him to

24    respond.  And then move forward, Your Honor.  And

25    after the Markman ruling, I would narrow those

1     down to ten.

2           MR. McDONALD:  I have an opinion on that, if

3     I may.  I think actually narrowing it down to ten

4     will help the Markman process.  We will know what

5     we are talking about.  Ten is still a lot of

6     claims to go after in accused infringement, Your

7     Honor.  With the very three closely-related

8     patents, all have the same specification.  Here

9     they have ten bullets to shoot.  That should be

10    enough.  And that will streamline the Markman

11    process if we know what the ten are.

12          THE COURT:  What are -- what would the

13    Markman process entail in this case?

14          MR. McDONALD:  I could see us looking at the

15    prior decision stage to see if we can agree on

16    which ones we can live with.  If there are

17    discreet ones we can't even decide to do that, we

18    might have one or two we might --

19          THE COURT:  Sorry.  I have a conference call.

20          SECRETARY:  I wanted direction.  Do you want

21    them to call back?  I guess this is follow up from

22    yesterday.

23                          (Recess)

24          THE COURT:  How many terms there will be at

25    issue in the Markman?

1           MR. ROBERTSON:  Your Honor, unfortunately

2      this is, again, reflects poorly upon the patent

3      bar in prior litigation fighting over what is a

4      catalog and what is a purchase order and what is a

5      requisition.  That was silly to me.  I think lay

6      persons understand what those terms are.  But they

7      were disputed.  Those were resolved by Judge

8      Brinkema and Spencer.  I would think we wouldn't

9      be fighting over that again.

10          THE COURT:  Anybody who will be fighting over

11     the term "catalog" better have a dag gone good

12     reason for fighting over it.  That is ridiculous.

13     These things have ordinary meaning unless there is

14     some special definition to them in this case or

15     the patent lingo.  They were chosen by the

16     inventor.  I don't see any basis for even

17     wrestling with that.

18          MR. ROBERTSON:  I think --

19          THE COURT:  What are --

20          MR. ROBERTSON:  Terms that will be --

21     function terms in contest of what the computer

22     implemented process is, that is, a means for

23     searching.  What are the means?  In the SAP case,

24     SAP imported all of this verbiage from its

25     specification that it claimed had to be the

1      algorithm.  We think that was improper.  I think

2      largely that will, dispute will be over what are

3      some of these algorithm --

4          THE COURT:  Let me take this call.

5                      (Recess)

6          THE COURT:  The terms, the Markman terms,

7      what are they and how many of them are there at

8      issue?

9          MR. ROBERTSON:  Yes, sir.  Let me -- I think

10     I can address this, and I will let Mr. McDonald

11     respond.  If you would like, I could hand you copy

12     of one patent.

13         THE COURT:  I have the patents over here.

14     What are they?  Now, you ought to know the terms.

15         MR. ROBERTSON:  These terms that Mr. McDonald

16     mentioned that are computer-implemented talk about

17     means for doing things.  When you have a means for

18     performing a function, it is the courts

19     requirements under the case law to go and see what

20     the structure is in the specification that

21     performs that function -- what the means do in the

22     computer is implement software product like this.

23     It going to be an algorithm.  What is that?  Makes

24     the computer -- says it is just a series of steps

25     to perform a task.  We are going to have to tell

1          you what those means are.  There are terms like

2          means for selecting product catalog search, the

3          means for searching for matching items, means for

4          building a requisition.  We think it is all laid

5          out.  We think we can do that, but that is what

6          the fight is.  There are a lot of terms, there are

7          a lot of means terms, but almost alike, very

8          similar, if not identical, in most, if not all,

9          the claims.  I think it boils down to half dozen

10         or so.  I think the courts are exactly right.  We

11         should not be fighting over terms like catalog,

12         requisitions, purchase order.  Specially when they

13         have been constricted by Judges Brinkema and

14         Spencer to be the same.

15             We would be urging that we reach an agreement

16         on those terms.  And then I think the fight is

17         going to center around these means plus function

18         terms.  As I said, I think that is half a dozen or

19         so, sir.

20             MR. McDONALD:  That we were aware of means

21         plus function claims, that is more than I heard

22         before.  I wasn't sure how far they would push

23         those.  That is more involved in the Markman

24         construction process, means plus function, and

25         other terminology.  There are --

1          THE COURT:  The Markman process, if it

2     involves means plus function, require expert

3     testimony to consider what the claim terms mean.

4     I can't imagine if you had catalogs you would need

5     an expert to determine that.  But what about means

6     plus function?

7          MR. McDONALD:  Most is within the four

8     corners of the patents themselves, and prosecution

9     history, to some extent.

10         THE COURT:  So we are not going to need an

11    expert?

12         MR. McDONALD:  I don't know about testimony.

13    Maybe affidavits.  A little context for these

14    things.  But i think none -- it will be more in

15    the nature of --

16         MR. ROBERTSON:  I don't disagree.  I think it

17    should come from the specification.

18         THE COURT:  Should, but do either of you

19    intend to use experts as part of the Markman

20    process?

21         MR. ROBERTSON:  No, sir, I don't.

22         MR. McDONALD:  I don't know that we made a

23    final decision.  If they use, it would only be for

24    context.  I don't think it is going to be

25    significant.

```
 1          THE COURT:  "Context" has a lot of different
 2     meanings, I have found, in patent cases.  Depends
 3     on what lawyer you are talking to.  Here is -- I
 4     think you have done a lot of talking before.  You
 5     need to revise this.
 6          I will give you a copy of the pretrial order
 7     in another case that is over here.  It is a
 8     different kind of case, but it will help get some
 9     things straightened out.  It is not necessarily
10     the end of the pretrial order process.  They are
11     going to have to be doing the same thing, and have
12     done the same thing that you all have done.  But
13     this will help you.
14          MR. CARR:  This is what you asked us to look
15     at before, and we tried to focus.
16          THE COURT:  What you did is leave a lot of
17     stuff out undone.  I want you to please file,
18     Mr. Robertson, the claims that you intend that
19     you, based on what you know, that you contend are
20     infringed, and how they are infringed based upon
21     what you know right now.  And I want to know the
22     quickest date you can do that.  And that those are
23     going to be the ones that are going to shape the
24     way the rest of the case is going to go.  Now --
25          MR. McDONALD:  The list, that really is
```

1      listing what they are going to try.

2          THE COURT:  The list of claims he believes

3      are infringing, as if you were having to do that

4      under the rules of pleading.  And the Mark -- the

5      Twombly issues.  And you are going to have to

6      figure out how many they are and get them done so

7      they know what they are dealing with.

8          And then I want at the same time a list of

9      the claim terms that are, that you contend to be

10     in dispute.

11         MR. ROBERTSON:  I need to confer, of course,

12     to see what is in dispute.

13         THE COURT:  I know.  Here we are.  This is

14     November.  This has been going on since May.  It

15     is time to get it done.

16         MR. ROBERTSON:  Sure.

17         THE COURT:  And then I want you to file all

18     of, a list of your invalidity defenses, your

19     infringement defenses, and your positions in

20     opposition to what he has so everybody knows where

21     you stand.

22         I want to list the defenses that you are

23     really going to be dealing with somewhere.  I mean

24     in separate pleadings.  Which are the ones.  Take

25     out the fluff that is in here.  That needs to be

1       done in a very short period of time after he has

2       finished.  And then we are going to know from

3       there where we need to go.

4            And I want your list of claim terms at the

5       same time.

6            Now, you all can go down the hall, or you

7       can -- I guess you need to eat lunch -- but down

8       the hall and sit down and talk about that and

9       restructure an order that has that provision in

10      it.  I want to see it happen.  I am really talking

11      about within a week or so for you and week after

12      that for you.  It is just time that needs to get

13      done, I think.

14           Now, when you re-do your discovery, here are

15      the things that come to mind.  At page two of the

16      schedule A I want the summary judgment motion much

17      further ahead of time from the trial date, than 40

18      days.  I want the discovery cutoff to be much

19      further ahead in time than the 45 days.  I want

20      the motions in limine due ahead of the final

21      pretrial conference and briefed ten days

22      completely finished, briefing ten days before the

23      final pretrial conference.

24           I would like to have a schedule for your

25      experts, a specific date schedule when you are

1      going to disclose to each other your expert

2      reports, et cetera.

3          I think those schedules can be, those kinds

4      of dates and schedules can be done in a separate

5      context.  You don't need to be tied down by using

6      this format if you don't want to.  In fact, most

7      people don't.  They do it in a separate schedule.

8      And then whatever is left is done with the

9      remnants of the pretrial schedule.

10          I am going to refer the case to Magistrate

11      Judge Dohnal for settlement.  And -- any reason he

12      shouldn't be given?  He has been through it once.

13          MR. ROBERTSON:  No, Your Honor.

14          THE COURT:  Did you settle after the jury,

15      after the case with the Judge Brinkama, end up

16      settling after that or go to judgment?

17          MR. ROBERTSON:  Jury verdict came back.  She

18      bifurcated damages.  And then we went into

19      intensive discussions.  Judge Brinkama managed the

20      case.

21          THE COURT:  She handled that, not a

22      magistrate judge?

23          MR. ROBERTSON:  That is right, sir.

24          THE COURT:  Okay.

25          All right.

 1            You need to get these expert disclosures and

 2       reports out in time for the expert opinions to be

 3       useful and known and be deposed.  I know what is

 4       going to happen, the way summary judgments end up

 5       in patent cases.  Unless you get all that done

 6       first is this:  Somebody says, well, all of this

 7       summary judgment resolution has to depend on the

 8       expert testimony.  It is not finished yet.  Let's

 9       put it off.  I don't want to have that happen.  If

10       expert testimony is going to be involved in the

11       summary judgment process, then you have to have

12       the expert discovery done in each case before the

13       summary judgment process begins.  Each case has

14       its own peculiar issues with respect to when or

15       whether what has to be done and what particular

16       order.

17            On the Markman hearing once I know the list

18       of claim terms and see how much we can use of what

19       has already been done, we can set a Markman

20       hearing.  And I would like to have that -- it

21       sounds to me like this is a case where I don't

22       need expert testimony or anything, but the terms

23       of the patent and specifications in it.  And the

24       file history.  I would like to have a complete

25       file history of each patent filed here.

```
 1          How big are each one of them?  What is the
 2     file history, excluding the reexamination?  I
 3     don't want that.
 4          MR. ROBERTSON:  About eight to ten inches.
 5          THE COURT:  Eight.
 6          MR. ROBERTSON:  Total.
 7          THE COURT:  Tomorrow.
 8          MR. ROBERTSON:  We will get it to you in a
 9     joint appendix if you like.
10          THE COURT:  File one, and we want two copies
11     of it up here.  One for each.
12          MR. ROBERTSON:  At the time of the Markman
13     briefing or now?
14          THE COURT:  Right, as soon as I can get it.
15     And then this item, I think we are, you are going
16     to have to restructure this, as I have suggested.
17     I think that you can re-do some of that and talk
18     about it and come back and we can arrive at a
19     schedule.  You may want to come back next week
20     some time.  And what I think you ought to do is
21     try to have a revision of this together with a
22     schedule for doing all of the things that we have
23     talked about.  I am not going to try to cram it
24     down your throat, but I will insist that you do
25     it.  And I don't think -- I am not -- I don't
```

1     think we are not looking at a long process,

2     because you have had plenty of time.  You know

3     where you are going to go.  And there is no reason

4     to delay as we are in this.  Do you want me to

5     rule on the motion for the stay on the papers, or

6     do you want an argument on it?  Anybody need

7     argument?

8          MR. McDONALD:  I think we may want to

9     supplement to let you get an update as to what

10    happened so you have the rest of the facts that

11    happened.

12         THE COURT:  When do you want to file that?

13         MR. McDONALD:  Next week.

14         THE COURT:  What day?

15         MR. McDONALD:  Thursday.

16         THE COURT:  What date is that?  Nineteenth.

17    That is your supplement.

18         MR. McDONALD:  Yes.  Defendant's.

19         THE COURT:  All right.

20         MR. ROBERTSON:  Could I have three days to

21    respond?

22         THE COURT:  What?  That is the 22nd?

23         MR. MERRITT:  20th is Friday.  Saturday and

24    Sunday.  23rd is Monday.

25         THE COURT:  When do you want to file?

1          MR. ROBERTSON:  24th.

2          THE COURT:  Okay.  Any need for a reply?

3          MR. McDONALD:  I doubt it.

4          THE COURT:  Okay.

5          Then we are updating what has happened here.

6          MR. McDONALD:  Okay.

7          THE COURT:  Now, those motions have very

8     little left, it looks to me, after reading the

9     reply brief about the discovery.  Looks to me like

10    you have mostly that taken care of.

11         But I have to read that, those papers.

12         Have I entered the joint protective order?

13         MR. CARR:  We made a joint protective order

14    submitted to Judge Spencer that has been posted,

15    publicly posted, for the time period it has, and

16    is waiting to be signed.

17         THE COURT:  It has passed its time when you

18    sent it?

19         MR. CARR:  Had not.  But has now.  So it can

20    be signed any time.

21         THE COURT:  Where is it?

22         MR. CARR:  We would have sent over an

23    ink-signed copy when we filed the motion to have

24    it entered in the clerk's office.

25         THE COURT:  In the clerk's office.  Okay.

1    Make sure we get that entered.  All right.

2         All right.

3         Why can't there be -- why can't Lawson

4    respond to interrogatory number ten pertaining to

5    the revenues for your accused products?  What is

6    the problem with that?  Certainly you know that.

7         MR. McDONALD:  The problem was from 2005 on

8    there were electronic records of that that made it

9    easier; but prior to 2005 they don't have

10   summaries for these particular products.  So what

11   we did is produce raw data that the contractor

12   called for, revenues, which is the best we can

13   tell, the best available information on the pre

14   2005 financials the products that are at issue.

15   We produced what we have, Your Honor.

16        THE COURT:  Well, you relied then on Rule 33

17   to produce documents as an answer?

18        MR. McDONALD:  For the pre-2005, yes.

19        THE COURT:  What I am talking about.  Those

20   have to be as easy for them to answer as you to

21   answer to find the information.  I find it

22   difficult to understand how they could find the

23   totals quicker and easier than you could.  You

24   have the mechanisms to know how to find the

25   answers.  I don't understand.

1          MR. McDONALD:  We have -- we have to go

2     through the available documents and get out a

3     calculator.  There is summary figures in it.

4          THE COURT:  You certainly have books and

5     records from which you can figure out what your

6     income is.  I mean, you have got to pay taxes and

7     all this other stuff.

8          MR. McDONALD:  Sure, a summary, but when you

9     drill down to the particular products they don't

10     have that from pre-2005.  They don't have summary

11     for modems that are at issue.  So we have given

12     them the best thing we have.

13          THE COURT:  No.  What you just said is you

14     don't have a summary document.  And I am not

15     talking about that summary.  I am talking about

16     the basic information that all businesses keep

17     with their products and their inventory.  And they

18     have that data.  They ought to be able to find it.

19     It may be difficult for them, but they have got to

20     have it.  And the task is; A, do they have it; B,

21     how burdensome is it to find out?  I mean to put

22     it together?

23          MR. McDONALD:  Maybe I do need to clarify

24     what they are looking for.

25          I think we have given those types of

1    documents that we have.  So what exactly do you

2    not have that you still want?

3         MR. ROBERTSON:  Well, to be fair, 2 point

4    8 million pages of documents have come in over the

5    last couple weeks, Your Honor.  At the time we

6    filed the motion we didn't have any financial

7    documents prior to October, excuse me, 2005.  I

8    guess I am hearing for the first time what they

9    want us to rely upon is contracts for these

10   specific products.  Let me, if they could, first

11   step would be nice if they identified the bates

12   ranges for them.

13        THE COURT:  Could you identify the documents

14   from where these answers can be found and go from

15   there?  Here is the ground for future discussion

16   in the resolution of this.  The burden is going to

17   be on you, the people who have that information,

18   Mr. McDonald, to put it in front of them in some

19   way they can meaningfully calculate it.  I can't

20   believe that a business doesn't have -- I know

21   they may not have it in the easily retrievable

22   form, but they have some responsibility to pony up

23   the work necessary to find the answer, otherwise

24   what is going to happen is you will get struck

25   with the the highest figure they can come up with.

 1       You are not going to have an ability at that

 2       juncture to come in and say, well, that is not

 3       right.  Here is why.  Because that is something

 4       you should have done a long time ago in answering

 5       this interrogatory.  So your client needs to know

 6       they have a responsibility to do it that way.

 7           The identification of the potential

 8       infringing products, that will be done as part of

 9       the process we just talked about, right?

10           MR. ROBERTSON:  Yes, sir.

11           THE COURT:  Responses and claims, charts,

12       invalidity issues, and other defenses, we have

13       that taken care of.

14           And you are going to take care of that, too?

15           MR. McDONALD:  Correct.

16           MR. CARR:  I should say, you asked for those

17       charts to be filed, and we have just been serving

18       them each other.  Do you want copies filed?

19           THE COURT:  The claim charts?

20           MR. CARR:  Yes.

21           THE COURT:  Yes.

22           MR. CARR:  Okay.

23           THE COURT:  Well, I want -- I am hopeful at

24       the end of day what you will end up doing is

25       looking at other claim charts saying, okay, here

```
1      is where we agree and why we don't.

2           MR. ROBERTSON:  One point for clarification.

3      Several defenses, such as 112, have been

4      mentioned.  And does it have adequate description,

5      or this 101, is it patentable subject matter?  I

6      would hope that we are getting something more

7      than, no, it is not.

8           THE COURT:  I assume you asked

9      interrogatories about their defenses.

10          MR. McDONALD:  We have specific interrogatory

11     responses, specific elements we identify as having

12     these deficiencies.

13          THE COURT:  I understand that.  You are going

14     to live with that.  If that isn't sufficient to

15     tell them how to move forward, that is going to be

16     the end of what you do.  You won't be able to add

17     it later.  So you may want to go back and look at

18     it.  What I am looking forward to is having each

19     of you inform the other very precisely as best you

20     can right now based on what you know of what you

21     are doing and what your contentions are.  So that

22     you know where to head the discovery, what to do

23     with your depositions, and how we are going to

24     proceed.  I recognize that the litigation evolves

25     and it may be necessary to make supplements and
```

1    amendments.  That can be done.  But when you do

2    that, you say, I supplement this position by

3    stating this, and here is why I am doing it now

4    rather than later -- rather than earlier.  The

5    time for fencing is over.  We are going to have

6    see if we can't get some touches.

7         All right.

8         What is this complaint?  Its production of

9    e-mail correspondence.  What is that?

10        MR. McDONALD:  I believe we have done that

11   now, Your Honor.  May I mention certain

12   depositions where that particular witness,

13   Mr. Grout, indicated some other e-mails.  Those

14   have been captured.

15        THE COURT:  You have done that?

16        MR. McDONALD:  Yes.  Got those out.  We have

17   to do a final double-checking, but I believe we

18   have supplemented since the motion was filed,

19   certainly with the all the other e-mail we are

20   aware.

21        THE COURT:  How about the documents

22   pertaining to the customers and competition with

23   the ePlus that you agreed to provide but they say

24   you have not done that yet?

25        MR. McDONALD:  Those have all been produced

1    now as well.

2         THE COURT:  Do you agree?

3         MR. McDONALD:  With specific bates numbers.

4    All been produced.

5         MR. ROBERTSON:  I have to go back and check.

6         THE COURT:  You don't know the answer?

7         MR. ROBERTSON:  No, sir.

8         THE COURT:  I expect you all to talk about

9    this status of discovery.  Submit to me an order

10   that resolves everything the way you all have

11   agreed to resolve it.  It is all set out in here.

12   Based on what we have agreed we are going to do

13   and what you are going to come up with today and

14   tomorrow in the way of an order, we ought to be

15   able to resolve all of these motions, this motion

16   in this fashion, with the guidance you have gotten

17   today.

18        MR. ROBERTSON:  You know, we wrote defendant

19   yesterday withdrawing a number of issues as moot

20   in the motion.

21        THE COURT:  I am not criticizing you, just

22   trying to get some of this stuff decided.  I

23   haven't forgotten what being a lawyers in complex

24   litigation is about.  But one thing I also learned

25   early on is some times it helps to have an outside

```
1      influence in restructuring the approach to things,

2      to help things be more efficient.  That is what

3      Judge Merhige told me when he was kicking my back

4      side.  So I found it actually to be helpful most

5      of the time.  All right.

6          Anything else you need take up?

7          MR. CARR:  One thought about scheduling.

8          THE COURT:  We have a trial date we have to

9      deal with.

10         MR. CARR:  You talked about getting specific

11     dates for the expert.  One thing we have seen in

12     the discovery plan we pointed out was that the

13     experts in order to issue their expert reports,

14     the best situation is they have the Markman ruling

15     by them.

16         THE COURT:  I understand they would like to,

17     but the standard way of doing it, if you can't get

18     the Markman hearing, they dot best they can and

19     then if they, you know, want to file some kind of

20     supplemental provision, they have to, you have to

21     work that out.  Actually the case called Rambus,

22     in which procedure for dealing with this in an

23     unresolved case where the claim construction was

24     unresolved the expert opinions were due and there

25     is a mechanism for dealing with all that.  One of
```

1      the Rambus versus Infenion case where experts

2      testimony was excluded, I still think that is the

3      appropriate way to do it.  But, if I find that the

4      claim construction issues are not out of hand and

5      that they are down to the precious few, if they

6      dwindle down to the precious few, then probably we

7      can get a Markman hearing quickly and get it

8      resolved.  And I want a date for the Markman

9      hearing based on what I see you all doing here.

10     And then a trial date.  An d say ten to 15 days.

11     You say that is not possible?

12         MR. ROBERTSON:  I think more like eight,

13     especially if we are narrowing the claims.

14         THE COURT:  And are you going to insist that

15     a jury be subjected to violation of their eighth

16     amendment rights in this case?

17         MR. ROBERTSON:  I think my client is going to

18     insist on that, yes, sir.

19         THE COURT:  Well --

20         MR. ROBERTSON:  Unless Magistrate Dohnal can

21     work his magic.

22         THE COURT:  Well, that is all right.  But

23     since they won one in front of a jury and mistrial

24     of another, I guess they have some reason for

25     that.  All right.

```
1          When will we get back together now with a

2     revised schedule and revised draft of this order?

3     I would like to have that a little bit ahead of

4     time, say 24 hours ahead of time, so I can read

5     it.

6          You don't need you to stay around.

7

8                    (Reporter excuxed)

9               True and correct transcript

10

11               Gilbert F. Halasz, RMR

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```