**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| *e*PLUS, INC., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:09cv620 |
| | ) | |
| LAWSON SOFTWARE, INC. | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

<u>**DEFENDANT LAWSON SOFTWARE, INC.'S**</u>
<u>**OPENING CLAIM CONSTRUCTION BRIEF**</u>

.

# TABLE OF CONTENTS

I.      Introduction ................................................................................................................ 1

II.     Factual Background .................................................................................................... 2

        A.      The Patents .................................................................................................... 2

        B.      The Disputed Claims and Claim Terms ........................................................ 4

III.    Legal Background ...................................................................................................... 4

        A.      General Claim Construction Principles ........................................................ 4

        B.      Construction of Means-Plus-Function Claims ............................................. 6

IV.     Discussion .................................................................................................................. 8

        A.      The Means-Plus-Function Claims Should be Construed in Light of the
                Corresponding Structure Actually Disclosed in the Specification ................ 8

                1.      Means for building a requisition using data relating to
                        selected matching items and their associated source(s) ................... 9

                2.      Means for building a requisition that uses data obtained
                        from said database relating to selected matching items
                        on said order list ............................................................................... 9

                3.      Means for entering product information that at least partially
                        describes at least one desired item .................................................. 12

                4.      Means for generating an order list that includes at least one
                        matching item selected by said means for searching ..................... 13

                5.      Means for searching for matching items in the database ................. 15

                6.      Means for searching for matching items that match the
                        entered product information in the selected portions
                        of the database ............................................................................... 15

                7.      Means for searching for matching items among the
                        selected product catalogs ............................................................... 15

                8.      Means for selecting the product catalogs to search ........................ 18

9. Means for processing the requisition to generate one or more purchase orders for the selected matching items ........................ 18

10. Means for processing said requisition to generate purchase orders for said selected matching items .................................................. 18

11. Means for converting data relating to a selected matching item and an associated source to data relating to an item and a different source .............................................................................. 19

12. A multiple purchase order generation module, said purchase order generation module creating multiple purchase orders from a single requisition created with said user generated criteria and said search-module criteria .................................................. 20

B. Proposed Constructions—Remaining Terms and Phrases ................................. 21

1. Catalog / Product Catalog ....................................................................... 21

2. Converting data relating to a selected matching item . . . to an item and a different source ....................................................... 23

3. Matching Items ...................................................................................... 25

4. Selected Matching Items ....................................................................... 25

5. Electronic sourcing system ................................................................... 26

6. Subset ..................................................................................................... 26

7. Searching for matching items among the selected product catalogs / Searching for matching items among the data relating to the items ................................................................................. 27

8. Order list ................................................................................................ 28

9. Protocol .................................................................................................. 28

10. Cross-Reference Table .......................................................................... 29

IV. Conclusion ........................................................................................................... 30

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*Apple Computer, Inc. v. Articulate Sys., Inc.*,
    234 F.3d 14 (Fed. Cir. 2000) .................................................................. 5, 26

*Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*,
    521 F.3d 1328 (Fed. Cir. 2008)........................................................ 7, 8, 11, 21

*Cisco Sys. Inc. v. Telcondia Techs.*, 590 F. Supp. 2d 828 (E.D. Tex. 2008) ............................... 6

*CytoLogix Corp. v. Ventana Med. Sys., Inc.*, 424 F.3d 1168 (Fed. Cir. 2005) ............................ 5

*Default Proof Credit Card System, Inc. v. Home Depot U.S.A., Inc.*,
    412 F.3d 1291 (Fed. Cir. 2005)................................................................... 19

*E-Pass Techs., Inc. v. 3Com Corp*, 473 F.3d 1213 (Fed. Cir. 2007) ........................................... 24

*Finisar Corp. v. DirectTV Group, Inc.*, 523 F.3d 1323 (Fed. Cir. 2008) ...................................... 7

*Harris Corp. v. Ericsson, Inc.*, 417 F.3d 1241 (Fed. Cir. 2005) .................................................... 7

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, 381 F.3d 1111 (Fed. Cir. 2004)............. 4

*KX Indus. v. PUR Water Purification Prods., Inc.*, 108 F. Supp. 2d 380 (D. Del. 2000) .............. 6

*Kahn v. Gen. Motors Corp.*, 135 F.3d 1472 (Fed. Cir. 1998) ....................................................... 7

*MIT v. Abacus Software*, 462 F.3d 1344 (Fed. Cir. 2006) .......................................................... 20

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995), *aff'd,* 517 U.S. 370 (1996)................................. 4

*Med. Instru. & Diagnostics Corp. v. Elekta AB*,
    344 F.3d 1205 (Fed. Cir. 2003)........................................................ 6, 7, 19, 20

*Micro Chem., Inc. v. Great Plains Chem. Co., Inc.*, 194 F.3d 1250 (Fed. Cir. 1999)................... 6

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351 (Fed. Cir. 2008) ................. 4

*Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307 (Fed. Cir. 2007)............................................... 5

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) .......................................................... 4, 5

*Ranpak Corp. v. Storopack, Inc.*, No. 98-1009, 1998 U.S. App. LEXIS 16348

(Fed. Cir. July 15, 1998) ........................................................................ 6, 20

*SciMed Life Sys., Inc. v. Adv. Cardiovascular Sys., Inc.*, 242 F.3d 1337 (Fed. Cir. 2001) ........... 5

*Spectrum Int'l v. Sterilite Corp.*, 164 F.3d 1372 (Fed. Cir. 1998) ................................. 5

*Tehrani v. Hamilton Med., Inc.*, 331 F.3d 1355 (Fed. Cir. 2003) ................................ 7

*Texas Instru., Inc. v. Linear Techs. Corp.*, 182 F. Supp. 2d 580 (E.D. Tex. 2002) ...................... 6

*Toro Co. v. White Consol. Indus., Inc.*, 199 F.3d 1295 (Fed. Cir. 1999) ...................... 5

*Vitronics Corp.  v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996) ...................... 5

*WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339 (Fed. Cir. 1999) ................. 6, 7

*Walker Bearing Co. v. PHD, Inc.*, 550 F.3d 1090 (Fed. Cir. 2008) ............................... 6

**STATUTES**

35 U.S.C. § 101 ........................................................................................... 9.

35 U.S.C. § 112 ¶ 6 ................................................................................ 6, 21

## I.    Introduction

ePlus sued Lawson for infringement of three related patents.  The alleged invention in these patents, described in an application filed in 1994, is a combination of a requisition/purchasing system, a catalog database with a search program, and a communication link for transferring information between them.  (*E.g.,* '683 patent col. 2 lines 51-60 ("2:51-60").)  The patents disclose that the preferred requisition/purchasing system was a Requisition and Inventory Management System ("RIMS") and that the preferred search program was the IBM Technical Viewer 2 ("TV/2").  (*Id.* 4:6-14.)  The listed inventors worked for Fisher Scientific, the long-time publisher of the "Fisher catalog" of over 100,000 items.  RIMS helped sell products in the Fisher catalog.

The specifications of the patents-in-suit acknowledge that many different requisition/ purchasing systems, including RIMS, existed prior to the filing of the patents-in-suit.  (*Id.* 1:16-2:20.)  RIMS could search a database containing product information from multiple vendors, build requisitions, check inventory, substitute items, determine prices, and generate purchase orders.  Systems for searching databases containing catalogs, such as TV/2, also are prior art.  TV/2 could be used to display and search part information from catalogs to locate every occurrence of a word or phrase in a file, a subset of files, or a complete set of files.

ePlus contends that the invention lay in combining the catalog searching of a TV/2 system with the requisition and purchasing capabilities of a RIMS system to enable searching selected multiple catalogs simultaneously for comparison shopping.  However, a prior art 1991 manual for the TV/2 specifically taught that it was designed to combine its catalog search program with a requisition/purchasing program such as a parts ordering system.

Unlike the system and method disclosed and claimed in the patents-in-suit, the accused Lawson system does not include catalogs. Rather, for over 20 years, Lawson's system enables a user to create an Item Master list of items to track in inventory and/or purchase. The listing is not a collection of catalogs, but rather a customer's own list of items, similar to the Part Master Table used with the prior art RIMS system. ('989 patent, 8:28-34.) Lawson's system enabled a customer to search the Item Master for items. The Lawson system does not substitute one product for another, nor does it facilitate comparison shopping among catalogs.

## II.     Factual Background

Lawson has sold software systems for over 30 years. Since at least the 1980's Lawson has sold systems to customers who then add item descriptions to an Item Master List. In about 2003, in part because its system did not have catalog searching capability, Lawson started offering a "Punch-Out" option to enable customers to communicate over the Internet with supplier websites to select products, using industry-standard communications protocols. A small percentage of customers use this option. Lawson provides no product lists or catalogs, nor does it host or control the punch-out websites. ePlus alleges that Lawson has infringed since 2003, but ePlus gave no notice of infringement until filing suit in 2009.

### A.     The Patents

ePlus alleges that Lawson infringes U.S. Patent Nos. 6,023,683 ("the '683 patent"), 6,055,516 ("the '516 patent"), and 6,505,172 ("the '172 patent") (collectively "the patents-in-suit").[1] ePlus purchased the then-pending and issued patents-in-suit in 2001. Each of the

---

[1] The '683 patent is attached as Exhibit A, the '172 patent is attached as Exhibit B, and the '516 patent is attached as Exhibit C.

patents-in-suit incorporates by reference the prior art RIMS requisition/purchasing system as described in U.S. Patent No. 5,712,989 ("the '989 patent") at 1:3-5.[2]

The patents generally claim an electronic sourcing system. The electronic sourcing system includes a computer that maintains a catalog database of data including product information relating to catalog items available from vendor product catalogs, and a means for building a requisition including at least one requisitioned item. ('683 patent, abstract.)

In 2004, ePlus sued Ariba for infringement of the patents-in-suit. In 2005, Judge Brinkema construed certain claim terms in the context of summary judgment motions regarding infringement. As the court recognized, "Claim construction has been especially difficult in this case because so much of the parties' pleadings dispute not the meaning of a particular term but rather whether defendant's products infringe a given claim." (Ex. E at 10, n.5.)[3] The case settled after ePlus won at trial.[4]

In 2005, ePlus sued SAP for infringement of the patents-in-suit. In 2006, Judge Spencer issued an order construing 35 terms in the patents-in-suit. (Ex. G at 1-16.)[5] Judge Spencer later granted SAP's motion for summary judgment of non-infringement of the means-plus-function claims of the patents-in-suit after ePlus conceded SAP did not infringe those claims.[6] The case later went to trial on the remaining claims, and ended in a hung jury. The court dismissed the action and vacated the orders pursuant to the parties' settlement agreement.

---

[2] Exhibit D.
[3] The court's summary judgment decision in *ePlus, Inc. v. Ariba, Inc.,* 1:04-cv-612 (E.D. Va. Jan. 19, 2005), is attached as Exhibit E.
[4] The court's jury instructions for *ePlus, Inc. v. Ariba, Inc.,* which include its final claim constructions, is attached as Exhibit F.
[5] The court's Markman decision in *ePlus, Inc. v. SAP America, Inc.*, No. 3:05-cv-281 (E.D. Va. Jan. 20, 2006) (Doc. No. 53-2), is attached as Exhibit G.
[6] The court's summary judgment decision in *ePlus, Inc. v. SAP America, Inc.*, No. 3:05-cv-281 (E.D. Va. Jan. 20, 2006), is attached as Exhibit H.

Claims from each of the patents-in-suit are currently in reexamination proceedings before the Patent and Trademark Office. As explained in Lawson's motion for a stay, all claims considered by the Patent Office to date have been rejected in view of prior art. ePlus has appealed the final rejection of the '683 patent claims, and must soon respond to the initial rejection of the '172 patent. In November 2009, the Patent Office accepted for determination the request to reexamine all claims of the '516 patent.

### B. The Disputed Claims and Claim Terms

Pursuant to ePlus's infringement charts filed on December 29, 2009, ePlus is asserting the following claims:

- the '683 patent claims 3, 6, 26, 28, and 29
- the '516 patent claims 1, 2, 6, 9, 21, 22, and 29
- the '172 patent claim 1

(Doc. No. 138.) Lawson and ePlus have identified twenty-two terms and phrases found in these claims to be construed. The attached Appendix A sets forth the disputed terms, the parties' proposed definitions, and any relevant constructions from the *Ariba* and *SAP* decisions.

## III. Legal Background

### A. General Claim Construction Principles

The claims of a patent define the potential scope of a patentee's right to exclude. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). Interpretation of patent claims is a legal question for the court, *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd,* 517 U.S. 370 (1996), and the court should accord the claims the meaning they would have to a person of ordinary skill in the art at the time of the invention. *Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004).

The court must construe any claim the parties genuinely dispute. *O2 Micro Int'l Ltd. v.*

*Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008). Simply asserting that a term "needs no construction" or has a "plain and ordinary meaning" does not resolve the dispute. *Id.* at 1361. Allowing parties to argue claim construction at trial risks jury confusion. *See CytoLogix Corp. v. Ventana Med. Sys., Inc.*, 424 F.3d 1168, 1172-73 (Fed. Cir. 2005).

The construction of disputed claim terms focuses on the intrinsic evidence, which includes the claims, the specification, and the prosecution history of the patent. *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996). A person of ordinary skill in the art is deemed to read the disputed terms in context of the particular claim, although the specification is the single best guide to the meaning of a claim. *Phillips*, 415 F.3d at 1313-15. The prosecution history of a patent is relevant to the interpretation of terms in the patent prosecuted as well as related patents. *Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1314 (Fed. Cir. 2007).

The meaning of a term may be narrowed by a patentee's statements in the intrinsic evidence distinguishing the term from the prior art. *Spectrum Int'l v. Sterilite Corp.*, 164 F.3d 1372, 1378 (Fed. Cir. 1998). The meaning of a term is also narrowed by a patentee's statements in the intrinsic evidence that all embodiments of the invention use particular structure. *SciMed Life Sys., Inc. v. Adv. Cardiovascular Sys., Inc.,* 242 F.3d 1337, 1343-44 (Fed. Cir. 2001). Similarly, a patentee's statements that particular structure is important will narrow the meaning of a claim term. *Toro Co. v. White Consol. Indus., Inc.,* 199 F.3d 1295, 1301 (Fed. Cir. 1999).

ePlus seeks to construe the claim preamble language. Unlike other claim terms, a claim preamble acts as a claim limitation only when it "serves to give meaning to a claim and properly define the invention, not when the preamble merely states a purpose or intended use of the invention." *Apple Computer, Inc. v. Articulate Sys., Inc.*, 234 F.3d 14, 22 (Fed. Cir. 2000)

(internal quotations omitted).

While an earlier claim construction does not have preclusive effect against an accused infringer, and may not have preclusive effect against a patentee in certain circumstances, a court may nevertheless give weight to earlier constructions. *See KX Indus. v. PUR Water Purification Prods., Inc.,* 108 F. Supp. 2d 380, 387 (D. Del. 2000); *see also Texas Instru., Inc. v. Linear Techs. Corp.,* 182 F. Supp. 2d 580, 588-89 (E.D. Tex. 2002). This is true even if the previous decision has been vacated. *Cisco Sys. Inc. v. Telcondia Techs.*, 590 F. Supp. 2d 828, 831 (E.D. Tex. 2008).

## B. Construction of Means-Plus-Function Claims

Several claims at-issue in this case are means-plus-function claims. An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, but such claims "are limited to the structure, material, or acts disclosed in the specification and their equivalents." 35 U.S.C. § 112 ¶ 6; *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1348 (Fed. Cir. 1999). Claims that include the word "means" are presumed to require such construction under 35 U.S.C. § 112 ¶ 6, but the word "means" is not necessary to invoke § 112 ¶ 6. *Walker Bearing Co. v. PHD, Inc.*, 550 F.3d 1090, 1096 (Fed. Cir. 2008); *Ranpak Corp. v. Storopack, Inc.*, No. 98-1009, 1998 U.S. App. LEXIS 16348, *3-*6 (Fed. Cir. July 15, 1998).

In construing means-plus-function claim language, a court must first identify the stated function of the claim element and then identify the specific corresponding structure in the patent specification that performs the function. *Micro Chem., Inc. v. Great Plains Chem. Co.,* 194 F.3d 1250, 1258 (Fed. Cir. 1999). A structure is not corresponding unless the specification clearly links or associates that structure to the function recited in the claim. *Med. Instru. & Diagnostics*

*Corp. v. Elekta AB*, 344 F.3d 1205, 1215 (Fed. Cir. 2003). "The duty to link or associate structure in the specification with the function is the *quid pro quo* for the convenience of employing § 112 ¶ 6." *Kahn v. Gen. Motors Corp.*, 135 F.3d 1472, 1476 (Fed. Cir. 1998).

A disclosure that only re-recites the function or the outcome of the function performed by a computer, or otherwise fails to link some structure to the claimed term, is not structure corresponding to § 112 ¶ 6. *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1334 (Fed. Cir. 2008). The structure may not be just computer software that performs the claimed function. Similarly, indicating in a figure or in the specification that performing the function is a step in practicing the invention does not identify any structure for completing the function. *Med. Instru.*, 344 F.3d at 1212-15.

Instead, the corresponding structure must specify an algorithm for performing the function programmed in a special-purpose computer. *Finisar Corp. v. DirectTV Group, Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008); *WMS Gaming*, 184 F.3d at 1349; *see also Aristocrat*, 521 F.3d at 1333-34, 1337 ("It was required, however, to at least disclose the algorithm that transforms the general purpose microprocessor to a 'special purpose computer programmed to perform the disclosed algorithm.'"); *Harris Corp. v. Ericsson, Inc.,* 417 F.3d 1241, 1253 (Fed. Cir. 2005) (in computer-implemented means-plus-function claims "the corresponding structure is the algorithm"). The corresponding structure for a computer-implemented means-plus-function claim is the specific steps described in the specification of the algorithms executed by the software and specifically linked to the language of the term. *Harris,* 417 F.3d at 1253; *Med. Instru.*, 344 F.3d at 1215-16; *see also Tehrani v. Hamilton Med., Inc.,* 331 F.3d 1355, 1361-62 (Fed. Cir. 2003) (court must determine "the precise algorithm that is part of the recited structure").

A patentee cannot rely on the ability of those skilled in the art to create an appropriate program—undisclosed in the specification—to provide the corresponding structure. *Aristocrat*, 521 F.3d at 1336. The inquiry under § 112 ¶ 6 is not whether a person of ordinary skill in the art *could* create an appropriate algorithm, but rather whether the patent *discloses* the appropriate algorithm in the specification. *Id.* at 1337-38.

## IV.    Discussion

### A.    The Means-Plus-Function Claims Should be Construed in Light of the Corresponding Structure Actually Disclosed in the Specification.

The parties agree that several phrases in dispute are means-plus-function terms. The parties also generally agree on the functions recited in the phrases. The differences between the parties' proposed constructions of these terms lie primarily in defining the corresponding structure. Lawson construes the claims using the specific structure disclosed in the specification, as required by law, while ePlus does not. Lawson's constructions are consistent with—and in many cases identical to—the *SAP* court's constructions of these phrases, while ePlus's are not. Moreover, as shown below, ePlus's constructions fall into the trap of improperly restating the functional phrases in functional rather than structural terms. Essentially all the construction issues involving these terms boil down to this fundamentally different approach to construction.

Moreover, in each of ePlus's proposed constructions for the means-plus-function claims, ePlus cites "exemplary" structure. Apparently, ePlus seeks constructions which have a nonexclusive description of "exemplary" structure, but no limit on the scope. ePlus's proposals are not really constructions at all. The statute does not allow for construing means-plus-function claims by way of example. Instead, the specific structure must be identified, period. *See Aristocrat*, 521 F.3d at 1333-38. The only additional breadth the claims are allowed under § 112 ¶ 6 is that the terms will also encompass equivalents to the specific structure disclosed. Thus, as

did the court in *SAP*, this Court should reject ePlus's attempts to improperly broaden the scope of these terms by describing the structure as "exemplary."

Each of ePlus' proposed means constructions recites "a computer which is programmed with special-purpose software modules . . . to execute an algorithm" that includes certain steps. In addition, several of its proposed means constructions also include "a search engine module." But ePlus's proposed constructions are incorrect for at least two reasons. One, they are disconnected from the structure disclosed in the patent specification. There is no disclosure in the specifications of a generalized "search engine module." The only structure described using algorithms for performing any of the recited functions are the TV/2 and RIMS systems run by local computer (20 or 220). ('683 patent, 4:13-15.) There is no disclosure of "special-purpose software modules" at all, and thus no clear linking or association of such modules to the functions claimed. ePlus therefore cannot invoke such unrecited structure to construe these terms, even if that means its claims are narrower or even invalid under 35 U.S.C. § 101 or § 112 as a result.

The specific means-plus function terms are each addressed below, and grouped to the extent they recite similar functions.

      1.    <u>Means for building a requisition using data relating to selected matching items and their associated source(s)</u>

      2.    <u>Means for building a requisition that uses data obtained from said database relating to selected matching items on said order list</u>

Lawson's proposed constructions: See Appendix A

These two clauses are sufficiently similar to be discussed together. The parties agree on the function for the first phrase, but disagree on the corresponding structure. The *SAP* court's construction of the corresponding structure was correct and should be adopted in this case. (Ex.

G at 3-4.)  As the court properly recognized, and as described in the cited excerpts from the specification, the patent discloses structures which are necessary to the described function of building a requisition.  Lawson's definition properly cites those structures.

The patents specifically disclose the means for building a requisition.  They explain that the "first step in creating a requisition" involves "entry by the user" in RIMS system 40 (on local computer 20) including a search for requisition databases 42A.  ('172 patent, 6:44-65.)  "Once the user has entered such information," the user can "initiate a search" of catalog database 36 through interface 60.  (*Id.* at 8:7-10, 10:11-22.)  After the search in shell 52 and search program 50, a Hit List is displayed, as shown in Appendix III.  (*Id.* 9:41-45, Appendix III.)  "Once Hit List 47 has been created . . . the user can view it and select particular ones of the located catalog items for Order List 48 that is being created in Shell 52. . . ."  (*Id.* 10:22-25, 11:35-36.)  Next, the order list is "created in Shell."  (*Id.* 11:39-40.)  The information relating to the items is then "shown on the Items Selected screen of Shell 52," as displayed in Appendix VI.  (*Id.* 11:40-42, Appendix VI.)  Next, data is transmitted from the order list.  (*Id.* 11:52-57, 12:52-54.)  Finally, the requisition tables are updated, as the patent explains that either the original items remain or selected items will replace original items.  (*Id.* 12:60-67.)

The structures used to accomplish these eight steps—(a) entering certain data, (b) initiating search, (c) displaying via catalog search program a hit list, (d) selecting one or more items to be requisitioned, (e) generating an order list in shell and catalog search program, (f) displaying data relating to selected items in order list, (g) transmitting data, and (h) updating requisition tables—are the structures disclosed for building a requisition.  Only after these necessary structures and functions are described does the patent indicate that the requisition is near completion, stating:

At this point in the use of the Fisher RIMS system 40, as many entries (lines) of the Requisition Management data screen 110 **have been built up (some through use of electronic sourcing system 5) as are necessary to complete the requisition**.

(*Id.* 14:5-10 (emphasis added).) Thus, these are the structures associated with and necessary to the "means for building a requisition." They underlie Lawson's and the *SAP* constructions.

ePlus's proposed construction, on the other hand, fails to identify a single structural component disclosed in the specification. Instead, it recites an undisclosed computer programmed to perform certain functions—selecting items from a hit list, transferring the selected items to a requisition module, and building a requisition. (Appendix A.) The specification does not describe such a broad structure. If it did, ePlus could and would cite its part number. The specification certainly does not associate such a broad structure with the recited function. ePlus does not explain how it decided which steps to include and which to exclude. Instead, ePlus's proposed "structure" improperly picks three of the steps necessary for building a requisition, without disclosing any particular algorithm or structure that would reveal *how* those steps are performed. *See Aristocrat*, 521 F.3d at 1333-38.

Regarding the second means clause at-issue in this section, Lawson's proposed function is identical to that found in the *SAP* decision. This function invokes the literal language of the clause, which is specific to "said" database and "said" order list, meaning the ones described in the claim. ePlus, on the other hand, seeks to improperly expand the function to apply to "a" database and "an" order list, disconnecting the function from the claim language. Because Lawson's proposed construction is the only one using the phrase's literal language, Lawson's proposed function should be adopted.

The *SAP* court's construction of the structure for the second clause was also correct and should be adopted in this case because it describes the corresponding structure associated with

and required to perform the stated function.  (Ex. G at 13-14.)  As described in the cited excerpts from the specification, the patent discloses structures 40/240, 20/220, 42A, 36/236, 20/220, 47, 48, 52/252, 50/250, and 60, all necessary to the described function of building a requisition.

While "means for building a requisition that uses data obtained from said database relating to selected matching items on said order list" describes a slightly different function than "means for building a requisition using data relating to selected matching items and their associated source(s)" both literally describe building a requisition, and the structure disclosed in the patents for both functions is identical.  Thus, for the same reasons cited above and as recognized by the *SAP* court, Lawson's proposed construction should be adopted by this Court.

ePlus's proposed construction of this second term similarly fails.  ePlus uses the boundless "exemplary" language and fails to identify a single structural component disclosed in the specification and instead recites an undisclosed and unidentified computer programmed to perform selected functions.  (Appendix A.)  The structure in ePlus's construction does not even include an order list.  Its structure lacks elements necessary for building a requisition, such as selecting items for inclusion on a requisition.  It should be rejected.

> 3.   Means for entering product information that at least partially describes at least one desired item

Lawson's proposed construction: See Appendix A

The parties agree on the function, but not the structure.  The *SAP* court's construction of this means is correct because it includes the clearly-linked corresponding structure required to perform the claimed function, including the local computer operating the requisition/purchasing system (40 or 240) or the shell program (52 or 252).  (Ex. G at 12.)  The '172 patent discloses two means for performing the function of entering product information that at least partially

describes at least one desired item: the requisition/purchasing system (40 or 240) and the shell program running on local computer (20 or 220). ('172 patent, 5:33-44, 4:30-40.)

With respect to the first software means, the patent discloses the step of entering information that partially describes an item. (*Id.* 7:48-55, 7:61-8:2, 8:22-26) With respect to the second software means, the patent discloses two steps: (1) displaying a search screen on the monitor 22 of local computer 20 (*id.* at 12:4-12, Appendix VII) and (2) entering search criteria (*id.* at 12:12-24 ("user can search" by entering criteria), 9:12-14 (listing criteria)). These are the structures clearly linked to the function of "entering product information that at least partially describes at least one desired item."

ePlus's proposed corresponding structure fails because it again purports to be merely "exemplary" and because it again describes a structure that is nowhere disclosed in the specification as linked to the recited function. Again, ePlus cannot even provide a structural part number disclosed in the patent for its proposed structure. ePlus's approach should be rejected.

4. Means for generating an order list that includes at least one matching item selected by said means for searching

Lawson's proposed construction: See Appendix A

As articulated in claim 1 of the '172 patent and adopted by the *SAP* court, the function is "generating an order list that includes at least one matching item selected by said means for searching." ePlus attempts to broaden the function with the generic "a search engine program" rather than "said means for searching" as recited in the phrase at-issue. Again, ePlus proposes a function that ignores the claim language in the hopes of improperly broadening the claim. The Lawson/*SAP* construction of the function should be adopted based on the literal claim language.

The *SAP* court's construction of the corresponding structure was also correct and should be adopted in this case because it describes the corresponding structure clearly linked to the

stated function. (Ex. G at 13.) As the court properly recognized, and as described in the cited excerpts from the specification, the patent discloses shell (52/252) and TV/2 search program (50/250), which are the disclosed structures necessary for generating an order list. The patent discloses three steps for generating an order list. First, displaying via catalog search program a hit list of search results ('172 patent, 9:39-45 (displaying a hit list), Appendix III). The hit list will often include more items than the customer wants to order. Thus, the second step is selecting one or more of the displayed items to create an "Order List" of desired products to be requisitioned. (*Id.* 10:22-25 ("Once Hit List 47 has been created . . . the user can view it and select particular ones of the located catalog items for Order List 48 that is being created in Shell 52. . . ."), 11:30-38.) The third step is transferring data relating to the selected Order List items. (*Id.* 11:64-67.) The structure used for these three steps is the structure linked to generating an order list.

ePlus's proposed construction again fails for the same reasons its above-described constructions fail. ePlus fails to identify a single structural component disclosed in the specification. It again recites a merely "exemplary," yet undisclosed, "computer which is programmed with special-purpose software modules to execute an algorithm." The specification does not identify such a broad structure nor does it link it to the recited function. ePlus's proposed "means" ignores, for example, the disclosed shell program (52 or 252), the structure in which the Order List is created. (*Id.* 10:22-25). The Lawson/*SAP* construction should be adopted as the only one that recites structure clearly linked to the described function.

5.    Means for searching for matching items in the database

6.    Means for searching for matching items that match the entered product information in the selected portions of the database

7.    Means for searching for matching items among the selected product catalogs

Lawson's proposed constructions: See Appendix A

The parties generally agree on the functions. Lawson generally agrees with the *SAP* court's construction of the first phrase, except that Lawson includes structure with this function, involving combining or "concatenating" catalogs, that the *SAP* Order associates with a different function. This difference is explained below.

There are two disclosed ways to search for matching items in the database; the algorithm that is used depends on whether the search is (1) initiated in RIMS (40) and passed to TV/2 (search program 50), or (2) initiated directly in TV/2:

> A typical data exchange may begin with **requisition/purchasing system 40** (which, in the illustrated embodiment, is the Fisher RIMS system) **requesting information from catalog database 36 via search program 50**. Once a search by search program 50 has been completed, the selected information will be communicated to requisition/purchasing system 40 via interface 60.
> Alternatively, if the **search of catalog database 36 is initiated from search program 50**, the information selected from the search is returned to requisition/procurement system 40 via interface 60.

('683 patent, 5:29-39 (emphasis added).) The first algorithm, searching initiated within RIMS, is described as searching local RIMS databases according to entered criteria (steps a and c of Lawson's proposed construction), and optionally passing control to TV/2 search program 50 if no items are found. (*Id.* 9:4-30.) The second algorithm displays a search screen from a shell program to provide search criteria to the TV/2 search program 50 (steps a-b of the second algorithm). (*Id.* 12:4-12.)

Both described approaches invoke the TV/2 search program. Once TV/2 is invoked, the two algorithms share a number of common features. The three "searching" phrases recited involve searching a database with "selected product catalogs," "selected portions of the database," or "the database," which in claim 6 of the '683 patent refers to a "database containing data relating to items associated with at least two sources." The corresponding structure to each of these clauses is found at '683 patent, 9:52-56, which describes searching "when multiple catalogs are present . . . for selecting catalogs to be searched." Lawson's construction recognizes that to perform such a search with either algorithm, the TV/2 system "concatenate[s]" the selected catalogs. (*Id.* 9:67-10:4.) The concatenated catalogs are searched, and search results are prioritized. (*Id.* 9:34-37, 10:8-20 (search of concatenated catalogs), 6:14-22 (search prioritization).) The results ("matching items") are displayed to a user in a Hit List format. (*Id.* 9:39-45, 10:2-4, 12:27-29, Appendix III.)

Thus, Lawson's proposed construction is the same as that adopted by *SAP* except that Lawson places the structure for "concatenating" (i.e., joining together by linking so as to form a chain or series) selected product catalogs in these "searching" clauses, whereas *SAP* includes them in the clause related to "means for selecting the product catalogs to be searched" (see term #8, below). Lawson submits that combining the catalogs to be searched more appropriately falls within the searching function, not the selection function, since concatenating the selected catalogs occurs *after* the user selects the catalogs to be searched.

Regarding the second "means for searching" clause, Lawson again mostly adopts the first means that the *SAP* court identified, except that Lawson's construction recognizes that the searching means also must include displaying via the catalog search program a hit list of search results, as discussed above. ('172 patent, 9:39-45.) Lawson's proposed construction also

includes the structure for "concatenating" for the reasons recited above. The *SAP* construction properly asserted that *two* means for searching were disclosed but apparently in an oversight identified only *one* of them. Lawson's proposed construction correctly identifies the second means disclosed in the patent as linked to the recited function as in the term above.

Regarding the third "means for searching" clause, Lawson's proposed construction merely makes clear that two or more product catalogs must be selected, as the use of the plural word "catalogs" implicitly requires, and as also required by the context of the claim where this element appears ('683 patent claim 3). Claim 3 requires selection of "the product catalogs to search" in a system that has "at least two product catalogs." (*Id.* 25:10-13.)

Lawson's proposed corresponding structure for the third clause is the same as that recited for the two terms above. The corresponding structure is again slightly modified from the *SAP* court's construction for the same reasons stated above. The *SAP* court's construction eliminated a portion of the structure disclosed (step b and a portion of step c). However, the full recited algorithm clearly linked to the searching functions requires initiation of a search of local RIMS databases prior to transfer of control to the TV/2 search programs to search two or more catalogs, analogous to searching selected portions of a database as in term number 6. Finally, as explained above for the other "searching" clauses, concatenation of catalogs is included with this clause.

Whereas Lawson's proposed corresponding structure is clearly linked in the specification to the recited function, ePlus's is not. ePlus again improperly seeks to provide only "exemplary" structure. It again describes a computer without any cite to a structure described in the patents. It again fails to show how its proposed structure is clearly linked to the recited functions, as required. Lawson's proposed constructions should, therefore, be adopted.

8. <u>Means for selecting the product catalogs to search</u>

Lawson's proposed construction: See Appendix A

Lawson's proposed structure includes two algorithms that allow selection of catalogs to be searched, depending on whether the search is to be initiated using either RIMS or TV/2. If RIMS initiates the search, information regarding selected catalogs is communicated to the TV/2 search program via a DDE interface. (*Id.* 10:8-20.) If TV/2 initiates the search, search program 50 provides a list of available catalogs for selection. (*Id.* 9:52-67.) Lawson slightly differs from the *SAP* court's construction because Lawson moves concatenating to searching, after the catalogs are selected, as explained above. ePlus's alternative should be rejected for the same reasons listed above—its use of "exemplary" and its failure to recite disclosed structure.

9. <u>Means for processing the requisition to generate one or more purchase orders for the selected matching items</u>

10. <u>Means for processing said requisition to generate purchase orders for said selected matching items</u>

Lawson's proposed constructions: No corresponding structure disclosed.

The parties agree on the functions. Lawson submits that the patents do not disclose any structure for performing this function. Where "the patent does not disclose the required algorithm or algorithms, and a person of ordinary skill in the art would not recognize the patent as disclosing any algorithm at all," the patent lacks structure that corresponds to the function. *Aristocrat*, 521 F.3d at 1337-38. Lawson departs from *SAP* on this issue.

The *SAP* court relied on the '683 patent 15:20-49 for the purported corresponding structure. Scrutiny of that short section, however, shows it describes that pushing the F6 key "would result in the generation of the following three purchase orders." ('683 patent, 15:24-26.) This describes a result, not an algorithm. The specification further states, "a purchase order is

generated by host computer 10." (*Id.* 15:38-39.) Again, this is the result, not the algorithm. The specification also states, "[o]nce a requisition has been inventory sourced and accepted by the CSR, it can be converted to one or more purchase orders, as represented by step 114 in FIG. 3." (*Id.* 15:19-21.) Step 114 of Fig. 3 is merely an oval that states "PURCHASE ORDERS." A step identified in a figure, however, is not structure. *Med. Instru.*, 344 F.3d at 1213-14.

This description of result rather than algorithm contrasts with the RIMS patent. There, detailed flow charts are provided and described for generating purchase orders. (*See, e.g.*, '989 patent, Fig. 5A, 17:17-21:67.) ePlus, however, may not rely on this disclosure to provide the corresponding structure under § 112 ¶ 6. *Default Proof Credit Card System, Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1301 (Fed. Cir. 2005) ("material incorporated by reference cannot provide the corresponding structure necessary to satisfy the definiteness requirement for a means-plus-function clause").

ePlus's definitions have flaws similar to those described previously. ePlus again invokes the limitless "exemplary" language. It cites no structure in the specification by part number, clearly linked to the recited function. Left with nothing more, ePlus argues that the structure for generating multiple purchase orders is a computer that generates multiple purchase orders. This argument fails to recite structure as required by § 112 ¶ 6 and should be rejected.

11.   Means for converting data relating to a selected matching item and an associated source to data relating to an item and a different source

Lawson's proposed construction: No corresponding structure.

The '683 patent does not provide any structure or algorithm clearly associated with the function of converting. Indeed, the specification only once uses the term "convert":

Once a requisition has been in inventory sourced and accepted by the CSR, it can be converted to one or more purchase orders, . . . ."

('683 patent, 25:19-21.) This phrase has nothing to do with converting matching item data. The

patent does not link any structure in the specification to the "means for converting." The Federal

Circuit rejected a similar attempt in a strikingly parallel case. *Medical Instru.*, 344 F.3d at 1215

("As it is actually written, there is nothing to indicate that conversion is one of the functions

performed by the described software . . . .").

There is no clear link between "converting data relating to a selected matching item" and

the structure included in ePlus's construction. Maintaining a cross reference table is not an

inherently required part of a converting algorithm, and is not linked to that function in the

specification. The RIMS patent discusses converting, but as explained above its disclosure

cannot be relied upon to satisfy § 112 ¶ 6. ePlus's proposed corresponding structure suffers the

same defects as its other proposed constructions and should be rejected.

> 12. <u>A multiple purchase order generation module, said purchase order generation module creating multiple purchase orders from a single requisition created with said user generated criteria and said search-module criteria</u>

Lawson's proposed construction: See Appendix A

While this phrase does not explicitly use the term "means," this phrase is a means-plus-

function element because "module" does not connote sufficient structure. "The generic terms

'mechanism,' 'means,' 'element,' and 'device,' typically do not connote sufficiently definite

structure. . . . in *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354 (Fed. Cir.

2004), we recognized that Section 112 ¶ 6 does not apply to 'a term that is simply a nonce word

or a verbal construct that is not recognized as the name of structure and is simply a substitute for

the term 'means for.' *Id.* at 1360." *MIT v. Abacus Software*, 462 F.3d 1344, 1354 (Fed. Cir.

2006) (finding functional phrases describing a "mechanism" and "circuitry" to be means plus

function terms). Indeed, the Federal Circuit has affirmed that the term "module" is tantamount

to the term "means." *Ranpak*, 1998 U.S. App. LEXIS 16348, at *3-*6 (affirming that both the

phrase "settable control means" and "settable control module" required construction under in 35 U.S.C. § 112 ¶ 6). ePlus disagrees and states the phrase needs no construction.

While there is a function disclosed, the claim is indefinite because no clearly-linked structure performing the function is disclosed in the specification. As discussed with respect to the term "means for processing the requisition to generate one or more purchase orders for the selected matching items," the specification does not describe any structure for "creating multiple purchase orders from a single requisition." Nor does the specification disclose structure for that function involving a requisition "created with said user generated criteria and said search-module criteria." ePlus "is in essence arguing for pure functional claiming as long as the function is performed by a general purpose computer. [The Federal Circuit]'s cases flatly reject that position." *See Aristocrat*, 521 F.3d at 1336.

### B. Proposed Constructions—Remaining Terms and Phrases

#### 1. Catalog / Product Catalog

Lawson's proposed construction for "catalog" and "product catalog": "A collection of text and images organized and published by a vendor, representing products sold by that vendor."

The patents describe examples of catalogs, but all examples are published by vendors:

A feature of the present invention is the ability to search **multiple catalogs from different suppliers**. For example, catalog database 36 **can contain the catalog or catalogs published by a vendor Distributor** . . . . Catalog database 36 can further contain catalogs **published by some of the vendor manufacturers** . . . . [and] catalogs **published by outside suppliers** . . . listing such vendor's products . . . . ('683 patent, 4:46-60 (emphasis added).)

The patents explain that prior art systems could only look at one catalog ("from a particular vendor") at a time. (*Id.* 2:3-17.) This sets the stage for contrasting the objects of the claimed invention with such prior art. The Summary of the Invention begins as follows:

> In view of the foregoing, **it is an object of this invention** to provide an electronic sourcing method and system that provides a user with the capability of searching a database containing data (including product/vendor identification, and other product information) relating to items available **from at least two vendor product catalogs**, and the capability of transferring the product information for desired catalog items obtained as a result of the search to a requisition/ purchasing system for use in generating a requisition including entries for the desired catalog items.

(*Id.* 2:47-56 (emphasis added).) All of the other objects of the invention described in the summary refer back to "such product information" or "such a database search." (*Id.* 2:61, 2:66-67.) The invention summary similarly describes the invention as maintaining a database "relating to items available from vendor product catalogs." (*Id.* 3:8-9.)

These sections are not merely describing a preferred embodiment of the invention; they are summarizing "the invention" and stating all of its core purposes. The inventors portrayed the invention as searching multiple "vendor product catalogs." So does Lawson. ePlus's definition is broader. It requires only that a catalog be "an organized collection of items and associated information" and lists "typical" information, presumably none of it intended to be limiting. It would facially include many things not published by a vendor or normally considered a "catalog," such as a grocery store shopping list or inventory record.

The patents help define "catalog" by their use of "non-catalog." The '516 patent claim 17, for example, recites a "non-catalog database" with item information organized for cross referencing items. Under ePlus's definition, this "non-catalog" would be a "catalog." Under Lawson's definition, the "non-catalog" item information is not generated by the vendor, and thus properly would not be a catalog. Similarly, the RIMS patent describes a "Non-Catalog Information" data screen at Table V, using Non-Catalog Information shown in Fig. 2A at item 80, and uses such data for a Cross Reference Table. (*See, e.g.,* '989 patent, 10:39-62.) Table V includes several item information fields such as vendor catalog number, vendor name, cost, etc.

Again, this "non-catalog" information would be part of a "catalog" under ePlus's definition, but not Lawson's because it is entered by or on behalf of a user and not published by a vendor. Lawson's definition is thus the only one that is consistent with the use of catalog *and* "non-catalog" in the intrinsic record.

The patents-in-suit also recognize that the "catalog" or "product catalog" of the invention includes images and text. The Abstract and Summary of the Invention both recite that "**Text** describing the catalog items, **and images** of the items, may be viewed" in the catalog database. ('683 patent, abstract, summary of invention at 3:10-16 (emphasis added).) These sections describe the invention, not merely preferred embodiments of the invention. They capture the essence of *the invention*. They are consistent with the Detailed Description of the Invention. (*See, e.g.*, *id.* at 9:9-12, 9:48-51, 10:65-11:2.) The inclusion of images also distinguishes the above-referenced RIMS Part Master Table, which had no images. The inventors so recognized. (James Johnson Depo. at 190:3-190:8[7] ("Q. What information did the catalog have that the part master table did not have? A. It had information that was a detailed description that would describe the product in great length. It -- **the catalog had images where the inventory record would not**." (emphasis added)); *see also* Robert Kindross Depo. at 200:20-201:7.[8])

This intrinsic evidence demonstrates that a catalog is more than just an "organized collection of items and associated information" as ePlus proposes. A catalog is published by a vendor. It has text and images. Lawson's proposed construction is proper.

> 2.  <u>Converting data relating to a selected matching item . . . to an item and a different source</u>

Lawson's proposed construction for "converting data relating to a selected matching item . . . to an item and a different source": "Substituting a catalog entry related to a product

---

[7] Exhibit I.
[8] Exhibit J.

with a catalog entry describing the product from a different source by using matching codes in a cross-reference table for sourcing and pricing."

The '683 and patent demonstrates that "converting" is directed to substitution, as Lawson has proposed, and not cross-referencing, as ePlus suggests:

> The first two messages of the message screen of Appendix X indicate that a part number for line 001, identified as part number 53610, was successfully added in **substitution** for a prior part originally entered as part number S100-06 (from the Fisher Scientific catalog). These messages were generated because the originally entered part (S100-06) did not exist in the Fisher catalog, but its corresponding part number S100-06 (that was located by another search in another catalog) did exist in that other catalog. ('683 patent, 16:19-32 (emphasis added).)

The purpose of the step of "converting data relating to a selected matching item . . . to an item and a different source" is that equivalent or interchangeable items will be substituted, not merely cross-referenced. Indeed, during prosecution of the '683 patent, ePlus specifically explained that the "converting" step requires that the matching items are identical or suitable replacements:

> Applicants also have clarified those claims that contain the 'means for converting' element or the 'converting' step. . . . . The amended language properly claims identical matching items from different sources, as well as a suitable replacement for the selected matching item. ('683 File History, Response to Second Office Action dated May 26, 1998 at 14.)[9]

The RIMS patent describes using a cross-reference table to convert. ('989 patent, 33:15-23.) Cross-reference tables are required for the substitution or converting but are not converting.

The claim language supports Lawson's definition. '683 patent claim 28 recites converting data relating to a "selected" matching item. That past-tense use of "selected" shows that converting happens *after* the item is selected. *See E-Pass Techs., Inc. v. 3Com Corp*, 473 F.3d 1213, 1222 (Fed. Cir. 2007) (step involving "transferred" data must occur after step of "transferring" data). With Lawson's definition, substitution would properly occur after an item is selected. With ePlus's definition, the cross-reference table as described in the patents would

---

[9] Exhibit K.

exist, and thus "converting" occur, *before* a product is selected. ePlus's definition should be rejected as inconsistent with the claims.

The extrinsic evidence also supports Lawson's proposed definition. In the previous *Ariba* case, the court indicated that conversion is "The process of changing from one form or format to another; where information is concerned, a changeover that affects form but not substance." (Ex. E at 19-20.) Lawson's proposed definition, which recognizes that there must be substituting, is consistent with the prior construction of the term "converting." ePlus's proposed construction of "cross-referencing" does not change anything from one format to another, and should be rejected.

### 3. Matching Items

Lawson's proposed construction for "matching items": "The results of a search of items matching a user-entered search criteria (i.e. "Hit List")."

The '683 patent specification explains that the "matching items" are a "Hit List" generated as a result of a search after user-entry of the search criteria. (9:39-46.) ePlus's proposed construction fails to recognize this requirement. Lawson's construction is correct.

### 4. Selected Matching Items

Lawson's proposed construction for "selected matching items": "One or more items selected by a user in the search program from the list of 'matching items' for inclusion in an order list."

The '683 patent supports Lawson's proposed construction of "selected matching items" as requiring selection of the matching items by a user:

> Once Hit List 47 has been created by TV/2 search program 50, **the user can view it and select particular ones of the located catalog items for Order List** 48. . . . ('683 patent, 10:21-24 (emphasis added); *see also id.* 2:64-3:2)

A Hit List is created from the search. A user then selects a particular item for the Order List.

The Order List is then transferred to the requisition system. ePlus's proposed construction

conflates this order by stating that items are "selected for inclusion on a hit list." This is not correct, as the hit list is the original search result, created before the user selects any items. ePlus's alternative, that the selection is for inclusion "on a requisition," is also incorrect, as the requisition is generated after the Hit List and Order List are generated. Lawson's definition should be adopted.

### 5. Electronic sourcing system

Lawson's proposed construction for "electronic sourcing system": None. If found limiting, "A system for determining what inventory will be used to fulfill requests for items."

The phrase "electronic sourcing system" is used in the preamble of claims 3 and 6 of the '683 patent, the preamble of claims 1, 2, 6, 9, 17, 21, 22 and 29 of the '516 patent, and the preamble of claim 1 of the '172 patent. This court should not construe the phrase "electronic sourcing system" because is a preamble statement of purpose or intended use that is not a limitation on the scope of the claim. *See Apple*, 234 F.3d at 22.

If this Court decides to interpret the phrase and consider it a limitation, Lawson's definition should be used. It is grounded in the intrinsic record: "Sourcing the requisition is the process of determining what inventory will be used to fill the requisition." ('989 patent, 11:27-30.) ePlus's proposed definition is incorrect because it has no "source." It appears to have emerged from thin air.

### 6. Subset

Lawson's proposed construction for "subset": "Less than all of a set of selectable items"

ePlus proposes no definition, leaving ambiguity as to whether "subset" may include all the items in the set. The patents support the construction that a subset is less than all of a set of selectable items. Support comes from the claims which call "said subset" less than the entire

collection of catalogs, and also comes from the specification:

> "[S]aid catalog selection protocol relying on said first set of pre-determined criteria to select **less than said entire collection of catalogs**, and including matching a vendor identification code with a subset of said collection of catalogs, **wherein said subset** of catalogs includes both a vendor catalog from a predetermined vendor and a second catalog from a predetermined third party" ('516 patent, claim 1, claim 29 (emphasis added).)
> "The data passed by interface 60 preferably comprise **all or a subset** of the following twelve fields" ('683 patent, 5:66-67 (emphasis added).)

"Subset" as used excludes "all." This makes sense, because the detailed description of the patent describes a system which is capable of searching less than the entire database, which would save time and increase efficiency when searching large volumes of information. The admitted prior art was capable of searching an entire database. Lawson's construction should be adopted.

> 7.    Searching for matching items among the selected product catalogs /
>        Searching for matching items among the data relating to the items

Lawson's proposed construction for "searching for matching items among the [selected product catalogs / data relating to the items]": "Searching selected product catalogs to locate items in response to user-entered search criteria."

The '683 patent explains that this function requires searching selected product catalogs to locate items in response to user-entered search criteria. Claims 3 and 28 of the '683 patent specifically recite that this searching is "among selected product catalogs." Moreover, the '683 patent describes searching among multiple selected catalogs (not just one catalog), with user-initiated searches on vendor items (not inventory items):

> "**A feature of the present invention is the ability to search multiple catalogs from different suppliers.**" ('683 patent, 4:46-51 (emphasis added).)
> "Then, the **user would initiate** the electronic sourcing system 5 of the present invention **to search the vendor product catalogs** contained in catalog database 36." (*Id.* 8:26-32 (emphasis added); *see also id.* 8:2-14, 12:26-30.)

Claim 31 of the '683 patent recites that the search is "among the data relating to the items." On its face, it is unlike claims 3 and 28 because it does not specify "selected product

catalogs." However, the rest of the claim shows that a similar construction to the above should

apply. The next step of claim 31 recites that the database searched contains data relating to items

"associated with at least two sources." Sources are vendors who publish the catalogs searched.

Therefore, claim 31 read in context of the claim as a whole shows that it too involves searching

selected product catalogs. That selections among vendor catalogs are made is further supported

by the third element of claim 31, which recites "selected matching items *and their associated*

*sources*." (emphasis added).

8.     Order list

Lawson's proposed construction for "order list": "A list of items derived from a list of
selected matching items."

ePlus proposes no construction for this term. The '683 patent explains that an order list is

a list of items derived from a list of selected matching items:

"It is a further object of this invention to provide an electronic sourcing system capable of
**creating an order list including desired catalog items located as the result of such a
database search**, and transferring that order list to a requisition/purchasing system for
generating a requisition including entries for the desired catalog items." ('683 patent,
2:64-3:2 (emphasis added).)
"**Once Hit List 47 has been created** by TV/2 search program 50, **the user can view it
and select particular ones of the located catalog items for Order List** 48 that is being
created in Shell 52, as shown in FIG. 1C." (*Id.* 10:21-24 (emphasis added).)

Lawson's definition is well supported and should be adopted.

9.     Protocol

Lawson's proposed construction for "protocol": "A procedure."

The '516 patent claims demonstrate that "protocol" is a procedure:

"a catalog selection protocol, **said catalog selection protocol relying on said first set of
pre-determined criteria to select less than said entire collection of catalogs, and
including matching a vendor identification code with a subset of said collection of
catalogs**, wherein said subset of catalogs includes both a vendor catalog from a
predetermined vendor and a second catalog from a predetermined third party that is one
of a manufacturer and a competing vendor" ('516 patent, claim 1, 29 (emphasis added).)

"An electronic sourcing system as recited in claim 1, wherein **said catalog selection protocol includes providing an electronic listing of available catalogs from said collection of catalogs**." (*Id.* claim 7 (emphasis added).)

The extrinsic evidence also supports the definition of "protocol" as a procedure. *Webster's Ninth New Collegiate Dictionary* defines "protocol" as "a set of conventions governing the treatment and esp. the formatting of data in an electronic communications system."[10] ePlus proposes no definition, but the term should be construed as Lawson proposes.

      10.    <u>Cross-Reference Table</u>

Lawson's proposed construction for "cross-reference table": "A table including reference or identification codes used to link vendor items by catalog number between two or more different vendors determined by a Distributor to be equivalent."

Lawson's proposed construction is correct based on the intrinsic evidence. '516 patent claims 17, 21, and 29 specifically explain that a cross reference table matches an identification code from a first located item with a second identification code from a second located item that are equivalent, where the items are from different vendors.

The patents also recognize that a cross reference table matches an identification code from a first located item with a second identification code from a second located item that are equivalent, where the items are from different vendors:

"When a customer asks for **products by manufacturer part number or a competitor's catalog number, the CSR has access to cross-reference files**, as earlier described, either maintained on the local host or maintained on the Distributor host computer 210." ('683 patent, 17:29-33 (emphasis added).)

"[A]nd **cross-references from the Distributor's catalog number to its corresponding vendor's part (catalog) number and to similar corresponding catalog numbers of other vendors (suppliers or distributors) for the same Product**." (*Id.* 5:4-8 (emphasis added).)

The cross reference table is used to identify "equivalent" corresponding products. The patents-in-suit do not describe how the subjective quality of "equivalence" is determined. The

---

[10] Exhibit L.

'989 patent, however, incorporated by reference in the patents-in-suit and describing the RIMS system, explains that the Distributor determines whether two items are equivalent:

> The Host Cross-Reference Table includes, for each item regularly stocked or supplied by the Distributor . . . a list of the corresponding part numbers of Distributor's vendor and other distributors . . . for items which have been determined to be equivalent. This relational database is created by the Distributor by, for example, reviewing the catalogs of other distributors and determining which items are equivalent to items in the Distributor catalog. ('989 patent, 34:14-24.)

Lawson's proposed definition is well-supported by the intrinsic record and appropriate given the lack of an "ordinary" definition applicable in this context.

## IV.    Conclusion

Lawson's proposed definitions are well-supported by the intrinsic record and properly capture the invention as it would be understood by one skilled in the art.  Lawson's proposed constructions should be adopted.

Dated:  January 6, 2009

LAWSON SOFTWARE, INC.

_____/s/_____
Dabney J. Carr, IV (VSB No. 28679)
Robert A. Angle (VSB No. 37691)
dabney.carr@troutmansanders.com
robert.angle@troutmansanders.com
**Troutman Sanders LLP**
1001 Haxall Point, Richmond, VA 23219
Telephone:  (804) 697-1200
Facsimile:  (804) 697-1339
*Counsel for Defendant Lawson Software, Inc.*

Daniel McDonald (admitted *pro hac vice*)
William D. Schultz (admitted *pro hac vice*)
Rachel C. Hughey (admitted *pro hac vice*)
Andrew J. Lagatta (admitted *pro hac vice*)
Joshua P. Graham (admitted *pro hac vice*)
**MERCHANT & GOULD P.C.**
3200 IDS Center, 80 South Eighth Street,
Minneapolis, MN  55402
Telephone:  (612) 332-5300
Facsimile:  (612) 332-9081

<u>CERTIFICATE OF SERVICE</u>

I certify that on this 6th day of January, 2009, a true copy of the foregoing will be filed electronically with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Craig T. Merritt
Henry I. Willett, III
Christian & Barton, LLP
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
cmerritt@cblaw.com
hwillett@cblaw.com

Lana S. Shiferman
James D. Clements
Goodwin Procter, LLP
Exchange Place
53 State Street
Boston, MA 02109-2881
jclements@goodwinprocter.com

Scott L. Robertson
Jennifer A. Albert
David M. Young (VSB No. 35997)
Goodwin Procter, LLP
901 New York Avenue, N.W.
Washington, DC 20001
srobertson@goodwinprocter.com
jalbert@goodwinprocter.com
dyoung@goodwinprocter.com
rspendlove@goodwinprocter.com

*Attorneys for Plaintiff*

　　　　　　　/s/
Dabney J. Carr, IV (VSB No. 28679)
Robert A. Angle (VSB No. 37691)
dabney.carr@troutmansanders.com
robert.angle@troutmansanders.com
**Troutman Sanders LLP**
1001 Haxall Point
Richmond, VA 23219
Telephone:  (804) 697-1200
Facsimile:  (804) 697-1339
*Counsel for Defendant Lawson Software, Inc.*