**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | | |
|---|---|---|
| *e*PLUS INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:09-CV-620 (REP) |
| | ) | |
| v. | ) | |
| | ) | |
| LAWSON SOFTWARE, INC., | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

### PLAINTIFF EPLUS INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

Henry I. Willett, III (VSB #44655)
Craig T. Merritt (VSB #20281)
**CHRISTIAN & BARTON, LLP**
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
Telephone: (804) 697-4100

*Attorneys for Plaintiff, ePlus Inc.*

Scott L. Robertson (admitted *pro hac vice*)
Jennifer A. Albert (admitted *pro hac vice*)
David M. Young (VSB#35997)
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4000

Lana S. Shiferman (admitted *pro hac vice*)
Michael G. Strapp (*pro hac vice* application pending)
James D. Clements (admitted *pro hac vice*)
**GOODWIN PROCTER LLP**
Exchange Place
53 State Street
Boston, MA 02109-2881
Telephone:  (617) 570-1000

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................................... 1

II.   DEFENDANT URGES THE COURT TO ADOPT INCORRECT AND
      UNNECESSARY CONSTRUCTIONS OF THE GENERAL CLAIM TERMS ............. 2

      A.    Defendant's Approach Violates Basic Claim Construction Principles ................. 2

      B.    Construction Of The General Terms ................................................... 5

            1.    Catalog ........................................................................... 6

            2.    Subset ............................................................................. 8

            3.    Order List ........................................................................ 8

            4.    Protocol .......................................................................... 9

            5.    Matching Items ................................................................ 10

            6.    Selected Matching Items .................................................... 11

            7.    Searching for Matching Items Among the Selected Product
                  Catalogs.......................................................................... 12

            8.    Cross-Reference Table ....................................................... 13

      C.    General Claim Terms Requiring Construction .................................... 14

            1.    Electronic Sourcing System ................................................ 14

            2.    Converting Data Relating To A Selected Matching Item And An
                  Associated Source To Data Relating To An Item And A Different
                  Source.......................................................................... 16

            3.    Multiple Purchase Order Generation Module ......................... 17

III.  LAWSON'S PROPOSED CONSTRUCTIONS OF THE MEANS-PLUS-
      FUNCTION ELEMENTS ARE IMPROPER UNDER THE LAW............................. 18

      A.    Construction Of Means-Plus-Function Elements For Computer Software-
            Implemented Inventions ................................................................ 18

      B.    Lawson's Random And Illogical Approach To Construction Of The
            Means-Plus-Function Claim Terms Should Be Rejected.................... 20

      C.    There is Structure Disclosed in the Specification Corresponding to the
            "Means For Processing the Requisition to Generate One or More Purchase
            Orders" and the "Means for Processing Said Requisition to Generate
            Purchase Orders For Said Selected Matching Items" ......................... 26

i

D.      The Specification Describes Structure Corresponding to the "Means for
        Converting Data Relating to a Selected Matching Item And an Associated
        Source to Data Relating to an Item and Different Source" ................................ 29

IV.     CONCLUSION.......................................................................................................... 30

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*AllVoice Computing PLC v. Nuance Communs., Inc.,*
    504 F.3d 1236 (Fed. Cir. 2007) ................................................................................... 19

*Aristocrat Technologies Australia PTY Ltd. v. Int'l Game Tech.,*
    521 F.3d 1328 (Fed. Cir. 2008) ............................................................................. 18, 19

*Cisco Sys. Inc. v. Telcondia Techs.,*
    590 F. Supp.2d 828 (E.D. Tex. 2008) ............................................................................ 5

*Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.,*
    412 F.3d 1291 (Fed. Cir. 2005) ................................................................................... 27

*Finisar Corp. v. DirecTV Group, Inc.,*
    523 F.3d 1323 (Fed. Cir. 2008) ................................................................................... 19

*Harris Corp. v. Ericsson Inc.,*
    417 F.3d 1241 (Fed. Cir. 2005) ............................................................................. 19, 24

*Housey Pharm. Inc. v. AstraZeneca UK Ltd.,*
    366 F.3d 1348 (Fed. Cir. 2004) ..................................................................................... 3

*Howmedica Osteonics Corp. v. Wright Med. Tech.,*
    540 F.3d 1337 (Fed. Cir. 2008) ..................................................................................... 4

*KX Indus. v. PUR Water Purification Prods., Inc.,*
    108 F. Supp.2d 380 (D. Del. 2000) ............................................................................... 5

*Liebel-Flarsheim Co. v. Medrad, Inc.,*
    358 F.3d 898 (Fed. Cir. 2004) ................................................................................ 4, 10

*Med. Instrum. And Diagnostics Corp. v. Elekta AB,*
    344 F.3d 1205 (Fed. Cir. 2003) ............................................................................. 18, 19

*Micro Chem., Inc. v. Great Plains Chem. Co., Inc.,*
    194 F.3d 1250 (Fed. Cir. 1999) ............................................................................. 19, 20

*Netscape Communications Corp. v. ValueClick, Inc.,*
    ___ F. Supp.2d ___, 2009 WL 3422918 (E.D. Va. Oct. 22, 2009) .............................. 3

*On Demand Mach. Corp. v. Ingram Indus., Inc.,*
    442 F.3d 1331 (Fed. Cir. 2006) ................................................................................... 18

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005) ................................................................................ 2, 3

*Ranpak Corp. v. Storopack, Inc.,*
    1998 U.S. App. LEXIS 16348 (Fed. Cir. Jul. 15, 1998) ......................................... 17, 18

*Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.,*
    537 F.3d 1357 (Fed. Cir. 2008) ................................................................................... 26

*Texas Instrum., Inc. v. Linear Techs. Corp.*,
   182 F. Supp.2d 580 (E.D. Tex. 2002)......................................................................... 5

*TI Group Automotive Sys. (North America), Inc. v. VDO North America, L.L.C.*,
   375 F.3d 1126 (Fed. Cir.)..................................................................................... 21

*Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*,
   473 F.3d 1173 (Fed. Cir. 2006)............................................................................ 4

*Voda v. Cordis Corp.*,
   536 F.3d 1311 (Fed. Cir. 2008)....................................................................... 4, 10

## I.    INTRODUCTION

Plaintiff *e*Plus Inc. (hereinafter "*e*Plus") submits its Responsive Claim Construction Brief in support of its construction of certain claim terms in U.S. Patent Nos. 6,023,683 ("the '683 Patent"), 6,055,516 ("the '516 Patent") and 6,505,172 ("the '172 Patent") (collectively, "the Patents-in-Suit").

Defendant Lawson Software, Inc. ("Defendant") urges upon the Court a results-oriented approach to claim construction in an effort to manufacture non-infringement "silver bullets." With respect to the general claim elements in dispute, Defendant asks the Court to deconstruct simple words and phrases such as "catalog," matching items," and "order list," with no justification other than apparently to provide some basis on which Defendant can craft its non-infringement arguments.  Indeed, most of Defendant's proposed constructions are nothing more than poorly-disguised "stealth" motions for summary judgment.

Thus, for example, plain and ordinary words such as "protocol" must, according to Defendant, be rewritten as "procedure," in support of which Defendant cites a dictionary definition that nowhere uses the word "procedure."  On what principled basis would the Court then not need to construe the term "procedure" as well?  Likewise, Defendant takes other terms readily understandable by jurors in the context of the claims, such as "order list," "matching items," and "selected matching items," finds examples where those terms are used in the specification, and on that basis asks this Court to commit the "cardinal sin" of construing these exemplary uses to be claim limitations.

Similarly, there is no principled basis for Defendant's proposed constructions of the means-plus-function elements in dispute.  Without rhyme or reason, Defendant alternately adopts, discards, or modifies Judge Spencer's vacated claim construction from the *SAP* litigation. The results are proposed constructions that are little more than random limitations that render the

actual claim language barely recognizable.  One could just as well throw darts at the specification to determine the structures for the elements in dispute as adopt Defendant's approach.

Indeed, Defendant's proposed constructions are both over-inclusive and under-inclusive with respect to the structures that are actually necessary for performing the functions of these claims.  And similar to its approach to the general claim elements, Defendant literally hunts for purported "structure" in the specification and asks the Court to impose these as claim limitations.

In contrast, *e*Plus has provided the Court with proposed constructions that are consistent with *Phillips* and other Federal Circuit case law governing claim construction.  *e*Plus does not ask the Court to reconstrue plain and ordinary words and phrases.  And with respect to the means-plus-function elements, *e*Plus has identified only those structures necessary for performing the functions of the claims, which is what Federal Circuit law requires.[1]

## II. DEFENDANT URGES THE COURT TO ADOPT INCORRECT AND UNNECESSARY CONSTRUCTIONS OF THE GENERAL CLAIM TERMS

### A. Defendant's Approach Violates Basic Claim Construction Principles

Defendant's approach to the general claim elements violates well-established principles of claim construction.  Repeatedly, Defendant ignores the ordinary and customary meaning of claim terms that will be readily understood by jurors, and asks the Court to limit these terms based on selectively-chosen examples from the specification.

For example, Defendant takes ordinary words and phrases and — without so much as a pause to consider the term's plain meaning or whether there was a clear disavowal of claim scope — grasps for limiting constructions based on selectively-culled embodiments in the

---

[1] The exhibits referenced in this brief are attached to the two Declarations of David M. Young ("Young Decl.").  Any additional exhibits cited herein are numbered sequentially and attached to the Supplemental Declaration of David M. Young submitted herewith.

specification.  *See, e.g.,* Def's Br. at 21-22 (proposing that "catalog" should be limited by supposed explanation of prior art and summary of invention in specification); *id.* at 23-25 ("converting data relating to a selected matching item .. to an item and a different source" should be redefined and limited to "substituted," *etc.*, due to selected passages from specification and extrinsic evidence); *id.* at 25 (proposing that "matching items" should be redefined and limited based on selective passages from specification); *id.* at 26-27 (same with respect to "selected matching items," and "subset"); *id.* at 28 (same with respect to "order list"); *id.* at 28-29 (proposing that "protocol" should be redefined as "procedure" based on the claims that actually fail to use that term and other extrinsic evidence); *id.* at 29-30 (proposing that "cross-reference table" be redefined and limited based on passage from specification and limitations appearing in *other* elements of claims).

Defendant's approach violates the fundamental principle that, when construing claim terms, there is a "heavy presumption that the language in the claim carries its ordinary and customary meaning amongst artisans of ordinary skill in the relevant art at the time of the invention."  *Housey Pharm. Inc. v. AstraZeneca UK Ltd.*, 366 F.3d 1348, 1351-52 (Fed. Cir. 2004); *see also Phillips v. AWH Corp.,* 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) *(en banc)* ("the words of a claim are generally given their ordinary and customary meaning," *i.e.,* "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention.").  Defendant thereby commits the "cardinal sin" of ignoring the ordinary and customary meaning of the claims in an effort to read limitations from the specification into the claim.  *Phillips,* 415 F.3d at 1320; *Netscape Communications Corp. v. ValueClick, Inc.,* ___ F. Supp.2d ___, 2009 WL 3422918, * 6 (E.D. Va. Oct. 22, 2009).

"[T]he claims of the patent will not be read restrictively unless the patentee has

demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'"  *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004).  Yet time after time Defendant asks the Court to import limitations from the specification without ever identifying a disavowal of claim scope.

To find a disavowal, courts require an explicit statement of intent to disclaim.  *See Voda v. Cordis Corp.*, 536 F.3d 1311, 1320 (Fed. Cir. 2008) (refusing to limit claim scope because no "clear disavowal of claim scope" in specification).  In contrast to this well-established precedent, Defendant fails to identify *even a single* such statement evidencing a "manifest exclusion or restriction, representing a clear disavowal of claim scope."  Defendant instead relies on statements in the specification that describe general improvements and advantages of the disclosed invention over the prior art systems disclosed.  Such "general statements [regarding prior art systems], without more," do not effect a disavowal of claim scope.  *See Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*, 473 F.3d 1173, 1180-1181 (Fed. Cir. 2006) (finding that description of embodiments in specification would not be used to limit claim scope).

Defendant also relies on the depositions of two of the inventors with respect to the "catalog" element.  Def's Br. at 23.  While *e*Plus has no quarrel with their testimony on this issue, the Federal Circuit has repeatedly held such testimony irrelevant to claim construction, regardless whether it is against interest.[2]

Defendant's statement of claim construction law also urges the Court to give weight to the *vacated* claim constructions of Judge Spencer, while grudgingly conceding that these

---

[2] *See, e.g.*, *Howmedica Osteonics Corp. v. Wright Med. Tech.*, 540 F.3d 1337, 1347-48 (Fed. Cir. 2008) ("Whether an inventor's testimony is consistent with a broader or narrower claim scope, that testimony is still limited by the fact that an inventor understands the invention but may not understand the claims, which are typically drafted by the attorney prosecuting the patent application …We hold that inventor testimony as to the inventor's subjective intent is irrelevant to the issue of claim construction.").

4

constructions "may not have preclusive effect against a patentee in certain circumstances." Def's Br. at 6. However, none of the cases cited by Defendant require or even suggest that this Court should follow the rulings that Judge Spencer made a considered decision to vacate (together with a summary judgment ruling based on those rulings).[3]

Moreover, Defendant itself is not faithful in its appeal to Judge Spencer's vacated ruling, as it adopts, revises, and ignores Judge Spencer's ruling with respect to the means-plus-function claims as convenient to its non-infringement positions. *See* Def's Br. at 9, 12, 14-15 (urging Court to adopt vacated *SAP* construction), *id.* at 15-18 (urging Court to modify vacated *SAP* constructions), *id.* at 18-19 (rejecting vacated *SAP* construction). In addition, Defendant fails to explain any rational basis on which this Court should "give weight" to the constructions that led Judge Spencer to vacate his *Markman* Order, while ignoring Judge Spencer's other constructions which are very much at odds with Defendant's arguments relating to the general claim elements. *See* Ex. 11 at 1-2.

### B.   Construction Of The General Terms

Defendant's consistent theme of claim construction is to immediately rush headlong to the specification in an effort to insert and include as many restrictions and limitations as possible in order to later bolster its non-infringement positions. In virtually every instance, Defendant's first resort is not to the claim language itself, as the Federal Circuit has repeatedly emphasized, but rather to embodiments in the specification. This pattern is repeated throughout.

---

[3] Neither the *KX Indus.* case nor the *Texas Instruments* case dealt with the weight to be given to a *vacated* ruling. *See Texas Instrum., Inc. v. Linear Techs. Corp.,* 182 F. Supp.2d 580, 588-89 (E.D. Tex. 2002); *KX Indus. v. PUR Water Purification Prods., Inc.,* 108 F. Supp.2d 380, 387 (D. Del. 2000). The additional authority Defendant relies upon was not, as its argument suggests, a holding as to the weight to be given a vacated *Markman* ruling; instead, the case involved a district court's decision to vacate its ruling. *Cisco Sys. Inc. v. Telcondia Techs.,* 590 F. Supp.2d 828, 831 (E.D. Tex. 2008). The court merely observed (in what is clearly *dicta*) that even with the order vacated another court might consider the ruling for "whatever instructive or persuasive guidance it may provide." *Id.*

### 1.      Catalog

Defendant's methodology for construction of the simple claim term "catalog" is emblematic of its results-oriented approach.

This is apparent first from Defendant's immediate reliance upon the specification to support its construction, rather than the plain meaning of the term itself.  The specification, however, in this regard, is unavailing.  For example, Defendant relies upon an excerpt from the specification that discloses that a "feature" of the invention is the ability to search multiple catalogs from different suppliers. Def's Br. at 21.  This is no doubt true.  This was one of the advantages over the prior art.  Defendant then, however, goes on to quote the specification which provides that the invention "[f]or example, *can* contain the catalog or catalogs published by a vendor distributor…[and that such a] catalog database 36 can further contain catalogs published by some of the vendor manufacturers … [and] catalogs published by outside suppliers …" *Id.* at 21 (citing Ex. 2, Col.4:46-60) (emphasis added).  That the invention *can* do something, does not require that it *must* do it.  The specification, therefore, is not limiting in this manner.

Moreover, Defendant fails to inform the Court that the specification repeatedly provides that certain attributes of the catalog data *may* be included, but need not necessarily be included in all instances.  Thus, for example, the specification provides,

> [t]he catalogs, and hence catalog database 36, ***preferably include*** such information as part number, price, catalog number, vendor name or I.D., and vendor catalog number, as well as textual information and images of or relating to the catalog products.

Ex. 2, Col. 4:38-43 (emphasis added).  Something that is "preferably" included, by definition, need not necessarily be included.  Thus, Defendant's construction that requires text and images

organized and published by a vendor should not be a limitation.[4]

The specification also provides that the catalog data that is exchanged between the search engine and the requisition module,

> ***preferably comprise all or a subset of*** the following twelve fields: vendor name, vendor number, vendor part (catalog) number, product description, bid price, list price, key word, page number, quantity, unit, catalog text, and catalog images.

Ex. 2, Col.5:66 – Col. 6:3 (emphasis added).  Again, "preferably" connotes that all of this information is not necessarily required.

Accordingly, while *e*Plus maintains that this simple term need not be construed, it would not be improper — should the Court so determine — that catalog be construed as *e*Plus suggests as "an organized collection of items and associated information which *typically* [but not necessarily] includes a part number, price, catalog number, vendor name, vendor I.D., a textual description of an item, and images of or relating to the item," as was defined by Judge Spencer in his construction.  *See e*Plus Br. at 8; Ex. 11 at 2.

To be sure, *e*Plus does not dispute that one of the advantages of the claimed electronic sourcing system was to include more robust product information than was contained in the prior art.  In addition, *e*Plus does not dispute that the claimed invention sought to distinguish simple "parts lists" which typically do not contain the more detailed information present in a catalog.  Thus, as Defendant observes, the inventors recognized the limitations of, for example, the prior art RIMS Part Master Table which contained, among other things, no images of the products offered for sale.  Def's Br. at 23.

But that does not mean, however, that in every instance, a product offered as a part of a

---

[4] Similarly, there is no requirement that the catalog be "published" by a "vendor."  For example, the specification also discloses "manufacturer" and "supplier" catalogs.  Ex. 2, Col. 4:56-60; Col. 17:14-15.  Further, nothing in the specification speaks to a "publication" requirement.

catalog *must* have an image, for example.  Apparently Defendant seeks this construction to provide it with a ready-made non-infringement argument, should the catalog data included as part of its accused system include images of most product offerings, but not all.  Thus, requiring images of the product offered for sale in every instance would be improper, and is actually inconsistent with the specification.

### 2.    Subset

Like the other general terms, Defendant immediately resorts to the specification of the patents in order to limit the claim term "subset."  Consistently, dictionary definitions explain that the term "subset" *may* include "some *or all* of the elements of a given set."  *See e*Plus Br. at 8. Therefore, reading into the term that a "subset" must be "less than all" is inconsistent with its ordinary meaning.

Further, the fact that a "subset" again *may* be "less than all" does not exclude the fact that it *may* comprise *all* of the set.  Thus, examples from the specification should not be controlling.

Defendant's construction, however, is flawed for an additional reason.  It improperly includes within the definition of "subset" that the *set* must necessarily be one of "selectable items."  Def's Br. at 26.  As Defendant itself observes, in the claims at issue (Claim 1 and 29 of the '516 Patent), the term "subset" is used in the context of a "collection of catalogs."  *Id.* at 27. Therefore, to import the limitation "selectable items" into a claim addressed to a "selection of catalogs," would be mixing "apples with oranges."  Accordingly, Defendant's construction should be rejected.

### 3.    Order List

As explained in Plaintiff's Opening Brief, Defendant's proposed construction for the term "order list" is inconsistent with the usage of the term in the specification and unnecessary in the context of the claim in which it is used (Claim 1 of the '172 Patent).  Once again, Defendant

attempts to impose limitations on the claim term "order list" from the specification.  Def's Br. at 28.  The citations to the specification Defendant relies upon, however, fail to support its construction.  For example, Defendant argues that because the claimed "electronic sourcing system [is] *capable of* creating an order list including desired catalog items located as the result of … a database search," *id.* at 28, the "order list" *must* be "derived from a list of selected matching items."  A system, however, that is *capable of* doing something need not necessarily do it in every instance.

Further, Defendant's reliance on the fact that a "user" of the system "*can* view [a Hit List] and select particular ones of the located catalog items for the order list," Def's Br. at 28, again, does not compel a conclusion that the user *must* do so.

Indeed, as demonstrated in *e*Plus' Opening Brief, no such restriction is necessary.  Thus, "the user *may also* add additional items to the Order List 48 being built in Shell 52 *if desired*, whether those additional items had been selected from the hit list 47 *or not*."  *e*Plus Br. at 9, n.6 (emphasis added).[5]  Thus, Defendant's construction is incorrect as a matter of law.

### 4.   Protocol

Once again, Defendant seeks to take a common term, "protocol," and rewrite the claim language.  Ironically, in doing so, Defendant relies on the actual language of the claims that utilize the term "protocol."  *See* Def's Br. at 28-29.  It is incongruous, to say the least, that Defendant relies for support for its construction of the term "protocol" on the very claims that eschew the word "procedure."  It is difficult to understand how the *failure* to use a term in the claim can support its adoption and substitution.

---

[5] The specification also provides that "[t]he user *may* have selected *no items*, one item or several items from the catalogs contained in catalog database 36 by using TV/2 search program 50.  If no items had been selected, the original items that were entered on Requisition Item Table 46 of Requisition Management data screen 110 will remain on that screen and will continue to be processed …."  Ex. 2, Col. 12:54-60 (emphasis added).

Moreover, Defendant's reliance on a dictionary definition for "protocol" as "a set of conventions governing the treatment and esp. the formatting of data in an electronic communication system," Def's Br. at 28, provides no support for construction of "protocol" as "procedure." Nowhere does the word "procedure" even appear in that definition.

*e*Plus, therefore, maintains that this term requires no construction, particularly when Defendant's only support for its position are the very claims that utilize a different term.

### 5.     Matching Items

Defendant proposes that the Court should rewrite and limit the term "matching items" to mean "the results of a search of items matching a *user-entered* search criteria (*i.e.*, 'Hit List')." Def's Br. at 25 (emphasis added). As with all of the "matching items" elements, Defendant's proposal to redefine this ordinary term should be rejected.

Defendant's argument with respect to this and all the "matching items" elements is a classic exercise in attempting to incorporate an exemplary passage from the specification to limit the meaning of an ordinary term readily understandable by a jury. Defendant nowhere identifies any alleged "disavowal" of claim scope by the inventors. The solitary exemplary specification passage Defendant cites to does not even arguably constitute "words or expressions of manifest exclusion or restriction," *Liebel-Flarsheim*, 358 F.3d at 906, nor an "explicit statement of intent to disclaim." *Voda*, 536 F.3d at 1320.

Moreover, Defendant's proposal to limit the term by appending "items matching a *user-entered* search criteria (i.e. 'Hit List')" is both unnecessary for a juror to understand the term and inconsistent with the prosecution history and the prior constructions of Judges Brinkema and Spencer. In the prosecution history for the '683 Patent, the inventors expressly noted when amending the claims, "Applicants have amended the claims using the following terminology: *'matching items' are the search results* (see e.g., specification at page 5, lines 11-24)." Ex. 22 at

11 (emphasis added).  Consistent with the claim language and the prosecution history, in the

*Ariba* litigation Judge Brinkema construed this term to mean simply "search results."  *See* Ex. F

to Def's Br. at 27.  Similarly, Judge Spencer's construction was simply "[i]tems in search results

that have been selected for inclusion in a requisition."  Ex. G to Def's Br. at 1.  Neither judge

deemed it necessary to add additional verbiage to the effect that the search results must be "items

matching a *user-entered* search criteria (*i.e.*, 'Hit List')."

Accordingly, the Court should resolve this dispute by holding that the term "matching

items" has its ordinary and customary meaning and should not redefine or limit this element as

requested by Defendant.  To the extent the Court believes any further construction is necessary,

the Court should construe the term as "items returned in search results that satisfy search

criteria," which is consistent with the ordinary meaning of the term and the prosecution history.

### 6.    Selected Matching Items

Perhaps even more egregiously, Defendant proposes that the term "selected matching

items" requires even more redefinition and limitation by the Court to mean "[o]ne or more items

*selected by a user* in the search program from the list of 'matching items' for inclusion in an

order list."  *Id.* at 25-26 (emphasis added).  Essentially, Defendant argues that the simple word

"selected" must be further redefined and limited by the Court.

Here again, Defendant points to nothing that could be construed as an explicit disclaimer

of claim scope or words of manifest exclusion or restriction.  And likewise, Defendant again

ignores the same prosecution history from the '683 Patent in which the inventors stated,

"Applicants have amended the claims using the following terminology: … 'selected matching

items' are requisition items (see e.g., specification at page 5, lines 11-24)."  Ex. 22 at 11.[6]  This

---

[6] With respect to the '172 Patent claims, the same holds true except that instead of "requisition items" the term would also mean "order list items."

is precisely the definition that Judge Brinkema provided in the *Ariba* litigation.  *See* Ex. F to Def's Br. at 27.

Accordingly, the Court should resolve this dispute by holding that the term "selected matching items" has its ordinary and customary meaning and should not redefine or limit this element as requested by Defendant.  To the extent the Court believes any further construction is necessary, the Court should construe the term as "items returned in search results that satisfy search criteria and are selected for inclusion on an order list or in a requisition," which is consistent with the ordinary meaning of the term and the prosecution history.

### 7.  Searching for Matching Items Among the Selected Product Catalogs

Finally, Defendant proposes that the Court should impose additional limitations, such as "in response to user-entered search criteria" for the "searching for matching items …" elements. Def's Br. at 27-28.  Two elements are at issue here, one that states "searching for matching items among the selected product catalogs," the other which states "searching for matching items among the data relating to the items."[7]

The "matching items" element is discussed above, so what is at issue here is what is meant by "searching for."  *e*Plus respectfully suggests that any juror will readily understand what it means to "search for" the matching items.  Yet Defendant again argues that the Court should rewrite these elements to state "searching selected product catalogs to locate items in response to user-entered search criteria."

Although Defendant does not explain why the term as written cannot be understood by jurors, at least in this instance Defendant confesses to the litigation-inspired reason behind its position.  Defendant seeks a Court ruling — and appears to believe its proposed construction

---

[7] This language appears in claim 31 of the '683 Patent.  *e*Plus is not asserting this claim as part of the 13 claims in suit.  Therefore, it need not be construed.

would embody that ruling — that the "searches" must be "user-initiated," must involve "multiple" selected catalogs "(not just one catalog)," [8] and must be of "vendor items (not inventory items." Def's Br. and 27.

But once again, Defendant points to nothing that could be construed as an explicit disclaimer of claim scope or words of manifest exclusion or restriction. Neither does Defendant explain why the Court should distinguish between "product catalogs" and "catalogs from suppliers," "vendor product catalogs," and "catalogs from sources," or how Defendant's proposed construction even accomplishes these distinctions. *See id.* at 27-28. Indeed, the claim language only requires that the catalogs be associated with "sources." *See* Ex. 2, Claim 26 and 28. If additional limitations appear in other claim elements, the Court need not and should not impose them in elements where the limitations do not appear.

Accordingly, the Court should resolve this dispute by holding that the term has its ordinary and customary meaning and should not redefine or limit this element as requested by Defendant.

### 8.    Cross-Reference Table

Not only does Defendant's construction for the claim term "cross-reference table" import improper limitations from the specification of the Patents-in-Suit, it also purports to import limitations from a predecessor patent of two of the named inventors of the Patents-in-Suit, the '989 Patent, as well. Thus, Defendant's construction for this term must be a table that "include[es] reference or identification codes used to link vendor items *by catalog number* between two or more different vendors *determined by a Distributor* to be *equivalent*." Def's Br. at 29.

---

[8] If Defendant's point is that term "catalogs" is plural, Defendant ignores the claim term "among" which connotes some selection of fewer than the whole. Thus, if you are searching "among" two catalogs, you may only be searching one.

In the context of the claim, however, there is no requirement that the cross-reference table involves *solely* catalog numbers, or that the vendor items be determined by a Distributor to be equivalent.  Defendant interjects these limitations for the sole purpose of manufacturing a non-infringement argument based on improper importations not only from the Patents-in-Suit, but an entirely separate patent.  Defendant's proposed construction, therefore, must be rejected.

For example, claim 21 of the '516 Patent recites,

> wherein said determination system includes a cross reference table matching **an identification code** from a first located item with **a second identification code** from a second located item.

Ex. 3, Col. 26:15-18.  To adopt Defendant's construction would necessarily require the identification code to be a "catalog number" and not some other code (*e.g.*, part number, classification code, etc.).[9]  Further, the requirement that "equivalence" be determined by a Distributor" is nowhere to be found in the claim.  Indeed, there are other examples in the specification where the correspondence between items need not be "determined by a Distributor."[10]

### C.     General Claim Terms Requiring Construction

#### 1.     Electronic Sourcing System

Defendant's proposed construction for "electronic sourcing system", *i.e.*, "a system for determining what inventory will be used to fulfill requests for items," incorporates limitations that are neither necessary nor appropriate and which are inconsistent with the language of the claims.

None of the asserted "electronic sourcing system" claims *even recites* any functionality

---

[9] For example, the specification discloses that "part numbers" may be cross-referenced such that "substitutions" may be made. Ex. 2, Col. 16:19-32 ("part number"); Col. 17:29-30 ("manufacturer part number" as opposed to "catalog number"); App. X.

[10] *See, e.g.*, Ex. 2, Col. 16:19-23 (system "successfully added [part number] in substitution for a prior originally entered part.").

relating to "inventory."[11]   Moreover, several of the asserted "electronic sourcing system" claims do not recite "requisitions" or relate to "requests for items."  *See* Ex. 3, claims 1, 2, 6, 9 and 29. Indeed, it is telling that the Defendant refers to the '989 Patent for support for its proposed construction rather than to the specification of the Patents-in-Suit.  *See* Def's Br. at 26.  The system described in the '989 Patent was a "just-in-time" requisition and inventory management system used by a distributor.  However, the systems of the asserted patents are "use[d] by a prospective buyer to locate and find items to purchase from sources, suppliers or vendors."  *See* *e*Plus Br. at 13.  Indeed, this is a significant difference between the systems described in the '989 Patent and those described and claimed in the asserted patents.  The Court should resist Defendant's invitation, therefore, to import inappropriate and inaccurate limitations from another patent into the "electronic sourcing system" claims.

In contrast to Defendant's proposed construction, *e*Plus' proposed construction is entirely consistent with the term's usage in the specification of the Patents-in-Suit.[12]  In addition, *e*Plus' proposed construction is consistent with the usage of the term in the electronic procurement industry.[13]

---

[11] The asserted "electronic sourcing system" claims are claims 3 and 6 of the '683 Patent, claims 1, 2, 6, 9, 21, 22 and 29 of the '516 Patent and claim 1 of the '172 Patent.

[12] *See, e.g.*, Ex. 1, Col. 2:47-56 ("[I]t is an object of this invention to provide an *electronic sourcing method and system* that provides a user with the capability of searching a database containing data (including product/vendor identification, and other product information) relating to items available from at least two vendor product catalogs, and the capability of transferring the product information for desired catalog items obtained as a result of the search to a requisition/purchasing system for use in generating a requisition including entries for the desired catalog items.").

[13] *See, e.g.*, the PC Magazine Encyclopedia which defines "e-sourcing" as "[t]he electronic procurement of products.  Although purchases have been computerized for decades, e-sourcing implies more automatic procedures; especially dealing with contracts and processes that continue to be reviewed and managed entirely by individuals."  (Ex. 20); *see also* ZDNet definition for "e-sourcing" (same) (Ex. 21).

Finally, *e*Plus' proposed construction is the same as that adopted by Judge Spencer in the *SAP* litigation.  *See* Ex. 11 at 1.

>    2.    **Converting Data Relating To A Selected Matching Item And An Associated Source To Data Relating To An Item And A Different Source**

Defendant proposes that the term "converting data relating to a selected matching item and an associated source to data relating to an item and a different source" as recited in claim 28 of the '683 Patent, be construed as "substituting a catalog entry related to a product with a catalog entry describing the product from a different source by using matching codes in a cross-reference table for sourcing and pricing."  Def's Br. at 23-24.  This construction is incorrect as it engrafts limitations onto the claim term that are inconsistent with the language of the claims and specification.

First, the claim term relates to "selected matching items," *i.e.*, "items returned in search results that are selected for inclusion on an order list or in a requisition."  Thus, the "converting" process does not relate to substitutions made to "catalog entries" and such imported limitation does not make sense in the context of the claim.

Second, the claim does not require that a "substitution" occur.  Although in one example referenced by Defendant, the cross-reference tables are accessed in order to find a suitable substitution product for one originally included in a requisition, in another example, the cross reference tables are accessed to determine items available from various suppliers during the requisitioning process and *prior to* having to substitute a product for a requisitioned item that was unavailable.  *See* Ex. 2, Col. 17:23-48 ("the CSR has access to cross-reference files, … Appropriate Distributor catalogs and manufacturer catalogs then are consulted, using TV-2 search program 250…the resultant lists of products are then transferred…to a work-in-progress requisition 260…").  Thus, it would be improper to import a "substitution" limitation into a

claim term that would eliminate a described embodiment.

Finally, there is no requirement in the claims or the specification that there be "matching codes" used in the cross-reference tables.  There are examples in the specification where cross-referenced items had differing codes associated with them.  *See* Ex. 2, Col. 10:43-52 ("Distributor's mainframe host computer 10 would recognize the entry for the item from vendor Promega's catalog (R6012, 00005860), as corresponding to that same item available from Fisher's catalog (PRR6012, 00000001).").

### 3.    Multiple Purchase Order Generation Module

As noted in *e*Plus' Opening Brief, Defendant proffers no construction for this claim element, but rather contends that it must be construed as a means-plus-element, notwithstanding that it fails to employ conventional language ("means for") that would bring it within the ambit of Section 112, ¶6.  Moreover, as demonstrated in *e*Plus' Opening Brief, a software "module" *has* structure as is readily understood in computer-software technology.  *e*Plus Br. at 14-15. Once this is appreciated, the construction of this claim element should not be in doubt.  The claimed software module may "generate multiple purchase orders" from "a single requisition" that is created by a "user-generated search" utilizing the software "search module," as claimed and disclosed in the '516 Patent.  The jurors will readily comprehend this element in the context of the claim.

Defendant relies on the non-precedential, unreported *Ranpak* decision for the proposition that any use of the term "module" is tantamount to the term "means."  *See Ranpak Corp. v. Storopack, Inc.,* 1998 U.S. App. LEXIS 16348 (Fed. Cir. Jul. 15, 1998); Def's Br. at 20. *Ranpak*, however, simply held under the facts of that case that the patentee's interchangeable use of the terms "settable control means" and "settable control module," without any explanation of relevant structure, resulted in both terms being treated as means-plus-function elements.

*Ranpak*, 1998 U.S. App. LEXIS at **3-6.  In contrast, the Federal Circuit did not hesitate to uphold, in a precedential opinion, that a computer software "module" was corresponding *structure* for a computer-implemented means-plus-function claim.  *See On Demand Mach. Corp. v. Ingram Indus., Inc.,* 442 F.3d 1331, 1341 (Fed. Cir. 2006).  *A fortiori,* if a computer software "module" can constitute sufficient structure for a means-plus-function claim, the express recitation of such structure in a non-means-plus-function claim *must be* more than adequate.

## III.   LAWSON'S PROPOSED CONSTRUCTIONS OF THE MEANS-PLUS-FUNCTION ELEMENTS ARE IMPROPER UNDER THE LAW

### A.    Construction Of Means-Plus-Function Elements For Computer Software-Implemented Inventions

Defendant relies on two principal cases with respect to the identification of the structures for the computer-implemented means-plus-function claims.  *See Aristocrat Technologies Australia PTY Ltd. v. Int'l Game Tech.,* 521 F.3d 1328, 1333 (Fed. Cir. 2008); *Med. Instrum. And Diagnostics Corp. v. Elekta AB,* 344 F.3d 1205 (Fed. Cir. 2003).  As discussed below, both of these cases involved claims that are readily distinguishable from the means-plus-function elements in this case.

In *Aristocrat*, the patentee's alleged structure for the function at issue was simply "any standard microprocessor base [sic] gaming machine [with] appropriate programming."  521 F.3d at 1333.[14]  The Federal Circuit affirmed the lower court's holding of invalidity, stating that "the structure disclosed in the specification [must] be more than simply a general purpose computer or microprocessor" and finding that "in this case there was no algorithm at all disclosed in the specification."  *Id.* at 1333, 1337.  Whereas in this case *e*Plus has identified the relevant

---

[14] Significantly, *Aristocrat* was not a *Markman* ruling, but, rather, pertained to summary judgment motions regarding invalidity due to indefiniteness.

algorithms for the Court,[15] the patentee in *Aristocrat* argued that it was unnecessary for it to have "designate[d] any particular algorithm to perform the claimed function." *Id.* at 1334.

Here, Defendant alternately ignores passages of the specification reciting structure and proposes that the Court incorporate as claim limitations structure unnecessary for performing the functions at issue.[16] Defendant also overstates the particularity required for the pertinent algorithms. *See Finisar Corp. v. DirecTV Group, Inc.,* 523 F.3d 1323, 1340 (Fed. Cir. 2008) ("court permits a patentee to express that algorithm in any understandable terms including as a mathematical formula, in prose, … or as a flow chart, or in any other manner that provides sufficient structure").[17]

Defendant also relies on the *Medical Instrumentation* case with respect to the "means for converting" element for the propositions that: (i) "indicating in a figure or in the specification that performing the function is a step in practicing the invention does not identify any structure for completing the function"; Def.'s Br. at 7, and (ii) that the specification must link the structure to the function in question. Def's Br. at 19-20. *e*Plus does not quarrel with the legal proposition that the structure must be linked to the function, but that requirement is clearly met in this case. As explained below, *e*Plus has cited passages from the specification showing the corresponding

---

[15] Indeed for most, but not all, of the means-plus-function elements in dispute, Defendant agrees that the Patents-in-Suit disclose relevant structure, although the parties disagree as to those structures.

[16] *See, e.g.*, *Micro Chem., Inc. v. Great Plains Chem. Co., Inc.,* 194 F.3d 1250, 1258 (Fed. Cir. 1999) (statute does not "permit incorporation of structure from the written description beyond that necessary to perform the claimed functions and by incorporating unrecited functional limitations into the claims.").

[17] *See also AllVoice Computing PLC v. Nuance Communs., Inc.,* 504 F.3d 1236, 1245 (Fed. Cir. 2007) ("In software cases, therefore, algorithms in the specification need only disclose adequate defining structure to render the bounds of the claim understandable to one of ordinary skill in the art."); *Harris Corp. v. Ericsson Inc.,* 417 F.3d 1241, 1253-54 (Fed. Cir. 2005) (holding that of the three figures and associated text disclosed, proper construction was simply a two-step process for performing the recited function).

structure for the "means for converting" element.  *See* Ex. 1 at 7-8.

For its argument Defendant simply ignores relevant passages from the specification (even though it relies on some of those same passages for its arguments with respect to the general claim element "converting data …", *see* Def's Br. at 24), and declares that "[m]aintaining a cross reference table is not an inherently required part of a converting algorithm."  Def's Br. at 20. Defendant's argument is mere *ipse dixit* and fails to consider the passages of the specification cited by *e*Plus.  Further, *e*Plus' proposed construction does not, as Defendant contends, rely on "performing a step of the function" as the structure for the function.  *e*Plus has identified the relevant structures, as well as the algorithms disclosed for each of those functions.

**B.    Lawson's Random And Illogical Approach To Construction Of The Means-Plus-Function Claim Terms Should Be Rejected**

There is no principled basis for Defendant's proposed constructions of the means-plus-function elements in dispute.  Indeed, in a completely haphazard fashion, without explanation, Defendant alternately adopts, discards, or modifies Judge Spencer's vacated claim constructions from the prior *SAP* litigation.[18]  The result of Defendant's litigation-inspired positions is a jumbled assortment of arguments wholly divorced from proper claim construction principles.

First, Defendant's proposed constructions of the means-plus-function claim element are improper because they fail to cover all of the embodiments disclosed in the patent specification. It is a fundamental principle of claim construction that a means-plus-function claim term must be construed to cover all embodiments disclosed in the patent specification that correspond to the recited function of the claim term.[19]

---

[18] For the eleven means-plus-function claim terms, Defendant has modified Judge Spencer's vacated constructions for four terms and has completely discarded Judge Spencer's vacated constructions for three of the terms.  *See* App. A to Def's Br.

[19] *See, e.g.*, *Micro Chem., Inc.*, 194 F.3d at 1258 (finding that "a means-plus-function claim encompasses all structure in the specification corresponding to that element and equivalent

Second, Defendant has included in 7 of 11 of its proposed means-plus-function claim constructions the requirement that the recited means execute on a "local computer," notwithstanding that it is undisputed that the specification of the Patents-in-Suit discloses a networked embodiment of the inventions that is not limited to execution on a local computer. *See* Ex. 12 at 4-7; *see also* Defendant's proposed constructions at Ex. 1 at 3-15.

Third, Defendant's proposed constructions for 5 of the 11 means-plus-function claim terms limit the claims to software modules that communicate using a specific communication protocol (the Dynamic Data Exchange (DDE) protocol), whereas the specification describes other communication protocols that could have been employed to communicate and transmit data between the software modules of the patented electronic sourcing systems. *See* Ex. 12 at 7-11. For these reasons Judge Spencer vacated his constructions set forth in his *Markman* Order. *See* Ex. 14.

Fourth, in many cases, Defendant's proposed constructions recite steps that are either not necessary to perform the claimed function, or that relate to functions claimed in other elements of a particular claim. For example, with reference to the "means for building a requisition using data relating to selected matching items and their associated source(s)" as recited in claims 3 and 6 of the '683 Patent, Defendant's construction of the corresponding structure includes the step of "initiating a search for matching item(s) in catalog database (36 or 236)" (*see* Ex. 1 at 6), even though both claims already recite a separate "means for searching for matching items."

---

structures" and holding that district court's construction was erroneous as it overlooked alternative embodiments described in the specification); *TI Group Automotive Sys. (North America), Inc. v. VDO North America, L.L.C.*, 375 F.3d 1126, 1137 (Fed. Cir.) ("[w]hen multiple embodiments in the specification correspond to the claimed function, proper application of § 112, [paragraph 6] reads the claim elements to embrace each of those embodiments.").

Therefore, the "search" has been conducted and it need not be repeated.[20]

And, although Defendant represents that its proposed constructions are consistent with Judge Spencer's prior constructions, a cursory examination reveals significant differences.  In most instances, Defendant makes these "modifications" without articulating *any reasons* why it deviated from Judge Spencer's Constructions.  *See* Def's Br. at 15-20.[21]  In many cases, however, Defendant's proposed constructions deviate significantly from Judge Spencer's construction.  For example, below is a red-line showing the deletions and additions Defendant has made to Judge Spencer's construction of the term "means for searching for matching items among the selected product catalogs" as recited in claim 3 of the '683 Patent:

Function: Searching for matching items among the selected **two or more** product catalogs.

Means: Two means ~~for searching for matching items~~ are disclosed:

1. ~~A~~ software ~~means~~ initiated from requisition/ purchasing system (40 or 240) running on local computer (20 or 220) that consists of the following steps:

a. entering certain search criteria (e.g., catalog number, part number, or partial text) relating to item(s) to be searched into requisition/purchasing system (7:48-55; 7:61-8:2; 8:22-26);

b. ~~communicating the search criteria from requisition/purchasing system (40 or 240) to catalog search program (50 or 250) running on same local computer via the DDE protocol of interface (60) (8:37-9:8);~~

c. ~~searching catalog database (36 or 236) via catalog search program (50 or 250) based on the search criteria received from requisition/purchasing system (9:34-37);~~

---

[20] *See also* Ex. 1 at 14 and Defendant's proposed construction for the "means for building a requisition that uses data from said database relating to selected matching items on said order list" which improperly includes the step of "initiating a search for matching item(s) in catalog database (36 or 236)" when the claim term itself requires that a search have been conducted and matching items from the search results have already been included on an order list.

[21] Indeed, in some cases, Defendant asserts that it "mostly adopts" the *SAP* Court's definition, or that Defendant's proposed construction is "the same as that adopted by *SAP except…*"  *See* Def's Br. at 15-18 (emphasis added).

~~d. if more than one search criterion is received, catalog search program prioritizes search as follows: (a) part (catalog) number, (b) keyword, and (c) page number, stopping at highest priority search criteria resulting in a match (6:14-22); and (e) displaying via catalog search program a hit list of search results (9:39-45).~~

**b. searching local RIMS databases (42) based on search criteria, and if found, search is complete (6:6-8; 7:36-38; 4:20-23);**

**c. if items are not found in RIMS databases (42), communicating the search criteria from requisition/purchasing system (40 or 240) to catalog search program (50 or 250) running on same local computer via the DDE protocol of interface (60) (8:37-9:8);**

**d. concatenating (*i.e.*, joining together by linking so as to form a chain or series) only selected product catalogs to be searched after the user selects the catalogs to be searched (9:67-10:4).**

~~2. A software means initiated from shell program (52 or 252) running on local computer (20 or 220), that consists of the following steps:~~

~~a. displaying a search screen on the monitor of local computer (12:4-12; Appendix VII);~~

~~b. entering receiving search criteria (e.g., catalog page number, keyword, part number) for item to be searched (9:12-14; 12:12-24);~~

e. searching **the concatenated catalogs from** catalog database (36 or 236) via catalog search program (50 or 25~~0) running on local computer~~ based on **the** ~~data received from shell program (52)~~ (9:34-37);

~~d. if more than one search criterion is received, catalog search program prioritizes search as follows: (a) part (catalog) number, (b) keyword, and (c) page number, stopping at highest priority~~ search criteria ~~resulting~~ in a match ~~(6:14-22)~~ **received from requisition/purchasing system (9:34-37; 10:8-20)**; and

f. displaying via catalog search program a hit list (47) of search results (9:39-45; **10:2-4;** 12:27-29, Appendix III).

**2. Software initiated from shell program (52 or 252) running on local computer (20 or 220), that consists of the following steps:**

**a. displaying a search screen on the monitor of local computer (12:4-12; Appendix VII);**

**b. receiving search criteria (*e.g.*, catalog page number, keyword, part number) for item to be searched (9:12-14; 12:12-24);**

23

**c. concatenating (*i.e.*, joining together by linking so as to form a chain or series) only the selected product catalogs to be searched after the user selects the product catalogs to be searched (*id.* 9:67-10:4).**

**d. searching the concatenated catalogs from catalog database (36 or 236) via catalog search program (50 or 250) running on local computer based on data received from shell program (52) (9:34-37; 10:8-20);**

**e. if more than one search criterion is received, catalog search program prioritizes search as follows:  (a) part (catalog) number, (b) keyword, and (c) page number, stopping at highest priority search criteria resulting in a match (6:14-22); and**

**f. displaying via catalog search program a hit list (47) of search results (9:39-45; 10:2-4; 12:27-29, Appendix III).**

Thus, not only does Defendant's proposed construction deviate significantly from Judge Spencer's vacated construction, but it is also demonstrably incorrect.  First, as set forth above, it limits the claim to a system executing on a local computer and communicating via the DDE protocol when there is a networked embodiment disclosed in the specification.[22]

Second, Defendant's proposed construction limits the claim to a system which searches two or more product catalogs simultaneously, misconstruing the function of the claim term by adding the words "two or more," as well as misconstruing steps in the algorithm as requiring "concatenating" of selected catalogs.  As this Court previously held in the *Ariba* litigation, there is no support for such a construction.  The claim specifically contemplates that the system may only include "at least two product catalogs containing data relating to items associated with the respective sources."  Ex. 2, claim 3.  In other words, to fulfill the claim the system may be limited to two catalogs.  In fact, these two catalogs may be stored in separate databases.  Ex. 2, FIG. 1B; Col. 17:55-64 (the system can include multiple catalog databases 236).  In such cases,

---

[22] Moreover, it is improper to include hardware elements such as "local computer" in a construction of a software-implemented means-plus-function element.  The structures associated with the elements are the steps of an *algorithm, or process*, performed by the software.  *Harris*, 417 F.3d at 1253.

the selected catalogs would not be "concatenated" to be searched.

The Court should not adopt a construction which would disregard this embodiment. Moreover, as the *Ariba* Court held, a user could select to search only one catalog from among the "at least two catalogs" maintained in the system and, in such cases, there would be no concatenation since only one catalog was selected to be searched. *See* Ex. 19 at 11-12. It is therefore improper to read into the claim term the requirement that the search be conducted on "two or more product catalogs" or that selected product catalogs be "concatenated" to be searched. *Id.*

Third, Defendant's proposed construction also suggests that the "means for searching" first searches "RIMS databases (42) based on the search criteria."[23] This is wholly incorrect. The claim term requires that the "means for searching" searches for matching items "among the selected product catalogs." Ex. 2, claim 3. There are no product catalogs stored in the RIMS databases. The product catalogs are stored in the catalog databases 36 and 236. Ex. 2, Col. 4:35-45; Col. 9:9-12; Col. 17:60-64. Thus, the language of the claims precludes a construction which would require that the "means for searching" search the RIMS databases.

Fourth, the search engine program (50 or 250) is never described as conducting searches of the RIMS databases. In all instances described in the patent specification, the search engine program searches the catalog databases, even where a search is initiated from the requisition/purchasing module.[24]

---

[23] The RIMS databases are various databases associated with a preferred embodiment of the requisition/purchasing module of the electronic sourcing system and include requisition databases 42A, inventory databases 42B, and customer-specific databases 42C. Ex. 2, Col. 4:10-24, FIG 1A.

[24] *See, e.g.*, Ex. 2, Col. 5: 28-34 ("[a] typical data exchange may begin with requisition/purchasing system 40… requesting information from catalog database 36 via search program 50."); Col. 8:7-8 ("[o]nce the user has entered such information at least partially

Thus, Defendant's proposed construction is completely inconsistent with the algorithm described in the specification corresponding to the "means for searching" claim term. Defendant's proposed constructions for the other means-plus-function terms suffer from similar deficiencies.  *See e*Plus Br. at 20-30.

In contrast to the numerous problems with Defendant's constructions of the means-plus-function claim terms, *e*Plus' proposed means-plus-function constructions are consistent with Federal Circuit precedent requiring that the algorithms associated with software-implemented means-plus-function terms recite the essential sequence of steps for performing the recited function.  Moreover, *e*Plus' proposed constructions apply equally to all embodiments disclosed in the patent specification and do not attempt to engraft unnecessary steps onto the algorithm, or steps that are inconsistent with the algorithms described in the specification.  Additionally, and most importantly, *e*Plus' proposed constructions are consistent with the plain meaning of the language used in the claims.

> **C.    There is Structure Disclosed in the Specification Corresponding to the "Means For Processing the Requisition to Generate One or More Purchase Orders" and the "Means for Processing Said Requisition to Generate Purchase Orders For Said Selected Matching Items"**

Lawson contends that the patent specification fails to disclose structure that corresponds to the "means for processing the requisition to generate one or more purchase orders," as recited in claims 3 and 6 of the '683 Patent, and the "means for processing said requisition to generate purchase orders for said selected matching items," as recited in claim 1 of the '172 Patent.[25]  No

---

describing a desired item on Requisition Management data screen 110, he or she may wish to initiate a search of catalog database 36 to find all the part numbers contained in catalog database 36 that match the part number entered…").

[25] This is essentially an argument of invalidity for indefiniteness based on 35 U.S.C. §112, ¶2. *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1371 (Fed. Cir. 2008) ("only claims not amenable to construction or insolubly ambiguous are indefinite") (citation omitted).

accused infringer has ever argued, and no jurist has ever found, such to be the case.  Moreover, this contention is demonstrably incorrect.[26]

As described in the patent specification, the first step in the algorithm for generating one or more purchase orders from a requisition is that the system "accepts" the requisition.  *See* Ex. 2, Col. 15:20-26 ("Once a requisition has been … accepted …, it can be converted to one or more purchase orders, …").  The next step in the algorithm is that the system generates one or more purchase orders based on predetermined rules relating to the user's preference (*e.g.*, one purchase order to each distinct supplier referenced in the requisition).  *See* Ex. 2, Col. 10:48-64.

As described in the specification, the system analyzes each line item of the requisition and the source associated with such item and generates purchase orders to each source.  For example, as described at Ex. 2, Col. 10: 48-64, the system recognizes one line item on a requisition as an item associated with a first Distributor (because it is a type 01 product) and generates a first purchase order to that Distributor.  When an item included on the requisition is associated with a second distributor (*e.g.*, as either a type 07 product or a type 05 product), the system recognizes that requisition line item as being associated with a second distributor, *e.g.*,

---

[26] Contrary to Lawson's contention, *e*Plus is not relying on description included in the '989 Patent incorporated by reference.  There is more than adequate disclosure of the algorithm included in the specification of the Patents-in-Suit.  Although the specification recites sufficient structure, *e*Plus has also cited additional disclosure from the predecessor '989 or "RIMS" Patent, which is incorporated by reference.  Defendant contends that *e*Plus may not rely on the '989 Patent as an "incorporation by reference," but its reliance upon the *Default Proof* case is misplaced.  *See Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.,* 412 F.3d 1291 (Fed. Cir. 2005).  That case did not involve the situation presented here where the '989 Patent was invented by two of the same inventors.  Further, the structures of this predecessor patent were discussed throughout the specification of the Patents-in-Suit.  *See, e.g.,* Ex. 2, 6:39-53 ("Preferably, a user will start the electronic sourcing system from Fisher RIMS system 40.  Requisitioning on Fisher RIMS system 40 in context of the electronic sourcing system 5 of the present invention is illustrated in pertinent part in FIG. 3 (and is fully described in U.S. Pat. No. 5,712,989.").

Ironically, Defendant itself repeatedly invokes the '989 Patent as intrinsic evidence of what is claimed in the Patents-in-Suit.  *See, e.g.,* Def's Br. at 1, 22, 24, 26, 29-30.

"Fairmont," and generates a second purchase order corresponding to the "Fairmont catalog item" that was requisitioned.  Thus, the system generated a first purchase order for the requisition line item associated with the first Distributor and a second purchase order for the requisition line item associated with the second distributor based on pre-established rules recognizing a type 01 product as associated with a first Distributor and a type 05 or type 07 product as an item associated with a different distributor.  *See also* Ex. 2, Col. 14:46-65 (explaining the different sources associated with product types 01 to 05).

Another example of the purchase order generation algorithm is provided with reference to Ex. 2, Col. 15:20-49 and Appendix IX.  Again, that description references a step wherein a requisition is accepted and another step wherein multiple purchase orders are generated from the requisition shown in Appendix IX based on the different sources from which each requisitioned item is to be ordered.  It describes that "line items 001 and 003" on the requisition shown in Appendix IX would result in generation of a first purchase order because both of those requisitioned items are being procured from the first Distributor's external warehouses.  A second purchase order would be generated for "line item 002" because that item is a type "01" product which is being sourced from on-site Distributor-owned inventory.  And, a third purchase order is generated for requisition line item 004 because it is a type "06" product that is sourced from the customer's own inventory.  This discussion further indicates that if a type "05" product had been included on the requisition, *i.e.*, a product to be procured from a second distributor, the system would have generated another purchase order to the second distributor, which could then be transmitted to the distributor by mail, fax, or EDI (electronic data interchange).  *See also* Ex. 2, Col. 18:18-29 (describing the system generating purchase orders from the customer to the Distributor or another supplier).

28

These descriptions do not simply relate to "results" of the purchase order generation process, as Defendant argues, but describe the actual algorithm used by the system to analyze a requisition and decide which line items of the requisition are to be included on different purchase orders being generated by the system.  Thus, *e*Plus' proposed constructions for these claim terms are correct and fully described in the patent specification.

> **D.    The Specification Describes Structure Corresponding to the "Means for Converting Data Relating to a Selected Matching Item And an Associated Source to Data Relating to an Item and Different Source"**

Defendant again is the first accused infringer to contend that the patent specification fails to disclose any structure for performing the function of "converting data relating to a selected matching item and an associated source to data relating to an item and a different source" as recited in claims 3 and 6 of the '683 Patent.  Once again, Defendant overlooks description included in the specification of the Patents-in-Suit.

The patent specification clearly discloses that the system maintains cross-reference tables which include "cross-references from the Distributor's catalog number to its corresponding vendor's part (catalog) number and to similar corresponding catalog numbers of other vendors (suppliers or distributors) for the same Product."  *See* Ex. 2, Col. 4:66-Col. 5:8.  As described in the specification, after the system has built a requisition with one or more matching items selected from hit lists returned as results of searches of the catalog database(s) by the search engine program, the next step is inventory sourcing.  *See* Ex. 2, Col. 14:4-Col. 15:19; Col. 15:60-Col. 16:32.  The system can search the databases that include the cross-reference tables (Ex. 2, Col. 14:21-22).[27]  If in accessing the cross-reference tables, there is another corresponding item available from a different source, such item may replace the item originally included in the

_____

[27] These are the same databases described at Col. 4:66-Col. 5:8 as maintaining the cross-reference tables.

requisition.  Ex. 2, Col. 14:11-65 and Appendices VIII to IX.  As further described at Col. 15:60-Col. 16:32 of the '683 Patent, if the cross-reference tables provide an item that corresponds to a requisitioned item that is available from another source, that item may be substituted for, or replace, the requisitioned item, as shown in Appendix X where a "REPLACEMENT WAS MADE FOR PRIOR PART:  S100-06 LINE NUMBER 001 PART NUMBER 53610."

Thus, the correct construction of the corresponding structure for this claim term is that proposed by *e*Plus.  *See* Ex. 1 at 7-8.

**IV.   CONCLUSION**

For the foregoing reasons, *e*Plus respectfully requests that the Court adopt its proposed claim constructions.

/s/ Henry I. Willett, III
Henry I. Willett, III (VSB #44655)
Craig T. Merritt (VSB #20281)
**CHRISTIAN & BARTON, L.L.P.**
909 East Main Street, Suite 1200
Richmond, VA 23219
Telephone:  (804) 697-4100
Facsimile:  (804) 697-4112
hwillett@cblaw.com
cmerritt@cblaw.com

David M. Young (VSB #35997)
Jennifer A. Albert (*admitted pro hac vice*)
Scott L. Robertson (*admitted pro hac vice*)
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone: (202) 346-4000
Facsimile: (202) 346-4444
dyoung@goodwinprocter.com jalbert@goodwinprocter.com
srobertson@goodwinprocter.com

Lana S. Shiferman (*admitted pro hac vice*)
James D. Clements (*admitted pro hac vice*)
**GOODWIN PROCTER LLP**
Exchange Place

53 State Street
Boston, MA 02109-2881
Telephone: (617) 570-1000
Facsimile: (617) 523-1231
lshiferman@goodwinprocter.com
jclements@goodwinrpocter.com

 Counsel for Plaintiff, *e*Plus inc.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 19th of January, 2010, the foregoing Plaintiff *e*Plus, Inc.'s

Responsive Claim Construction Brief was electronically filed with the Clerk of the Court using

the CM/EFC system, which will then send a notification of such filing (NEF) to the following.

Copies of the foregoing were also transmitted ***via electronic mail*** to the following:

Daniel W. McDonald, *pro hac vice*
William D. Schultz, *pro hac vice*
Rachel C. Hughey, *pro hac vice*
Joshua P. Graham, *pro hac vice*
Andrew Lagatta, *pro hac vice*
Merchant & Gould P.C.
3200 IDS Center
80 South 8th Street
Minneapolis, MN 55402-2215
Lawsonservice@merchantgould.com

Robert A. Angle (VSB# 37691)
Dabney J. Carr, IV (VSB #28679)
Troutman Sanders LLP
P.O. Box 1122
Richmond, VA  23218-1122
Telephone:  (804) 697-1238
Facsimile:  (804) 698-5119
robert.angle@troutmansanders.com
dabney.carr@troutmansanders.com
***Counsel for Defendant Lawson Software, Inc.***

/s/ Henry I. Willett, III
Henry I. Willett, III (VSB #44655)
**CHRISTIAN & BARTON, L.L.P.**
909 East Main Street, Suite 1200
Richmond, VA 23219
Telephone:  (804) 697-4100
Facsimile:  (804) 697-4112
hwillett@cblaw.com

***Counsel for Plaintiff, ePlus inc.***
