# EXHIBIT B

Application No.: 90/008,104                5                Docket No.: EPL-001REX

## REMARKS

### I.    INTRODUCTION

The Patent Owner submits this paper in response to the Office Action dated February 29, 2008 (the "Office Action"). Claims 26-45 are subject to reexamination and stand rejected in the Office Action. Claims 1-25 are not subject to reexamination.

The Patent Owner submits herewith a Declaration Under 37 C.F.R. § 1.132 Of Brooks L. Hilliard Supporting Patentability Of U.S. Patent No. 6,023,683 And Traversing Rejections In Office Action Dated February 29, 2008 (the "Hilliard Declaration"). Mr. Hilliard has worked as a computer and management consultant since the 1980s. Mr. Hilliard is one of fewer than fifteen consultants in the world who are both a Certified Management Consultant and a Certified Computing Consultant. Mr. Hilliard has been retained by the Patent Owner to provide an expert technical analysis as to the patentability of the claims of the '683 patent.

The Office Action sets a shortened statutory period of two months for response. The Patent Owner filed a petition requesting an additional month to prepare the response on April 8, 2008. The Office granted the petition for extension of time on April 11, 2008. This response is thus timely filed on May 29, 2008.

### II.    SUMMARY OF PROCEEDING

On September 15, 2006, SAP AG and SAP America, Inc. (the "Requester") filed a Request for *Ex parte* Reexamination on September 15, 2006, which asserted that claims 26-45 of Patent Owner's U.S. Patent No. 6,023,683 (the "'683 Patent") are unpatentable based on twenty-one (21) alleged prior art references, when interpreted in 20 different combinations. An Order Granting Request for *Ex parte* Reexamination was issued on October 28, 2006, (the "Order Granting Reexamination") which found that the alleged art cited by the Requester did raise substantial new questions of patentability.

The Patent Owner, in a Patent Owner Statement filed January 29, 2007, identified numerous flaws in the alleged substantial new questions of patentability asserted by the Requester and adopted by the Examiner. In particular, the Patent Owner's statement demonstrated that many of the alleged references relied upon by the Requester and the Examiner do not qualify as patents or printed publications that may serve as the basis for reexamination under 35 U.S.C. §§ 301-302. The Patent Owner's statement further explained why the cited references fail to render claims 26-45 unpatentable.

The Examiner issued an Office Action on February 29, 2008. In the Office Action, claims 26-45 are rejected:

Under 35 U.S.C. § 102(a) as being anticipated by "J-CON Manual, Volume 1," authored by Cooperative Computing, Inc. (the "J-CON Manual"),

Under 35 U.S.C. § 102(b) as being anticipated by "A Practical Guide to SABRE Reservations and Ticketing authored by Jeanne Semer-Purzycki (the "SABRE Guide"),

Under 35 U.S.C. § 102(a) as being anticipated by "P.O. Writer Plus Guided Tour Version 10.0," from American Tech, Inc. (the "P.O. Writer Manual"), and

Under 35 U.S.C. § 102(b) as being anticipated by "Gateway 2000/MRO Version," from Technical Service Associates (the "Gateway 2000/MRO Manual").

In basing the claim rejections on only four of the over twenty alleged references cited in the Order Granting Reexamination, the Examiner has acknowledged that the bases for many of the issues which were asserted to raise a substantial new question of patentability against claims 26-45 do not, in fact, render the claims unpatentable under 35 U.S.C. §§ 102-103. The Patent Owner, thus, understands that the remaining references relied upon in the request either are not prior art printed publications or do not teach the claimed invention. The Patent Owner appreciates the Examiner's efforts to limit the applied rejections to printed publications available

Application No.: 90/008,104                 7                 Docket No.: EPL-001REX

as a basis for reexamination under 35 U.S.C. §§ 301-302 and to avoid undue multiplication of

references. However, for the reasons set forth below, the Patent Owner maintains that several of

the applied references are not printed publications available as prior art under 35 U.S.C. § 102.

Further, for the reasons discussed below, none of the applied references teach each limitation of

the invention set forth by claims 26-45. Accordingly, the Patent Owner requests that the

patentability of claims 26-45 be reconsidered in light of this response.

## III.   LEVEL OF ORDINARY SKILL IN THE ART

As an initial matter, the Patent Owner asserts that a person of ordinary skill in the art to

which the invention pertains would be a person in the field of computer science with an

undergraduate Bachelor of Science degree, or equivalent, and some practical programming

experience, perhaps about a year or two of experience, and having an understanding of basic

principles of supply chain management and procurement in the 1993 to mid-1994 time frame.

The basis for this assertion is set forth in paragraphs 19 – 21 of the Hilliard Declaration.

## IV.   THE APPLIED REFERENCES FAIL TO QUALIFY AS PRIOR ART

The '683 Patent was the subject of litigation in the matter of *ePlus, Inc. v. SAP America,*

*Inc. and SAP AG*, Civil Action No. 3:05CV281 (E.D.Va.).[1] At trial, the Patent Owner accused

the Requester's electronic sourcing system of infringing the claims of the '683 Patent, as well as

claims of another of the Patent Owner's patents, U.S. Patent 6,055,516. The case was tried from

March 28, 2006, through April 19, 2006. While the Court's decision was pending, the case

settled.

---

[1] The patent claims at issue were also the subject of an earlier patent infringement matter styled
as *ePlus, Inc. v. Ariba, Inc.*, Civil Action No. 1:04-cv-612 (E.D.Va). In that action, *ePlus*
accused Ariba's Ariba Buyer and Ariba Supplier Network electronic sourcing system of patent
infringement. After a two week trial on liability issues, the jury returned a verdict finding Ariba
to have willfully infringed all of the patent claims at issue. The jury also found the patent claims
to be not invalid based on the prior art Ariba asserted. Ariba ultimately took a license for a
payment of $37M.

Application No.: 90/008,104                    8                    Docket No.: EPL-001REX

The Patent Owner notes the history of this litigation because at trial the Requester did not assert any invalidity defenses based on prior description in a printed publication. Rather, the Requester used the alleged prior art cited in the Order Granting Reexamination, including the four references applied in the Office Action, in an attempt to show purported prior use of the claimed invention.

A reexamination proceeding may not be based on matters such as public use. 35 U.S.C. §§ 301-302; 37 C.F.R. § 1.552; M.P.E.P. § 2258 I. B; *see also Ex Parte the Successor in Interest of Robert S. McGaughey*, 6 U.S.P.Q.2d 1334 (Bd. Pat. App. & Inter. 1998); *Quad Envirmental v. Union Sanitary District*, 946 F.2d 870, 875, 20 U.S.P.Q.2d 1392, 1395 (Fed. Cir. 1991). Thus, the Requester in the Request for Reexamination alleged that the cited references describe the Patent Owner's claimed invention. However, Requester essentially reiterated its public use arguments from the trial without adequately addressing the requirements that must be met for a reference to be an anticipatory printed publication under 35 U.S.C. § 102 (a) or (b). This flaw has been carried through this proceeding including the Office Action. The flaw manifests in two critical manners. First, several of the applied references do not qualify as printed publications because they were not publicly disseminated prior the filing date of the application that issued as the ·683 patent. Second, the applied references do not adequately describe the claimed inventions.

A.       **Applied References Fail To Qualify As Printed Publications**
    1.       **Requirements of a Printed Publication**

In order for a document to constitute a "printed publication" and thus qualify for possible use as "prior art" under the patent laws, there must be evidence that the document was publicly distributed and accessible to the public interested in the relevant art. *See In re Marshall W. Cronyn*, 890 F.2d 1158, 1159-60, 13 U.S.P.Q.2d 1070, 1071-72 (Fed. Cir. 1989); *Preemption*

*Devices, Inc. v. Minnesota Mining & Mfg. Co.*, 732 F.2d 903, 221 U.S.P.Q. 841 (Fed. Cir. 1984).

The essential requisites for a "printed publication" under 35 U.S.C. § 102 are that the document

be: (1) a work of public character intended for general use; and (2) within reach of the relevant

public (*i.e.*, persons of ordinary skill in the relevant art).

     In order for a work to be one of a "public character," "the work must be intended and

employed for the communication of ideas to persons in general, as distinguished from particular

individuals. Private communications, even if printed, do not fall within this description, whether

designed for the use of single persons or of a few restricted groups or persons. In other words,

the work must have been actually published in such a manner that anyone who chooses may

avail himself of the information it contains." *See* 1 W. Robinson, *The Law of Patents* §§ 325-

326 at 446-48 (1890).

     Where a work could have been located only by one having been informed of its

existence, and not by means of customary research aids available at the relevant time, the

probability of knowledge of the work by the relevant public is virtually nil and, as a result, such

a work cannot constitute a "printed publication" under the patent laws. *See In re Marshall W.

Cronyn*, 890 F.2d at 1159-60, 13 U.S.P.Q. at 1071-72 (although copies of theses were filed in

the main college library and were indexed by author's name, the theses did not constitute

"printed publications," because they were not reasonably accessible to the public since the only

research aid available to locate them was the author's name which bears no relationship to the

subject matter of the theses); *Preemption Devices*, 732 F.2d at 906, 221 U.S.P.Q. at 843 (the

dissemination of only six copies of article at issue was insufficient to render such article a

"printed publication"); *In re Bayer*, 568 F.2d 1357, 1360-62, 196 U.S.P.Q. 670, 673-675

(C.C.P.A. 1978) (graduate thesis deposited in university library but uncatalogued was not a

"printed publication" within meaning of 35 U.S.C. § 102 since the thesis could only have been

located in the library by one having been informed of its existence by the author or the faculty

dissertation committee, and not by means of the customary research aids available).

Moreover, documents disseminated under conditions of confidentiality to a closed group

are not "printed publications" under § 102 because they are not accessible to the public. *See,*

*e.g., Garrett Corp. v. U.S.*, 422 F.2d 874, 164 U.S.P.Q. 521 (Cl. Ct. 1970) (distribution of 80

copies of report within government agencies to government personnel may not constitute

publication); *Northern Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 936-37, 15 U.S.P.Q.2d

1321, 1324-25 (Fed. Cir. 1990) (government documents which included the legend

"reproduction or further dissemination is not authorized...not for public release" could not

constitute "printed publications" for use as prior art); *IMX, Inc. v. Lendingtree, LLC*, 405 F.

Supp.2d 479, 491 (D. Del. 2005) (a user manual for a software program and computer system

did not constitute prior art because it was designated "Highly Confidential" and there as no proof

that it was sufficiently accessible to the public to constitute a "printed publication").

"Because there are many ways in which a reference may be disseminated to the

interested public, 'public accessibility' has been called the touchstone in determining whether a

reference constitutes a 'printed publication' bar under 35 U.S.C. §102(b)." *In re Hall*, 781 F.2d

897, 898-99, 228 U.S.P.Q. 453, 455 (Fed. Cir. 1986). "The burden of establishing that a

document was publicly accessible rests upon the Examiner as part of establishing a *prima facie*

basis for denying patentability." *Ex Parte Natale*, 11 U.S.P.Q.2d 1222, 1226 (Bd. Pat. App. &

Int. 1989).

### 2.    Failure to Show Applied Reference Qualify as Printed Publications

The Examiner acknowledges that to be proven as a "printed publication" a satisfactory

showing must be made that the relied-upon document has been disseminated or otherwise made

available to the extent that persons interested and ordinarily skilled in the art, exercising

reasonable diligence, can locate it.  Office Action at 4, *citing* M.P.E.P. § 2128.  However, the Examiner has not made such a showing with respect to several of the documents relied upon.

Rather than demonstrating dissemination of the relied-upon documents, the Examiner discusses *Carella v. Starlight Archery*, 804 F.2d 135, 231 U.S.P.Q. 644 (Fed. Cir. 1986).  The Examiner notes that the Court in *Carella* held that since there was no evidence that the relied-upon documents were accessible to *any* member of the public before the filing date there could be no rejection under 35 U.S.C. 102(a).  The Examiner then erroneously asserts that the *Carella* holding supports its converse, *i.e.* that if *any* member of the public were to have access to a publication before a filing date, the publication would qualify as a printed publication.

There is no support for the Examiner's conclusion that dissemination to *any* member of the public is sufficient to show dissemination or availability to those skilled in the art.  The Examiner's conclusion is, in fact, directly contrary to several cases that have addressed this question.  *SRI International Inc. v. Internet Security Systems Inc.*, 511 F.3d 1186, 85 U.S.P.Q.2d 1489 (Fed. Cir. 2008) (knowledge of only one person from outside patentee corporation about availability of research paper insufficient to render paper a "printed publication"), *Preemption Devices, Inc. v. Minnesota Mining & Mfg. Co.*, 732 F.2d 903, 906, 221 U.S.P.Q. 841, 843 (Fed. Cir. 1984) (dissemination of only six copies of article at issue was insufficient to render such article a "printed publication."); *In re Bayer*, 568 F.2d 1357, 1360-62, 196 U.S.P.Q. 670, 673-74 (C.C.P.A. 1978) (thesis known to three professors on dissertation committee insufficient to render thesis a "printed publication"); *Ex Parte Souzzi*, 125 U.S.P.Q. 445 (Bd. Pat. App. & Inter. 1959) (twenty-five copies of a United States government research report circulated to various governmental individuals and agencies insufficient to render report a "printed publication").  The Examiner has simply failed to make a satisfactory showing that the relied-upon documents

have been disseminated or otherwise made available to the extent that those of ordinary skill in the art, exercising reasonable diligence, can find them.

### 3.    J-CON Manual Fails to Qualify as a Printed Publication

The Examiner has failed to provide a satisfactory showing that the J-CON Manual qualifies as a "printed publication." There is no indication that the J-CON Manual was ever sold or otherwise made available to the public. Rather, it appears that the J-CON Manual was provided by Creative Computing, Inc. ("CCI") to customers only when it licensed a J-CON computer system. It is the normal custom and practice of software developers not to release manuals or system documentation to anyone other than licensed users and, even then, nearly every contract for commercial software states that this documentation is proprietary to the licensor, cannot be disclosed to anyone outside of the licensee's company and must be destroyed or returned to the licensor upon termination of the license or termination of use. (Hilliard Declaration para. 37.) That the J-CON licensees were under an obligation to keep the information contained in the J-CON Manual confidential, contradicts the Examiner's assertion that the manuals provided to such licensees were publicly accessible.

The Examiner merely asserts that J-CON licensees are members of the public and dissemination of the manual to any member of the public is sufficient to qualify the J-CON Manual as a "printed publication." (Office Action at 5-6.) The Examiner is incorrect for the reasons set forth above. Furthermore, the obligation of the licensees to keep the J-CON Manual confidential is specifically designed to keep the document from the interested parties that comprise those of ordinary skill in the art. Distribution of the J-CON Manuals to interested parties in the art, such as other computer science professionals, was specifically excluded. The J-CON Manuals were not within reach of those in the computer science filed with practical programming experience (i.e., one of ordinary skill in the art). (Hilliard Declaration para. 37.)

For at least these reasons, the Examiner has failed to make a satisfactory showing that the J-CON Manual was made available to the extent that persons interested and ordinarily skilled in the art, exercising reasonable diligence, could locate it.  The J-CON Manual is, thus, not a "printed publication" as that term is used in 35 U.S.C. § 102 and is not available as prior art against claims 26-45.  The Patent Owner requests that the rejections of claims 26-45 as being anticipated by the J-CON Manual be withdrawn for at least this reason.

### 4.     P.O. Writer Manual Fails to Qualify as a Printed Publication

The Examiner has failed to provide a satisfactory showing that the P.O. Writer Manual qualifies as a "printed publication."  The P.O. Writer Manual, like the J-CON Manual, was only provided to licensees of American Tech., Inc. when it licensed the P.O. Writer Plus product.  Each license agreement for each version of the P.O. Writer Plus product included an explicit provision prohibiting the disclosure or copying of the software as well as the User's Manuals.

> Client acknowledges the proprietary nature of P.O. WRITER PLUS and agrees not to make copies of P.O. WRITER PLUS software or User's Manuals.  Client is aware that American Tech, Inc. will vigorously prosecute anyone who makes unauthorized copies of its software and User's Manuals, and client will be responsible for all loss of profits and costs of prosecution in the event of such duplication.

Sample P.O. Writer Plus License Agreement ¶ 4 (attached as Ex. 1 hereto) (DX 651 at POWriter_0000003 *et seq.*).  This is entirely consistent with the normal custom and practice of software developers as discussed above with respect to the J-CON Manual.  As the P.O. Writer Plus licensees were under an obligation to keep the information contained in the P.O. Writer Plus Manual confidential, there is no showing that the manuals intended for such licensees were publicly accessible.

Again, the Examiner merely asserts that P.O. Writer Plus licensees are members of the public and dissemination to any member of the public is sufficient to qualify the P.O. Writer

Manual as a "printed publication." (Office Action at 5-6.) The Examiner is incorrect for the reasons set forth above. Further, as discussed above with regard to the J-CON Manual, the obligation of the licensees to keep the P.O. Writer Manual confidential is specifically designed to keep the document from the interested parties that comprise those of ordinary skill in the art. The P.O. Writer Manual was not within reach of those of ordinary skill in the art.

For at least these reasons, the Examiner has failed to make a satisfactory showing that the P.O. Writer Plus Manual was disseminated to the extent that persons interested and ordinarily skilled in the art, exercising reasonable diligence, could locate it. The P.O. Writer Plus Manual is, thus, not a "printed publication" as that term is used in 35 U.S.C. § 102 and is not available as prior art against claims 26-45. The Patent Owner requests that the rejections of claims 26-45 as being anticipated by the P.O. Writer Plus Manual be withdrawn for at least this reason.

> **5.    Gateway 2000/MRO Manual Fails to Qualify as a Printed Publication**

The Examiner has failed to provide a satisfactory showing that the Gateway 2000/MRO Manual qualifies as a "printed publication." The Gateway 2000/MRO Manual was only provided to licensees of Technical Services Associates, Inc. when it licensed the Gateway 2000/MRO software. The sample Gateway 2000 license agreement includes an explicit prohibition against any public disclosure of any information concerning the Gateway 2000 computer program or any materials relating to the Gateway 2000 computer program, as set forth below:

> Proprietary Information. LICENSEE understands and agrees that the Program constitutes confidential and proprietary information of LICENSOR. *LICENSEE agrees to maintain the Program in strict confidence and agrees not to duplicate or otherwise reproduce the Program in whole or in part or any materials relating thereto except as provided herein.* LICENSEE agrees to take all reasonable steps to insure that no unauthorized persons shall have access to the Program and that all authorized person having access to the Program shall refrain from any disclosure, duplication or reproduction.

Application No.: 90/008,104                15                Docket No.: EPL-001REX

TSA Gateway 2000 License Agreement with Aramco Services at Schedule A, Section 6

(emphasis added) (Ex. 2 hereto) (DX 175 TSA_0000289 *et seq.*)

Moreover, the Gateway 2000/MRO Manual also includes an explicit prohibition of any

copying, reproduction or dissemination of the manual.

> This product contains proprietary information which is protected
> by copyright. No part of this product may be copied, reproduced,
> translated or transcribed (other than for backup purposes) without
> the prior written consent of Technical Services Associates Inc.

Gateway 2000/MRO Manual, Title Page. As the Gateway 2000/MRO licensees were under an

obligation to keep the information contained in the Gateway 2000/MRO Manual confidential,

there is no showing that the manuals intended for such licensees were publicly accessible.

Again, the Examiner merely asserts that Gateway 2000/MRO licensees are members of

the public and that dissemination of the manual to any member of the public is sufficient to

qualify the Gateway 2000/MRO Manual as a "printed publication." (Office Action at 5-6.) The

Examiner is incorrect for the reasons set forth above. Further, as discussed above with regard to

the J-CON Manual, the obligation of the licensees to keep the Gateway 2000/MRO Manual

confidential is specifically designed to keep the document from the interested parties that

comprise those of ordinary skill in the art. The Gateway 2000/MRO Manual was not within

reach of those of ordinary skill in the art.

For at least these reasons, the Examiner has failed to make a satisfactory showing that the

Gateway 2000/MRO Manual was made available to the extent that persons interested and

ordinarily skilled in the art, exercising reasonable diligence, could locate it. The Gateway

2000/MRO Manual is, thus, not a "printed publication" as that term is used in 35 U.S.C. § 102

and is not available as prior art against claims 26-45. The Patent Owner requests that the

Application No.: 90/008,104                 16                 Docket No.: EPL-001REX

rejections of claims 26-45 as being anticipated by the Gateway 2000/MRO Manual be

withdrawn for at least this reason.

### B.      Applied References Do Not Sufficiently Describe Claimed Invention

The documents relied upon by the Examiner are not patents that include a written

description of an invention in such clear, concise and exact terms as to enable any person skilled

in the art to make the claimed inventions.  Nor are the documents relied upon by the Examiner

scientific or technical articles that explain to one of skill in the art how to make an invention.  To

the contrary, the documents are what those of ordinary skill in the art would customarily

describe as "user manuals."  However, a prior publication must contain a full enabling

description in order to constitute anticipation.  *Seymour v. Osbourne*, 78 U.S. (11 Wall.) 516

(1870); *see also Transclean Corp. v. Bridgewood Services Inc.*, 290 F.3d 1364, 62 U.S.P.Q.2d

1865 (Fed. Cir. 2002) ("To anticipate, the reference must also enable one of skill in the art to

make and use the claimed invention.").

The J-CON Manual, the SABRE Guide, the P.O. Writer Manual and the Gateway

2000/MRO Manual do not enable one of skill in the art to make the software systems.  To the

contrary, they only describe how to use the systems.  (Hilliard Decl. paras. 23-24.)  Accordingly,

the relied upon references are not enabling and are insufficient to anticipate the inventions set

forth in claims 26-45.  For at least this reason, the Patent Owner requests that the rejections of

claims 26-45 as being anticipated by the J-CON Manual, the SABRE Guide, the P.O. Writer

Manual and the Gateway 2000/MRO Manual be withdrawn.

### V.      THE CLAIMED INVENTIONS

The claimed inventions relate to electronic sourcing methods conducted by electronic

sourcing systems.  An electronic sourcing system, according to the patent, is an electronic

system for use by a prospective buyer to locate and find items to purchase from sources.  The

electronic sourcing and procurement systems and methods automate internal corporate purchasing processes, resulting in enormous savings in time and expense. Corporate customer users may search for items for sale from multiple selected electronic catalogs, view inventory availability information for those items, find related items available from other suppliers, and requisition desired goods or services. The system then generates electronic purchase orders to each different supplier for approved requisitions. *See, e.g.,* '683 Patent, Col. 3:3-24.

Prior to the inventions in the patent, procuring products for large corporations could involve several manual, paper-based operations coupled with awkward automated electronic processes. *See, e.g.,* '683 Patent, Col. 1:11- Col. 2:18. A company might be able to access a system to type information into an electronic requisition or submit an electronic order from hard-copy catalogs. *See id.* at Col. 1:36-59. Alternatively, a company might be able to view items from a single electronic catalog, for example, from a compact disc. *See id.* at Col. 2:3-12. However, these systems provided only limited improvements to the traditional paper-based corporate procurement processes.

The inventors of the '683 Patent recognized that significant efficiencies could be realized by enabling users to make purchasing decisions based on price, item availability and product comparison. Thus, they detailed in the patent specification systems and methods that:

- "search[] a database containing data (including product/vendor identification and other product information) relating to items available from at least two vendor product catalogs" ('683 Patent, Col. 2:49-52) (thereby enabling product comparison);

- "transfer[] the product information for desired catalog items obtained as a result of the search to a requisition/purchasing system for use in generating a requisition including entries for the desired catalog items" ('683Patent, Col. 2:53-56) (thereby automating the flow of information from an electronic catalog into an electronic requisition/purchase order);

- "check[] the availability in one or more inventory locations" ("'683 Patent, Col. 3:19-22) (thereby avoiding delays in delivery of items); and

Application No.: 90/008,104                18                Docket No.: EPL-001REX

- "cross-reference[] from the [one catalog item] ... to similar corresponding catalog numbers of other vendors (suppliers or distributors) for the same Product" ('683 Patent, Col. 3:19-22) (thereby making comparison shopping easier and more efficient).

Each claim of the patent recites one or more of these steps performed by the electronic sourcing system.

Claim 26 is illustrative. It recites the following:

26.    A method comprising the steps of:

maintaining at least two product catalogs on a database containing data relating to items associated with the respective sources;

selecting the product catalogs to search;

searching for matching items among the selected product catalogs;

building a requisition using data relating to selected matching items and their associated source(s);

processing the requisition to generate one or more purchase orders for the selected matching items; and

determining whether a selected matching item is available in inventory.

According to the disclosed methods, a computer is provided with a catalog database comprised preferably of at least two product catalogs, each associated with a respective source. '683 Patent, Col. 4: 35-37.  In this context, a "catalog" is an organized collection of items and associated source information.  The catalog item information typically includes such information as part number, price, catalog number, vendor name or ID, as well as textual information and images of or relating to the items. '683 Patent, Col. 4: 37-41.

The disclosed methods facilitate searching multiple catalogs associated with different sources, *e.g.*, suppliers, vendors or distributors of products or services. '683 Patent, Col. 4: 45-46. The disclosed methods permit the customer end-user to select the catalogs to be searched for

a needed item. '683 Patent, Col. 9:52-55. The electronic sourcing methods permit the customer

to then search the selected catalogs to identify needed items from different sources. Matching

items found in conducting searches of the multiple catalogs may be selected for inclusion in an

electronic requisition built by the system. '683 Patent, Col. 11:30-32; Col. 3:50-56. As

discussed in more detail below, requisitioning means requesting a needed item. Thus, a

requisition is the formal written request to purchase something needed.

The disclosed electronic sourcing methods also provide for automatically generating one

or more purchase orders from the electronic requisition. '683 Patent, Col. 15:50-54. In this

context, a purchase order is a commission or instruction to buy something. Thus, for example,

after a requisition has been approved, the electronic sourcing system generates one or more

electronic purchase orders from the requisition, for example, generating a purchase order to

transmit to each separate source associated with the items included in the requisition.

The disclosed electronic sourcing methods further provide for various other desirable

functions. For example, the disclosed methods are used to determine the availability of a

selected catalog item in inventory of the associated source of the item. '683 Patent, Col. 14:16-

20. The disclosed methods are also used to convert item data and its associated source to a

corresponding item from another source. '683 Patent, Col. 10: 49-52; Col. 14: 38-45.

The electronic sourcing systems and methods of the claimed inventions were designed to

empower a customer end-user by allowing this customer end-user to identify a product to buy.

Since customers would typically browse and search for products in a print catalog, the invention

implemented multiple product catalogs of multiple suppliers in an online environment and

provided search and retrieval capabilities in connection therewith. The system facilitated

comparison shopping by use of these multiple supplier catalogs. Once a customer end-user

conducted searches of the multiple supplier product catalogs and found catalog items matching

Application No.: 90/008,104                    20                    Docket No.: EPL-001REX

the user's search queries, the electronic sourcing system was provided with interfaces to the

supplier systems so that the customer end-user could determine the prices of the desired products

and the availability of those desired products in the suppliers' inventories.  If a particular

supplier did not have a desired item currently in its inventory, the system of the invention could

convert the selected item and its associated source to another item having another associated

source.  The system also had the capability to automatically pull the desired catalog item(s) and

source-related data for each of the desired item(s) from the electronic catalog into an electronic

requisition form and, thereby, build a requisition.  This requisition could be submitted to the

system and, once approved, the system would automatically process a multi-item requisition to

generate one or more electronic purchase orders from the data included in the requisition without

human intervention, for example, the system could generate one purchase order to each supplier

associated with the items included in the requisition.  Thus, the claimed system had to have the

capability to pull a product off a catalog and automatically process that item through

requisitioning through to a purchase order, and with no previous purchase history for that

product.

## VI.   CLAIM CONSTRUCTION

### A.      Requirements For Claim Construction

During reexamination, as with original examination, the Office must give claims their

broadest reasonable construction consistent with the specification.  *In re Am. Acad. of Sci. Tech*

*Ctr.*, 367 F.3d 1359, 1364, 70 U.S.P.Q.2d 1827, 1830 (Fed. Cir. 2004) cited in *In re Icon Health*

*& Fitness, Inc.*, 496 F.3d 1374, 1378-1379, 83 U.S.P.Q.2d 1746, 1749 (Fed. Cir. 2007).  In

addition, the claim language should be read in light of the specification as it would be interpreted

by one of ordinary skill in the relevant art.  *In re Bond*, 910 F.2d 831, 833, 15 U.S.P.Q.2d 1566,

1567 (Fed. Cir. 1990); *In re Bass*, 314 F.3d 575, 577, 65 U.S.P.Q.2d 1156, 1158 ("[T]he PTO

must apply the broadest reasonable meaning to the claim language, taking into account any definitions presented in the specification."); *In re Cortright*, 165 F.3d 1353, 1358, 49 U.S.P.Q.2d 1464, 1467 (Fed. Cir. 1999) ("Although the PTO must give claims their broadest reasonable interpretation, this interpretation must be consistent with the one that those skilled in the art would reach."); *In re Hyatt*, 211 F.3d 1367, 1372.  The best practices for claim construction were recently reiterated by the Court of Appeal for the Federal Circuit in *Phillips v. AWH Corp.*, 415 F.3d 1303, 75 U.S.P.Q.2d 1321 (Fed. Cir. 2005) (*en banc.*).  The words of a claim "are generally given their ordinary and customary meaning." *Philips* at 1312, 75 U.S.P.Q.2d at 1326.  The ordinary and customary meaning "is the meaning that the term would have to a person of ordinary skill in the art in question." *Id.* at 1313, 75 U.S.P.Q.2d at 1326.

**B.     The Examiner's Claim Construction**

The Examiner properly notes:

> [T]he broadest reasonable standard of the claim terms, such as "catalog", "sources", "requisition", and/or "purchase order" will be used in viewing the claim language.  Further, the broadest reasonable interpretation is also utilized in interpreting the claim limitations.

(Office Action at 8.)  The Examiner asserts that if the Patent Owner wishes the claims to be narrowed based upon the Court's construction of the claim terms, then the claims must be amended accordingly. *Id.*  The Examiner, however, has failed to provide the broadest reasonable interpretation of any of these claim terms.  Accordingly, the Patent Owner cannot determine how the Examiner believes that the Court's claim construction differs from the broadest reasonable interpretation.  The Patent Owner maintains that the claims, when given their broadest reasonable interpretation, are distinguishable over the applied art.

## C.    Proper Claim Construction

The Patent Owner asserts that the broadest reasonable interpretation of the claim terms

"catalog," "database," "inventory," "item," "requisition," "purchase order" and "source" are as

follows. The construction of these terms is consistent with the specification and the ordinary

meaning of these terms in the supply chain management and procurement fields. *See* Hilliard

Declaration at para. 41-43.

**Catalog:** an organized collection of items and associated information which typically

includes a part number, price, catalog number, vendor name, vendor ID, a textual description of

an item, and images of or relating to the item. This construction is entirely consistent with the

term's usage in the '683 patent's specification. *See, e.g.,* Specification at Col. 4:36-42 ("Local

computer 20 is also provided with a catalog database 36 comprised preferably of at least two

vendor product catalogs. The catalogs, and hence catalog database 36, preferably include such

information as part number, price, catalog number, vendor name or I.D., and vendor catalog

number, as well as textual information and images of or relating to the catalog products."). *See

also* Col. 9:53-10:8. A person of ordinary skill in the art would understand that the broadest

common usage of the term "catalog," its construction must be stated in a way that both fulfill a

catalog's essential purpose as a product reference used by buyers for shopping, and distinguishes

it from a mere price list. As such, a catalog must include not only the attributes of a price list

(*i.e.,* product or catalog number, a brief description and price), but also significant additional

descriptive information (*e.g.,* some or all of the following: vendor name or I.D., vendor catalog

number, graphic image if applicable, etc.).

**Database:** a collection of related information stored on a computer system organized in

a useful manner that provides a base or foundation for procedures, such as retrieving

information. This construction is entirely consistent with the term's usage in the specification.

*See, e.g.,* Specification at Col. 4:20-25 ("These database[s] 42 preferably include requisition

databases 42A, inventory databases 42B and customer-specific databases 42C..."); *see also* Col.

4:36-45, Col. 4:66-Col. 5:8.

**Inventory:** a stock of items in a location, which may be available for sale or use, or may

be committed for some particular use or delivery. *See, e.g.,* Specification at Col. 3:19-24

("Additionally, the invention includes a means for checking the availability in one or more

inventory locations of the desired catalog items, and for generating one or more purchase orders for desired items from inventory locations stocking the items."). *See also, e.g.,* Specification at Col. 4:66 – Col. 5:4 ("Host pricing and inventory databases 11 may include such information as: descriptions of the items and the quantities thereof available at a particular Distributor warehouse and at other Distributor warehouses; item records for each Product regularly sold by the Distributor; discount records by Customer; . . ."). This construction is confirmed by the 1992 APICS Dictionary, which defines "available inventory" as "The on-hand balance minus allocations, reservations, backorders, and (usually) quantities held for quality problems . . . Syn: net inventory." *See* APICS Dictionary, p. 3. It is also confirmed by the 1992 APICS Dictionary's definition of the term "stock" as "1) items in inventory, 2) Stored products ready for sale . . ." *See* APICS Dictionary, p. 48.

**Item:** products or services. *See, e.g.,* Specification at Col. 9:30-43 ("If the user has marked an item on Requisition Management data screen 110 with the designation 'S,' the entered data at least partially describing the item will be sent to Shell 52 and TV/2 search program 50 in the manner described above. TV/2 search program 50 will search catalog database 36 for all items that match the search field sent over from REQI program 44A and Requisition Management data screen 110. When a search is performed in Shell 52 and search program 50, a Hit List 47 is produced, as indicated in FIG. 1C.") *See also* Abstract of the Disclosure. This construction is confirmed by the 1992 APICS Dictionary, which defines an item as "Any unique manufactured or purchased part, material, intermediate, subassembly, or product." *See* APICS Dictionary, p. 24.

**Requisition:** a formal request to purchase something. This construction is also entirely consistent with the term's usage in the specification. *See, e.g.,* Specification at Col. 7:60-66 ("The user can next enter desired items and quantities for the requisition. Each desired item may be identified by entering its distributor catalog or part number, if known, in the field below the STOCK NBR label on the appropriate line in Requisition Item Table 46 shown on Requisition management data screen 110."). This definition is consistent with the term's usage in the relevant art, as confirmed by the APICS Dictionary, which defines a requisition as, "a document conveying authority to the purchasing department to purchase specified materials in specified quantities within a specified time" (*See* APICS Dictionary, p. 40). The 1996 NAPM Glossary of Key Purchasing Terms also confirms the above construction with its definition of a purchase requisition as "A written or computerized request to the purchasing department for the

procurement of goods or services from suppliers" (*See* NAPM Glossary of Key Purchasing Terms, p. 21).

   **Purchase Order:**  a contractual document prepared by a buyer committing to buy something from a seller (*e.g.*, the Uniform Commercial Code, Article 2, Section 2, Paragraph 201 states that "a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties" and the purchase order is customarily considered to be this "writing" by those of ordinary skill in the art).  This construction is consistent with the term's usage in the specification.  *See, e.g.,* Specification at Col. 15:20 ("Once a requisition has been inventory sourced and accepted by the CSR, it can be converted to one or more purchase orders").  This definition is also consistent with the term's usage in the relevant art.  The APICS Dictionary confirms this construction, defining a purchase order as, "the purchaser's document used to formalize a purchase transaction with a supplier.  A purchase order, when given to a supplier, should contain statements of quantity, description, and price of the goods or services ordered, agreed-to terms as to payment, discounts, date of performance, and transportation, and all other agreements pertinent to the purchase and its execution by the supplier." (*See* APICS Dictionary, p. 40.)  This construction is also confirmed by the 1996 NAPM Glossary of Key Purchasing Terms, which defines the term purchase order as "A written contractual document prepared by a buyer to describe all terms and conditions of a purchase." (*See* NAPM Glossary of Key Purchasing Terms, p. 21.)

   **Source:**  when used as a noun, a supplier, vendor or distributor of products or services. This construction is entirely consistent with the term's usage in the specification.  *See, e.g.,* Specification at Col. 17:34-54 describing the source as the entity supplying the goods to the buyer ("Appropriate Distributor catalogs and manufacturer catalogs then are consulted, using TV-2 search program 250 and proper selection of Distributor catalogs and of catalogs and bulletins from manufacturers whose products Distributor regularly sells.  Catalogs and bulletins are contained in catalog database 236.  The resultant lists of products are then transferred by Shell program 252 to a work-in-progress requisition 260, and then entered from graphical user interface 254 directly onto Distributor's mainframe computer 210 as orders from the applicable customer to Distributor.  The CSR, knowing which items are available from which Distributor warehouse and direct-shipping supplier, then may divide the customer's requested items into multiple orders, so as to assure that each order is completely filled by a single shipment.  In this

regional environment, file server 200 or the minicomputer acting as local host can maintain files of completed requisitions 242 which can be subsequently used for generating reports for customers in the region. Reports can be generated either from such local data or from data periodically downloaded to the local host from Distributor's host computer 210."). This construction is confirmed by the 1992 APICS Dictionary, which equates the term "source" and the term "supplier" (*see* APICS Dictionary, p. 47), where the term "sole source" is defined to mean "Supply of a product is available from only one organization. Usually technical barriers such as patents exist to preclude other *suppliers* from offering the product." A person of ordinary skill in the art would understand that this is the broadest common usage of both terms. The APICS Dictionary defines the term "supplier" to mean "1) Provider of goods or services. Syn: vendor. 2) Seller with whom the buyer does business, as opposed to vendors, which is a generic term referring to all sellers in the marketplace." (*See* APICS Dictionary, p. 49.) Similarly, the NAPM Glossary of Key Purchasing Terms confirms the construction with its definition of the term "supplier" as "An organization that supplies goods and/or services to a purchasing organization." (*See* NAPM Glossary of Key Purchasing Terms, p. 24.)

## VII.   REJECTIONS UNDER 35 U.S.C. § 102

Claims 26-45 stand rejected under 35 U.S.C. § 102 as being anticipated by each of the J-CON Manual, the SABRE Guide, the P.O. Writer Manual and the Gateway 2000/MRO Manual. Each of these references fails to anticipate the invention set forth by claims 26-45 for at least the following reasons.

### A.   Requirements Of 35 U.S.C. § 102

To prove a patent claim invalid based upon an anticipatory printed publication under 35 U.S.C. § 102, "*every element and limitation* of the claimed invention must be found in a single prior art reference, *arranged as in the claim.*" *Brown v. 3M*, 265 F.3d 1349, 1351 (Fed. Cir. 2001) (emphasis added). *See also PIN/NIP Inc. v. Platte Chem. Co.*, 304 F.3d 1235, 1243 (Fed. Cir. 2002); *Advanced Display Sys. Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2002). Accordingly, "'[a] claim is anticipated only if each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior art reference.'"

M.P.E.P. § 2131 (*quoting Verdegaal Bros. v. Union Oil Co. of California*, 814 F.2d 628, 631, 2

U.S.P.Q.2d 1051, 1053 (Fed. Cir. 1987)). It is improper to "build an anticipation" or add

missing elements not found in the allegedly anticipatory reference by reference to other

documents. *Studiengesellschaft Kohle, mbH v. Dart Indus., Inc.*, 726 F.2d 724, 727 (Fed. Cir.

1984).

### B.    The J-CON Manual Fails To Anticipate Claims 26-45

Claims 26-45 stand rejected under 35 U.S.C. § 102(a) as allegedly anticipated by the J-

CON Manual. The J-CON Manual fails to teach every element and limitation of the inventions

set forth by claims 26-45.

The J-CON Manual is a manual written to assist users in the operation of the J-CON

computer system. Generally, it should be understood that the J-CON system is a sellers system,

in contrast to the buyers system set forth by claims 26-45. The J-CON system is installed in a

retail establishment to sell goods. It is not used by end users to requisition or purchase goods.

The J-CON system is, thus, used for a distinctly different purpose than is the invention of the

methods of claims 26-45. Accordingly, the J-CON system does not include the steps of claims

26-45 directed to buying goods through the use of requisitions and purchase orders. The

Examiner must stretch the teaching of the J-CON Manual in an attempt to make it fit the

purchasing environment set forth by the claims. In attempting to fit the sales system of J-CON

to the claimed purchasing methods, the Examiner has ignored critical claim limitations and

overstated the teaching of the J-CON Manual.

In particular, the J-CON system is designed for use in retail establishments to permit

employees of those establishments to assist customers to find automotive parts from a catalog of

available parts in an over-the-counter sales environment. (Hilliard Decl. para. 49.) Once a part

required by the retail customer is indentified, the J-CON system is used to generate a sales ticket

for picking the parts and to supply information describing the selected parts to a point-of-sale system to permit consummation of the transaction. *Id.*

The systems and methods embodied in claims 26-45 are for use in an organization that acquires supplies through a requisition and purchase order process. These systems and methods automate what was previously a multi-step, manual process. These systems exist primarily for the benefit of the entity seeking to purchase products, that is, the purchaser. It is the purchaser that uses the claimed methods to build requisitions and generate purchase orders.

In contrast, the J-CON system is intended for retailer applications. The J-CON system assists retailers in selling auto parts to customers who come into the retailer's store to find desired parts and buy them directly. While a particular retailer may stock parts from many different manufacturers, the retailer is selling the customer only those parts that it has in its own inventory, not parts from other retailers. Thus, there is only a single source in the J-CON system — the retailer using the system. Moreover, requisitions and purchase orders are not part of the process — these are unique to institutional customers. In contrast to the method described in instant claims, the J-CON system is intended to benefit the seller. (Hilliard Decl. para. 51.) For these reasons as set forth in more detail below, the J-CON Manual does not anticipate the claimed invention.

### 1.    Claim 26

Claim 26 recites the following:

A method comprising the steps of:

maintaining at least two product catalogs on a database containing data relating to items associated with the respective sources;

selecting the product catalogs to search;

searching for matching items among the selected product catalogs;

building a requisition using data relating to selected matching items and their associated source(s);

processing the requisition to generate one or more purchase orders for the
selected matching items; and

determining whether a selected matching item is available in inventory.

Regarding the first limitation recited in claim 26, the J-CON Manual fails to disclose or

even suggest "maintaining at least two product catalogs on a database containing data relating to

items associated with respective sources." A discussed above, the J-CON system identifies parts

available for sale from a retail automotive parts store. As the parts are sold by a single source —

the retail establishment — the J-CON system does not maintain at least two product catalogs

relating to items associated with respective sources.

The Examiner relies on Ch. 3, Sec. 5, p. 1 of the J-CON Manual (Office Action at 11) to

assert that the J-CON PartsFinder catalog includes at least two product catalogs. The J-CON

Manual does not support the Examiner's assertion. Although the cited chapter of the J-CON

Manual in fact refers to a product catalog, it is a single catalog only, the electronic parts catalog

of the retailer.

> PartFinder, JobFinder, and InterChange are optional catalog
> products that can help you quickly find the parts your customers
> need.
>
> PartFinder is J-CON's electronic parts catalog. Use it with Point-
> of-Sale (POS) to look-up the parts a customer wants and put them
> on the ticket.

J-CON Manual, Ch. 3, Sec. 1, p. 1. Similarly, the J-CON Manual states:

> PartFinder is an electronic parts catalog that you use to sell the
> correct parts for a specific vehicle.

J-CON Manual, Ch. 2, Sec. 1, p. 2. (Hilliard Decl. para. 55.) The J-CON Manual does not

contemplate multiple catalogs that are associated with respective sources. The Examiner

appears to have improperly construed "multiple catalogs associated with respective sources" as

including a single catalog containing goods produced by more than one manufacture, even though the catalog is a single retailer's catalog.

As discussed above, the J-CON system allows retail employees to find automotive parts for customers and to supply information corresponding to selected parts to a point-of-sale (POS) terminal to allow the retailer to complete the transaction. The catalog includes the products that are available for sale by that retailer — to use the language of the claims, there is only one catalog and goods have only a single source. The fact that the J-CON system uses a single catalog whereas claim 26 recites "maintaining at least two product catalogs" is a significant distinction. Users of the J-CON system do not want their customers to access catalogs from other sources. Rather, the system is intended to facilitate the exact opposite, that is, sales from a single source, *i.e.*, the retailer using the J-CON system. This is in direct contrast to the method embodied in claim 26 where at least two product catalogs are maintained from respective sources so that, among other things, the purchaser may compare prices from more than one source. Simply put, the method of claim 26 does not favor any single source, while that of the J-CON system is intended to benefit only a single source. (Hilliard Decl. para. 56.)

The Examiner cites to the J-CON Manual Ch. 3, Sec. 2, p. 11, which references the catalog function of the J-CON system as allegedly including information on multiple manufacturers. However, there is no indication that this information is in any format that would fit the meaning of a catalog as this term is broadly construed. (Hilliard Decl. para. 57.) As discussed above, a "source" is "a supplier, vendor or distributor of products or services." The Examiner fails to set forth how the primary and alternate manufacturers of the J-CON Manual anticipate the "respective sources" set forth by claim 26. Furthermore, the reliance by the Examiner on the primary and alternate manufacturers cited by the J-CON Manual does not

Application No.: 90/008,104               30               Docket No.: EPL-001REX

conform to what the Examiner refers to below as the "catalog" functions of the J-CON system (*see* the J-CON Manual, Ch. 3, Sec. 2, p. 3).

Regarding the second limitation of claim 26, the J-CON Manual fails to disclose or suggest "selecting the product catalogs to search." In rejecting this claim limitation, the Examiner relies on the J-CON Manual, Ch. 2, Sec. 2, p. 3 (which references the use of the J-CON system for the selection of a "subgroup", not a catalog) and Ch. 2, Sec. 2, p. 11 (which describes the use of the J-CON system to find parts based on manufacturer numbers). (Office Action at 11.) Neither of these excerpts relate to the selection of catalogs with items associated with their respective sources, as explained above. (Hilliard Decl, para. 59.) In attempting to force the J-CON sales system onto the limitations of the claimed method of purchasing, the Examiner's arguments are inconsistent. On one hand, the Examiner relies on the primary and alternate manufacturer in an attempt to show "at least two product catalogs containing data relating to items associated with the respective sources." On the other hand, the Examiner relies on choosing a subgroup of parts types to show "selecting the product catalogs to search." The resulting flaw in the Examiner's position is that the J-CON Manual does not teach that the selected subgroups are catalogs associated with respective sources and the J-CON Manual does not teach that the primary or alternate manufacturers are selected for searching. The J-CON Manual does not teach selecting product catalogs to search from among at least two product catalogs containing data relating to items associated with respective sources.

Regarding the third limitation recited in claim 26, the J-CON Manual fails to disclose or even suggest the step of "searching for matching items among the selected product catalogs." The Examiner relies on Ch. 3, Sec. 2, p. 1 of the J-CON Manual (Office Action at 11-12), which states:

When you look up a part with PartFinder, you specify its group

> and subgroup, as well as the vehicle's year, make, and model. J-CON then displays a list of possible parts and their prices for the customer. You select a part form the list and specify how may you want.

At best this passage discloses searching only a single catalog, as it contains no reference to any resource other than the single "PartFinder." (Hilliard Decl. para. 59.) The Examiner fails to explain how this passage anticipates "searching for matching items *among the selected product catalogs.*"

Regarding the next limitation of claim 26, the J-CON Manual fails to disclose or even suggest the step of "building a requisition using data relating to selected matching items and their associated source(s)." The Examiner relies on the disclosure at Ch. 3, Sec. 2, p. 4 of the J-CON Manual (Office Action at 12), which states:

> At Selection, choose one:
> • Enter the number for the part you want.
> • When you finish selecting parts, press <Order Screen> to return to POS

The Examiner fails to identify a requisition in the cited passage. Above the cited portion of the J-CON Manual, the following table shows a parts list with part names, part numbers, quantity available, and prices.

Application No.: 90/008,104                32                Docket No.: EPL-001REX



This parts list is not a requisition.  The disclosure relied upon by the Examiner describes the use of the seller's J-CON system for selection of items being sold to an over-the-counter customer using the J-CON Point-of-Sale functionality, not the customer's preparation of a requisition of items to be sourced from one or more catalog suppliers.  The selection of items by the J-CON system does not meet the broadest construction of the term requisition because, among other reasons, a requisition is a *customer* document, not a *supplier* document.  (Hilliard Decl. para. 63.)  As discussed above, a "requisition" is "a formal request to purchase something."  As described throughout Chapter 3 of the J-CON Manual, the parts identification and selection process is done using the auto parts retailer's J-CON system to enter the items for *sale* to its customers.  (*Id.*)  The purchaser who requires the parts identified by the J-CON system builds no request to purchase the parts through the J-CON system.  In addition, as disclosed by the J-CON Manual, the document created by this sales process is the *only* document involved in

the catalog/search/sales process, *i.e.*, there is no separate purchase order document as disclosed by claim 26.

Regarding the next limitation of claim 26, the J-CON Manual fails to disclose or even suggest the step of "processing the requisition to generate one or more purchase orders for the selected matching items." It is important to understand that the generation of the purchase orders in the claimed method is not an isolated step. Rather, the purchase orders are generated by processing the requisition. Further, the purchase orders are for the selected matching items searched for among the selected product catalogs. In an attempt to show this step, the Examiner relies upon Ch. 4, Sections 3 and 4 of the J-CON Manual (Office Action at 12), which discloses methods for generating purchase orders in the J-CON system. As discussed above, requisitions are not generated in the J-CON system. Therefore, the step of "processing the requisition to generate one or more purchase orders for the selected matching items" cannot be performed by the J-CON system. What the Examiner fails to consider is that the process described in Ch. 4 of the J-CON Manual is not related to the process described in Ch. 3 of the J-CON Manual. (Hilliard Decl. para. 65.) Thus, the Examiner fails to consider the claimed relationship between the generation of the purchase orders and the remaining claim limitations.

Chapter 4 of the J-CON Manual is titled "Purchasing and Receiving" and it has no correspondence to the catalog/search/sales process of Chapter 3, but rather deals with the replenishment of the J-CON system owner's in-store inventory. The items on the purchase orders described in Chapter 3 are either computed manually or computed automatically during an End-of-Day process (*see* Ch. 4, Sec. 3, p. 1 and Ch. 4, Section 4, pp. 1–7 of the J-CON Manual). In neither of these instances is there any reference to any items (matching or otherwise) that were selected from catalogs for POS sales (or, for that matter, items included in any requisitions) being processed into one or more purchase orders. Rather, as described in the

J-CON Manual, this process is done "to compute and issue [purchase orders] for stock . . ." (*see* Ch. 4, Sec. 4, p. 1 of the J-CON Manual). The meaning of this sentence is an unequivocal reference to replenishment of the J-CON system user's inventory, as anyone of average skill in the art would know (*e.g.*, The 1992 APICS Dictionary defines "stock" as "1) Items in inventory, 2) Stored products ready for sale." *See* APICS Dictionary, p. 48. Similarly, the 1996 NAPM Glossary of Key Purchasing Terms defines "stock" as "The material and supplies kept in the storeroom/warehouse *to satisfy the needs of* the internal using departments or the *external buyers*." *See* NAPM Glossary of Key Purchasing Terms, p. 24). (Hilliard Decl. para. 65.) The purchase orders in the J-CON Manual are purchase orders from the retail store to replenish inventory. Accordingly, the purchase orders in the J-CON Manual are not generated by processing requisitions. Furthermore, the purchase orders in the J-CON Manual are not for selected matching items as set forth by claim 26.

Regarding the final limitation of claim 26, the J-CON Manual fails to disclose or even suggest the claim step of "determining whether a selected matching item is available in inventory." The Examiner relies upon Ch. 3, Sec. 2, pp. 6 and 10 of the J-CON Manual (Office Action at 12), which describes looking up and displaying the available quantity. The section relied upon by the Examiner, that is Ch. 3, describes the PartFinder application. That is the portion of the J-CON system that helps employees look-up and find parts for customers. On page 6, the J-CON Manual states that AVL is the quantity available. As stated with respect the prior limitation of claim 26, this portion of the J-CON Manual is separate and distinct from the portion describing the generation of purchase orders. In the language of claim 26, generating a purchase order is a precursor to the step of "determining whether a selected matching item is available in inventory." Thus, while the J-CON Manual describes a process for determining whether a selected item is in inventory, it does so only in the context of selling items to

customers on an over-the-counter basis using the J-CON Point-of-Sale functionality, and not in connection with the preparation of purchase orders, as disclosed in claim 26. (Hilliard Decl. para. 67.) For at least this reason, the J-CON Manual fails to teach the final step of claim 26.

For at least the above reasons, the J-CON Manual fails to teach each element or limitation of claim 26. The Patent Owner requests that this rejection of claim 26 as being anticipated by the J-CON Manual be reconsidered and withdrawn.

### 2.    Claim 27

Claim 27 depends from claim 26. Because the J-CON Manual fails to disclose each and every element of independent claim 26, it necessarily fails to disclose each and every element of claim 27. In addition, the J-CON Manual fails to disclose or even suggest the claim limitation of "purchase orders includ[ing] data relating to a vendor catalog number for the selected matching items." In rejecting this claim, the Examiner relies on Ch. 2, Sec. 10, pp. 8–9. (Office Action at 12-13.) These pages describe a "warehouse inquiry screen" used in the context of POS parts sales. As stated with regard to claim 26, this over-the-counter POS process is unrelated to the purchase order generation described in Chapter 4. (Hilliard Decl. para. 69.) As the "warehouse inquiry screen" is not a purchase order, the Examiner has failed to show where the J-CON Manual teaches that the purchase orders include data relating to a vendor catalog number as set forth by claim 27. The Examiner further cites to the sample purchase order illustrated at Ch. 4, Sec. 5, p. 5 of the J-CON Manual. (Office Action at 13.) However, the Examiner identifies no data relating to a vendor catalog number on the illustrated purchase order. For at least the above reasons, the J-CON Manual fails to teach each element or limitation of claim 27. The Patent Owner requests that this rejection of claim 27 as being anticipated by the J-CON Manual be reconsidered and withdrawn.

### 3.    Claim 28

Independent claim 28 recites substantially the same features as claim 26 except that the limitation of "determining whether a selected matching item is available in inventory" has been replaced with the limitation of "converting data relating to a selected matching item and an associated source to data relating to an item and a different source." For the reasons articulated above in the discussion of claim 26, the J-CON Manual does not disclose or even suggest the first five steps of claim 28.

Moreover, the J-CON Manual also fails to disclose or even suggest the limitation of "converting data related to a selected matching item and an associated source to data relating to an item and a different source." In rejecting this claim step, the Examiner has relied on the J-CON Manual at Ch. 3, Sec. 2, p. 11 and Ch. 3, Sec. 4, pp. 1-5. (Office Action at 14.) As to the first citation, this portion of the J-CON Manual describes a subroutine for the PartFinder application, which, as discussed above, is used to assist the auto parts retailer when selling auto parts to its customers. The description of this feature is as follows:

> Alternate parts are parts you can sell if you are out of the original part.  J-CON usually displays an alternate part in PartFinder only if you're out of the original part.

J-CON Manual, Ch. 3, Sec. 2, p. 11. Contrary to the method of claim 28, the methods described in the very sections of the J-CON Manual referenced by the Examiner are obviously directed to displaying alternate parts the auto parts retailer can sell when the desired part is unavailable in the retailer's inventory on hand (*i.e.*, "parts you can sell if you are out of the original part," *see* J-CON Manual Ch. 3, Sec. 2, p. 11), or when the prospective customer has a part number for a competitive product not carried by the retailer that is one for which the retailer can sell an equivalent part that he does have in stock (*i.e.*, "entering the competitive part number, searching for the part . . . selling [the equivalent] parts", *see* J-CON Manual, Ch. 3, Sec. 4, p. 1). In this

method, although the alternate part is a substitute for the desired part, it is still coming from the same source — namely, the J-CON System retailer's stock. This is directly contrary to the plain language of claim 28 which requires the step of "converting data relating to a selected matching item and an associated source to data relating to an item and a different source." There is no different source in the J-CON system. (Hilliard Decl. para. 73.)

Regarding the second citation, this portion of the J-CON Manual describes the InterChange component of the J-CON system. The section relied upon by the Examiner describes a method for finding replacement parts for a competitive part. In this method, the user enters the part number for the competitive part and, in response, is provided with one or more interchangeable parts. This does not involve "data relating to an item and a different source," as recited in claim 28, but instead describes a method of using the product identifier for a non-stocked product as a means of finding and selling the buyer a similar product from the same retail inventory that is the source of all other products being sold. Thus, as with the J-CON application described at the first citation, this application still provides substitute parts from the same source — the J-CON retailer. (Hilliard Decl. para. 74.)

For at least the above reasons, the J-CON Manual fails to teach each element or limitation of claim 28. The Patent Owner requests that the rejection of claim 28 as anticipated by the J-CON Manual be and withdrawn.

### 4.    Claims 29 and 30

Claims 29 and 30 depend from claim 28. Because the J-CON Manual fails to disclose each and every element of independent claim 28, upon which these claims depend, it necessarily fails to disclose each and every element of claims 29 and 30.

Claim 29 sets forth "determining whether a selected matching item is available in inventory." This limitation is also found in claim 26. The J-CON Manual fails to teach this limitation for the reasons set forth above with respect to claim 26.

With regard to claim 30, the J-CON Manual also fails to disclose or even suggest the limitation of "determining the applicable price of a selected matching item." In rejecting claim 30, the Examiner has relied on the J-CON Manual at Ch. 3, Sec. 4, pp 4 and 6. (Office Action at 14-15.) As noted above with respect to checking inventory, the POS transaction described in Chapter 3 is unrelated to the purchase order creation process described in Chapter 4. Therefore, the pricing function described on the cited pages is different from the price determination disclosed by claim 30 of the patent because it cannot be used in conjunction with purchase order creation (prices must appear in a purchase order for the purchase order to be valid). (Hilliard Decl. para. 76.)

For at least the above reasons, the J-CON Manual fails to teach each element or limitation of claims 29 and 30. The Patent Owner requests that the rejections of claims 29 and 30 as anticipated by the J-CON Manual be withdrawn.

5.    **Claim 31**

Independent claim 31 includes substantially the same limitations as independent claims 26 and 28, and the Examiner has utilized the same reasoning with this claim as with claims 26 and 28. (Office Action at 15-16.) Therefore, for the reasons articulated above with respect to claims 26 and 28, the J-CON Manual fails to anticipate claim 31. The Patent Owner requests that this rejection of claim 31 as being anticipated by the J-CON Manual be reconsidered and withdrawn.

6.  **Claims 32, 33, 34 and 35**

Claims 32, 33, 34 and 35 depend from independent claim 31. Because the J-CON Manual fails to disclose each and every element of independent claim 31, upon which these claims depend, it necessarily fails to disclose each and every element of claims 32, 33, 34, and 35.

In addition, with regard to claim 32, the J-CON Manual also fails to disclose or even suggest the limitation of "purchase orders use data relating to at least two sources." In rejecting claim 32, the Examiner has relied on the J-CON Manual at Ch. 3, Sec. 5, p. 1; Ch. 2, Sec. 10, p. 8; and Ch. 4, Sec. 5, pp. 3–4. (Office Action at 16.) As noted above with respect to "determining the availability of an item in inventory," the POS transaction described in Chapter 3 (as well as Chapter 2) is unrelated to the purchase order creation process described in Chapter 4. Therefore, the Examiner's citations differ from the purchase order creation recited in claim 32 of the patent because there is no connection between the various capabilities described in the pages cited. (Hilliard Decl. para. 79.)

Claim 33 sets forth that "the purchase orders use data relating to catalog numbers." The J-CON Manual fails to teach this limitation for at least the reasons set forth above with respect to claim 27.

Claim 34 sets forth the step of "determining whether a selected matching item is available in inventory." The J-CON Manual fails to teach this limitation for at least the reasons set forth above with respect to claim 29.

Claim 35 sets forth the step of "determining the applicable price of a selected matching item." The J-CON Manual fails to teach this limitation for at least the reasons set forth above with respect to claim 30.

Application No.: 90/008,104                40                Docket No.: EPL-001REX

For at least the above reasons, the J-CON Manual fails to teach each element or limitation of claims 32, 33, 34 and 35. The Patent Owner requests that the rejections of claims 32, 33, 34 and 35 as anticipated by the J-CON Manual be withdrawn.

### 7.   Claim 36

Independent claim 36 recites substantially the same limitations as independent claims 26, 28 and 31, and the Examiner has utilized the same reasoning with this claim as with claims 26, 28 and 31. (Office Action at 17-18.) The J-CON Manual fails to anticipate claim 36 for at least the reasons articulated above with respect to claims 26, 28 and 31. The Patent Owner requests that the rejection of claim 36 as anticipated by the J-CON Manual be withdrawn.

### 8.   Claims 37, 38 and 39

Claims 37, 38 and 39 depend from claim 36. Because the J-CON Manual fails to disclose each and every element of independent claim 36, upon which these claims depend, it necessarily fails to disclose each and every element of claims 37, 38 and 39. In addition, as the Examiner has utilized the same reasoning with these claims as with similar claims 32, 26 and 30, respectively, (Office Action at 18-19) the J-CON Manual fails to anticipate claims 37, 38 and 39 for the reasons set forth above with regard to claims 32, 26 and 30. The Patent Owner requests that the rejections of claims 37, 38 and 39 as anticipated by the J-CON Manual be withdrawn.

### 9.   Claim 40

Independent claim 40 recites limitations that are substantially the same as those recited in independent claims 26, 28, 31 and 36 with the exception of the first claim limitation. The Examiner has utilized the same reasoning with this claim as with claims 26, 28, 31 and 36. (Office Action at 18-21.) The J-CON Manual fails to anticipate the final four steps of claim 40 for at least the reasons set forth above with regard to claims 26, 28, 31 and 36. The Patent Owner requests that the rejection of claim 40 as anticipated by the J-CON Manual be withdrawn.

### 10.    Claim 41

Independent claim 41 recites substantially the same claim limitations as claim 40 except that the last step of "determining whether a selected matching item is available in inventory" has been replaced with the step of "converting data relating to a selected matching item and an associated source to data relating to an item and a different source." As discussed above in the context of claim 28, the J-CON Manual fails to provide support for this claim limitation, and the Examiner has utilized the same reasoning with this claim as with claims 40 and 28. (Office Action at 21-22.) Accordingly, the J-CON Manual fails to anticipate claim 41 for at least the reasons set forth above with respect to claims 40 and 28. Therefore, the Patent Owner requests that the rejection of claim 41 as anticipated by the J-CON Manual be withdrawn.

### 11.    Claims 42, 43 and 44

Claims 42, 43 and 44 depend from claim 41. Because the J-CON Manual fails to disclose each and every element of independent claim 41 upon which these claims depend, it necessarily fails to disclose each and every element of claims 42, 43, and 44. In addition, the Examiner has utilized the same reasoning with these claims as with similar claims 32, 26 and 30. (Office Action at 22-23.) The J-CON Manual fails to anticipate claims 42, 43 and 44 for at least the reasons set forth above with respect to claims 32, 26 and 30. The Patent Owner therefore requests that the rejections of claims 42, 43 and 44 as anticipated by the J-CON Manual be withdrawn.

### 12.    Claim 45

Independent claim 45 contains limitations that are identical to those recited in the other independent claims already discussed (*e.g.*, claim 26, etc.), and the Examiner has utilized the same reasoning with this claim as with those claims. (Office Action at 23-24.) Therefore, for the reasons articulated above, the J-CON Manual fails to anticipate claim 45. The Patent Owner requests that the rejection of claim 45 as anticipated by the J-CON Manual be withdrawn.

Application No.: 90/008,104                42                Docket No.: EPL-001REX

### C.    The SABRE Guide Fails To Anticipate Claims 26-45

Claims 26-45 stand rejected under 35 U.S.C. § 102(b) as allegedly anticipated by the SABRE Guide. The SABRE Guide fails to teach every claim element and limitation of the inventions set forth by claims 26-45.

The SABRE Guide is a tutorial designed to teach travel agents how to use American Airline's reservation and ticketing system designated "SABRE." As with the J-CON system, it should be understood that the SABRE system is the airline's system, *i.e.* the SABRE system is maintained and operated by the provider of services (in this case airline travel). The SABRE system is not a purchasing system. The SABRE system is used to manage the reservations of seats on airline flights. The SABRE system does not include the steps of claims 26-45 directed to buying goods or services through the use of requisitions and purchase orders. The Examiner again ignores critical claim limitations in an attempt to read claims 26-45 on the SABRE system as taught by the SABRE Guide.

Specifically, the SABRE system maintains information on available airline flights and hotel rooms. This was a precursor to Internet-based reservation systems which allowed travel agents and other travel professionals to search for available flights and rooms. Applying the above claim construction, the SABRE system does not include a "catalog" of "items" from multiple "sources." Moreover, the SABRE system does not permit the creation of "requisitions" nor of "purchase orders." Ascribing the plain meaning to these claim terms in view of the specification and what was known to the person of ordinary skill in the art at the time of the invention in this field, the SABRE Guide necessarily fails to anticipate claims 26-45. Although not explicitly articulated, the Examiner's anticipation position appears to be that the services ordered through SABRE are identical to items ordered through the systems of the claimed invention. (Hilliard Decl. para. 87.) This is incorrect for the following reasons.

The Examiner's contention that the SABRE Guide anticipates claims 26–45 of the '683 patent is contradicted by page 2 of the SABRE Guide itself. The SABRE Guide describes SABRE not as a sourcing system like the patented invention, but rather it states: "The two main functions of SABRE are as a storage device, and a communications device." Further, on the same page, it describes what the SABRE system provides: "SABRE offers information and reservation capabilities." This is a wholly different function from the catalog selection and search, requisition building, purchase order generation and other capabilities recited in claims 26–46. Therefore, for this reason alone, the SABRE Guide fails to anticipate claims 26–45. (Hilliard Decl. para. 88.) The failure of the SABRE Guide to teach each element and limitation of claims 26-45 is discussed below.

### 1.    Claim 26

The SABRE system, as described in the SABRE Guide, fails to disclose or even suggest the first claim limitation of "maintaining at least two product catalogs on a database containing data relating to items associated with the respective sources." In rejecting this portion of the claim, the Examiner relies upon the disclosure at page 2 in the SABRE Guide (Office Action at 25), which states:

> SABRE maintains a vast amount of current information. For example, it stores: flight schedules…; seat-by-seat availability for more than 680 worldwide carriers; and hotel descriptions and prices for more than 17,000 properties throughout the world.

The Examiner provides no further support for the contention that this claim limitation is met by this disclosure. In appears that the Examiner's position is that this vast amount of information is identical to the requirement of claim 26 of "maintaining at least two product catalogs on a database containing data relating to items associated with the respective sources." While it is true that the sources of the various services are maintained in SABRE, *e.g.*, the specific airline offering a flight or the specific hotel offering a room, nowhere in SABRE are at

least two product catalogs maintained. Moreover, there is no explicit disclosure, in the relied-upon portion of the reference, of a catalog that is associated with a particular source. Again it appears that the Examiner has equated all the services from a particular vendor, *e.g.*, American Airlines, as a catalog, despite the fact there is no suggestion of this in the reference nor explanation of this in the Office Action. As discussed above, a "catalog" is "an organized collection of items and associated information which typically includes a part number, price, catalog number, vendor name, vendor ID, a textual description of an item, and images of or relating to the item." There is no indication anywhere on the page cited by the Examiner that the information maintain by the SABRE system is a catalog or possesses the characteristics of a catalog as that term is broadly construed. For at least this reason, the SABRE Guide fails to teach this step of claim 26.

Regarding the second limitation of claim 26, the SABRE Guide fails to disclose or even suggest the limitation of "selecting the product catalogs to search and searching for matching items among the selected product catalogs." In rejecting this portion of the claim, the Examiner relies on page 51 (*i.e.*, Ch. 4) of the SABRE Guide (Office Action at 25), which describes, among other things, a primary availability display and a carrier specific availability display. In the primary availability display, the operator inputs a query string that specifies the date, the two airports in order of flight, and departure time. If the operator wants to limit the query to a single carrier's availability, additional characters are appended to the end of the query string identifying the particular carrier, *e.g.*, UA for United Airlines. In contrast to claim 26, at no point in the SABRE system is a selection made of product catalogs to search. As discussed above, using the claim construction consistent with the specification and the knowledge of the person of ordinary skill in the art, there is no showing of catalogs in the SABRE system. There is merely a database of data, that can be truncated using one or more query fields. That distinction notwithstanding,

even if it is assumed arguendo that conducting queries using the SABRE system constitutes both steps of selecting catalogs and searching for matching items among the selected catalogs, the options described in the SABRE Guide (*i.e.*, examining the entire referenced chapter, not just the summary p. 51 at the beginning) limit the user to performing queries for all carriers or for one specific carrier. In the first case, no particular catalogs are selected — the entire database is searched — and in the second case, only one specific catalog is selected. Neither option permits the operator to select multiple product catalogs. (Hilliard Decl. para. 91.)

Regarding the third limitation of claim 26, the SABRE Guide, fails to disclose or even suggest the limitation of "searching for matching items among the selected product catalogs." In connection with this limitation, the Examiner has relied on pp. 62-65 of the SABRE Guide. (Office Action at 25.) The Examiner asserts that the SABRE system inherently searches "the catalogs." As discussed above, the SABRE Guide does not teach or suggest "selecting the product catalogs to search." Thus, it cannot be inherent that the SABRE Guide teaches or suggests searching among such selected product catalogs. (Hilliard Decl. para. 95.)

Regarding the fourth limitation of claim 26, the SABRE Guide fails to disclose or even suggest the limitation of "building a requisition using data relating to selected matching items and their associated source(s)." In rejecting this limitation, the Examiner has relied on pages 7 and 9–11 of the SABRE Guide, entitled "Building the PNR." (Office Action at 25.) It is clear from the rejection that the Examiner has equated the passenger name record ("PNR") to the requisition of claim 26. However, the PNR is not equivalent to a requisition for several reasons. As discussed above, a "requisition" is "a formal request to purchase something." As described in the SABRE Guide, the PNR contains information about a passenger's reservation (*see* SABRE Guide p. 7) and is used by the SABRE system to "hold" — not actually buy ( *see* SABRE Guide p. 76) — an itinerary from a carrier. The PNR only includes ticketing

Application No.: 90/008,104                46                Docket No.: EPL-001REX

instructions (*see* p. 11).  These ticketing instructions can optionally be ignored, causing the held

reservation to be forfeited without penalty to the prospective passenger named in the PNR.

(Hilliard Decl. para. 97.)  Indeed, as described at the very beginning of the SABRE Guide,

SABRE is a storage and communications device that simply provides information and

reservation capabilities (*see* SABRE Guide p. 2).  Further, the PNR is provided to the carrier to

make a reservation, thereby holding a reservation that encumbers the carrier's "inventory."  In

contrast, a "requisition," as used in the patent claims, is not provided to a source.  A requisition

is a document internal to the purchasing organization.  Unlike a requisition, the PNR interacts

with the "source," or carrier, to reserve airline seats.  For these reasons, the SABRE Guide does

not teach building a requisition as set forth by claim 26.

Regarding the fifth limitation of claim 26, the SABRE Guide fails to disclose or even

suggest the limitation of "processing the requisition to generate one or more purchase orders for

the selected matching items."  In rejecting this claim limitation, the Examiner relies on the

disclosure at page 16 of the SABRE Guide where the E (End Record) Key is discussed.  (Office

Action at 25-26.)  In describing the E Key, the Guide states:

> This key is the letter *E* on the keyboard.  The travel agent always
> must end a PNR after it has been completed.  Ending a record
> transmits the PNR directly to American Airlines' central computer
> for permanent storage.

SABRE Guide at 16.  The Examiner fails to identify a purchase order in this passage of the

SABRE Guide.  The Examiner's characterization of this functionality as "generating one or

more purchase orders" is not accurate.  This operation in the SABRE system is merely finalizing

the reservation in the airline's computer system.  It is in no way analogous to processing a

requisition to generate a purchase order.  (Hilliard Decl. para. 99.)  In addition, the SABRE

system cannot "process the requisition" because there is no requisition.  As discussed above, a

"purchase order" is "a contractual document prepared by a buyer committing to buy something from a seller." The finalized PNR is not a purchase order because it does not possess the characteristics of a purchase order. In particular, the purpose of a PNR (consistent with SABRE's function as a storage and communications device offering information and reservation capabilities) is defined as "storage of all required and pertinent information related to a passenger's reservation" (*see* SABRE Guide p. 7), *i.e.*, not purchasing capabilities. Unlike a purchase order, finalizing the PNRt does not obligate the passenger to buy the reserved items (*e.g.*, flights) and it does not obligate the airline to sell the items at an agreed upon price. Specifically, a "Completed PNR" contains only "ticketing instructions (who is ticketing and when ticket is being issued)" (*see* SABRE Guide pp. 10 - 11) but does not commit to the ticket purchase because: (a) the pricing is not firm (*i.e.*, the "Guaranteed Fare Rule" states that "the passenger is charged and is guaranteed the airfare that is in effect on the date of the ticket purchase and issue," *see* SABRE Guide p. 256), (b) the airline only holds the reservation described in the PNR for a limited period of time, after which it cancels the reservation unilaterally if the passenger has not ticketed it (*i.e.*, the PNR includes a ticketing date, after which the reservation is invalidated, *see* SABRE Guide pp. 27–28), and (c) the PNR is only a reservation that allows passenger to reject by simply failing to ticket the reserved itinerary (*i.e.*, the payment arrangements are stored in a PNR "notes" field that is not transmitted to the airline, giving the airline no method of collecting in the event that ticketing is not completed by the expiration date, *see* SABRE Guide pp. 103–105). For these reasons, the SABRE Guide fails to teach generating one or more purchase orders as set forth by claim 26.

Regarding the final limitation of claim 26, the SABRE Guide fails to disclose or even suggest the limitation of "determining whether a selected matching item is available in inventory." In rejecting this step, the Examine relies on the disclosure at page 34 of the SABRE

Guide. (Office Action at 26.) To be certain, availability is determined in the SABRE system,

which is an essential precursor to making a travel reservation. However, unlike the method of

claim 26, in the SABRE system, as it is analogized to the claimed invention by the Examiner,

availability is determined at the time of the first catalog look-up. This underscores the

fundamental difference between computerized reservation systems like SABRE and the

requisition and purchase order based electronic sourcing system of the claimed invention. In the

context of the former, timing is of paramount performance. Therefore, availability must be

determined before flights or reservations are offered. The customer then selects and reserves

his/her itinerary and this reservation is saved as a PNR. This is completely different than the

method disclosed by claim 26 of the patent at issue where products are selected, a requisition is

prepared from the selected products, and a purchase order is generated based on the requisition.

In the latter, the transaction is not complete until confirmation is received that the desired

product is available. If so, the purchase order is issued to the source. Otherwise, another source

for the requisitioned product is found and the purchase order is issued to that source. (Hilliard

Decl. para. 101.) For these reasons, the SABRE Guide fails to teach the final step of claim 26.

For at least the above reasons, the SABRE Guide fails to teach each element or limitation

of claim 26. The Patent Owner, thus, requests that the rejection of claim 26 as anticipated by the

SABRE Guide be withdrawn.

### 2.   Claim 27

Claim 27 depends from claim 26. Because the SABRE Guide fails to disclose each and

every element of independent claim 26, upon which this claim depends, it necessarily fails to

disclose each and every element of claim 27. In addition, the SABRE Guide fails to disclose or

even suggest the limitation of claim 27 of "purchase orders include[ing] data relating to a vendor

catalog number for the selected matching items." In rejecting this claim, the Examiner relies on

pages 10–11 of the SABRE Guide. (Office Action at 26.) However, this citation fails to

disclose any catalog number uniquely identifying the flights, dates, origins, destinations, etc.

covered by a reservation and, as explained above, there is no purchase order. (Hilliard Decl.

para. 103.) For at least these reasons, the SABRE Guide fails to teach each element or limitation

of claim 27. The Patent Owner requests that the rejection of claim 27 as anticipated by the

SABRE Guide be withdrawn.

### 3.    Claim 28

As noted above in the context of the J-CON Manual, claim 28 recites substantially the

same features as claim 26 except that the step of "determining whether a selected matching item

is available in inventory" has been replaced with the step of "converting data relating to a

selected matching item and an associated source to data relating to an item and a different

source." For the reasons articulated above in the discussion of claim 26, the SABRE Guide does

not disclose or even suggest the first five steps of claim 28.

Moreover, the SABRE Guide also fails to disclose or even suggest the step of

"converting data related to a selected matching item and an associated source to data relating to

an item and a different source." In discussing this final claim limitation, the Examiner has relied

on the SABRE Guide's description of the substitution feature, as described on page 64 of the

SABRE Guide. (Office Action at 27.) As explained in this citation, when a query is made to the

system, if the requested itinerary is unavailable, to the extent possible, alternative itineraries are

displayed. This is analogous to the function of the J-CON system that displays alternate parts

when the desired parts are unavailable. This differs, however, from claim 28 because in the

SABRE system, when this step is performed, a selected matching item has not yet been found.

Even if it is assumed that a potentially reserved flight is an item, and that a different airline than

the one requested is a different source, no matching items have been selected, therefore, the step

of converting data related to a selected matching item cannot be performed.  In claim 28, a previous step of the method requires "searching for matching items and building a requisition using data related to selected matching items and their associated source(s)."  This has not happened when alternatives are displayed in the SABRE system.  (Hilliard Decl. para. 105.)

For at least the above reasons, the SABRE Guide fails to teach each element or limitation of claim 28.  The Patent Owner requests that the rejection of claim 28 as anticipated by the SABRE Guide be withdrawn.

### 4.      Claims 29 and 30

Claims 29 and 30 depend from claim 28.  Because the SABRE Guide fails to disclose each and every element of independent claim 28, upon which these claims depend, it necessarily fails to disclose each and every element of claims 29 and 30.

Claim 29 sets forth "determining whether a selected matching item is available in inventory."  This limitation is also found in claim 26.  The SABRE Guide fails to teach this limitation for the reasons set forth above with respect to claim 26.

In addition, with regard to claim 30, the SABRE Guide fails to disclose or even suggest the limitation of "determining the applicable price of a selected matching item."  In rejecting claim 30, the Examiner has relied on the SABRE Guide at page 279.  (Office Action at 28.)  However, as noted above with respect to the issue of purchase order generation, the pricing described on page 279 is not the correct or accurate pricing due to the "Guaranteed Fare Rule." (Hilliard Decl. para. 107 *citing* SABRE Guide p. 256.)

For at least the above reasons, the SABRE Guide fails to teach each element or limitation of claims 29 and 30.  The Patent Owner requests that the rejections of claims 29 and 30 as anticipated by the SABRE Guide be withdrawn.

### 5.    Claim 31

Independent claim 31 includes substantially the same limitations as independent claims 26 and 28.  For at least the reasons set forth above with respect to claims 26 and 28, the SABRE Guide fails to anticipate claim 31.  The Patent Owner requests that the rejection of claim 31 as anticipated by the SABRE Guide be withdrawn.

### 6.    Claims 32, 33, 34 and 35

Claims 32, 33, 34 and 35 depend from independent claim 31.  Because the SABRE Guide fails to disclose each and every element of independent claim 31, upon which these claims depend, it necessarily fails to disclose each and every element of claims 32, 33, 34 and 35.

In addition, with regard to claim 32, the SABRE Guide also fails to disclose or even suggest the limitation of "purchase orders use data relating to at least two sources."  In rejecting claim 32, the Examiner has relied on the SABRE Guide at page 2.  (Office Action at 29.)  As noted above with respect to claim 26, the SABRE Guide does not describe anything that fits what one of ordinary skill in the art would consider a purchase order.  (Hilliard Decl. para. 110.)

Claim 33 sets forth that "the purchase orders use data relating to catalog numbers."  The SABRE Guide fails to teach this limitation for the reasons set forth above with respect to claim 27.

Claim 34 sets forth the step of "determining whether a selected matching item is available in inventory."  The SABRE Guide fails to teach this limitation for the reasons set forth above with respect to claim 29.

Claim 35 sets forth the step of "determining the applicable price of a selected matching item."  The SABRE Guide fails to teach this limitation for the reasons set forth above with respect to claim 30.

For at least the above reasons, the SABRE Guide fails to teach each element or limitation of claims 32, 33, 34 and 35. The Patent Owner requests that the rejections of claims 32, 33, 34 and 35 as anticipated by the SABRE Guide be withdrawn.

### 7.    Claim 36

Independent claim 36 recites substantially the same limitations as independent claims 26, 28 and 31, and the Examiner has utilized the same reasoning with this claim as with claims 26, 28 and 31. (Office Action at 30-31.) The SABRE Guide fails to anticipate claim 36 for at least the reasons articulated above with respect to claims 26, 28 and 31. The Patent Owner therefore requests that the rejection of claim 36 as anticipated by the SABRE Guide be withdrawn.

### 8.    Claims 37, 38 and 39

Claims 37, 38 and 39 depend from claim 36. Because the SABRE Guide fails to disclose each and every element of independent claim 36, upon which these claims depend, it necessarily fails to disclose each and every element of claims 37, 38 and 39. In addition, as the Examiner has utilized the same reasoning with these claims as with similar claims 32, 26 and 30, respectively, (Office Action at 32) and because the SABRE Guide fails to anticipate claims 32, 26 and 30, the SABRE Guide similarly fails to anticipate claims 37, 38 and 39. Therefore, the Patent Owner requests that the rejections of claims 37, 38 and 39 as anticipated by the SABRE Guide be withdrawn.

### 9.    Claim 40

Independent claim 40 recites limitations that are substantially the same as those recited in independent claims 26, 28, 31 and 36 with the exception of the first claim limitation. The Examiner has utilized the same reasoning with this claim as with claims 26, 28, 31 and 36. (Office Action at 33-34.) The SABRE Guide fails to anticipate the final four steps of claim 40 for the reasons set forth above with regard to claims 26, 28, 31 and 36. The Patent Owner requests that the rejection of claim 40 as anticipated by the SABRE Guide be withdrawn.

### 10.   Claim 41

Independent claim 41 recites substantially the same claim limitations as claim 40 except that the last step of "<u>determining whether a selected matching item is available in inventory</u>" has been replaced with the step of "<u>converting data relating to a selected matching item and an associated source to data relating to an item and a different source</u>." The Examiner has utilized the same reasoning with this claim as with claims 40 and 28. As discussed above in the context of claim 28, the SABRE Guide fails to provide support for this claim limitation. (Office Action at 34-35.) Accordingly, the SABRE Guide fails to anticipate claim 41 for at least the reasons set forth above with respect to claims 40 and 28. The Patent Owner requests that the rejection of claim 41 as anticipated by the SABRE Guide be withdrawn.

### 11.   Claims 42, 43 and 44

Claims 42, 43 and 44 depend from claim 41. Because the SABRE Guide fails to disclose each and every element of independent claim 41 upon which these claims depend, it necessarily fails to disclose each and every element of claims 42, 43, and 44. In addition, the Examiner has utilized the same reasoning with these claims as with similar claims 32, 26 and 30. The SABRE Guide fails to anticipate claims 42, 43 and 44 for at least the reasons set forth above with respect to claims 32, 26 and 30. The Patent Owner requests that the rejections of claims 42, 43 and 44 as anticipated by the SABRE Guide be withdrawn.

### 12.   Claim 45

Independent claim 45 contains limitations that are identical to those recited in the other independent claims already discussed (*e.g.*, claim 26, etc.), and the Examiner has utilized the same reasoning with this claim as with those claims. Therefore, for the reasons articulated above, the SABRE Guide fails to anticipate claim 45. Thus, the Patent Owner therefore requests that the rejection of claim 45 as anticipated by the SABRE Guide be withdrawn.

Application No.: 90/008,104                54                Docket No.: EPL-001REX

### D.    The P.O. Writer Manual Fails To Anticipate Claims 26-45

Claims 26-45 stand rejected under 35 U.S.C. § 102(a) as allegedly anticipated by the P.O. Writer Manual.  The P.O. Writer Manual fails to teach every element and limitation of the invention set forth by claims 26-45.

The P.O. Writer Manual is designed to assist users to learn how to operate the P.O. Writer Plus software package provided by American Tech. Inc.  The P.O. Writer Plus software was intended to facilitate purchasing operations by creating purchase orders.  The P.O. Writer Plus software, however, does not address several of the advances disclosed and claimed in the '683 Patent.  The P.O. Writer Plus software does not enable product comparison as does the invention of the '683 Patent.  The P.O. Writer Plus software does not address reducing delays by checking a supplier's inventory prior to placing an order.  As the P.O. Writer Plus software lacks these advancements disclosed by and claimed in the '683 Patent, the P.O. Writer Manual relied upon by the Examiner does not teach the specific claim limitations related to these functions.

For the reasons set forth in detail below, the P.O. Writer Manual fails to anticipate the claimed inventions.

### 1.    Claim 26

Regarding the first three limitations recited in claim 26, the P.O. Writer Manual fails to disclose or even suggest "maintaining *at least two product catalogs* on a database containing data relating to items associated with respective sources, selecting the product catalogs to search, and searing for matching items among the selected product catalogs," as recited in claim 26.  To the contrary, all references in the P.O. Writer Manual refer only to a single catalog.

The P.O. Writer Manual fails to disclose or even suggest the limitation of "maintaining at least two product catalogs on a database containing data relating to items associated with the respective sources."  In rejecting this claim limitation, the Examiner relies on page 22 and pages

45–46 of the P.O. Writer Manual. (Office Action at 38.) The disclosure at page 22 shows that the P.O. Writer system simply maintains a history of prior purchase orders, including the suppliers to whom they were issued. The Examiner identifies no product catalogs taught in the disclosure at page 22. Pages 45–46 of the P.O. Writer Manual describes only a *single* catalog, not "*at least two catalogs*", as disclosed in the claim limitation. (Hilliard Decl. para. 120.) The Examiner points to no teaching in the P.O. Writer Manual of maintaining at least two catalogs.

Regarding the second limitation of claim 26, the P.O. Writer Manual fails to disclose or even suggest the limitation of "selecting the product catalogs to search." In rejecting this claim limitation, the Examiner relies on page 131 of the P.O. Writer Manual. (Office Action at 38.) However, this portion of the P.O. Writer Manual describes only a process whereby items from a single catalog may be displayed (*i.e.*, "Items from a specific Catalogue can be displayed by entering a Catalogue ID at the top of the screen.") *See* P.O. Writer at 131. Nowhere in this section of the P.O. Writer Manual is the ability to select more than a single catalog to search disclosed. Therefore, the P.O. Writer Manual cannot anticipate the step of "selecting the product catalogs to search." (Hilliard Decl. para. 122.)

Regarding the third limitation of claim 26, the P.O. Writer Manual fails to disclose or even suggest the limitation of "searching for matching items among the selected product catalogs." In rejecting this claim limitation, the Examiner relies on pages 46–47 of the P.O. Writer Manual. (Office Action at 38.) As cited above in the context of the first two claim limitations, the P.O Writer Manual describes the ability to search for particular items among a selected catalog. However, the P.O. Writer Manual does not disclose searching for items from more than one selected catalog. Items may be searched independent of catalogs, that is, a user can search for an item from any source, or items may be searched from a single source. There is

no support in the P.O. Writer Manual for searching for particular items from selected catalogs. (Hilliard Decl. para. 124.)

Regarding the fourth limitation of claim 26, the P.O. Writer Manual fails to disclose or even suggest the limitation of "building a requisition using data related to selected matching items and their associated sources." In rejecting this claim limitation, the Examiner first cites pages 47–48 of the P.O. Writer Manual. (Office Action at 38.) However, these pages relate to the creation of purchase orders, not requisitions and are therefore inapplicable to this limitation. (Hilliard Decl. para. 127.) The Examiner fails to identify both the requisition and purchase order recited in claim 26.

In addition to pages 47–48, the Examiner relies on pages 117–147 of the P.O. Writer Manual in an attempt to show a step of building a requisition. (Office Action at 38.) The first portion of this passage (*i.e.*, pp. 117–130) is a part of Chapter 12 of the P.O. Writer Manual, entitled "Stock Requisitioning and Kitting." As the title implies, Chapter 12 deals with stock requisitions. This chapter describes a process whereby stock requisitions may be sent electronically to the stockroom where Pick Lists can be generated and material issued with a few key strokes. This is the same process described in the APICS Dictionary as a "parts requisition" (*i.e.*, "An authorization that identifies the item and quantity required to be withdrawn from an inventory") and has nothing to do with the type of requisition disclosed in the patent. (Hilliard Decl. para. 127.) As discussed above, one of ordinary skill in the art would understand that in the context of claim 26 a requisition is "a formal request to purchase something." One of ordinary skill in the art would distinguish the requisition set forth by claim 26 from the "stock requisition" or "parts requisition" relied upon by the Examiner. In fact, chapter 12 is irrelevant to claim 26 because there is no sourcing and no purchase.

The second portion of the passage cited by the Examiner (*i.e.*, pp. 129–136) refers to Chapter 13 of the P.O. Writer Manual, dealing with requisitions for goods sourced from vendors. Although the capabilities described in this chapter do relate to building a requisition from a catalog, the text states:

> Items from a specific catalogue can be displayed by entering the Catalogue ID at the top of the screen.

P.O. Writer Manual, p. 131. Thus, the P.O. Writer Manual does not provide any option for selecting additional catalogs as disclosed by the patent. (Hilliard Decl. para. 128.)

Beginning at page 137, the P.O. Writer Manual describes another way of requisitioning items — free form requisitions. Free form requisitions do not use catalogs or searches (*see* P.O. Writer Manual at 137–140) and are therefore not relevant to claim 26 of the patent. (Hilliard Decl. para. 129) The remainder of the section cited by the Examiner (*i.e.*, pp. 141–147) has no relevance to requisition creation.

For the above reasons, the Examiner fails to show where the P.O. Writer Manual teaches building a requisition using data relating to selected matching items and their associated source(s) as set forth by claim 26.

Regarding the fifth limitation of claim 26, the P.O. Writer Manual fails to disclose or even suggest the limitation of "processing the requisition to generate one or more purchase orders for the selected items." In rejecting this claim limitation, the Examiner relies on page 49 of the P.O. Writer Manual. (Office Action at 38.) Although pages 45–49 of the P.O. Writer Manual do show how parts can be looked up in one single catalog and placed into a purchase order, this is different from the method recited in claim 26 because it does not involve the selection of more than one catalog, the searching for items in the selected catalogs or – in

particular – any reference to creation of a requisition or the conversion of a requisition to one or more purchase orders. (Hilliard Decl. para. 131.)

In addition, the Examiner also relies on pages 149-153 of the P.O. Writer Manual describing how to convert requisitions into purchase orders. (Office Action at 38-39.) Although this section of the P.O. Writer Manual does describe a process of converting requisitions into purchase orders, this process is wholly different from what is required by claim 26 because the requisition does not include the information about the sources associated with the included line items. This is shown by the fact that, during purchase order generation, the user must "select a vendor" or, if no vendor is selected, P.O. Writer "will select the vendor based on the past P.O. for [each] item" (*i.e.*, not on the catalog that was used to build the requisition). *See* P.O. Writer Manual p. 151. This is a fundamental distinction between the invention of claim 26 and the P.O. Writer Plus system. (Hilliard Decl. para. 132.)

Regarding the final limitation of claim 26, the P.O. Writer Manual fails to disclose or even suggest the limitation of "determining whether a selected matching item is available in inventory." In rejecting this claim limitation, the Examiner relies on the description of the Inventory Module at pages 102–103 of the P.O. Writer Manual. (Office Action at 39.) While it is true that this module permits users to check the inventory on hand, this process differs from the method of claim 26 because it is completely unrelated to the process of requisitioning and ordering goods as disclosed in the sections of the P.O. Writer Manual referenced by the Examiner with respect to the previous claim 26 limitations. Instead, it enables generation of a Re-order Analysis for replenishment of the internal inventory. In addition, in the context of claim 26, one of ordinary skill in the art would understand that the inventory checking recited in the final limitation refers to determining whether the selected items are available for purchase from a supplier by virtue of their being on-hand in the supplier's inventory. Indeed, this

understanding is confirmed by Col. 3, lines 19-24 of the '683 Patent, which provides an

explanation mirroring this section of the claim language:

> Additionally, the invention includes a means for checking the availability in one or more inventory locations of the corresponding desired catalog items, and for generating one or more purchase orders for desired items from inventory locations stocking the items.

*See also* '683 patent, Abstract. It is the connection between checking the availability of an item

in inventory and generating purchase orders described here that makes it obvious to one of

ordinary skill in the art that this capability refers to a supplier's inventory rather than the user's

inventory, since no purchase order would be required to get items from an inventory already

owned by the user. (Hilliard Decl. para. 134.)

For at least the above reasons, the P.O. Writer Manual fails to teach each element or

limitation of claim 26. The Patent Owner, thus, requests that the rejection of claim 26 as

anticipated by the P.O. Writer Manual be withdrawn.

### 2.    Claim 27

Claim 27 depends from claim 26. Because the P.O. Writer Manual fails to disclose each

and every element of independent claim 26, upon which this claim depends, it necessarily fails

to disclose each and every element of claim 27. In addition, the P.O. Writer Manual fails to

disclose or even suggest the limitation of "include[ing] data relating to a vendor catalog number

for the selected matching items." In rejecting this claim, the Examiner relies on pages 29, 44, 49

and 131 of the P.O. Writer Manual. (Office Action at 39.) These references show that the

purchase orders include "item numbers." but, since the purchase order items are not associated

with a source, these are obviously the manufacturer's part numbers that could apply to any

catalog that sells the respective manufacturer's products. The vendor catalog numbers are not

there. (Hilliard Decl. para. 136.) Accordingly, for at least these reasons, the P.O. Writer Manual

Application No.: 90/008,104                60                Docket No.: EPL-001REX

does not anticipate claim 27. The Patent Owner requests that the rejection of claim 27 be withdrawn.

### 3.    Claim 28

Independent claim 28 recites substantially the same features as claim 26 except that the step of "determining whether a selected matching item is available in inventory" has been replaced with the step of "converting data relating to a selected matching item and an associated source to data relating to an item and a different source." For the reasons articulated above in the discussion of claim 26, the P.O. Writer Manual does not disclose or even suggest the first five steps of claim 28.

Moreover, the P.O. Writer Manual also fails to disclose or even suggest the limitation of "converting data related to a selected matching item and an associated source to data relating to an item and a different source." In rejecting this claim limitation, the Examiner relies on pages 21–22 and 151–152 of the P.O. Writer Manual. (Office Action at 40.) However, the step of selecting a vendor or having the system automatically select one is not analogous to the step of claim 28 of "converting data related to a selected matching item and an associated source to data relating to an item and a different source." This claim language is clearly stating that a different source is being selected – the source is being replaced with another source. In direct contrast, the P.O. Writer Manual describes only selecting a source, not converting data related to one source to a different source. For at least these reasons, the P.O. Writer Manual fails to anticipate claim 28.

Because the P.O. Writer Manual fails to teach each element or limitation of claim 28, the Patent Owner requests that the rejection of claim 28 be withdrawn.

### 4.     Claims 29 and 30

Claims 29 and 30 depend from claim 28. Because the P.O. Writer Manual fails to disclose each and every element of independent claim 28, upon which these claims depend, it necessarily fails to disclose each and every element of claims 29 and 30.

Claim 29 recites the step of "determining whether a selected matching item is available in inventory." This limitation is also found in claim 26. The P.O. Writer Manual fails to teach this limitation for at least the reasons set forth above with respect to claim 26.

With regard to claim 30, the P.O. Writer Manual fails to disclose or even suggest the limitation of "determining the applicable price of a selected matching item." In rejecting claim 30, the Examiner relies on page 71 of the P.O. Writer Manual, which describes a Price Analysis report. (Office Action at 41.) However, the Price Analysis report is an after-the-fact report, totally unrelated to determining the pricing for selected matching items *at the time they are selected* during the process of building requisitions and/or generating purchase orders. (Hilliard Decl. para. 141.) For at least this reason, the P.O. Writer Manual fails to anticipate claim 30.

For at least the above reasons, the P.O. Writer Manual fails to teach each element or limitation of claims 29 and 30. Thus, the Patent Owner requests that the rejections of claims 29 and 30 as anticipated by the P.O. Writer Manual be withdrawn.

### 5.     Claim 31

Independent claim 31 includes substantially the same limitations as independent claims 26 and 28. Therefore, for the reasons articulated above with respect to claims 26 and 28, the P.O. Writer Manual fails to anticipate claim 31. The Patent Owner requests that this rejection of claim 31 as being anticipated by the P.O. Writer Manual be reconsidered and withdrawn.

6.    Claims 32, 33, 34 and 35

Claims 32, 33, 34 and 35 depend from claim 31. Because the P.O. Writer Manual fails to disclose each and every element of independent claim 31, upon which these claims depend, it necessarily fails to disclose each and every element of claims 32, 33, 34 and 35.

In addition, with regard to claim 32, the P.O. Writer Manual also fails to disclose or even suggest the limitation of "purchase orders use data relating to at least two sources." In rejecting claim 32, the Examiner relies on pages 22, 29 and 44–46 of the P.O. Writer Manual. (Office Action at 42.) While some of the cited pages do refer to multiple sources and pages 149–153 does provide a way to create purchase orders from multiple sources, this method does not comply with the method disclosed by the patent because the sources are not the sources associated with the selected catalog (the system only allows the selection of a single catalog) as disclosed by the patent. (Hilliard Decl. para. 144.)

Claim 33 sets forth that "the purchase orders use data relating to catalog numbers." The P.O. Writer Manual fails to teach this limitation for the reasons set forth above with respect to claim 27.

Claim 34 recites the step of "determining whether a selected matching item is available in inventory." The P.O. Writer Manual fails to teach this limitation for the reasons set forth above with respect to claim 29.

Claim 35 sets forth the step of "determining the applicable price of a selected matching item." The P.O. Writer Manual fails to teach this limitation for the reasons set forth above with respect to claim 30.

For at least the above reasons, the P.O. Writer Manual fails to teach each element or limitation of claims 32, 33, 34 and 35. The Patent Owner requests that the rejections of claims 32, 33, 34 and 35 be withdrawn.

### 7.    Claim 36

Independent claim 36 recites substantially the same limitations as independent claims 26, 28 and 31, and the Examiner has utilized the same reasoning with this claim as with claims 26, 28 and 31. (Office Action at 44-45.) The P.O. Writer Manual fails to anticipate claim 36 for at least the reasons articulated above with respect to claims 26, 28 and 31. The Patent Owner therefore requests that the rejection of claim 36 as anticipated by the P.O. Writer Manual be withdrawn.

### 8.    Claims 37, 38 and 39

Claims 37, 38 and 39 depend from claim 36. Because the P.O. Writer Manual fails to disclose each and every element of independent claim 36, upon which these claims depend, it necessarily fails to disclose each and every element of claims 37, 38 and 39. In addition, as the Examiner has utilized the same reasoning with these claims as with similar claims 32, 26 and 30, respectively, (Office Action at 45-46), the P.O. Writer Manual fails to anticipate claims 37, 38 and 39 for the reasons set forth above with regard to claims 32, 26 and 30. The Patent Owner requests that the rejections of claims 37, 38 and 39 as anticipated by the P.O. Writer Manual be withdrawn.

### 9.    Claim 40

Independent claim 40 recites limitations that are substantially the same as those recited in independent claims 26, 28, 31 and 36 with the exception of the first claim limitation. The Examiner has utilized the same reasoning with this claim as with claims 26, 28, 31 and 36. (Office Action at 46-47.) The P.O. Writer Manual fails to anticipate the final four steps of claim 40 for the reasons set forth above with regard to claims 26, 28, 31 and 36. The Patent Owner requests that the rejection of claim 40 as anticipated by the P.O. Writer Manual be withdrawn.

### 10.   Claim 41

Independent claim 41 recites substantially the same claim limitations as claim 40 except that the last step of "determining whether a selected matching item is available in inventory" has been replaced with the step of "converting data relating to a selected matching item and an associated source to data relating to an item and a different source." The Examiner has utilized the same reasoning with this claim as with claims 40 and 28. (Office Action at 47-48.) As discussed above in the context of claim 28, the P.O. Writer Manual fails to provide support for this claim limitation, and Accordingly, the P.O. Writer Manual fails to anticipate claim 41 for the reasons set forth above with respect to claims 40 and 28. Therefore, the Patent Owner requests that the rejection of claim 41 as anticipated by the P.O. Writer Manual be withdrawn.

### 11.   Claims 42, 43 and 44

Claims 42, 43 and 44 depend from claim 41. Because the P.O. Writer Manual fails to disclose each and every element of independent claim 41 upon which these claims depend, it necessarily fails to disclose each and every element of claims 42, 43 and 44. In addition, the Examiner has utilized the same reasoning with these claims as with similar claims 32, 26 and 30. (Office Action at 48-49.) The P.O. Writer Manual fails to anticipate claims 42, 43 and 44 for at least the reasons set forth above with respect to claims 32, 26 and 30. The Patent Owner therefore requests that the rejections of claims 42, 43 and 44 as anticipated by the P.O. Writer Manual be withdrawn.

### 12.   Claim 45

Independent claim 45 contains limitations that are identical to those recited in the other independent claims already discussed, and the Examiner has utilized the same reasoning with this claim as with those claims. (Office Action at 49-50.) Therefore, for the reasons articulated above, the P.O. Writer Manual fails to anticipate claim 45. The Patent Owner requests that the rejection of claim 45 as anticipated by the P.O. Writer Manual be withdrawn.

**E.      The Gateway 2000/MRO Manual Fails To Anticipate Claims 26-45**

Claims 26-45 stand rejected under 35 U.S.C. § 102(b) as allegedly anticipated by the
Gateway 2000/MRO Manual. The Gateway 2000/MRO Manual fails to teach every element and
limitation of the invention set forth by claims 26-45.

The Gateway 2000/MRO Manual is designed primarily as a reference document for
understanding the operation of the Gateway 2000/MRO System. The Gateway 2000/MRO
System is a purchasing system. However, like the P.O. Writer Plus software, the Gateway
2000/MRO System does not address several of the advances disclosed and claimed in the '683
Patent. The Gateway 2000/MRO System does not enable product comparison as does the
invention of the '683 Patent. The Gateway 2000/MRO System does not address reducing delays
by checking a supplier's inventory prior to placing an order. As the Gateway 2000/MRO
System lacks these advancements disclosed by the '683 Patent, the Gateway 2000/MRO Manual
relied upon by the Examiner does not teach the specific claim limitations related to these
functions.

For the reasons set forth in detail below, the Gateway 2000/MRO Manual fails to
anticipate the claimed invention.

**1.      Claim 26**

Regarding the first limitation of claim 26, the Gateway 2000/MRO Manual fails to
disclose or even suggest the limitation of "maintaining at least two product catalogs on a
database containing data relating to items associated with the respective sources." In rejecting
this limitation, the Examiner relies on pages 4-18, 4-19 and 15-42 of the Gateway 2000/MRO
Manual. (Office Action at 50.) The disclosure at page 4-18 demonstrates that the Gateway
2000/MRO System does in fact maintain a database of product catalogs and corresponding
products and their sources – *i.e.*, the vendor name.

> Catalogs can be created for any group of commonly ordered items and used repeatedly throughout requisition and PO processing. Catalogs contain a heading that describes the catalog plus the vendor name and catalog name.

Gateway 2000/MRO Manual at 4-18.

However, as set forth in paragraph 155 of the Hilliard Declaration, from this passage of the Gateway 2000/MRO Manual it is clear that at least two product catalogs containing data relating to items associated with respective sources are maintained in the Gateway 2000/MRO system. However, even under the broadest construction of the term "catalog" as understood by one of ordinary skill in the art, pricing is an essential (*i.e.*, non-optional) attribute of any catalog. The Gateway 2000/MRO Manual confirms that catalogs (as maintained by the Gateway 2000/MRO system) do not necessarily include pricing. Specifically, in describing the creation of a catalog, the Gateway 2000/MRO Manual states that pricing may not be known (*i.e.*, regarding entry of a unit price in creation of a catalog, it states "If the price of the item is known, it may be entered at this time.") *See* Gateway 2000/MRO Manual at 4-20 (just one page after the Examiner's citation of pp. 4-18 and 4-19).

Regarding the second limitation of claim 26, the Gateway 2000/MRO Manual fails to disclose or even suggest the step of "selecting the product catalogs to search." In rejecting this feature, the Examiner relies on pages 4-18 and 4-19 of the Gateway 2000/MRO Manual. (Office Action at 51.) This portion of the Gateway 2000/MRO Manual describes the catalog ordering process. According to the manual, to select items from a standard catalog, the user positions the cursor at the beginning of a new line item description and presses the F7 key. In response, a list of pre-stored catalog names is displayed. Nowhere in this section of the reference is the ability to select catalogs to search disclosed – that is, more than one catalog cannot be selected. This distinction may appear to be subtle, but it is important. The method described in claim 26

discloses the capability for multiple catalogs to be selected and searched. In the system

described in the Gateway 2000/MRO Manual, as with the P.O. Writer system, the referenced

pages describe no option for selecting of more than a single catalog (*i.e.*, "To select items from a

standard catalog . . . To select a catalog . . . When a catalog has been selected"). (Hilliard Decl.

para. 157 *citing* Gateway 2000/MRO manual pp. 4-18 and 4-19.)

Regarding the third limitation of claim 26, the Gateway 2000/MRO Manual fails to

disclose or even suggest the step of "<u>searching for matching items among the selected product</u>

<u>catalogs</u>." In rejecting this limitation, the Examiner relies on pages 4-18 and 4-17 of the

Gateway 2000/MRO Manual. (Office Action at 51.) The first referenced page (4-18) of the

Gateway 2000/MRO Manual does not describe the ability to search other than to the extent that a

user may scroll through the list of items displayed in response to a command to load a particular

catalog. In order to reject this claim feature, the Examiner has relied on a different portion of the

Gateway 2000/MRO Manual unrelated to catalog searching. The second referenced page (4-17)

does describe a keyword searching function, but this function is limited to searching for stock

items. While this function is searching — as opposed to scrolling through a list — this function

is wholly unrelated to searching for items from selected catalogs. Stock items are items that

don't need to be requisitioned from catalogs. The fact that the Examiner has relied on a different

section of the Gateway 2000/MRO Manual unrelated to catalog searching is a tacit

acknowledgement that the limited catalog "searching" capabilities in the Gateway 2000/MRO

system are not analogous to the searching step in claim 26. Indeed the cited passages of the

Gateway 2000/MRO Manual have nothing to do with searching catalogs. In addition, pages 4-

18 and 4-19 of the Gateway 2000/MRO Manual fail to disclose any method for even scrolling

through more than a single selected catalog. (Hilliard Decl. para. 159.)

Application No.: 90/008,104                    68                    Docket No.: EPL-001REX

Regarding the fourth limitation of claim 26, the Gateway 2000/MRO Manual fails to disclose or even suggest the step of "building a requisition using data related to selected matching items and their associated sources." In rejecting this claim limitation, the Examiner relies on pages 4-17 and 4-33 of the Gateway 2000/MRO Manual. (Office Action at 51.) The first referenced page selection deals with requisitions for stock items (*see* Gateway 2000/MRO Manual p. 4-17). As discussed above, sources are not relevant to requisitions for stock items because these items are in stock and don't need to be ordered via catalogs. In fact, the only teaching relating to "sources" is that the vendor ID (instead of being built into the requisition through the catalog selection/search process) can, optionally, be entered manually by the user. (Hilliard Decl. para. 161 *citing* Gateway 2000/MRO Manual p. 4-8.).)

The second referenced page selection relied upon by the Examiner is to the sample requisition form at page 4-33 of the Gateway 2000/MRO Manual. Although this requisition form has a portion labeled "vendor" there is no vendor information on the form. Moreover, nowhere else on this requisition is there an indication of associated sources for the selected matching items. Additionally, there is no suggestion in the requisition section of the Gateway 2000/MRO Manual that vendors are selected. (Hilliard Decl. para. 162) To the contrary, vendor information must be entered when entering a purchase order.

> The vendor ID must be included as the purchase order is being entered. Enter the vendor ID code and press "Enter". The vendor's name, address and contact/phone number will be displayed.

Gateway 2000/MRO Manual at p. 6-8.

In addition, the Gateway 2000/MRO Manual further provides, in the chapter dealing with Vendors, that this information is added at the time of the creation of the purchase order.

> Enter the Vendor ID number. The vendor ID is the locally assigned control number used to identify, each vendor in the

> system. This is the number that will be entered on the PO entry
> screen when selecting a vendor.

Gateway 2000/MRO Manual p. 8-2.

These passages of the Gateway 2000/MRO manual make it clear that the vendor is

selected at the time of the creation of the purchase order which confirms that the vendor is not

selected at the requisition stage. (Hilliard Decl. para. 164.)

Regarding the fifth limitation of claim 26, the Gateway 2000/MRO Manual fails to

disclose or even suggest the step of "processing the requisition to generate one or more purchase

orders for the selected items." In rejecting this claim limitation, the Examiner relies on pages 6-

3, 6-16, 6-35 and 4-33 of the Gateway 2000/MRO Manual. (Office Action at 51.) These pages

do describe a process for creating purchase orders and state that purchase orders can be created

by importing data from a requisition. However, as described above in the context of the

previous claim step, in the Gateway 2000/MRO Manual the vendor or source information must

be specified at the time the purchase order is created rather than being carried over from the

requisition. This is confirmed by two illustrations in the Gateway 2000/MRO

Application No.: 90/008,104          70          Docket No.: EPL-001REX

Manual:



| REQUISITION | | | | | |
|---|---|---|---|---|---|
| TYPE P   REQ NO. 000006   REQ BY djw   DEPT Engineering | | | | | |
| DATE 07/11/87 RDD 07/21/87  ACCT NO. 198-090-006-01  JOB 23-09 | | | | | |
| DESC. Spare parts for baling machine | | | | | |

VENDOR | SHIP TO
Building 14
Major Manufacturing Co.
Main Street
Topeka, KS 66625

CONTACT          PHONE

VIA  Vendor's Truck     FOB/FRT Delivered     TERMS Net 30

| IT | QTY | U/M | DESCRIPTION | U/PRICE | E/PRICE |
|---|---|---|---|---|---|
| 1 | 2 | EA | Control belt, model 204 | 23.60 | 47.20 |
| 2 | 1 | EA | Blower motor, 1 hp, 400 rpm model No. 23-009 Rev. 455 with mounting bracket | 324.00 | 324.00 |
| 3 | 2 | EA | Operator guard plate No 45-00 | 12.50 | 25.00 |

INTERNAL REMARKS.          APPROVALS:
Please ensure that vendor has
all items prior to releasing     Dept Head _____
the order. No partial shipment
will be accepted.                Purchasing _____

This sample requisition print format is the standard shipped
with the GATEWAY 2000/MRO Software.

Gateway 2000/MRO Manual at p. 4-33.

```
┌─────────────────────────────────────────────────────────────────────┐
│                         PURCHASE ORDER                                │
│  TYPE P   REQ NO. 000006 ·  REQ BY djw · DEPT Engineering             │
│  DATE 07/11/87 RDD 07/21/87  ACCT NO. 198-090-006-01  JOB 23-09       │
│  DESC. Spare parts for baling machine                                 │
│  VENDOR                        SHIP TO                                 │
│                                Building 14                             │
│                                Major Manufacturing Co.                 │
│                                Main Street                             │
│                                Topeka, KS 66625                        │
│  CONTACT          PHONE                                                │
│  VIA  Vendors Truck    FOB/FRT Delivered    TERMS Net 30              │
└─────────────────────────────────────────────────────────────────────┘
```

| IT | QTY | U/M | DESCRIPTION | U/PRICE | E/PRICE |
|----|-----|-----|-------------|---------|---------|
| 1 | 2 | EA | Control belt, model 204 | 23.60 | 47.20 |
| 2 | 1 | EA | Blower motor, 1 hp, 400 rpm model No. 23-009 Rev. 455 with mounting bracket | 324.00 | 324.00 |
| 3 | 2 | EA | Operator guard plate No 45-00 | 12.50 | 25.00 |

INTERNAL REMARKS          APPROVALS:
Please ensure that vendor has
all items prior to releasing     Dept Head _____
the order. No partial shipment
will be accepted.                Purchasing _____

This sample purchase order print format is the standard shipped with the GATEWAY 2000/MRO Software.

Gateway 2000/MRO Manual at p. 6-35. These two illustrations show that no vendor information is included in either the requisition or the purchase order. In contrast, in the method of claim 26, when the requisition is created, it includes items and their associated sources. Thus, as with the P.O. Writer system, in the Gateway 2000/MRO system sources for requisitioned products are selected by the person creating the purchase order, while in the method of claim 26,

the source data is included in the requisitioning step that comes from the results of searches of

vendor catalogs. (Hilliard Decl. para. 166.)

With regard to the last step of claim 26, the Gateway 2000/MRO Manual fails to disclose

or even suggest the step of "determining whether a selected matching item is available in

inventory." In rejecting this claim limitation, the Examiner again relies on page 4-17 of the

Gateway 2000/MRO Manual. (Office Action at 52.) As discussed above, this page deals with

stock ordering, inventory replenishment and does not teach ordering from vendor catalogs.

Moreover, the Examiner's interpretation of the Gateway 2000/MRO Manual relies on a mistaken

understanding of the manual. The "not on file" response quoted by the Examiner (*see* Office

Action at 52) refers to whether an item is in the database, not whether there is any available

inventory for an item that is listed in the database. (Hilliard Decl. para. 168.)

For at least the above reasons, the Gateway 2000/MRO Manual fails to teach each

element or limitation of claim 26. The Patent Owner, thus, requests that the rejection of claim

26 as anticipated by the Gateway 2000/MRO Manual be withdrawn.

### 2.   Claim 27

Claim 27 depends from claim 26. Because the Gateway 2000/MRO Manual fails to

disclose each and every element of independent claim 26, upon which this claim depends, it

necessarily fails to disclose each and every element of claim 27. In addition, the Gateway

2000/MRO Manual fails to disclose or even suggest the limitation of "include[ing] data relating

to a vendor catalog number for the selected matching items." In rejecting this claim, the

Examiner relies on page 6-35 of the Gateway 2000/MRO manual. (Office Action at 52.) This

page is simply a printout of a purchase order which illustrates that every line on the purchase

order has a product or item number. However (as described in the discussion of the 5th element

of Claim 26, above, which illustrates the same page), this purchase order has no relationship to

any catalog selection and/or searching. (Hilliard Decl. para. 170.) Accordingly for at least these reasons, the Gateway 2000/MRO Manual does not anticipate claim 27. The Patent Owner requests that the rejection of claim 27 as anticipated by the Gateway 2000/MRO Manual be withdrawn.

### 3.    Claim 28

Independent claim 28 recites substantially the same features as claim 26 except that the step of "determining whether a selected matching item is available in inventory" has been replaced with the step of "converting data relating to a selected matching item and an associated source to data relating to an item and a different source." For the reasons articulated above in the discussion of claim 26, the Gateway 2000/MRO Manual does not disclose or even suggest the first five steps of claim 28.

Moreover, the Gateway 2000/MRO Manual also fails to disclose or even suggest the step of "converting data related to a selected matching item and an associated source to data relating to an item and a different source." In rejecting this claim step, the Examiner relies principally on pages 4-26 through 4-28 of the Gateway 2000/MRO Manual. (Office Action at 53.) These pages deal with modifying fields in the requisition (*i.e.*, this subsection of the Gateway 2000/MRO Manual is titled "Requisition Maintenance"). The purchase order has not yet been created. In fact, the first sentence on page 4-26 states:

> Requisitions can be changed or updated at any time until a purchase order is prepared. Once an order is created, the requisition is locked and any maintenance must be performed using the purchase order maintenance process.

This is clearly out of sequence with the steps in claim 26. Moreover, because the source is not specified in the requisition of the Gateway 2000/MRO Manual, even if it is assumed that the timing of the step is irrelevant, the Gateway 2000/MRO Manual teaching is limited to manual modification of an existing requisition and (a) there is no teaching about the system

performing any "conversion" (from anything to anything else, let alone conversion from one source-associated item to another source-associated item), and (b) as stated above, the source (if existing in a requisition at all) is not associated with any catalog selection/search process but must, optionally, be entered manually. In addition to pages 4-26 through 4-28 of the Gateway 2000/MRO Manual, the Examiner also relies on pages 12-3 and 4-8 through 4-9 of the Gateway 2000/MRO Manual, but as shown below in the illustration on page 12-3 the vendor fields are blank.



This illustration confirms that the vendor was not picked up as the source through the catalog selection/search process. Further, pages 4-8 through 4-9 contain no teaching related to "converting data relating to a selected matching item and an associated source to data relating to an item and a different source." (Hilliard Decl. para. 173.)

For at least the above reasons, the Gateway 2000/MRO Manual fails to teach each element or limitation of claim 28. The Patent Owner requests that the rejection of claim 28 as anticipated by the Gateway 2000/MRO Manual be withdrawn.

Application No.: 90/008,104                    75                    Docket No.: EPL-001REX

### 4.    Claims 29 and 30

Regarding claims 29 and 30, because the Gateway 2000/MRO Manual fails to disclose each and every element of independent claim 28, upon which these claims depend, it necessarily fails to disclose each and every element of claims 29 and 30.

Claim 29 sets forth "determining whether a selected matching item is available in inventory." This limitation is also found in claim 26. The Gateway 2000/MRO Manual fails to teach this limitation for the reasons set forth above with respect to claim 26.

With regard to claim 30, the Gateway 2000/MRO Manual fails to disclose or even suggest the limitation of "determining the applicable price of a selected matching item." In rejecting this limitation of claim 30, the Examiner relies on pages 4-8 and 4-20 of the Gateway 2000/MRO manual. (Office Action at 54.) But instead of showing how the Gateway 2000/MRO Manual anticipates the claim, these pages show why it is that the Gateway 2000/MRO system does not operate as disclosed claim 30. Specifically, (a) page 4-8 of the Gateway 2000/MRO Manual has no teaching that items have associated prices, only that once prices have been entered into the system and a purchase order has been created, the system is optionally capable of computing sales tax on those prices, and (b) page 4-20 of the Gateway 2000/MRO Manual describes a process by which pricing (if known) may optionally be manually entered into the system during purchase order creation. There is no teaching of the system being able to recognize or use any applicable price for an item. (Hilliard Decl. para. 175.)

For at least the above reasons, the Gateway 2000/MRO Manual fails to teach each element or limitation of claims 29 and 30. The Patent Owner requests that the rejections of claims 29 and 30 as anticipated by the Gateway 2000/MRO Manual be withdrawn.

Application No.: 90/008,104                76                Docket No.: EPL-001REX

### 5.    Claim 31

Independent claim 31 includes substantially the same limitations as independent claims 26 and 28. Therefore, for the reasons articulated above with respect to claims 26 and 28 the Gateway 2000/MRO Manual fails to anticipate claim 31. The Patent Owner requests that the rejection of claim 31 as anticipated by the Gateway 2000/MRO Manual be withdrawn.

### 6.    Claims 32, 33, 34 and 35

Claims 32, 33, 34 and 35 depend from independent claim 31. Because the Gateway 2000/MRO Manual fails to disclose each and every element of independent claim 31, upon which these claims depend, it necessarily fails to disclose each and every element of claims 32, 33, 34, and 35.

In addition, with regard to claim 32, the Gateway 2000/MRO Manual also fails to disclose or even suggest the limitation of "purchase orders use data relating to at least two sources." In rejecting claim 32, the Examiner relies on pages 4-8–9, 4-18–19 and 15-42 in the Gateway 2000/MRO Manual. (Office Action at 56.) Because this is a dependent claim, the Gateway 2000/MRO system cannot anticipate the patent for this claim for the same reasons it fails to anticipate claim 31. In addition, as described above, none of the referenced pages of the Gateway 2000/MRO Manual describes a relationship with even a single source that can be used for building a requisition or generating a purchase order, so it certainly does not describe data relating to multiple sources. (Hilliard Decl. para. 178.)

Claim 33 sets forth that "the purchase orders use data relating to catalog numbers." The Gateway 2000/MRO Manual fails to teach this limitation for the reasons set forth above with respect to claim 27.

Claim 34 sets forth the step of "determining whether a selected matching item is available in inventory." The Gateway 2000/MRO Manual fails to teach this limitation for the reasons set forth above with respect to claim 29.

Claim 35 sets forth the step of "determining the applicable price of a selected matching item." The Gateway 2000/MRO Manual fails to teach this limitation for the reasons set forth above with respect to claim 30.

For at least the above reasons, the Gateway 2000/MRO Manual fails to teach each element or limitation of claims 32, 33, 34 and 35. The Patent Owner requests that the rejections of claims 32, 33, 34 and 35 as anticipated by the Gateway 2000/MRO Manual be withdrawn.

### 7. Claim 36

Independent claim 36 recites substantially the same limitations as independent claims 26, 28 and 31, and the Examiner has utilized the same reasoning with this claim as with claims 26, 28 and 31. The Gateway 2000/MRO manual fails to anticipate claim 36 for at least the reasons articulated above with respect to claims 26, 28 and 31. The Patent Owner requests that the rejection of claim 36 as anticipated by the Gateway 2000/MRO Manual be withdrawn.

### 8. Claims 37, 38 and 39

Claims 37, 38 and 39 depend from claim 36. Because the Gateway 2000/MRO Manual fails to disclose each and every element of independent claim 36, upon which these claims depend, it necessarily fails to disclose each and every element of claims 37, 38 and 39. In addition, as the Examiner has utilized the same reasoning with these claims as with similar claims 32, 26 and 30, respectively, (Office Action at 58-59.) the Gateway 2000/MRO Manual fails to anticipate claims 37, 38 and 39 for the same reasons set forth above with regard to claims 32, 26 and 30. The Patent Owner requests that the rejections of claims 37, 38 and 39 as anticipated by the Gateway 2000/MRO Manual be withdrawn.

### 9.    Claim 40

Independent claim 40 recites limitations that are substantially the same as those recited in independent claims 26, 28, 31 and 36 with the exception of the first claim limitation. The Examiner has utilized the same reasoning with this claim as with claims 26, 28, 31 and 36. (Office Action at 59-60.) The Gateway 2000/MRO manual fails to anticipate the final four steps of claim 40 for the reasons set forth above with regard to claims 26, 28, 31 and 36. The Patent Owner requests that the rejection of claim 40 as anticipated by the Gateway 2000/MRO Manual be withdrawn.

### 10.    Claim 41

Independent claim 41 recites substantially the same claim limitations as claim 40 except that the last step of "determining whether a selected matching item is available in inventory" has been replaced with the step of "converting data relating to a selected matching item and an associated source to data relating to an item and a different source." As discussed above in the context of claim 28, the Gateway 2000/MRO manual fails to provide support for this claim limitation, and the Examiner has utilized the same reasoning with this claim as with claims 40 and 28. (Office Action at 60-61.) Accordingly, the Gateway 2000/MRO manual fails to anticipate claim 41 for the reasons set forth above with respect to claims 40 and 28. Therefore, the Patent Owner requests that the rejection of claim 41 as anticipated by the Gateway 2000/MRO Manual withdrawn.

### 11.    Claims 42, 43 and 44

Claims 42, 43 and 44 depend from claim 41. Because the Gateway 2000/MRO Manual fails to disclose each and every element of independent claim 41 upon which these claims depend, it necessarily fails to disclose each and every element of claims 42, 43 and 44. In addition, the Examiner has utilized the same reasoning with these claims as with similar claims 32, 26 and 30. (Office Action at 62-63.) The Gateway 2000/MRO Manual fails to anticipate

Application No.: 90/008,104                79                Docket No.: EPL-001REX

claims 42, 43 and 44 for at least the reasons set forth above with respect to claims 32, 26 and 30.

The Patent Owner therefore requests that the rejections of claims 42, 43 and 44 as anticipated by

the Gateway 2000/MRO Manual be withdrawn.

### 12.    Claim 45

Independent claim 45 claim contains limitations that are identical to those recited in the

other independent claims already discussed (e.g., claim 26, etc.), and the Examiner has utilized

the same reasoning with this claim as with those claims. (Office Action at 63-64.) Therefore,

for the reasons articulated above, the Gateway 2000/MRO manual fails to anticipate claim 45.

The Patent Owner requests that the rejection of claim 45 as anticipated by the Gateway

2000/MRO Manual be withdrawn.

## VIII.   CONCLUSION

In view of the above, each of the claims under reexamination is believed to be patentable

over the cited references. Accordingly, the Examiner is respectfully requested to withdraw the

outstanding rejections of the claims under reexamination and to issue a reexamination certificate

confirming the patentability of these claims.

Dated: May 29, 2008                    Respectfully submitted,

                                       By    _Thomas J. Scott_
                                             Thomas J. Scott, Jr.
                                             Registration No.: 27,836
                                             GOODWIN PROCTER LLP
                                             901 New York Avenue, N.W.
                                             Washington, DC 20001
                                             (202) 346-4000
                                             Attorney for Patent Owner