# EXHIBIT C

Control No.: 90/008,104                                          Docket No.: EPL-001REX
Appeal Brief under 37 C.R.F. § 41.37
Evidence Appendix

**Exhibit 4)**     Declaration Under 37 C.F.R. § 1.132 of Brooks L. Hilliard Supporting

Patentability of U.S. Patent No. 6,023,683 and Traversing Rejections in Office

Action Dated 2/29/2008 of May 29, 2008.

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| **In re Reexamination of:** | ) | |
| | ) | |
| **Patent Number:  6,023,683** | ) | **Group Art Unit:  3992** |
| | ) | |
| **Control Number:  90/008,104** | ) | **Examiner:  Joseph R. Pokrzywa** |
| | ) | |
| **Filing Date:  9/15/2006** | ) | |
| | ) | |
| **For:  ELECTRONIC SOURCING** | ) | |
| **        SYSTEM AND METHOD** | ) | |
| | ) | |

**Commission for Patents**
**P.O. Box 1450**
**Alexandria, VA 22313-1450**

### DECLARATION UNDER 37 C.F.R. § 1.132 OF BROOKS L. HILLIARD SUPPORTING PATENTABILITY OF U.S. PATENT NO. 6,023,683 AND TRAVERSING REJECTIONS IN OFFICE ACTION DATED 2/29/2008

I, Brooks L. Hilliard, being over eighteen years of age, declare and state the following:

## I.    INTRODUCTION

1.    I have been asked by ePlus, Inc. ("ePlus"), the owner of U.S. Patent 6,023,683 (the '683 patent), to provide my expert opinion in support of the patentability of the claims and traversing the claims rejections set forth in the Office Action dated February 29, 2008 ("Office Action") in the above-captioned reexamination application.  I am being compensated for my time at the rate of $450 per hour.

2.    I currently hold the opinions set forth in this declaration.

3.    In summary, it is my opinion that the rejections set forth in the Office Action fail to anticipate many of the claim elements of at least each independent claim of the '683 patent that is under reexamination.  My detailed responses to the Examiner's outstanding rejections are set forth below.

1

## II.     BACKGROUND/QUALIFICATIONS

4.     In terms of my background and experiences that qualify me as an expert in this case, I earned my Science Baccalaureate Degree in Mechanical Engineering from the Massachusetts Institute of Technology (where I earned Deans' List academic honors) in 1968.  I also obtained a Masters in Business Administration degree from Harvard Business School in 1973.

5.     I am a Certified Management Consultant.  The Certified Management Consultant (CMC®) designation is an internationally-recognized standard of competence and professional conduct for the individual management consultant.  CMC certifications in the United States are awarded by the Institute of Management Consultants USA, the founding affiliate of the International Council of Management Consulting Institutes ICMCI), a world-wide organization with affiliated Institutes in more than 40 countries.  Requirements for CMC certification, under the quality control supervision of the ICMCI, include: (a) Experience: Three years in practice as a full-time consultant, with major management responsibility, (b) Education: Degree from a four-year college, (c) References: Five satisfactory references from officers or executives of client organizations, (d) Engagements: Written summaries and discussions with panel of five client assignments, (e) Application: Written response to an engagement case study and presentation to a panel, (f) Competence: Qualifying written examination and oral review by senior CMCs to demonstrate professional competence and currency in areas of specialization, application of experience, and understanding of the management consulting process and common body of knowledge, and (g) Ethics: Written examination and oral interview on the IMC Code of Ethics and ethical aspects of consulting.  CMC certification must be renewed every three years and requires ongoing management consulting education in addition to the continued adherence to the initial qualification requirements.

6.     Additionally, I am a Certified Computing Professional.  The Certified Computing Professional (CCP) certification program is directed to senior level personnel in the information processing industry and is the only broadly applicable and internationally recognized certification program in the profession, and the only certification program that is independent of individual computing products and services vendors.  The CCP is awarded by the Institute for the Certification of Computing Professionals (ICCP) which operates under the direction of seven constituent societies and seventeen affiliate societies in nine countries around the world including: the Association for Computing Machinery (ACM), the Association for Information Technology Professionals (AITP, formerly DPMA), the Canadian Information Processing Society, the Information Systems Consultants Association and the Independent Computer Consultants Association, among others. Requirements for the CCP certification include: (a) Experience: At least 48 months of full-time (or part-time equivalent) direct experience in computer-based information systems, (b) Examination: A 70% or higher passing grade on at least three objective ICCP-administered examinations, one in core computing technology and at least two more in specialty computing technologies, and (c) Ethics: Adherence to the ICCP's Codes of Ethics, Conduct, and Good Practice. CCPs must recertify every three years, which requires maintaining currency in the field, meeting continuing professional education requirements and continued adherence to the ethics code.

7.     I am one of fewer than fifteen (15) consultants in the world to have been certified as both a CMC and a CCP.

8.     I served as a Faculty Associate with the Arizona State University School of Business during the early 1980s, where I taught computer systems and programming.

3

9.     For the past 25 years, I have served as a consultant for numerous businesses in a wide variety of industries including businesses engaged in manufacturing and distribution.  Some of the clients for whom I have provided consulting services in the information technology field have included Advanced Controls Corp, Irvine, CA; Aircraft Gear Corp, Mesa, AZ; American Transit Systems (Phoenix Transit), St. Louis, MO; Arizona Attorney General's Office, Phoenix, AZ; Arizona Industries for the Blind, Phoenix, AZ; Atlas Roofing, Meridian, MS; Coreslab Systems, Austin, TX; Dowty Aerospace, St. Louis, MO; City of Glendale; Glendale, AZ; Insilco Technologies, Raleigh, NC; Paddock Pools, Scottsdale, AZ; Regional Public Transit Authority, Phoenix, AZ; Shasta Industries, Phoenix, AZ; Sinclair Paint, Los Angeles, CA; Southern Holdings, New Orleans, LA; Stewart Stamping Corp, Yonkers, NY; and others.  In connection with such consulting engagements, I have evaluated and/or investigated numerous procurement systems, materials resource planning (MRP) systems, enterprise resource planning (ERP) systems, electronic data interchange (EDI) systems and Internet-based e-procurement systems and portals, and have assisted my clients in selecting systems among these options for implementation in their businesses.  I have evaluated well over 100 Enterprise Resource Planning (ERP) and "vertical market" business systems (i.e., ERP-type systems with all the functionality of an ERP system, but designed for a specific industry and not using the ERP designation), nearly all of which included procurement functionality (e.g., MRP, requisition and purchase order generation, EDI, etc.) as critical components, and have assisted more than 150 clients in selection and implementation of such systems in their businesses. Among the systems I evaluated and/or assisted in implementing clients have included systems from such vendors as Oracle, J.D. Edwards (now Oracle), PeopleSoft (now Oracle), Baan (now Infor ERP Baan) , Symix (now Infor ERP SyteLine), SSA Global (now Infor ERP LN), Lawson

4

Software, Friedman and Epicor, among others.  In addition, some of my engagements have required that I conduct a "fair market" valuation of certain computer systems, software and related equipment.

10.    I have authored a book entitled "Buying a Computer for your Growing Business, An Insider's Guide," which was published by Dow Jones in 1984, providing advice to owners and top managers of mid-size businesses on the selection and implementation of computer systems and software for critical business applications (i.e., what are now referred to as "enterprise" applications).

11.    I have been retained for professional speaking engagements for over 20 business and industry associations, including: the American Edged Products Manufacturers Association, Potomac Falls, VA; the Arizona Newspaper Association, Phoenix, AZ; the Associated Oregon Loggers, Salem, OR; the Cookware Manufacturers Association, Birmingham, AL; the Electronic Industries Alliance, Arlington, VA; the Floor Covering Installation Contractors Association, W. Bloomfield, MI; Georgia Telephone Association, Atlanta, GA; the International Council of Shopping Centers, New York, NY; the International Wood Products Association, Alexandria, VA, the Measurement Control and Automation Association, Williamsburg, VA, and the National Association of Metal Finishers, Washington, DC; among others.  Topics of my speeches have included areas such as use of the Internet for enterprise applications including materials procurement, business-to-business and business-to-consumer sales and customer support.  I have also conducted seminars on computer technology in business for the American Management Association.

12.    In addition to my consulting activities, I am currently serving as Chairman of the Ethics Committee for the Institute of Management Consultants USA in Washington, DC,

and have served on the National Board of Directors and Arizona Chapter Board of Directors of the Institute in the past.

13.     I have served as board member for both the Arizona Harvard Business School Association and the Arizona Alumni Organization for the Massachusetts Institute of Technology.

14.     I am a member of the Arizona Technology Council, the Independent Computer Consultants Association, the Forensic Expert Witness Association and the IEEE.

15.     I have been qualified as an expert in the field of computer systems and software in various state and federal courts, and have testified as an expert witness in more than 35 computer-related cases.

16.     My fields of expertise include the functionality, operation, sales, selection, implementation, use and support of computer systems for business applications, including the prevailing customs and practices of the industry in those areas and the prevailing standards of care exercised by buyers, sellers and servicers of such systems.  I have particular experience and expertise in "enterprise" software applications, including purchasing and procurement software, where I have consulted for dozens of clients in several industries.  I also have considerable expertise in (a) software and software standards (including development of software and associated documentation standards), (b) hardware, networking and communications systems capability and functionality for business applications of computers, and (c) various business software packages in use for "enterprise" and "desktop" business applications.  I have this expertise for systems and software in use from at least the early 1980s to the present.

17.     A detailed *curriculum vitae* showing more of my credentials is attached as Exhibit 1.

6

## III.   MATERIALS REVIEWED

18.     In forming the opinions set forth in this declaration, I have reviewed the prosecution history of the '683 patent, the Office Action dated 2/29/2008, the reference identified as the "J-CON Manual, Volume 1," the reference identified as "A Practical Guide to SABRE Reservations and Ticketing," the reference identified as the "P.O. Writer Plus Guided Tour Version 10.0," and the reference identified as the "Gateway 2000/MRO."

## IV.   FIELD OF THE INVENTION AND PERSON OF ORDINARY SKILL IN THE ART

19.     It is my understanding that my analyses regarding the patentability of the claims of the '683 patent are to be undertaken from the perspective of what would have been known or understood by someone of ordinary skill in the art at the time of the inventions claimed in the '683 patent.  Therefore, I will define the relevant field of the inventions and the level of ordinary skill in that field at the time of the claimed invention.

20.     It is my opinion that the relevant fields of the invention claimed in the '683 patent and, consequently, in the above-captioned reexamination proceedings, are the fields of computerized systems for procurement of goods, and computerized systems for processing requisitions and purchase orders.  These systems are also known in the art as electronic sourcing systems.

21.     Based on my study of the '683 patent's specification and claims, prosecution file history, and over thirty-five years of experience in the computer science field, it is my opinion that they are directed to a person in the field of computer science with an undergraduate Bachelor of Science degree, or equivalent, and some practical programming experience, perhaps about a year or two of experience, and having an understanding of basic principles of supply chain management and procurement in the 1993 to mid-1994 time frame

7

when the inventors of the '683 patent conceived their invention and reduced it to practice. With over thirty-five years of experience in the computer systems and software field, I am well acquainted with the level of ordinary skill required to implement computerized processes and the computer systems and software used to implement them. I have direct experience and am capable of rendering an informed opinion on what the level of ordinary skill in the art was for such persons in 1993-1994. Moreover, I have an understanding of supply chain management and procurement principles and am capable of rendering an informed opinion in that area.

22.    The level of technical specificity provided in the patent specification would have been sufficient for a person with an undergraduate Bachelor of Science in Computer Science degree (or equivalent) with some practical programming experience to build and implement the systems and computer-implemented methods claimed in the '683 patent claims that are under reexamination. I believe that some understanding of supply chain management and procurement concepts would have been useful to enable the computer scientist to understand the concepts described and claimed in the '683 patent. Therefore, my analysis of the proper meaning of the terms and phrases used in the claims of the'683 patent as well as my analysis of issues relating to the validity of the '683 patent will be undertaken from this perspective.

23.    It is my understanding that the hypothetical "person of ordinary skill in the art" is the prism through which the inventions and prior art must be reviewed. The same hypothetical "person of ordinary skill in the art" applies for all claims in a patent. The definition does not change based upon the claim under review. Nor does it change based upon differing claim construction theories. Once the "person of ordinary skill in the art" has been determined, the question is then whether that hypothetical person of ordinary skill in the art could have implemented the systems and methods of the claimed inventions based upon the teachings of the

asserted prior art and his background knowledge and level of skill. My understanding is that such a person must be able to *implement* the claimed inventions, not merely *use* the claimed invention. In other words, with respect to the method claims at issue, this hypothetical person of ordinary skill in the art must be able to design and make a system that would perform the claimed method, not merely make use of a system that was previously built to perform the claimed method. The patent specification is not directed to someone with a business degree. Rather, it is directed to someone having an undergraduate computer science degree or equivalent having some programming experience and an understanding of supply chain management and procurement principles.

24.     Based on my review of the four documents use by the Examiner (i.e., the "J-CON Manual, Volume 1", "A Practical Guide to SABRE Reservations and Ticketing", "P.O. Writer Plus Guided Tour Version 10.0", and "Gateway 2000/MRO"), I have found no portions in any of these references that would allow a person of ordinary skill in the art to implement the described systems. Indeed, all four of these references are what those of ordinary skill in the art would customarily describe as "*user manuals*" that do no more that describe how to *use* the alleged prior art systems, rather than how to implement them. I therefore disagree with the Examiner's contention that these documents constitute valid prior art that anticipates the claims under reexamination.

## V.     UNDERSTANDING OF THE LAW TO BE APPLIED TO DETERMINE PATENTABILITY

25.     In formulating my opinions and conclusions in this case, I have been provided with an understanding of the prevailing principles of U.S. patent law that govern the issues of patent claim interpretation and patentability. As a result, I understand that it is a basic principle of patent law that assessing the patentability of a patent claim involves a two-step

9

analysis. In the first step, the claim language must be properly construed to determine its scope and meaning. In the second step, the claim as properly construed, must be compared to the alleged prior art to determine whether the claim is patentable.

26.    In performing my analysis of the proper interpretation to be given to the claims of the '683 Patent, I understand that I should look to the "intrinsic evidence" for their meaning, starting with the language of the claims themselves.  As an initial matter, claim terms should be given their ordinary meaning to a person of ordinary skill in the art.

27.    In addition, I understand that if a term used in a claim has a plain and ordinary meaning on its face, I am not to construe any special meaning for that claim term unless the patentee provided a special meaning in the patent.

28.    Moreover, because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims.

29.    Differences among claims can also be a useful guide in understanding the meaning of particular claim terms.  For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim.

30.    I further understand that I may also consult the patent specification and drawings in formulating the proper construction to be accorded to particular claim terms since the patent claims should be read in view of the specification of which they are a part.

31.    Moreover, the specification may reveal that the inventor gave a special definition to a claim term which differs from the ordinary and customary meaning of such term, in which case, the inventor's lexicography governs.  In other cases, the specification may reveal

an intentional disavowal of claim scope by the inventor and, in such cases, the inventor's intention also governs.

32. However, it is my understanding that it is improper to limit the claims to specific embodiments described in the specification or to import limitations from the specification into the claims. That is because the claim terms mean what they say to a person of ordinary skill in the art, and it is improper to look first to the embodiments in the specification to interpret the terms of the claims. Moreover, the specification does not delimit the patent owner's legal rights. That is the function and purpose of the claims. Additionally, a person of ordinary skill in the art has knowledge beyond what is written in the specification and such knowledge may be used to understand the meanings of the claim terms.

33. In addition to consulting the specification, I understand that the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the scope of the invention during prosecution, thereby making the claim scope narrower than it would otherwise be understood by a person of ordinary skill in the art. However, because the prosecution history represents an ongoing negotiation between the Patent Office and the inventor, rather than the final product of the negotiation which is the issued patent, it lacks the clarity of the specification and is therefore less useful for claim construction purposes.

34. I further understand that extrinsic evidence such as inventor testimony, dictionaries and learned treatises are less reliable than the intrinsic record in determining the meaning of claim language because such evidence often focuses the inquiry on the abstract meaning of the terms rather than on the meaning of such terms in the proper context of the claims and patent specification. Such evidence, however, may be useful to confirm that the

11

inventor used a claim term in a manner consistent with its customary and ordinary meaning to persons of ordinary skill in the art.

35.     It is my understanding that only information which satisfies one of the categories of prior art set forth in 35 U.S.C. § 102 may be used in any invalidity analysis under §§ 102 or 103.  Therefore, if information is not properly classified as prior art under one of the subsections of § 102, then it may not be considered in an anticipation or obviousness determination.

36.     I am informed and understand that in order for a document to constitute a "printed publication" under Section 102 and thus qualify for possible "prior art" under the patent laws, the challenger must present clear and convincing evidence that the document was publicly distributed and accessible to the public interested in the art.  In other words, the alleged "printed publication" must be a work of public character intended for general use and within the reach of the relevant public (i.e., persons of ordinary skill in the relevant art).  I understand that private documents designed for use by a restricted group do not constitute "printed publications" available for use as prior art.  The evidence must establish that the work was published at the relevant time in such a manner that anyone who chooses may avail himself of the information in the work.  Moreover, if a work can be located only by a person who has been informed of its existence, and not by means of customary research aids available at the relevant time, such as catalogs and indexes, the probability of knowledge of the work by the relevant public is low and, as a result, such a work cannot constitute a "printed publication" under the patent laws.

37.     Having over 35 years of computer industry experience related to commercial software products for business applications, I am very knowledgeable about the normal customs and practices of the commercial software industry.  I have also negotiated well

over 100 contracts between software companies licensing business software and their customers. One important facet of these customs and practices which relates to the software system manuals referred to by experts in this matter is whether such manuals are, as I understand is required by patent law, normally "accessible to the relevant public." In fact, in the cases of J-CON, P.O Writer, and Gateway 2000, they are not. It is the normal custom and practice of software developers not to release manuals or system documentation to anyone other than licensed users, and even then nearly every contract for commercial software states that this documentation is proprietary to the licensor, cannot be disclosed to anyone outside of the licensee's company and must be destroyed or returned to the licensor upon termination of the license or termination of use. In addition, such manuals and publications are normally marked as proprietary and confidential, including a prohibition against unauthorized disclosure (*i.e.*, disclosures prohibited by the terms of the license). Thus, these manuals are not within reach of those in the computer science field with practical programming experience (*i.e.*, one of ordinary skill in the art). For this reason, I disagree with the Examiner's contention that the "J-CON Manual, Volume 1", "P.O. Writer Plus Guided Tour Version 10.0", and "Gateway 2000/MRO" constitute valid prior art that anticipates the patent at issue.

38.    I am also informed and understand that, in order to be considered prior art which would anticipate or render a claimed invention obvious and invalid, a reference must be enabling and must describe the claimed invention sufficiently to have placed it in the possession of a person of ordinary skill in the field of the invention. In other words, the disclosure within the "four comers" of the alleged prior art document must be sufficiently detailed to enable a person of ordinary skill in the relevant field to make and use the claimed invention.

39.     Furthermore, it is my understanding that to anticipate a patent claim under 35 U.S.C. § 102, a single asserted prior art reference must disclose each and every element of the claimed invention, either explicitly or inherently to a person of ordinary skill in the art.  There must be no difference between the claimed invention and the disclosure of the alleged prior reference as viewed from the perspective of the person of ordinary skill in the art.  Also, I understand that in order for a reference to be an anticipating reference, it must describe the claimed subject matter with sufficient clarity to establish that the subject matter existed and that its existence was recognized by persons of ordinary skill in the field of the invention.  In addition, I am informed and understand that in order to establish that an element of a claim is "inherent" in the disclosure of an asserted prior art reference, the extrinsic evidence (or the evidence outside the four corners of the asserted prior art reference) must make clear that the missing element is the inevitable outcome of the process and/or thing that is explicitly described in the asserted prior art reference, and that it would be recognized as necessarily present by persons of ordinary skill in the relevant field.  Inherency, I understand, however, may not be established by mere probabilities or possibilities.  In other words, the mere fact that a certain thing may result from a given set of circumstances is not sufficient.

40.     Therefore, I will analyze the Office Action's contention that the claims of the '683 under reexamination are fully anticipated by the prior art using this proper analysis.

## VI.     CLAIM CONSTRUCTION

41.     It is my understanding that the Court of Appeals for the Federal Circuit, the statutory court of appeal from the Patent Office, has provided guidance to the Patent Office regarding claim construction.  Specifically, I understand the Court's guidance to be that during reexamination, as with original examination, the PTO must give claims their broadest reasonable construction consistent with the specification.

14

42.     In addition to giving claims their broadest reasonable interpretation consistent with the specification, I understand that the claim language should be read in light of the specification as it would be interpreted by one of ordinary skill in the relevant art. In particular, I understand that various legal precedents have established that "The PTO must apply the broadest reasonable meaning to the claim language, taking into account any definitions presented in the specification." However, in a 2005 decision, the Court set forth the best practices for claim construction, stating that the words of a claim "are generally given their ordinary and customary meaning [which] is the meaning that the term would have to a person of ordinary skill in the art in question."

43.     Therefore, in construing the specific terms used in the claims of the '683 patent, I have accorded them their broadest reasonable scope consistent with the manner in which these terms are used in the specification and also consistent with a construction that those skilled in the art in question would have reached. I have reviewed the specification to find explicit definitions of selected claim terms. To the extent that definitions were not explicitly made, I relied on my personal knowledge of what was known to the person of ordinary skill in the relevant art at the time of the invention based my years of experience up to and including the time that the subject matter of this invention was conceived. I also consulted the "American Production and Inventory Control Society (APICS) Dictionary, 7[th] Edition," Cox, Blackstone and Spencer, 1992 and the "National Association of Purchasing Management (NAPM) Glossary of Key Purchasing Terms, Second Edition," Gentry, Langdon and Dobler, 1996 to provide further evidence of the accepted meaning of the claim terms in the relevant art. Based on my review of the Office Action, I believe that in the Examiner has failed to construe several of the claim terms in a manner consistent with the specification and what those terms would mean to a

person of ordinary skill in the art, in direct contradiction to the Federal Circuit's guidance.  I

have based the opinions set forth herein on the following claim constructions:

**A.**    **Catalog:**  an organized collection of items and associated information which

typically includes a part number, price, catalog number, vendor name, vendor ID, a textual

description of an item, and images of or relating to the item.  This construction is entirely

consistent with the term's usage in the '683 patent's specification.  *See, e.g.*, Specification at Col.

4:36-42 ("Local computer 20 is also provided with a catalog database 36 comprised preferably of

at least two vendor product catalogs.  The catalogs, and hence catalog database 36, preferably

include such information as part number, price, catalog number, vendor name or I.D., and vendor

catalog number, as well as textual information and images of or relating to the catalog

products.").  *See also*, Col. 9:53-10:8.  Applying my experiences as one of ordinary skill in the

art and the broadest common usage of the term "catalog," its construction must be stated in a

way that both fulfill a catalog's essential purpose as a product reference used by buyers for

shopping, and distinguishes it from a mere price list.  As such, a catalog must include not only

the attributes of a price list (i.e., product or catalog number, a brief description and price), but

also significant additional descriptive information (e.g., some or all of the following: vendor

name or I.D., vendor catalog number, graphic image if applicable, etc.).

**B.**    **Database:**  a collection of related information stored on a computer system

organized in a useful manner that provides a base or foundation for procedures, such as

retrieving information.  This construction is entirely consistent with the term's usage in the

specification.  *See, e.g.*, Specification at Col. 4:20-25 ("These database 42 preferably include

requisition databases 42A, inventory databases 42B and customer-specific databases 42C…");

*See also*, Col. 4:36-45, Col. 4:66-Col. 5:8.

**C.     Inventory:** a stock of items in a location, which may be available for sale or use, or may be committed for some particular use or delivery. *See, e.g.,* Specification at Col. 3:19-24 ("Additionally, the invention includes a means for checking the availability in one or more inventory locations of the desired catalog items, and for generating one or more purchase orders for desired items from inventory locations stocking the items."). *See also, e.g.,* Specification at Col. 4:66 – Col. 5:4 ("Host pricing and inventory databases 11 may include such information as: descriptions of the items and the quantities thereof available at a particular Distributor warehouse and at other Distributor warehouses; item records for each Product regularly sold by the Distributor; discount records by Customer; . . ."). This construction is confirmed by the 1992 APICS Dictionary, which defines "available inventory" as "The on-hand balance minus allocations, reservations, backorders, and (usually) quantities held for quality problems . . . Syn: net inventory." *See* APICS Dictionary, p. 3. It is also confirmed by the 1992 APICS Dictionary's definition of the term "stock" as "1) items in inventory, 2) Stored products ready for sale . . ." *See* APICS Dictionary, p. 48.

**D.     Item:** products or services. *See, e.g.,* Specification at Col. 9:30-43 ("If the user has marked an item on Requisition Management data screen 110 with the designation 'S,' the entered data at least partially describing the item will be sent to Shell 52 and TV/2 search program 50 in the manner described above. TV/2 search program 50 will search catalog database 36 for all items that match the search field sent over from REQI program 44A and Requisition Management data screen 110. When a search is performed in Shell 52 and search program 50, a Hit List 47 is produced, as indicated in FIG. 1C.") *See also,* Abstract of the Disclosure. This construction is confirmed by the 1992 APICS Dictionary, which defines an

item as "Any unique manufactured or purchased part, material, intermediate, subassembly, or

product." *See* APICS Dictionary, p. 24.

      **E.**    **Requisition:**  a formal request to purchase something. This construction is also

entirely consistent with the term's usage in the specification. *See, e.g.*, Specification at Col.

7:60-66 ("The user can next enter desired items and quantities for the requisition. Each desired

item may be identified by entering its distributor catalog or part number, if known, in the field

below the STOCK NBR label on the appropriate line in Requisition Item Table 46 shown on

Requisition management data screen 110."). This definition is consistent with the term's usage

in the relevant art, as confirmed by the APICS Dictionary, which defines a requisition as, "a

document conveying authority to the purchasing department to purchase specified materials in

specified quantities within a specified time" (*See* APICS Dictionary, p. 40). The 1996 NAPM

Glossary of Key Purchasing Terms also confirms the above construction with its definition of a

purchase requisition as "A written or computerized request to the purchasing department for the

procurement of goods or services from suppliers" (*See* NAPM Glossary of Key Purchasing

Terms, p. 21).

      **F.**    **Purchase Order:**  a contractual document prepared by a buyer committing to buy

something from a seller (*e.g.*, the Uniform Commercial Code, Article 2, Section 2, Paragraph

201 states that "a contract for the sale of goods for the price of $500 or more is not enforceable

by way of action or defense unless there is some writing sufficient to indicate that a contract for

sale has been made between the parties" and the purchase order is customarily considered to be

this "writing" by those of ordinary skill in the art). This construction is consistent with the

term's usage in the specification. *See, e.g.*, Specification at Col. 15:20 ("Once a requisition has

been inventory sourced and accepted by the CSR, it can be converted to one or more purchase

orders"). This definition is also consistent with the term's usage in the relevant art. The APICS Dictionary confirms this construction, defining a purchase order as, "the purchaser's document used to formalize a purchase transaction with a supplier. A purchase order, when given to a supplier, should contain statements of quantity, description, and price of the goods or services ordered, agreed-to terms as to payment, discounts, date of performance, and transportation, and all other agreements pertinent to the purchase and its execution by the supplier." (*See* APICS Dictionary, p. 40.) This construction is also confirmed by the 1996 NAPM Glossary of Key Purchasing Terms, which defines the term purchase order as "A written contractual document prepared by a buyer to describe all terms and conditions of a purchase." (*See* NAPM Glossary of Key Purchasing Terms, p. 21.)

     **G.**    **Source:** when used as a noun, a supplier, vendor or distributor of products or services. This construction is entirely consistent with the term's usage in the specification. *See, e.g.*, Specification at Col. 17:34-54 describing the source as the entity supplying the goods to the buyer ("Appropriate Distributor catalogs and manufacturer catalogs then are consulted, using TV-2 search program 250 and proper selection of Distributor catalogs and of catalogs and bulletins from manufacturers whose products Distributor regularly sells. Catalogs and bulletins are contained in catalog database 236. The resultant lists of products are then transferred by Shell program 252 to a work-in-progress requisition 260, and then entered from graphical user interface 254 directly onto Distributor's mainframe computer 210 as orders from the applicable customer to Distributor. The CSR, knowing which items are available from which Distributor warehouse and direct-shipping supplier, then may divide the customer's requested items into multiple orders, so as to assure that each order is completely filled by a single shipment. In this regional environment, file server 200 or the minicomputer acting as local host can maintain files

of completed requisitions 242 which can be subsequently used for generating reports for customers in the region.  Reports can be generated either from such local data or from data periodically downloaded to the local host from Distributor's host computer 210.").  This construction is confirmed by the 1992 APICS Dictionary, which equates the term "source" and the term "supplier" (*see* APICS Dictionary, p. 47), where the term "sole source" is defined to mean "Supply of a product is available from only one organization.  Usually technical barriers such as patents exist to preclude other *suppliers* from offering the product."  This conforms to my experience as one of ordinary skill in the art and is the broadest common usage of both terms.  The APICS Dictionary defines the term "supplier" to mean "1) Provider of goods or services.  Syn: vendor.  2) Seller with whom the buyer does business, as opposed to vendors, which is a generic term referring to all sellers in the marketplace." (*See* APICS Dictionary, p. 49.)  Similarly, the NAPM Glossary of Key Purchasing Terms confirms the construction with its definition of the term "supplier" as "An organization that supplies goods and/or services to a purchasing organization." (*See* NAPM Glossary of Key Purchasing Terms, p. 24.)

## VII.   THE FEBRUARY 29, 2008 OFFICE ACTION

44.   The Office Action indicates that each of the claims subject to reexamination, that is, claims 26-45, stand rejected.  Specifically, the Office Action indicates that claims 26-45 stand rejected as allegedly anticipated under 35 U.S.C. § 102(a) over the J-CON Manual, Version 1; claims 26-45 stand rejected as allegedly anticipated under 35 U.S.C. § 102(b) over the SABRE Guide; claims 26-45 stand rejected as allegedly anticipated under 35 U.S.C. § 102(a) over the P.O. Writer Plus Manual; and claims 26-45 stand rejected as allegedly anticipated under 35 U.S.C. § 102(b) over the Gateway 2000/MRO.

45.     As I will discuss in Section VIII of this declaration, each of the references fails to anticipate the claims subject to reexamination because each fail to disclose multiple elements of at least the independent claims.

## VIII.  THE CITED ART DOES NOT ANTICIPATE CLAIMS 26-45 OF U.S. PATENT NO. 6.023,683

### A.     Rejection of Claims 26-45 as allegedly anticipated by J-CON Manual

46.     I understand that claims 26-45 stand rejected under 35 U.S.C. § 102(a) as allegedly anticipated by Volume 1 of the Cooperative Computing, Inc. user manual dated April 1994, referred to herein as "the J-CON Manual."

47.     I have read the '683 patent and I observe that Claim 26 recites the following:

A method comprising the steps of:

maintaining at least two product catalogs on a database containing data relating to items associated with the respective sources;

selecting the product catalogs to search;

searching for matching items among the selected product catalogs;

building a requisition using data relating to selected matching items and their associated source(s);

processing the requisition to generate one or more purchase orders for the selected matching items; and

determining whether a selected matching item is available in inventory.

48.     Based on my review of the J-CON Manual, I disagree with the Examiner's contention that it anticipates claim 26 of the '683 patent because I cannot find explicit discussion of or even suggestion for several of the recited features of claim 26.

49.     As a threshold issue, I observe that the J-CON system is designed for use in retail establishments to permit employees of those establishments to assist customers to find automotive parts from a catalog of available parts in an over-the-counter sales environment. Once found, the system is used to generate a sales ticket for picking the parts and to supply

21

information describing the selected parts to a point-of-sale system to permit consummation of the transaction.

50.     I understand that the systems and methods embodied in claims 26-45 are for use in an organization that acquires supplies through the requisition and purchase order process. These systems and methods automate what was previously a multi-step, manually-dependent process. These systems exist primarily for the benefit of the entity seeking to purchase products, that is, the purchaser.

51.     In contrast, J-CON system is intended for retailer applications. The J-CON system assists retailers in selling auto parts to customers who come into the retailer's store to find desired parts and buy them directly. While a particular retailer may stock parts from many different manufactures, the retailer is selling the customer only those parts that it has in its own inventory, not parts of other retailers. Thus, there is only a single source in the J-CON system – the retailer using the system. Moreover, requisitions and purchase orders are not part of the process – these are unique to institutional customers. In contrast to the method described in claim 26, the J-CON system is intended to benefit the seller.

52.     The buyer seller distinction between the systems and methods of claims 26-45 and the J-CON system are not merely abstract. These distinctions are manifestly obvious when the language of the claims, according them the claim constructions set forth above, is compared to the disclosure of the J-CON Manual.

53.     Regarding the first limitation recited in claim 26, the J-CON Manual fails to disclose or even suggest "maintaining at least two product catalogs on a database containing data relating to items associated with respective sources."

54.      In rejecting this claim limitation, the Examiner relies on Ch. 3, Sec. 5, P. 1 of the J-CON Manual. This chapter of the J-CON Manual does in fact refer to a product catalog. See below:

> *PartFinder, JobFinder, and InterChange are optional catalog products that can help you quickly find the parts your customers need.*
>
> *PartFinder is J-CON's electronic parts catalog. Use it with Point-of-Sale (POS) to look-up the parts a customer wants and put them on the ticket.*

J-CON Manual, Ch. 3, Sec. 1, P. 1.

55.      It is obvious from the preceding disclosure that the J-CON Manual contemplates only a single product catalog – the electronic parts catalog of the retailer. It does not contemplate multiple catalogs that are associated with respective sources. The Examiner appears to have construed "multiple catalogs associated with respective sources" as including a single catalog containing goods produced by more than one manufacture, even though the catalog is a single retailer's catalog.

56.      As pointed out in the Patent Owner's Statement and discussed above, the J-CON system allows retail employees to find automotive parts for customers and to supply information corresponding to selected parts to a point-of-sale (POS) terminal to allow the customer to complete the transaction. The catalog includes the products that are available for sale by that retailer – to use the language of the claims, there is only one catalog and goods have only a single source. The fact that the J-CON system uses a single catalog whereas claim 26 recites "maintaining at least two product catalogs" is a significant distinction. Users of J-CON do not want their customers to access catalogs from other sources. Rather, the system is intended to facilitate the exact opposite, that is, sales from a single source, *i.e.*, the retailer using the J-CON system. This is in direct contrast to the method embodied in claim 26 where at least two product catalogs are maintained from respective sources so that, among other things, the

purchaser may compare prices from more than one source.  Simply put, the method of claim 26 does not favor any single source, while that of the J-CON system is intended to benefit only a single source.  Therefore, I disagree with the Examiner's contention that the J-CON Manual anticipates this claim because it does not teach the claim feature of maintaining at least two product catalogs on a database containing data relating to items associated with the respective sources – in fact, its disclosure teaches away from this feature because it is designed for single source purchasing.

57.    With regard to this same limitation, the Examiner also relies on the J-CON Manual Ch. 3, Sec. 2, p. 11, which references the catalog function of the J-CON system including information on multiple manufacturers.  However, there is no indication that this is in any format that would fit the meaning of a catalog as this term is broadly construed (*see* ¶43 above), and it does not conform to what the Examiner refers to below as the "catalog" functions of the J-CON system (*see* the J-CON Manual, Ch. 3, Section 2, p. 3).  I therefore disagree for this reason as well, with the Examiner's contention that the J-CON Manual anticipates the first limitation of claim 26.

58.    Regarding the second limitation of claim 26, the J-CON Manual fails to disclose or even suggest "selecting the product catalogs to search."

59.    In rejecting this claim limitation, the Examiner relies on the J-CON Manual, Ch. 2, Sec. 2, P. 3 (which references the use of the J-CON system for the selection of a "subgroup", not a catalog) and Ch. 2, Section 2, P. 11 (which describes the use of the J-CON system to find parts based on manufacturer numbers).  Neither of these selections relates to the selection of catalogs with items associated with their respective sources, as explained above.  However, even if one were to construe them to be catalogs they are not different catalogs, but

rather are different ways of categorizing the items in a single catalog (*i.e.*, by part type and by manufacturer). As such, I disagree with the Examiners conclusion that the J-CON Manual anticipates the second limitation of claim 26.

60.    Regarding the third limitation recited in claim 26, the J-CON Manual fails to disclose or even suggest the step of, "searching for matching items among the selected product catalogs."

61.    In rejecting this claim limitation, the Examiner relies on Ch. 3, Section 2, P. 1 of the J-CON Manual, which clearly discloses searching only a single catalog, as best evidenced by the very page in the J-CON Manual relied on by the Examiner, which contains no reference to any resource other than the single "PartFinder." Thus, I disagree with the Examiner's contention that the J-CON Manual anticipates this limitation of claim 26.

62.    Regarding the next limitation of claim 26, the J-CON Manual fails to disclose or even suggest the step of "building a requisition using data relating to selected matching items and their associated source(s)."

63.    In rejecting this claim, the Examiner relies on the disclosure at Ch. 3, Sec. 2, p. 4 of the J-CON Manual which states, "At Selection, choose one: Enter the number for the part you want. When you finish selecting parts, press <Order Screen> to return to POS." The table above this cited portion of the J-CON Manual shows a parts list with part names, part numbers, quantity available, and prices. This disclosure describes the use of the seller's J-CON system for selection of items being sold to an over-the-counter customer using the J-CON Point-of-Sale functionality, not the customer's preparation of a requisition of items to be sourced from one or more catalog suppliers. This does not meet the broadest construction of the term requisition because, among other reasons, a requisition is a *customer* document, not a *supplier*

document and, as described throughout Ch. 3 of the J-CON Manual, the parts identification and selection process is done using the auto parts retailer's J-CON system to enter the items for sale to its customers. In addition, as disclosed by the J-CON Manual, the document created by this process is the *only* document involved in the catalog/search/sales process, *i.e.*, there is no separate purchase order document as disclosed by claim 26. Therefore, I disagree with the Examiner's contention that the cited page of the J-CON Manual anticipates this limitation of claim 26.

64.     Regarding the next limitation of claim 26, the J-CON Manual fails to disclose or even suggest the step of "processing the requisition to generate one or more purchase orders for the selected matching items."

65.     In rejecting this claim limitation, the Examiner has relied upon Ch. 4, Secs. 3 and 4 which disclose methods for generating purchase orders in the J-CON system. As discussed above, requisitions are not generated in the J-CON system. Therefore, the step of "processing the requisition to generated one or more purchase orders for the selected matching items" can not be performed by this system. What the Examiner fails to consider is that the process described in Ch. 4 of the J-CON Manual is not related to the process described in Ch. 3 of the J-CON Manual. Chapter 4 of the J-CON Manual is titled "Purchasing and Receiving" and it has no correspondence to the catalog/search/sales process of Chapter 3, but rather deals with the replenishment of the J-CON system owner's in-store inventory. The items on the purchase orders described in Chapter 3 are either computed manually or computed automatically during an End-of-Day process (*see* Ch. 4, Section 3, P. 1 and Ch. 4, Section 4, pp. 1–7 of the J-CON Manual). In neither of these instances is there any reference to any items (matching or otherwise) that were selected from catalogs for POS sales (or, for that matter, items included in

26

any requisitions) being processed into one or more purchase orders.  Rather, as describe in the J-CON Manual, this process is done "to compute and issue [purchase orders] for stock . . ." (*see* Ch. 4, Sec. 4, P. 1 of the J-CON Manual).  The meaning of this sentence is an unequivocal reference to replenishment of the J-CON system user's inventory, as anyone of average skill in the art would know (*e.g.*, The 1992 APICS Dictionary defines "stock" as "1) items in inventory, 2) Stored products ready for sale." *See* APICS Dictionary, p. 48.  Similarly, the 1996 NAPM Glossary of Key Purchasing Terms defines "stock" as "The material and supplies kept in the storeroom/warehouse *to satisfy the needs of* the internal using departments or the *external buyers*." *See* NAPM Glossary of Key Purchasing Terms, p. 24.).  Therefore, I disagree with the Examiner's contention that the J-CON Manual anticipates this limitation of claim 26.

66.     Regarding the final limitation of claim 26, the J-CON Manual fails to disclose or even suggest the claim step of "<u>determining whether a selected matching item is available in inventory</u>."

67.     In rejecting this portion of the claim, the Examiner relies upon Ch. 3, Sec. 2, pp. 6 and 10 of the J-CON Manual which describe looking up and displaying the available quantity.  As a preliminary matter, I note that the section relied upon by the Examiner, that is Ch. 3, describes the PartFinder application.  That is the portion of the J-CON system that helps employees look-up and find parts for customers.  On p. 6, it states that AVL is the quantity available.  As stated with respect the prior limitation of claim 26, this portion of the J-CON Manual is separate and distinct from the portion describing the generation of purchase orders.  In the language of claim 26, generating a purchase order is a precursor to the step of "determining whether a selected matching item is available in inventory."  Thus, while the J-CON Manual describes a process for determining whether a selected item is in inventory, it does so only in the

27

context of selling items to customers on an over-the-counter basis using the J-CON Point-of-Sale functionality, and not in connection with the preparation of purchase orders as purchase orders, as disclosed in claim 26. Therefore, I disagree with the Examiner's contention that the J-CON Manual anticipates the last limitation of claim 26.

68.     Regarding claim 27, because the J-CON Manual fails to disclose each and every element of independent claim 26, it necessarily fails to disclose each and every element of claim 27. In addition, the J-CON Manual fails to disclose or even suggest the claim limitation of "purchase orders includ[ing] data relating to a vendor catalog number for the selected matching items."

69.     In rejecting this claim, the Examiner relies on Ch. 2, Sec. 10, Pp. 8–9. These pages describe a "warehouse inquiry screen" used in the context of POS parts sales. As stated with regard to claim 26, this over-the-counter POS process is unrelated to the purchase order generation described in Chapter 4. Therefore, for this reason as well, I disagree with the Examiner's contention that the J-CON Manual anticipates claim 27.

70.     Regarding independent claim 28, I observe that claim 28 recites substantially the same features as claim 26 except that the limitation of "determining whether a selected matching item is available in inventory" has been replaced with the limitation of "converting data relating to a selected matching item and an associated source to data relating to an item and a different source."

71.     For the reasons articulated above in the discussion of claim 26, the J-CON Manual does not disclose or even suggest the first five steps of claim 28. Moreover, the J-CON Manual also fails to disclose or even suggest the limitation of "converting data related to a

selected matching item and an associated source to data relating to an item and a different source."

72.     In rejecting this claim step, the Examiner has relied on the J-CON Manual at Ch. 3, Sec. 2, p. 11 and Ch. 3, Section 4, pp. 1-5.  As to the first citation, this portion of the J-CON Manual describes a subroutine for the PartFinder application, which, as discussed above, is used to assist the auto parts retailer sell auto parts to its customers.  The description of this feature is as follows:

> *Alternate parts are parts you can sell if you are out of the original part.  J-CON usually displays an alternate part in PartFinder only if you're out of the original part...*

73.     Contrary to the method of claim 28, the method described in the very sections of the J-CON Manual referenced by the Examiner are obviously describing a method for displaying alternate parts the auto parts retailer can sell when the desired part is unavailable in the retailer's inventory on hand (i.e., "parts you can sell if you are out of the original part", *see* J-CON Manual Ch. 3, Section 2, p. 11), or when the prospective customer has a part number for a competitive product not carried by the retailer that is one for which the retailer can sell an equivalent part that he does have in stock (*i.e.*, "entering the competitive part number, searching for the part . . . selling [the equivalent] parts", *see* J-CON Manual, Ch. 3, Section 4, p. 1).  In this method, although the alternate part is a substitute for the desired part, it is still coming from the same source – namely, the J-CON System retailer's stock.  This is directly contrary to the plain language of claim 28 which requires the step of "converting data relating to a selected matching item and an associated source to data relating to an item and a different source."  There is no different source in the J-CON system.

74.     Regarding the second citation, this portion of the J-CON Manual describes the InterChange component of the J-CON system.  The section relied upon by the Examiner

29

describes a method for finding replacement parts for a competitive part. In this method, the user

enters the part number for the competitive part and in response is provided with one or more

interchangeable parts. This does not involve the "relating to an item and a different source," as

disclosed in claim 28, but instead describes a method of using the product identifier for a non-

stocked product, as a means of finding and selling the buyer a similar product from the same

retail inventory that is the source of all other products being sold. Thus, as with the J-CON

application described at the first citation, this application still provides substitute parts from the

same source – the J-CON retailer. Therefore for at least the reasons articulated above, I disagree

with the Examiner's contention that the J-CON Manual anticipates claim 28.

      75.     Regarding claims 29 and 30, because the J-CON Manual fails to disclose

each and every element of independent claim 28, upon which these claims depend, it necessarily

fails to disclose each and every element of claims 29 and 30. In addition, with regard to claim

30, the J-CON Manual also fails to disclose or even suggest the limitation of "<u>determining the

applicable price of a selected matching item</u>."

      76.     In rejecting claim 30, the Examiner has relied on the J-CON Manual at

Ch. 3, Sec. 4, pp 4 and 6. As noted above with respect to checking inventory, the POS

transaction described in Chapter 3 is unrelated to the purchase order creation process described

in Chapter 4. Therefore, the pricing function described on the cited pages is different from the

price determination disclosed by claim 30 of the patent because it cannot be used in conjunction

with purchase order creation (prices must appear in a purchase order for the purchase order to be

valid). Thus, for this reason as well, I disagree with the Examiner's contention that claim 30 is

anticipated by the J-CON Manual.

77.     Regarding independent claim 31, I observe that this claim includes substantially the same limitations as independent claims 26 and 28, and the Examiner has utilized the same reasoning with this claim as with claims 26 and 28. Therefore, for the reasons articulated above, I disagree with the Examiner's contention that claim 31 is anticipated by the J-CON Manual.

78.     Regarding claims 32, 33, 34, and 35, because the J-CON Manual fails to disclose each and every element of independent claim 31, upon which these claims depend, it necessarily fails to disclose each and every element of claims 32, 33, 34, and 35. In addition, with regard to claim 32, the J-CON Manual also fails to disclose or even suggest the limitation of "purchase orders use data relating to at least two sources."

79.     In rejecting claim 32, the Examiner has relied on the J-CON Manual at Ch. 3, Sec. 5, p. 1; Ch. 2, Section 10, p. 8; and Ch. 4, Section 5, pp. 3–4. As noted above with respect to checking inventory, the POS transaction described in Chapter 3 (as well as Chapter 2) is unrelated to the purchase order creation process described in Chapter 4. Therefore, the Examiner's citations differ from the purchase order creation disclosed by claim 32 of the patent because there is no connection between the various capabilities described in the pages cited. Thus, for this reason as well, I disagree with the Examiner's contention that claim 30 is anticipated by the J-CON Manual.

80.     Regarding independent claim 36, I observe that this claim recites substantially the same limitations as independent claims 26, 28 and 31, and the Examiner has utilized the same reasoning with this claim as with claims 26, 28 and 31. Therefore, I disagree with the Examiner's contention that this claim is anticipated by the J-CON Manual for at least the same reasons articulated above in the context of these claims.

81.     Regarding claims 37, 38 and 39, because the J-CON Manual fails to disclose each and every element of independent claim 36, upon which these claims depend, it necessarily fails to disclose each and every element of claims 37, 38 and 39. In addition, the Examiner has utilized the same reasoning with these claims as with similar claims 32, 26 and 30, respectively and I disagree with the Examiner's contention that claims 37, 38 and 39 are anticipated by the J-CON Manual for the same reasons I stated with regard to the similar claims.

82.     Regarding independent claim 40, I observe that this claim recites limitations that are substantially the same as those recited in independent claims 26, 28, 31 and 36 with the exception of the first claim limitation, and the Examiner has utilized the same reasoning with this claim as with claims 26, 28, 31 and 36. Therefore, I disagree with the Examiner's contention that the J-CON Manual anticipates claim 40 for the same reasons I stated with regard to claims 26, 28, 31 and 36.

83.     Regarding independent claim 41, I observe that it recites substantially the same claim limitations as claim 40 except that the last step of "determining whether a selected matching item is available in inventory" has been replaced with the step of "converting data relating to a selected matching item and an associated source to data relating to an item and a different source." As discussed above in the context of claim 28, the J-CON Manual fails to provide support for this claim limitation, and the Examiner has utilized the same reasoning with this claim as with claims 40 and 28. Therefore, I disagree with the Examiner's contention that the J-CON Manual anticipates claim 41.

84.     Regarding claims 42, 43, and 44, because the J-CON Manual fails to disclose each and every element of independent claim 41 upon which these claims depend, it necessarily fails to disclose each and every element of claims 42, 43, and 44. In addition, the

Examiner has utilized the same reasoning with these claims as with similar claims 32, 26 and 30, respectively and I disagree with the Examiner's contention that claims 42, 43 and 44 are anticipated by the J-CON Manual for the same reasons I stated with regard to the similar claims.

85.     Regarding independent claim 45, I observe that this claim contains limitations that are identical to those recited in the other independent claims already discussed (*e.g.*, claim 26, etc.), and the Examiner has utilized the same reasoning with this claim as with those claims. Therefore, for the reasons articulated above, I disagree with the Examiner's contention that this claim is anticipated by the J-CON Manual.

**B.      Rejection of Claims 26-45 as allegedly anticipated by SABRE Guide**

86.     I understand that claims 26-45 stand rejected under 35 U.S.C. § 102(b) as allegedly anticipated by "A Practical Guide to SABRE Reservations and Ticketing" (the SABRE Guide).

87.     As an initial matter, I observe that the SABRE system maintains information on available airline flights and hotel rooms. This was a precursor to Internet-based reservation systems which allowed travel agents and other travel professionals to search for available flights and rooms. Applying the above claim construction, the SABRE system does not include a "catalog" of "items" from multiple "sources." Moreover, the SABRE system does not permit the creation of "requisitions" nor of "purchase orders." Ascribing the plain meaning to these claim terms in view of the specification and what was known to the person of ordinary skill in the art at the time of the invention in this field, the SABRE Guide necessarily fails to anticipate claims 26-45. Although not explicitly articulated, the Examiner's anticipation position appears to be that the services ordered through SABRE are identical to items ordered through the systems of the claimed invention. I disagree with this conclusion.

88.     In point of fact, the Examiner's contention that the SABRE Guide anticipates claims 26–45 of the '683 patent is contradicted by page 2 of the SABRE Guide itself. The SABRE Guide describes SABRE not as a sourcing system like the patented invention, but rather it states "The two main functions of SABRE are as a storage device, and a communications device." Further, on the same page, it describes what the SABRE system provides: "SABRE offers information and reservation capabilities." This is a wholly different function from the catalog selection and search, requisition building, purchase order generation and other capabilities disclosed in claims 26–46 of the '683 patent. Therefore, for this reason alone, I disagree with the Examiner's contention that the SABRE Guide anticipates claims 26–45 of the patent.

89.     Regarding independent claim 26, the SABRE system as described in the SABRE Guide, fails to disclose or even suggest the claim limitation of "maintaining at least two product catalogs on a database containing data relating to items associated with the respective sources."

90.     In rejecting this portion of the claim, the Examiner relies upon the disclosure at page 2 in the SABRE Guide which states,

> *SABRE maintains a vast amount of current information.  For example, it stores: flight schedules…; seat-by-seat availability for more than 680 worldwide carriers; and hotel descriptions and prices for more than 17,000 properties throughout the world.*

91.     Since the Examiner provides no further support for the contention that this claim limitation is met by this disclosure, I must assume that his position is that this vast amount of information is identical to the claim's requirement of "maintaining at least two product catalogs on a database containing data relating to items associated with the respective sources." While it is true that the sources of the various services are maintained in SABRE, *e.g.*, the

specific airline offering a flight, or the specific hotel offering a room, nowhere in SABRE are at least two product catalogs maintained.  Moreover, there is no explicit disclosure in the relied upon portion of the reference of a catalog that is associated with a particular source.  I can only assume that to the extent the Examiner has considered this, he has equated all the services from a particular vendor, *e.g.*, American Airlines, as a catalog, despite the fact there is no suggestion of this in the reference nor explanation of this in the Office Action.  Indeed, there is no indication anywhere on the cited page that this information is a catalog or possesses the characteristics of a catalog as that term is broadly construed (*see* ¶43 above).  Thus, for at least these reasons, I disagree with the Examiner's contention that the SABRE Guide anticipates this limitation of claim 26.

   92.    Regarding the second limitation of claim 26, the SABRE Guide fails to disclose or even suggest the limitation of "selecting the product catalogs to search and searching for matching items among the selected product catalogs."

   93.    In rejecting this portion of the claim, the Examiner relies on page 51 (*i.e.*, Ch. 4) of the SABRE Guide which describes, among other things, a primary availability display and a carrier specific availability display.  In the primary availability display, the operator inputs a query string that specifies the date, the two airports in order of flight, and departure time.  If the operator wants to limit the query to a single carrier's availability, additional characters are appended to the end of the query string identifying the particular carrier, *e.g.*, UA for United Airlines.  In contrast to claim 26, at no point in SABRE is a selection made of product catalogs to search.  As discussed above, using the claim construction consistent with the specification and the knowledge of the person of ordinary skill in the art, I do not agree that there are catalogs in the SABRE system.  There is merely a database of data, that can be truncated using one or more

35

query fields.  That distinction notwithstanding, even if it is assumed arguendo that queries in SABRE constitutes both steps of selecting catalogs and searching for matching items in among the selected catalogs, the options described in the SABRE Guide (*i.e.*, examining the entire referenced chapter, not just the summary p. 51 at the beginning) limit the user to performing queries for all carriers or for one specific carrier.  In the first case, no particular catalogs are selected – the entire database is searched – and in the second case, only one specific catalog is selected.  Neither option permits the operator to select multiple product catalogs.  Thus, for these reasons too, I disagree with the Examiner's contention that the SABRE Guide anticipates this limitation of claim 26.

94.     Regarding the third limitation of claim 26, the SABRE Guide, fails to disclose or even suggest the limitation of "searching for matching items among the selected product catalogs."

95.     In rejecting this limitation, the Examiner has relied on pp. 62-65 of the SABRE Guide.  The Examiner asserts that the SABRE system inherently searches "the catalogs."  As discussed above, the SABRE Guide does not teach or suggest "selecting the product catalogs to search."  Thus, it cannot be inherent that the SABRE Guide teaches or suggests searching among such selected product catalogs.  For this reason, I disagree with the Examiner's contention that this limitation is inherent in the SABRE system.

96.     Regarding the fourth limitation of claim 26, the SABRE Guide fails to disclose or even suggest the limitation of "building a requisition using data relating to selected matching items and their associated source(s)."

97.     In rejecting this limitation, the Examiner has relied on pp. 7 and 9–11 of the SABRE Guide, entitled, "Building the PNR."  It is clear from the rejection that the Examiner

has equated the passenger name record (PNR) to the requisition of claim 26. However, these two are not equivalent for several reasons. As described in the SABRE Guide, the PNR contains information about a passenger's reservation (*see* p. 7) and is used by the SABRE system to "hold" (not actually buy, *see* p. 76) an itinerary from a carrier and it only includes ticketing instructions (*see* p. 11). Based on my experience and understanding of the SABRE system, these ticketing instructions can optionally be ignored, causing the held reservation to be forfeited without penalty to the prospective passenger named in the PNR. Indeed, as described at the very beginning of the SABRE Guide, SABRE is a storage and communications device that simply provides information and reservation capabilities (*see* p. 2 of the SABRE Guide). Further, the PNR is provided to the carrier to make a reservation thereby holding a reservation that encumbers the carrier's "inventory," while a "requisition," as used in the patent claims, is not provided to a source. It is a document internal to the purchasing organization. Unlike a requisition, the PNR interacts with the "source," or carrier, to reserve airline seats. Thus, I disagree with the Examiner's contention that the SABRE Guide anticipates this limitation of claim 26.

98.     Regarding the fifth limitation of claim 26, the SABRE Guide fails to disclose or even suggest the limitation of "processing the requisition to generate one or more purchase orders for the selected matching items."

99.     In rejecting this claim limitation, the Examiner relies on the disclosure at p. 16 of the SABRE Guide where the E (End Record) Key is discussed. In describing the E Key, the Guide states, "This key is the letter *E* on the keyboard. The travel agent always must end a PNR after it has been completed. Ending a record transmits the PNR directly to American Airlines' central computer for permanent storage." However, the Examiner's characterization of

this as "generating one or more purchase orders" is not accurate. This step in the SABRE system is merely finalizing the reservation in the airline's computer system. It is in no way analogous to processing a requisition to generate a purchase orders. In addition, the SABRE system cannot "process the requisition" because there is no requisition and the finalized PNR is not a purchase order because it does not possess the characteristics of a purchase order as that term is most broadly construed from the perspective of someone of ordinary skill in the art (*see* ¶43 above). In particular, the purpose of a PNR (consistent with its function as a storage and communications device offering information and reservation capabilities) is defined as "storage of all required and pertinent information related to a passenger's reservation" (*See* p. 7 of the SABRE Guide), i.e., not purchasing capabilities, and unlike a purchase order, it does not obligate the passenger to buy the reserved items (e.g., flights) and it does not obligate the airline to sell the items at an agreed upon price. Specifically, a "Completed PNR" contains only "ticketing instructions (who is ticketing and when ticket is being issued)" (see pp. 10–11 of the SABRE Guide) but does not commit to the ticket purchase because: (a) the pricing is not firm (i.e., The "Guaranteed Fare Rule" states that "the passenger is charged and is guaranteed the airfare that is in effect on the date of the ticket purchase and issue". *See* p. 256 of the SABRE Guide), (b) the airline only holds the reservation described in the PNR for a limited period of time, after which it cancels the reservation unilaterally if the passenger has not ticketed it (i.e., the PNR includes a ticketing date, after which the reservation is invalidated. *See* pp. 27–28 of the SABRE Guide), and (c) the PNR is only a reservation that allows passenger to reject by simply failing to ticket the reserved itinerary (*i.e.*, the payment arrangements are stored in a PNR "notes" field that is not transmitted to the airline, giving the airline no method of collecting in the event that ticketing is not completed by the expiration date. *See* pp. 103–105 of the SABRE Guide). Because the claimed

step is not performed in the SABRE system, I disagree with the Examiner's contention that the SABRE Guide anticipates this limitation of claim 26.

100.    Regarding the final limitation of claim 26, the SABRE Guide fails to disclose or even suggest the limitation of "determining whether a selected matching item is available in inventory."

101.    In rejecting this step, the Examine relies on the disclosure at p. 34 of the SABRE Guide.  To be certain, availability is determined in the SABRE system, which is an essential precursor to making a travel reservation.  However, unlike the method of claim 26, in the SABRE system as it is analogized to the claimed invention by the Examiner, availability is determined at the time of the first catalog look-up.  This underscores the fundamental difference between the computerized reservations systems like SABRE and the requisition and purchase order based electronic sourcing system of the claimed invention.  In the context of the former, timing is of paramount performance.  Therefore, availability must be determined before flights or reservations are offered.  The customer then selects and reserves his/her itinerary and this reservation is saved as a PNR.  , This is completely different than the method disclosed by claim 26 of the patent at issue where products are selected, a requisition is prepared from the selected products, and purchase order is generated based on the requisition.  In the latter, the transaction is not complete until confirmation is received that the desired product(s) is available.  If so, the purchase order is issued to the source.  Otherwise, another source for the requisitioned product is found and the purchase order is issued to that source.  Thus, for these reasons as well, I disagree with the Examiner's contention that the SABRE Guide anticipates claim 26.

102.    Regarding claim 27, the SABRE Guide fails to disclose or even suggest the limitation of "purchase orders include[ing] data relating to a vendor catalog number for the selected matching items."

103.    Because the SABRE Guide fails to disclose each and every element of independent claim 26, upon which this claim depends, it necessarily fails to disclose each and every element of claim 27.   In rejecting this claim, the Examiner relies on pp. 10–11 of the SABRE Guide.  However, this citation fails to disclose any catalog number uniquely identifying the flights, dates, origins, destinations, etc. covered by a reservation and, as explained above, there is no purchase order.  Thus, for this reason as well, I disagree with the Examiner's contention that claim 27 is anticipated by the SABRE Guide.

104.    As noted above in the context of the J-CON Manual, claim 28 recites substantially the same features as claim 26 except that the step of "determining whether a selected matching item is available in inventory" has been replaced with the step of "converting data relating to a selected matching item and an associated source to data relating to an item and a different source."  For the reasons I articulated in the discussion of claim 26, the SABRE Guide does not disclose or even suggest the first five steps of claim 28.  Moreover, the SABRE Guide also fails to disclose or even suggest the step of, "converting data related to a selected matching item and an associated source to data relating to an item and a different source."

105.    In rejecting this final claim limitation, the Examiner has relied on the SABRE Guide's description of the substitution feature, as described on page 64 of the SABRE Guide.  As explained in this citation, when a query is made to the system, if the requested itinerary is unavailable, to the extent possible, alternative itineraries are displayed.  This is analogous to the function of the J-CON system that displays alternate parts when the desired

parts are unavailable. This differs, however, from claim 28 because in the SABRE system, when this step is performed, a selected matching item has not yet been found. Even if it is assumed that a potentially reserved flight is an item, and that a different airline than the one requested is a different source, no matching items have been selected, therefore, the step of converting data related to a selected matching item can not be performed. In claim 28, a previous step of the method requires "searching for matching items and building a requisition using data related to selected matching items and their associated source(s)." This has not happened when alternatives are displayed in the SABRE system. Thus, in addition to the SABRE Guide not anticipating all of the other limitations of claim 28, I disagree with the Examiner's contention that the SABRE Guide anticipates this final limitation of claim 28.

106.   Regarding claims 29 and 30, because the SABRE Guide fails to disclose each and every element of independent claim 28, upon which these claims depend, it necessarily fails to disclose each and every element of claims 29 and 30. In addition, with regard to claim 30, the SABRE Guide fails to disclose or even suggest the limitation of "determining the applicable price of a selected matching item."

107.   In rejecting claim 30, the Examiner has relied on the SABRE Guide page 279. However, as noted above with respect to the issue of purchase order generation, the pricing described on page 279 is not the correct or accurate pricing due to the "Guaranteed Fare Rule" (see p. 256). Thus, for this reason as well, I disagree with the Examiner's contention that claim 30 is anticipated by the SABRE Guide.

108.   Regarding independent claim 31, I observe that this claim includes substantially the same limitations as independent claims 26 and 28. Therefore, for the reasons

articulated above, I disagree with the Examiner's contention that claim 31 is anticipated by the SABRE Guide.

109.    Regarding claims 32, 33, 34 and 35, because the SABRE Guide fails to disclose each and every element of independent claim 31, upon which these claims depend, it necessarily fails to disclose each and every element of claims 32, 33, 34 and 35.  In addition, with regard to claim 32, the SABRE Guide also fails to disclose or even suggest the limitation of "purchase orders use data relating to at least two sources."

110.    In rejecting claim 32, the Examiner has relied on the SABRE Guide page 2.  As noted above with respect to claim 26, the SABRE Guide does not describe anything that fits what one of ordinary skill in the art would consider a purchase order.  Thus, for this reason as well, I disagree with the Examiner's contention that claim 32 is anticipated by the SABRE Guide.

111.    Regarding independent claim 36, I observe that this claim recites substantially the same limitations as independent claims 26, 28 and 31, and the Examiner has utilized the same reasoning with this claim as with claims 26, 28 and 31.  Therefore, I disagree with the Examiner's contention that this claim is anticipated by the SABRE Guide for at least the same reasons articulated above in the context of these claims.

112.    Regarding claims 37, 38 and 39, because the SABRE Guide fails to disclose each and every element of independent claim 36, upon which these claims depend, it necessarily fails to disclose each and every element of claims 37, 38 and 39.  In addition, the Examiner has utilized the same reasoning with these claims as with similar claims 32, 26 and 30, respectively and I disagree with the Examiner's contention that claims 37, 38 and 39 are anticipated by the SABRE Guide for the same reasons I stated with regard to the similar claims.

113.    Regarding independent claim 40, I observe that this claim recites limitations that are substantially the same as those recited in independent claims 26, 28, 31 and 36 with the exception of the first claim limitation, and the Examiner has utilized the same reasoning with this claim as with claims 26, 28, 31 and 36.  Therefore, I disagree with the Examiner's contention that the SABRE Guide anticipates claim 40 for the same reasons I stated with regard to claims 26, 28, 31 and 36.

114.    Regarding independent claim 41, I observe that it recites substantially the same claim limitations as claim 40 except that the last step of "determining whether a selected matching item is available in inventory" has been replaced with the step of "converting data relating to a selected matching item and an associated source to data relating to an item and a different source."  As discussed above in the context of claim 28, the SABRE Guide fails to provide support for this claim limitation, and the Examiner has utilized the same reasoning with this claim as with claims 40 and 28.  Therefore, I disagree with the Examiner's contention that the SABRE Guide anticipates claim 41.

115.    Regarding claims 42, 43 and 44, because the SABRE Guide fails to disclose each and every element of independent claim 41 upon which these claims depend, it necessarily fails to disclose each and every element of claims 42, 43, and 44.  In addition, the Examiner has utilized the same reasoning with these claims as with similar claims 32, 26 and 30, respectively and I disagree with the Examiner's contention that claims 42, 43 and 44 are anticipated by the SABRE Guide for the same reasons I stated with regard to the similar claims.

116.    Regarding independent claim 45, I observe that this claim contains limitations that are identical to those recited in the other independent claims already discussed (*e.g.*, claim 26, etc.), and the Examiner has utilized the same reasoning with this claim as with

43

those claims. Therefore, for the reasons articulated above, I disagree with the Examiner's contention that this claim is anticipated by the SABRE Guide.

**C.      Rejection of Claims 26-45 as allegedly anticipated by the P.O. Writer Manual**

117.     I understand that claims 26-45 stand rejected under 35 U.S.C. § 102(a) as allegedly anticipated by "P.O. Writer Plus, Guided Tour Version 10.0," (the P.O. Writer Manual). Based on my review of the P.O. Writer Manual, I disagree with the Examiner's contention that it anticipates claims 26-45 of the '683 patent because I cannot find support or even suggestion for several of the recited features of these claims.

118.     Regarding the first three limitations recited in claim 26, the P.O. Writer Manual fails to disclose or even suggest "maintaining *at least two product catalogs* on a database containing data relating to items associated with respective sources, selecting the product catalogs to search, and searing for matching items among the selected product catalogs," as recited in claim 26. To the contrary, all references in the P.O. Writer Manual refer only to a single catalog.

119.     Regarding the first limitation of claim 26, the P.O. Writer Manual, fails to disclose or even suggest the limitation of "maintaining at least two product catalogs on a database containing data relating to items associated with the respective sources."

120.     In rejecting this claim limitation, the Examiner relies on page 22 and pages 45–46 of the P.O. Writer Manual. The disclosure at page 22 shows that the P.O. Writer system simply maintains a history of prior purchase orders, including the suppliers to whom they were issued. And pages 45–46 of the P.O. Writer Manual describes only a *single* catalog, not "*at least two catalogs*", as disclosed in the claim limitation. Therefore, I disagree with the Examiner's contention that the P.O. Writer Manual anticipates this limitation of claim 26.

121.    Regarding the second limitation of claim 26, the P.O. Writer Manual, fails to disclose or even suggest the limitation of "selecting the product catalogs to search."

122.    In rejecting this claim limitation, the Examiner relies on page 131 of the P.O. Writer Manual.  However, this portion of the Manual describes only a process whereby items from a single catalog may be displayed (*i.e.*, "Items from a specific Catalogue can be displayed by entering a Catalogue ID at the top of the screen", *see* P.O. Writer Manual p. 131).  Nowhere in this section of the reference is the ability to or step of selecting more than a single catalog to search disclosed.  Therefore, the P.O. Writer Manual can not anticipate the step of "selecting the product catalogs to search."  Thus, I disagree with the Examiner's contention that the P.O. Writer Manual anticipates this limitation of claim 26.

123.    Regarding the third limitation of claim 26, the P.O. Writer Manual, fails to disclose or even suggest the limitation of "searching for matching items among the selected product catalogs."

124.    In rejecting this claim limitation, the Examiner relies on pages 46–47 of the P.O. Writer Manual.  As cited above in the context of the first two claim limitations, the P.O Writer Manual does describe the ability to search for particular items among a selected catalog.  However, as I noted in the context of the second limitation, it does not disclose searching for items from more than one selected catalog.  Items may be searched independent of catalogs, that is from any source, or they may be searched from a single source.  There is no support in the P.O. Writer Manual for searching for particular items from selected catalogs.  Therefore, for this reason as well, I disagree with the Examiner's contention that the P.O. Writer Manual anticipates this limitation of claim 26.

125.     Regarding the fourth limitation of claim 26, the P.O. Writer Manual fails to disclose or even suggest the limitation of "building a requisition using data related to selected matching items and their associated sources."

126.     In rejecting this claim limitation, the Examiner first cites pages 47–48 of the P.O. Writer Manual. However, these pages relate to the creation of purchase orders, not requisitions and are therefore inapplicable to this limitation.

127.     In addition to pages 47–48, the Examiner relies on pages 117–147 of the P.O. Writer Manual. The first portion of this (*i.e.*, pp. 117–130) are a part of Chapter 12 of the P.O. Writer Manual, entitled "Stock Requisitioning and Kitting." As the title would imply, Ch. 12 deals with stock requisitions. This chapter describes a process whereby stock requisitions may be sent electronically to the stockroom where Pick Lists can be generated and material issued with a few key strokes. This is the same process described in the APICS Dictionary as a "parts requisition" (*i.e.*, "An authorization that identifies the item and quantity required to be withdrawn from an inventory") and has nothing to do with the type of requisition disclosed in the patent. As such, this chapter is irrelevant to claim 26 because there is no sourcing and no purchase.

128.     The second portion of the pages cited by the Examiner (*i.e.*, pp. 129–136) refer to Ch. 13 of the P.O. Writer Manual, dealing with requisitions for goods sourced from vendors. Although the capabilities described in this chapter do describe building a requisition from a catalog, the text states "Items from a specific catalogue can be displayed by entering the Catalogue ID at the top of the screen." (*see* p. 131) without providing any option for selecting additional catalogs as disclosed by the patent.

129.    Beginning, at p. 137, the P.O. Writer Manual describes another way of requisitioning items – free form requisitions.  Free form requisitions do not use catalogs or searches (*see* pp. 137–140) and are therefore not relevant to claim 26 of the patent.  The remainder of the section cited by the Examiner (*i.e.*, pp. 141–147) has no relevance to requisition creation.  Therefore I disagree with the Examiner's contention that this limitation of claim 26 is anticipated by the P.O. Writer system.

130.    Regarding the fifth limitation of claim 26, the P.O. Writer Manual fails to disclose or even suggest the limitation of "<u>processing the requisition to generate one or more purchase orders for the selected items</u>,"

131.    In rejecting this claim limitation, the Examiner relies on page 49 of the P.O. Writer Manual.  Although pages 45–49 of the P.O. Writer Manual do show how parts can be looked up in one single catalog and be put into a purchase order, but this is different from the method disclosed in claim 26 because it does not involve the selection of more than one catalog, the searching for items in the selected catalogs or – in particular – any reference to creation of a requisition or the conversion of a requisition to one or more purchase orders.

132.    In addition, the Examiner also relies on pages 149-153 of the P.O. Writer Manual describing how to convert requisitions into purchase orders.  Although this section of the P.O. Writer Manual does describe a process of converting requisitions into purchase orders, this process is wholly different from what is described in claim 26 because the requisition does not include <u>the information about the sources associated with the included line items</u>.  This is shown by the fact that, during the purchase order generation, the user must "select a vendor" or, if no vendor is selected, P.O. Writer "will select the vendor based on the past P.O. for [each] item" (*i.e.*, not on the catalog that was used to build the requisition). (*See* p. 151).  Therefore, based on

this fundamental distinction, I disagree with the Examiner's contention that the P.O. Writer Manual anticipates this limitation of claim 26.

133.    Regarding the final limitation of claim 26, the P.O. Writer Manual fails to disclose or even suggest the limitation of "determining whether a selected matching item is available in inventory."

134.    In rejecting this claim limitation, the Examiner relies on the description of the Inventory Module at pages 102–103 of the P.O. Writer Manual. While it is true that this module permits users to check the inventory on hand, this process differs from the method disclosed in claim 26 because it is completely unrelated to the process of requisitioning and ordering goods as disclosed in the sections of the P.O. Writer Manual referenced by the Examiner with respect to the previous claim 26 limitations. Instead, it enables generation of a Re-order Analysis for replenishment of the internal inventory. In addition, in the context of claim 26, one of ordinary skill in the art would understand that the inventory checking disclosed in the final limitation refers to determining whether the selected items are available for purchase from a supplier by virtue of their being on-hand in the supplier's inventory. Indeed, this understanding is confirmed by Col. 3, lines 19-24, which provides an explanation mirroring this section of the claim language, stating "Additionally, the invention includes a means for checking the availability in one or more inventory locations of the corresponding desired catalog items, and for generating one or more purchase orders for desired items from inventory locations stocking the items." *See also,* the Abstract of the '683 patent. It is the connection between checking the inventory availability and generating purchase orders described here that makes it obvious to one of ordinary skill in the art that this capability refers to a supplier's inventory rather than the user's inventory, since no purchase order would be required to get items from an

48

inventory already owned by the user. This understanding is also consistent with the broad construction of the term "inventory" (*see* ¶43 above). For this reason as well, I disagree with the Examiner's contention that this limitation of claim 26 is anticipated by the P.O. Writer Manual.

135.    Regarding claim 27, because the P.O. Writer Manual fails to disclose each and every element of independent claim 26, upon which this claim depends, it necessarily fails to disclose each and every element of claim 27.  In addition, the P.O. Writer Manual fails to disclose or even suggest the limitation of "include[ing] data relating to a vendor catalog number for the selected matching items."

136.    In rejecting this claim, the Examiner relies on pages 29, 44, 49 and 131 of the P.O. Writer Manual. These references show that the purchase orders include "item numbers," but, since the purchase order items are not associated with a source, these are obviously the manufacturers' part numbers that could apply to any catalog that sells the respective manufacturer's products. The catalog numbers are not there. Therefore, I disagree with the Examiner's contention that claim 27 is anticipated by the P.O. Writer Manual.

137.    As noted above in the context of the J-CON Manual and the SABRE Guide, claim 28 recites substantially the same features as claim 26 except that the step of "determining whether a selected matching item is available in inventory" has been replaced with the step of "converting data relating to a selected matching item and an associated source to data relating to an item and a different source."

138.    For the reasons I articulated in the discussion of claim 26, the P.O. Writer Manual does not disclose or even suggest the first five steps of claim 28. Moreover, the P.O. Writer Manual also fails to disclose or even suggest the limitation of "converting data related to a

selected matching item and an associated source to data relating to an item and a different source."

139.    In rejecting this claim limitation, the Examiner relies on pages 21–22 and 151–152 of the P.O. Writer Manual.  However, the step of selecting a vendor or having the system automatically select one is analogous to the step of claim 28 of "converting data related to a selected matching item and an associated source to data relating to an item and a different source."  This claim language is clearly stating that a different source is being selected – the source is being replaced with another source.  In direct contrast, the P.O. Writer Manual describes only selecting a source, not converting data related to one source to a different source.  Therefore, I disagree with the Examiner's contention that the P.O. Writer Manual anticipates claim 28.

140.    Regarding claims 29 and 30, because the P.O. Writer Manual fails to disclose each and every element of independent claim 28, upon which these claims depend, it necessarily fails to disclose each and every element of claims 29 and 30.  In addition, with regard to claim 30, the P.O. Writer Manual fails to disclose or even suggest the limitation of "determining the applicable price of a selected matching item."

141.    In rejecting claim 30, the Examiner relies on page 71 of the P.O. Writer Manual, which describes a Price Analysis report.  However, this is an after-the-fact report, totally unrelated to determining the pricing for selected matching items *at the time they are selected* during the process of building requisitions and/or generating purchase orders.  Thus, for this reason as well, I disagree with the Examiner's contention that claim 30 is anticipated by the P.O. Writer Manual.

142.    Regarding independent claim 31, I observe that this claim includes substantially the same limitations as independent claims 26 and 28.  Therefore, for the reasons articulated above, I disagree with the Examiner's contention that claim 31 is anticipated by the P.O. Writer Manual.

143.    Regarding claims 32, 33, 34 and 35, because the P.O. Writer Manual fails to disclose each and every element of independent claim 31, upon which these claims depend, it necessarily fails to disclose each and every element of claims 32, 33, 34 and 35.  In addition, with regard to claim 32, the P.O. Writer Manual also fails to disclose or even suggest the limitation of "purchase orders use data relating to at least two sources."

144.    In rejecting claim 32, the Examiner relies on pages 22, 29 and 44–46 of the P.O. Writer Manual.  While some of the cited pages do refer to multiple sources and pages 149–153 do provide a way to create purchase orders from multiple sources, this method does not comply with the method disclosed by the patent because the sources are not the sources associated with the selected catalog (the system only allows the selection of a single catalog) as disclosed by the patent.  Thus, for this reason as well, I disagree with the Examiner's contention that claim 32 is anticipated by the P.O. Writer Manual.

145.    Regarding independent claim 36, I observe that this claim recites substantially the same limitations as independent claims 26, 28 and 31, and the Examiner has utilized the same reasoning with this claim as with claims 26, 28 and 31.  Therefore, I disagree with the Examiner's contention that this claim is anticipated by the P.O. Writer Manual for at least the same reasons articulated above in the context of these claims.

146.    Regarding claims 37, 38 and 39, because the P.O. Writer Manual fails to disclose each and every element of independent claim 36, upon which these claims depend, it

necessarily fails to disclose each and every element of claims 37, 38 and 39.  In addition, the Examiner has utilized the same reasoning with these claims as with similar claims 32, 26 and 30, respectively and I disagree with the Examiner's contention that claims 37, 38 and 39 are anticipated by the P.O. Writer Manual for the same reasons I stated with regard to the similar claims.

147.    Regarding independent claim 40, I observe that this claim recites limitations that are substantially the same as those recited in independent claims 26, 28, 31 and 36 with the exception of the first claim limitation, and the Examiner has utilized the same reasoning with this claim as with claims 26, 28, 31 and 36.  Therefore, I disagree with the Examiner's contention that the P.O. Writer Manual anticipates claim 40 for the same reasons I stated with regard to claims 26, 28, 31 and 36.

148.    Regarding independent claim 41, I observe that it recites substantially the same claim limitations as claim 40 except that the last step of "determining whether a selected matching item is available in inventory" has been replaced with the step of "converting data relating to a selected matching item and an associated source to data relating to an item and a different source." As discussed above in the context of claim 28, the P.O. Writer Manual fails to provide support for this claim limitation, and the Examiner has utilized the same reasoning with this claim as with claims 40 and 28.  Therefore, I disagree with the Examiner's contention that the P.O. Writer Manual anticipates claim 41.

149.    Regarding claims 42, 43 and 44, because  the P.O. Writer Manual fails to disclose each and every element of independent claim 41 upon which these claims depend, it necessarily fails to disclose each and every element of claims 42, 43 and 44.  In addition, the Examiner has utilized the same reasoning with these claims as with similar claims 32, 26 and 30,

respectively and I disagree with the Examiner's contention that claims 42, 43 and 44 are anticipated by the P.O. Writer Manual for the same reasons I stated with regard to the similar claims.

150.    Regarding independent claim 45, I observe that this claim contains limitations that are identical to those recited in the other independent claims already discussed (*e.g.*, claim 26, etc.), and the Examiner has utilized the same reasoning with this claim as with those claims. Therefore, for the reasons articulated above, I disagree with the Examiner's contention that this claim is anticipated by the P.O. Writer Manual.

**D.    Rejection of Claims 26-45 as allegedly anticipated by the Gateway 2000/MRO Version**

151.    I understand that claims 26-45 stand rejected under 35 U.S.C. § 102(b) as allegedly anticipated by "Gateway 2000/MRO Version" (dated May 1991) from Technical Service Associates (the Gateway 2000/MRO manual). Based on my review of the Gateway 2000/MRO manual, I disagree with the Examiner's contention that it anticipates these claims of the '683 patent because I cannot find support or even suggestion for several of the recited features of these claims.

152.    Regarding the first three limitations recited in claim 26, the Gateway 2000/MRO manual fails to disclose or even suggest "maintaining at least two product catalogs on a database containing data relating to items associated with respective sources, selecting the product catalogs to search, and searching for matching items among the selected product catalogs" as recited in claim 26.

153.    Regarding the first limitation of claim 26, the Gateway 2000/MRO manual, fails to disclose or even suggest the limitation of "maintaining at least two product catalogs on a database containing data relating to items associated with the respective sources."

154.    In rejecting this limitation, the Examiner relies on pages 4-18, 4-19 and 15-42 of the Gateway 2000/MRO manual.  The disclosure at page 4-18 demonstrates that the Gateway 2000/MRO system does in fact maintain a database of product catalogs and corresponding products and their sources – *i.e.*, the vendor name.

> *Catalogs can be created for any group of commonly ordered items and used repeatedly throughout requisition and PO processing.  Catalogs contain a heading that describes the catalog plus the vendor name and catalog name.*
> *See* Gateway 2000/MRO manual at 4-18.

155.    From this description it is clear that at least two product catalogs containing data relating to items associated with respective sources are maintained in the Gateway 2000/MRO manual system.  However, even under the broadest construction of the term "catalog" as understood by one of ordinary skill in the art, pricing is an essential (i.e., non-optional) attributes of any catalog (*see* ¶43 above) and the Gateway 2000/MRO manual confirms that catalogs (as maintained by the Gateway 2000/MRO manual system) do not necessarily include pricing.  Specifically, in describing the creation of a catalog the Gateway 2000/MRO manual states that pricing may not be known (*i.e.*, regarding entry of a unit price in creation of a catalog, it states "If the price of the item is known, it may be entered at this time." *See* Gateway 2000/MRO manual p. 4-20, just one page after the Examiner's citation of pp. 4-18 and 4-19).  Thus I disagree with the Examiner's contention that the first limitation of claim 26 is anticipated by the Gateway 2000/MRO manual.

156.    Regarding the second limitation of claim 26, the Gateway 2000/MRO manual, fails to disclose or even suggest the limitation of "<u>selecting the product catalogs to search</u>."

157.    In rejecting this feature the Examiner relies on pages 4-18 and 4-19 of the Gateway 2000/MRO manual.  This portion describes the catalog ordering process.  According to

the reference, to select items from a standard catalog, the user positions the cursor at the beginning of a new line item description and presses the F7 key. In response, a list of pre-stored catalog names is displayed. Nowhere in this section of the reference is the ability to or step of selecting catalogs to search disclosed – that is, more than one catalog can not be selected. This distinction may appear to be subtle, but it is important. In the method described in claim 26 discloses the capability for multiple catalogs to be searched are selected. In the system described in the Gateway 2000/MRO manual, as with the P.O. Writer system, the referenced pages describe no option for selection more than a single catalog (*i.e.*, "To select items from a standard catalog . . . To select a catalog . . . When a catalog has been selected", *see* Gateway 2000/MRO manual pp. 4-18 and 4-19). Therefore, I disagree with the Examiner's contention that the Gateway 2000/MRO anticipates this limitation of claim 26.

158.    Regarding the third limitation of claim 26, the Gateway 2000/MRO manual, fails to disclose or even suggest the limitation of "<u>searching for matching items among the selected product catalogs.</u>"

159.    In rejecting this limitation, the Examiner relies on pages 4-18 and 4-17 of the Gateway 2000/MRO manual. In the first referenced page (4-18) of the Gateway 2000/MRO manual describes do not describe the ability to search other than to the extent that a user may scroll through the list of items displayed in response to command to load a particular catalog. In order to reject this claim feature, the Examiner has relied on a different portion of the Gateway 2000/MRO manual reference unrelated to catalog searching. The second referenced page (4-17) does describe a keyword searching function, but this is limited to searching for stock items. While this is the kind of searching being described in the claims – as opposed to scrolling through a list – this is wholly unrelated to searching items from selected catalogs. Stock items

are items that don't need to be requisitioned from catalogs. The fact that Examiner has relied on a different section of the Gateway 2000/MRO manual unrelated to catalog searching is a tacit acknowledgement that the limited catalog "searching" capabilities in the Gateway 2000/MRO manual system are not analogous to searching step in claim 26. Indeed it has nothing to do with searching catalogs. In addition, pages 4-18 and 4-19 of the Gateway 2000/MRO manual fail to disclose any method for even scrolling through more than a single selected catalog. Therefore, I disagree with the Examiner's contention that the Gateway 2000/MRO manual anticipates this limitation of claim 26.

160.    Regarding the fourth limitation of claim 26, the Gateway 2000/MRO manual fails to disclose or even suggest the step of "building a requisition using data related to selected matching items and their associated sources."

161.    In rejecting this claim limitation, the Examiner relies on pages 4-17 and 4-33 of the Gateway 2000/MRO manual. The first reference deals with requisitions for stock items (*see* Gateway 2000/MRO manual p. 4-17). As discussed above, sources are not relevant to requisitions for stock items because these items are in stock and don't need to be ordered via catalogs. In fact, the only teaching relating to this is that the vendor ID (instead of being built into the requisition through the catalog selection/search process) can, optionally, be entered manually by the user (*see* Gateway 2000/MRO manual p. 4-8).

162.    The second reference is the sample requisition form at p. 4-33. Although this requisition form has a portion labeled "vendor" there is no vendor information on the form. Moreover, nowhere else on this requisition is there an indication of associated sources for the selected matching items. Additionally, there is no suggestion in the requisition section of the Gateway 2000/MRO manual that vendors are selected. Because p. 4-33 is merely a form with no

description, I also reviewed the section of the Gateway 2000/MRO describing the purchase order

process because purchase orders can be created at least in part from requisitions.

> *The vendor ID must be included as the purchase order is being entered. Enter the vendor ID code and press "Enter". The vendor's name, address and contact/phone number will be displayed.*

*See* Gateway 2000/MRO manual at p. 6-8.

163.    In addition, because this description too was vague, I looked further in the

Gateway 2000/MRO manual to the chapter dealing with Vendors to confirm that this information

is added at the time of the P.O.'s creation, that is, Chapter 8.

> *Enter the Vendor ID number. The vendor ID is the locally assigned control number used to identify, each vendor in the system. This is the number that will be entered on the PO entry screen when selecting a vendor.*

*See* Gateway 2000/MRO manual p. 8-2.

164.    These passages make it clear that the vendor is selected at the time of the

P.O. which confirms my understanding that it is not selected at the requisition stage. Therefore,

in addition to the reasons articulated above, I disagree with the Examiner's contention that the

Gateway 2000/MRO manual anticipates the fourth limitation of claim 26.

165.    Regarding the fifth limitation of claim 26, the Gateway 2000/MRO

manual fails to disclose or even suggest the step of "processing the requisition to generate one or

more purchase orders for the selected items."

166.    In rejecting this claim limitation, the Examiner relies on pages 6-3, 6-16,

6-35 and 4-33 of the Gateway 2000/MRO manual. These pages do describe a process for

creating purchase orders and state that purchase orders can be created by importing data from a

requisition. However, as described above in the context of the previous claim step, in the

Gateway 2000/MRO manual, the vendor or source information must be specified at the time the

purchase order is created rather than being carried over from the requisition. This is confirmed

by the two illustrations (*see* pp. 4-33 and 6-35 of the Gateway 2000/MRO manual), which show that no vendor information is included in either the requisition or the purchase order. In contrast, in the method of claim 26, when the requisition is created, it includes items and their associated sources. Thus, as with the P.O. Writer system, in the Gateway 2000/MRO manual, sources for requisitioned products are selected by the person creating the P.O., while in the method of claim 26, the source data is included in the requisitioning step. Therefore, in addition to the reasons articulated above, I disagree with the Examiner's contention that the Gateway 2000/MRO manual anticipates claim 26.

167.   With regard to the last step of claim 26, the Gateway 2000/MRO manual fails to disclose or even suggest the step of "<u>determining whether a selected matching item is available in inventory</u>."

168.   In rejecting this claim limitation, the Examiner again relies on page 4-17 of the Gateway 2000/MRO manual. As discussed above, this page deals with stock ordering for inventory replenishment and is not based on ordering from vendor catalogs. Moreover, the Examiner's interpretation of the Gateway 2000/MRO manual relies on a mistaken understanding of the manual. The "not on file" response quoted by the Examiner (*see* Office Action, p. 52) refers to whether an item is in the database, not whether there is any available inventory for an item that is listed in the database. For these reasons, I disagree with the Examiner's contention that this limitation of claim 26 is anticipated by the P.O. Writer Manual.

169.   Regarding claim 27, because Gateway 2000/MRO manual fails to disclose each and every element of independent claim 26, upon which this claim depends, it necessarily fails to disclose each and every element of claim 27. In addition, Gateway 2000/MRO manual

fails to disclose or even suggest the limitation of "include[ing] data relating to a vendor catalog number for the selected matching items."

170.   In rejecting this claim, the Examiner relies on page 6-35 of the Gateway 2000/MRO manual.  This page is simply a printout of a purchase order which illustrates that every line on the purchase order has a product or item number.  However (as described in the discussion of the 5th element of Claim 26, above, which cites the same page), this purchase order has no relationship to any catalog selection and/or searching.

171.   As noted above in the context of the J-CON Manual, the SABRE Guide, and the P.O. Writer Manual, claim 28 recites substantially the same features as claim 26 except that the step of "determining whether a selected matching item is available in inventory" has been replaced with the step of "converting data relating to a selected matching item and an associated source to data relating to an item and a different source."

172.   For the reasons I articulated in the discussion of claim 26, the Gateway 2000/MRO manual does not disclose or even suggest the first five steps of claim 28.  Moreover, the Gateway 2000/MRO manual also fails to disclose or even suggest the step of "converting data related to a selected matching item and an associated source to data relating to an item and a different source."

173.   In rejecting this claim step, the Examiner relies principally on pages 4-26 through 4-28 of the Gateway 2000/MRO manual.  These pages deal with modifying fields in the requisition (i.e., this subsection of the Gateway 2000/MRO manual is titled "Requisition Maintenance").  The purchase order has not yet been created.  In fact, the first sentence on p. 4-26 states, "Requisitions can be changed or updated at any time until a purchase order is prepared. Once an order is created, the requisition is locked and any maintenance must be performed using

the purchase order maintenance process." This is clearly out of sequence with the steps in claim 26. Secondly, because the source is not specified in the requisition of the Gateway 2000/MRO manual, even if we were to assume that the timing of the step is irrelevant, the Gateway 2000/MRO manual does not describe any process to its teaching is limited to manual modification of an existing requisition and (a) there is no teaching about the system performing any "conversion" (from anything to anything else, let alone conversion from one source-associated item to another source-associated item), and (b) as stated above, the source (if existing in a requisition at all) is not associated with any catalog selection/search process but must, optionally, be entered manually.  In addition to pages 4-26 through 4-28 of the Gateway 2000/MRO manual, the Examiner also relies on pages 12-3 and 4-8 through 4-9 of the Gateway 2000/MRO manual, but in the illustration on page 12-3 the vendor fields are blank, confirming that the vendor was not picked up as the source through the catalog selection/search process and pages 4-8 through 4-9 contain no teaching related to "converting data relating to a selected matching item and an associated source to data relating to an item and a different source." Therefore, I disagree with the Examiner's contention that the Gateway 2000/MRO manual anticipates this claim.

      174.    Regarding claims 29 and 30, because the Gateway 2000/MRO manual fails to disclose each and every element of independent claim 28, upon which these claims depend, it necessarily fails to disclose each and every element of claims 29 and 30.  In addition, with regard to claim 30, the Gateway 2000/MRO Manual fails to disclose or even suggest the limitation of "determining the applicable price of a selected matching item."

      175.    In rejecting this limitation of claim 30, the Examiner relies on pages 4-8 and 4-20 of the Gateway 2000/MRO manual.  But instead of showing how the Gateway

2000/MRO manual anticipates the claim, these pages show why it is that the Gateway 2000/MRO system does not operate as disclosed claim 30. Specifically, (a) page 4-8 of the Gateway 2000/MRO manual has no teaching that items have associated prices, only that once prices have been entered into the system and a purchase order has been created, the system is optionally capable of computing sales tax on those prices, and (b) page 4-20 of the Gateway 2000/MRO manual describes a process by which pricing (if known) may optionally be manually entered into the system during purchase order creation. There is no teaching of the system being able to recognize or use any applicable price for an item. In addition, the Gateway 2000/MRO manual fails to disclose each and every element of independent claim 28, upon which these claims depend. Therefore, for all of these reasons, I disagree with the Examiner's contention that the Gateway 2000/MRO manual anticipates claim 30.

176.    Regarding independent claim 31, I observe that this claim includes substantially the same limitations as independent claims 26 and 28. Therefore, for the reasons articulated above, I disagree with the Examiner's contention that claim 31 is anticipated by the Gateway 2000/MRO manual.

177.    Regarding claims 32, 33, 34 and 35, because the Gateway 2000/MRO manual fails to disclose each and every element of independent claim 31, upon which these claims depend, it necessarily fails to disclose each and every element of claims 32, 33, 34, and 35. In addition, with regard to claim 32, the Gateway 2000/MRO manual also fails to disclose or even suggest the limitation of "purchase orders use data relating to at least two sources."

178.    In rejecting claim 32, the Examiner relies on pages 4-8–9, 4-18–19 and 15-42 in the Gateway 2000/MRO manual. Because this is a dependent claim, the Gateway 2000/MRO system cannot anticipate the patent for this claim for the same reasons it fails to

anticipate claim 31. In addition, as described above, none of the referenced pages of the Gateway 2000/MRO manual describes a relationship with even a single source that can be used for building a requisition or generating a purchase order, so it certainly does not describe data relating to multiple sources. Thus, I disagree with the Examiner's contention that the Gateway 2000/MRO manual anticipates claim 32.

179.    Regarding independent claim 36, I observe that this claim recites substantially the same limitations as independent claims 26, 28 and 31, and the Examiner has utilized the same reasoning with this claim as with claims 26, 28 and 31. Therefore, I disagree with the Examiner's contention that this claim is anticipated by the Gateway 2000/MRO manual for at least the same reasons articulated above in the context of these claims.

180.    Regarding claims 37, 38 and 39, because the Gateway 2000/MRO manual fails to disclose each and every element of independent claim 36, upon which these claims depend, it necessarily fails to disclose each and every element of claims 37, 38 and 39. In addition, the Examiner has utilized the same reasoning with these claims as with similar claims 32, 26 and 30, respectively and I disagree with the Examiner's contention that claims 37, 38 and 39 are anticipated by the Gateway 2000/MRO manual for the same reasons I stated with regard to the similar claims.

181.    Regarding independent claim 40, I observe that this claim recites limitations that are substantially the same as those recited in independent claims 26, 28, 31 and 36 with the exception of the first claim limitation, and the Examiner has utilized the same reasoning with this claim as with claims 26, 28, 31 and 36. Therefore, I disagree with the Examiner's contention that the Gateway 2000/MRO manual anticipates claim 40 for the same reasons I stated with regard to claims 26, 28, 31 and 36.

182.    Regarding independent claim 41, I observe that it recites substantially the same claim limitations as claim 40 except that the last step of "determining whether a selected matching item is available in inventory" has been replaced with the step of "converting data relating to a selected matching item and an associated source to data relating to an item and a different source." As discussed above in the context of claim 28, the Gateway 2000/MRO manual fails to provide support for this claim limitation, and the Examiner has utilized the same reasoning with this claim as with claims 40 and 28. Therefore, I disagree with the Examiner's contention that the Gateway 2000/MRO manual anticipates claim 41.

183.    Regarding claims 42, 43, and 44, because the Gateway 2000/MRO manual fails to disclose each and every element of independent claim 41 upon which these claims depend, it necessarily fails to disclose each and every element of claims 42, 43, and 44. In addition, the Examiner has utilized the same reasoning with these claims as with similar claims 32, 26 and 30, respectively and I disagree with the Examiner's contention that claims 42, 43 and 44 are anticipated by the Gateway 2000/MRO manual for the same reasons I stated with regard to the similar claims.

184.    Regarding independent claim 45, I observe that this claim contains limitations that are identical to those recited in the other independent claims already discussed (e.g., claim 26, etc.), and the Examiner has utilized the same reasoning with this claim as with those claims. Therefore, for the reasons articulated above, I disagree with the Examiner's contention that this claim is anticipated by the Gateway 2000/MRO manual.

## IX.    CONCLUSION

185.    In summary, for all of the foregoing reasons, it is my opinion that the references relied upon in the Office Action fail to anticipate any of the claims of the '683 patent.

The undersigned declares further that all statements made herein of his knowledge are true and all statements made on information and belief are believed to be true and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under § 1001 of Title 18 of the United States Code.

Date:_____May 29, 2008_____          By:_____
                                              Brooks L. Hilliard

# EXHIBIT 1

*Curriculum Vitae*

*Brooks L. Hilliard*

## 1. EDUCATION, EMPLOYMENT, AND PROFESSIONAL ACTIVITIES

### 1.1 Education

B.S. (Mechanical Engineering and Economics)
Massachusetts Institute of Technology: 1968

M.B.A. (Management and Marketing)
Harvard Business School, 1973

### 1.2 Professional Employment History

Business Automation Associates, 1980-Present
President

Arizona State University School of Business, 1981-1984
Faculty Associate (information technology courses)

ITT Career Terminal Systems, Tempe Arizona, 1977-1980
Product Marketing Director

Sanders Associates, Nashua, New Hampshire, 1974-1977
Product Marketing Director

Linolex Systems, North Billerica, Massachusetts, 1973-1974
Marketing Division Manager

Infomatics Incorporated, Sherman Oaks, California and Waltham, Massachusetts, 1965-1968
Programmer Analyst (summers and part-time)

### 1.3 Consulting Clients (partial list)

Advanced Controls Corp, Irvine, CA;
Aircraft Gear Corp, Mesa, AZ;
American Transit Systems (Phoenix Transit), St. Louis, MO;
Arizona Attorney General's Office, Phoenix, AZ;
Arizona Industries for the Blind, Phoenix, AZ;
Atlas Roofing, Meridian, MS;
Coreslab Systems, Austin, TX;
Dowty Aerospace, St. Louis, MO;
City of Glendale; Glendale, AZ;
Insilco Technologies, Raleigh, NC;

Paddock Pools, Scottsdale, AZ;
Regional Public Transit Authority, Phoenix, AZ;
Shasta Industries, Phoenix, AZ;
Sinclair Paint, Los Angeles, CA;
Southern Holdings, New Orleans, LA;
Stewart Stamping Corp, Yonkers, NY

## 1.4 Professional Certifications and Activities

### 1.4.1 Certifications

Certified Management Consultant (CMC), awarded by the Institute of Management Consultants, USA, the US chapter of the only world-wide certifying body for management consultants.

Certified Computing Professional (CCP), awarded by the Institute for the Certification of Computer Professionals, an international certifying authority sponsored by more than twenty domestic and international computer professional associations.

These certifications are achieved through peer reviews, client audits, competency tests and oral interviews, compliance with continuing education requirements, and pledge to uphold the Codes of Ethics for both organizations.

### 1.4.2 Professional Societies and Activities

National Board Member and Chairman of Ethics Committee,
    Institute of Management Consultants, USA.

Board Member,
    Arizona Chapter of the Institute of Management Consultants

Board Member,
    Arizona Harvard Business School Association

Board Member,
    MIT Alumni Club of Phoenix

Board Member and Officer,
    Arizona Chapter of the National Conference of Christians and Jews (NCCJ)

Advisory Board Member,
    Devereux Foundation Arizona Advisory Board

Board Member and Officer,
    Phoenix 100 Rotary

Member,
    Arizona State Bar Technology Task Force

Member,
    Arizona Technology Council

Member,
    Independent Computer Consultants Association

Member,
    I.E.E.E.

Member,
    Forensic Expert Witness Association

**1.5 Military**

Officer in U.S. Coast Guard, Washington, D.C., 1969-1972
    Programmer Analyst, Management Branch Naval Engineering Division, Coast Guard
Headquarters (1970-1972)

## 2. PUBLICATIONS AND LECTURES

### 2.1 Publications

Hilliard, Brooks L., "Hard Drive Archaeology: Digging It Up with Forensic Data Recovery," For The Defense, July 2002.

Hilliard, Brooks L., "Seven Keys to a Successful Internet Strategy," Association Trends, 2002.

Hilliard, Brooks L., "Businesses Must Respond to Growing Demands of Customers in The Global-communications Age," Jewish News of Greater Phoenix, 1997.

Hilliard, Brooks L., "Computer Software For Trial Attorneys," Trial Practice (a publication of the Trial Practice Section of the State Bar of Arizona), 1993.

Hilliard, Brooks L., "Today's Practice Management Systems: What They Have to Offer That Your Present System May Not," Arizona Attorney, 1992.

E-mail newsletters, the CEO's Web Review and the Management Consultants' Web Review.

Printed Newsletter, the Business Automation Bulletin, mailed to a private mailing list.

### 2.1.1. Book

Hilliard, Brooks L, "Buying a Computer for Your Growing Business, An Insider's Guide," Dow Jones-Irwin, 1984.

## 2.2 Invited Lectures/Speeches (partial list)

Topics included areas such as use of the Internet for enterprise applications including materials procurement, business-to-business and business-to-consumer sales and customer support.

> American Edged Products Manufacturers Association, Potomac Falls, VA;
> Arizona Newspaper Association, Phoenix AZ;
> Associated Oregon Loggers, Salem, OR;
> Cookware Manufacturers Association, Birmingham, AL;
> Electronic Industries Alliance, Arlington, VA;
> Floor Covering Installation Contractors Association, W. Bloomfield, MI;
> Georgia Telephone Association, Atlanta, GA;
> International Council of Shopping Centers, New York, NY;
> International Wood Products Association, Alexandria, VA,
> Measurement Control and Automation Association, Williamsburg, VA,
> National Association of Metal Finishers, Washington, DC.

Seminars Leader and Instructor on computer technology in business.
> American Management Association.