```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF VIRGINIA
 2                   RICHMOND DIVISION


 3  _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                                      :
 4  ePLUS, INC.,                      :
                                      :
 5                  Plaintiff,        :
    v.                                :  Civil Action
 6                                    :  No. 3:09CV620
    LAWSON SOFTWARE, INC.,            :
 7                                    :  January 22, 2010
                    Defendant.        :
 8  _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _:

 9


10


11         COMPLETE TRANSCRIPT OF MARKMAN HEARING
            BEFORE THE HONORABLE ROBERT E. PAYNE
12               UNITED STATES DISTRICT JUDGE


13


14


15  APPEARANCES:

16  Scott L. Robertson, Esq.
    Jennifer A. Albert, Esq.
17  GOODWIN PROCTOR
    901 New York Avenue, NW
18  Washington, D.C.   20001

19  Craig T. Merritt, Esq.
    CHRISTIAN & BARTON
20  909 E. Main Street, Suite 1200
    Richmond, VA   23219-3095
21
                Counsel for the plaintiff ePlus
22


23

                    DIANE J. DAFFRON, RPR
24                 OFFICIAL COURT REPORTER
                 UNITED STATES DISTRICT COURT
25
```

```
 1   APPEARANCES:  (Continuing)

 2   Daniel W. McDonald, Esq.
     MERCHANT & GOULD
 3   3200 IDS Center
     80 South Eighth Street
 4   Minneapolis, MN   55402-2215

 5   Dabney J. Carr, IV, Esq.
     Robert A. Angle, Esq.
 6   TROUTMAN SANDERS
     Troutman Sanders Building
 7   1001 Haxall Point
     P.O. Box 1122
 8   Richmond, VA   23218-1122

 9            Counsel for the defendant Lawson Software.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (The proceedings in this matter commenced at
 2   1:36 p.m.)
 3
 4              THE CLERK:  Civil Action 3:09CV00620, ePlus,
 5   Incorporated v. Lawson Software, Incorporated.
 6              Would counsel please state their name for the
 7   record and the parties they represent.
 8              MR. MERRITT:  Your Honor, good afternoon.
 9   Craig Merritt with Christian & Barton for ePlus.
10              MR. ROBERTSON:  Good afternoon, Your Honor.
11   Scott Robertson from Goodwin Proctor for plaintiff
12   ePlus.
13              MS. ALBERT:  Jennifer Albert with the firm of
14   Goodwin Proctor for plaintiff ePlus, Inc.
15              MR. CARR:  Good afternoon, Your Honor.
16   Dabney Carr from Troutman Sanders for Lawson Software.
17              MR. McDONALD:  Good afternoon, Your Honor.
18   Daniel McDonald of Merchant & Gould for Lawson
19   Software.
20              MR. ANGLE:  Good afternoon, Your Honor.
21   Robert Angle from Troutman Sanders on behalf of Lawson
22   Software.
23              THE COURT:  All right.  We have the Markman
24   hearing in this case.  There are three patents at
25   issue; '683, '516 and '172.
```

1                What is the difference between the

2    patents-in-suit as to the invention that is at issue?

3    The basic invention.  Why are there three patents and

4    what is best way for us to understand the real

5    differences between these patents?

6                Mr. Robertson, in a nutshell, give us an

7    answer.

8                MR. ROBERTSON:  Would you like me to address

9    it from the podium, Your Honor?

10               THE COURT:  Yes, so everybody can hear.

11               MR. ROBERTSON:  The best way to answer that,

12   Your Honor, is that the three patents all come from a

13   common specification and are what are called

14   continuation patents.  So, therefore, under the law the

15   patent statute, the patent owner is entitled to

16   continue claim coverage of its inventions as disclosed

17   in the specification by having a common pendency of the

18   applications in common inventors.

19               Again, it's black letter patent law that the

20   actual language of the claims define the inventions.

21   So we're going to need to look at the 13 individual

22   claims that are being asserted here in order to

23   understand the proper scope.  The --

24               THE COURT:  Basically, why do you need three

25   patents to deal with one basic invention?  Why do we

1  need three patents to deal with that?

2        MR. ROBERTSON:  Well, Your Honor, it's

3  because there are different aspects of the invention

4  that were important.  There are aspects of searching

5  multiple catalog databases.  There are aspects of

6  refining the search criteria, to be able to do what is

7  known as cross-referencing the patent in order to come

8  up with similar products or products that might be

9  replacement products.

10        So there are various different aspects.  It's

11  a big invention.  It's tough to get your arms around it

12  when you start out.  And so what initially happens is

13  the patent attorney looks at the specification and

14  decides on a set of claims, submits them to the Patent

15  Office, and then pursues that dialogue, that

16  communication, through the Patent Office to get a set

17  of certain claims, recognizing that you could get some

18  claims allowed fairly quickly, and then move on and

19  look at other aspects of the invention.

20        THE COURT:  It's a morass in the meantime for

21  people trying to understand the invention and creates a

22  morass for people trying to understand what's going on.

23  That's essentially what happens, I think.

24        I guess the answer is there is no real answer

25  to the question.

1          When the PTO did the reexamination, has it

2     reexamined these patents?  Which ones has it

3     reexamined?

4          MR. ROBERTSON:  Presently now all three of

5     the patents are in reexamination, Your Honor, but not

6     all of the claims are in reexamination.  That's a set

7     of claims from the '683 patent, the first patent at

8     issue, that are not currently in reexamination.

9          But if you pay your fee, and the statistics

10    show that 95 percent of the claims when requested by a

11    requester in reexamination are going to be put through

12    the reexamination.

13         THE COURT:  It's just another example of how

14    patent law, the patent system, has gotten itself so

15    bollocksed up it's almost impossible to allow things to

16    go forward.

17         But what I'm interested in is have all three

18    of these -- has the '172 been through reexamination?

19         MR. ROBERTSON:  They are all --

20         THE COURT:  Has it been through

21    reexamination?  Is it finished?

22         MR. ROBERTSON:  No, sir.

23         THE COURT:  Started?

24         MR. ROBERTSON:  No, sir.  Not even close.

25         THE COURT:  It hasn't even started?

1          MR. ROBERTSON:  It's at a very early stage,

2   Your Honor.

3          THE COURT:  Has there been in the process of

4   reexamination any claim construction opinion issued by

5   the Patent Office?

6          MR. ROBERTSON:  No.  Much to our frustration

7   there has not been, Your Honor, and most likely there's

8   not going to be.  The Patent Office does not do that

9   during the course of a reexamination.  In fact, there's

10  been a lot of back and forth as to how the claims

11  should be properly construed.

12          In fact, we have provided to the Patent

13  Office the prior constructions of both Judge Brinkema

14  and Judge Spencer and urged the Patent Office to help

15  us understand their view of the scope of the claims so

16  we can best apply and distinguish the prior art, and

17  they haven't done that for us.  In fact --

18          THE COURT:  So none of the three examinations

19  have produced a claim construction?

20          MR. ROBERTSON:  No.  And typically they

21  don't, Your Honor.

22          THE COURT:  How you can you have a

23  reexamination without a claim construction?  Why isn't

24  the result of reexamination a claim construction of

25  sorts?

1          MR. ROBERTSON:  Well, it should be.  For

2    example, some of the claim constructions are

3    means-plus-function constructions, which we'll be

4    discussing today that involve software implemented

5    processes.  And there needs to be an algorithm

6    disclosed.  And the examiner refuses to even identify

7    the algorithms that were issued.  We're going to

8    provide them with what we believe are the proper

9    algorithms, and once we do that, we think the

10   reexamination should result in the claims being found

11   to be valid and patentable.  But right now they don't

12   do it.  That's not their process.

13          What you have to do as a patent owner is

14   essentially infer or intuit from their actions the way

15   that the examiner is treating the scope of the claims.

16          One of our frustrations, for example, you'll

17   see, Your Honor, is in the process some of the method

18   claims and some of the systems, you first build a

19   requisition for items that you want to purchase.  And

20   then you generate from that requisition one or more

21   purchase orders.

22          There are clearly different elements of the

23   claim in the context of the claim.  They use different

24   words.  The examiner, from what we can tell, is

25   treating purchase orders the same as requisitions.

1            Again, like contract law, Your Honor, where

2   you use different words to mean different things, just

3   as in patent law shouldn't conflate different words and

4   different elements in the same claim even as meaning

5   the same things, and yet that's what we are running

6   into with regard --

7            THE COURT:  What good is reexamination?  I

8   mean, that's sort of Hornbook Law.  Every first year

9   contract student knows that.  Why on earth would you

10  even go through the reexamination process?

11           MR. ROBERTSON:  Well, we didn't put our

12  patents in reexamination.

13           THE COURT:  But, I mean, as the Patent

14  Office, why do they go through it if they can't -- are

15  they just staffed by inept people who don't know what

16  they're doing?

17           MR. ROBERTSON:  The political environment now

18  is, Your Honor, is the policy is, with a whole new

19  office there conducting these reexaminations, is

20  everything goes through three examinations.  The

21  examiners, essentially, in the first step find

22  everything non-patentable.  Then it goes up years later

23  to the Board of Patent Appeals and Interference where

24  for the first time it's given closer scrutiny.

25           I just saw this week, as a matter of fact,

1 Your Honor, that the Patent Office announced that the

2 Board of Patent Appeals and Interference misplaced

3 4,000 electronic appeals that are presently before

4 them.  They couldn't find them for a period of time.

5          So, yes, I think the wheels are broken over

6 there at the Patent Office, particularly with respect

7 to reexamination.  You pay tens of thousands of

8 dollars.  You go through your process.  It takes years

9 to get your patent.  And within literally days a

10 requester can come forward, file a fee, a very modest

11 fee, submit his request, and you have a 95 percent

12 chance that you're going back into reexamination.  The

13 5 percent that don't go through are typically because

14 the reexamination of papers that the requester filed

15 were defective and therefore need to be refiled as did

16 happen in this case initially with respect to one of

17 the patents.

18          So, yes, Judge, we're as frustrated as I

19 sense that the Court is.  But that's where we find

20 ourselves, Your Honor.

21          THE COURT:  You don't even know my

22 frustration.  I find that the fundamental approach to

23 patent construction and the basics of patent law have

24 gotten so convoluted from their origins and antecedent

25 development that it's really almost an exercise in

1  ridiculous reading and studying.  We're to be engaged

2  in what amounts to a contract interpretation.

3          In what area of contract law are you not

4  allowed in interpreting a contract to consider the

5  contract as a whole and all of its terms and all of the

6  things there?  What you're really trying to find out

7  from the invention is what did the inventor intend to

8  invent and say he was inventing.  And yet you can't

9  consider most of what's important.  But that's a topic

10 for another day and another forum.

11          Now we'll have to deal with what the rules

12 are as set forth in <u>Phillips</u>.

13         MR. ROBERTSON:  I don't disagree with Your

14 Honor.  I might just make one observation, though.  You

15 don't want to penalize the patent applicant, the

16 inventors, for providing too much detail, too much

17 information.  You want them to provide as much detail

18 as they can.  But then you don't want to penalize them

19 for taking that detail and then importing it into and

20 rendering simple terms, to have all these bells and

21 whistles and baggage attached to it and just make it

22 more confusing.

23         THE COURT:  No, that's not what happens.

24 What happens is people run off at the mouth in the

25 specifications and talk about things in the claims that

1  are different than in the specifications, and then you

2  get into litigation, and lawyers concoct entirely

3  different scenarios from what the real words actually

4  used 10 years ago or 20 years ago mean.  That's what

5  the problem is.  But we're dealing with it in the

6  framework that's been dictated to us.  So that's what

7  we have to use.

8           Who is the person of ordinary skill in the

9  art at the time of filing?  And how do I know who that

10  person is from your standpoint?

11           MR. ROBERTSON:  Your Honor, I believe in the

12  past we've said it's somebody with probably a

13  bachelor's of science or equivalent in the computer

14  science, computer architecture, that probably has some

15  experience, perhaps one to two years in procurement,

16  electronic sourcing.

17           Does the patent expressly recite that?  No.

18  But I think we've had experts in the past who have

19  looked at it and said that would be the person of

20  ordinary skill in the art.  And that's pretty much what

21  we have with regard to the inventors that were involved

22  here.

23           There were four inventors.  They were

24  employed by a company called Fisher Scientific in their

25  information and technology department.  And they have

1  worked on a series of projects over a number of years

2  that are described in the background of the invention

3  to help manage Fisher Scientific's requisitions and

4  inventory.  And then they struck upon this electronic

5  sourcing invention, which, as I say, is described in

6  the three patents.

7            THE COURT:  Are you all in agreement about

8  who is the person of ordinary skill in the art?  Do you

9  agree?

10           MR. McDONALD:  I think Mr. Robertson

11 characterized it as generally how I would as well, Your

12 Honor.

13           THE COURT:  But neither one of you, unless I

14 can't read, mention that in your papers.

15           MR. McDONALD:  No.  I think as we're using

16 the specification and intrinsic record here.  Whether

17 somebody has two years of industry experience or eight

18 doesn't really move the answer to the questions.  So I

19 don't think either one of us really focused on that.

20           THE COURT:  How am I supposed to know how the

21 person of ordinary skill in the art would interpret the

22 words used in this patent without hearing from a person

23 of ordinary skill in the art?

24           MR. ROBERTSON:  Well, Your Honor, with

25 respect --

1          THE COURT:  How do I do that?  Do you want to

2    help me with that?

3          MR. ROBERTSON:  Sure.  I think there are a

4    number of words, what I'll call the general terms, that

5    are in dispute here, Your Honor, that at least Lawson

6    contends are in dispute, that I think have the plain

7    and ordinary meaning divorced from the context of an

8    electronic sourcing system that we're talking about.

9          THE COURT:  Where do we find those?

10         MR. ROBERTSON:  Well, they are words that

11   anybody, any juror, is going to readily understand.

12         THE COURT:  Do you understand "protocol"?

13         MR. ROBERTSON:  I think --

14         THE COURT:  Define it for me.  Give me the

15   ordinary definition of "protocol."

16         MR. ROBERTSON:  Well, we gave --

17         THE COURT:  No, give me what you think it is.

18   Not what you're saying in your papers, but what you

19   think it is that the average juror would think of

20   "protocol."

21         MR. ROBERTSON:  Well --

22         THE COURT:  And where do you get that

23   definition?

24         MR. ROBERTSON:  In the context of the claim,

25   Your Honor, it's talking about a selection of the

1  catalogs, and it's talking about how you refine that

2  selection of the catalogs, and it goes through the

3  steps that you do it.

4          THE COURT:  So a protocol is a series of

5  steps?

6          MR. ROBERTSON:  It is a series of steps, I

7  think, to achieve --

8          THE COURT:  And you think the average juror

9  can understand that?  Because the answer you gave me

10  first was these terms have meaning just generally in

11  the everyday world.  Then you gave me an answer that

12  says, Well, if you look in the patent claim, that's

13  what it means.  And those are really two quite

14  different things it seems to me.

15          MR. ROBERTSON:  Well, "protocol" is probably

16  the best example for Your Honor to use, but "catalog,

17  order list, matching item to a search," I don't think

18  that's going to be too hard for a juror to intuit.

19          THE COURT:  "Catalog," where do they get the

20  definition of "catalog"?

21          MR. ROBERTSON:  Well --

22          THE COURT:  And how is it going to play out?

23  You're going to argue it now.  Tell me what you're

24  going to say about it.  Ladies and gentlemen of the

25  jury, "catalog" means such and such.  You're going to

1  argue that somewhere.  How are you going to say that
2  and what are you going to use to prove your point to
3  that jury?

4         MR. ROBERTSON:  Well, I'm not going to argue
5  the term "catalog."  Hopefully, it's either defined by
6  the Court, and, therefore, they will have to abide by
7  the Court's construction of what the term is.  I think
8  a juror who just went through the holiday season got
9  inundated by catalogs coming in, L. L. Bean catalogs
10  and Victoria Secret catalogs, and the Sears catalog.
11  Everybody who grows up knows and has a --

12         THE COURT:  There's no reference to that in
13  the patent, is there?  I looked for the Victoria Secret
14  reference and the L. L. Bean reference.  They weren't
15  in there.

16         MR. ROBERTSON:  There's no uniqueness to the
17  term "catalog" as used in this.  It's an electronic
18  catalog.  It's simply a catalog that has typical
19  attributes that a catalog has.  It's got information,
20  an actual description about the good that is being
21  sold.

22         THE COURT:  Well, is an electronic catalog --
23  if I go on the Joseph A. Bank's site and I want to look
24  at ties and their wares, and I've got suits and ties
25  and dress shirts and coats and that kind of thing.  Is

1 that an electronic catalog?

2          MR. ROBERTSON:  That's a catalog in the

3 electronic format, I would think.  It's got a picture

4 of the item, for example.  It typically does.  It's got

5 at a description of it.  It's probably got pricing

6 information.  It might have a skew number.  All of

7 those things are typical of catalogs, both electronic

8 and in printed published format.

9          That's the same use of the word both in

10 electronic format and the hard copy format, Your Honor.

11          THE COURT:  Has the patent applicant served

12 as a lexicographer in either of these three patents?

13          MR. ROBERTSON:  There may be instances, Your

14 Honor.  I can give you a couple of examples if you'd

15 like.

16          THE COURT:  Well, either they do serve as a

17 lexicographer or they don't.  And under the law, that's

18 significant.  And then you have to point me to where in

19 the patent they have in fact served as a lexicographer.

20 That serves a tremendous interest in claim

21 construction.  So that's one thing you better focus on

22 right away.  And neither one of you seem to talk about

23 that.

24          MR. ROBERTSON:  Well, I think we did, Your

25 Honor, and to be fair -- do you have the prosecution

1  history?  There are at least two terms, Your Honor,

2  that I think we specifically define – can you go to

3  page 11 of that, please – specifically define what a

4  term means.

5          And in fact when we presented that to Judge

6  Brinkema, Judge Brinkema adopted that as her claim

7  construction.

8          Your Honor, I do have a PowerPoint

9  presentation I'd like to pass out.

10          THE COURT:  Well, pass it out.

11          MR. ROBERTSON:  Thank you, Your Honor.

12          THE COURT:  That's one thing I want you to

13  cover.  If you're going to contend, either one of you,

14  that the applicant acted in any way as a lexicographer,

15  I want the page, column and line where that occurs and

16  what the term is so that I can understand what it is.

17          MR. ROBERTSON:  Certainly, Judge.  Two of the

18  claim terms that are at issue, that are claimed to be

19  disputed, were called "matching items" and "selected

20  matching items."

21          Again, in the context of the claims we don't

22  think that those require much construction.  And our

23  concern is that it's just rife with mischief to start

24  taking simple terms and appending baggage onto them.

25          But during the prosecution history, at one

1   point in remarks and in response to an office action

2   the patent applicant actually said -- and this is set

3   forth on the slide, Your Honor.  On the PowerPoint, I

4   might want to direct you to it.  It is starting at page

5   25 and going over to page 26.

6           Let's go back to the prosecution history for

7   a minute.  There you'll see the patent applicant said,

8   Matching items are the search results and selected

9   matching items are the requisition items.

10          And the patent owner made that representation

11  to the examiner for the purposes of responding to this

12  office action.  And it would be perfectly fair, Your

13  Honor, for you, as a judge, to rely on that and to take

14  the patent applicant's representation as his word.  The

15  examiner relied on it and the prosecution went forward

16  resulting in the patent.

17          THE COURT:  Matching items and what's the

18  other one?

19          MR. ROBERTSON:  Selected matching items, sir.

20          THE COURT:  And selected matching items are

21  what?

22          MR. ROBERTSON:  They are the requisition

23  items.  And we presented that to Judge Brinkema and

24  Judge Brinkema adopted those constructions.  So I think

25  also as part of uniformity and consistency, which is

```
 1   one of the objectives of the Markman procedure, it

 2   would be perfectly appropriate for the Court to adopt

 3   those constructions if the Court determines a

 4   construction is necessary.

 5          Let me go on to say, Your Honor, while I'm on

 6   that point about the prior constructions, as you know,

 7   this case was tried both before Judge Brinkema and

 8   Judge Spencer.  There are what I'll call the general

 9   terms and there are what I'll call these

10   means-plus-function terms, which I'll admit are a

11   little more thorny, and we have to get to them because

12   you need to look at corresponding structure and

13   specification under the statute.

14          But I think, and the Court raised this

15   initially in one of our pretrials, that it would be

16   perfectly appropriate given the fact that there have

17   been two preeminent judges in this district who have

18   examined these general terms, and to the extent they

19   were at issue in Judge Brinkema's case or to the extent

20   those general terms were at issue in Judges Spencer's

21   case and they were decided, that we should not need to

22   have to revisit those.  And there are a number of those

23   terms that have been decided.

24          In fact, it's nicely set forth in an appendix

25   to the defendant's opening brief with the exhibits.  We
```

1 provided you with jury instructions.  We provided you

2 with --

3          THE COURT:  So you agree that I can take all

4 of the prior constructions of Judge Brinkema in the --

5 what is it?  The Ariba case?

6          MR. ROBERTSON:  In the Ariba case, Your

7 Honor.

8          THE COURT:  -- and Judge Spencer in the SAP

9 case and use those?

10          MR. ROBERTSON:  To the extent they are in

11 dispute in this case.  There are some claims terms that

12 were in dispute, and those claims are no longer in

13 dispute in this case.  Let me just say with one caveat,

14 Your Honor.  And this is just Judge Spencer actually

15 was presented with defining "matching items" and

16 "selected matching items," and he did not define

17 "selected matching items," but he actually gave a

18 construction that was really more for "matching items."

19          Now, Judge Brinkema used these terms right

20 here as defined by the prosecution history and as

21 represented by the patent applicant accepted by the

22 examiner.  So I would say that those are correct.  But

23 just subject to that, anything that Judge Spencer and

24 Judge Brinkema did that are at issue here we would live

25 with except for that one matching items.

1          THE COURT:  How many of the terms does that

2   eliminate?

3          MR. ROBERTSON:  I think -- let me do it this

4   way.  I think what it leaves --

5          THE COURT:  Or how many does it leave?

6          MR. ROBERTSON:  Again, I'm keeping the

7   general terms to one side and leaving these

8   means-plus-function terms aside because we do, as

9   you'll see, you may have read from the papers, take

10  issue with Judge Spencer's means-plus-function claims,

11  which he vacated after that trial.

12          But the general terms, I think the ones that

13  are left, I was just asking this on the ride over,

14  was -- it will be subset, protocol, order list, and I

15  think that's it.  So it does take out of the 11 general

16  terms that are in dispute here or that's contended to

17  be in dispute by Lawson, that leaves three, Your Honor.

18          I think "order list" is a list of stuff you

19  want to order.  I don't really know why we're all

20  haggling over that.

21          "Protocol," Your Honor raises a good point.

22  Perhaps that needs a construction.

23          THE COURT:  Did you know that a protocol

24  before you got into this case was the preamble to a

25  paper roll?

1          MR. ROBERTSON:  I knew that when I looked it

2  up in Webster's Dictionary.

3          THE COURT:  You get down to what I understand

4  a protocol to mean about the fifth definition.

5          MR. ROBERTSON:  I think that's right, Your

6  Honor.

7          Ironically, we both point to a very similar

8  dictionary definition.  When we go to a dictionary

9  definition, we get down to the fifth definition, I

10  think we both arrive at something that is so similar we

11  could almost live with it if Your Honor is so inclined

12  to construe the term "protocol."

13          What I don't want it defined as is a

14  procedure because all that is is an effort to rewrite

15  the claim.  I, quite frankly, don't understand why

16  protocol should mean procedure.

17          THE COURT:  Why would you object to that

18  because the fact of the matter is if you read all of

19  the claim construction law, and if you look at a lot of

20  the claim construction opinions, all the claim

21  construction opinions do is rewrite the claims, and

22  that's what is sort of silly about the whole process is

23  these people go through the use of all of the terms,

24  and they go through a process to describe them.  And

25  then we come in after they use language, and we say,

1  Well, that really means this.  And some of the

2  that-really-means-this comes out to be some of the most

3  bizarre twisting of what people have actually said in

4  the patent process that you can envision.

5          So what you're really doing is asking for a

6  rewrite of the patent.

7          MR. ROBERTSON:  I'm not, Your Honor.  I'm was

8  just asking to use the term "protocol."

9          THE COURT:  Which definition of "protocol" do

10  you want me to use?  Which one do you think you all are

11  so close on it doesn't make any difference if I choose

12  one or the other?

13          MR. ROBERTSON:  Just give me a moment, Your

14  Honor.  I don't have it exactly committed to memory.

15          THE COURT:  You don't?  Not with all this you

16  don't have it committed to memory?

17          MR. ROBERTSON:  No, sir.

18          THE COURT:  Good.  It makes me feel better.

19          MR. ROBERTSON:  I think I saw it in both

20  responsive briefs.  The defendants rely on a term that

21  says a set of conventions governing the treatment and

22  especially the formatting of data in an electronic

23  communication system.  And I think our initial brief

24  with respect to "protocol," Your Honor, said -- it was

25  the Webster's New World Dictionary -- that it's a set

1  of rules governing communication and transfer of data

2  between machines as in a computer system.

3         And I believe you're right.  I believe that

4  was about the fifth definition of "protocol" in

5  Webster's when we got to it.

6         Quite frankly, Your Honor, I don't know the

7  answer to your question as to what is the problem with

8  "procedure."  I don't understand why they need to

9  substitute "procedure" with "protocol" other than --

10  because I don't understand their argument as to why

11  that needs to be because they don't ever really give a

12  reason why that is better other than to look at the

13  claim itself, read the word "protocol," and say,

14  "That's a procedure."

15         THE COURT:  How does it hurt to define it as

16  a procedure?  You say in your briefs that if I do what

17  they want to do, that's just granting summary judgment.

18  Is that going to happen if I define protocol as

19  procedure?  Is that what they are trying to do?

20         MR. ROBERTSON:  I think in many instances,

21  obviously, that's why --

22         THE COURT:  How about procedure?

23         MR. ROBERTSON:  I don't know the answer

24  honestly, Judge, with respect to procedure.  I don't

25  know why they want that, but I would not -- I'd be

1   surprised if there was not a non-infringement argument

2   that ultimately spun out of it.

3           THE COURT:  But to you doesn't "protocol"

4   mean to you procedure just in the ordinary way you use

5   it?  It's the way you do something.  It's a

6   standardized set way of doing something.  And that's a

7   procedure.  And you have a protocol so that you know

8   what the rules are for following.

9           In the computer field, it's generally defined

10  as a set of rules for communications within the

11  computer communication system, isn't it?

12          MR. ROBERTSON:  Your Honor, I'm just looking

13  at it in the context of the claim.  It's talking about

14  a catalog selection protocol.  So I suppose if I

15  substituted a catalog selection procedure, would I be

16  doing much harm to the claim?

17          THE COURT:  Suppose I extract from them a

18  promise that it won't be a basis for non-infringement,

19  do you think we could all agree that "protocol" is a

20  procedure so the jury could understand what we're

21  talking about?

22          MR. ROBERTSON:  I'll accept that, Your Honor.

23          THE COURT:  All right.  Promise?

24          MR. McDONALD:  Yes, Your Honor.  I didn't get

25  a chance as to why we wanted to distinguish it, but

1  that can wait until later.

2          THE COURT:  He wants to hear it, and I do,

3  too.  So we'll see.  Just keep that on the burner.  So

4  it looks like to me we have an agreement on that, too.

5          Why don't you go ahead now and proceed in the

6  fashion that you'd like to proceed since I've

7  interrupted about 37 times.

8          MR. ROBERTSON:  Your Honor, I think it just

9  might be helpful if I just give a little bit of the

10  background in context of the inventions and their

11  development.  I'll try to be brief as far as that.

12          But as Your Honor understands, the patents

13  are directed to this electronic sourcing systems and

14  methods of doing things.  I know Your Honor has been on

15  the bench a number of years.  I first appeared before

16  you in a patent case about 15 years ago.  And I've been

17  in front of you on three other patents cases since

18  then.

19          So I understand that Your Honor understands

20  basic claim construction principles and certainly your

21  frustration with them in the Federal Circuit.  The

22  Federal Circuit is trying to come around, though.

23          THE COURT:  They are doing a lot better job

24  telling us what to do than they used to.

25          MR. ROBERTSON:  Yeah.  Apparently they think

1  they can tell the Supreme Court what to do as well from

2  what I hear.

3          THE COURT:  Be careful.  You may have to be

4  arguing up there in front of them.

5          MR. ROBERTSON:  I will.

6          THE COURT:  And if it's in this case, I can

7  tell you that line will get into a brief somewhere.

8          Well, they are stuck and hamstrung with a lot

9  of antecedent old doctrines, too, that probably are

10  hard to deal with.  But anyway, go ahead.

11          MR. ROBERTSON:  One of the things they're

12  doing now, though, Your Honor, with respect to general

13  claim construction principles is they are recognizing

14  that people are fighting more and more often over what

15  the definition of "is" is.

16          So there's a number of case law now that's

17  coming out that's saying, Look, you don't need to just

18  rewrite claims.  If only those terms need to be

19  construed that are in controversy and only to the

20  extent necessary to resolve the controversy.  Even

21  Phillips said, Ordinary meaning of claim element

22  involves often little more than the application of

23  widely-accepted meaning of commonly understood words.

24          So when we get to something like "order

25  list," Your Honor, we would be urging that that is

1  something that is readily understood.  "Protocol," I

2  think Your Honor makes a good point.

3              With "catalog," let me just address that.

4              THE COURT:  All right.  Where are we going

5  now?  Catalog?

6              MR. ROBERTSON:  Let me direct you to page 14

7  of the PowerPoint.

8              THE COURT:  Okay.

9              MR. ROBERTSON:  Judge Brinkema did not

10 construe the term "catalog."  It wasn't at issue with

11 respect to the Ariba case.  Judge Spencer did.  We

12 believe our construction is consistent with Judge

13 Spencer.  In fact, it's identical to Judge Spencer

14 except -- let me direct you right to what is is.  We

15 actually included the word "typically" includes in

16 there.  "Typically" meaning you usual expect to find it

17 in a catalog.

18             What I don't want to have happen, Your Honor,

19 is the argument being made that you always need to have

20 such a requirement.  So, for example, Your Honor, if I

21 have a catalog that has a thousand items and 900 have

22 pictures, but 100 don't because it says something like

23 "picture unavailable" or "picture not depicted," I

24 don't want to hear an argument like I did in SAP that

25 that's not a catalog.

 1          THE COURT:  They better not make that

 2  argument here.

 3          MR. ROBERTSON:  That's why we included the

 4  term "typically" if this requires construction.

 5          "Catalog" is an interesting thing because

 6  everyone sort of knows what it is, but when you sit

 7  down and you have to define what it is, it doesn't lend

 8  itself readily to definition.  It's one of those

 9  things, it's one of those words that you sort of know

10  it when you see it.  I know what a catalog is.  I can

11  look at that.  And if you put it in front of a jury, 99

12  times out of 100 they are going to go, That's a

13  catalog.

14          Then if you have to say, What are its

15  attributes, you would say, Well, it typically has these

16  things, but it doesn't always have to have these

17  things.

18          What is Lawson doing here?  First of all, I

19  think, you know, it's requiring images.  But if they

20  want to give me a representation that they won't make a

21  non-infringement argument out of that, I could live

22  with it.

23          It says here that it has to be published by a

24  vendor.  So they have imported that into the

25  limitation.  There are examples and I can show them to

1   Your Honor in the patent where there are catalogs

2   published by suppliers, published by distributors.

3           THE COURT:  What's the difference between a

4   supplier and a vendor and a distributor and a vendor?

5           MR. ROBERTSON:  Well, there are also

6   manufacturer catalogs that are in there.

7           THE COURT:  What's the difference?

8           MR. ROBERTSON:  A manufacturer may not be

9   actually selling the goods.  A supplier or distributor

10  may be selling other vendor goods.  Typically, like in

11  the Fisher Scientific situation, Fisher Scientific was

12  a distributor of other manufacturers and other vendors'

13  goods.  They sold test tubes and beakers and pipettes

14  and syringes and laboratory equipment, test kits for

15  hospitals.  They rarely made anything or manufactured

16  anything themselves.

17          So to take and import vendor catalog would, I

18  think, is inserted in there to give this defendant a

19  non-infringement argument.  Why?  What they do is they

20  compile catalogs from a variety of different sources.

21  They sometimes do, and what some of the evidence would

22  show is they will take an old system in which someone

23  has a database of catalog items, and they will transfer

24  that - it's called a legacy system because it's their

25  old system - to their new system, and import that data

1  into the new database they are going to use.

2          Is that a vendor catalog?  It's got catalog

3  data.  Why does it have to be from a vendor,

4  particularly when the patent points out it can be from

5  so many different sources such as distributors and

6  manufacturers?

7          So I think that would be proper to import

8  that term.

9          THE COURT:  You agree with his definition

10  now, don't you, after you have read the briefs?

11          MR. McDONALD:  No, Your Honor.

12          THE COURT:  Why not?  I mean, really and

13  truly, there's no basis for the limitation of a vendor

14  that I can find because they do -- I think it's time

15  for you all to sort of really come to reason and

16  rationality.  They talk about all kinds of third

17  parties, manufacturers, suppliers, distributors.  Some

18  of whom sell.  Some vend.  Some of whom don't.  And it

19  doesn't appear in the claim language.  So why do we

20  have to bring that in or why do we have to spend any

21  more time arguing other than you saying something like

22  this:  You know, after having read their briefs, I

23  think we can live with that.  How about that?

24          MR. McDONALD:  The patent itself, Your Honor,

25  does talk about vendors and that is the --

1            THE COURT:  It talks about vendors, but it

2  doesn't limit it to vendors and you're trying to limit

3  it.

4            MR. McDONALD:  But when the invention itself,

5  though, is so focused on this concept of the new thing

6  using this catalog database with this large volume of

7  information --

8            THE COURT:  See, that's what I'm saying.  You

9  shouldn't be making arguments like that.  That's what

10  I'm saying.  You're arguing about how many angels can

11  stand on the head of a pin.  And there's no real merit

12  to it.  And it's the kind of thing that obscures the

13  ability of courts to efficiently process patent cases.

14            I really think in making your arguments, both

15  of you need to be facing the fact that -- face this

16  fact:  That if, in fact, I make a claim determination,

17  and I later find that what it is is a sneaky way to get

18  a summary judgment in, I may reconstrue the claim in

19  the summary judgment process because I'm not going

20  to -- this is one of the reasons why often I find that

21  it's important to have the claim construction and the

22  summary judgment proceed apace, and I may in fact just

23  do that in this case.  Holding everything until I see

24  your summary judgment motions.  But I really think that

25  there has come to be this approach to claim

1  construction that it is a "gotcha" for summary judgment
2  instead of being what it was intended to be.  And what
3  it was intended to be is where there really are genuine
4  ambiguities in a patent, let's get a construction and
5  live with it.
6          And sometimes that's going to result in
7  summary judgment and sometimes it's not.  And now claim
8  construction is becoming a way to try to structure and
9  rewrite claims in such a way as to get a summary
10 judgment.  And I want you to stop it.  Okay.
11         MR. ROBERTSON:  Just for record, I was
12 referencing the '683 Patent at column 4, lines 46 to
13 60, where all those different supplier, manufacturer or
14 vendor catalogs are described.  Of course, Fisher
15 Scientific was --
16         THE COURT:  Where is it?
17         MR. ROBERTSON:  Do you have that column?
18         THE COURT:  '683?
19         MR. ROBERTSON:  Column 4, 46 to 60, for
20 example.  There are other examples that we gave in the
21 brief.  But here you are, Judge, we're talking about
22 distributor catalogs, suppliers, manufacturers, other
23 distributors listing vendor products.
24         With that I'd like to move on from "catalog"
25 unless you have any other questions with respect to

1   that.

2         THE COURT:  Okay.

3         MR. ROBERTSON:  And the next one I want to

4   discuss is "subset."  I'd like to try and achieve

5   resolution of these things as much as we can by

6   agreement.  The dispute we're having here is, you know,

7   Lawson's proposed construction simply says it's less

8   than all the set first, and technically the definition

9   of a subset can mean all or less than all.

10        There are examples, Your Honor --

11        THE COURT:  I'm having trouble.  Why is a

12   subset all as opposed to less than all?  Typically, if

13   you have a set, it consists of some kind of grouping of

14   some kind.  And a subset includes something less than

15   that as a general proposition.  I'm having trouble

16   understanding because your definition suggests that a

17   subset and set are the same thing and that can't be

18   what it means.

19        MR. ROBERTSON:  Well, actually, Your Honor,

20   to go to most every dictionary definition, including

21   the ones that we have cited, the definition is --

22        THE COURT:  You can't use dictionaries.

23        MR. ROBERTSON:  Well, certainly you can, Your

24   Honor, if the word is not used -- if the word is used

25   in its ordinary context.  Phillips says, you know, if

1  the word is not used out of its ordinary context, that

2  a dictionary definition is completely appropriate to

3  show that it's not being used as their own

4  lexicographer.

5         But let me see if I can save you some trouble

6  here, Your Honor.  In the context that I think this

7  term is being used, again in the term of a claim, they

8  are talking about a selection process that is less than

9  all of the catalogs to be selected.  And that's from

10  the claim itself.

11        And so if we're going to use it consistently

12  in that claim, it can be less than all in that context.

13  Again, Your Honor, I'm concerned about some other

14  stealth summary judgment argument that I may have not

15  appreciated.  But in that term, a subset, if in fact

16  the Court thinks it needs further deconstruction and

17  it's for that claim 1 or claim 29 of the '516 Patent,

18  it is talking less than all.

19        There are other claims, Your Honor, that talk

20  about searching among the selected product catalogs,

21  and you have to have -- the patent makes clear you have

22  to have two or more catalogs.  That was one of the

23  advantages of the invention.  If you were searching

24  perhaps multiple catalogs, as many as you wanted, two

25  or more.

 1              And you'll see arguments made by Lawson that

 2  you always need to search two or more.  The patent

 3  makes clear in several instances that you can even

 4  search one or you can search all of the catalogs and

 5  that satisfies searching among the selected product

 6  catalogs.

 7              THE COURT:  What's that got to do with

 8  subsets, though?

 9              MR. ROBERTSON:  Well, I would hate to hear

10  later that a subset means it has to be less than all in

11  the context of those claims when --

12              THE COURT:  That's an entirely different

13  language question, isn't it?

14              MR. ROBERTSON:  I would hope so, Your Honor.

15              THE COURT:  I think it is.  I understand your

16  point, but if they make that argument, I think that you

17  could run up your frivolous semafore.

18              MR. ROBERTSON:  The only other point I would

19  make with respect to this term "subset," Your Honor, is

20  that they also include in its definition that it has to

21  be less than all of a set of selectable items.

22              Now, you look at the claim.  So they have

23  added this selectable items language to the word

24  "subset."  Now, I don't think anybody would think of

25  selectable -- Your Honor said you would think it's less

1 than all, but it wouldn't come immediately to mind it

2 would be of selectable items.  And that's at page 17.

3          THE COURT:  It's less than all of the set,

4 whatever the set is.

5          MR. ROBERTSON:  I think if you stop there,

6 Your Honor, you don't import the selectable items

7 because in the context of the claim -- I might just

8 mention claim 1 and claim 29 --

9          THE COURT:  Wait a minute.  We may have

10 agreement.

11          MR. McDONALD:  Yes, Your Honor, I think we

12 can live with that, if we just said less than all of a

13 set, we would be willing to drop the of selectable

14 items part.

15          MR. ROBERTSON:  That's fine.  I do fear

16 stealth summary judgment with this, but --

17          MR. McDONALD:  Did ePlus agree with that,

18 Your Honor?  I didn't hear.

19          THE COURT:  I haven't heard yet because he

20 was talking, and I made the unfortunate mistake of

21 talking over him.

22          MR. ROBERTSON:  I apologize, Your Honor.

23          THE COURT:  You shouldn't apologize for what

24 I did wrong.  But, look, if you want to get into that,

25 get on over there and give my wife some instructions,

1   will you?  Because I'd like to have that happen.

2           All right.  So you-all agree with less than

3   all of a set?

4           MR. ROBERTSON:  Yes, sir.

5           THE COURT:  Period.  Okay.  I'm not sure it

6   needs definition, but if that's what it is, we can do

7   that.  Okay.

8           MR. ROBERTSON:  The next then -- I can move

9   on, Your Honor?

10          THE COURT:  Yes.

11          MR. ROBERTSON:  Let's talk about order list.

12  Order list is at page 19 of our slide.  Again, Your

13  Honor, in the context of the claim, we think that

14  "order list" really is one of those that does not need

15  to be construed, but to the extent that the Court

16  thinks it is, we'd also say it's the list of items that

17  you're going to order.

18          THE COURT:  What is the difference between

19  that and an order list?  It's got a few more words in

20  it.  That's all.  In other words, you're making a point

21  that it's the ordinary meaning of the word?

22          MR. ROBERTSON:  Yes.

23          THE COURT:  What is the significance, do you

24  believe, of the defendant's construction:  A list of

25  items derived from a list of selected matching items?

1          MR. ROBERTSON:  Again, Your Honor, I wish I

2  knew.  The patent has examples.  They are not lists of

3  the selected matching items.

4          THE COURT:  Suppose you make a list of items

5  that are derived from a list of selected matching items

6  but you ultimately decided not to order them?

7          MR. ROBERTSON:  The specification talks

8  exactly about that.

9          THE COURT:  Yeah, and the order list is what

10 you order, what you actually order, right?

11         MR. ROBERTSON:  Well, you may have if you

12 turn to page 21.

13         THE COURT:  Of?

14         MR. ROBERTSON:  Page 21 of the PowerPoint,

15 Your Honor.  Here's an example where you're doing the

16 search and the user may also add additional items to

17 the order list whether those additional items were

18 selected from the hit list or not.  And that hit list

19 is the results you get back from your search.

20         So my point is when the specification

21 makes --

22         THE COURT:  Well, I can search and find "hit

23 list," and then I can go and say in addition to my ties

24 and my shirts, I want to buy some socks.  I'm not going

25 to do that same search because I didn't put "socks" in

1    my search.  I go find another list and say "I want the

2    socks," and I transport that over to my order list.

3    And now I've got something that didn't come from the

4    search at all.

5              MR. ROBERTSON:  Exactly or from the items

6    that you selected from the search.

7              THE COURT:  Yeah.

8              MR. ROBERTSON:  That's a perfect example of

9    what's happening there, and it can happen in a variety

10   of ways.  So why, again, import this element that says

11   it has to be from the selected matching items when it

12   doesn't have to be a result of the search or the

13   selection.  That's our point with respect to that, Your

14   Honor, and I'll move on if you'd like.

15             THE COURT:  You go right ahead.  I think what

16   I'm going to do is take these specific terms, and then

17   we'll take a break, and then we can do the

18   means-plus-function.  We'll see how far we get with it.

19             MR. ROBERTSON:  Sure, Your Honor.

20             The next one in the slide is "protocol," but

21   I think we've actually --

22             THE COURT:  I don't know that we did.

23             MR. ROBERTSON:  -- addressed that.

24             THE COURT:  Where have we gotten on

25   "protocol"?

1          MR. ROBERTSON:  I thought we had agreement

2    that it could be a procedure as long as it's not going

3    to form the basis of a non-infringement argument.

4          THE COURT:  And he said it's not.  You said

5    it's not, right?

6          MR. McDONALD:  That's right, Your Honor.

7          THE COURT:  Okay.  All right.  So we do.

8    Thank you.  Appreciate it, gentlemen.

9          The next one is what did you say?

10         MR. ROBERTSON:  Sir, it's at page 25 of the

11   PowerPoint.  It's "matching items."  You may recall I

12   indicated that Judge Brinkema construed this and that

13   she construed it to be the search results.  And that

14   that came from the prosecution history where I would

15   suggest that the patent owner was his own

16   lexicographer.  And that it was accepted by the

17   examiner, and that the patent issued reliance on it,

18   and we shouldn't be found now to suggest that it is

19   something different than what we did for purposes of

20   allowance of the patent.

21         THE COURT:  Where is his lexicography found?

22         MR. ROBERTSON:  In the prosecution history.

23   It is Exhibit 22.

24         THE COURT:  What is it?

25         MR. ROBERTSON:  It's Exhibit 22 to the

1  supplemental Young declaration.  It is at page 11.

2  It's now on your screen again, Your Honor.

3          THE COURT:  Just one minute.  I want to write

4  it down.  All right.  Let me see.

5          That's the prosecution history, right?

6          MR. ROBERTSON:  Yes, Your Honor.  I think

7  it's used consistently in the context in the

8  specification and it's consistent with the claims.

9  Again, Your Honor, I don't think matching items in the

10 context of these claims is something that would not be

11 readily understood by the jurors, but if the Court

12 thinks it requires construction, we would submit that's

13 the proper construction.

14         THE COURT:  Okay.

15         MR. ROBERTSON:  The reason that we think

16 Lawson's proposed construction is incorrect is because

17 it requires that it be a user-entered search criteria.

18 And there are examples in the patent where there are

19 not user-generated results.  In fact, not even

20 searches.  That the system itself can provide you with,

21 for example, matching items to things that were readily

22 ordered or things that were -- perhaps inventory drops

23 down low and the system automatically requisitions.

24         There's an example, I believe, in the

25 specification using the '683 Patent at column 566 over

1   to column 6, line 33.  Why don't we just --

2             THE COURT:  In the '683?

3             MR. ROBERTSON:  Yes, Your Honor, which is

4   Exhibit 1 attached to our handout here.  This

5   PowerPoint.  Just so Your Honor knows, let me just

6   backtrack a little bit and tell you this handout has as

7   Tab A all of the 13 claims that are being asserted here

8   just for ease of reference.

9             At Tab B there are the claim terms themselves

10  and ePlus's proposed constructions side by side with

11  Lawson's proposed constructions for ease of reference.

12  And Tabs 1 through 3 are the patents.  And we've

13  actually highlighted in there the claims that are at

14  issue.

15            THE COURT:  And you're saying that column 5,

16  line 33 --

17            MR. ROBERTSON:  Line 66, Your Honor, over to

18  column 6, line 13 there's a discussion, for example --

19            THE COURT:  The data passed by interface?

20            MR. ROBERTSON:  Yes, Your Honor.  The

21  specific language I wanted to focus on, we're talking

22  about filling in fields of different information with

23  respect to the search, and it says here these fields

24  may be filled by the requisition purchasing system

25  prior to requesting a search of the catalog database by

1  the search program.  So you can actually fill these

2  fields in, fill this information in, without actually

3  even doing a search.

4         THE COURT:  An example of that is something

5  when you go on and order something and it says, "Other

6  items ordered by people who ordered this appear below"

7  or "We're out of inventory and here are some items that

8  serve the same function that you might want to look at"

9  or is that user-generated?

10        MR. ROBERTSON:  No, I think the system

11  generates that response to the user-entered criteria.

12  You specify you want a particular type of hunting boots

13  and they are perhaps out of stock.  And what you are

14  suggesting is they say you may also be interested in

15  this.  I think that's an example of the system --

16        THE COURT:  For people who order these short

17  boots or who looked at these short boots also looked at

18  the wading boots?

19        MR. ROBERTSON:  Yeah.  I'm not sure that was

20  actually contemplated 16 years ago when the inventors

21  did this, but what this is showing is that the system

22  has the capability of entering in default information

23  in fields that are not user-generated.  And so the

24  mischief, I think, of Lawson's construction is they

25  want to in every instance include a user-entered search

 1  criteria requirement.

 2          Now, are most of these searches done by users

 3  and user-generated criteria?  Absolutely.  But I don't

 4  think in matching items, you need to import that,

 5  particularly when the patent owner represented it was

 6  simply search results, and the examiner accepted that

 7  construction, and Judge Brinkema did as well.

 8          So with that, Your Honor, I would move on to

 9  "selected matching items."

10          THE COURT:  That's another one where the

11  patent owner served as his lexicographer, you said?

12          MR. ROBERTSON:  I think that's a fair

13  characterization.

14          THE COURT:  Where does the lexicography

15  appear in the patent?

16          MR. ROBERTSON:  Well, again, Your Honor, it's

17  in the prosecution history.

18          THE COURT:  Excuse me.  I mean in the

19  prosecution history.

20          MR. ROBERTSON:  It was right after that

21  citation.  Again, it's Exhibit 22 to the Young

22  declaration.  It's at page 11 in response to an office

23  action.  And, again, it's a construction adopted by

24  Judge Brinkema.

25          I just might mention, remember, this was the

1    one I mentioned there was a slight hiccup with respect

2    to Judge Spencer's construction.

3            THE COURT:  Hold on one minute before you get

4    into that, sir.

5            MR. ROBERTSON:  Sure, sir.

6            THE COURT:  Okay.  All right.  Excuse me.  Go

7    ahead.

8            MR. ROBERTSON:  Yes, sir.  There was a slight

9    hiccup with respect to this in Judge Spencer's

10   construction.  He actually used the definition of

11   "selected matching items" for "matching items," and I

12   just think he just conflated the two.  We really don't

13   know what his motivation was, but I respectfully

14   suggest that that was wrong because a matching item is

15   not necessarily one you're going to select for a

16   requisition or an order list.

17           So we did -- I'm on page 27, Your Honor, of

18   our slides here.  Again, we suggested that this didn't

19   require construction, but to the extent the Court

20   thought it did, we put there are items returned in

21   search results that satisfy search criteria and are

22   selected for inclusion in an order list or in a

23   requisition.  I think that distilled down to its

24   essence, that's a requisition item.  And so, therefore,

25   I withdraw that alternative, and I would live with

1  Judge Brinkema's and the specification history.

2          I think the mischief of Lawson's proposed

3  construction is that it requires to be selected by a

4  user again in the search program, and that it be used

5  for inclusion in an order list.  And, again, we think

6  it does not necessarily need to be in an order list

7  because there are examples where it is not included

8  necessarily in an order list because it could be

9  included simply as a selected matching item in a

10 requisition before being ordered.

11          It could be in an order list in addition to a

12 requisition, which I'm being reminded of because

13 actually claim 1 of the '172 Patent says that it is

14 actually selected for an order list, but the claim

15 expressly states that.  So by implication, if there are

16 claims that don't state it, it can be included in an

17 order list.

18          THE COURT:  Does that mean that we have one

19 definition for one claim and another definition for

20 another claim?

21          MR. ROBERTSON:  That means when you add

22 additional language to a claim that further limits, it

23 should be read that way, and when there's a claim that

24 doesn't have that language in it, it shouldn't be so

25 limited.

1          THE COURT:  I guess what I'm saying is for

2    claim -- let's see.  This is in claim 3, 26, 28 and 29

3    of the '683.  It's one definition for that, and it's a

4    different definition when it's used in claim 1 of the

5    '172 Patent.  Is that what you're saying or not?

6          MR. ROBERTSON:  That's not what I'm saying,

7    sir.  I'm saying the '172 Patent actually expressly

8    states that it is selected matching items for an order

9    list.  Expressly has that language in it.

10         So by implication when it doesn't use that

11   language in the '683 Patent, it shouldn't be so limited

12   to an order list.

13         THE COURT:  Yes, I understand that, but for

14   the '172 Patent, does it have to include as part of the

15   definition for inclusion in the order list?

16         MR. ROBERTSON:  No, sir.

17         THE COURT:  In getting the claim '172 term.

18         MR. ROBERTSON:  No, sir, because in that

19   sense it would be redundant.  It would say selected

20   matching items for an order list to be included in an

21   order list.

22         THE COURT:  Means.  And then you'd repeat the

23   same thing.

24         MR. ROBERTSON:  Yes, sir.

25         THE COURT:  Okay.  I see.

1          She didn't like that.  Maybe you want to go

2   back there and see why she shook her head.  She got

3   exercised over that.

4          MR. ROBERTSON:  The point is, Your Honor,

5   it's requisition items, and that was what was in the

6   prosecution.  That's what Judge Brinkema found.  That

7   should be sufficient.

8          So what I was doing was I was withdrawing my

9   alternative instruction in here and just trying to

10  point out why Lawson's was not correct.

11         THE COURT:  We'll go with Ariba in the

12  prosecution claim.  All right.

13         MR. ROBERTSON:  We've moved on to -- there's

14  another term that they want construed, which is

15  "searching for matching items among the selected

16  product catalogs."  This was not construed by Judge

17  Brinkema or Judge Spencer.  And I'm kind of at a loss

18  to understand why we need to do it because we have

19  construed "matching item," we've construed "searching

20  selected matching items."  Now they want search

21  selected product catalogs to locate items in response

22  again to this user-entered search criteria, which I

23  don't think is necessary.  And I think also there's a

24  suggestion --

25         THE COURT:  Is the real difference the

1  user-entered?

2          MR. ROBERTSON:  I think it's being imported

3  into --

4          THE COURT:  I know, I'm sorry, but is that

5  the real difference between the definition you agree

6  and they won't?

7          MR. ROBERTSON:  We basically say that

8  searching for matching items among the selected product

9  catalogs doesn't --

10         THE COURT:  Needs nothing.

11         MR. ROBERTSON:  Needs nothings, sir,

12  especially after you've already defined matching items.

13         And the only other thing I can point to here

14  that makes me scratch my head a little, Your Honor, is

15  this plural where you have to search for a plurality of

16  catalogs.  And this is going to come up later, but

17  there are examples in the specification where you may

18  search against a specific catalog or you may search all

19  of the catalogs.

20         So I'm not quite sure if that's what they are

21  getting at here.  If your Honor would like to see an

22  example of it I can show you in the '683 Patent.  I'll

23  just state for the record at column 6, lines 11 to

24  13 --

25         THE COURT:  11 to 13?

1            MR. ROBERTSON:  Yes, sir.  There is an

2   example of executing a first search against a specific

3   catalog contained in the catalog database.  That's on

4   your screen right there.  This argument does come up

5   again, Your Honor.  Remember, Lawson has repeatedly

6   said that you need to search at least two catalogs, and

7   it's our position that you need to have two catalogs,

8   but when you're searching among just two, you may

9   search among just one and select it.

10            Again, here's an example, and there are

11   others in which you're just searching against a

12   specific catalog in a catalog database that may contain

13   multiple catalogs.

14            So I would respectfully suggest, Your Honor,

15   that that is probably one given the fact that you have

16   already construed or will be construing "matching

17   items" should you so decide that is unnecessary to

18   construe.

19            I can move on now, Your Honor, to this

20   cross-reference table, which is at page 31 of the

21   constructions.  Now, again, I think cross-reference

22   isn't used in any unusual way here, Your Honor.  What

23   really is going on is the inventors decided to have in

24   a computer context items from vendor, suppliers, or

25   other sources cross-referenced with items that may be

1  replacement items, may be similar items, or may be

2  generally equivalent items from other vendors,

3  suppliers or sources.  And the way they could do that,

4  the examples in the patents are, is they used

5  identification codes.  It could be a part number.  It

6  could be a catalog number.  It could be some arbitrary

7  number that was developed just to do the

8  cross-referencing.

9           Cross-referencing can be one-to-one

10  cross-referencing such as product A is cross-referenced

11  to link it to product B or, for example, could be

12  one-to-two.  Say product A is equivalent to Code C and

13  Product B is equivalent to Code C.  So Product A is

14  equivalent to Product B just by way of example.

15           But the problem I have with Lawson's

16  construction here is, first, it requires it be a

17  catalog number if you see there on page 31.  Secondly,

18  it has to be between vendors.  And we talked about the

19  fact that there are other providers of goods and

20  services besides just vendors such as distributors.

21           It then requires that these catalog numbers,

22  which is included in this construction by vendors, be

23  determined by a distributor.  So there has to be some

24  distributor determination that they are equivalent.

25           So why is that --

1          THE COURT:  How would that happen?  How would

2     it be determined by the distributor?  I mean, without

3     the interface with some other computer system.  Or I

4     guess you'd have to find something in the database

5     where a distributor had made a determination of

6     equivalency.

7          MR. ROBERTSON:  Well, one, we think reading

8     in the requirement of equivalents is not called for.

9     Reading in a requirement that is determined by a

10    distributor.  It could be anybody theoretically that

11    creates a cross-reference table.

12          I'll give you an example of how it occurs now

13    in the real world if this helps.  There are

14    codification schemes that people have created.  In

15    fact, there's one classic one that's used by Lawson.

16    It's been used by Ariba.  It's been used by SAP.  And

17    it's used by my client, ePlus.  It's a coding system

18    called the UNSPSC, which stands for United Nations

19    Standardized Products and Services Code.  It was

20    originally created to be able to categorize goods for

21    purposes of tariffs and taxes among the various

22    countries, and it is typically an eight digit code.

23    And it's a taxonomy or a hierarchy, Your Honor.

24          So office supplies might -- it's an eight

25    digit code.  Office supplies might start out with 01.

1  Then paper goods could be another code 04, and then

2  legal pads could be 87, and narrow-ruled three-hole

3  punch legal pads another code.

4          So through this drilling down you actually

5  get a taxonomy.  You get an identification code

6  assigned to a particular type of good.

7          Now, if someone else comes along and they

8  have other goods, and they can assign goods to them,

9  you now have an identification code that can correlate

10  goods that have similar characteristics through this

11  taxonomy.  That's how everyone is doing it right now.

12          As was described in the patent, what was

13  happening is someone was making a determination that

14  there were goods that had perhaps similar attributes or

15  maybe replacement parts.  Someone might say I have a

16  150 milliliter beaker and you know what?  This other

17  supplier doesn't have it, but it has a 175 milliliter

18  beaker.  It's not exactly the same.  But you know what?

19  We could substitute or that can serve as a potential

20  replacement for that.

21          So there were these cross-references simply

22  using identification codes that are identified in

23  there.  But this cross-reference table doesn't say it

24  has to happen by catalog number.  And, again, there

25  were other examples in which we don't use catalog

1 numbers.  It doesn't say it has to be by a vendor, and

2 it doesn't say it has to be determined by a

3 distributor, and it doesn't say it has to be

4 equivalent.

5         What Lawson has done here is actually gone to

6 what I'll call a predecessor patent, Your Honor, by two

7 of the inventors.  It's called the RIMS patent,

8 referenced in the briefs, or the '989 Patent.  That was

9 an inventory management system.  It wasn't a sourcing

10 system for goods.

11        And they have taken a requirement that the

12 cross-reference table be created by a distributor in

13 that separate patent.  It's not a parent or a

14 grandparent of any of these patents.  It's completely

15 unrelated.  It's incorporated by reference in this

16 because it was, as I said, on the continuum of

17 developing this electronic sourcing patent.  And they

18 say, Look at that.  The cross-reference table there is

19 created by a distributor.  So it must be in this patent

20 even though it's silent as to that.

21        So we think that's simply an improper -- it's

22 improper to import in the first instance from the

23 patents-in-suit.  It's even doubly improper to import

24 from a patent that's in a sense unrelated to it other

25 than it was in a continuum of a development by these

1  inventors.

2          So we think incorporating those elements into

3  simply a cross-reference table is unnecessary and

4  contrary to the law.

5          I'm now on to the actual three remaining

6  general terms as to what I think the parties are

7  genuinely in dispute on.  At least I'll represent that.

8  But I think we have transitioned to that.

9          This is electronic sourcing system, Your

10 Honor.  This is a preamble to two of the claims of the

11 '683 Patent and seven claims of the '516 Patent and one

12 claim of the '172 Patent.

13          The proposed construction we have --

14          THE COURT:  We claim an electronic sourcing

15 system?

16          MR. ROBERTSON:  Yes, sir.

17          THE COURT:  And then comprising whatever.

18          MR. ROBERTSON:  Right.  Comprising, Your

19 Honor, is one of those open-ended transition verbs that

20 means it includes all these following elements, but

21 it's not limited to that.  It may have additional

22 elements.

23          But for electronic sourcing system, it is in

24 the preamble, Your Honor.  We contend that it actually

25 is a limitation because it helps define the invention.

1  The case law says if it defines, breathes life or

2  vitality into the claims, then it becomes part of it.

3  If it provides antecedent basis for some of the terms

4  that are used later in the claim, it should be

5  considered a limitation.

6           It was in dispute in the SAP case, and it was

7  construed by Judge Spencer, and the construction that

8  Judge Spencer gave it is the construction that we have

9  identified here on page 34 and which we would be ready

10 to accept.

11          Lawson's first -- I actually have a

12 definition that Lawson proposed here, but to be fair

13 let me say that their first position is that this term

14 should not require construction.  They then say if it

15 does require construction, it's a system for

16 determining what inventory will be used to fulfill

17 requests for items.

18          What we think is wrong with that is many of

19 the claims it's dealing with have nothing to do with

20 inventory at all.  That notion is imported entirely

21 into the claim.  In fact, it could be just being used

22 for items that are going to be requested.

23          In fact, none of the claims that are

24 referenced that I've referenced before recite at all

25 any requirement about inventory.  It is the title of

1   the patent and it is basically the first sentence of

2   the summary of the invention, which is page 36, which

3   says it's an object of the invention to provide an

4   electronic sourcing method system.  It's our view that

5   the definition Lawson proposes would actually read on a

6   prior art.

7           When you're talking about determining

8   inventory to fill, you're not necessarily talking about

9   sourcing items from vendor, suppliers, distributors,

10  manufacturers, etc.  So we would urge the Court to

11  adopt the same construction that Judge Spencer adopted

12  in the SAP case.

13          With that, Your Honor, I'll be happy to move

14  on to the next one that is in dispute, which is the

15  "converting data" element, which is at page 37 of the

16  slides.

17          This claim term actually has a construction

18  from Judge Brinkema, which is not identified here.  And

19  just consistent with my representation to the Court

20  earlier, I would be content to live with the fact that

21  another jurist has examined this and made a

22  determination, and I can provide you with the

23  definition and the source for that.

24          THE COURT:  What is it?

25          MR. ROBERTSON:  It's actually at Exhibit E of

1  the defendant's opening brief, which --

2          THE COURT:  Oh, you mean the opinion is?

3          MR. ROBERTSON:  Yes, Your Honor.

4          THE COURT:  Is that what you're saying?

5          MR. ROBERTSON:  Yes, sir.

6          THE COURT:  Yeah, I read it.

7          MR. ROBERTSON:  Okay.  And the definition is

8  the process of changing from one form or format to

9  another.  Where information is concerned a changeover

10 that affects form but not substance.

11         THE COURT:  What page of that exhibit?

12         MR. ROBERTSON:  It's at pages 19-20 of --

13         THE COURT:  That's the Ariba?

14         MR. ROBERTSON:  Yes, Your Honor.

15         THE COURT:  Judge Spencer didn't do it in

16 SAP?

17         MR. ROBERTSON:  No, sir.

18         THE COURT:  Okay.

19         MR. ROBERTSON:  Now, what do I think is

20 improper about Lawson's proposed construction?  First,

21 Your Honor, it talks about substituting a catalog

22 entry.  We don't think that this converting data

23 requires any substituting.  Indeed there are examples

24 in the specification where no substitution happens.

25 And I'll provide an example of that in a moment, Your

1  Honor.

2          Secondly, we think it says it's substituting

3  a catalog entry.  I don't know what a catalog entry is

4  to be honest, Your Honor.  I know what perhaps a

5  selected matching item might be, but the patent doesn't

6  talk in terms of substituting catalog entries.  And

7  it's not necessarily for purposes of sourcing and

8  pricing, which is also suggested by Lawson's proposed

9  construction.

10          Can we go to column 17 of the '683 patent,

11 lines 23 to 48.

12          THE COURT:  Column what?

13          MR. ROBERTSON:  Column 17, Your Honor, of the

14 '683, lines 23 to 48.

15          There's actually a discussion in here where

16 you have a user of a system, in this case, it's what's

17 known as a CSR.  That's a customer service

18 representative.  That might be a human being that

19 Fisher supplied to help its customer use this system.

20 I have it on screen, Your Honor.

21          THE COURT:  What slide is this?

22          MR. ROBERTSON:  It's actually on the screen.

23          THE COURT:  Oh, I see.

24          MR. ROBERTSON:  My consultant has just pulled

25 it up.

1           It's talking here about the CSR has access to

2    cross-reference files.  So what he can do is when he's

3    determining whether or not -- in fact, in the context

4    here, CSR is creating an order list for customers by

5    entering, for example here, distributor catalog

6    numbers.

7           And what he can do is in the course of doing

8    this, he can just look up on a cross-reference table

9    and consult it.  So what he's doing is he's saying,

10   Well, if I needed to look at something and see what

11   may be similar or generally equivalent products, I've

12   got this table readily available to me.  He can use it

13   as a resource instead of, and this is my point,

14   requiring it to be substituted.  You don't need to

15   require it to be substituted.  You may just use it as

16   this resource to determine whether you might want to

17   replace one item with another.

18          So reading into this converting data element

19   of the claim the requirement that it substitute

20   something we think is improper.  And also, again, it's

21   not substituting catalog entries because I can't find

22   that.  I don't know where that comes from with respect

23   to the patent.  It's also not in context of the claim,

24   claim 28, for example, of the '683 Patent.  It's not

25   there.

 1            I'm reminded by my colleague that in that

 2   Exhibit E, Judge Brinkema indicated that she read the

 3   definition of conversion alongside the definition of a

 4   conversion table.  And as a conversion table, she

 5   defined it as a table listing a set of characters or

 6   numbers and their equivalents in another coding scheme.

 7            And so I'm reminded that she read those two

 8   in tandem, and that we would suggest that that is the

 9   proper construction in its entirety.

10            And the other example I have is you wouldn't

11   be using these -- it also references matching codes, by

12   using matching codes, Your Honor, is part of their

13   definition.  And if you'll go to slide 39, here's an

14   example where you're using for the purpose of actually

15   substituting in this case, but you're using a part

16   number code 53610 for an originally-entered part

17   S100-06.  So, obviously, they're not matching codes.

18   What they're doing is correlating two separate codes in

19   order to perform in this instance a cross-reference to

20   perform a substitution and successfully adding a

21   different part.

22       If Your Honor doesn't have any questions with

23   respect to that, I'll move on to the last general claim

24   element, which begins at page 40.

25            THE COURT:  All right.

1          MR. ROBERTSON:  This is a claim element, not

2     really a term.  It's an entire element.  It is in the

3     '516 Patent, claim 21.  Now, let me tell you what I

4     believe the dispute here is with respect to this claim

5     element from the '516 Patent, claim 21.

6          Lawson contends this needs to be construed.

7     It wants this to be treated as one of those

8     means-plus-function claim elements, Your Honor.  Now,

9     the Court may be familiar with the law for --

10          THE COURT:  It doesn't contain means.

11          MR. ROBERTSON:  That's right, sir.

12          THE COURT:  And there's a rebuttable

13     presumption that it's not a means-plus-function test.

14          MR. ROBERTSON:  Right, sir.

15          THE COURT:  I mean claim.

16          MR. ROBERTSON:  That's right.

17          THE COURT:  And they haven't rebutted the

18     presumption; is that your point?

19          MR. ROBERTSON:  That's our point.  We think

20     here what they want to do is they want to say it's a

21     means-plus-function claim element, and then they want

22     to say, by the way, when you look at it in that view,

23     there's no structure provided for this multiple

24     purchase order generation module in the specification.

25          THE COURT:  And therefore it doesn't

 1  satisfy --

 2          MR. ROBERTSON:  Therefore it's invalid.  So

 3  this is a summary judgment argument right here with

 4  respect to this claim element of invalidity.

 5          So, again, we argue, Your Honor, that the

 6  term "module" does connote structure in the relevant

 7  computer arts.  I think we provided you with two

 8  dictionary definitions.  One from Microsoft --

 9          THE COURT:  But that argument suggests that

10  you consider it to be a means-plus-function claim.

11          MR. ROBERTSON:  No, sir.  I suggest that

12  "module" is in fact data structures that are

13  structures, that are not means-plus-function claims

14  that are understood --

15          THE COURT:  You're not saying it's the

16  structure to be used with the means.

17          MR. ROBERTSON:  That's right.

18          THE COURT:  Function.  Excuse me.

19          MR. ROBERTSON:  I'm saying you don't even

20  need to go there.  That you already have structure when

21  you recite the term "module."  Lawson relies on this

22  non-precedential unreported Ranpak decision, which I

23  suggest is sort of unique and sua generous.  That case

24  treated two terms, settable control means

25  interchangeable with settable control module.  And

1 there they said, Well, we can't really see that you're

2 using them any different.

3          We have relied on this <u>On Demand Machine</u>

4 <u>Corp.</u> precedential decision in which they were looking

5 at a means-plus-function claim term, and they found it

6 to be a computer software module that was performing

7 the recited function.  So our argument would be *a*

8 *fortiori* .  If a module can be structure for a

9 means-plus-function claim when you have a

10 non-means-plus-function claim that recites module,

11 well, then it certainly should be sufficient structure.

12          Quite frankly, Your Honor, I think the best

13 argument is that the presumption is not overcome and

14 that module in the computer arts has structure.

15          With that, Your Honor, I've completed the

16 general terms.

17          THE COURT:  Well, let me hear from them.

18          MR. McDONALD:  We just need a moment, Your

19 Honor, to flip the switch.

20          THE COURT:  Sure.

21          MR. McDONALD:  May it please the Court, good

22 afternoon.

23          THE COURT:  Good afternoon, sir.

24          MR. McDONALD:  I'll start with the last point

25 first.  Could you go to slide No. 94?

 1           THE COURT:  Did you have books for us?

 2           MR. McDONALD:  Yes.  I'm sorry.

 3           THE COURT:  Have you got it?

 4           MR. McDONALD:  Let's go to 86.

 5           THE COURT:  Where are we going, Mr. McDonald?

 6           MR. McDONALD:  Starting with the last issue

 7 that was raised, Your Honor, regarding the purchase

 8 order generation module.

 9           THE COURT:  Right.  Where are we going?

10           MR. CARR:  Page 86, Your Honor.

11           THE COURT:  86.

12           MR. McDONALD:  86, I'm sorry.  Yes.

13           So I've got up on the screen here just the

14 quote of the element itself to start with here.

15 Obviously, the starting point is the language of the

16 claim itself.  And I guess the key point here is when

17 you read that, this multiple purchase order generation

18 module, said purchase order generation module creating

19 multiple purchase orders.  Okay.  That tells you what

20 it's doing, but it has no structure.  From a single

21 requisition.  Again, it tells you where it's coming

22 from.  It doesn't give you structure.  Created with

23 said user-generated criteria.  Criteria is just some

24 information.  There's no structure there either.  And

25 said search module criteria.  Again, some other

1  information.

2          This module takes some information and it

3  creates a purchase order.  That's a functional

4  description.  There's no structure described in there

5  at all.  The question obviously is:  Does module, that

6  word all by itself, does that give structure?

7  Presumptively, it does because it's not the word

8  "means."  This is not a means-plus-function clause.

9  But we did cite the Ranpak case to show that there are

10  examples.  It's a rebuttable presumption.  And there

11  are other terms that have been used by the Court that

12  aren't means before, and the Court said, Even though it

13  didn't have means in it, for example there have been

14  things like circuitry or mechanism --

15          THE COURT:  You're using Ranpak to say that

16  the Federal Circuit has equated the words "module" and

17  "means" to be the same thing.  Is that what you're

18  saying?

19          MR. McDONALD:  I think, Your Honor -- I'm not

20  sure if it's a general rule, but there's one fact in

21  that case that's very similar to what we have here that

22  seems to be been important there.  And that was that

23  there a was a parallel means-plus-function clause that

24  also called out in that case.  It was a settable

25  control means, settable control module.

1            Here we have this multiple purchase order

2    generation module, and we also have got the means for

3    building a requisition that involves generating

4    multiple purchase orders.  It's not identical language,

5    but it's very, very close.  It's essentially the same

6    sort of thing.  I think the logic of that case is when

7    you have that sort of parallelism going on with a

8    means-plus-function clause, you're not going to get

9    around the means-plus-function requirements simply by,

10   in essence, substituting the word "module."

11           So that's why we submit that the analysis of

12   the Ranpak case is appropriate here and showing that

13   term in the abstract really doesn't provide any

14   structure.  When it's read in the context of this

15   element, it does not have any structure in it.  There's

16   no light shed on the structure here.

17           THE COURT:  But first you're using that case

18   to show that the word "module" can be construed as the

19   word "means" in order to get it to be a

20   means-plus-function --

21           MR. McDONALD:  To take it out of the

22   means-plus-function area, right.

23           THE COURT:  Well, in order to -- you know,

24   you want it to be a means-plus-function which doesn't

25   have a structure, therefore it fails.

1          MR. McDONALD:  That's right.  So to the

2    extent ePlus is saying "module" inherently provides

3    structure, this case shows no, it doesn't.  So you're

4    right.  That is the point.

5          Now, ePlus cited the On Demand.  They brought

6    that up again during their argument.  This was in their

7    brief as well where they were saying, Well, this

8    actually shows that a module does provide structure.

9    But there it was a very different case because the

10   customer -- excuse me.  The customer-operated computer

11   module was described in detail in the patent.  And the

12   Court was citing that fact when they were defining the

13   term "module" as defined in the context of that

14   specification did have structure.

15         What I've got here is even the language from

16   the patent itself in that On Demand case which actually

17   talked about this customer module.  It's up here on

18   slide 92.  Customer module 103 from that patent

19   includes a customer consult, 155.  There's structure

20   right there.  With a Super VGA display monitor, 157.

21   More structure.  With touch panel, 159.  More

22   structure.  This goes on.

23         There are several more structural components

24   that are described in that patent that describe that

25   module that the Court said was structural and was not a

1  non-structural means-plus-function clause.

2          That's a very different case because what do

3  we have here?  A purchase order generation module.  I

4  can't put anything up on the screen like this for you

5  from the ePlus patents because there's no place in

6  their patent where they tell you, Let me tell you what

7  a purchase order generation module looks like or what

8  does it include.  There's nothing in that patent about

9  this.

10          This really goes back to one of the --

11  really, the policy underlying means-plus-function, that

12  statute 112, paragraph 6, in the first place.  This is

13  an option for patent applicants as a way to describe

14  their invention.  They don't have to use

15  means-plus-function.  They can actually use structural

16  language for a system claim or steps for a method

17  claim.  They don't have to do this, but it does give

18  them an option.

19          In effect, if they want a picture claim.  By

20  picture claim, I mean they may have some very specific

21  structure called out in their patent that performs a

22  function, and they don't want to have to put all that

23  language into the claim.  Or maybe there's two

24  embodiments, two different structures for performing a

25  single function in the specification.  They don't want

1  to bother writing all that language in the claim.  They

2  have this option of claiming it as a means for

3  performing that function in the claim.

4          And when they do so, they then invoke that

5  very specific statutory provision that says, You may do

6  that, but in that instance you do not get a claim that

7  covers all means for performing that function.  That's

8  not what this is about.  It's not for grabbing things

9  that you didn't really describe in your patent.  It's

10 not for giving you a scope that includes things that

11 you did not invent.

12         What this does is we'll let you use that

13 shorthand, and as long as you clearly link and

14 associate some specific structure in your specification

15 to the specific function that you're reciting in this

16 means-plus-function claim, we'll let you do it, and

17 your claim will be limited.  It will be limited to that

18 specific structure clearly linked, clearly associated

19 to that function in the specification and equivalents

20 to that.  And that's the point and that's the exact

21 same thing that's going on here with this purchase

22 order generation module issue.

23         They in a sense are saying it could be any

24 computer that generates purchase orders.  We don't have

25 to provide any structure.  We just are going to plant a

1 flag in that particular hill and nobody in the world

2 regardless of how they do it, regardless of what

3 structure they use, as long as they are developing

4 something that, I guess, uses a computer that generates

5 multiple purchase orders, they have satisfied that

6 element and they may be an infringer.

7          That's not how this purchase order generation

8 module clause should be interpreted.  They haven't put

9 enough in this specification to entitle them to that

10 sort of coverage of that particular element.

11          I'll go back.  I've just got --

12          THE COURT:  Give me a minute to look at the

13 '516.  It's claim what?  21?  Is that what it is?

14          MR. McDONALD:  Yes, '516, claim 21.  That's

15 right.

16          THE COURT:  It's column 26, line 1 through 4,

17 right?

18          MR. McDONALD:  That's correct.

19          THE COURT:  One of the elements of an

20 electronic sourcing system comprising --

21          MR. McDONALD:  Correct.

22          THE COURT:  And the first part of it is the

23 requisition module?

24          MR. McDONALD:  Yes.

25          THE COURT:  And the second is a catalog

1  collection searching module, and the third is a

2  multiple purchase order generation module.  And then it

3  goes on.

4          MR. McDONALD:  Yes.  I have a slide up that

5  has those other module claims here or elements just in

6  case the question arises, and I think ePlus did raise

7  this question.  Well, this claim has some other modules

8  in it, but you guys at Lawson didn't say those other

9  ones were also means-plus-function clauses.

10         They are right.  We're not contending those

11  first two that you just read are means-plus-function

12  because, yes, they use the word "module."  All by

13  itself that would not be enough structure, but what

14  I've got here on slide No. 88 highlighted is the

15  structural components of those first two modules that

16  are recited right in the claim elements that under the

17  law take them out of means-plus-function then because

18  (A) they don't have the word "means," and (B) they have

19  got the structure, but, frankly, even if they use the

20  word "means," if you have structure within that clause,

21  it's a means for doing something, but it includes

22  specific things like a collection of catalogs or a data

23  field, things like that.

24         You have now put enough structure into that

25  that actually you could even rebut presumption that it

1   is a means-plus-function claim if instead of module

2   those two have the word "means" in them.

3           So we didn't go there.  It would not be

4   appropriate under the law for us to contend that those

5   first two modules were means-plus-function, but it was

6   appropriate for the third one because there's just no

7   structure in there.  There's nothing like a data field

8   or collection of catalogs.

9           THE COURT:  All right.

10          MR. McDONALD:  Can we go to slide 494,

11  please.

12          This has to do with the catalog issue, Your

13  Honor.  I'm going through the terms that are not

14  means-plus-function terms, obviously.  And I think that

15  the core point that we're trying to emphasize here is

16  the case law makes it pretty clear that when you're

17  construing a term, sure, it's not limited necessarily

18  to the preferred embodiment, but you do have to read it

19  in view of the specification.  And there are ways that

20  an applicant will narrow the scope of a term or at

21  least give it some specificity through how they use it.

22  And we believe our definition is very consistent with

23  how various collections of item information are used in

24  the patents.

25          THE COURT:  If you do what you're talking

1  about, aren't you in this instance importing a

2  limitation from a specification into the claim?

3          MR. McDONALD:  No, Your Honor.  I think going

4  to the next slide here, we have a quote from a couple

5  of Federal Circuit cases.  The term shouldn't be

6  limited just because they are used in the specification

7  to describe a preferred embodiment.

8          But nevertheless, the context may narrow a

9  term that out of context may be broader.  You don't

10  have to have expressly defined it as a lexicographer as

11  the applicant in order to have used the term in a way

12  that will narrow it.

13          And here we talk about, obviously, the

14  features of our definition of catalog that are at issue

15  really are two things.  One is we're saying they come

16  from vendors.  And that term we do not mean to be

17  unduly narrow, and I'll show why in the specification

18  itself it uses vendors really to apply to all these

19  categories of sources for catalogs.  It applies to the

20  distributors.  It applies to vendors.  It applies to

21  other suppliers.  All those are called vendors.

22          So that's a term that we were not meaning to

23  be unduly narrow, but it is in general the folks that

24  are selling your products.

25          THE COURT:  If it includes manufacturers,

1  distributors and suppliers, why is your definition any

2  different from theirs?

3          MR. McDONALD:  Theirs would include things

4  like a shopping list or --

5          THE COURT:  Like a what?

6          MR. McDONALD:  A shopping list.  I'm going to

7  go to the store.  That's an organized --

8          THE COURT:  You mean a shopping list such as

9  my wife writes up when I go to Ukrop's?

10          MR. McDONALD:  Yeah.  It would include a

11  requisition.  It would include a purchase order.

12  That's an organized collection of items and associated

13  information.  Typically it includes a part number and

14  -- when you go to the grocery store, you probably

15  wouldn't have a part number on that one.  But

16  requisitions -- you're placing a requisition.  I'm not

17  selling anything.  I'm not putting out a catalog, but I

18  am placing an order for something or going down and

19  asking the boss to approve a requisition list.  I want

20  six rolls of Scotch tape.  I want 12 pens.  I want 15

21  notebooks.  And this is the size I want.  And maybe

22  I've even got a part number or a catalog number on

23  there because I looked it up.  And I need somebody's

24  approval.

25          That would meet their definition of a

1 catalog.  And that's our concern as to what's going on

2 here.  And I'll put the issue on the table.  We do have

3 a situation here, I think Mr. Robertson alluded to it,

4 but our client Lawson has been in business since the

5 '70s selling various business systems including

6 purchasing types of systems.

7         They have had something since long before

8 even that RIMS patent was filled going back to at least

9 to the '80s called an Item Master that their customers

10 would populate.  They don't sell it with it.  They sell

11 it basically as a blank book.  But the customer gets

12 it.  The customer can populate it with the stuff they

13 buy.  So they put in the list of things.  Not everybody

14 wants a catalog of Fisher Scientific's 100,000

15 products, Promega's 50,000 products or McKesson's

16 150,000 products for all their employees to be

17 reviewing while they are deciding what they want to

18 buy.

19         There are certain customers that need that

20 and this invention maybe is good for those folks, but

21 there's a whole lot of other folks out there.  Maybe

22 they are smaller businesses.  Maybe they --

23         THE COURT:  Well, is it accused?  Is that

24 part of what you are describing?  Is that accused?

25         MR. McDONALD:  Yes.  They are saying that our

1  Item Master that our customer is using will populate

2  with products of their own choosing that they choose to

3  have their employees have access to, that's multiple

4  catalogs.  That's what they are contending.

5          THE COURT:  Is that patented?

6          MR. McDONALD:  No.  A lot of folks don't

7  patent software.  That's why there is a lot of crazy

8  software patents out there that go back to the '80s and

9  '90s because a lot of folks back then didn't even know

10  you could patent software.

11          The Federal Circuit didn't really shoot that

12  across the bow with clarity until that State Street

13  Bank decision came out, which was not out back in the

14  '80s and '70s and early '90s.  I think it was about ten

15  years ago when that one came out.

16          So a lot of companies like Lawson were coming

17  up with products.  Maybe they didn't think it was more

18  than an obvious improvement.  Maybe they didn't realize

19  it was patentable.  I think it was a combination of

20  both.  That's why there have been a lot of software

21  cases.  This is one of the worst areas of patent law.

22          THE COURT:  Boy, you got that right.

23          MR. McDONALD:  It's because some people were

24  playing by the patent game and some folks weren't.  So

25  the Patent Office, you know, I guess, could they have

1    done a better job?  Sure.  But at some level they were

2    handcuffed there because they didn't have the prior art

3    with people filing it as much as they could have and

4    should have been to give that base of data available

5    where they could have said, Oops, here's somebody else

6    who's already filed for this one.  That's old.  That's

7    been around since the '70s.

8              THE COURT:  Does the prior art have to be a

9    prior patent?

10             MR. McDONALD:  No, it could be a printed

11   publication, things like that.

12             THE COURT:  Was your thing in a printed

13   publication?

14             MR. McDONALD:  Yes.  We got our version of

15   the product offered for sales really would be the way

16   it would qualify.

17             THE COURT:  So if they assert that this is

18   accused and use their definition, if they accuse your

19   system there -- what do you call it?

20             MR. McDONALD:  Our system, it's -- they have

21   the S3 and the M3.

22             THE COURT:  You gave it another name a minute

23   ago.

24             MR. McDONALD:  The Item Master.

25             THE COURT:  The Item Master.  You do the Item

1  Master.  They say that the Item Master infringes.  Your

2  defense to that is not a definitional situation.  It is

3  that you previously published about that before they

4  got their patent.  It was in the prior art and

5  therefore the patent is invalid as to that Item Master,

6  right?

7           MR. McDONALD:  Right.  Well, the issue there,

8  though, that doesn't answer the whole question because

9  we're really only talking about an element of a claim.

10 So now you have all these other issues of -- well, they

11 also have this purchase order generation module and so

12 on.  We have to walk through those.

13           But on this issue, if "catalog" was really

14 that broad, we would say, Well, yeah, we did have

15 something like that before.  But they could still say,

16 Well, maybe you didn't do that one before, but now we

17 have you over here or over there.

18           Part of my point, though, isn't just that

19 Lawson was doing it, but in fact things like an Item

20 Master were out there even in the RIM system that they

21 admit in these patents were prior art.

22           THE COURT:  So they lose under the prior art

23 doctrine but not because of a claim construction.

24           MR. McDONALD:  Well, that depends on what the

25 patent says about that and whether it's really saying

1  we've got something different here from the RIMS item

2  or organization of items and things like that or

3  whether a catalog is just one of those things that they

4  describe and disclose as --

5          THE COURT:  No, that's just one way you can

6  win.  That's just one way you get up on that issue.

7  It's where do you win it.  Do you win it here or do you

8  win it in the validity fight because your product and

9  idea was in the prior art.

10         What I'm getting at is this:  There isn't any

11  point in trying to squeeze or twist language in claim

12  construction for the mere purpose of dealing with what

13  can be dealt with in the validity part of the case.

14         MR. McDONALD:  Well, the claims mean what

15  they mean at some level.  You can only move that needle

16  so much.  I appreciate that.  But, I mean, the fact is

17  it's a lot harder for somebody in our shoes to prove

18  invalidity.  The patent is presumed valid.

19         Obviously, it's being pursued at the Patent

20  Office, at least so far, with the preliminary decisions

21  that have been made so far with uniform success.

22         THE COURT:  But if it's undisputed that your

23  system was in the prior art, you win that.  That's a

24  matter of summary judgment, don't you?

25         MR. McDONALD:  Well, there's other issues.

1  The product has evolved over the years.  So some of

2  these other features come into play.  So that's where

3  there's going to be other issues.  That in itself

4  doesn't mean I win.  That helps.  It could help on

5  that.  And certainly we have got other prior art other

6  than our own that may well be summary judgment.

7          So I understand that.  It's not necessarily

8  to our benefit for everything to be narrow, narrow,

9  narrow.  It may not be, but I do believe that one of

10  ordinary skill reading this patent, reading this series

11  of patents, would not believe a catalog is just any

12  organized collection of items with descriptions of

13  information about them because there's so many other

14  things in these patents that would meet that

15  description like a requisition, like a purchase order,

16  like the cross-reference tables that we were talking

17  about before, like what's in the RIMS patent, the parts

18  masters table.

19          There are so many lists of item information,

20  organized lists, that are not in catalogs.  In fact, in

21  some cases they are specifically called non-catalog

22  that I think it is certainly the case that one of

23  ordinary skill reading this thing would have to find a

24  way to construe the term "catalog" to be consistent

25  with what is a catalog and what is not a catalog in

1 these patents.

2          So just to give an example of that right

3 here.  This is slide No. 99.  What's not a catalog, I

4 think, sheds a lot of light on what is a catalog in the

5 specifications.  We've got some language even out of

6 one of the claims of this patent.  It's claim 17 of the

7 '516 Patent.

8          It said "converting" means -- includes a

9 non-catalog database containing a cross-reference

10 table.  You have already been hearing about the

11 cross-reference table.  I also have on this slide Table

12 5 because that refers to non-catalog information.  I

13 thing that's what they are talking about here as part

14 of this non-catalog database.

15          But what it's got is it's got things like

16 quantity, price, vendor, catalog, description.  It's an

17 organized database list of information about items.

18 They told the public when this patent came out that

19 that's not a catalog.  That is a non-catalog database.

20          So it would be in conflict with their own

21 message they gave to the public to define the term

22 "catalog" as broadly as ePlus proposes here.  That's

23 our point.  Here's an example.

24          THE COURT:  You would be willing to define

25 "vendor" as a supplier, a manufacturer or distributor

1   or any other person who offers products whether his or

2   his own for sale, is that --

3          MR. McDONALD:  That is absolutely true, Your

4   Honor.  I've got up here on the screen 97 or slide

5   No. 97, which is column 4, lines 46 to 60 of the '683

6   Patent.  I believe ePlus put this up before as well.

7   What I've highlighted here is really --

8          THE COURT:  They don't call it just a

9   distributor or a supplier or a manufacturer.  They call

10  it a vendor distributor, a vendor manufacturer.

11         MR. McDONALD:  Outside suppliers --

12         THE COURT:  Then they say "outside

13  suppliers," whether other manufacturers or

14  distributors, listing such vendor's products.

15         MR. McDONALD:  Right.  So my point here is,

16  Your Honor, I did not intend for the term "vendors" to

17  be limited.  I thought the patent would also tell the

18  world that a vendor could include just about anybody

19  who sells something, but not folks who are buying

20  stuff.  That's the fundamental difference between our

21  products here that they are trying to evade by having

22  this definition of catalog include lists of stuff

23  people buy.  Our client's focus is on the customer who

24  is buying stuff.  They are the folks buying our

25  software.

1          Fisher Scientific's focus was, We've got

2    100,000 things we're selling in this catalog.  The more

3    we can sell, the better.  So let's get a system out

4    there that sells as much stuff in our catalogs as we

5    possibly can.  This is an important distinction.  And

6    it reverberates throughout all the claims of this case.

7          THE COURT:  But your concern is to exclude

8    lists of things that people have decided to buy.

9          MR. McDONALD:  Lists of things that --

10         THE COURT:  Or listed that they are going to

11   buy.

12         MR. McDONALD:  Yes.

13         THE COURT:  And he's not trying to included

14   those, is he?

15         MR. McDONALD:  Well, I think his definition

16   is.  I think he's got to, I think, to include our

17   customers' products.

18         Let me pause for a moment, Your Honor, and

19   give you at least a little "heads-up" on an issue here

20   that you're probably not going to particularly like,

21   but I'll at least give you the context of it.

22         It has to do with these catalogs.  Remember,

23   I was saying before that Lawson when we sell our

24   products they're empty.  We've got the software, but

25   they don't have the items populated in them.  The

1  customers do that themselves.

2           I think there was maybe some testimony that

3  if somebody asked, we might do it for them.  But why

4  would they ask?  We're too expensive to go do something

5  like that for you.  So they do it themselves.

6           So what an individual customer actually does

7  has to be known to know whether or not a system

8  infringes when the claim calls out a system that has

9  multiple catalogs, for example.  And so that's a

10 complexity of this case, but it's an indirect

11 infringement case, in essence, there.  I know they

12 dispute that, but at some level here, Your Honor,

13 that's relevant to the case.

14          So what exactly a given customer has, is that

15 something they populated?  They're buying stuff.

16 That's what, I think, the vast majority of them do.

17 Are there some that do something else?  I guess there

18 might be an issue of fact there.

19          At this point they have subpoenaed several of

20 our customers.  They haven't really followed through

21 with any of the depositions of any of them to establish

22 that a single one of them even has a catalog under

23 their definition on their systems.

24          But, you know, odds are they are going to

25 have an Item Master like we have sold for 30 or 40

1  years, and they don't have confidence, I don't think,

2  that they were going to be able to necessarily show

3  that they are also getting these wholesale catalogs

4  imported in.  So they have to keep this as a plan B to

5  make sure that the catalog is defined broadly enough

6  that even if it's the normal customer just listing

7  stuff they buy, they can still have a gotcha.

8           That could be an issue going down the line

9  because of the indirect/direct infringement,

10 inducement, and things like that.  I at least wanted to

11 give you that context here.

12          THE COURT:  You know what the problem is with

13 lawyers sometimes?  It's a problem with very smart

14 lawyers according to Judge Williams, my colleague.

15 Sometimes they outthink owls.  And when they do, they

16 create a lot of issues that don't need to be litigated.

17 And I think both of you are outthinking owls right now.

18          All right.  Let's go.  I understand.

19          MR. McDONALD:  All right.  Thank you, Your

20 Honor.

21          THE COURT:  That was meant as a compliment.

22          MR. McDONALD:  Oh, thank you.

23          THE COURT:  To your ability to think.

24          MR. McDONALD:  Which now casts doubt on

25 whether we are really as smart as you just thought we

1    were if I didn't figure that out.

2              THE COURT:  Well, I'm not going to go there.

3              MR. McDONALD:  Our definition also says

4    catalogs have to have images.  They have cited some

5    places where the specs says, Well, things such as

6    images and all that.  What I've got here cut through

7    the preferred embodiments.  What I've got are

8    statements from the parts of the patent that talk about

9    what the invention is.  And we have cited some cases in

10   our briefs that when you find descriptions of the

11   invention itself in a place like the summary of the

12   invention or the abstract, that's not just a preferred

13   embodiment.  So that has some weight on helping to

14   understand what a term means.

15             THE COURT:  The last time that I took that

16   approach the Federal Circuit reversed my construction.

17   So --

18             MR. McDONALD:  How long ago was that?

19             THE COURT:  It was before Phillips.

20             MR. McDONALD:  Well, I've got some hope then.

21   Maybe we both do if you construe it this way.

22             THE COURT:  Where are you looking?

23             MR. McDONALD:  This is column 3.  I've got it

24   from the abstract of the '683 Patent.

25             THE COURT:  Column 3?

1          MR. McDONALD:  Also in the summary column 3,

2    lines 15 to 16.  Actually, I think the sentence is

3    verbatim the same in both places.

4          THE COURT:  Where are we on the abstract?

5          MR. McDONALD:  Just give me a moment, Your

6    Honor.

7          THE COURT:  It's text describing the catalog.

8          MR. McDONALD:  There's no line number.

9          THE COURT:  No, I've got it.  It's text

10   describing the catalog items, and images of the items,

11   may be viewed.  That's the line you're talking about

12   there?

13         MR. McDONALD:  That's right.

14         THE COURT:  Column 3 is in the -- that's the

15   summary of the invention, isn't it?

16         MR. McDONALD:  That is correct.

17         THE COURT:  Huh?

18         MR. McDONALD:  Yes.

19         THE COURT:  Okay.  Where are you in column 3?

20         MR. McDONALD:  Line 15.

21         THE COURT:  15?  It's the same sentence.

22         MR. McDONALD:  That's exactly right.

23         THE COURT:  Yes.  And you say that those two

24   things mean that images have to be in the definition of

25   catalog?

1          MR. McDONALD:  Yes.

2          THE COURT:  Under the invention?

3          MR. McDONALD:  That's right.

4          THE COURT:  Okay.

5          MR. McDONALD:  It's very consistent with the

6    idea here that part of what they did is they wed the

7    system here.  If you read the patent, it doesn't really

8    back up to that fundamental level of did they really

9    say what they were doing here.

10          They were acknowledging they have these prior

11   systems like the RIMS system that could do

12   requisitioning, inventory, assessment, sourcing, and

13   things like that.  That was out there.

14          They also acknowledge that IBM had this

15   search engine called Technical Viewer 2 which could

16   search large volumes of information including

17   information that would be in catalogs with images in

18   it.

19          In fact, the TV2 description from IBM, it's

20   the Technical Viewer 2, TV2.  It may be a little play

21   on words or something.  I'm not part of the idea

22   marketing department, but I think part of the idea

23   there is this is a search engine that could look

24   through large volumes of information that includes text

25   and images.  Things you would view.

1           So that was out there as well.  They wanted

2    to put these things together because customers were

3    coming to them and saying, Well, we like using your

4    requisition system on your catalog, but we like to buy

5    products from other people's catalogs as well.  We

6    don't want to have to use multiple systems to do that

7    or do it just for yours and not for theirs.  We would

8    like a single system to do that from.

9           So they went out and they said, Okay.  Let's

10   see if we can find a way to get these big catalogs,

11   which would be a lot of data when you start adding in

12   images, especially back in the '90s when that memory

13   was a lot more expensive that it is today.  We didn't

14   measure things in terabytes back then unless you were

15   maybe with the Department of Defense or something.

16          But that's where this TV2 type of system came

17   into play.  It was capable of searching large volumes

18   of information.  And the specification, the summary

19   does talk about large volumes of information that would

20   come into play here.  So I think it's very consistent

21   there that you've got the text, you've got images,

22   you've got a big system that can handle both of those,

23   the products that are described here.

24          THE COURT:  Is this a good place to take a

25   little recess?  The court reporter and all of us have

1    been here for two hours.  We'll take about a 15 or

2    20-minute break.  We'll take 20 minutes so there will

3    be some certainty to it.

4              (Recess taken from 3:30 p.m. to 3:50 p.m.)

5              THE COURT:  All right.

6              MR. MERRITT:  Your Honor, if I may, just to

7    avoid interrupting the arguments of counsel later,

8    Belinda Jones from our firm has joined us during the

9    break.  In about an hour, I have a need to excuse

10   myself if you give me permission to do so, and

11   Ms. Jones can slip into my chair if that's all right

12   with you.

13             THE COURT:  All right.

14             MR. MERRITT:  Thank you very much.

15             MR. McDONALD:  Your Honor, I think we don't

16   have too much time left on these

17   non-means-plus-function clauses so I'll try to get to

18   the key points.  We were talking about the catalog --

19             THE COURT:  Just for your information, I

20   think we could be here until midnight tonight on the

21   means-plus-function things.  And I don't really like to

22   spend Friday night doing that.  So I think we'll

23   probably continue this exercise, and we'll make our

24   choices later in the day as to what time depending on

25   where we are when the exhaustion factor sets in.

1          MR. McDONALD:  As long as I was going to be

2    able to watch the Vikings game by Sunday night, Your

3    Honor, I was going to be fine.

4          THE COURT:  I don't intend to have any claim

5    constructions that will require you to be anywhere on

6    Sunday night other than in front of a television.

7          MR. McDONALD:  Very good.  Thank you.

8          I've got here slide 101.  I don't think it's

9    got a number on it.  I think it was just the one after

10   100.  Do you have that one?

11         THE COURT:  I've got it.

12         MR. McDONALD:  Very good.  This is just a

13   reference.  Remember before the break I had referred to

14   a claim of one of the patents having that non-catalog

15   cross-reference table.  I just wanted to put up here a

16   visual from the RIMS patent that really shows what the

17   cross-reference table looks like.

18         And I'm using the RIMS patent here.  I heard

19   some reference to that by Mr. Robertson earlier.  I

20   just wanted to clarify.  Of course, it is incorporated

21   by reference in here in these three patents-in-suit,

22   which means it's certainly relevant to claim

23   construction, although specifically when we get to

24   means-plus-function that's a totally different

25   situation there because you don't import in materials

1  incorporated by reference when determining

2  corresponding structure for means-plus-function.

3          But certainly for other purposes, if it's

4  incorporated by reference, it's part of the intrinsic

5  record.  That's even more true here because the patent

6  specifically calls out that the preferred embodiment

7  that they are describing where one of the components is

8  a requisition and purchasing system, the preferred

9  embodiment is that RIMS system, the one that they

10  specifically identify as the one that's described in

11  the '989 Patent.  So you've got a couple of reasons why

12  it's a very appropriate place to look when determining

13  what the terms mean here.

14          That with respect to the cross-reference

15  table, I've got some language here that shows that that

16  cross-reference table here, we've got another organized

17  collection of information about items.  That includes

18  things like a vendor number, a catalog number, unit,

19  and so on so.

20          So this is further support for the patent

21  itself was telling one of ordinary skill.  Catalogs

22  aren't just any organized collection of information

23  about items.  It's a very specific group of things that

24  are coming from people selling products.

25          Our definition then works with respect to the

1  images because that cross-reference table doesn't have

2  images.

3          Another example here is just an example of

4  requisition.  This is Slide No. 103.  It refers to

5  Appendix 9.  When you look at the specification for

6  these three patents, it does refer to Appendix 9 as

7  showing the requisition management screen.  It really

8  sets out what goes on a requisition.

9          Another example, something not created by the

10 seller but created by the buyer.  It's an organized

11 collection of information about items.  It's got the

12 part number.  It's got quantity.  It's got pricing,

13 etc.  It doesn't have images.  So one of ordinary skill

14 reading this, there's other examples that I won't go

15 into as I mentioned on the slide like the order list,

16 the hit list.  There's others.  We don't need to go

17 through all those to get the point, I think, on this

18 issue.  So that's wrapping up the presentation on

19 "catalog."

20         I'd like to go now if I may, Your Honor, to

21 the issue of "matching items" and "selected matching

22 items."  Why don't we go to Slide No. 14, please.

23         I'm going to talk a little bit about the hit

24 list.  Maybe I'll turn that off for a brief moment,

25 Your Honor, because this was the issue, I believe, that

1  counsel for ePlus raised when you asked, "Are there any

2  terms here where your patent applicant was their own

3  lexicographer?"  They actually defined a term.  And

4  this was the one they pulled out.  And they pulled out

5  something from the prosecution history.

6          Your Honor, that's not an appropriate place

7  to look for being your own lexicographer.  It's got to

8  be within the four corners of the patent as filed.  You

9  can't come back later in prosecution and say, Oh, I

10 wish I had defined my terms differently or I wish I

11 defined my terms at all and come back later and

12 backfill during prosecution with perhaps self-serving

13 definitions of terms.  It's too late for that.

14         Certainly prosecution history is relevant to

15 claim construction, but where it comes up is to limit

16 scope.  That's file wrapper estoppel.  That will

17 constrain the scope of an applicant's invention and --

18         THE COURT:  Are you saying the patent

19 document whether in the specification or the claims has

20 to reflect that it's that location where the applicant

21 was his own lexicographer?  He cannot use terms defined

22 in the prosecution history to apply the lexicographer

23 legal precepts?

24         MR. McDONALD:  Exactly.  It's a bootstrap

25 because they are citing themselves.  Oh, well, two

1  years later I said this term meant something else.

2  Something broader or something in particular that I

3  didn't talk about at the time.  You can't do that.

4  That's too easy for the patent applicant to, in effect,

5  change the deal they made with the Patent Office in

6  terms of having a full disclosure when you get the

7  benefit of that filing date that meets all the

8  requirements of being a full description of your

9  invention.

10        There is a part of the statute we've been

11  talking about, Section 112, paragraph 6, on

12  means-plus-function.  Well, Section 112 also talks

13  about the requirements of the specification.  And to

14  get that filing date, you would have to have a written

15  description of the invention.  It has to be complete.

16  It has to be enough to guide one of ordinary skill as

17  to how to practice your invention.  That's the date you

18  measure what you have got in there.

19        What's in that specification on your filing

20  date is what needs to have those definitions if you're

21  going to act as your own lexicographer.

22        So on this matching items issue, I just want

23  to walk through a few slides I put together that I

24  think help explain how this system works as described

25  in the patent.  Just so we have clarity on what a hit

1  list versus an order list is, etc.

2           This is Slide 14.  This is the '683 Patent,

3  column 9, near the bottom of that one at line 53 up

4  through column 10, line 39.  And I basically did a

5  graphical representation of what they're talking about

6  there.  That's where it discussed where multiple

7  catalogs are present, there is a function for selecting

8  catalogs to be searched, and then searching for

9  particular items.

10          So what I'm trying to represent here in the

11 lower right, the big white box, is the catalog database

12 36.  I've got representations of four catalogs in

13 there.  Fisher, Promega, Fairmont, and NIST.  Those are

14 the four listed at the bottom of column 9 of the '683

15 Patent.

16          I then show the example that they walk

17 through in the patent.  And I understand it's an

18 example, but it still helps understand what's going on.

19 The example is they're looking for items that they know

20 are likely to only be in the Fisher and Promega

21 catalogs.  So they undertake a step in the algorithm of

22 just choosing those two catalogs.

23          By the way, this is reinforcing the idea that

24 these are large catalogs that are really the intent of

25 this because it would be fine to search everything if

1  the database was small, but they actually promote it as

2  an advantage that we can subdivide it as just search

3  parts of this thing as an option because that will make

4  the searching go faster and more efficient.

5           So we show searching a couple of catalogs.

6  The example in the specification is something that's

7  not on my difficult shopping list, EcoR1, which I

8  believe it says is some sort of a restriction enzyme.

9  So you search the two selected catalogs, Fisher and

10  Promega, for that term, and you get back a list of

11  products from each of those or items.  These are the

12  product numbers from those two catalogs.  PRR6011,

13  R6011, etc.

14          Those things then come over here on your hit

15  list.  That's your matching items.  Those are the

16  things that match the criteria that the user input.

17  That's like doing a Google search.  You do a search for

18  something and you get back a list of responses.  It's

19  probably not going to have everything that you want.

20  There's probably a few things in there you don't want

21  just like with a Google search.  The vast majority of

22  it is something you don't want.

23          But in any event, that's your next step is

24  you have done this search.  You get a hit list of

25  things that are responsive to what you asked for.

1          So what's next then?  Once the hit list is

2     created, the viewer can view it.  The user can view it.

3     They can select portions of it to put onto the order

4     list.  So that's the next step here.

5          Going to Slides 15 and 16 relatively quickly

6     because I have another graphic here in a moment that

7     will represent what's going on here.  But you have this

8     hit list.  And then you translate or transfer the items

9     you want to keep on your list to this order list.

10          So when you select, let's say it's one, maybe

11    it's more, off of that list of matched items, in effect

12    your Google results.

13          You have selected one or more of the items

14    that you actually want from the results of the search,

15    and then you put them on an order list.  So that's how

16    the patent describes these different things.

17          So now we've got an order list going, which

18    is the one that has some selected items from the ones

19    that were matched.  So when we talk about selected and

20    matched, this is where this comes from in the patent.

21    This is where they talk about those things.

22          And then you build the requisition that uses

23    this data.  So even that order list, just to clarify, I

24    think there was a little discussion with Mr. Robertson

25    about, Well, what's the plain and ordinary meaning of

1  an order list?  Well, it's a list of stuff you order.

2           Well, not so fast.  Actually, the patent

3  makes it pretty clear that that's not what it is

4  because there are further steps to go before you

5  actually place an order and what's on your order list

6  may well not be the same thing you wind up ordering.

7           So it's really an intermediate list that is

8  transferred from the search system, the TV2 search

9  program system, transferred to the requisition system.

10  It's kind of an interim order list of things they may

11  want to order.  But then it goes over there to the

12  requisition system, and you've got your selected items

13  there.  And from there you can build your requisition

14  using that.  You don't have to use everything on the

15  order list.  You can add to it.  You can subtract to

16  it.  Maybe from some other searches you did.  Maybe

17  because you just know a catalog number for a product

18  you may frequently order and don't need a search.

19           So there are some very specific meanings is

20  my main point here as to what an order list is, what a

21  hit list is, and just giving those things a plain and

22  ordinary meaning is inappropriate in view of what's

23  described here and really invites mischief.

24           It also highlights what a selected matching

25  item is.  Matching is the search part that gets you to

1 the hit list.  Then you select it, and that's how you

2 get to that derived list, the order list, and from

3 there you can get requisition.  And you can add and

4 subtract things at both steps.  Going from both hit

5 list to order list.  And from going from order list to

6 requisition.

7          So could we go to 126, please.

8          So just briefly touching back on that.  An

9 order list.

10          THE COURT:  You're not accepting of <u>Ariba</u>

11 definitions?

12          MR. McDONALD:  No.  I think this is the right

13 definition for that.  <u>Ariba</u>, frankly, I think is a

14 little confusing.

15          THE COURT:  Why?  It does everything that you

16 say.

17          MR. McDONALD:  I'm sorry?

18          THE COURT:  Exhibit E to your --

19          MR. McDONALD:  Our appendix or the actual

20 <u>Ariba</u> order?  I don't have that.

21          THE COURT:  It's Exhibit E to your first

22 notebook, I believe.

23          MR. CARR:  To this notebook?

24          THE COURT:  No, to the --

25          MR. ROBERTSON:  The opening brief.

1          THE COURT:  The opening brief.  I called it a

2  notebook.

3          MR. McDONALD:  Do you happen to have it handy

4  there because, I apologize, I don't have that.

5          THE COURT:  Wait a minute.  I mean, the

6  opinion is.  Well, I think -- yeah, that's the opinion.

7  And it says -- well, I can't lay my hands on the page,

8  now.  I think I patched over it.

9          MR. ROBERTSON:  Your Honor, if I might

10  assist.

11          THE COURT:  What page is it?

12          MR. ROBERTSON:  I believe it's actually the

13  search results and requisition items, which are Judge

14  Brinkema's constructions for matching items and

15  selected matching items, respectively, are actually in

16  Exhibit F, which are her jury instructions at page 27,

17  sir.

18          THE COURT:  Yeah, it's page 27 of Exhibit F,

19  and "matching items" means the search results.  And

20  "selected matching items" means the requisition items.

21  Why doesn't that solve -- both those solve -- boy, I

22  tell you.  It's too late in the afternoon.

23          Why isn't that consistent fully with what you

24  are proposing?

25          MR. McDONALD:  The selected matching items is

1  the order list, not the requisition.  That's my point.

2  That's part of what I was trying to show with these

3  graphics.  You go from hit list.  Then you select items

4  from the matching items.  Those go to the order list.

5  That's really what that's about.  It's not about the

6  final requisition.

7          THE COURT:  Where do you draw that from?

8  What part of the claim do you draw it from?  It has to

9  be from the claim.  You're talking about a sequence

10  now.  What part of the claim language does that come

11  from?  I didn't see that in the claims.

12         MR. McDONALD:  Well, in claim 1 of the '172

13  Patent, that's the selected matching items is one place

14  where that shows up.

15         THE COURT:  Wait a minute.

16         All right.  Claim 1?

17         MR. McDONALD:  Yes.

18         THE COURT:  All right.

19         MR. McDONALD:  I guess in that one, that's a

20  fair point because there's a separate means for

21  generating an order list that's separate from searching

22  for matching items, but means for generating an order

23  list specifically includes at least one matching item

24  selected by said means for searching.  So actually that

25  one does reinforce really what the selected matching

1  items are.  They comprise the order list, not the

2  requisition.

3          Then the next element is the means for

4  building a requisition that uses data obtained from the

5  database relating to selected matching items on said

6  order list.  So that claim 1 of the '172 does have

7  claimed in there that same sequence I was just

8  describing where you match them, you select them for

9  the order list, and then you go to the requisition, and

10 only then.

11         Do you have any other questions about that

12 one, Your Honor, or may I go on to the cross-reference

13 table?

14         THE COURT:  All right.

15         MR. McDONALD:  Thank you.

16         So we've got ePlus said this one doesn't need

17 to be construed.  We've got our proposed construction

18 because, again, a cross-reference table is not

19 necessarily really something that has a plain and

20 ordinary meaning, and the concern is certainly that if

21 you don't have a definition of that, is the jury really

22 when they get back in that deliberation room, are they

23 really resolving an issue of fact?  Or are they going

24 to be agreeing on what, for example, the Lawson product

25 is?  Or are in agreement on the facts of what the prior

1  art is, but they are going to be debating over whether

2  or not that prior art on the Lawson product has the

3  cross-reference table because they disagree on the

4  meaning of that.  Well, then we're not in a place we

5  want to be because Markman, etc., a fundamental tenet

6  of all that is that the scope of the claims, the

7  meaning of the terms, is an issue of law for the Court

8  to decide.  That's not something that should be given

9  to the fact finder.

10         So this is another example of I don't think

11  you know what a jury would say, what the different

12  jurors would say if you said, Look, you-all know what

13  that means.  Just go figure it out.

14         We've got some specifics in there with our

15  definition.

16         THE COURT:  Where does that definition come

17  from?

18         MR. McDONALD:  It comes from the

19  specification both of the RIMS patent and the

20  patents-in-suit because the --

21         THE COURT:  You can't use the RIMS patent

22  specification for this.

23         MR. McDONALD:  This is not a

24  means-plus-function term.  So actually we can do that

25  for this one.  And it's really the place where they

1   have a lot of discussion about --

2           THE COURT:  No, I'm not talking about the

3   legal principle.  I'm talking about they really are

4   different.  So you have got to talk about the

5   cross-reference that's used in this patent, not the one

6   that's used in the RIMS patent.

7           I understand it's incorporated by reference,

8   and I understand for use in determining the meaning of

9   terms you can look at an incorporated for reference

10  document, but you can't to find a structure in a

11  means-plus-function test.

12          My point is in this case on this patent you

13  really have to look at the cross-reference in the

14  specification or the claim.  And where is that?  I'm

15  not sure I've found it.  Your definition, that is.  I'm

16  not sure I find your definition.

17          MR. McDONALD:  Well, I do disagree on whether

18  you can go to the '989 and look at the definition of a

19  non-mean-plus-function --

20          THE COURT:  Conceptually, you can.  That's

21  not the point I'm making.  I'm saying on this

22  definition, on this patent, I really think you have to

23  look at the other one.  I mean, the one we're talking

24  about.  The '516 is what you're talking about here, I

25  think.

1          MR. McDONALD:  Right.

2          THE COURT:  It may be that for bolstering the

3   view you can look at the RIMS patent, but that's not --

4   in the first instance, we have to look at this patent.

5          MR. McDONALD:  That's fair.  And I guess the

6   reason why I'm going to RIMS, I probably jumped the gun

7   a little bit there, but the point is that really the

8   patents-in-suit don't flesh out much of anything on how

9   the cross-reference table is really put together.  How,

10  for example, is it determined?

11         THE COURT:  In other words, the

12  patent-in-suit doesn't have any definition of

13  cross-reference table in it, either in the

14  specification or the claim; is that your point?

15         MR. McDONALD:  My point is it doesn't explain

16  to you how one product is cross-referenced to another,

17  and that's obviously part of what a cross-reference

18  table is.  So that the four corners of the

19  specification filed, that's right, doesn't really

20  explain to you how do you know when one product should

21  be cross-referenced to another.

22         THE COURT:  We're not dealing with how you do

23  that.  We're dealing with that you do it.

24         MR. McDONALD:  Yes, but when you're

25  cross-referencing two things, there should be some

1  indication of what that means to cross-reference them,

2  and there has to be some relationship.  There's

3  something inherent in the term "cross-reference" that

4  there's a relationship between --

5          THE COURT:  What's the fight about here?

6  What is the reason for the fight over this?

7          MR. McDONALD:  Well, I think they said we

8  shouldn't have a definition of this at all.  And

9  perhaps I see why because they have trouble really

10 figuring out what it is based on the patent

11 specifications they've got in suit here.  We're finding

12 what we can find in the intrinsic record to define a

13 term that is not a plain and ordinary term.

14         THE COURT:  I don't know.  Cross-reference

15 tables are used all over everything we do, isn't it?

16         MR. McDONALD:  But what is being referenced

17 to what?  You have a couple items on our requisition.

18 Well, they have something in common.  You wanted to buy

19 both of them.  Is that cross-referenced?

20         THE COURT:  But in order to define what the

21 cross-reference table does, you can't find it in this

22 patent.

23         MR. McDONALD:  I couldn't find where they

24 explained how you decide this item is cross-referenced

25 to that item.  And I thought that was important when

1  trying to figure out what a cross-reference table is.

2  So that's why I resorted to this '989.  And that's

3  where this concept comes up.

4          Like I've indicated before, the

5  patent-in-suit doesn't just incorporate it by

6  reference.  They do say we actually use the RIMS system

7  as our preferred embodiment.  And so when you look at

8  the sentence I have on slide 133, there's a pretty big

9  section of the RIMS patent that talks about

10  cross-referencing.  It's actually over three columns of

11  the '989 Patent.  So that really sheds some light on

12  what cross-referencing is.

13          There's nothing like that in the

14  patents-in-suit.  And so that's why I looked to that

15  and really scoured that for where do you tell us how do

16  you determine when two things should be

17  cross-referenced to each other?  How do we know?  Does

18  it figure that out automatically?  Does a human being

19  look at it?  And if so, what does the human being do?

20          Those are questions I was asking myself

21  trying to put myself in the shoes of one of ordinary

22  skill trying to figure out what a cross-reference table

23  is.  And this is the section here in slide 133 that was

24  the closest thing I could find.  It talks about what's

25  in the table.  And it talks about a list of

1 corresponding part numbers of the distributors, vendor,

2 and other distributors for items which have been

3 determined to be equivalent.

4          We're making a little progress, but we're not

5 quite all the way there yet.

6          The next sentence.  This relational database

7 is created by the distributor by, for example,

8 reviewing the catalogs of other distributors and

9 determining which items are equivalent to items in the

10 distributor catalog.

11         So now we know.  It's a person.  It's the

12 distributor.  Somebody from Fisher Scientific would be

13 an example of someone that's a distributor.  They make

14 that determination of which item is going to be

15 equivalent.

16         That was the only place I could find anywhere

17 in the intrinsic record that would shed any light on

18 when this product is -- excuse me.  How you

19 determine --

20         THE COURT:  What difference does that make in

21 this case?

22         MR. McDONALD:  We don't have a

23 cross-reference table.

24         THE COURT:  Okay.

25         MR. McDONALD:  Could we turn to 117, please.

1  I'd like to turn now to the electronic sourcing system

2  preamble.  I just have a few more points to make and I

3  think we're just about done here.

4           So first question that was a little glossed

5  over I think in the ePlus presentation is:  Is this

6  even a limitation?  I want to clarify something.  It's

7  an important distinction because there are some terms

8  that we say should be construed, and ePlus said, Oh,

9  just use the plain and ordinary meaning.  And I heard

10  something during the ePlus presentation that suggested

11  that maybe that was understood to be Lawson's position

12  on electronic sourcing system.  Oh, it doesn't have to

13  be defined.  Just use the plain and ordinary meaning.

14           No, that's not the case.  This is different.

15  Our point isn't that it's use the plain and ordinary

16  meaning.  Our point is it's not a limitation at all

17  because under the law a preamble is presumptively not a

18  limitation.  Here at slide 119 is the legal test

19  essentially for deciding whether or not you're even

20  going to mention it to the jury as relevant to an

21  infringement or validity determination.

22           It doesn't act as a claim limitation if it

23  merely states a purpose or intended use of the

24  invention.  It would be a limitation if it serves to

25  give meaning to the claim and properly define it.

1          So here we go.  If it's a purpose or intended

2     use, it's not a limitation.  What's the phrase?

3     Electronic sourcing system.  Is that the intended use?

4     I think so.  Of the system.  It's for electronic

5     sourcing.

6          So that's why we submit this is not a term

7     that should be defined at all.  This may be relevant to

8     prior art, Your Honor, just to give some context to

9     this.  If there were some prior art activity that they

10    were saying, Oh, that's not electronic.  That wouldn't

11    apply.  That could be where this could come into play.

12         THE COURT:  Doesn't it define what the

13    invention is?  Doesn't it basically say, We claim, i.e.

14    this is our invention?  It is an electronic sourcing

15    system.  If it's not an electronic sourcing system, if

16    somebody comes in and shows that whatever they have is

17    not an electronic sourcing system, it just doesn't

18    offend the patent that they are making it or selling

19    it.

20         MR. McDONALD:  Well, if they have got all

21    those other elements to the system, though.

22         THE COURT:  No, if it's not an electronic

23    sourcing system at all, it doesn't make any difference.

24         MR. McDONALD:  Well, the words "electronic

25    sourcing system" sound to me like a purpose or intended

1  use.  I'm trying to plug it in here as best I can.

2  It's not much of a preamble.  It's three words.  And it

3  really doesn't seem to me that it really gives meaning

4  to the claim or defines the invention itself.

5          These other components are listed in the

6  claims.  Of course, they have all the specific elements

7  in them that is really where the definition, I think,

8  comes from.  But if it does come into play here, we

9  propose the definition that is a little different than

10  what ePlus did.  A system for determining what

11  inventory will be used to fulfill requests for items.

12  And they said, Well, where did that come from?

13          If you go to slide 121, again, I looked for a

14  definition of what sourcing is somewhere in the patent.

15  It doesn't really define it in the four corners of the

16  patents-in-suit, but lo and behold the RIMS

17  specification comes out and actually says exactly what

18  sourcing is.

19          Sourcing the requisition is the process of

20  determining what inventory will be used to fill the

21  requisition.  So that's where our definition comes

22  from.

23          And, finally, I think we have already

24  discussed -- we've got stipulations on some of the

25  other issues including "protocol" and "subset."  So I'd

1  just like together to "converting data" at this point.

2          Could we go to Slide 82, please.

3          THE COURT:  Which one did you say was from

4  the RIMS patent?

5          MR. McDONALD:  The definition of the term

6  "sourcing"?

7          THE COURT:  No, which slide?

8          MR. McDONALD:  Oh, that was -- I'm sorry.

9  Let's see.  Could we go back to 120.  121, I'm sorry.

10  It's the '989 Patent at column 11, lines 24 --

11          THE COURT:  121 has subset in my book.

12          MR. McDONALD:  It's 120.

13          THE COURT:  Okay.  Electronic system is 120.

14  And this is the RIMS.

15          MR. McDONALD:  Yes, that's right.

16          THE COURT:  All right.

17          MR. McDONALD:  Turn to 82, please.

18          THE COURT:  What did you say?

19          MR. McDONALD:  This is slide 82.

20          THE COURT:  Okay.

21          MR. McDONALD:  I'm talking about the

22  converting data step.  The heading on this particular

23  slide talks about the means for converting.  Of course,

24  we're not talking about that yet, but I wanted to point

25  out something here that this slide nevertheless

1  explains regarding the non-means-plus-function step of

2  converting data.

3            And the point is that, again, when you read

4  these patents, they are not the poster child for

5  clarity of using and explaining the terminology or even

6  being consistent in a lot of ways.

7            THE COURT:  How many patents have you

8  reviewed in your life?

9            MR. McDONALD:  Well, maybe it's one of many.

10            THE COURT:  Have you ever seen a poster child

11  of clarity in a patent yet?

12            MR. McDONALD:  I have seen -- probably not in

13  the software area.  I'll give you that.  Those are few

14  and far between.

15            THE COURT:  Okay.

16            MR. McDONALD:  I have been involved in some

17  involving shoes.  Even that involved the Court of

18  Appeals to figure out what the shoe was.  But it may be

19  relatively a little more clear.

20            THE COURT:  A 300-page claim construction

21  opinion to figure out what a shoe is.

22            MR. McDONALD:  So what I've got here at slide

23  82 is basically doing a word search for "converting" in

24  the patents-in-suit because that's what this step is.

25  Converting data.

1        So what does it mean?  The word "converting"

2   shows up.  It's at column 15 of the '683 Patent at

3   lines 20 to 33.  But the converting we're talking about

4   in the claim limitation is converting data relating to

5   a selected matching item, and it goes on to say to an

6   item in a different source.

7        Obviously, it's at some level related to two

8   different items.  When the word "converting" is used in

9   the specification, it talks about a requisition being

10  converted into a purchase order.  It's got nothing to

11  do with converting one item of data to another.

12       So my point here is that the patent does not

13  talk about converting.  And I think there was some

14  material put up or referenced by ePlus to say, Oh, this

15  is what converting data is.

16       Well, none of the stuff they put up actually

17  talks about converting data.  It uses other words for

18  other things, and it's somebody kind of guessing at

19  what that is.  So that's my point with that.

20       Now, what's the real difference here between

21  our definitions?  Our definition focuses on

22  substituting.  Theirs talks about cross-referencing.  I

23  think we could probably live with their definition if

24  you substituted cross-referencing with the word

25  "substituting."

1            THE COURT:  Say that again.

2            MR. McDONALD:  I'm going say it a different

3   way.  If you take their definition, take out the words

4   and the phrase "a process of cross-referencing data,"

5   and change that to "a process of substituting data

6   relating to a selected matching item."  I changed the

7   word "to" to for data relating to an item in a

8   different source because I think that's really the

9   difference between our two definitions is we're

10  requiring an act of substituting.  And they are saying

11  it's really just this act, such as it is an act, of

12  cross-referencing.

13           Can we go to slide 104, please.

14           THE COURT:  Do you agree with that, Mr.

15  Robertson?  It sounds to me like he might be right

16  about that.

17           MR. ROBERTSON:  Sorry.  I tried to point out

18  to you that there was no substitution that's required

19  by converting.

20           THE COURT:  I know, but conversion means

21  changing, doesn't it?  Conversion means something.  It

22  doesn't mean just identifying or setting it out or

23  cross-referencing it.  It has a meaning unto itself.

24  And if you convert something from one form to another,

25  it is in fact in a way substituting one description for

1  another description, is it not?

2          MR. ROBERTSON:  What they're talking about is

3  substituting an actual entry for one product in a

4  catalog entry for another product from a different

5  source.

6          THE COURT:  No, they're talking about your

7  definition.  They're not talking about his.  He's

8  talking about in yours, if construction is required,

9  you say a process of instead of cross-referencing, you

10 would say substituting data relating to.  And he would

11 say --

12         MR. McDONALD:  I think the rest would be the

13 same here.  A selected matching item in an associated

14 source.  And this is where it would change.  Take out

15 the word "to" and say for data relating to.  And then

16 continue with the last six words here.  "An item and a

17 different source."

18         MR. ROBERTSON:  Two observations, Your Honor.

19 One is we had said that Judge Brinkema's construction,

20 which talks about a process of changing from one form

21 or format to another where information is concerned, a

22 changeover that affects form but not substance.  And

23 reading that in conjunction with the conversion tables

24 that are these cross-reference tables, this converting

25 data language, and I need to find the citation for Your

1 Honor, was suggested by the examiner himself to capture

2 the cross-referencing capability of codes,

3 identification codes, from four different items, part

4 numbers, catalog numbers, whatever you have.

5          That was the examiner's suggestion to capture

6 that, and we accepted his suggestion, and I will dig

7 that up.  I'm not sure I have that at my fingertips,

8 but I will find that for you, Your Honor.

9          MR. McDONALD:  If I may go on, Your Honor.

10 The problem with Ariba, it says it's a change that

11 affects form but not substance.  And if I've got a

12 beaker from Promega and I'm going to substitute a

13 beaker from Fisher, that sounds to me like a change in

14 substance if I'm getting it from a different source.

15 So that's what's confusing to me about the Ariba.  I

16 think substituting is really capturing what the patent

17 is talking about.

18          The whole point here is I could buy this from

19 source A, but I can get something that's equivalent

20 from source B.  So I'm actually going to change my

21 source.  The product may be similar.  That to me is not

22 a change merely in form.  So that's where we're coming

23 from there.

24          I'm not sure if ePlus is still contending

25 just this relatively passive act of cross-referencing

1  data is converting data or not, but I did want to

2  explain here that --

3          THE COURT:  Excuse me, but is this what this

4  means?  That you have acquired some data as to product

5  A from manufacturer Z, and you have to convert that

6  according to this step, and you convert that to data

7  that relates to another item, product B, and a

8  different source, manufacturer Y.

9          MR. McDONALD:  That's my understanding.

10          THE COURT:  But it can be the same size.  It

11  can be a lacrosse stick six feet in length with a head

12  six inches across.

13          MR. McDONALD:  Exactly.  Or it could be a 250

14  milliliter Pyrex beaker even from the same

15  manufacturer, just from two different sources.

16          THE COURT:  So why isn't that converting or

17  changing in form but not substance?  It's because the

18  change is to a different product and a different

19  manufacturer.

20          MR. McDONALD:  That's right.

21          THE COURT:  Which is what you really make

22  your decision about when you purchase.

23          MR. McDONALD:  Right.

24          THE COURT:  So it is substantive.  Is that

25  your point?

1          MR. McDONALD:  That is exactly my point.

2          The point of this, at least I think one

3   benefit supposedly of this feature, is you might have a

4   special deal with vendor Z.  You get 10 percent off.

5   And one of your employees comes and says they want to

6   buy something from vendor Y, but you don't have a

7   special deal with vendor Y.  You want to be able to

8   know, Can I get the same thing from Z at 10 percent

9   off.

10          That's a substantive difference, too,

11   obviously, if you're going to save 10 percent.  Most

12   companies, that's the object of the game.  So that's my

13   concern, right.

14          I just wanted to point out one more thing,

15   and I'll be done here, well, two more things actually,

16   with the prosecution here.  I think there was some

17   reference to the prosecution involving the converting

18   element by Mr. Robertson.

19          I don't remember off the top of my head

20   whether the examiner suggested it, but we have an

21   excerpt here where they talk about how the applicant

22   clarified the claims.

23          THE COURT:  Where are you?

24          MR. McDONALD:  I'm on slide 105.  I see this

25   slide does not actually have the source stated on it.

1 I tried to have the source on all the slides.  So I

2 apologize for not actually identifying the source

3 document here.

4          THE COURT:  We can identify it here and write

5 it in.

6          MR. McDONALD:  The slide No. is 105.

7          THE COURT:  I've never had so much trouble

8 handling paper in my life.  Okay.  105.  This is the

9 prosecution history here on the left, you say?

10          MR. McDONALD:  That's right.  Where they talk

11 about adding this means for converting element with the

12 converting step.  And really right now we're talking

13 just about the converting step.

14          The amended language properly claims

15 identical matching items from different sources as well

16 as suitable replacement for the selected matching item.

17 And I think that's very consistent with our

18 substituting definition.  And so that supports our

19 definition.

20          And then, finally, just reading the claim

21 limitation itself, converting data relating to a

22 selected matching item.  And I said "ed" because of the

23 e-d ending on selected.  And we've cited some case law

24 in our brief.  I mentioned one of the cites here, the

25 Epass case, where you have a step-by-step method claim.

1  And it talks about a step, for example, of selecting.

2  And then the next step talks about doing something with

3  what you selected.  Then that next step is presumed to

4  be after.

5           THE COURT:  It cites a sequential --

6           MR. McDONALD:  It's past tense.  So it's been

7  done.

8           THE COURT:  Only if, though, there's a

9  predecessor step that suggests the accomplishing of

10 that step.

11          MR. McDONALD:  That's right.

12          THE COURT:  Though that same step that's

13 articulated in the past tense, right?

14          MR. McDONALD:  Right.  So, for example, in

15 the '683 Patent, claim 3, you have got means for

16 selecting or means for searching for matching items

17 among the selected catalogs, means for building a

18 requisition using data relating to selected matching

19 items and their associated sources.  And the last

20 element, going down a couple, is this converting data

21 one that relates to a selected matching item.

22          THE COURT:  All right.

23          MR. McDONALD:  And so the point there is I

24 think that supports the idea that substitution --

25 that's something that is very natural and intuitive.

1 That would happen after you have selected one item.

2 You have already selected your lacrosse stick from

3 vendor Y.  Now I'm going to substitute.

4          This relatively passive description of

5 cross-referencing data, that table of cross-referencing

6 can be set up any time before you even turn on the

7 machine to decide you're going to buy a lacrosse stick.

8 So this isn't intuitive.  I don't think that

9 cross-referencing really fits in that context.

10         So that's essentially everything I have on

11 the non-means-plus-function clauses.  Thank you, Your

12 Honor.

13         THE COURT:  All right.

14         MR. ROBERTSON:  I just have brief targeted

15 responses, Your Honor, to a few of those, if I might.

16         THE COURT:  All right.

17         MR. ROBERTSON:  While we're at it, if we

18 could before we switch over -- Your Honor, has it in

19 front of you actually.  It's slide 105 we were just

20 talking about there.

21         THE COURT:  I've got it now.

22         MR. ROBERTSON:  We're back at this converting

23 data issue.  And the whole point, as I understand it,

24 turns on whether or not there is this required

25 substitution or not.  And, in fact, the prosecution

1  history cited doesn't say anything about substituting.

2  It just says, essentially, that the means for

3  converting is going to properly claim identical

4  matching items from different sources so you'll be able

5  to identify those or you'll be able to see whether they

6  are suitable replacements for the selected matching

7  item.

8           It doesn't go on to state and then you have

9  to actually substitute it for the selected matching

10  item.  In deed, Judge Brinkema when she was dealing

11  with this very claim element said that the converting

12  or cross-referencing, which she uses interchangeably,

13  does not require the automatic replacement of ordered

14  items and can be satisfied by user-initiated

15  replacements of selected items, which the system can

16  accomplish through cross-reference tables.

17           Cross-reference searching for equivalent

18  items qualifies as converting.  This process need not

19  occur automatically either as a function of the

20  original search or after a user has placed an order.

21           THE COURT:  Are you citing from her opinion

22  now or the instructions?

23           MR. ROBERTSON:  I'm citing from her jury

24  instructions, Your Honor, which was I believe Exhibit

25  F, and that's at page 27.  So I think that's entirely

1  consistent with what's represented there as the

2  converting data element and again requires no

3  importation into the specification for substituting.

4         And I don't want to repeat myself, but I did

5  show Your Honor an example in my original arguments in

6  which a customer service representative simply uses the

7  cross-reference table to be able to identify suitable

8  replacements for generally equivalent products.

9         Let me go back to this catalog issue.  A lot

10  of ink and breath has been spent on this.  Let me be

11  clear.  First, we didn't create this definition that we

12  have from old cloth.  If you just go to column 4, lines

13  37, I guess it is, through 43, where it says "the

14  catalog database."

15         THE COURT:  Which one of your slides --

16         MR. ROBERTSON:  I'm on the '683.  This is on

17  the monitor, Your Honor, but it says "the catalogs" --

18         THE COURT:  Which claim?

19         MR. ROBERTSON:  It's in the specification at

20  column 4 of the '683 Patent, Your Honor.  It starts at

21  about line 37, I believe, with the sentence "The

22  catalogs and, hence, catalog database 36, may

23  preferably include such information as part number,

24  price, catalog number, vendor name or I.D., and vendor

25  catalog number, as well as textual information and

1  images of or relating to the catalog products."

2         What we're saying there consistent completely

3  with our definition is that it's typically going to

4  have those things.  But I do not want a catalog claim

5  --

6         THE COURT:  Wait a minute.  That isn't what

7  it says.

8         MR. ROBERTSON:  It says "preferably," Your

9  Honor.

10        THE COURT:  I understand.  It says

11 "preferably" and you are equating preferably with

12 typically.

13        MR. ROBERTSON:  Well, what I was trying to

14 get at before --

15        THE COURT:  That's the difference.

16 Otherwise, the language is the same, isn't it?

17        MR. ROBERTSON:  I think that's right, Your

18 Honor.

19        THE COURT:  Why shift from "preferably" to

20 "typically"?  Why not just use "preferably"?

21        MR. ROBERTSON:  I could live with

22 "preferably," Your Honor.  I don't want to have the

23 situation happen, Your Honor, where there is this

24 emphasis that in all instances there needs to be an

25 image.  And we all know that's not going to happen in

1  all instances with respect to a catalog.

2          THE COURT:  Which one of your slides is the

3  catalog?  The reason I ask is I wrote my notes on

4  there.

5          MS. WAGNER:  Fourteen.

6          THE COURT:  Fourteen?  Thank you.  All right.

7          MR. ROBERTSON:  Thank you.

8          This was Judge Spencer's construction sans

9  the word "typically," Your Honor.  I just don't want to

10 get in the situation we have here.  I heard Mr.

11 McDonald talk about this Item Master and that they have

12 had it for a long time predating these patents.

13         The fact is the evidence we have, Your Honor,

14 is the Item Master is simply a tool for loading catalog

15 data among other things.

16         In fact, the documents show and the

17 depositions testimony is --

18         THE COURT:  Are you accusing the Item Master?

19         MR. ROBERTSON:  No, sir.  Not when it doesn't

20 include catalog data.  What the Item Master is is a

21 tool for loading, among other things, catalog data.

22 You could load inventory data, for example, of existing

23 inventory you have in your database.  That's not an

24 accused infringing act.  But when you load catalog

25 data, and, Your Honor, we have dozens of documents and

1 representations on their Website that the Item Master

2 can be used to load catalog data.  There is a user

3 guide about two inches thick that I think is called

4 "The Vendor Catalog Load Guide" for their customers

5 that says, Use the Item Master and use it this way to

6 load catalog data.  That's when it infringes.  And they

7 didn't start doing that until after 2001.  Some seven

8 years after these patents came out.

9          And it's in that instance when the Item

10 Master is used to load catalog data that we'll be

11 accusing it.  I have no interest or incentive to have a

12 patent that was an improvement over this RIMS inventory

13 system, which simply had parts lists.

14          I don't want catalog to read on parts lists.

15 I don't want it to read on your wife's grocery list

16 that was used as an example.  I want it to read on

17 catalogs.

18          THE COURT:  If we just use "preferably"

19 rather than "typically," you're happy?

20          MR. ROBERTSON:  Yeah.  I think I could live

21 with that, Your Honor.  I just don't want to get in a

22 situation that we have hypertechnical non-infringement

23 arguments that this is not really "catalog."

24          I even heard the argument made that, Well,

25 sometimes we take the data and transfer it over to our

1  new system.  And that's not, you know, a vendor

2  catalog.  That's just items that the customer typically

3  or often orders.

4           Well, where did that original data come from?

5  It came from vendor catalogs.  It doesn't lose its

6  attributes as catalog data just because somebody

7  migrates it or migrates part of it.  What you're going

8  to find is these customers say, you know, for our

9  office supplies, we're going to use Staples, and

10  traditionally here's the 200 items that we order.

11           Is it the complete Staples catalog?  No.  But

12  am I going to hear an argument that because I have some

13  portion of a vendor's catalog that's been transferred

14  over into a database that these guys use when they

15  utilize the Item Master to load catalog data and that's

16  not a real catalog.  That's what I fear.  And that's

17  what I'm trying to avoid.

18           THE COURT:  What about this "by vendor"

19  because you cited that text and said that it had

20  distributors, manufacturers and suppliers, but if you

21  look at the part you cited, it refers actually to

22  vendor data, etc.  Vendor distributor, vendor

23  manufacturer.  You see, it's right down below where

24  you're talking about on column 4, line 46, and

25  following there for about five or six lines or maybe a

1  little further.

2          MR. McDONALD:  Yes, sir.

3          THE COURT:  Well, your definition has to

4  include vendor --

5          MR. ROBERTSON:  I think it should include

6  all, Your Honor.  I think it should include vendors,

7  distributors, manufacturers.

8          THE COURT:  So you're happy with his

9  definition as long as it reads like the text in column

10  4; is that right?

11          MR. ROBERTSON:  I think that's right, Your

12  Honor.  I'm trying to think if there's another example

13  that's beyond a distributor, a vendor, a supplier, or a

14  manufacturer that could be relevant, but I think if

15  it's inclusive, it shouldn't be a problem.

16          THE COURT:  Well, if you go on further down,

17  "Catalog database can further contain catalogs

18  published by outside suppliers whether other

19  manufacturers or distributors listing such vendor's

20  products different from those in the distributor's

21  catalogs."

22          Even that text connotes that the vendor --

23  that the word "suppliers" is intended to be a vendor,

24  doesn't it?

25          MR. ROBERTSON:  I think a supplier typically

1  is a vendor.  A distributor is a supplier of other

2  vendors' goods.

3           THE COURT:  But, look.  Catalog database can

4  further contain catalogs published by outside

5  suppliers.  Now, leave out the whether clause for

6  purposes of clarity for a moment.  Listing such

7  vendor's products, etc.  That such vendor's products

8  means supplier in that context, does it not?

9           MR. ROBERTSON:  In that context, yes, it

10  does.

11          THE COURT:  And adding back in the whether

12  clause, it would be whether other manufacturers or

13  distributors, they, too, could be considered vendors

14  because they had previously been defined as vendor

15  manufacturers and vendor distributors.

16          MR. ROBERTSON:  I think you've solved the

17  problem, Your Honor.  Vendor is construed broadly to

18  include all those types of suppliers of goods.  All the

19  sources.

20          THE COURT:  Then that takes care of the

21  problem for both of you.

22          MR. ROBERTSON:  Now, the claims don't

23  speak --

24          THE COURT:  You agree with that, too, don't

25  you?

 1             MR. McDONALD:  That was our intent all along.

 2  That's why we chose the word "vendor" to grab all those

 3  --

 4             THE COURT:  But you just shortened it too

 5  much.

 6             MR. McDONALD:  We didn't really explain that

 7  adequately, yeah.  We shortened it too much.

 8             THE COURT:  Well, I mean in the presentation

 9  of it here.  But in your actual presentation, you seem

10  to go along with that notion.  Do you now?

11             MR. McDONALD:  That's correct.

12             THE COURT:  Okay.  That's fine.  That's good

13  to get a feeling of accomplishment at the end of the

14  day.

15             MR. ROBERTSON:  I will just observe, Your

16  Honor, there is an example.  There's appendices at the

17  end.

18             THE COURT:  What?

19             MR. ROBERTSON:  There are appendices at the

20  end.

21             THE COURT:  Of '683?

22             MR. ROBERTSON:  Yes, sir.  For example, at

23  column 21 of Appendix IV, which appears to be a

24  description of a catalog item for a Fisher isotemp 300

25  series programmable ovens.  And it's got a textural

1  description.  It's got --

2           THE COURT:  You have really good glasses or

3  really strong eyes.  Which one of those is it?  Three

4  or four or what?

5           MR. ROBERTSON:  It's Roman numeral IV right

6  in the middle.  And I'll just note that there's no

7  image there for that description.

8           THE COURT:  There are five others and I don't

9  see any images for the others either.

10          MR. ROBERTSON:  Well, they are not actually

11 screen shots.  They are images of -- it's not supposed

12 to -- that's a catalog entry, Your Honor.

13          THE COURT:  I know.  I'm saying article

14 three, four and five I don't have images on my copy.

15 Am I missing something?

16          MR. ROBERTSON:  No, sir.  I'm just saying

17 that that was a descriptive entry for a product

18 available from the Fisher catalog.

19          THE COURT:  Yeah.

20          MR. ROBERTSON:  I will observe, Your Honor,

21 there are patent claims of the patents, for example,

22 that do specifically call out for manufacturer

23 catalogs, and I wouldn't want to read vendor catalog

24 into it.  If Your Honor says "vendor" is broad enough

25 to include manufacturer, then I think we have reached

1    at least an agreement there.

2              I want to quickly just --

3              THE COURT:  Wait a minute.  It seemed to me

4    that you just took away with one hand and then gave it

5    back.  You gave, then you took away, then you gave it

6    back.  I just want to make sure we're clear before I

7    trot off to write this weekend this wonderful epistle

8    that you'll get on Monday or whenever.

9              You are in agreement that "vendor" includes

10   all the things in that section of '683, column 4, line

11   46 and following, that "a vendor manufacturer, a vendor

12   distributor, a vendor supplier," that that's okay?

13   Given that you all said it in your -- that's in the

14   specifications on the claim.

15             MR. ROBERTSON:  It's not in the claim, and

16   there are claims that just address the manufacturer

17   catalogs.

18             THE COURT:  What difference does that make?

19             MR. ROBERTSON:  Does a manufacturer have to

20   be a vendor?  Not necessarily, Your Honor.  But --

21             THE COURT:  No.  And if a manufacturer is

22   only listed as a manufacturer, he doesn't come up as a

23   vendor, does he?

24             MR. ROBERTSON:  I think that that claim then

25   would be limited to a manufacturer catalog and not a

1   vendor catalog.

2            THE COURT:  Right.

3            MR. ROBERTSON:  Then we can move forward,

4   Your Honor.

5            Matching items and selected matching items.

6   There was the suggestion made notwithstanding that

7   these were the terms that were adopted by Judge

8   Brinkema that --

9            THE COURT:  That she is wrong.

10           MR. ROBERTSON:  I'm sorry, sir?

11           THE COURT:  The suggestion was that she was

12   wrong.

13           MR. ROBERTSON:  And we needed to rely on the

14   specification, not the prosecution history.

15           THE COURT:  Yeah.

16           MR. ROBERTSON:  I think that misstates the

17   law, but I'll go back and pull that for you.  I think

18   certainly when the applicants are adding new terms and

19   are telling the examiner what they mean, that that is

20   exactly being your own lexicographer, particularly when

21   they cite to the specification as support.

22           If you could pull up that prosecution history

23   again.

24           This is prosecution history we have cited

25   earlier to Your Honor about the applicants --

1              THE COURT:  Where is it?

2              MR. ROBERTSON:  It is Exhibit 22 to the Young

3  declaration, Your Honor.  It's a hard copy, which is --

4              THE COURT:  It's not a slide?

5              MR. ROBERTSON:  No, sir.  It's on the screen.

6  Let me just make the point about why this should serve

7  to provide the definition for these terms.

8              THE COURT:  Excuse me.  This is from where?

9              MR. ROBERTSON:  It is from the prosecution

10  history, Your Honor.

11             THE COURT:  This is what is Young

12  supplemental --

13             MR. ROBERTSON:  Exhibit 22.

14             THE COURT:  Exhibit 22?

15             MR. ROBERTSON:  Yes, sir.

16             THE COURT:  Supplemental declaration

17  Exhibit 22?

18             MR. ROBERTSON:  Yes.  This is the support

19  that Judge Brinkema relied on for her definition of

20  these two terms.

21             THE COURT:  Okay.

22             MR. ROBERTSON:  And you'll see here in this

23  office action response, the applicants had actually

24  withdrawn claims 1 through 78 and submitted new claims

25  79 through 129, which they represent more clearly

1   "define" the claimed inventions.  And they go on to say

2   that we've used the following terminology.  And we say,

3   Here's what we intend that to mean.  And then we go on

4   to cite specification line support for those

5   definitions.

6            Now, those terms ultimately made it into

7   claims that were allowed by the examiner, and those

8   were the first time that they were introduced.

9            THE COURT:  The first time those terms were

10  introduced were in the new claims that accompanied this

11  part of the prosecution history, this document in the

12  prosecution history, is that what you're saying?

13           MR. ROBERTSON:  Exactly right.

14           THE COURT:  All right.  I think I understand.

15  You don't happen to have an extra copy of that that you

16  can share with us, do you?

17           MR. ROBERTSON:  The prosecution history, Your

18  Honor?

19           THE COURT:  No, that particular page you're

20  talking about.

21           MR. ROBERTSON:  You can have mine, Your

22  Honor.

23           THE COURT:  Well, we have the prosecution

24  history.

25           MR. ROBERTSON:  I don't think you have a

1  complete set of it, Your Honor.

2         THE COURT:  Do we have a complete set?

3         MS. WAGNER:  No.

4         THE COURT:  No.

5         MR. ROBERTSON:  We are remiss on that.  I

6  have spoken to --

7         THE COURT:  But we have parts of it.  I guess

8  they are the exhibits to some of these papers or

9  declarations.

10         MR. ROBERTSON:  We're happy to get you the

11  entire prosecution history.

12         THE COURT:  Yeah, I think you better agree on

13  what is it is and get one over here.

14         MR. ROBERTSON:  We'll do that, Your Honor.

15  In fact, we had agreed to number it sequentially from

16  A001 through whatever.

17         THE COURT:  How long is it?  Do you know?

18         MR. ROBERTSON:  That thick, Your Honor.  Six

19  inches.

20         THE COURT:  That's closer to a foot.

21         MR. ROBERTSON:  It's closer to six inches,

22  Your Honor.  It's closer to six inches.

23         We talked a little bit about this preamble,

24  the electronic sourcing system.  And Mr. McDonald

25  referred you to the '989 Patent as support for what

1  "sourcing" meant.

2         What's important to understand, Your Honor,

3  and I sense Your Honor's little bit of scepticism with

4  accepting the definition of sourcing from the '989

5  Patent instead of the patents that are at issue here.

6         THE COURT:  No, I'm saying that the first

7  place to look is at the patents that are at issue, and

8  then since it's incorporated by reference it can be

9  considered, but that doesn't mean that it's dispositive

10 I guess what I was trying to say and probably did not

11 do it very clearly.

12        MR. ROBERTSON:  The point I would like to

13 make consistent with that is the system that was at

14 issue in the '989 Patent is what's called the RIMS

15 patent.  It's a requisition inventory management

16 system.  It was managing Fisher Scientific inventory.

17 It wasn't a situation where you were using catalogs to

18 search other vendors' goods for sale and source them

19 from multiple vendors or suppliers.

20        So when you source in the RIMS patent, which

21 is why they wanted to import that term "inventory" into

22 electronic sourcing system, you sourced from your own

23 inventory, the Fisher Scientific inventory.

24        When you source in the electronic sourcing

25 patents, which have multiple vendor catalogs, you're

1 sourcing from those vendors, not from your own

2 warehouse where you're just trying to supply inventory

3 to one of your clients.

4          So sourcing -- my whole point is simply this:

5 Sourcing in the electronic sourcing patents is very

6 different from sourcing in the RIMS inventory control

7 patent.

8          THE COURT:  Is there a specialized dictionary

9 to which we might look to find out what electronic

10 sourcing systems was interpreted to be?  When was the

11 '863 -- that was the first one, wasn't it?

12          MR. ROBERTSON:  Yes, Your Honor.

13          THE COURT:  When was that filed?  2000 and

14 what?

15          MR. ROBERTSON:  It's priority date is 1994,

16 and I don't think you're going to find one since then.

17 The industry has grown enormously, and there are

18 standardized glossaries that have come to adopt certain

19 inventions.

20          THE COURT:  When did they come into being?

21          MR. ROBERTSON:  Well, I think this industry

22 expanded rapidly from the early 2000s to today where

23 now you have probably north of 100 companies involved

24 in what is called e procurement or e sourcing.

25          We did cite, Your Honor, in our responsive

1 brief two contemporary definitions as to what e

2 sourcing means, and we believe that's consistent with

3 the way we defined it.

4          THE COURT:  Yeah, but that doesn't show us

5 what the person of ordinary skill in the art might have

6 turned to if he or she were confused when this patent

7 was published.  I guess you really have to go back to

8 when it was applied for, don't you?

9          MR. ROBERTSON:  I think the patent actually

10 really tries to speak about it really in the summary of

11 the invention.

12          THE COURT:  Where is that?

13          MR. ROBERTSON:  Right midway down in the '683

14 Patent, page 2, where it says, It's an object of the

15 invention to provide an electronic sourcing methoding

16 system.  And that lets you search databases containing

17 data relating to items available from at least two

18 vendor product catalogs.

19          So --

20          THE COURT:  Where are you?

21          MR. ROBERTSON:  I'm at the summary of the

22 invention, Your Honor, at column 2.

23          THE COURT:  Column 2.  Oh.

24          MR. ROBERTSON:  There's a heading there

25 "Summary of the Invention."

1                THE COURT:  Yes.

2                MR. ROBERTSON:  And it goes on to provide

3    very detailed descriptions as to what the objects of

4    the invention are.

5                It's black letter law that the patent

6    shouldn't be restricted to this, but it's clearly

7    saying what the -- particularly after the background of

8    the invention what some of the benefits are.  And one

9    of the benefits is --

10               THE COURT:  Are you talking about it is also

11   the object?

12               MR. ROBERTSON:  Yes.

13               THE COURT:  Well, you're citing this as

14   something to which I should turn for defining

15   electronic sourcing?

16               MR. ROBERTSON:  It's certainly consistent

17   with what electronic sourcing system is as opposed to

18   the RIMS inventory sourcing.

19               THE COURT:  Now, that is a lawyer answer.

20   How about giving me yes or no?  Can I rely on this in

21   defining electronic sourcing in your judgment?

22               MR. ROBERTSON:  It informs what electronic

23   sourcing system is.  I would not want everything in

24   there imported into the claim limitations because there

25   are actual claim limitations that --

1              THE COURT:  Did I say I was going to import

2 it?

3              MR. ROBERTSON:  No, sir.

4              THE COURT:  What did I say?

5              MR. ROBERTSON:  You can certainly look to it,

6 sir, to inform your construction.

7              THE COURT:  I can consider it?

8              MR. ROBERTSON:  Yes, sir.

9              THE COURT:  Okay.  In the absence of

10 something better, I can use it as an informative thing,

11 right?

12              MR. ROBERTSON:  As long as you don't import

13 limitations from it into the definition.

14              THE COURT:  That's a fine line, isn't it?

15              MR. ROBERTSON:  It certainly is, sir.

16              I wanted to talk about this multiple purchase

17 order generation module for one second.

18              THE COURT:  All right.  Where is your slide

19 on that?

20              MR. ROBERTSON:  To do that, I'd like to focus

21 on claim 21 of the '516 Patent.

22              THE COURT:  Where is your slide on that?

23              MR. ROBERTSON:  I don't have a slide.  I

24 think you're going to have to look to Tab 2.

25              THE COURT:  No, the original one that you

1  had.

2          MR. ROBERTSON:  Tab 2.

3          MS. WAGNER:  Forty.

4          THE COURT:  Forty.  Multiple purchase order

5  generation module.  That's what you want to talk about,

6  right?

7          MR. ROBERTSON:  Yes, sir.

8          THE COURT:  Where is yours, Mr. McDonald?

9  Which one is that one?  Somebody tell me and I'll find

10  it.  It's the '516 Patent?  Is that what you all are

11  looking at?

12         MR. ROBERTSON:  Yes, sir.

13         THE COURT:  Claim 21?

14         MR. ROBERTSON:  Claim 21.

15         MR. McDONALD:  Our slides begin at slide

16  No. 86.

17         THE COURT:  Eighty-six.  All right.  I have

18  both of them in front of me.

19         MR. ROBERTSON:  Let's see if we could put

20  that all together if we could.

21         THE COURT:  Okay.  Claim 21 you want to turn

22  to, right?

23         MR. ROBERTSON:  Yes, sir.  And you will

24  recall that the suggestion here is that this multiple

25  purchase order generation module has to be construed as

1  a means-plus-function claim term.  And then once that's

2  done, the argument was made there's no structure

3  allegedly in the specification that discloses how this

4  multiple purchase order generation occurs from a single

5  requisition.

6         Now, I understood Mr. McDonald to represent,

7  because we sort of took them to task in briefing, that

8  each one of these elements recites a module.  Your

9  Honor picked up on it.  There's a requisition module.

10         THE COURT:  He agreed with that, and he said

11  the requisition module and the catalog collection

12  searching module are not subject to the same frailty of

13  absence of structure as is the multiple purchase order

14  generation module, I believe.

15         MR. McDONALD:  I think that's right.  Now,

16  notwithstanding that, the attorney who crafted these

17  claims utilized the term "module" throughout for each

18  one.  And notwithstanding, if you quickly look at claim

19  16, when this patent attorney wanted to claim a

20  means-plus-function claim, he knew exactly how to do

21  it.  I'm sorry I was saying him.  It was a woman.  So

22  she knew exactly how to do it.  She said converting

23  means for converting data.

24         So she knows when to use the term "means" in

25  order to create the presumption that it falls under the

1  ambit of 1.12.6.

2         But here's the more important note.  I heard

3  Mr. McDonald concede that each one of these modules, he

4  said, the requisition module, the searching module, had

5  sufficient detailed structure to support it as a

6  non-means-plus-function claim.

7         So what happens when we get to the multiple

8  purchase order generation module?  What's it going to

9  use to do this?

10        Well, the first thing it's going to use, and

11 just circle this, it's going to use the said purchase

12 order generation module creating multiple purchase

13 orders with said user-generated criteria and said

14 search module criteria.

15        Those are the very two claim elements that

16 come right before that Mr. McDonald conceded had

17 sufficient structure.

18        So when we're getting to this purchase order

19 generation module, it's saying I'm going to use the

20 prior modules that had structure in order to be able to

21 do this multiple purchase order generation module from

22 a requisition that was created by this admittedly

23 detailed, sufficiently detailed, requisition module and

24 found from user-generated criteria, sufficiently

25 detailed, for the search module criteria, admittedly

 1  containing sufficient structure.

 2          THE COURT:  Does that mean then that there

 3  are two points to be resolved here?  (A) Whether

 4  there's a means-plus-function.  And your point is that

 5  it is not for the reasons you've said, but even if it

 6  is a means-plus-function, the structure is adequately

 7  disclosed.

 8          MR. ROBERTSON:  I think it's adequately

 9  disclosed by concessions from counsel right in that

10  claim itself.

11          THE COURT:  That's what I'm saying.

12          MR. ROBERTSON:  I do, but I'd like to go even

13  beyond that if I could and tell you where the structure

14  is in the specification even if it is a

15  means-plus-function claim.

16          THE COURT:  All right.

17          MR. ROBERTSON:  Because there are

18  means-plus-function claim elements that do recite this

19  multiple purchase order capability.  And, first, I'd

20  like to go to column 15, starting at about line 19, and

21  in fact I think that Mr. McDonald relied on that.

22  Going down to about line 49.  Here where there's a

23  discussion that once a requisition has been inventory

24  sourced and accepted by the CSR, it can be converted to

25  one or more purchase orders.  So we're talking about

1 this whole multiple purchase order generation process.

2 This module.  This procedure here that's going to

3 happen.

4          So how do we do it?  You'll see, for example,

5 it says that, for example, the requisition represented

6 by requisition item table 46, this is in one of the

7 appendices, it accepted without further revision.  You

8 press a function key, which accepts.  And it can

9 generate the following three purchase orders.

10          So you've got three different lines.  One is

11 you're purchasing from an on-site distributor-owned

12 inventory.  The next one is you can be ordering from an

13 on-site customer-owned inventory, which is actually

14 sort of an internal transfer of the customer.

15          Another example is two other lines, 001 and

16 003, ordered respectively from distributors, and they

17 have two different type of warehouses.  These three

18 purchase orders, type 01, type 03, is stated as shared

19 between these computers it goes on to say.

20          Now, where are we getting these different

21 codes, these different types, of sources for these

22 products?  You go over onto column 18, starting at

23 about line 18, "Once responses."  Do you see that?

24 Going down to about line 29.  You have, Once responses

25 from either or both have been obtained, the distributor

1  purchasing employee can use the item list in Easel

2  Interface.  This Easel Interface was a commercially

3  available graphical user interface much like you see on

4  computers today that's user-friendly instead of -- at

5  the time what was cutting edge technology in the sense

6  that they first started out with what are called "green

7  screens."  To create one or more of the following

8  purchase orders.

9           So you have an order from the customer to

10  supplier, which is an administrative purchase.  You

11  have an order from a customer to a distributor, which

12  was a type 7 product, or an order from the distributor

13  to the supplier usually providing for direct shipment

14  from the supplier to the customer.  And it gives these

15  different types of purchases from various sources,

16  whether they be internal or external, it gives them

17  type numbers.  It gives them identification codes.

18           Once you're given codes to the type of

19  distributor or supplier or even internal vendor, the

20  computer, which is a machine which processes data, can

21  process those codes.  Those codes permit you to take a

22  single requisition as is disclosed there and split them

23  up based on the source.

24           So once I've assigned codes to this thing,

25  the computer does the rest of the work for me.  That's

1 exactly how the multiple purchase order generation

2 module can do it.  It identifies for me the various

3 sources of the product for which I'm going to generate

4 a purchase order.

5          THE COURT:  So you're saying that's the

6 structure?

7          MR. ROBERTSON:  Yes, sir.  I'm saying --

8          THE COURT:  Line 23 or 24 through 29, and

9 then the examples that follow through line 34 and the

10 references therein made.

11          MR. ROBERTSON:  And I also have been pointed

12 out by my colleague there's an additional description

13 at column 10, lines 48 through 64, discussing the

14 purchase order would then be generated for this

15 corresponding distributor item as further described

16 below.

17          It actually breaks out these different type

18 products from different distributors.  That's

19 additional support.  In fact, that actually is a better

20 place to find these different product types that are

21 described.

22          THE COURT:  What line?

23          MR. ROBERTSON:  Column 10, lines 48 through

24 64, column --

25          THE COURT:  Forty-eight?

1              MR. ROBERTSON:  Forty-eight, sir, yes,

2 through 64.

3              THE COURT:  Uh-huh.

4              MR. ROBERTSON:  And then we were on to column

5 15 where it's the multiple purchase order --

6              THE COURT:  Yes, I've got that.

7              MR. ROBERTSON:  That was actually 19

8 through -- goes down to about 59.

9              THE COURT:  All right.

10             MR. ROBERTSON:  And then 18 was -- column 18

11 was lines 17 through about 29.

12             I think, Your Honor, with that -- oh,

13 actually --

14             THE COURT:  Is that all you wanted to say

15 about generating?

16             MR. ROBERTSON:  I think I did, sir, yes.

17             One other point I wanted to make about

18 selected matching items.  You'll recall that Lawson's

19 position is it has to be selected matching items for

20 inclusion on the order list, as I recall.

21             THE COURT:  It kind of looked that way from

22 the claim he was reading.

23             MR. ROBERTSON:  Excuse me, sir?

24             THE COURT:  It kind of looked that way from

25 the claim language he was reading.  Wasn't that '172,

1 claim 1.

2          MR. ROBERTSON:  Yes, that's exactly right,

3 Your Honor.

4          THE COURT:  Hold on.  Let me get it.  Go

5 ahead.  I've got it.

6          MR. ROBERTSON:  That's because '172, claim 1,

7 actually includes the words "order list."  So what he

8 wants to do now is take that claim which specifically

9 uses the words "order list," and make it always be an

10 order list when you're talking about selected matching

11 items.

12          THE COURT:  That would be a very good

13 argument for the other patents if it were in the other

14 patents, but it's not so strong you say since it's in a

15 different patent.

16          MR. ROBERTSON:  It's not in any of the other

17 patents.  So let me just show you '683, for example,

18 claim 28.  You can look at claim 26 or 28 because it's

19 in both of them.  And the first time you see selected

20 matching items is not when you're generating one or

21 more purchase orders, which is the fifth element down,

22 processing the requisition to generate one or more

23 purchaser orders for the selected matching items.  It's

24 actually --

25          THE COURT:  Hold on a minute.  How many

1  claims are there in '683?

2          MR. ROBERTSON:  Forty-five, Your Honor.

3          THE COURT:  I'm sorry.  I picked up the wrong

4  one.  What have I got here?  Here it is.  I'm sorry.

5  In '683 at what claim?  Twenty-eight?

6          MR. ROBERTSON:  Yes, sir.  We're specifically

7  talking about this selected matching items language,

8  which Lawson says has to include an order.

9          THE COURT:  Twenty-eight.

10          MR. ROBERTSON:  You'll note the first time

11  the words "selected matching item" appear in claim 28

12  is not in relationship to generating orders.  It's you

13  build a requisition using data related to selecting

14  matching items and their associated sources.

15          So you're actually not using selected

16  matching items for an order list at all.  You're using

17  it for a requisition.

18          And then subsequently --

19          THE COURT:  Your definition is for

20  "requisition" or "order," isn't that right?

21          MR. ROBERTSON:  My definition is actually --

22  yes, it can be used alternatively.  There are claims

23  that use order list, as you pointed out, '172, and

24  there are claims that don't.  Our definition

25  actually -- I have adopted Judge Brinkema's definition

1  for selected matching items as requisition items,

2  unless, of course, the claim specifically makes clear

3  it's for an order list, such as '172, claim 1.

4          THE COURT:  All right.

5          MR. ROBERTSON:  That's all I have, Your

6  Honor.

7          THE COURT:  All right.  Get your calendars

8  out unless you-all want to spend the night here until

9  tomorrow morning.  I didn't hear any volunteers.

10         I don't have very much time available.  It's

11  going to take a while to do that, isn't it?

12         MR. McDONALD:  Means-plus-function you mean,

13  Your Honor?

14         THE COURT:  Yes.

15         MR. McDONALD:  I'm not sure how much is going

16  to be really going through element-by-element.  I think

17  that's some of it, but I think a lot of it is just a

18  whole different approach to the means-plus-function

19  clauses.  So I would say maybe about comparable to what

20  we did today.  Maybe a little less even.  But it looks

21  like more stuff, but I think it will be about

22  comparable to today.

23         MR. ROBERTSON:  I disagree with my brother on

24  that.  I think my approach is going to be at a higher

25  level to say is our approach better or is their

1  approach better, and give the Court hopefully a

2  framework for then having confidence in our approach or

3  having confidence in their approach.  And that

4  hopefully should resolve the matter.  So I would like

5  to use less time actually.

6          THE COURT:  Well, given that I might need

7  more, let's start at 1:30 on January 27.

8          We need to change the conference call away

9  from that time frame.  All right.  Thank you all very

10  much.

11          MR. CARR:  Judge, could I raise one

12  procedural issue?

13          THE COURT:  Yes.

14          MR. CARR:  Back in November we submitted an

15  agreed scheduling order --

16          THE COURT:  Yes.

17          MR. CARR:  -- to the Court.  We have all been

18  abiding by that order, but it was never entered.

19          THE COURT:  I'll enter it.

20          MR. CARR:  I just want to point that out to

21  you.

22          THE COURT:  Yes.  I will tell you now, I

23  don't believe that we're going to be able to have a

24  trial on the date.  That's why I was holding it.  I

25  think it was June the 15th or something like that,

1    wasn't it?

2                MR. ROBERTSON:  June 14.

3                THE COURT:  And when I set that trial, I will

4    tell you what it is.  It's a date that I have to be in

5    Oregon.  I didn't realize that I had to be in Oregon,

6    and I've been trying to work out a way to tell you

7    exactly what the trial was before I did the order.  But

8    I'll sign the order and you all can have it.  You've

9    been abiding by it anyway, haven't you?

10               MR. CARR:  Yes, sir.

11               THE COURT:  All right.  Okay.  Does that take

12   care of what we're going to do today?

13               MR. McDONALD:  Yes, sir.

14               THE COURT:  Thank you all very much.  We'll

15   see you on the 27th.

16               We'll be in adjournment.

17

18               (The proceedings were adjourned at 5:20 p.m.)

19

20               I, Diane J. Daffron, certify that the

21   foregoing is a true and accurate transcription of my

22   stenographic notes.

23

24                  /s/                        1/26/10
         _____   _____
25          DIANE J. DAFFRON, RPR, CCR        DATE