1

```
 1          IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF VIRGINIA
 2                 RICHMOND DIVISION

 3  _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                                    :
 4  ePLUS, INC.,                    :
                                    :
 5                  Plaintiff,      :
    v.                              :   Civil Action
 6                                  :   No. 3:09CV620
    LAWSON SOFTWARE, INC.,          :
 7                                  :   January 27, 2010
                    Defendant.      :
 8  _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _:

 9

10

11      COMPLETE TRANSCRIPT OF THE MARKMAN HEARING
          BEFORE THE HONORABLE ROBERT E. PAYNE
12             UNITED STATES DISTRICT JUDGE

13

14

15  APPEARANCES:

16  Scott L. Robertson, Esq.
    Jennifer A. Albert, Esq.
17  GOODWIN PROCTOR
    901 New York Avenue, NW
18  Washington, D.C.   20001

19  Craig T. Merritt, Esq.
    CHRISTIAN & BARTON
20  909 E. Main Street, Suite 1200
    Richmond, VA   23219-3095
21
            Counsel for the plaintiff ePlus
22

23

            DIANE J. DAFFRON, RPR
24          OFFICIAL COURT REPORTER
          UNITED STATES DISTRICT COURT
25
```

1    APPEARANCES:   (Continuing)

2    Daniel W. McDonald, Esq.
     MERCHANT & GOULD
3    3200 IDS Center
     80 South Eighth Street
4    Minneapolis, MN   55402-2215

5    Dabney J. Carr, IV, Esq.
     Robert A. Angle, Esq.
6    TROUTMAN SANDERS
     Troutman Sanders Building
7    1001 Haxall Point
     P.O. Box 1122
8    Richmond, VA   23218-1122

9               Counsel for the defendant Lawson Software

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

```
1              (The proceedings in this matter commenced at

2   2:00 p.m.)

3

4              THE CLERK:  Civil Action 3:09CV00620, ePlus,

5   Incorporated v. Lawson Software, Incorporated.

6              Mr. Scott L. Robertson, Mr. Craig T. Merritt,

7   and Ms. Jennifer A. Albert represent the plaintiff.

8              Mr. Daniel W. McDonald, Mr. Robert A. Angle,

9   and Mr. Dabney J. Carr, IV, represent the defendant.

10             Are counsel ready to proceed?

11             MR. ROBERTSON:  Yes, Your Honor.

12             MR. McDONALD:  Yes, Your Honor.

13             THE COURT:  All right.  Let's finish up with

14  the Markman hearing in this case.

15             MR. ROBERTSON:  Thank you, Your Honor.  Good

16  afternoon, sir.

17             THE COURT:  Good afternoon.

18             MR. ROBERTSON:  I'm going to be referring

19  back, if I might, to the printout of the slides that we

20  had for several of the points I'd like to make with

21  Your Honor today.

22             As the Court knows, we're here today to

23  discuss the appropriate proper construction via

24  means-plus-function claim elements that are at issue

25  before Your Honor.  They are in three of the asserted
```

4

1  claims.  Claim 3 and 6 of the '683 Patent, and claim 1

2  of the '172 Patent.

3            Just referring to slide 7, Your Honor, in the

4  book.  I've just included for the Court a copy of the

5  statute 35 U.S.C. Section 112, paragraph 6, which

6  permits a patent owner to claim a claim element and

7  express it as a means or step for performing a

8  specified function without reciting the structure in

9  the claim.

10           THE COURT:  What slide is this?

11           MR. ROBERTSON:  Slide 7, sir.

12           THE COURT:  All right.

13           MR. ROBERTSON:  So that's the reference to

14  the statute that permits the patent owner to claim an

15  element as a means-plus-function element.

16           The *quid pro quo* then is that the patent

17  owner must disclose in the specification the structure

18  that's issued that actually performs the function as it

19  is expressed in the claim.

20           The next page, Your Honor, I've included a

21  representative means-plus-function claim, it's claim 6

22  of the '683 Patent, which claims an electronic sourcing

23  system comprising.  And then it has a number of steps

24  or elements that are included in that.  And you'll see

25  there, for example, the first requirement is that there

1   be a database containing data relating to items

2   associated with at least two sources.  And then with

3   that database you can have a means for searching for

4   matching items in the database, means for building a

5   requisition using data related to the selected matching

6   items and their sources, means for processing the

7   requisition to generate one or more purchase orders for

8   selected matching items.

9          And then in this element, you have this means

10  for converting the data relating to a selected matching

11  item and an associated source to data relating to an

12  item and in a different source.

13         I'd like to move forward Your Honor in my

14  presentation to Slide 42.  Slides prior to that we were

15  discussing the general terms that we addressed last

16  week.  What I've just done here for Your Honor is I

17  identified the 11 elements that are at issue here for

18  construction.

19         Unfortunately, the means-plus-function claim

20  terms the Court actually is required to identify the

21  function and then to identify the corresponding

22  structure.  So these are claim terms that actually do

23  require construction as opposed to some of those that

24  we had asserted for the general terms that we suggest

25  that the Court might not need to construe.

 1              Slide 43, just for ease of the Court's

 2    analysis, we've actually identified what we believe to

 3    be the function for each of these 11 claim elements

 4    that are at issue.  Our function, in contrast to

 5    Lawson's function, tracks exactly the function as

 6    described in the means-for paragraph.  And when I get

 7    to Lawson's constructions, I'll try to illustrate for

 8    the Court why we think in certain instances they

 9    incorporate improper functions into the function as

10    recited, which is contrary to the law.

11              The next slide I'd like to show you is slide

12    46, which is the approach to construing these items.

13              THE COURT:  Look at claim 6.

14              MR. ROBERTSON:  Yes, sir.

15              THE COURT:  An electronic system comprising.

16    The function there is what?

17              MR. ROBERTSON:  There's no function in that

18    particular -- that's the preamble, Your Honor.

19              THE COURT:  No, I mean in A, the next

20    paragraph down.  What's the function?

21              MR. ROBERTSON:  The next paragraph down, I

22    believe, Your Honor, is not a means-plus-function

23    format because that next paragraph --

24              THE COURT:  I've numbered them.  Paragraph 2,

25    "Means for searching," is that it?

1          MR. ROBERTSON:  The function is --

2          THE COURT:  "Means for searching for matching

3     items in the database."  That's the function, right?

4          MR. ROBERTSON:  "Searching for matching items

5     in the database," yes, sir.

6          THE COURT:  Then I ought to be able to go to

7     a particular place in the specification that describes

8     exactly what that relates to, shouldn't I?

9          MR. ROBERTSON:  There are figures and

10    paragraphs in the specifications --

11         THE COURT:  No, but isn't that where I have

12    to go?  If it's not there, if you can't take the

13    function language and put it somewhere in the

14    specification, then you don't have it, somewhere in the

15    whole patent, you don't have any means-plus-function

16    claim, right?  Isn't that right?

17         MR. ROBERTSON:  I need to have structure in

18    the specification.

19         THE COURT:  And you have to show me by line,

20    page, and precise words where your structure is, and if

21    you can't do that, there isn't my means-plus-function

22    claim, and it's gone, right?

23         MR. ROBERTSON:  That's right, Your Honor, and

24    we believe we have done that.  We have in our briefs

25    showed you exactly columns, and lines, and figures

1  where we believe that the function is set out for each

2  of these means-plus-function elements.

3       Now, is it all contained in one spot?  No

4  your Honor.  It's in various spots.

5       THE COURT:  Why is the Court required to go

6  jog-hopping around in some inventor's language in order

7  to figure out what the structure is?  It looks to me

8  like the risk of not describing the structure

9  specifically against the law that has been set out --

10  this law is -- how old is the means-plus-function law?

11  It's terribly old.

12       MR. ROBERTSON:  It's probably from the 1952

13  Act.

14       THE COURT:  Yeah, so it's 50 years old.  If

15  an inventor doesn't know that, and a lawyer does know

16  that, why is it that a Court ought to have to do that?

17  Can't we just say, if we have to hop over here and put

18  this together and put it over there, then you fail in

19  identifying a structure?  Why can't we do that?

20       MR. ROBERTSON:  Well, Your Honor, let me

21  just -- when this patent was written, Your Honor, these

22  inventors were dealing with an actual commercial

23  product.  This is not a paper patent.  These guys built

24  something.  And they put it together.  And they put it

25  together in a way that made logical sense to them and

1  they described it that way, Your Honor.

2       THE COURT:  They had lawyers to help them.

3  You act like these people don't know how to use the

4  English language.  It is time, I think, to serve notice

5  to the whole patent community that if you can't cut the

6  mustard and do what law says, you lose, because you're

7  getting a monopoly.

8       I don't know why courts have to go searching

9  through all this stuff.  If you can't point me to a

10  precise line in one place that says it -- now, if it

11  says the same thing in two or three different places,

12  that's another thing.  If it just repeats it, that's

13  another thing.  But to put a court to the test of

14  constructing what it is that the structure is by

15  cobbling together things in different places in the

16  specification puts the Court in the position of doing

17  what the Patent Office ought to have done, the patent

18  holder ought to have done, and courts are ill-equipped

19  to do.  And if you can't do that, I don't know how you

20  can win.

21       So that's kind of how I'm approaching this.

22  If that's new law, then it's going to be new law.

23  Somebody needs to tee it up because this exercise, this

24  kind of idiocy that goes on in patent construction is

25  terribly wasteful.  And the problem is that it puts the

1    Court in the position of almost rewriting the patent.

2    Whereas, if you're held to a good, clear standard, and

3    the standard is show me in the specification or where

4    else in the patent it is that the structure exists, and

5    I'd say, Okay, there's your function in the claim.

6    There's your structure.  That's it.

7            MR. ROBERTSON:  I understand, Your Honor.

8    These claims were also written in not

9    means-plus-function format.  The patent owner decided

10   to do it in both formats.  And, yes, does it require

11   the Court to go through the specification and cite to

12   various structures that are disclosed?  It certainly

13   does, Your Honor.

14           THE COURT:  No, it's doesn't require the

15   Court.  That's where you're wrong.  The law, as best I

16   can tell, doesn't require me to go through it and cite

17   to anything.  What it does is it requires the patent

18   owner who wants the monopoly to go through and identify

19   precisely what it is that the patent owner says is the

20   structure.

21           And it's unfortunate that patent lawyers when

22   they are submitting the claims don't necessarily think

23   they have to do that.  They think they can do something

24   else, but it seems to me that the law says very clearly

25   that that's what needs to be done.

11

1        MR. ROBERTSON:  Well, and I think it is set

2   out in this patent, Your Honor.  I understand that the

3   Court is frustrated by the sense that it needs to hunt

4   and search for certain structures --

5        THE COURT:  No, no, no.  It's not hunting and

6   searching.  It's the cobbling together of different

7   languages that's the problem.  Courts spend their lives

8   hunting and searching through documents.  That's not a

9   problem.  It's the cobbling together and the

10  consequence of the cobbling together that's the

11  problem, Mr. Robertson.  And that is courts are then in

12  the position of rewriting what it is that was intended

13  and second guessing the Patent Office about what they

14  intended to allow.

15       And I just think it's time that we draw a

16  clear line and say that's what we really need to be

17  doing.  So I'd like to start there.  And if you can't

18  do that on any of these things, then tell me now that

19  you can't do it.  If you can do it claim-by-claim, then

20  let's do it claim-by-claim.  And what I'll do is I'll

21  write the line down, highlight the language, and then

22  I'll know what it is.  But that to me is the way to do

23  this.

24       MR. ROBERTSON:  All right.  Well, Your Honor,

25  might I suggest that -- I mean, we're talking about a

1   system here.  And if we can go back to claim 6, for

2   example.

3           THE COURT:  No.  Might I suggest that we do

4   what I said.  You take every claim that is issued -- I

5   think we're going to have to have you submit new briefs

6   on it because I think between the two of you this case

7   is an example of what the problem is with the current

8   approach to these things.  And that is that you really

9   want the Court to rewrite the patent.  Both of you do.

10  So how about let's do that.

11          Which claim are we talking about now?  Claim

12  6.  The second paragraph of that is "means for

13  searching for matching items in the database."  Where

14  is that found in the '683 Patent?  Where is the

15  structure for that?

16          MR. ROBERTSON:  Your Honor, we had, for the

17  Court's reference, Exhibit 1 to the plaintiff's opening

18  brief, this side-by-side construction of Lawson's and

19  ePlus's.

20          THE COURT:  Wait a minute.  What?  Okay.

21          MR. ROBERTSON:  All of the

22  means-plus-function claim elements are set forth there

23  starting at page 3, I believe, of Exhibit 1.

24          THE COURT:  Three?

25          MR. ROBERTSON:  Yes, sir.  Means for

1   selecting the product catalogs to search.  And what we

2   have done there is we have cited the columns and line

3   numbers that we believe the structure is set forth for

4   that.

5           Now, I can go through it, Your Honor, in

6   painstaking detail and read out each one of these

7   things.

8           THE COURT:  I think you're going to have to.

9   See, what you've left for me to do is to go in there

10  and guess what that means.  What needs to be done is if

11  you really and truly believe that all of those lines,

12  that is, for -- let's see, that's claim 3.  We're

13  talking about claim 3 now.  That's a different claim

14  than we were talking about just a minute ago.

15          MR. ROBERTSON:  Yes, sir.

16          THE COURT:  Claim 3.  Let's go to claim 3.

17  Claim 3 says, "An electronic sourcing system

18  comprising."  And then the first means-plus-function is

19  in paragraph 2 of that, right?  "Means for selecting

20  the product catalogs to search," right?  Isn't that the

21  first one?

22          MR. ROBERTSON:  "Means for selecting the

23  product catalogs to search," yes, sir.

24          THE COURT:  Is that in dispute?

25          MR. ROBERTSON:  Yes, sir.

14

1          THE COURT:  Okay.  Now, is that what's

2    intended to -- that's what's in the first column,

3    right?

4          Now, "See, e.g., '683 Patent, column 5, line

5    66."

6          MR. ROBERTSON:  Column 6, line 3.

7          THE COURT:  All right.

8          MR. ROBERTSON:  Your Honor, one thing I might

9    be able to do for the Court's convenience, and I'll

10   provide it afterwards, is I actually have color-coded

11   this patent using various colors for means for

12   performing certain functionality.  I've gone through

13   the patent and identified in those colors where the

14   structure is and the discussion is of that

15   functionality.  And I'd be happy at the conclusion,

16   this is my copy, it's all marked up, but to provide

17   that for the Court's assistance.  So it just can kind

18   of jump out at you off the page and you can look at it

19   and see where that's discussed.

20         THE COURT:  Now, wait just a minute.  Column

21   5, line 66.  That's a subset?

22         MR. ROBERTSON:  Yes, sir.  The data not

23   passed via interface 60.

24         THE COURT:  Column 6, line 3.

25         MR. ROBERTSON:  Yes, sir.  That's actually

1    discussing the data fields that are available for

2    making certain selections.  Those are utilized in order

3    to select product catalogs to search.  In fact, it also

4    starts in column 5, line --

5           THE COURT:  That stops with the word "images"

6    on line 3, right?

7           MR. ROBERTSON:  Yes.  And then there's also

8    reference to --

9           THE COURT:  Now, what does that tell me?

10   What does that tell me as to paragraph No. 2?

11          MR. ROBERTSON:  It tells you, sir, that in

12   selecting product catalogs, it's going to be certain

13   fields available in which you can enter keywords such

14   as a catalog name, a catalog I.D. number, that would

15   help you and assist you in making that selection

16   process.

17          There are other descriptions about how you

18   can select the product catalogs in there.  And as I

19   say --

20          THE COURT:  How does that disclose a

21   structure?

22          MR. ROBERTSON:  It's disclosing fields that

23   are available for the user to enter in order to make a

24   selection process.

25          THE COURT:  And then you've got column 6.

1  What you have here -- column 6 -- what does that say?

2          MR. ROBERTSON:  Column 6, lines 11 through

3  13.

4          THE COURT:  11 through 13.

5          MR. ROBERTSON:  Fields are filled with data

6  that will assist the search program in executing its

7  first search against a specific catalog contained in

8  the catalog database 36.  That's how those fields

9  assist the user.

10         THE COURT:  What is it telling me about means

11 for searching for matching items to the database that

12 is not told to me by the first one?

13         MR. ROBERTSON:  It's telling you about how

14 you can receive inputted information, Your Honor,

15 relating to the user selection of the catalogs to

16 search from at least the two product catalogs that are

17 in the database as set forth in the claim.

18         THE COURT:  Where in the papers does that all

19 play itself out?

20         MR. ROBERTSON:  I believe when we walked

21 through the proper construction of the

22 means-plus-function elements, we referenced every time

23 what we thought the specification support was for that

24 structure, sir, and then we put it in this summary

25 Exhibit No. 1 simply for ease of reference to the

1   Court.

2           THE COURT:   Let me ask you this question:

3   Why is it that there are 12, 13, 14 different column

4   citations in there and lines?  And how do they fit

5   together?  And why do I need to have so many of them?

6   Why is it that you can't point to one of them and say

7   "This is the structure"?

8           MR. ROBERTSON:  Because --

9           THE COURT:  Because you're making me guess

10  what all of that means or discern what all that means

11  and how it is a structure, and it sort of doesn't

12  exactly mesh together in a way that's readily

13  understood.

14          MR. ROBERTSON:  I appreciate the Court's

15  frustration with the difficulty of distilling the

16  structure from the specification.  Of course, the

17  specification was written to speak to one of ordinary

18  skill in the art, and I appreciate that the Court is

19  not one of ordinary skill in the art.  So we have tried

20  to a assist the Court in identifying that structure.

21          THE COURT:  You're not one of ordinary skill

22  in the art either.

23          MR. ROBERTSON:  I'm not, Your Honor.

24          THE COURT:  So I can't use your brief?

25          MR. ROBERTSON:  Well, my brief is -- I've

1  been assisted by people who are of extraordinary skill

2  in the art when it comes to many of these computer-type

3  of software-implemented inventions.  So I think our

4  brief is of some assistance to the Court in identifying

5  it.  What we tried to do, as I say, is go through and

6  identify where all the structure is that --

7        THE COURT:  Let's go find in the brief all

8  these column citations you're talking about and what

9  you say about them.  Do you want to point me to that

10 location?  That would be where?

11       MR. ROBERTSON:  Are we still doing the means

12 for selecting the product catalogs to search?

13       THE COURT:  We're doing claim 3.  I've

14 numbered every one of those little subparagraphs in

15 there 1, 2, 3.  And the second one is the means for

16 selecting the product catalogs to search.  Let's go

17 back in your brief now and show me where you did that

18 for me.  That would be paragraph 20, right?  I mean,

19 page 20?

20       MR. ROBERTSON:  Yes, sir.  What we did is,

21 first, we did identify for the Court that we had

22 attached as Exhibit 1 this chart that provides it all,

23 but you'll see in a footnote there we gave the Court

24 examples of the specification.  For example, Footnote

25 22 identifies that you can use certain letters and

1  enter online numbers to search the catalog database.

2  You can enter those numbers.  You can access a search

3  program.  Multiple catalogs are present in the catalog

4  database.  You can select the catalogs to be searched.

5         That's all set out first in column 8, lines 8

6  through 26, and column 9, line 52 going over to column

7  10, line 20.

8         THE COURT:  Now, if you'll look at that

9  section, that's where you deal with the structure.  If

10 you look at that section, page 20, page 21, page 22,

11 the first part of that, what you do is spend the first

12 line after identifying what we're talking about, that

13 is means for selecting the product catalogs to search,

14 describes the function, and then you say, "Exemplary

15 corresponding structure."  Is that the only

16 corresponding structure?

17        MR. ROBERTSON:  I think we provided the full

18 detail of the corresponding structure that we felt was

19 present in Exhibit 1 in this chart, Your Honor.

20        THE COURT:  And what you're doing is an

21 algorithm, right?

22        MR. ROBERTSON:  Yes, sir, you need to do an

23 algorithm.

24        THE COURT:  How do I know that (A) it's an

25 algorithm, and (B) that it fits together the way that

1  you want it fit together?  What you have basically

2  done is strung together a group of these things and

3  then in one footnote citation sort of saying, Well,

4  this is generally where you find this stuff.

5          It doesn't explain how it's set together.

6  Then the rest of this section on this claim attacks

7  their construction.  It doesn't really deal with your

8  construction.

9          So I'm left to figure out what all of this

10 means in a way that puts the Court in a position of

11 rewriting the claim to say something that doesn't

12 clearly appear.  And why is that so?  Because you have

13 to be able to go from this point to this next point to

14 the next point, and you have to cobble them together,

15 and there's no record upon which I can use to cobble

16 them together.  So how do I do this?

17         MR. ROBERTSON:  Well, sir, I think what was

18 disclosed in the specification was the specific

19 structure that these inventors were using coming up

20 with their invention.  I mean, they used commercially

21 available things like a search engine available for

22 IBM, but when they describe what the searching

23 capability is, it's not that particular search engine

24 or it's not a particular operating system or not a

25 particular communication protocol.  It's the essence of

1    the tasks being performed to perform that step.

2           Unfortunately, the Court needs to, if it's

3    going to construe means-plus-function, identify that

4    algorithm.  Those steps.  Algorithm is a very

5    intimidating word, but when you look at what's really

6    happening when you're selecting the product catalogs,

7    we think when you go through and you look at the

8    structure that's disclosed, it's really coming down to

9    receiving information about a selection of catalogs to

10   search from among at least two product catalogs because

11   the claim requires it, and then communicating that

12   selection to the search engine module, which is then

13   going to select the catalogs to be searched from those

14   available catalogs in the database.  That's what we've

15   tried to set forth in that means for selecting.

16          Take it down to its simplest basic steps.

17   There's a lot of structure that's disclosed here, Your

18   Honor, and I sometimes feel that the inventors get

19   penalized for saying too much about what their

20   invention was.  In a sense, it's like no good deed goes

21   unpunished.

22          The last case we were faulted supposedly for

23   not providing enough detail.  Now we provided a lot of

24   detail as to how this actual invention worked.  They

25   built it.  They made it.  They had within six months

1  after this patent came out they had a commercially

2  available system called Supply Link.

3          Within two years after that they had a

4  Web-based one over the Internet called Corner Stone.

5  So then they went and they said, What did we exactly

6  do?  And they put forward a lot of that structure in

7  here.

8          What we tried to do is say if it's got to be

9  an algorithm, and the Federal Circuit tells us there

10 has to be an algorithm, what are those precise steps

11 going on in the selection process that the software is

12 doing?

13         What I think part of the problem with

14 Lawson's approach is they want to start putting in

15 things like, Well, there has to be this particular

16 communication protocol or there has to be -- it has to

17 operate on a local computer.  Those are the kind of

18 non-infringement gotchas we were talking about on

19 Friday where they say if it's got to be on a local

20 computer, Your Honor, no one is going to infringe

21 because nobody does a local computer.  No one just

22 loads the software onto one computer and operates it.

23 And they clearly had a networked embodiment when they

24 disclosed it.

25         So in each instance our approach was to look

1  at the function and then look in the specification and

2  say, What is the algorithm that can be distilled from

3  all of this structure that's disclosed, with the

4  operations that are described, and how can the Court

5  come away with something, you know, that is workable

6  and a jury can understand and is consistent with the

7  law that the Federal Circuit has announced starting

8  around 2005 with respect to what's required for an

9  algorithm.

10            Let me just step back a little bit, Your

11  Honor, and tell you how we got to this position.  We

12  tried this case in front of Judge Brinkema.  We didn't

13  need to specify an algorithm.

14            THE COURT:  We did what?

15            MR. ROBERTSON:  Excuse me?

16            THE COURT:  We did what?

17            MR. ROBERTSON:  We did not need to specify an

18  algorithm when we tried it in front of Judge Brinkema.

19            THE COURT:  Why?

20            MR. ROBERTSON:  Because, frankly, the Federal

21  Circuit sort of changed the rules on us in 2005 when it

22  came out with the Harris v. Ericcson case.

23            What Judge Brinkema did -- and I can show the

24  Court, I believe it's at Tab 10 of our opening brief

25  starting at about page 21.

1          THE COURT:   These are the instructions?

2          MR. ROBERTSON:   Yes, Your Honor.

3          See, there's a number of these

4    means-plus-function claim elements there.   At the time

5    these were largely not in controversy.   In fact, Ariba

6    didn't even oppose these constructions.   And what Judge

7    Brinkema does, for example, we're talking about the one

8    at the top, "Means for searching for matching items

9    among the selected product catalogs."

10          She identifies the function.   "Searching for

11   matching items among the selected product catalogs."

12   Then she finds corresponding structures to be search

13   programs or modules operating on a computer system with

14   access to data or a database or other file system and

15   their equivalents.   And then she provides examples in

16   the specification from which she discerned that.

17          Now, that was Judge Brinkema's construction.

18   You'll see it's fairly consistent with all of these.

19   In 2005, the Federal Circuit came out with the Harris

20   v. Ericcson case.   For the first time they really

21   articulated that when you're going to use a

22   means-plus-function element for a computer software

23   implemented program, you need to specify this

24   algorithm.

25          Quite frankly, a lot of people, including,

1  I'm sure, a few federal judges, were scratching their

2  head and saying, What exactly do they mean when they

3  say you have to disclose an algorithm.

4        We looked at this when we came to Judge

5  Spencer.  Remember, this Harris case came out after

6  Judge Brinkema, right before the Markman hearing in

7  Judge Spencer.

8        THE COURT:  What does "algorithm" mean

9  according to the Federal Circuit?  In Ericcson, it

10 defines it, right?

11        MR. ROBERTSON:  I'm not sure it precisely

12 does, but if someone wants to direct me to it, I have

13 the case right in front of me.

14        You know, surprisingly, what Ericcson does

15 when it's looking for algorithm, it looks to at least,

16 and I think I counted up, five different sections of

17 the patent and three figures.

18        THE COURT:  Does "algorithm" have any

19 different meaning in the computer world than it does in

20 any other part of the world?

21        MR. ROBERTSON:  I mean, I think the

22 definition can be applied both to the computer world

23 and the non-computer world.  In fact, I think we gave

24 you Microsoft's -- this is slide 48 -- Microsoft's

25 computer definition.

1          THE COURT:  Excuse me just a minute.

2          Does your computer hook to Skip's printer?

3          MS. WAGNER:  Yes.

4          THE COURT:  Okay.

5          What's the best source to get "algorithm"

6    defined?  Mr. McDonald, do you have it?

7          MR. ROBERTSON:  If I can reference you to

8    page 48 of our slides, Your Honor.

9          THE COURT:  Okay.  The "Microsoft Computer

10   Dictionary."

11         MR. ROBERTSON:  Yes, sir.  We also in our

12   briefs gave you "Webster's Computer Dictionary"

13   definition.  But I like this one.  It's a finite series

14   of steps for --

15         THE COURT:  Sequence of steps.

16         MR. ROBERTSON:  "Finite sequence of steps for

17   solving a logical or mathematical problem or performing

18   a task."

19         THE COURT:  Do you agree with that, Mr.

20   McDonald?  Is that the definition of "algorithm"?

21         MR. McDONALD:  Yes, I think that's

22   appropriate, Your Honor.

23         THE COURT:  All right.  So what your task is

24   as the person who's propounding what this algorithm is

25   is complicated because your patent was written before

1    Harris v. Ericcson was decided.

2             MR. ROBERTSON:  Yes, sir.

3             THE COURT:  But that doesn't obviate the need

4    of the patentee to go through and say, Okay, these are

5    the sequence of steps, not these are examples of things

6    I do where they appear.  You have got to go through the

7    patent and show me either in one place or logically

8    connected by connective tissue of meaning how it is

9    that there is a sequence of steps for solving a logical

10   or mathematical problem or performing a task.

11            First thing, you say, "What is the task?"

12   The task is this.  Next thing, "Here are the steps.

13   Column A, column B, column C, Figure 2."

14            And that's what I think you-all have to do.

15   That's not what I do.  I will then decide whether I

16   agree that what you've done is that or not.  But we

17   have got here in this case right now, it seems to me,

18   is a lot of things that sort of seem to fit together in

19   the sense that they have some relationship one to

20   other, but they don't actually come across as a finite

21   sequence of steps for solving a logical or mathematical

22   problem or performing a task.  And I think you, based

23   on your brief, have to agree that that's true.  That is

24   that we're kind of short here.  I'm playing with a

25   short deck here.

1          MR. ROBERTSON:  I think the problem is these

2    guys were describing how they did it on the actual

3    embodiment that they invented.

4          But let me just take means for searching for

5    selected matching items, Your Honor.  The patent

6    describes a graphical user interface.  You're sitting

7    at a computer, almost like you brought up Google on

8    your screen from your Web browser.  And there's a query

9    box.  The patent describes where you put a query box

10   in.  Then it says you can enter search criteria.  For

11   example, a catalog number or part number, partial

12   textual description.  All of that is set forth in the

13   patent.

14         Then what happens is it describes how you

15   communicate that search criteria to the search engine

16   module.  Then you query the data fields for that term

17   that you put in there.

18         THE COURT:  All right.

19         MR. ROBERTSON:  That's the searching for

20   selected matching items.

21         THE COURT:  Where will I go find that?

22   That's a very cogent explanation of a task, but where

23   is it?  It's not in your brief.  It's not in this

24   patent.  It's in your head.  And as Justice Marshall

25   said in a case I witnessed one time when I was watching

1   the Supreme Court, "I can't cite what's in your head."

2          MR. ROBERTSON:  Respectfully, Your Honor, I

3   think it is in our brief.

4          THE COURT:  Where?  If it is, I didn't mean

5   to insult you, but I didn't see it.

6          MR. ROBERTSON:  Well, I direct you back to

7   Exhibit 1 again, Your Honor, which we referenced in the

8   brief, which we tried to set forth, for example, in the

9   "means for searching for matching items among the

10  selected product catalogs" the places where you would

11  be able to perform that task.  That structure I just

12  described, the query fields, the ability to input

13  certain keywords or textual descriptions.  I want to

14  buy ties.  And then to search that against the data

15  fields.

16         That's what we believe we have set forth in

17  the column and line numbers that are, for example, at

18  page 4 of Exhibit No. 1.  Does it require that the

19  Court move about the specification?  There's no

20  question.

21         THE COURT:  How do I know that?  I mean, you

22  moved about.  You moved about for a reason.  You

23  probably moved about, my guess, is with the aid of

24  somebody who is an expert in the field, that's my

25  guess, in the computer field.  But to me, you have to

1   show me what's the task?  Okay.  What's the task or

2   problem that we're trying to solve?

3          MR. ROBERTSON:  We're trying to search for

4   matching items among the selected product catalogs.

5          THE COURT:  In other words, the task in the

6   definition that you offered, slide 48, or the

7   problem -- it really isn't a mathematical problem, is

8   it?  It's just a task, isn't it?

9          MR. ROBERTSON:  That's right, sir.

10          THE COURT:  So the task is the function,

11   right?

12          MR. ROBERTSON:  Yes, sir.

13          THE COURT:  Now, the function then is the

14   algorithm, and the algorithm is --

15          MR. ROBERTSON:  It's the sequence of steps.

16          THE COURT:  Is the sequence of steps.  So the

17   sequence of steps -- it seems to me, that if the

18   patentee is claiming a sequence of steps, he says,

19   Okay, first, you do this.  Second, you do this.  Third,

20   you do that.  Fourth, you do that.  That's the clearest

21   way you do it.

22          Now, if the patent owner hasn't done that,

23   but paragraphs that follow one after the other in

24   sequence, the description is rendered, then they don't

25   have to say first, second, third, fourth, as long as

1  the text suggests that it is a sequence.

2         That's not what's done here.  What's done is

3  there's a jump from one column and line reference in

4  one place to another column and line reference in

5  another place.  And if you read the column and line

6  references, there's no connection between the first

7  entry and the second entry in the patent.

8         Where is that connection being made?  That

9  connection is being made in your argument.  Most of the

10 time not in the brief but in the oral argument and in

11 the slides.  And that's what happens.  And,

12 unfortunately, I don't think it fits the bill here.

13        Don't you think maybe we ought to start all

14 over again and go back and do it right?

15        MR. ROBERTSON:  No, Your Honor.

16        THE COURT:  And this may be -- I don't want

17 you to take this as personal criticism because I will

18 tell you, you're not the only one who's doing this.

19 But when you see it time after time, and you see sort

20 of the madness of trying to do what the Court of

21 Appeals wants us to do by all this cobbling together,

22 what you begin to realize is you're writing patents for

23 people and saying things about their structure on the

24 basis really of things that aren't in the record.

25 Because you can't connect cobble piece No. 1 to cobble

1   stone No. 2 except by way of reference to what the

2   lawyers are telling you.

3          And then you pick the best that makes the

4   most sense to you, but it doesn't necessarily really

5   always fit the patent.  And I'm trying to get out of

6   that mode and get something that really gets back to

7   what the Federal Circuit asks us to do.  And it sort of

8   seems to me that maybe it's time to retrench and start

9   again and do what you're doing here but do it in the

10  briefs in a textual way.  And what I think will happen

11  is if we do that, you will realize that your

12  obligations under Rule 11, and intellectual honesty

13  generally, will cause you to say, because you're being

14  made to focus this way, and just logic will compel you

15  to the conclusion, Well, yeah, maybe these are the

16  descriptions of the structure.  And it will be one,

17  two, three or four small items instead of this cobbled

18  together thing of six items that have some connection

19  in the mind of some expert.

20          I did not mean to suggest you violated any

21  rules in saying that.

22          MR. ROBERTSON:  I thank you, Your Honor, for

23  that.

24          I do appreciate the Court's observation and

25  certain that, in your words, we have to cobble

1  something together.  The way this thing was described,

2  a lot of these programs are interrelated.  This is a

3  computer system, Your Honor, that's going to be

4  searching a database of catalogs.  It is a computer

5  system that's then going to be building a requisition

6  of those selected items.

7          So the way the thing is written, does it

8  circle back sometimes and refer to structures and tasks

9  and descriptions that support a means-plus-function?

10  It certainly does because you can do a lot of different

11  things with this system.  You can go and do searches

12  again once you have built a requisition and you want to

13  search for other things or you want to delete what you

14  searched for and add it to the requisition.  Or you

15  only want to purchase certain of the things that you

16  have added to your requisition.

17          So this patent does a lot of zigzagging back

18  and forth to reference back to the functionality that

19  are described in these means-plus-function claims.  I

20  thought we were trying to be intellectually honest,

21  Your Honor, when we distilled this down to the

22  algorithm.

23          THE COURT:  I think you are being

24  intellectually honest.  I didn't mean to suggest that

25  you weren't.  I'm saying the combination of all those

1    things is going to make you focus in a way you haven't

2    focused before.

3           MR. ROBERTSON:  I also observe, Your Honor,

4    that perhaps you're suggesting that this is something

5    that might require expert testimony.

6           THE COURT:  It might.

7           MR. ROBERTSON:  Maybe I can make a

8    suggestion.

9           THE COURT:  It might.

10          MR. ROBERTSON:  Perhaps we need an expert

11   affidavit that says why this structure is appropriate

12   for ePlus's constructions and Lawson's is not and uses

13   the structures as a road map to walk the Court through

14   to say this is what the essence of these constructions

15   are.

16          We can do that now as part of our briefing or

17   we can defer on that, Your Honor, and do it as part of

18   any trial of this matter when these elements are being

19   discussed.

20          THE COURT:  You want me to construe the claim

21   while the jury is sitting out in the wings?  I've tried

22   that and it doesn't work real well.  I mean, on a

23   simple case.  It was a machine.

24          MR. ROBERTSON:  I guess I don't know where

25   the Court wants to go at this point.

1          THE COURT:  I'm inclined to say let's start

2    over again.  I don't want to put you needlessly to the

3    task of slaying trees and running up billable hours.  I

4    don't believe that's right for your clients or not.

5    But I do believe that -- I believe we have kind of,

6    both sides, are missing -- as far as I'm concerned, the

7    other side is in the same basic position you're in

8    almost.

9          I think that we are where we are for several

10   reasons.  And one is the patent was prepared before the

11   Ericcson decision was issued, and when the people were

12   preparing the patent they weren't necessarily preparing

13   it having in mind the need to satisfy that test.  And

14   that creates a terrible problem for lawyers trying to

15   deal with cases.  But I think it's a problem, I would

16   have thought it's a problem, that experts have dealt

17   with, too.

18          MR. ROBERTSON:  Well, I think often expert

19   testimony is brought to bear, particularly on computer

20   software implemented inventions to identify the

21   structure disclosed.  As they say, even in the Harris

22   case, they go through and point to a number of

23   different figures and columns and lines that they

24   cobbled together to come up with the two-step sequence.

25   I don't know if they had the benefit of expert

1  testimony in <u>Harris</u> or not.

2         THE COURT:  No.  I tell you what I think they

3  had the benefit of.  They had a vast staff on the Court

4  of Appeals up there of technical experts who get back

5  there in the back room and write these statements.

6  That's what really happens.  Anybody here who's clerked

7  on the Court of Appeals, that's what happens, and,

8  unfortunately, we don't have that vast technological

9  staff back here.  So guess who our staff is?  You're

10  looking at him.

11         MR. ROBERTSON:  We probably could have done a

12  better job of walking the Court through those steps, we

13  think.

14         THE COURT:  I find the same problem -- the

15  first thing is, I don't understand why we have so many

16  means-plus-function definitions that we really have to

17  get into deciding in the first place, but let's assume

18  we've got -- what are there?  Eleven or 13?

19         MR. ROBERTSON:  Yes.

20         THE COURT:  Let's assume we've the 11.  Let's

21  take the 11 and let's work through them assuming as a

22  predicate the agreement that both of you have that the

23  algorithm that has to be found in either the

24  specification or somewhere in the patent is defined to

25  be what we're talking about here.  Both of us seem to

1  be on track with that definition.

2          Then let's say what is the task we're

3  searching for.  I think we're all in agreement that the

4  task we're searching for here that's to be performed is

5  the function in each case; is that right?

6          MR. ROBERTSON:  Well --

7          THE COURT:  Or am I wrong?  I don't want to

8  do this wrong.  I want to try to do it in a way that

9  makes sense.  Isn't the task in the -- if we were to

10 apply the job that we have to the definition that

11 you've agreed upon, we first have to identify the

12 function, and the function that is to be performed is

13 the task, and the algorithm leads us in sequential

14 steps to get to the performance of that task; isn't

15 that right?

16         MR. ROBERTSON:  I think we do need to arrive

17 at what the function is first, and I think there is

18 some disagreement between the parties as to what the

19 function is.  I'll give you one example quickly.

20         THE COURT:  Hold that thought if you don't

21 mind.

22         MR. ROBERTSON:  Sure.

23         THE COURT:  And then take that, if we can

24 agree that we are going to on any claim that's a

25 means-plus-function claim take the task, and we have

 1  defined it.  I would define it as precisely as it is

 2  defined in the patent.  I think that's exactly where

 3  you go.  And if that's not understandable, then you've

 4  got a problem, but I don't think in these 11 -- I think

 5  you take the function right out of the patent.

 6          MR. ROBERTSON:  I wholeheartedly agree.  I

 7  think you take it right out of the claim.

 8          THE COURT:  Yes.  The claim is what I meant

 9  to say.  Pardon me.  Yes, I agree.  And then you say,

10  Okay, where in the rest of the patent are the finite

11  sequence of steps for solving the problem, that is

12  achieving the function?  And then you explain in words

13  of one syllable if you think there really are 16

14  different places where it appears, then it's your job

15  to explain how they fit together in a way that I can

16  understand them, and I don't have to go back and say,

17  well, I look at this column and this line, and this

18  column and this line, and keep going down the line

19  until I do all 15 of them and say this is how they fit

20  together.  That, I think, is something you all have to

21  do, and then they have to respond to that.  And I think

22  maybe that's what we need to do.

23          MR. ROBERTSON:  That's fine, Your Honor.

24          THE COURT:  Now, what were you saying?  I

25  interrupted you and I apologize.

1            MR. ROBERTSON:  I will say, just to reiterate

2    this one point, we're going to find examples of

3    structure all over this patent with layers of detail,

4    really unnecessary detail, I believe, to just identify

5    that sequence of steps to perform that task.

6            I mean, it's going to describe what kind of

7    keywords you can use to enter into it.  That's not

8    really germane to distilling down what we need to

9    arrive at which is that algorithm.

10           THE COURT:  That's not even a step.  That's a

11   definition of how you do a step.  And I don't think

12   that's part of the algorithmical problem, assuming

13   that's such a word, that we have to solve.

14           MR. ROBERTSON:  It certainly needs to make a

15   -- selection of matching items needs to receive

16   inputted data, and that's described in there.

17           THE COURT:  You really are good at getting

18   back into your argument, aren't you?

19           MR. ROBERTSON:  Well, I want to do what you

20   want, what makes your job easy.

21           THE COURT:  This job is never going to be

22   easy.

23           MR. ROBERTSON:  What I was going to suggest

24   is we have taken these steps, and I guess I will direct

25   the Court for each step where I think that is

1  adequately described in the specification as to how

2  that task ultimately gets performed.

3         We've gone through and we've told you in each

4  case is the function.  In every case.  We said it's

5  actually the function that is laid out in that claim.

6  Lawson, on the other hand, imports some things into the

7  functionality instead of just the actual words.  Then

8  we have tried to say, Okay, what's doing it?  Do we

9  rely on a particular type of operating system?  No,

10 that's not what the patent is all about.  There were

11 lots of operating systems that can be used.  Does it

12 have to be a particular type of search engine?  No,

13 they used one that was commercially available.  It

14 doesn't have to be that.  Algorithms aren't about

15 describing what hardware.

16        Does it have to operate on a local computer

17 because there's one example of that?  No, because it

18 also illustrates that it's a network invention.  And we

19 have to describe that.

20        Unfortunately, the Federal Circuit has told

21 us not only does it apply to specific embodiments, it

22 has to apply to all the embodiments.  So if there's

23 different embodiments, it can cover those as well.  In

24 this instance we say not only was there a local

25 computer embodiment, there's a networked embodiment as

1  well.

2           So I'm happy to do what the Court wants.  I

3  think I'd like to be able to deliberate and provide

4  supplemental briefing to Your Honor that supports what

5  we say the algorithm is with respect to that.

6           THE COURT:  If we do that, will we then be

7  completed with the means-plus-function interpretation

8  construction process?

9           MR. ROBERTSON:  I think so.

10          THE COURT:  Do you think we need experts?  I

11  mean, I don't think you do based on -- I'm not sure you

12  do based on the number of places that you cite, but if

13  do you, you don't have to decide today.

14          MR. ROBERTSON:  Well, you know, Your Honor, I

15  had the benefit of trying this case twice, and I've

16  also had the benefit of having experts who have been

17  sitting with me and can walk through this and having

18  talented colleagues who have backgrounds in electrical

19  engineering and computer science.

20          So to me, having read this patent so many

21  times, I can kind of navigate through it, but I

22  understand the Court doesn't have the benefit of having

23  done that and shouldn't have to do it.

24          THE COURT:  All right.  But there are a

25  couple of things I think we can resolve now.  One is

1  this local computer thing.  I don't understand how you

2  operate any of this without a local computer because I

3  must just not understand what a local computer is.  But

4  I don't think from reading it that the fact that one

5  uses -- is a local computer the one at my desk?  Is

6  that what a local computer is?

7           MR. ROBERTSON:  It can be.  It can be part of

8  like a large local area network.  This courthouse

9  probably has a local area network, I'm sure.  Your law

10 clerk has a computer, and there are central servers

11 that probably have programs operating on it.

12          THE COURT:  So "local computer" means some

13 kind of network, not the computer sitting at my desk?

14          MR. ROBERTSON:  Your computer is a networked

15 computer.

16          THE COURT:  I'm talking about just what's

17 sitting at my desk.  That's a computer.

18          MR. ROBERTSON:  It is.

19          THE COURT:  Now, it connects with something

20 that makes it operate and I can get places.  Is "local

21 computer" the same basic thing as "local area network"?

22          MR. ROBERTSON:  The embodiment, which is

23 Figure 1A of this patent, is simply a computer standing

24 alone that is not networked.

25          Figure 1B --

43

1        THE COURT:  What does that computer do?  How

2  does it do what needs to be done here?

3        MR. ROBERTSON:  Quite frankly, Your Honor, I

4  think the claims are agnostic as to whether it's a

5  local computer or a network computer in a sense.  It's

6  not about -- what Lawson argues is, Well, a local

7  computer is initiating certain of the entries.  They

8  don't eschew a networked embodiment, they say, in their

9  briefs, although I didn't understand that initially.

10        But then they talk about where the programs

11  are operating.  And the patent describes that the

12  programs can be operating on a local computer or they

13  can be operating on the server.  And there were

14  examples of that in the specification.

15        So it doesn't really matter where the

16  programs are doing their logic as long as they are

17  doing it somewhere is our view.

18        That structure, adding a local computer

19  versus a server versus a networked embodiment are not

20  really germane to the means-plus-function algorithm the

21  Court needs to discern.  That's our position.

22        If the Court would like to see where it's

23  described that the programs can operate on the server

24  as well, I can direct the Court to that --

25        THE COURT:  "Server" means Internet?

1          MR. ROBERTSON:  "Server" is probably a

2    computer that can be running programs that are then

3    communicated to someone's individual networked

4    computer.

5          THE COURT:  Yeah, I'd like to see that.  It

6    just seems to me that in ordinary for this system to

7    work as it's described, for the invention to achieve

8    its objective, it has to be connected with catalogs

9    that are somewhere beyond the local area network that

10   are beyond the local -- this is certainly not a

11   technical explanation, but you've got this vast body of

12   data out there somewhere.  Where is that vast body of

13   data residing?

14         Well, it resides on what I would refer to as

15   the Internet.  So your task is to go from where I am to

16   get to that data, and that's the only real -- isn't

17   that what happens here?

18         MR. ROBERTSON:  Maybe it would help if we

19   could show you slide 67, which is Figure 1B.

20         THE COURT:  Okay.

21         MR. ROBERTSON:  I'll hand the Court a copy.

22         THE COURT:  You don't have slide 67.

23         MR. ROBERTSON:  I forgot to hand it to, Your

24   Honor.

25         THE COURT:  You quit at 62.

1          MR. ROBERTSON:  Yeah, I made so additional

2    slides since last Friday, Your Honor.

3          THE COURT:  Thank you.  Okay.  67.

4          MR. ROBERTSON:  This is a figure that is

5    describing the networked embodiment.  You'll see

6    there -- actually, the databases that you were talking

7    about that have that information, and there can be

8    multiple databases, are actually - what this is

9    illustrating - are basically operating on that server.

10   That's that double-headed arrow.

11         THE COURT:  236 connects to 200.

12         MR. ROBERTSON:  Yes.  Then there's also the

13   local computer that's communicating with the server.

14         THE COURT:  220 connects to 200?

15         MR. ROBERTSON:  Yes.

16         THE COURT:  Where am I?  I'm the guy who is

17   down there trying to order up what I'm going to order.

18         MR. ROBERTSON:  You're sitting there with

19   that local computer with your monitor, 222, your

20   keyboard, 224, and in this case you also have a

21   printer, 226.

22         THE COURT:  Okay.  So this tells us that a

23   local computer really means the computer at my desk and

24   the things it takes to operate my computer, right?

25         MR. ROBERTSON:  In a sense.  What's happening

1   when this networked embodiment is working is you're

2   getting a presentation layer on your local computer.

3   You're seeing what the program is depicting.

4           For example, in the patent they talk about

5   using a graphical user interface.  And that's a display

6   that shows up on your computer that you can then enter

7   the keywords into, for example, to search the databases

8   that are accessed through the server that have the

9   items, the catalog items, that are for sale.

10          THE COURT:  Where are the databases here?

11  This is what?  Sears database?  No, not Sears.  But it

12  could belong to any one of several entities that have

13  products for sale, right?

14          MR. ROBERTSON:  It could.

15          THE COURT:  Whether they make the products or

16  supply the products or just are straight out retail

17  vendors or wholesale distributors.  They've got this

18  stuff on their computer, and it connects with the

19  server so that I can access it with my computer, right?

20          MR. ROBERTSON:  In one example that was a

21  Web-based network, that would be an example.

22          THE COURT:  There are other ones.

23          MR. ROBERTSON:  There are other examples

24  where, just for example, my client sells his software,

25  and they will provide a server, a hardware, to the

1  customer that they will load on there in the memory in

2  the databases.  They will load catalog items.

3          So you have a dedicated computer with catalog

4  databases that have information about items for sale.

5          THE COURT:  If I want to update what's on

6  that catalog, I have to get an update from somebody to

7  update it somewhere, right?

8          MR. ROBERTSON:  Yeah.  My client is someone

9  who actually provides those services if you want to

10 update your catalog information, if new items become

11 available, or you want to obtain items from different

12 vendors.

13         THE COURT:  Is it oversimplified to say that

14 I get a disk from your client, plug it into my

15 computer, and then I have everything that's on that

16 disk, but if I want to get an undate of those, I have

17 to get a new disk or some different application to

18 update what's there?

19         MR. ROBERTSON:  It's probably oversimplified,

20 Your Honor, but for purposes of our discussion, that

21 that would not be an inappropriate way to look at it.

22         THE COURT:  What's a host computer as opposed

23 to a local computer?  210 on Figure 1B.

24         MR. ROBERTSON:  May I just consult for one

25 second?

1            THE COURT:  Sure.

2            MR. ROBERTSON:  I understand a host, as

3  described in the patent, as being the supplier of the

4  goods.

5            THE COURT:  I'm not sure how that works with

6  the catalog data.  I would have thought that 236 would

7  have been up there next to the host computer and

8  connect with 210 and both of them directly or one or

9  the other would connect with the server.

10            MR. ROBERTSON:  The host computer can

11  communicate to the local computer.  The local computer

12  is communicating with the server so the data can be

13  transferred.  It's being stored in the catalog

14  databases.

15            THE COURT:  I see what you're saying.  Well,

16  I think I do.  It may be very ambitious of me to say I

17  understand.  All right.

18            MR. ROBERTSON:  Your Honor, I guess --

19            THE COURT:  So local computer is a limitation

20  that comes from where?

21            MR. ROBERTSON:  We don't think it's part of

22  the algorithm, Your Honor.  It comes from Lawson.

23            THE COURT:  Well, a local computer isn't a

24  step.  A local computer is something you use to

25  accomplish one of the steps.  It's just part of what

1  you use to accomplish a step, isn't it?

2           MR. ROBERTSON:  I couldn't agree with you

3  more, Your Honor.  We think it's unnecessary to the

4  algorithm.  We think it's inappropriate.

5           If you look at the cases like Harris v.

6  Ericcson, they don't say where the program that's going

7  to perform the algorithm is functioning.  They just say

8  here's what it's doing.

9           After you've looked at all those figures and

10 structures that are all disclosed, they take us to task

11 in their brief.  They're saying, well, we forget that

12 it's describing all these things and point out all

13 these figures, but at the end of the day, it says, The

14 processor (unintelligible) --

15          THE COURT:  Slow down.  Ms. Daffron is good,

16 but she's not even coming close to that.

17          MR. ROBERTSON:  Sorry.  It says, The

18 microprocessor -- in fact, the means-plus-function

19 element is time domain processing.  And it says it's a

20 microprocessor program to carry out a two-step

21 algorithm, which (1) the processor calculates generally

22 non-discrete estimates, and (2) selects the discrete

23 value closest to the estimate.  And you're done there.

24          There was no description of hardware or

25 communication protocols or all but the thing that we

1   think unfortunately litter, you know, the claim

2   constructions that Lawson suggested.  In fact, they

3   suggest that they are really the Lawson SAP

4   constructions that Judge Spencer arrived at.

5           I think at one point, Your Honor, just for

6   purposes of illustration, we did a red line off of

7   Judge Spencer's constructions.  And that starts at

8   slide 56.  And the things that are red-lined out are

9   deleted from Judge Spencer's construction, and the

10  things that are bold underlined are added.  And you see

11  there's not really much left of what judge Spencer's

12  construction was.  And including the fact that they

13  have added to the function this requirement that you

14  have to search in selected two or more product

15  catalogs, which the claim doesn't recite.

16          So we think they have improperly altered the

17  function.  We think any suggestion that this is in some

18  way faithful to what Judge Spencer did is demonstrably

19  incorrect.  In fact, you will recall Lawson eschews any

20  of Judge Spencer's constructions with regard to the

21  general terms he construed.  They think all of those

22  are wrong.  They also think all of Judge Brinkema's

23  constructions were wrong.

24          On means-plus-function at least three of them

25  they say no structure is apparent.  There's no jurist,

 1  Judge Brinkema or Judge Spencer, who has ever said

 2  there was no structure present for the claim

 3  means-plus-function.  And they have altered, as you'll

 4  see here, at least four of their constructions such

 5  that there's really not much left when you look at

 6  Judge Spencer's constructions.

 7          Now, respectfully, we think Judge Spencer's

 8  constructions were wrong, and we asked him to vacate

 9  that order at the conclusion of the SAP trial.

10          THE COURT:  Is there something that shows

11  that he vacated it because he thought it was wrong or

12  did he vacate it because you-all had settled the case?

13          MR. ROBERTSON:  I don't know.

14          THE COURT:  I.e., it was part of the

15  settlement.

16          MR. ROBERTSON:  I think certainly, Judge, it

17  was raised in order to facilitate the settlement.  The

18  defendant suggested that we colluded.  If we colluded,

19  well, my coconspirator is the law firm of Troutman

20  Sanders because they also represented SAP and Mr. Carr

21  was involved.

22          What we wanted --

23          THE COURT:  Was Judge Spencer a

24  coconspirator, too?

25          MR. ROBERTSON:  No, sir, I think Judge

1   Spencer actually --

2          THE COURT:  He probably just washed his hands

3   of it and was thankful to be done, wasn't he?

4          MR. ROBERTSON:  Well, I think he heard the

5   evidence at trial.  I think there must have been some

6   element of that, Judge.  But he heard the evidence at

7   trial, and we think the evidence demonstrated that the

8   construction was wrong, particularly with respect to,

9   for example, this local computer issue.  And we wrote

10  our brief.  We provided it to Your Honor.  And he wrote

11  an order saying, "For the reasons set forth in ePlus's

12  brief."

13         THE COURT:  He did include criticisms of the

14  findings in view of the testimony at trial, right?

15  Your brief said these were your constructions and the

16  testimony at trial said --

17         MR. ROBERTSON:  We said the testimony at

18  trial proved that the SAP constructions that were

19  adopted were incorrect.

20         THE COURT:  Right.

21         MR. ROBERTSON:  And --

22         THE COURT:  And he said for the reasons set

23  forth in your brief --

24         MR. ROBERTSON:  Yes, sir.

25         THE COURT:  It wasn't a situation where you

 1   ran afoul of that -- what's the name of the case that
 2   Justice Scalia -- it's the case that says you can't
 3   vacate orders as part of settlement because once they
 4   are decided, they are part of the literature.

 5           MR. ROBERTSON:  Well, there actually was a
 6   Federal Circuit decision that said one of the ways you
 7   might want to avoid any precedential value from an
 8   incorrect Markman is to ask the judge to vacate the
 9   order.  I don't know --

10           THE COURT:  Was that before or after Justice
11   Scalia said you can't do that?

12           MR. ROBERTSON:  I'm not certain, Your Honor.

13           THE COURT:  You might look at -- I can't
14   remember the name of the case.  It was in the 1990s.
15   It was bank of somebody.  And there actually then arose
16   some proposed changes to the federal rules about how
17   you evacuate vacating an order, but those rules don't
18   change the basic premise of that decision.

19           In essence, as I read it, once you call upon
20   a court to rule on something, the court rules, it's
21   part of the public domain, and you as private settling
22   parties can't come back in there without a really good
23   reason and show that it's to be set aside.  And I don't
24   know whether the Federal Circuit's decision that you're
25   talking about, I don't know that decision, was rendered

1    before or after that opinion, but if it's after it, I'm

2    sure that the Federal Circuit must have had some way of

3    harmonizing it with the Supreme Court's principles.

4          MR. ROBERTSON:  I'm pretty sure it would be

5    after the date that Your Honor recalls for that Supreme

6    Court decision.  I think it may be because it's

7    simply -- the exception might be it's just simply

8    contrary to the law and contrary to the facts.  But

9    I'll go research that decision.

10         Along with the local computer, Your Honor,

11   the only thing I was going to suggest is perhaps I

12   haven't persuaded Your Honor why our constructions are

13   correct, and I understand my marching orders with

14   regard to those.  I don't know if it would be helpful,

15   but I thought I might try to emphasize why we think

16   Lawson's are incorrect.

17         THE COURT:  Go right ahead.  Maybe we ought

18   to take a little recess.  The court reporter has been

19   at it here for a while and it isn't really easy on her.

20         Thank you all very much.  We'll take a

21   twenty-minute recess.

22         (Recess taken from 3:10 p.m. to 3:30 p.m.)

23         THE COURT:  All right.

24         MR. ROBERTSON:  Thank you, Your Honor.

25         Before we broke, I was going to move to part

1  of my argument where I was going to actually rebut some

2  of Lawson's means-plus-function constructions and give

3  you illustrations as to why I think they were

4  incorrect.  And to do that I have some additional

5  slides I'd like to hand up to Your Honor to illustrate

6  my points.

7            THE COURT:  All right.

8            MR. ROBERTSON:  They start with slide 64.  We

9  will probably be taking them in different orders as I

10  focus on --

11            THE COURT:  I have three sets of them here;

12  is that right?

13            MR. ROBERTSON:  Yes, sir.

14            THE COURT:  What is the third one for?

15            MR. ROBERTSON:  If you don't need it, I'll

16  take it back.

17            THE COURT REPORTER:  I'll take it.  Thank

18  you.

19            MR. ROBERTSON:  Judge, if I could, I'd like

20  to go back to claim 3 of the '683 Patent, which in our

21  general book of PowerPoint slides is the first page

22  right under Tab A.  In particular, just for purposes of

23  my argument, I'd like to focus on that third element

24  there, which is the means for searching for matching

25  items among the selected product catalogs.

1          THE COURT:  It's claim 3 of the '683?

2          MR. ROBERTSON:  Yes, sir.  It's right under

3   Tab A in our large book, the first page right there.

4          THE COURT:  You mean the "it's" is the

5   patent, you mean?

6          MR. ROBERTSON:  No, this was our large book

7   that we had put together.  I have all the claims that

8   are at issue reproduced at Tab A.

9          THE COURT:  All right.  I have all the claims

10   marked and outlined.

11          MR. ROBERTSON:  I'm focusing on this claim 3.

12   It's a means-plus-function claim.  The preamble is

13   electronic sourcing system.  You'll see the first

14   element there says you need at least two product

15   catalogs containing data relating to items associated

16   with the respective sources.

17          THE COURT:  Tab A.  All right.  I see it,

18   yes.

19          MR. ROBERTSON:  The first thing that is

20   absolutely required is you have to have at least two

21   product catalogs, data for items, and their associated

22   sources.  And then you're going to have this ability to

23   select the product catalogs to search, and then you

24   need to have this ability to search for matching items

25   among those product catalogs you select.

1          That's the one I want to focus on for

2    purposes of my argument.  This third element there, the

3    means for searching for matching items.  And now if I

4    could direct you to page 54 of our book and 55.

5          THE COURT:  All right.

6          MR. ROBERTSON:  These two pages, this is

7    Lawson's proposed construction for that term, "means

8    for searching for matching items among the selected

9    product catalogs."  First, you'll see that the function

10   that they described there is different from the actual

11   recited function.  They import that you have to search

12   for matching items among selected two or more product

13   catalogs.  It's not the function that's expressly

14   recited by the actual claim.

15         They have brought in the words "two or more"

16   to make that a requirement.  And we would submit, sir,

17   I think you observed before, that's improper.  You

18   don't add additional elements to the functionality when

19   they are not in fact required.

20         In fact, they also do it for the means for

21   selecting the product catalogs to search.  They say you

22   need to search or select two or more product catalogs

23   to search.  No. 1, I would just reference the Court

24   back to the claim again to show why that is improper.

25   If you go to the claim, you've got a system that has to

1  have at least two product catalogs.  In other words, it

2  can have two or more, but the minimum amount it needs

3  is two.  And then you are going to search for matching

4  items among the selected product catalogs.

5       If you only have two catalogs, and you're

6  going to search among those two, you can clearly be

7  searching one.  The construction that would add

8  different functionality is improper under the

9  Microchemical case that we cite to the Court.

10       So the system can only have two catalogs, and

11  the specification makes clear that you can select only

12  one product catalog to search.  If I might, Your Honor,

13  I've already called this out right from the

14  specification, but if you'll look at slide 84, which is

15  one of the new slides I just handed you, to support

16  it's construction for the fact that you have to search

17  two or more catalogs, Lawson actually relies on the

18  language right here that starts at line 6 that says,

19  "Any of the above fields may be filled."  It's not

20  actually the highlighted language.  It's "Any of the

21  above-listed fields may be filled by

22  requisition/purchasing system 40 prior to requesting a

23  search of catalog database 36 by search program."

24       I don't quite follow their argument as to why

25  that requires two or more, but you'll see in the

1  highlighted lines just below that, it says, "The fields

2  that are filled with data will assist search program 50

3  in executing its first search against a specific

4  catalog contained in catalog database 36."

5         So that's clearly demonstrating that a

6  specific catalog, that is one catalog, contained in the

7  catalog database may be searched.  If I could just

8  reference you to slide 83, as well.  The column line

9  numbers are noted there as column 10, lines 16 to 20.

10  It also establishes that one catalog need only be

11  searched.  It says, "If no catalog delimiting

12  information is entered for the item desired to be

13  requisitioned, interface 60 would be set up to search

14  only the Fisher catalog," that is one catalog, "or,

15  alternatively, to search all catalogs in catalog

16  database 36."

17         THE COURT:  In other words, the default would

18  be to search only the Fisher catalog?

19         MR. ROBERTSON:  Yes, sir, in that instance.

20         THE COURT:  Or to search all catalogs?

21         MR. ROBERTSON:  That's right, Your Honor.

22         THE COURT:  How is that a default if it's two

23  choices?

24         MR. ROBERTSON:  Well, it can be programmed to

25  do either.  You just set it ahead of time.  You say if

60

1    I don't enter anything, I just want to search the

2    Fisher or if I don't enter anything, I want to search

3    everything.

4           THE COURT:  You discern that by looking at

5    the words "interface would be set up"?

6           MR. ROBERTSON:  Yes, sir.

7           THE COURT:  Which means that I would set it

8    up as my default.  It would be the Fisher catalog or

9    all catalogs?

10          MR. ROBERTSON:  Yes, sir.

11          THE COURT:  If I don't put in the names of

12   any.

13          MR. ROBERTSON:  And I believe there are other

14   descriptions of that as well.  I'm just trying to

15   provide the Court with some illustrative examples.

16          If you go to slide 86, you'll see that this

17   is part of that interface where you can identify or

18   search for, for example, by vendor name.  That's in

19   Appendix VII to the '683 Patent, column 22.

20          So you can actually just enter the vendor

21   name.  I want to search Joseph A. Banks, and that would

22   search against that single catalog as part of the

23   selection process.

24          So under the law, we think it's improper for

25   them to import different functionality into the

1   expressly set forth function, and we also think it's

2   inconsistent with that which is disclosed in the

3   specification.

4          And just by the final observation, it's also

5   contrary to Judge Brinkema's claim construction which

6   she indicated clearly that the claim terms contemplate

7   a system through which the user could select to search

8   just one catalog from two or more available catalogs.

9   And that is cited in the Young declaration.  Her jury

10  instructions.

11         The other error we think that is present in

12  Lawson's claim constructions, if I can just direct you

13  back to page 54 again, which is their construction for

14  means for searching, is this running on a local

15  computer issue we talked about.  I don't want to beat

16  that to death, but I believe I did show you the

17  networked embodiments, and there are examples

18  throughout where it simply doesn't need to run on a

19  local computer.

20         THE COURT:  What is the difference here?

21  What's the difference?  What's the import in this case

22  of taking Lawson's construction "two or more product

23  catalogs"?

24         MR. ROBERTSON:  I think they're going to say

25  that there's not a searching of two or more product

1   catalogs.  They're going to say that in some instances

2   they are only searching one product catalog and that

3   would not be an infringing instance.

4           What's required is that the system as it says

5   right in the claim have two or more catalogs.  It's not

6   required that you select two or more or search two or

7   more.

8           THE COURT:  Well, it says the system

9   comprises at least two product catalogs.  And then it

10  has a means for selecting the product catalogs to

11  search, connoting two catalogs.  More than one.

12          MR. ROBERTSON:  Well --

13          THE COURT:  It's plural.  It's catalogs.  The

14  product catalogs to search.  That's plural.  Right?

15          MR. ROBERTSON:  In the context I think, Your

16  Honor, if you had a dozen and you wanted to search one,

17  you could do that.  If you only had two because you're

18  only required to have two, you'd search one of those

19  two.

20          THE COURT:  No, you'd search both.

21          MR. ROBERTSON:  Well, you wouldn't have to.

22          THE COURT:  Means for selecting the product

23  catalogs to search.  Are you saying selecting from

24  among is what that means?

25          MR. ROBERTSON:  It says "searching among the

1  selected product catalogs."

2         THE COURT:  No, the first one is selecting

3  the product catalogs to search.

4         MR. ROBERTSON:  I understand, sir.  I don't

5  think that connotes that you couldn't search one if you

6  had two.

7         THE COURT:  That's not the point.  It means

8  you select the product catalogs to search.  And you're

9  selecting more than one, right?  Selecting, not

10 searching, but selecting.

11        MR. ROBERTSON:  I don't think necessarily if

12 you had only two, you would need to select both of them

13 under that construction.

14        THE COURT:  Well, it says so.  Selecting the

15 product catalogs to search.  Your function is to select

16 the product catalogs, which is by the author's choice

17 of words, more than one.  Then the issue is:  Do you

18 have a means for searching matching items among the

19 selected product catalogs?  And what you're saying is

20 that the word "among" there shows that you can search

21 only one, right?

22        MR. ROBERTSON:  I believe that's correct,

23 yes.

24        THE COURT:  So even though I select two or

25 more, you still have a means to search only one, right?

1              MR. ROBERTSON:  I think -- yeah, that's
2    correct, Your Honor.  I also think that selecting
3    product catalogs, when you're saying that, if you're
4    talking about two, you really are -- the plural there
5    actually can connote the singular is my point because
6    if you have two, and I need to make a selection
7    process, why couldn't I just select one?
8              THE COURT:  Because you're selecting -- it
9    tells you what you have to select.  Select what?  You
10   select product catalogs to search.  You have selected
11   I'm going to search Joseph Bank and L. L. Bean.  Then
12   you have to have as a function for searching a means
13   for searching the matching items among the selected
14   two.  So you can look at one and then you can go to
15   another one or you can look at both of them at the same
16   time conceptually, I guess.  Is that what it says?
17             MR. ROBERTSON:  So my suggestion is, Your
18   Honor, that in the means for searching matching items
19   among the selected product catalogs, it would be
20   improper to import into that function the requirement
21   of two or more catalogs.  That's where you find it in
22   Lawson's construction.
23             The other point I want to make with respect
24   to Lawson's constructions is they often have more steps
25   than are necessary to perform the recited function.

1    Again, if we're looking, for example, in claim 3, you

2    have the step "means for building a requisition using

3    data relating to selected matching items and their

4    associated sources," and the claim language there

5    requires that there already be selected matching items.

6              THE COURT:  What part are you reading from

7    now?

8              MR. ROBERTSON:  The means for building the

9    requisition using data relating to selected matching

10   items and their associated sources.

11             THE COURT:  You have already selected the

12   matching items?

13             MR. ROBERTSON:  Yes, sir.

14             What Lawson does is it improperly imports

15   steps of initiating a search for matching items and

16   displaying a hit list of search results, selecting the

17   items, and then generating an order list.  These are

18   all in Lawson's construction for means for building a

19   requisition using data related to selected matching

20   items.

21             But the search, as you'll observe, has

22   already been conducted and the items have been

23   selected.  So to repeat all those steps as part of the

24   algorithm would actually be to require them to be

25   repeated in that one means for building a requisition.

1           The search is performed by the means for

2  searching step, and the order list is generated by the

3  means for generating an order list.  So it's improper

4  to repeat steps that have already occurred in a

5  subsequent step and require an additional search when

6  that search has already been conducted.

7           Actually, if you'd like to see that in their

8  claims, their claim construction, this is at Tab 1 to

9  ePlus's opening brief.  That's the side-by-side

10  comparison at page 6.  As part of this means for

11  building a requisition step, they have as Step B, for

12  example, initiating another search for matching items.

13          Lawson's constructions also recite steps that

14  are inconsistent with the language of the claims in the

15  specification.  For example, one of the requirements in

16  Lawson's means for searching is that they search local

17  RIMS databases.  This is actually at Exhibit 1 of our

18  brief under the means for searching.

19          THE COURT:  Wait a minute.  That's in their

20  means for building a requisition?

21          MR. ROBERTSON:  That is actually in many of

22  their claim elements.  It's in the means for searching

23  for matching items among selected product catalogs, for

24  example.  That was at page 54 of our brief.  I

25  reproduced their claim construction.  You'll see Step B

1   is searching local RIMS database.

2          THE COURT:  Yes.

3          MR. ROBERTSON:  Okay.  First, the claims make

4   clear that you're searching catalog databases, not this

5   RIMS database.  You'll recall that the RIMS database

6   was this predecessor --

7          THE COURT:  It's an inventory system.

8          MR. ROBERTSON:  It's an inventory management

9   system, yes sir.  Nowhere did any of the claims

10   specifically state or recite that you would search the

11   RIMS database.  Indeed, there's no example in this

12   specification where you searched the RIMS database as

13   part of means for searching for selected matching

14   items.

15          You recall, you're searching a database of

16   catalogs.  The RIMS database was not a database of

17   catalogs.  It was a database of inventories.  So that

18   would be improper.  In fact, I went through the

19   citations that Lawson relies on for this position that

20   the RIMS database needs to be first searched.  The

21   first one I reproduced for you at slide 84.  And this

22   was the highlighted portion.  It's the portion that

23   says that you're executing a search for specific

24   catalog in catalog database 36.

25          Indeed, in each instance when you're

1  searching, you're searching catalog database 36 because

2  that's where the catalog content is.  Additionally,

3  Lawson cites to the '683 Patent, and I've reproduced

4  that for you at page 90.  This is the second citation

5  they cite for support that you're searching the RIMS

6  database.  In fact, it says here that the entire

7  process of listing, sourcing and ordering products

8  using the Fisher RIMS system can be completed without

9  any reference to a search program 50.

10         And the last citation Lawson relies on for

11  this searching of the RIMS database which does not

12  contain catalog content is reproduced for you at slide

13  91.  And you'll see there that none of the databases

14  cited there are catalog databases and none of them

15  relate to conducting searches even on the databases

16  that are identified as part of the RIMS system.

17         So this importation that the search for

18  matching items among the selected product catalogs that

19  requires a searching of the local RIMS database is just

20  demonstrably incorrect.

21         The algorithms also don't require any

22  recitation to what was called a DDE interface, which

23  was a data structure that's used for a single computer,

24  which was required at the time by the operating system

25  that the inventors were using on their computer.  It is

1  an operating system much like Windows Vista or Windows

2  NT that was developed by IBM back in the late '80s,

3  early '90s, and they used it.

4        When they used that operating system, it

5  required that this DDE interface, this means for

6  communicating between the requisition program and the

7  search program was employed, but it's not part of the

8  algorithm.  It's not required other than the fact that

9  they chose preferably to use this OS/2 operating

10  system.

11        There are other communication protocols that

12  are described in the specification other than DDE.  DDE

13  would only be germane, as I say, if it were a single

14  not networked computer, which is why they want that

15  structure read into the algorithm because if that were

16  the case, Your Honor, then nobody would ever infringe

17  the claims that have that means for searching for

18  matching items among the selected product catalogs.

19        For example, slide 88, there are other

20  communication protocols that are described in the

21  patents for communicating between computers.  And,

22  again, at slide 89, the host computer and the local

23  computer can be linked point to point or in a network

24  employing the formats and protocols of IBM's System

25  Network Architecture, SNA.  So requiring the DDE would

1  be wholly inappropriate.

2          The next point I want to make is many of

3  Lawson's algorithms include steps that don't cover all

4  of the described embodiments.  For example, in the

5  means for searching step, again, if you can turn to

6  page 55, which is their construction continuing at step

7  C, they have this requirement of concatenating, which

8  they say is the joining together by linking so as to

9  form a chain or a series.  This is on page 55 at step

10 C.

11         There is a description in the patent of

12 concatenating or the ability to concatenate catalogs if

13 necessary, but there's no requirement and there's no --

14 certainly there are examples, some I've alluded to

15 already, where you're only searching one catalog of the

16 two or more catalogs that are maintained on it.  I

17 won't go through the slides again, but there were

18 examples where you could input one catalog or you could

19 simply search by default one catalog.

20         There's also described in the patent examples

21 where two or more product catalogs may be maintained in

22 multiple catalog databases.  We touched on this a

23 little bit before.  The patent illustrates in the

24 networked embodiment that there can be multiple catalog

25 databases.  They are also described in the patent.  If

1  I could direct you just to slide 94, for example.

2          THE COURT:  No. '683?

3          MR. ROBERTSON:  Yes.

4          THE COURT:  What is the use of concatenating?

5  Why does anybody use "concatenating" instead of saying

6  "joining"?  Where did that come from?

7          MR. ROBERTSON:  It's described as one way

8  that a search can be conducted of multiple catalogs.

9  It was the same point that was argued by Ariba before

10  Judge Brinkema, and she rejected the argument and said

11  that catalogs do not need to be concatenated.

12          THE COURT:  Where in the patent does it say

13  "concatenated"?

14          MR. ROBERTSON:  I believe it's at column 9 at

15  the bottom.  The last line, 67, where it says TV/2

16  search program, going over to column 10, would then

17  concatenate those two catalogs to perform a keyword

18  catalog number or other subject search and generate a

19  hit list of pages from both catalogs where the

20  searched-for terms were found.

21          THE COURT:  Why isn't that required?

22          MR. ROBERTSON:  It has the ability to do

23  that.  It's not required in all instances as I

24  hopefully illustrated when I said you may search all or

25  you may search one.

72

1          THE COURT:  So, again, it boils down to the

2   can-you-search-one issue.  That's what your argument is

3   basically.  That the claim language permits you to

4   search just one, and if you search just one, you don't

5   have to concatenate.  So you don't concatenate, though

6   possible, if you search more than one, is it required?

7   Isn't that what the whole argument boils down to?

8          MR. ROBERTSON:  I think that's correct, Your

9   Honor, yes.

10          The last two arguments, Your Honor, have to

11   do with whether or not there is sufficient structure

12   with respect to two of the means-plus-function claim

13   elements.  The means for converting data and the means

14   for processing the requisition to generate one or more

15   purchase orders.

16          We addressed that means for generating one or

17   more purchase orders on Friday, and I believe I cited

18   to the Court the supporting structure in the

19   specification that identifies certain sources of goods

20   with codes.  And once that's done, the patent actually

21   shows how they can break it out per vendor.

22          I guess I'll reserve whatever time I would

23   have left to address those arguments after I hear what

24   Lawson has to say, but, essentially, I just wanted to

25   alert the Court that this is an invalidity argument

1  that's being made at this time, that the patents are

2  indefinite for allegedly lacking structure with respect

3  to these claim elements.

4           THE COURT:  Well, if they don't have

5  structure, then it's invalid.

6           MR. ROBERTSON:  That's correct.  If they

7  don't have structure, they're indefinite.

8           THE COURT:  So it's not an invalidity

9  argument.  It's an argument that there is no structure,

10  the consequence of which will be a motion for summary

11  judgment on invalidity as to that claim.

12           MR. ROBERTSON:  That would be right.  We

13  submit, Your Honor, that they do have structure, and we

14  have identified that to the Court.

15           THE COURT:  All right.

16           MR. ROBERTSON:  So with that, Your Honor, I

17  will sit down unless you have any questions.

18           THE COURT:  No.

19           MR. McDONALD:  Your Honor, I also have an

20  alternative group of PowerPoints.

21           THE COURT:  More?

22           MR. McDONALD:  It's got a few more than I

23  gave you before and it's been reorganized a little bit

24  to kind of flow better and to respond to the ePlus

25  arguments I heard last week as well and their

1  PowerPoint.  Thank you.

2         May it please the Court, with respect to the

3  means-plus-function clauses here, obviously from the

4  questioning of opposing counsel, the Court's familiar

5  with the 112, paragraph 6, and we define that

6  corresponding structure that's clearly linked or

7  associated with respect to the function that's in the

8  means-plus-function clause.

9         And I think I just want to zero in on one

10  particular thing based on what I heard, and that is

11  that for a software patent, clearly the algorithm

12  disclosed for performing that function, has to be part

13  of the corresponding structure for claim construction

14  purposes.  But if the patent also calls out some

15  specific structure such as a particular microprocessor

16  or something, that structural device has to be part of

17  the, quote, corresponding structure.

18         And I think the nub of that issue is in that

19  same Harris v. Ericcson case that Mr. Robertson was

20  citing that sounds like it made his life a little more

21  difficult after the Ariba trial when that case came out

22  of the Federal Circuit because it was a pretty rigorous

23  analysis that was required for software

24  means-plus-function clauses.

25         Mr. Robertson, however, cited that case for

1  the proposition that it only requires that the

2  algorithm be part of the corresponding structure.  And

3  he read a sentence to you from Harris at page 1254.

4  That's 417 F.3d at 1254.  The sentence he read is, "We

5  hold that the corresponding structure for the time

6  domain processing means is a microprocessor programmed

7  to carry out a two-step algorithm in which the

8  processor calculates generally non-discrete estimates

9  and then selects the discrete value closest to each

10  estimate."  And I wrote down Mr. Robertson's words, and

11  he said, "We're done there."

12          Here's the rest of that paragraph, Your

13  Honor.  And it's in pages 5 to 6 of our reply brief.

14  The next sentence says, "Specifically, the patent

15  discloses as corresponding structure."  The Court's

16  obviously parroting the words of 112, paragraph 6,

17  there.  A processor 37, "Advantageously comprised of a

18  pair of processors, a support processor (SUPP) and a

19  fast array processor (FAP)."  There's element Nos. 37A

20  and 37B in brackets.  I'm not sure if those were in the

21  quote itself, but when you look at the patent those two

22  elements are in the pictures.

23          "Shown in Figure 4 and described at" and it

24  cites a section of columns 11 and 12.  And then it

25  talks about it's programmed to carry out the disclosed

1  data recovery algorithm illustrated in Figures 8A, 8B,

2  and 9, etc.

3         Next sentence, "Processor 37A carries out the

4  first part of the algorithm calculating the effect of

5  the media and applying it to the received symbols."

6  And there's a cite to the specification.

7         Next sentence says what processor 37B does.

8  It also cites the specification.

9         Last sentence of the quote, "Thus, each

10 processor performs one of these steps."

11        That case stands for the proposition that for

12 a software invention in which means-plus-function

13 terminology is invoked in the claims, you must construe

14 it as corresponding to the algorithm recited in the

15 patent that corresponds to the function, but you must

16 also find the corresponding structure to be whatever

17 microprocessors or local computers, as we have here, or

18 whatever other sort of specific computer device is

19 called up.

20        On that issue we're directly contrary to

21 ePlus's position, Your Honor.

22        THE COURT:  The Court actually doesn't say

23 that when it describes what is required.  You're

24 discerning that from the fact that in that case

25 applying that patent that was disclosed as part of the

1    structure.

2              MR. McDONALD:  Yes.

3              THE COURT:  So it doesn't say that in order

4    to have a valid structure, you have to disclose the

5    devices.

6              MR. McDONALD:  No, it doesn't.  That's right.

7    And there are some cases where the software patent

8    didn't have a specific computer structure such as a

9    particular microprocessor, and that's in some of the

10   other cases that I believe both of the parties cited.

11   And in those cases, the Court does say, Well, at a

12   minimum you have to disclose that algorithm that might

13   be implemented on a general purpose computer and that

14   will be the corresponding structure.  But that's in

15   that other type of a patent that doesn't have a

16   specific computer structure in it.

17             Harris did.  And I do think Harris pretty

18   clearly stands for the proposition that when the

19   structure disclosed in the specification does include

20   some particular type of computer that can be programmed

21   to implement the algorithm, the corresponding structure

22   includes that computer.  It doesn't just include an

23   algorithm for any general purpose computer.

24             112, paragraph 6, the applicant has a lot of

25   control over what they label as the corresponding

1   structure.  They could say it's just a general purpose

2   computer or they can say it's a specific local computer

3   or a specific type of processor.  They have control.

4   And the statute is clear that whatever they do

5   associate with the function, that's the corresponding

6   structure.  So it's a patent specific inquiry.

7           I'd like to turn to some of the tabs on our

8   constructions in a moment, but one thing I would like

9   to point out is when counsel for ePlus was pressed on

10  show me where in the specification there is

11  corresponding structure, they referred to, I guess you

12  could call it, a string cite.  When you look at their

13  constructions, they have a string cite of columns and

14  lines and things like that.

15          So I think the indication was, Oh, well,

16  there's lots of structure that corresponds to these

17  functions.  Well, they can't have it both ways, though,

18  because even though those columns and lines do call out

19  specific structure in many instances, the structure

20  that's in the cites to the columns and lines in ePlus's

21  construction is not found in their construction of the

22  claims.  There are references.  For example, I think

23  the one that was being discussed was the means for

24  selecting catalogs.

25          If we can go to slide 72, please.  The means

1  for selecting the product catalogs to search.

2  Actually, this is a slide with our construction in it,

3  but some of the language that was cited by ePlus and by

4  Mr. Robertson in the questioning on that included

5  sections such as column 5, line 66, to column 6, line

6  3, and column 8, lines 11 to 26, and 33 to 58.

7          And I wonder if we can go to the '683 Patent

8  and go to column 8, please.  Let's see if we can get

9  that up there.

10         I'll cite the part I'm talking about while

11  we're trying to blow that up.  But that section, for

12  example, at column 8 near the end of that section at

13  lines 52 to 58, it talks about an -- and this is

14  regarding, again, a means for selecting the product

15  catalogs to search.  That calls out an ESRC program 70

16  that will then link 82 to ESCP program 80.  That adopts

17  a certain CICS application there.

18         It's near the bottom of what's on the screen

19  right now.  Can you sort of scroll down a little bit so

20  we can get that last paragraph.

21         So there's a very specific discussion of

22  these two particular programs and this link 82 being

23  used there.  That's in the section that goes up to line

24  58.

25         All right.  So that supports this function,

1    they say.  So why isn't that in their construction of

2    the corresponding structure for this function?  They

3    can't say yes, the patent has corresponding structure

4    but ignore it while construing the claim.  The whole

5    point of finding it is to use it to construe the claim.

6            Moreover, I guess it's a mystery to me, how

7    do they draw the line?  How do they decide as the Court

8    indicated, given that this section doesn't actually say

9    we're talking about how we select the product catalogs

10   to search.  And some sections actually do talk about

11   searching.  The parts that we cited specifically talk

12   about searching catalogs.

13           And I'll show a little bit of detail on that

14   in a moment.  This doesn't really talk about that so

15   much here.  But that same paragraph, they cut it off at

16   line 58, but if you go up to column 9, which is a few

17   sentences later at line 4, the following paragraph, it

18   talks about that ESCP program that was referenced in

19   the section they cited.  And at lines 4 to 6 of column

20   9, it says ESCP program 80 links with Shell 52 and TV/2

21   search program 50 via DDE link 90.

22           Well, I thought ePlus was saying we were

23   wrong to include the DDE protocol in the corresponding

24   structure.  Here they have cited a section right before

25   this sentence that would indicate that is part of the

1  structure even they're relying on.  So I'm not sure

2  what they're trying to say here.

3          But I think what the right answer is is we've

4  got to find the sections of the specification that are

5  clearly linked or associated with the function.  This

6  is kind of a Where's Waldo process as it is.  At least

7  Waldo has to have the striped red and white shirt on so

8  we know we've found him.  Here we don't even know what

9  Waldo is wearing when they go through specification and

10 try to find parts that correspond to these various

11 functions.

12         So talking about the issues that they raised

13 their attacks on on the Lawson constructions, one was

14 the issue that we left out this alternative or

15 networked embodiment.  And the short answer is no, we

16 didn't.

17         Can we turn to slide 13, please.  So they

18 claim that we ignore the network embodiment and

19 similarly we fail to cover all the embodiments as a

20 result.

21         So what are the embodiments we're talking

22 about here?  Well, essentially, we've got Figures 1A

23 and 1B.  1A is this local embodiment.  It's got local

24 computer 20.  I already went though this a little bit

25 with Mr. Robertson.

1            The RIMS, a requisition system, is 40.  See
2  that number on the far left?
3            THE COURT:  Do you have a slide on that?
4            MR. McDONALD:  That is slide No. 13.
5            THE COURT:  Number what?
6            MR. McDONALD:  Slide No. 14.
7            MR. CARR:  This is 14 on the screen.
8            THE COURT:  Figure 1A.
9            MR. McDONALD:  So it's calling out some of
10 these structural components.  The local computer 20,
11 the TV/2 search program.  Actually, it's just 50.  It's
12 not 250 in this one.  And then the RIMS system is 40.
13           All those numbers are on the drawing.  That's
14 Figure 1A.  So what's this alternative embodiment?
15 Well, that's Figure 1B.  And what's interesting about
16 it is it's pretty easy to see how they are alternatives
17 because it still has a local computer in 1B.  Instead
18 of being called 20, it's 220.  It's still got the
19 requisition and purchasing system.  Instead of 40, it's
20 240.  And it's still got a search program.  Instead of
21 50, it's 250.
22           We've been talking about algorithms.  I think
23 I've got an algorithm for this drawing.  Just add 200
24 to the corresponding part in Figure 1A, you've got the
25 number in Figure 1B.  These are two alternative

1  embodiments but with very similar and parallel

2  structure to them.  That's the point here.

3           THE COURT:  What do you think "local

4  computer" means?

5           MR. McDONALD:  I think it's the computer

6  right where you're performing the functions where the

7  user is entering information.  It happens right on that

8  same computer that they are typing on.

9           THE COURT:  Does that mean that catalog

10  database has to be in the local computer?  Doesn't the

11  patent allow you to go find the catalog database on the

12  Internet anywhere it is?

13           MR. McDONALD:  No, I don't think it's that

14  broad.  It does have these two different embodiments,

15  though.

16           THE COURT:  What does "server" mean?

17           MR. McDONALD:  A server is a computer that in

18  effect serves up either data or computer for other

19  computers when they're needed.  I'll show you how that

20  works.  In fact, on the next slide, if we go to slide

21  16, I've got this section here from --

22           THE COURT:  So where would you go?  What

23  button would you push?  How would you get there?

24  You're on your computer and you have got to get a

25  catalog database.  That's what you want so you can

1    search it, right?

2            MR. McDONALD:  Okay.

3            THE COURT:  How do you get there?

4            MR. McDONALD:  Well, at slide 16 here we have

5    got a section that explains that.  It's column 17,

6    lines 12 to 17, and we have it highlighted.  This is

7    describing that Figure 1B, that embodiment with the

8    server.

9            So it talks about how the local computer is

10   provided with programs including that requisition

11   program.  The Shell program, the Shell program is the

12   interface to the search program.  That's 252.  And it's

13   got this graphic user interface.  One or more of these

14   may be copied from server 220 when needed.

15           So what happens is server to server in this

16   networked embodiment serves as a storage location.  And

17   when you do read the patent, it talks about this

18   networked embodiment potentially being involved with

19   the distributor's host computer being used with

20   thousands of customers who call in.  That's at column

21   17, lines 1 to 3.

22           THE COURT:  On this Figure 1B, what's the

23   server?

24           MR. McDONALD:  It's a computer, but it stores

25   things.  It's not the computer when you're actually

1   implementing the program.  What this talks about is the

2   server -- the program is copied from the server when

3   needed at the local computer.  That's what I've got

4   quoted right here and highlighted.

5            THE COURT:  But where is the server?

6            MR. McDONALD:  That server could be at a

7   different location.

8            THE COURT:  It could have data from the

9   internet on it, couldn't it?

10           MR. McDONALD:  Whatever else it has.

11           THE COURT:  What else would it have on it?

12           MR. McDONALD:  Typically, a server is

13   considered a computer that's kind of a dedicated device

14   for some purpose that can be accessed as need by parts

15   of a network.  That's typically how a server

16   environment works.

17           THE COURT:  I don't understand how databases

18   from companies can get from the company to the local

19   computer without going through the Internet unless you

20   have just a program that you stick into your computer

21   like an application or a disk, but it doesn't say that

22   you're confined to operating the system with either one

23   of those two things.

24           So if this catalog database is out there and

25   is to be searched, it's from four different companies,

1  A, B, C and D, then the way you've got to get to it is

2  to get to it through the Internet, isn't it?

3          MR. McDONALD:  Not necessarily.

4          THE COURT:  I mean, under this patent, under

5  1B.

6          MR. McDONALD:  Under this patent it would be

7  by cable.  It certainly doesn't talk about the

8  Internet.

9          THE COURT:  By cable?

10          MR. McDONALD:  Yeah.  You could have wires,

11  cables, connecting computers in different locations.

12  You can be talking about the next room.  Some of this

13  is not necessarily remote locations.

14          THE COURT:  So your view here is that in

15  order to -- what this patent contemplates is that you

16  somewhere go get the data on a disk or something that

17  contains a catalog, and you plug it into a computer

18  down the hall from you in a central area in the

19  company, in your own company, and then you punch the

20  computer buttons in your office, and you go to a

21  server, that server is just your server for your

22  company, and you don't ever go to the Internet to find

23  anything.  You're going to the catalog data that is

24  created because you have bought a program to stick into

25  your own computer, which is the server.  Is that what

1  you're saying?  It sounds to me like that's what you're

2  saying.

3          MR. McDONALD:  Well, it's not too far off

4  from that.  What I would cite you to is specifically at

5  the --

6          THE COURT:  Is that right or wrong to start

7  with?

8          MR. McDONALD:  Well, I guess I wouldn't

9  phrase it that exact way.  What I see here is there is

10  a local environment where all the computers are right

11  there in one spot.  Really, I think even both

12  environments, though, even this Figure 1B, applies the

13  same way because when you read column 16 at the bottom,

14  line 66, as shown in Figure 1B, "The present invention

15  also has application to distributor's regional customer

16  service locations where a large number of CSRs" --

17  those are customer service representatives working for

18  the distributor.  They're not necessarily working for

19  other customers.

20          They may be placing orders directly on

21  distributor's host computer 210 for thousands of

22  different customers who call in.

23          So I'm picturing a place where you have a

24  bunch of telephones.

25          THE COURT:  You can't order something from

1   somebody under this patent without going through the

2   Internet, can you?

3          MR. McDONALD:  Yes.

4          THE COURT:  How?  If you don't get to the

5   ordering entity by way of the Internet, how would you

6   possibly be able to place an order?

7          MR. McDONALD:  You see in the figures they

8   talk about printing out or faxing or mailing purchase

9   orders.  That's Figure 3 in box 118.

10         THE COURT:  That's not the only way you can

11  do it.

12         MR. McDONALD:  There's some reference in here

13  to, I think, doing something over phone lines.  That's

14  right.  But there's no mention --

15         THE COURT:  It doesn't mean that you don't go

16  to the Internet.  The issue we're dealing with is

17  whether it's confined to a local computer or you can go

18  to the Internet.  And I don't understand how you even

19  operate the system that's called for under the patent

20  without having access to the Internet to do some of the

21  things they want to do like place the requisition,

22  place the order.  I don't understand that.

23         MR. McDONALD:  There's no discussion in this

24  about the Internet.  There's other ways of

25  communication, other ways that it was done.  And that's

1   what it talks about.

2          THE COURT:  There's no discussion about the

3   Internet in the whole patent?

4          MR. McDONALD:  I don't think so.  Maybe

5   Mr. Robertson can correct me on that.

6          THE COURT:  I will get him to tell me.

7   That's one thing he's got to do is show me where the

8   discussion of the Internet is in the patent.

9          You're basically saying that under this

10  patent if you go to the Internet, you're not covered by

11  the patent because what this patent allows you to do or

12  requires that you do is to do your ordering from a

13  database that you imported into your local computer

14  system by whatever means, a disk or some other program,

15  then you place the order, and you search it, figure out

16  what you want.  Place your order.  Requisition it.  And

17  then you fax it or phone it in to the seller.  And

18  that's how you get the information or the product in

19  your hands.  Is that what you're saying?

20         MR. McDONALD:  With that Figure 1B

21  embodiment, I would agree with one exception.  As I

22  read this, the server does have the catalog database

23  stored on it.  So that will be accessed there.  But the

24  programs --

25         THE COURT:  No, but the server, the databases

1  stored on it has to come from somewhere.  If I'm going

2  to get access to Joseph Bank's database, I somewhere

3  have to get it.  If I'm putting it in a local computer,

4  I've got to get it from somewhere.

5         What do I do?  I buy a disk and load the

6  disk.  Or I buy some other application that says, Okay,

7  here's the Joseph Bank program.  Now it's in my server.

8  And then I'm no longer, when I'm interfacing, I'm not

9  interfacing with Joseph Bank at all except in one way,

10  and that's to acquire its program as it exists on the

11  date that I buy my disk or program, right?

12         MR. McDONALD:  That's right.

13         THE COURT:  Okay.  So you don't go to Joseph

14  Bank's Internet cite at all to order the product that

15  you want to order under your construction of the

16  patent, right?

17         MR. McDONALD:  That's right.

18         THE COURT:  Okay.

19         That's a fairly big difference, isn't it?

20         MR. McDONALD:  I think so.

21         THE COURT:  Well, if that claim construction

22  is right, what's the consequence?  You win?

23         MR. McDONALD:  I think on all the

24  means-plus-function clauses, they're going to leave

25  just like they did in the SAP case.

1          THE COURT:  They're going to what?

2          MR. McDONALD:  They're going to exit the

3     case.  They're going to drop them or --

4          THE COURT:  They are going to exit the case?

5          MR. McDONALD:  SAP -- after the Judge entered

6     his original ruling construing the claims, SAP moved

7     for summary judgment of non-infringement, and ePlus

8     conceded there was no infringement in view of --

9          THE COURT:  Boy, that's an easy way to get

10    out of the case, isn't it?

11         MR. McDONALD:  Well, that's why they've got

12    13 claims in here, and they're all not just their

13    means-plus-function.  It's the triad where they've got

14    air, land, and sea defenses here.  In case any one part

15    of it gets knocked out, they've got some other claims

16    to go on.  So this isn't all of their claims.

17         THE COURT:  So the basic difference between

18    the two of you on this whole local computer issue boils

19    down to the fact that you say this patent doesn't deal

20    with -- the invention of this patent doesn't deal with

21    getting to the Internet to look for these catalogs.

22    You have to have the catalogs in some kind of fixed

23    form that go into a local computer server or something

24    like that, and that's what you serve, right?

25         MR. McDONALD:  I think that's the consequence

1  of our position.  The core difference in our

2  position --

3          THE COURT:  Well, hold on.  I guess this.  To

4  me, that's the same thing as saying this in a

5  noncomputer world.  What I do under this patent is to

6  go buy or send for free the catalogs of each of 10

7  distributors, and I sit at my desk, and I look at the

8  ten, and I find whatever I want.  Automobile jacks.

9  Then I look at that.  Company A, Company B, Company C,

10  Company D.  And I look at them and I compare them and

11  then I order them.

12          The fixed component of that is the catalog

13  that I have secured.  And in your construction, the

14  catalog database to be searched is something that has

15  been obtained from a vendor or a manufacturer or

16  something, put into my local computer network, and

17  that's all I search.  I never go beyond that fixed base

18  of data into the Internet and search the updated

19  catalog of company A, B, C or D; is that right?

20          MR. McDONALD:  Do I never do that?  I guess

21  in terms of never, I don't know that I construe the

22  claims in terms of never doing something.  What I'm

23  saying is the corresponding structure is you've got two

24  embodiments.  One is the local computer's got the

25  catalog database and the other it's on server.  And

1    that's the corresponding structure for these

2    means-plus-function clauses.

3            THE COURT:  But the claim doesn't say you can

4    go to the Internet to find it?

5            MR. McDONALD:  No.

6            THE COURT:  Nothing in the --

7            MR. McDONALD:  That's not corresponding

8    structure.

9            THE COURT:  There's no structure that says

10   "Internet"?

11           MR. McDONALD:  Right.

12           THE COURT:  Okay.  I understand.

13           Is it correct that the catalog databases that

14   you're talking about to be put into the local computer

15   are obtained from a library or from the vendor or some

16   other source that sells them in a discrete way, in a

17   package of some kind that gets plugged into the local

18   computer, and that is the database I have to search; is

19   that right?

20           MR. McDONALD:  That's right.  And there is

21   some indication of that in the background section of

22   the patent.

23           THE COURT:  Where is that?

24           MR. McDONALD:  Column 2.

25           THE COURT:  What?

1          MR. McDONALD:  Column 2 of the '683.

2          THE COURT:  Hold on.  Let me get there if you

3  don't mind.

4          MR. McDONALD:  Sure.

5          THE COURT:  Column 2, '683, what line?

6          MR. McDONALD:  Three to five.

7          THE COURT:  Computer systems that are

8  capable, is that where were starting?

9          MR. McDONALD:  Yes.

10          THE COURT:  Computer systems that are capable

11  of searching databases containing a product catalog of

12  a particular vendor, for example, on CD-ROM are also

13  known.  That's talking about another technology, not

14  what this technology is.

15          MR. McDONALD:  Yes, but when you see a few

16  lines later, here's how they distinguish it.

17          THE COURT:  Wait just a minute.  Such

18  systems, that means the ones that have the CD-ROM, can

19  search for user-requested information about products

20  and create orders which the user can save, print, or in

21  some cases facsimile directly to a vendor.  That's the

22  old system.  That's not the one they're talking about

23  inventing.

24          MR. McDONALD:  Exactly.

25          THE COURT:  The known computer systems for

1  searching vendor catalogs are limited in that only one

2  such vendor catalog is accessible to a user at any

3  given time.  They are also limited in that they can

4  only create an order within the particular vendor

5  catalog database.

6          None of that tells me what the current system

7  is.  It tells me about what the old system is, not the

8  invention.

9          MR. McDONALD:  It's setting up what the

10  invention is.

11          THE COURT:  Tell me where the invention is.

12          MR. McDONALD:  Column 15, lines 53 to 58.

13  They talk about --

14          THE COURT:  Sorry?  15?

15          MR. McDONALD:  Yes, column 15.  The paragraph

16  is lines 50 to 58.

17          THE COURT:  All right.  "It is an important

18  feature," is that what you're talking about?

19          MR. McDONALD:  Yes.

20          THE COURT:  "It is an important feature of

21  the present invention that a requisition may be filled

22  by searching and selecting from a catalog database of

23  items, inventory sourced, and the resulting requisition

24  then divided into one or more purchase orders.  This

25  contrasts with known prior art CD-ROM catalog systems

1  in which only a single purchase order to a single

2  supplier is built without reference to inventory

3  records, and in which the information used to create

4  the purchase order is limited to that contained in the

5  product catalog of a single vendor."

6        So you're saying that whole section

7  illustrates that the invention -- that you can search

8  and select from a catalog database of items, inventory

9  sourced, and the resulting requisition then divided

10  into one or more purchase orders.  And when it says

11  this contrasts with known prior art CD-ROM, it means

12  our system, too, is a CD-ROM system?

13        MR. McDONALD:  Yes, it is.  It's not saying,

14  Well, ours is different because the old way was

15  CD-ROMs, but now we can get on the Internet and update

16  our catalog constantly.  It's sure not saying that.

17        It's saying, Yeah, there is prior art out

18  there that's got some similarities to the invention,

19  but they only look through one electronic catalog.

20        If you stick it into your little drive back

21  in the '80s or '90s, you have maybe one drive, and you

22  can search one CD at a time.  They've got this system.

23  Thank goodness they found IBM because IBM was the ones

24  that invented the Technical Viewer 2.  It's right in

25  the prior art brochure that it says we can search

1  through multiple part catalogs.

2          That was one of the things that really IBM

3  invented and the predecessor to ePlus here is taking

4  credit for that.  But in any event, that is the

5  distinction.  It's got nothing to do with the Internet.

6          THE COURT:  Just help me out here a minute.

7  I'm looking for fleece jacket vests, okay?  I know

8  they're sold by REI, by L.L. Bean, by Columbia

9  Sportswear, for example.  I can go on the Internet, and

10 I go on my computer, and I go to Google or I go get

11 those cites; REI.  And I look on there, and I say,

12 They've got the vest I want and the size and color I

13 want.  Where am I getting that?  That's not on my local

14 server here.  That's on something I'm having access to

15 by virtue of using the Internet, right?

16         MR. McDONALD:  Right.  That's a computer

17 that's hosted by or on behalf of those vendors.

18         THE COURT:  Right.  All right.  And you're

19 saying that the invention in this case does not

20 contemplate the doing of that at all?

21         MR. McDONALD:  It's got no mention at all

22 about Internet or going out there and getting those

23 updates like you would on the Internet or getting the

24 current snapshot directly from the vendor in realtime.

25 There's nothing about kind of a realtime updating of

1   this thing.  So that's right.

2           THE COURT:  Excuse me.  Go ahead.

3           MR. McDONALD:  Okay.  So we've addressed the

4   issue to some extent of the alternative embodiments

5   being covered here.  So we have explained what those

6   different embodiments are in 1A and 1B.  How the

7   numbers are 40 or 240, 50 or 250, etc.

8           EPlus says we didn't cover both embodiments.

9   So I have here slide 17 up as one example here since we

10  were talking about a means for building a requisition.

11  Our construction specifically calls out these

12  structural parts that are from Figure 1A and from

13  Figure B.  We've got them both.  For example, here we

14  see it.  Catalog database is either 36 or 236.  It

15  could be either location suitable for Figure 1A or

16  Figure 1B.

17          The requisition system is 40 or 240.  Search

18  program 50 or 250.  Local computer, it is part of both

19  systems.  Either networked or not they still both use

20  that local computer to actually load the programs.  And

21  that's 20 or 220.

22          We've got both embodiments covered.  And

23  that's through all of our constructions, Your Honor, on

24  the means-plus-function.  We've got all the either ors

25  there for Figures 1A and 1B.

1          THE COURT:  Just so I have a claim

2    construction lexigraph here, is "call out" the

3    vernacular for "identify"?  Is that what you're using

4    the term as?

5          MR. McDONALD:  I didn't even realize I used

6    that term, but if I did --

7          THE COURT:  You use it a lot.  And I just

8    want to know what you're saying when you say it.  Is

9    that Minneapolis or Viking territory for "identify"?

10         MR. McDONALD:  You're breaking my heart.

11         THE COURT:  I didn't mean those Vikings.  I

12   meant the real Vikings.

13         MR. McDONALD:  It may be.

14         THE COURT:  That's what you intend when you

15   say it?

16         MR. McDONALD:  Shall I make it a shout-out.

17         THE COURT:  No, no.  A shout-out is a

18   different thing.  That's when you call somebody and

19   identify them on the air or on the television.  And

20   each of us in different areas of the country use

21   different shorthands for different terms, and I just

22   want to make sure I understand what you're saying.

23   Don't change your speech as long as I know what you're

24   saying.

25         MR. McDONALD:  As long as we're on the same

1   page.

2          THE COURT:  Okay.

3          MR. McDONALD:  So that shows how we got both

4   embodiments shown here.

5          We also have, even in both embodiments, the

6   specification makes it clear that the initiation of the

7   search is a separate function from the searching.  So

8   even if the catalog database itself is on a server, you

9   still initiate the search from that local computer.

10          Mr. Robertson was the one who was saying it's

11   got that graphic user interface at the local computer.

12   That's for the user to enter the search.  That still

13   happens locally even in the network embodiment.

14          So there is a lot of parallelism here.

15   There's not a lot of differences, frankly, between the

16   two systems, but we've got both of them covered in our

17   constructions.

18          THE COURT:  Now, the means-plus-function, the

19   requirement in the means-plus-function requirement, one

20   of the purposes of requiring that you be able to

21   identify the structure in the specification or

22   somewhere else before the claims is to keep the

23   patentee from later coming in and saying by use of the

24   broad term means and then for doing something, i.e. the

25   function, from broadening his claim beyond that which

1  he has articulated, and is, in essence, incorporating

2  by reference to the structure, right?

3           MR. McDONALD:  Yes.

4           THE COURT:  And in this case that issue is

5  presented here, as you see it, because if "local

6  computer" is not part of the claim construction for the

7  structure -- right so far?

8           MR. McDONALD:  Yes.

9           THE COURT:  -- then what they are doing is

10  using the means-plus-function to reach a system that

11  does in fact allow the search of catalogs on the

12  Internet when, in fact, they didn't identify that

13  structure in the specifications; is that what you're

14  saying?

15           MR. McDONALD:  Yes.  I think that's fair.

16  There are certainly other ways you might be able to

17  perform the same functions, but if they aren't the same

18  structures or equivalent to the structures actually

19  disclosed, they should not be entitled to cover them

20  with their claims.  They didn't invent that.

21           THE COURT:  Is the rub here that your system

22  works through the Internet and theirs you say does not?

23           MR. McDONALD:  You know, they've got an

24  either/or on just about every issue, Your Honor.

25           THE COURT:  I'm trying to figure out what

 1   we're really wrestling with here, whether we've got an

 2   alligator, a crocodile or what.

 3          MR. McDONALD:  We've got two systems.  And

 4   one of them does punch out is the phrase that's used.

 5   It's not my phrase.  It's the term of art, punch out to

 6   the Internet to go visit a Dell catalog, and so on, one

 7   catalog at a time.  There's a number of ways I think

 8   it's non-infringing, but I think ePlus has realized

 9   it's also a pretty small sliver of our business.  So

10   now they're trying to go after the self-contained

11   system even without the punch out and try to cover that

12   as well here.

13          So Internet is one of the issues, but it's

14   not the only issue.

15          THE COURT:  Yeah.  Okay.

16          MR. McDONALD:  With respect to the DDE

17   protocol --

18          THE COURT:  Excuse me.  According to what you

19   just said, it's not even an important issue because

20   it's a very small part of your business.

21          MR. McDONALD:  Yeah, I think it's about 5 or

22   10 percent of our customers that would actually have

23   punch out if that.  I think it's actually less than

24   that.

25          THE COURT:  So to sort of put it in another

1  construct, your product accomplishes what I think

2  you-all say is basically the same function but by using

3  a different structure.

4          MR. McDONALD:  By a significantly different

5  structure.

6          THE COURT:  Even in those instances where the

7  structure does not include access to the Internet.

8          MR. McDONALD:  Exactly.

9          THE COURT:  Okay.

10          MR. McDONALD:  Could we go to slide 27,

11  please.

12          EPlus attacks our construction relating to

13  the communication between the requisition and the

14  search systems where we say the structure we cited

15  consistent with the SAP Markman ruling as requiring

16  this DDE or dynamic data exchange protocol.  They say,

17  Well, other communication protocols are disclosed.  But

18  when you actually read the specification, even the

19  parts ePlus cites, it's clear that DDE is the only

20  protocol used specifically for those communications

21  between the requisition purchasing system and the

22  search program.

23          We've got '683, column 5, lines 18 to 27

24  here, which talk about this interface 60.  And I've got

25  an excerpt of Figure 1C here on the slide as well.

1   This is slide 28.  Just to show that 60 goes between

2   the Shell, which is the gateway, essentially, to the

3   search program.  Shell 52.  And then REQ1 here is 44A.

4   That's part of the requisition system.  And 60 is the

5   communication between them.

6          This excerpt says, "Interface 60 is

7   preferably based upon the dynamic data exchange

8   protocol provided by OS/2 operating system 32."

9          Yes, it says "preferably."  It leaves the

10  door open that there could be another one, but they

11  don't actually disclose any other one for this

12  interface.  They don't actually clearly link any other

13  protocol, in fact, to this communication between the

14  requisition system and the search system.

15         THE COURT:  Excuse me, but if we're dealing

16  with a claim that is not a means-plus-function claim,

17  the "preferably" has a different significance then in

18  the means-plus-function claim because in

19  means-plus-function you have to identify the structure

20  that you have, and that's what you get linked to your

21  claim.  And if you don't, that's just tough luck.

22         MR. McDONALD:  That's exactly right.  That's

23  a real key point here because we've got some

24  means-plus-function, some not.  So it's easy to kind of

25  intersect the rules of law if we're not careful.

1          For the other ones, it's a rule of

2   construction that you don't limit the claim to the

3   preferred embodiment.  But if the preferred embodiment

4   is the only structure that's disclosed and is

5   corresponding to the function, for a

6   means-plus-function you do limit it to the preferred

7   embodiment.  That's exactly right.

8          So they've mentioned some other protocols,

9   and I've got some sections here on this next slide that

10  give you the discussion of those.  It's '683, columns 8

11  and 9.  As referenced here, they've got these XCTL and

12  LINK protocols.  But they are protocols, quote, within

13  CICS, that's an OS/2 related system, operating system,

14  that direct the execution of a program.  That's what

15  those protocols are for.

16         Protocols can be for all sorts of things.

17  Those protocols are not for communication between the

18  requisition system and the search system.  DDE is the

19  only one disclosed for that.

20         And just to show, going back to Figure 1A,

21  what is this CICS thing or C-I-C-S?  You can see here,

22  we've got the RIMS system 40.  CICS is part of that

23  RIMS system.  Over on the right there I've got

24  highlighted the searching parts.  TV 50, TV 250, and

25  the Shell 52 next to the catalog database.  CICS is not

1   used for the interaction between RIMS and the

2   searching.  CICS is used within RIMS.  So that's why

3   those protocols don't matter here.

4          The other, I guess, point I would make about

5   that is if ePlus really thinks those other protocols

6   are alternative protocols for that function, why don't

7   they include that additional corresponding structure in

8   their construction.  They don't have any of this in

9   there.  They didn't pick ours because we don't have the

10  alternative embodiments of network and so on, but they

11  are throwing stones from a glass house because they

12  don't call any of this structure.  At least we went

13  through, and I understand we may have more briefing,

14  but we at least tried to show by reference to, for

15  example, 40 and 240, and the specific elements of the

16  patent, at least tried to show you where we were

17  finding this structure when we did this.

18         Maybe there's some more work to be done

19  there, but my point is they didn't do any of that.

20  They just put that big string cite at the end, Look at

21  all these different places, and good luck.

22         Another Minnesota vernacular, I suppose, Your

23  Honor.

24         THE COURT:  No, I think that's universal.

25         MR. McDONALD:  The concatenation issue, I'd

1   like to turn to that now.

2            Can we go to slide 54, please.

3            THE COURT:  Slide what?

4            MR. McDONALD:  54.  This is just calling out

5   here what the means for searching.  We've got a group

6   of these means for searching for matching items

7   clauses.  They kind of group them all together here

8   because concatenating has to do with the searching.

9            And we've got the specific cite here.  Column

10  9.  This is of the '683 Patent.  Column 9, line 67 to

11  10, line 4.

12           THE COURT:  Is that the only place

13  "concatenating" appears in the '683?

14           MR. McDONALD:  I believe that is true, Your

15  Honor.  There may be a reference back to it in the past

16  tense farther on, but I think this is it.  What I think

17  is key here is at the bottom of column 9 to the top of

18  column 10, you're right in the middle -- if there's any

19  part of this specification that's clearly linked to

20  searching for a selected part of the database or

21  searching selected catalogs, this is it.  The paragraph

22  starts at the bottom of column 9, line 52 or 53.

23           "When multiple catalogs are present in

24  catalog database 36, search program 50 contains a

25  function associated with the catalog symbol of the

1   footer bar and screen window (not shown) for selecting

2   catalogs to be searched."

3        Then it goes on and gives an example of

4   you've got these four catalogs, what do you do?  And at

5   the bottom of column 9, if the user is looking for

6   molecular biology products, the user would select the

7   Fisher and Promega catalogs.  TV/2 search program would

8   then concatenate those two catalogs to perform a

9   keyword catalog number or other subject search and

10  generate a hit list of pages or panels from both

11  catalogs where the searched-for items were found.

12       We're right in the middle of talking about

13  how you performed a function of searching.

14  Concatenation is clearly linked and associated with

15  that function.  It is part of the algorithm of

16  searching.

17       There's only one more paragraph that really

18  zeros in on searching multiple catalogs or selected

19  parts of the database.  It's the next paragraph there

20  at the top of column 10, and then it moves on.  There's

21  only so much that they even talk about here with this

22  searching selected parts.  Without the concatenation,

23  there really isn't any beef here as to what the actual

24  process would be for that.  So it is clearly linked or

25  associated.

1           Now, Mr. Robertson said, Well, but it's

2   possible in this system that you might just look

3   through one catalog.  I suppose it is.  It's also

4   possible that the system could be turned off and

5   unplugged, and in which case you wouldn't be using

6   certain parts of it.

7           That's not the question.  This isn't a method

8   claim.  If it was the method of concatenating, and

9   somebody only looked through one catalog and that did

10  not involve concatenating, that's one issue, but the

11  question here is:  What is the structure that

12  corresponds to the function?  And the structure that is

13  disclosed is "concatenating" or at least part of the

14  algorithm in the system.  And that's true whether in a

15  particular case that particular part of the structure

16  is used or not.  It's simply an irrelevant question

17  whether or not from time to time you may search one

18  catalog or maybe not even search at all.  It doesn't

19  matter.

20          So just to put an illustration here, at slide

21  55, right out of columns 9 and 10 here in our

22  PowerPoint that show the user as the specification

23  states choosing out of those four catalogs just the

24  two, Fisher and Promega, and then concatenating those

25  two.  So now it's just going to search those.

1            I'm not sure if we have ever really given you

2    much context for what's the point or what difference

3    does that really make.  The point is, especially back

4    in the '90s, you've got these big catalogs with lots of

5    images on these CD-ROMs.  That takes up a lot of

6    memory.  It could take a lot of effort to search any

7    one CD of catalog information.  So they wanted to have

8    a system here that you didn't have to search through

9    everything.  If you knew some of these big catalogs

10   were catalogs that had nothing to do with finding your

11   fleece jacket or a molecular biology product or what,

12   don't waste system resources, don't waste time looking

13   for catalogs that you know don't have them.

14   Concatenate the ones you do think would have it and

15   just look in those.  That's the point.

16           THE COURT:  But those two that you're going

17   to concatenate, they have to be in the catalog database

18   that you've got that we talked about earlier, right?

19           MR. McDONALD:  Yeah.  I think there might be

20   some reference in here that catalog database may be in

21   two different places.  I can't recall that for sure,

22   but even if that's the case, that's consistent with

23   concatenating.  That's a device that's used to link

24   things together for searching purposes, and it might be

25   in two different places or two different parts of the

1  database or something, but you still find a way to

2  associate just those parts together so you search just

3  those parts.

4          I think another concern was the searching in

5  the RIMS system.  Can we go to slide 53, please.

6          We have some of these means for searching

7  matching items.  Entering search criteria into the

8  requisition and purchasing system.  We do call out here

9  with the cites, and I've got the blow-ups here from

10 column 7 and 8 where the system does say, basically,

11 first look in the requisition system.  You can type in

12 the catalog number and find the product that way.

13         And if you want, you can -- if you look at 54

14 here, you have the option of using a search system.

15 You don't have to.  Now, I think, as I looked at this,

16 we had lumped all of these together; five, six, and

17 seven here.

18         The first two talk about searching in a

19 database and the last one talks about selected product

20 catalogs.  And I do think it's fair as I look at this,

21 Your Honor, and I think I would modify our definition

22 specifically of that last one that it doesn't have to

23 search the RIMS system.  And I would say that because I

24 would agree with Mr. Robertson that the RIMS system

25 does not have the product catalogs.  That is over in

1 that catalog database 36.

2          But the other two aren't necessarily, unless

3 Mr. Robertson says they are limited, I don't know that

4 they are inherently limited to product catalogs when

5 they use the word "database."

6          The RIMS system certainly has database

7 capability on it.  It has databases on it.  And so I

8 think leaving these steps in for the first two is

9 appropriate, but I could see eliminating that

10 RIMS-based search for the means for searching for

11 matching items, specifically the one that's directed to

12 "the selected product catalogs."

13          THE COURT:  Which one are you talking about

14 leaving out?

15          MR. McDONALD:  This 1C that's here on slide

16 56.

17          THE COURT:  When you say it's 1C, what do you

18 mean?

19          MR. McDONALD:  1C is part of our

20 corresponding structure.

21          THE COURT:  You mean on his Exhibit 1, it

22 would be concatenating --

23          MR. McDONALD:  This is for the means for

24 searching --

25          THE COURT:  I've just got to get the right

1   thing.

2           MR. McDONALD:  It's our appendix page 14,

3   Appendix A, if you also have that one with our

4   instruction.  It's got C.

5           THE COURT:  That's item C in their copy?

6           MR. McDONALD:  I would assume so.

7           THE COURT:  Yeah, I've got you.  All right.

8           MR. McDONALD:  I'd like to turn, I guess, to

9   these two means-plus-function clauses that we say don't

10  have any corresponding structure, and I really didn't

11  hear much from ePlus about where they really have the

12  structure, but can we turn to slide 80, please.

13          This is the means for processing the

14  requisition to generate one or more purchase orders of

15  the selected matching items.  And I didn't hear them

16  really cite to where that is in here, but as you

17  understand now, the implication if there is no

18  corresponding structure is that claim would be invalid

19  under Section 112.

20          We've got this Aristocrat case here from

21  slide 82 where I think the key part of this one is a

22  passage in the specification that only describes the

23  results of the function and does not describe how the

24  function is performed is not sufficient disclosure

25  under 112, paragraph 6.

1          That's exactly what everything ePlus cites

2     and talks about the results or that you have already

3     generated a purchase order or what you do with it, but

4     it doesn't say how you do it.  So I won't spend a lot

5     of time on that.  I would refer back to our slides

6     here.

7          Also I'll point out here on slide 86, though,

8     that for some context here the RIMS system has some

9     flow charts that really set out how you generate

10    purchase orders in that old prior art system.  These

11    inventors, at least the two that are the common ones,

12    knew how to disclose an algorithm for generating

13    purchase orders.  They just didn't do it in the patents

14    involved in this suit.

15         They also know how to give you a pretty

16    specific algorithm on the means for building a

17    requisition.  It was a real step-by-step process there.

18    Search the matching items.  Generate a hit list.

19    Select items to put on an order list.  And send that to

20    the requisition system.

21         They know how to do that.  They didn't do any

22    of that for the purchase order generation function, nor

23    does ePlus cite to you any part of that system in

24    Figures 1A or 1B where they say, Here, here's where the

25    purchase order module is.  Here's where that happens.

1  They can't because the patent doesn't say a word about

2  where -- what structure here, what actually would be

3  the location of that algorithm.  They've got what they

4  say is the whole system here.  This is the whole

5  system.  They should have told us which part of it

6  generates a purchase order.  Not a peep about that

7  anywhere in the specification.

8            THE COURT:  If your construction is adopted

9  and that aspect of claim 3 is out as a

10 means-plus-function, what happens to the rest of claim

11 3?

12            MR. McDONALD:  The whole claim is invalid.

13            THE COURT:  So the invalidation of the one

14 component that we're talking about, the one element,

15 invalidates the whole claim?

16            MR. McDONALD:  Right, because it's

17 indefinite.  As long as one border to the property is

18 unknown, you don't know what's covered and you need to

19 have the definite boundaries to have a valid claim.

20            The only place really in the figures is

21 Figure 3 that shows this purchase order 114, and the

22 specification makes it clear that that's not a

23 structure.  That's a step.

24            So that's no structure either.  And it's just

25 a one box step.  Here come the purchase orders, which

1 in this medical instruments case, very analogous, there

2 was a one box, part of a flow chart, that talked about

3 image format conversion that the patent holder tried to

4 rely on as disclosing the corresponding means for

5 converting.  But the Court said that a figure simply

6 disclosing a one-box step for doing a function does not

7 describe the structure and isn't satisfactory.  And

8 that's exactly what we have here.

9        As we mentioned in our brief, the fact that

10 the RIMS patent has some discussion of generating a

11 purchase order doesn't help ePlus here because they

12 can't rely on that and incorporate it by reference to

13 the patent.  It has to be in the four corners of this

14 specification.

15        With respect to converting, can we go to

16 slide 94, please.  Converting really is used very

17 little in this specification.  The actual clause at

18 issue is means for converting data.  You've got one

19 catalog entry for beaker or something.  We're now going

20 to substitute a different one from the distributor or

21 another vendor, but the patent doesn't even talk about

22 that type of converting.

23        The cite we have here at slide 94 describes

24 not converting a catalog entry, but rather a

25 requisition being "converted to purchase orders."  It's

1   got nothing to do with this means-plus-function clause.

2   That's the only thing in here.  There is nothing in the

3   specification that's clearly linked or associated with

4   means for converting data related to a selected

5   matching item to data regarding another item from

6   another source, which is more or less paraphrasing the

7   whole clause here.

8         So there's nothing on that means for

9   converting clauses corresponding either.  So all the

10  claims that would have that would also be invalid as a

11  whole under Section 112.

12        I'm just about done, Your Honor.  I think you

13  were going over claim 3 with ePlus's counsel.  I think

14  our position on the plural issue, the claim

15  specifically calls out selected product catalogs.  That

16  to me makes it perfectly clear that, sure, the starting

17  point is you have multiple catalogs, but the selected

18  subset also is plural.  It's selected product catalogs.

19  And yes, we inserted the words "two or more" in here.

20  Really, I think they are redundant, but it highlights

21  exactly what ePlus is doing.  They are trying to ignore

22  the plural aspect of that.  We wanted to highlight

23  that.

24        You can take it out of our definition as long

25  as it is construed to mean selected product catalogs

1  does mean two or more.  Again, could the system just

2  look at one?  Maybe.  But that's not the function

3  that's recited in this particular claim.  This claim is

4  talking about searching among the selected product

5  catalogs.  This claim is talking about those situations

6  where you do look at two or more catalogs for

7  searching.

8         THE COURT:  He's saying if you search among

9  the two catalogs, that means you perforce can search

10  only one.

11         MR. McDONALD:  That's the selected product

12  catalog.  The word "selected" would have no meaning.

13  Otherwise, that's just search among the product

14  catalogs.  He says ignore the word "selected," Judge.

15  It means nothing.  And that's not an appropriate way.

16  You want to find a way to give each word in the claim

17  meaning.

18         THE COURT:  If you search among the selected

19  product catalogs.  So you have found two now, and you

20  search among them, can't you search just one and fall

21  within the definition of "among"?

22         MR. McDONALD:  I don't think so.  I don't

23  think the word "among" would qualify here for that.

24  But at least I think we all agree that you had to have

25  selected more than one catalog.

1            THE COURT:  Well, he doesn't agree with that.

2    He says the means for selecting the product catalogs

3    means you can select one.

4            MR. McDONALD:  I think on that point maybe he

5    doesn't agree, you're right, but I would say the words

6    mean what they say.  Selected product catalogs means at

7    a minimum you have to select more than one catalog.

8            I think it also means you have to search

9    among those more than one catalog.  I just think that's

10   the plain English and the grammar of that claim 3.

11           I believe I've covered everything else, Your

12   Honor.  So thank you.

13           THE COURT:  All right.

14           He says that Harris v. Ericcson requires that

15   devices, if mentioned, be included as part of the

16   structure, but they are not mentioned anywhere in the

17   specification.

18           MR. McDONALD:  I think that's not a proper

19   reading of Harris, Your Honor, and let me explain why.

20   But I think Your Honor touched upon the point that is

21   it really clear from Harris where, in fact -- this is a

22   jury instruction, Your Honor, ultimately, is what we're

23   doing here.  We're going to define for the jury what

24   the law is.

25           I, quite frankly, can't imagine that they go

1   on to say "We hold the corresponding structure for this

2   time domain processing means is this."  That they then

3   went on to give the jury all this verbiage about where

4   this algorithm is discerned from various columns and

5   lines and figures from the patent.

6          THE COURT:  When was Harris decided?

7          MR. ROBERTSON:  2005, Your Honor.  I think

8   maybe it would be helpful to see if I could actually

9   the jury instructions that were given in the Harris

10  case.  They might be available over the PACER system,

11  and I can look into that.

12         When I turn the very next page of Harris, it

13  says expressly after saying that the District Court

14  erred in holding that the claims can cover either a

15  one-step or a two-step process.  The corresponding

16  structure limits the time domain processing means to a

17  two-step algorithm, and it goes on to say what exactly

18  that algorithm is, those two steps.  No structure.  No

19  specific processors.

20         I would imagine that is the construction, and

21  that was the jury instruction that was given.

22         THE COURT:  Well, I guess has Harris been

23  interpreted since it was issued to include as part of

24  the structure any device mentioned as to how you

25  achieve the steps?

1          MR. ROBERTSON:  Well, I think it might be

2    helpful, actually, to look at the very next section of

3    Harris, which starts at page 1255, which is their

4    infringement analysis.  And, obviously, the first step

5    is always to construe the claim, and the next step is

6    to go ahead and apply the properly construed claim

7    against the accused device or accused widget, whatever

8    it is.

9          No description at all, no discussion at all

10   in this infringement analysis of any of those examples

11   or structure or anything when they are applying it to

12   the accused products.  None of that is recited.  So,

13   clearly, in doing the analysis, the Federal Circuit

14   didn't feel it necessary to go and analyze those

15   various specific examples of the types of processors

16   that are described at various columns and figures.

17         I can't imagine that it would have been

18   helpful jury instruction just to tell the jury it's a

19   two-step process and you should discern it and glean it

20   all from these various aspects of the specification.

21   I've never seen a jury instruction like that, Your

22   Honor, and I think it would be enormously confusing for

23   the jury to understand.

24         But certainly it's part of the Federal

25   Circuit's analysis in Harris.  They didn't then go

1  forward and say, Are all these structures used in the

2  accused device involved in the Harris v. Ericcson case?

3          I will make an effort to go and see if I can

4  find those jury instructions and maybe we'll have an

5  answer to your question.

6          A couple things, Your Honor.  We were talking

7  about this networked embodiment versus the local

8  computer embodiment.  And what I want to make clear is

9  the real problem, I think, the real mischief with

10  Lawson's construction is they are indicating that the

11  programs have to be operating on the local computer,

12  and it's not necessarily true in a server embodiment,

13  and there are numerous examples I can direct the Court

14  to in which they say the programs are actually on the

15  servers.

16          Occasionally, they can be downloaded or the

17  local computer can be updated, but it's not necessary.

18          THE COURT:  Does the server include the

19  Internet?  He says that the Internet is not mentioned

20  anywhere in the whole patent and put to you the

21  challenge to identify where it was.  How do you respond

22  to that challenge?

23          MR. ROBERTSON:  I will address it, Your

24  Honor, by saying, obviously, the network -- the

25  Internet is a network.  It's a network of networks.

 1            THE COURT:  It is a network?

 2            MR. ROBERTSON:  Yes, sir.  In fact, that's

 3    the definition.  A network of networks.  And when this

 4    patent came out in August of 1994, when it was filed

 5    for, the Internet actually was not open to commercial

 6    operations at the time, but the inventors were quite

 7    prescient and understood that there would be network

 8    protocols that would apply.

 9            So, for example, we could go to column 5,

10    starting at about line 9.  This is in the '683.  It

11    indicates there that the host computer -- and you'll

12    recall, Your Honor, that's the supplier, and that's

13    their database of goods.  That's your Joseph A. Banks.

14            THE COURT:  Column 5, what line?

15            MR. ROBERTSON:  Column 5 starting at line 9.

16            THE COURT:  Okay.

17            MR. ROBERTSON:  -- and the local computer are

18    preferably linked point-to-point or in a network

19    employing the formats and protocols of IBM's System

20    Network Architecture, SNA.  SNA was early network

21    architecture.  In fact, it's described in the '989

22    Patent incorporated by reference as a system that was

23    known as an LU.6.2.  An LU.6.2 was actually a network

24    predecessor of the Internet.  In fact, operated, the

25    expert testimony was, much in the same way.

1          The patent also describes other communication

2    protocols that could be served to provide updated

3    information.  So, for example, the patent describes

4    that purchase orders can be sent via an electronic data

5    interchange or EDI, and that appears at column 15,

6    lines 45 to 49.

7          THE COURT:  What does that mean?

8          MR. ROBERTSON:  It means that, for example,

9    you can communicate with a host computer, a supplier,

10   over a network in which you can actually use this EDI

11   data interchange to exchange information such as

12   purchase orders, for example.

13         THE COURT:  And that is in what line?

14         MR. ROBERTSON:  That is column 15, lines 45

15   to 95.  45 to 49, excuse me, Your Honor.

16         It also talks about a user of the system

17   being able to communicate with a distributor mainframe

18   to obtain updated information.

19         If we could go to column 17, line 26 through

20   line 29, I believe.

21         THE COURT:  Seventeen?

22         MR. ROBERTSON:  Yes, sir.

23         THE COURT:  Twenty-six, "For this"?

24         MR. ROBERTSON:  Yes.  "For this purpose, each

25   local computer is connected to host computer."

1   Remember, again, that's the supplier.  210 via a

2   phone/dataline or a gateway.  The Internet can

3   communicate over phone lines.  One definition is that

4   it's a gateway.

5           So what is this talking about?  This is

6   talking about various protocols that would include a

7   networked environment like the Internet in which data

8   can be updated and communicated to from the host

9   computer to the local computer.

10          It's not the only way it happens, Your Honor,

11  and Mr. McDonald is absolutely right.  You struck upon

12  an example, too.  You could get an updated CD-ROM, for

13  example, with new catalog data and just load it in your

14  database and use that and not have to communicate over

15  the Internet because you have just refreshed your data

16  for things that you want to obtain.

17          Now, to accomplish purchases to those

18  suppliers, you could use a network communication, as

19  the protocols are described there.  There's also, in

20  searching the catalogs, there's an example, Your Honor,

21  a representation made that you have to search two or

22  more.  There's actually examples in the patent in which

23  they say you have multiple catalog databases.  Each

24  database might have, for example, just one catalog,

25  like in your example.  If I'm going over the Internet,

1    for example, of one supplier and they have the REI

2    catalog, I can search that catalog and then seriatim go

3    and search a catalog database of other suppliers.

4         And so in that instance, I'm selecting a

5    catalog to search.  Just by way of example, the figure

6    1B, I believe, slide 93 in the package of materials I

7    gave you indicates that there are multiple catalog

8    databases that are available to the server.  That's

9    catalog databases 236.

10        And then if you turn to slide 94, this is a

11   discussion in the patent in which the file server 200

12   in that environment, it's talking about the networked

13   environment, contains TV-2 search program 250, EASEL,

14   this graphical user interface that was available at the

15   time, and multiple catalog databases containing

16   catalogs similar to the Fairmont and NIST catalogs

17   described above for the embodiment of Figure 1A.

18        I'd like to talk a little bit just briefly

19   about whether there is a sufficient structure with

20   respect to this multiple purchase order element.  I

21   went into that, I think, at length on Friday.  Just for

22   points of brevity, I didn't repeat myself here today,

23   but if you look at Figure 3 of the patent, there was a

24   reference to this.

25        THE COURT:  Do you have a slide?

1          MR. ROBERTSON:  Excuse me, sir?

2          THE COURT:  Is there a slide or do you want

3   me to just look at the patent?

4          MR. ROBERTSON:  I think -- I don't have a

5   slide on it.

6          THE COURT:  Okay.  Figure 3?

7          MR. ROBERTSON:  Figure 3.

8          THE COURT:  Got it.

9          MR. ROBERTSON:  Mr. McDonald just focused on

10  this purchase order and said, There's just a little box

11  there.  It doesn't really tell me anything.

12          Well, purchase orders are generated from the

13  requisition module and the requisition management is

14  there.  You'll see those numbers right next to the

15  purchase order, 01, 03, 04, 07, 05.  Those were those

16  numbers, Your Honor, that I mentioned on Friday that

17  are assigned to various distributors so that the

18  computer recognizes that code and says, That's from

19  this distributor, this is from that distributor, this

20  is from that distributor.

21          Why is that important?  Because when it's

22  going to break up the requisition, to route it to

23  different suppliers or distributors, it needs to know

24  what they are.  And that is laid out.  Those product

25  types are laid out in column 10, starting at line 53

128

1  going down to about line 64 describing how a purchase

2  order would then be generated for this corresponding

3  distributor item as further described below.

4           What was described right above, building a

5  requisition from various distributors and identifying,

6  for example, corresponding items, and then transmitting

7  back various information like contract price and

8  availability.

9           In this case, it's a type 03, which is a

10 regular distributor of the product.  You see there also

11 there's a type 07, which is that of a distributor from

12 a specific type of supplier, Fairmont.  There's a type

13 05 that the customer orders from Fairmont as an

14 administrative purchase.

15          There are various -- all of those items, I

16 won't go through them all, all those numbers are

17 identified in the patent.  Then if you go over to

18 column 15 it tells you, the paragraph that begins at

19 line 19, "Once a requisition has been inventory sourced

20 and accepted by the CSR, it can be converted to one or

21 more purchase orders."

22          You see, Your Honor, starting at about line

23 35, it's using the type of product codes that have been

24 determined from the available sources.  The type 01,

25 the type 03, as shown in Figure 3.

1           So upon execution of order A, the inventory

2    records on both computers for distributor-owned JIT,

3    that's for Just In Time, inventory are adjusted

4    synchronously.  A purchase order is generated by host

5    computer 10 immediately thereafter.

6           Then you'll see there's various order types

7    that are being processed.  So that is how it is

8    splitting the requisition into several purchase orders.

9    Once it's given a code, the computer is a machine.  It

10   does computations.  And it can, in fact, do those

11   computations.

12          Just for the Court's reference about the

13   different environments and the location of the programs

14   and where they are, are they on the local computer or

15   on the server, I would just refer the Court to column

16   18, lines 30 to 52, in which it describes requisition

17   and purchase order programs and databases operating on

18   the server in that instance.

19          It says, "In some situations (e.g.,

20   purchasing) each client computer has an independent

21   copy of requisition/purchasing program 240; in others

22   (e.g., an on-site customer service representative) a

23   single copy of the requisition/purchasing program 240

24   is maintained with associated local databases on the

25   server.

1            So it can be operated both on the local

2     computer and it can be operated on the server.   It

3     doesn't need to be read into the claim that it has to

4     be operating on the local computer.

5            I guess the only last issue I would address,

6     Your Honor, is whether there's adequate support for the

7     converting step, which Lawson contends there is not.

8     We have cited where the support is in the patent, but,

9     again, it had to do with those cross-reference tables

10    that are created where you have corresponding products

11    that have been assigned codes.

12           Again, once you assign a code, it's very easy

13    to have a computer perform the cross-referencing

14    functionality because you're saying that product is

15    similar or equivalent to that product, and the

16    cross-reference table will tell you that.   And that is

17    described in the patent at various places, Your Honor.

18    I think I did address that on Friday, so I won't go

19    through that cross-referencing again.

20           THE COURT:  All right.

21           MR. ROBERTSON:  Thank you, Your Honor.

22           THE COURT:  Why don't we take about a

23    10-minute break.

24           (Recess taken from 5:20 p.m. to 5:35 p.m.)

25           THE COURT:  Okay.  They didn't like it here,

1  did they?

2          MR. CARR:  No, they didn't.

3          THE COURT:  Well, first, I'd like to say that

4  I feel fortunate in this case to be confronted with and

5  working with good lawyers on both sides, and I feel

6  like the presentations have been helpful.

7          I do believe that the means-plus-function

8  analyses in this patent and all patents before <u>Harris</u>

9  was decided present problems for counsel and for the

10 Court, and I outlined what I thought those problems

11 were earlier.

12         I don't know if this is the right way to get

13 further help or not, but I have thought about it, and I

14 solicit your views.  The first thing I'd like you to do

15 is go back through everything you've done and see where

16 you agree, and let's get a statement of things you

17 agree on, constructions you agree on.  I think we

18 achieved a lot of that last week.  And let's have those

19 agreed just like we used to do with instructions.  Get

20 the agreed instructions.

21         I don't see that there are many differences

22 in the function department.  I will tell you that my

23 general approach to function is to use the words used

24 in claim unless there's some reason not to as to

25 describing function.

1          Now, what I'd like also for each of the

2    eleven -- there's eleven, isn't it, Mr. Carr?

3          MR. CARR:  There's the one that we claim is a

4    means-plus-function claim and they claim is not.

5          THE COURT:  And it fails.

6          MR. CARR:  That's right, correct.

7          THE COURT:  Well, for each of the eleven

8    means-plus-function claims, I'd like the following:

9    Where you agree that it's a means-plus-function, that

10   would be for the ten of them, I have in mind that for

11   each one --

12         MR. CARR:  Your Honor, it's eleven plus one.

13   So it would be the ones we agreed --

14         THE COURT:  Whatever.  Eleven.  Yeah.  That

15   you'll have a line up here at the top of the page that

16   says "claim."  Identify the claim you're talking about

17   at the beginning in the heading and then the part of it

18   that you're dealing with.

19         What I did to make my life easier was to take

20   my copy of the claims, and every section below the

21   preamble I numbered as a claim.  You don't have to do

22   that because that's not what I'm looking for, but take

23   the ones that are at issue and articulate them as they

24   are presented by the claim itself, and then say what

25   the function is.  Either the agreed function or tell me

1  if it's different.  I think you agree on almost all but

2  two of them, I think I'm right.

3           And then for the structure, I want a section

4  that says "Structure Identified," and I want you to go

5  down and start over here with the column and the line

6  on the one side, one part, and parenthetically note

7  what part of the specification are we dealing with to

8  find your citation for the structure.  Is it in the

9  abstract?  Is it in the specification part where it's

10 dealing with a particular topic?  Just so it will help

11 me understand and quickly get back to that section.

12          And then I want the text from the

13 specification, the part of the patent that you rely on

14 to establish the structure recited.  And put down every

15 one of them - as I said, there's a lot of effort to

16 cobble together - so I can read it.

17          And if you think there's some parenthetical

18 explanation that I need to understand what that says

19 like these ERCFDD2, 7, 14, 35, hike, it sounds like a

20 quarterback giving signals or something like that, you

21 put that at that point so I can understand it.

22          Then on a textual page following this, if

23 you-all need to link these together and explain them,

24 explain them.  Explain to me what your construction is

25 and how you get from one sentence to another sentence

1  to another sentence, and how does it prove the

2  structure you want and accomplish the function that you

3  have identified.

4          And I can envision coming away with each side

5  having eleven tabs in a notebook dealing with this.

6  And it would be helpful to me if for each tab you would

7  take the part of the patent, copy it, just xerox it or

8  something, however you do it, I don't care how you do

9  these fancy things, and highlight that language so I

10  can view it in context all at the same time.

11         And maybe I can do a better job interpreting

12  this because you-all have presented some issues that I

13  didn't actually discern were issues in your arguments.

14  I didn't perceive the import or significance of the

15  issues until I got to your arguments.  So take your

16  arguments, and see what you said, and then meld them

17  into something.  Use whatever part of your briefs you

18  want.  And don't try to refute the other side's

19  construction.  Just give me your construction.

20         And if I can have those, I think we can -- I

21  don't want you to have to start all over again.  I

22  don't think that's right from a lot of standpoints.  I

23  think there's a certain level of understanding that we

24  all have with each other's position.  That you have

25  with each other's positions and I have of your

1  positions.  But I think we're not quite there yet.  And

2  I'm not going to blame you-all.  I just believe it's

3  created because of the circumstances that I outlined

4  earlier.

5          If you can come up with some modification of

6  that approach that you think is a better way to present

7  all this in a simpler more direct form in a way that I

8  can convert into an opinion on this matter, then I'm

9  amenable to you all doing that as long as both of you

10  do it the same way.

11          So if I haven't come up with a very good way

12  of accomplishing it, you-all work it out and see what

13  you'd like to do, and call me and we'll talk about it.

14          I don't see the need for any more argument on

15  it or hearings, but if you-all feel as if, after

16  talking with each other, that I need testimony from

17  some expert or something, then you can let me know.

18  And I'm using the definition of "algorithm" that you

19  all had.  I think it was in your section from the

20  Microsoft computer dictionary.  I think that's a

21  reasonably accurate one.  It looks like the Federal

22  Circuit uses it.

23          In this process, do you think we've limited

24  any of the claims that we're dealing with or going to

25  be dealing with in the patents?  One of you cited a

136

1    construction, I think Lawson did, about a part of the

2    patent that I don't really think is at issue even.  I

3    don't know why it was in there.  Let's see.

4              MR. ROBERTSON:  I think it was claim 31.

5              MR. CARR:  '683, 31.

6              THE COURT:  Yes.  Ms. Wagner has done

7    something that is helpful to me.  When you're

8    discussing a claim term, you can discuss it from, say,

9    claim 3 of the '683 Patent, but footnote to me somehow

10   that that same claim language is pertinent to other

11   patents and other claims so I'll be able to have you

12   all in agreement on the ones that we are doing.

13             I think that will be sufficient.  Are there

14   any questions that you all have about that or anything?

15             MR. MERRITT:  Your Honor, we do have a couple

16   of questions.  One is about the timing on these

17   submissions.

18             THE COURT:  I want to get to that.

19             MR. MERRITT:  And the other is you had

20   mentioned at the end of last week's hearing that the

21   trial date of June 14 might not hold, and we have had

22   some discusses among ourselves in anticipation of --

23             THE COURT:  Do you have some ideas?  I don't

24   know that I'm ready to deal with that right now, but I

25   can deal with it shortly.  Do you-all have plans?

1          MR. MERRITT:  The only thing we're aware of

2    is I believe Mr. McDonald does have a family vacation

3    in July.

4          THE COURT:  I'm not going to interrupt

5    somebody's vacation because I have made a mistake.

6    That's not what I think is the right thing to do.

7          How long will it take you to do what I've

8    asked you to do?  Mr. Robertson, what's your view?

9          MR. ROBERTSON:  Well, Judge, we have some

10   expert reports coming up, too, in mid-February.  So

11   we've got a lot on our plate, obviously, and there's

12   some additional depositions going forward.

13         THE COURT:  Since you're not going to have

14   the trial on June the 14th, you can slide some of that

15   some.  I think the first thing to do is get this

16   straight.

17         MR. ROBERTSON:  We had discussed perhaps

18   getting some interim agreement assuming the dates are

19   going to slide something in the order of 20 to 60 days,

20   whatever it is, and pushing back the expert reports.

21   And I think we will be able to work that out among

22   counsel.  So would two weeks be too long?

23         THE COURT:  No.

24         MR. ROBERTSON:  From today.  Just to give you

25   the supplemental submission?

1           THE COURT:  No.

2           MR. ROBERTSON:  Okay.  Well, thank you then.

3           THE COURT:  Oh, I wasn't say no, you can't do

4    it.  I was answering your question:  Was it too long?

5    It's fine for you to have two weeks.

6           MR. ROBERTSON:  Okay.

7           THE COURT:  Now, do you need, do you think,

8    anything in rebuttal or not?  I don't know that you do.

9           MR. CARR:  No.

10           THE COURT:  If I feel like I need it, I'll

11    give you a short fuse on it.  Okay?

12           MR. ROBERTSON:  That's fine.

13           THE COURT:  I think this will help me a whole

14    lot, given what else I've got, and the other positions.

15           MR. CARR:  The issue with the expert reports

16    is that it's obviously easier for the experts to issue

17    their reports if they know what construction the Court

18    is going to adopt.

19           THE COURT:  Yes.

20           MR. CARR:  So we want to try to construct a

21    schedule that would allow those reports to be due after

22    your ruling comes down.

23           THE COURT:  I understand that.  There is

24    another way to approach expert reports, and that is

25    have them do alternate constructions.  And there are

139

1   cases where they just assume that the other side's

2   construction is adopted and then give the opinion based

3   on that as the alternative.

4          And, in fact, for a long time I think that

5   really was the way it had to be done.  People didn't

6   think too much about it, what you're talking about,

7   because Markman changed a lot of the practice in a lot

8   of ways.

9          What do you all think about doing it that way

10  in this case?

11         MR. CARR:  Well, I can answer that in a

12  couple of ways:  (1)  We also aren't sure whether it's

13  going to be either ours or theirs, but it could be a

14  third construction that you come up with.

15         THE COURT:  I understand, but I don't see

16  that happening in this case for most of them, but it

17  may.

18         Judge Brinkema did that, I think, didn't she?

19         MR. CARR:  Judge, she did not construe them

20  until --

21         THE COURT:  No, I mean she used some claim

22  constructions that neither one of the parties advanced,

23  I believe.

24         MR. ROBERTSON:  That's correct, Your Honor.

25         THE COURT:  I don't know whether Judge

1  Spencer did or not.  I can't remember that.

2         MR. ROBERTSON:  There was an overlap as to

3  two of the terms.

4         THE COURT:  All right.  Which way would you

5  rather deal with it?

6         MR. CARR:  Do you have a sense for how long

7  you want to move the trial date?

8         THE COURT:  I was looking into July sometime,

9  but I'm not going to ruin somebody's vacation.  That's

10 just not right for me to do because I'm the one that

11 made the mistake, not you all.

12        MR. CARR:  The bad dates are July 16th

13 through the 25th.

14        THE COURT:  Okay.  We may be looking into

15 August or September then.  Does that help you-all out?

16        MR. CARR:  Yes.

17        THE COURT:  You're not going to have a

18 June 14th date.  I'm sure of that.

19        MR. CARR:  If you anticipate it's going to be

20 in August, we can feel comfortable moving the expert

21 report dates a good 30 days, if not more.

22        THE COURT:  Okay.  It will be in August or

23 September, I think.

24        Ms. Wagner is very upset about the prospect

25 of it not occurring on her watch, and so I'm going to

1   try to get it in August.

2          MS. WAGNER:  Thank you.

3          THE COURT:  We don't need to have any more on

4   the record.

5          Thank you very much.  We will be in

6   adjournment.

7

8          (The proceedings were adjourned at 6:00 p.m.)

9

10          I, Diane J. Daffron, certify that the

11   foregoing is a true and accurate transcription of my

12   stenographic notes.

13

14                    /s/                     2/1/10
         _____   _____
15          DIANE J. DAFFRON, RPR, CCR        DATE

16

17

18

19

20

21

22

23

24

25