**THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| *e*PLUS, INC.,<br><br>          **Plaintiff,**<br><br>          **v.**<br><br>**LAWSON SOFTWARE, INC.,**<br><br>          **Defendant.** | )<br>)<br>)   **Civil Action No. 3:09-CV-620 (REP)**<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**DECLARATION OF ALFRED C. WEAVER, PH.D. IN SUPPORT OF EPLUS'S**
**PROPOSED CLAIM CONSTRUCTION FOR CERTAIN CLAIM TERMS IN**
**U.S. PATENT NOS. 6,023,683 AND 6,505,172**

I, Alfred C. Weaver, Ph.D., declare, depose and state the following:

1.      I am a Professor of Computer Science at the University of Virginia in Charlottesville, VA. My address is 151 Engineer's Way, P.O. Box 400740, Charlottesville, VA 22904-4740. I have been involved in the Computer Science field for over thirty-five years. I am over eighteen years of age and would otherwise be competent to testify to the matters declared herein if I am called upon to do so at trial.

2.      I have been retained by Goodwin Procter LLP on behalf of the Plaintiff *e*Plus, inc. ("*e*Plus") as a technical expert witness with respect to the proceedings currently before the Court in the above-captioned matter.

3.      For purposes of this Declaration, I have been asked to provide an expert technical analysis as to the issues related to the proper interpretation of certain means-plus-function terms in the claims of U.S. Patent No. 6,023,683 (the "'683 Patent") and U.S. Patent No. 6,505,172 (the "'172 Patent"), pursuant to 35 U.S.C. §112, ¶6.

## I.   BACKGROUND AND EXPERIENCE

4.     My background and experiences that qualify me as an expert in this case are set forth in Appendix A attached hereto.  A detailed *curriculum vitae* showing more of my credentials in these fields is attached as Exhibit 1.

## II.   MATERIALS REVIEWED

5.     In performing the analysis that is the subject of the Declaration, I have reviewed the '683 Patent and its prosecution history, the '516 Patent and its prosecution history, and the '172 Patent and its prosecution history.  In addition, I have reviewed the *Markman* Orders of this Court in *ePlus, Inc. v. Ariba, Inc.* and *ePlus, Inc. v. SAP America, Inc. and SAP AG,* and the instructions as to the meanings of certain claim terms that the Court gave the jury in both cases. Finally, I have reviewed the parties' proposed constructions of certain claim terms for this litigation.

## III.   UNDERSTANDING OF LAW TO BE APPLIED TO INTERPRET CLAIMS

6.     In formulating my opinions and conclusions in this case, I have been provided with an understanding of the prevailing principles of U.S. patent law that govern the issues of patent claim interpretation.  The legal principles upon which I have relied are set forth in Appendix B attached hereto.

## IV.   PERSON OF ORDINARY SKILL IN THE ART

7.     It is my understanding that my analysis of the interpretation of the asserted claims of the patents-in-suit must be undertaken from the perspective of what would have been known or understood by someone of ordinary skill in the art of the patents-in-suit.  From analyzing these patents (which share a common specification), it is my opinion that they are directed to a person in the field of computer science with a Bachelor of Science degree and some practical

2

programming experience, perhaps about a year or two of experience, and having an understanding of basic principles of supply chain management and procurement in the 1993 to mid-1994 time frame when the inventors of the inventions claimed in the patents-in-suit conceived their inventions and reduced them to practice. With over thirty-five years of experience in the computer science field, I am well acquainted with the level of ordinary skill required to implement computerized processes and the computer systems and software used to implement them. I have direct experience and am capable of rendering an informed opinion on what the level of ordinary skill in the art was for computer scientists in 1993-1994. Moreover, I have an understanding of supply chain management and procurement principles and am capable of rendering an informed opinion in that area.

8.    The level of technical specificity provided in the patent specification would have been sufficient for a person with a Bachelor of Science in Computer Science degree with some practical programming experience to build and implement the systems claimed in the patents-in-suit. I believe that some understanding of supply chain management and procurement concepts would have been useful to enable the computer scientists to understand the concepts described and claimed in the patents-in-suit. Therefore, my analysis of the proper meaning of the terms and phrases used in the claims of the patents-in-suit will be undertaken from this perspective.

## V.    PROPER INTERPRETATION OF THE CLAIM TERMS AT ISSUE

9.    I understand that *e*Plus has asserted infringement of claims 3 and 6 of the '683 Patent and claim 1 of the '172 Patent. Many of the elements of these claims are expressed as means for performing recited functions and, thus, I understand that these elements are subject to the claim construction principles under Section 112, paragraph 6 of the Patent Act. Moreover, the inventions claimed in the patents-in-suit are implemented via computer software. Therefore,

3

I understand that the corresponding structures for such means-plus-function elements are to be construed as the algorithms for performing the recited functions.

10.     Attached as Exhibit 2 hereto is a chart comparing *e*Plus's proposed claim constructions to those proposed by Lawson for the claim terms in dispute.

### A.     Definition Of "Algorithm"

11.     An "algorithm" is simply "a logical procedure for solving a problem." *See Webster's New World Computer Dictionary* (9th ed. 2001) at 17 (Ex. 3).  *See also Microsoft Computer Dictionary* (5th ed. 2001) at 23 (defining "algorithm" as "[a] finite sequence of steps for solving a logical or mathematical problem or performing a task.") (Ex. 4).  I am informed that the parties agree on this definition of an "algorithm."

12.     These definitions are consistent with the manner in which the term "algorithm" is used in the computer science field.  In mathematics, computer science and related subjects, an algorithm is an effective method for solving a problem using a finite sequence of instructions.  Algorithms are used for calculation, data processing and many other tasks.

13.     Consistent with this definition, in my opinion, the algorithms associated with the means-plus-function claim terms at issue are properly construed to recite the process steps executed by the software only and should not be construed to include specific hardware on which the software executes.  Thus, for example, in my opinion, recitation of the type of computer the software executes on would not be included as a "step" of the process executed by the software.  Therefore, in my opinion, Lawson's proposed constructions of the means-plus-function claim terms which include recitations requiring that the software "run[s] on local computer (20 or 230)" are not properly included in an algorithm executed by software.  *See* Ex. 2 at 3-16 (constructions of "means for selecting the product catalogs to search," "means for searching for matching items among the selected product catalogs," "means for building a requisition using

4

data relating to selected matching items and their associated source(s)," "means for searching for matching items in the database," "means for entering product information that at least partially describes at least one desired item," "means for searching for matching items that match the entered product information in the selected portions of the database," and "means for building a requisition that uses data obtained from said database relating to selected matching items on said order list.").

### B. The Specification Of The Patents-in-Suit Includes A Networked Embodiment

14. As discussed above, for most of the means-plus-function elements of claims 3 and 6 of the '683 Patent and claim 1 of the '172 Patent, Lawson's proposed constructions have incorporated the requirement that the computer software be "running on a local computer." As discussed above, in my opinion, this is improper because the steps of an algorithm executed by computer software would not include recitations of hardware. Moreover, in my opinion, such proposed constructions are also improper because they disregard the fact that networked embodiments for the inventions are disclosed in the patent specification. In such embodiments, the computer software need not be "running on a local computer."

15. Lawson further contends that a person of ordinary skill in the art would have understood in August 1994 that the DDE protocol described in the specification was the only means for communications between the requisition/purchasing program 40 and the catalog search program 50 of the embodiment illustrated in Figure 1A. Lawson contends that nowhere does the specification describe or identify any other means to achieve communications between a requisition/purchasing program and a catalog search program and, therefore, the requisition/purchasing program and a catalog search program must necessarily be running on the same local computer utilizing the DDE communication protocol. *See* Lawson's Responsive Br.

5

at 7-10. Thus, many of Lawson's proposed constructions recite that the requisition/purchasing program communicates with the catalog search program via a "DDE protocol of interface." *See* Ex. 2 at 3-16 (Lawson's proposed constructions of "means for selecting the product catalogs to search," "means for searching for matching items among the selected product catalogs," "means for building a requisition using data relating to selected matching items and their associated source(s)," "means for searching for matching items in the database," "means for searching for matching items that match the entered product information in the selected portions of the database," and "means for building a requisition that uses data obtained from said database relating to selected matching items on said order list.").

16.    Lawson's proposed constructions disregard the fact that in addition to the local computer embodiment illustrated in FIG. 1A and described in Columns 3-16 of the '683 Patent specification, the specification also describes various networked embodiments of the invention in FIG. 1B and Columns 16-19 of the specification. In such embodiments, the programs need not "run on the local computer" or utilize a "DDE protocol of interface." Moreover, a person of ordinary skill in the art would appreciate, based upon a review of the patent specification, that the inventors merely employed the DDE protocol because they were utilizing the IBM 0S/2 operating system with the CICS OS/2 application in one of their preferred embodiments and such DDE protocol was available with such operating system and application. *See* Newton's Telecom Dictionary (16th ed. 2000) at 288 (describing DDE as a form of InterProcess Communication in Microsoft Windows and OS/2) (Ex. 5). However, such operating system and application are not required to implement the invention. '683 Patent, Col. 3:60-67 ("Local computer 20 is *preferably* a conventional microcomputer…capable of…running the OS/2 operating system 32 and also running the CICS OS/2 application 34) (emphasis added); 5:22-24 ("Interface 60 is

6

*preferably* based upon the dynamic data exchange ('DDE') protocol provided by OS/2 operating system 32.") (emphasis added). If a person of ordinary skill in the art was implementing the systems of the claimed inventions in a different operating system environment, different communications protocols could be employed as applicable to the operating system selected.

17.   Indeed, the patent specification specifically discloses different communications protocols which can be employed to transfer data.

18.   For example, the specification states that "[h]ost computer 10 and local computer 20 are preferably linked point-to-point or in a network employing the formats and protocols of IBM's System Network Architecture ('SNA') … Preferably, host computer 10 is a mainframe computer, …, running… a Virtual Telecommunications Access Method communications network." '683 Patent, Col. 5:9-17. U.S. Patent No. 5,712,989 (the "'989 Patent"), which is expressly incorporated by reference into the specification of the patents-in-suit ('683 Patent, Col. 1:12-16), provides further description of the communications protocols employed using IBM's System Network Architecture (SNA). (The '989 Patent is attached as Ex. 6).

19.   Similar to the description at Col. 5:9-17 of the '683 Patent, the system described in the '989 Patent, in one embodiment, also includes a host computer 10 which is linked via modems 12 and 44 to the remotely-located local computer 40, as shown in Fig. 1. Host computer 10 and the local computer 40 are linked in a network employing the formats and protocols of IBM's Systems Network Architecture (SNA). *See* '989 Patent, Col. 2:67 to Col. 3: 3. Further the host computer 10 can be any mainframe or minicomputer running the Multiple Virtual Storage (MVS) operating system, the MVS CICS application and a Virtual Telecommunications Access Method (VTAM) communications network. '989 Patent, Col. 3:3-10. Additionally, similar to the description at Col. 3:60-67 of the '683 Patent, local computer 40

7

in the system of one embodiment in the '989 Patent is described as preferably being a minicomputer running the OS/2 operating system and the CICS OS/2 application. '989 Patent, Col. 3:55-61. The specification further provides that the local computer 40 can be a workstation which includes a multi-protocol adapter communications card, capable of supporting the LU 6.2 communications protocol, one of the communication protocols of IBM's SNA. '989 Patent, Col. 4:4-11. The host computer 10 is linked to a telephone line 15 via a communications front end processor 11 running conventional operating software, such as IBM's Network Control Program (NCP) and a modem 12, and a VTAM communication network. '989 Patent, Col. 4:45-50. The local computer 40 is linked to the telephone line via a DCU pass-through box and is programmed with the communications manager application. '989 Patent, Col. 4:50-53. Data can be exchanged between the host computer 10 and the networked, remotely-located local computer 40 using the LU 6.2 communications protocol which enables transfer of packets of data blocks between the application executing on the local computer 40 and the application executing on the host computer 10. '989 Patent, Col. 4:53-67.

20.     Thus, as described in the specification of the patents-in-suit and the '989 Patent (which is incorporated by reference into the specification of the patents-in-suit), the communications protocols and networking arrangement enable distributed transaction processing whereby two separate programs or tasks executing on two separate computers engage in a synchronized exchange of data to accomplish a particular job. '989 Patent, Col. 5:3-20. The '989 Patent describes a system wherein a requisition program operating on the host computer 10 can receive input relating to an item to be requisitioned from a remotely-located local computer 40 in electronic form over a network through a telephone line. '989 Patent, Col. 6:43-47.   (This is also described in the patents-in-suit. '683 Patent, Col. 17: 23-29 ("each local computer is

8

connected to host computer 210 via a phone/dataline and either a gateway or a mini-computer acting as a local host").) Additionally, the local computer 40 transmits data blocks to the remote host computer 10 via the communications link relating to queries to be performed against the host computer's inventory database. '989 Patent, Col. 12:34-52.

21.     Both the patents-in-suit and the '989 Patent further describe that an additional communications protocol, namely, electronic data interchange (EDI), can also be used for transmission of purchase orders and other data between local computer 40 and the host computer 10 using an ERI/EDI interface. '683 Patent, Col. 15: 45-49; '989 Patent, Col. 36:57-62.

22.     Therefore, based upon this description of various communications protocols which can be employed to transmit data between applications executing on two different computers which are networked, but remotely located from each other, a person of ordinary skill in the art would understand that any or all such communications protocols and networking means could be employed in connection with the systems described in the patents-in-suit. Moreover, in my opinion, a person of ordinary skill in the art would further understand, based upon the referenced use of the LU 6.2 communications protocol to facilitate transmission of data between the local computer 40 and the host computer 10, that such LU 6.2 communications protocol could be employed in the systems described in the patents-in-suit. To summarize, the DDE communications protocol is not necessary to the requisitions/purchasing program or the catalog search program and, therefore, should not form the basis of the algorithm, or the steps, to perform the tasks executed by such programs.

23.     A person of ordinary skill in the art in August 1994 would understand that the LU 6.2 communications protocol adapted IBM's SNA to make it comparable to today's peer-to-peer communications and distributed computing environments. A person of ordinary skill in the art in

9

August 1994 would have understood that in order to communicate data between applications executing on two computers utilizing the LU 6.2 communications protocol, a session path is created between the two end points, or Logical Units (LU's). An LU 6.2. session enables either side of the transaction to initiate the session. A person of ordinary skill in the art would also understand that, utilizing the LU 6.2 communications protocol, the communications between the two computers need not go through a mainframe host computer but can be true peer-to-peer communications, *i.e.*, a distributed computing environment similar to that existing today in the Internet arena.

24. My opinion is confirmed by the discussion found in the "Encyclopedia of Networking, Electronic Edition" (McGraw-Hill 1998) (attached as Exhibit 7 hereto). As described therein, the LU 6.2 communications protocol, also known as Advanced Program-to-Program Communications (APPC), was software that enabled high-speed communications between programs executing on different computers, from portables and work stations to mid-range and host computers, over SNA, Ethernet, X.25, token ring, and other network topologies. The LU 6.2 protocol represented a shift in network control away from centralized host systems to systems that were attached to the network. Systems running LU 6.2 sessions do not need the services of a host system when establishing sessions. Persons of ordinary skill in the art in August 1994 would therefore have understood that the LU 6.2 communications protocol described in the specification of the patents-in-suit provided peer-to-peer communications between computer systems other than hosts and allowed those systems to run distributed applications like file sharing and remote access. *Id.* at 33-34, 41-45. This arrangement was helpful in a local area network environment, such as that described in connection with the embodiments of Figure 1B of the patents-in-suit.

10

25. A person of ordinary skill in the art in August 1994 would also have understood that applications using the LU 6.2 protocols are called transactions programs. Examples of such transaction programs include IBM's Distributed Data Management (DDM) Application which provides file sharing and database sharing among systems that implement DDM and Document Interchange Architecture (DIA), which was a document exchange standard that defined searching, browsing, printing, and the distribution of documents. A transaction program can open a session, perform data transfer, and close the session. A transaction program performs a unit of work on a channel that interconnects IBM systems. A transaction program could hold multiple conversations with multiple systems in the network. *Id.*

26. Along with the LU 6.2 communications protocol, IBM also provided an application referred to as Advanced Peer-to-Peer Networking (APPN) which was also integrated into SNA. This application provided peer-to-peer networking services similar to TCP/IP employed in the present day Internet environment. One of the main reasons IBM introduced APPN was to provide client/server computing services to users who were considering moving to TCP/IP or other services. APPN is based on the concept that computers on a network have enough processing power of their own to handle session management and routing. APPN moved various services from central control, such as that provided by a host mainframe computer, to de-centralized control points that operate in a peer-to-peer relationship. In the APPN model of IBM's SNA architecture, user stations can set up and maintain their own sessions. The APPN architecture is similar to the OSI and TCP/IP architecture used in today's Internet environment. *Id. See also* Computer Desktop Encyclopedia (9th ed. 2001) at 564 (describing LU 6.2 as "[a]n SNA protocol that establishes a session between two programs. It allows peer-to-peer communications, as well as interaction between program running in the host with PCs, Macs and

11

midrange computers…. LU 6.2 allows processing to take place at both ends of the communications, necessary for today's distributed computing and client/server environment."); and 903, attached as Exhibit 8 hereto; and Ex. 5 at 750, 820-21 and 929.

27.    A person of ordinary skill in the art would also have understood in August 1994 that SNA is implemented in functional layers starting with the application that triggers the communications (in SNA, referred to as "Transaction Services"), to a presentation layer (in SNA, referred to as "Presentation Services") down to the bottom layers that transmit packets from station-to-station. *See, e.g.,* Ex. 8 at 903.

28.    Therefore, in my opinion, a person of ordinary skill in the art in August 1994 reading the specification of the patents-in-suit would have understood that the electronic sourcing systems of the patented inventions could have been implemented using the functional layers of the SNA in a manner such that a requisition/purchasing program could be executing on a different computer from a computer executing the catalog search program and that both applications need not execute on the same local computer communicating via DDE inter-process communication, such as suggested by Lawson. The specification of the patents-in-suit expressly describes means for achieving communications between applications running on a local computer and another application running on a different computer other than the DDE protocol, contrary to Lawson's position.

29.    Nor would the catalog search program which is stored at the file server in the embodiments described with reference to Figure 1B, need to be downloaded to and executing on a local computer along with a requisition/purchasing program, as suggested by Lawson. The specification, indeed, describes systems in which an application, such as the requisition/purchasing program, can execute on a different computer than another application

such as the catalog search program. Moreover, the specification expressly describes and identifies a means to separate the presentation functions of applications, such as the requisition/purchasing program and the catalog search program from the application functions of such programs, namely, via use of the SNA and APPN architecture.

30.    Additionally, in my opinion, a person of ordinary skill in the art in August 1994 would have understood, from the discussion of the multiple embodiments described with reference to Fig. 1B and columns 16-19 of the '683 Patent specification, that it would be desirable to implement a client/server based system wherein the catalog search program executed on a different computer than the requisition/purchasing program. For example, with reference to Fig. 1B, the specification of the patents-in-suit expressly teaches an embodiment related to a Distributor's Regional customer service location where a large number of CSR's may be placing orders directly on the Distributor's host computer for thousands of customers. *See*, '683 Patent, Col. 16:66-Col. 17:3.

31.    As described in the specification of the patents-in-suit, catalog search program 250 and catalog databases 236 are stored on file server 200. '683 Patent, FIG. 1B. The specification states that file server 200 can be a large personal computer, a workstation, or a mini-computer such as the IBM AS/400. The specification further describes that, alternatively, the file server 200 and a mini-computer (such as an IBM AS/400) can be ***independently*** connected to each local computer 220. Each CSR has a local computer 220 provided with the requisition/purchasing program 240 and the graphic user interface 254 for listing items. '683 Patent, Col. 17: 3-22. Because the patent specification describes the use of IBM's SNA to communicate between two networked computers with reference to queries transmitted to check the availability of an item with respect to the remote host computer 10's inventory database, a

13

person of ordinary skill in the art would recognize that this same communication means can be utilized in the embodiment relating to a remotely-located Distributor's host computer being simultaneously accessed by a large number of CSR's local computers in a networked environment. The specification expressly describes that each local computer servicing each CSR "can be connected to host computer 210 via a phone/data line and either a gateway or a mini-computer acting as a local host." '683 Patent, Col. 17: 23-33[1] Moreover, the specification expressly describes that a CSR at a local computer can enter from a graphical user interface 254 items to be requisitioned directly onto the Distributor's mainframe computer 210. '683 Patent, Col. 17:39-43. The specification goes on to describe that, in this regional environment, the file server 200 can act as a local host to a series of CSR's local computers, and data can be periodically downloaded to the local host (file server 200) from the Distributor's host computer 210. In other words, this embodiment is a true distributed computing environment.

32. The specification of the patents-in-suit describes another networked embodiment for use in connection with a Distributor's purchasing department. The file server 200 in that environment contains the catalog search program 250, the graphical user interface 254 and multiple catalog databases 236. '683 Patent, Col. 17:55-64. In this embodiment, a Distributor purchasing employee using local computer 220 can receive, via a Distributor's host computer 210, requests for items not shown in the Distributor's host databases as regular products sourced from the Distributor (type 03) or third party items purchased for particular customers from other suppliers or distributors (type 07). The Distributor purchasing employee can search appropriate catalogs using catalog search program 250 and can transfer "items selected" to a product list in

---

[1] A "gateway" is a device the connects networks using different communications protocols so that information can be passed form one to the other. A gateway both transfers information and converts it to a form compatible with the protocols used by the receiving network. Microsoft

the graphical user interface 254. The Distributor purchasing employee using local computer 220 can confirm pricing and availability of the items selected with the suppliers by transmitting a query to the host computer 210's inventory and pricing databases. '683 Patent, Col. 17:64- Col. 18:29.

33.     The specification of the patents-in-suit further describes several other networked embodiments with reference to Figure 1B. The specification makes clear that the number of client computers 220 and the number and size of the catalog databases 236 used in the networked environments will dictate the size of file server 200 that is required for the particular environment. The specification describes multiple networked operating environments such as a regional CSR site networked with a Distributor's host, an on-site CSR networked with a remote host, an on-site CSR networked with remote customer end users and with purchaser personnel or a Distributor purchasing site. The networked environment in which the electronic sourcing system of the invention is to be used will affect the specific catalog databases 236 that are included with the system, the size of the file server 200 that is employed, and the specific requisition/purchasing program 240 that is to be used.

34.     As described in the specification, in some situations, (*e.g.*, the purchasing environment mentioned above), each client computer has "an independent copy" of the requisition/purchasing program 240. In contrast, in other operating environments such as the on-site CSR networked embodiment described, a single copy of the requisition/purchasing program 240 is to be maintained along with associated local databases on the file server 200. '683 Patent, Col. 18:30-67.

Computer Dictionary (5th ed. 2002) at 232 (Ex. 4).

35.     For all of these reasons, it is my opinion that Lawson is incorrect and that a person of ordinary skill in the art in 1994 would have appreciated from a review of the patent specification that the requisition/purchasing program and the catalog search program could be executing on different computers in a networked environment and that such programs did not both need to be operating on the end-user's local computer.  Moreover, since the patent specification expressly describes the use of communications protocols other than the DDE protocol, *e.g.*, the LU 6.2 communication protocol, a person of ordinary skill in the art would have understood that the requisition/purchasing program and the catalog search program need not run on the local computer in order to provide the communications and functions required by the claims of the patented inventions.  The patent specification expressly describes other embodiments that would have been functional and operable in the August 1994 time frame beyond the local computer and DDE protocol environment.  Moreover, there is explicit description in the specification of a manner for implementing the claimed inventions in a distributed computing environment that would separate the presentation and application layers of such applications, thus confirming that the programs need not run/execute on a local computer. The application layers of such programs execute on the server in such an environment.

36.     In conclusion, in my opinion, it would be improper to import limitations requiring that the software programs of the claimed inventions execute on a local computer and communicate via a DDE protocol.

> C.     **There Is Structure Described In The Patent Specification Corresponding To The "Means For Processing The Requisition To Generate One Or More Purchase Orders And The "Means For Processing Said Requisition To Generate Purchase Orders For Said Selected Matching Items"**

37.     I am informed and understand that Lawson contends that the patent specification fails to disclose structure that corresponds to the "means for processing the requisition to

16

generate one or more purchase orders," as recited in claims 3 and 6 of the '683 Patent, and the "means for processing said requisition to generate purchase orders for said selected matching items," as recited in claim 1 of the '172 Patent. I disagree with Lawson's contention as a person of ordinary skill in the art would understand that the algorithm associated with these claimed functions and executed by the purchasing module of the system is clearly described in the patent specification and corresponds to the following steps:

>   (1)   accepting the requisition; and
>
>   (2)   generating one or more purchase orders based on the data
>   included in the requisition relating to the matching items selected
>   from the items returned from searching selected product catalogs
>   and based on predetermined rules relating to the user's preference
>   (*e.g.*, one purchase order to each distinct supplier referenced in the
>   requisition); and structural equivalents thereof.

38.     As described in the patent specification, the first step in the algorithm for generating one or more purchase orders from a requisition is that the system "accepts" the requisition. *See* '693 Patent, Col. 15:20-26 ("Once a requisition has been ... accepted ... it can be converted to one or more purchase orders, ..."). The next step in the algorithm is that the system generates one or more purchase orders based on predetermined rules relating to the user's preference (*e.g.*, one purchase order to each distinct supplier referenced in the requisition). *See* '683 Patent, Col. 10:48-64.

39.     As further described in the specification, the system analyzes each line item of the requisition and the source associated with such item and generates purchase orders to each source. For example, as described at '683 Patent, Col. 10:48-64, the system recognizes one line item on a requisition as an item associated with a first Distributor (because it is a type 01 product) and generates a first purchase order to that Distributor. When an item included on the requisition is associated with a second distributor (*e.g.,* as either a type 07 product or a type 05

17

product), the system recognizes that requisition line item as being associated with a second distributor, *e.g.*, "Fairmont," and generates a second purchase order corresponding to the "Fairmont catalog item" that was requisitioned. Thus, the system generated a first purchase order for the requisition line item associated with the first Distributor and a second purchase order for the requisition line item associated with the second distributor based on pre-established rules recognizing a type 01 product as associated with a first Distributor and a type 05 or type 07 product as an item associated with a different distributor. *See also* '683 Patent, Col. 14:46-65 (explaining the different sources associated with product types 01 to 05.)[2]

40.     Another example of the purchase order generation algorithm is provided with reference to '683 Patent, Col. 15:20-49, FIG. 3 and Appendix IX. Again, that description references a step wherein a requisition is accepted and another step wherein multiple purchase orders are generated from the requisition shown in Appendix IV based on the different sources from which each requisitioned item is to be ordered. It describes that "line items 001 and 003" on the requisition shown in Appendix IX would result in generation of a first purchase order because both of those requisitioned items are being procured from the first Distributor's external warehouses (*e.g.*, the line items are both type 03 products). A second purchase order would be generated for "line item 002" because that item is a type "01" product which is being sourced from on-site Distributor-owned inventory. And, a third purchase order is generated for requisition line item 004 because it is a type "06" product that is sourced from the customer's

---

[2] As described at Col 14:45-65, product type 01 indicates that the requisitioned item is to be sourced from the inventory owned by the first Distributor located in the JIT inventory that the first Distributor maintains at the customer's location. Product type "03" indicates that the requisitioned items are to be sourced from one of the first Distributor's warehouse locations. Product type "05" is associated with a requisitioned item to be purchased from an outside supplier. Product type "06" is associated with a requisitioned item to be sourced from inventory already owned by the customer. Product type "07" is associated with a requisitioned item to be

own inventory. This discussion further indicates that if a type "05" product had been included on the requisition, *i.e.*, a product to be procured from a second outside distributor, the system would have generated another purchase order to the second distributor, which could then be transmitted to the distributor by mail, fax or EDI (electronic data interchange). *See also* '683 Patent, Col. 18:18-29 (describing the system generating one or more purchase orders from the customer to the Distributor or another supplier).

41. A person of ordinary skill in the art would understand from these descriptions in the patent specification that certain rules could be predetermined in the requisition/purchasing program that would assist the requisition/purchasing program with the analysis of a requisition and the execution of a process whereby one or more purchase orders are generated from a single requisition, such as, generating one purchase order to each distinct distributor/supplier/source associated with the various line items in the requisition. Once the computer program recognizes the sources associated with each line item (by virtue of the predetermined codes associated with sources, for example), it can group the line items for each source together on separate purchase order forms.

> **D.   There Is Structure Described In The Patent Specification Corresponding To The "Means For Converting Data Relating To A Selected Matching Item And An Associated Source To Data Relating To An Item And A Different Source"**

42. I am informed and understand that Lawson contends that the patent specification fails to disclose any structure for performing the function of "converting data relating to a selected matching item and an associated source to data relating to an item and a different source" as recited in claims 3 and 6 of the '683 Patent. Again, I disagree with Lawson's

---

purchased from an outside supplier.

LIBW/1729493.1

contention as a person of ordinary skill in the art would appreciate that there is description in the patent specification corresponding to this claimed function.

43.     The patent specification clearly discloses that the system maintains cross-reference tables which include "cross-references from the Distributor's catalog number to its corresponding vendor's part (catalog) number and to similar corresponding catalog numbers of other vendors (suppliers or distributors) for the same Product." *See* '683 Patent, Col 4:66-Col. 5:8. As described in the specification, after the system has built a requisition with one or more matching items selected from hit lists returned as results of searches of the catalog database(s) by the search engine program, the next step is inventory sourcing. *See* '683 Patent, Col. 14:4-Col. 15:19; Col. 15:60-Col. 16:32. The system can search the databases that include the cross-reference tables ('683 Patent, Col. 14:21-22).[3] If in accessing the cross-reference tables, there is another corresponding item available from a different source, such item may replace the item originally included in the requisition. '683 Patent, Col. 14:11-65 and Appendices VIII to IX. As further described at Col. 15:60-Col. 16:32 of the '683 Patent, if the cross-reference tables provide an item that corresponds to a requisitioned item that is available from another source, that item may be substituted for, or replace, the requisitioned item, as shown in Appendix X where a "REPLACEMENT WAS MADE FOR PRIOR PART:  S100-06 LINE NUMBER 001 PART NUMBER 53610."

44.     A person of ordinary skill in the art would understand from these descriptions in the patent specification that database(s) in the electronic sourcing system maintain cross-reference tables that cross reference from an item associated with a first source (*e.g.*, supplier, distributor, manufacturer, vendor) to a corresponding, identical, similar, equivalent, related,

---

[3] These are the same databases described at Col 4:66-Col. 5:8 as maintaining the cross-

replacement and/or substitutable item from another source. *See* '683 Patent, Col. 5:4-8 (cross-references to similar corresponding catalog numbers of other vendors); 10:43-52 (system recognizes an item as corresponding to the same item available from another vendor); 16:19-32 (part from a different vendor substituted because it was no longer available from first vendor).

45.     The specification describes different situations in which a system user may access such cross reference tables, for example, during inventory sourcing ('683 Patent, Col. 14: 4-45); when performing searches for items in the product catalogs ('683 Patent, Col. 16:19-32 Col. 17:29-48), and when generating purchase orders from a requisition ('683 Patent, Col. 16:50-62).

46.     Thus, in my opinion, a person of ordinary skill in the art would understand that the algorithm that corresponds to the function of "converting data relating to a selected matching item and an associated source to data relating to an item and a different source" includes the steps of:

> (1)     maintaining a cross-reference table or file identifying cross-referenced items, identical items or generally equivalent items and one or more codes corresponding to cross-referenced items, identical items or generally equivalent items; (2) for a selected matching item, accessing the cross-reference table or file identify an identical item or generally equivalent item cross-referenced to the selected matching item and associated with a different source; and (3) replacing the selected matching item and its associated source with the identical item or generally equivalent item and its different source in a requisition; and structural equivalents thereof.

**E.      Lawson Has Misconstrued Some Of The Functions Associated With The Means-Plus-Function Claim Elements**

47.     As set forth above, I am informed and understand that the proper construction of the "function" part of a means-plus-function claim element is a construction of the function as expressly recited in the claim.

reference tables.

48.     Instead of following this principle, Lawson has proposed constructions of the functions of two of the means-plus-function elements which vary from the express claim language. For example, with respect to the claim term "means for selecting the product catalogs to search" as recited in claim 3 of the '683 Patent, Lawson proposes that the function of this element be construed as "selecting *two or more* product catalogs to search" and has imported the words "two or more" into the recitation of the function. In addition, for the claim term "means for searching for matching items among the selected product catalogs," as recited in claim 3 of the '683 Patent, Lawson proposes that the function of this claim term be construed as "searching for matching items among the selected *two or more* product catalogs," importing the words "two or more" into the term.

49.     In my opinion, these constructions are inconsistent with the manner in which those claim terms would be understood by a person of ordinary skill in the art and, also, would fail to cover all of the disclosed embodiments of the invention.

50.     Claim 3 of the '683 Patent is reproduced below and provides a basis for my opinions.

3.     An electronic sourcing system comprising:

at least two product catalogs containing data relating to items associated with the respective sources;

means for selecting the product catalogs to search;

means for searching for matching items among the selected product catalogs;

means for building a requisition using data relating to selected matching items and their associated source(s);

means for processing the requisition to generate one or more purchase orders for the selected matching items; and

means for converting data relating to a selected matching item and an associated source to data relating to an item and a different source.

51.    As shown, claim 3 recites an electronic sourcing system which includes "at least two product catalogs containing data relating to items associated with the respective sources." Thus, in order to satisfy this claim element, a system may include *only* two product catalogs.

52.    With respect to the element "means for selecting the product catalogs to search," in my opinion, a person of ordinary skill in the art would understand that the claimed function could be construed to cover the selection of only one product catalog to search from among the "at least two product catalogs" recited in the preceding claim element in addition to covering the selection of more than one catalog to search.  Otherwise, the claim element would be superfluous if the system started with only two product catalogs and the claim required the "selection" of both of the two catalogs.[4]

53.    Furthermore, the patent specification indicates that a single product catalog can be selected from the universe of product catalogs available to the system. *See, e.g.,* '683 Patent, Col. 5:66 to Col. 6:13 (indicating that data input into any field of the requisition form can be used to initiate a search, thus a system user could input a single vendor name or a specific part number of a product associated with a specific vendor and "[t]he fields that are filled with data will assist search program 50 in executing its first search *against a specific catalog contained in catalog database 36.*"); '683 Patent, Col. 10:16-20 ("If no catalog delimiting information is entered for the item desired to be requisitioned, interface 60 would be *set up to search only the Fisher catalog or,* alternatively, to search all catalogs in catalog database 36."); Appendix VII (sample search user interface indicating that a user can "select" to search a single catalog by

---

[4] Moreover, this Court in the *ePlus, Inc. v. Ariba, Inc.* case already construed this claim element and held that the "selecting the product catalogs to search" and the "searching the selected product catalogs" claim terms "contemplate a system through which a user could select just one catalog to search from among the two or more that are available." *Markman*/Summary Judgment Order in *ePlus, Inc. v. Ariba, Inc.* at 12.

LIBW/1729493.1

inputting, for example, a "vendor name" in field provided thereby limiting the search to items in that vendor's catalog only); '683 Patent, Col. 12: 13-25 (describing the ability to conduct searches by a vendor name or vendor part number, thus limiting the selected product catalog to be searched to that catalog associated with the vendor).

54.     The patent specification contains numerous examples where a single product catalog of the two or more product catalogs included in the system is selected and searched. Therefore, in my opinion, a person of ordinary skill in the art would understand that claim 3 contemplates such a system and the terms of claim 3 should not be construed in a manner such that they do not cover these embodiments.

> **F.     Lawson's Constructions Of The "Means For Searching" Claim Terms Are Improper Because They Recite Several Unnecessary And Incorrect Steps In The Proposed Algorithms**

55.     Several of the means-plus-function claim elements recite "means for searching." For example, claim 3 of the '683 Patent recites "means for searching for matching items among the selected product catalogs." Claim 6 of the '683 Patent recites "means for searching for matching items in the database." Claim 1 of the '172 Patent recites "means for searching for matching items that match the entered product information in the selected portions of the database."

56.     Lawson's proposed construction of the "means for searching for matching items among the selected product catalogs" of claim 3 of the '683 Patent is as follows:

> **Function:** searching for matching items among the selected two or more product catalogs
>
> **Corresponding Structure:** Two means are disclosed:
>
> 1. Software initiated from requisition/purchasing system (40 or 240) running on local computer (20 or 220) that consists of the following steps:

a. entering certain search criteria (*e.g.*, catalog number, part number, or partial text) relating to item(s) to be searched into requisition/purchasing system (7:48-55; 7:61-8:2; 8:22-26);

b. searching local RIMS databases (42) based on search criteria, and if found, search is complete (6:6-8; 7:36-38; 4:20-23);

c. if items are not found in RIMS databases (42), communicating the search criteria from requisition/purchasing system (40 or 240) to catalog search program (50 or 250) running on same local computer via the DDE protocol of interface (60) (8:37-9:8);

d. concatenating (*i.e.*, joining together by linking so as to form a chain or series) only selected product catalogs to be searched after the user selects the catalogs to be searched (9:67-10:4).

e. searching the concatenated catalogs from catalog database (36 or 236) via catalog search program (50 or 250) based on the search criteria received from requisition/purchasing system (9:34-37; 10:8-20);

f. if more than one search criterion is received, catalog search program prioritizes search as follows: (a) part (catalog) number, (b) keyword and (c) page number, stopping at highest priority search criteria resulting in a match (6:14-22); and

g. displaying via catalog search program a hit list of search results (9:39-45).

2. Software initiated from shell program (52 or 252) running on local computer (20 or 220), that consists of the following steps:

a. displaying a search screen on the monitor of local computer (12:4-12; Appendix VII);

b. receiving search criteria (*e.g.* catalog page number, keyword, part number) for item to be searched (9:12-14; 12:12-24);

c. concatenating (*i.e.*, joining together by linking so as to form a chain or series) only the selected product catalogs to be searched after the user selects the catalogs to be searched (9:67-10:4).

d. searching the concatenated catalogs from catalog database (36 or 236) via catalog search program (50 or 250) running on local computer based on data received from shell program (52) (9:34-37; 10:8-20);

e. if more than one search criterion is received, catalog search

25

program prioritizes search as follows: (a) part (catalog) number, (b) keyword, and (c) page number, stopping at highest priority search criteria resulting in a match (6:14-22); and

f. displaying via catalog search program a hit list (47) of search results (9:39-45; 10:2-4; 12:27-29, Appendix III)

57.     Lawson's proposed construction of the "means for searching for matching items in the database" of claim 6 of the '683 Patent is:

**Function:** searching for matching items in the database

**Corresponding Structure:**  Two means are disclosed:

1. Software initiated from requisition/purchasing system (40 or 240) running on local computer (20 or 220) that consists of the following steps:

a. entering certain search criteria (e.g., catalog number, part number, or partial text) relating to item(s) to be searched into requisition/purchasing system (7:48-55; 7:61-8:2; 8:22-26);

b. concatenating (i.e., joining together by linking so as to form a chain or series) only selected product catalogs to be searched after the user selects the catalogs to be searched (9:67-10:4).

c.  searching local RIMS databases (42) based on search criteria, and if found, search is complete (6:6-8; 7:36; 4:20-23);

d. if items are not found in RIMS databases (42), communicating the search criteria from requisition/purchasing system (40 or 240) to catalog search program (50 or 250) running on same local computer via the DDE protocol of interface (60) (8:37-9:8);

e. searching the concatenated catalogs from catalog database (36 or 236) via catalog search program (50 or 250) based on the search criteria received from requisition/purchasing system (9:34-37; 10:8-20);

f. if more than one search criterion is received, catalog search program prioritizes search as follows:  (a) part (catalog) number, (b) keyword and (c) page number, stopping at highest priority search criteria resulting in a match (6:14-22); and

g. displaying via catalog search program a hit list of search results (9:39-45).

2. Software initiated from shell program (52 or 252) running on local computer (20 or 220), that consists of the following steps:

a. displaying a search screen on the monitor of local computer (12:4-12; Appendix VII);

b. receiving search criteria (e.g., catalog page number, keyword, part number) for item to be searched (9:12-14; 12:12-24);

c. concatenating (i.e., joining together by linking so as to form a chain or series) only the selected product catalogs to be searched after the user selects the catalogs to be searched (9:67-10:4).

d. searching the concatenated catalogs from catalog database (36 or 236) via catalog search program (50 or 250) running on local computer based on data received from shell program (52) (9:34-37; 10:8-20);

e. if more than one search criterion is received, catalog search program prioritizes search as follows: (a) part (catalog) number, (b) keyword, and (c) page number, stopping at highest priority search criteria resulting in a match (6:14-22); and

f. displaying via catalog search program a hit list (47) of search results (9:39-45; 10:2-4; 12:27-29, Appendix III).

58.     Lawson's proposed construction for the "means for searching for matching items that match the entered product information in the selected portions of the database" for claim 1 of the '172 Patent is:

**Function:** searching for matching items that match the entered product information in the selected portions of the database

**Corresponding Structure:** Two means are disclosed:

1. Software initiated from requisition/purchasing system (40 or 240) running on local computer  (20 or 220) that consists of the following steps:

a. entering certain search criteria (*e.g.*, catalog number, part number, or partial text) relating to item(s) to be searched into requisition/purchasing system (7:48-55; 7:61-8:2; 8:22-26);

b. searching local RIMS databases (42) based on search criteria, and if found, search is complete (6:6-8; 7:36-38; 4:20-23);

27

c. if items are not found in RIMS databases (42), communicating the search criteria from requisition/purchasing system (40 or 240) to catalog search program (50 or 250) running on same local computer via the DDE protocol of interface (60) 8:37-9:8);

d. concatenating (*i.e.,* joining together by linking so as to form a chain or series) only selected product catalogs to be searched after the user selects the catalogs to be searched (9:67-10:4).

e. searching the concatenated catalogs from catalog database (36 or 236) via catalog search program (50 or 250) based on the search criteria received from requisition/purchasing system (9:34-37: 10:8-20);

f. if more than one search criterion is received, catalog search program prioritizes search as follows: (a) part (catalog) number, (b) keyword and (c) page number, stopping at highest priority search criteria insulting in a match (6:14-22); and

g. displaying via catalog search program a hit list of search results (9:39-45)

2. Software initiated from shell program (52 or 252) running on local computer (20 or 220), that consists of the following steps:

a. displaying a search screen on the monitor of local computer (12:4-12); Appendix VII);

b. receiving search criteria (*e.g.*, catalog page number, keyword, part number) for item to be searched (9:12-14; 12:12-24);

c. concatenating (*i.e.*, joining together by linking so as to form a chain or series) only the selected product catalogs to be searched after the user selects the catalogs to be searched (9:67-10:4).

d. searching the concatenated catalogs from catalog database (36 or 236) via catalog search program (50 or 250) running on local computer based on data received from shell program (52) (9:34-37: 10:8-20);

e. if more than one search criterion is received, catalog search program prioritizes search as follows: (a) part (catalog) number, (b) keyword, and (c) page number, stopping at highest priority search criteria resulting in a match (6:14-22); and

f. displaying via catalog search program at hit list (47) of search results (9:39-45; 10:2-4; 12:27-29, Appendix III).

59.     In my opinion, these proposed constructions recite steps that are either unnecessary or which are improper and inconsistent with the understanding of the system's operation that a person of ordinary skill in the art would have from a review of the language of the claims and the patent specification.

60.     For example, each of Lawson's proposed constructions recites a step of "searching local RIMS databases (42) based on search criteria, and if found, search is complete." This step is plainly incorrect for a construction of the "means for searching" for claim 3 as the claim language requires that the "means for searching" conducts its search "among the selected product catalogs." According to the description of the embodiments of the invention in the patent specification, there are no product catalogs stored in the RIMS databases. The product catalogs are stored in the catalog database 36, for the embodiment illustrated in FIG 1A, or in the multiple catalog databases 236, for the embodiment illustrated in FIG 1B.

61.     Moreover, there is no description anywhere in the patent specification where the search engine program ever conducts a search of the RIMS databases. Thus, Lawson's proposed constructions are clearly incorrect for all three "means for searching" claim terms. The search programs 50 and 250 are not even connected to the RIMS databases and have no ability to access the data stored in the RIMS databases. *See* FIGS. 1A, 1B and 2.

62.     The only descriptions of searches conducted by search programs 50 and 250 relate to searches of catalog databases. And, the data stored in the RIMS databases is not product catalog item data. *See, e.g.,* '683 Patent, Col. 6:11-13 ("The fields that are filled with data will assist ***search program 50 in executing its first search against a specific catalog contained in catalog database 36.***"); Col. 9:30-Col. 10:20 ("If the user has marked an item … with designation 'S' the entered data at least partially describing the item will be sent to Shell 52 and

29

TV/2 search program 50A... *TV/2 search program 50 will search the catalog database 36* for all items that match the search field sent over..."); Col. 16:66-Col. 17:41 ("As shown in FIG 1B, ... search program 250, ... and catalog databases 236 are stored on file server 200.... Appropriate Distributor catalogs and manufacturer catalogs are consulted, using TV/2 search program 250 and proper selection of Distributor catalogs and catalogs and bulletins from manufacturers whose products Distributor regularly sells. *Catalogs and bulletins are contained in catalog database 236.")*.

63.    Nor do Lawson's specification citations support its contention that the algorithms for the "means for searching" claim elements should include a step of "searching local RIMS databases." For example, Lawson cites to the '683 Patent, Col. 6:6-8. This excerpt relates to filling out fields in a requisition form prior to requesting a search of the catalog database 36 by search program 50. However, reading a few lines further down that column to lines 11-13, the inventors made clear that any of the fields filled out in the requisition form are then passed to the search engine program 50 to assist it in *"executing its first search against a specific catalog contained in catalog database 36."* Lawson's citation has nothing whatsoever to do with the search engine program conducting a search of the RIMS databases. That simply never happens.

64.    Lawson also relies on a citation of Col. 7:36-38 of the '683 Patent. This excerpt makes clear that the system can conduct a process of listing, sourcing and ordering products without the use of a search program. This could happen, for example, if a user knew exactly which product he/she wanted to requisition and order such that there was no need for conducting a search for the item. This passage has no relevance to claims which specifically recite searching such as claims 3 and 6 of the '683 Patent and claim 1 of the '172 Patent. Nor does this passage

provide any support for Lawson's contention that the search engine program searches the RIMS databases. This passage relates to a situation where no search is conducted.

65. Finally, Lawson cites to Col. 4:20-23 of the '683 Patent. Again, this excerpt does not relate to searching. It merely describes the various RIMS databases.

66. For all of these reasons, in my opinion, a person of ordinary skill in the art would not understand that the algorithms corresponding to the three "means for searching" claim elements include a step of "searching the local RIMS databases" and, in fact, such a step is inconsistent with the descriptions of the operation of the various embodiments in the specification.

67. Each of Lawson's proposed constructions for the three "means for searching" claim element also recites the step of "concatenating (*i.e.,* joining together by linking so as to form a chain or series) only selected product catalogs to be searched after the user selects the catalogs to be searched." Again, in my opinion, a person of ordinary skill in the art would not understand that the search algorithms need to include such a step. Indeed, in several embodiments described in the specification such a step would not be performed by the search engine program.

68. As I discussed above, in my opinion, a person of ordinary skill in the art would understand from the claims and patent specification that a system user could select only one catalog to be searched from among the available catalogs. In such cases, no concatenating step is required since only one catalog was selected to be searched.

69. Moreover, the "concatenating" step proposed by Lawson is inconsistent with the language of claim 6 of the '683 Patent and claim 1 of the '172 Patent. Claim 6 only requires that the "means for searching" search "for matching items in the database." There is no prior

31

selection of one or more product catalogs required to satisfy claim 6. And, as described in the patent specification, a search can be conducted based on entry of one or more of the following criteria: vendor name, vendor number, vendor part (catalog) number, product description, bid price, list price, keyword, page number, quantity, unit and catalog text. '683 Patent, Col. 5:66-Col. 6:13. Entry of one or more of these criteria will assist the search engine program in executing its search "for matching items in the database" in accordance with claim 6. There is no need for a concatenation step in such circumstance.

70.     Similarly, claim 1 of the '172 Patent recites that the "means for searching" search "for matching items that match the entered product information in the selected portions of the database." There is no requirement in claim 1 that catalogs be selected to be searched. Again, a portion of the catalog database may be selected to be searched merely by inputting a product description or a keyword. No concatenation is required in such circumstance.

71.     In addition, assuming a user did wish to search multiple product catalogs, in accordance with claim 3 of the '683 Patent, a person of ordinary skill would not understand the claim language to prohibit a user from first selecting to search one product catalog and subsequently selecting to search a second product catalog. The patent specification describes such a situation. '683 Patent, Col. 12:4-29. This is particularly true given that the system can include multiple catalog databases. *See* '683 Patent, FIG 1B (catalog databases 236); Col. 17:55-64 ("The file server 200 in that environment contains ... multiple catalog databases 236"). By definition, catalogs stored in separate databases *cannot be* concatenated.

72.     For all of these reasons, in my opinion, a person of ordinary skill in the art, upon reviewing the language of the claims and the patent specification, would not understand that the algorithm for performing the functions corresponding to the three "means for searching" claim

32

elements would include a step of "concatenating (*i.e.*, joining together by linking so as to form a chain or series) only selected product catalogs to be searched after the user selects the catalogs to be searched," as Lawson proposes.

> **G.  Lawson's Proposed Algorithms For The "Means For Building A Requisition" Claim Elements Include Unnecessary And Improper Steps**

73.     In my opinion, Lawson's proposed constructions for algorithms corresponding to the "means for building a requisition using data relating to selected matching items and their associated source(s)" as recited in claims 3 and 6 of the '683 Patent and the "means for building a requisition that uses data obtained from said database relating to selected matching items on said order list" as recited in claim 1 of the '172 Patent include several unnecessary and inappropriate steps.

74.     Lawson's proposed construction for the "means for building a requisition using data relating to selected matching items and their associated source(s) of claims 3 and 6 of the '683 Patent follows:

> **Function:** building a requisition using data relating to selected matching items and their associated source(s)
>
> **Corresponding Structure:** A software means initiated from requisition/purchasing system (40 or 240) running on local computer (20 or 220) that consists of the following steps:
>
> a. entering certain data (*e.g.*, account number, requisition number) in requisition/purchasing system (40 or 240) to create requisition tables stored in requisition database (42A) 6:44-65; 7:20-28);
>
> b. initiating a search for matching item(s) in catalog database (36 or 236) from either requisition/purchasing system (40 or 240) or catalog search program (50 or 250) running on local computer (20 or 220) via two search means described above (8:15-32);
>
> c. displaying via catalog search program a hit list (47) of search results (9:39-45; 12:27-29; Appendix III); d. selecting one or more items to be requisitioned (20:21-24; 11:30-38);

e. generating an order list (48) in shell (52 or 252) and catalog search program (50 or 250) containing data relating to selected items (e.g. vendor name, product description, list price) (11:20-38; 11:62-66);

f. displaying data relating to selected items in order lists (48) (11:38-43; 12:38-40; Appendix VI);

g. transmitting data from order list (48) to requisition/purchasing system running on same local computer (20) or 220) via the DDE protocol of interface (60) (11:50-54; 12:48-53; 13:1-21); and

h. updating requisition tables in requisition database (42A) with data received from order list (48) via interface (60) (12:60-67).

75.     Lawson's proposed construction for the "means for building a requisition that uses data obtained from said database relating to selected matching items on said order list" as recited in claim 1 of the '172 Patent is as follows:

**Function:** building a requisition that uses data obtained from said database relating to selected matching items on said order list

**Corresponding Structure:** A software means initiated from requisition/purchasing system (40 or 240) running on local computer (20 or 220) that consists of the following steps:

a. entering certain data (*e.g.*, account number, requisition number) in requisition/purchasing system (40 or 240) to create requisition tables stored in requisition database (42A) 6:44-65; 7:20-28);

b. initiating search for matching items(s) in catalog database (36 or 236) from either requisition/purchasing system (40 or 240) or catalog search program (50 or 250) running on local computer (20 or 220) via two search means described above (8:15-32);

c. displaying via catalog search program a hit list (47) of search results (9:39-45; 12:27-29; Appendix III)

d. selecting one or more items to be requisitioned (10:21-24; 11:30-38);

e. generating an order list (48) in shell (52 or 252) and catalog search program (50 or 250) containing data relating to selected items (*e.g.*, vendor name, product description, list price) (11:20-38: 11: 62-66);

> f. displaying data relating to selected items in order list (48)
> (11:38-43; 12:38-40; Appendix VI);
>
> g. transmitting data from order list (48) to requisition/purchasing
> system running on same local computer (20 or 220) via DDE
> protocol of interface (60) (11:50-54; 12:48-53; 13:1-21); and
>
> h. updating requisition tables in requisition database (42A) with
> data received from order list (48) via interface (60) (12:60-67)

76.     In my opinion, Lawson has improperly included the steps of "initiating a search

for matching items," "displaying via catalog search program a hit list (47) of search results,"

"selecting one or more items to be requisitioned" and "generating an order list" in each proposed

construction.

77.     The language of the claim elements themselves confirm my opinion. Claims 3 and

6 of the '683 Patent recite that the requisition is built from "selected matching items and their

associated source(s)" and claim 1 of the '172 Patent recites that the requisition is built from

"selected matching items on said order list." Thus, the claimed functions require that you

already have selected matching items (*i.e.*, items selected from matching items included in search

results). Thus, since you are starting the requisition building function already having selected

matching items from search results, there is no need to perform steps relating to conducting the

searches all over again.

78.     Moreover, the requisition/purchasing module is the software module described in

the specification for building requisitions. The search engine module, not the

requisition/purchasing module, performs the steps of "initiating a search for matching items,"

"displaying a hit list of search results," "selecting one or more items," and "generating an order

list."

79.     The patent specification makes clear that it is only after an order list is generated,

that the data included on the order list is transmitted from the search engine program to the

requisition/purchasing program which will then build a requisition using the transmitted data. *See* '683 Patent, Col. 12: 48-53 ("Once the user has completely built the Order List 48 within Shell 52 and TV/2 search program 50, he or she can transmit it to Fisher RIMS system 40.")

80.     Thus, in my opinion, a person of ordinary skill in the art would not understand from review of the claim language and the patent specification that the algorithms associated with the functions of building a requisition would include the steps that Lawson has proposed in its constructions.

I declare under penalty of perjury under the laws of the United States of America that to the best of my knowledge, the foregoing is true and correct.

February _10_, 2010

_Alfred C. Weaver_

Alfred C. Weaver, Ph.D.

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of February, 2010, the foregoing DECLARATION OF ALFRED C. WEAVER, PH.D. was electronically filed with the Clerk of the Court using the CM/EFC system, which will then send a notification of such filing (NEF) to counsel of record. Copies of the foregoing were also served on the following:

Daniel W. McDonald, *pro hac vice*
William D. Schultz, *pro hac vice*
Rachel C. Hughey, *pro hac vice*
Joshua P. Graham, *pro hac vice*
Andrew Lagatta, *pro hac vice*
Merchant & Gould P.C.
3200 IDS Center
80 South 8th Street
Minneapolis, MN 55402-2215
Lawsonservice@merchantgould.com
(by overnight courier)


Robert A. Angle (VSB# 37691)
Dabney J. Carr, IV (VSB #28679)
Troutman Sanders LLP
P.O. Box 1122
Richmond, VA  23218-1122
Telephone:  (804) 697-1238
Facsimile:  (804) 698-5119
robert.angle@troutmansanders.com
dabney.carr@troutmansanders.com
(by hand delivery)

**Counsel for Defendant Lawson Software, Inc.**


/s/ Henry I. Willett, III
Henry I. Willett, III (VSB #44655)
CHRISTIAN & BARTON, L.L.P.
909 East Main Street, Suite 1200
Richmond, VA 23219
Telephone:  (804) 697-4100
Facsimile:  (804) 697-4112
hwillett@cblaw.com

**Counsel for Plaintiff ePlus, inc.**