# EXHIBIT 5

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

| | | |
|---|---|---|
| *e*PLUS iNC., | ) | |
| | ) | |
| Plaintiff, | ) | **Civil Action No. 2:09-CV-232-HCM-TEM** |
| | ) | |
| v. | ) | |
| | ) | |
| **PERFECT COMMERCE, INC.,** | ) | |
| **SCIQUEST, INC., LAWSON** | ) | |
| **SOFTWARE, INC., and VERIAN** | ) | |
| **TECHNOLOGIES, INC.,** | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF *e*PLUS iNC.'S ANSWERS AND OBJECTIONS TO DEFENDANT LAWSON SOFTWARE, INC.'S SECOND SET OF INTERROGATORIES**

Pursuant to Fed. R. Civ. P. 33 and Local Rule 26(c), Plaintiff *e*Plus inc. ("*e*Plus" or "Plaintiff"), by and through its attorneys, hereby objects to and answers the Second Set of Interrogatories ("Interrogatories") served by Defendant Lawson Software, Inc. ("Defendant" or "Lawson") upon *e*Plus.

## GENERAL OBJECTIONS

*e*Plus makes the following General Objections, whether or not separately set forth in response to each Interrogatory, to each and every instruction, definition, and question posed in the Interrogatories:

1.      *e*Plus objects to Defendant's Second Set of Interrogatories, including the Definitions and Instructions, to the extent they seek to impose discovery obligations beyond those imposed by the Local Rules of the United States District Court for the Eastern District of Virginia, the Federal Rules of Civil Procedure, and/or other applicable law.

receives Lawson's document production and has had an opportunity to review and assess it and propound any follow-up discovery necessitated by such production.

## INTERROGATORY NO. 6:

State all facts and identify all documents, things, and testimony that you contend constitute objective evidence of the non-obviousness of each asserted claim of the patents-in-suit.

## OBJECTIONS:

*e*Plus objects to this Interrogatory to the extent that it calls for information protected from discovery by the attorney-client privilege and/or the work product doctrine. *e*Plus also objects to this Interrogatory as overly broad and unduly burdensome. *e*Plus further objects to this Interrogatory to the extent that it seeks information that is readily accessible to Defendant, as through public sources.

Subject to and without waiver of its General and Specific Objections, *e*Plus will provide a response to this Interrogatory.

## ANSWER TO INTERROGATORY NO. 6:

Studies have shown that the purchase of non-production materials such as office supplies, computer and other office equipment and other similar operating provisions can account for 30 to 60% of a company's total expenditures. Yet many companies do a poor job of controlling such expenditures utilizing inefficient, decentralized and slow processes to procure such materials. There are also delays in companies' procurement processes due to the need for various approvals to be obtained prior to placement of orders for materials. Additionally, there were redundant processes in place at some companies due to the fact that many departments within a company would purchase their own supplies from their own preferred vendors. Such decentralized buying resulted in a company's payment of higher prices for such non-production materials and the loss of its ability to negotiate more favorable discounts than could be achieved if purchases were

-9-

aggregated.  *See* "Complex Indirect Procurement:  The Final Frontier for Savings, An Executive

White Paper," Aberdeen Group (Nov. 2001) at *e*PLUS 0115274-276 (hereinafter "Aberdeen

White Paper").

In the early 1990s, many companies recognized the potential cost savings that could be

realized by improving the processes they used to procure such non-production materials.  For

example, as Ariba noted, "without an effective procurement solution, organizations are forced to

rely on paper-driven and often error-prone purchasing processes that waste time and money.

Frustration with system inefficiency reduces user and supplier engagement and lowers

compliance to preferred suppliers and contracts… Automated, Streamlined Plan-to-Pay

Functionality for all users, suppliers, and commodities boosts users' process and price

compliance and drives exceptional spend management efficiency across your enterprise."

*e*PLUS 0082349-50.

However, early attempts to solve the inefficient procurement processes failed.  For

example, early computer-based product ordering systems tended to be proprietary to a particular

vendor.  Vendors asked their customers to use proprietary ordering systems that would

electronically transmit orders directly to the vendor for the vendor's products.  Such systems had

disadvantages since they could be used only for ordering products from a single vendor.  An

organization that purchased products from many different vendors would need to install multiple

such ordering systems.  Moreover, such systems could not be used for comparison shopping

among products offered by multiple vendors.  *See, e.g.*, '683 Patent, Col. 1:35-59.

Vendors also began to put their paper-based catalogs into digital form, but these catalogs

tended to be separately stored on a CD-ROM, for example.  They were not integrated with an

organization's requisition and/or ordering systems.  An employee could conduct a search of a

particular vendor's electronic catalog, but would have to use another means to requisition and order a product, such as by facsimile.  And, since the electronic catalogs were limited to a single vendor's product, comparison shopping among different vendors could not be conducted.  *See* '683 Patent, Col. 2:3-17.

Thus, there was a long-felt, but unmet need for an electronic sourcing system and process that could integrate product information, such as is typically found in vendor catalogs that are provided to customers and requisition and ordering systems that could use the results of searches of product information in vendor catalogs.  *See, e.g.,* '683 Patent, Col. 1:5-10.

The inventors of the patents-in-suit recognized that there was a need to provide an electronic sourcing system that was capable of conducting searches of product catalogs of multiple vendors and transferring information about items selected from the results of a vendor catalog database search (for example, a catalog or part number and a vendor identifier, such as a vendor name and/or vendor number) to a requisition building module for inclusion of the catalog items as entries in a requisition generated by the system.  *See, e.g.,* '683 Patent, Col. 2:18-44. Moreover, such an electronic sourcing system would enable the automation of necessary approvals that may be required with respect to a requisition prior to placing an order with a vendor.  '683 Patent, Col. 16:40-Col. 17:22.  The inventors recognized that the electronic sourcing system could also include databases having vendors' inventory information or other inventory determination means so that, for a particular selected item from a catalog database search, the system could determine its availability in the inventory of a vendor.  *See, e.g.,* '683 Patent, Col. 3:19-22.  If a particular vendor was out-of-stock with respect to a selected item, the inventors recognized that the system should be capable of finding another item available from a different vendor in another vendor catalog by means of, for example, a database which identifies

cross-referenced items.  *See, e.g.*, '683 Patent, Col. 4:60-Col. 5:8; Col. 10:43-54.

*e*Plus's predecessor-in-interest of the patents-in-suit, Fisher Technology Group, launched its first products practicing some of the patented inventions in 1995.  These products were known as "Cornerstone," "SupplyLink" and "ProcureNet."  *See, e.g.,* Fisher Technology Group web site pages and press releases entitled "New Electronic Commerce Product, SupplyLink Revolutionizes Requisitioning and Procurement," dated March 6, 1996 and "FTG's ProcureNet Internet Mall Helps Companies Reach Bigger Audience, Sell On-Line," May 21, 1997 at *e*PLUS 0134592-658.  In March 1997, following Fisher Technology Group's introduction of these products, it won the Internet and Electronic Commerce Conference (iEC) Award for best Internet Infrastructure which recognized Fisher's outstanding achievement and creative execution of enterprise-wide Internet systems for ProcureNet, the first public electronic mall for business-to-business transactions.  *e*PLUS 123643-44.  The iEC recognized Fisher's products as pioneering because "ProcureNet [powered by Cornerstone] enables vendors to create electronic storefronts to display and sell their products over the Internet.  Fisher's electronic mall interfaces directly to participants' legacy systems -- order entry, customer service, inventory -- to fulfill and complete the purchasing process."

Industry analysts, such as Aberdeen, surveyed early adopters of electronic sourcing and procurement systems between November 1998 and June 2000.  "The results:  Users of e-Procurement realized shortened order-processing cycles, reduced administration costs, improved inventory management and reduced maverick spending."  Aberdeen White Paper at *e*PLUS 0115277.  Aberdeen's survey results indicated that adopters of e-Procurement technology realized a 5 to 10% cost reduction in the prices of the non-production goods purchased.  Their purchase and fulfillment cycle times decreased from an average 8.36 day cycle to an average

-12-

2.27 day cycle from order through fulfillment of an order.  The administrative costs associated

with each requisition/order decreased from an average of $114 per requisition/order to $31 per

requisition/order.  *Id.*  Thus, companies that have implemented systems covered by the patents-

in-suit have realized significant benefits that were not realized by prior technology.

Indeed, Lawson has recognized the benefits achieved by automating the e-procurement

process as claimed in the patented inventions, as noted on its website:  "[b]y automating many

steps of the indirect procurement process, from requisitioning and authorization, through

generation and transmission of a purchase order to invoicing and payment, your company can

realize significant savings and actually turn everyday purchasing tasks into a competitive

advantage.  With Lawson M3 e-Procurement, you can simplify, automate and integrate all the

administrative tasks related to indirect procurement.  Lawson M3 e-Procurement can reduce your

total purchasing costs by 5 to 15 percent.  It reduces both internal administration costs and

external supplier-related costs."  *e*PLUS 0240737-739.

*e*Plus's products utilizing the patented inventions have received numerous industry

awards and recognition.  For example, *e*Plus was named one of the 2003 and 2004 Supply &

Demand Chain Executive 100 List of Leading Supply Chain Product Providers.  *See, e.g.,*

*e*PLUS 0027032-33.  *e*Plus's inclusion in these lists reflects the industry's recognition of *e*Plus's

Enterprise Chain Management product offerings which include its procurement catalog, content

management, and eProcurement products Content$^{+TM}$ and Procure$^{+TM}$.  Moreover, in 2003, *e*Plus

was ranked #1 on the Aberdeen Group's Supply Chain 50 Report as the leading supply chain

management technology provider for its suite of electronic procurement and procurement catalog

content management products and services that can be used to support customers' strategic

sourcing and management initiatives.  *See, e.g., e*Plus trial exhibit 596 from the *ePlus v. SAP*

-13-

litigation (produced as *e*PLUS 0026955-57).  Also, in 2003, *e*Plus was named to iSource

Business Magazine's "iSource 100" list of leading supply chain-enabling organizations.  The

iSource 100 list recognized *e*Plus for its innovative Enterprise Cost Management platform which

includes its suite of electronic procurement, product and catalog content management products.

*See e*Plus trial exhibit 595 from the *ePlus v. SAP* litigation (produced as *e*PLUS 0026860-61).

Moreover, as noted above, the prior owners of the patents-in-suit also received awards for

their technology utilizing the patented inventions reflecting the industry's recognition of the

pioneering nature of that technology.  For example, as discussed above, in March, 1997, *e*Plus's

predecessor, ProcureNet, received an Internet Electronic Commerce Conference Award for its

innovation and excellence in electronic commerce relating to its launch of its first public

electronic mall for business-to-business transactions.  This electronic mall interfaced directly to

the participants' requisition and order entry systems.  *See e*PLUS 0134643-44, *e*Plus trial exhibit

594 from the *ePlus v. SAP* litigation (produced as *e*PLUS 0134592-658).

Moreover, the patented inventions have been commercially successful.  The commercial

success of the patented inventions may be demonstrated by the commercial success of the

patentee's products as well as through the commercial success of infringers' infringing activity

and licensees' activities.  As *e*Plus's expert Dr. Weaver testified in the *ePlus v. SAP* trial, the

patented inventions have enjoyed commercial success and have been licensed to other

companies, resulting in significant licensing revenues.  *See ePlus v. SAP* trial transcript at

2772:21-23; 2773:11-21.  One licensee of the patents-in-suit is SAP.  According to published

commentary and SAP's own comments, SAP's electronic sourcing and procurement products

have realized commercial success and industry recognition attributable at least in part to the

inventions of the patents-in-suit.  According to SAP, its licensed mySAP SRM solution became

-14-

the market-leading purchasing platform because it covered the full cycle of supplier relationship management including purchasing and sourcing, operational procurement and supplier collaboration. *See, e.g.,* SAP April 26, 2004 Press Release entitled "SAP Achieves Top Spot in Supplier Relationship Management Market," obtained at www.sap.com/solutions/business-suite/srm/newsevents/Press.epx?pageview.

Another licensee of the patents-in-suit, Ariba, has also realized commercial success and industry recognition for its licensed electronic sourcing and procurement products which success is attributable at least in part to the inventions of the patents-in-suit. For example, in 2001, both FedEx and Unilever received awards from the Aberdeen Group in recognition of their successful implementation of Ariba's eProcurement application, Ariba Buyer. *See e*PLUS 0133477-78.

When *e*Plus's predecessor Fisher Scientific first introduced the patented technology, they were initially met with some degree of skepticism. As the President of Fisher Technology Group noted when Fisher Technology Group launched a software application incorporating the patented inventions in 1997, "FTG first had to do a bit of education. Most buyers and suppliers hadn't modified their business process to facilitate electronic commerce. As a result, FTG spent a lot of time helping its beta customers web-enable their business data and then establish consistent business processes to use that data effectively for procurement." *See* "Window of Opportunity," CIO Magazine (June 1, 1998) (*e*PLUS 0134651-58 at 56). As set forth above, notwithstanding this initial skepticism, the patented inventions have now been recognized as innovative and adopted by several companies in the industry.

## INTERROGATORY NO. 7:

If you contend that any fact, document, or other matter constitutes secondary evidence of non-obviousness of any claim of any of the patents-in-suit, identify such fact, document, or other matter, describe in detail the basis for your contention that it evidences non-obviousness, and identify all persons with knowledge thereof and all documents related thereto.

-15-

Respectfully submitted,

Date:  September 21, 2009

_Jennifer A. Albert_

Gregory N. Stillman (VSB #14308)
Brent L. VanNorman (VSB #45956)
**HUNTON & WILLIAMS LLP**
500 East Main Street, Suite 100
Norfolk, VA 23510
Telephone:  (757) 640-5300
Facsimile:   (757) 625-7720
gstillman@hunton.com
bvannorman@hunton.com

Scott L. Robertson (*admitted pro hac vice*)
Jennifer A. Albert (*admitted pro hac vice*)
David M. Young (VSB #35997)
Robert D. Spendlove (VSB #75468)
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4000
Facsimile:   (202) 346-4444
jalbert@goodwinprocter.com
srobertson@goodwinprocter.com
dyoung@goodwinprocter.com
rspendlove@goodwinprocter.com

Lana Shiferman (*admitted pro hac vice*)
James D. Clements  (*admitted pro hac vice*)
**GOODWIN PROCTER LLP**
Exchange Place
53 State Street
Boston, MA 02109-2881
Telephone:  (617) 570-1000
Facsimile:   (617) 523-1231
lshiferman@goodwinprocter.com
jclements@goodwinprocter.com

Attorneys for Plaintiff, *e*Plus inc.

-30-

## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of September, 2009, I will serve Plaintiff *e*Plus inc.'s

Answers and Objections to Defendant Lawson Software, Inc.'s Second Set of Interrogatories, on

the following counsel of record as indicated:

*via electronic mail:*

Stephen E. Noona (VSB #25367)
Kaufman & Canoles, P.C.
150 West Main Street, Suite 2100
Norfolk, VA  23510
Telephone:  (757) 624-3289
Facsmile:  (757) 624-3169
senoona@kaufcan.com

**Counsel for Defendant Lawson Software, Inc.**

Daniel W. McDonald
Merchant & Gould P.C.
3200 IDS Center
80 South 8th Street
Minneapolis, MN 55402-2215

**Counsel for Defendant Lawson Software, Inc.**

Jennifer A. Albert

-31-

I, Kenneth G. Farber, declare that:

I am President of *e*Plus Systems, Inc. and Content Services, Inc. I am authorized to make this verification on behalf of *e*Plus.

I have read *e*Plus's Answers and Objections to Lawson Software's Second Set of Interrogatories.  The information responsive to the Interrogatories was obtained from documents within the possession, custody or control of *e*Plus, from employees of *e*Plus or from investigations and analyses conducted on behalf of *e*Plus by its attorneys and/or retained consultants.  To the best of my knowledge and belief, I verify that the answers given herein are true and accurate.

Kenneth G. Farber

Executed on: _Sept. 21, 09_