# EXHIBIT 16

Robert P. Kinross   December 2, 2009

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION

- - - - - - - - - - - - - - - -+

ePLUS, INC.,                    : Civil Action

    Plaintiff,                  : No. 3:09cv620

v.                              :

LAWSON SOFTWARE, INC.           :

    Defendant.                  :

- - - - - - - - - - - - - - - -+


Videotaped Deposition of ROBERT P. KINROSS

Washington, DC

Wednesday, December 2, 2009

11:03 a.m.


Job No.:  22-169719

Pages 1 - 212

Reported by:  Katy M. Zamora, RPR


Merrill Legal Solutions
Tel: (312) 386-2000          (800) 868-0061

3e02d9e4-dbeb-4f57-9243-b26ce929dda6

Robert P. Kinross   December 2, 2009

Page 22

1  to the customers and say, basically, if you have a
2  vendor relationship with us, you have this option of
3  using the RIMS system?
4     A.   The customer would not have the option of
5  using the RIMS system.  The customer service rep from
6  Fisher would be part of the bundled package, so that it
7  would have an on-site customer service representative
8  that would be included to run the RIMS system.
9     Q.   And with that vendor relationship, is that
10 how Fisher Scientific made its money?
11    A.   Yes.  By selling products, yes.
12    Q.   So customers would buy products, enter a
13 relationship with Fisher Scientific, and as part of
14 that relationship Fisher Scientific would offer to put
15 a customer service representative on site to use the
16 RIMS system?
17    A.   Yes.
18    Q.   Did the customers ever provide information to
19 the RIMS system?  Did you have a way to do that?
20    A.   The typical way to do that was through paper
21 requisitions handed to the customer service rep,
22 handwritten.
23    Q.   That was the typical way, was there any other
24 way of doing it back before 1993?
25    A.   I don't believe so.  I can't recall any other

Page 23

1  way, yes.  The telephone would be another way.
2     Q.   People calling up the customer service
3  representative --
4     A.   Yes.
5     Q.   -- and just saying, here's the products I
6  want to buy?
7     A.   Exactly.
8     Q.   Now, if you go back to column 1, again, on
9  that 683 patent -- column 1, not page 1 --
10    A.   All right.
11    Q.   If you go back to column 1 in the left side
12 of about line 10, do you see the sentence there:  There
13 are a number of known requisition/purchasing systems
14 that manage and process requisitions and purchase
15 orders.  One such system is the Fisher Scientific
16 requisition and inventory management system (Fisher),
17 described in U.S. patent number 5712989 filed April 2,
18 '93 and assigned to Fisher Scientific Company of
19 Pittsburgh, PA, the disclosure of which is incorporated
20 herein by reference, quote.  Do you see those two
21 sentences?
22    A.   Yes, I do.
23    Q.   I want to direct your attention now where it
24 says, known requisition systems.  As I understand it
25 these two sentences, and this is a document, if I can

Page 24

1  back up for a second -- you reviewed this and signed a
2  declaration saying that you had reviewed this and you
3  are one of the inventors on this, right?
4     A.   Yes.
5     Q.   As I understand -- is it correct to construe
6  this as saying the Fisher Scientific requisition system
7  known as Fisher RIMS was among the known requisitioning
8  and purchasing systems at the time you filed for the
9  683 patent?
10    A.   Yes.
11    Q.   Who was it known to?
12    A.   Well, it would certainly be known to Fisher
13 sales reps, trying to entice large customers to use the
14 system.  Fisher would participate in trade shows and
15 have representatives from the information systems and
16 services department available to talk to customers
17 about what system capabilities Fisher had.  So they
18 were actively marketing Fisher capabilities as
19 value-added systems.
20    Q.   So trade shows would be an example of a place
21 where Fisher Scientific employees were out marketing
22 Fisher's capabilities for the vendor relationship
23 including the RIMS system?
24    A.   Yes.
25    Q.   And that was happening at least by 1992,

Page 25

1  correct?
2     A.   Yes, that's correct.
3     Q.   So is it your understanding -- well, let me
4  back up for a second.
5          As one of the vendors who signed an oath with
6  this patent and the other two patents that we've marked
7  as exhibits, did you have an understanding that there
8  is something called "prior art" when you file a patent
9  publication?
10    A.   Yes, I understood that.  Yes.
11    Q.   What was your understanding of what prior art
12 is at the time, August of '94 when you filed -- first
13 filed these patent applications?
14    A.   My understanding with prior art was systems
15 or ideas that may have existed that were building
16 blocks or similar to what the invention here would be.
17    Q.   And the idea with your patent is you're not
18 supposed to get a patent on things that are prior art,
19 correct?
20         MS. ALBERT:  Object to the form.  Calls for
21 legal conclusion.
22 BY MR. McDONALD:
23    Q.   I'm asking for your understanding.
24    A.   Well, yes.
25    Q.   And you understood as one of the applicants

7 (Pages 22 to 25)

3e02d9e4-dbeb-4f57-9243-b26ce929dda6

Robert P. Kinross   December 2, 2009

Page 26

1  for these patents that you had a duty to disclose prior
2  art to the patent office?
3      A.  Yes.
4      Q.  Was the RIMS system as it existed at the end
5  of 1992 something that you understood was prior art to
6  the three patents we've marked as exhibits --
7          MS. ALBERT:  Calls for a legal collusion.
8  BY MR. McDONALD:
9      Q.  -- today?
10     A.  Yes, I think it was.
11     Q.  Is that because it was out in the
12 marketplace, it was part of what Fisher Scientific was
13 offering to customers more than one year before August
14 of '94 when you filed this patent application, is that
15 why?
16         MS. ALBERT:  Calls for a legal conclusion.
17 BY MR. McDONALD:
18     Q.  I'm asking for your understanding,
19 Mr. Kinross.
20     A.  Could you repeat the question, please?
21     Q.  I'll rephrase it.
22         Was it your understanding when you filed the
23 application for the 683 patent and signed on the
24 declaration and oath that went with that as an
25 inventor, that the RIMS system was prior art to that

Page 27

1  patent because it was on the market being offered to
2  customers as part of the vendor relationship package
3  more than a year before the filing date on the 683
4  patent?
5          MS. ALBERT:  Calls for a legal conclusion.
6      A.  My understanding of prior art was basically
7  what I told you before, and whether RIMS qualified as
8  prior art or not, I didn't know.  It could be, based on
9  whether or not our patent attorney concluded it was
10 prior art.  He was basically deciding what prior art
11 was; I was not.  So if he concluded it as prior art, I
12 would agree with it.  If he didn't conclude it as prior
13 art, I had no basis to determine what prior art was and
14 what prior art was not.
15 BY MR. McDONALD:
16     Q.  Well, you had some understanding though at
17 the time, right?
18     A.  Vaguely, saying, you know, prior art was
19 things that were invented before your invention that
20 might be similar.
21     Q.  Can we mark this as Exhibit 5, please.
22         (Lawson Exhibit No. 5 was marked for
23 identification and attached to the deposition
24 transcript.)
25         Mr. Kinross, I'm handing you Exhibit 5, which

Page 28

1  is a copy of the Declaration and Power of Attorney form
2  that you signed in 1994, as indicated on page 3.  Do
3  you recognize this document?
4      A.  Yes.
5      Q.  What is it?
6      A.  Well, my understanding of the power of
7  attorney is giving a lawyer, and basically Allen
8  Dornberg, the authority to represent me for this patent
9  application.
10     Q.  So the title of this is declaration and power
11 of attorney for patent application, right?
12     A.  Yes.
13         MS. ALBERT:  I just want to note for the
14 record that I think you've misidentified exactly what
15 the exhibit is because it appears to be multiple
16 documents stapled together, at least my copy is.
17         MR. McDONALD:  Oh, okay.  You're right.  How
18 about -- would you agree, Jennifer, that we should
19 detach the pages beginning with notice to file missing
20 parts, just to keep it to the declaration?
21         MS. ALBERT:  Yeah, correct.
22         MR. McDONALD:  Mr. Kinross, I can get that
23 back and do that for you.
24         MS. ALBERT:  So then, for the record, it's
25 going to be the document bearing, I guess, these are

Page 29

1  production numbers L0132817 through 820.
2          MR. McDONALD:  That is correct.  Thank you.
3  BY MR. McDONALD:
4      Q.  So if we just stick with this new version of
5  the document, Mr. Kinross, Exhibit 5 as modified, that
6  is a declaration and power of attorney for a patent
7  application that you, among other people, signed,
8  correct?
9      A.  Yes.
10     Q.  You signed it, is that September 30, 1994?
11 Is that the date?
12     A.  Yes, September 30, '94.
13     Q.  That's your signature there next to the --
14     A.  Yes, it is.
15     Q.  And you see on the first page this is for
16 application that was filed on August 10, '94 with the
17 serial number 08/288,577?
18     A.  Yes.
19     Q.  And that's the same filing date and serial or
20 application number that's on the first page of the 683
21 patent, Exhibit 1, right?
22     A.  The August 10th, 1994 date --
23     Q.  Yes.
24     A.  Right.
25     Q.  And also that serial or application number,

8  (Pages 26 to 29)

Robert P. Kinross   December 2, 2009

1  items. So the notion was Fisher could handle your
2  purchasing requirements, and we could do not just
3  Fisher items, but we could handle more than that. We
4  could take over part of your purchasing department and
5  handle your MRO, Maintenance Repair and Operating items
6  so that the impetus of the third-party group was to
7  take those nonstandard items and establish
8  relationships with suppliers for those and be able to
9  order them.
10 BY MR. McDONALD:
11    Q. Did personnel at Fisher Scientific offer the
12 RIMS capability as a tool in trying to get customer
13 business in part to help them message that Fisher can
14 also help you order products from other sources?
15    A. Yes.
16    Q. Was that true in the late '92, early '93 time
17 frame?
18    A. Yes.
19    Q. Could you turn to the RIMS patent to column
20 3, line 13. I'll just read the whole sentence then
21 once you get to that page. This is in the RIMS patent
22 now, and it says at -- beginning really at line 10,
23 quote, host computer 10 controls all inventory, pricing
24 and requisitioning operations of the distributor's
25 regularly stocked items using host pricing and

1  inventory database 20, (which is actually comprised of
2  several databases as will be described below) in a
3  manner which is well known to those of ordinary skill
4  in the art, do you see that sentence?
5     A. Yes.
6     Q. All right. One question I have about this
7  is, is it your understanding -- what is the host
8  pricing and inventory database in the RIMS system, can
9  you explain to me generally what that is?
10    MS. ALBERT: Object to the form. Lacks
11 foundation.
12    A. The host pricing and inventory database would
13 be records that exist on the Fisher mainframe that
14 would provide inventory availability at various Fisher
15 stocking locations, and it would also provide types of
16 pricing that were available for this customer for this
17 particular item. And there were various pricing
18 schemes and algorithms that were employed at Fisher,
19 and the pricing routines would know which databases to
20 look at for an appropriate price for the customer based
21 on who they were and what arrangements were made with
22 that customer in the sales process.
23 BY MR. McDONALD:
24    Q. Okay. So when that sentence that I just read
25 says that that database is actually comprised of

1  several databases, do you have an understanding of at
2  least what some of those multiple databases are that
3  are in that host or part of what the host computer
4  controls there in the inventory database 20?
5     A. Okay. It's referencing -- describing them
6  below --
7     Q. Yeah.
8     A. Do I have an opportunity to read that before
9  I answer?
10    Q. Sure. If that would help you, sure. Yeah.
11    A. Do you know where that would be below?
12    Q. Well, I had a little trouble really
13 understanding it myself. That's kind of one of the
14 reasons I'm asking you, but there is some continuing
15 discussion of that database 20 throughout column 3. I
16 guess, I'll refer you to that column 3 -- the entirety
17 of column 3 as at least talking about database 20.
18    A. Okay. Well, without --
19    MS. ALBERT: But feel free to look at other
20 portions of the patent, if that helps you.
21    THE WITNESS: Okay.
22 BY MR. McDONALD:
23    Q. Right.
24    A. Okay. I've read the entire column 3 and the
25 question, I believe, was related to --

1     Q. What I was asking -- I'll bring it back.
2  I'll just rephrase it.
3     About lines 13, 14 of column 3, there's a
4  parenthetical about that database 20 --
5     A. Right.
6     Q. -- which says it's actually comprised of
7  several databases.
8     A. That's right.
9     Q. And I was trying to figure out what are the
10 several databases that comprise host pricing and
11 inventory database 20?
12    A. Okay. All right. And in regard to the
13 pricing, there were different pricing databases at
14 Fisher to provide a unique price for a given customer.
15 One, in particular, was a customer hand price --
16    Q. Hand?
17    A. Hand, H-A-N-D, pricing. And what that would
18 do is allow a sales rep for a particular product to
19 enter an exact price that customer would pay for
20 regardless of what other contracting negotiations were
21 established for that customer. So that's one
22 database --
23    Q. Okay. So --
24    A. -- that could be used for pricing.
25    Another database that could be used for

3e02d9e4-dbeb-4f57-9243-b26ce929dda6