```
 1            IN THE UNITED STATES DISTRICT COURT

 2          FOR THE EASTERN DISTRICT OF VIRGINIA

 3                   RICHMOND DIVISION

 4

 5    -------------------------------------
                                          :
 6    ePLUS, INC.                         :    Civil Action No.
                                          :    3:09CV620
 7    vs.                                 :
                                          :
 8    LAWSON SOFTWARE, INC.               :    July 28, 2010
                                          :
 9    -------------------------------------

10

11       COMPLETE TRANSCRIPT OF THE MOTIONS HEARING

12          BEFORE THE HONORABLE ROBERT E. PAYNE

13              UNITED STATES DISTRICT JUDGE

14
      APPEARANCES:
15
      Scott L. Robertson, Esquire
16    Michael G. Strapp, Esquire
      Jennifer A. Albert, Esquire
17    Goodwin Procter, LLP
      901 New York Avenue NW
18    Suite 900
      Washington, D.C.  20001
19
      Craig T. Merritt, Esquire
20    Christian & Barton, LLP
      909 East Main Street
21    Suite 1200
      Richmond, Virginia  23219-3095
22    Counsel for the plaintiff

23

24              Peppy Peterson, RPR
                Official Court Reporter
25            United States District Court
```

```
 1   APPEARANCES:  (cont'g)

 2   Dabney J. Carr, IV, Esquire
     Troutman Sanders, LLP
 3   1001 Haxall Point
     Richmond, Virginia  23219
 4
     Daniel W. McDonald, Esquire
 5   Kirstin L. Stoll-DeBell, Esquire
     Merchant & Gould, PC
 6   80 South Eighth Street
     Suite 3200
 7   Minneapolis, Minnesota  55402
     Counsel for the defendant
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

1

2

3          THE CLERK:  Civil action number 3:09CV00620, ePlus,

4   Inc., versus Lawson Software, Inc.  Will counsel please state

5   their names for the record and identify the parties they

6   represent.

7          MR. MERRITT:  Greg Merritt, Christian & Barton, for

8   ePlus.

9          MR. ROBERTSON:  Scott Robertson, Goodwin Procter

10   firm.  With me are my partners.

11          MR. STRAPP:  Michael Strapp.

12          MS. ALBERT:  Jennifer Albert.

13          MR. CARR:  Dabney Carr, Troutman Sanders, for Lawson

14   Software.

15          MR. McDONALD:  Good morning, Your Honor.  Dan

16   McDonald, Merchant & Gould, representing Lawson Software, and

17   with me today, I'd like to introduce Kirstin Stoll-DeBell, also

18   with Merchant & Gould, also representing Lawson Software.

19          MS. STOLL-DeBELL:  Good morning.

20          THE COURT:  Morning.  I always think it's a good idea

21   to throw counsel a curve ball.  I always enjoyed it so much

22   when judges did it to me.

23          I've decided, upon further reflection, that I would

24   like to hear your views on the damages issue reflected in

25   Lawson's -- what is it, motion in limine number one?  Is that

1   what it is?

2           MR. McDONALD:  That's one of them, Your Honor.

3   There's one, two, and three all related to the damages issue.

4           THE COURT:  I mean the settlement.

5           MR. McDONALD:  That's where you want to start?

6           THE COURT:  No, we'll start with the motion for

7   summary judgment, but I would like somebody to -- I'd like for

8   you to address that.  I don't want a lot of -- we don't have a

9   lot of time to do this, and we've got a lot to do, so get right

10  to the point.  All right, the motion for summary judgment on

11  the written description.

12          MR. McDONALD:  Thank you, Your Honor.  May it please

13  the Court, I have some binders with PowerPoint slides I'd like

14  to hand up.

15          THE COURT:  Is that a question of law or fact?

16          MR. McDONALD:  It's a question of fact, but the facts

17  are undisputed.  Can I hand up the binders?

18          THE COURT:  I'm sorry, it's in paragraph four of what

19  is to be argued.

20          MR. McDONALD:  That was just a fast ball, not a curve

21  ball.

22          THE COURT:  I don't know.  Maybe that was a slider.

23  All right.

24          MR. McDONALD:  Is the PowerPoint visible on the

25  screen right now for Your Honor?

```
 1              THE COURT:  Yes, but the slides are here.  I use
 2      them, too.  Easier to read.
 3              MR. McDONALD:  Your Honor, the question is under
 4      section 112, paragraph one of the Patent Code 35 U.S.C. which
 5      is a separate and distinct requirement for claims of a patent
 6      to be valid, and that is that the specification shall contain a
 7      written description of an invention, and that's the invention
 8      as claimed.
 9              What we have here, you asked is this a question of
10      law or fact, and I think that gets to the nut of it, because I
11      think it's a key fact here when you look at ePlus's opposition
12      and what's in dispute and what's not in terms of the facts.
13              They don't dispute that the objects of the invention
14      are accurately described in our brief.  It's very clear in the
15      patent.  There's three or four paragraphs that talk about the
16      object of the invention, the invention described.  All of them
17      involve this requisition module and purchasing module or system
18      and the transfer of information to that.  They don't dispute
19      that.
20              Now, they say, well, we don't think that's material,
21      though, and if you look at paragraph 33 of their statements of
22      the facts, they say, well, the patents also state that the
23      inventions include the ability to search multiple catalogs from
24      different suppliers.  They don't deny that that invention
25      description includes the purchase order and requisition
```

1   modules, but they say it also includes this ability to search.

2   And they say a person of ordinary skill in the art would

3   understand, based on the specification, that the system

4   includes these catalogs maintained on databases, a search

5   program, and they admit this, and modules, requisition, and

6   purchase order generation programs among its components.

7          They also admit that the search component, the aspect

8   of searching with multiple vendors is of significant if not

9   equal importance.

10         THE COURT:  As I understand it, it's the -- the

11   specification has to have the written description.

12         MR. McDONALD:  Right.

13         THE COURT:  And the fact that the claim doesn't have

14   the same thing as the specification doesn't make it faulty

15   under 112; right or wrong?

16         MR. McDONALD:  Well, the key is what part of the

17   specification are we talking about.

18         THE COURT:  No.  I'm talking in a more general level

19   than that.  The law says the specification has to have a

20   written description.

21         MR. McDONALD:  Correct.

22         THE COURT:  Your argument is the claim doesn't have

23   in it what the specification has; isn't that right?  Isn't that

24   your argument?

25         MR. McDONALD:  Yes.

1           THE COURT:  All right.  Now, what part of the law

2      says that 112 is violated if the claim doesn't have the exact

3      wording of the specification in it when it is the specification

4      that has to have the written description?

5           MR. McDONALD:  There is nothing --

6           THE COURT:  There is no case that holds that.

7           MR. McDONALD:  It doesn't require exact wording,

8      but that's not what our argument is based on.

9           THE COURT:  Well, it does seem to me to be based on

10     that.

11          MR. McDONALD:  When you see these cases like the

12     *Gentry Gallery* case and *ICU Medical* and so on, they look at

13     what the invention is.  The day they file their application,

14     they have to do more than just describe a bunch of technology.

15     They have to go on record that day and say, here's what I'm

16     saying I invented, here's my creation, and that's what this

17     particular requirement goes to.

18          The issue of is it supported, that's a separate part

19     of 112.  That's not what the paragraph one has to do with.  You

20     have to say what your invention is to one of ordinary skill.

21     Then the claims have to be consistent with that.  If they are

22     outside --

23          THE COURT:  So if one of ordinary skill in the art

24     looks at the claim, looks at the specification and says, well,

25     yeah, that's -- what is said in the specification is reflected

 1    in the claim, and that's okay according to ePlus, why isn't

 2    that okay?

 3            MR. McDONALD:  That's not okay because the mere fact

 4    that you have a description of some features in the

 5    specification doesn't show that on the day the applicant filed

 6    it, they were recognizing that particular group of components.

 7            THE COURT:  But that argument is simply a way, it

 8    seems to me, of saying the specification has to be repeated

 9    verbatim in the claim or substantially, and the law doesn't say

10    that, does it?

11            MR. McDONALD:  No.  The law does say, though, that if

12    you describe your invention, what your invention is as having a

13    set of elements, let's say A, B, and C, and you only claim A

14    and B, the claim does not include C, that's invalid for failing

15    to meet the written description requirement even though you can

16    find A in the specification and you can find B in the

17    specification.

18            You have, for example, the *Anascape* case at page

19    1,338 talking about how removing a limitation broadens the

20    claim, and that's considered classic new matter.  In that case,

21    they found that because the claims did not include the

22    limitation that was described as part of the invention in the

23    specification, that that patent could not get the benefit of

24    the filing date of that earlier application.  That earlier

25    application did not satisfy the written description

1    requirements.

2         You have the *Anascape.*  The *Alonzo* case that ePlus

3    cites at page 1,021 talks about how while the claim may be

4    enabled, maybe your elements A and B may be enabled, but if you

5    don't claim all the elements necessary to be consistent with

6    the invention, you can still run afoul of the written

7    description requirement.

8         So the mere fact that the elements that are in the

9    claims can be found in the specification, that does not answer

10   the question.  The ICU --

11        THE COURT:  I don't understand the argument.  If a

12   person of ordinary skill in the art can read the claim and say

13   that it's the same thing -- it does and has the elements of

14   what's in the specification, I thought the cases said that the

15   law 1123 was satisfied.

16        MR. McDONALD:  Well, if that claim --

17        THE COURT:  Isn't that what they say?

18        MR. McDONALD:  No.

19        THE COURT:  Yeah, it does.

20        MR. McDONALD:  For example, the *Gentry Gallery* case

21   that even as interpreted by the cases cited -- ePlus talks

22   about how if that claim -- even if the elements, you can't find

23   some support for them in the specification, but if that claimed

24   collection of features doesn't satisfy, it's not consistent

25   with the stated purpose of the invention, so that's going

1    beyond just the description of the components of the invention

2    and specification.  The Court is looking at the stated purpose

3    of the invention.  It's what is this invention.  That's got to

4    be part of your description in addition to just this technical

5    description.

6              If the claim is outside of that stated purpose,

7    *Gentry Gallery* and cases after *Gentry Gallery* state that that

8    claim is invalid.  So here the question is, the legal question,

9    I think, is --

10             THE COURT:  But isn't the issue what a person of

11   ordinary skill in the art would find in reading the claim and

12   comparing the specification?  Isn't that how --

13             MR. McDONALD:  I don't think I'd put it that way.

14             THE COURT:  Well, how's it done?  As a matter of

15   fact, how is it done?  How do you see this being assessed as a

16   matter of fact?  That's what the Court says it is.  How is it

17   assessed?

18             MR. McDONALD:  Well, I think the courts talk about

19   looking at the objects of the invention.  I think that's a key

20   component, because that's essentially stating the purpose of

21   the invention.

22             THE COURT:  Okay, but I don't decide that, the jury

23   does.

24             MR. McDONALD:  Well, when you read the four corners

25   of the patents, what those objects are, they are unambiguous,

 1   and, in fact --

 2            THE COURT:  Then it makes it a matter of law.

 3            MR. McDONALD:  It does in this case because they

 4   admit that the --

 5            THE COURT:  That's not what I'm asking.  I'm asking

 6   you generally, how does this issue get presented to the jury?

 7   Let me try it another way.  If it's a matter of fact, how does

 8   it get presented to the jury?

 9            MR. McDONALD:  They -- I think oftentimes it is

10   decided --

11            THE COURT:  Let me put it this way:  I think it's a

12   matter of fact.  It's going to be presented to the jury

13   probably.  How are you going to present your case to the jury?

14   Let's try it that way.

15            MR. McDONALD:  We would show them the patent itself

16   where it talks about the objects of the invention and the

17   purpose of the invention requiring these purchase order and

18   requisition features.

19            THE COURT:  You'd have expert testimony about what

20   one of ordinary skill in the art would think about all that,

21   wouldn't you?

22            MR. McDONALD:  I don't know that they have to add

23   that much more to it.

24            THE COURT:  You don't have to, but you can, can't

25   you?

1              MR. McDONALD:  I don't think in this case that would

2      be appropriate.  I think that the patent is very

3      self-explanatory as to what its state --

4              THE COURT:  That's just rearguing the issue here.

5      You're arguing the motion *in limine*.  Now I'm saying, I'm

6      asking you this:  Your motion *in limine* has been denied.

7      You're going to have to try the case to the jury.

8              Are you going to have an expert come in, say, I'm one

9      of ordinary skill in the art, I know what it is, that's what

10     this means, and this is -- this element, the specification is

11     reflected in this element, that element?  Are you going to have

12     an expert do that?

13             MR. McDONALD:  Yeah, that's right.

14             THE COURT:  You've had an expert actually review the

15     case for that purpose and prepared a report on that purpose,

16     haven't you?

17             MR. McDONALD:  That's right.

18             THE COURT:  So that's how it gets dealt with, and

19     then the jury decides, the decision being what's one of

20     ordinary skill in the art -- how does one of the ordinary skill

21     understand all this; is that right?

22             MR. McDONALD:  If you decide it's an issue of fact.

23             THE COURT:  Right.  I'm not asking you to give that

24     up.  I'm just trying to get all of this in one place so I can

25     understand how it works.  Okay, go ahead.

 1          MR. McDONALD:  And so, I guess playing that out a

 2   little bit, the question is, are the experts really going to

 3   disagree on anything as a factual matter.  That's where -- if

 4   you look at paragraph 33 out of the statements of facts, and

 5   they say, well, the invention includes the search program and

 6   the requisition and purchase order generation programs.

 7          ePlus is acknowledging that, and they are

 8   acknowledging that the search program is of significant, if not

 9   equal importance to the aspects relating to requisition and

10   purchase order generation.  So we're all admitting that the

11   requisition and purchase order generating are important aspects

12   of the invention.

13          They are part of the stated purpose, and there's

14   really no other reasonable conclusion one could reach looking

15   at the objects of the invention as stated in the patent looking

16   at the entirety of the description.  If you look at the figures

17   of the patent such as -- I'm going up ahead a little bit here

18   -- figure 1-A, which the patent says, this is a description of

19   one embodiment of the invention, 1-B is another one, but it's

20   got all these same components in a little more shorthand form,

21   but it's got the requisitioning --

22          THE COURT:  Was this issue presented in the *Ariba* or

23   *SAP* litigation?

24          MR. McDONALD:  I'm not sure about that.

25          THE COURT:  The description issue?

1           MR. McDONALD:  Maybe Mr. Robertson knows the answer

2     to that, but I don't remember seeing anything, you know -- of

3     course, the *SAP* case was a hung jury.  I don't know if it was

4     presented to them or not.

5           THE COURT:  All right, thank you.  I'll let him

6     address that.

7           MR. McDONALD:  Sure, but all the figures, one of

8     ordinary skill reading the patent, it looks to me like both

9     experts are agreeing that one of ordinary skill in the art that

10    would read this patent, the '516 patent, would say that the

11    requisition and purchase order components are part of the

12    invention.  They're part of the purpose of the invention.

13          And once that is an agreed fact, once that is an

14    undisputed fact, this issue becomes an issue of law, because

15    these claims clearly, the claims that we have in this --

16          THE COURT:  It doesn't become an issue of law.  It

17    becomes -- I think you mean to say it becomes a matter as to

18    which there's no genuine dispute of material fact, and,

19    therefore, a reasonable jury could not return a verdict in

20    their favor; right?  And so under summary judgment principles,

21    then you win as a matter of law.

22          That doesn't make it a matter of law.  It means that

23    in its context as presented in this case, it can be resolved

24    because as a matter of law you win.  That doesn't mean that the

25    issue is a matter of law, I don't think.

 1          MR. McDONALD:  That's fair.  That's what I'm trying

 2    to say.  It could be resolved as a matter of law because the

 3    facts are undisputed.  So when you actually look at the

 4    claims -- I can maybe go back to some of these purposes here on

 5    the slide up on the screen right now.  This is slide number

 6    four if you are just looking at your paper version.

 7          We've got one of the objects here, but all of the

 8    objects have very similar descriptions specific to the

 9    requisition and purchasing system components.  It is an object

10    of the invention.  Part of that object is to provide an

11    electronic sourcing system, method and system, that provides

12    the capability of transferring the product information to a

13    requisition/purchasing system.  So maybe you're going to search

14    something, but part of the invention is transferring the

15    information to requisition and purchasing.

16          That's what you're trying to automate here with this

17    electronic system.  If all you did was search a catalog and

18    then did everything else manually, you really haven't gained

19    much.  It's like driving a car to the end of the driveway and

20    then walking from there.  What's the point of speeding up the

21    one part of it if you don't speed up the whole thing if you've

22    got an electronic sourcing system?

23          That's what the patent says.  It says that in

24    paragraph after paragraph in the summary of the invention.

25    That's further bolstered by the second bullet point here on

```
 1    slide four which is not in the summary, it's in the detailed
 2    description, and it's the only sentence in the whole patent
 3    that talks about anything being an important feature of the
 4    invention.
 5            And it says that it's an important feature of the
 6    present invention that the requisition be filled, and we've got
 7    some portion of the quote missing here, but the rest of that
 8    very sentence goes on to say, and the resulting requisition
 9    then divided into one or more purchase orders showing that the
10    requisitioning and purchase ordering is important -- is an
11    important feature of the invention.
12            That's what one of ordinary skill would understand.
13    I don't see ePlus's expert disputing that the requisition and
14    purchase order is an important feature of the invention.  So
15    once you recognize that --
16            THE COURT:  Do the experts claim that one of ordinary
17    skill in the art would read the claim and understand that to be
18    the case?
19            MR. McDONALD:  Yes.  They put it in the context of
20    one of ordinary skill, both experts.
21            THE COURT:  They say they would understand that if
22    you read the claim, one of them says if you read the claim you
23    wouldn't find the purchase and requisition system to be a part
24    of it.  The other one says if you read the claim, it would be.
25    Isn't that the dichotomy that we have here?
```

1          MR. McDONALD:  I don't think they disagree on what

2     the scope of these particular '516 claims are.  I think they

3     both agree that those claims that we have at issue here don't

4     include a requisition module or purchasing module.

5          I think what they disagree on, or at least they're

6     trying to take it a step further and try to say, yeah, but

7     because the search engine is an important part of the

8     invention, it's good enough that the claims only recite the

9     catalog and search engine.

10          That argument in itself, by the way, doesn't go far

11     enough at least as to one of the claims at issue here.  I'll go

12     up to that on the slide, claim nine of the '516.  That's slide

13     10.  This one only calls out the selection of catalogs and then

14     these sets of first and second identification codes associated

15     with the catalogs.

16          That claim in itself does not even recite a search

17     program, so when their expert says that the search program is

18     at least of equal importance to the other purchasing and

19     requisition features, that doesn't get them anywhere on claim

20     nine because claim nine doesn't describe a search engine.  It

21     is only the catalog with those codes.

22          So I don't know that I can characterize what their

23     position really is specific to claim nine, but on the other

24     claims that do require a search program, I guess their position

25     is, well, it's enough to have the search program, and what I'm

```
 1    saying is that when they admit, though, that the invention

 2    aspects include requisitioning and purchase orders, that's not

 3    enough.  Having just the search program without those features

 4    is not enough to satisfy the written description requirement.

 5              THE COURT:  All right, thank you.

 6              MR. McDONALD:  Thank you.  Do you want me to go

 7    through the other claims and show you each one in any detail?

 8              THE COURT:  I think I understand.

 9              MR. McDONALD:  Thank you.

10              THE COURT:  Do those claims have in them a

11    requirement or mention a requisition and purchasing system?

12              MR. ROBERTSON:  Claim 21 of the '516 does, Your

13    Honor.

14              THE COURT:  So that one stays, and the rest of them

15    go.

16              MR. ROBERTSON:  No, that's not correct, Your Honor.

17              THE COURT:  Why isn't it correct?

18              MR. ROBERTSON:  Because Your Honor is exactly right

19    on the law, Your Honor.  There's no requirement that you need

20    to claim all the specification in a claim.  The claims define

21    the invention.  The specification is the written description

22    that supports and ensures that the claim subject matter is

23    supported and that the inventors had grasp of the invention.

24              THE COURT:  One of you or the Court of Appeals has a

25    totally fouled up view of how you work the concept of a claim
```

1    against the concept of 112 which speaks in terms of the

2    specification, and I'm not willing to say, since I only have

3    one vote, that it's the Court of Appeals.  So it's got to be

4    one of you two.  Which one of you is it and what's wrong?

5            MR. ROBERTSON:  Let me see if I can clarify, Your

6    Honor, because I think the Court of Appeals has made

7    significant strides since the *Gentry Gallery* case which Lawson

8    so heavily relies on.

9            In fact, the case has been largely discredited and

10   confined to its facts, and there are numerous cases in the

11   presentation that I would like to provide to the Court.

12           THE COURT:  What does that court do up there?  That

13   court has a rule, like most appellate courts, that one panel

14   can't overrule another, and it takes an *en banc* hearing, yet

15   they don't every do anything *en banc*.

16           You are asking me in several different instances

17   today to find that a decision made by a panel is changed by --

18   one of you or both of you, not just you -- by a subsequent

19   panel decision of the Court of appeals.  Now, have they changed

20   the rules up there, and do they function differently than I

21   thought they did in *Rawlins*.

22           MR. ROBERTSON:  Your Honor, I'd respectfully like to

23   pass on that question, if I could --

24           THE COURT:  The question is, have they changed the

25   rules.

1           MR. ROBERTSON:  I don't think they've changed the

2     rules.

3           THE COURT:  *Rawlins* is still the law?  One panel

4     can't overrule another?

5           MR. ROBERTSON:  The Federal Circuit says and adheres

6     to that, though I think at times they are tested.

7           THE COURT:  The judges on that panel, for example --

8     I mean on that court, on claim construction for seven, eight

9     years argued that they weren't being faithful -- in a sense

10    argued that they weren't being faithful to the way they ruled

11    and applied their own rule.

12          Are you saying that's exactly -- I've got the same

13    situation here involving the *Gentry* case, that *Gentry* is a

14    panel decision, and subsequent decisions have basically

15    overruled *Gentry*?

16          MR. ROBERTSON:  I think what subsequent panels have

17    done is what's probably called red-circled the case, Your

18    Honor.  It's confined to its facts in the nature of -- perhaps

19    the panel, I think, in subsequent cases overstated the case, in

20    fact, tried to define what was called the essential omitted

21    test which meant that there was an element that somehow got

22    omitted.

23          The facts of the *Gentry Gallery* case, Your Honor,

24    involved a recliner, every football fan's favorite furniture.

25    It was a dual recliner and had a console that was in the center

```
1    of the dual seats that reclined.  That's all that was disclosed
2    in the specification.  It wasn't disclosed as being anywhere
3    else, and later on, the applicant tried to claim the location
4    of the control mechanism for making the sofa recline in a
5    different position.
6            Essentially, the Gentry Gallery decision went a
7    little too far in rejecting the claim when it could have
8    narrowed it and said, look, that's all he disclosed, was
9    putting the control mechanism in the central console, and you
10   can't then expand and claim more than you actually disclosed in
11   your specification.
12           It's not at all what's going on here.  Indeed, we're
13   disclosing less that's in the specification.  Your Honor is
14   exactly right.  There's no prohibition on that, and, in fact,
15   when you ask about the facts, I don't dispute what's in the
16   specification.  The specification is the specification.  We
17   have a very different take on, indeed, what those facts
18   disclose, and, in fact, in many instances, even in Lawson's own
19   brief, what's described as objects of the invention or the
20   capability of the invention is that it is in the permissive
21   sense, it may include this, it might be desirable.
22           In fact, if you have in front of you, Your Honor, the
23   demonstration that was just put on, I note at page four where
24   there was quotations from the specification --
25           THE COURT:  Page four of what?
```

1          MR. ROBERTSON:  Page four of Lawson's slides.

2          THE COURT:  Can somebody put that up?

3          MR. ROBERTSON:  You will see, Your Honor, there's a

4  number of ellipses in here where there's been information left

5  out.  I went back and actually looked at the patent, and, for

6  example, in the second bullet point, it says, it is an

7  important feature of the present invention that requisitions be

8  filled.  They omitted the word "may" be filled.

9          In fact, in their brief at page 29 where they talk

10  about this ability to interface between the requisition and

11  purchasing system, this is citing to the five -- the facts that

12  recite the specifications of the '516, it indicates in the

13  background -- again, this is Lawson's brief -- that it would be

14  desirable to provide electronic sourcing system that provides a

15  means for transferring information between a

16  requisition/purchasing system that may use the results.

17          THE COURT:  Now, Mr. Robertson, you agree that this

18  is a question of fact.

19          MR. ROBERTSON:  Yes.

20          THE COURT:  And as a question of fact, it's something

21  you have to prove; right?  Of course.

22          MR. ROBERTSON:  I don't think it's my burden to show

23  that the written description is satisfied.

24          THE COURT:  If it's called into issue, who has the

25  burden?

1          MR. ROBERTSON:  They have the burden.  It's an

2    affirmative defense.  There's a presumption of validity under

3    the statute.

4          THE COURT:  I understand that --

5          MR. ROBERTSON:  They need to prove this very issue by

6    clear and convincing evidence.

7          THE COURT:  But they put it on --

8          MR. ROBERTSON:  And the examiner -- I'm sorry, Your

9    Honor.

10          THE COURT:  They put on the evidence.  They put on

11    the evidence, and he says he's going to put on the

12    specification and the patent claim and the expert to testify

13    about it, and then what are you going to put on?

14          MR. ROBERTSON:  I'm going to put on my expert, and

15    he's going to go through the specification and show where it's

16    permissive, and then you're going to instruct the jury on the

17    law, and then I'm going to argue that in each instance and

18    under the clear settled black letter law, I don't need to claim

19    fully everything that's disclosed in the specification.

20          And, Your Honor, I have some slides myself I'd like

21    to hand up to you which includes a number of the cases that

22    indicate that, and --

23          THE COURT:  Do you want to hand them up?

24          MR. ROBERTSON:  Excuse me, sir?

25          THE COURT:  You said you wanted to hand them up.  I'm

1     just not sure how this is tried.  All the lore is it's a

2     question of fact.  Questions of fact don't put to the jury a

3     decision on the law.  I think we ought to have learned that in

4     *Markman*.

5              MR. ROBERTSON:  I think that's correct, Your Honor,

6     but it's a classic duel between the experts, Your Honor, and

7     they're going to have to be persuasive, and they're going to

8     have to direct the jury to those areas of the specification

9     that we contend support, factually support our position that it

10    is disclosed in the specification and need not be fully claimed

11    in every instance.

12             THE COURT:  But isn't that a question of law?  Isn't

13    the way you are putting it, isn't it a question of law?

14             MR. ROBERTSON:  I think it's a question of

15    application of fact to law like many of the questions that the

16    jury is going to be resolving.

17             THE COURT:  So the law is, you don't have to claim

18    everything, and the fact is did they claim everything or didn't

19    they.  How is it going to shake out at trial?

20             MR. ROBERTSON:  Well, Your Honor, we hope to get a

21    jury instruction that follows the law faithfully and says, you

22    don't need to claim everything, and then we're going to show

23    that what is claimed in the '516 claim finds full support in

24    the specification.

25             THE COURT:  That's an expert testimony.

1              MR. ROBERTSON:  Yes, sir.  Person who is

2     knowledgeable as to a person of ordinary skill in the art.

3              THE COURT:  Right.

4              MR. ROBERTSON:  I'll skip ahead, Your Honor, but, of

5     course, there are a number of post-*Gentry Gallery* cases that we

6     cite, and I apologize, Your Honor.  At the time that we

7     responded to the summary judgment, there were just so many

8     issues that we couldn't devote as much time as wholesomely as

9     we would have wished to respond to these issues, but that's why

10    I put together the slide.  You'll see, for example, in this

11    *Reiffin v. Microsoft* case --

12             THE COURT:  What page --

13             MR. ROBERTSON:  I'm on slide four, Your Honor.  We

14    will have to switch back to our slide presentation.

15             THE COURT:  All right.  You need to put yours on now,

16    so Lawson's needs to get off.  All right, they're off, you're

17    on.  Go.

18             MR. McDONALD:  And I have copies of the *Reiffin* case,

19    if Your Honor would like it, but I'm not going to read the

20    entire excerpt.  But the same argument was made by Microsoft

21    that the patentee must include in every claim each and every

22    element --

23             THE COURT REPORTER:  Excuse me, Mr. Robertson.

24             MR. ROBERTSON:  I'm sorry.  Each and every element

25    that was described as part of his invention whether or not the

1    element is necessary for patentability of the claim.

2           It goes on to say, that is not a correct statement of

3    the law.  Cited in this *Reiffin* case, Your Honor, is, indeed,

4    an expert treatise, if you'll go to slide six, by Ernest

5    Lipscomb.  That's Lawson's expert in this case.

6           Mr. Lipscomb has a treatise, *Walker on Patents*, that

7    was cited with approval in *Reiffin v. Microsoft* as actually the

8    venerable practice of claiming less than all as disclosed in

9    the specification, and here's what Lawson's expert says.

10          The claim may cover invention embracing the entire

11   process, machine, manufacture, or composition of matter which

12   is described in the specification, or it may cover such

13   subprocesses or such sub-combinations of the invention as are

14   new, useful, and patentable.

15          Indeed, after we took Mr. Lipscomb's deposition, we

16   actually checked in our library to see if we had his treatise

17   and was disappointed to find that we didn't, but I soon

18   obtained it.

19          Again, Your Honor, if you'll take a look at the next

20   slide, slide seven, again, the case law consistent with Your

21   Honor's understanding -- again, this is the *Revolution Eyewear*

22   case.  I won't read the entire excerpt, but what is in bold

23   there is, "we have held that when the specification sets out

24   two different problems present in the prior art, it is

25   unnecessary for each and every claim in the patent to address

1    both problems."

2            Turning to slide eight, I just wanted to show to the

3    Court some of the cases that have now disparaged *Gentry Gallery*

4    including this *Carnegie Mellon* case which says, we agree with

5    appellant the district court erred by invalidating the claims

6    of the patent by applying the essential element test indicating

7    that in *Gentry Gallery* they did not announce any such new

8    elemental -- essential element test mandating inquiry into what

9    the inventor considers to be essential to his invention.

10           Again, Your Honor, the next slide, more authority,

11   the *Amgen* case distinguishing *Gentry Gallery* saying that the

12   accused infringer "would have us view *Gentry* as a watershed

13   case, in reliance on an isolated statement -- probably only

14   dicta --" in *Gentry*.  "One sees the holding in *Gentry* for what

15   it really was:  An application of the settled principle that a

16   broadly drafted claim must be fully supported by the written

17   description and drawings," and that's all.

18           Indeed, what Lawson is saying is just the opposite.

19   We didn't draft the claims broadly enough to capture the

20   requisition and purchasing order module.  Not necessary for us

21   to do under the law.

22           I can go on and on, Your Honor.  At claim ten,

23   there's also the *Cooper Cameron* case also limiting *Gentry*

24   *Gallery*.  The fact is, Your Honor, what we have done is put

25   together a declaration that was in opposition to this where Dr.

1   Weaver goes through and shows in the specification that it

2   makes clear that searches are not mandatory -- excuse me,

3   requisition and purchase orders are not mandatory parts of the

4   invention.

5           Indeed, again, if I can just refer back to the Lawson

6   brief at page 30, which is their motion for summary judgment,

7   these are the sections they cite.  It would also be desirable

8   -- not mandatory, not -- but permissive to provide a system for

9   transferring information about items selected to a requisition

10  purchasing system.  It would also be desirable to provide an

11  electronic sourcing system capable of transferring the order

12  list of a desired catalog.

13          None of this speaks in terms of mandatory.  It's all

14  permissive, and when one looks at the claims, there's no

15  question here that those claims that are in the '516 are fully

16  supported by the specification.

17          THE COURT:  If you take the defendant's view of the

18  law, are the only three disputed legal issues set forth in your

19  slide 11 under the written description category?  Isn't that

20  really what it's all about?  Even under their view of the law,

21  if I were to adopt their view of the law, you'd still have to

22  have this decided.  Not that I adopt their view of the law, but

23  if I do and say that -- give the appropriate guidance to the

24  jury as to their task, these are the tasks the jury would have

25  to undertake in your slide 11.

1          MR. ROBERTSON:  Your Honor, I'm not --

2          THE COURT:  You hang up terribly on "only," don't

3    you?

4          MR. ROBERTSON:  No, sir.

5          THE COURT:  You all have been in the case long enough

6    now to make "only" a real part of your vocabulary.  The answer

7    to that is yes.

8          MR. ROBERTSON:  I'm not certain I understand their

9    view of the law, to be honest with you, Your Honor, so if

10   that's a premise to your question --

11         THE COURT:  Where do you live?

12         MR. ROBERTSON:  Washington, D.C., Your Honor.

13         THE COURT:  You won't be able to run for Congress,

14   but it sounds to me like you might be able to run for city

15   council up there or something.  Either that or go run for the

16   Redskins and get into the dodgeball place they've got up there.

17   Do they have a dodgeball team up there?

18         MR. ROBERTSON:  I'm not certain, Your Honor.

19         THE COURT:  The answer to the question is -- I mean

20   the question is, if you assume their view of the law, there's

21   still these three facts, and they're the only real facts that

22   have to be decided, but they have to be decided by a jury if

23   you assume their view of the law is right.  You said that.

24         MR. ROBERTSON:  I'll assume their version of the law,

25   which I think is incorrect, and I think these facts need to be

1    resolved, yes, Your Honor.

2              THE COURT:  And they are the only ones you would

3    resolve, right, for this issue?

4              MR. ROBERTSON:  Yeah.  I think I bring to bear on

5    these facts marshal evidence to prove these facts that in

6    fact --

7              THE COURT:  Wrap your tongue around yes or no.

8              MR. ROBERTSON:  Yes.

9              THE COURT:  You prepared this slide, didn't you?

10             MR. ROBERTSON:  Yes, Your Honor.

11             THE COURT:  And it says exactly what I said, come on.

12             MR. ROBERTSON:  Yes, Your Honor.

13             THE COURT:  Okay.  Thank you very much.  That's it.

14   Thank you.  Mr. McDonald.

15             MR. McDONALD:  Your Honor, I'd like to address a

16   couple of points, one on the legal issue that *Gentry Gallery*

17   is, if it's not dead, it's been confined to solitary

18   confinement in an undisclosed location.

19             THE COURT:  I think it's out at the Super Max in

20   Colorado.  But you do rely on *Gentry Gallery*.

21             MR. McDONALD:  Just as one of our cases, *Anascape*,

22   *ICU*, these are 2009 and 2010 cases that still apply that

23   principle.  Now, maybe there's some dispute over how it was

24   applied in the *Gentry Gallery* case, but this idea that you

25   still have to describe what my invention is, not just dump a

1   user manual or a bunch of source code on the Patent Office and

2   say, hey, here's some technology I came up with.  I'll figure

3   out later what the invention is, but I'll dump it all on you

4   now.  We'll see what happens in the marketplace, and then I'll

5   bob and weave and then start claiming things later.

6          No, you have to go on record the day you file your

7   application with what your invention is, and I think that

8   that's the principle that is not limited to *Gentry Gallery* at

9   all.  It was reaffirmed as a separate requirement from this

10  enablement requirement embanked by the Federal Circuit very

11  recently.  So the doctrine is alive and well.

12         Then the question is, you know, do we have any

13  disputed facts here on it, and I think there was a little

14  dodging in terms of which --

15         THE COURT:  Look, I think Minneapolis has a dodgeball

16  team, too.

17         MR. McDONALD:  That's news to me, but I wouldn't be

18  surprised.  That's what my kids play.  But if you look at the

19  summary of the invention, they're talking about these optional

20  and the word "may."  I don't see the word "may" in the summary

21  of the invention including the part that we quoted from with

22  the ellipses.  The word "may" is not in there.

23         I could read the whole thing to you, but I'm looking

24  at these, at that very first one that we quoted from.  "In view

25  of the foregoing, it is an object of this invention to provide

1    an electronic sourcing method and system that provides a user

2    with the capability of searching a database containing data,

3    including product vendor identification and other product

4    information relating to items available from at least two

5    vendor product catalogs" -- that's half of it, comma -- "and

6    the capability of transferring the product information for

7    desired cataloged items obtained as a result of the search to a

8    requisition purchasing system for use in generating a

9    requisition including entries for the desired catalog items."

10          There's nothing about maybe in there.  There's

11   nothing about you can do it or not do it.  That is an object of

12   this invention.  That is a stated purpose, that it has to not

13   just search the catalogs but transfer the product information

14   obtained from the search to that requisition purchasing system.

15   I don't see where the issue of fact is.  I don't see that their

16   expert disagrees about the summary of the invention.

17          Now, in a particular embodiment, they might describe,

18   well, when the customer is using it, they might use this

19   feature or they might not.  That's in the big body where the

20   specification has all sorts of description of things, but that

21   doesn't say, our invention doesn't need to have transfer to a

22   purchase or requisition system.  There's no place that

23   contradicts what I just read, and that's the point.

24          That's why there is a summary of the invention.  It

25   tells you what the object of the game is, speaking of

1    dodgeball.  It tells you what this thing is.  This is where I'm

2    planting my flag is my invention, and these claims, by the way,

3    keep in mind that we've got the '516 patent here.  The original

4    patent issued --

5         THE COURT:  What kind of lawyer would just omit from

6    the claim the guts of the invention?

7         MR. McDONALD:  When he's trying to get a broader

8    coverage for his client and grab things that they didn't

9    realize were something that could be called part of the

10   invention when they filed the application.  They're going for

11   more.  They're an advocate for their client, but the --

12        THE COURT:  According to you, it's so obvious that

13   their attitude is wrong they ought to be guilty of malpractice

14   and guilty of fraud on the Patent Office, and the lawyer ought

15   to be -- committed a knowing a fraud and ought to go to jail.

16   That's the way you've painted the picture it seems to me, and

17   that's hard to back.

18        MR. McDONALD:  Well, I think part of the issue here

19   you were talking about earlier is the law of the Federal

20   Circuit, and this *Gentry Gallery* case goes to 1998.  This

21   application was filed in 1994.  There was some dispute for many

22   years as to whether the written descriptions requirement really

23   was or should be a separate requirement, but now that's been

24   resolved.  It is.

25        So I don't know that we're really casting aspersions.

1    I'm not trying to say anybody had evil motives, but the law has

2    become a little more clear relatively speaking.  I'm not going

3    to go out on a limb here, but there is a separate --

4                THE COURT:  Relative to what?

5                MR. McDONALD:  Pardon?

6                THE COURT:  It's become clear relative to what?

7                MR. McDONALD:  There is a separate written

8    description requirement that's beyond just the specification --

9                THE COURT:  In other words, the statute means what it

10   says.

11               MR. McDONALD:  Yes, that's right.  And so that really

12   ties into this issue of the summary of the invention.  Their

13   original claims did not claim just the catalog and the catalog

14   and search engine.  They had the purchase and requisition

15   modules in the original claims, all those proposed claims that

16   they had to modify to get their first patent, but when they

17   were claiming it, the day they filed the application, they did

18   not go on record saying, oh, it's just a catalog with the

19   search engine that's the invention.  You don't need purchase

20   order requisition.  They didn't claim it that way.  That wasn't

21   until later where they added those claims that took out those

22   elements.

23               I think Mr. Robertson said something like, well,

24   maybe the claims weren't broad enough to capture the purchase

25   order and requisition modules.  You have to be a little careful

1   here.  When you add elements to a claim, you're narrowing it.

2   When you take out elements, you're broadening the claim,

3   because it either could or couldn't include that element that's

4   omitted now.

5          So that's what we're taking about in those cases I

6   mentioned in the first part where the Court says, you know, you

7   can't do that.  Just because you've got elements A, B, and C

8   described in the original application, if you -- along with D.

9   Let's say your invention as described is A, B, C, and D.  You

10  can't come back later and decide that actually my invention is

11  just A, B, and C.  And you can't get by that merely because you

12  have a good description of A, B, and C individually in the

13  specification.

14         You had to have gone on record on day one saying, my

15  invention is A, B, C, and D, but it can also be A, B, and C

16  alone, and all those cases Mr. Robertson was citing and Mr.

17  Lipscomb, that's all he's saying, is that you can have those

18  sub-combinations also be part of your invention, but you still

19  have to go on record and say that sub-combination is a separate

20  invention.

21         THE COURT:  All right.  Thank you.  The motion for

22  summary judgment on written description will be denied.  There

23  are disputed issues of fact that have to be resolved in order

24  to reach the conclusion that the patent is invalid.  It is the

25  burden of Lawson to prove invalidity by clear and convincing

1    evidence.  The patent comes with the presumption of validity.

2          The record contains a number of places where there

3    are disputed facts acknowledged by both of the experts, and I

4    think the case law that clarifies the *Gentry* case and limits it

5    is certainly more persuasive in resolving this question.

6    That's *Revolution Eyewear*, *Amgen v. Hoechst*, *Cooper Cameron* are

7    more persuasive in the resolution of the issue.

8          The specification of the '516 patent, according to

9    Dr. Weaver, adequately describes the claimed inventions, and

10   the experts disagree on the point.  Even if we take Lawson's

11   view of the law, there still are disputed issues of fact, and

12   the motion for summary judgment will be denied.

13         All right, let's take next the damages issue that are

14   reflected in number one motion *in limine* of the defendants.

15         MR. McDONALD:  So, Your Honor, would you like us to

16   argue motions one, two, and three in a row?

17         THE COURT:  I want to hear one right now.

18         MR. McDONALD:  Motion *in limine* number one has to do

19   with the request to exclude the settlement agreements and the

20   references to the prior litigation, first and foremost the

21   *Ariba* and *SAP* litigation, and we've cited --

22         THE COURT:  The groundwork, just so I understand it,

23   is the law still what I have understood it to be for some time,

24   that the construct in which a reasonable royalty is to be

25   determined is a hypothetical negotiation conducted between a

1    willing buyer and a willing seller, neither acting under

2    compulsion to either buy or sell; is that right?

3              MR. McDONALD:  That's it in a nutshell, yes.

4              THE COURT:  And that negotiation takes place at the

5    date of the first infringement; is that correct?

6              MR. McDONALD:  Yes.  Sometimes people refer to it as

7    the date just before the infringement began, but it's splitting

8    hairs.

9              THE COURT:  When is that date?

10             MR. McDONALD:  2002 is when ePlus alleges the

11   infringement began.

12             THE COURT:  So we have a hypothetical negotiation in

13   2002?

14             MR. McDONALD:  Correct.

15             THE COURT:  All right.  I think everybody is in

16   agreement on that.  Go ahead.

17             MR. McDONALD:  Well, what we have here in the first

18   slide is -- excuse me.  I forgot to bring the little clicker

19   with me, Your Honor.

20             THE COURT:  Go ahead.

21             MR. McDONALD:  Going back over a hundred years and

22   even some of the recent case law talks about how it's over

23   100 years of law that it is an agreement, that settlement

24   agreements, in the context under the shadow of litigation, are

25   inherently unreliable indicators of what an appropriate royalty

1    would be and should not be introduced.

2            Why is that?  We've got some quotes here going back

3    121 years.  The courts have recognized this in the *Rude v.*

4    *Westcott* case, that many considerations other than the value of

5    the improvements patented may induce the payment in such cases.

6            There are so many factors that go into a settlement.

7            THE COURT:  That is the Supreme Court of the United

8    States, isn't it?

9            MR. McDONALD:  Yes, it is.

10           THE COURT:  Is that a patent case?

11           MR. McDONALD:  Yes.

12           THE COURT:  Is it a reasonable royalty case?

13           MR. McDONALD:  Yeah, I believe --

14           THE COURT:  Has it been overruled?

15           MR. McDONALD:  No.

16           THE COURT:  Okay.  How can the Federal Circuit change

17   that rule?  What authority does the Court of Appeals have to

18   take a clear case of the Supreme Court of the United States and

19   change it?  They don't have any, do they?

20           MR. McDONALD:  No.

21           THE COURT:  But the Federal Circuit has in the Studi

22   -- how do you pronounce that?

23           MR. McDONALD:  Oh, that German thing?  Good luck.

24           MR. ROBERTSON:  Studiengesellschaft.

25           THE COURT:  Let's call it the Dart Industries case.

1          MR. McDONALD:  Shall we call it the Dart case?

2          THE COURT:  Yes.

3          MR. McDONALD:  I agree.  I don't think --

4          THE COURT:  But the *Dart* case changes it, doesn't it?

5    It says, we note that *Hanson*, it's own case, does not establish

6    any rule at all post-infringement evidence is irrelevant to a

7    reasonable royalty calculation.  Indeed, most recently in

8    discussing the hypothetical negotiations methodology, this

9    Court stated that, quote, the methodology encompasses...

10   flexibility because it speaks of negotiations as of the time

11   infringement began, yet permits, and often requires, a court to

12   look to evince some facts that occurred thereafter and it could

13   not have been known to or predicated or predicted by the

14   hypothetical negotiation.  And then it went on and said that

15   you could consider settlement negotiations.  How do you

16   harmonize that with *Rude*?

17          MR. McDONALD:  The only thing is I've got on the

18   slide here a brief note on slide 17 about that case.  It was a

19   nonjury case, and as far as I could tell reading it, there

20   wasn't really a question of admissibility.  The license

21   agreement was kind of a weird agreement, but you're right.  I

22   think the fundamental principle seems to be at odds with *Rude*

23   *v. Westcott*, but if somebody doesn't bring up admissibility as

24   a problem, I guess the Court is not there to decide whether

25   it's admissible or not.

1        I think that's about the best way I can come up with

2   to distinguish a case like *Dart*, is that the issue wasn't

3   clearly front and center where there was a motion to exclude

4   the agreement.  Maybe both parties decided they wanted to let

5   it in because they thought they could get something out of it.

6        I don't know the context, but I don't think that case

7   actually said there was a motion here to exclude it, and we're

8   saying that it was appropriate to let it in dispute that.

9        THE COURT:  But in *Hanson*, the Court held that those

10  settlement agreements have minimal probative value.  That

11  suggests they have some and, therefore, could be considered.

12  Isn't that what they held in *Hanson?*

13       MR. McDONALD:  Well, minimal probative value does

14  sound like the right language in there.  I think, again,

15  arguably -- well, I guess you could say minimal isn't

16  necessarily inconsistent with the *Rude v. Westcott* case on that

17  particular point.

18       I think the overriding issue, though, is that minimal

19  relevance doesn't mean you let it in, and it doesn't mean you

20  let that dictate your analysis and, in effect, delegate the

21  jury's role here to come up with --

22       THE COURT:  But if it's of minimal relevance, it's

23  relevant.  That's the point.  And then the issue, the analysis

24  under the Federal Rules of Evidence is whether that minimal

25  relevance is substantially outweighed by the 403 factors, and

1    you're not at that point yet.  Your argument is it's not

2    relevant at all, and it looks to me like the Federal Circuit

3    has held, whether it intended to go astride or opposite, the

4    *Rude* case has held otherwise.

5              MR. McDONALD:  I think in an individual case, a

6    license agreement can be so remote from the fact that it is

7    irrelevant entirely, but we're certainly not limiting ourselves

8    to that here, because that's a fine line between very little

9    relevance and none at all.

10             THE COURT:  You are arguing for a bright line no

11   relevance; isn't that your premise?

12             MR. McDONALD:  I think that would be appropriate, but

13   that's certainly not the only argument we're making.

14             THE COURT:  I know, but that's your lead argument.

15   The lead argument is it's not relevant, period, get out of

16   here.

17             MR. McDONALD:  I guess that's the lead argument.

18             THE COURT:  The next argument is, if it's relevant,

19   it has marginal relevance, and its prejudicial effect is

20   substantially outweighed by the risk of confusion and delay.

21             MR. McDONALD:  Yes.  I think really, a lot of the

22   rulings of the cases that we have tend to rely upon both 402

23   and 403, and when you think about it, in effect they are

24   relying on 403 more almost by definition when they talk about

25   both of them --

```
 1              THE COURT:  They have to, because you have to
 2    consider 402, i.e., relevance in making the analysis called for
 3    by 403.
 4              So what is it -- this guy calculated the royalty, a
 5    running royalty, and he used the Ariba and SAP royalties, and
 6    then he used three more; is that right?
 7              MR. McDONALD:  He referred to those other thee from
 8    2009, but I don't think he relied on much at all.  I think he
 9    was saying that those weren't --
10              THE COURT:  That's sort of being a little bit
11    pregnant.  You either are or you aren't.  Did he or did he not
12    rely on them?
13              MR. McDONALD:  I think he cites them.
14              THE COURT:  Why do you all let your experts do that?
15    Why would any lawyer let an expert sit around and cite
16    something and then not rely on it?  Of course, it's not your
17    report, so I'll ask Mr. Robertson is your way of handling that
18    argument, so your objection to the question is sustained.
19              MR. McDONALD:  Thank you.
20              THE COURT:  But I'm trying to get the facts in.  Did
21    he only base the royalty then on Ariba and -- what do you call
22    it -- SAP?
23              MR. McDONALD:  When you actually look at the
24    analysis, it looks to me like that's all he's relying on.  I
25    mean, he mentions the other ones in there, but I don't really
```

1    see those affecting how he comes up with his numbers.  That's

2    how I read the report.  Maybe Mr. Robertson has a different

3    view.

4              THE COURT:  So your motion *in limine* is, in essence,

5    one for summary judgment on damages; is that right?

6              MR. McDONALD:  No.

7              THE COURT:  If they can't use these, they can't use

8    any if that's all they used; right?  I mean, they don't have

9    any.

10             MR. McDONALD:  I think the expert's report should be

11   tossed out, but that doesn't mean we get summary judgment.

12   They still have a chance to put evidence in for damages and go

13   through the evidence that would relate to *Georgia-Pacific* other

14   than these inappropriate settlement agreements to make their

15   case.

16             THE COURT:  Have they offered other evidence than the

17   expert?  In other words, is somebody coming in, or are you

18   going to be, down the road, saying, well, look, we asked in the

19   interrogatories what your damages were and what the basis of

20   them was, and you didn't say that you were going to offer your

21   royalty department, your vice president, your financial

22   officer, you didn't tender any of that, and so you can't do

23   that now because you violated the rules of discovery?

24             MR. McDONALD:  Yes, I would say if they're going to

25   put somebody on the witness stand to say, in my opinion, the

1    royalty should be X percent, yes, we would object to that, but
2    they can put in evidence on the *Georgia-Pacific* factors and let
3    the jury decide what that is, and as long as the jury's
4    decision is soundly based, I guess that's an alternative way to
5    do it.
6            THE COURT:  My question is, have they forecast in the
7    answers to interrogatories that you inevitably put about the
8    damages, have they forecast any such evidence from any other
9    source?  Neither of you cite it.
10           MR. McDONALD:  I can't recall that off the top of my
11   head.  I mean, we certainly didn't get a number from them
12   separate from the expert's percentage.  I'm trying to think if
13   we had an answer where they said, well, here's some evidence
14   that relates to damages, and they may have given us an
15   interrogatory on that.  I can't recall right now one way or the
16   other.
17           THE COURT:  Okay, go ahead.
18           MR. McDONALD:  So you've got this litigation that can
19   skew the results.  Many cases on that, including just this year
20   in this *ResQNet* case --
21           THE COURT:  Yes, but *ResQNet*, they sent the case
22   back.  It was a bench trial, I understand that.  They sent the
23   case back and in this elliptical statement said, consider the
24   panoply of the world, and the panoply of the world that they
25   left open included two settlement agreements and knocked out,

1    what, three or four?  Three.

2        MR. McDONALD:  I think they weren't necessarily

3    saying do or don't consider that.  I would agree it's a totally

4    mystifying thing for what the district court is supposed to do

5    next, because they say, well, this is maybe left here, but it's

6    got a skewed result, so they're saying it's tainted evidence.

7        I don't know what -- I can't tell you what the

8    district court is supposed to do there now, and I don't think

9    that case, frankly, has a lot of guidance for us one way or the

10   other.  So maybe we just go back to the Supreme Court who says

11   pretty square up it's, you know, it's tainted evidence, it

12   shouldn't be used to figure out damages.  I think that's the

13   appropriate rule to apply here.

14       I don't know that you have to rely only on that

15   because these agreements are so remote from the situation here,

16   and just to hit a couple of the key points there, I mean, I've

17   got some slides that talk about a lot of the differences

18   between --

19       THE COURT:  That's on a different point than whether

20   it's -- and whether it is, per se, irrelevant, it's irrelevant

21   because it is not even sufficiently analogous -- neither one of

22   these are sufficiently analogous.

23       MR. McDONALD:  Right.  So even if you were going to

24   accept this proposition that in some cases a settlement

25   agreement might have minimal probative value, then you have to

```
 1   go to 403.  The question is, is this case one of those cases,
 2   and here, I don't think these agreements have that minimal
 3   probative value.
 4            I would say the situation of that hypothetical
 5   negotiation is before i.nfringement begins, so this is a
 6   business deal, in a sense.  ePlus, Lawson get together in 2002,
 7   and ePlus has got these patents, Lawson is deciding they want
 8   to take a license, what is the right price.  We haven't started
 9   using it.  The only issue is, what's your technology worth?
10   Keep the lawyers out of it, keep the judges out of it, what do
11   these businesspeople think would be the right deal?
12            That's got nothing to do with these lump sum
13   settlements reached after intensive trials in the *Ariba* and *SAP*
14   cases.  *Ariba*, for goodness sakes, had a finding of willful
15   infringement.  80 percent of Ariba's business was at stake with
16   the threat of an injunction, and now we're going to sit down
17   and decide what this thing is worth while they're teetering on
18   bankruptcy, and even if they thought they had some good appeal
19   issues, they may not make it that long.
20            Has that got anything to do with the hypothetical
21   negotiation in 2002 that these businesspeople at ePlus and
22   Lawson had?  Absolutely not, and that's where I go from minimal
23   probative value to none when you have such an extreme
24   difference in the facts as you do here with these settlement
25   agreements set up in the way they are and the context that
```

1   they're in.

2          *SAP* as well was a hung jury.  They hadn't been found

3   to willfully infringe yet, but that was part of the case.  They

4   had e-mails, they had smoking guns that we don't have here that

5   showed internal SAP people were aware of the ePlus patents and

6   the issues there, and so they were at risk for that, and that

7   settled after trial number one.

8          It was probably a very expensive trial, and those

9   business executives had a bunch of lawyers in the room for that

10  one, and they'd just been paying them all a whole lot of money

11  for what amounted to merely unfinished round one.

12         THE COURT:  Have you all taken in this case the

13  depositions of the people at SAP and Ariba and asked them why

14  they settled, how, what the factors were?  In other words, is

15  there a fact basis for me to conclude that there was compulsion

16  in those negotiations, or do I just discern it from the facts?

17         MR. McDONALD:  I think you can discern it from Mr.

18  Mangum's own report.  He talks about how Ariba was sitting

19  there on the verge of bankruptcy, and the case had just

20  finished phase one with a finding of willful infringement.

21         I guess, are you asking did we get out of Ariba's

22  mouth at a deposition, did they say, we felt like we were

23  against the wall?  No, we didn't get that.  We actually tried

24  to get at the documents that ePlus had regarding Ariba's sales

25  and things like that.  Ariba had objected to allowing it to be

1    produced, and we didn't get it from ePlus.

2            SAP allowed some materials to be produced, but ePlus

3    withheld other materials from the *SAP* case on the basis of

4    third-party confidentiality.  This was all back and forth in

5    discovery before we understood they were really going to hang

6    their hat only on these two agreements.

7            This only came out in the Mangum report in May when

8    discovery had two weeks to go that we understood they are

9    putting all their eggs in this basket, so, certainly, had we

10   understood that earlier, we would have pursued it further, but

11   we did pursue it and were limited in what we could get.

12           We did take a deposition of SAP who was not very

13   willing to share any information about anything.  They

14   barely -- they wouldn't share any sales figures with us or

15   anything like that.  The witness, if you read the transcript,

16   really shows a battle in the trenches to get answers to any

17   questions.

18           THE COURT:  Where is SAP located?  The deposition,

19   where was it located?

20           MR. McDONALD:  Kirstin took that deposition, so...

21           MS. STOLL-DeBELL:  The witness was in New York, I

22   think, Your Honor, but they're everywhere.

23           THE COURT:  They have courts there where the

24   deposition was?  They do, don't they?  They still have a court

25   system up there.  You can go to a judge.  Can't you even get on

1   the phone to ask to talk to me?

2         MR. McDONALD:  Sure.

3         THE COURT:  You all are singing a song of sixpence,

4   and you didn't come here and try to get me to rule, you didn't

5   go to a court up there, so I can't consider that too much.  How

6   do you deal with their cases?

7         MR. McDONALD:  Pardon?

8         THE COURT:  How do you deal with the cases they cited

9   which allow -- particularly, what is -- the case that I have so

10   much trouble understanding is, the Court of Appeals, to

11   distinguish the principle that you are not under compulsion,

12   that this wasn't entered into under compulsion, that after

13   you've been found to infringe, you can consider the royalty

14   arrived at because otherwise would be to ignore the

15   infringement.  I don't understand the logic of all that.  Help

16   me with that case.

17         MR. McDONALD:  Well, I can't help.  I don't know that

18   I can help you with that.  I, frankly, look at these as

19   aberrations.  The cases that say keep it out, it's apples and

20   oranges.  I understand those.

21         There are a couple of cases where they let it in, and

22   I think they just use different logic.  Some of them, there

23   really wasn't an actual motion to exclude the license

24   agreement, so it maybe didn't get teed up just the way it is

25   right here and right now.

1              Some of them simply use a different approach where

2      they say, oh, I'm going to let it in, and they seem to be

3      ignoring Supreme Court precedent.  They don't involve a willful

4      infringement here, and, you know, the prospect of a mini trial,

5      I'm just not sure all the concerns about admissibility as

6      developed in those cases, but there's a couple of cases where

7      they let it in, and there's a whole lot of cases where they

8      keep it out.  That's about the best I can give you on that,

9      frankly.

10             THE COURT:  Suppose we work out a way to let it in

11     but limit it, the jury's ability to understand that those came

12     in litigation?  Could we do that?

13             MR. McDONALD:  That just makes it worse then, because

14     they'll just think that was an arm's-length negotiation that

15     wasn't under the threat of willfulness and bankruptcy and a

16     threat of injunction, and they'll think that was just a regular

17     old business deal --

18             THE COURT:  So you'd be entitled to cross-examine the

19     expert on the circumstances of the agreement; is that right?

20             MR. McDONALD:  But now we're going against the

21     premise that you just described which is we're going to limit

22     the information to the jury about the context of the

23     settlement.  I thought that was the hypothetical --

24             THE COURT:  Your response is, I'm entitled to

25     cross-examine on that, in essence.

1            MR. McDONALD:  And have a whole mini trial then about

2     what the other case was about and make this case about that

3     case.  I guess that's my only option at that point, but it's a

4     very bad option, it's a very unfair option for us to face that

5     at that point.

6            THE COURT:  How can I limit with limiting

7     instructions -- can't I use limiting instructions to protect

8     you from harm?

9            MR. McDONALD:  Well, you know, I think the most

10    prejudicial parts of those settlements are the dollar figures.

11    The jury hears 17.5 million and they hear 37 million, that's

12    more prejudicial than anything else, and if that didn't come

13    in, then what about these things has anything to do with the

14    royalty now?

15           Again, those are lump sum deals.  These were brought

16    in by Mr. Mangum.  *Georgia-Pacific* factor number one, he puts

17    it under that heading.  You know what that heading talks about?

18    It talks about --

19           THE COURT:  Reasonable royalties.

20           MR. McDONALD:  Factor number one is established

21    royalties.

22           THE COURT:  Yes, established royalties.

23           MR. McDONALD:  This doesn't -- or says tending to

24    prove an established royalty.  In other words, I've got a

25    licensing program, and people sign up and they pay two percent.

1    I've got an established program, that's the going price, that's

2    the list price, that's the established royalty.  That's what

3    factor number one has to do with.

4            It's got nothing to do with the Ariba and SAP

5    situations.  Their own expert, Mr. Mangum, when he tries to run

6    all of his numbers here about the sales could be up here, the

7    sales could be down there or someplace in between because he

8    doesn't know what the sales are, he's got royalties that go

9    from 1.8 percent to 8.3 percent that are his translated

10   versions of those lump sums.

11           How can you say, when there's a multiple of four to

12   five times in that spread -- 8.3 is more than four times 1.8 --

13   how, by any stretch of the imagination, can you say that tends

14   to prove an established royalty?  He can't even tell what the

15   royalty was in the one case.  How can he say that this is the

16   going price now, and so --

17           THE COURT:  How many royalties do they have other

18   than these?

19           MR. McDONALD:  They don't have any that involve the

20   percentage except there is one that if they sold over a certain

21   amount that -- this was one of the recent ones that their

22   expert really didn't rely on.  Over a certain millions of

23   dollars, they might have to a pay certain percentage.  The rest

24   of them were these lump sums.  The three in 2009 were up in the

25   range of between 500,000 and a million for one or two of them,

1   and I think the third one was maybe around two million or 2.4.

2          THE COURT:  And then one of them had a royalty on

3   sales over 15 million or something?

4          MR. McDONALD:  Who knows whether they're ever going

5   to sell anything close to that.  There is no evidence one way

6   or the other on that.

7          THE COURT:  I guess, get back to my original

8   question, and that is, if this motion is granted, isn't that,

9   in effect, the same thing as granting a motion for partial

10  summary judgment on the reasonable royalty aspect of damages;

11  that is, you don't get any reasonable royalty here?  You either

12  have to prove lost profits -- you have to prove lost profits as

13  your damage.

14         MR. McDONALD:  I think they can still prove

15  reasonable royalty.  They just would have to go through those

16  factors in *Georgia-Pacific*.

17         THE COURT:  Let me ask you, are you willing to live

18  by that at the trial when they start offering this evidence, or

19  are you going to pop up and say, I object because they didn't

20  offer any evidence of this?

21         I understand that conceptually what you're saying is

22  true, but that's not what you are arguing.  You are really

23  arguing that they have another alternative, and I want you to

24  understand that you may be held, you probably will be held to

25  that if you object later, or are you simply arguing they

1    conceptually have another way, and if they can work it out and

2    get it in admissibly, then so what, that's what happens?

3         MR. McDONALD:  I think conceptually they can.  I'm

4    trying to remember what their interrogatory answers were, but I

5    think, obviously, that's of some relevance here.

6         THE COURT:  What did the disclosures say, for

7    example?  Did the disclosures say they were going to seek

8    damages by virtue of a reasonable royalty, and if so, what they

9    had to back that up?

10        MR. McDONALD:  I believe they indicated it was going

11   to be a reasonable royalty that they sought.  I can't recall

12   the details.  I think they probably referred to the

13   *Georgia-Pacific* factors, but what factual information they gave

14   us, I can't recall off the top of my head right now.

15        THE COURT:  Okay.  All right.  Thank you.

16        MR. McDONALD:  Any other questions?

17        THE COURT:  No.  I want to hear from them.

18   Mr. Robertson, the question I have is, do you have any

19   royalties that were arrived at and available by 2002?  That's

20   the date the negotiation took place here, because that's the

21   date of infringement.

22        MR. ROBERTSON:  No, Your Honor, but we don't need

23   them because the *Studiengesellschaft* case makes clear --

24        THE COURT REPORTER:  Because the?

25        MR. ROBERTSON:  *Studiengesellschaft.*

1          THE COURT:  That's what we call the *Dart* case.

2          MR. ROBERTSON:  Yes, sir.  The *Dart* case makes clear,

3    and as does the *Fromson* case and others, that you can employ

4    what's called a book of wisdom, and so, for example, in the

5    *Dart* case, the license at issue that was considered in the

6    settlement agreement was, indeed, ten years after the

7    hypothetical negotiation would have incurred, but Judge Rich,

8    who actually was a coauthor of the Patent Act and, therefore,

9    was fairly knowledgeable about reasonable royalties and damages

10   that could be set forth, indicated that that was still relevant

11   to inquire into when determining what the reasonable royalty

12   is.

13         Let me approach Your Honor's concern about this issue

14   about compulsion and the fact that somehow this skews the

15   litigation.  I want to --

16         THE COURT:  The Fourth Circuit and the Supreme Court

17   have held that.  Not the Fourth Circuit, the Federal Circuit.

18         MR. ROBERTSON:  It's important to understand the

19   context, Your Honor.  All of this involved a negotiation, even

20   if it's hypothetical.  It's still a negotiation, and even if

21   you have a willing licensor and a willing licensee, the other

22   assumption that has to be part of it is that the patents are

23   valid and infringed and the licensee knows that.  That's made

24   clear.  So right there, Your Honor, you have a licensee who

25   understands he's infringing a valid patent and he needs a

1    license.

2            Now, what else goes into that?  The economic factors

3    that need to be concerned that are incorporated some way are

4    the *Georgia-Pacific* factors.  What is the financial condition

5    of the licensee?  Is it undercapitalized?  Does it have a lot

6    of cash on hand?  How central to its business operations is the

7    patent technology?  Is he going to be out of business if he

8    can't get a license?

9            These are all economic compulsory factors, Your

10   Honor, that go into every negotiation when they sit down.

11   These factors drive the royalty rate up or down depending on

12   their impact on the licensee or the licensor.  That's what's

13   going on here even in this hypothetical negotiation.

14           So in the *Dart* case, when Judge Rich was looking at

15   this, he was saying, where are we procedurally in this case?

16   Now, the *Rude v. Westcott* case, I agree, the Federal Circuit

17   can't overturn the Supreme Court even if that case is, I would

18   say, somewhat dated and probably doesn't reflect the economic

19   realities of today, but I'll leave that aside for another day.

20           What's going on in the *Dart* case is Judge Rich is

21   saying, we are now, at this stage of the case, just like the

22   hypothetical negotiation.  We have a valid patent, it's known

23   to be infringed, we have a few more procedural issues to move

24   forward in the litigation, but the litigation, for all intents

25   and purposes, is over.  The litigation costs that were at

1    issue, that all the cases, including the *Rude v. Westcott,* skew

2    the negotiations are sunk, they're done.  Now, there's not

3    going to be any more significant litigation costs, so here we

4    are sitting at the table --

5            THE COURT:  Because why?

6            MR. ROBERTSON:  Because the case is at a posture

7    where the patents are valid and infringed, just --

8            THE COURT:  That's silly.  That's absolutely

9    ridiculous, because there's an appeal that can lie *en banc* to

10   the Federal Circuit.  There's an appeal to the Supreme Court.

11   In fact, there's an appeal on that issue, on the very issue

12   that's being litigated that would lie to the Supreme Court,

13   find out if *Rude* is still good law.  And that, it just seems to

14   me to be just -- the approach taken in that case makes no

15   intellectual sense in view of all of the other cases that have

16   been decided, and I don't understand it.

17           MR. ROBERTSON:  That approach has been followed by a

18   number of cases, including the *Snellman* case, and a number of

19   the district court cases that actually look at this distinguish

20   the situation where you have a threat of litigation or probable

21   litigation or actual litigation early on in the case or where

22   you've proceeded to get to a point where you are at a situation

23   which is more akin to the hypothetical negotiation which is why

24   Dr. Mangum, in his expert report, was intellectually honest

25   when he relies on the *SAP* and *Ariba* case in which the

 1   litigation had effectively concluded, and the three settlement

 2   agreements that occurred early in this case, Verian, SciQuest,

 3   and Perfect Commerce, which he cites but then doesn't rely on,

 4   because he says exactly under this approach, those were done

 5   early on and could have been the result, and the numbers could

 6   have been skewed because of the concern of wanting to avoid the

 7   litigation expenses.

 8           THE COURT:  The real reason he didn't include it is

 9   because they were pretty low.

10           MR. ROBERTSON:  No, Your Honor, I think that's not

11   true.  In fact, the Verian license agreement, I think, was

12   $500,000 at a total revenues of about six million, and so if

13   you look at that percentage, that royalty rate, that would have

14   been the highest royalty rate available.  Some of the others we

15   didn't have --

16           THE COURT:  He didn't consider them.

17           MR. ROBERTSON:  He didn't consider it because he was

18   following the construct in *Studiengesellschaft* and also, I

19   think, the *ResQNet* case.  Now, I'm not going to over argue the

20   *ResQNet* case.

21           THE COURT:  Yeah, I'd leave that the --

22           MR. ROBERTSON:  All I would say is they pointed out

23   these license agreements were the most reliable evidence and

24   could be considered.

25           THE COURT:  You know, but why on earth -- the most

 1    reliable evidence -- there's not one single rule of evidence

 2    that says you let it in because it's the most reliable.  It's

 3    got to first pass all the tests.

 4            MR. ROBERTSON:  I would think if it's reliable --

 5            THE COURT:  That just says the best they could come

 6    up with was something that was filed that weren't reliable and

 7    let the most reliable one in, and then they sent it back to the

 8    district court and said, now we've made up a mess, you figure

 9    out what to do with it.

10            MR. ROBERTSON:  I think they indicated it was most

11    reliable because they were actual license agreements of the

12    patents in suit where the other ones weren't.  Just like the

13    *Ariba* and *SAP* cases are license agreements of the patents in

14    suit.

15            THE COURT:  That's an implied -- according to the two

16    Texas cases, that holding in *ResQ* is an implied warrant to

17    consider the patent -- I mean infringed patent license

18    agreements, that is after the trial or part of the settlement

19    agreement.

20            MR. ROBERTSON:  There were several Texas cases, Your

21    Honor.  There are Texas cases that have said that the *ResQNet*

22    case permits them to consider license agreements.

23            THE COURT:  One is *Tyco* and the other one is -- you

24    all cite --

25            MR. ROBERTSON:  *DataTreasury*, Your Honor.

 1           THE COURT:  *Tyco v. E-Z-EM* and *DataTreasury*, and

 2    *DataTreasury* goes so far as to believe that *ResQNet* may have

 3    changed the legal landscape regarding admissibility of

 4    litigation licenses which is a strange animal given that the

 5    Federal Circuit follows the rule that one panel can't change

 6    the rule of another.

 7           MR. ROBERTSON:  Again, Your Honor, I don't think you

 8    need to go that far when you look at the context of

 9    *Studiengesellschaft* and apply it to the cases -- excuse me, the

10    *DART* case.  I'll have the spelling of that for the court

11    reporter later.  And then you look at the context that these

12    settlement agreements arose.

13           Even the *SAP* case, Your Honor, where we went through

14    the jury trial and all litigation costs were sunk, and then we

15    got to a posture where we submitted it to Judge Spencer as a

16    bench trial.  We did all the briefing, and we completed all the

17    briefing for that, and we were sitting there, we were actually

18    working with Judge Dohnal seeing if we could settle that case.

19           Now, why is that similar or analogous to the

20    hypothetical negotiation?  Because there were two outcomes at

21    that point, Your Honor, all the litigation costs involved.

22    There was Judge Spencer would have found the patents valid and

23    infringed, or he would have either found them invalid or not

24    infringed.

25           In that latter instance, the royalty would have been

1   zero.  In this instance, we didn't know what was going to

2   happen.  So, in fact, Dr. Mangum says that the amount of

3   royalties that were received in the *SAP* case is conservative,

4   because if we had got the outcome of infringed and valid,

5   obviously they would have been much higher.  So when he

6   estimates the royalty rate off the *SAP* case, he does so in a

7   conservative fashion, and that's why I think that is also

8   relevant to the inquiry.

9          Now, there's been some argument that this would be

10  unduly prejudicial because the numbers of 15 million and 37

11  million -- or, excuse me, 17 million and 37 million.  Well,

12  that's because the royalty bases are so high in these cases.

13  The royalty bases --

14          THE COURT:  Did SAP agree to a royalty?

15          MR. ROBERTSON:  They agreed to a fully paid-up lump

16  sum agreement.

17          THE COURT:  What was the basis upon which the fully

18  paid-up royalty was calculated according to the record in that

19  case?

20          MR. ROBERTSON:  Well, it was negotiated out of what

21  the exposure was.  It was a comprised agreement just like any

22  negotiation for a license agreement is.  It also included other

23  things in it like cross licenses for patents which Dr. Mangum

24  considered because that meant that there was additional

25  consideration.  So the actual monies exchanged were lower given

1    the fact that there was additional consideration.

2         There was also additional consideration in the *Ariba*

3    case because there was a cross license involved, in fact, cross

4    licenses to patents that Ariba then went out and enforced

5    against others and prevailed.  So that was consideration that

6    was valuable to my client.  And he takes all these into

7    account.

8         Now, to be sure, Dr. Mangum considers these as one of

9    the *Georgia-Pacific* factors, in fact factor number one, and

10   this was raised about that it was for proving established

11   royalty.  Factor number one actually says, royalties received

12   by the patentee for licensing of the patent suit proving, or

13   tending to prove, an established royalty.

14        So what he did was he took those, and he looked at

15   them, and he translated them into what would be a running

16   royalty.  He did that because he's only looking at damages from

17   the period of the infringement, in this case I believe 2003

18   going forward to the date of trial, not projecting forward into

19   the future as the Ariba and the SAP licenses necessarily did

20   because they were fully paid up.

21        So he factors all that in, but he goes on, and to be

22   sure, he looks at all 15 factors, and he does an analysis on

23   this.  Are these license agreements important to us?

24   Absolutely.  Do we want them in evidence?  Yes.  But we don't

25   think they're prejudicial simply because the numbers are going

1    to be high.

2              THE COURT:  How is this going to get tried?  Your man

3    gets on the stand and says, I arrived at this royalty rate, and

4    it's based on two royalties, license agreement that came out of

5    settlements, and then in order for Mr. McDonald to test the

6    validity of your man's assertions, he's going to be able to go

7    into a wide range of cross-examination about the litigation and

8    about what was going on, and then the jury has to sit there and

9    listen that somebody else has paid that money and thought in

10   their case that they had a risk of it being infringed -- being

11   held to be infringed.

12             In one case, the judge was considering -- all this

13   would have to come out.  It would have to come out to the jury

14   here in this case.  Yeah, if this comes in, he's going to be

15   able to have wide cross-examination in order to establish the

16   circumstances and the validity of the assumptions that your man

17   uses, because they are the only two he uses.

18             MR. ROBERTSON:  Your Honor, they are the only two of

19   the patents in suit, because the other three he discounted

20   because of the context of the litigation, yes.

21             THE COURT:  If he discounted those in context of the

22   litigation, why didn't he discount these?

23             MR. ROBERTSON:  Because they were arrived at after --

24   they were arrived at a situation more analogous to where you

25   are in the hypothetical negotiation, not in the beginning of

1    the litigation where all the litigation costs are still to be

2    incurred and have not already been spent which is where we were

3    in Ariba and SAP.  That's why they're more relevant than the

4    other ones.

5         Now, there are other factors he looked at, but, yes,

6    these are going to be important.  I don't mind if Mr. --

7         THE COURT:  My question is, how long is this going to

8    take for him to do that?  How do I limit the damage to him by

9    letting in the fact that somebody else, some other case, the

10   two people thought that they had a risk of being slapped with

11   infringement?  How do I limit that?

12        MR. ROBERTSON:  That's what every willing licensee

13   has when he faces the hypothetical negotiation.  They have to

14   assume that the patents are valid and infringed.  That is the

15   law on this.

16        THE COURT:  But it doesn't -- that assumes that the

17   patents are valid and would be infringed by the other person's

18   product.

19        MR. ROBERTSON:  No, they are infringed by the other

20   person's product, and that's where the licensee finds himself

21   at the table --

22        THE COURT:  How can he not be under compulsion if

23   he's got an infringed product?

24        MR. ROBERTSON:  Lots of people who enter into

25   licenses -- in fact, most people --

```
 1              THE COURT REPORTER:  Mr. Robertson, you have to slow
 2    down.
 3              MR. ROBERTSON:  Sorry.  I apologize.  Licensees
 4    typically only enter into licenses, Your Honor, when they
 5    believe they infringe.  Otherwise, they don't enter into the
 6    license.  Why pay a patent owner money that you don't believe
 7    they deserve?
 8              So the hypothetical negotiation posits, its premise
 9    is that the patents are valid and infringed.  That's why
10    they're at the negotiation table.  In fact, Judge Rich --
11              THE COURT:  Not that they've been held to be
12    infringed but that the person who is doing the negotiation
13    assumed they are infringed for purposes of arriving at a deal.
14              MR. ROBERTSON:  Yes.
15              THE COURT:  But they haven't been held to be
16    infringed.
17              MR. ROBERTSON:  No, but in a situation where they
18    have been held to be infringed, I would think a party like
19    Ariba understands that that's a strong likelihood, and that's
20    why they are sitting down and negotiating in that context.
21              The issue was raised about Ariba potentially being in
22    bankruptcy.  That's an issue that can be brought out, but,
23    again, that's an issue that could be present in any
24    hypothetical negotiation.  You can't wash away all the economic
25    factors that go into a negotiation, hypothetical or otherwise.
```

1          The suggestion was made that they don't have all the

2     information with respect to these issues.  Well, Lawson did

3     issue subpoenas to both Ariba and SAP.  We made every effort we

4     could to get them all the financial information.  We reached

5     out to SAP and got their permission to turn over their

6     confidential financial information.  We reached out on multiple

7     occasions to Ariba to get their -- to be permitted to turn over

8     their financial information.  We did that months earlier,

9     before their subpoena back in September of 2009.

10          They never pursued the subpoena with Ariba.  With

11     respect to SAP, they took a very limited deposition with

12     respect to marketing and agreed not to pursue SAP with respect

13     to a lot of this financial information, and the Court is

14     exactly right.  There were mechanisms for them to go forward

15     and enforce those subpoenas.  They declined to do it.

16          But we made every effort we could to give them the

17     information that was in our possession, that under the

18     protective orders signed by Judge Spencer and Judge Brinkema we

19     could provide to them.  So they don't have any less information

20     than Dr. Mangum has when he put together his analysis as far as

21     the underlying financial data, and if there's any fault, I

22     think it would lie with Lawson in not pursuing the subpoenas

23     that they issued to those parties.

24          So, Your Honor, I don't know if there are any other

25     questions.  I certainly think with respect to the fact that

1    these license agreements occur after the hypothetical

2    negotiation, case law makes clear they can be considered.

3           THE COURT:  One case makes clear that they can be

4    considered in a strange context, and these were years -- I'm

5    sorry.  I did what I don't allow to be done.  I thought I put

6    this thing on my desk.

7

8           (Brief interruption.)

9

10          MR. ROBERTSON:  I'm reminded by my colleague that

11   there is a Supreme Court *Sinclair* case, Your Honor, that

12   involved the application of a subsequent agreement for

13   consideration long after the fact the hypothetical negotiations

14   occurred, and I will get the cite for you.  I do believe it's

15   in our briefs there, Your Honor.

16          So, the fact is, Your Honor, the evidence of these

17   licenses and of the value of the royalties is also highly

18   relevant in another context, and the Court is going to have to

19   consider that, and that is Lawson has challenged these claims

20   as being obvious, and under the Supreme Court's *Graham v. John*

21   *Deere* case, to rebut allegations of obviousness, the jury can

22   consider what are called secondary factors which have to do

23   with the commercial success of the patented technology,

24   licensing of the patented technology, the royalties enjoined by

25   the patented technology, and so we would think this would have

1   to come out because the Supreme Court says these factors must

2   be considered --

3          THE COURT:  No, but you just say, do you have a

4   license and what's the amount of the license, and then we apply

5   the question, how do you convert lump sum into a royalty issue.

6   Your man has gone all over the ballpark.

7          What was in the *ResQ* case, didn't the range of

8   royalties alone suggest that it was ridiculous, the expert's

9   calculations were ridiculous, or was it another case?

10         MR. ROBERTSON:  I think in the *ResQNet* case, the

11  damages expert's calculation was criticized, but I believe that

12  was because he included licenses that were not comparable.

13         THE COURT:  It was criticized because it was silly.

14         MR. ROBERTSON:  I think it included underlying data

15  that didn't involve the patents in suit and wasn't related to

16  comparable technology, and so when you took those license

17  agreements out of the equation, it certainly did have an impact

18  on the outcome.  And would I characterize them as silly?  I

19  wouldn't disagree with Your Honor on that.

20         THE COURT:  All right.  Thank you.  We'll take a

21  20-minute recess.

22

23         (Recess taken.)

24

25         THE COURT:  All right, is that it on that issue?

1          MR. ROBERTSON:  For the plaintiff it is, Your Honor.

2     I gave the citations to your clerk.

3          THE COURT:  All right.

4          MR. McDONALD:  Your Honor, I just had a few points

5     here.  One is with respect to the discovery of SAP and Ariba

6     and how we didn't take their deposition, well, the burden of

7     proof is on ePlus to prove damages.  The burden of proof is on

8     them to show that these other license agreements are

9     sufficiently relevant to the damages to be brought in, and yet

10    they have their expert guess at how much sales SAP and Ariba

11    have been making since the settlements were entered.  They

12    don't even go and try to get this data.

13         The burden really was on them to go to Ariba and SAP

14    and find out the real facts instead of having Mangum guess.

15    You know, we put this in a little funny context, but I'm

16    supposed to cross-examine this expert who is making these

17    guesses about what other companies are doing that aren't in

18    this case, and I'm supposed to take that discovery.  Well, I

19    would have cross-examined their effort to obtain support for

20    their position, but they didn't do that.

21         THE COURT:  How does that play into what we're

22    deciding today?

23         MR. McDONALD:  Well, these settlement agreements have

24    to do with the prejudice versus the probative value of them.

25    They haven't shown that these -- their own briefing on the

1    marking issue.

2         We brought up that the Mangum report says SAP is

3    continuing to sell patented products that aren't marked.  Their

4    own brief says -- can we put up slide number 35.

5         THE COURT:  You know, one of the things that happens

6    in these cases is I get too much information, and you are in

7    too much depth for me to be able -- and I understand that when

8    you're in tight on a case, that you can stack inferences, but

9    stacking inferences are not particularly helpful here.  I think

10   I've heard enough.

11        MR. McDONALD:  Okay.  Maybe I can make just two broad

12   points.  One is, let's not forget Rule 408 of evidence which,

13   among other things, says you should not introduce a settlement

14   of a claim to indicate the value of the claim.  That's exactly

15   what they're doing here, and whatever case --

16        THE COURT:  That's settlement offer in the same case.

17        MR. McDONALD:  Well, it's to prove the value of SAP's

18   deal.  They're trying to say that's a representative deal, and

19   here's the value of that one, and, therefore, that helps them

20   in this one.  They can't prove the value of the SAP deal by a

21   settlement.  That's what Rule 408 says, and the same should go

22   for Ariba.

23        And then finally, this issue of what are they going

24   to do if they can't have their expert rely on it, they took

25   that risk.  There's 120 years of case precedence that says

1    those settlement agreements have minimal probative value.  They

2    really wanted to get them in.  I can't blame them, because they

3    have nice shiny dollar figures on them, but they could have had

4    a plan B in the Mangum report that says even if that doesn't

5    come in --

6                THE COURT:  There's no alternative calculation in

7    that report, is there?

8                MR. McDONALD:  No, there isn't, but they could have

9    and should have done that because they knew they were taking a

10   risk here.  The prejudice to us far outweighs the prejudice to

11   them because we have no control over the situation, but they

12   did.

13               THE COURT:  Let me tell you how I feel about this.

14   I'm not sure what I'm going to do, but it appears as if there

15   are circumstances when the Court of Appeals, the Federal

16   Circuit, allows in these cases -- I've got to sort out --

17   allows in the post-litigation settlement agreement type

18   evidence on royalties.

19               I've got to sort the extent to which they have to be

20   analogous and deal with that question, but -- and you have to

21   deal with the temporal distance as well, and all of that may

22   very well factor into that these come out.  Apart from the

23   ruling that they can be relevant, they may not be relevant

24   circumstantially, but if they are relevant circumstantially, my

25   great concern -- that is beyond a marginal relevance, and they

1    have some relevance -- is what it's going to do to the trial of

2    the case.

3         I think that most of the decisions that make the most

4    sense to me keep the evidence out under 403 in a situation such

5    as this.

6         MR. McDONALD:  The *SAP* trial was 15 days to go

7    through that evidence, and we, obviously, wouldn't do that

8    here, but we're talking about very complex issues.

9         THE COURT:  Don't make noise about that.  They were

10   trying an infringement and validity and all that other stuff.

11   You would be trying the circumstances that have to do with the

12   money.  So I don't think that helps you, and we'll wait and see

13   how -- I'm afraid it's going to turn this case into a damages

14   side show.

15        One of the ways to avoid that problem is to sever the

16   trial of damages but not sever it in any major sense but sever

17   it and keep all this evidence out until there's a finding of

18   infringement and then tell the jury, okay, now you've got to

19   come in and figure out the infringement -- I mean the damages.

20        I've thought that through as an alternative, and I'm

21   not sure it solves the problem here, because I think the

22   problem here is the inherent unreliability issue as to the

23   damages itself.  I don't think it's so much that the evidence

24   is going to spill over, although there is some spillover

25   effect, and say, well, if one jury found that they infringed,

1    maybe these people infringed, too.

2           I think I can deal with that with limiting

3    instructions, so I'll be reflecting on all that, and if you all

4    have -- if you have anything to say on those concerns with that

5    in mind, I'll be glad to hear them now.

6           MR. McDONALD:  At this point, Your Honor, that is an

7    intriguing possibility.  I think all the problems still exist

8    even if you try to bifurcate it because of that inherent

9    unreliability.  That's the nut of it, so I'll just leave it at

10   that.

11          THE COURT:  You've got another damages-related motion

12   *in limine*, and it is which one, which number?

13          MR. McDONALD:  Number two has to do with the expanded

14   royalty base, and number three has to do with Mr. Mangum's

15   expert report.

16          THE COURT:  Two.  Wait a minute.  I'm sorry, I have

17   the wrong two.  Your motion *in limine* two, isn't it?

18          MR. McDONALD:  That's right.  This has to do with the

19   royalty base.  You've got A times B equals C is the math when

20   it comes to royalty damages.  A is percentage and B is the

21   number of dollars involved, five percent times ten million or

22   whatever, and that's how you get to the actual damages.

23          This motion has to do more with that second number,

24   the actual royalty base, and there are cases out there that

25   would allow somebody to show beyond the infringing product that

1    there are other products that should be part of the royalty

2    base as well, but to get to that, you have to satisfy the

3    entire market value rule which shows that the demand for the

4    patented product substantially creates the value for the

5    unpatented product, and we've got the case law for that here.

6          The problem with that is that ePlus didn't even begin

7    to attempt to say that any products beyond the accused product

8    would be brought into the royalty base under the entire market

9    value rule, so where they're left then is everything in their

10   royalty base then has to be something that's an infringing

11   product.

12         We've got some cases like this *LaserDynamics* case,

13   and the *Cornell* case is also one that we've cited, that talks

14   about especially these computer cases, this can happen where --

15         THE COURT:  Which slides are you on?

16         MR. McDONALD:  I'm on 23.  You have the invention is

17   on a small component, but it's part of a bigger system.  That

18   happens often with respect to computer software devices.  You

19   have to be very careful, and you should not include the bigger

20   product in the royalty base when the individual infringing or

21   accused product is something that could be available and sold

22   separately.

23         So that's the basic law here.  You can see the last

24   cite there.  If you cite to non-accused product revenues,

25   that's afoul of the entire market rule and leaves you

1    vulnerable to this prejudice, because the jury will be hearing

2    a much bigger base than they should, and that can improperly

3    taint the damages award.

4              THE COURT:  I understand the principle, and I think

5    there's a great problem created here.  I guess what I'm trying

6    to figure out is whether all these SKUs that you seek to be

7    excluded really fit the bill for exclusion as a factual matter,

8    and I don't see much on that, and I'm wondering if I

9    misapprehended.

10             MR. McDONALD:  We listed the ones that were not

11   included within the Weaver report analysis, and if you go to

12   slide 24, we've got a summary of the products that he includes,

13   and he does cite -- they say, well, we weren't really looking

14   at modules, we were looking at something else like a product,

15   but he does, as we have in these quotes here, talk about

16   modules and applications, and these are the products that are

17   in the units that Lawson actually sells.

18             So he's got specific ones that he identified, and we

19   understand that while we disagree with infringement, that those

20   would be at least appropriate for their side of the story to

21   put that into the royalty base.

22             THE COURT:  But on the four categories listed there,

23   in slide 25.

24             MR. McDONALD:  25 now we're on?

25             THE COURT:  Yes.  He didn't --

1          MR. McDONALD:  That's right.

2          THE COURT:  Is that the same as in the motion, the

3    text of the motion itself?

4          MR. McDONALD:  All of these, I think, are in the text

5    of the motion itself, that's right.

6          THE COURT:  Not the brief, but the first -- the

7    motion.  It looks to me like they are the same, but I haven't

8    done the comparison.

9          MR. McDONALD:  I was --

10         THE COURT:  But they're all done with all these

11   numbers, and I don't have time to sit down and compare them.

12         MR. McDONALD:  I can verify.  I was pretty confident

13   on the brief.  I'm not a hundred percent sure of the motion.  I

14   think we were trying to be consistent with everything, but I

15   didn't double-check that particular question.  I believe this

16   is the same list.

17         THE COURT:  All right.

18         MR. McDONALD:  So these are the ones that weren't

19   part of his equation.  Just to get an understanding of what

20   we're really talking about here, I thought I'd show in slide 26

21   what's really going on here.

22         You've got some groups of suites we will call it,

23   where they will have 13 or even more different individual

24   products that are presented as a package to potential

25   customers, and we've got in these pie charts, you can see three

1    of the ones on this PPS suite, for example, are the actual

2    accused ones, the inventory control or IC, the purchase order

3    or PO, and the requisition or RQ.

4              Those are accused, and that's fine, but they've got

5    the whole revenue for the whole suite in their royalty base and

6    without any proof that the demand for the other ten modules has

7    got anything to do with demand being driven by the patented

8    product.  They don't even allege that.

9              THE COURT:  In other words, you are saying other ten,

10   other 12, other 13, there's no proof under the market value?

11             MR. McDONALD:  Right.  Those are unaccused products,

12   and there's no other reason to tie them into the royalty base.

13   And so, you know, we've got two flaws with that, I guess.  One

14   is you shouldn't have accused products in there, and they might

15   say, well -- for whatever reason they might say we want to lump

16   them all together because that's how it's sold, for example.

17   Well, you know, there's a little case law that you might be

18   able to, in some circumstances, use the broader product if

19   that's the only way you can really slice the bologna there, but

20   the problem -- the second problem, though, is that they've come

21   up with a royalty that's just for the actual accused products

22   like the IC and the RQ and PO.

23             So six percent or five percent of that, they don't do

24   anything to recognize, though, if we're going to use this

25   bigger base that the infringing products comprise only a

1    fraction of, you shouldn't be using the same royalty though.

2            That's like if there's a patent on the car tires,

3    five percent patent on the car tires, fine, but if you're going

4    to try to do it on the car acknowledging that the car has

5    tires, you shouldn't apply that same number, five percent, to

6    the price of the whole car.  You've got to do something to

7    address the fact that this is just a tiny slice of the overall

8    package, and they don't do anything to sever off those other

9    products, and they don't do anything to reduce the royalty.

10           THE COURT:  Do they do anything to say that this is

11   an appropriate method of computation?

12           MR. McDONALD:  No.  Their main argument, as I looked

13   at it, I think, is that they're saying, well, this is the

14   information as you gave it to us, and that's not the case.  We

15   tried to show in the record there with the exhibits that there

16   was back-and-forth in the letters where we were saying, what do

17   you want, and they told us what they wanted, and we gave them

18   what they wanted.

19           They make it sound like we were answering questions

20   of, okay, here's the products we think are infringing.  We

21   weren't doing that.  We don't think anything is infringing.

22   That would have been a pretty short list.  We were trying to

23   answer their questions that were, what do you want and how do

24   you want it subdivided, we'll give you the data that you want,

25   ePlus, but this isn't something that we were vouching for as

1    the right list by any means, and as soon as we actually saw the

2    expert report, just within about two days after that where we

3    actually saw the accused products, we realized now we know

4    finally these are the products they're actually talking about,

5    and so we immediately generated a new revenue spreadsheet for

6    them that was specific to those particular products.

7         THE COURT:  Did you give that to them before this guy

8    did his report?

9         MR. McDONALD:  We didn't give it to them because we

10   got the reports at the same time.  We got the Weaver report

11   identifying the products at the same time we got the damages

12   report.  We just got it to them as quick as we could, and we

13   said, you know, you should use this instead basically.

14        We would have worked with them certainly to give them

15   time to change the numbers.  In fact, they have supplemented

16   their numbers more than once with the quarterly information

17   coming in, and we haven't had a problem with that.  We could

18   have done the same thing here to get the right numbers, not

19   just the updated numbers, but the numbers for right modules,

20   but they refused to do that.

21        THE COURT:  You can do that.  All that is is math, if

22   they apply math to your data you've given them.

23        MR. McDONALD:  Exactly.

24        THE COURT:  What you are saying is that they asked

25   what they wanted, you gave it to them, but they weren't asking

1    for the right things.  After you saw they were asking for the

2    wrong things in these two reports, you then gave them the

3    underlying data for what are the accused products.

4              MR. McDONALD:  That's right.

5              THE COURT:  And that's what they ought to use.

6              MR. McDONALD:  That's right.

7              THE COURT:  Let him address that, because it sounds

8    like it's right to me.  Why isn't he right?

9              MR. STRAPP:  Your Honor --

10             THE COURT:  You go back to square one and you do the

11   calculations, whatever you do, on the basis of the data for the

12   sales for the accused products and leave the others out.

13             MR. STRAPP:  Your Honor, in August and November 2009,

14   we asked for revenues for the accused products, and we

15   specified what accused products meant.  In fact, we identified

16   which products we believed were accused of infringing.  This

17   was when Lawson learned about what was accused.  It wasn't in

18   May 2010.

19             THE COURT:  They gave you the wrong thing.

20             MR. STRAPP:  Let me explain.  In December 2009, we

21   exchanged correspondence, and Lawson said to ePlus, give us a

22   list of SKUs.  Don't just give us a list of products, because

23   we keep track of information on revenue on an SKU basis --

24             THE COURT:  So the bottom line here is that you all

25   were not communicating accurately, and so you got put in a

1    position that you used information which you now know isn't a

2    proper basis to use the calculations.  Why don't you just go

3    back and redo the calculation?

4              MR. STRAPP:  Because, Your Honor, in December of

5    2009, we were provided a list of 60 SKUs.  Lawson took a look

6    at that list and said, we're not going to give you the revenue

7    information for those 60 SKUs even though you want it.  What

8    we're going to do is call that information and give you only

9    the revenue SKUs that are relevant to the accused products.

10             In fact, in footnote one of the reply brief that

11   Lawson has filed on this motion *in limine*, Lawson admits it

12   removed SKUs that had nothing to do with the procurement

13   software at issue.  So during discovery, Lawson made a cut,

14   said, we're not going to give you what you want, we're going to

15   give you a subset that's actually relevant to the accused

16   products.  That's the information that's responsive to your

17   interrogatories, that's the information that's actually revenue

18   for the accused products.  Go and do what you want with that

19   revenue information.

20             Our expert, relying on Lawson's representations and

21   verified interrogatory responses, calculated a royalty base and

22   then put together a damages expert report.

23             THE COURT:  That doesn't square with what he's

24   saying.  He's saying that they just figured out and just gave

25   you the new data as to the accused products.  One of you is

1    wrong.

2           MR. STRAPP:  Your Honor, we can demonstrate --

3           THE COURT:  I'm going to put you in a room and let

4    you all fight until you get it right, but one of you has got to

5    be wrong.  So who is wrong here?

6           MR. STRAPP:  Your Honor, on December 11th, 2009, we

7    sent a letter to Lawson, and we listed -- it was a four-page

8    letter.  We listed several different SKUs, and we said, we

9    think these are probably the accused SKUs, we're not sure, we

10   think these are the accused SKUs.

11          To be sure, what we do want are revenues for the

12   accused products, and we listed what those accused products

13   were.  In response, Lawson didn't give us revenue information

14   for all those accused SKUs.  They gave it to us for a subset.

15   We asked for about 60 SKUs.  They gave us about 30.  They said,

16   here are the 30 --

17          THE COURT:  Look, you and I are talking at

18   cross-purposes.  I don't care about the fights that you all

19   didn't resolve actively.  I'm not going to make a decision on

20   the basis of who struck John in the process of coming up with

21   the wrong numbers.

22          I want to know what the right numbers are, and that's

23   what you're entitled to, and that's all you're entitled to.

24   His point, it seems to me to be correct, but I may be wrong

25   about that, that you don't satisfy the market value rule and

1    that he now has given you, albeit erroneous -- he didn't give

2    it to you before, and maybe he should have, all the data for

3    the accused products.

4         Why isn't the right remedy for you to go, recalculate

5    based on the correct data?  Your answer to that has to be, at

6    least has to address at the threshold, well, they didn't

7    really -- what he's now saying he gave us isn't really the

8    revenue for the accused products.

9         MR. STRAPP:  That's correct, Your Honor, and in our

10   infringement expert report where we list what the products are,

11   we have several different products.  Lawson has taken those

12   products and said, here's the SKUs you accuse of infringement,

13   but in so doing, Lawson has ignored some of the products that

14   are accused of infringement in the expert report.  For example,

15   on footnote one --

16        THE COURT:  Some doesn't cut it.

17        MR. STRAPP:  Well, the some that they ignore are the

18   some that they wish to exclude.  In other words, what they wish

19   to exclude from the royalty base are products and services that

20   they say we never accused of infringement, but they're ignoring

21   our infringement expert report where we accuse those products

22   of infringement.

23        THE COURT:  That isn't where you accuse.  You accuse

24   them in the infringement accusations that you are required to

25   file at the beginning of the case.

1          MR. STRAPP:  That's correct, Your Honor, and we did

2     it there as well.  We've done it several times in this case.

3          THE COURT:  That's what you're limited to.

4          MR. STRAPP:  Exactly.  We've done it several times in

5     this case, and what they're saying now is, we didn't know what

6     your infringement contentions were until we got your expert

7     report.  They've made that argument in a motion that was

8     denied, the motion to strike portions of the Weaver expert

9     report because information in that report hadn't been disclosed

10    in the initial infringement contentions, and Your Honor found

11    that that was incorrect as a matter of law.

12         Now they're making the same argument in this motion

13    saying, we didn't know what you were really accusing of

14    infringement until we got your expert report in May 2010.  So

15    all that information we gave to you in discovery that you

16    relied upon, it was false, it was incorrect, we shouldn't be

17    allowed to rely upon it, it's inadmissible --

18         THE COURT REPORTER:  Sir, you need to slow down,

19    please.

20         MR. STRAPP:  I apologize.  It's inadmissible at trial

21    because we made a big mistake.  We represented that it was

22    relevant, and it's not really relevant.

23         THE COURT:  Okay.  So, now they've said it is

24    relevant.  Do you -- have you looked at it and said, okay, it

25    is or isn't and concluded that it is correct, something you can

1    rely on?

2         MR. STRAPP:  We've concluded that it is not correct,

3    because in coming up with a list of SKUs --

4         THE COURT:  You see, the problem with both of you is

5    that you argue -- you would argue, both sides, until the sun

6    sets that night was day and day was night, and I don't have

7    enough time in my life to resolve it, because neither one of

8    you tried to approach things in a reasonable fashion.

9         Now, address this question:  Do you accuse of

10   infringing, and do you include in your royalty calculations,

11   the products that are sold as a package and that package

12   includes non-accused products?

13        MR. STRAPP:  No, we do not.  And I make that

14   representation based on the fact that we have asked only for

15   accused revenue --

16        THE COURT:  No.  What you asked for is not the answer

17   to that question.  It's what you've got, what you've actually

18   presented in your damage calculation.  That's what's relevant.

19        MR. STRAPP:  Your Honor, the SKUs that are kept at

20   Lawson are an alphabet soup that's mysterious to anyone outside

21   of Lawson.

22        THE COURT:  That's not a problem for me to deal with.

23   That's a problem for you to deal with, and the way you deal

24   with it is you get a deponent if they won't straighten it out,

25   and you depose the person, and if they don't answer the

1    question and you don't get it straightened out, you move to

2    strike whatever they are doing, but you don't come to the end

3    of the day and say, we couldn't find the answer.

4         MR. STRAPP:  Your Honor, we believe that we found the

5    answer because that is what was represented to us in 30(b)(6)

6    sworn deposition testimony.  That was what was represented to

7    us during discovery in sworn, verified interrogatory responses,

8    and it was only late in the game after discovery was over that

9    Lawson did a 360 and said, gotcha, those representations that

10   we swore to you were correct, they were actually wrong.  You

11   can't rely on what we did.  Everything that went on in

12   discovery was a big sham and really here are the real numbers

13   that you have to rely on.

14        We looked at those real numbers.  Those don't match

15   up with the numbers that were provided in discovery, nor do

16   they match up with the accused products that are listed in our

17   initial infringement contentions as well as in our infringement

18   expert report.

19        So we say, if you want to challenge our expert

20   through cross-examination about his royalty base at trial,

21   you're welcome to do so, but we shouldn't be excluded from

22   introducing at trial evidence that Lawson represented during

23   discovery was relevant and was attributable directly to the

24   accused products.

25        THE COURT:  I don't know what you all have been doing

1    in discovery if you haven't sorted this out.

2         MR. STRAPP:  We thought we had sorted it out because

3    we only heard about this after the fact.  In fact, we

4    understood repeatedly, there were assurances given, revenue

5    spreadsheets were provided, updates were provided to

6    interrogatory responses that said, this is the revenue you've

7    been seeking, this is the revenue that is attributable to the

8    infringing products.

9         If we thought that there was some confusion over this

10   issue, we would have pursued it further during discovery.  We

11   relied upon the representations of Lawson.  We took deposition

12   testimony, we took written discovery, we asked for documents,

13   we reviewed those documents, we analyzed them with our damages

14   experts.

15        After doing that thorough review, we concluded this

16   is what matches up with the accused products, and this is what

17   we will rely upon in our damages expert report, and we didn't

18   hear that that would be problematic until after the fact when

19   Lawson said, we gave you the wrong information.

20        THE COURT:  All right.  Thank you.

21        He paints a somewhat different picture, Mr. McDonald,

22   than you paint.

23        MR. McDONALD:  Well, what I don't understand --

24        THE COURT:  You make it sound like a big legal issue

25   based on a mistake.  What they said is, they asked you time

1   after time, you told them time after time, you did it in

2   interrogatories, you did it in clarifying letters, you did it

3   in a 30(b)(6) deposition, and only after it was all over did

4   you say, oh, king's X, this isn't it.

5          MR. McDONALD:  We put up this slide.  It's in our

6   brief.  There's a set of modules that Dr. Weaver, their

7   infringement expert, did not accuse of infringement.  We're

8   simply trying to have their own damages expert match up with

9   their own infringement expert.

10          I guess what he's saying is, well, they don't have to

11   match up with what our infringement expert is going to say is

12   infringing because Lawson has already admitted that it's

13   infringing.  I don't even understand what he's --

14          THE COURT:  Yeah, if you admitted it's infringing,

15   it's infringing.  They don't need an expert.  If you admitted

16   it was infringing by saying, if, in response to an

17   interrogatory, give me all your infringing product, and you

18   gave it to them, then they don't even need an expert.

19          MR. McDONALD:  Obviously we would have had answered

20   with a goose egg if they said, give us all the revenues for

21   your infringing products.

22          What they asked about were the accused products, and

23   we asked for clarification.  He mentions the December 11th

24   letter where they listed a whole bunch of SKUs and products and

25   all that, but the bottom line is, we gave them the accused

1    stuff before they had to fish or cut bait on which ones they

2    were actually going to accuse.

3              And then we get the Weaver report, and if I

4    understand the way things are supposed to work correctly, Mr.

5    Weaver is the guy that's going to talk about what infringes,

6    and if it's not in his report, then it's not listed in his

7    report as infringing --

8              THE COURT:  So the bottom line for your motion is on

9    slide 25, and that is, if Weaver did not opine as to the

10   infringement of those products in paragraphs one through four,

11   then they can't include paragraphs one through four in -- the

12   revenue from paragraphs one through four in the base for

13   calculating the royalty; right?

14             MR. McDONALD:  That's correct.

15             THE COURT:  Thank you.  You may be seated.

16             Answer that.  If your man didn't include these --

17   look at their slide 25.  Have you got it?

18             MR. STRAPP:  Yes, I have slide 25.

19             THE COURT:  If your man didn't include those products

20   in his infringement, then how can you -- conclude they were

21   infringing products, how is it that you can use the revenue

22   from those in the royalty-based calculation?

23             MR. STRAPP:  Your Honor, our infringement expert did

24   conclude that all of those products were infringing.  That's

25   what's listed in his expert report.

1          THE COURT:  Jesus Christ.  Excuse me, but you know

2     what?  You people cannot continue to do this.  Either he did it

3     or he didn't.  What I'm going to do is this.

4          MR. STRAPP:  I think Lawson's counsel would concede

5     that those are in the infringement report.

6          THE COURT:  Here's what it says.  Read it.  Page 25,

7     give it to him.  It says that he did not opine, and you say he

8     did.  Now, you know, that can't be -- I don't care whether he's

9     right or he's wrong, but the simple fact about what he opines

10    on can, in fact, be ascertained by looking at the report, and I

11    don't expect two lawyers to come in here and disagree over

12    something like that.

13         One of you is wrong, and one of you is violating

14    Rule 11, and I'm going to find out who it is.  I'm going to

15    appoint somebody to do it, and we're going to post sanctions

16    for having wasted my time.  I don't care who it is.

17         MR. STRAPP:  Your Honor, may I provide?  This is a

18    copy of the infringement expert report, and here's a copy of

19    the slide.

20         THE COURT:  I'm talking to you, too, Mr. McDonald.

21    It's not just him that's in trouble here.  This is what's wrong

22    with this litigation.

23         MR. STRAPP:  If I could direct Your Honor's attention

24    to the footnote on the bottom of the page that's been handed up

25    to you, there's a mention there of the Lawson system foundation

1    as well as the process flow applications.

2                THE COURT:  Lawson's system foundation and process

3    flow nine are prerequisite modules that must licensed with

4    modules for any of the above four appointed scenarios.  Is that

5    what you're talking about?

6                MR. STRAPP:  That's correct.

7                THE COURT:  Does that accuse them of infringing?

8                MR. STRAPP:  That's correct, Your Honor.

9                THE COURT:  Where does it say that?  Where in this

10   does it say that they are infringing?  Is this your Weaver

11   report?

12               MR. STRAPP:  Correct.

13               THE COURT:  Where does Weaver in there say that it's

14   infringing?

15               MR. STRAPP:  He's saying that those are prerequisite

16   to infringement because they are required in order for any of

17   the infringing modules to be run through the software that

18   Lawson sells.

19               THE COURT:  But he didn't opine that these were

20   infringing.  He said, you have to use these in order to use the

21   infringing products; right?

22               MR. STRAPP:  That's correct, Your Honor.

23               THE COURT:  That is a big difference.  Don't you

24   understand that?

25               MR. STRAPP:  I do understand that.

1          THE COURT:  All right.

2          MR. STRAPP:  If I could direct Your Honor's attention

3     as well, in the text of that same page, there's a mention of

4     the acronym EDI.  You might see that.

5          THE COURT:  EDI.

6          MR. STRAPP:  It's the middle paragraph on the page.

7          THE COURT:  You mean in the substantive paragraph.

8          MR. STRAPP:  Correct, Your Honor.

9          THE COURT:  Hold on, let me get it.  I don't see it.

10         MR. STRAPP:  Paragraph 46.

11         THE COURT:  Okay, I found it in 46.  I thought you

12    were talking about 45.

13         MR. STRAPP:  If you refer back to slide 25 of

14    Lawson's presentation where they say that Weaver did not

15    include these modules, take a look at paragraph three.  They

16    say that Weaver did not include --

17         THE COURT:  Wait a minute.  Paragraph three of the

18    slide?

19         MR. STRAPP:  Correct.  They say that Weaver did not

20    include the EDI modules.  Well, there it is in his report.  If

21    you take a look at paragraph one, they say that Weaver did not

22    include the LSF, the Lawson system foundation modules.  Well,

23    there it is on page 15 of his report.

24         THE COURT:  But, when he says in the next system --

25    next sentence, this system also constitutes an electronic -- an

1    infringing electronic sourcing system, is he saying that the

2    EDI combined with the others do; is that what you're saying?

3            MR. STRAPP:  That's correct.

4            THE COURT:  Let me ask you -- all right, I

5    understand.

6            Mr. McDonald, how do you get out of that?  He does

7    accuse it as infringing in paragraph 46 it looks like.

8            MR. McDONALD:  In three, we've got these specific

9    modules here.  To say it's an EDI module doesn't tell you

10   anything.  These are very specific modules that we've listed

11   here that they've been aware of.  We don't see corresponding

12   information for it.  Moreover, 46 I think we were --

13           THE COURT:  Did you take his deposition and ask him

14   what he meant by the Lawson EDI application of the S3, S3M

15   suite?

16           MR. McDONALD:  I don't recall that, but what we did

17   do, and we gave them the updated report after we got this.

18   They said it didn't include everything, so we asked them, okay,

19   can you tell us where in the Weaver report you included any of

20   these other modules, and we wanted to work that out.  They

21   could have pointed something out to us.  You know, we

22   understand there's a fact issue here.  If they think it's in

23   there --

24           THE COURT REPORTER:  Mr. McDonald.

25           THE COURT:  Slow down.

1      MR. McDONALD:  Okay, excuse me.  We tried to find the

2  ones that correspond to the report and ask them to show us

3  where in the report -- if we missed any that should be in

4  there, show us where in the report that is.  They didn't do

5  that.  Maybe we can figure that out.

6      I think this is talking about a different module here

7  because it's not specific.  There isn't really an EDI module,

8  per se, as in 46.  I do think it's ambiguous in 46 what they

9  are saying, but if they are now clarifying what they're saying,

10  you know, we'll give them an updated report that includes a

11  couple more EDI modules, I guess.  I just don't understand why

12  we couldn't get on the same page.

13      THE COURT:  I don't either.  Because you're not

14  talking and you're not sitting down and being straight with

15  each other.  That's what's going on.

16      MR. McDONALD:  The other one, certainly that's the

17  foundational product that they are not accusing of infringing,

18  so that was pretty clear.

19      THE COURT:  Well, you all are going to have to figure

20  out what the reports say, what is included and what's not, and

21  you're going to have to quit playing cute little games.  You

22  have to sort it out and do it right, but the bottom line is

23  that if it is not accused of infringing, it cannot be included

24  in the royalty base, period, and it's your responsibility to

25  demonstrate where in Weaver's report it actually accuses any of

1    these things.

2              We now got it at least confined to slide 25, whether

3    any of these things are accused of infringement, and if they

4    don't, that isn't coming in, and I don't know why we had to get

5    to this point in the case for you all to figure that out.

6    That's the ruling on this motion.

7              All right, you've got number three now?  Is that

8    right?

9              MR. McDONALD:  Yes.

10             THE COURT:  Let me get it in front of me.  Isn't this

11   just the corollary of number one?

12             MR. McDONALD:  It's very closely related to number

13   one.

14             THE COURT:  What is the difference?  Obviously, if

15   they're inadmissible, he can't testify.

16             MR. McDONALD:  That's right.  So then it's a short

17   hearing.  If the license agreements don't come in, I think his

18   whole opinion falls.  The question is, even if the opinions --

19   excuse me, the settlement licenses do come into evidence, did

20   he do what you need to do under *Daubert* and Rule 702, apply the

21   right methodology and use the actual facts of the case in an

22   admissible way to get to the royalty that he opines on in this

23   case.

24             That is the additional issue, I think, that's

25   relevant here.  That's where it comes back into play, again

```
 1   related to the other issues that we talked about regarding the

 2   first motion, but he's speculating on the sales of Ariba and

 3   SAP --

 4            THE COURT:  Is this all based on the speculative

 5   nature of the SAP and Ariba sales figures?  Is that what this

 6   is all about?

 7            MR. McDONALD:  That's probably the biggest part of

 8   it, I would say.

 9            THE COURT:  What else is the other part of it?

10            MR. McDONALD:  His failure to show the factual

11   similarities, like do those products even come within the

12   claims, are they at a higher risk of infringement because --

13   for Ariba, for example, they actually sell products that give

14   you a selection of catalogs.  It looks a lot more like what the

15   patent is actually taking about in contrast to what Lawson does

16   with their single item master, and SAP has also got products

17   where they actually have this ability where they have graphics

18   that show separate catalogs that you can have access to which

19   is different.

20            He hasn't really gone to the underlying facts to show

21   the similarities of the products.  He hasn't looked at the

22   profitability.  Lawson is a smaller player compared to a

23   company like SAP and historically has had a significantly lower

24   profit margin.  Mangum doesn't even talk about that.  Profits

25   are very important in the *Georgia-Pacific* analysis.
```

1          He doesn't connect those dots at all here to show the

2     relevance, so there's a number of aspects of it beyond just the

3     admissibility of the settlement that are flaws --

4          THE COURT:  What else?

5          MR. McDONALD:  -- in his presentation.

6          THE COURT:  He improperly arrived on settlement.

7     Speculation as to the SAP and Ariba sales.  He doesn't rely on

8     the *Georgia-Pacific* factor of assessing the capitalization and

9     profitability of the alleged infringer which would be something

10    that would lead to the establishment of an agreed royalty.

11    What else?

12         MR. McDONALD:  What else is that he adjusts the

13    number, he's got this 1.8 percent to 8.3 percent range.  He

14    then indicates that there's a range -- the equivalent is a

15    range from 2.5 percent -- let me go to slide 37 so you can see

16    what I'm talking about.

17         We've got a quote here from his report that he's got

18    some sort of rate that he distills from SAP and Ariba of 2.5 to

19    something in excess of 3.7 percent, and then he says the

20    royalty should be five to six percent.  He's got some

21    *Georgia-Pacific* analysis where he says, well, some of these

22    factors, I think, should make the number go up, but he doesn't

23    explain why it goes up or why wouldn't it go from 3.7 to 3.8.

24         There's no analysis at all that would indicate how do

25    you go from something between 2.5 and 3.7 to five to six.

1    There's simply no justification for it.  You see no math, no

2    quantitative or qualitative analysis other than it should be

3    more than this kind of equivalent I found from the other ones.

4    That's a big hole in his analysis that does not satisfy the

5    *Daubert* requirement.

6           THE COURT:  Are you objecting to the fact that he

7    goes from 2.5 to 3.7 to a derived rate of five to six percent,

8    or are you objecting that it goes from 2.5 to -- a range of 3.7

9    when he says that the range of royalty is 1.8 to 8.3 percent?

10          MR. McDONALD:  I don't have a problem with him saying

11   I'm going to pick this range of 2.5 to 3.7 as representing

12   Ariba and SAP.  You know, if you accepted sales figures, I

13   mean, obviously those numbers all stand or fall with

14   speculative sales figures, but this is a separate issue from

15   disputing the sales figures.

16          THE COURT:  I understand that.  What I'm asking you

17   is, is the -- he extrapolates and he projects, and that's an

18   acceptable method in mathematics, and he takes a base of 2.5 or

19   3.7 from SAP and Ariba, and then he extends it to get a derived

20   number of 5.6 -- excuse me, between five and six on slide 37,

21   and then he gets -- he again states 1.8 to 8.3 overall which is

22   reflected on 31.  Which of those are you objecting to him

23   making the extrapolation from 2.5-3.7?

24          MR. McDONALD:  I'm objecting from that starting

25   point.  I'll accept that starting point.

1          THE COURT:  Object to the starting point to begin

2     with because the sales are speculative, but if you accept -- if

3     you get over that, then you accept those ranges.  Then the next

4     question is, what are you objecting to?

5          MR. McDONALD:  What I'm objecting to is how do you

6     get to the range of five to six percent from that 2.5 to --

7          THE COURT:  So it's not explained.

8          MR. McDONALD:  That's right.  He simply says, it

9     should be more than SAP and Ariba, but there's no analytical

10    approach to how much more.

11         THE COURT:  All right.

12         MR. McDONALD:  That's the problem.  The last point

13    also is mentioned on this slide, the other motion we were just

14    talking about regarding the royalty base, that he's got an

15    improper base, and that, again, is affected by that issue.  The

16    other issue that had to do with the royalty base --

17         THE COURT:  That is the SKU issue.

18         MR. McDONALD:  Well, that was one part of the base.

19    Of the other part of the base was the service revenues which

20    include service revenues for all the different Lawson products,

21    and so it's the same sort of issue.  They haven't shown an

22    entire market value sort of demand for all of those services.

23    They want them all in there, and maybe they'll say, well, it's

24    because Lawson just does services by customers, not by product,

25    which is true like every other software company.  That's how we

1    measure it.

2             But the problem, again, is they've done nothing to

3    alter the royalty rate to acknowledge the fact that this is now

4    based on servicing the whole car instead of servicing just the

5    tires.

6             THE COURT:  All right.

7             MR. McDONALD:  Thank you.

8             THE COURT:  Who's going to address this?

9             MR. ROBERTSON:  I am going to, Your Honor.

10            THE COURT:  The first thing is, give me this guy's

11   report.  Where is it?  When I looked at it, excerpts of it, I

12   thought it sounded like he did guess as to what the SAP and

13   Ariba sales figures are.  Where is it that he decides what the

14   SAP sales figures are, and what does he say about it, and

15   Ariba?

16            MR. ROBERTSON:  I'm going to locate it for you right

17   now.

18            THE COURT:  It's that simple, and you all ought to

19   have known that.  As a lawyer getting this, you should have

20   said, oh, my Lord, what he's done when you get a report like

21   that.  What page is it where he tells us how he arrived at the

22   Ariba and SAP sales figures?

23            MR. ROBERTSON:  He begins at the bottom of page ten

24   where he's citing to the Ariba and SAP figures, and --

25            THE COURT:  Where does he say -- what part of that

1    does he say about the sales, what they actually were, because

2    that's what he uses to make the conversion.

3           MR. ROBERTSON:  Your Honor, it's in the appendix in

4    the back.

5           THE COURT:  Where is it?

6           MR. ROBERTSON:  Your Honor, he obtained the SAP sales

7    figures from the SAP litigation because we produced the SAP

8    expert reports that referenced all those sales figures --

9           THE COURT:  Where is it?

10          MR. ROBERTSON:  It's in an appendix, Your Honor,

11   that, unfortunately, is not attached to this draft of the

12   report.  Do we have the appendix available?

13          Your Honor, I assume we're going to take a lunch

14   break.  I'm sure we have the appendix back at the hotel, and I

15   will bring it back --

16          THE COURT:  I'm going to tell you right now that if,

17   as they allege, and I can't tell that from what I've got, and

18   your all's papers don't demonstrate it, if it's speculative,

19   those calculations are out, period, for that reason alone.  And

20   that means he's got to have actual sales figures and know what

21   those sales are to apply to -- in the calculation, and if he

22   doesn't, it's out and it's that simple.

23          MR. ROBERTSON:  Let me locate that for you during --

24          THE COURT:  It's your burden to show me exactly where

25   he does -- I want to know what the actual sales figures are and

1    see where he actually multiplied them out so I can see how he

2    did it.

3           MR. ROBERTSON:  Understood.

4           THE COURT:  I think your man is playing right fast

5    and loose from what I'm able to read with the numbers.  It's

6    because he doesn't have them, and it's your burden to show

7    that.  All right.  Also, where in this report does he explain

8    how he gets from 2.5, a range of 2.5 to 3.7 to 5.6?  Where does

9    that appear in this report?

10          MR. ROBERTSON:  Your Honor, he explains the 2.5 to

11   3.7 --

12          THE COURT:  Where?

13          MR. ROBERTSON:  He takes into account all the other

14   15 factors.

15          THE COURT:  Where?  I'm sorry, Mr. Robertson, but I'm

16   beyond accepting anybody's statements here.  I've got to see

17   it.  I've got to put eyes on it, because you all just have a

18   way of drawing, taking a kernel of truth and drawing it into a

19   very, very extrapolated point, both sides.

20          MR. ROBERTSON:  At page 29 of the report.  If we can

21   switch to our slides.

22          THE COURT:  Page 29.

23          MR. ROBERTSON:  Yes, under reasonable royalty rate,

24   when he looked at Ariba and SAP agreements, Your Honor, that's

25   how -- it was one factor.  It's factor one of 15 factors.  You

1    see there he concludes, in summary, the market measures

2    indicate applicable running royalty rates ranging from 2.5 to

3    rates in excess of 3.7 for those rights to the patents in suit.

4    That was for the Ariba and SAP.

5           Then he says, I took into account, and there's

6    21 pages of discussion of these *Georgia-Pacific* factors,

7    factors five, six, and eight through 13 which indicate a higher

8    royalty rate.

9           THE COURT:  But he doesn't explain how.

10          MR. ROBERTSON:  And after consideration -- he

11   explains in the context of each -- this is a summation

12   paragraph, Your Honor.  The way you look at these factors is

13   say, this factor tends to drive the royalty rate higher --

14          THE COURT:  Where does it say that?  Let's take

15   evaluation of factor three.  Take that one.  Where does it say

16   that in the report, that it drives the 2.5 to the 5.6 higher

17   and explain why?

18          It doesn't, I don't think, or your briefs would have

19   explained it better.  It's the absence of the explanation in

20   the briefs that leads me to believe there's no substance here,

21   there's a lot of smoke.  Where is it?

22          MR. ROBERTSON:  Factor three is discussed at 18.

23          THE COURT:  All right.  Let me understand how he

24   shows that it goes -- it's one thing to say, factor three

25   drives -- here is factor three, and I see that that's what he

1    does on page 18, but maybe it's just I don't understand the

2    language of the economics here.  Tell me how you can say that

3    he has, at this point, explained how factor three leads to or

4    contributes to a royalty rate greater than 2.5 to 2.7.

5            MR. ROBERTSON:  I may have misspoke, Your Honor, in

6    this sense:  Factors three, four, seven, and 14 he finds to be

7    neutral to having an impact on the royalty rate.

8            THE COURT:  All right.

9            MR. ROBERTSON:  I think I said earlier factors five,

10   six --

11           THE COURT:  Let's take factors five and six then.

12   Where does he explain that?

13           MR. ROBERTSON:  Factor five has to do with the

14   commercial --

15           THE COURT:  It's on page what?

16           MR. ROBERTSON:  19, sir.  Commercial relationship

17   between the licensor and licensee such as whether they are

18   competitors in the same territory and whether they are in the

19   same line of business.

20           When he looks at that factor, he understands that

21   Lawson and ePlus compete for customers and sales of electronic

22   sourcing and procuring systems and services.

23           THE COURT:  I've read what he did.  This is actually

24   what's recited.  I think some of this is recited, or the

25   essence of it is recited in some of the papers.

1          MR. ROBERTSON:  So he says, this suggests a greater

2     level of competition between ePlus and Lawson as compared to

3     ePlus and Ariba --

4          THE COURT REPORTER:  Mr. Robertson, I have no idea

5     what you're saying.

6          MR. ROBERTSON:  This suggests a greater level of

7     competition between ePlus and Lawson as compared to ePlus and

8     Ariba or SAP.

9          THE COURT:  Okay.  I understand.  And I read six, and

10    he says that it drives it higher in six and eight through 13.

11    Let me look at those.

12          All right.  In all of that, what he says is, it

13    indicates a higher royalty rate.  He doesn't explain at all how

14    he doubles it.  What he's done is take a range of two to 3.7,

15    say it's higher because of those factors.  Those are six, five

16    factors.  It doubles the rate to five, six, basically, not

17    quite completely doubled on the high end, and not one time does

18    he explain how any one of those factors achieves that doubling

19    or how that combination of factors achieves that doubling, and

20    that is what I think he has to do in order to do it so that it

21    is reliable and that there is a fit, in the words of *Daubert*.

22    Why isn't that the right result in this case, i.e., he just

23    hasn't done it right?

24          MR. ROBERTSON:  Judge, I think that's really holding

25    somebody to a higher standard.  Let me just explain.  The

1    Federal Circuit has repeatedly said, this *Georgia-Pacific*

2    analysis is the appropriate analysis under *Daubert* and in the

3    *Micro Chemical v. Lextron* case, a similar case where someone

4    tried the *Daubert* damages expert by saying that, you know, it

5    was somehow unreliable.

6         The Federal Circuit reversed saying, no, he used the

7    proper methodology.  The appropriate approach was to

8    cross-examine.  Now, this isn't an exact science.  As the

9    Federal Circuit has said, as recently as this *Lucent* case that

10   we cite in the briefs, creating a license agreement for

11   patented technology is, at best, an inexact science.  The

12   *Fromson* case says, it often involves talents more of a conjurer

13   than those of a judge, but he did the best way he could --

14        THE COURT:  You know what?  Bear Bryant said years

15   ago, that and a nickel will get you a Coke, and let me explain

16   to you.  If you're arguing to me that I'm to accept conjuring

17   as an appropriate method, I don't believe I'm buying that.

18        MR. ROBERTSON:  What he did was take eight of those

19   factors, I believe the count is eight or nine, eight through

20   13, that's six, seven, eight factors of the 15, leaving aside

21   the factor in number one, the Ariba and the SAP, and he said,

22   look, those have a tendency to raise the royalty rate.

23        Is that going to be exact and tell you exactly how

24   this factor impacts and drives it up a tenth of a point or

25   two tenths of a point?  No, no one can really do that, and I've

 1   never seen that done, Your Honor, in the con --

 2          THE COURT:  I have seen it done, and it's done all

 3   the time.  I'm going to recess now for lunch, and you can go

 4   find out the speculation.  I think that you've got problems

 5   with this.

 6          Do you have any other answers that in some part of

 7   this report that he does what he needs to do?  He at least has

 8   to say, if I take all of a combination of these factors, it

 9   drives it -- he's doubled the rate now -- that it doubles the

10   rate, and here's basically why it doubles the rate.

11          What he's done is make a conclusion that would give

12   him the basis for making an analysis later that he never makes,

13   and when you try to double the ante on somebody, you've got to

14   have more than conjuring.  That's how I feel about it, and the

15   spec -- I still don't understand how he did not speculate as to

16   the SAP and Ariba sales based on your papers, but I didn't have

17   the 3-A of his report, or if he did, I didn't understand that

18   that's what it was.  So you can show me after lunch.  We'll

19   take an hour recess.

20

21          (Luncheon recess.)

22

23          THE COURT:  All right.  Mr. Robertson, did you find

24   the part where he explains the basis for -- what the SAP and

25   Ariba sales were in the royalty calculation?

1           MR. ROBERTSON:  Yes, sir, I did.

2           THE COURT:  Where is that?

3           MR. ROBERTSON:  May I hand up to the Court the

4   appendices which are 3-A through 3-D with respect to Ariba and

5   4-A and 4-D with respect to SAP.  If I might try to explain --

6           THE COURT:  Excuse me, 3-A is --

7           MR. ROBERTSON:  3-A through 3-D, Your Honor, relate

8   to Ariba.  4-A through 4-D relate to SAP, and they track each

9   other in the information they are attempting to disclose.

10          THE COURT:  What period does it cover here now?  It's

11  hard for me to read.  11/1/2003 to 12/1/2003.

12          MR. ROBERTSON:  What it does, Your Honor, is it

13  tracks the actual accused revenue for Ariba in this first

14  slide, 3-A, up until the time of the settlement, and then in

15  order to determine what the appropriate royalty rate would be,

16  Dr. Mangum projects the 2006 sales revenue which was obtained

17  through the life of the patents at a static number, because

18  that information is not available at the time that the parties

19  sit down and negotiate the license.  So he took a conservative

20  figure going forward from the date the license was executed.

21          THE COURT:  Where does it say what he picked?

22          MR. ROBERTSON:  Well, you see under 2006, the

23  revenues were $191,446 and 762, and he continues to project

24  that static -- well, no growth --

25          THE COURT:  That's the same figure beginning in 2004.

1          MR. ROBERTSON:  I believe we had partial information,

2     Your Honor, for 2005 and 2006.  Actually this came from the

3     data that was produced during the SAP litigation and was part

4     of SAP's expert report on Ariba's data that they had obtained

5     through discovery from the Ariba case.

6          THE COURT:  It doesn't say that.

7          MR. ROBERTSON:  Well, this source down here, Your

8     Honor, the ePlus document Bates number that was produced in

9     this litigation is that report.  In fact, I think we printed it

10    out.

11         THE COURT:  The thing that's listed as a source at

12    the bottom of this identifies a document that is what?

13         MR. ROBERTSON:  It is an expert report from the SAP

14    case, Your Honor, that had the figures that were actually

15    discovered during that litigation and also obtained from the

16    Ariba litigation.  And what Dr. Mangum needs to do, then, is

17    project --

18         THE COURT:  Why would the SAP litigation figures be

19    relevant to determining what the actual sales of Ariba were?

20         MR. ROBERTSON:  That was the source, Your Honor,

21    because SAP had obtained the Ariba revenue information during

22    that litigation, and it was included in SAP's expert report.

23         THE COURT:  Wait a minute.  You're saying there was

24    litigation between SAP and Ariba?

25         MR. ROBERTSON:  No, sir.  We had litigation with SAP.

1    During the course of that litigation, we were going through the

2    same process that we're doing right here with Lawson as to what

3    a reasonable royalty would be.  That made the Ariba license

4    relevant to the SAP litigation.  Based on that, SAP's damages

5    expert examined those revenues that were discovered through

6    discovery in the Ariba case and in the SAP case.

7         In other words, we had information that we obtained

8    during the Ariba case.  SAP had that same information.  They

9    processed that information and included it in their expert

10   report.  I don't know why I'm not making myself clear, Your

11   Honor.  Let me try again.

12        THE COURT:  I think I understand, but what I don't

13   understand is how does that provide the basis for figuring out

14   what the revenue is going to be in the future?

15        MR. ROBERTSON:  Well, it doesn't, Your Honor, but

16   nobody typically has information for projected sales in the

17   future, and the Federal Circuit has said, that's perfectly

18   acceptable.  When you're sitting down in this actual

19   negotiation with Ariba, I don't have the information of what

20   their projected sales in the future are going to be.

21        All Dr. Mangum can do is say, I'm going to take the

22   conservative approach and assume no growth for the life of the

23   patents on the last reported year, and if I could just --

24        THE COURT:  Why is that conservative in an economy

25   that's tanking?

1          MR. ROBERTSON:  Well, the economy wasn't tanking back

2     in 2006, Your Honor.

3          THE COURT:  It is now.  It has been since 2007.

4          MR. ROBERTSON:  No one could have predicted that,

5     Your Honor, back in 2006 --

6          THE COURT:  But we're talking about now.

7          MR. ROBERTSON:  We're actually not, Your Honor.  We

8     are talking about what projected revenues would be at the time

9     they entered the settlement agreement, and as the Federal

10    Circuit said most recently in the *Lucent* case, which is 580

11    F.3d 1301, decided in September of 2009, "consideration of

12    evidence of usage after infringement started can, under

13    appropriate circumstances, be helpful to the jury...in

14    assessing whether a royalty is reasonable.  Usage of similar

15    data may provide information that the parties frequently have

16    estimated during the negotiations."

17         It goes on to say, "even though parties to a license

18    negotiation would usually not have precise data about future

19    usage, they often have rough estimates as to the expected

20    frequency of use.  This quantitative information, assuming it

21    meets admissibility requirements, ought to be given its proper

22    weight in each case."

23         THE COURT:  I understand that.

24         MR. ROBERTSON:  What I'm suggesting right here, Your

25    Honor --

1          THE COURT:  We're talking about a negotiation that

2    occurs in 2002; right?

3          MR. ROBERTSON:  No, sir.  I'm talking about -- this

4    was an actual negotiation that occurred and was consummated in

5    2006, so that money was realized, Your Honor, with Ariba at

6    $37 million, and what Dr. Mangum is trying to say is, okay, let

7    me determine what that would be as a royalty rate for my range

8    as a running royalty if I assume that Ariba's sales were static

9    for the life of the patent.

10          What he next does in the next slide, if I could just

11    follow, because this is how he gets his range, he assumes that

12    immediately after the license agreement is signed, the license

13    agreement effectively -- the patents effectively become

14    obsolete.  So he examines what the royalty rate would be if the

15    day after the license agreement was consummated the patents

16    were obsolete, and he comes up with an effective rate of

17    8.3 percent in that instance.

18          He then does in 3-C a midrange calculation, if you'll

19    turn, and I'll just go --

20          THE COURT:  You mean 3-B is a low?

21          MR. ROBERTSON:  3-C, as in cow.

22          THE COURT:  3-B is a low figure.  I don't understand

23    what?

24          MR. ROBERTSON:  3-B is a high figure, because the

25    $37 million accounts for the revenue right up until the patent

1    was signed, the patent license was signed, and then the patent

2    becomes obsolete.  That is the shortest commercial life for the

3    license agreement.

4              THE COURT:  What's the obsolescence of the patent?

5              MR. ROBERTSON:  What he's trying to do is come up

6    with a reasonable range for what the royalty rate would be

7    making certain assumptions.  One assumption is that the patent

8    becomes obsolete.  The licensee no longer needs it right

9    after --

10             THE COURT:  Why did he do that?

11             MR. ROBERTSON:  So he could come up with a range of

12   the royalty rates, Your Honor, so --

13             THE COURT:  Why did he say, I'm going to assume --

14   this guy signs a license and then doesn't need to operate -- I

15   don't understand that point.  Like most of the things that Mr.

16   Mangum does, I don't understand, but anyway, what is the reason

17   for doing it the way he did it?

18             MR. ROBERTSON:  Because he's trying to find a

19   reasonable midpoint, Your Honor.

20             THE COURT:  Well, it sounds to me like he's flailing

21   around in the figures.  Why did he pick -- why did he make the

22   decision to factor out the patent is what I'm trying to get at.

23             MR. ROBERTSON:  He made the decision to consider

24   either ends of the spectrum, Your Honor.

25             THE COURT:  Why does it make sense to take it out?

1    That's what I'm asking.  I don't care what result he achieved,

2    high, low, or indifferent.  Why do you make the decision to

3    take it out?  There's got to be an intellectual reason.  I'm

4    doing it for what reason?

5              MR. ROBERTSON:  I'm not sure I understand what you

6    mean by take it out, Your Honor.

7              THE COURT:  He's assuming the patent is obsolete.

8              MR. ROBERTSON:  He's trying to come up with what

9    would be a reasonable assumption from either end of the

10   spectrum; that is where the patent immediately becomes obsolete

11   to where the patent is valuable and used for the entire life

12   expectancy of the patent, and he comes up with a number for

13   that low spectrum and a number for that high spectrum, and then

14   he says, here, I'm going to take something reasonable in

15   between.  It's a midpoint.

16             THE COURT:  Which is the low spectrum?

17             MR. ROBERTSON:  Low spectrum would mean the payment

18   extends for the life of the patent.

19             THE COURT:  Does that mean when the patent is

20   obsolete?

21             MR. ROBERTSON:  That means when the patent expires.

22   What I mean by the patent being obsolete, Your Honor, is the

23   technology is no longer valuable to the licensee, and so it

24   doesn't need to use it anymore.  So it terminates virtually

25   right after --

```
 1                THE COURT:  I don't see any of that in here.  Where
 2   do you figure that?  Where does it say that in 3-B?  Where does
 3   it say that?
 4                MR. ROBERTSON:  It's because the values of accused
 5   revenue terminates in February of --
 6                THE COURT:  Where does it say that -- just answer the
 7   question.  Where does it say that?
 8                MR. ROBERTSON:  It says it in his report, Your Honor.
 9                THE COURT:  Okay, that's fine.  I don't need to look
10   for it in the exhibit.
11                MR. ROBERTSON:  He references this exhibit in his
12   report, Your Honor.
13                THE COURT:  Yes, he does.
14                MR. ROBERTSON:  So that's where he's --
15                THE COURT:  Where does he say it in the report?
16   Referencing and saying what you just said are different things.
17                MR. ROBERTSON:  I believe it starts at page 11 of his
18   report, first full paragraph, beginning, these lump sum fixed
19   payment amounts provide economic evidence reflecting the value
20   attached to the relevant patents by the parties to the license
21   agreements -- excuse me, to the agreements.
22                Although the patent amounts in the Ariba and SAP
23   agreements reflect one-time payments regarding specific amounts
24   of accused sales, the payment amounts can be reasonably and
25   appropriately evaluated to provide information on payment
```

1    amounts that would reflect the situation between the parties in

2    the present suit.

3            It goes on to say, the lump sum payments can be

4    converted into effective running royalty rates.  He explained

5    that 3-A reflects the amount of the accused Ariba revenue at

6    issue in the agreement with ePlus.  The Ariba license covered

7    past and future sales.  In addition, by paying up front, Ariba

8    was bearing, agreeing to bear the business risk related to

9    making the accused sales and the risk related to the effective

10   economic life of the patent in suit.

11           So he goes on to explain on the next page, first full

12   paragraph, as shown in Exhibits 3-A through D, the effective

13   running royalty rates from the Ariba settlement range from 3.0

14   percent to 8.3 percent.  He says, setting aside this extreme

15   reflecting never obsolete, which means they run until the

16   patents terminated, to immediately obsolete, leaves a range of

17   3.3 to 4.2 percent with a midpoint of 3.8 percent.

18           So what he's trying to do, Your Honor, is say, these

19   are the extremes, I want to pick something that's within the

20   extremes, because it's rare that the patents are either going

21   to become immediately obsolete or going to be never obsolete.

22           THE COURT:  All right.

23           MR. ROBERTSON:  He goes on to do the exact same

24   calculation with the SAP license agreement.  I was reminded by

25   my colleagues that I had mentioned earlier, Your Honor, that

1    one of the factors he considered with the Ariba license and the

2    SAP license was that there was additional consideration, that

3    is cross licenses, which necessarily, he says, would impact on

4    the actual monies paid because there was additional

5    consideration.  So he takes that into effect when he determines

6    what an appropriate range of the royalty rates would be.

7              THE COURT:  How does he do that?

8              MR. ROBERTSON:  He determines that they're depressed

9    somewhat.  It's acceptable --

10             THE COURT:  What?

11             MR. ROBERTSON:  The numbers would be depressed, that

12   is lower, because there was additional consideration.  Just,

13   you know, an economic assumption that's tried and true when you

14   have additional consideration.  Can he say with exactitude what

15   that present --

16             THE COURT:  How did he get to whatever figure he

17   chose?

18             MR. ROBERTSON:  Well, he took the ranges, Your Honor.

19             THE COURT:  To reflect the diminished amount

20   accounted for by the fact that there was additional

21   consideration?

22             Here's the problem, Mr. Robertson:  This guy is as

23   smart as a cut cow, and you all have been through this a lot.

24   That's not what we're dealing with.  He's got to explain in the

25   report in this case so they can deal with it and the jury can

```
 1    deal with it how he did what he did.  He could have just as
 2    well have ascribed a ridiculous figure to the value created by
 3    the additional consideration, and where in here does he explain
 4    what it is that he did to ascribe a value to the additional
 5    consideration so he could factor that out and account for the
 6    depression in the royalty rate?  Where does he do that?  Other
 7    than say, I did it, where does he actually do it and tell us
 8    what he's doing?
 9              MR. ROBERTSON:  Your Honor --
10              THE COURT:  Where does he do it?  If he doesn't do
11    it, say he doesn't do it.  That's fine.
12              MR. ROBERTSON:  I need to find it, Your Honor.
13              THE COURT:  Take a moment and look at it.  In the
14    report, what page?
15              MR. ROBERTSON:  Page 13, Your Honor.
16              THE COURT:  13, all right, let me look at that.
17              MR. ROBERTSON:  At the bottom, he says, in the Ariba
18    agreement, Ariba contributed all of its patents which are --
19              THE COURT:  Wait a minute.  Let me find it.  Page 13,
20    what paragraph?
21              MR. ROBERTSON:  Third full paragraph, second
22    sentence.
23              THE COURT:  Okay, in the Ariba agreement, all right.
24              MR. ROBERTSON:  Ariba contributed all its patents
25    which are more numerous than the patents in suit.
```

1            THE COURT:  Right.

2            MR. ROBERTSON:  He drops a footnote concerning the

3     enforcement of one of the Ariba patents that he was aware of --

4            THE COURT REPORTER:  Mr. Robertson, I can't hear you.

5            MR. ROBERTSON:  He drops a footnote, footnote 46,

6     which he indicates that he was aware that one of the Ariba

7     patents that had been licensed actually involved litigation

8     resulting in damages figures.

9            THE COURT:  I still don't understand how he values

10    this.  He just -- these are words that don't actually reflect

11    that he's doing anything, what his process was and how he got

12    there.  Therefore, they are just his conclusions.

13           Is there something else in the rest of the paragraph

14    that explains how he got to the valuation he gave to those

15    patents that were not accused?

16           MR. ROBERTSON:  Your Honor, in all fairness --

17           THE COURT:  And were included in the license.  Just

18    answer the question.

19           MR. ROBERTSON:  He applies his understandings as an

20    economist to --

21           THE COURT:  Here's what I'm going to do.  If you

22    don't answer the question, I'm going to supply the answer that

23    I think is the answer based on reading the document, and if you

24    want to explain, you're perfectly willing to explain it.  I

25    need to get the basics down first.  Does he or does he not,

```
 1    anywhere in this report, explain what he did to arrive at the

 2    value that he factored out because of the additional patents?

 3    If so, where in this report is it so I can read it?

 4             MR. ROBERTSON:  I think, Your Honor, he doesn't do it

 5    with the mathematical exactitude that you are looking for.

 6             THE COURT:  I'm not looking for exactitude.  I'm

 7    looking for what he did no matter how exact it is.

 8             MR. ROBERTSON:  He says in the next sentence there,

 9    all else equal, the contribution of the Ariba patents rendered

10    the settlement amount, $37 million, a net amount lower than it

11    would have been otherwise.  That's as close as he can get based

12    on --

13             THE COURT:  That's just a conclusory assertion.  You

14    know, an expert can come in here and say anything, and he has

15    to explain how he got where he got or his ideas aren't really

16    very valuable to the jury.  They become -- they become at that

17    point -- you come to the point with this kind of stuff in the

18    report where his influence on the jury is not created by the

19    intellectual power he has brought to the report but by the fact

20    that he is an expert, and that doesn't help the jury understand

21    the evidence or determine the fact in issue, and it also calls

22    into question the reliability of the conclusions in my

23    judgment.

24             MR. ROBERTSON:  Well, Your Honor, let me just

25    respectfully disagree and make this point.
```

1            THE COURT:  Sure.

2            MR. ROBERTSON:  The *Georgia-Pacific* are factors.

3    They are not a precise calculation that says to an economist or

4    says to a damages expert, factor number 11 should drive up the

5    royalty rate by .3 percent, or factor number nine should drive

6    it down by .5 percent.  I have never seen that in a Federal

7    Circuit decision.  I have only seen the Federal Circuit say --

8            THE COURT:  That's not addressed to this issue.

9    We're going to address the question of the contribution made, I

10   thought.

11           MR. ROBERTSON:  He has not done it with the

12   mathematical exactitude that Your Honor apparently is looking

13   for.

14           THE COURT:  You don't know what I'm looking for.

15           MR. ROBERTSON:  This is the only thing, sir, I can

16   point to.

17           THE COURT:  Okay, that's fine.

18           MR. ROBERTSON:  With respect to the factors, the

19   Federal Circuit says, you have to weigh the factors.  What

20   weight you give them is in the opinion of an economist based on

21   the totality of the circumstances.  When he's looking at 15

22   factors in this report, for example, he found eight of the

23   factors that weighed in favor of increasing the royalty rate,

24   and he found, I think, the other six that were neutral with

25   respect to that.

1            Now, if he came into this Court and said, factor

2    number seven warrants a 3.3 percent increase, that would be

3    disingenuous, Your Honor.  Nobody has ever done that with the

4    amount of precision under the methodology of the

5    *Georgia-Pacific* factors that has been accepted by the Federal

6    Circuit.

7            I've been doing this for 20 years, sir.  I've worked

8    with a lot of economists and damage experts.  It just doesn't

9    happen.

10           THE COURT:  Well, if that's true, perhaps, like other

11   aspects of patent law, patent law and lawyers and courts need

12   to come into the world that the rest the people function in in

13   applying the expert disciplines in assessing expert reports.

14           However, I don't believe that what you're saying is

15   right.  I think it can be done.  I've seen it done, and it is

16   important that at least some effort be made to explain what it

17   is, why he reaches whatever opinion he reaches.

18           Now what you're basically talking about is what we

19   were talking about before lunch, and that is what the effect of

20   his failure to explain how factors five, six, and eight through

21   13 indicate a higher royalty rate.  We agreed before lunch that

22   he didn't explain how they did, and you were saying that's not

23   required.

24           MR. ROBERTSON:  He explained why he thought they

25   weren't a higher royalty rate.  He did not do it, apparently,

1    Your Honor, in a way that would provide exact quantification as

2    to how incrementally that would raise it.

3              THE COURT:  Did he provide any quantification?

4              MR. ROBERTSON:  He provided a cumulative

5    assessment --

6              THE COURT:  Show me where he did any quantification

7    of any single factor or of those factors added together other

8    than his conclusory conclusion that five and six and eight

9    through 13 will result in a higher rate, ergo I'm going to

10   double it from two to 3.7, that level, to five to six?  Did he

11   do that?

12             MR. ROBERTSON:  Let me suggest he didn't necessarily

13   double it, Your Honor, because one of the assumptions we saw,

14   he had an eight percent royalty rate at one point, and he

15   actually threw that one out as being nonrepresentative.

16             THE COURT:  It was an outlier.

17             MR. ROBERTSON:  In his opinion, yes, that's right.

18             THE COURT:  And the low one was an outlier.

19             MR. ROBERTSON:  That's correct.

20             THE COURT:  That's fairly standardly done in making

21   analyses of this kind.

22             MR. ROBERTSON:  There are a lot of assumptions that

23   go into this, and the assumptions can always be challenged, and

24   exactly that's what the --

25             THE COURT:  Your argument is that all this has to do

1    with -- doesn't affect the validity of his report, the

2    reliability of it under *Daubert*.  It has to do with the issue

3    could be dealt with in cross-examination.

4            MR. ROBERTSON:  I'm not only saying it.  The *Micro*

5    *Chemical Lextron* case says exactly that, Your Honor, and it

6    doesn't say in that case that the experts need to offer a

7    quantitative analysis as to these factors which simply need to

8    be weighed.

9            THE COURT:  I don't think that issue was presented in

10   that case, was it, that they had to do a quantitative -- I

11   don't think it's presented here.

12           MR. ROBERTSON:  I think it was exactly what was

13   presented because his analysis was thrown out, and they said,

14   look, he adopted the proper methodology.  The fact is, under

15   702 and under the *Daubert* case, the *Georgia-Pacific* factors are

16   something that can be weighed in determining what the

17   appropriate royalty rate is.

18           Can they be attacked on cross-examination?  Yes, and

19   that's the proper vehicle for dealing with an expert, not

20   throwing his testimony out.  If they want to question him on

21   his failure --

22           THE COURT:  Let me disapprise you and anybody else

23   who is interested.  *Daubert* says that you keep the testimony

24   out if it's not reliable, i.e., the judge has a gatekeeping

25   responsibility as to who goes on and explains it, so there is

1    actually animated by *Daubert* and its progeny an obligation to

2    exclude unreliable evidence from a jury, and to the extent that

3    someone in another court, including the Federal Circuit, has

4    held that that isn't so, I'm bound by the Supreme Court, not by

5    any other court.

6         Now, does that mean that the automatic approach to

7    resolving problems with experts' reports is to keep them out?

8    No, it certainly isn't, but don't believe for a moment that the

9    issue here is not properly raised as to whether this report can

10   come in under the *Daubert* methodology -- under the *Daubert*

11   decision and its progeny, and the issue they are raising is not

12   so much methodology but reliability based on conclusory

13   thinking and assertions.

14        MR. ROBERTSON:  I don't think he could come to any

15   other precise conclusions other than the factor tends to raise

16   the rate, it's neutral, or it lowers the rate.  I just don't

17   think the methodology, when you look at factors themselves,

18   even applied to the circumstances of a patent case or any case,

19   permits an expert to reasonably say, oh, I think this raises it

20   three percent, three-tenths of a percent of a point.

21        THE COURT:  Suppose that he's doubled it now, he's

22   gone from a million dollars to $2 million.  That's a pretty --

23   in fact, what he's done is gone from one set of millions to

24   double that in the number of millions is what he's done in his

25   report.  That's a lot of money, and people are entitled to know

1   how it is that you come to the conclusion that you go from one

2   million to two million or from ten to 20, aren't they?

3           MR. ROBERTSON:  And I think within the methodology

4   that's provided, he has attempted to do that, Your Honor.  He

5   has tried to show under the factors that they provide -- this

6   isn't something he made up.  This is something that he was told

7   is the appropriate methodology for doing it.  Now --

8           THE COURT:  Who told him that?

9           MR. ROBERTSON:  The Federal Circuit said, this is the

10  accepted, and it's accepted across the land as the approach for

11  determining a reasonable royalty, and the statute itself says

12  that a patent owner, where there's a finding of infringement,

13  can receive no less than a reasonable royalty, and that's

14  always the floor.

15          So, he's looked at the factors.  He's looked at how

16  he can weigh them.  Can he weigh them with the preciseness that

17  the Court apparently is requiring --

18          THE COURT:  If you say that one more time, I'm going

19  to strike it as -- I'm telling you, he needs to explain in some

20  way how he does it.  He hasn't explained any way, and the

21  failure to explain it is what's the issue.

22          MR. ROBERTSON:  Might I suggest, Your Honor, then

23  perhaps we could have a voir dire.  Perhaps your issue of

24  bifurcation might be worth examining.  I could discuss that

25  with my client.  He's been cross-examined on this by Lawson's

1    counsel.  This is where we find ourselves, Your Honor.

2          THE COURT:  All right, I understand.  Anything else

3    that you have on this motion, Mr. Robertson?

4          MR. ROBERTSON:  Let me see my notes, Your Honor, see

5    if there were any other issues that were raised.  I think the

6    issue of the sales revenues don't need to be rehashed that are

7    accused.

8          THE COURT:  His argument included an argument that

9    your expert did not even address the issue of the

10   capitalization and profitability of Lawson which is one of the

11   *Georgia-Pacific* factors.  What do you say to that?

12         MR. ROBERTSON:  Let me go back and look.  It may have

13   been a factor he didn't consider relevant.  I think there were

14   a few factors -- when we met with him to determine his report,

15   he said, I find sometimes some of these factors to be not

16   relevant to the inquiry.

17         THE COURT:  But the way I see it -- I've got to get a

18   list of the factors.  I never can remember the numbers.

19         MR. ROBERTSON:  Your Honor, I guess he considered it

20   cumulatively starting at page 25 where he groups factors nine,

21   10, and 11 together.

22         THE COURT:  Hold on just a minute.  I need to --

23   which one of your briefs has the *Georgia-Pacific* factors listed

24   by number?

25         MR. ROBERTSON:  I think we have a slide on it, Your

 1   Honor.  Slide 15 --

 2              THE COURT:  Slide what?

 3              MR. ROBERTSON:  15 in tab three, I believe.

 4              THE COURT:  Thank you very much.  I never can

 5   remember the numbers.  Okay.  Let's see.  Which one are you

 6   raising it under?  I didn't write the number down you were

 7   arguing, Mr. McDonald.  Eight, factor eight.  "The established

 8   profitability of the product made under the patent; its

 9   commercial success; and its current popularity."

10              He says that he didn't consider the established --

11   Mr. McDonald says that your man didn't consider the established

12   profitability of the product.  Where in the report does he

13   consider that?  You were about to tell me, and then I

14   interrupted you.

15              MR. ROBERTSON:  Factor eight begins on page 22, Your

16   Honor.

17              THE COURT:  Page 22 of Mr. Mangum's report.

18              MR. ROBERTSON:  Second full paragraph, I think, and

19   going over to page 23.  I don't know if you want me to read it,

20   Your Honor.

21              THE COURT:  No.  I just want Mr. McDonald to address

22   it once you've identified -- it looks to me like he's got four

23   pages addressing it, three and a half pages addressing it, but

24   I may be wrong.  All right, so that's where it is.  All right.

25   I see.  Anything else?

1           MR. ROBERTSON:  No.  Thank you, Your Honor.

2           THE COURT:  All right, Mr. McDonald.  Kind of looks

3    likes he's addressing profitability on page 22 of the report,

4    isn't it?  You may not like it, but it's what he's talking

5    about.  What's defective about it.

6           MR. McDONALD:  Let me explain what I was talking

7    about there, Your Honor.  It does mention -- to some extent he

8    mentions at the time of the hypothetical negotiation, Lawson

9    would have an operating profitability of five percent, which is

10   actually the low range of his reasonable royalty, so I guess

11   what he's saying on that particular number is Lawson would

12   have, under a reasonable analysis, would have given all its

13   profits over to ePlus.

14          He says that there's some indications that perhaps

15   the profitability is greater, but really, here's my main point

16   on this.  When he goes through these other factors, it's

17   always, okay, let's looks at SAP and Ariba and now compare them

18   to Lawson.  Competition-wise, well, Ariba and SAP are in the

19   business, but I have decided in my opinion that Lawson is a

20   closer competitor.

21          So he keeps using Ariba and SAP as a benchmark or

22   loadstar, but you don't see that anywhere in here, and that's

23   because SAP makes a lot more money.  They have a bigger profit

24   margin.  He just glosses over that.  Well, his methodology is,

25   I'm going to start from this range that I've come up with on

1   the effective royalty of SAP and Ariba and now compare those

2   companies to Lawson on a comparative relative basis.  Where

3   does he do that on the profitability?  He doesn't say anything

4   about the SAP profitability.  He doesn't say anything about the

5   Ariba profitability in this profitability analysis comparing

6   Lawson to SAP and Ariba.  That's a fundamental flaw.

7           THE COURT:  All right.  That concludes one through

8   three.

9           MR. McDONALD:  If I could mention the speculative

10  nature of the sales, those charts in the appendix that

11  Mr. Robertson drew your attention to after lunch, I just want

12  to make clear here the amount of speculation in this tiny print

13  here.

14          THE COURT:  Hold on a minute.  I need to pull that

15  back up.  This is referred to on what page of his report?  Ten

16  or 11?

17          MR. McDONALD:  3-A.  It's after page --

18          THE COURT:  3-A is referred to on page 12.

19  Exhibit 3-A reflects the amount of accused Ariba revenue at

20  issue in the license agreement with ePlus.

21          MR. McDONALD:  Yes.  You're talking about the body of

22  the report.  I was actually going to the exhibit itself.

23          THE COURT:  All right.

24          MR. McDONALD:  Which is near the back, and at least

25  my copy does not have a page number, but it's -- I think you

1   referred to that earlier.  It comes after a page numbered 15

2   near the end.  It's the first of these charts.

3           THE COURT:  I'm lost because you said there isn't any

4   page numbers.

5           MR. McDONALD:  My copy of Exhibit 3-A doesn't have a

6   page number on it.

7           THE COURT:  Mine doesn't either, but there's Exhibit

8   3-A, and it looks to me like it's one page.  Exhibit 3-B is

9   another, 3-C is another.  3-D is another, and then 4-A is SAP

10  running rate.  4-B is -- 4-C is -- 4-D are all SAP royalty

11  calculations.

12          MR. McDONALD:  We're in the same place then.

13          THE COURT:  What page do you want me to look at?

14          MR. McDONALD:  Let's start with 3-A.  Now, there you

15  have the accused revenue, and the footnote A assumed that after

16  2003, the annual accused revenue will equal 2003 accused

17  revenue.  So they take one year from 2003 to today, and they

18  pick that year, and that's the year they assume is going to be,

19  or was, Ariba's sales for every one of those eight years.

20          2005 is when they actually settled the case.  You can

21  see they've got their cutoff here because February 12th, '05 --

22  if you look at the columns, you see they divided 2005 into two

23  parts, because it was kind of a past or compound factor versus

24  the discount factor for the future activities.

25          So why would -- why is it reasonable for their expert

1    in February of '05 to think that Ariba was thinking in terms of

2    their 2003 revenue?  He's got no showing of why wouldn't you

3    look at 2004 revenues and pick that number.  That number can

4    make a huge difference because that's the one and only number

5    that's you're multiplier here for eight or nine years, and this

6    particular chart goes all the way out to 2016.  So that's a

7    huge swing factor.  It's a number times 14.

8            THE COURT:  The revenue for 2003 is 29 million -- I

9    mean --

10           MR. McDONALD:  You are right, but that is just a

11   partial year.

12           THE COURT:  11/1/2003 to 12/1/2003 is 21,265,000.

13           MR. McDONALD:  It's 29,265,000.  I have my glasses

14   on.

15           THE COURT:  29 million, yes.  And the other in 2004

16   is 100 -- is that 191 million?

17           MR. McDONALD:  That's right.

18           THE COURT:  So this would be 29 times five -- times

19   12, roughly 30 times 12 would be 360 million.  I do not

20   understand where this guy got these assumptions.  Is there

21   anything that explains it?

22           MR. McDONALD:  No.  That was one of my points, is he

23   has this November 1 to December 31, '03 as his first time

24   period.  He doesn't explain why he stops the past revenue at

25   November 1 of '03.  There's no place in the report that

1    explains that, but he does it.  That's a two-month period.  It

2    doesn't explain where that 29 million figure for that two-month

3    period comes from.  The footnotes don't explain that.

4             It says it's an apportionment of fiscal 2004, first

5    quarter.  So here he's using '04 numbers to calculate '03, and

6    then he uses '03 numbers to calculate '04 on.  I'm sorry for

7    sounding confusing, Your Honor, but I'm just the messenger

8    here.  That's the crazy way this guy was doing these numbers.

9    It makes no sense to me either, and he doesn't explain why he

10   would do that backwards.

11            So you've got that, no explanation here, why didn't

12   you go and try to get the actual '04 sales or find out actual

13   '05, '06, up to 2010.  I know Mr. Robertson would say in '05

14   Ariba wouldn't have been able to know what they were going to

15   do in '06 and '07, but that's probably a little better

16   indication of what they would have been thinking, their actual

17   revenues than Mr. Mangum just assuming they're going to flat

18   line.

19            THE COURT:  The question is, you deposed him.  Did he

20   indicate in his deposition where in the report is the basis for

21   that assumption?

22            MR. McDONALD:  I don't believe he did, Your Honor.

23   It's not in the report, I'm fairly confident.  You are talking

24   about which assumption?  The assumption of using the 2003

25   revenues?

 1          THE COURT:  He says he assumes that the 2003 revenue

 2    figure would be the one that would be projected every year at a

 3    flat rate.  The case settled in 2005.  I can't find any

 4    explanation of why the man used -- why he assumed the 2000

 5    revenue to be the basis, and I'm asking you if you know from --

 6    I couldn't find it in the report, but that doesn't mean

 7    anything.  I could have mis-looked at it.  You deposed him.

 8    Did you ask him that?

 9          MR. McDONALD:  I didn't personally depose him.  I'm

10    not aware of him providing a basis for why he used that year

11    instead of '04.  This report doesn't explain that.  I'm pretty

12    confident of that.

13          THE COURT:  Okay.

14          MR. McDONALD:  And also, I don't think he gave an

15    explanation of why he didn't go get the other numbers except

16    that they weren't handed to him.  And all the other charts

17    basically use the same, similar types of assumptions.  They

18    change the number of years that are involved, but they still

19    use the 2003 revenues without any explanation of why.

20          So for 2003, I agree, that's not a speculative

21    number, but for all the other years it is.  And SAP, that's --

22          THE COURT:  But you know that in doing the

23    negotiation in this case, it's going to be in 2002; right?

24          MR. McDONALD:  Right.  This is all giving the benefit

25    of the doubt that we even care what somebody was going to do in

1    2005.

2              THE COURT:  All right.  Anything else?

3              MR. McDONALD:  SAP is basically a similar story

4    except that one is up to 2006.  They do use the 2005 number for

5    after that, but, again, you have the whole year.  Basically the

6    settlement was in December of '06.  Why didn't you use at least

7    the first three quarters of '06, the actual data there?  Why

8    didn't you figure out the actual data for '07, '08, '09, et

9    cetera, as the best indicator of all of what SAP was likely

10   thinking at the time?

11             So these are all speculative numbers after '05 on the

12   SAP charts as well.  And I guess I'd mention one other thing

13   about that issue, and that is the *Wordtech* case -- that's one

14   of the cases we cited -- talks about not using a lump sum

15   licensing figure as a benchmark for the royalty even though the

16   party was trying to, in effect, come up with some theories as

17   to why the jury's verdict could be supported by this, and the

18   Court said, we're not going to do that because it's not in the

19   license where there's any evidence that this thought process

20   was actually going on that you have this expectation of a

21   certain amount of revenues and so on.

22             THE COURT:  The lump sum settlement is $37 million

23   with what, Ariba?

24             MR. McDONALD:  That's Ariba.

25             THE COURT:  All right.  Is there an explanation in

1    the Ariba contract or anywhere else or the record that the lump

2    sum -- how the lump sum was arrived at?

3           MR. McDONALD:  Mr. Mangum's report, if I recall

4    correctly -- I'll see if I can find the page while I'm talking

5    about it -- says that Ariba -- at page 14.  Ariba indicated 37

6    million was the maximum it would pay.  Otherwise, it would

7    declare bankruptcy.

8           Now, this would be something that I guess came out of

9    confidential settlement negotiations that we never would have

10   had access to.

11          THE COURT:  Where is that?

12          MR. McDONALD:  Page 14 at the top, about line four.

13   Lines four and five.

14          THE COURT:  But --

15          MR. McDONALD:  How we were supposed to know this, I

16   don't know.

17          THE COURT:  But that's not the question I'm asking.

18   I'm asking you -- as I understand the Federal Circuit's cases,

19   lump sum can, in instances, be used -- lump sum payments can

20   be, in instances, used to project a reasonable royalty or to

21   convert it into a royalty if there's something in the license

22   agreement that allows one to conclude that the 37 million was

23   based upon the notion, some notion of a reasonable royalty such

24   as the reasonable royalty usually paid for this product are

25   three percent, and we'll present value discount it to X percent

1    by X percent, and, therefore, the total amount that we'll pay

2    you will be a lump sum paid-up license of Y.

3              MR. McDONALD:  Exactly.

4              THE COURT:  As I understand it, that's what the

5    Federal Circuit allows to be done when it requires -- or

6    requires to be done, something like that, if you're going to

7    use a lump sum.

8              MR. McDONALD:  I would agree exactly with that, and

9    that statement by Mr. Mangum shows that the Ariba agreement

10   does not fit that criteria.

11             THE COURT:  How about the lump sum in SAP?  It was

12   what, 17 and a half?

13             MR. McDONALD:  That's right.

14             THE COURT:  Was there a license --

15             MR. McDONALD:  There is no calculations, no

16   indication in the license agreement that this is the same as a

17   percentage or we're assuming we're going to have X million

18   dollars a year in sales or any indication that that number is

19   based on a revenue stream or present valuation of a --

20             THE COURT:  Or of any other -- it doesn't have to be

21   present valuation.  It can be, okay, we have decided that we

22   have a 50 percent chance of winning, and we're going to cut the

23   royalty rate from five to 2.5, we'll multiply that by the

24   sales, and that will be the lump sum we're going to pay you.

25   That's okay, too, isn't it?

1          MR. McDONALD:  I don't know if you use that to

2     legitimize the royalty in another case --

3          THE COURT:  No, I mean --

4          MR. McDONALD:  -- but I think the --

5          THE COURT REPORTER:  Mr. McDonald.

6          THE COURT:  I think it was me.  But anyway, is there

7     anything in the record about -- in Mr. Mangum's report about

8     how he got to the notion that these lump sum payments could be

9     appropriately converted in any way to a royalty stream?

10         MR. McDONALD:  No.  There's no indication that that

11    was even going through the minds of the people in the

12    negotiations.  There's no evidence.

13         THE COURT:  Usually the best evidence of that is the

14    agreement itself.  That failing, then you can depose the people

15    and arrive at what their assumptions were in going forward, but

16    that wasn't done in this case?

17         MR. McDONALD:  That's right.  I'm not sure you could

18    take discovery on what people's settlement negotiations were

19    anyway, but it was not done, and we have no evidence on that.

20    That, to me, is a key point on why it's so speculative.  That

21    is the fundamental premise for all of these numbers that Mangum

22    invents, is that people were even thinking in those terms.

23    There's no evidence they were, and, in fact, in Ariba, he

24    admits they weren't.

25         THE COURT:  All right.

1          MR. McDONALD:  Thank you.

2          THE COURT:  Do you want to say something about any of

3     that, Mr. Robertson?

4          MR. ROBERTSON:  I would, Your Honor.  First let me

5     say both the Ariba and SAP licenses were both past and future

6     sales, and they say so right in the agreement.  So there was a

7     release from past infringement, past damages, and there was a

8     license, fully paid-up license going forward for the life of

9     the patent until the last patent expired.

10          THE COURT:  Does it explain in there what the past

11     and future sales were, and can you take the quantum of the

12     future sales and factor mathematically against the $37 million

13     and come up with a basis for using that as a royalty rate?

14          MR. ROBERTSON:  It doesn't break it down in the

15     agreement for this is the amount of dollars allocated to past

16     sales and this is the amount of dollars allocated to future

17     sales.

18          THE COURT:  How about total sales?  Does it total the

19     sales --

20          MR. ROBERTSON:  It doesn't refer in the agreement,

21     and I've never typically seen it in license agreements that do

22     refer to total sales.  Total sales are what the total accused

23     sales were.

24          THE COURT:  Stop just a minute.  Do you not agree

25     that a lump sum can be used in an appropriate situation as a

1    marker or measure of what a reasonable royalty will be if the

2    license agreement or some part of the record permits one to

3    reasonably assess, to translate the lump sum under some

4    commercially acceptable mode into what a reasonable royalty

5    would be?  Isn't that permitted?

6          MR. ROBERTSON:  I think that's what the *Lucent* case

7    says and vice versa.  You can take a running royalty license

8    agreement and convert it to a lump sum.

9          THE COURT:  Right.  So my question is, what is there

10    in either the $37 million figure or the $17.5 million figure

11    that allows us to conclude that the -- in other words, how did

12    he conclude a reasonable running royalty from those two

13    figures?  I didn't see it in here.

14          MR. ROBERTSON:  Well, Your Honor, what he -- first of

15    all, go back to the 3-A through 3-D.  What he does, he starts

16    from the beginning of the accused infringement, which is prior

17    to the settlement, and he carries it out through three various

18    scenarios as we talked about:  A short-term license that would

19    terminate shortly afterwards, a midterm, and one that runs the

20    life of the patents.  And he determines what the reasonable

21    royalty based on that would be, and then he tries to come up

22    with something that is a reasonable assumption understanding

23    that he can't absolutely predict the future as to what's going

24    to happen with respect to these patents.

25          THE COURT:  Is the answer that one cannot determine

```
 1   how he converted 37 from any of the license agreements or the
 2   settlement agreements?  You can't take those and the
 3   information contained therein and determine how he converted 37
 4   million and 17 million into a running royalty?
 5            MR. ROBERTSON:  No.  In fact, we have the -- it's
 6   slide -- not this one.  The factors you would need, Your
 7   Honor --
 8            THE COURT:  Where is the slide you're taking about?
 9            MR. ROBERTSON:  Actually I think -- I have how he did
10   the calculation in my outline.
11            THE COURT:  It's not a slide.
12            MR. ROBERTSON:  It's slide seven, Your Honor.  Tab
13   one, Your Honor.
14            THE COURT:  I don't have a tab one.
15            MR. ROBERTSON:  Their motion in limine, tab one.
16            THE COURT:  I misunderstood what you're saying.  All
17   right.  Tab one is the licenses to the patent in suit are
18   reliable evidence; is that what you are talking about?
19            MR. ROBERTSON:  Yes, sir.
20            THE COURT:  Where is it?
21            MR. ROBERTSON:  Page seven.
22            THE COURT:  Page seven.
23            MR. ROBERTSON:  Some of the factors you need to know
24   is when the infringement started and when would have been the
25   termination of the license agreement, whether, as I said,
```

1    assuming Dr. Mangum's assumptions, early, midterm, or late.

2            He takes the lump sum amount paid, and he takes the

3    value of the accused revenue based on the license agreements,

4    he looks at the accused revenue for SAP and Ariba that are

5    disclosed in the damages expert reports.  Those are the 3-A

6    through 3-D and 4-A through 4-D.  If I can just address that

7    one issue Mr. McDonald raises --

8            THE COURT:  Wait a minute.  I'm trying to understand

9    something real simple, and these tabs don't show that, and that

10   is, what part of the settlement agreement or the record shows

11   factors that Mangum could or did use in converting the

12   $37 million lump sum into a reasonable royalty, and the same

13   thing for the 17?

14           For example, $37 million divided by the sales, total

15   sales figures equals what, or that we were using some other

16   formula to arrive at our $37 million lump sum.  Is there

17   anything like that in this record or in those agreements?

18           MR. ROBERTSON:  The agreements were produced, and the

19   37 million covers both the past infringement and future

20   infringement.

21           THE COURT:  Yes.

22           MR. ROBERTSON:  Then what he does -- so the numerator

23   for determining what the royalty rate is going to be is going

24   to be 37 for Ariba and 17.5 for SAP.  Then he's going to divide

25   that by the past yearly accused revenue going into the license

1   agreements.

2           THE COURT:  Did he do that?

3           MR. ROBERTSON:  In 3-A through 3-D and --

4           THE COURT:  Either in 3-A -- 3-A and 4-A and

5   following or not at all.

6           MR. ROBERTSON:  Yes.

7           THE COURT:  Because it's not in the report.  All

8   right, now, he refers to the 3-A -- look, the fact that

9   somebody refers to something doesn't mean it's in the report.

10  I'm trying to find out where it is.

11          Now, show me how he did -- take 3-A and show me how

12  he did that.  Use the numbers he used -- I don't see how he did

13  it, but I'm sure -- and the report doesn't explain how he did

14  it, so just help me.  Settlement amount is 37 million.  The

15  effective rate is three percent.  How did he get that?

16          MR. ROBERTSON:  He takes, Your Honor, the accused

17  revenues that he has -- he had information for the full year

18  available for 2003 because we obtained --

19          THE COURT:  Forget about talking about that right

20  now.  Just tell me what figures he used to get here.  You can

21  go back and deal with that in a minute.

22          MR. ROBERTSON:  He adds up the accused revenue, he

23  applies appropriate compound factors.

24          THE COURT:  Wait just a minute.  Is that two and a

25  half billion dollars?  Is that what it is roughly?

```
1              MR. ROBERTSON:   2.5 billion.

2              THE COURT:   Two and a half billion dollars, and then

3      he did what?

4              MR. ROBERTSON:   He does a compound factor because of

5      the value of money over time, and he does a discount value to

6      present value the future revenues.   He comes up with a cash

7      flow of 1.24 million -- excuse me, 1.24 billion after he's done

8      that calculation.   And then he divides the 37 million by

9      1.24 billion to arrive at effective rate of three percent in

10     that scenario.

11             THE COURT:   Is there any indication in the license

12     agreement that that method was at all in the minds of the

13     parties, or is this just something he arrived at as a way to do

14     it?

15             MR. ROBERTSON:   It's a way to -- there's nothing in

16     the agreement other than the agreement, Your Honor, is both for

17     past and future damages.

18             THE COURT:   That's the best you can say.   All right,

19     now, where in his report does he explain what you just told me,

20     what page?

21             MR. ROBERTSON:   It's at page 12, I believe, Your

22     Honor.   Exhibit 3-A reflects the amount of accused Ariba

23     revenue at issue in the license agreement with ePlus.   The

24     Ariba license covered past and future accused sales.

25             Next full paragraph, accordingly, when converting a
```

 1    lump sum royalty to a running royalty, the calculation includes

 2    an estimate of the related revenues, a measure of a business

 3    risk, measure of the risk related to the continuing relevance

 4    of the technology.  More specifically, a lump sum royalty is

 5    essentially the present value at the time of the agreement of

 6    the stream of related revenue accounting for discounts for

 7    business and technology risks.

 8          3-A-D show four calculations of the effective running

 9    royalty rate in the Ariba agreement based on four assumptions

10    regarding the remaining effective life of the technology.

11          He drops a footnote as to what he calls extreme, or

12    as you refer to them, outlier assumptions, and then he uses

13    what he thinks is a more reasonable range.

14          THE COURT:  All right, I see.

15          MR. ROBERTSON:  He does the same exact calculation

16    for SAP explaining that it's slightly different because the

17    agreement occurred nearly two years after the Ariba agreement.

18          THE COURT:  Where in the report does he explain that

19    this is an acceptable methodology in his field for doing what

20    he did?  I see how he did it.  Where does he explain, and what

21    does the record show that this is an acceptable methodology for

22    him doing what he did?

23          MR. ROBERTSON:  I don't know that that exact language

24    appears in there.

25          THE COURT:  It's not in there anywhere that I can

1    tell.

2           MR. ROBERTSON:  I don't -- I do know that he was --

3    neither is it that it's acceptable that the *Georgia-Pacific*

4    factors govern the methodology.  He didn't expressly say it,

5    but the law makes clear that you can convert them, and this, it

6    seems to me to be a reasonable way to convert them under

7    certain assumptions --

8           THE COURT:  It may seem to you to be, but that's not

9    the test, what you assume to be.  It's what's appropriate in

10   his discipline to do what he's doing, and -- ordinarily, people

11   recite that this is something that's done in their discipline

12   in doing this, and, for example, see textbook A, B, C, D of

13   Jones published in 1999, and I don't see -- just as an example.

14   I don't see any of this as an appropriate methodology

15   demonstrated in the report, and I just was asking if there is

16   any that I've missed.

17          MR. ROBERTSON:  Your Honor, I think the methodology

18   is just math, and I think that is an acceptable -- for when he

19   understands as an economist I have to take something as a lump

20   sum and determine what the rate would be under various

21   scenarios, this is the math that would apply.

22          THE COURT:  You know what?  I can say that seven

23   divided by 2.5 is just math, but that doesn't mean it's the

24   right way to do the math.  You have to demonstrate, he has to

25   demonstrate that it's appropriate to arrive at this calculation

1    that he used by using a compound factor and a discount factor

2    and why it's appropriate to do that in this context.  I don't

3    see that he's done that.  Is there a case, for example, that

4    establishes in the law that all of us are charged with

5    knowledge that the proper way to do this is to do it the way he

6    did it?  I don't know of any, but if there is, tell me.

7              MR. ROBERTSON:  Your Honor, you know, just through my

8    experience and apparently through his, he understands that

9    present valuing future revenues to today's dollars is an

10   acceptable methodology.  Did he say that in his report?  I

11   don't think I can point you to it, Your Honor.

12             THE COURT:  Where does he say it's accepted

13   methodology to take the 2000 -- the kind of sales figure that

14   he did and assume that they're constant?  Where does he say

15   that that's appropriate?

16             MR. ROBERTSON:  He used the information that was

17   available to him.

18             THE COURT:  That's not sufficient, because he could

19   have gotten the information off the street.  He could have

20   walked out and found ten pieces of paper on the ground and

21   said, I used the information available to me.  I know he didn't

22   do that, but that isn't a sufficient explanation.

23             MR. ROBERTSON:  Respectfully, he could not have done

24   that, Your Honor.  This was accused revenue of both SAP and

25   both Ariba.  That information --

```
 1              THE COURT:  My point is -- that rationale isn't
 2    explanatory.  You say that as if that's the end of it all.  He
 3    used what was available to him.  That's not the answer.  The
 4    answer is, why did he -- he's got to explain, I think, why did
 5    I pick 2003 as the basis for my assumption down here in
 6    footnote A, for example, of Exhibit 3-A.  Does he do that
 7    somewhere?
 8              MR. ROBERTSON:  That's when the infringement started,
 9    when the Ariba suit was filed.  That was the period of time he
10    could reach back for damages, so he assumed that that was the
11    start of the revenue stream for the royalty, the date that
12    the --
13              THE COURT:  Did he say that?
14              MR. ROBERTSON:  He may have, Your Honor.  I have not
15    committed this completely to memory.
16              THE COURT:  Damages is the single most important part
17    of a case, at least to the client.  So I am sorry if I have
18    pressed on this more than perhaps I should, but I don't
19    understand the man's method.  He just seems -- it almost is as
20    if his report says, I'm an expert and dress well, have a good
21    head of gray hair, and, therefore, you ought to believe me.
22    That's exactly what *Daubert* says can't be done.
23              MR. ROBERTSON:  All I can say, Your Honor --
24              THE COURT:  All right.  Excuse me.
25              MR. ROBERTSON:  -- is that if you use the methodology
```

1    that he was told by a higher court to employ, there are factors

2    and weighed them --

3          THE COURT:  He was told by a court to do this?

4          MR. ROBERTSON:  Yes, Your Honor.

5          THE COURT:  What court told him to do this?

6          MR. ROBERTSON:  The Federal Circuit has repeatedly

7    said, this is the appropriate methodology for determining

8    patent damages.  I mean, if he were not to use it, he'd

9    probably be faulted for not employing the standard

10   *Georgia-Pacific* factors.

11         THE COURT:  This isn't a *Georgia-Pacific* issue.  This

12   is how you get to -- this is how you get to the part of your

13   analysis of one of the *Georgia-Pacific* factors, and no court

14   that I know of has ordered that a particular method be used to

15   do that.

16         All right, let's go to the next motion.  Now, on one,

17   two, and three, I'm going to reflect upon what you've said, but

18   I'm going to tell you, I'm very suspect of Dr. Mangum, of the

19   ability of Dr. Mangum to be able to testify because of the

20   reliability factors here.  So you all can start thinking about

21   that and how that affects your case and what you want to do

22   with it in proving what you're going to prove.

23         I feel like -- I'll try to get an opinion out as soon

24   as I can, but it's not going to be for a week or so, but at

25   least you now know that in getting ready for trial, it may very

1    well be that you don't have Dr. Mangum's report.  And you may

2    not have it because of the questionable and unexplained

3    methodology and some of the reliability factors that we have

4    identified here today.  That will be what keeps it out if it is

5    out.

6            I don't see that the *Sinclair* case deals with running

7    reasonable royalties.  Did somebody read it differently?  Maybe

8    we got the wrong *Sinclair* case.  Did you all give -- did we get

9    it and get the cite, or did you all give it to us?

10           MR. ROBERTSON:  We gave it to you, Your Honor.  It

11   had to do with this issue about the wisdom of looking forward

12   to events that occur afterwards to factor into -- the issue was

13   whether or not a license agreement that occurred in the future

14   could be relevant to a hypothetical negotiation that occurs in

15   the past.

16           *Sinclair* case was the first case that announced the

17   book of wisdom that said you may look forward as if you're

18   omniscient to see these things and apply them to events that

19   occurred in the past.  It was applied in the *Fromson* case in a

20   patent case, and it was applied in the *Dart* case specifically

21   with respect to the Phillips license that was used -- the

22   Phillips settlement agreement that was used for determining an

23   appropriate royalty even though it was ten years after the

24   negotiations, the hypothetical negotiations would have

25   occurred.

1        So it's the first case announcing the book of wisdom

2   which then was followed in *Fromson* in the context of

3   understanding what information can be used during hypothetical

4   negotiations, followed again in *Dart* in the specific

5   circumstances we were talking about in this case, Your Honor,

6   as to later settlement agreements that are used for earlier

7   hypothetical negotiations.

8        THE COURT:  All right.  I see the point.  Okay.  What

9   is the next one?  Plaintiff's motion *in limine* number two.

10  ePlus, you're up.

11       MR. ROBERTSON:  Your Honor, there was Lawson motion

12  *in limine* number five.

13       THE COURT:  I haven't finished.  I'm just shifting

14  gears.  ePlus number two.

15       MR. ROBERTSON:  Your Honor, if you have the slides in

16  front of you, this has to pertain again to Dr. Shamos's

17  reports, the second Court-ordered supplement and validity

18  statements and his infringement report or non-infringement

19  report.  If we can go to slide number two, Your Honor, I just

20  wanted to sort of briefly revisit the chronology.

21       You will recall that the Court had ordered Lawson to

22  file a second supplemental invalidity defense on March 29th,

23  and on April 9th, Lawson served us with the Court-ordered

24  supplemental invalidity statement.  On May 5, we then received

25  Dr. Shamos's report which expanded the number of prior art

1    references, accommodations, and the various theories that he

2    was espousing with respect to invalidity.

3            We filed a motion to strike.  We had a hearing that

4    lasted almost three hours on May 24, and the Court issued an

5    order from the bench that afternoon and then issued a written

6    order the following day, and then ordered further briefing

7    going forward on the issues of -- the limited issue of whether

8    Lawson's version five and version six could be used for very

9    limited purposes with respect to two claim elements --

10           THE COURT:  I believe those were issues in which I

11   decided at the hearing on one of the Lawson systems that it --

12   accepted Lawson's argument that the claim construction had made

13   it necessary for them to put up a different defense or put up

14   that defense which they had left out earlier.

15           MR. McDONALD:  Right.

16           MR. ROBERTSON:  I understand, Your Honor, that you --

17           THE COURT:  That's what the order did, and it let

18   them have one of them and told them to brief one that Mr.

19   McDonald couldn't come up with the explanation at the hearing,

20   and I said, I thought better of striking it after I left here

21   and said I would let him brief it.

22           MR. ROBERTSON:  That's correct, Your Honor.  And we

23   did brief it, and you gave us until June 4 to do a rebuttal

24   brief.  So with respect to that one element from one claim of

25   the '683 patent that involved the searching for matching items

1    in the database, you reserved on the issue of whether the

2    Lawson 5.0 and 6.0 could come in for one additional limited

3    purpose on the building requisitions using the data related to

4    the selecting matching items.

5         THE COURT:  And in that order, I reserved for

6    judgment on J-Con and what else?

7         MR. ROBERTSON:  Your Honor, rather than have me read

8    it to you, I can hand it up to the Court if you'd like.  You

9    reserved, Your Honor -- you are absolutely right -- in

10   subsection eight on new documents on just J-Con and Gateway.

11        THE COURT:  J-Con and Gateway.

12        MR. ROBERTSON:  Yes.  Your Honor, after this order

13   and after the Court instructed us to brief it, during the

14   middle of the briefing, we received the non-infringement report

15   of Dr. Shamos.  So this is after, more than a month after his

16   invalidity report in the context of a non-infringement report,

17   after Your Honor has issued this May 25 order limiting the

18   version five and six for just one purpose and opening briefing

19   on another purpose, Dr. Shamos took from his invalidity report

20   nearly verbatim 15 paragraphs on Lawson prior art systems,

21   alleged prior art systems 5.0 and 6.0, and placed them in his

22   non-infringement report.

23        THE COURT:  Are they being offered -- is it your

24   position that Lawson is offending in respect of the invalidity

25   issue or using the infringement issue as a vehicle to get in as

1    to which his opinion is not relevant but getting it in by the

2    back door?  Which is it?

3              MR. ROBERTSON:  Both, Your Honor.  I think it

4    violates the Court's order, and I think it violates the Court's

5    order because it's trying to get it in through the back door.

6              THE COURT:  As I remember the original -- it was

7    something like four different theories of invalidity; right?

8              MR. ROBERTSON:  In this case, Your Honor?

9              THE COURT:  Originally.

10             MR. ROBERTSON:  As far as I know, there are at least

11   a dozen or so and 41 different combinations of obviousness that

12   were not in the original supplemental -- second supplemental

13   court-ordered invalidity statements.

14             THE COURT:  That's not what I asked you.

15             MR. ROBERTSON:  I'm sorry, sir.  There were more than

16   four, so I'm missing a point, and I apologize.

17             THE COURT:  14, I'm sorry.  There were a total...

18             MR. ROBERTSON:  The Court narrowed it down

19   specifically, but what we're very concerned about is this

20   Lawson 6.0 and 5.0 systems that the Court took a considerable

21   amount of time to say for invalidity purposes they were limited

22   to one claim element and perhaps two after the Court reviewed

23   the additional briefing it ordered.

24             And after that, we received this Shamos

25   non-infringement report, and he is taking his invalidity

1    contentions with respect to these 5.0 and 6.0 systems and

2    inserted them into a non-infringement opinion.  So the question

3    way, why did he do that, and if you go -- and you'll see on

4    slide six, I've just -- I provided you with the various

5    paragraphs in both the non-infringement report and the

6    invalidity report that correspond, and I've got just one

7    example here you'll see that tracks virtually verbatim.

8            Now, Your Honor, we couldn't respond, we didn't

9    respond to his invalidity contentions on 5.0 and 6.0 because

10   you ruled that they couldn't come into evidence except with

11   respect to those two particular narrow issues.  And we did

12   respond to that.  But we took the Court's order at face value

13   and said, we don't need to respond to all these invalidity

14   contentions because they are out of the case now.

15           And so we were surprised when on the same day we're

16   submitting our invalidity report not addressing all these

17   Lawson 5.0 and 6.0 issues, they suddenly show up in the

18   non-infringement report.  So we took Dr. Shamos's deposition,

19   and if you go to the next slide, why did Dr. Shamos do it?  We

20   asked him that.  He said, it, of course, has to do with

21   invalidity.

22           Now, why are we prejudiced?  Why is it manifest

23   prejudice?  We now can't address these things because they were

24   supposed to be out of the case.  We filed our invalidity

25   report.  They show up again in the non-infringement report, and

1    he expressly avows on June 16th it's for that very purpose, to

2    backdoor my invalidity opinions that were struck by Judge Payne

3    through my non-infringement report.

4            Now, we think that's just wholly improper, and so

5    what's gone on now, Your Honor, is there's been lots of

6    arguments made, well, okay, they are relevant to other

7    purposes, and we really don't think that's actually --

8            THE COURT:  Isn't that the whole issue that they

9    present, is that these opinions are relevant to other purposes?

10   Isn't that their reason for doing this?

11           MR. ROBERTSON:  We don't believe so, Your Honor.

12           THE COURT:  Isn't that what they said in their brief

13   as their reasoning for doing it?

14           MR. ROBERTSON:  They say there's reasons because

15   they're relevant to willfulness is one argument.

16           THE COURT:  Relevant on the issue of damages, lack of

17   specific intent to induce infringement, and lack of willful

18   infringement.  They're also relevant to infringement, at least

19   because Lawson should be entitled to use systems -- use the

20   system to rebut and discredit ePlus's infringement and damages

21   contention.  That's where the issue is joined, isn't it?

22           MR. ROBERTSON:  Well --

23           THE COURT:  They abandoned now, I think, the notion

24   that what they did was okay.  They're just saying it's another,

25   other reasons for getting it in.

1          MR. ROBERTSON:  I can address those other reasons,

2     but Dr. Shamos's professed reason for getting it in is for

3     invalidity purposes.  So I would hope and expect that Dr.

4     Shamos won't be taking the stand and making arguments with

5     respect to 5.0 and 6.0 for invalidity purposes other than in

6     the limited manner the Court has permitted.  But, you know --

7          THE COURT:  Dr. Shamos isn't going to be making any

8     arguments at all, and if he does, he'll be asked to step

9     outside.

10          MR. ROBERTSON:  I would hope he would not be

11     attempting to give testimony with respect to invalidity based

12     on the version five and six.  What concerns me, Your Honor, is,

13     one, what you've just read is entirely conclusory without any

14     analysis really as to why it might be relevant to willfulness,

15     why it might be relevant to these indirect infringement issues,

16     why it's relevant to damages, and why it would be in a

17     non-infringement report, for example.

18          He's not a damages expert, and he's not testifying on

19     willfulness any longer, Your Honor.  So we don't think it

20     should come in for that, but we are also concerned with the

21     prejudice that the jury sees this and misapprehends the purpose

22     for which this is offered, but let me address these issues that

23     they've raised with respect to willfulness, for example.

24          Willfulness focuses on Lawson's objective

25     recklessness or their state of mind, their intent.  What

1   relevance does it have that back in 19 -- prior to 1994, they

2   had some systems that they no longer use and haven't used for

3   years as to their state of mind or as to whether or not they

4   had an objective recklessness.

5          We're not accusing those systems of infringing, and

6   they haven't moved back to those systems in 2010, nor could

7   they according to the 30(b)(6) witness who we deposed.  You

8   can't go back in time and ask people to pay hundreds of

9   thousands of dollars to move back to a technology that has

10  become completely obsolete.

11         So we believe under any of the law that would apply

12  to the issue of willfulness, the 5.0 and 6.0 systems just have

13  no relevance whatsoever.  Certainly products in the early '90s

14  are not relevant to whether it willfully infringed starting in

15  2002.

16         As to indirect infringement, again, this all has to

17  do with Lawson's actual knowledge of the patent in suits which

18  they claim, although the law actually says deliberate

19  indifference is now enough, or whether or not the infringer

20  knew his actions would induce the infringing acts or knew that

21  his actions would induce -- or should have known that they

22  would induce actual infringement.

23         The possible relevance that a system from the early

24  '90s have to whether or not they had that proper intent in 2002

25  and going forward, how does that negate that in any way?  It's

 1    just a complete non sequitur in our view.

 2              On the nine infringing alternatives, again, this is a

 3    situation where their customers paid hundreds of thousands of

 4    dollars, and it takes months, sometimes as long as a year, to

 5    implement this software.  No one is going to go in the 2000 to

 6    2003 time frame and go back to obsolete software from the

 7    '92/'93 time period, much of which had to be done on mainframe

 8    computers in the version 5.0 according to their witness.

 9              And we asked that question, could they have gone

10    back, for example, using 9.0 today and go back to use procuring

11    modules for 5.0.

12              Answer:  We've never done that for a client.

13              And you never would; correct?

14              No, it wouldn't be good business practice.

15              So, Your Honor, I don't understand how it can be used

16    for non-infringing alternatives, but if that's the instant, it

17    should be showing up in a non-infringement report of a

18    technical expert.

19              THE COURT:  What about the J-Con and the Gateway?

20              MR. ROBERTSON:  Well, Your Honor, we think that

21    they've raised the issues --

22              THE COURT:  J-Con and Gateway you oppose because they

23    were new to beyond -- in fact, they were in the original

24    contentions and dropped them, didn't they?

25              MR. ROBERTSON:  Well, they were not in the original

1    contentions.  If you go to -- I'm sorry, Your Honor, skipping

2    around here.  If you go to slide five, these were the new

3    Shamos invalidity theories based on J-Con, Gateway, PO Writer,

4    the King patent, all of which were not in the second

5    supplemental statement and are now in the Shamos report.

6              In addition, he relied on other documents that had

7    never been applied before in addressing these things.  I think

8    we spelled it out fairly clearly in one of the attachments.

9              THE COURT:  All right.

10             MR. ROBERTSON:  So we would ask that they not be able

11   to rely on this.  In fact, I think it's summarized in the

12   relief sought which is page 12 of our outline.  Thank you.

13             THE COURT:  Who is going to do this?  Hello.

14             MS. STOLL-DeBELL:  Let's go to slide 57.  So we think

15   there are four reasons why you should deny their motion *in*

16   *limine* number two.  The first is that the evidence that they're

17   seeking to strike and preclude is relevant to issues other than

18   invalidity, and I'll get into all of these in detail.  This is

19   sort of a summary of where I'm going.

20             The second is that we did disclose J-Con and PO

21   Writer and Gateway and the King patent in the second

22   supplemental invalidity contentions.  It's not new prior art.

23   It was all set forth in there.

24             Now, Dr. Shamos took a slightly different view of how

25   that invalidated their claims, and he thought that it

1   invalidated or anticipated more of the claims.  We said 103, he

2   said 102, but all of those references were disclosed in that

3   second supplemental invalidity contention, and I'll get into

4   that as well.

5          Regarding some of these manuals, the Gateway and the

6   J-Con manuals that Dr. Shamos included in his claim chart that

7   were not cited in our second supplemental invalidity

8   contentions, I think that's just new evidence in support of old

9   theories, and this Court is allowing Dr. Weaver to rely on

10  hundreds of pages of new evidence in support of old theories.

11         THE COURT:  I'm not quite sure that one is right.  I

12  think -- they showed how that's the case with Weaver, but your

13  man Shamos is talking about a bunch of new anticipation --

14  claims that are anticipated, and what you originally did, the

15  number of claims that were anticipated in your second

16  supplemental was one by the J-Con, three by Gateway, seven by

17  PO Writer, three by King 542, total of 14.

18         Your man Shamos says 13 each in J-Con, Gateway, and

19  PO Writer, and 11 in King 542 according to them, and, frankly,

20  that's sort of what that looks like to me, that Shamos did, and

21  if that's what he did, he can't do that.

22         MS. STOLL-DeBELL:  So, yes.  In our second

23  supplemental invalidity contentions, we said some of those

24  claims were rendered obvious in light of those references in

25  combination with other references, and Dr. Shamos did take a

1    slightly different view and felt like there actually was

2    anticipation.

3           THE COURT:  He did it to 13 -- instead of -- for

4    J-Con he did it to 13 claims, not one, and he can't do that.

5    So we understand where we're going, at the beginning of this

6    case, I issued an order and directed that infringement

7    contentions and validity contentions be disclosed.

8           That wasn't for the purpose of making an opening bid.

9    That was for the purpose of setting the course of this case.

10   It is a case management order.  It says, this is how -- where

11   you are to focus your discovery, et cetera.

12          You all needed a little second bite at the apple, and

13   I gave it to you, and I think you actually dropped something

14   from your original invalidity contentions and shifted it a

15   little bit, but you made them, and you made them as I think

16   ePlus has described in its brief.

17          And now this man, Shamos, comes in at the expert

18   stage and under the guise of saying that he is using additional

19   rationale to explain the original 14 issues that you all

20   posited in your invalidity contentions, he's doing it as to

21   about 50 claims, and that cannot be done.  And it's that issue,

22   I think, you need to demonstrate to me, and I don't see your

23   brief as seriously saying that he's doing anything other than

24   that.

25          MS. STOLL-DeBELL:  I would characterize it as

1    changing the argument from 103, which is what we said in our

2    second supplemental invalidity contentions for some of the

3    claims, to a 102 argument.  But if you are asking me --

4              THE COURT:  But didn't he do it to more claims, for

5    example?

6              MS. STOLL-DeBELL:  Well, he says more claims were 102

7    where we had said they were 103.

8              THE COURT:  I know, but you can't do that.  That's

9    the point.  I believe that Dr. Shamos believes that he runs the

10   operations around here, and he doesn't.  He's going to abide by

11   the rules that are set by the Court.  So I'm troubled by what I

12   see there.

13             MS. STOLL-DeBELL:  As a technical expert, we hired

14   him for his technical expertise, and he looked at the

15   documents, he looked at the prior art, he looked at the claims,

16   and he gave his opinion as to what he thought -- the reasons he

17   thought they invalidated the claims.

18             THE COURT:  That's fine, but he could have given them

19   to you until the cows came home, and you could have done with

20   them what you wanted to, but you and your client are

21   circumscribed by the basic rules that you operate in, and you

22   should have said to him, Doctor, you have expanded the game,

23   we're not playing seven-man football like we started off with.

24   We're playing with 11, and the Court said you can't do that, so

25   go back and give us a report that deals just with what we said,

1    and if you can't say that, then we'll -- you know, that's okay,

2    we'll have to figure out what to do, but you just do what

3    you're supposed to do.  You don't come in here and do what he

4    did, I don't think.

5         MS. STOLL-DeBELL:  To be fair, Your Honor, we're

6    taking about his invalidity report which was filed before they

7    filed their motion to strike and before Your Honor ruled on

8    their motion to strike.

9         THE COURT:  I've already said, told you all at the

10   beginning that you were supposed to do these things, and that's

11   what they mean, but when you're told to do something, the

12   limits are there.  You don't have to be -- we don't have to do

13   it any other way, I don't think.

14        MS. STOLL-DeBELL:  Okay.  So going back to -- I think

15   we've covered that issue.  Going back to the relevance to other

16   issues, talking about this prior art --

17        THE COURT:  How is the prior art relevant to other

18   issues?

19        MS. STOLL-DeBELL:  Let me first start off by saying

20   that the May 25th order that you issued was not, did not relate

21   to any of these other issues.  It was specifically related to

22   invalidity, and, further, it was granted in part and denied in

23   part as you mentioned earlier.

24        THE COURT:  That's entirely correct, and I don't

25   think there's any question about that.

 1          MS. STOLL-DeBELL:  I think -- I keep hearing from

 2     ePlus that we are violating the order and we're going against

 3     the order because we want to use this information for issues

 4     other than invalidity, and so I just want to point out again

 5     that that issue, that motion and the order were related to

 6     invalidity.

 7          THE COURT:  That's right.

 8          MS. STOLL-DeBELL:  We do, in fact, want to use this

 9     evidence for other issues --

10          THE COURT:  But how is it relevant, how does it

11     pertain to other issues?

12          MS. STOLL-DeBELL:  Okay, well, I think the real key

13     here, Your Honor --

14          THE COURT:  How does the prior art, for example,

15     relate to damages which is the first matter that you assert in

16     your brief?

17          MS. STOLL-DeBELL:  I think a fundamental thing to

18     understand here, which explains why it's relevant to all of

19     these different issues, is what ePlus is saying infringes in

20     this case and what they are saying does not infringe.

21          And so they draw this line in the sand starting in

22     2002, and they say Lawson's version 8.0.3 began the

23     infringement, and that began in 2002.  You've heard that date

24     all day today, and that all prior versions of the same

25     software, this S3 procurement software, did not infringe.  So

1   we've got this line, everything before 8.0.3 does not infringe,

2   and everything after it does.

3           So what we're looking here for, non-infringement, for

4   example, Dr. Weaver says that there were two changes made to

5   the software, 8.0.3, that triggered the infringement in this

6   case.  Those are that it allowed key word searching, and it

7   allowed searching by these UNSPSC codes or category searches.

8           Those are the things that triggered infringement,

9   that caused it to go from non-infringing to infringing.  And so

10  what we want to do is go back and look at our software prior to

11  2002, which has, frankly, been the same going back to the early

12  '90s, going back to version five, and say, it's substantially

13  the same as version 8.0.3.  So, Dr. Weaver, if you say that,

14  you know, this infringes and the other one doesn't, they're the

15  same, and we'll use that to impeach him, to attack the

16  credibility of his opinions.

17          THE COURT:  How does it relate to damages?

18          MS. STOLL-DeBELL:  Damages, okay.  One of the things

19  that you look at when deciding, when figuring out what that

20  reasonable royalty is going to be, what alternatives were

21  available to Lawson in 2002, what non-infringing alternatives

22  were available that it could have used instead of the

23  infringing technology, because if there are viable alternatives

24  out there, it's going to be less likely to pay a higher

25  royalty, so you factor that in.  You have to look at what was

1    available.  Certainly Lawson's been selling this same software

2    for decades --

3            THE COURT:  I thought your man testified that you

4    couldn't go back, you couldn't go back and you wouldn't go back

5    because it's bad business, and if you can't go back and you

6    won't go back because it's bad business, the mere fact that in

7    concept it's a non-infringing alternative doesn't make a

8    difference which your folks already made the decision they are

9    not going back.

10            MS. STOLL-DeBELL:  I don't think that's fair, and I

11    don't think that's accurate.  What our witness was asked is, in

12    2010, could you take version 9.0 and switch it out for version

13    5.0.  No, you couldn't, but 2010 is not the relevant date.

14    It's 2002, and in 2002, there was still a version 6.0 software

15    out there.  It was an available alternative at the relevant

16    date which is at the time that the hypothetical negotiation

17    would happen.

18            THE COURT:  How does it have to do with willful

19    infringement?

20            MS. STOLL-DeBELL:  Because, Your Honor, Lawson has --

21    they've been selling the same software for years, since well

22    before the filing date of these patents, and it further

23    believes that the software that it sells today, the

24    functionality is substantially the same as it's been selling

25    since the early 1990s.

 1          That shows, it is evidence that Lawson doesn't intend

 2     to infringe, and, further, that there is not an objectively

 3     high risk that Lawson's infringing a valid claim of ePlus's

 4     patents and that there's not subjective intent either.

 5          It's a very similar issue for indirect infringement.

 6     Lawson doesn't think it infringes because it's been doing the

 7     same thing since before ePlus, and it doesn't intend for its

 8     customers to infringe either, because, again, it isn't doing

 9     anything different.

10          THE COURT:  Okay.  Anything else?

11          MS. STOLL-DeBELL:  Yes.  If you'd let me look through

12     my notes really quick.  They raise an issue as to the Gateway

13     system, and they say that Dr. Shamos should be limited to

14     relying on the Gateway system as prior, a prior art printed

15     publication under Section 102(b).

16          In Dr. Shamos's report, and if we can go to slide 70,

17     he did, in fact, list the subsections of 102 that he was

18     relying on for each of these different types of prior art, but

19     it was not an exhaustive list.  So he said, you know, these

20     references qualify as prior art at least under these

21     subsections.

22          It's further our view that Dr. Shamos is not in any

23     better position than the jury to determine whether a system

24     qualifies for prior art.  We're going to put witnesses on the

25     stand who will talk about when things were on sale, whether

1    they were in public use, when that happened, what the documents

2    say, whether they are printed publications.  All of that stuff

3    is fact issues that fact witnesses will put evidence on, and

4    the jury will have to decide that.  That's not Dr. Shamos's job

5    to do that.  His job is to look and see what is disclosed in

6    these references, compare it to the claims, and give an opinion

7    as to whether they anticipate or render obvious these things.

8            Further, in his claim chart -- so I would say

9    although he did say printed publications for Gateway in his

10   report, he shouldn't be limited to that specific subsection,

11   and in his claim chart that he produced with his report, he

12   talked about the Gateway system, and he cited multiple

13   different documents to show what that Gateway system had at the

14   relevant time period.  We would ask he be permitted to give

15   opinions on that as well.

16           THE COURT:  All right.  Thank you.  We'll take a

17   20-minute recess, and then we'll come back, and I'm inclined to

18   believe that the number five -- what is it - V5 and V6 systems

19   may be appropriate for means for -- may be made appropriate

20   because of construction of means for building requisition using

21   data related to selecting matching items and their associated

22   sources, and you might tell me how that affects this motion.

23           Otherwise, I'm inclined to believe that what is in

24   those invalidity reports is what he testifies to, and that's --

25   and he can't bring in something that he claims is an invalidity

1    ground under the guise of other things, other opinions.

2             There are a couple of other loose ends that need to

3    be tied up, but you frame your argument and address these

4    issues.

5

6             (Recess taken.)

7

8             THE COURT:  Have a seat, Mr. Robertson.  Excuse me

9    just one minute.  I am -- it's getting late in the afternoon,

10   and I think I misspoke myself when I left, so I want to make it

11   clear.

12             An opinion will be issued, brief though it be.  I

13   don't believe that Lawson carried its burden to show that the

14   construction-of-means-for-building term that was left open

15   changed the rules of the game or called for further opinion,

16   and so the issue that was left open, that aspect of the relief,

17   Lawson's request to have an extra opinion on the V6 and V5 will

18   be denied.  I think I said exactly the opposite of that when I

19   left here, and I didn't mean that, but that's what I do mean.

20   Now, where do we go?

21             MR. ROBERTSON:  Thank you.  I'll be brief in

22   responding to a few of these things.  Number one, I actually

23   thought I heard counsel say that because Dr. Shamos actually

24   opined with respect to one Gateway manual as a prior art

25   printed publication, that now we opened the door for him to

1    opine on things he didn't even include in his report such as a

2    prior public use with respect to the Gateway system.

3           That would go even beyond what Dr. Shamos has already

4    said in his report, and I can show it to you with respect to

5    this Gateway manual because I have his report right here if

6    you'd like me to show you, but I can just identify that in his

7    prior art reference at page 26 with respect to the Gateway

8    2000/MRO version, what type of prior art he says, 102(b)

9    publication.

10          So I certainly wouldn't want to have a situation --

11   not have a situation where simply because he identified

12   something as a publication, he then gets to start pulling in

13   and opining on issues as to prior public uses when he's never

14   identified those before.  Can we see slide 11?

15          THE COURT:  What are you on there?

16          MR. ROBERTSON:  Slide 11 of our motion *in limine*, tab

17   two.  This is just to illustrate that Dr. Shamos's sole opinion

18   with respect to the Gateway system was this one manual, and

19   when you are dealing with a printed publication as

20   anticipation, which this is, all of the elements need to be

21   anticipated within a single printed publication, a single prior

22   art reference, in other words within the four corners of the

23   document.

24          He's now trying to identify all these other

25   publications that don't qualify as 102(b) prior art because

1    they are published less than one year prior to the filing date

2    of our patents, and I heard counsel argue that he now also

3    wants to opine on a prior public use which he's never even

4    identified in his report.  So I was hoping we were contracting,

5    not expanding.  That was my only point, Your Honor.

6            With respect to some of these arguments about why

7    Lawson 5.0 and 6.0 should come in for these other reasons, I

8    did not find them persuasive.  In fact, I really saw them as

9    just stealth arguments that they really apply to invalidity.

10   Even the argument made with respect to non-infringement was,

11   well, there's only a couple of alleged new elements Dr. Weaver

12   testified about.  Of course, his expert report goes well beyond

13   those two elements that were identified there, not the least of

14   which is the multiple catalog aspect which is not present in

15   5.0 and 6.0.

16           THE COURT:  You mean Dr. Shamos?

17           MR. ROBERTSON:  No, Dr. Weaver.  Did I misspeak?  Dr.

18   Weaver opined well beyond -- this was slide 62 of Lawson's

19   presentation about the two changes that triggered infringement.

20   His report goes well beyond keyword searching and searching by

21   categories and UNSPSC codes.  And so what this is really

22   arguing is, well, these are only the new elements and really,

23   you know, that would mean that Lawson 5.0 and 6.0 render it

24   obvious.

25           THE COURT:  You say you don't contend that 6.5 and

1    five infringe; right?

2         MR. ROBERTSON:  That's correct, for a variety of

3    reasons, Your Honor.

4         THE COURT:  But did you allege that in your

5    complaint, that they didn't infringe?

6         MR. ROBERTSON:  We did not identify them in our

7    infringement contentions because we don't believe --

8         THE COURT:  No, I didn't ask you that.  I asked you

9    if you alleged in your complaint that they didn't infringe.  In

10   other words, is that in play in the case already because you

11   put it into play in your complaint?

12        MR. ROBERTSON:  I'm fairly confident that we did not.

13   The patents didn't issue until 1994, and those predate the

14   patents, so we couldn't accuse something that predates the

15   filing date of the patents.

16        THE COURT:  How did you put it in issue?

17        MR. ROBERTSON:  How did we put it in issue?

18        THE COURT:  Yeah.  How did you put it in issue?  They

19   want to rebut something -- they want to use this to rebut

20   something that you are contending.  So you're not contending

21   anything about the 6.5 at all in the case.  You're not offering

22   evidence about it at all.

23        MR. ROBERTSON:  Not at all, Your Honor.  In fact,

24   you're going to hear from Ms. Albert today that a demonstration

25   they put on of the alleged 5.0 and 6.0 system is a doctored

```
1    system that they re-created well after the fact.  It has source

2    code after the fact, and it has hardware and middle ware and

3    operating systems well after the fact, and we think that

4    actually shouldn't come into evidence.  So we certainly -- I

5    didn't mean to suggest in any way that we ever put it into

6    play.

7              THE COURT:  You didn't.  They did.

8              MR. ROBERTSON:  We want it fully excluded, sir.

9              THE COURT:  Well, they seem to say that because you

10   acknowledge 6.5 and five don't infringe, it's okay for them to,

11   on the topic of damages, to show a non-infringing alternative

12   and willful infringement to show their state of mind to prove

13   up that the -- is it 8.0.3?

14             MR. ROBERTSON:  8.0.3.

15             THE COURT:  Yes, 8.0.3, and the six, V6 and V5 are

16   substantially the same and that they ought to be permitted to

17   prove that.  What do you say about that?

18             MR. ROBERTSON:  I don't understand how substantially

19   the same goes to their state of mind whether -- for a product

20   system that was on sale in the early '90s goes to their state

21   of mind in 2002 as to whether or not they're willfully

22   infringing the patents, because they don't have all the

23   elements, and, otherwise, they're offering it really for

24   invalidity, and that's where unfair confusion, I think, will

25   arise.
```

1          It hasn't been accused in the infringement.  For that

2    matter, then why isn't 7.0, 8.0, 8.01, and 8.02 at issue?  In

3    fact, those would be closer in time to the hypothetical

4    negotiation and the relevant state of mind.  But they're really

5    offering 6.0 and 5.0 for the very reasons that Dr. Shamos

6    conceded in his deposition.  They want them in for invalidity

7    purposes.  That's all I have on that, Your Honor.  Thank you.

8          THE COURT:  Do you have anything to say?  It's not

9    your motion, but since I did what I did on the outstanding

10   issue, you can say what you need to say.

11         MS. STOLL-DeBELL:  First of all, Your Honor, they did

12   put it into issue as part of their damages case by saying

13   infringement started in 2002, and it started with this version

14   8.0.3, and they have said on the record both with Dr. Weaver,

15   their technical expert, and their damages expert, that that is

16   what infringes going forward and what was prior to that does

17   not.

18         And so when we're talking about the infringement

19   issues and damages, it's not just 5.0 and 6.0 that we're

20   talking about.  It's everything prior to 8.0.3, and Dr.

21   Shamos's expert report talks about how Lawson's S3 software has

22   really been substantially the same starting at version five and

23   coming to present day.  So it's not just limited to five and

24   six.

25         And I would further say that this isn't an invalidity

1    argument in disguise because we're talking about 2002.  We're

2    not going all the way back to 1994, and what we want to do is

3    compare what they say is infringing and the things that they

4    say triggered infringement against what they say doesn't

5    infringe.

6              THE COURT:  How do you see this evidence playing out?

7    I'm having trouble understanding it in respect -- the only

8    thing, I think, that is even colorable is the state of mind on

9    the willful infringement.  I don't think it shows any

10   non-infringing alternatives in this case.  Time is too distant

11   to be able to do that.  But beyond that, I just don't see how

12   it shows any non-infringing alternative but to say that I

13   didn't intend to infringe when I did 8.0.3 because all I

14   thought I did was change from V6 and V5 in our previous

15   versions to 8.0.3, and, therefore, I really didn't have any

16   intent to infringe.  Isn't that your point of what you're

17   trying to prove, it wasn't willful, it was just one of those

18   things?

19             MS. STOLL-DeBELL:  Are we talking about willfulness?

20             THE COURT:  Yes.

21             MS. STOLL-DeBELL:  You have to compare it or contrast

22   it with somebody who didn't have prior software.  I think of it

23   as the opposite of copying, really.

24             THE COURT:  I'm asking you how you're planning on

25   putting this evidence on so I can understand what relevance it

```
 1   has, because the papers don't show that.

 2              MS. STOLL-DeBELL:  Well, I think we'll have Lawson

 3   witnesses get on the stand.  We've got witnesses with personal

 4   knowledge about --

 5              THE COURT:  I assume they know all the systems.  What

 6   are they going to do?

 7              MS. STOLL-DeBELL:  They're going to get on and talk

 8   about how the systems are the same and that there was keyword

 9   searching in the earlier versions of Lawson's system and there

10   was category searching.

11              THE COURT:  And then where do we take that?

12              MS. STOLL-DeBELL:  Well, then we use it to impeach

13   Dr. Weaver who says these things triggered infringement, these

14   are changes.  We don't think they are changes, Your Honor.

15              THE COURT:  You're really not going to the state of

16   mind.  You're going to the substantive issue of infringement

17   vel non, and what you told me is that it didn't go to the issue

18   of willful infringement, i.e., their state of mind.

19              MS. STOLL-DeBELL:  I'm sorry.  I'm probably missing

20   the issues up here.  As far as state of mind goes, we will have

21   Lawson witnesses up there saying, we didn't think we did

22   anything wrong and we didn't think there was a high risk of

23   infringing a valid claim because we've been doing the same

24   thing that we've always done.  There's nothing new in this

25   version 8.0.3 that we weren't doing before, so how can we be at
```

1    high risk of infringing a claim when we're doing the same thing
2    we've always been doing.
3            THE COURT:  That doesn't have any value unless its
4    shown that five and six and before didn't infringe.
5            MS. STOLL-DeBELL:  They say it didn't infringe, Your
6    Honor.
7            THE COURT:  Is that correct or not?  That doesn't
8    have any probative value to state of mind without a showing
9    that V5, V6, and the other systems didn't infringe, does it?
10           MS. STOLL-DeBELL:  Well, I think the showing is --
11           THE COURT:  On that point.
12           MS. STOLL-DeBELL:  Their witnesses will say they
13   don't infringe.  Their damages expert is going to say they
14   don't infringe, so they admitted --
15           THE COURT:  They're not going to put on evidence
16   about what doesn't infringe.  That's going to be part of your
17   case.  They're not going to be allowed to testify that V5 and
18   V6 don't infringe and anything else doesn't infringe.  There's
19   a zillion things in the world that don't infringe.  They're not
20   going to put on a case like that.
21           That's part of your case if it's part of the case at
22   all, so when you get to -- you are arguing to me that this is
23   relevant to show that they didn't intend to infringe, and I
24   assume the argument is this:  We just thought we were
25   continuing what we did before.  Isn't that right?  Isn't that

1    basically what this whole argument boils down to, and from that

2    you want to argue that -- from that fact you want to argue that

3    because what they did before didn't infringe, the infringement

4    here, if it's shown, couldn't be willful; right?  Isn't that

5    what you want to do?

6          MS. STOLL-DeBELL:  Yeah, I mean, I think when you are

7    talking willful infringement and intent, you have to look at

8    was there this high risk of infringement and did they act

9    despite a high risk of infringement.  That's sort of the

10   subjective inquiry that we're looking at.

11         THE COURT:  I understand that, but they can't get on

12   the stand and say, I didn't act, there wasn't a high risk of

13   infringement in my mind unless they actually knew about the

14   infringing product and said -- I mean the patent, excuse me,

15   and then said, hey, I looked at that, and I didn't think it was

16   any risk of infringement.

17         So that's not how you put that on.  That's not how

18   you do what you're trying to do, I don't think, and I'm trying

19   to get from you how you're going to use this.

20         MS. STOLL-DeBELL:  Well, let's back up a little bit

21   and start with the fact that Lawson did not know about these

22   patents until this lawsuit was filed, and they say there were

23   articles out there, and the subject of one of the motions *in*

24   *limine*, these articles talked about the patents, but they don't

25   have any proof that anyone at Lawson ever saw those.  Lawson

1    did not know about the patents until this lawsuit was filed,

2    and at that time, you know, what they accused of infringement

3    is 8.0.3, and as Mr. Robertson said, they have never said that

4    anything before that infringed, and, in fact, they've said

5    stuff before that does not infringe.

6         So when you're looking at Lawson's state of mind, we

7    are really looking at post-filing of this suit, and at that

8    time, we know that they say 8.0.3 --

9         THE COURT:  Now let's stop.  So it doesn't have

10   anything to do with willful pre-filing infringement, it's

11   solely confined to willful post-filing infringement; right?

12   That's why you're offering it.

13        MS. STOLL-DeBELL:  Right, because you can't willfully

14   infringe a patent we don't know about.

15        THE COURT:  That presupposes, don't you realize, that

16   everybody believes that you didn't know about it when there's

17   proof out there that there were publications that you could

18   have known about, and I don't know whether you did or didn't,

19   but I'm trying to define the issue.

20        The issue now is -- and that's all I'm trying to

21   do -- this evidence is admissible for the purpose of showing

22   that you did not willfully infringe post-filing of the lawsuit;

23   right?

24        MS. STOLL-DeBELL:  Yes, it is relevant to that, yes.

25        THE COURT:  That is the only reason it's relevant,

1   because you said it doesn't have anything to do with

2   pre-filing.  On the willful infringement issue, that's the only

3   issue it's relevant to; right?

4           MS. STOLL-DeBELL:  Post-filing.

5           THE COURT:  Okay.  Now, how does it play out

6   post-filing?  Tell me about that.

7           MS. STOLL-DeBELL:  There is going to be evidence of

8   when they say Lawson started infringing these patents.  They

9   have to put it on for their damages case, and we're talking

10  about which version they say infringed and when they say Lawson

11  started infringing.

12          So those are going to be facts that come into the

13  case.  So the jury will hear about that, and it will be a fact

14  that these prior versions, anything before 8.0.3, does not

15  infringe.  And we will have witnesses --

16          THE COURT:  They're not going to prove that.  They're

17  not going to offer that evidence -- are you, Mr. Robertson?  He

18  said he wasn't.

19          MR. ROBERTSON:  No.  I'm going to prove that 8.0.3

20  and subsequent versions infringe.

21          THE COURT:  But you're not going to say, in doing

22  that, earlier versions they had didn't infringe.  That's not

23  going to be part of your case.

24          MR. ROBERTSON:  Not going to be part of my case.

25          THE COURT:  So now it comes in, you say, to deal with

1      -- when it comes in as part of your case.

2            MS. STOLL-DeBELL:  Well, yeah.  I mean, at a minimum,

3      it's part of our cross-examination of Dr. Weaver, that he is

4      not asserting that these prior versions infringed, and he is

5      asserting --

6            THE COURT:  I'm going to tell you what that's going

7      to come up with.  That's going to come up with what you call an

8      objection, and it's going to be sustained most likely.  You've

9      got to realize that you've got to try cases in the order that

10     the issues are presented.

11           Now, this is something that you need to raise, so the

12     question is, can you put in evidence probative of your state of

13     mind that when you got the lawsuit, you didn't think you were

14     infringing with the new 8.0.3 because it was just like all the

15     others and they didn't infringe.

16           MS. STOLL-DeBELL:  Yes.

17           THE COURT:  So you have to then, you say, offer proof

18     that those earlier ones didn't infringe in order to be able to

19     make that argument; right?

20           MS. STOLL-DeBELL:  Right, but I think it's all tied

21     in to we don't think any of it infringes because it's all the

22     same thing.  So it's -- you know, we don't think any of them

23     had catalogs.

24           THE COURT:  What you're doing is thinking without

25     putting it in context of a piece of litigation.  You're

1    thinking the thing through as if logic dictated that these

2    things follow one unto the other.  That isn't exactly how the

3    trial of the case works.  We're looking at whether or not it's

4    probative in your case.  All right.  Anything else that you

5    wish to say on any of these things?

6            MS. STOLL-DeBELL:  I don't think so, Your Honor.

7            THE COURT:  Okay.

8            MR. ROBERTSON:  One point on that last issue, Your

9    Honor.

10           THE COURT:  Yes, since you have the burden on the

11    motion.

12           MR. ROBERTSON:  If it's all the same and 8.0.3

13    doesn't infringe, they don't willfully infringe, what's the

14    relevance of 5.0 and 6.0?

15           THE COURT:  Because they looked at 5.0 and 6.0 which

16    you didn't accuse of infringing, so they didn't think they were

17    infringing, and they thought you were all wet.

18           MR. ROBERTSON:  If it hasn't changed, what they're

19    saying is then it's invalidated because it predates the

20    patents.  If they're not infringing now, they're not willfully

21    infringing, it makes the relevance of 5.0 and 6.0 that they

22    didn't infringe even earlier pre-attenuated and marginal in my

23    view.  Thank you.

24           THE COURT:  This motion is going to be granted.  This

25    report goes somewhat considerably off the reservation

1    established by the previous orders of the Court beginning with

2    the requirements that contentions, invalidity contentions be

3    stated at a certain time, and then Lawson was given a second

4    bite at the apple and told to restate them, and those orders

5    were put in place in order that everybody would know how the

6    discovery was to proceed, what were the contentions, what are

7    the contentions, what do we then direct the discovery to.

8            They are not just pro forma requirements of throwing

9    up pieces of paper into the file that contain something about

10   invalidity.  They shape -- they are the skeleton of the case to

11   which the flesh and muscles and viscera are attached by

12   discovery, and they mean something.

13           To the extent that Dr. Shamos's report talks about

14   infringement issues -- I mean invalidity issues or infringement

15   issues beyond what was disclosed, that evidence cannot be

16   brought in.  It just simply can't.

17           When the validity contentions were filed in the

18   second supplement on the issue of anticipation, it was said

19   there were 14 claims that were infringed -- I mean anticipated.

20   J-Con had one.  Gateway was three claims.  PO Writer was seven

21   claims anticipated, and 542, King 542 anticipated three.

22           Dr. Shamos says for the first three, J-Con, Gateway,

23   and PO Writer, there were 13 each, and for King 542 there were

24   11, there were 50.  He can't testify to anything but to the 14.

25   That's been clear from the beginning.

1          Now, to the extent that Dr. Shamos can offer evidence

2    focused only on those claims and why they anticipate it, he's

3    not bound by the evidence offered at the time of the second

4    supplemental.  He can offer, just like Dr. Weaver can offer,

5    additional evidence directed to the same proposition, but that

6    isn't what he did.

7          What he did is, he went out and he concocted a whole

8    new game, and he's not going to be allowed to testify to it,

9    and he can't now go back and find all these references that he

10   constitutes -- that you all say on your side, Lawson, is new

11   evidence in support of the old contention.  He's bound to those

12   things that were in his report on which he relied to support

13   the anticipations identified in the 14 claims.

14         I hope that everybody is clear on that, and in that

15   way, Lawson and ePlus are going to be treated the same.  But I

16   don't believe the big difference is that Shamos didn't confine

17   himself to the original contentions as did Weaver when he

18   confined himself to the original infringement contentions and

19   then offered more evidence than, in fact, was referred to

20   earlier.

21         That's permissible for him, and it would be for Dr.

22   Shamos had he done that.  I don't see that he did it, but if

23   you can show he did it, he did it, but let me tell when you

24   come to trial, when you have him on the witness stand, you

25   better have something to hand up to me to show me exactly how

1    and where and when it -- what he's testifying to relates back

2    to those original claims because he has, I've been able to tell

3    from what I've been given, a propensity to roam and wander, and

4    you better get him back on the reservation, because if he roams

5    and wanders and I have to tell him more than once, he will be

6    roaming and wandering out the back door.

7              And the same is true for Dr. Weaver.  They're not

8    going to take over the courtroom and do what they want to do.

9    It's going to be done according to the rules.

10             The same is true for these obviousness combinations,

11   41 brand new ones.  They weren't disclosed.  Now, if he

12   identified Gateway references originally that were other than

13   the 2000/MRO manual, he can testify about that.  If he didn't,

14   he can't.

15             The next issue is whether this evidence of Shamos's

16   that you're fighting over is relevant to the issue of damages.

17   It is said that it's relevant to the issue of non-infringing

18   alternative.  I don't believe that that's been established.

19             It is true that the original orders on this point

20   that we were dealing with dealt with invalidity contentions,

21   but you can't get in all these extrinsic information that

22   really relate to points of invalidity under the guise of

23   something else.  In other words, you can't dress them up in

24   another dress and send them out into the world.  That would be

25   like -- would be like what Jefferson Davis did to lead the

1    confederacy, dressed up like his wife in a dress and headed

2    out.  We can't have that.

3            I don't see how any of this evidence bears on the

4    damages issue, nor do I see how the evidence that 6.5 -- six

5    and 5V systems and earlier are substantially the same as the

6    8.0.3 systems that are accused has any probative value as to

7    the willfulness issue, and to the extent that it has value on

8    that issue, i.e., to the extent it's relevant on that issue,

9    the presentation of that evidence would offend Rule 403 because

10   it would cause delay, confusion, and make side trials out of a

11   very difficult case already, and the jury, I expect, I

12   anticipate would be hopelessly confused.

13           With the help of a mind substantially better than my

14   own, for sometime I have been trying to understand what's been

15   going on in this area, and if I can get confused by it, I have

16   every confidence that a jury can.  I have to make sure what I'm

17   doing every time that I deal with this issue just to avoid

18   confusion.

19           I don't think it's pertinent to lack of specific

20   intent to induce infringement either or to discredit ePlus's

21   infringement and damages contention for the same reason.  To

22   the extent it might be relevant, it's a 403 analysis, and the

23   use of the pre-2002 systems don't do anything but provide

24   confusion, delay.

25           Also, to the extent that Shamos is proffered to

1    testify to something on infringement, he already testified that

2    he didn't study the information on it for infringement

3    purposes.  He did it for invalidity purposes, that is the

4    information we're talking about, and so his opinions on that

5    point that are repeated in the infringement issue from the

6    invalidity issue are not either relevant, nor do they fit --

7    nor do they satisfy the fit part of *Daubert*.

8            All right, I think that takes care of all the issues

9    in that motion.  Now we have defendant's motion number five.

10   Who is going to do that?

11           MS. STOLL-DeBELL:  I am, Your Honor.  Just gathering

12   my stuff.

13           THE COURT:  You know what?  It might be the best

14   thing to do is let Mr. Robertson go first and explain just

15   exactly who is testifying to what so that I get that fixed in

16   my mind.  That's this motion, isn't it?  Do we have the right

17   one, limit to one expert on infringement and one on invalidity?

18           MS. STOLL-DeBELL:  Yes, that's right.  I can tell you

19   also.

20           THE COURT:  You want to do it?  Why don't you go

21   ahead.  Since you're planning to do it, you go ahead.  Which

22   one of these tabs is it?  Five.

23           MS. STOLL-DeBELL:  We're looking at slide number 38.

24   Does that help you?

25           THE COURT:  Let me get your book first.  All right.

1              MS. STOLL-DeBELL:  That's the beginning slide.  So

2    slide 39 just shows the order that you know already, that the

3    scheduling order of March 15th limited the parties to one

4    expert per discipline.  If you look at slide 40 in the book,

5    this is ePlus's Rule 16(b) identification of expert witnesses,

6    and you'll see that they have three technical experts listed

7    with the same discipline:  Dr. Alfred Weaver, Brooks Hilliard,

8    and Patrick Niemeyer, and they're all listed as having a field

9    of expertise of computer science and engineering, and then Dr.

10   Weaver and Mr. Hilliard are also listed for application of

11   computer science principles to electronic commerce.

12             Now, they're going to use two infringement experts.

13   They plan to use Dr. Weaver and Mr. Niemeyer to testify on

14   infringement, and they gave us two infringement expert reports,

15   one from each of these men.  In their Rule 16(b) identification

16   of experts, which is shown on slide 41, they designate both of

17   them to testify about infringement.

18             Now, I think --

19             THE COURT:  Is one of them to testify on source code

20   as well?

21             MS. STOLL-DeBELL:  Mr. Niemeyer to testify on source

22   code and both Dr. Weaver and Mr. Niemeyer to testify about

23   infringement.  I think in their opposition brief, they say,

24   well, Mr. Niemeyer is not really an infringement expert.  He

25   doesn't use the word "infringement" in his report, but that's

1   just not true, Your Honor.

2          He goes through the functionality of Lawson's accused

3   software to prove up their infringement theories.  I mean, it

4   is an infringement report, and you can see it right here.  I

5   mean, they designated him to testify about infringement, and

6   that's what his expert report is about.

7          You know, I think they also say, well, there's not

8   going to be any overlap, and that's just not true either.  Both

9   of these experts are going to get on the stand and talk about

10   the same functionality of Lawson's software.  They are both

11   going to talk about item master, what's an item master, how do

12   you search item master, what do you do with the search results,

13   how do you bill a requisition, how do you generate purchase

14   orders, how do you check inventory.  It's the same thing.

15          The same is true for validity.  If you look at slide

16   42, they intend to use Dr. Weaver and Brooks Hilliard as, as

17   they would say, validity experts, and they gave us two expert

18   reports on validity.  Now, they try and divide this up, so they

19   would say Dr. Weaver is going to testify about sections 101 and

20   112, and Mr. Hilliard is going to testify about sections 102

21   and 103 and that there's no overlap there so they ought to be

22   able to subdivide it out that way.

23          I think there's going to be overlap because both of

24   these experts have to talk about what the claims are.  We've

25   got 13 asserted claims in this case.  They have to go through

1    and talk about the elements.  Dr. Weaver is going to do so for

2    section 112.  He's going to get up and say, these claims are

3    not indefinite and this is why, this is what they mean.

4              Mr. Hilliard is going to have to do the same thing.

5    He needs to go through element by element and say why the

6    claims are different than the prior art, and so there is

7    inherent duplication in this testimony.

8              You know, I think under their theory, if you can just

9    subdivide out all these issues, we could have 14 experts in

10   this case.  If you look at the table I put in, slide 43, you

11   could have one for section 101, let's do section 112 second

12   paragraph, section 112 paragraph six, 102(a).

13             It's just ridiculous, frankly, to divide up the

14   experts this way.  It's a waste of time.  It's prejudicial to

15   us because we've had to depose all their different experts.

16   It's prejudicial to Lawson because they have three times the

17   amount of technical experts that we do.  We have Dr. Shamos.

18   He's our computer science technical expert.  He's going to be

19   the guy on the stand for us, and the jury is going to see three

20   different --

21             THE COURT:  Who are the other experts?

22             MS. STOLL-DeBELL:  Pardon me?

23             THE COURT:  Who are your other two experts, and what

24   do they testify about?

25             MS. STOLL-DeBELL:  I think we only have one other --

1          THE COURT:  I thought you said you had three

2    technical experts.

3          MS. STOLL-DeBELL:  No, they do.  We have one.  We

4    have Dr. Shamos.  He's our technical expert, and we have a

5    damages expert.  I think that's it unless I'm forgetting

6    somebody.  They've got three, three technical experts.  We had

7    to depose all of these people, we have to prepare

8    cross-examination for all of them, but I think even more

9    importantly, the jury is going to see three different computer

10   science experts on the stand and, you know, I think --

11         THE COURT:  Why didn't you come forward earlier at

12   the time they were proffering these people and move to strike

13   one of the experts?

14         MS. STOLL-DeBELL:  I think we have to look at the

15   timing.  So they served their Rule 16(b) identification of

16   experts in October of last year.  The scheduling order with

17   this limitation wasn't issued until March 15th.  We had no idea

18   that they were going to violate this order and offer all these

19   experts until they actually did it.

20         THE COURT:  Okay.  So they did it.

21         MS. STOLL-DeBELL:  In fact, Your Honor, I would point

22   out they had more experts in this Rule 16(b) disclosure than

23   they actually used.  They had another technical expert that we

24   didn't get a report on.  So there was no way for us to know

25   that they were going to do this.

```
 1            THE COURT:  The order wasn't entered, but you all
 2   were operating under the order, weren't you?  There was some
 3   snafu over here in my office, wasn't there, about entering the
 4   order?
 5            MR. CARR:  That's right, Your Honor.  It took some
 6   time to get the order entered because of the trial date.
 7            THE COURT:  I think I fouled up something and thought
 8   I had entered it and didn't, but anyway, but you all -- I
 9   believe when we did enter the order, you all agreed you had
10   been abiding by it, the basic terms.
11            MR. CARR:  Mid November or maybe late November,
12   around that time, we had a pretrial conference when we started
13   operating under that, after the Rule 16(b).
14            THE COURT:  So my question is, how come you wait
15   until now instead of bringing this motion earlier and saying,
16   look, you're violating the terms -- in fact, I believe the
17   local rule doesn't have that, does it?  So how come you didn't?
18            MS. STOLL-DeBELL:  First of all, we didn't know they
19   were going to do this until we saw the expert reports, and
20   within a couple of days we sent them a letter saying, what are
21   you doing.
22            THE COURT:  And they said what?  In response, they
23   said what?
24            MS. STOLL-DeBELL:  I think they said that they are
25   different disciplines and they didn't do anything wrong.  And
```

1    then we get the two validity reports, and at that time, you

2    know, we knew this motion *in limine* deadline was coming up, and

3    we filed it at the appropriate time, timely, when the motions

4    *in limine* were due.  But, I think another point I wanted to

5    make, Your Honor --

6              THE COURT:  So you want them to get the best horse

7    and let it run.

8              MS. STOLL-DeBELL:  Yeah, let them pick.  They should

9    have one expert for infringement and one for validity.  I don't

10   care who they pick, but pick one of them.  We shouldn't have to

11   deal with all three.

12             THE COURT:  I thought it was four.  I guess

13   Niemeyer -- it's Weaver and Niemeyer on infringement and Weaver

14   and Hilliard on invalidity.

15             MS. STOLL-DeBELL:  Right.  Another point I wanted to

16   make, if you look at slide 44, Dr. Weaver testified in his

17   deposition that we took last week that he was perfectly capable

18   of reviewing source code, but he wasn't asked to do so.

19             THE COURT:  You wouldn't object if he looks at the

20   source code and testifies about it then, as long as you get an

21   opportunity to depose him.

22             MS. STOLL-DeBELL:  Well, Your Honor, they should have

23   followed the rules.  So I would object to that if they do it

24   now.

25             THE COURT:  What if you had the choice of Niemeyer or

1    letting him testify about the source code?

2            MS. STOLL-DeBELL:  What was my choice?

3            THE COURT:  Niemeyer testifying on the source code or

4    letting Weaver go back and testify about it and you depose him.

5    You don't have to decide that right now, but that may be your

6    choice.

7            MS. STOLL-DeBELL:  I think they knew what the rules

8    were, Your Honor.  They knew that they were limited to one

9    expert per discipline, and they made the decision to split it

10   up this way.  And now we're a month away from trial, and to

11   take a deposition of Dr. Weaver again is, frankly, impossible.

12           I mean, it took us months to get it scheduled.  We

13   finally just got it done last week.  I flew to Charlottesville

14   twice for it because the first time he had a personal issue and

15   had to cancel it after we had already got there.  I had an

16   employee of Lawson that went with me.  We made two trips.  We

17   had to split it over two days.

18           So I don't see that deposing Dr. Weaver again is a

19   viable option at all, particularly when we have all of the

20   other things that we need to do to get ready for trial in this

21   case.  We've got our exhibit lists coming up, we've got the

22   pretrial conference in this.  It's just not fair to Lawson to

23   put us in that position at this point when we didn't do

24   anything wrong.  We have one expert.

25           THE COURT:  Okay.

1          MS. STOLL-DeBELL:  My other point is Dr. Weaver could

2     have looked at the prior art.  He testified about that.  He was

3     perfectly capable of looking at the prior art in this case.  He

4     wasn't asked to do so, and you'll see that testimony on slide

5     45.

6          And, in fact, in the Ariba case, it's my

7     understanding that Dr. Weaver did, in fact, look at the prior

8     art and testify about validity under sections 102 and 103.  So

9     I don't understand why they felt like they could divide it into

10    three experts when the order is very clear.  It's one expert

11    per discipline.

12         You know, I think they have a couple of excuses or

13    reasons why they think this motion should be denied.  The first

14    is they say there's no overlap, but I already talked about

15    that.  There is substantial overlap between all of these

16    experts.  They talk about the SAP case, and they split

17    responsibilities among their experts in that case like they're

18    trying to do here.

19         THE COURT:  Before the expert reports were prepared,

20    were submitted, you called them out on this issue; is that what

21    you did?

22         MS. STOLL-DeBELL:  I don't think so, no, Your Honor.

23    I think we sent them a letter a couple days after we received

24    their two infringement reports.

25         THE COURT:  You called them out then, and they could

1    have said, oh, my goodness, we're going to have to restructure,

2    and at that time you could have deposed the experts over again

3    and let them do some supplemental reports if they'd been caught

4    with their foot on the base, and they could come to the Court

5    and said, we fouled up.

6         MS. STOLL-DeBELL:  Yeah, possibly, and certainly we

7    gave them plenty of notice before the validity reports were

8    due.  So at a minimum, they could have come up with one

9    validity report, but they didn't.  They said, we didn't do

10   anything wrong, and, yeah, and made the choice to violate that

11   order again, two validity experts, and to not try and work it

12   out and fix it with respect to the infringement experts.

13        You know, I already talked about their parade of

14   experts.  It will be prejudicial to Lawson.  I think the jury

15   can only conclude that they've got three computer scientists up

16   there saying they're right, and we only have one saying we're

17   right.  It's not fair.  It seems to me that's one of the

18   reasons the Court has the rule in the first place, not to

19   mention the waste of time.

20        This case is already immensely complicated.  I don't

21   see how there's any way we're going to get it tried in two

22   weeks with 13 claims, and if we have three experts testifying

23   about the same thing, it makes it that much worse.  So for that

24   reason, we ask they be limited to one expert for infringement

25   and one for validity.

1                THE COURT:  All right.  Thank you.

2                MR. ROBERTSON:  Thank you, Your Honor.  Let me

3     represent we certainly had no intent to circumvent the

4     scheduling order in section four, and we were very surprised

5     when we received a letter after they received the infringement

6     report from Dr. Weaver and a source code report from Mr.

7     Niemeyer.

8                They do not overlap in any way, and they're directed

9     to each of their disciplines.  Scheduling order says that it is

10    expressly directed to discipline, Your Honor.  We understood

11    that to be consistent with Rule 403 which talks about

12    introducing cumulative evidence.

13               I want to show Your Honor today, and they have never

14    come forward once and showed that there was any particular

15    paragraph from any particular expert report that overlaps.  In

16    other words, Your Honor, we don't have a situation --

17               THE COURT:  That's not the issue.  The issue is

18    whether they're the same discipline, and the other thing is

19    when you have some apprehension, you come to the Court and

20    raise it.  You could have done it in a telephone conference,

21    and then after they told you that you had your foot off base,

22    you went ahead blindly instead of coming to the Court and

23    saying what happened at a time when we could have done

24    something about it.  We could have said to them, well, you can

25    have another expert.

 1          MR. ROBERTSON:  We did say to them --

 2          THE COURT:  You didn't come to the Court.

 3          MR. ROBERTSON:  Because we didn't believe, and we

 4   still don't believe, we did anything wrong under the scheduling

 5   order.  What we said to them at the time was, there's no

 6   overlap, these are not separate disciplines, and they said to

 7   us in response, okay, we'll table the issue for now, we'll go

 8   and take their depositions, and they did go and take their

 9   deposition.

10          I'll just give you an example.  In the Niemeyer

11   report, for example, Your Honor, there's not one instance where

12   Mr. Niemeyer says anything about infringement or the claims or

13   anything.  What he says is, I was retained because I'm an

14   expert in Java code.  In fact, he wrote books, well-received

15   books on interpreting Java codes.  It took hundreds of hours

16   for him to review the source code.  He had to make seven trips

17   to Washington, D.C. because we had to keep the source code in a

18   secure room, and he spent 350 hours and ten of thousands of

19   dollars pouring over the source code only to be able to say

20   this is what the source code shows me its functionality is.

21          Now, Dr. Weaver can rely on Mr. Niemeyer's report to

22   say, yes.  In addition to all this other evidence I have that

23   I've disclosed in my infringement contentions and my expert

24   reports, relying on demonstrations of the systems, relying on

25   manuals, relying on other evidence that shows the features and

1    functionality of Lawson Software, that it's also confirmed by

2    Mr. Niemeyer, who is an expert in source code review, that that

3    software also had that functionality, but Niemeyer never once

4    went into the territory where he discussed the claims or he

5    discussed the infringement.  He never makes any such

6    conclusions.  If I might just have the slides.

7         THE COURT:  He's going to testify, are both of them

8    going to testify about functionality?

9         MR. ROBERTSON:  No.  Mr. Niemeyer is only going to

10   testify about what the source code says.  In fact, I might not

11   even need to call Mr. Niemeyer because Dr. Weaver can rely on

12   his exhibit report and did so when he generated --

13        THE COURT REPORTER:  Mr. Robertson.

14        MR. ROBERTSON:  Sorry.

15        THE COURT REPORTER:  I can't keep up.

16        MR. ROBERTSON:  I apologize.  Dr. Weaver relied on

17   Mr. Niemeyer's report when he did his export report to confirm

18   that his conclusions were, indeed, correct in that the source

19   code was an additional piece of evidence that showed that the

20   Lawson software does everything that its manual say it does,

21   their representations to their customers, the testimony we got

22   from their witnesses, and the demonstration systems that we're

23   going to put on to the jury to show what indeed happened.

24        If I could go to the next slide.  So this is in our

25   response to defendant's number five.  Let's go to the next one.

1    We went back and we looked at this even at the time, Your

2    Honor.  We said, you know, the report is directed to a

3    discipline.  Slide number 18.  So we said, what is a

4    discipline?  It's a branch of knowledge or teaching.  It's a

5    subject that's taught, a field of study.  This is consistent.

6    We go to the next one.

7            So here's their fields of study.  It was represented

8    that they're all computer scientists.  They're not all computer

9    scientists.

10           THE COURT:  She said you said this.  She said that

11   you were asked to give their qualifications, and this is your

12   material, she says, on her slide 40.

13           MR. ROBERTSON:  This is not their field of study.

14   This is what is represented as saying these are areas in which

15   they may testify.  This was back in October 1 of 2009.  They

16   ultimately did not testify as to all these things.  This was

17   very early on.

18           If you look at the next slide, 41, they said they may

19   be proffered on these issues.  Ultimately, they weren't

20   proffered on many of these issues.  When you look at the field

21   of discipline and you look at these experts' field of studies,

22   Dr. Weaver is a computer scientist.

23           Mr. Hilliard, who has experience in computer science

24   but doesn't have a degree in computer science, is a consultant

25   with almost 30 years of experience in the kind of information

1    technology field, procuring systems, internet-based

2    e-procurement systems, and other business systems with

3    procurement functionality.  And Mr. Niemeyer is this Java code

4    expert who confined himself only to interpreting the source

5    code.

6         Why are these particular disciplines, these fields of

7    study relevant to the issues on which we've offered their

8    testimony?  That's because they don't overlap in issues.  The

9    defendant wants to conflate the Court's ordered discipline with

10   legal issues.  I don't think that follows.  I think it really

11   is field of study.  At least that's how we understood it, and

12   we've confined their --

13        THE COURT:  I may have made a mistake in the way I

14   wrote that order, but you're about as far off base as you can

15   get.  My question is, how do I remedy the situation for them.

16        MR. ROBERTSON:  There is absolutely no overlap, and

17   we've had no inefficiencies in presenting this evidence.  The

18   representations that were made about how this is going to be

19   inefficient just haven't borne out in reality when we put this

20   case on.  I mean, anybody is going to have to go through the

21   claims with respect to how the functionality and features --

22        THE COURT:  Who is going to do that for you?

23        MR. ROBERTSON:  Dr. Weaver, nobody else.  An expert

24   is going to have to go through the claims --

25        THE COURT:  Niemeyer is not going to mention any of

1   the claims at all?

2          MR. ROBERTSON:  Not a one, zero.  He's going to talk

3   about what his review of the source code revealed if, in fact,

4   he even needs to testify, and I think I might make the decision

5   that he doesn't need to testify simply because Dr. Weaver can

6   rely on that under Rule 702.

7          Dr. Hilliard testified in the SAP trial, he's --

8   excuse me, Mr. Hilliard.  He's been familiar with a lot of this

9   prior art that they've been offering now.  He's been working

10  with it on the re-exams, he's offered --

11         THE COURT:  What is Weaver testifying to on

12  invalidity?

13         MR. ROBERTSON:  There are certain -- there's almost

14  every defense in this case, Your Honor.  There's a 101

15  patentability defense, there's a 102 anticipation as you are

16  aware.  There's a 103 prior art defense.  There's 112

17  written --

18         THE COURT:  Patentability, isn't that a question of

19  law?

20         MR. ROBERTSON:  Excuse me?

21         THE COURT:  Isn't that a question of law?

22         MR. ROBERTSON:  Which question?

23         THE COURT:  Patentability.  And didn't I just decide

24  it?

25         MR. ROBERTSON:  It's unclear, Your Honor, from your

 1    report.  Is it a question of law, because I thought you had

 2    indicated it might be some factual issues.  I viewed it as a

 3    question of law that was either up or down, that is the claims

 4    are either patentable subject matter or not, and that the Court

 5    had ruled that -- I thought I understood the Court to rule that

 6    they were, and, therefore, it was out of the --

 7             THE COURT:  You didn't come forward and ask for a

 8    determination it was patentable.  You just opposed their motion

 9    for summary judgment.  That's all you did, so you can't get

10    what you want that way.  That's the problem that you've created

11    when you approached it that way.  That's okay, but that's where

12    we are.

13             MR. ROBERTSON:  I suppose I should have cross moved,

14    Your Honor, but I had indicated to Your Honor I wasn't going to

15    move for summary judgment, and, quite frankly, the claims were

16    claims --

17             THE COURT:  What is Weaver going --

18             MR. ROBERTSON:  If you look at slide number 21 on the

19    invalidity defenses, if the Court permits, and I can understand

20    if the Court views it as purely a legal issue, expert testimony

21    may not be necessary, but let me just suggest, Your Honor,

22    expert testimony is often offered on the issue of claim

23    construction and was, in fact, offered in this case, and that

24    is a purely legal issue.

25             So, in the context of this *Bilski* Section 101

1    argument, you may recall, Your Honor, from the briefing, the

2    Supreme Court didn't give us much guidance, but it did say the

3    machine or transformation test is a clue to whether it's

4    patentable subject matter.

5        I would think it could be some assistance to the

6    Court if a computer scientist could actually tell the Court how

7    the subject matter of those claims is tied to a machine or

8    transformation of matter.  So that would be the only place I

9    would you suggest --

10       THE COURT:  The jury would decide is it tied to a

11   transformation once it is --

12       MR. ROBERTSON:  I don't think that's a fact question

13   that the jury could decide.  In fact, as Your Honor mentioned

14   this morning, you wouldn't have two experts take the witness

15   stand, testify as to claim interpretation, and then put the

16   claim interpretation to the jury.  That would be a purely legal

17   issue for the Court to determine.

18       I think like claim construction, like the

19   construction of a contract, Section 101 of the patent statute

20   would be an issue that the Court should decide.  It might want

21   to hear testimony on it, it might not.  We did offer a

22   declaration of Dr. Weaver indicating that it was patentable

23   subject matter under the Supreme Court's recently articulated

24   reiteration of the Federal Circuit's machine or transformation

25   test.

1          Dr. Weaver is not going to talk about the 102 prior

2     art because Mr. Hilliard has studied all these prior art

3     references going back to the SAP case involved in the re-exams.

4     Dr. Weaver is not going to talk about the 103 because Mr.

5     Hilliard is an expert on that.  Why is that?  Because they are

6     relying largely on these public uses and printed publications,

7     all associated with these systems they claim existed out there.

8          As a person who has 30 years experience in the

9     electronic procurement field, he has studied all those and is

10    very efficient at putting on that testimony.  Now, as to these

11    112 issues, they all relate to the specification, as Your Honor

12    knows.  We had the written description argument this morning.

13    We had the enablement -- putting forward an enablement defense

14    and this indefiniteness defense.

15         All those have to do with what the patent teaches to

16    one of ordinary skill in the art or what it doesn't.  Dr.

17    Weaver, as a computer scientist, because the Court is aware

18    that these are heavily technical issues, is the person best

19    suited under his discipline to address those issues.

20         Now, I would make one observation, Your Honor.  This

21    was known to Lawson's counsel long ago, because Dr. Weaver and

22    Mr. Hilliard both testified in the SAP case, and we produced

23    all of their testimony and all of their depositions, so it came

24    to us as a little bit of a surprise, particularly when we were

25    viewing them as separate disciplines, that suddenly there was

1    some sort of issue with this, but we certainly don't intend to

2    have anybody saying, I agree with Dr. Weaver, or Mr. Niemeyer

3    is going to testify about the claims.  It's not going to

4    happen.

5             In fact, the way this infringement case typically

6    comes in, Your Honor, is we spend about a day, maybe a day and

7    a half, showing the jury the features and functionality of the

8    accused Lawson Software.  And we do that, as I said, through

9    these demos.  Just watch us do these searches and come back

10   with these results and build requisitions, generate the

11   purchase orders.  Takes about a day, day and a half.  Dr.

12   Weaver, using the evidence -- and I know you've seen Dr.

13   Weaver's report, and it looks a little intimidating, but we

14   counted out and there's only --

15            THE COURT REPORTER:  Mr. Robertson --

16            MR. ROBERTSON:  Sorry.  There's only --

17            THE COURT REPORTER:  Judge, I can't keep up with him.

18            MR. ROBERTSON:  I apologize.

19            THE COURT:  Okay, if you don't do something to

20   moderate what's going on, you're going to have to let somebody

21   else talk because I don't have but one court reporter in here

22   at a time, and she's been here a long time anyway.  She's asked

23   you several times, and have I, so you have to slow down.

24            MR. ROBERTSON:  Yes, sir.  I lost my train of

25   thought.  We put on the evidence with the features and

1    functionality, and then Dr. Weaver, in about an hour, hour and

2    a half, can walk through the claims and show, Dr. Weaver, do we

3    see where they can search multiple catalogs; yes.  Do we see

4    where they can build the requisition and the purchase orders.

5    He goes through all that, and we're done with the infringement

6    case.

7         With Hilliard, he's actually responding in rebuttal

8    to the case that they're going to put on.  Now, Mr. Hilliard

9    can get up and show what features and functionality in the

10   alleged prior art or the alleged prior art systems is not

11   available.  He doesn't have to go through every single claim.

12        Your Honor may recall that we've had some issues with

13   Dr. Weaver's health, and, in fact, the deposition was canceled

14   that Ms. Stoll-DeBell had to go down there because the day

15   before, the afternoon of, Dr. Weaver's 86-year-old mother

16   slipped and fell, broke her pelvis and ribs, and he had to go

17   to the hospital.  I immediately called them, and I volunteered

18   to pay their expenses for that trip, but that was unavoidable.

19        Now, Dr. Weaver was not in a position to come to

20   Washington, D.C., for 350 hours, seven times during the

21   academic -- with the academic career he has, and as I say,

22   well, the argument is made he could read source code.  It

23   certainly isn't something he makes a practice out of doing, and

24   he certainly didn't have the time given his medical condition.

25        That's just a reality we were working with, but I'm

1   not going to have any me-too experts.  I'm not going to have

2   any overlap.  I'm not going to have any situation where someone

3   has to go through a claim analysis all over again.

4           We didn't understand discipline to mean legal issue.

5   The legal issues are separate and distinct and apply themselves

6   to a particular expertise or experience, either a computer

7   scientist or somebody who actually has experience in this

8   field.  Now, of course, if we were --

9           THE COURT:  How are you defining field?

10          MR. ROBERTSON:  Well, in the case of Dr. Weaver, he

11  is a Ph.D. with computer science technology background.  Mr.

12  Hilliard is this electronic procurement expert, and Mr.

13  Niemeyer is an expert in reading source code.  He is -- and

14  it's not --

15          THE COURT:  That isn't what you said under Rule 16,

16  though, your identification.

17          MR. ROBERTSON:  You know, we were perhaps a little

18  bit too broad in there, but we did identify them and provide

19  their CVs, and, you know, in addition -- so I think they could

20  have seen all their credentials as to what they had.  It was

21  very early on in the case, Your Honor.  Subsequently --

22          THE COURT:  You think that that's a good argument for

23  you when you are attacking them on other things that happened

24  early on in the case?  I mean, these invalidity contentions are

25  early on in the case.  If that's the rule we're going to

 1    follow, I better revise my ruling as to them.  Come on.

 2              MR. ROBERTSON:  But, it's -- the point about --

 3              THE COURT:  You've tried this case twice, and you

 4    know exactly what you're doing with it.  You could have put

 5    these experts in along with your complaint almost.  Come on.

 6              MR. ROBERTSON:  We identified them early on.  We

 7    identified them in our initial disclosures.  We provided all

 8    their testimony from the prior cases, Your Honor.  I mean, this

 9    is not something that came as a surprise to them.  I'm

10    surprised to hear that later on they were surprised.

11              The fact is, the scheduling order is addressed to,

12    what I understand, Your Honor, the efficiencies at trial in not

13    presenting cumulative evidence, and we have no intention of

14    doing that.  We're going to be as efficient as we can with

15    absolutely no overlap, and I understand the Court is going to

16    hold me to that, and I want the Court to hold me to that, and I

17    can put this case on very efficiently with these experts if I

18    even need to call Mr. Niemeyer.

19              THE COURT:  Okay.

20              MR. ROBERTSON:  But if I am not permitted to call

21    them -- if I can go back to that last slide -- I may not have

22    anybody to rebut Mr. Shamos on written description, enablement,

23    or indefiniteness because Mr. Hilliard --

24              THE COURT:  Good.  Rule 50 will kick right in.  We

25    can shorten things.

1              MR. ROBERTSON:  I would suggest, Judge, that that

2       would just be a manifest injustice to not permit us, when the

3       scheduling order did not make clear that it was per legal

4       issue, and we had, we understood --

5              THE COURT:  It still isn't per legal issue.

6              MR. ROBERTSON:  I'm sorry?

7              THE COURT:  It's still not per legal issue.  You're

8       the one who has divided it into legal issue.

9              MR. ROBERTSON:  No, sir.

10             THE COURT:  Yeah, right here.  101 subject matter,

11      Weaver.  102 prior art, Hilliard.  That's your structure.  The

12      Court didn't do that.  She didn't do it either.  That's the way

13      you've chosen to deal with it.

14             MR. ROBERTSON:  I respectfully disagree, Your Honor.

15      What they characterize the disciplines mean is invalidity and

16      infringement, and we need one invalidity expert and one

17      infringement expert.  So they equate discipline with the legal

18      issue.  We didn't.  We equated it with a particular field of

19      study that a witness --

20             THE COURT:  Field of study, subject matter; field of

21      study, prior art; field of study, written description; field of

22      study, enablement; field of study, indefiniteness.  Is that the

23      field you're talking about?

24             MR. ROBERTSON:  No.  I think those are sub legal

25      issues, but what I'm talking about is field of study, I'm a

 1    computer scientist who can address the issues that are relevant

 2    to a written description because I need to look at the

 3    specification and find the support as we were arguing this

 4    morning.  Field of study, I'm an e-procurement expert, I can

 5    look at these systems and tell you that they don't have the

 6    functionality of the patents, and field of study, I'm a source

 7    code expert, I can read their source code and tell you what it

 8    says.

 9            THE COURT:  All right.  Thank you.

10            MS. STOLL-DeBELL:  I think just a couple of very

11    brief responses to that, Your Honor.

12            THE COURT:  Do you need any time?  Do you want to

13    designate another expert and want a continuance?

14            MS. STOLL-DeBELL:  I don't know.  I would have to --

15    we'd have to think about that.  You know, we've put a lot of

16    time in getting ready for trial, and so I'm not sure I can

17    answer that question right now.  It would certainly mean

18    substantially more costs for our client if trial is delayed,

19    and so that's something that we need to think about.

20            You know, I think our requested relief would be to

21    hold ePlus to the rule in the scheduling order that they knew

22    about.  Mr. Robertson keeps talking about the *SAP* case, but

23    there wasn't that rule in the *SAP* case.  My understanding is

24    they had Dr. Weaver as the infringement expert and Mr. Hilliard

25    as the validity expert in that case.  Now, obviously we weren't

1    part of it.  I wasn't there.

2           THE COURT:  You read the deposition and the

3    testimony, didn't you?  Is that what he testified to?

4           MS. STOLL-DeBELL:  That's my understanding, Your

5    Honor.  As far as Dr. Weaver and his health issues, he

6    testified during his deposition last week that he's had back

7    problems for years and that ePlus knew about his back problems

8    when they hired him as their expert in this case.

9           THE COURT:  What does this have anything to do with?

10          MS. STOLL-DeBELL:  I think they're saying he couldn't

11   review the source code because he has health issues, and my

12   response to that is --

13          THE COURT:  I thought they said he couldn't go up

14   there and go through the source code because of his teaching

15   responsibilities.  They didn't say he couldn't review it

16   because of his back issues.  Maybe I misunderstood.

17          MS. STOLL-DeBELL:  Maybe I misunderstood.

18          THE COURT:  Mr. Robertson, were you saying he

19   couldn't go review the source code because of his teaching

20   responsibilities or because of his back?  Which one of us is

21   right?

22          MR. ROBERTSON:  Well, I spoke to the teaching

23   obligations, Your Honor, but, you know, to be perfectly candid,

24   seven trips back and forth from Charlottesville to D.C. would

25   have been very taxing on Dr. Weaver, and it was a factor --

1          THE COURT:  It's taxing on anybody.

2          MR. ROBERTSON:  I wouldn't hide the fact that it was

3     a consideration in my mind when Mr. Niemeyer, an expert in

4     source code review, became available and was identified early

5     in the case.

6          MS. STOLL-DeBELL:  Your Honor, I think the bottom

7     line here for us, Your Honor, in their own words, they said,

8     all three of these gentlemen have a field of expertise of

9     computer science and engineering, and, you know, that is how I

10    interpret discipline.

11         Now, we have only asked that they be limited to one

12    expert for infringement and one for validity.  That's what we

13    asked for in our motion.

14         THE COURT:  But the experts who have testified

15    haven't testified that way or haven't reported that way, have

16    they?

17         MS. STOLL-DeBELL:  I'm sorry, I don't understand the

18    question.

19         THE COURT:  They haven't made their reports in that

20    fashion as you are suggesting, so he says he'd be left off

21    base.  Let me try it another way.  Mr. Robertson says that

22    because of the situation he would be left without anybody to

23    meet the testimony of Dr. Shamos on issues and perhaps -- and

24    isn't that what he said?

25         MS. STOLL-DeBELL:  Well, I mean, they knew what the

1    rule was, and they divided their expert reports up.  We

2    objected --

3              THE COURT:  I know that.  I got that.  What we have

4    here is what does that word in the order mean, I suppose, and

5    how the parties have dealt with the issues surrounding it and

6    what's the consequence to them and to you of granting the

7    relief or denying it respectively.  That's what I'm trying to

8    sort out.

9              MS. STOLL-DeBELL:  So, I think, you know, he's

10   already said he may not call Mr. Niemeyer.  So I assume if you

11   order them to choose one expert for infringement and one for

12   validity, I assume they'll choose Dr. Weaver for infringement,

13   and they'll put him on the stand and he'll give the opinion he

14   disclosed in his report.  As for validity, they are going --

15             THE COURT:  Did Hilliard give validity opinions that

16   are at issue in the case?

17             MS. STOLL-DeBELL:  Pardon me?

18             THE COURT:  Did he give validity opinions on the

19   issues in the case?

20             MS. STOLL-DeBELL:  Mr. Hilliard?

21             THE COURT:  Yes.

22             MS. STOLL-DeBELL:  Yeah, he did on Sections 102 and

23   103.

24             THE COURT:  Would you look at 21, his slide 21.  He

25   says, if Weaver can't testify on invalidity, he doesn't have

1    anybody on 101 -- 112, description, enablement, and

2    indefiniteness, because Hilliard didn't opine on those issues.

3    Is that a correct assertion, in your view?

4              MS. STOLL-DeBELL:  Yes, I think it is.

5              THE COURT:  So in essence what you are asking me to

6    do is to grant judgment for you because they had their foot off

7    base, i.e., they're going to be at the point where they don't

8    have any testimony, and a Rule 50 motion would have to be

9    granted at the end of the case, and we'd be going through all

10   this for nothing insofar as they're concerned, and so I think I

11   understand.  Is there anything else that you've got to argue?

12             MS. STOLL-DeBELL:  No, I don't think so.

13             THE COURT:  You've made quite a good argument, and

14   it's a forceful one and a right one, but in many respects, I

15   think the Court has got to be mindful of the fact that perhaps

16   it played a role in this situation as well, and when that

17   happens, the Court has to be somewhat more understanding than

18   when the parties are on their own, do something that is

19   prohibited by an order.  So that's kind of what's on my mind,

20   and if you want to address any of that, you can.

21             MS. STOLL-DeBELL:  I just think Lawson didn't do

22   anything wrong here for this particular issue.

23             THE COURT:  You didn't, and I don't think he's argued

24   for one minute that you did anything wrong with respect to what

25   you designated and how you interpreted things.  He did say you

1   should have raised it earlier with me and with them, and

2   perhaps there's some truth to that.

3          MS. STOLL-DeBELL:  So my response to that is, Lawson

4   should not have to suffer for this, and we will suffer unless

5   you grant our motion.  If we have to do a continuance and look

6   at hiring another expert, that's substantially more cost in a

7   case that has cost already a lot of time and money, frankly,

8   Your Honor.

9          THE COURT:  I'm well aware of that one.

10         MS. STOLL-DeBELL:  So, you know, and allowing them to

11   just get by with violating this rule and put on two experts is

12   not fair to Lawson either.  It's very prejudicial.

13         THE COURT:  I understand your point.

14         MS. STOLL-DeBELL:  I would ask that you keep those

15   things in your mind, Your Honor.

16         THE COURT:  I've had them in my mind as I've been

17   reading these things.  I understand where you are and what the

18   situation is.  It's clear from the papers.  I probably could

19   have decided this without argument, but I felt like it was only

20   fair to hear.  Okay, thank you.

21         Well, the scheduling order says only one expert per

22   discipline is permitted except by order of the Court.  In

23   February, or in March, I guess it was -- when was it you made

24   your disclosures, 16(b) that you rely on?

25         MS. STOLL-DeBELL:  October.

1          THE COURT:  October, yes.  October ePlus identifies

2     its experts, describes their fields of expertise, and there's

3     significant overlap in them, very significant overlap.  And

4     then there is identified what the true state of affairs is when

5     the expert reports are filed.  And as it turns out, Mr. Weaver

6     is addressing both infringement and invalidity, and Mr.

7     Niemeyer is addressing a basic subject related to the issue of

8     infringement that is needed by Mr. Weaver in order to formulate

9     his opinions.  Mr. Hilliard is addressing just two components

10    of the aspect of invalidity.

11         Right after that occurred -- when were those reports

12    filed, the infringement report?

13         MS. STOLL-DeBELL:  I believe it was May 5th.

14         THE COURT:  Within a couple of days after that, the

15    defendants complained of the problem to ePlus, and ePlus --

16    neither ePlus nor the defendants then came to the Court and

17    raised it at a point in time when something could have been

18    done about it.

19         Something can be done about it now, and then mindful

20    of the scheduling for motions *in limine*, ePlus thought the best

21    way to deal with it, after they got Lawson's response, was to

22    file a motion *in limine* promptly which they did and acted

23    properly in doing that.

24         The problem that I see here is that the Court has a

25    role in not clarifying what "one per discipline" means, and it

```
 1    is not right for the parties to be saddled with the

 2    consequences of the Court's failure to be precise in its

 3    orders.

 4             Mr. Robertson is correct that the purpose of that

 5    provision is to avoid redundant, cumulative expert testimony

 6    and the situation that is presented when you have three experts

 7    testifying essentially to the same thing and you're trying

 8    to -- and one side is forced then to try to meet the number of

 9    experts that the other side puts on.

10             That was the intent of the provision, and it's the

11    way it's been applied over the years.  So I can't say ePlus's

12    interpretation of the word "discipline" is wrong in perspective

13    of its representations that there will be no overlapping

14    testimony.  I can't say either that the testimony -- that the

15    interpretation of Lawson was wrong in respect of its

16    interpretation of the matter.

17             Under the circumstances, it's important to remember

18    that under Rule 1 of the Federal Rules, it is the purpose of

19    all the rules, federal and local, to achieve a prompt or a

20    speedy, just, and efficient resolution of cases.  So this rule,

21    this order has to be interpreted in respect of the basic

22    concepts of fairness and justice as well.

23             Doing that in this case under the circumstances of

24    this case, so long as there isn't any overlapping testimony,

25    justice can best be served by denying this motion and allowing
```

1    ePlus leave to have either -- I mean Lawson, excuse me, it's

2    been a long day -- to have time to have another expert if it so

3    desires if it feels like it's disadvantaged in the area of

4    source code.  I think that -- I'm sure that your own people,

5    you can probably do that in-house, but if you need to go

6    outside, you can go outside, and you can meet Mr. Hilliard's

7    testimony with another expert if you so desire.

8         I think that in that way -- I regret the Court's

9    failure to define the matter more precisely, and I regret that

10   you all didn't bring this to me when it first came up, because

11   I would have solved it by extending your time for getting

12   experts and giving you some extra leeway had it been brought to

13   me, but I don't think that the result that should obtain here,

14   notwithstanding that you all didn't come to the Court as early

15   as you should have, is to prejudice the outcome of the case by

16   striking experts which will, in effect, mean that one party or

17   the other is left without evidence on a topic thereby

18   resulting, or almost assuredly resulting, in a Rule 50(b)

19   motion that will be based on something that's artificial and

20   not in the interest or the spirit of the enforcement of the

21   rules, nor do I think it's fair to keep Lawson tied to where it

22   is right now.

23         It doesn't have to have any other experts.  I need

24   for you to fish or cut bait very quickly, but you have every

25   right to talk to your client and caucus among yourselves, and I

```
 1    didn't really mean to put you in the position that you had to

 2    answer right today, but you handled it correctly by saying you

 3    had to go talk to somebody, and you're absolutely right.  You

 4    had to.

 5              So that will be the ruling in this motion.  How much

 6    more do we have in the way of motions?  How many, Mr. --

 7              MR. McDONALD:  I think we have two left, Your Honor,

 8    one on the demonstration system and the other on the third

 9    party, the South Jersey customer's deposition, and two

10    demonstrations.

11              THE COURT:  I think we ought to take a little break.

12    I'll tell you, I'm worried Ms. Peterson is going on strike here

13    anyway, so we'll take about a 15-minute recess, and then we'll

14    try to finish these up this afternoon.

15

16              (Recess taken.)

17

18              THE COURT:  Which goes first, ePlus's four or

19    Lawson's nine?  Excuse me, Mr. Robertson.

20              MR. ROBERTSON:  Sorry, Judge.

21              THE COURT:  Which goes first, ePlus's four or

22    Lawson's nine?  They both are demonstrations sort of generally.

23              MS. ALBERT:  I'll address ePlus number four first if

24    the other side doesn't --

25              THE COURT:  Is that okay with you?
```

1          MR. McDONALD:  That's fine.

2          MS. ALBERT:  So, Your Honor, ePlus's motion *in limine*

3     number four addresses these Lawson re-created legacy system

4     demonstrations that are purported to be demonstrations of

5     Lawson system version five and six.  As an overview, on our

6     slide 14, the defendant has conceded that the alleged Lawson

7     legacy systems postdate the prior art date of the patents in

8     suit.

9          Much of the relevant source code for these systems

10    was created after August 1994 as demonstrated by the

11    defendant's own documents.  Virtually all of the hardware,

12    middle ware, and operating system software that was used for

13    these demonstration systems postdates 1994.

14         The witness who --

15         THE COURT:  You all talk about the legacy system.

16    What are you talking about?  Is it V6 and V5?

17         MS. ALBERT:  Correct, Your Honor.  They are

18    represented by Lawson to be version five and version six

19    systems, but it is ePlus's contention that these are not

20    accurate depictions of the Lawson version five and version six

21    systems, because much of the relevant source code for these

22    systems was actually created after the fact.  They postdate --

23         THE COURT:  After the fact of what?

24         MS. ALBERT:  After these systems were represented to

25    have been commercially available.  They are also after the

 1   prior art date of the patents in suit, August 10th of 1994, so

 2   they are not relevant to show any prior art system.  And the

 3   hardware, middle ware, and operating system software that was

 4   used in these re-created demonstrations, virtually all of that

 5   postdates 1994.

 6          The witness who proffered the systems could not

 7   authenticate that the systems were what they are purported to

 8   be by Lawson, so under Rule 901, they should be excluded on

 9   that basis.  And it's ePlus's position that any demonstration

10   of systems would be highly prejudicial because they would be

11   likely to mislead the jury to think that these are actual

12   Lawson version 5.0 and version 6.0 systems when they are not.

13          THE COURT:  Why does 5.0 and 6.0 come into the case

14   at all anyway?

15          MS. ALBERT:  Well, I think under Your Honor's orders

16   on the various motions *in limine*, now the admissibility of

17   evidence related to these systems is limited to that one

18   element of the one claim that relates to the means for

19   searching for matching items in the database.  I think that's

20   claim three of the '683 patent, and that's the only issue for

21   which --

22          THE COURT:  How does this relate to the -- that's an

23   infringement issue, isn't it?

24          MS. ALBERT:  I think it was related to a validity

25   issue in that Dr. Shamos dealt with that issue in his

1    invalidity report, and I think --

2            THE COURT:  Fill me in on that.  Because this system

3    is for prior art; is that what that is?

4            MS. ALBERT:  Well, I believe that they would intend

5    to put this demonstration on at trial in order to establish

6    that the Lawson version 5.0 and version 6.0 systems could

7    perform that element of that claim.

8            THE COURT:  So that's an invalidity issue, because

9    it's prior art; is that what the point is?

10           MS. ALBERT:  That's what Lawson's contention is, the

11   version 5.0 and version 6.0 systems are prior art systems, but

12   these demonstration systems are not prior art systems.  They

13   don't predate the date of the patents because the source code

14   that was used for the systems actually postdates August of '94,

15   and the hardware, the middle ware, and the operating system

16   software postdates 1994.  Can you turn to the next slide,

17   please.

18           Slide 15 illustrates some of the source code file

19   directories that were produced by Lawson relating to the source

20   code that was compiled in order to generate these demonstration

21   systems.  We've highlighted just an excerpt of these -- it was

22   about a hundred-page document of the source code file listings

23   just to show that, you know, Lawson acknowledges that many of

24   the source code files that are included in the source code that

25   was used for these re-created demonstration systems actually

1    postdates August 10th of '94.  So it's not a relevant prior art

2    system because it's not prior art.

3            Can you turn to the next slide, please.  As to the

4    re-created -- what's purported to be a Lawson version 6.0

5    system, once again, the source code file directories that were

6    produced by Lawson illustrate that much of the relevant

7    portions of the source code that was compiled to re-create the

8    system actually postdate August 10th of 1994.

9            So this, again, is not a prior art system, and it

10   shouldn't come into evidence to confuse the jury that this

11   accurately depicts a system that is prior to the date of the

12   patents.

13           The next slide, slide 17, shows the various hardware,

14   operating systems, and middle ware that was used by Lawson in

15   these re-created demonstration systems, and as you can see on

16   this table, virtually all of this postdates August 10th, 1994.

17   And why is that relevant?  Well, contrary to Lawson's

18   contentions that what they did with their demonstration system

19   is akin to showing an old movie on a new projector, that's not

20   the case.  Much of the operating system actually affects the

21   functionality of the system.  The user interface that was used

22   that dated from 2009 actually creates differences in the

23   usability of the system, creates differences in the look and

24   feel of the system.

25           The terminal emulation software that was used in

1    order to replicate what would have been a system that you would

2    have operated at a terminal that would have communicated to a

3    mainframe system.  What Lawson used for that, once again, was

4    something that postdated August 10th, 1994, and adds an

5    entirely new process into a terminal-to-database translation

6    process that would never have existed in 1994 in order to

7    access data in the database.

8           Turn to the next slide, please.  Lawson's 30(b)(6)

9    witness that proffered these demonstration systems had no

10   firsthand knowledge regarding the source code that was used for

11   the system, and he had no direct involvement in the preparation

12   of the systems for the demonstration, so he is not a competent

13   witness to be able to authenticate that these systems

14   accurately depict version 5.0 and version 6.0 systems.

15          And moreover, the defendant has admitted that these

16   are not the actual systems that were in use prior to August of

17   1994 because they include the source code, the operating

18   systems, the middle ware, and the hardware that postdates

19   August of 1994, and, therefore, there's no dispute that these

20   are not authentic or original systems.  These systems were

21   re-created solely for purposes of this litigation.

22          THE COURT:  At your request?

23          MS. ALBERT:  Well, we didn't request that.  We

24   requested to be able to inspect whatever systems they intended

25   to put on at trial once they said that they were relying on

1    their prior art systems for purposes of invalidity.  We didn't

2    request that they create doctored-up systems using post-1994

3    technology.  We requested to inspect the actual systems that

4    were allegedly in use prior to the date of the patents.  That's

5    not what was produced.

6              THE COURT:  All right.

7              MS. ALBERT:  This, again, I think that in Lawson's

8    opposition they asserted that, well, we're not intending to put

9    this system on purely for purposes of invalidity.  We also

10   intend that it go to all these other issues, but I think Your

11   Honor has already dealt with that, so I'm not going to raise

12   that again.

13             I think you've decided that these version 5.0 and

14   version 6.0 systems are not relevant for purposes of trying to

15   establish non-infringing alternatives, willfulness, lack of

16   intent, and those other issues that Lawson raised in its

17   opposition brief, so I'm not intending to go over those again.

18             THE COURT:  Thank you.

19             MS. ALBERT:  ePlus believes that any demonstration of

20   these systems would be highly prejudicial, and the jury will

21   likely believe that they are actual prior art systems that were

22   in public use prior to August of 1994 when they are not.  And

23   this is --

24             THE COURT:  We can deal with that by telling the jury

25   that they haven't.  So if we do that, what value do they have

1    in the case then?  So if I tell the jury, these really aren't

2    the prior art systems, so you can't consider them as prior art,

3    what happens?  Why is that evidence in the case?

4            MS. ALBERT:  Well, that's a good question.  I would

5    think it wouldn't be admissible if it's not -- you know, it's

6    not even relevant because it's not the actual system, so under

7    Rule 402, it shouldn't come in.  Under Rule 403, it shouldn't

8    come in because it's highly prejudicial, it's likely to mislead

9    the jury.

10           Notwithstanding a limiting instruction of the type,

11   you know, I think a picture is worth a thousand words, and if

12   they have in their mind that the system had some purported

13   functionality that's being demonstrated, they still might, you

14   know, make use of that, and that would be highly prejudicial to

15   ePlus because these are not the actual systems.

16           THE COURT:  All right.  Thank you.

17           MS. ALBERT:  Thank you.

18           MR. McDONALD:  Your Honor, I think we need access to

19   the system, put up some slides, please.

20           As I understood the Judge's earlier rulings today on

21   5.0 and 6.0, I think it is a pretty limited thing we're talking

22   about at this point.  Those issues have been resolved in terms

23   of the other uses or nonuse of the version 5.0 and 6.0, but we

24   still have this one specific use that the Court has left open

25   with respect to invalidity, with respect to the searching for

1    matching items system.

2          And this demonstration does relate to that, and so

3    it's still something that's appropriate for presentation.  So

4    what I've got up here on the screen at slide number 73 is the

5    notice of deposition and the inspection request from ePlus.  I

6    think they indicated, you know, they were just asking us what

7    we were going to do at trial.  That's not what this says.

8          It says, you are commanded to permit inspection of a

9    live fully functional version of Lawson Software release 6.0

10   operating on a fully functional computer system.  That's what

11   they asked for, so that's what we did.  We had this old system,

12   dusted it off, and got it loaded up on a fully functional

13   computer system so that they could see the function of it,

14   because that's what they asked for.

15         So that's the genesis of this, and they had a full

16   and fair opportunity to examine our witness on exactly what

17   they asked for.  So this witness, if we go to slide 75, Mr.

18   Hvass was there in the '90s.  As you can see here, he was

19   involved with presentation of this software, the version 5.0,

20   6.0 in the 1991 through '97 period including specifically these

21   procurement purchase order inventory requisition systems.

22         So this is somebody that had personal knowledge, had

23   been with Lawson a long time and actually operated those

24   systems, the software on those systems for customers.

25         And as you see on slide 76, the bottom line is he

1    testified that the functionality that he demonstrated for ePlus

2    at this deposition was the same functionality that the system

3    6.0 had in the 1993 time frame and the 5.0 had in the 1991 time

4    frame.

5              So this is the classic form of authentication where

6    if you drove a 1964 Mustang and somebody shows you a photo of

7    it, is that the car that you drove, you are allowed to say,

8    yes, that photo -- I recognize that as -- it looks like the car

9    I drove in 1964.  Now, did you have to have taken the picture?

10   No, not necessarily.  Does that have to be identical in every

11   respect?  No.  You're trying to show this is the same

12   functionality.  And we should be allowed to do that.

13             They talk about these changes to the software, but

14   they didn't ask about the significance of any of those changes.

15   Many of those changes relate to things like software bug fixes

16   and patches that we all get every week or so from Microsoft

17   when your computer -- you have Outlook or Word, and at night

18   while we're all sleeping you get some little updates, but your

19   functionality doesn't change on the software.  Those changes

20   are insignificant.

21             They've made no showing that any of them actually

22   altered the functionality that's relevant to the claims.  Mr.

23   Hvass testified that the functionality that's of relevance that

24   he actually demonstrated is unchanged and was accurate for what

25   was done back in the '90s.

1          So there's no unfair prejudice here.  They had a

2    chance to inspect it.  If they want to talk about those other

3    software changes, they can, but the fact is that none of them

4    make a difference to the functionality that's relevant to the

5    searching for matching items claim.

6          We've given them the demo, they've had a chance to

7    cross-examine.  It is relevant here because it's a way for the

8    jury to see what the system looked like, just like Mr. Weaver,

9    their infringement expert, has his own demo system of our

10   accused product that he's going to use and show a demo to the

11   jury of how our system works.

12         Is it an actual system installed at a customer?  No.

13   It's a demo system he has where he puts some data on it.  We

14   have a chance to cross-examine him on what he put on there, but

15   the bottom line is that is a useful thing for the jury to hear

16   about.  That should go both ways.  Just as they would like to

17   use a demo to prove infringement, we should be able to do at

18   least what's going to amount to a pretty limited demo given the

19   limited admissibility of this system on its functionality

20   relevant here to the searching for matching items claim.

21         THE COURT:  How do you do that?

22         MR. McDONALD:  Well, it would be through some screen

23   shots.  I don't know that we're actually going to bring the

24   whole system in, but to do some screen shots, and, in fact, in

25   deposition, there were some screen shots demonstrated or

1    developed there.  We might try to keep it a little more
2    streamlined by simply bringing in some screen shots, what is
3    going on in the functionality that's listed when you have those
4    menu of choices on your user screen and, okay, you click there
5    and you came to this next screen, okay, let's take a look at
6    the picture of the next screen.
7           That's kind of what I would envision being the most
8    efficient way to balance the idea of letting people see what's
9    going on here but not taking up too much time in the courtroom
10   with a lot of wires and cables and things like that.
11          THE COURT:  All right.
12          MR. McDONALD:  Thank you.  I would also point out, we
13   did have a case cite that I think is relevant here at page 12
14   of our brief, the *Liquid Dynamics* case where the Federal
15   Circuit had affirmed that there was a model of a product
16   introduced.  The expert admitted it wasn't identical but it was
17   in relevant respects suitable to what the expert's point was to
18   be made, and the Court said, that's fine.  It doesn't have to
19   be identical to the prior product to serve the purpose of a
20   demonstration.  Thank you.
21          MS. ALBERT:  To address a couple points that Mr.
22   McDonald raised, he said that Mr. Hvass testified that this
23   demonstration system had the same functionality as the one that
24   existed prior to August of 1994, but how do we know that when
25   we don't have the actual system that existed prior to August of

1    1994 in order to compare the functionality of the demonstration

2    system that was re-created during the litigation to the system

3    that was actually in use prior to August of 1994?

4         And Mr. Hvass is not competent to testify that the

5    demonstration system is the same as the one used prior to 1994

6    when he doesn't even know how the demonstration system was

7    prepared.  Moreover, under Supreme Court and Federal Circuit

8    precedent, these courts have long admonished against relying

9    upon uncorroborated testimony of interested parties regarding

10   alleged prior art.  We had a number of cases cited in our reply

11   brief at pages four and five.

12        The Supreme Court case that's most famous is called

13   the *Barbed Wire Patent* case, and that related to some barbed

14   wire used for fencing that 20 witnesses, I think, came forward

15   and said, yes, I saw this same barbed wire out in this field,

16   you know, prior to the time of the patent, and the Supreme

17   Court said, no, that evidence cannot be used to corroborate the

18   alleged prior public use because witnesses whose memories are

19   prodded by the eagerness of interested parties to elicit

20   testimony favorable to themselves are not usually to be

21   depended upon for accurate information.

22        They can't rely --

23        THE COURT:  We've sure come a long way since then,

24   haven't we?

25        MS. ALBERT:  Pardon me?

1          THE COURT:  Were the Federal Rules of Evidence even

2     in effect then?  What date was that case?

3          MS. ALBERT:  That was in 1892.

4          THE COURT:  They didn't come in until 1938.

5          MS. ALBERT:  There have been subsequent cases of the

6     Federal Circuit that have followed the ruling in that case.

7     The *Juicy Whip* case, *Finnegan* case, the *Woodland Trust* case

8     that we cited in our brief all, you know, rely upon that prior

9     Supreme Court precedent to keep this kind of uncorroborated

10    witness testimony out.  There needs to be some contemporaneous

11    documentation of the prior public use, and a re-created

12    demonstration system using current technology does not

13    corroborate the functionality of the system that they're saying

14    existed prior to '94.

15         Also, one other point that Mr. McDonald raised was

16    this *Liquid Dynamics* case.  That case is inapposite.  That

17    involved computer-generated models that were relied upon by a

18    plaintiff's expert to evaluate whether the defendant's products

19    infringed the claims, and in that case, the defendant did not,

20    in fact, challenge the reliability of the models that were used

21    by the plaintiff's infringement expert.

22         In fact, the plaintiff's infringement expert's

23    studies were performed using the same software that the

24    defendant used for its own analysis, and the models -- the

25    Court found that the models were generated by an expert using

1    modeling methodology that has been recognized as reliable in

2    the scientific community.

3             This has no application to the issue of whether

4    Lawson should be permitted to introduce at trial demonstrations

5    of re-created artificial software systems and represent them as

6    alleged -- as alleged prior art or similar to alleged prior art

7    since, admittedly, the software and the hardware that was used

8    to create this demonstration system did not exist prior to

9    August of '94 and cannot be prior art.

10            THE COURT:  All right.

11            MS. ALBERT:  Thank you, Your Honor.

12            THE COURT:  Let me hear the argument on the other.

13   Did you have something else?

14            MR. McDONALD:  You are asking if I had one point I'd

15   like to make?

16            THE COURT:  Yes.

17            MR. McDONALD:  I have one point.  With respect to the

18   this lack of corroboration, this is not relevant at all here to

19   the version 6.0 and 5.0.  We've been talking about those

20   systems for a long time.  There really was no documentation to

21   support the fact that they did exist back in the early to mid

22   '90s.  We would have heard about it long before now.

23            The fact is, we produced user manuals and source

24   code.  There's certainly documentation of the functionality

25   that ePlus has had for a long time, so this is an issue that

1    the only evidence of the system is this one person giving this

2    testimony.  That's my only point.

3            THE COURT:  All right.

4            MS. ALBERT:  Nothing further.

5            THE COURT:  I believe that the motion should be

6    granted.  The key to allowing demonstrations of this sort is

7    the reliability, and the fellow doesn't really know how the

8    demo was put together, and so while he thinks it probably

9    matches what was in effect, it does not seem that he can truly

10   testify to that.

11           To the extent that it's relevant, I question whether

12   it's relevant given the date when the -- the date problem,

13   post-1994 problem, but even if it's relevant, its marginal

14   relevance is overcome by the potential to confuse the jury and

15   thereby create prejudice and delay in the case.  That will be

16   the ruling on that.

17           Motion number -- what is it -- nine?

18           MS. STOLL-DeBELL:  Nine.

19           THE COURT:  Neither one of you want these

20   demonstrations in.  Why did you take them?  Why did you go

21   through all that?  You wanted a trip to -- where was it --

22   South Jersey?

23           MS. STOLL-DeBELL:  Well, I didn't go, but, sure,

24   that'd be great.

25           THE COURT:  Only if you went to the shore.

1            MS. STOLL-DeBELL:  So we're on slide 50, Your Honor,

2    of our presentation.  I'll try and make this quick because it's

3    getting late, and I think everybody is a little tired here.

4            ePlus deposed four of Lawson's customers.  One of

5    them was South Jersey Health Care, but there were three other

6    customers that were deposed that demonstrated the Lawson

7    Software that they purchased from Lawson and how it works, and

8    we're only seeking to preclude the South Jersey demonstration.

9            THE COURT:  You're not precluding the other three?

10           MS. STOLL-DeBELL:  We're not seeking -- no.

11           THE COURT:  What's wrong with this one?

12           MS. STOLL-DeBELL:  Well, to start off with, South

13   Jersey, they do have Lawson software, but they don't typically

14   use it to create electronic requisitions.  They do paper

15   requisitions, and they use Lawson software to create electronic

16   purchase orders.  That's their normal practice.  You know, the

17   claims in this case all -- almost all of them require

18   electronic requisitions.

19           The second issue is, you know, there are multiple

20   different accused products in this case, one of which you've

21   heard about is this product called requisition self-service.

22   South Jersey did purchase that software from Lawson, but they

23   haven't actually started using it.  They haven't gone live with

24   it.  They haven't had training on it.  They've got some test

25   data set up, and they're in the process of getting it up and

1  running, although the witness testified that she didn't even

2  know when it was going to go live.

3         So that's another problem with the demonstration, and

4  they asked her to do things and use the software in ways that

5  were, frankly, abnormal.  They were asking her to generate

6  electronic requisitions.  They're asking her --

7         THE COURT:  Which they don't do.

8         MS. STOLL-DeBELL:  They don't do, and she said, as

9  you can see -- actually, we pulled out some clips for you, Your

10 Honor.  On slide 52 that's just two examples.  She is telling

11 them, I'm doing the best I can, but this isn't working.  She's

12 trying to put account numbers in, and the software is not

13 working.  She did her best, but she didn't know what she was

14 doing because that's not what they normally do.  It's just

15 prejudicial to show the jury this demonstration that's

16 artificial and inaccurate.

17        THE COURT:  Let's see what they say about why they

18 want to do it.

19        MS. STOLL-DeBELL:  I think what they say is, look, we

20 want to show what this software is capable of, and capable of

21 doing something is good enough to show infringement.  Well,

22 they are asserting method claims, Your Honor.  They are

23 asserting three method claims, and capability to do something

24 is not good enough to prove infringement of a method claim.

25        They have to prove that someone actually performed

1    all of the steps of that method, and another issue is

2    non-infringing uses of the software.  We will put on evidence

3    that there are ways to use our software that are not

4    infringing, one of which is how South Jersey uses it.

5         THE COURT:  Why isn't it relevant then for them to

6    rebut your contention that it can be used in other ways?

7         MS. STOLL-DeBELL:  Because they have essentially

8    forced South Jersey us to use it in an infringing way or in a

9    way that they say is an infringing.  We would say it's not.

10        THE COURT:  Wait a minute, just a minute.  Let's go

11   back.  They don't get to put it on in their case in chief, but

12   you come on and you say, well, the way South Jersey does it is

13   a non-infringing use.  Why can't they then put on evidence in

14   rebuttal to say, this is -- it can be used another way, i.e.,

15   in an infringing way?

16        MS. STOLL-DeBELL:  Well, first of all, I think they

17   do --

18        THE COURT:  And here's the proof of that.

19        MS. STOLL-DeBELL:  I do think they intend to use it

20   in their case in chief.

21        THE COURT:  They may intend to do it, but I might not

22   let them.

23        MS. STOLL-DeBELL:  They have other evidence of what

24   this software is capable of.  They don't need to use this

25   confusing and inaccurate demonstration.  Like I said, they have

1      three other customers they deposed, and they walked through the

2      software and how it's used with those customers.

3              THE COURT:  So it's cumulative.  You're objecting to

4      this as cumulative and also as confusing, because in this

5      particular case -- because this customer doesn't use it in the

6      way that they wanted to have it demonstrated, it's a

7      bollixed-up operation and gives the wrong impression.

8              MS. STOLL-DeBELL:  Absolutely.  They don't need it.

9      They've got plenty of other evidence to show what the system

10     and what the software is capable of, and so there's just --

11     yeah, it's cumulative, it's prejudicial to Lawson.  There's

12     just no reason to allow this in.

13             THE COURT:  All right.

14             MS. STOLL-DeBELL:  That was quick.

15             THE COURT:  Who is going to do this from your side?

16     Are you going to get applauded for being quick?

17             MR. STRAPP:  I think I'm the final word of the day,

18     so I better be; right?

19             THE COURT:  I didn't say.  She put you to the sword.

20             MR. STRAPP:  Your Honor, I actually was in South

21     Jersey.  I had the privilege and honor of traveling there to

22     take this deposition at South Jersey, and at the deposition I

23     asked, Ms. Cimino, who was the financial services manager of

24     South Jersey, if she would demonstrate for me how South Jersey

25     uses a software system that they purchased from Lawson.

1           Now, mind you, this is not a software system that

2     ePlus modified in any way or that Lawson or South Jersey

3     modified in any way.  It's not a re-created system like the

4     Lawson legacy systems which were demonstrated.  This is an

5     actual operating system that's in use at South Jersey.

6           THE COURT:  But they don't use it the way that you

7     asked them to demonstrate it according to her.

8           MR. STRAPP:  Well, actually --

9           THE COURT:  Is that true or not true?

10          MR. STRAPP:  I think the proof is in the testimony of

11    the witness here.  If you could turn to slide 29, please.

12          Sorry, Your Honor, slide 30.  My apologies.

13          THE COURT:  30?

14          MR. STRAPP:  Yes.  I asked the witness during this

15    demonstration to go through the system that's at South Jersey

16    and asked her whether it was capable of performing the claimed

17    functionality.  I said, for example, "Could you create on the

18    system multiple purchase orders from a single requisition?"

19    That's one of the claim elements.

20          Ms. Cimino testified, "Yes, because the requisition

21    has the various items.  Depending on who the manufacturer or

22    who the vendor for the order is, it gets split up on that

23    purchase order."  Then going on, I also asked her, "Are you

24    familiar with the process of creating a requisition,"

25    electronic requisition.

1          Now, if you'll recall, Lawson's counsel testified

2     South Jersey doesn't do electronic requisition.  Well, Ms.

3     Cimino testified at her deposition that she was somewhat

4     familiar with creating electronic requisitions using the Lawson

5     system, and I said, can you demonstrate that for me, and later

6     on in the testimony she said, yeah, "I could probably walk you

7     through that, yes."  I said, "Okay, and what about through the

8     requisition module?"  She said, "I could probably create a

9     requisition through the requisition module."

10          That was what she testified.  Later on in the

11    demonstration -- I'll have the video here for you -- but she

12    actually did what she said she could do.  She went on the

13    system, the real live Lawson system purchased by South Jersey,

14    she created a requisition.

15          Lawson seeks to keep out this testimony -- Lawson

16    concedes that the other three customers' demonstrations we can

17    provide to the jury.  Now, why is it, you might ask, do they

18    want to take out this one?  What's special about --

19          THE COURT:  Because it's cumulative, she said, and

20    because it is not accurately representative of the usage and,

21    therefore, doesn't reflect the real-life situation, and it

22    contains errors in the way that it was used.  I think I've got

23    it right.  Is that right?

24          MS. STOLL-DeBELL:  Yes, Your Honor.

25          MR. STRAPP:  Let me address the two points, the

 1    cumulative point and the point that it doesn't actually --

 2    isn't usually performed this way.

 3            On the cumulative point, South Jersey has an older

 4    module that it's using right now.  It's called a requisition

 5    module, RQ module.  That's one of the accused infringing

 6    modules.  The other customers that we demonstrated were using a

 7    system called requisition self service.  That is like a

 8    souped-up newer version of the RQ module, and South Jersey is

 9    the only customer who actually was able to demonstrate for us

10    how the RQ module, the older requisition module works.

11            So that's our only evidence that we can provide in

12    terms of a demonstration of how a customer is using a real live

13    RQ module, and that's why it's not cumulative to the other

14    three depositions.

15            Now, with respect --

16            THE COURT:  Because it relates to a different module.

17            MR. STRAPP:  Exactly.  Now, with respect to the

18    contention that this is somehow misleading or this isn't the

19    way that it's typically used, you saw from the testimony Ms.

20    Cimino said, actually, you know, I do do it sometimes, I do

21    create electronic requisitions, and she went ahead and she

22    actually created a requisition, but I think what's important to

23    keep in mind here is the black letter law about capability of

24    infringement.

25            If I could direct Your Honor to, I think it's slide

1    27.  At a conference call earlier in this case, this issue came

2    up, and you said, quote, during the conference call, "I,

3    frankly, don't understand how it is a defense to infringement

4    to say you sold Payne something, but Payne didn't use all of

5    it.  If you sold it to me, that's an infringement, it seems to

6    me."  And Your Honor's statement is in accord with the Federal

7    Circuit law which says, at the top of page 27, "An accused

8    device may be found to infringe if it is reasonably capable of

9    satisfying the claim limitations, even though it may also be

10   capable of non-infringing modes of operation."

11        The bottom of that slide, you'll see the expert

12   report of Lawson's expert who also agrees that capability is

13   the test of literal and direct infringement.  So my point, Your

14   Honor, with respect to South Jersey and the demonstration, is

15   that there's no dispute here that the demonstration showed that

16   the RQ module, this older requisitions module, is capable of

17   creating electronic requisitions.

18        In fact, Ms. Cimino went on the system, it was

19   videotaped, we have the demonstration available, and she

20   created an electronic requisition and performed the claimed

21   functionality.  The only question is whether or not that's

22   usually the way that South Jersey performs it, or it's not

23   usually, but under law --

24        THE COURT:  She's going to testify it isn't the way

25   they usually use it.

```
 1              MR. STRAPP:  Right, and my point is under the Federal

 2     Circuit law, it doesn't matter.  If it's capable of infringing,

 3     it's at least relevant to our claims for infringement.  She

 4     might say, it's not usually used that way.  She might say with

 5     respect to contributory infringement, I want to have a defense

 6     that it's a substantial non-infringing use, and it can be used

 7     in substantial non-infringing -- infringing ways, and she's

 8     obviously permitted to say that.

 9              We, on the other hand, are permitted to offer this

10     evidence to show that because it's capable of being used in

11     infringing ways, even if it can be used in non-infringing ways,

12     that's probative of our -- probative of our infringement claim.

13              One other point, Your Honor.  If you could turn to

14     slide 28.  Let's stop there for a second.  This issue came up

15     in the Ariba and SAP cases, and the Court, in those cases,

16     agreed that the proper way to instruct the jury on this issue

17     about capability of infringement was to let the jury know that

18     the law is that it's not a defense to a claim of infringement

19     if the product is also reasonably capable of being used in a

20     manner that doesn't infringe.  So long as the product is

21     capable of being used in an infringing manner, that is relevant

22     to a claim of infringement.

23              Next slide.  A similar instruction was provided by

24     the Court in the SAP case.  "A product or process accused of

25     infringing a patent infringes if it is reasonably capable of
```

1    satisfying the claim elements, even though it may also be

2    capable of operating in a way that does not infringe."

3           Lawson will surely argue and will put on evidence

4    that this South Jersey system was capable of being used in a

5    way that it claims doesn't infringe.  That doesn't matter.  If

6    it is reasonably capable of infringing, it's relevant to our

7    infringement claim.

8           Ms. Cimino demonstrated as much at her deposition,

9    and, therefore, the demonstration is relevant, it's probative,

10   and the last point is, Your Honor, it's not prejudicial,

11   because unlike the re-created legacy system, this is an actual

12   live Lawson system in use not modified by ePlus in any way that

13   South Jersey has purchased in an arm's-length transaction from

14   Lawson.

15           THE COURT:  Thank you.

16           MS. STOLL-DeBELL:  Let me first address this module

17   issue.  They have got other evidence to show how the RQ module

18   actually works.

19           THE COURT:  What is it?

20           MS. STOLL-DeBELL:  Well, there's multiple different

21   things.  They deposed Lawson.  I think it was three days of

22   deposition of Lawson walking through, Lawson giving them demos.

23   We also produced to them a laptop with the software loaded,

24   both the RQ module and the RSS module.

25           Dr. Weaver had additional data loaded onto that

1   laptop, and he did his own demonstrations of the RQ module by

2   itself without RSS, and he's relying on those demonstrations.

3   He's got screen shots and videos of this demo that he's going

4   to play at trial.  So as far as what the RQ module is capable

5   of, they've got --

6           THE COURT:  In other words, this is not the only

7   evidence they have of what the RQ module is capable of doing;

8   right?

9           MS. STOLL-DeBELL:  Yes.

10          THE COURT:  Okay.

11          MS. STOLL-DeBELL:  Yes, that's right.  Capability,

12  what a system is capable of -- I said this already, I'm going

13  to say it again -- is not relevant to method claims, and it's

14  confusing and prejudicial to put this testimony on when they're

15  trying to prove a method claim.  They're forcing her to perform

16  a step of the method that they don't normally do, and so, you

17  know, I don't take issue with this statement of law that for a

18  system claim, if it's capable of doing it, you know, that might

19  be good enough.  We don't dispute that, but I am talking

20  about --

21          THE COURT:  It doesn't apply as to a method claim.

22  Are they offering it to prove infringement of a method claim?

23          MS. STOLL-DeBELL:  They don't distinguish it.  They

24  just say claims, first of all, but second of all --

25          THE COURT:  If all we had was a method claim, it

1    would not be probative; right?

2              MS. STOLL-DeBELL:  No, it would not.

3              THE COURT:  It couldn't come in because it wouldn't

4    be probative, would be not relevant; right?

5              MS. STOLL-DeBELL:  I think that's right.  And I think

6    already we've got 13 claims in this case, Your Honor, and it's

7    going to be hard enough -- it's hard enough for me to keep them

8    sorted out, let alone have the jury figure out what are

9    methods, what's means plus function, what is this relevant to,

10   what is it not relevant to.  It's just -- it's cumulative, it's

11   not necessary, it's prejudicial, it's confusing, and it should

12   not be allowed in.

13             MR. STRAPP:  Briefly, one more point, Your Honor.

14             THE COURT:  All right.  She can have the last word,

15   but let me tell you something.  You stood there and you told me

16   that it was the only proof you had of how the RQ works, and

17   that was very effective.  She came back and said, not so at

18   all.  Now, one of you all have to be wrong about that.  Who is

19   wrong; you or her?

20             MR. STRAPP:  Let me explain, Your Honor.  I was

21   mentioning in the context of the customer demonstrations, which

22   are the only actual evidence of use by customers --

23             THE COURT:  Then the correct thing to have said is,

24   this is the only customer demonstration we have.  Maybe you did

25   say that and I misunderstood because of the late hour --

1          MR. STRAPP:  This is the only actual evidence we have

2    demonstrating the use of the RQ.

3          THE COURT:  Excuse me.  She said that Dr. Weaver has

4    evidence that he's going to use to demonstrate the use of the

5    RQ.  Now, is he or isn't he?

6          MR. STRAPP:  The system that Dr. Weaver has is a

7    demonstration system, not an actual live RQ system.

8          THE COURT:  You are drawing a distinction not

9    relevant to answer the question that I asked.  It's all right

10   if you want to say, this is the only customer demonstration.

11   Yes, we have Weaver, but Weaver is a put-together operation,

12   and we want the custom one, and the reason we want it is

13   because it shows what actually it's capable of.

14         Now, that's the way to handle that stuff, and I don't

15   want you to fall into the trap that some of these senior people

16   in this case have fallen into by not drawing the fine

17   distinctions that make a difference between making a

18   representation that's accurate and one that's not.

19         MR. STRAPP:  Your Honor, that's the representation I

20   would like to make.

21         THE COURT:  All right, I got it.  Now, how about --

22         MR. STRAPP:  The method claims?

23         THE COURT:  -- method issue.

24         MR. STRAPP:  Yes, Your Honor.  I think Your Honor got

25   to the nub of the issue when you said, if there were only

 1    method claims, maybe that would be a good argument.  Well,

 2    there aren't only method claims.  There are also apparatus

 3    claims.

 4            In other words, because there are apparatus claims,

 5    it seems that Lawson's counsel concedes that at least the fact

 6    that it's capable of infringement at the South Jersey

 7    demonstration, it could be relevant to infringement of those --

 8            THE COURT:  She says it's confusing.  How do we deal

 9    with that?

10            MR. STRAPP:  That it's confusing?

11            THE COURT:  Do we just tell the jury that that

12    evidence is pertinent as to the apparatus claim but not --

13            MR. STRAPP:  I wanted to --

14            THE COURT:  Is that how we --

15            MR. STRAPP:  No.  I also wanted to address the fact

16    that it's relevant to the method claims.  First of all, there's

17    a Federal Circuit -- if you would put up slide 29, please.

18    There's a Federal Circuit case called *Hilgraeve Corporation*

19    which we cite in our papers.  It's 265 F.3d 1336, and that case

20    said that the sale of a device that is capable of

21    non-infringing modes of operation may induce infringement of a

22    method claim.

23            That's the statement of the Federal Circuit.  In

24    other words, even if this -- even if this product is capable of

25    being used in a non-infringing way, it's capable -- it's

1    relevant to infringement of a method claim.

2                THE COURT:  I can deal with that later, can't I?  She

3    doesn't agree that that's the law.

4                MR. STRAPP:  Let me tell you what this Court has said

5    was the law in the *ePlus v. SAP* case when it instructed the

6    jury.  If you turn to slide 29, please.

7                THE COURT:  Is this one of those cases where --

8                MR. STRAPP:  This is a jury instruction that the

9    Eastern District of Virginia issued in the prior case

10   involving --

11               THE COURT:  I know, but you all pick and choose from

12   the *SAP* case.  Is this something you like about it?

13               MR. STRAPP:  Well, if I could just direct you to the

14   first sentence of this jury instruction, it says, "A product or

15   process accused of infringing a patent infringes if it is

16   reasonably capable of satisfying the claim elements."

17               Now "product" here is code word for apparatus.

18   "Process" is code word for method claim.  In other words, if

19   something is reasonably capable of infringing, it's relevant

20   both to your apparatus issue, and it's relevant to your method

21   claims.  We argue here, Your Honor, and it seems the law

22   supports us, the Court has found so in *SAP,* that because South

23   Jersey's system is capable of infringing, it's relevant to both

24   our apparatus claims and our infringement claims on the method

25   claims as well.

1          THE COURT:  When we turn on the videotape of her

2     deposition -- that's what's going to happen; right?

3          MR. STRAPP:  Right.

4          THE COURT:  If you have your way.  Are we going to

5     see Katzenjammer kids -- you don't even know what that is.  Let

6     me start again.  Is this going to be a joke because she

7     doesn't -- the lady doesn't know how to do it and she makes

8     mistakes and everything?

9          MR. STRAPP:  Your Honor, it would not be in our

10    interest to put on a demonstration that's a joke or shows a

11    woman not being able to use the system --

12         THE COURT:  It would be if it's the only thing you've

13    got.

14         MR. STRAPP:  Your Honor, respectfully, I was at that

15    deposition, and I would like to believe that it wasn't a joke,

16    and I think it wasn't.  In fact, I think that's the reason why

17    Lawson is fighting to exclude it, because it's evidence that

18    shows that the RQ product operates as it's supposed to operate

19    in an infringing manner.

20         THE COURT:  All right, you have the last word if you

21    want it.

22         MS. STOLL-DeBELL:  I think I'm done, Your Honor.

23         THE COURT:  Okay, I have to reserve for further study

24    the extent to which this evidence would be admissible on the

25    capability question as to system and apparatus versus method,

```
 1    but at least it is irrelevant as to the method -- I mean as to

 2    the apparatus even in the acknowledgment of the defendant, and

 3    it is -- it is not cumulative evidence, it being the only

 4    actual system that shows the RQ in operation in the hands of

 5    the customer, and the prejudicial aspect, I think, that would

 6    arise from the missteps that the woman made can be cured by

 7    just letting the jury see the videotape and see how it works.

 8    But I'm going to instruct you both to review it carefully, and

 9    if what we've got is a comedy of errors, it's not going to come

10    in because that's wasteful of the jury's time.  So the motion

11    will be provisionally denied.

12            That leaves me with a few things to do; is that

13    right?  We don't have any more motions to argue; is that right?

14            MR. McDONALD:  That's correct, Your Honor.  Your

15    Honor, I wonder if I would have leave because I have a

16    seven o'clock flight.

17            THE COURT:  Hit the road.

18            MR. McDONALD:  Thank you.

19            THE COURT:  You are cutting it close as it is.

20            MR. McDONALD:  I agree.  Thank you, Your Honor.

21            THE COURT:  All right, Mr. McDonald is gone, but

22    we're going to go.  You all have a time to talk with Judge

23    Dohnal?

24            MR. ROBERTSON:  August 19th.

25            MR. CARR:  Correct, Your Honor.
```

1            THE COURT:  August 19th.  Both of you have some

2    problems in the case, folks, problems that warrant a serious

3    look at whether you're going to settle it or not, and I will

4    say -- I wasn't saying this for settlement purposes.  I

5    genuinely believe that your damages case takes a hit for the

6    reasons that I expressed, and I wasn't trying to communicate

7    that for purposes of inviting you all to settle, but whereas

8    here you have liability problems, and you might make sure you

9    communicate this to Mr. McDonald, and you do, I think, have

10   some liability problems, and they have damage problems.

11           That usually provides a reasonably efficacious way in

12   which to try to reach an accommodation that businesspeople can

13   live with.  All right?  Thank you.  We will be in adjournment.

14

15                  (End of proceedings.)

16

17

18           I certify that the foregoing is a correct transcript

19   from the record of proceedings in the above-entitled matter.

20

21

22   _____/s/_____        _____
     P. E. Peterson, RPR                 Date
23

24

25