**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | | |
|---|---|---|
| *e*PLUS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:09-CV-620 (REP) |
| | ) | |
| v. | ) | |
| | ) | |
| LAWSON SOFTWARE, INC., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF *e*PLUS'S OBJECTIONS TO DEFENDANT'S DEPOSITION
DESIGNATIONS AND SUMMARY OF THE DEPOSITION OF KENNETH FARBER
AND COUNTER-DESIGNATIONS**

Plaintiff *e*Plus, Inc. ("*e*Plus"), through counsel, hereby submits the following general and

specific objections to Defendant Lawson Software, Inc.'s ("Defendant's") Deposition

Designations and summary of the deposition of Kenneth Gary Farber and offers the following

counter-designations:

<u>**General Objections**</u>

1.     <u>Outside the Scope</u>.  Mr. Farber was designated by *e*Plus to testify, subject to its

objections, concerning information reasonably available to *e*Plus with respect to Topic Nos. 1-

11, 14-17, 19-21, 22, 24-27, 29-31 and 36 of Defendant's Rule 30(b)(6) Notice, pursuant to

correspondence from *e*Plus's counsel to Defendant's counsel on Nov. 3, 2009 and from *e*Plus's

counsel to Defendant's counsel on May 11, 2010.  To the extent any of the designated testimony

is outside of the scope of these topics, *e*Plus objects to its use as testimony on the company's

behalf.

2.     <u>Best Evidence</u>:  Counsel for Defendant repeatedly asked Mr. Farber to confirm the

contents of particular documents that had been marked as exhibits.  The documents speak for

themselves.  In responding to counsel's questions, Mr. Farber merely confirmed that the

document said what it said.  Defendant must introduce into evidence the underlying documents –

not testimony as to the contents of such documents.  *See* Fed. R. Evid. 1002, 1004 ("To prove the

content of a writing . . . the original writing . . . is required"); *see also* Fed. R. Evid. 1004 ("other

evidence of the contents of a writing is admissible" only if originals are lost, destroyed, not

obtainable or possessed by opponent or are "not closely related to a controlling issue").

<u>**Specific Objections**</u>

<u>**Objections to December 16, 2009 Testimony**</u>

| Defendant's Designations (Dec. 16, 2009) | *e*Plus's Objections | *e*Plus's Objections to Defendant's Deposition Summary |
|---|---|---|
| 5:5-18 | | |
| 30:6-8; 30:11-12 | **30:6-8, 30:11-12 –** 602, 701, Outside Scope | |
| 30:14-23 | **30:14-23 –** 602, 701, Outside Scope | |
| 30:25 – 31:7 | **30:25-31:7 –** 602, V (as to "e-procurement product") | |
| 33:7-14 | | |
| 76:17 – 79:10 | | |
| 81:19 – 82:4 | | |
| 99:14 – 100:4 | | |
| 151:22 – 155:5 | **151:22-152:5 –** V (as to "standardized form of communication") **153:7-10 –** 611 (compound) **153:17-24 –** 602, 701 **154:24-155:1 –** 602 | |
| 162:17 – 163:3 | **162:21-163:3 –** 602 | |

LIBNY/4927184.1

## Objections to December 17, 2009 Testimony

| Defendant's Designations (Dec. 17, 2009) | *e*Plus's Objections | *e*Plus's Objections to Defendant's Deposition Summary |
|---|---|---|
| 412:17 - 413:8 | **412:17-22 –** 602 | |

## Objections to May 18, 2010 Deposition Testimony

| Defendant's Designations (May 18, 2010) | *e*Plus's Objections | *e*Plus's Objections to Defendant's Deposition Summary |
|---|---|---|
| 6:7-8 | | |
| 11:14-19 | | |
| 11:20-23 | | |
| 12:6-7; 12:12-24; 13:1-3; 13:5-20 | | |
| 14:7-25 | | |
| 17:8 – 18:10; 18:22-23 | **17:12-21 –** 1002, 1004 <br> **18:6-23 –** 701, 1002, 1004 | |
| 18:25 – 21:1 | **19:5-11 –** 1002, 1004 <br> **19:16-21 –** 1002, 1004 <br> **20:1-9 –** 1002, 1004 | |
| 21:2-25 | **21:11-14 –** 1002, 1004 | |
| 22:7 – 23:12 | **22:11-17 –** 1002, 1004 <br> **23:7-12 –** 1002, 1004 | |
| 25:15 – 26:23 | | |
| 31:6 – 32:16; 32:19-21 | **31:6-10 –** 701 <br> **32:5-10 –** 402, 611 <br> **32:5-21 –** 402, 701 | **Mischaracterizes Testimony** (As someone not skilled in the art of the patents, Mr. Farber does not understand the patents to describe the actual code written to implement the patented technology on a computer, but he does understand that the patents include a description in the specification.) |
| 33:20 – 34:20 | **34:9-20 –** 1002, 1004 | |
| 34:21 – 36:19 | | |
| 37:17 – 38:11 | **37:17-23 –** 402, 1002, 1004 <br> **37:24-38:11 –** 402, V (as to "fair market value") | **Mischaracterizes Testimony** (Exhibit 58 notes that when ePlus |

| Defendant's Designations (May 18, 2010) | *e*Plus's Objections | *e*Plus's Objections to Defendant's Deposition Summary |
|---|---|---|
| | | acquired the assets of ProcureNet, ePlus gave a fair market valuation to the patents-in-suit of $12,000, but Mr. Farber testified that this amount was actually related to the costs of administrative processing of the patents.) |
| 39:22-25; 40:2-4; 40:6-12 | **39:22-40:4 –** 402, 1002, 1004, V (as to "fair market value") **40:6-12 –** 402, 1002, 1004 | **Mischaracterizes Testimony (**Exhibit 58 states that the $12,000 amount was based on what ePlus considered to be a fair market value at that time.) |
| 48:11 – 49:5 | **48:11-18 –** 402, V (as to "valuation") **49:1-5 –** 402, 701 | **Mischaracterizes Testimony (**To Mr. Farber's knowledge, there is no claim by ePlus that Lawson has copied any software or taken any code from ePlus.) |
| 49:24 – 50:2 | 701, 1002, 1004 | |
| 50:18 – 51:7 | | |
| 51:11 – 54:17 | **51:20-52:3 –** 402, 701 **52:16-53:12 –** 701, 1002, 1004 **53:13-21 –** 701, 1002, 1004 | |
| 56:3-7 | | |
| 58:9-18 | 701, 1002, 1004 | |
| 63:25 – 64:11 | 602, 701, 1002, 1004 | |
| 66:14 – 68:11 | **66:14-22 –** 602, V (as to "valuation") **66:23-68:11 –** 602, 1002, 1004 **68:6-11 –** 602, 611, 1002, 1004, V (as to "valuation") | **Mischaracterizes Testimony (**Mr. Farber is shown Exhibit 60. Mr. Farber's understanding of this exhibit is that the exhibit showed accounting entries, possibly ePlus's initial accounting of assets acquired from ProcureNet. The exhibit lists $12,000 for the |

LIBNY/4927184.1

| Defendant's Designations (May 18, 2010) | *e*Plus's Objections | *e*Plus's Objections to Defendant's Deposition Summary |
|---|---|---|
| | | patents-in-suit.) |
| 68:18-22 | | |
| 69:17-20 | 602 | |
| 70:20-21 | | |
| 73:19 – 74:6 | **73:22-74:6 –** 402, 1002, 1004, V (as to "valuation") | **Mischaracterizes Testimony (**Mr. Farber's understanding of the third page of Exhibit 62 is that it is a calculation of goodwill based on *e*Plus's projections and supports what is shown in Exhibit 58.) |
| 76:19 – 77:3 | | |
| 77:11 – 78:1 | | **Mischaracterizes Testimony (**ProcureNet's 2000 initial public offering application was filed, but no public offering was ever made for ProcureNet.) |
| 78:2 – 79:23 | **78:14-17 –** 1002, 1004 <br> **78:18-79:1 –** 602 <br> **79:8-23 –** 602 | |
| 79:24 – 80:5; 80:21 – 81:8; 81:23 – 82:3 | **81:23-82:3 –** 1002, 1004 | |
| 82:4-10; 82:20 – 85:15 | **82:7-10 –** 1002, 1004 <br> **82:20-23 –** 402, 602 <br> **82:24-85:10 –** 402, 602, 1002, 1004 | |
| 86:15-23 | | |
| 96:23 – 97:1 | | |
| 97:8 -14; 97:19 – 98:11 | **97:11-14 –** 1002, 1004 <br> **97:19-98:2 –** 602, 1002, 1004 | |
| 102:14 – 103:13 | **102:17-25 –** 1002, 1004 <br> **103:1-13 –** 701, 1002, 1004 | |
| 105:19 – 106:6 | 402, 1002, 1004 | |
| 106:07 – 107:3; 108:6-21 | **106:7-107:3 –** 402 <br> **108:16-21 –** 402, 701, 1002, 1004 | |
| 156:19-22; 157:2-4; 157:20-24; 158:1-2; 159:13-18; 161:7-11 | **156:19-22 –** 402, 602, 701, Outside Scope, V (as to "similar") | **Mischaracterizes Testimony (**Mr. Farber's belief is that SAP has |

| Defendant's Designations (May 18, 2010) | *e*Plus's Objections | *e*Plus's Objections to Defendant's Deposition Summary |
|---|---|---|
| | **157:20-158:2 –** 402, 602, 701, Outside Scope<br>**159:13-18 –** 402, 602, 701, Outside Scope, V (as to "similar")<br>**161:7-11 –** 701, 1002, 1004 | continued to sell products similar to the products at issue in *e*Plus's suit against SAP and *e*Plus's license agreement with SAP.  *e*Plus's license agreement with SAP does not require SAP to mark the patent numbers on its products.) |
| 162:19 – 163:7 | **163:5-7 –** 1002, 1004 | |
| 173:18-22 | 402 | |

**_e_Plus's Counter-Designations (December 16, 2009 Testimony)**

| *e*Plus's Counter-Designations (Dec. 16, 2009) |
|---|
| 12:10-15 |
| 16:8-13 |
| 16:17-24 |
| 18:7-14 |
| 31:25-32:11 |
| 34:19-21 |
| 34:25-35:15 |
| 35:20-36:9 |
| 37:2-6 |
| 37:23-38:9 |
| 38:13-25 |
| 39:7-11 |
| 48:16-18 |
| 51:11-17 |
| 52:21-23 |
| 53:24-54:4 |
| 66:22-67:2 |
| 67:9-13 |
| 91:6-13 |
| 98:21-24 |
| 100:15-102:17 |
| 103:2-5 |
| 103:9-104:7 |
| 104:11-105:5 |
| 105:6-13 |
| 105:17-23 |

6

| *e*Plus's Counter-Designations (Dec. 16, 2009) |
|---|
| 112:3-20 |
| 112:25-113:10 |
| 114:3-18 |
| 115:21-25 |
| 116:18-117:5 |
| 130:22-131:11 |
| 132:6-22 |
| 132:25-133:22 |
| 142:5-7 |
| 142:12-143:15 |
| 145:6-18 |
| 169:3-15 |
| 170:17-171:2 |
| 171:24-175:10 |

**_e_Plus's Counter-Designations (December 17, 2009 Testimony)**

| *e*Plus's Counter-Designations (Dec. 17, 2009) |
|---|
| 207:24-208:2 |
| 208:6-12 |
| 208:15-17 |
| 208:25-209:18 |
| 210:1-5 |
| 211:12-17 |
| 272:12-16 |
| 307:8-11, 15-17 |
| 307:19-23 |
| 309:3-4, 7-18 |
| 318:20-25 |
| 398:18-21 |
| 401:19-404:1 |

**_e_Plus's Counter-Designations (May 18, 2010 Testimony)**

| *e*Plus's Counter-Designations (May 18, 2010) |
|---|
| 11:24-12:5 |
| 41:6-24 |
| 42:10-43:17 |
| 51:8-10 |
| 54:18-55:9, 12-22 |
| 56:22-23 |
| 68:23-69:16 |

7

| *e*Plus's Counter-Designations (May 18, 2010) |
|---|
| 77:4-6 |
| 93:11-94:1 |
| 94:10-19 |
| 156: 25 |
| 160:6-18 |
| 160:23-161:5 |
| 162:2-18 |

Dated:  August 9, 2010

Respectfully submitted,

/s/_____
Craig T. Merritt (VSB #20281)
Henry I. Willett, III (VSB #44655)
**CHRISTIAN & BARTON, LLP**
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
Telephone: (804) 697-4100
cmerritt@cblaw.com
hwillett@cblaw.com

Scott L. Robertson (admitted *pro hac vice*)
Jennifer A. Albert (admitted *pro hac vice*)
David M. Young (VSB#35997)
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4000
SRobertson@goodwinprocter.com
JAlbert@goodwinprocter.com
DYoung@goodwinprocter.com

Michael G. Strapp (admitted *pro hac vice*)
James D. Clements (admitted *pro hac vice*)
**GOODWIN PROCTER LLP**
Exchange Place
53 State Street
Boston, MA 02109-2881
Telephone:  (617) 570-1000
MSrapp@goodwinprocter.com
JClements@Goodwinprocter.com

*Attorneys for Plaintiff, ePlus Inc.*

8

## Summary of Counter-Designations for Ken Farber – Day 1

Since 2001, and up until the time the spend analytics category was added, the four product categories in Mr. Farber's division were e-Procurement, content and catalog management, asset management, and document management.  (12:10-15; 16:8-13)  Mr. Farber considers Lawson Software to be *e*Plus's competitor in the procurement and catalog/content management categories.  (16:17-24)  Mr. Farber views Lawson as a top four competitor in both procurement and catalog/content management.  (18:7-14)

Nothing was done in 2004 to investigate whether Lawson's products specifically came within any of the patents-in-suit because *e*Plus had its hands full with other litigation and other investigations it was doing at the time – *e*Plus is a small company with limited resources and financial capability.  (31:25-32:11)  The decision to sue Lawson was made in February/March 2009.  The ultimate decision was made at the board level, and it was based on information that Mr. Farber had supplied to the board concerning competition that *e*Plus was facing in sales situations, which included Lawson, Perfect Commerce, SciQuest, and Verian Technologies.  (34:19-21; 34:25-15; 35:20-36:9; 37:2-6)  With respect to Lawson in particular, *e*Plus had directly competed against Lawson for business from Gannett, Indalex, Novant, Cleveland Clinic, BlueCross/BlueShield of North Carolina, Hanes Brands, Wolters Kluwer, and XM Radio.  (37:23-38:9; 39:13-25; 39:7-11)  *e*Plus considered Lawson a competitor in both 2005, 2006, 2007, and 2008.  (66:22-67:2; 67:9-13; 91:6-13)

SAP, Ariba, Perfect Commerce, and SciQuest are licensees of *e*Plus's patents.  (48:16-18, 51:11-17; 52:21-23; 54:2-4)  Mr. Farber was involved in negotiating all of these licenses.  (53:24-54:1)

At times, *e*Plus cites the patents-in-suit in marketing materials to customers as a differentiator.  *e*Plus also marks its marketing materials with the patent numbers.  (98:21-24)  *e*Plus marks the patent numbers on the splash screens of the procurement and content products a user sees when he enters the system.  (116:18-117:5)

Mr. Farber believes that Lawson was aware of the patents-in-suit before the suit was filed.  The basis of such belief is the very much publicized litigation between Ariba and *e*Plus, which is in almost every trade magazine in *e*Plus's industry.  It also received significant coverage on the web by blogs and analysts.  Mr. Farber thinks that someone would have to have been hiding under a shell to be ignorant of what was going on.  (100:15-102:17; 103:2-20)  Mr. Farber was also aware of publicity of other patent litigation involving electronic commerce patents between Ariba and Emptoris.  (103:22-104:7; 104:11-17)  When Mr. Farber heard about this litigation, he took steps to investigate, which included looking at the patents that were involved in that litigation, and concluded that those patents were not relevant to *e*Plus's business.  (103:18-105:1; 105:6-13; 105:17-23)

*e*Plus has taken steps to monitor whether its licensees mark their products with the patent numbers of the patents-in-suit by having legal counsel involved.  Counsel has sent letters to *e*Plus's licensees concerning their marking obligations, if any.  (112:3-20; 112:25-113:10; 113:3-18; 115:21-25)

In *e*Plus's Catalog+ system, the system uses one physical database with logical catalogs within it.  From the user's standpoint, it is one physical environment.  Within Catalog+, the end-user may restrict his search to particular suppliers or vendors .  Pictures of products are included in the database if the pictures are available from the suppliers.  (130:22-131:11; 131:16-18)

In the Catalog+ and Procure+ products, there is a commodity code structure that can be adopted to categorize products.  The logical catalogs in the database may be populated by the supplier, but whether this happens varies by customer.  If the supplier does not populate the logical catalog, then *e*Plus may populate them.  In the instance where *e*Plus populates the data in the catalog database, *e*Plus provides a service where it identifies the suppliers a customer is using, the customer notifies the supplier to expect *e*Plus's call, and *e*Plus then contacts the supplier to get the necessary data.  *e*Plus sometimes charges for this service.  (130:22-131:11; 131:16-18; 132:6-8, 13-15; 132:16-22; 132:25-133:22)  The catalogs are organized logically within the database as the database contains multiple suppliers and a cross-reference table.  (169:3-15; 170:17-171:2; 171:24-173:1; 173:6-17; 174:14-175:10)  UNSPSC codes may be used to arrange and categorize the data about each item housed in the database.  (170:17-171:2)

*e*Plus provides Procure+ customers with a punchout option.  A punchout option is the ability to go from within the application, and open up a frame whereby the user visits a third-party website using specific credentials to visit that website, and then shops with that supplier, all the while being within the Procure+ application.  (142:5-7; 142:12-143:15)  One punchout site may enable access to more than one supplier catalog through that website.  (145:6-18)

## Summary of Counter-Designations  for Ken Farber – Day 2

*e*Plus and Lawson competed in the procurement space at least eight times from 2008 to 2009, and the companies for whose business they competed are Gannett, Indalex, Novant, Cleveland Clinic, BlueCross/BlueShield of North Carolina, XM Radio, Hanes, and Wolters Kluwer.  (207:24-209:18)  Starting in 2008, competition between *e*Plus and Lawson escalated.  (210:1-5)

Forrester Research is an industry research firm that covers the procurement supply-chain contents space.  (272:12-16)  Aberdeen Group is similar to Forrester Research, in that it is an industry research firm and it is a competitor to Forrester.  (318:20-25)

*e*Plus began marking the numbers of the patents-in-suit on its products starting in October 2003.  (307:8-23)  Around this time, correspondence was sent out to the appropriate groups within *e*Plus to specify how marking language that had been received from *e*Plus's outside attorneys was to be used.  (309:3-18)

Ariba is a licensee of the patents-in-suit.  (398:18-21)  *e*Plus's litigations against Ariba and against SAP for the patents-in-suit received significant press coverage.  These litigations were covered in trade magazines and industry blogs and the companies made public statements about these litigations.  The jury's findings in the Ariba litigation that Ariba infringed the patents-in-suit received much publicity.  Subsequent to the jury verdict, the trade magazines and analysis picked up on the fact that that case had settled.  Based on Mr. Farber's experience, he believed that if someone in the electronic procurement space had not heard of *e*Plus's litigation with Ariba, they were living in a cave or under a rock.  (401:19-404:1)

## Summary of Counter-Designations for Ken Farber – Day 3

*e*Plus did not do a formal valuation of the assets acquired from ProcureNet as part of the acquisition process and reporting of the *e*Plus acquisition of ProcureNet assets to shareholders.  (11:24-12:5; 41:6-24)  *e*Plus did not undertake a third-party analysis of the value of the ProcureNet assets because the *e*Plus principals were primarily concerned with acquiring the software and liabilities of ProcureNet, and only later in the negotiations did *e*Plus become aware of ProcureNet's patents.  *e*Plus's principals checked with counsel to determine how expensive it would be to transfer the patents to *e*Plus, and *e*Plus made a verbal agreement with Fisher and assessed this cost at $12,000 to cover the cost of administration fees, which was bundled within the transfer of assets from ProcureNet to *e*Plus.  (42:10-43:17)

Mr. Farber did not look at exhibit 59 in preparation for his deposition.  (51:8-10)

ProcureNet may have continued, for a very short time after *e*Plus's acquisition, to use the procurement software that it had sold to *e*Plus, but it ceased using the procurement software after it was acquired by another company.  (54:18-55:9, 12-22)

The last time Mr. Farber saw exhibit 57 was in the 2000/2001 timeframe.  (56:22-23)
Mr. Farber did not recognize exhibit 61.  (68:23-24)

*e*Plus's e-commerce business has contributed significantly to *e*Plus's overall growth as a company.  The e-commerce software revenue has pretty much stayed flat as a percentage of *e*Plus's overall revenue since 2001 because *e*Plus has faced a lot of competition in the industry, and *e*Plus has had difficulties competing with the resources that it has.  (93:11-94:1; 94:10-19)

Exhibit 70 is a 2006 patent license and settlement agreement between SAP and *e*Plus for a license to SAP of the patents-in-suit.  (160:6-18; 160:23-161:5)  The primary reason that *e*Plus did not require SAP to mark the patent numbers on its products was because SAP does not mark its products and it would not accept that provision.  *e*Plus decided that it should just settle for $17.5 million.  (162:2-18)

Page 1

```
 1            UNITED STATES DISTRICT COURT
 2            EASTERN DISTRICT OF VIRGINIA
 3                RICHMOND DIVISION
 4    ePLUS, INC.,          )
 5            Plaintiff, )
 6        v.          ) No. 3:09cv620
 7    LAWSON SOFTWARE, INC.,    )
 8            Defendant. )
 9        CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
10            Washington, D.C.
11            Wednesday, December 16, 2009
12    30(b)(6) Videotape Deposition of ePLUS, INC., by and
13    through its designee, KENNETH GARY FARBER, and in his
14    individual capacity, called for examination by
15    counsel for Defendant in the above-entitled matter,
16    the witness being duly sworn by CHERYL A. LORD, a
17    Notary Public in and for the District of Columbia,
18    taken at the offices of TROUTMAN SANDERS LLP, 401 9th
19    Street, Suite 1000, Washington, D.C., at 12:09 p.m.,
20    and the proceedings being taken down by Stenotype by
21    CHERYL A. LORD, RPR, CRR.
22
23
24
25
```

Page 2

```
 1    APPEARANCES:
 2
 3    On behalf of Plaintiff:
 4        SCOTT L. ROBERTSON, ESQUIRE
 5        GOODWIN PROCTER LLP
 6        901 New York Avenue, N.W.
 7        Washington, D.C.  20001
 8        (202) 346-4000
 9
10    On behalf of Defendant:
11        DANIEL W. McDONALD, ESQ.
12        MERCHANT & GOULD
13        80 S. 8th Street, Suite 3200
14        Minneapolis, MN  55402-2215
15        (612) 332-5300
16
17    ALSO PRESENT:
18        Brian Ciccone, videographer
19
20
21
22
23
24
25
```

Page 3

```
 1                C O N T E N T S
 2    WITNESS            EXAMINATION
 3                    PAGE NO.
 4    KENNETH GARY FARBER
 5        By Mr. McDonald        5
 6
 7                E X H I B I T S
 8            (Exhibits attached.)
 9    LAWSON EXHIBIT NO.        PAGE NO.
10    13  Amended Schedule A - Topics for
11        Depositions, Definitions      6
12    14  Transcript of the Deposition of
13        Kenneth Farber, 10-12-04,
14        EPLUS0137093-157        21
15    15  Annual Report, 2009,
16        ePLUS0528737-826        81
17    16  PO Print Formats, ePLUS0070332-38    179
18    17  Manage + Demo Request Form,
19        ePLUS0110605-606        181
20    18  Requirements for an e-Procurement
21        System, July 2002, ePLUS0002709-15    188
22    19  e-Procurement Administration Guide,
23        ePLUS0241541-90        196
24
25
```

Page 4

```
 1                P R O C E E D I N G S
 2
 3        THE VIDEOGRAPHER:  Today is Wednesday,
 4    December 16th, 2009.  The time is approximately 12:09
 5    PM.  We're at the law office of Troutman Sanders LLP
 6    located in Washington, D.C.
 7        This is the commencement of the video
 8    deposition of ePlus Inc. pursuant to rule 30(b)(6) by
 9    their designee, Kenneth G. Farber, and Kenneth G.
10    Farber personally.
11        My name is Brian Ciccone, and I am the
12    video technician.
13        Will the attorneys please note their
14    appearances for voice identification.
15        MR. McDONALD:  For Lawson Software, Dan
16    McDonald, of Merchant & Gould.
17        MR. ROBERTSON:  And for plaintiff, ePlus
18    Inc., Scott Robertson, of Goodwin Procter LLP.
19        THE VIDEOGRAPHER:  Will the court reporter
20    please swear in the witness.
21
22    Whereupon,
23            KENNETH GARY FARBER
24    was called as a witness by counsel for Defendant,
25    and, having been duly sworn by the Notary Public, was
```

Farber, Kenneth, Gary  - 30(b)(6) & Individual  12/16/2009  12:00:00 PM

**5**

1  examined and testified as follows:

2

3      EXAMINATION BY COUNSEL FOR DEFENDANT

4          BY MR. McDONALD:

5      Q.   What is your full name?

6      A.   Kenneth G. Farber.

7      Q.   Where do you live?

8      A.   39 Cabana Drive, Brick, New Jersey.

9      Q.   Where do you work?

10     A.   ePlus Incorporated.

11     Q.   What's your job with ePlus?

12     A.   I am the president of ePlus's systems

13  division.

14     Q.   Do you also have a title with the parent

15  company, ePlus Inc.?

16     A.   Yes.

17         I think informally, it's vice president or

18  executive vice president.

19     Q.   Do you understand that you're here today

20  at least in part to testify on -- as the

21  representative of ePlus Inc. as to certain topics?

22     A.   I am.

23     Q.   Have you reviewed the topics?

24     A.   I have.

25         MR. McDONALD:  Please mark this as exhibit

**6**

1  13.

2          (Lawson Exhibit No. 13

3              was marked for

4              identification.)

5      BY MR. McDONALD:

6      Q.   Mr. Farber, you've been handed what was

7  marked exhibit 13.

8          And you see on the first page, it says,

9  amended schedule A topics for depositions?

10     A.   Yes.

11     Q.   Could you turn to page 6, please, where

12  it's got the heading, topics.

13         Do you have that?

14     A.   Yes.

15     Q.   Is this -- can you review this document?

16         Is this the one that you reviewed to get

17  an understanding of what topics you were going to

18  testify about today?

19     A.   Yes, I believe it is.

20     Q.   All right.

21         MR. McDONALD:  And, Scott, maybe I'll

22  just -- rather than make him try to remember all the

23  categories, I'll tell you:  My understanding is,

24  it's 1 through 11, 14 through 17, 22, and 27 through

25  32.

**7**

1      Is that your understanding as well?

2          MR. ROBERTSON:  Can you do --

3          MR. McDONALD:  Sure.

4          MR. ROBERTSON:  -- I'm sorry -- a little

5  slower for me.  I've got stuff highlighted in here.

6  1 through 11 I've got.

7          MR. McDONALD:  14, 15, 16, and 17.

8          MR. ROBERTSON:  I also had 12 and 13.

9          MR. McDONALD:  Okay.

10         MR. ROBERTSON:  And then 14, 15, 16, 17,

11  I've got that.

12         MR. McDONALD:  And then the next one I

13  have is 22 after 17.

14         MR. ROBERTSON:  I also had 18.

15         MR. McDONALD:  Okay.  And then the next

16  one after 22 I have is 27.

17         MR. ROBERTSON:  I do not have 27.  I have

18  37 --

19         MR. McDONALD:  We don't have a 37.  I've

20  got 27 through 32 as the rest of them.

21         MR. ROBERTSON:  I've got a 37 here on page

22  11.

23         MR. McDONALD:  Okay.  Well, do you have

24  any of categories 27 through 32?

25         MR. ROBERTSON:  No.

**8**

1      I just have 30 and 37.  And if you'd like,

2  let me just hand this to you, Dan.

3          I've got a letter that Jennifer Albert

4  sent to Will Schultz on November 3 identifying the

5  topics.  I don't know if you want to mark it or not,

6  and during a break, I can look at those additional

7  topics and see if we can designate Mr. Farber.

8          But I don't -- you know, the ones that are

9  on this November 3 letter that we sent you were the

10  ones that he was -- he's been either knowledgeable or

11  prepared to testify as to.

12         MR. McDONALD:  Yeah.

13         I've got -- can we go off the record for a

14  moment?

15         THE VIDEOGRAPHER:  Yeah.

16         The time is approximately 12:14 PM.  We

17  are going off the video record.  Off the record.

18         (Discussion off the record.)

19         THE VIDEOGRAPHER:  The time is

20  approximately 12:20 PM.  We are back on the video

21  record.

22         BY MR. McDONALD:

23     Q.   Mr. Farber, as you know, during the break,

24  Mr. Robertson and I kind of worked through the topics

25  here.  And rather than list them all, we're just

Farber, Kenneth, Gary  - 30(b)(6) & Individual  12/16/2009  12:00:00 PM

<table>
<tr><td colspan="2">9</td></tr>
<tr><td>1</td><td>going to take one at a time.</td></tr>
<tr><td>2</td><td>All right?</td></tr>
<tr><td>3</td><td>A.  Okay.</td></tr>
<tr><td>4</td><td>Q.  So if we just take it from the top here</td></tr>
<tr><td>5</td><td>with topic number 1 on page 6 of exhibit 13, we'll</td></tr>
<tr><td>6</td><td>give you a chance to read that.  I'm not going to</td></tr>
<tr><td>7</td><td>read it out loud.</td></tr>
<tr><td>8</td><td>And why don't you also read number 2,</td></tr>
<tr><td>9</td><td>because I think they both relate to competition.</td></tr>
<tr><td>10</td><td>A.  Okay.</td></tr>
<tr><td>11</td><td>Q.  Is it your understanding that you're here</td></tr>
<tr><td>12</td><td>today as ePlus Inc.'s representative to talk about</td></tr>
<tr><td>13</td><td>categories 1 and 2?</td></tr>
<tr><td>14</td><td>A.  Yes, it is.</td></tr>
<tr><td>15</td><td>Q.  All right.  What did you do to gather up</td></tr>
<tr><td>16</td><td>the information available to ePlus Inc. that relates</td></tr>
<tr><td>17</td><td>to these competition-related topics 1 and 2?</td></tr>
<tr><td>18</td><td>A.  Well, I spoke to some folks within ePlus.</td></tr>
<tr><td>19</td><td>I referenced materials that may have been available</td></tr>
<tr><td>20</td><td>to me.  I sat and I met with counsel.</td></tr>
<tr><td>21</td><td>Q.  Did you talk to some people from ePlus</td></tr>
<tr><td>22</td><td>that were not counsel relating to the competition --</td></tr>
<tr><td>23</td><td>A.  Yes.</td></tr>
<tr><td>24</td><td>Q.  -- involving Lawson?</td></tr>
<tr><td>25</td><td>Who did you talk to about competition?</td></tr>
</table>

<table>
<tr><td colspan="2">11</td></tr>
<tr><td>1</td><td>Q.  What's your current involvement?</td></tr>
<tr><td>2</td><td>A.  President of the ePlus systems group.</td></tr>
<tr><td>3</td><td>Q.  Do you participate in sales calls?</td></tr>
<tr><td>4</td><td>A.  At times?</td></tr>
<tr><td>5</td><td>Q.  Do you talk to the salespeople about how</td></tr>
<tr><td>6</td><td>to make sales presentations or conduct sales efforts?</td></tr>
<tr><td>7</td><td>A.  I'm involved, yes.</td></tr>
<tr><td>8</td><td>Q.  For how many years have you been involved</td></tr>
<tr><td>9</td><td>in sales at ePlus?</td></tr>
<tr><td>10</td><td>A.  Roughly a little over -- about 9 years, I</td></tr>
<tr><td>11</td><td>would say.</td></tr>
<tr><td>12</td><td>Q.  Have you at least from time to time gone</td></tr>
<tr><td>13</td><td>on sales calls on behalf of ePlus throughout those 9</td></tr>
<tr><td>14</td><td>years?</td></tr>
<tr><td>15</td><td>A.  Yes.</td></tr>
<tr><td>16</td><td>Q.  Do you consider it part of your job to</td></tr>
<tr><td>17</td><td>know who ePlus's competition is?</td></tr>
<tr><td>18</td><td>A.  That's one of the aspects to determine who</td></tr>
<tr><td>19</td><td>we're competing with.</td></tr>
<tr><td>20</td><td>Q.  Is that important information for you so</td></tr>
<tr><td>21</td><td>that ePlus can put together a better sales or</td></tr>
<tr><td>22</td><td>marketing pitch of its own?</td></tr>
<tr><td>23</td><td>A.  Yeah, at times, certainly.</td></tr>
<tr><td>24</td><td>THE VIDEOGRAPHER:  Dan, can we go off the</td></tr>
<tr><td>25</td><td>record?</td></tr>
</table>

<table>
<tr><td colspan="2">10</td></tr>
<tr><td>1</td><td>A.  I spoke to one of my sales executives, an</td></tr>
<tr><td>2</td><td>individual in marketing, and a product analyst.</td></tr>
<tr><td>3</td><td>Q.  Who is the sales executive?</td></tr>
<tr><td>4</td><td>A.  Will Thomas.</td></tr>
<tr><td>5</td><td>Q.  Which office is he in?</td></tr>
<tr><td>6</td><td>A.  Dallas, Texas.</td></tr>
<tr><td>7</td><td>Q.  Who did you talk to in marketing?</td></tr>
<tr><td>8</td><td>A.  Jeff Pinkerton.</td></tr>
<tr><td>9</td><td>Q.  Which office is he in?</td></tr>
<tr><td>10</td><td>A.  Canton, Massachusetts.</td></tr>
<tr><td>11</td><td>Q.  And which product analyst did you talk to?</td></tr>
<tr><td>12</td><td>A.  Robert Pelletier.</td></tr>
<tr><td>13</td><td>Q.  What office is he located at?</td></tr>
<tr><td>14</td><td>A.  Avon, Connecticut.</td></tr>
<tr><td>15</td><td>Q.  How did you pick these 3 people to talk to</td></tr>
<tr><td>16</td><td>about competition?</td></tr>
<tr><td>17</td><td>A.  Well, each of them have a function that I</td></tr>
<tr><td>18</td><td>thought would be knowledgeable about who we compete</td></tr>
<tr><td>19</td><td>with in certain circumstances.</td></tr>
<tr><td>20</td><td>Q.  Have you personally been involved in sales</td></tr>
<tr><td>21</td><td>efforts at ePlus Inc.?</td></tr>
<tr><td>22</td><td>A.  I have historically, yes.</td></tr>
<tr><td>23</td><td>Q.  Are you currently involved in sales</td></tr>
<tr><td>24</td><td>efforts?</td></tr>
<tr><td>25</td><td>A.  Yes.</td></tr>
</table>

<table>
<tr><td colspan="2">12</td></tr>
<tr><td>1</td><td>MR. McDONALD:  Off the record.</td></tr>
<tr><td>2</td><td>THE VIDEOGRAPHER:  The time is</td></tr>
<tr><td>3</td><td>approximately 12:23 PM.  We're going off the video</td></tr>
<tr><td>4</td><td>record.</td></tr>
<tr><td>5</td><td>(Discussion off the record.)</td></tr>
<tr><td>6</td><td>THE VIDEOGRAPHER:  The time is</td></tr>
<tr><td>7</td><td>approximately 12:25 PM.  We are back on the video</td></tr>
<tr><td>8</td><td>record.</td></tr>
<tr><td>9</td><td>BY MR. McDONALD:</td></tr>
<tr><td>10</td><td>Q.  Mr. Farber, what product lines of ePlus</td></tr>
<tr><td>11</td><td>are current lines that you're responsible for?</td></tr>
<tr><td>12</td><td>A.  Electronic procurement, content, catalog</td></tr>
<tr><td>13</td><td>management, asset management, spend analytics or</td></tr>
<tr><td>14</td><td>business intelligence application, and our document</td></tr>
<tr><td>15</td><td>management system.</td></tr>
<tr><td>16</td><td>Q.  So are those considered as 5 discrete</td></tr>
<tr><td>17</td><td>product areas that you're responsible for?</td></tr>
<tr><td>18</td><td>A.  Well, they're not -- I wouldn't call them</td></tr>
<tr><td>19</td><td>necessarily discrete.  They're --</td></tr>
<tr><td>20</td><td>Q.  Well, what are they?</td></tr>
<tr><td>21</td><td>A.  -- product line -- well, they're</td></tr>
<tr><td>22</td><td>individual products and products that also work</td></tr>
<tr><td>23</td><td>together.</td></tr>
<tr><td>24</td><td>Q.  Is there a reason why they're in 5</td></tr>
<tr><td>25</td><td>different categories?</td></tr>
</table>

Farber, Kenneth, Gary  - 30(b)(6) & Individual  12/16/2009  12:00:00 PM

13

1    A.   Well, there's -- there's -- document
2    management is a separate type of a sale that's not
3    necessarily one that is enjoined with electronic
4    procurement.
5        Q.   Okay.  That's one of the 5.
6        But -- so is that consistent with the
7    other 5 as well, that they are products that you can
8    sell separately?
9        A.   They are products that we can sell
10   separately.
11       Q.   And from time to time, do you sell various
12   combinations of those 5 together to a given client as
13   well?
14       A.   Yes.
15       Q.   Do you have employees that have
16   responsibilities dedicated to individual ones of
17   those 5 categories?
18       A.   Some are dedicated, yes.
19       Q.   For example, with document management
20   systems, do you have some people dedicated just to
21   that?
22       A.   Yes.
23       Q.   Do you have some people dedicated just to
24   e-procurement?
25       A.   Yes.

14

1        Q.   Do you have some people dedicated just to
2    content and catalog management?
3        A.   Yes.
4        Q.   And did I understand right that content
5    and catalog management, that's one of the 5
6    categories?
7        A.   One of the 5 categories.
8        Q.   Do you have some employees dedicated to
9    asset management?
10       A.   Yes.
11       Q.   Do you have some employees dedicated to
12   spend analytics?
13       A.   Yes.
14       Q.   How long has your division operated within
15   that 5-category structure?
16       A.   Well, it -- it varies by -- by product
17   line.
18       Q.   I'm just talking about that structure of
19   5.  I mean, if you have 4 or 6, then you don't have 5
20   anymore, so I just want to stick -- how long have you
21   had these 5 categories?
22       A.   All 5 categories?
23       Again, it varies by -- by application, so
24   that we're 5 categories for -- you know, analytics as
25   an example was offered I think within the last 2

15

1    years.
2        Q.   Okay.  So have you had 5 categories for
3    about 2 years now?
4        A.   If you want to consider all 5 of those
5    categories together, yes.
6        Q.   Well, whether they're together or not, I
7    mean, have you had a structure within your division
8    at ePlus that has had these 5 categories that you
9    listed for about 2 years now?
10       A.   Yeah.
11       I think I answered the question.
12       Q.   Okay.  Well, prior to the time you had
13   these 5 categories, how many categories did you have
14   immediately prior?
15       A.   4.
16       Q.   Did you have all of the ones you listed
17   except for spend analytics?
18       A.   Yes.
19       Q.   Was spend analytics added in about 2007?
20       A.   Yeah, latter part of 2006, early 2007, I
21   believe that's correct.
22       Q.   All right.  So maybe closer to about 3
23   years, then, that you got the 5?
24       A.   Perhaps.  I'd have to check, but --
25       Q.   How long did you have the 4 categories

16

1    other than spend analytics?
2        A.   That's been in place since I joined ePlus.
3        Q.   Was that 9 years ago?
4        A.   Yes.
5        Q.   Okay.  So 2000, is that when you started?
6        A.   It was actually 2001.  We're coming up on
7    9 years.
8        Q.   So since 2001 up until the time spend
9    analytics was added, the 4 product categories in your
10   division were e-procurement, 1, content and catalog
11   management, 2, asset management, 3, and document
12   management systems, 4; is that right?
13       A.   Correct.
14       Q.   Does your division at ePlus use those 4
15   categories for purposes of sales and marketing?
16       A.   Yes.
17       Q.   Within the 5 categories that you've
18   listed, do you consider Lawson Software to be a
19   competitor in any of those?
20       A.   Yes.
21       Q.   Which one or ones of the 5 do you consider
22   them to compete with ePlus in?
23       A.   What I have knowledge about would be
24   procurement and catalog and content management.
25       Q.   Does Lawson compete with ePlus in asset

Farber, Kenneth, Gary  - 30(b)(6) & Individual  12/16/2009  12:00:00 PM

17

1    management?
2        A.  I don't know.  I haven't -- I don't have
3    familiarity of Lawson in that category.
4        Q.  Does Lawson compete with ePlus in spend
5    analytics?
6        A.  Again, they may, but none that I've been
7    aware of in a competitive situation.
8        Q.  Does Lawson compete with ePlus in document
9    management systems?
10       A.  Same answer.
11       Q.  Who would you consider to be your top 4
12   competitors in the procurement area today?
13       A.  Well, that really depends how -- how one
14   would quantify a top competitor.  It really does
15   vary.
16           Certainly, you know, I categorize them in
17   certain buckets.
18       Q.  Buckets according to how significant a
19   competitor they are?
20       A.  Yeah, and how -- you know, there's waves
21   in terms of how companies concentrate on their -- on
22   their portfolio and how many -- how much marketing
23   they're doing in a specific area, how many
24   salespeople they may have, how often we're seeing
25   them in a particular area.

18

1        Q.  When you say, waves, do you mean there are
2    various time frames when certain competitors are more
3    visible than others?
4        A.  Yes.
5        Q.  So if we take 2009 --
6        A.  M-hm.
7        Q.  -- who would you view as ePlus's top 4
8    competitors in procurement?
9        A.  Well, I'd say Lawson, SciQuest, SAP,
10   Perfect Commerce.
11       Q.  Who do you view as your top 4 competitors
12   in the catalog and content management area?
13       A.  I'd have to go with the same -- the same
14   list of vendors previously mentioned.
15       Q.  If we go back about 5 years to late 2004,
16   who were your top 4 competitors in the procurement
17   area?
18       A.  2004, Ariba, SAP, Perfect Commerce, and
19   the fourth category would probably of a host of --
20   let me see -- maybe somebody like a Ketera.
21       Q.  Is that K-E-T-E-R-A?
22       A.  That's correct.
23       Q.  Was Oracle one of your top 4 competitors
24   in 2004?
25       A.  Oracle was a competitor.  I don't know

19

1    that I'd classify them at that period as a top
2    competitor.
3        Q.  Was PeopleSoft one of your biggest
4    competitors in late '04?
5        A.  Again, they were one of the competitors in
6    the market.
7        Q.  Were they one of the top competitors in
8    the market or not?
9        A.  Well, I didn't label them as a top
10   competitor at that time frame that I can recall.
11       Q.  Right.
12           I'm just throwing out that name.
13       A.  Yeah.
14       Q.  You wouldn't add them to the list of top
15   competitors.
16           You're just saying they're basically kind
17   of below that top tier?
18       A.  Yeah.
19           Well, they were acquired by Oracle,
20   PeopleSoft, if that's who you're referring to.  I
21   don't recall what the year was, but there are --
22   there are a lot of procurement vendors that have come
23   and gone in the market.
24           I think I answered the question in that
25   period of time, I thought, from my recollection who

20

1    were the top.
2        Q.  Who acquired PeopleSoft?
3        A.  I believe it was Oracle.
4        Q.  Is Oracle, slash, PeopleSoft still a
5    competitor in the procurement area?
6        A.  They provide procurement and catalog and
7    content management applications.  We see them on
8    occasion.
9        Q.  Did you see them less often in 2009 than
10   you did in 2004?
11       A.  I don't know if I have the data to support
12   that, as I answered for you.
13       Q.  Well, do you recall giving some testimony
14   about the market for procurement products back in
15   2004?
16       A.  Today or earlier?
17       Q.  As you sit here today do you recall
18   doing -- giving some testimony back in 2004?
19       A.  I may have.  I don't recall the exact
20   testimony.
21       Q.  Okay.  Well, I can put the transcript in
22   front of -- let's just go ahead and do that.
23       A.  M-hm.
24           MR. McDONALD:  Please mark that exhibit
25   14.

Farber, Kenneth, Gary  - 30(b)(6) & Individual  12/16/2009  12:00:00 PM

21

1          (Lawson Exhibit No. 14
2      was marked for
3          identification.)
4      BY MR. McDONALD:
5      Q.   Do you have exhibit 14 before you,
6  Mr. Farber?
7      A.   I do.
8      Q.   I'll just represent to you that that is a
9  copy of your deposition dated October 12, 2004.
10      All right?
11      A.   Okay.
12      Q.   Could you turn to pages 213 and 214 of the
13  transcript, which are the little numbers where there
14  are 4 to a page.
15      A.   213 and 214?
16      Q.   Yes.
17      A.   Okay.
18      Q.   Now, you see at the very bottom of page
19  213, there's an answer that you gave actually I think
20  clarifying a question where you said, who are my 5
21  biggest competitors, question mark.
22      Do you see that?
23      A.   No.
24      I'm actually --
25      Q.   Bottom of page 213.

22

1      A.   Okay.  Yes.
2      Q.   And then can you go to the top of page 214
3  now.
4      A.   Yes.
5      Q.   You see the questioner said, m-hm, I guess
6  affirming that that's what he wants to know.
7      A.   Yes.
8      Q.   And then your answer was, quote:  I would
9  say you'd have Ariba, you'd have SAP, Oracle,
10  PeopleSoft, and, you know, maybe the fifth one is a
11  combination of people that come in and out based on
12  how much funding they have for that day, you know, so
13  it could be a variety of vendors that, you know,
14  nobody consistent beyond that, quote.
15      Do you see that?
16      A.   Yes, I do.
17      Q.   Does seeing that testimony -- you tried to
18  be accurate at the time you gave it.
19      Right?
20      A.   I certainly believe so.
21      Q.   Right.
22      And you believe this to be a true and
23  accurate statement at the time it was made.
24      Right?
25      A.   I would have to believe so, yes.

23

1      Q.   Does seeing this answer that you gave back
2  there -- does that refresh your recollection at all
3  as to whether or not specifically Oracle and
4  PeopleSoft would have been among the top 4
5  competitors of ePlus in 2004?
6      A.   It doesn't refresh any new recollection,
7  no, it doesn't.
8      Q.   Okay.  Would you have any reason to
9  dispute your answer that you gave in 2004 that the
10  top 4 competitors of ePlus at that time were Ariba,
11  SAP, Oracle, and PeopleSoft?
12      A.   No.
13      Q.   Now, you did not list Lawson in 2004 as
14  one of your biggest competitors.
15      Right?
16      A.   That's correct.
17      Q.   And as you sit here today, you would agree
18  that in 2004, Lawson was not one of ePlus's biggest
19  competitors in the e-procurement area.
20      Right?
21      A.   One of the biggest competitors --
22      Q.   Yes, one of the --
23      A.   -- of the top 4?
24      Perhaps not.
25      Q.   Well, you say, perhaps.  I just want to

24

1  get a clear answer.
2      I mean, would you agree that as you sit
3  here today based on what you know today that in 2004
4  Lawson was not one of the top 4 or 5 ePlus
5  competitors in the procurement area?
6      A.   Of the top 4 that are listed according to
7  the statements, yes.
8      Q.   Is it also true that in 2004, Lawson was
9  not one of ePlus's top 4 competitors in the catalog
10  and content management area?
11      A.   Based on the same criteria, yes.
12      Q.   In 2004, did you consider Lawson a
13  competitor in the procurement area?
14      A.   They may have been.
15      Q.   In 2004, you made it part of your job to
16  know about who the competition was in procurement.
17      Right?
18      A.   Sure.
19      Q.   As part of those efforts to determine who
20  the competition was in procurement, did you identify
21  Lawson as a competitor or not?
22      A.   Well, back in 2004, they were probably
23  part of the landscape of competitors.
24      Q.   Would they fall into this category that
25  you talked about in -- at page 214 where you said --

25

1  the fifth -- and I'll supply the words biggest
2  competitor -- is a combination of people that come in
3  and out based on how much funding they have for that
4  day, you know, so it could be a variety of vendors
5  that, you know, nobody consistent beyond that?
6      Is that where you place Lawson in 2004?
7  A.  Not necessarily.
8  Q.  Where would you place Lawson in 2004 if
9  they're not in the top 4 and they're not in that
10  fifth group?
11  A.  I would -- I would have to say you have
12  your top 4 and then you have many others that -- that
13  trail and follow with very slim differences in who
14  you might consider a competitor and who you may be
15  seeing more frequently than -- than others.
16  Q.  So would you put Lawson in that other
17  category in 2004 or not?
18  A.  I'd put them as a competitor in 2004.
19  Q.  A competitor that's in a different bucket
20  from the top 4 that you listed here, though.
21      Is that fair?
22  A.  Yes.
23  Q.  In 2004, did you perceive that Lawson was
24  more or less competitive in certain niches such as
25  types of industries that the customer was in or

26

1  geographic areas or anything like that?
2  A.  I can't say for certain that I -- that I
3  had a -- data to support niches or vertical marketing
4  at that -- at that period of time.
5  Q.  You had some knowledge of Lawson in the
6  procurement marketplace, though, in 2004; is that
7  right?
8  A.  Yes.
9  Q.  What did you know about Lawson in the
10  procurement market in 2004?
11  A.  I knew that Lawson was in the procurement
12  market space, and I knew that they had other
13  applications that competed with traditional ERP
14  systems.
15      THE COURT REPORTER:  "Traditionally
16  linear?"
17      THE WITNESS:  ERP.
18      MR. McDONALD:  ERP.
19      BY MR. McDONALD:
20  Q.  Given our court reporter's reaction here,
21  maybe we should get on the record:  What does ERP
22  stand for?
23  A.  It's an electronic resource planning, I
24  believe is the acronym's definition.
25  Q.  Is that some sort of a business computer

27

1  system that would be sold to customers?
2  A.  Yes.
3  Q.  Would you consider ePlus's product line in
4  2004 to be ERP systems or not?
5  A.  It's an element of what's defined in the
6  ERP space.
7  Q.  So procurement would be considered an
8  element of ERP?
9  A.  One of the disciplines.
10  Q.  Can you give me a couple other examples of
11  disciplines in the ERP space?
12  A.  Inventory, demand forecasting.
13  Q.  "Inventory" would be inventory control?
14  A.  Inventory control and management and
15  demand forecasting of inventory.
16  Q.  Was it your understanding that in 2004,
17  Lawson had a procurement product?
18  A.  Yes.
19  Q.  This was a computerized procurement system
20  product?
21  A.  I don't know what your definition is of
22  computerized, but it was considered to be at the time
23  my recollection is of an electronic procurement
24  system.
25  Q.  Help me understand, when you say,

28

1  electronic procurement system, how would you define
2  that?
3  A.  My personal definition of an electronic
4  procurement system is one that is -- facilitates the
5  purchasing -- the life cycle of purchasing through
6  computer network of systems.
7  Q.  Is it your understanding that the patents
8  involved in the lawsuit with Lawson are involved with
9  electronic procurement systems?
10  A.  I believe they are to the best of my
11  knowledge.
12  Q.  When was the last time you looked at the
13  patents?
14  A.  Last time I probably looked at the patents
15  in detail was at the last trial.
16  Q.  When was the last time you looked at the
17  patents whether it was in detail or not?
18  A.  I probab-- let's see, at the -- the
19  trial I think was in 2005 or 6, and I've probably
20  looked at them as a refresher over the last several
21  months.
22  Q.  How many times in 2009 have you looked at
23  the patents involved in the lawsuit with Lawson?
24  A.  Perhaps once.
25  Q.  And you have some prior familiarity with

Farber, Kenneth, Gary  - 30(b)(6) & Individual  12/16/2009  12:00:00 PM

29

1    the patents; is that right?
2         MR. ROBERTSON: Objection to the form of
3    the question as vague and ambiguous.
4         A.   As much as I can understand them, I
5    have some familiarity with them.
6         BY MR. McDONALD:
7         Q.   What is your understanding as to what the
8    patents involved in the lawsuit cover?
9         MR. ROBERTSON: Objection, calls for a
10   legal conclusion.
11        A.   You know, at -- at a high level,
12   excluding, you know, any legal definitions that
13   are -- that are beyond my -- my comprehension,
14   they -- they involve the process of electronic
15   procurement.
16        BY MR. McDONALD:
17        Q.   Do you have an understanding as to whether
18   there are any essential pieces or elements of the
19   patents involved in the lawsuit?
20        MR. ROBERTSON: Same objection, calls for
21   a legal conclusion, and arguably outside of the scope
22   of topic 37.
23        But go ahead and answer if you can.
24        A.   Well, I guess essentially would be based
25   on who the recipient of the patent is and what they

30

1    may consider essential, but I understand there are a
2    number of claims and association of functions that --
3    that are performed or described within the claims of
4    the patent.
5         BY MR. McDONALD:
6         Q.   Do you have some specific understanding as
7    to what within the electronic procurement high-level
8    area the patents actually protect?
9         MR. ROBERTSON: Same objection.
10        A.   Yeah.
11        I mean, I have a high-level understanding,
12   yes.
13        BY MR. McDONALD:
14        Q.   Beyond just being an electronic
15   procurement, what is your understanding, if any?
16        MR. ROBERTSON: Same objection.
17        A.   Well, again, at a layman's terms, it is --
18   my understanding of the -- of the patent is -- or the
19   patents, I should say, involve the ability to -- to
20   search multiple suppliers in a catalog, do comparison
21   and selection of those suppliers, check inventory, do
22   requisitioning, and be able to generate purchase
23   orders from the requisitions to multiple suppliers.
24        BY MR. McDONALD:
25        Q.   In 2004, did you have an understanding as

31

1    to whether or not Lawson's e-procurement product
2    performed one or more of those functions you just
3    listed?
4         A.   It would have been difficult for me to --
5    to tell. There was no detailed analysis that I was
6    aware of that would have matched the functionality of
7    Lawson to the represented claims of the patent.
8         Q.   Well, whether you matched them to the
9    claims or not, are you aware as to whether or not
10   Lawson's e-procurement system had any of those
11   specific functions that you just listed in 2004?
12        A.   At a -- at a high-level capability, I
13   believe that -- my recollection is that they offered
14   a procurement system. How detailed, what
15   functionality was involved, I don't know at that
16   time.
17        Q.   In 2004, ePlus did own the patents
18   involved in the lawsuit.
19        Right?
20        A.   Yes.
21        Q.   Did ePlus believe that enforcing those
22   patents was important in 2004?
23        A.   Sure.
24        I mean, I believe we did, yeah.
25        Q.   As part of that effort to enforce the

32

1    patents, was anything done in 2004 to investigate
2    whether or not Lawson's product specifically came
3    within any of the patents?
4         A.   No, I don't believe we did in 2004.
5         Q.   Why not?
6         A.   Well, I think we had our hands full with
7    other litigation and other investigations that we
8    were doing at that time. We're a small company with
9    limited resources, limited financial capability, and
10   as I said, we were -- we were involved in other
11   investigations, I believe litigation at that time.
12        Q.   Do you look at the patents involved in the
13   lawsuit as a potential way to generate income for
14   ePlus?
15        A.   No.
16        We don't look at it as an
17   income-generating facility.
18        Q.   Did you give any consideration in 2004 to
19   putting Lawson on notice that you own patents in the
20   e-procurement area?
21        MR. ROBERTSON: Objection, vague and
22   ambiguous.
23        A.   I don't know individually by -- by
24   company. We -- we followed what we thought was
25   appropriate, what was outlined by our counsel, and

Farber, Kenneth, Gary  - 30(b)(6) & Individual  12/16/2009  12:00:00 PM

33

1  what we needed to do to provide notice to -- third
2  parties of our patents.
3      BY MR. McDONALD:
4      Q.  Well, I'm just asking a very specific
5  question, though.
6      A.  Okay.
7      Q.  Did you give some consideration at ePlus
8  in 2004 to specifically notifying Lawson Software
9  about the patents involved in the lawsuit today?
10      A.  I think we gave consideration of anybody
11  that we thought might be a competitor and how we
12  might handle notice to -- to competitors, but I don't
13  know that we singled out Lawson over one -- one or
14  the other at that time.
15      Q.  As you sit here today and speaking on
16  behalf of the company, are you aware of any documents
17  that would relate to whether or not ePlus
18  specifically considered whether or not it should give
19  Lawson notice of the patents in 2004?
20      A.  Not that I could recall at this time.
21      Q.  And is it true that after talking to other
22  people at the company to prepare for the deposition
23  today, there are no recollections you're aware of of
24  anybody outside of documents that would indicate
25  there was consideration given in 2004 to notify

34

1  Lawson about the patents?
2      MR. ROBERTSON:  Object to --
3      BY MR. McDONALD:
4      Q.  Is that right?
5      MR. ROBERTSON:  -- the form.
6      Sorry.
7      Object to the form of the question.
8      You can answer.
9      A.  Again, specifically calling out Lawson
10  versus another competitor, no.
11      BY MR. McDONALD:
12      Q.  Were you involved in the decision to sue
13  Lawson?
14      A.  I think I played a role in it, yes.
15      Q.  What was your role?
16      A.  My role was to recommend who I thought may
17  be infringing and to conduct an investigation of
18  that.
19      Q.  When was the decision to sue Lawson made?
20      A.  As I recall, it was around the February,
21  March 2009 time frame.
22      Q.  Did you actually participate in that
23  decision to sue?
24      A.  I made a recommendation.
25      Q.  Did somebody else make the ultimate

35

1  decision?
2      A.  Well, I think ultimate decisions are at a
3  board level where we present potential findings, and
4  ultimately it's not my singular decision.
5      Q.  So the ePlus Inc. board decided to bring a
6  lawsuit; is that right?
7      A.  Well, based on the information that was
8  provided, yes.
9      Q.  Sometime before that decision, did you
10  have a role in recommending who may be infringing the
11  ePlus patents?
12      A.  I knew who we were running up against more
13  frequently, and I was responsible for identifying the
14  vendors and making the recommendation of who should
15  be investigated.
16      Q.  Did somebody ask you to do that?
17      A.  No, not that I recall.
18      Q.  That was your own decision?
19      A.  That was my decision.
20      Q.  When did you make that decision to
21  identify the vendors and start on this process that
22  led to the recommendations of who to sue?
23      A.  I thought the decision was probably made
24  around the February time frame.
25      Q.  So pretty close to the time you actually

36

1  went to the board with the recommendation?
2      A.  Between the time that I -- you know, might
3  have been Jan- -- December or January, and then asked
4  counsel to conduct an investigation early February.
5      Q.  As part of that process, what company or
6  companies did you identify as the ones that you were
7  running up against more frequently?
8      A.  At that time, it was Lawson, Perfect
9  Commerce, SciQuest, and Verian Technologies.
10      Q.  How did you determine that these were the
11  4 companies that ePlus was running up against more
12  frequently?
13      MR. ROBERTSON:  Let me just caution the
14  witness here -- just that you can answer the question
15  to the extent you can without revealing
16  attorney-client communications.  And we're getting
17  into an area now where it might be called for, but if
18  you can determine from a business view, by all means,
19  please answer the question.
20      A.  Can you repeat that for me, please.
21      BY MR. McDONALD:
22      Q.  Yes.
23      I'm really not asking about I don't think
24  lawyer stuff.  Let me back up a little bit and
25  clarify something.

Farber, Kenneth, Gary  - 30(b)(6) & Individual  12/16/2009  12:00:00 PM

---

37

1    A.  Sure.

2        Q.  When you say there were certain companies

3    that you were running up against more frequently,

4    that's in the marketplace.

5        Right?

6        A.  That's in sales situations.

7        Q.  So it's got nothing to do with the

8    lawyers.

9        Right?

10    A.  I hope not.

11    Q.  On a good day.

12    A.  Yeah, exactly.

13    Q.  So how is it that you identified those 4

14    companies as the ones in the marketplace that ePlus

15    was running up against more frequently?

16    A.  Typically -- I shouldn't say

17    "typically" -- but there are a number of situations

18    whereby you're responding to a proposal or you're in

19    a situation where you're trying to sell a product to

20    a prospective buyer, and there are times that you're

21    able to determine who your competition is.

22        So that was used as a basis.

23        Q.  If we go back to the early 2009 time

24    frame, then, when you were going through this process

25    of identifying --

---

38

1        A.  Yes.

2        Q.  -- who you were running up against more

3    frequently, were there specific RFPs or prospective

4    buyers who caused Lawson -- Lawson's name to come up

5    as a competitor?

6        A.  There were -- there were a number of

7    specific sales situations that had arisen, yes.

8        Q.  What specific sales situations arose

9    specific to Lawson?

10    A.  Specific to Lawson, you're asking for the

11    specific customers or prospects?

12    Q.  Yes.

13    A.  Okay.  I think Gannett, newspaper

14    division, that is, Indalex, Novant, Cleveland Clinic,

15    BlueCross BlueShield North Carolina, I think XM

16    Radio.

17        And that was the more recent ones.

18    Q.  Was Hanes brands one of them too?

19    A.  Hanes was as I recall, a competitive

20    situation, may have been a little earlier than 2009.

21    Q.  A competitive situation involving Lawson?

22    A.  Yes, yes.

23    Q.  How about Wolters Kluwer?

24    A.  Wolters Kluwer.

25        Yes.  Thank you.

---

39

1        Q.  That also was a Lawson-specific

2    competitive situation?

3        A.  Wolters and others, yes.

4        Q.  Was that in early 2009?

5        A.  I believe it was in the 2009 time frame,

6    best of my recollection.

7        Q.  Of the companies that you listed, did

8    ePlus wind up getting any of those customers?

9        A.  Hanes is a customer of ours.

10    Q.  Any others?

11    A.  I don't believe so.

12    Q.  Do you know which of the companies you

13    listed are Lawson customers?

14    A.  I wish I did, but I -- it's very often

15    when customers make a selection, they don't share it.

16    So we either find out from a press release if

17    there's -- one is issued.

18        I do believe, though, that again that did

19    share with us that they were operating Lawson

20    procurement in one of their locations.

21    Q.  Do you have an understanding as to whether

22    Gannett had been already operating a Lawson product

23    for some years or whether they had just signed up

24    with Lawson in 2009?

25    A.  My recollection is that they had a -- were

---

40

1    running a back office application of Lawson that I

2    believe was nonprocurement-related for a number of

3    years.

4        Q.  Do you have an understanding as to whether

5    Gannett, then, bought a Lawson product specific to

6    procurement?

7        A.  I don't know when they purchased a license

8    to procurement.

9        Q.  Of the prospects that you listed, do you

10    have an understanding as to whether or not Lawson was

11    teaming up with any other companies as part of their

12    proposal?

13    A.  No, I don't believe that I have -- they

14    may -- I'm just trying to think -- I'd be

15    speculating, my recollection right now.  They may or

16    may not have been.

17    Q.  Are you aware of whether or not from time

18    to time Lawson has made any proposals in conjunction

19    with SciQuest?

20    A.  I believe that Lawson has a relationship

21    with SciQuest.

22    Q.  What's your understanding as to what that

23    relationship is?

24    A.  I think the relationship revolves around

25    at certain times partnering to utilize different

---

Farber, Kenneth, Gary  - 30(b)(6) & Individual  12/16/2009  12:00:00 PM

41

1　aspects of each other's application.
2　　Q.　Do you have an understanding as to what
3　types of applications SciQuest markets?
4　　A.　SciQuest markets both procurement and
5　catalog management.
6　　Q.　Do you have an understanding as to which
7　aspects of SciQuest's product line are the ones used
8　in partnership with Lawson?
9　　A.　I don't have the details of that.
10　　Q.　Of those companies that you listed, did
11　anybody other than Lawson compete with ePlus for
12　those prospects?
13　　A.　Yes, I believe so.
14　　Q.　Who else competed for some or all of them?
15　　A.　I think SAP, Ariba.  I believe Perfect
16　Commerce may have competed on -- on a few of them.  I
17　don't know which combinations per se, you know, of
18　those competitors on individual clients were, but I
19　think those were the -- Verian and SciQuest may have
20　also competed on some of those.
21　　Q.　Of any of the ones you listed, were there
22　any situations where the only companies competing
23　were Lawson and ePlus?
24　　A.　I don't necessarily have that information.
25　　Q.　Is it your belief that for all of them,

42

1　somebody else was in the mix in terms of a
2　competitor?
3　　A.　That would be speculation on my part.  I
4　don't -- I don't have concrete proof of that.
5　　Q.　What is the basis for your belief that SAP
6　was competing for at least some of those same
7　prospects?
8　　A.　Speculation and -- well, not some
9　speculation -- Wolters Kluwer, I believe, also had an
10　SAP back-office system and I believe was evaluating
11　that as well.
12　　　　And then it's information that I've
13　attained through either, you know, my sales rep
14　asking those -- those clients specifically or
15　participating in a Q and A pre-RFP vendor call where
16　vendors get on the phone, ask their questions about
17　an RFP, and sometimes vendors identify themselves,
18　sometimes they don't.
19　　Q.　You say, sometimes the vendors identify
20　themselves.
21　　　　This is a call involving the other
22　vendors?
23　　A.　Yeah.
24　　　　Typically what happens in an RFP is, the
25　client will have a conference call, and if there's

43

1　questions, that's the time to ask.
2　　Q.　So you have to decide whether you're going
3　to identify yourself on that phone call?
4　　A.　We don't.  Others may.
5　　Q.　Okay.  I think you indicated Gannett had a
6　preexisting Lawson nonprocurement product.
7　　　　Is that your understanding?
8　　A.　My -- yes, yes, that's correct.
9　　Q.　Did they have somebody's procurement
10　product at the time, Gannett?
11　　A.　Ours.
12　　Q.　They did have your procurement product?
13　　A.　Yes.
14　　Q.　Do they still have it?
15　　A.　No.
16　　Q.　Your understanding is that Lawson got the
17　procurement product?
18　　A.　My understanding is that I was informed
19　that they had a license to Lawson, were running it in
20　one or more of their locations, and were as a result
21　of, you know, budgetary constraints and things that
22　were going on obviously in the economy, they were
23　looking to leverage applications that they already
24　had in-house, and Lawson was one of those in the area
25　of procurement.

44

1　　Q.　What product or products of ePlus did
2　Gannett have that they no longer use?
3　　A.　Procurement and content management.
4　　Q.　Is that the products that go by the name
5　procure plus and content plus?
6　　A.　Yes, catalog plus.
7　　Q.　Is that a third one, or is that -- it's
8　now content?
9　　A.　It's the catalog component of the
10　procurement engine.
11　　Q.　Okay.  So maybe I better take it from the
12　top.
13　　　　Which of your products did Gannett have?
14　　A.　Our procurement system.
15　　Q.　What was the brand name of that?
16　　A.　Procure plus.
17　　　　And our content management component they
18　licensed called catalog plus.
19　　Q.　And they're not using either one of those
20　anymore?
21　　A.　No, they're not.
22　　Q.　Did they tell you why they decided not to
23　use your product anymore?
24　　A.　Well, they told us that, you know, there
25　were budgetary constraints within the corporation and

Farber, Kenneth, Gary  - 30(b)(6) & Individual  12/16/2009  12:00:00 PM

45

1  that they were looking inside to leverage other
2  technologies, and they were looking at Lawson because
3  they knew they had a license to it.
4        And it was successfully being run in
5  another area of the company, and our maintenance
6  was -- and license was -- was canceled at that point.
7     Q.  So basically -- well, did I understand you
8  right that they had a preexisting nonprocurement
9  Lawson product, or did they have something with some
10  procurement capabilities from Lawson?
11     A.  They -- they had a nonprocurement system
12  in place that I was aware of when they licensed our
13  technology, our procurement and catalog systems.
14  When they licensed Lawson's procurement, whether it
15  was -- whether they had it on their shelf as part of
16  the original license, I don't know.  I have no
17  knowledge of when that transpired.
18     Q.  Is it your understanding that the ePlus
19  procurement in catalog plus products interacted with
20  the Lawson back-office system at Gannett?
21     A.  I don't recall the specific integration
22  that may have been done to the Lawson system.
23  Typically our clients have us integrate with their
24  accounting systems, so it may have been done.  I'd
25  have to go back and refresh my memory on the

46

1  agreement.
2     Q.  With respect to Indalex, do you know who
3  got their business?
4     A.  No.
5     Q.  Do you have an understanding that Lawson
6  was specifically competing for that business?
7     A.  Yes.
8     Q.  Who else do you know of was specifically
9  competing for Indalex?
10     A.  As I said before, I don't recall the
11  combinations of vendors per each client, so --
12     Q.  I'd just like to go through them one at a
13  time, though.
14        Tell me which ones you may know for each
15  individual one.
16     A.  I think my answer might be the same
17  though.
18     Q.  Okay.  So for any of those, you're not
19  aware of any -- except for Wolters Kluwer, I think
20  you said they had a SAP system?
21     A.  Yes.
22        And the other one might be -- in addition
23  to Lawson at Cleveland Clinic, I believe SciQuest was
24  also part of that.
25     Q.  Other than Gannett, do you know whether

47

1  Lawson got any of the contracts for any of the other
2  companies you listed other than Gannett and Indalex?
3     A.  Clients did not share that information
4  with us.
5     Q.  Did Indalex already have some -- some
6  other software, business software vendor that it was
7  working with before it put out a proposal?
8     A.  They may have.  I don't -- I don't recall.
9  There could have been.
10     Q.  Did Novant have any preexisting system,
11  commerce-related system that it had before it put out
12  bids?
13     A.  It also may have.
14     Q.  Do you have some recollection one way or
15  the other about Novant?
16     A.  No.
17     Q.  Did Cleveland Clinic have a preexisting
18  system from anybody?
19     A.  Again, not that I can recall.
20     Q.  Do you recall whether or not Cleveland
21  Clinic was seeking any specific functionality
22  involving catalogs?
23     A.  Well, I think that their main interest at
24  the catalog level was -- was health care-related.
25     Q.  Do you have an understanding that when

48

1  they sent out a request for proposal in the early
2  2009, maybe late 2008 time frame, that they were
3  specifically seeking to add a catalog component to
4  their existing procurement system?
5     A.  Our proposal to them ended up being just a
6  catalog system, having not had -- not being able to
7  participate on the procurement side of the house.
8     Q.  Were they also bidding out a procurement
9  request?
10     A.  I think they were evaluating conversations
11  that they had with us procurement systems, and we
12  were hoping to be part of that.
13     Q.  Did they have a preexisting procurement
14  system?
15     A.  They may have.
16     Q.  SAP and Ariba are both licensees of ePlus.
17        Correct?
18     A.  Licensees as it relates to the patents.
19     Q.  Yes.
20     A.  Yes.
21     Q.  If a prospect decides to use SAP or Ariba
22  for catalog or content management, you wouldn't
23  consider that to infringe your patents.
24        Right?
25        MR. ROBERTSON:  Objection; calls for a

Farber, Kenneth, Gary  - 30(b)(6) & Individual  12/16/2009  12:00:00 PM

---

**49**

1    legal conclusion.

2        A.   There's -- there's a number of legal

3    elements within the agreements that I have some

4    familiarity with, others that I don't, but my

5    understanding is that if a prospect is licensed to

6    let's just say the SAP system as an example -- if

7    it's the SAP standalone system that's offered to

8    them, I believe the license extends to those

9    customers.

10       BY MR. McDONALD:

11       Q.   What do you mean by, SAP standalone

12   system?

13       A.   My recollection is that there were certain

14   exclusions, so if it was SAP-developed code or

15   -developed application, then their customers would be

16   licensed, whereas if in certain situations there were

17   other catalog providers that were not basing their

18   solutions on SAP code, the license wouldn't

19   automatically be extended to those.

20       Q.   So the distinction would be who wrote the

21   code for the catalog services?

22       MR. ROBERTSON:  Same objection.

23       A.   I think that's one example.  I'd have to

24   go back to the agreement to in my nonlegal view of

25   things, you know, at a business level, break it down.

---

**50**

1        BY MR. McDONALD:

2        Q.   Do you recall what the name of the SAP

3    product is that they developed themselves that

4    involves the catalog management?

5        A.   Catalog management under SAP, they've gone

6    through best that I can recall 3 different gyrations

7    of their catalog management system, some that they

8    license, some that they developed internally.

9        Q.   Currently, do you know what it's called?

10       A.   Let me see if I can recall the name of

11   their -- I should know.  I've got a -- I don't recall

12   it at this moment.

13       Q.   Have they gone through 3 different brand

14   names on it over the last few years?

15       A.   The names have changed over the numbers of

16   years, yes.

17       Q.   How about for Ariba?

18       Do they have a similar deal as SAP with

19   respect to whether the system is licensed or not?

20       MR. ROBERTSON:  Objection, vague and

21   ambiguous, and calls for a legal conclusion.

22       A.   There's nuances within each agreement in

23   terms of how their licenses extend, but again, I'd

24   have to go back to each individual one.

25       BY MR. McDONALD:

---

**51**

1        Q.   Well, if a customer or a prospect elects

2    to use an Ariba catalog management system, would you

3    consider that to be an event that does not infringe

4    any of your patents because of Ariba's license?

5        MR. ROBERTSON:  Objection, calls for a

6    legal conclusion.

7        A.   Yeah.

8        I wouldn't know.  That would have to be

9    investigated.  I'd have to --

10       BY MR. McDONALD:

11       Q.   Well, Ariba paid for the license.

12       Right?

13       A.   They paid for a certain level of

14   distribution and restrictions around the license, but

15   there's some legal aspects around the license in

16   terms of how they can interact with extending that

17   license to -- to other parties of the Ariba system.

18       Q.   So your understanding, are there some

19   limits on -- on the license for Ariba?

20       A.   As I recall, yes.

21       Q.   What is your understanding -- I understand

22   you're not a lawyer -- but what's your understanding

23   from a business standpoint as to what those limits

24   are?

25       A.   Okay.  Well, as you know, I'm not a

---

**52**

1    lawyer, so at a very high level?

2        MR. ROBERTSON:  And we're talking about

3    the Ariba contract for now.

4        MR. McDONALD:  Ariba.

5        A.   Yes.

6        My high-level understanding and

7    recollection of that was that it could be extended to

8    their clients as it related to the Ariba code as

9    delivered by Ariba.

10       BY MR. McDONALD:

11       Q.   What is your business understanding as to

12   what the limits if any were on the SAP license?

13       A.   That the -- again, at a very high nonlegal

14   definition understanding as delivered to their

15   customers for SAP-delivered code, and I think there

16   was an exclusion at a catalog level of

17   non-SAP-developed catalog code.

18       And I'm sure there were many other nuances

19   of that agree-- -- of both those agreements that I'd

20   have to look at closer.

21       Q.   Perfect Commerce is also a licensee.

22       Right?

23       A.   Yes, they are.

24       Q.   What is your understanding as to what

25   types of systems Perfect Commerce provides?

---

Farber, Kenneth, Gary  - 30(b)(6) & Individual  12/16/2009  12:00:00 PM

---

**53**

1    A.  Perfect Commerce, again, procurement
2  catalog management.
3    Q.  Does Ariba provide both procurement and
4  catalog management?
5    A.  Does procure- -- does Ariba --
6    Q.  Yes.
7    A.  -- provide electronic procurement and
8  catalog management?
9    Q.  Right.
10    A.  Yes.
11    Q.  Does SAP also provide both electronic
12  procurement and catalog management?
13    A.  Yes.
14    Q.  Is Perfect Commerce licensed for both
15  electronic procurement and catalog management from
16  ePlus?
17    A.  I believe they are, yes.
18    Q.  Do you have any understanding at a
19  business level as to any limitations on that license?
20    A.  Yes.
21    There were limitations.  I'd have to go
22  back to the license to recall.  Again, each one had
23  its little oddities to them.
24    Q.  Were you involved in negotiating all these
25  licenses?

**54**

1    A.  I was.
2    Q.  SciQuest has a license as well.
3  Correct?
4    A.  Yes.
5    Q.  What is your understanding as to what
6  types of system SciQuest sells?
7    A.  Electronic procurement and catalogs.
8    Q.  When you say, they sell catalogs, can you
9  explain what you mean by that?
10    A.  Well, catalog management.
11    Q.  Okay.  Maybe we should kind of make sure
12  we both know what we're talking about with that term.
13    A.  Sure.
14    Q.  Can you explain what you mean by, catalog
15  management?
16    A.  At a high level, when I say, catalog
17  management, it's the ability to have an electronic
18  catalog that represents the elements that -- that
19  would be typically used by a purchasing system or
20  accessed by an electronic procurement system.
21    Q.  Is an electronic catalog basically an
22  electronic version of what lay people would refer to
23  as a catalog for somebody like Sears?
24    A.  I don't know.  I've never done that
25  correlation.

**55**

1    This electronic catalog is -- I'm not sure
2  I understand your question in terms of the
3  correlation of Sears.
4    Q.  Even if you pull somebody off the street
5  who is not in your business and you talk to them
6  about a catalog, a Sears catalog might come to mind.
7  Is that fair?
8    A.  Perhaps, yeah, from a laymen's
9  perspective, yes.
10    Q.  I use that as an example.
11    Is there something else you think a
12  layperson walking down the street would think of when
13  they think of a catalog other than a Sears catalog?
14    A.  I look at things myopically.  They may
15  come up with other things.  I'm just too close to it,
16  I think.
17    MR. ROBERTSON:  Victoria's Secret comes to
18  mind.
19    THE WITNESS:  Yeah.
20    BY MR. McDONALD:
21    Q.  Is an electronic catalog an electronic
22  version in the sense of a paper catalog such as --
23  I'm going to stick with the Sears catalog?
24    A.  No.
25    Q.  How is it different?

**56**

1    A.  I think, you know, when you look at a
2  paper catalog, a paper catalog is, you know,
3  something that somebody is physically touching.
4  Right?
5    I mean, it has -- you have to manually go
6  through a paper catalog, find what it is that you're
7  looking for.  Whereas an electronic catalog, you
8  know, as we're referring to, is one that has
9  information contained about the product that may be
10  cross-referenced with -- with other similar products
11  of its type and then have a lot of, you know -- not a
12  lot -- doesn't necessarily mean a lot -- but has
13  attributes associated with it.
14    Q.  What do you mean by, attributes?
15    A.  Generally referred to in the industry as
16  kind of fit, form, and function, electronically
17  representing different elements of the -- of the part
18  or item.
19    So let's -- let's use the example of a
20  shirt, color, size, sleeve length, picture.
21    Q.  Parts of what would describe the product?
22    A.  All the elements that would describe the
23  product would be a fair analogy.
24    Q.  And also have some graphic representation
25  like a picture or diagram or something?

---

57

1     A.   A -- when they're available, it would have
2   a graphic representation and it would have a
3   correlation to other similar products within --
4   within that catalog.
5     Q.   So generally, an electronic catalog would
6   have the same type of information that a paper
7   catalog would have, but it would also have some
8   additional functionality, for example this ability to
9   cross-reference similar products.
10    Is that fair?
11    A.   That's right one of the differences.
12  There may be other differences as well.
13    Q.   What are the other differences?
14    A.   Sometimes there's attachments associated
15  with the item.  Sometimes there's the ability to know
16  if the item is in inventory, which you wouldn't get
17  out of a paper catalog.  Sometimes there's video
18  associated with it, doesn't have to be, but can be.
19    Those are a few examples.
20    Q.   When you say, attachments, can you give me
21  an example of what an attachment would be?
22    A.   Sure.
23    An attachment may be -- consider a
24  category like you're building an airplane and you're
25  purchasing an element for a rotor blade.  You may

58

1   want to give the supplier -- or have the supplier
2   provide to you rather the specifications of that part
3   for that rotor blade -- for that rotor blade, and
4   that may show up as an attachment.  So that's called
5   their specification sheets.
6     It may describe the torque that it has to
7   be installed it.  It may have an installation guide
8   associated with it.
9     So it's additional information that the
10  suppliers may want to provide to the purchasers at a
11  more detailed level of granularity.
12    Q.   Any other differences between an
13  electronic catalog and a paper catalog other than the
14  ones you've listed?
15    A.   I'm sure there's others.  I just have to
16  kind of go through them in my mind, but --
17    Q.   I'll just refresh you with what you
18  already said.
19    A.   Sure.
20    Q.   You mentioned cross-referencing similar
21  products.
22    A.   M-hm.
23    Q.   Attachments, providing information about
24  whether the product is in inventory, and at least the
25  option of providing video.

59

1     A.   Right.
2     And those are good -- good examples.
3     Q.   Can you think of anything else as you're
4   sitting here right now?
5     A.   In terms of capabilities of catalog
6   versus --
7     Q.   In terms of any other differences between
8   an electronic catalog as you're talking about it
9   today versus, you know, what you might call an
10  old-fashioned paper catalog.
11    A.   Sure.
12    I'd say an electronic catalog.
13    Let's see what else comes to mind --
14  differences -- oh, provides the ability to interact
15  with an electronic procurement system in such a way
16  that you can compare and select multiple products
17  through searching, and then convert that information
18  to be part of a workflow of a procurement system and
19  interact with a procurement system so -- in such a
20  way that it has the ability to electronically issue
21  purchase orders to the suppliers.
22    And I'm sure there's others, but those are
23  the ones that come to my immediate -- forefront of my
24  mind.
25    MR. McDONALD:  Why don't we go ahead and

60

1   take a break.  We've been going for a while.
2     THE WITNESS:  Okay.
3     THE VIDEOGRAPHER:  The time is
4   approximately 1:29 PM.  We're going off the video
5   record.
6     (Recess.)
7     THE VIDEOGRAPHER:  The time is
8   approximately 1:44 PM.  We're back on the video
9   record.
10    BY MR. McDONALD:
11    Q.   Mr. Farber, I'd like to return to
12  something we were talking about earlier with respect
13  to early 2009 when you were looking into the issues
14  that led to the lawsuit, and I think you talked about
15  identifying some companies that ePlus was running up
16  against more frequently.
17    Do you recall that area?
18    A.   Yes.
19    Q.   Okay.  And as a result of identifying
20  those companies that you ran into more frequently,
21  did you take the names of those companies and then
22  turn them over to counsel for further investigation?
23    A.   Ultimately, yes.
24    Q.   Was there anything else you did in between
25  identifying which companies you were running into

Farber, Kenneth, Gary  - 30(b)(6) & Individual  12/16/2009  12:00:00 PM

61

1   more frequently and providing the names to counsel
2   for further investigation?
3   A.   Is there anything that I did other than
4   turning -- once I determined -- no.  I believe
5   provided the information to counsel.
6   Q.   Were the companies you identified to
7   counsel Perfect Commerce, Verian, SciQuest, and
8   Lawson?
9   A.   Yes, I believe that's correct.
10  Q.   Were there any other companies on that
11  list?
12  A.   Not to my knowledge.
13  Q.   As part of that process, did you learn
14  anything new about the functionality or capabilities
15  of the Lawson products that you didn't know before?
16  A.   I haven't been exposed to that -- to that
17  much other -- other than conversations with -- with
18  counsel.
19  Q.   And I just want to be clear.  I'm talking
20  about before talking to counsel.
21  A.   Did I learn anything --
22  Q.   -- new about the functionality or
23  capability of the Lawson products as part of this
24  early 2009 process of identifying the companies you
25  were running into.

62

1       Let me just rephrase the question because
2   it's getting pretty long now.
3   A.   Yeah, yeah.
4   Q.   Back as -- we'll call it that
5   investigation that you were doing of the companies?
6   A.   Yes.
7   Q.   All right.
8       As part of that investigation before you
9   went to the lawyers with the names of the
10  companies --
11  A.   M-hm.
12  Q.   -- did you learn anything new about the
13  functionality or capabilities of the Lawson products
14  that you didn't know before?
15  A.   Not that I can recall the structure.
16  Q.   Was there anybody else at the company
17  other than you that was involved in this process of
18  identifying companies for the lawyers?
19  A.   No.
20      Ultimately, it was -- it was me.
21  Q.   Earlier, we talked about what you knew
22  about Lawson in 2004.
23      Now I want to hit some other years.
24  A.   Okay.
25  Q.   In 2007, who were ePlus's main competitors

63

1   in the procurement and catalog management areas?
2   A.   Oh, gosh, there's literally dozens of what
3   we could perceive as competitors.
4   Q.   I was looking for the main ones like we
5   had identified the top 4 --
6   A.   Okay.
7   Q.   -- remember for 2004.
8       Can you give me a comparable list for
9   2005?
10  A.   I -- I think that it would be a similar
11  list as we discussed earlier.
12  Q.   A list I think you gave for 2004 was
13  Ariba, SAP, Perfect Commerce, and you said a host of
14  other competitors, and you gave Ketera as a specific
15  example.  At least that's what my notes indicate.
16  A.   Okay.
17  Q.   I'm just giving you that to set up the
18  question here.
19      In 2005, did you consider the primary
20  competitors Ariba, SAP, and Perfect Commerce?
21  A.   Well, you reminded me of Oracle, slash,
22  PeopleSoft, so going back a number of years ago, I'm
23  sure that they were in the mix.  I think I stated
24  there are very slim differentiations between primary
25  and I guess nonprimary, to use those words, so there

64

1   were a host of other perceived competitors.
2   Q.   And when you identified the list of main
3   competitors, are you identifying the companies that
4   ePlus was most often running up against?
5   A.   Again, that balance and tie changes.
6       One, you know, particular company we may
7   not be running up against, but they may have been
8   infused with a lot of cash for market, so they're
9   making a lot of noise in the industry.  How serious
10  of a contender they are depends.
11      As I indicated earlier, there's many, many
12  occasions where you don't know who your competitors
13  are.  The prospects are tight-lipped about that
14  situation.
15  Q.   What criteria were you using when you were
16  identifying your primary competitors?
17  A.   Well, your definition of a primary
18  competitor limited to 4 is much narrower than my
19  definition of a primary competitor, but it's a
20  combination of those that you run into in sales
21  situations, those that you see doing a lot of infused
22  marketing in the industry or advertising to promote
23  their -- their solutions, those that are covered by
24  the analysts, articles, press releases, a combination
25  of things that -- that are in play.

Farber, Kenneth, Gary  - 30(b)(6) & Individual  12/16/2009  12:00:00 PM

---

65

1    Q.   With -- with that definition, you
2    mentioned the number 4.
3         And -- and for 2005, would you have a
4    different number than 4 as your primary competitors,
5    using your definition?
6    A.   Well, that's not my definition.
7         Primary competitors for me fall probably
8    into the dozens.  I don't limit them to 4.
9    Q.   So when you list the 4, are you just --
10   those are just the highest-ranking on that list in
11   terms of how much you run into them in the
12   marketplace, how much they're spending on advertising
13   and marketing, and how much analysts cover them?
14   A.   Maybe for that particular moment in time.
15   At the particular instance that that question was
16   asked, those may have been in the forefront of my
17   mind.
18        3 months later, it very well could have --
19   could have changed.
20   Q.   Well, let's go ahead and go to the next
21   year, then.
22        For 2006, who would you identify as the
23   primary competitors for ePlus?
24   A.   I think that again you'd have a similar
25   list.  You'd have -- start to see some others, you

---

66

1    know, coming into the market as well.
2         It's pretty difficult for me to determine
3    year by year which are the competitors, because
4    they're -- there's a subset of companies that have
5    been in the space or stated that they're in the space
6    for a period of time and those that come and go,
7    so --
8    Q.   For 2006, would Ariba, SAP, Perfect
9    Commerce, and Oracle, slash, PeopleSoft still be on
10   the list of primary competitors?
11   A.   They would be part of the list of
12   competitors.
13   Q.   In 2006, who else would be on that list of
14   primary competitors?
15   A.   I think you'd see Ketera, Basware.  I
16   think there was a lot of marketing, but I'm not
17   necessarily sure of product development and what was
18   available from a company called Coupa, C-O-U-P-A
19   Technologies.
20        You know, there's dozens.  There's, you
21   know --
22   Q.   Would you consider Lawson one of the
23   primary competitors in 2006?
24   A.   I think I would have considered them a
25   competitor in 2006.  I don't know where they would

---

67

1    stack against everybody, you know, at that particular
2    moment in time.
3    Q.   Did you consider Lawson an ePlus
4    competitor in 2005?
5    A.   We may have run across them.  I don't know
6    that I can give you a particular instance off the top
7    of my head, but I believe that -- that Lawson was in
8    the procurement space during that time.
9    Q.   So whether you ran into them specifically
10   head to head or not in 2005, your belief is that
11   Lawson was a competitor?
12   A.   I believe they were in their space -- in
13   the space, yes.
14   Q.   Well, I'm asking about competitor.  You're
15   talking about space.  I just want to make sure we're
16   talking about the same thing.
17   A.   Well, yeah -- I mean, from a -- yes, I
18   think we are referring to the same thing.
19   Q.   Okay.  So "space" means competitive space?
20   A.   Yes.
21   Q.   Okay.  2007 --
22   A.   M-hm.
23   Q.   -- would your list of the top primary
24   competitors change?
25   A.   I think they would just be potentially

---

68

1    added to, you know, in terms of the number of
2    vendors, companies that are jumping into the market.
3    Q.   Who would be added in 2007?
4    A.   I think it's e-companies, Basware.  I
5    don't know if I've mentioned them before.
6    Q.   You did for 2006.
7    A.   I did?
8         Okay.  So, you know, they fluctuate back
9    and forth.  You know, I don't recall what year I
10   talked about, you know, the Verians and those
11   companies.
12   Q.   I don't know that you've mentioned Verian
13   for 2004, 2005, or 2006 yet.
14   A.   Yeah.
15   Q.   So in 2007, does Verian start getting on
16   the -- higher on the list?
17   A.   Yeah, maybe because they did more
18   marketing than before.  Although they probably -- we
19   probably ran up against them in 2005 as well.
20   Q.   Did you run up against them in 2006 as
21   well?
22   A.   Probably.
23   Q.   But in 2007, did they kind of become more
24   prominent?
25   A.   I don't necessarily know that they became

---

69

1   more prominent.  You know, there was a period of time
2   later on where we had the capability and the cycles
3   to start looking at some of these perceived
4   competitors.
5       Q.   What do you mean by -- (indiscernible)?
6       A.   Well, they were competitors.  And we were
7   involved in other things as a company with limited
8   resources, whether it was relative to litigation or
9   other things, and, you know, competing day to day
10  with companies and not having the resources or
11  financial means necessary to pursue what may have
12  been perceived at the time.
13      Q.   When you say you lacked resources, you
14  lacked resources to pursue what?
15      A.   Undertaking a further evaluation of those
16  companies.
17      Q.   So at some point, you had more resources
18  where you could evaluate competitor products?
19      A.   I don't know that I can necessarily say I
20  had more resources, but there was a reprieve as far
21  as prior litigation was concerned, and a reprieve
22  from, you know, other functions and other things that
23  we were looking to do within the company to give us a
24  time to be able to look closer.
25      Q.   When did that reprieve take place?

70

1       A.   This past year.
2       Q.   2009?
3       A.   Yeah, yeah.
4       Q.   You weren't in litigation in 2008, were
5   you?
6       A.   I don't believe so.
7       Q.   When I say, litigation, I mean, litigation
8   involving patents.
9       A.   No.
10           That's correct.
11      Q.   Yeah.
12           Was there any other significant litigation
13  going on that was a drain on or a diversion of
14  company resources between 2007 and 2009?
15      A.   There were a number of things that were --
16  the company was undertaking that was a diversion,
17  yes.
18      Q.   What were the other activities of the
19  company that were taking resources between 2007 and
20  2009?
21      A.   Well, as an org-- as a company, we were
22  involved along with 700 other companies or peers in
23  the industry on reevaluating how stocks were issued
24  and when they were dated and those sort of things.
25      Q.   Stocks or stock options?

71

1       A.   Stock options, yeah.
2           So -- so that took a lot of -- a lot of
3   resources from the company.
4       Q.   What were the issues regarding stock
5   options?
6       A.   Just questions in terms of, were we
7   properly dating and pricing the options.
8       Q.   What was the conclusion of that
9   investigation?
10      A.   We were -- we cleared that hurdle.
11      Q.   Did you have to go back and restate
12  anything?
13      A.   There was a restatement I think on -- on
14  some revenue.
15      Q.   Were the options redated?
16      A.   I don't know.  I don't recall.
17      Q.   Do you hold stock options?
18      A.   I do.
19      Q.   How many?
20      A.   Approximately 50,000, I think.
21      Q.   Were there any other activities that were
22  taking significant company resources between 2007 and
23  2009 other than this stock options issue?
24      A.   No.
25           That was considerable.  The -- there was

72

1   also the consideration of my time and projects that I
2   was working on for the company that precluded me from
3   looking in other areas.
4       Q.   What was your focus in 2007 and 2008?
5       A.   Primary focus was to -- a number of
6   different focuses.
7           One was, we were undertaking some major
8   development projects, so it was oversight of those --
9   of development projects and new products, both for
10  internal and external use.  There was oversight of
11  the operations of the divisions and groups that I'm
12  responsible for at the company and focusing back on
13  our core business as a company, since I was taken out
14  of that stream for a while due to prior litigation.
15      Q.   Anything else in 2007 and 2008 that was a
16  focus for you?
17      A.   Well, I think the other focus was -- was
18  maintaining or trying to maintain the P and L as we
19  had some -- I don't know if you want to call it a
20  premonition, but we saw markets changing and business
21  changing in the industry.
22           And I don't want to say that we forecasted
23  an economic downturn, but we were very cognizant of
24  the fact that people's spending patterns were
25  changing, and we concentrated very heavily in our

Farber, Kenneth, Gary  - 30(b)(6) & Individual  12/16/2009  12:00:00 PM

73

1  organization in reducing costs wherever possible so
2  that we could ride out whatever potential storm was
3  going to occur.
4      Q.   So that was something else you were
5  working on personally between 2007 and 2008?
6      A.   Yes.
7      Q.   With respect to the major development of
8  new products --
9      A.   M-hm.
10      Q.   -- what external new products were you
11  involved with developing in 2007 and 2008?
12      A.   Our business intelligence spend analytics
13  product, you know, providing oversight and direction
14  in that particular area.  Our customer-facing
15  1-source application, providing oversight and
16  direction in that area as well.
17      Q.   I think we talked about spend analytics
18  earlier when we talked about the product groups.
19          That was a new product group that was
20  added a couple years ago.
21          Right?
22      A.   Yes, that's correct.
23      Q.   And so that's this new product line that
24  you're talking about?
25      A.   For spend plus.

74

1      Q.   Spend plus.
2          And generally what does spend plus do?
3      A.   It takes accounting data, procurement data
4  and analyzes spend and -- spending patterns for
5  companies.
6      Q.   That product doesn't use the patents
7  involved in this suit directly, does it?
8          MR. ROBERTSON:  Objection, calls for a
9  legal conclusion.
10      A.   My business-level knowledge of the patents
11  would believe that the spend plus solution doesn't --
12  is a separate entity from the patents.
13          BY MR. McDONALD:
14      Q.   What is a 1-source?
15      A.   1-source is a customer-facing application
16  that is used by our customers at ePlus when they're
17  purchasing hardware and software from ePlus.
18      Q.   So this isn't helping their general
19  purchasing of their day-to-day stuff.
20          This is specific to purchasing from ePlus?
21      A.   That's correct.
22      Q.   When was that product introduced?
23      A.   There have been -- there was a product --
24  I don't know if it was -- it might have been called
25  1-source back then, but when I came on board at

75

1  ePlus, they had a product that was customer-facing
2  to -- to allow customers to purchase.
3      Q.   Is this a product that customers could
4  access through the Internet?
5      A.   Yes.
6      Q.   Well, as I understand what you're saying,
7  1-source was somehow a new product that was a
8  customer-facing product.
9          Correct?
10      A.   New generation of an older product.
11      Q.   Okay.  When did the new generation of
12  1-source product come out?
13      A.   Within the last 3 years.
14      Q.   When you said one of things you also did
15  in the 2007 to 2008 time frame was to focus on the
16  core business --
17      A.   M-hm.
18      Q.   -- can you explain what the core business
19  is?
20      A.   Well, the core business for me, which was
21  our suite of products and associated services, so
22  procurement, content management, asset management,
23  spend analytics.
24      Q.   The 5 categories you talked about --
25      A.   That's correct.

76

1      Q.   -- earlier?
2          About what percentage of ePlus Inc.'s
3  revenues comprised the product lines that you're
4  responsible for?
5      A.   That's always been a hard summation for
6  the following reason:  There's stand-alone revenue,
7  and then there's revenue that's associated with the
8  applications that ePlus runs as a company in their
9  back office to support their other -- their other
10  customers.
11          So we've never successfully correlated the
12  contribution of that to that side of the business.
13      Q.   In terms of internal reporting purposes,
14  though, do you somehow try to identify what your
15  division's revenues are and --
16      A.   As a stand-alone division, yes.
17      Q.   Okay.  So if we focus on that stand-alone
18  division, what -- approximately what percentage of
19  ePlus's overall revenues are in your division?
20      A.   It's less than 10 percent.
21      Q.   Approximately what are the overall
22  company's annual sales?
23      A.   I think the last fiscal reporting was 6
24  hundred and some-odd million.
25      Q.   Fiscal year ends in March; is that right?

Farber, Kenneth, Gary  - 30(b)(6) & Individual  12/16/2009  12:00:00 PM

---

**77**

1     A.   In March, that's correct.

2     Q.   So as of March of '09, it was in the 600

3   million-plus range?

4     A.   Yes.

5     Q.   What were the sales in your division for

6   that same time period?

7     A.   Just give me one second.

8         Probably for all the software and

9   services, maybe 9 million or so, so --

10    Q.   What percentage are you saying 9 million

11  would be of 600 million?

12    A.   I knew you were going to go there.

13    Q.   Okay.

14    A.   So there's a number of customers that

15  running -- that are running our software that are

16  also buying from ePlus, so that becomes a component

17  of our offering to the customer that we don't

18  necessarily charge a license to.

19    Q.   So these are customers that are using

20  ePlus to outsource basically their procurement

21  services?

22    A.   No.

23        These are customers that are buying from

24  ePlus, hardware and software, that are using our

25  procurement catalog management system because of its

---

**78**

1   advanced functionality to use certain functions of

2   those applications to interact directly with ePlus.

3     Q.   For what purposes do they -- do the

4   customers in those situations interact with ePlus?

5     A.   Well, ePlus -- one side of ePlus is a VAR,

6   right, a value-added reseller of hardware and

7   hardware, so we represent and resell different

8   hardware and software from a multitude of

9   manufacturers.  They're using our systems to interact

10  with us.

11    Q.   The customers that use the software and

12  services your division provides, they could use

13  anybody for value-added reselling of hardware and

14  software.

15        Right?

16    A.   The software is agnostic to -- who the

17  customers want to utilize as their suppliers.

18    Q.   By, agnostic, do you mean independent --

19    A.   M-hm.

20    Q.   -- essentially?

21    A.   Yes.

22    Q.   So the actual software and services

23  revenues of your division are 9 million dollars?

24    A.   Yeah, roughly, that's correct.

25    Q.   For the year ending March of '09.

---

**79**

1         Right?

2     A.   Well, our -- yes.

3     Q.   That's about -- that's a little less than

4   2 percent of the overall company?

5     A.   That's right, of the overall company.

6     Q.   Are most of the overall company's revenues

7   from the hardware and software VAR sales?

8     A.   There's a -- the largest percentage of

9   revenue is from the VAR business, followed by our

10  financing division and our consulting division.

11    Q.   What does the financing division do?

12    A.   Finances transactions for customers, basic

13  leasing.

14    Q.   Leasing hardware and software products --

15    A.   No.

16    Q.   -- or anything?

17    A.   Anything.

18    Q.   Okay.  What does the consulting division

19  do?

20    A.   They install hardware.  They support

21  hardware.  They design architecture.  They do

22  offshore -- not "offshore" -- they do outsource

23  development projects for customers.

24    Q.   Is this mostly the computer hardware and

25  software area?

---

**80**

1     A.   Yes, it is.

2     Q.   Any other sort of consulting other than

3   that?

4     A.   Outside of --

5     Q.   Computer hardware and software.

6     A.   No, no.

7     Q.   In 2007, who were the primary competitors

8   within your division now if we return --

9     A.   Right.

10    Q.   -- back to your bailiwick.

11    A.   You know, I think we, you know, seeing

12  the same vendors and probably growing, you know, at

13  various levels and verticals, and, you know, we're

14  starting to see at that time perhaps more -- more

15  companies making more of a push into certain vertical

16  markets and offering very specific solutions for

17  those verticals.

18    Q.   When you say, vertical markets, what do

19  you mean?

20    A.   Vertical markets such as health care,

21  manufacturing, finance, insurance.

22    Q.   So that's the business of the specific

23  customer that might be buying your products?

24    A.   Correct.

25    Q.   Do you look at the barriers to entry in

---

Farber, Kenneth, Gary  - 30(b)(6) & Individual  12/16/2009  12:00:00 PM

81

1   the areas of electronic procurement, catalog
2   management to be relative low?
3       A.   What do you refer to as the barriers of
4   entry?
5       Q.   The same sort of thing that ePlus would
6   talk about in its annual reports.
7       A.   I'm not quite certain that we talk about
8   barriers of entry, so you have to point out the
9   reference, and I'll discuss it.
10      Q.   Just give me a moment here.
11      A.   Sure.
12          (Pause.)
13          MR. McDONALD:  Mark that as the next
14  exhibit.
15              (Lawson Exhibit No. 15
16              was marked for
17              identification.)
18      BY MR. McDONALD:
19      Q.   Mr. Farber, you have before you what's
20  been marked as exhibit 15.
21          Do you recognize it?
22      A.   Yep, yes, I do.
23          It's the annual report.
24      Q.   For what year?
25      A.   2009.

82

1       Q.   So that's for the year ending March 31,
2   2009?
3       A.   Yes, I believe so.
4          Yep, that's correct.
5       Q.   Can you turn to the risk factors section,
6   which begins I believe at page 12.
7       A.   Okay.  Okay.
8       Q.   Do you have an understanding for the
9   purposes of an annual report like this what the
10  section on risk factors relates to?
11      A.   I do.  I have some understanding of that.
12      Q.   What's your understanding?
13      A.   Risk factors highlight those areas that a
14  company could be adversely affected by that may be
15  either within or -- you know, or outside of their
16  control.
17      Q.   Is this -- a risk factor something a
18  publicly traded company has an obligation to disclose
19  to its shareholders?
20      A.   Yes, they do.
21      Q.   That's what this section here beginning at
22  page 12 is about.
23          Right?
24      A.   Correct.
25      Q.   Can you turn within the section to page

83

1   17.
2       A.   Okay.
3       Q.   You see at the top of the page, there's a
4   heading there, quote:  The electronic commerce
5   business-to-business solutions market is highly
6   competitive, and we may not be able to compete
7   effectively, quote.
8          Do you see that?
9       A.   Yes, I do.
10      Q.   Do you consider your division to be within
11  the description of electronic commerce
12  business-to-business solutions market?
13      A.   My particular division is -- is part of
14  that group, yes.
15      Q.   And your understanding is, the company
16  tries to be accurate in the annual report with what
17  it discloses to shareholders.
18          Right?
19      A.   Absolutely.
20      Q.   So you would agree that's an accurate
21  statement that I just read that that business is
22  highly competitive.
23      A.   Yes.
24      Q.   And we may not be able to compete
25  effectively?

84

1       A.   Yes.
2       Q.   And in the second paragraph there, do you
3   see where it says, quote, in the first sentence:
4   Because there are relatively low barriers to entry in
5   the electronic commerce market, competition from
6   other established and emerging companies may develop
7   in the future, quote.
8          Do you see that sentence?
9       A.   I do.
10      Q.   Would you agree that's an accurate
11  statement?
12      A.   I believe it would be accurate, yes.
13      Q.   So in this context -- I think earlier you
14  asked me what did I mean by, barriers to entry.
15      A.   M-hm.
16      Q.   In that context of this sentence, what is
17  your understanding as an executive of ePlus Inc. as
18  to what barriers to entry means?
19      A.   Well, I think that -- in this reference,
20  first of all, at a higher level, the electronic
21  commerce business-to-business solution is more than
22  just the procurement and catalog management offering
23  of ePlus.
24      Q.   It includes your division as well as other
25  parts of the company?

Farber, Kenneth, Gary  - 30(b)(6) & Individual  12/16/2009  12:00:00 PM

85

```
 1      A.  Absolutely.
 2         So with that, in terms of, you know,
 3   relatively low barrier of entry into the commerce
 4   market, it is a market that has matured.  You're not
 5   trying to create a market.  It's one that already
 6   exists.  It allows other companies to emerge over
 7   time, whether present or in the future.
 8      Q.  What is your understanding as to what
 9   would be an example of a higher barrier to entry for
10   a given industry?
11      A.  Okay.  I'll give you an example.
12         Back when the -- in the 19- -- early
13   1990s, when perhaps the patents were first coming out
14   or devised by the inventors, the procurement market
15   was not a market like it is today.  People weren't
16   doing a lot of the functions that exist today in
17   electronic procurement systems.
18         So there's a higher barrier to market in
19   terms of showing value, showing ROI, creating the
20   market and the opportunity for customers.  So that's
21   just one example within our market.
22      Q.  Well, does that make marketing the product
23   difficult, or does it make it difficult to enter the
24   market?
25      A.  It's both.  I think it's fair to say that
```

86

```
 1   it's both.
 2      Q.  Those are 2 different things though.
 3         Would you agree with that?
 4      A.  Marketing and entering?
 5      Q.  Yes.
 6      A.  In one sense, they go hand in hand.
 7         In another sense, you can market all you
 8   want, but the industry has to be convinced of
 9   something new.  And that could be in the form of
10   -- (indiscernible) -- press, whatever.
11      Q.  What happened?
12         Computers have just gotten cheaper, more
13   powerful, more prevalent in business since the early
14   '90s?
15      A.  Certainly computers and hardware have
16   certainly become cheaper over time, certainly, yes.
17      Q.  Has that made it easier for other
18   companies to enter this market?
19      A.  No.
20         It has nothing to do with the cost of the
21   hardware that's made it -- I think it's easier for
22   people to enter the market now because it is a
23   recognized market.
24      Q.  Would it take --
25      A.  It's an established market.
```

87

```
 1      Q.  Excuse me.
 2         Would it take today relatively less money,
 3   less capital to get to the -- to invest in the
 4   equipment needed to get into the market than it would
 5   have 10 or 20 years ago?
 6      A.  Are we -- are you asking about this market
 7   in my space in procurement?
 8      Q.  Yes, let's talk about your division.
 9      A.  Okay.  No, I don't believe it would take
10   less money.
11         From hardware is one thing, but developing
12   an application, it still costs a lot, a lot of money
13   to, you know -- with a lot of people that know
14   processes and coding and everything that goes along
15   with it to create and develop and nurture and
16   application to provide levels of functionality that
17   the market utilizes.
18      Q.  Well, you say it takes a lot of money, but
19   here in the annual report, it does say there are
20   relatively low barriers to entry.
21         So I just want to make sure I understand:
22   Are you saying that the cost it would take to develop
23   the software to compete in your division, does that
24   create a high barrier of entry into your market or
25   not?
```

88

```
 1      A.  Well, I think we're talking about 2
 2   different things.
 3         As I stated earlier, the low barrier of
 4   entry is a result of the fact that it's a recognized
 5   e-commerce in general, business-to-business
 6   e-commerce is now a recognized and proven
 7   marketplace.  And that's the low barrier to entry.
 8         The high-barrier entry, which we don't
 9   refer to in this disclosure, is the cost of
10   developing those solutions.  And the cost that if we
11   were going into a new market, it could be very
12   expensive.
13         But we're not talking about the expense of
14   entering the market.  We're talking about the low
15   barrier to get into the market, which is already
16   established and recognized once you have the software
17   available for it.
18      Q.  Was that market established by the 2001,
19   2002 time frame?
20      A.  I think there's been an evolution in the
21   market.  I would still say from a business
22   perspective, it still isn't established.  There's
23   still a long way for people to go.
24      Q.  All right.  Well, do you view that as
25   significant barrier to entering the market in your
```

Farber, Kenneth, Gary  - 30(b)(6) & Individual  12/16/2009  12:00:00 PM

89

1   division today that the marketplace is still learning
2   about this product?
3       A.   I think there's still a high barrier for
4   people to enter the market to develop technology to
5   be in parity with other companies in the market, no
6   different to use a different analogy that you have,
7   you know, 3 or 4 primary automobile manufacturers in
8   the industry.
9       It's an established market.  Everybody
10  knows what the automobile does now.
11      But if I were to establish a new company
12  to manufacture automobiles, yeah, it's a low barrier
13  to -- to -- in the market in terms of recognition.
14  You're not creating the automobile and saying it's
15  better than a horse-drawn carriage, but it's very
16  expensive to start manufacturing ground up to create
17  the automobile that's in parity with others that are
18  on the market.
19      Q.   Would you agree with what's said on page
20  17 of the annual report that there are relatively low
21  barriers to entry in the electronic commerce market
22  or not?
23      A.   As I stated --
24      MR. ROBERTSON:  Objection, asked and
25  answered.

90

1       But go ahead.
2       A.   I'll repeat my answer.
3       Low barrier as it relates to the fact that
4   it's a recognized market today.
5       BY MR. McDONALD:
6       Q.   Well, this sentence here on page 17 is not
7   limited to market recognition, is it?
8       A.   Well, it's saying the market for
9   Internet-based business-to-business electronic
10  commerce solutions is competitive.
11      That's number 1.
12      Right?
13      And we expect it to intensify with new
14  products, new competitors in the market.
15      And then the next paragraph, it's saying
16  that -- I'm sorry -- further down, it says:  Our
17  strategy of providing Internet-based electronic
18  commerce solutions may not be successful or we may
19  not execute it effectively.  Accordingly, our
20  solution may not be widely adopted by business.
21      So we're making an investment in
22  technology that may or may not be widely adopted
23  going forward.  But there's low barriers to entry not
24  as it relates to how much it costs to get into the
25  market.

91

1       It's refer- -- our definition, it's
2   referring to that it's a recognized, available
3   market, and we're not trying to create a new market.
4   We're not trying to create an automobile that has
5   wings and convince people it can fly.
6       Q.   In 2007, did you consider Lawson to be
7   among your competitors within e-procurement and
8   catalog management?
9       A.   I believe they were part of the mix of
10  vendors that we may have considered as competitors.
11      Q.   In 2008, was Lawson also a competitor in
12  those areas?
13      A.   I would believe so.
14      Q.   In 2008, who do you consider to be your
15  primary competitors in those areas?
16      A.   It's what I answered earlier, same, same
17  list and probably growing.
18      Q.   Well, would you add anybody in 2008 that
19  you didn't have in your prior list?
20      A.   I'm sure.
21      Q.   Who would you add?
22      A.   I'd have to go back and fill in the gaps
23  for you of all the companies.
24      Q.   Can you give me -- go ahead and take a
25  moment if it would help you.

92

1       A.   All right.
2       Q.   I'd just like to see what your
3   recollection is of that right now.
4       A.   In terms of new companies that enter the
5   market that would be perceived competitors?
6       Q.   I don't know if they're new companies, but
7   they're companies that you have not named yet today
8   as amongst your primary competitors.
9       A.   Okay.  There were companies that entered
10  the market like Protivity.  There were companies that
11  entered the market -- or that actually I probably
12  should have named earlier that may have been in the
13  market, fluctuated in terms of -- trying to think --
14  I think I exhausted my recollection at this point.
15      Q.   Generally, is it true that in the 2007,
16  2008 time frame, you had dozens of competitors in
17  e-procurement and catalog management?
18      A.   I think there's more than dozens, but,
19  yes, there were a significant number of competitors.
20      Q.   More than a hundred?
21      A.   Approaching.
22      Q.   Is that still true in 2009?
23      A.   Yeah.
24      They come and go every day.
25      Q.   But overall, the number is still in that

Farber, Kenneth, Gary  - 30(b)(6) & Individual  12/16/2009  12:00:00 PM

93

1   range of many dozens, close to a hundred?
2       A.   Oh, yes, yes.
3       Q.   Was that also true in 2005 and 2006?
4       A.   Maybe not as true, maybe not as many.
5   Maybe half to three-quarters of that size.
6       Q.   So a few dozen, maybe closer to 50 or
7   somewhere in --
8       A.   Yeah, yeah.
9       Q.   -- that region?
10      Okay.  When you're out there competing in
11  the marketplace, do you try to develop a list of ways
12  to distinguish you from your competition?
13      A.   I think you always try to distinguish
14  yourself with some level of value against any
15  competitor in the market.
16      Q.   In the e-procurement and catalog
17  management areas, what is ePlus's sales pitch to
18  prospects as to how its different and better than its
19  competition?
20      A.   Well, I think the one that comes foremost
21  to my mind in terms of differentiators are, 1, the
22  length of time that we have been doing this, that we
23  have been in the procurement business much before
24  many of these companies were even incorporated that
25  we compete with, so that's one story line if you

94

1   will.
2       Experience of our people, knowledge of our
3   people, expertise that we have in the procurement
4   arena and the length of time that each of those
5   individuals have spent, and the value that they could
6   bring to companies that select us in terms of
7   procurement methodology, that sort of thing.
8       Certainly highlight our patents,
9   innovation, modular approach of the application,
10  flexibility of the application.
11      Q.   Is the modular approach and flexibility --
12  are those part of the same thing, or are those 2
13  different points?
14      A.   It's 2 different points.
15      Q.   Any other differentiators that you use in
16  the marketplace?
17      A.   Those -- those are the high-level
18  differentiators.
19      I mean, there's times I'm sure where
20  there's other differentiators we may have to get into
21  in terms of how -- which, you know, within the
22  application works as compared to somebody else's.
23      Q.   With respect to length of time, how long
24  has ePlus been in the e-procurement catalog
25  management business?

95

1       A.   Well, ePlus as a company has -- you know,
2   when I joined the end of 2000, 2001, they were --
3   they'd been involved in selling e-procurement systems
4   from the time that I joined, but our individuals
5   within the company were with prior companies that far
6   exceeded ePlus's experience.
7       Q.   So when you got to the company in 2000 or
8   2001, there were a number of employees at ePlus who
9   had worked at prior companies specifically in the
10  e-procurement catalog management area?
11      A.   No.
12      There were individuals that worked with me
13  at procure net, which ePlus acquired, that were in
14  the field for a significant length of time.
15      Q.   Procure net was a separate company from
16  ePlus.
17      Right?
18      A.   That's correct.
19      Q.   Did ePlus acquire assets of procure net?
20      A.   Yes.
21      Q.   Was it assets relating to the
22  e-procurement product line?
23      A.   Procurement catalog management.
24      Q.   Was ePlus formed around the 2000 time
25  frame?

96

1       A.   Was ePlus formed?
2       Q.   Yes.
3       A.   No.
4       Q.   They were preexisting, but they bought
5   these assets to add to their existing business?
6       A.   Yes, that's correct.
7       Q.   Prior to acquiring the procure net assets,
8   was ePlus in the e-procurement business?
9       A.   From a selling or licensing the
10  application, no, not that I'm aware of.
11      Q.   Would there be another way that they could
12  have been involved in e-procurement?
13      A.   I think they had a solution that allowed
14  customers to purchase their hardware directly from
15  them, but it was not necessarily a sophisticated
16  system.
17      Q.   When did procure net enter the electronic
18  procurement business?
19      A.   Well, I joined a year prior to the
20  acquisition of ePlus, so I don't know how long
21  procure net was -- was actually in business as a
22  stand-alone entity.
23      Q.   When you talk about the differentiator
24  that ePlus has been doing this a long time, did you
25  tell customers, our employees have been in the





97

[illegible]

99

[illegible]

98

[illegible]

100

[illegible]

101

103

102

104

Farber, Kenneth, Gary - 30(b)(6) & Individual - Vol 2  12/17/2009  12:00:00 PM







109

111

110

112

113

[illegible]

114

[illegible]

115

[illegible]

116

[illegible]

117

[illegible]

119

[illegible]

118

MR. ROBERTSON: Objection, calls for [illegible]

120

[illegible]





















121

[illegible]

122

[illegible]

123

[illegible]

124

[illegible]

125

[illegible]

127

[illegible]

126

[illegible]

128

[illegible]

129

[illegible]

131

[illegible]

130

[illegible]

132

[illegible]

133

[illegible]

134

[illegible]

135

[illegible]

136

[illegible]

137

[illegible]

138

[illegible]

139

[illegible]

140

[illegible]

141

[illegible]

143

[illegible]

142

[illegible]

144

[illegible]

145

[illegible]

146

[illegible]

147

[illegible]

148

[illegible]

149

151

150

152

153

[illegible]

154

[illegible]

155

[illegible]

156

[illegible]

Farber, Kenneth, Gary - 30(b)(6) & Individual - Vol 2  12/17/2009  12:00:00 PM







161

[illegible]

163

[illegible]

162

[illegible]

164

[illegible]

165

[illegible]

167

[illegible]

166

[illegible]

168

[illegible]

Farber, Kenneth, Gary - 30(b)(6) & Individual - Vol 2  12/17/2009  12:00:00 PM





173

175

174

176

Farber, Kenneth, Gary - 30(b)(6) & Individual - Vol 2  12/17/2009  12:00:00 PM











181

183

182

184

185

[illegible]

187

[illegible]

186

[illegible]

188

[illegible]

189

[illegible]

190

[illegible]

191

[illegible]

192

[illegible]

193

[illegible]

194

[illegible]

195

[illegible]

196

[illegible]

Farber, Kenneth, Gary - 30(b)(6) & Individual - Vol 2  12/17/2009  12:00:00 PM



Farber, Kenneth, Gary - 30(b)(6) & Individual - Vol 2  12/17/2009  12:00:00 PM

201

```
 1            UNITED STATES DISTRICT COURT
 2            EASTERN DISTRICT OF VIRGINIA
 3                  RICHMOND DIVISION
 4    ePLUS, INC.,          )
 5          Plaintiff,  )
 6       v.          ) No. 3:09cv620
 7    LAWSON SOFTWARE, INC.,    )
 8          Defendant.  )
 9      CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
10            Washington, D.C.
11          Thursday, December 17, 2009
12    30(b)(6) Videotape Continued Deposition of ePLUS,
13    INC., by and through its designee, KENNETH GARY
14    FARBER, and in his individual capacity, called for
15    examination by counsel for Defendant in the
16    above-entitled matter, the witness being duly sworn
17    by CHERYL A. LORD, a Notary Public in and for the
18    District of Columbia, taken at the offices of
19    TROUTMAN SANDERS LLP, 401 9th Street, Suite 1000,
20    Washington, D.C., at 8:52 a.m., and the proceedings
21    being taken down by Stenotype by CHERYL A. LORD, RPR,
22    CRR.
23
24
25
```

202

```
 1    APPEARANCES:
 2
 3    On behalf of Plaintiff:
 4        SCOTT L. ROBERTSON, ESQUIRE
 5        GOODWIN PROCTER LLP
 6        901 New York Avenue, N.W.
 7        Washington, D.C.  20001
 8        (202) 346-4000
 9
10    On behalf of Defendant:
11        DANIEL W. McDONALD, ESQ.
12        MERCHANT & GOULD
13        80 S. 8th Street, Suite 3200
14        Minneapolis, MN  55402-2215
15        (612) 332-5300
16
17    ALSO PRESENT:
18        Brian Ciccone, videographer
19
20
21
22
23
24
25
```

203

```
 1          C O N T E N T S
 2    WITNESS          EXAMINATION
 3                PAGE NO.
 4    KENNETH GARY FARBER
 5      By Mr. McDonald      207
 6      By Mr. Robertson      419
 7
 8          E X H I B I T S
 9        (Exhibits attached.)
10    LAWSON   EXHIBIT NO.      PAGE NO.
11    20    ePlus Briefing, September 2008,
12        ePLUS0909859-89      214
13    21    Procure+ 6.6 Sales Data Sheet,
14        ePLUS0037213-24      244
15    22    Procure+ Integration Processing,
16        ePLUS0909271-64      257
17    23    eProcurement - Indalex 3/2008,
18        ePLUS0434494-515      267
19    24    Analyst Briefing, August 2008,
20        ePLUS0818140-96      271
21    25    Enterprise Supply Management,
22        November 2008, ePLUS0813431-510   287
23    26    Email, 12-22-03, ePLUS0134656-58  303
24    27    Complex Indirect Procurement:
25        The Final Frontier for Savings,
```

204

```
 1       E X H I B I T S   C O N T I N U E D
 2    LAWSON   EXHIBIT NO.      PAGE NO.
 3
 4        EPLUS0115273-91      318
 5    28    Article, 7-31-03,
 6        ePLUS0026860-61      324
 7    29    Article, 1-21-04,
 8        ePLUS0026955-57      332
 9    30    Article, 6-25-04,
10        ePLUS0027032-33      339
11    31    Merchants and Categories
12        Directory, ePLUS0134621-22   343
13    32    Advantages of Selling on Procure
14        Net, ePLUS0134619-20      349
15    33    Procurement-Current State,
16        ePLUS0911573-82      353
17    34    Novant Health Procure to Pay
18        System, March 20, 2009,
19        ePLUS0432884-910      357
20    35    Email, 3-17-09, and attachment,
21        ePLUS0611525-26      360
22    36    Email, 2-15-08, ePLUS0864667   375
23    37    Email, 3-17-09,
24        ePLUS0911571-72      383
25    38    Email, 3-17-09, and attachment,
```

205

1    E X H I B I T S   C O N T I N U E D

2    LAWSON   EXHIBIT NO.          PAGE NO.

3

4         EPLUS0913891-904          404

5    39   February Management Meeting

6         2009, ePLUS0538719-38     406

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

206

1         P R O C E E D I N G S

2

3         THE VIDEOGRAPHER:  Today is Thursday,

4    December 17th, 2009.  The time is approximately 8:52

5    AM.

6         We are at the law office of Troutman

7    Sanders LLP location in Minneap- -- excuse me --

8    Washington, D.C.  This is the commencement of the

9    video deposition of ePlus Inc. pursuant to rule

10   30(b)(6) by their designate, Kenneth G. Farber, and

11   Kenneth G. Farber personally.

12        My name is Brian Ciccone, and I am the

13   video technician.

14        Will the attorneys please note their

15   appearances for voice identification.

16        MR. McDONALD:  For Lawson Software, Daniel

17   McDonald, of Merchant & Gould.

18        MR. ROBERTSON:  And for ePlus Inc., Scott

19   Robertson, of Goodwin Procter LLP.

20        THE VIDEOGRAPHER:  Will the court reporter

21   please swear in the witness.

22

23   Whereupon,

24        KENNETH GARY FARBER

25   was called as a witness by counsel for Defendant,

---

207

1    and, having been duly sworn by the Notary Public, was

2    examined and testified as follows:

3

4         MR. ROBERTSON:  Dan, I just have a quick

5    question.

6         The videographer just indicated that he

7    believed this was a 30(b)(6) deposition and a

8    personal deposition as well.

9         Mr. Farber was noticed personally?

10        MR. McDONALD:  I think there was a

11   stipulation going both directions that if there's a

12   30(b)(6), people could also be deposed in their

13   individual capacity.

14        MR. ROBERTSON:  Okay.  I think I recall

15   that.  I just -- so were you doing both yesterday

16   simultaneously?

17        MR. McDONALD:  Yeah, I guess so.

18        MR. ROBERTSON:  Okay.  All right.

19

20   FURTHER EXAMINATION BY COUNSEL FOR DEFENDANT

21   BY MR. McDONALD:

22   Q.   Morning, Mr. Farber.

23   A.   Good morning.

24   Q.   I wanted to go back through that list of

25   prospects that you mentioned yesterday that you said

---

208

1    you were up against Lawson with.

2    A.   Okay.

3    Q.   And I wanted to clarify for one thing the

4    timing on when these bids -- bidding activities took

5    place.

6         For Gannett, when were you up against

7    Lawson?

8    A.   For Gannett, that was this past year,

9    2009, when that had occurred.

10   Q.   For Indalex, when did that happen?

11   A.   I think that might have been within the

12   last year to 18 months.

13   Q.   So 2008 to 2009?

14   A.   I believe so, best of my recollection.

15   Q.   When did you go up against Lawson for

16   Novant?

17   A.   Same time period.

18   Q.   2008?

19   A.   I believe so.

20   Q.   When did --

21   A.   2008, 2009.

22   Q.   Early 2009?

23   A.   I'd have to check, but, yeah, I believe

24   so.

25   Q.   Was that sometime before the lawsuit

209

1  anyway?
2      A.   Yes.
3      Q.   What was the timing of the Cleveland
4  Clinic bid?
5      A.   Cleveland Clinic I also believe
6  approximately the same time frame.
7      Q.   2008, early -- first half of 2009?
8      A.   Best I recall.
9      Q.   For BlueCross BlueShield of North
10  Carolina, what was the timing?
11      A.   I think that was also 2008.
12      Q.   For XM Radio, what was the timing?
13      A.   2008.
14      Q.   For Hanes, what was the timing?
15      A.   Hanes, I believe, was the latter part of
16  2006.
17      Q.   Wolters Kluwer, what was the timing?
18      A.   2009.
19      Q.   Do you believe that from time to time
20  prior to 2008 you did go up against Lawson for
21  customers other than Hanes for e-procurement?
22      A.   I could have, or as a company, we could
23  have.  I'm -- I'm not sure that I recall, you know,
24  off the top of my head if we did what the
25  circumstances were exactly.

210

1      Q.   Is it your sense that in 2008, the
2  competition for Lawson escalated with respect to
3  ePlus?
4      A.   I think that during that time frame, we --
5  we were seeing more of -- Lawson in accounts.
6      Q.   Why do you think that is?
7      A.   Just by the number of accounts that I was
8  privy to within that period.
9      Q.   Okay.  Maybe my question was unclear.
10      What I'm asking is, do you have an
11  understanding as to why it is you saw more of Lawson
12  in 2008 than you had previously?
13      A.   No, I don't.
14      Q.   Has ePlus developed a sales message to
15  convey to prospects when you're selling up against
16  Lawson for differentiating itself from Lawson?
17      A.   Trying to think if we did or didn't.  I
18  don't -- I don't think we did.  We may have, but I
19  don't know.
20      Q.   Do you have an understanding -- well, let
21  me put it this way.
22      If a customer asks you, well, Lawson is up
23  against your procure plus and content plus products,
24  give me some reasons why we should use ePlus instead
25  of Lawson --

211

1      A.   M-hm.
2      Q.   -- what would you tell that customer?
3      A.   Well, I think the message to my sales
4  folks or clients would be the same as I stated
5  yesterday in terms of the differentiators.
6      Q.   So your message wouldn't be different for
7  Lawson than it is when you're competing against other
8  competitors?
9      A.   I don't believe so.  We try to stay out of
10  the feature function comparisons and bring in a level
11  higher, more at a business level.
12      Q.   Does ePlus compete against some of its
13  licensees like Ariba and SAP?
14      A.   Sure.
15      Q.   And specifically, with the procure plus
16  and content plus products?
17      A.   Yes.
18      Q.   Again, do you have basically the same
19  response to customers when you're trying to
20  differentiate yourself?
21      A.   I do.
22      Q.   Is that what you tell your salespeople to
23  do as well?
24      A.   I try.
25      Q.   Are there any competitors of procure plus

212

1  and content plus who have products that you try to
2  differentiate from based on features and function?
3      A.   I think there may have been times where
4  prospects would -- would get down to a certain level
5  and ask for those, you know, differentiators.
6      Q.   Was it -- absent a customer actually
7  asking that specific question, has it ever been part
8  of your sales pitch to differentiate ePlus's procure
9  plus and content plus products from competitor
10  products based on features or functions?
11      A.   We may have in responses to proposals.
12  You know, I'd have to look at specific ones to see.
13  Depends on the sales situation, I suppose.
14      Q.   Well, absent a customer either asking the
15  question --
16      A.   M-hm.
17      Q.   -- verbally or in effect through a request
18  for proposal, has it ever been part of your standard
19  sales pitch to differentiate based on feature or
20  function?
21      A.   Our standard sales pitch, no, our Web
22  materials, no, we don't, you know, list those
23  comparisons publicly.  Whether somebody inserted
24  slides to do something specific for a customer I
25  don't have recollection of.

Farber, Kenneth, Gary - 30(b)(6) & Individual - Vol 2  12/17/2009  12:00:00 PM

213

1    Q.    When ePlus has gone head to head against
2    Lawson for procure plus or content plus, has it ever
3    in response to a customer inquiry distinguished the
4    products -- the Lawson products based on features or
5    functions?
6    A.    We may have.  I don't have immediate
7    recollection of those presentations or documents that
8    may or may not have been presented.
9    Q.    Do you have an understanding as to whether
10   there are differences in features and function
11   between the ePlus procure plus and content plus
12   products and the Lawson products?
13   A.    I suppose there's always going to be
14   nuances.  Specific differences don't come -- come to
15   my mind.  I haven't looked at the application, you
16   know, other than Website stuff, so --
17   Q.    Do you know what the names are of any of
18   the Lawson products that have similar -- generally
19   similar function?
20   A.    Well, I know there's a Lawson purchasing
21   module.  I know there's a content.  I don't know what
22   the official names are that are referred to.  I don't
23   recall the official names.  I know I looked at it
24   and --
25   Q.    When you say you looked at it, how did you

214

1    look at it?
2    A.    Well, I looked at the Website obviously.
3    Q.    The Lawson Website?
4    A.    Yeah.
5    Q.    What is your understanding as to how long
6    Lawson has had and sold a purchasing module?
7    A.    Not sure I recall how long they've had the
8    module and what generations of the module have
9    occurred.
10   Q.    Do you have an understanding at least that
11   it was before 2008 that they had one?
12   A.    I would -- I would suspect they did.  If
13   we competed in some form or function in 2006, tail
14   end of 2006 with Hanes, I would -- I would have to
15   surmise that they did.
16   Q.    Okay.  So at least by the time you were up
17   against Lawson in 2006 going after Hanes, you believe
18   they had -- Lawson had a purchasing module at least
19   by then?
20   A.    I would believe.
21   MR. McDONALD:  Let's mark this as the next
22   exhibit, please.
23        (Lawson Exhibit No. 20
24            was marked for
25            identification.)

215

1    BY MR. McDONALD:
2    Q.    Mr. Farber, you've been handed what was
3    marked Lawson exhibit 20.
4    A.    Okay.
5    Q.    Do you recognize this document?
6    A.    Not offhand, but if you give me a minute,
7    I'll look through it.
8    Q.    Sure.
9        (Pause.)
10   A.    Okay.
11   BY MR. McDONALD:
12   Q.    Have you had a chance to review it?
13   A.    Yeah, briefly, sure.
14   Q.    Okay.  Do you recognize exhibit 20?
15   A.    Well, it appears to me to be a
16   presentation of some of the products and services
17   that we offer.
18   Q.    And your name and Will Thomas's names are
19   on the first page of this document.
20        Right?
21   A.    Apparently, yes.
22   Q.    Is this a PowerPoint presentation that you
23   did?
24   A.    It appears so, yes.
25   Q.    And the title of it is, ePlus briefing

216

1    September 2008.
2        Correct?
3    A.    Yes.
4    Q.    And then it's got the ePlus logo on the
5    top right corner of at least the first page?
6    A.    M-hm.
7    Q.    Say yes or no.
8    A.    Yes, sir.
9    Q.    What was the purpose of this document?
10   A.    I have no clue at the time.  It could have
11   been prepared for a number of different reasons.
12   Q.    Do you do briefings about ePlus as a
13   company from time to time?
14   A.    Yes, certainly.
15   Q.    You do that sometimes with Mr. Thomas, the
16   senior vice president?
17   A.    At times.
18   Q.    Who do you brief?
19   A.    It could have been for an internal call
20   with my team.  It could have been for a seminar.  It
21   could have been for a prospect.
22   Q.    So as you look at this document, do you
23   think it could have been for use for all 3 of those
24   purposes?
25   A.    Well, if you give me a couple minutes --

Farber, Kenneth, Gary - 30(b)(6) & Individual - Vol 2  12/17/2009  12:00:00 PM

217

1   Q.   Sure.

2   A.   -- I'll go through it in a little bit more

3   detail.

4       (Pause.)

5   A.   Possibly could have been.  It looks fairly

6   high-level, so it could have been used for --

7       BY MR. McDONALD:

8   Q.   You don't see any internal company

9   confidential information in this -- as you're

10  reviewing it in any way, do you?

11  A.   It says, ePlus proprietary and

12  confidential.

13  Q.   Oh, okay.

14      Well, was that a good indication, then,

15  whether that would have just been used internally or

16  whether you would have used it outside the company?

17  A.   No, not necessarily.

18  Q.   Okay.  So you might mark it that way even

19  though you might be at a public seminar?

20  A.   Exactly.

21  Q.   Okay.

22  A.   This looks a little lengthy to be doing at

23  a public seminar, but --

24  Q.   Did you prepare exhibit 20 yourself?

25  A.   Probably not.

219

1   A.   That's correct.

2   Q.   Went from about 830 million to about --

3   was it 660?

4   A.   600 and change.

5   Q.   600 --

6   A.   Yes.

7   Q.   -- million and change.  Okay.

8       So that was a decline in sales of over 200

9   million dollars?

10      Correct?

11  A.   About 150 I think it was or somewhere

12  thereabouts.

13  Q.   Well, if it went from 830 to --

14  A.   I know.

15  Q.   -- 150 -- about 680.

16      Is that -- is that right?

17  A.   Well, if it was 680 and it was 800, it's a

18  difference of 120.

19  Q.   Well, I thought you said it was 830

20  million or so.

21  A.   I -- to the best of my recollection, it

22  was, but --

23  Q.   Okay.

24  A.   It would be in the -- in our public

25  documents --

218

1   Q.   Who probably prepared it?

2   A.   It could have been prepared by a

3   combination of Will Thomas and Jeff Pinkerton, our

4   marketing department.

5   Q.   Can you turn to the second page of exhibit

6   20.

7   A.   Certainly.

8   Q.   This is a company overview.

9       Right?

10  A.   Yes.

11  Q.   Now, the third bullet point down says, 800

12  million-plus in revenue; is that right?

13  A.   Yes.

14  Q.   This is as of September of '08.

15      Correct?

16  A.   That's what it says, yes.

17  Q.   So was that for the fiscal year ending

18  March of 2008 that you had over 800 million in

19  revenue?

20  A.   I don't remember if it was fiscal year '07

21  or '08, but it was our last publicly announced

22  revenue numbers, which I think that year was maybe

23  830 million.

24  Q.   So revenues went down from the year-ending

25  March of '08 to the year-ending March of '09?

220

1   Q.   Okay.

2   A.   -- our annual reports.

3   Q.   All right.

4   A.   But there was a decline.

5   Q.   What do you attribute the decline to?

6   A.   Well, the decline was basically the state

7   of what I explained yesterday.  ePlus was -- was not

8   unscathed as most companies in terms of the change of

9   economy and the downsize in purchasing mainly

10  attributed to you, you know, the way people were driving

11  their capital expenses and just holding onto their

12  funds and their cash, so --

13  Q.   Did the market as a whole for the types of

14  products that ePlus sells also decline during that

15  same time frame?

16  A.   In some areas there's multiple lines of

17  business, so some areas, yes.

18  Q.   Did the sales in your division

19  specifically that includes plus -- or content plus

20  and procure plus, did -- did your sales revenues

21  decline from fiscal 2008 to fiscal 2009 ending in

22  March?

23  A.   No, I don't recall a variation best of my

24  recollection.

25  Q.   So didn't go up or down much one way or

Farber, Kenneth, Gary - 30(b)(6) & Individual - Vol 2  12/17/2009  12:00:00 PM

221

1    the other?
2        A.   Within boundaries.  I mean I think it
3    could have been plus on minus a little bit but
4    nothing that I recall being that tangible.
5        Q.   Most of ePlus's revenues are in the
6    value-added reseller area; is that right?
7        A.   At the top end of revenue, yes, that's
8    correct.
9        Q.   The top end being the number that would
10   correlate to this 800 million-plus figure.
11       Right?
12   A.   Yes.
13       Q.   That's where ePlus sells customers
14   computer hardware and software mostly; is that right?
15       A.   It's where we provide computer hardware,
16   computer software.  We make as I said earlier or
17   yesterday our software available to our clients as
18   well that are purchasing from us as a driver to gain
19   more business.
20       Q.   Does ePlus use the information on page 2
21   of exhibit 20 here talking about how it's been public
22   since '96, 800 million-plus in revenue over 2700
23   customers, over 700 employees, industry leader,
24   growing market position -- does it use all of that
25   basically to convey to customers that ePlus is a

222

1    stable, goodsized company that's going to be around?
2        A.   ePlus as an entity, as a company, as a
3    whole, I think that stating that we're public,
4    stating the revenues, stating the customers and
5    employees and market position, I think it's been used
6    in the past, yes.
7        Q.   But I want to clarify the purpose of that
8    in sales pitch.
9        Do you say use that sort of information in
10   sales pitches to convey to prospects that ePlus is a
11   stable, large company that's going to be around for a
12   while?
13       A.   ePlus as a company?
14       We probably have in the past.
15       Q.   Do you believe you're currently doing
16   that?
17       A.   I don't think -- I don't recall calling it
18   out saying, we're a financial company that's going to
19   be around tomorrow, but I believe that it's in our
20   proposals and responses when people ask for, tell us
21   about your company as a whole.
22       Q.   Is that your intent in including this sort
23   of information when you answer that question to
24   convey to people that ePlus is a financially stable
25   large company that's going to be around a long time?

223

1        A.   It's in response to what our -- what our
2    customers always ask, so it's included in there.  I
3    don't know if that's necessarily the driving forces.
4    To some companies, it's of importance, and others
5    it's less importance, but, yeah, I mean, we certainly
6    want to say that the company as a whole has been
7    around a while.
8        Q.   And is going to be around for a while
9    longer.
10       Right?
11       A.   We hope so.
12       Q.   Right?
13       A.   You know, that would be a forward-looking
14   statement.
15       Q.   Right.
16       Could you turn to the page -- it's about
17   the seventh page in, the last 4 digits of the ePlus
18   number are 9865.
19       A.   Certainly.  Okay.
20       Q.   This slide has the heading, software
21   solutions.
22       Do you see that?
23       A.   I do.
24       Q.   Is this slide and the bullet points listed
25   there, are those the product areas you have

224

1    responsibility for in your division?
2        A.   Product information manage --
3        MR. ROBERTSON:  If you read, you've got to
4    slow down.
5        (Discussion off the record.)
6        A.   That is correct.
7        BY MR. McDONALD:
8        Q.   Now, early in the deposition yesterday,
9    you listed I believe 5 product categories.
10       And this list has 6 product categories.
11       Right?
12   A.   M-hm, m-hm.
13       Q.   Can you say yes or no?
14   A.   Yes.
15       I'm sorry.
16       Q.   I think the extra one that I see in this
17   list that you did not mention yesterday is payables
18   processing?
19   A.   M-hm.
20       Q.   Do you see that?
21   A.   Yes, I do.
22       Q.   Is that one of the categories within your
23   division?
24       A.   Well, payables processing was a -- in I
25   believe it was 2008, latter part of 2007 perhaps, we

225

1  were going to use our document management system to
2  do payables processing and provided it as an
3  offering, and then have since moved in a different
4  direction.
5      Q.  Was it your decision at least in part to
6  stop having a separate division for payables
7  processing?
8      A.  It wasn't a division.  An application,
9  yes.
10     Q.  Okay.  Why did you drop payables
11 processing as an application?
12     A.  I think it was -- it was more a matter of
13 resources that we had to put on the process or the --
14 or the program, and other priorities.
15     Q.  Over the last 4 years, have there been any
16 other applications or categories within your group
17 that at one time existed but do not exist any longer
18 other than payables processing?
19     A.  To the best of my recollection, I don't --
20 I don't believe so.
21     Q.  Can you turn 2 pages later to the page
22 ending in 9867, please.
23     A.  Okay.
24     Q.  This is under the heading, approach and
25 target market.

226

1      Do you see that?
2      A.  I do.
3      Q.  Do you know whether this slide is talking
4  specifically about your software solutions division,
5  or is it talking about ePlus as a whole?
6      A.  I think it appears to be at both -- both
7  levels.
8      Q.  What's your basis for saying that as you
9  look at the slide?
10     A.  Bases are 80 percent of new clients are
11 referral-based, would seem to apply to -- could apply
12 to both, you know, sides of the -- of the
13 organization.  Our prospects, experienced users of
14 spend management have deployed other solutions in the
15 past.
16     This could talk to a number of our
17 different product- -- solutions that may be agnostic
18 to the application platform, or it could be our VAR
19 business, you know, selling into companies that are
20 using these -- these solutions.
21     Q.  Another division of the company I believe
22 you indicated yesterday is leasing.
23     Right?
24     A.  That's correct, yes.
25     Q.  Could this also apply to leasing, this

227

1  second bullet point here?
2      A.  I don't necessarily know about the second
3  bullet point, but it could apply to the first and
4  latter third bullet point.
5      Q.  And I'm sorry.
6      I don't recall whether there are any other
7  divisions other than VAR, your software division, and
8  leasing.
9      Was there another one?
10     A.  There is a leasing value-added reselling
11 business, and our supply chain solutions are the
12 main --
13     Q.  Those are the 3.  Okay.
14     And the second bullet point, it says,
15 quote:  Our prospects are experienced users of spend
16 management and have previously deployed other
17 solutions in the past.
18     Do you see that?
19     A.  I do.
20     Q.  So spend management, does that indicate to
21 you that this is talking about your division in
22 particular or not?
23     A.  No.
24     Spend management -- there's -- there's a
25 lot of acronyms in our industry.  Earlier in the

228

1  presentation, you may have noticed when you were
2  talking about and asking me, are those 4 or 5 or 6
3  within my division, there was something called PIM,
4  product information management.  By example, that's
5  another analogy that also refers to the space of
6  catalog content, supplier collaboration, management.
7      Spend management in 2008 was also a term
8  that was utilized by a number of companies as the
9  supply chain space as a whole, which encompassed a
10 lot of different components and elements.
11     Q.  Okay.  So that could still refer to your
12 VAR business as well as your other business.
13     Right?
14     A.  It very well could, yes.
15     Q.  And then below that bullet point, there's
16 a subpoint that lists companies Ariba, Lawson,
17 Oracle, SAP, Infor, Microsoft and Commerce One.
18     Do you see that list?
19     A.  I do.
20     Q.  Are those all companies that provide these
21 previously deployed solutions you're talking about in
22 this bullet point?
23     A.  It's an interesting context.  It leads me
24 to believe for example Infor, Microsoft being in that
25 list, it looks like -- like this presentation may

229

1   have been for a specific targeted purpose of somebody
2   that was interested in that, so I don't -- I don't
3   know.
4        Q.   Okay.  Do Infor and Microsoft compete in
5   your division, or do they compete with VAR, or what?
6        A.   Yeah.
7             I don't look at Microsoft as -- as
8   competing with us.  So, you know, I don't know the
9   context of why Microsoft may have been in this
10  presentation.
11       Q.   Actually I guess this bullet point isn't
12  necessarily listing competitors, is it?
13       A.   It just says, other solutions.
14       Q.   Right.
15            So is the point of this that you can sell
16  your products to companies who have deployed
17  solutions from Ariba, Lawson, Microsoft, and the
18  other listed companies here?
19       A.   Certainly.  And it could be any number of
20  products that -- that they may have installed, so --
21       Q.   Does the value-added reseller division of
22  ePlus sell equipment to companies that use Lawson
23  software?
24       A.   I would assume they do.
25       Q.   On the VAR side of the business, do

230

1   customers communicate to ePlus about what they need
2   the computer hardware and software to do
3   specifically?
4        A.   At times, not always.
5        Q.   Sometimes they just say, I need 2 of these
6   and one of those?
7        A.   Exactly.
8        Q.   Other times they come to you and say,
9   here's -- here are my needs, can you help me
10  determine what's the right hardware and software I
11  need?
12       A.   At times.
13       Q.   Do you know whether or not ePlus on its
14  VAR side has installed products at customers who
15  specifically were using Lawson's purchasing module or
16  not?
17       A.   Unaware of any.
18       Q.   You said, unaware?
19       A.   I'm unaware.
20       Q.   Is that a conversation you ever had with
21  anybody on the VAR side, that sort of conversation
22  about competitor products?
23       A.   No, not that I recall specifically.
24       Q.   So with respect to Lawson in this bullet
25  point, what -- can you give me an understanding of

231

1   what, quote, solution you're talking about there as
2   an example anyway that Lawson has provided to your
3   prospects?
4        A.   You know, as I said earlier, it says, our
5   prospects are experienced users.
6             Right?
7             So -- and not knowing the audience, I
8   don't know the context by which this was being
9   presented at that time in 2008.  It could have been
10  somebody that had an Ariba procurement system, a
11  Lawson procurement or accounting system, or inventory
12  management, et cetera, et cetera, so I don't -- it's
13  hard for me to suggest or surmise the context by
14  which this was put together and for what exact
15  purpose, an intent of that bullet.
16       Q.   So can you tell me for example whether the
17  intent here is to indicate that ePlus is trying to
18  sell products that would complement these previously
19  deployed solutions of other companies, or replace the
20  solutions previously deployed for customers?
21       A.   I think you're -- you're asking me a
22  question I don't have an answer to.
23       Q.   Okay.  Well, who would know more than you
24  about this presentation when your name is on it?
25       A.   That's a good question.  The only other

232

1   person's name on it is Will Thomas, so whether it was
2   possibly him, I don't know.
3        Q.   When ePlus is aware of a prospect that has
4   a Lawson purchasing module -- let me back up a little
5   bit.
6        A.   Sure.
7        Q.   Do you know whether or not it's happened
8   that a prospect uses a Lawson purchasing module but
9   they're looking to add functionality for example in
10  catalog management?
11       A.   I'm sure that's occurred.
12       Q.   When that's occurred, is ePlus -- I'll
13  withdraw that.
14            When that has occurred, does ePlus try to
15  convey to the prospect that ePlus does have a catalog
16  management product that will work together with the
17  Lawson purchasing module?
18       A.   I don't know if it was -- has been
19  conveyed specifically with Lawson.  I know that we
20  have done that with -- with other systems in the
21  past.
22       Q.   Based on your communications with
23  salespeople, do you think it's true that if they
24  encountered a prospect who had a Lawson purchasing
25  module that was looking to add catalog content

233

1  management functionality that ePlus would try to find
2  a way to communicate to that customer that, yes, we
3  can sell you our product, and it will be compatible
4  with Lawson?
5      A.  Well, our salespeople look at things
6  agnostically, so if there's something that they think
7  they could sell, I'm sure they would sell it or try
8  to sell it.
9      Q.  And that's true even in cases where the
10  prospect had a Lawson purchasing module?
11     A.  It may very well be true.
12     Q.  If you turn to the next page of exhibit
13  20, please.
14     A.  Certainly.
15     Q.  This page has the heading, integrated
16  solutions.
17         Do you see that?
18     A.  I do.
19     Q.  Now, are all the products that are
20  described on this page products that are sold by your
21  division?
22     A.  Well, they're not all products, but, yes.
23  It's part of my division.
24     Q.  Okay.  Let's walk through.
25         Which of these 5 big boxes on the page

234

1  here that have bullet points in them -- which ones
2  are corresponding to products sold by your division?
3      A.  Well, supplier enablement, procure plus,
4  spend analysis, asset management.
5          Integration is sold by my division, but
6  it's not a product, and that's the distinction that I
7  was making for you.
8      Q.  What is integration?
9      A.  Integration is when as we described a
10  little bit yesterday as an ex- -- by example is when
11  a customer has a back-office ERP system or accounting
12  system and they want to exchange a general ledger
13  information, accounts payable information between the
14  2 systems, that's what the integration is for.
15     Q.  So that's a service that ePlus provides?
16     A.  It's part of our services, yes.
17     Q.  And you get revenues for that?
18     A.  At times, yes.
19     Q.  Supplier enablement.
20         Is that the box that has the content plus
21  product described in it?
22     A.  Yes.
23     Q.  What does the term supplier enablement
24  mean?
25     A.  Well, supplier enablement is a generic

235

1  term that we use that has a connotation of creating
2  of the catalog, creating of the -- or preparation
3  of -- of the interaction with the systems and a
4  client's suppliers.
5      Q.  So it says, enabling suppliers to put in
6  catalog information for example into the customer's
7  system one way or another.
8      A.  That may be one example.
9      Q.  Then the upper right corner above, spend
10  analysis, it says, quote:  Use them together or
11  augment and support applications already in place,
12  quote.
13         Do you see that?
14     A.  Yes, I do.
15     Q.  Does that mean that any of these 5 blocks
16  here could be a block that the customer may have
17  already in place from some other vendor?
18     A.  It -- it could potentially mean that,
19  yes.
20     Q.  And ePlus will sell the other blocks to
21  make the system whole to the customer's desire?
22     A.  I believe so.
23     Q.  So is supplier enablement -- is that box
24  basically correlated to the product information
25  management area?

236

1      A.  Supplier enablement is a a -- is an area of
2  product information management, yes.
3      Q.  On the next page.
4      A.  Yes.
5      Q.  That's page 9869.
6          Correct?
7      A.  Correct.
8      Q.  What does the heading, enabling solutions,
9  mean?
10     A.  It's a -- just a term that -- I don't know
11  why we called it here, enabling solutions, but it's
12  just the solutions that enable the areas of
13  electronic procurement, document management, content
14  management, et cetera.
15     Q.  So e-procurement and content management
16  are shown here as being 2 discrete areas.
17         Right?
18     A.  For some customers, they are.  For others,
19  they're not.
20         But the industry as a whole always breaks
21  out or more frequently breaks out from a descriptive
22  perspective electronic procurement and content
23  management even though they work hand in hand.
24     Q.  Now, under the procurement box, the brand
25  name is there, procure plus.

237

1    Right?
2    A.  Correct.
3    Q.  And then below that, are there some logos
4    for some customers of ePlus that use procure plus?
5    A.  M-hm, yes.
6    Q.  And so Hanes' Brands Inc. is one of them.
7    Right?
8    A.  I see that.
9    Q.  Is that the Hanes that you mentioned that
10   you were up against Lawson for in 2006?
11   A.  I believe so.
12   Q.  So did ePlus beat out Lawson for that
13   Hanes business in 2006?
14   A.  Well, if I believe that we were to the
15   best of my recollection competing and it's here, I
16   could only assume -- and it is an assumption on my
17   part -- that we beat Lawson in that area.
18       Hanes is a big organization.
19       Could they be running Lawson procurement
20   in another area?
21       Possibly.
22   Q.  And under the logos in the e-procurement
23   box, it says, quote, provided since 1983, quote.
24       Do you see that?
25   A.  I see the bullet, yes.

238

1    Q.  What is it that was provided beginning in
2    1983 that relates to e-procurement?
3    A.  I think they were multiple generations of
4    electronic procurement, certainly not by ePlus.  So I
5    think they're trying to put forth, you know, that
6    there's some longevity both in the application,
7    sourcing, et cetera.
8    Q.  So going back to 1983, would that be the
9    expertise in e-procurement developed at Fisher
10   Scientific that you're invoking there?
11   A.  I wouldn't know.  I -- I know that there's
12   been people involved in procurement, within the
13   procurement organization that have been -- it's part
14   of the longevity of people that I was talking about
15   yesterday.
16   Q.  Well, ePlus has been around just since
17   1990.
18       Right?
19   A.  ePlus as a company, certainly.
20   Q.  Right.
21       So did it have some predecessor company
22   that dates back to 1983?
23   A.  Well, ePlus acquired Procure Net, and
24   people at Procure Net were around for a long time
25   prior to that.

239

1    Q.  So do you believe this '83 date goes to
2    the people at Procure Net and their history?
3    A.  I believe so.
4    Q.  And the people at Procure Net, do you know
5    whether they were at Fisher in 1983 or not, at least
6    some of them?
7    A.  I don't know.
8    Q.  You see the reference a couple bullet
9    points before -- below that one to sixth-generation
10   software?
11   A.  Yes, I do.
12   Q.  I think you just mentioned this generation
13   thing a moment ago.
14   A.  M-hm.
15   Q.  Can you walk through for me generally what
16   these different generations are of procurement
17   software.
18   A.  Our reference to generation is by the
19   version number.  So with every product, there's a
20   version number, version 1, version 2, version 3, et
21   cetera, all the way to version 6.  And I think we are
22   at version 6.9 now.
23   Q.  And that's for what, for the procure plus
24   product?
25   A.  Correct.

240

1    Q.  Okay.  So this is procure plus version
2    6 --
3    A.  That's right.
4    Q.  -- 6 point something?
5    A.  Exactly.
6    Q.  Now, over on the right side under, content
7    management, you see that's got the content plus brand
8    name there?
9    A.  Yes, I do.
10   Q.  Then again there's some company logos
11   listed?
12   A.  Yes.
13   Q.  And in bullet points, that one says,
14   provided since 1990.
15       Correct?
16   A.  Yes.
17   Q.  Now, do you have an understanding as to
18   what the product was in 1990 that corresponds to
19   content plus?
20   A.  It's similar to what we discussed in
21   procurement.  There are people that were involved
22   since '90 in a facility that Procure Net had.
23   Q.  Yeah.
24       This goes back to when Procure Net was
25   founded then, or ePlus?

241

1      A.  Well, I don't know the exact date Procure
2   Net was founded, but Procure Net had electronic
3   procurement and content management, so just as I was
4   referring earlier about people that have been
5   involved since '83, there were people involved since
6   1990 in the content side.
7      Q.  Now, under this content management
8   heading, the third bullet point says, quote:
9   patented technology, quote.
10         Do you see that?
11      A.  I do.
12      Q.  Do you know whether that refers to the
13   patents involved in this suit or some other patents?
14      A.  They may.
15      Q.  Do you know one way or the other?
16      A.  No, I don't, because there's other --
17   other patents that are not in suit.
18      Q.  ePlus has other patents related to content
19   management.
20         Correct?
21      A.  That's correct.
22      Q.  Why did you list patented technology as a
23   bullet point under this heading here?
24      A.  Why it was listed specifically here, I
25   don't know.  My -- my -- this could have been again

242

1   an opportunity that was more content-specific than
2   others and somebody was trying to highlight that here
3   for some reason.
4      Q.  In any event, there is no bullet point
5   under the e-procurement heading on this slide
6   indicating that that is, quote, patented technology,
7   quote.
8         Correct?
9      A.  Not on this particular one.
10      Q.  Can you go ahead a few pages to the page
11   ending in numbers 9873.
12      A.  Okay.
13      Q.  Is this a page that generally indicates
14   the features of the procure plus product?
15      A.  It appears so.  It's titled, procure plus.
16      Q.  Okay.  The first feature listed is, quote:
17   advanced patented catalog management, quote.
18         Do you see that?
19      A.  I do.
20      Q.  So is that indicating that the procure
21   plus product will work with the content plus product
22   that provides advanced patented catalog management?
23      A.  Again, I don't know the context by which
24   this was being positioned and for what purpose.
25         There are other patents in our -- in our

243

1   catalog management technology that may have been
2   being highlighted for -- for a certain reference
3   here.
4      Q.  Can you tell me generally what that
5   advanced catalog management is that you're referring
6   to here as patented?
7      A.  There's other patents that ePlus possesses
8   that deal with the syntax of information and how we
9   break down the syntax of information and
10   automatically create long descriptions and --
11      Q.  This has to do with building the content
12   for catalogs?
13      A.  It's one of the means by which somebody
14   could do that.
15      Q.  What are the advantages of that
16   technology?
17      A.  It -- it ultimately we believe helps the
18   catalog process by removing some of the nuances that
19   suppliers use.  "Supply" may refer to something as a
20   quote mark in their description.  Others may have the
21   word inch.
22         So we basically have rules with synonyms
23   that associate the 2 and come up with a standardized,
24   normalized meaning for that term.
25      Q.  So all the different catalogs that are in

244

1   the database regardless of the supplier, they all use
2   similar language?
3      A.  Sometimes.  Sometimes we use it and
4   sometimes clients don't want it, so --
5      Q.  Right, but I mean, that's the purpose of
6   the technology?
7      A.  So that there's similar vernacular
8   throughout the catalog.
9      Q.  You understand that those patents on the
10   syntax for the catalogs, those are not involved in
11   the Lawson case.
12         Correct?
13      A.  I don't believe they were named.
14      Q.  You can put that one aside.
15      A.  Okay.
16      Q.  Give me a moment.
17      A.  Certainly.
18      Q.  I'll see if I can zip through this
19   one.
20      A.  Certainly.
21         MR. McDONALD:  Would you mark that as the
22   next exhibit, please.
23         (Lawson Exhibit No. 21
24            was marked for
25            identification.)

245

```
1        BY MR. McDONALD:
2        Q.  Mr. Farber, you've been handed what is
3    marked exhibit 21 entitled, procure plus 6.6 sales
4    data sheet.  You can certainly review it all you'd
5    like.
6        I'd just like to -- my first question is
7    going to be, do you recognize this thing?
8        A.  Not off the top of my head, but --
9        Q.  Okay.  Can you take a look at it.
10        (Pause.)
11        A.  Okay.
12        BY MR. McDONALD:
13        Q.  Now that you've had a chance to look at
14    it, do you recognize this document?
15        A.  No.
16        Q.  It does -- is 6.6 -- is that one of the
17    versions of the sixth-generation procure plus
18    product?
19        A.  I believe so, yes.
20        Q.  Now, at the top, the print is kind of tiny
21    above that heading, but it looks like it says,
22    procure plus sell sheet October 21, 2002.
23        Do you see that at the very top?
24        A.  I do.
25        Q.  Is it true that at least in the 2002 time
```

246

```
1    frame, ePlus would develop documents to help its
2    salespeople sell procure plus?
3        A.  ePlus, I don't believe that we had a
4    standard way at that time of providing information.
5        Q.  Well, whether it's standard or not, I
6    mean, would this document be something that at least
7    is typical of something that ePlus would put together
8    to help its salespeople sell procure plus?
9        A.  It looks like it would have come from
10    ePlus.  It looks like -- I don't know where it was --
11    was put together, so --
12        Q.  Are you familiar with the term sell
13    sheet?
14        A.  No, I'm not familiar with the document.  I
15    don't -- not familiar with the term.
16        I can surmise what sales sheet means, or
17    data sheet, but we don't use that -- that term today,
18    so I haven't heard it for some time that I'm aware
19    of, or didn't at any time, so --
20        Q.  Well, based on your experience at ePlus,
21    do you believe that an ePlus document that's called a
22    sales -- a sell sheet or a sales data sheet, that
23    would be a document put together to help people sell
24    ePlus products?
25        A.  I believe so.
```

247

```
1        Q.  In 2002, was procure plus at version 6.6?
2        A.  I'd have to go back and check.  I --
3        Q.  At least were you in the version 6, that
4    sixth generation, by 2002?
5        A.  I believe we were.
6        Q.  You turn to the second page of this
7    document.
8        A.  Yes.
9        Q.  The fifth bullet point down, do you see
10    where it says, integration?
11        A.  I do.
12        Q.  Now, is this -- can you read that bullet
13    point to yourself, please.
14        A.  Yes.
15        Q.  All right.  Does -- is this a statement
16    that could be used in sales pitches for procure plus
17    in 2002 indicating that procure plus can be
18    integrated with ERP and other IT systems from
19    companies including Lawson?
20        A.  It does, yes.
21        Q.  Now, going down below that black box, I
22    know it's hard to read in that black box, but looks
23    to me like this might be a glossary of terms that
24    start on the bottom of this second page of the
25    document.
```

248

```
1        Do you see that?
2        A.  The quick reference glossary?
3        Q.  You can read that?
4        A.  Mine is clear.
5        Q.  Oh, okay.  Good for you.
6        Mine is not as good as yours.
7        A.  Okay.
8        Q.  So it is called, quick reference glossary?
9        A.  Yes.
10        Q.  All right.  You see the third and fourth
11    terms defined there in the glossary are catalog
12    management and content management?
13        A.  I do.
14        Q.  Does ePlus distinguish between catalog
15    management and content management?
16        A.  I think a lot of times they're confused
17    and interchanged, so I mean, both are used in the
18    industry with little delineation at times between the
19    2, broad terms.
20        Q.  Does ePlus try to distinguish the 2?
21        A.  At times.
22        Q.  Here the last sentence of the catalog
23    management definition says:  Catalog management is a
24    subset of content management, quote.
25        Do you see that?
```

249

1    A.  Where are you looking?
2        I'm sorry.
3    Q.  The last sentence of the definition of
4  catalog management.
5    A.  Okay.  Yes, I see that.
6    Q.  Do you think that's accurate in terms of
7  how ePlus tries to use these terms?
8    A.  I can't say that I would -- you know, we
9  would condone the statements.
10   Q.  In 2002, did ePlus look at catalog
11  management as a subset of content management?
12   A.  No, I don't believe we did as a company.
13   Q.  Do you have any idea of who put this
14  document together?
15   A.  I really have no clue.
16   Q.  Can you turn to the last page, please.
17   A.  I can.
18   Q.  What's the heading on that page?
19   A.  Go to resources.
20   Q.  All right.  You see the third bullet point
21  is, product experts for procure plus?
22   A.  Yes.
23   Q.  And, you're the guy listed first there as
24  the product owner, Ken Farber, president, ePlus
25  systems.

250

1    A.  Okay.
2    Q.  Correct?
3    A.  Yes.
4    Q.  Does that refresh your recollection at all
5  as to whether you had some involvement in putting
6  exhibit 20 together?
7    A.  No, that would give me no indication that
8  had any -- anything to do whatsoever with putting the
9  document together.  My name is plastered on more
10  things than I care to know about and don't know
11  about.
12   Q.  Can you turn to the page with the last 4
13  digits at the very bottom right, number 8584.
14   A.  I'm looking on the same -- the same
15  document.
16       Right?
17   Q.  That's correct.
18   A.  And the last 4 digits were?
19   Q.  8584 in the very lowest right corner.
20   A.  I don't -- I don't have --
21       MR. ROBERTSON:  We have a different
22  document.
23       BY MR. McDONALD:
24   Q.  Do you have 140459?
25       MR. ROBERTSON:  Nope.

251

1    A.  No.
2        BY MR. McDONALD:
3    Q.  How about 41906?
4    A.  No, I don't have anything in the 4 series.
5    Q.  Can you hand me that back, please.
6        I've got a different one here.  I guess
7  that explains why your copy was better than mine.
8    A.  Okay.
9    Q.  Okay.  I can now speak your language.
10   A.  All right.  Thank you.
11   Q.  Can you turn to the page marked the last 5
12  digits 37217.
13   A.  Yes.
14   Q.  Now, in the middle of the page there, the
15  second box, what's in the second box?
16   A.  The key differentiators.
17   Q.  Okay.  Is that the one that the first
18  bullet point says, e-procurement leader?
19   A.  Yes.  Yes.
20   Q.  Okay.  So we're in the same place,
21  because again I can't read the boxes --
22   A.  Okay.
23   Q.  -- on my copy?
24       Over on the right side of that --
25  underneath that box, the second bullet point down

252

1  says, quote:  Supported by content plus and an ePlus
2  catalog, dash, 800,000 MRO IT office products items.
3        Do you see that?
4    A.  I do.
5    Q.  Can you tell me what that means in
6  English.
7    A.  Okay.  I think what -- what it means is
8  that -- well, it's a just a bullet, so I'm going to
9  surmise what it means, but my recollection is that at
10  that time we had processed catalogs for our clients
11  in the areas of MRO IT office supplies and probably
12  other categories and that we probably had done over a
13  period of time over 800,000 items.
14   Q.  So ePlus had built up a catalog
15  electronically that had over 800,000 item
16  descriptions in it?
17   A.  No, no.
18       It's not our catalog.  It's catalogs that
19  we've built for our customers.  We don't have a
20  catalog that we provide to customers for MRO, et
21  cetera.
22   Q.  Okay.  So I guess I was confused, because
23  it says, and on ePlus catalog.  Makes it sounds like
24  there is a thing called an ePlus catalog there.
25   A.  No.

Farber, Kenneth, Gary - 30(b)(6) & Individual - Vol 2  12/17/2009  12:00:00 PM

253

1     I understand, but it's not.
2     Q.   Okay.  What does MRO stand for?
3     A.   I think it's a term that refers to
4  maintenance, repair, and operation.
5     Q.   That's just a category of products?
6     A.   It's a category of goods, yes.
7     Q.   Can you give me a couple of examples of
8  what's in that?
9     A.   Electrical supplies, gates, gate valves,
10  things of that -- that are referred to as indirect
11  materials.
12     Q.   Things used in manufacturing?
13     A.   Correct.
14     Q.   Can you turn to the next page, please.
15     A.   Yes.
16     Q.   You see under the -- there's 2 subheadings
17  there, hosted and enterprise.
18     A.   Yes.
19     Q.   What do those 2 terms mean?
20     A.   "Hosted" is an application that is
21  maintained and run in the data centers of the
22  companies that are selling them as a hosted
23  application.
24     Q.   So if ePlus is selling, it would be hosted
25  at ePlus?

254

1     A.   Or ePlus hosted a data center as an
2  example.
3     "Enterprise" typically refers to customers
4  that have installed or want to install an application
5  behind their -- what we call their firewall or within
6  their data center that they operate and maintain.
7     Q.   And under, enterprise, the third and
8  fourth bullet points refer to Oracle procurement and
9  SAP procurement.
10     Do you see that?
11     A.   I do.
12     Q.   And at both of those, the italics next to
13  them say, quote, not functionally competitive, hard
14  to implement, doesn't really work, quote.
15     Do you see that?
16     A.   I do.
17     Q.   In the 2002 time frame, did ePlus try to
18  sell against Oracle and SAP by emphasizing those 3
19  points?
20     A.   Well, it's -- it's an internal document.
21  I don't think that we would put that bullet point
22  exactly in a presentation perhaps.
23     Q.   Okay.
24     A.   But it's saying that at that time whoever
25  wrote the document didn't believe that they were

255

1  functionally competitive.
2     Q.   What made the Oracle product not
3  functionally competitive in 2002?
4     A.   I have no recollection to know at that
5  period of time what functionality was there or not
6  there to recall those elements.
7     Q.   Do you have an understanding for any time
8  between 2002 and now what functional differences
9  there are or have been versus the Oracle product?
10     A.   I think one of the things if I go back to
11  2002 Oracle or otherwise, I know that we at one point
12  talked about 3-way matching, matching a requisition
13  to an invoice to a purchase order, but a lot of
14  electronic procurement systems did not have in that
15  period of time but was important to customers, so
16  that may be one indication of a functional aspect of
17  the applications.
18     Q.   So you said, 3-way matching.
19     Is that -- that's between the requisition,
20  the purchase order, and an invoice?
21     A.   Correct.
22     Q.   What is it that customers wanted the
23  system to be able to do functionally regarding that?
24     A.   Well, a 3-way match is just basically take
25  the requisition price, take the purchase order price,

256

1  and the invoice price that you were getting from the
2  supplier and make sure that they match and there's no
3  significant deviation.
4     Historically, that process was managed
5  either in different systems or partially was done
6  manually.  And they wanted a central system to create
7  that level of functionality and integration.
8     Q.   In 2002, did procure plus have that
9  functionality?
10     A.   I believe we did.
11     Q.   And you believe at least at some point,
12  last 8 years, Oracle and SAP did not have that
13  functionality?
14     A.   At some point, I believe they didn't.
15     Q.   Was -- or is the content plus product
16  marketed to suppliers?
17     A.   There was a brief period of time that I
18  think there was a concerted -- or I shouldn't say
19  "concerted" -- but there was an effort to determine
20  if we could market the product to suppliers.
21     Q.   What time period was that?
22     A.   Early to mid-2000s, I think.
23     Q.   First half of the decade, basically?
24     A.   I think so.
25     Q.   Was that effort successful?

Farber, Kenneth, Gary - 30(b)(6) & Individual - Vol 2  12/17/2009  12:00:00 PM

257

1    A.   Well, we're not doing it today, so I
2    suppose it wasn't.
3    Q.   Was that -- were you involved that
4    decision to stop doing that?
5    A.   Yeah, to not do it any further, yes.
6    Q.   Was that because the revenues just weren't
7    there?
8    A.   Yes.
9        MR. McDONALD:  Why don't we take a break.
10       THE WITNESS:  Sure.
11       THE VIDEOGRAPHER:  The time is
12   approximately 9:54 AM.  We're going off the video
13   record.  Off the record.
14       (Recess.)
15       THE VIDEOGRAPHER:  The time is
16   approximately 10:08 AM.  We are back on the video
17   record.
18           (Lawson Exhibit No. 22
19               was marked for
20               identification.)
21       BY MR. McDONALD:
22   Q.   Mr. Farber, you've been handed what's
23   marked exhibit Lawson 22.
24       That's an ePlus document entitled, procure
25   plus integrated processing -- integration processing.

258

1        Correct?
2    A.   Correct.
3    Q.   Give you a chance to generally review this
4    document.
5        My question is, do you recognize it?
6    A.   Yeah, I believe I do.
7    Q.   What is it?
8    A.   Appears to be a document that describes
9    the different types of integrations or examples of
10   integrations that can be done with the application.
11   Q.   So integrations is basically connecting
12   the procure plus patent -- or system to other systems
13   and communicating with those other systems?
14   A.   Correct.
15   Q.   If you turn to the third page of the
16   document, the last 4 digits, 9273.
17   A.   Yes.
18   Q.   That's the page that has a heading,
19   introduction.
20       Correct?
21   A.   Yes.
22   Q.   And then the third subheading on the page,
23   integration process points general, do you see that
24   one?
25   A.   I do.

259

1    Q.   Now, does that have a list of bullet
2    points as to the general groupings of what are
3    called, interface touch points?
4    A.   Yes, that's what it appears to be,
5    correct.
6    Q.   Can you explain generally what interface
7    touch points are?
8    A.   Touch points are -- can be viewed a couple
9    different ways, but a touch point is -- from one
10   system to another system, we refer to that level of
11   integration as a touch point.  So from an accounts --
12   from a procurement to an accounts payable component
13   would be considered a touch point, just by example.
14   Q.   So it's points in the process flow where
15   the system has to interact with some external system?
16   A.   Correct.
17   Q.   And it's got several touch-point groupings
18   here, the last one being general.
19       Correct?
20   A.   Okay.  Yes.
21   Q.   The next page has got a graphic below the
22   heading, procure plus integration touch points.
23       Correct?
24   A.   It says, procure plus integration.
25   Q.   Does it also say "touch points" on yours?

260

1    A.   Oh, you're looking at the second bar?
2    Q.   Yes.
3    A.   I can barely read it but, yes, I see it
4    now.
5    Q.   Okay.  Yeah.
6        And then below that, it's got a bunch of
7    boxes going down the center of the page with some
8    other boxes to the left and right.
9        Correct?
10   A.   That's correct.
11   Q.   What are the boxes going down the middle
12   of the page?
13       What do they represent?
14   A.   Let's see, need catalog -- I believe they
15   may be summarizing the elements of process that takes
16   place in a system.
17   Q.   Would those all be elements of the procure
18   plus process?
19   A.   I think it could be a combination of
20   the -- of the procure plus and other system, but many
21   of the categories would appear to be from -- from the
22   procurement application.
23   Q.   Okay.  Well, it looked to me like the
24   graphic was trying to show procure plus processes
25   down the middle and then there would be these arrows

261

1   going in and out from procure plus, and those would
2   represent the touch points to external systems.
3       Is that how you look at this?
4   A.   At a high level, yes.
5   Q.   So you think it is fair that the boxes
6   down the middle of the page represent what's in
7   procure plus?
8   A.   At a high level, yes.
9       I'd have to go further in the document to
10  see how each one is discussed, but at a high level, I
11  would agree.
12  Q.   Can you turn to the page marked last 4
13  digits 9277.
14  A.   Okay.
15  Q.   The second heading here on this page is
16  the word general.
17      Correct?
18  A.   Correct.
19  Q.   Is this summarizing one category of the
20  integration interface touch points?
21  A.   Yes.
22  Q.   The first sentence under, general, says:
23  The distribution of item and vendor master records is
24  a common interface point between procure plus and the
25  corporate system, quote.

262

1       Do you see that?
2   A.   I do.
3   Q.   Is that an accurate statement as you
4   understand the procure plus system?
5   A.   It's one of the interfaces, sure, yes.
6   Q.   What are item master records?
7   A.   In this term, I believe it's referring to
8   item master records that are in a GL and accounting
9   systems, general ledger and accounting systems.
10  Q.   In that context, can you explain to me
11  what item master records represent.
12  A.   Well, as it says under the file build
13  utility within that box below, it says it supports
14  data from external sources such as user, cost center,
15  account code, information from corporate systems.
16      So that would be the systems that I was
17  just previously referring to.
18  Q.   Okay.  So those would be the sort of
19  systems that would use item master records in the GL
20  and accounting systems?
21  A.   In this example, that's how it's used,
22  yes.
23  Q.   So in that example, what do the item
24  master records actually represent?
25  A.   The cost center, the defined user for that

263

1   cost center, the account code structure that's used
2   for the processing of payments, everything you would
3   expect to see in a general ledger.
4   Q.   Okay.  But when you it says, item master,
5   does that mean it's got all that information like the
6   cost and the user for a particular item of some sort?
7   A.   No.
8       It's not discussing the item here.
9       It's discussing their cost center and
10  account level general ledger controls of their
11  accounting system, not the items that you would
12  consider to be in a catalog, as an example.
13  Q.   And you're talking about the file build
14  utility touch point.
15      Correct?
16  A.   Yes, correct.
17  Q.   But if we go 2 above that to the item
18  master create, slash, change touch point.
19  A.   Yes.
20  Q.   That one, the comments are, can be either
21  inbound or outbound.
22      Correct?
23  A.   That's correct.
24  Q.   So what would an external general ledger
25  or accounting system use an item master record for?

264

1   A.   Well, repeat the question.
2       I apologize.
3       (The reporter read the last
4       question.)
5   A.   Well, the item master as I explained in
6   the terms of how it's used here is -- if you take an
7   accounting system as an example, it is normally in
8   the corporate environment used as part of their back
9   office in terms of the way they have all their cost
10  center information, general ledger information,
11  account payable information of record.
12      So when you refer to create a change, if
13  there is a change in a GL code, if there's a change
14  in an account code, those have to be synchronized or
15  can be synchronized.  They don't necessarily have to
16  be synchronized, but in some instance, clients want
17  them synchronized, and there is a process by which
18  that can be done.
19      BY MR. McDONALD:
20  Q.   In this context, what is an item?
21  A.   An item is a reference to an account code,
22  a general ledger code, just as an example.
23  Q.   So an item in that context you're saying
24  would not be something like a part that accounts
25  payable has to buy?

Farber, Kenneth, Gary - 30(b)(6) & Individual - Vol 2  12/17/2009  12:00:00 PM

265

1    A.   Not if it's -- no, not -- not -- no -- not
2  in this context, it's not.
3    Q.   What is a vendor master record?
4    A.   The vendor master record again in these
5  type of back-office systems is a list of vendors that
6  are associated with account codes.
7          So as you're exchanging account code
8  information, there's a vendor name that's associated
9  with that for proper payment to the right vendor.
10   Q.   Can you turn to the page marked last 4
11 digits 9281 in the lower right corner, please.
12   A.   Yes.
13   Q.   Does this page list the business to
14 business and vertical industry standards that procure
15 plus uses when it integrates or interfaces with other
16 systems?
17   A.   Just give me a minute.  Let me just review
18 the items here.
19        (Pause.)
20   A.   This is a list of a third-party's
21 application called Web methods that's used for
22 integration, and I believe it was supplied by Web
23 methods so we could describe to clients what Web
24 methods is and what they do if they're not familiar
25 with it.

266

1          It does not identify how procure plus is
2  using them, because we don't use all these B2B
3  vertical -- what they refer to as B2B in vertical
4  standards.
5          THE COURT REPORTER:  I'm sorry.
6  "Be" --
7          THE WITNESS:  B2B.
8          THE COURT REPORTER:  "Be to be"?
9          THE WITNESS:  Yes, numeric 2.
10         MR. McDONALD:  (Showing exhibit to the
11 court reporter.)
12         THE COURT REPORTER:  Oh, B -- oh.
13         BY MR. McDONALD:
14   Q.   Web method is some third-party service
15 product?
16   A.   It's a product.
17   Q.   Is it a product that Lawson interfaces
18 with -- or excuse me -- I'll withdraw that question.
19        Is it a product that the ePlus, procure
20 plus system can interface with?
21   A.   It's a system or an application that ePlus
22 utilizes to connect to and integrate with other
23 systems.
24   Q.   So the procure plus product has its own
25 standard way of communicating with Web method, and

267

1  then Web method can in effect translate the
2  information into any of these listed standards for
3  other applications?
4    A.   For certain functions that we perform.
5    Q.   So that is true for certain applica- --
6  certain functions but not all of them --
7    A.   Correct.
8    Q.   -- for procure plus?
9          MR. McDONALD:  Please mark that as the
10 next exhibit.
11         (Lawson Exhibit No. 23
12              was marked for
13              identification.)
14 BY MR. McDONALD:
15   Q.   Mr. Farber, you've been handed exhibit 23.
16        It's a document titled, e-procurement,
17 Indalex 3, slash, 2008.
18        Correct?
19   A.   Yes, it is, yes.
20   Q.   Indalex, that's a company you indicated
21 earlier as one that ePlus competed with Lawson on.
22        Correct?
23   A.   Yes, yes.
24   Q.   Do you have an understanding as to who
25 wound up getting that Indalex business?

268

1    A.   I don't recall.
2    Q.   Do you know it was not ePlus?
3    A.   No, it was not ePlus.
4    Q.   Okay.  Do you recognize exhibit 23?
5    A.   No, I don't.
6    Q.   When ePlus is preparing to respond to a
7  request from a customer, does it put together from
8  time to time documents that may be drafts of how it's
9  going to respond to the request?
10   A.   Do we put together drafts of how we plan
11 on responding?
12   Q.   Yes.
13   A.   Yes, certainly.
14   Q.   Does this look like a draft document that
15 relates to the process of presenting the ePlus
16 solution to Indalex?
17   A.   No, it actually doesn't to me.
18   Q.   Why -- is there something about that that
19 indicates it's not such a thing?
20   A.   I don't recall any document that we've
21 ever provided in a response to a customer that
22 provides, you know, one page, there's something here
23 on Indalex, the next page there's something here from
24 Washington state colleges, there's something here
25 from University of Florida, et cetera.

269

1    And typically, what we do is, we
2    protect -- I shouldn't say "protect" -- but we honor
3    the confidentiality of our -- of our clients, and in
4    our response to a proposal, we typically don't
5    provide this information unless we receive approval
6    from those customers, and as it relates to Indalex,
7    which is this is dated March of 2008, I really don't
8    know how this document was assembled in its source,
9    but we wouldn't be talking about things that occurred
10   in 2007, and we would be using more current
11   references, there's stuff that dates back to 2004.
12       So this -- I don't -- I've never seen the
13   document, nor do I understand how it was compiled and
14   for what purpose, because it really doesn't make
15   sense of anything that we utilize and provide to
16   customers.
17       Q.  If you were going to try to figure out who
18   put this thing together, who would you talk to?
19       A.  Oh, my gosh.
20       I would start with my own sales
21   organization, my own marketing organization.  It's
22   not anything that we would have approved in a review
23   process to -- to go out anywhere.
24       Q.  All right.  That does remind me:  Did you
25   have a chance to track down any of the information

271

1    they using Lawson beforehand, and are they using any
2    other systems.
3        So in regards to the integration within
4    those systems, in each instance, with the exception
5    of Devon Energy.  Devon Energy we're not integrating
6    to Lawson at all.
7        In each of the other instances, we are
8    integrating with Lawson.  And it's the Lawson as
9    I refer to it the back-office system, the
10   accounting components, general ledger codes, account
11   codes, things of that nature in each of those
12   instances.
13       So I think that's what I've been able to
14   ascertain thus far.
15       Q.  Okay.  Thank you.
16       Go ahead and put exhibit 23 aside.
17       A.  This?
18       Oh, aside?
19       Q.  Yeah.
20       A.  Okay.
21       MR. McDONALD:  Would you mark that the
22   next exhibit, please.
23       (Lawson Exhibit No. 24
24       was marked for
25       identification.)

270

1    overnight that we had kind of left open yesterday?
2        A.  Some of it I have been able to track down,
3    yes.
4        Q.  What were you able to figure out?
5        A.  I think one of the questions that you had
6    asked yesterday was about procure net receiving a
7    license, was one of the topics for procure net at
8    Fisher Scientific.
9        I do know now that procure net did as part
10   of the acquisition receive a license to the -- to the
11   software.  It's unclear whether procure net had given
12   a license prior to the acquisition to Fisher.
13       That does not seem to be part of the ePlus
14   agreement with procure net.
15       Q.  Okay.
16       A.  Okay.  In regards to the other things that
17   you asked to look at, I think it was Hanes, Digitas,
18   Devon Energy.  There was one other one in there.
19   It's just escaping my mind.
20       It will come to me.
21       Q.  Gannett, maybe?
22       A.  Gannett.  Thank you.
23       You asked if they were -- how we were
24   integrating with -- with those systems and if they --
25   I think on one in particular, which was Hanes, were

272

1    BY MR. McDONALD:
2        Q.  Mr. Farber, do you recognize exhibit 24?
3        A.  Just give me one second.
4        Yes.
5        Q.  What is it?
6        A.  This is a presentation that as I recall we
7    put together for Forrester Research.  We were meeting
8    with them, talking about our solutions and
9    potentially soliciting their support in certain areas
10   of our business relative to messaging and marketing
11   and advice.
12       Q.  Who is Forrester Research?
13       A.  Forrester Research is an industry research
14   firm that covers -- well, one of the areas that they
15   cover happens to be in the procurement supply chain
16   contents space.
17       Q.  When you say you're seeking support from
18   them, what sort of support were you hoping to get?
19       A.  Well, I was hoping to get free support,
20   but unfortunately, they charge you for their time and
21   services.  So -- they're an analyst firm.  They are
22   primarily engaged in reporting to their customers,
23   commercial customers and government customers, the
24   state of the industry.
25       They cover many topical areas, and

Farber, Kenneth, Gary - 30(b)(6) & Individual - Vol 2  12/17/2009  12:00:00 PM

273

1  customers, commercial and government customers,
2  utilize these firms for their briefing documents on
3  topical information in the supply chain.  It could be
4  anything from the latest and greatest things in
5  accounts payable, tools, techniques, tips, where the
6  industry may be going.
7       They do have often information about
8  certain companies and products that are of interest
9  to clients.  But they have knowledge about where the
10  industry is going in terms of what their customers
11  are telling them in terms of their needs today and in
12  the future.
13       They offer a service to vendors that if
14  you pay them enough money, they will work with you to
15  construct a -- whether a development road map, a
16  marketing road map, a messaging road map to provide
17  insight on the data that they have, not about
18  specific customers, but just the data and information
19  to formulate an appropriate corporate strategy.
20    Q.  Is that what they -- they charge money
21  for, then?
22    A.  Absolutely.
23    Q.  You were hoping to get some of that for
24  free?
25    A.  Always.

274

1    Q.  Doesn't hurt to ask?
2    A.  Never hurts to ask.
3    Q.  Do you present this information to them in
4  part so that they present ePlus in a favorable light
5  in their reports used by potential customers?
6    A.  There are different reasons that you meet
7  with analysts.  That -- what you just mentioned is
8  another reason to meet with analysts.  They try to be
9  vendor-neutral, and they get briefings from I believe
10  certain vendors, depending upon what they're
11  reporting on.
12       That you don't pay for.
13    Q.  When you say they try to be neutral, is
14  there a reason they wouldn't be neutral?
15    A.  I would hope not.
16    Q.  Okay.  Well, are you suggesting that
17  there's some potential be -- the -- the fact being
18  that there are human beings involved here that
19  vendors that perhaps utilize and pay Forrester for
20  their services might be treated more favorably by a
21  company like than companies that don't pay?
22    A.  I would hope not.  That's my sincere hope.
23    Q.  Do you know one way or the other whether
24  that happens?
25    A.  No, no, of course not.

275

1    Q.  Did you help put together this exhibit 24
2  briefing?
3    A.  I think I participated in it to the best
4  of my recollection.
5    Q.  You turn to the second page.
6    A.  Yes.
7    Q.  It says, an overview regarding the ePlus
8  solution suite.
9       Correct?
10    A.  Oh, I'm sorry.
11       Second page?
12       Oh, yes.
13       I'm sorry.
14       That's correct.
15    Q.  And this is regarding the products that
16  are sold in your division.
17       Correct?
18    A.  Yes.
19    Q.  Now, IT automation, I'm trying to remember
20  if that was one of the ones listed.
21       Was that one of the categories in your
22  division?
23    A.  It's part of our procurement portfolio.
24    Q.  Okay.  Looks like it's separated out here,
25  though.

276

1       Correct?
2    A.  It is, yes.
3    Q.  All right.  What exactly is IT automation?
4    A.  I think if we can -- if I can point you to
5  a page, it would be actually easier for me to
6  describe it.
7       Just bear with me.
8       On page ePlus that says, 0818159.
9    Q.  Okay.
10    A.  And this was -- IT automation is a
11  methodology that we introduced to help our
12  value-added reseller group sell more hardware, and
13  when we refer to IT automation, we refer to the fact
14  that IT organizations have purchasing arrangements
15  with many, many different IT suppliers.
16       And when we refer to IT automation, we
17  talk about it as being able to combine those
18  processes -- if you go to 18163, IT parts skews
19  products change daily, so it's very hard to maintain
20  catalogs in those specific areas.
21       And we're saying basically with a
22  combination of our catalog and content solutions in
23  connection with our procurement solutions and the
24  integration that we can do across various vendors, we
25  can create an environment that brings IT purchasing

277

1    into the fold of procurement whereby it's not as
2    prevalent today because of the constant change and
3    influx of information on a daily basis.
4        So it's very high-level, but that
5    describes the process.
6    Q.   So is there more to it than simply selling
7    your e-procurement products to IT organizations?
8    A.   Well, there's more to it in the sense that
9    ultimately we would like to get a larger percentage
10   of the IT spend from the customer, so we have other
11   services that we offer as part of our IT automation
12   pitch if you will to the customer.
13   Q.   You offer more services when they're going
14   to use your e-procurement product to buy products
15   from ePlus?
16   A.   From -- from ePlus -- we would offer
17   additional products and services, yes.
18   Q.   You turn to the third page of exhibit 24,
19   please.
20   A.   Yes.
21   Q.   This shows the revenues for the 4 fiscal
22   years 2005 through 2008.
23       Correct?
24   A.   Okay.
25   Q.   Correct?

279

1    potentially losing some customers, gaining in
2    other -- you know, wash -- creating a wash effect.
3    Q.   Will you turn to the page a couple more
4    pages in marked last digits 8144.
5    A.   Yes.
6    Q.   This is similar to another drawing we saw
7    in one of the other presentation documents we've
8    talked about today.
9        Correct?
10   A.   Yes, it's similar.
11   Q.   There's a couple of terms here I want to
12   ask about under the left -- upper left square,
13   product information management.  There's a bullet
14   there for catalog management.
15       Correct?
16   A.   That's correct.
17   Q.   And then the second-to-the-last bullet
18   under e-procurement.
19       That's inventory management.
20       Correct?
21   A.   That's correct.
22   Q.   What's the difference between inventory
23   management and catalog management?
24   A.   Inventory management as part of the
25   offering -- optional offering within our procurement

278

1    A.   Yes, it does.
2    Q.   And the 2008 one, that should also have an
3    M next to it, right, for "millions"?
4    A.   2008?
5    Q.   Yeah.
6        FY --
7    A.   Yes, yes.
8    Q.   It should be 849 million.
9        Right?
10   A.   Yes, correct.
11   Q.   Okay.  For each of these years, can you
12   tell me what the sales were in the ePlus division
13   that you handled approximately?
14   A.   They've been roughly the same as what we
15   spoke about the other day.
16       I think it's gone, you know, maybe from --
17   I'd have to go back and check.  I'd be speculating,
18   but it has not grown significantly each year.
19   Q.   Has it been around -- was it around 9
20   million each of those years?
21   A.   Roughly, you know, somewhere between the
22   7, 9 million mark.
23   Q.   Have sales generally been flat since 2005
24   in your division?
25   A.   I would characterize them as flat,

280

1    application is an optional module that manages
2    inventory, manages stock, manages bin locations,
3    manages reorders when a certain number of products
4    have hit a threshold, if you will, and it becomes
5    time to reorder.
6        That's inventory management.
7    Q.   Does the inventory management system
8    create a list of products that are in stock?
9    A.   The inventory management system stores the
10   information as part of our catalog, and it would have
11   the number of items that are available as well as the
12   number of items that are committed to.
13   Q.   So for the inventory management module of
14   e-procurement to work, it has to be connected to the
15   catalog?
16   A.   It's all interconnected with the catalog,
17   yes.
18   Q.   Where is the catalog -- withdraw that.
19       I'm trying to picture the physical
20   appearance of a system that includes e-procurement or
21   procure plus and the catalog plus in it.
22       All right?
23   A.   M-hm.
24   Q.   Is all that stuff on a single computer
25   typically?

281

1    A.   It can be, and at times it doesn't have to
2    be.
3    Q.   What criteria are used to determine
4    whether the catalog is or is not on the same computer
5    as procure plus?
6    A.   I think it's more a matter of the way a
7    data center is assembled and how much space is on a
8    specific device, you know, to -- and how much
9    networking bandwidth one may have to determine where
10   you may want to put it physically.
11   Q.   How does the procure plus system
12   communicate with the catalog database?
13   A.   It's an integral part, you know, between
14   the 2 systems -- between the environments.  It does
15   database calls, you know, to the -- to the database.
16   Q.   Is the catalog database typically resident
17   right on the same computer that has procure plus?
18   A.   No.
19   You asked me that.
20   Q.   Yes.
21   Okay.  You said sometimes it is.
22   Right?
23   A.   It can be.  It doesn't have to be.
24   Q.   What -- what is the most frequent
25   embodiment?

282

1    Is it more typically on the same computer
2    or not?
3    A.   You know, it changes, because today --
4    well, if you asked me the question several years ago,
5    you know, I may have a different answer.
6    Today, companies like VMware have come out
7    with virtualization and cloud computing, which allows
8    you to take very big boxes and slice them up.  So you
9    could say it's sitting on the same physical machine,
10   but it's in a different logical portion of the
11   machine.
12   In other areas within our data center, we
13   have it in applications sitting on one server and the
14   catalog on another server.  It really is more a
15   matter of what we have available to us and the size
16   of these systems and the performance for
17   characteristics.
18   It's not a requirement.
19   Q.   Who makes the decision as to whether the
20   catalog is on the same computer as procure plus or
21   not?
22   A.   It's our data center.  It's strictly
23   performance considerations and what's available in
24   our data center.
25   Q.   So is that a decision that ePlus makes for

283

1    a customer, or does the customer make that decision?
2    A.   The ePlus is managing it for the customer,
3    so the customer really doesn't care how we have it
4    set up.
5    Now, in an enterprise situation where
6    somebody has it installed in back of their firewall,
7    that's up to their -- to them in terms of the size of
8    the server that they have available and how they may
9    want to split it up.
10   Q.   So when it -- the alternative to
11   enterprise is the hosted situation.
12   Right?
13   A.   Right, either license in your data center
14   or have us manage it.
15   Q.   So in the hosted situation, does ePlus
16   host both the procure plus software and the catalog
17   database for the customer?
18   A.   I think in -- in some instances, we do.
19   In a couple of instances, we have clients running the
20   procurement application at their site and the catalog
21   at our site.
22   Q.   About what percentage of the procure plus
23   customers use the hosted embodiment?
24   A.   Today -- well, almost every new customer
25   today is using hosted, but that's just the way the

284

1    industry has moved.
2    I'd have to go back and look at it, but
3    I'd say that we're probably sitting -- 60 percent, 70
4    percent of all licenses today are being hosted.
5    Q.   And so out of that 60 or 70 percent, what
6    percentage of those have procure plus software and
7    the catalog database both hosted by ePlus?
8    A.   The majority of them.
9    Q.   At the ePlus hosted location, do you keep
10   multiple catalog databases, different ones for
11   different customers?
12   A.   Do we keep different catalogs for
13   different customers?
14   Q.   Yes.
15   A.   Well, each customer has -- has their --
16   for security purposes a catalog that's specific to --
17   to their suppliers.
18   Q.   Does each customer have its own dedicated
19   procure plus software, or is it a shared system?
20   A.   There's some customers that have what's
21   referred to as a dedicated application server, which
22   is just simply -- it's their own instance of the
23   software.  There's others that share the application
24   because the application is generic to the customers.
25   Q.   Is there some sort of a communication

285

1    protocol that exists for transmitting information
2    from the catalog database to the ePlus system for a
3    given customer?
4        A.   There is, but I don't know the technical
5    details of what, you know, standard database
6    calls are and things of that nature.
7        Q.   When you say, standard database calls, can
8    you tell me generally what are thinking of?
9        A.   When you're talking about the application
10   talking to the catalog, is that what you're referring
11   to?
12       Q.   Yes.
13       A.   There's methods of communications that are
14   used.  I don't know what they're called and how we
15   refer to them and what they're actually physically
16   using to do that.
17            That's all.
18       Q.   Your understanding, though, that whatever
19   methods are used there are the standard methods?
20       A.   I call them standard methods.  They may be
21   just, you know, standard industry methods.
22            I don't know.  I don't have the
23   information to get to that level of granularity for
24   you.
25       Q.   Who would know more about that than you?

286

1        A.   I would suspect our development manager.
2        Q.   Who's that?
3        A.   A gentleman by the name of Devander
4    Achalla (phonetic).
5        Q.   Get the spelling for that later, I
6    suppose.
7        A.   Ah, it's easy.  (Laughing.)
8        Q.   When the customer hosts their own catalog
9    database in procure plus software, does ePlus provide
10   them some sort of a means for their catalog database
11   to communicate with the ePlus software -- excuse
12   me -- the procure plus software?
13       A.   Yeah.
14            When we deliver software for a customer
15   whether it's hosted or whether it's enterprise, the
16   catalog and the procurement system communicate with
17   one another.
18            So there are calls, application calls to
19   do queries and searches from the application to
20   the -- to the catalog.
21       Q.   What protocols or communication protocols
22   are used for those calls?
23       A.   That's what we just covered.
24       Q.   I thought we were talking about in the
25   hosted situation.

287

1        Q.   You're saying it's the same sort of thing
2    in the enterprise?
3        A.   Yes, yes.
4        Q.   Okay.  What is the platform that ePlus
5    uses to host the databases, the catalog databases?
6        A.   I think it's a combination of Oracle
7    databases.  I think we may have some SQL as well.
8        Q.   Has the way the catalog databases
9    communicate with procure plus -- has that changed all
10   in the last 10 years?
11       A.   Not that I'm aware of.  I have no
12   detailed, you know, knowledge of that.
13       Q.   Let's put this one aside.
14       A.   Okay.  Okay.
15            MR. McDONALD:  Mark that as the next
16   exhibit, please.
17            (Lawson Exhibit No. 25
18            was marked for
19            identification.)
20   BY MR. McDONALD:
21       Q.   Mr. Farber, do you recognize what was
22   marked as exhibit 25?
23       A.   It appears to be a -- another variation of
24   a description of our solutions.
25       Q.   How -- have you seen exhibit 5 before?

288

1            MR. ROBERTSON:  25, I think you mean.
2   BY MR. McDONALD:
3        Q.   Excuse me.
4            25.
5        A.   Components of it, not that -- not in
6    detail.
7            People use different components, different
8    presentations to put them together for different
9    purposes, so I may not have seen this one in its
10   entirety.
11       Q.   Would the presentation, exhibit 25, have
12   been used with customers, analysts internally, or
13   what?
14       A.   Let me just -- if I can just breeze
15   through this.
16       Q.   M-hm.
17            (Pause.)
18       A.   I mean, just at a high level, not going
19   through every single page, it looks like it may be
20   used for an internal training.  It could also
21   potentially pieces of it be used for prospects.
22            BY MR. McDONALD:
23       Q.   Can you turn to the page last 5 digits
24   13443, please.
25       A.   Yes.

289

1    Q.   Can you tell me generally what is being

2   depicted here in this drawing?

3    A.   This is a discussion that depicts quality

4   of content, and I'm sure later, it talks about why

5   it's important to have good content.  But it is a

6   representation that there's times that content

7   resides in its originating form in -- on multiple

8   sources.

9        They may be sitting in old legacy

10   back-office systems.  They may be sitting on paper

11   catalogs, computer disks.  They may be electronic

12   from the suppliers, which is even -- you know, is

13   good.  And we have a process and a professional

14   content group that has expertise in taking that

15   information and making that information electronic to

16   build a content catalog.

17        And it talks about the processes by which

18   they go through, and that's kind of the group we were

19   referring back to earlier when we were talking about,

20   you know, them being involved for 10 years, and I was

21   trying to describe what that content box was.  That's

22   what they do.

23    Q.   So aggregation is basically collecting the

24   catalogs from these various sources listed in the

25   green boxes here?

290

1    A.   It's pulling all the data together.

2    Q.   Then the next few boxes, validation,

3   classification, standardization, normalization, and

4   enrichment, is that part of the data cleansing

5   process?

6    A.   It's part of the services that we provide,

7   yes.

8    Q.   You call that cleansing the data.

9        Right?

10    A.   Cleaning the data, cleansing the data,

11   enriching the data.  It's all synonymous.

12    Q.   Is the standardization step -- is that the

13   step that relates to the other patent technology that

14   you referred to earlier?

15    A.   It's one of the elements you can refer to

16   as standardization.

17    Q.   Are there other parts of the -- of that

18   patent that are shown in this flow chart here other

19   than standardization, generally?

20    A.   It's really not meant to depict the steps

21   of the patent.  But, you know, I'd have to go back

22   and look at the patent and see which pieces may or

23   may not fit in.

24    Q.   Then there's a box here shown as rich

25   content.

291

1    Correct?

2    A.   Yes.

3    Q.   What does that refer to?

4    A.   Well, that means when -- when our -- when

5   our folks help our clients get better data, rich

6   content refers to a catalog that has been validated,

7   cleaned, normalized, follows a certain taxonomy or

8   schema, and can be used in an electronic procurement

9   system.

10    Q.   Can you go ahead 5 pages to the page last

11   5 digits 13448.

12    A.   Yes, yes.

13    Q.   Is this an example of an entry in the

14   ePlus catalog that's gone through that process that

15   you just described?

16    A.   This is the extreme.

17        There's -- I'd love to say that all the

18   work that we do for our customers are to this level,

19   but this is the -- this is nirvana when it comes to

20   catalog content.

21    Q.   Is this atypical, what's on page 134- --

22    A.   For some customers -- I'm sorry.

23    Q.   I'm sorry.

24        Just making sure we're talking about the

25   same thing.

292

1        Is what's on page 13448 atypical of what's

2   in the ePlus catalogs developed by the process you

3   described?

4    A.   Well, yeah.

5        I mean, just to verify, it's not our

6   catalogs.  It's our clients' catalogs.

7        Right?

8        So sometimes we're doing the work for our

9   customers, sometimes the customers can do the work

10   for themselves with the tools that we provide.

11        Sometimes we don't have enough information

12   to get to this level.  Other times, we do.  So it

13   varies.

14    Q.   When you say, this is extreme, I'm trying

15   to get a sense:  Is this close to what's typically in

16   the e-catalogs generated using your systems, or not?

17    A.   Depending upon the commodity.

18        If we are talking about IT, which is

19   something that we have a good handle on because of

20   our value-added reseller business and working closely

21   with the suppliers, we're able to get this level of

22   granularity.

23        There's other suppliers that do not have

24   this level of granularity.  Sometimes customers pay

25   us to do that for them.  And other times, they're

Farber, Kenneth, Gary - 30(b)(6) & Individual - Vol 2  12/17/2009  12:00:00 PM

293

1   okay with shorter descriptions.
2       Q.   So in the cases where the customer doesn't
3   have the level of granularity as you put it shown on
4   this page, what would be missing that's -- that's on
5   this page in those instances?
6       A.   Typically, it would just be shorter levels
7   of information.
8       Q.   So the descriptions would be shorter?
9       A.   Description would -- could be shorter.
10  There could be more or less attributes associated
11  with the item.  There may or may not be a picture.
12      It varies.
13      Q.   With respect to attributes, that -- those
14  are the things identified by the green boxes next to
15  the number 4.
16      Correct?
17      A.   That's a visual representation, correct.
18      Q.   When a user of the ePlus system searches
19  let's say for a laser printer and if this item was
20  one of the items that was responsive to the search,
21  would the user see a page that looks like 13448?
22      A.   After they've selected the particular
23  item?
24      Q.   Yes.
25      A.   You know, said, this the one I want to

294

1   look at closer?
2       Not exactly.  I think we may have changed
3   our -- our graphical interface.  I don't know that
4   this is the exact representation of it.
5       Q.   Is it generally similar?
6       A.   I'd have to go back and look.  It's been a
7   while.
8       Q.   Well, you've seen the page the -- what the
9   catalog looks like up on the computer screen from
10  time to time.
11      Right?
12      A.   Yeah.
13      There's general information.  The layouts
14  may be different, but there's attributes -- I think
15  the attributes now go across the screen versus going
16  down vertically, subtle differences that way.
17      Q.   Okay.  So there might be some subtle
18  differences from 13448, but other than that, is this
19  generally what a user is going to see if they select
20  a particular item?
21      A.   If they select an item, they will see a
22  picture if it's available, a short and long
23  description if it's available, and the attributes
24  that are available.
25      Q.   Will they see -- I'm sorry.

295

1       Did you say they would see a picture if
2   it's available?
3       A.   If it's available.
4       Q.   Now, if the customer is trying to do a
5   side-by-side comparison of 2 products from 2
6   different suppliers, how much of what's shown here on
7   13448 would they see for each product they're
8   comparing?
9       A.   My recollection is that they would see --
10  they may see the picture if it's available.  They may
11  see the item number.  They may see the attributes.
12  They're not going to necessarily see the short and
13  long description, I don't believe.
14      Q.   So if available, they'll see 2 pictures,
15  one for one product, the other for the other product
16  they're comparing to?
17      A.   They may be comparing 10 products.
18      Q.   They could see 10 pictures in that case?
19      A.   If it's available.  Could be small,
20  doesn't -- you know, it's kind of irrelevant to the
21  search.  It just pulls up the information that's
22  available.
23      If there's no picture, it's not going to
24  show up, so it could work either way.
25      Q.   But there's less information per item if

296

1   you've got multiple items on the screen.
2       Right?
3       A.   There's just so much that you could
4   physically look at on the screen, but you could also
5   scroll down.
6       I think the way we did the layout is to
7   allow the user to scroll to potentially see more
8   because there may be more information from one
9   supplier may have been provided from another
10  supplier.
11      Q.   Could you skip ahead about 3 pages to the
12  page ending in 13451.
13      A.   Yes.
14      Q.   This talks about the supplier portal.
15      Correct?
16      A.   That's correct.
17      Q.   Is that part of procure plus or something
18  else?
19      A.   No.
20      That's the portal that we discussed
21  yesterday.
22      Q.   Okay.  Which -- is that part of content
23  plus or is that part of one --
24      A.   It's part of the content plus family --
25      Q.   Okay.

297

1      A.   -- called, supplier portal.
2      Q.   Oh, there it is.  It's right there.
3           And it refers to -- well, supplier portal
4   provides an interface to content plus.
5           That's what it says here on the first
6   bullet.
7           Right?
8      A.   That's right.
9      Q.   Okay.  So a buyer of content plus has the
10   option of getting a supplier portal?
11      A.   If -- yes.  If they -- if they purchase
12   it, yes.
13           The supplier portal can also work with --
14   with -- with other systems too.  It doesn't have to
15   use our catalog.  A lot of times the supplier portal
16   isn't necessarily used just for content as a -- as a
17   catalog.
18      Q.   How else is supplier portal used?
19      A.   Sometimes it's used to -- if there's
20   information that people want to put into their legacy
21   databases and keep them synchronized, whether they're
22   inventory databases or accounting systems and they
23   want to use the system to normalize records that they
24   have, they may use the system that way.
25           Its most typical application though is for

298

1   building collaboration with suppliers for catalogs.
2      Q.   Are you aware of any instances where the
3   supplier portal was provided to customers that were
4   using a Lawson system and not using the ePlus
5   catalog?
6      A.   I don't have recollection of it.
7      Q.   That's a possibility, though?
8      A.   It could be.
9      Q.   It says here in the first bullet point,
10   suppliers can self-author their catalogs online.
11           Do you see that?
12      A.   I do.
13      Q.   What does that mean?
14      A.   The supplier portal has a -- I refer to it
15   as a dashboard.  And the dashboard is a collaboration
16   vehicle for the suppliers to take their product
17   information and load it into the system through an
18   interface.
19           And that interface then can help end-users
20   go through a workflow process to determine if they
21   want that item to be migrated into a production
22   environment.
23      Q.   Can you turn ahead about 30 pages actually
24   to the last 5 digits 13480.
25      A.   480?

299

1      Q.   Yes.
2      A.   Yes.
3      Q.   This represents the procure plus process
4   from requisitioning to sourcing.
5           Correct?
6      A.   This is one very high-level view of the --
7   of the process.  There's I think several pages before
8   it are more detailed, so this is one element of
9   the -- of the process.
10      Q.   Well, the prior pages, the lower right box
11   is accounts payable and spend analysis, right, the
12   prior 3 pages?
13      A.   Well, I mean -- just give me a second.
14           This 13480 is showing sourcing events --
15      Q.   Yeah.
16      A.   -- to do ad hoc sourcing, I think.
17           The one prior is -- was for support spend
18   analysis.  The other has -- the one prior deals with
19   matching invoices.
20           So these are showing different functions
21   and the flow of those different functions within the
22   system.
23           I guess the point is that this doesn't
24   replicate the whole system functionality.
25      Q.   But this page 13480 does seem to at least

300

1   relate to sourcing.
2           Right?
3      A.   Sourcing as it relates to the quotation
4   function for an RFQ.
5      Q.   So is it your understanding that this
6   process only shows processing for sourcing involving
7   an RFQ?
8      A.   Yeah.
9           This is specifically highlighting that if
10   you want to have a request for a quote in a separate
11   bid to a specific vendor, this is showing the process
12   of the system in that particular instance.
13      Q.   That's what a sourcing event would be?
14      A.   That's correct.  That's correct.
15      Q.   Can you turn 10 more pages to the page
16   ending in 13490.
17      A.   Okay.  Yes.
18      Q.   In the upper left corner says, achieving
19   spend analysis.
20           Correct?
21      A.   That's correct.
22      Q.   So this page talks about the spend
23   analysis category of your business.
24           Right?
25      A.   I believe it does, yes.

Farber, Kenneth, Gary - 30(b)(6) & Individual - Vol 2  12/17/2009  12:00:00 PM

301

1     Q.   Now, on this page on the left, there's a
2   green box under the heading, data sources.
3         Correct?
4     A.   That's correct.
5     Q.   And 2 of the data sources are inventory
6   and catalogs.
7         Correct?
8     A.   That's correct.
9     Q.   What's the difference between the
10   inventory data source and the catalogs data source?
11     A.   M-hm.  Again, catalogs are catalogs that,
12   you know, I've been describing in terms of the
13   catalogs that are used in the procurement systems.
14         Inventory is some old -- older, I should
15   say, legacy inventory systems that customers run in
16   their back-office maintenance facilities and
17   manufacturing facilities that just manage inventory.
18         They have a list of their bin locations,
19   their bin max levels, rules for demand forecasting
20   and prediction and analysis, so they may have some
21   data residing in different forms in those systems as
22   well.
23     Q.   Do those inventory data sources that are
24   referred to here -- would they include that
25   information on an item-by-item basis?

302

1     A.   The inventory systems typically have some
2   level of item information so that they are associated
3   with I guess the levels of inventory that they have.
4     Q.   What sort of item information do the
5   inventory data sources typically have that you're
6   referring to here?
7     A.   I guess it varies.  It could vary by
8   vendor or by home-grown system.
9     Q.   Can you give me an idea, though, what
10   would typically be the item information available for
11   an inventory data source?
12     A.   It could be a -- I would imagine a -- in
13   the older inventory systems, it was just -- there's
14   generally part numbers, bin location, quantity,
15   min-max levels, what are replenish levels.
16     Q.   Would that data source include some part
17   description in the inventory --
18     A.   It may or may not.  I don't know.  I
19   suppose that would vary by the system too.
20     Q.   Would you consider those item-by-item
21   inventory records to be catalogs?
22     A.   I don't know.  I don't know how they're
23   particularly assembled, and that would be out of my
24   expertise there.
25     Q.   What would you need to know to determine

303

1   whether you would think those are catalogs or not?
2     A.   Depends what you use in terms of -- it's
3   data sources.  It's information -- we don't refer to
4   the inventory systems as catalog systems.
5         We refer to supplier catalogs, but we
6   don't refer to inventory catalogs.  But again, I
7   don't -- I don't know the semantics of one or the
8   other.
9     Q.   Okay.  We can put that one down.
10     A.   Okay.
11     MR. McDONALD:  We can take another break.
12   Gone through a stack.  So it's a good time to break.
13     THE VIDEOGRAPHER:  The time is
14   approximately 11:09 AM.  We're going off the video
15   record.  Off the record.
16         (Recess.)
17         (Lawson Exhibit No. 26
18         was marked for
19         identification.)
20     THE VIDEOGRAPHER:  The time is
21   approximately 11:29 AM.  We're back on the video
22   record.
23     BY MR. McDONALD:
24     Q.   Mr. Farber, you've been handed exhibit 26.
25   This is a document ePlus produced to us that looks

304

1   like a series of emails.
2     A.   Okay.
3     Q.   Some of the names here are Barry Tager,
4   T-A-G-E-R.
5         Do you see his name on here?
6     A.   Yes, I do.
7     Q.   Who is Barry Tager?
8     A.   Barry Tager was a former employee.
9     Q.   What was his job?
10     A.   I believe his role was customer support.
11     Q.   Who is Mary Anderson?
12     A.   Mary Anderson was a tech writer, I
13   believe, documentation.
14     Q.   And who is Amy Crouse?
15     A.   Amy Crouse -- Amy Crouse was -- I think
16   she was an administrator.
17     Q.   Now, these emails here are from November
18   and December 2003.
19         Correct?
20     A.   Yes.
21     Q.   If you go to page 2 of this document, at
22   the bottom, take these things as you do for emails
23   from the bottom up --
24     A.   Yes.
25     Q.   -- to get them in chronological order.

Farber, Kenneth, Gary - 30(b)(6) & Individual - Vol 2  12/17/2009  12:00:00 PM

305

1     That one is an email from Amy Crouse dated
2  November 14th, 2003?
3     Correct?
4     A.  Yes, sir.
5     Q.  The subject of that is marking of all
6  documentation.
7     Right?
8     A.  Yes, yes.
9     Q.  And then she says:  Hello, everyone,
10  please see the attached list of documentation.  I am
11  sorry to be putting more work onto you, but I need to
12  get the procure plus patent information into all of
13  the documents on this list.
14     A.  Okay.
15     Q.  The next sentence lists the 3 patents
16  involved in this suit.
17     Right?
18     A.  Yes.
19     MR. ROBERTSON:  It's actually a typo in
20  one, but --
21     MR. McDONALD:  Which one is the typo?
22     MR. ROBERTSON:  It says, 515.  It's
23  actually 516.
24     BY MR. McDONALD:
25     Q.  Okay.  Please make the documentation

306

1  accordingly and let me know when it is completed.  I
2  need to have this done by December 30, 2003.  Thanks
3  for all of your help.
4     That's the email.
5     Right?
6     A.  That's what it says, yes, correct.
7     Q.  Okay.  Now, this would indicate that as of
8  November 14th, 2003, the patent information had not
9  been put in all the documentation relating to procure
10  plus yet.
11     Correct?
12     MR. ROBERTSON:  Objection, assumes --
13  contains an assumption, improper assumption.
14     Go ahead.
15     A.  Yeah.
16     I actually wouldn't know that.  I'd have
17  to check.
18     I mean, at that period of time, there may
19  have been marked and we may have been coming out with
20  a new release, new documentation that before it hit
21  the street or was sent to customers, it needed to be
22  marked.
23     I don't have a list of the documents that
24  are being referred to.  So it's difficult for me to
25  ascertain in what context they're asking certain

307

1  documents to be marked.
2     BY MR. McDONALD:
3     Q.  In preparation for the deposition
4  yesterday and today, did you do any investigation as
5  to when ePlus started marking the patent number?
6     A.  I didn't do any new investigations.  It's
7  come up in prior litigation.
8     Q.  What is your understanding as to when
9  ePlus first began continuously marking the patent
10  numbers on the products it sold that were covered by
11  the patents?
12     MR. ROBERTSON:  Object to the form of the
13  question.
14     But you can answer.
15     A.  Well, our products as far as I'm aware and
16  recall were looking at marking I believe as of -- to
17  the best of my recollection, it was October 2003.
18     BY MR. McDONALD:
19     Q.  And how do you know that?
20     A.  How do I know that?
21     Well, I think it was a result of
22  investigation from prior, you know, litigation going
23  back to determine when we started marking.
24     Q.  Are you aware of any documentation at
25  ePlus that would indicate the marking had been done

308

1  on a continuous basis by October of '03?
2     A.  Am I aware of documentation that --
3     Q.  Right.
4     A.  It's always an evolution.  Everything that
5  we do continues.  You know, if we produce a new
6  document, a new document has to be marked, so --
7     Q.  I'm not so much talking about that.
8     A.  Okay.
9     Q.  I'm saying, is there any sort of a record,
10  electronic record, piece of paper, something that
11  actually corroborates that marking began on a
12  continuous basis in October of 2003?
13     A.  There very well may be documents that were
14  produced that show that things were marked as of that
15  date.
16     Q.  Have you seen any such documents in the
17  past?
18     A.  I may have.  I mean, I can't say exactly
19  which ones, but if they existed, I'm sure they were
20  produced.
21     Q.  As you sit here today, can you recall any
22  documents with particularity?
23     A.  I know at the point in time that we were
24  aware that we needed to mark products, we were
25  informed that the way you go about marking products,

Farber, Kenneth, Gary - 30(b)(6) & Individual - Vol 2  12/17/2009  12:00:00 PM

**309**

1  I know that we did do confirmations around that
2  period of time.
3     Q.   What was actually done to mark the ePlus
4  products?
5     A.   What was done?
6     Q.   Yes.
7     A.   We were advised by counsel to mark the
8  products.  We received the specific language that
9  needed to be used for marking of the products.
10       I believe correspondence was sent out to
11  the appropriate groups on how to utilize that
12  language and a confirmation from them when they were
13  marked.
14     Q.   So when you say, confirmation, was there
15  some documentation of the various groups confirming
16  that they had begun marking?
17     A.   I believe that there were emails that were
18  exchanged that created a confirmation.
19     Q.   Do you know whether those emails were
20  produced in litigation, in this litigation?
21     A.   I can only assume they were.
22     Q.   Do you believe that exhibit 26 here -- is
23  that an example of one of the confirming emails that
24  was produced?
25     A.   No, no.

**310**

1        This is -- this to me looks entirely
2  different.  This to me appears to be I guess Amy
3  saying, you know, make sure the attached list of
4  documentation has the patent numbers on it.
5        So again, it could be a new set of
6  documentation that was going out or something that
7  was just created.  I really don't know.
8        The email doesn't have the attachment
9  associated with it, so I don't know the exact
10  reference point here.
11     Q.   But the first page of exhibit 26, the top
12  and last email --
13     A.   M-hm.
14     Q.   -- dated December 22nd, 2003, it does say,
15  Amy, I've updated all my documents.
16     A.   Okay.
17     Q.   Right?
18       So this does -- is this the sort of thing
19  you would expect to see for emails where groups
20  confirmed that they had begun marking?
21     A.   If -- if somebody asked somebody to mark
22  specific documents, yeah, I think it's fair to say
23  that Mary in this case whatever it is that she had to
24  update in that particular time period that she was
25  requested to do, it looks like she's responded to

**311**

1  that.
2     Q.   Was Amy Crouse in charge of or involved in
3  the efforts to begin marking the patent numbers?
4     A.   No, no.
5     Q.   What is your understanding of why on
6  November 14th, she sent the email on the bottom of
7  page 2 of this exhibit about patent marking?
8     A.   Well, she's an office administrator, so
9  clearly somebody had asked her or reminded her or
10  informed her that whatever documentation they were
11  referring to had to be marked in accordance with the
12  instructions that we received prior to that.
13       So she's doing what I would expect an
14  office administrator to do, coordinate activities at
15  somebody's direction.
16     Q.   At whose direction did marking take place?
17     A.   Well, I would say counsel's direction.
18     Q.   From Amy Crouse's standpoint, though, who
19  would have given her those instructions?
20     A.   Well, there was instructions that came
21  from our internal counsel, our internal general
22  counsel.
23     Q.   Who is that at the time?
24     A.   Erica Stoecker.
25       And all the appropriate individuals were

**312**

1  notified in the company of our requirements to not
2  only initially mark but to -- you know, what -- what
3  needs to be done on an ongoing basis with what we
4  produce.
5     Q.   Do you believe in-house counsel is who
6  instructed Amy Crouse to communicate with employees
7  about marking?
8     A.   I would have no clue in this instance.
9  I'd have to say not in this particular instance,
10  because I don't see general counsel copied on the
11  email.
12     Q.   Who is the most senior person copied on
13  the email?
14     A.   This is going back to 2003.  I would say
15  there's -- pretty comparable in positions here.
16       Bob was a product analyst.  Cindy Webb
17  (phonetic) was a developer.  Pamela Johnston was an
18  integration person.  David Maloney was an
19  implementation consultant.  Joel Anderson was in
20  support.
21       So there's a lot of people with different
22  functions but similar levels.
23     Q.   Do you think any of the people who
24  received this email were the people that instructed
25  Amy Crouse to send the email?

Farber, Kenneth, Gary - 30(b)(6) & Individual - Vol 2  12/17/2009  12:00:00 PM

313

1    A.  I would suspect so, yes.

2    Q.  Who do you think assisted in that?

3    A.  It could have been any number of them.  It

4  could have been Cindy, Patty Frenette, Joel, Barry

5  Tager.

6    Q.  So in any event, is it your understanding

7  that Amy Crouse was acting on the direction of some

8  executive at ePlus to send this out?

9    A.  I think I'll repeat it, but I'll describe

10  it a different way.

11      Amy Crouse is an office administrator, so

12  not to demean her position.  She's taking direction

13  from somebody.

14    Q.  Yeah, that's what I'm asking.

15    A.  Yes, yes.

16    Q.  Okay.  And then in her email, the

17  second-to-the-last line says, quote:  I need to have

18  this done by 12, slash, 30, slash, 03, quote.

19      Do you see that?

20    A.  In which -- which piece?

21      I'm sorry.

22    Q.  The bottom of page 2.

23    A.  Bottom of page 2, yes, I do.

24    Q.  Is it your understanding that there were

25  instructions issued at ePlus to have the marking of

314

1  the patents-in-suit done by December 30, 2003?

2    A.  No, not that I recall.  I don't know what

3  the significance of that particular date was for her.

4    Q.  Do you have any reason to doubt that Amy

5  Crouse was instructed by somebody to inform those

6  people who had to mark the patent number that they

7  needed to have the marking process done by December

8  30, 2003?

9    A.  I couldn't say.  I mean, there may have

10  been -- like I said, if it was associated with a new

11  product release and they were going to go and deliver

12  the products it a certain customer, it may have been

13  projected that everything had to be done December

14  28th, and she was being diligent in saying, well, in

15  order to do that, I needed information by an earlier

16  date.

17      So I would have no indication of knowing.

18    Q.  Well, let's look at the email that starts

19  at the bottom of the first page of exhibit 26, the

20  email from Barry Tager.

21    A.  From Barry Tager.

22    Q.  Now, again what was Barry Tager's

23  responsibility at the time?

24    A.  Barry Tager was support, customer service.

25    Q.  Now, you see there's a paragraph that

315

1  begins on the bottom of page 1 and continues to the

2  top of 2.

3      He says, quote:  I also know that there

4  may be some docs on this list which are old and no

5  longer needed.  If that's the case, just get rid of

6  them.  Many are now on Live Link and don't waste any

7  time updating them with patent info.

8      Do you see that?

9    A.  Yeah, I do.

10    Q.  Okay.  Well, that would indicate that Amy

11  Crouse's email wasn't just related to new release of

12  products.

13      Right?

14    A.  No, not necessarily, because there's -- I

15  think what he's referring to, there's a lot of

16  documentation with our products.  Some of it -- as we

17  go through new releases, some of it is rewritten,

18  some of it is the old documents may be discarded

19  because they've been incorporated into other

20  documents, so he clearly could have been referring to

21  those as well.

22    Q.  Well, he's talking specifically about the

23  list of documents on Amy Crouse's email.

24      Right?

25    A.  That's -- that's correct, sure.

316

1    Q.  All right.  And he's saying, some of those

2  documents may be old and no longer needed.

3      Right?

4    A.  That what's he's saying.

5    Q.  So those old and no longer needed

6  documents clearly would not be for a new release,

7  would they?

8    A.  Let me go back and rephrase what I -- when

9  we put together a new release, we always go back to

10  the documents.  I'm not saying this pertained to a

11  new release because I really have no clue what

12  documents they're referring to here without the list

13  in front of me, but I'm giving a hypothetical.

14      We come up with a new release, some old

15  documents, some old chapters of other manuals may be

16  incorporated into another manual.  All right.  Used

17  to be a stand-alone manual.  With the new release

18  maybe it's incorporated as a subchapter in a larger

19  manual now.

20      So you're going to discard the old manual

21  because it's no longer needed.  There's been an

22  incorporation of that manual into something else.

23      So that could be an example.  Again it's

24  hypothetical.  Without knowing the list, you know, I

25  have no way of doing anything but speculating what

Farber, Kenneth, Gary - 30(b)(6) & Individual - Vol 2  12/17/2009  12:00:00 PM

317

1   the answer might be.
2       Q.   You know whether the list attached to Amy
3   Crouse's email still exists or not?
4       A.   I may.  I don't know.
5       MR. McDONALD:  I guess, Mr. Robertson, I'm
6   going to ask to see if we can track down that list
7   and, you know, there's been a lot of documents.
8       I really can't vouch for the fact that
9   there aren't any other emails on marking, but I would
10  like to ask for those.  It seems like there may be
11  some others based Mr. Farber's testimony.
12      MR. ROBERTSON:  I'll be happy to go back
13  and look and see if we have the list in any other
14  emails.
15      Just while we're on that subject, try and
16  track down the Bates range for the procure net
17  agreement too.  It is part of the acquisition
18  documents, and so if I locate those, I'll send you
19  the Bates range.
20      I might have that before the close of
21  business today, but someone is trying to do a quick
22  search on it.
23      MR. McDONALD:  All right.  Thank you.
24      MR. ROBERTSON:  But if you've identified
25  the procure net acquisition documents, it should be

318

1   with that.
2       MR. McDONALD:  All right.  I'm going to
3   put this one aside.
4       Mark this as the next exhibit, please.
5           (Lawson Exhibit No. 27
6               was marked for
7               identification.)
8   BY MR. McDONALD:
9       Q.   Mr. Farber, you've been handed exhibit
10  Lawson 27.
11      Do you recognize this document?
12      A.   I recognize it as a -- as an Aberdeen
13  white paper.
14      Q.   The title on the first page, complex
15  indirect procurement, the final frontier for savings.
16  Correct?
17      A.   That's what it says.
18      Q.   It's dated November 2001?
19      A.   Yes.
20      Q.   Who is Aberdeen Group Inc.?
21      A.   It's a very similar group to what we
22  discussed earlier as it relates to analyst firms.  We
23  talked about Forrester Research.  Aberdeen I guess
24  could be considered a competitor of Forrester
25  providing the same services.

319

1       Q.   Have you seen this document before?
2       A.   I may have.  I don't recall it.
3       Q.   Direct your attention to the page marked
4   EP 115285, about the 13th page.
5       A.   Yes.
6       Q.   That's the page that's right marked also
7   page 12 in the upper right corner.
8   Correct?
9       A.   Yes, that's correct.  I'm with you.
10      Q.   You see a heading on the middle of the
11  page, Zeborg, Z-E-B-O-R-G, offers third-generation
12  solution for complex indirect procurement?
13      A.   I do see that.
14      Q.   Who is Zeborg?
15      A.   You know what, I don't recall to be honest
16  with you.  I mean, there's a lot of companies that
17  have come and gone.  I don't recall who they are.
18      Q.   You see any -- anything -- obviously you
19  might need some time to be able to answer this next
20  question, I'll just tell you that right now.
21      A.   Okay.
22      Q.   But do you see anything in exhibit 27 that
23  is talking specifically about the ePlus procure --
24  e-procurement or catalog products?
25      A.   You want me to go through the entire

320

1   document or --
2       Q.   Yes, at whatever level you have to do.
3           (Pause.)
4       MR. ROBERTSON:  By the way, Dan, I just
5   want to put on the record that I want to have the
6   transcript marked confidential pursuant to the
7   protective order, both yesterday's and today's.
8       A.   So having gone through it, I have a better
9   familiarity with the document and understand its
10  contents.
11  BY MR. McDONALD:
12      Q.   Okay.  Good.
13      Do you recall the question?
14      A.   I do.
15      I did not see a reference unless I missed
16  a word, but I didn't see a reference.
17      Q.   Now, as of November of 2001, did ePlus
18  have a procurement product?
19      A.   Sure, yes.
20      Q.   Was it called procure plus at that point?
21      A.   It may have been called 1-source, it may
22  have been called procure plus, but one of the 2.
23      Q.   Whatever it was called now that you've had
24  a chance to look at the document exhibit 27, did you
25  see any reference to it?

Farber, Kenneth, Gary - 30(b)(6) & Individual - Vol 2  12/17/2009  12:00:00 PM

321

1    A.   Not in this particular document, no.

2    Q.   The particular product this document

3  refers to appears to be something by this company

4  called Zeborg.

5       Right?

6    A.   Not surprising.

7    Q.   Not surprising that they don't exist

8  anymore or --

9    A.   No, not surprising that they're the ones

10  that were highlighted.

11   Q.   And why is that not surprising?

12   A.   This is a typical Aberdeen white paper

13  that incidentally we've done similar things where you

14  pay Aberdeen a certain amount of money to discuss a

15  certain segment of the industry or whatever it is,

16  that vertical that you're talking about, and you're

17  basically paying them to cover that space but then to

18  list you and use you by example in the subset, you

19  know, conclusions of that space and show how and what

20  your position, so you pay handsomely for that but

21  that's what Aberdeen does or had done for companies.

22   Q.   So you're pretty sure that's what happened

23  here given the prominence of Zeborg?

24   A.   It appears to be -- it appears to be that,

25  because when you look at an analyst's report that's

322

1  not a white paper and it's just an analyst report,

2  it's a balanced report.

3       This is an advertorial white paper for

4  Zeborg that I'm sure they -- they paid handsomely

5  for.

6    Q.   Did you see any reference in exhibit 27 as

7  you went through it to any specific e-procurement

8  technology that related to being able to search

9  multiple catalogs?

10   A.   I have to go back and zero in.  I was not

11  going through and absorbing each paragraph.  I was,

12  you know, just looking as per your request to go

13  through and see if we were referenced anywhere.  So

14  it's skim reading.

15       (Pause.)

16       BY MR. McDONALD:

17   Q.   You know, I will withdraw that question,

18  because I think it's too hard to answer on the fly.

19   A.   Okay.

20   Q.   All right?

21   A.   Okay.

22   Q.   Can we go though to page 115281.

23   A.   Okay.

24   Q.   The first paragraph that begins on this

25  page says, quote:  These findings partially explain

323

1  why adopters of e-procurement reported to Aberdeen

2  that they were only processing 18 percent of their

3  indirect expenditures through e-procurement systems

4  on average.

5       Do you see that?

6    A.   I do.

7    Q.   Do you have an understanding in the

8  context of this paper what the term indirect

9  expenditures means?

10   A.   Well, if you look at the next sentence, it

11  says:  Such factors lead Aberdeen to conclude that

12  services procurement is one of the largest and yet

13  untapped areas for cost savings.

14       So they're referring -- that 18 percent in

15  my interpretation based on the next sentence

16  correlates to services procurement.

17   Q.   So it would be services as opposed to

18  parts?

19   A.   Yes.

20   Q.   Has ePlus ever used exhibit 27 for

21  marketing purposes to show customers why their

22  technology is a valuable technology?

23   A.   I would hope not since we're not listed in

24  there.

25       MR. McDONALD:  Mark that as the next

324

1  exhibit, please.

2            (Lawson Exhibit No. 28

3            was marked for

4            identification.)

5       BY MR. McDONALD:

6    Q.   Mr. Farber, do you recognize exhibit 28?

7    A.   Yeah.

8       It appears to be a press release issued by

9  ePlus.

10   Q.   This is from July of 2003.

11       Correct?

12   A.   Yes.

13   Q.   It indicates that ePlus was named to

14  iSource business magazine's top 100.

15       Correct?

16   A.   That's correct.

17   Q.   What is iSource business magazine?

18   A.   It's a trade publication.

19   Q.   Is it your understanding that this top 100

20  relates to companies rather than individual products?

21   A.   Well, I don't know how to answer that

22  actually, because there's companies that can have

23  multiple products that may fit on their 100 list.

24   Q.   Well, in the first sentence there, it says

25  that ePlus was named to the, quote:  iSource 100 list

Farber, Kenneth, Gary - 30(b)(6) & Individual - Vol 2  12/17/2009  12:00:00 PM

325

1  of leading supply and demand chain, dash, enabling
2  organizations.
3      A.   That's right.
4      Q.   Right?
5      A.   That's right.
6      Q.   So is it your understanding that the list
7  of a hundred is a list of a hundred organizations?
8      A.   That's our terminology.  I don't know how
9  iSource represented it.  But it's saying that within
10  the supply and demand chain offerings, we were one of
11  the ones in the -- in the 100 named.
12      Q.   One of -- basically it's probably 100
13  companies.
14          Right?
15      A.   Products --
16      Q.   Well --
17      A.   -- offered by ePlus as an example.
18      Q.   Well, you say, products, but a product is
19  different from an organization.
20          Right?
21      A.   Yeah, but let me -- I'd have to see the
22  representation of the top 100, how iSource
23  categorized it.
24      Q.   That's not an exhibit, is it?
25      A.   I don't know.  I didn't look.  No.

326

1          But to be fair and to describe what I'm
2  referring to is that it talks -- it is a demand chain
3  publication.  You know, there's within the supply
4  chain, right, or demand chain enabling supply chain,
5  there's multiple categories, one of which may be
6  procurement and content management.  Another one
7  could be demand and forecasting systems.  Another one
8  could be analytics and business intelligence.
9          So that's -- and there may be a company
10  that offers more than one category, so they may have
11  been listed multiple times, is all I was trying to
12  delineate before for you.
13      Q.   Okay.  But do you know one way or the
14  other whether the list was subdivided that?
15      A.   I think the list covered more than just
16  the space of procurement and content as I recall.
17      Q.   The third paragraph there says: ePlus's
18  inclusion in the list reflects the effectiveness and
19  maturity of its enterprise cost management platform.
20          Do you see that sentence?
21      A.   I do.
22      Q.   What is the enterprise cost management
23  platform?
24      A.   That was our marketing term, ECM as we
25  refer to it.  And enterprise cost management was a --

327

1  kind of a mantra if you will that we utilize to
2  describe our offerings.
3      Q.   Which offerings of ePlus came under the
4  heading, ECM platform?
5      A.   It -- primarily the ones we've been
6  talking about procurement content, catalog
7  management, asset management.
8          At the time we did not I don't believe
9  have spend analytics.  So it's been all the other
10  ones that we've been discussing.
11      Q.   The next sentence, quote:  The company
12  offers a suite of electronic procurement product and
13  catalog content management, asset management,
14  equipment financing and leasing, IT supply, and
15  electronic payment solutions that can stand alone or
16  work in tandem to eliminate extraneous supply chain
17  costs and support customers' strategic sourcing and
18  spend management initiatives, quote.
19          Do you see that?
20      A.   I do.
21      Q.   So is that suite that's described in that
22  sentence -- is that what ePlus marketed as the
23  enterprise cost management platform?
24      A.   No, our IT supply and financing business
25  wasn't part of the software enterprise cost

328

1  management platform.
2          So I think we're saying 2 different
3  things.  You know, our inclusion in the list, you
4  know, reflects the effectiveness and maturity of its
5  platform, enterprise cost management platform.  And
6  in the second sentence, I think it's our intent to
7  put a plug in to make anybody that's aware of reading
8  this press release of what other things ePlus does as
9  a company.
10      Q.   But you do list all of those things
11  including the financing and leasing and IT supply as
12  something that can help to eliminate extraneous
13  supply chain costs.
14          Right?
15      A.   Sure.
16      Q.   So would you agree that at least reading
17  this paragraph, somebody might read this paragraph
18  and understand that finance and leasing and IT supply
19  were part of the enterprise cost management platform?
20      A.   Maybe they could, maybe they couldn't.  I
21  don't know.  I'm not sure.
22      Q.   And then what's electronic payment
23  solutions?
24      A.   That applies more to our IT business side
25  of our reselling, and, you know, electronically

329

1　dealing with payments between us and our invoices and
2　payment processing for our customers.
3　　Q.　For the customers that are
4　buying equipment?
5　　A.　-- buying -- yeah, from ePlus, that's
6　correct.
7　　Q.　Okay.  Would you agree that this listing
8　of ePlus as part of this iSource 100 list of leading
9　supply and demand chain enabling organizations isn't
10　specific to the procure plus or content plus
11　products?
12　　A.　The customers that -- it says that there
13　was a list of companies that had to demonstrate
14　return on investment.  With iSource, it would have
15　been the procurement and content products that we
16　submitted.
17　　Q.　When you say, we submitted, what do you
18　mean?
19　　A.　iSource, what they typically do is, they
20　go to vendors and say, we're going to do a new
21　survey, do you want to participate.  If you want to
22　participate and have a ranking, we need X number of
23　references, and here are the product categories that
24　you can participate in.
25　　　And we would have at that time used our

330

1　product and content solutions and submitted I'm sure
2　customers to be part of that list.  It would not have
3　been our IT supply or payment solutions or anything
4　or financing and leasing.
5　　Q.　Would you have supplied customers that
6　were customers both of the procurement product and
7　the IT supply or financing and leasing?
8　　A.　No.
9　　Q.　Why not?
10　　A.　Because, it was a supply chain survey, and
11　for us, just by what I see here in terms of the name
12　of enterprise cost management and using that term, we
13　were trying to build more and more momentum and
14　marketware for our procurement and content solution.
15　　Q.　Does this press release elevate the
16　procurement and catalog services above any of the
17　other services ePlus provides, or products?
18　　A.　Well, it says:  We are honored to be
19　recognized for our contributions --
20　　Q.　Slow down.
21　　A.　This is -- I'm sorry -- at the bottom of
22　page 1 -- we are honored to be recognized for our
23　contributions to cost-effective sourcing and
24　procurement.
25　　　So --

331

1　　Q.　It also goes on to say:  And for the value
2　we provide to enterprises that use our products and
3　services.
4　　Right?
5　　That's the whole sentence.
6　　Right?
7　　A.　That's correct.  That's correct.
8　　Q.　So that doesn't single out e-procurement,
9　does it?
10　　A.　I suppose it doesn't, but I am -- could be
11　a poorly written press release, but the fact of the
12　matter is, I can assure you that it was for
13　procurement and content of the names that we submit.
14　　Q.　That was -- okay.  And that sentence you
15　read doesn't say anything about the catalog
16　management.
17　　Right?
18　　A.　No.
19　　It's a press release.
20　　Q.　At the time of the press release, were you
21　using the procure plus trademark?
22　　A.　This is going back to 2003.  I don't
23　recall if it was procure plus or 1-source that we
24　were using at that time.
25　　Q.　All right.  As of July 2003, were you

332

1　using the content plus trademark?
2　　A.　I think we were using the content plus
3　trademark.  I'd have to check.
4　　Q.　Neither of those trademarks is used in
5　this press release in any event.
6　　Right?
7　　A.　It says:  Enterprise cost management and
8　ECM are trademarks of ePlus.
9　　So ECM is not describing the procurement
10　of the content product specifically.
11　　Q.　Yeah.
12　　And those 2 brand names, procure plus and
13　content plus, they're not used in this thing, this
14　press release.
15　　Right?
16　　A.　No.
17　　It's a generic press release.
18　　MR. McDONALD:  Mark as the next exhibit,
19　please.
20　　　(Lawson Exhibit No. 29
21　　　was marked for
22　　　identification.)
23　　BY MR. McDONALD:
24　　Q.　Mr. Farber, do you recognize exhibit 29?
25　　A.　Well, looks like another press release.

333

1  Q.  This is from January of 2004.
2      Correct?
3  A.  Okay.  Yes.
4  Q.  This is from -- this press release is by
5  ePlus.
6      Correct?
7  A.  Yes.
8  Q.  This relates to ePlus being ranked by
9  Aberdeen as number 1 in the first quarter of '03 on
10  its supply chain 50 report.
11  A.  That's correct.
12  Q.  And also number 2 on the second quarter
13  '03 supply chain 50 report.
14      Correct?
15  A.  That is correct.
16  Q.  Aberdeen is the company that wrote that
17  paper about Zeborg that we were talking about before.
18      Right?
19  A.  That is correct, yes.
20  Q.  This particular rating has to do with
21  recognizing companies as a whole rather than
22  individual products.
23      Correct?
24  A.  No.
25      This -- this top 50 ranking, and I know

334

1  this from -- from the quote here and who participated
2  in it to Minahan -- his space was specifically supply
3  chain in the area of procurement and content
4  management, his -- his supply chain top 50 reports.
5  Q.  Can you look at the second paragraph and
6  the second sentence, and you see where it says,
7  quote:  The supply chain 50 rewards companies based
8  on quarterly financial information weighing a number
9  of factors, including --
10  A.  I'm sorry.
11      I don't mean to interrupt you.
12      Where are we?
13  Q.  Second full paragraph on page 1 of exhibit
14  29.
15  A.  Oh, okay.
16  Q.  The second sentence says, quote:  The
17  supply chain 50 rewards companies based on quarterly
18  financial information weighing a number of factors
19  including overall dollar increase in revenue, revenue
20  growth in proportion to their own size, profitability
21  posture and improvements, and market share gains as
22  analyzed by Aberdeen, quote.
23      Do you see that sentence?
24  A.  I do.
25  Q.  That all has to do with ePlus and the

335

1  other companies' performance as a whole.
2      Right?
3  A.  It's one of the factors, sure.
4  Q.  It's not just one the factors.
5      Isn't this listing all of the factors?
6  A.  It's also -- has to do with the
7  positioning of its -- of the products as an analysis
8  that was done by the products as well.
9  Q.  Where does it say that?
10  A.  Well, if you go to -- it's not an
11  attachment here, but I would recommend to understand
12  what the report is about, there's a link there
13  following, a summary of the supply chain 50 can be
14  viewed.
15      And I think that's the place to -- to look
16  at the link.  And, you know, as far as our
17  participation, the first sentence does say that it
18  positioned the company ahead of 48 other companies,
19  including Ariba, Commerce One, I 2, and MRO Software.
20      Those companies we highlight because they
21  specifically were there competing with us in the
22  procurement and content space.  And that's why we
23  called them out in that particular report.
24  Q.  Would you agree that this press release
25  indicates that the only criteria for being on the

336

1  supply chain 50 is clearly financial information for
2  the corporation as a whole weighing a number of
3  factors including overall dollar increase in revenue,
4  revenue growth in proportion to size, profitability,
5  posture and improvements, and market share gains as
6  analyzed by Aberdeen?
7  A.  No, I wouldn't -- I wouldn't say that.
8  Q.  Okay.  Are -- do you see in this press
9  release any factors identified as factors considered
10  in putting a company on the supply chain 50 other
11  than the ones I just described?
12  A.  The reason that we have the link there
13  within the press release is because the link will
14  pull anybody that's interested to go to the Aberdeen
15  Website and understand the criteria of probably what
16  was, you know, maybe 10, 20, 50, or a hundred pages
17  of criteria that they made all the vendors go
18  through.
19  Q.  Okay.
20  A.  And there was a lot of criteria that one
21  had to go through to be part of the list.  And that
22  report I'm sure would describe that.
23  Q.  Okay.  So whether or not a document
24  external to this press release describes it or not --
25  and I understand what you're saying -- but would you

Farber, Kenneth, Gary - 30(b)(6) & Individual - Vol 2  12/17/2009  12:00:00 PM

337

1    at least agree that within the 4 corners of this
2    press release though, there aren't any other criteria
3    for being on that supply chain 50 list other than the
4    ones I described in paragraph 2?
5        A.  If you want to interpret it that way,
6    that's fine.  It's not the way I -- I interpret
7    it.
8        Q.  Would Aberdeen have access to the revenue
9    growth that's specific to ePlus's procure plus or
10   content plus products?
11       A.  No.
12           I think, you know, what the analysts do
13   is, they surmise based upon clients that they
14   interview or talk to and so on, and they are often
15   not that accurate in projections or predictions, but,
16   you know, they don't -- they don't normally involve
17   the vendors that much that I can recall.  At times
18   they might, but other times, they don't.
19       Q.  Do you know whether or not Aberdeen even
20   estimated what your e-procurement and content plus
21   sales were for purposes of identifying the supply
22   chain 50?
23       A.  They may have.  I'd have to go back to the
24   report and look at the criteria that they used.
25       Q.  You don't know one way or the other though

338

1    as you sit here right now.
2           Right?
3        A.  No.
4           I'd have to look at their report.
5           MR. McDONALD:  How about if we just put
6    that one aside.
7           We can take a break now.  This will be the
8    slightly longer break.
9           THE VIDEOGRAPHER:  The time is
10   approximately 12:13 PM.  We are going off the video
11   record.  Off the record.
12           (Whereupon, at 12:13 p.m., the deposition
13   in the above-entitled matter was recessed, to
14   reconvene at 12:40 p.m., this same day.)
15
16
17
18
19
20
21
22
23           AFTERNOON SESSION
24              (12:40 p.m.)
25

339

1    Whereupon,
2           KENNETH GARY FARBER,
3    the witness testifying at the time of recess, having
4    been previously duly sworn, was further examined and
5    testified further as follows:
6
7           (Lawson Exhibit No. 30
8            was marked for
9            identification.)
10          THE VIDEOGRAPHER:  The time is
11   approximately 12:40 PM.  We are back on the video
12   record.
13
14       EXAMINATION BY COUNSEL FOR DEFENDANT (RESUMED)
15       BY MR. McDONALD:
16       Q.  Mr. Farber, you've been handed exhibit
17   Lawson 30.
18           Do you recognize it?
19       A.  Appears to be another ePlus press release.
20       Q.  This one relates to ePlus being named on
21   the 2004 supply and demand chain executive magazine's
22   top 100?
23       A.  Yes.
24       Q.  What is supply and demand chain executive
25   magazine?

340

1        A.  It's another trade publication.
2        Q.  Is this the list of the top 100 companies
3    that provide supply chain solutions?
4        A.  Appears to be.
5        Q.  And if you look at the second paragraph,
6    it appears that the criteria include being a provider
7    with financial strength and relevant industry
8    knowledge and expertise whose solutions address
9    specific pain points in the supply chain and which
10   can demonstrate a return on investment and are
11   continuing to drive innovation in their solutions and
12   services offerings.
13           Correct?
14       A.  Yeah, that's what it references with the
15   practitioners that we're looking for.
16       Q.  Do you know how the magazine collected the
17   information it used to put this list together?
18       A.  I would have to go back and refresh my
19   memory on the criteria that they used.
20       Q.  Did ePlus submit information to that
21   magazine in an effort to get on that list?
22       A.  We very well may have.
23       Q.  And the last year, have you done something
24   similar with supply and demand chain executive
25   magazine?

341

1    A.   We might have.
2    Q.   Do you know one way or the other?
3    A.   I don't know for sure.  I'd have to check.
4    Q.   There's nothing in this press release that
5    would indicate that that listing on the top 100
6    providers was specifically due to procure plus or
7    content plus.
8         Correct?
9    A.   Well, supply and demand chain, the -- my
10   knowledge of the supply and demand chain magazine and
11   our participation in it and what they report on as it
12   relates to ePlus's -- it's pertaining to our supply
13   chain solutions, which were procurement and content
14   in terms of what we would have submitted to them.
15   Q.   Do you know one way or the other if you
16   submitted anything to them or what it was you
17   submitted for this press release?
18   A.   I'd have to go back like I said at the
19   criteria that we submitted to them.  Usually we
20   submit customers and they want to know about
21   functionality of products.
22   Q.   What would you have submitted to them
23   about financial strength?
24   A.   We typically try to avoid providing any
25   financials.  We usually just say that we don't break

342

1    down financials by product line and to reference our
2    annual reports.
3    Q.   Do you believe that you provided them your
4    annual report to address the financial strength
5    issue?
6    A.   No.
7         We typically just point them, you know, to
8    public information as we see information, so --
9    Q.   And the public information is about the
10   company as a whole, including the VAR business.
11        Right?
12   A.   Yeah.
13        We're -- as a company, you know, we're not
14   permitted to state anything financially that hasn't
15   been publicly stated.
16   Q.   Is it your understanding that the public
17   statements regarding ePlus's finances are -- or they
18   include revenues for the company as a whole as
19   opposed to revenues broken down by specific product
20   line like procure plus?
21   A.   The product line such as procure plus are
22   not broken out specifically from the overall
23   financials.  There are other breakdowns, but that's
24   not one of them.
25        MR. McDONALD:  We'll mark this as the next

343

1    exhibit, please.
2         (Lawson Exhibit No. 31
3         was marked for
4         identification.)
5    BY MR. McDONALD:
6    Q.   Mr. Farber, you've been handed exhibit
7    Lawson 31.
8         Do you recognize this document?
9    A.   No, I don't.
10   Q.   You see on the second page of this
11   document, there's a reference there near the top to
12   the copyright 1996, '97, Fisher Technology Group?
13   A.   Yeah, I see that's what it says certainly.
14   Q.   Who is Fisher Technology Group?
15   A.   My --
16        MR. ROBERTSON:  I'm sorry.
17        Where does it say '96, '97?
18        Do I have the right --
19        MR. McDONALD:  Page 2 under the logos.
20        MR. ROBERTSON:  I've got '96.  It says,
21   copyright '96, Fisher Technology Group.
22        MR. McDONALD:  It doesn't say '97 on
23   yours?
24        MR. ROBERTSON:  No.
25        MR. McDONALD:  What's the production

344

1    number on that?
2         MR. ROBERTSON:  Well, there's 2, but which
3    one do you want, the one that references the
4    particular litigation?
5         MR. McDONALD:  Sure.
6         MR. ROBERTSON:  It was produced in 2
7    litigations.  It looks like it's ePlus 0134621, dash,
8    62.
9         MR. McDONALD:  Okay.
10        MR. ROBERTSON:  Excuse me.
11        Dash 22.  So mine only has 1996.  That's
12   the only point I wanted to make.
13   BY MR. McDONALD:
14   Q.   Could I see that exhibit?
15   A.   Certainly.
16   Q.   That's actually the only difference that I
17   can see, so I think we can muddle through here.
18   A.   Okay.
19   Q.   So yours just has the '96 year on it; is
20   that correct?
21   A.   That is correct, yes.
22   Q.   I apologize if you already answered the
23   question, but who is Fisher Technology Group?
24   A.   My understanding of Fisher Technology
25   Group was a group that Fisher had established where

345

1 they did some development work on their product
2 offering of selling their goods and services.
3     Q.   Do you have an understanding as to whether
4 Fisher Technology Group created some sort of a
5 Web-based shopping mall?
6     A.   The very -- very, very high-level
7 knowledge that Fisher had some form of technology
8 that allowed their customers purchase from them. I
9 don't know how you would characterize that, but they
10 had an application that allowed customers to purchase
11 from Fisher.
12     Q.   Okay. Well, are you aware of some
13 application that they called a mall which would allow
14 other suppliers to in effect post their catalogs on
15 the Internet for people to buy from?
16     A.   I really don't. I mean, this is probably
17 close to 4 years from when I was -- came on board
18 with procurement.
19     Q.   '96, that year, you mean?
20     A.   Well, this is dated '96 --
21     Q.   Right.
22     A.   -- so I was -- I have no involvement and
23 knowledge of the details of what they did back then.
24     Q.   When you were at ePlus, did ePlus ever get
25 involved with having an electronic or Web-based

346

1 shopping mall?
2     A.   ePlus, you know, we toyed with the idea of
3 creating a -- I don't know that we called it a
4 shopping mall, but a trading network or an exchange
5 of multiple suppliers, but we never -- never did.
6     Q.   Why not?
7     A.   You know, we're a small company, limited
8 resources. You know, you have to move your resources
9 in certain areas.
10        You know, for somebody to put together a
11 substantial list of suppliers, you know, that you
12 could resell, or you know, create trading networks,
13 takes a significant amount of people to do that, and
14 finances.
15     Q.   When you say that ePlus is a small
16 company, how do you define a small company?
17     A.   Well, small in terms of, you know, number
18 of people that are allocated to, you know, the
19 division and trying to prioritize and do things in
20 our software areas.
21     Q.   Okay. So you're talking about your
22 particular division is small?
23     A.   Yeah, certainly.
24     Q.   How many people are in your division?
25     A.   Right now, there's probably a little over

347

1 60 people.
2     Q.   How many people work for ePlus Inc. as a
3 whole?
4     A.   600 and I think it's 25 or 26 right now.
5     Q.   Do you consider ePlus Inc. as a whole to
6 be a small company with over 600 million in revenues?
7     A.   On the revenue side, I'd say it's a
8 microcomp- -- mid-sized company, so on the margin
9 side of the business, I consider it a small business,
10 because hardware, which is the bulk that we described
11 earlier in the financials, is a low-margin business,
12 so I -- my opinion is, I consider it a small company,
13 yes.
14     Q.   Do you consider Lawson to be a small
15 company, big company, something else?
16     A.   I think Lawson is larger in the sense of
17 its geographical reaches, client base, number of
18 people, so in that regard, I think they're larger
19 than ePlus.
20     Q.   Do you consider them a small company or a
21 big company or mid-size company?
22     A.   I'd say they're bigger than us. I'd say
23 they're a medium to a large player in the software
24 space.
25     Q.   From a revenue standpoint, company revenue

348

1 standpoint, is Lawson about the same size as ePlus?
2     A.   I haven't looked at the financials.
3     Q.   What's your basis for saying that Lawson
4 has -- is a larger company from a geographical reach
5 standpoint?
6     A.   I think they have some international
7 operations from what I can recall, so when I say,
8 geographical reach, I think they have, you know, more
9 international presence than -- than we would.
10     Q.   Does ePlus have presence outside the U.S.?
11     A.   Only from the standpoint of customers that
12 we've sold to in the United States that have an
13 international presence that are using our software.
14     Q.   Have you actually installed any systems
15 for U.S.-based customers at locations outside the
16 U.S.?
17     A.   One, yeah, one in particular that we
18 physically went to to do the installation, sure.
19     Q.   Where is that?
20     A.   That was Japan.
21     Q.   Is that Hitachi?
22     A.   That's correct.
23     Q.   I think you also indicated Lawson was
24 larger from a client base standpoint.
25        Can you explain the basis for that?

349

1    A.  Well, I think they're -- when -- going off
2    recollection, so I can't quote you exact numbers, but
3    I recall in looking at the Website and the product
4    offerings and different things that they did, I think
5    there was a listing of the number of customers or
6    clients that they had worldwide, so --
7        Q.  So you thought the list was longer for
8    Lawson than it is for ePlus?
9        A.  That was my recollection, may or may not
10   be accurate.  I don't know.  I don't have anything to
11   conclusively back that up for you.
12       Q.  Did you have in mind when you were doing
13   that comparison just the ePlus clients within your
14   division or the ePlus Inc. client base as a whole?
15       A.  I was just looking at it as a whole
16   between companies.  That's all.
17           MR. McDONALD:  Mark that as the next
18   exhibit, please.
19               (Lawson Exhibit No. 32
20                was marked for
21                identification.)
22           BY MR. McDONALD:
23       Q.  Mr. Farber, you've been handed Lawson
24   exhibit 32.
25           Does this appear to be another printout

350

1    from Fisher Technology with a copyright 1996 date on
2    it?
3        A.  Where are we looking?
4        Q.  I see that date on the second page.
5        A.  Oh, I'm sorry.
6            Yes, that's correct.  That's what it says.
7        Q.  Does this document describe the advantages
8    of selling on the Fisher Technology Group's procure
9    net product?
10       A.  I don't know if this was -- well, I'm
11   actually confused because I thought procure net -- I
12   didn't know Fisher used that term, procure net.  I'm
13   only familiar with this as a company.  So --
14       Q.  Is Procure Net the name of the company
15   that Fisher spun off that used to be its technology
16   group?
17       A.  That's how I knew it, yes, yes.
18       Q.  Do you know whether that spinoff happened
19   before or after 1996?
20       A.  I actually don't.
21       Q.  But is it your understanding that Procure
22   Net was the name of the company that used the
23   technology that's in the patents involved in this
24   lawsuit?
25       A.  Procure Net had -- I don't know what

351

1    pieces of the functionality that they used.  Procure
2    Net had -- as I know it, had 2 distinct lines of
3    business.
4        Q.  What were the 2 lines of business of
5    Procure Net?
6        A.  One was the technologies or software
7    applications that we have been talking about, and the
8    other was a sourcing group that actually purchased
9    goods on behalf of organizations that did what we
10   call spot buying.
11       Q.  Is it your understanding that procure net
12   was offered to distributors and manufacturers
13   interested in selling products?
14       A.  My familiarity with procure net from the
15   time that I was involved in it did sourcing and spot
16   buying based on contracts that they had, and most of
17   their contracts were with either government agencies
18   or those companies that were involved with government
19   agencies, on the sourcing side that is.
20       Q.  Okay.  If we talk on the technology side,
21   though, do you have an understanding as to whether
22   the procure net technology was at least at some point
23   in time offered by Fisher Technology Group or procure
24   net for distributors and manufacturers interested in
25   selling products?

352

1        A.  I don't believe from the time that I was
2    there that we -- we offered that.
3        Q.  Well, the first page, anyway, under the
4    heading of this exhibit 32 --
5        A.  Yes.
6        Q.  -- it says, quote:  There are many
7    advantages for distributors and manufacturers
8    interested in selling products through procure net.
9            Do you see that line?
10       A.  Yes, I do.
11       Q.  So do you have any understanding whether
12   or not before ePlus acquired the procure net-related
13   technology whether or not that technology was offered
14   to distributors and manufacturers interested in
15   selling products?
16       A.  I don't have any prior knowledge to know
17   what they were doing or what their intentions were.
18       Q.  Is there somebody else at ePlus that would
19   know more about that than you?
20       A.  I don't know that there's anybody that was
21   involved in this area of the business that's at ePlus
22   today.
23       Q.  Is there anybody outside of ePlus that you
24   know of based on your interaction with the Fisher
25   people that would know about this?

Farber, Kenneth, Gary - 30(b)(6) & Individual - Vol 2  12/17/2009  12:00:00 PM

353

1     A.   You know, I think -- I wasn't really
2   involved with that group, so, you know, it's
3   something I could look at, but there's nobody that
4   pings to mind right now.  It was a different division
5   group there that was doing this stuff.
6        We're done with this?
7     Q.   Yeah, we're done with that.
8     MR. McDONALD:  Mark that as the next
9   exhibit.
10        (Lawson Exhibit No. 33
11         was marked for
12         identification.)
13   BY MR. McDONALD:
14     Q.   We're going do turn now to some questions
15   and documents involving Novant.
16        Okay?
17     A.   Okay.
18     Q.   So you've got before you, Mr. Farber, what
19   was marked as exhibit 33.
20     A.   Yes.
21     Q.   Do you recognize this document?
22     A.   Not particularly, but it looks like a
23   presentation to Novant.
24     Q.   What was your role in responding to the
25   Novant request for proposals?

354

1     A.   I wasn't engaged directly with the
2   customer, so I didn't -- I don't -- I wouldn't say
3   that I had much of a role.
4     Q.   Did you get involved at an approval level,
5   on a directional level?
6     A.   I may have in a formal response.  I may
7   have reviewed the formal response and given approval,
8   whether it be on an RFP or a final pricing.
9     Q.   Was there someone else that had primary
10   responsibility for responding to Novant?
11     A.   I would have to see who was involved in
12   the response to provide a name.
13     Q.   This document, does it appear to you
14   anyway to be a PowerPoint from Novant that was
15   providing background information for responding to
16   their RFP?
17     A.   Well, just give me -- if I can have a
18   minute?
19     Q.   Sure.
20        (Pause.)
21     A.   It appears that it would have -- would be
22   a Novant PowerPoint.
23        BY MR. McDONALD:
24     Q.   So they're trying to give some background
25   to you so you know how their current system is to

355

1   help you put together a response for whatever changes
2   they wanted to make to their system; is that right?
3     A.   Well, not changes they make.  That's hard
4   to tell from here.  This is the current state.
5     Q.   Right.
6        This doesn't talk about what the changes
7   are going to be; is that right?
8     A.   It's scanning it from what I can see.  I
9   don't think that it's outlining the 2 B state and
10   what they were looking at doing.  It's giving an
11   indication of what they're going today.
12     Q.   But is it your understanding that the
13   reason why they were telling you what they were doing
14   at least on that day was to give you that background
15   so that you could provide a better response to their
16   request?
17     A.   This would one of the components of the
18   information that they would provide perhaps, yeah.
19     Q.   Did they provide other components other
20   than the state of their system at the time?
21     A.   Oh, I'm sure they may have.
22        I mean, generally what occurs and I can't
23   speak -- I'd have to look back -- you know, many
24   clients -- or prospects I should say provide RFIs,
25   requests for information, or request for proposals,

356

1   so I suspect if Novant provided this information,
2   then it was done under some form of confidentiality
3   to the vendors in order to address wherever it is
4   that they wanted to go.
5     Q.   In the course of responding to the Novant
6   RFP, did you review any information that related to
7   their existing product and system that they were
8   using from Lawson?
9     A.   I'd have to look at the -- our response,
10   because this doesn't tell me what we needed to do.
11   It doesn't tell me if they were keeping Lawson, not
12   keeping Lawson, how they wanted to integrate with
13   Lawson, if there was integration involved.
14        So I'd have to link this up with their
15   RFI, RFP, if it existed, and our formal response, and
16   see how we handled that.
17     Q.   Okay.  Can you turn to the third page of
18   exhibit 33.
19     A.   How are purchase orders created?
20     Q.   Yes.
21     A.   Okay.
22     Q.   Is it your understanding that this is a
23   document from Novant describing their then current
24   system before the RFP at the time of their request?
25     A.   This appears to be, you know, their

357

1 description of how they're currently using the
2 systems today, sure.
3 Q. Do you see the first bullet point there?
4 It says, quote: From Lawson requisition
5 self-service using shopping lists specific to the
6 end-user, quote.
7 Do you see that?
8 A. I do.
9 Q. Do you have an understanding as to that
10 that means?
11 A. I have no clue.
12 MR. McDONALD: Next exhibit, please.
13 (Lawson Exhibit No. 34
14 was marked for
15 identification.)
16 BY MR. McDONALD:
17 Q. Mr. Farber, you've been handed exhibit 34.
18 Based on the first page of this document,
19 does it look like this is ePlus's response to Novant
20 Health's request for a proposal on a procure to pay
21 system?
22 A. It does.
23 Q. This is dated March 20, 2009.
24 Correct?
25 A. Correct.

358

1 Q. Out in the upper left corner, do you see
2 that the contact information at ePlus is Will Thomas?
3 A. Yes.
4 Q. Was Will Thomas in charge of putting this
5 response together for Novant?
6 A. He would have been the sales
7 representative, customer-facing sales representative.
8 Q. Was he responsible for putting the RFP
9 response together or not?
10 A. Not necessarily.
11 He was responsible for submitting that
12 into our group that manages responses, and then work
13 is divvied out to various players to provide answers
14 to various sections.
15 Q. Is seeing his name on here and seeing this
16 document now -- and feel free to thumb through it if
17 you'd like -- does this give you an indication of who
18 probably was in charge of responding to the Novant
19 RFP?
20 A. That doesn't -- no. I don't need to thumb
21 through it to give you an answer.
22 Will Thomas is responsible for the
23 relationship with the prospect, in this case, Novant.
24 He submits a request if we got a formal RFP to a
25 central group at ePlus, who then is responsible to

359

1 have a conference call with Will, and based on the
2 questions, they know who at ePlus may have answers to
3 these questions, and then they divvy out pieces of
4 the RFP and then bring the answers back in to one
5 full document.
6 He's ultimately responsible to make sure
7 that people having the conference calls that this
8 main group is responsible for ensuring that people
9 are answering the questions.
10 Q. So who ultimately gave final approval to
11 this response?
12 A. Let me see the date on it.
13 I may have, or somebody else may have in
14 my absence.
15 Q. On the second page, do you see near the
16 middle of Mr. Thomas's letter to Novant, there's a
17 reference to JV Kelly Group?
18 A. Yes, I do.
19 Q. And it says here, ePlus has teamed with
20 the JV Kelly Group.
21 Right?
22 A. Yes.
23 Q. Who is the JV Kelly Group?
24 A. JV Kelly is -- I think they've since been
25 acquired, but they were a consulting organization

360

1 that may -- I think had certain products in certain
2 areas, but their primary revenue source was project
3 management and consulting.
4 Q. Can you tell by looking at this
5 document -- is this the final version of it as
6 provided to Novant?
7 A. It would appear that it would be. I can't
8 conclusively say that there wasn't a subsequent one
9 that was ultimately sent to them, but it would appear
10 so.
11 Q. I'd like you to keep that document handy
12 and I'm going to mark another one now.
13 Okay?
14 A. Sure.
15 MR. McDONALD: Thank you.
16 (Lawson Exhibit No. 35
17 was marked for
18 identification.)
19 BY MR. McDONALD:
20 Q. Okay. So what I'd like to do now with
21 exhibit 34 that was already in front of you,
22 Mr. Farber --
23 A. Yes.
24 Q. -- can you turn to the page number last 5
25 digits 3 -- 432891. I guess that's 6 digits.

361

```
 1    A.  Yes.  Okay.
 2    Q.  Put that kind of on your left there.  And
 3  then on your right, can you have page 2 of Lawson
 4  exhibit 35.
 5        That page is fine.  There you go.
 6    A.  Right.
 7    Q.  Okay.  Is page 2 of exhibit 35 the color
 8  version of the figure that's on page 432891 of
 9  exhibit 34?
10    A.  Yes, it is.  Yeah, they look like they
11  match up.
12    Q.  Can you help me understand why ePlus is
13  coded in exhibit 35 as having the yellow box -- boxes
14  and the blue boxes?
15        Why wouldn't you put ePlus with the same
16  color?
17    A.  I have no clue.  Maybe somebody's artistic
18  impression.  I don't know.  Oh -- I don't know.
19    Q.  In any event, the yellow box, that
20  includes the supplier portal and catalogs blocks.
21        Correct?
22    A.  The yellow?
23        Yes.
24    Q.  And then the blue one, which is the other
25  ePlus color, that's goes the 5 boxes reporting spend
```

362

```
 1  visibility, purchasing, receiving, and invoicing.
 2        Right?
 3    A.  Yes.
 4    Q.  And then JV Kelly, their boxes are the
 5  contracting and sourcing boxes.
 6        Correct?
 7    A.  Correct.
 8    Q.  And then D&B has got supplier diversity
 9  and spend analysis.
10        Correct?
11    A.  That's correct.
12    Q.  Did ePlus also partner with D&B on this
13  proposal?
14    A.  I'd have to look at the proposal in its
15  entirety in the RFP.  Dun & Bradstreet has diversity
16  information that they maintain about suppliers.
17    Q.  What is diversity information?
18    A.  Well, of a small-owned business,
19  minority-owned business, financial health of the
20  supplier, things of that nature.
21    Q.  There's a couple of boxes in the diagram,
22  suppliers and spend data, that that don't seem to be
23  allocated to any of ePlus, JV Kelly, or D&B.
24        Correct?
25    A.  No.
```

363

```
 1        The box that says, suppliers, if I'm
 2  interpreting it correctly -- and again I'd have to go
 3  through all the schematics that may be in the
 4  response -- so I'm doing my interpretation here.
 5    Q.  Okay.
 6    A.  It would appear to me that supplier
 7  diversity information, there may have been a
 8  requirement by Novant to have that information as
 9  part of the catalog, so that supplier diversity
10  information is flowing between that system that Dun &
11  Bradstreet had and our supplier portal in order to
12  build a catalog with that additional information,
13  which would have been attributes associated with
14  those items.
15    Q.  Okay.  In the drawing, though, between the
16  supplier portal and supplier diversity, there's a box
17  called, suppliers.
18        Right?
19    A.  Yes.
20    Q.  And that's meant to represent parties
21  other than ePlus, JV Kelly, and D&B.
22        Right?
23    A.  I think it may represent the customers'
24  suppliers that they do business with.
25    Q.  Right.
```

364

```
 1        So that would be none of the above, right,
 2  not ePlus, not JV Kelly, and not D&B?
 3    A.  That's correct.
 4    Q.  Okay.  The spend data box down below the
 5  sourcing box, though, that one also is not associated
 6  by color with ePlus, JV Kelly, or D&B.
 7        Correct?
 8    A.  That's correct.
 9    Q.  What is spend data as you understand it
10  representing here?
11    A.  Well, I think -- again, my
12  interpretation -- I don't know how it's represented
13  in the response, so I'm giving my interpretation as I
14  look at a doc -- at just a graph, right, not knowing
15  its pure intent, but it would appear to me at a high
16  level that it looks like what comes out of the
17  purchasing system that uses, you know, catalogs, it
18  can feed a spend analytic system, which may be
19  provided by in this case Dun & Bradstreet.
20        So it's showing the flow of the spend
21  data, which is that box, from the purchasing system
22  to what appears to be Dun & Bradstreet spend
23  analytics.  Now, I don't know, the customer or
24  prospect may have had spend analytics from Dun &
25  Bradstreet.  It may have been a requirement, which is
```

365

1  where why we may have depicted it that way.
2  Q.  All right.  You can put exhibit 35 anyway
3  to the side.
4  A.  Which one was 35?
5  Q.  The one on the right with the colors.
6  A.  Okay.  Fix that.
7  Q.  If we return now to exhibit 34, and can
8  you go up to the page lower right corner number
9  432900, please.
10  A.  900.  Okay.
11  Q.  This page has in the middle of a part of
12  the page a list of supplier portal features; is that
13  right?
14  A.  Yes.
15     It appears to list some of the features of
16  the portal.
17  Q.  The fifth bullet point down has the
18  heading, compare products.
19     Correct?
20  A.  I see that, yes.
21  Q.  Now, it says, quote:  After requisitioners
22  search for products, they can conveniently compare
23  products using the discovery catalog, quote.
24     Do you see that sentence?
25  A.  I do see it.

366

1  Q.  All right.  Is that a feature of the
2  supplier portal, or is that a feature of some other
3  part of the ePlus system?
4  A.  The portal has -- uses the same catalog as
5  the procurement system.  What ultimately the portal
6  populates is the catalog.
7  Q.  The portal populates the catalog?
8  A.  The output of the data coming from the
9  portal.  It's the tool that we use to create the
10  catalog.
11  Q.  Okay.  So it creates the catalog, but this
12  particular bullet point is talking about after a
13  search, there could be a comparison.
14     Right?
15  A.  Let me just go back to where we were
16  talking about.
17     I'm sorry.
18  Q.  M-hm.
19  A.  It's saying here that the requisitioners
20  can search and they can compare, yes.
21  Q.  Where does that search for product by a
22  requisitioner take place in the ePlus system as being
23  proposed here?
24  A.  It's in the procurement system.
25  Q.  It's in procure plus?

367

1  A.  It would be -- they'd be going into
2  procure plus, yes.
3  Q.  And then the step of conveniently
4  comparing products using the discovery catalog, where
5  in the ePlus system does that happen?
6  A.  Well, I think it's part of the catalog
7  search capability.
8  Q.  Which -- is that in the catalog plus
9  part --
10  A.  Yeah, you could refer to it as the
11  catalog -- catalog plus.
12  Q.  What is the discovery catalog?
13  A.  That just seems like a very interesting
14  marketing term that somebody threw in there that
15  we're trying to show that they could discover items
16  in the catalogs.
17  Q.  Okay.  Is that a new one in terms of what
18  you've heard of before?
19  A.  You know, every time I look at this, I see
20  a new word and I go, where did somebody come up with
21  that one, so --
22  Q.  But it's the same catalog we've been
23  talking about --
24  A.  It's the catalog, yes.
25  Q.  -- all along?

368

1     The next sentence, quote -- well, before
2  we go on to the next sentence, the compare -- the
3  conveniently compare products step, is that the
4  side-by-side comparison that's up on the user screen
5  that we talked about earlier?
6  A.  That's one of the ways, sure.
7  Q.  What other ways can the user conveniently
8  compare products using the catalog?
9  A.  Well, it's the representation, whether
10  it's side by side or it's -- remember we were talking
11  about horizontal, vertical, the representation of how
12  it looks on the screen.
13  Q.  Okay.  So it's either left, right, or top,
14  bottom?
15  A.  Yeah, how it's set up and how the users
16  prefer to see things.
17  Q.  Okay.  Are there any other ways that the
18  ePlus system allows users to conveniently compare
19  products other than either top, bottom or left,
20  right?
21  A.  You know there may be, but I don't -- I'm
22  not sure they'd be widely used, or there may be some
23  little feature in there I'm unfamiliar with.
24  Q.  Okay.  In the next sentence, quote:  It
25  displays product information for multiple commodities

369

1   in a tabular or graphical format enabling users to
2   compare product descriptions, pricing, manufacturers,
3   and other attributes, quote.
4        Do you see that sentence?
5   A.  I do.
6   Q.  So does that indicates that with either
7   the top, bottom or side to side that could either be
8   a table of words or it could be a graphical format?
9   A.  I don't -- it's basically a comparison as
10  it says, that you could compare product descriptions
11  and pricing and manufacturers or other attributes.
12  And it could -- you know, what it's trying to point
13  out is, you could look at it different ways as we
14  were talking about before.
15  Q.  Yeah.
16       So would the tabular format be some sort
17  of a table or there might be a row for product and A
18  a row for product B, and then on the left side, you
19  have a bunch of -- those be columns I guess, and then
20  you have a bunch of rows for the different attributes
21  so that they could compare side by side?
22  A.  Yeah, associated with those.
23  Q.  And so that would be the tabular format.
24       Would the graphical format basically just
25  be kind of shots of the catalog excerpts for the

370

1   different products?
2   A.  Yeah.
3        I'm trying to decipher the term graphical
4   and whoever the author was, how they represented
5   graphical.  I'm not quite sure to be honest with you.
6   Q.  Okay.  There is an alternative format
7   though to that tabular format to display product
8   comparisons side by side or top, bottom?
9   A.  I don't -- I don't believe so.  I think
10  it's -- you're either looking at in the ways that
11  we've previously discussed.  And there may be like I
12  said some other little feature there that has some
13  nice little whiz-bang way of viewing the data.
14       I just don't recall what it might be.
15  Q.  Could you move forward to the page marked
16  lower right 432902.
17  A.  Okay.
18  Q.  This is referring to produce plus 6.8,
19  hosted production environment physical presentation.
20  Right?
21  A.  Okay.
22  Q.  You see that heading anyway.
23  Right?
24  A.  I do, yes.
25  Q.  So 6.8, is that the then current version

371

1   of procure plus in March of 2009?
2   A.  6.8?
3        What was the date?
4   Q.  March --
5   A.  It might have been at that -- at that
6   time.
7   Q.  All right.  And hosted, this was the
8   proposal is Novant, is that ePlus would host this
9   environment for them?
10  A.  I don't know if they wanted both hosting
11  and enterprise.  Leads me to believe without
12  necessarily seeing the questions that typically when
13  people ask if, you know, if we host, they want to see
14  how we plan on putting the application within the
15  hosting subject.
16  Q.  Under the left side of this picture, it
17  says, shared resources, at the top.
18  Right?
19  A.  Yes.
20  Q.  The last 2 boxes on the left side there
21  are catalog publishing server and catalog free form
22  server.
23       Correct?
24  A.  Yes, I see that.
25  Q.  What's -- what's the difference between a

372

1   catalog publishing server and a catalog free form
2   server?
3   A.  My recollection is, I think the difference
4   in those is, we use a separate server to move the
5   data once the catalogs are created for the customer
6   to the production environment, so it just does a push
7   of the data, of the information.
8   Q.  Is the push to the publishing server?
9   A.  It's done to the production catalog.
10       You see where it says, the catalog
11  database?
12  Q.  I see -- yes, over to the right between
13  procure plus database --
14  A.  That's right.
15  Q.  -- and content plus, there's a catalog
16  database?
17  A.  That's right, that's right.
18  Q.  All right.  So catalog database, is that
19  different from the catalog publishing server and the
20  catalog free form server?
21  A.  Yeah.
22       It's a separate server that we're using to
23  move data around within -- it's all test data.  It's
24  our environment that my folks use that I believe is
25  used for them to set up environments and move data

373

1   around before things get into production.

2       Q.   Does data move from the catalog publishing

3   server there on the left over to the catalog database

4   on the right?

5       A.   It may.  It very well may, not as part of

6   production, though, in the use of the system.  It's

7   all used for the setup from what I recall.

8       Q.   What is used for setup?

9       A.   The publishing server.

10      Q.   Okay.  And then the catalog free-form

11  server, is that also used in the publishing process?

12      A.   I don't know if -- I believe it is, and

13  that's the other stuff that we talked about, the

14  services that we performed to enhance data for

15  customers and provide services.

16      Q.   Does that have to do with standardizing

17  the catalog data?

18      A.   If they want us to perform that as a

19  service for them, I believe that that's what that may

20  refer to, so not always used.

21      Q.   And catalog database, that includes the

22  catalogs of supplier products?

23      A.   That's the catalogs of the suppliers.

24      Q.   What's in the procure plus database on the

25  left in the picture here?

374

1       A.   That's commodity code structures, general

2   ledger rules, the integration points with the

3   accounting system.

4       Q.   Anything else?

5       A.   Well, it houses all the rules for the

6   procurement application in terms of how the customer

7   wants it to be configured.

8       Q.   What is in the content plus, slash, SP

9   database to the right of the catalog database?

10      A.   That's our supplier portal database, and

11  that's the database that we use if we're providing a

12  service to enable suppliers for our customers.

13      Q.   So will suppliers that use the portal

14  transmit information in the first instance to that

15  content plus, slash, SP database?

16      A.   If clients want us to help them maintain

17  catalogs, then that's a tool -- we were talking I

18  think -- I don't know if it was earlier today or

19  yesterday -- about our supplier portal and what it

20  does.

21          This is the system that I was referring

22  to, which is the tool that's used, the utility that's

23  used to create catalogs, see what changed in the

24  future if -- if a supplier gives us another upload of

25  data and something has changed, it has some nice

375

1   features in it to show the delta analysis between

2   what was given to us before and what may have been

3   changed or obsoleted as far as the products are

4   concerned.

5       Q.   And above that, content plus, slash, SP

6   database.

7          Do you see a box for the content plus SP

8   server?

9       A.   Yes, I do.

10      Q.   That's also for the supplier portal?

11      A.   That's right.

12      Q.   All right.  Done with that.

13      A.   Okay.

14          MR. McDONALD:  Mark that as the next

15  exhibit, please.

16          (Lawson Exhibit No. 36

17              was marked for

18              identification.)

19  BY MR. McDONALD:

20      Q.   Mr. Farber, you've been handed --

21          MR. McDONALD:  Is it exhibit 35?

22  THE COURT REPORTER:  36.

23  BY MR. McDONALD:

24      Q.   -- 36.

25      A.   Yes, that's correct.

376

1       Q.   Is that an email dated February 15, '08?

2       A.   That's what it says, yes.

3       Q.   It's from Drew Burford.

4   Right?

5       A.   Yes.

6       Q.   Who is Drew Burford?

7       A.   He used to be a junior-level salesperson

8   for ePlus --

9       Q.   Where is he now?

10      A.   -- account manager.

11          I don't know where he's gone to.

12      Q.   Has he left the company?

13      A.   Mutually left the company, yes.

14      Q.   Who is Paul Jarboe?

15      A.   Paul Jarboe is -- plays a number of roles

16  at ePlus.  He is a product analyst in one sense that

17  works to ensure that our product does what it says it

18  does and gives his opinions of where he thinks it

19  should be.  He also works with our clients on their

20  implementations.

21      Q.   Who is Jay Raulerson?

22      A.   He's a presales demo consultant.

23      Q.   Now, the subject of this email is Lawson

24  meeting.

25          Do you see that?

377

1    A.  I do.

2    Q.  Was there a meeting involving Lawson

3   around February 15th, 2008?

4    A.  Well, let's see what it says.

5    (Pause.)

6    A.  I think it is from what I'm gathering in

7   reading this, that it was information that these

8   individuals, more specifically -- or more probably

9   Drew ascertained from Cleveland Clinic.

10    BY MR. McDONALD:

11    Q.  That's what CCF stands for?

12    A.  Yes.

13    That's what I believe this to be.

14    Q.  What is your understanding as to how the

15   information provided in this email was gathered?

16    A.  My view of it would be that Drew probably

17   had a conversation with Cleveland Clinic.  They

18   provided him with some base information, and he --

19   he's reporting back.

20    Q.  So that first bullet point 1 in terms of

21   the notes from Lawson meeting says, quote:  They are

22   no-bidding this RFP as they do not have the catalog

23   services necessary, quote.

24    Do you see that?

25    A.  I do.

378

1    Q.  So is it your understanding here that

2   Mr. Burford is indicating that based on his

3   information from Cleveland Clinic or wherever, he

4   found out that Lawson was not bidding on the

5   Cleveland Clinic RFP because they did not have the

6   catalog services that Cleveland Clinic was looking

7   for?

8    MR. ROBERTSON:  Objection, lacks

9   foundation.

10    A.  No.

11    I don't know if I can interpret it that

12   way.

13    BY MR. McDONALD:

14    Q.  What else would it mean?

15    A.  Well, again, you know, I'm surmising who

16   had the conversation with who.

17    Right?

18    So given that, you know, it could also

19   mean the Cleveland Clinic is not bidding out the RFP,

20   and perhaps they don't have the catalog services that

21   are necessary.

22    Now, those catalog services is a broad,

23   broad topic, and what that could mean, it could mean

24   that, you know, they may have catalogs, but they

25   don't like how the suppliers are being managed by

379

1   whoever the service provider was, whether internal or

2   external, and they want to build better catalogs for

3   their systems.

4    Q.  Do you know one way or the other whether

5   or not Cleveland Clinic told ePlus that Lawson was

6   not bidding for the RFP because Lawson did not have

7   the catalog services necessary?

8    A.  I don't -- I don't know that, no.

9    Q.  Mr. Burford would know that?

10    A.  He -- I would imagine he may know that.  I

11   don't know.

12    Q.  The fourth bullet point there says, quote:

13   CCF can elect to turn on Lawson's e-pro punchout

14   capability to access ePlus catalog or punchout sites,

15   quote.

16    Do you see that?

17    A.  I do see that, yes.

18    Q.  Can you explain to me what that means?

19    A.  I think this is Drew saying that -- you

20   know, in his interpretation I think he's trying to

21   come up with whatever solution he thinks will fit the

22   criteria that -- that there's a punchout capability

23   that if we wanted to replace our catalog with

24   whatever they may be using of the Lawson system that

25   that's something that could very well be done.

380

1    Q.  Did you have an understanding as to

2   whether as of February of '08, Cleveland Clinic had

3   or had not turned on the Lawson punchout capability?

4    A.  No, I don't -- I don't -- I don't have any

5   indication of -- of when they may or may not have

6   done something in that regard.

7    Q.  Paragraph 7 says, quote:  Lawson has

8   agreed to validate our integration strategy, dash,

9   Paul, any docs you recommend to send to Lawson

10   product management to accomplish this, question mark.

11    Do you see that?

12    A.  I do.

13    Q.  Can you explain what that means?

14    A.  Well, again, I'd have to go through our

15   proposal, but the integration could be a number of

16   different things.

17    It could be at the catalog site of the

18   house.  It could be at the AP -- accounts payable and

19   general ledger level of integration.  It certainly is

20   not uncommon to have what I refer to as co-opitition,

21   where we may compete in one area but need to work

22   side by side in another area together.

23    So they may have been validating a number

24   of different integration points.  I don't know all

25   the applications that were necessarily in play with

381

1  this response, so that would be my view of what may
2  have occurred.
3       Q.   Is it your understanding that as of the
4  time of this email, February of '08, Lawson's system
5  at Cleveland Clinic was already using Lawson's
6  requisition self-service functionality?
7       A.   I think at the time of -- as this was
8  written on February 15th of '08, it says that all of
9  the Cleveland Clinic facility or current users, they
10  use Lawson's requisition service, including research,
11  and they must continue to stay in compliance with
12  grants.
13       And then it says, see below.
14       Q.   Do you have an understanding as to what
15  Lawson's requisition self-service system does?
16       A.   No.
17       I'm not familiar with the details and the
18  analysis of those systems.
19       Q.   Was the integration strategy that's
20  referenced in paragraph 7 a strategy for integrating
21  what the Lawson system, including the Lawson
22  requisition self-service system?
23       A.   I don't know.  I'd have to reference other
24  documents to determine that.
25       Q.   Below the 10 bullet points, there's a

382

1  sentence that says, quote:  Lawson has taken a
2  neutral position on this, quote.
3       Do you see that?
4       A.   I do.
5       Q.   Then the next sentence, quote:  I do not
6  think they knew the extent of the threat SciQuest
7  poses until our conversation, quote.
8       Do you see that sentence?
9       A.   I do.
10       Q.   Now, this would indicate, wouldn't it,
11  that ePlus actually had a conversation directly with
12  Lawson about the Cleveland Clinic matter?
13       A.   No, not necessarily.
14       They -- they could have gotten -- you
15  know, Drew could have received from Cleveland Clinic
16  an indication that they may have said, hey, Lawson
17  doesn't care which position you take, they're
18  neutral.
19       That could have come from Lawson's field,
20  and then Drew may have just been following up saying,
21  hey, you know, they may not know the extent of the
22  threat it poses.
23       And then it says, as our relationship
24  progresses with Lawson, we may find out more.
25       Q.   But when it says there that he doesn't

383

1  think Lawson knew the extent of the threat SciQuest
2  poses until our conversation, isn't that pretty clear
3  to you that he's talking about the conversation
4  between him and somebody at Lawson?
5       A.   Well, let me just re-read it, and I
6  will --
7       (Pause.)
8       A.   I guess you can interpret that as well.
9       I just -- I don't know enough detail to
10  determine that.  I can see it both ways.
11  BY MR. McDONALD:
12       Q.   In the first sentence in that paragraph,
13  what is your understanding as to what the neutral
14  position is about?
15       A.   I haven't a clue.  I don't -- I don't know
16  the details of the conversations that -- that had
17  transpired.
18       (Discussion off the record.)
19       THE VIDEOGRAPHER:  The time is
20  approximately 1:37 PM.  We are going off the video
21  record.  Off the record.
22       (Recess.)
23            (Lawson Exhibit No. 37
24            was marked for
25            identification.)

384

1       THE VIDEOGRAPHER:  The time is
2  approximately 1:48 PM.  We are back on the video
3  record.
4  BY MR. McDONALD:
5       Q.   Mr. Farber, I wanted to stick with exhibit
6  36 for just another question or 2 here.
7       A.   Certainly.
8       Q.   Under bullet 2, there is a reference there
9  to, Cleveland Clinic currently uses Lawson's
10  requisition self-service.
11       Right?
12       A.   Yes, that's what it says.
13       Q.   ePlus did bid for the Cleveland Clinic
14  work around that February 2008 time frame or
15  thereafter; is that right?
16       A.   My recollection is there were 2 elements
17  of Cleveland Clinic.
18       One is, there was a belief in conversation
19  that Cleveland Clinic may have been determining if
20  they were going to stay with whatever Lawson system
21  they had that was doing requisitioning.  And at one
22  point, we were looking at the possibility of selling
23  our procurement and catalog solutions to them.
24       I think ultimately, they determined -- if
25  my recollection serves me correctly -- that they were

Farber, Kenneth, Gary - 30(b)(6) & Individual - Vol 2  12/17/2009  12:00:00 PM

385

1  going to continue with whatever Lawson system they
2  were using, and potentially looking at our catalog
3  solution.
4      Q.   Did they go with somebody else's catalog
5  solution?
6      A.   I believe -- and again, recollection is
7  that Lawson may have had a relationship with SciQuest
8  and that they used the SciQuest catalog ultimately.
9      Q.   Had Cleveland Clinic indicated that they
10  were going to stay with Lawson's requisition
11  self-service but use the ePlus catalog, would ePlus
12  have found a way to accommodate Cleveland Clinic and
13  integrate their catalog functionality with Lawson's
14  requisition self-service?
15      A.   Yeah.
16      I don't know what -- what -- what they
17  were lacking at the catalog level and what they were
18  doing with whatever was referred to as the
19  requisition self-service.  I'm not familiar with the
20  application in detail.
21      But I know we did respond to a request for
22  information on our catalog component, and we did
23  propose that solution.
24      Q.   And was it your understanding that the
25  solution proposed by ePlus would have given Cleveland

386

1  Clinic the option of using the ePlus catalog with the
2  existing Lawson system?
3      A.   Whatever components of Lawson that they
4  may have been using.  I'd have to look at the
5  proposal to see if it discusses the integration
6  levels and however it was being referred to.
7      Q.   Has ePlus had other situations where
8  prospects that had somebody else's requisitioning
9  computer electronic system were looking to add to the
10  capabilities of the system by adding catalog
11  functionality like ePlus provides?
12      A.   I believe that there's a situation where a
13  client of ours has an Ariba system that we're
14  providing -- it's either Ariba or SAP.  I don't
15  recall -- that we're providing catalog systems to.
16      Q.   Is it true that the catalog system needs
17  to work with some sort of an electronic
18  requisitioning system?
19      A.   No.
20      It could stand on its own as well.
21      Q.   How would you do requisitioning if it
22  doesn't have a requisition system with it?
23      A.   You don't have to necessarily.
24      I mean, it's a -- there's a separate
25  component to the -- to the catalog option that just

387

1  allows it to be used for searching.
2      Q.   Okay.
3      A.   So technically it doesn't have to be.
4      Q.   I see.
5      So you could still buy the catalog module
6  as a stand-alone module and search the catalog?
7      A.   That's correct.
8      Q.   But if a prospect wanted to use the
9  catalog with procurement or requisitioning, they'd
10  have to have somebody's electronic procurement
11  module.
12      Right?
13      A.   They would have to have some form of a --
14  if they wanted to use it in the context of
15  procurement, there are differences in every
16  procurement system, but we would certainly look to
17  potentially enable that solution for them if we
18  could.
19      Q.   Does a customer typically -- let me word
20  it a little differently.  I'll withdraw that.
21      Do most customers that -- or most
22  prospects that are seeking the procure plus
23  product -- do they already have some sort of an
24  electronic system in place?
25      MR. ROBERTSON:  Object to the form of the

388

1  question.
2      BY MR. McDONALD:
3      Q.   That was pretty vague, wasn't it?
4      A.   Yeah, I was going to ask --
5      Q.   Let me rephrase that.
6      Do most of the prospects for ePlus's
7  procure plus products have an electronic ERP system
8  in place already?
9      A.   When you say, ERP, are you -- are you
10  referring -- what component of ERP as a broad space
11  as we've discussed?
12      I'm sorry.
13      Q.   Let me ask it this way, then.
14      Maybe I'll have you fill in the blank.
15      A.   Okay.
16      Q.   What sort of modules or functionality do
17  prospects already have in place in terms of
18  electronic resource planning typically when they're
19  in the market for a product like procure plus?
20      A.   Okay.  So there are a number of
21  occurrences or instances that we could refer to.
22      One is, most companies today have a
23  back-office accounting system managing their accounts
24  payable, general -- general ledger from a variety of
25  vendors.

389

1    And that becomes an element of potential
2  integration where they wanted to connect the 2
3  systems.  There's some customers that do not have any
4  form of requisitioning in place today and are looking
5  to create an electronic procurement system.
6    There's a third class that have a
7  procurement system in place but are looking to
8  potentially reduce the cost that they incur with
9  their existing vendor and will be bidding for
10  alternatives because their contract may be coming up
11  for term, for example.
12    So these are the immediate ones that come
13  to mind.  I'm sure there's many other delineations
14  and occurrences of why that might happen, but those
15  are the ones that come to mind.
16    Q.  Do most of the prospects at least have
17  some form of electronic inventory control already?
18    A.  No, not necessarily.
19    Q.  Well, do you know whether it's more or
20  less than half?
21    A.  I don't -- don't know.
22    The reason I say I don't know is, it's not
23  always a requirement depending on the goods and
24  services that they plan on using through the
25  purchasing system that they get tied into their

390

1  inventory system.
2    Q.  Do more than half of the prospects have at
3  least some sort of electronic accounting system in
4  place?
5    A.  The customers that we deal with would
6  generally have an accounting system.
7    Q.  Do more than half of the ePlus prospects
8  have an electronic requisitioning system already in
9  place?
10    A.  That varies by -- that goes in cycles.
11    I could tell you today as I stand here, I
12  was out at a number of companies over the last 2
13  weeks, number of prospects that do not have, and
14  we're talking about some very large customers.
15    So based on today, I could say, well,
16  my -- my high-level prospects don't have a system
17  right now.  There's others that we have talked to,
18  you know, in recent months that are reevaluating what
19  they have.
20    Q.  Other prospects do have some sort of a
21  requisition system in place electronic but they're
22  looking at other options anyway?
23    A.  Sure.
24    Q.  How long does a typical contract run with
25  a customer using a procure plus type of product?

391

1    A.  I think the majority of our contracts seem
2  to run -- the initial terms are somewhere between 3
3  to 5 years.
4    Q.  Is that pretty representative of the
5  length of the contracts that your competitors get to?
6    A.  I wish I knew.  I'd be in a better
7  position if I did.
8    Q.  But at least a number of your
9  opportunities that come up are in situations where
10  somebody else's contract is about to expire and
11  they're -- the prospect is now looking at options
12  again?
13    A.  No.
14    I didn't say that.
15    I said earlier there's -- you know, it
16  goes in waves.
17    Right?
18    So there's times where they don't have
19  anything, and then all of a sudden there's times when
20  they're looking to replace things.
21    Q.  Okay.  But over the course of let's say
22  the last 2 or 3 years then, at least a significant
23  portion of the prospects who had existing electronic
24  systems with contracts that were expiring?
25    A.  No.

392

1    Q.  So it's a very small number, or it's none
2  at all?
3    A.  I think it's a mix.  I think it's probably
4  a 50-50 mix.
5    Q.  Okay.  And 50-50 meaning ones that had
6  systems that were up for renewal versus ones that
7  didn't have systems at all?
8    A.  Ones that I don't want to say was just up
9  for renewal.  Ones that had some form of a
10  requisitioning system with some functionality, and
11  some that have considered to have nothing in place or
12  some home-grown, you know, half-baked system.
13    Q.  I think it was either earlier today or
14  maybe yesterday that you mentioned sometime I believe
15  in 2009 you went to the SciQuest Website.
16    A.  I think we did have a discussion of that,
17  yeah.
18    Q.  Why did you go to the SciQuest Website in
19  2009?
20    A.  I don't know when it was in reference to
21  when we spoke about, but there -- in the particulars
22  of the reason that I may have gone to it at that
23  point in time.
24    Q.  As you sit here right now, do you recall
25  why you went to the Website?

393

1    A.   Obviously to look at something, to find
2  something out about them.
3    Q.   I think you might have mentioned that it
4  had to do about checking on their use of the patent
5  numbers?
6    A.   Oh, you're right.  Absolutely.  That's
7  correct.
8    Q.   Did you ever visit the SciQuest Website
9  before you entered a license agreement with SciQuest?
10    A.   Yes.
11    Q.   Why did you do it then?
12    A.   Well, I wanted to go on the Website to get
13  an idea of the products and services that they were
14  offering.
15    Q.   What did you learn from that visit about
16  that?
17    A.   My recollection is that they did
18  procurement.  They did content and catalog
19  management.
20         They had a large presence in health care.
21  They maintained a catalog for the health care
22  industry, research and science revolving around
23  health care.
24         And they had a few other things, you know,
25  contract management and so on that I recall.

394

1    Q.   Did -- was this particular visit to the
2  SciQuest Website in 2009 or sooner?
3    A.   I -- you know, my latest recollection of
4  doing it is -- is when, you know, we were making a
5  determination -- or I was making the determination of
6  how we should potentially proceed with -- with
7  SciQuest.
8    Q.   From a patent standpoint?
9    A.   Yes.
10    Q.   Have you visited the Lawson Website?
11    A.   I have.
12    Q.   Did you do that before the lawsuit was
13  brought or after?
14    A.   No.
15         Look, I'm not in a position to want to be
16  frivolous about filing a lawsuit.  It's expensive.
17  So before I engage my counsel, not that I can
18  interpret the patents to the extent that my counsel
19  can and do the evaluation, I want to be convinced at
20  a high level that even though I may have a belief of
21  what it -- you know, from -- from competitive
22  situations of what Lawson may be doing.
23         I want to go on their Website as I did
24  with SciQuest and just kind of landscape-out, you
25  know, what are they doing, and, you know, then --

395

1  then speak to -- to counsel.  I just don't want to be
2  frivolous about it.
3    Q.   All right.  Did you visit the Lawson
4  Website before you sued Lawson?
5    A.   I said yes.
6    Q.   Okay.  Did you visit the Lawson Website in
7  2008?
8    A.   I may have.
9    Q.   Have you visited the Lawson Website for
10  any reason other than understanding their product
11  line for purposes related to patent enforcement?
12    A.   It may have been for competitive reasons,
13  you know, and it may not -- I don't know -- I visit
14  hundreds if not thousands of different Websites for
15  information.  And one thing leads you to something
16  else, and then you bounce into somebody else's
17  Website, so, you know, I couldn't tell you specifics.
18    Q.   What information did you learn about the
19  functionality of Lawson's product line from going to
20  their Website?
21    A.   You know, it's -- it's difficult to
22  ascertain from Websites, you know, what people say
23  and do.  But I looked for some basic information
24  before I spoke to counsel.
25         Do they have a procurement system.  Do

396

1  they claim to do requisitions.  Do they claim to be
2  able to search catalogs.  Do they claim to
3  potentially check inventory.  Do they provide content
4  services to build catalogs.
5         I look for those basic things.  And I
6  don't try to interpret everything back to our patents
7  and claims because I'm not a lawyer and I don't, you
8  know, know all the legal aspects of interpretation.
9  But if I believe that those basic areas that there's
10  some -- some things to look at, then I'll make a
11  determination and contact our counsel and ask them to
12  look at this for us.
13    Q.   Did you make a determination from your
14  visit to the Lawson Website as to whether or not
15  Lawson's purchasing and requisition systems would
16  allow a user to do comparison shopping?
17    A.   I don't know how I broke down my -- my --
18  my view of things.  I -- it looked to me when I went
19  onto the -- to the Website to the best of my
20  recollection, there was enough information available
21  to me at that time to initiate further investigation.
22    Q.   Okay.  But my question is a little
23  different.
24         Okay?
25    A.   Okay.

397

1    MR. McDONALD:  Could you read it back,
2  please.
3    (The reporter read the next-to-last
4    question.)
5    A.  I think I found and I can't cite where and
6  what it was and what I read, but I think I found
7  enough information to make me believe that in fact
8  there was a capability to do that.
9    BY MR. McDONALD:
10    Q.  And from visiting the Lawson Website, did
11  you reach any conclusions as to whether or not the
12  Lawson purchasing and requisition system could search
13  a selected subset of catalogs from a catalog
14  database?
15    MR. ROBERTSON:  Object to the form of the
16  question.
17    But you can answer.
18    A.  That's what I leave up for further
19  investigation.  I can't get to -- to levels of
20  granularity.  And rather than surmising and rather
21  than wasting a lot of dollars and frivolously
22  launching a lawsuit, that's why we have, you know,
23  our counsel investigate that for us.
24    BY MR. McDONALD:
25    Q.  So apart from counsel, is it fair to say

398

1  just based on your personal visit to the Website, you
2  did not have the ability to ascertain whether
3  Lawson's systems allowed a user to search a subset of
4  catalogs for items?
5    MR. ROBERTSON:  Object to the form of the
6  question.
7    A.  I think there was enough information
8  available from what I read that would give me an
9  indication that it could.
10    BY MR. McDONALD:
11    Q.  What information indicated that the Lawson
12  system could search a subset of catalogs?
13    A.  I'd have to go back and repeat all those
14  searches to find out specifically what specific page
15  I read or what specific brochure or PDF Lawson
16  published that had that information to provide me
17  with that -- that strong belief.
18    Q.  Ariba is a licensee.
19    Correct?
20    Yes, we have a settlement agreement with
21  Ariba.
22    Q.  If Cleveland Clinic had chosen Ariba to
23  provide their catalog services --
24    A.  Okay.
25    Q.  -- to integrate with the existing Lawson

399

1  system, would you -- would that raise any patent
2  infringement concerns for you?
3    MR. ROBERTSON:  Objection, calls for a
4  legal conclusion.
5    A.  I don't know.  I'd have to have our
6  counsel look at the settlement agreement to determine
7  if there was a not honoring of the agreement.
8    BY MR. McDONALD:
9    Q.  Are you aware of any situations where
10  Ariba was awarded the business for catalog management
11  on a prospect's system that already was using a
12  Lawson requisition system?
13    A.  Not that I'm aware of.
14    Q.  If you became aware of that sort of
15  situation, would that in itself, just the fact that
16  Ariba's system was the one used -- would that cause
17  you to talk to counsel or not?
18    A.  I may have them look at it.
19    I'm not familiar with Ariba offering their
20  catalogs to other systems, but it's something we --
21  you know, that may cause concern on my part, and
22  more likely than not, I would probably have it looked
23  at.
24    Q.  I think you indicated you had at least
25  from a layperson understanding an understanding of

400

1  the scope of the Ariba license.
2    Right?
3    A.  At a high -- high-nonlegal definition
4  perspective, yes.
5    Q.  Right.
6    And if I recall right, it had to do with
7  whether or not the Ariba written code was being used
8  by the customer for the functionality.
9    Is that where you drew the line or not?
10    A.  I believe as I recall that it dealt with
11  Ariba's system as it was delivered by Ariba.
12    Q.  And did it have to use Ariba written code
13  or not?
14    A.  I believe it did.
15    Q.  So if your understanding was that
16  Cleveland Clinic, for example, chose Ariba for its
17  catalog functionality and Ariba had written the code
18  for that, would you still talk to counsel about
19  whether that was okay under the license or not?
20    MR. ROBERTSON:  Objection, calls for a
21  legal conclusion.
22    A.  I think it may -- as I stated earlier the
23  same response, I think if I saw it happening, I may
24  have it looked at.
25    BY MR. McDONALD:

Farber, Kenneth, Gary - 30(b)(6) & Individual - Vol 2  12/17/2009  12:00:00 PM

401

1    Q.   Yesterday, we talked a little bit about

2    the notice to Lawson.

3    A.   Yes.

4    Q.   And you talked about some press coverage

5    of the other litigation.

6    Right?

7    A.   The Ariba litigation?

8    Q.   I believe you mentioned the press coverage

9    of other litigation, whether it was Ariba or SAP,

10   but --

11   A.   Okay.

12   Q.   Is that right?

13   Were you referring to press coverage of

14   both litigations or just the Ariba litigation?

15   A.   I think in the context of yesterday when

16   we were talking about the time periods, you were

17   asking me more in the Ariba time period than you were

18   asking --

19   Q.   So the press coverage -- do you believe

20   the Ariba case had significant press coverage?

21   A.   I do.

22   Q.   Do you believe the SAP settlement had

23   significant press coverage or not?

24   A.   I do.

25   Q.   What's the basis for that belief?

402

1    A.   Same -- same belief as I had with -- with

2    Ariba.  I think it was -- it was covered in trade

3    magazines and industry blogs, statements by both

4    companies, public statements by both companies

5    pertaining to -- to the -- to the lawsuit.

6    So, you know, it received I think

7    enough -- enough publicity to warrant somebody in the

8    space to -- to know what was going on.

9    Q.   What did the media coverage say about the

10   SAP litigation, media coverage that you're talking

11   about?

12   A.   Well, usually starts off with ePlus sues

13   Ariba or ePlus sues SAP.  Then it usually revolves

14   into Ariba denies the charges or SAP denies the

15   charges.  And both parties will, you know, vigorously

16   defend their rights and so on and so forth.

17   And, you know, then there's some

18   republication of -- of that information, you know,

19   that there's a suit pending.  And then there's the --

20   some reproduction by some of the trade magazines

21   about the claims associated with -- with what we're

22   litigating about.

23   The analysts, some of them have picked up,

24   you know, blurbs and talked about that there's suits

25   pending.  And then, you know, in the case -- in Ariba

403

1    as an example where the jury found that the -- that

2    Ariba willfully infringed and that the patents were

3    valid, there was a lot of publicity because there was

4    this whole thing, and I don't understand all the

5    legal aspects, but, you know, that ePlus could

6    potentially be awarded treble damages.

7    So people were expecting, you know, a lot

8    of money and a lot of problems and, you know, from

9    Ariba's perspective and so on and so forth.  So

10   there's a lot of discussion about that.

11   And then the settlement occurred.  And

12   again, a republication of Ariba and ePlus by example

13   settled, and then the trade magazines picked up that.

14   The analysts picked that up.  The blogs picked that

15   up.

16   So there was coverage at different levels

17   of the litigation because it became -- it became

18   publicized.  Ariba was the first one of its type in

19   this space, received a lot.

20   Q.   Do you have any basis to believe that any

21   particular article or press coverage was seen by any

22   individuals at Lawson?

23   A.   That would be speculation on my part and

24   what I think I believe -- I think yesterday I said

25   that anybody that I thought in my opinion didn't see

404

1    it was probably living in a cave or under a rock.

2    MR. McDONALD:  Would you mark this as an

3    exhibit, please.

4    (Lawson Exhibit No. 38

5    was marked for

6    identification.)

7    BY MR. McDONALD:

8    Q.   Mr. Farber, is exhibit 38 an email to

9    persons including you dated March 17, 2009, with an

10   attachment?

11   A.   Yes, it is.

12   Q.   Is the attachment the response to the

13   Novant RFP?

14   A.   It appears to be -- let me just see

15   here -- it's not the final response, no.

16   Q.   Okay.  It's a draft.

17   Right?

18   A.   It is I think -- it looks like the initial

19   RFP questions being put in here.

20   Q.   All right.

21   A.   And maybe some -- actually I don't see any

22   responses yet.

23   Q.   So -- and I think we saw that that date of

24   the other document that we looked at that was a

25   response was actually March 20, 2009.

Farber, Kenneth, Gary - 30(b)(6) & Individual - Vol 2  12/17/2009  12:00:00 PM

405

1        Correct?
2        A.   An earlier document?
3        Q.   The RFP that had the questions answered.
4        A.   Yeah, that's what this one actually says.
5    It has the same dates on it.
6        Q.   Oh, that's right.  This attachment says,
7    March 20th on it as well.
8        A.   That's right.  That's right.
9        Q.   So it's a draft that's going to be due in
10   a few more days.
11       Right?
12       A.   I would suspect.
13       Q.   Okay.  So does this refresh your
14   recollection as to whether you had some involvement
15   in actually reviewing the draft RFP?
16       A.   I could have been copied on it.  I try to
17   look at all the responses.  I try to give my
18   approvals of them.
19       There's times when I'm unavailable or
20   outside the office and somebody else may do it.  So I
21   don't know.  I'd have to see if there was a copy of
22   my approved email on it.
23       Q.   Did ePlus integrate its e-procurement
24   system with a Lawson system at Gannett?
25       A.   Yes.

406

1        Q.   What -- did the Lawson system at Gannett
2    have requisitioning capabilities?
3        A.   To be clear, when we did our
4    implementation with Gannett, we did it in -- the
5    group that was managing it was in Virginia.  And we
6    integrated with Lawson's accounting system or what
7    I -- I don't know the name of the product, but it's
8    the accounting system that has the general ledger,
9    accounts payable.
10       MR. McDONALD:  Mark this, please.
11            (Lawson Exhibit No. 39
12            was marked for
13            identification.)
14       BY MR. McDONALD:
15       Q.   Mr. Farber, you've been shown what was
16   marked exhibit 39.
17       Do you recognize this document?
18       A.   I believe I do.
19       Q.   What is it?
20       A.   I believe it's a document that I prepared
21   in this time frame for an internal meeting.
22       Q.   It's an ePlus internal meeting?
23       A.   Yes.
24       Q.   Was that with the top executives at ePlus?
25       A.   I don't know if it was my internal

407

1    managers or if it was used for a higher-level
2    management meeting.
3        Q.   Whatever the purpose of the presentation?
4        A.   If I could spend a minute, let me just --
5        Q.   Oh, sure.
6        A.   -- go through that.
7        Q.   Sure.
8        A.   It looks like it had a number of different
9    purposes.
10       One was to kind of review the state of
11   affairs within the company, within the organization,
12   and the other is potentially talking about alignment
13   of staff and resources.
14       Q.   Was there any concerns at ePlus about the
15   downward trend in revenues from fiscal year ending
16   March 31, 2008, to the fiscal year that was going to
17   end in March of 2009 at the time this presentation
18   was made?
19       A.   ePlus as a company?
20       Q.   Yes.
21       A.   Let me just make sure I understand.
22       You're asking me if ePlus as a company had
23   any concern about a downward trend.
24       Q.   Right?
25       A.   Okay.  I think ePlus as a company quarter

408

1    by quarter is very concerned about trends, whether
2    they go up or they go down.  We're very cognizant of
3    that aspect of the market.
4        So there were some -- some positive things
5    that -- that occurred in a downward trend, and that
6    is in our hardware side -- our margins actually went
7    up, so even though that we -- our revenue went down,
8    our -- our earnings based on the margins and net
9    income had increased a little bit from what I recall.
10       So it was good on the margin side of the
11   value-added reseller aspect of our business, but we
12   were working on news strategies and new ways to
13   increase the top-line spend with the company.
14       Q.   Top-line spend, is that revenues?
15       A.   Revenue, yes.
16       Q.   Can you turn to the third page of exhibit
17   39, please.
18       A.   39.  That's this one.
19       Okay.  Yes.
20       Q.   Can you tell me what is depicted here on
21   the third page?
22       A.   This looks like a depiction of what our
23   sales account managers were reporting as of the state
24   of this month in terms of where certain deals were
25   being projected.

Farber, Kenneth, Gary - 30(b)(6) & Individual - Vol 2  12/17/2009  12:00:00 PM

409

1   Q.   So with the 3 bullet points under renewals
2  there for Digitas, Cisco, and Purdue --
3   A.   Yes.
4   Q.   -- did ePlus wind up getting all 3 of
5  those renewals?
6   A.   Yes.
7   Q.   With respect to the, new deals looking
8  pretty good, on that page, do you see there's about
9  10 company names there?
10   A.   Yes.
11   Q.   Which one or ones of those did ePlus wind
12  up getting?
13   A.   Koch Industries, which was the first one.
14  Dow Chemical I believe uses our content tool.  I
15  don't know if this was an add-on to it or not, so I
16  can't -- but I think we did get that.
17       United Nations, the Coke PCR, Sikorsky,
18  and I believe Dessault.
19   Q.   Do you know who got U Mass?
20   A.   No, I don't.
21   Q.   Do you know who got KLM?
22   A.   No.
23   Q.   Do you know who got Wolters Kluwers (sic)?
24   A.   Not off the top of my head, no.
25   Q.   With respect to the Dow Chemical deal,

410

1  that one has listed there, content.
2       Correct?
3   A.   Yes.
4   Q.   Did you did sell Dow the content plus
5  product?
6   A.   Dow uses one of our contents tools, and I
7  believe best of my recollection that that was
8  actually a services engagement where they asked us to
9  come in and do some -- some service work for them.
10   Q.   Did they have somebody else's requisition
11  or e-procurement system?
12   A.   I don't know.  We're not working with the
13  procurement group at Dow.
14   Q.   On this chart, does P plus refer to
15  procure plus?
16   A.   I believe so, yes, yes.
17   Q.   What does C plus refer to?
18   A.   Catalog or content -- the content family
19  of solutions, whatever they may be.
20   Q.   What does DP stand for?
21   A.   Digital paper.
22   Q.   Turn to the next page, please.
23   A.   Yes.
24   Q.   Are these potential deals that were in the
25  pipeline; is that right?

411

1   A.   Yes, that's correct.
2   Q.   Of any of these, did ePlus lose any of
3  those customers to Lawson?
4   A.   I don't know.  I would have to -- to find
5  out.  I don't know.  Some of them are still active.
6  Some aren't.
7   Q.   Which ones has ePlus won?
8   A.   Let's see, UN spend management, which
9  seems to be a repeat from the prior page by the way.
10       And I think that's right now of this
11  subsetted list.
12   Q.   Which ones of this list did somebody else
13  win?
14   A.   I don't know.  I have to go back on each
15  one.  I don't know that off the top of my head.
16   Q.   Do you know which ones are still up in the
17  air?
18   A.   Let's see, I would think Cushman &
19  Wakefield, Fannie Mae.  Verizon is still open.
20  Family Dollar portal is still open.  I know Cisco
21  country of origin is still open.
22       I don't know where the others stand.  They
23  may be open, they may not be.
24   Q.   Okay.  Just a few more questions, then,
25  Mr. Farber.

412

1   A.   Sure.
2   Q.   When do you think Lawson first became
3  aware of the ePlus patents?
4   A.   When do I think they may have become
5  aware?
6   Q.   Yes.
7   A.   You know, I would say as late as the Ariba
8  case.  Maybe they knew about it earlier.  I don't
9  know.
10       But I would believe in my opinion
11  certainly around the time frame of the Ariba case --
12  litigation, I should say.
13   Q.   And is the basis for that the press
14  coverage that you referred to earlier?
15   A.   Yeah, everything we discussed earlier in
16  that -- in that regard.
17   Q.   Do you have a date by which you believe
18  Lawson first believed that any products that it sold
19  infringed ePlus's patents?
20   A.   I don't -- I don't have any insight into
21  what goes on inside of Lawson where a communication
22  or whatever may have been done in that regard.
23   Q.   It is true though that ePlus never
24  communicated directly with Lawson about its patents
25  before it sued it.

413

1        Right?
2     A.  No, of course not.
3     Q.  You say, no, of course not, you're
4  agreeing that ePlus never communicated with Lawson
5  before the lawsuit?
6     A.  Regarding the patents?
7     Q.  Right.
8     A.  Correct.
9     Q.  Has ePlus had any communications with IBM
10  about the patents involved in this lawsuit?
11     A.  Not to my knowledge.
12     Q.  Has ePlus had any communications with
13  anyone regarding the IBM technical viewer or TV 2
14  product?
15     A.  Have we had any conversations about it?
16     Q.  Any written communications or --
17     A.  I don't know about written communication,
18  certainly not -- not at ePlus or since I've been
19  involved.
20        The only thing I heard of TV 2 the first
21  time was at trial.
22     Q.  Do you know whether or not IBM has an
23  e-procurement product?
24     A.  Who?
25     Q.  IBM.

414

1     A.  They may have some elements of a
2  procurement system.  I know they also resell and
3  represent other -- other companies' procurement
4  systems.
5     Q.  Do you have any reason to believe that IBM
6  sells any e-procurement systems that infringe any of
7  the patents in this suit?
8        MR. ROBERTSON:  Objection, calls for a
9  legal conclusion.
10     A.  I don't have knowledge of IBM having their
11  own procurement system.
12        I have knowledge of IBM selling other
13  companies' procurement system, you know, one of those
14  being SAP, who has a license.
15        BY MR. McDONALD:
16     Q.  Does IBM sell any e-procurement systems
17  other than SAP's?
18     A.  I'm not aware.
19     Q.  Does ePlus have any knowledge of the
20  Fisher Scientific RIMS system that was the subject of
21  a patent filed back in the early '90s?
22     A.  You know, only from what -- I wouldn't
23  even say at a high level -- on what -- what -- the
24  only knowledge that I have of that system is it being
25  some form of inventory management system, but that

415

1  was it.
2     Q.  Do any of ePlus's licensees under the
3  patents-in-suit pay any royalties that are based on a
4  percentage of the revenues?
5     A.  There is one that -- that there's a -- a
6  revenue carveout for, yes.
7     Q.  Is it a carveout in the sense that a
8  royalty is paid based on a percentage of revenue?
9     A.  Based on attai- -- a -- there's a
10  percentage that needs to get paid to ePlus based on
11  their attainment of a certain level of revenue for
12  the products.
13     Q.  Can you explain a little more specifically
14  how that works?
15        What happens when the licensee gets to
16  that certain level of sales?
17     A.  So -- and I'd have to reference the
18  agreement for the exact percentage in dollar amounts,
19  but in -- to illustrate it for you, a certain amount
20  was paid to ePlus as a cash payment, and the next --
21  there's a couple of cash payments.
22        And then if the company hits a certain
23  revenue size as a company, then there's a percentage
24  of that revenue that would be given to ePlus as a
25  royalty.

416

1     Q.  Which company has that licensed deal?
2     A.  I believe it was Verian Technologies.
3     Q.  That was a license entered here in 2009?
4     A.  Yes, it was since the initial complaint,
5  correct.
6     Q.  With respect to SAP, do you have an
7  understanding as to how many dollars' worth of SAP
8  revenue were at issue in the infringement case on an
9  annual basis approximately?
10     A.  I wasn't exposed to that, the financial
11  data of SAP, so I don't know.
12     Q.  Were you involved in the settlement
13  negotiations with SAP?
14     A.  I was involved, yes.
15     Q.  In the course of those negotiations, did
16  you learn the amount of SAP revenues that were at
17  issue in the infringement case?
18     A.  No.
19     Q.  How did you come up with a settlement
20  number in the SAP case without access to the revenue
21  figures?
22     A.  Fair question.
23        I used my counsel to determine if they
24  thought it was fair based on the information that was
25  considered confidential or attorney-client -- you

417

1    know, attorney-privileged that I couldn't see.  I
2    could only look to them and say, is this a good deal,
3    a bad deal.
4        Q.   So none of the business people at ePlus
5    got information about the revenues at issue in the
6    SAP matter?
7        A.   Not to my knowledge.
8            I believe -- I believe and recall that
9    they may have been confidential.  I know if I
10   received them, I probably would have remembered them.
11   But I don't believe they were ever disclosed to us.
12       Q.   How much Ariba revenue was at issue in the
13   infringement case?
14       A.   We never got to the -- to the damages
15   portion of the trial, which I suspect a lot of that
16   would have potentially come out of that portion of
17   the trial, and I don't recall ever having been given
18   the revenue numbers.
19       Q.   When you reached a settlement with Ariba,
20   did the determination of the amount of the settlement
21   from your standpoint have anything to do with the
22   Ariba's revenues that were at issue?
23       A.   No.
24           You know, I didn't have access to the
25   information, so there were a number of considerations

418

1    that I had to consider when we did that settlement
2    agreement.
3        Q.   And finally, do I understand right that
4    with respect to the databases that are used in the
5    ePlus products, you don't really have much knowledge
6    beyond a high level on that?
7        Q.   At the database level?
8        A.   Right, as to how the databases work and
9    how they're organized and how they communicate and
10   things like that.
11       A.   Well, you asked me about the communication
12   aspects of the databases, and I said -- I referred to
13   them I think as database calls.  And that was the
14   level of my knowledge in terms of, you know, how the
15   database communicates.
16       Q.   Do you have any more detailed information
17   about how the database communicates or how it's
18   structured other than what you've testified about?
19       A.   No, no.
20           MR. McDONALD:  All right.  I think,
21   Mr. Farber, we're done with respect to the categories
22   that you were identified with.
23           Except, Mr. Robertson, I think I will
24   specifically identify at least in my copy I'm looking
25   at right now, number 30, category 30 that has to do

419

1    with the database architecture design function, et
2    cetera.  You've got other categories we're going to
3    have to hit with somebody else sooner or later
4    anyway, so I'm just asking that we keep that one open
5    for the next -- or the completion of the 30(b)(6).
6            Other than that, Mr. Farber, I have no
7    further questions.
8            Thank you.
9            THE WITNESS:  Thank you.
10           MR. ROBERTSON:  Just briefly, Mr. Farber.
11
12           EXAMINATION BY COUNSEL FOR PLAINTIFF
13           BY MR. ROBERTSON:
14       Q.   Could you look at exhibit number 20, which
15   was the ePlus briefing dated September 20 -- excuse
16   me -- September 2008.
17       A.   20?
18       Q.   Exhibit number 20.
19           MR. McDONALD:  Okay.  Hold on.
20           BY MR. ROBERTSON:
21       Q.   It's the ePlus briefing.
22       A.   I know.  I kept these in order, so I'm
23   sure -- yes, I have it.
24       Q.   And specifically, you were asked questions
25   concerning enabling solutions that appear on a page

420

1    of exhibit 20 that ends 9869.
2            I'll wait for Mr. McDonald to get his
3    copy.
4        A.   Okay.
5            MR. McDONALD:  I have it.  Thanks.
6        A.   This one.
7            BY MR. ROBERTSON:
8        Q.   989 is the enabling solutions page?
9        A.   989.
10       Q.   Yes -- well, excuse me -- 9869.
11       A.   98-- the enabling solution?
12       Q.   Yes.
13       A.   Okay.
14       Q.   You recall you were asked some questions
15   about this particular page of exhibit 20 by
16   Mr. McDonald.
17       A.   Yes.
18       Q.   Okay.  Now, did I understand your
19   testimony to be that prior to 1990, ePlus wasn't a
20   company?
21           Did we see some documents to that effect?
22       A.   Correct.
23       Q.   Okay.  And under this heading,
24   e-procurement, there's this brand product that you've
25   been testifying about over the course of the past 2

Farber, Kenneth, Gary - 30(b)(6) & Individual - Vol 2  12/17/2009  12:00:00 PM

421

1  days, procure plus.
2      Do you see that?
3  A.  Yes.
4  Q.  Okay.  Now, procure plus existed at the
5  time of the creation of this document, September
6  2008; is that right?
7  A.  That's correct.
8  Q.  Okay.  You see at the bottom, it says,
9  provided since 1983.
10  A.  Yes.
11  Q.  Procure plus, there was a number company
12  logos, and then there's a bullet point.
13      First one says, provided since 1983.
14      Do you see that?
15  A.  Yes, I do.
16  Q.  Did ePlus exist in 1983?
17      Do you know?
18  A.  No, it didn't.
19  Q.  Did procure net exist in 1983?
20  A.  No.
21  Q.  Did a product known as procure plus exist
22  in 1983?
23  A.  No, no.
24  Q.  Okay.  Now, I want to understand, then,
25  what is meant by this bullet point that says,

422

1  provided since 1983, because you were asked that
2  question in response to the -- by Mr. McDonald.
3  A.  Okay.
4  Q.  Can you explain that for me?
5  A.  Yeah.
6      The -- you know, the title is called,
7  enabling solutions, so when we talk about
8  procurement, you know, we're listing clients that are
9  procure plus, we've provided -- when I say, we, one
10  of the things that I said earlier -- I think it may
11  have been yesterday -- in terms of what
12  differentiates us from others in the industry, one of
13  those things that I discussed was people.
14      And our people have -- have been in the
15  industry providing their expertise in the procurement
16  arena for 20 some-odd years dating back to '83.
17  Q.  How long have you been involved in the
18  procurement area?
19  A.  Personally, I've been involved in the
20  procurement area 10 years.
21  Q.  Okay.  Do you know whether or not there
22  were electronic procurement systems available in
23  1983?
24  A.  Well, I've been involved in the computer
25  industry for 30 years, and I'm not aware of

423

1  procurement systems dating back to 1983.
2  Q.  How about -- there's -- you were asked
3  some questions about the content management column in
4  exhibit number 20.
5      Do you recall that?
6  A.  Yes.
7  Q.  Again similarly, their -- your trademarked
8  product, the content plus that you've been asked some
9  questions about concerning catalog management, is
10  referenced there.
11      Correct?
12  A.  Yes, that's correct.
13  Q.  And again underneath that were a number of
14  company logos; is that right?
15  A.  That's correct.
16  Q.  I just want to understand.
17      Does that indicate that at some point in
18  time, those companies employed this software
19  solution?
20  A.  No.
21      I mean, if you're dating back to 1990?
22  Q.  No.
23      I'm asking you about in the 2008 period.
24  A.  Oh, in 2008?
25  Q.  Yes.

424

1  A.  Well, it's a combination in the content
2  space too.
3      I mean, they either have used our solution
4  as of that date as the application or utilized the
5  services and knowledge of our people.
6  Q.  Specifically, I'm asking about, do you
7  know whether or not the logos appear there because
8  they are customers or clients of ePlus?
9      For example, is Hitachi a customer of
10  ePlus?
11  A.  Sure.
12  Q.  Okay.  Is Devon Industries?
13  A.  Yes, yes, yeah, they're customers.
14  Q.  Do they use the procure plus solution?
15  A.  Yes, they did at this time, sure.
16  Q.  All right.  We're talking at this time in
17  2008?
18  A.  Correct.
19  Q.  Okay.  Now, underneath there, the first
20  bullet point in the column on content management
21  says, provided since 1990.
22  A.  Yes.
23  Q.  Did ePlus have a product known as content
24  plus in 1990?
25  A.  No, no.

425

```
1      Q.   Okay.  So what are you indicating there on
2   this bullet point again under content management
3   where you list content plus as a product?
4           What are you attempting to illustrate?
5      A.   Sure.
6           So content management expertise was
7   provided to customers, you know, dating back to 1990,
8   and I guess we're coming on almost 20 years now, but
9   what the group of knowledgeable people used to do is
10  manually clean data for people, you know, the
11  old-fashioned way.
12     Q.   But do you know whether or not the
13  functionality that is present in content plus, the
14  product that's being offered in this -- referenced in
15  this document of September 2008 was offered in 1990?
16     A.   No, it wasn't.
17     Q.   Okay.  Do you know approximately when the
18  first iteration of content plus came out?
19     A.   It was more in the -- I believe in the --
20  in the latter part of the procure net days and into
21  the ePlus days.
22     Q.   Maybe you answered this question.
23          But the last bullet point under the
24  column, content management, says, patented
25  technology.
```

426

```
1      A.   Yes.
2      Q.   Is that referencing or not referencing the
3   actual patents that are involved in the complaint
4   here against Lawson?
5      A.   The -- in the context of those solutions,
6   they would not be the patents.
7      Q.   Do you know how many patents you have with
8   respect to content management?
9      A.   I think there might be 2 or 3 patents in
10  that -- in that area.
11     Q.   Okay.  But they're not the subject of this
12  lawsuit?
13     A.   No, they're not, not at all.
14          MR. ROBERTSON:  That's all the questions I
15  have.
16          MR. McDONALD:  I have no questions.
17          Thank you, Mr. Farber.
18          THE WITNESS:  Thank you.
19          THE VIDEOGRAPHER:  The time is
20  approximately 2:42 PM.  This is the conclusion of the
21  video deposition of ePlus Inc. pursuant to rule
22  30(b)(6) by their designee, Kenneth G. Farber, and
23  Kenneth G. Farber personally, taken on Thursday,
24  December 17th, 2009.
25          Off the record.
```

427

```
1           (Whereupon, at 2:42 p.m., the taking of
2   the instant deposition ceased.)
3
4
5           _____
6                 Signature of the Witness
7   SUBSCRIBED AND SWORN to before me this _____ day of
8   _____, 20_____.
9
10          _____
11                Notary Public
12  My Commission Expires:_____
13
14
15
16
17
18
19
20
21
22
23
24
25
```

428

```
1           CERTIFICATE OF COURT REPORTER
2   UNITED STATES OF AMERICA      )
3   DISTRICT OF COLUMBIA          )
4           I, CHERYL A. LORD, the reporter before
5   whom the foregoing deposition was taken, do hereby
6   certify that the witness whose testimony appears in
7   the foregoing deposition was sworn by me; that the
8   testimony of said witness was taken by me in machine
9   shorthand and thereafter transcribed by
10  computer-aided transcription; that said deposition is
11  a true record of the testimony given by said witness;
12  that I am neither counsel for, related to, nor
13  employed by any of the parties to the action in which
14  this deposition was taken; and, further, that I am
15  not a relative or employee of any attorney or counsel
16  employed by the parties hereto, or financially or
17  otherwise interested in the outcome of this action.
18          _____
19                CHERYL A. LORD
20                Notary Public in and for
21                the District of Columbia
22  My Commission expires April 30, 2011
23
24
25
```

1

1     UNITED STATES DISTRICT COURT
2     EASTERN DISTRICT OF VIRGINIA
3          RICHMOND DIVISION
4   ePLUS, INC.,          )
5          Plaintiff,  )
6       v.        ) No. 3:09cv620
7   LAWSON SOFTWARE, INC.,    )
8          Defendant.  )
9
10          Washington, D.C.
11          Tuesday, May 18, 2010
12   30(b)(6) Videotape Deposition of ePLUS INC., by and
13   through its designee, KENNETH GARY FARBER, called for
14   examination by counsel for Defendant in the
15   above-entitled matter, the witness being duly sworn
16   by CHERYL A. LORD, a Notary Public in and for the
17   District of Columbia, taken at the offices of
18   TROUTMAN SANDERS LLP, 401 9th Street, Suite 1000,
19   Washington, D.C., at 9:56 a.m., and the proceedings
20   being taken down by Stenotype by CHERYL A. LORD, RPR,
21   CRR.
22
23
24
25

2

1   APPEARANCES:
2
3   On behalf of Plaintiff:
4     MICHAEL STRAPP, ESQUIRE
5     GOODWIN PROCTER LLP
6     Exchange Place
7     53 State Street
8     Boston, MA  02109
9     (617) 570-1658
10
11   On behalf of Defendant:
12     DANIEL W. McDONALD, ESQ.
13     MERCHANT & GOULD P.C.
14     80 S. 8th Street, Suite 3200
15     Minneapolis, MN  55402-2215
16     (612) 332-5300
17
18   ALSO PRESENT:
19     Merinda Ellis Evans, videographer
20
21
22
23
24
25

3

1       C O N T E N T S
2   WITNESS
3   KENNETH GARY FARBER          PAGE NO.
4   EXAMINATION
5     By Mr. McDonald          6
6
7
8       E X H I B I T S
9       (Exhibits attached.)
10   LAWSON EXHIBIT NO.          PAGE NO.
11   56  Defendant Lawson Software, Inc.'s
12      Amended Notice of Deposition of
13      ePlus, Inc. Pursuant to Rule
14      30(b)(6) of the Federal Rules of
15      Civil Procedure          5
16   57  Software License Agreement,
17      April 14, 1999, ePLUS0700136-55      9
18   58  Valuation Methodologies and
19      Valuations, ePLUS0135341-44      12
20   59  Intellectual Property License
21      Agreement, ePLUS0949000-17      50
22   60  Opening Journal Entries,
23      ePLUS0135345          66
24   61  Deferred Maintenance,
25      ePLUS0135349-51          68

4

1     E X H I B I T S   C O N T I N U E D
2   62  Exhibit 6, Valuation of Assembled
3      Work Force, ePLUS0135347-46      69
4   63  SEC Form S-1, ePLUS0448712-851      76
5   64  2001 Annual Report          86
6   65  2002 Annual Report, ePLUS0133288-373   96
7   66  Letter, 11-10-00          105
8   67  Screenprint, Content + Advanced   119
9   68  Screenprint, Catalog +      130
10   69  Screenprint, Differentiators   143
11   70  Patent License and Settlement
12      Agreement, ePLUS094077-801      160
13   71  Form 10-K, ePLUS0139447-555      162
14
15
16
17
18
19
20
21
22
23
24
25

**5**

```
1          P R O C E E D I N G S
2          (Lawson Exhibit No. 56
3          was marked for
4          identification.)
5          THE VIDEOGRAPHER:  Good morning.
6          Here begins videotape number 1 in the
7   deposition Kenneth Farber in the matter of ePlus Inc.
8   versus Lawson Software for the court -- for the court
9   of -- United States court for the Eastern District of
10  Virginia, case number 3, colon, 09 CV 620 REP.
11         Today's date is May 18th, and the time is
12  now 9:56 AM.  This deposition is being held at the
13  request of Daniel W. McDonald, Esquire, of Merchant &
14  Gould and being taken at Troutman Sanders LLP, 401
15  9th Street N.W., Washington, D.C., 2004 (sic).
16         The videographer today is Merinda Evans,
17  the court reporter is Cheryl Lord, representing Pro
18  Systems Court Reporting.
19         Will all the attorneys please identify
20  yourself and anyone you represent, and would the
21  court reporter please swear in the witness.
22         MR. McDONALD:  Daniel McDonald for Lawson
23  Software.
24         MR. STRAPP:  Michael Strapp for ePlus.
25  Whereupon,
```

**6**

```
1          KENNETH GARY FARBER
2   was called as a witness by counsel for Defendant,
3   and, having been duly sworn by the Notary Public, was
4   examined and testified as follows:
5          EXAMINATION BY COUNSEL FOR DEFENDANT
6          BY MR. McDONALD:
7      Q.  Mr. Farber, good morning.
8      A.  Good morning.
9      Q.  You have before you what was marked as
10  exhibit 56.  This is a deposition notice for today's
11  deposition.
12         Have you reviewed the categories listed
13  there on page 1, namely, 19 to 21, 24 to 29, and 31
14  to 36 listed in the schedule A attached to it?
15     A.  Yes, I believe so.
16     Q.  Okay.  Is it your understanding that you
17  are here today to testify as the corporate
18  representative for ePlus Inc. with respect to those
19  categories?
20     A.  Yes.
21         MR. STRAPP:  I'll put on the record, topic
22  19 is going to be a deposition that takes place this
23  Friday, and topic 23 is going to be a deposition that
24  takes place next week, so Mr. Farber isn't here to
25  testify about those 2 documents.
```

**7**

```
1          MR. McDONALD:  So we'll leave 19 off.  I
2   didn't list 23, but 19 was on my list, and that
3   should be off, so we'll take that off today,
4   Mr. Farber.
5          THE WITNESS:  M-hm.
6          BY MR. McDONALD:
7      Q.  I'd like to start with the categories 21
8   and 24.  You can review those on pages 9 and 10, but
9   generally, they would relate to valuations of the
10  patents-in-suit and facts and circumstances
11  surrounding offers or attempts to license the
12  patents-in-suit.
13         All right?
14     A.  Yes.
15     Q.  How is it that you got selected to be the
16  corporate representative as to those topics for
17  today's deposition?
18         MR. STRAPP:  Objection to the extent it
19  requests communications between your counsel, so if
20  you can answer without referring to the
21  communications we've had, go ahead, but otherwise, I
22  instruct you not to answer.
23     A.  Well, I think that it was just deemed that
24  I was knowledgeable to the extent that I would be
25  able to represent the company to respond to these
```

**8**

```
1   questions.
2          BY MR. McDONALD:
3      Q.  Did you talk to anybody else at ePlus
4   relating to these categories to prepare yourself to
5   testify today?
6      A.  No.
7      Q.  Did you look at any documents to prepare
8   yourself to testify today?
9      A.  There were a few.
10     Q.  What documents did you look at?
11     A.  Well, specific to certain categories here,
12  looked at some of the settlement agreements that we
13  had done in the past with other parties.
14     Q.  Did you look at anything else with respect
15  to those 2 categories I mentioned?
16     A.  We're talking specifically which 2
17  categories again?
18     Q.  21 and 24 regarding the valuation of the
19  patents and the circumstances surrounding attempts to
20  license the patents.
21     A.  Well, the settlement agreements as I
22  previously discussed and the original license
23  agreement between ProcureNet and Fisher.
24     Q.  Is that the software license agreement
25  from April of 1999 between ProcureNet and Fisher?
```

**9**

1    A.  I'd have to look.  I believe that's
2  probably the one.
3    Q.  Okay.
4    MR. McDONALD:  Let's go ahead and mark
5  this as the next exhibit, and we'll identify that.
6    (Lawson Exhibit No. 57
7    was marked for
8    identification.)
9    BY MR. McDONALD:
10   Q.  Mr. Farber, exhibit 57 was just handed to
11  you.
12   Is that the ProcureNet-Fisher license
13  agreement that you just referred to that you had
14  reviewed?
15   A.  Yes, I believe it is.
16   Q.  And that is dated April of '99.
17   Correct?
18   A.  That's correct.
19   Q.  In this case, ePlus has a damages expert
20  named Mr. Mangum.
21   Right?
22   A.  That's correct.
23   Q.  Did you talk to Mr. Mangum when he was
24  preparing his expert opinion for this case on the
25  damages?

**10**

1    A.  I have spoken to Mr. Mangum, yes.
2    Q.  Do you have an understanding that his
3  assessment of damages relates to coming up with a
4  royalty arrangement between a hypothetical licensor
5  and licensee?
6    A.  Well, I do understand that his role is to
7  come up with an assessed level of damages.  How he
8  does it and what the laws are about that, I'm
9  unfamiliar with, but just to come up with a damage
10  estimation.
11   Q.  Do you know anything about whether or not
12  part of his analysis does include trying to determine
13  what a reasonable royalty would be that would be
14  negotiated between a licensor of the patents and a
15  licensee?
16   A.  I would suspect that would be one of the
17  elements that he would use.
18   Q.  Did he talk to you at all about that issue
19  when you talked to him?
20   A.  Did he talk to me specific to what issue?
21   Q.  About the fact that his analysis included
22  looking at this reasonable royalty that would be
23  entered between a licensor and a licensee?
24   A.  No, I don't believe we talked about his
25  role.  I knew him as the damages expert, and he asked

**11**

1  me a series of questions.
2    Q.  Do you have an understanding as to what
3  date he used as the frame of reference for the
4  negotiation of a royalty?
5    A.  No, I don't.
6    Q.  I'll just represent to you that at page 7
7  of his reports, he says May of 2002 is when he says
8  he understands anyway that the infringement allegedly
9  began.
10   A.  Okay.
11   Q.  And so that's the date he used.
12   All right?
13   A.  Okay.
14   Q.  Now, as of May of 2002, what was your role
15  with ePlus?
16   A.  Same as it is today.
17   Q.  What was the title at that time?
18   A.  It was president of ePlus Systems and
19  Content Services.
20   Q.  In 2001, ePlus acquired the patents from
21  ProcureNet.
22   Right?
23   A.  Yes.
24   Q.  As part of the acquisition process and
25  reporting the acquisition to shareholders and the

**12**

1  like, ePlus did a valuation of the assets acquired
2  from ProcureNet.
3    Correct?
4    A.  No, not that I'm aware of, I can't say
5  that to be true.
6    MR. McDONALD:  Would you mark this as the
7  next exhibit, please.
8    (Lawson Exhibit No. 58
9    was marked for
10   identification.)
11   BY MR. McDONALD:
12   Q.  Entitled, ePlus acquisition of Structured
13  Computer Services and SourceSys Inc., valuation
14  methodologies and valuations.
15   Right?
16   A.  Okay.
17   Q.  Have you seen this document before?
18   A.  I have, yes.
19   Q.  What is it?
20   A.  It's a document that describes the
21  transaction that had taken place with the acquisition
22  of the software and the services of the company that
23  was acquired.  And -- just looking through it again.
24  Just give me a minute.
25   (Pause.)

Farber - 30(b)(6), Kenneth Gary  5/18/2010  12:00:00 PM

13

1  A.  I'm not -- I don't recall the exact nature
2  of the document.  It may have been put together for a
3  10-K or description of the transaction.
4  BY MR. McDONALD:
5  Q.  Even though the title doesn't have the
6  name ProcureNet in it, when you read the overview on
7  page 1, it specifically refers to ePlus Inc.
8  purchased the commercial technology business assets
9  of ProcureNet Inc.
10  Correct?
11  A.  Yes, it does.
12  Q.  And those assets include 2 distinct
13  business units, Structured Computer Services, in
14  Avon, Connecticut, and SourceSys in Houston.
15  Right?
16  A.  That's correct.
17  Q.  So that's why the title talks about
18  Structured Computer Services and SourceSys.  They
19  both used to be business units of ProcureNet?
20  A.  That's correct.
21  Q.  Before the acquisition by ePlus, did you
22  work for ProcureNet?
23  A.  I did, yes.
24  Q.  What was your position with ProcureNet
25  just before the acquisition by ePlus?

14

1  A.  I believe it was senior vice president of
2  business development.
3  Q.  So after the acquisition, did you
4  immediately become an employee of ePlus?
5  A.  After the acquisition, I did become an
6  employee of ePlus.
7  Q.  Is it true that at the time in 2001, when
8  ePlus acquired the assets of ProcureNet, ePlus was a
9  publicly traded company?
10  A.  Yes.
11  Q.  And so you had a duty to report accurate
12  information to shareholders and the SEC about
13  financial issues.
14  Correct?
15  A.  Well, I think any public company has a
16  responsibility to do it to the best of their ability,
17  yes.
18  Q.  Right.  As a publicly traded company,
19  you're just like every other publicly traded company.
20  Right?
21  A.  Correct.
22  Q.  And so part that of that accurate
23  reporting has to do with valuation of assets.
24  Correct?
25  A.  To the best of their ability, yes.

15

1  Q.  Who was involved in preparing exhibit 58?
2  A.  I don't recall specifically.
3  Q.  As the spokesperson for ePlus today, the
4  corporate-designated witness on valuations, can you
5  give me any information at all about who prepared
6  this document?
7  A.  I don't specifically recall who wrote the
8  document or prepared it.
9  Q.  Do you have any general recollections
10  about that?
11  A.  It would be speculation, but --
12  Q.  Well, I'll take what I can get at this
13  point.
14  Who do you think was most likely to have
15  been involved in preparing this valuation document,
16  exhibit 58?
17  A.  It may have been a gentleman by the name
18  of Clay Parkhurst.
19  Q.  Does he currently work for ePlus?
20  A.  He does.
21  Q.  What's his position?
22  A.  He's I believe senior vice president of
23  ePlus.
24  Q.  Do you have any reason to believe he would
25  know any more about this document, exhibit 58, than

16

1  you do?
2  A.  He may or may not.  I don't know.
3  Q.  Are you comfortable testifying today as
4  the ePlus corporate-designated witness about this
5  valuation document?
6  A.  I believe so.
7  Q.  I know you've had a chance to page through
8  the document.
9  Have you seen it before today?
10  A.  I did see it briefly the other day.
11  Q.  Okay.  Did you see it the other day for
12  purposes of preparing for today's deposition --
13  A.  Yes.
14  Q.  -- or some other purpose?
15  A.  Yes.
16  Q.  This was for today?
17  A.  Correct.
18  Q.  Had you seen it at any time before you saw
19  it a few days ago to prepare for today's deposition?
20  A.  I believe I may have.
21  Q.  How long ago was the last time you saw it
22  before a few days ago?
23  A.  Maybe 5 plus years ago.
24  Q.  Did you see it around 2001, which was the
25  date of the acquisition that's referenced here?

Farber - 30(b)(6), Kenneth Gary  5/18/2010  12:00:00 PM

---

17

1  A.  No.

2  Q.  Are you sure about that?

3  A.  Yes.

4  Q.  How is it that you're sure that you didn't

5  see it around 2001?

6  A.  Because it really came to my attention as

7  I recall during our litigation with Ariba.

8  Q.  If we look at the first paragraph of this

9  document in the middle of the page, do you see

10  there's a section called, objectives?

11  A.  Yes.

12  Q.  Is it your understanding that one of the

13  objectives of this valuation described here in

14  exhibit 58 was to allocate the purchase price of the

15  assets over all of the tangible assets and any

16  identifiable intangible assets at the 2 ProcureNet

17  companies?

18  A.  Yes.

19  Q.  And for purposes of this document, was a

20  fair market value, or FMV, used to value the assets?

21  A.  That's what it says, yes.

22  Q.  And fair market value is defined here in

23  that paragraph about objectives as, quote, the price

24  for which property would exchange between a willing

25  buyer and a willing seller, each having reasonable

---

18

1  knowledge of all relevant facts, neither under

2  compulsion to buy or sell, and with equity to both,

3  quote.

4  Do you see that language?

5  A.  I do.

6  Q.  So this is in effect an attempt to

7  determine if you had 2 hypothetical buyers and

8  sellers with appropriate knowledge, that would be the

9  fair value that one would sell and one would buy each

10  given asset for; is that right?

11  MR. STRAPP:  Objection, mischaracterizes

12  the witness's testimony.

13  Q.  Do you want --

14  BY MR. McDONALD:

15  Q.  You may answer.  If you think you need

16  to -- if I got it wrong, let me know, but is that a

17  fair statement?

18  A.  Just repeat the statement for me, please.

19  MR. McDONALD:  Could you read that back.

20  (The reporter read the

21  next-to-last question.)

22  A.  I think that's a fair characterization as

23  depicted by the document.

24  BY MR. McDONALD:

25  Q.  On the first page of the document, above

---

19

1  the objectives, it indicates how much ePlus paid for

2  these assets in cash and other consideration.

3  Correct?

4  A.  Yes.

5  Q.  And it lists three million dollars in

6  actual cash?

7  Right?

8  A.  Correct.

9  Q.  And then ePlus transferred to ProcureNet

10  422,833 shares of ePlus stock; is that right?

11  A.  That's correct.

12  Q.  So ProcureNet Inc., they continued as a

13  business entity after this acquisition; is that

14  correct?

15  A.  Correct.

16  Q.  And the 9-dollar and 16-cent price, was

17  that based on some sort of a look at the stock market

18  and whatever the price was on the day of the

19  purchase?

20  A.  I believe it was as of the date of the

21  execution of the agreement that was the stock price.

22  Q.  So that would have been on or about May

23  15th, 2001.

24  Correct?

25  A.  I believe so.

---

20

1  Q.  So when you determined the dollar value of

2  the shares that day, that adds up to 3,873,150

3  dollars.

4  Correct?

5  A.  That's what it says, yes.

6  Q.  And then there was an assumption of

7  liabilities for 1,370,512 dollars.

8  Correct?

9  A.  Correct.

10  Q.  What is an assumption of liabilities?

11  A.  That's outstanding -- it could be

12  outstanding debt.  It could be rent.  It could be a

13  number of different things.  I don't recall.  I'd

14  have to look at the -- if there was a breakdown of

15  what the liabilities were at that point in time.  The

16  liabilities could be, you know, something that's

17  deferred, not guaranteed.

18  Q.  They would be liabilities of ProcureNet

19  Inc. formerly.

20  Correct?

21  A.  Correct.

22  Q.  And then as part of the deal, ePlus would

23  say, well, ProcureNet, you used to owe somebody some

24  money or something, now we'll take over that

25  obligation.

---

Farber - 30(b)(6), Kenneth Gary  5/18/2010  12:00:00 PM

21

1      A.   That's correct.
2      Q.   Okay.  Now, if we turn to the third page
3  of the document, exhibit 58, that's got the heading,
4  valuation of assets.
5      Correct?
6      A.   Yes, it does.
7      Q.   And it lists some categories of assets
8  under that heading.
9      Correct?
10     A.   It does.
11     Q.   The first category is, furniture, fixture,
12  and equipment.
13     Right?
14     A.   M-hm, yes.
15     Q.   That's pretty self-explanatory.  That
16  would be things like desks and chairs, maybe some
17  hardware and things like that that were acquired.
18     Correct?
19     A.   Correct.
20     Q.   So you had to come up with a fair market
21  value for those assets as part of this valuation
22  process.
23     Correct?
24     A.   That's correct, and I think it says they
25  used some Blue Books here to do that.

22

1      Q.   Blue Books would be like when you're going
2  to sell a car, you go to a book and figure out what
3  the fair value is of the car.
4          Same thing for the desks and chairs and
5  the like?
6      A.   I believe so, that's correct.
7      Q.   Then the next category lists intangible
8  assets.
9      Correct?
10     A.   Yes.
11     Q.   And there are 5 numbered categories of
12  intangible assets on this third page.
13     Correct?
14     A.   That's correct.
15     Q.   First one is, assembled work force.
16     Right?
17     A.   Yes.
18     Q.   Can you explain what assembled work force
19  is in terms of how you value that?
20     A.   Well, there was roughly 20 -- I think the
21  number was 24 or 23 -- people that were brought on
22  from Avon and 26 from the Houston operations.  And
23  the estimate or the valuations of the assembled work
24  force is, as it's stated here, the estimate number of
25  weeks it would take a new hire to become productive,

23

1  and that ranged from 4 weeks to 13 weeks.
2          And then they evaluate what the cost would
3  be to potentially replace via new hire, put a number
4  on that, and then they come up with a calculation
5  that I think was attached to some exhibit of how they
6  come up with that number.
7      Q.   Yes.  It does refer to an exhibit, but it
8  looks like it's got the number right here in this
9  paragraph number 1, a total for the 2 business units
10  of 554,017 dollars.
11     Correct?
12     A.   That's what they're estimating.
13     Q.   Were you part of that work force that they
14  were estimating at that time, or does that not
15  include you?
16     A.   I don't believe it actually included me at
17  the time.
18     Q.   Were you part of either that SES unit or
19  the SSI unit?
20     A.   I actually spanned both units while I was
21  at ProcureNet.
22     Q.   Do you know whether there's some
23  executives of ProcureNet that weren't part of this
24  work force evaluation?
25     A.   Well, there were certainly some that were

24

1  not brought over as one example.  And I believe
2  myself was not included.  And, yeah, it would be
3  myself and others that weren't carried over.
4      Q.   Okay.  So was anybody other than you
5  carried over but excluded from the work force
6  evaluation?
7      A.   I couldn't say for sure.  I'd have to go
8  back and see if somebody has the list of who was part
9  of that group.  Again, I'm speculating, but I didn't
10  believe I was part of that initially.
11     Q.   All right.  What's your basis for
12  believing you weren't part of that group?
13     A.   I didn't agree to come over initially.
14     Q.   How long after -- when you say, initially,
15  do you mean on May 15th, 2001, when they actually
16  acquired the assets, you hadn't agreed at that time?
17     A.   Well, up to the point of the execution of
18  the agreements, I was still doing my own negotiation
19  as it relates to, you know, myself potentially
20  joining ePlus and what capacity that might be in.
21     Q.   Okay.  So the date on this document, and
22  I've seen other places, of May 15th, 2001, seems to
23  be the capital D date of the ePlus acquisition of
24  ProcureNet.
25          So was it sometime after that date that

25

1  you think you agreed to come over?
2     A.  You know, it could have been a week before
3  or a week after.  I couldn't -- I'm trying to recall
4  and I don't recall which exactly it was.
5     Q.  All right.  But you do recall that
6  initially, you said no?
7     A.  No, I didn't say no.
8     Q.  Just didn't say yes?
9     A.  I didn't say yes.
10    Q.  Okay.  So you had your own separate
11  negotiations --
12    A.  I did.
13    Q.  -- apart from the rest of the work force?
14    A.  I did.
15    Q.  Okay.  So let's go to the second category
16  here of intangible assets on page 3 of exhibit 58.
17  That is, purchased software.
18        Do you see that?
19    A.  Yes, I do.
20    Q.  It says under that heading number 2,
21  purchase software, quote, purchased software
22  comprises of licenses of operating systems, office
23  applications, and other miscellaneous utilities and
24  programs.  It has been valued at net book value, NBV,
25  which is original purchase price minus accumulated

26

1  amortization.  It is estimated by ePlus management
2  that NBV is the true value of such software on the
3  date of purchase, quote.
4        Do you see that language?
5     A.  I do.
6     Q.  Do you have an understanding of what
7  specific software was included within this valuation
8  of purchased software?
9     A.  Well, the purchased software was the
10  electronic procurement system and our content
11  solutions that were out of our Houston, Texas,
12  facility.
13    Q.  Well, I want to double-check that with
14  you.
15        When you say that's the e-procurement
16  system and content stuff, that would be the stuff
17  that was developed internally, the software developed
18  internally at ProcureNet.
19        Right?
20    A.  What do you mean?
21    Q.  The e-procurement system software?
22    A.  I believe it's what we refer to today as
23  Proceed Plus.
24    Q.  Procure Plus was developed at ProcureNet,
25  right, the software?

27

1     A.  When I joined the company, which was just
2  under a year prior to the acquisition by ePlus, the
3  software was there.  The history, you know, I don't
4  know exactly when it was developed by ProcureNet or
5  prior.
6     Q.  Did ProcureNet buy the Procure Plus
7  software?
8     A.  Again, before my time, but I think I
9  recall that ProcureNet was rolled out by -- as a
10  rollout company of Fisher Scientific.
11    Q.  So is it your understanding that
12  ProcureNet bought the Procure Plus software from
13  Fisher Scientific?
14    A.  No.  I believe, again, to the best of my
15  knowledge, that ProcureNet was created as a company
16  by Fisher Scientific.
17    Q.  Okay.  So the Procure Plus software was
18  not purchased by ProcureNet.
19        Correct?
20    A.  It's before my time, so I couldn't -- I
21  couldn't answer that.
22        I'm sorry.
23    Q.  Well, the reason why I'm asking those
24  questions is that in the second sentence of the
25  section on purchased software, it talks about

28

1  calculating the value of the software based on,
2  quote, original purchase price minus accumulated
3  amortization, quote.
4        Do you see that language?
5     A.  I do.
6     Q.  I'm just trying to figure out, did the
7  Procure Plus software even have an original purchase
8  price associated with it?
9     A.  I don't know.
10    Q.  So do you know one way or the other
11  whether purchased software, section 2 here, that
12  valuation, includes a valuation specifically of the
13  Procure Plus software or not?
14    A.  I don't.
15    Q.  Now, if we go to category 3, capitalized
16  software.
17        Do you see that one?
18    A.  I do.
19    Q.  The first 2 sentences of that section say,
20  quote, this purchased software is valued using
21  discounted cash flow method.  The procurement
22  software developed by SES is fully functional at the
23  date of purchase and is being used by many customers,
24  quote.
25        Do you see that language?

Farber - 30(b)(6), Kenneth Gary   5/18/2010   12:00:00 PM

---

**29**

1     A.   I do.

2     Q.   Then it goes on in the next sentence to

3   say, quote, it is one of the most valuable intangible

4   assets acquired by ePlus in this deal, quote.

5        Do you see that?

6     A.   I do.

7     Q.   Now that you've seen this section 3 here

8   about capitalized software, which is separate from

9   the purchased software, do you think that actually

10   the Procure Plus software falls into the category of

11   number 3, the capitalized software?

12        MR. STRAPP:   Objection, mischaracterizes

13   the document.

14     A.   It doesn't say that.  You know, you could

15   draw a conclusion by, you know, that, but I couldn't

16   be certain.

17   BY MR. McDONALD:

18     Q.   Well, as the witness identified today to

19   testify on behalf of ePlus, can you tell me whether

20   or not the Procure Plus software was considered for

21   purposes of this valuation, exhibit 58, to be

22   capitalized software or purchased software or

23   something else?

24     A.   I believe it refers to the software that

25   was transferred as the assets from ProcureNet to

---

**30**

1   ePlus.

2     Q.   That's not one of the categories here for

3   intangible assets, though, as you described it just

4   now.

5        Right?

6        MR. STRAPP:   Objection, form.

7        MR. McDONALD:   I'll withdraw the question.

8   BY MR. McDONALD:

9     Q.   As I understand these categories of

10   assets, Mr. Farber, the software has got to fall into

11   one of 2 categories.  It's either number 2, purchased

12   software, or number 3, capitalized software.

13        Do I understand correct or not?

14     A.   I believe so, yes.

15     Q.   And as you sit here today, you cannot tell

16   me which of those categories the Procure Plus

17   software falls into; is that right?

18     A.   Well, if you look at the next page, the

19   third paragraph down, it refers to, based on

20   aforementioned facts and assumptions, the future cash

21   flows were discounts arrived at a value of a

22   million -- a little over a million for the software.

23        And then the next sentence says:  The

24   capitalized software will be amortized over a period

25   of 5 years, which would be pointing to capitalized to

---

**31**

1   software as identified in number 3.

2     Q.   My question is, is the Procure Plus

3   software within category 3, capitalized software, or

4   category 2, purchased software, or what?

5     A.   I don't recall.

6     Q.   Now, the Procure Plus software, is that

7   the software that implements the patented technology

8   involved with the patents involved in this suit?

9     A.   The software that was acquired from

10   ProcureNet to ePlus, yes.

11     Q.   That was the Procure Plus software.

12   That's what it was called.

13        Right?

14     A.   It was called something else at

15   ProcureNet.

16     Q.   Okay.  Do you remember what it was called

17   at ProcureNet?

18     A.   I think it was called One Source, if I'm

19   not mistaken.

20     Q.   Then once ePlus bought it, it changed the

21   name from One Source to Procure Plus?

22     A.   That's correct.

23     Q.   And with respect to the capitalization of

24   the software, that's valuing the actual code written

25   for the software, right, on the cost to write the

---

**32**

1   software itself?

2     A.   On the capitalized?

3     Q.   Yes.

4     A.   Yes, that would be correct.

5     Q.   The patents-in-suit don't describe the

6   actual code written to implement the patented

7   technology on the computer.

8        Correct?

9     A.   Can you repeat that?

10   I'm sorry.

11     Q.   Sure.  The patents involved in the lawsuit

12   here with Lawson, those don't actually set forth the

13   computer code, the source code, the object code, or

14   any programming code used to implement the invention

15   on a computer.

16        Right?

17        MR. STRAPP:   Objection, calls for a legal

18   conclusion.

19     A.   Well, my understanding of the patent is

20   that it doesn't provide the code, but it provides I

21   believe a description specification.

22   BY MR. McDONALD:

23     Q.   Right.  So if somebody was going to try to

24   implement the invention described in the patents,

25   they'd have to go write their own code.

---

Farber - 30(b)(6), Kenneth Gary  5/18/2010  12:00:00 PM

<table>
<tr><td>

33

1     Right?

2     MR. STRAPP:  Objection, calls for a legal

3 conclusion.

4     A.   I don't know that that's necessarily true.

5 You can combine certain elements of code.  I mean,

6 the patent describes elements that weren't

7 necessarily invented by the patent holders but uses,

8 you know, other technologies.

9     BY MR. McDONALD:

10    Q.   That's fair.  Maybe I oversimplified it

11 with my statement.  But to implement the invention

12 described in the patents, a person, a company would

13 have to acquire code whether they had their own

14 programmers write it on they acquired it from some

15 third-party supplier.

16    Correct?

17    A.   Well, the patent certainly involves an

18 application, which is written with some type of

19 computer code.

20    Q.   And was that code for the Procure Plus

21 system, formerly known as One Source -- that was

22 considered an asset of ProcureNet that ePlus wanted

23 to buy.

24    Right?

25    A.   Well, it was considered one of the assets

</td><td>

35

1 that ePlus acquired from ProcureNet included 2 of the

2 3 patents in this case as issued and one pending

3 application for the third one?

4    A.   Correct.

5    Q.   So all the patents in this case -- all the

6 rights in those patents were purchased by ePlus from

7 ProcureNet.

8    Right?

9    A.   That's correct.

10    Q.   And all of those patents are the subject

11 of this valuation in category 4 here of exhibit 58.

12    Right?

13    A.   The patents that are in suit here, yes,

14 they would be in category 4.

15    Q.   Did ePlus acquire any patents in addition

16 to the 3 patents and applications in this suit when

17 they bought ProcureNet?

18    A.   Yes, actually I believe there were some

19 patents from our Houston facility.

20    Q.   Houston is the SourceSys Inc. --

21    A.   Correct.

22    Q.   -- unit?

23    A.   That's correct.

24    Q.   What did those patents from SourceSys Inc.

25 involve?

</td></tr>
<tr><td>

34

1 that ePlus was interested in.

2    Q.   And ePlus did buy that actual code from

3 ProcureNet from One Source, which became Procure

4 Plus.

5    Right?

6    A.   Well, yes, they purchased the application

7 and the resources and state of the liability that went

8 along with operating companies.

9    Q.   So if we look at the valuation here for

10 the capitalized software as you pointed out, it was a

11 little over a million dollars, specifically 1,075,000

12 dollars for the software, the capitalized software.

13    Right?

14    A.   That is what's listed here, yes.

15    Q.   And then for the purchased software on the

16 prior page, it lists a figure of 59,867 for the SCS

17 purchased software and 18,247 dollars for the SSI

18 software.

19    Correct?

20    A.   That's what they're listing here, yes.

21    Q.   So let's turn to the fourth category of

22 intangible assets now, patents.

23    A.   Okay.

24    Q.   Right?

25    Is it your understanding that the patents

</td><td>

36

1    A.   They were referred to as the information

2 translation protocol content patents.

3    Q.   Can you tell me generally what those

4 patents related to?

5    A.   It related to a technology that was

6 developed that involved something called the common

7 language generator that was used in an advanced

8 fashion of creating catalogs for suppliers or for

9 retail organizations, which was part of what SES used

10 to do.

11    Q.   So the common language generator patents

12 came from SourceSys.

13    Did the 3 patents in this suit then --

14 those were part of Structured Computer Systems in

15 Connecticut?

16    A.   Yeah.  They were part of ProcureNet, so I

17 don't know if they -- they date back to Structured

18 Computer or whatever, but they were part of the

19 ProcureNet acquisition.

20    Q.   Was Avon, Connecticut, the location of the

21 employees who were involved with the Procure Plus or

22 at that time One Source software?

23    A.   Yeah.  Avon was involved with the Procure

24 Plus software, yes.  We also had some people in New

25 Jersey and some people in Pittsburgh.

</td></tr>
</table>

37

1  Q.   Did ePlus use the common language
2  generator technology after it acquired the assets
3  from ProcureNet?
4  A.   We still use it today.
5  Q.   So it's still used today to generate
6  catalog content?
7  A.   It's used for service -- mainly services
8  business for customers that may or may not be
9  associated with our procurement software.
10  Q.   So when you say, your services business,
11  can you explain what you mean by that?
12  A.   Well, there's a -- there are times where
13  companies are asking us to help them work with their
14  suppliers to create their own catalogs and to take
15  information that is not very descriptive and help
16  them categorize it to specific schemas or codes.
17  Q.   All right.  So in this valuation, after
18  ePlus acquired the assets of ProcureNet, the
19  valuation placed on all the patents, including the 3
20  involved in this lawsuit plus those additional
21  patents, was a total of how much money?
22  A.   According to this document, it's saying
23  here that it was 12,000 dollars.
24  Q.   So all 3 patents in this suit plus the
25  additional ones total -- collected together, total

38

1  price for the whole package, 12,000 dollars.
2  Do I understand that correctly?
3  A.   That's how they calculated it at that
4  time.
5  Q.   And that was based on a fair market value
6  calculation.
7  Correct?
8  A.   It was according to this document what
9  they're saying is a fair market value.  But it was
10  actually -- administrative processing is how they
11  came up with the 12,000-dollar number.
12  Q.   I thought you weren't involved in
13  preparing exhibit 58.
14  A.   I'm sorry?
15  Q.   Were you involved in preparing this
16  valuation or not?
17  A.   Not in this valuation, but I was very
18  involved in understanding how this valuation specific
19  to the patents were valued.
20  Q.   At what time were you very involved with
21  that?
22  A.   When we were involved with the Ariba
23  litigation.
24  Q.   That was 3 years after this document was
25  prepared.

39

1  Right?
2  A.   I believe so.
3  Q.   And that's when you were trying to get a
4  lot of money and damages from Ariba at that point.
5  Right?
6  A.   It was when I was trying to understand how
7  they came up with 12,000 dollars, and I spoke to
8  individuals about that to find out how it was
9  characterized at 12,000 dollars.
10  Q.   You didn't like that number.
11  It was pretty small.
12  Right?
13  MR. STRAPP:  Objection, argumentative,
14  assumes facts not in evidence.
15  A.   I don't know how that numbers affects
16  litigation whatsoever.  I know it became a point of
17  interest during the Ariba trial, that that was raised
18  by Ariba's counsel, and I had to do my due diligence
19  to find out what was deciphered and how they came up
20  with that number.
21  BY MR. McDONALD:
22  Q.   This document states that the number
23  12,000 dollars was developed by the fair market
24  value.
25  Correct?

40

1  MR. STRAPP:  Objection, vague.
2  A.   The document states that it was what they
3  considered to be a fair market value at that time,
4  yes.
5  BY MR. McDONALD:
6  Q.   For all the patents?
7  A.   That's what it says.
8  Q.   And on the first page, again, the fair
9  market value is determined by this willing buyer,
10  willing seller exchange.
11  Correct?
12  A.   It does say that, yes.
13  Q.   And this valuation -- this was used for
14  purposes of disclosures regarding assets and
15  financial information for ePlus to the SEC and to
16  shareholders.
17  Correct?
18  MR. STRAPP:  Objection, assumes facts not
19  in evidence.
20  BY MR. McDONALD:
21  Q.   You may answer.
22  A.   I don't know if this was provided for the
23  SEC or for a 10-K.  It was -- you know, this was a
24  document that was, you know, prepared.  It doesn't
25  state what it was included in or how it was -- what

**41**

```
1   it was provided for.
2      Q.  Well, the fifth category right after
3   patents, that's goodwill.
4         Correct?
5      A.  Yes, sir.
6      Q.  And you understand that there are
7   categories in the disclosures to ePlus's shareholders
8   after this acquisition for assets, including goodwill
9   and other categories, that would include these
10  patents.
11        Right?
12     A.  I would believe so, correct.
13     Q.  Are you aware of any other valuations done
14  in 2001 that would relate to valuing the patents for
15  purposes of reporting asset value to shareholders
16  other than exhibit 58?
17     A.  I don't believe so.  ePlus didn't do a
18  formal valuation from a third party as it relates to
19  the valuation, the patents, or the other assets.  They
20  used Blue Book for assets as we described earlier,
21  you know, office supplies and so on and so forth, but
22  there are third-party companies that do valuations of
23  software assets, patent assets, and none of those
24  were done during that acquisition or post.
25     Q.  But it's your understanding that ePlus did
```

**42**

```
1   truthfully disclose to its shareholders in its 2001
2   and 2002 reports values of its assets?
3      A.  I think to the best of ePlus's ability
4   without third-party valuation they reported the
5   transaction, what the purchase price was, the assets,
6   and the liabilities.  We'd have to look at the 10-K,
7   which I don't know off the top of my head of when
8   this information was reported during that time, and
9   we'd specifically see what was publicly announced.
10     Q.  Do you believe that a third-party
11  evaluation of the value of the patents would have
12  been necessary to come up with a fair valuation in
13  2001?
14     A.  Yes.
15     Q.  Why didn't ePlus do a third-party analysis
16  of that valuation in 2001?
17     A.  What actually transpired during the
18  acquisition process is, ePlus negotiated with
19  ProcureNet and Fisher and the principals to acquire
20  the technology and liabilities that we've been
21  discussing.  And what transpired is, ePlus at some
22  point during the process of discussion of interest in
23  the technologies became aware of the patents.  And in
24  the closing minutes or days of that transaction as
25  the document was being prepared for the acquisition
```

**43**

```
1   and as they became aware of the patents insisted that
2   the patents be transferred as part of that asset sale
3   from ProcureNet.
4         It's then my understanding what occurred
5   in that asset sale is that there wasn't really a
6   formal valuation done, but there was principals
7   within ePlus that checked with counsel to determine
8   what the cost of transferring these patents over to
9   ePlus through, you know, paper means and
10  administrative means, what has to occur and what
11  those costs would be.  And that was approximately
12  12,000 dollars.
13        And then ePlus made an agreement, verbal
14  agreement with Fisher is, we'll call the fair market
15  value of 12,000 dollars for the patents.  That will
16  cover the cost of the administration fees and will be
17  bundled in with the whole asset transfer.
18     Q.  So you're just describing the interaction
19  between ProcureNet and ePlus leading up to the close
20  of the sale; is that right?
21     A.  The process of the negotiation and the
22  closing of the sale.
23     Q.  Exhibit 58, though, that's generated just
24  by ePlus, right, the valuation document here?
25     A.  I don't know if it was generated -- what
```

**44**

```
1   do you mean, the document that describes the 12,000
2   dollars?
3      Q.  Yeah --
4      A.  This is an ePlus document.
5      Q.  Right.  This was generated after the
6   acquisition.
7         Right?
8      A.  Yes, I believe that's correct.
9      Q.  So after that, there's no time pressure.
10  There's no reason to limit the valuation to whatever
11  was done in the waning days of the acquisition, is
12  there?
13     A.  I don't think there's waning pressures, if
14  you will, but they reported accurately what they had
15  done with coming up with the numbers with ProcureNet
16  and Fisher.  And I don't think it tries to state
17  anything less or anything more.
18     Q.  Well, exhibit 58 does not state that the
19  figure 12,000 dollars was developed based on
20  ProcureNet telling ePlus that that's how much it
21  would cost to transfer the patents.
22        Right?
23     A.  No, it doesn't say that in this document,
24  that's correct.
25     Q.  It does say it was based on fair market
```

45

1   value.

2       Right?

3       A.   It's estimated by ePlus management what

4   they refer to as fair market value, correct.

5       Q.   Is there some reason why ePlus would state

6   in this valuation document that the value of the

7   patents was determined by fair market value if in

8   fact it was not determined by fair market value?

9       A.   I could only suspect, but I'm sure this

10  document was vetted by attorneys as well as auditors

11  to come up with the language of what should be

12  written.

13      Q.   And based on that vetting process, it was

14  determined that it was an accurate statement that the

15  12,000-dollar valuation of the patents was an

16  accurate fair market value assessment as defined here

17  in exhibit 58?

18      A.   That's how it's characterized here.

19      Q.   I know that's how its characterized, but

20  could you answer my question?

21      MR. STRAPP:  Objection, asked and

22  answered.

23      A.   I did.  I thought I answered it.

24      BY MR. McDONALD:

25      Q.   So while it's characterized here that way,

46

1   you think it's an accurate characterization.

2       Right?

3       A.   Accurate characterization as it's listed

4   here, yes.

5       Q.   So if I understood you right, when ePlus

6   was going through the process of acquiring the assets

7   of ProcureNet, they weren't even aware of the patents

8   of ProcureNet at the beginning of the process.

9       Correct?

10      A.   I don't believe they were aware of it at

11  the beginning, yes.

12      Q.   What is your understanding as to why ePlus

13  was interested in buying the assets of ProcureNet?

14      A.   ePlus is a risk-adverse company.  They

15  have looked at other companies in the past that had

16  gotten themselves into legal issues in infringing

17  other people's patents, and as a risk-adverse

18  company, they saw that -- believed that there was

19  some protection around the fact that there were

20  patents that were -- that came along with these

21  assets, and they wanted to ensure that protection for

22  themselves in the ownership of those patents.

23      Q.   Okay.  Maybe I wasn't clear with my

24  question.  I was going back to the time before ePlus

25  even knew ProcureNet had patents.

47

1       A.   Okay.

2       Q.   But there was a time period when ePlus was

3   interested in acquiring ProcureNet's business assets

4   without even knowing that ProcureNet had patents.

5       Did I understand you right?

6       A.   I think the first letter that ePlus had

7   written to ProcureNet expressing an interest in the

8   company or the software, there was not mention to my

9   recollection of patents or their knowledge of

10  patents.  Earlier on in the discussion, the patents

11  came up but weren't talked about or included through

12  those discussions, and it was near the end of the

13  discussions that ePlus stated, we have to make sure

14  that the patents are transferred over as well, and

15  they got into a dialogue and a negotiation with both

16  ProcureNet and Fisher at that time.

17      Q.   Is it fair to say that ePlus's primary

18  interest in acquiring assets of ProcureNet was to get

19  the procurement software developed by ProcureNet?

20      A.   I can't say what was going -- the

21  motivation of what was going on in ePlus's mind at

22  the time that I wasn't working for them, so I'm not

23  in a position to be able to say to.

24      Q.   All right.  Well, your prior answers

25  though indicated some understanding of what ePlus was

48

1   thinking during the course of negotiations, so I

2   mean, have you ever talked to anybody from ePlus to

3   say to what their thought process was prior to the

4   closing of the acquisition of the ProcureNet assets?

5       A.   Yes.

6       Q.   Who have you talked to about that?

7       A.   I've spoken to management of the company.

8       Q.   Who specifically by name?

9       A.   Phillip Norton, our CEO, Steve Mencarini,

10  and Clay Parkhurst.

11      Q.   This valuation document at the bottom of

12  page 3 indicates that the capitalized software was,

13  quote, one of the most valuable intangible assets

14  acquired by ePlus in this deal, quote.

15      Do you see that, or bottom of page 3 to

16  the top of page 4?

17      A.   Oh, I'm sorry.

18      I do see that, yes.

19      Q.   Is it fair to say that the acquisition of

20  that capitalized software identified as one of the

21  most valuable intangible assets acquired by ePlus in

22  the deal was also one of the main motivations for

23  ePlus to buy the assets?

24      A.   I think they were -- they were absolutely

25  interested in the software for their business.

Farber - 30(b)(6), Kenneth Gary   5/18/2010   12:00:00 PM

49

1    Q.   There's no claim by the way in this case
2  that Lawson has copied any software or taken any code
3  or anything from ePlus.
4        Correct?
5    A.   Not to my knowledge.
6    Q.   As far as you know, Lawson wrote their own
7  code to make their procurement systems, right, or got
8  them from third parties by purchasing them?
9        MR. STRAPP:  Objection, calls for
10 speculation.
11   A.   I don't believe that we're accusing Lawson
12 of taking or stealing code from ePlus.  How they
13 have the code, whether it's developed, acquired
14 through a third party, I don't have knowledge of.
15       BY MR. McDONALD:
16   Q.   But in any event, the code that's
17 described here as one the most valuable intangible
18 assets acquired by ePlus, that's not code that
19 Lawson's ever had access to.
20       Correct?
21   A.   The application code that was acquired by
22 ProcureNet.
23       No, I wouldn't believe so.
24   Q.   At the time of the acquisition of assets
25 from ProcureNet by ePlus, did ePlus grant ProcureNet

50

1  a license under the patents-in-suit?
2    A.   Yes, they did.
3    Q.   Have you seen that license?
4    A.   I had seen the license in the past, yes.
5    Q.   When had you seen it?
6    A.   Maybe about 5 years ago as well, 5, 6
7  years ago.
8    Q.   Do you have any idea why that agreement
9  wasn't part of the document productions by ePlus to
10 Lawson until just last week?
11   A.   I have no knowledge of that.
12       MR. McDONALD:  Mark this as the next
13 exhibit, please.
14       (Lawson Exhibit No. 59
15            was marked for
16            identification.)
17       BY MR. McDONALD:
18   Q.   Mr. Farber, you've been handed exhibit 59,
19 entitled, intellectual property license agreement.
20 The first paragraph indicates that it's dated May 15,
21 2001, between ePlus Inc. and ProcureNet Inc.
22       Do you see that?
23   A.   I do.
24   Q.   I'll give you a chance to review the other
25 pages of this document if you like.

51

1    Q.   My question is, do you recognize this
2  document?
3    A.   It appears to be what I probably looked at
4  5 years ago or so.
5    Q.   It is the license agreement between ePlus
6  and ProcureNet?
7    A.   Appears to be, yes.
8    Q.   So you have not looked at this again
9  recently in preparation for today's deposition?
10   A.   No, I haven't.
11   Q.   This license agreement between ePlus and
12 ProcureNet, this was part of the negotiated agreement
13 between ePlus and ProcureNet in 2001.
14       Right?
15   A.   I believe so, yes.
16   Q.   And at the time, ePlus and ProcureNet had
17 no prior relationship with each other.
18       Right?
19   A.   Not to my knowledge.
20   Q.   So this is kind of a situation where the
21 price for the acquisition of assets was in effect a
22 market price determined by a willing buyer and a
23 willing seller who are independent of each other.
24       Right?
25   A.   I don't know that you would say, market

52

1  price.  I think there were -- it was an agreement of
2  a sales price of the assets between a buyer and a
3  seller.
4    Q.   But it's a normal kind of a commercial
5  transaction where the parties are independent of each
6  other and one party is trying to pay as little as
7  they can, the other one is trying to sell it for as
8  much as they can.
9        Right?
10   A.   Absolutely.
11   Q.   Just like when you're buying or selling a
12 house or something.
13       Right?
14   A.   Or a car.
15   Q.   Or a car.
16       Just to be clear:  When ePlus bought these
17 assets from ProcureNet relating to the patents in
18 this suit, ePlus didn't get a license.
19       Right?
20   A.   They actually bought the patents hook,
21 line, and sinker.
22       Correct?
23   A.   When ePlus acquired the assets, they
24 got the -- well, besides the furniture and the things
25 that we talked about, individuals, people, as well as

53

1  the associated software and the patents as well.
2      Q.  Right.  And you understand that getting a
3  license under a patent, that's a more limited set of
4  rights than actually owning the patents outright?
5      A.  Say that again.  I'm sorry.
6      Q.  It's a more limited set of rights under
7  those patents than if you were actually going to own
8  the patents outright.
9      Correct?
10      A.  Getting a license to use the patents has
11  less rights than owning the patents, I would agree
12  with that.
13      Q.  Right.  So this agreement 59, exhibit 59
14  here, this was a license from ePlus to ProcureNet of
15  the patents that ePlus was buying from ProcureNet as
16  part of the deal.
17      Right?
18      A.  That's correct.
19      Q.  So that would include the patents involved
20  in this suit?
21      A.  I believe so, yes.
22      Q.  Is it true that ProcureNet paid nothing
23  for this license?
24      A.  I think that as part of the deal, ePlus
25  granted a zero-price license to ProcureNet.

54

1      Q.  Why wasn't the license agreement one that
2  includes a royalty?
3      A.  It's not -- it's not uncommon through
4  acquisition that when one party buys the other
5  companies that cross -- give a cross-license,
6  zero-cost license agreement.
7      Q.  Why was it done in this case?
8      A.  It's not an uncommon business practice.  I
9  guess you can say it was a thank you for doing
10  business.  ePlus got what they wanted.  You know,
11  the -- ProcureNet wanted to protect themselves
12  because they were still in business as an entity, and
13  they still had wanted to use, you know, part of the
14  software for components of their business, and both
15  parties were happy to get what they wanted.
16      So again it's not an uncommon practice
17  from a buyer and a seller.
18      Q.  After the May 2001 acquisition, did
19  ProcureNet continue using procurement software that
20  it had sold to ePlus?
21      A.  They may have for a very short time.
22      Q.  Why do you say it was for a short time?
23      A.  I think they were later acquired, or the
24  remaining component of their business was acquired by
25  another company.

55

1      Q.  Did they continue to use the procurement
2  software after they were acquired by another company?
3      A.  No, they didn't.
4      Q.  How do you know that?
5      A.  I checked.
6      Q.  Well, when did you check?
7      A.  When they were acquired, which was 4, 5
8  years ago.
9      Q.  How did you check?
10      A.  How did I check?
11      Q.  Yes.
12      A.  I knew people that still worked in the
13  organization.  I asked them what they were using,
14  what they were doing, how their business had changed,
15  so on and so forth.  Within the year or so that they
16  actually had -- that I was aware as ProcureNet as a
17  stand-alone operation was using our solution, they
18  hadn't asked for any updates, and they were changing
19  their business model and what they were doing as a
20  company and concentrating more on just logistics, and
21  they sold to another logistics company, so they
22  really had no reason to use the software.
23      Q.  Other than the license between ePlus and
24  ProcureNet, are you aware of any other licenses under
25  the patents-in-suit that were outside the context of

56

1  a lawsuit?
2      A.  No, I'm not aware of any.
3      Q.  We had looked at exhibit 57 a little
4  earlier here, a license agreement between ProcureNet
5  and Fisher Scientific, and I guess some other
6  entities as well.
7      A.  Okay.
8      Q.  I think you indicated you had reviewed
9  this particular agreement before testifying today.
10      Was that right?
11      A.  Actually, I was wrong.  I apologize.
12      I had seen this agreement, this document.
13      Q.  Wait.
14      Which is, this, here?
15      A.  I'm sorry.
16      What was marked as 58, exhibit 58, the
17  ePlus acquisition of Structured Computer Services,
18  the valuation document.  I hadn't gone through this
19  yesterday or the day before though.
20      Q.  Have you seen exhibit 57 before today?
21      A.  Yes.
22      Q.  How long ago did you see it?
23      A.  Oh, gosh, 2000, 2001 time frame.
24      Q.  Why were you looking at it back at that
25  time?

Farber - 30(b)(6), Kenneth Gary  5/18/2010  12:00:00 PM

|  | 57 |
|---|---|
| 1 | A.  I think it had to do with the use of the |
| 2 | licenses by ProcureNet, or it might have been around |
| 3 | the time that the acquisition had taken place, and I |
| 4 | was checking the agreement to see if they were going |
| 5 | to use it, because I didn't know at that time if |
| 6 | there were transfer rights and so on associated with |
| 7 | it. |
| 8 | Q.  So you were trying to assess the rights in |
| 9 | the patents that ProcureNet had because they were |
| 10 | looking at transferring those rights? |
| 11 | A.  Correct, potentially transferring those |
| 12 | rights, yes. |
| 13 | Q.  Okay.  Did you at that time determine what |
| 14 | were the circumstances of this license agreement |
| 15 | between ProcureNet and Fisher Scientific that's |
| 16 | exhibit 57? |
| 17 | A.  Can you repeat that? |
| 18 | I'm sorry. |
| 19 | Q.  Sure.  Did you talk to anybody about the |
| 20 | context for this agreement or the circumstances |
| 21 | surrounding the license between ProcureNet and Fisher |
| 22 | Scientific? |
| 23 | A.  Not that I recall, no. |
| 24 | Q.  This exhibit 57 indicates that it's a |
| 25 | software license agreement. |

|  | 58 |
|---|---|
| 1 | Correct? |
| 2 | A.  That's correct. |
| 3 | Q.  It's dated April 14th, 1999. |
| 4 | Correct? |
| 5 | A.  That's correct. |
| 6 | Q.  Is it your understanding that under this |
| 7 | agreement -- let me back up a little bit here.  Let's |
| 8 | get the parties straight. |
| 9 | Under this agreement, exhibit 57, who was |
| 10 | the party that was doing the licensing and who was |
| 11 | receiving the license? |
| 12 | A.  Well, I believe this agreement had to do |
| 13 | with the transfer of the licenses of spinning out |
| 14 | from Fisher Scientific to ProcureNet. |
| 15 | Q.  So is it your understanding that Fisher |
| 16 | had transferred the assets to ProcureNet and then |
| 17 | ProcureNet was giving a license back to Fisher? |
| 18 | A.  Correct. |
| 19 | Q.  I'd have to say, I'm a little confused. |
| 20 | If we turn to the fourth page of the |
| 21 | document with the actual heading, software license |
| 22 | agreement. |
| 23 | A.  Fourth page? |
| 24 | Q.  Yeah, of the document. |
| 25 | A.  What page? |

|  | 59 |
|---|---|
| 1 | Q.  It's page 700139 in the very lower right |
| 2 | corner -- lower right. |
| 3 | A.  Okay.  139. |
| 4 | Q.  700139. |
| 5 | A.  I have it. |
| 6 | Q.  So that looks kind of like the initial |
| 7 | page of a software license agreement. |
| 8 | Right? |
| 9 | It's got the heading up there, software |
| 10 | license agreement? |
| 11 | A.  Yeah, it does say that, yes. |
| 12 | Q.  Now, in the first paragraph, it's |
| 13 | describing these parties, and ProcureNet is one of |
| 14 | the parties. |
| 15 | Right? |
| 16 | A.  Correct. |
| 17 | Q.  Then there's a company, Strategic Computer |
| 18 | Services Inc., who is also a party. |
| 19 | Correct? |
| 20 | A.  Correct. |
| 21 | Q.  What's the relationship at this time of |
| 22 | 1999 between ProcureNet and Strategic Computer |
| 23 | Services? |
| 24 | A.  I don't -- I really don't recall. |
| 25 | Q.  Do you have any idea why somebody would |

|  | 60 |
|---|---|
| 1 | abbreviate Strategic Computer Services "SPS"? |
| 2 | A.  No, I don't. |
| 3 | Q.  That just struck me as a little odd. |
| 4 | This does look odd. |
| 5 | Q.  And then there's these 2 Fisher Scientific |
| 6 | entities that are also identified as parties. |
| 7 | Correct? |
| 8 | A.  That's correct. |
| 9 | Q.  Now, under the recitals, it looks like |
| 10 | recital B kinds of summarizes the asset transfer. |
| 11 | Correct? |
| 12 | A.  Yes. |
| 13 | Q.  It says:  This Fisher Scientific |
| 14 | International Inc. entity transferred the assets of |
| 15 | the electronic commerce division of its wholly owned |
| 16 | subsidiary to ProcureNet, which then transferred |
| 17 | those assets to Strategic Computer Services. |
| 18 | Right? |
| 19 | A.  This is what it says, yes. |
| 20 | Q.  All right.  And so -- in C it goes on and |
| 21 | says:  In connection with the spinoff, then |
| 22 | ProcureNet and SPS are willing to grant and Fisher is |
| 23 | willing to accept a license. |
| 24 | Correct? |
| 25 | A.  Yes. |

**61**

1    Q.   And the license is to use software owned
2  or licensed for use by SPS for certain specified
3  purposes.
4       Right?
5    A.   That's correct.
6    Q.   So under this agreement, did Fisher
7  actually get the code itself?
8    A.   I don't know if Fisher received the code
9  or not.
10    Q.   All right.  Well, if you turn to the next
11  page of the agreement, the one 700140, numbered page
12  2.
13    A.   Yes.
14    Q.   In middle of the page there, do you see a
15  definition for licensed software?
16    A.   Yes, I do.
17    Q.   It says, quote:  It shall mean the
18  CornerStone and SupplyLink computer programs as
19  described in schedule B hereto, quote.
20       Do you see that?
21    A.   I do.
22    Q.   What are CornerStone and SupplyLink?
23    A.   I think those were solutions that either
24  Fisher acquired or had at the time.
25    Q.   Do those relate to procurement?

**62**

1    A.   They may have.  I don't have detailed
2  knowledge of those solutions.  That was before my
3  time or ePlus's time with Fisher.
4    Q.   If we turn to the second-to-the-last page
5  of exhibit 57, 700154.
6    A.   154, yes.
7    Q.   That's the schedule B that's referenced
8  there in the licensed software definition.
9       Right?
10    A.   Yes, it does relate back to exhibit B,
11  yes.
12    Q.   All right.  So schedule B looks like it
13  does list certain versions of the CornerStone and
14  SupplyLink software.
15       Correct?
16    A.   Yes.
17    Q.   Then also gives documentation that goes
18  along with those, including for example SupplyLink
19  source code file with notes and CornerStone source
20  code file with notes.
21       Right?
22    A.   That's correct.
23    Q.   So does it at least appear to you here as
24  the spokesperson for ePLUS that this license
25  agreement included the code itself?

**63**

1    A.   As a spokesperson for ePlus, I and ePlus
2  would be speculating, but it appears that that would
3  be the case.  It was again before both our times.
4    Q.   And in addition to the licensed software,
5  this agreement also involved a license for licensed
6  software intellectual property.
7       Correct?
8    A.   Where are you looking?
9    Q.   If we can go back to page 2 of the
10  agreement, which was 700140.
11    A.   Yes.  What paragraph?
12    Q.   Right above, licensed software, in the
13  middle of the page, do you see a paragraph, licensed
14  software intellectual property?
15    A.   Yes, I do.
16    Q.   And so those were both licensed under this
17  agreement, right, both the software and the software
18  intellectual property?
19    A.   Yes.  I don't --
20    Q.   Well, we can go to the grant of license
21  here.
22    A.   Yeah.  I was just looking to see if it
23  correlated to any specific -- okay.  That's fine.  Go
24  ahead.  I'm sorry.
25    Q.   So if you turn to page numbered 3 of the

**64**

1  agreement, or 700141.
2    A.   Yes.
3    Q.   Paragraph 2.1 is the grant of the license
4  to Fisher.
5       Correct?
6    A.   Correct.
7    Q.   And that's a license for both the licensed
8  software and the licensed software intellectual
9  property as well as documentation.
10       Correct?
11    A.   That's correct, yes.
12    Q.   Do you have an understanding as to whether
13  this agreement, exhibit 57, licensed the rights
14  related to the patents involved in this lawsuit?
15    A.   I have no clue.  That's why I was seeing
16  if they -- it just looked like according to this
17  document that it dealt with the software -- the
18  associated code and documentation.  I didn't see any
19  reference to patents.
20    Q.   Well, if you go back to page 2.
21    A.   Yes.
22    Q.   The definition of licensed software
23  intellectual property does include patents, including
24  U.S. and foreign applications and continuations,
25  necessary for the operation of the licensed software.

Farber - 30(b)(6), Kenneth Gary  5/18/2010  12:00:00 PM

65

1       Right?

2       A.   Intellectual property should be no

3   copyright patent -- yeah, I think that's a pretty

4   broad statement that's pretty standard in all

5   agreements, but I don't see any cross-listing as we

6   do in exhibit B as to the -- you know, a similar

7   exhibit.

8       Schedule A is plan.  Schedule B is

9   software and documentation.  Schedule C has some

10  equipment, it looks like, and I don't see anything

11  that refers to the actual patents.

12  Q.   Okay.  So you don't know whether or not

13  the patents involved in this suit are necessary for

14  use with this Cornerstone and SupplyLink software or

15  not?

16  A.   No, I wouldn't know.

17  Q.   Are you aware of any particular patents

18  that would be included within this agreement, exhibit

19  57?

20  A.   I don't personally, no.

21      MR. McDONALD:  I think we're at the end of

22  the tape, so why don't we take a little break.

23      THE WITNESS:  Okay.

24      THE VIDEOGRAPHER:  This ends videotape

25  number 1 in the deposition Kenneth Farber.  The time

66

1   is now 11:07 AM.

2       (Recess.)

3       THE VIDEOGRAPHER:  We're now back on the

4   record.

5       This is the beginning of videotape number

6   2 in the deposition of Kenneth Farber.  The time is

7   now 11:24 AM.  You may proceed.

8       MR. McDONALD:  Would you mark this as the

9   next exhibit, please.

10      (Lawson Exhibit No. 60

11          was marked for

12          identification.)

13  BY MR. McDONALD:

14  Q.   Mr. Farber, you've been handed what was

15  marked as exhibit 6 0, 60.  This one has a production

16  number in the lower right corner that is the next

17  page following the valuation document that we had

18  been talking about earlier that was marked I believe

19  exhibit 58.  So I'll just point that out to you.

20      Can you tell me whether exhibit 60 somehow

21  relates to exhibit 58, the valuation document?

22  A.   I don't know actually for sure.

23  Q.   All right.  Do you know what exhibit 60

24  is?

25  A.   It looks like some form of a financial

67

1   analysis.

2   Q.   Do you know what it means -- the heading

3   there is, opening journal entries.

4       Do you see that?

5   A.   I do.

6   Q.   Do you know what that phrase means?

7   A.   It's the accounting entries that were

8   apparently posted, you know, at some point in time,

9   so some point in time going forward, they're referred

10  to it as, you know, the existing or current journal

11  entries.

12      The term opening suggests to me anyway

13  that this would maybe be the initial accounting

14  entries for the acquisition of the assets from

15  ProcureNet.

16      Is that your interpretation of this or

17  not?

18  A.   It could be, yes.  It would appear that

19  way.

20  Q.   In any event, it does list under ePlus

21  systems some figures, including 12,000 for patents.

22  Correct?

23  A.   Let me see where you're looking.

24      Do it does.

25  Q.   That's under the heading, ePlus systems.

68

1       Correct?

2   A.   Correct.

3   Q.   That's about the eighth entry on the list

4   there?

5   A.   Yes.

6   Q.   And that 12,000 figure, that's consistent

7   anyway with the exhibit 58 valuation of the patents

8   acquired from ProcureNet of 12,000 dollars.

9       Right?

10  A.   As it was characterized in that document,

11  correct.

12      MR. McDONALD:  Would you mark that as the

13  next exhibit.

14      (Lawson Exhibit No. 61

15          was marked for

16          identification.)

17  BY MR. McDONALD:

18  Q.   Mr. Farber, you've been handed exhibit 61,

19  which again appears to have some financial figures

20  referring to exhibits 1, exhibit 2, exhibit 3 on the

21  top of each of the 3 pages of that exhibit.

22  A.   Okay.

23  Q.   Do you recognize exhibit 61?

24  A.   No, not by just looking at it, I don't.

25  Q.   If we go back to exhibit 58, the valuation

Farber - 30(b)(6), Kenneth Gary  5/18/2010  12:00:00 PM

**69**

1  document.

2  A.  Yes.

3  Q.  If you can turn to page 2.

4  Do you see there's some paragraphs on that

5  page, page 2?

6  A.  Yes.

7  Q.  At the end of each one, there's a

8  reference to an exhibit.  For the first paragraph,

9  it's exhibit 1, the second paragraph, exhibit 2, and

10  the third paragraph, exhibit 3.

11  Do you see that?

12  A.  Yes.

13  Q.  Do those paragraphs appear to match up

14  with the exhibits 1, 2, and 3 of exhibit 61, or not?

15  A.  Let's see, they appear to, yes, by name,

16  yeah, at least by the title, sure.

17  Q.  So these have to do with some liabilities

18  that were acquired as part of ePlus's acquisition of

19  ProcureNet?

20  A.  It does, yes.

21  MR. McDONALD:  Would you mark that as the

22  next exhibit, please.

23  (Lawson Exhibit No. 62

24  was marked for

25  identification.)

**70**

1  BY MR. McDONALD:

2  Q.  You've been handed exhibit 62, but before

3  we go to that, let's just stick with 61 for a moment,

4  Mr. Farber.

5  A.  Yes.

6  Q.  If you look at the second page of exhibit

7  61, that's called, exhibit 2, liability for deferred

8  software license sales.

9  A.  Okay.

10  Q.  Do you have an understanding as to what

11  that is about?

12  A.  Well, what it appears to be is -- looks

13  like there is a deferment of payment from the

14  Washington Department of Labor for 30,000 dollars.

15  Q.  So the Department of Labor had already

16  paid for some software, but it had not been delivered

17  yet by May 15.

18  Does appear to be the deal?

19  A.  Yes, I believe so.

20  Q.  Okay.  So let's go to exhibit 62.

21  A.  Okay.

22  Q.  Does -- the first page of exhibit 62

23  that's entitled, exhibit 6, valuation of assembled

24  work force.

25  Correct?

**71**

1  A.  That's correct.

2  Q.  And does that appear to be the backup

3  substantiation for the valuation of assembled work

4  force at page 3 of exhibit 58?

5  A.  It appears to be.

6  Q.  And if we go to the second page of exhibit

7  62, that's called exhibit 7, valuation of capitalized

8  software.

9  Correct?

10  A.  Yes.

11  Q.  Is that the backup for the description of

12  the capitalized software at pages 3 to 4 of exhibit

13  58?

14  A.  Appears to be, yes.

15  Q.  Can you explain why there's -- it's set

16  forth here in exhibit 7 3 years, year 1, year 2, year

17  3?

18  A.  I think they're just projections.

19  Q.  Well, if you go pack to the last page of

20  exhibit 58 at the very top.

21  A.  Okay.

22  Q.  It's talking at the top still about

23  capitalized software.

24  Right?

25  A.  Yes.

**72**

1  Q.  And the first full sentence on page 4, it

2  says, quote:  It is estimated by ePlus management

3  that this software as it exists today will have a

4  useful economic life of 3 years before it undergoes

5  either substantial modifications and improvements or

6  is completely rewritten from scratch to meet the

7  future customer needs and to keep pace with rapid

8  changes in hardware and software technology, quote.

9  Do you see that sentence?

10  A.  I do.

11  Q.  So that refers to a 3-year expected or

12  useful economic life of that capitalized software.

13  Right?

14  A.  The software as it existed or as delivered

15  to ePlus by ProcureNet, they estimated as it was

16  written 3 years without major rewrites or upgrades or

17  enhancements to it.

18  Q.  So was this exhibit 7 in effect trying to

19  determine the income that will be generated by that

20  software for that 3-year useful economic life and

21  then come up with a present value of that?

22  A.  Yeah.  I think it's best-guess estimates

23  based on what they had at that time, sure.

24  Q.  And do you have an understanding whether

25  this software that's being described in exhibit 7 --

Farber - 30(b)(6), Kenneth Gary   5/18/2010   12:00:00 PM

73

1   is that the One Source software that became Procure
2   Plus or something else?
3      A.   I believe it was, yes.
4      Q.   It was the One Source?
5      A.   I believe so, yes.
6      Q.   Do you see for year 1 the total revenues
7   listed at 5,182,480?
8      A.   Yes.
9      Q.   Around the time of the acquisition of the
10  ProcureNet assets by ePlus, what were the annual
11  revenues for software sales maintenance, training,
12  subscription revenues, all the associated revenues
13  for the One Source software?
14     A.   Oh, gosh, at the time -- I don't recall
15  the revenue at that particular point in time.
16     Q.   Was it around 5.2 million or so?
17     A.   I don't know.  I'd have to go back and
18  look at documents on that.
19     Q.   And if you look at the third page of
20  exhibit 62.
21     A.   Okay.
22     Q.   Does this also appear to be supporting
23  documentation for the valuation in exhibit 58?
24     A.   Yeah.  It looks to be a calculation of
25  goodwill test based on their projections.

74

1      Q.   If you look near the bottom of exhibit 8
2   with line item number 9 under, assets purchased, you
3   see again there patents with a valuation of 12,000
4   dollars.
5      Correct?
6      A.   Yeah.  It says, 12,000 estimated, yes.
7      Q.   Before ePlus acquired these assets of
8   ProcureNet back in 2000, ProcureNet was seeking to
9   have an initial public offering; is that right?
10     A.   That is correct.
11     Q.   Why is it that ProcureNet wanted to have
12  an initial public offering in 2000?
13     A.   Well, I think --
14          MR. STRAPP:  Objection, beyond the scope
15  of the deposition topics.
16          Go ahead.
17          THE WITNESS:  Okay.
18     A.   I think for the purposes of expansions,
19  you know, and potentially acquiring other companies
20  and doing more marketing and bringing more resources
21  into the company that they could afford to have that
22  venture at that point in time, so as to way to
23  increase the presence, the branding, and the strength
24  of the company.
25          BY MR. McDONALD:

75

1      Q.   Did ProcureNet complete that initial
2   public offering?
3      A.   They did not complete the IPO.
4      Q.   Did they withdraw the offering?
5      A.   I believe they may have withdrawn.
6      Q.   You were there at the time?
7      A.   I was.
8      Q.   Why did they withdraw the offering?
9      A.   Well, the entire market was imploding, the
10  e-commerce market exploded in the late '90s, and
11  ProcureNet and Fisher both were very late to the
12  table to file an S 1 for a future IPO, and at the
13  time of the filing, everything else was -- in the
14  market was falling apart, and the attractiveness of
15  anything that began with an E, e-commerce, you know,
16  or anything of that nature, people were not investing
17  in.
18          They were just -- the market was running
19  scared at that point in time, because a lot of
20  companies that did IPO lost a lot of money, and
21  investors were not as open to jumping in as they were
22  in the past, so we never completed it.
23     Q.   Did ProcureNet fail to find underwriters
24  for it?
25          MR. STRAPP:  A continuing objection to

76

1   this line of questioning as beyond the scope of the
2   noticed deposition topics.
3      A.   I mean, my believe it wasn't a matter of
4   underwriting.  It was more of -- you could always
5   find underwriters, but it's what do you want to
6   achieve as a company, and was it the right time to do
7   an IPO, and it was not the right time.
8          The philosophy of wanting to do an IPO was
9   appropriate at the time they decided to file the S 1,
10  but between the time the S 1 was done and shortly
11  thereafter what was occurring in the market, it
12  didn't make sense whatsoever.
13          MR. McDONALD:  Would you mark this as the
14  next exhibit, please.
15          (Lawson Exhibit No. 63
16          was marked for
17          identification.)
18          BY MR. McDONALD:
19     Q.   Mr. Farber, you've been handed exhibit 63.
20  I'll tell you I don't know who put that handwriting
21  in the upper right corner.  That's kind of how we got
22  it, but do you recognize this?
23          And obviously take the time you need to
24  get familiar with it.
25          At least generally recognize this as a

Farber - 30(b)(6), Kenneth Gary  5/18/2010  12:00:00 PM

77

1  copy of the application by ProcureNet Inc. back in
2  2000 to file for an initial public offering?
3      A.  Yes.
4      Q.  Were you involved at all in the
5  presentation of this S 1?
6      A.  A little bit.
7      Q.  What was your role?
8      A.  My role was reviewing it.  My role was
9  getting some facts related to what we did and what we
10  intended to do as a company.
11      Q.  On the very first page there near the
12  bottom, there's a line where it says, proposed
13  maximum aggregate offering price of 10 million
14  dollars.
15      Do you see that?
16      A.  I do.
17      Q.  Is that figure essentially what ProcureNet
18  hoped to raise when it filed this offering proposal?
19      A.  I think they hoped to raise more, but that
20  was the initial offering.
21      Q.  And so this was never completed.
22      Right?
23      A.  One was filed.
24      Q.  Okay.  But the offering itself was never
25  completed?

78

1      A.  That's correct.
2      Q.  S 1 was filed with the Securities and
3  Exchange Commission.
4      Right?
5      A.  That's correct.
6      Q.  And the S 1, you tried to be as accurate
7  as you could about all the statement and facts set
8  forth.
9      A.  Sure.
10      Q.  Right?
11      If you turn to the page -- the lower
12  corner would be 448719.
13      A.  Yes.
14      Q.  This has got a summary of historical
15  financial information.
16      Correct?
17      A.  Correct.
18      Q.  Now, is it true that ProcureNet wasn't
19  informed until January of 1999?
20      A.  Before my time, but that sounds about
21  right.
22      Q.  And then Fisher actually spun ProcureNet
23  off as a separate entity in about April of '99.
24      Correct?
25      A.  Again, before my time, but that sounds,

79

1  you know -- it was in the '99 time frame.
2      Q.  Okay.  Well, this particular page if you
3  look at the second paragraph up there, it says,
4  quote, in April of 1999, we were spun off from Fisher
5  and became a stand-alone company, quote.
6      Do you see that?
7      A.  Yes, I do.
8      Q.  You don't have any reason to dispute that.
9  Right?
10      A.  None whatsoever.
11      Q.  Now, just before that in early '99, did
12  ProcureNet acquire Structured Computer Systems?
13      A.  I don't know if it was ProcureNet or
14  Fisher that did.  I don't recall the facts
15  surrounding those acquisitions.
16      Q.  Okay.  But either Fisher or ProcureNet did
17  acquire Structured Computer Systems; is that right?
18      A.  I believe that's correct, yes.
19      Q.  What was the business of Structured
20  Computer Systems when it was purchased?
21      A.  I know that they were a software company,
22  and I don't know if they did anything else at that
23  time.
24      Q.  If you could turn to the page 448824.
25      A.  24?

80

1      A.  8824.
2      Q.  Okay.  Okay.
3      Q.  This is an attachment to the S 1 filing.
4      Correct?
5      A.  Yes.
6      Q.  Up at the top, it says, Structured
7  Computer Systems Inc.
8      A.  I think I'm on the wrong -- I'm sorry.
9      Did you say 8724?
10      Q.  448824.
11      A.  88.
12      I apologize.
13      Q.  Sure.
14      A.  You went way down.  Okay.  That's what I'm
15  doing wrong.
16      Okay.
17      Q.  So it's an attachment that's part of the S
18  1 filing.
19      Right?
20      A.  Okay.
21      Q.  It's entitled, Structured Computer Systems
22  Inc. notes to financial statements, year ended
23  January 31, '98, and the period ended January 12,
24  '99.
25      Correct?

81

1    A.   Okay.  Yes.
2    Q.   You see under section 1 there, it
3    indicates that Structured Computer Systems Inc. is an
4    established developer and marketer of enterprise
5    procurement software under the brand named Reality
6    and operating in only one segment, quote.
7         Do you see that?
8    A.   I do.
9    Q.   Are you familiar with the software
10   marketed under the brand name Reality?
11   A.   No, not really, just by name of hearing
12   it.
13   Q.   Do you have any idea why ProcureNet would
14   be interested in acquiring Structured Computer
15   Systems or its Reality brand enterprise procurement
16   software in 1999?
17        MR. STRAPP:  Objection, calls for
18   speculation beyond the scope of the deposition
19   documents.
20   A.   I have no knowledge of what occurred at
21   that juncture.
22        BY MR. McDONALD:
23   Q.   Okay.  In any event, the next paragraph
24   indicates that in January of '99, ProcureNet acquired
25   all of the outstanding stock of Structured Computer

82

1    Systems.
2         Right?
3    A.   That's what it says, yes.
4    Q.   So if we go back now to the page early on,
5    448719.
6    A.   Okay.
7    Q.   This has got some summary financial
8    information.
9         Correct?
10   A.   Yes.
11   Q.   Some of this is for years prior to 1999.
12        Right?
13   A.   That's correct.
14   Q.   How is it that this data was put together
15   for years prior to 1999 if ProcureNet did not exist
16   before 1999?
17   A.   I don't know.  I mean, they may have
18   included some things that Fisher did in this regard.
19   I really -- really don't have the knowledge of that.
20   Q.   Okay.  Is it likely that the pre-1999
21   figures are for a Fisher business unit that became
22   ProcureNet?
23   A.   I don't know.
24   Q.   In any event, is it true that for every
25   year shown here on this summary historical financial

83

1    information document from '95 up through March 31,
2    2000, this division lost money?
3    A.   That's what it's stating, yes.
4    Q.   And in the last full year, it lost over 24
5    million dollars?
6    A.   Right.
7    Q.   In the last year of what, '99, 2000?
8    A.   The year ending December 31, 1999, is the
9    last full year.
10        Correct?
11        (Pause.)
12        BY MR. McDONALD:
13   Q.   The first 5 columns are for full years.
14        Right?
15   A.   Yeah.  I'm just looking through it to make
16   sure.
17   Q.   Okay.
18   A.   Yep, that's correct.  That's what it's
19   saying.  I'm just trying to determine if this was
20   the -- I'm just trying to recall if this was all of
21   ProcureNet.  Nevertheless, yes, that's correct.
22   Q.   All right.  Then right up until the 3
23   months ended March 31, 2000, which is the last period
24   covered here, that 3-month period, the company lost
25   7,837,000 dollars.

84

1         Right?
2    A.   That's right.
3    Q.   Was ProcureNet ever profitable before it
4    sold its assets to ePlus?
5    A.   I was only there for less than a year, so
6    I don't know.  I'm looking at the same information
7    that you are.
8    Q.   We're looking at information that
9    indicates it was not profitable up until March of
10   2000.
11        Right?
12   A.   That's what this states, yes.
13   Q.   And then you were with the company for
14   what year?
15   A.   Year of the acquisition.
16   Q.   So the year between spring of 2000 and the
17   spring of 2001?
18   A.   Yes.
19   Q.   Was ProcureNet profitable during that
20   year?
21   A.   I don't believe so.
22   Q.   So at the time ProcureNet sold the patents
23   and applications involved in this lawsuit to ePlus,
24   it had never made a profit on the business.
25        Right?

Farber - 30(b)(6), Kenneth Gary  5/18/2010  12:00:00 PM

---

85

```
1       A.   As far as I'm aware, that's correct.
2       Q.   In the 2001 time frame, was the market for
3   e-commerce-related businesses still such that the
4   valuations of those assets were depressed?
5       In the 2001 time frame?
6       Q.   Right.
7       A.   I don't -- I believe it was probably in a
8   slow recovery, but I don't think it was at its
9   heyday, so I think it's fair to say there was still a
10  depression in the market.
11      Q.   In 2002, was there still the after-effects
12  of that?
13      A.   I think we still feel after-effects today,
14  so it's kind of all relative in terms of one's
15  opinion.
16      Q.   After you got hired by ePlus, did ePlus
17  continue to look for acquisitions of other
18  e-commerce-related businesses?
19      A.   I think ePlus always looks for
20  acquisitions of businesses that can complement or
21  supplement our solutions.  I wouldn't necessarily
22  just characterize them as e-commerce.
23      Q.   Okay.  But did ePlus continue to look for
24  acquisitions including businesses in the e-commerce
25  area?
```

---

86

```
1       A.   In that particular space, yeah.  I think
2   we still do today as well.
3       Q.   Why is that?
4       A.   Again, I mean, there's companies that are
5   out there that -- not necessarily to replace what we
6   have and what we offer our clients, but to augment
7   and supplement functionality, enhance functionality
8   in other areas in the e-commerce space.
9           MR. McDONALD:  Mark this as the next
10  exhibit, please.
11          (Lawson Exhibit No. 64
12              was marked for
13              identification.)
14  BY MR. McDONALD:
15      Q.   Mr. Farber, do you recognize exhibit 64?
16      A.   Yes.
17      Q.   What is it?
18      A.   Appears to be our annual report from 2001.
19      Q.   So is this for the period -- would this
20  include a period of time after the ProcureNet
21  acquisition, or not?
22      A.   I believe it should have.  It's just for
23  the fiscal year ending March 31, 2001.
24      Q.   Okay.  And the acquisition, that was May
25  of '01; is that right?
```

---

87

```
1       A.   I believe so.
2       Q.   But if you go to the second page of the
3   annual report, the letter to shareholders is dated
4   August of 2001.
5           Right?
6       A.   Oh, I went right past it.  Don't tell them
7   I did that.
8       Q.   You know, you've got a double-sided one
9   there.
10      A.   Yeah, that's why I was --
11      Q.   Let me switch this with you.
12          MR. McDONALD:  Let's re-mark this one.
13          (Discussion off the record.)
14  BY MR. McDONALD:
15      Q.   So exhibit 64 has been re-marked,
16  Mr. Farber, and if you turn to page 2 of that
17  document, do you see there, there's a letter from the
18  CEO of ePlus to shareholders dated August of 2001?
19      A.   Correct.
20      Q.   So the fiscal year ends March 31, 2001,
21  but this is actually produced sometime after March of
22  2001.
23          Correct?
24      A.   Absolutely.
25      Q.   Could you turn to page 27.
```

---

88

```
1       A.   Okay.
2       Q.   You have there a statement of earnings.
3           Right?
4       A.   Yes.
5       Q.   For the years '97 up to 2001.
6           Correct?
7       A.   That's correct.
8       Q.   The -- under revenues, there's a number
9   about 5 entries under, revenues.
10          Correct?
11      A.   Yes.
12      Q.   The first 3 are sales of equipment, sales
13  of leased equipment, and lease revenues.
14          Correct?
15      A.   That's right.
16      Q.   And those each total about 216 million, 34
17  million, and 43 million or so for 2001.
18          Correct?
19      A.   That's correct.
20      Q.   Now, those businesses, can you generally
21  tell me what those businesses are?
22      A.   Well, I mean, there's multiple business
23  units within ePlus.  There's the valuated -- the VAR
24  business under the head of ePlus technology, which is
25  our fulfillment business that we talked about in the
```

---

89

1   last deposition.  There's leasing, sales of leased
2   equipment in terms of remarketing, and lease revenues
3   from the leasing business.
4       Q.   So none of those 3 businesses have
5   anything to do with e-commerce or e-procurement.
6       Right?
7       A.   Well, yes and no.  There is some crossover
8   between e-commerce solution and equipment and
9   leasing.
10      Q.   On page 27 here, there's a separate entry
11  for something called, ePlus suite revenues.
12      Correct?
13      A.   That's correct.
14      Q.   What is your understanding as to what
15  ePlus suite revenues are?
16      A.   Those are revenues that are stand-alone
17  revenues that are just, somebody is buying our
18  application suite from ePlus and nothing else, so
19  sometimes they're buying or utilizing our commerce
20  suite in connection with our lease operations and our
21  equipment fulfillment operations, and everything just
22  kind of gets buried into those numbers.
23      Q.   So in 2001, the ePlus suite revenues, that
24  would be -- when you say, a suite, this is software
25  we're talking about.

90

1       Right?
2       A.   I believe so.  I'd have to see how we
3   referred to the term ePlus suite in here, but --
4       Q.   Well, if you turn to page 29, I think
5   there's some reference to that in the last paragraph.
6       A.   Okay, good.
7       Q.   It looks like to it to me anyway, and -- but
8   that last paragraph there, it says, the first 2
9   sentences of the last paragraph, quote:  The company
10  has added new classifications to its financial
11  statement presentation.  In order to reflect the
12  changes in its business, a line item, ePlus suite
13  revenues, has been added to the statement of earnings
14  that includes the revenues associated with the
15  e-commerce business unit, quote.
16      Do you see that?
17      A.   Yes, I do.
18      Q.   Okay.  So does that help you explain what
19  ePlus suite revenues is?
20      A.   Absolutely.
21      Q.   So how would you answer that question now
22  if I asked you, what are ePlus suite revenues?
23      A.   It would be associated with the commerce
24  side of the business as it relates to the acquired
25  software solutions from ProcureNet.

91

1       Q.   Okay.  So even though this is for the year
2   ended March 31, 2001, that 5,685,000 dollars in ePlus
3   suite revenues, that's actually for the ProcureNet
4   software?
5       A.   That could have also been for some other
6   things that ePlus had at the time that I'm not
7   familiar with.
8       Q.   Okay.  But it does at least include the
9   sales, the software revenues for ProcureNet?
10      A.   I suspect it does, yes.
11      Q.   Do they do that because after this annual
12  report was prepared, ePlus had acquired ProcureNet,
13  and so they went to show the results for the acquired
14  entity as well as the prior ePlus entity?
15      A.   I believe that's correct.
16      Q.   Okay.  So the ProcureNet revenues in the
17  year 2000 were only 1,376,000.
18      Right?
19      A.   Let's see.
20      Q.   Excuse me.  Let me rephrase that question.
21      According to page 27, the ePlus suite
22  revenues were only 1,376,000.
23      Right?
24      A.   In 2000, that was the amount that was
25  contributed to ePlus from that suite.  I don't think

92

1   ePlus had the suite for the entire year, did they?
2       Q.   Well, they didn't even have it until May
3   of 2001.
4       Right?
5       A.   Right.  So they had some commerce-related
6   activity going on in some area that they generated
7   1.3 million from.
8       Q.   Okay.  Why did ePlus separately report the
9   ePlus suite revenues in its 2001 annual report?
10      A.   Well, I think as you just pointed out in
11  29, the new company added a new classification to its
12  financial statement to reflect changes in its
13  business.
14      Q.   Now, is it generally true that the
15  acquisition of the e-commerce business of ProcureNet
16  actually increased ePlus's expenses?
17      A.   Well, certainly, overall expenses.  SG and
18  A would go up through the acquisition, yes.
19      Q.   In 2001, was ePlus trying to shift its
20  business from the sales of equipment, the sales of
21  leased equipment and leased revenues more into the
22  e-commerce area?
23      A.   I don't think it was a matter of shifting
24  business.  It was a matter of creating a new enhanced
25  business model.  I don't think the company wavered

93

1    whatsoever from its fulfillment or leasing business.
2       Q.   Was that a goal of the company in the
3    2001, 2002 time frame, to make e-commerce a bigger
4    percentage of its overall revenues?
5       A.   I think it was -- in the 2001 time frame
6    as it is today, I think there was a very strong
7    resolve to use e-commerce to empower our other
8    businesses as well as operating as a standalone
9    business to increase the overall revenues of the
10   company.
11      Q.   As a percentage of its overall revenues,
12   has -- the e-commerce software revenues, they really
13   haven't grown at all since 2001 as a percentage of
14   the company's overall revenues, have they?
15      A.   Well, if you look at it from a -- again,
16   there's 2 aspects of the e-commerce business.  One as
17   just selling to companies that are just -- have
18   interest in a procurement-only solution or a
19   content-only solution, and then there's other
20   businesses that are very large that -- large and
21   small, I should say, that use our commerce
22   capabilities as a differentiator from our competitors
23   that help drive overall corporate revenue in the
24   fulfillment of the leasing business, so it has
25   contributed significantly to our overall growth as a

94

1    company.
2       Q.   I just have a specific question though
3    about the software revenue.
4       A.   Right.
5       Q.   Like these ePlus suite revenues that are
6    shown here on page 27.
7       A.   Yes.
8       Q.   That's a separate revenue source.
9       A.   Okay.
10      Q.   Has that e-commerce software revenue
11   stayed pretty much flat as a percentage of the
12   company's overall revenue since 2001?
13      A.   Yes.
14      Q.   Why is that?
15      A.   Well, there's a lot of reasons I think,
16   but I think it's been flat because we have faced a
17   lot of competition in the industry, and it's been a
18   very difficult time in competing with the resources
19   that we have.
20           MR. McDONALD:  Why don't we take a little
21   break here.
22           THE VIDEOGRAPHER:  All right.  We're going
23   off the record.  The time is 12:04 PM.
24           (Recess.)
25           THE VIDEOGRAPHER:  We're now back on the

95

1    record.
2            The time is 12:06 PM.  You may proceed.
3            BY MR. McDONALD:
4       Q.   Around the August 2001 time frame, which
5    is the date of the letter from the CEO in this annual
6    report, did ePlus expect that the expenses associated
7    with its e-commerce unit would negatively impact its
8    profitability?
9       A.   Over what period of time?
10      Q.   Over the next few years.
11      A.   Well, I think that the company was
12   probably hoping that it would contribute more to the
13   profitability of the company.
14      Q.   Did ePlus in that late 2001 time frame
15   consider the e-commerce business to be an unproven
16   business model in its early stages?
17      A.   I believe then and I believe if you look
18   at anybody's 10-K today, they pretty much say the
19   same thing, that there's a lot of unproven things in
20   the world of e-commerce.
21      Q.   Was that true specifically in the late
22   2001 time frame?
23      A.   Sure.
24      Q.   Why is that?
25      A.   Well, in -- when you're looking in the

96

1    '90s, late '90s and early 2000, companies were
2    starting to adopt the Internet.  They were adopting
3    companies that were doing commerce over the Internet.
4    There were barriers that had to be crossed as it
5    relates to ensuring that there were appropriate
6    levels of security and business processes that could
7    secure companies' data.
8            The industry was fairly new as it relates
9    to the commerce space.  And there's a lot of
10   influencing things back then and today that could
11   have an effect on commerce, just as you see
12   volatility in the stock market based on people's
13   thoughts and beliefs and where they want to put their
14   money.
15           So there's a lot of factors outside of the
16   control of companies.
17           MR. McDONALD:  Mark this as the next
18   exhibit, please.
19           (Lawson Exhibit No. 65
20                  was marked for
21                  identification.)
22           BY MR. McDONALD:
23      Q.   Mr. Farber, you've been handed what was
24   marked as exhibit 65.
25           Would it be an ePlus 2002 annual report?

Farber - 30(b)(6), Kenneth Gary  5/18/2010  12:00:00 PM

97

1    A.   Yes, it is.

2    Q.   Were you involved at all in preparing this

3    document?

4    A.   No.

5    Q.   But you were an executive at ePlus at the

6    time?

7    A.   I was.

8    Q.   Could you turn to page 25, please, or the

9    page marked 133314.

10   A.   Yes.

11   Q.   This has got some more consolidated

12   statements of earnings information.

13   Right?

14   A.   Yes.

15   Q.   Do you still have the 2001 annual report

16   handy, and can you go to page -- keep that 2002 one

17   open while you open up to page 27 again in 2001.

18   A.   Sure, yes.

19   Q.   So if you look at the 2002 report, it

20   looks like sales went down quite a bit for sales of

21   equipment and sales of leased equipment between 2001

22   and 2002.

23   Correct?

24   A.   Yes.

25   Q.   Do you know why?

98

1    A.   I don't have a recollection what occurred

2    in that period of time.

3    Q.   Well, that was -- that's the year that --

4    well, September 11, 2001, was in the intervening time

5    period.

6    Right?

7    A.   That would have been, absolutely.

8    Q.   That had a big, downward impact on

9    revenue; is that right?

10   A.   I think it had an impact on companies

11   overall.

12   Q.   Oh, I'm not saying you guys were the only

13   ones.

14   A.   Yeah, but I don't want to use that as an

15   excuse either.

16   Q.   Okay.  But that was a tough --

17   A.   It was a tough --

18   Q.   -- year.

19   A.   -- year, sure.

20   Q.   Right.  One change in how the information

21   is reported I see from '01 to '02 is that in '01, you

22   had a separate line item for ePlus suite revenues,

23   but I don't see that separate line anymore in the '02

24   report.

25   A.   That's correct.

99

1    Q.   Why is that?

2    A.   You know, there was a lot of discussion

3    internally about reporting of ePlus suite revenues,

4    mainly because we had a very difficult time ourselves

5    internally deciphering how to accurately report on it

6    and how to decipher the percentage of revenue that

7    ePlus suite software generated to our other business

8    units and journaling all that information, so it was

9    taken out as a specific line item because of our

10   internal difficulties in accounting for a lot of that

11   revenue.

12   Q.   It looks like for the 2002 annual

13   report when you re-reported the 2001 data, you

14   added the fee and other income category to the

15   ePlus suite's revenue category to make those

16   collectively now the fee and other income category;

17   is that right?

18   A.   We are looking -- I'm sorry.

19   Q.   Let me be real specific here.

20   A.   Yes.

21   Q.   If you look at the 2001 reporting, 2001

22   annual report, the last year on there is for the

23   year-ending March 31, 2001.

24   Right?

25   A.   Yes.

100

1    Q.   And those -- you've got 2 numbers there.

2    The fee and other income is 7 thousand 9 93.

3    Right?

4    A.   Yes.

5    Q.   And then the ePlus suite revenue is 5

6    million 6 85.

7    Right?

8    A.   That's right.

9    Q.   Now, I guess it's hard to do the math in

10   one's head here, but you if you add those 2 things

11   together, they get -- they're about 13 million --

12   A.   Correct.

13   Q.   -- 700 thousand or so.

14   Right?

15   A.   Correct.

16   Q.   And if look at the 2002 annual report now

17   reporting the same year, March 31, 2001, the last

18   year's data, it's got the number 13 million 6 78 for

19   fees and other income now.

20   Right?

21   A.   I'm looking at it, sure.

22   Q.   There is no number that maps to that in

23   the 2001 annual report.

24   Right?

25   A.   Fees and other income, yes, that's

Farber - 30(b)(6), Kenneth Gary  5/18/2010  12:00:00 PM

101

1    correct.

2        Q.   But it looks to me that if you add the

3    fees and other income to the ePlus suite revenue from

4    the 2001 annual report, you get that same number for

5    the fees and other income --

6        A.   Right.

7        Q.   -- in the 2002 report?

8        So did the ePlus suite revenues get

9    included in the fee and other income category?

10       A.   I think a portion of them did.

11       Q.   Okay.

12       A.   You know, because if you look at this

13   report, then you go to 2002, we didn't suddenly jump

14   up 7 million dollars just in software, so there was

15   other stuff that was lumped into that.

16       Q.   What else contributed to that increase?

17       A.   I was looking to see in the report if we

18   defined what was in the fees and other income

19   bucket.

20       And I think --

21       THE WITNESS:  Steve was talking about

22   financing.

23       MR. STRAPP:  Yeah.

24       A.   I think Steve Mencarini, who you guys are

25   speaking to next week, is probably suited to answer

102

1    this particular --

2        BY MR. McDONALD:

3        Q.   All right.  Well, let's move on and maybe

4    we'll do more with him.

5        So for the -- let's go to the 2002 annual

6    report then, time frame.  Can you turn to -- and

7    2002, as I indicated earlier, my understanding is

8    from your expert, that's when he sets ups the

9    hypothetical negotiation between ePlus and Lawson for

10   a license agreement under the patents.

11       Okay?

12       It's 2002.

13       A.   That's what you had indicated.

14       Q.   Okay.  So if we turn to page 17 of the

15   annual report, page 13306.

16       A.   Okay.

17       Q.   This page describes ePlus's competition.

18       Correct?

19       A.   It's listing some of the ones that are in

20   here, sure.

21       Q.   Right.  And it's talking about competitors

22   for its businesses, including procurement software

23   and electronic commerce.

24       Right?

25       A.   Correct.

103

1        Q.   And that's the area that these patents

2    involve.

3        Correct?

4        A.   That's correct.

5        Q.   Lawson was not listed as one of the

6    competitors here.

7        Correct?

8        A.   No.  It's not meant to be an all-inclusive

9    list.  It states that.

10       Q.   Right.  But there are some competitors

11   listed by name here.

12       Right?

13       A.   There are some, yep.

14       Q.   How did ePlus decide which companies to

15   list by name here?

16       A.   Well, I think that, you know, going back

17   to 2001, you know, these are companies that maybe we

18   ran into more often than others at that point in

19   time.

20       Q.   About how many total competitors did ePlus

21   have in the procurement software and e-commerce

22   market in the 2002 time frame?

23       A.   I couldn't speculate.  There were --

24       Q.   Dozens?

25       A.   -- a lot, yeah.

104

1        Q.   A hundred?

2        A.   I don't know if it was quite a hundred,

3    but there were quite a bit.

4        MR. McDONALD:  Okay.  Why don't we go

5    ahead and take a break now.

6        THE WITNESS:  Okay.

7        THE VIDEOGRAPHER:  We're going off the

8    record.  This ends videotape number 2 in the

9    deposition of Kenneth Farber.  The time is now 12:17

10   PM.

11       (Whereupon, at 12:17 p.m., the deposition

12   in the above-entitled matter was recessed, to

13   reconvene at 1:10 p.m., this same day.)

14

15

16

17

18

19

20

21

22

23

24

25

Farber - 30(b)(6), Kenneth Gary  5/18/2010  12:00:00 PM

---

105

1     AFTERNOON SESSION

2          (1:10 p.m.)

3     Whereupon,

4          KENNETH GARY FARBER,

5     the witness testifying at the time of recess, having

6     been previously duly sworn, was further examined and

7     testified further as follows:

8          (Lawson Exhibit No. 66

9          was marked for

10         identification.)

11    THE VIDEOGRAPHER:  Good afternoon.  We're

12    now back on the record.

13         This is the beginning of videotape number

14    3 in the deposition of Kenneth Farber.  The time is

15    now 1:10 PM.  You may proceed.

16

17    EXAMINATION BY COUNSEL FOR DEFENDANT (RESUMED)

18    BY MR. McDONALD:

19    Q.   Mr. Farber, just picking up on a couple

20    things before the break, you've got before you now

21    what's been marked as exhibit 66.  It looks like it's

22    got the title, ProcureNet Inc. withdrawal of

23    registration statement on form S 1.

24         Do you see that in the middle of the page?

25    A.   Yes.

---

106

1     Q.   It's dated November 10, 2000?

2     A.   M-hm, yes.

3     Q.   Is this the formal withdrawal by

4     ProcureNet of its effort to have an initial public

5     offering in 2000?

6     A.   Yes.

7     Q.   Then can we return to the exhibit 57,

8     which is the software license agreement between

9     Fisher Scientific and ProcureNet?

10    A.   The last one.

11    Q.   That's the way it works.

12    A.   Okay.

13    Q.   Would you turn please to the page numbered

14    5 of that license agreement, which is also 700143.

15    A.   13 --

16    Q.   143.

17    A.   Oh, 143.  Okay.  Okay.

18    Q.   You see in there at the bottom of the

19    page, there's a section 7, fees, cost, and expenses?

20    A.   Yes.

21    Q.   And under 7.1, what fee did Fisher

22    Scientific pay to ProcureNet or Strategic Computer

23    Services for the license?

24    A.   This says -- let's see, consideration of

25    license granted, a thousand dollars.

---

107

1     Q.   So one thousand dollars for the license

2     that Fisher got; is that right?

3     A.   Yes.

4     Q.   Now, that amount was made as a paidup

5     royalty-free license, so that was the one and only

6     payment they had to make.

7          Right?

8     MR. STRAPP:  Objection, calls for

9     speculation.

10    A.   I'd have to look.

11    BY MR. McDONALD:

12    Q.   Could you turn to 2 pages earlier.

13    MR. STRAPP:  I'm going to object that this

14    line of questioning about this document is beyond the

15    scope of the topics.

16    MR. McDONALD:  The topics include

17    licenses.

18    MR. STRAPP:  The topics are about ePlus's

19    licenses.  This isn't ePlus.  This is a ProcureNet

20    and Fisher.  You're asking a corporate designee ePlus

21    questions about a company that's not ePlus.

22    MR. McDONALD:  Category 24 includes

23    efforts or attempts by made ePlus, ProcureNet, and/or

24    Fisher Scientific to license and/or sell the patents,

25    just to be clear on the scope here.

---

108

1     BY MR. McDONALD:

2     Q.   And I understand, Mr. Farber.  I'm just

3     asking you for whatever knowledge ePlus has such as

4     it is and all that, but this is certainly within the

5     topic.

6          Do you have paragraph 2.1 before you?

7     A.   Yes.

8     Q.   That is the paragraph entitled, grant of

9     license.

10         Correct?

11    A.   Yes.

12    Q.   Under that, you see where it says the

13    grant in line 3, it's a fully paidup royalty-free

14    nonexclusive and nontransferable license?

15    A.   Yes.

16    Q.   So is it your understanding just looking

17    at the document anyway as ePlus's spokesperson today

18    that the thousand-dollar payment set forth in section

19    7.1 entitled Fisher to a fully paidup royalty-free

20    license?

21    A.   Yes.  It doesn't appear out of the norm.

22    Q.   This morning, we were talking about that

23    one valuation document going back to the May 2001

24    acquisition.

25         Are you aware of any other documents that

---

109

1   are done for business purposes by ePlus or ProcureNet
2   apart from any litigation now that relate to efforts
3   to value the patents involved in this lawsuit?
4       A.   Not that I'm aware of.
5       Q.   Are you aware of any license agreements
6   related to the patents-in-suit other than licenses
7   entered with parties involved in litigation and other
8   than the ones we've been talking about today?
9       A.   No, I'm not.
10      Q.   Can you please pull back out the S 1
11  filing of ProcureNet, exhibit 63.
12      A.   Certainly.
13      Q.   And turn to page 448839, please.
14      A.   Okay.
15      Q.   That page has an exhibit index.
16          Correct?
17      A.   Yes.
18      Q.   Now, do you see an entry there, 10.10?
19      A.   Yes.
20      Q.   That one is, quote, patent license
21  agreement dated as of July 5, 2000, between
22  ProcureNet and Fisher, quote.
23          Correct?
24      A.   Yes.
25      Q.   Now, the agreement we looked at earlier

110

1   looks like it's actually that April 14th, '99,
2   agreement that's at 10.9 here, correct, exhibit 57 is
3   actually 10.9?
4       A.   Yes.
5       Q.   Are you aware of any efforts to find a
6   copy of the patent license agreement dated July 5,
7   2000, between ProcureNet and Fisher listed here as
8   10.10?
9       A.   I'm not -- I'm not -- am I aware of --
10      Q.   -- of efforts to find a copy of that
11  agreement?
12          Because it has not been produced to me in
13  this case.
14      A.   Oh, I see.  No, I'm not aware of specific
15  efforts.
16      Q.   Has anybody asked you for a copy?
17      A.   Not personally, no.
18      Q.   Okay.  I'm going to make the request and
19  obviously you'll consult with counsel later, but I'm
20  going to make the request right now on the record for
21  you to do whatever you can to find a copy of that
22  document.  I know both parties have gone to SEC
23  records and so on, weren't able to find it there, and
24  also not any other --
25          MR. STRAPP:  I'll represent on the record

111

1   that we've made an effort not -- we've spoken with
2   personnel at ePlus to try to determine if they have
3   this document in possession, custody, or control.  We
4   searched internal databases both at ePlus and our own
5   databases from previous litigations and have not been
6   able to find the document.
7           MR. McDONALD:  Have you contacted the
8   counsel on the IPO that's listed on the front here,
9   either Paul Hastings or Debevoise & Plimpton?
10          MR. STRAPP:  I'm not aware of that.  I'm
11  not aware yes or no.
12          MR. McDONALD:  Well, I think that's within
13  the scope or control of ePlus here to make that
14  inquiry of counsel, and sometimes lawyers keep things
15  for a while, so maybe you can get it that way.
16          Would you do that, Michael?
17          MR. STRAPP:  Sure.
18          MR. McDONALD:  Okay.  Thank you.
19          BY MR. McDONALD:
20      Q.   Do you as you sit here today have any
21  recollection of what the terms were of that July 5th,
22  2000, license agreement?
23      A.   No, I don't specifically, no.
24      Q.   Are you aware of any industry reports from
25  companies such as Gardner, Forrester, or Aberdeen

112

1   that talk about Lawson?
2       A.   Sure.
3       Q.   Are you aware of a report from 2002
4   regarding Lawson introducing a new version of its
5   e-procurement-related products?
6       A.   I couldn't tell you the date.  I mean, I
7   know that Lawson has -- I don't know the exact date
8   that they announced it.  I know there's been
9   subsequent announcements related to the procurement
10  offerings.
11      Q.   What is your understanding as to when
12  Lawson introduced its procurement-related systems?
13      A.   It was in the early 2000s, as I recall.
14      Q.   And what is your understanding of the
15  functionality of that system as it was introduced in
16  the early 2000s?
17      A.   Well, I didn't have access to detailed
18  information about the system other than perhaps with
19  what the announcement said or what others may have
20  reported on it or any press that may be available in
21  the public domain, but I wouldn't have access to the
22  system, you know, to do a detailed analysis at that
23  time I don't think.
24      Q.   Do any of these industry reports provide
25  any details as to what Lawson systems did?

113

1  A.  They may.  I just don't have recollection

2  back to 2002.  That was quite a while ago.

3  Q.  Do you have any understanding as to which

4  if any of these industry reports are being relied

5  upon by any of the experts testifying on behalf of

6  ePlus in this case that relate to Lawson systems?

7  A.  I don't have personal knowledge of that,

8  no.

9  Q.  Did anybody ask you about when you became

10  aware of any industry reports relating to Lawson in

11  the context of preparing these expert reports?

12  A.  No, not that I remember.

13  Q.  Has ePlus licensed any patents other than

14  the 3 patents involved in this suit to other

15  companies apart from litigation?

16  A.  Sure, sure.  Not that I recall or have

17  knowledge of.

18  Q.  Has ePlus taken licenses from any other

19  parties apart from litigation?

20  A.  As it relates to patents?

21  Q.  As it relates to patents, yes.

22  A.  Outside of litigation, again, I don't

23  believe so.

24  Q.  Were you involved in the settlement with

25  SciQuest?

114

1  A.  To some degree, yes.

2  Q.  Who was the primary negotiator from a

3  business or nonlawyer standpoint for ePlus regarding

4  the SciQuest agreement?

5  A.  Well, I was directly responsible for the

6  negotiation of the final agreement.

7  Q.  Was there -- did ePlus enter that

8  agreement with SciQuest voluntarily?

9  A.  Yes.

10  Q.  Was it your decision to enter that

11  agreement?

12  A.  Well, the agreement was something that was

13  in general terms agreed upon by our CEO along with

14  the CEO and one of the board members I believe from

15  SciQuest.  Did the decision makers at ePlus have all

16  Q.  Did the decision makers at ePlus have all

17  the information that they think they needed to make a

18  decision as to whether to enter that agreement with

19  SciQuest?

20  A.  I personally didn't believe we did, no.

21  Q.  Did somebody else at ePlus believe you

22  did?

23  A.  Believe that we had the necessary

24  information --

25  Q.  -- to enter an agreement with SciQuest to

115

1  resolve the patent claims.

2  A.  I think more appropriately stated, I think

3  that there was an agreement made, and we -- you know,

4  based on the terms that the principals of both

5  companies agreed to in terms of the dollar amounts,

6  you know, I then became engaged to finalize that in

7  the form of a settlement agreement, license agreement

8  if you will.

9  Q.  Well, I think my question related, though,

10  when I asked whether you had all the information at

11  ePlus that you think you needed to decide to enter

12  that agreement, I think you said you didn't think so,

13  but I was asking, did somebody else tell you to go ahead

14  enough information and basically tell you to go ahead

15  and make the deal?

16  A.  Well, I think our CEO believed he felt

17  comfortable with the conversation that he had with

18  SciQuest and asked me to go ahead and draw up the

19  paperwork for the deal.

20  Q.  So from the -- the CEO is Mr. Norton?

21  A.  That's correct.

22  Q.  From Mr. Norton's standpoint your

23  understanding it terms of what he communicated to you

24  was that he had gathered enough information that he

25  was ready to make that decision to enter the

116

1  agreement?

2  A.  I wouldn't say that he stated that he had

3  enough information.  He stated that, we're going to

4  settle for this amount, and I asked him, what about

5  the, you know, other elements of things we would

6  normally expect before entering into an agreement,

7  and he expressed that he agreed to a settlement with

8  them, so let's go ahead and move forward at this

9  juncture.  It was early in the process.

10  Q.  So you had some concerns about entering

11  into that agreement that early in the process?

12  A.  I stated some concerns about the dollar

13  amount, not knowing their financials in as much

14  detail as I had on others.

15  Q.  What did you not know about the financial

16  details for SciQuest?

17  A.  Any of them.

18  Q.  Did you get any revenue figures or

19  anything for SciQuest?

20  A.  No, I did not.

21  Q.  Did you have some estimates as to what

22  SciQuest's revenues were?

23  A.  No.

24  Q.  Did Mr. Norton indicate that he had had

25  conversations with SciQuest where he had gotten some

117

1    indication of the revenues?

2        A.   Not that I recall that.

3        Q.   Did you review any industry reports that

4    would be an indication of what SciQuest's revenues

5    were?

6        A.   No, not in preparation in connection with

7    the agreement.

8        Q.   Did you review any industry reports

9    outside of preparing the agreement that indicated

10   what SciQuest's revenues were?

11       A.   Well, I regularly read analysts' reports

12   or news items that come across my desk.  I don't know

13   that I saw anything specific that I can recall to the

14   revenue numbers on an annual basis.

15       Q.   During the negotiations with SciQuest, did

16   you make an effort to look through those industry

17   reports to see if you could find revenue information

18   as to SciQuest?

19       A.   No.

20       Q.   Why not?

21       A.   Because again it was very early in the

22   process.  We knew that we would be expending a

23   significant amount of dollars as it relates to the

24   case, and this was I think within the first month or

25   2 of when the litigation started, and we would not be

118

1    expending a significant amount of money and hadn't at

2    that point in time.

3            And like I said, the -- our CEO as well as

4    the CEO of SciQuest and a board member got together

5    on a golf course, came to terms, and I followed the

6    direction of our CEO.

7        Q.   Is SciQuest publicly traded or private?

8        A.   Today its private.

9        Q.   In the past, has it been public?

10       A.   It has been public in the past.

11       Q.   What did it go from public to private?

12       A.   I want to say within the last 10 years.

13       Q.   Did you look any of the information about

14   SciQuest's revenues or business based on information

15   available from when the company was public?

16       A.   Not that I recall.

17       Q.   Were you involved in the negotiations of

18   Verian?

19       A.   I was.

20       Q.   Did ePlus voluntarily enter into an

21   agreement with Verian to resolve the patent issues?

22       A.   Yes.

23       Q.   Did ePlus have all the information it felt

24   it needed to have in order to make that decision to

25   enter an agreement with Verian?

119

1        A.   Yes.

2        Q.   Were you also involved with the

3    negotiations with Perfect Commerce?

4        A.   Yes.

5        Q.   Did ePlus voluntarily enter that

6    agreement?

7        A.   Yes, we did.

8        Q.   Did ePlus have all the information it

9    thought it needed to have in order to make that

10   decision to reach an agreement with Perfect Commerce

11   about the patent issues?

12       A.   Yes, we did.

13       Q.   For Verian and Perfect Commerce, did you

14   have information about their revenues?

15       A.   Yes, I did.

16           MR. McDONALD:  Would you mark this as the

17   next exhibit, please.

18           (Lawson Exhibit No. 67

19           was marked for

20           identification.)

21       BY MR. McDONALD:

22       Q.   Mr. Farber, do you recognize what has been

23   marked as exhibit 67?

24       A.   Not particularly.

25       Q.   Do you ever -- or do you have some

120

1    familiarity with the materials available on ePlus's

2    Website regarding its products and services?

3        A.   Sure, yes.

4        Q.   Do you have some role in approving those

5    or supervising the people who approve the materials

6    on the Website?

7        A.   I supervise the people that prepare the

8    information.  And then it goes through an internal

9    approval process before being posted.

10       Q.   What is your understanding as to what

11   exhibit 67 relates to?

12       A.   It looks like it would be something that

13   came from our Website under the section of content

14   management.  And it looks as though it's referring to

15   a tool that we have called, Content Plus Advanced.

16       Q.   What is Content Plus Advanced?

17       A.   Content Plus Advanced is a software

18   product that's sold as an enterprise system, which

19   means that a client would install that behind their

20   firewall to manage and maintain advanced levels of

21   content.

22       Q.   When you say, content, can you give me an

23   idea what sort of content you're talking about?

24       A.   Well, it could be content for

25   commerce-related engines.  It could be content for

121

1  inventory management systems.  It could be content
2  for legacy inventory management systems.  It could be
3  content for databases that contain maintenance,
4  repair, and operations data.  So that's kind of
5  listed on the left side in terms of the data sources
6  here on this diagram, is what I'm referring to.
7      Q.   Oh, under the heading, data sources?
8      A.   That's correct.
9      Q.   Okay.  So when you mentioned commerce,
10  would that be the ones that correspond to supplier
11  catalogs?
12     A.   And buy-side applications, which is the
13  last one.
14     Q.   Can you explain in a little more detail
15  what buy-side applications are?
16     A.   At a very high level, buy-side application
17  is an application where any company is using their
18  database to look to determine who they're doing
19  business with, who their contracts are with, so it
20  could be with a procurement system or it could just
21  be a database that's connected to other applications
22  that they use to search their repository of suppliers
23  and what SKUs they purchase from those suppliers?
24     Q.   Okay.  So buy-side applications that could
25  include information about individual products to

122

1  purchase?
2      A.   It could.
3      Q.   It also could include contract information
4  from suppliers?
5      A.   It could, sure.
6      Q.   So how would the item information in the
7  buy-side applications be different from the item
8  information in supplier catalogs?
9      A.   Well, they don't have to necessarily have
10  item-level information related to them.  The
11  supplier -- the data sources in the supplier catalog
12  usually have item-level information associated with
13  them.
14     Q.   So the buy-side applications may or may
15  not have item information?
16     A.   That's correct.
17     Q.   Supplier catalogs are pretty much always
18  going to have item information?
19     A.   I don't want to say, always.  I mean,
20  there may be some clients that elect to just their
21  suppliers as a -- what's referred to as a vendor
22  master.  They may have 12,000 suppliers they deal
23  with and they want to say supplier A is capable
24  of selling us commodities, you know, B, C, and D, but
25  not necessarily in a list by part number.

123

1      Q.   So if the customer wants to have a list of
2  vendors with this particular selected items in there,
3  would that be considered buy-side applications,
4  supplier catalogs, or both?
5      A.   It could be one, the other, or both
6  actually.
7      Q.   Either or both?
8      A.   Yes, that's correct.
9      Q.   All right.  The legacy systems, does that
10  involve commerce-related data, or is that something
11  else?
12     A.   It -- legacy-related systems could be
13  accounting systems.  They could be maintenance,
14  repair, and operation systems.  They could be old
15  inventory systems, very old ERP systems.  They could
16  be just databases with a bunch of old parts and SKUs,
17  S-K-U.
18     Q.   You said it could be old inventory or very
19  old ERP.  I was curious why you called ERP very old.
20     A.   Well, legacy -- no, not -- ERP could be
21  new or old.  When I say, legacy, though, legacy tends
22  to refer to something that's old or that's been
23  sitting in the enterprise for a long time.
24     Q.   Okay.  So there's no reason -- ERP could
25  be very old or old or not so old?

124

1      A.   And there's new ERP systems too, so --
2      Q.   ERP stands for -- is it enterprise
3  resource planning?
4      A.   Enterprise resource planning, yeah.
5      Q.   And then another item listed under data
6  sources here on exhibit 67, I think the only one we
7  have not talked about in detail is called, enterprise
8  applications.
9      A.   M-hm.
10     Q.   Can you explain what that is?
11     A.   Well, again, that could be a multitude of
12  systems that somebody has either internally developed
13  to keep information in, it could be as we refer to
14  the newer ERP systems, the newer accounting systems.
15     Q.   So this Content Plus Advanced product,
16  that provides a way to manage and maintain data that
17  falls under this list of data sources?
18     A.   That's correct.  It does other things that
19  aren't listed here.
20     Q.   Is that technology a technology you
21  considered to be covered by the patents involved in
22  this lawsuit or not?
23     A.   There is -- I think the -- I don't know
24  what kind of conclusion to make on that question.  I
25  think there's 3 patents-in-suit.

125

1    Q.   That's right.  The electronic sourcing
2    system, I think is --
3    A.   Right.
4    Q.   -- the title of all of them more or less.
5        MR. STRAPP:  Let me just object before you
6    answer as beyond the scope of the topics at issue
7    today.
8        MR. McDONALD:  We've got -- category 31 is
9    content and purpose of any advertising or marketing
10   materials --
11       MR. STRAPP:  Right.
12       MR. McDONALD:  -- created by ePlus
13   relating to any ePlus electronic procurement product
14   or service.  I think it falls within that.
15       MR. STRAPP:  Okay.  Well, I'll make the
16   objection.
17   A.   It's one of the tools that we use in our
18   back-office just by example to provide services to
19   some our customers when we need to use it.
20       BY MR. McDONALD:
21   Q.   You know, you see here on exhibit 67 up
22   near the top, there's some boldface language where it
23   says, quote:  Content Plus Advanced, a patented
24   comprehensive system for the management, syndication,
25   and analysis of all product content, quote.

126

1        Do you see that?
2    A.   I do.
3    Q.   I'm trying to get an understanding, when
4    there's a reference there to patented, does that
5    refer to the patents, the 3 patents involved in this
6    case or some other patents?
7    A.   No.  There's other patents associated with
8    this tool that are referred to as the information
9    translation protocol patents.
10   Q.   All right.  So it's not the patents
11   involved in this suit, then, that are under this
12   Content Plus Advanced product line?
13   A.   The patents that are associated with this
14   product are not within the initial complaint of the
15   '516, '172, and the other one.
16   Q.   You say, the initial complaint.
17       Does that suggest we have a next chapter
18   to this story?
19   A.   No, I hope not.  I certainly hope not.
20   Q.   All right.
21   A.   Bad choice of words there, isn't it?
22   Wow.  That's why I'm not a lawyer.
23   Q.   If we can go back to exhibit 67 for just a
24   moment.
25   A.   Sure.

127

1    Q.   In the second paragraph under the
2    boldface, it refers to sell-side order entry systems.
3        Do you see that reference?
4    A.   Yes.
5    Q.   We talked before about buy-side
6    application.  I don't think we talked about
7    sell-side.
8        Can you tell me what a sell-side order
9    entry system is?
10   A.   Sure.  So there are companies that may
11   want to sell their goods and services, so they can
12   use this tool for that as well.
13   Q.   All right.  Then it refers to,
14   customer-facing catalogs.
15       Do you see that?
16   A.   Yes, I do.
17   Q.   What are customer-facing catalogs?
18   A.   Those catalogs that are built that a
19   consumer a customer -- that you would expose to a
20   consumer or a customer.
21   Q.   So this would again be from a sell side
22   that somebody is selling products to a customer so
23   they want to generate content that will be facing the
24   customers?
25   A.   Right.  It could also be inferred that a

128

1    customer could be within a very large corporation,
2    they have multiple departments and multiple
3    subsidiaries, and those are their customers, because
4    a lot of larger companies have what they called
5    service departments that service other operating
6    units, so they may consider those operating units
7    their customers as well.
8    Q.   Okay.  It refers to "parametrically
9    searchable content" in the next line.
10       Do you see that?
11   A.   Yes.
12   Q.   What is parametrically searchable content?
13   A.   It's an advanced method of searching based
14   on the attributes of an item.
15   Q.   Did the patents-in-suit involve
16   parametrically searchable content or not?
17   A.   I don't believe the patents-in-suit are
18   related to parametric searching.  In other words, the
19   patents aren't for parametric searching.
20   Q.   Can you give me some example of what a
21   parametric search might look like?
22       I'm having a little trouble getting an
23   understanding of what that means.
24   A.   Parametric searching is a means by which
25   you may ask the system to respond -- to bring back to

Farber - 30(b)(6), Kenneth Gary  5/18/2010  12:00:00 PM

129

1   you all items that are made by Philips and that are
2   light bulbs and that are all 60-watt, and if you
3   think of a light bulb, you'll have a lot of
4   attributes associated with a light bulb, the
5   filament, the length of the -- you know, how long the
6   filament will last, is it a 3-hour light bulb or is
7   it a 500-hour light bulb.
8       But when somebody goes into parametric
9   searching, they actually drill and query the system
10  to find very precise information, I'm looking for
11  Philips light bulb, I'm looking for something that's
12  going to last 500 hours that can operate in an
13  environment that's exposed to let's say a lot of
14  water or humidity or something of that nature.  And
15  there's a dropdown that has all the attributes
16  associated with a light bulb or whatever one can
17  think about a light bulb, and they would narrow their
18  field if you will to get specifically that item.
19      Q.   So for example, if the 500 hours of life
20  you referred to, could you do a search with
21  parametric searching for all light bulbs that lasted
22  at least 500 hours that would include the ones that
23  last a thousand hours or more?
24      A.   No, no.  You're specifically saying to the
25  system in a dropdown, there may be something that

130

1   says, hours of life, and it will say, 50, 100, 500,
2   600, a thousand, et cetera.  All right.
3       Q.   All right.
4       MR. McDONALD:  Mark this as the next
5   exhibit, please.
6           (Lawson Exhibit No. 68
7           Was marked for
8           identification.)
9       BY MR. McDONALD:
10      Q.   Mr. Farber, you've been handed what was
11  marked exhibit 68.
12      Do you recognize this document?
13      A.   Again, it looks like something that had
14  come from our Website, and another component called
15  Catalog Plus.
16      Q.   So you've got a picture here in exhibit 68
17  under the heading, product information management.
18      Right?
19      A.   Yes.
20      Q.   It's got 3 circles and then one more big
21  circle.
22      Right?
23      A.   Correct.
24      Q.   The big circle has got the label, Catalog
25  Plus.

131

1       Right?
2       A.   Correct.
3       Q.   And then on the left, there's an arrow
4   with the Content Plus Advanced on it.
5       Right?
6       A.   Yes.
7       Q.   And Content Plus Advanced, that's what we
8   were just talking about, exhibit 67.
9       Right?
10      A.   Correct.
11      Q.   Now, of these circles, do any of them or
12  any combination of them use the technology that's
13  involved in the patents-in-suit?
14      A.   I think that -- well, the Catalog Plus or
15  the catalog engine is what sits in the procurement
16  product, so you're actually searching the catalog to
17  find items from one or more suppliers.
18      Q.   Okay.  So does that mean that the big
19  circle Catalog Plus -- is that where you would find
20  where in the ePlus system it uses the patented
21  technology that's involved in this lawsuit?
22      A.   Yeah.  I believe that it's the catalog
23  that you're searching.  Searching is one of the
24  components of the claim, so the catalog would be a
25  component of that.

132

1       Q.   So can you explain to me what's being
2   depicted in this picture with the circles and the
3   arrows?
4       A.   I think this is one of the things that we
5   provide to a customer.  We're saying that there's a
6   lot of different ways that one can create and
7   populate a catalog.  You know, it could be done
8   through our Content Plus Advanced solution, which
9   puts the tool in the hands of our customers.  It
10  could be done as a hosted content management
11  solution, supplier portal, which we can manage or a
12  customer can manage on their own to load data into
13  the catalog.  Or it could be, you know, through
14  services that we provide to do it on behalf of our
15  customers.
16      So those are the 3 methods by which we're
17  describing at a very high level how data can be
18  populated into a catalog.
19      Q.   So we've got the 3 arrows coming into
20  Catalog Plus here, that would indicate the flow of
21  information about catalog items, all the options
22  there?
23      A.   It would -- those are the 3 ways by which
24  catalog, slash, supplier information and SKUs are
25  loaded into system.

133

1  Q.  So on the left with the Content Plus
2  Advanced arrow coming from the circle enterprise
3  content management, that's where one of your customer
4  would buy the Content Plus Advanced system and in
5  effect create their own content to load up into
6  Catalog Plus?
7  A.  That's one of the ways that Content Plus
8  Advanced can be used, yes.
9  Q.  Okay.  Are there other ways Content Plus
10  Advanced can be used to create catalog information
11  for the Catalog Plus system?
12  A.  No.  Content Plus Advanced can be used for
13  other means other than creating catalogs.
14  Q.  Okay.  Right.  Then the upper middle
15  circle is, hosted content management, with an arrow
16  saying, supplier portal.
17  A.  Yes.
18  Q.  I think -- just trying match that up to
19  the options that you've said earlier.
20      Can you tell me which of the options is
21  being depicted there in terms of how you get catalog
22  information into the Catalog Plus system?
23  A.  What do you mean, which of the options?
24  Q.  Well, you talked about, you know, the
25  customer can do it themselves or ePlus can do it, et

134

1  cetera.  I can't remember what exactly what all --
2  A.  Again the customer can completely do this
3  themself or we could do it for them, or it could be a
4  combination.  We provide some services.  They do some
5  of the work themselves.
6  Q.  This term supplier portal, it kind of
7  sounds to me like that's maybe some routing to or
8  from an actual third-party supplier?
9      Is that right, or not?
10  A.  We call it the supplier portal.  I mean,
11  we're dealing with supplier information, so it's a
12  portal to deal with that information.
13  Q.  Does this picture show any -- does this --
14  I'll withdraw that.
15      In exhibit 68 here, does this picture
16  depict in any part of it an option where customers
17  can punch out onto the Internet and find catalogs of
18  retailers or third-party suppliers?
19  A.  No.  That's more as it relates to
20  information that we have in I think more advanced
21  documentation about Catalog Plus and Procure Plus,
22  not on this particular.  This is a very high-level
23  Web page about taking information in from suppliers
24  and putting it into a resident catalog.  It's not
25  intended to talk about external catalogs.

135

1  Q.  Okay.  So that hosted content management,
2  is that an option where customers can hire ePlus to
3  have servers, computers, data storage to host item
4  information, catalog information?
5  A.  Yeah.  It's available to them if they want
6  us to host the information, or they can have their
7  catalog sitting, you know, within their premise.
8  Q.  Do you have a sense for generally what
9  percentage of ePlus's customers that use the Catalog
10  Plus system will ask or have asked ePlus to host the
11  data as opposed to hosting it themselves?
12  A.  I think -- I guess -- let me just make
13  sure I understand the question:  How many customers
14  are hosting their data versus not.
15  Q.  Versus asking ePlus to host the data for
16  them.
17  A.  Right.
18  Q.  As a percentage ballpark.
19  A.  Today it's probably -- you know, I'm
20  speculating, but I would say approximately 60 percent
21  have asked of late to have their data hosted.  The
22  majority of them are managing that data themselves.
23  And then the remainder, again, would be behind their
24  firewall within their data centers.
25  Q.  So within this circle of hosted content

136

1  management, you're saying that's about 60 percent of
2  your customers would be in that area?
3  A.  I think so.  I'm speculating, but think
4  that's probably fair.
5  Q.  And of that 60 percent, more than half of
6  the customer does their own hosting?
7  A.  Of the 60 percent?
8      The majority of them are -- I'm sorry.
9      Of the 60 percent you're asking about?
10      When you say, do their own hosting, I
11  didn't understand the question.
12  Q.  I thought you divided the hosted content
13  management into 2 categories, and if I'm wrong,
14  correct me, but I thought either a customer could do
15  their own hosting or ePlus could do the hosting for
16  them.
17  A.  Correct.
18  Q.  So that's what I'm talking about.
19  A.  Oh, 60 percent of the customers we're
20  hosting their data.
21  Q.  ePlus is hosting their data?
22  A.  Correct.  That's where I was getting
23  confused with the question.
24  Q.  I'm not sure which of us was.
25  A.  That's right.  And then the remaining are

137

1  themselves.
2      Q.   Okay.  And then with respect to the ePlus
3  content services, can you explain what that covers,
4  the circle on the right in the drawing?
5      A.   Sure, sure.  So a lot of times, there's
6  companies that have -- I shouldn't say, a lot -- on a
7  number of occasions, there are companies that have
8  either catalogs that are connected to other systems
9  like ERP systems as an example that may be doing
10  inventory management, or they may have our system in
11  place and what they ask of us is to do the services
12  for them, interact with their suppliers, manage their
13  content, instead of them doing it, translating it
14  into different languages if they have an
15  international company -- you know, customers.
16          So we provide, you know, ad hoc services
17  when customers would ask us to do that for them.
18      Q.   Approximately what percentage of ePlus's
19  customers that use the Catalog Plus system hire ePlus
20  to provide services of the type you just described?
21      A.   Very small amount.
22      Q.   Less than 10 percent?
23      A.   I would think so.
24      Q.   So about 60 percent use the -- well, I
25  don't want to be confused again here.

138

1          With respect to the whole pie of your
2  customers that use Catalog Plus, less than 10 percent
3  use ePlus content services.  About what percentage
4  would use the hosted content management that's
5  represented here?
6      A.   It was about 60 percent.
7      Q.   Okay.  That is right.  I don't want to get
8  it wrong again.  And then about what percentage use
9  enterprise content management of those that your use
10  Catalog Plus system?
11      A.   I would think that is again less than 10
12  percent.
13      Q.   Are the remainder customers that use
14  Catalog Plus but don't use any of those 3 add-on
15  services or products?
16      A.   Correct.
17      Q.   So you can use Catalog Plus without using
18  any of those 3 things shown in exhibit 68?
19      A.   That's correct.
20      Q.   So about what percentage of the Catalog
21  Plus customers do not use enterprise content
22  management or hosted content management or ePlus
23  content services?
24      A.   What percentage of the clients don't use
25  any of these?

139

1      Q.   Right, the ones that have Catalog Plus.
2      A.   What percentage of clients that use
3  Catalog Plus don't use enterprise content hosted or
4  services?
5      Q.   Right.
6      A.   Again, a very small percent.  I'd have to
7  actually go back and look.  I don't know that I have
8  an answer to that.
9      Q.   I was hoping everything was going to add
10  up to a hundred percent more or less.
11      A.   Right.
12      Q.   So you've got about 60 percent with the
13  hosted content management --
14      A.   Right.
15      Q.   -- less than 10 percent each on the other
16  2 --
17      A.   Right.
18      Q.   -- enterprise content management, and
19  ePlus content services.
20          Right?
21      A.   Yeah.  There's a tool that's not
22  represented here called the CMT, which is a content
23  maintenance tool, so that makes up the other
24  difference, the other small percentage, which was an
25  old way that we used to provide to customers to

140

1  upload their data into Catalog Plus.
2      Q.   Okay.  So less than 10 percent would just
3  have Catalog Plus with none of those 4 add-ons?
4      A.   I think that's accurate.
5      Q.   All right.  So about what percentage have
6  the content maintenance tool?
7      A.   Whatever the remaining number is.  You got
8  60 percent, 70, 80, it's going to be less -- 20 or
9  less percent.
10      Q.   Does the content maintenance tool have a
11  name associated with it?
12      A.   Content maintenance tool.  It's actually
13  called the Content Plus Content Maintenance Tool.
14      Q.   Okay.  Is there a reason why that one is
15  not represented in this particular Web page, exhibit
16  68?
17      A.   We really don't promote it anymore.  It
18  was an older tool that was there that as we were
19  building out some of these other tools, it was a way
20  to load content.
21      Q.   So is it true that the name Content Plus
22  Advanced, that kind of indicated that that was the
23  next generation product after just Content Plus?
24      A.   No.  It's marketing people thinking that
25  there's logic to the names they put on things.

141

1  Q.  Does the Content Plus content maintenance
2  tool -- does that one use the technology that's the
3  subject of the 3 patents in this suit?
4  A.  Well, it --
5  MR. STRAPP:  Go ahead.
6  A.  I was just going to say that it loads the
7  catalog.  It's a utility to just load the catalog
8  data.
9  BY MR. McDONALD:
10  Q.  When did that Content Plus utility get
11  developed?
12  A.  Oh, gosh, 8, 9 years ago or more.  I don't
13  know.
14  Q.  It was developed after ePlus had acquired
15  ProcureNet or not?
16  A.  No, I think it might have been before, so
17  it was a little longer.
18  Q.  Was it developed at ProcureNet or at
19  ePlus?
20  A.  I think it was at ProcureNet.
21  Q.  Do you know whether or not Lawson provides
22  services that are competitive with the ePlus content
23  services?
24  MR. STRAPP:  Objection, beyond the scope.
25  A.  I have -- when you say, services, I think

142

1  you need to define that so I can make sure I'm
2  accurately giving you the correct answer.
3  BY MR. McDONALD:
4  Q.  Well, you described for me earlier what is
5  within the ePlus content services area.
6  A.  Yes.
7  Q.  I think you gave some examples like
8  interacting with suppliers, translation services,
9  managing content, I believe, and maybe some other
10  things I don't remember.
11  Do you have an understanding one way or
12  the other whether Lawson provides similar services to
13  that, to its customers?
14  A.  That would just be speculation.  I don't
15  know factually what they do in that area.
16  Q.  All right.  With respect to hosted content
17  management, for those -- you said 60 percent of the
18  customers that have hosted content management ask
19  ePlus to do the hosting for them.
20  Correct?
21  A.  Just hosting it rather than them putting
22  it in their data center.
23  Q.  So it's actually hosted on ePlus-owned
24  memory storage?
25  A.  Yeah.  It's actually in a Verizon center

143

1  in Manassas, Virginia, so it's just a bunch of
2  servers and storage, and the application is put up
3  there, and the customers use it.  It's their license
4  to it.
5  Q.  Do you know whether or not Lawson offers
6  hosted content management like that?
7  A.  I don't know how they do that.
8  Q.  And the enterprise content management was
9  that Content Plus Advanced product line.
10  Correct?
11  A.  Correct.
12  Q.  Do you know whether or not Lawson offers
13  some products or services that are competitive
14  specifically with the Content Plus Advanced?
15  A.  Again, I would be speculating how Lawson
16  creates their catalogs.  These are our methods to
17  create catalogs.  I don't know that Lawson, you
18  know -- how they're doing it, what utilities they're
19  putting in the hand of their clients or services or
20  what they're doing to create their catalogs.
21  MR. McDONALD:  Mark that as the next
22  exhibit, please.
23  (Lawson Exhibit No. 69
24  was marked for
25  identification.)

144

1  BY MR. McDONALD:
2  Q.  Mr. Farber, you have exhibit 69 before
3  you.
4  Do you recognize this document?
5  A.  It looks again like it came off the Web
6  under the category of product information management,
7  and it's in looking to describe what differentiates
8  our offerings.
9  Q.  Within that category of product
10  information management, I don't know if we actually
11  talked about that, but I guess it's kind of the
12  heading on this exhibit 68 that we were just talking
13  about.
14  Can you tell me generally what product
15  information management means?
16  A.  It's another high-level term for catalog
17  information, product information.  You notice at the
18  top level of this page where it says, home, that it
19  says, supply management?
20  Q.  M-hm.
21  A.  Again, that's a very generic category, so
22  supply management has a number of disciplines.  One
23  of them we refer to as product information
24  management.  Supply management could also mean -- you
25  know, have an element called, procurement.  It could

145

1  be demand forecasting, so we break it down that way,
2  you know, to get more specific about offerings.
3      Q.  So when exhibit 69 talks about
4  differentiators, what's your understanding as to what
5  that means?
6      A.  Differentiators?
7      Q.  Yes.
8      A.  You know, it really is meant that when
9  somebody is looking at ePlus compared to others, what
10  benefits do we think that you're going to derive by
11  working with ePlus.
12      Q.  And are these benefits that ePlus doesn't
13  think are available from its competitors?
14      A.  No, I wouldn't say that.
15      Q.  When I see the term differentiators, it
16  sounds like, you know, this is how we're different.
17      Is that not how to read that?
18      A.  I think when you talk about
19  differentiators, there's a lot of things that go into
20  it.  You can't just look at one item, one sentence
21  and take everything literally and that's going to be
22  that I'm different than you.
23      You take every -- the sum of the parts and
24  say, okay, this company, have they been doing it
25  longer than anything else, are their solutions and

146

1  people and services adaptive to me as a business, is
2  their technology adaptive to my business, how quickly
3  can they do this for me.  There's a lot of different
4  elements that create differentiators.
5      Q.  What do you think is ePlus's primary
6  differentiator with respect to its catalog-related
7  software systems?
8      A.  What do I think of the primary
9  differentiators?
10      Q.  Yes.
11      A.  I think that there's a multitude of
12  solutions that we offer to clients in the way that
13  they can manage their data.  I also think that
14  experience is a differentiator, and then of course we
15  have some of our own technology when we're doing the
16  work, but that's, you know -- that falls into our
17  experience.  When the clients are doing it
18  themselves, they're not necessarily exposed to that
19  technology.
20      Q.  Under the first differentiator,
21  comprehensive offering, do you have an understanding
22  of whether or not Lawson offers the same
23  functionality in any suite of its products as are
24  described here in your product information management
25  suite?

147

1      MR. STRAPP:  Objection, calls for
2  speculation, beyond the scope.
3      A.  I think as it relates to content
4  management, they may not call it the same things, but
5  I think that there are tools that are provided by
6  Lawson to their customers to be able to load content
7  or catalog data.
8      BY MR. McDONALD:
9      Q.  And at the end of that paragraph, it
10  mentions content services where customers outsource
11  product information management to ePlus.
12      Do you see that?
13      A.  I do.
14      Q.  Do you know whether or not Lawson provides
15  such content services to its customers?
16      A.  I wouldn't have that knowledge.
17      Q.  There's a reference to a repository of
18  clean data here.
19      Do you see that?
20      A.  I do.
21      Q.  What is clean data?
22      A.  Well, it's data that's already gone
23  through -- not to be redundant -- the cleansing
24  process, you know, so that it's legible, it's
25  organized, and available.

148

1      Q.  You know whether or not -- well, does
2  ePlus provide services which clean data for catalogs?
3      A.  That is part of our services.
4      Q.  Do you know whether or not Lawson offers
5  those services?
6      A.  About providing a repository of clean
7  data?
8      Q.  I guess -- well, you could do 2 things,
9  either be a repository, which I assume is a storage
10  location for clean data, or actually do the cleaning
11  of the data itself.
12      A.  Right.  So there's a couple ways that as
13  you mentioned that one could go about it.  So you can
14  put the tools in the hands of your customers to do
15  their own bringing in of the data to create their
16  catalogs.
17      And it's my belief that ePlus has that and
18  Lawson, you know, both provide that solution.  Then
19  you could have a repository of information, which I
20  believe is the second part of your question, that
21  customers can have access to -- potentially to use,
22  and again I believe ePlus has that information and I
23  believe Lawson has that information available to
24  their clients specifically in health care.
25      Q.  They have a repository of clean data for

Farber - 30(b)(6), Kenneth Gary  5/18/2010  12:00:00 PM

149

1  health care?
2      A.  They have a repository of information
3  through partnerships that are available to customers.
4      Q.  What partnerships are you aware of that
5  Lawson has in this area?
6      A.  I think the ones that I've seen
7  publicized -- there may be others -- a relation with
8  SciQuest that has a very extensive catalog of clean
9  data for health care.  I think another one is GXH or
10  GHX.  I may be misrepresenting the name probably, but
11  again, another area of health care repository.
12          So there's a lot of different ways and
13  forms that one could be provided through relationship
14  or through giving the tools to the customers to
15  create that information, whether or not you're doing
16  the services for it or not is not material.
17      Q.  Under the third point here on the
18  differentiators, page -- exhibit 69, flexibility is
19  the heading.
20          Do you see that one?
21      A.  Yes.
22      Q.  First sentence:  We create aggregated
23  supplier catalogs using either buyer or supplier
24  data.
25          Do you see that?

150

1      A.  Okay, yes.
2      Q.  Do you know whether or not Lawson does the
3  same thing or not?
4      A.  I don't know.
5      Q.  We can also augment this data with our own
6  product databases.
7          Do you see that next sentence?
8      A.  I do.
9      Q.  Do you know whether or not Lawson provides
10  that as well?
11      A.  I think they're augmenting what a client
12  has through relationships that they have struck with
13  other partners.
14      Q.  That would be the SciQuest and the GHX
15  type of partnerships you're talking about?
16      A.  As an example.
17      Q.  Do you think they have other partnerships
18  like those?
19      A.  They may or may not.  I don't know.
20      Q.  The next point, scaleability.  It says,
21  ePlus has processed millions of items.
22          Do you know whether or not Lawson has
23  processed millions of items?
24      A.  I don't know.  I mean, we're not dealing
25  apples and apples.  This is specifically talking to

151

1  services that we are providing that don't necessarily
2  have anything to do with our litigation or the
3  patents-in-suit.  This is a separate service offering
4  of ePlus.  It may or may not have anything to do
5  whatsoever with this litigation.
6      Q.  All right.  So it may not be catalogs or
7  products even?
8      A.  Exactly.
9      Q.  So when it says, ePlus has processed
10  millions of items, what are items?
11      A.  Items could be vendor records, accounting
12  records.  It could be any form of data.
13      Q.  There's a reference there to comprehensive
14  software technology that supports more than 100
15  production sites every day.
16          Do you see that?
17      A.  No.
18      Q.  Scaleability.
19      A.  Okay.
20      Q.  The second and third lines of that?
21      A.  Okay.  Sure, sure.
22      Q.  What are these more than 100 production
23  sites?
24          What are those?
25      A.  Those are -- when they talk about

152

1  production sites, they're talking about instances of
2  the application, the procurement application or other
3  applications that we provide to customers who are
4  using the tools.  That could be also for their
5  back-office.  They may have their ERP system
6  connected to, you know, one of our systems that
7  they've used our data for, so --
8      Q.  So are production sites customer sites?
9      A.  You could refer to that I guess, you know,
10  make an assumption there on that.
11      Q.  Approximately how many current customers
12  does ePlus have with respect to its catalog products?
13      A.  Well, there's probably just under a
14  hundred in one area and 300 or so in another area of
15  business that we do.
16      Q.  What are the 2 areas that you're talking
17  about?
18      A.  Well, we have one area that's our
19  procurement solution.
20      Q.  Is that the 100 or the 300?
21      A.  Well, it's part of the 100.
22      Q.  Okay.
23      A.  There's another component where people
24  again are just licensing our catalogs and have
25  nothing to do with procurement.

153

1        Right?
2        They're just licensing their tools for
3    their own use and their own facility for whatever
4    data they want to use it for.  That's part of the
5    hundred.
6        The other, you know, 300 or so are those
7    that have catalogs connected that we provide for our
8    IT business that have -- it's catalogs prepopulated
9    with about 500,000 IT items where people are actually
10   doing the purchasing of IT equipment through ePlus.
11       Q.   When you say, they purchase through ePlus,
12   what is ePlus's role in purchasing for those
13   customers in that group of 300?
14       A.   We do the fulfillment of what they're
15   purchasing.
16       Q.   So you actually will place the orders for
17   your customers?
18       A.   That's correct.  They select it off the
19   catalog, goes into our systems, and et cetera.
20       Q.   Do you know whether or not Lawson provides
21   fulfillment services like that?
22       A.   I have -- I don't believe Lawson is a VAR,
23   value-added reseller.
24       Q.   So this goes to the -- kind of the other
25   side of the ePlus business from the software where

154

1    you're a value-added reseller of equipment?
2        A.   Correct.
3        Q.   So the technology that uses the patents
4    involved in this suit, what brand names does that go
5    by at ePlus?
6        A.   What brand names --
7        Q.   Right.
8        A.   -- do the --
9        Q.   Is it Procure Plus?
10       Does that use the technology involved in
11   the lawsuit?
12       A.   Yeah.
13       MR. STRAPP:  And I'm going to object as
14   beyond the scope of the deposition.
15       Go ahead.
16       A.   I'm suspecting that it's probably the
17   procurement -- the Procure Plus application that
18   we've been referring to, and our catalog tool.
19       BY MR. McDONALD:
20       Q.   Your Catalog Plus or something else?
21       A.   Well, the repository, the catalog that you
22   search from.
23       Q.   Is that called Catalog Plus?
24       A.   Yeah.
25       Q.   I'm trying to just get a noun here.

155

1        A.   Yes.
2        Q.   So you have that group of 100 that had the
3    procurement solutions.
4        Are those about a hundred that use Procure
5    Plus?
6        A.   Yeah.
7        Q.   Okay.
8        MR. McDONALD:  Why don't we take a little
9    break at this point.
10       THE WITNESS:  Sure.
11       THE VIDEOGRAPHER:  We're going off the
12   record.  This is the end of videotape number 3.  The
13   time is now 2:13 PM.
14       (Recess.)
15       THE VIDEOGRAPHER:  Going back on the
16   record.
17       This is the beginning of videotape number
18   4 in the deposition of Kenneth Farber.  The time is
19   now 2:30 PM.  You may proceed.
20       BY MR. McDONALD:
21       Q.   Mr. Farber, did you talk at all to the
22   damages expert for ePlus, Mr. Mangum, about the
23   license agreement with SAP?
24       A.   I may have.
25       Q.   Do you remember one way or the other?

156

1        A.   Actually, I don't.
2        Q.   Did you have any discussions with them
3    regarding the continued use by SAP of the infringing
4    technology after you settled with SAP?
5        A.   I think if I recall properly, he did ask
6    me some elements of the agreement, the settlement
7    agreement and the licensing of the patents.
8        Q.   Was it your understanding that after SAP
9    and ePlus entered their settlement with SAP getting a
10   license that SAP continued to use the ePlus patented
11   technology on its products?
12       A.   After they entered into a license
13   agreement, they were granted a license to continue to
14   use those solutions.
15       Q.   That was one of the enticements for SAP to
16   enter the agreement, right, is that that they could
17   continue to use the technology?
18       A.   I would believe so, certainly.
19       Q.   Is it your understanding that SAP has
20   continued to keep selling products similar to the
21   products that were at issue in the lawsuit?
22       A.   Yes.
23       MR. STRAPP:  Objection, calls for
24   speculation.
25       A.   Yes, I believe so.

157

1      BY MR. McDONALD:
2          Q.   What's the basis for that belief?
3          A.   They're still marketing the solution, and
4      we still see them every once in a while.
5          Q.   Is there a brand name for the SAP product
6      that was accused of infringement?
7          A.   I think it went under a number of
8      different names.  "SAP buyer" was one of the names
9      that they used.
10         Q.   Do they continue to use the same brand
11     names -- did they continue to use the same brand
12     names after the license agreement was entered as they
13     had before?
14             MR. STRAPP:  Objection, calls for
15     speculation.
16         A.   I think they might, but I wouldn't know
17     for sure.  It's not uncommon to change names with new
18     generations of solutions.
19             BY MR. McDONALD:
20         Q.   But your understanding is, whatever they
21     call them, the solutions they're offering since the
22     license agreement was entered were -- are
23     substantially the same as they were before the
24     license was entered?
25             MR. STRAPP:  Same objection.

158

1          A.   To the best of my knowledge.  I don't have
2      any information that would say otherwise.
3              BY MR. McDONALD:
4          Q.   Do you get information from ePlus
5      employees involved with marketing products regarding
6      SAP as competition?
7          A.   From time to time.
8          Q.   Is that how you've gotten most of your
9      more recent information about what SAP is doing?
10         A.   No.  There's been some recent analysts or
11     blogs and other forms of media available on the Web
12     related to their products and solutions.
13         Q.   And you've reviewed those Web materials?
14         A.   At times.  I mean, they come across my
15     screen as notifications from all these different
16     services, and they'll talk about a new release of
17     their procurement solution or their accounting
18     solution or their demand planning solution.
19         Q.   To you specifically get alerts for SAP?
20         A.   No.  I don't have alerts set.
21     Unfortunately, my name is on a lot of lists, and
22     people just send me a lot of stuff, and I try to weed
23     through that stuff as best I can.
24         Q.   Are these ePlus employees mostly?
25         A.   No.  It's outside, unsolicited,

159

1      unrequested information.
2          Q.   Through that process mostly with emails,
3      is that how typically have gotten information about
4      SAP or at least references to sites on the Internet
5      or whatever it is that you go look at?
6          A.   Yeah.  There's some things that may come
7      internally.  There's other things externally.  I may
8      be reading an article on one subject and then I see,
9      oh, SAP or some other company announces another
10     version of their product XYZ, you know, within the
11     same string of links and topics that are addressed in
12     these bulletins.
13         Q.   So it's based on that accumulation of
14     information that you believe SAP continues to sell
15     products with similar functionalities since the
16     license agreement?
17         A.   Yeah, a combination of sources I think
18     would lead me to that belief.
19         Q.   Have you looked at the SAP license
20     agreement recently?
21         A.   Within the past year or so?
22             I don't recall actually sitting down and
23     going through the agreements since the execution of
24     the agreement.
25             MR. McDONALD:  Would you mark this as the

160

1      next exhibit, please.
2              (Lawson Exhibit No. 70
3              was marked for
4              identification.)
5              BY MR. McDONALD:
6          Q.   Mr. Farber, you've been handed exhibit 70,
7      Lawson 70.
8              Is this the 2006 patent license and
9      settlement agreement between the SAP companies and
10     ePlus Inc.?
11         A.   It is.
12         Q.   This agreement includes a license to SAP
13     for the patents involved in this lawsuit.
14         Correct?
15         A.   Correct.
16         Q.   Those are all listed at among others on
17     page 19 of this document number 940795?
18         A.   Correct.
19         Q.   This agreement was executed around
20     December of '06; is that right?
21         A.   Let's see -- well, this doesn't have a
22     signature block on it, does it?
23         Q.   At page 14, 940790, it's got ePlus's CEO's
24     signature, Phillip Norton.
25         Right?

161

```
1      A.   Okay.  So within a day or so of that, it
2    was finalized, yes.
3      Q.   Day or so of December 11, 2006?
4      Can you say yes or no?
5      A.   Yes.  Sorry.
6      Q.   Thank you.
7      The license that ePlus granted to SAP
8    under the patents-in-suit does not require SAP to
9    mark the patent numbers for the patent-in-suit, does
10   it?
11     A.   That's correct.
12     Q.   So is it your understanding that SAP does
13   not mark any of the patent numbers involved in this
14   case?
15         MR. STRAPP:  Objection, calls for
16   speculation.
17     A.   I don't know what their marking -- you
18   know, what if anything they mark this agreement.  As
19   you stated, it is correct, this agreement does not
20   have a requirement of marking.
21         BY MR. McDONALD:
22     Q.   And there is no other agreement that
23   requires SAP to mark the patent numbers for the
24   patents-in-suit.
25         Correct?
```

162

```
1      A.   That's correct.
2      Q.   Is there a reason why ePlus did not
3    require SAP to mark the patent numbers?
4      A.   Yes.
5      Q.   What's the reason?
6      A.   Well, the primary reason is that after a
7    trial and then during negotiation of the settlement
8    agreement, SAP was beyond belligerent over the fact
9    that they don't do any markings and would not accept
10   that provision.  So we had a decision to make, do we
11   put this behind us and settle for the 17 and a half
12   million dollars and, you know, just be done with it
13   at this point, and deferred to counsel on advice on
14   what to do in that regard, and they said, move on.
15     Q.   Were there any other reasons marking was
16   not required in the SAP license?
17     A.   Other than their absolute definitive
18   objection to it, no, not that I'm aware of.
19         MR. McDONALD:  Would you mark that as the
20   next exhibit, please.
21         (Lawson Exhibit No. 71
22         was marked for
23         identification.)
24         BY MR. McDONALD:
25     Q.   Mr. Farber, do you recognize this document
```

163

```
1    exhibit 71 as the ePlus 10-K annual report for the
2    year ending March 31, 2001?
3      A.   That's certainly what it's titled.  I
4    don't have any reason to believe otherwise.
5      Q.   It says it was filed June 29th, 2001,
6    correct, on the first page?
7      A.   It does, yes.
8      Q.   At that time, were you working for ePlus
9    Inc.?
10     A.   I believe I was.
11     Q.   Did you have any role in putting together
12   this 10-K report?
13     A.   No, I did not.
14     Q.   Could turn to the page 139461.
15     A.   Yes.
16     Q.   You see a heading there the middle of the
17   page there, research and development?
18     A.   I do.
19     Q.   In the first sentence it says, quote, to
20   date, the majority of our software has been acquired
21   from third-party vendors, and some development has
22   been outsourced to third-party software companies,
23   quote.
24         Do you see that sentence?
25     A.   I do.
```

164

```
1      Q.   What third-party vendors had provided
2    ePlus the majority of its software as of 2001?
3      A.   Well, what it's saying is that, you know,
4    the software came from acquisition, and some of the
5    development has been outsourced to third-party
6    software companies.  What that's saying is that some
7    of our development that we do, we used offshore
8    resources for, not all the development that we've
9    done, but some of the development.  We hired a firm
10   to work in conjunction with our employees to do a
11   number of development functions for us.
12     Q.   What was the name of the firm?
13     A.   The name of the firm was called Net Web
14   Limited.
15     Q.   With where where they located?
16     A.   India.
17     Q.   When did ePlus first beginning working
18   with Net Web Limited?
19     A.   I believe -- I believe it was early in
20   2001.  This same section describes as much of the
21   internal software development as going to be handled
22   within the company, but it does point out that we've
23   externalized some of the development to this firm.
24     Q.   Do you know whether or not ProcureNet
25   prior to the time it was acquired by ePlus had
```

Farber - 30(b)(6), Kenneth Gary  5/18/2010  12:00:00 PM

165

1   acquired a significant part of its software from
2   third-party vendors?
3       A.   When I was there during that time that I
4   was at ProcureNet, we didn't do any acquisition, so I
5   don't know the history of the company.
6       Q.   While you were at ProcureNet, did they
7   purchase software from third-party vendors even if
8   they did not acquire those vendors?
9       A.   Well, there's software that's purchased to
10  run the operations of a company, but other than that,
11  not that I'm aware of for resale.
12      Q.   Okay.  So the software used in the
13  procurement products that they were selling, who
14  developed that?
15      A.   It was the intellectual property of
16  ProcureNet as far as I know.
17      Q.   Do you know the names of any of the people
18  who actually wrote the programs?
19      A.   I think there were a number of people
20  involved, but they were before my time.
21      Q.   At the time ePlus settled with SAP in
22  December of '06, did ePlus consider SAP to be one of
23  its primary e-commerce competitors?
24      A.   When we settled with SAP?
25      Q.   Right.

166

1       A.   Yes.  We still considered them to be a
2   competitor.
3       Q.   Do you consider them to be among your top
4   5 competitors?
5       A.   Yeah, I believe so.
6       Q.   Was that true in December of '06 when you
7   settled with them?
8       A.   I believe so.
9       Q.   You understand one of the categories for
10  today's deposition relates to the effect of ePlus's
11  sales of its electronic procurement software on the
12  sales and profits of any other ePlus product or
13  service?
14      A.   I do, yes.
15      Q.   Has ePlus performed any sort of a written
16  or recorded analysis of the effect of its sales of
17  its electronic procurement software on the sales
18  of -- and profits on other products?
19      A.   In terms of a formal analysis, no, I don't
20  believe we have.
21      Q.   Has anybody by or at or on behalf of ePlus
22  done any informal analysis that they put on paper or
23  somehow recorded regarding the effect of ePlus's
24  sales of its electronic procurement software on the
25  sales and profit of its other products and services?

167

1       A.   I don't believe so.
2       Q.   Why hasn't ePlus done an analysis like
3   that?
4       A.   I don't know that the analysis is
5   necessary.  The solutions are an integral component
6   to our strategy as a company and integral to the
7   sales and offerings to our customers in the other
8   divisions of the company, so we're very committed to
9   the solution and very committed to drive revenue in
10  other areas of our business through the use of this
11  technology.
12      Q.   Has ePlus ever given consideration to
13  shutting down the electronic procurement software
14  portion of the company or selling it off?
15      A.   Not that I've been informed of.
16      Q.   Has there been any consideration of -- as
17  to whether or not e-procurement software could be
18  obtained by outside third parties from ePlus and
19  supply the ePlus customer needs through products
20  outside of ePlus?
21      A.   No.  That wouldn't -- that wouldn't be
22  appropriate for ePlus to do that, because of, you
23  know, our ability to have control over continuing to
24  enhance the solutions, to grow as a company, and to
25  influence sales of other divisions of the company.

168

1   We could not do that with third-party software.  It
2   would have to be our own intellectual property.
3       Q.   Does the electronic procurement software
4   business have its own profitability reports at ePlus?
5       A.   We have our own monitoring of just the
6   procurement business unassociated with the other
7   businesses.
8       Q.   And what is that business unit called?
9       you're in charge of the business unit.  I
10  forget the name of the business unit.
11      A.   EPlus systems.
12      Q.   EPlus systems.
13      So that's the e-procurement software?
14      A.   That's correct.
15      Q.   Is ePlus systems' profitability as a
16  business unit determined on a periodic basis?
17      A.   It's looked at on a quarterly and annual
18  basis.
19      Q.   How is its profitability determined?
20      A.   It's determined just strictly on the sale
21  of procurement software, services, and maintenance
22  associated with the product that have no connection
23  to any other area of our business where we may be
24  utilizing that software to drive other sales in the
25  company.

169

1    Q.   Why is it, then, for purposes of assessing
2  the profitability of your ePlus systems division, it
3  is strictly based on this, the outright sales of
4  software and the related services rather than
5  incorporating anything involving any of the other
6  parts of the business?
7    A.   Because determining the effect of
8  profitability in other areas of the business -- I
9  don't even want to call it an art or a science.  When
10  you're selling a license for procurement, you're
11  company ABC, and I sell you procurement, it's very
12  easy to look at your expenses, your SG and A, it's
13  the sale of the license, the subscription, the
14  maintenance, the services that go along with it.
15  Okay?
16    Very clean, very easy to do from an
17  accounting standpoint.  You have another subset of
18  clients -- and that's what's in the ePlus systems P
19  and L, if you will.  Okay?
20    You have another class of customers,
21  let's -- for example that use our software.  And one
22  of the reasons that they do business with ePlus is
23  because of that software.  So you have customers
24  engaged with us in leasing and fulfillment but are
25  using what you know as Procure Plus.

170

1    We're providing fulfillment services.
2  We're providing leasing services.  And all those
3  procurement transactions of all the things that
4  they're buying from ePlus is going through our
5  Procure Plus tool.
6    We didn't license it to them.  It was an
7  inhibitor for them to do business with ePlus to
8  create additional value in our other business units.
9  We have discussed in the past of taking a percentage
10  of margin or gross sales and applying that back to
11  the systems group, because the numbers obviously
12  would look much better than what they do on paper
13  today, but again it's not a science.  It's not an
14  accounting science that we have been able to say,
15  this is the ratio of how much business, you know,
16  we've been able to influence as a result of this.
17  However, the application has contributed to a
18  significant amount of opportunity within the other
19  divisions of the company.
20    Q.   Have you or others at ePlus consulted with
21  your accountants as to whether there's a way within
22  generally accepted accounting principles to allocate
23  additional revenue to your business now?
24    A.   I've asked that question.
25    The unfortunate part when you're dealing

171

1  with accounting firms, because of all the unfortunate
2  things that have happened in years gone past with
3  accounting companies and other companies
4  misrepresenting revenues, accounting companies today
5  don't tell you what to do to solve a problem.  You
6  continue to present things to them, and they'll tell
7  if you if it's right on wrong, but they won't give
8  you the advice and say, do it this way, because that
9  creates too much of a liability on their behalf.
10    But the exercise quite honestly of doing
11  it, you know, as a company, we're considered to be
12  very cognisant of our top-line, bottom-line revenues
13  and our shareholders, and it's the total revenue with
14  the company and the total profitability of the
15  company that ePlus and the board is most concerned
16  about versus, you know, the business unit level, you
17  know, of systems as an example, which is a smaller
18  piece of the overall company, but at the same point
19  contributes to it, with all the things that we have
20  on our plate, it wasn't the most important thing to
21  beef up those numbers just to make them look good.
22    We're more concerned with the top- and
23  bottom-line numbers of the company as a whole.
24    Q.   When you asked the accountants whether
25  there was a way to account for additional sales and

172

1  allocate those to ePlus systems, what did the
2  accountants tell you?
3    A.   I don't believe we had a detailed
4  discussion with them on that subject.
5    Q.   Did you have a general discussion with
6  them?
7    A.   No, not to my knowledge.
8    Q.   I thought you had indicated you'd asked
9  the question.
10    A.   No.  Internally we've talked about, should
11  we do this, is it worth doing.  At the end of the
12  day, people are looking at the top- and bottom-line
13  numbers.  That's what they're most concerned about.
14  So we -- with everything on you are plate, it's not
15  something that we concentrated on as having the
16  importance compared to other things we were doing.
17    Q.   So for ePlus systems, you indicated the
18  revenues that are allocated to your division.
19    A.   M-hm.
20    Q.   How -- or what costs are allocated to your
21  division?
22    A.   The costs are specific to the people that
23  are within that -- within that organization that are
24  supporting our procurement customers, those that are
25  not using anything other service from ePlus other

Farber - 30(b)(6), Kenneth Gary  5/18/2010  12:00:00 PM

173

1    than the procurement.
2        Q.   Do people outside of ePlus systems help to
3    market the software of ePlus systems?
4        A.   They do.
5        Q.   Are there costs allocated to your
6    division?
7        A.   Those that are out there talking about the
8    solution or --
9        Q.   And marketing it.
10       A.   Well, the marketing is within my
11   organization of that solution.  I also consider
12   marketing to be salespeople that are out there
13   talking.  There are salespeople that will talk about
14   our solution that costs are not allocated to my
15   group, because they're driving revenue by the use of
16   our software in their own groups, and that's their
17   motivation.
18       Q.   Is the ePlus systems group or division
19   currently profitable?
20       A.   No.
21       Q.   Has it ever been profitable?
22       A.   No.
23       MR. McDONALD:  Why don't we take a quick
24   break here.
25       THE WITNESS:  Sure.

174

1        THE VIDEOGRAPHER:  We're going off the
2    record.  The time is 2:55 PM.
3        (Recess.)
4        THE VIDEOGRAPHER:  We're now back on the
5    record.  The time is 3:06 PM.  You may proceed.
6        BY MR. McDONALD:
7        Q.   Mr. Farber, I already asked this off the
8    forward from your counsel, but I'll go ahead and ask
9    you on the record here.
10       Do you know whether or not any of these
11   quarterly profitability reports specific to your
12   ePlus systems division have been produced in the case
13   as documents?
14       A.   I believe financials have been provided,
15   yes.
16       Q.   Financials specific to your division?
17       A.   Yes.
18       Q.   I just wasn't sure of that, so I've asked
19   for it in this case, but we'll check on that.  I
20   appreciate it.
21       Such records do still exist though as far
22   as you know?
23       A.   I believe so.
24       Q.   Do they go back all the way to 2001 when
25   you joined the company?

175

1        A.   I'm not sure about as early as 2001 if it
2    was broken out as it is today, but it has been for a
3    while.
4        Q.   Okay.  With respect to the license
5    agreement that you entered with SciQuest, did you
6    think that the compensation to ePlus was reasonable?
7        A.   It's not the way I personally would have
8    gone about formulating the agreement, so reasonable
9    would be in the eye of the person doing the
10   negotiation.
11       Q.   Ultimately, the CEO of ePlus approved the
12   dollar figure?
13       A.   Yes, he did.
14       Q.   Okay.  So at least from the corporate
15   standpoint, though, does ePlus -- I understand how it
16   may not be your personal opinion, but as the
17   representative of the company, was the compensation
18   to ePlus under the SciQuest license reasonable?
19       A.   I fully support my CEO.
20       Q.   Do you have an understanding of what
21   SciQuest actually sells?
22       A.   I have I think a fairly good
23   understanding.
24       Q.   What do they sell?
25       A.   They sell procurement software.  They sell

176

1    software for what's referred to as spend management.
2        Q.   You had talked about them earlier along
3    with GHX, and I'm trying to remember what product
4    line that was.
5        Is that one of these, or is that something
6    different?
7        A.   No.  That's a separate company that I
8    believe Lawson had some association with.
9        Q.   I think it came up when you talked about
10   Lawson and SciQuest having some sort of a
11   partnership.
12       A.   Yes.
13       Q.   Do you know whether at least in the past
14   Lawson and SciQuest had some sort of a partnership?
15       A.   I think there was an announced partnership
16   between Lawson and SciQuest where Lawson was
17   providing best of my recollection the procurement
18   software.  SciQuest was providing the catalog for the
19   health care industry.
20       Q.   So in addition to providing procurement
21   software and spend management software, does SciQuest
22   offer a catalog specific to the health care industry?
23       A.   Yes.
24       Q.   Do they have any catalog specific to other
25   industries?

177

1  A.  Not that they provide.  They provide tools
2  to customers so that customers can create catalogs.
3  Q.  But for the health care industry, SciQuest
4  actually created its own catalog?
5  A.  Yes.  I believe they have a catalog of
6  numerous -- numerous SKUs or product information as
7  it relates to the health care industry.
8  Q.  Is the SciQuest catalog -- is that -- does
9  that have catalogs from a number of vendors or
10 suppliers of health care products?
11 A.  I believe it would.
12 Q.  Do you know whether or not it actually is
13 searchable according to vendor?
14 A.  I wasn't part of any of the discovery, so
15 I never got to that detail.
16 Q.  Does ePlus consider the compensation it
17 received under the Perfect Commerce license agreement
18 to be reasonable?
19 A.  Based on what we found out about Perfect
20 Commerce, I think, yes.
21 Q.  That was a lump sum settlement; is that
22 right?
23 A.  Yes, I believe that's correct.
24 Q.  Did you try to calculate the lump sum in
25 terms of equivalent percentage royalty?

178

1  A.  No.  We physically did an audit of Perfect
2  Commerce, because we had a very difficult time
3  understanding what are their revenue really was on
4  the accused products that we were claiming, or at
5  least what we thought was potentially infringing our
6  patents, and found that -- let's just say what we
7  found that they said publicly or stated publicly
8  versus what was reality were 2 different things.  And
9  the revenues were very, very low.
10 Q.  But you didn't actually ever calculate the
11 lump sum settlement in terms of an equivalent
12 expected royalty?
13 A.  No.  Based on the information of what we
14 found out as it related to what their revenue was in
15 their model and the assets that they had, et cetera,
16 in conferring with our general counsel, it's the
17 number that we came up with that was -- appeared to
18 be acceptable based on their financial condition.
19 Q.  Do you have an understanding of what
20 Perfect Commerce sells?
21 A.  Yes.
22 Q.  What do they sell?
23 A.  Perfect Commerce sold procurement
24 solution, and they also provided tools for customers
25 to load supplier information into catalogs.  And they

179

1  had other businesses too that did not fall within the
2  context of these patents.
3  Q.  Did you make any effort to calculate the
4  SciQuest lump sum settlement in terms of an
5  equivalent royalty percentage?
6  A.  SciQuest or Perfect Commerce?
7  Q.  SciQuest.  I jumped back to SciQuest
8  again.
9  A.  No.  You know, again, I mean, I didn't
10 have anything to correlate.  I didn't know what their
11 financials were.  I didn't know -- you know, I didn't
12 have any information to make any type of assessment,
13 determination to even go back to our counsel to say,
14 you know, is this appropriate, not appropriate.
15 Q.  With respect to Verian, did the company
16 consider the amount of money it got for the Verian
17 license to be reasonable?
18 A.  Yeah.  I think that would be accurate.
19 Q.  What does Verian sell?
20 A.  Again, Verian sells procurement-related
21 software, tools to populate catalogs.  I believe they
22 also have a spend analysis or analytics product.
23 They may also have an expense management product and
24 a contract management product if I'm not mistaken.
25 Q.  Do you know how long Verian has been in

180

1  business?
2  A.  I should know that.  I don't recall off
3  the top of my head.  I did know at the time of the
4  settlement.
5  Q.  Do you know whether it was more or less
6  than 10 years?
7  A.  Yeah.  I think -- I believe it was more
8  than 10 years.
9  Q.  How long has Perfect Commerce been in
10 business?
11 A.  I think they were in business probably
12 within the 10-year window as well.
13 Q.  For less than 10 years or more?
14 A.  I don't know.
15 Q.  How long has SciQuest been in business?
16 A.  I guess around the same time, but I
17 couldn't tell you exactly when they incorporated.
18 Late '90s, maybe.
19 Q.  Were you involved at all in the efforts in
20 this lawsuit to gather up documents for production?
21 A.  Gather up documents as it relates to what?
22 Q.  For discovery purposes to produce.
23 A.  Oh, yes, I was.
24 Q.  What was your role in that?
25 A.  Well, in the -- my role was working with

181

1    our external counsel as well as our internal counsel
2    and the management to abide by the discovery efforts
3    of document retention as well as, you know, providing
4    them the necessary documents to our legal counsel.
5        We went through an extensive exercise internally to
6    identify all the things that were needed as it
7    related to this litigation, named custodians in terms
8    of who we believed to be the best people to have
9    access to all this information, whether it was in
10   internal databases, on the Website, on people's
11   laptops, you know, any system that we had from all
12   the various groups, individuals within ePlus.
13       And then I connected all those individuals
14   with our counsel, had the counsel arrange phone calls
15   with each of those individuals, everybody from the IT
16   department to the business head owners, product
17   managers, et cetera, to collect all that information,
18   which subsequently, you know, was collected.  I think
19   there was something from what I heard like a million
20   some-odd documents produced as a result of those
21   efforts.
22       Q.   About how many custodians did you
23   identify?
24       A.   Oh, my gosh, I think there were probably 6
25   to 8 primary custodians.

182

1        Q.   Were there some other secondary custodians
2    that you --
3        A.   Another bad choice of words, m-m-m?
4        Q.   Eventually you realize that's going to be
5    the followup question.
6        A.   That's right.  That's right.
7    (Gesturing) -- rewind the tape.
8        No, actually, there wouldn't be secondary
9    custodians.
10       Q.   I think Structured Computer Systems --
11   were they the ones located in Avon, Connecticut?
12       A.   I guess there might have been some people
13   in other locations too.
14       Q.   Does ePlus still have employees in Avon,
15   Connecticut?
16       A.   We do have an office in Avon, yes.
17       Q.   Did you direct counsel to look for any
18   documents in Avon, Connecticut, that might be
19   relevant to the case?
20       A.   Absolutely.
21       Q.   About how many different cities is ePlus
22   located in terms of having facilities that might
23   have documents in them.
24       A.   Well, I mean, we looked at ePlus all over
25   the company, because there's no telling who had what

183

1    type of documents, whether it was directly within
2    ePlus systems or ePlus technology, which is another
3    division of the company, so we spanned the entire
4    company.  There's 35 primary office locations across
5    the country.  There's computer systems that we have
6    that are centralized.  There's some that you don't
7    have control of.  You don't know what's on people's
8    laptops.
9        But we did go out and, you know, to seek
10   information off of those personal laptops, as well as
11   you have to consider hard copy as well, the files
12   that may be sitting in an office location and may not
13   be electronic, because there's no telling, you know,
14   what information was out there, so we wanted to cover
15   all the bases.
16       Q.   Were the documents gathered up -- were
17   they managed through any content management systems
18   provided by ePlus?
19       A.   Are you interested in buying one?
20   (Laughing.)
21       No.  We don't do that.
22       Q.   You don't do litigation documents?
23       A.   Although I understand that it's quite a
24   lucrative business.
25       No.  We did -- our counsel gave us search

184

1    criteria or gave our IT folks search criteria.  A
2    letter went out to the company from our counsel as
3    well that was constructed with our outside counsel to
4    the entire company, one to search for information
5    based on this, you know, relevant information that we
6    were provided, and the other is, you know, do not
7    destroy any information either, obviously.
8        So, you know, based on that information,
9    we put it on disks or files when they were on paper,
10   shipped it all off to the legal firm, Goodwin, and
11   let them process it.
12       Q.   So among the words you searched for was
13   "Lawson."
14       Right?
15       A.   Yeah.  There was a criteria that we were
16   provided, you know, a time frame and a criteria of
17   information relevant to this, and it wasn't just
18   Lawson.  I think that started with SciQuest, Perfect
19   Commerce, Verian, who was a much more expanded
20   search.
21       Q.   Okay.  That's that for that topic.  I
22   basically have just one last topic for you.
23       A.   Okay.
24       Q.   Has ePlus ever commissioned any studies to
25   determine specifically whether or not ePlus's

185

1   procurement software products saved them money
2   compared to other products?
3       A.   There was -- you mean for our customers?
4       Q.   Right.
5       A.   Okay.  Yes.
6            There was one study that we did commission
7   through -- I believe it was Aberdeen Research that we
8   asked to write a paper and do an analysis on price
9   cost management and potentially what savings clients
10  or prospects the average company could derive from
11  procurement solutions.
12      Q.   And that resulted in a report by Aberdeen?
13      A.   Correct.
14      Q.   How much did ePlus pay for that report?
15      A.   I think those reports -- industry reports
16  at the time tend to run somewhere -- you know, they
17  can run 5,000 to 20,000.  I think we paid somewhere
18  between 5 and 10,000 to have them run the reports --
19  write the report.
20      Q.   Has ePlus ever done or commissioned any
21  reports that compare ePlus procurement products
22  versus competitor procurement products?
23      A.   No.  We've never to my knowledge have gone
24  out and asked a third party to do that analysis.  I
25  think there's enough analysis by outside sources not

186

1   to do comparisons but just talk about the
2   functionality of systems and generally what they do.
3       Q.   And those reports are more general about
4   having electronic procurement rather than ePlus's
5   specific procurement product as opposed to a
6   competitor's product.
7            Right?
8       A.   Yeah.  The only way we generally find out
9   very specific information about a competitor's
10  product is that -- you know, and it happens very,
11  very infrequently is when you have a prospect that's
12  saying, well, company XYZ is saying they have this,
13  do you guys have that.
14           So, you know -- so its very difficult
15  information to ascertain, because it's the
16  intellectual property of, you know -- of a
17  competitor, so they generally don't put that
18  information out and they hold it pretty tight.
19      Q.   What information are you saying is
20  intellectual property that would make it hard to do
21  this study?
22      A.   Well, you know, you can find information
23  out over the Web, as an example.  Sometimes you get
24  blurbs of information from an analyst report or
25  through a press release that a vendor may put out on

187

1   the wire boasting their functionality of a new
2   system.  Those are different things that you use to
3   put the pieces together if you will, if you're
4   interested in doing.
5            But when I talk about the intellectual
6   property or the property of a company, it's very rare
7   that if at all that you would see a company such as
8   Lawson or such as ePlus or such as SAP for that
9   matter publishing every single feature and function
10  that they have about their system in an open public
11  document.  They're usually marked confidential and
12  they're usually licensed users to get that specific
13  information or done under a nondisclosure.
14           So -- and for us, it's -- you know, we do
15  the same.  There's a lot of information that we don't
16  publicize, because as we talked about early, the
17  procurement solutions are -- you know, have some
18  intrinsic value into the fabric of ePlus as a whole
19  and how we drive revenues as a whole, you know, of
20  the company.
21      Q.   Are you aware of any reports done by
22  Aberdeen or these other research companies that
23  actually put 2 procurement products head to head?
24      A.   None that I have seen or recall seeing
25  that kind of do what used to be called years ago a

188

1   bakeoff of products.  You don't see it.  You don't
2   really get a lot of vendors that want to participate
3   in that because they don't want that information
4   public.
5       Q.   Does Oracle have an e-procurement product?
6       A.   Yes, they do.
7       Q.   Do you have any understanding as to
8   whether it's got any differences from a functional
9   standpoint from ePlus's procurement product?
10      A.   Very little.  I mean, we have not done an
11  analysis, a detailed analysis to make that
12  determination on how it relates directly.  I mean, at
13  a high level, you could say it's procurement.  At a
14  high level, you know, you could make assumptions, but
15  diving into the analysis very deeply, I don't know
16  that we've done that or that I can recall other than
17  maybe at a very high level.
18      Q.   Do you have any reason to believe that
19  Oracle sells any products that infringe the patents
20  involved in this lawsuit?
21      A.   They could.  They very well could.  I
22  mean, we -- you know, we compete, you know, just as
23  we've competed with Lawson, we've competed with
24  Oracle, and many, many other players in the industry.
25  It's a matter of, you know, how frequently are you

189

1    running up against these folks and how much time and
2    money do you have as a company to pursue them, and
3    earlier we spoke -- not today, but prior months
4    about, you know, ePlus, you know, is an okay-sized
5    company but doesn't have unlimited resources to be
6    able to take everybody on, you know, at one time.
7         And that's certainly not our intentions, but, you
8    know, we really haven't gotten to the level of doing
9    as I understand what needs to be done, some kind of a
10   claim construction, evaluation, you know, are they
11   infringing, are they not infringing.  I don't want to
12   launch into anything frivolous because of the expense
13   in doing so without having that knowledge and firm
14   belief.
15       Q.   Has ePlus internally apart from
16   discussions with lawyers ever made a decision that
17   they wanted the lawyers to analyze whether or not
18   Oracle infringes the patents-in-suit?
19            MR. STRAPP: Objection, beyond the scope.
20       A.   We haven't asked our lawyers to do that.
21            BY MR. McDONALD:
22       Q.   Have you had any communications with
23   Oracle about licensing the patents-in-suit?
24       A.   No.
25       Q.   Have you had any communications with any

190

1    other parties whether or not you entered a license?
2         I mean, have you discussed the possibility
3    of licensing with any entities other than entities
4    you've sued?
5         A.   My understanding -- well, let me say no
6    and tell you that my understanding is that that's not
7    the most wise thing to do, because as I've been
8    informed, you can expose yourself to countersuits.
9    So generally speaking, you know, we have learned or
10   at least been informed that one of the methods is not
11   to expose yourself.
12            MR. STRAPP: Before you go any further, to
13   the extent that this information that you're relaying
14   to Mr. McDonald comes from advice of counsel, I'll
15   instruct you not to relay it.  To the extent you know
16   this on your own, go ahead, but if this is from your
17   attorneys, then I would instruct you not to go any
18   further.
19       A.   Can't go any further.
20            BY MR. McDONALD:
21       Q.   Okay.  ePlus has made a business decision,
22   though, that it will not communicate with other
23   parties about licensing before there's a lawsuit; is
24   that right?
25       A.   I'll tell you that it's our hope and

191

1    interest that if we decide to file a complaint with
2    the courts that it doesn't get to the level of
3    litigation, that both parties would be able to sit
4    down and reasonably have a discussion of settlement.
5    Unfortunately, it hasn't happened thus far in this
6    case, as it had with the 3 other litigants, but
7    that's our true hope and desire, not to go to a
8    trial.
9         Q.   My question is a different question.
10            My question is, has ePlus made a
11   decision to not communicate with third parties about
12   licensing the patents-in-suit until after they've
13   sued them?
14       A.   I think I answered that.  You know,
15   I said that, you know, it's kind of our hope
16   that after a complaint is filed, and that's the
17   protocol that we follow as a company, is, we
18   file a complaint with the courts and then
19   hope to have communication, you know, that
20   would lead to a license agreement.
21            MR. McDONALD: I have no further
22   questions.
23            Thank you.
24            MR. STRAPP: I have no questions.
25            THE VIDEOGRAPHER:  This ends the

192

1    deposition of Mr. Kenneth Farber.  The time is now
2    3:29 PM.  There were 4 tapes used.
3            Thank you.
4            (Whereupon, at 3:29 p.m., the taking of
5    the instant deposition ceased.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Farber - 30(b)(6), Kenneth Gary  5/18/2010  12:00:00 PM



193

1        CERTIFICATE OF DEPONENT

2    I hereby certify that I have read and examined the

3    foregoing transcript, and the same is a true and

4    accurate record of the testimony given by me.

5    Any additions or corrections that I feel are

6    necessary, I will attach on a separate sheet of

7    paper to the original transcript.

8

9

10   _____

11          Signature of Deponent

12

13   I hereby certify that the individual representing

14   himself/herself to be the above-named individual,

15   appeared before me this _____ day of _____,

16   2010, and executed the above certificate in my

17   presence.

18

19

20   _____

21          NOTARY PUBLIC IN AND FOR

22

23   _____

24                 County Name

25   MY COMMISSION EXPIRES:

194

1        CERTIFICATE OF COURT REPORTER

2    UNITED STATES OF AMERICA    )

3    DISTRICT OF COLUMBIA        )

4          I, CHERYL A. LORD, the reporter before

5    whom the foregoing deposition was taken, do hereby

6    certify that the witness whose testimony appears in

7    the foregoing deposition was sworn by me; that the

8    testimony of said witness was taken by me in machine

9    shorthand and thereafter transcribed by

10   computer-aided transcription; that said deposition is

11   a true record of the testimony given by said witness;

12   that I am neither counsel for, related to, nor

13   employed by any of the parties to the action in which

14   this deposition was taken; and, further, that I am

15   not a relative or employee of any attorney or counsel

16   employed by the parties hereto, or financially or

17   otherwise interested in the outcome of this action.

18

19

20

21          CHERYL A. LORD

22          Notary Public in and for

23          the District of Columbia

24   My Commission expires April 30, 2011

25

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 9th day of August, 2010, I will electronically file the foregoing

**PLAINTIFF *e*PLUS'S OBJECTIONS TO DEFENDANT'S DEPOSITION DESIGNATIONS AND SUMMARY OF THE DEPOSITION OF KENNETH FARBER AND COUNTER-DESIGNATIONS**

with the Clerk of Court using the CM/ECF system which will then send a notification of such filing (NEF) via email to the following:

Daniel McDonald, *pro hac vice*
William D. Schultz, *pro hac vice*
Rachel C. Hughey, *pro hac vice*
Joshua P. Graham, *pro hac vice*
Andrew Lagatta, *pro hac vice*
Merchant & Gould P.C.
3200 IDS Center
80 South Eighth Street
Minneapolis. MN 55402
Telephone: (612) 332-5300
Facsimile: (612) 332-9081
lawsonscrvicc@)merchantgould.com


Robert A. Angle (VSB# 37691)
Dabney J. Carr, IV (VSB #28679)
Troutman Sanders LLP
P.O. Box 1122
Richmond, VA  23218-1122
Telephone:  (804) 697-1238
Facsimile:  (804) 698-5119
robert.angle@troutmansanders.com
dabney.carr@troutmansanders.com

*Counsel for Defendant Lawson Software, Inc.*


_____/s/_____
David M. Young (VSB #35997)
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4000
Facsimile:  (202) 346-4444
dyoung@goodwinprocter.com