**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | | |
|---|---|---|
| *e*PLUS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:09-CV-620 (REP) |
| | ) | |
| v. | ) | |
| | ) | |
| LAWSON SOFTWARE, INC., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF EPLUS'S OBJECTIONS TO DEFENDANT'S DESIGNATION AND
SUMMARY OF THE DEPOSITION OF ROBERT IRWIN AND COUNTER-
DESIGNATIONS**

**Specific Objections**

| Defendant's Designations | *e*Plus's Objections (designations) | *e*Plus's Objections (summary) |
|---|---|---|
| 10:14-16 | | |
| 16:13-17:16 | 401/402 (16:25-17:16) | Mischaracterizes testimony (Mr. Irwin testified that Robert Wood Johnson negotiated a statement of work with Lawson to outline the responsibilities of Robert Wood Johnson and Lawson during implementation.  Robert Wood Johnson hired a subcontractor that met on a regular basis with the Robert Wood Johnson/Lawson implementation team) |
| 17:25-18:12 | | Incomplete summary (Mr. Irwin testified that Lawson provided the software, provided guidance to Robert Wood Johnson on how to build the system, and trained the core users at Robert Wood Johnson) |
| 28:25-29:17 | | Mischaracterizes testimony (Mr. Irwin testified that Robert Wood Johnson uploaded additional data put into the Lawson system *after* |

| | | *the item data import was done during the initial implementation*) |
|---|---|---|
| 31:17-20 | | |
| 49:9 – 50:7 | | |
| 55:16 – 56:19 | 602 | |
| 57:11 – 58:7 | 602 | |
| 67:25-68:23 | 602 | |
| 69:16-70:16 | | |

## Counter-Designations

| *e*Plus's Counter-Designations |
|---|
| 56:20-57:5 |
| 58:8-59:6 |
| 69:7-10 |

2

Respectfully submitted,

Dated:  August 9, 2010

/s/_____
Craig T. Merritt (VSB #20281)
Henry I. Willett, III (VSB #44655)
**CHRISTIAN & BARTON, LLP**
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
Telephone: (804) 697-4100
cmerritt@cblaw.com
hwillett@cblaw.com

Scott L. Robertson (admitted *pro hac vice*)
Jennifer A. Albert (admitted *pro hac vice*)
David M. Young (VSB#35997)
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4000
SRobertson@goodwinprocter.com
JAlbert@goodwinprocter.com
DYoung@goodwinprocter.com

Michael G. Strapp (admitted *pro hac vice*)
James D. Clements (admitted *pro hac vice*)
**GOODWIN PROCTER LLP**
Exchange Place
53 State Street
Boston, MA 02109-2881
Telephone:  (617) 570-1000
MSrapp@goodwinprocter.com
JClements@Goodwinprocter.com

*Attorneys for Plaintiff, ePlus Inc.*

3

## <u>Robert Irwin – Rebuttal Summary</u>

Lawson installed the procurement system on Robert Wood Johnson's hardware.  (69:7-10)

Mr. Irwin does not know whether Lawson provided any assistance in drafting the Requisition Self-Service Training Guide (Exhibit 7) or when it was created.  (56:20-57:5)

Lawson authored the Lawson Implementation Buyer Training Guide (Exhibit 8).  This document was used for training that Bart Fisher, a Lawson consultant, gave to Robert Wood Johnson employees.  (58:8-59:6)

Irwin, Robert - RW Johnson  3/10/2010  12:00:00 PM

**1**

1           IN THE UNITED STATES DISTRICT COURT
.           FOR THE EASTERN DISTRICT OF VIRGINIA
2               RICHMOND DIVISION
.           CIVIL ACTION NO. 3:09-CV-620 (JRS)
3
.        - - - - - - - - - - - - - - - - - :
4      ePLUS, INC.,
.                          : Civil Action
5          Plaintiff,    :
.                          : DEPOSITION UPON
6      vs.                : ORAL EXAMINATION
.                          :
7      LAWSON SOFTWARE, INC.,  :   of
.                          :
8      Defendant.   : ROBERT G. IRWIN
.        - - - - - - - - - - - - - - - - - :
9
10        TRANSCRIPT of the Videotaped Deposition of
11    ROBERT G. IRWIN, a Witness, called for Oral
12    Examination by the Plaintiff in the above-entitled
13    action, said deposition being taken pursuant to
14    Federal Rules of Civil Procedure, by and before
15    PATRICIA J. RUSSONIELLO, a Certified Court Reporter
16
17    and Notary Public of the State of New Jersey, at
18
19    the office of ROBERT WOOD JOHNSON UNIVERSITY
20
21    HOSPITAL, 120 Albany Street, New Brunswick, New
22
23    Jersey, on Wednesday, March 10, 2010, commencing at
24
25    1:55 o'clock in the afternoon.

**2**

1      A P P E A R A N C E S :
2          GOODWIN PROCTER LLP
.              By  JAMES D. CLEMENTS, ESQUIRE
3          53 State Street, Exchange Place
.              Boston, Massachusetts 02109
4          Tel: (617) 570-1000  Fax: (617) 523-1231
.              Attorneys for Plaintiff
5
.          MERCHANT & GOULD P.C.
6          By  JOSHUA P. GRAHAM, ESQUIRE
.              3200 IDS Center
7          80 South Eighth Street
.              Minneapolis, Minnesota 55402-2215
8          Tel: (612) 332-5300  Fax: (612) 332-9081
.              Attorneys for Defendant
9
.          NORRIS, MC LAUGHLIN & MARCUS, P.A.
10          By  JAMES J. SHRAGER, ESQUIRE
.              731 Route 202-206
11          Bridgewater, New Jersey 08807
.              Tel: (908) 722-0700  Fax: (908) 722-0755
12              Attorneys for Deponent
13
14    A L S O  P R E S E N T :
15          Michael Ciliberti, Videographer
16
17
18
19
20
21
22
23
24
25

**3**

1              I N D E X
2      WITNESS         DIRECT  CROSS  REDIRECT
3      ROBERT G. IRWIN
.        By Mr. Clements      6      71
4      By Mr. Graham        67
5
6          E X H I B I T S
7      NUMBER        DESCRIPTION        PAGE
8      RWJ-2  Six-page document, re, Product Order  35
.              Form, Lawson Software Customer
9              Agreement
10    RWJ-3  Six-page document, re, Lawson Software  38
.              Customer Agreement, Master Terms and
11              Conditions
12    RWJ-4  Multi-page document, re, Lawson      43
.              Software Customer Agreement, Master
13              Terms and Conditions
14    RWJ-5  Multi-page document, re, Lawson      46
.              Software Customer Agreement, Master
15              Terms and Conditions (draft)
16    RWJ-6  Multi-page document, re, Lawson      49
.              Software America's, Inc., Statement
17              Of Work
18    RWJ-7  Multi-page document, re, Requisition  55
.              Self-Service RSS Training Guide, Lawson
19              Software
20    RWJ-8  Multi-page document, re, Lawson      57
.              Implementation Buyer Training Guide
21
.          RWJ-9  Multi-page document, re, System      59
22              Admin Steps To Adding An Item
23    RWJ-10  Multi-page document, re, Requisition  62
.              Approval Training Guide
24
25

**4**

1          E X H I B I T S (continued)
2      NUMBER        DESCRIPTION        PAGE
3      RWJ-11  Multi-page document, re, Procure    64
.              Design Document For Robert Wood
4              Johnson University Health
5      RWJ-12  Lawson S3 demo video (to be marked)  ---
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

5

1    THE VIDEOGRAPHER:  Here begins

2  videotape number one in the deposition of Robert

3  Irwin in the matter of ePLUS Incorporated versus

4  Lawson Software in the U.S. District Court for the

5  Eastern District of Virginia, Case Number

6  3:09-CV-620.,

7    Today's date is March 10th, 2010 and

8  the time indicated on the video screen is 1:55 p.m.

9    The video operator today is Mike

10  Ciliberti and this video deposition is taking place

11  at 120 Albany Street, New Brunswick, New Jersey.

12    Counsel, please voice identify

13  yourselves and state whom you represent.

14    MR. CLEMENTS:  This is James Clements

15  from Goodwin Procter representing plaintiff, ePLUS.

16    MR. GRAHAM:  Joshua Graham from

17  Merchant Gould on behalf of the defendant, Lawson

18  Software.

19    MR. SHRAGER:  James J. Shrager, Norris,

20  McLaughlin, Marcus, on behalf of the deponent.

21    THE VIDEOGRAPHER:  The Court reporter

22  today is Patricia Russoniello.

23    Will the reporter please swear in the

24  witness.

25  R O B E R T  G.  I R W I N, having been duly sworn

6

1  by the Notary, testifies as follows:

2    THE VIDEOGRAPHER:  Please begin.

3  DIRECT EXAMINATION BY MR. CLEMENTS:

4    Q.   Mr. Irwin, who is your employer?

5    A.   Robert Wood Johnson University

6  Hospital.

7    Q.   And could you tell me your -- both

8  your home and your work address, please?

9    A.   Home address is 1 Confield Court, Red

10  Bank, New Jersey.  Work is 1 Robert Wood Johnson

11  Place, New Brunswick, New Jersey.

12    Q.   Thanks.

13    Mr. Irwin have you ever been deposed

14  before?

15    A.   No.

16    Q.   Have you attended a deposition before

17  today?

18    A.   No.

19    Q.   Okay.  I think you saw based on the

20  demonstration this morning that I'm going to be

21  referring to a number of documents that we'll be

22  marking as exhibits and I'm going to ask you some

23  questions about them.

24    A.   Okay.

25    Q.   When I ask you questions I need your

7

1  responses to be oral because I can't see from the

2  transcript if you just nod your head or -- or say

3  uh-huh.  Does that make sense?

4    A.   I understand.

5    Q.   Okay.  And if you don't understand a

6  question please say something; otherwise, I'll

7  assume that you understood the question.  Does

8  that --

9    A.   Okay.

10    Q.   -- make sense?

11    Are you representing by counsel

12  today?

13    A.   Yes.

14    Q.   And that would be Mr. Shrager?

15    A.   Yes.

16    Q.   Okay.  And sometimes Mr. Shrager may

17  object to a question but unless he instructs you

18  not to answer then you can go ahead and answer the

19  question after his objection.  Does that make sense?

20    A.   So if he objects I'm still to answer

21  the question?

22    Q.   Yes, unless he --

23    A.   Unless he tells me.

24    Q.   -- instructs you not to answer.

25    A.   Okay.

8

1    Q.   Is there any reason at all why you

2  feel you cannot testify fully and accurately today?

3    A.   No.

4    Q.   Okay.  Are you on any medication?

5    A.   Just my daily meds for...

6    Q.   Okay.

7    A.   You know.

8    Q.   Okay.  And we'll take breaks when you

9  want them.  If there's a question pending I just

10  ask that you answer the question before we go on

11  break.

12    A.   Okay.

13    Q.   Do you have any questions about the

14  procedures today?

15    A.   Nope.

16    Q.   Okay.  All right.  We'll get started

17  then.

18    Okay.  If we could refer back to

19  Exhibit SWJ-1 (sic) and as I explained earlier this

20  is the subpoenas and schedules that were served

21  upon Robert Wood Johnson University Hospital by

22  plaintiff, ePLUS.

23    Mr. Irwin, have you seen this

24  document before?

25    A.   Yes.

Irwin, Robert - RW Johnson  3/10/2010  12:00:00 PM

9

```
 1      Q.   And when was that?
 2      A.   I would say about three weeks ago.
 3      Q.   Okay.  If you could turn to Schedule
 4   A of the subpoenas and it's on Page 10 of the
 5   attached schedules.
 6      A.   Mm'mm.
 7      Q.   Okay.  And could you review topics 1
 8   through 11 of Schedule A quickly.
 9      A.   I've reviewed these.
10      Q.   Okay.  And you understand that you've
11   been designated to testify regarding these topics?
12      A.   I do.
13      Q.   And you understand that you are
14   providing testimony on behalf of Robert Wood
15   Johnson as if Robert Wood Johnson itself were
16   sitting in the chair and giving testimony?
17      A.   Yes.
18      Q.   Are you prepared to testify on Robert
19   Wood Johnson's behalf with respect to these topics?
20      A.   Yes.
21      Q.   And what did you do to prepare to
22   testify concerning these topics?
23      A.   I reviewed the material that was sent
24   out in this suit and then I reviewed a series of
25   documents to prepare for what was going to be sent
```

11

```
 1   became vice-president of information systems?
 2      A.   I was a consultant with Price
 3   Waterhouse Coopers.
 4      Q.   So since you started Robert Wood
 5   Johnson your only position has been the
 6   vice-president of information systems?
 7      A.   Correct.
 8      Q.   Okay.  And what did your position at
 9   Price Waterhouse Coopers entail?
10      A.   I was a consultant so we did system
11   selection, project management for implementation
12   and strategic IT planning.
13      Q.   And how long did you work there?
14      A.   About five years.
15      Q.   All right.  Mr. Irwin, who's the
16   principal -- excuse me.  Let me start over.
17           Who's the principal person that you
18   interact with on a daily basis in your job here at
19   Robert Wood Johnson?
20      A.   I interact with quite a few different
21   people on a daily basis.
22           We have clinical and financial
23   systems so I interact with the physicians, the
24   nurses for the clinical systems.  I interact with
25   the finance staff, the financial systems, and then
```

10

```
 1   to you.
 2      Q.   Okay.  So you -- I apologize.
 3           You reviewed the documents that were
 4   sent to me or reviewed an index of the documents?
 5      A.   I went through my files, my office
 6   files to pull those documents out and as I was
 7   pulling them out I was reviewing them.
 8      Q.   Okay.  And were the documents that
 9   were provided all from your files?
10      A.   No.  There were some from others.
11      Q.   And were you personally responsible
12   for collecting those documents?
13      A.   Yes.
14      Q.   Okay.  Mr. Irwin, what is your
15   current position at Robert Wood Johnson?
16      A.   Vice-president of information systems.
17      Q.   And how long have you held that title?
18      A.   Almost eight years.  Eight years
19   in -- by the end of March.
20      Q.   Okay.  And what -- what are the scope
21   of responsibilities associated with that position?
22      A.   Responsible for all the information
23   systems selection and maintenance and running.
24   Implementation.
25      Q.   What position did you have before you
```

12

```
 1   I have my own staff and the supporting
 2   infrastructure; the technicians.
 3      Q.   Okay.  And so within your department
 4   of information systems who is the person that you
 5   report to directly?
 6      A.   I report to the CFO.
 7      Q.   And --
 8      A.   Carl O'Brien.
 9      Q.   Okay.  And who reports to you?
10      A.   Brenda Gazinski, the director of
11   clinical systems, Lila Price is the director of
12   financial systems, Ray Tyska is director of
13   operations and then I have a couple of second-tier
14   people that report directly to me.
15      Q.   And who are those two people?
16      A.   Jordan Ruch and Irene Singer and, of
17   course, the -- the secretary, the assistant to the
18   department, Antoinetta Cappiella.
19      Q.   Okay.  Thanks.
20           And how long -- excuse me.
21           How large is the information systems
22   group at Robert Wood Johnson?
23      A.   It's about 70 FTEs.
24      Q.   And you would be the overall head of
25   that group?
```

13

1    A.   Yes.
2    Q.   Okay.  Mr. Irwin, when did you find
3  out that you would be the designee for Robert Wood
4  Johnson for this deposition?
5    A.   About three weeks ago.
6    Q.   And did you meet with anyone to
7  prepare for this deposition?
8    A.   I met with Jim via telephone.  I
9  reviewed some materials with Manny Matias who was
10  recently here and -- but I can't say really...
11    Q.   Okay.  So no one else besides Mr.
12  Shrager and Mr. Matias?
13    A.   And my associate, Ira Novak.
14    Q.   Okay.  And so when you met with Mr.
15  Matias --
16    A.   Yes.
17    Q.   -- how many times did you meet with
18  him prior to this deposition?
19    A.   I meet with Manny on a daily basis
20  for the last six weeks for issues concerning the
21  Lawson install so I'm meeting with him regularly
22  working on completing the implementation.
23    Q.   I see.  But not specifically --
24    A.   Not.
25    Q.   -- to discuss the deposition?

14

1    A.   That's correct.
2    Q.   Okay.  Did you have any meetings that
3  were with Mr. Matias to discuss this deposition
4  specifically?
5    A.   We did have a few conversations.  I
6  would say two or three conversations.
7    Q.   And what was the substance of those
8  conversations?
9    A.   My question to Manny first and
10  foremost is what is Punch-Out because I had no idea
11  what it was.
12    Q.   Okay.  Anything else discussed?
13    A.   Just to prepare him to do the demo.
14    Q.   Okay.  Did you review any
15  documents -- let me -- let me rephrase that.
16       You said earlier that you reviewed
17  the documents that you had collected --
18    A.   Mm'mm.
19    Q.   -- and produced to ePLUS?
20    A.   Yes.
21    Q.   Okay.  Were there any other documents
22  that you reviewed besides the ones that you had
23  collected in preparation for this deposition?
24    A.   There probably were E-mails that I
25  did not send on but after talking to Jim -- when we

15

1  sent the first batch of documents out which
2  specifically were around the contract and its
3  Statement Of Work, Jim said to me that he didn't
4  think this was complete and so the second time
5  through I just started taking everything out of the
6  mail files that I had.
7    Q.   Okay.  But there were no other
8  documents besides those --
9    A.   No other document.
10    Q.   -- that you reviewed?
11    A.   I mean, I didn't even give you drafts
12  of the contract negotiations.
13    Q.   Right.  Okay.  All right.  Thanks.
14       All right.  So I understood earlier
15  from the testimony of Mr. Matias that Robert Wood
16  Johnson did an implementation of the Lawson
17  procurement software last year between -- starting
18  in April until about November --
19    A.   Mm'mm.
20    Q.   -- is that correct?
21    A.   That's correct.  We signed the
22  contract with Lawson in August of '08 and there
23  were a series of false starts between August and I
24  would say March so we really kicked off the
25  implementation in March.

16

1    Q.   I see.  And could you explain what
2  those false starts related to?
3    A.   Mostly around me acquiring the staff
4  to staff the project.
5    Q.   So --
6    A.   I was...
7    Q.   -- you felt you had insufficient
8  staff at the time when the contract was signed to
9  implement --
10    A.   That's correct.
11    Q.   -- the software?
12    A.   That's correct.
13    Q.   Okay.  And could you provide an
14  overview of how that implementation was
15  accomplished?
16    A.   We contracted with Lawson -- first of
17  all, we negotiated a Statement Of Work which
18  outlined what tasks were Lawson's responsibility
19  and what tasks were the Hospital's responsibility.
20       I hired a subcontractor to be the
21  project manager and we -- we met on a regular basis
22  with the implementation team and we moved through
23  the milestones that were outlined in the Statement
24  Of Work.
25    Q.   So you said that you subcontracted a

17

1    project manager?
2         A.    Yes.
3         Q.    That was someone outside of Robert
4    Wood Johnson?
5         A.    We brought him on as a per diem
6    employee.
7         Q.    I see.  And it was someone that was
8    also unaffiliated with Lawson?
9         A.    Yes.
10        Q.    What was that person's name?
11        A.    Mitchell Tredwell.
12        Q.    Could you spell the last name, please?
13        A.    T-r-e-d-w-e-l-l.
14        Q.    Okay.  And what company did Mr.
15   Tredwell --
16        A.    He was independent.
17        Q.    -- work for?
18        A.    He reported to me.
19        Q.    Okay.  Thanks.
20             You said that -- that Lawson and
21   Robert Wood Johnson had negotiated a Statement Of
22   Work to outline the responsibilities of Lawson and
23   the hospital respectively.  Is that correct?
24        A.    Correct.
25        Q.    Could you provide an overview of what

18

1    the responsibilities of Robert Wood Johnson were
2    for the implementation and what the responsibilities
3    of Lawson were?
4         A.    Lawson was to provide the software.
5    Robert Wood was to provide the hardware, get the
6    system installed.  Lawson provided guidance on how
7    to build the system.  Robert Wood staff actually
8    built the system and made the final decisions on
9    how the system would function.  And then Robert
10   Wood was responsible for testing.  Lawson trained
11   our core group of users and then our -- our we call
12   them super users trained the staff.
13        Q.    Okay.  So you said that Lawson was
14   responsible for providing the software?
15        A.    Mm'mm.
16        Q.    Does --
17        A.    Yes.
18        Q.    -- that include the installation of
19   the software?
20        A.    Lawson installed the software on the
21   systems.
22             Excuse me.  Traditionally in
23   healthcare the vendor -- vendors usually always
24   install the software.  I do believe in this case
25   Lawson didn't install the software.

19

1             My own staff might have installed the
2    software.
3             The Lawson's Statement Of Work was
4    slightly different than I'm used to.
5         Q.    Okay.  So you're not sure, though,
6    whether --
7         A.    Who actually loaded the software up.
8         Q.    Right.
9         A.    Yeah.
10        Q.    Okay.  And you said that Lawson
11   provided guidance on how to build the system?
12        A.    Yes.
13        Q.    Could you explain what sort of
14   guidance they provided?
15        A.    The various teams would get together
16   and talk about the work flow and how they wanted
17   the system to function and Lawson would explain if
18   you chose these set of parameters, the system would
19   meet that need or if you did it this way, it would
20   work, you know -- it would work differently.
21        Q.    So when you talk about the teams
22   associated with the implementation could you
23   describe how each team was composed?
24        A.    Right.  Now, in addition to the
25   applications that Manny discussed this morning, we

20

1    also contracted for payroll and Human Resources so
2    we had a Human Resources team, a payroll team, a
3    general ledger team, a materials team, an accounts
4    payable team, all right?
5         Q.    So the materials team would include
6    the procurement --
7         A.    Yes.
8         Q.    -- system?
9         A.    And they worked closely with the
10   accounts payable team.
11        Q.    I see.  So there was one team
12   associated with materials?
13        A.    That's correct.
14        Q.    And how large was that team?
15        A.    There probably were about five or six
16   on that.
17        Q.    How many of those five or six people
18   were Robert Wood Johnson employees?
19        A.    Four.  There was one Lawson person.
20        Q.    Okay.  So the team was four Robert
21   Wood Johnson employees and one Lawson employee?
22        A.    Yeah.  Don't hold me to the exact
23   numbers.
24        Q.    Okay.
25        A.    It was one Lawson person and, you

21

1   know -- the team would bring in someone who might
2   only come to a couple of meetings on a specific
3   topic.
4        Q.   Okay.  So do you remember the name of
5   the Lawson employee that was on that team?
6        A.   His first name was Bert.  I can get
7   you the last name later.
8        Q.   Would it be Bert --
9        A.   Bart.
10       Q.   -- Fisher?
11       A.   Bart.  Yeah.  Bart Fisher.
12       Q.   Bart Fisher.  Okay.
13            And do you know what his title was?
14       A.   Lawson consultant.
15       Q.   Okay.  He was -- Mr. Fisher was the
16  one that was providing the guidance on how to build
17  the materials system for Robert Wood Johnson?
18       A.   Yes.
19       Q.   Okay.  Thanks.
20            So you said that the implementation
21  began in March of 2009.  Is that correct?
22       A.   Yes.
23       Q.   And it was completed in November?
24  So --
25       A.   November 2009 -- yeah.  2009.

22

1        Q.   Okay.  So the entire implementation
2   took about eight months.  Is that correct?
3        A.   Mm'mm.  Yes.
4        Q.   In -- do you know what portion of
5   that time period was spent on implementing the
6   Lawson procurement software?
7        A.   That entire time frame was spent on
8   procurement.
9        Q.   Okay.
10       A.   Parallel to that, general ledger was
11  also being done, accounts payable was being done.
12       Q.   Okay.  And you said that Lawson also
13  provided some training to Robert Wood Johnson's
14  personnel on the procurement software?
15       A.   Yes.
16       Q.   And who did they provide that
17  training to?
18       A.   Well, Manny, a gentleman -- Paul
19  Febres and George Malik who's no longer with us.
20            That would be the three individuals
21  who received the majority of the training directly
22  from Lawson.
23       Q.   And these three personnel were all
24  part of the materials team --
25       A.   Yes.

23

1        Q.   -- for the project?  Okay.
2            And did Lawson also provide training
3   manuals to Robert Wood Johnson personnel?
4        A.   Yes.
5        Q.   What about administrator manuals?
6        A.   What's the difference?
7        Q.   Let me ask the question a different
8   way.
9            What types of documentation did
10  Lawson provide on its procurement software to
11  Robert Wood Johnson?
12       A.   Lawson provided a series of
13  instructional documents on how to load the item as
14  to file, how to load the vendor file, how -- what
15  jobs to run on a daily basis.
16            I did not review those documents
17  personally but we sent all those documents to you
18  in the last thumb drive.
19       Q.   Right.  I appreciate that, too.
20       A.   Okay.
21            MR. SHRAGER:  That was sarcastic in
22  case you didn't know.
23            THE WITNESS:  That's all we had.
24            MR. SHRAGER:  He got it on the
25  weekend.

24

1        Q.   Okay.  Was Robert Wood Johnson also
2   provided access to Lawson's Web site?
3        A.   I don't believe so.
4        Q.   Are you familiar with something
5   referred to as the Lawson online library?
6        A.   Only the words.
7        Q.   Okay.  So to your knowledge the
8   personnel at Robert Wood Johnson have never gone on
9   the Lawson Web site to download different types of
10  documentation --
11       A.   I don't know the answer to that.
12       Q.   Okay.
13       A.   For all I know some of those
14  documents could have come from there.
15       Q.   Okay.  Do you know who provided the
16  training associated with the Lawson procurement
17  software?
18       A.   Bart.
19       Q.   So Mr. Fisher, Bart Fisher?
20       A.   (Witness indicates.)
21       Q.   And do you know about how many hours
22  of training he provided?
23       A.   It's not a number off the top of my
24  head.  I know we were billed for it so I could
25  probably get you the number.

Irwin, Robert - RW Johnson  3/10/2010  12:00:00 PM

25

1    Q.  Okay.  Was there any sort of syllabus
2    provided for the topics that he gave training on?
3    A.  Yes, I believe there was.
4    Q.  Okay.  Do you know if that was
5    included in the documents that you provided ePLUS?
6    A.  I'm going to assume that it was.
7    Q.  Okay.
8    A.  It was our intention to.
9    Q.  And do you know if there was any
10   training that Mr. Fisher gave that wouldn't have
11   shown up on any such syllabus?
12   A.  I'm sure there was because as -- in
13   the training classes and there would be a follow-up
14   meeting, people would ask questions and he would
15   show them how to use the system.
16   Q.  Okay.
17   A.  Ad hoc.
18   Q.  Yeah.  Okay, Mr. Irwin.  You're
19   familiar with the Item Master in Lawson Software
20   system?
21   A.  Yes.
22   Q.  And can you explain how the Item
23   Master was initially set up for Robert Wood Johnson?
24   A.  We -- our staff extracted -- first of
25   all, we were told what -- what fields were

26

1    available in the Item Master.  Then we extracted
2    those fields from our previous vendor file -- Item
3    Master file.  Then we gave those -- that file to
4    Bart Fisher who then loaded it up into Lawson and
5    we did that in test and then we did that in
6    production.
7    Q.  Okay.  So you stated that the data
8    was extracted from the preexisting system that
9    Robert Wood Johnson was using?
10   A.  Correct.
11   Q.  And what was that system called?
12   A.  Matkon.  It was -- it's owned by
13   McKesson.
14   Q.  Okay.  And you stated that Robert
15   Wood Johnson performed the extraction of that data
16   from the Matkon system?
17   A.  Correct.
18   Q.  And how was that done?
19   A.  Probably using Crystal or Sequel.
20   Q.  Do you know if Lawson provided any of
21   the software that was used to extract the data from
22   the Matkon system?
23   A.  I don't think they did at all.  My
24   staff has been extracting data from Matkon for
25   years.  There would be no reason to ask for that

27

1    help.
2    Q.  Okay.  And once that data was
3    extracted from Matkon system were there particular
4    formats that the data had to be put in order for
5    it to be loaded into the Item Master?
6    A.  Yes.
7    Q.  And who performed that formatting?
8    A.  I don't know who exactly did it.  It
9    was either Manny Matias, Ryan Durco or Paul Febres;
10   all members of the Robert Wood Johnson staff.
11   Q.  Okay.  And how did Robert Wood
12   Johnson know what format that the data needed to be
13   in in order for it to work with Item Master?
14   A.  Lawson gave us the specs.
15   Q.  Okay.  So once this data that was
16   extracted from the Matkon system was formatted
17   along Lawson specs you stated that this data was
18   given to Mr. Fisher to load into the Item Master?
19   A.  He did the upload.
20   Q.  I see.  So at the time that the --
21   let me start over.
22       At the time that the system went live
23   in November 2009 all the item data that was in the
24   Item Master have been loaded in by Bart Fisher?
25   A.  Okay.  Yeah.

28

1    Q.  Yes?
2    A.  Yes.
3    Q.  Okay.  Does Lawson provide any
4    ongoing maintenance services to Robert Wood Johnson
5    related to the Lawson procurement system?
6    A.  We have an annual software
7    maintenance contract with Lawson to provide bug
8    fixes and enhancements.
9    Q.  And has this maintenance agreement
10   been in place with Lawson since the initial contract
11   was signed with Lawson?
12   A.  Yes.
13   Q.  And how often does Lawson provide
14   this type of maintenance?
15   A.  We have not taken any enhancements
16   yet because we're relatively new.  We have had a
17   few bug fixes --
18   Q.  Okay.
19   A.  -- since then that we loaded up.
20   Q.  Okay.  Is there any other type of
21   maintenance that's covered by the agreement other
22   than the bug fixes and enhancements that you
23   mentioned?
24   A.  No.
25   Q.  Okay.  And since the system went live

Irwin, Robert - RW Johnson  3/10/2010  12:00:00 PM

29

1   in November 2009 has any additional item data been
2   loaded to the Item Master?
3       A.   Yes.
4       Q.   And how is that performed?
5       A.   Using add-ins.  Using the Microsoft
6   add-ins feature.
7       Q.   And if I understood correctly from
8   testimony earlier these Microsoft add-ins were
9   provided from Lawson?
10      A.   As part of the Lawson contract
11  Microsoft add-in is a third-party software package
12  that we purchased through Lawson.
13      Q.   And who performs the upload of this
14  data now that the system is live?
15      A.   My staff.
16      Q.   Robert Wood Johnson?
17      A.   Robert Wood Johnson.
18      Q.   Has Lawson ever provided any
19  instructions on how to use the Microsoft add-ins
20  for loading new vendor or item data into the system?
21      A.   Yes.  And -- yes.
22      Q.   When was that?
23      A.   As recently as three weeks ago.
24      Q.   So Lawson has provided additional
25  instruction on how to upload this data even after

30

1   the implementation was complete?
2       A.   Yes.  We continue to contract with
3   Lawson for support and training.
4       Q.   So the support and training agreement
5   is separate from the maintenance agreement --
6       A.   Yes, it is.
7       Q.   -- that you referred to earlier?
8       A.   Yes, it is.
9       Q.   I see.  And do you know about how
10  many hours of training Lawson has provided on using
11  the Microsoft add-ins for loading data into the
12  Item Master?
13      A.   I would say it's between 10 and 14,
14  16 hours -- 10 to 16 hours.  One to two days.
15      Q.   And is this training schedule
16  beforehand or is it -- excuse me.
17          Is this training provided on an ad
18  hoc basis?
19      A.   We contracted with a support person
20  to come out for a week and we established what his
21  schedule would be for that week.
22      Q.   And do you know the person's name
23  from Lawson that gave the training?
24      A.   Eric.  I can get you the name.
25      Q.   Okay.  That's fine.

31

1       Q.   Did Lawson provide any additional
2   training materials relating to loading new data
3   into the Item Master?
4       A.   Lawson provided additional training
5   three weeks ago to the materials staff because we
6   weren't performing at a level that we would be
7   happy.
8           When they came out they brought out
9   the original syllabus of what should be covered and
10  then from that syllabus myself and others picked
11  the topics that we wanted to have focus training on
12  and add-ins was one of the topics.
13      Q.   I see.  So were the topics on the
14  syllabus the same topics that were from the
15  syllabus that Bart Fisher provided training from?
16      A.   I'm not sure.
17      Q.   Okay.  And has Robert Wood Johnson
18  ever used any software besides the Microsoft add-ins
19  to load new data into the Item Master?
20      A.   No.
21      Q.   Are you familiar with the module in
22  the Lawson system called IC 811?
23      A.   I'm not familiar with any of the
24  nomenclature of Lawson so if you rephrase that
25  question -- I don't know what an IC 811 is.

32

1       Q.   Okay.  Are you familiar with any APIs
2   that Lawson provided that could be used to load
3   data into the Item Master?
4       A.   No.
5       Q.   So all the data loads have been done
6   with the Microsoft add-ins?
7       A.   Yes.  All the data loads that we have
8   done have been done with the Microsoft add-in.
9       Q.   Right.  Because you said initially
10  Bart Fisher had done the upload onto the Item
11  Master.
12      A.   Yes.
13      Q.   Does Robert Wood Johnson have any
14  designated contacts at Lawson for maintenance?
15      A.   The staff uses global support and I
16  have a project director that I contact when I have
17  concerns.
18      Q.   What's the project director's name?
19      A.   Hannah Reilly.
20      Q.   Okay.  Thanks.
21          So if you had any technical problems
22  with the Lawson software would Hannah Reilly be the
23  person that you would speak to?
24      A.   That's who I would speak to.
25      Q.   Right.  Okay.  And, otherwise,

**33**

1  personnel at Robert Wood Johnson would contact

2  Global Support at Lawson?

3      A.   (Witness indicates.)

4      Q.   Is there any other specific people

5  that...

6      A.   There was a project manager, Kevin

7  Carney, but, frankly, he reports to Hannah and I

8  call Hannah.

9      Q.   Okay.  Do you know if Lawson puts any

10  restrictions on the ability of Robert Wood Johnson

11  to modify the Lawson procurement software?

12      A.   I'm not aware of Lawson having any

13  restrictions.

14      Q.   So to your knowledge Robert Wood

15  Johnson can make any modifications it wanted to the

16  Lawson procurement software as it's implemented

17  here?

18      A.   We can make any change we want using

19  the tables and screens provided.  We don't have

20  access to source code.

21      Q.   Okay.

22      A.   Nor do we want it.

23      Q.   Do you know if Lawson puts any

24  conditions on the warranty on the Lawson procurement

25  software -- let me back up.

**34**

1          Do you know if Robert Wood Johnson

2  has a warranty on the Lawson procurement software?

3      A.   We do.

4      Q.   And do you know if Lawson puts any

5  conditions on this warranty?

6          MR. SHRAGER:  If you remember, tell

7  him.  I assume the warranty will speak for itself.

8      A.   It's a fit for service warranty,

9  right?  Workmanlike...

10      Q.   Okay.

11      A.   We don't have access to the source

12  codes so, you know, we need to use it as it's been

13  built to be used, right?  It's a standard bold

14  letter type.

15      Q.   So to your knowledge there's -- with

16  the exception of accessing the source code which I

17  understand that you can't do here --

18      A.   That's right.

19      Q.   -- there's no other use that you're

20  familiar with that -- that if you used it in such a

21  manner it would void the warranty?

22      A.   That's correct.

23      Q.   Okay.  Do you know if there's any

24  circumstances on which Lawson reserves the right to

25  terminate its license agreement with Robert Wood

**35**

1  Johnson for the Lawson procurement software?

2      A.   One reason would be lack of payment.

3  Reverse engineering.  I don't recall all of them

4  but there are a few.

5      Q.   Okay.  And are these provided in the

6  license agreement?

7      A.   Yes.

8      Q.   Okay.

9          MR. CLEMENTS:  Court Reporter, could

10  you please mark this document as Exhibit Number

11  RWJ-2, please.

12          (Exhibit RWJ-2 marked for

13  identification.)

14      Q.   Okay.  What you've just been handed

15  has been marked Exhibit Number RWJ-2.  If you could

16  please take a moment to review it.

17          MR. CLEMENTS:  For the record, this

18  document is entitled Product Order Form, Lawson

19  Software Customer Agreement, and it bears Bates

20  label RWJ 000003 through RWJ 000008.

21          MR. SHRAGER:  The record should

22  reflect the Bates stamp numbers were put on by I

23  take it your office, Mr. Clements?

24          MR. CLEMENTS:  Yes, that's correct.

25      A.   (Witness indicates.)

**36**

1      Q.   Okay.  Mr. Irwin, have you seen this

2  document before?

3      A.   Yes.

4      Q.   And does this appear to be an

5  executed agreement between Lawson and Robert Wood

6  Johnson for the license of Lawson Software

7  applications?

8      A.   Yes.

9      Q.   And do you note that it's signed

10  August 29th, 2008?

11      A.   Yes.

12      Q.   So to your understanding August 2008

13  was the first time that Robert Wood Johnson entered

14  into a software license agreement with Lawson?

15      A.   Yes.

16      Q.   Okay.  If you could, turn to the page

17  marked Bates number RWJ -- let me just say the last

18  three digits -- ending in 007.

19      A.   Okay.

20      Q.   And you note at the top of the page

21  is -- has the header Schedule, parentheses, S-3

22  units/NT?

23      A.   Yes.

24      Q.   Does this schedule accurately reflect

25  the software applications that Robert Wood Johnson

37

1    licensed from Lawson in August 2008?
2         A.   Yes, it does.
3         Q.   Okay.  And so if you look about
4    halfway down the document there's a table with the
5    header Lawson Procurement Suite.  You see that?
6         A.   Yes.
7         Q.   And it says, "The suite includes
8    Requisitions, Purchase Order, Inventory Control,
9    Requisition Self-Service."  You see that?
10        A.   Yes.
11        Q.   So is it correct that -- that these
12   modules in the Lawson procurement suite were
13   licensed from Lawson in August 2008?
14        A.   Yes.
15        Q.   And is Robert Wood Johnson currently
16   licensing all the procurement suite products shown
17   in this schedule?
18        A.   Yes.
19        Q.   And have all these products been
20   implemented?
21        A.   I believe so.
22        Q.   Okay.  Okay.  You could put that
23   document aside.
24            MR. CLEMENTS:  Court Reporter, could
25   you please mark this document as Exhibit Number

38

1    RWJ-3, please.
2             (Exhibit RWJ-3 marked for
3    identification.)
4         Q.   Okay, Mr. Irwin.  I'm handing you
5    what has been marked as Exhibit Number RWJ-3.  If
6    you could please take a moment to review it.
7             MR. CLEMENTS:  For the record, this
8    document is entitled Lawson Software Customer
9    Agreement, Master Terms and Conditions, and it
10   bears the Bates label RWJ 000011 through RWJ
11   000016.
12        Q.   Just let me know when you're finished
13   reviewing it, please.
14        A.   I've reviewed it.
15        Q.   Okay.  Have you seen this document
16   before?
17        A.   Yes.
18        Q.   And is it an executed agreement
19   between Lawson and Robert Wood Johnson governing
20   the terms and conditions of all other written
21   agreements between these parties?
22        A.   Yes.
23        Q.   And you note that it was also dated
24   and signed on August 29th, 2008?
25        A.   Yes.

39

1         Q.   Okay.
2             MR. SHRAGER:  There's two separate
3    dates when Robert Wood signed it and when Lawson
4    signed it.
5             MR. CLEMENTS:  Okay.  Fair point.
6         Q.   So you see that it was signed by
7    Lawson on August 29, 2008.
8         A.   Yes.
9         Q.   Is that correct?  And that on August
10   28, 2008 it was signed by Robert Wood Johnson?
11        A.   Yes.
12        Q.   Okay.  Thanks.
13        A.   That's the same as the last agreement.
14        Q.   Yes.
15        A.   Okay.
16        Q.   Okay.  If you would please turn to
17   the page marked Bates number RWJ 000013.
18        A.   Okay.
19        Q.   And if you would, if you look at the
20   top left column there's a Section 2.1 titled
21   Installation And Use.  Do you see that?
22        A.   Yes.
23        Q.   Okay.  And then underneath there's a
24   Section 2.1.1 and here it says, "Unless otherwise
25   authorized by Lawson in writing only the applicable

40

1    specified customer, Lawson group, or a Lawson
2    partner retained by that specified customer may
3    install or host the products, upgrades,
4    enhancements and new releases of the products,
5    service deliverables and specified customer
6    modifications of the Lawson products and service
7    deliverables listed in the order form identifying
8    that specified customer."
9             You see that?
10        A.   Yes.
11        Q.   Are you aware that Lawson does not
12   permit Robert Wood Johnson to use third parties to
13   perform installation or hosting of the software
14   licensed from Lawson unless that third party is a
15   Lawson partner?
16        A.   Yes.
17        Q.   Okay.  And if you look at Section
18   2.1.2 it states, "The specified customer identified
19   in an order form or Statement Of Work may use the
20   products and service deliverables listed in that
21   order form or Statement Of Work only in accordance
22   with the documentation."
23             You see that?
24        A.   Yes.
25        Q.   And are you aware that Lawson does

Irwin, Robert - RW Johnson  3/10/2010  12:00:00 PM

41

1   not permit Robert Wood Johnson to use the licensed
2   software except in accordance with the
3   documentation that was provided with the software?
4       A.   That's what it says.
5       Q.   Okay.  Now, if you look down -- let
6   me back up for a moment.
7       If you look down at Section 2.4.
8   It's titled Modifications And Ownership.  Do you
9   see that?
10      A.   Yes.  Okay.
11      Q.   And it states, "Customer may modify
12  the Lawson products and service deliverables only
13  to the extent permitted under an order form or
14  described in the documentation for those products."
15      Do you see that?
16      A.   Yes.
17      Q.   And are you aware that Lawson does
18  not permit Robert Wood Johnson to modify the
19  licensed software except as described in the
20  documentation for the software?
21      A.   Yes.
22      Q.   Okay.  And if you look at the top of
23  the next column, Section 2.5, and it's titled
24  Restrictions.
25      And under 2.5.1 it states, "The

42

1   specified customer identified in an order form may
2   not transfer, rent, lease, redistribute or
3   re-license the products or service deliverables or
4   use the products or service deliverables listed in
5   that order form to provide data processing,
6   outsourcing, service bureau, hosting services or
7   training to third parties.  Customer will not
8   disassemble, decompile, decode or reverse engineer
9   the software except as expressly permitted by
10  applicable law."
11      You see that?
12      A.   Yes.
13      Q.   And are you aware that Lawson does
14  not permit Robert Wood Johnson to use the licensed
15  software to provide data processing, outsourcing,
16  service bureau, hosting services or training to
17  third parties?
18      A.   Yes.
19      Q.   And if you look down at Section 2.5.3
20  it states, "Customer shall not directly or indirectly
21  export the products or service deliverables from
22  the country of initial delivery by Lawson without
23  the prior written authorization of Lawson in
24  compliance with applicable laws and regulations."
25      You see that?

43

1       A.   Yes.
2       Q.   Are you aware that Lawson does not
3   permit Robert Wood Johnson to export the licensed
4   software outside this country?
5       A.   Yes.
6       Q.   Okay.  All right.  That's all I have
7   for that document.  You can put that aside.
8       MR. CLEMENTS:  Court Reporter, could
9   you please mark this document as Exhibit Number
10  RWJ-4.
11      (Exhibit RWJ-4 marked for
12  identification.)
13      Q.   Mr. Irwin, I'm handing you what has
14  been marked as Exhibit Number RWJ-4.  If you could,
15  please, take a moment to review it and let me know
16  when you're finished.
17      MR. CLEMENTS:  For the record, this
18  document is entitled Lawson Software Customer
19  Agreement, Master Terms and Conditions.  It also
20  has stamped across it "Draft.  Not a legal document."
21  it bears the Bates label RWJ 000048 through RWJ
22  000060.
23      A.   Yes.
24      Q.   Okay.  Mr. Irwin, have you seen this
25  document before?

44

1       A.   Yes.
2       Q.   Does it appear to reflect draft terms
3   for an agreement regarding the master terms and
4   conditions between Lawson and Robert Wood Johnson?
5       A.   Yes, it does.
6       Q.   Okay.  And you note that it's
7   unsigned by either party?
8       A.   Yes.
9       Q.   What is the purpose of this document?
10      A.   It was used for contract negotiation.
11      Q.   Okay.  If you note there's a column
12  on the right-hand side behind -- excuse me.
13      You note there's a column on the
14  right-hand side next to each of the terms in this
15  draft agreement?
16      A.   Yes.
17      Q.   See that?  And there's both typed and
18  handwritten remarks in some of the blocks in the
19  right-hand column.  You see that?
20      A.   Yes.
21      Q.   And were these remarks that were made
22  by Robert Wood Johnson?
23      A.   These remarks were made by me.  I
24  took their master agreement, created the column,
25  read through their document, typed in my initial

45

1   request, sent it off to Lawson and then in the
2   follow-up telephone conversation my handwritten
3   notes are on this document.
4        Q.   I see.  So that the remarks that are
5   typed into this right-hand column reflect your
6   concerns about the draft terms as they were set
7   forth initially?
8        A.   Yes.
9        Q.   And the handwritten notes reflect
10  what was discussed during negotiations with Lawson
11  on those terms?
12       A.   On July 14th.
13       Q.   On July 14th.  Thank you.
14            Okay.  You can put that document aside.
15  thank you.
16            I'm going to just relieve you now.
17  We're not going to go through every document in
18  this box.
19            MR. SHRAGER:  That was just what was
20  going through my head.  Good timing.
21            MR. CLEMENTS:  What are we up to now?
22            MR. SHRAGER:  5.
23            MR. CLEMENTS:  Court Reporter, could
24  you please mark this document as Exhibit Number
25  RWJ-5.

46

1            (Exhibit RWJ-5 marked for
2   identification.)
3        Q.   Mr. Irwin, if you would please take a
4   moment to review this document and let me know when
5   you've had a chance to look it over.
6            MR. CLEMENTS:  For the record, this
7   document is entitled Lawson Software Customer
8   Agreement, Master Terms and Conditions, and similar
9   to the last document we looked at, it also has
10  stamped on it "Draft.  Not a legal document."
11            It bears the Bates label range of RWJ
12  000068 through RWJ 000084.
13       A.   I've reviewed it.
14       Q.   Okay.  Great.
15            Mr. Irwin, have you seen this
16  document before?
17       A.   Yes.
18       Q.   And similar to the last exhibit we
19  looked at does this appear to reflect draft terms
20  for an agreement regarding the master terms and
21  conditions between Lawson and Robert Wood Johnson?
22       A.   Yes.
23       Q.   Okay.  And you'll note that this
24  document has a third column added to it.
25       A.   Yes.

47

1        Q.   And the third column also has remarks
2   typed into it?
3        A.   Yes.
4        Q.   Could you explain what the purpose of
5   this document is?
6        A.   This document is -- reflects Lawson's
7   response to the previous document and discussion.
8        Q.   So would the --
9        A.   For that third column on the right
10  would be Lawson's responses.
11       Q.   Okay.  Great.
12            And if you would, would you turn to
13  the page marked Bates number RWJ 000074.
14       A.   Yes.
15       Q.   And now if you'll look down about
16  three-quarters of the way down the document there's
17  number 3.2 and it states in the left-hand column,
18  "Except as otherwise agreed in order form,
19  customer's responsible at customer's expense for
20  installation of the software and service
21  deliverables, user training, data conversion,
22  implementation and other services."
23            Do you see that?
24       A.   Yes.
25       Q.   And then in the second column it

48

1   states "We plan on contracting for installation."
2            You see that?
3        A.   Yes.
4        Q.   And we being Robert Wood Johnson?
5        A.   Correct.
6        Q.   Okay.  And then in the third column
7   it states, "As seen in Lawson's Statement Of Work
8   Lawson will be installing the software at both
9   sites, parentheses, New Brunswick and Hamilton."
10       A.   Correct.
11       Q.   You see that?
12       A.   Yes.
13       Q.   And is it your understanding that
14  Lawson installed the software for Robert Wood
15  Johnson?
16       A.   Yes.
17       Q.   Okay.  Thank you.
18            Okay.  You can put that document aside.
19            MR. CLEMENTS:  Videographer, how are
20  we doing on time?
21            THE VIDEOGRAPHER:  25 minutes.
22            MR. CLEMENTS:  Okay.  Good.
23            (Pause.)
24            THE VIDEOGRAPHER:  Oh, I'm sorry.
25  Actually, we have 20 minutes.

**49**

1  MR. CLEMENTS:  20 minutes?  Okay.
2  MR. SHRAGER:  It's enough for him to
3  finish.
4  MR. CLEMENTS:  Sorry?
5  MR. SHRAGER:  Nothing.
6  MR. CLEMENTS:  Court Reporter, could
7  you please mark this document as Exhibit Number
8  RWJ-6, please.
9  (Exhibit RWJ-6 marked for
10  identification.)
11  Q.  Okay.  I'm handing you what has been
12  marked as Exhibit Number RWJ-6.  Please take a
13  moment to review it and let me know when you're
14  finished.
15  MR. CLEMENTS:  For the record, this
16  document is entitled Lawson Software Americas,
17  Inc., Statement Of Work For Robert Wood Johnson
18  University Hospital, New Brunswick, New Jersey.  It
19  bears the Bates label RWJ 000086 through RWJ 0000124.
20  A.  I've reviewed it.
21  Q.  Okay.  Mr. Irwin, have you seen this
22  document before?
23  A.  Yes.
24  Q.  And does this appear to be a
25  Statement Of Work entered into by Lawson and Robert

**50**

1  Wood Johnson?
2  A.  Yes.
3  Q.  And does this Statement Of Work
4  pertain to the services that Lawson performed for
5  the implementation of software applications that
6  Robert Wood Johnson had licensed from Lawson?
7  A.  Yes.
8  Q.  Okay.  If you would, turn to Page
9  marked Bates number RWJ 000089.
10  A.  Okay.
11  Q.  And if you note Section 2.1, about
12  halfway down, it's -- the heading is titled Current
13  Application Landscape.  You see that?
14  A.  Yes.
15  Q.  And does this section reflect
16  preexisting software applications that Robert Wood
17  Johnson had in place at the time of the agreement?
18  A.  Some of them.
19  Q.  Okay.  Could you state which ones are
20  not accurate?
21  A.  No.  Robert Wood Johnson runs well
22  over a hundred software applications.  This is a
23  subset of the applications we run.
24  Q.  I see.  But all these applications on
25  this list were being run at Robert Wood Johnson at

**51**

1  the time of the agreement?
2  A.  Yes.
3  Q.  Okay.  And if you note under the
4  headings for New Brunswick on this page and under
5  Hamilton on the next page there's an MM and next to
6  it it says McKesson ESI, parentheses, Matkon.  You
7  see that?
8  A.  Yes.
9  Q.  And is this the procurement software
10  that you referred to earlier that Robert Wood
11  Johnson was using from Lawson?
12  A.  Yes.
13  Q.  Okay.  All right.  If you would turn
14  to Page Bates number RWJ 000090.
15  A.  Okay.
16  Q.  Okay.  And you see the heading 3.1,
17  Proposed Application Landscape.  You see that?
18  A.  Yes.
19  Q.  And underneath it it states again
20  Proposed Applications Scope.
21  A.  Yes.
22  Q.  Were all the software applications
23  listed in this section within the scope of the
24  project described in the Statement Of Work?
25  A.  Could you ask that again?

**52**

1  MR. SHRAGER:  Yeah.  That one didn't
2  work.
3  MR. CLEMENTS:  I apologize --
4  THE WITNESS:  That's okay.
5  MR. CLEMENTS:  -- for that question.
6  Q.  Were all the software applications
7  listed in this section covered within the scope of
8  this Statement Of Work?
9  A.  That was its intention.
10  Q.  Okay.  And looking over this list of
11  applications are there any that look like they were
12  not actually part of the Statement Of Work as it
13  was performed?
14  A.  They were all part of the Statement
15  Of Work.
16  Q.  Okay.  And you note the heading
17  Supply Chain Management underneath?
18  A.  Yes.
19  Q.  And within that there's requisitions,
20  Requisition Self-Service, purchase order, inventory
21  control, electronic data interchange and mobile
22  pricing management.  You see that?
23  A.  Yes.
24  Q.  So all of these applications were
25  part of this Statement Of Work?

53

1     A.  Yes.

2     Q.  Okay.  And you see under Electronic

3  Data Interchange, next to that it states "Up to

4  five transactions (such as EDI, PO invoice, et

5  cetera) with two training partners/vendors one of

6  which is GHX."

7     You see that?

8     A.  Yes.

9     Q.  And does that mean that five

10  transactions within EDI were part of this Statement

11  Of Work?

12     A.  That was the intention.

13     Q.  Okay.  And what would it mean that

14  these were within the Statement Of Work?

15     A.  That Lawson would help set them up

16  and provide training to my staff that we would then

17  be able to continue with other vendors past the

18  first two vendors.

19     Q.  Okay.  So Lawson would assist with

20  providing up to five transactions for two vendors

21  and then after that Robert Wood Johnson would be on

22  their own for the remaining --

23     A.  That's right.

24     Q.  -- vendors?

25     And do you know when five

54

1  transactions were set up?

2     A.  I don't believe all five were set up.

3  I do -- you know, the invoice -- let's see.  The PO

4  out to GHX was set up, the electronic invoicing

5  coming back in which I believe is the A 10 was set

6  up.  We haven't taken advantage of all five of the

7  EDI transactions that we would find deeper into

8  this document.

9     Q.  Okay.  And do you know who the other

10  trading vendor was besides GHX that was part of it?

11     A.  No.  It was to be determined by us.

12     Q.  Okay.

13     A.  So like Manny or I would choose who

14  that vendor is.

15     Q.  Did you ever choose another vendor?

16     A.  We have not.

17     Q.  I see.  But Lawson assisted with

18  setting up GHX?

19     A.  GHX.

20     Q.  Okay.

21     A.  The concern at the time was that

22  Hamilton might not go -- continue with GHX so they

23  would need another vendor like GHX but that never

24  happened.

25     Q.  Okay.  Do you know what percentage of

55

1  transactions that GHX accounts for for Robert Wood

2  Johnson?

3     A.  Only what Manny said this morning.

4     Q.  Okay.

5     A.  70, 80 percent.

6     Q.  Okay.

7     (Pause.)

8     Q.  Okay.  You could put that document

9  aside for now.  I might return to it a little bit.

10  I want to keep moving on.

11     MR. CLEMENTS:  Court Reporter, could

12  you please mark this document as Exhibit Number

13  RWJ-7.

14     I just want to go through these

15  documents fairly quickly.

16     (Exhibit RWJ-7 marked for

17  identification.)

18     Q.  I've handed you what's been marked as

19  Exhibit Number RWJ-7.  If you could please take a

20  moment to review it and let me know when you're

21  finished.

22     MR. CLEMENTS:  For the record, this

23  document is entitled Requisition Self-Service RSS

24  Training Guide, Lawson Software.  It bears a Bates

25  label RWJ 003998 through RWJ 004020.

56

1     A.  I've looked at it.

2     Q.  Okay.  Have you seen this document

3  before?

4     A.  Only briefly before I sent it off to

5  you.

6     Q.  Okay.  And does this appear to be a

7  training guide for Lawson's Requisition

8  Self-Service application for use by Robert Wood

9  Johnson?

10     A.  Yes.

11     Q.  Do you know who authored this

12  document?

13     A.  I believe Manny Matias authored this

14  document.

15     Q.  If it was not Mr. Matias would it

16  have been someone at Robert Wood Johnson?

17     A.  Yes.

18     Q.  So it was not authored by Lawson?

19     A.  No.

20     Q.  Did Lawson provide any assistance in

21  drafting this document?

22     A.  I don't know.

23     Q.  You see down at the bottom left

24  corner it says modified 7/27/2009.  Do you know if

25  that was the date this document was created?

Irwin, Robert - RW Johnson  3/10/2010  12:00:00 PM

57

1    MR. SHRAGER: Modified?
2    A.   I don't know.
3    Q.   Do you have any idea when the
4    document might have been created?
5    A.   No.
6    Q.   Okay.  You can put that document
7    aside.
8    MR. CLEMENTS: Court Reporter, could
9    you please mark this document as Exhibit Number
10   RWJ-8, please.
11   (Exhibit RWJ-8 marked for
12   identification.)
13   Q.   I'm handing you what has been marked
14   as Exhibit Number RWJ-8.  If you would, please take
15   a moment to review it.  Let me know when you're
16   finished.
17   MR. CLEMENTS: For the record --
18   A.   I'm okay.
19   Q.   Okay.
20   MR. CLEMENTS: And for the record
21   this document is entitled Lawson Implementation
22   Buyer Training Guide.  Bears Bates range RWJ 003860
23   through RWJ 003912.
24   Q.   Have you ever seen this document
25   before?

58

1    A.   Only in preparing the documents for
2    you.
3    Q.   Okay.  Does this document appear to
4    be a guide on Lawson's procurement software for --
5    for the purpose of training buyers at Robert Wood
6    Johnson?
7    A.   Yes, it does.
8    Q.   Do you know who authored this
9    document?
10   A.   Lawson to the best of my knowledge.
11   Q.   Do you know who at Lawson authored
12   this document?
13   A.   No.
14   Q.   Okay.  Do you know when this document
15   was provided to Robert Wood Johnson?
16   A.   No.
17   Q.   Do you know if this document was used
18   during any training provided to buyers at Robert
19   Wood Johnson?
20   A.   Can I just go tongue in cheek for a
21   minute?  I hope so.  Yes.  Sorry.
22   Q.   That's okay.
23   Do you know -- do you know who gave
24   the training?
25   A.   That would be Bart Fisher.

59

1    Q.   Okay.  Is this -- let me start over.
2    The training for these buyers would
3    be the same training that we discussed earlier that
4    Mr. Fisher provided to law -- excuse me -- to
5    Robert Wood Johnson?
6    A.   Yes.
7    Q.   Okay.  You can set that document
8    aside.
9    MR. CLEMENTS: What are we up to now?
10   9?
11   MR. SHRAGER: 9.
12   MR. CLEMENTS: Court Reporter, could
13   you please mark this document as Exhibit Number
14   RWJ-9.
15   (Exhibit RWJ-9 marked for
16   identification.)
17   Q.   Okay.  You've been handed what's been
18   marked as Exhibit Number RWJ-9.  Take a moment to
19   review it and let me know when you've had a chance
20   to finish.
21   MR. CLEMENTS: For the record this
22   document is entitled System Admin Steps To Adding
23   An Item.  It bears the Bates label RWJ 004144
24   through RWJ 004165.
25   A.   Okay.

60

1    Q.   Have you ever seen this document
2    before?
3    A.   Only in preparing for the deposition.
4    Q.   Okay.  Does this appear to be a guide
5    providing instructions on methods to add items to
6    the Item Master in Lawson's procurement software?
7    A.   Yes.
8    Q.   Do you know who authored this
9    document?
10   A.   I would assume Lawson authored the
11   document.
12   Q.   If Lawson -- strike that question.
13   Do you know when this document was
14   created?
15   A.   No, I do not.
16   Q.   Do you know if this document was used
17   in conjunction with --
18   A.   Can I bring something up?
19   Q.   Yes.
20   A.   If you look at the detail on this
21   document, if you look at Page 004146, under the
22   C -- 1 IC 11 Item Master, if you see Prepared By?
23   Q.   Yes.
24   A.   That is a Robert Wood Johnson
25   employee.

Irwin, Robert - RW Johnson  3/10/2010  12:00:00 PM

---

61

1    Q.    Okay.

2    A.    And I see that his initials are on

3 another page, 004149.  That would lead me to

4 believe that Paul Febres created the document.

5    Q.    Okay.  All right.  Thank you.

6         And do you know if this document was

7 used in conjunction with any training that was

8 provided to Robert Wood Johnson personnel on --

9    A.    That was --

10    Q.    -- Lawson procurement --

11    A.    -- the intention --

12    Q.    -- software?

13    A.    -- of this -- the intention of this

14 document was to help train the buyers and the

15 storeroom to how to maintain the Item Master?

16    Q.    And do you know who provided that

17 training?

18    A.    From -- from Lawson it would be Bart

19 Fisher but it appears that one of my staff, Paul

20 Febres, has been an integral part of that.  Paul

21 was our technical rep on the Lawson project.

22 Technical analyst.

23    Q.    So it could be Paul Febres or Bart

24 Fisher or both in conjunction that performed the

25 training?

---

62

1    A.    Yes.

2    Q.    Okay.  I think we can put that

3 document aside and if we could take a break for the

4 videographer to change tapes.  I think we're just

5 about out of tape.

6         THE VIDEOGRAPHER:  This concludes

7 volume one, tape number one in the deposition of

8 Robert Irwin.  Going off the record.  The time is

9 3:12.,

10         (Recess taken at 3:12 p.m.)

11         (Exhibit RWJ-10 marked for

12 identification.)

13         THE VIDEOGRAPHER:  Back on the record

14 at 3:23.,

15         This begins volume one, tape number

16 two in the deposition of Robert Irwin.

17 BY MR. CLEMENTS:

18    Q.    Mr. Irwin, I handed you what's been

19 marked as Exhibit Number RWJ-10.  If you would,

20 please take a moment to review it and let me know

21 when you're done.

22         MR. CLEMENTS:  For the record, this

23 document is entitled Requisition Approval Training

24 Guide.  It bears a Bates label RWJ 004166 through

25 RWJ 004175.

---

63

1    A.    All right.

2    Q.    Have you seen this document before?

3    A.    Only in gathering the materials to

4 send to you.

5    Q.    Okay.  Does this document appear to

6 be a guide to Lawson's procurement software for

7 training those personnel at Robert Wood Johnson who

8 would be approving requisitions?

9    A.    Yes.

10    Q.    And do you know who authored this

11 document?

12    A.    No.

13    Q.    Do you know if it was someone at

14 Robert Wood Johnson?

15    A.    It appears that it was done by staff

16 at Robert Wood Johnson.

17    Q.    And how is it that you can tell that?

18    A.    On Page 4168 the -- where it says

19 unit work 160, says the host was done on our

20 systems.  It says dev host sap.  That's a -- that's

21 the computer at Hamilton.

22    Q.    Okay.

23    A.    All right.  See ham there?  And there

24 are other nomenclature further down in the

25 document.

---

64

1         On Page 004172 again it says hhtp sap

2 100 Hamilton rwjuh at edu.

3    Q.    Okay.  Do you know if this document

4 was used in conjunction with any training done at

5 Robert Wood Johnson?

6    A.    The purpose of this document would be

7 to train directors and vice-presidents to approve

8 requisitions that were generated by their staff.

9    Q.    Okay.  And was any such training done

10 at Robert Wood Johnson?

11    A.    There were training classes.  Not

12 everyone attended but there were training classes.

13    Q.    And who gave those training classes?

14    A.    Our staff.

15    Q.    Okay.

16    A.    Earlier we talked about the super

17 user.  Lawson trained the super user.  Super user

18 trained the staff.

19    Q.    Okay.  You can put that document

20 aside.

21         MR. CLEMENTS: Court Reporter, could

22 you please mark this document as Exhibit Number

23 RWJ-11, please.

24         (Exhibit RWJ-11 marked for

25 identification.)

---

Irwin, Robert - RW Johnson  3/10/2010  12:00:00 PM

65

1   Q.   Okay, Mr. Irwin.  I've handed you
2   what's been marked as Exhibit Number RWJ-11.  If
3   you would please take a moment to review it and let
4   me know when you're done.
5        MR. CLEMENTS:  For the record, this
6   document is entitled Procurement Design Document
7   For Robert Wood Johnson University Health.  It bears
8   the Bates label RWJ 002452 through RWJ 002525.  Okay.
9   Q.   Have you seen this document before?
10  A.   Only in preparing the documents for
11  you.
12  Q.   Does this document appear to be
13  laying out the design configuration of Lawson's
14  procurement software as it was implemented at
15  Robert Wood Johnson?
16  A.   I haven't reviewed the document in
17  detail enough to answer that question.  You want to
18  try another question or...
19  Q.   Sure.  Do you have any reason to
20  believe that this document does not accurately
21  describe the design configuration that's used at
22  Robert Wood Johnson?
23  A.   I don't know whether it does or it
24  doesn't.
25  Q.   Okay.  Do you know who authored this

66

1   document?
2   A.   It says that Bart Fisher authored the
3   document.
4   Q.   And Bart Fisher is a Lawson employee?
5   A.   Yes, he is.
6   Q.   And he was the consultant that we've
7   discussed earlier?
8   A.   Yes.
9   Q.   And do you know when this document
10  was created?
11  A.   June 28th, 2009 based on what's
12  marked on the document.
13  Q.   And do you have any idea what the
14  purpose of this document might be?
15  A.   When it was first handed to me I
16  thought it was another training document.  I'm
17  starting to think that it wasn't.  It was used for
18  more than just training.
19  Q.   Okay.
20  A.   It appears to be the first set-up of
21  the software.
22  Q.   And when you say first set up do you
23  think there might have been some alterations?
24  A.   Since --
25  Q.   -- since then?

67

1   A.   -- that time.
2   Q.   And do you know what --
3   A.   Based --
4   Q.   -- alterations were performed since
5   that time?
6   A.   I do not know but based on this date
7   this would be the time frame for the training --
8   the test system to be set up so there would
9   definitely be changes since that date.
10  Q.   I see.  Based on what the results of
11  the test were?
12  A.   Right.
13  Q.   Okay.  All right.  That's all I have
14  for that document.
15       MR. CLEMENTS:  And why don't we just
16  check?  I think that may be all I have.
17       (Pause.)
18       MR. CLEMENTS:  Yeah, I have no
19  further questions.
20       MR. SHRAGER:  Mr. Graham, I assume
21  you do.
22       MR. GRAHAM:  Just a few questions,
23  yes.
24  CROSS-EXAMINATION BY MR. GRAHAM:
25  Q.   Mr. Irwin, can I have you take a look

68

1   at Exhibit 8 again?
2   A.   8?
3   Q.   It is entitled Lawson Implementation
4   Buyer Training Guide.
5   A.   Yes.
6   Q.   And you stated when Mr. Clements was
7   asking you that this was -- you believe this was
8   authored by Lawson?
9   A.   Yes.
10  Q.   Can I have you look at Page 2 which
11  is Bates number RWJ-003862.
12  A.   Yes.
13  Q.   Can I direct your attention to the
14  line that says Prepared By four lines from the top?
15  A.   Yes.
16  Q.   And it says P --
17  A.   Febres.
18  Q.   Febres.
19  A.   He's a Robert Wood employee.
20  Q.   Would that lead you to believe that
21  this document was actually authored by a Robert
22  Wood Johnson employee?
23  A.   Yes.
24       MR. GRAHAM:  I have no further
25  questions on that document.

Irwin, Robert - RW Johnson  3/10/2010  12:00:00 PM

69

1          MR. SHRAGER:  I almost got real
2     excited the way that was phrased.
3          Q.   I just want to ask you a couple of
4     questions about the installation and the
5     implementation.
6          A.   Okay.
7          Q.   So you stated that Lawson installed
8     the procurement system on Robert Wood Johnson's
9     hardware.  Is that right?
10         A.   Yes.
11         Q.   After installation but before
12    implementation were there any items in the Item
13    Master?
14         A.   I -- I didn't quite understand the
15    question.  After?
16         Q.   After the installation but before the
17    implementation were there any items in the Item
18    Master?
19         A.   No.
20         Q.   And let me make sure I got the steps
21    correctly.
22         It sounds like the way that the Item
23    Master was initially populated was employees from
24    Robert Wood Johnson extracted files from the old
25    Matkon system and then formatted the data and then

70

1     Bart Fisher or -- imported those into the Item
2     Master.  Is that correct?
3          A.   That's the way I understand it.
4          Q.   At that point were the items in the
5     Item Master associated with any vendors?
6          A.   No.  That's something I found out
7     recently; that in our old system all the items were
8     associated with vendors.  In Lawson we have to go
9     through a second step to associate them with
10    vendors.
11         Q.   Who did that second step in the
12    Lawson system of associating the items with the
13    vendors?
14         A.   We're still doing it.
15         Q.   You're still doing it.
16         A.   So we do it.
17         Q.   One more set of questions.
18         Regarding the GHX transactions, you
19    stated that Lawson helped you set up the purchase
20    order out and the electronic invoicing for GHX?
21         A.   (Witness indicates.)
22         Q.   What were the other three
23    transactions that you didn't have set up?
24         A.   I don't know all the -- the five EDI
25    transactions, all right?

71

1          Q.   Do you know what was -- what was
2     required to set the purchase order out transaction
3     up for GHX?
4          A.   No.
5          Q.   Do you know what was required to set
6     up the electronic invoicing from GHX?
7          A.   Let me re -- let me restate that.
8          I believe the electronic invoicing is
9     coming directly from Owens and Minor.  Not -- no.
10         The electronic invoice -- yeah.  The
11    electronic invoicing is coming from Owens and
12    Minor.  That's the only vendor we have on the 810.
13         Q.   Okay.  What information comes back
14    from Owens and Minor when they send an electronic
15    invoice through EDI?
16         A.   Oh, the PO number, the PO amount for
17    each line.
18         Q.   Okay.
19         A.   So it -- it -- it's really like a
20    paper invoice.  It has all the lines on it.
21         MR. GRAHAM:  That's all the questions
22    I have.
23         MR. CLEMENTS:  Okay.  I have just a
24    couple more questions.
25    REDIRECT EXAMINATION BY MR. CLEMENTS:

72

1          Q.   Okay.  Mr. Irwin, you said that
2     you're still working on -- excuse me.
3          You said that Robert Wood Johnson is
4     still working on associating items in Item Master
5     with vendors.  Is that correct?
6          A.   Correct.
7          Q.   And when did that process begin?
8          A.   It began with the go live on November
9     1st.
10         Q.   And who is responsible for doing this
11    work?
12         A.   Various members of the materials
13    management staff but it's being led by Manny.
14         Q.   And has Lawson had any involvement
15    in -- with this project of associating Item Master
16    items with vendors?
17         A.   It has been part of the follow-up
18    education that we've asked Lawson to provide.
19         Q.   And aside from that -- that
20    additional education that was provided by Lawson
21    for this purpose has Lawson provided any other
22    assistance for this project?
23         A.   That's pretty open-ended.  Yes.
24         Q.   And what -- what sort of assistance?
25         MR. SHRAGER:  That's all right.

Irwin, Robert - RW Johnson  3/10/2010  12:00:00 PM

73

1          A.    The same type of assistance that had
2     been provided all along; education of the staff,
3     review of how the system is set up and how it
4     functions and a lot -- lately a lot of problem
5     resolution.  Because we had a vendor problem, we
6     have a lot of unmatched invoices and Lawson is
7     helping us match the invoices that are coming in
8     whether paper or electronic with the POs that we've
9     generated.
10         Q.    Okay.
11         A.    Okay?
12         Q.    Okay.
13              MR. CLEMENTS:  I don't have any more
14     questions.
15              MR. GRAHAM:  None.
16              MR. SHRAGER:  Thank you, gentlemen.
17              MR. CLEMENTS:  All right.  Go off the
18     record.
19              THE VIDEOGRAPHER:  Here marks the end
20     of volume one, tape number two in the deposition of
21     Robert Irwin.
22              Going off the record.  The time is
23     3:37.,
24              (Counsel retains exhibits.)
25              (3:37 p.m.)

74

1          CERTIFICATE   OF   OFFICER
2
3
4          I, PATRICIA J. RUSSONIELLO, a
5     Certified Court Reporter and a Notary Public of the
6     State of New Jersey, do hereby certify that prior
7     to the commencement of the examination the witness
8     was duly sworn by me.
9          I DO FURTHER CERTIFY that the
10     following is a true and accurate transcript of the
11     testimony as taken stenographically by and before
12     me at the date, time and place aforementioned and
13     that reading and signing of the deposition has been
14     requested.
15          I DO FURTHER CERTIFY that I am
16     neither a relative nor employee, nor attorney or
17     counsel to any parties involved; that I am neither
18     related to nor employed by any such attorney or
19     counsel, and that I am not financially interested
20     in the action.
21
22
23
       _____
24     A NOTARY PUBLIC OF THE STATE OF NEW JERSEY
       .   My Commission Expires: 4/20/2010
25     C.C.R. License No. XI00517

75

1              JURAT
2          I, ROBERT G. IRWIN, do hereby
.      certify that I have read the foregoing transcript
3     of my testimony taken on Wednesday, March 10, 2010
.      and have signed it subject to the following
4     changes:
.      PAGE   LINE                     CHANGE
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
       _____
20              ROBERT G. IRWIN
21
.      DATE: _____
22
23
.      Sworn and subscribed to before me this
24     day of     , 20  .
25     NOTARY PUBLIC
.
.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 9th day of August, 2010, I will electronically file the foregoing

### PLAINTIFF EPLUS'S OBJECTIONS TO DEFENDANT'S DESIGNATION AND SUMMARY OF THE DEPOSITION OF ROBERT IRWIN AND COUNTER-DESIGNATIONS

with the Clerk of Court using the CM/ECF system which will then send a notification of such filing (NEF) via email to the following:

Daniel McDonald, *pro hac vice*
William D. Schultz, *pro hac vice*
Rachel C. Hughey, *pro hac vice*
Joshua P. Graham, *pro hac vice*
Andrew Lagatta, *pro hac vice*
Merchant & Gould P.C.
3200 IDS Center
80 South Eighth Street
Minneapolis. MN 55402
Telephone: (612) 332-5300
Facsimile: (612) 332-9081
lawsonscrvicc@)merchantgould.com

Robert A. Angle (VSB# 37691)
Dabney J. Carr, IV (VSB #28679)
Troutman Sanders LLP
P.O. Box 1122
Richmond, VA  23218-1122
Telephone:  (804) 697-1238
Facsimile:  (804) 698-5119
robert.angle@troutmansanders.com
dabney.carr@troutmansanders.com

*Counsel for Defendant Lawson Software, Inc.*

_____/s/_____
David M. Young (VSB #35997)
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4000
Facsimile:  (202) 346-4444
dyoung@goodwinprocter.com