**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | | |
|---|---|---|
| ePLUS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:09-CV-620 (REP) |
| | ) | |
| v. | ) | |
| | ) | |
| LAWSON SOFTWARE, INC., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF EPLUS'S OBJECTIONS TO DEFENDANT'S DEPOSITION
DESIGNATIONS AND SUMMARY OF THE DEPOSITION OF JAMES JOHNSON AND
COUNTER-DESIGNATIONS**

Plaintiff *e*Plus Inc. ("*e*Plus"), through counsel, hereby submits the following general and specific objections to Defendant's designation of the deposition testimony of James Johnson ("Johnson Designations") and summary of the deposition and offers the following counter-designations.

**General Objections**

1.     *e*Plus generally objects to the Johnson Designations as being inadmissible under Fed. R. Civ. P. 32(a) on the grounds that Mr. Johnson is scheduled to appear as a live witness at the trial in this matter.  To the extent that the Court allows the Johnson Designations into evidence, however, *e*Plus makes the following specific objections and counter-designates the testimony of Mr. Johnson as set forth below.

**Specific Objections**

| Defendant's Designations | *e*Plus's Objections | *e*Plus's Objections to Defendant's Deposition Summaries |
|---|---|---|
| 5:9-19 | | |
| 6:1-7 | | |

| Defendant's Designations | *e*Plus's Objections | *e*Plus's Objections to Defendant's Deposition Summaries |
|---|---|---|
| 6:17 – 8:3 | | |
| 8:13-17 | | |
| 12:5-12 | | Summary is vague and ambiguous as to which "patent" and "technology" it refers.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 13:20-24 | | Summary is vague and ambiguous as to which "patent" and "technology" it refers.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 15:12-22 | Lacks foundation; calls for speculation.  (FRE 602) | Summary is vague and ambiguous as to which "patent" and "technology" it refers.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 16:1-21 | Lacks foundation; calls for speculation.  (FRE 602) | Summary is vague and ambiguous as to which "patent" and "technology" it refers.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 19:9-22 | Vague and ambiguous as to which RIMS system is referenced; misleading. | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 20:2-25 | | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated |

| Defendant's Designations | *e*Plus's Objections | *e*Plus's Objections to Defendant's Deposition Summaries |
|---|---|---|
| | | testimony. |
| 21:14-17 | | Summary is vague and ambiguous as to which RIMS system is referenced. Summary is incomplete. It fails to summarize the designated testimony. |
| 22:15-22 | Vague and ambiguous as to which RIMS system is referenced; misleading. | Summary is vague and ambiguous as to which RIMS system is referenced. Summary is incomplete. It fails to summarize the designated testimony. |
| 23:9-14 | Vague and ambiguous as to which RIMS system is referenced; misleading. | Summary is vague and ambiguous as to which RIMS system is referenced. Summary is incomplete. It fails to summarize the designated testimony. |
| 23:16-17; 23:20-21 | Vague and ambiguous as to which RIMS system is referenced; misleading. | Summary is vague and ambiguous as to which RIMS system is referenced. Summary is incomplete. It fails to summarize the designated testimony. |
| 23:23-24 | Vague and ambiguous as to which RIMS system is referenced; misleading. | Summary is vague and ambiguous as to which RIMS system is referenced. Summary is incomplete. It fails to summarize the designated testimony. |
| 24:18 – 27:9 | Vague and ambiguous as to which RIMS system is referenced; misleading. | Summary is vague and ambiguous as to which RIMS system is referenced. Summary is incomplete. It fails to summarize the designated testimony. |

3

| Defendant's Designations | *e*Plus's Objections | *e*Plus's Objections to Defendant's Deposition Summaries |
|---|---|---|
| 28:10-20; 28:23 | Lacks foundation; calls for speculation.  (FRE 602).  Vague and ambiguous as to which RIMS system is referenced; misleading. | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 28:25 – 29:8 | Lacks foundation; calls for speculation.  (FRE 602).  Vague and ambiguous as to which RIMS system is referenced; misleading. | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 29:19 – 30:21 | Misleading question.  The designation at 30:8-18 includes an answer that was non-responsive.  (FRE 611). | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 32:2-16 | Lacks foundation; calls for speculation.  (FRE 602) | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 34:3-18 | | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 37:3-23 | Vague and ambiguous as to whether question is directed to some unspecified commercial version of the RIMS system or the system described in the '989 Patent; misleading.  Answer to question at 73:12-23 is not responsive.  (FRE 611) | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |

4

| Defendant's Designations | *e*Plus's Objections | *e*Plus's Objections to Defendant's Deposition Summaries |
|---|---|---|
| | and lacks foundation; calls for speculation. (FRE 602). Additionally, the designation is incomplete as it failed to designate witness' complete answer. (FRE 106). | |
| 38:1-3; 38-17-21 | Vague and ambiguous as to whether question is directed to some unspecified commercial version of the RIMS system or to the system described in the '989 Patent, misleading. | Summary is vague and ambiguous as to which RIMS system is referenced. Summary is incomplete. It fails to summarize the designated testimony. |
| 39:18-20 | Vague and ambiguous as to whether question is directed to some unspecified commercial version of the RIMS system or to the system described in the patent; misleading. | Summary is vague and ambiguous as to which RIMS system is referenced. Summary is incomplete. It fails to summarize the designated testimony. |
| 40:1-11 | | Summary is vague and ambiguous as to which RIMS system is referenced. Summary is incomplete. It fails to summarize the designated testimony. |
| 40:16 – 41:8 | Vague and ambiguous as to whether question at 41:4-7 is directed to some unspecified commercial version of the RIMS system or to the system described in the '989 Patent; misleading. | Summary is vague and ambiguous as to which RIMS system is referenced. Summary is incomplete. It fails to summarize the designated testimony. |
| 42:25 – 44:22 | Vague and ambiguous as to whether question is directed to some unspecified commercial version of the RIMS system or to the system described in the '989 Patent; misleading. | Summary is vague and ambiguous as to which RIMS system is referenced. Summary is incomplete. It fails to summarize the designated testimony. |
| 45:14-24 | Vague and ambiguous as to whether question is directed to | Summary is vague and ambiguous as to which |

| Defendant's Designations | *e*Plus's Objections | *e*Plus's Objections to Defendant's Deposition Summaries |
|---|---|---|
| | some unspecified commercial version of the RIMS system or to the system described in the '989 Patent; misleading. | RIMS system is referenced. Summary is incomplete. It fails to summarize the designated testimony. |
| 46:1 – 48:13 | Vague and ambiguous as to whether question is directed to some unspecified commercial version of the RIMS system or to the system described in the '989 Patent; misleading. | Summary is vague and ambiguous as to which RIMS system is referenced. Summary is incomplete. It fails to summarize the designated testimony. |
| 49:23 – 50:15 | Vague and ambiguous as to whether question is directed to some unspecified commercial version of the RIMS system or to the system described in the '989 Patent; misleading. | Summary is vague and ambiguous as to which RIMS system is referenced. Summary is incomplete. It fails to summarize the designated testimony. |
| 50:22 – 51:16; 51:19-20 | | Summary is vague and ambiguous as to which RIMS system is referenced. Summary is incomplete. It fails to summarize the designated testimony. |
| 51:22-25; 52:3-4 | Vague and ambiguous as to whether question is directed to some unspecified commercial version of the RIMS system or to the system described in the '989 Patent; misleading. Additionally the designation at 52:3-4 is incomplete as it improperly fails to include the witness' answer. (FRE 106). | Summary is vague and ambiguous as to which RIMS system is referenced. Summary is incomplete. It fails to summarize the designated testimony. |
| 52:7-21 | | Summary is vague and ambiguous as to which RIMS system is referenced. Summary is incomplete. It fails to summarize the designated testimony. |

6

| Defendant's Designations | *e*Plus's Objections | *e*Plus's Objections to Defendant's Deposition Summaries |
|---|---|---|
| 53:19-22; 54:3 | | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 54:19 – 56:15; 56:18-20 | Vague and ambiguous as to whether question is directed to some unspecified commercial version of the RIMS system or to the system described in the '989 Patent; misleading. | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 56:22 – 57:15 | | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 58:12-22 | | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 60:20-21; 60:24 | | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 61:7-22 | Vague and ambiguous as to whether question is directed to some unspecified commercial version of the RIMS system or to the system described in the '989 Patent; misleading. | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 65:7-10; 65:13 | | Summary is vague and |

| Defendant's Designations | *e*Plus's Objections | *e*Plus's Objections to Defendant's Deposition Summaries |
|---|---|---|
| | | ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 67:14 – 68:7 | Incomplete designation.  The designation failed to include the witness' complete answer. (FRE 106) | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 69:17 – 71:4; 71:7 | Vague and ambiguous as to whether question is directed to some unspecified commercial version of the RIMS system or to the system described in the '989 Patent; misleading. | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 71:9-14; 71:17-18 | Vague and ambiguous as to whether question is directed to some unspecified commercial version of the RIMS system or to the system described in the '989 Patent; misleading. | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 72:4-10 | | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 74:1 – 75:7 | Vague and ambiguous as to whether question is directed to some unspecified commercial version of the RIMS system or to the system described in the '989 Patent; misleading. | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 76:11-15 | | Summary is vague and ambiguous as to which |

| Defendant's Designations | *e*Plus's Objections | *e*Plus's Objections to Defendant's Deposition Summaries |
|---|---|---|
| | | RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 77:9-20; 77:22-23 | Misleading question. | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 77:25 – 78:2; 78:11-12 | | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 78:14-17; 78:20-21 | | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 78:23 – 79:10 | Misleading question. | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 79:13-19 | Misleading question. | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 80:12-14; 80:17-18 | Misleading question. | Summary is vague and ambiguous as to which RIMS system is |

9

| Defendant's Designations | *e*Plus's Objections | *e*Plus's Objections to Defendant's Deposition Summaries |
|---|---|---|
| | | referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 81:3-6 | Misleading question. | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 82:22-24 | Designation is incomplete.  It fails to designate witness' complete answer.  (FRE 106). | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 85:8 – 86:22 | | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 88:2-3 | | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 88:17 – 89:2 | Incomplete designation; designation fails to include witness' complete answer (FRE 106). | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 89:13-20 | | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is |

10

| Defendant's Designations | *e*Plus's Objections | *e*Plus's Objections to Defendant's Deposition Summaries |
|---|---|---|
| | | incomplete.  It fails to summarize the designated testimony. |
| 101:3-10; 101:17-23 | Question at 101:3-10 improperly calls for an expert opinion from a lay witness.  (FRE 701-704). | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 101:25 – 102:3 | Question improperly calls for an expert opinion from a lay witness.  (FRE 701-704). | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 104:3-6; 104:9-10 | Question improperly calls for an expert opinion from a lay witness.  (FRE 701-704). | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 113:19 – 114:4; 114:7-8 | Vague and ambiguous as to whether question is directed to some unspecified commercial version of the RIMS system or to the system described in the '989 Patent; misleading. | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 114:10-13; 114:16-17 | Vague and ambiguous as to whether question is directed to some unspecified commercial version of the RIMS system or to the system described in the '989 Patent; misleading. | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 114:19 – 115:1 | Vague and ambiguous as to whether question is directed to some unspecified commercial version of the RIMS system or to the system described in the | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to |

11

| Defendant's Designations | *e*Plus's Objections | *e*Plus's Objections to Defendant's Deposition Summaries |
|---|---|---|
| | '989 Patent; misleading. | summarize the designated testimony. |
| 115:7-24 | Questions mis-characterize the disclosure of the '989 Patent. | Summary is vague and ambiguous as to which RIMS system is referenced. Summary is incomplete. It fails to summarize the designated testimony. |
| 116:2 – 117:2 | Vague and ambiguous as to whether question is directed to some unspecified commercial version of the RIMS system or to the system described in the '989 Patent; misleading. | Summary is vague and ambiguous as to which RIMS system is referenced. Summary is incomplete. It fails to summarize the designated testimony. |
| 117:6-9; 117:18-19 | Vague and ambiguous as to whether question is directed to some unspecified commercial version of the RIMS system or to the system described in the '989 Patent; misleading. | Summary is vague and ambiguous as to which RIMS system is referenced. Summary is incomplete. It fails to summarize the designated testimony. |
| 117:21 – 118:3 | Vague and ambiguous as to whether question is directed to some unspecified commercial version of the RIMS system or to the system described in the '989 Patent; misleading. | Summary is vague and ambiguous as to which RIMS system is referenced. Summary is incomplete. It fails to summarize the designated testimony. |
| 118:14-20 | Vague and ambiguous as to whether question is directed to some unspecified commercial version of the RIMS system or to the system described in the '989 Patent; misleading. | Summary is vague and ambiguous as to which RIMS system is referenced. Summary is incomplete. It fails to summarize the designated testimony. |
| 119:11 – 120:3; 120:10 | | Summary is vague and ambiguous as to which RIMS system is referenced. Summary is incomplete. It fails to summarize the designated |

12

| Defendant's Designations | *e*Plus's Objections | *e*Plus's Objections to Defendant's Deposition Summaries |
|---|---|---|
| | | testimony. |
| 120:12 – 121:23 | | Summary is vague and ambiguous as to which RIMS system is referenced. Summary is incomplete. It fails to summarize the designated testimony. |
| 125:18-20; 125:25-126:2 | Incomplete designation. The designation fails to include the witness' entire answer. (FRE 106) | Summary is vague and ambiguous as to which RIMS system is referenced. Summary is incomplete. It fails to summarize the designated testimony. |
| 126:15-21 | Incomplete designation. The designation fails to include the witness' entire answer. (FRE 106) | Summary is vague and ambiguous as to which RIMS system is referenced. Summary is incomplete. It fails to summarize the designated testimony. |
| 132:18 – 133:12 | Vague and ambiguous as to whether question is directed to some unspecified commercial version of the RIMS system or to the system described in the '989 Patent; misleading. | Summary is vague and ambiguous as to which RIMS system is referenced. Summary is incomplete. It fails to summarize the designated testimony. |
| 134:15 – 136:19 | Vague and ambiguous as to whether question is directed to some unspecified commercial version of the RIMS system or to the system described in the '989 Patent; misleading. | Summary is vague and ambiguous as to which RIMS system is referenced. Summary is incomplete. It fails to summarize the designated testimony. |
| 137:10 – 138:17 | Vague and ambiguous as to whether question is directed to some unspecified commercial version of the RIMS system or to the system described in the '989 Patent; misleading. | Summary is vague and ambiguous as to which RIMS system is referenced. Summary is incomplete. It fails to summarize the designated testimony. |

| Defendant's Designations | *e*Plus's Objections | *e*Plus's Objections to Defendant's Deposition Summaries |
|---|---|---|
| 139:5 – 139:20; 140:1-3 | Vague and ambiguous as to whether question is directed to some unspecified commercial version of the RIMS system or to the system described in the '989 Patent; misleading. | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 140:5 – 141:11; 141:14 | Vague and ambiguous as to whether question is directed to some unspecified commercial version of the RIMS system or to the system described in the '989 Patent; misleading. | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 155:7-11 | | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 156:19-23; 157:1 | | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 157:11-25; 158:3-5; 158:8-9 | | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 158:20 – 159:5; 159:9-13 | | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 162:7-8 | | Summary is vague and |

14

| Defendant's Designations | *e*Plus's Objections | *e*Plus's Objections to Defendant's Deposition Summaries |
|---|---|---|
| | | ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 162:14 – 163:3 | | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 163:10-25; 165:4-13 | Improper designation.  Attorney merely read document and failed to pose a question to the witness.  (FRE 106) | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 165:13 – 166:22 | | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 168:16-20 | | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 169:13 – 170:13 | Incomplete designation.  Designation fails to include witness' entire answer.  (FRE 106) | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 172:16-20 | | Summary is vague and ambiguous as to which |

15

| Defendant's Designations | *e*Plus's Objections | *e*Plus's Objections to Defendant's Deposition Summaries |
|---|---|---|
| | | RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 172:23 – 174:17 | | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 176:11-22 | | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 177:15-22 | Vague and ambiguous as to whether question is directed to some unspecified commercial version of the RIMS system or to the system described in the '989 Patent; misleading.  In addition, the designation improperly fails to include the witness' response to the question.  (FRE 106) | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 178:4 – 180:7 | Vague and ambiguous as to whether question is directed to some unspecified commercial version of the RIMS system or to the system described in the '989 Patent; misleading. | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 180:22 – 181:18 | Misleading; assumes facts not in evidence.  (FRE 611).  Calls for speculation; lacks foundation.  (FRE 602) | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |

| Defendant's Designations | *e*Plus's Objections | *e*Plus's Objections to Defendant's Deposition Summaries |
|---|---|---|
| 183:17-19; 183:22-23 | Calls for speculation; lacks foundation.  (FRE 602). Assumes facts not in evidence.  (FRE 611) | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 183:25 – 184:17; 184:19; 184:21-22 | Calls for speculation; lacks foundation.  (FRE 602). Assumes facts not in evidence.  (FRE 611) | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 184:24 – 185:4; 185:8-11 | Calls for speculation; lacks foundation.  (FRE 602). Assumes facts not in evidence.  (FRE 611) | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 185:23 – 186:19 | Improperly calls for a legal conclusion on issue of claim construction.  Subject to MIL Court's Order excludes evidence that contradicts Court's claim construction. | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 189:22 – 190:11 | | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 191:9-12 | | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 198:18-21; 198:24-199:3 | Vague and ambiguous as to | Summary is vague and |

| Defendant's Designations | *e*Plus's Objections | *e*Plus's Objections to Defendant's Deposition Summaries |
|---|---|---|
| | whether question is directed to some unspecified commercial version of the RIMS system or to the system described in the '989 Patent; misleading. | ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 199:5-8; 199:11-14 | Vague and ambiguous as to whether question is directed to some unspecified commercial version of the RIMS system or to the system described in the '989 Patent; misleading. | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 199:16 – 200:5 | Vague and ambiguous as to whether question is directed to some unspecified commercial version of the RIMS system or to the system described in the '989 Patent; misleading. | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 201:15 – 202:5 | Incomplete designation.  Designation improperly fails to include witness' entire answer.  (FRE 106) | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 202:15 – 203:2; 203:5-7 | | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 203:22 – 204:1 | Vague and ambiguous as to whether question is directed to some unspecified commercial version of the RIMS system or to the system described in the '989 Patent; misleading. | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 206:13 – 207:2 | | Summary is vague and ambiguous as to which |

18

| Defendant's Designations | ePlus's Objections | ePlus's Objections to Defendant's Deposition Summaries |
|---|---|---|
| | | RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 207:8-21 | | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 223:3 – 224:3 | | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 228:1-11 | | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 228:16-22; 228:25-229:1 | | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 229:3-8; 229:11-12 | Incomplete designation. Designation fails to include witness' entire answer.  (FRE 106) | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 234:15-19; 234:22-24 | | Summary is vague and ambiguous as to which RIMS system is |

19

| Defendant's Designations | *e*Plus's Objections | *e*Plus's Objections to Defendant's Deposition Summaries |
|---|---|---|
| | | referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 235:1-8; 235:11-12 | | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 236:21 – 237:4; 237:7 | | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 237:9-14; 237:17-19 | | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 237:21-24 | | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 239:6-18 | Incomplete designation.  Designation fails to include witness' entire answer.  (FRE 106) | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 244:25 – 245:8 | Incomplete designation.  Designation fails to include witness' entire answer.  (FRE 106) | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is |

20

| Defendant's Designations | *e*Plus's Objections | *e*Plus's Objections to Defendant's Deposition Summaries |
|---|---|---|
| | | incomplete.  It fails to summarize the designated testimony. |
| 245:15-21 | | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 247:10-16; 247:19-24 | Vague and ambiguous as to whether question is directed to some unspecified commercial version of the RIMS system or to the system described in the '989 Patent; misleading. | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 248:1 – 249:9 | Vague and ambiguous as to whether question is directed to some unspecified commercial version of the RIMS system or to the system described in the '989 Patent; misleading. | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 250:13-17; 250:19-20 | | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 250:22-25 | Incomplete designation. Designation fails to include witness' answer to the pending question.  (FRE 106) | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to summarize the designated testimony. |
| 251:13-20 | | Summary is vague and ambiguous as to which RIMS system is referenced.  Summary is incomplete.  It fails to |

21

| Defendant's Designations | ePlus's Objections | ePlus's Objections to Defendant's Deposition Summaries |
|---|---|---|
| | | summarize the designated testimony. |

| ePlus's Counter-Designations |
|---|
| 13:25-14:1 |
| 14:5-15:11 |
| 16:22-24 |
| 17:3-7 |
| 17:10-14 |
| 35:14-36:1 |
| 37:24-25 |
| 38:22-24; 39:4 |
| 39:21-25 |
| 44:23-45:13 |
| 52:3-5 |
| 52:22-25 |
| 54:4-16 |
| 57:16-58:3; 58:6-11 |
| 58:23-25; 59:3-12 |
| 62:2-63:1; 63:4-10 |
| 65:15-17; 65:24-66:5 |
| 68:8-9; 69:1-16 |
| 71:20-72:2 |
| 72:15-22 |
| 75:8-13; 75:16-76:9 |
| 82:25-83:3 |
| 84:11-14; 84:20-24 |
| 85:1-3; 85:6-7 |
| 86:23-87:7; 87:10-16 |
| 89:3-7 |
| 89:21-90:11 |
| 91:17-23; 92:1-2; 92:6-21 |
| 93:8-94:1; 94:4-95:9 |
| 95:14-97:6 |
| 102:4-12 |
| 105:19-106:1; 106:4-6 |
| 112:10-18 |
| 113:15-18 |
| 115:2-16 |
| 118:4-9 |

22

| *e*Plus's Counter-Designations |
| --- |
| 118:21-119:10 |
| 121:24-122:20 |
| 126:3-8 |
| 126:22-24 |
| 127:23-128:13 |
| 129:8-16; 129: 19-22 |
| 133:14-134:14 |
| 142:5-10; 142:14-15 |
| 154:21-155:1 |
| 163:4-9 |
| 164:22-165:12 |
| 166:23-167:2; 167:4 |
| 167:8-168:10; 168:13-14 |
| 170:14-15 |
| 171:4-18 |
| 171:25-172:3; 172:6-10 |
| 174:18-175:10 |
| 175:18-176:10 |
| 176:23-177:3; 177:6-13 |
| 177:23 |
| 187:2-13 |
| 191:13-23 |
| 197:8-12; 197:15-19 |
| 202:6-9 |
| 203:9-10; 203:13-20 |
| 204:2-25 |
| 208:20-25 |
| 209:9-210:2 |
| 218:18-219:3 |
| 219:25-220:24 |
| 221:6-222:24 |
| 224:4-8; 224:11-12 |
| 225:12-16 |
| 225:25-226:23 |
| 229:13-15 |
| 232:18-233:13 |
| 235:14-18; 235:21-236:20 |
| 239:19-240:4; 240-7-8 |
| 240:14-241:11; 241;14-19; 241:22 |
| 241:24-242:14 |
| 245:11-13 |
| 245:22-246:3; 246:6-247:9 |
| 251:1-3 |

LIBW/1755202.1

Respectfully submitted,


/s/ _____
Craig T. Merritt (VSB #20281)
Henry I. Willett, III (VSB #44655)
**CHRISTIAN & BARTON, LLP**
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
Telephone: (804) 697-4100
cmerritt@cblaw.com
hwillett@cblaw.com


Scott L. Robertson (admitted *pro hac vice*)
Jennifer A. Albert (admitted *pro hac vice*)
David M. Young (VSB#35997)
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4000
SRobertson@goodwinprocter.com
JAlbert@goodwinprocter.com
DYoung@goodwinprocter.com


Michael G. Strapp (admitted *pro hac vice*)
James D. Clements (admitted *pro hac vice*)
**GOODWIN PROCTER LLP**
Exchange Place
53 State Street
Boston, MA 02109-2881
Telephone:  (617) 570-1000
MSrapp@goodwinprocter.com
JClements@Goodwinprocter.com


*Attorneys for Plaintiff, ePlus Inc.*



Dated:  August 9, 2010

LIBW/1755202.1

## James Michael Johnson (December 9, 2009) - Rebuttal Summary

The RIMS system was used by Fisher Scientific ("Fisher") as a tool to entice large organizations to use Fisher as a distributor for the products. Fisher would house inventory at the customer's location to provide products in a just-in-time ("JIT") fashion to the customer. The RIMS system was used at the customer's location by a Fisher representative to manage that inventory. (13:25; 14:1; 14:5-15:11). Mr. Johnson was not sure of the date when Fisher first began to use the RIMS system in marketing pitches, or whether the RIMS system was on sale or in public use more than one year before the filing date of the electronic sourcing system patents. (16:22-24; 17:3-7; 17:10; 17:12-14; 142:5-10; 142:15-15).

Mr. Johnson had no involvement in the production of Fisher's paper catalog and could not answer questions directed to it. (35:14-36:1; 37:24-35).

The part master database of the RIMS system did not include records of items unless the item was stored in the JIT inventory facility. (38:22-24; 39:4; 39:21-25).

A requisition for an item of product type 04 (a third-party item that the distributor orders) would be transmitted by the RIMS system to the Fisher host computer system. The host computer prints out a report relating to the requested third-party product. The report would be taken to a purchasing agent in a group at Fisher called strategic procurement services ("SPS") who would be responsible for sourcing the requested item wherever they could find it. (44:23-45:13; 57:16-58:3; 58:6; 58:8-11; 58:23-25; 59:3; 59:5-12; 62:2-63:1; 63:4-10; 65:15-17; 65:24-66:5; 76:4-9; 203:9-10; 203:13-20). The activities conducted by the SPS group were done outside of the RIMS system. (219:25-220:12).

The RIMS system transmitted a requisition in progress to the distributor's host system. A requisition was not finalized until a response was received from the distributor's host system. (54:4-16).

For replenishment of a product type 06 item (customer-owned product in a customer warehouse), the RIMS system's reorder logic would generate a replenishment order which was sent to the customer's computer system. The customer's system would then generate a purchase order for such a product to be shipped to the JIT site. (71;20-72:2; 72:15-22; 75:8-13; 75:16-24).

The primary function of the RIMS system was to generate requisitions to be submitted to the host computer system at Fisher. The Fisher host system would then generate a purchase order for purchase of a product from Fisher. (84:11-14; 84:20-85:3; 85:6-7).

The requisitioning process described in the '683 patent was changed significantly from that described in the RIMS '989 Patent. The system of the '683 patent built on the existing technology, but that technology was modified significantly to add in additional functionality. The process was changed to introduce a graphical user interface for the user. This required tearing the business logic apart from the presentation layer. The RIMS system employed a 2-tiered architecture whereas the system of the '683 patent employed an N-tiered architecture. The system of the '683 patent allowed for requisitions relating to multiple distributors to be

processed.  The system of the '683 patent included an additional product type – product type 07 relating to products sourced from distributors other than Fisher.  The RIMS system could not handle product type 07 items.  Changes were made to the database structure and the computer programs to be able to allow for purchase orders to be generated to multiple distributors.  Changes were made to the functionality to allow the system to be used by end users rather than limited to employees in the purchasing department.  So, a new security system had to be built.  Programming changes were made to allow the '683 patent system to generate multiple purchase orders from a single requisition.  There were two separate development efforts.  Mr. Johnson's team was involved in developing the business logic.  His team included 4-5 programmers and a senior analyst in addition to Mr. Johnson.  A second group, headed by Mr. Kinross, worked on the cataloging component.  The catalog database of the system of the '683 patent was a brand-new database added.  It was not in existence in the RIMS system.  Mr. Kinross' team included contractors from IBM who worked on the system requirements managed by Mr. Kinross.  Mr. Johnson's team spent a good 6 months working on the development efforts.  (86:23-87:7; 87:10-16; 89:3-7; 89:21-90:11; 91:17-23; 92:1-2; 92:6-21; 93:8-94:1; 94:4; 94:6-95:9; 95:14-97:6; 102:4-12; 105:19-106:1; 106:4-6; 112:10-18; 113:15-18; 115:2-6; 221:17-222:24; 224:4-8; 224:11-12; 225:12-16; 225:25-226:23; 229:13-15; 232:18-233:13; 235:14-18; 235:21-236:13; 236:15-20).

The RIMS system did not allow a product type 05 item (an item to be purchased by the customer) to be included on a requisition sent to Fisher.  (118:4-9).

The parts master records in the RIMS system database did not include records for product type 04 items.  The parts master records only included records for product 01 or 06.  (118:21-119:10; 121:24-122:20; 129:8-16; 129:19-22).  The only types of items tracked by the RIMS system were customer owned JIT products and distributor-owned JIT items.  (133:14-134:14).

The RIMS system could not be used to comparison shop for a product between 2 different catalogs.  (154:21-155:1).  The cross-reference table in the RIMS system did not have the capability of cross- referencing a product from a company other than Fisher to a Fisher part number.  (163:4-9).  The cross-reference table on Fisher's host computer system cross-referenced from Fisher part numbers to competitor part numbers.  Fisher used the table to substitute Fisher items for a competitor item.  The RIMS system did not allow an order to be placed to the competitor.  (166:23-167:2; 167:4; 167:8-168:10; 168:13-14; 170:14-15).

The architecture for the cross-reference system of the electronic sourcing system patents was completely different from that in the RIMS system.  The cross-referencing system for the electronic sourcing system patents was built from the ground up using a brand new code base.  There was a new cross-referencing component that Bob Kinross implemented into the cataloging system that enabled cross-referencing in connection with the search portion of the system.  This enabled cross-referencing across multiple electronic catalogs.  The new functionality enabled conversion between Fisher part numbers and vendor part numbers, whereas the RIMS system lacked that functionality.  Such functionality was only possible at Fisher's host mainframe system.  (171:4-18; 171:25-172:3; 172:6-10; 174:18-175:10; 175:18-176:10; 176:23-177:3; 177:6-13; 177:23; 187:2-14).

LIBW/1755461.1

One goal of the catalog database in the electronic sourcing system was to manage the whole supply chain management for a customer from product identification to requisitioning to purchase order generation.  (191:13-23).

The catalog database in the electronic sourcing system had the capability of storing a complete vendor catalog or a portion of a vendor catalog.  (197:8-12; 197:15-19).

In the RIMS system, there was no purchase order acknowledgement for an order relating to a product type 05 item (customer-owned inventory).  (202:6-9)

The RIMS system maintained pricing and availability information only with respect to product type 01 items (Fisher JIT item), product type 03 items (local distribution center item) and product type 04 items (but only if Fisher had such item in stock because a customer had returned a specialty product).  The RIMS system did not maintain pricing and availability information for product type 05 items because it had no connection to an outside distributor.  (204:2-25).

In the electronic sourcing system, the system linked over to the catalog to perform the function of generating an order list from a hit list.  The order list data would then be returned back to the requisitioning system.  (208:20-25; 209:9-210:2).

The parts master table of the RIMS system was not organized by a product type, such as glassware or chemicals.  (218:18-219: 3).

A customer service representative using the RIMS system as of April of '93 could not generate any purchase orders.  The RIMS system generated a requisition to Fisher.  The Fisher host system turned the requisition into a purchase order.  (220:13-19; 239:19-240:4; 240:7-8; 240:14-241:11; 241:14-19; 241:22; 241:24-242:14; 245:11-13; 245:22-246:3; 246:6-9; 246:11-247:9).

The RIMS system as of April of '93 did not have any capability to determine the availability of an item in a third-party supplier's inventory.  (220:20-24)

As of April of '93, the Fisher host computer could not generate multiple purchase orders from a single requisition.  (221:6-9)

The RIMS system as of April of '93 could not generate a requisition having multiple lines that you could procure from multiple different sources.  Everything was sourced through Fisher.  (221:10-16)

LIBW/1755461.1

Johnson, James Michael  12/9/2009  12:00:00 PM

Page 1

```
 1          UNITED STATES DISTRICT COURT
 2          EASTERN DISTRICT OF VIRGINIA
 3               RICHMOND DIVISION
 4    ePLUS, INC.,        )
 5          Plaintiff, )
 6       v.        ) No. 3:09cv620
 7    LAWSON SOFTWARE, INC.,   )
 8          Defendant. )
 9
10               Washington, D.C.
11          Wednesday, December 9, 2009
12    Videotape Deposition of JAMES MICHAEL JOHNSON, called
13    for examination by counsel for Defendant in the
14    above-entitled matter, the witness being duly sworn
15    by CHERYL A. LORD, a Notary Public in and for the
16    District of Columbia, taken at the offices of
17    TROUTMAN SANDERS LLP, 401 9th Street, Suite 1000,
18    Washington, D.C., at 8:35 a.m., and the proceedings
19    being taken down by Stenotype by CHERYL A. LORD, RPR,
20    CRR.
21
22
23
24
25
```

Page 3

```
 1               C O N T E N T S
 2    WITNESS              EXAMINATION
 3                    PAGE NO.
 4    JAMES MICHAEL JOHNSON
 5       By Mr. McDonald        5
 6       By Ms. Albert        219
 7       By Mr. McDonald        223
 8
 9    P R E V I O U S L Y   M A R K E D   E X H I B I T S
10    LAWSON EXHIBIT NO.     FIRST MENTIONED
11    1  U.S. Patent No. 6,023,683
12       EP011104-24        13
13    7  U.S. Patent No. 5,712,989,
14       L0260803-44        16
15
16
17
18
19
20
21
22
23
24
25
```

Page 2

```
 1    APPEARANCES:
 2
 3    On behalf of Plaintiff and James M. Johnson:
 4       JENNIFER A. ALBERT, ESQUIRE
 5       GOODWIN PROCTER LLP
 6       901 New York Avenue, N.W.
 7       Washington, D.C. 20001
 8       (202) 346-4000
 9
10    On behalf of James M. Johnson:
11       ERIN FISCHER ACTON, ESQUIRE
12       McGUIRE WOODS LLP
13       625 Liberty Avenue, 23rd Floor
14       Pittsburgh, PA  15222-3142
15       (412) 667-6000
16
17    On behalf of Defendant:
18       DANIEL W. McDONALD, ESQ.
19       MERCHANT & GOULD
20       80 S. 8th Street, Suite 3200
21       Minneapolis, MN  55402-2215
22       (612) 332-5300
23
24    ALSO PRESENT:
25       Brian Ciccone, videographer
```

Page 4

```
 1               P R O C E E D I N G S
 2
 3          THE VIDEOGRAPHER:  Today is Wednesday,
 4    December 9th, 2009.  The time is approximately 8:35
 5    AM.
 6          We are at the law office of Troutman
 7    Sanders LLP located in Washington, D.C.  This is the
 8    commencement of the video deposition of James M.
 9    Johnson.  My name is Brian Ciccone, and I am the
10    video technician.
11          Will the attorneys please note their
12    appearances for voice identification.
13          MS. ALBERT:  Jennifer Albert, with the law
14    firm of Goodwin Procter, representing the plaintiff,
15    ePlus Incorporated, and the witness.
16          MS. ACTON:  Erin Fischer Acton, of McGuire
17    Woods, representing James Johnson individually.
18          MR. McDONALD:  Daniel McDonald, of
19    Merchant & Gould, representing Law- -- Lawson
20    Software.
21          THE VIDEOGRAPHER:  Will the court reporter
22    please swear in the witness.
23
24
25
```

Johnson, James Michael  12/9/2009  12:00:00 PM

**5**

1    Whereupon,
2         JAMES MICHAEL JOHNSON
3    was called as a witness by counsel for Defendant,
4    and, having been duly sworn by the Notary Public, was
5    examined and testified as follows:
6
7         EXAMINATION BY COUNSEL FOR DEFENDANT
8         BY MR. McDONALD:
9         Q.   What's your full name?
10        A.   James Michael Johnson.
11        Q.   And are you one of the listed inventors on
12   the 3 patents that are at issue in the lawsuit
13   between ePlus and Lawson Software?
14        A.   Yes, sir.
15        Q.   Do you have counsel representing you today
16   for the deposition?
17        A.   Yes, sir.
18        Q.   Who is your counsel?
19        A.   Jennifer and Erin.
20        Q.   Can you state their full names for the
21   record if -- if you know?
22        A.   I forget Jennifer's last name, but --
23        Q.   You understand -- are they -- are they
24   both also attorneys for ePlus?
25        A.   No.

**6**

1         Q.   Okay.  Is -- is one of them an attorney --
2         A.   Jennifer --
3         Q.   -- for ePlus?
4         A.   Jennifer is the attorney for ePlus, and
5    Erin is representing me --
6         Q.   Okay.
7         A.   -- independently.
8         Q.   Were you aware that there was a request
9    that you for purposes of today's deposition review
10   the patents involved in this case as well as the
11   patent on the RIMS system?
12        A.   I've looked them over.
13        Q.   About how much time did you spend looking
14   them over in the last week or 2?
15        A.   A few hours over the weekend and some more
16   over the last 2 days.
17        Q.   Are you getting paid for your time in
18   preparation for the deposition or at today's
19   deposition?
20        A.   Yes, sir.
21        Q.   Who is paying you?
22        A.   ePlus, I will.
23        Q.   How much are they paying you?
24        A.   450 dollars an hour.
25        Q.   Did you develop the systems that are

**7**

1    described in -- in the patents involved in this suit
2    as well as the RIMS patent when you worked at Fisher
3    Scientific?
4         A.   I was part of the team that developed
5    those systems, yes.
6         Q.   What years did you work at Fisher
7    Scientific?
8         A.   I don't have exact dates, but I started in
9    Fisher I believe in the spring of 1986, and I worked
10   through 19- -- I believe it was either '99 or late
11   '98.  I can't recall exactly.
12        Q.   During that time frame, what position or
13   positions did you hold at Fisher Scientific?
14        A.   I started Fisher as a programmer analyst
15   developing applications for remote order entry,
16   things like Lightning, FastBack 2, and supporting the
17   customer service side of the business.  As I went
18   into -- I had 2 or 3 years, maybe 4 years, I started
19   working on the various other systems in the company
20   and was promoted to a senior analyst-type position,
21   ultimately became a supervisor.
22        And before I left Fisher Technology Group,
23   which was the spinoff company from Fisher, I was the
24   director of applications development.
25        Q.   While you were at Fisher Scientific, did

**8**

1    you work on developing the RIMS, R-I-M-S, system?
2         A.   Yes, again, I was part of a team, but,
3    yes.
4         Q.   You mentioned a spinoff of Fisher
5    Technology Group.
6         Is that what caused you to leave Fisher
7    Scientific in late '98 or '99?
8         A.   No.
9         Fisher Technology Group was a spinoff from
10   Fisher Scientific U.S. operations.  It was the core
11   group that developed the RIMS application as well as
12   the electronic sourcing system.
13        Q.   When -- when you say, electronic sourcing,
14   is that the phrase you use to describe the system in
15   the 3 patents that you understand are in this Lawson
16   lawsuit?
17        A.   Yes, sir.
18        Q.   So what -- when did you join the Fisher
19   Technology Group spinoff, what year?
20        A.   That's a good question.
21        I don't recall exactly.
22        Q.   It was sometime before late '98, though?
23        A.   Oh, yeah.  Oh, yeah.
24        I would say it was probably earlier to
25   mid-'90s they spun that off if I recall correctly,

Johnson, James Michael  12/9/2009  12:00:00 PM

9

1    but I wouldn't quote me on that.  My memory is not
2    all that good 15 years ago.
3        Q.   Okay.  Can you tell me, at least briefly
4    summarize what you have been doing since you left
5    Fisher Scientific in late '98 or '99?
6        A.   I started working for a company called
7    Signal Extraprise, another startup company, worked
8    for them for about a year and a half to 2 years, and
9    then left that organization to work as a consultant
10   in the IT industry where I had a client, Dominion
11   Retail.
12           I worked for them for -- up until two
13   thousand- -- probably 2002, and then in 2003, I
14   joined a group that purchased a company that I
15   currently work for now.
16       Q.   What's name of that company?
17       A.   Utility Service Partners.
18       Q.   What's your position with Utility Service
19   Partners?
20       A.   I'm the AVP of IT.
21       Q.   If I got all those letters, assistant vice
22   president of information technology?
23       A.   Yeah.
24           It's a mouthful.
25       Q.   Okay.  What does Utility Service Partners

10

1    do?
2        A.   They're a company that has 2 -- 2
3    companies, subsidiaries basically.
4            One is called Columbia Service Partners,
5    which is a warranty-based organization.  They sell
6    warranties in the utility industry.
7            And then the second subsidiary is AWHR,
8    which is a company that rents appliances and water
9    heaters.
10       Q.   So with respect to warranties in the
11   utility industry, are we talking about consumer
12   products or business products?
13       A.   In most utilities, they have the main
14   lines that come up to the house, but they don't
15   actually own the lines that go from the main lines to
16   the house itself.
17           Those lines are owned by the customer.
18   And we warrant those lines.
19       Q.   Okay.  So you -- you're working for people
20   that have -- that are living in houses and
21   apartments.
22           That's who you sell your warranty services
23   to?
24       A.   Our customers are, yes, residential
25   customers.

11

1        Q.   And similarly, is the rental business also
2    for residents?
3        A.   Primarily.  We do have some commercial
4    accounts.
5        Q.   And what do you do as the assistant vice
6    president of information technology?
7        A.   I manage the information technology
8    organization, the IT department including operations,
9    all the data center environments.  I manage all the
10   applications development in terms of the systems that
11   we develop.
12       Q.   Okay.  Let's -- let's turn the clock back
13   now to when you were working at Fisher Technology --
14   or Fisher Scientific.
15           Excuse me.
16           We've mentioned the RIMS product and the
17   electronic sourcing product so far, right, among --
18       A.   Yes.
19       Q.   -- others?
20           The -- RIMS product, was that the
21   predecessor to the electronic sourcing product --
22   product?
23           MS. ALBERT:  Objection, vague and
24   ambiguous.
25           BY MR. McDONALD:

12

1        Q.   You may answer.
2        A.   In the sequence of events, we developed
3    the RIMS application prior to the electronic
4    sourcing.
5        Q.   Generally, what is RIMS?
6        A.   It's a requisition and inventory
7    management system that we developed.
8        Q.   Did it use computers?
9        A.   Yes.
10       Q.   Were you one of the listed inventors on a
11   patent filed for that system?
12       A.   Yes.
13       Q.   The other inventor -- can you tell me the
14   name of the other inventor?
15       A.   Doug Momyer, I believe.
16       Q.   And then with the electronic sourcing
17   patent, it was a -- little bigger group of
18   inventors listed on the patent applications for that
19   system.
20           Right?
21       A.   Yes, sir.
22       Q.   Do you recall who the -- the 4 people are
23   who are listed on that?
24           And I've got the patents right here.
25   We're going to be talking about those sooner or later

Johnson, James Michael   12/9/2009   12:00:00 PM

---

**13**

1  anyway, so you could look at that if you like.
2      So the pending question is, do you know --
3  and if you like you can look at the patents in front
4  of you there -- who are the 4 listed inventors on the
5  electronic sourcing patents?
6      A.   Frank Melly, Doug Momyer, Bob Kinross, and
7  myself, is what I believe it was.
8      Yes.
9      Q.   And you're looking -- are you looking
10  right now at the patent with the first page
11  6,023,683?
12      A.   Yes.
13      Q.   That's the one marked Lawson exhibit 1?
14      A.   Yes.
15      Q.   Okay.  Is it your understanding that the
16  '683 patent accurately lists the 4 people that you
17  think were involved in developing the electronic
18  sourcing system?
19      A.   Yes.
20      Q.   And is it your understanding that the 2
21  people -- you and Mr. Momyer are the 2 people that
22  developed the RIMS system that's described in the
23  RIMS patent?
24      A.   Yes.
25      Q.   The RIMS system was -- how was that

---

**14**

1  marketed to customers of Fisher?
2      MS. ALBERT:  Objection, vague and
3  ambiguous as to time.
4      BY MR. McDONALD:
5      Q.   You can answer.
6      A.   It was used as a tool by Fisher Scientific
7  U.S. operations to gain large accounts.
8      Q.   Was -- was the way that large accounts
9  were enticed to use Fisher Scientific in part because
10  Fisher would offer to have a customer service
11  representative at the -- at the customer's location
12  using the RIMS system?
13      A.   That was part of it.
14      Typically, the larger customers that
15  Fisher Scientific had at that time were organizations
16  such as Johnson & Johnson, Hoffmann-La Roche, very
17  large organizations.  And thinking about what Fisher
18  Scientific did, they were a distribution company.
19  So we -- think of your tenth-grade biology
20  class.  We sold everything that was in that lab, you
21  know, from beakers to chemicals to frogs, you name
22  it.
23      And basically, we would house inventory at
24  these customer locations.  And -- for JIT purposes,
25  and we used RIMS to entice large companies to be able

---

**15**

1  to house our inventory in a just-in-time fashion
2  allowing to us manage that inventory so that we could
3  service the customer as well as gain new accounts,
4  large accounts for revenue purposes.
5      Q.   How -- how did Fisher Scientific actually
6  make its money in those situations where the RIMS
7  system was installed at customer locations?
8      A.   By sale of our product.
9      Q.   That would be all the stuff you were
10  listing like the frogs and the beakers and all that?
11      A.   Yes, sir.
12      Q.   Okay.  So the -- the RIMS system -- having
13  that RIMS system on-site at customers such as Johnson
14  & Johnson, that was part of the -- sales or
15  marketing pitch to either gain or keep large
16  customers?
17      A.   Yes, sir.
18      Q.   RIMS was part of that marketing pitch by
19  1992.
20      Correct?
21      A.   That sounds accurate.
22      I'm not sure of the exact dates, but --
23      Q.   If you turn to the last document, the
24  patent for RIMS is the bottom one in that little
25  stack I gave you there.

---

**16**

1      Do you have Lawson exhibit 7 now before
2  you?
3      A.   Yes, sir.
4      Q.   Is that the patent number 5,712,989?
5      A.   Yes.
6      Q.   And that's what entitled, just-in-time
7  requisition and inventory management system?
8      A.   Yes.
9      Q.   Is this your understanding of the RIMS
10  patent?
11      A.   Yes.
12      Q.   Do you see there on the first page on the
13  left side a little below the title, this was filed
14  April 2, 1993?
15      A.   Yes.
16      Q.   Does that refresh your recollection at all
17  as to whether the RIMS system was part of the Fisher
18  Scientific marketing pitches at least by late '92?
19      A.   I'd say that accurate.  It may have
20  been a little before.
21      Q.   Yeah.
22      It was at least on sale by the end of '92
23  and perhaps sometime earlier than that even; is that
24  right?
25      MS. ALBERT:  Objection, calls for

---

Johnson, James Michael  12/9/2009  12:00:00 PM

17

1   speculation.
2       BY MR. McDONALD:
3       Q.   You can answer.
4       A.   I guess it could be, yes.
5       Q.   Do you have any idea how long before the
6   end of 1992 the RIMS system was being used in the
7   Fisher Scientific marketing pitches?
8       MS. ALBERT:  Objection, calls for
9   speculation.
10      A.   How long after?
11      BY MR. McDONALD:
12      Q.   How long prior to the end of '92.
13      A.   Don't recall exactly.  I would be
14  guessing.
15      Q.   Did you have any role with respect to the
16  marketing of the RIMS system?
17      A.   Did I have any role?
18      Q.   Yes.
19      A.   Other than training the marketing folks,
20  no.
21      Q.   Okay.  So when you say, training the
22  marketing folks, can you explain what you mean by
23  that?
24      A.   There was a marketing team that would
25  market the applications that we developed in the IT

18

1   department.  And their role was to go out to the
2   customers and give presentations.
3       We would train those folks, and then they
4   would go out and train the sales force in the
5   functionality that we have within our systems.
6       Q.   In 1992, did you train Fisher Scientific
7   marketing personnel specifically on the RIMS system?
8       MS. ALBERT:  Objection, calls for
9   speculation.
10      A.   I'm sure we did.  We trained them on all
11  our systems.
12      BY MR. McDONALD:
13      Q.   And you personally did that; is that
14  right?
15      A.   Either me or one of my staff depending on
16  what particular time we're talking about.
17      Q.   Well, let's take the 1992 time frame.
18      Did you perhaps among others participate
19  in marketing training regarding the RIMS system?
20      MS. ALBERT:  Objection, calls for
21  speculation.
22      A.   I was involved in training Fisher
23  personnel that were in the marketing group, yes.
24      BY MR. McDONALD:
25      Q.   And the purpose of that training was to

19

1   help those marketing personnel then train the Fisher
2   Scientific sales personnel; is that right?
3       A.   Yeah, to tell them what our systems could
4   do.
5       Q.   And then the sales personnel would then
6   tell the customers what the system could do in sales
7   pitches?
8       A.   Yes, sir.
9       Q.   If you have the RIMS patent, the '989
10  patent before, exhibit 7, does this document describe
11  the RIMS system as it existed at least by April 2nd,
12  1993?
13      A.   Yes.
14      Q.   So it accurately describes the RIMS system
15  that was part of those sales pitches to customers at
16  least by April of 1993?
17      A.   Yes.
18      Q.   You reviewed this application and in
19  effect signed an oath and declaration related to it
20  when it was filed.
21      Right?
22      A.   Yes.
23      Q.   Did you participate at all in either
24  drafting the application or reviewing a draft?
25      A.   I would review drafts from the attorneys

20

1   that were working on this, yes.
2       Q.   There's a number of tables in the RIMS
3   '989 patent.  If you turn to the column -- beginning
4   of column 37 and continuing to column 48.
5       You see tables going from Roman numeral 1
6   to table 24 in that range of columns.
7       Correct?
8       A.   Yes.
9       Q.   Where did those tables come from?
10      A.   In some case, they are screenshots.
11      Q.   Screenshots of what?
12      A.   RIMS.
13      Q.   So these would be shots of the computer
14  screen for the RIMS system at various points in using
15  the system?
16      Is that what you mean by, screenshots?
17      A.   Yes.
18      Q.   Are some of the tables something other
19  than screenshots of RIMS?
20      A.   Looks like there's a printout here from a
21  report.
22      Q.   Which of the tables is a printout?
23      A.   It appears to me the last one, the
24  document printing process, where we're printing out
25  information.

21

1    Q.   So that would be table 24 that begins at
2    the bottom of column 45 and continues to column 48?
3    A.   It starts at column 41, line 35.
4    Is that what you said?
5    Q.   I said -- actually I was talking about
6    column 45, because I thought you said it was the last
7    table.
8    A.   Oh, sorry.
9    Nope.  There's more tables.
10   I'm sorry.
11   Nope.  I was talking about the one that
12   was on column 41, starting on 35.  Looks like a print
13   document of some kind.
14   Q.   Okay.  So that's table 15 you're saying
15   that's a printout.
16   Correct?
17   A.   Yes, that's what it would appear to be.
18   Q.   Are there any other tables in here that
19   are printouts as opposed to screenshots other than
20   table 15?
21   (Pause.)
22   A.   On column 45, at the bottom, tables 24
23   and -- continued 24.  That looks like just a list of
24   messages we had in the system.  That wouldn't be a
25   screenshot.

22

1    BY MR. McDONALD:
2    Q.   So was that a printout generated from the
3    RIMS system?
4    A.   It was probably a SQL statement that we
5    created that did a dump of the data.
6    Q.   Was the dump then in a paper form?
7    A.   It could have been in a paper form or we
8    could have put it in a Word document.  I don't
9    recall.
10   Q.   But somehow, this material got to the
11   patent attorney that -- that prepared the patent
12   application.
13   Correct?
14   A.   Yes.
15   Q.   So all of these tables, whether they were
16   screenshots or printouts or data dumps, they were all
17   taken from an actual RIMS system in existence prior
18   to April of '93?
19   A.   Yes.
20   Q.   Did the RIMS system have some sort of a
21   database or list of parts that would be ordered for a
22   customer?
23   MS. ALBERT:  Objection, vague and
24   ambiguous.
25   A.   Can you clarify what you mean by that?

23

1    BY MR. McDONALD:
2    Q.   I'm not sure what was unclear about that.
3    MR. McDONALD:  Could we read the question
4    back.
5    And maybe you can tell me what parts you
6    don't understand, or whether it's unclear.
7    (The reporter read the next-to-last
8    question.)
9    A.   The RIMS system had a database.  It had a
10   database of multiple tables.
11   By it's very name, requisition and
12   inventory management system, it had requisition
13   information in it and it had inventory JIT items in
14   it as a part list.
15   BY MR. McDONALD:
16   Q.   Did the parts list comprise one of the
17   multiple tables in the RIMS database?
18   MS. ALBERT:  Objection as vague and
19   ambiguous.
20   A.   The inventory records was a -- yeah,
21   that's where we kept the JIT inventory part numbers.
22   BY MR. McDONALD:
23   Q.   It was a table in the database?
24   A.   Yes, sir.
25   Q.   Can you turn to figure 1 of the RIMS '989

24

1    patent, please.  It's about the third page in.
2    A.   Third page in, you said?
3    Q.   Yes.
4    It's actually marked -- I think it's
5    missing the F and the I, because it just says, G.1,
6    at the bottom.
7    A.   Okay.
8    Q.   It looks like a figure anyway.
9    Right?
10   A.   Yeah, I guess.
11   Q.   It doesn't look like a G anyway.
12   Right?
13   Which -- this -- this has some references
14   to a host database and local database and some other
15   boxes here in this figure.
16   Correct?
17   A.   Yes.
18   Q.   Is the location of the parts list in the
19   RIMS system shown anywhere in this figure?
20   A.   Well, there's a 52 that says, JI- -- JIT
21   inventory.
22   Q.   Is it your understanding that a table of a
23   parts list was located there at number 52, the
24   distributor's JIT inventory?
25   A.   Yeah.

25

1    That would have been a subset of products
2    that we stored at that location.
3    Q.   When you say, a subset, what do you mean?
4    A subset of something bigger?
5    A.   Yeah.
6    I mean, Fisher sold thousands and
7    thousands of different products.
8    A customer like Hoffman-La Roche might
9    only store a small portion of what they needed to do
10   their research.  So if they used a large volume of
11   let's say acetone in their research, we would store
12   acetone at that location for them so that the
13   researcher didn't have to go and make a phone call to
14   our distribution center and wait 2 days to get
15   product.
16   They could go right down to the customer
17   service rep at that location, at that customer
18   location, and say, I need acetone.  And they would
19   get it and give it to them so they could continue
20   their research.
21   Q.   So right there at the customer location,
22   there would be this separate table of records of just
23   the sort of parts that that particular customer would
24   typically use?
25   A.   That was -- that information was stored

26

1    both on RIMS and on the Fisher host systems.
2    Q.   Okay.
3    A.   We stored both places.
4    Q.   But just to understand what you're talking
5    about that's located at 52, distributors JIT
6    inventory --
7    A.   Yeah.
8    Q.   -- does that box represent the inventory
9    itself or a database for the inventory?
10   A.   That represents the inventory.  That's a
11   record of what inventory was at that JIT facility.
12   Q.   Well, inventory and a record of it are 2
13   different things.  That's what I'm trying to
14   distinguish here.
15   You could have the actual beakers and
16   acetone on the shelf.
17   That's the inventory itself.
18   Right?
19   A.   That's correct.
20   Q.   Then you also have something else, which
21   is a table of records about those various items.
22   Right?
23   A.   Yes.
24   Q.   Is that table -- is that located at the
25   local database number 50 that's shown here in the

27

1    picture next to the distributor's JIT inventory?
2    A.   There was -- yes.
3    There was a database table on the local
4    database and at the host database.
5    Q.   Okay.  So the -- and the host database is
6    shown here in number -- as number 20 up higher in the
7    figure of the RIMS patent.
8    Right?
9    A.   Yes.
10   Q.   So in the RIMS system, both the host
11   database at Fisher Scientific and the local database
12   located at the customer had a table that was just
13   those particular items or parts that that particular
14   customer typically ordered?
15   A.   That they would order a significant
16   amount, yes.  If there was a need for a researcher to
17   have access to that quickly, and that was defined by
18   the customer.
19   You got to remember what we were trying to
20   do there.
21   Right?
22   You have researchers that would -- you
23   know, Hoffman-La Roche was paying an enormous amount
24   of money for to try and do R and D.  That's what they
25   did.

28

1    So they would not want to hold up those
2    researchers from getting through their job, whatever
3    they were trying to accomplish.  So if we could
4    provide products faster, what better way to do it if
5    we have that product on-site ready to go for them.
6    So the customer would define that product
7    in terms of what they thought they would need in a
8    just-in-time environment, and we would supply it,
9    store it, and manage it.
10   Q.   So you have that listed.
11   It might be a few hundred products or a
12   couple of thousand products that were -- was specific
13   that customer's desires?
14   A.   It could -- yeah, it could be any number.
15   We didn't restrict it, but --
16   Q.   Right.
17   But that -- was that kind of the range,
18   the typical sort of --
19   A.   I don't know --
20   Q.   -- number on the local database?
21   MS. ALBERT:  Objection, calls for
22   speculation.
23   A.   Don't recall the high-end side of it.
24   BY MR. McDONALD:
25   Q.   Okay.  But in any event, it was not all of

Johnson, James Michael  12/9/2009  12:00:00 PM

### 29

1  the products offered by Fisher Scientific in its
2  catalog.
3      Right?
4  A.   No, sir.
5  Q.   These were the products identified by the
6  customer as the ones they wanted to have immediate
7  access to?
8  A.   M-hm, yes.
9  Q.   At the host database, was there -- in the
10 RIMS system now, was there also a -- some sort of a
11 database or table regarding the entire Fisher
12 Scientific catalog?
13     MS. ALBERT:  Objection, misrepresents the
14 nature of the document.
15     A.   You mentioned RIMS in the host.
16     The RIMS was running on local.  Host was
17 running on -- had its own inventory records, yes.
18     BY MR. McDONALD:
19     Q.   Well, if you go to column 2 of the '989
20 patent, after the drawings.
21     A.   Column 2.
22     Q.   Just after the drawings, the first text
23 page after the drawings.
24     A.   Okay.
25     Q.   Do you see in column 2, there's a heading

### 30

1  called, brief description of the drawings?
2  A.   Yes.
3  Q.   And it says there in line 35:  Figure 1 is
4  a diagram showing the overall system of the present
5  invention and the environment in which it is used.
6      Do you see that?
7  A.   That's correct.
8  Q.   All right.  And figure 1, that's -- if we
9  can go back to figure 1, then, third page in, I
10 think:  So that depicts the overall system of the
11 RIMS invention and the environment in which it is
12 used?
13 A.   Yes.
14 Q.   So the host database there, number 20, is
15 that a part of the RIMS system or not?
16 A.   That was RIMS specific code and
17 information running on the host computer, that's
18 true.
19 Q.   Did that -- and on the host database, was
20 that accessed by the RIMS system?
21 A.   Yes, sir.
22 Q.   Did the host database have records or
23 tables or databases reflecting the whole Fisher
24 Scientific catalog?
25 A.   I've got to get clarification here when

### 31

1  you say, the Fisher catalog.
2      The Fisher catalog was a -- at that time
3  was a paper book that housed every product that
4  Fisher sold at the moment in time that catalog was
5  produced.  The challenge with a paper catalog was
6  that that had a tendency to get outdated fairly
7  quickly, because we would either discontinue items,
8  bring new items on.
9      So while we could update the inventory
10 records on the host computer quicker than we could
11 generate another catalog, and the Fisher catalog being
12 roughly that thick and it takes roughly 6 months to a
13 year to produce in a paper form, they didn't always
14 match.
15     So I mean, my definition of a catalog is
16 something you would see in, you know -- it's a book.
17 Right?  -- that you would open up and search the
18 catalog via categories, those kinds of things, so
19 they're really 2 different things.
20 Q.   Okay.  We'll back up a little bit then and
21 get that clarified.
22     You're holding up your fingers, and I just
23 want to make sure the record is clear on the printed
24 page for a second.
25     Your fingers were about 6 inches wide?

### 32

1  A.   I'd say they were more like 4 or 5, but --
2  Q.   Okay.  Fisher Scientific catalog, you were
3  trying to depict the thickness of that thing with
4  your fingers there?
5  A.   It was a lot of pages.
6  Q.   So it was like a phone book for a pretty
7  big city?
8  A.   Yes.
9  Q.   About how many items?
10     Can you give me some idea at least in
11 terms of order magnitude?
12     Was it hundreds, thousands, tens of
13 thousands in that catalog?
14 A.   I don't recall.
15 Q.   But a lot?
16 A.   It was a lot.
17 Q.   What information generally -- what
18 categories of information were in there for the
19 products that Fisher Scientific had in its catalog?
20 A.   Well, they had different sections.
21     You had chemical sections.  You had
22 glassware sections.  You had electronic sections.
23 You had oven sections where you had heating elements
24 and various types of ovens.
25     This goes back a ways.  I can't rem- --

Johnson, James Michael  12/9/2009  12:00:00 PM

---

33

1  I'm trying --
2  Q.  Yeah.
3      You don't have to list all those sections.
4  A.  Yeah.
5  Q.  I'm just looking for the generic kind of
6  types of --
7  A.  Yeah.
8  Q.  -- things in there.
9  A.  It was organized in a -- in a way that
10 folks could try -- the customer could try to find
11 things, you know, fairly quickly.
12     So if they were looking for a beaker, they
13 would go to glassware because, you know,  there's
14 different types of beakers.
15 Q.  Who selected the items in the catalog?
16     Was it somebody at Fisher Scientific who
17 put the catalog together, or a group of people at
18 Fisher Scientific?
19 A.  Yeah.
20     There was a whole group of people that
21 managed the production of the catalog.
22 Q.  Was the purpose of the catalog to help
23 Fisher Scientific customers buy Fisher Scientific
24 products?
25 A.  Yeah.

---

34

1      They would distribute that paper catalog
2  to all the customers, to the various customers.
3  Q.  The idea was to list pretty much
4  everything that Fisher Scientific sold at least as of
5  the day it went to the printer?
6  A.  Pretty much.
7  Q.  Did the catalog include images or pictures
8  of the products?
9  A.  Yes.
10 Q.  Did it include drawings or sketches
11 related to the products?
12 A.  Yes.
13 Q.  What else did it include?
14 A.  Detail description, list price, brief
15 description, part numbers.  It had contact
16 information I believe at the bottom like 800 numbers
17 that made it easy for them to call, you know, the
18 distribution center.
19 Q.  Anything else that comes to mind right
20 now?
21 A.  Again, that was a number of years ago
22 since I've seen the catalog, so I don't --
23 Q.  So what you listed for me, do you believe
24 that was a comprehensive list of all the things, or
25 might there have been more information in the

---

35

1  catalog?
2  A.  Oh, I'm sure there was more information.
3  Don't -- you know, I'm sure there was.
4  Q.  I just want to get the record clear here
5  that you're leaving that open-ended.
6      Right?
7  A.  Okay.
8  Q.  You mentioned both -- I think I heard
9  something that sounded like kind of a long
10 description as well as a short description of each
11 product.
12     Is that what was in the Fisher catalog?
13 A.  I believe so, yeah.
14 Q.  Why did you have.  Why -- why did the
15 Fisher Scientific catalog have both a long
16 description and a short description of the products?
17 A.  I didn't produce it, so I couldn't tell
18 you.
19 Q.  Do you have any understanding of that
20 based on your years at Fisher Scientific?
21 A.  I never worked necessarily with the paper
22 catalog directly.
23 Q.  So do you have an understanding one way or
24 the other as to why they had both a long and a short
25 description of products?

---

36

1  A.  No, I don't.
2  Q.  Did the customer have any input as to
3  which products were or were not listed in the Fisher
4  Scientific catalog?
5  A.  You mean directly?
6  Q.  Yes.
7  A.  In other words, if -- just to clarify
8  because I need to understand what you're asking.
9      If a customer came to us and said, I want
10 you to start distributing a product that we didn't
11 distribute that was within our product line, and it
12 was a big-enough customer, I'm sure they would.  It
13 depended on the product I would assume.
14     I mean, again, think about what we sold.
15 We sold scientific equipment.  We -- if a customer
16 came to us and asked us to distribute something
17 outside of our core competency, I don't believe they
18 would.
19     But again, I wasn't part of that -- that
20 group.
21 Q.  The -- a little while ago, we were talking
22 about the parts list for -- that's defined by a
23 customer that was located on the local database of
24 the RIMS system.
25     Remember we were talking about that a few

---

Johnson, James Michael  12/9/2009  12:00:00 PM

---

**37**

1  minutes ago?
2      A.   About the JIT inventory?
3      Q.   Well, about a parts list I think that was
4  on the local database.
5      A.   Yes.
6      Q.   That is something where the customer
7  actually identifies what products they want on that
8  parts list; is that right?
9      A.   It identifies, yeah, a group of -- a
10  subset of products that Fisher sold that the customer
11  would like to have us manage at that JIT facility.
12      Q.   Your understanding on the other hand is
13  that the Fisher Scientific catalog, the products
14  actually listed in there are products that Fisher
15  Scientific decides to list in there.
16      Right?
17      A.   That was a comprehensive list of all
18  products that were sold by Fisher typically at a
19  particular moment in time.
20      Q.   And Fisher decided what was in that
21  catalog.
22      Right?
23      A.   I assume.
24      Again, not part of that group.  Don't know
25  who made that decision.

---

**38**

1      Q.   Are you familiar with the term part master
2  records used with the RIMS system?
3      A.   Yes.
4      Q.   What are part master records?
5      MS. ALBERT:  Are you -- I just want to get
6  the question.  It's a little bit vague and ambiguous.
7      Are you referring to the patent or the
8  commercial product?
9      MR. McDONALD:  Do you have an objection to
10  my question?
11      MS. ALBERT:  Yes, vague and ambiguous.
12      BY MR. McDONALD:
13      Q.   All right.  You may answer.
14      A.   Did you say, part master?
15      Is that what you said?
16      Q.   Yeah.
17      I think the question is, what are part
18  master records?
19      A.   That's the JIT inventory.  That was the
20  parts list if you will of the products that we stored
21  at that JIT facility.
22      Q.   Could a part master record also include a
23  record of an item that wasn't necessarily stored in
24  the just-in-time inventory?
25      MS. ALBERT:  Same objection, vague and

---

**39**

1  ambiguous.
2      BY MR. McDONALD:
3      Q.   You may answer.
4      A.   No.
5      Q.   Couldn't a customer service representative
6  add a part record to the parts master records list?
7      A.   They could, but it had to be -- it had to
8  be a JIT item that was located at that facility.
9      Q.   Why did it have to be in the JIT
10  inventory?
11      A.   Because in order to do that, you would
12  have -- if you were -- you'd have to create a
13  transfer order to get the product shipped from our
14  central distribution center to that location.
15      The only way you would be able to create a
16  non-Fisher JIT product would be as if it was
17  customer-owned.
18      Q.   All right.  So the part master record
19  could also include customer-owned items?
20      A.   Yes.
21      Q.   And would that be something that may or
22  may not be in the just-in-time inventory?
23      A.   No.
24      It would have to be in that inventory
25  record.  It would have to be in that JIT facility.

---

**40**

1      Q.   In the RIMS patent, could you turn now --
2  it's exhibit 7, the '989 patent -- turn to columns 5
3  and 6.
4      A.   M-hm.
5      Q.   You see there table 1.
6      A.   Yes.
7      Q.   Do you understand that table 1 indicates
8  the product types for the types of products that were
9  the subject of the part master records?
10      A.   Those are the product types that were
11  processed through the requisitioning system in RIMS.
12      MR. McDONALD:  Could I have my question
13  read back please.
14      (The reporter read the last
15      question.)
16      A.   No, I don't, because they aren't.
17      Again, those are product types that were
18  managed by the requisition management system.
19      01 is a JIT.  02 we didn't use.  03 was a
20  Fisher-distributed product that came from a central
21  distribution center.  And 04 was a third-party
22  purchase that was purchased by Fisher SPS group.  And
23  05 was an administrative purchase that the customer
24  purchased.  And 06 was a customer inventory.
25      Q.   So of those product types 01 through 06,

---

Johnson, James Michael  12/9/2009  12:00:00 PM

41

1  which ones reflected -- which ones were on the parts
2  master records?
3     A.   An 01 and an 06.
4     Q.   When you say these -- this list of
5  products, as I understand then, 01, 03, 04, 05, and
6  06, those product types were all processed through
7  the RIMS system?
8     A.   Yes.
9     Q.   When you say, processed through the RIMS
10  system, what do you mean?
11     A.   When you entered a product number in the
12  RIMS requisition management system, that program had
13  an algorithm built into it that would look to the JIT
14  record first.
15         If it found it, it presented it to the CSR
16  as an item in JIT.  If it did not find it, it would
17  then source to the distributor, which at that time
18  was Fisher, and look at the Fisher distribution
19  centers to find that product.  If it found it, it
20  brought it back as a product type 03.
21     Q.   When you say, brought -- brought back as a
22  type -- product type 03, what do you mean by that?
23     A.   The host computer would -- again if it
24  found that product in the Fisher distribution
25  centers, it would send back to the RIMS local

42

1  computer that product, price, availability as a
2  product type 03.
3     Q.   So that information if we go back to
4  figure 1 of the '989 patent for a moment -- why don't
5  you keep this page kind of under your thumb there
6  because we may come back to it.
7         When you say you -- you mentioned the
8  Fisher data centers.
9         That's shown somewhere in this figure,
10  figure 1?
11     A.   I'm sorry?
12     Q.   You mentioned the Fisher data center.
13         Do you remember that?
14     No.
15     I'm sorry.
16     Fisher distribution center.  You mentioned
17  the Fisher distribution center.
18         Right?
19     A.   Yes.
20     Q.   Is that shown anywhere on figure 1?
21     A.   It's part of the distributor's warehouse.
22     Q.   That's the number 30 there up at the top
23  of the figure?
24     A.   Yes.
25     Q.   All right.  So for that product type 03,

43

1  which would be a distributor catalog item stored in
2  the distributor warehouse, in that situation, that
3  would be a situation where information was sent back
4  to the RIMS local database; is that correct?
5     A.   Yes.
6         The -- for example, I'll use acetone
7  again.  That's my favorite test item.
8         Product ID in the Fisher catalog or the
9  Fisher databases was A 181.  That was acetone.  If
10  they typed in A 181 as a part number in the requisition management
11  system, it would look to the JIT record locally on
12  the RIMS database on the local computer.
13         If it found it, it would bring it back to
14  the CSR and say, this is a JIT item and here is
15  what's available.  If it did not find it in the JIT
16  facility, it would communicate to the host computer.
17         The host computer had programs on it that
18  ran that would go through the algorithm of looking
19  for A 181 as a part number for a warehouse record on
20  the host computer for acetone.  If it found it in a
21  warehouse that was close to the customer, it would
22  bring -- it would assign that product type 03 to that
23  record and send it back to the local computer saying
24  that you could get that product from the EDC, which
25  was the eastern distribution center, and I'm using

44

1  Hoffman-La Roche as an example in my head because
2  they're in Jersey.  EDC was in Nutley, New Jersey, I
3  believe.
4         So having said that, the customer felt
5  comfortable that they would get that product
6  overnight typically.
7     Q.   All right.  So in the context of figure 1,
8  you asked for a product A 181, the first step is, it
9  look in the local RIMS database number 50 there and
10  see if it was in the local inventory?
11     A.   Yes, sir.
12     Q.   And if it was not, then there was some
13  communication with the host computer 10 to look in
14  other Fisher Scientific warehouses?
15     A.   Yes, sir.
16     Q.   Okay.  And if it was found in another
17  Fisher Scientific warehouse, the host computer 10
18  would send some data back to the local computer 40
19  assigning product type 03 and giving it the part
20  information, including where it was -- which
21  warehouse it was located at?
22     A.   And a price, yes.
23     Q.   Okay.  Now, if it's an item number 04 --
24  excuse me -- product type 04 from the table 1, that's
25  a third-party item that distributor orders.

Johnson, James Michael  12/9/2009  12:00:00 PM

45

1      What was the process -- the similar
2   process for that type 04 product?
3      A.   That was very similar to 03 in the sense
4   that the local computer sent that to the Fisher host
5   system for a group that was formed in Fisher called
6   SPS, strategic procurement services.  They were
7   Fisher employees that would make purchases for
8   customers on a one-off basis.
9      If there was a product that Fisher did not
10  have in their local distribution centers, and we were
11  trying to service the customer, this group's
12  responsibility was to go out and source that item
13  somewhere, wherever they could find it.
14     Q.   Okay.  But let's walk through the process
15  though.
16     All right?
17     You described the process for type 03.
18  I'd like a similar description for what the process
19  is for type 04.
20     MS. ALBERT:  Objection, calls for a
21  narrative.
22     A.   Okay.  Let's assume the product they
23  entered was not found on the Fisher mainframe or the
24  Fisher host system.
25     BY MR. McDONALD:

46

1      Q.   But let -- let -- just walk me through
2   step 1 here.
3      Is step 1 -- it would -- you -- if
4   somebody inputs some sort of a product description
5   for this third-party product?
6      A.   Yes.
7      Q.   Can you give me an example of what that
8   might look like?
9      A.   XYZ, doesn't matter.
10     Q.   Like a parts number type of thing?
11     A.   Yes.
12     Q.   Is step 1 that the RIMS system would look
13  for part XYZ in the local database?
14     A.   Yes.
15     It always looked there first for JIT
16  inventory.
17     Q.   All right.  And if it's a third-party
18  product, it will not be found in the local database
19  then; is that right?
20     A.   That's correct.
21     Q.   And so what happens next?
22     A.   It goes to the host computer.
23     Q.   So the local computer sends the host
24  computer in effect some sort of an inquiry saying,
25  the customer wants a product calls XYZ, I don't have

47

1   it in my local inventory, you know, do what you can
2   to find it.
3      Is that basically the purpose of that
4   message?
5      A.   It went up and looked for XYZ on the
6   Fisher host systems.
7      Q.   Okay.
8      A.   If it did not find it, it would come back
9   and say, this is not a valid part number, and the CSR
10  would then have the opportunity to change it to a
11  product type 04 and say, okay, I want Fisher to
12  source this for me.
13     Q.   So the host computer would respond to the
14  local computer and say -- indicate information that
15  would indicate, this is not a product that's
16  available at the Fisher Scientific other warehouses
17  either?
18     A.   That's correct.
19     Q.   And so that information would be received
20  by the customer service representative located at the
21  customer location?
22     A.   Yes.
23     Q.   And at that point the customer service
24  representative would change the product to a product
25  type 04?

48

1      A.   Yes.
2      Q.   What happens next?
3      A.   That would be sent back up to the host
4   computer, and a document would be printed in the
5   strategic procurement services group.  And then that
6   person in that group would go out and try to find
7   this item, whatever -- wherever their resources they
8   used.
9      Q.   When you say that there would be a
10  document printed at the SPS, what doc- -- is
11  that document called?
12     A.   It was an noncatalog item I believe is
13  what we called that process, but I could be mistaken.
14  I don't recall exactly.
15     Q.   I'm looking for the name of the document
16  itself that's printed.
17     What's that called for that noncatalog
18  item?
19     A.   I don't recall.
20     MS. ALBERT:  Dan, if you reach a good
21  stopping point sometime soon, I wouldn't mind taking
22  a break.
23     MR. McDONALD:  All right.  We can do that
24  right now.
25     THE VIDEOGRAPHER:  The time is

Johnson, James Michael  12/9/2009  12:00:00 PM

49

1  approximately 9:26 AM.  We are going off the video
2  record.  Off the record.
3      (Recess.)
4      THE VIDEOGRAPHER:  The time is
5  approximately 9:38 AM.  We are back on the video
6  record.
7      BY MR. McDONALD:
8  Q.  Mr. Johnson, do you recall before the
9  break, we were talking about how an item of product
10  type 04 was processed by the RIMS system.
11      Do you recall that?
12  A.  Yes.
13  Q.  And as part of the processing of the RIMS
14  system with product type 04 are certain -- is it
15  certain document or are certain documents printed by
16  the system typically?
17  A.  There's a document that's printed in the
18  strategic procurement group.
19  Q.  Are there any other documents other than
20  the one printed at the strategic procurement group
21  with a type 04 product?
22  A.  Not that I'm aware of, no.
23  Q.  And just to be clear, the type 04 product,
24  that's a third-party or non-Fisher Scientific product
25  that Fisher Scientific would handle the purchasing of

50

1  for the customer?
2  A.  Yes.
3  Q.  Could you turn in the RIMS patent to
4  figure 5 A, please.
5  A.  5 A?
6  Q.  Yes.
7  You've seen this figure before.
8  Right?
9  A.  Yes.
10  Q.  Generally, what is it?
11  A.  It's a flow chart.
12  Q.  What generally is this flow chart in
13  figure 5 A describing or depicting?
14  A.  It's depicting a path of the product logic
15  in terms of the path it took.
16  Q.  Is this depicting a path in the process
17  flow after a customer service representative accepts
18  a requisition?
19  A.  Nope.
20  I think it says they're building a
21  requisition.
22  Q.  Well, you see the very top box there, 330,
23  in figure 5 A?
24  Does it says, CSR accepts requisition?
25  A.  Yes.

51

1  Q.  So that's the first step depicted on this
2  flow chart.
3  Right?
4  A.  M-hm.
5  Q.  And, CSR, that means customer service
6  representative accepts requisition.
7  Right?
8  A.  Yes.
9  Q.  And then the following steps shows what
10  happens after -- after the CSR accepts the
11  requisition?
12  A.  Right.  Yes, you're right.
13  Sorry.
14  Q.  And so this is the point in the process
15  where a requisition is going to be converted into a
16  purchase order.
17  Right?
18  MS. ALBERT:  Object to the form.
19  A.  It's going to send the requisition up to
20  the host.
21  BY MR. McDONALD:
22  Q.  Okay.  After the CSR accepts the
23  requisition, is the next basic step to generate
24  purchase orders at that point depending on the
25  product type?

52

1  MS. ALBERT:  Object to the form, vague and
2  ambiguous.
3  A.  It sends a requisition to the host where a
4  purchase order is generated through the order
5  creation.
6  BY MR. McDONALD:
7  Q.  That's what happens after the CSR accepts
8  a requisition.
9  Right?
10  A.  Yes.
11  Q.  Acceptance, that's basically finalizing
12  the requisition?
13  A.  It's -- yes.
14  Q.  So if we look at figure 5 A here, the next
15  box after, CSR accepts requisition, is box 331.
16  Correct?
17  A.  Yes.
18  Q.  That box says, update status code to P in
19  requisition item table and display.
20  Do you see that?
21  A.  Yes.
22  Q.  Do you have an understanding as to why the
23  status code is updated to P?
24  A.  I don't recall all the status codes in the
25  system.

Johnson, James Michael  12/9/2009  12:00:00 PM

---

53

1      Q.   Okay.  If you turn to column 16 of the
2  RIMS patent.
3          At line 37 -- basically lines 35 to 37, do
4  you see the sentence, quote:  After acceptance of a
5  sourced requisition, the status can change to F,
6  filled, B, back ordered, P, in process, or C,
7  canceled?
8          Do you see that?
9      A.   Yes.
10     Q.   So if we return back to figure 5 A now,
11 when it says, update status code to P in the
12 requisition item table in display, does that -- meant
13 to indicate that the requisition is in process?
14         MS. ALBERT:  Objection, mischaracterizes
15 the document.
16     A.   Actually it means that it was sent to the
17 host mainframe to be processed.  It's in process.
18         BY MR. McDONALD:
19     Q.   Okay.  So the P -- what we just read from
20 from column 16, that's the same P status code that's
21 the status code that's in box 331 of figure 5 A.
22     Right?
23         MS. ALBERT:  Objection, mischaracterizes
24 the document.
25         BY MR. McDONALD:

---

54

1      Q.   I'm just asking.
2          Is that right or not, Mr. Johnson?
3      A.   I believe so, yes.
4      Q.   So your understanding also with respect to
5  the RIMS system as described in this RIMS '989 patent
6  is that once the customer service representative
7  accepts a requisition, it's finalized and then sent
8  to a computer for processing?
9      A.   Well, it's not finalized.  It's in
10 process.
11     Q.   The requisition is -- is finalized,
12 though.
13     Right?
14     A.   The requisition is still in process.  It
15 hasn't been finalized until we get a response back
16 from the host computer as to what Fisher systems did.
17     Q.   Okay.  So that's the -- that's the
18 purpose.
19         Once the customer service representative
20 accepts a requisition, update the status code to P,
21 and then you send some information to the host
22 computer at that point?
23     A.   Yes.
24     Q.   And what's the purpose of sending
25 information to the host computer at that point?

---

55

1      A.   To process that requisition into a
2  purchase order to Fisher.
3      Q.   Okay.  So if we return now to 5 A, figure
4  5 A, after we've updated the status code, do you see
5  there's a diamond-shaped 332 next.
6     Right?
7      A.   Yes.
8      Q.   And that's basically a decision point or a
9  question that the system is asking to the algorithm.
10     Correct?
11     A.   Yes.
12     Q.   And at that point, the question is whether
13 the product is of a type 01, 03, or 04 or not.
14     Right?
15     A.   Yes.
16     Q.   And again 04 is one of those third-party
17 products that Fisher does not carry itself.
18     Right?
19     A.   Yes.
20     Q.   So if it's a product type 04, it will
21 branch right in this figure why there's a Y.
22     Correct?
23     A.   M-hm.
24     Q.   You say yes or no?
25     A.   Yes.

---

56

1      Q.   And for one of those third-party products
2  of type 04, what's the next step as reflected in
3  figure 5 A?
4      A.   It says, create and send a purchase order
5  data block, including relevant requisition data from
6  requisition header and item tables.
7      Q.   What's your understanding as to why for
8  one of those third-party products of a type 04 the
9  system creates and sends a purchase order data block?
10     A.   At that point, it's submitting the
11 requisition to the host computer to be processed as a
12 purchase order.
13     Q.   Is that what's reflected there in steps
14 340, 344 -- and 344 of figure 5 A, that interaction
15 with the host?
16         MS. ALBERT:  Objection, mischaracterizes
17 the document.
18     A.   That's the representation of the
19 communications between the local computer and the
20 host computer.
21         BY MR. McDONALD:
22     Q.   Okay.  So the purchase order data block
23 for one of those third-party products of type 04,
24 that data is sent to the host computer.
25         Then the host provides confirmation data

---

Johnson, James Michael   12/9/2009   12:00:00 PM

57

1   that it got the purchase order data block?
2       A.   It confirms after it processes those 3
3   product types what it did with it, yes.
4       Q.   Okay.  So it does more just confirm it
5   that it got the data.
6            It actually confirms that it did something
7   with the data?
8            Is that right or not?
9       A.   Yes, depending on the product type, it
10  would do one of 3 things.
11      Q.   All right.  If it's product type 04, the
12  third-party product, what does it do?
13      A.   I believe that's where it prints that
14  report out at the strategic procurement services
15  group in Fisher purchasing.
16      Q.   Isn't it true that the -- for -- for a
17  party type 04, that third-party product, the host
18  computer will actually wind up generating a proposed
19  purchase order?
20      A.   No.
21           It just prints a document out describing
22  what's on that data related to that product type of
23  what product, and then a purchasing agent would take
24  that report and try to figure out where they could
25  purchase that product from.

58

1       Q.   Isn't it true that if the product type is
2   04 for that third-party product, the host computer
3   generates a proposed purchase order to the vendor?
4            MS. ALBERT:  Objection, asked and
5   answered.
6       A.   No.
7            BY MR. McDONALD:
8       Q.   Can you turn in the RIMS '989 patent to
9   column 19 at line 38.
10      A.   I'm sorry.
11           Say that again.
12      Q.   Column 19, beginning at line 38.  I'm
13  going to read a section there to you.
14           Quote:  If the product type is 04, host
15  computer 10 verifies the vendor part number, period.
16  If the part number is found, host computer 10
17  executes the order in step 366 by generating a
18  proposed purchase order to the vendor and creates a
19  data block including a status code of B, back ordered
20  for transmission to local computer 40, quote.
21           Do you see that language?
22      A.   Yes.
23      Q.   So isn't it true that if there is a
24  product type 04, the host computer does generate a
25  proposed purchase order?

59

1            MS. ALBERT:  Objection, mischaracterizes
2   the document.
3       A.   It generates a report.
4            BY MR. McDONALD:
5       Q.   Well, that's not what the language that I
6   just read says.
7       A.   It generates --
8       Q.   Right?
9       A.   It generates information to the SPS group
10  so that that SPS group could go out and source the
11  product.  There was no connectivity out to
12  distributors from the host computer --
13      Q.   Well, this is your patent.
14      A.   -- in the sense --
15      Q.   This is your patent.
16           Right?
17      A.   Well, I mean, a purchase order could be a
18  printed document.
19      Q.   Okay.  Please just answer my questions.
20           All right?
21           This patent, the '989 patent, is a patent
22  that you're listed as an inventor.
23           Correct?
24      A.   Yes.
25      Q.   And you signed an oath and declaration

60

1   indicating you had reviewed this document and when it
2   was filed with the Patent Office, you thought it was
3   accurate.
4            Right?
5       A.   Yes.
6       Q.   And in that column 19, I just read a
7   section from your patent to you which says that if
8   the product type is 04 the host computer generates a
9   proposed purchase order.
10           Right?
11           MS. ALBERT:  Objection to the form,
12  badgering the witness and mischaracterizing the
13  document.
14      A.   A purchase order could be a printed
15  document that a purchasing agent takes and then goes
16  to a vendor to see if he can source it.
17           BY MR. McDONALD:
18      Q.   Okay.
19      A.   That's legitimate.
20      Q.   So this is an accurate statement in column
21  19 that I just read to you?
22           MS. ALBERT:  It's mischaracterizing the
23  document.
24      A.   Sure.
25           MS. ALBERT:  Objection.

Johnson, James Michael  12/9/2009  12:00:00 PM

**61**

1       BY MR. McDONALD:
2           Q.   Then the next sentence there in column 19
3       at line 44 or so, quote:  The distributor's
4       purchasing department will then verify that order,
5       e.g. --
6           A.   I'm sorry.  I didn't hear the column.
7           Q.   I'm sorry.
8                Column 19.
9                Do you have that before you?
10          A.   Yes.
11          Q.   At line 44.
12               And I'll read the sentence there.
13               Quote:  The distributor's purchasing
14      department will then verify that order, paren, e.g.,
15      verifies that the pricing is correct, paren, and
16      generate a purchase order to that vendor, quote.
17               You see that?
18          A.   Yes.
19          Q.   And that's an accurate statement about how
20      the RIMS system worked prior to April of '93.
21               Correct?
22          A.   Yes.
23          Q.   And if you look at -- that sentence or
24      that paragraph refers to a step 366 there at line 41.
25               Do you see that?

**62**

1           A.   Yes.
2           Q.   And if you turn to figure 5 B of your '989
3       patent.
4           A.   I'm sorry.
5                Which figure?
6           Q.   5 B as in boy.
7                That's a flow chart.
8                Correct?
9           A.   Yes.
10          Q.   And there's a box 366, that same number
11      that was in column 19.
12               Correct?
13          A.   Yes, I believe so.
14          Q.   That step 366 is depicted in column 19,
15      the part that I read, that specifically relates to
16      product type 04, one of those third-party products.
17               Correct?
18          A.   What you stated earlier above?
19               Yes.
20          Q.   Yes.
21               And so in figure 5 B, can you read to me
22      what's in box 366?
23          A.   Execute purchase order.
24          Q.   So the RIMS system prior to April '93 for
25      third-party products of type 04 executed purchase

**63**

1       orders, didn't it?
2                MS. ALBERT:  Objection, mischaracterizes
3       the document.
4           A.   No.
5                It was managed by the distributor as it
6       says in that statement on 44.
7                The distributor purchasing department,
8       which was the SPS group, would then verify the order,
9       and verify the pricing is correct and generate the
10      purchase order separate and distinct from RIMS.
11               BY MR. McDONALD:
12          Q.   Well, figure 5 B depicts a flow chart
13      describing programs employed by an embodiment of the
14      system of the present invention to accept a sourced
15      requisition.
16               Right?
17          A.   Where are you reading that?
18          Q.   Well, you can tell I was reading?
19               It's at column 2, the description of
20      figure 5 B there under the brief description of the
21      drawings.  I'll refer you to that.
22               It's column 2 near the bottom about line
23      52 where it says, figures 5 A and 5 B are flow charts
24      describing programs employed by an embodiment of the
25      system of the present invention to accept a sourced

**64**

1       requisition.
2                Right?
3           A.   Yes.
4           Q.   And this is your figure 5 B that you said
5       was a flow chart describing programs embodied by your
6       RIMS system.
7                Right?
8                MS. ALBERT:  Objection to the form,
9       mischaracterizes the document.
10               BY MR. McDONALD:
11          Q.   You may answer.
12               MS. ALBERT:  Asked and answered.
13          A.   Yes.
14               BY MR. McDONALD:
15          Q.   And in your depiction of your system in
16      figure 5 B for item product types 04, third-party
17      item types or product types, you said that at step
18      366 you execute purchase order.
19               Right?
20               MS. ALBERT:  Objection, asked and
21      answered.
22               (Pause.)
23          A.   It's been some time since I've looked at
24      this, but as I look at it again, I'm not seeing a
25      product type 04 in this process.

Johnson, James Michael  12/9/2009  12:00:00 PM

65

```
1         BY MR. McDONALD:
2    Q.   Well, it's not identified in figure 5 B in
3    366 as a product type 04.
4         Correct?
5    A.   I don't see product type 04 referenced
6    anywhere in this process.
7    Q.   But in column 19 of your patent that talks
8    about step thirty- -- 366 at line 41, that paragraph
9    is talking about product type 04.
10        Correct?
11        MS. ALBERT:  Objection, mischaracterizes
12   the document.
13   A.   Yes, it does.
14        BY MR. McDONALD:
15   Q.   And isn't it true that for product type 04
16   in your RIMS system, the execution of the purchase
17   order is by the host computer?
18        MS. ALBERT:  Could you read that question
19   back, please.
20        (The reporter read the last
21        question.)
22        MS. ALBERT:  Objection, mischaracterizes
23   the document and asked and answered.
24   A.   Yeah, depending on the product type.
25        If it's an 01 or an 03, a purchase order
```

66

```
1    is generated to Fisher Scientific.  In the case of
2    product type 04, it's submitted to the purchasing
3    department within the Fisher organization, and then
4    they need to go source where they're going to get
5    that product from.
6         BY MR. McDONALD:
7    Q.   I'd like an answer to my question.
8         Isn't it true that for product type 04,
9    those third-party products, the execution of the
10   purchase order is by the host computer in the RIMS
11   system?
12        MS. ALBERT:  Asked and answered 3 times
13   now.
14   A.   Executed by the SPS group.
15        BY MR. McDONALD:
16   Q.   So you're saying it's not executed by the
17   host computer for product type 04?
18   A.   The execution of the actual purchase is by
19   the SPS group.
20   Q.   Not the host computer?
21        I'd like an answer specifically about the
22   host computer.
23        Yes or no?
24        MS. ALBERT:  Objection, asked and answered
25   5 times.
```

67

```
1    A.   I answered that question.
2         BY MR. McDONALD:
3    Q.   Well, you've talked about the SPS group,
4    and I'm asking about something other than the SPS
5    group.
6         I'm asking about the host computer.
7    A.   And I'm telling you what it did.
8         It generated a document that those folks
9    use to generate a purchase order to a distributor.
10   Q.   All right.  So you're saying the host
11   computer doesn't generate a purchase order?
12   A.   It generates a document with what the
13   request is for that purchase order.
14   Q.   Could you turn to column 19 at line 23,
15   please, of the RIMS '989 patent.
16   A.   I'm sorry.
17        19 what line?
18   Q.   Line 23.
19        Do you see there where it says, quote:  As
20   to items of product type 03 or 04, the execution of
21   the purchase order by the host computer 10 in step
22   366 may be performed by any conventional means for
23   arrangement -- arranging shipment of the items from
24   the distributor warehouse 30 or from the facility of
25   a vendor 37 or 38, depending upon whether the type 03
```

68

```
1    or 04 product is routinely stocked by the
2    distributor, quote.
3         Do you see that?
4    A.   Yes.
5    Q.   Is that an accurate statement about the
6    RIMS system as of April of '93?
7    A.   Yes.
8         And -- and I can explain that one I think.
9         There were --
10   Q.   I'm not asking you to explain it.
11        MS. ALBERT:  Well, let him finish his
12   answer, please.
13        MR. McDONALD:  He has finished his answer.
14        MS. ALBERT:  No, he hasn't.
15        MR. McDONALD:  I don't want him to put a
16   speech on the record.
17        I asked him whether the statement was
18   accurate, and I got it.
19        THE COURT REPORTER:  Talk one at a time,
20   please.
21        MS. ALBERT:  He is entitled to finish his
22   answer.  You cut him off, sir.
23        MR. McDONALD:  I can ask a separate
24   question here.
25        BY MR. McDONALD:
```

69

1    Q.   Is there some explanation that you'd like
2    to give us, Mr. Johnson, about that sentence I just
3    read?
4    A.   Yes.
5         In some cases, in the Fisher environment,
6    there would be specially -- special-ordered items
7    like 04 items that they may have in their
8    distribution center.  They were phasing out a product
9    or they purchased a product, a customer canceled it,
10   we ended up getting that shipment into a warehouse,
11   and we may have that product in inventory in some
12   instances.
13        So in any and all events, if that product
14   type 04 happened to exist in the Fisher distribution
15   center, it would source from that distribution
16   center.
17   Q.   So in those situations, it's a product
18   type 04, a third-party product, and the RIMS system
19   as it existed in April '93 would generate a purchase
20   order?
21   A.   To Fisher, in the instance where that
22   product type happened to be in the warehouse for some
23   odd reason.
24   Q.   All right.  So the system would generate
25   for product type 04 either an internal Fisher

70

1    purchase order, or it would generate a proposed
2    purchase order for the SPS group to then issue as a
3    purchase order.
4    Right?
5    A.   Their responsibility was to source it,
6    yes.
7    Q.   So when you say, yes, you're saying yes in
8    answer to my question?
9    A.   Yes.
10        They -- they manage that process.
11   Q.   And it's true that the RIMS system would
12   also generate purchase orders for product type 01 or
13   03.
14        Correct?
15   A.   Yes.
16   Q.   And product types 01 and 03 are items that
17   the distributor such as Fisher Scientific owns that
18   are either in its just-in-time warehouse or at the
19   distributor's warehouse.
20        Right?
21   A.   Well, as I -- product type 01 could also
22   be stored at the distribution center.  01 -- the only
23   thing that made 01 distinct was the fact that it was
24   a JIT facility at a customer location.
25   Q.   Yeah.

71

1         So -- so the system could also generate
2    from a requisition purchase orders for those product
3    types 01 or 03, the Fisher products.
4    Right?
5    MS. ALBERT:  Objection, vague and
6    ambiguous.
7    A.   To Fisher Scientific yes.
8    BY MR. McDONALD:
9    Q.   Now, for a product type 06, a
10   customer-owned item located in the customer warehouse
11   at or near the customer site, the system also
12   provided for creating and printing a customer
13   purchase order.
14        Correct?
15   MS. ALBERT:  Objection, vague and
16   ambiguous.
17   A.   It created a replenishment order for the
18   replenishment of customer JIT.
19   BY MR. McDONALD:
20   Q.   For those product type 06s, those
21   customer-owned products, didn't you in your own
22   patents say that the system created purchase orders?
23   A.   It came out of the RIMS system from the
24   reorder point logic and generated a replenishment
25   order which would be sent over to the customer, and

72

1    that customer would then generate a purchase order
2    for those products to be shipped into the JIT site.
3    Q.   I've got a different question for you.
4         My question is that didn't you in your
5    RIMS '989 patent, the one right in front of you right
6    now, didn't you say in there that for those customer
7    products type 06 that a purchase order record
8    internal to the customer may be created and printed
9    out at the printer?
10   A.   That's true.
11   Q.   And in fact if you look at figure 5 A
12   again of your RIMS '989 patent.
13        Do you have that in front of you again?
14   A.   Yes.
15   Q.   Do you see there's the diamond at 332
16   where it's -- determines whether it's type 01, 03, or
17   04.
18        If it's a type 06, it goes to the left
19   because the answer to that question is no.
20        Right?
21   A.   As I recall it, 06s never went to the host
22   at all as I recall it.
23   Q.   Well, can you turn to column 18 of the
24   '989 patent at line 4.
25        Do you see there the first sentence of

Johnson, James Michael  12/9/2009  12:00:00 PM

**73**

1 that paragraph says:  If the line item has a product
2 type of 06, control is passed to block 334.
3     Do you see that?
4 A.  M-hm, yes.
5 Q.  Say yes or no.  Okay.
6     And 06, that's that customer-owned
7 inventory.
8     Right?
9 A.  Yes.
10 Q.  And so -- and 334, that's what's in figure
11 5 A.
12     Correct?
13 A.  I'm sorry.
14     334 or 3- --
15 Q.  334 is what the diamond --
16 A.  Customer internal -- yeah, that's correct.
17 THE COURT REPORTER:  I'm sorry.
18     I lost you.
19 (Discussion off the record.)
20 MR. McDONALD:  I'll clear it up here.
21 BY MR. McDONALD:
22 Q.   The question is, in figure 5 A, there is
23 that block 334.
24     Correct?
25 A.  Yes.

**74**

1 Q.  And that's the block that we just read
2 that relates to product type 06, control is passed to
3 that block 334.
4     Correct?
5 A.  Yes.
6     Customer internal PO.
7 Q.  Right.
8     And 334 says, customer internal PO -- it's
9 a question mark indicating basically yes or no -- do
10 we want a customer internal PO.
11     Correct?
12 A.  Yes.
13 Q.  And PO, what does that stand for?
14 A.  Stands for a purchase order.
15 Q.  And if the answer to that question is yes,
16 in figure 5 A, it then goes to block 336.
17     Correct?
18 A.  Yes.
19 Q.  And 336 for that type -- product type 06
20 for the customer-owned inventory says, quote, create
21 and print purchase order internal to customer, quote.
22     Correct?
23 A.  Yes.
24 Q.  And this is your patent and your drawings.
25     Right?

**75**

1 A.  Yes.
2 Q.  So isn't it true as shown in figure 5 A up
3 in that top box there 330, after a customer service
4 representative accepts a requisition, there is a
5 process by which the product type associated with
6 each item in the requisition is determined?
7 A.  Yes.
8 Q.  And depending on the product type for that
9 single requisition, either a customer internal
10 purchase order will be produced, a purchase order to
11 Fisher Scientific will be produced, or a proposed
12 purchase order for a third-party vendor will be
13 produced?
14 MS. ALBERT:  Objection, compound, vague
15 and ambiguous.
16 A.  No.
17     The 06s were all in one requisition.  You
18 couldn't mix 06s and 04s and any of the other
19 products.
20     That was primarily used to replenish the
21 JIT inventory site for customer-owned inventory.
22 That's solely what it was used for.  So you would
23 never see an 06 on any requisition with other product
24 types.
25     01 and 03 are typically stocked items for

**76**

1 Fisher Scientific, so purchase order -- the
2 requisition would be sent to the mainframe for
3 purchase order to be created for those products.
4     The 04 as I mentioned earlier followed a
5 similar path.  If by chance Fisher had that product
6 in-house, it would come back with that availability
7 in its distribution center.  If it did not, it would
8 then print to the procurement group that would go out
9 and try to find the product.
10 BY MR. McDONALD:
11 Q.   Well, is it true that in the preferred
12 embodiment of the RIMS invention requisitions could
13 have several lines each of which was for a different
14 item that could be sourced at once?
15 A.  Yes.
16 Q.  Turn back to Lawson exhibit 1, the '683
17 patent, please.
18     The 6,023,683 patent.  It's one of the
19 other patents in the stack there near you.
20 A.  Okay.
21 Q.  Now, figure 3, that's a block diagram
22 showing a portion of a Fisher RIMS system for
23 requisition management.
24     Correct?
25 MS. ALBERT:  Objection, mischaracterizes

Johnson, James Michael  12/9/2009  12:00:00 PM

---

**77**

1  the document.
2      A.   Could you ask the question again.
3          (The reporter read the last
4      question.)
5      MS. ALBERT:  Same objection.
6      A.   This is a block diagram showing a process
7  that was in the electronic sourcing system.
8      BY MR. McDONALD:
9      Q.   Can you turn in the '683 patent to column
10  3 under the brief description of the drawings.
11     A.   Okay.
12     Q.   At about line 43, do you see there where
13  it says:  Figure 3 is a block diagram showing a
14  portion of a system, paren, Fisher RIMS, paren, for
15  requisition management, including the electronic
16  sourcing system of the present invention, quote.
17         Do you see that?
18     A.   Yes.
19     Q.   All right.  So is that an accurate
20  statement about what figure 3 depicts?
21     MS. ALBERT:  Objection to the form.
22     A.   It's a portion of the system.  In this
23  case, we used RIMS as an example.
24     BY MR. McDONALD:
25     Q.   Figure 3 specifically depicts the RIMS

---

**78**

1  system example.
2      Correct?
3      MS. ALBERT:  Objection, mischaracterizes
4  the document.
5          (Pause.)
6      Q.   You can answer.
7      A.   I'm thinking.
8      Q.   Okay.
9          (Pause.)
10     A.   There are portions of RIMS logic -- there
11  are similar processes in RIMS in this diagram, yes.
12     BY MR. McDONALD:
13     Q.   So in figure 3 of the '683 patent, can you
14  point to me to which sections of that figure
15  correspond to the RIMS system as it existed at the
16  time you filed your RIMS patent in April of '93?
17     MS. ALBERT:  Objection, mischaracterizes
18  the document.
19     A.   Well, RIMS had a requisition system in it.
20  It had customer variable data --
21     BY MR. McDONALD:
22     Q.   Can you tell me the numbers just so I can
23  keep up with what -- (indiscernible) -- figure you're
24  talking about here?

---

**79**

1      A.   It had a requisition management component
2  to it, 10- -- 110.  It had customer variable header,
3  104.  It also had the order header, which is the 100.
4      Q.   Did the RIMS system as of April of '93
5  have any other components of figure 3 of the '683
6  patent?
7      A.   It had the connection to the host.
8      Q.   Can you tell me where that's located in
9  figure 3?
10     A.   10.
11     Q.   Okay.
12     A.   Only for products 1, 3, 4, not 7.
13     Q.   Okay.  Is there anything else in figure 3
14  that was found in the RIMS system as of -- as it
15  existed in early April '93?
16     A.   A portion of the inventory in the sense
17  that it looked at the JIT parts list.
18     Q.   So which box are you referring to now?
19     A.   44 B.
20     Q.   Okay.  Anything else?
21     A.   No.
22         That's it.
23     Q.   Did the RIMS system as of April of '93
24  have a requisition maintenance box or -- or section?
25     A.   Don't understand the question.

---

**80**

1      Q.   Was there a part of the RIMS system as
2  described in the '989 patent that was a requisition
3  maintenance block or functionality?
4      A.   We use maintenance -- the term maintenance
5  and requisition management almost interchangeably in
6  discussions, so --
7      Q.   So RIMS did have a requisition
8  maintenance --
9      A.   It had --
10     Q.   -- section?
11     A.   -- a requisition component to it, yes.
12     Q.   So did RIMS have a function that
13  corresponds to box 120 of figure 3 of the '683
14  patent?
15     MS. ALBERT:  Objection, mischaracterizes
16  the document.
17     A.   Again, it had a requisition management
18  component.  That's true.
19     BY MR. McDONALD:
20     Q.   Did the RIMS system as of April '93 have a
21  purchase order component corresponding to item 114 in
22  figure 3?
23     A.   It had a requisition process that could
24  submit a requisition to the Fisher host computer for
25  product types 1, 3, 4 --

---

Johnson, James Michael  12/9/2009  12:00:00 PM

81

1   Q.   And --
2   A.   -- only.
3   Q.   -- did that RIMS requisition process --
4   did that correspond to item 114 in figure 3 of the
5   '683 patent?
6   A.   Yes.
7   Q.   Did the RIMS system as of April of '93
8   have a component where it could print, mail, or fax
9   purchase orders?
10   A.   No.
11   It could just print.  It couldn't mail or
12   fax.
13   Q.   So it had a print purchase order
14   capability, which is part of block 118 in figure 3,
15   but it did not have the mail or fax components of
16   that.
17   A.   No.
18   Q.   Is that accurate?
19   A.   That's accurate.
20   Q.   And in fact figure 3, does that depict a
21   system which can generate multiple purchase orders
22   from a single requisition, figure 3 of the '683
23   patent?
24   A.   So you're asking if it could generate
25   multiple purchase orders from a requisition?

82

1   Is that your question?
2   Q.   The system shown in figure 3 of your '683
3   patent, does that figure depict a system that
4   generates multiple purchase orders from a single
5   requisition?
6   A.   At a high level.
7   Q.   What do you mean by that?
8   A.   Well, in the IT world, you usually have a
9   high-level design and a detail design, but at a high
10   level, there's -- you have inventory sourcing and you
11   have electronic sourcing in there for the electronic
12   sourcing system where we would be able to generate
13   purchase orders to multiple distributors, yes.
14   Q.   In the depiction of the requisitioning
15   system, which part of figure 3 would be
16   requisitioning, if anything?
17   A.   I'm sorry.  I didn't understand the
18   question.
19   As figure 3, which part is the
20   requisitioning?
21   Q.   Yeah.
22   Figure 3 of the '683 patent, which boxes,
23   blocks on that figure correspond to requisitioning?
24   A.   110 and 120.
25   I mean, there's -- there's interfaces

83

1   there to electronic sourcing through the catalogs as
2   well as inventory sorting, which was also part of the
3   process.
4   MR. McDONALD:  Why don't we take a little
5   break at this point.
6   MS. ALBERT:  Sure.
7   THE VIDEOGRAPHER:  The time is
8   approximately 10:18 AM.  We are going off the video
9   record.  Off the record.
10   (Recess.)
11   THE VIDEOGRAPHER:  The time is
12   approximately 10:33 AM.  We are back on the video
13   record.
14   BY MR. McDONALD:
15   Q.   Mr. Johnson, before the break, we were
16   talking about figure 3 of your '683 patent.
17   Correct?
18   A.   Yes.
19   Q.   I'd like to keep that page open, but also
20   turn back now to the RIMS patent, the '989 patent.
21   Before we go to a specific figure in that,
22   I want to get something clarified here.
23   The title of the '989 is, just-in-time
24   requisition and inventory management system.
25   Correct?

84

1   A.   Yes.
2   Q.   Earlier today, we went through how parts
3   of the RIMS system that's described in the '989
4   patent talk about creating purchase orders.
5   Right?
6   MS. ALBERT:  Object to the form,
7   mischaracterizes the document.
8   A.   It generates a requisition that ultimately
9   can become a purchase order to Fisher.
10   BY MR. McDONALD:
11   Q.   Is the process of controlling the
12   generation of purchase orders -- is that considered
13   part of the requisition and inventory management
14   system?
15   A.   I'm sorry.
16   Say that again.
17   MR. McDONALD:  Read that back.
18   (The reporter read the last
19   question.)
20   A.   Yeah.
21   The primary function of RIMS was to
22   generate requisitions to be submitted to the host
23   computer for Fisher Scientific to generate a purchase
24   order for them to ship product.
25   BY MR. McDONALD:

Johnson, James Michael  12/9/2009  12:00:00 PM

85

1   Q.   And the requisition system would generate
2   the information necessary to generate the purchase
3   orders?
4        MS. ALBERT:  Object to the form,
5   mischaracterizes --
6   A.   Submit a requisition to the host computer
7   where a purchase order could be generated to Fisher.
8   Q.   Right, but the requisition system
9   described in the '989 patent, one of the things it
10  did was provide the host system with the information
11  necessary to generate purchase orders.
12  Right?
13  A.   Yeah.
14  Q.   Could we go to now in the RIMS '989 patent
15  to figure 2 A.
16       And actually I'd like you to put that side
17  by side if you would, figure 2 A of the RIMS '989
18  patent on the left and then figure 3 of the '683
19  patent on the right.
20       Do you have both of those figures in front
21  of you?
22  A.   Yes.
23  Q.   So in the RIMS patent in figure 2 A, it's
24  got an order header box 60.
25  Correct?

86

1   A.   Yes.
2   Q.   What's the function of that order header
3   box 60 in the '989 RIMS system?
4   A.   It would generate a header record in the
5   requisition table of the RIMS database.
6   Q.   What sort of information is in that header
7   record?
8   A.   Customer account number, contact
9   information, things of that nature.
10  Q.   If we go to figure 3 of the '683 patent,
11  that also has a box called, order header, at 100.
12  Correct?
13  A.   Yes.
14  Q.   Does that box in the '683 patent -- does
15  that perform the same function as order header 60 in
16  figure 2 A of the '989 RIMS patent?
17  A.   It was similar.
18       There was information about the customer
19  account.  There was also information about
20  potential -- if this was a particular distributor,
21  purchase order or requisition, there was some
22  additional information added into that module.
23  Q.   Is that order header 100 in the '683
24  patent -- is that part of the requisitioning?
25  A.   It's the first step of the requisition

87

1   process.  And in addition, that process was changed
2   significantly to introduce a graphical user interface
3   for the user.
4   Q.   Well, in the '683 patent, didn't you say
5   that with respect to figure 3, the requisitioning
6   illustrated in figure 3 was fully described in the
7   RIMS '989 patent?
8        MS. ALBERT:  Objection, mischaracterizes
9   the document.
10  A.   What we did between these 2 systems was,
11  we built on technology we already had.  The RIMS
12  system had some core functionality that we intended
13  to reuse in the electronic sourcing system.
14       So we modified it significantly to add in
15  additional functionality to provide various things
16  that we wanted to accomplish.
17  BY MR. McDONALD:
18  Q.   Isn't it true that with respect to figure
19  3 of the '683 patent, the requisitioning on the
20  Fisher RIMS system is illustrated in figure 3 as
21  fully described in the '989 RIMS patent?
22       MS. ALBERT:  Objection, mischaracterizes
23  the document.
24  A.   And I apologize.
25       I don't understand the question.

88

1   BY MR. McDONALD:
2   Q.   Okay.  Well, let's just turn in the '683
3   patent to column 6 at line 41.
4   It says, quote -- I'll start from the
5   start of the paragraph:  Preferably a user will start
6   the electronic sourcing system 5 from --
7   A.   I'm sorry.
8   I got the wrong --
9   Q.   I'm sorry.
10  It's the '683 patent.
11  A.   Yeah.
12  Q.   Column 6?
13  A.   Oh, I was in 5.
14  Sorry.
15  Q.   At line 40.
16  A.   Yeah.
17  Q.   Okay.  Quote:  Preferably a user will
18  start the electronic sourcing system 5 from Fisher
19  RIMS system 40.  Requisitioning on Fisher RIMS system
20  40 in context of the electronic sourcing system 5 of
21  the present invention is illustrated in pertinent
22  part in figure 3, parentheses, and is fully described
23  in U.S. patent number 5,712,989, quote.
24  Do you see that?
25  A.   Yes.

Johnson, James Michael  12/9/2009  12:00:00 PM

89

1    Q.   Is that an accurate statement?
2    A.   Yes.
3         We use the RIMS functionality in the new
4    system.  I mean, we built on that logic.  We took the
5    fundamental core business logic from the RIMS
6    application and expanded on it a number of different
7    ways.
8    Q.   All right.  So can you go back to figure 3
9    of the '683 patent and keep that side by side with
10   figure 2 of the RIMS '989 patent?
11        Have you got them both side by side now?
12   A.   Yes, I believe so.
13   Q.   All right.  And so in the RIMS patent
14   figure 2 A, it's got a customer variable header 64.
15        Correct?
16   A.   Yes.
17   Q.   And in the '683 patent, it's also got a
18   customer variable header 104 in figure 3.
19        Correct?
20   A.   Yes.
21   Q.   Those do the same thing?
22   A.   The only significant difference between
23   those 2 was that we tore the business logic apart
24   from the presentation layer and introduced a
25   graphical user interface is the only that we made in

90

1    that module, I believe.
2    Q.   Was your patent intended to depict a
3    graphical user interface change that you made there?
4    A.   One of the objectives of the new system
5    was to be able to go from a 2-tiered architecture,
6    which was RIMS, which was the local computer and the
7    host computer, to an N-tiered architecture where we
8    could have a graphical user interface that we could
9    push out to the end-users that would communicate to
10   the middle-tiered architecture that would ultimately
11   communicate to a distributor's host computer.
12   Q.   Is that graphical user interface described
13   anywhere in figure 3 of the '683 patent?
14   A.   It's not described here, but we reference
15   it in the product that we were intending to use,
16   which was Easel, which is mentioned later in the
17   patent.
18   Q.   The product name was Easel?
19   A.   That was the tool that we were going to
20   use.
21   Q.   Okay.  But figure 3 doesn't talk -- or
22   describe that graphical user interface, does it?
23   A.   No, it does not.
24   Q.   If we go back to the RIMS '989 patent,
25   figure 2 A has a box 68 called, requisition

91

1    management.
2    Correct?
3    A.   Yes.
4    Q.   And there's also a box in figure 3 of the
5    '683 patent at 110 for requisition management.
6    Correct?
7    A.   Yes.
8    Q.   Then there's a box in the RIMS patent in
9    figure 2 A of -- at 104, if item error.
10        Do you see that decision box?
11   A.   Yes.
12   Q.   In the figure 3 of the '683 patent, it
13   also has a box or really a diamond that says the same
14   thing, if item error, add number 116.
15        Correct?
16   A.   Yes.
17   Q.   And in the RIMS '989 patent, box 108 is
18   requisition maintenance.
19        Correct?
20   A.   Yes.
21   Q.   And in figure 3, it's got a corresponding
22   box in the '683 patent at 120 for requisition
23   manage- --
24        MS. ALBERT:  Objec- --
25        BY MR. McDONALD:

92

1    Q.   -- management.
2    Correct?
3        MS. ALBERT:  Objection to the form,
4    mischaracterizes the document.
5        BY MR. McDONALD:
6    Q.   Right?
7    A.   108 says, requisition maintenance in
8    figure 2 A of the RIMS patent, and 120 says,
9    requisition management, which is a little different.
10   Q.   They're the same thing though, aren't
11   they?
12   A.   Well, in the electronic sourcing programs
13   that we were developing, again I said we made
14   significant -- you know, significant changes in the
15   system.
16        We allowed for multiple distributors to be
17   processed.  We allowed for a graphical user
18   interface.  We changed the architecture to be a
19   3-tiered architecture versus a 2-tiered architecture.
20        So there were some significant changes
21   between these 2 systems.
22   Q.   Okay.  But the requisition management box
23   in figure 3 of the '683 patent, that also can be
24   described as a requisition maintenance data screen,
25   couldn't it?

Johnson, James Michael  12/9/2009  12:00:00 PM

93

1    MS. ALBERT:  Objection to the form,
2    mischaracterizes the document.
3        A.   Yeah, that would -- that would include all
4    the functionality that we put in there for the
5    changes that we made between the RIMS system and the
6    electronic sourcing system.
7        BY MR. McDONALD:
8        Q.   And if you turn in your '683 patent to
9    column 15.
10       A.   15, you said?
11       Q.   That's right.
12           At line 10, do you see there, it refers to
13    that item 120 as a requisition maintenance data
14    screen, 120?
15       A.   Yes.
16       Q.   Even though figure 3 calls it, requisition
17    management.
18       Right?
19       A.   As I said earlier, we kind of use those
20    terms somewhat interchangeably.
21       Q.   Right.
22           And requisition maintenance, that's the
23    same term that shows up in the '989 figure 2 A at box
24    108, below that item error decision diamond.
25       Right?

94

1        A.   M-hm.
2        MS. ALBERT:  Objection, asked and
3    answered.
4        A.   Yes.
5        BY MR. McDONALD:
6        Q.   And in the '989 patent, coming out of the
7    requisition maintenance box 108, there's a rounded
8    box 112 called, build purchase order.
9        Correct?
10       A.   Yes.
11       Q.   And another box with an arrow,
12    bidirectional error -- arrow called, purchase order
13    confirmation 116, shown connected to the requisition
14    maintenance box.
15       Correct?
16       A.   Yes.
17       Q.   And is -- does -- do those boxes
18    correspond to figure 3 of the '683 patent, the 114
19    box that says, purchase orders?
20       A.   Again, we reused business logic that we
21    had created in RIMS and expanded on its functionality
22    to be able to provide for additional distributors to
23    be managed in this whole process.
24           So that's what you would see product type
25    07 is.  RIMS did not have that capability.

95

1        Q.   What is product type 07?
2        A.   That is a purchase order to distributor.
3        Outside of Fisher to be more specific.
4        Q.   A non-Fisher distributor?
5        A.   Yes.
6        Q.   Okay.  So the RIMS system did not have
7    that product type 07.
8        Right?
9        A.   That's correct.
10       Q.   But the Fisher RIMS system did as it
11    existed in April of '93 handle requisitioning for
12    types 01, 03, 04, 05, and 06; is that right?
13       A.   Yes.
14       Q.   What did you do if anything to the RIMS
15    functionality to change its capability regarding
16    generating multiple purchase orders from a single
17    requisition?
18       A.   We made changes to the database structure.
19    We made changes to the application itself, the actual
20    programs, to be able to allow for purchase orders to
21    be generated to multiple distributors.
22           And in addition to that, like I said, we
23    had to tear apart the code in order to make it an
24    N-tiered architecture so that we could push that
25    whole process of -- requisitioning process out to the

96

1    end user, which also caused us to implement security
2    into the system in the sense that we would allow the
3    end-users to access only certain components of the
4    electronic sourcing module.
5        They weren't permitted to get into things
6    like the inventory control.  They weren't allowed to
7    get into things like maintenance functions that were
8    related to the purchasing department.  The purchasing
9    department wanted to control those things.
10       So the end-user wouldn't have access to
11    those.  So we had to build a whole security system
12    around that by user.
13       Q.   Were those changes you made to the
14    purchase order creation capabilities in your
15    electronic sourcing system -- did you -- did you
16    consider those to be significant changes?
17       A.   Yeah.
18       We spent a good 6 months working on it,
19    so -- and I had a team of -- well, there were 2
20    development efforts.
21       There was my team, which was developing
22    the business logic.  I had roughly 4 or 5 programmers
23    and a senior analyst on that project, and then
24    myself.
25       In addition to that, there was a second

97

1   group working on the cataloging component, which Bob
2   Kinross was in charge of.  And he had -- and I don't
3   recall exactly how many contractors he had, but he
4   had some contractors from IBM working on the changes
5   that we required for the requirements he was
6   managing.
7       Q.   Did you consider the work done to allow a
8   single requisition to generate multiple purchase
9   orders as being merely ordinary programming, or was
10  there something more than ordinary programming to
11  that?
12      MS. ALBERT:  Objection, calls for a legal
13  conclusion.
14      A.   Not exactly sure what you mean by,
15  ordinary.
16      We have a set of requirement that we had
17  to fulfill and we worked to fulfill those
18  requirements, which required us to do some
19  significant development.
20      BY MR. McDONALD:
21      Q.   Was that development you think obvious
22  sort of work to one of ordinary programming skill
23  back in 1994?
24      MS. ALBERT:  Objection, calls for a legal
25  conclusion.

98

1       A.   Again, it was a set of requirements.
2       We ran into issues.  We had things we had
3   to resolve, and we worked through them to solve -- to
4   get to the end result.
5       BY MR. McDONALD:
6       Q.   Well, what -- that's -- I have a different
7   question though.
8       My question is, is what you did regarding
9   that functionality of taking a single requisition and
10  generating multiple purchase orders -- was that
11  something that one of ordinary computer programming
12  skill could have done in 1994 --
13      MS. ALBERT:  Objection
14      BY MR. McDONALD:
15      Q.   -- or not?
16      MS. ALBERT:  -- calls for a legal
17  conclusion.
18      A.   I don't -- I don't believe it was ordinary
19  by any means.  There was a significant amount of
20  work.
21      We had to generate -- we put a whole EDI
22  component into this thing, things that, you know,
23  were state of the art at that time.  There wasn't a
24  whole lot of knowledge out there.
25      BY MR. McDONALD:

99

1   structure or programming are described anywhere in
2   your electronic sourcing patents that relate to
3   generating multiple purchase orders from a single
4   requisition, are they?
5       MS. ALBERT:  Objection, calls for a legal
6   conclusion.
7       A.   I believe there are.
8       BY MR. McDONALD:
9       Q.   Can you point to where in any of those
10  patents that the programming changes or the database
11  structure changes are described?
12      A.   Specifically where the database changes
13  were described?
14      Is that --
15      Q.   Yeah --
16      A.   Or just in general some of the changes we
17  made like putting EDI components in.
18      Q.   Let me clarify.
19      If I understand right, you said that you
20  made changes to database structures from the RIMS
21  system as it existed in April of '93 that related to
22  this capability of generating multiple purchase
23  orders from a single requisition.
24      Is that -- is that accurate or not?

1   Q.   None of those changes in database

100

1       A.   Yeah, that's accurate.  We made a lot of
2   changes --
3       Q.   Okay.
4       A.   -- to the system.
5       Q.   Are any of those changes described
6   anywhere in your electronic sourcing patents, the
7   changes to the database structure?
8       A.   That I don't know.
9       Specifically the database, I'd have to go
10  through the whole patent and look for it.  I don't --
11  I mean, I can do that if you want.  I don't recall
12  off the top of my head.  It's --
13      Q.   I would like you --
14      A.   I don't --
15      Q.   -- to look through it.
16      A.   I don't read this thing on a daily basis.
17      Q.   I understand.
18      But you did look at them in the last few
19  days, though.
20      Right?
21      A.   I did --
22      Q.   Let me finish my question.
23      You did look in the last few days at the
24  electronic sourcing patents to at least get somewhat
25  reacquainted and familiar with them.

Johnson, James Michael  12/9/2009  12:00:00 PM

101

1    Right?
2    A.  Yes, I did go through them.
3    Q.   Okay.  So I would like you to look right
4    now and let's use the '683 patent as the one you look
5    through.
6         Tell me, is there anything in there that
7    describes the changes to the database structures that
8    you just described that related to this functionality
9    added relating to generating multiple purchase orders
10   from a single requisition?
11       MS. ALBERT:  Calls for a legal conclusion.
12   A.   It might take me a while, but I certainly
13   can do that.
14       BY MR. McDONALD:
15   Q.   Okay.
16       (Pause.)
17   A.   The only thing I'm seeing in here, which I
18   don't believe is in the RIMS patent, but I'd have to
19   look through that to be a hundred percent sure, but I
20   don't believe is in here, is, we introduced the
21   catalog database itself.  That was one of the
22   changes.  I mean, it talks a fair amount about that
23   in here.
24       BY MR. McDONALD:
25   Q.   Have you had a chance to review everything

102

1    you wanted to review?
2    A.   I'm not -- I'm not seeing all the other
3    changes we made to the database other than that.
4    Q.   Well, the catalog database, that was a
5    brand-new database added.
6         It was not in existence in the RIMS
7    system; is that right?
8    A.   No, but it was integrated into the
9    electronic sourcing process, yes.  I mean, it was
10   implemented into the complete system.
11        We introduced that.  It was a new
12   component.
13   Q.   Okay.  With respect specifically to this
14   functionality of taking a single requisition and
15   generating multiple purchase orders, were there any
16   changes to the database structures that enabled that
17   functionality?
18   A.   Yes, there were.
19   Q.   And with respect to those database
20   structure changes, did you find anything in the '683
21   patent related to those changes specific to
22   generating multiple purchase orders?
23       MS. ALBERT:  Object to the form, calls for
24   a legal conclusion.
25   A.   Only the reference to the functionality of

103

1    being able to generate multiple purchase orders.  I
2    didn't see anything in there that related to the
3    specifics of the database changes.
4        BY MR. McDONALD:
5    Q.   The patent, at column 15 of the '683
6    patent, can you turn there for a moment.
7         Is that the column where it talks about
8    the functionality that a single requisition can be
9    divided into one or more purchase orders?
10   A.   That's part of it, yes.
11   Q.   So it talks that you can do it, but it
12   doesn't say how to do it.
13        Correct?
14       MS. ALBERT:  Objection, calls for a legal
15   conclusion.
16   A.   I think we define the process pretty well,
17   yes.
18       BY MR. McDONALD:
19   Q.   Well, column 15 doesn't say anything about
20   how you change the database structures to allow
21   requisitions to be divided into one or more purchase
22   orders.
23        Right?
24       MS. ALBERT:  Objection, calls for a legal
25   conclusion.

104

1    A.   I'm not seeing it at this point.
2        BY MR. McDONALD:
3    Q.   Did you see anything about database
4    structure changes relating to dividing a single
5    requisition into multiple purchase orders anyplace
6    else in the '683 patent?
7        MS. ALBERT:  Objection, calls for a legal
8    conclusion.
9    A.   In that -- in that brief time looking
10   through it, I did not come across any.
11       BY MR. McDONALD:
12   Q.   Well, do you need more time to confirm
13   that, Mr. Johnson?
14   A.   I could sit here and read this word for
15   word.
16   Q.   I know you could.
17        I'm just asking, do you need more time to
18   be comfortable answering that question.
19   A.   Sure.
20        I could sit here and read it word for
21   word.  I didn't do that.  I was trying to skim
22   through to see if I saw something related to it.
23   Q.   Okay.
24   A.   I mean, I didn't read it word for word.
25   Q.   So you skimmed through it and looked for

Johnson, James Michael  12/9/2009  12:00:00 PM

105

1  the sections that you would expect to see that
2  database structure described?
3      A.  I was looking for keywords that I would
4  have thought would've described that in my mind.
5      Q.  What keywords were you looking for?
6      A.  "Database" was one of them.
7      Q.  The word database does show up in here in
8  some places.
9      Right?
10     A.  Yes.
11     Q.  But it doesn't show up in the context of
12  the changes to the database structure related to
13  taking a single requisition to generate multiple
14  purchase orders; is that correct?
15     MS. ALBERT:  Objection, calls for a legal
16  conclusion.
17     A.  I did not see it as I skimmed through.
18     BY MR. McDONALD:
19     Q.  You also mentioned that there was some
20  programming and coding changes to the RIMS system
21  related to generating multiple purchase orders from a
22  single requisition; is that correct?
23     A.  Yes.
24     Q.  Did you see anything in your review of the
25  '683 patent over the last several minutes that

106

1  described any of those programming or code changes?
2      MS. ALBERT:  Objection, calls for a legal
3  conclusion.
4      A.  I saw reference to product type 07, which
5  is the product type we used to manage that process,
6  yes.
7      BY MR. McDONALD:
8      Q.  Can you -- other than the reference to
9  product type 07, did you see anything else that
10  relates to the coding or programming changes relating
11  to creating multiple purchase orders from a single
12  requisition?
13     MS. ALBERT:  Objection, calls for a legal
14  conclusion.
15     A.  That's the one I recall off the top of my
16  head.
17     BY MR. McDONALD:
18     Q.  Okay.  Well, let me -- you got a chance to
19  look at the patent just a few minutes ago.  I'm
20  really not -- if you need some more time to answer
21  that, please -- please take the time you need,
22  because I don't want just off-the-top-of-the-head
23  answers here.
24     A.  Okay.  I mean, I saw a reference to
25  being -- the functionality being generated, but as

107

1  far as relating to specific code, that product type
2  07 was the only one I noticed.
3      Q.  Okay.  Can you direct me to where in the
4  '683 patent it -- discussion of that type 07 is that
5  you're referring to?
6      A.  Jeez, I lost track of it.
7      Q.  I guess I'm seeing one just because we
8  were on column 15.  Let me direct you at least to one
9  and see if this is what you're talking about or not.
10     Near the top at column 15 up around line
11  5, there's a sentence that says:  Host computer 10
12  also prices any type 04 or type 07 item if present.
13     A.  That was one location.  There was other
14  locations.
15     Q.  Please -- please direct me to any other
16  locations that relate to this topic of generating
17  multiple purchase orders from a single requisition in
18  your opinion.
19     (Pause.)
20     BY MR. McDONALD:
21     Q.  I don't mean to interrupt, but at column
22  18, between lines 20 and 30, it looks like there's
23  some discussion that refers to type 07.
24     A.  On 18?
25     Q.  Column 18.

108

1      A.  Yeah.
2      Q.  Between lines 20 and 30 of the '683
3  patent, that number 2 has a parenthetical about type
4  07.
5      Do you see that?
6      A.  I'm not looking at the same thing you are,
7  then.
8      Q.  Are you in the '683 patent?
9      A.  Yes.
10     Q.  Are you in column 18?
11     A.  Yes.
12     Q.  Between lines 20 and 30, do you see
13  there's an indented 1, 2, and 3?
14     A.  Oh, yeah.
15     I'm sorry.
16     Yeah.
17     No.  There was -- there was -- I saw it
18  somewhere else too.  It was related to the NIST.
19     Q.  So at the bottom of that same column.
20     Right?
21     A.  Yeah.
22     -- (indiscernible) -- as either a type 07
23  purchase from distributor, which NIST was --
24     THE COURT REPORTER:  NIST?
25     THE WITNESS:  NIST, N-I-S-T.

Johnson, James Michael  12/9/2009  12:00:00 PM

109

1       BY MR. McDONALD:
2       Q.   What is -- what is NIST?
3       A.   I forget the acronym, but it was a firm
4    down here in D.C. actually that was testing our
5    system.
6       Q.   What is a NIST standard?
7       A.   You're tapping my memory now.
8            National Institute of -- gosh, I don't --
9    I've forgotten what it stands for.
10      Q.   What generally is the purpose of a NIST
11   standard?
12           I mean, can you describe it to me
13   without --
14      A.   It's an organization down here in D.C.  I
15   don't recall what they did.
16           To be candid, I think Doug's the one that
17   went down and met with them.  I never met with them,
18   so I don't know necessarily who and what they are.
19      Q.   I'm just trying to get a sense of what
20   it's for, what its purpose is, even if you don't know
21   the details.
22      A.   That's probably a Doug question.  I
23   don't --
24      Q.   Okay.
25      A.   -- I don't recall.

110

1       Q.   All right.  So now that we've identified a
2    total of 3 I guess references to type 07, do any of
3    those actually include any discussion of any of the
4    programming or coding changes made to the RIMS system
5    to -- that relate to generating multiple purchase
6    orders from a single requisition?
7            MS. ALBERT:  Objection, calls for a legal
8    conclusion.
9       A.   Are you asking me the specifications of
10   what the code changes were?
11           No.  I'm not -- I mean, when you say, code
12   changes, are you asking me if we documented what
13   all -- every piece of code we changed in this patent?
14       BY MR. McDONALD:
15      Q.   Oh, no, I'm not asking you that.
16           I'm just asking, is there any references
17   in the '683 patent to what the code or programming
18   changes were --
19           MS. ALBERT:  Objec- --
20           BY MR. McDONALD:
21      Q.   -- not necessarily the specific coding
22   changes themselves, but just some discussion about
23   what you would do differently from the coding and
24   programming aspect of the RIMS system.
25           MS. ALBERT:  Objection, calls for a legal

111

1    conclusion.
2       A.   I think the way that this -- the -- you
3    know.
4            BY MR. McDONALD:
5       Q.   Let's -- let's back up, because I didn't
6    get a chance to finish my question --
7       A.   Okay.  Sorry.
8       Q.   -- before there was an objection, and so
9    I'd like to get the record clear here.
10           I'm not necessarily asking for the
11   specific line-by-line code changes.
12           I'm asking for references in the '683
13   patent to the substance of any of the programming or
14   code changes made relating to generating multiple
15   purchase orders from a single requisition.
16      A.   Well, I think --
17           MS. ALBERT:  I don't think there was a
18   question the way you framed that.
19           I'm sorry.
20           So I object to the form.
21           BY MR. McDONALD:
22      Q.   Okay.  Those references that we found
23   regarding product type 07, did any of the discussions
24   regarding that product indicate any information
25   relating to the programming or coding changes that

112

1    related to changing a single requisition into
2    multiple purchase orders?
3            MS. ALBERT:  Objection, calls for a legal
4    conclusion.
5       A.   I think what we described is the functions
6    that we changed, not necessarily the programming that
7    we did, so, so, no, I guess the answer to your question
8    is no.
9            BY MR. McDONALD:
10      Q.   What function changes were described here?
11      A.   Well, RIMS couldn't generate multiple
12   purchase orders to other distributors.  That was one
13   of the functions that we added into the system.
14      Q.   My question is, what function changes are
15   described in the '683 patent that relate to product
16   type 07?
17      A.   It allows you to generate a purchase order
18   to an outside vendor other than Fisher.
19      Q.   All right.  If we go back to column 18
20   there where some of discussion of type 07 was.
21           Do you see there at column 18 about line
22   18, it says:  Once responses from either or both have
23   been obtained, the distributor purchasing employee
24   can use the item list in Easel, E-A-S-E-L, interface
25   254 to create one or more of the following purchase

Johnson, James Michael  12/9/2009  12:00:00 PM

113

1   orders.
2       Do you see that language?
3   A.  Yes.
4   Q.  And then the reference to responses from
5   either or both, is that from a customer service
6   representative, a customer end-user, or a customer
7   purchasing employee?
8   A.  It could be any one of them.
9   Q.  All right.  So once you get a response
10  from one of them, the distributor purchasing employee
11  can use the item listed in Easel interface 254 to
12  create one or more of the 3 listed purchase orders.
13      Right?
14  A.  Yes.
15  Q.  Now, in the RIMS system, it did not create
16  purchase order number 2 for product type 07; is that
17  right?
18  A.  That's correct.
19  Q.  But RIMS did create purchase order type
20  number 1 there, an order from the customer to the
21  supplier, paren, an administrative purchase, paren.
22      Right?
23  A.  It created it -- yeah, that's the 05.
24  Q.  That type 05?
25  A.  I believe.  Yeah, I think that was 05.

114

1   Q.  And the RIMS system as it existed by April
2   of '93 also created purchase orders of type number 3
3   here in column 18.
4       Correct?
5       MS. ALBERT:  Object to the form,
6   mischaracterizes the documents.
7   A.  That would have been the JIT, which would
8   be the 01 product type and the 03 direct to Fisher.
9       BY MR. McDONALD:
10  Q.  All right.  So the RIMS system generated
11  at least 2 purchase orders corresponding to items 1
12  and 3 here in column 18.
13      Correct?
14      MS. ALBERT:  Object to the form,
15  mischaracterizes the documents.
16  A.  It submitted a requisition to the host,
17  which processed the purchase order to Fisher, yes.
18      BY MR. McDONALD:
19  Q.  And that's as you describe it here
20  creating one or more of the following purchase
21  orders.
22      Right?
23      That's what you meant.
24      Right?
25  A.  Yeah, it could generate any one of those

115

1   3.
2   Q.  So the new thing in your system was to
3   also generate this third type of purchase order for
4   these type 07 products.
5       Right?
6   A.  Yes.
7   Q.  If we go back to the '989 patent to the
8   figure 5 A.
9       Do you have that before you now,
10  Mr. Johnson?
11  A.  '989 patent?
12      Yes, figure 5 A.
13  Q.  Okay.  This is the flow chart that related
14  to creating and printing purchase orders.
15      Correct?
16  A.  This is the flow chart of the RIMS
17  process, so requisitioning --
18  Q.  Requisitioning and converting the
19  requisitions into purchase orders.
20      Right?
21  A.  To Fisher, yes.
22  Q.  Well, this figure 5 A does not merely
23  depict generating purchase orders to Fisher, does it,
24  Mr. Johnson?
25      MS. ALBERT:  Object to the form,

116

1   mischaracterizes the document.
2   A.  Well, it does in the product type 01, 03,
3   and 04.  Those product types could only go to Fisher.
4       BY MR. McDONALD:
5   Q.  Well, it also describes in box 336, create
6   and print purchase order internal to customer.
7       Correct?
8   A.  That's for a product type 05.
9   Q.  That's right.
10      That's for a different product type, and
11  it's not a Fisher purchase order, is it?
12  A.  That's a customer purchase order.
13  Q.  Right.
14      It's a different purchase order from the
15  Fisher purchase order.
16      Correct?
17  A.  It's a printout handed to the purchasing
18  agent, yes.
19  Q.  Yes, meaning you are agreeing I'm correct?
20      Those are 2 different types of purchase
21  orders.
22      Right?
23      In figure 5 A, one is to Fisher
24  Scientific.  There's another one that goes to the
25  customer internally.

117

1      Right?
2      A.  Yeah.
3      MS. ALBERT:  Objection, asked and
4  answered.
5      BY MR. McDONALD:
6      Q.  And even the type 04 that is for Fisher
7  Scientific, that ultimately results in a purchase
8  order issued to a third-party vendor.
9      Right?
10     A.  I'm sorry.
11     MS. ALBERT:  Objection, mischaracterizes
12  the document.
13     A.  Which one?
14     MR. McDONALD:  Could you read the question
15  back, please.
16     (The reporter read the last
17     question.)
18     A.  Through the Fisher purchasing department,
19  yes.
20     BY MR. McDONALD:
21     Q.  Now, that -- that decision box 332 in
22  figure 5 A where it determines which -- whether or
23  not it's product type 01, 03, or 04 or not, the RIMS
24  system as it existed in April of '93, it evaluated
25  that product type on a line-item by line-item basis

118

1  within a requisition.
2      Correct?
3      A.  For product types 01, 03 -- yeah, and 04.
4      Q.  Well, didn't the system walk through the
5  requisition and reach this box 332 for every line
6  item in a requisition?
7      A.  You couldn't -- you couldn't put a product
8  type 05 on a Fisher requisition to purchase order I
9  don't believe, if I recall correctly.
10     Q.  All right.  But for every line item on the
11  requisition, that's what I'm talking about right now.
12     Okay?
13     A.  Okay.
14     Q.  For every item on the requisition, the
15  RIMS system as of April of '93 would reach this
16  decision box 332 determining that the product type on
17  a line-item by line-item basis within that
18  requisition.
19     Correct?
20     A.  Yes.
21     Q.  Now, in the RIMS system, could the parts
22  master records include records for products of type
23  04?
24     A.  No.
25     Q.  Why do you say that?

119

1      A.  When you say that, are you referring to
2  the JIT?
3      Q.  I'm not being specific to anything else
4  other than product type 04.
5      A.  Okay.  Well, but you asked for the parts
6  master.  That's the JIT table --
7      Q.  Okay.
8      A.  -- so, no, you wouldn't put a product type
9  04 on there.  You could only put a product type 01 or
10  06.
11     Q.  In the '989, the RIMS patent, could you
12  turn to column 22, please.
13     Do you have that before you now?
14     A.  The 22 for '989?
15     Q.  Yes.
16     A.  Yes.
17     Q.  You see there the top of that column, the
18  heading is, inventory maintenance?
19     A.  Yes.
20     Q.  The first sentence says:  Inventory
21  records for items in JIT facility 51 are created
22  using the part master data screen, an exemplary
23  screen being set forth in table 6.
24     Do you see that?
25     A.  Yes.

120

1      Q.  And is it -- does this section of the '989
2  RIMS patent go on to describe how to add part master
3  records to the database?
4      MS. ALBERT:  And go ahead and if you need
5  to look through the section --
6      MR. McDONALD:  Sure.
7      MS. ALBERT:  -- to answer the question,
8  you can do so.
9      (Pause.)
10     A.  Yes.
11     BY MR. McDONALD:
12     Q.  And this refers here to table 6, correct,
13  in that sentence I read at the top of the column?
14     A.  Yes.
15     Q.  Can you turn to table 6, which begins at
16  column 38 and continues to column 39 of the '989
17  patent, please.
18     A.  I'm sorry.
19     Which column again?
20     Q.  38 and 39.
21     A.  Okay.
22     Q.  Now, you see there, table 6 begins at 38
23  and continues to table 39.
24     Correct?
25     A.  Yes.

Johnson, James Michael  12/9/2009  12:00:00 PM

121

1    Q.   And the heading on that table is, part
2    master.
3         Correct?
4    A.   Yes.
5    Q.   Is that a screenshot of the screen you see
6    when you're loading up data for a part master record
7    that you're going to add to the database of part
8    master records in the RIMS system?
9    A.   Looks like it, yeah.
10   Q.   And all the fields here are the different
11   fields that you can put information into for a given
12   part.
13        Correct?
14   A.   Yes.
15   Q.   And on column 38, one of the type -- one
16   of the fields you can fill in is product type.
17        Correct?
18   A.   Yes.
19   Q.   And that relates to these numbers 01 and
20   04 and 06, et cetera, that we've been talking about.
21        Right?
22   A.   In this instance, it relates to product
23   types 01 and 6 only.
24   Q.   And you're saying -- and for table 6, the
25   part master table, the only product types you can put

122

1    in there are 01 and 06?
2    A.   This table was meant to be han- -- to
3    handle the JIT inventory that was on location, so
4    those are the only 2 product types that were valid.
5    Q.   What would happen if a customer service
6    representative typed in a product type 04 on this
7    part master interface?
8    A.   Well, product -- they couldn't, because it
9    wouldn't let them.
10        The product type 01 was a Fisher JIT item.
11   So for that product, they would enter the part
12   number.  This system would go to the host computer
13   and pull that product from the Fisher host system and
14   bring it down as an 01 automatically.  They didn't
15   have to enter anything.
16        For product type that was customer-owned,
17   they would type, 06.  Those are the only 2 product
18   types you could put in there.
19        Again, it was to manage the JIT inventory
20   on-site.
21   Q.   Was there a way for the RIMS system to
22   maintain a database of products that a customer might
23   want to order that were not in the JIT inventory?
24   A.   I don't -- I don't believe so.  I don't
25   recall exactly.  I don't think so.

123

1    Q.   In table 6, column 39, that part of the
2    table 6, the part master table, do you see about 7
3    lines down, there's an entry called, stock policy?
4    A.   Yes.
5    Q.   What is that entry for?
6    A.   That I don't recall.
7    Q.   Isn't it true that the stock policy field
8    is a way to indicate if a distributor normally has an
9    item of product type 04 direct-ship to its customers
10   from a vendor?
11        MS. ALBERT:  Objection, calls for
12   speculation.
13   A.   Direct-ships were handled by the Fisher
14   mainframe.
15        I don't recall what stock policy is.
16        BY MR. MCDONALD:
17   Q.   All right.  Please turn to column 22 of
18   the '989 patent at line 37.
19        Do you have that before you?
20   A.   Line twenty- -- column 22, line 37, you
21   said?
22   Q.   That's right.
23        And this is in the section talking about
24   inventory maintenance relating to the part master
25   table including that table 6.

124

1        Correct?
2    A.   M-hm.
3    Q.   You say yes or no?
4    A.   It has a stock policy field in there.
5    Q.   Right, but my question is, in this section
6    here at column 22, line 37, we're still talking about
7    the part master records and that table 6 relating to
8    entry of part master records.
9        Correct?
10   A.   Yeah, I would say so.
11   Q.   And that sentence at the beginning of line
12   37 says, quote:  If the distributor normally has the
13   an item of product type 04 -- it is "the" and then
14   the word "an."
15        THE COURT REPORTER:  Sorry?
16        BY MR. MCDONALD:
17   Q.   Okay.  I'll start over again, just do it
18   literally here.  It's a little funny.
19        Quote:  If the distributor normally has
20   the an item of product type 04 direct-shipped to its
21   customers -- that's capital C -- from a vendor 37,
22   comma, that can be so indicated in the stock policy
23   field, quote.
24        Do you see that?
25        Do you see that?

125

1   A.   Yes.

2   Q.   Okay.  And so that table 6, that entry on

3   stock policy that you said you didn't know what it

4   was for, that -- that sentence I just read tells you

5   what it's for, doesn't it?

6   MS. ALBERT:  Objection.

7   A.   It wasn't used for anything.  It's

8   information only.  It had no bearing on the actual

9   code.

10   BY MR. McDONALD:

11   Q.   My question is, that sentence tells you

12   what that stock policy field in table 6 is for,

13   doesn't it?

14   MS. ALBERT:  Objection, calls for

15   speculation.

16   A.   It tells me it's a direct-shipped item.

17   BY MR. McDONALD:

18   Q.   Doesn't that sentence I read tell you what

19   you used the stock policy field for in the part

20   master record table 6?

21   MS. ALBERT:  Objection, calls for

22   speculation.

23   Feel free to refer to other sections if

24   you need the context of the sentences.

25   A.   It apparently is used for multiple things

126

1   according to what I'm reading here.

2   04 is one.

3   Then it goes on to say:  Other possible

4   entries in this field include codes to indicate if

5   the item is a product type 03, which the distributor

6   warehouse should be searched in the searching of the

7   item.  One such code might be indicated that the item

8   should be shipped from only a particular warehouse.

9   BY MR. McDONALD:

10   Q.   Okay.  So there are other uses for that

11   stock policy field.

12   Right?

13   A.   It -- it -- it appears to have multiple

14   functions.

15   Q.   Okay.  And one of the functions of the

16   stock policy field is for product type 04 to indicate

17   a distributor normally has that type 04 item

18   direct-shipped to customers from a vendor.

19   Right?

20   A.   Yeah, from a purchase order generated to

21   Fisher.

22   I mean, that's the only way it could work.

23   There was no connection to a direct-ship vendor.  It

24   all went through the Fisher mainframe.

25   Q.   Okay.  But the part master record database

127

1   could then include products of a type 04.

2   Correct?

3   MS. ALBERT:  Objection, asked and

4   answered.

5   A.   Not as a product type, no.

6   There may have been a stocking policy to

7   say, this is where we'd like to get it.  But that's a

8   policy.  It didn't drive the business logic.

9   Product type drove the business logic.

10   BY MR. McDONALD:

11   Q.   But why would you even have a field that

12   relates to what you would do with a product type 04

13   in the customer record database if you couldn't enter

14   product type 04 --

15   MS. ALBERT:  Calls --

16   BY MR. McDONALD:

17   Q.   -- in the customer database?

18   MS. ALBERT:  Calls for speculation.

19   A.   Define customer database.

20   What do you mean by, customer database?

21   BY MR. McDONALD:

22   Q.   I'm sorry.

23   I'll rephrase the question.

24   Why would the parts master record database

25   have a field that would indicate that type 04

128

1   products are direct-shipped to customers from a

2   vendor, in other words, type 04, unless that part

3   master database could accept descriptions of products

4   of type 04?

5   MS. ALBERT:  Calls for speculation, asked

6   and answered.

7   A.   As I recall, that was for information only

8   to let the CSR know that Fisher may not stock that at

9   a local warehouse and that they would need to

10   generate a requisition to be sent to the Fisher host

11   system to generate an order to be shipped.

12   That's -- it was primarily for information

13   only.

14   BY MR. McDONALD:

15   Q.   Okay.

16   A.   There was no business logic driven on

17   that.

18   Q.   It was in the customer -- excuse me -- it

19   was in the parts master record database for

20   information purposes only; is that right?

21   A.   Yeah.

22   Q.   And "it" being records relating to type --

23   product type 04, those products sourced from third

24   parties.

25   Right?

129

1       MS. ALBERT:  Objection, mischaracterizes
2   the document.
3       BY MR. McDONALD:
4    Q.   That's what we're talking about.
5   Right?
6    A.   Well, it would be products that Fisher
7   would source to third parties, yes.
8    Q.   All right.  So the part master record
9   database included -- includes products or items of
10  type 01, which are distributor-owned items in the
11  just-in-time inventory, also items of type 06, which
12  are customer-owned items located in the customer
13  warehouse or near a customer site, and items of
14  product type 04, third-party items that a distributor
15  orders from a third-party vendor; is that right?
16   A.   No.
17       MS. ALBERT:  Objection, compound, and
18  asked and answered.
19   A.   No.
20       Product type 01 and product type 06 were
21  the only 2 product types permitted to be entered into
22  the part master, period.
23       BY MR. McDONALD:
24   Q.   When you say, the part master, what are
25  you referring to?

130

1    A.   The inventory, the JIT inventory part
2   master.
3    Q.   Is that --
4    A.   The screen --
5    Q.   -- a database?
6    A.   The screen we just looked at.
7    Q.   I thought you said, though, that you could
8   enter information on that screen for a product type
9   04 for information purposes.
10       Right?
11       MS. ALBERT:  Objection, asked and answered
12  and mischaracterizes his prior testimony.
13   A.   For a product type 04, there was only one
14  field that the product type had any value, and that
15  was in the product type field, and you could only
16  enter a product type 01 and 06 into -- into that
17  table.  You could enter in additional information
18  about a customer-owned product, but the stocking
19  policy wasn't the product type.  The product type was
20  either an 01 or an 06.
21       MS. ALBERT:  Dan, is there a time when we
22  can take a short break?
23       MR. McDONALD:  Yeah, yeah.
24       We can take a break now.
25       THE VIDEOGRAPHER:  The time is

131

1   approximately 11:47 AM.  We are going off the video
2   record.  Off the record.
3       (Whereupon, at 11:47 a.m., the deposition
4   in the above-entitled matter was recessed, to
5   reconvene at 12:39 p.m., this same day.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

132

1       AFTERNOON SESSION
2       (12:39 p.m.)
3       THE VIDEOGRAPHER:  The time is
4   approximately 12:39 PM.  We are back on the video
5   record.
6
7   Whereupon,
8       JAMES MICHAEL JOHNSON,
9   the witness testifying at the time of recess, having
10  been previously duly sworn, was further examined and
11  testified further as follows:
12
13    EXAMINATION BY COUNSEL FOR DEFENDANT (RESUMED)
14       BY MR. McDONALD:
15   Q.   Mr. Johnson, before lunch, we were talking
16  a little bit about the part master records, and I
17  just want to finish up on that.
18       With respect to the part master records in
19  the RIMS system as it existed back in April of '93,
20  did that track products that were either
21  customer-owned in just-in-time inventory or
22  distributor-owned in just-in-time inventory?
23   A.   It tracked customer-owned and Fisher-owned
24  JIT only.
25   Q.   Well, Fisher is a distributor.

133

1      Right?
2      A.   That's correct.
3      Q.   So in theory, in the patent, Fisher
4    wouldn't be the only company using the system
5    necessarily.
6    Right?
7      A.   No.
8      The RIMS was a Fisher system.
9      Q.   So -- so Fisher was an example of a
10   distributor.
11   Right?
12     A.   They were a distributor, yes.
13     Q.   Right.
14     Now, within the -- were there any other
15   products tracked other than the customer-owned
16   just-in-time inventory products and the Fisher or
17   distributor-owned just-in-time inventory in the part
18   master records maintained in the RIMS system?
19     A.   No.
20     Q.   Now, within the set of customer-owned
21   products in the just-in-time inventory part master
22   records, those customer-owned products, those would
23   have records that would describe how the customer
24   would restock the items.
25   Right?

134

1      A.   There was a mechanism in there that
2    allowed the replenishment process.  It was a typical
3    inventory control system where we would set reorder
4    points for the products that were in the JIT site.
5      When those reorder points hit, a transfer
6    order would be generated.  A transfer order for
7    product type 01s, which were Fisher items, would cut
8    a transfer order to Fisher to transfer those items to
9    that JIT facility.
10     And for customer-owned items, it would
11   create a replenishment order which would print out a
12   list of products that somebody in the customer
13   purchasing department would have to go find
14   somewhere.
15     Q.   Well, with respect to those customer-owned
16   products, doesn't the part master record include a
17   field for product type that can include for example
18   type 04, the vendor -- third-party vendor products?
19     A.   In terms of where they get it?
20     Q.   Right, where they would restock, right.
21     A.   There was a -- for customer-owned
22   inventory, there was an indicator, and I can't
23   remember exactly what the indicator was, to say if
24   this -- if that product happened to be a Fisher-owned
25   item at one time, and the scenario there would be,

135

1    you know, the customer purchased 5 cases of acetone
2    for Fisher, they bought it but they wanted to stock
3    it in the JIT site.
4      So there was a mechanism in the system to
5    say to the replenishment process, is this a
6    Fisher-sourced item so to speak, or is this an item
7    that the customer's purchasing department would need
8    to go find.
9      Q.   Could you turn to column 22 of the '989
10   patent please.
11     A.   22, so --
12     Q.   Yes, column 22.
13     A.   In the RIMS patent?
14     Q.   That's right.
15     A.   Okay.
16     Q.   And at line 24, there's a couple sentences
17   I want to direct your attention to, and I'll read
18   them now.
19     Quote:  If the item being entered is of
20   product type 06, paren, customer-owned JIT inventory,
21   paren, comma, the CSR will also enter a code in the
22   cust, C-U-S-T, owned prod type field to indicate how
23   the item will be restocked, period.  There will
24   preferably be a different code for each of the
25   possible manners of restocking the product, i.e., as

136

1    a requisition of an item of product type 03, 04, or
2    05, quote.
3      Do you see that?
4      A.   Yes.
5      Q.   If you go to that table 6 at column 39 of
6    the RIMS patent.
7      A.   Column 39?
8      Q.   Right.
9      A.   Okay.  Table 6.
10     About halfway down or a third of the way
11   down on that part of the table, there's an entry
12   about 5 lines down, cust-owned product type.
13     Do you see that?
14     A.   Yes.
15     Q.   So this is a place to indicate one of
16   those product types when the inventory is owned by
17   the customer.
18     Right?
19     A.   Yes.
20     Q.   And those categories 03, 04, and 05, do
21   those correspond to the categories in table 1 at
22   column 6 of the RIMS patent?
23     A.   I'm sorry.
24     Table 1.
25     MS. ALBERT:  Could you read that question

Johnson, James Michael  12/9/2009  12:00:00 PM

---

137

1  back again.
2  A.  Did you say, table 1?
3  BY MR. McDONALD:
4  Q.  Yes.
5  MR. McDONALD:  We can read it back.
6  (The reporter read the
7  next-to-last question.)
8  A.  Column 6 -- yes.
9  BY MR. McDONALD:
10  Q.  So category or type 04 for example is a
11  third-party item that the distributor orders.
12  Correct?
13  A.  Yes.
14  Q.  And type 05 is a third-party item which
15  the customer service representative or the customer
16  orders.
17  Correct?
18  A.  Yes.
19  Q.  So within the part master -- well, I'd
20  like to back up a second just to make sure I use the
21  right words.
22  This -- this collection of part master
23  records, is that maintained as a table or a database
24  or some other term for that aggregate group of
25  records?

---

138

1  A.  It's a table within a database.
2  Q.  And so this table would have all these
3  records in it?
4  A.  Yes.
5  Q.  All right.  So amongst those records in
6  that table would be part master records for
7  customer-owned just-in-time inventory.
8  Correct?
9  A.  Yes.
10  Q.  And within the customer-owned just-in-time
11  inventory records, there would be records that would
12  indicate products that can be restocked from third
13  parties that Fisher could order from.
14  Right?
15  A.  Yeah, Fisher would order those products or
16  distribute those products to the customer in the case
17  of product type 03 and 04.
18  Q.  Right.
19  And that part master record, then, for
20  those customer-owned inventory would also include
21  some items that are third-party items that the
22  customer could order themselves or the customer
23  service representative for the customer would order?
24  THE WITNESS:  Sorry.
25  I'm covering up here?

---

139

1  THE VIDEOGRAPHER:  You're scratching on
2  my --
3  BY MR. McDONALD:
4  Q.  Let me try it again.
5  So when that table in the database of all
6  those part master records, that includes
7  customer-owned inventory with the product types that
8  would correspond to third-party items that a customer
9  would order directly.
10  Right?
11  A.  Customer -- owned, yeah.
12  You could set it up so that when you
13  printed that report to give it to the customer to
14  purchase, you could say that -- you could give him
15  whatever information was available in the database to
16  say, here is what the product is, here is the
17  description, go get it.
18  Q.  Now, on a requisition, is it true that any
19  of the products on that part master table could be
20  put on a requisition within the RIMS system?
21  A.  I didn't understand the question.
22  MR. McDONALD:  Let's read it back and see
23  if that works.
24  (The reporter read the last
25  question.)

---

140

1  A.  Yeah, product type 01 or product type 06
2  could be -- those are the only 2 products types that
3  were in that -- in that table.
4  BY MR. McDONALD:
5  Q.  But within product type 06 are products
6  where the part master record would indicate they
7  would be restocked as if they're a type 04 product or
8  05 product for example.
9  Right?
10  A.  That would be a transfer order, so think
11  about what the system was trying to manage.
12  It was trying to manage inventory at a JIT
13  location.  And again as I said earlier, it was pretty
14  traditional in the sense that it had some basic
15  functionality for reorder points, so if they wanted
16  to keep a case of, you know, widgets in the JIT site,
17  if they got below 2 cases, it would cut a transfer
18  order to say, you need to replenish this JIT
19  inventory.
20  Q.  So those would be more or less
21  automatically generated?
22  A.  In the case -- it would -- it would
23  generate a transfer order that CSR for Fisher-owned
24  items would need to manage and send up to the host
25  computer and say, cut this transfer order.  A

---

141

1   transfer order would be generated in the warehouse.
2   It would be picked, packed, and shipped to that
3   location.
4        For the customer-owned items, it would
5   generate as I mentioned earlier a document that could
6   be handed to the purchasing agent to say, you're low
7   on these items, you need -- you know, restock them,
8   you need to go find out where you can get them.
9        Q.   In the RIMS system, could a customer
10  service representative also generate a requisition
11  list of items generated from the parts master table?
12       MS. ALBERT:  Objection, asked and
13  answered.
14       A.   For JIT items, sure.
15       BY MR. McDONALD:
16       Q.   Do you have an understanding as to whether
17  or not the RIMS system as it existed prior to April
18  of '93 is prior art to the electronic sourcing
19  patents?
20       MS. ALBERT:  Objection, vague as to time
21  and calls for a legal conclusion.
22       A.   I'm fuzzy on dates.  It's been a number of
23  years.
24       RIMS was generated or created if you will
25  prior to the electronic sourcing system.  We in fact

142

1   as I mentioned earlier used various components of the
2   RIMS system and made significant enhancements to it
3   to produce the electronic sourcing system.
4        BY MR. McDONALD:
5        Q.   In the course of drafting and pursuing the
6   electronic sourcing patents, did anybody ever ask you
7   whether or not the RIMS system was on sale or in
8   public use more than one year before the filing date
9   on the electronic sourcing patents?
10       A.   I'm not familiar with --
11       MS. ALBERT:  And I just caution you as far
12  as not reflecting any -- not disclosing any
13  attorney-client-privileged communications.
14       A.   I'm fuzzy on dates.  That was a number of
15  years ago.
16       BY MR. McDONALD:
17       Q.   Well, I'm not asking for a specific date.
18       I'm just asking:  Did anybody ask you --
19  well, let me rephrase it to eliminate the date issue
20  from the equation.
21       Did anybody ever ask you whether or not
22  the RIMS system was on sale before you filed for the
23  electronic sourcing patents?
24       A.   Not that I recall.  I don't --
25       Q.   Do you have an understanding one way or

143

1   the other as to whether or not a product that's being
2   offered for sale might be prior art depending on when
3   it was offered for sale?
4        A.   I have no idea.
5        Q.   Nobody ever explained that to you?
6        A.   Not that I can recall.
7        Q.   With respect to the electronic sourcing
8   patents, the first actual product that Fisher
9   Scientific came out with that corresponded to those,
10  was that the product called the SupplyLink product?
11       A.   That was the first marketable product that
12  we introduced.
13       Q.   Was that introduced sometime after August
14  of '94 when the patents were filed, or was it before
15  then?
16       A.   Again, fuzzy on dates, but it more likely
17  was after as I recollect.
18       Q.   Now, can you describe for me step by step
19  how someone using the SupplyLink system that
20  corresponds to the electronic sourcing patents would
21  comparison-shop for a product between 2 different
22  catalogs if they could?
23       A.   Yes, they could.
24       Q.   Okay.
25       A.   They had the ability to do one of 2

144

1   things.
2        They could go directly into the catalog --
3   excuse me -- and search across multiple vendor
4   catalogs, or they could access them through the
5   SupplyLink system.  In either case, they would be
6   able to enter in various search criteria,
7   descriptions, part numbers, those kinds of things.
8        Q.   Maybe what you can do is just walk me
9   through just step by step.
10       Somebody sitting I assume at a computer
11  terminal is step 1 for this; is that right?
12       And just, you know, what do they do first,
13  what do they see on the screen generally, what do
14  they do second and so on.  I'd really like you to
15  walk that through.
16       What would be the first thing that you do
17  if you want to try to find a product and compare
18  between 2 different vendors if you're using the
19  SupplyLink system?
20       A.   You would log onto the system.
21       Q.   Okay.
22       It was a couple paths.  You could go into
23  the requisition.  You could -- in some cases the
24  users knew the part number.  They could enter that
25  part number directly.

145

1    In other cases, they may not, so they
2  could transfer control over to the electronic catalog
3  system, select --
4    Q.   Let's stop right there and just -- just
5  take them one at a time here, and then I can ask you
6  a question or 2 in between.
7    So would you typically do it within the
8  SupplyLink system if you already knew what the part
9  number was?
10    A.   If they had -- yeah, if they ordered that
11  part a lot, they might know what the part number is,
12  and it might be a JIT item.
13    Q.   Now, in that case, would it be a situation
14  still where a customer might want to comparison-shop
15  between catalogs from different sources?
16    A.   They could.
17    Q.   Okay.
18    A.   And they could select that product to have
19  it go over to that catalog and search across multiple
20  catalogs looking for equivalents as well.
21    Q.   All right.  So if you didn't know the part
22  number, though, in that particular case, you're
23  pretty likely to go into the search module; is that
24  right?
25    A.   More than likely, yes.

146

1    Q.   And so how did that look on the screen,
2  then, for that user in terms of, I've just logged
3  down, now am I going to go to the requisition module
4  or the search module?
5    How does that actually look to you?
6    A.   It depends on what the user wanted to do.
7    They could go in and start to create a
8  requisition if we wanted to, or they could go
9  directly to the catalog.  It didn't -- there was no
10  set pattern or path.  It depended on what the
11  customer's objective was.
12    In some cases, they may have been looking
13  for specifications and not even generating an order.
14  I mean, the catalog had that capability as well.
15    So it just depended on what the customer
16  was trying to achieve at that particular moment in
17  time.
18    Q.   Okay.  But let's take a situation where
19  they're trying to build a requisition that's going to
20  lead to a purchase order.
21    Okay?
22    They've logged on.
23    What are they going to see now where they
24  have the choice to go through either the requisition
25  system or the search system in the next step?

147

1    A.   Typically I would think they'd go to the
2  requisition system.
3    Q.   Is there a computer screen that gives them
4  those options and then they pick one?
5    A.   Yeah.
6    It was a graphical user interface that we
7  built on top of the business logic.  And it was all
8  point and click, dropdown boxes, that kind of thing.
9    Q.   So would it have a box for, go to the
10  requisition module, and a separate box for, go to the
11  search module?
12    A.   They were more -- they were more buttons,
13  not boxes, but, yeah, you would click on a button and
14  it go to the requisition.  Then you could click on
15  catalog and it would go over to the catalog where you
16  would see the search criteria screen that could enter
17  in the search criteria, whatever they were looking
18  for, and opt to search across one or multiple
19  catalogs, and manage -- you know, at that point, a
20  results list would come back.
21    They'd be able to look at -- in detail as
22  to what each product was, from which catalog it came
23  from, and read the various descriptions, and make a
24  decision as to which one they wanted to place an
25  order for.

148

1    At that point they could send it back to
2  the requisitioning system, which would then create a
3  requisition line item in the requisition.
4    Q.   So at the point in time where they're
5  entering the search module and they want to pick a --
6  certain catalogs.
7    All right?
8    Let's go to that step.
9    Okay?
10    You with me?
11    A.   You're in the cataloging system, yes.
12    Q.   Yeah.
13    Now, if you go to the '683 patent at
14  column 9 near the bottom.
15    A.   Okay.  Wait a minute.
16    Yes, at the bottom.
17    Q.   Yeah.
18    There's a list of 1, 2, 3, 4 -- looks like
19  4 different catalogs.
20    Right?
21    A.   Yes.
22    Q.   Is this an example of maybe 4 catalogs
23  that would then be displayed on the screen for the
24  user?
25    A.   Those would be 4 catalogs that would --

149

1    would have been defined to the system, yes.
2        Q.   So that the user could actually see the
3    names of the catalogs?
4            And I know these are just examples, but
5    you could see the names of the catalogs up on the
6    screen?
7        A.   Yes.
8        Q.   Then the user could scroll through and
9    point and click or hit buttons to say, okay, I just
10   want to search for -- through catalog number 1 and
11   catalog number 4 for example.
12           Right?
13       A.   Yes, I believe they could select which
14   catalogs they wanted to search through.
15       Q.   That -- that was one of the features of
16   the invention -- right?
17       A.   Yes.
18       Q.   -- to be able to search just some of the
19   catalogs but not all of them?
20       A.   That's correct.
21       MS. ALBERT:  Objection, calls for a legal
22   conclusion.
23       BY MR. McDONALD:
24       Q.   Why -- why do you think that was an
25   important feature for the system?

150

1        MS. ALBERT:  Objection, mischaracterizes
2    his testimony.
3        A.   Well, from a user's perspective, if I were
4    using the system and I wanted to look up a particular
5    product that I knew was either in one of 2 vendor
6    catalogs, I wouldn't want to search through if I had
7    15 of them.
8            I'd select the ones I wanted, or if I had
9    a preference to the vendor's catalog that I wanted.
10   For example, and this is a personal example if you
11   will:  My brother is a biochemist, and he prefers
12   Fisher Scientific products.  He works for Baxter, and
13   they sell the same products, but he still orders
14   Fisher products because that's what he grew up with.
15           And so they may have a preference as to
16   which vendor they want to go to.  So it's -- it's
17   almost -- it was primarily left up to the user how
18   though wanted to manage it.
19       BY MR. McDONALD:
20       Q.   All right.  So they could pick these
21   couple of catalogs for example, and then they would
22   enter some sort of a search term or phrase; is that
23   right?
24       A.   They could enter in a text description,
25   they enter a catalog number, they could enter in --

151

1    there was one other thing.  I've forgotten now what
2    it was.
3            The catalog functionality, I know at a --
4    you know, I would say to a high or a mid-level, that
5    project wasn't mine.  I was responsible for the
6    requisitioning side of the fence and the inventory
7    control development.
8            Bob Kinross was primarily responsible for
9    all the functionality in the catalog.
10       Q.   Did you hear that he got deposed last
11   week?
12       A.   I heard rumor of that, yes.
13       Q.   The rumors are true.
14           So the customer then, they've selected a
15   couple catalogs.  They enter some search language
16   that they want to look for whether it's a part number
17   or some text.
18       A.   Yes.
19       Q.   And then they hit a search button at that
20   point.
21           Is that the next step?
22       A.   Yes.
23       Q.   All right.  And then what -- what appears
24   on the screen after you hit the search button next?
25       A.   That was a --

152

1        MS. ALBERT:  Objection, vague and
2    ambiguous.
3        A.   There was a results screen that came back
4    with the hits that it found.
5        BY MR. McDONALD:
6        Q.   So it would have a list of perhaps several
7    items that come from the selected catalogs?
8        A.   That's correct.
9        Q.   This is still in the SupplyLink system
10   that corresponds to the electronic sourcing patents.
11           Right?
12       A.   Yes.
13       Q.   What would the customer do with that list
14   of products, then, that was returned from the search
15   next?
16       A.   The user could do a number of different
17   things.
18           If -- if they got multiple hits from the
19   same -- of the same product or same type of product
20   from different vendors and they decided that they
21   didn't want one versus the other, they could remove
22   it from the list.  They could manage the list by
23   adding more products to it if they wanted to do
24   additional searches.
25           They could, you know -- once they were

153

1    completed with what they were doing in the cataloging
2    system, they would get a finite group of products.
3    They could send those products back over to the
4    requisitioning system.
5        Q.   So the results from the search, was that
6    called a hit list?
7        A.   It was called an order list, but --
8        Q.   Before you've made changes to it even it
9    was called an order list or not, was the hit list
10   what the search engine brought back initially?
11       A.   Don't recall the exact term.
12       Q.   Okay.  Let me -- and I know it's just
13   terms, but I just want to make sure we're talking the
14   same language here.
15            Can you look if you've still got the '683
16   in front of you, look on that same page over on
17   column 10 on the right --
18       A.   M-hm.
19       Q.   -- at about line 21.
20            It says:  Once hit list has been created
21   by TV 2 search program 50.
22            I'm just going to stop right there.  You
23   can read the rest of it if you'd like to.
24            But is it true that at least in the patent
25   it used the term hit list to indicate the list that

154

1    was the return list from the search program?
2        A.   Those would be the items that the search
3    engine found based on the criteria that was entered.
4        Q.   Right.
5            And then I think you were describing the
6    customer could take off some of the items that came
7    back from the hit list and if they wanted to add some
8    items to the list, they could do that as well.
9            Right?
10       A.   Yes.
11       Q.   Now, at some point when they were finished
12   making changes to it, would that be the, quote, order
13   list?
14       A.   That would ultimately be the order list
15   once they've got done with it and wanted to -- to
16   send it back to the requisitioning system.
17       Q.   So that order list is the thing, they hit
18   a button to send it back to the requisition system.
19            Right?
20       A.   Yes.
21       Q.   Now, in the old RIMS system back before
22   April of '93, if somebody wanted to do the same
23   thing, a customer wanted to see a -- comparison-shop
24   for a product between 2 different catalogs, was that
25   possible?

155

1        A.   No, not in the RIMS system.
2        Q.   Okay.  It wasn't possible within the
3    confines of the RIMS system, but could the customer
4    do that between acts on their own part together with
5    using the RIMS system?
6        A.   How?
7        Q.   Well, could the -- did customers actually
8    have physical catalogs for different distributors at
9    the time the RIMS system was being used in late '92,
10   early '93?
11       A.   They had paper catalogs, yeah.
12       Q.   Okay.  So using paper catalogs, can you
13   walk me through how a customer would comparison-shop
14   using paper catalogs in the RIMS system --
15            MS. ALBERT:  Objection --
16            BY MR. McDONALD:
17       Q.   -- prior to April of '93?
18            MS. ALBERT:  Objection, calls for
19   speculation, lacks foundation.
20       A.   Yeah.
21            I mean, I'm not a researcher, but I can
22   take a stab at it I suppose.  I'd be guessing.
23            BY MR. McDONALD:
24       Q.   Well, did you get -- was part of the
25   genesis for the SupplyLink system that you got

156

1    feedback from customers that they wanted a more
2    efficient way to do that type of comparison shopping?
3            MS. ALBERT:  Objection, calls for
4    speculation.
5        A.   We got a business -- our business
6    requirements came from pretty much what we did on a
7    day-to-day basis and what we saw -- you know, how our
8    company operated.  And we worked in customer service
9    systems since the day I got there.
10            Doug Momyer was there long before me and
11   Bob Kinross was there long before me, and we had
12   worked on many different systems.  So I mean,
13   requirements came from, you know, how we operated our
14   customer service IT department.
15            We worked on various systems, came up with
16   various ideas, and just enhanced those ideas as we
17   moved forward.
18            BY MR. McDONALD:
19       Q.   Well, you had an understanding that in the
20   RIMS system, customers would walk to the customer
21   service representative with a paper list of items
22   that they wanted or call them up on the phone.
23            Right?
24            MS. ALBERT:  Objection, calls for
25   speculation.

Johnson, James Michael  12/9/2009  12:00:00 PM

---

157

1       A.   That's typically what they would do.
2            THE COURT REPORTER:  I didn't -- I don't
3    know if I heard an answer before the objection or
4    not.
5            (Discussion off the record.)
6            (The reporter read the last
7    question.)
8    A.   Yeah, I would presume that's the way it
9    worked.
10           BY MR. McDONALD:
11      Q.   Well, wasn't one of the purposes of the
12   electronic sourcing system to help the customer be
13   more efficient in how they would gather the
14   information they would -- that would be used to build
15   a requisition?
16      A.   That was the theory that we came up with.
17   We felt that if we could present that information in
18   electronic format and the researcher could access
19   that information from their labs, it would save them
20   time and money to be able to manage that
21   requisitioning process right from their labs.
22      Q.   Do it by computer instead of manually?
23      A.   That's right.
24      Q.   And so you did have an understanding that
25   customers did something similar manually --

---

158

1            MS. ALBERT:  Objection.
2            BY MR. McDONALD:
3       Q.   -- before the SupplyLink system came
4    along?
5            Right?
6            MS. ALBERT:  Objection, calls for
7    speculation.
8    A.   Yeah.
9            We had an idea that that's what they'd do.
10           BY MR. McDONALD:
11      Q.   What was your understanding as to how
12   customers would do in comparison shopping back when
13   they had the RIMS system?
14           MS. ALBERT:  Objection, lacks foundation,
15   calls for speculation.
16      A.   To be candid, there probably were many
17   different ways they did it.  I don't know.
18           I mean --
19           BY MR. McDONALD:
20      Q.   Well, let -- let me walk through a
21   possibility here and you tell me whether you think
22   this is representative of something customers would
23   do prior to April of '93 if they had a RIMS system at
24   their facility.
25           A customer might have -- for example to

---

159

1    use the catalogs at column 9 of the '683 patent, they
2    might have paper copies of those 4 catalogs on a
3    bookshelf, the Fisher general catalog, the Fairmont
4    supplies catalog, the NIST standards catalog, and the
5    Promega Biological Research Products catalog.
6            MS. ALBERT:  Objection, hypothetical,
7    lacks foundation, calls for speculation.
8            BY MR. McDONALD:
9       Q.   Is it your understanding that at least
10   those catalogs as examples are catalogs that existed
11   in paper form prior to April of '93?
12      A.   Yes, they can -- they existed in paper
13   form I'm sure.
14      Q.   And those catalogs, the purpose of them
15   was to help customers order products from those
16   companies.
17           Right?
18      A.   Presumably they would use those catalogs
19   to order products.
20      Q.   So would it be representative of what a
21   Fisher RIMS customer would do is, that customer
22   might -- would have these 4 catalogs, for example, on
23   their shelves, they might have down 2 of the 4
24   catalogs that they select, they look for a certain
25   part in both of those 2 catalogs, and they decide if

---

160

1    they want one or the other or both, and start to
2    build up a list maybe on a piece of paper.
3            MS. ALBERT:  Objection --
4            BY MR. McDONALD:
5    Q.   It that --
6            MS. ALBERT:  -- hypothetical --
7            BY MR. McDONALD:
8    Q.   -- is that fair?
9            MS. ALBERT:  -- lacks foundation, calls
10   for speculation, and compound.
11      A.   I can only speculate with how they manage
12   their requisitioning process on that end.
13           BY MR. McDONALD:
14      Q.   Well, I think you have -- you indicated
15   you had some idea of that as you were designing the
16   SupplyLink system to computerize what had been done
17   manually.
18           Right?
19      A.   You got to remember the genesis of this as
20   well.
21           I mean, we had a situation also on the
22   inventory side of the fence where we were managing a
23   distribution center.  And we also used that catalog
24   and connected it to our customer service systems.
25   And we saw the value in that.

---

Johnson, James Michael  12/9/2009  12:00:00 PM

161

1    So I mean, there was -- you know, our
2    development was driven by what we thought was a
3    really, really good idea.  And every time we would
4    start to talk about something, we'd say, wouldn't
5    this be a good idea if we did this, creating the
6    electronic catalog, giving it to them in electronic
7    form.
8        And, you know, the ideas came from, you
9    know, Doug and -- and Bob and I and -- and Frank to
10   come up with these solutions.
11   Q.   Did you talk to any customer service
12   representatives as part of your process of developing
13   the electronic sourcing system as described in your
14   patents?
15   A.   I don't recall talking to any of them, no.
16   Q.   Did you talk to anybody in marketing or
17   sales at Fisher as part of your work in developing
18   the electronic sourcing system and its functions?
19   A.   I don't recall doing that, no.
20   Q.   Did you do something to get some
21   understanding of how customers were using systems
22   like the RIMS system that were already out there?
23   A.   I don't recall doing that, no.
24   Q.   How did you get the understanding that
25   customers would want to do comparison shopping

162

1    between catalogs?
2    A.   That actually -- that idea I think came
3    from Bob and Doug from my recollection.  I think Bob
4    was thinking that that would be an opportunity to
5    improve the process.  I can't specifically remember
6    who came up with what idea, but --
7    Q.   Now, the RIMS system, did that have
8    something called a cross-reference table?
9        MS. ALBERT:  Objection, vague and
10   ambiguous.
11   A.   The RIMS system?
12   BY MR. McDONALD:
13   Q.   Right.
14   A.   There was a cross-reference -- customer
15   cross-reference table that allowed customers that had
16   their own list of products numbers.  A lot of times
17   they would have their own purchasing system with
18   their own product numbers in their purchasing system,
19   and they wanted their customers or their users to
20   reference those product numbers.
21       So we had a feature in RIMS to say, for
22   this customer number, it cross-references over to a
23   Fisher catalog number called A 181.
24       So in the RIMS system as it existed in
25   April of '93, the cross-reference table would have a

163

1    table that would link a customer number -- product
2    number to a Fisher Scientific number?
3    A.   Yeah.
4    Q.   Did it also have products -- or have the
5    capability of having products on it that would be a
6    product from another company other than Fisher, their
7    part number or product number that was
8    cross-referenced to a Fisher number?
9    A.   Not in the RIMS system.
10   Q.   Can you turn in the '989 patent now -- go
11   back to that for a moment.
12   A.   Which page?
13   Q.   Bottom of column 31.
14   A.   Yes.
15   Q.   You see down there, there's a heading
16   called cross-referencing.
17   A.   Yes.
18   Q.   Then a coup- -- second sentence under
19   that, it says, quote:  In addition to the
20   distributor's own catalog numbers, the vendors from
21   which the distributor will stock or order items may
22   also have their own vendor part numbers, period.
23   Moreover, the customer may employ its own catalog of
24   part numbers using a numbering system unique to that
25   customer, quote.

164

1        Do you see that language?
2    A.   The bottom?
3        No, I lost where you were, so --
4    Q.   The bottom of column 31 --
5    A.   Yeah.
6    Q.   -- right under the heading called,
7    cross-referencing --
8    A.   Yes.
9    Q.   -- beginning at about line 62 --
10   A.   Okay.
11   Q.   -- in the '989 patent?
12   A.   Yeah.  Okay.
13       I'm there now.
14       Sorry.
15   Q.   Do you see those sentences I just read?
16   A.   As described above, is that where you
17   started?
18   Q.   Yeah.
19       It was actually the sentence right after
20   that one beginning with the words in addition to.
21   A.   Okay.
22   Q.   Now, that paragraph is talking about
23   distributor catalog numbers, vendor part numbers, and
24   customer catalog or part numbers as well.
25   A.   Right?

Johnson, James Michael   12/9/2009   12:00:00 PM

165

1    A.   Yes.
2         Distributor being Fisher.   Vendor part
3    numbers are -- think about who Fisher Scientific was.
4    Right?
5         Fisher Scientific, they weren't a
6    manufacturer.   They were a distributor.   They
7    purchased products from other vendors, and they had a
8    unique vendor number associated to that.
9         So you could have like -- for example a
10   Promega item.   That was not necessarily a Fisher
11   item.   But Fisher bought it from Promega and then
12   would distribute it to their customer base.
13   Q.   So the same product could have both a
14   vendor number from Promega and a Fisher number as a
15   distributor number?
16   A.   It -- it would have a vendor -- yeah, it
17   would -- yeah, because Fisher needed to know where to
18   purchase it from.
19   Q.   All right.   And if you go to the top of
20   column 32 here, continuing on the '989 patent, in
21   that same paragraph, do you see there the last
22   sentence of that paragraph that says, quote:
23   Distributor and competitors may also have similar
24   products from other vendors, e.g., a 250-milliliter
25   KIMAX, K-I-M-A-X, Griffin beaker from Kimble,

166

1    parentheses.
2         Do you see that?
3    A.   Yes.
4    Q.   That distributor there, again, that's
5    referring to Fisher typically, right?
6    A.   Yes.
7    Q.   And then competitors -- can you give me an
8    example of who a Fisher competitor was in April of
9    '93 when this patent was filed?
10   A.   Apparently KIMAX, Griffin beakers, and
11   Kimble.
12   Q.   Are all --
13   A.   Kimble would be --
14   Q.   -- those competitors, or just one of them?
15   A.   Well, no.
16        Actually, KIMAX, Griffin beaker, I think
17   is the product.   Kimble was the -- I believe the -- a
18   competitor.
19   Q.   They're an alternative distributor to
20   Fisher, is that what that would -- a competitor would
21   be?
22   A.   Yeah.
23   Q.   So it's the same product, this KIMAX
24   250-milliliter Griffin beaker.
25        You could either order it from distributor

167

1    Fisher or distributor Kimble?
2    Right?
3         MS. ALBERT:   Objection.
4    A.   No.
5         BY MR. McDONALD:
6    Q.   No?
7    A.   No.
8    Q.   I mean, the product could be purchased
9    from either one.   I'm not talking about necessarily
10   in the RIMS system, but I'm just trying to understand
11   who Kimble is.
12        Kimble is somebody that's a competitor of
13   Fisher that offered some -- the same -- at least some
14   of the same products that Fisher offered; is that
15   right?
16   A.   As I read this being under the
17   cross-referencing, Fisher Scientific had systems on
18   their mainframe that allowed them to substitute items
19   that all their systems tapped into.
20        So the Lightning system tapped into it,
21   the Century system, which was the customer service
22   system they used at the distribution centers.   And it
23   had a -- there was a file up on the host that had
24   Fisher part numbers that were associated to
25   competitor part numbers.   And it would do a -- either

168

1    a substitution of that part, so if Kimble was selling
2    a beaker -- 5-liter beaker and Fisher had a 5-liter
3    beaker, the system would be able to bring back and
4    say, look, we have a Fisher product here that's a
5    5-liter beaker, you probably want to sell this, not
6    the Kimble beaker.
7    Q.   So the cross-reference table would include
8    links between a Fisher part number and either a
9    customer part number, a vendor part number, or a
10   Fisher competitor number?
11        MS. ALBERT:   Objection, mischaracterizes
12   the testimony.
13   A.   It just said that Fisher had an equivalent
14   to that competitor item.
15        BY MR. McDONALD:
16   Q.   Yeah, but did I get the products right,
17   the type of products that the system would indicate
18   in the cross-reference table?
19   A.   There were competitor items in there that
20   were cross-referenced to Fisher items, yes.
21   Q.   Now, that process that if the customer put
22   in a non-Fisher number and then the system returned a
23   notice that there was also a Fisher part number that
24   was equivalent to that, was that process called
25   conversion in the '989 patent?

Johnson, James Michael  12/9/2009  12:00:00 PM

---

**169**

1  A.  In the '989 -- that I don't remember.

2  Q.  Forget the patent.  I was just --

3  conversion, is that a term that you're familiar with

4  as being used to refer to that process of identifying

5  the Fisher catalog equivalent product to a different

6  non-Fisher product that's searched in the

7  cross-reference?

8  A.  There were many terms.  We used,

9  substitute.  I don't recall, conversion, but I could

10  be wrong.

11  Q.  Okay.

12  A.  That was a long time ago.

13  Q.  All right.  Well, let me direct your

14  attention here while we're still in the RIMS patent

15  to column 33 on the next page.

16  And in column 33, starting at about line

17  33, I'm going to read a couple of sentences there.

18  A.  Which line?

19  Q.  Line 33.

20  The host computer 10 will then search the

21  competitor cross-reference file and identify B

22  2650250 as a competitor's designation for the same

23  Pyrex beaker, comma, convert the line to 02, space,

24  540 K, and then proceed to sourcing 306 and pricing

25  308, period.  It is contemplated but not required

---

**170**

1  that a warning message be included in the data block

2  transmitted in step 312.  For this line to alert the

3  CSR that a conversion from the competitor's catalog

4  number has been made, quote.

5  Do you see that language?

6  A.  Yep.

7  Q.  Is that quoted language there that's

8  talking about conversion -- is that talking about the

9  process where a non-Fisher catalog number is searched

10  in the cross-reference table and then the system

11  returns a Fisher catalog number that is identified as

12  an equivalent to that number?

13  A.  Yeah.

14  That's the process I just described to you

15  earlier.

16  Q.  Okay.  Did the electronic sourcing system

17  in your 3 patents also cross-reference tables that

18  worked that same way?

19  A.  I can't speak to the exact way those

20  worked.  That was something that Bob Kinross

21  developed.  I don't recall the details of how all

22  those processes were developed at that level at this

23  point.

24  I mean, I may have remembered 15 years

25  ago, but it's been a long time.  So I know there was

---

**171**

1  cross-referencing capability built into the

2  cataloging system.  I don't necessarily recall all

3  the details.

4  Q.  So do you know one way or the other

5  whether or not in the electronic sourcing system

6  your 3 patents, as described in your 3 patents, the

7  conversion or cross-referencing process was done

8  either the same as or different from the

9  cross-referencing and conversion described in the

10  RIMS patent?

11  A.  It would have been a completely different

12  architecture, I know that, because the

13  cross-referencing referenced in the RIMS was driven

14  by the host mainframe of Fisher, which was a com- --

15  M -- MVS, V Sam (phonetic) process, which is

16  completely different architecture than what we

17  implemented in the sourcing -- electronic sourcing,

18  so it would be significantly different.

19  Q.  So the architecture was significantly

20  different?

21  A.  Yeah.

22  And as far as the functionality is

23  concerned, again, that would be a Bob Kinross

24  question directly, because I don't --

25  Q.  Okay.  You don't know one way or the other

---

**172**

1  whether from a functional standpoint any changes were

2  made versus what was done for RIMS cross-referencing?

3  A.  Well, it was --

4  MS. ALBERT:  Objection, mischaracterizes

5  his testimony.

6  A.  It was built from the ground up, so I

7  can't -- I can't -- I'm sure it had some of the same

8  similar functions, but it was built from the ground

9  up.  It was brand-new code because it was built on a

10  completely different architecture.

11  BY MR. McDONALD:

12  Q.  When you say, it, what are you talking

13  about?

14  A.  The cross-referencing process in the

15  cataloging system.

16  Q.  Is there any description in your

17  electronic sourcing patents such as the '683 patent

18  of the cross-referencing system?

19  A.  I believe so.

20  Q.  Can you direct me to where that is?

21  (Pause.)

22  BY MR. McDONALD:

23  Q.  Are you having any luck yet, Mr. Johnson?

24  A.  I'm only on column 8 right now.

25  Q.  Let me -- let me direct your attention to

---

Johnson, James Michael  12/9/2009  12:00:00 PM

173

1  something here and see if we can speed this along a
2  little bit.
3      A.   Okay.
4      Q.   In the '683 patent, is that where you're
5  looking right now?
6      A.   Yes.
7      Q.   All right.  If you look at the bottom of
8  column 4 at about line 61, there's a paragraph there
9  that the first sentence says:  Where the Fisher RIMS
10  system is in use with electronic sourcing system 5, a
11  host computer 10 located at a distributor site is
12  also provided as shown in figure 1 A.
13      Do you see that sentence?
14      A.   Yes.
15      Q.   Then it goes on and it describes what host
16  computer 10 controls there, right, and refers to some
17  databases?
18      A.   Yeah, for pricing inventory database,
19  yeah.
20      Q.   Then if we go up to column 5 on the next
21  page.
22      A.   M-hm.
23      Q.   Of the list of records it has in here, do
24  you see one of them at column 5, line 4 to 6, saying,
25  quote:  And cross-references from the distributor's

174

1  catalog number to its corresponding vendor's part,
2  paren, catalog, paren, number and to similar
3  corresponding catalog numbers of other vendors,
4  paren, suppliers or distributors, paren, for the same
5  product.
6      Do you see that?
7      A.   Yeah.
8      Q.   Does that appear to be a reference to
9  cross-reference tables?
10      A.   It appears to be.
11      Q.   And that's in this paragraph describing
12  the situation where the Fisher RIMS system is in use
13  with the electronic sourcing system.
14      Correct?
15      A.   M-hm.
16      Q.   Can you say yes or no?
17      A.   Yes.
18      Q.   So is it -- reading this section, does it
19  appear to you that in the electronic sourcing patent
20  such as the '683 patent, the cross-referencing tables
21  were actually part of the Fisher RIMS system?
22      A.   Well, there was a component there as I
23  mentioned earlier.  There was the cross-referencing
24  that occurred on the host Fisher systems.  But there
25  was another -- there was additional cross-referencing

175

1  that Bob Kinross had implemented into the cataloging
2  system as well.
3      Q.   Oh, okay.
4      So when you were talking before about
5  rewriting all this code from the bottom up and so on,
6  were you talking about some cross-referencing going
7  on in connection with the search portion of the
8  system?
9      A.   That was part of it, but that wasn't the
10  only thing.
11      Q.   Well, is it your understanding that
12  Mr. Kinross started from scratch to write new code
13  corresponding to the cross-reference tables in the
14  RIMS system?
15      A.   I believe he built that from scratch, but
16  again, you'd have to talk to him.  I wasn't part of
17  that development effort.
18      Q.   Why did -- what is the basis for your
19  belief that he started from scratch to rebuild the
20  cross-reference tables in the preexisting RIMS
21  system?
22      A.   Because they didn't exist.  That
23  functionality didn't exist in the cataloging system.
24      Q.   Well, but the function -- what
25  functionality are you talking about?

176

1      A.   To cross-reference across multiple
2  electronic catalogs.  There was a -- there was a
3  whole process when we left -- when we left the
4  requisitioning system and went over to the cataloging
5  system, there was a whole development effort that
6  went into building functionality around a search
7  engine that we purchased from IBM, the TV 2 product,
8  and amongst that development, I believe that Bob
9  built a cross-reference process in that
10  functionality.
11      Q.   But in the RIMS system that existed as of
12  April of '93, it already had cross-referencing
13  tables.
14      Correct?
15      A.   It had a customer cross-referenced table,
16  yeah.
17      Q.   Is that somehow different from a
18  cross-reference table?
19      You said, customer cross-reference table.
20  I'm just trying to clarify.
21      A.   All I did was convert customer part
22  numbers to Fisher part numbers.  That's all it did.
23      Q.   I thought we just read some sections of
24  that RIMS patent that indicated it didn't just do it
25  for customer part numbers.

Johnson, James Michael  12/9/2009  12:00:00 PM

177

1   It did it for vendor part numbers and
2   competitors as well.
3   Right?
4       MS. ALBERT:  Objection, mischaracterizes
5   the document.
6       A.   Not on the local computer.
7       The competitor cross-referencing occurred
8   at the host mainframe on the Fisher systems.  We just
9   tapped into it.
10      I mean, that process was used in their
11  customer service system.  It was used in their
12  Lightning system.  It was used in their Fastback 2
13  systems.  It was used across all their systems.
14      BY MR. McDONALD:
15      Q.   All right.  So in the RIMS system, the
16  cross-reference table existed at the host computer
17  database?
18      A.   For substitutions of competitor items,
19  yes.
20      Q.   Was there more than one cross-reference
21  table in the RIMS system as it existed in April of
22  '93?
23      A.   No.
24      Q.   All right.  So the cross-reference table
25  in that system was at the host computer database?

178

1       A.   I'm sorry.
2       I misunderstood what you were asking.
3       Q.   Okay.
4       A.   There was a customer cross-reference on
5   the local computer, and then there was the Fisher
6   host cross-referencing that Fisher did on the host
7   computer, which RIMS tapped into.
8       Q.   All right.  So at the customer local
9   database, that cross-reference table was -- in the
10  RIMS system, was that developed by the customer?
11      A.   They gave us the part list and we just --
12  we inputted it into the table.
13      Q.   So the customer would identify which
14  products they thought were equivalent?
15      A.   No.
16      They had a list of their own -- their --
17  it wasn't a matter of equivalency.  It was a list
18  of -- think about what we were doing there.
19      Right?
20      They had a purchasing system.  And in
21  their purchasing system, they had specific part
22  numbers.  They may be and more than likely were
23  Fisher part numbers.
24      Right?
25      Fisher part number was A 181.  But the

179

1   customer didn't want to call it A 181, because they
2   had SAP in their -- in their -- in their
3   implemented -- or they had some other system
4   implemented from a purchasing standpoint.
5       And they already had these products under
6   their own names that really had no relationship to
7   anything, to a vendor.  So they would give us their
8   part numbers that they had in their system, in their
9   purchasing system that said, we want to be able to
10  order acetone from you and we want to call it -- from
11  our end user's perspective, we want to call it ABC.
12      So they would give you a list of their
13  numbers with enough of a description of the product
14  that you could figure out the corresponding Fisher
15  number?
16      A.   They actually probably gave us both.
17      Q.   All right.
18      A.   Because they already had -- they already
19  knew that there ABC product was A 181 Fisher.
20      Q.   All right.  So they actually did have --
21  give you the information that actually included both
22  their product number and the corresponding Fisher
23  number at least in many cases?
24      A.   Yes.
25      Q.   And then you would load that up on the

180

1   database locally.
2       Right?
3       A.   Locally, yes.
4       Q.   And so there's a separate cross-reference
5   table at the host database?
6       A.   There was a separate cross-reference table
7   for substitutions at the Fisher host database, yes.
8       Q.   Who created that cross-reference database
9   at the host?
10      A.   Who created it or who maintained it?
11      Q.   Let's go with created first.  Then we can
12  talk about who maintained it.
13      A.   Don't know who created it.  It was
14  something that was created before I even got to
15  Fisher.
16      Q.   Okay.  So this is just kind of a running
17  table that was maintained and updated over time?
18      A.   That's correct.
19      Q.   At Fisher though.
20      Right?
21      A.   At Fisher.
22      Q.   Okay.  So in the RIMS system when it was
23  made part of the electronic sourcing system, did the
24  RIMS system still have a local database that housed a
25  customer cross-reference table?

Johnson, James Michael  12/9/2009  12:00:00 PM

181

1    A.   Did the local database -- yeah, I just
2    said, it had a customer cross-reference.
3    Q.   We were talking about RIMS before --
4    right? -- as it existed in April of '93.  That RIMS
5    system as of April of '93 had local customer -- had a
6    local database that had a customer-generated
7    cross-reference table loaded up on it.
8    Right?
9    A.   It was inputted by us, yeah.  The customer
10   gave us a list of products and we inputted them.
11   Q.   The information was the customer and you
12   loaded it on the computer.
13   Right?
14   A.   That's correct.
15   Q.   So that was in the RIMS system as of April
16   of '93.
17   Right?
18   A.   As I remember it, yes.
19   Q.   Right.
20   So now if we turn the clock forward to the
21   electronic sourcing system described in your patents
22   here, that also had a local database with a
23   cross-reference table based on information provided
24   by a customer; is that right?
25   A.   That I don't specifically recall, but we

182

1    probably brought that functionality over I would
2    think.
3    Q.   No reason to take it out --
4    A.   Yeah.
5    Q.   -- is there?
6    A.   I would think we brought that --
7    MS. ALBERT:  Objection --
8    A.   -- over.
9    MS. ALBERT:  -- calls for speculation.
10   A.   I don't recall that specifically, but --
11   BY MR. McDONALD:
12   Q.   You're not aware of any reason you'd take
13   it out in the electronic sourcing --
14   A.   No --
15   Q.   -- system, are you?
16   A.   -- I'm not.
17   MS. ALBERT:  Objection, calls for
18   speculation.
19   BY MR. McDONALD:
20   Q.   So in the '683 patent, if we go to figure
21   1 A, where -- where in the system would that
22   customer-generated -- well, I'll withdraw that.
23   In figure 1 A, where would the local
24   cross-reference table be located that was generated
25   based on information provided by the customer?

183

1    MS. ALBERT:  Objection, calls for
2    speculation, lacks foundation.
3    A.   I'm in the wrong one.
4    Sorry.
5    I went back to the --
6    BY MR. McDONALD:
7    Q.   Okay.  Back in the '683, now figure 1 A.
8    A.   Okay.  Sorry.
9    Q.   M-hm.
10   (Pause.)
11   MS. ALBERT:  Did you need the question
12   re-read?
13   A.   Yeah.
14   I didn't --
15   I was looking for it.  I didn't --
16   BY MR. McDONALD:
17   Q.   All right.  So where in figure 1 A is the
18   local database cross-reference table located that is
19   based on information provided by the customer?
20   MS. ALBERT:  Objection, calls for
21   speculation, lacks foundation.
22   A.   It would be in the requisition database, I
23   would believe.
24   BY MR. McDONALD:
25   Q.   That's 42 A?

184

1    A.   I believe.  I mean, without going through
2    this, I don't recall exactly.
3    Q.   What's the basis for your belief that
4    it's -- it was in 42 A?
5    A.   Well, I mean, there's a -- there was a
6    whole database associated to RIMS, and it had various
7    aspects to that database, various tables.  Some of
8    them were part of the requisitioning process, some of
9    them were part of the inventory process, and some of
10   them were part of the customer-specific database.
11   So when you were talking about
12   cross-referencing a customer part number to a Fisher
13   part number, I would suspect that would have been in
14   the requisition process.
15   Q.   Is it most likely at least within either
16   42 A, 42 B, or 42 C, those --
17   MS. ALBERT:  Objection --
18   BY MR. McDONALD:
19   Q.   -- 3 databases?
20   MS. ALBERT:  -- calls for speculation.
21   A.   I mean, it would have to be in one of
22   them.
23   BY MR. McDONALD:
24   Q.   Those are all the local databases, right,
25   from the RIMS system?

Johnson, James Michael  12/9/2009  12:00:00 PM

185

1      A.   Yes.
2      Q.   The part master table that we were talking
3   about earlier, would that be in the inventory
4   databases, 42 B?
5      MS. ALBERT:  Objection, calls for
6   speculation, lacks foundation that there was a part
7   master table.
8      A.   It would be in the inventory.
9      Q.   42 B, as in boy.
10      Right?
11      A.   Yes.
12      THE WITNESS:  Do you mind if we take a
13   break?
14      MR. McDONALD:  Oh, not at all.
15      THE VIDEOGRAPHER:  The time is
16   approximately 1:38 PM.  We're going off the video
17   record.  Off the record.
18      (Recess.)
19      THE VIDEOGRAPHER:  The time is
20   approximately 1:53 PM.  We are back on the video
21   record.
22      BY MR. McDONALD:
23      Q.   Mr. Johnson, before the break, we were
24   talking about where in figure 1 A of the '683 patent
25   the part master table and the cross-reference tables

186

1   would be located.
2      And one of the places you did not indicate
3   they would be located is the catalog database 36.
4      Correct?
5      A.   When I said that, I thought you were
6   talking about the customer cross-reference table
7   specifically.
8      Q.   Right.
9      So the customer cross-reference table is
10   not at catalog database 36.
11      Correct?
12      A.   No, that would not be.
13      That would be the cross-reference table
14   for things like equivalents, substitutes, that kind
15   of stuff.
16      Q.   The part master table, that is not a
17   catalog database 36, is it?
18      A.   No, that would not be part of the catalog
19   database.
20      Q.   But there would be the Fisher-generated
21   cross-reference table -- is that located at catalog
22   database 36?
23      MS. ALBERT:  Objection, vague and
24   ambiguous.
25      A.   No.

187

1      BY MR. McDONALD:
2      Q.   I thought you said there was -- was there
3   some cross-reference table that you said would be
4   located at catalog database 36, or did I
5   misunderstand?
6      A.   There was a cross-reference table that Bob
7   built that would cross-reference product numbers -- I
8   believe product numbers across multiple catalogs that
9   were either substitutes or equivalents.  Again, to
10   get into the details of how that operated, you would
11   need to talk to Bob.
12      Q.   Do you know where that cross-reference
13   table that Bob Kinross built is located for sure?
14      A.   It was part of the catalog system.
15      Q.   It was located -- are you sure it's
16   located at catalog database 36?
17      A.   Again, to get to the details, you'd have
18   to talk -- I don't know how it was implemented.  That
19   was a project that Bob was responsible for.
20      Q.   Do you have an understanding as to why the
21   part master table is not located at catalog database
22   36?
23      A.   Because that's just JIT inventory -- I'm
24   sorry -- I think I may have misunderstood what your
25   question was.

188

1      THE WITNESS:  Can you re-read it?
2      (The reporter read the last
3      question.)
4      A.   Okay.  No, I didn't misunderstand it.
5      That's because it -- part master was the
6   JIT inventory for product type 01s and 06s.
7      BY MR. McDONALD:
8      Q.   So that's what it is, but could you
9   explain why you wouldn't also put that at catalog
10   database 36?
11      A.   2 different functions.  One manages the
12   JIT inventory and the other one was a cross-reference
13   across multiple catalogs.  They're 2 different
14   function.
15      Q.   Does the catalog database provide any
16   inventory management function?
17      A.   No.
18      Can you clarify that?
19      What do you mean --
20      Q.   Okay.
21      A.   -- by, inventory?
22      Q.   Does the catalog database include any data
23   that helps track inventory?
24      A.   No, not that I was aware.
25      Q.   A regular catalog typically doesn't have

Johnson, James Michael  12/9/2009  12:00:00 PM

189

1    inventory-related information.
2        Correct?
3    A.   No.
4        MS. ALBERT:  Objection, vague and
5    ambiguous.
6        BY MR. McDONALD:
7    Q.   Let me -- let me ask that question again
8    here and just get it clarified, because I think you
9    said, no.
10       Would you agree with me that a typical
11   catalog like the Fisher Scientific catalog, that
12   includes information about products, but it doesn't
13   tell you anything about how much is in inventory.
14       Is that fair?
15       MS. ALBERT:  Objection, vague and
16   ambiguous, lacks foundation, calls for speculation.
17   A.   None that I've ever seen.
18       BY MR. McDONALD:
19   Q.   You're saying you haven't seen any
20   catalogs that include inventory information?
21   A.   That's correct.
22   Q.   Would you agree or disagree that the part
23   master table from the RIMS system is a catalog?
24   A.   Disagree.
25   Q.   Why is that?

191

1    Q.   And those types of information related to
2    inventory, those are not in the catalogs.
3        Right?
4    A.   Inventory-related information, like
5    availability?
6    Q.   Right.
7    A.   No, that stuff would not be in a --
8    typically in a catalog or any catalog I ever saw.
9    Q.   Was the goal of the catalog database part
10   of the electronic sourcing system was to create an
11   electronic version of the big paper catalogs?
12   A.   That was one of the goals, yeah.
13   Q.   What were the other goals of the catalog
14   database in the electronic sourcing system?
15   A.   It was to manage the whole supply chain
16   management for a customer from the point in time you
17   would do product identification to requisitioning
18   creation to purchase order generation.
19   Q.   By taking the paper catalog and putting it
20   in electronic form, that facilitated all the
21   functions you just listed.
22       Correct?
23   A.   It aided in it.  It was a piece of it.
24   Q.   Did the catalog database 36 in the
25   electronic sourcing system -- by, 36, I mean, that

190

1    A.   It did not have the same information in
2    that table that the catalog would have.
3    Q.   What information did the catalog have that
4    the part master table did not have?
5    A.   It had information that was a detailed
6    description that would describe the product in great
7    length.  It -- the catalog had images where the
8    inventory record would not.
9        It would have detailed specifications on
10   what the product was like dimensions, things of that
11   nature, which the part master would not have.
12   Q.   And is it true that the part master record
13   had information that the catalog did not have?
14   A.   The part master would have -- the only
15   thing that comes to mind would be like the product
16   type of 01 or an 06, because the catalog wouldn't
17   know that.
18   Q.   Well, we were just talking a moment ago
19   about the inventory information.
20       Wouldn't the part master table also have
21   inventory information in it?
22   A.   That's true.  It would have -- it would
23   have the reorder point information in it.  It would
24   have the quantity available at that JIT facility for
25   those 2 product types, things of that nature.

192

1    number in figure 1 A -- did that house distributor
2    catalogs, vendor catalogs, and outside supplier
3    catalogs?
4    A.   It could house any catalog you wanted.  It
5    could house a brochure.  It could house a technical
6    document.  Didn't matter.  It was whatever you wanted
7    to author into it.
8        So for example, if a researcher had a
9    technical manual, you could author that into it as
10   well.
11   Q.   Would you consider a technical manual to
12   be a catalog?
13   A.   Not particularly.
14       We didn't implement it that way, but you
15   asked if a catalog could do that.  Technically, it
16   could do that.
17   Q.   All right.  Well, with respect to the part
18   of the catalog database that actually housed
19   catalogs, did those catalogs come from Fisher
20   Scientific vendors and other suppliers?
21   A.   Yes.
22   Q.   Did those catalogs, the catalog part of
23   the catalog database in figure 1 A -- did that
24   include the catalogs from anybody else?
25   A.   At one point, we were working on the Boise

193

1   catalog, which was a paper catalog distributor for
2   office supplies.  Again, you'll have to go back to
3   Bob.  He was working with those vendors in terms
4   of --
5       Q.   But in terms of the categories of types of
6   companies that would have catalogs, Fisher Scientific
7   is one, vendors is another, and other suppliers is a
8   third, at least the 3 I can think of.
9           Are there any other types of companies
10  that would have catalogs in catalog database 36 in
11  figure 1 A other than those 3 categories?
12      A.   Well, you could have a customer catalog.
13  I mean, a customer may have put their own catalog
14  together, and that could be authored as well.
15      Q.   Are you aware of that ever happening?
16      A.   I'm aware of a customer that did have
17  their own catalog.  Don't know whether we ever
18  authored that into the system or not, but I do know
19  of one instance where there was a customer that had
20  their own catalog.
21      Q.   So when you say, their own catalog, these
22  are products that the customer sold or bought or
23  what?
24      A.   No.
25          It was -- it was a customer catalog that

194

1   they -- again, back in those days, purchasing wanted
2   to have control over what their users could purchase.
3       Right?
4           And typically, a researcher, he or she
5   would want a particular brand.  They were
6   brand-loyal.
7           And the purchasing agent's responsibility
8   at that customer location was to try to get the best
9   deal from the best supplier, so in order to do that,
10  he had to purchase volume.  So sometimes purchasing
11  departments would try to limit the end-users as to
12  what they were allowed to purchase in terms of what
13  vendors.
14          So in other words, if you had one
15  researcher that wanted to purchase something from
16  Boise Cascade and another vendor wanted to order from
17  Office Supplies, now your order -- another
18  customer -- or user wanted to order it from another
19  paper supplier, now you've got kind of a bit of a
20  nightmare for the purchasing department at that
21  customer location because you're fragmenting your
22  order.
23          When you can get all those products from
24  one location, you get a better deal.  So sometimes
25  purchasing departments at some of the customers that

195

1   we had had a certain set of products, certain set of
2   vendors that they dealt with just because of
3   financial reasons.  Not all of them but some of them
4   did that.
5       Q.   All right.  That's a certain set of
6   vendors, so that you might have catalogs only from
7   certain selected vendors in that situation.
8       Correct?
9       A.   Or they would limit the actual -- they
10  would limit the products from that cat- -- that
11  vendor as well.  So they would have just a list of
12  the products that they wanted to purchase.
13      Q.   How would that list be created?
14      A.   The purchasing department would do it.
15          I mean, like I said, we never implemented
16  that into the electronic catalog, but I -- I vaguely
17  remember an instance where one of our customers had
18  a -- had their own catalog of products that they
19  wanted their users to order from.
20      Q.   So this nightmare that you're describing,
21  I want to make sure I understand what the nightmare
22  is.
23          The nightmare is that different users at a
24  given customer might want the same product but order
25  from their own personal favorite distributor.

196

1           So then you failed to get volume discounts
2   and things like that?
3       A.   That was one problem for some of the
4   customer purchasing departments, yeah.
5       Q.   Is that -- I just want to make sure I
6   understand the nightmare that you're referring to.
7           Is that the nightmare or is it something
8   else?
9       A.   In -- in this particular instance -- and I
10  I've forgotten who the customer was and it was
11  unrelated to this -- these patents.  It was just
12  something I had run across in developing stuff for
13  Fisher at some point.
14          There was one customer -- I'm not sure who
15  it was -- they actually produced their own internal
16  catalog.
17      Q.   I understand that.
18          I just want to make sure I understand the
19  nightmare.
20          You heard me describe it as, you have
21  different users at the customer using different
22  distributors for the same product, which means you
23  don't get the volume discounts.
24          Is that the nightmare or is it something
25  else?

Johnson, James Michael  12/9/2009  12:00:00 PM

197

```
1      A.   That was how that was described to me by
2   the purchase department --
3      Q.   Okay.
4      A.   -- yeah.
5           I mean, I didn't work there, so I don't
6   have firsthand knowledge.  That's just what I was
7   told.
8      Q.   Okay.  In the electronic sourcing system
9   in your patents, the catalog database as described in
10  your patents, that includes the entirety of the
11  distributor supplier vendor catalogs typically; is
12  that right?
13          MS. ALBERT:  Objection, calls for
14  speculation, also calls for a legal conclusion.
15     A.   I would be -- I mean, it had the
16  capability of storing whatever you wanted to author
17  into it, a complete catalog, portion of the catalog.
18  But again, that's probably a better question for Bob,
19  because he was responsible for that process.
20          BY MR. McDONALD:
21     Q.   Well, in your patent, didn't you disclose
22  at least that the catalog database 36 at least was
23  capable of containing catalogs published by
24  distributors, vendors, and suppliers?
25     A.   M-hm, yes, you could author various
```

198

```
1   suppliers, various distributors, various vendors,
2   whatever you want to call it.  You could author their
3   catalog into that cataloging database.
4      Q.   So they would publish a catalog which
5   would have all of their products in it, and then you
6   could convert that into the catalog database
7   electronically.
8           Right?
9      A.   Yes, we could author that into it.
10          At least that's what they called it back
11  in.  It was authoring.  They authored that catalog
12  into the catalog database.
13     Q.   Okay.  And so authoring is the process of
14  taking a catalog that was in paper form and then
15  converting it electronically so it could go in the
16  database?
17     A.   Yes.
18     Q.   The RIMS system as part of the requisition
19  process had a way to determine whether or not a
20  selected item was available in inventory.
21          Correct?
22          MS. ALBERT:  Objection, calls for a legal
23  conclusion, vague and ambiguous.
24     A.   There was an algorithm in RIMS where a
25  part number was entered, it looked to JIT first.  It
```

199

```
1   didn't find it, it looked to the host computer to
2   find that product.  It was a 1-for-1 match on the
3   part number.
4           BY MR. McDONALD:
5      Q.   And in the process of going through that
6   algorithm, would the RIMS system determine whether
7   the item that corresponded to that part number was
8   available in inventory?
9           MS. ALBERT:  Objection, calls for a legal
10  conclusion, vague and ambiguous.
11     A.   Yes, if it found the item at the JIT
12  location, it would bring back availability, or if it
13  found it at the Fisher distribution center, it would
14  bring back availability.
15          BY MR. McDONALD:
16     Q.   And it would identify that availability
17  before the purchase order was completed; is that
18  correct?
19     A.   Yes.
20     Q.   And in that first step looking in
21  just-in-time inventory, it would look for
22  Fisher-owned products in the inventory as well as
23  customer-owned products in inventory.
24          Correct?
25     A.   Yes.
```

200

```
1      Q.   And those customer-owned products in
2   inventory, those would be potentially restocked from
3   third-party vendors or suppliers.
4           Right?
5      A.   It was restocked by the customer.
6      Q.   But by the customer from third-party
7   suppliers or vendors.
8           Right?
9      A.   We didn't get involved in that.
10     Q.   But the RIMS system had that capability.
11          Right?
12          That's one of the things that it allowed.
13          Right?
14     A.   On the inventory side, it would house the
15  inventory, but it didn't know or care about where the
16  customer purchased that product.  It generated a
17  piece of paper, a report that was given to the
18  purchasing agent.  And then the purchasing agent was
19  responsible for going out and finding that product.
20     Q.   Well, it generated a proposed protec-- --
21  purchase order.
22          Right?
23     A.   A proposed.  That's the keyword.
24     Q.   Right.
25     A.   It's proposed.  It's not an actual
```

Johnson, James Michael  12/9/2009  12:00:00 PM

201

1    purchase order to a vendor.
2        It's a suggested list of items that need
3    to be replenished by the customer.
4        Q.   But it's not like the system didn't care
5    about it at all.  It cared enough to issue a purchase
6    order acknowledgement.
7        Right?
8        MS. ALBERT:  Objection, mischaracterizes
9    the document.
10       A.   It didn't create an acknowledgement.
11       It created a list of items that was
12   printed out and handed to the purchasing agent at the
13   customer location.
14       BY MR. McDONALD:
15       Q.   Well, if you turn back to the RIMS patent,
16   the '989 patent, at figure 5 A.
17       A.   Yep.
18       Q.   That's the flow chart relating to creating
19   purchase orders.
20       Correct?
21       A.   Yes.
22       Q.   Isn't one of the things created for a
23   product of a type 04 that's obtained from third
24   parties shown there in box 350 print purchase order
25   acknowledgment?

202

1        A.   That is when that product type 04 was
2    procured through Fisher and happened to be in a
3    Fisher warehouse, because of a returned item,
4    discontinued item.  That was managed by the strategic
5    procurement group.
6        For the customer-owned inventory, that was
7    a product type 05.  There was no purchase order
8    acknowledgement on that.  I thought that's what we
9    were talking about.
10       Q.   Well, for a customer internal purchase
11   order, the system -- the RIMS system did create and
12   print a purchase order internal to the customer.
13       Right?
14       A.   It created a parts list to be ordered.
15       Q.   Okay.  Again we're still on 5 A of the
16   RIMS '989 patent.
17       Right?
18       A.   Yes.
19       Q.   In box 336, that -- that's a box that's
20   part of the customer-owned inventory processing flow.
21       Correct?
22       A.   The left side of that, 336, is the --
23   yeah, that's product type 05.  That's a customer
24   internal process.
25       Q.   And doesn't it say as part of that

203

1    customer process at box 336, one of the steps is to
2    create and print purchase order internal to customer?
3        MS. ALBERT:  Objection, asked and
4    answered.
5        A.   Yes, but in the text as you -- as you
6    mentioned earlier, it's really a proposed purchase
7    order.
8        BY MR. McDONALD:
9        Q.   Well, it's called both in your patent,
10   isn't it?
11       MS. ALBERT:  Objection, asked and
12   answered.
13       A.   Yes.
14       I mean, the reality of the process is, it
15   printed a report which had a list of items that would
16   need to be replenished for customer-owned inventory.
17   That list of products would then be given to a
18   purchasing agent within the customer purchasing
19   department, and then they were responsible for going
20   out and finding that product wherever they could.
21       BY MR. McDONALD:
22       Q.   The RIMS system as it existed in April of
23   '93 did provide a way to determine the price of a
24   selected item; is that right?
25       A.   It -- for those items it was aware of,

204

1    yes.
2        Q.   Okay.  So when you say, items it was aware
3    of, can you tell me -- are you talking about what's
4    in the part master table or something else?
5        A.   Depending on the product type.
6        So if it was a product type 01, which was
7    a Fisher JIT item, it was in the -- in the Fisher
8    systems, so we had the availability and the pricing
9    for it, because it was a Fisher product.  It was in
10   their distribution center.  Whether it was a JIT item
11   didn't matter.
12       03 was a local distribution center item.
13   It was in the Fisher system.  They would have the
14   price and availability for that.
15       For an 04, if we had stocked that because
16   we had a customer return a specialty product that
17   they no longer wanted and we took it back into the
18   warehouse but didn't have it for general distribution
19   and we have that record on our inventory files, that
20   information would be available.  If it was not, we
21   wouldn't have it.
22       And for product type 05s, which were
23   administrative purchases, we wouldn't have any
24   information, because we have no connection to an
25   outside distributor for those.

Johnson, James Michael  12/9/2009  12:00:00 PM

205

1    Q.   So for item type 04, if you had some

2  customer-owned inventory on the part master list that

3  would be restocked as an item 04, that could have a

4  price.

5       Right?

6    A.   If it was a customer-owned item in there

7  as a product type 06 --

8    Q.   04.

9    A.   -- yes.

10   Q.   It's the product type 04 I'm talking about

11  now.

12   A.   Yeah, but there was no product type of

13  04 --

14   Q.   Okay.

15   A.   -- in -- in the inventory.

16   Q.   I see.

17       Let me -- let me clarify my question.

18       If in the part master record there was a

19  type 06 product but the part master record indicated

20  it could be restocked as a product type 04, in that

21  case, was price of information in the system

22  available?

23   A.   If it was a product type 06 in the

24  customer-owned inventory, if they had entered a

25  price, it would probably have been available, more

206

1  than likely been outdated, but it probably would have

2  been available.

3    Q.   Why do you say, more than likely outdated?

4    A.   Because pricing changes.

5       Right?

6       And if they entered that in September of

7  '03 and they replenished it in September of '04, more

8  than likely prices went up.  And we had no direct

9  connection to the distributor in order to get

10  realtime pricing, or anything for that matter.  There

11  was no realtime connection to any distributor other

12  than Fisher.

13   Q.   For the Fisher-owned items in inventory,

14  the type 01s, did you constantly update the price in

15  the part master record?

16   A.   The pricing on the 01s and the 03s

17  occurred at the host, because we had all the updated

18  information on the host.  So that was -- the record

19  at the JIT -- at the local customer was just a really

20  small, basic list of fields to give the customer or

21  give the CSR just kind of a brief description of

22  what -- what the product was.

23       There were some other fields there for --

24  you know, obviously the product type was there, you

25  know, the part number, brief description.  As far

207

1  as the actual realtime availability and pricing, that

2  came from the host systems.

3    Q.   In the -- going back now to the electronic

4  sourcing system at that catalog database 36, was

5  pricing information updated in that catalog database?

6    A.   That's a Bob question.  I'm not sure how

7  he maintained it.

8    Q.   In the electronic sourcing system in the

9  patents, once a list of items was generated from a

10  search, an order list, I believe we talked about

11  earlier -- okay?

12       Can we go back to that?

13   A.   Yes.

14       It was 2 things, a hit list and an order

15  list, but go ahead.

16   Q.   Right.

17       So you had a search that would generate a

18  hit list, and then the user could add or subtract to

19  that to get to an order list?

20       Right?

21   A.   That's correct.

22   Q.   At that point, could that list be directly

23  transmitted into the requisition system for further

24  processing, or was it already in the requisition

25  system?

208

1    A.   No.

2       It may or may not have been in the

3  original requisition system.

4    Q.   All right.  So that order list that you

5  have from the searching process, in what

6  circumstances would that be in the requisition system

7  without having to transmit it to the requisition

8  system?

9    A.   If they had entered it -- if they had

10  taken the path that I described to you earlier and

11  entered that part number if the requisitioning system

12  and went over to the catalog, it would be in the

13  requisitioning system.

14       At that point, the user could add

15  additional items that they had not added in the

16  requisitioning system, and those -- at the point in

17  time where they said, yeah, I want to add these to

18  the requisition, those items would then come over to

19  the requisitioning system.

20   Q.   All right.  So in that instance that we

21  talked about earlier where you generate a hit list

22  and massage that into an order list, that's something

23  that could be performed from the requisition system?

24   A.   It linked over to the catalog to perform

25  that function.

209

1    Q.   All right.  So the user's portal in effect
2  was the requisition system?
3    A.   That was one mechanism to it, yes.
4    Q.   Okay.  And the other mechanism is the
5  customer or the user could actually enter the system
6  through the search program?
7    A.   They could go directly into the catalog
8  system, yes.
9    Q.   And in that case when the customer goes in
10  directly from the catalog system, they could also
11  generate a hit list and then modify that into an
12  order list.
13    Right?
14    A.   True.
15    Q.   And at that point, then, would the user
16  hit some button that would transmit that order list
17  back into the requisition system?
18    A.   Yeah, because you would launch that from
19  the req-- you would launch it from -- if we're
20  referring to SupplyLink -- right? -- you could
21  launch the catalog -- without going in and creating a
22  requisition, you could launch the catalog from
23  SupplyLink over to the catalog system, search, select
24  items, put them into the order list, and then return
25  back, and it would return back to the requisitioning

210

1  process at that point and then populate whatever
2  items that you selected from the catalog.
3    Q.   Did that ability to transmit that order
4  list from the search engine to the requisition
5  module -- did that have any benefits in your mind?
6    A.   I'm sorry.
7    I didn't understand the question.
8    MR. McDONALD:  Read that back, please.
9    (The reporter read the last
10    question.)
11    A.   Yeah.
12    They didn't have to type -- they could
13  just point and click to get the products they wanted
14  to order.  They didn't have to enter it.  They didn't
15  have to know what the part number was.  There were a
16  lot of benefits.
17    BY MR. McDONALD:
18    Q.   That was because the order list could be
19  electronically transmitted back to the requisition
20  system without any manual intervention?
21    A.   Without having to enter the A 181, the
22  XYZ.  They didn't have to know what the distributor
23  part numbers were.
24    All they needed to know is, I want that
25  beaker.  It's a 5-milliliter beaker, select it, add

211

1  to the order list, and then back to the requisition.
2    Q.   In the electronic sourcing system when it
3  did a cross-referencing process and came up with a
4  Fisher catalog number that was equivalent to some
5  other part number, could that also be electronically
6  transmitted into the requisition system?
7    A.   Any part that ended up on the order list
8  that the customer wanted to send over could come back
9  over to the requisitioning system.
10    Q.   All right.  Maybe I need to walk through
11  the process a little bit with the cross-referencing
12  just so I again see it from the user's perspective.
13    If you're a user that wants to find an
14  equivalent Fisher product -- okay? -- that's --
15  that's the environment we're in right now.
16    All right?
17    Do you go into the Fisher -- excuse me --
18  the requisition module or the search module, or can
19  you go to either one if that's what you want to do?
20    MS. ALBERT:  I'm --
21    Q.   Okay.  Let me try it again.
22    MS. ALBERT:  It's a little vague and
23  ambiguous as to which system you're --
24    MR. McDONALD:  I'll withdraw --
25    MS. ALBERT:  -- talking about here.

212

1    MR. McDONALD:  I'll withdraw it here.
2    BY MR. McDONALD:
3    Q.   In the electronic sourcing system in your
4  patents.
5    A.   Yes.
6    Q.   If a user wants to put in a part number
7  and find out if there's an equivalent Fisher number,
8  can they enter the system either through the
9  requisition module or the searching module, or does
10  it have to be one or the other?
11    A.   Well, the electronic sourcing system as we
12  envisioned it was all one system -- right? -- in the
13  sense that you would log into it.  And we ultimately
14  marketed it as SupplyLink.
15    So you would log into SupplyLink, and at
16  that point, you could go into the requisitioning
17  process or you could go over to the catalog.
18    Q.   Could you go either way if you wanted to
19  find a cross-referenced Fisher Scientific equivalent
20  catalog number?
21    A.   Could you go either way?
22    Q.   Either into the requisition module or to
23  the catalog?
24    A.   You wouldn't -- the requisition module
25  wouldn't know anything about a Fisher equivalent at

Johnson, James Michael  12/9/2009  12:00:00 PM

213

1     that particular moment in time.
2        Q.   So you'd only go into the catalog if you
3     want to do a cross-reference?
4        A.   You could go into the catalog, and there
5     was a cross-reference file in the catalog that Bob
6     implemented, and look for products that might be
7     crossing -- I would look for the cross-references in
8     that -- in that process.
9        Q.   Okay.  So the customer would log into
10    SupplyLink, go to the catalog, put in a part number
11    and then the system would return if there was one an
12    equivalent Fisher catalog number.
13       A.   It wasn't just a Fisher.
14            It was -- however they -- again, you're
15    asking me some detailed questions about how Bob
16    implemented the cross-referencing process within the
17    catalog.  I don't have -- or pretty much no longer
18    have that in-depth knowledge.
19            I left a number of years ago that whole
20    project.  So I don't really recall exactly how that
21    process worked.
22       Q.   And that's why I'm not trying to ask so
23    much how it worked as just from a user standpoint,
24    what would they see, you know --
25       A.   That's part --

214

1        Q.   -- from the outset (phonetic)?
2        A.   -- of how it works.
3            I mean, I just don't recall the specifics
4     of that particular function.
5        Q.   All right.  Do you recall whether or not
6     once a customer did an inquiry that would indicate a
7     Fisher catalog number that was equivalent to some
8     other number, whether that returned information could
9     be electronically transmitted into a requisition?
10       A.   Once it made the order list and the
11    customer was satisfied with what was on that order
12    list, it could be then -- they could say -- and I've
13    forgotten what the button said.  I don't know if it
14    said "save" or "return" -- they'd press a button, and
15    it would return back to the requisitioning process
16    with those items on the order list.
17       Q.   Okay.  So again that would save the
18    customer, the user the trouble of writing it down on
19    a piece of paper or something?
20       A.   That's correct.
21       Q.   Are you aware of anything in the
22    electronic sourcing system in your patents that
23    relates to the criteria that would identify which
24    catalogs to select for purposes of a search?
25       A.   That was left up to the user from my

215

1     recollection.
2        Q.   What criteria -- or how would a user
3     identify or provide some criteria to the system to
4     select catalogs to search?
5        A.   Well, when the user would log on and go to
6     the catalog, they would have some idea of what they
7     were looking for.
8            Correct?
9            Presumably.  So they're looking for
10    acetone.  So they would type in "acetone."  And then
11    hit search.  And it would go out and look for all
12    instances of "acetone" across the catalogs that they
13    were searching.
14       Q.   Okay.  I'm talking about -- let me -- let
15    me zero you in on a particular part of the process.
16            Okay?
17            With respect to specifically the part of
18    the process where a set of catalogs is being selected
19    that's going to be searched, was there some sort of
20    criteria available to or generated by the users other
21    than just picking catalogs that related to which --
22    which catalogs would be selected for the subset that
23    would be searched?
24       A.   No, I don't believe there was from my
25    recollection.

216

1            I believe the customer would need to
2     select the catalogs they wished to search as I
3     remember it.  But again, that's a number of years
4     ago.
5            MR. McDONALD:  Why don't we take a little
6     break here.
7            MS. ALBERT:  Okay.
8            THE WITNESS:  Yeah, that's fine.
9            What time is it?
10           MR. McDONALD:  It's 2:30.
11           THE VIDEOGRAPHER:  The time is
12    approximately 2:29 PM.  We are going off the video
13    record.  Off the record.
14           (Recess.)
15           THE VIDEOGRAPHER:  The time is
16    approximately 2:40 PM.  We are back on the video
17    record.
18           BY MR. McDONALD:
19       Q.   Mr. Johnson, with respect to the
20    cross-reference capabilities in the electronic
21    sourcing system in your patents, I think you
22    mentioned at some point that the Fisher number that
23    would be identified by the cross-reference table
24    would be an equivalent of the part number that the
25    customer may have entered.

Johnson, James Michael  12/9/2009  12:00:00 PM

217

1    Is -- did I get that right?
2    A.  Which cross-reference?
3    We talked about 2, one in the cataloging
4    system and one in the requisitioning system.
5    Q.  Okay.  We'll -- we'll break it out, then.
6    Let's just talk for the moment about the
7    cataloging system.
8    A.  The details of that I'm not intimately
9    familiar with anymore, since time has passed.  But I
10   believe there was the ability to do equivalency in
11   that process, yes.
12   Q.  In the catalog part of the system, how was
13   equivalency determined?
14   A.  Again, that's a question for Bob Kinross.
15   I don't -- you're getting into some details I'm
16   just -- I just don't recall.
17   Q.  All right.  Then on the -- on the
18   requisition system side of the cross-reference table,
19   you said that was another place where
20   cross-referencing was located.
21   Right?
22   A.  That's where a customer cross-reference --
23   where a customer part number would cross-reference
24   over to a vendor part number.
25   Q.  In that situation, how was equivalency

218

1    determined?
2    A.  It wasn't -- it was -- well, I guess it
3    was determined by some human being.  It was a list
4    that was given to us that we just inputted into the
5    system as is.
6    Q.  So it was some human being such as a user
7    at the customer would make some judgment as to
8    whether product X was equivalent to product Y?
9    A.  That's how --
10   MS. ALBERT:  Objection, calls for
11   speculation.
12   A.  That's how I understood it to be.
13   They would give us a list of parts as I
14   described before, XYZ, use the customer part number,
15   and they wanted it to cross-reference to A 181, which
16   is acetone for Fisher.
17   BY MR. McDONALD:
18   Q.  Earlier in the day you mentioned how the
19   catalog such as the Fisher catalog was organized in
20   sections like glassware and chemicals and things like
21   that to help the customer find products.
22   Do you recall that?
23   A.  Yes.
24   Q.  In the -- either in the RIMS system or the
25   electronic sourcing system that adopted parts of the

219

1    RIMS system, did the parts master table include any
2    organization by type of product such as glassware?
3    A.  No.
4    Q.  Why didn't that parts master table include
5    that type of organization?
6    A.  It wasn't a requirement.
7    It was there to manage the JIT inventory
8    only, so it was a record that existed for an item
9    that happened to be in that JIT facility where they
10   could search by part number only on that product from
11   the requisitioning process.
12   Q.  Before you got the notice of your
13   deposition in this case, had you heard of Lawson
14   Software before?
15   A.  No, I had not.
16   MR. McDONALD:  All right.  I have no
17   further questions.
18   Thank you.
19   MS. ALBERT:  I have -- I have a few.
20   MR. McDONALD:  You don't have to say,
21   thank you.
22
23   EXAMINATION BY COUNSEL FOR PLAINTIFF
24   BY MS. ALBERT:
25   Q.  Now, Mr. Johnson, we talked a lot about

220

1    the processes conducted using the RIMS system today.
2    And do you recall Mr. McDonald asking you
3    about a process which you indicated would involve the
4    strategic procurement, or SPS group, within Fisher?
5    A.  Yes.
6    The strategic procurement services.
7    Q.  Now, were the activities conducted by the
8    strategic procurement services group at Fisher -- was
9    that process inside or outside of the RIMS system?
10   A.  That was outside of the RIMS system.  That
11   was a separate group that managed purchases for
12   Fisher Scientific.
13   Q.  Now, with respect to the RIMS system as it
14   existed at least as of April of '93, could a customer
15   service representative at the local computer using
16   the RIMS system generate any purchase orders?
17   A.  It could -- no.
18   It could generate a requisition to Fisher,
19   which would turn into a purchase order on the host.
20   Q.  Did the RIMS system as it existed as of
21   April of '93 have any capability to determine the
22   availability of an item in a third-party supplier's
23   inventory?
24   A.  No.
25   Q.  Did a user of the RIMS system at the

Johnson, James Michael  12/9/2009  12:00:00 PM

221

1   customer service rep at the local computer -- did
2   that customer service representative have any
3   capability to search the part master database based
4   on any criteria other than part number?
5       A.   No.
6       Q.   In the RIMS system as it existed at -- as
7   of April of '93, could the host computer generate
8   multiple purchase orders from a single requisition?
9       A.   No.
10      Q.   Could the RIMS system generate -- could
11  the RIMS system as it existed as of April of '93 --
12  could it generate a requisition having multiple lines
13  that you would procure from multiple different
14  sources?
15      A.   No.
16          Everything was sourced through Fisher.
17      Q.   You -- do you recall some discussions
18  regarding the development efforts that you undertook
19  for development of the systems described in the
20  electronic sourcing system patents and what changes
21  had to be made to the RIMS system to come up with the
22  requisitioning system used in the electronic sourcing
23  system patents?
24      A.   Yes.
25      Q.   Could you explain some of those

222

1   development efforts that you undertook.
2       A.   We implemented the electronic cataloging
3   system.  We built the interface between the
4   electronic catalog system and the requisitioning
5   system.
6          On the requisitioning side, we tore apart
7   the application from a presentation standpoint and
8   completely replaced that, kept some of the core
9   business logic from the RIMS application, but
10  developed all new front-end graphical user interface
11  to it so that it could be pushed out to the end-users
12  in an N-tiered environment.  Prior to that, RIMS was
13  pretty much a 2-tiered architecture.
14          In addition to that, because of the
15  functionality that we made, changes we made, it
16  required database changes to be made in the system to
17  allow us to generate purchase orders through -- or to
18  multiple distributors.  So that inherently caused
19  database changes to the existing structure, so we had
20  to make those database changes at well.
21          We also implemented the capability to
22  communicate to those distributors through the EDI
23  functionality that we implemented, which was a fair
24  amount of work as well.
25          MS. ALBERT:  No further questions.

223

1           FURTHER EXAMINATION BY COUNSEL FOR DEFENDANT
2       BY MR. McDONALD:
3       Q.   Well, in your electronic sourcing patents,
4   Mr. Johnson, didn't you indicate in those patents
5   that they worked with the RIMS system as described in
6   your RIMS patent filed in April of '93?
7       A.   It was used -- RIMS was used as an example
8   at the time.
9       Q.   So you did say in your electronic sourcing
10  patents that the RIMS system as it existed in April
11  of '93 could be used as the requisition and
12  purchasing part of your electronic sourcing system.
13  Right?
14      A.   We -- I don't recall that specifically,
15  but we did use RIMS as an example as I said as a
16  requisitioning system that could be used with the
17  sourcing system -- the electronic sourcing system.
18          The RIMS system as it sat in 1993 did not
19  have the capabilities of going to multiple
20  distributors.  It didn't have a GUI front end.
21      Q.   But whether it had those features or not,
22  the fact is, in your patent, you disclose that that
23  April '93 version of the RIMS system was at least an
24  example of the requisitioning system that could be
25  used with your invention.

224

1   Right?
2       A.   It was an example of one that could be
3   used with the system.
4       Q.   And it could be used in its form as of
5   April of '93 without tearing apart the application
6   and replacing the software or adding new graphic user
7   interfaces or making it into an N-tiered environment.
8   Right?
9           MS. ALBERT:  Objection, mischaracterizes
10  the document.
11      A.   It would lack certain functionality like
12  multiple distributors being able to send POs to.
13          BY MR. McDONALD:
14      Q.   But it would still be a way to implement
15  the invention as you described and claimed in your
16  electronic sourcing patents.
17          MS. ALBERT:  Objection, calls --
18          BY MR. McDONALD:
19      Q.   Correct?
20          MS. ALBERT:  Objection, calls for a legal
21  conclusion and mischaracterizes the document.
22      A.   It wouldn't support some of the
23  functionality that we have in that, like being able
24  to sent to multiple distributors the EDI capability
25  that we implemented, as well as I believe in that

Johnson, James Michael  12/9/2009  12:00:00 PM

225

1  patent we also have the graphical user interface
2  defined in there.
3       So none of that would have been in there.
4       BY MR. McDONALD:
5    Q.  Do you know whether or not any of the
6  claims in your electronic sourcing patents claim the
7  graphic user interface or the EDI capability?
8       MS. ALBERT:  Objection, calls for a legal
9  conclusion.
10   A.  Don't recall.
11      BY MR. McDONALD:
12   Q.  Can you point to any place in the '683
13  patent where you actually show or describe the
14  graphic user interface?
15   A.  It's referred to in the section where you
16  saw Easel.
17   Q.  I think I saw Easel at columns 17 and 18
18  of the '683 patent.  So I'll refer you to those
19  columns.
20      MS. ALBERT:  Excuse me for interrupting,
21  but which columns are you referring to?
22      MR. McDONALD:  Columns 17 and 18 of the
23  '683 patent.
24      BY MR. McDONALD:
25   Q.  Column 17 in the last paragraph, I see at

226

1  about line 61 a reference to Easel graphical user
2  interface 254.
3    A.  Yep.
4    Q.  So that's what you're saying in this area
5  here on column 17 and 18 that you talk about the
6  graphical user interface called Easel?
7    A.  Easel was the tool that we used to build
8  the graphical user interface.
9    Q.  Okay.  So this is the section you're
10  talking about, though?
11   A.  That's part of it, yeah.  I think there
12  was another reference to it as well.
13   Q.  Does this -- well, over in column 18 at
14  about line 20, do you see another reference to Easel
15  interface 254, and also at column 18, line 10?
16   A.  Yeah.
17      Those are 2 other references to it.
18   Q.  All right.
19   A.  To Easel specifically.
20      But there was also a reference to the
21  graphical user interface that was pushed out to the
22  customer as well.  I can't -- can't recall exactly
23  where it was, but I do recall it being in here.
24   Q.  Is that a graphic user interface different
25  from the one that was implemented using the Easel

227

1  program?
2    A.  No.
3       It would have been the same tool.  I mean,
4  Easel was a tool that we at that time were planning
5  to use --
6    Q.  Okay.
7    A.  -- so -- Easel is a -- how do I want to
8  describe -- Easel was a tool that was in the
9  marketplace at that time that allowed developers to
10  develop a graphical user interface that would
11  interface to various systems.
12   Q.  All right.  So that Easel user interface,
13  that was not developed as of April of '93; is that
14  right?
15   A.  That I'm fuzzy on.  I'm not sure exactly
16  how far we were with that as far as the development
17  of the graphical user interface.
18   Q.  This references numeral 254 anyway at
19  column 17 and 18 when it refers to that interface.
20      Correct?
21   A.  Yes.
22   Q.  If you turn to the '683 patent at figure 1
23  B, do you see there a reference for exhibit two
24  fifty- -- or item number 254?
25   A.  254 -- graphical user interface, yes.

228

1    Q.  So 254 as shown on the figure is simply a
2  box that says the words graphical user interface.
3       Right?
4    A.  M-hm.
5    Q.  Can you say yes or no?
6    A.  I'm sorry.
7       Yes.
8    Q.  There's no place in your patent that you
9  actually show what this graphical user interface
10  looks like, is there?
11   A.  No.
12      MS. ALBERT:  Objection, calls for a legal
13  conclusion.
14      BY MR. McDONALD:
15   Q.  You may answer.
16   A.  No.
17      The -- graphical user interface that
18  we went to market with is not in this particular
19  document.
20   Q.  Is it described at columns 17 and 18 in
21  terms of what it actually looked like, or anyplace
22  else in the '683 patent for that matter?
23      MS. ALBERT:  Objection, calls for a legal
24  conclusion.
25   A.  Well, it performed the functions that were

Johnson, James Michael  12/9/2009  12:00:00 PM

229

1 individual in here, so, yeah, I think it's --
2      BY MR. McDONALD:
3      Q.   Well, but a graphical user interface has a
4 visual appearance to it.
5      Right?
6      A.   Yes.
7      Q.   Do you describe anywhere in the '683
8 patent what the graphical user interface looks like?
9      MS. ALBERT:  Objection, asked and
10 answered, and calls for a legal conclusion.
11      A.   If you're talking about buttons and tabs
12 and things of that nature, no.
13      If you're talking about the functionality
14 that was developed in the graphical user interface, I
15 think we described that.
16      BY MR. McDONALD:
17      Q.   Well, isn't the functionality of your
18 electronic sourcing system the same whether or not it
19 was implemented with the Easel user interface or not?
20      MS. ALBERT:  Objection, calls for a legal
21 conclusion.
22      A.   In my opinion, no.
23      I mean, there was functionality we added
24 above and beyond the RIMS system that RIMS didn't
25 have.

230

1      BY MR. McDONALD:
2      Q.   Do you understand your electronic sourcing
3 patents to be limited to implementation using that
4 specific graphic user interface that was developed
5 with the Easel program?
6      MS. ALBERT:  Objection, calls for a legal
7 conclusion.
8      A.   Can you rephrase that?
9      Because I'm not sure I follow what you're
10 asking.
11      MR. McDONALD:  Please read it back.
12      (The reporter read the last
13      question.)
14      MS. ALBERT:  Objection, calls for a legal
15 conclusion.
16      A.   Well, you could have used any tool.  It
17 didn't matter.  I mean, you develop an application,
18 you typically use at that time a tool for a client
19 server environment, which is what this was initially
20 implemented as.
21      MR. McDONALD:  Please read my question
22 back.
23      (The reporter read the last
24      question.)
25      MS. ALBERT:  Objection, calls for a legal

231

1 conclusion and now asked and answered.
2      A.   Again, Easel was a package tool that we
3 used at that particular moment in time.
4      BY MR. McDONALD:
5      Q.   You understand I'm asking specifically
6 about your claims of your patent now, though.
7      Right?
8      I'm not asking whether that's a tool or
9 not a tool.
10      A.   Well, but you're asking about the
11 graphical user interface.  That could have been
12 developed in anything, any of the tools that were out
13 there at the time.
14      Q.   Do you understand your claims, then, are
15 claims that could be implemented using any user
16 interface out there?
17      MS. ALBERT:  Objection, calls for a legal
18 conclusion.
19      A.   No, I don't.
20      I think it had to be developed by us with
21 the tools that were available at the time, and we
22 happened to choose at this particular moment in time
23 Easel to help us develop that graphical user
24 interface.
25      BY MR. McDONALD:

232

1      Q.   Had you actually developed the Easel
2 graphic user interface by August of '94 when you
3 filed the electronic sourcing patent applications?
4      A.   Again, you asked me that question earlier.
5      I'm fuzzy on the dates in terms of where
6 the development cycle was.
7      Q.   I actually asked you before about April of
8 '93 when the RIMS patent was filed.  So this was a
9 different question.  I just want to make sure you at
10 least understand it --
11      A.   Oh, okay.
12      Q.   -- in your answer --
13      A.   Either way --
14      Q.   -- either way -- (indiscernible) --
15      A.   Yeah, either way it's the same.  I mean,
16 that -- you're talking a number of years ago, and
17 development --
18      Q.   All right.  And you mentioned that for the
19 requisitioning system, you -- or somebody at Fisher
20 tore apart the application and essentially replaced
21 it.
22      Do you remember that in the questioning by
23 Ms. Alberts (sic)?
24      A.   We tore about the application to separate
25 the business logic from the presentation logic, yes.

Johnson, James Michael   12/9/2009   12:00:00 PM

233

1    Q.   That -- is that talking about the software
2    that you wrote, basically rewrote the software?
3    A.   Yeah, we had to change it significantly.
4        The way the architecture worked in RIMS,
5    it was a -- it was a technical jargon, but it was the
6    CICS COBAL BMS map system, and it was
7    character-based, and the maps were embedded within
8    the business logic.
9        That all had to be changed, and all that
10   presentation layer had to be taken out of those
11   programs across the board, and the business logic had
12   to be stabilized in terms of how it was going to
13   manage requests from the graphical user interface.
14   Q.   Was that work done before or after the
15   electronic sourcing patent application was filed in
16   August of '94?
17   A.   Again, dates are fuzzy to me as to when we
18   started and finished certain projects that number of
19   years ago.
20   Q.   So you don't know?
21   A.   I don't recall.
22   Q.   When you rewrote it, did -- was it
23   rewritten to work on a CICS platform?
24   A.   It interfaced to a CICS OS 2 platform.
25   Q.   So that part did not change?

234

1    A.   The platform did not change from the local
2    computer, that's true.
3    Q.   So what did change generally?
4    A.   The programs that ran the business logic
5    that actually performed the functions that are
6    described in here.
7    Q.   Did you describe in your electronic
8    sourcing patent application how the programs were
9    rewritten?
10       MS. ALBERT:  Objection, calls for a legal
11   conclusion.
12   A.   Just from a functional standpoint, the
13   features we added.
14       BY MR. McDONALD:
15   Q.   Is it true that in the electronic sourcing
16   system described and claimed your patents, the
17   requisition purchasing system part of that was
18   preferably the RIMS system as it existed in April of
19   '93?
20       MS. ALBERT:  Objection, calls for a legal
21   conclusion.
22   A.   We utilized RIMS as a foundation to build
23   what we wanted to build in the electronic sourcing
24   module.  We used components of it.
25       BY MR. McDONALD:

235

1    Q.   I'm not talking about just using
2    components.
3        I'm asking, isn't it true that in your
4    electronic sourcing patent applications, you actually
5    disclosed that the RIMS system which identified as
6    the one in your '989 patent application was the
7    preferable way of implementing the requisition and
8    purchasing part of the system?
9        MS. ALBERT:  Objection, calls for a legal
10   conclusion.
11   A.   I believe we said it was an example of a
12   system that could be used, yes.
13       BY MR. McDONALD:
14   Q.   And is that an accurate statement?
15       Is true that the RIMS system as it
16   existed in April '93 could serve as the requisition
17   and purchasing part of your electronic sourcing
18   technology described in the patent?
19       MS. ALBERT:  Calls for a legal conclusion
20   and asked and answered.
21   A.   RIMS as it was at that stage lacked
22   functionality as we've already determined in terms of
23   what the electronic sourcing patent was trying to
24   accomplish.
25       So while we used RIMS as an example in the

236

1    patent, there was functionality that we built into
2    the electronic sourcing modules that allowed it to do
3    things that we've talked about, creating multiple
4    purchase orders to different vendors or different
5    distributors via the EDI technology was implemented,
6    the electronic catalog database was implemented.  The
7    interfaces between the requisitioning module and the
8    cataloging component were built.
9        So I mean -- and then the GUI development
10   was complete.
11       So there was a number of enhancements made
12   to the electronic sourcing system above and beyond
13   what RIMS actually did.
14       BY MR. McDONALD:
15   Q.   Well, you mentioned the e-catalog.
16       The e-catalog is described in your
17   electronic sourcing patent as being separate from the
18   RIMS system.
19       Right?
20   A.   Yes.
21   Q.   And the EDI -- what -- that's for
22   communication outside the system?
23   A.   That was to communicate the RFQ, response
24   to RFQ, the PO, and the POA to the various
25   distributors.

Johnson, James Michael  12/9/2009  12:00:00 PM

237

1    Q.   And then the interface, that was the
2    interface between the preexisting RIMS system and the
3    new catalog and search system.
4         Right?
5         MS. ALBERT:  Objection, mischaracterizes
6    the document.
7    A.   That functionality didn't exist in RIMS.
8         BY MR. McDONALD:
9    Q.   Right.
10        So that was one of the new things.
11        You had to develop this interface between
12   the old RIMS system and the TV 2 search engine with
13   the electronic catalogs.
14        Right?
15        MS. ALBERT:  Objection, mischaracterizes
16   the document.
17   A.   The catalog was -- is -- is another
18   component.  I mean, EDI is another component that we
19   implemented.  They're different components.
20        BY MR. McDONALD:
21   Q.   But you viewed those as separate from the
22   RIMS system.
23        Right?
24   A.   They are separate.
25   Q.   Now -- and then the last thing you

238

1    mentioned was the capability of generating multiple
2    purchase orders.
3         Right?
4    A.   Yes.
5    Q.   Now, that is something that has to do with
6    the RIMS system itself.
7         Right?
8    A.   I'm sorry?
9    Q.   The capability of generating multiple
10   purchase orders, is that something that was a
11   capability that was the sort of thing that would
12   occur in the requisition and purchasing system
13   itself?
14   A.   In RIMS?
15        Are you asking in RIMS, or are you asking
16   in electronic sourcing?
17   Q.   I'm asking in electronic sourcing as
18   described in your patent.
19   A.   Yes.
20        We could create multiple purchase orders.
21   Q.   And isn't it true though -- if you go to
22   column 18 of the '683 patent, at column 18, line 18,
23   you see there:  Once responses from either or both
24   have been obtained, the distributor purchasing
25   employee can use the item list in Easel interface 254

239

1    to create one or more of the following purchase
2    orders.
3         And there's the 3 listed there.
4         Right?
5    A.   Yes.
6    Q.   And if I understood your prior testimony
7    right, the new functionality that you programmed in
8    that was not in the RIMS system as of April of '93 is
9    item number 2 there, an order from the customer to
10   distributor for a type zero 7 product.
11        Correct?
12   A.   Correct.
13   Q.   And the 2 other purchase orders listed
14   here numbers 1 and 3, those were both purchase orders
15   that could be created in the RIMS system as it
16   existed in April of '93.
17        Correct?
18   A.   Yeah.
19        One would be product type 05, I believe,
20   in RIMS, and 3 was either a JIT, which would be
21   either product type 01 or an 06, and the distributor
22   would have been Fisher, which would have been a
23   product type 03.
24   Q.   All right.  So isn't it true that the RIMS
25   system as of April of '93 did itself generate

240

1    multiple purchase orders, but you modified the system
2    to generate -- you add one more type of purchase
3    order, the one corresponding to type -- product type
4    07?
5         MS. ALBERT:  Objection, mischaracterizes
6    his prior testimony.
7    A.   RIMS created a single purchase order
8    directly to Fisher, and Fisher did the sourcing.
9         BY MR. McDONALD:
10   Q.   Is that a yes or a no?
11   A.   I guess it's a no.  It couldn't create
12   multiple purchase orders.  It created one purchase
13   order to Fisher.
14   Q.   Could a user of the RIMS system create
15   both purchase order type 1 and purchase order type 3
16   from column 18?
17   A.   It could create a requisition that was
18   submitted to the host computer to create a purchase
19   order at Fisher for -- for those 2 types -- no.  I
20   back that up.
21        The administrative purchase was that
22   product list.  That's the product type 05 that the
23   purchase agent at the customer location would
24   actually source.
25   Q.   Well, right here in column 18, you call

Johnson, James Michael  12/9/2009  12:00:00 PM

241

1    that a purchase order.
2        Right?
3        You say:  One or more of the following
4    purchase orders.  1, an order from the customer to
5    the supplier, paren, an administrative purchase,
6    paren.
7        Right?
8        A.   That's an administrative purchase, yes.
9        Q.   You call it here in your patent a purchase
10   order.
11       Right?
12       MS. ALBERT:  Objection, asked and answered
13   and badgering the witness.
14       A.   It says it's an administrative purchase.
15   That's not a purchase order.
16       Q.   This is -- this is one of the 3 things
17   that you say is one or more of the following purchase
18   orders at line 20 to 21 of column 18.
19       Right?
20       MS. ALBERT:  Objection, asked and
21   answered.
22       A.   It's a purchase order, sir.
23       BY MR. McDONALD:
24       Q.   "It" being the patent that you swore under
25   oath was accurate.

242

1        Right?
2        A.   It does create the purchase orders to
3    Fisher.
4        Q.   Yeah.
5        And the "it" you're talking about is
6    column 18 of the '683 patent that you're listed on as
7    an inventor and that you reviewed, approved, and
8    signed off on under oath.
9        Right?
10       A.   Yes.
11       You're asking me about RIMS.  I'm telling
12   you that RIMS did not create purchase orders to
13   outside vendors.
14       That's what I'm saying.
15       Q.   I wasn't asking you about RIMS with that
16   question.  I think you've answered my question that
17   was specific to column 18.
18       RIMS did do this step -- this thing
19   described in number 1 in column 18.
20       Right?
21       MS. ALBERT:  Objection, asked and answered
22   like 5 or 6 times now, badgering the witness.
23       A.   Yeah.
24       I mean, my understanding of your question
25   was, you were asking me about RIMS.  That's what I

243

1    was answering.  Maybe I misunderstood.
2        BY MR. McDONALD:
3        Q.   I don't even know what question you're
4    talking about now.
5        Can you tell me what you're talking about?
6        A.   Whether or not RIMS could generate
7    multiple purchase orders to multiple vendors.  That
8    was what I thought the question was.
9        Q.   That was not the question that was
10   pending.
11       A.   Okay.  Then I misunderstood.
12       Q.   If I understand you right, the order
13   that's described by subparagraph 1 there at column 18
14   of the '683 patent at line 22, that is something --
15   that order from the customer to the supplier, paren,
16   an administrative purchase, paren, that was something
17   that could be generated in the RIMS system as it
18   existed in April of '93; is that right?
19       MS. ALBERT:  Objection, asked and answered
20   6 times now.
21       MR. McDONALD:  He said he wasn't sure what
22   the question was.
23       A.   Yeah.
24       I mean, in RIMS, we could generate a
25   product list that could be given to the customer's

244

1    purchasing agent to place an order with the vendor.
2        BY MR. McDONALD:
3        Q.   In the RIMS system, was that called an
4    administrative purchase?
5        A.   Yes.
6        Q.   All right.  Here in column 18, you call
7    that a purchase order.
8        Right?
9        A.   Yes.
10       Q.   And number 3 there, an order from the
11   distributor to the supplier, paren, usually providing
12   for direct shipment from the supplier to the customer
13   or to a JIT site maintained by a distributor for the
14   customer, paren, that was also an order that could be
15   generated from the RIMS system as it existed in April
16   of '93.
17       Right?
18       MS. ALBERT:  Objection, mischaracterizes
19   the document and prior testimony.
20       A.   The RIMS could create a purchase order
21   directly to Fisher -- or a requisition that would
22   turn into a purchase order to Fisher, yes.
23       Q.   That's not what I asked you.
24       A.   It is what you asked me.
25       Q.   Well, I asked you specifically about --

245

1  and I quoted verbatim the number 3 there from column
2  18.
3       I just want to make sure we're talking
4  about the exact same thing.
5       That order that's described there in
6  number 3 in column 18, that type of an order could be
7  generated by the RIMS system as it existed in April
8  of '93.
9       Correct?
10      MS. ALBERT:  Asked and answered.
11      A.  It could create a requisition submitted to
12  Fisher for a -- that's a product type 3 and a JIT for
13  product type 1.  That's what that is in RIMS.
14      BY MR. McDONALD:
15      Q.  So that's a yes.
16      Right?
17      A.  That's what it could do, yes.
18      Q.  So number 3 is also described here in
19  column 18 as a purchase order.
20      Correct?
21      A.  Yes.
22      Q.  So if we ent- -- use the definition of
23  purchase order in column 18 of the '683 patent, the
24  RIMS system was capable of generating 2 types of
25  purchase orders at least, the type corresponding to

246

1  description number 1 and another type corresponding
2  to description number 3.
3       Correct?
4       MS. ALBERT:  Objection, mischaracterizes
5  his testimony and asked and answered multiple times.
6       A.  I go back to that first one where you said
7  administrative purchase.  It was a piece of paper
8  that had a list of products on it.  That's what it
9  was in RIMS.
10      BY MR. McDONALD:
11      Q.  So you have trouble calling that a
12  purchase order.
13      Is that the issue?
14      A.  Yeah, because it hasn't closed the loop.
15  It hasn't gone to a vendor.  It hasn't been sourced.
16  In the RIMS system, it was just a
17  document that had a list of products on it.
18      And if you were a business owner, would
19  you call that a purchase order?
20      Q.  Well, you called a purchase order in
21  your patent.
22      Right?
23      A.  In -- in the RIMS system -- in the RIMS
24  system, it was a requisition that was to be sourced
25  by the customer.  That's why I'm -- you know, when

247

1  you -- I get kind of confused a little bit when
2  you're looking at this patent and you're referring
3  back to RIMS.
4       Right?
5       You're asking me specifically in RIMS if
6  it actually generated a purchase order for an
7  administrative purchase.  And that's where I -- I'm
8  saying no, RIMS did not generate a physical purchase
9  order to a distributor for a product type 05.
10      Q.  So in the RIMS system, though, in addition
11  to the -- or separate from anything described as
12  numbers 1, 2, or 3 here, in the RIMS system as it
13  existed in April of '93, if there was a product type
14  04, the RIMS system would generate a proposed
15  purchase order to the vendor.
16      Correct?
17      MS. ALBERT:  Objection, asked and
18  answered.
19      A.  It would be a proposed purchase order.  It
20  would be sent to the mainframe.
21      If the mainframe systems found it by
22  chance because we'd had a returned item, it could
23  come back with information.  Otherwise, it would
24  submitted to the SPS group for sourcing.
25      BY MR. McDONALD:

248

1       Q.  And the RIMS system as it existed in April
2  of '93 could generate a purchase order internal to
3  the customer for a type 06 product.
4       Correct?
5       A.  No.
6       That was customer-owned inventory.  It
7  didn't really generate a purchase order.
8       Q.  In the RIMS '989 patent, isn't that
9  exactly what you said it did though for those
10  products?
11      A.  Well, I mean, it created a requisition,
12  and it did create a purchase order in the system in
13  the sense that it was removed from inventory and
14  recorded, but it was JIT inventory that was
15  physically housed at that customer's location.
16      And the customer already owned it, so they
17  weren't actually going to go out and purchase it
18  again.  It was inventory that was located that the
19  customer's location.  So it was already prepurchased.
20  It just happened to be in inventory and the customer
21  happened to own it.
22      And we would gen a requisition, and then,
23  you know, when we accepted that to process it and
24  gave that inventory to the end-user, it would
25  change the status to being complete as a purchase

Johnson, James Michael  12/9/2009  12:00:00 PM

---

249

1   order done so that we could send that information
2   over to the customer's purchasing system saying
3   that, somebody took your inventory and here is who
4   took it.
5       Q.   Is that a yes?
6       A.   Well, I'm just telling you what it did.
7       Q.   Is that a yes in response to my question?
8            Because I don't -- I want you to answer my
9   questions.
10           Okay?
11      A.   I think I am.  I --
12           BY MR. McDONALD:
13      Q.   Do you remember what my question was?
14      A.   Did it create a purchase order.
15           MR. McDONALD:  Can we read back my
16   question, please.
17           THE COURT REPORTER:  I'm not sure how far
18   back you want to go.
19      A.   You're asking if an 05 created a purchase
20   order if --
21           THE COURT REPORTER:  If what?
22   I'm sorry.
23           THE WITNESS:  He's asking if an 05 -- or
24   an 06 product type created a purchase order.  That's
25   what he asked.

---

250

1            BY MR. McDONALD:
2       Q.   In the RIMS system as it existed in the
3   April of '93.  I asked --
4            MR. McDONALD:  Let's read back my question
5   before the long answer.
6            (The reporter read the record as
7            follows:
8            "Question:  In the RIMS '989 patent,
9   i        isn't that exactly what you said it
10           did though for those products?")
11           MS. ALBERT:  That doesn't compute.
12           BY MR. McDONALD:
13      Q.   Isn't it true that in the RIMS '989
14   patent with respect to product type 06, the '989
15   patent specifically says that the RIMS system
16   creates and prints a purchase order internal to the
17   customer?
18           MS. ALBERT:  Asked and answered.
19      A.   For an 06, can I ask where you're looking
20   for exactly again?
21           BY MR. McDONALD:
22      Q.   I'm looking at figure 5 A of the '989
23   patent.
24      A.   For a product type 06?
25      Q.   Yes.

---

251

1       A.   In this -- in this process flow?
2       Q.   Yes, at box 336.
3       A.   That's for a product type 05.
4       Q.   If you direct your attention to column 18,
5   lines 4 to 5.
6       A.   18, 4 and 5.
7       Q.   Isn't it true that boxes 334 and 336 are
8   for an item of product type 06?
9            (Pause.)
10      A.   Yes, it is.  I mean, it followed that
11   path.
12           BY MR. McDONALD:
13      Q.   All right.  So for product type 06, your
14   '989 patent says in column 18 and at figure 5 A that
15   at step 336 of the processing of that requisition,
16   the system would create and print a purchase order
17   internal to customer.
18      A.   That's what it says, yes, and it did.  I
19   mean, it would print it out so that they could keep
20   record that that inventory was taken.
21           MR. McDONALD:  I have no further
22   questions.
23           MS. ALBERT:  Nothing further.
24           THE VIDEOGRAPHER:  The time is
25   approximately 3:20 PM.  This is the conclusion of the

---

252

1   video deposition of James M. Johnson, taken on
2   Wednesday, December 9th, 2009.  Off the record.
3            (Whereupon, at 3:20 p.m., the taking of
4   the instant deposition ceased.)
5
6
7            _____
8            Signature of the Witness
9   SUBSCRIBED AND SWORN to before me this _____ day of
10   _____, 20_____.
11
12            _____
13            Notary Public
14   My Commission Expires:_____
15
16
17
18
19
20
21
22
23
24
25

---

Johnson, James Michael  12/9/2009  12:00:00 PM

253

1          CERTIFICATE OF COURT REPORTER

2    UNITED STATES OF AMERICA    )

3    DISTRICT OF COLUMBIA        )

4          I, CHERYL A. LORD, the reporter before

5    whom the foregoing deposition was taken, do hereby

6    certify that the witness whose testimony appears in

7    the foregoing deposition was sworn by me; that the

8    testimony of said witness was taken by me in machine

9    shorthand and thereafter transcribed by

10   computer-aided transcription; that said deposition is

11   a true record of the testimony given by said witness;

12   that I am neither counsel for, related to, nor

13   employed by any of the parties to the action in which

14   this deposition was taken; and, further, that I am

15   not a relative or employee of any attorney or counsel

16   employed by the parties hereto, or financially or

17   otherwise interested in the outcome of this action.

18   _____

19          CHERYL A. LORD

20          Notary Public in and for

21          the District of Columbia

22   My Commission expires April 30, 2011

23

24

25

## CERTIFICATE OF SERVICE

I hereby certify that on the 9th day of August, 2010, I will electronically file the foregoing

**PLAINTIFF EPLUS'S OBJECTIONS TO DEFENDANT'S DEPOSITION DESIGNATIONS AND SUMMARY OF THE DEPOSITION OF JAMES JOHNSON AND COUNTER-DESIGNATIONS**

with the Clerk of Court using the CM/ECF system which will then send a notification of such filing (NEF) via email to the following:

Daniel McDonald, *pro hac vice*
William D. Schultz, *pro hac vice*
Rachel C. Hughey, *pro hac vice*
Joshua P. Graham, *pro hac vice*
Andrew Lagatta, *pro hac vice*
Merchant & Gould P.C.
3200 IDS Center
80 South Eighth Street
Minneapolis. MN 55402
Telephone: (612) 332-5300
Facsimile: (612) 332-9081
lawsonscrvicc@)merchantgould.com

Robert A. Angle (VSB# 37691)
Dabney J. Carr, IV (VSB #28679)
Troutman Sanders LLP
P.O. Box 1122
Richmond, VA  23218-1122
Telephone:  (804) 697-1238
Facsimile:  (804) 698-5119
robert.angle@troutmansanders.com
dabney.carr@troutmansanders.com

*Counsel for Defendant Lawson Software, Inc.*

_____/s/_____
David M. Young (VSB #35997)
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4000
Facsimile:  (202) 346-4444
dyoung@goodwinprocter.com

LIBW/1736775.2