**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| *e*PLUS, INC., | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No. 3:09-CV-620 (REP)** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **LAWSON SOFTWARE, INC.,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF EPLUS'S OBJECTIONS TO DEFENDANT'S DEPOSITION**
**DESIGNATIONS AND SUMMARY OF THE DEPOSITION OF JOHANNA**
**O'LOUGHLIN AND COUNTER-DESIGNATIONS**

Plaintiff *e*Plus Inc. ("*e*Plus"), through counsel, hereby submits the following objections to

Defendant's deposition designations and summary of the deposition of Johanna O'Loughlin and

offers the following counter-designations:

**Specific Objections**

| Defendant's Designations | *e*Plus's Objections | *e*Plus's Objections to Defendant's Deposition Summary |
|---|---|---|
| 4:24 – 7:5 | | |
| 7:18 – 10:10 | | Mischaracterizes testimony: Ms. O'Loughlin only signed two documents that are a part of Exhibit 40.  Other documents in Exhibit 40 are either unsigned or signed by someone else.<br><br>Incomplete: Summary does not mention Ms. O'Loughlin's testimony that she probably did not review the documents she signed for accuracy. |

| Defendant's Designations | *e*Plus's Objections | *e*Plus's Objections to Defendant's Deposition Summary |
|---|---|---|
| 10:15 – 12:1 | leading question (11:24 – 12:1); 602 (11:19-23) | Mischaracterizes testimony: Ms. O'Loughlin testified that, while she had no reason to believe that the papers she signed did not contain accurate information, she relied on the attorney who prepared the documents for their accuracy.  Ms. O'Loughlin also testified that she has no present recollection as to whether the Fisher RIMS mark was used in commerce in August 1992. |
| 12:3 – 13:18 | 403 (12:12-15); 602 (12:12-15, 12:24 – 13:3) | Mischaracterizes testimony: Ms. O'Loughlin testified that she has no present recollection as to whether the Fisher RIMS mark was used in commerce in August 1992. |
| 13:19 – 14:7 | | |
| 14:8 – 15:10 | Questions from 14:12-15:10 are improper as attorney simply read from document and failed to pose questions to the witness. | Mischaracterizes testimony: in these lines in the transcript, Ms. O'Loughlin simply agrees that she sees in the document particular disclosure that counsel directed her attention to. |
| 15:15 – 16:6 | 403 (15:15-17) | Mischaracterizes testimony: Ms. O'Loughlin testified that a particular brochure that is part of Exhibit 40 was used in commerce at the time that Fisher filed the trademark application. |
| 16:13 – 19:10; 19:12-21 | leading question (18:20 – 19:2, 19:3-10, 19:12); 403 (18:8-19, | Mischaracterizes testimony: Ms. |

| Defendant's Designations | *e*Plus's Objections | *e*Plus's Objections to Defendant's Deposition Summary |
|---|---|---|
| | 18:20 – 19:2, 19:3-10, 19:12, 19:13-21); 602 (17:14-17) | O'Loughlin testified that she thought that certain statements identified by counsel in the 10-K were accurate. |
| 19:22 – 20:17 | | |
| 20:18 – 20:22; 21:3-8; 21:10-22:23 | 401/402 (22:9-23) | |
| 22:24 – 23:10 | 401/402 (23:4-9) | |
| 23:11 – 24:18 | 602 (24:8-16) | Mischaracterizes testimony: Ms. O'Loughlin testified that she thought that one paragraph identified by counsel in the 1994 10-K was accurate.  She also testified that she assumed that it was important to Fisher that the information in its filed 10-Ks were accurate. |
| 24:19 – 26:5; 26:17 – 27:14; 27:21 – 28:18; 28:20 – 28:23 | leading questions (28:6-18, 28:20-23); 401/402 (27:9-14); 403 (28:6-18, 28:20-23); 602 (27:9-14, 28:6-18, 28:20-23) | Mischaracterizes testimony: Ms. O'Loughlin testified only about specific statements in the Annual Report that counsel pointed out. |
| 28:24 – 29:8 | leading question; 403 | Mischaracterizes testimony: Ms. O'Loughlin testified only that she has no reason to doubt the accuracy of the information in the documents placed before her. |
| 48:18-22; 48:24 – 49:8; 49:10 | leading questions; 401/402; 403 | Mischaracterizes testimony: Ms. O'Loughlin testified that she has a general recollection of the issues relating to the catalog and the existence of Fisher RIMs.  She had no |

| Defendant's Designations | *e*Plus's Objections | *e*Plus's Objections to Defendant's Deposition Summary |
|---|---|---|
| | | specific recollections about either topic. |

| *e*Plus's Counter-Designations |
|---|
| 16:10-12 |
| 29:17 – 30:3 |
| 30:12-17 |
| 31:7-20 |
| 32:9-20 |
| 34:4 – 38:1 |
| 39:19-40:4 |
| 40:5 – 41:15 |
| 41:19-22 |
| 43:1-25 |
| 48:3-12 |

LIBW/1755252.1

Respectfully submitted,


/s/ _____
Craig T. Merritt (VSB #20281)
Henry I. Willett, III (VSB #44655)
**CHRISTIAN & BARTON, LLP**
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
Telephone: (804) 697-4100
cmerritt@cblaw.com
hwillett@cblaw.com


Scott L. Robertson (admitted *pro hac vice*)
Jennifer A. Albert (admitted *pro hac vice*)
David M. Young (VSB#35997)
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4000
SRobertson@goodwinprocter.com
JAlbert@goodwinprocter.com
DYoung@goodwinprocter.com


Michael G. Strapp (admitted *pro hac vice*)
James D. Clements (admitted *pro hac vice*)
**GOODWIN PROCTER LLP**
Exchange Place
53 State Street
Boston, MA 02109-2881
Telephone:  (617) 570-1000
MSrapp@goodwinprocter.com
JClements@Goodwinprocter.com


*Attorneys for Plaintiff, ePlus Inc.*



Dated:  August 9, 2010

## Summary of Rebuttal Designations for Johanna O'Loughlin

Ms. O'Loughlin's undergraduate major was economics.  She is not a computer scientist or electrical engineer.  Technology in general, and information technology in particular, is not her area of expertise.  (29:17 – 30:3; 30:12-17)

Ms. O'Loughlin does not consider herself to be an expert in the functionality, features, and capability of the RIMS system.  She concedes that the inventors of the RIMS system are more knowledgeable as to the features and capabilities of that system than she is.  (31:14-20; 32:9-20)

Ms. O'Loughlin has no knowledge as to any patent applications that Fisher Scientific filed for the RIMS system or for an electronic sourcing system.  (31:7-13; 34:4-23; 35:12-18; 48:3-12)

As general counsel of Fisher Scientific, Ms. O'Loughlin did not direct anyone at the company to file any patent application that Fisher Scientific believed to be without value.  Fisher Scientific did not have a policy of filing valueless patent applications.  (34:24 – 36:24)

The brochure starting on page L0260595 of the trademark application for the "Fisher RIMS" mark (Ex. 40) is a marketing brochure for consumption by customers.  It is not a technical document.  (36:25 – 38:1)

Ms. O'Loughlin does not know how many iterations the RIMS system went through.  She does not know the trade names used with various iterations of the RIMS system.  She does not know how the features and functionality of the RIMS system changed during a period of time from 1992 to 1995.  (39:19 – 40:4)

Ms. O'Loughlin confirmed that the entry titled "Computer Order-Entry System," on page L0343589 of the Form 10-K for Fisher Scientific International for calendar year 1993 (Ex. 43) does not discuss a capability of searching multiple vendor catalogs.  The corresponding paragraph in the Form 10-K for Fisher Scientific International for calendar year 1992 also does not discuss such a capability.  The paragraph titled "The Fisher Catalog" on the page L0343589 of the Form 10-K for Fisher Scientific International for calendar year 1993 (Ex. 43) does not mention any catalog except for the Fisher catalog.  The corresponding paragraph in the Form 10-K for Fisher Scientific International for calendar year 1992 also does not mention any other catalog.  (40:5 – 41:15)

 Ms. O'Loughlin never reviewed U.S. Patent No. 5,712,989, which is for the Fisher RIMS system.  (41:19-22)

Ms. O'Loughlin has no independent knowledge as to the truth of any statements made in any of the (1) trademark application for "Fisher RIMS" (Ex. 40), (2) the 1994 Annual Report for Fisher Scientific International (Ex. 41), (3) the Form 10-K for Fisher Scientific International for calendar year 1992 (Ex. 42), and (4) the Form 10-K for Fisher Scientific International for calendar year 1993 (Ex. 43).  The only thing that she can say for sure is that her signature appears in the trademark application and it is her expectation that the application was properly prepared.  (43:1-25)

Ms. O'Loughlin does not recall working on Fisher 10-K forms during her time at the company. (16:10-12)

2

O'Loughlin, Johanna  4/26/2010  12:00:00 PM

**Page 1**

```
1    IN THE UNITED STATES DISTRICT COURT FOR THE
2        WESTERN DISTRICT OF PENNSYLVANIA
3
4             - - - -
5
6    ePLUS, INC.,        )
7                        )
8                        )
9        Plaintiff,  )
10                      )
11       Vs.          )    Civil Action
12                    )    No. 3:09-cv-620
13   LAWSON SOFTWARE,     )
14   INC.,               )
15                       )
16       Defendant.  )
17                    )
18                    )
19                    )
20                    )
21                    )
22
23
24             - - - -
25
26   DEPOSITION OF: JOHANNA O'LOUGHLIN
27
28             - - - -
29
30        DATE:  Monday, April 26, 2010
31
32   LOCATION:  REED SMITH
33            225 Fifth Avenue
34            Pittsburgh, PA  15222
35
36
37   TAKEN BY:  Defendant
38            Lawson Software, Inc.
39
40   REPORTED BY: Julie A. Casella
41            Notary Public
42            Reference No. JC17705
43
```

**Page 3**

```
1              * I N D E X *
2    Direct Examination by Ms. Hughey - - - - - - - - 4
3    Cross Examination by Mr. Robertson - - - - - - - 29
4    Redirect Examination by Ms. Hughey - - - - - - - 48
5    Certificate of Court Reporter  - - - - - - - - - 49
6
7
8        * INDEX OF EXHIBITS *
9    (Exhibit Nos. 40-44 were pre-marked.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
```

**Page 2**

```
1    witness, called by the Defendant for examination, in
2    accordance with the Federal Rules of Civil Procedure,
3    taken by and before Julie A. Casella, a Court Reporter
4    and Notary Public in and for the Commonwealth of
5    Pennsylvania, at the offices of REED SMITH, 225 Fifth
6    Avenue, Pittsburgh, Pennsylvania, on Monday, April 26,
7    2010, commencing at 10:34 a.m.
8
9              - - - -
10
11   APPEARANCES VIA TELEPHONE:
12
13       FOR THE PLAINTIFF ePLUS, INC.
14
15   Scott L. Robertson, Esq.
16   GOODWIN PROCTER, LLP
17   901 New York Avenue, NW
18   Washington, DC 20001
19     P (202) 346-4331
20   E-mail: srobertson@goodwinprocter.com
21
22       FOR THE DEFENDANT LAWSON SOFTWARE, INC.
23   Rachel C. Hughey, Esq.
24   MERCHANT & GOULD, P.C.
25   3200 IDS Center
26     80 South 8th Street
27   Minneapolis, MN 55402
28     P (612) 336-4688
29   E-mail: rhughey@merchantgould.com
30
31
32
33
34
35
36
```

**Page 4**

```
1              - - - - -
2        P R O C E E D I N G S
3
4        VIDEOGRAPHER:  Hello.  My name is Miranda
5    Nee.  I am the videographer for today.  Today's
6    date is April 26, 2010.  We are now going on the
7    record.  The time indicated on the screen is
8    10:34 a.m.  If counsel would like to introduce
9    themselves, please do so at this time.
10       MS. HUGHEY:  Good morning, this is Rachel
11   Hughey for defendant, Lawson Software.
12       MR. ROBERTSON:  This is Scott Robertson
13   from Proctor for plaintiff, ePlus, Inc.
14       THE COURT:  If this court reporter would
15   now swear in the witness, we may begin.
16
17        JOHANNA G. O'LOUGHLIN
18              - - - - -
19   a witness herein, having been first duly sworn, was
20   examined and testified as follows:
21              - - - - -
22        DIRECT EXAMINATION
23   BY MS. HUGHEY:
24   Q.  Good morning, Ms. O'Loughlin.  Could you state
25       your full name for the record.
```

O'Loughlin, Johanna  4/26/2010  12:00:00 PM

**Page 5**

1    A.  Johanna G. O'Loughlin.
2    Q.  You are the former vice-president and general
3        counsel of Fisher Scientific; is that correct?
4    A.  That is correct.
5    Q.  Who are you presently employed by?
6    A.  I am presently of counsel at the law firm of
7        REED SMITH in Pittsburgh.
8    Q.  What is your work address?
9    A.  225 Fifth Avenue, Pittsburgh, 15222.
10   Q.  What is your home address?
11   A.  9 Dunmoyle Place.  That is D-U-N-M-O-Y-L-E
12       Place, Pittsburgh, 15217.
13   Q.  You understand that you are under oath today?
14   A.  I do.
15   Q.  How long were you at Fisher?
16   A.  About 16 years.
17   Q.  What years were you there?
18   A.  I started in 1980 and I left in about March or
19       April of 1996.
20   Q.  What was your last position at Fisher?
21   A.  I think it was senior vice-president and
22       general counsel, but I don't really recall
23       those details.
24   Q.  How long were you in that position?
25   A.  One way or the other I had the same duties for

**Page 6**

1        about ten years.  I think I exceeded to that
2        position about -- generally about ten years
3        before -- about 1986.
4    Q.  What did you do before that position?
5    A.  I was assistant general counsel, assistant
6        corporate secretary?
7    Q.  About how many attorneys did Fisher have at
8        that time that you were working there?
9    A.  At any given time it was approximately two in
10       the Pittsburgh office and it could have been
11       at different times three because we had an
12       attorney in another office.  I really don't
13       recall.
14   Q.  You have a law degree?
15   A.  I do.
16   Q.  Where is your law degree from?
17   A.  The University of Pittsburgh Law School.
18   Q.  What year did you get that law degree?
19   A.  1973.
20   Q.  You have been practicing law for more than 35
21       years; is that correct?
22   A.  That is correct.
23   Q.  Now, when you worked at Fisher Scientific in
24       early 1990s, were you responsible for certain
25       legal filings?

**Page 7**

1    A.  Occasionally.
2    Q.  Did you have responsibility for things like
3        trademark applications?
4    A.  Generally under my oversight that would be the
5        case.
6    Q.  Can you please turn to what has been marked as
7        Lawson Exhibit 44.  I will represent to you
8        that this is the subpoena and amended
9        Schedule A that we served on you.
10   A.  Yes.
11   Q.  Have you had an opportunity to look at this
12       document?
13   A.  I have.
14   Q.  I understand that you have been subpoenaed to
15       answer my questions today based on your
16       personal knowledge?
17   A.  I do understand that.
18   Q.  Can you please turn to what has been marked as
19       Lawson Exhibit 40, L0260585 to L0260624.  It
20       appears to be entitled "Service Mark,
21       Principal Register, Fisher RIMS."
22   A.  I have that.
23   Q.  What is this document?
24   A.  It says that it is just as you described it, a
25       service mark, principal register.  I really

**Page 8**

1        don't know beyond that how to describe it.
2    Q.  What is this document dated?
3    A.  It says registered May 31, 1994 on the title
4        line.
5    Q.  You understand this is a trademark application
6        for the Fisher RIMS trademark; is that
7        correct?
8    A.  Is it the application?  It looks like it has
9        been -- that there are markups from the
10       officials at the trademark office but maybe I
11       am wrong about that.
12   Q.  You see that this appears to be Fisher RIMS
13       and you see that the first page says, "For
14       computerized database management featuring
15       requisition process, entering purchase orders,
16       maintaining inventory record, transferring
17       related reports and data to other computers
18       and generating documents for picking, packing,
19       shipping and receiving requisitioned and
20       ordered products."
21   A.  It says that.  There is a scrawl through it
22       and it says, "See inside A1."
23   Q.  Can you please turn to page L0260591?
24   A.  Yes.
25   Q.  Do you see at the bottom of the page the

O'Loughlin, Johanna   4/26/2010   12:00:00 PM

9

1    signature block for Fisher Scientific Company?
2    A.  Yes.
3    Q.  Do you see it says, "Johanna G. O'Loughlin,
4        Vice-president, general counsel"?
5    A.  I do.
6    Q.  That is you, correct?
7    A.  That is.
8    Q.  Is that your signature in the signature block?
9    A.  It is.
10   Q.  Could you please turn to the next page, page
11       L0260592?
12   A.  I have it.
13   Q.  Do you again see that signature block for
14       Fisher Scientific?
15   A.  I do.
16   Q.  And again, that is Johanna G. O'Loughlin.  Is
17       that your signature?
18   A.  It appears to be.
19   Q.  And you signed this on behalf of Fisher
20       Scientific?
21   A.  I did.
22   Q.  Were you working for Fisher Scientific that
23       day that is dated below that, the 26th day of
24       April 1993?
25   A.  I was.

10

1    Q.  Now, was it your job at the time that you were
2        working at Fisher Scientific to review
3        applications like this for accuracy and to
4        sign them on behalf of Fisher?
5    A.  I probably didn't review it for accuracy.  I
6        probably signed it on behalf of Fisher because
7        I was the officer and an officer needs to sign
8        on behalf of the company.  It would have been
9        prepared by a patent attorney who worked for
10       me.
11   Q.  It would have been your expectation that this
12       document was accurate?
13       MR. ROBERTSON:  Objection.  Leading.
14   A.  Indeed.
15   Q.  Would it have been your understanding that
16       this document was accurate?
17   A.  I relied on the lawyer who worked for me to
18       prepare them in accordance with the
19       requirements and it would contain
20       accurate information.
21   Q.  You have no reason to believe that this
22       document does not have accurate information?
23   A.  Correct.
24   Q.  You see the first paragraph, the paragraph
25       that you have your signature under here maybe

11

1    the fifth -- fourth sentence down says, "She
2    believes said corporation to be the owner of
3    the mark sought to be registered."  Was that
4    your understanding at the time that you signed
5    this document?
6    A.  It certainly was.
7    Q.  Could you please turn to the next page
8        L0260593?
9    A.  I have it.
10   Q.  Do you see the bottom of the page where it
11       says, "Services" and then to the right there
12       is a paragraph?
13   A.  I do.
14   Q.  Underneath that it says Fisher RIMS?
15   A.  It does.
16   Q.  And then above that you see "Use in Commerce,
17       August 1992"?
18   A.  Yes.
19   Q.  To the best of your knowledge was that Fisher
20       RIMS mark being used in Commerce in August of
21       1992?
22   A.  To the best of my knowledge but I have no
23       present recollection of those facts.
24   Q.  You have no reason to believe that that is not
25       true?

12

1    A.  None.
2        MR. ROBERTSON:  Objection, leading.
3    Q.  Now you see next to it services it says,
4        "Computer-based services for processing
5        requisitions, entering purchase orders,
6        maintaining inventory records, transferring
7        related reports and data to other computers
8        and generating documents for picking, packing,
9        shipping and receiving requisitioned and
10       ordered products."  Do you see that paragraph?
11   A.  I do.
12   Q.  Was it your understanding that those are the
13       services that were being used by Fisher RIMS
14       in August of 1992?
15   A.  It is.
16   Q.  To the best of your knowledge, just to be
17       clear, is it your understanding to the best of
18       your knowledge that the Fisher RIMS trademark
19       was being used in Commerce in August of 1992?
20   A.  I have no present, independent recollection,
21       but based on this document and the processes
22       that we use to apply for trademarks, I believe
23       that is accurate.
24   Q.  Do you have any recollection of why Fisher
25       decided to file a trademark on Fisher RIMS?

O'Loughlin, Johanna  4/26/2010  12:00:00 PM

13

1   A.  I have no independent recollection and I would
2   only have to speculate that it is for the
3   usual reasons, commercial protection reasons.
4   Q.  As a general matter, would Fisher decide to
5   file trademark applications on products that
6   they were seeking to protect?
7   A.  Of course.
8   Q.  Could you turn to L0260594, the next page.
9   A.  Okay.
10  Q.  Again, do you see on this page where it says,
11  "Used in Commerce, August 1992"?
12  A.  I see that.
13  Q.  And below it has services and it has a similar
14  paragraphs talking about those services?
15  A.  Right.
16  Q.  Is it your understanding that this Fisher RIMS
17  mark was being used in Commerce in 1992?
18  A.  It is.
19  Q.  Could you please turn to the next page,
20  L0260595?
21  A.  I have that.
22  Q.  What is this document?
23  A.  It appears to be the cover of a commercial
24  brochure entitled Fisher RIMS.
25  Q.  And you see at the bottom where it says, "A

14

1   revolutionary electronic Requisition and
2   Inventory Management System"?
3   A.  Yes.
4   Q.  Was it your understanding that the Fisher RIMS
5   was a requisition and inventory management
6   system?
7   A.  It was.
8   Q.  Could you turn to the next page, page
9   L026059 -- actually, let's turn a few pages
10  down. L0260598.
11  A.  Okay. All right.
12  Q.  You see that this page has what looks to be a
13  series of bullet points describing Fisher
14  RIMS?
15  A.  I see that.
16  Q.  Do you see the bullet point one says,
17  "Consolidates all supplier activity, including
18  third-party and administrative purchases"?
19  A.  I see that.
20  Q.  Do you see bullet point four that says,
21  "Allows flexible remote requisitioning by
22  formatted screen, telephone, fax or bar code
23  scanning"?
24  A.  I see that.
25  Q.  Do you see bullet point it looks like maybe

15

1   bullet point eight. It says,
2   "Cross-references your stock numbers and all
3   your supplier numbers."
4   A.  Yes.
5   Q.  And then bullet point 15, do you see that?  It
6   says "Utilizes file transfers and EDI"?
7   A.  I see that.
8   Q.  And bullet point 17 says, "Utilizes OS/2
9   operating system, relational database."
10  A.  Right.
11      MR. ROBERTSON:  Objection.  Objection.  I
12  mean, do you have any questions about this?
13      MS. HUGHEY:  I do.  I do.
14      MR. ROBERTSON:  Please get to them.
15  Q.  Is it your understanding that the Fisher RIMS
16  system had these features?
17  A.  In general, yes.
18  Q.  To the best of your knowledge this document
19  starting at page L0260595 to L0260608 -- to
20  the best of your knowledge was this document
21  used in Commerce at the time this application
22  was filed?
23  A.  It is the same answer I gave before.  To the
24  best of my knowledge that would be the case.
25  The facts are accurately recorded.  If this

16

1   was attached to it, that was the document that
2   was in Commerce -- used in Commerce.
3   Q.  You can put that document aside now.  When you
4   were working at Fisher, did your work involve
5   10-Ks?
6   A.  Not generally.
7      MR. ROBERTSON:  I am sorry.  Can you
8   repeat that, Rachel.
9      MS. HUGHEY:  Yes.
10  Q.  When you were working at Fisher, did you ever
11  work with Fisher on its 10-Ks?
12  A.  I don't really recall doing that.
13  Q.  Do you know what a 10-K is?
14  A.  I certainly do.
15  Q.  Can you tell me what a 10-K is?
16  A.  The 10-K is the annual report that public
17  companies are required to file with the
18  Securities and Exchange Commission?
19  Q.  Can you please turn to what has been marked as
20  Lawson Exhibit No. 42, L0343548 to L0343586.
21  A.  I have that.
22  Q.  What is this document?
23  A.  This is a form 10-K for Fisher Scientific
24  International for, I guess, 1993.
25  Q.  Were you aware that Fisher filed 10-Ks while

17

1   you were working there?
2   A.  Whenever they were a public company, they had
3   to file a 10-K but I wasn't directly involved
4   in it.
5   Q.  I believe you said that that is required by
6   the SEC; is that correct?
7   A.  Right.
8   Q.  So, a company -- just let me understand.  Is
9   it your understanding that a company would
10  file a 10-K to comply with certain
11  requirements from the Securities and Exchange
12  Commission?
13  A.  Right.
14  Q.  Is it your understanding that this is the kind
15  of document that Fisher would want to be
16  accurate?
17  A.  Yes.
18  Q.  Could you please turn to page L0343549.  That
19  is the next page.
20  A.  All right.
21  Q.  Do you see where it says, "Item 1 business"?
22  A.  Yes.
23  Q.  And do you see the third paragraph down where
24  it says -- the third section down where it
25  says "products and services"?

18

1   A.  I see that.
2   Q.  Can you turn to the next page, L0343550?
3   A.  I have that.
4   Q.  The first full paragraph, the one that starts,
5   "Computerized order-entry system," do you see
6   that paragraph?
7   A.  I do.
8   Q.  Do you see where it says, "Information on
9   all 100,000 products offered in the Fisher
10  Catalog can be obtained through Fisher RIMS,
11  the company's newest and most powerful
12  electronic order-entry system, which provides
13  paperless purchasing, receiving, billing and
14  product distributions."  Do you see that
15  sentence?
16  A.  I do.
17  Q.  Is it your understanding that that is what the
18  Fisher RIMS product was?
19  A.  Yes, it is.
20  Q.  Do you see the next sentence, it says, "Fisher
21  RIMS facilitates just-in-time delivery and
22  third-party purchasing, contributing to
23  supplier consolidation for its customers"?  Is
24  it your understanding that that is also true
25  of the Fisher RIMS system?

19

1        MR. ROBERTSON:  Objection, leading.
2   A.  It is.
3   Q.  The third paragraph -- the third sentence, do
4   you see that?  It says, "The company believes
5   that the lower procurement cost and increased
6   control offered by Fisher RIMS has been
7   instrumental in securing several long-term
8   supplier agreements with large customers."  Is
9   it your understanding that the Fisher RIMS
10  system also had had those qualities?
11       MR. ROBERTSON:  Same objection.
12  A.  I think the sentence is accurate.
13  Q.  Is this paragraph consistent with your
14  understanding of the Fisher RIMS system?
15  A.  It is.
16  Q.  Is it consistent with your understanding of
17  the Fisher RIMS system that was on sale in
18  1992?
19  A.  The Fisher RIMS system that I was aware of,
20  yes.  I think this is an accurate depiction of
21  my understanding of its capabilities.
22  Q.  The first sentence talked about the Fisher
23  Catalog.  What is the Fisher Catalog?
24  A.  I don't know what it is today but at the time
25  it was still a printed catalog that was really

20

1   for purposes of ordering.  It was a
2   hard-backed, huge catalog.  Fisher was kind of
3   famous for it because it was so comprehensive
4   and Fisher was then and maybe still is the
5   leading laboratory supply company.
6   It was sort of a bible for ordering, but
7   they recognized that the electronic age
8   required them to also be able to facilitate
9   ordering in all kinds of electronic formats so
10  that those same items that were in the
11  hardback Fisher Catalog were being made
12  available to customers through computerized
13  means.
14  Q.  I see.  And you said the Fisher Catalog had
15  information about products.  Did it have
16  descriptions of the products?
17  A.  It did, and photos.
18  Q.  And photos.  Could you turn to page -- one
19  other question.  This sentence talks about
20  receiving and it talks about purchasing.  Do
21  you have any understanding of what those words
22  mean?
23       MR. ROBERTSON:  What sentence?
24  Q.  So the first sentence talks about the
25  electronic --

O'Loughlin, Johanna  4/26/2010  12:00:00 PM

| | 21 |
|---|---|
| 1 | MR. ROBERTSON:  The first sentence of what |
| 2 | category?  What column are we talking about? |
| 3 | MS. HUGHEY:  The first sentence, third |
| 4 | line, "which provides paperless purchasing, |
| 5 | billing and product distribution." |
| 6 | THE WITNESS:  I think it is the paragraph |
| 7 | that begins with the italicized title |
| 8 | "Computerized Order-Entry Systems." |
| 9 | MR. ROBERTSON:  Thank you. |
| 10 | A.  My understanding is this.  The company sold to |
| 11 | many -- almost all laboratory -- scientific |
| 12 | laboratories in the industry.  At big |
| 13 | companies where there were lots of them, they |
| 14 | needed to run an inventory supply room, the |
| 15 | customer had to run its own inventory supply |
| 16 | room.  They had to order goods and receive |
| 17 | them in their inventory supply room and handle |
| 18 | all of the purchasing that way and then |
| 19 | distributing it among out to their various |
| 20 | component parts. |
| 21 | That was an expense and required a lot of |
| 22 | record maintenance and so what this is |
| 23 | referring to are those activities that |
| 24 | customers had to engage in and the |
| 25 | company's -- Fisher's attempt to provide them |

| | 23 |
|---|---|
| 1 | A.  I have it. |
| 2 | Q.  It starts with signatures. |
| 3 | A.  I see that. |
| 4 | Q.  It appears to be signed by Mark A. Underberg, |
| 5 | vice president, general counsel and secretary. |
| 6 | Did you work with Mark A. Underberg? |
| 7 | A.  I did.  He was the vice president and general |
| 8 | counsel of the public company, Fisher |
| 9 | Scientific International, Inc. and I |
| 10 | indirectly reported to him. |
| 11 | Q.  You can put this document aside.  Can you |
| 12 | please turn to what has been marked as Lawson |
| 13 | Exhibit 43, L034357 to L0343631. |
| 14 | A.  Okay. |
| 15 | Q.  What is this document. |
| 16 | A.  It is another 10-K I think for the following |
| 17 | year.  It has a date stamp of March 31, 1994 |
| 18 | for Fisher Scientific International. |
| 19 | Q.  Please turn to page L0343589, the third page |
| 20 | in this document. |
| 21 | A.  Yep. |
| 22 | Q.  Do you see the paragraph there that starts |
| 23 | "Computerized order-entry systems"? |
| 24 | A.  I do. |
| 25 | Q.  It appears to be similar, if not exact, to the |

| | 22 |
|---|---|
| 1 | with a product that would streamline that for |
| 2 | them and allow them to do it much more cheaply |
| 3 | and simply by using an inventory management |
| 4 | system which would accommodate third-party |
| 5 | products as well as Fisher's product and allow |
| 6 | them to essentially run their own storeroom |
| 7 | for difficulty that is what that is all |
| 8 | referring to. |
| 9 | Q.  This first sentence that talks about the |
| 10 | Fisher Catalog and information on 100,000 |
| 11 | products, you said that at one point.  You |
| 12 | said it was a hard-backed document, book.  Was |
| 13 | this something that would be like as big as a |
| 14 | phone book? |
| 15 | A.  It was three inches thick.  It was -- it took |
| 16 | an enormous effort to produce it every year. |
| 17 | I guess they did it every year.  Maybe |
| 18 | every -- I can't remember.  I think it was |
| 19 | every year.  Maybe every couple of years and |
| 20 | photographed all of the products and described |
| 21 | all of the products and it was considered to |
| 22 | be a very useful document for most lab |
| 23 | managers. |
| 24 | Q.  Could you please turn to page L0383584.  It is |
| 25 | maybe the third to last page in the exhibit. |

| | 24 |
|---|---|
| 1 | paragraph in the earlier 10-K; is that |
| 2 | correct? |
| 3 | A.  Yes, it does. |
| 4 | Q.  Is it, again, consistent with your |
| 5 | understanding of the Fisher RIMS system that |
| 6 | was on sale in 1992? |
| 7 | A.  It is. |
| 8 | Q.  Was it Fisher's policy from 1992 to 1994 to |
| 9 | provide accurate verified information in its |
| 10 | 10-K filing to the SEC? |
| 11 | A.  It was. |
| 12 | Q.  And was that important to Fisher? |
| 13 | A.  I assume it was.  I don't -- of course, it is |
| 14 | a public -- liability document filed on behalf |
| 15 | of a public company.  I assume it was all |
| 16 | important to them. |
| 17 | Q.  That is required by the SEC; is that correct? |
| 18 | A.  The filing requirement, yes. |
| 19 | Q.  Could you please turn to what has been marked |
| 20 | as Lawson Exhibit 41 L0343632. |
| 21 | A.  Yes. |
| 22 | Q.  L0343632 to L0343667. |
| 23 | A.  That is right. |
| 24 | Q.  What is this document? |
| 25 | A.  It looks like an annual report, the 1994 |

25

1    annual report at Fisher Scientific
2    International.
3    Q.   What is an annual report?
4    A.   Public companies typically create an annual
5    report for shareholder consumption that is --
6    that doesn't contain all of the required
7    elements of a 10-K but contains the same
8    financial -- general financial information and
9    a little more description of the company for
10   the benefit of the shareholders.
11   Q.   Did you have any responsibility while you were
12   at Fisher Scientific with filings like annual
13   reports?
14   A.   I didn't, no.  I wasn't responsible for the
15   corporate filing despite my title because at
16   some point in time Fisher Scientific, the
17   operating company, became a subsidiary of
18   Fisher Scientific International, the public
19   parent company.
20   Q.   Was it typical for you to see Fisher's annual
21   reports?
22   A.   At some point, yes.
23   Q.   Could you please turn to L0343635.
24   A.   Okay.
25   Q.   Do you see that this document appears to be

26

1    entitled "Letter to shareholders"?
2    A.   I do.
3    Q.   Do you see the third column maybe a third of
4    the way down it starts with SupplyLink?
5    A.   I see that.
6    Q.   Do you see the paragraph below it and then the
7    one below that that starts, "The latest of
8    these customer-friendly computer systems,
9    SupplyLink, is fully interactive and combines
10   electronic sourcing with electronic purchasing
11   and inventory management.  The electronic
12   sourcing" -- "electronic sourcing permits the
13   customer --
14       MR. ROBERTSON:  You may want to start
15   over, Rachel.
16       MS. HUGHEY:  Okay.  I will start over.
17   Q.   "The latest of these customer-friendly
18   computer systems, SupplyLink, is fully
19   interactive and combines electronic sourcing
20   with electronic purchasing and inventory
21   management.  Electronic sourcing permits the
22   customer using a personal computer to select
23   products from the Fisher Catalog and other
24   electronically indexed catalogs." Do you see
25   that paragraph?

27

1    A.   I do.
2    Q.   Is the Fisher Catalog the same 10,000 product,
3    phone book sized document that we were talking
4    about before?
5    A.   Yes, it could be more products than that but,
6    yes.
7    Q.   That is 100,000 maybe or more?
8    A.   That is right.
9    Q.   What is electronically indexed catalogs?
10   A.   I don't know.  Just what I would say I
11   think, anything that can be accessed
12   electronically in a way that can be read by
13   the system that they are selling, the
14   SupplyLink system.
15   Q.   With respect to SupplyLink, is it your
16   understanding that it combined electronic
17   sourcing, electronic purchasing and inventory
18   management?
19       MR. ROBERTSON:  Objection, leading.
20   A.   I have no reason to believe --
21   Q.   "Introduced in 1992 as Fisher Rims,
22   Requisition and Inventory Management System,
23   now widely used by our major customers."  Do
24   you see that sentence?
25   A.   I do.

28

1    Q.   Is it your understanding that this is the same
2    Fisher RIMS that we were talking about before
3    when we were discussing the trademark
4    application?
5    A.   It is.
6    Q.   Is it your understanding that the Fisher RIMS
7    contained the electronic purchasing and
8    inventory management in 1992?
9       MR. ROBERTSON:  Objection, leading.
10   A.   It is.
11   Q.   Do you see the third sentence down it says,
12   "These elements include interactive
13   procurement, automatic replenishment of stock
14   rooms, electronic invoicing and related
15   functions, all of them paperless."
16   A.   I see that.
17   Q.   Is it your understanding that these are the
18   elements that were in that product?
19       MR. ROBERTSON:  Same objection.
20   A.   I described to you what I think my
21   understanding of the use of the product and I
22   have no reason to believe that this specific
23   description of the elements is not accurate?
24   Q.   Okay, so all of these filings, RIMS trademark
25   application filed with the US Patent and

O'Loughlin, Johanna  4/26/2010  12:00:00 PM

29

1  Trademark Office in 1993 and that 1992 and
2  1993 10-K reports filed with the SEC appear to
3  indicate that the RIMS product was on sale at
4  least as of August of 1992?  Is that your
5  understanding?
6      MR. ROBERTSON:  Objection, leading.
7  A.  I have no reason to believe any of these
8  documents is inaccurate.
9      MS. HUGHEY:  Thank you, Ms. O'Loughlin.  I
10  have no further questions.
11          -----
12      CROSS-EXAMINATION
13  BY MR. ROBERTSON:
14  Q.  Ms. O'Loughlin, do you want to take a short
15  break or are you --
16  A.  No, let's just go ahead and keep going.
17  Q.  Let me ask a background question.  I
18  understand you got your JD from the University
19  of Pittsburgh in 1973; is that right?
20  A.  That is right.
21  Q.  What is your undergraduate degree in?
22  A.  I have a BA in economics from Smith College,
23  1968.
24  Q.  It is safe to say that you are not a computer
25  scientist, correct?

30

1  A.  That is correct.
2  Q.  And you are not an electrical engineer?
3  A.  No, I am not.
4  Q.  And the technology involving this RIMS system
5  that we have been talking about toady, this
6  electronic sourcing system that is the subject
7  of this litigation is not really your strong
8  suit?  Fair to say?
9  A.  I didn't think I was asked a lot of technology
10  questions.  I thought I was just asked
11  features and benefits questions of a product.
12  Q.  You are absolutely right.  You weren't asked a
13  lot of technology questions.  I am just trying
14  to establish that that is not your area of
15  expertise?
16  A.  What is not?  IT, technology, no, it is not my
17  area of expertise.
18  Q.  That is all I wanted to establish.  You were
19  asked about these annual reports and I
20  understood you to say that that wasn't one of
21  your responsibilities as a general counsel
22  during the time period we are talking about
23  from 1992 to 1994; is that correct?
24  A.  You are correct.
25  Q.  Essentially you were asked basically to

31

1  confirm that statements made in these annual
2  reports to your knowledge were not inaccurate,
3  fair?
4  A.  Right, because they conform to my
5  understanding of the product that the company
6  was purveying.
7  Q.  Understood.  Are you aware that this RIMS
8  system that we are talking about was patented?
9  A.  I just have no present recollection of that.
10  Q.  I am sorry.  You have no present recollection
11  of it?
12  A.  I just don't have any present recollection of
13  it.
14  Q.  Fair enough.  I understand.  The RIMS patent
15  issued or was applied for back in 1993.  That
16  is 17 years ago.  That is a long time to go
17  back.  You wouldn't consider yourself an
18  expert on the functionality, features and
19  capability of the RIMS system, would you?
20  A.  No.
21  Q.  You would agree with me that you would defer
22  to the inventors who were former employees of
23  Fisher Scientific on those futures and
24  functionality, correct?
25      MS. HUGHEY:  Objection, leading.

32

1      MR. ROBERTSON:  It is cross-examination,
2  Rachel.
3  A.  They might have a conflict, so I don't know
4  that I would want to totally rely on their
5  opinion.  You might also want to know what the
6  patent lawyer who actually prepared these
7  documents thought.  He might be a more
8  independent witness.
9  Q.  All I am suggesting is that inventors of the
10  RIMS systems are more knowledgeable as to its
11  features and capabilities as you are; isn't
12  that right?
13  A.  I would say they are more knowledgeable but
14  that doesn't mean that I would credit their
15  testimony.  You asked me a question about
16  whether I would rely on it and I would be
17  interested to know what they thought about it
18  and they are more expert than I am.  I don't
19  purport to be an expert on it.  I
20  authenticated my signature.
21  Q.  Let me ask you this, Ms. O'Loughlin.  What did
22  you do to prepare for today's deposition?
23  A.  What did I do?
24  Q.  Yes.
25  A.  I just looked over these documents generally

O'Loughlin, Johanna   4/26/2010   12:00:00 PM

33

1  that were sent to me.
2  Q.  Did you speak to Ms. Hughey?
3  A.  Not about -- not about the merits at all, just
4  about what are these documents and do I have
5  to copy them or will the court reporter copy
6  them.
7  Q.  On how many occasions did you speak to Ms.
8  Hughey?
9  A.  Maybe twice to set up the time and to confirm
10  the time.  After I got calls from you I
11  checked with her and then this morning I sent
12  her the phone number of the conference room
13  and she called me to confirm that we were all
14  present in the conference room after the
15  reporter and the videographer were her.
16  Q.  Did you speak to her at all about the
17  substance of any of these documents she has
18  asked you about this morning?
19  A.  No.
20  Q.  I called you on three occasions, didn't I, Ms.
21  O'Loughlin?
22  A.  I was out of the office.  I did return your
23  call, but you were out of the office.
24  Q.  I didn't get any message from you.
25  A.  I left a message.

34

1  Q.  I called you on three occasions.  We never
2  spoke, did we?
3  A.  We did not.
4  Q.  Are you aware that during your tenure as
5  general counsel Fisher Scientific filed for an
6  application on the RIMS system?
7  A.  You mean a patent application or a
8  trademark --
9  Q.  A patent application.
10  A.  I just do not recall.  We filed lots of
11  applications for different products and I
12  just don't remember that one specifically.
13  The lawyer who worked for me was a patent and
14  trademark lawyer.  He took the laboring for
15  all of those things.
16  Q.  That is Mr. Dornburg, correct?
17  A.  Alan Dornburg.
18  Q.  And you are aware that during the time of your
19  tenure as general counsel Fisher Scientific
20  applied for a patent for an electronic
21  sourcing system and method in August of 1994?
22  A.  I just don't have any recollection of specific
23  applications.
24  Q.  Fair enough.  Was the company in the habit of
25  filing for patent applications that it thought

35

1  were not new, non-obvious and useful?
2  A.  You know, that -- I would say phrased that way
3  that sounds pretty cynical.  I am sure they
4  applied for things where they weren't sure it
5  would be granted or weren't sure whether they
6  would have to narrow their claims at a later
7  date and all of those sorts of things but I
8  think because of the expense involved there
9  would be some expectation that they would
10  achieve their goal of getting some kind of
11  protection.
12  Q.  Were you aware that there was a patent granted
13  by the patent office for the RIMS system?
14  A.  No.
15  Q.  Were you aware that there were three patents
16  granted by the patent office for the
17  electronic sourcing system?
18  A.  I was not.
19  Q.  Would the company expend resources seeking to
20  obtain intellectual property protection for
21  inventions that it thought was worthless?  Is
22  that part of the policy of the company?
23  A.  Well, I can't speak for others but it doesn't
24  make much sense to me.
25  Q.  You, as the general counsel, wouldn't be

36

1  authorizing your subordinate, Mr. Dornburg, to
2  go file applications that you thought were a
3  complete waste of time and money, would you?
4  A.  I wouldn't.  The only thing I have seen with
5  my signature on it is the trademark
6  application and I certainly would have not
7  authorized filing it if I thought it was
8  worthless.
9  Q.  Understood, but as general counsel at the time
10  from the -- just focusing on the 1992 to 1996
11  period you weren't authorizing Mr. Dornburg to
12  file applications for patents at the patent
13  office that the company thought had no value,
14  correct?
15  A.  I wasn't, but I don't know if I was involved
16  in the patent applications or not since you
17  haven't shown me anything with my signature on
18  it.
19  Q.  I am not asking you about what you had your
20  signature on.  As general counsel, was it the
21  policy of the company to file applications to
22  the patent office that the company thought had
23  no value?  Yes or no?
24  A.  I would not have executed such a policy, no.
25  Q.  I didn't think you would.  All right.  Let me

37

1  ask you about some of these exhibits if you
2  have them in front of you.  Let's start out
3  with -- first you were asked some questions
4  about Exhibit No. 40, which is this trademark
5  application that bears your signature in
6  various places.  Do you recall that?
7  A.  I do.
8  Q.  Do you have it in front of you?
9  A.  I do.
10  Q.  Let's just skip over some of the stuff and go
11  right to the brochure.  You called it a
12  marketing brochure.  Do you recall that?  That
13  starts at page 595 at the bottom right.
14  A.  Okay.
15  Q.  It is a marketing brochure, correct?
16  A.  That is what it looks like.
17  Q.  Is it not a technical document, right, like a
18  manual that would help you understand the
19  functioning of the Fisher RIMS system,
20  correct?
21  A.  I assume not.  It looks like a commercial
22  brochure to me.
23  Q.  For consumption of potential --
24  A.  Customers.
25  Q.  -- customers of the RIMS system, correct?

38

1  A.  That is my understanding.
2  Q.  You were asked some questions about some
3  bullet points that appear at page -- it ends
4  with 598.  Do you recall that?
5  A.  I do.
6  Q.  You have no independent knowledge as to
7  whether or not the RIMS system in this period
8  of time say in 1992 or so had that
9  functionality, correct?
10  A.  I actually think that it had this genre of
11  functionality.  That is what it was designed
12  to do.  It was designed to take over.  I know
13  what you are asking me but my understanding
14  was that the RIMS system was designed to take
15  over the inventory storeroom of large
16  customers and to manage it from the beginning
17  to the end, from purchase to the lab bench for
18  the customer and that it needed features like
19  these to be effective.  I have no specific
20  knowledge of each one of these things in
21  detail, no.
22  Q.  Fine.  Thank you.  You just confirmed for me
23  on page 598 the documentation that we are
24  looking at with these bullet points Ms. Hughey
25  asked you about, there is no mention at all

39

1  about catalogs, correct?
2  A.  There may not have --
3  Q.  Does the word catalog appear there?
4  A.  Does the word catalog appear, no, but that is
5  what they would be accessing would be the
6  catalog system.
7  Q.  The Fisher Catalog?
8  A.  I think it was intended to be able to manage
9  other items otherwise it wouldn't have been
10  able to replace --
11  Q.  Does it have any discussion of the word
12  catalog anywhere on this page, yes or no?  Can
13  you answer that fairly?
14  A.  I would have to look.  It says, "Consolidates
15  all supplier activity including third-party
16  and administrative purchases."  It doesn't
17  have the word catalog, but that is my
18  understanding.
19  Q.  Fair enough.  How many iterations did the
20  Fisher RIMS system go through?
21  A.  I don't know.
22  Q.  The inventors say it went through many
23  iterations.  Do you know any of the trade
24  names that the iterations went through?
25  A.  I don't know.

40

1  Q.  Do you know how the features and functionality
2  changed during the period of time from 1992 to
3  1995, for example?
4  A.  I do not.
5  Q.  Let's focus on Exhibit No. 43 for a moment if
6  we could.  That was the annual report that you
7  said you had no responsibility for?
8  A.  Right.  I have it.
9  Q.  The page that ends with the page No. 589?
10  A.  Okay.  I have it.
11  Q.  You were asked about this entry italicized
12  "Computer order-entry system," do you see
13  that?
14  A.  I do.
15  Q.  Can you tell me where in this paragraph it
16  discusses the capabilities searching multiple
17  vendor catalogs?
18  A.  I don't see it there.
19  Q.  Fair enough.  Next paragraph, the Fisher
20  Catalog.  Is there any other catalog other
21  than the Fisher Catalog mentioned in that
22  paragraph?
23  A.  The paragraph is entitled "The Fisher
24  Catalog," so, no.
25  Q.  Fair enough.  Is it Exhibit No. 42 was also an

O'Loughlin, Johanna  4/26/2010  12:00:00 PM

|  | 41 |
|---|---|
| 1 | annual report.  I took these out of order. |
| 2 | A.  That is okay.  I have it. |
| 3 | Q.  The page that ends 550. |
| 4 | A.  I have it. |
| 5 | Q.  Computerized order-entry systems.  The only |
| 6 | mention there is the Fisher Catalog, correct? |
| 7 | A.  Yes, it is. |
| 8 | Q.  The next paragraph, which you have informed me |
| 9 | is entitled The Fisher Catalog, it doesn't |
| 10 | discuss any other vender catalogs in that |
| 11 | paragraph, correct? |
| 12 | A.  It doesn't, because this is a general |
| 13 | description of the company's business and not |
| 14 | everybody used computerized order-entry |
| 15 | systems. |
| 16 | Q.  Have you had the opportunity to review the |
| 17 | patents that was issued in this lawsuit? |
| 18 | A.  No. |
| 19 | Q.  You didn't have any opportunity to review the |
| 20 | Fisher RIMS patent which is 5712989 that was |
| 21 | issued in January of 1998, correct? |
| 22 | A.  No. |
| 23 | Q.  You were asked about Exhibit No. 41 which is |
| 24 | the annual report from 1994.  Do you have that |
| 25 | in front of you? |

|  | 43 |
|---|---|
| 1 | Q.  All right.  Fair enough.  Let's just get this |
| 2 | clear on the record.  Independently you have |
| 3 | no knowledge one way or the other whether |
| 4 | these statements are truthful or not? |
| 5 | A.  Right.  I don't have any detailed knowledge. |
| 6 | I only know generally what I described to you |
| 7 | about Fisher Catalog, about RIMS and about the |
| 8 | company's practices.  The only thing I can say |
| 9 | for certain is that looks like my signature on |
| 10 | the trademark application and my expectation |
| 11 | would have been then and it is now that it was |
| 12 | properly prepared. |
| 13 | Q.  I understand that, so just focusing on the |
| 14 | annual reports right now.  I just want to make |
| 15 | sure it is clear on the record.  When you were |
| 16 | asked about these statement, your response is |
| 17 | that it was the policy of the company not to |
| 18 | make misleading statements in annual reports, |
| 19 | fair enough? |
| 20 | A.  That would be my expectation, yes. |
| 21 | Q.  As you sit here today in 2010, you have no |
| 22 | independent knowledge one way or the other |
| 23 | whether these statements are true or not, |
| 24 | correct? |
| 25 | A.  Correct. |

|  | 42 |
|---|---|
| 1 | A.  I have it. |
| 2 | Q.  You were asked about this SupplyLink |
| 3 | paragraph.  It appears at page 635 if you want |
| 4 | to turn to that. |
| 5 | A.  I have that. |
| 6 | Q.  Now, were you aware that SupplyLink was an |
| 7 | evolution of the RIMS system that added new |
| 8 | capabilities and features that the company |
| 9 | then applied for a patent? |
| 10 | A.  I have no knowledge of any of those things you |
| 11 | described, no independent knowledge.  I only |
| 12 | know what I read here. |
| 13 | Q.  That is fair enough.  You were asked to |
| 14 | confirm though for Ms. Hughey the accuracy of |
| 15 | statements in this document, correct. |
| 16 | A.  I don't think I -- I think I was careful not |
| 17 | to say that I have any independent knowledge |
| 18 | of the accuracy but only -- I think I was |
| 19 | asked whether I have any reason to doubt their |
| 20 | accuracy and I don't.  I wasn't involved in |
| 21 | the preparation of the -- or approval of the |
| 22 | document but they are public documents and I |
| 23 | was asked whether I would believe that such |
| 24 | documents -- that the company's policy would |
| 25 | be to be accurate and I said, yes. |

|  | 44 |
|---|---|
| 1 | Q.  But nevertheless, at page 635 under this |
| 2 | heading "SupplyLink," the company does |
| 3 | represent that SupplyLink is the latest of |
| 4 | customer-friendly computer systems, correct? |
| 5 | A.  Yes. |
| 6 | Q.  And that it combines electronic sourcing with |
| 7 | electronic purchasing and inventory |
| 8 | management, correct? |
| 9 | A.  Yes. |
| 10 | Q.  You have no reason to doubt the accuracy of |
| 11 | that statement; isn't that true? |
| 12 | A.  That it combines sourcing with purchasing and |
| 13 | inventory management.  I always viewed it as |
| 14 | kind of a complete inventory management |
| 15 | system. |
| 16 | Q.  It says, "SupplyLink, the latest of these |
| 17 | customer-friendly systems."  Isn't that what |
| 18 | the company is representing? |
| 19 | A.  Right. |
| 20 | Q.  Do you know that in August of 1994 the company |
| 21 | filed for a patent application on these latest |
| 22 | of customer-friendly computer systems?"  Are |
| 23 | you aware of that fact? |
| 24 | A.  I am not -- I am really not aware of any of |
| 25 | the patent -- |

**45**

1  Q.  That is fair enough.  Would the company have
2      filed a patent application in August of 1994
3      on the latest of customer-friendly computer
4      systems, SupplyLink, if it didn't think it had
5      something that was worth patenting?  Yes or no
6      if you can answer that question fairly.
7  A.  I don't know what they filed the patent
8      application on whether it was --
9  Q.  Let me restate the question then.  Assume as a
10     fact that in August of 1994 Fisher Scientific
11     filed an application for a system that
12     combined the latest of computer-friendly
13     consistence including electronic sourcing,
14     electronic purchasing and inventory
15     management; my question is, would the company
16     have filed that application if it thought it
17     had no value?
18  A.  I think that I don't really understand the
19     question.  I am not going to adopt market
20     speak of "the latest of customer-friendly
21     computer systems."  They would have included
22     those elements that they thought they could
23     get a patent on whether they were the latest
24     or the original.  I can't speak to it.
25         I don't think I want to put those words

**46**

1      in my mouth that they were the latest.  They
2      were whatever elements they thought they would
3      be able to get the patent office to grant them
4      a patent on and I don't know at what point in
5      time those elements came into being.  I can't
6      rely on a marketing description to make the
7      statement that you want me to make.  I have
8      never seen what claims they included in the
9      patent so I don't know.
10  Q.  Ms. O'Loughlin, this isn't a marketing
11     brochure.  This is an annual report.  Ms.
12     Hughey asked you if this was accurate and you
13     said, "Yes, the company had no reason to doubt
14     otherwise."  Are you telling me now that this
15     is marketing puffery or is this accurate
16     statements given to the shareholders of a
17     publicly held company?
18  A.  I don't think I like your tone, but --
19  Q.  I want to know whether this is an accurate
20     statement or this is a marketing statement.
21     Those are your words.  This is a statement to
22     an annual report to your shareholders.  Is it
23     true or is it false?
24         MS. HUGHEY:  Now, I am going to object.
25  A.  If you want to testify, it is okay with me.

**47**

1  Q.  You were asked if this was accurate and you
2      said yes.
3  A.  No.
4  Q.  Stick to you testimony.
5         MS. HUGHEY:  I am going to continue to
6      object.  This is argumentative.
7         MR. ROBERTSON:  No, it is not.  It is
8      cross-examination, Rachel.
9  Q.  Is this statement correct or is it not
10     correct, Ms. O'Loughlin?
11  A.  I believed I have asked -- you have asked it
12     and I have answered it several times.  I did
13     not participate in this and I have no reason
14     to believe that it isn't accurate but it is
15     not -- it is marketing speak, "The latest of
16     these customer-friendly computer systems" and
17     I am not willing -- and it says nothing about
18     a patent here, so I am not willing to draw the
19     connection that you want me to draw that only
20     the latest somehow of some claims got into a
21     patent application in 1994.  I simply cannot
22     make that conclusion for you no matter how
23     much you want me to make that conclusion.
24  Q.  Let me ask you this.  Are you aware that the
25     company filed an application for --

**48**

1         MS. HUGHEY:  That has been asked and
2      answered.
3  Q.  Are you aware that the company filed an
4      application in August of 1994 for an
5      electronic sourcing system?
6  A.  You asked me that.  I answered it.
7  Q.  And what is your answer?
8  A.  My answer was that I don't know anything about
9      a patent application or the claims included in
10     a patent application.
11  Q.  You can't speak to that at all, correct?
12  A.  I cannot.
13         MR. ROBERTSON:  Thank you.  No further
14     questions.
15         -----
16         REDIRECT EXAMINATION
17  BY MS. HUGHEY:
18  Q.  Ms. O'Loughlin, I have one follow-up briefly.
19     My understanding from our conversation was
20     that you did have some independent knowledge
21     of the Fisher Catalog and Fisher RIMS; is that
22     correct?
23         MR. ROBERTSON:  Objection, leading.
24  A.  I have general independent recollection of the
25     issues related to the catalog and the

O'Loughlin, Johanna  4/26/2010  12:00:00 PM

49

1    existence of Fisher RIMS.  No, I have no
2    independent recollection of any specifics
3    about either one.
4    Q.  And the questions that I asked you today to
5    the extent that I asked you is it your
6    understanding that RIMS had this and you said
7    yes, is that based on your independent
8    recollection?
9         MR. ROBERTSON:  Objection, leading.
10   A.  Whatever I said I said.
11        MS. HUGHEY:  I have no further questions.
12        MR. ROBERTSON:  We are concluded.  Thank
13   you.
14        VIDEOGRAPHER:  We are now going off the
15   record.  This time indicated on the screen is
16   11:27 a.m.
17        (Whereupon, the above-entitled matter was
18   concluded at 11:27 a.m., this date.)
19             -----
20
21
22
23
24
25

50

1    COMMONWEALTH OF PENNSLVANIA  )  CERTIFICATE
2    COUNTY OF ALLEGHENY          )  SS:
3
4         I, Julie Casella, a Court Reporter and Notary Public
5    in and for the Commonwealth of Pennsylvania, do hereby
6    certify that the witness, JOHANNA G. O'LOUGHLIN, was by
7    me first duly sworn to testify to the truth, the whole
8    truth, and nothing but the truth; that the foregoing
9    deposition was taken at the time and place stated herein;
10   and that the said deposition was recorded
11   stenographically by me and then reduced to printing under
12   my direction, and constitutes a true record of the
13   testimony given by said witness.
14        I further certify that the inspection, reading and
15   signing of said deposition were waived by counsel for the
16   respective parties and by the witness.
17        I further certify that I am not a relative or
18   employee of any of the parties, or a relative or employee
19   of either counsel, and that I am in no way interested
20   directly or indirectly in this action.
21        IN WITNESS WHEREOF, I have hereunto set my hand and
22   affixed my seal of office this 30th day of April 2010.
23
24        _____
25             Notary Public

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 9th day of August, 2010, I will electronically file the foregoing

**PLAINTIFF EPLUS'S OBJECTIONS TO DEFENDANT'S DEPOSITION
DESIGNATIONS AND SUMMARY OF THE DEPOSITION OF JOHANNA
O'LOUGHLIN AND COUNTER-DESIGNATIONS**

with the Clerk of Court using the CM/ECF system which will then send a notification of such filing (NEF) via email to the following:

Daniel McDonald, *pro hac vice*
William D. Schultz, *pro hac vice*
Rachel C. Hughey, *pro hac vice*
Joshua P. Graham, *pro hac vice*
Andrew Lagatta, *pro hac vice*
Merchant & Gould P.C.
3200 IDS Center
80 South Eighth Street
Minneapolis. MN 55402
Telephone: (612) 332-5300
Facsimile: (612) 332-9081
lawsonscrvicc@)merchantgould.com

Robert A. Angle (VSB# 37691)
Dabney J. Carr, IV (VSB #28679)
Troutman Sanders LLP
P.O. Box 1122
Richmond, VA  23218-1122
Telephone:  (804) 697-1238
Facsimile:  (804) 698-5119
robert.angle@troutmansanders.com
dabney.carr@troutmansanders.com

*Counsel for Defendant Lawson Software, Inc.*

*/s/*
David M. Young (VSB #35997)
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4000
Facsimile:   (202) 346-4444
dyoung@goodwinprocter.com

LIBW/1736775.2