**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | | |
|---|---|---|
| *e*PLUS, INC., | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No. 3:09-CV-620 (REP)** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **LAWSON SOFTWARE, INC.,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF *e*PLUS'S OBJECTIONS TO DEFENDANT'S DESIGNATIONS AND
SUMMARY OF THE DEPOSITION OF
LAURENE McENENY AND COUNTER-DESIGNATIONS**

Plaintiff, *e*Plus, Inc. ("*e*Plus"), through counsel, hereby submits the following general and specific objections to Defendant Lawson Software, Inc. ("Defendant's") Deposition Designations and summary from the deposition of Laurene McEneny and offers the following counter-designations:

**General Objections**

1.  Undue prejudice as to testimony concerning the P.O. Writer Version 10.0. Defendant solicited testimony as to whether the P.O. Writer Version 10.0 software was in public use or on sale before the filing date of the patents-in-suit. The P.O. Writer system was a collection of separately licensed modules. Defendant's expert opines that several of these separately licensed modules must be licensed together to allegedly invalidate the patents-in-suit. The testimony gleaned from Defendant's counsel's questioning as to whether the P.O. Writer Version 10.0 system was in public use or on sale in general is irrelevant and unduly prejudicial since this testimony does not qualify whether any systems allegedly in use or on sale contained the necessary modules.

2.      <u>Seeks legal conclusion</u>.  Defendant repeatedly asked the witness whether the P.O.

Writer system met certain limitations disclosed in the patents-in-suit (*e.g.* whether the P.O.

Writer systems was an "electronic sourcing system").  The questioning improperly seeks expert

testimony from a lay witness.  Ms. McEneny testified that she is not an attorney, does not know

what claims of the patents-in-suit are being asserted and has not studied the asserted claims.

**<u>Specific Objections</u>**

| Defendant's Designations | *e*Plus's Objections (designations) | *e*Plus's Objections (summary) |
|---|---|---|
| 4:8-12 | | |
| 17:24 – 19:10 | 401/403 | Incomplete summary.  (Witness also testified that subsequent versions of the software were released over time.) |
| 19:17-22 | 401/403 | |
| 20:8-15 | 106.  Incomplete designation.  Designation fails to include witness' entire answer.  (106) | Mischaracterizes witness' testimony.  (Witness indicated she would need to double-check dates.) |
| 23:3-8 | | |
| 24:3-4; 24:11 | Incomplete designation.  Designation fails to include witness' entire answer (106). | Mischaracterizes witness' testimony.  Witness indicated she would need to double-check dates.) |
| 24:22-24 | | |
| 25:11-26:12 | Improperly includes attorney objection. | Incomplete summary.  (Witness testified that customers would have to license the purchasing module and then license other modules as needed.) |
| 27:8 – 29:8 | | |
| 29:12 – 30:13 | | |
| 31:1-24 | | |
| 31:25 – 33:14 | | |
| 34:2-18 | | |
| 35:7-11; 35:14 – 36:22 | | Incomplete summary.  Fails to summarize witness' testimony. |
| 38:18 – 39:14; 39:20 – 40:12 | | Incomplete summary.  Fails to summarize witness' testimony. |
| 41:4-15 | | Mischaracterizes testimony (Ms. McEneny testified that the |

2

| Defendant's Designations | *e*Plus's Objections (designations) | *e*Plus's Objections (summary) |
|---|---|---|
| | | Catalog ID is only part of the item master) |
| 41:16-18; 41:21 – 42:11 | | |
| 43:13-19 | | Mischaracterizes testimony (Ms. McEneny clarified later in the deposition that key word searches could only be conducted on the item description field (53:17 – 54:15)) |
| 46:7-17 | | |
| 47:21 – 48:1 | | |
| 48:9-24 | | |
| 49:16-19 | | |
| 50:18 – 51:12 | | |
| 53:17-19; 53:22-23 | Incomplete designation.  Designation fails to include witness entire answer. (106). | Incomplete summary.  (Witness testified that there is no catalog ID in the vendor master.) |
| 53:25 – 54:15 | | Incomplete summary.  (Witness testified that a user could not search an extended item description and that the user-defined fields were not searchable.) |
| 56:21-25 | | |
| 72:7-20 | | |
| 74:9-15; 74:18 – 75:9 | Vague and ambiguous (as to "the user selects the vendor themselves" 611 (compound) | |
| 83:3 – 84:23 | | |
| 94:5-10; 95:4 – 96:5 | | Incomplete summary.  Fails to summarize witness' testimony. |
| 106:7 – 107:20 | Improperly designates attorney objection. | |
| 109:9-12 | | |
| 109:17 – 111:3 | Vague and ambiguous (as to "new releases automatically"); 611; 602 | Mischaracterizes witness' testimony. |
| 111:8 – 112:6 | 401/403 (timeframe); vague and ambiguous as to version of modules | Summary is vague and ambiguous as to versions. |
| 112:12-22 | | Mischaracterizes testimony. (Witness stated that Ex. 97 is a page of notes from the contract management system and the second page is a P.O. Writer |

3

| Defendant's Designations | *e*Plus's Objections (designations) | *e*Plus's Objections (summary) |
|---|---|---|
| | | Plus license agreement with Kirkland & Ellis.) |
| 113:11 – 115:21 | Vague and ambiguous (as to whether the document "reflect[s] when PO Writer Version 20 was on sale"); 401/403 (does not include alleged anticipatory modules); 602 | Mischaracterizes testimony. (Witness testified that customer licensed the purchasing module, the tax interface of the version 10 software, CSP rollout version. Additionally, witness' did not testify that version 10 was used by customers before August 10, 1993.  She stated that she would need to check support notes to determine this.) |
| 116:1 – 117:1 | Vague and ambiguous (as to "volumes"); 611 | |
| 117:2-4; 117:8 – 118:25 | 401/403 (relevance, corroboration) | Mischaracterizes testimony. (Ms. McEneny's testimony confirms only that the inventory control module manual was published prior to August 10, 1993.) |
| 119:8 – 120:4 | 401/403 (relevance, corroboration) | |
| 120:8 – 121:15 | 401/403 (relevance, corroboration) | Mischaracterizes testimony (Ms. McEneny's testimony confirms only that the ad hoc manual was released in 1993, not that all modules of version 10 were released) |
| 121:20 – 122:1 | 401/403 (relevance, corroboration); 611 | Mischaracterizes testimony (Ms. McEneny's testimony confirms only that the ad hoc manual was released in 1993, not that all modules of version 10 were released) |
| 122:6-15; 122:19 – 123:3 | 401/403 (relevance, corroboration) | Mischaracterizes testimony (Ms. McEneny's testimony confirms only that the bar code interface manual was released in 1993, not that all modules of version 10 were released prior to that date) |
| 123:8 – 124:25 | 401/403 (relevance, corroboration) | Mischaracterizes testimony (Ms. McEneny's testimony confirms only that the bar code interface manual was released in 1993, not |

4

| Defendant's Designations | *e*Plus's Objections (designations) | *e*Plus's Objections (summary) |
|---|---|---|
| | | that all modules of version 10 were released prior to that date) |
| 125:4-21 | 401/403 (relevance, corroboration) | Mischaracterizes testimony (Ms. McEneny's testimony confirms only that the EDI interface manual was released in 1993, not that all modules of version 10 were released) |
| 126:1-24 | 401/403 (relevance, corroboration) | |
| 127:16 – 128:5 | 401/403 (relevance, corroboration) | Mischaracterizes testimony (Ms. McEneny's testimony confirms only that the manual for the fax module was released in 1993, not that all modules for version 10 were released) |
| 128:19 – 129:16 | 401/403 (relevance, corroboration) | Mischaracterizes testimony (Ms. McEneny's testimony confirms only that the manual for the receiving module was released in 1993, not that all modules for version 10 were released) |
| 129:21 – 130:22 | | Mischaracterizes testimony (Ms. McEneny's testimony confirms only that the requisition interface module was released in 1993, not that all modules for version 10 were released) |
| 131:1-24 | 401/403 (relevance, corroboration) | Mischaracterizes testimony (Ms. McEneny's testimony confirms only that the security administrator's guide was released in 1993, not that all modules for version 10 were released) |
| 132:3-18 | 401/403 (relevance, corroboration) | Mischaracterizes testimony (Ms. McEneny's testimony confirms only that the stock requisitioning and kitting system manual was released in 1993, not that all modules for version 10 were released) |
| 132:22 – 133:15 | 401/403 (relevance, corroboration) | Mischaracterizes testimony (Ms. McEneny's testimony confirms only that the stock requisitioning |

| Defendant's Designations | *e*Plus's Objections (designations) | *e*Plus's Objections (summary) |
|---|---|---|
| | | and kitting module was released in 1993, not that all modules version 10 were released) |
| 133:20-21 | | Mischaracterizes testimony (Ms. McEneny's testimony confirms only that the supplier performance module was released in 1993, not that all modules for version 10 were released) |
| 133:25 – 135:10 | 401/403 (relevance, corroboration) | Mischaracterizes testimony (Ms. McEneny's testimony confirms only that the supplier performance module was released in 1993, not that all modules for version 10 were released) |
| 135:11 – 137:4 | 401/403 (relevance, corroboration) | Mischaracterizes testimony (Ms. McEneny's testimony confirms only that the supplier performance module was released in 1993, not that all modules for version 10 were released) |
| 137:8-24 | 401/403 (relevance, corroboration) | Mischaracterizes testimony (Ms. McEneny's testimony confirms only that the system administrator's guide was released in 1993, not that all modules for version 10 were released) |
| 138:4-17 | 401/403 (relevance, corroboration) | Mischaracterizes testimony (Ms. McEneny's testimony confirms only that the system administrator's guide was released in 1993, not that all modules for version 10 were released) |
| 138:22 – 139:12 | 401/403 (relevance, corroboration) | Mischaracterizes testimony (Ms. McEneny's testimony confirms only that the system administrator's guide was released in 1993, not that all modules for version 10 were |

6

| Defendant's Designations | *e*Plus's Objections (designations) | *e*Plus's Objections (summary) |
|---|---|---|
| | | released) |
| 139:16 – 140:11 | 602; authenticity | Mischaracterizes testimony (Ms. McEneny's testimony confirms only that the system administrator's guide was released in 1993, not that all modules for version 10 were released) |
| 140:20 – 141:11 | | |
| 142:3-17; 143:6-18 | 403 (corroboration) | |
| 144:20 – 145:19 | Vague and ambiguous (as to "a set of volumes"); 602; 701-704 (inappropriate expert testimony); improper designation of attorney objections | Incomplete summary - (Witness testified that customer received manuals only for the modules customer purchased.) |
| 145:20-147:15 | | Incomplete summary.  (Witness testified that at trade shows they would lock up manuals to prevent competitors from viewing them.  They would also ask competitors to leave their trade show booth.) |
| 147:16 – 148:9; 148:11-22 | 611 | Mischaracterizes witness' testimony.  (Witness testified that customers could not make copies of the manuals to give to somebody.  Witness further testified that customers were not permitted to make copies of the manuals to provide to their competitors. |
| 149:3 – 150:21 | Vague and ambiguous (as to "the number of people who would be shown the manual"); 701-704 (calls for expert testimony.)  611 | Mischaracterizes witness' testimony.  (Witness testified that customers could not make copies of the manuals to give to somebody.  Witness further testified that customers were not permitted to make copies of the manuals to provide to their competitors.) |
| 150:24 – 151:5 | | |
| 153:4-13 | | |
| 153:20-21; 153:25 – 154:1 | 401/403; 602; 701-704 (inappropriate expert testimony) | |

LIBW/1755246.2

| Defendant's Designations | ePlus's Objections (designations) | ePlus's Objections (summary) |
|---|---|---|
| 154:2-4 | Vague and ambiguous (as to "electronic database"); 401/403; 602 | |
| 154:13-18 | 401/403; 602; 701-704 (inappropriate expert testimony) | |
| 154:24 – 155:1; 155:3 | 401/403; 602; 701-704 (inappropriate expert testimony) | |
| 155:4-6; 155:9 | 401/403; 602; 701-704 (inappropriate expert testimony) | |
| 155:10-14 | Vague and ambiguous (as to "product information" and "product catalogs organized in various ways"); 701-704 | |
| 155:23 – 156:2; 156:8-15 | Vague and ambiguous (as to "product information"); 602 | |
| 156:16-22; 156:24 – 157:3 | Vague and ambiguous (as to "maintained" and "product type") | |
| 157:4-11 | Vague and ambiguous (as to "Catalog ID") | |
| 157:17-25; 158:3-7 | Vague and ambiguous (as to "searchable criteria"); 701-704 (inappropriate expert testimony) | |
| 158:8 – 159:6 | Vague and ambiguous (as to whether "the catalog ID field and the item master record is used to assign an item to a catalog") | |
| 159:7 - 160:7 | Vague and ambiguous (as to "catalog ID") | |
| 160:22-25 | Vague and ambiguous (as to "catalog ID") | |
| 161:1-4 | Vague and ambiguous (as to "maintaining"); 701-704 (inappropriate expert testimony) | |
| 161:5-9; 161:12-15 | 611 (compound question); 401/403 | |
| 161:16 – 162:15 | Vague and ambiguous (as to "product catalog"); 401/403 | |
| 162:16-21 | 701-704 (inappropriate expert testimony) | |
| 162:22-25 | 701-704 (inappropriate expert testimony) | |
| 163:1-5 | 701-704 (inappropriate expert testimony) | |
| 163:6-10; 163:13-25 | 701-704 (inappropriate expert testimony) | |
| 164:1-10 | | |

| Defendant's Designations | ePlus's Objections (designations) | ePlus's Objections (summary) |
|---|---|---|
| 164:11-16; 164:19 – 165:17 | 701-704 (inappropriate expert testimony) | |
| 165:18-21; 165:23-25; 166:1-7 | 401/403; 701-704 (inappropriate expert testimony) | |
| 166:8-10 | Vague and ambiguous (as to "a list of items resulting from a search") | |
| 166:11-13; 166:15 – 168:5 | | |
| 171:2-18 | 401/403 (relevance, corroboration); 701-704 (inappropriate expert testimony) | |
| 171:21 – 173:1 | 401/403 (relevance, corroboration) | |
| 173:11-25 | 401/403 (relevance, corroboration) | |
| 174:1-2; 174:5 – 175:4- 176:1 | Vague and ambiguous (as to "user generated criteria"); 401/403 (relevance, corroboration) | |
| 176:2-11; 176:14 – 178:3; 178:6 – 179:3; 179:10-25 | 401/403 (relevance, corroboration) | |
| 180:1 – 181:15 | Vague and ambiguous (as to "product account logs") | |
| 181:16 – 182:7; 182:10-17; 182:19-20 | 401/403 (relevance, corroboration); 701-704 (inappropriate expert testimony) | |
| 182:21 – 183:8; 183:11-25 | 701-704 (inappropriate expert testimony) | |
| 184:1-8 | 701-704 (inappropriate expert testimony) | |
| 184:9-11; 184:13; 184:19-20; 184:22– 185:6 | 701-704 (inappropriate expert testimony) | |
| 185:7-9; 185:12-19 | 602; 701-704 (inappropriate expert testimony) | |
| 186:2-12 | 602 | |
| 186:18-19; 186:22 – 187:9; 187:12-17 | 701-704 (inappropriate expert testimony) | |
| 187:18-20; 187:24 – 188:13 | 701-704 (inappropriate expert testimony) | |
| 188:14-17 | | |
| 188:19-21; 188:24 – 189:5; | Vague and ambiguous (as to "type of item [a user] put on the requisition" and | |

| Defendant's Designations | *e*Plus's Objections (designations) | *e*Plus's Objections (summary) |
|---|---|---|
| 189:7 | "number of combinations of items [a user] could put on the requisition) | |
| 191:14 – 193:1 | 401/403; 1002/1004 | |
| 200:13-17; 200:19 – 201:10 | | |
| 204:22 – 205:20 | 602 | |

| *e*Plus's Counter-Designations |
|---|
| 9:21 - 10:21 |
| 13:5 - 13:10 |
| 20:15 - 20:25 |
| 24:5 - 24:10 |
| 24:12 - 24:21 |
| 26:13 - 27:7 |
| 33:15 - 34:1 |
| 34:19 - 35:6 |
| 36:23 - 37:10 |
| 37:14 - 37:16 |
| 37:25 - 38:6 |
| 38:13 - 38:17 |
| 40:13 - 40:25 |
| 41:2 |
| 42:12 - 42:25 |
| 43:24 - 44:18 |
| 44:22 - 44:23 |
| 45:2 - 45:19 |
| 46:18 - 47:9 |
| 47:11 - 47:17 |
| 48:25 - 49:1 |
| 49:3 - 49:6 |
| 49:9 - 49:12 |
| 49:22 - 50:15 |
| 50:17 |
| 52:11 - 52:21 |
| 53:23 - 53:24 |
| 54:16 - 56:18 |
| 56:20 |
| 57:1 - 57:7 |
| 57:16 - 58:11 |
| 58:13 - 59:13 |
| 60:1 - 60:21 |

| *e*Plus's Counter-Designations |
|---|
| 60:24 - 62:3 |
| 62:5 - 62:18 |
| 72:21 - 74:3 |
| 75:14 - 76:19 |
| 76:21 - 78:15 |
| 79:1 - 79:5 |
| 79:8 - 79:12 |
| 80:15 - 82:20 |
| 84:24 - 85:16 |
| 89:19 - 90:2 |
| 90:4 - 91:4 |
| 91:7 - 92:5 |
| 92:13 - 92:22 |
| 93:10 - 94:4 |
| 97:21 - 98:1 |
| 98:6 - 98:25 |
| 99:19 - 100:10 |
| 101:4 - 102:3 |
| 102:5 - 102:8 |
| 102:17 - 102:19 |
| 102:21 - 104:19 |
| 108:3 - 108:16 |
| 152:4 - 152:7 |
| 152:9 - 152:15 |
| 152:17 - 152:25 |
| 154:21 - 154:23 |
| 179:4 - 179:6 |
| 179:9 |
| 193:13 - 193:16 |
| 193:18 - 193:20 |
| 193:22 - 194:12 |
| 194:15 - 194:18 |
| 194:21 - 195:3 |
| 196:25 - 197:19 |
| 197:22 - 198:6 |
| 202:18 - 202:25 |
| 204:12 - 204:15 |
| 204:18 - 204:21 |
| 205:21 - 206:3 |
| 218:1 - 218:16 |
| 221:25 - 222:15 |
| 223:2 - 225:6 |

11

Respectfully submitted,


/s/ _____
Craig T. Merritt (VSB #20281)
Henry I. Willett, III (VSB #44655)
**CHRISTIAN & BARTON, LLP**
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
Telephone: (804) 697-4100
cmerritt@cblaw.com
hwillett@cblaw.com


Scott L. Robertson (admitted *pro hac vice*)
Jennifer A. Albert (admitted *pro hac vice*)
David M. Young (VSB#35997)
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4000
SRobertson@goodwinprocter.com
JAlbert@goodwinprocter.com
DYoung@goodwinprocter.com


Michael G. Strapp (admitted *pro hac vice*)
James D. Clements (admitted *pro hac vice*)
**GOODWIN PROCTER LLP**
Exchange Place
53 State Street
Boston, MA 02109-2881
Telephone:  (617) 570-1000
MSrapp@goodwinprocter.com
JClements@Goodwinprocter.com

*Attorneys for Plaintiff, ePlus Inc.*


Dated:  August 9, 2010

## <u>Laurene McEneny (June 10, 2010) – Rebuttal Summary</u>

Counsel for Defendant contacted Ms. McEneny and asked her to be a consultant in the litigation. (13:5-10).  Ms. McEneny was a paid consultant in the SAP litigation and testified at trial. (108:3-16).  Counsel for Defendant sent Ms. McEneny documents including her testimony from the SAP litigation.  (9:21 – 10:21).  Ms. McEneny consulted her prior testimony during the course of her deposition.  (24:12-21).

The PO Writer product included many modules, all of which were optional and must be purchased separately.  (26:13 – 27:7; 97:21 – 98:1).  The PO Writer software including a purchasing module containing an item master record.  (42:12-25).  Ms. McEneny did not know whether the "Guided Tour" document was a draft document.  (54:16 – 55:17; 77:10-15; 79:1-5; 79:8-12).

Ms. McEneny testified that in the PO Writer system, a user could not search user generated information contained in the item master record.  (45:2-19; 91:2-4; 91:7-13).  Items in the PO Writer item master are not tied to any specific source.  (48:25 – 49:1; 49:3-6; 49:9-12; 49:22 – 50:7; 50:9-15; 50:17; 52:11-21).  Users manually entered a supplier into a purchase order after they had selected an item.  (99:19 – 100:10).  The PO Writer software assigned a vendor to an item based on the order history of the item.  (73:10 – 74:3; 103:6 – 104:19).

There is no catalog identifier in the vendor master.  (53:17-19; 53:22-24).  The Catalog ID in the item master is not associated with any specific vendor and is instead a way for a user to group items together.  (101:25 – 102:3; 102:5-8).  The PO Writer Version 10 software did not include the ability to cross reference items within the system.  (89:19 – 90:2; 90:4-19).  While the PO Writer product could check item availability in inventory, it was designed for and limited to checking the customer's own inventory.  (36:23 – 37:10; 37:14-16; 37:25 – 38:6; 38:13-17).

American Tech's standard licensing agreement stated that it would "vigorously prosecute anyone who makes unauthorized copies of its software and users manual."  (81:10 -82:20).  American Tech also wrote in its manuals that users could not copy the manuals without the consent of American Tech.  (92:13-22; 93:10 – 94:4).  Ms. McEneny understood that users of the PO Writer product were under an obligation to keep information contained in the PO Writer manual confidential.  (152:4-7; 152:9-15; 152:17-25).

**Page 1**

```
 1        UNITED STATES DISTRICT COURT
 2        EASTERN DISTRICT OF VIRGINIA
 3           (Richmond Division)
 4    ePLUS, inc.,
 5              Plaintiff,
 6    -against-        Civil Action No.
 7                3:09-cv-620(JRS),
 8    LAWSON SOFTWARE, INC.,
 9              Defendant.
10
11              June 10, 2010
11              10:44 a.m.
12
13        Videotaped Deposition of LAURENE McENENY,
14    taken pursuant to Subpoena, at the offices of
15    Goodwin Procter LLP, 620 Eighth Avenue, New
16    York, New York, before ERIC J. FINZ, a Shorthand
17    Reporter and Notary Public within and for the
18    State of New York.
19
20
21
22
24    JOB NO.: 24-180169
25    Pages: 1 - 233
```

**Page 2**

```
 1    A P P E A R A N C E S :
 2       GOODWIN PROCTER LLP
 3          Attorneys for Plaintiff
             Exchange Place
             Boston, Massachusetts 02109
 4
 5       BY:   SRIKANTH K. REDDY, ESQUIRE
 6               -AND-
 7       GOODWIN PROCTER LLP
            901 New York Avenue, Northwest
            Washington, DC 20001
 8
 9       BY:   SCOTT L. ROBERTSON, ESQUIRE
10       MERCHANT & GOULD
            Attorneys for Defendant
11          80 South Eighth Street
            Minneapolis, Minnesota 55402
12
         BY:   RACHEL C. HUGHEY, ESQUIRE
13
14       MARCUS BRODY FORD KESSLER & SAHNER LLC
15       Attorneys for the Witness
            5 Becker Farm Road
16          Roseland, New Jersey 07068
17       BY:   TODD M. SAHNER, ESQUIRE
18
19
20       ALSO PRESENT:
         DOUGLAS HUEBNER, Videographer
21
22
23
24
25
```

**Page 3**

```
 1           THE VIDEOGRAPHER:  This is the
 2    video operator speaking, Douglas Huebner of
 3    Merrill Legal Solutions.  Today is June 10,
 4    2010, and the time is 10:44.,
 5        We are at the offices of Goodwin
 6    Procter, 620 Eighth Avenue, New York, New
 7    York, to take the video deposition of
 8    Laurene McEneny, in the matter of ePlus,
 9    Inc. versus Lawson Software, Inc., in the
10    United States District Court, Eastern
11    District of Virginia, Richmond Division,
12    Case No. 3:09-cv-620.,
13        Will counsel please introduce
14    themselves for the record.
15           MR. REDDY:  Srikanth Reddy from the
16    law firm of Goodwin Procter on behalf of
17    the plaintiff ePlus, Inc.
18           MR. ROBERTSON:  Scott Robertson
19    from Goodwin Procter for plaintiff.
20           MS. HUGHEY:  Rachel Hughey from
21    Merchant & Gould for defendant Lawson
22    Software.
23           MR. SAHNER:  Todd M. Sahner from
24    Marcus Brody on behalf of the witness.
25           THE VIDEOGRAPHER:  Will the court
```

**Page 4**

```
 1    reporter please swear the witness.
 2    L A U R E N E   M c E N E N Y,
 3    having been first duly sworn by the Notary
 4    Public (Eric J. Finz), was examined and
 5    testified as follows:
 6           EXAMINATION BY
 7           MR. REDDY:
 8        Q.   Good morning.  Would you please
 9    state your full name for the record?
10        A.   My name is Laurene Jean, maiden
11    name, which I used in business is Fielder, and
12    my married name is McEneny.
13        Q.   Do you have a preference of
14    Ms. McEneny versus Ms. Fielder?
15        A.   That's fine.
16        Q.   I'll try to make sure I get that
17    correct.  I was hoping you'd say Fielder.
18        A.   Before we sold the company I would
19    have, but now I'm officially a one name person
20    here.
21        Q.   My name is Srikanth Reddy, I
22    represent the plaintiff in this matter, ePlus,
23    Inc.
24        Ms. McEneny, do you understand that
25    your answers today are being given under oath
```

McEneny, Laurene  6/10/2010  12:08:00 PM

5

1   and that you are under the same obligation as
2   you would have been in court to answer
3   truthfully and completely?
4        A.   Yes.
5        Q.   And have you ever given a
6   deposition before?
7        A.   No.
8        Q.   And so in that case I'll go over
9   some different rules, and if at any time you
10  have any questions about the process or anything
11  you should certainly feel free to ask those.   If
12  any of my questions are unclear just let me know
13  and I'll try to clarify them.
14       Will you do that?
15       A.   Sure.
16       Q.   If you need to take a break at any
17  time, just let me know.  I may ask you to wait
18  if we are in the middle of a question, but
19  otherwise we'll certainly take a break if you
20  need to.
21       Do you understand that?
22       A.   Um-hum.
23       Q.   And because the court reporter is
24  typing all the questions and all the responses,
25  he generally needs an audible response.  So

6

1   um-hum --
2        A.   Yes.
3        Q.   -- as opposed to yes, might be a
4   little bit more helpful.  Thank you.
5        Are you taking any medication or
6   drugs that would affect your ability to answer
7   questions truthfully and accurately here today?
8        A.   No.
9        Q.   Is there any reason that you feel
10  you would not be able to give truthful answers
11  to my questions today?
12       A.   No.
13       Q.   Your counsel, Mr. Sahner, who I
14  understand is Mr. Sahner, he may object from
15  time to time.  But unless he specifically
16  instructs you not to answer one of my questions,
17  I expect you to answer my question.
18       Do you understand that?
19       A.   Yes.
20       Q.   And the court reporter here, again,
21  he needs to take down everything we say.  So he
22  can't take down nonverbal responses or shakes of
23  your head.  So just make sure that you verbally
24  respond to each of my questions.  Do you
25  understand that?

7

1        A.   Yes.
2        Q.   And are you represented by counsel
3   here today?
4        A.   Yes.
5        Q.   And who is that representing you?
6        A.   Todd Sahner.
7        MR. REDDY:  Ms. McEneny, I'm
8   handing to the reporter what I would like
9   him to mark as Exhibit No. 1.
10       (McEneny Exhibit 1 for
11  identification, Subpoena.)
12       Q.   You can take a couple, however much
13  time you need to familiarize yourself with that
14  document.  And look up at me after you've had a
15  chance to do so.
16       A.   Is this the one that was sent to me
17  originally, or is this something different?
18       Q.   It should fairly and accurately
19  depict what was sent to you.  Perhaps if you
20  want to take a look just to confirm.
21       A.   This looks identical.
22       Okay.
23       Q.   So have you seen this document
24  before?
25       A.   I believe this is the same document

8

1   that I was given when I was subpoenaed.
2        Q.   And if I can direct your attention
3   to page number 7.  The heading says "schedule A,
4   documents."
5        A.   Um-hum.
6        Q.   Do you see that there are five
7   requests for production listed there?
8        A.   Yes.
9        Q.   And have you produced documents in
10  response to this subpoena?
11       A.   Yes, I have.
12       Q.   And what did you produce?
13       A.   Can I look?  I brought a file of
14  what I sent you.  Is that okay?
15       Q.   Yes, that's appropriate, sure.
16       A.   I mailed to you a letter, let's
17  see, all documents provided to Lawson, so
18  basically I sent a letter.  And it had the --
19  some email correspondence with Rachel Hughey.
20  And a copy of an engagement letter that they had
21  sent.  And, let's see what else was in here.
22       And also I sent a USB, a ScanDisk
23  with some attachments that Rachel sent,
24  which was a subpoena that their firm had sent me
25  a letter, the SAP trial transcript, day one and

McEneny, Laurene  6/10/2010  12:08:00 PM

9

1    day two, and -- so basically the content of what
2    she sent.
3        Q.   I don't mean to interrupt you, but
4    perhaps to speed the process along, I can
5    represent that all the documents you produced to
6    us have been produced in this litigation and
7    given to Lawson Software.  I kind of wanted to
8    go through the specific requests that were made.
9        Have you provided any documents to
10   Lawson during the course of this litigation?
11       A.   The only things, I gave you
12   everything I would have given them.
13       Q.   And are there any existing
14   agreements or contracts between you and the
15   defendant Lawson Software?
16       A.   No.
17       Q.   And have you invoiced or billed
18   Lawson Software for anything with regards to
19   this litigation?
20       A.   No.
21       Q.   And has Lawson provided any
22   documents to you during the course of this
23   matter?
24       A.   Only the things I've given you.
25       Q.   And did you review the documents

10

1    that Ms. Hughey sent to you during the course of
2    the litigation?
3        A.   I did read it briefly.  I haven't
4    studied it.
5        Q.   And do you recall specifically what
6    documents she had sent you?
7        A.   She sent me, basically my testimony
8    from the original trial, which was the ePlus/SAP
9    trial.  So I did read through that.
10       Q.   Do you know why she sent you those
11   specific documents?
12       A.   No, not really.
13       Q.   Did you have any conversations or
14   any discussions with anybody from Lawson
15   Software or the law firm of Merchant & Gould
16   with regards to this litigation?
17       A.   Other than what I shared.  I mean,
18   Rachel contacted me, which summarized our
19   conversation for you and provided that.  They
20   asked if I would be interested in being an
21   expert witness, and I indicated I'm not.
22       Q.   And other than the conversations
23   that were summarized in the documents that you
24   provided, were there any other conversations or
25   discussions that you had with Ms. Hughey or any

11

1    other attorney from the Merchant & Gould law
2    firm or from anybody from Lawson Software with
3    regards to this matter?
4        A.   Everything that's happened has been
5    documented and provided to you.
6        Q.   Have you had any conversations with
7    anybody concerning the patents that are at issue
8    in this matter?
9        A.   When you say anybody, my husband,
10   yeah, we've talked about it.
11       Q.   Other than your husband, have you
12   had discussions with anybody with regards to the
13   patents that are at suit in this litigation?
14       THE WITNESS:  Does that include our
15   conversation?
16       MR. SAHNER:  Our conversations are
17   privileged.
18       A.   Then no.
19       Q.   I'm not asking about the specific
20   subject matter of anything you may have
21   discussed with your counsel.  But are you
22   familiar with the patents that are at suit in
23   this litigation?
24       A.   I read them very carefully years
25   ago.  I have not looked at them.  I only looked

12

1    at my testimony.
2        Q.   And when you say that you read them
3    carefully, how many patents are you referring
4    to?
5        A.   I don't really recall how many
6    patents were in question.  This was a few years
7    ago when I was involved in the ePlus versus SAP
8    case.
9        Q.   When you say those patents, are you
10   referring to the patents that were at suit in
11   the SAP litigation?
12       A.   Correct.
13       Q.   Were there any patents other than
14   those patents that were at suit in the SAP
15   litigation assigned to ePlus that you reviewed?
16       A.   No.
17       Q.   Now, when you say that you
18   discussed the patents in suit with your husband,
19   what was the general substance of those
20   conversations?
21       MR. SAHNER:  I just want to caution
22   the witness, your discussions with your
23   husband are privileged.  What that means is
24   that you don't have to disclose what you
25   said, but you can disclose just the general

13

1  subject matter of what you talked about.

2  A.  Yeah, just generally saying kind of

3  here we go again.  And nothing that I can even

4  think of that's worth mentioning.

5  Q.  Okay.  When you say that you were

6  asked to be a consultant in this litigation, who

7  asked you to be a consultant in this litigation?

8  A.  Rachel.

9  Q.  And how did you respond to her?

10  A.  I said I wasn't interested.

11  Q.  And do you intend to testify at

12  trial in this matter?

13  A.  At this moment in time it's not my

14  intention.

15  Q.  Did you meet with anybody in order

16  to prepare to testify here today?

17  A.  Just Todd.

18  Q.  And when did that meeting take

19  place?

20  A.  Last Friday.

21  Q.  And how many times did you meet

22  with him?

23  A.  Just once.

24  Q.  And was anybody else present at

25  that meeting?

14

1  A.  My husband was.

2  Q.  And for how long did you meet with

3  Mr. Sahner?

4  A.  I don't know, maybe half hour.

5  Mostly talking about golf.

6  Q.  Did you have any discussions with

7  anybody besides Mr. Sahner or your husband in

8  order to prepare for your testimony here today?

9  A.  No.

10  Q.  Now, you mentioned that you

11  reviewed your testimony in the SAP case; is that

12  correct?

13  A.  Right, I read it once.

14  Q.  And at various times today I might

15  refer to some of that testimony.

16  A.  Um-hum.

17  Q.  Do you recall in general the

18  testimony that you had given in the SAP case?

19  A.  In general I recall.

20  Q.  Now, if you can talk to me a little

21  bit about your background starting after

22  college, after secondary school, leading up to

23  the time that you were at American Tech, Inc.

24  A.  I went to Aquinas College.  I was

25  hired by General Electric Information Services

15

1  out of college.  I worked for them for a few

2  years.  Briefly worked for ADP.  And started

3  American Tech with Tim.

4  Q.  Now, do you recall what year you

5  graduated from Aquinas College?

6  A.  Think back, 1989.  Well, '88,

7  December of '88.  But I graduated with my class

8  in spring of '89.  So actually commenced in the

9  spring.  But my degree and my date was December

10  of '88.

11  Q.  And did you have a specific major

12  that you graduated?

13  A.  I'm sorry.  '78.  I'm sorry.

14  Q.  So you graduated from Aquinas

15  College in 1978; is that correct?

16  A.  That's correct.

17  Q.  And was there a specific area that

18  you majored in while at Aquinas College?

19  A.  Yes.

20  Q.  And what is that?

21  A.  Marketing communications.

22  Q.  So after graduating in 1978, I

23  think you said you went to work for the General

24  Electric Company; is that correct?

25  A.  Um-hum, Information Services.

16

1  Q.  And for how long did you stay at

2  General Electric Information Services?

3  A.  I think about four years.  A little

4  over four years.

5  Q.  And what did you do while at GE

6  Information Services?

7  A.  I sold software services.

8  Q.  What types of software services did

9  you sell?

10  A.  Time sharing services,

11  manufacturing software.

12  Q.  So if you were at GE Information

13  Services for approximately four years from 1978,

14  is it true that you left GE Information Services

15  around 1982 then?

16  A.  Um-hum.  Right.  Worked for ADP for

17  just a few months.

18  Q.  What is ADP?

19  A.  Automated Data Processing, the

20  payroll people.

21  Q.  I'm sorry, when you say the payroll

22  people, what do you mean by that?

23  A.  Most people think of ADP as a

24  payroll service provider.

25  Q.  And what did you do while you were

McEneny, Laurene  6/10/2010  12:08:00 PM

17

1   at ADP?
2       A.   Sales.
3       Q.   And what was ADP selling at that
4   time?
5       A.   They were selling a lot of things.
6   But mostly time sharing, financial services
7   software.
8       Q.   What do you mean by time sharing?
9       A.   At that point in time companies
10  would buy time on large computer systems. So
11  instead of having personal computers like we do
12  now, people would have basically dumb terminals
13  and they would buy time on large computer
14  systems.
15      Q.   Wow. How long did that practice
16  continue?
17      A.   Oh, God, I feel old.
18      Q.   I'm sorry, you don't need to. I'll
19  withdraw that question, you don't need to answer
20  that question.
21      A.   That's fine.
22      Q.   How long did you stay at ADP?
23      A.   It was just a couple of months.
24      Q.   And so sometime in 1982 you and
25  your husband started American Tech; is that

18

1   correct?
2       A.   In '83 we founded the company.
3       Q.   And what was the first product that
4   American Tech sold?
5       A.   It was a product called P.O.
6   Writer.
7       Q.   And what was the business of
8   American Tech?
9       A.   We were in the business of selling
10  PC based purchasing software.
11      Q.   Now, when was the first version of
12  the P.O. Writer product released?
13      A.   I guess commercially released in
14  '84. We started the company in '83, and the
15  first version was out in '84.
16      Q.   And what was the P.O. Writer
17  product?
18      A.   It was a purchasing module.
19  Software.
20      Q.   When you say a purchasing module,
21  what do you mean by that?
22      A.   It was a software product that
23  would allow people to generate a purchase order
24  and do some basic reports.
25      Q.   Now, after that first version was

19

1   released in 1984, were there subsequent versions
2   of the P.O. Writer software?
3       A.   Yes.
4       Q.   And approximately how many versions
5   of the software were released over time?
6       A.   There were twelve DOS versions, and
7   there were, oh, gosh, P.O. Writer Plus for
8   Windows. I can't remember exactly how many we
9   had, because then we switched into the web based
10  product line.
11      Q.   Do you still work for American
12  Tech?
13      A.   No, I don't.
14      Q.   And when did you cease working for
15  American Tech?
16      A.   At the end of last year.
17      Q.   And is American Tech still -- does
18  American Tech still exist?
19      A.   American Tech, the name changed in
20  2000. So American Tech became Purchasing Net,
21  Incorporated. And Purchasing Net, it was a name
22  change only. And that company still exists.
23      Q.   And have you, do you retain any
24  interest in Purchasing Net?
25      A.   None.

20

1       Q.   And I'm sorry, so you ceased being
2   involved with Purchasing Net sometime in 2009;
3   is that correct?
4       A.   We sold the company.
5       Q.   Okay. And so your husband, does he
6   still retain any interest in Purchasing Net?
7       A.   No.
8       Q.   Now, the twelve DOS versions of the
9   P.O. Writer Plus program, do you recall when the
10  last DOS version of P.O. Writer was released,
11  roughly?
12      A.   Let's see.
13           Probably about '95.
14      Q.   Are you sure it was in 1995?
15      A.   Let me see. Yeah, that's right. I
16  have to double-check, since I didn't know when I
17  graduated from college, I'm slow on the dates.
18  All right?
19      Q.   I understand. Do you recall what
20  functionality was added with each version of the
21  DOS throughout those twelve different versions
22  from 1984 and 1995?
23      A.   There was a lot. I would have to
24  really go back to documentation to look
25  specifically at the features in every year.

McEneny, Laurene  6/10/2010  12:08:00 PM

21

1    Q.   Just here testifying today, do you
2    recall the specific functionality that might
3    have been added from version 1 to version 12?
4    A.   I remember some of it.
5    Q.   Now, you testified that you no
6    longer are employed by or have any interest with
7    P.O. Writer -- I'm sorry, with Purchasing Net;
8    correct?
9    A.   Correct.
10   Q.   Have you retained any documents
11   from either Purchasing Net or American Tech that
12   were generated while you were affiliated with
13   those two companies?
14   A.   I probably have a few things.  Some
15   files.  I have kept a couple of folders on
16   customers, you know, we were working with just
17   to make sure if anybody had any questions that
18   they wanted to call me, you know, they could.
19   So just trying to be helpful to the staff that
20   was left behind.  We sold the company, so still
21   felt some responsibility to the people.
22   Q.   So other than the customer folders,
23   are you aware of any other documents that you
24   might have retained from Purchasing Net?
25   A.   You know, I'm not really sure, we

22

1    do have some things in the garage.  And the
2    reason is Tim is writing a book, and I know he
3    saved some things.  But I honestly don't know
4    what he has specifically.
5    Q.   Now, I think you testified that
6    version 1 of the P.O. Writer software was
7    released in 1984; correct?
8    A.   I believe that's correct.
9    Q.   Do you recall when the second
10   version of P.O. Writer was released?
11   A.   Probably about a year later, but I
12   don't know the exact date.
13   Q.   So during that time frame, the
14   company was known as American Tech, correct?
15       So in general I'll try to refer to
16   it as American Tech for the company that you and
17   your husband started, which became Purchasing
18   Net in 2000 and which you subsequently sold in
19   2009.
20   A.   Um-hum.
21   Q.   Does that make sense?
22   A.   That's fine.
23   Q.   And if you have any questions at
24   any time as to what entity I'm referring to, you
25   could certainly feel free to ask.

23

1    A.   To me it would be the same, it was
2    just a name change.
3    Q.   Did American Tech have a general
4    policy with regards to the schedule by which it
5    would release different versions of the P.O.
6    Writer project?
7    A.   Generally we did one major release
8    per year.
9    Q.   So between 1984 and 1995, that's
10   twelve years actually, correct?  I'm sorry, I'll
11   withdraw that question as well.
12       So the twelve DOS versions of the
13   P.O. Writer software, were each of those
14   versions released between 1984 and 1995?
15   A.   Yes.
16   Q.   Now, if I can start with -- I'm
17   sorry, so I think you testified that version
18   number 2 was released in 1985; correct?
19   A.   I'd have to double-check, but that
20   sounds right.
21   Q.   Was version 3 -- when was version 3
22   released then?
23   A.   Generally they would be one major
24   release per year.  That was the general
25   practice.  So if you ask me about 3 then 4 then

24

1    5, they kind of fall along that line.  It was
2    the general practice to try and do that.
3    Q.   Now, when was version 10 of the
4    P.O. Writer product released?
5    A.   It was released in the -- well, can
6    I check my notes?  I want to double-check to
7    make sure I get this right.
8    Q.   Sure.
9    A.   Should be '83, but let me just
10   double-check.
11       Yes, '83.  I'm sorry, '93.
12   Q.   When you say you were checking your
13   notes, the notes you were checking was your
14   testimony from the SAP case; is that correct?
15   A.   That's right.
16   Q.   Now, other than your testimony from
17   the SAP case, is there anything else that you
18   have to corroborate that version 10 of the P.O.
19   Writer product was released in 1993?
20   A.   No.  Just everything I testified to
21   originally would still be true.
22   MR. REDDY:  I'm handing to the
23   reporter what I'll ask him to mark as
24   McEneny Exhibit No. 2.
25       (McEneny Exhibit 2 for

25

1    identification, document headed "Guided
2    Tour, Version 10.0," production numbers L
3    0126514 through L 0126701.)
4        MR. REDDY:  It's a document, the
5    cover of which states "guided tour, version
6    10.0."
7    Q.    That's a rather large document, so
8    I'll ask you to peruse the document and you can
9    look up at me after you've had a chance to
10   familiarize yourself with it.
11       Do you recognize that document
12   that's been marked as Exhibit No. 2?
13   A.    Yes, I do.
14   Q.    And what is that document?
15   A.    This is a guided tour that was
16   published for our software.
17   Q.    What is the purpose of that
18   document?
19   A.    This document was used to teach
20   people how to use the product.
21   Q.    Now, when you say the product, what
22   product are you referring to?
23   A.    The P.O. Writer Plus software.
24   Q.    Now, there were several different
25   modules that were associated with the P.O.

26

1    Writer Plus software; is that correct?
2    A.    Correct.
3    Q.    And when a user purchased the
4    software, they purchased only the purchasing
5    module; is that correct?
6        MS. HUGHEY:  Objection; vague.
7    A.    There were many modules.  In our
8    product they would have to purchase the
9    purchasing module in order to make anything else
10   work.  That was like our foundation module.  But
11   they could buy as much or as little as they
12   needed to meet their needs.
13   Q.    And those other modules, they were
14   all optional; correct?
15   A.    Correct.
16   Q.    So a customer of American Tech
17   could choose whether or not they wanted those
18   additional modules; correct?
19   A.    That's correct.
20   Q.    And so when we refer to customers
21   of American Tech, each of those customers
22   purchased the purchasing module; is that
23   correct?
24   A.    That's correct.
25   Q.    But whether or not they purchased

27

1    additional modules would vary on a case-by-case
2    basis?
3    A.    That's right.
4    Q.    And some of those customers might
5    not have purchased any additional modules; is
6    that correct?
7    A.    That's correct.
8    Q.    If I can direct your attention to
9    page number 7.  I realize there is several
10   different numbers along there, I'll try to refer
11   to the numbers that have an L prefix on it.  We
12   call those Bates labels.  The document Bates
13   labelled L 0126537.
14       The heading of the document refers
15   to "purchasing - the basics."
16       Do you see that?
17   A.    Yes.
18   Q.    What is this section of the manual
19   discussing?
20   A.    This particular page is discussing
21   the P.O. Writer Plus item master file.
22   Q.    And what was the item master file?
23   A.    It was a file that people could use
24   to input things that they were going to purchase
25   in the software.

28

1    Q.    So other than the item master
2    record, is there any other place in the P.O.
3    Writer software where data would be inputted
4    reflecting specific items that a user would like
5    to purchase?
6    A.    Well, there was the ability to free
7    form an item.  So they didn't have to put it in
8    the item master file.
9    Q.    Other than the free form -- the
10   ability to free form an item and the item master
11   record, were there any other ways that a person
12   could purchase items using the P.O. Writer
13   software?
14   A.    So let me make sure I understand
15   the question.  Are you asking is there another
16   way to get data into the system?
17   Q.    That's correct.  My question is
18   other than the item master record or by free
19   form typing in a specific item, are there any
20   other items that a person could purchase using
21   the P.O. Writer software?  Would all of those
22   items be associated with only with the item
23   master record or the free form searching?
24   A.    In order to create a requisition or
25   a purchase order, yes, you would need to either

29

1    access information from the item master or use
2    the free form feature.  There were different
3    ways to get the software, to get data into the
4    database.  This entry screen is one way.  But in
5    order to actually create an order, you would
6    either need to use an item that exists in the
7    item master or you would use a free form
8    feature.  Or -- okay.
9        Q.   I'm sorry, I didn't mean to
10   interrupt you.  Is your response complete?
11       A.   No, I'm done.
12       Q.   This specific page, which is Bates
13   numbered L 0126537, there is a screenshot of an
14   item master record; is that correct?
15       A.   Correct.
16       Q.   And there are several fields that
17   are associated with the item master record; is
18   that correct?
19       A.   Um-hum.
20       Q.   Are there any fields that are
21   associated with the item master record, to your
22   knowledge, that are missing from this specific
23   screenshot?
24       A.   That are missing from this
25   screenshot?  Well, if you go to the next page,

30

1    you'll see that there are additional fields that
2    you could use.  So if you go to 858, it looks
3    like an 8, it's a little blurry, you can see
4    that there was additional functionality that you
5    could use.  So this was like the main screen,
6    the highest level, if you will, and then you
7    could put additional information in by using a
8    function key.
9        So if you go to the next page, you
10   could see then you could put in extended
11   description, you could put in user defined
12   fields.  You could also put in inventory control
13   data.
14       Q.   And I understand that there are
15   those other user defined fields, and there is
16   the inventory control data as well as the
17   extended description.  But other than those
18   three, is there any specific data with regards
19   to a specific item that can be inputted into the
20   item master file?
21       MS. HUGHEY:  I'm going to object,
22   that's vague.  Can you rephrase? .
23       A.   I guess I'm trying to anticipate
24   what you're asking, and I just don't understand
25   what you're getting at.

31

1        Q.   I'm just trying to confirm that the
2    specific fields that are listed in this
3    screenshot that's on L 126537, that those fields
4    are the limits to the amount of data for any
5    item that's located in the item master record.
6        A.   Well, there is some data that the
7    system, the database itself would maintain that
8    would be stored in the database associated with
9    the item.  So for example, I could put an item
10   in, I could use the additional fields that we
11   talked about.  Then when I'm actually using the
12   product, the system would record and the
13   database behind the scenes additional
14   information for the user.  Such as historic
15   information used to generate a history card.
16       Does that answer your question?
17       Q.   Sure.  Other than the history --
18   the historical information that was associated
19   with the history card, can you think of any
20   other information with regards to an item that
21   would be located in the database in the P.O.
22   product that could be associated with a specific
23   item?
24       A.   No.
25       Q.   Now, looking at these specific

32

1    fields that are listed on the item master file,
2    do you see the first one says item number?
3        A.   Um-hum.
4        Q.   Now, the item number, that's
5    generated by the user; correct?
6        A.   It could be generated by the user.
7    Could also be a catalog number.  So that means
8    it could have been generated by a supplier
9    and --
10       Q.   But -- I'm sorry, I didn't mean to
11   interrupt you.
12       A.   So it could be imported to the item
13   master file from an external file, which was
14   very common.  We had a utility that was called
15   the data interface utility that would allow
16   people to import information to populate the
17   item master record.  Or the user could make it
18   up.
19       Q.   So the item number could be
20   anything in the P.O. Writer product; is that
21   correct?
22       A.   It just is there to uniquely
23   identify the item.
24       Q.   And the user can key in anything
25   they want for the item number; is that correct?



33

1    A.   They could.  I mean, within the
2    limits of the field size of course.
3    Q.   Looking to the third field from the
4    bottom, do you see where it says catalog ID?
5    A.   Correct.
6    Q.   So the catalog ID, that's also a
7    user generated field; correct?
8    A.   Again, it could be or it could be
9    included in an import file.
10   Q.   Again, the user can determine what
11   goes into the catalog ID field?
12   A.   Sure.
13   Q.   At their own discretion.
14   A.   Um-hum.
15   Q.   And for this specific example
16   that's listed here on page L 0126537, there is
17   no data associated with the catalog ID; is that
18   correct?
19   A.   That's correct, it's not a
20   required -- it was not a required field.
21   Q.   So a user did not have to enter
22   data with regards to the catalog ID associated
23   with the specific item in order for the P.O.
24   Writer Plus module, purchasing module to
25   function; is that correct?

34

1    A.   That's correct.
2    Q.   Now, going to the next page, which
3    is L 0126538, which I think you referred to.
4    A.   Um-hum.
5    Q.   You do you see there is three
6    additional, I don't know what's the best term to
7    use to refer to the extended description, the
8    user defined fields or the inventory control
9    data, what do you think is the best way to refer
10   to those?
11   A.   I don't know, additional item
12   information.
13   Q.   So for the additional item
14   information that's associated with the extended
15   description, that's an entirely user generated
16   description; correct?
17   A.   Again, same thing, user could
18   control it or import it.
19   Q.   Right.  And a user could not search
20   or conduct any keyword search of information
21   that was in the extended description; correct?
22   A.   I would have to double-check.  I
23   believe that they were using the description 1
24   and description 2 if they were going to search
25   for an item based on description in this

35

1    version.  But I would have to double-check that.
2    Q.   But sitting here today you don't
3    know whether a user could conduct any sort of
4    keyword search associated with the extended
5    description; correct?
6    A.   Correct.
7    Q.   If I can direct your attention to
8    the document that's Bates labelled L 0126541.  I
9    believe it's page number 11 of the manual.
10   A.   Um-hum.
11   Q.   What does this page depict?
12        MS. HUGHEY:  What page are we on?
13        MR. REDDY:  I'm sorry, L 126541.
14   A.   This is the input screen for the
15   inventory control master file.
16   Q.   And what was the inventory control
17   module?
18   A.   It was a separate P.O. Writer Plus
19   module that people could buy to manage on hand
20   inventory.  So this particular screen would be
21   used if the user was going to manage inventory
22   for an item.
23   Q.   Now, when you say to manage on hand
24   inventory, that refers to the inventory actually
25   owned by the user; correct?

36

1    A.   Not always.  I mean, there was a
2    single database that was the P.O. Writer Plus
3    database.  But you can see on this particular
4    page that you can have -- let's see.  Third from
5    the bottom, where it says default inventory
6    location, you could actually store an item in
7    different locations.
8         And that location was what you were
9    referring to earlier can be defined by a user.
10   So it could be a location that was a warehouse
11   that was owned by the customer.  But it also
12   could be a location that might be owned by a
13   supplier.
14        So for example, one of the things
15   people would use our product for was managing
16   forms.  So if the forms happened to be stored,
17   you know, at a vendor site, you could keep track
18   of that yourself.  But it was simply contained
19   within this single database, it was not a case
20   where you were going to somebody else's computer
21   system and checking inventory.  We didn't do
22   that.
23   Q.   When you say that you could store,
24   actually store an item in a different location,
25   you're referring to that a user could store

McEneny, Laurene  6/10/2010  12:08:00 PM



**37**

1 specific items in different locations; correct?
2 A. That's correct.
3 Q. And that's inventory that's
4 specific to that user; correct?
5 A. That's correct.
6 Q. And is it accurate to say that what
7 the P.O. Writer system did not do is that it did
8 not permit a user to go and check inventory in
9 another company's inventory; is that an accurate
10 statement?
11 MS. HUGHEY: Objection; leading.
12 THE WITNESS: Do I answer that?
13 MR. REDDY: You can answer it, yes.
14 A. The P.O. Writer system only checked
15 inventory that existed within the P.O. Writer
16 Plus database.
17 Q. And the only inventory that could
18 be associated with the P.O. Writer Plus database
19 would be the inventory owned by the actual user;
20 is that correct?
21 A. The inventory owned? That would be
22 a common practice. I mean, it wouldn't be a
23 software limitation, but certainly that would be
24 a common practice.
25 Q. But with respect to the actual

**38**

1 software that's within the P.O. Writer system, a
2 user of the -- the inventory control module only
3 permitted a user to manage their own inventory;
4 is that correct?
5 A. It was designed to manage their own
6 inventory.
7 Q. And there wasn't any functionality
8 that permits a user to manage inventory owned by
9 a different entity; is that correct?
10 MS. HUGHEY: Objection; leading.
11 Q. You can answer.
12 A. I'm sorry, one more time.
13 Q. There wasn't any functionality in
14 the P.O. Writer Plus version 10 system that
15 permitted a user to manage inventory owned by a
16 different entity?
17 A. Correct.
18 Q. Now, if I can direct your attention
19 to the document marked L 0126543. I believe
20 it's page number 13 of the manual.
21 A. Um-hum.
22 Q. Do you recognize this specific
23 page?
24 A. I do. It's the P.O. Writer Plus
25 vendor master input screen.

**39**

1 Q. And what was the purpose of the
2 vendor master file?
3 A. You would enter supplier or vendor
4 information using this screen into the database.
5 Q. And what would a user do with the
6 information that's stored in the vendor master
7 file?
8 A. They would use this to create
9 requisitions, to generate requests for quotes,
10 to generate purchase orders.
11 Q. And do you see that there is
12 various fields that are associated with the
13 vendor master file as depicted on the page
14 numbered L 0126543?
15 A. I'm sorry, 543?
16 Q. Yes, I'm sorry, I'm referring to
17 the L numbers. I believe it's page number 13 of
18 the manual, the document Bates labelled L
19 0126543.
20 A. Yes. Um-hum.
21 Q. And other than the fields that are
22 depicted -- I'm sorry, is this a screenshot of
23 the vendor master file that's associated with
24 the version 10 of the P.O. Writer product?
25 A. Yes.

**40**

1 Q. Are the specific fields that are
2 indicated on this screen that's on document
3 Bates labelled L 0126543, are there any other
4 fields that could be input into the vendor
5 master file?
6 A. Yes, there were. And on the next
7 page, the 544, it does show additional
8 information that you could enter about a
9 supplier.
10 Q. And those would be vendor notes;
11 correct?
12 A. That's correct.
13 Q. And again, much like the extended
14 description that we talked about with respect to
15 the master item inventory, that was a free form
16 area where a user could input their own data;
17 correct?
18 A. That's correct.
19 Q. And to your knowledge, just as I
20 believe you testified to with respect to the
21 extended description, you're testifying today
22 you're not aware of whether a user could
23 manually keyword search information that was
24 contained with respect to the vendor notes; is
25 that correct?

McEneny, Laurene   6/10/2010   12:08:00 PM



**41**

1    MS. HUGHEY:  Objection; leading.
2    A.   Correct.
3    Q.   Thank you.
4         Now, with respect to these specific
5    fields that are depicted on the document Bates
6    labelled L 0126543, the vendor number, is that
7    number, again, inputted by the user?
8    A.   Yes.
9    Q.   And the catalog ID field that was
10   mentioned in the item master file that we just
11   discussed, there is no field associated with the
12   catalog ID in the vendor master file; is that
13   correct?
14   A.   Correct.  The catalog was part of
15   the item master.
16   Q.   And that catalog ID was not
17   associated with the vendor master file; is that
18   correct?
19        MS. HUGHEY:  Objection; vague as to
20   associated.
21   A.   The item master file contained user
22   defined fields.  And those user defined fields
23   could and often did contain reference to the
24   vendor number.  So if a user was going to look
25   for an item, and they weren't really sure who

**43**

1    Q.   And again, just to your
2    recollection today, you don't recall whether a
3    user could physically search by keyword
4    information that was contained in the user
5    defined fields; correct?
6    A.   In the item master file?
7    Q.   Correct.
8    A.   You're asking, let me make sure I
9    understand the question.  So you're saying if
10   they use the user defined field in the item
11   master, could they search on the data in those
12   user defined fields?
13   Q.   That's correct.  I'm asking so if a
14   person turns on their P.O. Writer system and
15   they want to conduct a keyword search for
16   information that's contained in the user defined
17   field, could a person do that?
18   A.   As it relates to the item master,
19   yes.
20   Q.   And where is that functionality
21   disclosed with regards to this specific
22   document?
23   A.   Oh, I don't know.
24   Q.   Do you have -- is there anything
25   you could point to to corroborate the statement

**42**

1    they could buy it from, it was common practice,
2    and we educated people on using the item master
3    user defined fields, to say things like
4    preferred supplier or primary supplier,
5    alternate supplier.
6         So that would have been an
7    implementation of that feature in the item
8    master file.
9         To answer your question, there is
10   no field in the vendor master file called
11   catalog.  Does that answer your question?
12   Q.   Specifically I'm just -- you recall
13   there was a field in the item master that's
14   called catalog ID; correct?
15   A.   Um-hum.
16   Q.   There is no reference to that
17   catalog ID field in the vendor master file;
18   correct?
19   A.   That's correct.
20   Q.   And with respect to those user
21   defined fields that you just referenced, those
22   user defined fields, again, are free form fields
23   where a user could manually input whatever
24   information they want?
25   A.   Absolutely.

**44**

1    that a person could conduct a keyword search for
2    information with respect to the user defined
3    fields?
4    A.   Can I refer to the demonstration
5    from the original trial, the SAP trial?
6    Q.   You haven't provided a
7    demonstration to Lawson in this litigation;
8    correct?
9    A.   No.
10   Q.   And you haven't provided any
11   documents to Lawson in this litigation; correct?
12   A.   No.
13   Q.   So anything that you would use to
14   corroborate your statement that a user may be
15   able to conduct a keyword search of the user
16   defined fields, anything that you use to
17   corroborate that would be based on your
18   testimony from the SAP litigation; correct?
19        MS. HUGHEY:  Objection;
20   mischaracterizes the witness' testimony.
21   Q.   You can answer.
22   A.   I would refer to my demonstration
23   testimony to help you understand this.
24   Q.   And that's the testimony that you
25   gave in the SAP litigation; correct?

McEneny, Laurene  6/10/2010  12:08:00 PM

45

1     A.   Correct.
2     Q.   And other than that testimony,
3     there is nothing else you can point to to
4     corroborate whether or not a user could conduct
5     a keyword search of the user defined fields in
6     version number 10 of the P.O. Writer system; is
7     that correct?
8     A.   Give me just a few minutes, I could
9     look through here and see if it's in here.  I
10    just don't remember off the top of my head.
11    Q.   Please, go ahead.  Take all the
12    time you need.
13    A.   Nope, I don't see anything.
14    Q.   So there is nothing in the guided
15    tour which discusses a user's ability to conduct
16    a keyword search of the user defined fields
17    associated with the item master record in
18    version 10; correct?
19    A.   I don't see any.
20         MS. HUGHEY:  Mischaracterizes the
21    witness' testimony.  Objection.
22         MR. REDDY:  So I believe we've been
23    going for a little bit over an hour, so now
24    might be a good time for a short break.
25         THE WITNESS:  Okay.

46

1          THE VIDEOGRAPHER:  Going off the
2     record at 10:38.,
3          (A recess was taken.)
4          THE VIDEOGRAPHER:  Back on the
5     record, 11:52.,
6     BY MR. REDDY:
7     Q.   Ms. McEneny, I would like to direct
8     your attention to the document that's Bates
9     labelled L 0126551.  The heading of it is "P.O.
10    Writer Plus 3, creating purchase orders."  I
11    believe it's page 21 of the manual.
12         Now, this section regarding
13    creating purchase orders, can you just describe
14    generally what that section is about?
15    A.   This section of the manual would
16    teach a user the basic options for creating an
17    order in the P.O. Writer system.
18    Q.   And I would like to direct your
19    attention to, there is a paragraph that begins
20    P.O. Writer Plus, I believe it states "P.O.
21    Writer Plus has an 'electronic history card'.
22    This feature allows you to stop keeping manual
23    records of purchase history."
24         Does that accurately depict what
25    the purpose of the electronic history card was

47

1     in the P.O. Writer Plus system?
2     A.   Yes.
3     Q.   Is there anything else you can tell
4     me about what the purpose is of the electronic
5     history card?
6     A.   No, it's for history.
7     Q.   So it just permitted a user to
8     track the history of different purchases of a
9     specific item; is that correct?
10         MS. HUGHEY:  Objection; leading.
11    A.   It would allow people to look at
12    anything associated with the item.  So for
13    example, if the item was sent out for quote, it
14    would note the quote number.  If it was
15    purchased, it would note the purchase number.
16    So it was not just purchase history, it was
17    history about activity around the system.
18    Q.   But it was history with regards to
19    activity for the specific item; correct?
20    A.   That's correct.
21    Q.   If I can direct you to the next
22    page, which is Bates labelled L 0126552.
23    A.   Um-hum.
24    Q.   Does this screen depict a purchase
25    order history?

48

1     A.   Yes, it does.
2     Q.   And if I can direct your attention
3     to the paragraph at the top of the page, it
4     states "the purchase order history screen shows
5     that you have purchased A1000 twice from Best
6     Buy Supply and issued an RFQ to Bayless."
7          Did I read that correctly?
8     A.   Correct.
9     Q.   So the screenshot here depicts the
10    history of requests or are purchases associated
11    with that a specific item A1000; correct?
12    A.   Correct.
13    Q.   And in this example, there are
14    three different entries; correct?
15    A.   Yes.
16    Q.   And two of those are associated
17    with a vendor called Best Buy Supply?
18    A.   Um-hum.
19    Q.   I'm sorry, is that a yes?
20    A.   That's a yes.
21    Q.   And one of those is associated with
22    a company called Bayless Stationers; is that
23    correct?
24    A.   That's correct.
25    Q.   So this specific item number is not

McEneny, Laurene  6/10/2010  12:08:00 PM



49

1    tied to any particular single source; correct?
2            MS. HUGHEY:  Objection; vague.
3        A.    This is, this history card is
4    showing three transactions for the item A1000.
5        Q.    But that item number, A1000, is not
6    tied to a particular single source; correct?
7            MS. HUGHEY:  Objection; same
8    objection; vague.
9        A.    Correct.  I believe it's -- they're
10   independent suppliers that are shown on this
11   history card.  The activity is three different
12   types of activity.  Or in this case.
13       Q.    And that -- I'm sorry, I didn't
14   mean to interrupt you.
15       A.    No.
16       Q.    And that history reflects that this
17   item number is associated with more than one
18   source; correct?
19       A.    That's correct.
20       Q.    And I'm sorry, I'll withdraw that
21   question.
22           If I can direct your attention to
23   the paragraph located immediately below the
24   screen.  It says "you can now buy this item from
25   Best Buy, Bayless or any other vendor you would

50

1    like to select."
2            Did I read that correctly?
3        A.    Yes.
4        Q.    Now, the only reason that this
5    particular item, A1000, is associated with these
6    two sources, Best Buy Supply and Bayless
7    Stationers, is because of the history; correct?
8            MS. HUGHEY:  Objection; vague.
9        A.    In this example those three
10   transactions would be in the P.O. Writer
11   database in ordered to show up on this card.
12       Q.    That's correct.  So the only reason
13   that this item number is tied to Best Buy Supply
14   or Bayless Stationers is because of the history;
15   correct?
16           MS. HUGHEY:  Objection; vague.
17       A.    In this example, yes.
18       Q.    Now, when it says you can now buy
19   this item from Best Buy, Bayless or any other
20   vendor you would like to select, does that
21   indicate that the vendor can -- the vendor --
22   I'm sorry, the user independently determines the
23   vendor from whom it purchased the item?
24       A.    That states that they could select
25   another supplier.

51

1        Q.    So it was entirely up to the user
2    to decide from whom they would purchase a
3    specific item; correct?
4        A.    On this particular screen, which is
5    on creating a purchase order, this screen would
6    typically be used by a buyer.  And a buyer in
7    this product was not limited on who they could
8    buy from.  So they could buy from, in this
9    example, the two suppliers that are shown, Best
10   Buy or Bayless, or the buyer could pick another
11   supplier that was in the P.O. Writer Plus vendor
12   master file.
13       Q.    Is it an accurate statement to say,
14   is the catalog in the P.O. Writer Plus system
15   always tied to a vendor and is that always a
16   requirement -- I'm sorry, let me start over
17   again.
18           Is it an accurate statement to say
19   that the catalog in the P.O. Writer system is
20   not tied to a vendor and that by design the P.O.
21   Writer system was designed to be very flexible?
22           MS. HUGHEY:  Objection; compound.
23   Objection; vague.
24           THE WITNESS:  Where do I go?
25           MR. REDDY:  You can answer the

52

1    question.
2        A.    Let me tell you what I think you
3    said, just to make sure I understood this.  I
4    think the first thing you said is that the
5    catalog is not tied to the vendor master.  Is
6    that what you said?
7        Q.    Perhaps let me, I'll try and divide
8    up the question, hopefully that will simplify it
9    a little bit.
10       A.    Okay.
11       Q.    Is it an accurate statement to say
12   that the catalog in the P.O. Writer system is
13   not always tied to a vendor?
14       A.    Is not always tied to a vendor,
15   that's correct.
16       Q.    Is it also an accurate statement to
17   say that by design the P.O. Writer system was
18   designed to be very flexible with regards to
19   places from which a user could purchase a
20   specific item?
21       A.    Yes.
22       Q.    And is it also accurate to say that
23   the catalog in the P.O. Writer system may or may
24   not be associated with a supplier?
25       A.    Catalog is associated with the

McEneny, Laurene  6/10/2010  12:08:00 PM

53

1    item.
2        When we were on break -- can I make
3    a comment?
4        Q.    Perhaps we should go off the
5    record.
6        THE WITNESS:  Okay, could we.
7        THE VIDEOGRAPHER:  Going off the
8    record at 12 o'clock.
9        (Discussion off the record.)
10        THE VIDEOGRAPHER:  Back on the
11    record, 12:01.,
12    BY MR. REDDY:
13        Q.    Now, I believe you just stated that
14    the catalog was associated with the specific
15    item; is that correct?
16        A.    Correct.
17        Q.    So the catalog is not associated
18    with the supplier; is that an accurate
19    statement?
20        MS. HUGHEY:  Objection;
21    mischaracterizes the witness' testimony.
22        A.    The catalog ID is part of the item
23    master file, period.  There is no catalog ID in
24    the vendor master.
25        Q.    Now, with respect to the user

54

1    defined fields, the extended description and the
2    vendor notes fields, does -- could a user
3    conduct a keyword search of the specific
4    information that was manually entered by a user
5    into those free form areas?
6        A.    After looking through this guided
7    tour, it appears in this version that the user
8    could not search on the item master extended
9    description.  They could search on description 1
10    and description 2 in the item master.
11        It also appears from this document
12    that I'm looking at that the user defined fields
13    were for reference and not searchable in this
14    version.  That's what it looks like to me after
15    looking at the manual.
16        Q.    If I could direct your attention to
17    the document that's Bates labelled L 0126617.
18    It's page 87 of the manual.
19        I would like to ask specifically
20    about the notes that are located at the top of
21    the page.  Can you make out what's written
22    there?
23        A.    It looks like these are the page
24    prestige lost, page 9 needs paste in, AR,
25    5/7/93.

55

1        Q.    Do you know who AR is?
2        A.    That would be Andy Russo.
3        Q.    And this document was produced by
4    Purchasing Net in the SAP litigation; correct?
5        A.    Yes, it was.
6        Q.    And are these, do these notes from
7    Mr. Russo suggest that this was a draft document
8    that needed to be further revised?
9        A.    I don't know.
10        Q.    Do you have any independent
11    recollection one way or another whether or not
12    this document, which is Exhibit No. 2, is a
13    draft document?
14        A.    I don't know.
15        Q.    Do you know why Mr. Russo would
16    have placed these notes on this document.
17        A.    I have no idea.
18        Q.    If I can direct your attention to
19    the document that's Bates labelled L 0126662.
20    It's page number 131 of the manual.
21        So this section entitled "purchase
22    requisitioning," what is this section about?
23        A.    This teaches a user how to use the
24    purchasing -- excuse me, the purchase
25    requisitioning module.

56

1        Q.    And if I can direct your attention
2    to what appears to be a screenshot located at
3    the top of the page.
4        A.    Um-hum.
5        Q.    Does that depict the functionality
6    or the requisition interface for the P.O. Writer
7    Plus version 10?
8        A.    Yes.
9        Q.    And if I can direct your attention
10    to the paragraph that's located underneath the
11    screenshot, it indicates "items from a specific
12    catalog can be displayed by entering a catalog
13    ID at the top of the screen."
14        Did I read that correctly?
15        A.    Correct.
16        Q.    So that catalog ID, that's derived
17    from the item master record; is that correct?
18        A.    That's correct.
19        MS. HUGHEY:  Objection; leading.
20        A.    That's correct.
21        Q.    And that catalog ID information is
22    inputted by the user as they're setting up the
23    P.O. Writer Plus system; is that correct?
24        A.    Right, input by the user or
25    imported through the data interface utility.

McEneny, Laurene  6/10/2010  12:08:00 PM

57

1    Q.   If I can direct your attention to
2    two pages further, it's document Bates labelled
3    L 0126664.
4        You see at the top it depicts what
5    appears to be a screenshot.  Does that appear to
6    be a screenshot?
7    A.   Yes.
8        Q.   And where it says catalog all, this
9    screenshot depicts all items that are in the
10   P.O. Writer Plus system as demonstrated in this
11   manual; is that correct?
12   A.   I'm sorry.
13       Q.   This specific screenshot, where it
14   says all next to catalog.
15   A.   Um-hum.
16       Q.   So this would depict all items that
17   are in this specific example of the system;
18   correct?
19   A.   That's right.  On the prior screen,
20   the user was directed, in this teaching example,
21   to -- there were different ways that you could
22   create the list of things that you might want to
23   request.  In this particular example, they're
24   teaching the user to use -- to create a list by
25   just the description.  So the result then is the

58

1    system is coming back and saying no specific
2    catalog was specified.  So all are being
3    considered and blank would be all.
4        And then this is, in this example,
5    giving just a full list of the items that were
6    in the database, the example database that was
7    provided with the guided tour booklet.
8        Q.   And with regards to the items that
9    are located in these specific search results,
10   there is no supplier that's associated with any
11   of these items; correct?
12       MS. HUGHEY:  Objection; vague.
13   A.   What you're looking at is simply a
14   list of the items that are in the item master
15   that met the criteria on the prior page.
16       Q.   And this describes all of the items
17   in the item master record; correct?
18   A.   Based on the search criteria, yes.
19       Q.   And the only search criteria that
20   are available are item numbers sequence, item
21   description sequence and commodity code
22   sequence; correct?
23   A.   That's correct.
24       Q.   And the results that are associated
25   with all items that are in the database, in this

59

1    specific example, are depicted in the screenshot
2    on L 0126664; correct?
3    A.   Correct.
4        Q.   And that doesn't include any
5    information with respect to the specific
6    suppliers from whom one could purchase these
7    specific items; correct?
8    A.   On this exact screen at this moment
9    in time, the answer would be no.  But you'll
10   notice at the bottom you have additional
11   function keys that you could use, that would
12   allow the user to drill in and get more
13   information.
14       Q.   And again, those additional
15   function keys are the extended description;
16   correct?
17   A.   Well, it's one of them is they
18   wanted more information, the shift, I believe
19   it's F5, is for additional description.  And the
20   shift F4 is for additional line information.  So
21   that, let's see if they have one in here.
22       Then if you look at the next page,
23   this would be an example, on 665, of the
24   additional information that might be available
25   to the user.

60

1    Q.   And these additional line
2    information, the next page, if we can go to
3    that, which is L 126665.
4    A.   Um-hum.
5        Q.   That depicts several additional
6    fields; correct?
7    A.   Right.  But that's all you would
8    get at this point.  Whatever was populated, you
9    would see it there.
10       Q.   And so those fields in the item
11   line description as depicted on L 0126665,
12   including due date, account requisitioner,
13   department, user defined field number 7, user
14   defined field number 8, tax 1, tax 2, fractional
15   quantity, VOM?
16   A.   UOM, unit of measure.
17       Q.   UOM, and unit price.
18   A.   Right.
19       Q.   Other than those fields, are there
20   any other fields that were associated with the
21   additional line information?
22       MS. HUGHEY:  Objection;
23   mischaracterizes the exhibit.
24   A.   This is, if you were to press the
25   combination that is the shift F4, this is all

McEneny, Laurene  6/10/2010  12:08:00 PM

61

1   the information you would see.  If you pressed
2   control, I believe it's function 5, then you
3   would see the item master extended description,
4   which probably is in here.  No, it's not.
5       Q.   The item extended description, that
6   is what we previously discussed; correct?
7       A.   That's right.
8       Q.   So the extended item description,
9   that's that free form description where a user
10  could input whatever information they wanted to?
11      A.   Correct.
12      Q.   With regards to that specific item
13  in the item master record; correct?
14      A.   Correct.
15      Q.   And with regards to the additional
16  line information, that includes only the
17  information that's depicted on document Bates
18  labelled L 0126665, the eleven fields that are
19  depicted on that specific page; is that correct?
20      A.   Correct.
21      Q.   And so between -- I'm sorry.
22     Other than the extended
23  description, the additional line information,
24  there are no other -- there is no other
25  information that a user could obtain in this

62

1   specific example searching for items that are in
2   the entire catalog in this specific example;
3   correct?
4     MS. HUGHEY:  Objection; vague.
5      A.   On this page, this is all you can
6   do, at this point in using the product.
7      Q.   And just so I'm clear, the only
8   search results a user could obtain when using
9   the P.O. Writer Plus product were the three
10  items listed here, which are item number
11  sequence, item description sequence, and
12  commodity code sequence, with the additional
13  option of being able to view the extended
14  description and the additional line information;
15  is that correct?
16      A.   At this point in using the product,
17  the way the user is being taught, that's
18  correct.
19      Q.   And so at this point when using the
20  product, when a user is reviewing the results of
21  their search, there is no source information for
22  any of these items; correct?
23     MS. HUGHEY:  Objection; vague.
24      A.   If they used user defined field for
25  specifying a preferred supplier or an alternate

63

1   supplier, that could be shown in place of user
2   defined field 7, user defined field 8.
3      Q.   So the only way the search results
4   would indicate a supplier for a product would be
5   if the user manually inputted that information
6   in either user defined field number 7 or user
7   defined field number 8, and the additional line
8   information which the user can see by pressing
9   shift and F4 from the results screen; correct?
10     A.   That's correct.
11     Q.   If I can direct your attention to
12  the document that's Bates labelled L 0126680.
13  I'm sorry, there is one further question.  If we
14  can go back to the previous page, L 0126664.  If
15  the user decides, for example, that they want
16  the second item that's located here, 3/8th inch
17  drill bits, what would they do?
18     A.   They would move the cursor down
19  next to the item they want, and they would input
20  a quantity.
21     Q.   And then what?
22     A.   Oh, let's see, and then what would
23  they do.
24     Q.   Perhaps I can rephrase the
25  question.  After the user enters the quantity,

64

1   does that information then go to a requisition?
2     A.   They're building a requisition
3   here.  So they would really have a couple of
4   choices.  They would put in a quantity of
5   the item they wanted, if they found it.  If
6   based on their search they didn't find the item
7   they wanted, they could go back and they could
8   do another search and look for the item.  But in
9   this example if they only wanted one item, they
10  could continue on to create a requisition.
11     Q.   So my question is specific to just
12  this one example, where a user sees the results,
13  they decide they want 3/8ths inch drill bits,
14  and they enter into a quantity for that number.
15     A.   Um-hum.
16     Q.   Do the 3/8th inch drill bits then
17  go directly to the requisition?
18     A.   It goes to -- it's going to go on
19  to the requisition, correct.  And then if you go
20  to 666.
21     Q.   I'm sorry.
22     A.   It's the user manual page, 135.
23  And it's the page numbering ending in 666.
24     This is then where they fill in
25  header information for the requisition.  So the

65

1   purpose of this part of the manual was simply to
2   teach people how to create a purchase
3   requisition.  With the idea being that it would
4   flow through and become either a quote or an
5   order.
6       Q.   So there is no intermediate step
7   between selecting that item and having that
8   information transported to the requisition; is
9   that correct?
10      A.   When you mean intermediate,
11  intermediate step?
12      Q.   I believe your testimony was that
13  if the user were to select those 3/8th inch
14  drill bits and entered a quantity for that
15  information, that the user would then be
16  transported to the requisition header
17  information screen; is that correct?
18      A.   Right.
19      Q.   And that requisition header
20  information is associated with the requisition;
21  correct?
22      A.   Correct.
23      Q.   So is there any intermediate step
24  that a user would undertake between entering the
25  quantity for that specific item before they got

67

1   me in this case I want a drill bit.  I want a
2   drill bit, and maybe I want to, on the
3   requisition header, you know, specify somebody.
4   They're done in the process.
5       If somebody is going to go buy it
6   from them, the people who we sold to are
7   typically buyers, and that's where the buyer
8   gets involved is on this page in the manual.  So
9   the buyer is going to turn the requisition into
10  something, or they're going to look at the
11  requisition and say you can't have it.  So
12  something is going to happen to that requisition
13  at this point.
14      Q.   So is it accurate to say that the
15  P.O. Writer Plus system was designed so that the
16  person who ultimately made the purchasing
17  decisions was distinct from the person who was
18  deciding what specific items they wanted?
19      A.   They could be -- you know, that's a
20  yes and no answer.
21      Sometimes people that bought our
22  product knew very clearly who they wanted
23  something from.  Maybe they were an engineer.
24  And they knew that they wanted a very specific
25  item and they wanted it from a very specific

66

1   to the requisition?
2       A.   To the requisition header, no.
3       Q.   Now if I could direct your
4   attention to the document labelled L 0126680.
5   The heading of this, there is the number 14
6   period, and then it states "requisitioning
7   interface."
8       What does requisitioning interface
9   mean?
10      A.   When the requisitioner is done with
11  their request, and basically that's them saying,
12  in this case I want the drill bit.  Then that
13  user community or that particular user is
14  finished.  The requisition interface was a piece
15  of software that was designed for the buyer.  So
16  again, in the purchasing department, you have
17  people that are taking care of the end user, the
18  requester's needs.
19      The purpose of this was to allow a
20  buyer to manage requisitions.
21      Q.   Now, when you say that the
22  particular user is finished once they enter into
23  the quantity of the specific item that they
24  want, what do you mean by that?
25      A.   They're finished.  They are telling

68

1   company, because it was just part of their
2   engineering process.  But you might also have
3   another user who doesn't really care where, you
4   know, where you get it, the drill bit.  I don't
5   care where you get the drill bit, just get me a
6   drill bit.
7       Typically then that would be
8   something that a buyer would go out and procure.
9   Because it's not very specific to a project,
10  it's not engineering related, it's something
11  that they just want to get.
12      Q.   Is it accurate to state that there
13  were two user communities associated with the
14  P.O. Writer Plus product?
15      MS. HUGHEY:  Objection; vague.
16      Q.   You can answer if you understand my
17  question.
18      A.   Well, there is several user
19  communities.  On the requisitioning side, you
20  know, as I mentioned, you might have a technical
21  person, like a research person.  And then you
22  might just have just a general user that needs
23  papers, pens, things like that.  So there could
24  be two communities on the requester side.  And
25  across the business process, then there are

McEneny, Laurene  6/10/2010  12:08:00 PM

---

69

1     requesters as a user community, and then there
2     are people in the purchasing department as
3     another user community.
4       Q.  So I believe you identified two
5     user communities then; correct?  There is the
6     requester community and the purchasing
7     department; is that correct?
8       A.  I did identify those as two
9     separate groups, yes.
10      Q.  Are those the only communities,
11    user communities for whom the P.O. Writer Plus
12    product was designed for?
13      A.  No.  There were others, depending
14    on the modules that people purchased at that
15    point in time.
16      Q.  And how would you define those
17    other communities for whom the product was made
18    for?
19      A.  The inventory control module might
20    be used for -- used by the warehouse people.  So
21    that might be an additional community.  That
22    just is an example.
23      Q.  Other than the individuals in the
24    warehouse that are managing the inventory, the
25    requisitioning community or the purchasing

---

70

1    community, can you identify any other users of
2    the P.O. Writer Plus system?
3      A.  No.  Again, as it relates to
4    modules that they might have.  One of the
5    modules people could buy is receiving.  And
6    depending on the size of the company, there
7    might be a receiving doc or a receiving
8    department that could be a community.
9       There was an interface called the
10    accounts payable interface, and that community
11    could be the accounts payable department.  So
12    that might be an additional community.
13      Q.  So whether or not those other user
14    communities would use the P.O. Writer system was
15    dependent upon whether or not that customer
16    purchased those additional modules; correct?
17      A.  Yes.
18      Q.  Now, specific just to the
19    purchasing and requisitioning side of the P.O.
20    Writer Plus system, is it accurate to say that
21    there are only two user communities that are
22    associated with that specific aspect of the
23    product?
24       MS. HUGHEY:  Objection; asked and
25    answered.

---

71

1      Q.  You can answer.
2      A.  At a high level, generally, yes,
3    there are two major communities.  People that
4    need things and the people that serve those
5    needs.
6      Q.  Is it also an accurate statement
7    that once the requisitioners -- I'm sorry, let
8    me strike that and start over again.
9       Is it an accurate statement to say
10    that once the requisitions were the way the user
11    wanted them, they would send them to purchasing?
12       MS. HUGHEY:  Objection; vague.
13      Q.  You can answer if you understand
14    the question.
15      A.  When the request was completed it
16    was available to people in purchasing.  Does
17    that answer your question?
18      Q.  If we can return to the document
19    that's at L 0126680.
20      A.  Um-hum.
21      Q.  So that this requisitioning
22    interface, who used the requisitioning
23    interface?
24      A.  Typically a buyer.
25      Q.  Now, if I can direct your attention

---

72

1    to the page of the manual that's 151, which is
2    the document Bates labelled L 0126682.
3      A.  Um-hum.
4      Q.  There is a screenshot located at
5    the top of the page.
6      A.  Um-hum.
7      Q.  And it states "selection" -- at the
8    top of the page it states "selection number 3
9    allows you to consolidate or split
10    requisitions."  Correct?
11      A.  Correct.
12      Q.  Did I read that correctly?
13      A.  Correct.
14      Q.  So what was the purpose of this
15    specific feature?
16      A.  This feature would allow a buyer to
17    do what it says, it allows them to take multiple
18    requisitions and combine them on to a single
19    order.  Conversely, they could take a single
20    requisition and split it into multiple orders.
21      Q.  Now, if I can direct your attention
22    to the screenshot.  There is several fields that
23    are associated with each item; correct?
24      A.  Correct.
25      Q.  And in this specific example at the

---

McEneny, Laurene  6/10/2010  12:08:00 PM

73

1  top it looks like those 3/8th inch drill bits
2  were selected; correct?
3      A.   Correct.
4      Q.   And there are several fields that
5  include, one of which includes vendor from REQ.;
6  correct?
7      A.   I'm sorry, ask your question again.
8  I'm busy trying to read.  I can hardly read this
9  screen.
10     Q.   There are several fields associated
11  with this specific screenshot in the requisition
12  consolidating and splitting module.  One of
13  which includes vendor from REQ.; correct?
14     A.   Correct.
15     Q.   And is the purpose of that field
16  that the user could specify the vendor from whom
17  they wanted to purchase that specific item?
18     A.   They could suggest the vendor, yes.
19     Q.   And if I can direct your attention
20  to the last paragraph on the page, it states "we
21  can now select a vendor for each item or we can
22  have the system do it for us."
23     A.   Correct.
24     Q.   "The system will select a vendor
25  based on the last PO for a given item."

74

1      A.   That is what it says, correct.
2      Q.   And did I read that correctly?
3      A.   Yes.
4      Q.   And so is the only way that the
5  vendor information ends up on this specific
6  consolidation and splitting module, the only
7  ways that that -- I'm sorry, let me start over
8  again.
9          Is it true that there is only two
10  ways that vendor information arrives on to the
11  consolidation and splitting module, one of which
12  is that the user selects the vendor themselves,
13  and the second of which is that the system
14  selects it based on the last purchase order for
15  a given item?
16     MS. HUGHEY:  Objection; compound,
17  vague.
18     A.   Let's see if I can break this up
19  and answer it.  If I heard you correctly, the
20  first question is how can vendor information end
21  up on this screen, which is on the user guide
22  151.  And the first way is it can come from the
23  requisition if the user input a vendor number.
24  The next way is the system can try and assign
25  the vendor.  And that is looking at the purchase

75

1  history, and that is not necessarily a PO, it
2  could be a contract, it could be a request for
3  quote, that type of thing.
4      So the two ways to, on this
5  particular screen, populate the field in
6  question, which is vendor from REQ, would be
7  just those two methods.  And it can remain blank
8  at this point, it doesn't have to have a vendor
9  number.
10     Q.   So at this stage, where a user is
11  attempting to consolidate or split requisitions,
12  the vendor information is either blank -- I'm
13  sorry, let me start over again.
14     With respect to this specific stage
15  of the requisition consolidation and splitting
16  module, the vendor information can be blank;
17  correct?
18     A.   Correct.
19     Q.   And also with respect to this
20  specific stage of the consolidation and
21  splitting module, the vendor information could
22  be manually inputted by the user; correct?
23     A.   Correct.
24     Q.   And with respect to this specific
25  module for consolidating and splitting

76

1  requisitions, the vendor information could come
2  where the system assigned it based on history
3  located within the system; correct?
4      A.   Correct.
5      Q.   So other than those three ways that
6  we've discussed, are there any other ways that
7  the vendor information or are there any other
8  ways that that specific vendor field can exist
9  in this splitting and consolidation module?
10     A.   Not that I'm aware of.
11     Q.   I'm sorry, I have one other
12  question that I need to go back and discuss with
13  respect to the search results on the
14  requisition, which was the document Bates
15  labelled L 0126664.
16     If a user selects a specific item,
17  is there any way that the system will
18  automatically convert that selection to a
19  different item?
20     MS. HUGHEY:  Objection; vague.
21     A.   The answer is no.  So if I
22  understand your question, you're saying if they
23  select drill, 3/8ths drill, will it make it
24  something else.  And the answer is the way the
25  product worked is you either selected the drill

McEneny, Laurene  6/10/2010  12:08:00 PM

|  | 77 |
|---|---|
| 1 | or not.  So that's how it worked. |
| 2 | Q.   So if I can direct your attention |
| 3 | to the document that's Bates labelled L 0126696. |
| 4 | And just generally if you can review the next |
| 5 | six pages, it appears to be some sort of |
| 6 | printout. |
| 7 | And do you know what these |
| 8 | documents are? |
| 9 | A.   No.  I mean, do I recognize them? |
| 10 | Q.   Do you recognize the documents, we |
| 11 | can start with that? |
| 12 | A.   Oh, I'm sorry, yes.  These look |
| 13 | like examples of purchase orders that would have |
| 14 | been generated from the P.O. Writer Plus system. |
| 15 | Q.   And do you see there is some notes |
| 16 | on the page that's Bates labelled L 0126696? |
| 17 | A.   Um-hum. |
| 18 | Q.   Can you make out what those notes |
| 19 | say at the top of the page? |
| 20 | A.   One looks like G+.  Paste-ins, page |
| 21 | 24. |
| 22 | Q.   And do you recognize the |
| 23 | handwriting for -- |
| 24 | A.   It looks like Andy Russo's |
| 25 | handwriting. |

|  | 78 |
|---|---|
| 1 | Q.   Okay.  And if I can direct your |
| 2 | attention to the document that's Bates labelled |
| 3 | L 0126697. |
| 4 | A.   697, yes. |
| 5 | Q.   It's the next page. |
| 6 | A.   Um-hum. |
| 7 | Q.   And you see there is some |
| 8 | additional handwriting on this page? |
| 9 | A.   Um-hum, that looks like Andy's. |
| 10 | Q.   Now, does the handwriting that's on |
| 11 | these pages, which are located at the documents |
| 12 | in the Bates range of L 0126696 to L 0126701, |
| 13 | were these documents with this handwriting, were |
| 14 | they included in the P.O. Writer manual? |
| 15 | A.   I don't know. |
| 16 | Q.   And does the fact that there is |
| 17 | this handwriting on these documents suggest that |
| 18 | this document may be a draft document? |
| 19 | MS. HUGHEY:  Objection; vague, |
| 20 | leading. |
| 21 | A.   I don't know why they would be |
| 22 | included in here.  And the reason I say that is |
| 23 | the guided tour ended with the accounts payable |
| 24 | interface module.  And so I don't know why these |
| 25 | are included in here.  They don't seem to fit. |

|  | 79 |
|---|---|
| 1 | Q.   So based on the handwriting that we |
| 2 | had seen and discussed previously with respect |
| 3 | to this document, as well as the handwriting on |
| 4 | these specific pages, it's possible that this |
| 5 | document might be a draft document? |
| 6 | MS. HUGHEY:  Objection; leading, |
| 7 | vague. |
| 8 | A.   I don't know. |
| 9 | Q.   So is it possible that this |
| 10 | document may be a draft document? |
| 11 | A.   I don't know if it's a draft |
| 12 | document or not. |
| 13 | MR. REDDY:  It's about 12:40, it |
| 14 | might be a good breaking point if we want |
| 15 | to break for lunch, it's been about two |
| 16 | hours. |
| 17 | THE VIDEOGRAPHER:  Going off the |
| 18 | record, end of tape 1 at 12:36., |
| 19 | (Luncheon recess:  12:36 p.m.) |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

|  | 80 |
|---|---|
| 1 | A F T E R N O O N   S E S S I O N |
| 2 | 1:21 p.m. |
| 3 | THE VIDEOGRAPHER:  Back on the |
| 4 | record, 1:21, this is the beginning of tape |
| 5 | 2. |
| 6 | (McEneny Exhibit 3 for |
| 7 | identification, note report dated February |
| 8 | 1, 2006, production numbers ePLUS 219477 |
| 9 | through ePLUS 219483.) |
| 10 | L A U R E N E   M c E N E N Y, |
| 11 | resumed, having been previously duly sworn, was |
| 12 | examined and testified further as follows: |
| 13 | CONTINUED EXAMINATION |
| 14 | BY MR. REDDY: |
| 15 | Q.   Ms. McEneny, I've handed to the |
| 16 | reporter a document that's Bates labelled ePLUS |
| 17 | 219477 to 219483.  It's stated note report, |
| 18 | dated February 1, 2006. |
| 19 | Could you take a minutes to |
| 20 | familiarize yourself with that document. |
| 21 | Do you recognize this collection of |
| 22 | documents? |
| 23 | A.   Yes. |
| 24 | Q.   And what do you recognize it as? |
| 25 | A.   The first page would be notes from |

McEneny, Laurene  6/10/2010  12:08:00 PM

81

1    our contact management system.  The second page
2    would be our, a copy of our license agreement,
3    our being the P.O. Writer Plus license
4    agreement.  Behind that is the American Tech
5    client support program, which was on the back of
6    the license agreement.  A letter to one of our
7    customers at the time, Steve Cruz at Household
8    Credit.  And some more notes from the contact
9    management system.
10   Q.    If I could direct your attention to
11   the second page of the document, which is Bates
12   labelled ePLUS 219478.  I believe you testified
13   that this is the P.O. Writer Plus license
14   agreement; is that correct?
15   A.    This is a copy of the agreement at
16   this point in time, yes.
17   Q.    Is this a standard license
18   agreement that American Tech would have used
19   with its customers for the P.O. Writer Plus
20   program in this time frame?
21   A.    Yes.
22   Q.    Now, if I could direct your
23   attention to point number 4, the headline says
24   "reproduction."
25   A.    Um-hum.

82

1    Q.    And it states "client acknowledges
2    the proprietary nature of P.O. Writer Plus and
3    agrees not to make copies of P.O. Writer Plus
4    software or users manual.  Client is aware that
5    American Tech, Inc. will vigorously prosecute
6    anyone who makes unauthorized copies of its
7    software and users manual, and client will be
8    responsible for all loss of profits and costs of
9    prosecution in the event of such duplication."
10   Did I read that correctly?
11   A.    Yes.
12   Q.    Now, does that statement accurately
13   reflect the policy of American Tech with respect
14   to the P.O. Writer Plus product version 10?
15   A.    It's what's in our license
16   agreement, so I would say yes.
17   Q.    So would this be the standard
18   language that was used whenever American Tech
19   licensed the P.O. Writer Plus product?
20   A.    This was our standard agreement.
21   Q.    Thank you.  You can put that one
22   aside.
23   Now, when a customer purchased the
24   P.O. Writer Plus product, how would they set it
25   up?

83

1    A.    What do you mean how would they set
2    it up?
3    Q.    So did the user or the purchaser of
4    a P.O. Writer Plus product, did they need to
5    have a password in order to unlock the product
6    when they initially put it on their system?
7    A.    Yes.  The product at this point in
8    time was being sold on diskette.  So typically
9    people would take a trial, they would fill out a
10   trial agreement.  We would send them the actual
11   software and the users manuals for whatever they
12   wanted to look at.  They could look at one
13   module or they could look at all the modules.
14   And then it was supposed to be a 30
15   day trial, it rarely was 30 days, it typically
16   ran longer.  And if they decided to buy, then we
17   would send them a password, it was a sheet of
18   instructions that basically would open up the
19   system for them to take advantage of the full
20   functionality as far as, you know, some file
21   limits that were on the product.  Then we
22   expected them to return the rest of the product
23   that they weren't purchasing.
24   Q.    What happened if a user did not
25   first have a trial version of the product?

84

1    A.    That was pretty rare.  But it could
2    happen, they could just buy the product.  As
3    soon as they paid and signed a license
4    agreement, our policy was then to issue the
5    password.
6    Q.    So a user needed to have the
7    password in order to unlock the features of the
8    P.O. Writer Plus product; is that correct?
9    A.    No, not to unlock the features.  To
10   take a limit off the database.  The full
11   features were there.
12   Q.    And what limits would be placed on
13   the database during the trial period?
14   A.    I don't recall exactly what limits
15   were on each particular module.  But generally
16   it was how large we would let the master -- the
17   database become.  It would limit it to certain
18   transactions.  But I don't remember at that
19   point in time exactly what the number was.
20   Q.    Do you recall any other limitations
21   that would be placed on the product during the
22   trial period?
23   A.    No.
24   Q.    If the user did not have the
25   password at the conclusion of their trial

McEneny, Laurene  6/10/2010  12:08:00 PM

85

1  period, how would P.O. -- how would American
2  Tech recover their product?
3      A.   Well, we didn't always recover
4  them.  Sometimes people would hang on to them
5  and we would contact them repeatedly and ask
6  them to ship it back.  I would say, you know,
7  majority of the time that was not an issue.  But
8  really the only protection we had is on the
9  limitation of the database size.
10     Q.   So those users that kept their
11 trial versions, they're unauthorized users of
12 the product; is that correct?
13     A.   They wouldn't get very far.  I
14 mean, you can only put so much information in
15 the database, so it wouldn't really be very
16 useful to them.
17     Q.   When you say they wouldn't get very
18 far, what do you mean by that?
19     A.   Well, they wouldn't be able to put
20 a lot of transactions in the database.
21     Q.   Now, with respect to the trial
22 users, did the trial users also have to agree to
23 the prohibition on reproduction that we just
24 discussed that was in the standard license
25 agreement?

86

1      A.   I don't remember what the trial
2  agreement specifically said.  I'd have to look
3  at that.
4      Q.   Is it your understanding that the
5  trial agreement was distinct from the license
6  agreement that we just went through, which was
7  Exhibit No. 3?
8      A.   It was, correct.
9      Q.   And so you don't recall here today
10 whether or not the trial users were required to
11 or were prohibited, I'm sorry, from reproducing
12 the software?
13     A.   I don't recall.  I don't know if we
14 gave that as an exhibit or not.  But I'd want to
15 look at the trial agreement to answer that
16 question.
17     Q.   Do you have any reason to believe
18 that trial users were not prohibited from
19 reproducing the software or the manuals that
20 they were given?
21     A.   I think that we would want to
22 protect ourselves, so, you know, I don't want to
23 guess.  I'd just say that I would believe that
24 they would be told not to do that.  But again, I
25 would simply want to verify that.

87

1      Q.   But sitting here today do you have
2  any reason to believe that American Tech shipped
3  trial versions of the P.O. Writer Plus software
4  and did not include a prohibition against
5  reproduction of either the software or the
6  manual?
7      A.   I'm not sure what the trial
8  agreement said.  I would expect us to try and
9  protect ourselves, that's our practice.
10         MR. REDDY:  I'm handing you a
11 document which is going to be marked as
12 Exhibit No. 4.  It's a two-page document
13 Bates labelled ePLUS 219491 to 219492.
14         (McEneny Exhibit 4 for
15 identification, note report, dated February
16 1, 2006, production ePLUS 219491
17 through ePLUS 219492.)
18     Q.   Do you recognize this document?
19     A.   I do.
20     Q.   And what do you recognize it to be?
21     A.   The first page are notes from our
22 contact management system.  And the second page
23 is a P.O. Writer Plus license agreement.
24     Q.   So the first page of that document,
25 does that reflect that this specific user was

88

1  shipped a trial version of 10.0?
2      A.   Um-hum.
3      Q.   Now, the second page, if we look to
4  the license agreement, would this have been the
5  license agreement that was signed in order for
6  the user to obtain trial version of the product?
7      A.   No.
8      Q.   What is the purpose of this
9  document then?
10     A.   This is the license agreement that
11 Bank United of Texas would have signed, in this
12 case it's dated 1/24/94.  So what would have
13 happened is either they took a trial and bought
14 the product, or they bought the product, signed
15 the license agreement, and then called us and
16 wanted to look at the newer version.  And that
17 was not uncommon.  People often, you know,
18 wanted to look at the latest software.
19         So I guess what I'm saying is this
20 October 8, '93, this is when they shipped the
21 trial.  Then this is a license agreement.  So
22 this doesn't represent a trial agreement.  This
23 represents an actual license agreement.
24     Q.   Now, with respect to these trial
25 agreements, do you have any reason to believe

McEneny, Laurene  6/10/2010  12:08:00 PM

89

1  that there was not a prohibition against
2  duplication of either the software or the
3  manuals with respect to the trial version of the
4  software?
5      MS. HUGHEY:  Objection; asked and
6  answered.
7      A.  Yeah, I think I've already answered
8  that.
9      Q.  What was your answer?
10     A.  My answer is I believe that it was
11 most probable that there was some kind of
12 wording to protect us on that.  But I couldn't
13 say for sure unless I had the agreement in front
14 of me.
15     Q.  If I could return for a moment to
16 Exhibit No. 2, which was I believe the guided
17 tour.
18     A.  Okay.  Got it.
19     Q.  And the page which we've been
20 referring to as L 126664.  Which were the
21 results from the purchase requisitioning
22 section.
23     A.  Okay.
24     Q.  So if a user selected an item from
25 this list, at this point was there any way that

90

1  a user could cross-reference this item with
2  other items in the P.O. Writer database?
3      MS. HUGHEY:  Objection; vague.
4      Q.  You can answer if you understand
5  the question.
6      A.  On this screen, they're looking at
7  a list of items that match their search
8  criteria.  If they were to select the
9  combination, the ship forward to look for
10 additional information, that's shown on the next
11 page, the 665.
12     The only way in this version that
13 they could cross-reference is if they chose, as
14 a customer, to implement the user defined fields
15 or to provide additional information in the
16 extended description area as to what a
17 cross-reference might be.  So that would
18 strictly be how that particular customer might
19 have chosen to implement the product.
20     Q.  And as we discussed earlier, that
21 additional line information, the user defined
22 fields within the additional line information,
23 was entirely up to the user to enter whatever
24 information they wanted to in those fields;
25 correct?

91

1      A.  That's correct.
2      Q.  And those user defined fields could
3  not have been searched in the version 10 of the
4  P.O. Writer Plus system; correct?
5      MS. HUGHEY:  Objection;
6  mischaracterizes the witness' testimony.
7      A.  The user defined fields could not
8  be searched to do an item look up.  And to my
9  knowledge, and based on what's in this document,
10 they couldn't be searched in this version.
11 That's my understanding after looking at this
12 document.
13     So they were there for reference.
14     Q.  You can set that document aside.
15     (McEneny Exhibit 5 for
16 identification, production entitled "Tenth
17 Edition," production numbers L 126501
18 through L 126513.)
19     MR. REDDY:  I've handed a document
20 to be marked as Exhibit No. 5, which is a
21 document Bates labelled L 126501 through
22 126513.  And at the top it states "tenth
23 edition," in parentheses, April 1993.
24     Q.  If you can take a few moments to
25 familiarize yourself with that document.

92

1      And do you recognize the collection
2  of approximately twelve pages of documents?
3      A.  Yes, I recognize these as pages
4  from the purchasing manual at that point in
5  time.
6      Q.  Now, when you say that point in
7  time, what are you referring to?
8      A.  Spring of '93.
9      Q.  And is that referring to version 10
10 of the P.O. Writer Plus software?
11     A.  That's correct.  This specifically
12 would be relating to the purchasing module.
13     Q.  Now, if I can direct your attention
14 to the third page of the document.  It states
15 "no part of this work may be reproduced or used
16 in any way for or by any means, graphic,
17 electronic or mechanical, including
18 photocopying, recording, taping or information
19 storage and retrieval systems, without express
20 permission from American Tech, Inc."
21     Did I read that correctly?
22     A.  Yes.
23     Q.  Now, was that prohibition against
24 copying of the manual placed on every manual
25 sent by American Tech with respect to version 10

McEneny, Laurene  6/10/2010  12:08:00 PM

93

1 of the P.O. Writer product?
2     A.  I don't know if this appeared on
3 every manual.
4     Q.  Do you have any reason to believe
5 that that prohibition did not exist on each of
6 the manuals that were released?
7     A.  I couldn't speak to that.  All I
8 know is it's on this one.  I really don't know
9 if it's on the others.
10     Q.  Why was this information contained
11 in the manual?
12     A.  Again, I'm sure, like I said
13 earlier, it's kind of our practice to try and
14 protect ourselves.
15     Q.  When you say protect yourselves,
16 what do you mean by that?
17     A.  So people don't copy the software
18 and the users manuals.
19     Q.  So in general did American Tech
20 have a practice of trying to prevent people from
21 copying the software and the users manuals --
22 and the user manuals?
23     A.  Well, yes, we did.  We didn't want
24 a company to buy one copy of our product and pay
25 for it and get the password, and then copy the

94

1 software and copy the manuals and, you know,
2 send it to other facilities or friends and
3 family or whatever.  So that's a large concern
4 of any software company.
5     Q.  If I can direct your attention to
6 the document in the manual, it's 1-1.  I
7 actually need to reference the SAP number, which
8 is 803288.  I believe it's 1-1.  And the heading
9 is "getting started."
10     A.  Yes.
11     Q.  If I can direct your attention to
12 the paragraph that begins "the purchasing module
13 is the foundation of the P.O. Writer Plus family
14 of programs."
15     A.  Yes.
16     Q.  Do you see that paragraph?
17     A.  I do.
18     Q.  And there are several other modules
19 that are located in that paragraph; is that
20 correct?
21     A.  That's correct.
22     Q.  Are these the other modules that we
23 discussed earlier that a customer had the option
24 of purchasing after they purchased the
25 purchasing module?

95

1     A.  That's correct.  There are other --
2 this represents -- yes, these are the other
3 modules that were available.
4     Q.  Are there any other modules that
5 were available, to your knowledge, with respect
6 to version 10 of the program that aren't stated
7 in this specific paragraph?
8     A.  You know, I probably want to map
9 this to the license agreement at the time.
10     Vendor performance is listed in the
11 manual and on the license agreement it's called
12 supplier performance.  It's the same module.
13     Accounts payable interface is AP
14 interface module.
15     Inventory control is the same.
16     Requisitioning is purchase
17 requisitioning module in the license agreement.
18     Ad hoc reporting is the same.
19     DD interface utility is the same.
20     Remote requisitioning is listed in
21 the purchasing manual, and not called out
22 specifically on the license agreement.
23     And remote requisitioning interface
24 is listed in the manual and not called out
25 specifically on this license agreement that we

96

1 had for Bank United.
2     Fax/EDI interface, X12 translation.
3     And the bar code interface.
4     So it looks like these were the
5 modules available at that time.
6     Q.  Now, I notice that you were looking
7 at Fielder Exhibit No. 4, which was the two-page
8 document indicating a note report to Bank United
9 of Texas; is that correct?
10     A.  I was actually looking at the
11 second page of that, it's the P.O. Writer Plus
12 license agreement that lists the modules on the
13 top left side.
14     Q.  And this specific license agreement
15 was signed in January of 1994; correct?
16     A.  This one was, that's correct.
17     Q.  And was this the standard license
18 agreement used by American Tech with respect to
19 the P.O. Writer Plus product as of January 1994?
20     A.  Well, the manual was released in
21 '93.  This particular license agreement was
22 signed in '94.  And I don't see a date on this
23 license agreement.  So the only thing I could
24 tell you is that this is what we were using on
25 January 24th of '94.

McEneny, Laurene  6/10/2010  12:08:00 PM

97

```
1        Q.   Did American Tech have a practice
2   of writing different license agreements for
3   different customers?
4        A.   We had a practice of having a
5   general license agreement.  But occasionally a
6   customer would want to make a modification to
7   it.  They would get their attorneys involved or.
8   So occasionally.  It was not -- it was not the
9   norm that we would change the license agreement,
10  but occasionally we would.
11       Q.   But the license agreement that's
12  depicted in this specific exhibit, is that your
13  understanding that this was the standard license
14  agreement used by American Tech in January of
15  1994?
16       A.   This looks like the standard used
17  in 1994, yeah.
18       Q.   Okay.  Now, returning to Exhibit
19  No. 5.
20       A.   Um-hum.
21       Q.   And that specific paragraph we were
22  talking about.  With respect to each of those
23  modules.  So each of those -- a user wishing to
24  use those modules would have to purchase and
25  license that module separately; is that correct?
```

98

```
1        A.   That's correct.
2        Q.   You can set that document aside.
3            (McEneny Exhibit 6 for
4   identification, document, production
5   numbers L 126718 through L 126964.)
6        Q.   You've been handed a document which
7   is marked as Exhibit No. 6.  It's a document
8   Bates labelled L 126718 to L 126964.  And I'm
9   not going to ask you to go through it page by
10  page.  But if you can maybe peruse it and look
11  up at me after you've had a chance to do so.
12           It's actually only one specific
13  section of this document that I'd like to
14  discuss with you.  If I can direct you to, at
15  the manual, it's at 2-221.
16           And before you investigate that
17  page further, can I just ask generally do you
18  recognize this document that's been marked as
19  Exhibit No. 6?
20       A.   Yes, I do.
21       Q.   And what do you recognize it to be?
22       A.   As chapter 2 of the purchasing
23  module users manual, which was a self-paste
24  tutorial, to teach users how to use this
25  particular module.
```

99

```
1        Q.   Now, directing you again to page
2   2-221 of the document.
3        A.   Um-hum.
4        Q.   The heading states "creating POs
5   from a catalog."
6        A.   Correct.
7        Q.   What is the purpose of this
8   section?
9        A.   Is to train an end user on how to
10  use a feature in the product that would allow
11  them to search the item master by catalog and
12  pick items and create a purchase order.
13       Q.   So a user, with respect to this
14  specific section, would take items from the
15  catalog and enter them directly on to a purchase
16  order; is that correct?
17       A.   That was a feature in the product,
18  that's correct.
19       Q.   Now, if I can direct your attention
20  to the page that's 2-229.  At the top of the
21  page is a screenshot.
22           And the screenshot depicts I
23  believe two items that will be purchased from a
24  specific vendor; is that correct?
25       A.   That's correct.
```

100

```
1        Q.   Now, if I can direct your attention
2   to the note field, the first sentence states
3   "items in the Best Buy catalog can be purchased
4   from any vendor."
5           Did I read that correctly?
6        A.   Yes, you did.
7        Q.   So by purchased from any vendor,
8   does that mean that the user can select the
9   supplier for that specific item?
10       A.   Yes, that's correct.
11       Q.   Now, with respect to the second
12  sentence, it states "also, the catalog
13  designation does not determine the vendor for
14  the purchase order."
15           Did I read that correctly?
16       A.   Yes, you did.
17       Q.   Now, the catalog designation that
18  that's referring to, is that the same thing as
19  the catalog ID from the item master that we
20  discussed previously?
21       A.   Yes.
22       Q.   Now, when the statement says that
23  the catalog designation does not determine the
24  vendor for the purchase order, is that because
25  the user is the person who ultimately decides
```

McEneny, Laurene  6/10/2010  12:08:00 PM

101

```
1    who the vendor will be for that item?
2         A.    That's because the system would
3    allow the user to determine that.
4         Q.    So my question was, the statement
5    says that the catalog designation does not
6    determine the vendor for the purchase order.  Is
7    the reason for that because the user who
8    ultimately decides who the vendor will be can
9    select whom the vendor will be?
10        A.    The reason is because we also allow
11   the user to determine that.  So I could have two
12   items in a catalog called Staples, and I could
13   use Staples to select the item.  And then I
14   could continue on and place the order with
15   Staples if I wanted.  But I also was not limited
16   by the software.
17             And that's the point I think we're
18   trying to make here, you could, you being the
19   buyer, because that's who would use this module,
20   you could check -- change the vendor to, in this
21   example, Best Buy.
22             So the way the software worked is
23   you had the ability as an end user to specify
24   any supplier that you wanted.
25        Q.    But the catalog information, the
```

102

```
1    catalog ID field that was from the item master,
2    that catalog ID was not associated with any
3    specific vendor in the system; correct?
4         MS. HUGHEY:  Objection; vague.
5         A.    That's right.  The catalog ID and
6    the item master is really a way to group items
7    together, to make it easy for a user to select
8    those items.
9         Q.    And the user is the one that sets
10   and determines what the catalog will be;
11   correct?
12        A.    A user could be a requisitioner,
13   part of that community, or a user could be a
14   buyer.  And they both can use the same catalog
15   ID.  So again, that's only one catalog ID in the
16   item master file.
17        Q.    So there was no way to associate
18   the catalog ID with the vendor master file;
19   correct?
20        MS. HUGHEY:  Objection; vague.
21        A.    The only way that you could
22   associate it was through use of the user defined
23   fields or through providing additional
24   information in the extended description field,
25   which would be a reference.
```

103

```
1         Q.    In either respect, using either the
2    user defined fields or the extended description
3    field, that does not draw from the vendor master
4    file; correct?
5         A.    That's correct.
6         Q.    Now, if I can direct your attention
7    to the third paragraph here.  It states "the
8    vendor field contains the last vendor that the
9    first item on this PO (in this case A2000 ) was
10   purchased from.  The last PO created for A2000
11   was from vendor number 12345-Best Buy Supply.
12   If the last PO for A2000 was for vendor number
13   NAPC-1, (North American Packaging) NAPC-1 would
14   be displayed in the vendor field."
15             Did I read that correctly?
16        A.    Yes, you did.
17        Q.    So does that paragraph indicate
18   that the vendor for this specific purchase order
19   is determined solely from the last vendor for
20   that specific item?
21        A.    In this example, yes.
22        Q.    And the only other way that the
23   vendor could be changed is if the user manually
24   selected a different vendor; is that correct?
25        A.    That's correct.
```

104

```
1         Q.    And then if I can direct your
2    attention two pages further.  It's page 2-231 in
3    the manual.  And the heading states "major
4    points to remember."
5             And when you decide in this manual,
6    what was the purpose of the major points to
7    remember highlight?
8         A.    Just to summarize some of the key
9    concepts for the user.  Things that they would
10   have learned in that chapter.
11        Q.    Now, if I can direct your attention
12   to the second to last point to remember, it
13   states "the catalog designation does not
14   determine the vendor for the purchase order.
15   The default vendor is determined by the previous
16   purchase for the first item on the purchase
17   order."
18        A.    For this tutorial lesson, that is a
19   key major point to remember.
20        Q.    You can put that document aside as
21   well.
22        MR. REDDY:  If we can maybe take
23   just a quick two minute break I think I may
24   be done.
25        MR. SAHNER:  We can take a
```

McEneny, Laurene  6/10/2010  12:08:00 PM

---

**105**

1   five-minute break.
2        THE VIDEOGRAPHER:  Going off the
3   record at 2 o'clock.
4        (A recess was taken.)
5        THE VIDEOGRAPHER:  Back on the
6   record, 2:15.,
7   BY MR. REDDY:
8        Q.   Ms. McEneny, I notice that you
9   brought your testimony from the SAP trial with
10  you here today; is that correct?
11       A.   Correct.
12       Q.   And you've occasionally been
13  consulting it at different times throughout the
14  course of the deposition today?
15       A.   Correct.
16       Q.   Just one item I would like to
17  specifically bring to your attention.  If you
18  can review your testimony at page 2179.
19       A.   Which day was that, first or second
20  day?
21       Q.   I believe it's the second day.
22       A.   Oh, that's the ePlus number?
23       Q.   No, the number of the actual
24  transcript.
25       A.   Oh, I see.

---

**106**

1        MS. HUGHEY:  What page are you on?
2        MR. REDDY:  2179 of the transcript.
3        A.   Okay.
4        Q.   Actually specifically at page 2180,
5   beginning at line -- I'm sorry, beginning at
6   line 3, the question was:
7        "Question:  If you ran a search
8   catalog, it was one or all; right?"
9        The answer was:
10       "Answer:  That's correct, yes."
11       A.   I'm sorry, where are we in this
12  process?
13       Is this within the context of
14  requisitioning or purchasing?
15       Q.   Perhaps I can speed this up.  I
16  just want to ask, when you testified that a user
17  of the P.O. Writer Plus system could only search
18  either one catalog or all of the catalogs in the
19  system, was that a truthful statement?
20       MS. HUGHEY:  Objection;
21  mischaracterizes the witness' testimony,
22  foundation.
23       A.   When you're searching in the
24  system, whether you're in the requisitioning
25  module or you're in the purchasing module, if

---

**107**

1   you were using the catalog field, you could
2   either put a catalog ID in or you could leave it
3   blank.  So when I answer yes, that you can do a
4   search on a catalog or leave it blank, let's
5   see, I understand that if you ran a search
6   catalog is at 1 or all.  So when I say 1, it's
7   specifically 1 a user would want to enter, or
8   all would be the absence of entry, in which case
9   it would be everything that's in the item
10  master.  So that would be items that have
11  various catalogs or blank.
12       Q.   So those were the only two options,
13  a person either left it blank, at which point
14  they searched all the catalogs, or they entered
15  into a specific catalog ID; is that correct?
16       A.   Correct.  For that particular
17  search session.  You could circle back and
18  research it and continue to add items if you
19  wanted.  But for that particular search session
20  it was leave it blank or put something in.
21       MR. REDDY:  I don't have of any
22  further questions at this time, I may have
23  some additional questions based on
24  Ms. Hughey's questioning.
25       I'm sorry, there is one further

---

**108**

1   question I need to ask.  I'm sorry, I was
2   getting a little ahead of myself.
3        Q.   You testified in the SAP trial;
4   correct?
5        A.   Correct.
6        Q.   You were hired as a paid consultant
7   on behalf of SAP; is that correct?
8        A.   Yes.  Right.  I was a fact witness.
9        Q.   And were you compensated for the
10  time you spent working on that case?
11       A.   Everything up to the trial.  I
12  wasn't compensated for the trial time.
13       Q.   And do you recall roughly how much
14  you were compensated by SAP for the work that
15  you did in that case?
16       A.   No.
17       Q.   Would it be more than $10,000?
18       A.   I actually don't recall.  It
19  wasn't, it didn't seem like a lot of money.
20       Q.   When you say it didn't seem like a
21  lot of money, can you --
22       A.   I don't remember, so I'm not going
23  to speculate.
24       Q.   Was your husband, Mr. Tim McEneny,
25  was he also a paid consultant of SAP during that

---

McEneny, Laurene  6/10/2010  12:08:00 PM

109

1    trial?
2        A.   No.
3            MR. REDDY:  In that case I don't
4    have any further questions at this time.  I
5    may have some additional questions based on
6    Ms. Hughey's questioning.
7            EXAMINATION BY
8            MS. HUGHEY:
9        Q.   Hello, Ms. McEneny, I'm going to be
10   asking you some questions.  You understand that
11   I represent Lawson.
12       A.   Yes.
13           (Lawson Exhibit 95 for
14   identification, document, production
15   numbers ePLUS 0219927 through ePLUS
16   0219937.)
17       Q.   I'm going to hand you what's been
18   marked as Exhibit 95.
19           Do you recognize this document?
20       A.   I do.
21       Q.   What is this document?
22       A.   This is a brochure that we used to
23   sell our client support program.
24       Q.   Can you turn to page ePlus 0219928
25   of the document that's been marked Lawson

110

1            Exhibit 95, which for the record has a range
2    ePLUS 0219927 to 0219937.  So this is the second
3    page of the document.
4            Do you see where it says "new
5    releases automatically."
6        A.   Yes.
7        Q.   Is this consistent with your
8    testimony that you did about one major release a
9    year?
10       A.   Yes.
11       Q.   So would it be fair to say that
12   version 9.0 would have been released sometime in
13   the spring or summer of 1992?
14       A.   Yes.
15       Q.   And version 10 would have been
16   released sometime in the spring or summer of
17   1993?
18       A.   Correct.
19       Q.   Why do you have a regular release
20   date?
21       A.   One of the -- one of the reasons --
22   well, let's put it this way, a big part of our
23   revenue would come from support revenue.  And so
24   in addition to just supporting customers, we
25   also included major releases as a major feature.

111

1            So that was our decision to just improve the
2    value of this program, because it was pretty
3    much a major revenue stream for the company.
4            (Lawson Exhibit 96 for
5    identification, document, production
6    numbers ePLUS 0219612 through ePLUS
7    0219619.)
8        Q.   I'm going to hand you what's been
9    previously marked as Lawson Exhibit 96.  And
10   this is numbered ePLUS 0219612 to 619.
11           Do you recognize this document?
12       A.   Yes.
13       Q.   What is this document?
14       A.   This was a direct mail piece that
15   we had printed and we would send to prospects
16   and customers.
17       Q.   Can you turn to page ePLUS 0219616.
18   The third page of this document.
19           What is this document showing?
20       A.   This is the insert that would be in
21   this particular brochure.  And it is listing the
22   modules, the prices that they're being sold at,
23   and a special discount offer that we had at that
24   time.
25       Q.   And so is it consistent to say that

112

1            purchasing, receiving, vendor performance,
2    inventory control, AP interface, report writer,
3    data interface utility, EDI interface, remote
4    requisitioning and bar code interface were on
5    sale as of December 31, 1989?
6        A.   Yes.
7        Q.   You can put that aside.
8            (Lawson Exhibit 97 for
9    identification, document, production
10   numbers ePLUS 0219493 through ePLUS
11   0219494.)
12       Q.   I'm handing you what's been marked
13   Lawson Exhibit 97, which has the Bates range
14   ePLUS 0219493 to 94.  And this is Exhibit 1 in
15   that binder I handed you.
16           Do you recognize this document?
17       A.   I do.
18       Q.   What is this document?
19       A.   The first page is -- are notes from
20   our contact management system.  And the second
21   page is a P.O. Writer Plus license agreement for
22   a law firm in Chicago, Kirkland & Ellis.
23       Q.   Is this document consistent with
24   your testimony that Lawson version 10 -- I'm
25   sorry, strike that.

McEneny, Laurene  6/10/2010  12:08:00 PM



113

1        Is this consistent with your
2    testimony that P.O. Writer version 10 was on
3    sale of at least June 9, 1993?
4        MR. REDDY:  Objection;
5    mischaracterizes testimony.
6        MS. HUGHEY:  Let me rephrase.
7    Q.    Does this document reflect when
8    P.O. Writer version 10.0 was on sale?
9        MR. REDDY:  Objection; leading.
10       MS. HUGHEY:  Let me rephrase.
11   Q.    Does this document reflect when
12   P.O. Writer version 10 was on sale or not?
13   A.    Yes, it does.
14   Q.    And when was P.O. Writer version 10
15   on sale?
16   A.    We started shipping in the spring.
17   I can -- you want me to just explain what this
18   is?
19   Q.    Yes.
20   A.    On the first page, on the bottom is
21   a note from January 7th of '93.  And it's simply
22   stating that we shipped purchased versions, as
23   opposed to shipped trial version, that would be
24   the definition in how we would keep the notes.
25   And that's a version 9 multiuser version for

114

1    between five and seven users.  PM indicates it's
2    a purchasing multiuser version, and then behind
3    that's the serial number.
4        So they are purchasing and
5    receiving a fax interface.  Then a note was
6    entered on February 8th, we received a fax copy
7    and a check.  So they bought the software.
8        And then above that, the top note
9    then indicates on June 9, '93, we shipped them,
10   it says CSP rollout version.  What that stands
11   for is client support program rollout version.
12   So that would mean that they were entitled to
13   software and this was the software we shipped
14   them.  So they may have decided they, you know,
15   wanted their upgrade then.  But that's what that
16   would indicate to me.
17   Q.    So did you ship Kirkland & Ellis
18   version 10.0 software on June 9, 1993?
19   A.    That's what this indicates.
20   Q.    And when was version 10 released?
21   A.    I don't know the exact date.  But
22   it was in the spring of '93.
23   Q.    Was version 10 released before
24   August 10, 1993?
25   A.    Yes, it was.

115

1    Q.    And was version 10 sold before
2    August 10, 1993?
3    A.    Yes.
4    Q.    Was version 10 used by customers
5    before August 10, 1993?
6    A.    I would say yes, it was.  I think
7    there is some other exhibits perhaps that maybe
8    where there were support questions.  I think
9    you'd want to refer to the testimony.  So I'll
10   just say that I would look and see if there is
11   support notes.
12   Q.    Did you demonstrate the version 10
13   product before August 10, 1993?
14   A.    Absolutely.
15   Q.    Were version 10 manuals shipped to
16   customers before August 10, 1993?
17   A.    Yes.
18   Q.    Was that the document that you
19   would provide to any customer who would buy
20   version 10, the manual?
21   A.    Yes.
22   Q.    How long was the P.O. Writer
23   manual?
24       MR. REDDY:  Objection; vague as to
25   which manual.

116

1    Q.    My understanding is that in the
2    spring of 1993 you released version 10.0.  Is
3    that accurate or not?
4    A.    Yes.
5    Q.    Did a manual -- did you have a
6    manual that went along with that version 10.0
7    product?
8    A.    The way the manuals were structured
9    is the major modules had a manual.  And there
10   would be a module -- a manual for each module
11   that would have been available at that point in
12   time.
13   Q.    Approximately how many volumes were
14   there?
15   A.    Volumes?  Well, there would be one
16   for each major module.  So there would be
17   purchasing manual, receiving manual, inventory
18   control manual.  Because again, the way we sold
19   the product is you didn't have to buy the whole
20   suite, you bought -- you tried what you wanted
21   to use, if you bought it, you kept the manual,
22   kept the software.  So it was packaged that way.
23       But there were prerequisites, you'd
24   have to have a purchasing module to make
25   everything else work.  So everybody had at least

McEneny, Laurene  6/10/2010  12:08:00 PM

117

1  the purchasing manual.
2     Q.   I'm going to go through some of the
3  documents for the modules that I think you were
4  discussing.
5        (Lawson Exhibit 98 for
6        identification, document, production
7        numbers L 0126147 through L 0126395.)
8     Q.   I'm going to hand you what's been
9  marked as Lawson Exhibit 98.  It has Bates range
10  L 0126147 to L 0126395.
11     Do you recognize this document?
12     A.   I recognize inventory control.
13  Yes, I do.
14     Q.   Does this manual accurately reflect
15  the product that was sold to customers prior to
16  August 10, 1993?
17     A.   Yes, as version 10, yes.
18     Q.   And to be clear, I'll be talking
19  about version 10 unless I say otherwise.  Just
20  assume I'm talking about version 10.
21     A.   Okay.
22     Q.   Thank you.
23     Is this a document that was
24  provided to customers before August 10, 1993?
25     A.   Yes.

119

1     Q.   You can put that aside.
2        Actually, I'm sorry, I have one
3  further question on that document, I apologize.
4  Can you turn to page L 0126362.
5  And that would be marked as 4-53.  Do you see
6  there is an example on that document?
7     A.   Um-hum.
8     Q.   And do you see it says "report
9  already exists."  And there is a date.  It looks
10  like March 10, 1993.
11     A.   I'm sorry, is this recalculate
12  reorder points, is that what yours says at the
13  top?
14     Q.   Yes, exactly.  At the top it says
15  recalculate order points.
16     A.   Let me see.
17     Q.   Pretty close to the bottom, so
18  three lines above.  System message is the
19  bottom.  F1 is the one above that.  And the one
20  above that says report already exists, 3/10/93.
21     A.   Yes.
22     Q.   Was it common for you to use the
23  current date approximately in examples in the
24  manual?
25     A.   Yes, it was.  This date would

118

1     Q.   Can you please turn to page L
2  0126155.  It's the page that the tenth edition
3  starts on.  It's pretty early in the document.
4  It ends with 155.
5     A.   Got it.  I was right on it.
6     Q.   Do you see at the top it says tenth
7  edition?
8     A.   Yes.
9     Q.   Do you see below that it says April
10  1993?
11     A.   Correct.
12     Q.   And do you see below that it says
13  software revision 10.0?
14     A.   Yes.
15     Q.   Is that consistent with your
16  testimony that version 10.0 was released in the
17  spring of 1993?
18     A.   Yes.
19     Q.   Do you see at the bottom it has a
20  copyright number -- copyright mark, it says
21  copyright 1993?
22     A.   Yes.
23     Q.   Is that also consistent with your
24  testimony that this was available in 1993?
25     A.   Yes.

120

1  indicate to me that when they were preparing the
2  manual and capturing the screen, they would have
3  run this example on that date.
4     Q.   Okay.  You can put that aside.
5        (Lawson Exhibit 99 for
6        identification, document, production
7        numbers L 0126396 through L 0126402.)
8     Q.   I'm handing you what's been marked
9  Lawson Exhibit 99.  It's Bates numbered L
10  0126396 to 402.
11     Do you recognize this document?
12     A.   Yes.
13     Q.   What is this document?
14     A.   It's from our ad hoc reporting
15  module.  And version 10.
16     Q.   Can you turn to page L 0126397.
17  That's the second page of the document.
18     A.   Um-hum.
19     Q.   And again, do you see where it says
20  tenth edition, April 10, 1993, software edition
21  10.0?
22     A.   Yes.
23     Q.   Is that consistent with your
24  testimony that the tenth edition was released in
25  the spring or summer of 1993?

McEneny, Laurene  6/10/2010  12:08:00 PM



121

```
 1        A.   Yes.
 2        Q.   When you would release manuals for
 3   the different modules, would they all be
 4   released at the same time or would you release
 5   them at different times?
 6        A.   It was our practice to announce the
 7   product in the spring and release on a certain
 8   release date.  And the practice was that, you
 9   know, since people were buying the product at
10   the same time, that the modules would all be
11   released at the same time.
12        Q.   So by the time modules were being
13   sold, is it safe to say that it all of the
14   manuals were also available?
15        A.   Yes.
16        Q.   I don't have any further questions
17   with respect to that document, you can put it
18   aside.
19             I apologize, I do have a question.
20   I'm sorry.  Does this accurately represent the
21   product that was sold to customers prior to
22   August 10, 1993?
23        A.   Yes.
24        Q.   Is this a document that was
25   provided to customers prior to August 10, 1993?
```

123

```
 1   provided to customers prior to August 10, 1993?
 2        A.   Yes, this would be sent with that
 3   module.
 4        Q.   Okay, you can put this aside.
 5             (Lawson Exhibit 101 for
 6   identification, document, production
 7   numbers L 0126423 through L 0126481.)
 8        Q.   I'm handing you what's been marked
 9   Lawson Exhibit 101.  It has a Bates range from L
10   0126423 to L 0126481.
11             Do you recognize this document?
12        A.   I do.  It's our users manual for
13   the data interface utility.
14        Q.   Okay.  Can you turn to page L
15   0126424, that's the second page.  Do you see the
16   top where it says tenth edition, April 1993,
17   software revision 10.0?
18        A.   Yes.
19        Q.   Is that consistent with your
20   testimony that version 10.0 was released in the
21   spring or summer of 1993?
22        A.   Yes.
23        Q.   Does this accurately represent the
24   product that was sold to customers prior to
25   August 10, 1993?
```

122

```
 1        A.   Yes.
 2             (Lawson Exhibit 100 for
 3   identification, document, production
 4   numbers L 0126403 through L 0126422.)
 5        Q.   I'm handing you what's been marked
 6   Lawson Exhibit 100.  Bates range is L 0126403 to
 7   L 0126422.
 8             Do you recognize this document?
 9        A.   I do.  It's our users manual for
10   the bar code interface.
11        Q.   Okay.  Now, I'm going to represent
12   to you that I didn't see a date in this
13   document.  But is it consistent with your
14   understanding that this would have also been
15   available prior to August 10, 1993 or not?
16             MR. REDDY:  Objection; leading.
17        Q.   You can answer.
18        A.   I can answer, okay.
19             Yes, this would be consistent
20   because of the version number.
21        Q.   Does this accurately represent the
22   product that was sold to customers prior to
23   August 10, 1993?
24        A.   Yes.
25        Q.   Is this a document that was
```

124

```
 1        A.   Yes, this would.
 2        Q.   Was this a document that was
 3   provided to customers prior to August 10, 1993?
 4        A.   Yes.
 5        Q.   Okay.  And quickly, just to
 6   understand, I think you gave me a little bit of
 7   information, but could you explain a little
 8   further, what was data interface utility?
 9        A.   This was a piece of software that
10   would allow customers to import information into
11   the P.O. Writer Plus database, so they could
12   import catalog information, which would be the
13   item master.  They could import vendor
14   information, account codes.
15             So one of the primary uses for this
16   would be customers that bought our product that
17   maybe had data in other systems and they didn't
18   want to hand key it in using the interface, they
19   would put it in a flat file, or according to our
20   format, and then they would run this utility and
21   import the data.  And they could also use this,
22   it wasn't just a one time thing, they could use
23   it to keep their records up to date.  So that
24   was the primary use.
25        Q.   Okay.  Thank you.
```

McEneny, Laurene  6/10/2010  12:08:00 PM

125

```
1              (Lawson Exhibit 102 for
2        identification, document, production
3        numbers L 0126482 through L 0126500.)
4           Q.   I'm handing you what's been marked
5        Lawson Exhibit 102.  Bates range L 0126482 to
6        500.
7              Do you recognize this document?
8           A.   I do.
9           Q.   What is this document?
10          A.   This is the users manual for our
11       EDI interface.
12          Q.   And again, do you see on the front
13       of the page it says version 10.0?
14          A.   Yes.
15          Q.   Does this accurately represent the
16       product that was sold to customers prior to
17       August 10, 1993?
18          A.   Yes.
19          Q.   Is this a document that was
20       provided to customers prior to August 10, 1993?
21          A.   Yes.
22          Q.   You can put that aside.
23             (Lawson Exhibit 103 for
24       identification, document, production
25       numbers L 0126501 through L 0126513.)
```

126

```
1           Q.   I'm handing you what's been marked
2        Lawson Exhibit 103.  The Bates range is L
3        0126501 to L 0126513.
4              Do you recognize this document?
5           A.   Yes, I do.
6           Q.   What is it?
7           A.   It's the section of the purchasing
8        manual for P.O. Writer Plus.
9           Q.   Does this accurately represent the
10       product that was sold to customers prior to
11       August 10, 1993?
12          A.   Yes.
13          Q.   Is this a document that was
14       provided to customers prior to August 10, 1993?
15          A.   Yes.
16          Q.   And do you see the page L 0126501,
17       it says tenth edition, April 1993, software
18       revision 10.0?
19          A.   Yes.
20          Q.   Is that consistent with what you've
21       already told me about the other documents we've
22       discussed?
23          A.   Yes.
24          Q.   Okay.  You can put that aside.
25             (Lawson Exhibit 104 for
```

127

```
1        identification, Subpoena.)
2           Q.   I'm handing you what's been marked
3        Lawson Exhibit 104.  It is not a manual.  I'm
4        going a little bit out of order because I wanted
5        to preserve the numbering of my documents.
6              Do you recognize that document?
7           A.   Yes, I do.
8           Q.   What is this document?
9           A.   This was the subpoena emailed to me
10       by you to appear here today.
11          Q.   Okay, I have no further questions
12       on that document.
13             (Lawson Exhibit 105 for
14       identification, document, production
15       numbers L 0126702 through L 0126717.)
16          Q.   I'm handing you what's been marked
17       Lawson Exhibit 105.  It's Bates number L 0126702
18       to L 0126717.
19             Do you recognize this document?
20          A.   I do.
21          Q.   What is this document?
22          A.   The users manual for the P.O.
23       Writer Plus fax module.
24          Q.   Does this accurately represent the
25       product that was sold to customers prior to
```

128

```
1        August 10, 1993?
2           A.   Yes.
3           Q.   Is this a document that's provided
4        to customers prior to August 10, 1993?
5           A.   Yes.
6           Q.   Okay, I have no further questions
7        on that document.
8              MR. SAHNER:  Can we go off the
9        record for one second.
10             THE VIDEOGRAPHER:  Going off the
11       record at 2:44.,
12             (Discussion off the record.)
13             THE VIDEOGRAPHER:  Back on the
14       record, 2:45.,
15             (Lawson Exhibit 106 for
16       identification, document, production
17       numbers L 0127297 through L 0127504.)
18       BY MS. HUGHEY:
19          Q.   I'm going to hand you what's been
20       marked Lawson Exhibit 106.  It's marked L
21       0127297 to L 0127504.
22             Do you recognize this document?
23          A.   Yes, I do.
24          Q.   What is this document?
25          A.   It's the users manual for the P.O.
```

McEneny, Laurene  6/10/2010  12:08:00 PM

129

1    Writer Plus receiving module.
2    Q.    And do you see where it says tenth
3    edition, April 1993, software version 10.0 on
4    the first page of this document?
5    A.    Yes.
6    Q.    Is that consistent with your
7    testimony that version 10.0 was released in the
8    spring or summer of 1993?
9    A.    Yes.
10   Q.    Does this document accurately
11   reflect the product that was sold to customers
12   prior to August 10, 1993?
13   A.    Yes.
14   Q.    Is this a document that was
15   provided to customers prior to August 10, 1993?
16   A.    Yes.
17   Q.    You can put that aside.
18         (Lawson Exhibit 107 for
19   identification, document, production
20   numbers L 0126965 through L 0126980.)
21   Q.    I'm handing you what's been marked
22   Lawson Exhibit 107.
23         Do you recognize this document?
24   A.    I do.
25         MS. HUGHEY:  For the record, this

130

1    document is L 0126965 to 980.
2    Q.    What is this document?
3    A.    This is the requisition interface
4    users guide.
5    Q.    Did American Tech have a
6    requisitioning interface in version 10?
7    A.    Yes, we did.
8    Q.    Can you turn to page L 0126962.
9    Hold on.  I'm sorry.
10   Turn to page L 0126969.  Do you see
11   there is an example on that page?
12   A.    Yes.
13   Q.    Do you see that it's dated June 1,
14   1993?
15   A.    Yes.
16   Q.    Does this accurately represent the
17   product that was sold to customers prior to
18   August 10, 1993?
19   A.    Yes.
20   Q.    Is this a document that was
21   provided to customers prior to August 10, 1993?
22   A.    Yes.
23         (Lawson Exhibit 108 for
24   identification, document, production
25   numbers L 0126981 through L 0126998.)

131

1    Q.    I'm handing you what's been marked
2    Lawson Exhibit 108.
3    Do you recognize this document?
4    A.    Yes.
5    Q.    What is this document?
6    A.    It's the security administrator's
7    guide for P.O. Writer Plus.
8         MS. HUGHEY:  For the record, this
9    document, if I didn't already state, is L
10   0126931 to 998.
11   Q.    And do you see that this document
12   says version 10.0 on the first page?
13   A.    Yes.
14   Q.    And do you see the second page says
15   tenth edition, April 1993, software revision
16   10.0?
17   A.    Yes.
18   Q.    Does this accurately represent the
19   product that was sold to customers prior to
20   August 10, 1993?
21   A.    Yes.
22   Q.    Was this a document provided to
23   customers prior to August 10, 1993?
24   A.    Yes.
25         (Lawson Exhibit 109 for

132

1    identification, document, production
2    numbers L 0127000 through L 0127019.)
3    Q.    I'm handing you what I was marked
4    Lawson Exhibit 109.  It's L 0127000 to 019.
5         Do you recognize this document?
6    A.    Yes, it's the stock requisitioning
7    and kitting and system and admin users guide for
8    P.O. Writer Plus.
9    Q.    And this is version 10.0?
10   A.    Correct.
11   Q.    Does this accurately represent the
12   product that was sold to customers prior to
13   August 10, 1993?
14   A.    Yes.
15   Q.    Is this a document that was
16   provided to customers prior to August 10, 1993?
17   A.    Yes.
18   Q.    You can put that document aside.
19         (Lawson Exhibit 110 for
20   identification, document, production
21   numbers L 0127020 through L 0127102.)
22   Q.    I'm handing you what's been marked
23   Lawson Exhibit 110.  Which is Bates ranged L
24   0127020 to L 0127102.
25         Do you recognize this document?

133

1     A.  I do.  I recognize it as the stock
2   requisitioning and kitting users manual for P.O.
3   Writer Plus.
4     Q.   And do you see the second page, or
5   the first page says version 10.0, second page
6   says tenth edition, April 1993, software
7   revision 10.0?
8     A.  Yes.
9     Q.   Does this accurately represent the
10  product that was sold to customers prior to
11  August 10, 1993?
12    A.  Yes.
13    Q.   Is this a document that was
14  provided to customer prior to August 10, 1993?
15    A.  Yes.
16    Q.   You can put that document aside.
17        (Lawson Exhibit 111 for
18    identification, document, production
19    numbers L 0127103 through L 0127137.)
20    Q.   I'm handing you what's been marked
21  Lawson Exhibit 111.  L 0127103 to 137.
22        MR. REDDY:  I'm sorry, what number
23  are we up to?
24        MS. HUGHEY:  111.
25    Q.   Do you recognize this document?

134

1     A.  I do.  There are some supplier
2   rating reports in the beginning of this packet.
3   And then there is the supplier performance users
4   manual attached as well.
5     Q.   Do those supplier rating reports,
6   were they part of the manual or were those maybe
7   produced as part of a file, do you know?
8     A.  They probably were just in the
9   manila folder.
10    Q.   These first pages, L 1012703 to
11  108, those were not part of the manual; is that
12  correct?
13    A.  They may be included in the manual
14  somewhere, pasted in.  But the actual manual
15  would start at L 0127109.
16    Q.   Is it your understanding that when
17  these manuals were produced, they were in hard
18  form and they were produced in files so things
19  might have gotten in between them?
20    A.  They were stored in manila folders,
21  in a fireproof filing cabinet.  And then the way
22  they were actually produced at that period of
23  time is that they were taken to a printer, a
24  local printer called Prestige Printing, and they
25  printed, you know, however many copies we

135

1   ordered.
2     Q.   Were they hard bound or were they
3   electronic?
4     A.  No, we actually sent these to the
5   customer.  We didn't send them the electronic
6   files.  We sent them in a binder, three ring
7   binders.
8     Q.   It they were bound, you said three
9   ring binder?
10    A.  Three ring binders.
11    Q.   So do you recognize this document
12  that starts on L 0127109 that says supplier
13  performance, version 10.0?
14    A.  Yes.
15    Q.   What is this document?
16    A.  It's the users guide for the
17  supplier performance module, also called vendor
18  performance.
19    Q.   And if you turn to the next page,
20  it says ninth edition, April 1993, software
21  revision 10.0.  Why is this different, ninth
22  edition versus the other ones we talked about,
23  do you know?
24    A.  I don't know.  Other than it may
25  have had to do when the product was originally

136

1   released.  I mean, all the modules weren't
2   available in the very beginning of time, they
3   were developed over time.  So that is most
4   probably what it is.
5     Q.   Okay.  Do you remember if supplier
6   performance was a module that you did not offer
7   at the beginning when you were offering some of
8   the other modules we've discussed?
9     A.  The first module was purchasing.
10  And then receiving came after that.  So this
11  would have not been one of the first.  Because
12  you would have to have purchasing and receiving
13  in order to create a supplier performance
14  report.  So it would have not probably been in
15  the first few years.  Those other two modules
16  had to be developed first.
17    Q.   Again, do you see where it says L
18  0127109, supplier performance version 10.0?
19    A.  Yes.
20    Q.   And then the next page, tenth
21  edition, April 1993, software revision 10.0?
22    A.  Um-hum.
23    Q.   Does this accurately represent the
24  product that was sold to customers prior to
25  August 10, 1993?

McEneny, Laurene  6/10/2010  12:08:00 PM

137

1      A.   Yes, it would.
2      Q.   Is this a document that was
3   provided to customers prior to August 10, 1993?
4      A.   Yes.
5          (Lawson Exhibit 112 for
6      identification, document, production
7      numbers L 0127138 through L 0127227.)
8      Q.   I'm handing you what's been marked
9   Lawson Exhibit 112, L 0127138 to L 0127227.
10         Do you recognize this document?
11     A.   Yes, I do.
12     Q.   What is this document?
13     A.   It's the system administrator's
14   guide for P.O. Writer Plus.
15     Q.   Do you see the first page says
16   version 10.0?
17     A.   Yes.
18     Q.   Does this accurately represent the
19   product that was sold to customers prior to
20   August 10, 1993?
21     A.   Yes.
22     Q.   This is a document that was
23   provided to customers prior to August 10, 1993?
24     A.   Yes.
25     Q.   You can put this document aside.

138

1          (Lawson Exhibit 113 for
2      identification, document, production
3      numbers L 0127228 through L 0127255.)
4      Q.   I'm handing you what's been marked
5   Lawson Exhibit 113. L 0127228 to L 0127255.
6          Do you recognize this document?
7      A.   I do.  It's the version upgrade kit
8   instructions for P.O. Writer Plus version 10.
9      Q.   Does this accurately represent the
10   product that was sold to customers prior to
11   August 10, 1993?
12     A.   Yes, it does.  This is the software
13   that they would need to upgrade their database
14   to this particular version.
15     Q.   Is this a document that was
16   provided to customers prior to August 10, 1993?
17     A.   Yes.
18     Q.   You can set the document aside.
19         (Lawson Exhibit 114 for
20      identification, document, production
21      numbers L 0127256 through L 0127296.)
22     Q.   I'm handing you what's been marked
23   Lawson Exhibit 114. L 0127256.
24         Do you recognize this document?
25     A.   I do.  It's the purchasing

139

1   requisitioning system administrator's guide for
2   P.O. Writer Plus version 10.
3      Q.   Do you see the first page says
4   version 10.0?
5      A.   Yes.
6      Q.   Does this accurately represent the
7   product that was sold to customers prior to
8   August 10, 1993?
9      A.   Yes, it does.
10     Q.   Is this a document that was
11   provided to customers prior to August 10, 1993?
12     A.   Yes.
13         (Lawson Exhibit 115 for
14      identification, document, production
15      numbers L 0127505 through L 0127601.)
16     Q.   I'm handing you what's been marked
17   Lawson Exhibit 115. L 0127505 to 601.
18         Do you recognize this document?
19     A.   This, the beginning, I recognize
20   the first page as writing from a person I know
21   very well, Linda Swenarton, who is our client
22   support manager.  So this appears to be her
23   office copy of P.O. Writer Plus version 10
24   requisitioning module.  And there are a couple
25   of sample pages.  And then on 508 it's the

140

1   beginning of the requisitioning manual.
2      Q.   So is it your understanding this
3   was the manual for version 10.0?
4      A.   Yes.
5      Q.   Does this manual starting at L
6   0127508 accurately represent the product that
7   was sold to customers prior to August 10, 1993?
8      A.   Yes.
9      Q.   Is this a document that was
10   provided to customers prior to August 10, 1993?
11     A.   Yes.
12     Q.   I'm going to ask you to turn to two
13   of the documents that have already been admitted
14   in this case.  Defendant's Exhibit 2, I believe
15   it's the guided tour document.
16         MR. ROBERTSON:  When you say
17   Defendant's Exhibit 2?
18         MS. HUGHEY:  I'm sorry, let me
19   rephrase.
20     Q.   This is ePlus's Exhibit 2.  So I
21   understand this is the guided tour?
22     A.   Yes.  It says McEneny 2, that's it?
23     Q.   Yes.  Do you see where it says
24   version 10.0?
25     A.   Um-hum.

McEneny, Laurene  6/10/2010  12:08:00 PM

141

1    Q.   Is it your understanding that this
2    was the manual for the version 10.0 product?
3    A.   Yes.  This is the guided tour for
4    the 10.0 product.
5    Q.   Does this accurately represent the
6    product that was sold to customers prior to
7    August 10, 1993?
8    A.   Yes.
9    Q.   Is this a document that was
10   provided to customers prior to August 10, 1993?
11   A.   Yes.
12   Q.   And then I'd also like you to turn
13   to McEneny Exhibit 6.  I think it begins at the
14   top "purchasing tutorial."
15   A.   Yes.
16   Q.   And I think we spoke already
17   that -- one second.
18   MS. HUGHEY:  Could we take a
19   two-minute break so I can arrange myself?
20   MR. REDDY:  Sure.
21   THE VIDEOGRAPHER:  Going off the
22   record at 3:03.,
23   (A recess was taken.)
24   THE VIDEOGRAPHER:  Back on the
25   record, 3:12, this is the beginning of tape

142

1    3.
2    BY MS. HUGHEY:
3    Q.   Ms. McEneny, can you please take a
4    look at McEneny Exhibit 6, please.  And I
5    believe we previously talked about this
6    document.
7    A.   Yes.
8    Q.   Did P.O. Writer have a purchasing
9    module in 1993?
10   A.   Yes.
11   Q.   Can you take a look at page L
12   0126962.  And I suppose before you do that I
13   should ask, what is this document again?
14   A.   This is the tutorial for the
15   purchasing module of P.O. Writer Plus.  And you
16   want 6962?
17   Q.   That's right, 6962.
18   MR. REDDY:  I'm sorry, just for my
19   benefit, do you mind telling me what page
20   in the manual that is?
21   MS. HUGHEY:  Page 4-242.
22   Although -- I'm sorry, I'm at the wrong
23   page myself.  962 are the last three
24   digits.
25   MR. REDDY:  I'm sorry, of the

143

1    actual manual, not the Bates number.
2    MS. HUGHEY:  Yes, I can do that.
3    It's like third to last page.
4    THE WITNESS:  I think it's 2-242.
5    MS. HUGHEY:  That's right.
6    Q.   Do you see there is an example on
7    that page?
8    A.   Um-hum.
9    Q.   Do you see the example is dated
10   March 18, 1993?  It's right at the top.
11   A.   Yes.
12   Q.   Does this accurately represent the
13   product that was sold to customers prior to
14   August 10, 1993?
15   A.   Yes.
16   Q.   Is this a document that was
17   provided to customers prior to August 10, 1993?
18   A.   Yes.
19   Q.   The next exhibit I'd like you to
20   look at is McEneny Exhibit 2.
21   MR. ROBERTSON:  I think you asked
22   these questions already with Exhibit 2 and
23   Exhibit 6?
24   MS. HUGHEY:  I don't believe I did.
25   I didn't check them.

144

1    MR. ROBERTSON:  Remember we had the
2    confusion about whether it was Defendant's
3    Exhibit 2 or McEneny Exhibit 2?
4    MS. HUGHEY:  I started on it before
5    the break but I never got to it.
6    Q.   What is this document?
7    A.   It's the guided tour for P.O.
8    Writer Plus version 10.
9    Q.   And do you see the first page says
10   version 10.0?  The very first page, the one you
11   just flipped.
12   A.   Yes.
13   Q.   Does this accurately represent the
14   product that was sold to customers prior to
15   August 10, 1993?
16   A.   Yes.
17   Q.   Is this a document that was
18   provided to customers prior to August 10, 1993?
19   A.   Yes.
20   Q.   Is it accurate to say that the
21   version 10 P.O. Writer manual was a set of
22   volumes or not?
23   MR. REDDY:  Objection; leading.
24   Q.   You can answer.
25   A.   A set of volumes?

McEneny, Laurene  6/10/2010  12:08:00 PM



145

1  Q.  Yes.
2  A.  Together the manuals made up the
3  volumes.  I guess library, whatever you would
4  call it.  Teaching people how to operate the
5  product.
6  Q.  Do you consider the different
7  volumes to be a single publication or not?
8  MR. REDDY:  Objection.
9  A.  Yes.
10  MR. REDDY:  Calls for a legal
11  conclusion.
12  A.  We do consider these to be a single
13  publication.  You wouldn't ship a version 10
14  purchasing manual with a version 11
15  requisitioning.  They were, you know, version 10
16  worked together, it was released and tested so
17  that it operated together.  So they definitely
18  went out as a single version set for whatever
19  modules the customer bought.
20  Q.  Okay.  Was the version 10 P.O.
21  Writer manual shipped to customers prior to
22  August 10, 1993?
23  A.  Yes.
24  Q.  Was the P.O. Writer manual publicly
25  available and distributed to customers prior to

146

1  August 10, 1993?
2  A.  Yes.
3  Q.  Did you attend trade shows?
4  A.  Yes.
5  Q.  Did you have the manuals at trade
6  shows?
7  A.  We did.
8  Q.  Did you demonstrate version 10
9  prior to August 10, 1993?
10  A.  Yes.
11  Q.  When you were at trade shows, did
12  you have the version 10 manuals at trade shows
13  prior to August 10, 1993?
14  A.  Yes.
15  Q.  Is it accurate to say that you
16  would sell version 10 to any customer who asked
17  to bought it or not -- strike that.
18  Is it accurate to say that you
19  would sell a version 10 product to any customer
20  or not?
21  A.  Yes.
22  Q.  Did you do anything to stop your
23  competitors from reviewing the version 10
24  manuals?
25  A.  Did we do anything?  Well, we tried

147

1  to prevent them from doing that.  But, you know,
2  at trade shows for example we would lock them up
3  at night.  So yes.
4  Q.  But during the day if somebody came
5  by and wanted to look at the manual, is there
6  anything that you would do to stop them, would
7  you ask them for identification?
8  A.  We knew who our competitors were.
9  If they were standing in our booth trying to
10  read our manual we would probably ask them to
11  leave.
12  Q.  If they were a potential customer
13  you would probably let them read the manual; is
14  that correct?
15  A.  Oh, absolutely.
16  Q.  Earlier we spoke about the
17  copyright limit on some of the manuals.  I
18  believe it was -- just grab the ad hoc reporting
19  manual as an example, that's Lawson Exhibit 99.
20  It's a pretty little one.
21  A.  There we go.
22  Q.  And the second page, L 0126397.
23  A.  Um-hum.
24  Q.  The third paragraph says "no part
25  of this work may be reproduced," and so on,

148

1  we've already discussed this paragraph.
2  A.  Um-hum.
3  Q.  Is it fair to say that you did not
4  want your competitors to obtain your manuals?
5  A.  Sure.
6  Q.  Is it fair to say that if your
7  customers had made copies of your manuals for
8  their personal use that would not have been a
9  problem?
10  MR. REDDY:  Objection; leading.
11  A.  If a customer made a copy for their
12  own personal use to give to a user that they had
13  a license for, that wouldn't have been a problem
14  for us.  What would have been a problem is if
15  they made a copy of the manual and the software
16  and gave it to somebody, therefore we wouldn't
17  get the revenue for it.  That would be a
18  problem.  Or if they would give it to a
19  competitor who would read it and look at our
20  ideas, that would be a problem.  But generally
21  speaking if it's just to support a user who's
22  licensed, it wouldn't have been a problem.
23  Q.  Is it accurate to say that this
24  statement placed no limitation on who could be
25  shown the manual?

McEneny, Laurene  6/10/2010  12:08:00 PM

149

1      MR. REDDY:  Objection; leading.
2      MS. HUGHEY:  Let me rephrase.
3      Q.   Is it accurate to say that this
4   statement does not limit the number of people
5   who would be shown the manual or not?
6      A.   This paragraph, in my opinion,
7   wouldn't limit who could look at the manual.
8      Q.   Is it accurate to say that this
9   statement does not limit the number of people
10   who could review the manual or not?
11      A.   I don't think it does.
12      Q.   Is it accurate to say that if a
13   customer purchased the product you would provide
14   them with the manual?
15      A.   Yes.
16      Q.   Is it true that once a customer
17   purchased the product and received a manual,
18   that customer could show the manual to anyone or
19   not?
20      A.   I couldn't control that, so I guess
21   it's conceivable.
22      Q.   Is it accurate to say that you did
23   not password protect the manuals?
24      A.   Correct.
25      Q.   Is it accurate to say that trade

150

1   shows you publicly displayed the manuals?
2      A.   Yes.
3      Q.   Is it accurate to say that people
4   at the trade shows could look at the manuals?
5      A.   Again, we wouldn't want our
6   competitors looking at them.  But yes, people
7   were welcome to come into the booth, see the
8   demonstration of the products.
9      And we were very proud of the
10   manuals primarily because a lot of people
11   were -- had a lot of reservation about learning
12   the product and whether or not they could manage
13   teaching themselves, supporting themselves,
14   without a lot of IT support.  So we would show
15   the manuals and the tutorials as proof to people
16   that it isn't that difficult to use.  And if you
17   just follow through it's very easy to learn.  So
18   we probably would even offer that to, somebody
19   that we thought was a decent prospect.  But
20   again, we would not be handing them over to
21   competitors.
22      Q.   Is it accurate to say that
23   someone -- strike that.
24      Is it accurate to say that all
25   someone would have to do to obtain a P.O. Writer

151

1   version 10 manual would be to order the version
2   10 product?
3      A.   They could order a trial, a $95
4   trial.  And get the manual.  Or they could order
5   the product.  Either one.
6      (Lawson Exhibit 116 for
7   identification, substitute response to
8   non-final office action.)
9      Q.   I'm going to hand you what's been
10   marked as Lawson Exhibit 116.
11      Can you turn to page 20 of that
12   document.  Maybe a third of the way down, under
13   that chunk paragraph, the last sentence in that
14   paragraph says "because the P.O. Writer Plus
15   licensees were under an obligation to keep the
16   information contained in the P.O. Writer manual
17   confidential, the manuals were not publicly
18   accessible and cannot qualify as a printed
19   publication of prior art."
20      Do you agree with the statement
21   that the P.O. Writer licensees were under an
22   obligation to keep the information contained in
23   the P.O. Writer Plus manual confidential?
24      MR. REDDY:  Objection; calls for a
25   legal conclusion.  Objection; leading.

152

1      MS. HUGHEY:  Let me rephrase.
2      MR. REDDY:  Objection; foundation
3   as well.
4      Q.   Do you agree that the P.O. Writer
5   Plus licensees were under an obligation to keep
6   the information contained in the P.O. Writer
7   Plus manual confidential or not?
8      MR. REDDY:  Same objections.
9      A.   You're saying the licensees, people
10   that bought our product?
11      Q.   Yes.
12      A.   Yes, I would think that they should
13   keep it confidential.
14      Q.   But were they under an obligation
15   to keep it confidential?
16      MR. REDDY:  Same objections.
17      A.   Were they under an obligation to
18   keep it confidential?  My expectation if they
19   wanted to talk to people where it would result
20   in a sale for us, you know, that might have been
21   one thing.  But to send the manuals around, I
22   mean, our license agreement said you're not
23   going to distribute, you're not going to
24   share our ideas.  So I think they should keep it
25   confidential.

McEneny, Laurene  6/10/2010  12:08:00 PM



153

1    Q.   Did the customers have to be
2  specifically trained to use -- you can put that
3  aside.
4        Did the customers have to be
5  specifically trained to use P.O. Writer?
6    A.   They were taught how to use P.O.
7  Writer by going through the guided tour or going
8  through the tutorials that were in the users
9  manuals.  And also we offered training, and I
10  did a lot of the training.  I mean, other people
11  did it as well.  But most of the time people
12  used the printed materials that were available
13  and taught themselves how to use the product.
14    Q.   Was P.O. Writer an electronic
15  sourcing system?
16        MR. REDDY:  Objection; calls for a
17  legal conclusion.  Objection; no
18  foundation.
19        MS. HUGHEY:  Okay, let me rephrase.
20    Q.   Was P.O. Writer an electronic
21  sourcing system or not?
22        MR. REDDY:  Objection; calls for a
23  legal conclusion.  Objection; no
24  foundation.
25    A.   We considered it, yes, we

154

1  considered it a sourcing system.
2    Q.   Did P.O. Writer have an electronic
3  database?
4    A.   Yes.
5        MR. REDDY:  Objection.  I'm sorry,
6  I withdraw that objection.
7    Q.   Is it accurate to say that the P.O.
8  Writer was an electronic system for use by a
9  prospective buyer?
10        MR. REDDY:  Objection; calls for a
11  legal conclusion.  I'm sorry, were you not
12  finished yet?  Go ahead.
13    Q.   Is it accurate to say that the P.O.
14  Writer product was an electronic system for use
15  by a prospective buyer to locate and find buyers
16  to purchase from sources, suppliers or vendors
17  or not?
18    A.   Yes.
19        MR. REDDY:  Objection; calls for a
20  legal conclusion.
21    A.   Do you want my opinion?
22    Q.   Yes.
23    A.   My opinion is yes.
24    Q.   Is it accurate to say that the P.O.
25  Writer manual discloses a collection of catalogs

155

1  of items stored in electronic format or not?
2        MR. REDDY:  Same objections.
3    A.   Yes.
4    Q.   Is it accurate to say that P.O.
5  Writer discloses an electronic database to store
6  multiple catalogs?
7        MR. REDDY:  Objection.  Same
8  objections.
9    A.   Yes.
10    Q.   Is it accurate to say that the
11  product information could be maintained within
12  the P.O. Writer Plus system as product catalogs
13  organized in various ways?
14    A.   Yes.
15        MR. REDDY:  Same objections.
16        MS. HUGHEY:  What are your
17  objections?
18        MR. REDDY:  Calls for a legal
19  conclusion, no foundation.
20        MS. HUGHEY:  I'm asking about the
21  product that she sold.
22        MR. ROBERTSON:  No, you're not.
23    Q.   Is it accurate to say that the
24  product information could be organized by
25  vendor?

156

1    A.   Product information could be
2  organized by vendor?
3        MR. REDDY:  Objection.  Objection;
4  foundation.  Objection -- rest with
5  foundation.
6        MS. HUGHEY:  Let me take a step
7  back.
8    A.   If the user -- it depends on
9  implementation.  If the user used the user
10  defined field in the item master and said
11  supplier, preferred supplier, alternate
12  supplier, then they are to me organizing that
13  data by vendor.  A lot of this would have to do
14  with the customer, the industry and how they
15  implemented the product.
16    Q.   Is it accurate to say that the P.O.
17  Writer product, and just to be clear, I'm always
18  talking about the P.O. Writer product version 10
19  unless I say otherwise.
20        Is it accurate to say that the P.O.
21  Writer version product 10 product information
22  could be maintained by product type?
23        MR. REDDY:  Objection; vague.
24    A.   By product type, yes.  I would say
25  yes.  And my thinking is it would be using the

McEneny, Laurene  6/10/2010  12:08:00 PM



157

1   commodity field to indicate a product type.
2   Which would be a common implementation.  So I
3   would say yes with that caveat.
4       Q.   Is it accurate to say that the
5   catalog ID field is used to assign an item to a
6   specific catalog?
7       A.   Yes.
8       Q.   Is it accurate to say that a
9   particular catalog can be selected for searching
10  by entering a catalog ID?
11      A.   Yes.
12           MR. REDDY:  Objection; foundation.
13      Q.   Do you understand my question?
14      A.   I believe I do.
15           THE WITNESS:  Do I need to go back
16  on any of this?
17      Q.   Is it accurate to say that the P.O.
18  Writer system displays all the items in a
19  selected catalog that meet the searchable
20  criteria?
21      A.   I'm sorry, can you repeat that?
22      Q.   Is it accurate to say the P.O.
23  Writer system displays all the items in a
24  selected catalog that meet the searchable
25  criteria?

158

1           MR. REDDY:  Objection; calls for a
2   legal conclusion.
3       A.   If you select a catalog ID, on
4   either the requisition creation screen or the
5   purchase order creation screen, and the system
6   will display all items that have that catalog ID
7   in the item master file field.
8       Q.   Can you turn to McEneny Exhibit 6,
9   please.
10      A.   Um-hum.
11      Q.   Can you please turn to page L
12  0126951, which is 2-231.
13           Do you see the top line that says
14  "the catalog ID field and the item master record
15  is used to assign an item to a catalog"?
16      A.   I'm not on the same page.
17      Q.   2-231.  This is McEneny Exhibit 6.
18      A.   Yes, Exhibit 6.  What's the?
19      Q.   2-231, which is L 0126951.
20      A.   Okay.
21      Q.   Do you see the first point that
22  says "the catalog ID field and the item master
23  record is used to assign an item to a catalog"?
24      A.   Yes.
25      Q.   Is it accurate to say that the P.O.

159

1   Writer version 10 -- let me rephrase.
2           Is it accurate to say in the P.O.
3   Writer version 10 product that the catalog ID
4   field and the item master record is used to
5   assign an item to a catalog?
6       A.   Yes.
7       Q.   Okay.  Can you please turn to same
8   exhibit, page 224.  Do you see the third
9   sentence down that starts with "as shown below"?
10  This is 2-224.
11      A.   Hum.
12      Q.   It says "as shown below, a window
13  opens displaying a list of catalog IDs.  At this
14  time the list consists of only Best Buy."
15           Is it accurate to say the P.O.
16  Writer system may contain multiple catalog IDs?
17      A.   Yes.
18      Q.   Is it accurate to say that a
19  particular catalog can be searched for by
20  entering a catalog ID?  Let me rephrase.
21           Is it accurate to say that a
22  particular catalog can be selected for searching
23  by entering a catalog ID?
24      A.   Yes.
25      Q.   Is it accurate to say that the P.O.

160

1   Writer system displays all the items in a
2   selected catalog that meet the selected search
3   for criteria?
4       A.   Yes.
5       Q.   Is it accurate to say that the
6   system may contain multiple catalog IDs?
7       A.   Yes.
8       Q.   Is it accurate to say that a list
9   of available catalogs may be displayed by
10  catalog ID?
11      A.   A list of available catalogs by
12  catalog ID?
13      Q.   Yes.
14      A.   If you put in a catalog ID you see
15  a list of valid items that are in that catalog,
16  associated with that catalog ID.  But I think I
17  heard you say a list of valid catalogs by
18  catalog ID.  Maybe I misunderstood your
19  question.
20      Q.   Let me rephrase.  Let me try and be
21  clear.
22           Is it accurate to say that a list
23  of available catalogs may be displayed by
24  catalog ID?
25      A.   Oh, yes.

McEneny, Laurene  6/10/2010  12:08:00 PM

161

1      Q.   Is it accurate to say that the P.O.
2    Writer system was capable of maintaining
3    multiple catalogs?
4      A.   Yes.
5      Q.   Did P.O. Writer include product
6    information such as an item number, item
7    description, inventory location, price,
8    commodity code, unit of measure and vendor
9    identification?
10      MR. REDDY:  Objection; calls for a
11    legal conclusion and compound.
12      A.   The only thing that wasn't in the
13    item master that we already discussed is the
14    vendor ID, unless a user defined field was
15    purposed for that.
16      Q.   Can you turn to what I believe has
17    been marked as -- I'm sorry, we have so many
18    manuals here.  I'm trying to find the
19    requisitioning manual.  I think it's been marked
20    as 115.
21      Can you turn to Lawson's Exhibit
22    115.  Can you turn to L 0127525.  Which is page
23    2-7.
24      Do you see where it says at the top
25    "from this screen there are several ways to

162

1    display a catalog"?
2      A.   Yes.
3      Q.   Do you see below that it says item
4    number, item description, commodity code?
5      A.   Yes.
6      Q.   Is it accurate to say that using
7    the P.O. Writer version 10 system a user could
8    display the catalog by catalog ID or item number
9    sequence or item description sequence or
10    commodity code sequence?
11      A.   Correct, it's an or.  So if you put
12    in a catalog ID, you can then subsort underneath
13    that by one of those three items.  Or you can
14    leave the catalog ID blank and then you could
15    pick one of the search criteria.
16      Q.   Is it accurate to say that in the
17    P.O. Writer product, product catalog can be
18    organized to contain only products supplied by a
19    single vendor?
20      A.   Yes.  Again, it depends on how the
21    customer set the system up.
22      Q.   Is it accurate to say that the P.O.
23    Writer system enabled the user to select a
24    particular product catalog to search?
25      A.   Yes.

163

1      Q.   Is it accurate to say that P.O.
2    Writer enabled a user to select a particular
3    product catalog to search such as by using the
4    catalog IDs?
5      A.   Yes.
6      Q.   Is it accurate to say that the P.O.
7    Writer Plus system allowed a user to select
8    product catalogs to search resulting in a search
9    of less than the entire data in the database?
10      A.   Yes.
11      MR. REDDY:  Objection; calls for a
12    legal conclusion.  Objection; foundation.
13      A.   My answer again, the idea of
14    picking and then subsorting, my answer would be
15    yes.
16      Q.   Can you explain --
17      A.   That's exactly what it does.
18      Q.   Explain to me a little more how it
19    does it.
20      A.   Again, if you select a catalog ID,
21    and then a subcriteria, the system will go in
22    based on those filters and bring back just those
23    items that match that selection criteria.  So
24    based on my understanding of your question, the
25    answer would be yes.

164

1      Q.   Is it accurate to say that if a
2    user did not know the specific catalog ID to
3    select, the user could view a list of available
4    catalog IDs?
5      A.   Yes.
6      Q.   Is it accurate to say that
7    alternatively, user could select all the
8    catalogs for searching by leaving the catalog ID
9    field blank?
10      A.   Yes.
11      Q.   Did P.O. Writer retain product
12    information for multiple vendors?
13      A.   Yes.
14      Q.   Is it accurate to say P.O.
15    Writer could associate a particular catalog ID
16    to multiple vendors?
17      MR. REDDY:  Objection; calls for a
18    legal conclusion.
19      A.   Particular catalog ID with multiple
20    vendors?
21      Again, depends on how the system
22    was configured.
23      Q.   Explain to me how a customer might
24    associate a particular catalog ID with multiple
25    vendors.

McEneny, Laurene  6/10/2010  12:08:00 PM



165

1      A.    At the highest, in the item master
2   you can put a catalog ID in and it doesn't have
3   to be a catalog name or a vendor.  It could be a
4   group.  So I might say furniture, because the
5   user can put information in in any way they
6   want.  So that could be the catalog ID.
7          And then they could have any item
8   that is in this particular group associated with
9   that catalog ID.  And, again, configured
10  properly, using the user defined fields, they
11  could assign a preferred supplier and an
12  alternate supplier, which would give the user
13  visibility.  Again, it doesn't automatically
14  pick the supplier but it gives them visibility
15  to that information.  So it would be completely
16  on how the system was configured for the
17  customer.
18     Q.    Is it accurate to say that as items
19  are added to the item master record, they can be
20  assigned a particular catalog associated with a
21  particular vendor?
22          MR. REDDY:  Objection.
23     A.    Yes, well, they could do that too.
24  Again, it's a configuration issue, how the
25  customer implements the product.

167

1   Is that accurate?
2      A.    Yes.
3      Q.    Did I read that correctly?
4      A.    Yes.
5      Q.    Did the inventory control module
6   enable tracking of on hand inventory balances?
7      A.    Yes.
8      Q.    Is it accurate to say that for a
9   selected item a requisition, the P.O. Writer
10  system was capable of determining the
11  availability of the item in the inventory of the
12  customer?
13     A.    In the inventory of the customer?
14  Let me make sure I understand the question.  If
15  they -- are they looking for the inventory at
16  another, like at a Staples, are they looking --
17  ask the question again, I'm sorry.
18     Q.    Why don't you tell me what they
19  could do.
20     A.    That would be better.  They could
21  maintain inventory in P.O. Writer Plus.  They
22  could have that item stored in multiple
23  locations.  Those multiple locations could be
24  owned by the company that owns P.O. Writer.  Or
25  they could have information in the P.O. Writer

166

1      Q.    Can you explain how that would be
2   done?
3      A.    They might say I only buy office
4   supplies from this particular supplier, and
5   therefore all my office supply items have a
6   catalog ID of Staples, in which case it's
7   organized that way.
8      Q.    Did P.O. Writer create a list of
9   items resulting from a search?
10     A.    Yes.
11     Q.    Turning to the inventory control
12  module.  Did the inventory control module enable
13  tracking of on hand inventory balances?
14          MR. REDDY:  Objection; vague.
15     A.    Well, I don't know.  The answer is
16  yes.  Do you need to reference it?
17     Q.    Let's turn to McEneny Exhibit 2.
18  Which is the guided tour version 10.0.
19     A.    Um-hum.
20     Q.    Can you turn to page L 0126633.
21  This is page 102.
22     A.    Yes.
23     Q.    Do you see the sentence right below
24  the image, it says "the inventory control module
25  allows you to track on hand inventory balances."

168

1   database about inventory that might be stored
2   somewhere else, like uniforms, forms, that type
3   of thing.
4          So there is visibility to an item
5   and its location in the P.O. Writer Plus system.
6      Q.    Can you turn to Lawson Exhibit 116.
7   That would be that document entitled, starts in
8   the United States Patent and Trademark Office.
9          You know what, that's not the
10  document I want.
11          (Lawson Exhibit 117 for
12          identification, appeal brief.)
13     Q.    I'm handing you what's been marked
14  Lawson Exhibit 117.  Can you turn to page 82 of
15  that document.
16          Do you see where it says "the P.O.
17  Writer manual fails to disclose or suggest the
18  limitation of determining whether a selected
19  matching item is available in inventory"?  It's
20  the first full paragraph, the sentence starts
21  "regarding."
22          Do you agree that the P.O. Writer
23  manual fails to disclose determining whether a
24  selected matching item is available in
25  inventory?

McEneny, Laurene  6/10/2010  12:08:00 PM

169

1          MR. REDDY:  Objection; foundation.
2      Objection; seeks a legal conclusion.
3          A.   You know, let me just take a look
4      at what they -- I think they're using the
5      inventory manual.  I don't know what this is,
6      I've never seen this before.  So I presume this
7      is -- I don't know what it is.  Let me look.
8          Did you put the stock
9      requisitioning module in here?
10         Q.   I put them all in.
11         A.   So they're talking about inventory
12     module page 102 and 103.
13         Q.   Let's divorce the question from
14     this document.
15         A.   Okay.
16         Q.   I just want to know, if you don't
17     know because you don't understand the question
18     or you don't know what the words mean, that's
19     fine.
20         A.   I guess what I'm saying is I think
21     in this document they're referring to the
22     inventory module as a place to look for
23     functionality that would be described in the
24     stock requisitioning manual.
25         Q.   Okay.

170

1          A.   So I mean, the way you would
2      look -- if you were creating a requisition, you
3      could log in if you owned the stock
4      requisitioning module, then you could not only
5      create what we call a purchase requisition, but
6      you also could have visibility to your on hand
7      inventory with the stock requisitioning.  So I
8      guess that's what I'm doing, is just saying they
9      might have been referencing the wrong place,
10     because this would be the manual where you would
11     do that.
12         MR. REDDY:  And I'm going to move
13     to strike the last two responses as
14     nonresponsive, there is no question
15     pending.
16         MR. ROBERTSON:  Is there a
17     convenient time to take a short break at
18     some point?
19         MS. HUGHEY:  Now we can take a
20     break.
21         THE VIDEOGRAPHER:  Going off the
22     record at 3:48.,
23     (A recess was taken.)
24         THE VIDEOGRAPHER:  Back on the
25     record, 3:56.,

171

1          BY MS. HUGHEY:
2          Q.   Did the P.O. Writer system contain
3      a requisitions module?
4          A.   Yes, it did.
5          Q.   Did the requisitions module allow
6      users to create requisitions?
7          A.   Yes.
8          Q.   Could requisitions be created from
9      a catalog?
10         A.   Yes.
11         Q.   Did P.O. Writer allow the use of
12     the requisitions interface module to convert
13     requisitions into one or more purchase orders?
14         A.   Yes.
15         Q.   Did P.O. Writer have the capability
16     of creating multiple purchase orders from a
17     single requisition?
18         A.   Yes.
19         MR. REDDY:  Objection; seeks legal
20     conclusion.
21         Q.   Can I have you turn to what's been
22     marked Lawson Exhibit 107.  It's pretty thin, it
23     will start with table of contents.
24         If you please turn to the page in
25     that document that ends 76.

172

1          Do you see the third paragraph
2      down, it says "some requisitions will need to be
3      split because there are multiple items that are
4      purchased from different vendors"?
5          A.   Yes.
6          Q.   Did P.O. Writer have the capability
7      of creating multiple purchase orders from a
8      single requisition?
9          A.   Yes.
10         Q.   Is it accurate to say that
11     requisitions included items purchased from
12     different vendors that were split into different
13     purchase orders by a vendor?
14         A.   Items that were purchased from
15     different vendors?  I'm sorry.
16         Q.   Yes.
17         A.   Items that could be purchased from
18     different vendors?
19         Q.   Let's say it like that.  Let me
20     rephrase it.
21         A.   Okay.
22         Q.   Could requisitions be used to
23     include items purchased from different vendors
24     that were split into different purchase orders
25     by a vendor?

McEneny, Laurene  6/10/2010  12:08:00 PM



173

1      A.   Yes.

2      Q.   Did P.O. Writer have the capability

3  to create purchase orders from user generated

4  criteria?

5      MR. REDDY:  Objection; vague.

6      Q.   Do you understand my question?

7      A.   Maybe you should be more specific.

8      Q.   Why don't you tell me, how did the

9  P.O. Writer create purchase orders?  Let me

10  rephrase.

11      How did a customer use P.O. Writer

12  to create purchase orders?

13      A.   Again, two user communities,

14  requisitioner would create a REQ with items or

15  services they wanted.  The buyer then would turn

16  that into a purchase order.  That was kind of

17  one business flow.

18      A second business flow was a buyer

19  could log into the system and create a purchase

20  order, and they could do that using similar

21  methods that a requisition order, they could

22  select a catalog, they could select an item,

23  they could select a commodity group, to sort the

24  item master, pick off items and put them on a

25  purchase order.

174

1      Q.   Were purchase orders created from

2  user generated criteria?

3      MR. REDDY:  Objection; seeks legal

4  conclusion.

5      A.   So if user generated criteria is,

6  I'm the user, I'm setting up my item master file

7  for my business the way it makes sense, and then

8  I'm selecting data based on that criteria, such

9  as catalog IDs that are meaningful to me,

10  commodities that are meaningful to me.  If

11  that's your definition of criteria, then the

12  answer is yes, because that's how the product

13  worked.

14      Q.   Is it accurate to say that once the

15  requisitions have been processed by the

16  requisition interface module, purchase orders

17  could be directly generated?

18      A.   Yes.

19      Q.   Is it accurate to say that when the

20  original requisition was split into multiple

21  requisitions, purchase orders could be created

22  by utilizing the purchasing module?

23      A.   Yes.

24      Q.   Is it accurate to say that upon

25  selection of a desired item from the results of

175

1  a database search, the P.O. Writer system was

2  capable of transferring the relevant product

3  information for the selected item from the

4  database on to an electronic requisition?

5      MR. REDDY:  Objection; compound.

6      Objection; seeks legal conclusion.

7      A.   Yes.

8      Q.   Can you turn to guided tour version

9  10.0.  This is Lawson Exhibit -- I'm sorry, this

10  is McEneny Exhibit 2.

11      And I would like you to turn to

12  page 47 of that document, L 0126577.  Maybe look

13  at the next couple of pages as well.  Look at 48

14  and 49.

15      A.   This is creating purchase orders?

16  I just want to make sure I'm in the right place,

17  you're in our user manual number 17, creating

18  purchase orders.

19      Q.   Page 47?

20      A.   Page 47, but the user manual number

21  is 17.  I just want to make sure I'm in the

22  right place.

23      Q.   What does this reflect?

24      A.   This is teaching a user how to

25  begin the order creation process in P.O. Writer

176

1  Plus.

2      Q.   You can put that away for now.

3      Is it accurate to say that P.O.

4  Writer enabled a purchase order to be created

5  from a requisition list?

6      A.   Yes.

7      Q.   Is it accurate to say that during

8  purchase order generation on the P.O. Writer

9  system, the vendor listed on the requisition

10  could be automatically converted to a different

11  vendor?

12      MR. REDDY:  Objection; seeks legal

13  conclusion, foundation.

14      A.   Automatically?  There was a feature

15  in the product that the buyer could use in the

16  requisitioning interface that would allow the

17  system to try and help them put in a supplier.

18  It was described earlier.  It's in the

19  requisitioning interface module.

20      Q.   Okay.  Are you referring maybe to

21  the guided tour version 10.0 document?

22      A.   Let's see.

23      Q.   I'll refer you to page 552.  This

24  is McEneny Exhibit 2 again.  Like I said, L

25  0126552.

McEneny, Laurene  6/10/2010  12:08:00 PM



177

1    Do you see the example on this
2    page?
3        A.   Um-hum.  That's not the page I was
4    thinking of.  I was thinking of the one that
5    ends in 6682.  I just want to make sure we're
6    communicating.
7        Q.   Yup.  And what does --
8        A.   This is the screen that a user
9    would use, and again, typically a buyer would
10   log in, who is managing the requisition Q.  And
11   this particular screen, what it's showing is
12   that there is the ability to have the system --
13   let's see, what are we doing here?  Let me make
14   sure I'm absolutely in the right place.
15       You can see on the following page,
16   the one that's 6683, where the system is
17   automatically doing the vendor assignment after
18   the user presses the, I believe that's the F6
19   key, it's a little hard to read with this copy.
20   So that's, when I answered your question, that's
21   what I was specifically referring to.
22       Q.   Okay.  Can you turn back to that
23   page 6552.
24       A.   Um-hum.  I'm sorry 65?
25       Q.   6552, yes.

179

1    that correct?
2        A.   It identifies the vendor associated
3    with that particular transaction for that item.
4        Q.   Is it accurate to say that this
5    shows catalog numbers for items that are
6    generally equivalent?
7        MR. REDDY:  Objection; seeks legal
8    conclusion.
9        A.   No, it doesn't.
10       Q.   I'm sorry, what does it show again,
11   what are the catalog numbers?
12       A.   In the item master, at the top
13   left-hand corner, you'll see the item number.
14   And then kind of a third of the way down on the
15   right side, it says catalog.  If there were a
16   catalog ID in the item master for that item,
17   then it would show there.  In this particular
18   example it's left blank, so there was no catalog
19   ID for this item number.
20       Q.   I see.
21       But it could be, it could be filled
22   in, it didn't always have to be blank?
23       A.   It could be filled in.  But again,
24   it was one catalog in the item master file.  And
25   that's the field it's referring to.

178

1        A.   Um-hum.
2        Q.   Is it accurate to say that this
3    example shows the vendor identification?
4        MR. REDDY:  Objection; seeks legal
5    conclusion.
6        A.   Yeah, I'm not really sure I
7    understand the question.  I can tell you what
8    this screen is showing.
9        Q.   Yes, tell me what this screen
10   shows.
11       A.   This is the, with the P.O. Writer
12   Plus purchase history card.  And if there was
13   history for that item, it would show the order
14   number, and that could be a PO number, it could
15   show a quote number.  Next to that it would show
16   the order type.  So if it were a new order you
17   could see that, if it would be a blank, a
18   contract release, a Q would be a request for
19   quote.
20       And then what it's specifically
21   showing is if there is a transaction, it would
22   show who the vendor was associated with that
23   transaction.  That's all it's showing on this
24   page.
25       Q.   So it identifies the vendor; is

180

1        Q.   Did the P.O. Writer enable a user
2    to locate and find items to be purchased?
3        A.   Yes.
4        Q.   Did P.O. Writer maintain product
5    account logs on a database?
6        A.   Yes.
7        Q.   Did P.O. Writer display catalogs?
8        A.   Yes.
9        Q.   Once the catalogs were displayed,
10   could you select particular catalogs to search?
11       MR. REDDY:  Objection; no
12   foundation.
13       A.   Once the catalog was displayed?
14       Q.   Yes.
15       A.   Then you could select items.
16       Q.   Did P.O. Writer maintain product
17   catalogs on multiple databases?
18       A.   On multiple databases?  It had one
19   single database.  Well, no, that's not true
20   actually.
21       If they used our remote
22   requisitioning software, they could have
23   different catalogs on different stand-alone PCs.
24   So, and there was a product called remote
25   requisitioning, and then you would use the data

McEneny, Laurene  6/10/2010  12:08:00 PM

181

1   interface to import, and actually there is a
2   feature that imports the catalog.  So you could
3   have catalogs on different stand-alone
4   computers, and users at different facilities
5   could requisition.  And then they could be
6   imported into the big P.O. Writer Plus database.
7        So my answer would be yes, with
8   that explanation.
9        Q.   Understood.
10       A.   Again, I just want to make sure
11  that there is no misunderstanding, we didn't go
12  out to disparate supplier mainframes and check
13  their inventory.
14       Q.   I understand.
15            Did P.O. Writer -- let me rephrase.
16            Did P.O. Writer maintain various
17  types of information about items from those
18  catalogs?
19       A.   Yes.
20       Q.   Could the product catalogs in P.O.
21  Writer be updated with new items?
22       A.   Yes.
23       Q.   Could the product catalogs in P.O.
24  Writer be updated with price information?
25       A.   Yes.

182

1        Q.   Could P.O. Writer store additional
2   text that would allow for a more detailed item
3   description?
4        A.   Yes.
5        Q.   Is there a limit to the number of
6   items that could be associated with a particular
7   source?
8            MR. REDDY:  Objection; seeks legal
9   conclusion.
10       A.   I would again say no.  But based on
11  the way the customer configured their system,
12  it's really up to them on how they organized the
13  data.
14       Q.   So could a customer configure its
15  product such that there was no limit on the
16  number of items that could be associated with a
17  particular source?
18            MR. REDDY:  Same objections.
19       A.   Again, same answer.  I'd say there
20  wasn't a limitation.
21       Q.   Could a user select a particular
22  catalog and search for desired items within the
23  catalog?
24       A.   Yes.
25       Q.   Could a user view a list of search

183

1   results from a catalog search?
2        A.   Yes.
3        Q.   Was a selected item placed on a
4   requisition by P.O. Writer?
5        A.   Yes.
6        Q.   Did P.O. Writer provide the ability
7   to build a requisition with selected matching
8   items from a catalog search?
9            MR. REDDY:  Objection; seeks legal
10  conclusion.
11       A.   Yes.
12       Q.   Can you explain how that was done.
13       A.   Again, the user can select items in
14  a number of ways.  They can start with a
15  catalog, subsort, pick items, go back, scroll
16  back in, perhaps leave the catalog ID blank, put
17  in a description, get another item, put it on
18  the requisition.
19            So the user was able, through a
20  single sit down session, to create a requisition
21  with a single item or multiple items that could
22  then become an order, or multiple orders.
23       Q.   Did P.O. Writer provide the ability
24  to generate a purchase order from a requisition?
25       A.   Yes.

184

1        Q.   Did P.O. Writer provide the ability
2   to generate multiple purchase orders to
3   different vendors from a single requisition?
4        A.   Yes.
5        Q.   Did P.O. Writer provide the ability
6   to determine the inventory status of a selected
7   item?
8        A.   Yes.
9        Q.   Was it possible to populate a
10  requisition from items selected from the
11  catalog?
12            MR. REDDY:  Objection.
13       A.   Yes.
14            MR. REDDY:  Seeks legal conclusion.
15       Q.   How is that done?
16       A.   I'm sorry?
17       Q.   How is that done?
18       A.   The question one more time.
19       Q.   How would a user populate a
20  requisition with items selected from a catalog?
21            MR. REDDY:  Same objection.
22       A.   The user would select the catalog,
23  subsort however they want, or get a whole list
24  of items that belong to that catalog.  And they
25  would simply move the cursor next to the item

185

1   and indicate a quantity for the item.  And that
2   was the process then for selecting that item to
3   be included on requisition.
4       Q.   Was it possible to search across
5   multiple catalogs?
6       A.   Yes.
7       Q.   When you built a requisition from
8   items in a catalog, were the items in the
9   requisition associated with the source?
10      MR. REDDY:  Objection; foundation,
11   seeks legal conclusion.
12      A.   Again, the answer would be yes,
13   configured properly.
14      Q.   Could a customer use the catalog ID
15   field to represent the suppliers they were
16   buying the item from?
17      A.   They could.
18      Q.   Did users do that?
19      A.   Yes.
20      Q.   Is it accurate to say that if a
21   customer took the catalog ID field in the master
22   item table into their database, and they chose
23   to enter into -- let me rephrase.
24      A.   I'm taking notes on this one, it's
25   a little long.

186

1       Q.   Let me ask a different question.
2       Once you built a requisition with
3   items from the catalog, was it possible to
4   generate purchase orders for the items in the
5   requisition?
6       A.   Yes.
7       Q.   Could you take a requisition and
8   turn it directly into a purchase order?
9       A.   Yes.
10      Q.   Could you take a requisition and
11   turn it into multiple purchase orders?
12      A.   Yes.
13      Q.   Could a user check both local and
14   remote inventory?
15      MR. REDDY:  Objection; foundation,
16   calls for a legal conclusion.
17      MS. HUGHEY:  Let me rephrase.
18      Q.   Could a user check the availability
19   of requisitioned items in inventory?
20      MR. REDDY:  Objection; seeks legal
21   conclusion, foundation.
22      A.   During the requisitioning process
23   if a user had stock requisitioning, they had the
24   ability to see where an item was stored, with
25   how many locations an item might be stored in.

187

1   They could also check through the stock
2   requisitioning available inventory in the
3   requisition process.  They could also, the
4   buyers could also view on hand inventory.
5       Q.   So could a user check the
6   availability of on hand inventory?
7       A.   Yes.
8       Q.   Could a user check the availability
9   of remote inventory?
10      MR. REDDY:  Objection; seeks legal
11   conclusion.
12      A.   If, when I say yes to remote
13   inventory, that assumes that the inventory
14   location is remote.  I mean, again, an item can
15   be stored in many locations.  And if one of
16   those locations happens to be remote, then the
17   answer is yes.
18      Q.   Could you use P.O. Writer to search
19   for select items from multiple product catalogs?
20      A.   Yes.
21      MR. REDDY:  Objection; asked and
22   answered.  I think you asked this question
23   six, seven times.
24      Q.   How is that done?
25      A.   I'm sorry?

188

1       Q.   How would a user use P.O. Writer to
2   search for select items from multiple product
3   catalogs?
4       MR. REDDY:  Objection; calls for a
5   legal conclusion.
6       A.   They would enter into the either
7   requisitioning module or the, as a buyer could
8   go in when they're creating a purchase order,
9   leave the catalog ID blank, and put in a search
10   criteria, item, description, commodity, in which
11   case the system would ignore the catalog ID
12   field and go out and search across the database,
13   effectively searching across catalogs.
14      Q.   In the P.O. Writer system, could
15   user defined fields be used to associate a
16   vendor with an item?
17      A.   Yes.
18      MR. REDDY:  Objection.
19      Q.   Was a user limited to the type of
20   item they put on the requisition?
21      A.   No.
22      MR. REDDY:  Objection; foundation,
23   vague.
24      Q.   Was a user limited to starting with
25   the catalog and only putting those items on a

McEneny, Laurene  6/10/2010  12:08:00 PM

189

1    requisition?
2    A.   No.
3    Q.   Was there a limit to the number of
4    combinations of items they could put on the
5    requisition?
6    MR. REDDY:  Objection; vague.
7    A.   No.
8    Q.   I'm not talking about version 10
9    anymore.
10   A.   Okay.
11   Q.   I want to understand what you were
12   selling in 2002.  Did P.O. Writer have a system
13   in 2002?
14   A.   Yes.
15   Q.   Let me rephrase.
16   Did American Tech -- at that point
17   were you American Tech anymore?
18   A.   No, we were Purchasing Net at that
19   point.  And yes, we were selling procurement
20   software.
21   Q.   Did the procurement software that
22   Purchasing Net --
23   A.   Yes.
24   Q.   -- was selling in 2002 have the
25   same functionality with respect to the version

190

1    10 product?
2    A.   I don't know -- I can't answer that
3    specifically.  And the reason is we were
4    rebuilding the product line, so I would have to
5    go back and check and see exactly what was
6    available in the product at that moment in time.
7    Q.   Is it accurate to say that ePlus
8    was aware of your product since at least 2006?
9    MR. REDDY:  Objection; foundation.
10   MS. HUGHEY:  Let me take a step
11   back.
12   Q.   Are you aware of a company called
13   ePlus?
14   A.   Yes.
15   Q.   Is it your understanding that ePlus
16   was aware of your product -- was aware of P.O.
17   Writer since at least 2006 or not?
18   MR. REDDY:  Objection; foundation.
19   A.   You know, we knew each other, but I
20   can't tell you exactly what year we met.
21   Q.   Okay.  Has P.O. Writer ever been
22   accused of infringing any of ePlus's patents?
23   A.   No.  I mean, not that I know of.
24   MS. HUGHEY:  I have one more
25   exhibit.

191

1    MR. ROBERTSON:  Are we coming to a
2    close?
3    MS. HUGHEY:  This is it.
4    (Lawson Exhibit 118 for
5    identification, article entitled "Buyers'
6    Guide to Software for Purchasing,"
7    production numbers ePLUS 0219905 through
8    ePLUS 0219910.)
9    THE WITNESS:  When I say not to
10   that I know of, the company was sold at the
11   end of last year, so I have no knowledge.
12   Q.   But prior to last year?
13   A.   No.
14   Q.   I've handed you what's been marked
15   Lawson Exhibit 118.  Marked ePLUS 0219905 to
16   910.
17   Do you recognize this document?
18   A.   I do recognize it.
19   Q.   What is this document?
20   A.   This is an excerpt from a magazine
21   that was published called Purchasing Magazine.
22   Q.   And do you see on page ePLUS
23   0219905, the first page, it says American Tech?
24   A.   Yes.
25   Q.   Is that your company?

192

1    A.   That was the company we owned at
2    the time, yes.
3    Q.   And do you see, if you go to page
4    ePLUS 0219908.
5    A.   Um-hum.
6    Q.   Do you see right in the middle it
7    says Structured Computer Systems?
8    A.   Yes.
9    Q.   Were you aware of Structured
10   Computer Systems?
11   A.   Yes.
12   Q.   What product does Structured
13   Computer Systems sell?
14   A.   Their product was called Reality.
15   Q.   Do you see just a couple below that
16   it says Technical Services Associates?
17   A.   Yes.
18   Q.   Were you aware of Technical
19   Services Associates?
20   A.   Yes, we were.
21   Q.   What product did they sell?
22   A.   Gateway.
23   Q.   Do you see ePlus on this document?
24   A.   In the article?
25   Q.   Yes.

McEneny, Laurene  6/10/2010  12:08:00 PM

193

1      A.   No, I don't.
2      Q.   I just have a couple of questions
3   about the P.O. Writer product.  We've talked a
4   lot about your desire to keep it confidential
5   from your competitors.  Is that accurate?
6      A.   Yes.
7      Q.   Is it fair to say that the reason
8   you didn't want your competitors to see the
9   manuals or the products is because you did not
10  want them taking your product and selling it?
11          MR. REDDY:  Objection; leading.
12          MS. HUGHEY:  Let me rephrase.
13      Q.   Is it fair to say that you did not
14  want your customers to see your manuals or have
15  access to your software because you didn't want
16  them to sell it or not?
17          MR. REDDY:  Objection; leading.
18      A.   To sell?
19      Q.   To sell the product.
20      A.   To sell our product?
21          MR. REDDY:  Same objections.
22      A.   The reason, I mean, I'll answer
23  your question by saying the reason you don't
24  want your competitors to see your product is you
25  don't want them to take your ideas.  It's a very

194

1   competitive market, and every year everybody is
2   coming out with new features and functions to
3   try and stay, you know, keep customers excited
4   and meet, you know, needs and requirements.
5          And so, you know, you don't want
6   people knowing what you're doing for the very
7   reason competitors don't like to share
8   information.
9      Q.   So is it accurate to say that your
10  concern wasn't with third parties who weren't
11  going to use the information for commercial
12  purposes, such as customers?
13          MR. REDDY:  Objection; vague,
14  compound, leading.
15      Q.   Is it accurate to say that you had
16  no concerns with confidentiality when it came to
17  customers reviewing the products, as long as
18  they weren't showing them to third parties?
19          MR. REDDY:  Objection; vague,
20  compound and leading.
21      A.   It's fair to say that we wanted our
22  customers to know how to use the product.  And
23  we wanted the users within their company that
24  had a license to use the product to know exactly
25  how to use it.  And that we didn't want our

195

1   confidential information getting to somebody
2   that could put it in a product and use it
3   against us.
4          MS. HUGHEY:  I have no further
5   questions.
6          MR. REDDY:  I do have a few
7   follow-up items.
8          CONTINUED EXAMINATION
9   BY MR. REDDY:
10      Q.   If we can start with the document
11  that was given to you as Lawson Exhibit 110, the
12  stock requisition -- I'm sorry, Lawson 107, the
13  requisition interface module.
14      A.   Um-hum.
15      Q.   I would like to start with it's
16  page number 4 in the manual, the Bates number is
17  L 0126969.
18          MS. HUGHEY:  I'm sorry, what
19  exhibit are we on?
20          MR. REDDY:  It would be Lawson 107,
21  the requisition interface manual.
22          MS. HUGHEY:  Okay, go ahead.
23      Q.   Do you see there is a screenshot at
24  the top of the page?
25      A.   Um-hum.

196

1      Q.   And there are several fields
2   displayed in that screenshot; is that correct?
3      A.   Yes.
4      Q.   And one of those includes a vendor
5   and another one includes a vendor name; is that
6   correct?
7          MS. HUGHEY:  I'm sorry, I'm going
8   to stop you for one second.  I can't find
9   my 107.  I'm just going to grab his.
10          Can we take a fifteen second break.
11          THE VIDEOGRAPHER:  Going off the
12  record at 4:23.,
13          (Discussion off the record.)
14          THE VIDEOGRAPHER:  Back on the
15  record, 4:23.,
16  BY MR. REDDY:
17      Q.   So I think my question was do you
18  see that there is two fields there, one says
19  vendor and the other one says vendor name?
20          MS. HUGHEY:  What page are we on?
21          MR. REDDY:  Page number 4, the
22  document labelled L 0126969.
23      Q.   Do you see those two fields?
24      A.   Um-hum.
25      Q.   Now, as we discussed this morning,

McEneny, Laurene  6/10/2010  12:08:00 PM

197

1    the only way that that vendor information would
2    be in the requisition is if it was either
3    manually entered by the user or was taken from
4    the history; is that correct?
5        A.   In this context, that's correct.
6    Because in this context this manual is
7    describing the conversion of a requisition to a
8    purchase order.  So this particular feature is
9    feature number 2 on the prior screen.  So when
10   you're using that function, which is a direct
11   conversion requisition to P.O., then if a
12   supplier is shown here, it's because it's come
13   from the requisition itself.
14       Q.   And the only way the supplier would
15   become a requisition would be in one of those
16   two ways, correct, and those two ways that I'm
17   referring to are that it was either manually
18   entered by the user or else it was associated
19   with the history that we discussed?
20           MS. HUGHEY:  Objection; compound,
21   leading.
22       A.   In this case it would be if the
23   user suggests a vendor on this particular screen
24   in this flow of a manual.
25       Q.   So with respect to this particular

198

1    screen as depicted on L 0126969, the only way
2    that vendor item data would be on this screen
3    would be if the user manually entered that data;
4    is that correct?
5        A.   In creating the requisition, that's
6    correct.
7        Q.   Now, if I can also direct your
8    attention to page number 11 of the document,
9    which is Bates labelled L 0126976.  And there is
10   a screenshot --
11       A.   I'm sorry, where are you?
12       Q.   Page 11 of the same document, of
13   the manual, which is Bates labelled L 0126976.
14       A.   Got it.
15       Q.   And I'm looking at the screenshot
16   located at the top of the page.
17       A.   Um-hum.
18       Q.   And I'm going to read from it.  It
19   states "all requisitions are displayed in
20   requisition number order.  You may enter a
21   vendor number for each item displayed or you can
22   let the system assign vendor numbers.  It will
23   use the vendor from the latest purchase order
24   for the item.  The system will not assign a
25   vendor number for items without history or from

199

1    asterisk items."
2        Did I read that correctly?
3        A.   Yes, you did.
4        Q.   Is that a true statement of the
5    functionality of the requisition module in the
6    P.O. Writer Plus system?
7        A.   That is a true statement as it
8    relates to this function in the requisition
9    interface on page 10 and 11.  So it's what I
10   explained before.  If there is no transaction
11   history and there is nothing for the system to
12   refer to to come back and suggest a supplier, if
13   you're using a function that is asking the
14   system to do an automatic supplier assignment
15   for you.
16       Q.   Now, if I can direct your attention
17   to the next page, which is L 0126977.  I believe
18   this page is discussing how vendor information
19   is placed on the requisition.  And if I can
20   direct your attention to the last paragraph.
21       It states "the objective is to
22   assign a vendor number, buyer code and ship to
23   line for each REQ./line you wish to move to the
24   P.O. hold file.  This may be done automatically
25   but can be overwritten by the user."

200

1        Did I read that correctly?
2        A.   Yes, you did.
3        Q.   So is it true that the vendor
4    assignment process takes place during the
5    requisitioning stage, or during the purchase
6    order stage?
7        A.   Your question is can -- I'm sorry,
8    ask me the question again.
9        Q.   So I'm referring to this paragraph,
10   it states "the objective is to assign a vendor
11   number."
12       A.   Right.
13       Q.   So is it an accurate statement to
14   say that the vendor assignment takes place
15   during the requisitioning stage, or else later
16   on in the stage, such as in the purchase order
17   generation stage as we discussed earlier?
18           MS. HUGHEY:  Objection; vague.
19       A.   It can take place in many places.
20   The requisitioner can suggest a supplier or not.
21   The buyer can use the requisition interface.
22   And they can accept the suggested supplier from
23   the requisitioner, they can change it, or they
24   can use a function key to have the system try
25   and assign a supplier based on history.

McEneny, Laurene  6/10/2010  12:08:00 PM

201

1     And -- or, and what this is
2     concluding, this lesson concept, the idea is in
3     order to move to, in this example, the purchase
4     order stage, the system's looking for a vendor,
5     a buyer and a ship to code for each line.  So in
6     this example, these were the lines that were
7     left over that hadn't been managed earlier in
8     the example.  So that's the context of this.  So
9     the vendor assignment can really happen in many
10    places.
11        Q.    Now, if I can direct your
12    attention -- we can put that one aside.
13        If I can direct your attention to
14    the stock requisitioning and kitting module,
15    which was Exhibit L 110.
16        Now, when you used the term stock
17    requisitioning, what is meant by that?
18        A.    When a user had the inventory
19    control module, the user -- the requisitioner
20    might want an item.  And the item can be put on
21    a purchase requisition, which has been the focus
22    of most of the conversation, or using this
23    module, if they license the stock requisitioning
24    module, they could request an item from stock.
25        So the idea is, you know, do I have

202

1     it somewhere in an inventory location.  So
2     instead of asking a buyer to buy it, you want to
3     use what you have already instead of buying
4     something new.
5         Q.    And so the stock requisitioning
6     feature could only be used if the person also
7     had the inventory control module; is that
8     correct?
9         A.    That's correct.
10        Q.    I don't think I have any further
11    questions with respect to that manual.
12        Now, with respect to the data
13    interface utility, do you recall being asked
14    some questions about that specific module?
15        A.    Today?
16        Q.    Yes.
17        A.    Yes.
18        Q.    Now, the data interface utility, I
19    think you testified, in order for a user to
20    import data they would have to have the data
21    interface utility; is that correct?
22        A.    To import, yes.
23        Q.    And that was a separate module from
24    the purchasing module; correct?
25        A.    That's right, um-hum.

203

1         Q.    Now, I'd also like to direct your
2     attention to Lawson Exhibit 115, which is the
3     requisition module.
4         Now, this specific document, there
5     is no date that's specifically associated with
6     this document; is that correct?
7         MS. HUGHEY:  Objection; vague.
8         MR. REDDY:  I'm sorry, I'll
9     rephrase the question.
10        Q.    There is no reference in this
11    document to what version this requisitioning
12    module that's described herein is referring to?
13        A.    Well, the cover is handwritten by
14    the woman who's headed up client care and still
15    does.  This happens I guess to be her office
16    copy.  And I suppose if we look through the
17    whole thing we might find something with a
18    version number on its screen or a date or
19    whatever.
20        But it's my testimony that this
21    represents the requisitioning module version 10.
22        Q.    And is there anything to
23    corroborate your testimony today that this --
24    that the requisitioning module capabilities
25    described in this manual were associated with

204

1     version 10?
2         A.    Well, probably on page L 0127533,
3     there is a screen that I just flipped to that
4     has a requisition date in the top right-hand
5     corner of 6/1/93, which is consistent with a lot
6     of the dating.
7         The features that were in here
8     could probably be mapped back to the client
9     support program list where we talk about
10    features and functions.  And that's really all I
11    could think of for you today.
12        Q.    Now, you testified earlier that the
13    screenshots that are located within these
14    manuals were taken contemporaneous with the
15    manuals being prepared; is that correct?
16        MS. HUGHEY:  Objection;
17    mischaracterizes the witness' testimony.
18        Q.    Is that a correct statement?
19        A.    The screenshots, I'll testify that
20    the dates on the screens are when people were
21    probably capturing the screenshots.
22        Q.    And so if I can direct your
23    attention to the page that's 2-48 in the manual,
24    which is L 0127566.  This is a screenshot titled
25    "archived requisitions by item number for 1/1/93

205

1    to 12/31/94."
2        A.   I'm sorry, this is 7556?
3        Q.   Or 7566, I'm sorry.
4        A.   That is correct, that would be a
5    from and to range, which would be controlled by
6    the user.  They would have entered any period of
7    time that they wanted.  And it was not unusual
8    when you're writing a manual to -- for a report
9    to have a lower date, maybe a higher date.  Just
10   so we didn't have to update them every year.
11       Q.   So is it -- I'm sorry, I didn't
12   mean to interrupt you.
13            Is it possible that this specific
14   document, this requisition module, was written
15   sometime after 12/31/1994?
16       A.   No.  No, this is version 10 manual.
17   It's most probable that the person that was
18   doing the screen just put in a wide date range.
19   Which would be perfectly acceptable to the
20   computer.
21       Q.   And as we just discussed, there is
22   nothing you can specifically point to to
23   corroborate the fact that this is associated
24   with the version 10 manual; is that correct?
25       A.   All I can tell you is looking

206

1    through this and knowing what we were doing at
2    that point in time, that I believe this is the
3    version 10 manual.
4        Q.   Now, if I can direct your attention
5    to page 2-4 of the manual, which is Bates
6    labelled L 0127522.
7            Now, the heading of that page says
8    "creating a catalog."
9        A.   Um-hum.
10       Q.   The first sentence says "before
11   creating a requisition you'll need to create a
12   catalog of items."
13            Did I read that correctly?
14       A.   Correct.
15       Q.   Now, does this page suggest that
16   there could only be one catalog of items in the
17   P.O. Writer at any given time?
18       A.   No.
19       Q.   Well, if I can direct your
20   attention to the second page.  I'm sorry, the
21   next page, which is Bates labelled L 0127523.
22   There is a screenshot that says "create new
23   catalog."
24            Do you see that?
25       A.   Yes.

207

1        Q.   And the screenshot says "this will
2    replace your current catalog with a brand new
3    catalog."
4            Did I read that correctly?
5        A.   This will replace -- I'm sorry.
6    Are you on 523?
7        Q.   Yes.
8        A.   This function completes --
9        Q.   I'm referring to the screenshot
10   which says "this will replace your current
11   catalog with a brand new catalog."
12       A.   I'm sorry, yes, that's what the
13   screen says.
14       Q.   Now, does that not suggest that
15   there can only be one catalog in the P.O. Writer
16   database at any given time?
17       A.   Let me go back and see what the
18   context of this is.
19            I think that's misleading.  If you
20   go back to page, the prior page, 522, it shows
21   you your different options for creating a
22   catalog.  So in the utility section you can
23   create a brand new catalog, you can merge with a
24   current catalog, you can create new extended
25   description files, merge with current extended

208

1    descriptions, delete requisitions, delete
2    archived or requisitions, backup or reorganize.
3            So this particular area, depending
4    on which function you chose, that might be true.
5    But there was -- it was possible to merge
6    catalogs with the system.  But it's a utility,
7    you have to be careful, you don't want to not
8    know what you're doing and end up overwriting
9    something, which users do.
10       Q.   But when you merge a catalog, there
11   is still only one catalog; correct?
12       A.   It becomes one item master file.
13   And each item can have its own catalog ID.  So
14   effectively you're bringing in multiple
15   catalogs.
16       Q.   I guess I just don't understand,
17   where does this specific page of this document
18   say that there can be more than one catalog in
19   the system?
20       A.   Well, I think that page may not say
21   that.  But I think if you look at other
22   functionality, like merge with current catalog,
23   that might help people understand.
24       Q.   So when you merge with one catalog,
25   that doesn't mean that there is more than one

209

1     catalog; correct?  Would you agree with me?
2         MS. HUGHEY:  Objection; calls for a
3     legal conclusion.  You're getting
4     argumentative.
5       A.   I want to make sure you understand.
6     There is an item master file.  And that can also
7     be considered your catalog.  The item number is
8     your key.  The catalog ID is a very key field in
9     that.  And the way the user interfaces with the
10     system is when they say I want a catalog ID or I
11     want to look at the list of catalogs, it's
12     looking in the item master file and searching
13     based on that particular field.
14       Q.   So this catalog, is this the
15     catalog that's described in this specific page,
16     is that the same catalog as the catalog ID from
17     the item master file that we talked about
18     previously?
19       A.   This is probably mixing terms,
20     which is probably what's confusing.  When this
21     word catalog, it should really be item master.
22     But the users think of things more as a catalog
23     than they do item master.  I don't know if that
24     helps you or not.
25       Q.   So looking to the next page,

210

1     0127523, I'm just asking, when a user tries to
2     create a new catalog, why does that replace,
3     quote, replace your current catalog with a brand
4     new catalog, end quote?
5       A.   Because they've selected a feature
6     called create a new catalog.  So this particular
7     utility, again, you're in a utilities section of
8     the product.  This is not something an end user
9     is going to be doing, this is something your
10     system manager is going to be doing.  And maybe
11     they just want to start all over.  Maybe they,
12     you know, want to create something brand new.
13       Q.   So returning back to the previous
14     page, which is L 127522, you'd agree with me
15     that the heading says creating a catalog;
16     correct?
17         MS. HUGHEY:  Objection; asked and
18     answered.  The document speaks for itself.
19       A.   The page says creating a catalog,
20     correct.
21       Q.   And there are, this is a screenshot
22     which indicates utilities; correct?
23       A.   That's correct.
24       Q.   And the first sentence states
25     "before creating a requisition, you'll need to

211

1     create a catalog of items"; correct?
2       A.   That's what it says.
3       Q.   And with respect to the catalog,
4     there is only two options, a user can either
5     create a new catalog or merge with a current
6     catalog; is that correct?
7       A.   Those -- these are two methods.
8     The things we were talking about earlier today,
9     where you go to the item master file, that's
10     another method.  The data interface utility is
11     another method.  So there are many methods to
12     update that item master file.  This is just two
13     more.
14       Q.   Well, with respect to this specific
15     document, the only functionality with respect to
16     the catalog that's a disclosed here is that you
17     can either create a new catalog or merge with a
18     current catalog; is that correct?
19       A.   This is two of many ways to do
20     that.  And these are two -- the only two that
21     are referenced on this page.
22       Q.   And you're saying that in contrast
23     to the item master record, the catalog that's
24     described on this page refers to the totality of
25     item master records and not the catalog ID

212

1     that's specifically written in the item master
2     file; is that correct?
3         MS. HUGHEY:  Objection; vague.
4       A.   What I'm saying is I think what's
5     confusing is the use, on this page, of the word
6     catalog.
7       Q.   The system had the word catalog in
8     it; correct?  These are screenshots from the
9     system?
10       A.   This is a utility page that is
11     given to a user that would have the authority,
12     would have the privileges in the system to do
13     updating of the item master file.  So maybe the
14     customer doesn't own the data in the interface
15     utility, and they want to get items in the
16     database.  This would be one way they would do
17     it if they didn't happen to own that particular
18     module.
19       Q.   So by creating --
20       A.   So just another way to do this.
21       Q.   I'm sorry, I didn't mean to
22     interrupt you.
23       By creating a catalog, does that
24     mean that the user is creating a new catalog ID
25     for the item master record?

213

1    A.   No.
2    Q.   I'm just trying to understand.  I
3  believe your testimony was that this is a
4  utility page that is given to a user that would
5  have the authority to update the item master
6  file.  Is that correct?
7    A.   Right.
8    Q.   And so the only catalog information
9  contained in the item user file is the catalog
10  ID; correct?
11    A.   Oh, no.  I mean, there if --
12  earlier there were the fields in the item master
13  file, the item, unit of measure, description,
14  the price, catalog ID, user defined fields.
15  Those are all part of the item master file.
16    So if you're importing catalog
17  information, those would be fields that would be
18  imported as well.
19    Q.   I'm really not trying to be
20  argumentative.
21    A.   I'm trying to help you understand.
22  And I'm just not getting through.
23    Q.   I'm trying to understand what this
24  means when it says creating a catalog.  Maybe if
25  we go back to the item master record, maybe that

214

1  will help us out.
2    If you can go to Exhibit No. 2,
3  which is the guided tour.  And just keep that
4  other document handy if you can.
5    The item master record is discussed
6  beginning at L 0126537.  Which is page 7 of the
7  manual.
8    You see there is several fields
9  associated with that, right, which we discussed
10  this morning?
11    A.   Right.
12    Q.   And one of those fields is a
13  catalog ID; correct?
14    A.   That's correct.
15    Q.   So when we talk about Exhibit,
16  Lawson Exhibit 115, when it's talking about
17  creating a catalog, what does that have to do
18  with the item master record?
19    A.   Some users think of the item master
20  as their catalog.  So I think where the
21  confusion is coming in is if you are using the
22  requisitioning utility, and you're wanting to
23  bring data in, either start with a brand new
24  item master or you want to bring data in,
25  that -- you know what, I want to make sure I get

215

1  this right.  Let me take five minutes, and I
2  want to make sure that this isn't specifically
3  talking about updating the remote requisitioning
4  catalog.  Remember I was talking about could you
5  have remote users with their own individual
6  catalog?
7    Q.   You should certainly take any time
8  that you need to answer the question.  If you
9  would like to take the time.
10    A.   Because I really want to make sure.
11  I think where I'm feeling like we're getting a
12  disconnect is that there is an idea that you can
13  only have one catalog at a time.  And, you know,
14  again, as it relates to purchase requisitions
15  and purchase orders in P.O. Writer, it was
16  driven around this item master file.
17    In requisitioning you did have the
18  ability to have disparate stand-alone systems,
19  and then you could pull in requisitions into the
20  database.  I just want to make sure that this
21  maybe wasn't specifically related to that.
22  Because I might be confusing it, in which case
23  maybe I should just say I don't remember and we
24  can move on.
25    How about that?  Let's do that.

216

1  Because it's getting late.  I'll just go with I
2  don't remember and we'll move on.  I like that
3  better.  That works for me.
4    Because honestly, I would have to
5  go back and study it, and that's not really what
6  we're here for.  And I don't remember.  So let's
7  move on.
8    Q.   So my question is with respect to
9  the creating a catalog feature that's discussed
10  on L 0127522, my question is whether or not the
11  system, the database had more than one catalog.
12    A.   My answer that PNet, from a user's
13  perspective, could have more than one catalog.
14    Q.   But based on this specific
15  document --
16    A.   But that's all I can recall.
17  Anything else I'd have to do the research on it.
18    Q.   Is it your understanding that the
19  catalog that's referenced on this specific page
20  refers to the item master?
21    A.   You know what, I'm going to say I
22  don't recall.  I'd have to research it.  Let's
23  go with that.  Because I really think there is a
24  great possibility that in that particular manual
25  it may have referred to building out catalogs

McEneny, Laurene  6/10/2010  12:08:00 PM

217

1   for the remote requisition.  So without me
2   really having done my homework, I think what I
3   would rather just say is let's just.
4       Q.   So my understanding of your
5   testimony today is that you don't know to what
6   this specific catalog is referring to as listed
7   on this specific page, 127522?
8       A.   Let's say that that is correct.
9       Q.   And does that also hold true for
10  the word catalog listed on the next page,
11  127523, discussing creating a new catalog?
12      A.   Let's say the same thing holds.  I
13  would like to research that before I -- because
14  I can see that without some research I might
15  take you somewhere you don't want to be.
16      Q.   I think we can put that document
17  away as well.
18          Now, Ms. Hughey asked you whether
19  or not she had the manuals available at trade
20  shows.  Do you recall her asking you about that?
21      A.   Yes, we do.  Yes.
22      Q.   And when you would have the manuals
23  available at trade shows, what would you do with
24  them at night after the trade show was over?
25      A.   We would usually lock them up.

218

1       Q.   Now, Ms. Hughey, I recall she also
2   asked you whether or not you would sell the P.O.
3   Writer Plus -- the P.O. Writer Plus product to
4   any customer.  Do you recall her asking you that
5   question?
6       A.   Yes.
7       Q.   And you recall what your answer was
8   to that question?
9       A.   I said yes, we would sell it to
10  anyone.  Not considering a competitor a
11  customer, considering like --
12      Q.   So there are certain customers to
13  whom American Tech would not have sold the P.O.
14  Writer Plus product; is that correct?
15      A.   I wouldn't sell the product to a
16  competitor.
17      Q.   And how would you typically go
18  about the process of investigating who was
19  trying to purchase the specific product?
20      A.   How would we go through that
21  process?  I think a lot of times you just know
22  who's in business.  Recognize the names.  A lot
23  of the people that would buy our product were
24  Fortune 500 companies, so we knew the names
25  pretty well.

219

1       Q.   Now, there was another thing that
2   Ms. Hughey directed you to with respect to the
3   guided tour document, which if you recall was
4   Exhibit No. 2.  And specifically you directed
5   her to the document that's listed at 126682.
6   Which is page 153 -- I'm sorry, 151 and 152.
7          And I believe she was asking you
8   whether or not the P.O. Writer product had the
9   capability of converting an item from one
10  product in one source to another product in a
11  different source.  Do you recall her asking
12  about that?
13      A.   Yes.
14      Q.   And I believe you testified that
15  this specific page described that functionality.
16  Is that correct?
17      A.   This specific page allows you to,
18  when you select number 3, which was on the prior
19  page, requisition consolidating and splitting.
20  So this particular page once you made that
21  selection number 3 in this version, would allow
22  you to use that functionality.
23          And let's see, what are we doing
24  here?  Consolidate or split, correct.  So number
25  3 gets you to this page where you can begin to

220

1   use that consolidate and split functionality.
2       Q.   But the functionality that she was
3   asking you about, which is whether or not you
4   could convert one item in one source to a
5   different item in a different source, that's not
6   described in the specific page; is that correct?
7          MS. HUGHEY:  Objection; foundation,
8   leading.
9       A.   What's described on this page is
10  after you make selection number 3, this
11  particular screen that's shown here is this
12  screen the user would use if they wanted to
13  begin to split or consolidate requisition lines.
14          MR. REDDY:  I think if we can just
15  take a one-minute break, I'm pretty sure
16  I'm going to be done as well.
17          THE VIDEOGRAPHER:  Going off the
18  record at 4:54.,
19          (A recess was taken.)
20          THE VIDEOGRAPHER:  Back on the
21  record, 4:59.,
22  BY MR. REDDY:
23      Q.   Now, you understand that the case
24  at issue here involves a suggestion of patent
25  infringement; correct?

McEneny, Laurene  6/10/2010  12:08:00 PM

221

1    A.   Correct.
2    Q.   And you're not the familiar with
3    the specific patent claims that are being
4    asserted in this case; is that correct?
5    A.   I was years ago.  But I haven't --
6    I didn't read them recently, so it's not fresh
7    on my mind.
8    Q.   But the specific claims that are
9    being asserted in this case, you're not familiar
10   with what claims are being asserted in this
11   case; is that correct?
12   A.   I vaguely recall what was asserted
13   years ago.  I mean.
14   Q.   If I were to tell you that one of
15   the patents that's being asserted in this case
16   wasn't asserted in the other case, would that
17   change your response as to whether or not you're
18   familiar with the specific patent claims that
19   are being asserted in this case?
20   A.   All I can tell you is years ago
21   when I was a witness in the ePlus/SAP trial, I
22   did read the patent or patents that were in
23   question at that time.  And I haven't done
24   anything since then.
25   Q.   Perhaps I can speed it along.  Let

222

1    me represent that certain claims that are being
2    asserted in this case were not asserted in the
3    SAP case.
4    A.   Okay.
5    Q.   So based upon that representation,
6    you're not familiar with all of the patent
7    claims that are being asserted in this case;
8    correct?
9    A.   Correct.
10   Q.   And you're not familiar with the
11   order that the judge in this case has issued
12   telling the parties what certain terms within
13   those patent claims mean; correct?
14   A.   Right, I have no information other
15   than what I sent you.
16   Q.   And so when you gave testimony
17   today about certain terms that are within the
18   patent, you gave that testimony as a layperson;
19   correct?
20   A.   Well, a layperson who's been
21   through a trial.  I don't know if that makes me
22   a layperson or not.
23   Q.   You're not --
24   A.   I have some experience with this
25   topic.  And so maybe then it would seem

223

1    familiar.
2    Q.   But you're not familiar with how
3    the court construed the claims in this case;
4    correct?
5    A.   No, I don't know what's going on
6    here.
7    Q.   So the testimony that you gave is
8    just from your own personal knowledge and not
9    taking into consideration the constructions that
10   the judge has given as to what those terms mean?
11   A.   That's right.
12   Q.   Now, we briefly talked about the
13   SAP case.  And I think you indicated that you
14   don't recall how much you were compensated by
15   SAP in that case; is that correct?
16   A.   Not the exact number.
17   And I'm glad you brought that up.
18   Because I couldn't remember, once I answered
19   that Tim may not have -- he may or may not have
20   gotten compensated, I believe I said he didn't.
21   Then I started to second-guess myself on that.
22   So I did text him and ask him if he had gotten
23   any money for that, and he said he couldn't
24   remember either.
25   So on that note, you know, he may

224

1    have dug around in some files and that might
2    have ended up on the bill.  So I'm going to say
3    that we don't remember exactly on that.  And I
4    definitely don't remember the number.
5    Q.   Now, the consulting agreement that
6    you had with SAP, was that between you and SAP;
7    is that correct?
8    A.   I don't know if it was between
9    me -- I think it was me and SAP.  I don't think
10   it was me and the law firm.  That doesn't seem
11   quite right.
12   Q.   But regardless, it was between you
13   individually and either the SAP lawyers or SAP
14   the company; is that correct?
15   A.   That's right.
16   Q.   And your husband may or may not
17   have had a separate consulting arrangement with
18   either SAP or the attorneys representing SAP; is
19   that correct?
20   A.   I don't think he had an agreement.
21   But I'm not 100 percent sure.  I definitely had
22   an agreement with them.
23   Q.   Do you recall how much you were
24   compensated by, pursuant to that agreement, on
25   an hourly basis?

McEneny, Laurene  6/10/2010  12:08:00 PM

225

1      A.   You know, I don't.  It's in the
2    testimony.  When I was kind of skimming through
3    it kind of glossed over it.  But I don't
4    remember the exact number.  It was around 200 an
5    hour.  But, again, I don't remember the exact
6    number.
7      Q.   And do you recall roughly how many
8    hours you billed SAP for your work on that case?
9      A.   I don't recall.
10     Q.   Do you believe it would be more
11   than 50?
12     A.   I honestly just don't know.
13     Q.   Could it be more than a hundred?
14     A.   I don't know.
15     Q.   Is it more than ten?
16     A.   Is it more than ten?  It would be
17   more than ten.
18     Q.   So would it be less than a
19   thousand?
20     A.   You know what.
21     Q.   Okay.
22          So my understanding is that you
23   were at the trial for SAP; is that correct?
24     A.   That's right.
25     Q.   And you were there for several

226

1    days; correct?
2      A.   Yeah, I definitely was.  I
3    testified over like half of one day and I think
4    the morning of another.  So yeah, I was there
5    for a couple of days.
6      Q.   You were in the specific city where
7    that trial took place for more than just those
8    two days; correct?
9      A.   Yeah, I think they had me -- I
10   don't remember exactly when I came down.  But
11   they told me I was going to testify on -- and it
12   turned out to be later.  I think it was maybe I
13   was going to testify on a Wednesday and it
14   turned out to be a Thursday, or something.  I
15   know that I didn't testify when I was supposed
16   to.
17     Q.   And as a result of that you were in
18   that specific location for that trial for
19   several days; correct?
20          MS. HUGHEY:  Objection; relevance,
21     beyond the scope of redirect.
22     A.   Yeah, I was there for a couple of
23   days.
24     Q.   And were you also compensated for
25   that time that you spent working -- while

227

1    working on that case?
2      A.   I don't recall.
3          MR. REDDY:  That's fine.  I have
4    nothing further then.
5          MS. HUGHEY:  I have nothing.  Thank
6    you.
7          THE VIDEOGRAPHER:  Going off the
8    record, end of tape 3 at 5:05.,
9          (Time noted:  5:05 p.m.)
10
11          _____
12          LAURENE McENENY
13
14   Subscribed and sworn to before me
15   this _____ day of _____, 2010.
16
17          _____
18
19
20
21
22
23
24
25

228

1          C E R T I F I C A T E
2    STATE OF NEW YORK   )
                        :  ss.
3    COUNTY OF NEW YORK  )
4
5      I, ERIC J. FINZ, a Shorthand Reporter and
6    Notary Public within and for the State of New
7    York, do hereby certify:
8          That LAURENE McENENY, the witness whose
9    deposition is hereinbefore set forth, was duly
10   sworn by me and that such deposition is a true
11   record of the testimony given by the witness.
12        I further certify that I am not related to
13   any of the parties to this action by blood or
14   marriage, and that I am in no way interested in
15   the outcome of this matter.
16        IN WITNESS WHEREOF, I have hereunto set my
17   hand this _____ day of _____, 2010.
18
19          _____
20          ERIC J. FINZ
21
22
23
24
25

229

| 1 | E X H I B I T S | |
|---|---|---|
| 2 | DESCRIPTION | PAGE |
| 3 | (McEneny Exhibit 1 for | 7 |
| 4 | identification, Subpoena.) | |
| 5 | (McEneny Exhibit 2 for | 24 |
| 6 | identification, document headed | |
| 7 | "Guided Tour, Version 10.0," | |
| 8 | production numbers L 0126514 through | |
| 9 | L 0126701.) | |
| 10 | (McEneny Exhibit 3 for | 80 |
| 11 | identification, note report dated | |
| 12 | February 1, 2006, production numbers | |
| 13 | ePLUS 219477 through ePLUS 219483.) | |
| 14 | (McEneny Exhibit 4 for | 87 |
| 15 | identification, note report, dated | |
| 16 | February 1, 2006, production numbers | |
| 17 | ePLUS 219491 through ePLUS 219492.) | |
| 18 | (McEneny Exhibit 5 for | 91 |
| 19 | identification, document entitled | |
| 20 | "Tenth Edition," production numbers L | |
| 21 | 126501 through L 126513.) | |
| 22 | (McEneny Exhibit 6 for | 98 |
| 23 | identification, document, production | |
| 24 | numbers L 126718 through L 126964.) | |
| 25 | | |

231

| 1 | E X H I B I T S (Continued) | |
|---|---|---|
| 2 | DESCRIPTION | PAGE |
| 3 | (Lawson Exhibit 101 for | 123 |
| 4 | identification, document, production | |
| 5 | numbers L 0126423 through L 0126481.) | |
| 6 | (Lawson Exhibit 102 for | 125 |
| 7 | identification, document, production | |
| 8 | numbers L 0126482 through L 0126500.) | |
| 9 | (Lawson Exhibit 103 for | 125 |
| 10 | identification, document, production | |
| 11 | numbers L 0126501 through L 0126513.) | |
| 12 | (Lawson Exhibit 104 for | 126 |
| 13 | identification, Subpoena.) | |
| 14 | (Lawson Exhibit 105 for | 127 |
| 15 | identification, document, production | |
| 16 | numbers L 0126702 through L 0126717.) | |
| 17 | (Lawson Exhibit 106 for | 128 |
| 18 | identification, document, production | |
| 19 | numbers L 0127297 through L 0127504.) | |
| 20 | (Lawson Exhibit 107 for | 129 |
| 21 | identification, document, production | |
| 22 | numbers L 0126965 through L 0126980.) | |
| 23 | (Lawson Exhibit 108 for | 130 |
| 24 | identification, document, production | |
| 25 | numbers L 0126981 through L 0126998.) | |

230

| 1 | E X H I B I T S (Continued) | |
|---|---|---|
| 2 | DESCRIPTION | PAGE |
| 3 | (Lawson Exhibit 95 for | 109 |
| 4 | identification, document, production | |
| 5 | numbers ePLUS 0219927 through ePLUS | |
| 6 | 0219937.) | |
| 7 | (Lawson Exhibit 96 for | 111 |
| 8 | identification, document, production | |
| 9 | numbers ePLUS 0219612 through ePLUS | |
| 10 | 0219619.) | |
| 11 | (Lawson Exhibit 97 for | 112 |
| 12 | identification, document, production | |
| 13 | numbers ePLUS 0219493 through ePLUS | |
| 14 | 0219494.) | |
| 15 | (Lawson Exhibit 98 for | 117 |
| 16 | identification, document, production | |
| 17 | numbers L 0126147 through L 0126395.) | |
| 18 | (Lawson Exhibit 99 for | 120 |
| 19 | identification, document, production | |
| 20 | numbers L 0126396 through L 0126402.) | |
| 21 | (Lawson Exhibit 100 for | 122 |
| 22 | identification, document, production | |
| 23 | numbers L 0126403 through L 0126422.) | |
| 24 | | |
| 25 | | |

232

| 1 | E X H I B I T S (Continued) | |
|---|---|---|
| 2 | DESCRIPTION | PAGE |
| 3 | (Lawson Exhibit 109 for | 131 |
| 4 | identification, document, production | |
| 5 | numbers L 0127000 through L 0127019.) | |
| 6 | (Lawson Exhibit 110 for | 132 |
| 7 | identification, document, production | |
| 8 | numbers L 0127020 through L 0127102.) | |
| 9 | (Lawson Exhibit 111 for | 133 |
| 10 | identification, document, production | |
| 11 | numbers L 0127103 through L 0127137.) | |
| 12 | (Lawson Exhibit 112 for | 137 |
| 13 | identification, document, production | |
| 14 | numbers L 0127138 through L 0127227.) | |
| 15 | (Lawson Exhibit 113 for | 138 |
| 16 | identification, document, production | |
| 17 | numbers L 0127228 through L 0127255.) | |
| 18 | (Lawson Exhibit 114 for | 138 |
| 19 | identification, document, production | |
| 20 | numbers L 0127256 through L 0127296.) | |
| 21 | (Lawson Exhibit 115 for | 139 |
| 22 | identification, document, production | |
| 23 | numbers L 0127505 through L 0127601.) | |
| 24 | | |
| 25 | | |

McEneny, Laurene  6/10/2010  12:08:00 PM



233

1        E X H I B I T S (Continued)

2     DESCRIPTION            PAGE

3      (Lawson Exhibit 116 for        151

4     identification, substitute response

5     to non-final office action.)

6      (Lawson Exhibit 117 for        168

7     identification, appeal brief.)

8      (Lawson Exhibit 118 for        191

9     identification, article entitled

10    "Buyers' Guide to Software for

11    Purchasing," production numbers ePLUS

12    0219905 through ePLUS 0219910.)

13

14

15

16

17

18

19

20

21

22

23

24

25

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 9th day of August, 2010, I will electronically file the foregoing

**PLAINTIFF EPLUS'S OBJECTIONS TO DEFENDANT'S DEPOSITION DESIGNATIONS AND SUMMARY OF THE DEPOSITION OF LAURENE McENENY AND COUNTER-DESIGNATIONS**

with the Clerk of Court using the CM/ECF system which will then send a notification of such filing (NEF) via email to the following:

Daniel McDonald, *pro hac vice*
William D. Schultz, *pro hac vice*
Rachel C. Hughey, *pro hac vice*
Joshua P. Graham, *pro hac vice*
Andrew Lagatta, *pro hac vice*
Merchant & Gould P.C.
3200 IDS Center
80 South Eighth Street
Minneapolis. MN 55402
Telephone: (612) 332-5300
Facsimile: (612) 332-9081
lawsonscrvicc@)merchantgould.com

Robert A. Angle (VSB# 37691)
Dabney J. Carr, IV (VSB #28679)
Troutman Sanders LLP
P.O. Box 1122
Richmond, VA  23218-1122
Telephone:  (804) 697-1238
Facsimile:  (804) 698-5119
robert.angle@troutmansanders.com
dabney.carr@troutmansanders.com

***Counsel for Defendant Lawson Software, Inc.***

                         <u>      /s/           </u>
                         David M. Young (VSB #35997)
                         **GOODWIN PROCTER LLP**
                         901 New York Avenue, N.W.
                         Washington, DC 20001
                         Telephone:  (202) 346-4000
                         Facsimile:  (202) 346-4444
                         dyoung@goodwinprocter.com