IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| *e*PLUS, INC., | ) | |
| | ) | |
| **Plaintiff,** | ) | Civil Action No. 3:09-CV-620 (REP) |
| | ) | |
| **v.** | ) | |
| | ) | |
| LAWSON SOFTWARE, INC., | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF EPLUS'S OBJECTIONS TO DEFENDANT'S DEPOSITION
DESIGNATIONS AND SUMMARY OF THE DEPOSITION OF STEVE MENCARINI
AND COUNTER-DESIGNATIONS**

Plaintiff *e*Plus, Inc. ("*e*Plus"), through counsel, hereby submits the following general and

specific objections to Defendant Lawson Software, Inc.'s ("Defendant's") Deposition

Designations and summary of the deposition of Steven John Mencarini and offers the following

counter-designations:

**General Objections**

1.    <u>Outside the Scope</u>.  Mr. Mencarini was designated by *e*Plus, to testify, subject to its

objections, concerning information reasonably available to *e*Plus with respect to the portion of

Topic No. 23 of Defendant's Rule 30(b)(6) Notice that reads: "All facts and circumstances

relating to *e*Plus' past, current, and projected costs, fees, revenues, profits, and/or losses from its

operations by product for *e*Plus' electronic procurement software and services, including

implementation, installation, training, support and maintenance services, and the licensing and

contract terms, revenues generated and discounts provided for each customer, when *e*Plus began

marketing and licensing such software…."  To the extent any of the designated testimony is

outside of the scope of this topic, *e*Plus objects to its use as testimony on the company's behalf.

2.    <u>Best Evidence</u>:  Counsel for Defendant repeatedly asked Mr. Mencarini to confirm the contents of particular documents that had been marked as exhibits.  The documents speak for themselves.  In responding to counsel's questions, Mr. Mencarini merely confirmed that the document said what it said.  Defendant must introduce into evidence the underlying documents – not testimony as to the contents of such documents.  *See* Fed. R. Evid. 1002, 1004 ("To prove the content of a writing . . . the original writing . . . is required"); *see also* Fed. R. Evid. 1004 ("other evidence of the contents of a writing is admissible" only if originals are lost, destroyed, not obtainable or possessed by opponent or are "not closely related to a controlling issue").

**Specific Objections**

| Defendant's Designations | *e*Plus's Objections | *e*Plus's Objections to Defendant's Deposition Summary |
|---|---|---|
| 6:9-14 | | |
| 8:21-24 | | |
| 21:21 – 22:4 | | |
| 26:7 – 28:19 | **28:8-14 –** 402, 1002, 1004 | |
| 28:24 – 29:22 | **29:13-18 –** 402, 1002, 1004 | |
| 30:6 – 31:9; 31:17 – 33:11; 35:24 – 36:2 | **30:19-24 –** 1002, 1004 <br> **30:25-31:9 –** 402, 611 (non-responsive), 1002, 1004 <br> **31:17-18 –** 402, 1002, 1004 <br> **31:19-32:2 –** 402, 1002, 1004 <br> **32:3-10 –** 106, 402, 1002, 1004 <br> **32:13-33:5 –** 402, 1002, 1004 | |
| 36:7 – 37:2; 37:6 | 402, 1002, 1004 | |
| 37:8 – 38:18 | 402, 1002, 1004 | |
| 39:23 – 40:19 | **39:23-40:11 –** V (as to "business units") | |
| 40:20 – 41:21 | **41:16-21 –** 1002, 1004, 402 (41:16-21) | |

| Defendant's Designations | ePlus's Objections | ePlus's Objections to Defendant's Deposition Summary |
|---|---|---|
| 42:5-7 | 1002, 1004, 402 | |
| 44:11-19 | | |
| 45:3-12 | **45:3-6** – V (as to "majority")<br>**45:7-12** – 1002, 1004 | |
| 47:25 – 48:3 | | |
| 48:23 – 49:4 | **48:23-49:1 –** 1002, 1004, 402 | |
| 49:17-23 | | |
| 50:22-25 | | |
| 56:24 – 57:2 | Outside Scope | |
| 66:15-20 | | |
| 67:8-14 | 402, 602 | |
| 68:9 – 69:15 | **68:9-15 –** V (as to time), 402<br>**68:16-25 –** 402 | |
| 70:7-11 | | |
| 70:15-24 | | |
| 71:6-7 | | |
| 71:9-10 | | |
| 71:12-16 | **71:15-16** – 602 | |
| 74:13-18 | | |
| 74:21 – 75:22 | | |
| 75:23 – 77:7; 77:13-17 | **76:10-21** – 402<br>**77:5-7 –** V (as to exclusion of other competitors)<br>**77:13-17 –** 1002, 1004 | |
| 80:3-15 | | |
| 84:5-11 | | |
| 84:16-23 | | |
| 85:14-17 | 1002, 1004 | |
| 85:22 – 86:8 | **86:2-8** – 1002, 1004 | |
| 86:14-19 | | |
| 90:9-11 | 1002, 1004 | |
| 92:9-23 | **92:18-23 –** 1002, 1004 | |
| 93:8-22 | **93:17-22 –** 1002, 1004 | |
| 94:24 – 95:6 | | |
| 99:7 – 100:1 | | |
| 100:6-8 | | |
| 100:15-18 | | |
| 101:12-18 | | |

LIBNY/4927128.1

| Defendant's Designations | *e*Plus's Objections | *e*Plus's Objections to Defendant's Deposition Summary |
|---|---|---|
| 101:23 – 102:10 | 1002, 1004 | |
| 102:15 – 103:4 | 1002, 1004 | |
| 103:9-18 | | |
| 103:23 – 104:10 | | |
| 104:19-23 | | |
| 105:6 – 106:10 | | |
| 106:15-24 | | |
| 107:4-17 | **107:15-17 –** I, V | |
| 113:16 – 114:4 | | |
| 114:18-22 | | |
| 115:21 – 116:5 | | |
| 118:22 – 119:1 | | |
| 119:7-10 | | |
| 119:12-15 | **119:12-15 –** 602, V (as to "accounting"), Outside Scope | |
| 120:14 – 121:17 | **121:8-17 –** 1002, 1004 | |
| 122:17-23 | | |
| 123:20-21 | | |
| 124:2-10 | 402 | |
| 124:13-20 | 402 | |
| 127:22 – 128:24 | 1002, 1004 | |
| 133:10-19 | 1002, 1004 | |

**_e_Plus's Counter-Designations**

| *e*Plus's Counter-Designations |
|---|
| 19:10-20:4 |
| 21:19-20 |
| 42:8-16 |
| 49:24-50:2 |
| 57:16-58:15 |
| 58:20-59:1 |
| 67:19-23 |
| 69:21-24 |
| 104:24-105:4 |

LIBNY/4927128.1

Respectfully submitted,


/s/ _____
Craig T. Merritt (VSB #20281)
Henry I. Willett, III (VSB #44655)
**CHRISTIAN & BARTON, LLP**
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
Telephone: (804) 697-4100
cmerritt@cblaw.com
hwillett@cblaw.com


Scott L. Robertson (admitted *pro hac vice*)
Jennifer A. Albert (admitted *pro hac vice*)
David M. Young (VSB#35997)
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4000
SRobertson@goodwinprocter.com
JAlbert@goodwinprocter.com
DYoung@goodwinprocter.com


Michael G. Strapp (admitted *pro hac vice*)
James D. Clements (admitted *pro hac vice*)
**GOODWIN PROCTER LLP**
Exchange Place
53 State Street
Boston, MA 02109-2881
Telephone:  (617) 570-1000
MSrapp@goodwinprocter.com
JClements@Goodwinprocter.com


*Attorneys for Plaintiff, ePlus Inc.*



Dated:  August 9, 2010

LIBNY/4927128.1

**Steven John Mencarini**

Mr. Mencarini graduated high school and subsequently received a bachelor's degree in accounting from the University of Maryland in December 1976.  (19:10-15)  He matriculated to American University, and was awarded a master's degree in taxation in 1985.  (19:16-20)  Mr. Mencarini also is a licensed Certified Public Accountant.  (19:21-23)

Mr. Mencarini has an extensive background in accounting, with four years of public accounting work experience, and over 25 years of corporate accounting experience.  (19:23-20:4)  Mr. Mencarini is not currently the Chief Financial Officer of *e*Plus.  (21:19-20)

*e*Plus's total revenues dropped from $306 million to $204 million in the 2001-2002 timeframe because the company stopped selling equipment that it had previously leased, which caused a decline of about $50 million in revenue.  The rest of the decline was attributable to the September 11th attacks.  (42:8-16)

*e*Plus's sales of its e-Procurement product are attributable to *e*Plus's Technology sales unit.  (49:24-50:2)  When *e*Plus sells its Procure+ and Content+ products, it recognizes license and maintenance revenues, as well as revenues for its performance of certain services for the customer, such as installation.  (57:16-58:15, 58:20-59:1, 69:21-24)  The maintenance revenues that *e*Plus receives are typical in the software industry.  (67:19-23)

1

| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| 2 | EASTERN DISTRICT OF VIRGINIA |
| 3 | RICHMOND DIVISION |
| 4 | |
| 5 | ePLUS, INC.,          ) |
| 6 | Plaintiff,  ) |
| 7 | v.          ) No. 3:09cv620 |
| 8 | LAWSON SOFTWARE, INC.,    ) |
| 9 | Defendant.  ) |
| 10 | |
| 11 | CONFIDENTIAL |
| 12 | |
| 13 | Washington, D.C. |
| 14 | Wednesday, May 26, 2010 |
| 15 | |
| 16 | 30(b)(6) Videotape Deposition of ePLUS INC., by and |
| 17 | through its designee, STEVEN JOHN MENCARINI, called |
| 18 | for examination by counsel for Defendant in the |
| 19 | above-entitled matter, the witness being duly sworn |
| 20 | by CHERYL A. LORD, a Notary Public in and for the |
| 21 | District of Columbia, taken at the offices of |
| 22 | TROUTMAN SANDERS LLP, 401 9th Street, Suite 1000, |
| 23 | Washington, D.C., at 9:08 a.m., and the proceedings |
| 24 | being taken down by Stenotype by CHERYL A. LORD, RPR, |
| 25 | CRR. |

2

| | |
|---|---|
| 1 | APPEARANCES: |
| 2 | |
| 3 | On behalf of Plaintiff: |
| 4 | MICHAEL STRAPP, ESQUIRE |
| 5 | GOODWIN PROCTER LLP |
| 6 | Exchange Place |
| 7 | Boston, MA  02109 |
| 8 | (617) 570-1658 |
| 9 | |
| 10 | On behalf of Defendant: |
| 11 | RACHEL C. HUGHEY, ESQ. |
| 12 | MERCHANT & GOULD |
| 13 | 80 S. 8th Street, Suite 3200 |
| 14 | Minneapolis, MN  55402-2215 |
| 15 | (612) 332-5300 |
| 16 | |
| 17 | ALSO PRESENT: |
| 18 | Philip Green and Merinda Ellis Evans, |
| 19 | videographer |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

3

| | |
|---|---|
| 1 | C O N T E N T S |
| 2 | WITNESS          EXAMINATION |
| 3 | PAGE NO. |
| 4 | STEVEN JOHN MENCARINI |
| 5 | By Ms. Hughey          6 |
| 6 | |
| 7 | E X H I B I T S |
| 8 | (Exhibits attached.) |
| 9 | LAWSON EXHIBIT NO.          PAGE NO. |
| 10 | 72  Amended Deposition Notice          9 |
| 11 | 73  Document, ePlus 013278          28 |
| 12 | 74  2004 10-K, ePlus 0136030-0136100          30 |
| 13 | 75  2005 annual report, ePlus |
| 14 | 0506321-0506409          36 |
| 15 | 76  2009 annual report and 10-K, ePLUS |
| 16 | 0528737-0528826          37 |
| 17 | 77  Documents, ePlus 0091337-0091382          79 |
| 18 | 78  Income Statement, ePlus 0091331-0091336  84 |
| 19 | 79  Income Statement, ePlus 0091343-348          85 |
| 20 | 80  Income Statement, ePlus 0091363-368          86 |
| 21 | 81  Income Statement, ePlus |
| 22 | 0091369-0091374          92 |
| 23 | 82  Income Statement, ePlus 0091375-380          93 |
| 24 | 83  Documents, ePlus 0091381-386          94 |
| 25 | 84  Balance Sheet, ePlus 0091349-0091351  94 |

4

| | |
|---|---|
| 1 | E X H I B I T S   C O N T I N U E D |
| 2 | LAWSON EXHIBIT NO.          PAGE NO. |
| 3 | |
| 4 | 85  Balance Sheet, ePlus 0091352-354          101 |
| 5 | 86  Balance Sheet, ePlus 0091355-358          102 |
| 6 | 87  Balance Sheet, ePlus 0091359-362          103 |
| 7 | 88  Balance Sheet, ePlus 0091390-0091394    103 |
| 8 | 89  Balance Sheet, ePlus 0091395-0091399    106 |
| 9 | 90  Balance Sheet, ePlus 0091400-404          106 |
| 10 | 91  Document, ePlus 0942131          128 |
| 11 | 92  ePlus's 10-K 2008          133 |
| 12 | 93  ePlus's 10-K 2007          133 |
| 13 | 94  ePlus's 10-K 2004          133 |
| 14 | |
| 15 | P R E V I O U S L Y   M A R K E D   E X H I B I T S |
| 16 | LAWSON EXHIBIT NO.          PAGE NO. |
| 17 | |
| 18 | 64  Annual Report, ePlus 2001          26 |
| 19 | 65  Annual report, ePlus 2002, ePlus 0133288  27 |
| 20 | 58  Document, ePlus 0135341          117 |
| 21 | 61  (Document not identified)          117 |
| 22 | 62  Document, ePlus 0135348          118 |
| 23 | |
| 24 | |
| 25 | |

Mencarini - 30(b)(6), Steven John  5/26/2010  12:00:00 PM

5

1       P R O C E E D I N G S

2

3           THE VIDEOGRAPHER:  Good morning.  Here

4    begins videotape number 1 in the deposition of Steven

5    Mencarini in the case of ePlus Inc. versus Lawson

6    Software Inc. in the court of the United States

7    District Court for the Eastern District of Virginia,

8    Richmond Division, case number CA 3, colon, 09 CV 620

9    REP.

10          Today's date is May 26, 2010, and the time

11   is 9:08 AM.  This deposition is being held at the

12   request of Rachel C. Hughey, Esquire, of Merchant &

13   Gould, and being taken at Troutman Sanders LLP, 401

14   9th Street N.W., Washington, D.C., 20004.

15          The videographer today is Merinda Evans,

16   the court reporter is Cheryl Lord, representing Pro

17   Systems Court Reporting.

18          Would all attorneys please identify

19   yourselves and the parties that you represent, and

20   will the court reporter please swear in the witness.

21          MS. HUGHEY:  Yes.  My name is Rachel

22   Hughey, for Lawson Software, and I'm here with Philip

23   Green.

24          MR. STRAPP:  Michael Strapp, for

25   plaintiff, ePlus.

6

1    Whereupon,

2           STEVEN JOHN MENCARINI

3    was called as a witness by counsel for Defendant,

4    and, having been duly sworn by the Notary Public, was

5    examined and testified as follows:

6

7       EXAMINATION BY COUNSEL FOR DEFENDANT

8       BY MS. HUGHEY:

9       Q.  Good morning, Mr. Mencarini.  How are you

10   doing today?

11      A.  Fine.

12      Q.  Could you please state your name and --

13   your full name for the record, please.

14      A.  Steven John Mencarini.

15      Q.  And your address?

16      A.  1921 Batten Hollow Road, Vienna, Virginia.

17      Q.  And who is your current employer?

18      A.  ePlus.

19      Q.  Have you ever been deposed before?

20      A.  Yes.

21      Q.  Was that within your role as an employee

22   of ePlus?

23      A.  Yes.

24      Q.  What were the circumstances of that

25   deposition?

7

1       A.  They were lawsuits or court cases.

2       Q.  How many times have you been deposed?

3       A.  I think 3.

4       Q.  Were any of those patent cases?

5       A.  One.

6       Q.  What were the other 2?

7       A.  Case against -- trying to think of the

8    name of the -- we bought CLG Inc.  The seller of CLG

9    Inc. we had an issue with -- I think that was in

10   2000 -- and then in the case with General Motors and

11   Bank of America regarding the CyberCore issue.

12      Q.  So you're familiar with how the deposition

13   works; is that correct?

14      A.  Yes.

15      Q.  Okay.  So as you understand, I'm going to

16   be asking you a series of questions today.  If you

17   don't understand any of my questions, just let me

18   know.  If you tell me -- if you don't tell me that

19   you don't understand, I'm going to assume that you

20   do.

21          Is that all right?

22      A.  Yes.

23      Q.  It's important that only one person talks

24   today so the court reporter can take down everything

25   accurately.  I'm going to make every effort to let

8

1    you finish your questions (sic), and you should make

2    every effort allow me to finish my questions.

3           Is that all right?

4       A.  Yes.

5       Q.  It's important that you give audible

6    yes-or-no answers so that the court reporter can

7    record what you're saying.  Don't say m-hm or nod

8    your head.  Actually give yes-or-no answers.

9           If at any time you'd like to take a break,

10   just let me know, and we can take a break.  If

11   there's a question pending, I'll ask that you finish

12   answering the question before you take a break.

13          Is that all right?

14      A.  Yes.

15      Q.  Okay.  Are you on any medication or drugs

16   affecting your testimony today?

17      A.  No.

18      Q.  Do you understand that you're under oath

19   today?

20      A.  Yes.

21      Q.  Do you understand that you've been

22   designated by ePlus as its corporate designee to

23   testify as its representative today?

24      A.  Yes.

25          MS. HUGHEY:  I'm going to ask the court

9

1    reporter to mark that as Lawson exhibit 72.
2        (Lawson Exhibit No. 72
3            was marked for
4            identification.)
5        BY MS. HUGHEY:
6    Q.   Okay.  Mr. Mencarini, you've been handed
7    what's been marked as Lawson exhibit 72, which is the
8    amended deposition notice that has been issued in
9    this case.
10       Have you seen that document before?
11   A.   No.
12   Q.   There are a list of topics at the end of
13   this document.  Can you turn to topic 23.  It's on
14   page 9.
15       Do you see that topic 23 says:  All facts
16   and circumstances relating to ePlus's past, current,
17   and projected costs, fees, revenues --
18   A.   Yes.
19   Q.   -- profits and/or losses from its
20   operations by product for ePlus's electronic
21   procurement software and services, including
22   implementation, installation, training, support, and
23   maintenance services, and the licensing and contract
24   terms, revenues generated and discounts provided for
25   each customer when ePlus began marketing and

10

1    licensing such software and the features, functions,
2    and use of licensed software and services.
3        Do you see that?
4    A.   Yes.
5    Q.   Are you prepared to testify with respect
6    to that category today?
7    A.   Yes.
8        MR. STRAPP:  And let me just note a quick
9    objection here.
10       The last part of topic 23 asks about the
11   features, functions, and use of the software and
12   services.  That's identical to topic 11.  We've
13   already provided a witness to testify about features,
14   functions, and the identity of the procurement
15   software, so we're going to object to Mr. Mencarini
16   being corporate representative on that portion of
17   topic 23, but he's available to testify as to the
18   remainder of topic 23 today.
19       BY MS. HUGHEY:
20   Q.   Okay.  Mr. Mencarini, do you see that
21   there are other topics listed on this document?
22   A.   Yes.
23   Q.   Is it your understanding that Mr. Farber
24   was designated to testify on some of these topics
25   already?

11

1    A.   Yes.
2    Q.   Do you have an understanding of how
3    Mr. Farber was chosen to be ePlus's corporate
4    representative on some of these topics?
5        MR. STRAPP:  Objection, calls for
6    speculation, and to the extent that that invades the
7    attorney-client privilege, I instruct you not to
8    answer, so if you know outside of conversations
9    you've had with attorneys, you can try to answer the
10   question in your individual capacity, but
11   otherwise, I instruct you not to answer.
12   A.   I'm confused, so I'll abide my attorney's
13   instructions.
14       BY MS. HUGHEY:
15   Q.   Do you have independent knowledge of why
16   Mr. Farber was chosen to testify on some of these
17   topics instead of you?
18       MR. STRAPP:  Objection, calls -- calls for
19   speculation.
20       BY MS. HUGHEY:
21   Q.   Okay.  For example, topic 20 says, any
22   valuations of any of the patents-in-suit.
23       Do you see that?
24   A.   Yes, I see that.
25   Q.   Do you have an understanding of why

12

1    Mr. Farber was designated by ePlus to testify on that
2    topic instead of you?
3        MR. STRAPP:  I'm going to object and
4    instruct you not to answer because this question
5    invades the attorney-client privilege.
6        THE WITNESS:  Okay.
7        BY MS. HUGHEY:
8    Q.   Is it your understanding that you are not
9    here to talk about topic 20 and valuations of the
10   patents-in-suit?
11       MR. STRAPP:  Objection, form.
12   A.   I don't understand the question with the
13   negative.
14       BY MS. HUGHEY:
15   Q.   Okay.  Is it your understanding that
16   you're here to talk about topic 23 today?
17   A.   Yes.
18   Q.   Is it your understanding that you're not
19   here to talk about any other topic today?
20   A.   Yes.
21   Q.   So it's your understanding that you're not
22   here to talk about topic 20?
23   A.   Yes.
24   Q.   With respect to topic 23, is there anyone
25   at ePlus who has more information about this topic

13

1    than you do?

2        A.   No.

3        Q.   How did you prepare for this deposition?

4        MR. STRAPP:  Before you answer, you can't

5    get into the conversations we had or the substance of

6    those conversations.  You can talk about who you met

7    with, when you met, but to the extent this question

8    is seeking information about what you talked about

9    with your attorneys, I instruct you not to answer.

10       A.   How did I prepare, was that the question?

11       BY MS. HUGHEY:

12       Q.   Yes.

13       A.   I reviewed and had pulled a financial --

14   summary report of the results, the annual results of

15   systems, ePlus systems and ePlus content for our --

16   from the beginning 2002 to 2009, and I reviewed in a

17   general fashion that report.

18       Q.   Did you have any meetings with anyone at

19   ePlus?

20       A.   I had one phone conversation with a

21   financial analyst who pulled the report.

22       Q.   What was that person's name?

23       A.   Rajiv Arora.

24       Q.   And how long did you talk?

25       A.   5 minutes.

14

1        Q.   Did you discuss the summary report that

2    was prepared?

3        A.   Yes.  He pulled it.  He prepared it.

4        Q.   Did you have any meetings with ePlus

5    attorneys?

6        MR. STRAPP:  You can answer yes or no.

7        A.   ePlus attorneys, would that mean an

8    employee of ePlus or ePlus's retained attorneys?

9        BY MS. HUGHEY:

10       Q.   Let's start with the retained attorneys.

11       Did you have any meetings with any of

12   ePlus's retained attorneys?

13       A.   Yes.

14       Q.   Okay.  Which attorneys?

15       A.   I think it was --

16       MR. STRAPP:  If you don't remember the

17   names, we won't be insulted.

18       THE WITNESS:  You were on it.

19       A.   And I think Jennifer Alpert?

20       MR. STRAPP:  Albert.

21       A.   I'm sorry.  I know her as Jennifer.

22       BY MS. HUGHEY:

23       Q.   So you met with Michael Strapp and

24   Jennifer Albert?

25       A.   A telephone conversation.

15

1        Q.   Did you have one telephone conversation or

2    more than one telephone conversation?

3        A.   One main one and -- just one, I would say.

4        Q.   Did you talk to anyone else -- any other

5    ePlus outside attorneys?

6        A.   No.

7        Q.   You didn't talk to Andrew Stein?

8        A.   Not that I recall.

9        Q.   You didn't talk to Scott Robertson?

10       A.   On this topic?

11       Q.   With respect to preparing for this topic.

12       A.   No, I did not talk to Scott Robertson.

13       Q.   When was the first meeting that you had

14   with Michael Strapp?

15       A.   Within the last month.  I don't remember

16   the exact date.

17       Q.   Okay.  How many meetings have you had

18   since then with Michael Strapp?

19       A.   I remember the one phone call, and we met

20   yesterday.

21       Q.   And how about Jennifer Albert?

22       When did you meet with her?

23       A.   She was there yesterday.

24       Q.   Was she in a phone conference that you

25   had?

16

1        A.   Yes, I do believe.

2        Q.   And approximately how many hours was that

3    first phone conference?

4        A.   I think about a half an hour.

5        Q.   Okay.  And how long did you meet with

6    Michael Strapp and Jennifer Albert yesterday?

7        A.   Let's say 1:30 to 3:30, 2 hours.

8        Q.   Okay.  Did you talk about the summary

9    reports you prepared, those 2002 to 2009 documents?

10       A.   Yes.

11       Q.   Did you look at any other documents?

12       A.   One other document that Michael Strapp had

13   that was detailed version of a piece of one of the

14   reports.

15       Q.   When you say, one of the reports, you're

16   talking about an ePlus financial report?

17       A.   Yes.

18       Q.   Do you know what year it was from?

19       A.   I think it was 2007.

20       Q.   Did you look at any of ePlus's 10-Ks?

21       A.   At the meeting?

22       Q.   Yes.

23       A.   No.

24       Q.   Did you look at any other documents

25   besides that summary report or the 2007 report at the

Mencarini - 30(b)(6), Steven John  5/26/2010  12:00:00 PM

17

1  meeting with Jennifer Albert and Michael Strapp?
2      A.   The only other document I do remember was
3  this 23, but only this page.  So when I looked at
4  this whole document, I didn't recognize it, but 23 we
5  talked about.
6      Q.   Have you talked to anyone at ePlus who has
7  been deposed in this case with respect to your
8  deposition?
9      A.   I'm confused.  I've talked to Ken Farber,
10 but not about his deposition or my deposition, but I
11 talk to him every day just on general business
12 issues.
13     Q.   Okay.  Have you talked to anyone at ePlus
14 who is going to be deposed in this case about either
15 your deposition or their deposition?
16     A.   No.
17     Q.   Were you asked to review your files and
18 produce documents for this litigation?
19     A.   Yes.
20     Q.   Do you know when that occurred?
21     A.   Not exactly.  I mean, recently.
22     Q.   Recently?
23     A.   Well, last -- I don't -- when -- when --
24 give me a time frame.  I don't remember exactly when
25 it was asked or what was asked, so --

18

1      Q.   Were you asked to review your files and
2  produce documents for this litigation within the last
3  year?
4      A.   Yes.
5      Q.   Were you asked to review your files and
6  produce documents for this litigation within the last
7  month?
8      A.   I don't know if it was the last month when
9  I gave whatever we provided.
10     Q.   Was it within the last 2 months?
11     A.   Yes, probably.
12     Q.   Do you know if the documents that you
13 reviewed, the summary 2002 to 2009 report or the 2007
14 report, were produced in this case?
15     A.   I'm sorry?
16     Q.   Do you know if the documents that you
17 reviewed with Michael Strapp and Jennifer Albert
18 yesterday were produced to Lawson in this case?
19     A.   Produced to, given to you?
20     Q.   Correct.
21     MR. STRAPP:  I can answer that they have
22 been.
23     A.   Yeah.
24     BY MS. HUGHEY:
25     Q.   What specific information did you collect

19

1  to be produced in this litigation?
2      A.   That particular income statement report.
3      Q.   The summary reports?
4      A.   Summary reports, yeah.
5      Q.   Anything else?
6      A.   Not that I remember.
7      Q.   Before we get started with the specific
8  questions on topic 23, I'd like to talk to you
9  briefly about your background.
10     Q.   Can you please describe for me your
11 educational background starting with high school.
12     A.   High school graduate.  Attended University
13 of Maryland, got a bachelor degree in accounting.
14     Q.   What year was that?
15     A.   December 1976.
16     Q.   Do you have any further education?
17     A.   I attended American University and got a
18 master's in taxation.
19     Q.   What year was that?
20     A.   1985.
21     Q.   Do you have any other education?
22     A.   I have continued professional education to
23 maintain my CPA license.
24     Q.   Can you describe for me your employment
25 background starting with your first job.

20

1      A.   I was in public accounting for 4 years.
2  Then I went into corporate accounting, became a
3  controller, worked for the last 25 years in corporate
4  accounting.
5      Q.   When you were a public accountant, where
6  did you work?
7      A.   I worked at a small firm named Bond Beebe,
8  B-E-E-B-E, and then I worked 2 years at Deloitte
9  Haskins & Sells.
10     Q.   And what was your first corporate
11 accounting job?
12     A.   It was Systems Leasing Corporation.
13     Q.   And when did you start that job
14 approximately?
15     A.   1981.
16     Q.   And what year did you leave?
17     A.   1987.
18     Q.   And where did you go after that?
19     A.   To Computer Sciences Corporation.
20     Q.   Okay.  And what role -- what job did you
21 have while you were there?
22     A.   I was a financial director and then a
23 controller in the technology management group.
24     Q.   And what year did you leave that role?
25     A.   1997.

Mencarini - 30(b)(6), Steven John  5/26/2010  12:00:00 PM

---

21

1   Q.   And where did you go after that?
2   A.   I went to MLC Holdings, which has become
3   ePlus.
4   Q.   What was your first position at MLC
5   Holdings?
6   A.   CFO.
7   Q.   And when did MLC Holdings become ePlus?
8   A.   It changed names I think in 1999. I'm not
9   sure.
10  Q.   And when MLC Holdings changed names to
11  ePlus, you remained the CFO?
12  A.   Yes.
13  Q.   So your first position at MLC Holdings was
14  CFO?
15  A.   Correct.
16  Q.   And your first position when MLC Holdings
17  became ePlus was continuing to be CFO?
18  A.   It just changed names.
19  Q.   And are you currently the CFO of ePlus?
20  A.   No.
21  Q.   What is your current role?
22  A.   The senior vice president of business
23  operations.
24  Q.   And when did you first start that role?
25  A.   August of 2007 or 8. I'm not sure

---

22

1   exactly. I think it was 2007.
2   Q.   And prior to that, were you the CFO of
3   ePlus?
4   A.   Yes.
5   Q.   When you were the CFO of ePlus, at a high
6   level, what were your day-to-day responsibilities in
7   that role?
8   A.   Accounting, tax, treasury, credit.
9   Q.   Do you have any other day-to-day
10  responsibilities?
11  A.   As CFO?
12  Q.   Yes.
13  A.   No. That was pretty much -- oh, I'm
14  sorry -- and risk management insurance.
15  Q.   I'm sorry. What was that?
16  A.   Risk management insurance.
17  Q.   And when you were CFO, who did you report
18  to?
19  A.   The CEO.
20  Q.   Who is?
21  A.   Phil Norton.
22  Q.   Who do you report to currently?
23  A.   Phillip Norton.
24  Q.   What is your current compensation?
25       MR. STRAPP:  Objection, calls for

---

23

1   confidential information that's not relevant to this
2   case, personal and confidential information.
3        Do you really need this information?
4        MS. HUGHEY:  I'll be more specific.
5        BY MS. HUGHEY:
6   Q.   In your position, does your job provide
7   bonuses?
8   A.   Yes.
9   Q.   What have your bonuses been since 2003?
10       MR. STRAPP:  Same objection.
11  A.   I don't know the exact amounts. It is
12  public data, because I'm a corporate -- senior
13  corporate officer. It's in every proxy if you want
14  the detail.
15       BY MS. HUGHEY:
16  Q.   Do you own any stock in ePlus?
17  A.   I don't own any shares. I have options.
18  Q.   What is the approximate value of those
19  options?
20  Q.   Today?
21  Q.   Yes.
22  A.   Probably -- the options are underwater, so
23  nothing, and I have 5,000 restricted stock shares
24  that I have not yet received. It has not yet vested.
25  Q.   Other than your salary, bonuses, and stock

---

24

1   options, do you receive any other compensation from
2   ePlus?
3   A.   Yes. I have a life insurance -- a
4   whole-life life insurance plan.
5   Q.   Is that it?
6   A.   Yes.
7   Q.   Who reports directly to you at ePlus?
8   A.   The director of HR and the director of
9   contracts.
10  Q.   When you were the CFO at ePlus, who
11  reported directly to you?
12  A.   The accounting staff effectively.
13  Q.   So in 2007, for example, who reported
14  directly to you?
15  A.   Elaine Marion, who was the vice president
16  of accounting, and Nancy Callahan, who was the
17  director of tax.
18  Q.   Anyone else?
19  A.   No.
20  Q.   Are you or anyone that reports to you
21  involved in negotiating contracts or terms of
22  contracts at ePlus?
23  A.   Yes.
24  Q.   Have you ever been involved in a software
25  licensing negotiation before?

---

**25**

```
1        A.  Yes.
2        Q.  If someone would have sought to license
3    ePlus's software in 2002, who would have been
4    involved in that negotiation?
5        MR. STRAPP:  Objection, calls for a
6    hypothetical.
7        A.  2002, you mean -- I don't remember the
8    names of the folks who were there in the contracts
9    department in 2002.  That's a long time ago.
10       BY MS. HUGHEY:
11       Q.  Was that someone that would have been
12   working for you?
13       A.  Not then.
14       Q.  Are you involved in setting the price or
15   deciding whether or not a discount should be given in
16   particular situations?
17       MR. STRAPP:  Objection, compound.
18       BY MS. HUGHEY:
19       Q.  Are you involved in setting the prices of
20   licensing software?
21       MR. STRAPP:  Objection, form.
22       A.  No.
23       BY MS. HUGHEY:
24       Q.  Are you involved in determining whether or
25   not someone should be given a discount?
```

**26**

```
1        A.  No.
2        Q.  Are you familiar with ePlus's 10-K filings
3    with the Securities and Exchange Commission?
4        A.  Yes.
5        Q.  I'm handing you what's been previously
6    marked as Lawson exhibit 64.
7        Mr. Mencarini, I've handed you what's been
8    previously marked as Lawson exhibit 64, which is
9    ePlus's 2001 annual report.
10       Are you familiar with this document?
11       A.  Yes.
12       Q.  Can you turn to page 47 of this document.
13       Is that your signature on the middle of
14   page 47, Steven J. Mencarini?
15       A.  No.  There's not a signature there, but it
16   indicates -- yeah, that's my name and my indication
17   of a signature.
18       Q.  Okay.  And above that, it says:  Pursuant
19   to the requirements of the Securities and Exchange
20   Act of 1934, this report has been signed by the
21   following persons on behalf of the registrant and in
22   the capacities and on the dates indicated.
23       Do you see that?
24       A.  Yes.
25       Q.  Can you confirm for me that you signed
```

**27**

```
1    this 10-K in your capacity as the senior vice
2    president, chief financial officer, and principal
3    accounting officer for ePlus?
4        A.  Yes.
5        Q.  Can you confirm for me that as the chief
6    financial officer of ePlus, the disclosures in
7    ePlus's 10-K are your responsibility?
8        A.  The disclosures of the company's
9    disclosures of its financial condition in the
10   company.  I'm part of that.  The CEO signs it.  The
11   CFO signs it.  And the board of directors signs it.
12       Q.  So is it your responsibility to make sure
13   that the financials in this report are accurate?
14       A.  That they're fairly presented, correct.
15       Q.  Is "fairly presented" different than
16   "accurate"?
17       A.  No.
18       Q.  Is it accurate to say that based on your
19   knowledge, you faithfully carried out your
20   responsibilities to make sure that this contained
21   accurate information?
22       A.  Yes.
23       Q.  Mr. Mencarini, I've handed you what's been
24   previously marked as Lawson exhibit 65,
25   Bates-numbered ePlus 0133288.  It's the 2002 ePlus
```

**28**

```
1    annual report.
2        Are you familiar with this document?
3        A.  Yes.
4        Q.  And turning to page 45, what's been marked
5    ePlus 0133334.
6        Is that again your signature?
7        A.  Yes.
8        Q.  Okay.  And once again can you confirm for
9    me that this says:  Pursuant to the requirements
10   Securities and Exchange Act of 1934, this report has
11   been signed by the following persons on behalf of the
12   registrant and in the capacities and on the dates
13   indicated?
14       A.  Yes.
15       Q.  And once again, can you confirm for me
16   that to the best of your ability, you faithfully
17   carried out your responsibilities to make sure that
18   information in this document was accurate?
19       A.  Yes.
20       (Lawson Exhibit No. 73
21       was marked for
22       identification.)
23       BY MS. HUGHEY:
24       Q.  Mr. Mencarini, I've handed you what's been
25   marked as Lawson exhibit 73, Bates-numbered ePlus
```

Mencarini - 30(b)(6), Steven John  5/26/2010  12:00:00 PM

29

1  013278 -- oh, I'm sorry.  I'm sorry -- marked ePlus
2  0132738.
3      Are you familiar with this document?
4      A.  Yes.
5      Q.  Is this ePlus's 2003 annual report and
6  10-K?
7      A.  Yes.
8      Q.  Can you turn to page 46 for me.  That's
9  ePlus 0132786.
10     And can you confirm again for me that
11  that's your signature?
12     A.  Yes.
13     Q.  And that it says:  Pursuant to the
14  requirements of the Securities and Exchange Act of
15  1934, this report has been signed by the following
16  persons on behalf of registrant and in the capacities
17  and on the dates indicated?
18     A.  Yes.
19     Q.  And can you confirm for me that you -- the
20  information, the financial information in this
21  document is accurate to your knowledge?
22     A.  Yes.
23         MR. STRAPP:  Rachel, the copy -- this
24  doesn't have to be on the record.
25         (Discussion off the record.)

30

1         MS. HUGHEY:  Can you mark that as 74.
2         (Lawson Exhibit No. 74
3             was marked for
4             identification.)
5  BY MS. HUGHEY:
6      Q.  Okay.  Mr. Mencarini, I've handed you
7  what's been marked Lawson exhibit 74, Bates-numbered
8  ePlus 0136030 to 0136100.  This is ePlus's 2004 10-K.
9      Are you familiar with this document?
10     A.  Yes.
11     Q.  I direct your attention to page ePlus
12  0136099.
13     A.  Okay.
14     Q.  Now, you also certify on behalf of ePlus
15  as to certain facts about the financial information
16  contained in this document.
17     Correct?
18     A.  Yes.
19     Q.  Okay.  And this shows a certification that
20  says:  I, Steven J. Mencarini, certify that, 1, I
21  have reviewed this annual report on form 10-K of
22  ePlus Inc.
23     Correct?
24     A.  Yes.
25     Q.  2, based on my knowledge, this report does

31

1  not contain any untrue statement of a material fact
2  or omit to state a material fact necessary to make
3  the statements made in light of the circumstances
4  under which such statements were made not misleading
5  with respect to the period covered by this report.
6      Correct?
7      A.  I'm sorry.
8      Where were you reading?
9      Q.  Paragraph 2.
10         MR. STRAPP:  Is the question whether you
11  read it correctly?
12         MS. HUGHEY:  My question is whether it
13  says it there.
14     A.  I wasn't listening to what you were
15  reading.  I'm sorry.
16  BY MS. HUGHEY:
17     Q.  Is paragraph 2 accurate?
18     A.  Yes.
19     Q.  Paragraph 3 says:  Based on my knowledge,
20  the financial statements and other financial
21  information included in this report fairly present in
22  all material respects the financial condition,
23  results of operations, and cash flows of the
24  registrant as of and for the periods presented in the
25  report -- in this report.

32

1      Is that accurate?
2      A.  Yes.
3      Q.  Paragraph 4 says:  The registrants, other
4  certifying officers, and I are responsible for
5  establishing and maintaining disclosure controls and
6  procedures as defined in Exchange Act rules 13 A to
7  15 E and 15 D to 15 E for the registrant and have --
8  and then there's a list of 3 things.  I've give you a
9  minute to read them.
10     A.  Okay.
11     Q.  Are all of those accurate?
12     A.  Yes.
13     Q.  Paragraph 5 says:  The registrants, other
14  certifying officers, and I have disclosed based on
15  our most recent evaluation of internal control over
16  financial reporting to the registrants, auditors, and
17  the audit committee of the registrant's board of
18  directors or persons performing the equivalent
19  functions, A, all significant deficiencies and
20  material weaknesses in the design or operation of
21  internal control over financial reporting which are
22  reasonably likely to adversely affect the
23  registrants' ability to record, process, summarize,
24  and report financial information, and 2, any fraud
25  whether or not material that involves management or

33

1    other employees who have a significant role in the
2    registrants' internal control over financial
3    reporting.
4        Is that accurate?
5    A.   Yes.
6    Q.   And is that your signature at the bottom?
7    A.   Yes.
8    Q.   So at the time that you signed this on
9    June 15, 2004, was that statement that we just
10   discussed, the certification, accurate?
11   A.   Yes.
12   Q.   Now, why is the certification in the 2004
13   10-K different than the one that we looked at in the
14   2001 through 2003 10-K?
15       MR. STRAPP:  Objection, calls for
16   speculation.
17   BY MS. HUGHEY:
18   Q.   You can answer.
19   A.   Reviewing the differences.
20       Hold on.
21       What was the question again?
22   Q.   2001 and 2002 had a different
23   certification than what is in 2004.
24       Do you know why that is?
25   A.   No.  I don't remember.

34

1    Q.   Do you have any information about whether
2    it relates to Sarbanes-Oxley?
3    A.   No.  I believe it's the Sarbanes-Oxley
4    report.
5        Correct.
6    Q.   So signing this certification, you were
7    making a statement that to the best of your
8    knowledge, everything in this document, the financial
9    information, was accurate; is that correct?
10   A.   Yes.
11   Q.   And was that true of the 2002 and 2001
12   annual reports as well?
13       MR. STRAPP:  Objection, asked and
14   answered.
15       Go ahead.
16   A.   Yes.
17   BY MS. HUGHEY:
18   Q.   Even though this certification is longer
19   than what you signed in those documents?
20       MR. STRAPP:  Objection, form.
21   A.   Yes.
22   BY MS. HUGHEY:
23   Q.   Is it your understanding that this
24   certification that we just discussed would be
25   something that would be in ePlus's 10-Ks from 2005 to

35

1    2009 as well?
2    A.   They're Sarbanes-Oxley certification
3    requirements and the subsequent 10-Ks.  I don't
4    remember the exact wording of each one.
5    Q.   So to the best your understanding, the
6    2004 10-K doesn't contain any untrue statements of
7    material fact.
8        Correct?
9    A.   Well, there's one point I want to make
10   sure you're understanding, is that we did have a
11   restatement due to stock option accounting, and that
12   was subsequently amended, and there were 10-K As
13   (phonetic) filed.  The materiality of those changes
14   in my opinion, they're not material, so at the time
15   these were filed, yes, I thought they were fine.  The
16   10-K As (phonetic) were filed and restated stock
17   option account.
18   Q.   So you're aware now of an inaccuracy
19   related to stock option accounting; is that correct?
20   A.   Yes.
21   Q.   But other than that, are you aware of any
22   other inaccuracies?
23   A.   No.
24   Q.   Is it your understanding that this
25   document would fairly represent the financial

36

1    condition of ePlus?
2    A.   Yes.
3            (Lawson Exhibit No. 75
4            was marked for
5            identification.)
6        BY MS. HUGHEY:
7    Q.   Mr. Mencarini, I've handed you what's been
8    marked Lawson exhibit 75, ePlus's 2005 annual report,
9    Bates-numbered ePlus 0506321 to 0506409.
10       Are you familiar with this document?
11   A.   Yes.
12   Q.   Can you turn to page ePlus 0506405.
13   A.   Okay.
14   Q.   And that goes on to page 0506406.
15       Can you confirm for me once again that
16   there's a certification on behalf of ePlus that you
17   signed?
18   A.   Yes.
19   Q.   Can you confirm for me that to the best of
20   your knowledge you faithfully carried out the
21   responsibilities set forth in this certification
22   while you were at ePlus?
23   A.   Yes.
24   Q.   Can you firm for me that as the CFO of
25   ePlus the disclosures in the 2005 annual report are

Mencarini - 30(b)(6), Steven John  5/26/2010  12:00:00 PM

37

1  your responsibility and complete to the best of your
2  knowledge?
3              (Lawson Exhibit No. 76
4              was marked for
5              identification.)
6     A.   Yes.
7        BY MS. HUGHEY:
8     Q.   Mr. Mencarini, I've handed you what's been
9  marked Lawson exhibit 76, ePlus 0528737 to 0528826,
10  the ePlus 2009 annual report and 10-K.
11        Are you familiar with this document?
12     A.   Yes.
13     Q.   Is this the most recent publicly available
14  10-K for ePlus?
15     A.   Yes.
16     Q.   Can you turn to page ePlus 0528823.
17     A.   Okay.
18     Q.   And do you see the certification on that
19  page?
20     A.   Yes.
21     Q.   Do you see that its signed by Elaine
22  Marion?
23     A.   Yes.
24     Q.   Is that consistent with what you told me
25  earlier that Elaine Marion is now the chief financial

38

1  officer?
2     A.   Yes.
3     Q.   But prior to that from 1999 to 2008, you
4  were the CFO and had responsibility for the company's
5  10-Ks?
6     A.   I think this was 2007.  I think she took
7  over in 2008.
8     Q.   With respect to 1999 to 2007, can you
9  confirm for me that you were ePlus's CFO and had
10  responsibility for the company's 10-Ks?
11     A.   Yes.
12     Q.   Without going through the rest of ePlus's
13  10-Ks during the time that you were there, can you
14  confirm for me that you were the CFO during that time
15  and consistent with your responsibilities the
16  information in those documents would be accurate to
17  the best of your knowledge?
18     A.   Yes.
19     Q.   Okay.  Can you turn now to the document
20  marked Lawson 65, which was ePlus's 2002 annual
21  report and 10-K.
22        What is ePlus's fiscal year?
23     A.   April 1st through March 30th.
24     Q.   So is it correct that fiscal year 2002
25  begins on April 1st, 2001?

39

1     A.   Yes.
2     Q.   In 2002, what software package did ePlus
3  use to prepare its financial statements?
4        MR. STRAPP:  Objection, beyond the scope.
5     A.   I don't remember exactly.  Think it was a
6  combination of MAS 90 and Great Plains.
7        BY MS. HUGHEY:
8     Q.   What is the financial system that ePlus
9  currently uses?
10     A.   Great Plains.
11     Q.   How long has it used that?
12     A.   I'm not sure exactly.
13     Q.   Did it use any other financial systems
14  before that?
15     A.   MAS 90.
16     Q.   What are ePlus's different business units?
17        MR. STRAPP:  Currently?
18        MS. HUGHEY:  I'm sorry.  That's a good
19  question.
20        BY MS. HUGHEY:
21     Q.   With respect to 2002.  Let's limit our
22  discussion right now to 2002.
23        Did ePlus have different business units in
24  2002?
25     A.   We had if you look on page 3, the

40

1  corporate structure, those were the companies we had
2  and were effectively separate sets of books at that
3  time.
4     Q.   And what did the different business units
5  do?
6     A.   Group did leasing.  ePlus technology of
7  North Carolina, Pennsylvania, and Inc. was a
8  value-added reseller.  ePlus government did
9  government contractor and government leasing.  ePlus
10  capital was dormant.  ePlus systems and ePlus content
11  did the procurement and catalog part of our business.
12     Q.   And what did ePlus technology do?
13     A.   They were a value-added reseller.
14     Q.   Is that related to procurement?
15     A.   It's related to supplying computer
16  equipment and services to customers.
17     Q.   And what did ePlus government do?
18     A.   It provided leasing to government and
19  government contractors.
20     Q.   So are ePlus systems and ePlus content
21  services the only business units that dealt with
22  procurement?
23     A.   In 2002?
24     Q.   Yes.
25     A.   When you -- define, dealt with

ePlus - Perfect Commerce (Lawson)              Unsigned              Page  37 - 40

Mencarini - 30(b)(6), Steven John  5/26/2010  12:00:00 PM

41

1  procurement.
2      Q.   When ePlus recognized revenues from sales
3  of its procurement products, were those sales
4  recognized by ePlus systems and ePlus content
5  services only?
6      A.   I believe so.
7      Q.   Can you turn to F 4 of this document,
8  ePlus 0133338.
9      Can you confirm for me that --
10     A.   Sorry.  What F page?
11     Q.   F 4.
12     A.   Okay.
13     Q.   Do you see the line marked, total
14  revenues?
15     A.   Yes.
16     Q.   Can you confirm for me that in 2000,
17  ePlus's total revenues were 264 million dollars?
18     A.   Yes.
19     Q.   Can you confirm for me in 2001, ePlus's
20  total revenues were 306 million dollars?
21     A.   Yes.
22     Q.   Can you firm for me in 2002 that ePlus's
23  total revenues were 204,000 dollars?
24     A.   Yes.
25     Q.   Did I say 204 "million" dollars?

42

1      THE COURT REPORTER:  (Shaking head.)
2      BY MS. HUGHEY:
3      Q.   No.  Let me --
4      I'm sorry.
5      Can you confirm for me that in 2002,
6  ePlus's total revenues were 204 million dollars?
7      A.   Yes.
8      What was the reason for the drop from 2001
9  to 2002 from 306 million dollars to 204 million
10  dollars?
11     A.   The bulk of it is the second line, sales
12  of leased equipment.  We stopped selling equipment we
13  put on lease.  That went down about 50 million
14  dollars.  And in September of 2001, the 9/11 attack
15  pretty much slowed business down from September to
16  March of that fiscal year.
17     Q.   Did the September 11 issue that you talked
18  about affect valuations of other software companies?
19     MR. STRAPP:  Objection, calls for
20  speculation.
21     A.   No idea.
22     BY MS. HUGHEY:
23     Q.   Did ePlus's stock go down?
24     A.   I don't remember.
25     Q.   What kind of records does ePlus keep with

43

1  respect to its revenues?
2      A.   Account records -- we have -- in the
3  leasing company, we have leases and lease accounting
4  system, and in technology and systems and content, we
5  have invoices from the Great Plains system.
6      MR. STRAPP:  Could I interject for a
7  minute?
8      To the extent that you're asking about
9  financials besides ePlus's e-procurement software and
10  services, I want to have a continuing objection that
11  it's beyond the scope of the notice topic.
12     But you can go ahead and answer.
13     BY MS. HUGHEY:
14     Q.   Does ePlus report its revenues by
15  customer?
16     A.   Yes.
17     Q.   How long has it done that?
18     A.   As far as I can remember.
19     Q.   So starting in 2000?
20     A.   Yes.
21     Q.   Does ePlus report its revenues by product?
22     A.   No.
23     Q.   What's the smallest functional unit ePlus
24  reports revenues for?
25     A.   I don't understand the question.

44

1      Q.   Does ePlus have any way to understand the
2  revenues that it gets for its different products?
3      MR. STRAPP:  Objection, form.
4      A.   I don't understand what you're asking.
5      We do keep track of what we sell by
6  customer in our accounting system, but they're to the
7  level of an invoice.  The detail behind that maybe
8  be -- might be pulled.  I don't know.  I'm not sure
9  of the detail, exact detail of the database.
10     BY MS. HUGHEY:
11     Q.   So I just want to confirm:  ePlus doesn't
12  have detailed records of its revenue by product?
13     A.   They have detailed records of its sales to
14  customers and contracts with customers and POs.  We
15  don't record any financial record of product sales,
16  any type of financial report by that.
17     Q.   Okay.  So ePlus doesn't have detailed
18  records of revenue by product; is that correct?
19     A.   Correct.
20     Q.   Is it accurate to say that the majority of
21  ePlus's revenues are from leasing?
22     MR. STRAPP:  Currently or 2002?
23     BY MS. HUGHEY:
24     Q.   Let's start with 2002, in 2002.
25     A.   No.

Mencarini - 30(b)(6), Steven John  5/26/2010  12:00:00 PM

---

**45**

1    Q.   It's not accurate?

2    A.   It's not from leasing, no.

3    Q.   Is it accurate to say that the majority of

4    ePlus's revenues are from sales of equipment and

5    sales of leased equipment?

6    A.   Yes.

7    Q.   Can you turn to page F 34, which is marked

8    ePlus 0133368.

9         Can you tell me, what does this chart

10   show?

11   A.   This is a chart that is related to the

12   segment reporting of the company.

13   Q.   What does that mean?

14   A.   In a footnote, a company is to define its

15   business results in segments that senior management

16   or the chief decision-maker views the company as.

17   Q.   Can you firm for me that for fiscal year

18   2002, ePlus's sales in its technology sales business

19   units, sales of equipment was 126 million dollars?

20   A.   I'm sorry.  Let me -- what was the

21   question again?

22   Q.   Of course.  We're looking at F 34, which

23   is ePlus 0133368.

24   A.   Okay.

25   Q.   And I'm referring to the third table.

---

**46**

1    A.   Okay.

2    Q.   That talks about the 12 months ending

3    March 31st, 2002, which I understand is ePlus's 2002

4    fiscal year; is that correct?

5    A.   Yes, yes.  I'm sorry.

6    Q.   Can you firm for me that in the technology

7    sales business unit, the sales of equipment for

8    fiscal year 2002 were 126 million dollars?

9    A.   Yes.

10   Q.   Can you confirm for me that sales in the

11   financing business unit -- sales of equipment for

12   fiscal year 2002 was 1 million dollars?

13   A.   The line item says a million dollars,

14   correct.  There's also a line item that says sales of

15   leased equipment for 9 million.

16   Q.   So can you confirm for me that in fiscal

17   year 2002, ePlus's total sales of equipment was 127

18   million dollars?

19   A.   Yes.

20   Q.   Can you confirm for me that ePlus's total

21   sales of leased equipment was 9 million dollars?

22   A.   Yes.

23   Q.   And can you confirm for me that ePlus's

24   lease revenues for fiscal year 2002 was 48 million

25   dollars?

---

**47**

1    A.   Yes.

2    Q.   And can you confirm for me that in the

3    financing business unit in fiscal year 2002, ePlus

4    had 10 million dollars in fee and other income?

5    A.   Yes.

6    Q.   And can you confirm for me that in fiscal

7    year 2002 in the technology sales business unit, fee

8    and other income was 8 million dollars?

9    A.   Yes.

10   Q.   And can you confirm for me the total for

11   fiscal year 2002, fee and other income was 19 million

12   dollars?

13   A.   Yes.

14   MR. STRAPP:  Could we go off the record

15   for one minute?

16   MS. HUGHEY:  M-hm.

17   (Discussion off the record.)

18   THE VIDEOGRAPHER:  We're going off the

19   record.  The time is 10:09 AM.

20   (Recess.)

21   THE VIDEOGRAPHER:  We're now back on the

22   record in the deposition of Steve Mencarini.  The

23   time is now 10:20 AM.  You may proceed.

24   BY MS. HUGHEY:

25   Q.   Mr. Mencarini, before the break, we were

---

**48**

1    talking about ePlus's 2002 annual report and 10-K,

2    Lawson exhibit 65, and we were looking at page F 34,

3    which is marked ePlus 0133368.

4         Can you please tell me, what is included

5    in fee and other income, the line 4 down from where

6    it says, 12 months ended March 31st, 2002.

7    A.   In the 19 million?

8    Q.   Yes.

9    A.   It would be anything other than sales of

10   equipment or lease revenues or sales of leased

11   equipment effectively.  It would include fees, broker

12   fees, sales of software, software subscriptions,

13   consulting revenues, service revenues.

14   Q.   And what's the difference between fees and

15   other income in the financing business unit and

16   technology sales business unit?

17   A.   The technology sales business unit would

18   be a combination of the VAR -- the VARs and systems

19   and content, and the fees related to that business

20   versus a financial-related business fee.

21   Q.   What does VARs stand for?

22   A.   Value-added reseller.

23   Q.   Can you confirm for me that of ePlus's

24   total revenues of 204 million dollars, less than 10

25   percent of that is fee and other income?

---

Mencarini - 30(b)(6), Steven John  5/26/2010  12:00:00 PM

49

1    A.   Yes.
2        Q.   Does ePlus's sales of its e-procurement
3    product fall into the fee and other income?
4        A.   Yes.
5        Q.   Does Lawson's revenues from its
6    e-procurement products fall into any of the other
7    sales of equipment, sales of leased equipment, or
8    lease revenues?
9        A.   Can you ask that again.
10       Q.   Yes.  For Lawson's revenues from its sales
11   of its e-procurement --
12       A.   From Lawson's sales?
13       Q.   I'm sorry.
14       A.   That's what threw me off.
15       Q.   If I ever say that again, please stop me.
16       A.   Okay.  I thought it was a trick question.
17       Q.   For ePlus's sales of its procurement
18   product, can you confirm for me that no revenues
19   would be included for sales of equipment, sales of
20   leased equipment, or leased revenues?
21       A.   I think all the sales from the software --
22   revenue related to the software is in the fee and
23   other income line.
24       Q.   Okay.  Is ePlus's sales of its
25   e-procurement product in the financing business unit

50

1    or the technology sales business unit?
2        A.   In the technology sales unit.
3        Q.   So that number 8,900,000 that falls under
4    the technology sales business unit fee and other
5    income, that would be where ePlus's sales from its
6    e-procurement systems would be?
7        A.   I believe that's correct.
8        Q.   Can you turn to what's already been marked
9    as exhibit 76, ePlus's annual report and 10-K for
10   2009.  Can you please turn to page ePlus 0528792,
11   which is F 4.
12       Can you confirm for me that ePlus's total
13   revenues for the year ending March 31st, 2009, are
14   698 million dollars?
15       A.   Yes.
16       Q.   And can you confirm of that number 12
17   million is fee and other income?
18       A.   Yes.
19       Q.   So once again, please confirm for me that
20   Lawson's revenues from fee and other income -- I'm
21   sorry.
22       Please confirm for me that ePlus's
23   revenues from fee and other income is well less than
24   10 percent of its revenues -- its total revenues?
25       A.   Yes.

51

1        Q.   What are the revenue streams that ePlus
2    recognizes from the sales of its procurement systems?
3        MR. STRAPP:  Objection, vague as to,
4    procurement systems.
5        A.   I don't understand the question.  I'm
6    sorry.
7        BY MS. HUGHEY:
8        Q.   Previously, we talked about what would be
9    included in the fees and other income, and you said,
10   brokerage fees; is that correct?
11       What else does that include, fees and
12   other income, what revenues?
13       MR. STRAPP:  Objection, asked and
14   answered.
15       A.   It's effectively everything but sales of
16   VAR product, services, and lease revenues.
17       BY MS. HUGHEY:
18       Q.   So that includes software licensing
19   revenues; is that correct?
20       A.   I believe it does.  I didn't prepare the
21   2009 and 8 financials, but it's my understanding that
22   all the financial -- the revenues of the procurements
23   and content go into fee and other income.
24       Q.   What about 2002?
25       Let's look at the 2002 10-K.

52

1        A.   2002?
2        Q.   2002.  So fee and other income, does that
3    include software licenses?
4        A.   I believe it does.  I don't remember
5    exactly how it mapped up.  I don't have the mapping.
6    I believe that's the case, but I'm not a hundred
7    percent sure.
8        But I'm pretty sure it's not in sales of
9    equipment, so it would be -- and it's not lease
10   revenues, so my memory is that in 2002, it was in fee
11   and other income.
12       Q.   Okay.  So software licenses would be
13   included in fee and other income; is that correct?
14       MR. STRAPP:  Objection, asked and
15   answered.
16       A.   I believe it is in 2002.  We changed the
17   name of the sale line item to sales -- from sales of
18   equipment to sales of product and services, so
19   certain items were remapped.
20       BY MS. HUGHEY:
21       Q.   I'm sorry.  When did you make that change?
22       A.   I don't know the exact date.  I'd have to
23   go back and look at the different financial reports.
24       Q.   As part of your job as CFO -- let's talk
25   about the 2002 time frame -- were you familiar at a

53

1  high level with the services and products that were
2  sold by ePlus?
3  A.  Yes.
4  Q.  What kind of products does ePlus sell?
5  MR. STRAPP:  Objection, vague as to time.
6  BY MS. HUGHEY:
7  Q.  In 2002, what kind of products did ePlus
8  sell?
9  A.  As a company in total?
10  Q.  Yes.
11  A.  We sold computer equipment, computer --
12  certain software products.  We sold procurement
13  software, and I do believe we sold cat- -- and
14  procurement software being procurement and inventory
15  catalogs.  That's basically the products we sold.
16  And our other financial product we sold was lease
17  financing.
18  Q.  Okay.  So referring to the 2002 annual
19  report and 10-K, can you please turn to page 9 of
20  that document, which is marked ePlus 0133298.  We
21  talked about the procurement software that ePlus
22  sold.
23  Is that product called Procure Plus?
24  Again in 2002.
25  A.  Yes.

54

1  Q.  What is Procure Plus?
2  MR. STRAPP:  Objection, beyond the scope.
3  You can answer in your individual capacity
4  to the extent you know.
5  A.  What I understand of Procure Plus as a
6  finance person, it's our Internet-based procurement
7  software product.
8  BY MS. HUGHEY:
9  Q.  And do you see the next page, ePlus
10  0133299?
11  Do you see Content Plus?
12  A.  Yes.
13  Q.  What is Content Plus?
14  MR. STRAPP:  Same objection.
15  A.  Again, my understanding of Content Plus,
16  it was an electronic catalog content product.
17  BY MS. HUGHEY:
18  Q.  And can you turn to the next page, ePlus
19  0133300.
20  What is Manage Plus?
21  MR. STRAPP:  Same objection.
22  A.  Manage Plus was effectively a fixed asset
23  program, a service we offered for clients who wanted
24  to track their items fixed assets.
25  BY MS. HUGHEY:

55

1  Q.  Turn to the next page, ePlus 0133301.
2  What is ePlus leasing?
3  MR. STRAPP:  Continuing objection.
4  Go ahead.
5  A.  ePlus leasing is the financing of
6  equipment and products.  It's general equipment and
7  software financing.
8  BY MS. HUGHEY:
9  Q.  Okay.  Below that, it says, other EECM
10  services, and it lists, business process outsourcing,
11  network engineering, monitoring, maintenance,
12  implementation services.
13  What is that -- what is the EECM services?
14  A.  We had it titled -- EECM was ePlus
15  enterprise cost management, and it was a descriptive
16  term of our overall services.
17  Q.  And then in that paragraph at the bottom
18  it says, pay plus.
19  What is pay plus?
20  A.  That was where we would take people's
21  bills, monitor them, pay them, and reconcile them to
22  the invoice from a purchase order.
23  Q.  You previously referred to ePlus's
24  procurement software.
25  Were you talking about Procure Plus?

56

1  A.  Yes.
2  Q.  Are any of these others, Content Plus,
3  Manage Plus, and so on, part of ePlus's procurement
4  software?
5  A.  Content Plus is an electronic catalog
6  system.  I'm not technical enough to understand the
7  actual technical parts.
8  Manage Plus I know is not -- is a separate
9  program, a separate function.  It's asset management.
10  It's not really related to procurement, but
11  electronic procurement can feed it.  Electronic
12  procurement can create tables to download into it.
13  Q.  So when you say, procurement software, and
14  again in the 2002 time period, what would you be
15  referring to?
16  MR. STRAPP:  Let me just make a continuing
17  objection that this is all beyond the scope.  We've
18  already provided a witness to talk about the products
19  that are involved in the patents-in-suit.
20  You can answer to the extent.
21  A.  I'm sorry.  Can you ask the question
22  again.
23  BY MS. HUGHEY:
24  Q.  When you say, procurement software, what
25  are you referring to?

Mencarini - 30(b)(6), Steven John   5/26/2010   12:00:00 PM

57

1    A.   When I say, procurement software,
2    personally, I mean, Procure Plus and Content Plus.
3        Q.   With respect to Procure Plus, what are the
4    revenue streams that ePlus recognizes from the sales
5    of Procure Plus?
6            And let's limit this discussion to 2002
7    right now.
8        A.   When you say, revenue streams, what do you
9    mean?
10       Q.   When ePlus recognizes revenue for the
11   sales of its Procure Plus product, what different
12   kind of revenues does it recognize?
13       A.   I don't understand your question in an
14   accounting context.  I want to answer your question,
15   but I'm not sure exactly what you're asking for.
16       Q.   For example, when ePlus sells its Procure
17   Plus product, does it recognize license revenue?
18       A.   Yes.  And in that context, I think in
19   2002 -- that's 8 years ago -- we provided -- I think
20   the majority of the deals were enterprise licenses
21   where someone would buy a license and then maintain
22   it with a maintenance -- an annual maintenance fee.
23           Subsequently, and I don't know exactly
24   when, we came -- started selling term use
25   effectively subscriptions of the software.  And that

58

1    was market-based.  I don't know exactly when the
2    market started with subscription-based software, but
3    we modified our -- you can buy an enterprise version
4    or a subscription-based version.
5        Q.   Did ePlus recognize any other revenue
6    streams from the sales of Procure Plus?
7            MR. STRAPP:  Objection, form.
8        A.   With a sale of software, there's
9    sometimes -- or most of the time I do believe there
10   were installation charges.
11           BY MS. HUGHEY:
12       Q.   Would those also be known as service fees?
13       A.   In 2002, I don't remember exactly how that
14   was -- I would suppose it would be.  That would be a
15   good assumption, not certain.
16       Q.   So other than license fees, maintenance
17   fees, and installation charges, did ePlus have any
18   other revenue from the sale of Procure Plus in 2002?
19       A.   Not that I recall.
20       Q.   With respect to the Content Plus product,
21   were the revenue streams that ePlus recognized in
22   2002 again license fees, maintenance fees, and
23   installation charges?
24       A.   Don't recall exactly what was done in
25   2002, but I would assume the answer would be the

59

1    same, the same general template.
2        Q.   Okay.  As ePlus's corporate designee on
3    the topic, are you aware of any other types of
4    revenue that ePlus recognizes for its Procure Plus or
5    Content Plus products?
6            MR. STRAPP:  Objection, vague as to time.
7            BY MS. HUGHEY:
8        Q.   In 2002.
9        A.   Other than license fees, subscription
10   fees, installation, not that I can currently recall.
11       Q.   What kind of revenue is captured in the
12   licensing category?
13       A.   Again, I don't understand your question.
14       Q.   I believe and I could be incorrect -- I
15   believe you talked about subscription license; is
16   that correct?
17       A.   I said we started marketing it as
18   enterprise license and then subsequently added
19   subscription licensing, but I don't know exactly when
20   we started that.
21       Q.   What is an enterprise license?
22       A.   That would be when a person purchases a
23   license.
24       Q.   And what's a subscription license?
25       A.   Something that they would pay on a

60

1    periodic basis for specific term.
2        Q.   And in 2002, did ePlus offer both
3    enterprise licenses and subscription licenses?
4        A.   Don't remember.
5        Q.   Does ePlus currently offer enterprise
6    licenses and subscription licenses?
7        A.   Today we do.
8        Q.   Is one more common than the other?
9        A.   Today the more common is subscription.
10       Q.   Since ePlus has offered enterprise
11   licenses and subscription licenses, has subscription
12   always been more common?
13       A.   I don't remember exactly when we started
14   subscription, so I can't really answer that.
15       Q.   In 2008, was subscription licenses more
16   common than enterprise licenses?
17       A.   For new opportunities or new licenses, I
18   would say yes.
19       Q.   In 2007, were subscription licenses more
20   common than enterprise licenses?
21       A.   My guess is yes.
22       Q.   Okay.  What about 2006?
23       A.   6 and prior, don't really remember.
24       Q.   Can you turn to Lawson exhibit 65, which
25   is ePlus's 2002 annual report, page 31, which is

61

1  marked ePlus 0133320.  I want to direct your
2  attention to the second full paragraph starting for
3  the year ended March 31, 2002, included in fee and
4  other income.
5      Do you see that paragraph?
6  A.  Yes.
7  Q.  The last sentence says:  These revenues
8  consist of amounts charged for the arrangement of
9  procurement transactions executed through Procure
10 Plus and Manage Plus components of ePlus suite.
11     Do you see that?
12 A.  Yes.
13 Q.  What does it mean, revenues consist of
14 amounts charged for the arrangement of procurement
15 transactions?
16 A.  Let me review one thing for one minute.
17     (Pause.)
18     BY MS. HUGHEY:
19 Q.  Mr. Mencarini, I don't mean to hurry you,
20 but do you -- are we still talking about my question
21 right now?
22 A.  Yes.  This has been 8 years.  I don't
23 exactly -- I remember the ePlus suite.  I don't have
24 a recall exactly what's in it.  I was trying to
25 review this document to give you an answer, but --

62

1  rather than "I don't remember what's in it," because
2  it's been 8 years, but right now --
3      MR. STRAPP:  Take your time to review it
4  if you need to answer the question.
5      THE WITNESS:  That's what I'm doing.
6      MR. STRAPP:  Take as much time as you
7  need.
8      BY MS. HUGHEY:
9  Q.  Let me ask a different question.
10     Does ePlus charge its customers on a per
11 transaction basis?
12     MR. STRAPP:  Objection, vague, vague as to
13 product, vague as to time, vague as to customers.
14     BY MS. HUGHEY:
15 Q.  For ePlus's procurement products, does it
16 charge its customers on a per transaction basis
17 currently?
18 A.  No.
19 Q.  In 2002, did ePlus charge its procurement
20 customers on a per transaction basis?
21 A.  No.
22 Q.  How about for Manage Plus in 2002?
23     Did ePlus charge customers on a per
24 transaction basis?
25 A.  For Manage Plus, I believe the charges

63

1  were a factor of the lease rate we would charge
2  customers.
3  Q.  So they were charged -- customers were
4  charged in 2002 on a per transaction basis?
5  A.  That's not fair to say --
6      MR. STRAPP:  Hold on one second.
7      So to the extent that you're asking about
8  products besides Procure Plus and Content Plus, it's
9  outside the scope of the noticed topic.
10     You can answer to the extent you know in
11 your individual capacity.
12 A.  It's not a per transaction basis.  It was
13 effectively part of the lease rate factor was
14 associated and priced to a customer as Manage Plus.
15     BY MS. HUGHEY:
16 Q.  But you said not on a per transaction
17 basis?
18 A.  It is part of the financing rate.  When
19 you say, on a per transaction, I don't know what that
20 means.  I'm telling you what it is, not agreeing to
21 you or disagreeing with your question.
22 Q.  I'm trying to understand this sentence
23 here:  These revenues consist of amounts charged for
24 the arrangement of procurement transactions executed
25 for Procure Plus and Manage Plus components of ePlus

64

1  suite.
2      Is that a per transaction basis?
3      Is that referring to a per transaction
4  basis?
5  A.  It relates relative to transactions that
6  flowed through certain procurement systems we had.
7  Q.  Was ePlus charging its customers on a per
8  transaction basis?
9  A.  Not a specific charge.
10 Q.  Was it a general charge?
11 A.  It was a -- I think it was an allocation.
12 I don't remember exactly how it was determined.  It's
13 been 8 years.
14 I'm sorry.
15 Q.  So --
16 A.  I'm not going to speculate, because I
17 don't remember.
18     MR. STRAPP:  You're asking about Manage
19 Plus right now.
20     Right?
21     MS. HUGHEY:  No.  Both of them, both
22 Procure Plus and Manage Plus.
23     MR. STRAPP:  And what page are you on
24 again?
25     BY MS. HUGHEY:

Mencarini - 30(b)(6), Steven John  5/26/2010  12:00:00 PM

---

**65**

1    Q.  Page 31 of ePlus's 2002 annual report and

2  10-K, page ePlus 0133320.

3    A.  Okay.

4    Q.  So the paragraph we're talking about is

5  the second full paragraph which says:  For the year

6  ended March 31st, 2002, included in fee and other

7  income were 5.4 million in ePlus suite revenues as

8  compared to 5.7 million in the year ended March 31st,

9  2001.  This represents a decrease of 5.8 percent and

10  reflects a reduction of transactions utilizing our

11  ePlus suite products and services.  These revenues

12  consist of amounts charged for the arrangement of

13  procurement transactions executed through Procure

14  Plus and Manage Plus components of ePlus suite.

15    Do you see that?

16    A.  Yes.

17    Q.  So my question is, was ePlus charging its

18  customers in 2002 on a per transaction basis for

19  Procure Plus?

20    A.  No, not for Procure Plus.

21    Q.  What about for Manage Plus?

22    A.  It was based on a rate factor of the

23  amount financed.

24    Q.  Is ePlus able to determine license revenue

25  on its Procure Plus product by customer?

---

**66**

1    A.  Yes.

2    Q.  How would you go about doing that?

3    A.  I'd go back to the financial records and

4  the contract records and associate revenues with the

5  customer, with the product they used.

6    Q.  Is ePlus able to determine a license

7  revenue by product for its Procure Plus product?

8    A.  In theory, we could do it outside the

9  accounting system if we went to the historical

10  archives in the contracts.

11    Q.  What about in 2002?

12    Was ePlus able to determine license

13  revenue by customer?

14    A.  I believe so.

15    Q.  In 2002, was ePlus able to determine

16  license revenue by product?

17    A.  Don't know.  I mean, I don't know if we --

18  today could I do it?

19    I don't know.  Back then, we did not do it

20  by product.

21    Q.  In 2002, would ePlus be able to determine

22  its license revenue for Procure Plus?

23    A.  In total, yes.

24    Q.  What do you mean by, in total?

25    A.  Well, it's in the -- go back to your

---

**67**

1  question again.  I'll answer again.

2    Q.  Is ePlus able to determine the license

3  revenue on Procure Plus in 2002?

4    A.  Today?

5    Q.  Today.

6    A.  I think we could do it if we -- if we got

7  into the archives.

8    Q.  Was ePlus able to determine license

9  revenue for its Procure Plus product in 2002?

10    A.  Was it able?

11    Q.  Yes.

12    A.  Don't remember what we could do 8 years

13  ago.

14    I'm sorry.

15    Q.  We talked about maintenance revenue.

16    What kinds of revenue are captured within

17  maintenance?

18    A.  For what company?

19    Q.  How about this:  What types of things does

20  maintenance revenue include?

21    A.  Maintenance revenue would include

22  software, an annual charge for a typical software

23  industry maintenance charge.

24    Q.  Anything else?

25    A.  Not that I can recall.

---

**68**

1    Q.  Did maintenance revenue include upgrades

2  to software?

3    A.  I don't know exactly what -- when you say

4  that, fixes, bug fixes, et cetera, maintenance

5  revenue I think covered that.

6    Q.  Were there any kinds of upgrades that

7  maintenance revenue didn't cover?

8    A.  I don't know.

9    Q.  Is ePlus able to determine maintenance

10  revenue by customer?

11    A.  Is it able to?

12    Yes.

13    Q.  How would you go about doing that?

14    A.  Forensically go through contracts and

15  invoices and create a spreadsheet.

16    Q.  In 2002, was ePlus able to determine

17  maintenance revenue by customer?

18    A.  I don't remember.

19    Q.  Is ePlus able to determine maintenance

20  revenue by product?

21    A.  Today?

22    Q.  Yes.

23    A.  I'm pretty sure we could do it.

24    Q.  What about in 2002?

25    A.  I think we could do it.

---

Mencarini - 30(b)(6), Steven John  5/26/2010  12:00:00 PM

69

1    Q.   Today, how would you go about determining
2    maintenance revenue by product?
3    A.   I would go through our contract summary
4    and forensically pull out the maintenance charge by
5    customer through the billing.
6    Q.   What do you mean by, forensically pull
7    out?
8    A.   Just using databases and accounting
9    analysis, pull it out.
10   Q.   Is this something you would have a
11   spreadsheet on or would you have to actually manually
12   enter information in?
13   A.   I don't know if we have it by product.  We
14   have it by company.  Systems -- ePlus systems and
15   ePlus content are 2 separate contents.
16   Q.   And we talked about services revenue.
17   What does services revenue include?
18       MR. STRAPP:  Objection, mischaracterizes
19   testimony.
20       BY MS. HUGHEY:
21   Q.   Okay.  We talked about installation
22   revenues.
23   What do installation revenues include?
24   A.   Installing a product.
25   Q.   Is there anything else?

70

1    A.   Not that I know of.
2    Q.   Is ePlus able to determine service revenue
3    by customer?
4    A.   Installation services by customer?
5    Yes.
6    Q.   Strike my earlier question.
7    Is ePlus able to determine installation
8    revenue by customer?
9    A.   I'm sure we could figure it out.
10   Q.   How would you go about doing that?
11   A.   Go through the accounting records.
12   Q.   In 2002, was ePlus able to determine
13   installation revenue by customer?
14   A.   I don't remember that far back.
15   Q.   Is ePlus able to determine installation
16   revenue by product?
17   A.   Are we able to?
18   I would say we probably today could do it.
19   Q.   What about in 2002?
20   A.   Don't know if we had the detail.
21   Q.   How would you go about determining
22   installation revenue by product today?
23   A.   I would get it through the accounting
24   records and analysis and pull it together.
25   Q.   And would that give you service revenue by

71

1    product as a whole, or could you go for each
2    individual installation?
3        MR. STRAPP:  Objection, form.
4        MS. HUGHEY:  I can rephrase.
5        BY MS. HUGHEY:
6    Q.   Is ePlus able to determine installation
7    revenue by individual installation?
8        MR. STRAPP:  Objection, vague.
9    A.   I would say yes, we could probably figure
10   it out.
11       BY MS. HUGHEY:
12   Q.   How would you go about doing that?
13   A.   Go through the accounting records and
14   contract records.
15   Q.   Was ePlus able to do that in 2002?
16   A.   Don't remember.
17   Q.   Okay.  Can we turn back to F 4 of ePlus's
18   2002 annual report and 10-K.  That's page ePlus
19   0133338.
20       Looking at the cost columns of the income
21   statement, what are costs and expenses?
22   A.   Those are the expenses of the business.
23   Q.   What kinds of things would be included in
24   costs and expenses?
25   A.   The salaries, benefits, general overhead

72

1    of a company, typical expenses of any organization.
2    Q.   What kinds of records does ePlus keep with
3    respect to its costs?
4    A.   Keep costs by vendor, paper records.  We
5    have accounting systems that we maintain.
6    Q.   Does ePlus record its costs by product?
7    A.   No.
8    Q.   Does ePlus record its costs by customer?
9    A.   No.
10   Q.   What's the smallest functional unit that
11   ePlus records costs for?
12       MR. STRAPP:  Objection, vague.
13       MS. HUGHEY:  Let me rephrase.
14       BY MS. HUGHEY:
15   Q.   Does ePlus record costs with respect to
16   its different business units?
17   A.   Yes.
18   Q.   Does ePlus record costs with respect to
19   anything other than its business units?
20   A.   In technology, we keep costs by region,
21   which is a function within the company to map
22   profitability of your costs and sales and expenses by
23   geographic location.  That's the only company that we
24   keep any regional data.
25   Q.   Does ePlus record costs for research and

**73**

1  development?

2      A.  We don't have a line item research and

3  development.

4      Q.  What kinds of records does ePlus keep with

5  respect to its profits?

6      A.  I can't address that question.  As an

7  accountant, it doesn't ring -- or make sense to me.

8      I'm sorry.

9      Q.  How are ePlus's procurement products sold?

10      MR. STRAPP:  Objection, form.

11      A.  Again, I don't know what you mean.

12      Do you mean -- sold, I mean, marketed

13  or --

14      BY MS. HUGHEY:

15      Q.  No.  When ePlus sells its Procure Plus

16  product, does the customer pay for the Procure Plus

17  product, or are there smaller functional units that

18  the customer can pay for?

19      MR. STRAPP:  Objection, compound.

20      BY MS. HUGHEY:

21      Q.  Does ePlus sell its Procure Plus -- let me

22  strike that.

23      When ePlus sells its Procure Plus product,

24  does it sell modules for that product?

25      A.  I'm not sure exactly each module.  I only

**74**

1  look at the bill of materials or whatever we sold in

2  total.  I'm not into that detail, so I can't answer

3  that.  It's my understanding they're different pieces

4  of the product, of the software, but I'm not

5  technical.

6      Q.  Who would know the answer to whether --

7  how ePlus's products are sold, whether there are

8  different modules?

9      A.  Ken Farber.

10      Q.  Do you know the smallest functional unit

11  that a customer can purchase?

12      A.  No.

13      Q.  I'd like to direct your attention to page

14  29 of ePlus's 2002 annual report, page ePlus 0133318,

15  and the second full paragraph is entitled, sales.

16      Do you see that?

17      A.  Yes.

18      Q.  That paragraph says, sales revenue

19  includes the following 4 -- I'm sorry.

20      Let me start over.

21      Sales revenue includes the following types

22  of transactions.  And then there are 4 transactions.

23  The first is sales of new or used equipment which is

24  not subject to any type of lease.  The second is

25  sales of equipment subject to an existing lease under

**75**

1  which we are lessor, including any underlying

2  financing relating to the lease.  Third is sales of

3  off-lease equipment to the secondary market.

4      Do you see those?

5      A.  Yes.

6      Q.  Do you see the fourth says, sales of

7  procurement software?

8      A.  Yes, I do.

9      Q.  So is it accurate to say that ePlus

10  recognizes 4 kinds of sales revenue?

11      A.  The 4 listed, correct.

12      Q.  How does ePlus determine what would be in

13  the fourth category, sales of procurement software?

14      Let me rephrase.

15      The fourth category of sales of

16  procurement software.

17      A.  Right.

18      Q.  What products are in that category?

19      A.  That would be Procure Plus and Content

20  Plus.

21      Q.  Anything else?

22      A.  Not that I know of.

23      Q.  I'd like to direct your attention to page

24  17 of this document, ePlus 0133306.  It says,

25  competition.  And the first paragraph says --

**76**

1      A.  Sorry.  Hold on.

2      Q.  Take your time.

3      A.  Okay.

4      Q.  The first paragraph refers to the market

5  for leasing IT sales and services -- I'm sorry.

6      Let me take a step back.

7      That paragraph, the competition paragraph,

8  the one that I just referred you to.

9      A.  Yes.

10      Q.  The third sentence says:  We compete

11  directly with various leasing companies such as GE

12  Capital Corporation and bank leasing subsidiaries as

13  well as captive finance companies such as IBM Credit

14  Corporation.

15      Do you see that?

16      A.  Yes.

17      Q.  Is this referring to the competition for

18  sales of equipment and leased equipment and revenues

19  that we talked about on F 34?

20      A.  GE and bank leasing would be just for

21  leasing.

22      Q.  Okay.  The second paragraph that starts,

23  our current and potential competitors in the

24  procurement software and electronic commerce market

25  include among others Ariba Inc., Commerce One Inc.,

Mencarini - 30(b)(6), Steven John  5/26/2010  12:00:00 PM

77

1   Claris Corporation, International Business Machines
2   Corporation, and General Electric.
3        Do you see that?
4     A.   Yes.
5     Q.   Is that referring to ePlus's competitors
6   for its procurement software?
7     A.   Yes.
8     Q.   Can you confirm for me that Ariba and SAP
9   are both listed in that paragraph?
10    A.   In paragraph on page 17?
11    Q.   That's right.
12    A.   Yes, it's there.
13    Q.   Can you confirm for me that Lawson is not
14   listed in that paragraph?
15    A.   Can I say it's not named?
16        Yes, it's not named.  Lawson is not in
17   there.
18    Q.   Okay.  Can you turn to page 14 of the
19   10-K, of ePlus's 2002 10-K, page ePlus 0133303.
20        Do you see the heading marked research and
21   development?
22    A.   Yes.
23    Q.   Can you confirm for me that the research
24   and development that's referred to in this paragraph
25   would include ePlus's software development?

78

1        MR. STRAPP:  Objection, beyond the scope.
2        And we can stipulate if you'd like that
3   the information -- in fact I think we already have --
4   the information in the 10-K is accurate, so frankly,
5   I think it's -- no disrespect -- wasting the
6   witness's time to ask him to confirm things that are
7   in a 10-K that he's already said are accurate.
8        Go ahead and answer the question, if you
9   would.
10    A.   I'm sorry.  Rachel, what was the question
11   again?
12        MS. HUGHEY:  You can strike my question.
13        THE WITNESS:  Okay.
14        BY MS. HUGHEY:
15    Q.   Still on page 14, it's the -- about sixth
16   line down says:  We have obtained perpetual license
17   rights and source code from third-party software
18   companies.
19        Do you see that?
20    A.   Yes.
21    Q.   Do you know what that's referring to?
22    A.   Yes.
23    Q.   Can you tell me?
24    A.   At the time we had a perpetual license
25   from -- for another procurement software product from

79

1   a third party.
2     Q.   Who was that third party?
3     A.   I think the name was Cy Biz.  Can't -- I'm
4   not a hundred percent sure.
5     Q.   And what were the terms of that license?
6     A.   Don't remember.
7     Q.   Do you know if ePlus still has that
8   license?
9     A.   I do not know.
10    Q.   Do you know if ePlus produced that license
11   in connection with this case?
12    A.   I have no idea.
13        MS. HUGHEY:  Can we take maybe a 15-minute
14   break, Michael?
15        MR. STRAPP:  Okay.
16        THE VIDEOGRAPHER:  We're now going off the
17   record.  This is the end of videotape number 2.  The
18   time is 11:13 AM.
19        (Recess.)
20        THE VIDEOGRAPHER:  We're now back on the
21   record.  This is the beginning of videotape number 3
22   in the deposition of Steve Mencarini.  The time is
23   now 11:30 AM.  You may proceed.
24        (Lawson Exhibit No. 77
25        was marked for

80

1        identification.)
2        BY MS. HUGHEY:
3     Q.   Mr. Mencarini, I've handed you what's been
4   marked as exhibit 77.  It's ePlus 0091337 to 0091382.
5   It appears to be an income statement for -- sorry --
6   342 is what the document ends on.  It appears to be
7   an income statement for ePlus content services for
8   12-month period ending March 31st, 2002; is that
9   correct?
10    A.   Yes, I see it's March 31st till the last
11   page.
12    Q.   What is this document?
13    A.   It's the ePlus content services monthly
14   financial report for income statement for the fiscal
15   year 3-31-2002.
16    Q.   How was the spreadsheet generated?
17    A.   I believe it is an FRX report, an extract,
18   which is a financial reporting system that pulls
19   reports out of Great Plains, general ledger.
20    Q.   Is that the same accounting system that
21   ePlus uses for its SEC reporting?
22    A.   Yes, effectively.
23    Q.   What is ePlus content services?
24        MR. STRAPP:  Objection, asked and
25   answered.

Mencarini - 30(b)(6), Steven John  5/26/2010  12:00:00 PM

81

1       A.   It's ePlus content services.  It's the
2   electronic catalog company service.
3          BY MS. HUGHEY:
4       Q.   Is the same ePlus content services we
5   talked about during the conversation with ePlus's
6   2002 annual report?
7       A.   Yes.
8       Q.   That's listed on page ePlus 0133292 of
9   that document, of the 2002 annual report?
10      A.   Which one again?
11           That's 65?
12      Q.   Yes, exhibit 65.
13      A.   Okay.
14      Q.   Page 3 of that document.
15      A.   Yes.
16      Q.   Is the information in Lawson exhibit 77
17  prepared with the same level of accuracy and validity
18  as the data shown in ePlus's 10-K?
19           MR. STRAPP:  Objection, calls for
20  speculation.
21           MS. HUGHEY:  He's the one that prepared
22  it.
23           MR. STRAPP:  That's inaccurate.  He never
24  testified that he prepared it.
25           BY MS. HUGHEY:

82

1       Q.   Let's take a step back.
2            Who prepares these documents on behalf of
3   ePlus?
4       A.   This document?
5       Q.   Yes.  Who prepared this document on behalf
6   of ePlus?
7       A.   The controller at the time -- or the
8   controller of ePlus content.
9       Q.   Who is that?
10      A.   That was Rajiv Arora.
11      Q.   And is that someone who worked for you?
12      A.   Yes.
13      Q.   So were you responsible for the accuracy
14  in this document?
15      A.   Yes.
16      Q.   Does this document have the same level of
17  accuracy and validity as the consolidated data shown
18  in ePlus's 10-K?
19           MR. STRAPP:  Objection, form.
20           BY MS. HUGHEY:
21      Q.   You can answer.
22      A.   All's I can tell you is, a financial
23  statement in an individual subsidiary and a
24  consolidated have different levels of materiality.  I
25  would assume and it's been since 2002 that this

83

1   financial is accurate, but I haven't seen it for 8
2   years.
3       Q.   So is it your testimony as ePlus's CFO in
4   2002 that this document is accurate?
5            MR. STRAPP:  Objection, asked and
6   answered.
7       A.   Yes.
8            BY MS. HUGHEY:
9       Q.   Was this document prepared using the same
10  accounting principles that were used in the
11  preparation of ePlus's 10-K?
12      A.   Yes.
13      Q.   Can you confirm for me that ePlus's net
14  sales for ePlus content services in fiscal year 2002
15  was 320,000 dollars as shown on ePlus 0091338?
16      A.   Yes.
17      Q.   Can you confirm for me that the total cost
18  of goods sold was 447,000 dollars on the same page?
19      A.   Yes.
20      Q.   What costs are included in cost of goods
21  sold?
22      A.   It would either be a combination of
23  employee cost and third-party cost if we had used any
24  outsource services at the time or third-party
25  services.

84

1       Q.   Can you confirm for me that ePlus content
2   services operating expenses for the fiscal year 2002
3   was 1,355,000 dollars as shown on ePlus 0091340?
4       A.   Yes.
5       Q.   Is it accurate to say that ePlus content
6   services lost approximately a million dollars in
7   2002?
8       A.   Well, it says 1,500,000.
9       Q.   Is it accurate to say that ePlus content
10  services lost 1 million --
11      A.   Yes, a million dollars, correct.
12           (Lawson Exhibit No. 78
13           was marked for
14           identification.)
15           BY MS. HUGHEY:
16      Q.   Mr. Mencarini, I've handed you what's been
17  marked as Lawson exhibit 78, ePlus 0091331 to
18  0091336.
19           What is this document?
20      A.   It says it's the income statement for the
21  12 months ending March 31st, 2003 --
22      Q.   Is this --
23      A.   -- for ePlus content services.
24      Q.   Is this the same as the exhibit we just
25  looked at, exhibit 77, just for a different year?

Mencarini - 30(b)(6), Steven John  5/26/2010  12:00:00 PM

85

1      A.   Yes, looks like it's the subsequent year.

2      Q.   Okay.  And again, was this document

3  created with the same accounting principles that were

4  used in preparing ePlus's 10-K?

5      A.   Yes.

6      Q.   Was this document prepared with the same

7  level of accuracy and validity as the data used in

8  ePlus's 10-K?

9          MR. STRAPP:  Objection, form.

10         BY MS. HUGHEY:

11     Q.   Do you have any reason to believe that

12 this document is not accurate?

13     A.   No.

14     Q.   Can you confirm for me that ePlus content

15 services lost 723,000 dollars in fiscal year 2003

16 that's on page ePlus 0091334?

17     A.   Yes.

18         (Lawson Exhibit No. 79

19          was marked for

20          identification.)

21         BY MS. HUGHEY:

22     Q.   Mr. Mencarini, you've been handed what's

23 been marked Lawson exhibit 79, ePlus 0091343 to 348.

24     What is this document?

25     A.   It's the income statement for content

86

1  services for the 12 months ended March 31st, 2004.

2      Q.   Which is the same as exhibit 77 and 78 we

3  just talked about, just with an updated year?

4      A.   Yes.

5      Q.   Can you confirm for me that in fiscal year

6  2004, ePlus content services lost 1,168,000 dollars?

7      I'm sorry.

8      A.   Yes.

9      Q.   Thank you.

10         (Lawson Exhibit No. 80

11          was marked for

12          identification.)

13         BY MS. HUGHEY:

14     Q.   Mr. Mencarini, you've just been handed

15 what's been marked as Lawson exhibit 80, ePlus

16 0091363 to 368.

17     What is this document?

18     A.   That's the March 31st, 2002, income

19 statement for ePlus systems.

20     Q.   And is ePlus systems the same company that

21 we talked about in ePlus's 2002 10-K and annual

22 report?

23     A.   Yes.

24     Q.   Is this document the same as exhibit 77

25 that we already discussed, just for ePlus systems as

87

1  opposed to ePlus content services?

2      A.   It's an income statement for systems,

3  correct.

4      Q.   How is the spreadsheet generated?

5      A.   This is a report from FRX.

6      Q.   Is this data from the same accounting

7  system that ePlus uses for its SEC reporting?

8      A.   Yes.

9      Q.   Does it have the same level of accuracy

10 and validity as the data shown in ePlus's 10-Ks?

11     A.   Yes.

12         MR. STRAPP:  Objection, form.

13         BY MS. HUGHEY:

14     Q.   Was it prepared using accounting

15 principles consistent with what ePlus uses for its

16 10-Ks?

17     A.   Yes.

18     Q.   This document shows at the top a line

19 entitled, revenue, and then underneath that, it has,

20 sales equipment sales, sales freight, sales

21 maintenance fees, sales software licenses, sales

22 service labor, sales revenue -- it looks like revenue

23 adjustment, sales adjustment.

24     Do you see that?

25     A.   Yes.

88

1      Q.   Do you remember when we were discussing

2  what kinds of revenues ePlus recognizes from the

3  sales of its products?

4      A.   Yes.

5      Q.   Does this refresh your recollection that

6  these are the kinds of revenues that ePlus recognizes

7  with respect to procurement products?

8      A.   Yes.

9      Q.   Do you see where the column says, sales

10 software licenses?

11     A.   Yes.

12     Q.   Can you confirm for me that that includes

13 the sales -- that includes -- strike that question.

14     Can you confirm for me that sales software

15 licenses includes revenue for ePlus's licensing of

16 its procurement software?

17     A.   Yes.

18     Q.   Can you confirm for me that the line above

19 it, sales maintenance fees, includes revenues for

20 maintenance on Lawson's procurement systems -- I'm

21 sorry -- ePlus?

22     A.   Yes.

23     Q.   Thank you.

24     And same question, can you confirm for me

25 the line below it, sales service labor, includes

Mencarini - 30(b)(6), Steven John   5/26/2010   12:00:00 PM

89

1   revenues for services on ePlus's procurement
2   products?
3       A.   Yes.
4       Q.   Can you confirm for me that in fiscal year
5   2002, ePlus systems Inc. made 12,000 dollars in sales
6   of equipment sales that's on page ePlus 0091364?
7       A.   Yes.
8       Q.   Can you confirm for me that ePlus made 45
9   dollars in revenue on freight?
10      A.   Yes.
11      Q.   Can you confirm for me that ePlus made
12  975,000 dollars in revenue on maintenance fees in
13  2002?
14      A.   Yes.
15      Q.   Can you confirm for me that ePlus systems
16  Inc. made 824,000 dollars in software license revenue
17  in fiscal year 2002?
18      A.   Yes.
19      Q.   Can you confirm for me that EPlus Systems
20  Inc. made 419,000 dollars in service labor revenue in
21  fiscal year 2002?
22      A.   Yes.
23      Q.   Can you confirm for me that EPlus Systems
24  Inc. total operating expense was 2.5 million dollars
25  in fiscal year 2002?

90

1          That's on page ePlus 0091366.
2       A.   Yes.
3       Q.   Do you know, does ePlus's operating
4   expense include research and development for
5   procurement products?
6       A.   We don't have a line item for research and
7   development.  The salaries and general expenses would
8   include that type of activity.
9       Q.   Can you confirm for me that EPlus Systems
10  Inc. lost 934,000 dollars in fiscal year 2002?
11      A.   Yes.
12      Q.   Referring back to Lawson exhibit 77, ePlus
13  content services income statement for fiscal year
14  2002, can you confirm for me that combining the net
15  sales of 320,000 dollars shown on ePlus 0091338 and
16  the total revenues from EPlus Systems Inc., exhibit
17  80, 2.2 million dollars, would be the total revenues
18  for ePlus's procurement business in fiscal year 2002?
19      A.   I can tell you that's the total of those 2
20  companies.  I don't know the exact total of the
21  procurement business when you mention procurement
22  business.  That is the total of the 2 companies'
23  combined revenues, correct.
24      Q.   Are there any other revenues for ePlus's
25  procurement business that aren't included in fiscal

91

1   year 2002 in the income statements for EPlus Systems
2   Inc. and ePlus content services?
3       A.   I'm not sure.  I have to go back and look
4   at more detail for the -- in technology.
5       Q.   Where else might those services -- strike
6   that question.
7          Where else might revenues for ePlus's
8   procurement products be located?
9       A.   In ePlus technology in the VAR.
10      Q.   But sitting here today as ePlus's
11  corporate representative, you can't tell me if
12  ePlus's content services and ePlus system Inc. income
13  statements would be the total revenues for ePlus's
14  procurement business?
15      A.   I'm telling you those 2 -- the 2 numbers
16  you -- we discussed, content and services, represent
17  those 2 companies.
18      Q.   Understood.
19         But as ePlus's corporate representative,
20  you can't tell me right now --
21      A.   Correct.
22      Q.   -- if during fiscal year 2002, the income
23  statements for EPlus Systems Inc. and ePlus content
24  services Inc. would be the total revenues for ePlus's
25  procurement business in fiscal year 2002?

92

1       A.   Correct.
2       Q.   Who would you need to talk to understand
3   whether that was accurate?
4       A.   Elaine Marion.
5          (Lawson Exhibit No. 81
6          was marked for
7          identification.)
8       BY MS. HUGHEY:
9       Q.   Mr. Mencarini, I've handed you what's been
10  marked as Lawson exhibit 81, ePlus 0091369 to
11  0091374.
12         What is this document?
13      A.   EPlus Systems Inc. income statement for
14  the 12 months ended March 31st, 2003.
15      Q.   Is this the same as exhibit 80 that we
16  just discussed, just for the next fiscal year?
17      A.   Yes.
18      Q.   Can you confirm for me that EPlus Systems
19  Inc. lost 1.67 million dollars in fiscal year 2003?
20      A.   Yes.
21      Q.   That's on page ePlus 0091372.
22         Correct?
23      A.   Yes.
24      Q.   And just to be clear:  Just like I asked
25  you with exhibit 80, was exhibit 81 prepared with the

Mencarini - 30(b)(6), Steven John  5/26/2010  12:00:00 PM

93

1   same accounting principles that ePlus uses for its
2   10-Ks?
3       A.   Yes.
4            (Lawson Exhibit No. 82
5            was marked for
6            identification.)
7   BY MS. HUGHEY:
8       Q.   Mr. Mencarini, I've handed you what's been
9   marked as Lawson exhibit 82, ePlus 0091375 to 380.
10   What is this document?
11       A.   March 31st, 2004, income statement for
12   ePlus systems.
13       Q.   Is this the same as exhibit 80 and exhibit
14   81 that we already discussed, just with the most
15   recent fiscal year -- more recent fiscal year?
16       A.   Yes.
17       Q.   Can you confirm for me that EPlus Systems
18   Inc. lost 1.499 million dollars in fiscal year 2004?
19       A.   Yes.
20       Q.   And that's on page ePlus 0091378.
21            Correct?
22       A.   Yes.
23       Q.   And again, same question, was this
24   prepared with the same accounting principles that
25   ePlus uses to prepare its 10-Ks?

94

1       A.   Yes.
2            (Lawson Exhibit No. 83
3            was marked for
4            identification.)
5   BY MS. HUGHEY:
6       Q.   Mr. Mencarini, you've been handed what's
7   been marked Lawson exhibit 83, ePlus 0091381 to 386.
8       What is this document?
9       A.   I'm not sure.  It looks like a partial
10   year.  It's July through June.  It appears to be
11   misnamed for the 3 months ended June 30th, 2004.  It
12   says, for the 3 months ended, but it obviously shows
13   more than 3 months.
14       Q.   Can I turn your attention back to ePlus
15   exhibit 82.
16       Do you understand if the column July in
17   ePlus exhibit 82 is the same as the column July for
18   ePlus exhibit 83?
19       A.   It appears that way.
20            (Lawson Exhibit No. 84
21            was marked for
22            identification.)
23   BY MS. HUGHEY:
24       Q.   Mr. Mencarini, you've been handed what's
25   been marked as Lawson exhibit 84, ePlus 0091346 to

95

1   0091354.
2       I'm sorry.  I apologize.
3       It's ePlus 0091349 to 0091351.
4       What is this document?
5       A.   It's a balance sheet for ePlus content
6   services for the 12 months ended 3-31-2002.
7       Q.   Is this the same ePlus content services
8   we've previously discussed and is referenced in
9   ePlus's 10-K?
10       A.   Yes.
11       Q.   How was this spreadsheet generated?
12       A.   It's not a spreadsheet.  It looks like an
13   FRX report.
14       Q.   How is this document generated?
15       A.   Out of the general ledger.
16       Q.   Is this data from the same accounting
17   system that ePlus uses for its SEC reporting?
18       A.   Yes.
19       Q.   Does it have the same level of accuracy
20   and validity as ePlus's 10-Ks?
21       A.   Yes.
22       Q.   Was it prepared using accounting
23   principles consistent with what ePlus uses for its
24   10-Ks?
25       A.   Yes.

96

1       Q.   Do you contribute or supply information in
2   this document?
3       A.   I don't understand that question.
4       Q.   Who created this document?
5       A.   The controller of content services.
6       Q.   What's that person's name?
7       A.   Rajiv Arora.
8       Q.   In 2002, was Rajiv Arora someone who
9   reported to you?
10       A.   Yes.
11       Q.   Do you know, does this balance sheet
12   include United States or worldwide figures?
13       A.   It's United States.  I don't know --
14   there's no worldwide report.  This is United States
15   figures.
16       Q.   Do you see the column that says, total
17   other current assets, and the line below that that
18   says, property and equipment?
19       A.   Yes.
20       Q.   Do you see that it says, 333,000 dollars?
21       A.   I'm sorry?
22       Q.   Do you see where the property and
23   equipment if you go right, it looks like it says --
24   I'm sorry -- I'm sorry.
25            Go below property and equipment to PP and

Mencarini - 30(b)(6), Steven John  5/26/2010  12:00:00 PM

97

1  E software.

2  A.  Okay.

3  Q.  And then do you see if you go right, it

4  says, 33,000 dollars?

5  A.  Yes.

6  Q.  What does that balance represent?

7  A.  Property, plant, and equipment software.

8  I don't know -- I think it's the office-related

9  products of the other people of the company.

10  Q.  So is this the software that you use in

11  your daily business, not the software that you sell

12  to third parties?

13  A.  I think it is.  I'm not sure.

14  Q.  If you drop down that same column, you see

15  the line that says, net property and equipment?

16  A.  Yes.

17  Q.  And then you drop down a couple more, you

18  see, other assets, goodwill?

19  A.  Yes.

20  Q.  And it says, 312,000 dollars?

21  A.  Yes.

22  Q.  What are, other assets, goodwill?

23  A.  I don't have the complete list, but it's

24  probably the goodwill associated with ePlus content

25  services, but I don't know if there's other assets

98

1  other than goodwill.  I don't have the detailed

2  report.

3  Q.  Where did the goodwill come from?

4  A.  The acquisition.

5  Q.  Which acquisition?

6  A.  By ePlus of this company.

7  Q.  Of the company?

8  A.  ePlus content services.

9  Q.  Before ePlus content services was called

10  ePlus content services before ePlus acquired it, what

11  was it called?

12  A.  I have no idea.  I think it was -- it's in

13  the 10-K.

14  Q.  The line below, other assets, goodwill,

15  says, assembled work force.

16  Do you see that?

17  A.  We.

18  Q.  It shows a value of 154,000 dollars?

19  A.  Right.

20  Q.  What is assembled work force?

21  A.  The value associated with the people we

22  obtained in the acquisition.

23  Q.  Again, which acquisition are you talking

24  about?

25  A.  Content services.

99

1  Q.  If ePlus had acquired patents when it

2  purchased the company that became ePlus content

3  services, where would the value of those patents be

4  listed?

5  A.  It's a hypothetical question.  It would

6  probably be in, other assets.

7  Q.  Can I turn your attention back to ePlus's

8  2002 annual report and 10-K, Lawson exhibit 65, page

9  ePlus 0133292, just page 3 of that document.

10  A.  Again, what page number?

11  Q.  ePlus 0133292, or page 3 of that document.

12  A.  Okay.

13  Q.  The long paragraph underneath all the

14  bullet points says:  EPlus Systems Inc. and EPlus

15  Content Services Inc. were incorporated on May 15,

16  2001, and are the entities that hold certain assets

17  and liabilities acquired from ProcureNet Inc.

18  Do you see where it says that?

19  A.  Yes.

20  Q.  Is it your understanding that EPlus

21  Systems Inc. and EPlus Content Services Inc. are the

22  entities that were created when ePlus acquired

23  ProcureNet?

24  A.  Yes.

25  Q.  So going back to Lawson exhibit 84, other

100

1  assets, goodwill.

2  MR. STRAPP:  Which one is 84?

3  MS. HUGHEY:  ePlus 0091349, ePlus content

4  services Inc. balance sheet, fiscal year 2002.

5  BY MS. HUGHEY:

6  Q.  Do you see where it says, other assets,

7  goodwill?

8  A.  Yes.

9  Q.  Is it your understanding that that 312,000

10  dollars is the goodwill associated with ePlus's

11  acquisition of ProcureNet?

12  A.  I just said I'm not sure if that is other

13  assets and goodwill or just the goodwill.  I'm not

14  sure, don't have the detail.

15  Q.  The line below that says, assembled work

16  force, and it shows a value of 154,000 dollars.

17  Do you see that?

18  A.  Yes.

19  Q.  Is it your understanding that the value of

20  the assembled work force is from ePlus's acquisition

21  of ProcureNet?

22  MR. STRAPP:  Objection, form.

23  A.  It is the assembled work force associated

24  with the folks who went into content services.

25  BY MS. HUGHEY:

Mencarini - 30(b)(6), Steven John  5/26/2010  12:00:00 PM

101

1    Q.   And content services was -- ePlus
2    content -- strike that.
3         And is it correct that ePlus content
4    services was created from ePlus's acquisition of
5    ProcureNet?
6    A.   They were created to hold the assets that
7    were acquired.
8    Q.   So is my statement accurate?
9    A.   I'm not sure.  I don't -- ask your
10   question again and I'll answer.
11        I'm sorry.
12   Q.   Okay.  Is it accurate that the assembled
13   work force shown on EPlus Content Services Inc.'s
14   fiscal year 2002 balance sheet of 154,000 dollars is
15   from ePlus's acquisition of ProcureNet?
16   A.   It is from the acquisition from
17   ProcureNet, the part of which went into content
18   services.
19            (Lawson Exhibit No. 85
20            was marked for
21            identification.)
22   BY MS. HUGHEY:
23   Q.   Mr. Mencarini, you've been handed what's
24   been marked as Lawson's exhibit 85, ePlus 0091352 to
25   354.

103

1    Q.   And again, was this document prepared with
2    the same level of accuracy and validity as the data
3    shown in ePlus's 10-Ks?
4    A.   Yes.
5            (Lawson Exhibit No. 87
6            was marked for
7            identification.)
8    BY MS. HUGHEY:
9    Q.   Mr. Mencarini, you've been handed what's
10   been marked as Lawson exhibit 87, ePlus 0091359 to
11   362.
12        What is this document?
13   A.   It's the balance sheet as of June 30th,
14   2004.
15   Q.   How is exhibit 87 different from exhibit
16   86?
17   A.   It's for a different period.  It's a
18   subsequent -- 3 months later.
19            (Lawson Exhibit No. 88
20            was marked for
21            identification.)
22   BY MS. HUGHEY:
23   Q.   Mr. Mencarini, you've been handed what's
24   been marked as Lawson exhibit 88, ePlus 0091390 to
25   0091394.

102

1         What is this document?
2    A.   It's a balance sheet of ePlus content
3    services as of March 31st, 2003.
4    Q.   Is this the same as Lawson exhibit 84,
5    just with the next fiscal year?
6    A.   Yes.
7    Q.   And again, was this prepared with the same
8    level of accuracy and validity as the data shown in
9    ePlus's 10-Ks?
10   A.   Yes.
11            (Lawson Exhibit No. 86
12            was marked for
13            identification.)
14   BY MS. HUGHEY:
15   Q.   Mr. Mencarini, you've been handed what's
16   been marked as Lawson exhibit 86, ePlus 0091355 to
17   358.
18        What is this document?
19   A.   The balance sheet of content services for
20   the 12 months ended March 31st, 2004.
21   Q.   Is this the same document as we already
22   talked about with Lawson exhibit 84 and 85, just with
23   the next fiscal year?
24   A.   It's not the same document.  It's the same
25   balance sheet, same form, same template.

104

1         What is this document?
2    A.   It's the balance sheet of ePlus systems as
3    of March 31st, 2003.
4    Q.   And is it accurate to say that this
5    document also shows ePlus systems balance sheet for
6    2002, fiscal year 2002?
7    A.   It says it does, yes.  It says, prior
8    year-to-date.
9    Q.   And that refers to fiscal year 2002?
10   A.   Yes.
11   Q.   Was this document prepared using the same
12   accounting principles as the documents you and I have
13   already discussed?
14   A.   Yes.
15   Q.   Does it have the same level of accuracy
16   and validity as the documents we've already
17   discussed?
18   A.   Yes.
19   Q.   Referring to the PP and E software, do you
20   see that it says, for prior YTDs.
21        That must be fiscal year 2002?
22   A.   Right.
23   Q.   33,000 dollars, do you see that?
24   A.   Yes.
25   Q.   Again, what is PP and E software?

105

1      MR. STRAPP:  Objection, asked and
2   answered.
3      A.   PP and E means property, plant, and
4   equipment.  It's a generic term for accounting.
5      BY MS. HUGHEY:
6      Q.   Is the same PP and E software that we
7   previously discussed with respect to ePlus content
8   services, exhibit 84?
9      A.   It's the same line item, correct.
10      Q.   Do you see below that where it says, PP
11   and E software development?
12      A.   Yes.
13      Q.   What is that?
14      A.   That would be capitalized costs for
15   software.
16      Q.   Is that software sold to third parties?
17      A.   Yes.
18      Q.   Do you see down below where it says, net
19   property and equipment, other assets, security
20   deposit?
21      A.   Yes.
22      Q.   What is that?
23      A.   Security deposit?
24      It's probably a rental.
25      Q.   What about the line below that, other

106

1   assets, goodwill?
2      A.   That's the goodwill from the original
3   purchase.
4      Q.   Are you referring to the purchase of
5   ProcureNet?
6      A.   Yes.
7      Q.   Okay.  And, assembled work force, below
8   that, is that again the assembled work force from the
9   acquisition of ProcureNet?
10      A.   Yes.
11      (Lawson Exhibit No. 89
12      was marked for
13      identification.)
14      BY MS. HUGHEY:
15      Q.   Mr. Mencarini, you've been handed what's
16   been marked as Lawson exhibit 89, ePlus 0091395 to
17   0091399.
18      What is this document?
19      A.   It's the ePlus systems balance sheet for
20   March 31st, 2004.
21      Q.   Is this the same type of document that we
22   just discussed with respect to exhibit 88, just with
23   the next fiscal year?
24      A.   Yes.
25      (Lawson Exhibit No. 90

107

1      was marked for
2      identification.)
3      BY MS. HUGHEY:
4      Q.   Mr. Mencarini, you've been handed what's
5   been marked as Lawson exhibit 90, ePlus 0091400 to
6   404.
7      What is this document?
8      A.   It is the ePlus balance sheet for ePlus
9   systems as of June 30th, 2004.
10      Q.   Is this the same type of document we
11   discussed with respect to exhibit 88 and 89, just
12   with the updated fiscal year?
13      A.   It's not an updated fiscal year.  It's 3
14   months subsequent to the prior fiscal year.
15      Q.   I apologize.
16      Is this the same document as exhibit --
17      A.   Yes.
18      Q.   Okay.
19      MS. HUGHEY:  I think this would be a good
20   time for a break.
21      MR. STRAPP:  You want to break for lunch
22   now?
23      MS. HUGHEY:  Yeah.
24      MR. STRAPP:  Do you know if it's going to
25   be brought in or should we head out?

108

1      MS. HUGHEY:  We can go off the record.
2      THE VIDEOGRAPHER:  We're going off the
3   record.  This is the end of number 3.  The time is
4   now 12:25 PM.
5      (Whereupon, at 12:25 p.m., the deposition
6   in the above-entitled matter was recessed, to
7   reconvene at 1:29 p.m., this same day.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

109

1    AFTERNOON SESSION
2         (1:29 p.m.)
3
4    Whereupon,
5         STEVEN JOHN MENCARINI,
6    the witness testifying at the time of recess, having
7    been previously duly sworn, was further examined and
8    testified further as follows:
9
10        THE VIDEOGRAPHER:  We're now back on the
11   record.
12        This is the beginning of videotape number
13   4 in the deposition of Mr. Steven Mencarini.  The
14   time is now 1:29 PM.  You may proceed.
15
16   EXAMINATION BY COUNSEL FOR DEFENDANT (RESUMED)
17   BY MS. HUGHEY:
18   Q.  Good afternoon, Mr. Mencarini.
19        Before the break, we were talking about
20   EPlus Systems Inc. and ePlus Content Services Inc.?
21        Do you remember that?
22   A.  Yes.
23   Q.  Is it your understanding that ePlus's
24   procurement products -- strike that.
25        Is it your understanding that the revenues

110

1    for ePlus's procurement products would be included in
2    EPlus Systems Inc. and EPlus Content Services Inc.
3    and no other companies?
4    A.  Again, ePlus technology had some Cy Biz --
5    Cy Biz-related fee income, but all the revenue from
6    procurement -- Procure Plus or Content Plus are in
7    ePlus Procure Plus and content -- ePlus systems and
8    ePlus content.
9    Q.  Okay.  So directing your attention back to
10   exhibits 77 and 80, could you please grab those for
11   me.  I direct your attention to ePlus content
12   services income statement, which is Lawson exhibit
13   77, page ePlus 0091338.
14   A.  Okay.
15   Q.  Can you confirm for me that the net sales
16   for ePlus content services for fiscal year 2002 was
17   320,000 dollars?
18   A.  Yes.
19   Q.  And with respect to EPlus Systems Inc.,
20   the income statement that's been marked exhibit 80,
21   can you please confirm for me that in fiscal year
22   2002, EPlus Systems Inc.'s total revenues were 2.23
23   million dollars?
24   A.  Yes.
25   Q.  Is it your understanding that these 2

111

1    numbers combined would be the total revenues for
2    fiscal year 2002 for ePlus's Content Plus and Procure
3    Plus products?
4    A.  Yes.
5    Q.  And just verify for me that that total
6    amount would be somewhere around 2.5 million dollars,
7    just over 2.5 million dollars?
8    A.  That's adding the 3 3 and the 2 2?
9    Q.  That's right.
10   A.  Yes.
11   Q.  And with respect to exhibits 81 and 78 --
12   exhibit 78 is ePlus content services income statement
13   for fiscal year 2003.
14        Can you please verify for me on ePlus
15   0091332 that the net sales are 788,000 dollars?
16   A.  Yes.
17   Q.  And can you confirm for me that for EPlus
18   Systems Inc., the income statement for fiscal year
19   2003, that the total revenue for EPlus Systems Inc.
20   is 1.898 million dollars?
21   A.  Yes.
22   Q.  And again, is it your understanding that
23   for fiscal year 2003, these are the only revenues for
24   ePlus's Content Plus and Procure Plus products?
25   A.  Yes.

112

1    Q.  Okay.  And again, just doing the math for
2    me, that would be approximately 1.9 plus 800,000
3    dollars, so just under 2.7 million dollars?
4    A.  Yes.
5    Q.  For fiscal year 2003.
6        And with respect to exhibits 79 and 82,
7    can you please confirm for me that ePlus content
8    services had net sales of 919,000 dollars in fiscal
9    year 2004?
10        That's exhibit 79, ePlus 0091344.
11   A.  What was the number again?
12   Q.  Exhibit 79, and the page ending 344.
13        My question again is:  Please confirm for
14   me that ePlus content services' net sales for fiscal
15   year 2004 was 919,000 dollars.
16   A.  Yes.
17   Q.  And with respect to exhibit 82, can you
18   please confirm for me that EPlus Systems Inc. total
19   revenue in fiscal year 2004 is 3.29 million dollars?
20   A.  Yes.
21   Q.  And so again, is it your understanding
22   that these 2 revenues would be the total revenues for
23   ePlus's Content Plus and Procure Plus products?
24   A.  Yes.
25   Q.  And again, that's approximately 4 million

Mencarini - 30(b)(6), Steven John  5/26/2010  12:00:00 PM

113

1  dollars; is that correct?
2      A.   Yes.
3      Q.   Can you please turn to ePlus's 2002 annual
4  report that's been marked as Lawson exhibit 65.  And
5  please turn to page F 34, which is marked ePlus
6  0013368.
7      Are you there?
8      A.   What was the page again?
9      Q.   Yes.  It's page F 34.
10     A.   Okay.
11     Q.   You previously confirmed for me that the
12  revenues for fiscal year 2004 for ePlus content
13  services and EPlus Systems Inc., which would include
14  ePlus's procurement products, were -- I'm sorry
15  -- 2002 -- strike that.
16     You previously confirmed for me that in
17  fiscal year 2004, ePlus's revenue for ePlus content
18  services and EPlus Systems Inc. was approximately 2.5
19  million dollars.
20     Do you remember that?
21     A.   When we added the 2 companies up?
22     Q.   Yes.
23     A.   Okay.  I remember that.
24     Q.   And you confirmed for me that that revenue
25  stream, that 2.5 million dollars for fiscal year 2002

114

1  was the entire revenue for ePlus's Content Plus and
2  Procure Plus products.
3      Correct?
4      A.   Yes.
5      Q.   Can you confirm for me that that 2.5
6  million dollars is less than 1 percent of ePlus's
7  total revenues per its 2002 10-K?
8      A.   No, it would be more than 1 percent --
9      Q.   I'm sorry.
10     A.   -- not less than 1 percent.
11     Q.   Less than 1 percent?
12     A.   Between 1 and 2 percent.
13     Q.   So confirm for me that it's less than 2
14  percent?
15     A.   Less than 2 percent.  Correct.
16     Q.   And just to be clear because I may have
17  mucked that up a bit.
18     I'm going to ask you to confirm for me
19  that ePlus's revenues for its Procure Plus and
20  Content Plus products was less than 2 percent of
21  ePlus's total revenues in fiscal year 2002.
22     A.   Correct.
23     Q.   And just for clarity, can you confirm for
24  me that ePlus's total revenues in fiscal year 2004
25  were --

115

1      A.   2 or two thousand --
2      Q.   I'm sorry.  Strike that.
3      Please confirm for me that ePlus's total
4  revenues in fiscal year 2002 were 264 million
5  dollars.
6      A.   You have two thou-- year 2000 is 264.
7      You want a number at the bottom of the
8  page?
9      204 million.
10     Q.   Oh, I'm sorry.
11     MR. STRAPP:  If it's going to help
12  anything, we can again stipulate that the numbers in
13  the 10-Ks are accurate.
14     MS. HUGHEY:  Okay.  Thank you, Michael.
15     BY MS. HUGHEY:
16     Q.   I'm going to ask you one time, and then
17  I'm going to put this document away, Mr. Mencari
18  (sic).
19     A.   It's okay.
20     Q.   I apologize.
21     Can you please confirm for me that in
22  fiscal year 2002, ePlus's revenues were 204 million
23  dollars.
24     A.   Yes.
25     Q.   Thank you.

116

1      And one last question:  Can you confirm
2  for me that the 2.5 million dollars for ePlus systems
3  and ePlus content services is included in that 204
4  million dollars?
5      A.   Yes.
6      Q.   Can you please turn to ePlus 0133304 of
7  ePlus's 2002 annual report and 10-K.  That's page 14.
8      Is it your understanding that ePlus
9  acquired ProcureNet on May 15, 2001?
10     A.   Yes.
11     Q.   Can you turn to page F 17 of the same
12  document, ePlus 0133351.
13     A.   Yes.
14     Q.   Do you see that there was an increase in
15  goodwill during the period from 2001 to 2002?
16     A.   Yes.
17     Q.   Is it your understanding that some portion
18  of this goodwill would be attributed to the
19  acquisition of ProcureNet?
20     A.   Yes.
21     Q.   Can you turn to page F 21, which is ePlus
22  0133355.
23     Do you see where it says, property and
24  equipment down -- maybe the third point says,
25  capitalized software?

Mencarini - 30(b)(6), Steven John  5/26/2010  12:00:00 PM

117

1    A.  Yes.
2    Q.  Do you see the capitalized software
3  increased from 2001 to 2002?
4    A.  Yes.
5    Q.  Is it your understanding that some portion
6  of this increase would be from the acquisition of
7  ProcureNet?
8    A.  I'm not sure.  I think it could be, but
9  I'm not sure.
10    Q.  I'm going to hand you what's been
11  previously marked as Lawson exhibit 58, Lawson
12  exhibit 61.
13    MR. STRAPP:  Objection before you begin
14  even asking about this.
15    We've already had a 30(b)(6) designee
16  testify about valuations of the patents-in-suit,
17  which is topic 20.  Mr. Farber testified about that
18  last week.
19    So you can ask Mr. Mencarini questions if
20  you like, but it's in his individual capacity that
21  he'll be providing testimony, not as a corporate
22  representative of ePlus.
23    MS. HUGHEY:  Lawson agrees that ePlus has
24  already presented a witness on topic 20, any
25  valuations of the patents-in-suit.  Lawson's

118

1  understanding is that Mr. Mencari (sic) has been
2  designated on --
3    MR. STRAPP:  Mencarini.
4    MS. HUGHEY:  -- Mr. Mencarini has been
5  designated on topic 23, which relates to all facts
6  and circumstances relating to ePlus's past, current,
7  and projected costs, fees, revenues, profits, and/or
8  losses from its operations by product for ePlus's
9  electronic procurement software and services,
10  including implementation, installation, training,
11  support, and maintenance services and the licensing
12  and contract terms, revenue generated and discounts
13  provided for each customer when ePlus began marketing
14  and licensing such software, and the features
15  functions, and use of the licensed software and
16  services.
17    To the extent that you have a specific
18  objection that a question falls into category 20 or
19  another category, please let me know.
20    MR. STRAPP:  Okay.
21    BY MS. HUGHEY:
22    Q.  Okay.  Mr. Mencarini, I've handed you what
23  has previously been marked as Lawson exhibit 58, 61,
24  and 62.  I'm going to represent to you that my
25  understanding is these documents go together.

119

1    Can you tell me what these documents are?
2    MR. STRAPP:  Objection, beyond the scope.
3    MS. HUGHEY:  To the extent that any
4  questions that I ask fall within topic 23, those
5  would be within the scope.
6    (Pause.)
7    A.  Okay.  Look at these next 2.
8    Hold on.
9    (Pause.)
10    A.  Okay.  I'm sorry.
11    BY MS. HUGHEY:
12    Q.  Mr. Mencarini, is it your understanding
13  that this document was prepared as part of an
14  accounting for the acquisition of ProcureNet?
15    A.  Yes.
16    Q.  Is it your understanding that it would
17  have been reviewed by independent auditors?
18    MR. STRAPP:  Objection, beyond the scope.
19  It falls within topic 21 and topic twenty- --
20    MS. HUGHEY:  Sorry?
21    MR. STRAPP:  I said, it falls within
22  topics 21 and -- which has already been testified to
23  by Mr. Farber.
24    MS. HUGHEY:  These topics do not go to --
25  these questions don't go to valuation.

120

1    BY MS. HUGHEY:
2    Q.  Mr. Mencari (sic), to be clear, my
3  question is, is it your understanding that
4  independent auditors would have looked at this
5  document?
6    A.  Would have or have looked?
7    Q.  Would have.
8    A.  I don't know exactly what our auditors
9  would have looked at, but we prepared this analysis
10  to support our entries into our general ledger.
11    Q.  And that information would have been
12  included in your 10-K as well; is that correct?
13    A.  What information?
14    Q.  For example, the numbers on this
15  document -- I'm going to direct your attention to
16  Lawson exhibit 58, which is ePlus 0135341.  It shows
17  cash of 1 million dollars, stock of ePlus of 3.8
18  million dollars, and assumption of liabilities of 1.3
19  million dollars.
20    Do you see that?
21    A.  Yes.
22    Q.  Would those numbers have been included in
23  ePlus's 10-K?
24    A.  I think they were, yes.
25    Q.  Okay.  Can you please direct your

ePlus - Perfect Commerce (Lawson)          Unsigned          Page  117 - 120

Mencarini - 30(b)(6), Steven John  5/26/2010  12:00:00 PM

121

1  attention to ePlus's 2002 annual report and 10-K,
2  which is Lawson exhibit 65.  And turn to page 4,
3  which is ePlus 0133293.
4      A.   Yes.
5      Q.   Do you see the third point down, the May
6  15, 2001?
7      A.   Yes.
8      Q.   So to be clear, do you see that the cash
9  of 1 million dollars is shown on that page of the
10  10-K?
11      A.   Yes.
12      Q.   And do you see that the stock of ePlus of
13  3.8 million dollars is shown on that 10-K?
14      A.   Yes.
15      Q.   And do you show that the 422,000 shares of
16  stock is shown on that page?
17      A.   Yes.
18      Q.   So is it your understanding that this
19  document was prepared to provide an accounting of the
20  allocation of the purchase price of the ProcureNet
21  company?
22          MR. STRAPP:  Objection, calls for
23  speculation, beyond the scope.
24      A.   It's been 8 years, but I imagine it was.
25          BY MS. HUGHEY:

122

1      Q.   Okay.  Can you confirm for me that the
2  analysis that was done to come up with these numbers
3  is accurate?
4          MR. STRAPP:  Same objection.
5      A.   Can I confirm that it's accurate?
6          BY MS. HUGHEY:
7      Q.   Let me strike that question.
8          Can you confirm for me that the numbers in
9  Lawson exhibit 58, the ePlus acquisition of
10  Structured Computer Services and SourceSys Inc., are
11  included in ePlus's 10-K?
12          MR. STRAPP:  Objection, form.
13      A.   Again, are you -- ask it one more time and
14  I'll try to understand what you're asking.
15          I'm sorry.
16      Q.   Fair enough.
17          Can you please confirm for me that the
18  information in Lawson exhibit 58, the valuation
19  methodologies and valuations, are included in ePlus's
20  2002 10-K?
21      A.   Some of the data is, yes.  It's obvious
22  right there and right there.  We just -- you just
23  asked about it.
24      Q.   Can you confirm for me that the
25  information that Lawson puts in its 10-Ks is done

123

1  with accuracy and thought?
2          MR. STRAPP:  Objection, asked and
3  answered.
4          We've been over this for multiple 10-Ks.
5  So go ahead and answer.
6      A.   You used the word Lawson again, so --
7          BY MS. HUGHEY:
8      Q.   I'm sorry.  Let me --
9      A.   -- ask the question again.
10      Q.   I apologize.
11          Can you please confirm for me that ePlus
12  prepares its 10-Ks with the intention of the
13  information in them being accurate.
14          MR. STRAPP:  Objection, asked and
15  answered.  It's getting to the point of badgering the
16  witness.
17          THE WITNESS:  Yeah.  I agree.
18      A.   Yes.
19          BY MS. HUGHEY:
20      Q.   Can you please turn to page 4 of this
21  Lawson exhibit 58, ePlus 0135344.
22      A.   I'm sorry.  Mine are cut off.
23          What page is it?
24          MR. STRAPP:  Page 44.
25      A.   Okay.

124

1          BY MS. HUGHEY:
2      Q.   Do you see where it says, the top
3  paragraph:  It is estimated by ePlus management that
4  this software as it exists today will have a useful
5  economic life of 3 years before it undergoes either
6  substantial modifications and improvement or is
7  completely rewritten from scratch to meet the future
8  customer needs and to keep pace with rapid changes in
9  hardware and software technology?
10      A.   Yes, I see that.
11      Q.   Was that your understanding that -- strike
12  that.
13          Is it your understanding that this
14  statement was accurate at the time ePlus prepared
15  this document?
16      A.   At the time, that's what was put in this
17  report.
18      Q.   So it's your understanding that that's
19  accurate?
20      A.   Correct.
21      Q.   Can you turn to Lawson exhibit 62, which
22  is an exhibit of the document we were just speaking
23  about, Lawson 58.  And please turn to exhibit 7,
24  which starts on ePlus 0135348.
25      A.   I'm sorry.  Exhibit 62?

Mencarini - 30(b)(6), Steven John  5/26/2010  12:00:00 PM

125

1    Q.   Yes.
2        MR. STRAPP:  Second page of exhibit 62.
3    A.   Oh, mine is out of order.
4        BY MS. HUGHEY:
5    Q.   Can you please confirm for me on this page
6    ePlus 0135348 that it is a valuzation -- valua- -- I
7    can't say that word -- valuation of capitalized
8    software for the acquisition of Structured Computer
9    Services and SourceSys?
10   A.   Yes.
11   Q.   Can you confirm for me that year 1 would
12   have been Lawson's fiscal year 2002?
13   A.   Not Lawson's.
14   Q.   I'm sorry.
15       Can you confirm for me that year 1 would
16   have been ePlus's fiscal year 2002?
17   A.   This would be a calendar year or a
18   12-month period estimation, not a particular fiscal
19   year.
20   Q.   So would that have been a 12-month --
21   would year 1 have been a 12-month period starting on
22   January 1, 2002?
23   A.   I can only speculate.  I don't know the
24   exact date of this paper.  It's not dated.
25   Q.   Oh.

126

1        MR. STRAPP:  I'm going to object to this
2    line of questioning as beyond the scope of the
3    30(b)(6) topic.
4        MS. HUGHEY:  The category right below
5    talks about total revenues, and this witness has been
6    designated to talk about revenues.
7        MR. STRAPP:  For ePlus.  These are
8    revenues projected for ProcureNet, and we already had
9    a witness to come and talk about ProcureNet.  21,
10   this topic 21, is ProcureNet assets.
11       MS. HUGHEY:  Yeah.  So topic 23 talks
12   about -- I'm going to abbreviate because I know you
13   already are well aware of it -- facts and
14   circumstances relating to ePlus's past, current, and
15   projected cost, fees, and revenues.
16       MR. STRAPP:  Right, but 21 talks about
17   valuation of the purchase of assets from ProcureNet,
18   which is exactly what this document is.  In fact
19   it's capitalized.  It's titled, valuation of
20   capitalized software that's being purchased by
21   ProcureNet.
22       Mr. Farber was here last week.  I know you
23   weren't here.  And Mr. McDonald asked him a few
24   hours' worth of questions about these topics, so
25   you're free to ask Mr. Mencarini about it.  I just

127

1    want to make the point that we've already had a
2    30(b)(6) witness testify about it and that he's
3    testifying in his individual capacity about this.
4        MS. HUGHEY:  These numbers are used in
5    ePlus's financial documents that Mr. Mencarini had
6    control over and are under the topic 23.
7        MR. STRAPP:  You can ask him about
8    ePlus's financial documents, but this is a valuation
9    of the assets that are being purchased from
10   ProcureNet.
11       MS. HUGHEY:  Well, we can disagree.
12       MR. STRAPP:  Okay.
13       MS. HUGHEY:  Okay.
14       BY MS. HUGHEY:
15   Q.   Mr. Mencarini, can you please confirm for
16   me that the ePlus acquisition was -- you already
17   confirmed this for me, that ePlus acquisition
18   occurred on May 15, 2001, so would year 1 have
19   started on May 15, 2001?
20   A.   For this report, for this valuation, I'll
21   say yes.
22   Q.   Okay.  So is it your understanding
23   that ePlus expected to make revenues of 5.1
24   million dollars from May 15, 2001, to May 15,
25   2002?

128

1    A.   That's what this projection shows,
2    correct.
3    Q.   Okay.  Is it your understanding that ePlus
4    expected to make revenues of 6.1 million dollars from
5    May 15, 2002, to 2003?
6    A.   Let's back up.
7        Your question -- you're taking a number
8    off of valuation estimate and saying that is a
9    projection.  I'm saying this is a projection for a
10   valuation.  We didn't have a true understanding of
11   of exactly the real world.  This is a projection, and
12   that's all it is.
13   Q.   Okay.
14   A.   An accounting projection.
15   Q.   So can you confirm for me that ePlus
16   projected revenues of 6.1 million dollars for May
17   15, 2002, to 2003?
18   A.   For the valuation of this capitalized
19   software in that context only.
20   Q.   And can you confirm for me that ePlus
21   projected revenues of 7.49 million dollars for May
22   15, 2003, to 2004?
23   A.   Yes.
24       (Lawson Exhibit No. 91
25       was marked for

Mencarini - 30(b)(6), Steven John  5/26/2010  12:00:00 PM

129

1           identification.)
2       BY MS. HUGHEY:
3       Q.   Mr. Mencarini, I've handed you
4   what's been marked as Lawson exhibit 91 entitled,
5   ePlus 0942131.
6       What is this document?
7       A.   I'm going to have to take a couple minutes
8   to read it.
9       (Pause.)
10      A.   I'm not sure exactly what this document
11  is.
12      BY MS. HUGHEY:
13      Q.   Do you remember testifying earlier that
14  ePlus had the ability to break out revenues by
15  customer?
16      A.   Yes.
17      Q.   Is this the kind of document that ePlus
18  would create if it were going to break out revenues
19  by customer?
20      A.   Yes.
21      Q.   Mr. Mencarini, can I turn your attention
22  to the exhibit marked Lawson 58 -- I apologize --
23  Lawson exhibit 62.
24      A.   Okay.
25      Q.   Can you please turn to page ePlus

130

1   0135348.
2       A.   Okay.
3       Q.   Do you see at the bottom of the page where
4   it says, PV?
5       A.   348?
6       Q.   Correct.
7       A.   I got you.
8       Q.   Do you see where it says at the bottom of
9   the page, PV?
10      A.   Right.
11      Q.   1 million -- 1,075,202?
12      A.   Yes.
13      Q.   What is that?
14      A.   That's the present value of the above 3
15  cash flows at 18 percent.
16      Q.   Can you please turn to Lawson exhibit 88.
17  It would be the ePlus systems balance sheet for
18  fiscal year 2003.
19      MR. STRAPP:  What's the Bates number on
20  that?
21      MS. HUGHEY:  ePlus 0091390.
22      BY MS. HUGHEY:
23      Q.   Do you see the heading, PP and E
24  software development, in about the middle of the
25  page?

131

1       A.   Yes.
2       Q.   Do you see where it says, prior Y 2 D,
3   which is fiscal year 2002?
4       A.   M-hm.
5       Q.   Do you see that it says, 1,075,000?
6       A.   Yes.
7       Q.   Is this PPE software development for
8   fiscal year 2002 on EPlus Systems Inc.'s balance
9   sheet the same 1,075,000 included in the ePlus
10  acquisition of Structured Computer Services and
11  SourceSys?
12      A.   You lost me.
13      MR. STRAPP:  Do you mean 1 million 75
14  202?
15      MS. HUGHEY:  Yes.
16      MR. STRAPP:  Because those 2 numbers
17  are different.  The way you said it, they were the
18  same.
19      MS. HUGHEY:  Got it.
20      BY MS. HUGHEY:
21      Q.   Is the number referenced in EPlus Systems
22  Inc.'s balance sheet fiscal year 2002 under PP and E
23  software development the same as the number on
24  exhibit 7, valuation of capitalized software?
25      A.   The one -- I'm not sure.  I think it is.

132

1   It looks very similar.  But I don't have the buildup
2   of this one.  It looks like in the next year it's
3   been remapped to software and that development was a
4   new code, so I don't have the detailed balance sheet
5   that creates this.  I mean, this is the rollup
6   balance sheet.  Something must have been reclassified
7   or remapped within this.
8       Q.   Do you have any -- strike that.
9       Where would ePlus have taken into account
10  that 1,775,202 on its balance sheet?
11      A.   As I said before, it's either up here in
12  property and equipment or in other assets, slash,
13  goodwill.  I don't have the detail with me to pull
14  that out.  This is 8 years ago.
15      Q.   But you'll agree with me that it's pretty
16  coincidental that those numbers are virtually the
17  same?
18      MR. STRAPP:  Objection, calls for
19  speculation, argumentative.
20      A.   Very similar numbers.
21      MS. HUGHEY:  I think I'd like to take a
22  5-minute break just to make sure I don't have any
23  other questions.
24      MR. STRAPP:  Okay.
25      THE VIDEOGRAPHER:  We're going off the

Mencarini - 30(b)(6), Steven John  5/26/2010  12:00:00 PM

133

1 record.  The time is 2:06 PM.
2       (Recess.)
3             (Lawson Exhibit Nos. 92-94
4       were marked for
5       identification.)
6       THE VIDEOGRAPHER:  We're now back
7 on the record.  The time is now 2:13 PM.  You may
8 proceed.
9       BY MS. HUGHEY:
10      Q.   Mr. Mencarini, you've been handed what's
11 been marked as Lawson exhibit 92, which is ePlus's
12 10-K for 2008, Lawson exhibit 93, which is ePlus's
13 10-K for 2007, and Lawson's exhibit 94, which is
14 ePlus's 10-K for 2004.
15      Do you see those documents?
16      A.   Yes.
17      Q.   Is it your understanding as we've already
18 discussed those documents are accurate?
19      A.   Yes.
20      MS. HUGHEY:  I have no further
21 questions.
22      MR. STRAPP:  I have no questions.
23      THE VIDEOGRAPHER:  This concludes the
24 deposition of Mr. Steven Mencarini.  The time is
25 now 2:14 PM.  The number of videotapes used were

134

1 4.
2       Thank you.
3       (Whereupon, at 2:14 p.m., the taking of
4 the instant deposition ceased.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

135

1       CERTIFICATE OF DEPONENT
2 I hereby certify that I have read and examined the
3 foregoing transcript, and the same is a true and
4 accurate record of the testimony given by me.
5 Any additions or corrections that I feel are
6 necessary, I will attach on a separate sheet of
7 paper to the original transcript.
8
9
10      _____
11            Signature of Deponent
12
13 I hereby certify that the individual representing
14 himself/herself to be the above-named individual,
15 appeared before me this _____ day of _____,
16 2010, and executed the above certificate in my
17 presence.
18
19
20      _____
21      NOTARY PUBLIC IN AND FOR
22
23      _____
24            County Name
25 MY COMMISSION EXPIRES:

136

1       CERTIFICATE OF COURT REPORTER
2 COMMONWEALTH OF VIRGINIA     )
3 COUNTY OF ARLINGTON          )
4       I, CHERYL A. LORD, the reporter before
5 whom the foregoing deposition was taken, do hereby
6 certify that the witness whose testimony appears in
7 the foregoing deposition was sworn by me; that the
8 testimony of said witness was taken by me in machine
9 shorthand and thereafter transcribed by
10 computer-aided transcription; that said deposition is
11 a true record of the testimony given by said witness;
12 that I am neither counsel for, related to, nor
13 employed by any of the parties to the action in which
14 this deposition was taken; and, further, that I am
15 not a relative or employee of any attorney or counsel
16 employed by the parties hereto, or financially or
17 otherwise interested in the outcome of this action.
18
19
20
21      CHERYL A. LORD
22      Notary Public in and for
23      the District of Columbia
24 My Commission expires April 30, 2011
25

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 9th day of August, 2010, I will electronically file the foregoing

**PLAINTIFF EPLUS'S OBJECTIONS TO DEFENDANT'S DEPOSITION DESIGNATIONS AND SUMMARY OF THE DEPOSITION OF DOUGLAS A. MOMYER AND COUNTER-DESIGNATIONS**

with the Clerk of Court using the CM/ECF system which will then send a notification of such filing (NEF) via email to the following:

Daniel McDonald, *pro hac vice*
William D. Schultz, *pro hac vice*
Rachel C. Hughey, *pro hac vice*
Joshua P. Graham, *pro hac vice*
Andrew Lagatta, *pro hac vice*
Merchant & Gould P.C.
3200 IDS Center
80 South Eighth Street
Minneapolis. MN 55402
Telephone: (612) 332-5300
Facsimile: (612) 332-9081
lawsonscrvicc@)merchantgould.com

Robert A. Angle (VSB# 37691)
Dabney J. Carr, IV (VSB #28679)
Troutman Sanders LLP
P.O. Box 1122
Richmond, VA  23218-1122
Telephone:  (804) 697-1238
Facsimile:  (804) 698-5119
robert.angle@troutmansanders.com
dabney.carr@troutmansanders.com

*Counsel for Defendant Lawson Software, Inc.*

_____/s/_____

David M. Young (VSB #35997)
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4000
Facsimile:  (202) 346-4444
dyoung@goodwinprocter.com