**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | | |
|---|---|---|
| *e*PLUS, INC., | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No. 3:09-CV-620 (REP)** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **LAWSON SOFTWARE, INC.,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF *e*PLUS INC.'S OBJECTIONS TO DEFENDANT'S
DESIGNATIONS AND SUMMARY OF THE DEPOSITION OF
<u>ROBERT KINROSS AND COUNTER-DESIGNATIONS</u>**

Plaintiff, *e*Plus, Inc. ("*e*Plus"), through counsel, hereby submits the following general and

specific objections to Defendant Lawson Software, Inc. ("Defendant's") Deposition

Designations and summary from the deposition of Robert Kinross and offers the following

counter-designations:

<u>**General Objections**</u>

1.      *e*Plus generally objects to the Kinross Designations as being inadmissible under

Fed. R. Civ. P. 32(a) on the grounds that Mr. Kinross is scheduled to appear as a live witness at

the trial in this matter.

2.      <u>Undue prejudice as to testimony concerning the IBM Technical Viewer/ 2</u>

<u>Software</u>.  Defendant solicited testimony as to whether the IBM Technical Viewer/2 ("TV/2")

software was in public use or on sale before the filing date of the patents-in-suit.  Defendant's

expert relies on alleged publications discussing the TV/2 software allegedly published before

1994.  In questioning Mr. Kinross, Defendant's counsel did not specify which version of the

TV/2 software the question referred to.  Testimony concerning versions of the TV/2 software

made after August 10, 1994 are irrelevant and unduly prejudicial since they suggest to the jury

that pre-August 10, 1994 versions of the TV/2 software contained the same functionality.

## Specific Objections

| Defendant's Designations | *e*Plus's Objections (designations) | *e*Plus's Objections (summary) |
|---|---|---|
| 6:3-11 | | |
| 6:15-25 | | |
| 9:15 – 10:9 | | |
| 12:9; 12:12-22 | | Summary is vague and ambiguous as to which RIMS system is referenced. |
| 13:6-8 | Vague and ambiguous as to which RIMS system is referenced (13:6-7). | Summary is vague and ambiguous as to which RIMS system is referenced. |
| 13:9-24 | Ex. 4 is an incomplete document. (FRE 106) | |
| 14:16 – 15:7 | | |
| 15:19-21 | 602 | |
| 15:22 – 16:3 | 602 | |
| 16:6 | 602 | |
| 16:8 – 17:14 | | |
| 17:15 – 18:3 | Vague and ambiguous as to which RIMS system is referenced. | Mischaracterizes testimony. (Witness did not state that the RIMS system ever implemented EDI.  He testified that he worked on a project to implement EDI, but he was not certain whether it was ever implemented for the RIMS system.) |
| 18:20 – 19:1 | 401/403 (version of RIMS); 602 | Mischaracterizes testimony. (Witness did not state that the RIMS system ever implemented EDI.  He testified that he worked on a project to implement EDI, but he was not certain whether it was ever implemented for the RIMS system.) |
| 19:15-20 | 401/403 (version of RIMS); 602 | Mischaracterizes testimony and vague and ambiguous as to version of RIMS system. |
| 20:12-17 | 401/403 (version of RIMS) | Mischaracterizes testimony |

| Defendant's Designations | *e*Plus's Objections (designations) | *e*Plus's Objections (summary) |
|---|---|---|
| | | (Mr. Kinross testified that the RIMS system was akin to a computer terminal) |
| 21:14-24 | | |
| 23:23 – 25:2 | 602; 701-702 (improper expert testimony); vague and ambiguous as to which RIMS system is referenced. | |
| 26:4-6 | 602; 701-702 (improper expert testimony) ; vague and ambiguous as to which RIMS system is referenced. | |
| 26:9-10 | 602; 701-702 (improper expert testimony) | Incomplete (Mr. Kinross testified that he did not know whether the RIMS system was prior art to the patents-in-suit (26:21 – 27:4; 27:6-14) |
| 27:22 – 31:23 | 401/403 (relevance, inadmissible attorney colloquy) | |
| 34:15-18 | 401/403 (version of RIMS) | Summary is vague and ambiguous as to version of the RIMS system. |
| 35:8-10 | 401/403 (relevance) | |
| 36:1-9 | 401/403 (relevance) | |
| 40:2-14 | 401/403 (version of RIMS) | Summary is vague and ambiguous as to version of the RIMS system. |
| 40:17 – 41:13 | 602 | |
| 42:8-24 | 602; questions are vague and ambiguous as to whether they are directed to some unspecified version of the RIMS system or to the system described in the '989 Patent. | |
| 43:23 – 44:1 | Vague and ambiguous as to whether questions are directed to some unspecified version of the RIMS system, or to the system described in the '989 Patent; misleading.  Also, FRE 602. | |
| 44:2 – 45:8 | Vague and ambiguous as to whether questions are directed to some unspecified version of the RIMS system, or to the system described in the '989 Patent; misleading.  Also, FRE 602. | Summary is incomplete.  Fails to summarize witness' testimony. |
| 45:17-21 | Vague and ambiguous as to whether | Summary is incomplete.  Fails |

3

LIBW/1755264.2

| Defendant's Designations | *e*Plus's Objections (designations) | *e*Plus's Objections (summary) |
|---|---|---|
| | questions are directed to some unspecified version of the RIMS system, or to the system described in the '989 Patent; misleading.  Also, FRE 602. | to summarize witness' testimony. |
| 46:22 – 47:1 | 401/403 (relevance); 602.  Vague and ambiguous as to whether questions are directed to some unspecified version of the RIMS system, or to the system described in the '989 Patent; misleading.  Also, FRE 602. | Summary is incomplete.  Fails to summarize witness' testimony. |
| 47:4-7 | 401/403 (relevance); 602.  Vague and ambiguous as to whether questions are directed to some unspecified version of the RIMS system, or to the system described in the '989 Patent; misleading.  Also, FRE 602. | Summary is incomplete.  Fails to summarize witness' testimony. |
| 47:9 – 49:24 | 401/403 (relevance); 602.  Vague and ambiguous as to whether questions are directed to some unspecified version of the RIMS system, or to the system described in the '989 Patent; misleading.  Also, FRE 602. | Summary is incomplete.  Fails to summarize witness' testimony. |
| 50:3 | | |
| 50:4-11 | 401/403 (relevance, version of RIMS) | Summary is incomplete.  Fails to summarize witness' testimony. |
| 50:14-15 | 401/403 (relevance, version of RIMS) | Summary is incomplete.  Fails to summarize witness' testimony. |
| 50:17 – 51:3 | 401/403 (relevance, version of RIMS) | Summary is incomplete.  Fails to summarize witness' testimony. |
| 51:4-18 | 401/403 (relevance, version of RIMS) | Summary is incomplete.  Fails to summarize witness' testimony. |
| 54:10 – 55:23 | 602 | Summary is incomplete.  Fails to summarize witness' testimony. |
| 58:5 – 59:4 | Improper questions; attorney merely reads from document and fails to pose question to witness | Summary is incomplete.  Fails to summarize witness' testimony. |
| 59:5-7 | 602 | Summary is incomplete.  Fails to summarize witness' |

| Defendant's Designations | *e*Plus's Objections (designations) | *e*Plus's Objections (summary) |
|---|---|---|
| | | testimony. |
| 59:10 – 60:9 | 701-702 (improper expert testimony); questions are also vague and ambiguous as to whether they related to some unspecified version of the RIMS system or to the system described in the '989 Patent; misleading. | Summary is incomplete. Fails to summarize witness' testimony. |
| 61:3-9 | | Summary is incomplete. Fails to summarize witness' testimony. |
| 61:14-21 | 602 | Summary is incomplete. Fails to summarize witness' testimony. |
| 65:11-13 | 602 | Summary is incomplete. Fails to summarize witness' testimony. |
| 65:18-19 | | Summary is incomplete. Fails to summarize witness' testimony. |
| 69:3-16; 69:19-20 | 401/403 (relevance); 602 | Summary is incomplete. Fails to summarize witness' testimony. |
| 70:11-18 | Questions are vague and ambiguous as to version of RIMS system referenced. | Summary is incomplete. Fails to summarize witness' testimony. |
| 70:19 – 71:9; 71:12-22 | 602 | Summary is incomplete. Fails to summarize witness' testimony. |
| 75:4-16 | 602 | Summary is incomplete. Fails to summarize witness' testimony. |
| 75:21 – 76:21 | 602 | Summary is incomplete. Fails to summarize witness' testimony. |
| 76:22 – 77:9; 77:11-16 | 602 | Summary is incomplete. Fails to summarize witness' testimony. |
| 77:18 – 78:7 | | Summary is incomplete. Fails to summarize witness' testimony. |
| 78:8-12 | | Mischaracterizes testimony. (The designated testimony does not relate to cross- |

5

| Defendant's Designations | *e*Plus's Objections (designations) | *e*Plus's Objections (summary) |
|---|---|---|
| | | reference tables.) |
| 78:24 – 79:17 | | Mischaracterizes testimony (Mr. Kinross did not testify about cross reference tables in the RIMS system as existed "at the end of 1992") |
| 79:18 – 81:17 | | Mischaracterizes testimony (Mr. Kinross did not testify about cross reference tables in the RIMS system as existed "at the end of 1992") |
| 83:3-14 | | Mischaracterizes testimony (Mr. Kinross did not testify about cross reference tables in the RIMS system as existed "at the end of 1992") |
| 83:15-19; 83:22-24 | 602; also vague and ambiguous as to version of RIMS system. | Summary is incomplete. Fails to summarize witness' testimony. |
| 84:1-23 | Vague and ambiguous as to version of RIMS system. | Summary is incomplete. Fails to summarize witness' testimony. |
| 84:24 – 85:4 | Vague and ambiguous as to version of RIMS system. | Summary is incomplete. Fails to summarize witness' testimony. |
| 85:5-8 | 401/403 (relevance); vague and ambiguous as to version of RIMS system. | Summary is incomplete. Fails to summarize witness' testimony. |
| 85:11-12 | 401/403 (relevance); vague and ambiguous as to version of RIMS system. | Summary is incomplete. Fails to summarize witness' testimony. |
| 85:18 – 86:20 | vague and ambiguous as to versions of RIMS | Summary is incomplete. Fails to summarize witness' testimony. |
| 88:22-24 | Vague and ambiguous as to version of RIMS | Summary is incomplete. Fails to summarize witness' testimony. |
| 89:3 | 611 (compound) | Summary is incomplete. Fails to summarize witness' testimony. |
| 92:1-11 | | Summary is incomplete. Fails to summarize witness' testimony. |
| 92:12-22 | Vague and ambiguous as to version of | Summary is incomplete. Fails |

| Defendant's Designations | *e*Plus's Objections (designations) | *e*Plus's Objections (summary) |
|---|---|---|
| | RIMS | to summarize witness' testimony. |
| 97:10-12 | | Summary is incomplete.  Fails to summarize witness' testimony. |
| 97:21 – 98:9 | | Summary is incomplete.  Fails to summarize witness' testimony. |
| 99:1-7 | | Summary is incomplete.  Fails to summarize witness' testimony. |
| 99:8-24 | Vague and ambiguous as to version of RIMS | Summary is incomplete.  Fails to summarize witness' testimony. |
| 99:25 – 100:2 | Vague and ambiguous (as to "inventory sourcing" and to version of RIMS); 602; 401/403 | |
| 100:7-10 | | Mischaracterizes testimony. (Designated testimony does not relate to the RIMS system.) |
| 101:6-14 | | |
| 101:20 – 102:7 | 401/403; vague and ambiguous as to version of RIMS. | Mischaracterizes testimony. (Designated testimony does not relate to the customer variable module.) |
| 102:8-15 | Vague and ambiguous as to version of RIMS | Vague and ambiguous as to version of RIMS. |
| 102:16 – 103:25 | Improper designation including attorney objection; vague and ambiguous as to version of RIMS system, misleading. | Mischaracterizes testimony. (The designation does not relate to "RIMS system and TV 250."  The witness testified that the RIMS system did not include catalog database 36, TV 250, shell 52, customer-specific databases were not included in the RIMS patent, and certain functions of REQI program were not included.) |
| 105:14 – 106:4 | Vague and ambiguous (as to Technical Viewer/2 product") | |
| 106:12 – 107:3 | | Incomplete summary.  Fails to summarize witness' testimony. |
| 107:15 – 108:12 | 1002/1004 | Incomplete summary.  Fails to summarize witness' testimony. |

7

| Defendant's Designations | *e*Plus's Objections (designations) | *e*Plus's Objections (summary) |
|---|---|---|
| 108:13-16 | 602 | Incomplete summary. Fails to summarize witness' testimony. |
| 108:19-21 | 602 | Incomplete summary. Fails to summarize witness' testimony. |
| 108:23-24 | 602 | Incomplete summary. Fails to summarize witness' testimony. |
| 110:14-19 | Vague and ambiguous as to time. | Mischaracterizes testimony. (The witness did not testify that the TV/2 product was used with the RIMS system.) |
| 111:11 – 112:3 | Vague and ambiguous (as to "communicate"); 401/403; 701-702 (improper expert testimony) | Mischaracterizes testimony. (The witness did not testify that TV/2 was used in the RIMS system. |
| 112:5-8 | 701-702 (improper expert testimony) | Mischaracterizes testimony. (The witness did not testify that TV/2 was used in the RIMS system. |
| 114:23-25 | 602 | Incomplete summary. Fails to summarize witness' testimony. |
| 115:3 | | |
| 115:5-7 | 401/403 (time); 602; 1002/1004 | Incomplete summary. Fails to summarize witness' testimony. |
| 116:1 – 117:6 | 401/403 (time); 602 | |
| 119:12 – 120:7 | | |
| 125:14 – 129:25 | 401/403; 602 | Incomplete summary. Fails to summarize witness' testimony. |
| 130:24 – 131:19 | | Mischaracterizes testimony (Mr. Kinross did not testify that IBM had "developed the super indexing" for the TV/2) |
| 133:10-17 | | Mischaracterizes testimony (Testimony is not limited to a RIMS side of the interface.) |
| 136:4-7 | 602; 701 | Mischaracterizes testimony (Testimony is not limited to a RIMS side of the interface.) |
| 137:11-14 | | Mischaracterizes testimony (Testimony is not limited to a RIMS side of the interface.) |
| 137:15-19 | | Mischaracterizes testimony (Testimony is not limited to a RIMS side of the interface.) |
| 140:8-14 | Vague and ambiguous (as to "relevant | Mischaracterizes testimony |

8

| Defendant's Designations | *e*Plus's Objections (designations) | *e*Plus's Objections (summary) |
|---|---|---|
| | to what we're talking about"); 401/403; 602 | (Designated testimony relates to building an order list in shell 52 using TV/2 and transmitting order list to RIMS system 40, as described in the '683 patent.) |
| 140:23 – 141:1 | | Mischaracterizes testimony (Designated testimony relates to building an order list in shell 52 using TV/2 and transmitting order list to RIMS system 40, as described in the '683 patent.) |
| 141:2-14 | Vague and ambiguous (as to "extraordinary"); 701-702 (improper expert testimony) | Incomplete summary. (Testimony relate to development of system described in '683 patent.) |
| 141:17-19 | Vague and ambiguous (as to "extraordinary"); 701-702 (improper expert testimony) | Incomplete summary. (Testimony relate to development of system described in '683 patent.) |
| 164:12-16 | 401/403 | |
| 165:5-10 | 401/403 | Incomplete summary. Fails to summarize witness' testimony. |
| 166:16-21 | 401/403 | Incomplete summary. Fails to summarize witness' testimony |
| 167:24 – 168:9 | 401/403 | Incomplete summary. Fails to summarize witness' testimony |
| 170:12-17 | 401/403 | |
| 171:9-15 | 602 | |
| 173:5-13 | | Mischaracterizes testimony. (Designated testimony does not relate to Mr. Kinross' '683 patent. It is a discussion of the '989 Patent.) |
| 173:14 – 174:4 | 401/403; 602 | Mischaracterizes testimony. (Testimony relates to the '989 Patent, rather than the RIMS system.) |
| 174:11 – 175:6; 175:9 | 602 | |
| 175:11-22; 175:25 | Vague and ambiguous (as to "which of those boxes, if any, the Part Master Table would be located locally"); 602 | Mischaracterizes testimony. (Testimony relates to the system of the '683 Patent |

| Defendant's Designations | *e*Plus's Objections (designations) | *e*Plus's Objections (summary) |
|---|---|---|
| 176:2-4 | 602 | Mischaracterizes testimony. (Testimony relates to the system of the '683 Patent |
| 176:19-24 | 602 | Mischaracterizes testimony. (Testimony relates to the system of the '683 Patent.) |
| 177:22 – 178:16 | | Incomplete summary. Fails to summarize witness' testimony. |
| 180:24 – 181:22 | 602, 701-702 (improper expert testimony) | Incomplete summary. Fails to summarize witness' testimony. |
| 181:25 – 182:2 | 602, 701-702 (improper expert testimony) | Incomplete summary. Fails to summarize witness' testimony. |
| 182:4-7 | 602, 701-702 (improper expert testimony) | Incomplete summary. Fails to summarize witness' testimony. |
| 182:10-16 | 602, 701-702 (improper expert testimony) | Incomplete summary. Fails to summarize witness' testimony. |
| 183:3 – 184:23 | Vague and ambiguous (as to "key features") | Incomplete summary. Fails to summarize witness' testimony. |
| 186:10-13 | 602, 701-702 (improper expert testimony) | Incomplete summary. Fails to summarize witness' testimony. |
| 186:16 | 602, 701-702 (improper expert testimony) | Incomplete summary. Fails to summarize witness' testimony. |
| 186:18 – 187:1 | 602, 701-702 (improper expert testimony) | Incomplete summary. Fails to summarize witness' testimony. |
| 188:23-25 | | |
| 189:4-22 | 602 | Incomplete summary. Fails to summarize witness' testimony. |
| 190:23 – 191:22 | 401/403; 602; 901 | |
| 202:3-5 | | |
| 205:25 – 206:8 | | Mischaracterizes testimony (Mr. Kinross testified that his knowledge was based on information gleaned from Mr. Johnson only as to whether "the system did not generate multiple purchase orders in that time frame") |
| 206:9-18 | Vague and ambiguous as to version of RIMS system. | Summary is vague and ambiguous as to version of RIMS system. |
| 207:6 – 208:13 | 401/403 | |

10

| *e*Plus's Counter-Designations |
| --- |
| 10:19 – 11:4 |
| 11:22 – 12:8 |
| 12:24 – 13:5 |
| 15:9-10 |
| 15:14-18 |
| 18:4-10 |
| 19:21 – 20:2 |
| 21:25 – 22:8 |
| 22:12 – 23:7 |
| 26:21 – 27:4 |
| 27:6 – 27:14 |
| 35:11-14 |
| 35:17-23 |
| 53:18-25 |
| 54:1-9 |
| 55:24 – 56:2 |
| 56:4-5 |
| 65:20-22; 66:2-12 |
| 67:23 – 68:1; 68:5-13; 68:16:69:2 |
| 69:22 – 70:9 |
| 85:14 – 85:17 |
| 106:5-11 |
| 112:17 – 113:12 |
| 114:9 – 114:11 |
| 114:13-22 |
| 115:11-25 |
| 117:12-14 |
| 117:23-25 |
| 118:6-9 |
| 118:12 – 119:7 |
| 123:1-3 |
| 124:8-21 |
| 131:20 – 132:13 |
| 133:18-21 |
| 138:1-8 |
| 138:12 – 139:6 |
| 143:2 – 144:13 |
| 174:7 – 174:10 |
| 193:19 – 197:11 |
| 197:20 – 199:17 |
| 199:24 – 200:12 |
| 202:9 – 202:20 |
| 203:3-16 |

Respectfully submitted,


_____/s/_____
Craig T. Merritt (VSB #20281)
Henry I. Willett, III (VSB #44655)
**CHRISTIAN & BARTON, LLP**
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
Telephone: (804) 697-4100
cmerritt@cblaw.com
hwillett@cblaw.com


Scott L. Robertson (admitted *pro hac vice)*
Jennifer A. Albert (admitted *pro hac vice)*
David M. Young (VSB#35997)
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4000
SRobertson@goodwinprocter.com
JAlbert@goodwinprocter.com
DYoung@goodwinprocter.com


Michael G. Strapp (admitted *pro hac vice)*
James D. Clements (admitted *pro hac vice)*
**GOODWIN PROCTER LLP**
Exchange Place
53 State Street
Boston, MA 02109-2881
Telephone:  (617) 570-1000
MSrapp@goodwinprocter.com
JClements@Goodwinprocter.com


*Attorneys for Plaintiff, ePlus Inc.*


Dated:  August 9, 2010


12

## Robert Kinross (December 2, 2009) - Rebuttal Summary

Mr. Kinross worked for Fisher Scientific from 1979 to 2003.  (10:19 – 11:4).  While at Fisher, Mr. Kinross assisted in the early development of the RIMS system because of his familiarity with a development architecture called CICS.  (11:22 – 12:8).  Mr. Kinross understands that there were several different versions of the RIMS system released between 1992 and August 10, 1994.  (193:19 – 194:25).  Mr. Kinross does not know whether the RIMS system is prior art the patents-in-suit.  (26:21 – 27:4; 27:6-14).

The RIMS system was used by Fisher employees for its customers.  (12:24 – 13:5; 19:21 – 20:2).  The Fisher customer service representative ("CSR") was part of the bundled package of offerings available to Fisher's customers.  (21:25 – 22:8).  Customers interacted with the RIMS system by either handing a paper requisition to a CSR or calling the CSR and requesting a specific item.  (22:12 – 23:7).

When using the RIMS system, a CSR could not prepare a requisition that included products for multiple vendors.  (35:11-14; 35:17-23).  Mr. Kinross further testified that a CSR could not use the RIMS system to issue a purchase order or to issue multiple purchase orders from a single requisition.  (195:9-17).  A CSR using the RIMS system could not cross reference a Fisher item to items from other vendors.  (52:4-17; 53:18-25).  A CSR using the RIMS system could not determine whether a non-Fisher supplied item was available in inventory.  (85:14-17; 195:18-21).  Mr. Kinross is not aware of a single instance where a customer configured the RIMS system to include non-Fisher supplied items.  (65:20-22; 66:2-12).  The RIMS system also could not be used to generate an "order list" as disclosed in the patents-in-suit.  (197:20 – 198:9).

Before April, 1993, a CSR using the RIMS system could not search for items by part number.  (55:24 – 56:2; 56:4-5).  Mr. Kinross understands that item number lookup is different from the search functionality claimed in the patents-in-suit.  (196:4 – 197:6).  Mr. Kinross also does not know whether a CSR user of the RIMS system as described in the '989 patent could load part master records for Fisher competitors.  (67:23 – 68:1; 68:5-13; 68:16 – 69:2; 69:22 – 70:9).  A RIMS system user could not select a portion of the item master to search separately or select a particular catalog to search from among a collection of catalogs.  (196:1-3; 197:7-11).

Mr. Kinross does not know whether an electronic data interchange (EDI) module was ever built into the RIMS system.  (18:4-10).

Mr. Kinross and the other co-inventors had already conceived the invention disclosed in the patents-in-suit before they first read the alleged publications discussing the Technical Viewer/2 ("TV/2") Search Engine which were later submitted to the U.S. Patent Office.  (198:10 – 199:17; 202:9-20; 203:3-16).  In integrating the TV/2 Search Engine with the RIMS system, it was necessary to add the ability to search multiple catalogs.  (112:17 – 113:12).  Mr. Kinross's understanding is that the TV/2 system could not search multiple documents off the shelf because an API file must interact with TV/2 to concatenate the part files.  (114:9-11; 114:13-22; 115:11-25; 117:12-14; 117:23-25; 118:6-9; 118:12 – 119:7).  Mr. Kinross also testified that developers at IBM told him that the TV/2 product could not search a subset of selected topics.  (124:8-21; 143:2 – 144:13).  Fisher contributed to this integration by selecting, documenting and testing the technical specifications for the user interface and developing the RIMS side of the technical

viewer interface.  (131:20 – 132:13).  Fisher also determined the specifications for the DDE protocol.  (138:1-8; 138:12 – 139:6).  Fisher employees also gave the IBM programmers specifications from which they wrote the shell program disclosed in the patents-in-suit.  (199:24 – 200:12).

2

Kinross, Robert  12/2/2009  9:00:00 AM

Page 1

1      IN THE UNITED STATES DISTRICT COURT
2      FOR THE EASTERN DISTRICT OF VIRGINIA
3           RICHMOND DIVISION
4    - - - - - - - - - - - - - - - +
5    ePLUS, INC.,          : Civil Action
6      Plaintiff,        : No. 3:09cv620
7    v.            :
8    LAWSON SOFTWARE, INC.    :
9      Defendant.        :
10   - - - - - - - - - - - - - - - +
11
12
13      Videotaped Deposition of ROBERT P. KINROSS
14            Washington, DC
15        Wednesday, December 2, 2009
16            11:03 a.m.
17
18
19
20
21
22
23   Job No.: 22-169719
24   Pages 1 - 212
25   Reported by:  Katy M. Zamora, RPR

Page 2

1          Videotaped Deposition of ROBERT P.
2    KINROSS, held at the offices of:
3
4         TROUTMAN SANDERS
5         401 9th Street, Northwest
6         Suite 1000
7         Washington, D.C. 20005
8         202.274.2950
9
10        Pursuant to Notice, before
11   Katy M. Zamora, Registered Professional Reporter and
12   Notary Public in and for the District of Columbia.
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1           A P P E A R A N C E S
2    ON BEHALF OF THE PLAINTIFF:
3         JENNIFER A. ALBERT, ESQUIRE
4         GOODWIN PROCTER, LLP
5         901 New York Avenue, Northwest
6         Washington, DC 20001
7         202.346.4000
8
9    ON BEHALF OF THE DEFENDANT:
10        DANIEL W. McDONALD, ESQUIRE
11        MERCHANT & GOULD
12        3200 IDS Center
13        80th South Eighth Street
14        Minneapolis, Minnesota 55402
15        612.332.5300
16
17   ALSO PRESENT:  Antonio Tropeano, Videographer
18
19
20
21
22
23
24
25

Page 4

1           C O N T E N T S
2    EXAMINATION OF ROBERT P. KINROSS        PAGE

3      By Mr. McDonald            6
4      By Ms. Albert             193
5      By Mr. McDonald           201
6
7
8           E X H I B I T S
9         (Attached to the transcript)
10   LAWSON EXHIBITS                PAGE
11   Exhibit 1  683 Patent          7
12   Exhibit 2  516 Patent          7
13   Exhibit 3  172 Patent          7
14   Exhibit 4  Fisher Scientific International, Inc.,
15        Annual Report            13
16   Exhibit 5  Document numbered L0132817 through 820  27
17   Exhibit 6  November 2005 Deposition of Robert P.
18        Kinross              35
19   Exhibit 7  RIMS Patent          40
     Exhibit 8  Technical Viewer/2 IBM Publication    105
20   Exhibit 9  IBM Technical Viewer General
21        Information Manual        119
22   Exhibit 10 Supply Link Document      188
     Exhibit 11 August 10, 1996 United States Patent
23        and Trademark Office Document    190
24
25

Kinross, Robert  12/2/2009  9:00:00 AM

**5**

```
1            P R O C E E D I N G S
2         THE VIDEOGRAPHER:  Here begins videotape
3    number one in the deposition of Robert P. Kinross, in
4    the matter of ePlus, Inc., versus Lawson Software,
5    Inc., in the United States District Court for the
6    Eastern District of Virginia, Richmond division.  Case
7    number, rather civil action number 3:09CV620.
8         Today's date is December 2, 2009.
9         The time on the video monitor is 11:03 a.m.
10        This video deposition is taking place at 401
11   9th Street, Washington, D.C., Northwest.
12        Counsel, please voice identify yourselves and
13   state whom you represent.
14        MR. McDONALD:  For defendant Lawson Software,
15   Daniel McDonald.
16        MS. ALBERT:  Jennifer Albert with the law
17   firm of Goodwin Procter representing the plaintiff,
18   ePlus, Incorporated, and the witness, Mr. Kinross.
19        THE VIDEOGRAPHER:  The court reporter today
20   is Katy Zamora of LegalLink, Chicago.
21        Would the reporter please swear in the
22   witness.
23             ROBERT P. KINROSS
24   having been duly sworn, testified as follows:
25        THE VIDEOGRAPHER:  Please begin.
```

**6**

```
1    EXAMINATION BY COUNSEL FOR DEFENDANT
2    BY MR. McDONALD:
3         Q.  What's your full name?
4         A.  Robert Paul Kinross.
5         Q.  Mr. Kinross, you're one of the listed
6    inventors on some patents that originally were filed
7    when you worked at Fisher Scientific; is that right?
8         A.  Yes.
9         Q.  Are you familiar with the numbers of those
10   patents?
11        A.  Yes.
12        Q.  What are the numbers?
13        A.  The one that I am most familiar with is
14   typically referred to as the 896 patent.
15        Q.  Are you familiar with patent No. 6023683 for
16   electronic sourcing and system method?
17        A.  Yes.
18        Q.  Are you also familiar with a patent with the
19   title electronic sourcing system where you're listed as
20   an inventor, number 6055516?
21        A.  Yes.
22        Q.  And are you familiar with the third patent
23   listing you as an inventor for an electronic sourcing
24   system, number 6505172?
25        A.  Yes.
```

**7**

```
1         Q.  Now, you said you're familiar with another
2    patent that wasn't one of the numbers I just listed,
3    what was that number again?
4         A.  I thought it was 896, but I would have to
5    refer to the document to be sure.
6         Q.  Okay.  Well, let me just put these three in
7    front of you, just so I make sure we're working off the
8    same number here.
9         Can you mark these as Lawson Exhibits 1, 2
10   and 3, please.
11        (Lawson Exhibit Nos. 1, 2 and 3 were marked
12   for identification and attached to the deposition
13   transcript.)
14        MS. ALBERT:  Dan, just for the record, which
15   one will be 1, which one will be 2, and which one will
16   be 3?
17   BY MR. McDONALD:
18        Q.  Sure.  We'll get that clarified here in just
19   a moment.
20        We'll mark Exhibit 1 as the 683 patent,
21   Exhibit 2 will be the 516 patent, and Exhibit 3 will be
22   the 172 patent.
23        Did I get the numbers right, Mr. Kinross?
24        A.  Yes, the 683 patent is the one I was trying
25   to recall --
```

**8**

```
1         Q.  Okay.
2         A.  -- initially.
3         Q.  You were subpoenaed for testifying in this
4    case about three weeks ago; is that right?
5         A.  Yes.
6         Q.  And you did review the subpoena?
7         A.  Yes.
8         Q.  And you saw it mentioned these three patents,
9    correct?
10        A.  Yes.
11        Q.  You recall it also talked about or listed
12   requests for documents involving a system known as the
13   RIMS or R-I-M-S system?
14        A.  Yes.
15        Q.  And do you recall that the subpoena also
16   asked about documents, among others, that related to a
17   system called the TV/2 system?
18        A.  Yes.
19        Q.  Did you look for any documents in response to
20   the subpoena?
21        A.  I was -- I looked at the subpoena and
22   evaluated what it was asking for and determined that
23   everything that was requested had already been turned
24   over in prior litigation to Jennifer Albert and Scott
25   Robertson.
```

**9**

1    Q.  Those two people are the two attorneys for
2    ePlus, correct?
3    A.  Yes.
4    Q.  When did you turn over those documents to
5    them, generally?
6    A.  There were two trials that I was aware of
7    concerning these patents, the first was Ariba.
8    Q.  Okay.  Let me just clarify my question here.
9    Can you give me a year when you first turned over the
10   documents?
11   A.  A year, I think it was 2005.
12   Q.  Have you come across any further documents
13   since you gave those documents to the two lawyers?
14   A.  No, I haven't.
15   Q.  The two lawyers, you understand, is
16   Ms. Albert and Mr. Roberts, they both represent you and
17   ePlus; is that correct?
18   A.  Yes.
19   Q.  Did the ePlus attorneys come to you and offer
20   to represent you for your deposition?
21   A.  Yes.
22   Q.  Are you getting paid by ePlus or by the
23   lawyers in connection with your time spent meeting with
24   them in the deposition?
25   A.  Yes, I am.

**10**

1    Q.  How much are you getting paid for that?
2    A.  $350 per hour.
3    Q.  Did you meet with the attorneys for ePlus
4    between the time you got the subpoena for this case and
5    today?
6    A.  Yes.
7    Q.  About how many hours did you spend with them?
8    A.  Monday, it was three hours; and yesterday,
9    about five hours.
10   Q.  Did you review documents during the time you
11   spent with them?
12   A.  Yes.
13   Q.  Did the documents include the three patents?
14   A.  Yes, they did.
15   Q.  At least that first patent that you said
16   you're most, I think, familiar with, the 683 patent,
17   that issued to the Fisher Scientific company, correct?
18   A.  Yes.
19   Q.  You used to work for Fisher Scientific,
20   right?
21   A.  Yes, that's correct.
22   Q.  What years did you work for them?
23   A.  From 1979 to 2003.
24   Q.  Can you summarize your job history or
25   activities you've had since 2003?

**11**

1    A.  I'm basically retired, since 2003.
2    Q.  Where do you live now?
3    A.  In Ben Avon, Pennsylvania.  It's a suburb of
4    Pittsburgh.
5    Q.  Did -- do you know how it came about that the
6    deposition got moved here to Washington, D.C. instead
7    of being in the Pittsburgh area?
8    A.  No, I'm not familiar with those details.
9    Q.  Was it your idea to move the deposition?
10   A.  No.
11   Q.  If we look at Exhibit 1 and turn to the page
12   column 1, could you do that for me, in Exhibit 1, in
13   the 683 patent?
14   A.  And what page?
15   Q.  Column 1.
16   A.  Column 1, all right.
17   A.  It's the first page after the journals.
18   A.  Okay.  I've got it.
19   Q.  You see there in column 1 in the left side
20   about 13 lines down there's a reference to Fisher RIMS?
21   A.  Yes.
22   Q.  You're familiar with the Fisher RIMS system;
23   is that right?
24   A.  Yes, I am.
25   Q.  How is it that you became familiar with that

**12**

1    system?
2    A.  Well, initially when the system was first
3    written, I was a supervisor of Jim Johnson who's
4    primarily the author of the system.  The RIMS system
5    utilized a product called CICS for its development
6    architecture, and I was very familiar with the CICS
7    development architecture, so I assisted in the
8    development of RIMS early on.
9    Q.  What is the RIMS system?
10   MS. ALBERT:  Object to the form.  Vague and
11   ambiguous as to time.
12   A.  The RIMS system is a requisition and
13   inventory management system, that's what the RIMS
14   acronym stands for, and the system allows a Fisher
15   customer service representative to enter requisitions
16   into the system at a customer location.  So we
17   typically refer to them as on-site CSRs, on site
18   meaning they were on site at a customer location; and
19   CSR meaning they're a customer service representative.
20   So the system was used by a Fisher CSR for
21   requisitioning products that Fisher was distributor for
22   them.
23   BY MR. McDONALD:
24   Q.  You understand that the Fisher system was --
25   was out in the marketplace being used by customers

Kinross, Robert  12/2/2009  9:00:00 AM

13

1  and -- for their business purposes, at least by 1992;
2  is that right?
3      A.  It's not -- it's not correct to say it was
4  used by customers.  It was used for customers by Fisher
5  employees.
6      Q.  When was the RIMS system first in the
7  marketplace?
8      A.  I think the dates on that were 1989.
9      Q.  We'll mark this as Exhibit 4, please.
10      (Lawson Exhibit No. 4 was marked for
11  identification and attached to the deposition
12  transcript.)
13      Did the RIMS system undergo some enhancements
14  and changes between 1989 and 1992?
15      A.  Yes.
16      Q.  And if you could look at Exhibit 4 here.  Do
17  you recognize that as, at least the cover page, let's
18  talk about the cover page, as the first page of Fisher
19  Scientific International, Inc., Annual Report?
20      A.  Yes.
21      Q.  Do you see on the first page it says on a
22  stamp in the lower, right corner, processed by March
23  1993?
24      A.  Yes, I see that.
25      MS. ALBERT:  I just note for the record that

14

1  the first page says page 1 of 417 pages, and it doesn't
2  appear that the exhibit that's been marked as Exhibit 4
3  is 417 pages, so I'm just not sure --
4      MR. McDONALD:  Yeah, I'll represent to you
5  that this document is the annual report with an exhibit
6  index, you'll see on the last page, but not the
7  exhibits themselves.  They were attached to the annual
8  report, so that explains, I think, the discrepancy in
9  the page numbers.
10      MS. ALBERT:  Mine does not appear to contain
11  an index.
12      MR. McDONALD:  If you look at the very last
13  page, it's got a title exhibit index, do you see that?
14      MS. ALBERT:  Okay.
15  BY MR. McDONALD:
16      Q.  Now, if you turn to the page -- about the
17  seventh page of this document, Mr. Kinross --
18      A.  Marked page 4?
19      Q.  Well, it's actually got a 003 in the lower
20  right-hand corner.  It's right before that one.
21      A.  003, all right.  I've got it.
22      Q.  Do you see there a paragraph called
23  computerised order entry systems?
24      A.  Yes.
25      Q.  And the next sentence says, quote,

15

1  information on all 100,000 products offered in the
2  Fisher catalog can be obtained through Fisher RIMS, the
3  company's newest and most powerful electronic order
4  entry system which provides paperless purchasing,
5  receiving, billing and product distribution, quote.  Do
6  you see that sentence?
7      A.  Yes.
8      Q.  Do you think that's an accurate sentence as
9  to what Fisher Scientific was doing with the Fisher
10  RIMS system as of at least the end of 1992?
11      MS. ALBERT:  Object to the form.  Lacks
12  foundation.
13  BY MR. McDONALD:
14      Q.  You may answer.
15      A.  I think the reference to the Fisher catalog
16  is basically how the depth of product information in
17  the Fisher mainframe would be characterized in the
18  document.
19      Q.  I'm just asking, do you agree that that's an
20  accurate statement or not?
21      A.  Yes, I think that's an accurate statement.
22      Q.  And in the next sentence, "Fisher RIMS
23  facilitates just-in-time delivery and third-party
24  purchasing contributing to supplier consolidation for
25  its customers," do you see that sentence?

16

1      A.  Yes.
2      Q.  Do you think that's an accurate statement
3  regarding the RIMS system as of the end of 1992?
4      MS. ALBERT:  Object to the form.  Lacks
5  foundation.
6      A.  Yes, I think that's an accurate statement.
7  BY MR. McDONALD:
8      Q.  And as of the end of 1992, you were working
9  at Fisher Scientific and were familiar with the Fisher
10  RIMS system, right?
11      A.  Not as familiar with it as Jim Johnson would
12  be.
13      Q.  Well, I'm not asking relative to other
14  people, I'm just saying you were familiar with the
15  system as of the end of 1992, right?
16      A.  Yes.
17      Q.  You were working there at Fisher Scientific
18  at the time, right?
19      A.  Not specifically on RIMS, but, yes, I was
20  working at Fisher, yes.
21      Q.  At some point did you stop working on the
22  Fisher RIMS system?
23      A.  Yes.
24      Q.  When was that?
25      A.  Probably 1990 time frame.

Kinross, Robert  12/2/2009  9:00:00 AM

17

1    Q.  Did you maintain some familiarity with the
2    RIMS system after you stopped working on them?
3    A.  Yes.
4    Q.  How did you maintain familiarity with the
5    RIMS system after that?
6    A.  I was working on EDI at the time, and one of
7    the components of RIMS was to have an EDI interface,
8    so, I think, I worked on the EDI interface for RIMS.
9    Q.  When you say, "at the time," are you talking
10   about around that 1992 time or some other time?
11   A.  I can't really tell you exactly the date.
12   Q.  But it was after you stopped working on the
13   core RIMS product?
14   A.  Yes.
15   Q.  So how is it that the RIMS product used the
16   EDI that you -- well, let's back up for a second.
17        Can you say what EDI is or explain what that
18   is?
19   A.  EDI is electronic data interchange.
20   Q.  What's it used for?
21   A.  It's a way to transmit business documents to
22   other parties.
23   Q.  Transmitted electronically?
24   A.  Electronically, yes.
25   Q.  You -- after you stopped working on the core

18

1    RIMS product you then worked on an EDI capability for
2    the RIMS product; is that right?
3    A.  I believe so, yes.
4    Q.  Do you have any doubt about that?
5    A.  The doubt would be whether it actually was
6    implemented and used.  I'm not familiar with actually
7    having it as an active, live part of the RIMS system.
8    Q.  Who would know more about whether EDI was
9    implemented with RIMS than you?
10   A.  Jim Johnson.
11   Q.  But in any event, your project, the purpose
12   of it was to come up with an EDI technology that could
13   be added on to the RIMS technology?
14   A.  Yes.
15   Q.  Whether, in fact, that happened or not,
16   you're not sure?
17   A.  The project happened.  Whether or not it was
18   facilitated by implementing it with a customer may have
19   not happened.
20   Q.  On the project that you worked on for EDI,
21   what sort of information was going to be transmitted
22   either to or from the RIMS system using EDI?
23   A.  Purchase orders.
24   Q.  Would those be purchase orders then
25   transmitted from the RIMS system to someplace else?

19

1    A.  Yes.
2    Q.  So you see on the 683 patent on the fist page
3    of that, if we go back to Exhibit 1, I think the one
4    you've got folded open there.
5    A.  Yes.
6    Q.  Page 1 indicates -- if you go back to the
7    very first page of Exhibit 1, please.
8        MS. ALBERT:  Do you mean column 1?
9    BY MR. McDONALD:
10   Q.  No, I mean page 1.
11        The first page there on the left column, do
12   you see a couple inches down where it says filed August
13   10, 1994?
14   A.  Yes.
15   Q.  And isn't it true that the RIMS system was
16   commercialized by Fisher Scientific more than one year
17   before that August 10th, '94 date?
18   A.  By commercialized, what do you mean?
19   Q.  Was Fisher Scientific using it in commerce?
20   A.  Yes.
21   Q.  Did Fisher Scientific actually sell RIMS
22   systems to customers before August of 1993?
23   A.  I don't believe the RIMS system was sold to
24   customers.  It was bundled with what they called prime
25   vendor relationships, so it was a sales tool to provide

20

1    a value-added product so that the customer could reduce
2    their cost of procurement.
3    Q.  What did the RIMS system actually look like,
4    back before August of '93?
5    A.  It looked like a 3270 application.  A 3270 is
6    the type of terminal that is commonly referred to as a
7    full screen with character data on that screen.
8    Typical specifications for that were 24 characters by
9    80 characters, so you got a matrix of that many
10   characters on the screen to use to format input fields
11   in a textual manner.
12   Q.  So the RIMS system was this, basically a
13   computer screen?
14   A.  Yes -- well, a computer -- a terminal --
15   computer screens today are more like TV screens.
16   Computer screens back then were typically only able to
17   display character data, 3270-type data.
18   Q.  So how big was the screen back in the --
19   A.  24 by 80.
20   Q.  What unit of measure are you using?
21   A.  Number of characters.
22   Q.  How about in inches, how big was the screen,
23   approximately?  I'm just trying to visualize this
24   thing.
25   A.  It could be various sizes, and the bigger the

21

1  screen would be the larger the characters would be, but
2  typically it was probably smaller than a 20-inch TV.
3  Q.  So about how wide would that be --
4  A.  20-inch diagonal.
5  Q.  20-inch diagonal?
6  A.  Yes.
7  Q.  A little smaller than that, you say?
8  A.  Yes.
9  Q.  Typically?
10  A.  15 to 20 inches would be my guess, yes.
11  Q.  You could vary it, if I understand you right,
12  it could be a little bigger or smaller than this?
13  A.  Yes.
14  Q.  Were there any other components to it other
15  than that display terminal?  Was there like an input,
16  like a keyboard or something like that?
17  A.  Keyboard, yes, there was a keyboard.
18  Q.  Was there a computer that came with it as
19  well?
20  A.  Yes.
21  Q.  Was that something that Fisher Scientific
22  installed at customer locations as part of that vendor
23  location or vendor relationship you were describing?
24  A.  Yes.
25  Q.  Did Fisher Scientific offer that RIMS system

22

1  to the customers and say, basically, if you have a
2  vendor relationship with us, you have this option of
3  using the RIMS system?
4  A.  The customer would not have the option of
5  using the RIMS system.  The customer service rep from
6  Fisher would be part of the bundled package, so that it
7  would have an on-site customer service representative
8  that would be included to run the RIMS system.
9  Q.  And with that vendor relationship, is that
10  how Fisher Scientific made its money?
11  A.  Yes.  By selling products, yes.
12  Q.  So customers would buy products, enter a
13  relationship with Fisher Scientific, and as part of
14  that relationship Fisher Scientific would offer to put
15  a customer service representative on site to use the
16  RIMS system?
17  A.  Yes.
18  Q.  Did the customers ever provide information to
19  the RIMS system?  Did you have a way to do that?
20  A.  The typical way to do that was through paper
21  requisitions handed to the customer service rep,
22  handwritten.
23  Q.  That was the typical way, was there any other
24  way of doing it back before 1993?
25  A.  I don't believe so.  I can't recall any other

23

1  way, yes.  The telephone would be another way.
2  Q.  People calling up the customer service
3  representative --
4  A.  Yes.
5  Q.  -- and just saying, here's the products I
6  want to buy?
7  A.  Exactly.
8  Q.  Now, if you go back to column 1, again, on
9  that 683 patent -- column 1, not page 1 --
10  A.  All right.
11  Q.  If you go back to column 1 in the left side
12  of about line 10, do you see the sentence there:  There
13  are a number of known requisition/purchasing systems
14  that manage and process requisitions and purchase
15  orders.  One such system is the Fisher Scientific
16  requisition and inventory management system (Fisher),
17  described in U.S. patent number 5712989 filed April 2,
18  '93 and assigned to Fisher Scientific Company of
19  Pittsburgh, PA, the disclosure of which is incorporated
20  herein by reference, quote.  Do you see those two
21  sentences?
22  A.  Yes, I do.
23  Q.  I want to direct your attention now where it
24  says, known requisition systems.  As I understand it
25  these two sentences, and this is a document, if I can

24

1  back up for a second -- you reviewed this and signed a
2  declaration saying that you had reviewed this and you
3  are one of the inventors on this, right?
4  A.  Yes.
5  Q.  As I understand -- is it correct to construe
6  this as saying the Fisher Scientific requisition system
7  known as Fisher RIMS was among the known requisitioning
8  and purchasing systems at the time you filed for the
9  683 patent?
10  A.  Yes.
11  Q.  Who was it known to?
12  A.  Well, it would certainly be known to Fisher
13  sales reps, trying to entice large customers to use the
14  system.  Fisher would participate in trade shows and
15  have representatives from the information systems and
16  services department available to talk to customers
17  about what system capabilities Fisher had.  So they
18  were actively marketing Fisher capabilities as
19  value-added systems.
20  Q.  So trade shows would be an example of a place
21  where Fisher Scientific employees were out marketing
22  Fisher's capabilities for the vendor relationship
23  including the RIMS system?
24  A.  Yes.
25  Q.  And that was happening at least by 1992,

Kinross, Robert  12/2/2009  9:00:00 AM

---

25

1   correct?

2       A.  Yes, that's correct.

3       Q.  So is it your understanding -- well, let me

4   back up for a second.

5           As one of the vendors who signed an oath with

6   this patent and the other two patents that we've marked

7   as exhibits, did you have an understanding that there

8   is something called "prior art" when you file a patent

9   publication?

10      A.  Yes, I understood that.  Yes.

11      Q.  What was your understanding of what prior art

12  is at the time, August of '94 when you filed -- first

13  filed these patent applications?

14      A.  My understanding with prior art was systems

15  or ideas that may have existed that were building

16  blocks or similar to what the invention here would be.

17      Q.  And the idea with your patent is you're not

18  supposed to get a patent on things that are prior art,

19  correct?

20          MS. ALBERT:  Object to the form.  Calls for

21  legal conclusion.

22  BY MR. McDONALD:

23      Q.  I'm asking for your understanding.

24      A.  Well, yes.

25      Q.  And you understood as one of the applicants

---

26

1   for these patents that you had a duty to disclose prior

2   art to the patent office?

3       A.  Yes.

4       Q.  Was the RIMS system as it existed at the end

5   of 1992 something that you understood was prior art to

6   the three patents we've marked as exhibits --

7           MS. ALBERT:  Calls for a legal collusion.

8   BY MR. McDONALD:

9       Q.  -- today?

10      A.  Yes, I think it was.

11      Q.  Is that because it was out in the

12  marketplace, it was part of what Fisher Scientific was

13  offering to customers more than one year before August

14  of '94 when you filed this patent application, is that

15  why?

16          MS. ALBERT:  Calls for legal conclusion.

17  BY MR. McDONALD:

18      Q.  I'm asking for your understanding,

19  Mr. Kinross.

20      A.  Could you repeat the question, please?

21      Q.  I'll rephrase it.

22          Was it your understanding when you filed the

23  application for the 683 patent and signed on the

24  declaration and oath that went with that as an

25  inventor, that the RIMS system was prior art to that

---

27

1   patent because it was on the market being offered to

2   customers as part of the vendor relationship package

3   more than a year before the filing date on the 683

4   patent?

5           MS. ALBERT:  Calls for a legal conclusion.

6       A.  My understanding of prior art was basically

7   what I told you before, and whether RIMS qualified as

8   prior art or not, I didn't know.  It could be, based on

9   whether or not our patent attorney concluded it was

10  prior art.  He was basically deciding what prior art

11  was; I was not.  So if he concluded it as prior art, I

12  would agree with it.  If he didn't conclude it as prior

13  art, I had no basis to determine what prior art was and

14  what prior art was not.

15  BY MR. McDONALD:

16      Q.  Well, you had some understanding though at

17  the time, right?

18      A.  Vaguely, saying, you know, prior art was

19  things that were invented before your invention that

20  might be similar.

21      Q.  Can we mark this as Exhibit 5, please.

22          (Lawson Exhibit No. 5 was marked for

23  identification and attached to the deposition

24  transcript.)

25          Mr. Kinross, I'm handing you Exhibit 5, which

---

28

1   is a copy of the Declaration and Power of Attorney form

2   that you signed in 1994, as indicated on page 3.  Do

3   you recognize this document?

4       A.  Yes.

5       Q.  What is it?

6       A.  Well, my understanding of the power of

7   attorney is giving a lawyer, and basically Allen

8   Dornberg, the authority to represent me for this patent

9   application.

10      Q.  So the title of this is declaration and power

11  of attorney for patent application, right?

12      A.  Yes.

13          MS. ALBERT:  I just want to note for the

14  record that I think you've misidentified exactly what

15  the exhibit is because it appears to be multiple

16  documents stapled together, at least my copy is.

17          MR. McDONALD:  Oh, okay.  You're right.  How

18  about -- would you agree, Jennifer, that we should

19  detach the pages beginning with notice to file missing

20  parts, just to keep it to the declaration?

21          MS. ALBERT:  Yeah, correct.

22          MR. McDONALD:  Mr. Kinross, I can get that

23  back and do that for you.

24          MS. ALBERT:  So then, for the record, it's

25  going to be the document bearing, I guess, these are

---

Kinross, Robert  12/2/2009  9:00:00 AM

29

1  production numbers L0132817 through 820.
2      MR. McDONALD:  That is correct.  Thank you.
3  BY MR. McDONALD:
4      Q.  So if we just stick with this new version of
5  the document, Mr. Kinross, Exhibit 5 as modified, that
6  is a declaration and power of attorney for a patent
7  application that you, among other people, signed,
8  correct?
9      A.  Yes.
10      Q.  You signed it, is that September 30, 1994?
11  Is that the date?
12      A.  Yes, September 30, '94.
13      Q.  That's your signature there next to the --
14      A.  Yes, it is.
15      Q.  And you see on the first page this is for
16  application that was filed on August 10, '94 with the
17  serial number 08/288,577?
18      A.  Yes.
19      Q.  And that's the same filing date and serial or
20  application number that's on the first page of the 683
21  patent, Exhibit 1, right?
22      A.  The August 10th, 1994 date --
23      A.  Yes.
24      A.  Right.
25      Q.  And also that serial or application number,

30

1  it's the same number?  Do you see it right above the
2  filing date, August 10?
3      A.  Yes, that's the same number.
4      Q.  So in this oath you stated that you had
5  reviewed and understand the contents of the above
6  identified specification including the claims as
7  amended by the amendment referred to above.  Do you see
8  that language on page 1 of the declaration?
9      A.  Where would that be?
10      Q.  All right.  Right below the blanks there that
11  have the filing date and the application serial --
12      A.  Yes.
13      Q.  Do you see the first --
14      A.  The first sentence --
15      Q.  Can you read that first sentence there?
16      A.  I hereby state I have reviewed and understand
17  the contents of the above identified specifications
18  including the claims as amended by any amendment
19  referred to above, yes.
20      Q.  And you see if we go a couple more paragraphs
21  down where you said, quote, I do not know and do not
22  believe that the invention was in public use or on sale
23  in the United States of America more than one year
24  prior to this application, quote?
25      A.  Yes.

31

1      Q.  Do you have an understanding as to why you
2  were making that statement here?
3      A.  Because I believed it to be true.
4      Q.  Do you know why it was -- it was included in
5  this oath, filed with the patent office?  Did you have
6  an understanding as to the reason why that true
7  statement was included in here?
8      A.  No.
9      Q.  And the next statement in your oath here, do
10  you see there, quote, I acknowledge the duty to
11  disclose to the United States Patent and Trademark
12  Office all information known by me to be material to
13  patentability as defined in Title 37 Code of Federal
14  Regulations Section 1.56, quote, do you see that?
15      A.  Yes, I see that.
16      Q.  At the time you signed this oath, did you
17  have an understanding of what the duty to disclose was
18  that you were acknowledging here?
19      A.  Not exactly, no.
20      Q.  Did you have a general understanding of it?
21      A.  It may have been explained to me, but in --
22  not in great detail.  I have never reviewed the Federal
23  Regulations Code 1.56.
24      Q.  Based on whatever your understanding that you
25  had relating to prior art now, if we go back to that

32

1  issue, is it your understanding that the RIMS system
2  was prior art to the 683 patent application?
3      MS. ALBERT:  Object to the form.  Calls for a
4  legal conclusion.
5  BY MR. McDONALD:
6      Q.  You may answer.
7      MS. ALBERT:  And asked and answered as well.
8      A.  I don't know if it qualified as prior art or
9  not.  I think it could have.  Again, if Allen Dornberg
10  determined that it was prior art, I would have agreed
11  with him based on his legal knowledge.
12  BY MR. McDONALD:
13      Q.  This declaration, Exhibit 5, actually
14  indicates some -- an attorney Lawrence S. Rogers and
15  some other people other than somebody named
16  Mr. Dornberg, do you see that on page 2?
17      A.  Yes, I see that, uh-huh.
18      Q.  Who's Mr. Dornberg?
19      A.  He was Fisher's attorney.
20      Q.  Did you work directly with the lawyers listed
21  here on page 2 on the 683 patent application?
22      A.  No, I did not.
23      Q.  So you worked directly with Fisher's in-house
24  counsel, Mr. Dornberg?
25      A.  Yes, I did.

Kinross, Robert  12/2/2009  9:00:00 AM

33

1    Q.  Do you know whether or not he provided --
2    well, did you have prior-art information that you
3    provided to somebody in connection with filing the 683
4    application?
5    A.  No.
6    Q.  Were you asked to gather any prior art?
7    A.  I don't believe I was.  I'd have to review
8    the prior art again to state definitively that I did
9    not.
10    Q.  Well --
11    A.  But I did review the prior art, and I didn't
12    recognize anything in there as something I was aware
13    of.
14    Q.  Were you aware of some prior art at the time
15    you filed the 683 patent application?
16    MS. ALBERT:  Asked and answered, and calls
17    for a legal conclusion.
18    A.  I wasn't -- I think -- well --
19    BY MR. McDONALD:
20    Q.  Well, you were aware of the RIMS system, so I
21    guess it --
22    A.  Is RIMS listed as prior art in here?
23    Q.  Well, what's your understanding of that?
24    We've got the 683 patent in front of you.  Page 1 has a
25    list of references cited and that continues to page 2

34

1    with other publications.  I don't see anything
2    mentioned on that list regarding the RIMS system, but,
3    please, look at that and let me know if you see
4    anything on that list of references cited that refer to
5    the RIMS system as prior art.
6    A.  So no, I do not see the RIMS system listed as
7    references cited.
8    Q.  Either under the patents or the other
9    publications; is that right?
10    A.  That's right.
11    Q.  Did you ever discuss with anybody whether the
12    RIMS system should be disclosed as prior art to the 683
13    patent or other patents in suit?
14    A.  No, I did not.
15    Q.  The RIMS system generally allowed someone to
16    put together a requisition list that would then be
17    processed into purchase orders; is that fair?
18    A.  Yes.
19    Q.  Now, is it true that a single requisition in
20    the RIMS system as it existed in 1992, that a single
21    requisition that could be processed into purchase
22    orders for multiple vendors?
23    MS. ALBERT:  Object to the form.  Lacks
24    foundation.
25    BY MR. McDONALD:

35

1    Q.  You may answer.
2    A.  I'm aware that RIMS had a third-party
3    procurement piece to it, but as far as the details of
4    how that worked and what the specification was for that
5    I would have to defer to Jim Johnson.
6    Q.  All right.  So let's mark this as the next
7    exhibit here, Exhibit 6.
8    (Lawson Exhibit No. 6 was marked for
9    identification and attached to the deposition
10    transcript.)
11    Let me just ask you one more question.  Could
12    the user of a RIMS system prepare a requisition that
13    included on the requisition products for multiple
14    vendors?
15    MS. ALBERT:  Object to the form.  Vague and
16    ambiguous as to time.
17    A.  I'm not sure.  I think it -- when you talk
18    about the multiple vendors piece of it, my
19    understanding of that is that multiple vendors on the
20    same requisition; is that your understanding as well?
21    BY MR. McDONALD:
22    Q.  Yes, that's what I'm asking about.
23    A.  Yeah, I would say, no, RIMS couldn't do that.
24    Q.  I'm going to hand you what was marked as
25    Exhibit Lawson 6.

36

1    Do you remember giving a deposition,
2    Mr. Kinross, regarding these patents back in November
3    of 2005?
4    A.  Yes.
5    Q.  And at that deposition, just as you were
6    today, you were sworn in to tell the truth, correct?
7    A.  Right.
8    Q.  And you did tell the truth, didn't you?
9    A.  I tried to, yes.
10    Q.  Can I direct your attention to the page No.
11    39 from that deposition, and by page 39 I mean the
12    actual little number, page number where there's four
13    pages to a big page here.
14    A.  Right.
15    MS. ALBERT:  So you're looking at, it's on
16    the page Bates stamped EPlus 0200150?
17    BY MR. McDONALD:
18    Q.  That's correct.
19    Do you see there, page 39, line 7 to 11,
20    Mr. Kinross, you were asked:  But using the RIMS
21    system, a customer service representative at a customer
22    location could prepare a requisition that included on
23    the requisition products from multiple vendors, you see
24    that question?
25    A.  Yes.

Kinross, Robert  12/2/2009  9:00:00 AM

---

**37**

1    Q.  And you said the answer to that question was
2  yes, correct?
3    A.  Yes.
4    Q.  Does seeing this testimony from a little more
5  than four years ago, does that refresh your
6  recollection that, in fact, the RIMS system could
7  prepare a requisition that included on the requisition
8  products for multiple vendors?
9    A.  I think at this time I did believe that it
10  could, but in speaking with Jim Johnson about it, it
11  was basically the RIMS expert.  He informed me later
12  that the third-party items had to be on a separate
13  requisition, so that's why I'm changing my
14  understanding of how RIMS worked.
15    Q.  Now, at the time, 2005, you weren't working
16  for Fisher Scientific anymore, right?
17    A.  That's right.
18    Q.  You were retired at that time?
19    A.  Yes.
20    Q.  Why were you talking to Mr. Johnson about the
21  topic of your testimony here that we just quoted from
22  page 39?
23    A.  I think we were reviewing the patents and the
24  issues in meetings we had with the attorneys.
25    Q.  The attorneys for ePlus?

**38**

1    A.  Yes.
2    Q.  Were you meeting with them because they were
3  having some litigation involving those patents?
4    A.  Yes.
5    Q.  Were you getting ready for a trial testimony?
6    A.  Yes, that's right.
7    Q.  So you were talking to Mr. Johnson about your
8  trial testimony?
9    A.  Talking to him about the patents and not
10  particularly trial testimony, but functionality of the
11  system.
12    Q.  Well, why -- isn't the only reason you were
13  talking to him because you were planning on potentially
14  testifying at a trial about these patents?
15    A.  Yes.
16    Q.  That was the whole point of talking to him,
17  right?
18    A.  Yes.
19    Q.  And why is it that you were specifically
20  talking about the issue of whether in the RIMS system
21  it could take a requisition that included products for
22  multiple vendors, why were you talking about that
23  specific issue with Mr. Johnson after you gave this
24  deposition in November of 2005?
25    MS. ALBERT:  And I just caution you, to the

**39**

1  extent any of your communications were done pursuant to
2  advice of counsel or included meetings with counsel,
3  not to reveal any communications you had involving
4  counsel.
5  BY MR. McDONALD:
6    Q.  I'm asking about your conversations with
7  Mr. Johnson, Mr. Kinross, and he's not a lawyer, right,
8  last time I checked?
9    A.  Lawyers were present at all these meetings.
10    Q.  So you had lawyers present at the meetings,
11  including the one where you mentioned Mr. Johnson tried
12  to set you straight about whether requisitions included
13  multiple vendors --
14    A.  Yes.
15    Q.  -- in the RIMS system?
16    A.  Yes.
17    Q.  What were the role -- what was the role of
18  the lawyers at this meeting, were they there to give or
19  receive information relating to advice?
20    A.  They were obtaining details about
21  functionality in the systems and understanding the
22  system as it relates to the patent.
23    Q.  And this was after your deposition here that
24  we marked as Exhibit 6, I believe, the November 2005
25  deposition?

**40**

1    A.  Yes.
2    Q.  Now, it is true that in the RIMS system it
3  could maintain part information for multiple vendors,
4  right?
5    A.  My understanding of it was, yes, it could.
6  There was a feature of it that allowed the system to
7  keep track of customer-owned inventory, whether Fisher
8  was responsible for the stock room at a customer
9  location and if the customer wanted to store cleaning
10  supplies, for instance, which Fisher typically did not
11  stock, like brooms or things like that.  The RIMS
12  system would take that into account and allow the
13  customer to requisition things they already owned from
14  other vendors.  It would be customer-owned inventory.
15    Q.  Could we mark this as the next exhibit,
16  please.
17    (Lawson Exhibit No. 7 was marked for
18  identification and attached to the deposition
19  transcript.)
20    Mr. Kinross, I am handing you what was marked
21  as Exhibit 7.  Do you recognize Exhibit 7?
22    A.  Yes.
23    Q.  What is it?
24    A.  It looks like a patent for RIMS.
25    Q.  When was the last time you saw this patent?

---

Kinross, Robert  12/2/2009  9:00:00 AM

41

1    A.  I couldn't tell you with any specific date,
2    when I last saw it.
3    Q.  How is it that you became familiar with the
4    patent?
5    A.  Probably in preparation for trials I was
6    aware that a patent was filed for RIMS and heard the
7    legal team talking about the RIMS patent.
8    Q.  And you're not listed as an inventor on this
9    989 patent for the RIMS system, correct?
10   A.  That's correct.
11   Q.  And do you consider yourself to be an
12   inventor of the RIMS system?
13   A.  No.
14   Q.  If you turn to the page with columns 5 and 6
15   on it after the drawings, it's in the lower, right-hand
16   corner, it's L0260819, do you see there's a Table I
17   that goes from the bottom of -- actually, it's past the
18   figures to columns 5 and 6.
19   A.  Okay.
20   Q.  Do you see at the bottom of column 5 and
21   continuing to the top of table -- excuse me, column 6,
22   there's something called Table I?
23   A.  Yes.
24   Q.  I'll give you a chance to review that here.
25   My question is, does Table I indicate the sorts of

42

1    products that are -- or the types of products that are
2    of record in the RIMS system?
3       MS. ALBERT:  And, Mr. Kinross, if you need to
4    review more than just that table in order to put his
5    question in context, please do so.
6    A.  Okay.  Yeah, I'm familiar with the RIMS
7    product types in RIMS inventory, yes.
8    Q.  So whether they're in RIMS inventory does
9    that mean they're in database or databases in the RIMS
10   system?
11   A.  Yes.
12   Q.  Okay.  So product type 01 is a
13   distributor-owned item in a just-in-time warehouse
14   located at or near the customer site, right?
15   A.  Correct.
16   Q.  So that's owned by the distributor.
17       And if we look at item 03, that's a
18   distributor catalog item, start at the distributor's
19   warehouse, do you see that one?
20   A.  Yes.
21   Q.  And, again, that's still owned by the
22   distributors but that's at the distributor's warehouse
23   instead of this warehouse near the customer's site?
24   A.  Correct.
25   Q.  That's the difference?  Okay.

43

1       And were both of those product types you're
2    familiar with in the RIMS system?
3    A.  Yes.
4       MS. ALBERT:  Object to the form.  Vague and
5    ambiguous.
6    BY MR. McDONALD:
7    Q.  Well, let's clarify here.
8       In this RIMS system as it existed in 1992 did
9    its database include products both with product types
10   01 and 03 as described here in this Table I?
11   A.  I couldn't testify the dates.  Seems in
12   1992 -- I couldn't tell you that.
13   Q.  Well, when you say you are familiar with
14   these product types, what are you -- in the RIMS
15   system, what RIMS system are you -- do you have in mind
16   when you say that?
17   A.  I don't know if they exist -- this RIMS could
18   have evolved over time and introduced new product types
19   over that evolution.
20   Q.  Well, you see on the first page of this
21   Exhibit 7 there's a filing date of April 2, 1993?
22   A.  Yes.
23   Q.  So do you think it is likely that at least
24   prior to April of '93 the RIMS system had the product
25   types listed in Table I?

44

1    A.  Yes.
2    Q.  Now, if we look at product type 04 in Table I
3    here, it says a third-party item that the distributor
4    orders, do you see that one?
5    A.  Yes.
6    Q.  And then 05 is a third-party item which the
7    CSI -- CSR or customer orders, do you see that?
8    A.  Correct.
9    Q.  Now, was -- in the typical use of the Fisher
10   RIMS system, was Fisher considered the distributor?
11   A.  Yes.
12   Q.  And Fisher also provided the CSR or customer
13   service representative, right?
14   A.  Yes.
15   Q.  So why -- what's the distinction here?  Why
16   would you have an item 04, an item -- third-party item
17   in the distributor orders, and 05 a third-party item
18   which the CSR or the customer orders?
19   A.  My understanding of this is that third-party
20   items existed on -- they were non-stock items,
21   basically.  They were items that Fisher would never
22   carry in inventory.  It's special order basically.  And
23   the distinction there, the 04 items, would be that it
24   would be a special order that a variety of customers
25   could order from Fisher, meaning it was very expensive

Kinross, Robert  12/2/2009  9:00:00 AM

45

1    and didn't want to stock it because of the cost of
2    inventory and that kind of thing.  But the general
3    Fisher customers would order it and the distinction
4    would be the 05 would be unique to a particular
5    customer or no other customer could order it, as it
6    didn't relate to the general population of Fisher
7    customers.  That's why, I think, that distinction
8    exists.
9       Q.   Okay.
10      A.   But, again, that's my interpretation of this.
11      Q.   Okay.
12      A.   And, you know, Jim Johnson would be the
13   expert on the RIMS system at this time --
14      Q.   All right.
15      A.   -- so he could probably give better testimony
16   than I on it.
17      Q.   But at least it's true that both product
18   types 04 and 05 in the RIMS system as it existed prior
19   to April of '93, it -- it included data for items from
20   third parties other than Fisher?
21      A.   Yes.
22      Q.   Yeah.  I think you indicated you have
23   reviewed Exhibit 7 before, is there anything that you
24   recall seeing in Exhibit 7 that was inaccurate about
25   how the RIMS system operated as of April of '93?

46

1       A.   I -- I haven't read this document in a while,
2    so I really can't answer that.
3       Q.   Well, let's talk a little bit about the RIMS
4    system's cross-referencing capabilities, if you can
5    turn to that topic.  Are you familiar with the term
6    cross-referencing --
7       A.   Yes.
8       Q.   -- in context of a system like a RIMS system?
9       A.   Yes.
10      Q.   What is your understanding of what
11   cross-referencing is in the context of a RIMS system?
12           MS. ALBERT:  Object to the form.  Vague as to
13   time.
14   BY MR. McDONALD:
15      Q.   We'll say the RIMS system as it existed prior
16   to April of '93.
17           MS. ALBERT:  Still same objection as there's
18   no boundary on that.
19   BY MR. McDONALD:
20      Q.   Okay.  Let me rephrase the question,
21   Mr. Kinross.
22           With respect to your understanding of how the
23   RIMS system existed as of the time frame December '92
24   to April of '93, that time range, what is your
25   understanding of how it -- or what cross-referencing

47

1    was in the RIMS system?
2            MS. ALBERT:  Object to the form.  Lacks
3    foundation.
4       A.   My understanding of cross-referencing for
5    RIMS would be the ability to take a competitor's part
6    number and cross reference it to a Fisher part
7    number.
8    BY MR. McDONALD:
9       Q.   What's the purpose of that?
10      A.   The purpose would be to make it easier for a
11   customer to order from Fisher and speak the language of
12   the particular paper catalog they may be looking at for
13   an item they wanted to purchase.  So if they were
14   looking at a competitor's catalog, say VWR, for
15   instance, they had similar catalogs of Fisher, we would
16   take that VWR parts number and cross-referencing it --
17   cross-reference it to a similar or exact match in the
18   Fisher catalog.
19      Q.   So can you describe for me what the
20   cross-referencing process actually looks like from the
21   standpoint of the -- either the customer or the
22   customer service representative, I guess, do I
23   understand you right that a customer would come to the
24   customer service representative using the RIMS system
25   and have a part number, for example, from this VWR

48

1    catalog?
2       A.   Yes.
3       Q.   Maybe it's part No. 1001, okay?
4       A.   Yes.
5       Q.   So it takes that to the customer service
6    representative, then what happens to have this
7    cross-referencing become apparent to either the
8    customer service representative or the user?
9       A.   I don't recall the exact details of how that
10   interface worked, but the end result would be
11   suggesting that that part number existed in the Fisher
12   catalog as part No. A, B, C, D.
13      Q.   So generally the part number from VWR would
14   be inputted into the RIMS system and somehow it would
15   give you a display back that would indicate there was
16   some corresponding Fisher Scientific product?
17      A.   Yes.
18      Q.   And that capability did exist in the RIMS
19   system as of April of '93?
20      A.   I believe it did.
21      Q.   And, in fact, in this patent that was filed
22   in April of '93 for the RIMS system, do you see there's
23   a whole section beginning at the bottom of column 31
24   entitled cross-referencing?
25      A.   Yes.

Kinross, Robert  12/2/2009  9:00:00 AM

49

1     Q.  And that -- that's a section of the RIMS
2  patent, the 989 patent, starts at the bottom of column
3  31 continues through columns 32, 33 and 34, correct?
4     Q.  Do you want me to have a chance to read this?
5     Q.  Yeah, go ahead and review those pages
6  generally just to confirm.  I don't know that you have
7  to read every word.  But isn't it true that all of
8  those columns that I referred to from the bottom of
9  column 31 through column 34, that's all discussing the
10  RIMS patent cross-referencing?
11     A.  Okay.  Yeah, that deals with
12  cross-referencing.
13     Q.  You had a chance to now review those columns,
14  correct?
15     A.  Yeah, the --
16     Q.  Did you actually read them?
17     A.  The end of column 31 beginning at line 60 and
18  the entire column 32, I did review those, and they do
19  reference cross-referencing and describe the processing
20  RIMS of cross-referencing.
21     Q.  Okay.  Is it your understanding that in the
22  RIMS system as used at customer locations prior to
23  April of '93 employed this cross-referencing as
24  described here?
25        MS. ALBERT:  Objection.  Vague as to time.

50

1  BY MR. McDONALD:
2     Q.  You may answer.
3     A.  Yes.
4     Q.  You saw in your reading here in column 32
5  some discussion of cross-reference tables; is that
6  right?
7     A.  Yes.
8     Q.  Is it your understanding that the RIMS system
9  as used for customers prior to April of '93
10  specifically employed cross-referencing tables to
11  perform this cross-referencing function we discussed?
12        MS. ALBERT:  Same objection.  Vague as to
13  time, prior to '93.
14     A.  Yes, it was referring to local
15  cross-referencing tables.
16  BY MR. McDONALD:
17     Q.  Refers both to, I think, local and host
18  cross-referencing tables, right?
19     A.  Yes.
20     Q.  Local and host, does that refer to the two
21  different computers that the Table is located at?
22     A.  Yes.
23     Q.  The local table is on a local computer,
24  correct?
25     A.  Yes.

51

1     Q.  And then the host table -- cross-reference
2  table is on a host computer, correct?
3     A.  Correct.
4     Q.  What is a -- what's the difference between a
5  local computer and a host computer for purposes of the
6  RIMS system?
7     A.  The local computer would be the PC at the
8  customer location that would run the RIMS system.
9     Q.  Okay.  That's the local one?
10     A.  Yes.
11     Q.  What's the host?
12     A.  The host would be the IBM mainframe.
13     Q.  Where is that located?
14     A.  That was in Pittsburgh at the time.
15     Q.  That's at Fisher Scientific?
16     A.  Yes.
17     Q.  At the time being that early '93 time frame?
18     A.  Yes.
19        MS. ALBERT:  Whenever you reach a good
20  stopping point, can we take a short break?
21        MR. McDONALD:  Yeah.  Yes, we can.  Right
22  now.
23        THE VIDEOGRAPHER:  Going off the record.  The
24  time is 12:14 p.m.
25        (A brief recess was taken.)

52

1        THE VIDEOGRAPHER:  We're now back on the
2  record.  The time is 12:21 p.m.
3  BY MR. McDONALD:
4     Q.  Mr. Kinross, before the break we were talking
5  about cross-referencing, I just want to come back to
6  that for a moment.
7        Is the cross-referencing function in the RIMS
8  system as it existed in early '93 also sometimes called
9  conversion?
10     A.  I was not familiar with the term "conversion"
11  to reference to cross-referencing.
12     Q.  Did you have an understanding of what
13  conversion or converting means in connection with a
14  requisition system like either the RIMS system or the
15  system described in your patents?
16     A.  No, I don't have an understanding of what the
17  conversion would mean.
18     Q.  Okay.  Well, let me just refer you to the 989
19  patent, the RIMS patent, Exhibit 7, at column 33, do
20  you have that column in front of you?
21        There's a reference to the word conversion
22  there about halfway down the page at about line 39 or
23  40.  You see there's a phrase there.  I'll just read
24  part of it.  Feel free to read everything you need to
25  here, but I'm just referring to this phrase, to alert

Kinross, Robert  12/2/2009  9:00:00 AM

53

1   the CSR that a conversion from the competitor's catalog
2   number has been made, quote.  Do you see that language?
3     A.  Column 33, line 40?
4     A.  Yes.
5     A.  Okay.
6     Q.  In this context do you have an understanding
7   of what conversion is?
8     A.  Yes.
9     Q.  What's your understanding in this context?
10     A.  Let me just back up and read that
11   paragraph --
12     Q.  Sure, sure.  Read whatever you need to.
13     A.  All right.
14       My understanding of this is that it's finding
15   a match in a competitor cross-reference table and
16   wanting to alert the customer service rep that it's
17   switching that number to a Fisher number for the order.
18     Q.  So conversion is the process by which you, in
19   the RIMS system here, as described in the RIMS patent,
20   you enter a part number for vendor X into the system
21   and then it will indicate to you a corresponding part
22   from vendor Y; is that right?
23     A.  Not vendor.  Vendor to me means the
24   manufacturer.  The distributor would mean a seller of
25   that vendor's --

54

1     Q.  The source, the actual source, is that what a
2   distributor is?
3     A.  The distributor deals with vendors to supply
4   products in Fisher's terminology, so the vendor might
5   be Pyrex in this example, Pyrex Griffin beaker, but the
6   distributor may be Fisher and the other distributor may
7   be VWR, and they're both assigning different part
8   numbers to the same Pyrex beaker which would be the
9   vendor's beaker.
10     Q.  So the same -- the product could have the
11   same vendor or manufacturer but come from two different
12   distributors or sources?
13     A.  Yes.
14     Q.  Okay.  And so your understanding that in the
15   RIMS system as described here in the RIMS patent that
16   conversion is you might have a beaker from distributor
17   X and the system will then come back and give you a
18   conversion of what you asked for from vendor X and give
19   you an indication of the same product from vendor -- or
20   excuse me, distributor Y?
21     A.  If that distributor was Fisher, yes, it's
22   converting two Fisher numbers all the time, something
23   that we can stock and service the customer with.
24     Q.  Is that because, you know, Fisher is really
25   in the business of selling products, right?

55

1     A.  Yes.
2     Q.  And so if you can sell them a product where
3   you're the distributor source for it, as opposed to one
4   of your competitors, all things being equal you'd
5   rather do that, right?
6     A.  Exactly.
7     Q.  Is that capability that was also in the
8   system described and the 683 patent in the other two
9   patents that involve you as an inventor?
10     A.  There was a feature for cross-referencing in
11   that patent, yes.
12     Q.  Was the cross-referencing or conversion
13   feature in the patents that you're an inventor on done
14   any differently than it was for the RIMS system?
15     A.  I don't believe we had all the different
16   product types coded.  Like the 01, the table that you
17   showed me before, that did not exist in the 683 patent.
18     Q.  Okay.  Were there any other differences in
19   the conversion or cross-referencing done in your
20   patents that you were inventor on versus how it was
21   done in the RIMS system as described in the RIMS
22   patent?
23     A.  I don't think so.
24     Q.  In the RIMS system as it existed at the end
25   of 1992 and prior to April of '93, it had the

56

1   capability of searching a part database by part number,
2   right?
3     MS. ALBERT:  Object to the form.
4     A.  I wouldn't consider it searching.  It could
5   do part lookups giving a part number.
6   BY MR. McDONALD:
7     Q.  Do you still have the RIMS patent, the 989
8   patent in front of you?
9     A.  Yes.
10     Q.  Could you turn to column 8 of that patent,
11   please.
12     Do you have column 8 in front of you?
13     A.  Yes.
14     Q.  And just to back up a little bit, the
15   heading, the last heading before column 8, if you go
16   back to column 6, it's under the Table I, there's a
17   heading on column 6 called requisitioning, do you see
18   that heading on column 6?
19     A.  Yes.
20     Q.  And there's no other headings between column
21   6 and column 8, correct, other than requisitioning?
22     A.  Correct.
23     Q.  So it looks like we're in the requisitioning
24   section of the patent, right?
25     A.  Yes.

Kinross, Robert  12/2/2009  9:00:00 AM

57

1    Q.  All right, sir.  So in column 8, do you see
2  at about line 46 there's the sentence, quote, in step
3  202 local computer 40 searches the Part Master Table in
4  local database 50 for the stock number that has just
5  been entered, (which can be either the customer's stock
6  number or a valid cross-reference number, such as a
7  distributor catalog number).  Do you see that sentence?
8    A.  Yes.
9    Q.  So that does refer to searching in the RIMS
10  system, correct?
11    A.  It's describing a part number lookup as a
12  search, yes.
13    Q.  Right.  Do you think -- is that an accurate
14  and fair characterization of the RIMS system, that it
15  does search the Part Master Table for a stock number?
16    A.  If -- I think the term "search" here and
17  "lookup" or "database inquiry" could be used
18  interchangeably.  That's -- I think the context is
19  that it's doing a product lookup based on a part number
20  entered.
21    Q.  So you can call it a lookup but you could
22  also call it a search for the part number, right?
23    A.  Yes, I think that's --
24    Q.  And --
25    A.  -- what's going on there.

58

1    Q.  And in that sentence, do you see reference to
2  step 202 at the beginning of the sentence I just read
3  at column or line 46?
4    A.  Yes.
5    Q.  If you turn to Figure 3 of the 989 patent
6  back earlier in the patent --
7    A.  Okay.
8    Q.  -- do you see there Figure 3 of the RIMS
9  patent shows a flowchart?
10    A.  Yes.
11    Q.  The first box at the top of the chart as box
12  200, it says, CSR enter stock number, do you see that?
13    A.  Yes.
14    Q.  And the next box 201, this stock number is
15  entered into the requisition item table?
16    A.  Yes.
17    Q.  And then the next one is 202, that was just
18  in that sentence we read, where it says, quote, local
19  computer searches Part Master Table for entered stock
20  number, quote, do you see that?
21    A.  Yes.
22    Q.  And then it has a little decision diamond box
23  right below that to determine whether or not the stock
24  number was found in 204, right?
25    A.  Yes.

59

1    Q.  All right.  So that's further description
2  here of how in the RIMS system it does search for the
3  stock number in the Part Master Table, right?
4    A.  Yes.
5    Q.  What is your understanding as to what the
6  Part Master Table is in the RIMS system as it existed
7  in late '92, early '93?
8    MS. ALBERT:  Object to the form.  Lacks
9  foundation.
10    A.  My understanding of the Part Master Table is
11  a database of products that existed in the RIMS system.
12    Q.  When you say a database of products, is that
13  a database that's got a collection of information about
14  items?
15    A.  Yes.
16    Q.  What sort of information about items were in
17  the RIMS Part Master list as existed in late '92,
18  early '93?
19    A.  I would -- I would think that the Part Master
20  would have the description of the item and the catalog
21  number of the item, the units that the item were
22  stocked, generally part information.
23    Q.  You say you would think that, are you pretty
24  sure that is what, in fact, the RIMS system had in the
25  late '92, early '93 time frame?

60

1    A.  I wouldn't know all of the fields that are in
2  a Part Master Table.  I couldn't recite what they all
3  were and -- to my way of thinking, the Part Master
4  Table in RIMS was a subset of items that existed on the
5  Fisher mainframe.  Typically the customer would
6  identify a market basket of items that they would deal
7  with and they would load those into the RIMS database
8  for local database of those items that that customer
9  typically purchased.
10    Q.  Is it -- that Part Master Table, is that also
11  referred to as a Part Master list, or are those two
12  different things?
13    A.  Do you have any reference to Part Master list
14  that I could look at to see what context it's being
15  used in?
16    Q.  Let me see if I can find one for you.
17    Well, in that same column 8, if you go a
18  little higher up, if we go back to column 8, excuse me,
19  of the RIMS patent --
20    A.  Yes.
21    Q.  Go back to line 32 of column 8.  There's a
22  reference to Part Master records and then it says, see
23  Table VI, do you see that reference?
24    A.  Yes.
25    Q.  Column -- and the words "part" and "master"

61

1 are both capitalized, right?

2    A.  Yes.

3    Q.  I know this is a different question because I

4 asked you about a list before, but if we just ask about

5 the records now, is it your understanding that Part

6 Master records are those the records that make up a

7 Part Master Table?

8    A.  I think that would be a safe assumption to

9 make, yes.

10    Q.  And then in the reference to Part Master

11 reference it says see Table VI, do you see that there

12 at line 32?

13    A.  Yes, I do.

14    Q.  If you turn to column 38 and column 39 of the

15 patent, do you see there Table VI that starts at column

16 38 and continues to column 39, Roman numeral six?

17    A.  Yes.

18    Q.  Is that a Part Master record?  Is that your

19 understanding here in the RIMS system?

20    A.  Yes, that would look to me as if it were a

21 Part Master record being described here.

22    Q.  And is it your understanding the Table VI

23 lists all the different information about an item that

24 is recorded for a given item in the Part Master Table?

25    A.  I'm not sure about some of the fields like,

62

1 "action code," I don't know that what would be, or

2 "used IND," I'm not familiar with what that would be.

3    Q.  Which ones are you familiar with?

4    A.  Well, description, the part number, product

5 type, standard unit, alternate unit, list price,

6 standard cost.  I don't know what action code would be

7 or used INB would be.

8    Q.  If we go over to column 39 with the

9 continuation of Table VI, let me just ask about a

10 couple particular ones here.  Commodity, do you see

11 that one?

12    A.  Yes.

13    Q.  Do you have an understanding as to what that

14 is?

15    A.  No, I don't.

16    Q.  BOL code, do you see that?

17    A.  Yes.

18    Q.  Do you have an understanding of what that is?

19    A.  Yeah, that is a Bill of Lading code.

20    Q.  What is that used for?

21    A.  Shipping information to provide UPS with what

22 kind of item they're going to be transporting.

23    Q.  And --

24    A.  Hazardous material would be the same kind of

25 thing, where if you couldn't --

63

1    Q.  So it has a code that would be like a

2 classification whether it's hazardous or breakable --

3    A.  Flammable.

4    Q.  -- flammable --

5    A.  That type --

6    Q.  Okay.  Things that the carrier would want to

7 know?

8    A.  Yes.

9    Q.  Okay.  And it lists there, manufacturing part

10 number, that's part of the Part Master record as well,

11 correct?

12    A.  Yes.

13    Q.  Key(s), do you see the reference to Key(s)

14 K-E-Y, parentheses S, in Table VI?

15    A.  Yes, I see that.

16    Q.  Do you have an understanding as to what that

17 is?

18    A.  No.

19    Q.  So generally it's your understanding, though,

20 that the customer of Fisher Scientific will select what

21 you call the market basket of items from the Fisher

22 catalog to put onto its Part Master table?

23    A.  Yes.

24    Q.  And so who actually puts that table together,

25 is it the customer service representative or somebody

64

1 else?

2    A.  I would think the customer service

3 representative would do that.  There was a group within

4 Fisher that supported RIMS that could do that as well.

5 Prior to a RIMS installation they would get a computer

6 in, load it with the software, and one of their

7 responsibilities could be to either load this Part

8 Master or train the CSR to load to Part Master

9 depending on what level of expertise the CSR had at the

10 particular time.

11    Q.  Did you ever work with actual customers that

12 had RIMS systems at their location?

13    A.  Yes, I did.

14    Q.  I want -- I'm trying to get a sense of how

15 many products would typically be part of a Part Master

16 Table.  By customers, can you give me a range of what

17 would be typical in terms of a number of products on a

18 Part Master Table?

19    MS. ALBERT:  Objection.  Vague and ambiguous.

20    A.  My understanding was it was from 2 to 500 --

21 200 to 500 products.

22 BY MR. McDONALD:

23    Q.  Pretty typical?

24    A.  Uh-huh.

25    Q.  Were they added one at a time into the Part

Kinross, Robert  12/2/2009  9:00:00 AM

65

1  Master Table, or was there some way to move a bundle of
2  them electronically or something?
3     A.  My recollection is they were added one at a
4  time, but I don't know if there were utilities that
5  existed to help people do that.  I think it was manual
6  entry.
7     Q.  Would it be typical that these 200 to 500
8  items you're talking about, those would be all items
9  that came from the Fisher catalog?
10    A.  The majority of them would be.
11    Q.  Okay.  Would most customers have a mix of
12  items from a Fisher Scientific catalog and then parts
13  from other catalogs?
14       MS. ALBERT: Object to the form.  Lacks
15  foundation.
16  BY MR. McDONALD:
17    Q.  You may answer.
18    A.  I think most customers would have Fisher part
19  numbers in their catalog.
20    Sure, most would have Fisher, but would most
21  also have an addition to the Fisher catalog parts --
22  part records from other catalogs?
23       MS. ALBERT:  Object to the form.
24       Are you asking him about the customers he's
25  aware of or beyond that?

66

1  BY MR. McDONALD:
2     Q.  Based on any of your experience.
3     A.  Based on my experience, I don't know of any
4  customers that had their own items in the Part Master.
5  I was aware that that capability existed, but I wasn't
6  aware of any customer who were using that particular
7  feature.  The example that was always used was the
8  customer wanted to stock brooms in their stock room,
9  and we were able to, because that's not a, quote,
10 Fisher item, we were able to take the brooms from the
11 customers-owned inventory and put that in the Part
12 Master.  They could order those.
13    Q.  In terms of that cross-referencing or
14 conversion we were talking about though, that's a
15 process where there might be a non-Fisher catalog item
16 in the customer's Part Master Table, correct?
17       MS. ALBERT:  Object to the form.  Lacks
18 foundation.
19    A.  I don't think the cross-reference would be
20 built for the customer-owned items.
21 BY MR. McDONALD:
22    Q.  Okay.  Let's forget customer owned.  I don't
23 want to talk about customer owned.
24    A.  All right.
25    Q.  Let's talk about, like you mentioned, VWR --

67

1     A.  Yes.
2     Q.  That was when we talked about
3  cross-referencing and conversion.  VWR is a competitor
4  of Fisher Scientific, right?
5     A.  Correct.
6     Q.  Is it your understanding that customers using
7  the RIMS system had items in their Part Master Tables
8  from VWR?
9        MS. ALBERT: Object to the form.  Lacks
10 foundation.
11    A.  No, that's not my understanding.
12 BY MR. McDONALD:
13    Q.  What was the purpose of the cross-reference
14 table for customers or the cross-reference process?
15    A.  Well, as I said earlier, the customer may be
16 using a VWR catalog to look at products.  And they may
17 call the CSR up and say, well, I would like to order
18 this product, and they'd give the CSR a number from the
19 VWR catalog.  And the cross-reference would take that
20 number and say, okay, we have that in the Fisher
21 system.  That's how the cross-referencing is typically
22 used.
23    Q.  But you're -- but the RIMS system as
24 described in the 989 patent does at least provide the
25 capability of loading up on the Part Master record part

68

1  records from other companies like VWR, right?
2        MS. ALBERT: Object to the form.  Lacks
3  foundation.
4        Do you want him to review the patent?
5     A.  I can't really say with certainty that the
6  RIMS system did that.
7  BY MR. McDONALD:
8     Q.  Well, if we go back to that product type
9  table on columns 5 and 6 --
10    A.  Yes.
11    Q.  -- if the customer wanted the Part Master
12 Table to include items from VWR, isn't it true that the
13 RIMS system could load those as a product type 05?
14       MS. ALBERT:  Object to the form.  Lacks
15 foundation.
16    A.  I think because VWR was a competitor, we
17 would not do that.  The typical third-party item was
18 dealing with suppliers that were not competitors.  They
19 were suppliers that we dealt with and had a business
20 relationship with but didn't stock their parts.
21 BY MR. McDONALD:
22    Q.  Okay.  So maybe they're supplying products
23 totally different from the types of products that
24 Fisher Scientific provided?
25    A.  Yes, that could be, or they were very

69

1  expensive and we didn't want to stock them.  They were
2  special-order items, that type of thing.
3      Q.  So in those instances, did some RIMS
4  customers want Part Master records for those
5  third-party sources in the Part Master Table?
6      A.  Yes.  It seems that way, yes.  They were --
7  they exist in the RIMS.  What we're talking about here
8  in Table I is a RIMS table, so that --
9      Q.  Right.  The RIMS system specifically
10  contemplated you'd have products in the product type 05
11  that would be from some non-Fisher Scientific
12  distributor source or something, right?
13      A.  Yes.
14      Q.  And is it your understanding that that was a
15  feature of the RIMS system that at least some customers
16  found desirable?
17      MS. ALBERT:  Object to the form.  Lacks
18  foundation.
19      A.  Yes, I think that some customers would find
20  that desirable, yes.
21  BY MR. McDONALD:
22      Q.  Why do you say that?
23      A.  Well, because there was a whole group at
24  Fisher that was called SPS, Strategic Procurement
25  Services, that whole group dealt with third-party

70

1  items.  So the notion was Fisher could handle your
2  purchasing requirements, and we could do not just
3  Fisher items, but we could handle more than that.  We
4  could take over part of your purchasing department and
5  handle your MRO, Maintenance Repair and Operating items
6  so that the impetus of the third-party group was to
7  take those nonstandard items and establish
8  relationships with suppliers for those and be able to
9  order them.
10  BY MR. McDONALD:
11      Q.  Did personnel at Fisher Scientific offer the
12  RIMS capability as a tool in trying to get customer
13  business in part to help them message that Fisher can
14  also help you order products from other sources?
15      A.  Yes.
16      Q.  Was that true in the late '92, early '93 time
17  frame?
18      A.  Yes.
19      Q.  Could you turn to the RIMS patent to column
20  3, line 13.  I'll just read the whole sentence there
21  once you get to that page.  This is in the RIMS patent
22  now, and it says at -- beginning really at line 10,
23  quote, host computer 10 controls all inventory, pricing
24  and requisitioning operations of the distributor's
25  regularly stocked items using host pricing and

71

1  inventory database 20, (which is actually comprised of
2  several databases as will be described below) in a
3  manner which is well known to those of ordinary skill
4  in the art, do you see that sentence?
5      A.  Yes.
6      Q.  All right.  One question I have about this
7  is, is it your understanding -- what is the host
8  pricing and inventory database in the RIMS system, can
9  you explain to me generally what that is?
10      MS. ALBERT:  Object to the form.  Lacks
11  foundation.
12      A.  The host pricing and inventory database would
13  be records that exist on the Fisher mainframe that
14  would provide inventory availability at various Fisher
15  stocking locations, and it would also provide types of
16  pricing that were available for this customer for this
17  particular item.  And there were various pricing
18  schemes and algorithms that were employed at Fisher,
19  and the pricing routines would know which databases to
20  look at for an appropriate price for the customer based
21  on who they were and what arrangements were made with
22  that customer in the sales process.
23  BY MR. McDONALD:
24      Q.  Okay.  So when that sentence that I just read
25  says that that database is actually comprised of

72

1  several databases, do you have an understanding of at
2  least what some of those multiple databases are that
3  are in that host or part of what the host computer
4  controls there in the inventory database 20?
5      A.  Okay.  It's referencing -- describing them
6  below --
7      Q.  Yeah.
8      A.  Do I have an opportunity to read that before
9  I answer?
10      Q.  Sure.  If that would help you, sure.  Yeah.
11      A.  Do you know where that would be below?
12      Q.  Well, I had a little trouble really
13  understanding it myself.  That's kind of one of the
14  reasons I'm asking you, but there is some continuing
15  discussion of that database 20 throughout column 3.  I
16  guess, I'll refer you to that column 3 -- the entirety
17  of column 3 as at least talking about database 20.
18      A.  Okay.  Well, without --
19      MS. ALBERT:  But feel free to look at other
20  portions of the patent, if that helps you.
21      THE WITNESS:  Okay.
22  BY MR. McDONALD:
23      Q.  Right.
24      A.  Okay.  I've read the entire column 3 and the
25  question, I believe, was related to --

Kinross, Robert  12/2/2009  9:00:00 AM

73

1    Q.   What I was asking -- I'll bring it back.

2  I'll just rephrase it.

3        About lines 13, 14 of column 3, there's a

4  parenthetical about that database 20 --

5    A.   Right.

6    Q.   -- which says it's actually comprised of

7  several databases.

8    A.   That's right.

9    Q.   And I was trying to figure out what are the

10  several databases that comprise host pricing and

11  inventory database 20?

12    A.   Okay.  All right.  And in regard to the

13  pricing, there were different pricing databases at

14  Fisher to provide a unique price for a given customer.

15  One, in particular, was a customer hand price --

16    Q.   Hand?

17    A.   Hand, H-A-N-D, pricing.  And what that would

18  do is allow a sales rep for a particular product to

19  enter an exact price that that customer would pay for

20  regardless of what other contracting negotiations were

21  established for that customer.  So that's one

22  database --

23    Q.   Okay.  So --

24    A.   -- that could be used for pricing.

25        Another database that could be used for

74

1  pricing would be the Part Master that would have a cost

2  price and a list price in it.  And the sales rep, if

3  they chose not to use a hand pricing, which was a

4  tedious task, by the way, going through every part the

5  customer may want, they could put in codes to indicate,

6  well, this customer gets 30 percent off this or 10

7  percent above cost, those kinds of figures in that

8  database to allow pricing to happen in a general manner

9  by providing discounts rather than specific prices.

10        In that way, if the cost price went up for

11  instance or margins became smaller, if they were using

12  cost-plus pricing, it'd maintain the margins.  So those

13  types of pricing algorithms existed at Fisher, and they

14  used various databases to support that kind of pricing.

15        In regard to the multiple inventory

16  databases, of course, have the Fisher mainframe item

17  location database -- and, let's see, what did they call

18  that?  I can't remember the exact table name for it,

19  but basically it was a table of part numbers at Fisher

20  warehouses and it would provide the quantities

21  available at that particular warehouse.

22        And the other database that this column 3 is

23  referring to is the local database that existed on RIMS

24  that essentially provided the same type of information,

25  so for the JIT inventory, for instance, in line 40.  So

75

1  those were the databases that I'm aware of that it's

2  referring to in this document, as you know, multiple

3  databases.

4    Q.   Okay.  So on the inventory side, if we focus

5  on database 20 which the host database, right?  If you

6  look up at line 16 or so of column 3, it refers to 20

7  as the host database?

8    A.   Yes.

9    Q.   All right.  So on the inventory side the

10  multiple inventory databases at host database 20

11  include the Fisher mainframe item location database by

12  warehouse, is that one of them?

13    A.   Yes.

14    Q.   And is another one the just-in-time or the

15  J-I-T sites database?

16    A.   Yes.

17    Q.   Are there any other that relate to inventory

18  down on the host database 20?

19    A.   I didn't see any in here that were mentioned,

20  but --

21    Q.   At line 47 it says, "Database 20 may also

22  include file records for items which distributor does

23  not routinely supply to all customers but has agreed to

24  purchase for supply to particular customers on a

25  special or third-party procurement basis," do you see

76

1  that sentence?

2    A.   And what line was that?

3    Q.   Line 46 of column 3.

4    A.   Yes.

5    Q.   And, in fact, I think you've kind of

6  referred, at least in general terms, to this set of

7  information --

8    A.   Yeah, the third-party items, yes.

9    Q.   Right.  Now, when it says the database may

10  also include those file records, is that indicating

11  that's a separate database, or is that going to be

12  parts of one of the other databases?

13    A.   My recollection was, it is part of the

14  database that would be the product master.

15    Q.   Okay.  Does the host database 20 have as one

16  of its databases the Part Master Table?

17    A.   It definitely had a Part Master, yes.

18    Q.   And then so that third-party information

19  would be part of that Part Master database; is that

20  right?

21    A.   Yes.

22    Q.   Is that Part Master database in addition to

23  the Fisher items database that indicates the parts at

24  various Fisher warehouses?  Is that a separate

25  database?

Kinross, Robert  12/2/2009  9:00:00 AM

**77**

1    A.  Separate data -- yeah, there are two levels
2  there.  I mean the product existed at the top level in
3  the Part Master, and then you would have multiple
4  records in the inventory database to represent the
5  locations that stock that part at the various Fisher
6  locations and warehouses.
7    Q.  So which database or databases are searched
8  when the customer service representative inputs a part
9  number when he's doing a requisition?
10    MS. ALBERT:  Object to the form.
11    A.  Well, in the RIMS system, which is what we're
12  talking about, I believe the search would start with
13  the local database Part Master, the 2 to 500 products
14  we were talking about, and it would also consult the
15  mainframe to see that part existed in the Fisher
16  mainframe.
17  BY MR. McDONALD:
18    Q.  The mainframe, that's the same as the host
19  computer database?
20    A.  Yes, uh-huh.  So those would be the two
21  databases that it would look at.
22    Q.  Would it always look in both, or would it
23  sometimes just look at the local database?
24    A.  I think if found in the local, it would stop
25  there, because it would be the same part in the

**78**

1  mainframe, so there would be no need to look for it in
2  the mainframe.
3    Q.  So the only reason it would have a reason to
4  go look in the home -- or, excuse me, the host database
5  or the mainframe is if it wasn't available in the local
6  databases Part Master Table?
7    A.  Yes.
8    Q.  Did the RIMS system as it existed at the end
9  of '92 also have a way to check inventory for
10  availability of a part that was the subject of a
11  search?
12    A.  Yes.
13    Q.  Was the cross-reference table, which data --
14  which -- where was that located?  Was it on the host,
15  was it at the local database or where or both?
16    A.  Without referring to the documentation, I
17  would --
18    MS. ALBERT:  We don't want you to speculate.
19    A.  Well, yeah, I'd be speculating.
20  BY MR. McDONALD:
21    Q.  Okay.  Let me give you something to refer to
22  here.  If we go to column 32 of the RIMS patent.  I
23  recall that we actually earlier made a note of this.
24    At column 32, line 14, there's a reference to
25  a host cross-reference table, do you see that?  Line

**79**

1  14.
2    A.  Yes.
3    Q.  And then you get down to about line 30
4  there's a reference to a local cross-reference table,
5  right, line 30, 31 or so.  There's a sentence that says
6  the CSR at local computer 40 creates the local
7  cross-reference table?
8    A.  Yes.
9    Q.  Okay.  So it does appear that RIMS both had a
10  cross-reference table at the local computer as well as
11  at the --
12    A.  Yes.
13    Q.  -- the host database, right?
14    A.  Right.
15    Q.  It was at the local database as well as the
16  host database, right?
17    A.  That appears so, yes.
18    Q.  Now, I think you indicated that that
19  cross-reference table, for example, for that competitor
20  VWR, you wouldn't necessarily have VWR listed in the
21  Parts Master Table, but they would be listed on the
22  cross-reference table, right?
23    A.  Yes.
24    Q.  So if -- while we're on column 32 here at
25  line 30, where we were just reading from --

**80**

1    A.  Yes.
2    Q.  -- it says it creates the local
3  cross-reference table and local database 50 using the
4  cross-reference maintenance data screen 76 shown in
5  Figure 2A, a sample of which is set forth in Table
6  XVIII, do you see that?
7    A.  Uh-huh.
8    Q.  So if we turn to Table XVIII, column 43 and
9  44 --
10    A.  Okay.  I have it.
11    Q.  -- Table XVIII says, cross-reference
12  maintenance, that's what looks like a heading there,
13  right?
14    A.  Cross-reference maintenance, yes.
15    Q.  Is this in effect a record that would be in
16  the cross-reference table for a product such as a VWR
17  beaker?
18    A.  Yes, it looks like it would be.
19    Q.  So looks like it doesn't have as much
20  information about that part as you would find in the
21  Part Master records, right?
22    A.  Correct.
23    Q.  But it does have at least a catalog number, a
24  vendor number, a description, a unit price and product
25  code among other fields, correct?

81

1     A.  Yes.
2     Q.  All right.  So when the customer service
3   representative would input a part number for VWR, would
4   it just search the cross-reference table, the local
5   cross-reference table, or would it also search the Part
6   Master Table?
7     A.  I think the order of the search would be to
8   try to find it in the Part Master first.  If it didn't
9   find it there, it would try to find it in the
10   cross-reference.
11     Q.  All right.  So if the customer service
12   representative had a VWR catalog or a part number,
13   they'd put that in, the system would search for it
14   first in the Part Master Table, and if it found it
15   there it would stop, but if it didn't find it there, it
16   would then look for it in the cross-reference table?
17     A.  Yeah.
18     MR. McDONALD:  We're going to take a break
19   for the video.
20     THE VIDEOGRAPHER:  This marks the end of tape
21   No. 1 in the deposition of Mr. Kinross.  We're going
22   off the record.  The time is 1:10 p.m.
23     (A brief recess was taken.)
24     THE VIDEOGRAPHER:  This marks the beginning
25   of tape No. 2 in the deposition of Mr. Kinross.  We are

82

1   now back on the record.  The time is 1:18 p.m.
2   BY MR. McDONALD:
3     Q.  Mr. Kinross, in the RIMS system as it existed
4   at the end of 1992 that was -- you consider that an
5   electronic sourcing system, right?
6     MS. ALBERT:  Object to the form.  Calls for a
7   legal conclusion.
8     A.  It's not the electronic sourcing system that
9   we had envisioned in a 683 patent.
10   BY MR. McDONALD:
11     Q.  Okay.
12     A.  It's a requisitioning system.
13     Q.  Well, the RIMS system did do sourcing, right?
14     MS. ALBERT:  Object to the form.  Calls for a
15   legal conclusion.
16     A.  It did inventory availability.
17   BY MR. McDONALD:
18     Q.  Could you turn back to the RIMS patent, the
19   989 patent, please.  Do you have that in front of you?
20     A.  Yes.
21     Q.  Could you turn to page, or excuse me, column
22   11.
23     A.  Got it.
24     Q.  Do you see there's a whole section beginning
25   at column 11 at about line 25 that is under the

83

1   heading, "Sourcing"?
2     A.  Yes.
3     Q.  It's true that the RIMS system did sourcing,
4   right?
5     A.  Yes.
6     Q.  And it did sourcing invoking computers,
7   right?
8     A.  Yes.
9     Q.  It's fair to call the RIMS system a system
10   that included electronic sourcing, right?
11     A.  Based on that definition, yes.
12     Q.  Based on which definition?
13     A.  That it used computers, and it provided
14   sourcing information.
15     Q.  Okay.  The cross-reference tables in the RIMS
16   system as it existed at the end of '92, that would
17   include data regarding products from Fisher Scientific
18   as well as products from other distributors or sources
19   such as VWR, right?
20     MS. ALBERT:  Object to the form.  Lacks
21   foundation.
22     A.  Yes.  It would include data from distributors
23   like VWR in terms of cross-referencing information,
24   yes.
25   BY MR. McDONALD:

84

1     Q.  As well as Fisher Scientific, correct?
2     A.  As well as Fisher Scientific, yes.
3     Q.  That's the point of the cross-reference, is
4   to have it from two sources, right?
5     A.  Yes.
6     Q.  And in the RIMS system as it existed at the
7   end of 1992, did it have a way with that
8   cross-reference table to put in a part number from
9   another distributor such as VWR that search for it and
10   find it?
11     A.  In Fisher's system, yes.
12     Q.  In the RIMS system, as it existed at the end
13   of '92, right?
14     A.  Yes.
15     Q.  All right.  And in the RIMS system as it
16   existed at the end of '92, could you take the results
17   of that search in the cross-reference table and use the
18   results of that to build the requisition?
19     A.  Yes.
20     Q.  And in the RIMS system as it existed at the
21   end of '92, could it then take that requisition and
22   process it into a purchase order?
23     A.  Yes.
24     Q.  And in that RIMS system as it existed at the
25   end of '92, could it use that cross-reference table to

85

1  take a non-Fisher part number, such as a VWR part
2  number, and, in effect, convert that over to a Fisher
3  Scientific part number?
4      A.  Yes.
5      Q.  In the RIMS system, could it take, if you
6  search for a particular part number and chose it, could
7  the RIMS system then determine whether that particular
8  part was available in an inventory?
9      MS. ALBERT:  Object to the form.  Vague and
10  ambiguous.
11     A.  For Fisher items, yes, it could determine
12  whether Fisher had that in inventory, yes.
13  BY MR. McDONALD:
14     Q.  Could it do it for -- that determination of
15  whether it's in inventory, could it do that for any
16  non-Fisher items?
17     A.  No.
18     Q.  Could it do that for customer-owned items?
19     A.  I believe it could.  In the instance where
20  they were in the stock room, at the JIT location, it
21  could certainly tell whether that customer-owned item
22  was in the stock room, yes.
23     Q.  And we're still talking about the RIMS system
24  as it existed at the end of '92?
25     A.  Yes.

86

1      Q.  Can you refer back to the 683 patent now,
2  Exhibit 1.
3      Now, in the -- there's a series of figures or
4  drawings after the first two pages of the patent,
5  correct?
6      A.  Yes.
7      Q.  Begins with Figure 1A and then it continues
8  up to Figure 3, correct?
9      A.  Yes.
10     Q.  And in Figure 1A that's a block diagram
11  showing one example embodiment of the overall system of
12  the invention described in the patent; is that right?
13     A.  Yes.
14     Q.  Now, of these boxes, you've got this block
15  diagram showing different boxes that represent certain
16  things, right?
17     A.  Correct.
18     Q.  These boxes are generally representations of
19  what's on computers, right?
20     A.  Yes.
21     Q.  Now, there's a few things that aren't on the
22  computers like the monitor, the printer and the
23  keyboard, those wouldn't -- that would be things that
24  would plug into the computer basically, right?
25     A.  Right.  Hardware.

87

1      Q.  Okay.  Now, of all these boxes in Figure 1A,
2  there is a reference over to the left side of the
3  figure to the number 40, with underneath that in
4  parentheses, RIMS, do you see that?
5      A.  Yes.
6      Q.  And it's got two arrows kind of curving out
7  of it from above and then off to the left and down
8  below?
9      A.  Yes.
10     Q.  Is it your understanding that the RIMS system
11  as it existed at the end of 1992 included all of the
12  functions represented by all the boxes in Figure 1A
13  except the box TV 250, the Catalog Database box 36 and
14  Shell 52?
15     MS. ALBERT:  Object to the form.  Lacks
16  foundation.
17     A.  No, that's not my understanding of what RIMS
18  included in this diagram.
19  BY MR. McDONALD:
20     Q.  Well, which blocks in Figure 1A do you think
21  correspond to blocks or boxes that existed in the RIMS
22  system as it existed in '92?
23     MS. ALBERT:  Object to the form.  Lacks
24  foundation.
25     A.  I think that the boxes may not change, but

88

1  the functionality within RIMS had to change for this
2  particular patent.
3  BY MR. McDONALD:
4      Q.  Okay.  So if we break out the two concepts of
5  the boxes versus what's in the boxes, if I understand
6  that's what we're working with here --
7      A.  Yes.
8      Q.  So let's take that process.  Did RIMS have --
9  or was RIMS a system that had functions that
10  corresponded to all of the blocks or boxes in Figure 1A
11  except for TV 250, Catalog Database 36 and Shell 52?
12     MS. ALBERT:  Object to the form.  Vague as to
13  time.
14     A.  Well, in looking at the diagram, RIMS had
15  requisition databases, it had a requisition
16  maintenance, it had inventory sourcing.  I'm not
17  certain if REQI was in RIMS at the time.  I'd have to
18  research that.  It did have customer variable data.  It
19  did have order headers.  But what's in the database had
20  to change between 1992 and this implementation of RIMS.
21  BY MR. McDONALD:
22     Q.  Okay.  Well, did the RIMS system as it
23  existed at the end of '92 have requisition databases,
24  inventory database and customer-specific databases?
25     MS. ALBERT:  Object to the form.  Compound.

Kinross, Robert  12/2/2009  9:00:00 AM

89

1    BY MR. McDONALD:
2        Q.  You may answer.
3        A.  Yes, I believe it did.
4        Q.  Are you saying what was in those databases,
5    though, was different for the system you claimed here?
6        A.  Yes.
7        Q.  How were those three databases represented by
8    42A, 42B and 42C, how were they different for the
9    system described in the patents that you're listed as
10   an inventor in?
11       A.  I think the biggest difference would be, RIMS
12   in this implementation had to account for the multiple
13   vendors scenario to be able to handle the multiple
14   catalogs coming back from the shell.
15       Q.  So was there something different about the
16   requisition databases 42A in the system described in
17   your patents versus the requisition databases in the
18   RIMS system as it existed in '92?
19       A.  I wouldn't know exactly what needed to be
20   changed in the requisition databases to support the
21   multiple vendor environment that the Figure 1A suggests
22   by having the catalog databases in there.  I just know
23   that it needed to be changed to handle that.  I don't
24   know what --
25       Q.  Do you know what other changes were?

90

1        A.  I don't know what the changes were or not.
2        Q.  Are you 100 percent sure that 42A, 42B and
3    42C, in terms of the system itself, had to be changed?
4        A.  I don't know which ones.  I'd be speculating
5    on which ones had to be changed.  I think Jim Johnson
6    would be better able to answer what changes were made.
7        Q.  What other changes, if any, had to be made to
8    the RIMS or the boxes in Figure 1A that correspond to
9    the RIMS system as it existed in 1992?
10       A.  Well, if you look at Figure 2 and Figure 1C,
11   and you see REQI there, and REQI listed in Figure 1A, I
12   believe, represent the same thing.  And the changes
13   that would have to be made would be the communications
14   between REQI and the Shell.
15       Q.  So, I'm sorry, what in Figure 2 corresponds
16   to REQI in Figure 1A?
17       A.  Well, Figure 1C has REQI interacting with the
18   Shell; and Figure 2, it says, requisition management
19   like the 110 starting point.
20       Q.  So you think 110 is the same as REQI?
21       A.  I think it's like blowing up what REQI is in
22   terms of the various modules that existed within REQI.
23       Q.  What is a blowup of REQI, Figure 2?
24       A.  Yes.
25       Q.  So what else in Figure 2, other than that box

91

1    110, would correspond to REQI in Figure 1A?
2        A.  Oh, given the knowledge that there was one
3    interface point between the technical viewer and RIMS
4    and the depiction of REQI in Figure 1A and the
5    depiction of REQI in Figure 1C, the link between REQI
6    and the Shell program exists there, 61 and 60.
7        Q.  You're in which drawing?
8        A.  On 1C.
9        Q.  1C, okay.
10       A.  And you could see that the Figure 2 has the
11   90 and DDE link --
12       Q.  Yes.
13       A.  -- and that link would be the same link as
14   the one depicted in 61 and 62.
15       Q.  All right.  Well, it looks to me like the
16   REQI box itself didn't change; it's more the fact that
17   you've added some connections between it and something
18   else, is that fair or not?
19       MS. ALBERT:  Object to the form.
20       A.  I don't think so.  I think REQI changed, and
21   Figure 2 represents an exploded view of what REQI is.
22   It's trying to give you more level of detail.  The big
23   picture is Figure 1A, like Figure 1C and then
24   the more detail of that is Figure 2.
25   BY MR. McDONALD:

92

1        Q.  All right.  Well, in the -- your 683 patent
2    there, as well as the other patents, they all have the
3    same Figure 1A in them, right?
4        A.  I'd have to verify that.
5        Q.  Sure.  Exhibits 2 and 3.
6        A.  516 looks the same.  Well, there is a
7    difference in the 172 patent in that 44 has been added
8    with a box around it, so that's different.
9        Q.  All right, sir.  Any other differences in
10   there, in the 172 patent?
11       A.  I don't see any.
12       Q.  Okay.  The RIMS system had a host computer
13   and host database as of '92, right?
14       A.  Yes.
15       Q.  It also had a local computer with a monitor,
16   printer and keyboard, right?
17       A.  Yes.
18       Q.  It did have requisition and inventory
19   databases, right?
20       A.  Yes.
21       Q.  Did it have customer-specific databases?
22       A.  I believe it did.
23       Q.  What is your understanding is the type of
24   data that would be in the customer-specific databases
25   in the RIMS system as it existed at the end of '92?

93

1    A. Well, do they have the customer-specific
2  database documented in the RIMS patent?
3    Q. Well, you have the 989 still in front of you.
4    A. Yeah.
5    Q. Okay.
6    A. Well, the 683. Yeah, 989 is there.
7    Q. 989 is the RIMS patent.
8    A. Yeah.
9    Q. If you refer to Figure 1, it does show a
10  local database in boxes 54 and 52 called customer's JIT
11  inventory and distributor's JIT inventory, if that
12  helps answer that question.
13     MS. ALBERT: Object to the form.
14    A. No, that really doesn't help me answer the
15  question. What I was looking for is --
16  customer-specific databases would be a type of database
17  that would contain records as we looked at, back in
18  column 43, the various tables, that RIMS employed.
19  BY MR. McDONALD:
20    Q. You're talking about column 43 of the RIMS
21  989 patent?
22    A. Yes, I am.
23    Q. So the RIMS patent clearly discloses these
24  tables 16, 17, 18 and 19 in column 43, right?
25    A. Right.

94

1    Q. Are those -- are all those tables things that
2  you would consider to be the sort of information you
3  would see in the customer-specific database?
4    A. No, they're not. What I'm looking for is
5  something that would be labeled customer-specific data
6  and have fields and that sort of thing in it defining
7  what customer-specific data would be.
8    Q. I see.
9    A. Would that include things like discounts
10  available to a specific customer, that
11  customer-specific database?
12     MS. ALBERT: Object to the form. Lacks
13  foundation.
14    A. I don't see the customer-specific data
15  documented in the RIMS patent here. My recollection of
16  what customer-specific data is would be things that
17  were required by a customer in the purchasing
18  department to identify things like who the
19  requisitioner is that's placing the order, what
20  accounting codes may be associated with that particular
21  customer, the use of information in the customer's
22  accounting system that would lend itself to facilitate
23  RIMS reports back to the customer as far as what the
24  buying activity was. That to me is what
25  customer-specific databases would be used for.

95

1  BY MR. McDONALD:
2    Q. Now, if you turn to the 683 patent --
3    A. Yes.
4    Q. -- you have that in front of you -- and go to
5  column 4, there's a short paragraph at column 4 from
6  lines 20 to 25 that says, Fisher RIMS system 40 also
7  includes several Fisher RIMS databases 42. These
8  databases 42 preferably include requisition databases
9  42A, inventory databases 42B, and customer-specific
10  databases 42C, each maintained within OS2 operating
11  system 32, quote, do you see that paragraph?
12    A. Uh-huh.
13    Q. So is it true that at least in your patent
14  application you indicated that that customer-specific
15  databases 42C were part of the Fisher RIMS system?
16    A. Yes.
17    Q. Is that your understanding that as of
18  late 40 -- of 1992, the Fisher RIMS system did include
19  customer-specific databases?
20     MS. ALBERT: Object to the form.
21  Mischaracterizes his prior testimony.
22    A. It's my recollection that RIMS did include
23  customer-specific databases for the purposes I
24  mentioned in 1992. Now, I cannot explain why they're
25  not in the tables that are documented as the RIMS

96

1  system. I would think they would be in here.
2  BY MR. McDONALD:
3    Q. Well, they may be in the body of the patent
4  that's not in the table. You don't have time to read
5  the whole thing right now, right?
6    A. Could be. Exactly. Could be. I can't
7  explain why they're not there.
8    Q. All right. And if we -- since we have the
9  683 patent at column 4, it does in that, immediately
10  above the section I just read it -- the last sentence
11  at about column 4, lines 18 to 19 says, "REQI program
12  44A is most often the RIMS program 44 that interfaces
13  with TV/2 search program 50," do you see that sentence?
14    A. Yes.
15    Q. So it is true that the RIMS system, as it
16  existed at the end of '92, had an REQI program in it,
17  it just didn't interface with the TV/2 search program
18  yet, right?
19     MS. ALBERT: Object to the form.
20  Mischaracterizes the document. Document is dated 1994.
21    A. You know, I don't know that. REQI could have
22  been a new module. Is it documented in the RIMS patent
23  anywhere?
24  BY MR. McDONALD:
25    Q. Requisition management?

Kinross, Robert  12/2/2009  9:00:00 AM

---

97

1      A.  REQI.
2      Q.  Well, isn't it true that REQI is a
3  requisition management program for -- stay with column
4  again --
5      A.  Yeah, that's what this document is saying,
6  but requisition management is a general term, and REQI
7  is a specific transaction ID that would be a CICS base
8  transaction ID that they're referring to there, and
9  that's why it's called REQI.
10     Q.  Well, the RIMS system operated running on a
11  CICS OS2 application, didn't it?
12     A.  Yes.
13     Q.  So if REQI refers to a CICS, isn't that true
14  then that the RIMS system would have had an REQI
15  system?
16     MS. ALBERT:  Object to the form.  Vague as to
17  time.
18     A.  I can't say that with any degree of certainty
19  REQI existed without having seen it in the RIMS patent.
20  BY MR. McDONALD:
21     Q.  What did REQI do, as you understand it and as
22  you described it in your 683 patent?
23     A.  It's showing that it interfaces with the
24  electronic catalog.
25     Q.  I understand that's what it interfaces with,

---

98

1  but what did it do?
2      A.  Well, it looks like Figure 1C shows it's
3  updating the requisition item table, and it also shows
4  it communicating with the Shell program.  So that's
5  what it, based on the documentation I'm looking at now,
6  that's what it did.
7      Q.  So it interfaced with TV/2, and it updated
8  the requisition item table?
9      A.  That's what it's showing, yeah.
10     MS. ALBERT:  Objection to form.
11  Mischaracterizes his prior testimony.
12  BY MR. McDONALD:
13     Q.  Did I mischaracterize your testimony?
14     A.  The box here, requisition item table and the
15  arrows between it and REQI, would indicate to me that
16  REQI is updating the requisition item table.
17     Q.  All right.  You're referring to Figure 1C?
18     A.  Yes, Figure 1C, yes.
19     Q.  All right.  So your understanding is that the
20  REQI program, is that a program, is that what it is
21  or --
22     A.  It's a trans -- the correct termination would
23  be a transaction.
24     Q.  A transaction.
25     A.  It could consist of one or many programs.

---

99

1      Q.  So the REQI transaction performed two
2  functions, one is it interacted with the Shell, and two
3  is it updated the requisition item table?
4      A.  Yes.
5      Q.  What's the requisition item table?
6      A.  That would be the items that are being
7  requisitioned.
8      Q.  Okay.  Did the RIMS system as it existed at
9  the end of '92 have a transaction that would update a
10  requisition item table?
11     A.  Absolutely.  Whether that was REQI or not, I
12  can't verify without, A, finding anytime here, or, you
13  know, I just can't recall that from memory the REQI
14  transaction existed in 1992.
15     Q.  So it might have been different in name,
16  maybe had some different design to it, but functionally
17  the RIMS system as of the end of '92 did perform that
18  same function of updating that requisition item table?
19     A.  Yes.  It definitely -- the requisition
20  management, whether it's REQI or not, would have
21  updated a requisition item table in 1992.
22     Q.  The RIMS system in '92 would have performed
23  requisition maintenance as well, right?
24     A.  Yes.
25     Q.  The RIMS system as of the end of '92 did

---

100

1  inventory sourcing, correct?
2      A.  Yes.
3      Q.  And the order headers, going back to
4  figure -- I mean looking at Figure 1A of your patents,
5  if you want to follow along there --
6      A.  Okay.
7      Q.  We just talked about 44C and 44B.  We already
8  talked about 44A, that's REQI.  Now I'm looking at 44D,
9  the order header, do you see that one?  44D, as in dog.
10     A.  Yes.
11     Q.  Did the RIMS system as of the end of '92 have
12  a transaction or program that corresponded to the order
13  header?
14     A.  I don't know.
15     Q.  Well, wouldn't orders in the RIMS system need
16  an order header?
17     A.  Could have been a requisition header.
18     Q.  What is an order header?  Let's back up here.
19     A.  Sometimes the terminology between order and
20  requisition become blurred, particularly when you're
21  talk about a Fisher system.  It's basically, everything
22  is a requisition until it becomes a purchase order, so
23  I don't know whether the order header depicted here was
24  a special new entity, or it could have been the
25  requisition header in the RIMS system.

---

Kinross, Robert  12/2/2009  9:00:00 AM

---

101

1      Q.   So the RIMS system did have a requisition
2    header program, right?
3      A.   Well, it had something to keep track of the
4    header of the requisition -- yeah, order header
5    information, Table I, in column 37 in the RIMS patent.
6      Q.   And that's in the RIMS 989 patent Table --
7      A.   Yeah.
8      Q.   -- I in column 37?
9      A.   Yeah.
10      Q.   -- has something called, order header
11    information?
12      A.   Yes, right. So it would be agreed that order
13    header there would be the same as order header in the
14    RIMS system.
15      Q.   Okay.  And then --
16      A.   And that's what I was looking for in that
17    customer-specific data too.
18      Q.   I see.
19      A.   The tie between the two.
20      Q.   If you go to 44E now in Figure 1A, it says,
21    customer variable in Figure 1A of your patents that
22    you're an inventor on, right?
23      A.   Yes.
24      Q.   Now, if you look -- while we got Table I here
25    we can look right below that at Table II in the RIMS

---

102

1    989 patent, Table II is entitled, "Customer Variable
2    Header," right?
3      A.   Yes.
4      Q.   So the RIMS system as of the end of '92, that
5    also had a customer variable module or system or
6    program, right?
7      A.   Yes.
8      Q.   Okay.  So the things that the -- and the RIMS
9    system did operate on CICS which is referenced in box
10    34 in Figure 1A, correct?
11      A.   Yes.
12      Q.   And the RIMS system operated on the OS2
13    system, which is represented by box 32 in Figure 1A,
14    correct?
15      A.   Yes.
16      Q.   So the only boxes that didn't have something
17    corresponding to the 1992 version of the RIMS system in
18    Figure 1A of your three patents are the catalog
19    database 36, the TV 250 and the Shell 52, correct?
20      MS. ALBERT:  Object to the form.
21    Mischaracterizes his testimony.
22    BY MR. McDONALD:
23      Q.   You may answer.
24      A.   Well, I didn't -- I didn't see the
25    customer-specific databases in the RIMS patent.

---

103

1      Q.   Right.  But I think you indicated you believe
2    that they had that customer-specific database even if
3    it's not in the patent, right?
4      A.   Right.
5      Q.   Okay.  So with that qualifier, is it true
6    that Figure 1A in your patents, all the boxes except TV
7    250, Catalog Database 36 and Shell 52, all are also
8    represented by the RIMS system as it existed at the end
9    of '92?
10      A.   Well, we had the discussion of whether REQI
11    was in the '92 system.
12      Q.   Right.  So but the REQI -- one of the two
13    functions, which was updating the requisition table, I
14    believe it was --
15      A.   Yes.
16      Q.   -- requisition item table, that function did
17    exist in RIMS, right?
18      A.   Yes.
19      Q.   The other function of REQI, which was the
20    interface with TV/2, that did not exist in the RIMS '92
21    system?
22      A.   Correct.
23      Q.   Any other qualifiers then on how Figure 1A
24    compares to the RIMS system as of '92?
25      A.   No, I think that just about does it.

---

104

1      MR. McDONALD:  Should we go ahead and have a
2    break now, have some lunch?
3      MS. ALBERT:  Sure.
4      THE VIDEOGRAPHER:  We are going off the
5    record.  The time is 1:58 p.m.
6      (A brief recess was taken.)
7      THE VIDEOGRAPHER:  We're now back on the
8    record.  The time is 2:48 p.m.
9    BY MR. McDONALD:
10      Q.   Mr. Kinross, if we can refer back to Figure
11    1A of one of your patents, the 683 patent --
12      A.   Okay.
13      Q.   So we had gone through the boxes that
14    corresponded to the RIMS system, and I wanted to talk
15    about the ones now that didn't correspond to the RIMS
16    system, the TV/2 box 50 to start with.  The goal here
17    of the boxes TV 250 Catalog Database 36 and Shell 52
18    was to add and connect to the RIMS system in ability to
19    search through catalogs; is that right?
20      A.   Yes.
21      Q.   And you did some research to see if there are
22    any existing products that might be a good fit for that
23    purpose, right?
24      A.   Correct.
25      Q.   And as a result of that process you chosen an

---

Kinross, Robert  12/2/2009  9:00:00 AM

105

1    IBM product called the TV/2?

2        A.  Yes.

3        Q.  That stands for Technical Viewer/2; is that

4    right?

5        A.  That's correct.

6        Q.  And you chose that one because of its

7    features and because you didn't want to reinvent the

8    wheel, right?

9        A.  Correct.

10       Q.  Can we mark this as the next exhibit, please.

11           (Lawson Exhibit No. 8 was marked for

12    identification and attached to the deposition

13    transcript.)

14           Mr. Kinross, I'm handing you what's been

15    marked as Exhibit 8.  Do you recognize that document?

16       A.  Yes.

17       Q.  What is it?

18       A.  It's an IBM publication about Technical

19    Viewer/2.

20       Q.  Is that the same document that's listed on

21    the cover page of your patent under other publications

22    as IBM Technical Viewer/2 Product Information Brochure

23    IBM, Corporation, undated?

24       A.  Yes.

25       Q.  Is it your understanding that Exhibit 8 of

106

1    the description of this IBM Technical Viewer/2 product

2    that predated your invention that you filed patents

3    for?

4        A.  Yes.

5        Q.  Had you seen this brochure before you

6    actually developed your invention?

7        A.  I can't recall the exact time I saw this

8    brochure.

9        Q.  Did you see it sometime before you filed for

10    your patent?

11       A.  I would say, yes.

12       Q.  I'd like to talk now about the off-the-shelf

13    version of the Technical Viewer/2 product as existed

14    before you did any work.  What is your understanding as

15    to what that product could do?

16       A.  My understanding was it could display

17    technical information and search technical information

18    from a searchable database.

19       Q.  Did it search many databases loaded on a

20    computer, or did it search CD ROMs or both?

21       A.  The CD ROM type searching would have to be on

22    a computer as well.  The CD ROM is just stored as a

23    disk just like a hard drive, it's just a different

24    storage format.

25       Q.  Did the Technical Viewer/2 have the

107

1    capability of searching databases that were on a

2    computer other than in the form of a CD ROM?

3        A.  Yes.

4        Q.  And that was before you started working with

5    IBM?

6        A.  Yes.

7        Q.  Did you understand that the IBM off-the-shelf

8    product was intended at least in one application to be

9    used to search through parts catalogs?

10           MS. ALBERT:  Object to the form.  Lacks

11    foundation.

12       A.  Prior to the invention, no, I did not become

13    aware that it could search through parts catalogs.

14    BY MR. McDONALD:

15       Q.  Could you turn to page 2 of the brochure we

16    just marked, Exhibit 8.  And under the heading there,

17    "Coping With the Information Overload," it's talking --

18    do you see the sentence, "There you can search through

19    parts catalogs, service manuals, stock lists,

20    schematics, user documentation, warranty information

21    and training aids, but it takes time to find the right

22    document and page to answer your own or customer's

23    questions," you see that?

24       A.  Yes.

25       Q.  And then the next paragraph it says, now IBM

108

1    can help you save time, space and frustration with the

2    facility which makes it easy to search through large

3    volumes of information quickly, easily and accurately,

4    quote.  You see that?

5        A.  Yes.

6        Q.  Do you understand the message of the brochure

7    here is that the IBM product can search through large

8    volumes of information such as parts catalogs?

9        A.  Yes.

10       Q.  And that was what it could do off the shelf,

11    right?

12       A.  Yes.

13       Q.  And did you understand that the TV/2 product

14    off the shelf would allow you to create a shopping list

15    by selecting items and then pass that list to another

16    application such as a parts ordering system?

17           MS. ALBERT:  Object to the form.  Lacks

18    foundation.

19       A.  My understanding was the off-the-shelf

20    version provided application programming interface and

21    that's what would allow the passing of data.

22    BY MR. McDONALD:

23       Q.  That's what would allow the passing of data?

24       A.  Yes.

25       Q.  And did you understand that before you

Kinross, Robert  12/2/2009  9:00:00 AM

109

1    started working with IBM, they had already marketed the
2    TV/2 product as a product that would allow a user to
3    create a shopping list of selected items and pass that
4    list to an application such as a parts ordering system?
5        A.  No, I wasn't aware of their marketing.
6        Q.  Well, in this brochure, if you turn to the
7    page in the lower corner, L0132133, there with -- on
8    the left column, the heading is, "Move Straight To What
9    You Need Fast," do you have that before you now?  Do
10   you see that?
11       A.  I'm looking at 133 --
12       Q.  There's a heading under the pictures that
13   says --
14       A.  Yes, okay.
15       Q.  -- "Move To What You Need Fast."
16       A.  I see it.
17       Q.  And then last paragraph there I'm going to
18   read that to you:  You can also create a shopping list
19   just by selecting items and passing that list to
20   another application.  For example, you might select
21   parts to be ordered from the exploded drawing in a
22   parts catalog.  The parts list could then be sent
23   directly to your parts ordering system all without
24   moving from your PS2, quote, do you see that?
25       A.  Yes.

110

1        Q.  So it does appear that the IBM in the
2    off-the-shelf version in the Technical Viewer/2 product
3    had marketed it as allowing a user to create a shopping
4    list of selected items and then have that list
5    transferred directly to a parts ordering system, right?
6        MS. ALBERT:  Object to the form.
7        A.  I think the off-the-shelf version of the
8    product through the API allowed it to do that, so you
9    didn't get that capability without writing an API to do
10   that.  So that would not be off the shelf.
11   BY MR. McDONALD:
12       Q.  Okay.
13           It would be customized.
14       Q.  So the IBM TV/2 had the capability of
15   communicating with another system, but you had to
16   customize the means of communication to make sure the
17   other system could understand what it was communicating
18   and also transmit information it understood?
19       A.  Yes.
20       Q.  Is there any reason to doubt that the people
21   at IBM, the programmers at IBM that write interfaces
22   couldn't come up with an interface that would work with
23   the RIMS system?
24       MS. ALBERT:  Objection.  Calls for
25   speculation, also vague as to time.

111

1        A.  It would be difficult for them to write an
2    interface that dealt with the RIMS system without
3    Fisher involvement.
4    BY MR. McDONALD:
5        Q.  What is provided by the Fisher involvement
6    that would make that process easier?
7        A.  An understanding of what the RIMS application
8    did, an understanding of the data elements required to
9    create an order basically in the RIMS system or
10   requisition in the RIMS system.
11       Q.  Was there anything about the RIMS system that
12   made it uniquely challenging in terms of being able to
13   communicate with the Technical Viewer/2 system?
14       A.  Well, you would have to know the architecture
15   of the RIMS system in order to do that.  You couldn't
16   just presume that RIMS is going to understand this data
17   that you pass it and write a program to pass it the
18   data and expect anything to happen with it.
19       Q.  Right.  But other than just knowing the
20   architecture of the RIMS system, is there anything else
21   that was extraordinary about creating a communications
22   system between TV/2 system and the RIMS system?
23       A.  No, we used facilities that were known at the
24   time to effect that communication.
25       Q.  Did you do the same thing you think anybody

112

1    else of skill in the field would have done that caused
2    the Technical Viewer/2 system to communicate with the
3    RIMS system?
4        MS. ALBERT:  Calls for a legal conclusion.
5        A.  The interface between Technical Viewer and
6    the RIMS system used well-known documented
7    capabilities, so it wasn't anything that was unique
8    that we used to effect that communication.
9    BY MR. McDONALD:
10       Q.  Were there any unexpected results that came
11   about from interconnecting the Technical Viewer/2
12   system to the RIMS system?
13       MS. ALBERT:  Objection.  Calls for legal
14   conclusion.
15       A.  By unexpected results, what would you mean?
16   BY MR. McDONALD:
17       Q.  Was there anything that was extraordinary or
18   out of the usual that arose from the fact that you can
19   connect the two systems together?
20       A.  I think that one thing that was unique was
21   the multiple catalog aspect of the system.  When you
22   looked at what was going on in the '93, '94 time frame
23   and catalog development, CD ROM catalog development,
24   the idea at the time was to create a catalog, put it on
25   a CD and then print purchase orders from it to effect a

113

1   requisition or a purchase order.  That was basically
2   state of the art at that time and other companies were
3   doing that sort of thing.
4       Q.  Other companies, I'm sorry --
5       A.  Other companies were doing that sort of
6   thing.
7       Q.  Other companies were doing what sort of
8   thing?
9       A.  Using CD ROM catalogs.
10      Q.  Did other companies have CD ROMs that would
11  store more than one catalog?
12      A.  Not that I aware of.
13      Q.  CD ROMs were -- had enough storage on them
14  that, you know, depending on how big the catalog was it
15  could be capable of storing more than one catalog,
16  right?
17          MS. ALBERT:  Objection.  Calls for
18  speculation.
19  BY MR. McDONALD:
20      Q.  This is back in '92, '93 time frame we're
21  talking about.
22      A.  The '93, '94 time frame?
23      Q.  '92, '93.
24      A.  I would agree that the -- a CD ROM could
25  store more than one catalog.  It has the capacity to

114

1   store more than one catalog.
2       Q.  All right.  So -- but I understand you're
3   saying that's what you thought was unique.  With
4   respect specifically to the ability of the TV/2 system
5   to communicate with the RIMS system, transferring
6   information back and forth, was there anything about
7   that that was extraordinary in any way?
8       A.  No.
9       Q.  The Technical Viewer/2 system had the
10  capability of searching multiple documents essentially
11  off the shelf, right?
12          MS. ALBERT:  Objection.  Lacks foundation.
13      A.  I don't think that's correct.  It had the
14  ability to search INF files off the shelf.
15  MR. McDONALD:
16      Q.  What's an INF file?
17      A.  It was the Technical Viewer file format that
18  was used by Technical Viewer to search documents.
19      Q.  What -- in the Technical Viewer/2 product as
20  it existed before you merged it with the RIMS system,
21  what would be in the INF files?
22      A.  Data, text data of a document.  An index.
23      Q.  Before you started working with IBM on the
24  Technical Viewer/2, parts catalogs could be stored in
25  INF files, right?

115

1           MS. ALBERT:  Objection.  Calls for
2   speculation.  Lacks foundation.
3       A.  Yes.
4   BY MR. McDONALD:
5       Q.  Their brochure we just looked at specifically
6   talked about parts catalog, right?
7       A.  Yes.
8           MS. ALBERT:  Objection.  Mischaracterizes the
9   document.  There's no indication of time.
10  BY MR. McDONALD:
11      Q.  Was there some limit as to how big an INF
12  file could be in the Technical Viewer system off the
13  shelf?
14      A.  Yes.
15      Q.  Could you give me an idea of that limitation?
16  I'm not sure how you can quantify that.  I just want to
17  get some sense of how big an INF file could be in that
18  system.
19      A.  It was variable depending on what you were
20  putting into the INF file.  The images and the text
21  were both stored in the INF file, so if you had a
22  document with lots of images, you could store less
23  text.  If you had a document with few images, you could
24  store more text, so it was really variable based on
25  what was being stored.

116

1       Q.  Did IBM do kind of a prototype or demo
2   version of how the product would work with Fisher
3   catalog pages?
4       A.  Yes.
5       Q.  Did they use INF files for that?
6       A.  Yes.
7       Q.  About how many Fisher catalog pages did they
8   use for that prototype or demo?
9       A.  I think about ten, maybe less.
10      Q.  Did they put all ten pages into a single INF
11  file?
12      A.  I don't know.
13      Q.  What was the purpose of that demo?
14      A.  To entice us into selecting Technical Viewer
15  as a search engine.
16      Q.  So did IBM develop that demo on its own?
17      A.  Yes.
18      Q.  What did the demo do?
19      A.  It displayed catalog pages.
20      Q.  Did it search catalog pages?
21      A.  Yes.
22      Q.  Did it do anything else?
23      A.  No.
24      Q.  Was -- did IBM indicate when they did the
25  demo that they could develop an interface for returning

**117**

1  the results of a search on the TV/2 system to a RIMS
2  product?
3      A.  They indicated an API existed with Technical
4  Viewer that would allow that to happen, yes.
5      Q.  And was that true?
6      A.  Yes.
7      Q.  Did the Technical Viewer/2 product, if I
8  understood right, you said it actually could search
9  through multiple INF files at the same time; is that
10  right?
11      A.  Yes, that's right.
12      Q.  So off the shelf, if you could fit a catalog
13  onto a single INF file, it had the capability to search
14  multiple catalogs, right?
15      MS. ALBERT:  Objection.  Calls for
16  speculation.
17      A.  Could you repeat that again?
18      MR. McDONALD:  Read it back, please.
19      (Reporter read back the previous question as
20  requested.)
21      MS. ALBERT:  And I objected that it called
22  for speculation.
23      A.  You could search for multiple catalogs --
24  well, no, I mean if you're putting a single catalog in
25  the INF file, you can only search that single catalog.

**118**

1  BY MR. McDONALD:
2      Q.  But I thought you said that a Technical
3  Viewer/2 system had the capability of searching
4  multiple INF files?
5      A.  Yes, it does.
6      Q.  So you could have a catalog on INF file
7  No. 1, another catalog on INF file No. 2, and a third
8  catalog on INF file 3 and search all three of them,
9  right?
10      MS. ALBERT:  Objection.  Calls for
11  speculation.
12      A.  At the same time?
13  BY MR. McDONALD:
14      Q.  Yes.
15      A.  Off the shelf?
16      Q.  Yes.
17      A.  Without an API, no, I don't believe that's
18  true.
19      Q.  What was missing from the TV/2 that wouldn't
20  allow you to do that off the shelf?
21      A.  The API interacting with Technical Viewer/2
22  concatenate the INF files.
23      Q.  When you say concatenate, what do you mean?
24      A.  The way that Technical Viewer worked from the
25  shelf program the files that Technical Viewer could

**119**

1  search could be opened either individually or as a
2  group, and when you opened them as a group you were
3  concatenating the INF file into that group to effect a
4  larger catalog.
5      Q.  Couldn't the Technical Viewer/2 product do
6  that off the shelf?
7      A.  I don't think so.
8      Q.  We'll mark this as the next exhibit, please.
9      (Lawson Exhibit No. 9 was marked for
10  identification and attached to the deposition
11  transcript.)
12      Mr. Kinross, I'll show you what was marked
13  Exhibit 9.  Do you recognize this document?
14      A.  Yes.
15      Q.  What is it?
16      A.  The IBM Technical Viewer General Information
17  manual.
18      Q.  And the second page in the lower, left corner
19  this indicates a copyright date of 1991, correct?
20      A.  Yes.
21      Q.  Is this the same document listed on the cover
22  page of your patents under other publications, if you
23  have like 683 patents, for example?
24      A.  Yes.
25      Q.  Described as the IBM Technical Viewer/2

**120**

1  general information manual 1991?
2      A.  Yes.
3      Q.  Was this a document that you obtained before
4  you developed the system that you filed the patents on?
5      A.  Yes.
6      Q.  How did you get it?
7      A.  It was given to me by IBM.
8      Q.  Is the fact that you reviewed this document
9  one of the factors that led you to choose the TV/2
10  product as the one to integrate with the RIMS system?
11      A.  I don't think this document had as much
12  impact as the demo.
13      Q.  Okay.  It was just a little bit of
14  information along the way that you used as part of your
15  process?
16      A.  Yes.
17      Q.  If I could direct your attention here to the
18  page with the number L0132128 of Exhibit 9.
19      A.  132?
20      A.  Yes.  128 --
21      A.  128.
22      Q.  -- are the last three digits.
23      A.  Okay.
24      Q.  That's the page with the heading features of
25  IBM Technical Viewer/2, correct?

Kinross, Robert  12/2/2009  9:00:00 AM

---

121

1    A.  Yes.
2    Q.  You see a couple features down, the feature
3    called, "Search"?
4    A.  Yes.
5    Q.  It says there, quote, a search facility that
6    can locate every occurrence of a word or phrase in
7    either the current topic, a list of selected topics,
8    the complete document or another document.  A global
9    character can be used to search for a partial string,
10   close quote, do you see that?
11   A.  Yes.
12   Q.  Do you have an understanding as to what is a
13   topic for purposes of that description?
14   A.  Yes.
15   Q.  What's a topic?
16   A.  A topic is a unit of information that
17   Technical Viewer would display in its entirety on a PC
18   monitor.
19   Q.  So it's about the size of a page that you may
20   see on your computer?
21   A.  It could be longer.
22   Q.  Okay.
23   A.  It depends on how the author would create the
24   markup to create a topic.
25   Q.  Did you see a demo of the Technical Viewer/2

---

122

1    that had topics on it?
2    A.  Yes.
3    Q.  Was it -- was that the same demo of the
4    Fisher Scientific catalog?
5    A.  Yes.
6    Q.  So how did IBM have the structure of the
7    Fisher catalog on that demo?
8    A.  What I recall is the topic was an item from
9    the catalog, one item.
10   Q.  So about how many topics were on there?
11   A.  Probably 30.
12   Q.  In the demo could the TV/2 search for a word
13   or phrase in all 30 of those topics?
14   A.  Yes.
15   Q.  Could it also search selected of those 30
16   topics?
17   A.  I didn't see that in the demo.
18   Q.  Did you have an understanding, though, that
19   the TV/2 product could search just in a list of
20   selected topics as described here under the search
21   feature, in Exhibit 9?
22   A.  No, I'm not familiar with that feature.
23   Q.  Okay.  Was it a feature you asked them about
24   when you got the demo?
25   A.  No.

---

123

1    Q.  In the demo, could the TV/2 also search just
2    a single topic of parts description?
3    A.  In the demo I saw, no, it couldn't.
4    Q.  Did you try to have it do that?
5    A.  No.
6    Q.  Was that something that you'd asked IBM to
7    demo to you?
8    A.  No.
9    Q.  What did you ask IBM to give you a demo of at
10   that time?
11   A.  I didn't ask IBM to give me a demo.
12   Q.  Okay.  Somebody else from Fisher asked them?
13   A.  Yes.
14   Q.  Do you have an understanding as to what IBM
15   was asked to do?
16   A.  I don't have first-hand information on that,
17   no.
18   Q.  Do you have an understanding, though, whether
19   it's firsthand or not?
20   A.  No.
21   Q.  Do you have -- who communicated with IBM
22   regarding what you wanted to see in the demo?
23   A.  I think Frank Melly.
24   Q.  Did anybody else communicate with IBM about
25   that?

---

124

1    A.  Not that I'm aware of.
2    Q.  When was the demo done?
3    A.  I can't recall the exact date.  Time frame
4    would be sometime in 1993.
5    Q.  Was it before or after you entered a contract
6    with IBM?  By you, I mean Fisher.
7    A.  It would have been before that, yes.
8    Q.  Okay.  So do you know one way or the other
9    whether the TV/2 product was capable of searching a
10   subset of selected topics at the time that they did the
11   demo for you?
12   A.  No, I don't know that.  My understanding of
13   the subset search was that it did not exist in the
14   product because we wanted -- we had a requirement to do
15   a subset search of topics that came up in the search
16   and that couldn't be done.
17   Q.  What's the basis for that understanding?
18   A.  That it couldn't be done.
19   Q.  Right.
20   A.  That IBM Technical Viewer developers
21   indicated it couldn't be done.
22   Q.  Was the Technical Viewer product capable of
23   doing a slow version of a search of a subset of
24   catalogs?
25   A.  A slow?

---

Kinross, Robert  12/2/2009  9:00:00 AM

125

1    Q.   Yeah, just a slow version of it but still be
2  able to do it?
3    A.   I'm not -- I'm not understanding what a slow
4  version of it is.
5    Q.   Well, I guess, I think, I've seen some
6  testimony indicating that through the -- through some
7  modified use of the INF file structure there was a
8  speeding up of searching of a subset of catalogs, and
9  are you aware generally of whether that's a case or
10  not?
11    A.   That that happens?
12    Q.   Yeah.
13    A.   Yes.
14    Q.   Okay.  So tell me about how the -- well, let
15  me just clarify.  Did that involve the modification of
16  the TV/2 searching product to search a set of selected
17  catalogs?
18    A.   Yes.  Yeah.
19    Q.   What was done with the system -- what was
20  modified about it to help it search catalogs faster?
21    A.   An additional index was added.
22    Q.   So before you added that index what did the
23  index look like on the TV/2 product?
24    A.   It was part of the INF file.  It was embedded
25  into the INF file.

126

1    Q.   The index was?
2    A.   Yes.
3    Q.   What was the purpose of the index?
4    A.   It indexed every word in the catalog.
5    Q.   So would you have every word in the catalog
6  and then the list of which records that word appeared
7  in?
8    A.   Yes.
9    Q.   Is that something that the TV/2 product did
10  that indexing before you began working with IBM?
11    A.   Yes.
12    Q.   And what about the way IBM did it made that
13  searching file slow?
14    A.   I don't know.
15    Q.   How did you change the indexing in the system
16  from the one that had the list of words in the INF
17  file?
18    A.   I didn't change the index in the system.
19    Q.   What was changed in the system?
20    A.   Well, as I said, they added another level of
21  index.
22    Q.   Can you describe that other level of index
23  for me?
24    A.   Not really, no.
25    Q.   Who would be able to do that?

127

1    A.   I couldn't tell you.
2    Q.   Would it be somebody at IBM or who was at IBM
3  at the time?
4    A.   Yes.
5    Q.   Are they the ones that actually did it?
6    A.   Yes.
7    Q.   Did they ever tell Fisher how they did it?
8    A.   I'm trying to recall.  To the extent that
9  they add another index, they told Fisher how they did
10  it.
11    Q.   What did they tell Fisher?
12    A.   They added another index.
13    Q.   Did they give any more detail than that?
14    A.   No.
15    Q.   Okay.  I think I've seen a phrase, "super
16  index," is that what that was called?
17    A.   Right.
18    Q.   What was the purpose of the super index?
19    A.   To speed up the search.
20    Q.   What was in the super index?
21    A.   My understanding of it was the super index
22  was an index to the indexes, so that the way it speeded
23  up the search was, prior to the super index it had to
24  look in every INF file at the index of that INF file to
25  see if that word existed in that particular document,

128

1  the document being that INF file.  And that was fine
2  until you started having many INF files and then it
3  started to degrade the performance of the system
4  because it was looking at too many indexes, needlessly
5  just to say, well, no, that word doesn't exist here.
6        So the super index said, well, the word
7  exists in index No. 1 and index No. 5, so you can skip
8  over 2, 3 and 4 and don't even look there for the word
9  in the document, because it doesn't exist.
10    Q.   Okay.  I think I'm getting the hang of it
11  here, but I want to make sure I've got a good, accurate
12  image of this.
13        If we put it in the context of a catalog, the
14  database in the TV/2 product would have the equivalent
15  of item information for each item in a catalog that
16  they put in the database, right?
17    A.   Yes.
18    Q.   Now, what type of files was the item
19  information in?
20    A.   The item information was in the INF file.
21    Q.   Was there anything in the INF files other
22  than just the descriptions of the items?
23    A.   Yes.
24    Q.   What else was in there?
25    A.   There were tables in there to compare items.

Kinross, Robert  12/2/2009  9:00:00 AM

129

1  There were bulletins in there to expand on different
2  items or talk about a group of items.  There were
3  images of the items in there.
4      Q.  Did those INF files that you've just
5  described, did they also have indexes within those INF
6  files?
7      A.  Each INF file had an index, yes.
8      Q.  So each INF file, for example, of parts, some
9  part descriptions would have an index or -- of words
10 that occurred in that document or in that file?
11     A.  Yes.
12     Q.  And that's in the TV/2 product before it was
13 modified with the super index, right?
14     A.  Yes, that's correct.
15     Q.  So with the super index a new INF file was
16 created that was just the indexes from the other INF
17 file?
18     A.  I'm not sure that was an INF file.
19     Q.  Okay.  Some sort of a file was created that
20 included the index of the INF files or collection of
21 the indexes?
22     A.  Might not have been a file.
23     Q.  What else would it might have been if it
24 wasn't a file?
25     A.  A table in memory.

130

1      Q.  Do you know one way or the other?
2      A.  No, I don't.
3      Q.  That super indexing isn't described anywhere
4  in your patents, right?
5      A.  No.
6      Q.  Why isn't that described in the patents?
7      A.  Well, it was part of Technical Viewer and
8  Technical Viewer was mentioned as what we were using as
9  a search engine.  So under the umbrella of describing
10 Technical Viewer, we didn't describe every feature or
11 function of Technical Viewer.  We let IBM provide that
12 information.
13     Q.  When you say you let IBM provide that
14 information, what do you mean?
15     A.  By referencing the documents in the patent.
16     Q.  Those -- you're talking about referencing the
17 IBM Technical Viewer/2 documents?
18     A.  Yes.
19     Q.  Those documents though, the one we just
20 looked at, for example, was from 1991.  They don't talk
21 about the super indexing, do they?
22     A.  They don't talk about a lot of things that
23 were in Technical Viewer, that's right.
24     Q.  The super indexing, was that done
25 specifically for Fisher Scientific, or was IBM adding

131

1  that to their Technical Viewer/2 product anyway?
2      A.  My understanding of the Technical Viewer
3  development was once it was added to the product it
4  became part of the product.  Fisher paid for
5  enhancements to the Technical Viewer product, which
6  also became part of the product, so they would
7  basically be enhancing the product at that time.
8      Q.  So your understanding is this feature was
9  added to the Technical Viewer/2 product, it was
10 available to others?
11     A.  Yes.
12     Q.  Is it your understanding that IBM came up
13 with the idea of using the super index?
14     A.  I was aware of the super index.  I don't know
15 what time frame I was aware of that.
16     Q.  But regardless of when you became aware of
17 it, is it your understanding that the IBM people
18 actually came up with the idea of using a super index?
19     A.  Yes.
20     Q.  Did Fisher have any role in developing the
21 means of communicating between the TV/2 system and the
22 RIMS system?
23     A.  Yes.
24     Q.  What was Fisher's role in that?
25     A.  Selecting the interface in terms of what

132

1  technique would be used was a role of Fisher and also
2  documenting the interface, the technical specifications
3  for the interface.
4      Q.  Did Fisher have any other role in the
5  development of the interface between TV/2 and RIMS?
6      A.  Yes.
7      Q.  What else?
8      A.  Developing the RIMS side of the Technical
9  Viewer interface.
10     Q.  Did Fisher have any other role in that
11 interface development?
12     A.  The testing of the interface and the
13 acceptance of the interface.
14     Q.  And is it true that all of the inventors
15 listed on your patents were all working for Fisher at
16 the time this was developed?
17     A.  Yes.
18     Q.  So you understood when I was asking about
19 Fisher's role I was asking about the role of those four
20 people including yourself and anybody else at Fisher as
21 well?
22     A.  I'm not understanding the role of anybody
23 else at Fisher.  Like the people who work for us, for
24 instance?
25     Q.  So when you were answering the question about

Kinross, Robert  12/2/2009  9:00:00 AM

133

1  Fisher's role in the interface, which people at Fisher
2  did you have in mind as doing the things you listed for
3  me?
4      A.  Myself and Jim Johnson and his group.
5      Q.  Who was in Jim Johnson's group or who was at
6  the time?
7      A.  He had a number of people working for him,
8  Mark Mullen was probably the most senior person that I
9  recall.
10     Q.  So with respect to the role that you
11  described here, I think the first thing you mentioned
12  was that Fisher was involved in selecting the interface
13  technique; is that accurate?
14     A.  Yes.
15     Q.  What technique did Fisher select?
16     A.  We selected the dynamic data exchange
17  technique.
18     Q.  What other options were available to you?
19     A.  The other options available were using a
20  database to effect data transfer and the use of sockets
21  to effect a data transfer.
22     Q.  Can you tell me generally how dynamic data
23  interchange works or exchange works?
24     A.  Dynamic data exchange uses a shared memory
25  block in the operating system to place data into the

134

1  area to make it available to other programs running on
2  the same operating system.
3      Q.  So here when you say shared memory, it would
4  be shared between the RIMS system and the TV/2 system?
5      A.  Yes.
6      Q.  Was using that dynamic data exchange
7  technique a known technique for interfacing two
8  applications that were on the same operating system at
9  the time?
10     A.  Yes.
11     Q.  Was it -- was it conventional wisdom that
12  that was the best way for two systems on the same
13  operating system to interface?
14         MS. ALBERT:  Object to the form.  Calls for
15  legal conclusion.
16     A.  I don't know about conventional wisdom, I
17  know that Fisher viewed it as the preferred method.
18  BY MR. McDONALD:
19     Q.  Why was it preferred at the time?
20     A.  It would be faster and more efficient.
21     Q.  It was faster and more efficient than the
22  database method or the sockets method?
23     A.  Yes.
24     Q.  And that was your understanding at the time?
25     A.  Yes.

135

1      Q.  What was the basis for that understanding?
2      A.  Just describing how they worked and how they
3  fit into the PC architecture seemed like that method
4  would be the most efficient.
5      Q.  Can you tell me generally how sockets would
6  work to interface the two programs?
7      A.  Sockets were primarily a units method of
8  effecting data transfer by, they called them listeners
9  for sockets.  And it was -- it was more from the UNIX
10  world basically.  It did exist in PCs and OS2 at the
11  time, it just didn't seem to be as a direct method.
12  Seemed like it would be more overhead.
13     Q.  UNIX is an alternative operating system to
14  the OS2 system, correct?
15     A.  Yes.
16     Q.  And you were operating RIMS on the OS2
17  already, right?
18     A.  Yes.
19     Q.  And TV/2 was designed for the OS2 as well?
20     A.  Correct.
21     Q.  So from that standpoint the data dynamic
22  exchange was that a technique before you made your
23  invention here that was used for interfacing
24  applications on OS2?
25     A.  I don't know.  I mean, it was interfacing PC

136

1  applications, OS2 being a PC application or operating
2  system.  Yes, that was my understanding that work on a
3  PC using OS2 or Windows.
4      Q.  Dynamic data exchange was the preferred
5  method of interfacing if you're on a PC using OS2 or
6  Windows?
7      A.  Yes.
8          MS. ALBERT:  Object to the form.
9  BY MR. McDONALD:
10     Q.  Yes?
11     A.  Yes.
12     Q.  And can you tell me generally how the
13  database technique for transfer would work or worked at
14  the time you were making this decision?
15     A.  Well, you would put the data that you wanted
16  to transfer into a database and then have basically the
17  application consult the database to see if anything new
18  was available.
19     Q.  So how was that database different from a
20  memory block used in the dynamic data exchange method?
21     A.  Essentially they're both transferring data.
22  You know, the efficiency would be you're not using the
23  overhead of a database and just storing it directly in
24  memory.  You're going through less level -- less levels
25  of overhead.

Kinross, Robert  12/2/2009  9:00:00 AM

137

1    Q. So what does a database have that would
2  increase the overhead that a memory block by itself
3  would not have?
4    A. Oh, going through the overhead of, A, opening
5  the database, reading a record from the database,
6  updating the database, rewriting it.
7    Q. So those are all things that would make the
8  database approach less efficient than dynamic data
9  exchange?
10   A. Less efficient, correct.
11   Q. Was there any dispute as to whether or not
12  dynamic data exchange would be the preferred interface
13  between RIMS and TV/2?
14   A. No.
15   Q. The second thing you said was Fisher's role
16  in developing the interface was documenting the
17  interface through technical specifications; did I get
18  that right?
19   A. Yes.
20   Q. Is that technical specification, is that a
21  document that no longer exists?
22   A. I haven't seen it.
23   Q. How long has it been since you've seen it,
24  more than ten years?
25   A. Yes.

138

1    Q. Can you tell me generally what sort of
2  information was in that specification?
3    A. Yes.  It contained the fields that were to be
4  used as the data within the DDE link.  It stated what
5  the purpose of the DDE link would be, and it also
6  documented the DDE commands to be used on both sides to
7  determine whether there was any new information being
8  passed.
9    Q. By both sides, you mean the TV/2 side and the
10  RIMS side?
11   A. Yes.
12   Q. What generally was the purpose of the DDE as
13  described in that specification?
14   A. To have a two-way conversation between the
15  RIMS system and the Shell program and ultimately
16  Technical Viewer about what data would be passed, what
17  data would be searched in Technical Viewer, what data
18  would be returned from Technical Viewer to RIMS, were
19  there any technical hurdles involved with developing
20  that technical specification for the interface.
21   Q. Other than understanding it completely and
22  implementing it correctly, no.
23   Q. Did IBM participate at all in developing the
24  specification?
25   A. No.

139

1    Q. Was this a matter of Fisher, the
2  specification was a way for Fisher to communicate to
3  IBM what it needed in terms of information to be
4  exchanged using the DDE interface?
5    A. That was part of it; the other part was what
6  we would get back from Technical Viewer.
7    Q. So it would be, what is RIMS going to send to
8  TV/2, and also, what does RIMS need to get back from
9  TV/2?
10   A. Yes.
11   Q. Can you give me examples of some of the
12  fields that RIMS communicated to TV/2?
13   A. Yes.  If you refer to the patent, they are
14  documented --
15   Q. The 683 patent?
16   A. 683, correct.  The bottom of column 11,
17  starting at line 62 --
18   Q. Where it says, the following fields are
19  transferred to order list 48 created in TV/2 search
20  program 50?
21   A. Yes.
22   Q. So that's transferred -- what's described in
23  that paragraph is a transfer from RIMS to TV/2?
24   A. Yes.
25   Q. Okay.  And that goes to the bottom of column

140

1  11 then to line 67, that description?
2    A. Yes.
3    Q. And does it also describe in your patent what
4  information is transferred from TV/2 to RIMS?
5    A. I think it does.
6    Q. Is that essentially the order list?
7    A. Might be harder for me to find it right now.
8    Q. I just -- what caught my eye here is at
9  column 12, line 48 where it says, once the user has
10  completely built the order list 48 within Shell 52 and
11  TV/2 search program 50, he or she can transmit it to
12  Fisher RIMS system 40; is that relevant to what we're
13  talking about?
14   A. Yes.
15   Q. Okay.  Do you have an understanding of what's
16  in the order list that's being referred to there?
17   A. No.  I know that's documented --
18   Q. It's in a patent somewhere, is that what you
19  mean?
20   A. Yes, uh-huh.
21   Q. Well, we don't have to find it right now
22  then.
23       Is there anything that's transmitted from the
24  TV/2 search system to the RIMS system other than the
25  orders list?

141

```
 1       A.  No.
 2       Q.  Okay.  The third thing you mentioned that
 3   Fisher did with respect to that interface is developing
 4   the RIMS side of the interface; is that right?
 5       A.  Yes.
 6       Q.  What did Fisher do to develop the RIMS side
 7   of the interface with TV/2?
 8       A.  It created the programs to accept, send and
 9   receive data, and then once the data was sent or
10   received they'd develop programs to deal with that data
11   to create requisitioning data from it.
12       Q.  Was there anything extraordinary or unusual
13   about the programming done to develop the RIMS side of
14   the interface as you just described it?
15       MS. ALBERT:  Object to the form.  Vague and
16   ambiguous as to extraordinary.
17       A.  It was programming that was done that would
18   be understood by anyone skilled in the art of CICS
19   programming.
20   BY MR. McDONALD:
21       Q.  With respect to the testing of the interface,
22   that was more or less once you had developed the
23   specification, developed the RIMS side of the
24   interface, and, I assume, IBM did the TV/2 side of the
25   interface then, right?
```

142

```
 1       A.  Yes.
 2       Q.  You put all those things together and tested
 3   them then?
 4       A.  Yes.
 5       Q.  Was there anything unusual or unexpected that
 6   arose out of the testing phase?
 7       MS. ALBERT:  Objection to the form.  Calls
 8   for legal conclusion.
 9       A.  Not that I recall, nothing unusual or
10   unexpected happened.
11   BY MR. McDONALD:
12       Q.  And acceptance basically happened, in effect,
13   once it passed the test?
14       A.  Yes.
15       MS. ALBERT:  Sometime when you reach a good
16   stopping point, can we take a short break?
17       MR. McDONALD:  We can do that right now.
18       MS. ALBERT:  Thanks.
19       THE VIDEOGRAPHER:  This marks the end of tape
20   No. 2 in the deposition of Mr. Kinross.  We're going
21   off the record.  The time is 3:46 p.m.
22       (A brief recess was taken.)
23       THE VIDEOGRAPHER:  This marks the beginning
24   of tape No. 3 in the deposition of Mr. Kinross.  We are
25   now back on the record.  The time is 3:58 p.m.
```

143

```
 1   BY MR. McDONALD:
 2       Q.  Mr. Kinross, you had indicated that the TV/2
 3   off the shelf did not have the capability of searching
 4   a selected subset of catalogs; is that right?
 5       A.  That's right, yes.
 6       Q.  How -- what -- was the TV/2 product modified
 7   so that it could search a subset of catalogs?
 8       A.  In our implementation you either selected a
 9   catalog or you did not select a catalog, and you could
10   never select a subset of a catalog.
11       Q.  So at the time you filed for your patent
12   applications, were you not able to actually search a
13   subset of catalogs yet, is that what you're saying?
14       A.  We never implemented partial catalogs, subset
15   catalogs to be searched.
16       Q.  Okay.  Did you implement a function where,
17   let's say if the system had five catalogs on it and you
18   wanted to search two of the five, that you could just
19   search those two?
20       A.  Yes.
21       Q.  How did you do that?
22       A.  There was a catalog icon that was depressed,
23   and once the end user would be presented a display
24   panel indicating what catalogs were available in the
25   system they would highlight the catalogs that they
```

144

```
 1   wanted to search.  And those catalogs would then be
 2   selected, and subsequent searches would only search the
 3   catalogs that were selected.
 4       Q.  What did the system do with the inputs from
 5   the user identifying the catalogs to search?
 6       A.  Once the user identified the catalogs to be
 7   searched the system would know what INF files
 8   constituted that particular catalog, and it would open
 9   the INF files associated with that catalog and any
10   other catalog that was searched.
11       Q.  That was the capability that did not exist on
12   the TV/2 off the shelf?
13       A.  Correct.
14       Q.  That way of searching a selected group of
15   catalogs, that's not described anywhere in your patent,
16   is it?
17       MS. ALBERT:  Object to the form.
18   Mischaracterizes the document.
19       A.  I think it is.  There's a catalog icon
20   described in the patent and --
21   BY MR. McDONALD:
22       Q.  Okay.
23       A.  -- the way to select them is described in the
24   patent.
25       Q.  Can you turn to page -- or column 9 and 10 of
```

145

1   the 683 patent.

2     A.  Okay.

3     Q.  Beginning at about line 53, do you see a

4   sentence there, "When multiple catalogs are present in

5   catalog database 36, search program 50 contains a

6   function associated with the catalog symbol of the

7   footer bar and screen window (not shown) for selecting

8   catalogs to be searched," do you see that sentence?

9     A.  Yes.

10     Q.  Now, when you say here that the program

11   contains a function associated with the catalog symbol

12   of the footer bar and screen window, that reference to

13   the footer bar and screen window, is that the icon that

14   you were talking about that the user would press, or is

15   that the display for the icon?

16     A.  Yes.

17     Q.  Okay.  And so there's a function associated

18   with the user selecting the catalogs on the screen,

19   correct, that's what you're saying here?

20     A.  Yes.

21     Q.  And that function, is that the function you

22   described before, that the system would know what INF

23   files are associated with the given catalog and open up

24   those INF files if that catalog is searched?

25     A.  Yes.

146

1     Q.  Is that particular feature where the system

2   knows what INF files are associated with the catalog,

3   is that described anywhere in the patent?

4     A.  Not specifically.  I mean, it's alluded to in

5   the concatenation statement at the top of 10.

6     Q.  And there that's where it says, with the

7   sentence starting at the bottom of column 9:  "TV/2

8   search program 50 would then concatenate those two

9   catalogs to perform a keyword catalog number or other

10   search -- subject search and generate a hit list of

11   pages (panels) from both catalogs where the

12   searched-for items were found," is that the sentence

13   you're referring to?

14     A.  Yes.

15     Q.  And in that sentence, what does it mean to

16   concatenate those two catalogs?

17     A.  Join them together.

18     Q.  If I understand the way the system actually

19   worked at the time the system would actually be a

20   number of INF files, correct?

21     A.  Correct.

22     Q.  So how is it that a number of INF files for

23   catalog No. 1 were concatenated to a number of INF

24   files for catalog No. 2?

25     A.  As I said, the way Technical Viewer accesses

147

1   these INF files, it opened them.  So the fact that it's

2   opening individual INF files is the concatenation

3   process.

4     Q.  Are the files ever actually merged together?

5     A.  No.

6     Q.  Are the files ever joined together?

7     A.  In what sense do you mean joined?

8   Concatenation would --

9     Q.  Joined into a new file or separate file?

10     A.  No, not a separate file, no.

11     Q.  Can you remind me again what your definition

12   of concatenate is in this context?

13     A.  To group together --

14     Q.  To group together.

15     A.  -- or join together as one.  To, in a logical

16   sense, to view them as one entity.

17     Q.  Well, would you agree that the files aren't

18   actually joined together?

19     MS. ALBERT:  Object to the form.  Calls for

20   speculation.

21     A.  It's hard to say.  To the end user it would

22   look as if it's the seamless one-file interface.  The

23   fact that they're separate really is under the covers.

24     Q.  Right.  But what -- we are talking about how

25   it works under the covers.  Now, I'm not so much

148

1   talking about what the user sees, okay.  So in terms of

2   how the system itself actually operates, the INF files

3   for catalog No. 1 are not, in fact, joined to the INF

4   files of catalog No. 2, when you concatenate as

5   described in column 10 here, right?

6     A.  Right.

7     Q.  So your other definition of concatenate was,

8   well, if they're not joined, they're somehow grouped

9   together, was that your phrase?

10     A.  Well, I would use "grouped" and "joined"

11   interchangeably there.

12     Let's see, typically the definition for

13   concatenating files in an operating system sense is

14   that you would stack them one on top of the other in

15   some job control language and then open them as one

16   file through that concatenation process.  So even

17   though they're not physically joined together, you get

18   a single view of that file at that point.  Does that

19   help?

20     Q.  Well, you're talking about the typical

21   definition of concatenate?

22     A.  Yes, in a data processing sense.

23     Q.  So as your system, as described in the

24   patent, actually worked -- or I'll withdraw that.

25     As your system worked, did it concatenate in

149

```
 1   the way you just described?
 2       A.  Yes.
 3           MS. ALBERT:  Object to the form.  Vague and
 4   ambiguous as to the commercial system versus the
 5   patented system.
 6   BY MR. MCDONALD:
 7       Q.  In your system that you're describing in your
 8   patent, the 683 patent, were the individual INF files
 9   that make up a single catalog concatenated?
10       A.  Yes.  They were concatenated.  There was a
11   controlling file called the .inf file.  And the way
12   that you would combine multiple INFs to have the single
13   catalog view is by defining each INF file in that INI
14   file and simply concatenating them one after another
15   and sharing the catalog name between INF files.  So
16   there was a way to say Fisher catalog, INF file 1;
17   Fisher catalog, INF file 2; Fisher catalog, INF file 3.
18           And the Shell program would know if it's
19   Fisher, it's the Fisher catalog, so I'd read down until
20   I was at the end of Fisher.  So that was end of the
21   Fisher catalog.  Now there's another catalog that's
22   called NIST or some other thing.  So that was a way of
23   concatenating INF files into a single view.
24       Q.  Why did you let Fisher use that approach to
25   store the catalogs in the system?
```

150

```
 1       A.  Well, there was a limit in the amount of data
 2   that could be stored in one INF file.  So that was one
 3   reason.  The other reason would be we wanted to
 4   represent different catalogs from different vendors in
 5   the system and have a way to differentiate between
 6   them.
 7       Q.  That approach to storing the catalogs using
 8   an INF file, is that described anywhere in your patent?
 9       A.  I don't think so.
10       Q.  Did that method exist at the time you filed
11   for your patent in August of '94?
12       A.  Yes.
13       Q.  Did the method of knowing what INF files to
14   open when a user selected multiple catalogs to search,
15   did that exist at the time you filed the application in
16   August of '94?
17       A.  Yes.  And I think we see it here on column 9
18   on 52.
19       Q.  What it says there is that the search program
20   contains a function, right?
21       A.  Uh-huh.
22       Q.  Can you say yes or no, so she can type that?
23       A.  Yes.
24       Q.  You've actually been pretty good.  It's the
25   first time I had to say that today.
```

151

```
 1           The patent does not actually describe the
 2   function that is contained in the search program, does
 3   it?
 4           MS. ALBERT:  Object to the form.  Calls for a
 5   legal conclusion.
 6       A.  I think it does.  It's describing how it can
 7   select various catalogs and search them using the
 8   Technical Viewer program, search program 50.
 9   BY MR. MCDONALD:
10       Q.  Are you aware of any description of how that
11   searching of a selected group of catalogs works in your
12   system other than what's described between column 9,
13   line 52 and column 10, line 8?
14       A.  No.  I think that's the extent of it.
15       Q.  Did using the super index, did that help
16   increase the speed of searching?
17       A.  I'm not real clear on when the super index
18   was actually developed.  I think that that -- I think
19   that the super index was actually developed after this
20   patent was filed.  I'm aware of the developers in
21   Manassas having a performance problem when they were
22   completing the ending of the markup for the complete
23   2,000-page Fisher catalog, but I'm not aware of how
24   that performance issue was resolved.  I know they did
25   get the people that developed the Technical Viewer
```

152

```
 1   product in England to help them fix the problem, but
 2   I'm not certain that the super index was developed at
 3   that particular point in time.
 4       Q.  Was the super index developed before Fisher
 5   launched the product commercially?
 6       A.  I don't know.  I know that there was
 7   discussion of the super index in additional work that
 8   we wanted the people in England to perform.  So whether
 9   the super index was originally used to solve a
10   particular performance problem early on or whether the
11   super index was developed to enhance TV/2 per our
12   specifications, I don't know the exact time line for
13   that.
14           There was a project after 1995 where Fisher
15   wanted -- we were told when we delivered the original
16   Technical Viewer 1993, 1994 catalogs, the work that
17   Manassas was done, that the Technical Viewer product
18   would handle about two times the size of the Fisher
19   catalog, so 4,000 pages.  And we knew we had a
20   requirement for it to handle more than that.  So we
21   contracted with Havant, the developers in England to
22   create a, we called it unlimited catalog support.
23           We also contracted with Havant to develop a
24   super index.  And all that development was done after
25   the '94 time frame, although I am aware of a
```

Kinross, Robert  12/2/2009  9:00:00 AM

153

1  performance problem.  I don't know how they solved it
2  with the delivery of the '93, '94 catalog.
3      Q.  Okay.  So at the time you filed your patent
4  application in August of '94, do you know what method
5  was actually being used to select individual catalogs
6  to search?
7      A.  The method that was described herein which we
8  talked about already was used to select individual
9  catalogs to be searched.
10     Q.  You say it's a method, was there any actual
11  parts to the system or components of the system to
12  implement that method used?
13         MS. ALBERT:  Object to the form.  Vague and
14  ambiguous.
15     A.  The parts to the system that were used to
16  perform that method were the INF files, obviously, and
17  the screens that would represent catalog content were
18  used and the opening of the files so that they could be
19  searched or used.
20  BY MR. McDONALD:
21     Q.  How was the user selection of individual
22  catalogs, how was that selection process converted into
23  information that the system would recognize as, oh,
24  that means I've got to open up these particular INF
25  files?

154

1      A.  Right.  Well, I talked about the INI file and
2  how it contained information grouping INF files into
3  catalogs, so --
4      Q.  Did that exist as of August of '94?
5      A.  Yes.
6      Q.  Okay.  So you've got the customers selecting
7  catalog 1 and 5 --
8      A.  Correct.
9      Q.  -- and then you've also got an INF -- an INF
10  file, is it, or INI file that has a list of INF files
11  associated with the single catalog?
12     A.  With catalog 1 and catalog 5, yes.
13     Q.  Okay.  So how does that information get used
14  in the customer selection?  How does that get used now?
15  What happens next?
16     A.  Well, the customers presented a screen with a
17  picture of the catalogs that exist in the system, and
18  we used the catalog icon to get to that screen.  And
19  each cover page of the catalog that was available in
20  the system was displayed as an icon, a picture of, say,
21  the cover of the Fisher catalog, catalog 1.  The
22  picture of the cover of the NIST catalog was catalog 2.
23  And when the user clicked on that catalog it would
24  become brighter, meaning selected.
25         So depending on which ones they would select,

155

1  that's what indicate -- once they said, okay or
2  continue, that would indicate to the system to consult
3  the INI file, go to those catalogs that were associated
4  with those icons and open those INFs that were
5  associated with the icons.
6      Q.  When the customer selects the catalog, is
7  that done through the RIMS system?  Are they in the
8  RIMS system at that point?
9      A.  No, they were in the Shell program.
10     Q.  Shell program.
11     A.  Yeah, that was the Technical Viewer API.
12     Q.  Okay.
13     A.  That was -- we looked at Figure 1A, that was
14  52.
15     Q.  Okay.  When the customer selects, let's say,
16  the Fisher Scientific catalog, what information is sent
17  to help the system identify the -- which of the INI
18  files to open, how does it convert for that?
19     A.  There's only one INI file.
20     Q.  Well, there's -- there's one for Fisher
21  Scientific and there's --
22     A.  You're confusing INI with INF.
23     Q.  Okay.  Yeah, probably.
24     A.  The INI file was like a -- an options file,
25  like what options are you creating for the Shell

156

1  program in this implementation of Technical Viewer?
2  Because it varied by customer.  So not all customers
3  wanted all the catalogs in the system, so the INI file
4  would tell the Shell what the implementation was for
5  this particular use of electronic sourcing program.
6      Q.  So the INI file would have how many catalogs
7  in it as of August of '94 -- identified in it, I mean?
8      A.  The INI file could have any number of
9  catalogs in it.  According to IBM it could have maybe
10  4,000 pages maximum that were authored, and the
11  groupings within the 4,000 pages were left to authoring
12  catalogs and basically left up to us to determine what
13  contents was in each of the catalogs.
14     Q.  So then did you have kind of a master INI
15  file that listed all the possible catalogs in it and
16  then certain ones would be, in effect, activated for
17  individual customers?
18     A.  No.  We knew which INF files were associated
19  with which catalogs, and we would basically put that
20  list of INF files in the INI file to say, okay, you've
21  got the Fisher catalog, you've got the NIST catalog --
22     Q.  So the actual data in the INF file, I guess,
23  trying to picture what -- the data that's in there, so
24  what's the first line of the INI file?
25     A.  It would be text data.  You could edit it

Kinross, Robert  12/2/2009  9:00:00 AM

157

1   with a word processor.  It would just say for, I forget
2   what the very first entry would be, but there were a
3   series of things that would direct the Shell program to
4   set up certain defaults for the system.  And, for
5   instance, one default would be, oh, what catalogs
6   should we default to open if the end user doesn't
7   select any catalogs?  You know, well, what's the first
8   thing Technical Viewer should do as far as looking at
9   catalogs?  So we had a way to default one or more
10  catalogs being opened upon system startup.
11      Then, as I said, there were the entries that
12  would concatenate the INF files into logical catalog
13  views.
14      Q.  Then you have some data that would indicate
15  which INF files correspond to, for example, the Fisher
16  Scientific catalog?
17      A.  Correct.
18      Q.  Then you'd have another set of data that
19  would indicate which other INF catalog -- or files
20  correspond to another catalog?
21      A.  Correct.
22      Q.  All right.  And then that would go for each
23  catalog that's in the system?
24      A.  Correct.
25      Q.  Would there be anything else then in the INI

158

1   file?
2       A.  There were.  There were performance and
3   tuning parameters.  I don't recall all of them that,
4   you know, that -- it was if there was some
5   customizations that you wanted per customer location,
6   that was the place to do them.
7       Q.  Okay.  So the customer selects two catalogs.
8   That data is somehow transmitted somewhere in the
9   search program, that selection of catalog 1 and catalog
10  5?
11      A.  Excuse me.
12          The customer selects two catalogs.  That data
13  is now opened by Technical Viewer.
14      Q.  Okay.
15      A.  And then the search program is just saying,
16  search the realm of open INF files.
17      Q.  Okay.  So in between there though, it had to
18  decide which INF files to open.  So it uses --
19      A.  Well, that's what the catalog selection
20  process did.
21      Q.  All right.  So it took the data from the
22  customer, went into the INI file with that data --
23      A.  Uh-huh.
24      Q.  -- and figured out which INF files to open --
25      A.  Yes.

159

1       Q.  -- and then went to the search program?
2       A.  Correct.
3       Q.  Okay.  And none of that's described in the
4   patent, right?
5       MS. ALBERT:  Object to the form.  Calls for a
6   legal conclusion.
7       A.  Yes, it is.  That paragraph that we keep
8   going back to, about line -- column 9 --
9       Q.  Columns 9 and 10.
10      A.  Yeah.
11      Q.  But there's nothing in those two columns
12  either about an INI file or an INF file, correct?
13      A.  Correct.
14      MS. ALBERT:  Object to the form.  Calls for
15  legal conclusion.
16  BY MR. McDONALD:
17      Q.  Was IBM's work in modifying the TV/2 system
18  proprietary to IBM?
19      MS. ALBERT:  Object to the form.  Calls for a
20  legal conclusion.
21      Can you -- I see the question again?
22      (Reporter read back the previous question as
23  requested.)
24      A.  I think it would be.  They had a system in
25  place whereby you license their product, so that would

160

1   be -- and Fisher did license the Technical Viewer
2   product.  So that would indicate to me that that's
3   proprietary to IBM.
4   BY MR. McDONALD:
5       Q.  We go back to the 683 patent, at column 2 --
6       A.  Okay.
7       Q.  -- under the summary of the invention in that
8   page from column -- bottom of column 2 to the top of
9   column 3, there's three paragraphs regarding objects of
10  the invention, correct?
11      A.  Yes.
12      Q.  And what is your understanding as to what
13  those three paragraphs are intended to communicate?
14      A.  Beginning at 45?
15      Q.  Yes.  Right after summary of the invention.
16      MS. ALBERT:  Object to the form.  Calls for
17  legal conclusion.
18      A.  Okay.  Well, the first paragraph is saying
19  that the invention allows it to search multiple
20  catalogs with the intent of building requisitions and
21  passing them to a requisitioning purchasing system.
22  BY MR. McDONALD:
23      Q.  And it also refers to the capability for
24  transferring the product information for desired
25  catalog items obtained as a result of the search to a

Kinross, Robert  12/2/2009  9:00:00 AM

161

1   requisition purchasing system for use in generating a
2   requisition including entries for the desired catalog
3   items, right?
4        A.   Right.
5        Q.   All right.  But in terms of what's the
6   purpose, do you have an understanding what the purpose
7   of that paragraph is, is it intended to describe, in
8   effect, the purposes of the invention you came up with
9   or at least one of them?
10       A.   Sure.
11            MS. ALBERT:  Object to the form.  Calls for
12   legal conclusion.
13   BY MR. McDONALD:
14       Q.   You said sure?
15       A.   Yes, I said sure.  That's -- the intention of
16   the summary of the invention is to describe in general
17   what the invention components are and why you would use
18   the invention.
19       Q.   And the second paragraph under the summary of
20   the invention refers to another object of the
21   invention, correct?
22       A.   Yes.
23       Q.   And that one refers to, "provide an
24   electronic sourcing system that provides a means for
25   bidirectionally transferring information between a

162

1   requisition purchasing system that may use the results
2   of a search of such product information and a means for
3   searching large volumes of product information such as
4   would be included in a vendor product catalog,"
5   correct?
6        A.   Correct.
7        Q.   So that one refers to bidirectional transfer
8   of information, correct?
9        A.   Right.
10       Q.   Is that essentially in the embodiment shown
11   in Figure 1A, the transfer of information between the
12   RIMS system and the TV/2 search system?
13       A.   Going in both directions.  You could start in
14   a catalog search and select all your items from the
15   catalog and then go to RIMS to source them, or you
16   could start in RIMS with requisition.  And then if you
17   find that you're having trouble identifying a product
18   under the catalog, then see if you can find something
19   else or maybe the end user transposed the digit and the
20   number, they could find it in the catalog and get the
21   right thing and send it over to the requisitioning
22   system.  So a way to fix errors in requisitions is one.
23       Q.   So one of the things that was unique about
24   your invention is the user of the system could start
25   either in the search engine or in the requisition

163

1   system --
2            MS. ALBERT:  Object to the form.
3   BY MR. McDONALD:
4        Q.   -- correct?
5            MS. ALBERT:  Calls for legal conclusion.
6        A.   I don't know if it was unique, but it could
7   do that.
8   BY MR. McDONALD:
9        Q.   Well, is that what you're referring to here
10   in the second paragraph though, or at least that's part
11   of what you're referring to?
12       A.   It was the intention of the invention to do
13   that, yes.
14       Q.   Did you think that was one of the purposes of
15   the invention?
16       A.   Yes.
17       Q.   And the third paragraph lists a third object
18   of the invention, correct?
19       A.   Right.
20       Q.   It says there the object is, quote, to
21   provide an electronic sourcing system capable of
22   creating an order list including desired catalog items
23   located as the result of such a database search and
24   transferring that order list to a
25   requisition/purchasing system for generating a

164

1   requisition including entries for the desired catalog
2   items, quote.  Do you see that?
3        A.   Yes.
4        Q.   And so this is talking about, in effect,
5   starting from the search engines to generate the order
6   list and then transferring that list to the
7   requisitioning system to generate a requisition, right?
8        A.   Right.
9        Q.   And that was one of your purposes of this
10   invention as well, correct?
11       A.   Yes.
12       Q.   Now, in terms of the -- well -- of the Shell
13   program that enabled the transfer of data between the
14   TV/2 and RIMS system, the IBM people actually wrote the
15   computer program to do that, right?
16       A.   Correct.
17       Q.   If we go up a little higher on column 2 of
18   this 683 patent, above the summary there's a section
19   called, "Background of the Invention," correct?
20       A.   Yes.
21       Q.   And if you go to the first full paragraph on
22   column 2 in that background section, you say here,
23   quote, computer systems that are capable of searching
24   databases containing a product catalog of a familiar
25   vendor, for example, on CD ROM, are also known, do you

Kinross, Robert  12/2/2009  9:00:00 AM

165

1  see that?
2      A.  What line?
3      Q.  Top of column 2, about lines 3 to 5.
4      A.  3 to 5, yes.
5      Q.  So is that CD ROM system or based system one
6  that you were familiar with at the time you filed that
7  patent application in August of '94?
8      A.  We were familiar with CD ROM systems, yes.
9      Q.  Were you personally familiar with those?
10     A.  With those, yes.
11     Q.  Okay.  How did you become familiar with the
12 CD ROM systems?
13     A.  Well, in searching for alternatives to
14 Technical Viewer there were a number of known vendors
15 of CD ROM systems that we looked at to see if there
16 were capabilities in the product to achieve what we
17 wanted to do with electronics sourcing program.
18         THE COURT REPORTER:  Say that again.
19         THE WITNESS:  Electronics sourcing system.
20 BY MR. McDONALD:
21     Q.  Did any of those systems have the capability
22 of allowing the user to insert more than one CD ROM?
23     A.  Not that I'm aware of.
24     Q.  Could they have one CD ROM in the system and
25 you could take that one out and then put a new CD ROM?

166

1      A.  Sure.
2      Q.  That's like a record player, I mean you can't
3  play more than one record at a time, but you could play
4  ten records in a row, right?
5      A.  Right.
6      Q.  You say here in the -- in that same paragraph
7  about the CD ROMs there at about line 8, quote, the
8  known computer systems for searching vendor catalogs
9  are limited in that only one such vendor catalog is
10 accessible to a user at any given time, quote; do you
11 see that language?
12     A.  Yes.
13     Q.  That's kind of what I was just talking about
14 with the record player, right?
15     A.  Correct.
16     Q.  Now, with those prior CD ROM systems though,
17 was it possible that a user could put a CD ROM for a
18 catalog from company X, search that for a beaker, take
19 out that CD and then put in another CD from vendor Y
20 and look for beakers again?
21     A.  That's possible, uh-huh.
22     Q.  Those systems were designed to be able to be
23 used with any CD ROMs that you wanted to use with them
24 as long as the CD ROM was in the right format, right?
25         MS. ALBERT:  Objection.  Calls for

167

1  speculation.
2      A.  I don't know that.
3  BY MR. McDONALD:
4      Q.  Well, when you looked at them, did you figure
5  out whether they were just dedicated for one CD ROM or
6  whether they -- any of those other systems you looked
7  at had the capability of being use with different CD
8  ROMs?
9      A.  The ones that we looked at, the program and
10 the data were married, and you could not take a
11 different program and use it on somebody else's data.
12 BY MR. McDONALD:
13     Q.  So they were basically designed to use with
14 only a single CD ROM?
15     A.  Yes.  A single data format, actually.
16     Q.  Okay.  Well, single data format, I mean, the
17 same format could be on two different CD ROMs, right?
18         MS. ALBERT:  Calls for speculation.
19     A.  It wasn't a standardized format, so the only
20 way I know of for the same data to be on two CD ROMs at
21 this time is if they were produced by the same CD ROM
22 supplier.
23 BY MR. McDONALD:
24     Q.  Were there CD ROM suppliers out there?
25     A.  Yes.

168

1      Q.  Did they provide CD ROMs for multiple
2  sources?
3      A.  For multiple customers, you mean?
4      Q.  Well, catalogs representing multiple
5  distributors or sources, that's what I mean.  I mean,
6  were there companies that didn't sell their own
7  products, they made CD ROMs for other people's
8  catalogs?
9      A.  Yes.
10     Q.  Okay.  So can you give me an example of a
11 company that did that?
12     A.  Prism was a company that was a CD ROM
13 supplier and Stibo, they were our print book publisher.
14     Q.  That's S-T-I-B-O?
15     A.  Yes, S-T-I-B-O, they were in Atlanta.
16     Q.  So those two companies would make CD ROMs of
17 other people's catalogs in kind of a standard format?
18     A.  Not a standard format, a proprietary format.
19     Q.  Oh, each customer had their own format for
20 those catalogs?
21         Or when you say proprietary you mean
22 proprietary to Stibo --
23     A.  Proprietary to Stibo --
24     Q.  -- and proprietary to --
25     A.  -- and proprietary to Prism, yes.

Kinross, Robert  12/2/2009  9:00:00 AM

169

1  Q.  Okay.  So multiple companies that had
2  catalogs could go to Prism and Prism would put each of
3  their individual catalogs on its own CD ROM pursuant to
4  the Prism proprietary format; is that right?
5  A.  Right.
6  Q.  Then were there systems out there that could
7  read those Prism proprietary CD ROMs?
8  A.  That came on the CD ROM as well.
9  Q.  Oh, the way to read it?
10  A.  Yes.
11  Q.  Okay.
12  A.  So when you inserted the CD you were getting
13  the program as well as the catalog data.  So it would
14  load up the program and then start reading the catalog
15  data, that's how it knew that it was going to work
16  basically.
17  Q.  Okay.
18  A.  You couldn't put a CD ROM program in there
19  and eject the disk and then try to read your favorite
20  rock-and-roll band CD, wouldn't work that way.
21  Q.  Okay.  So Fisher used Stibo to make that CD
22  ROM catalog?
23  A.  No.
24  Q.  Did Fisher use somebody else to make a CD ROM
25  catalog?

170

1  A.  No.  They were -- no, they didn't.
2  Q.  Did Fisher make its own CD ROM catalog?
3  A.  We eventually implemented a CD ROM catalog
4  from this development.
5  Q.  From the development of the product described
6  in the patent?
7  A.  Yes.
8  Q.  Did any of Fisher's competitors use Prism or
9  Stibo to make CD ROM catalogs?
10  A.  I couldn't tell you.  I don't know what the
11  competitors did.
12  Q.  Now, you worked at Fisher Scientific until
13  what year?
14  A.  2003.
15  Q.  And how long did you work in the area
16  involving the electronic sourcing?
17  A.  From about 1992 to 1998.
18  Q.  Now, at the time you left that electronic
19  sourcing area in '98, was it true that even then most
20  product orders of customers were still being placed by
21  telephone?
22  A.  By "most," do you mean more than 50 percent?
23  Q.  Yes.
24  A.  Yes, that's true.
25  Q.  And, in fact, less than 20 percent were done

171

1  electronically through the Supply Link system; is that
2  right?
3  A.  My understanding was 0 percent for all
4  electronic sources, which included Supply Link as well
5  as EDI.
6  Q.  Okay.  So Supply Link was even a subset of
7  the 20 percent as of 1998, right?
8  A.  Yes.
9  Q.  And is it true that only a small portion of
10  the RIMS customers ever adopted the Supply Link system
11  to use with RIMS?
12  A.  Yes.
13  Q.  And Supply Link, that was the brand name used
14  for the system described in your patents, right?
15  A.  Yes.
16  Q.  Now, in the Figure 1A system -- well,
17  actually, let's back up.  Let's go back to the 989
18  patents for a moment, the RIMS patent, Exhibit 7.
19  A.  All right.
20  Q.  The Part Master Table, that was in the local
21  database 50 in Figure 1 of the 989 patent, right?
22  A.  On what page is that on?
23  Q.  Figure 1 is in the lower right corner, would
24  be the page ending in 805.
25  MS. ALBERT:  Can I see the question?

172

1  A.  I see G.1.
2  BY MR. McDONALD:
3  Q.  Yeah, I guess -- that must be missing the F
4  and the I.
5  A.  All right.
6  Q.  So that's a figure, though, from the 989 RIMS
7  patent, correct?
8  A.  Yes.
9  Q.  All right.  You see their local database 50?
10  A.  Yes.
11  Q.  That's where Part Master Table is stored
12  in the RIMS system, correct?
13  A.  Object to the form.  Vague and ambiguous as
14  to which Part Master Table.
15  BY MR. McDONALD:
16  Q.  Are you not sure -- I can help you out a
17  little bit more.
18  A.  Can you give anymore --
19  Q.  If you go to column 8 of the patent, lower
20  left page ending at 820 --
21  A.  Okay.
22  Q.  -- go down to about line 46, it says, quote,
23  in step 202, local computer 40 searches the Part Master
24  Table in local database 50 for the stock NBR that has
25  just been entered, and there's a parenthetical.  Do you

Kinross, Robert  12/2/2009  9:00:00 AM

173

1  see that?  Lines about 46 to 50, column 8.
2  A.  Of -- oh, 8.
3  Q.  Whoops.  There you go.
4  A.  I was on 9, sorry.
5  Q.  Column 8 about lines 46 to 50.  That sentence
6  indicates that the Part Master Table is located in
7  local database 50, right?
8  A.  Yes.  Yes, it does.
9  Q.  And if we go back then to Figure 1805, page
10  ending in 805, we see the local database 50 then
11  connected to the local computer 40, correct?
12  A.  Figure 1805 -- okay.  50 connected to 40,
13  local computer, correct.
14  Q.  Yeah.  Now, do you have an understanding, is
15  there more than one Part Master Table, by the way, in
16  the RIMS system?
17  A.  No, I don't think there is.
18  Q.  Okay.  So there's just one, right?
19  A.  Yes.
20  Q.  Is there a copy of the Part Master Table
21  that's maintained on the host database?
22  A.  There would be something corresponding to it,
23  yes.
24  Q.  When you say corresponding, is it something
25  similar but not identical, is that what you mean?

174

1  A.  Probably.
2  Q.  How would it be different, or why would it be
3  different?
4  A.  It would probably contain more data.
5  Q.  At the host or --
6  A.  At the host level.
7  Q.  Okay.  So both the local database and the
8  host database should have some version of the Part
9  Master Table in the RIMS system?
10  A.  Yes.
11  Q.  All right.  So going back to Figure 1 of the
12  RIMS system at page 805, last three digits, 805, a Part
13  Master Table would be located at local database 50 and
14  another version of the Part Master data, Part Master
15  Table would be located at host database 20, correct?
16  A.  Yes.
17  Q.  Now, in the -- if we go now back to one of
18  your patents, 683 patent, Figure 1A, does the system
19  shown in Figure 1A with RIMS, does that have a local
20  database, something that corresponds to what was
21  numbered 50 in the RIMS 989 patent?
22  A.  Yes.
23  Q.  Where is that in Figure 1A?
24  A.  I think it would be a combination of 42A,
25  42B, 42C, as well as 44C, 44E, 44D.

175

1  Q.  Okay.  And then the host database that's
2  numbered 20 in the 989, would that correspond to host
3  databases 11 in Figure 1A?
4  A.  Yes.
5  Q.  In your system as shown in Figure 1A, would
6  there be a Part Master Table anywhere?
7  MS. ALBERT:  Object to the form.  Vague and
8  ambiguous.
9  A.  I think there would be.
10  BY MR. McDONALD:
11  Q.  Where would it be located if we use Figure 1A
12  as a reference?
13  A.  It would be located in both places just like
14  the RIMS patent would indicate the Part Master at the
15  host level and the local level.
16  Q.  So it would be located up at host databases
17  11, that'd be one of the spots?
18  A.  Yes.
19  Q.  Of those local database locations that you
20  listed there in the 44s and the 42s, do you know which
21  of those boxes, if any, the Part Master Table would be
22  located locally?
23  MS. ALBERT:  Object to the form.  Vague and
24  ambiguous.
25  A.  It may be included in requisition databases.

176

1  BY MR. McDONALD:
2  Q.  42A?
3  A.  42A.  Maybe 42B inventory databases, if a Part
4  Master of it implied some control of inventory.
5  Q.  So it could be in either of 42A or 42B, most
6  likely?
7  MS. ALBERT:  Mr. Kinross, I caution you not
8  to speculate.
9  A.  Okay.  I don't know where it would be
10  represented on this document without trying to find a
11  writeup in 683 about what 42B represents.
12  BY MR. McDONALD:
13  Q.  Is there still a purpose to having a Part
14  Master Table in the system described in your patents?
15  A.  There would be a purpose to have it.  The
16  RIMS system would not eliminate functionality from --
17  from -- it would add functionality.  So in that regard,
18  it would have it.
19  Q.  Okay.  So it's going to be the Part Master
20  Table is going to be listed in host databases 11 and
21  then one of the boxes that corresponds to the local
22  database, something in the 42s or 44s, but you're not
23  sure which?
24  A.  Correct.
25  MS. ALBERT:  Objection.  Calls for

Kinross, Robert  12/2/2009  9:00:00 AM

---

**177**

1  speculation.
2      MR. McDONALD:  You got that answer?
3      THE COURT REPORTER:  Yes.
4  BY MR. McDONALD:
5      Q.  The Part Master list would be an organized
6  collection of information about items, correct?
7      MS. ALBERT:  Objection.  Calls for
8  speculation.  Calls for legal conclusion.
9      A.  And where are you pulling that out of?
10  BY MR. McDONALD:
11      Q.  I'm just asking you, given the ordinary
12  meaning of those terms?
13      A.  What a Part Master list --
14      Q.  Yeah.  We went over it before in that table,
15  things like item description and price, stock number
16  and so on from that Table VI, remember that part in the
17  989 patent, the Part Master Table at columns 38 and 39?
18      A.  This is in which?
19      Q.  The 989 patent, I'm sorry.  I led you astray
20  here.
21      A.  All right.
22      Q.  It's pretty close to the back.  It's the page
23  lower, left -- I mean, lower, right corner, 835 to 836
24  are the last three digits.  We've got that Table VI
25  which continues to the second page there that --

**178**

1  entitled, "Part Master," right?
2      A.  Right.
3      Q.  That's got all this data about an item,
4  right?
5      A.  Correct.
6      Q.  Things like a description of the product, its
7  price, its part number and other things, correct?
8      A.  Correct.
9      Q.  And the Part Master record would be -- excuse
10  me, the Part Master Table would be comprised of a
11  series of Part Master records that have this sort of
12  information in them, right?
13      A.  Yes.
14      Q.  And so that would be an organized collection
15  of information about those items, right?
16      A.  Yes.
17      Q.  And in Figure 1A, that Part Master list would
18  not be located at the catalog database 36, would it?
19      A.  No, it wouldn't be.
20      Q.  It would be at host databases 11 and then in
21  the box, one of the boxes with the prefix 42 or 44?
22      MS. ALBERT:  Calls for speculation.
23  BY MR. McDONALD:
24      Q.  In Figure 1A of your patents, correct?
25      MS. ALBERT:  Calls for speculation.

**179**

1      A.  Well, we've already determined that I don't
2  know where the Part Master would be in the 40 series of
3  databases represented here without additional
4  documentation describing what those are, so I wouldn't
5  be able to verify whether it would be a requisition
6  database or an inventory database.  But the host
7  database I could say that it would be there, yes.
8      Q.  Do you consider the Part Master Table a
9  catalog?
10      A.  No.
11      Q.  Why not?
12      MS. ALBERT:  Calls for a legal conclusion.
13      A.  I consider a catalog to be more feature and
14  functionally rich in terms of what it can display than
15  a parts list.  The parts list would have things that
16  just look like records and short descriptions and
17  various other information like unit of measure and
18  price, and it wouldn't really adequately describe the
19  product in a lot of instances, whereas a catalog fully
20  describes the product and gives a full amount of
21  specifications about it to help buying decisions.
22  BY MR. McDONALD:
23      Q.  Well, people make buying decisions with the
24  RIMS system based on the Part Master Tables, right?
25      A.  Well, I think a catalog is helping them in

**180**

1  form of a paper catalog before it ever gets to that
2  point.
3      Q.  How do you know that?
4      A.  Well, I don't, but the fact that they're
5  calling in a CSR and giving them numbers from a
6  competitor's catalog would indicate that that's what
7  they're doing to find parts, unless it's a commonly
8  used item that they happened to memorize the part for.
9  They would not be using -- first of all, they don't
10  have access to the database table; and secondly, they
11  would not get very good description from it.
12      Q.  Did you explain your distinction between a
13  Part Master Table and a catalog anywhere in your
14  patents?
15      A.  I don't think so, no.
16      MR. McDONALD:  We can go ahead and take a
17  break.
18      THE VIDEOGRAPHER:  We're going off the
19  record.  The time is 4:58 p.m.
20      (A brief recess was taken.)
21      THE VIDEOGRAPHER:  We're now back on the
22  record.  The time is 5:12 p.m.
23  BY MR. McDONALD:
24      Q.  Mr. Kinross, referring back to column 2 of
25  your patent, the 683 --

---

181

```
 1      A.  Okay.
 2      Q.  -- returning to the summary of the invention.
 3   I wanted to talk about one part of those objects that I
 4   didn't talk about before.  At the, about line 60 to 63
 5   or so, that second paragraph of the objects of the
 6   invention, the last clause talks about, "and a means
 7   for searching large volumes of product information such
 8   as would be included in a vendor product catalog," do
 9   you see that language?
10      A.  Yes.
11      Q.  Now, before the break you mentioned your
12   vision of a catalog was that it was a little -- had
13   more information in it other than just the parts list;
14   is that fair?
15      A.  That's correct, yes.
16      Q.  Do you think with language such as the
17   language I just quoted that you communicated to people
18   of ordinary skill in the art in your patent, that when
19   you were talking about a catalog you were talking about
20   something that would have that more full set of
21   information in it like what you described would be
22   typical of a larger document?
23        MS. ALBERT:  Objection.  Calls for legal
24   conclusion.
25      A.  I think that's what it's referring to when
```

182

```
 1   it's saying large volumes and vendor product catalogs,
 2   yes.
 3   BY MR. McDONALD:
 4      Q.  So you think one of ordinary skill in the art
 5   of reading your patent would understand when you
 6   referred to catalogs you weren't referring to just to
 7   lists like a Parts Master Table?
 8        MS. ALBERT:  Objection.  Calls for legal
 9   conclusion.
10      A.  I think it would be a fair assumption if we
11   were referring to a parts list, it would more likely be
12   represented as a database rather than a catalog.  So I
13   think it would be fair to say people in 1994 weren't
14   using CD ROMs to put their parts list on CD ROMs,
15   although they may have, yeah.  But would they call it a
16   catalog, I don't think so.  It's called a parts list.
17   BY MR. McDONALD:
18      Q.  Now, if we go back up above in column 2 again
19   to the language about CD ROMs, we read that one
20   sentence therein, it's in the paragraph at the top of
21   column 2, the paragraph going from lines 3 to 17, where
22   you said in the middle there at about line 8, quote,
23   the known computer systems for searching vendor
24   catalogs are limited that only one such vendor catalog
25   is accessible to a user at any given time, quote; do
```

183

```
 1   you see that sentence?
 2      A.  Yes.
 3      Q.  Now is it your view that one of the key
 4   features of your invention is it allows you to search
 5   more than one vendor catalog at a given time?
 6      A.  Yes.
 7      Q.  Why is that an important feature?
 8      A.  Depending on the end user, who you're talking
 9   about, and three are mentioned in the patent.  The SPS
10   person that I was talking about, the strategic
11   procurement services person handling third-party items
12   exclusively, we had envisioned that this would be a
13   useful tool for them to be able to find products across
14   a wide spectrum of catalog content.  Because oftentimes
15   those people were fielding questions about a product
16   and they didn't know what vendor they may have needed
17   to contact to get that product.  So if they had a way
18   to search multiple catalogs at the same time, that
19   would significantly reduce their workload.
20        In terms of a customer in a typical buying
21   situation at a laboratory or some other research
22   facility, which was typical of Fisher customers, Fisher
23   was known as a MRO supplier, maintenance, repair and
24   operation types of products.  So it would be good for
25   them to have available multiple catalogs on their
```

184

```
 1   desktop to be able to purchase things like office
 2   supplies, for instance, rather than laboratory
 3   supplies.
 4        So the multiple catalog aspect of that would
 5   be helpful for the end customer in that scenario.
 6      Q.  Does it also help the end customer to be able
 7   to search multiple catalogs at the same time?
 8      A.  Yes.
 9      Q.  Why is that?
10      A.  Well, the way we envisioned using the
11   product, the customer would have the system on their
12   desktop represented by icons, which was typical at the
13   time, having multiple windows and an OS2 or Windows
14   environment, and they would simply go to the system and
15   do a search for a product that they want.  So they
16   wouldn't have to, you know, do extra work to load up a
17   system or select catalogs or things like, that they
18   could just search for what they wanted at that
19   particular time.  So it was viewed as a productivity
20   increase for them.
21      Q.  Productivity increase as opposed to a system
22   that would only let you look at one catalog at a time?
23      A.  Correct.
24      Q.  Now, all of your patents have in their names
25   the term, "electronic sourcing system," correct?
```

185

1    A.  Yes.  683 does, 516 does, and the 172 does,

2    yes.

3    Q.  Can you explain what sourcing is, generally?

4    A.  My definition of sourcing is finding

5    products, finding price and availability of those

6    products and ultimately ordering those products.

7    Q.  A product that's just as a search for

8    products, that's not a sourcing system, is it?

9    MS. ALBERT:  Object to the form of the

10   question.  Calls for legal conclusion.

11    A.  Well, back to my definition of what sourcing

12   is, it's a piece of sourcing, but not completely what I

13   would term --

14   BY MR. McDONALD:

15    Q.  You may or may not search for something to do

16   the sourcing, but the sourcing is really, whether you

17   got search results or you know what the product is some

18   other way, you take that information, you determine

19   pricing and availability, and you place an order for

20   it, that's what sourcing is, right?

21   MS. ALBERT:  Calls for a legal conclusion.

22    A.  I think I gave you an adequate description of

23   what I viewed was sourcing originally, and you're

24   giving me back pieces of my answer.  So I would agree

25   with you that's part of sourcing, yes.

186

1   BY MR. McDONALD:

2    Q.  Okay.  If we look at Figure 1A of your

3   patents, you probably have it memorized by now, but if

4   you want to turn back to it one more time --

5    A.  Figure 18?

6    Q.  1A.

7    A.  Oh, I'm sorry.

8    Q.  That we used a lot.

9    A.  Okay.

10    Q.  Now, would you consider the system including

11   the TV/2 program 50, the catalog database 36  and the

12   Shell 52 by itself, that's not an electronic sourcing

13   system, is it?

14   MS. ALBERT:  Object to the form. Calls for a

15   legal conclusion.

16    A.  By my definition earlier, no, it does not.

17   BY MR. McDONALD:

18    Q.  And in your summary of the invention, isn't

19   it true that all of the objects that you described

20   indicate that an object of the invention is to provide

21   an electronic sourcing system?

22    A.  Yes.  It says right there, providing an

23   electronic sourcing method and system, yes.

24    Q.  It wasn't your invention simply to come up

25   with a new search engine, right?

187

1    A.  Correct.

2    Q.  In your experience while you worked at

3   Fisher, was the Supply Link system that was the brand

4   name for your invention, was that ever actually sold to

5   customers?

6    A.  I don't know --

7    Q.  And by sold, I mean sold as a separate

8   system.

9    A.  I don't know.  I know we had customers and

10   there was money exchanged.  Whether it was for Supply

11   Link or Procurenet or Cornerstone, which were

12   variations of the product, I don't know the exact

13   figures of Supply Link versus Cornerstone versus

14   Procurenet.

15    Q.  Okay.  Was it your understanding they were

16   sold as separate products --

17    A.  Yes.

18    Q.  -- just one of those?  Okay.

19    Was one or more of those products also part

20   of that vendor relationship bundle that Fisher would

21   offer to customers?

22    A.  At the time Fisher had a history of bundling

23   products and providing them as value-added systems, and

24   this was the first time they departed from that

25   philosophy and actually wanted to make money from the

188

1   software.  So it required hiring additional staff in

2   terms of salespeople and marketing people to actually

3   sell the product rather than have the Fisher sales reps

4   bundle it as a value-added system.

5    Q.  So does that mean you didn't really bundle

6   the products like Supply Link that were the brand names

7   for your invention here, you didn't sell those bundled

8   with other vendor relationship services?

9    A.  I can't say that with any degree of

10   certainty, because it was like a bad habit and it's

11   hard to break, and I don't know whether they've bundled

12   it for certain customers or not.  So I don't know.

13    Q.  The habit being the bundling of these

14   electronic sourcing products?

15    A.  Yes.

16    Q.  RIMS was part of bundles that were sold to

17   customers though, right?

18    A.  Not sold, placed as part of the prime vendor

19   relationship which included --

20    Q.  Which generated revenue?

21    A.  Exactly, yes.

22    Q.  We'll mark this as the next exhibit, please.

23    (Lawson Exhibit No. 10 was marked for

24   identification and attached to the deposition

25   transcript.)

Kinross, Robert  12/2/2009  9:00:00 AM

189

1     MS. ALBERT:  What number is that?
2   BY MR. MCDONALD:
3     Q.  10.
4     Mr. Kinross, I just handed you what was
5   marked as Exhibit 10.  There's a fax cover sheet and
6   then after that is a document beginning with the page
7   with the heading, "Supply Link."  Do you recognize all
8   or part of Exhibit 10?
9     A.  Do I recognize it in terms of what it is, or
10   have I seen this document before, or --
11     Q.  Well, we'll try both.
12     A.  Okay.
13     Q.  Have you seen it before?
14     A.  I don't believe I have, no.
15     Q.  Do you recognize the information and graphics
16   in here?
17     A.  Yes.
18     Q.  What do you recognize the information and
19   graphics as?
20     A.  These would be representations of what was
21   trying to be achieved in Supply Link in terms of data
22   entry.
23     Q.  Now, on the first page, it's kind of hard to
24   see the year, but on the second page on the bottom
25   upside down looks like this document was faxed in 1996,

190

1   do you see that?
2     A.  On the front page?
3     Q.  Actually, on the second page at the bottom.
4   I thought it was a little easier to read.
5     A.  Oh, upside down.
6     Q.  Yeah, upside down.
7     A.  1996, yes.  10/17.
8     Q.  Does this look like what you recall Supply
9   Link looking like in terms of the user interfaces
10   depicted in here in the 1996 time frame?
11     A.  It looks to me like an artist representation
12   of what Supply Link may look like.  Whether it's, in
13   fact, this one, I couldn't tell you.  I think that --
14   someone did this and it's not screen shots, basically,
15   it's drawings and artist renderings, so --
16     Q.  Do you know how close it is to the real
17   thing?
18     A.  I couldn't tell you that, no.  I don't have
19   the Supply Link side of it memorized to the point where
20   I could say it's an accurate or inaccurate
21   representation.
22     Q.  Okay.  Mark that as the next exhibit, please.
23     (Lawson Exhibit No. 11 was marked for
24   identification and attached to the deposition
25   transcript.)

191

1     Mr. Kinross, I'm handing you what's marked as
2   Exhibit Lawson 11.  Now, the first page of this
3   document, you see it's got a heading for the United
4   States Patent and Trademark Office?
5     A.  Yes.
6     Q.  Down on the left side it lists some
7   information including the serial number 08/288577 --
8     A.  Yes.
9     Q.  -- with the filing date August 10, 1996,
10   right?
11     A.  Yes.
12     Q.  That's the same application number and filing
13   date as your 683 patent, Exhibit 1, correct?
14     A.  Correct.
15     Q.  Do you see this as entitled, "Response To
16   Second Office Action," dated May 26, 1998?
17     A.  Yes.
18     Q.  And this one's got a date stamped at the
19   patent office in the upper left in the circle there,
20   September 14, 1998, do you see that circle up in the
21   upper left?
22     A.  Yes.
23     Q.  Now, did you have some involvement, at least
24   in the 1998 time frame with dealing with what was going
25   on with the patent applications?

192

1     A.  No.
2     Q.  Did you ever talk to anybody about office
3   actions or responding to them or anything?
4     A.  No.
5     Q.  What -- did you know if any of the other
6   inventors were involved in that?
7     A.  I don't know.
8     Q.  Is it your understanding that this was held
9   by the patent attorneys, prosecution?
10     MS. ALBERT:  Objection.  Calls for
11   speculation.
12     A.  I don't understand anything about this
13   document.  I've never seen it.  I certainly have no
14   valid input.
15   BY MR. MCDONALD:
16     Q.  I'm not asking about the document, though.  I
17   real -- I can recognize that, so I'm just kind of
18   asking a different question now, okay.
19     A.  Oh, okay.
20     Q.  Do you have an understanding as to who did
21   handle the back and forth with the patent office
22   involving these patents after they were filed?
23     A.  No, I don't.
24     Q.  Is that true for all three of the patents,
25   that you don't know?

Kinross, Robert  12/2/2009  9:00:00 AM

**193**

1  A.  That's true.
2  MR. McDONALD:  All right.  I guess, I have no
3  further questions.  Thank you, Mr. Kinross.
4  THE WITNESS:  Okay.  Thank you.
5  MS. ALBERT:  I'm going to have a few.
6  THE WITNESS:  Do you keep these documents?
7  MR. McDONALD:  You can keep that in a stack
8  right there.
9  MS. ALBERT:  Yeah, the court reporter
10  probably will retain the originals.
11  EXAMINATION BY COUNSEL FOR PLAINTIFF
12  BY MS. ALBERT:
13  Q.  Mr. Kinross, you were asked a lot of
14  questions today about the RIMS system in the 1992, 1993
15  time frame; do you recall those questions -- that
16  questioning --
17  A.  Yes.
18  Q.  -- by Mr. McDonald?
19  And you were also asked about the RIMS system
20  as reflected in the document that was marked as Exhibit
21  7, the 989 patent; do you recall those questions?
22  A.  Not all of them, but I recall being asked
23  questions about that patent, yes.
24  Q.  Fair enough.
25  When was the last time you reviewed the 989

**194**

1  patent before today?
2  A.  I can't say I ever read it cover to cover.
3  I've seen it.  I've seen pieces of it, but I've never
4  actually reviewed it.
5  Q.  Did you have an opportunity to review it in
6  its entirety today?
7  A.  No.
8  Q.  Are you aware of whether there are any
9  changes that were made by Fisher to the RIMS system
10  between the 1992 to 1993 time period and the submission
11  of your patent application that ultimately became the
12  683 patent that's reflected in Exhibit 1?
13  A.  Yes, I'm aware of changes made.
14  Q.  And what were some of the changes that were
15  made to the RIMS system between that -- the time frame?
16  A.  The biggest change was to allow RIMS to
17  handle multiple vendors to anticipate getting products
18  from multiple vendor catalogs and being able to do
19  something with them on the requisitioning side.
20  Q.  Do you recall what programs within RIMS were
21  modified in order to handle multiple vendor catalogs?
22  A.  I don't recall them all.  The documentation
23  on that Exhibit 1A and the followups showed some of the
24  programs that needed modifying, but I don't recall all
25  of the programs that needed modifying.

**195**

1  Q.  If I wanted to find out all of the
2  modifications that were made to the RIMS system during
3  the 1990 -- between the 1992 to '93 time frame and
4  August of '94 when you filed the application which
5  became the 683 patent, who should I consult to find out
6  those modifications?
7  A.  I think Jim Johnson would be the best source
8  for that information.
9  Q.  Based on your understanding of the RIMS
10  system, at any point -- as it existed at any point in
11  time, could the customer service representative at the
12  customer's location issue a purchase order?
13  A.  No.
14  Q.  Based on your understanding, could the RIMS
15  system generate multiple purchase orders from a single
16  requisition?
17  A.  No.
18  Q.  Could the RIMS system determine the
19  availability of an item in a third-party supplier's
20  inventory?
21  A.  No.
22  Q.  Did the RIMS system enable a perspective
23  buyer to conduct a search for a desired item and locate
24  goods to purchase from multiple different sources?
25  A.  No.

**196**

1  Q.  Could a user of the RIMS system select a
2  portion of the item master to search separately?
3  A.  No.
4  Q.  You referred to an item number lookup when
5  you mentioned how you could find an item that you wish
6  to requisition using the RIMS system; do you recall
7  that testimony?
8  A.  Yes.
9  Q.  Do you consider an item number lookup to be
10  distinguishable from search functionality as it's
11  described in the -- in your patents, for example, the
12  683 patent?
13  A.  Yes.
14  Q.  And what is the difference between an item
15  number lookup and search functionality as performed in
16  the systems of your inventions?
17  A.  The biggest difference would be the nature of
18  the data that was being entered.  In the RIMS system,
19  you had to know an exact part number and an accurate
20  part number and then that would be a database lookup
21  based on that information.  If there was anything
22  incorrect about the number, you would not get the
23  results that you anticipated.
24  Conversely, in the electronic sourcing system
25  with an electronic catalog you didn't necessarily need

Kinross, Robert  12/2/2009  9:00:00 AM

### 197

1    to know any part number.  All you needed to know was
2    what you were looking for, for instance, beakers, and
3    get a list of beakers and then be able to select, based
4    on the information that was returned, which particular
5    beaker and its related part number you were interested
6    in ordering.
7        Q.  Did the RIMS system in the 1992 to '93 time
8    period have any functionality to enable a customer
9    service representative to select particular catalogs to
10   search from among a collection of product catalogs?
11       A.  No.
12       Q.  Did the RIMS system in the 1992 to '93 time
13   period have any functionality to create an order list
14   that would include catalog items located as a result of
15   an item database search and to transfer that order list
16   to a requisition purchasing program to generate a
17   requisition that would include entries for the desired
18   catalog items?
19       A.  Could you repeat the question, please?
20       Q.  Did the RIMS system in the 1992 to '93 time
21   frame have any functionality to enable the customer
22   service representative to create an order list that
23   would include catalog items located as a result of a
24   search of an item database and to transfer that order
25   list to a requisition purchasing program to generate a

### 198

1    requisition that would include entries for those
2    desired catalog items?
3        A.  In terms of order list, could you define what
4    you mean by an order list?
5        Q.  Well, I'm -- let's say an order list as
6    described in your 683 patent, did the RIMS system in
7    the '92 to '93 time period have that functionality?
8        A.  No, it had no concept of an order list as
9    defined by the 683 patent.
10       Q.  Now, Mr. McDonald also asked you a number of
11   questions relating to the TV/2 search engine program;
12   do you recall that questioning?
13       A.  Yes.
14       Q.  Had the inventors of the patents at issue
15   here, the 683 patent, the 516 patent and the 172
16   patent, had you already conceived of the electronic
17   sourcing system ideas reflected in those applications
18   prior to meeting with IBM about the TV/2 search engine?
19       A.  Yes.
20       Q.  Had the inventors already conceived of the
21   electronic sourcing system idea described in your
22   patents prior to your having access to the document
23   that was marked as Exhibit 8, if you want to look at
24   that?
25       A.  Is that the one in your hand?

### 199

1        Q.  It's the IBM Technical Viewer/2 brochure, has
2    some pictures in it.
3        A.  Yes, we conceived of the idea before I saw
4    this particular document.
5        Q.  Had the inventors conceived of the concept of
6    the electronic sourcing system that's reflected in the
7    patents in suit prior to having access to the document
8    that was marked as Exhibit 9 --
9        A.  Being --
10       Q.  -- which was the IBM Technical Viewer/2
11   General Information Manual?
12       A.  Yes.
13       Q.  Had the inventors already conceived of the
14   concept of the electronic sourcing system described in
15   the patents prior to seeing the IBM demo of the Fisher
16   catalog pages?
17       A.  Yes.
18       Q.  Now, we talked a little bit about -- or
19   Mr. McDonald asked you some questions about the Shell
20   program; do you recall that?
21       A.  Yes.
22       Q.  Did -- who provided -- well, let me rephrase
23   that.
24       You testified that the IBM programmers wrote
25   the code for the Shell program, do you recall that?

### 200

1        A.  Yes.
2        Q.  Who provided IBM with specifications in order
3    that those IBM programmers could write the Shell
4    program?
5        A.  I did, as well as other members of the Fisher
6    team.
7        Q.  Did any members of the IBM personnel
8    contribute to the specifications for the Shell program?
9        A.  No.
10       Q.  Who ultimately owned the rights to the Shell
11   program?
12       A.  Fisher did.
13       Q.  Do you recall Mr. McDonald asking you some
14   questions with reference to your 683 patent concerning
15   your understanding of the meaning of the term
16   "catalog"?
17       A.  Yes.
18       Q.  Can you turn in that patent, to column 4.
19       A.  Okay.
20       Q.  And with reference to lines 36 through 42,
21   those lines read, "The catalogs enhanced catalog
22   database 36 preferably include such information as part
23   number, price catalog number, vendor name or ID and
24   vendor catalog number, as well as textual information
25   and images of or relating to the catalog products," do

201

1  you see that?
2      A.  Yes.
3      Q.  Do you consider that you set forth in this
4  section of the patent a description of what would be
5  included in a product catalog in accordance with your
6  invention?
7      A.  Yes.
8      MS. ALBERT:  I think that's all that I have.
9  REEXAMINATION BY COUNSEL FOR DEFENDANT
10  BY MR. McDONALD:
11      Q.  A few more questions, Mr. Kinross.
12      With respect to that description of catalogs
13  in column 4 of your 683 patent, that's consistent with
14  what you testified about when I was asking you about
15  what you think a catalog is, right?
16      A  I believe it is, yes.
17      Q.  Is it also consistent with what you thought
18  you were conveying to one of ordinary skill in this
19  patent as to what a catalog is?
20      A.  Yes.
21      Q.  Is there documentation regarding Fisher's
22  ownership of the Shell program?
23      A.  I think there is.
24      Q.  What does that look like?
25      A.  I think it's the statement of work and the

202

1  deliverables that Frank Melly and Chuck Eneris
2  [phonetic] agreed to.
3      Q.  Did IBM actually deliver to Fisher Scientific
4  the source code for the Shell program?
5      A.  Yes, they did.
6      Q.  Is there documentation of when you conceived
7  of the invention described in your patents?
8      A.  No, there's not.
9      Q.  When is your testimony that the time that you
10  conceived of the inventions described in your patents?
11      A.  Sometime in 1993.
12      Q.  What's your basis for saying it was sometime
13  in '93?
14      A.  Well, at that time we were researching
15  alternatives to CD ROM catalogs and how we would
16  implement electronic catalogs since Fisher had such a
17  large presence in the scientific community with its
18  catalog and prided itself on that catalog, that
19  customers would start expecting that catalog to be
20  available in electronic format.
21      Q.  What was the invention that you conceived of
22  sometime in 1993?
23      A.  What was the invention?
24      Q.  Yeah.  There's no documents, so I've got to
25  just ask you what it was you conceived.

203

1      A.  Well, it was the basis for the electronic
2  sourcing system method.
3      Q.  Please describe for me what was conceived in
4  1993.
5      A.  Well, the idea of having an electronic
6  catalog with Fisher data and other catalog data to
7  support the SPS group and the capability of rapidly
8  searching that data and the capability of making it a
9  closed-loop system, so that once the data was found you
10  could actually do something with it rather than just
11  print your findings and fax or mail documents.  So it
12  would be a complete end-to-end procurement system.
13      Q.  Is there anything more to what you conceived
14  in 1993 other than what you just described?
15      A.  Probably leaving something out, but right
16  now, I can't think of anything that I left out.
17      Q.  When you conceived of this idea, you say, in
18  1993, did you come up with a way to do what you
19  described as rapidly search the data at that time?
20      A.  We were looking for alternatives at that time
21  to rapidly search the data.
22      Q.  In '93, did you conceive of a way to rapidly
23  search data pursuant to that invention you've just
24  described?
25      A.  No.  It was a requirement that we had that we

204

1  knew we had, and we were looking for ways to do it at
2  that point.
3      Q.  That point being 1993?
4      A.  Yes.
5      Q.  When did you actually come up with the way to
6  rapidly search data?
7      A.  Well, the Technical Viewer product was the
8  solution to that particular requirement.
9      Q.  So you came up with that solution after you
10  became familiar with the IBM Technical Viewer product,
11  right?
12      A.  Yes.
13      Q.  I think you indicated you hadn't seen the
14  RIMS patent much before today, but you were familiar
15  with the RIMS system before today, right?
16      A.  Yes, I was familiar with the RIMS system.
17      Q.  You had worked on technology used in that
18  system back in the '92 time frame, correct?
19      MS. ALBERT:  Objection.  Mischaracterizes his
20  prior testimony.
21      A.  I used technology that was used in the RIMS
22  system in the 1992 time frame; namely, CICS and OS2, if
23  that's what the question was.
24      Q.  So you had some personal experience with the
25  RIMS system in 1992, early '93 time frame; is that

Kinross, Robert  12/2/2009  9:00:00 AM

205

1  right?

2          MS. ALBERT:  Mischaracterizes his testimony.

3  BY MR. McDONALD:

4      Q.  I'm just asking.

5      A.  As far as programming it or working on it

6  or --

7      Q.  Interfacing with it.

8      A.  Interfacing with it, I had knowledge of the

9  RIMS system in 1992.  As far as the programming aspects

10  and the minute technical details of it, I would not be

11  the one to be asking those kinds of questions.  It

12  would really be Jim Johnson who would be the expert in

13  that area.

14      Q.  So some people know more than you about the

15  RIMS system, right?

16      A.  Correct, yes.

17      Q.  What was it about the RIMS system as it

18  existed in 1992 and early 1993 that precluded it from

19  generating multiple purchase orders for a single

20  requisition, if anything?

21      A.  I don't know for sure.  I mean, as you

22  pointed out and from prior testimony, I thought it did

23  at one point, but I was told it did not.  So I'd have

24  to rely on Jim's expertise there.

25      Q.  So the basis for your testimony today and in

206

1  the examination by your attorney that the system did

2  not generate multiple purchase orders in that time

3  frame was what Mr. Johnson told you?

4      A.  Yes.

5      Q.  And that's what he told you in connection

6  with some meetings that you had with your lawyers a few

7  years ago?

8      A.  Yes.

9      Q.  Now, in fact, with the cross-reference table,

10  isn't it true that the RIMS system could do a search

11  for a part number and identify items from multiple

12  sources that were equivalent to or corresponding to

13  that part number?

14      A.  Define multiple sources again.

15      Q.  Well, Fisher and somebody other than Fisher.

16      A.  That's true.  Using the cross-reference it

17  could find a Fisher part number using another source

18  for that number.

19      Q.  And it is true that the RIMS system could

20  search for a product by the part number, correct?

21      A.  It goes back to the definition of search and

22  what a part number lookup would be, and I know the RIMS

23  documentation has search in it.  I think the problem

24  I'm having is the term "search" has changed over the

25  years.  Typically programmers were familiar with

207

1  calling database lookup searches having to search the

2  parts database or search -- using it interchangeably

3  with a lookup for it.  And then when things changed and

4  technology changed, "search" became some other meaning

5  in terms of more broadly defining what a search is.

6      Q.  You said you were unfamiliar with the RIMS

7  patent, but you do understand that in your patent

8  applications that you signed off on under oath, they

9  actually incorporate by reference that RIMS 989 patent?

10      A.  Right.

11      Q.  So weren't you familiar with it when you

12  signed that oath?

13      A.  No, I wasn't.

14      Q.  So you never looked at that patent when you

15  signed your oath?

16      A.  I looked --

17      Q.  That application, excuse me.

18      A.  I looked at the -- I looked at the 683

19  patent, but I had no -- I had no knowledge of the

20  requirement to look at the RIMS patent at that time

21  based on the information that was presented in here.

22      Q.  So nobody gave you a copy of that application

23  when you got the patent, the application for the RIMS

24  system, nobody showed you that --

25      A.  Correct.

208

1      Q.  -- while you were looking at the 683

2  application?

3      A.  That's correct.  I didn't know it would be a

4  requirement for me to review that.  To me it mentioned

5  RIMS in here, and that was as simple as that.  I knew

6  what RIMS was.

7      Q.  You knew what RIMS was, you didn't need to

8  read about it?

9      A.  Exactly, yeah.

10      Q.  But you do understand that your patent

11  incorporates the RIMS patent which specifically says

12  you can search proprietary numbers, right?

13      A.  Yes.

14          MR. McDONALD:  No further questions.

15          MS. ALBERT:  Nothing further.

16          MR. McDONALD:  Thank you, Mr. Kinross.

17          THE WITNESS:  Thank you.

18          MS. ALBERT:  And we do want to, you know,

19  review and sign the transcript.

20          THE COURT REPORTER:  Okay.

21          THE VIDEOGRAPHER:  This marks the end of tape

22  No. 3 in the deposition of Mr. Kinross and the end of

23  the deposition today.  We are going off the record.

24  The time is 5:57 p.m.

25

209

```
1      (The signature having not been waived, the deposition
2    of ROBERT P. KINROSS was concluded at 5:57 p.m.)
3
4
5           ACKNOWLEDGMENT OF DEPONENT
6       I, ROBERT P. KINROSS, do hereby acknowledge
7    that I have read and examined the foregoing testimony,
8    and the same is a true, correct and complete
9    transcription of the testimony given by me and any
10   corrections appear on the attached Errata sheet signed
11   by me.
12
13   _____   _____
14      (DATE)             (SIGNATURE)
15
16
17
18
19
20
21
22
23
24
25
```

211

```
1             E R R A T A   S H E E T
2    IN RE:  ePLUS, INC. vs. LAWSON SOFTWARE, INC.
3    RETURN BY: _____
4    ==============================================
5    PAGE  LINE        CORRECTION AND REASON
6    ==============================================
7    ____  _____
8    ____  _____
9    ____  _____
10   ____  _____
11   ____  _____
12   ____  _____
13   ____  _____
14   ____  _____
15   ____  _____
16   ____  _____
17   ____  _____
18   ____  _____
19   ____  _____
20   ____  _____
21   _____
22   (DATE)            (SIGNATURE)
23
24
25
```

210

```
1         CERTIFICATE OF SHORTHAND REPORTER
2       I, Katy M. Zamora, Registered
3    Professional Reporter, Certified Shorthand Reporter,
4    the officer before whom the foregoing proceedings were
5    taken, do hereby certify that the foregoing transcript
6    is a true and correct record of the proceedings; that
7    said proceedings were taken by me stenographically and
8    thereafter reduced to typewriting under my supervision;
9    and that I am neither counsel for, related to, nor
10   employed by any of the parties to this case and have no
11   interest, financial or otherwise, in its outcome.
12       IN WITNESS WHEREOF, I have hereunto set
13   my hand and affixed my notarial seal this 4TH day of
14   December, 2009.
15   My commission expires:
16   March 14, 2014
17
18
19   _____
20   KATY M. ZAMORA
21   NOTARY PUBLIC IN AND FOR
22   THE DISTRICT OF COLUMBIA
23
24
25
```

212

```
1             E R R A T A   S H E E T
2    IN RE:  ePLUS, INC. vs. LAWSON SOFTWARE, INC.
3    RETURN BY: _____
4    ==============================================
5    PAGE  LINE        CORRECTION AND REASON
6    ==============================================
7    ____  _____
8    ____  _____
9    ____  _____
10   ____  _____
11   ____  _____
12   ____  _____
13   ____  _____
14   ____  _____
15   ____  _____
16   ____  _____
17   ____  _____
18   ____  _____
19   ____  _____
20   ____  _____
21   _____
22   (DATE)            (SIGNATURE)
23
24
25
```

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 9th day of August, 2010, I will electronically file the foregoing

**PLAINTIFF EPLUS'S OBJECTIONS TO DEFENDANT'S DEPOSITION DESIGNATIONS AND SUMMARY OF THE DEPOSITION OF ROBERT KINROSS AND COUNTER-DESIGNATIONS**

with the Clerk of Court using the CM/ECF system which will then send a notification of such filing (NEF) via email to the following:

Daniel McDonald, *pro hac vice*
William D. Schultz, *pro hac vice*
Rachel C. Hughey, *pro hac vice*
Joshua P. Graham, *pro hac vice*
Andrew Lagatta, *pro hac vice*
Merchant & Gould P.C.
3200 IDS Center
80 South Eighth Street
Minneapolis. MN 55402
Telephone: (612) 332-5300
Facsimile: (612) 332-9081
lawsonscrvicc@)merchantgould.com

Robert A. Angle (VSB# 37691)
Dabney J. Carr, IV (VSB #28679)
Troutman Sanders LLP
P.O. Box 1122
Richmond, VA  23218-1122
Telephone:  (804) 697-1238
Facsimile:  (804) 698-5119
robert.angle@troutmansanders.com
dabney.carr@troutmansanders.com

*Counsel for Defendant Lawson Software, Inc.*

_____/s/_____

David M. Young (VSB #35997)
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4000
Facsimile:  (202) 346-4444
dyoung@goodwinprocter.com