**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| *e*PLUS, INC., | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No. 3:09-CV-620 (REP)** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **LAWSON SOFTWARE, INC.,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF *e*PLUS'S OBJECTIONS TO DEFENDANT'S DESIGNATIONS AND**
**SUMMARY OF THE DEPOSITION OF**
**DOUGLAS MOMYER AND COUNTER-DESIGNATIONS**

Plaintiff, *e*Plus, Inc. ("*e*Plus"), through counsel, hereby submits the following general and specific objections to Defendant Lawson Software, Inc. ("Defendant's") Deposition Designations and summary from the deposition of Douglas Momyer and offers the following counter-designations:

<u>**General Objections**</u>

1.      *e*Plus generally objects to the Momyer Designations as being inadmissible under Fed. R. Civ. P. 32(a) on the grounds that Mr. Momyer is scheduled to appear as a live witness at the trial in this matter.

2.      <u>Undue prejudice as to testimony concerning the RIMS product in general.</u>  Mr. Momyer testified that Fisher Scientific released several versions of its RIMS product.  Defendant solicited testimony from Mr. Momyer regarding the RIMS product without clarifying a specific version of the RIMS product.  Testimony concerning the RIMS product in use after the filing date of the patents-in-suit is irrelevant.  Testimony concerning the RIMS product that is not tied to any specific version of RIMS is unduly prejudicial since it suggests that any RIMS product

allegedly in use prior to the filing date of the patents-in-suit contained the functionality of all versions of the RIMS product.

      3.    <u>Irrelevant testimony concerning capabilities of the IBM mainframe host computer</u>.  Defendant designates testimony concerning the capabilities, features and functionality of the host computer to which the RIMS system communicated with.  Testimony concerning the IBM mainframe/ host computer is irrelevant since it does not relate to the RIMS system and is unduly prejudicial since it suggests to the jury that capabilities, features and functionality of the host computer are part of the RIMS system.

**Specific Objections**

| Defendant's Designations (December 9, 2009) | *e*Plus's Objections (designations) | *e*Plus's Objections (summary) |
|---|---|---|
| 5:3-6 | | |
| 5:7-9 | | |
| 5:10-15 | | |
| 6:15-17 | | |
| 7:18-25 | | |
| 8:1-4 | | |
| 8:14-20 | | |
| 8:21-9:6 | | |
| 10:9-12 | | |
| 11:15-12:4 | | |
| 16:12-16 | Vague and ambiguous (as to "customer installations") and as to the version of RIMS; 602 | |
| 19:22-20:2 | 401/ 403 (timeframe) | |
| 25:14-24; 26:10-14 | | Misleading (Mr. Momyer testified that customers asked Fisher to manage non-Fisher inventory when developing the concept of *the patents-in-suit*) |
| 28:7-14 | 401/403 (timeframe) | |
| 34:19-35:2 | | |
| 35:5-9; 35:12 | Vague and ambiguous (as to "a good job"); 401/403 (timeframe) | |
| 39:16-40:4 | 401/403 (timeframe) | |
| 40:12-41:4 | 401/403 (host) | |

2

| Defendant's Designations (December 9, 2009) | *e*Plus's Objections (designations) | *e*Plus's Objections (summary) |
|---|---|---|
| 48:23-49:4 | Vague and ambiguous (as to "internal purchase order"); 401/403 | |
| 50:6-25 | Incomplete; 401/403 (host); 701-704 (inappropriate expert testimony); | Mischaracterizes testimony (Mr. Momyer did not testify here that "RIMS in 92/93 created purchase orders in the 06 type") |
| 53:15-22 | Vague and ambiguous (as to "multiple line items") | |
| 55:17-21 | | |
| 62:20 – 63:5 | 401/403; 602 | |
| 67:11-13; 67:16 | Vague and ambiguous (as to "electronic catalog"); 701-704 (inappropriate expert testimony) | |
| 68:17-21 | Vague and ambiguous (as to "a difference"); 701-704 (inappropriate expert testimony) | |
| 68:24-25 | Vague and ambiguous (as to "a difference"); 701-704 (inappropriate expert testimony) | |
| 69:2-6 | | |
| 69:14-17 | Incomplete; Vague and ambiguous (as to "communication between businesses recording purchasing"); 602 | |
| 70:24 – 71:7 | 401/403 | |
| 71:8 – 72:3 | 401/403 | |
| 72:7-10 | 401/403 | |
| 81:19-23 | 701-704 (inappropriate expert testimony) | |
| 82:2 | 701-704 (inappropriate expert testimony) | |
| 82:4-8 | | |
| 82:9-14 | | |
| 82:17-20 | Vague and ambiguous | |
| 82:22 – 83:9 | Vague and ambiguous (as to "important part"); 401/403 | |
| 83:12 | Vague and ambiguous (as to "important part"); 401/403 | |
| 84:20-24 | | |
| 85:2 | | |
| 85:4-7 | | |
| 85:9 | | |

| Defendant's Designations (December 9, 2009) | *e*Plus's Objections (designations) | *e*Plus's Objections (summary) |
|---|---|---|
| 86:3-6 | Vague and ambiguous (as to "Fisher's goals); 602; 401/403 | |
| 87:20 – 88:10 | Incomplete designation.  The designation fails to include the witness' entire answer.  (106) | |
| 89:6-8 | 401/403 | |
| 89:11 | 401/403 | |
| 89:13-22 | 401/403 | |
| 90:16-18 | Vague and ambiguous (as to "maintained") | |
| 90:21 | | |
| 90:23 – 91:21 | Vague and ambiguous (as to "maintained"); 401/403; 601 | |
| 91:22 – 92:18 | | |

| Defendant's Designations (December 10, 2009) | *e*Plus's Objections (designations) | *e*Plus's Objections (summary) |
|---|---|---|
| 116:10 – 117:11 | 401/403; 602; 1002/1004 | |
| 120:12-23 | | |
| 123:11-19 | Vague and ambiguous (as to "outside system") | |
| 144:23-25 | 701-704 (improper expert testimony) | |
| 145:3-4 | | |
| 146:20 – 147:10 | Vague and ambiguous (as to "inventory pricing and requisition operations"); 401/403 (host) | |
| 149:1-13 | 401/403; 106 (misleading) | |
| 150:1-9 | | |
| 150:13-15 | | Mischaracterizes testimony (Mr. Momyer stated that sentence was accurate provided "the products we're managing are Fisher products in inventory") |
| 152:15-21 | 401/403 (host) | |
| 153:8-24 | 401/403 | |
| 155:1-4 | Incomplete; 401/403 | |
| 156:12-17 | 602; 401/403 | |
| 167:13-18 | Vague and ambiguous (as to "describing a system"); 401/403; | |

4

| Defendant's Designations (December 10, 2009) | *e*Plus's Objections (designations) | *e*Plus's Objections (summary) |
| --- | --- | --- |
| | 701-704 (improper expert testimony) | |
| 167:22 – 168:1 | Vague and ambiguous (as to "describing a system"); 401/403; 701-704 (improper expert testimony) | |
| 168:20 – 169:2 | Vague and ambiguous (as to "object of your invention"); 401-403; 701-704 (improper expert testimony) | |
| 169:5-10 | Vague and ambiguous (as to "object of your invention"); 401/403; 701-704 (improper expert testimony) | |
| 169:18 – 170:10 | Vague and ambiguous (as to "object of your invention"); 401/403; 701-704 (improper expert testimony) | |
| 171:4-8; 171:24 – 172:2 | Vague and ambiguous (as to "more accurate to say"); Incomplete; 106 (misleading) | |
| 172:3-18 | Vague and ambiguous (as to "communication between a searching module and a requisition purchasing module"); 401/403 | |
| 172:22 – 173:12 | Vague and ambiguous (as to "further object of the invention"); 401/403; 701-704 (improper expert testimony) | |
| 173:15 | Vague and ambiguous (as to "further object of the invention"); 401/403; 701-704 (improper expert testimony) | |
| 174:24 – 175:8 | | |
| 177:3-17 | 106 (misleading); 401/403 | |
| 179:1-12 | Incomplete (as to "that feedback"); 401/403; 602 | |
| 181:3-15 | Vague and ambiguous (as to "integrated supplier capability" and "something good"); 401/403; 602 | |
| 193:3 – 194:14 | | |
| 195:18-23 | 401/403; 611 (mischaracterizes | |

| Defendant's Designations (December 10, 2009) | *e*Plus's Objections (designations) | *e*Plus's Objections (summary) |
|---|---|---|
| | testimony) | |
| 196:1-2 | | |
| 196:4-5 | Vague and ambiguous (as to "done"); 401/403 | |
| 196:8 | Vague and ambiguous (as to "done"); 401/403 | |
| 196:17 – 197:14 | | |
| 200:14 – 202:5 | | |
| 202:6-11 | | |
| 205:9-17 | Vague and ambiguous (as to "data tables"); 401/403; 701-704 (improper expert testimony) | |
| 206:6-17 | 401/403 | |
| 206:21-23 | 401/403 | |
| 208:25 – 209:3; 209:6 | Scope; Vague and ambiguous (as to "flow charts"); 401/403 | |
| 219:9 – 220:5 | 401/403 | |

| *e*Plus's Counter-Designations (December 9, 2009) |
|---|
| 6:18 – 7:3 |
| 10:13 – 10:15 |
| 10:18 – 11:13 |
| 15:15 – 16:11 |
| 16:17 – 17:10 |
| 20:3 – 22:4 |
| 24:24 – 25:13 |
| 26:15 – 27:14 |
| 28:19 – 28:20 |
| 28:23 – 29:24 |
| 35:14 – 36:13 |
| 41:5 – 41:13 |
| 49:5 – 49:18 |
| 51:6 – 51:14 |
| 51:17 – 51:25 |
| 54:22 – 54:24 |
| 55:2 |
| 55:4 – 55:9 |
| 55:12 – 55:15 |
| 67:18 – 67:20 |
| 72:11 – 73:19 |

LIBW/1755249.1

| *e*Plus's Counter-Designations (December 9, 2009) |
|---|
| 83:14 – 84:19 |
| 85:11 – 85:17 |
| 85:20 – 86:1 |
| 88:11 – 88:15 |

| *e*Plus's Counter-Designations (December 10, 2009) |
|---|
| 110:18 – 112:5 |
| 112:16 – 113:16 |
| 113:18 – 114:9 |
| 114:19 – 115:19 |
| 115:22 – 116:8 |
| 118:11 – 119:7 |
| 119:22 – 120:8 |
| 120:24 – 121:16 |
| 126:11 – 127:15 |
| 127:18 – 127:19 |
| 127:21 – 127:22 |
| 150:10 – 150:12 |
| 151:7 – 152:14 |
| 155:12 – 156:5 |
| 156:8 – 156:11 |
| 170:11 – 170:14 |
| 170:17 – 170:22 |
| 184:16 – 190:10 |
| 190:15 – 192:18 |
| 194:15 – 195:17 |
| 202:12 – 202:13 |
| 202:16 |
| 202:19 – 202:20 |
| 202:22 – 203:13 |
| 203:18 – 203:25 |
| 204:6 – 204:9 |
| 204:12 – 205:8 |
| 209:13 – 211:4 |
| 211:12 – 213:25 |
| 214:2 – 215:12 |
| 220:11 – 221:1 |

Respectfully submitted,


_____/s/_____
Craig T. Merritt (VSB #20281)
Henry I. Willett, III (VSB #44655)
**CHRISTIAN & BARTON, LLP**
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
Telephone: (804) 697-4100
cmerritt@cblaw.com
hwillett@cblaw.com


Scott L. Robertson (admitted *pro hac vice*)
Jennifer A. Albert (admitted *pro hac vice*)
David M. Young (VSB#35997)
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4000
SRobertson@goodwinprocter.com
JAlbert@goodwinprocter.com
DYoung@goodwinprocter.com


Michael G. Strapp (admitted *pro hac vice*)
James D. Clements (admitted *pro hac vice*)
**GOODWIN PROCTER LLP**
Exchange Place
53 State Street
Boston, MA 02109-2881
Telephone:  (617) 570-1000
MSrapp@goodwinprocter.com
JClements@Goodwinprocter.com


*Attorneys for Plaintiff, ePlus Inc.*


Dated:  August 9, 2010

## Douglas A. Momyer Day 1 (Dec. 9, 2009) – Rebuttal Summary

At the time of the development of the RIMS system at Fisher Scientific, Mr. Momyer was the manager of customer systems. (6:20-21) Within that role, Mr. Momyer would develop systems that would manage certain operations or interact with customers. (6:21-25) RIMS was one of the systems developed within the customer systems group. (7:1-3)

The RIMS system was developed more to protect an asset of Fisher Scientific than to increase business. (10:13-15; 10:18-20) The RIMS system was developed to control inventory at Fisher Scientific's customers' sites, i.e., reduce shrinkage and gain better control of inventory in a just-in-time inventory arrangement. (10:21-11:7) The RIMS system saved Fisher Scientific millions of dollars in terms of loss in inventory. (11:8-13)

Mr. Momyer believed it was not entirely accurate to say in early 1993 that "information on all 100,000 products offered in the Fisher catalog can be obtained through Fisher RIMS, the company's newest and most powerful electronic order entry system, which provides paperless purchasing, receiving, billing, and product distribution." (15:15-16:1; 16:17-22) The 100,000 products referred to were not part of the local RIMS environment, but were sitting out on the host environment. (16:2-6) What ran locally within RIMS were the inventory records. (16:7-11) It was misleading to say that the purchasing was paperless, because the purchasing began with a paper requisition brought from the customer to one of Fisher Scientific's customer-service representatives, who would enter it into the RIMS system. (16:23-17:3) Purchase orders generated on the host to fill requisitions were sent to the RIMS system to update the inventory. (17:4-8) Mr. Momyer was not certain what was meant by "product distribution." (17:9-10)

Mr. Momyer did not believe that Fisher Scientific's customers' desire was the event that drove the development of a system that would provide them access to catalogs other than the Fisher catalog. (24:24-25:7) The RIMS system was primarily designed to support Fisher products. (25:7-10) There were other events that would have driven Fisher Scientific to take a look at having access to supply catalogs. (25:11-13)

Fisher Scientific saw the management of inventory of products from other suppliers as a new business opportunity. (26:15-27:1) Fisher Scientific felt that it had established good credibility with its customers in handling Fisher products, so it thought it could expand its capabilities in managing inventory to cover other product groupings beyond the traditional Fisher product types. (27:2-11) The business generated from this new opportunity is what spawned electronic sourcing. (27:12-14)

Fisher Scientific sought to expand the amount of customer inventory managed by the RIMS system. (28:19-20; 28:23-29:6) Traditionally the customer would buy lab supplies from Fisher Scientific. (29:7-12) In the integrated supply role, the integrated supplier would assume procurement responsibilities for other commodity groupings, like electrical supplies, pipe valves and fittings, and office products. (29:13-17) Tremendous cost savings can be achieved by taking over the customer's procurement activities from

the requisition to the placement of the purchase order, and then managing the inventory and distribution of that inventory throughout the customer's location. (29:17-24)

Managing the procurement process involved taking responsibility for identifying the best supplier for a particular product on behalf of the customer. (35:14-36:2) The RIMS system did not manage the procurement process. (36:3-5) It could do administrative orders, but could not identify the best supplier for a product. (36:6-10) If a product was selected and a paper requisition was created, the customer would actually purchase the product. (36:11-13)

The RIMS system offered in 1992 could not generate "purchase orders." (41:5-10; 49:15-18; 51:6:14; 51:17-25) Any purchase orders were generated by the external host computer. (49:5 – 49:18). The RIMS system could generate requisitions, which the customer could independently enter into their own system to create a purchase order. (41:10-13; 49:5-14; 51:6:14; 51:17-25)

The RIMS system could only handle multiple line items on a requisition if the items were Fisher-owned products or Fisher-purchased products. (54:22-24; 55:2-15)

Mr. Momyer did not know whether two electronic catalogs could be searched simultaneously using punchout. (67:18-20)

Fisher's SupplyLink product is wholly distinct from RIMS. (72:24-73:3) It supplied a requisition workflow, with the ability for an individual end-user to directly enter the requisition into the system. (73:3-6) SupplyLink also provided end-users the ability to select products through accessing an electronic catalog and to create a single requisition that would flow through the customer's installation, allowing organizations to approve or not approve the requisition. (73:6-12) SupplyLink had the ability to translate that requisition into multiple purchase orders that would be electronically communicated to multiple suppliers. (73:12-19)

Figures depicting the products were an important part of the system described in the patents because the figures were one piece of information that a requisitioner would rely on when deciding whether or not to buy a product. (83:14-25) With the RIMS system, customers would either have to rely on the on-site customer service representatives to provide information about the products or to look though the Fisher paper catalog. (84:1-19) Customers using the RIMS system would not have much opportunity to buy other products because the RIMS system was only set up to handle Fisher products. (85:11-86:1)

The idea behind just-in-time inventory was to identify the products that were most commonly used and put those products into the stockroom. (88:11-15)

## Douglas A. Momyer (Dec. 10, 2009) – Rebuttal Summary

Mr. Momyer was involved in discussions between Fisher Scientific and Lawson around 2000-2002 to set up Lawson's procurement supply chain management system to punch out to the Fisher Scientific catalog.  (110:18-111:13)  The punch out integration never materialized because the Lawson customer that had originally wanted to purchase products from Fisher Scientific ended its engagement with Fisher Scientific.  (111:14:112:5)  The marketing manager at Fisher Scientific that brought the Lawson request to Mr. Momyer, Jane Stull, was also involved in these discussions.  (112:16-113:3)  Mr. Momyer's understanding at that time was that Lawson either had or was developing the punchout capability for their system.  (113:18-114:5)

Fisher Scientific spoke to other companies besides Ariba, Commerce One, and Lawson about punchout integration while Mr. Momyer was still at the company, but he did not remember any other particular companies.  (114:19-5)  Mr. Momyer was reminded of his discussions with Lawson when he received the notice of deposition.  (115:6-14)  At the time that Fisher Scientific had discussions with these companies regarding punchout, Mr. Momyer was not thinking about the patents because they were no longer owned by Fisher Scientific.  (115:15-19; 115:22-116:8)

The statement in the '683 patent that the "Host computer 10 controls all inventory, pricing, and requisitioning operations of the distributor's, with a capital D, regularly stocked items using host pricing and inventory databases 11" is accurate with respect to products that are within Fisher Scientific's inventory or are managed by Fisher Scientific.  (150:10-12)  The host computer 10 shown in Figure 3 of the '683 patent could represent a third-party distributor to whom a purchase order for an 07 product type is delivered.  (151:7-152:14)  There are multiple places in the '683 patent that illustrate that there can be multiple local and host computers employed in the system, e.g., col. 17, ll. 10 et seq. and col. 18, ll. 39 et seq.  (183:16-186:6)  According to the '989 patent, it is the host computer that generates the purchase order and not the customer service representative at the local RIMS computer.  (214:2-215:12)

The searching part of the patented system does not have to be something separate from the requisition and purchasing system.  (170:11-14; 170:17-18)  For example, they could be modules within an application, i.e., one module for searching and one module for processing orders.  (170:19-22)

The invention disclosed in the '683 patent, the '516 patent, and the '172 patent is far from a simple combination of the RIMS patent and the TV/2 search engine.  (189:24-190:5)  One example of the additional functionality and capability of the invention was to push the requisitioning process out into the customer's hands, which required a significant amount of development, including the complete development of a graphical interface and a work flow to allow approval of the requisition on various levels within the customer's site.  (190:15-191:11)  Another example was that significant development was required to source and price items to multiple suppliers, as well as splitting out a requisition into multiple purchase orders directed to multiple suppliers.  (191:12-25)  Also requiring

significant development was taking the 2-tier architecture of the RIMS system and building it into a 3-tier architecture.  (192:1-4)

Using the RIMS system, the customer service representative could neither determine the availability of an item in a third-party supplier's inventory nor generate purchase orders on the local computer.  (192:7:13)  The RIMS system did not have catalogs.  (192:14-15)  The RIMS system did not have the capability of sourcing products from third parties.  (192:16-18)

Conditioning of the tables is implied in the patents by the addition of the functionality to support a multi-vendor environment and to change how the requisitions are built, which would be understand by someone reading the patents.  (202:22-203:6)  Conditioning of the tables means supporting new data elements that were returned from the electronic catalogs.  (204:17-205:1)  As the data tables came back from the electronic catalogs, they would be stored as part of the requisition.  (205:2-8)

The Easel program disclosed in the '683 patent is a graphical user interface that Mr. Momyer was familiar with while he was at Fisher Scientific.  (209:13-211:4;  211:12-212:2)

Taken within the context of the patent specification, the article "the" when used in connection with a distributor could mean either singular or plural.  (212:3-213:25)

Both computers and graphical user interfaces were known at the time the patent application was filed in 1994.  (220:11-221:1)  Mr. Momyer did not feel the need to explain in the patent how a computer operates.  (220:21-23)

Momyer, Douglas A. - Vol. 1  12/9/2009  12:00:00 PM

1

1        UNITED STATES DISTRICT COURT
2        EASTERN DISTRICT OF VIRGINIA
3            RICHMOND DIVISION
4   ePLUS, INC.,        )
5        Plaintiff, )
6      v.        ) No. 3:09cv620
7   LAWSON SOFTWARE, INC.,   )
8        Defendant. )
9
10            Washington, D.C.
11          Wednesday, December 9, 2009
12   Videotape Deposition of DOUGLAS A. MOMYER, called for
13   examination by counsel for Defendant in the
14   above-entitled matter, the witness being duly sworn
15   by CHERYL A. LORD, a Notary Public in and for the
16   District of Columbia, taken at the offices of
17   TROUTMAN SANDERS LLP, 401 9th Street, Suite 1000,
18   Washington, D.C., at 4:14 p.m., and the proceedings
19   being taken down by Stenotype by CHERYL A. LORD, RPR,
20   CRR.
21
22
23
24
25

2

1   APPEARANCES:
2
3   On behalf of Plaintiff and Douglas A. Momyer:
4      JENNIFER A. ALBERT, ESQUIRE
5      SCOTT L. ROBERTSON, ESQUIRE
6      GOODWIN PROCTER LLP
7      901 New York Avenue, N.W.
8      Washington, D.C.  20001
9      (202) 346-4000
10   On behalf of Defendant:
11      DANIEL W. McDONALD, ESQ.
12      MERCHANT & GOULD
13      80 S. 8th Street, Suite 3200
14      Minneapolis, MN  55402-2215
15      (612) 332-5300
16
17   ALSO PRESENT:
18      Brian Ciccone, videographer
19
20
21
22
23
24
25

3

C O N T E N T S
WITNESS           EXAMINATION
             PAGE NO.
DOUGLAS A. MOMYER
   By Mr. McDonald          5

P R E V I O U S L Y   M A R K E D   E X H I B I T S
LAWSON EXHIBIT NO.       FIRST MENTIONED
   4  Form 10-K              12
   7  U.S. Patent No. 5,712,989        9

4

P R O C E E D I N G S

        THE VIDEOGRAPHER:  Today is Wednesday,
December 9th, 2009.  The time is approximately 4:14
PM.  We are at the law office of Troutman Sanders LLP
located in Washington, D.C.
        This is the commencement of the video
deposition of Douglas A. Momyer.  My name is Brian
Ciccone, and I am the video technician.
        Will the attorneys please note their
appearances for voice identification.
        MR. McDONALD:  For defendant, Lawson
Software, Daniel McDonald, of Merchant & Gould.
        MR. ROBERTSON:  And for plaintiff, ePlus
Inc., Scott Robertson, from Goodwin & Procter, and
with me is my partner, Jennifer Albert.
        THE VIDEOGRAPHER:  Will the court reporter
please swear in the witness.

Whereupon,
        DOUGLAS A. MOMYER
was called as a witness by counsel for Defendant,
and, having been duly sworn by the Notary Public, was
examined and testified as follows:

Momyer, Douglas A. - Vol. 1  12/9/2009  12:00:00 PM

---

**5**

```
1        EXAMINATION BY COUNSEL FOR DEFENDANT
2        BY MR. McDONALD:
3        Q.   What is your full name?
4        A.   Douglas Arno Momyer.
5        Q.   Where did you live?
6        A.   Pittsburgh, Pennsylvania.
7        Q.   Are you one of the people listed as an
8    inventor on these electronic sourcing patents?
9        A.   Yes, I am.
10       Q.   Did you at one time work for Fisher
11   Scientific?
12       A.   Yes, I did.
13       Q.   During what years did you work at Fisher
14   Scientific?
15       A.   1980 through 2003.
16       Q.   And briefly what have you done since 2003?
17       A.   I worked as IT director for Ferguson
18   Integrated Services.  I've worked for them since 2003
19   till the present.
20       Q.   What is -- what is your job with Ferguson
21   Integrating Service?
22       A.   Information technology director, IT
23   director.  I manage software development and
24   day-to-day activities for the business operation.
25       Q.   What's the business of Ferguson?
```

**6**

```
1        A.   Ferguson Integrated Services is a
2    subsidiary of Ferguson Enterprise.  Ferguson
3    Enterprise is a large distributor of plumbing
4    supplies and air conditioning and heating.
5            Ferguson Integrated Services is a -- deals
6    with the process of managing customers inventory.
7    They go to something called integrated supply, and
8    that is the -- as a company, we would go into a
9    customer's site, take over procurement activities,
10   take over the operations of the cribs, stockrooms,
11   and manage that inventory.
12           It ends up being a cost reduction for our
13   customers, and I'm responsible for developing systems
14   that support that operation.
15       Q.   Were you involved in developing a product
16   at Fisher called the RIMS system, R-I-M-S?
17       A.   Yes, I was.
18       Q.   What generally was your role with that
19   system?
20       A.   I was -- at the time at Fisher I was in a
21   position called manager of customer systems.  And as
22   a part of that, we would develop systems that would
23   be sitting out at our customers' locations, manage --
24   managing certain operations or having our customers
25   interact with customers -- with the systems.
```

**7**

```
1    And I manage all the development effort
2    that had to deal with that.  And RIMS happened to be
3    one of the systems that we developed in that group.
4        Q.   During what years were you the manager of
5    the customer systems area?
6        A.   It would have been in the early '90s,
7    mid-'80s, the early '90s, through probably '94, '95,
8    something like that, but I will tell you that in
9    between, there were a lot of different jobs.
10           We're kind of fluid in our organization.
11   I worked as a database administrator for a period of
12   time as well during that period.
13           THE COURT REPORTER:  You have to keep your
14   voice up for me because I'm not plugged into your
15   microphone.
16           THE WITNESS:  Okay.  I will.
17           BY MR. McDONALD:
18       Q.   Generally what was your role in developing
19   the RIMS system specifically?
20       A.   I was probably what would be considered
21   one of the principal architects of it, done a lot of
22   the design work, taken the original business need and
23   embellished that business need for the requirements
24   that we had to operate the -- to operate the
25   inventory crib management system at a customer site.
```

**8**

```
1        Q.   When did you start working on the RIMS
2    system?
3        A.   It was a while ago.  I'm -- I think it was
4    probably in the -- in the early '90s.
5        Q.   Did you do anything to refresh your memory
6    about the electronic sourcing patents in the RIMS
7    before today's deposition?
8        A.   We were asked to take a look at the
9    patents, and I yesterday did go through and review
10   the patents.
11       Q.   "The patents" being the electronic
12   sourcing patents as well as the RIMS patent?
13       A.   I looked at both, yes.
14       Q.   Are you represented by counsel today?
15       A.   My counsel is here, Scott Robertson.
16       Q.   Scott is.
17           Is Ms. Albert also?
18       A.   Both of them are, yes.
19       Q.   And you understand they also represent
20   ePlus?
21       A.   Yes.
22       Q.   Are you getting paid for your time?
23       A.   Yes, I am.
24       Q.   Is that your time spent yesterday as well
25   as your time today --
```

---

Momyer, Douglas A. - Vol. 1  12/9/2009  12:00:00 PM

---

**9**

1   A.   Yes.
2   Q.   -- at the deposition?
3        How much are you getting paid?
4   A.   350 dollars an hour.
5   Q.   Is ePlus paying that?
6   A.   Yes.
7   Q.   Do you have the RIMS patent -- that's the
8   one ending in the numbers 989 -- there in the stack
9   in front of you?
10  A.   Yes.
11  Q.   You see there on the first page of that
12  exhibit, which is exhibit 7, on the left side a
13  filing date of April 2, 1993?
14  A.   Exhibit 7.
15  Q.   Up there at line 22 on the left side.
16  A.   First page.
17  A.   Right.
18  A.   Title page.
19  Q.   That's right.
20       You see the title there anyway?
21  A.   I see something called, abstract.
22  Q.   Okay.  Go to the left side.
23  A.   Yep.
24  Q.   And go up -- you see the name Fisher
25  Scientific Company?

---

**10**

1   A.   Yes, assignee, Fisher Scientific Company.
2   Q.   Right.
3        Go a couple lines before it below that one
4   now.
5   A.   Application number filed.
6   Q.   Filed April 2, '93.
7        Do you see that?
8   A.   Yes.
9   Q.   The RIMS system was -- was -- in -- --
10  installation at customer sites prior to April of '93.
11  Right?
12  A.   Yes, it was.
13  Q.   The RIMS system was used in marketing
14  efforts to try to convince customers to do business
15  with Fisher; is that right?
16       MR. ROBERTSON:  Objection, vague and
17  ambiguous.
18  A.   I don't know if it really was -- the
19  system was really developed to increase our business
20  as much it was to protect an asset.
21       The primary reason that we developed the
22  RIMS system was because of a need to control our
23  inventory that was at our customer's site, in other
24  words, significant shrinkage, loss of control of
25  inventory where we would create this just-in-time

---

**11**

1   inventory arrangement with our customers, and we
2   would place the inventory at the customer's site.
3        And until we had RIMS really didn't have a
4   system that allowed us to keep track of who took the
5   material and what the amounts were in these
6   stockrooms that we had out there.  So that was really
7   the primary reason.
8        And quite frankly, it saved the company
9   millions of dollars as far as loss in inventory.  We
10  had over the course of many years as a business
11  practice placed inventory out at these customer
12  sites.  As I said until RIMS we didn't really have
13  any system in place to manage that.
14  BY MR. McDONALD:
15  Q.   Did the RIMS system manage the inventory
16  at a customer site owned by Fisher as well as owned
17  by the customer?
18  A.   It had the capability for managing 2
19  different inventory types.  One was Fisher-owned
20  inventory.  We owned it, and whenever the product was
21  consumed, at that point in time, the customer paid
22  for it.
23       And then customer-owned inventory, which
24  was inventory that the customer owned, and whenever
25  we replenished the inventory, as the point in time

---

**12**

1   that the customer paid for that.  But almost --
2   pretty much the inventory there was either Fisher
3   inventory that we owned or Fisher inventory the
4   customer had bought from Fisher.
5   Q.   Was the RIMS system instrumental in
6   securing supplier agreements with Fisher's larger
7   customers?
8        MR. ROBERTSON:  Objection, form of the
9   question.
10  A.   I don't know.
11       BY MR. McDONALD:
12  Q.   Let me show you what was previously marked
13  as exhibit Lawson 4.
14       I'm sorry.
15       Here we go.
16  A.   Put this down here?
17  Q.   Yes, that's fine.
18  A.   Okay.
19  Q.   This was previously marked as an exhibit,
20  Mr. Momyer.
21       If you look at the first page of this
22  document, do you see in the middle of the page the
23  name Fisher Scientific --
24  A.   Yes, I do.
25  Q.   -- International?

---

Momyer, Douglas A. - Vol. 1  12/9/2009  12:00:00 PM

---

**13**

1   A.   Yes.

2   Q.   And up above that, do you see the word --

3   or the phrase form 10-K?

4   A.   Form 10-K.  I see that.

5   Q.   Do you know what a form 10-K --

6   A.   No --

7   Q.   -- is?

8   A.   -- I do not.

9   Q.   Right below that, do you see an X --

10  checkmark next to the phrase annual report?

11  A.   Yes, I see that.

12  Q.   And I'll just represent to you that this

13  is a copy we obtained from some record that doesn't

14  have all the exhibits.  There's a bunch of

15  attachments to the report itself, but this is just

16  the report with all the -- without the exhibits.

17       All right?

18  A.   Okay.

19       MR. ROBERTSON:  Just a quick question,

20  Dan.

21       MR. McDONALD:  Yeah.

22       MR. ROBERTSON:  I mean, was this produced?

23       I've probably seen it before, but I just

24  don't know:  Was it produced?

25       MR. McDONALD:  It wasn't produced, but we

---

**14**

1   used it last week.

2        MR. ROBERTSON:  It doesn't have Bates

3   numbers, so I note that -- just observe for the

4   record that it appears to be incomplete, but by all

5   means, move forward with your questions.

6        MR. McDONALD:  Right.

7        I mean, as far as I know it's just missing

8   the exhibits.

9        Do you know notice anything else that's

10  incomplete about it?

11       MR. ROBERTSON:  Yeah.

12       It looks like -- I'm looking at the third

13  page starting out with section 9, so I'm not so sure

14  that the second page -- there seems to be pages

15  missing between the second page and the third page

16  for example.

17       MR. McDONALD:  All right.  I see what

18  you're saying.

19       I believe there's a numerically

20  consecutive copy that starts at the fifth page of the

21  exhibit with the numbers 001 in the lower right

22  corner.

23       With that, we'll go ahead and ask some

24  questions here, Mr. Momyer.

25       BY MR. McDONALD:

---

**15**

1   Q.   Can you direct your attention to the page

2   that's got in the lower right corner of that

3   document -- it's about the seventh page in.  It's a

4   little hard to read, but a 003.

5   A.   On the right-hand corner?

6   Q.   Lower right corner.

7        That's right.

8   A.   01, 2, 3.

9        I think that's it.

10  Q.   All right.  There's a paragraph that's

11  near the top of the page entitled, computerized order

12  entry systems.

13       Do you see that paragraph?

14  A.   Yes, I do.

15  Q.   The first sentence there -- I'll just read

16  it, quote:  Information on all 100,000 products

17  offered in the Fisher catalog can be obtained through

18  Fisher RIMS, the company's newest and most powerful

19  electronic order entry system, which provides

20  paperless purchasing, receiving, billing, and product

21  distribution, quote.

22       Do you see that line?

23  A.   Yes, I do.

24  Q.   Is that a sentence that you believe is an

25  accurate statement as of early 1993?

---

**16**

1   A.   Well, yeah, I suppose it would be.

2        A couple things we probably should point

3   out is that those hundred thousand products were not

4   part of the local RIMS environment.  Those hundred

5   thousand products were sitting out in the host

6   environment.

7        What ran locally within RIMS was --

8   primarily the inventory records were local.  The

9   other thing is it that the Fisher catalog is really I

10  think a reference to the paper catalog that Fisher

11  produced.

12  Q.   As of the end of 1992, was the Fisher RIMS

13  system being used at customer installations?

14  A.   I believe it was.  Dates are kind of tough

15  to remember, but I believe we had something in place

16  in 1992.

17  Q.   So you mentioned a couple of pieces of

18  information about the RIMS system, but with --

19  despite those statements, do you believe that

20  sentence I did read here is an accurate statement or

21  not?

22  A.   No.

23       When you say, paperless purchasing, that's

24  probably a little misleading in that very typically,

25  the start of the process was a piece of paper.  The

---

Momyer, Douglas A. - Vol. 1  12/9/2009  12:00:00 PM

17

1    customer very often would bring a paper requisition
2    to our on-site CSR, who then would enter it into the
3    RIMS system.
4        We did do receiving, and that would have
5    been done -- any of the purchase orders that would
6    have been generated on the host to fill reqs would
7    have been received into the RIMS system to update the
8    inventory.  That would have occurred.
9        Product distribution.  Okay.  I'm not
10   quite sure what they meant by, product distribution.
11   Q.   When you say, a paper was involved, is it
12   true that customers would come to the on-site Fisher
13   customer service representative sometimes with a
14   piece of paper that would basically include a list of
15   the products they wanted to requisition?
16   A.   Yes.
17   Q.   Is it also true that the user of the
18   system at the customer would sometimes call the
19   customer service representative and just tell them,
20   this is what we want?
21   A.   They could call or submit a paper req.
22   That's typically how the --
23   Q.   So at least in the calling scenario, that
24   would be paperless at that point in the process.
25       Right?

18

1    A.   Well, to be honest, what probably happened
2    was that the on-site CSR took the information on a
3    piece of paper and then entered it, so there probably
4    wasn't an interim step there to --
5    Q.   How do you know one way or the other --
6    A.   I don't.
7    Q.   -- whether a customer service
8    representative --
9    A.   Just through observation --
10   THE COURT REPORTER:  You have to --
11   BY MR. McDONALD:
12   Q.   You need to let me finish the question.
13   A.   I'm sorry.
14   Q.   This lady here, we have to kind of make
15   sure that she can get us --
16   A.   Excuse me.
17   Q.   -- one at a time.  I could care less if
18   you talked at the same time I do, but we need to do
19   that for a clear record.
20   MR. ROBERTSON:  And take your time.  Just
21   let him finish his question --
22   THE WITNESS:  Okay.
23   MR. ROBERTSON:  -- and then you can
24   understand what he's asking.
25   BY MR. McDONALD:

19

1    Q.   So with respect to the RIMS system as it
2    existed in late '92, do you know one way or the other
3    whether customer service representatives wrote down
4    what the users wanted to requisition on a piece of
5    paper or not?
6    A.   Only through some observation on one
7    visits to those sites and how they operate.
8    Q.   So based on those observations, those are
9    observations that happened in the '92 time frame?
10   A.   And after.
11   Q.   These are observations of customer service
12   representative on-site at customers using the RIMS
13   system?
14   A.   Yes.
15   Q.   And based on those observations, did you
16   see them -- the customer representatives sometimes
17   write down the list of products on a piece of paper
18   and sometimes not?
19   A.   I recall more often -- I recall writing
20   the information on a paper.  I'm -- I don't recall
21   keying in the information directly.
22   Q.   About how many RIMS sites did you visit
23   back in the '92 time frame?
24   A.   Well, I'm not -- I just -- I don't know
25   how many sites were up in running in '92.  I would

20

1    have visited numerous RIMS sites over the course of 3
2    or 4 years.
3    Q.   Why did you visit RIMS sites?
4    A.   See how the installation went, get a feel
5    for how the operation was going.  Get some ideas on
6    how we could improve -- improve the system.  Talk to
7    the customers, see how things were going for them.
8    Q.   So at the customers, you talked to the
9    Fisher Scientific customer employees?
10   A.   Yes.
11   Q.   Did you also talk to the Fisher Scientific
12   customer service representatives that were on-site it
13   customer locations?
14   A.   That's the employees I would have talked
15   to, the on-site customer service representative.
16   Q.   Okay.  So those CSRs, or customer service
17   representatives, are those employees of Fisher or of
18   the Fisher customer?
19   A.   Fisher.
20   Q.   All right.  So when you say you talked to
21   the --
22   A.   Fisher --
23   Q.   -- customers, who are you talking about?
24   A.   The customer whose inventory -- whose site
25   we had RIMS installed.  RIMS would have been

**21**

1  installed at a customer location.  We would have
2  been -- typically a customer service rep would have
3  been sitting either as a person keeping the stockroom
4  up to date, or in many cases, there were several
5  people there, one person who was sitting there just
6  taking -- taking the requisitions for material out of
7  the stockroom.
8      So I would have talked to those
9  individuals.  And those people were always Fisher
10  employees.  Fisher employees in the RIMS system were
11  the only people who interacted with RIMS.
12      We didn't have any customer interaction
13  with RIMS.
14  Q.  So did you talk to customers or not?
15  A.  Sure, yes, I did.
16  Q.  And were these customers that would
17  interact with your customer service representative?
18  A.  Yes.
19  Q.  What sort of questions did you ask them?
20  A.  If they were getting good service from
21  Fisher with the products that they needed were there
22  when they wanted them.
23      You have to realize, RIMS system, one of
24  the things it was doing was an inventory control
25  system, so it was -- it was responsible for

**22**

1  replenishing the inventory, and if you recall the
2  premise of RIMS, it's a just-in-time inventory, so if
3  the material wasn't there when the customer needs it,
4  then we failed in our business.
5      (Discussion off the record.)
6      (Pause.)
7      BY MR. McDONALD:
8  Q.  If we look back at this paragraph in
9  exhibit 4.
10  A.  Second paragraph?
11  Q.  That paragraph that begins with the words
12  computerized order entry systems.
13  A.  Yes.
14  Q.  The third sentence, I'm going to read that
15  one to you, quote:  The company believes that the
16  lower procurement cost and increased control offered
17  by Fisher RIMS has been instrumental in securing
18  several long-term supplier agreements with large
19  customers, quote.
20      Do you see that?
21  A.  Yes, I do.
22  Q.  Do you have any reason to dispute that
23  that is an accurate statement as of the end of 1992?
24  A.  No, I don't have any reason to believe
25  that that's inaccurate.

**23**

1  Q.  Do you have an understanding as to how the
2  RIMS system would be used to help secure long-term
3  supplier agreements with larger customers as of the
4  end of '92?
5  A.  Sure.
6      By -- there are several -- several ways in
7  which the RIMS system would drive down costs for our
8  customers.  If we put product in a stockroom which
9  Fisher owned instead of the customer-owned, their
10  initial investment is considerably less.
11      So if our system is keeping track of
12  inventory well and making sure that only enough is
13  there that you need and no more, it pretty well
14  reduces their cost of operation.
15  Q.  So was that information information that
16  was shared with these larger customers as a benefit
17  of the RIMS system?
18  A.  Yes.
19  Q.  And so that description of the benefit of
20  the RIMS system, was that used as part of the sales
21  or marketing pitch to those large customers to work
22  with Fisher?
23  A.  I don't -- I would make an assumption
24  yes, but I don't know.  I never sat in on any of the
25  sales pitches that were made.

**24**

1  Q.  Is it your understanding based on your
2  personal knowledge though that at least the RIMS
3  system was installed at some of Fisher's larger
4  customers by the end of '92?
5  A.  Time frames are tough for me.  I do know
6  it was installed at large customers.  I honestly -- I
7  can't tell you in fact it was '92 or not.  I would
8  assume that it was, but I just don't know.
9  Q.  Do you believe that the RIMS system was
10  installed at some of Fisher's larger customers before
11  you filed the RIMS patent application?
12  A.  I don't know that.
13  Q.  Do you have any recollection one way or
14  the other?
15  A.  The patent was filed in '93.
16  Q.  April of '93, right.
17  A.  I don't know.  I don't know.
18  Q.  You understand that the RIMS patent that
19  we marked here as exhibit 7, that's not one the
20  patents that Lawson is accused of infringing in this
21  case.
22      Right?
23  A.  Yes, I do.
24  Q.  Now, in the course of getting feedback out
25  at customer installations regarding the RIMS system,

25

1  did -- through that process, did you learn that
2  customers would want to be able to have some sort of
3  a system that would provide them with access to
4  catalogs other than the Fisher catalog?
5      A.  I don't believe that that was necessarily
6  the event that would have -- would have caused
7  that -- that conclusion to be made.  We -- you have
8  to realize that the Fisher -- the RIMS system was --
9  was primarily designed to support Fisher products and
10  Fisher products exclusively.
11          There were other events that I think would
12  have kind of driven us to -- to take a look at having
13  access to catalogs, supply catalogs.
14      Q.  At the time you were developing the
15  concept for the electronic sourcing system that's
16  described in the 3 patents --
17      A.  Yes.
18      Q.  -- involved in this case, did you learn
19  that customers were asking Fisher to manage other
20  types of product inventories other than the products
21  that Fisher supplied?
22      A.  Yes.
23      Q.  Was that one of the motivations for
24  developing the electronic sourcing system?
25          MR. ROBERTSON:  Object to the form of the

26

1  question.
2          BY MR. McDONALD:
3      Q.  You may answer.
4      A.  The question was?
5          MR. McDONALD:  Read that back, please.
6          (The reporter read the
7          next-to-last question.)
8      A.  And what was that?
9          BY MR. McDONALD:
10      Q.  That customers were asking Fisher to do
11  more than just manage Fisher inventory but also
12  manage inventory of products from other suppliers.
13      A.  Yes.
14          That was a main reason.
15      Q.  Did you identify that as a business
16  opportunity for Fisher, that if you could satisfy
17  that customer need that might be good for Fisher?
18      A.  Yes.
19          Although I can't -- I can't claim that I
20  identified that as the opportunity, but --
21      Q.  How did you learn about that as being a
22  need of some customers?
23      A.  We -- we -- about the time which we
24  started talking about electronic sourcing, we --
25  Fisher was embarking upon a new business opportunity.

27

1  business strategy.
2          And that really was building upon Fisher
3  managing -- initially Fisher-owned products.  That
4  was the concept of integrated supply where Fisher
5  felt it had established good credibility with their
6  customers in handling Fisher products, so they
7  thought they could expand their capabilities in
8  managing inventory to -- to cover other product
9  groupings, other commodity groupings beyond the --
10  the traditional Fisher product types, which was
11  laboratory supplies.
12          And that's really kind of what spawned
13  this electronic sourcing, was the business need that
14  was generated from this new business opportunity.
15      Q.  When you talk about managing inventory as
16  part of that business need, can you help me
17  understand what -- who is the owner of this inventory
18  that you're talking about?
19      A.  Which iteration?
20      Q.  Well, when --
21          (Talking at the same time.)
22          BY MR. McDONALD:
23      Q.  Please let me finish.
24      A.  I'm sorry.
25      Q.  When -- you mentioned something about

28

1  integrated supply and this was in effect I think the
2  next generation product you were working on, you
3  talked about this customer desired to manage
4  inventory beyond the Fisher inventory I believe, if I
5  understood you right.
6      A.  Fisher-owned, Fisher -- yes, that's right.
7      Q.  The RIMS system managed Fisher-owned
8  inventory.
9          Right?
10      A.  That's correct.
11      Q.  The RIMS system also managed
12  customer-owned inventory at the customer site.
13          Right?
14      A.  That's right.
15      Q.  So what other inventory needed to be
16  managed?
17          MR. ROBERTSON:  Object, form.
18          BY MR. McDONALD:
19      Q.  Was there any other inventory that needed
20  to be managed?
21          MR. ROBERTSON:  Objection, vague,
22  ambiguous.
23      A.  Well, I guess it would be expanding the --
24  expanding the amount of inventory -- excuse me --
25  that the customer had -- had wanted us to manage

Momyer, Douglas A. - Vol. 1  12/9/2009  12:00:00 PM

29

1  other than a small amount of customer inventory.
2      Typically in a customer environment, there
3  would be a system that would be managing inventory
4  for the customer that they owned, and they were
5  looking for opportunity to expand and have RIMS
6  manage more of that.
7      Now, the other thing that is part of
8  integrated supply is, in addition to -- when I say,
9  manage inventory, it's really manage the procurement
10  process as well as managing inventory.  So an
11  integrated supply, the customer would traditionally
12  buy lab supplies from Fisher.
13      And in the integrated supply role, the
14  integrated supplier would -- would assume procurement
15  responsibilities for other commodity groupings
16  outside, like electrical supplies, pipe valves and
17  fittings, office products.  And once again if you
18  take a look at that, there's tremendous cost savings
19  if you -- if you in integrated supply operation go in
20  and take over the customer's procurement activities
21  from requisition through to placement of the purchase
22  order, and then managing the inventory when it comes
23  in and distribution of that inventory throughout
24  the -- throughout the customer's location.
25      BY MR. McDONALD:

30

1      Q.  The RIMS system as it existed at the end
2  of '92 could manage customer inventory that would be
3  ordered or reordered from third parties.
4      Right?
5      A.  It -- it would -- the orders would always
6  be placed through -- through Fisher.
7      Q.  All right.  I'm asking a little different
8  question.
9      MR. McDONALD:  Could you read my question
10  back, please.
11      (The reporter read the next-to-last
12      question.)
13      MR. ROBERTSON:  Objection, asked and
14  answered.
15      BY MR. McDONALD:
16      Q.  Can you answer that yes or no or not?
17      A.  Well, I think I did answer it, that
18  what -- when you talk about third parties, I'm not
19  quite sure what -- what you mean by, third-party.
20      Q.  Products that are ordered from some entity
21  other than Fisher.
22      A.  RIMS would not -- would not generate a
23  purchase order to a supplier other than -- other than
24  the -- Fisher.
25      Q.  All right.  But I didn't ask about

31

1  generating a purchase order.
2      Okay?
3      My question is, isn't it true --
4      A.  Yes, you did.
5      Q.  -- that the RIMS system as of the end of
6  '92 would manage inventory for customer products
7  including products ordered from third parties?
8      MR. ROBERTSON:  Objection, asked and
9  answered.
10      A.  RIMS wouldn't have ordered the products
11  necessarily.
12      BY MR. McDONALD:
13      Q.  Well, do you think managing inventory and
14  ordering products are the same thing, or are they
15  different?
16      A.  I think they're different things.
17      Q.  Okay.  So if I ask you about managing
18  inventory --
19      A.  Yes.
20      Q.  -- what is your understanding as to what
21  managing inventory means?
22      A.  Keeping track of the inventory counts and
23  adjustments, distributing the -- the inventory.
24      Q.  With that definition of managing
25  inventory, isn't it true that the RIMS system as it

32

1  existed at the end of '92 managed customer-owned
2  inventory for products that would be reordered from
3  third parties?
4      MR. ROBERTSON:  Objection, asked and
5  answered.
6      A.  The customer-owned inventory in RIMS,
7  there were 2 product types.
8      There was a -- there was Fisher-owned
9  inventory and customer-owned inventory.  And I'm
10  trying to think of an instance where that inventory
11  was -- whenever we replenished inventory was not
12  replenished through Fisher.
13      BY MR. McDONALD:
14      Q.  Why are you asking about whether it's
15  replenished through Fisher?
16      That wasn't my question.
17      A.  Because that's the ordering piece.
18      Q.  Okay.  But I thought you described
19  managing inventory as something separate from orders.
20      Right?
21      Is that right?
22      A.  Yes.
23      Q.  Okay.  So if we focus again on managing
24  inventory --
25      A.  Yes.

| | 33 |
|---|---|
| 1 | Q.   Okay? |
| 2 | A.   I understand. |
| 3 | Q.   You understand now? |
| 4 | A.   I think so. |
| 5 | Q.   Okay.  Isn't it true that the RIMS system |
| 6 | as it existed at the end of '92 managed customer |
| 7 | inventory for products that were reordered from third |
| 8 | parties? |
| 9 | MR. ROBERTSON:  Objection, asked and |
| 10 | answered. |
| 11 | A.   You're using the order thing -- order now. |
| 12 | BY MR. McDONALD: |
| 13 | Q.   Yes, but I'm defining the types of |
| 14 | products as products that were capable of being |
| 15 | reordered by third parties.  That doesn't mean -- |
| 16 | you're managing the inventory of for example a |
| 17 | beaker. |
| 18 | Right? |
| 19 | A.   Yes. |
| 20 | Q.   And the beaker is owned by a customer at |
| 21 | its own inventory. |
| 22 | Right? |
| 23 | A.   Yes. |
| 24 | Q.   That beaker could be the sort of beaker |
| 25 | that was reordered from a third party. |

| | 34 |
|---|---|
| 1 | Okay? |
| 2 | MR. ROBERTSON:  Object to the form of the |
| 3 | question. |
| 4 | BY MR. McDONALD: |
| 5 | Q.   Now, with that understanding, the RIMS |
| 6 | system was capable of managing inventory of beakers |
| 7 | like that. |
| 8 | Right? |
| 9 | A.   It could manage customer-owned inventory. |
| 10 | I can't -- I honestly can't think of any instance |
| 11 | where -- you mentioned the reordering piece.  Let's |
| 12 | use beaker as an example.  That's probably a bad |
| 13 | example, but beaker would almost certainly have been |
| 14 | ordered by -- through Fisher. |
| 15 | Q.   Maybe it was a bad example, but I just |
| 16 | wanted to give you the concept. |
| 17 | If we use a broom? |
| 18 | A.   Okay. |
| 19 | Q.   All right.  The Fisher system could manage |
| 20 | customer-owned brooms in inventory. |
| 21 | Right? |
| 22 | A.   Yes, it could. |
| 23 | Q.   That's true even though the brooms may be |
| 24 | reordered if and when that was ever necessary from a |
| 25 | third-party. |

| | 35 |
|---|---|
| 1 | Right? |
| 2 | A.   Yes. |
| 3 | Q.   There we go. |
| 4 | A.   Okay. |
| 5 | Q.   All right.  So with respect to the |
| 6 | managing inventory need of customers, did RIMS do a |
| 7 | good job managing inventory for customers whether it |
| 8 | was a Fisher product or a product ordered from third |
| 9 | parties? |
| 10 | MR. ROBERTSON:  Objection, vague and |
| 11 | ambiguous. |
| 12 | A.   In my opinion, yes, it did a good job. |
| 13 | BY MR. McDONALD: |
| 14 | Q.   Now, you mentioned another component of |
| 15 | the customer needs, which was to manage the |
| 16 | procurement process. |
| 17 | Right? |
| 18 | A.   Yes. |
| 19 | Q.   Now, when you said that, what did you mean |
| 20 | by that? |
| 21 | A.   That's the process of a customer would |
| 22 | request a -- would request a product, and that |
| 23 | product would be a broom -- let's use a broom.  And |
| 24 | Fisher was responsible for taking that request and |
| 25 | sourcing, identifying who the -- who the proper -- |

| | 36 |
|---|---|
| 1 | who the best supplier was to purchase the product |
| 2 | from in -- on behalf of the customer, and -- |
| 3 | Q.   Did the RIMS system handle the procurement |
| 4 | process for products like those brooms? |
| 5 | A.   No. |
| 6 | It had the ability to do a -- what's |
| 7 | called an administrative order, but it really didn't |
| 8 | handle the -- it didn't do what we talked about as |
| 9 | far as providing sourcing of that broom as to |
| 10 | identifying what the best broom was. |
| 11 | It was just a matter of you put a broom in |
| 12 | and cranked out a paper req, and the customer would |
| 13 | actually purchase the product. |
| 14 | Q.   So in that broom, if we can go |
| 15 | back to the '989 patent now, exhibit 7. |
| 16 | That's the RIMS patent. |
| 17 | Right? |
| 18 | A.   Okay. |
| 19 | Q.   You got that in front of you? |
| 20 | A.   I will now. |
| 21 | Q.   Okay. |
| 22 | A.   I got the cover page up. |
| 23 | Q.   All right.  And then could you turn to the |
| 24 | page at columns 5 and 6.  It's several pages in. |
| 25 | It's 15 or 16 pages in or so. |

**37**

1    A.   All right.

2    Q.   You'll see there's a table 1 that goes

3  from the bottom of column 5 to the top of column 6.

4    A.   Yes, I see that.

5        I have trouble --

6    Q.   Pardon?

7    A.   I have trouble reading it.

8    Q.   You got your glasses on now.

9        Does that help?

10    A.   It's a bad angle for me.

11    Q.   It's pretty tiny print too on these

12  patents, isn't it?

13    A.   Well, yeah.

14        You know, I have bifocals on, I have

15  trouble reading.

16    Q.   On table 1 at the bottom of column 5, you

17  see a reference to, these product types are

18  summarized in table 1?

19    A.   I'm sorry.

20        I -- look at table 1 --

21    Q.   Yeah.

22        Right above that in column 5 at about

23  lines 56 to 57 or so.

24    A.   56 and 57.

25        On column 5?

**38**

1    Q.   Yes.

2    A.   It says, these product types are

3  summarized in table 1.

4    Q.   All right.  Now, is it your understanding

5  that RIMS system does some processing with respect to

6  the product types listed here at least except for

7  product type 02?

8    MR. ROBERTSON:  Objection to the form of

9  the question.

10    A.   I'm not certain what -- what the 05 was.

11    BY MR. McDONALD:

12    Q.   Okay.

13    A.   I -- if it's referenced there, it probably

14  was used, but off the top of my head, I don't know

15  what it was used for.

16    Q.   So are you familiar with product type 01,

17  03, 04, and 06 in that table 1?

18    A.   Yes.

19    Q.   And you gave me that example of that broom

20  that Fisher may not carry but would order from a

21  third party.

22        Would that fit into product type 04,

23  third-party item that distributor orders?

24    A.   Well, it could.  It probably also could

25  sit in 06.

**39**

1    Q.   Okay.  So both of those product types

2  could describe that broom.

3        Right?

4        Because that broom could be a

5  customer-owned item located in a customer warehouse

6  at or near a customer site, and it could also be a

7  third-party item that the distributor such as Fisher

8  ordered for that customer.

9        Right?

10    A.   Yes.

11    Q.   Now, isn't it --

12    A.   There would be a possibility that it -- it

13  could become a 1 or a 3 though, if Fisher chose to --

14  to restock that broom and create a -- create a part

15  number for it.

16    Q.   Now, for the item type 04, that

17  third-party item that Fisher would order for a

18  customer, the RIMS system would generate a proposed

19  purchase order.

20        Correct?

21    A.   If I recall how it would work.  The RIMS

22  system would -- would create a req for a product, and

23  the host system would -- would actually build the

24  order for it.

25    Q.   All right.  Well, the host system was part

**40**

1  of the RIMS system as depicted in the '989 patent,

2  wasn't it?

3    A.   It -- right.  It ran -- ran on the host,

4  not locally though.

5    Q.   So the RIMS system had some local

6  components it to and some host components to it.

7        Right?

8    A.   The RIMS had local components.  I don't

9  know if that -- the order processing would have been

10  considered part of it, but it turned it over to

11  the -- yeah, I -- I -- it probably was part of that.

12    Q.   All right.  So it's true, then, that for

13  presented type 04, the host computer that was in the

14  RIMS system would generate a proposed purchase order?

15    A.   The RIMS system would throw a req up to

16  the host system and it would go into the Fisher order

17  processing component.

18        If you want -- if you want to consider

19  that part an extension of RIMS, I --

20    Q.   And in that instance, did the host, then,

21  for that product type 04 generate a proposed purchase

22  order?

23        That's my question.

24    A.   The host would generate a purchase order,

25  yes.

**Page 41**

1    Q.   That's for type 04, the third-party items
2  that Fisher would order for the customer.
3        Right?
4    A.   Yes.
5        Q.   Did the RIMS system as described in the
6  '989 patent and offered back as late of '92 also
7  generate internal customer purchase orders related to
8  customer-owned inventory?
9    A.   Once again, I -- I think that's -- would
10  be a mistake to call it a purchase order.  It
11  generate a req that the customer would have taken,
12  and probably entered into their system to create a
13  purchase order.
14       Q.   Can you turn to figure 5 A of the RIMS
15  '989 patent, please.
16       Do you have that before you now,
17  Mr. Momyer?
18       A.   Yes, I do.
19       Q.   That flow chart describes programs
20  employed by an embodiment of the RIMS system to
21  accept a sourced requisition.
22       Right?
23       MR. ROBERTSON:  Objection, calls for a
24  legal conclusion.
25       A.   What was the question again?

**Page 42**

1       MR. McDONALD:  Would you read that back,
2  please.
3       (The reporter read the last
4       question.)
5       MR. ROBERTSON:  Same objection.
6       A.   A little embarrassed.  I don't quite
7  understand what the question is, what you're trying
8  to ask.
9       BY MR. McDONALD:
10       Q.   Let me ask it this way.
11       What is your understanding as to what
12  figure 5 A is describing here in the RIMS '989
13  patent?
14       A.   Well, it appears to be a flow chart of a
15  process flow of a req, requisition.
16       Q.   Is this describing the process at the top
17  of the page starting with the point of the customer
18  service representative accepting the requisition
19  there in box 330?
20       A.   Yes.
21       Q.   So this is describing a flow of what
22  happens after the requisition is accepted.
23       Right?
24       A.   Well, when you say, accept, means that
25  they took it and entered it into the system, so it's

**Page 43**

1  not completed at that point in time.  I think the req
2  is being processed in this flow.
3       Q.   Okay.  But at least as depicted in 5 A,
4  the first step in 5 A is described as customer
5  service representative, or CSR, accepts requisition.
6       Right?
7       A.   Deliver a piece of paper.  I accept that
8  requisition.  Now I'm going to enter it into the
9  system.
10       Q.   Okay.
11       A.   So it's still requisition.
12       Q.   Now, the next step there in figure 5 A is
13  box 331.
14       Correct?
15       A.   Box 331, yes.
16       Q.   And that says, update status code to P in
17  requisition item table and display.
18       Correct?
19       A.   Yeah.
20       Q.   Is it your understanding that that code
21  would indicate that the requisition is in process?
22       A.   I'm not sure.
23       Q.   All right.  Can you turn to column 16,
24  line 37, of the RIMS patent, please.
25       A.   16, line --

**Page 44**

1       Q.   -- 37.
2       A.   -- 37, column 16.
3       Q.   I'll read the sentence there just to make
4  sure we're in the same place.
5       A.   Can you see this?
6       Is this okay?
7       Because I'm -- okay.  Go ahead.
8       Q.   I'll just read it to you.
9       Quote:  After acceptance of a sourced
10  requisition, the status can change to F, filled, B,
11  back ordered, P, in process, or C, canceled.
12       Do you see that?
13       A.   Yes, I do.
14       Q.   So if we relate that back to figure 5 A,
15  there's a status code changed to P.
16       That would indicate that the requisition
17  is in process.
18       Right, in box 331?
19       A.   Yes.
20       Q.   Okay.  So now we go to box 332.
21       Correct?
22       A.   Yes.
23       Q.   In figure 5 A I'm back on now.
24       Right?
25       And customer-owned inventory, that's item

### 45

1    or product type 06.
2        Right?
3        A.  Yes.
4        Q.  So we get to this diamond-shaped box, 332,
5    that identifies whether or not the product type is
6    01, 03, or 04.
7        Do you see that?
8        A.  Yes, I do.
9        Q.  And so for a product type 06, a
10   customer-owned item, the answer to that would be no.
11       Right?
12       A.  Right, although if -- if an 05 is flowing
13   through there or an 02, it would -- it would go there
14   as well.
15       Right?
16       Q.  Well, I'm not going to try to ask about
17   every product in one question.
18       Okay?
19       I just wanted to walk through this with
20   the customer-owned inventory product type 06.
21       A.  If it were a product type 6, it would go
22   off to the end.
23       Q.  Right.
24       And 06, we all agree that's the
25   customer-owned inventory.

### 46

1        Right?
2        A.  Yes.
3        Q.  All right.  So the next box for that
4    particular type of product is 334.
5        Correct?
6        A.  That's correct.
7        Q.  And that's got the question, customer
8    internal PO.
9        Right?
10       A.  Yes, it does.
11       Q.  And "PO" stands for purchase order.
12       Right?
13       A.  Yes.
14       Q.  And then if there's a yes answer to that,
15   is that a question of whether the customer wants an
16   internal purchase order?
17       Is that the question as you understand it?
18       A.  That doesn't look like a question.  That's
19   normally a statement.
20       Q.  Yeah, but there's a question mark in the
21   box, so I'm just trying to figure out why that's --
22       A.  I don't see a question mark.
23       Q.  In box 334?
24       A.  Oh, 334.
25       I'm sorry.

### 47

1        I thought you were -- we were talking
2    about the diamond.  You mentioned box.
3        Q.  Oh, I'm sorry.
4        A.  In the diamond, yes, there's a question
5    mark there.
6        Q.  What is your understanding as to what
7    decision or question is the subject of 334, that
8    diamond?
9        A.  Is it a customer internal PO.
10       Q.  All right.  So for a type 06 product, that
11   would be the sort of product that would lead to a
12   customer internal purchase order.
13       Right?
14       A.  It would lead to a requisition being
15   printed.
16       Q.  Well, it would lead to a customer internal
17   purchase order.
18       Right?
19       A.  It would lead to a requisition.
20       I don't want to -- what I don't want to do
21   is, I don't want to -- "purchase order" to me means
22   that there's a legal agreement that's made with the
23   person that you're buying a product from.  And I
24   don't necessarily agree that that's what's happened
25   there.

### 48

1        Q.  Well, this is -- this is the figure 5 A
2    from your own patent that you're listed as --
3        A.  I understand.
4        Q.  -- an inventor on.
5        A.  I understand.
6        Q.  Right?
7        A.  And maybe that's terminology we were using
8    at that time internal.
9        Q.  Okay.  And you do understand that you
10   signed off --
11       A.  Yes, I do.
12       Q.  -- on this application.
13       Please let me finish the question.
14       You do understand that you signed off on
15   the patent application that led to this '989 patent
16   as an accurate document.
17       Right?
18       A.  I did sign off on it, yes.
19       Q.  And that the thing you signed off on
20   included this figure 5 A.
21       Right?
22       A.  Yes.
23       Q.  And so you do agree at least as of that
24   time April of '93 with that customer inventory
25   product type 06, you did describe your RIMS system as

**49**

1  a system that would generate a customer internal
2  purchase order.
3      Right?
4  A. Yes.
5  Q. Did the system also generate a purchase
6  order for products of the type 01?
7  A. Being -- that's the JIT I believe.
8  Q. Yeah.
9      In column 5, that's distributor-owned item
10  in JIT warehouse located at or near the customer
11  site.
12  A. It created -- once again the order would
13  have been -- sale would have been recorded on the
14  host.
15  Q. Is it true that for items of product types
16  01, 03, and 04 in the RIMS system, the local computer
17  would create a purchase order?
18  A. No.
19  Q. All right. Could you turn to column 17 of
20  the '989 patent, please.
21  A. Column 17.
22  Q. Do you have column --
23  A. Yeah.
24      I have column 17.
25  Q. Okay. I'm going to read a sentence to you

**50**

1  at line 37 of column 17 of the RIMS '989 patent.
2      Quote: As described in the diagram
3  figures 5 A and 5 B for items of product types 01,
4  03, and 04, local computer 40 uses purchase order
5  build program 112 to create a purchase order between
6  the customer and the distributor from the data in the
7  requisition header and item tables, quote.
8      Do you see that sentence?
9  A. Yes, I do.
10  Q. Is that an accurate description of the
11  RIMS system as it existed in the late '92, pre-April
12  '93 time frame?
13  MR. ROBERTSON: Objection, calls for a
14  legal conclusion.
15  A. I'm sorry.
16  THE WITNESS: Could you repeat the
17  question, again.
18      (The reporter read the last
19      question.)
20  A. Oh.
21      The one -- the one clarification I would
22  have to make would be that -- the purchase order
23  build program involved passing a block of data, which
24  was the req, up to the host to build the -- to build
25  the order.

**51**

1  BY MR. McDONALD:
2  Q. Okay. With that clarification, is that an
3  accurate statement, the one I just read from column
4  17?
5  A. Yes.
6  Q. So the RIMS system as it existed at the
7  end of '92 and early '93 created purchase orders for
8  product type 06, the customer-owned inventory,
9  product type 01, the Fisher-owned inventory, product
10  type 03, distributor of Fisher catalog items stored
11  at the Fisher warehouse, and item type 04,
12  third-party items of a distributor such as Fisher
13  ordered.
14      Correct?
15  MR. ROBERTSON: Objection,
16  mischaracterizes the document.
17  A. If we agree that the purchase order we
18  talked about in the 06 type was -- was only a paper
19  document -- actually is a req, entered -- it was
20  entered in the customer system, I would agree with 06
21  and that we agree that the local RIMS system did --
22  did not build the PO directly.
23      The PO was built by a host program that
24  was running at the direction of -- initiation of
25  RIMS.

**52**

1  BY MR. McDONALD:
2  Q. And figure 5 A basically between the boxes
3  336 and 350, that -- those boxes both relate to
4  creating purchase orders or printing purchase order
5  acknowledgements for those various types of products.
6      Right?
7  MR. ROBERTSON: Objection, calls for a
8  legal conclusion.
9  THE WITNESS: Could you read the question
10  again.
11      (The reporter read the last
12      question.)
13  A. Those -- those represent acknowledgments
14  the from the host system that an order had been
15  placed.
16  BY MR. McDONALD:
17  Q. And this is a flow chart that would
18  describe how an individual requisition is handled by
19  the RIMS system that might have multiple items in it.
20      Right?
21  MR. ROBERTSON: Objection, calls for a
22  legal conclusion, mischaracterizes the document.
23  A. Sorry.
24      I get confused.
25  THE WITNESS: Could you re-read the

53

1  question again.
2      (The reporter read the last
3      question.)
4  A.  I -- I don't think that's entirely
5  accurate.
6      The -- I don't believe that the -- I don't
7  believe that the customer -- the internal req, the
8  admin, the administrative purchase could be included
9  on the same req with some of these other product
10 types.
11 BY MR. McDONALD:
12 Q.  All right.  Well, I have a different
13 question for you.
14 A.  Okay.
15 Q.  My question is, isn't it true that the
16 flow chart in figure 5 A describes the process for
17 handling a requisition that may include multiple line
18 items?
19 A.  Yes.
20     You could handle multiple line items, but
21 certain types of line items could be handled on a
22 single req.
23 Q.  What types of --
24 A.  I don't think the 06 -- at least I don't
25 recall that the 06 was able to be handled on the same

54

1  requisition as 01s, 03s, and 04s, I don't believe.
2  At least that's my recall of how RIMS operated.
3  Q.  How sure about that are you?
4  A.  Only as sure as my memory is.
5  Q.  Which is how -- how sure is your memory?
6      MR. ROBERTSON:  Objection to the form of
7  the question.
8  A.  I don't know.
9  BY MR. McDONALD:
10 Q.  Well, this figure 5 A does seem to have a
11 flow chart that would handle both product type 06 and
12 other products.
13 Right?
14 A.  Well, that's your conclusion, yes.
15 Q.  Well, is that what it's depicting in your
16 patent, Mr. Momyer, or not?
17 A.  I think it's dealing with an individual --
18 a typical requisition was one-line reqs, so I think
19 it's dealing with at least one instance of that.  I
20 don't think I see any, go back and process the next
21 product, here.
22 Q.  Isn't it true that in the preferred
23 embodiment of the RIMS invention, a typical
24 requisition often had several line items?
25     MR. ROBERTSON:  Objection to the form of

55

1  the question.
2  A.  Preferred embodiment?
3  BY MR. McDONALD:
4  Q.  Yeah.
5  A.  Could you explain what -- what you mean by
6  that?
7  Q.  Well, that's you're describing here in the
8  '989 patent -- right?  -- a preferred embodiment of
9  the RIMS system?
10     MR. ROBERTSON:  Objection, calls for a
11 legal conclusion.
12 A.  The RIMS system could handle multiple line
13 items as long as they were -- to my understanding, as
14 long as they were Fisher products and Fisher-owned
15 products or Fisher-purchased products.
16 BY MR. McDONALD:
17 Q.  The flow chart shown in figure 5 A relates
18 to products that are both Fisher-owned and
19 non-Fisher-owned.
20     Correct?
21 A.  Yes.
22 Q.  And it shows a branch to the left for
23 customer-owned products there at diamond 332.
24 Right?
25 A.  Yes.

56

1  Q.  And it branches to the right for other
2  products, including Fisher-owned products.
3  Right?
4  A.  Yes.
5  Q.  And then down between box 350 and 352, the
6  flow chart comes back together again there.
7  Right?
8  A.  A flow chart goes from top to bottom
9  unless there's some direction to move back up to the
10 top again and restart.
11     So therefore, it's a single iteration
12 through that logic.  So I don't -- if you're asking
13 me to see does this particular flow chart demonstrate
14 that it's going to be processing multiple req lines,
15 I would say it probably doesn't necessarily display
16 that.
17     That may not have been the intent, but to
18 me it doesn't necessarily display that.
19 Q.  All right.  Well, figure 5 A would at
20 least be consistent with the capability of processing
21 items of multiple product types from the same
22 requisition, though.
23 Right?
24     MR. ROBERTSON:  Objection, asked and
25 answered.

57

1     A.  I don't know.
2         I told you -- I explained what I thought
3     it showed.  I don't think -- I don't think -- I don't
4     think this 5 A necessarily represented the process
5     flow for processing a multiline req.  It just showed
6     you what it would do with an individual line.
7         MR. McDONALD:  Why don't we go ahead and
8     take a break at this point.
9         THE WITNESS:  Okay.
10        THE VIDEOGRAPHER:  The time is
11    approximately 5:19 PM.  We are going off the video
12    record.  Off the record.
13        (Recess.)
14        THE VIDEOGRAPHER:  The time is
15    approximately 5:27 PM.  We are back on the video
16    record.
17        BY MR. McDONALD:
18    Q.   Mr. Momyer, I'd like to change subjects
19    now.
20        At the time 2003 I think is when you said
21    you left Fisher Scientific; is that right?
22    A.   That's correct.
23    Q.   What were you doing at Fisher Scientific
24    before you left, right before you left?
25    A.   The primary responsibility I had at the

58

1     time I left was the Fisher Scientific Website.
2     Q.   Is that a Website that had accessibility
3     to the catalog at Fisher Scientific?
4     A.   It had an electronic catalog, yes.
5     Q.   Why did you leave Fisher Scientific at
6     that time?
7     A.   It wasn't my choice.  They had a major
8     reorganization.  New principals came in and decided
9     to restructure the management team.
10    Q.   At some point, did you ever interact with
11    a company called Ariba relating to sourcing or
12    inventory types of technologies?
13    A.   I have talked to Ariba, yes.
14    Q.   When was the first time you talked to
15    somebody from Ariba?
16    A.   I would have talked to somebody from Ariba
17    probably late '90s, early 2000.
18    Q.   What did you talk to Ariba about at that
19    time?
20    A.   At that point in time, Ariba had developed
21    a system that was a procurement system -- electronic
22    procurement system that they were selling, and many
23    of their customers who purchased products, purchased
24    their -- their system required catalog content.
25        So we talked to Ariba on 2 fronts.  First

59

1     was to give them files that would allow them to
2     create a catalog, try and catalog, and the second
3     case was where we're talking about creating a --
4     Ariba requested to be able to do a technical
5     punching out to the Fisher electronic catalog.  And
6     we talked about what -- ways to do that.
7     Q.   This was in the late '90s time frame; is
8     that right?
9     A.   M-hm, early 2000.
10    Q.   Early 2000?
11    A.   Something like that.
12    Q.   Who from Ariba did you talk to?
13    A.   Oh, just -- I don't know.
14    Q.   Did you meet with them face to face about
15    this?
16    A.   I think I did.  I'm trying to recall, but
17    I believe it was out in California.  I think they're
18    based in California.
19    Q.   So just to understand this first thing you
20    said that you discussed about giving them files to
21    create an e-catalog, was this you providing them
22    e-files of a Fisher catalog?
23    A.   They would have been data that would have
24    been extracted from Fisher's product master.
25    Q.   So it was an electronic version of the

60

1     Fisher catalog?
2     A.   Yes.
3     Q.   Did you wind up actually giving Ariba an
4     electronic version of the Fisher catalog?
5     A.   We gave them a file.
6         Let's make sure we clarify what -- when we
7     say, electronic version.  It's a file that's on a
8     media that is a flat file, which is meaning it's
9     linear in nature, record 1, record 2, record 3, and
10    we had built each record based upon a format that was
11    provided to us by Ariba.
12    Q.   Was the media a CD ROM or something else?
13    A.   At this point, it could have been a CD
14    ROM.  I just -- not quite sure.  It more than likely
15    was transmitted to them -- I -- I don't recall how it
16    was -- how we transmitted to --
17    Q.   All right.  So media would be something
18    like a CD ROM or a disk?
19    A.   A disk.
20    Q.   Or a tape?
21    A.   Yes.
22    Q.   So in fact, Fisher Scientific did provide
23    Ariba this electronic-formatted listing of Fisher
24    Scientific products from its catalog?
25    A.   Yes.

Momyer, Douglas A. - Vol. 1  12/9/2009  12:00:00 PM

---

61

1   Q.   What was your understanding -- and you
2   were involved in that transaction; is that right?
3   A.   Yes.
4   Q.   What was your understanding as to how
5   Ariba was going to use that catalog?
6   A.   It was my understanding that it would take
7   that file and author it into a -- into an electronic
8   document that would be used in their system.
9   Q.   Did you understand that at the time Ariba
10  had some system that would allow their customers who
11  bought their system to access a catalog like the
12  Fisher Scientific catalog?
13  A.   Yes.
14       It -- yes.
15  Q.   What was your understanding as to what the
16  functionality of that Ariba product was at the time?
17  MR. ROBERTSON:  Objection, lacks
18  foundation.
19  A.   What it did?
20  BY MR. McDONALD:
21  Q.   Yes.
22  A.   What its capabilities were?
23  Q.   Right.
24  A.   It allowed an individual to request a
25  product and ultimately would place a -- an order with

---

62

1   whatever supplier was selected on the -- on the -- on
2   the -- in the order.
3   Q.   The '683 issued in February of 2000; is
4   that right?
5   A.   Yes.
6   Q.   Did you have any concerns about whether or
7   not Ariba's system -- at that time you were talking
8   to them I mean -- did you have some concerns at that
9   time that their system that would use your electronic
10  file for your catalog would infringe the patent?
11  MR. ROBERTSON:  Objection, calls for a
12  legal conclusion.
13  A.   I didn't even -- didn't even think of it.
14  BY MR. McDONALD:
15  Q.   You said the other -- another topic of
16  discussion with Ariba in that late '90s, early 2000
17  time frame was ways to do punching out.
18       Right?
19  A.   That's correct.
20  Q.   What's punching out?
21  A.   It's a technology to allow 2 computer
22  systems to interact.
23       And typically, the punchout occurs
24  whenever a -- if you're in a procurement system and
25  you want to access a -- an electronic catalog for

---

63

1   another -- for a supplier, you go punch out to their
2   site, and you -- the individual who is sitting within
3   the procurement system can actually search that
4   electronic catalog, select a product and return it
5   back to the procurement system.
6   Q.   What was the result of your discussions
7   with Ariba about punching out?
8   A.   There was a development that was done to
9   allow that to occur.
10  Q.   What did Fisher do pursuant to that
11  development?
12  A.   Excuse me?
13  Q.   What did Fisher do as part of that
14  development regarding punching out?
15  A.   What did Fisher do?
16  Q.   Yeah.
17       You said there was some development.  I
18  just want to understand what it was.
19  A.   There was a program you had to do to be
20  able to access from an external program, to also be
21  able to return contents, post contents back to the
22  other -- to their system.  So there's a standard
23  protocol that surrounds the punchout.
24       Basically it was to -- it was --
25  development was done to support that protocol.

---

64

1   Q.   When you say, standard protocol, what do
2   you mean?
3   A.   It's a format of transactions that pass
4   back and forth between the 2 systems.
5   Q.   In terms of standard, is that something
6   that's been standardized by some organization?
7   A.   Yes.
8   Q.   What organization standardized that
9   protocol?
10  A.   There's several.  RosettaNet is one that
11  standardized that.
12  Q.   Did that protocol have a name?
13  A.   It did, but I forget it right now.  I just
14  don't recall it right now.  It wasn't that important.
15  Q.   Was it CXML?
16  A.   Yes, it was CXML.
17  Q.   And so did Fisher develop some sort of a
18  Website that was used with this punchout, or was it
19  something other than a Website?
20  A.   Fisher had developed a Website.
21  Q.   And the Ariba system could interact with
22  the Fisher Website to access the Fisher catalog and
23  get content back from the Fisher Website?
24  A.   Yes.
25  Q.   That's what punching out was?

---

Momyer, Douglas A. - Vol. 1  12/9/2009  12:00:00 PM

**65**

1  A.   That's correct.
2  Q.   Was that system up and running at the time
3  you left Fisher in 2003?
4  A.   Yes.
5  Q.   And certainly at that point, you already
6  had at least the '683 patent on your electronic
7  sourcing system.
8  A.   Yeah.
9  Q.   Right?
10  Was there any concern that by Ariba
11  punching out to a catalog such as the Fisher catalog
12  that that would infringe any of the Fisher electronic
13  sourcing patents?
14  MR. ROBERTSON: Objection, calls for a
15  legal conclusion.
16  A.   I didn't -- I did not even consider it.
17  It was -- it was something I was instructed to do,
18  and so I performed what I was told to do there.
19  I didn't -- honestly didn't think about
20  the patent.
21  BY MR. McDONALD:
22  Q.   Do you have an understanding that the
23  electronic sourcing patents are essentially a
24  requisition and purchasing system that for example
25  can be a RIMS system that is set up to communicate

**66**

1  with a catalog database and a search engine such as
2  the IBM technical viewer 2 product?
3  MR. ROBERTSON: Objection, calls for a
4  legal conclusion.
5  A.   What was the question again?
6  MR. McDONALD: Please read it back.
7  (The reporter read the last
8  question.)
9  A.   Yes.
10  BY MR. McDONALD:
11  Q.   Do you view a system like a requisition or
12  purchasing system that can punch out on the Internet
13  to access a catalog as something that would come
14  within the scope of your electronic sourcing patents?
15  MR. ROBERTSON: Objection, calls for a
16  legal conclusion.
17  A.   The punchout technique is a bit different
18  than the -- what was proposed in the electronic
19  sourcing.
20  BY MR. McDONALD:
21  Q.   So you look at punchout as different from
22  what you described and claimed your patents?
23  MR. ROBERTSON: Objection, calls for a
24  legal conclusion.
25  A.   I'm sorry.

**67**

1  The question again?
2  (The reporter read the last
3  question.)
4  A.   Catalog content -- all the catalogs reside
5  within server, and the electronic sourcing patent and
6  punchout technology, electronic catalogs are sitting
7  at the suppliers' sites.  Search engines would be
8  whatever that particular site opted to use to access
9  this catalog.
10  BY MR. McDONALD:
11  Q.   With the punchout, is it your
12  understanding that with punchout, you're only
13  accessing one electronic catalog at a time?
14  MR. ROBERTSON: Objection, vague and
15  ambiguous and calls for a legal conclusion.
16  A.   That is my understanding.
17  BY MR. McDONALD:
18  Q.   And with punchout, then, you can't
19  simultaneously search 2 electronic catalogs?
20  A.   I don't know.
21  Q.   Well, with respect to the punchout that
22  you talked to Ariba about, is it your understanding
23  that as used there, the punchout would not have a
24  capability of doing a search in 2 different remote
25  electronic catalogs at the same time?

**68**

1  A.   I never really got into understanding how
2  the whole Ariba system worked.  I knew a little bit
3  about it.
4  The only thing I was concerned about is --
5  is providing them the ability to access from their
6  system the visual catalog.
7  Q.   As you sit here today, do you have any
8  understanding as to whether or not a punchout,
9  whether Ariba is doing it or somebody else, that
10  particular way of accessing an electronic catalog
11  would be something that would come within the scope
12  of any of your electronic sourcing patents?
13  MR. ROBERTSON: Objection, vague and
14  ambiguous and calls for a legal conclusion.
15  A.   I don't know.
16  BY MR. McDONALD:
17  Q.   But you do see a difference in how the
18  systems described by your patents work on the one
19  hand and how a system involving punch out would work
20  on the other hand.
21  Is that fair?
22  MS. ALBERT: Objection, calls for a legal
23  conclusion, vague and ambiguous.
24  A.   I -- there's a difference somewhat in the
25  architecture.

Momyer, Douglas A. - Vol. 1   12/9/2009  12:00:00 PM

**69**

```
 1      BY MR. McDONALD:
 2      Q.   Within the system contemplated in your
 3  electronic sourcing patents, the catalog database was
 4  designed to house multiple catalogs.
 5      Right?
 6      A.   That's correct.
 7      Q.   And within punchout, are you aware of any
 8  part of that system that would have a database that
 9  would house multiple catalogs?
10      MR. ROBERTSON:  Objection, vague and
11  ambiguous and calls for a legal conclusion.
12      A.  No, I'm not.
13      BY MR. McDONALD:
14      Q.   With respect to that standard CXML
15  protocol, is it your understanding that that protocol
16  was designed for communication between businesses
17  recording purchasing?
18      A.  Yes.
19      Q.   How long has CXML been around?
20      A.  I don't know.
21      Q.   At least it was around as of the time you
22  talked to Ariba in the late '80s -- or excuse me --
23  late '90s, early 2000s.
24      Right?
25      A.  Yeah.
```

**70**

```
 1      It -- honestly, I'm trying to remember
 2  what time it -- it more than likely would have been
 3  closer 2000, 2001, something like that is when we
 4  talked.
 5      Q.   You mentioned RosettaNet as maybe one
 6  of -- as an organization somehow related to CXML.
 7      Right?
 8      A.  There are multiple protocols that have
 9  been developed that support that kind of -- Oracle
10  has one, a couple others.
11      Q.  What is RosettaNet?
12      A.  It's an agency that is -- it's an
13  independent agency that legislates and provides a
14  direction for electronic commerce.
15      Q.   Is it made up of members who are
16  electronic commerce businesses or not?
17      A.  Yes.
18      Q.   Do you know any of the names of the
19  organizations that are part of that group?
20      A.  No.
21      Q.   Do you know whether Ariba is part of that
22  group?
23      A.  No, I don't.
24      Q.   With respect to the electronic sourcing
25  technology that led to the 3 patents in this suit.
```

**71**

```
 1  what was your role in that project?
 2      A.   The -- of the 4 inventors, Frank Melly,
 3  and myself, and Jim, and Bob Kinross, I was primarily
 4  responsible -- I managed both Jim and -- and Bob,
 5  providing direction for them as far as the business
 6  requirements for how some things would work and
 7  working with them to putting together designs.
 8      Q.   Were you involved with that project at
 9  least through the point that it first resulted in an
10  actual commercial product that could be used at
11  customer sites?
12      A.   The commercial product being SupplyLink?
13      Q.   Well, you're asking me.
14      I guess I'm supposed to ask the questions,
15  so maybe I'll ask you.
16      Was the first commercial embodiment of the
17  technology described in the electronic procurement
18  patents called SupplyLink?
19      A.  Yes.
20      Q.   Okay.  Were you involved in the project
21  still at the time that the SupplyLink product was
22  first introduced?
23      A.  Yes.
24      Very -- very tail-end of it.
25      Q.   Was it reduced -- excuse me -- was it
```

**72**

```
 1  introduced sometime after August of '94 when the
 2  patents were first filed?
 3      A.  Yes.
 4      Q.   Can you tell me any more specifically than
 5  that when?
 6      A.  No.
 7      Q.   Is it true that at the time SupplyLink was
 8  introduced, Fisher still had a number of customers
 9  that were using the RIMS system?
10      A.  Yes -- yes, that's true.
11      Q.   Is it true that for the customers using
12  the RIMS system, most of them stuck with the RIMS
13  system and did not move to SupplyLink even after
14  SupplyLink became available?
15      A.   The -- many of them stuck with RIMS --
16  stayed with RIMS, and the primary reason was that
17  RIMS' primary capability was to manage inventory
18  on-site.  That's what it was -- was built for.
19      And some of the additional needs or some
20  of the additional features of SupplyLink extended
21  that beyond I guess what customers would have wanted.
22  There really wasn't a need for them to move to
23  SupplyLink.
24      Q.   What was the functionality that SupplyLink
25  provided that the customers, those RIMS customers
```

Momyer, Douglas A. - Vol. 1   12/9/2009   12:00:00 PM

73

1 really didn't need?
2    A.   Well, SupplyLink is a whole different
3 system of course.  It supplied a requisition
4 workflow.  It supplied the ability to -- for the
5 individual end-user to directly enter the requisition
6 in the system.  At the same time, provide them the
7 ability to select products through accessing
8 electronic catalog, and would then allow creation of
9 a single requisition that would flow through the
10 customer's installation allowing, you know, that
11 their -- their organization to approve or not approve
12 the requisition, passing it through to in this case
13 the -- for SupplyLink, it would have been the Fisher
14 wouldn't allow them to take that, the requisition,
15 and then translate that requisition into multiple
16 purchase orders to send it off to many different
17 vendors and allow the -- those orders or those
18 transactions to be electronically communicated to the
19 suppliers.
20    Q.   And that functionality that you just
21 described, is it true that when the SupplyLink
22 product came out, most of the RIMS customers didn't
23 see enough of a need for that functionality to switch
24 to the SupplyLink system?
25    A.   In -- in -- that's true.

74

1    Q.   After SupplyLink was introduced, is it
2 true that even then, the majority of orders that
3 customers placed came in over the phone rather than
4 electronically?
5    A.   Fisher -- Fisher Scientific, the order --
6 most of the orders were received through call
7 centers.
8    Q.   So that's by phone.
9    Right?
10    A.   Phone, yes.
11    Q.   And that was true even after Fisher
12 Scientific introduced the SupplyLink technology to
13 the marketplace?
14    A.   Yes, but SupplyLink and -- was being --
15 the 2 organizations were -- there was a new
16 organization spun off, which was called, official
17 technology group, separate part, official, but, yes,
18 the majority orders for Fisher would come in through
19 call centers via phone.
20    Q.   My question specifically is, those orders
21 kept coming in by phone even after SupplyLink was
22 made available to customers.
23    Right?
24    A.   Yes.
25    Q.   Now, you mentioned something about the

75

1 spinoff company, the Fisher Technology Group.
2    Right?
3    A.   Yes.
4    Q.   What is Fisher Technology Group?
5    A.   It was a separate company that was formed
6 out of Fisher Scientific personnel to develop and
7 market software.
8    Q.   So the Fisher Scientific Company decided
9 to create the separate corporation?
10    A.   Yes.
11    Q.   What was the purpose of the Fisher
12 Technology Group?
13    A.   I just said that:  to market and sell
14 software.
15    Q.   Did it -- did it have a particular type of
16 software or category of software it was intended to
17 market.
18    A.   SupplyLink was procurement, requisitioning
19 software.
20    Q.   When was the Fisher Technology Group
21 formed?
22    A.   I don't recall.
23    Q.   It was while you were still at the
24 company, though?
25    A.   Yes.

76

1    A.   As a matter of fact, I was part it for
2 a period of time.  It was probably formed sometime in
3 the mid-'90s.  I'm not sure.
4    Q.   Was the Fisher Technology Group successful
5 in marketing the SupplyLink and other
6 procurement-related software?
7    A.   By, successful, you mean?
8    Q.   Well, was there some parameters to
9 identify what a successful launch of the Fisher
10 Technology Group would look like at the time that it
11 was spun off?
12    A.   Not that I know of.
13    Q.   Did you have any objectives that you're
14 aware of when you were working with the Fisher
15 Technology Group in terms of sales volume or some
16 other potential measure of success?
17    A.   I wouldn't be the right on to ask about
18 that.
19    Q.   What was your job within Fisher Technology
20 Group?
21    A.   Manage software development.
22    Q.   Is that the same sort of thing you were
23 doing with Fisher Scientific before the spinoff?
24    A.   Yes.
25    Q.   So was Fisher Technology Group the

77

1  organization you worked for at the time in 2003 when
2  you were let go?
3      A.  No.
4          I had left Fisher Technology Group and
5  moved back to Fisher Scientific.
6      Q.  How long before you left Fisher Scientific
7  did that happen?
8      A.  I -- I had been with -- back with Fisher
9  Scientific for -- I think I probably left Fisher
10  technology in '95 or '96, something like that.
11     Q.  So were --
12     A.  So I was back there for about 7 -- 7 years
13  at Fisher Scientific.
14     Q.  So it existed before RIMS was created?
15     A.  No.
16     Q.  Okay.  Why did you switch back to Fisher
17  Scientific from Fisher Technology Group?
18     A.  They had asked me to come back to help
19  manage their -- some of their customer service
20  systems like the official Website, and that was
21  appealing to me.
22     Q.  So even after Fisher Scientific formed the
23  Fisher Technology Group, they retained some technical
24  activities at Fisher Scientific?
25     A.  Yes.

78

1      Q.  And the Website was one of those things?
2      A.  Yes.
3      Q.  Yes.
4          At the time you left the Fisher Technology
5  Group, do you have a recollection as to whether you
6  thought that that group was a group worth staying
7  with or whether you'd be better if you went back to
8  Fisher Scientific?
9      A.  No, I didn't think that at all.  No.
10         Just I liked the opportunity that was
11  given me back at Fisher.
12     Q.  What did you like about the opportunity
13  back at Fisher Scientific?
14     A.  Oh, it was working with some -- some
15  different business requirements.
16     Q.  Something new to do?
17     A.  Yes.
18     Q.  Was that part of it?
19         With respect to the electronic procurement
20  system described in your 3 patents, did Bob Kinross
21  have certain responsibilities there that he focused
22  on?
23     A.  Yes.
24     Q.  What were his specific things that he
25  focused on?

79

1      A.  Bob focused on the interface to the
2  technical viewer product as well as the development
3  of the content for the electronic catalog.
4      Q.  That would be the catalog database?
5      A.  Yes.
6      Q.  Did Jim Johnson have any particular focus
7  on the electronic procurement project that related to
8  the 3 patents?
9      A.  Jim worked on the component which was the
10  requisition management component, which was a
11  component that would allow the end-user to enter the
12  requisition, the workflow that's involved with that,
13  the interfaces, interaction with the various
14  suppliers to source their product and price their
15  product.
16         He managed the development effort there.
17     Q.  Were there any components of the
18  electronic procurement system described in the
19  patents that were not a focus of either Mr. Kinross
20  or Mr. Johnson, or did they pretty much cover all the
21  pieces?
22         MR. ROBERTSON:  Objection to the form of
23  the question.
24     A.  Not being that intimate with it, I'd say
25  that the majority of the patent that would have been

80

1  involved with -- 1 of the 2 would have been involved
2  with it.
3          BY MR. McDONALD:
4      Q.  Are there any parts of the patent and
5  technology that either Mr. Johnson or Mr. Kinross was
6  not involved with?
7      A.  I don't --
8          MR. ROBERTSON:  Objection to the form of
9  the question.
10     A.  I don't know.
11         BY MR. McDONALD:
12     Q.  Nothing springs to mind anyway.
13         Is that fair?
14     A.  No.
15     Q.  That is fair?
16     A.  That is fair.
17     Q.  Okay.  What was Mr. Melly's role -- I see
18  he's one of the inventors on these patents as well,
19  right, Frank Melly?
20     A.  Yes.
21     Q.  What was his role with respect to the
22  development of the electronic procurement technology
23  described in the patents?
24     A.  Frank was my immediate boss.  And I would
25  call him kind of a visionary.  He would recognize the

**81**

1   need for -- for a system and present that thought,
2   saying, I think we need a system to manage our
3   integrated supply for -- that's -- here is what I
4   think it ought to do.
5       Q.   With respect to the electronic procurement
6   system described in these -- this -- these patents,
7   did Mr. Melly give you some kind of a broad vision
8   for what the parts of that would be or the
9   functionality of that system?
10      MR. ROBERTSON:  Objection, vague and
11  ambiguous.
12      A.   I think that the whole -- the whole
13  concept was a joint effort.
14      I'm not sure I can say that one person had
15  the light-bulb idea to do -- to do -- I think just
16  need to do this, and as a group talked about how --
17  how we should do it.
18      BY MR. McDONALD:
19      Q.   With respect to the search engine part of
20  the electronic procurement system described in your
21  patents, one of the purposes of that was to be able
22  to search electronic catalogs.
23      Right?
24      MR. ROBERTSON:  Objection, calls for a
25  legal conclusion.

**82**

1       You can answer.
2       A.   We needed a search engine.
3       BY MR. McDONALD:
4       Q.   And you needed a search engine to search
5   electronic catalogs.
6       Right?
7       A.   We needed to build a catalog, search
8   catalog, yes.  That was an important part.
9       Q.   Now, in terms of the result that would
10  come back from the search engine in your system --
11  I'm trying to visualize what that looked like.
12      All right?
13      Would you actually see pictures or images
14  from the catalog?
15      MR. ROBERTSON:  Objection, vague and
16  ambiguous.
17      A.   The catalog, it did involve pictures --
18  could have.  Some -- some of the products would have
19  had like a chemical kind of -- to show something
20  transparent.
21      BY MR. McDONALD:
22      Q.   For chemicals, would they have a drawing
23  of the molecular atomic structure of it?
24      A.   Yes, as well as specifications, you know,
25  what the boiling point, what it would freeze at, any

**83**

1   hazardous properties about the product.
2       Q.   So while a user of your electronic
3   procurement system was in the search part of the
4   system, could they see on their computer screen
5   figures depicting the products, figures depicting the
6   chemical structures of chemicals?
7       A.   Yes.
8       Q.   Was that an important part of the system
9   or not?
10      MR. ROBERTSON:  Objection, vague and
11  ambiguous.
12      A.   Yes, I think it was important.
13      BY MR. McDONALD:
14      Q.   Why do you say that?
15      A.   The -- there are -- there are several
16  pieces that come into making decision as to whether
17  or not I as a requisitioner going to buy a product or
18  request a product.
19      And some of that is -- is that detail
20  information you can only get from a catalog.  And if
21  I were an end-user such as a chemist, I would need to
22  know some of the properties of that to make my
23  decision, because I'm going to be doing some shopping
24  on -- on it.  I may look at different types of
25  chemicals, so, yes -- (indiscernible) --

**84**

1       Q.   Before you developed the electronic
2   procurement system, let's go back to the late '92
3   time frame with somebody who had the RIMS system.
4       All right?
5       A.   Yes.
6       Q.   How would that person, that customer, that
7   user at a customer site achieve that shopping
8   objective that you just described if they could?
9       A.   Well, it would be like 2 ways it would
10  happen.
11      First of all, they wouldn't know that.
12  They would -- they would rely upon our on-site
13  customer service rep, who had that kind of knowledge
14  about products, and they would ask them about the
15  products.
16      And second one would be if they had access
17  to the Fisher paper catalog.  Pull that out, leaf
18  through the catalog, and see if they could find any
19  connection.
20      Q.   So with respect to the RIMS system as it
21  existed at the end of '92, was it typical for
22  customer service representatives on site at customers
23  to have a Fisher paper catalog sitting in their
24  office?
25      MR. ROBERTSON:  Object to the form of the

Momyer, Douglas A. - Vol. 1   12/9/2009  12:00:00 PM

85

```
 1   question.
 2        A.   That would not be an unusual situation.
 3        BY MR. McDONALD:
 4        Q.   Was it also typical or not unusual for a
 5   customer service representative to have other
 6   catalogs from other companies than Fisher Scientific
 7   at their fingertips?
 8        MR. ROBERTSON: Same objection.
 9        A.   That would not be unusual.
10        BY MR. McDONALD:
11        Q.   So back with the RIMS system as it existed
12   at the end of '92 -- if -- if a customer service
13   representative wanted to do some comparison shopping
14   in effect, they pull down physical copies, paper
15   copies of whatever catalogs they selected to look --
16   look at and shop.
17        Right?
18        MR. ROBERTSON: Objection, calls for
19   speculation.
20        A.   They didn't have much of an opportunity
21   to -- to buy the other products.
22        What typically they would do is, they
23   would help -- have a Fisher catalog there, and they
24   would reference the Fisher catalog for additional
25   information, because that RIMS system was only set up
```

86

```
 1   to handle Fisher -- Fisher products.
 2        BY MR. McDONALD:
 3        Q.   But as of the end of '92, was one of
 4   Fisher's goals to help customers out even if they
 5   wanted to buy some non-Fisher products like brooms?
 6        A.   Yes.
 7        Q.   And in those situations, did the customer
 8   service representatives have access to paper physical
 9   catalogs that had brooms?
10        MR. ROBERTSON: Objection, calls for
11   speculation.
12        A.   At some of the sites that I visited, there
13   were other catalogs, yes.
14        Q.   So when you visited customer sites, you'd
15   actually walk into the customer service
16   representative's office sometimes.
17        Right?
18        A.   Yes.
19        Q.   This is back in the '92 time frame?
20        A.   Yes.
21        Q.   Would you actually see a Fisher catalog
22   along with some other catalogs in some other offices?
23        A.   I did see other catalogs, yes.
24        Q.   What were some of the other catalogs --
25        A.   I don't know.
```

87

```
 1        Q.   -- you saw?
 2        A.   I don't know.
 3        Q.   Were they for some products that were
 4   generally not competitive with the Fisher catalogs
 5   typically?
 6        A.   I can't remember.
 7        Q.   Don't remember one way or the other?
 8        A.   No.
 9        Q.   All right.  Did you talk to customer
10   service representatives back in '92 about whether or
11   not they from time to time would pull down the
12   physical paper catalogs and look through them?
13        A.   I saw them do it.
14        Q.   Did you see them do it for Fisher catalogs
15   as well as non-Fisher catalogs?
16        A.   I really never saw them access other --
17   other than Fisher catalogs.
18        Q.   So you saw them using the Fisher catalogs?
19        A.   Yes.
20        Q.   With respect to the RIMS system, are you
21   familiar with the parts master records?
22        A.   Somewhat.
23        Q.   What is your understanding as to what
24   parts master records are in the RIMS system?
25        A.   For the local parts master, it would
```

88

```
 1   represent those parts that would be local or be in
 2   the inventory in various cribs, stockroom.
 3        Q.   You said that's the local one.  That's at
 4   the local database in the RIMS system; is that right?
 5        A.   Yes.
 6        Q.   And is that the -- is -- are the parts
 7   that are listed in that parts master record at the
 8   local database -- are those parts that are generally
 9   selected by the customers?
10        A.   Yes.
11        I mean, that -- that was the reason that
12   we were there, was to -- just in time typically you
13   would -- you would identify the products that were
14   most commonly used, and that's what you'd put in
15   the -- in the stockroom.
16        Q.   Did the customer records in that local
17   database in the RIMS system as it existed at the end
18   of '92 include pricing information?
19        A.   The local?
20        Q.   Yes.
21        A.   I honestly don't recall that.  If it was,
22   it was probably list price.
23        Q.   Is there a difference between pricing
24   information and list price?
25        A.   Well, list price is of course what -- if
```

89

1  you went to a counter, Fisher sales office and bought
2  it, you'd get -- a contract price of course is
3  something has been negotiated between the sales rep
4  and the customers purchasing group for some kind of
5  discount.
6      Q.  So the local database with the parts
7  master records would have a list price in them.
8      Is that your recollection?
9      MR. ROBERTSON:  Objection,
10  mischaracterizes his testimony.
11      A.  It was a list price as best I can recall.
12      BY MR. McDONALD:
13      Q.  Okay.  Was there a way in the RIMS system
14  to update or keep up with price changes with respect
15  to the products in the parts master record at the
16  local database?
17      A.  There was a parts master maintenance
18  program that you could go in and directly enter
19  information update.
20      Q.  Okay.  So the user could go in and update
21  the price?
22      A.  Yes.
23      Q.  Was there any other way in the RIMS system
24  as it existed at the end of '92 for that local parts
25  master record to be updated as to price?

90

1      A.  I don't recall.
2      Q.  In the electronic procurement systems that
3  are the subject of your patents, the catalog database
4  had price information in it.
5      Right?
6      A.  Yes.
7      Q.  Was there a way that --
8      A.  List price.
9      Q.  A list price?
10      A.  Yes.
11      Q.  Okay.  Was there a way that the catalog
12  database was kept up to date with respect to pricing?
13      A.  I really don't recall how that update --
14  that would be something that you would probably need
15  to ask Bob about, because I just don't recall.
16      Q.  Who maintained -- for the electronic
17  procurement system that's the subject of your
18  patents, who maintained the catalog database?
19      MR. ROBERTSON:  Objection, vague and
20  ambiguous.
21      A.  An individual or a functional area?
22      BY MR. McDONALD:
23      Q.  Would this be an individual or functional
24  area at the customer or at Fisher Scientific?
25      A.  Fisher Scientific.

91

1      Q.  So for individual customers who had the
2  SupplyLink system, Fisher Scientific maintained the
3  catalog database for them?
4      A.  I -- that's my understanding, yes, as I
5  recall.
6      Q.  Well, you were involved with SupplyLink as
7  marketed to customers.
8      Right?
9      A.  Yes, I'm pretty sure that Fisher
10  maintained the content.
11      Q.  Was the content maintained at the customer
12  locations, or was it the some central location with
13  Fisher?
14      A.  I'm not sure what you're -- what you're --
15  the content itself, the catalogs ran on a local
16  server.
17      Q.  So this would be local to where the
18  customer is located?
19      A.  Right.
20      The offering resided at Fisher
21  headquarters.
22      Q.  Okay.  So if we go -- do you have the '683
23  patent nearby?
24      If you would turn to the third page in.
25      A.  The -- okay.

92

1      It's a figure 1 A?
2      Q.  Yes.
3      A.  Okay.
4      Q.  The catalog database is number 36.
5      Right?
6      A.  Yes.
7      Q.  Now, one -- the questions I was just
8  asking you, did you understand that those questions
9  related to this item that's shown in figure 1 A as
10  number 36, the catalog database?
11      A.  Yes.
12      Q.  In figure one A, that's shown as being
13  located at the local computer.
14      Right?
15      A.  Local server.
16      Q.  The local server, which is connected to
17  the local computer?
18      A.  Yes.
19      Q.  Okay.  And so how is it that Fisher
20  Scientific would update pricing information at that
21  catalog database located at the local server of the
22  customer?
23      A.  I would be only speculating, because I
24  don't recall, but the -- there was a -- files would
25  have been -- would have been shipped out to -- and --

Momyer, Douglas A. - Vol. 1  12/9/2009  12:00:00 PM

93

1    and would have been loaded onto the -- refreshed,
2    refreshed the data at the -- catalog -- in the
3    catalog database.
4        Q.   Is that something that was done through
5    electronic communication, or would somebody
6    physically show up at the customer's local location?
7        A.   It was -- it was done electronically.
8        Q.   Were you involved in the back-and-forth
9    with the Patent Office involving the electronic
10   procurement patents after they were initially filed?
11       A.   My involvement was interacting with the
12   Fisher attorney and responding to questions that he
13   had.  And then he would come back to me.
14           So my involvement would be primarily
15   whenever an attorney would come and he'd say, need
16   this information, this information, was explaining to
17   me how this -- this worked.
18       Q.   Did you ever actually see any of the
19   communications from the Patent Office about any of
20   the patents?
21       A.   I saw -- I don't remember seeing any
22   communications.  I saw him some drafts of -- of the
23   patent as we went through and reviewed that.
24       Q.   Did you see any drafts of communications
25   to the Patent Office in response to things they said?

94

1        A.   No.
2            MR. McDONALD:  Okay.  Why don't we go
3    ahead and break for today, and we'll start at 9
4    tomorrow.
5            THE WITNESS:  Okay.
6            (Discussion off the record.)
7            THE VIDEOGRAPHER:  We're just going to go
8    off the record.
9            The time is approximately 6:15 PM.  We're
10   going off the video record.  Off the record.
11           (Whereupon, at 6:15 p.m., the taking of
12   the instant deposition adjourned.)
13
14
15           _____
16               Signature of the Witness
17   SUBSCRIBED AND SWORN to before me this _____ day of
18   _____, 20_____.
19
20           _____
21               Notary Public
22   My Commission Expires:_____
23
24
25

95

1            CERTIFICATE OF COURT REPORTER
2    UNITED STATES OF AMERICA      )
3    DISTRICT OF COLUMBIA          )
4            I, CHERYL A. LORD, the reporter before
5    whom the foregoing deposition was taken, do hereby
6    certify that the witness whose testimony appears in
7    the foregoing deposition was sworn by me; that the
8    testimony of said witness was taken by me in machine
9    shorthand and thereafter transcribed by
10   computer-aided transcription; that said deposition is
11   a true record of the testimony given by said witness;
12   that I am neither counsel for, related to, nor
13   employed by any of the parties to the action in which
14   this deposition was taken; and, further, that I am
15   not a relative or employee of any attorney or counsel
16   employed by the parties hereto, or financially or
17   otherwise interested in the outcome of this action.
18           _____
19               CHERYL A. LORD
20               Notary Public in and for
21               the District of Columbia
22   My Commission expires April 30, 2011
23
24
25

Momyer, Douglas A. - Vol. 2  12/10/2009  12:00:00 PM

96

```
1              UNITED STATES DISTRICT COURT
2              EASTERN DISTRICT OF VIRGINIA
3                   RICHMOND DIVISION
4    ePLUS, INC.,        )
5           Plaintiff, )
6        v.       ) No. 3:09cv620
7    LAWSON SOFTWARE, INC.,   )
8           Defendant. )
9
10              Washington, D.C.
11           Thursday, December 10, 2009
12   Videotape Continued Deposition of DOUGLAS A. MOMYER,
13   called for examination by counsel for Defendant in
14   the above-entitled matter, the witness being duly
15   sworn by CHERYL A. LORD, a Notary Public in and for
16   the District of Columbia, taken at the offices of
17   TROUTMAN SANDERS LLP, 401 9th Street, Suite 1000,
18   Washington, D.C., at 9:09 a.m., and the proceedings
19   being taken down by Stenotype by CHERYL A. LORD, RPR,
20   CRR.
21
22
23
24
25
```

97

```
1    APPEARANCES:
2
3    On behalf of Plaintiff:
4       SCOTT L. ROBERTSON, ESQUIRE
5       GOODWIN PROCTER LLP
6       901 New York Avenue, N.W.
7       Washington, D.C.  20001
8       (202) 346-4000
9
10   On behalf of Defendant:
11      DANIEL W. McDONALD, ESQ.
12      MERCHANT & GOULD
13      80 S. 8th Street, Suite 3200
14      Minneapolis, MN  55402-2215
15      (612) 332-5300
16
17   ALSO PRESENT:
18      Brian Ciccone, videographer
19
20
21
22
23
24
25
```

98

```
1              C O N T E N T S
2    WITNESS            EXAMINATION
3                   PAGE NO.
4    DOUGLAS A. MOMYER
5    By Mr. McDonald          100
6    By Mr. Robertson         182
7    By Mr. McDonald          193
8    By Mr. Robertson         209
9    By Mr. McDonald          215
10   By Mr. Robertson         220
11
12
13           E X H I B I T S
14        (Exhibit attached.)
15   LAWSON EXHIBIT NO.          PAGE NO.
16   12 Transcript of the videotaped
17      deposition of Douglas Momyer
18      taken 9-16-04, ePLUS 0139360-416    177
19
20
21   P R E V I O U S L Y  M A R K E D  E X H I B I T S
22   LAWSON EXHIBIT NO.       FIRST MENTIONED
23   1   U.S. Patent No. 6,023,683    116
24
25
```

99

```
1              P R O C E E D I N G S
2
3        THE VIDEOGRAPHER:  Today is Thursday,
4    December 10th, 2009.  The time is approximately 9:09
5    AM.  We are at the law office of Troutman Sanders
6    LLP, located in Washington, D.C.
7        This is the commencement of the video
8    deposition of Douglas A. Momyer.  My name is Brian
9    Ciccone, and I'm the video technician.
10       Will the attorneys please note their
11   appearances for voice identification.
12       MR. McDONALD:  For Lawson Software, Daniel
13   McDonald, of Merchant & Gould.
14       MR. ROBERTSON:  For plaintiff, ePlus Inc.,
15   Scott Robertson, of Goodwin Procter, and with me is
16   my partner, Jennifer Albert.
17       THE VIDEOGRAPHER:  Will the court reporter
18   please swear in the witness.
19
20   Whereupon,
21           DOUGLAS A. MOMYER
22   was called as a witness by counsel for Defendant,
23   and, having been duly sworn by the Notary Public, was
24   examined and testified as follows:
25
```

100

1      EXAMINATION BY COUNSEL FOR DEFENDANT
2      BY MR. McDONALD:
3      Q.   Good morning, Mr. Momyer.
4      A.   Hi.
5           How are you today?
6      Q.   Good.
7           Just to follow up on 1 or 2 things from
8  yesterday to start with today:  Currently, you work
9  at Ferguson involved with among other things
10  inventory management; is that right?
11     A.   Yes.
12     Q.   Do you use any sort of an electronic
13  sourcing system in connection with your inventory
14  management work at Ferguson?
15     A.   Electronic sourcing system being like the
16  one where we were talking about pat- -- the pat- --
17  '683 patent?
18     Q.   Yeah.
19          I didn't want to limit it necessarily to
20  the patent, though, something that had -- there was a
21  computer-based system that would help manage
22  inventory, requisition or purchase.
23     A.   Yes.
24     Q.   What system do you work with?
25     A.   The system -- there are really 2

101

1  components to it.  The first system is one that was
2  developed in-house called, automated supply program,
3  ASP.  And the second is a package software called SX
4  Enterprise, and it was developed by a company called
5  Infor, I-N-F-O-R.
6      Q.   Does the computer system you used at
7  Ferguson provide a similar functionality to the
8  system described in your electronic sourcing patents?
9          MR. ROBERTSON:  Objection, ambiguous.
10     A.   It doesn't have -- it doesn't have a
11  catalog or cataloging component.  It has the ability
12  to manage inventory.
13          That's the business that the company is in
14  that I work for, is managing customers' inventory
15  on-site.
16          BY MR. McDONALD:
17     Q.   How does Ferguson handle buying parts or
18  equipment?
19     A.   They use the -- they use the SX system to
20  do procurement, so orders are placed through the SX
21  Enterprise software.
22     Q.   Does the SX Enterprise software -- does it
23  have some sort of an item list or parts list of the
24  products that you order for Ferguson?
25     A.   Yes.

102

1      Q.   Is that a catalog?
2      A.   No.
3           There is not an electronic catalog at this
4  time.
5      Q.   What's in the parts list?
6      A.   Meaning?
7      Q.   What types of information?
8      A.   Part number, description, inventory
9  quantity, certain stocking parameters for -- for the
10  product, some information about the product, whether
11  it's a hazardous product or not, price of the
12  product, cost of the product.
13     Q.   Can you do searches on the system?
14     A.   Do searches on the system -- yes.
15     Q.   Keyword searches?
16     A.   Searches -- text searches for -- against
17  the description.
18     Q.   So you put in a word like oven or beaker
19  or something, that it will come back and give a list
20  of the products that have that word in the item
21  description?
22     A.   Item description, yes.
23     Q.   Can you use that system, then, to build a
24  requisition?
25     A.   The SX isn't -- does not have

103

1  requisitioning.  We'd have to go to the ASP system
2  where you could -- you can do searches within that
3  system on products and then a process of
4  requisitioning through to ultimately generate a
5  purchase order.
6      Q.   So in the auto supplier ASP system, can
7  you also do searching in that one?
8      A.   Searching for product?
9      Q.   Yes, text searching.
10     A.   Yes.
11     Q.   And in that system, does it have a part
12  list?
13     A.   Yes.
14     Q.   Does it have a similar information to the
15  parts list that you just described was in the SX
16  system?
17     A.   Yes.
18     Q.   Do you consider that list in the ASP
19  system that has the part number, description, price,
20  and other information to be a catalog?
21     A.   No.
22     Q.   In the ASP system, can you use the results
23  of a word search to find products to build a
24  requisition?
25     A.   Could you explain what exactly- --

Momyer, Douglas A. - Vol. 2  12/10/2009  12:00:00 PM

---

**104**

1   Q.   Okay.  In the ASP system that you had or
2   you have at Ferguson, you can put in a word like oven
3   and do a word search for a description or item or
4   part description that have the word oven in them; is
5   that right?
6   A.   Yes.
7   Q.   And the result, then, it gives you a list
8   of products that need -- or satisfy that search
9   request?
10   A.   Yes.
11   Q.   With that list, can you then within the
12   ASP system build up a requisition?
13   A.   You could put that -- you could select
14   from that list and put it in a -- in a requisition,
15   yes.
16   Q.   Does the system electronically transfer
17   that -- the result from that search that you select
18   into a requisition?
19   A.   Yes.
20   Q.   Does the system have the capability of
21   converting the requisition into a purchase order?
22   A.   Yes.
23   Q.   Do you consider that ASP system that
24   you're using at Ferguson to infringe any of the 3
25   electronic sourcing patents you got while you were at

---

**105**

1   Fisher Scientific?
2   MR. ROBERTSON:  Objection, calls for a
3   legal conclusion.
4   A.   I don't know if it does or not.  That
5   system was developed internally, only used
6   internally.  It's not sold.
7   BY MR. McDONALD:
8   Q.   It's not sold.
9   A.   It's not marketed.
10   Q.   Do you have an understanding whether or
11   not you can infringe somebody else's patent by
12   developing a product in-house even if you don't sell
13   it to others?
14   A.   No idea.
15   Q.   Do you look at the lack of a catalog in
16   that internal Ferguson ASP system to be a relatively
17   fundamental distinction from the electronic sourcing
18   systems that you described in your patents?
19   MR. ROBERTSON:  Objection to the form of
20   the question, calls for a legal conclusion.
21   A.   State that question again.
22   MR. McDONALD:  Please read it back.
23   (The reporter read the last
24   question.)
25   A.   There's that -- that is a difference, a

---

**106**

1   fundamental difference yes.
2   BY MR. McDONALD:
3   Q.   Are you aware of any other fundamental
4   differences between the ASP system at Ferguson and
5   the electronic sourcing systems described in your
6   patents?
7   MR. ROBERTSON:  Object to the form of the
8   question, calls for a legal conclusion.
9   A.   The ASP system does not deliver POs from
10   itself directly to multiple suppliers.
11   BY MR. McDONALD:
12   Q.   Does the ASP system deliver purchase
13   orders to -- purchase orders to a single supplier?
14   A.   It delivers them to the SX system, which
15   then distributes the orders out.
16   Q.   Does the ASP system have the capability of
17   sending purchase orders to the SX system that are
18   multiple purchase orders from a single requisition?
19   A.   It's -- the -- the ASP system would
20   deliver a single request, which would be -- it could
21   contain a multiple lines.  The purchasing system
22   within SX determines if -- where those -- actually
23   delivers the purchase orders.
24   So it's not really breaking out the --
25   within the ASP system break out into multiple

---

**107**

1   vendors.
2   Q.   But does the SX system then take that
3   information from the ASP system from a single
4   requisition and then the SX system breaks it out into
5   multiple purchase orders?
6   A.   Yes.
7   Q.   That's multiple purchase orders for
8   multiple vendors or distributors?
9   A.   Yes.
10   Q.   So other than the lack of a catalog, are
11   there any other fundamental distinctions between the
12   electronic sourcing system described in your 3
13   patents and Ferguson's system that includes both the
14   ASP and the SX --
15   MR. ROBERTSON:  Object --
16   BY MR. McDONALD:
17   Q.   -- systems?
18   MR. ROBERTSON:  Sorry.
19   Object to the form of the question, calls
20   for a legal conclusion.
21   A.   I can't think of -- at this time.
22   BY MR. McDONALD:
23   Q.   Did you help create the ASP system at
24   Ferguson?
25   A.   Yes.

---

Momyer, Douglas A. - Vol. 2  12/10/2009  12:00:00 PM

**108**

1    Q.   Were you involved in the decision to buy
2    the SX system?
3    A.   No.
4    Q.   Was that there when you got there?
5    A.   Yes.
6    Q.   Do you use those systems yourself in your
7    job currently?
8    A.   I do interact with them, yes.
9    Q.   About how often a week do you interact
10   with those systems?
11   A.   ASP would be daily.
12   Q.   Okay.  I'd like to change subjects now.
13       We talked yesterday a little bit about you
14   talking to Ariba back in the early 2000 time frame?
15   A.   Yes.
16   Q.   While you were still at Fisher Scientific.
17       Right?
18   A.   Yes.
19   Q.   Did you talk to anybody from a company
20   called Commerce One back around the same time?
21   A.   Yes.
22   Q.   Can you tell me what Commerce One -- what
23   type of company they are?
24       What do they do?
25   A.   I believe Commerce One was a company

**109**

1    similar to Ariba, had developed software to handle
2    customers' procurement activities.
3    Q.   Were you personally involved in
4    discussions with somebody from Commerce One?
5    A.   Yes.
6    Q.   When was that?
7    A.   I can just give you a general time frame.
8    Q.   That's fine.
9    A.   And it's going to be a range of years.
10   Late '90 till early 2000, more like I'm thinking
11   closer 2000, 2001.
12   Q.   What did you talk to Commerce One about?
13   A.   Similar things we talked to Ariba about,
14   was content, delivering content for authoring
15   electronic catalog, and then for providing for a
16   similar punchout capability.
17   Q.   Did Fisher Scientific as a result of the
18   conversations with Commerce One develop a way to
19   allow the Commerce One system to punch out to the
20   Fisher catalog at a Website?
21   A.   I don't think that we ever finalized the
22   connection.  We did deliver a content to them to
23   build catalogs.
24       I'm not sure if during the period of time
25   I was there that the Commerce One didn't go out of

**110**

1    business.  I don't think -- I think it went out of
2    business sometime I believe in the 2000 time frame,
3    because it -- I think it kind of went off the radar
4    screen for our company.
5    Q.   You said you did deliver something to
6    them --
7    A.   Content.
8    Q.   Okay.  So do you have --
9    A.   We talked yesterday.  It was a file, flat
10   file.  That's --
11   Q.   So was this electronically transmitted to
12   Commerce One?
13   A.   Yes.
14   Q.   So you never actually set up a situation
15   where Commerce One could access a Fisher Website
16   through a punchout method?
17   A.   No.
18   Q.   Were you ever involved while you were at
19   Fisher Scientific with any discussions with any
20   companies other than Ariba or Commerce One about
21   punchout?
22   A.   Yes.
23   Q.   What other companies did you talk to about
24   punchout?
25   A.   Lawson.

**111**

1    Q.   About what time frame was that?
2    A.   About the same time, late 2000, 2001,
3    2002.
4    Q.   What is your understanding as to what
5    Lawson's business was at that time when you talked to
6    them?
7    A.   They had developed and had a procurement
8    supply chain management systems.
9    Q.   They wanted to have their procurement
10   supply chain management system be able to punch out
11   to the Fisher Scientific catalog?
12       Is that what you talked to them about?
13   A.   Yes.
14   Q.   Did Fisher Scientific set up a way for
15   Lawson's system to punch out?
16   A.   That never materialized.
17   Q.   Why not?
18   A.   The -- what normally drives -- drives a
19   need for punchout is -- is if the particular
20   procurement of the company is using that software has
21   a need to purchase products from the supplier, and I
22   believe that the company that had purchased the
23   Lawson software ended its engagement with Fisher, so
24   Fisher was no longer a vendor that -- that they were
25   dealing with.

Momyer, Douglas A. - Vol. 2   12/10/2009  12:00:00 PM

112

1    Q.   So Lawson's customer just didn't have a
2    need anymore to punch out specifically to the Fisher
3    catalog.
4        Is that what happened?
5    A.   Yes.
6    Q.   Were there any technical hurdles to
7    Lawson's system being able to punch out to the Fisher
8    Scientific electronic catalog?
9        MR. ROBERTSON:  Object to the form of the
10   question.
11   A.   I really don't remember much about that
12   communication.
13       BY MR. McDONALD:
14   Q.   Who at Lawson was involved?
15   A.   I don't know.
16   Q.   Who else at Fisher Scientific was
17   involved?
18   A.   The -- it would have been -- we had a
19   corresponding manager who would -- would be on our
20   marketing end, who would deal with customer
21   relations, would have been brought -- would have
22   brought the request to me based upon the customer
23   requesting it.
24   Q.   Who is the marketing manager that brought
25   the Lawson request to you?

113

1    A.   Jane Stull.
2    Q.   Spell the last name.
3    A.   S-T-U-L-L.
4    Q.   Do you know where she is now?
5    A.   Yes.
6    Q.   Where is she now?
7    A.   She's no longer with Fisher.  She -- she's
8    in the north hills of Pittsburgh.  I don't -- I don't
9    have her address or -- or her phone number.
10   Q.   Is she still in the Pittsburgh area?
11   A.   As of 6 months ago.  I don't stay in touch
12   with her, but I knew she was there.
13   Q.   Did you ever some interaction with her 6
14   months ago?
15   A.   She's a real estate agent.  She sent me
16   her card and asked if I want to do buy property.
17   Q.   (Indiscernible.)
18       When you talked to Lawson back in that
19   2000, 2001 time frame, did you have an understanding
20   that they had a punchout capability in their system
21   already?
22   A.   That was my understanding, that they had
23   something at that time, or they were -- I'm thinking
24   that -- that they were developing it at that point in
25   time.  I didn't -- my memory is a little bit vague on

114

1    that because we really didn't have a lot of
2    conversations with them unlike some other companies
3    we talked to, but as I recall, they were in the
4    process of putting together something and had
5    punchout-type capabilities.
6    Q.   Did you have an understanding that they
7    would also be using that CXML standard for punchout?
8    A.   No, I don't recall what the -- what the
9    protocol that was being used.
10   Q.   Did anybody from Fisher Scientific
11   indicate at that time to Lawson that there would be
12   any issues regarding Lawson's use of punchout
13   potentially infringing any of the electronic sourcing
14   patents?
15       MR. ROBERTSON:  Objection, calls for a
16   legal conclusion.
17   A.   Didn't even -- I don't think anyone
18   thought of that at that point in time.
19   Q.   Did you talk to any companies other than
20   Ariba, Commerce One, or Lawson back when you were
21   still at Fisher Scientific?
22   A.   I'm sure we did.  There was -- you have to
23   realize, Fisher was a very large distributor of
24   products that companies who had bought purchasing
25   systems wanted to interact with.

115

1        And there was always a request to get
2    content to be interfacing through a customer's
3    internal system.  I don't -- off the top of my head,
4    I can't think of any, but it was not unusual for me
5    to talk to companies about --
6    Q.   Is there a reason why you remember the
7    Lawson in particular, even though you don't remember
8    the other ones?
9    A.   Well, think it came into mind when I saw
10   the -- when I saw the -- who I was being deposed by.
11   Q.   Okay.  So when you got the notice of
12   deposition, you saw the Lawson name on there, and
13   then some bells went off?
14   A.   Yes.
15   Q.   When you were at Fisher Scientific, did
16   Fisher Scientific communicate to any companies using
17   the punchout to access electronic catalogs any
18   concerns regarding their potential or actual
19   infringement of the electronic sourcing patents?
20       MR. ROBERTSON:  Objection, calls for a
21   legal conclusion, vague and ambiguous.
22   A.   The -- you have to realize at the point in
23   time when we are talking with those companies, the
24   company official technology involved in procurement
25   was no longer being purchased by another company like

116

1    ePlus.
2         The patents were no longer there or no
3    longer owned by Fisher Scientific.  So my mode of
4    operation is, I'm given a task to do, and I'll do it
5    to the best of my ability.
6         I honestly didn't even think about the
7    patents.  It was -- it was very much out of my
8    consciousness.
9         BY MR. McDONALD:
10        Q.   What is your understanding as to when
11   Fisher Scientific sold the patents?
12        A.   '90s, late '90s at a company -- was --
13        Q.   Do you still have exhibit Lawson 1 in
14   front of you?
15        A.   Exhibit --
16        Q.   The '683 patent, exhibit 1.
17        A.   Yes.
18        Q.   That's one of the electronic sourcing
19   patents.
20        Right?
21        A.   Yes.
22        Q.   And that was one issued on February 8,
23   2000.
24        Right?
25        A.   Yes.

117

1         Q.   And do you see there that the owner or
2    assignee of the patent as of that date was Fisher
3    Scientific Company?
4         A.   Yes, I do.
5         Q.   Okay.
6         A.   I -- honestly, I don't remember when it
7    would -- it had to have been sold before I left
8    Fisher, because I recall it happening.
9         Q.   Okay.  So sometime before you left Fisher
10   in 2003, the patents were sold?
11        A.   Yes.
12        Q.   Do you remember who bought them at that
13   time?
14        A.   No, I don't.
15        Q.   Did you have some -- obviously, you talked
16   to these other companies about punchout before you
17   left Fisher Scientific.
18        Right?
19        A.   Yes.
20        Q.   So do you know one way or the other
21   whether you talked to at least some of these
22   companies about punchout while Fisher still owned the
23   patents?
24        A.   I don't -- I really don't recall.
25        Q.   Either way, the patent issue really wasn't

118

1    one that you gave consideration to while you were
2    talking to other companies about punchout.
3         Right?
4         A.   It was not -- it was not in my
5    consideration, no.
6         Q.   Were there any efforts at Fisher
7    Scientific while you were there to try to enforce the
8    electronic sourcing patents regarding any other
9    companies?
10        A.   Not -- not that I'm aware of.
11        Q.   While we've got the '683 patent in front
12   of you, I'd like to change topics now so we talked a
13   little bit about item type 07 yesterday.
14        A.   Yes.
15        Q.   All right?
16        If I understand right, item type 07 was
17   not a type that was used in the RIMS system as it
18   existed in April of '93.
19        Correct?
20        A.   That's correct.
21        Q.   What is a type 07 product?
22        A.   It would have been a product that would --
23   in this case wouldn't have been sold or distributed
24   by Fisher, that it would be a -- I guess the term
25   would be third party, would be -- would be the -- the

119

1    product would have been sourced directly from as well
2    as or placed directly with.
3         Q.   Now, in the RIMS system, there was a type
4    04 product that was a third-party item the
5    distributor orders.
6         Right?
7         A.   That's correct.
8         Q.   So how was a type 07 product different
9    from a type 04 product?
10        A.   Type 04 product would have been a product
11   that traditionally not a product that Fisher would
12   have ordered or would have carried in -- in their
13   inventory but would have been sourced and ordered by
14   Fisher for the customer.
15        Q.   So it might be like we talked yesterday
16   about a broom as an example?
17        A.   That's correct.
18        Q.   Fisher doesn't carry brooms.
19        Somebody else does.
20        Right?
21        A.   That's correct.
22        Q.   Okay.  So type 07 is different from that?
23        A.   In that case, the broom would have been
24   instead of having Fisher source the product, in this
25   case, the SupplyLink product based upon how the

120

1   customer would have accessed the catalog and selected
2   the product would have directly sourced and obtained
3   pricing availability information from the
4   manufacturer, the supplier directly who had the
5   brooms and sold the brooms.
6       Q.   Who type 07 products could also be
7   non-Fisher products like brooms?
8       A.   Yes.
9       Q.   So I'm still -- I'm going -- maybe I'm
10  repeating myself.
11          I apologize, but I want to get clear.
12          What is actually the difference then
13  between a type 04 product and a type 07 product?
14      A.   Who sources it and where you -- who -- who
15  you buy -- who -- who actually buys it.
16      Q.   So 04, the distributor such as Fisher
17  actually places the order?
18      A.   Yes.
19      Q.   And for 07, the customer places the order?
20      A.   The SupplyLink system would place the
21  order, yes.
22      Q.   The system places the order?
23      A.   Yes.
24      Q.   Well, does some human being control the
25  system and direct it to place the order?

121

1       A.   Well, the way the flow would work would
2   be, you would have the catalog.  You'd select a
3   product from the catalog.  This would be the
4   customer, the user.
5           Put on the req.  The req would go through
6   the approval workflow up to the point in time when
7   it's accepted, and you -- it would be a sourcing and
8   pricing obtained from the -- from the broom
9   manufacturer, and then the order would actually be
10  transmitted to the supplier, who -- who had the --
11  the broom.
12      Q.   Who would secure the sourcing and pricing
13  information about the broom?
14          Was that the customer or somebody from
15  Fisher?
16      A.   The system would do that.
17      Q.   Would somebody -- who would be operating
18  the system at the time where the system is directed
19  to get that pricing information?
20      A.   There are -- there are multiple ways in
21  which the system could be deployed.  One way would be
22  the customer actually made the decision and placed
23  the PO through the system.  We also have the
24  capability for a Fisher person to be there and
25  actually once they accept it to place the order

122

1   directly with the supplier.
2       Q.   So for a type 07 product, the system
3   itself could directly access some third-party broom
4   distributor and get pricing availability information?
5       A.   Yes.
6       Q.   And for --
7       A.   We never tied to a broom distributor, but,
8   yes, it could do that.  That's how it was built.
9       Q.   Okay.  So either a broom distributor or
10  some other third-party non-Fisher distributor.
11          Right?
12      A.   Yes.
13      Q.   Is -- or do the figures in the '683 patent
14  anywhere show you any flow charts or block diagrams
15  that would describe the capability of the system for
16  these type 07 products to go out to a third-party
17  distributor and get pricing availability
18  information?
19      A.   The reference to host computer on 1 B,
20  figure 2 and figure 3 would be where I would point to
21  to indicate that inventory sourcing could be directed
22  to multiple host computers.
23      Q.   Okay.  So first thing you mentioned was
24  the host computer in figure 1 B; is that right?
25      A.   Yes.

123

1       Q.   So that's number 210 in figure 1 B of the
2   '683 patent.
3           Right?
4       A.   Yes.
5       Q.   What is it about this figure that -- that
6   indicates something that relates to the system's
7   ability for type 07 products to go out to a third-party
8   pricing information from a third-party distributor?
9       A.   I'm not sure what it is that it doesn't
10  indicate.
11      Q.   One thing I notice is the host computer in
12  figure 1 B is only connected to the local computer in
13  the system.
14          Right?
15      A.   Right.
16      Q.   There's no connection of the host computer
17  to any -- any communication link to an outside
18  system, is there?
19      A.   Right.
20      Q.   So the system shown in figure 1 B is not
21  going to have the capability of having the host
22  computer link outside the system to somebody else's
23  sourcing and pricing information, is it?
24          MR. ROBERTSON:  Objection, calls for a
25  legal conclusion.

Momyer, Douglas A. - Vol. 2  12/10/2009  12:00:00 PM

124

1     A.   Ideally, that connection should be to the
2  server.
3        BY MR. McDONALD:
4     Q.   Yeah.
5        But you do agree that that connection that
6  would allow that type 07 product pricing and sourcing
7  inquiry is not depicted in figure 1 B.
8        Right?
9     A.   Well, it could do that, but that's not how
10 it was actually deployed.
11    Q.   Okay.  But I'm asking a different
12 question.
13       I'm asking specifically figure 1 B doesn't
14 show the capability of the host computer going
15 outside the system to get third-party distributor
16 price or availability information.
17       Right?
18       MR. ROBERTSON:  Objection, calls for a
19 legal conclusion.
20    A.   The local computer could communicate to
21 multiple hosts.  That isn't was done.  That
22 isn't --
23       BY MR. McDONALD:
24    Q.   Again I'm asking a different question,
25 though.

125

1        You brought up the host computer, so I at
2  least want to get clear on what the host computer
3  can't do or isn't shown to do in figure 1 B.
4        With respect to figure 1 B of the '683
5  patent, there is no connection shown between the host
6  computer and any component or system outside the
7  electronic sourcing system.
8        Right?
9     A.   I'm sorry.
10       MR. McDONALD:  Could you read that back,
11 please.
12       (The reporter read the last
13       question.)
14    A.   Not quite sure how to answer that.
15       If -- if -- this whole configuration is
16 describing a -- is describing what's called the
17 electronic sourcing system, so you're asking me, is
18 there -- is there some connection that established
19 something outside of that?
20       I guess I'm not -- I don't quite
21 understand what you're -- what you're asking for.
22    Q.   That's right.
23       The figure 1 B only shows the host
24 computer as having an interaction with the electronic
25 sourcing system described in the patent.

126

1        Right?
2     A.   A host system, yes.
3     Q.   Now, with respect to the type 07 product,
4  when the system obtains availability and pricing
5  information about a third-party distributor, does it
6  have to go outside the electronic sourcing system to
7  get that information or not?
8     A.   When you say, outside, you're saying, ask
9  a -- a supplier -- multiple suppliers about price and
10 availability information.
11    Q.   Let me try to rephrase the question, help
12 you out.
13       Where does the system described in your
14 electronic sourcing patents go to get third-party
15 price and availability information for type 07
16 products?
17    A.   Goes to the -- would go to the supplier.
18    Q.   That would be some company other than
19 Fisher and other than the customer.
20       Right?
21    A.   Yes.
22    Q.   So when you say, go to the supplier, do
23 you mean the system would have to communicate
24 electronically with some computer system located at
25 some third-party supplier facility?

127

1     A.   Yes.
2     Q.   Is that connection shown anywhere in
3  figure 1 B?
4     A.   Well, the intent would have been to the
5  host computer, because there could be multiple host
6  computers.
7     Q.   I'm not asking what anybody intended.
8        Okay?
9        I'm asking what's actually shown in figure
10 1 B.
11       That connection that you described out to
12 a third-party distributor computer to obtain price
13 and availability information is not shown in figure 1
14 B.
15       Right?
16       MR. ROBERTSON:  Objection, calls for a
17 legal conclusion.
18    A.   I think it is, because that's the
19 connection to the host computer.
20       BY MR. McDONALD:
21    Q.   What connection to the host computer?
22    A.   From local computer to host computer.
23    Q.   Okay.  Well, the local computer is not
24 that third-party distributor system.
25       Right?

128

1      MR. ROBERTSON:  Objection, calls for a
2  legal conclusion.
3      A.   Local -- local computer is part of the
4  SupplyLink.
5      BY MR. McDONALD:
6      Q.   Right.
7          The local computer is located at the
8  customer of Fisher Scientific.
9          Right?
10     A.   Right.
11     Q.   That's not the third-party distributor
12  computer.
13         Right?
14     A.   It is not.
15     Q.   So there's no third-party distributor
16  computer shown anywhere on figure 1 B.
17         Right?
18         MR. ROBERTSON:  Objection,
19  mischaracterizes testimony.
20         MR. McDONALD:  I'm asking.
21         MR. ROBERTSON:  He's already answered.
22     A.   I thought it was host -- I mean, I think
23  it's the host computer.
24         BY MR. McDONALD:
25     Q.   Isn't the host computer the Fisher

129

1  Scientific computer?
2      A.   I said it could be multiple host
3  computers.
4      Q.   So the host computer 210 could be multiple
5  computers.
6          Is that what you're saying?
7      A.   Yes.
8      Q.   Could you turn to column 17 of the '683
9  patent, please.
10         Do you have that before you now?
11     A.   Yes.
12     Q.   I'd like to direct your attention to
13  column 17 at lines 39 to 43 or so.
14         And I'll read the sentence here, quote:
15  The resultant list of products are then transferred
16  by shell program 252 to a work in progress
17  requisition 260 and then entered from a graphical
18  user interface 254 directly onto distributor's
19  mainframe computer 210 as orders from the applicable
20  customer to distributor.
21         Do you see that sentence?
22     A.   Yes, I do.
23     Q.   Now, and that 210 number, that's the same
24  one we were just looking at in figure 1 B identified
25  as host computer.

130

1      Correct?
2      A.   Yes.
3      Q.   So in your patent, 210 is identified as
4  the distributor's mainframe computer.
5          Right?
6      A.   Yes.
7      Q.   And distributor is with a capital D here.
8          Right?
9      A.   And what does that mean?
10     Q.   Well, you tell me.
11     A.   I don't -- I don't -- does that mean that
12  it's -- there's only one -- one distributor?
13     Q.   Well, isn't there a primary distributor
14  that is associated with the implementation of the
15  electronic sourcing system described here in your
16  patent?
17         MR. ROBERTSON:  Objection, calls for a
18  legal conclusion.
19     A.   I don't know.
20         BY MR. McDONALD:
21     Q.   Isn't it true, Mr. Momyer, that in figure
22  1 B, the typical showing an embodiment of the
23  invention described in your patents, host computer
24  210 would be located at the distributor Fisher in the
25  typical embodiment involving Fisher?

131

1      MR. ROBERTSON:  Objection, vague and
2  ambiguous and calls for a legal conclusion.
3      (Pause.)
4      A.   If -- if you look at column 17 and then
5  column 18 starting about line 55.
6          BY MR. McDONALD:
7      Q.   Line 55 in 17?
8      A.   On 17.
9      Q.   Okay.
10         And read those paragraphs over to column
11  18, I think you talk about the process which we were
12  describing where you have a -- you have a request for
13  a product that is sourced from a supplier.
14         And in particular, let's see --
15  distributor purchasing employee can -- reading --
16  reading about line 64 -- the distributor purchasing
17  employee can receive by phone or via distributor's
18  host computer request for items --
19     Q.   I'm sorry, Mr. Momyer.
20         Could you slow down.
21     A.   Okay.
22     Q.   It's very hard for both the court reporter
23  and I to hear you right now.
24     A.   Okay.  Sorry.
25     Q.   And speak a little louder, please.

132

1     A.   The -- starting at line 64:  The
2 distributor purchasing employee can receive by phone
3 or via distributor's host computer requests for items
4 not shown in distributor's host database either as
5 regular products or third-party items purchased for
6 particular customers on a regular basis.
7     Transmitting certain requirements to the applicable
8 distributor purchasing employee can be a function of
9 the inventory sourcing routines -- that's what we
10 were talking about -- of host computer or may be
11 directed to distributor CSR interfacing with the
12 customer.  So the distributor purchasing employee can
13 search appropriate catalogs using TV 2 search program
14 and can transfer the items selected and to a product
15 list in Easel --
16     Q.   Slow down.
17     THE COURT REPORTER:  "Selected," after
18 "selected"?
19     A.   To a product list selected in Easel
20 interface --
21     THE COURT REPORTER:  I'm sorry.
22     Pick up with the "items selected."
23     A.   The distributor purchasing employee can
24 appropriate -- can search appropriate catalogs using
25 TV 2 search program and can transfer the items

133

1 selected to a product list in Easel interface.
2     Resultant list might display for example supplier
3 part numbers, supplier list price product and catalog
4 with access to other fields such as complete
5 description.  Distributor purchasing employee can
6 then either forward the information to CSR customer
7 end-user or customer purchasing employee requested
8 that item or contact the supplier to confirm pricing
9 availability.  Once response from either or both have
10 been obtained --
11     THE COURT REPORTER:  I'm sorry.
12     This is going to be long -- I can get it
13 off of there, but if you just slow down --
14     THE WITNESS:  Okay.  I'm sorry.
15     THE COURT REPORTER:  -- I can get it when
16 you say it.
17     A.   Once response from either or both have
18 been obtained, the distributor purchasing employee
19 can use the item list in Easel to create one or more
20 of the following purchase orders.  Order from the
21 customer to --
22     BY MR. McDONALD:
23     Q.   Can I stop you, Mr. Momyer, because why
24 are you reading this to us right now?
25     Do you remember what the question is

134

1 that's pending?
2     A.   The question was on 1 B.
3     Q.   Okay.  Isn't the host computer 210 the
4 host computer located at the distributor such as
5 Fisher Scientific?
6     MR. ROBERTSON:  Objection, calls for a
7 legal conclusion, mischaracterizes testimony.
8     BY MR. McDONALD:
9     Q.   That's a yes-or-no question, and if you
10 can't say yes or no, let me know, but it's a
11 yes-or-no question.
12     MR. ROBERTSON:  Object to the form of the
13 question.
14     A.   I don't think it -- it necessarily is.
15     BY MR. McDONALD:
16     Q.   Okay.  And in fact in the section you read
17 from, you -- that included column 17, line 65, which
18 specifically says, distributor's, with a capital D,
19 host computer 210.
20     Right?
21     Yes or no?
22     A.   Yes.
23     Q.   And do you see in column 18 where you read
24 from at about line 15, it says:  The customer
25 end-user or customer purchasing employee who

135

1 requested the item, paren, to confirm that the
2 requirement is being met, paren, or contact the
3 supplier to confirm pricing and availability.
4     Do you see that?
5     A.   Yes.
6     Q.   So that does not indicate that there's
7 anything in figure 1 B that would correspond to the
8 supplier's computer, is there -- does it?
9     MR. ROBERTSON:  Objection, calls for a
10 legal conclusion.
11     (Pause.)
12     A.   I would have to -- I would -- looking at
13 this, I would say that depiction would probably
14 indicate that that is a -- in this case, probably
15 talk about Fisher as the host computer.
16     BY MR. McDONALD:
17     Q.   All right.
18     So figure 1 B host computer 210 is the
19 computer at the primary distributor, Fisher, in the
20 typical embodiment at their location.
21     Right?
22     MR. ROBERTSON:  Objection, vague and
23 ambiguous, calls for a legal conclusion, asked and
24 answered.
25     A.   I'm sorry.

136

1      If you just restate that question.
2          (The reporter read the last
3          question.)
4          MR. ROBERTSON:  Same objections.
5      A.  I don't -- when you say, typical
6  embodiment, what -- what do you mean by that?
7          BY MR. McDONALD:
8      Q.  I mean, when -- when Fisher is the one
9  installing the SupplyLink system at a customer.
10         MR. ROBERTSON:  Same objection.
11     A.  Fisher was installing SupplyLink that host
12  computer we were guessing that that would be Fisher's
13  host.  That would be Fisher's.
14         BY MR. McDONALD:
15     Q.  I'm asking, isn't it true that in that
16  configuration where Fisher is the one providing the
17  SupplyLink system for example that host computer 210
18  would be located at Fisher?
19         MR. ROBERTSON:  Same objection, asked and
20  answered.
21     A.  It could be.
22         BY MR. McDONALD:
23     Q.  Well, what else could it be?
24     A.  It could be another host, another --
25  another -- we've talked about what it -- it -- the

137

1  way the system operated was, it could communicate to
2  multiple host computers to get price and available
3  information.
4      Q.  Does figure 1 B show those multiple host
5  computers?
6      A.  I --
7          MR. ROBERTSON:  Objection, asked and
8  answered.
9      A.  Shows one block, but that block could
10  be -- it -- local computer also is -- if you're
11  looking at that, local computer could be multiple --
12         BY MR. McDONALD:
13     Q.  We're not looking at local computer
14  though.
15         MR. ROBERTSON:  Wait.
16     A.  The terminology is more -- more than
17  likely a flat server (phonetic).  There's multiple
18  local computers.
19         BY MR. McDONALD:
20     Q.  Host computer 210 refers to the
21  distributor's host computer singular.
22     Right?
23         MR. ROBERTSON:  Objection, calls for a
24  legal conclusion, asked and answered.
25     A.  Does that imply that there's just one

138

1  distributor?
2          BY MR. McDONALD:
3      Q.  That implies that there's one distributor
4  who has a host computer.
5      There's only one host.
6      Right?
7          MR. ROBERTSON:  Objection, asked and
8  answered.
9          MR. McDONALD:  Really?
10         MR. ROBERTSON:  Multiple times.
11     A.  No.
12     There could be multiple hosts and could be
13  multiple local computers.
14         BY MR. McDONALD:
15     Q.  Where anywhere in this patent do you talk
16  about the possibility that the host computer 210
17  could actually be multiple computers and multiple
18  hosts?
19         MR. ROBERTSON:  Would you read that
20  question back, please.
21         (The reporter read the last
22         question.)
23     A.  Doesn't state anywhere that it couldn't
24  could be, that it isn't.
25         BY MR. McDONALD:

139

1      Q.  That's not my question.
2      Can you answer my question, please?
3      (Pause.)
4          BY MR. McDONALD:
5      Q.  Mr. Momyer, I'll withdraw that question.
6      I'll ask you a little narrower question
7  here so you don't have to read the whole patent.
8      Do you see at the bottom of column 16 of
9  the '683 patent at about line 66, that paragraph
10  starts off with the words as shown in figure 1 B?
11     A.  Which line is that?
12     Q.  Line 66 of column 16.
13     A.  Yes.
14     Q.  And figure 1 B, that's what we've been
15  talking about.
16     A.  Yes.
17     Q.  Right?
18     All right.  So if you look at the rest of
19  the bottom of column 16 up to the top of column 17,
20  you see there a reference to the number 210 in line 2
21  of the column 17?
22     A.  Yes, I see that.
23     Q.  And there in your patent, you describe 210
24  as quote:  Distributor's host computer, quote.
25     Correct?

140

1     A.   Yes.

2     Q.   Now, continuing down column 17, do you see

3   the reference to 210 at line 26 of column 17?

4          Line 26, do you see the number 210 there?

5     A.   Yes, I do.

6     Q.   And there it's called, distributor

7   mainframe 210.

8          Correct?

9     A.   I'm sorry.

10         Which line were you looking at?

11    Q.   Column 17, lines 25 to 26.

12         There 216 is called, distributor, with a

13   capital D, mainframe.

14         Right?

15    A.   Yes.

16    Q.   And the one I first read at line 2 of

17   column 17, the one we already looked at, that one

18   distributor's host computer 210 -- that's also with a

19   capital D.

20         Right?

21    A.   Yes.

22    Q.   And if we go down to line 28 of column 17,

23   there's another reference to 210 in the left side of

24   the column.

25         Right?

141

1          Do you see that?

2     A.   On line 31.

3     Q.   Line 28 or so.

4     A.   Host computer 210.

5     Q.   Right.

6          Do you see that one?

7          And that's called a host computer there.

8          Right?

9     A.   Yes.

10    Q.   And the next reference at line 33 or so,

11   that's called distributor, with a capital D, host

12   computer 210.

13         Right?

14    A.   Yes.

15    Q.   And if we go down to line 54, 210 is

16   referred to as, capital D, distributor's host

17   computer 210.

18         Right?

19         Line 54.

20    A.   Yes.

21    Q.   And then finally, on the second-to-last

22   line in column 17, line 66 -- 65 to 66, it calls 210

23   distributor's, with a capital D, host computer 210.

24         Right?

25    A.   Yes.

142

1     Q.   And in column 18, line 17, where it has

2   the words, quote, contact the supplier to confirm

3   pricing and availability, quote.

4          There's no reference to any -- any number

5   or part corresponding to figure 1 B.

6          Correct?

7     A.   No.

8     Q.   When you say, no, you're agreeing with me

9   that there is no reference to a number there?

10    A.   There is no reference to a number.

11    Q.   Thank you.

12         What other figures other than figure 1 B

13   did you indicate are drawing or figures that in your

14   opinion showed some aspect of the system that was

15   contacting a third-party distributor for pricing or

16   availability information for item type 07 other than

17   figure 1 B?

18    A.   Figure 3.

19    Q.   Which box or boxes in figure 3 --

20    A.   10.

21    Q.   I'm sorry.

22         Let me finish the question.

23    A.   Okay.

24    Q.   Which box or boxes in figure 3 in your

25   opinion relate to the item 07 inquiry by the system

143

1   out to a third-party distributor regarding pricing or

2   availability?

3     A.   Figure 3 would be block 10.

4     Q.   10 is called the host computer.

5          Correct?

6     A.   Yes.

7     Q.   What's the host computer 10 in figure 3 as

8   you understand it?

9     A.   As I understand it, it would be the -- the

10   host that would be supplier that you're trying to

11   source and get pricing from for the product selected.

12    Q.   So in a situation where Fisher supplied

13   the -- a SupplyLink system to a customer location --

14   okay?

15         Are you with me on that scenario?

16         SupplyLink would be a system that

17   implements the system described here in figure 3.

18         Right?

19    A.   Yes.

20    Q.   In that situation, would the host computer

21   be located at Fisher, at the customer, or someplace

22   else?

23         MR. ROBERTSON:  Objection, calls for a

24   legal conclusion.

25    A.   It would be located multi- -- could be

144

1   located other places.  It could be Fisher or it could
2   be at the -- another cust- -- another supplier's
3   location or supplier's data center.
4       BY MR. McDONALD:
5       Q.   So in the case where Fisher installed a
6   SupplyLink system at a customer, they would -- the
7   host computer would actually be located at some other
8   distributor's location?
9       A.   Well, I still contend that that's --
10  that's -- that host computer block is multiple host.
11      Q.   Please answer my question.
12      MR. McDONALD:  Could you read it back,
13  please.
14          (The reporter read the last
15          question.)
16      MR. ROBERTSON:  Objection.
17      A.   That's implying that there's one -- saying
18  there's only one host, and I still contend it's --
19  that how we deploy the system, you would have --
20  would have had multi- -- could have had multiple
21  hosts.
22      BY MR. McDONALD:
23      Q.   So in a situation where Fisher installed a
24  SupplyLink system at a customer, would Fisher always
25  have a host computer located at Fisher?

145

1       MR. ROBERTSON:  Objection, calls for a
2   legal conclusion.
3       A.   Would have one of the host comput- --
4   computers, yes.
5       BY MR. McDONALD:
6       Q.   And you're saying there was an option
7   where host computers could also be located at other
8   distributor locations for the SupplyLink system?
9       A.   Yes.
10      Q.   Would the host computer located at other
11  distributors' locations have all the same functions
12  of the host computer located at Fisher --
13      MR. ROBERTSON:  Objection, calls for a
14  legal conclu- --
15      Q.   -- when you install a SupplyLink system at
16  a customer location?
17      MR. ROBERTSON:  Calls for a legal
18  conclusion.
19      A.   It would have to have the ability to
20  return price and availability.
21      BY MR. McDONALD:
22      Q.   Is that all it had to do if it was located
23  at some third-party distributor, that host computer?
24      A.   For inventory sourcing.

146

1       Q.   Tell me all the functions that a host
2   computer had to have if the host computer was located
3   at a third-party distributor in a SupplyLink system.
4       MR. ROBERTSON:  Objection, overly broad,
5   calls for a legal conclusion.
6       A.   I don't know if I can list them all for
7   you right now.
8       BY MR. McDONALD:
9       Q.   What functions would a host computer
10  located at a third-party distributor have to have
11  other than ability to return price and availability
12  information?
13      MR. ROBERTSON:  Same objection.
14      A.   Have to process an order -- have to
15  process an order that was sent to it.
16      BY MR. McDONALD:
17      Q.   Anything else?
18      A.   Price and availability process and order.
19  Those are the 3 things I can think of.
20      Q.   When -- in that scenario that you're
21  describing that it would be host computer located at
22  a third-party distributor control all inventory
23  pricing and requisition operations of Fisher's
24  regularly stocked items?
25      A.   No, it wouldn't -- that's the host

147

1   computer as one of the host computers Fisher -- the
2   Fisher host computer would do that, but we wouldn't
3   necessarily expect the other host computers to -- to
4   do that.
5       Q.   Well, you wouldn't want some third party
6   controlling your --
7       A.   Right.
8       Q.   -- requisition inventory pricing
9   operations, would you?
10      A.   No.
11      Q.   Okay.  Isn't it true that host computer
12  controls all inventory pricing and requisition
13  operations of the distributor's regularly stocked
14  items?
15      MR. ROBERTSON:  Objection, calls for a
16  legal conclusion.
17      THE WITNESS:  Could you repeat the
18  question again?
19          (The reporter read the last
20          question.)
21      MR. ROBERTSON:  Same objection.
22      A.   One of the things that the SupplyLink
23  system would have managed in -- we're talking about
24  local inventory and inventory that's stored.  That's
25  separate and apart from items and products that may

Momyer, Douglas A. - Vol. 2  12/10/2009  12:00:00 PM

148

1   be ordered from the catalog that aren't stocked, such
2   as the broom we talked about.
3          And these would be ordered directly from
4   the catalog, and in the -- in a -- in an
5   environment -- supply -- supply line can -- if you're
6   containing inventory and you're managing inventory,
7   the only inventory that it really would have managed
8   would have been Fisher, but if you're ordering office
9   supplies, you wouldn't necessarily have those office
10  supplies locally.
11         If I'm ordering as a spot buy, then I
12  certainly wouldn't need to be maintaining inventory
13  information.
14  BY MR. McDONALD:
15      Q.  Can you answer my question yes or no or
16  not?
17      A.  I just thought I tried -- just tried to
18  answer your question.
19      Q.  Yes, but I'm just wondering -- it was a
20  yes-or-no question, so I'm -- so can you answer it
21  yes or no or not?
22         MR. ROBERTSON:  Object to the form of the
23  question, asked and answered.
24      A.  What is the question again?
25         MR. McDONALD:  Please read it back.

149

1          (The reporter read the record as
2          follows:
3          "Question:  Okay.  Isn't it true
4          that host computer 10 controls all
5          inventory pricing and requisition
6          operations of the distributor's
7          regularly stocked items?")
8   BY MR. McDONALD:
9       Q.  My question is, can you answer that yes
10  or no or not?
11      A.  I guess it isn't a simple yes or no --
12      Q.  All right.
13      A.  -- meaning I can't.
14      Q.  Turn to column 4 of the '683 patent,
15  please.
16         MR. ROBERTSON:  Dan, I don't want to
17  interrupt your line of questioning, but when you
18  reach a convenient stopping point, if we could take a
19  short break.
20         MR. McDONALD:  Sure.
21         Just a couple more minutes, I think.
22  BY MR. McDONALD:
23      Q.  Do you have column 4 before you,
24  Mr. Momyer?
25      A.  M-hm, yes I do.

150

1       Q.  Can you turn to the bottom of that column
2   to about line 63 or so.
3          Do you see the line that says, quote:
4   Host computer 10 controls all inventory, pricing, and
5   requisitioning operations of the distributor's, with
6   a capital D, regularly stocked items using host
7   pricing and inventory databases 11, quote.
8          Do you see that sentence?
9       A.  Yes, I do.
10      Q.  Is that sentence in your patent accurate?
11      A.  If the products we're managing are Fisher
12  products in inventory or managing -- yes.
13      Q.  The sentence is accurate.
14      Right?
15      A.  Yes, yes, it is.
16      Q.  Okay.  Is there anything in figure 3 of
17  the '683 patent -- now if we can turn to figure 3 --
18  that shows specifically any sort of whether it's a
19  computer or some other functionality located at a
20  third-party distributor?
21         MR. ROBERTSON:  Objection, calls for a
22  legal conclusion.
23      A.  I can't answer that because I -- the --
24  the question forces me to make a conclusion that I --
25  I don't -- I don't agree with, conclusion being, I

151

1   said, I think there's nothing there that doesn't tell
2   me that it doesn't -- isn't interacting with a third
3   party.
4   BY MR. McDONALD:
5       Q.  I'm trying to ask you a different question
6   that doesn't assume anything.
7          I'm just asking, is there anything in
8   figure 3 of your patent that specifically shows some
9   box or functionality that would be located at a
10  third-party distributor?
11         (Pause.)
12      A.  The purchase order routing 07 indicates
13  that delivery of a purchase order to an 07 product
14  type to a host computer, which I think says can be
15  delivered directly to a -- another distributor.
16         BY MR. McDONALD:
17      Q.  So you think host computer 10 could be
18  located at a third-party distributor in figure 3?
19      A.  Yes.
20      Q.  Are there any boxes other than host
21  computer 10 that in your opinion could be located at
22  a third-party distributor?
23      A.  18- -- 118.
24      Q.  That's the box entitled, print, mail, fax
25  purchase orders?

152

1    A.   Yes.
2    Q.   What's your understanding as to what
3    functionality is described by block 118?
4    A.   That is the -- the component actually
5    delivers the order, purchase order to -- directly to
6    the supplier.
7    Q.   So that system that would deliver the
8    order to the supplier, that would not be located at a
9    third-party distributor, would it?
10   A.   If it's sent -- yes, I -- yes, it would.
11   You're sending electronic communication to
12   process an order, it would go to -- it would go to
13   the -- the computer that would allow you to process
14   the order.
15   Q.   Would the third-party distributor have a
16   system that receives the purchase order or actually
17   generates the purchase order?
18   A.   It would receive the purchase order and
19   generate the purchase order.
20   Q.   It would do both?
21   A.   Sure.
22        MR. McDONALD:  All right.  We can take a
23   break.
24        THE WITNESS:  Okay.
25        THE VIDEOGRAPHER:  The time is

153

1    approximately 10:25 AM.  We are going off the video
2    record.  Off the record.
3        (Recess.)
4        THE VIDEOGRAPHER:  The time is
5    approximately 10:40 AM.  We are back on the video
6    record.
7        BY MR. McDONALD:
8    Q.   Mr. Momyer, can I direct your attention
9    again to the '683 patent, at the bottom of column 16,
10   and continuing to the top of 17.
11   I'd like to read a sentence to you there.
12   17 is about halfway through I think.  So at the
13   bottom of column 16 -- do you have column 16 before
14   you now?
15   A.   Yes.
16   Q.   Okay.  Here is the sentence that continues
17   to column 17:  As shown in figure 1 B, the present
18   invention also has application to distributor's
19   regional customer service locations where a large
20   number of CSRs may be placing orders directly on
21   distributor's host computer 210 for thousands of
22   different customers who call in, quote.
23        Do you see that sentence?
24   A.   Yes.
25   Q.   Now, yesterday I think I remember you

154

1    using a phrase something like N-tiered.
2        Do you remember that?
3    A.   Yes.
4        (Discussion off the record.)
5    Q.   Did I use "N-tiered"?
6        BY MR. McDONALD:
7    Q.   Well, did you use the term N in reference
8    to something?
9    A.   I don't recall.  Maybe I did.  I don't
10   remember that I said that.
11   Q.   All right.  Well, have you used the term
12   N-tiered to refer to a system like one of the
13   variations of the electronic sourcing system?
14   A.   Not within -- I don't think within this
15   context of this deposition.  Maybe I did, but I don't
16   recall.
17   Q.   Okay.  Can you spell for us what N-tiered
18   would mean in your vocabulary.
19   A.   N, hyphen, T-I-E-R.
20   Q.   So capital N, hyphen, T-I-E-R?
21   A.   I never use a capital.  I use lowercase.
22   Q.   All right.  So what does N represent in
23   that phrase N tier?
24   A.   More than one, multiple -- multiple
25   numbers.

155

1    Q.   Does the sentence that I just read -- does
2    that relate to an N-tier embodiment of the electronic
3    sourcing system or not?
4    A.   You're looking at figure 1 B?
5    Q.   You can look at whatever you need to --
6    excuse me.
7        I was asking about that specific sentence,
8    but of course you can certainly look at figure 1 B.
9    A.   Well, that's what it's referring to.
10   Q.   Right.
11   A.   1 B does refer to an N-tier environment.
12   Q.   So with N meaning some multiple, what is
13   it that there's a multiple of in the figure 1 B
14   environment?
15   A.   Well, that's really -- the N tier
16   represents the levels that the application would be
17   executing on, so a tier would be a graphical user
18   interface.  A tier would be a server.  A tier would
19   be a host or other -- any other host that are
20   talked -- being talked to.
21        So that's a tier.
22   Q.   The things you listed were various
23   functionalities or components of the system; is that
24   right?
25   A.   Yes.

156

1  Q.   So an N-tier system would be a system that
2  such as the one shown in figure 1 B that would have
3  multiple functionalities or components to it?
4  A.   Across multiple computer equipment
5  processors.
6      (Discussion off the record.)
7      BY MR. McDONALD:
8  Q.   So in figure 1 B, is there a multi or more
9  than one processor shown?
10  A.   There's -- there's a local computer, a
11  server, and a host computer.
12  Q.   Okay.  So the item server 200, host
13  computer 210, and local computer 220, those would be
14  representing at least 3 processors?
15  A.   3 -- 3 tiers, yes.
16  Q.   3 tiers.
17  A.   Yeah.
18  Q.   Okay.  Can you turn to column 4, please,
19  of the '683 patent.  I'd like to direct your
20  attention in column 4 to the paragraph beginning at
21  line 46.
22      First sentence says, quote:  A feature of
23  the present invention is the ability to search
24  multiple catalogs from different suppliers, quote.
25      Do you see that?

157

1  A.  Yes, I do.
2  Q.  And then as you scroll down this
3  paragraph, it does indicate as an example, quote,
4  catalog or catalogs published by a vendor
5  distributor, quote.
6      Do you see that at about lines 48 and 49?
7  A.  Yes.
8  Q.  And in that phrase, the word distributor
9  has a capital D.
10     Right?
11  A.  Yes.
12  Q.  And then if you go down in that same
13  paragraph, beginning at line 56, there's a sentence,
14  quote:  Catalog database 36 can further contain
15  catalogs published by outside suppliers whether other
16  manufacturers or distributors listing such vendors'
17  products --
18  A.  Sorry.
19  A.  Okay.
20  A.  You -- you were line 51, 52?
21  Q.  No.
22     Line 56?
23  A.  56, okay.
24  Q.  Okay.  I'll start over then.
25  A.  Okay.

158

1  Q.   Quote:  Catalog database 36 can further
2  contain catalogs published by outside suppliers,
3  whether other manufacturers or other distributors,
4  listing such vendors' products different from those
5  in the distributors' catalogs.
6      Do you see that sentence?
7  A.  Yes.
8  Q.  In the phrase other distributors, the word
9  D is not capitalized.
10     Right?
11  A.  That's correct.
12  Q.  And then it says, those are different from
13  those in the capital D distributors' catalogs.
14     Do you see that at the end of the
15  paragraph?
16  A.  I see it.  One is a cap and one is a
17  lowercase.
18  Q.  So in your patent, were you trying to
19  communicate that there was one primary distributor
20  with a capital D that was involved with the system,
21  but there could also be other distributors as well?
22     MR. ROBERTSON:  Objection, calls for a
23  legal conclusion.
24  A.  I don't think so.
25     I think that the distributor capital D

159

1  could also refer to multiple distributors.  I --
2      BY MR. McDONALD:
3  Q.  So why is the word distributor capitalized
4  in some uses here in this paragraph?
5  A.  I don't know other than it's -- I don't
6  know.  I don't know why the one would not be
7  capitalized.
8  Q.  So do you think it's a fair reading or not
9  a fair reading that the D -- capital D distributor is
10  the distributor who is hosting the host computer
11  whereas other distributors with a small D are ones
12  that at least in some embodiments wouldn't have a
13  host computer?
14     MR. ROBERTSON:  Objection, calls for a
15  legal conclusion.
16  A.  It could also mean that -- it could
17  identify that the -- that distributor, there are
18  multiple distributors who have multiple hosts who
19  have -- and so --
20     BY MR. McDONALD:
21  Q.  I'm not asking what it could also mean.
22     MR. McDONALD:  Could you read my question
23  back, please.
24     (The reporter read the next-to-last
25  question.)

160

1    MR. ROBERTSON:  Objection, vague and
2  ambiguous and calls for a legal conclusion and asked
3  and answered.
4    A.  I guess it would be an unfair reading
5  then, because if -- if you're saying that there's --
6  that this is implying that there's a single
7  distributor, D -- capital D refers to a single
8  distributor that's connected to a single host, then I
9  guess that would be unfair reading.
10    BY MR. McDONALD:
11    Q.  Unfair?
12    A.  Yeah.
13    Q.  Are there any figures in this '683 patent
14  that are flow charts describing how a purchase order
15  is generated?
16    A.  Figure 3 does take a flow from -- in
17  sequence out to a purchase order.
18    Q.  But it doesn't actually show how a
19  purchase order is generated by the system, does it?
20    A.  There are -- that particular one doesn't
21  go all the -- all the steps involved.  There are --
22  there are numerous cases I think within the patent
23  itself.
24    Q.  Okay.  But in your RIMS patent -- do you
25  have the '989 patent handy?

161

1    A.  Yes.
2    Q.  And in -- in column 2 of the RIMS '989
3  patent, it describes the drawings.
4    Correct?
5    A.  Under, brief description of the drawings?
6    Q.  Yes.
7    A.  Yes.
8    Q.  And there, do you see at about line 52 of
9  column 2, it says, quote -- in the RIMS patent now --
10  figures 5 A and 5 B are flow charts describing
11  programs employed by an embodiment of the system of
12  the present invention to accept a sourced
13  requisition, quote.
14    Do you see that?
15    A.  Yes.
16    Q.  And if you turn to 5 A and 5 B, those are
17  both in the RIMS patent flow charts that describe
18  steps that include creating and printing purchase
19  orders.
20    Right?
21    A.  Yes.
22    Q.  Is there a reason -- there aren't any flow
23  charts like figures 5 A or 5 B in the '683 patent,
24  are there?
25    A.  Those -- no, I didn't see flow charts.

162

1    Q.  Was there a reason why you didn't
2  create -- produce or -- I'll withdraw that.
3    Is there a reason why the '683 patent does
4  not have any flow charts relating to the purchase
5  order creation process like you had in figures 5 A
6  and 5 B of the RIMS patent?
7    MR. ROBERTSON:  Objection, calls for a
8  legal conclusion.
9    A.  I really can't -- I didn't -- I didn't
10  compose the patent.
11    I contributed to get information, but as
12  far as putting the patent together and what was
13  required for the patent, that was done -- that was
14  our patent attorney did that.
15    Q.  Do you have an understanding as to why the
16  flow charts were included in the RIMS patent, figures
17  5 A and 5 B?
18    A.  No.
19    MR. ROBERTSON:  Objection, calls for a
20  legal conclusion.
21    A.  No.
22    BY MR. McDONALD:
23    Q.  Do you think the flow charts in the RIMS
24  patent at least help on -- help somebody reading the
25  patent to understand the process of creating and

163

1  printing purchase orders in the RIMS system?
2    MR. ROBERTSON:  Objection, vague and
3  ambiguous and calls for a legal conclusion.
4    A.  I think that -- that they're helpful to
5  some people who can interpret things graphically,
6  but -- they can be helpful to some people.
7    BY MR. McDONALD:
8    Q.  Can you turn to the '683 patent now to
9  column 2.
10    Do you see there the heading, summary of
11  the invention, at line 45?
12    A.  Yes.
13    Q.  And you reviewed this summary of the
14  invention at the time the application was being
15  prepared before it was sent to the Patent Office.
16    Right?
17    A.  Yes.
18    Q.  Did you have any involvement specifically
19  in drafting up the summary of the invention?
20    A.  No --
21    Q.  Did you --
22    A.  -- other than describing how things
23  worked.  I didn't -- I didn't do any of the wording
24  of --
25    Q.  Okay.  You did review and approve the

Momyer, Douglas A. - Vol. 2  12/10/2009  12:00:00 PM

---

164

1  wording though that somebody else wrote?
2  A.  I did review it, yes.
3  Q.  Who actually wrote that?
4  A.  It was Alan Dornberg, who was Fisher's
5  corporate attorney, and I believe he had also
6  contracted with a patent firm to pull together.
7  Q.  Do you know where Alan Dornberg is now?
8  A.  The last I was aware, he still worked at
9  Fisher, but that would have been a year ago.
10  Q.  Now, the first paragraph under the summary
11  of the invention, I'll give you a chance to review
12  that.  I won't read the whole thing.
13  My question to you is that -- that first
14  paragraph, it describes an object of the invention.
15  Right?
16  A.  An "object" being?
17  Q.  Well, that's the word that -- that you use
18  in your patent there at about line 46 right where it
19  says --
20  A.  Oh, I'm sorry.
21  Q.  -- in view of the foregoing, it is an
22  object of this invention to.
23  And then I'll end the quote there.
24  It goes on from there.
25  Right?

---

165

1  A.  You got ahead of me there.
2  Q.  Okay.
3  A.  You want me to read through just the first
4  paragraph?
5  Q.  Well, sure.  You can at least read it to
6  yourself here.
7  A.  Okay.  I was (phonetic) going to read it
8  out loud.
9  Q.  Okay.
10  (Pause.)
11  A.  Okay.  I've read the first -- first
12  paragraph.
13  BY MR. McDONALD:
14  Q.  Okay.  That first paragraph describes one
15  object of the invention; is that right?
16  A.  Yes.
17  Q.  What is your understanding as to what the
18  word object means there?
19  Is that like a goal or a purpose?
20  A.  Yes.
21  Q.  In that -- in that first paragraph, does
22  it describe a system that has the capability of
23  searching a database relating to items available from
24  at least 2 vendor product catalogs and the capability
25  of transferring the product information for desired

---

166

1  catalog items obtained as a result of the search to a
2  requisition and purchasing system?
3  (Pause.)
4  A.  You're talking just within that first
5  paragraph.
6  BY MR. McDONALD:
7  Q.  That's right.
8  A.  I didn't -- I didn't see anything with
9  that -- I didn't see any reference to electronic
10  catalogs there.
11  Q.  Oh, I don't know that I used the word
12  electronic catalogs.
13  But if you understand my question as not
14  limited to electronic catalogs, was it accurate?
15  (Pause.)
16  A.  I don't see a reference to searching.
17  BY MR. McDONALD:
18  Q.  In that first paragraph?
19  A.  Yeah.
20  Q.  Do you see in line 49 where it says,
21  capability of searching a database?
22  A.  That's the second paragraph.
23  Q.  Under the summary of the invention, the
24  first paragraph begins at line 46.
25  Right?

---

167

1  A.  Oh, I'm sorry.
2  Excuse me.
3  I was reading the column 1.
4  Excuse me.
5  Background invention.
6  Q.  It will help if we get over to column 2,
7  then.
8  A.  Oh.  Apologize.
9  Let me read that quickly, then.
10  (Pause.)
11  A.  Yes, I do see that.
12  BY MR. McDONALD:
13  Q.  The first paragraph describing an object
14  of the invention under the summary of the invention,
15  as I understand it, you're describing a system that
16  transfers the results of the search to a requisition
17  and purchasing system.
18  Correct?
19  MR. ROBERTSON:  Objection, calls for a
20  legal conclusion.
21  (Pause.)
22  A.  Yes.
23  It looks like it passes it -- the
24  information to a requisition system.  That system of
25  course would be part of the application that we

---

Momyer, Douglas A. - Vol. 2  12/10/2009  12:00:00 PM

168

1    developed.
2        BY MR. McDONALD:
3        Q.   So with respect to that specific
4    paragraph, do I understand right that the searching
5    capability is something that happens outside the
6    requisition purchasing system?
7        MR. ROBERTSON: Objection, calls for a
8    legal conclusion.
9        A.   That's not how I would characterize how
10   the system worked.
11       BY MR. McDONALD:
12       Q.   But this paragraph, that's what this
13   paragraph was communicating, isn't it?
14       MR. ROBERTSON:  Objection,
15   mischaracterizes the testimony.
16       (Pause.)
17       A.   The -- the electronic catalog component
18   is -- is not a separate system.
19       BY MR. McDONALD:
20       Q.   Well, do you think it's fair to say that
21   part of the object of your invention described in
22   these patents was to have, quote, a capability of
23   transferring the product information for desired
24   catalog items obtained as a result of the search to a
25   requisition purchasing system for use in generating a

169

1    requisition including entries for the desired catalog
2    items, quote, as it states in that paragraph?
3        MR. ROBERTSON:  Objection, asked and
4    answered.
5        A.   If -- if you look at other object further
6    down, it's also an object -- objective of the
7    invention to provide an electronic sourcing system
8    capable of creating an order, list including catalog
9    and located as a result of such database or list to
10   a --
11       THE COURT REPORTER:  I'm sorry.
12       I can't understand you.
13       THE WITNESS:  I'm sorry.
14       I'm just --
15       BY MR. McDONALD:
16       Q.   You either have to, you know, say it clear
17   or don't say it all.  Otherwise we can't get it down.
18       A.   Okay.  I -- this -- this patent wasn't
19   just about creating an electronic catalog with
20   searching capabilities.
21       It was about creating a comprehensive
22   system that will allow you to search, find the
23   product, and then pass it through into requisition --
24   process the requisition and then transmit and send it
25   in as an order.  That's -- that's what the system was

170

1    that we developed.
2        Q.   Part of the system that you just described
3    involved taking the results of a search and
4    transferring or transmitting that information to the
5    requisition and purchasing system.
6        Right?
7        A.   Yes.
8        Q.   You do consider that to be part of your
9    invention?
10       A.   Yes.
11       Q.   As that's described -- it sounds like the
12   searching part of the system is something separate
13   from the requisition and purchasing system; is that
14   right?
15       MR. ROBERTSON:  Objection, calls for a
16   legal conclusion.
17       A.   I don't -- I don't necessarily think
18   that's so.
19       It would be like a module in a -- in an
20   application.  You could describe what a module does,
21   and one module would do your searching, another
22   module will do your processing order.
23       BY MR. McDONALD:
24       Q.   Okay.  So --
25       A.   Those modules all come together to create

171

1    a system.
2        Q.   Okay.
3        A.   And they don't work independent.
4        Q.   So do you think it's more accurate to say
5    that the invention described in the patents has a --
6    some sort of a search module that transfers or
7    transmits search-related information to a requisition
8    purchasing module?
9        MR. ROBERTSON:  Objection, vague and
10   ambiguous and calls for a legal conclusion.
11       A.   It has a searching component, which --
12       BY MR. McDONALD:
13       Q.   Can you answer my question, though, the
14   way I worded it?
15       I mean, do you think that's an accurate
16   statement or not?
17       A.   Okay.
18       THE WITNESS:  I'm going to ask you to read
19   it to me again.
20       (The reporter read the next-to-last
21   question.)
22       A.   Did -- right.  I think that makes sense.
23       BY MR. McDONALD:
24       Q.   That's consistent with paragraph 1 of the
25   summary of the invention in your opinion; is that

Momyer, Douglas A. - Vol. 2  12/10/2009  12:00:00 PM

172

1   right?
2       A.   How you stated that, yes.
3       Q.   Yeah.
4           And the second paragraph talks about,
5   quote, bidirectionally transferring information
6   between a requisition purchasing system that may use
7   the results of a search of such product information
8   and a means for searching large volumes of product
9   information such as would be included in a vendor
10  product catalog.
11          Do you see that?
12      A.   Yes, I do.
13      Q.   All right.  So do you think that's again
14  talking about in this case communication between a
15  searching module and a requisition purchasing module
16  that can go in both directions?
17      A.   Yes.
18      MR. ROBERTSON:  Objection.
19      THE WITNESS:  I'm sorry.
20      A.   Yes.
21      BY MR. McDONALD:
22      Q.   If we look at the third paragraph there at
23  the bottom of page -- or column 2, about the third
24  paragraph of the summary of the invention, at the
25  very last line on column 2 talks about and -- quote:

173

1   And transferring that order list to a requisition
2   purchasing system for generating a requisition
3   including entries for the desired catalog items,
4   quote.
5           Do you see that language?
6       A.   Yes, I do.
7       Q.   So is it true that this third paragraph in
8   the summary of the invention describing a further
9   object of the invention also describes this ability
10  to communicate information from a searching module,
11  namely an order list, to the -- to a requisition
12  purchasing module?
13      MR. ROBERTSON:  Objection, calls for a
14  legal conclusion.
15      A.   That's how I would interpret it, yes.
16      BY MR. McDONALD:
17      Q.   Now, the searching that is described in
18  your electronic sourcing patents -- I'd like to talk
19  about that for a moment.
20          Have you used Word software on your
21  computer to generate documents?
22      A.   Yes.
23      Q.   And now when you have a document up on
24  your computer screen in Word, you have a find
25  function up there as one of your options.

174

1       Right?
2       A.   Yes.
3       Q.   You can type in the word Momyer, and it
4   will go to the words in that document that match up
5   with Momyer.
6       Right?
7       A.   Yes.
8       Q.   Do you consider that type of find
9   functionality such as you would see on a Word
10  document to be something -- is the same as the
11  searching that you're talking about in your 3
12  electronic sourcing patents?
13      MR. ROBERTSON:  Objection, calls for a
14  legal conclusion.
15      A.   No.
16      I think -- I don't -- I think it -- it --
17  that search did do a text search, but also had the
18  ability to do some groupings and some -- for example,
19  selecting certain catalogs, certain vendors that you
20  wanted to search that would be a little bit more
21  complicated -- would be more complicated than just a
22  text search.
23      BY MR. McDONALD:
24      Q.   So the searching in your patents would
25  involve generating some sort of a list of hits that

175

1   are responsive to the search request?
2       A.   Yes.
3       Q.   And the find function I described for
4   Word, that doesn't actually generate a list of hits,
5   does it?
6       A.   No.
7       It just walks you through where -- where
8   you found it.
9       Q.   Do you think that's an important
10  distinction from a functionality or a user
11  standpoint?
12      MR. ROBERTSON:  Objection, vague and ambiguous.
13      A.   Well, certainly you need to be able to
14  look at all the products that you may have recovered
15  from the search.  It may help you do some additional
16  compar-- do some comparisons before you actually
17  look at the individual product itself.
18      BY MR. McDONALD:
19      Q.   So that would be a benefit of getting a
20  whole hit list back as opposed to just doing the
21  scrolling through and finding individual --
22      A.   Yes.
23      Q.   -- matches?
24      I'd like to turn now to your interactions,

Momyer, Douglas A. - Vol. 2  12/10/2009  12:00:00 PM

---

176

1  the feedback you got from customers as to what they
2  wanted in terms of requisitioning or sourcing
3  systems.
4       Is it true that some customers have asked
5  Fisher to manage their consumable products other than
6  Fisher products?
7       MR. ROBERTSON: Objection, vague and
8  ambiguous.
9    A.   When Fisher began its integrated supply
10  for -- we probably would have had some additional
11  products other than Fisher products in -- in the
12  inventory.
13       BY MR. McDONALD:
14    Q.   Okay.  That's helpful.
15       My question is specifically, is it your
16  understanding that customers or potential customers
17  were actually asking for Fisher to provide them an
18  ability to manage other consumables like office
19  supplies or electrical components that Fisher didn't
20  supply itself?
21       MR. ROBERTSON: Objection, vague and
22  ambiguous.
23    A.   I -- I never interacted with the customer
24  that asked for that, so I can't tell you that they --
25  a customer actually asked for --

---

178

1    A.   Okay.  Okay.
2    Q.   On page 54, do you see there, you were
3  asked a question and then you give an answer that is
4  an answer that goes from page 54 to page 55?
5    A.   Right.
6    Q.   Feel free to read the entirety of this
7  question and answer when you answer my question, but
8  I'd like to direct your attention specifically to a
9  couple sentences of this.
10       Quote:  One of the things that was
11  happening at that point in time was that Fisher was
12  being asked to take over more than just managing lab
13  supplies.  They were being asked to go in and start
14  taking over managing other types of consumables like
15  office supplies, electrical components, taking on
16  more of an integrated supplier-type role.  And that
17  was something we were being asked to do, quote.
18       Do you see that?
19    A.   Yes.
20       Can I respond to that?
21       That's -- that's correct.
22    Q.   Okay.
23    A.   The question you asked me is, the customer
24  asked me.  And I'm -- I'm -- that was what I was
25  being told by people the customers were asking for.

---

177

1       MR. McDONALD:  Mark that as the next
2  exhibit.
3       (Lawson Exhibit No. 12
4        was marked for
5        identification.)
6       (Discussion off the record.)
7       BY MR. McDONALD:
8    Q.   Now, Mr. Momyer, you've been handed what's
9  been marked exhibit 12.
10       Do you recall giving a deposition back in
11  2004 relating to these patents?
12    A.  Yes, I do.
13    Q.   And at that deposition, did you swear to
14  tell the truth?
15    A.  Yes.
16    Q.   And did you tell the truth?
17    A.  Yes.
18    Q.   Can I direct your attention to page 54 of
19  this exhibit 12, which is a transcript of that
20  deposition?
21       By the way, when I say, 54, I mean the
22  little number.  Each page has got 4 pages on it.
23    A.   Oh, okay.
24    Q.   So it should only be about 13 or 14 pages
25  in.

---

179

1    Q.   Okay.  So you didn't have the direct
2  feedback, but the people at Fisher working with you
3  had said they were getting that feedback?
4    A.   Yes, and I had mentioned the integrated
5  supply.  I also mentioned it there.
6    Q.   And what is integrated supply again?
7    A.   It's a process of managing for a customer
8  the procurement effort of multiple commodity groups
9  such as lab supplies, office supplies, electric
10  supplies, so you were responsible for the procurement
11  of those products and possibly the storage of those
12  products and managing the inventory.
13    Q.   Is it your understanding that one of the
14  purposes of the electronic sourcing technology that
15  Fisher did develop that's the subject of the 3
16  patents was to give these customers what they asked
17  for?
18       MR. ROBERTSON: Objection, calls for a
19  legal conclusion, calls for speculation.
20    A.   The -- to my -- I just want to read that
21  response.
22       BY MR. McDONALD:
23    Q.   Well, I'd like to ask your current
24  recollection first, and then --
25    A.   Okay.

---

Momyer, Douglas A. - Vol. 2  12/10/2009  12:00:00 PM

180

1    Q.    answer it as best you can, and then if
2    you'd like to look at your --
3    A.    Okay.
4    Q.    -- response, we can do that next.
5    A.    It's my -- the real driving force was
6    primarily the need to -- to manage this concept of
7    integrated supply.  That was the -- my belief was the
8    primary reason that we're moving into SupplyLink, was
9    a need for us to start managing multiple commodity
10   groups.
11   Q.    And the integrated supply need was a need
12   that Fisher identified as a result of getting
13   feedback from customers.
14   Right?
15   MR. ROBERTSON:  Objection,
16   mischaracterizes testimony.
17   A.    That would be speculation, but, yes, I
18   would assume that -- customers certainly contributed
19   to that, but was also I think recognized that
20   there were some benefits to -- to that internally as
21   far as another business venture.
22   BY MR. McDONALD:
23   Q.    Fisher identified a business opportunity
24   within integrated supply based on -- at least in part
25   on that customer feedback.

181

1    Right?
2    A.    Yes.
3    Q.    And some -- some of the customers that had
4    asked for integrated supplier capability included
5    Merck Pharmaceutical, Dow, Monsanto.
6    Correct?
7    A.    I'm sorry.
8    Yes.
9    Q.    Those are some pretty big customers.
10   Right?
11   A.    Yes.
12   Q.    So if you could satisfy their needs,
13   you're probably doing something good for Fisher.
14   Right?
15   A.    Yes.
16   MR. McDONALD:  I have no further
17   questions.
18   Thank you.
19   MR. ROBERTSON:  Yeah.
20   Just take a short recess, and then I'll
21   see if I have any.
22   MR. McDONALD:  Okay.
23   THE VIDEOGRAPHER:  The time is
24   approximately 11:22 AM.  We are going off the video
25   record.  Off the record.

182

1    (Recess.)
2    THE VIDEOGRAPHER:  The time is
3    approximately 11:30 AM.  We are back on the video
4    record.
5
6    EXAMINATION BY COUNSEL FOR PLAINTIFF
7    BY MR. ROBERTSON:
8    Q.    Mr. Momyer, do you have exhibit number 7,
9    which is the '989 patent, in front of you?
10   A.    Yes, I do.
11   Q.    And can you turn to figure 5 A for me,
12   sir.
13   It would probably help at the same time if
14   you put your '683 patent side by side.  I have some
15   questions about both.
16   Do you recall Mr. McDonald asked you some
17   questions about figure 5 A, which I think I
18   characterized as the purchase order flow process?
19   A.    Yes, I do.
20   Q.    Okay.  And he asked you if any similar
21   type of purchase order flow chart appeared -- and I
22   think he used the '683 patent as an example -- but
23   you understand all 3 patents have the same
24   disclosure, the same written description?
25   A.    Yes, I do.

183

1    Q.    Okay.  And I think if I recall your
2    testimony, you indicated that you didn't see a
3    similar flow chart like figure 5 A in the '683
4    patent; is that right?
5    A.    Right.
6    I did not see that particular flow chart
7    in '683.
8    Q.    Okay.  Let me direct you to column 1 of
9    the '683 patent, specifically the second paragraph
10   begins, there are a number.
11   A.    Which -- which?
12   Q.    Second full paragraph under the background
13   of the invention.
14   A.    There are a number of known requisition
15   purchasing systems?
16   Q.    Yeah.
17   Let me read it for you.  I'll read it
18   slowly.
19   A.    Sorry.
20   Q.    It states there in column 1 of the '683
21   patent beginning about line 11, I believe:  There are
22   a number of known requisition, slash, purchasing
23   systems that manage and process requisitions and
24   purchase orders.  One such system is the Fisher
25   Scientific requisition and inventory management

Momyer, Douglas A. - Vol. 2  12/10/2009  12:00:00 PM

184

1  system, open parenthesis, quote, Fisher RIMS, close
2  quote, close parenthesis, described in the United
3  States patent number 5,712,989 filed April 2, 1993,
4  and disclosure of which is incorporated herein by
5  reference.
6        Did I read that correctly?
7  A.   Yes.
8  Q.   Okay.  I'm not going to ask you what the
9  legal significance of that -- because I assume you
10  don't know that -- but do you know what the
11  disclosure of the '989 patent is?
12  A.   Well, from what I would un-- -- kind of
13  reading that through and understand that the -- the
14  patent itself and all the documentation would be
15  included as part of this '683 patent.
16  Q.   You were asked some questions about figure
17  1 B of the '683 patent.
18       Do you recall those?
19  A.   Yes.
20  Q.   Okay.  And I understood you to describe --
21  or that your understanding that figure 1 B could
22  involve I think what you referred to as N-tier
23  technology?
24  A.   That's correct.
25  Q.   Refresh me again on what you meant when

185

1  you used that term with respect to figure 1 B.
2  A.   N-tier architecture represents how an
3  application is deployed.  It can be deployed on
4  multiple levels or multiple computer processors.
5       So the application itself will do some
6  processing on one of multiple tiers.  In this case,
7  we were looking at a 3-tier architecture.
8  Q.   Okay.  And you were asked some questions
9  about box 210 that is labeled, the host computer.
10       Do you recall that?
11  A.   Yes.
12  Q.   And you were also asked about box 220,
13  which is labeled, the local computer.
14       Correct?
15       Is that right?
16  A.   Yes.
17  Q.   Now, do you know if there's anywhere in
18  the patent where notwithstanding that there is only
19  one local computer identified in figure 1 B that
20  there's a description or discussion of the fact that
21  there can be multiple local computers that are part
22  of a networked embodiment?
23  A.   Is there anywhere that there's only one?
24  Q.   No.
25       Is there anywhere where there is a

186

1  description that notwithstanding there's only one box
2  labeled, local computer, in figure 1 B, there's a
3  description that illustrates there can be many
4  local -- I'm sorry -- computers or multiple local
5  computers employed?
6  A.   Yes, I believe there are some places.
7  Q.   Okay.  Let me direct you for example to
8  column 17 of the '683 patent beginning at about line
9  10.
10  A.   Each CSR has a local personal computer?
11  Q.   Yeah.
12       Let me read it so we can get it in the
13  record.
14  A.   I'm sorry.
15  Q.   It says:  Each CSR has a local personal
16  computer 220, having a monitor 222, a keyboard 224,
17  and a printer 226.
18       Do you see that?
19  A.   Yes.
20  Q.   Okay.  Is 220 the local computer that's
21  identified in figure 1 B?
22  A.   220 -- yes.
23  Q.   Okay.  What if anything does that inform
24  you as to whether there could be multiple local
25  computers or just a single local computer in this

187

1  networked environment of figure 1 B?
2  A.   Well, that can -- that indicates that
3  there are -- there are multiple local computers in --
4  in a network environment.
5  Q.   Okay.  Is that consistent with your
6  understanding of this N-tier approach to your view of
7  figure 1 B?
8  A.   Yes.
9  Q.   Okay.  Let me direct you to column 18
10  beginning about line 39.
11       Let me know when you catch up with me.
12  I'm going to read it.
13  A.   Okay.
14  Q.   It says:  The number of client, open
15  parenthesis, local, close parenthesis, computers 220
16  and the number and size of catalog databases 236 will
17  help dictate what size file server 200 is required.
18       Do you see that?
19  A.   Yes.
20  Q.   What if anything does that inform you
21  about whether there can be multiple local computers
22  and multiple catalog databases as part of figure 1 B?
23  A.   It indicates that there can be certainly
24  more than one of each of those entities.
25  Q.   Is that consistent with your N-tier

188

1  observation with respect to figure 1 B?
2      A.   Yes.
3      Q.   Okay.  Let me take you back to column 17,
4  which I think is the first full paragraph that
5  begins, normally.
6      Do you see that?
7      A.   Yes, I do.
8      Q.   Okay.  Let me read that portion of that
9  paragraph into the record if I could, see if you can
10  follow along with me.
11      Starts out:  Normally, in section
12  environment, the CSR -- you understand that to be
13  customer service representative?
14      A.   Yes, I do.
15      Q.   -- creates order lists for customers by
16  entering distributor catalog numbers into graphic
17  user interface 254 and connecting to distributor
18  mainframe 210 for price and availability.
19      Are you with me so far?
20      A.   Yes, I am.
21      Q.   Okay.  For this purpose, each local
22  computer is connected to host computer 210 via a
23  phone, slash, data line and either a gateway or a
24  minicomputer acting as a local host.
25      Do you see that?

189

1      A.   Yes, I do.
2      Q.   Okay.  Where it references the host
3  computer 210, does it say there that it is a -- a.
4  quote, a host computer?
5      A.   No, it doesn't.
6      Q.   Once you have been able to create a
7  networked embodiment connecting to a distributor
8  mainframe 210 via a phone line, data line, or a
9  gateway, or minicomputer acting as a local host, what
10  if anything would you understand whether or not that
11  process could be repeated with multiple hosts?
12      A.   Well, it certainly could be with --
13  especially I think with the reference to gateway.
14  Gateways would indicate that there is a connection
15  out to multiple entities.  In this case, it would be
16  host computer.
17      Q.   Would a person of ordinary skill in the
18  art knowledgeable about the subject matter of this
19  patent understand that if one host computer could be
20  networked via a phone or data line or gateway or
21  minicomputer acting as a local host several host
22  computers could be so networked?
23      A.   Yes.
24      Q.   Mr. Momyer, is it your understanding that
25  the electronic sourcing patent, your invention that's

190

1  disclosed in claim -- in the '683, the '516, and the
2  '172 patents -- is simply a combination of the RIMS
3  patent and a TV 2 search engine?
4      A.   No.
5      It's really far from that.
6      Q.   Okay.  Can you tell me what you understand
7  some of the enhancements or additional functionality
8  and capability that your electronic sourcing system
9  patent has over simply putting a RIMS technology
10  together with a TV 2 search engine?
11      MR. McDONALD:  Objection, lack of
12  foundation.
13      BY MR. ROBERTSON:
14      Q.   You can answer.
15      A.   Okay.  The -- we have to consider what the
16  purpose of the electronic sourcing SupplyLink system
17  was in relation to what RIMS was.  And couple things
18  that really had to be added to -- to a RIMS
19  functionality to -- to make it service what func- --
20  SupplyLink was required to do, one big example would
21  be the entry and management of -- of the requisition.
22      If you recall in the RIMS system, the
23  requisition was directly entered by CSR into the
24  system.  And really the purpose of SupplyLink was
25  to -- was to push that process out into the

191

1  customer's hands.
2      So there was a significant amount of
3  development that went into pushing that requisition
4  management out into the customer's hands, which would
5  involve things such as complete development of a
6  graphical interface, which would allow the customer
7  to navigate through the requisition, a workflow that
8  would allow the requisition to pass from the entry
9  point through various approval levels within the
10  customer's site.  That's -- that's the first thing
11  that had to be done.
12      Secondly would be starting to have to deal
13  with multiple suppliers within the environment so the
14  process of trying to source and price to -- to
15  multiple sources or multiple suppliers was a lot of
16  development that had to be done to get that as well
17  as there was a lot of conditioning that had to be
18  done to the various tables to support a requisition
19  that would have multiple -- multiple suppliers and
20  splitting out a requisition into -- into multiple
21  purchase orders directed to different suppliers up
22  through the point of -- of coming up with a new
23  transit -- transit mechanisms to transmit the -- the
24  order out to supplier as well as actually putting it
25  into creating an interior architecture.

192

```
1        The system itself -- the RIMS system
2    was -- was a 2-tier architecture and putting
3    it into a 3-tier architecture also took quite a bit
4    of work to develop an application in -- in that mode.
5        Q.  I'm going to ask you some questions about
6    RIMS if I could.
7        In the RIMS system, could the CSR
8    determine the availability of an item in a
9    third-party supplier's inventory?
10       A.  No.
11       Q.  In the RIMS system, could the CSR at the
12   local computer generate purchase orders?
13       A.  No.
14       Q.  The RIMS system have catalogs?
15       A.  No.
16       Q.  Did the RIMS system have capabilities of
17   sourcing products from third parties?
18       A.  No, it did not.
19       MR. ROBERTSON:  I have no further
20   questions.
21       MR. McDONALD:  I've got a few more,
22   Mr. Momyer.
23
24
25
```

193

```
1    FURTHER EXAMINATION BY COUNSEL FOR DEFENDANT
2        BY MR. McDONALD:
3        Q.  With respect to the development work you
4    did beyond the RIMS system to get to the electronic
5    sourcing system described by your 3 patents here, you
6    had a list of things that were different.  I just
7    want to go through those with you.
8        One of the things you said is that you
9    came up with a complete graphic user interface for
10   customers.
11       Right?
12       A.  That's correct.
13       Q.  That's not shown anywhere in these 3
14   patents, is it?
15       A.  No, it's not.
16       Q.  Why not?
17       A.  The system that -- we hadn't really
18   developed the system at that point in time.  We were
19   in the process of defining it, and we were using --
20   we were using the RIMS system to define what we were
21   planning on doing.
22       Q.  So at the time you filed for the
23   electronic sourcing patents, you were using still the
24   RIMS interface; is that right?
25       A.  For -- for the purpose of -- of --
```

194

```
1        Q.  Well, let me rephrase the question.
2        At the time you filed your electronic
3    sourcing patents, was the only interface that had
4    been developed at that point the one that was used
5    with the RIMS system?
6        A.  That interface was developed to support
7    multiple systems.
8        Q.  Yes.
9        But if I understood you right, on the day
10   you filed your electronic sourcing patent
11   application, the graphic user interface that you
12   talked about in response to Mr. Robertson's questions
13   did not exist yet; is that correct?
14       A.  That's correct.
15       Q.  Did anything exist at that point regarding
16   an interface on the computer?
17       A.  You mean was there -- was there a system
18   that had -- was interfacing to electronic sourcing
19   or --
20       Q.  Yeah.
21       Did you have some sort of interface for
22   the electronic sourcing product as a preliminary or a
23   version 1 or something as of the time you filed the
24   patent application?
25       A.  The -- yes, we did.
```

195

```
1        Q.  Was it similar to the RIMS interface, or
2    is it something else?
3        A.  Well, the -- some of the documents there
4    are -- would have changed to support the integration
5    between RIMS and electronic cataloging component.
6        Q.  Can you --
7        A.  But --
8        Q.  Excuse me.
9        A.  -- but the -- we had a working model which
10   would have worked from a RIMS system to -- to
11   electronic sourcing -- to electronic catalog.  But --
12       Q.  If I --
13       A.  -- the interface was developed such that
14   it was -- it -- and I think we described it in the
15   patent -- was determined to be able to interface to
16   multiple environments, including SupplyLink
17   environment.
18       Q.  If I understand you right, though, the
19   complete graphic user interface that you described to
20   Mr. Robertson as one of the significant developments
21   beyond RIMS didn't even exist yet at the time you
22   filed for your electronic sourcing patents.
23       Right?
24       MR. ROBERTSON:  Mischaracterizes his
25   testimony.
```

Momyer, Douglas A. - Vol. 2  12/10/2009  12:00:00 PM

196

```
1      A.  It -- it was in design at that point in
2   time.
3          BY MR. McDONALD:
4      Q.  So it wasn't done yet.
5      Right?
6          MR. ROBERTSON:  Objection, vague and
7   ambiguous.
8      A.  Yes, it wasn't done.
9          BY MR. McDONALD:
10     Q.  And is the reason you didn't put it in
11  your patent that it wasn't far enough along?
12         MR. ROBERTSON:  Objection,
13  mischaracterizes the document.
14     A.  I don't know why it honestly wasn't put
15  in.
16         BY MR. McDONALD:
17     Q.  The second point you mention was the
18  ability to deal with multiple suppliers.
19     Right?
20     A.  Yes.
21     Q.  Now, isn't it true that in the RIMS
22  system, it did have the capability of dealing with
23  items such as item type 04, which were third-party
24  items that the distributor ordered?
25     A.  The -- yes.
```

197

```
1          It could deliver -- it could deal with --
2   those were products that Fisher would order.
3      Q.  And isn't it true that the RIMS system
4   also had an item type 05 that it handled, which were
5   third-party items which the customers could order?
6      A.  I don't have any -- I saw it in there, but
7   I really don't recall what the type 05 was for.
8      Q.  When you say you say you saw it in there,
9   you mean you saw it in the RIMS patent --
10     A.  Yes.
11     Q.  -- that was filed in April --
12     A.  Yeah.
13     Q.  -- of '93?
14     A.  Yes.
15     Q.  And as we discussed yesterday, the RIMS
16  system did have the capability of generating at least
17  2 different kinds of purchase orders.
18         Right?
19         MR. ROBERTSON:  Objection,
20  mischaracterizes testimony.
21     A.  It -- RIMS didn't generate the purchase
22  orders.  RIMS shipped the requisition to the host
23  to -- which created the purchase order.
24         BY MR. McDONALD:
25     Q.  The RIMS system facilitated generating at
```

198

```
1   least 2 different kind of purchase orders.
2      Right?
3          MR. ROBERTSON:  Objection, vague and
4   ambiguous.
5      A.  2 different types -- it -- which -- which
6   2 types are you -- are you referring to?
7          BY MR. McDONALD:
8      Q.  Can you refer -- do you have the RIMS
9   patent before you?
10     A.  '989?
11     Q.  Yes.
12     A.  Yeah.
13     Q.  Can you return to figure 5 A.
14     A.  Okay.
15     Q.  5 A shows a branch there including a box
16  336, create and print purchase order internal to
17  customer.
18         Right?
19     A.  336, yes.
20     Q.  And over on the right side, it also has a
21  path that includes, print purchase order
22  acknowledgement at 350.
23         Correct?
24     A.  Right.
25     Q.  And then if you continue to figure 5 B on
```

199

```
1   the next page, you see there, there's a box 366,
2   execute purchase order?
3      A.  Yes.
4      Q.  So wasn't --
5      A.  Where does come from?
6      Q.  So one type of purchase order that the
7   RIMS system generated was an internal purchase order
8   for the customer.
9          Correct?
10         MR. ROBERTSON:  Objection,
11  mischaracterizes the document.
12     A.  We talked at this a long time yesterday.
13         BY MR. McDONALD:
14     Q.  Right.  Yes, we did.
15     A.  And as I stated, it -- I don't believe
16  that it would have been considered a purchase order.
17         It was just creating a printed req, which
18  ultimately someone would take and create a purchase
19  order for.
20     Q.  All right.  So the RIMS system as depicted
21  in the RIMS patent though calls that internal
22  document for a customer a purchase order.
23         Correct?
24     A.  It does call it that, yes.
25     Q.  And isn't it true that the RIMS system for
```

Momyer, Douglas A. - Vol. 2  12/10/2009  12:00:00 PM

<table>
<tr><td valign="top">

**200**

1 third-party products of product type 04 would
2 generate a proposed purchase order?
3     A.  Let's --
4     (Pause.)
5     Q.  It's yes-or-no question, I think,
6 Mr. Momyer.
7     MR. ROBERTSON:  Object to that
8 characterization.
9     A.  I don't -- it would have submitted a
10 purchase order. It would have submitted a req which
11 could have become a purchase order on the -- the
12 Fisher system.
13     BY MR. McDONALD:
14     Q.  Can you turn to column 19 of the RIMS '989
15 patent.
16     A.  Okay.
17     Q.  At column 19 of your RIMS patent, could
18 you turn to the paragraph beginning at line 38, and
19 I'll read some parts of that to you.
20     Quote:  If the product type is 04, host
21 computer 10 --
22     A.  I'm sorry.
23     Q.  Yep.
24     You're in the RIMS patent, column 19.
25     A.  Yeah.

</td><td valign="top">

**202**

1 JIT, Fisher-owned, at the time at which the product
2 was issued.  It would have generated orders for --
3 for customer-owned that Fisher distributed at the
4 point in time that it was replenished, not the time
5 it was requisitioned.
6     Q.  All right.  Now, you mentioned also that
7 development after the RIMS system related to
8 SupplyLink involved conditioning tables for the
9 multisupplier and multipurchase order environment.
10     Is that right?
11     A.  That's correct.
12     Q.  That's not described anywhere in your 3
13 electronic sourcing patents, is it?
14     MR. ROBERTSON:  Objection.
15     BY MR. McDONALD:
16     Q.  Conditioning at tables?
17     MR. ROBERTSON:  Mischaracterizes the
18 document.
19     A.  Sorry.
20     Making changes to the tables?
21     BY MR. McDONALD:
22     Q.  Is that what you meant when you said
23 conditioning tables was part the significant
24 development work required?
25     A.  I think it's implied that if you're adding

</td></tr>
<tr><td valign="top">

**201**

1     And which line?
2     Q.  Line 38.  And I'll start again.
3     Quote:  If the product type is 04 -- do
4 you see that now?
5     A.  Yes, I do.
6     Q.  -- host computer 10 verifies the vendor
7 part number.  If the part number is found, host
8 computer 10 executes the order in step 366 by
9 generating a proposed purchase order to the vendor
10 and creates a data block, including a status code of
11 B, back ordered, for transmission to local computer
12 40, quote.
13     Do you see that?
14     A.  Yes, I do.
15     Q.  Now, that's an accurate statement
16 indicating that the RIMS system for those third-party
17 products of type 04, it would generate proposed
18 purchase orders.
19     Right?
20     A.  Yes.
21     Q.  And isn't it true that the RIMS system
22 also generated purchase orders from products to be
23 purchased from Fisher or the distributor who was
24 hosting the system?
25     A.  It could -- it could generate orders for

</td><td valign="top">

**203**

1 functionality to support a multivendor environment
2 and you're changing how the requisitions are built
3 that there would be some changes that would have to
4 occur.
5     And I think anyone who would read that
6 patent would certainly understand that.
7     Q.  All right.  I have a different question
8 for you.
9     My question is, is there any place in your
10 3 electronic sourcing patents where you describe the
11 conditioning of tables that you told Mr. Robertson
12 was a significant development that you did after
13 RIMS?
14     MR. ROBERTSON:  Objection, asked and
15 answered.
16     BY MR. McDONALD:
17     Q.  You may answer.
18     A.  My answer was, it's -- was implied based
19 upon the changes that were suggested in the system.
20     Q.  Is that expressed anywhere in the 3
21 electronic sourcing patents?
22     A.  If I were reading that, I would -- I would
23 know that I'd have to make changes to tables.
24     Q.  That's not my question Mr. Momyer.  Please
25 listen very carefully to my question.

</td></tr>
</table>

Momyer, Douglas A. - Vol. 2  12/10/2009  12:00:00 PM

**204**

```
1    A.   -- expressed -- (indiscernible).
2         THE COURT REPORTER:  I didn't understand
3    that.
4         THE WITNESS:  I'm sorry.
5         BY MR. McDONALD:
6    Q.   Isn't -- isn't it true that none of your
7    electronic sourcing patents anywhere in them include
8    any express disclosure of the conditioning of tables
9    that you told Mr. Robertson about?
10        MR. ROBERTSON:  Objection, asked and
11   answered.
12   A.   I would say it was expressed by the fact
13   that there were -- how you described changes in
14   processes.
15        BY MR. McDONALD:
16   Q.   How were the tables actually conditioned?
17        What do you mean when you say, the tables
18   are conditioned?
19   A.   Support new data elements that -- that you
20   would need.
21   Q.   Are those new data elements described
22   somewhere as part of a data table in the electronic
23   sourcing patents?
24   A.   Certainly information that was returned
25   back from the electronic catalog would have to be
```

**205**

```
1    considered.
2    Q.   Are those tables -- these are data tables
3    or what?
4    A.   Sure.
5    Q.   Okay.
6    A.   As they came back from the electronic
7    catalogs, they would be stored as part of the
8    requisition.
9    Q.   Are the data tables described anywhere in
10   the electronic sourcing patents?
11   A.   I -- I don't -- if you're asking, is there
12   a table layout somewhere, I didn't -- there is none.
13   Q.   Is there a written description of what the
14   table -- tables look like in the electronic sourcing
15   patents?
16   A.   I -- there is no written description of
17   what the tables look like.
18   Q.   Do you understand that -- I'll withdraw
19   that.
20        Going back now to the '683 patent at
21   columns 17 and 18.
22        With respect to the discussion of the
23   local computers 220, I'd like to direct your
24   attention to column 18, lines 39 to 42, in the
25   sentence there that --
```

**206**

```
1    A.   Column 18?
2    Q.   Yes.
3    A.   Lines --
4    Q.   -- 39 to 42.
5    A.   Okay.
6    Q.   Do you see the sentence that says, quote:
7    The number of client, parenthesis, local,
8    parenthesis, computers -- that's plural -- 220 and
9    the number and size of catalog databases 236 will
10   help dictate what size file server 200 is required?
11        Do you see that sentence?
12   A.   Yes, I do.
13   Q.   That sentence pretty explicitly indicates
14   that the local computer 220 could be multiple
15   computers.
16        Right?
17   A.   Yes.
18   Q.   Are there any statements in column 17 or
19   18 that would indicate that the host computer as
20   opposed to the local computer -- I'll withdraw that.
21        Is there any discussion in column 17 or
22   18 of the host computer 210 in the plural?
23   A.   There's nothing with the plural of host.
24   Q.   And in fact, at column 17, can you turn to
25   that column, please, at lines 25 to 26.
```

**207**

```
1         Do you see there that the 210 is referred
2    to as, quote, the distributor mainframe 210, quote?
3    A.   Yes, I do.
4    Q.   That indicates it's singular, not plural.
5         Right?
6    A.   I don't know.  You could say, the company,
7    and -- and --
8    Q.   How many companies would you be talking
9    about?
10   A.   One company.
11   Q.   Yep.
12        This refers to one device, 210.
13        Right?
14        (Pause.)
15   A.   The -- the sentence after that though
16   indicates to me that there's -- for this purpose each
17   local computer is connected to host computer via
18   phone data line computer gateway or minicomputer
19   acting as local host.
20        That indicates to me that it was certainly
21   a configuration that could be implied there that
22   there's connected to more than one host.
23        BY MR. McDONALD:
24   Q.   Well, the gateway could refer to having
25   multiple local hosts, couldn't it?
```

Momyer, Douglas A. - Vol. 2  12/10/2009  12:00:00 PM

208

1      A.   It could.

2      Q.   Okay.  So a gateway would be very

3   appropriate to refer to in a configuration with

4   multiple local hosts or only -- but only one single

5   mainframe 210.

6        Right?

7      A.   It could.  It certainly could mean -- I

8   think --

9      Q.   But getting back --

10     A.   -- local host.

11     Q.   -- to my question at column 17, line 25,

12   the phrase, quote, the distributor mainframe 210,

13   quote, indicates a singular.

14        Right?

15        MR. ROBERTSON:  Objection, asked and

16   answered.

17     A.   I don't -- I don't necessarily agree with

18   that.

19   BY MR. McDONALD:

20     Q.   Okay.  You were asked by Mr. Robertson

21   about the flow charts relating to the purchase order

22   process.

23        Do you recall that?

24     A.   Yes, I do.

25     Q.   Does the '683 patent have any flow charts

209

1   that describe the capability of generating multiple

2   purchase orders other than the flow charts

3   incorporated by reference from the RIMS patent?

4        MR. ROBERTSON:  Objection, outside the

5   scope of my direct.

6      A.   No, I don't think it does.

7        MR. McDONALD:  I have no further

8   questions.

9        MR. ROBERTSON:  I have a couple followup.

10

11        FURTHER EXAMINATION COUNSEL FOR PLAINTIFF

12   BY MR. ROBERTSON:

13     Q.   You were asked about whether there's any

14   disclosure in the '683 patent of graphical user

15   interface.

16        Do you recall that?

17     A.   Yes.

18     Q.   Okay.  Why don't you take a look at figure

19   1 B in '683, specifically, box 254.  Tell me what it

20   says there.

21     A.   Box 254.

22        Graphical user interface.

23     Q.   Okay.  Why don't you turn to column 17,

24   beginning at the first paragraph.

25        It starts, normally.  It's about line 23.

210

1      A.   Normally?

2      Q.   Yes, let me just read it to you.

3        Normally in such an environment, the CSR

4   creates order lists for customers by entering

5   distributor catalog numbers into graphic user

6   interface 254.

7        Do you see that?

8      A.   Yes.

9      Q.   Okay.  So that's an example of a graphic

10   user interface being described in the '683 patent?

11     A.   Yes.

12     Q.   Okay.  Looking down that same column,

13   beginning at about line 60 -- let me read it to you.

14        The file server 200 in that environment

15   contains TV 2 search program 250 Easel -- all in

16   caps, E-A-S-E-L -- graphical user interface 254 and

17   multiple catalog databases 236 containing catalogs

18   similar to the Fairmont and NIST catalogs described

19   above for the embodiment in figure one A.

20        Do you say that?

21     A.   Yes, I do.

22     Q.   Is that describing an example of a

23   particular Easel graphical user interface?

24     A.   Yes.

25     Q.   Were you familiar with Easel when you were

211

1   at Fisher Scientific?

2      A.   Yes, I was.

3      Q.   Is that a graphical user interface?

4      A.   That is a graphical user interface.

5      Q.   Okay.  Looking at column 18 --

6        MR. McDONALD:  I don't think he finished

7   his answer.

8      A.   It is.  It's a GUI generator.

9   BY MR. ROBERTSON:

10     Q.   GUI generator?

11     A.   Yeah.

12     Q.   Looking at column 18, about line 17 --

13     A.   18?

14     Q.   Column 18, line 17, the sentence that

15   begins, once.

16        Do you see that, once responses?

17     A.   17 -- 18 -- line 17 -- yes.

18     Q.   Let me read it to you.

19        Once responses from either or both have

20   been obtained, the distributor purchasing employee

21   can use the item list in Easel interface 254 to

22   create one or more of the following purchase orders.

23        Did I read that correctly?

24     A.   Yes.

25     Q.   Is that another example of a reference and

212

1  a disclosure to the graphical user interface?
2  A.  Yes.
3  Q.  Okay.  Now, you were asked some questions
4  about whether a distributor when -- when prefaced by
5  the article "the" could mean singular or plural.
6  Do you recall that?
7  A.  Yes.
8  Q.  Okay.  Let's look at those 3 purchase
9  orders that are described there right back in column
10  18 starting about line 21.
11  Do you see there's 1, 2, and 3?
12  A.  Yes.
13  Q.  Are you with me?
14  A.  Yes.
15  Q.  Okay.  Let's leave number 1 aside for now.
16  But one of the purchase orders that can be
17  created described here is an order from the customer
18  to distributor .
19  Do you see that does include the word the?
20  A.  Yes.
21  Q.  And then it says, for a type 07 product.
22  Can you tell us again what you understood
23  a type 07 product to be?
24  A.  It would be an order -- or a product that
25  would be sourced from a -- the catalog for any one of

213

1  whatever supplier is in that catalog.
2  Q.  Did I understand your testimony to be that
3  would be a third-party supplier?
4  A.  Yes.
5  Q.  Okay.  The next number then indicates that
6  another type of purchase order that can be created is
7  an order from the distributor to supplier.
8  Do you see that?
9  A.  Yes.
10  Q.  Okay.  They used "the distributor" in
11  example number 3, but they didn't use "the
12  distributor" in example number 2.
13  Correct?
14  A.  Correct.
15  Q.  And example number 2, if I understand your
16  testimony, was for a distributor that's providing
17  third-party products; is that right?
18  A.  Yes.
19  Q.  Okay.  What if anything does that lead you
20  to believe in the distinction made between the type
21  of purchase orders that are generated for example
22  number 2 as compared to example number 3?
23  A.  3 would be a specific distributor and --
24  Q.  And 2 would be?
25  A.  Any one of a number of distributors.

214

1  Q.  You were asked some -- strike that.
2  I understood on my direct testimony when I
3  asked you whether or not the CSR at the local
4  computer RIMS could generate purchase orders, and you
5  said you didn't understand that to be the case.
6  Do you recall that?
7  A.  Yes.
8  Q.  And then you were asked a number of
9  questions by Mr. McDonald with respect to the
10  generation of a purchase order, and specifically, if
11  you can go back to the '989 patent, he directed you
12  to column 19, beginning about line 38.
13  And he read a section of that paragraph to
14  you.
15  A.  Which column?
16  Q.  It's column 19.
17  A.  Oh, I'm sorry.
18  Line 38.  Okay.
19  Q.  Let's start about line 39.
20  You see, if the part number is found?
21  A.  I'm sorry, Scott.
22  Column 19 --
23  Q.  Column 19 about line 39.
24  A.  If the product type --
25  Q.  If the part number is found.

215

1  A.  Okay.  I see it.
2  Q.  Okay.  Let me read it to you.
3  It says:  If the part number is found,
4  host computer 10 executes the order in step 366 by
5  generating a proposed purchase order to the vendor.
6  Do you see that?
7  A.  Yes.
8  Q.  Okay.  Is that consistent with your
9  understanding that it was the host computer that
10  generates the purchase order and not the CSR at the
11  local RIMS computer?
12  A.  Yes.
13  MR. ROBERTSON:  That's all I have.
14
15  FURTHER EXAMINATION BY COUNSEL FOR DEFENDANT
16  BY MR. McDONALD:
17  Q.  With respect to the graphic user
18  interfaces, Mr. Momyer, none of those references that
19  Mr. Robertson pointed you to actually included a
20  visual depiction of a graphic user interface.
21  Right?
22  A.  That's correct.
23  Q.  And none of them included a written
24  description of what the graphic user interface would
25  actually look like.

Momyer, Douglas A. - Vol. 2  12/10/2009  12:00:00 PM

216

1    Right?
2    A. Yes.
3    Q. Now, in the '989 patent, if you have it
4    handy, can you turn to near the back of that '989
5    RIMS patent --
6    A. The back?
7    Q. Yeah, near column -- beginning of column
8    37.
9    A. Okay.
10    Q. There's a number of tables that start
11    there and continue for about 3 more pages -- 4 more
12    pages -- 5 more pages -- 6 more pages up to column
13    48.
14    Right?
15    A. You want to get -- okay.
16    If you want to start 37, I just want to --
17    A. Yeah.
18    I'm just asking you to generally confirm
19    that from column 37 all the way up to column 48,
20    there's a series of tables listed there.
21    Right?
22    A. Yes.
23    Q. Is it your understanding that at least a
24    number of these tables depict the interface that the
25    user experiences while using the RIMS system?

217

1    A. Yes.
2    Q. Why did you include all of these tables in
3    the RIMS patent depicting the user interface on -- on
4    the computer?
5    A. I didn't -- I don't know. I'm not sure
6    why they were included.
7    Q. Do you think it helped?
8    A. Yes, I think they do help.
9    Q. Do -- they help somebody reading your
10    patent understand how the interface works.
11    Right?
12    A. I think they would, right.
13    Q. You don't have anything like that in your
14    electronic sourcing patents, do you?
15    MR. ROBERTSON: Objection,
16    mischaracterizes the document.
17    A. There are -- there are examples, yes.
18    BY MR. McDONALD:
19    Q. You don't -- I'll rephrase the question.
20    In your electronic sourcing patents, you
21    do have anything like these tables depicting the user
22    interface for the graphic user interface.
23    Right?
24    A. I'd have to -- to take a look at the
25    patent.

218

1    Q. At the '683 patent?
2    A. Yeah.
3    Q. Sure.
4    A. I'm sorry.
5    Some of those depictions -- if you take a
6    look at in particular appendix 3, appendix 4,
7    appendix 5, and really appendix 6 and 8 would --
8    were -- all would have been graphical in nature.
9    And I think -- I'm not sure why they did
10    this, but the -- whoever put these pictures together
11    did not represent them graphically. I don't know why
12    that was --
13    Q. When you say they didn't --
14    A. Because these were really coming out of
15    the -- what would have been considered the shell
16    program.
17    Q. The shell program for the search?
18    A. Yes.
19    Q. Okay.
20    A. These -- these would have been graphical
21    in nature.
22    Q. When you say -- are you -- these were not
23    represented graphically, what do you mean by that?
24    A. You asked was there any -- any screens
25    that were put into this patent that were graphical in

219

1    nature, and I'm saying that those would --
2    wouldn't -- in -- in -- they were developed as
3    graphical programs. From the very beginning, they
4    were graphical in nature.
5    I'm not sure what -- where we got those
6    and how those are represented in there.
7    Q. Okay. But let me just clarify, because
8    it's kind of confusing, what you just said.
9    These are the appendixes at the end of the
10    '683 patent that you're talking about.
11    Right?
12    A. Yes.
13    Q. And some specific ones you called out.
14    Right?
15    Can you give me those numbers again?
16    A. 3, 4, and 5.
17    Q. All right. Do you consider appendixes 3,
18    4, and 5 of the '683 patent to depict graphical user
19    interfaces or not?
20    A. They don't.
21    Q. Okay. And you're not sure why they don't;
22    is that right?
23    A. Yes.
24    Q. What type -- what would -- what would you
25    describe these interfaces as if they're not

Momyer, Douglas A. - Vol. 2  12/10/2009  12:00:00 PM

220

1   graphical?
2       A.   They're formatted text.
3       Q.   How would you describe the interfaces
4   shown in the tables at the back of the RIMS patent?
5       A.   Formatted text.
6       MR. McDONALD:  I have no further
7   questions.
8
9       FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFF
10      BY MR. ROBERTSON:
11      Q.   At the time that you filed your patent
12  application back in August of 1994, were computers
13  well known in your field?
14      A.   My field?
15      MR. McDONALD:  Objection, outside the
16  scope of questioning.
17      A.   Were computers --
18      BY MR. ROBERTSON:
19      Q.   Yes.
20      A.   In my field, yes.
21      Q.   Did you feel the need to explain in your
22  patent how a computer operated?
23      A.   No.
24      Q.   Okay.  In 1994 when you filed your patent
25  application, were graphical user interfaces known?

221

1       A.   Yes.
2       MR. ROBERTSON:  No further questions.
3       MR. McDONALD:  No further questions from
4   me to Mr. Momyer.
5       Thank you.
6       THE VIDEOGRAPHER:  The time is
7   approximately 12:19 PM.  This is the conclusion of
8   the video deposition of Douglas A. Momyer taken on
9   Thursday, December 10th, 2009.  Off the record.
10      (Whereupon, at 12:19 p.m., the taking of
11  the instant deposition ceased.)
12
13
14      _____
15      Signature of the Witness
16  SUBSCRIBED AND SWORN to before me this _____ day of
17  _____, 20_____.
18
19      _____
20      Notary Public
21  My Commission Expires:_____
22
23
24
25

222

1       CERTIFICATE OF COURT REPORTER
2   UNITED STATES OF AMERICA    )
3   DISTRICT OF COLUMBIA        )
4       I, CHERYL A. LORD, the reporter before
5   whom the foregoing deposition was taken, do hereby
6   certify that the witness whose testimony appears in
7   the foregoing deposition was sworn by me; that the
8   testimony of said witness was taken by me in machine
9   shorthand and thereafter transcribed by
10  computer-aided transcription; that said deposition is
11  a true record of the testimony given by said witness;
12  that I am neither counsel for, related to, nor
13  employed by any of the parties to the action in which
14  this deposition was taken; and, further, that I am
15  not a relative or employee of any attorney or counsel
16  employed by the parties hereto, or financially or
17  otherwise interested in the outcome of this action.
18
19
20      _____
21      CHERYL A. LORD
22      Notary Public in and for
23      the District of Columbia
24  My Commission expires April 30, 2011
25

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 9th day of August, 2010, I will electronically file the foregoing

**PLAINTIFF EPLUS'S OBJECTIONS TO DEFENDANT'S DEPOSITION DESIGNATIONS AND SUMMARY OF THE DEPOSITION OF DOUGLAS A. MOMYER AND COUNTER-DESIGNATIONS**

with the Clerk of Court using the CM/ECF system which will then send a notification of such filing (NEF) via email to the following:

Daniel McDonald, *pro hac vice*
William D. Schultz, *pro hac vice*
Rachel C. Hughey, *pro hac vice*
Joshua P. Graham, *pro hac vice*
Andrew Lagatta, *pro hac vice*
Merchant & Gould P.C.
3200 IDS Center
80 South Eighth Street
Minneapolis. MN 55402
Telephone: (612) 332-5300
Facsimile: (612) 332-9081
lawsonscrvicc@)merchantgould.com

Robert A. Angle (VSB# 37691)
Dabney J. Carr, IV (VSB #28679)
Troutman Sanders LLP
P.O. Box 1122
Richmond, VA  23218-1122
Telephone:  (804) 697-1238
Facsimile:  (804) 698-5119
robert.angle@troutmansanders.com
dabney.carr@troutmansanders.com

*Counsel for Defendant Lawson Software, Inc.*

_____/s/_____
David M. Young (VSB #35997)
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4000
Facsimile:  (202) 346-4444
dyoung@goodwinprocter.com