**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | | |
|---|---|---|
| *e*PLUS INC., | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No. 3:09-CV-620 (REP)** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **LAWSON SOFTWARE, INC.,** | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF *e*PLUS INC'S OBJECTIONS TO DEFENDANT'S COUNTER
DEPOSITION DESIGNATIONS, COUNTER-COUNTER DESIGNATIONS AND
<u>REVISED SUMMARY OF THE DEPOSITION OF ROBERT IRWIN</u>**

Plaintiff, *e*Plus, Inc. ("*e*Plus"), through counsel, hereby submits the following specific

objections to Defendant Lawson Software, Inc. ("Lawson")'s Counter-Deposition Designations

of the deposition of Robert Irwin and offers the following counter-counter designations and

revised summary:

<u>**Specific Objections**</u>

| Defendant's Counter Designations | *e*Plus's Objections to Defendant's Counter Designations | *e*Plus's Counter-Counter Designations |
|---|---|---|
| 16:1-12 | 401/402 | |
| 16:25-17:19 | 401/402 | |
| 18:22-19:9 | 106, 602 | 18:13-21 |
| 24:1-3 | 602 | 24:4-14 |
| 28:20-24 | | |
| 40:25-41:4 | | |
| 53:24-54:16 | | |

## Revised Summary

Designated testimony relates to:

Mr. Irwin is the Vice President of Information Systems at Robert Wood Johnson University Hospital ("RWJUH").  (10:14-19)  His responsibilities include selection, implementation, and maintenance of all the information systems at RWJUH.  (10:20-24)

RWJUH entered a contract with Lawson for the Lawson S3 software in August 2008.  (15:13-25)  RWJUH licenses the Lawson Procurement Suite comprising Requisitions, Purchase Order, Inventory Control and Requisitions Self-Service.  (50:3-7; 52:6-53:1)  The implementation of the procurement software began in March 2009 and was completed around November 2009.  (15:13-25; 21:20-25)  Lawson installed the software on behalf of RWJUH.  (47:15-48:16)  Though RWJUH staff actually built the system and decided how the system would function, according to a statement of work between the parties, Lawson was to provide guidance on how to build the system.  (16:13-24; 17:20-18:12; 19:10-20)  This statement of work encompassed the Requisitions, Purchase Order, Inventory Control, and EDI modules, as well as the Requisitions Self-Service application.  (52:6-53:1)  Lawson trained the core group of users at RWJUH.  (18:10-12)  Lawson assisted RWJUH in setting up EDI transactions for two vendors.  (53:2-23)  RWJUH had a materials team for the implementation of the procurement system which included a Lawson employee named Bart Fisher.  (19:10-21:19)  Mr. Fisher provided training to RWJUH personnel, which included training classes and follow-up question-and-answer sessions.  (24:15-25:15)  Lawson also provided training manuals to RWJUH personnel, as well as instructional documents on how to load vendor files and what jobs RWJUH needed to run on a daily basis.  (23:9-15)

After Lawson told RWJUH what data fields were available in the S3 Item Master, RWJUH extracted those data fields from its prior pre-Lawson system known as Matkon.  (25:22-27:1)  The data file was then formatted according to specifications provided by Lawson.  (27:2-14)  The data file was given to a Lawson representative (Mr. Fisher), who loaded the item data into the Lawson system on behalf of RWJUH.  (27:15-28:2)  Following the initial implementation, additional item data has been loaded into the system using Microsoft add-ins.  (28:25-6)  Lawson has provided RWJUH with approximately 10-16 hours of training on using the Microsoft add-ins to load data into the Item Master.  (28:7-30:24)  Lawson provided additional training to the RWJUH materials staff on topics chosen by RWJUH personnel.  (31:1-12)  Lawson has continued to provide assistance to RWJUH in associating S3 Item Master items with vendors, including education of RWJUH staff, review of how the Lawson system is set up and how it functions, and problem resolution.[1]  (72:3-24; 73:1-9)

RWJUH has an annual software maintenance contract with Lawson that covers bug fixes and enhancements.  (28:3-19)  Mr. Irwin contacts Hannah Reilly [sic] at Lawson global support regarding technical issues with the Lawson software.  (32:13-24)

---

[1]     Lawson contends that the word "training" should be substituted for "assistance."  *e*Plus objects that the witness actually said "assistance" and not "training."

According to the license agreement between RWJUH and Lawson, certain restrictions are placed on the use of the licensed software by RWJUH.  (34:1-5; 34:8-14; 34:23-35:7)  Lawson does not permit RWJUH to use third parties to perform installation or hosting of the Lawson software unless that third party is a Lawson partner.  (39:19-40:16)  Lawson does not permit RWJUH to modify the Lawson software except as described in the documentation for the software.  (41:7-41:21)  Lawson does not permit RWJUH to use the licensed software to provide data processing, outsourcing, service bureau, hosting services or training to third parties.  (41:22-42:18)  Lawson does not permit RWJUH to expert the licensed software outside the United States.  (42:19-43:5)

Respectfully submitted,


_____/s/_____
Craig T. Merritt (VSB #20281)
Henry I. Willett, III (VSB #44655)
**CHRISTIAN & BARTON, LLP**
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
Telephone: (804) 697-4100
cmerritt@cblaw.com
hwillett@cblaw.com


Scott L. Robertson (admitted *pro hac vice*)
Jennifer A. Albert (admitted *pro hac vice*)
David M. Young (VSB#35997)
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4000
SRobertson@goodwinprocter.com
JAlbert@goodwinprocter.com
DYoung@goodwinprocter.com


Michael G. Strapp (admitted *pro hac vice*)
James D. Clements (admitted *pro hac vice*)
**GOODWIN PROCTER LLP**
Exchange Place
53 State Street
Boston, MA 02109-2881
Telephone:  (617) 570-1000
MSrapp@goodwinprocter.com
JClements@Goodwinprocter.com


*Attorneys for Plaintiff, ePlus Inc.*


Dated:  August 11, 2010

Irwin, Robert - RW Johnson  3/10/2010  12:00:00 PM

---

**Page 1**

```
 1         IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF VIRGINIA
 2              RICHMOND DIVISION
           CIVIL ACTION NO. 3:09-CV-620 (JRS)
 3
      . - - - - - - - - - - - - - - - - - :
 4   ePLUS, INC.,
      .                : Civil Action
 5        Plaintiff,
      .                : DEPOSITION UPON
 6   vs.               : ORAL EXAMINATION
      .
 7   LAWSON SOFTWARE, INC.,    :   of
      .
 8        Defendant.    : ROBERT G. IRWIN
      . - - - - - - - - - - - - - - - - - :
 9
10         TRANSCRIPT of the Videotaped Deposition of
11   ROBERT G. IRWIN, a Witness, called for Oral
12   Examination by the Plaintiff in the above-entitled
13   action, said deposition being taken pursuant to
14   Federal Rules of Civil Procedure, by and before
15   PATRICIA J. RUSSONIELLO, a Certified Court Reporter
16
17   and Notary Public of the State of New Jersey, at
18
19   the office of ROBERT WOOD JOHNSON UNIVERSITY
20
21   HOSPITAL, 120 Albany Street, New Brunswick, New
22
23   Jersey, on Wednesday, March 10, 2010, commencing at
24
25   1:55 o'clock in the afternoon.
```

**Page 2**

```
 1   A P P E A R A N C E S:
 2      GOODWIN PROCTER LLP
      .     By JAMES D. CLEMENTS, ESQUIRE
 3         53 State Street, Exchange Place
      .    Boston, Massachusetts 02109
 4      Tel: (617) 570-1000  Fax: (617) 523-1231
           Attorneys for Plaintiff
 5
      .    MERCHANT & GOULD P.C.
 6      By JOSHUA P. GRAHAM, ESQUIRE
      .       3200 IDS Center
 7         80 South Eighth Street
           Minneapolis, Minnesota 55402-2215
 8      Tel: (612) 332-5300  Fax: (612) 332-9081
           Attorneys for Defendant
 9
      .    NORRIS, MC LAUGHLIN & MARCUS, P.A.
10      By JAMES J. SHRAGER, ESQUIRE
           731 Route 202-206
11      Bridgewater, New Jersey 08807
           Tel: (908) 722-0700  Fax: (908) 722-0755
12      Attorneys for Deponent
13
14   A L S O  P R E S E N T:
15      Michael Ciliberti, Videographer
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1              I N D E X
 2   WITNESS          DIRECT  CROSS  REDIRECT
 3   ROBERT G. IRWIN
      .    By Mr. Clements      6        71
 4   By Mr. Graham            67
 5
 6           E X H I B I T S
 7   NUMBER        DESCRIPTION        PAGE
 8   RWJ-2  Six-page document, re, Product Order  35
           Form, Lawson Software Customer
 9         Agreement
10   RWJ-3  Six-page document, re, Lawson Software  38
           Customer Agreement, Master Terms and
11         Conditions
12   RWJ-4  Multi-page document, re, Lawson      43
      .    Software Customer Agreement, Master
13         Terms and Conditions
14   RWJ-5  Multi-page document, re, Lawson      46
           Software Customer Agreement, Master
15         Terms and Conditions (draft)
16   RWJ-6  Multi-page document, re, Lawson      49
      .    Software America's, Inc., Statement
17         Of Work
18   RWJ-7  Multi-page document, re, Requisition  55
           Self-Service RSS Training Guide, Lawson
19         Software
20   RWJ-8  Multi-page document, re, Lawson      57
           Implementation Buyer Training Guide
21
      .    RWJ-9  Multi-page document, re, System  59
22         Admin Steps To Adding An Item
23   RWJ-10  Multi-page document, re, Requisition  62
      .       Approval Training Guide
24
25
```

**Page 4**

```
 1         E X H I B I T S (continued)
 2   NUMBER        DESCRIPTION        PAGE
 3   RWJ-11  Multi-page document, re, Procure  64
      .    Design Document For Robert Wood
 4   Johnson University Health
 5   RWJ-12  Lawson S3 demo video (to be marked)  ---
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Irwin, Robert - RW Johnson  3/10/2010  12:00:00 PM

**5**

```
1          THE VIDEOGRAPHER:  Here begins
2    videotape number one in the deposition of Robert
3    Irwin in the matter of ePLUS Incorporated versus
4    Lawson Software in the U.S. District Court for the
5    Eastern District of Virginia, Case Number
6    3:09-CV-620.,
7          Today's date is March 10th, 2010 and
8    the time indicated on the video screen is 1:55 p.m.
9          The video operator today is Mike
10   Ciliberti and this video deposition is taking place
11   at 120 Albany Street, New Brunswick, New Jersey.
12         Counsel, please voice identify
13   yourselves and state whom you represent.
14         MR. CLEMENTS:  This is James Clements
15   from Goodwin Procter representing plaintiff, ePLUS.
16         MR. GRAHAM:  Joshua Graham from
17   Merchant Gould on behalf of the defendant, Lawson
18   Software.
19         MR. SHRAGER:  James J. Shrager, Norris,
20   McLaughlin, Marcus, on behalf of the deponent.
21         THE VIDEOGRAPHER:  The Court reporter
22   today is Patricia Russoniello.
23         Will the reporter please swear in the
24   witness.
25   R O B E R T  G.  I R W I N, having been duly sworn
```

**6**

```
1    by the Notary, testifies as follows:
2          THE VIDEOGRAPHER:  Please begin.
3    DIRECT EXAMINATION BY MR. CLEMENTS:
4          Q.   Mr. Irwin, who is your employer?
5          A.   Robert Wood Johnson University
6    Hospital.
7          Q.   And could you tell me your -- both
8    your home and your work address, please?
9          A.   Home address is 1 Confield Court, Red
10   Bank, New Jersey.  Work is 1 Robert Wood Johnson
11   Place, New Brunswick, New Jersey.
12         Q.   Thanks.
13         Mr. Irwin have you ever been deposed
14   before?
15         A.   No.
16         Q.   Have you attended a deposition before
17   today?
18         A.   No.
19         Q.   Okay.  I think you saw based on the
20   demonstration this morning that I'm going to be
21   referring to a number of documents that we'll be
22   marking as exhibits and I'm going to ask you some
23   questions about them.
24         A.   Okay.
25         Q.   When I ask you questions I need your
```

**7**

```
1    responses to be oral because I can't see from the
2    transcript if you just nod your head or -- or say
3    uh-huh.  Does that make sense?
4          A.   I understand.
5          Q.   Okay.  And if you don't understand a
6    question please say something; otherwise, I'll
7    assume that you understood the question.  Does
8    that --
9          A.   Okay.
10         Q.   -- make sense?
11         Are you representing by counsel
12   today?
13         A.   Yes.
14         Q.   And that would be Mr. Shrager?
15         A.   Yes.
16         Q.   Okay.  And sometimes Mr. Shrager may
17   object to a question but unless he instructs you
18   not to answer then you can go ahead and answer the
19   question after his objection.  Does that make sense?
20         A.   So if he objects I'm still to answer
21   the question?
22         Q.   Yes, unless he --
23         A.   Unless he tells me.
24         Q.   -- instructs you not to answer.
25         A.   Okay.
```

**8**

```
1          Q.   Is there any reason at all why you
2    feel you cannot testify fully and accurately today?
3          A.   No.
4          Q.   Okay.  Are you on any medication?
5          A.   Just my daily meds for...
6          Q.   Okay.
7          A.   You know.
8          Q.   Okay.  And we'll take breaks when you
9    want them.  If there's a question pending I just
10   ask that you answer the question before we go on
11   break.
12         A.   Okay.
13         Q.   Do you have any questions about the
14   procedures today?
15         A.   Nope.
16         Q.   Okay.  All right.  We'll get started
17   then.
18         Okay.  If we could refer back to
19   Exhibit SWJ-1 (sic) and as I explained earlier this
20   is the subpoenas and schedules that were served
21   upon Robert Wood Johnson University Hospital by
22   plaintiff, ePLUS.
23         Mr. Irwin, have you seen this
24   document before?
25         A.   Yes.
```

Irwin, Robert - RW Johnson  3/10/2010  12:00:00 PM

9

1    Q.    And when was that?
2    A.    I would say about three weeks ago.
3    Q.    Okay.  If you could turn to Schedule
4    A of the subpoenas and it's on Page 10 of the
5    attached schedules.
6    A.    Mm'mm.
7    Q.    Okay.  And could you review topics 1
8    through 11 of Schedule A quickly.
9    A.    I've reviewed these.
10   Q.    Okay.  And do you understand that you've
11   been designated to testify regarding these topics?
12   A.    I do.
13   Q.    And you understand that you are
14   providing testimony on behalf of Robert Wood
15   Johnson as if Robert Wood Johnson itself were
16   sitting in the chair and giving testimony?
17   A.    Yes.
18   Q.    Are you prepared to testify on Robert
19   Wood Johnson's behalf with respect to these topics?
20   A.    Yes.
21   Q.    And what did you do to prepare to
22   testify concerning these topics?
23   A.    I reviewed the material that was sent
24   out in this suit and then I reviewed a series of
25   documents to prepare for what was going to be sent

10

1    to you.
2    Q.    Okay.  So you -- I apologize.
3    You reviewed the documents that were
4    sent to me or reviewed an index of the documents?
5    A.    I went through my files, my office
6    files to pull those documents out and as I was
7    pulling them out I was reviewing them.
8    Q.    Okay.  And were the documents that
9    were provided all from your files?
10   A.    No.  There were some from others.
11   Q.    And were you personally responsible
12   for collecting those documents?
13   A.    Yes.
14   Q.    Okay.  Mr. Irwin, what is your
15   current position at Robert Wood Johnson?
16   A.    Vice-president of information systems.
17   Q.    And how long have you held that title?
18   A.    Almost eight years.  Eight years
19   in -- by the end of March.
20   Q.    Okay.  And what -- what are the scope
21   of responsibilities associated with that position?
22   A.    Responsible for all the information
23   systems selection and maintenance and running.
24   Implementation.
25   Q.    What position did you have before you

11

1    became vice-president of information systems?
2    A.    I was a consultant with Price
3    Waterhouse Coopers.
4    Q.    So since you started Robert Wood
5    Johnson your only position has been the
6    vice-president of information systems?
7    A.    Correct.
8    Q.    Okay.  And what did your position at
9    Price Waterhouse Coopers entail?
10   A.    I was a consultant so we did system
11   selection, project management for implementation
12   and strategic IT planning.
13   Q.    And how long did you work there?
14   A.    About five years.
15   Q.    All right.  Mr. Irwin, who's the
16   principal -- excuse me.  Let me start over.
17   Who's the principal person that you
18   interact with on a daily basis in your job here at
19   Robert Wood Johnson?
20   A.    I interact with quite a few different
21   people on a daily basis.
22   We have clinical and financial
23   systems so I interact with the physicians, the
24   nurses for the clinical systems.  I interact with
25   the finance staff, the financial systems, and then

12

1    I have my own staff and the supporting
2    infrastructure; the technicians.
3    Q.    Okay.  And so within your department
4    of information systems who is the person that you
5    report to directly?
6    A.    I report to the CFO.
7    Q.    And --
8    A.    Carl O'Brien.
9    Q.    Okay.  And who reports to you?
10   A.    Brenda Gazinski, the director of
11   clinical systems, Lila Price is the director of
12   financial systems, Ray Tyska is director of
13   operations and then I have a couple of second-tier
14   people that report directly to me.
15   Q.    And who are those two people?
16   A.    Jordan Ruch and Irene Singer and, of
17   course, the -- the secretary, the assistant to the
18   department, Antoinetta Cappiella.
19   Q.    Okay.  Thanks.
20   And how long -- excuse me.
21   How large is the information systems
22   group at Robert Wood Johnson?
23   A.    It's about 70 FTEs.
24   Q.    And you would be the overall head of
25   that group?

Irwin, Robert - RW Johnson  3/10/2010  12:00:00 PM

---

**13**

1    A.   Yes.

2    Q.   Okay.  Mr. Irwin, when did you find

3  out that you would be the designee for Robert Wood

4  Johnson for this deposition?

5    A.   About three weeks ago.

6    Q.   And did you meet with anyone to

7  prepare for the deposition?

8    A.   I met with Jim via telephone.  I

9  reviewed some materials with Manny Matias who was

10  recently here and -- but I can't say really...

11    Q.   Okay.  So no one else besides Mr.

12  Shrager and Mr. Matias --

13    A.   And my associate, Ira Novak.

14    Q.   And so when you met with Mr.

15  Matias --

16    A.   Yes.

17    Q.   -- how many times did you meet with

18  him prior to this deposition?

19    A.   I meet with Manny on a daily basis

20  for the last six weeks for issues concerning the

21  Lawson install so I'm meeting with him regularly

22  working on completing the implementation.

23    Q.   I see.  But not specifically --

24    A.   Not.

25    Q.   -- to discuss the deposition?

---

**14**

1    A.   That's correct.

2    Q.   Okay.  Did you have any meetings that

3  were with Mr. Matias to discuss this deposition

4  specifically?

5    A.   We did have a few conversations.  I

6  would say two or three conversations.

7    Q.   And what was the substance of those

8  conversations?

9    A.   My question to Manny first and

10  foremost is what is Punch-Out because I had no idea

11  what it was.

12    Q.   Okay.  Anything else discussed?

13    A.   Just to prepare him to do the demo.

14    Q.   Okay.  Did you review any

15  documents -- let me -- let me rephrase that.

16    You said earlier that you reviewed

17  the documents that you had collected --

18    A.   Mm'mm.

19    Q.   -- and produced to ePLUS?

20    A.   Yes.

21    Q.   Okay.  Were there any other documents

22  that you reviewed besides the ones that you had

23  collected in preparation for this deposition?

24    A.   There probably were E-mails that I

25  did not send out but after talking to Jim -- when we

---

**15**

1  sent the first batch of documents out which

2  specifically were around the contract and its

3  Statement Of Work, Jim said to me that he didn't

4  think this was complete and so the second time

5  through I just started taking everything out of the

6  mail files that I had.

7    Q.   But there were no other

8  documents besides those --

9    A.   No other document.

10    Q.   -- that you reviewed?

11    A.   I mean, I didn't even give you drafts

12  of the contract negotiations.

13    Q.   Right.  Okay.  All right.  Thanks.

14    All right.  So I understood earlier

15  from the testimony of Mr. Matias that Robert Wood

16  Johnson did an implementation of the Lawson

17  procurement software last year between -- starting

18  in April until about November --

19    A.   Mm'mm.

20    Q.   -- is that correct?

21    A.   That's correct.  We signed the

22  contract with Lawson in August of '08 and there

23  were a series of false starts between August and I

24  would say March so we really kicked off the

25  implementation in March.

---

**16**

1    Q.   I see.  And could you explain what

2  those false starts related to?

3    A.   Mostly around me acquiring the staff

4  to staff the project.

5    Q.   So --

6    A.   I was...

7    Q.   -- you felt you had insufficient

8  staff at the time when the contract was signed to

9  implement --

10    A.   That's correct.

11    Q.   -- the software?

12    A.   That's correct.

13    Q.   Okay.  And could you provide an

14  overview of how that implementation was

15  accomplished?

16    A.   We contracted with Lawson -- first of

17  all, we negated a Statement Of Work which

18  outlined what tasks were Lawson's responsibility

19  and what tasks were the Hospital's responsibility.

20    I hired a subcontractor to be the

21  project manager and we -- we met on a regular basis

22  with the implementation team and we moved through

23  the milestones that were outlined in the Statement

24  Of Work.

25    Q.   So you said that you subcontracted a

---

Irwin, Robert - RW Johnson  3/10/2010  12:00:00 PM

17

1  project manager?
2  A.  Yes.
3  Q.  That was someone outside of Robert
4  Wood Johnson?
5  A.  We brought him on as a per diem
6  employee.
7  Q.  I see.  And it was someone that was
8  also unaffiliated with Lawson?
9  A.  Yes.
10  Q.  What was that person's name?
11  A.  Mitchell Tredwell.
12  Q.  Could you spell the last name, please?
13  A.  T-r-e-d-w-e-l-l.
14  Q.  Okay.  And what company did Mr.
15  Tredwell --
16  A.  He was independent.
17  Q.  -- work for?
18  A.  He reported to me.
19  Q.  Okay.  Thanks.
20  You said that -- that Lawson and
21  Robert Wood Johnson had negotiated a Statement Of
22  Work to outline the responsibilities of Lawson and
23  the hospital respectively.  Is that correct?
24  A.  Correct.
25  Q.  Could you provide an overview of what

18

1  the responsibilities of Robert Wood Johnson were
2  for the implementation and what the responsibilities
3  of Lawson were?
4  A.  Lawson was to provide the software.
5  Robert Wood was to provide the hardware, get the
6  system installed.  Lawson provided guidance on how
7  to build the system.  Robert Wood staff actually
8  built the system and made the final decisions on
9  how the system would function.  And then Robert
10  Wood was responsible for testing.  Lawson trained
11  our core group of users and then our -- our we call
12  them super users trained the staff.
13  Q.  Okay.  So you said that Lawson was
14  responsible for providing the software?
15  A.  Mm'mm.
16  Q.  Does --
17  A.  Yes.
18  Q.  -- that include the installation of
19  the software?
20  A.  Lawson installed the software on the
21  systems.
22  Excuse me.  Traditionally in
23  healthcare the vendor -- vendors usually always
24  install the software.  I do believe in this case
25  Lawson didn't install the software.

19

1  My own staff might have installed the
2  software.
3  The Lawson's Statement Of Work was
4  slightly different than I'm used to.
5  Q.  Okay.  So you're not sure, though,
6  whether --
7  A.  Who actually loaded the software up.
8  Q.  Right.
9  A.  Yeah.
10  Q.  Okay.  And you said that Lawson
11  provided guidance on how to build the system?
12  A.  Yes.
13  Q.  Could you explain what sort of
14  guidance they provided?
15  A.  The various teams would get together
16  and talk about the work flow and how they wanted
17  the system to function and Lawson would explain if
18  you chose these set of parameters, the system would
19  meet that need or if you did it this way, it would
20  work, you know -- it would work different.
21  Q.  So when you talk about the teams
22  associated with the implementation could you
23  describe how each team was composed?
24  A.  Right.  Now, in addition to the
25  applications that Manny discussed this morning, we

20

1  also contracted for payroll and Human Resources so
2  we had a Human Resources team, a payroll team, a
3  general ledger team, a materials team, an accounts
4  payable team, all right?
5  Q.  So the materials team would include
6  the procurement --
7  A.  Yes.
8  Q.  -- system?
9  A.  And they worked closely with the
10  accounts payable team.
11  Q.  I see.  So there was one team
12  associated with materials?
13  A.  That's correct.
14  Q.  And how large was that team?
15  A.  There probably were about five or six
16  on that.
17  Q.  How many of those five or six people
18  were Robert Wood Johnson employees?
19  A.  Four.  There was one Lawson person.
20  Q.  Okay.  So the team was four Robert
21  Wood Johnson employees and one Lawson employee?
22  A.  Yeah.  Don't hold me to the exact
23  numbers.
24  Q.  Okay.
25  A.  It was one Lawson person and, you

Irwin, Robert - RW Johnson  3/10/2010  12:00:00 PM

21

1  know -- the team would bring in someone who might
2  only come to a couple of meetings on a specific
3  topic.
4      Q.    Okay.  So do you remember the name of
5  the Lawson employee that was on that team?
6      A.    His first name was Bert.  I can get
7  you the last name later.
8      Q.    Would it be Bert --
9      A.    Bart.
10     Q.    -- Fisher?
11     A.    Bart.  Yeah.  Bart Fisher.
12     Q.    Bart Fisher.  Okay.
13         And do you know what his title was?
14     A.    Lawson consultant.
15     Q.    Okay.  He was -- Mr. Fisher was the
16  one that was providing the guidance on how to build
17  the materials system for Robert Wood Johnson?
18     A.    Yes.
19     Q.    Okay.  Thanks.
20         So you said that the implementation
21  began in March of 2009.  Is that correct?
22     A.    Yes.
23     Q.    And it was completed in November?
24  So --
25     A.    November 2009 -- yeah.  2009.

22

1      Q.    Okay.  So the entire implementation
2  took about eight months.  Is that correct?
3      A.    Mm'mm.  Yes.
4      Q.    In -- do you know what portion of
5  that time period was spent on implementing the
6  Lawson procurement software?
7      A.    That entire time frame was spent on
8  procurement.
9      Q.    Okay.
10     A.    Parallel to that, general ledger was
11  also being done, accounts payable was being done.
12     Q.    Okay.  And you said that Lawson also
13  provided some training to Robert Wood Johnson's
14  personnel on the procurement software?
15     A.    Yes.
16     Q.    And who did they provide that
17  training to?
18     A.    Well, Manny, a gentleman -- Paul
19  Febres and George Malik who's no longer with us.
20         That would be the three individuals
21  who received the majority of the training directly
22  from Lawson.
23     Q.    And these three personnel were all
24  part of the materials team --
25     A.    Yes.

23

1      Q.    -- for the project?  Okay.
2         And did Lawson also provide training
3  manuals to Robert Wood Johnson personnel?
4      A.    Yes.
5      Q.    What about administrator manuals?
6      A.    What's the difference?
7      Q.    Let me ask the question a different
8  way.
9         What types of documentation did
10  Lawson provide on its procurement software to
11  Robert Wood Johnson?
12     A.    Lawson provided a series of
13  instructional documents on how to load the item as
14  to file, how to load the vendor file, how -- what
15  jobs to run on a daily basis.
16         I did not review those documents
17  personally but we sent all those documents to you
18  in the last thumb drive.
19     Q.    Right.  I appreciate that, too.
20     A.    Okay.
21         MR. SHRAGER:  That was sarcastic in
22  case you didn't know.
23         THE WITNESS:  That's all we had.
24         MR. SHRAGER:  He got it on the
25  weekend.

24

1      Q.    Okay.  Was Robert Wood Johnson also
2  provided access to Lawson's Web site?
3      A.    I don't believe so.
4      Q.    Are you familiar with something
5  referred to as the Lawson online library?
6      A.    Only the words.
7      Q.    Okay.  So to your knowledge the
8  personnel at Robert Wood Johnson have never gone on
9  the Lawson Web site to download different types of
10  documentation --
11     A.    I don't know the answer to that.
12     Q.    Okay.
13     A.    For all I know some of those
14  documents could have come from there.
15     Q.    Okay.  Do you know who provided the
16  training associated with the Lawson procurement
17  software?
18     A.    Bart.
19     Q.    So Mr. Fisher, Bart Fisher?
20     A.    (Witness indicates.)
21     Q.    And do you know about how many hours
22  of training he provided?
23     A.    It's not a number off the top of my
24  head.  I know we were billed for it so I could
25  probably get you the number.

Irwin, Robert - RW Johnson  3/10/2010  12:00:00 PM

25

1     Q.   Okay.  Was there any sort of syllabus
2 provided for the topics that he gave training on?
3     A.   Yes, I believe there was.
4     Q.   Okay.  Do you know if that was
5 included in the documents that you provided ePLUS?
6     A.   I'm going to assume that it was.
7     Q.   Okay.
8     A.   It was our intention to.
9     Q.   And do you know if there was any
10 training that Mr. Fisher gave that wouldn't have
11 shown up on any such syllabus?
12     A.   I'm sure there was because as -- in
13 the training classes and there would be a follow-up
14 meeting, people would ask questions and he would
15 show them how to use the system.
16     Q.   Okay.
17     Ad hoc.
18     Q.   Yeah.  Okay, Mr. Irwin.  You're
19 familiar with the Item Master in Lawson Software
20 system?
21     A.   Yes.
22     Q.   And can you explain how the Item
23 Master was initially set up for Robert Wood Johnson?
24     A.   We -- our staff extracted -- first of
25 all, we were told what -- what fields were

26

1 available in the Item Master.  Then we extracted
2 those fields from our previous vendor file -- Item
3 Master file.  Then we gave those -- that file to
4 Bart Fisher who then loaded it up into Lawson and
5 we did that in test and then we did that in
6 production.
7     Q.   Okay.  So you stated that the data
8 was extracted from the preexisting system that
9 Robert Wood Johnson was using?
10     A.   Correct.
11     Q.   And what was that system called?
12     A.   Matkon.  It was -- it's owned by
13 McKesson.
14     Q.   Okay.  And you stated that Robert
15 Wood Johnson performed the extraction of that data
16 from the Matkon system?
17     A.   Correct.
18     Q.   And how was that done?
19     A.   Probably using Crystal or Sequel.
20     Q.   Do you know if Lawson provided any of
21 the software that was used to extract the data from
22 the Matkon system?
23     A.   I don't think they did at all.  My
24 staff has been extracting data from Matkon for
25 years.  There would be no reason to ask for that

27

1 help.
2     Q.   Okay.  And once that data was
3 extracted from Matkon system were there particular
4 formats that the data had to be put in order for
5 it to be loaded into the Item Master?
6     A.   Yes.
7     Q.   And who performed that formatting?
8     A.   I don't know exactly did it.  It
9 was either Manny Matias, Ryan Durco or Paul Febres;
10 all members of the Robert Wood Johnson staff.
11     Q.   Okay.  And how did Robert Wood
12 Johnson know what format that the data needed to be
13 in in order for it to work with Item Master?
14     A.   Lawson gave us the specs.
15     Q.   Okay.  So once this data that was
16 extracted from the Matkon system was formatted
17 along Lawson specs you stated that this data was
18 given to Mr. Fisher to load into the Item Master?
19     A.   He did the upload.
20     Q.   I see.  So at the time that the --
21 let me start over.
22     At the time that the system went live
23 in November 2009 all the item data that was in the
24 Item Master have been loaded in by Bart Fisher?
25     A.   Okay.  Yeah.

28

1     Q.   Yes?
2     A.   Yes.
3     Q.   Okay.  Does Lawson provide any
4 ongoing maintenance services to Robert Wood Johnson
5 related to the Lawson procurement system?
6     A.   We have an annual software
7 maintenance contract with Lawson to provide bug
8 fixes and enhancements.
9     Q.   And has this maintenance agreement
10 been in place with Lawson since the initial contract
11 was signed with Lawson?
12     A.   Yes.
13     Q.   And how often does Lawson provide
14 this type of maintenance?
15     A.   We have not taken any enhancements
16 yet because we're relatively new.  We have had a
17 few bug fixes --
18     Q.   Okay.
19     A.   -- since then that we loaded up.
20     Q.   Okay.  Is there any other type of
21 maintenance that's covered by the agreement other
22 than the bug fixes and enhancements that you
23 mentioned?
24     A.   No.
25     Q.   Okay.  And since the system went live

Irwin, Robert - RW Johnson  3/10/2010  12:00:00 PM

29

1   in November 2009 has any additional item data been
2   loaded to the Item Master?
3       A.   Yes.
4       Q.   And how is that performed?
5       A.   Using add-ins.  Using the Microsoft
6   add-ins feature.
7       Q.   And if I understood correctly from
8   testimony earlier these Microsoft add-ins were
9   provided from Lawson?
10      A.   As part of the Lawson contract
11  Microsoft add-in is a third-party software package
12  that you purchased through Lawson.
13      Q.   And who performs the upload of this
14  data now that the system is live?
15      A.   My staff.
16      Robert Wood Johnson?
17      A.   Robert Wood Johnson.
18      Q.   Has Lawson ever provided any
19  instructions on how to use the Microsoft add-ins
20  for loading new vendor or item data into the system?
21      A.   Yes.  And -- yes.
22      Q.   When was that?
23      A.   As recently as three weeks ago.
24      Q.   So Lawson has provided additional
25  instruction on how to upload this data even after

30

1   the implementation was complete?
2       A.   Yes.  We continue to contract with
3   Lawson for support and training.
4       Q.   So the support and training agreement
5   is separate from the maintenance agreement --
6       A.   Yes, it is.
7       Q.   -- that you referred to earlier?
8       A.   Yes, it is.
9       Q.   I see.  And do you know about how
10  many hours of training Lawson has provided on using
11  the Microsoft add-ins for loading data into the
12  Item Master?
13      A.   I would say it's between 10 and 14,
14  16 hours -- 10 to 16 hours.  One to two days.
15      Q.   And is this training schedule
16  beforehand or is it -- excuse me.
17          Is this training provided on an ad
18  hoc basis?
19      A.   We contracted with a support person
20  to come out for a week and we established what his
21  schedule would be for that week.
22      Q.   And do you know the person's name
23  from Lawson that gave the training?
24      A.   Eric.  I can get you the name.
25      Q.   Okay.  That's fine.

31

1       Q.   Did Lawson provide any additional
2   training materials relating to loading new data
3   into the Item Master?
4       A.   Lawson provided additional training
5   three weeks ago to the materials staff because we
6   weren't performing at a level that we would be
7   happy.
8          When they came out they brought out
9   the original syllabus of what should be covered and
10  then from that syllabus myself and others picked
11  the topics that we wanted to have focus training on
12  and add-ins was one of the topics.
13      Q.   I see.  So were the topics on the
14  syllabus the same topics that were from the
15  syllabus that Bart Fisher provided training from?
16      A.   I'm not sure.
17      Q.   Okay.  And has Robert Wood Johnson
18  ever used any software besides the Microsoft add-ins
19  to load new data into the Item Master?
20      A.   No.
21      Q.   Are you familiar with the module in
22  the Lawson system called IC 811?
23      A.   I'm not familiar with any of the
24  nomenclature of Lawson so if you rephrase that
25  question -- I don't know what an IC 811 is.

32

1       Q.   Okay.  Are you familiar with any APIs
2   that Lawson provided that could be used to load
3   data into the Item Master?
4       A.   No.
5       Q.   So all the data loads have been done
6   with the Microsoft add-ins?
7       A.   Yes.  All the data loads that we have
8   done have been done with the Microsoft add-in.
9       Q.   Right.  Because you said initially
10  Bart Fisher had done the upload onto the Item
11  Master.
12      A.   Yes.
13      Q.   Does Robert Wood Johnson have any
14  designated contacts at Lawson for maintenance?
15      A.   The staff uses global support and I
16  have a project director that I contact when I have
17  concerns.
18      Q.   What's the project director's name?
19      A.   Hannah Reilly.
20      Q.   Okay.  Thanks.
21          So if you had any technical problems
22  with the Lawson software would Hannah Reilly be the
23  person that you would speak to?
24      A.   That's who I would speak to.
25      Q.   Right.  Okay.  And, otherwise,

**33**

1 personnel at Robert Wood Johnson would contact
2 Global Support at Lawson?
3  **A. (Witness indicates.)**
4  Q. Is there any other specific people
5 that...
6  **A. There was a project manager, Kevin**
7 **Carney, but, frankly, he reports to Hannah and I**
8 **call Hannah.**
9  Q. Okay. Do you know if Lawson puts any
10 restrictions on the ability of Robert Wood Johnson
11 to modify the Lawson procurement software?
12  **A. I'm not aware of Lawson having any**
13 **restrictions.**
14  Q. So to your knowledge Robert Wood
15 Johnson can make any modifications it wanted to the
16 Lawson procurement software as it's implemented
17 here?
18  **A. We can make any change we want using**
19 **the tables and screens provided. We don't have**
20 **access to source code.**
21  Q. Okay.
22  **A. Nor do we want it.**
23  Q. Do you know if Lawson puts any
24 conditions on the warranty on the Lawson procurement
25 software -- let me back up.

**34**

1  Do you know if Robert Wood Johnson
2 has a warranty on the Lawson procurement software?
3  **A. We do.**
4  Q. And do you know if Lawson puts any
5 conditions on this warranty?
6  MR. SHRAGER: If you remember, tell
7 him. I assume the warranty will speak for itself.
8  **A. It's a fit for service warranty,**
9 **right? Workmanlike...**
10  Q. Okay.
11  **A. We don't have access to the source**
12 **codes so, you know, we need to use it as it's been**
13 **built to be used, right? It's a standard bold**
14 **letter type.**
15  Q. So to your knowledge there's -- with
16 the exception of accessing the source code which I
17 understand that you can't do here --
18  **A. That's right.**
19  Q. -- there's no other use that you're
20 familiar with that -- that if you used it in such a
21 manner it would void the warranty?
22  **A. That's correct.**
23  Q. Okay. Do you know if there's any
24 circumstances on which Lawson reserves the right to
25 terminate its license agreement with Robert Wood

**35**

1 Johnson for the Lawson procurement software?
2  **A. One reason would be lack of payment.**
3 **Reverse engineering. I don't recall all of them**
4 **but there are a few.**
5  Q. Okay. And are these provided in the
6 license agreement?
7  **A. Yes.**
8  Q. Okay.
9  MR. CLEMENTS: Court Reporter, could
10 you please mark this document as Exhibit Number
11 RWJ-2, please.
12  (Exhibit RWJ-2 marked for
13 identification.)
14  Q. Okay. What you've just been handed
15 has been marked Exhibit Number RWJ-2. If you could
16 please take a moment to review it.
17  MR. CLEMENTS: For the record, this
18 document is entitled Product Order Form, Lawson
19 Software Customer Agreement, and it bears Bates
20 label RWJ 000003 through RWJ 000008.
21  MR. SHRAGER: The record should
22 reflect the Bates stamp numbers were put on by I
23 take it your office, Mr. Clements?
24  MR. CLEMENTS: Yes, that's correct.
25  **A. (Witness indicates.)**

**36**

1  Q. Okay. Mr. Irwin, have you seen this
2 document before?
3  **A. Yes.**
4  Q. And does this appear to be an
5 executed agreement between Lawson and Robert Wood
6 Johnson for the license of Lawson Software
7 applications?
8  **A. Yes.**
9  Q. And do you note that it's signed
10 August 29th, 2008?
11  **A. Yes.**
12  Q. So to your understanding August 2008
13 was the first time that Robert Wood Johnson entered
14 into a software license agreement with Lawson?
15  **A. Yes.**
16  Q. Okay. If you could, turn to the page
17 marked Bates number RWJ -- let me just say the last
18 three digits -- ending in 007.
19  **A. Okay.**
20  Q. And you note at the top of the page
21 is -- has the header Schedule, parentheses, S-3
22 units/NT?
23  **A. Yes.**
24  Q. Does this schedule accurately reflect
25 the software applications that Robert Wood Johnson

Irwin, Robert - RW Johnson  3/10/2010  12:00:00 PM

**37**

1  licensed from Lawson in August 2008?
2  A.  Yes, it does.
3  Q.  Okay.  And so if you look about
4  halfway down the document there's a table with the
5  header Lawson Procurement Suite.  You see that?
6  A.  Yes.
7  Q.  And it says, "The suite includes
8  Requisitions, Purchase Order, Inventory Control,
9  Requisition Self-Service."  You see that?
10  A.  Yes.
11  Q.  So is it correct that -- that these
12  modules in the Lawson procurement suite were
13  licensed from Lawson in August 2008?
14  A.  Yes.
15  Q.  And is Robert Wood Johnson currently
16  licensing all the procurement suite products shown
17  in this schedule?
18  A.  Yes.
19  Q.  And have all these products been
20  implemented?
21  A.  I believe so.
22  Q.  Okay.  Okay.  You could put that
23  document aside.
24  MR. CLEMENTS:  Court Reporter, could
25  you please mark this document as Exhibit Number

**38**

1  RWJ-3, please.
2  (Exhibit RWJ-3 marked for
3  identification.)
4  Q.  Okay, Mr. Irwin.  I'm handing you
5  what has been marked as Exhibit Number RWJ-3.  If
6  you could please take a moment to review it.
7  MR. CLEMENTS:  For the record, this
8  document is entitled Lawson Software Customer
9  Agreement, Master Terms and Conditions, and it
10  bears the Bates label RWJ 000011 through RWJ
11  000016.
12  Q.  Just let me know when you're finished
13  reviewing it, please.
14  A.  I've reviewed it.
15  Q.  Okay.  Have you seen this document
16  before?
17  A.  Yes.
18  Q.  And is it an executed agreement
19  between Lawson and Robert Wood Johnson governing
20  the terms and conditions of all other written
21  agreements between these parties?
22  A.  Yes.
23  Q.  And you note that it was also dated
24  and signed on August 29th, 2008?
25  A.  Yes.

**39**

1  Q.  Okay.
2  MR. SHRAGER:  There's two separate
3  dates when Robert Wood signed it and when Lawson
4  signed it.
5  MR. CLEMENTS:  Okay.  Fair point.
6  Q.  So you see that it was signed by
7  Lawson on August 29, 2008.
8  A.  Yes.
9  Q.  Is that correct?  And that on August
10  28, 2008 it was signed by Robert Wood Johnson?
11  A.  Yes.
12  Q.  Okay.  Thanks.
13  A.  That's the same as the last agreement.
14  Q.  Yes.
15  A.  Okay.
16  Q.  Okay.  If you would please turn to
17  the page marked Bates number RWJ 000013.
18  A.  Okay.
19  Q.  And if you would, if you look at the
20  top left column there's a Section 2.1 titled
21  Installation And Use.  Do you see that?
22  A.  Yes.
23  Q.  Okay.  And then underneath there's a
24  Section 2.1.1 and here it says, "Unless otherwise
25  authorized by Lawson in writing only the applicable

**40**

1  specified customer, Lawson group, or a Lawson
2  partner retained by that specified customer may
3  install or host the products, upgrades,
4  enhancements and new releases of the products,
5  service deliverables and specified customer
6  modifications of the Lawson products and service
7  deliverables listed in the order form identifying
8  that specified customer."
9  You see that?
10  A.  Yes.
11  Q.  Are you aware that Lawson does not
12  permit Robert Wood Johnson to use third parties to
13  perform installation or hosting of the software
14  licensed from Lawson unless that third party is a
15  Lawson partner?
16  A.  Yes.
17  Q.  Okay.  And if you look at Section
18  2.1.2 it states, "The specified customer identified
19  in an order form or Statement Of Work may use the
20  products and service deliverables listed in that
21  order form or Statement Of Work only in accordance
22  with the documentation."
23  You see that?
24  A.  Yes.
25  Q.  And are you aware that Lawson does

Irwin, Robert - RW Johnson  3/10/2010  12:00:00 PM

41

1  not permit Robert Wood Johnson to use the licensed
2  software except in accordance with the
3  documentation that was provided with the software?
4      A.   That's what it says.
5      Q.   Okay.  Now, if you look down -- let
6  me back up for a moment.
7         If you look down at Section 2.4.
8  It's titled Modifications And Ownership.  Do you
9  see that?
10     A.   Yes.  Okay.
11     Q.   And it states, "Customer may modify
12  the Lawson products and service deliverables only
13  to the extent permitted under an order form or
14  described in the documentation for those products."
15        Do you see that?
16     A.   Yes.
17     Q.   And are you aware that Lawson does
18  not permit Robert Wood Johnson to modify the
19  licensed software except as described in the
20  documentation for the software?
21     A.   Yes.
22     Q.   Okay.  And if you look at the top of
23  the next column, Section 2.5, and it's titled
24  Restrictions.
25        And under 2.5.1 it states, "The

42

1  specified customer identified in an order form may
2  not transfer, rent, lease, redistribute or
3  re-license the products or service deliverables or
4  use the products or service deliverables listed in
5  that order form to provide data processing,
6  outsourcing, service bureau, hosting services or
7  training to third parties.  Customer will not
8  disassemble, decompile, decode or reverse engineer
9  the software except as expressly permitted by
10  applicable law."
11        You see that?
12     A.   Yes.
13     Q.   And are you aware that Lawson does
14  not permit Robert Wood Johnson to use the licensed
15  software to provide data processing, outsourcing,
16  service bureau, hosting services or training to
17  third parties?
18     A.   Yes.
19     Q.   And if you look down at Section 2.5.3
20  it states, "Customer shall not directly or indirectly
21  export the products or service deliverables from
22  the country of initial delivery by Lawson without
23  the prior written authorization of Lawson in
24  compliance with applicable laws and regulations."
25        You see that?

43

1      A.   Yes.
2      Q.   Are you aware that Lawson does not
3  permit Robert Wood Johnson to export the licensed
4  software outside this country?
5      A.   Yes.
6      Q.   Okay.  All right.  That's all I have
7  for that document.  You can put that aside.
8         MR. CLEMENTS:  Court Reporter, could
9  you please mark this document as Exhibit Number
10  RWJ-4.
11        (Exhibit RWJ-4 marked for
12  identification.)
13     Q.   Mr. Irwin, I'm handing you what has
14  been marked as Exhibit Number RWJ-4.  If you could,
15  please, take a moment to review it and let me know
16  when you're finished.
17        MR. CLEMENTS:  For the record, this
18  document is entitled Lawson Software Customer
19  Agreement, Master Terms and Conditions.  It also
20  has stamped across it "Draft.  Not a legal document."
21  it bears the Bates label RWJ 000048 through RWJ
22  000060.
23     Q.   Okay.  Mr. Irwin, have you seen this
24  document before?
25

44

1      A.   Yes.
2      Q.   Does it appear to reflect draft terms
3  for an agreement regarding the master terms and
4  conditions between Lawson and Robert Wood Johnson?
5      A.   Yes, it does.
6      Q.   Okay.  And you note that it's
7  unsigned by either party?
8      A.   Yes.
9      Q.   What is the purpose of this document?
10     A.   It was used for contract negotiation.
11     Q.   Okay.  If you note there's a column
12  on the right-hand side behind -- excuse me.
13        You note there's a column on the
14  right-hand side next to each of the terms in this
15  draft agreement?
16     A.   Yes.
17     Q.   See that?  And there's both typed and
18  handwritten remarks in some of the blocks in the
19  right-hand column.  You see that?
20     A.   Yes.
21     Q.   And were these remarks that were made
22  by Robert Wood Johnson?
23     A.   These remarks were made by me.  I
24  took their master agreement, created the column,
25  read through their document, typed in my initial

45

1   request, sent it off to Lawson and then in the
2   follow-up telephone conversation my handwritten
3   notes are on this document.
4       Q.   I see.  So that the remarks that are
5   typed into this right-hand column reflect your
6   concerns about the draft terms as they were set
7   forth initially?
8       A.   Yes.
9       Q.   And the handwritten notes reflect
10  what was discussed during negotiations with Lawson
11  on those terms?
12      A.   On July 14th.
13      Q.   On July 14th.  Thank you.
14           Okay.  You can put that document aside.
15  thank you.
16           I'm going to just relieve you now.
17  We're not going to go through every document in
18  this box.
19           MR. SHRAGER:  That was just what was
20  going through my head.  Good timing.
21           MR. CLEMENTS:  What are we up to now?
22           MR. SHRAGER:  5.
23           MR. CLEMENTS:  Court Reporter, could
24  you please mark this document as Exhibit Number
25  RWJ-5.

46

1           (Exhibit RWJ-5 marked for
2   identification.)
3       Q.   Mr. Irwin, if you would please take a
4   moment to review this document and let me know when
5   you've had a chance to look it over.
6           MR. CLEMENTS:  For the record, this
7   document is entitled Lawson Software Customer
8   Agreement, Master Terms and Conditions, and similar
9   to the last document we looked at, it also has
10  stamped on it "Draft.  Not a legal document."
11          It bears the Bates label range of RWJ
12  000068 through RWJ 000084.
13      A.   I've reviewed it.
14      Q.   Okay.  Great.
15          Mr. Irwin, have you seen this
16  document before?
17      A.   Yes.
18      Q.   And similar to the last exhibit we
19  looked at does this appear to reflect draft terms
20  for an agreement regarding the master terms and
21  conditions between Lawson and Robert Wood Johnson?
22      A.   Yes.
23      Q.   Okay.  And you'll note that this
24  document has a third column added to it.
25      A.   Yes.

47

1       Q.   And the third column also has remarks
2   typed into it?
3       A.   Yes.
4       Q.   Could you explain what the purpose of
5   this document is?
6       A.   This document is -- reflects Lawson's
7   response to the previous document and discussion.
8       Q.   So would the --
9       A.   For that third column on the right
10  would be Lawson's responses.
11      Q.   Okay.  Great.
12          And if you would, would you turn to
13  the page marked Bates number RWJ 000074.
14      A.   Yes.
15      Q.   And now if you'll look down about
16  three-quarters of the way down the document there's
17  number 3.2 and it states in the left-hand column,
18  "Except as otherwise agreed in order form,
19  customer's responsible at customer's expense for
20  installation of the software and service
21  deliverables, user training, data conversion,
22  implementation and other services."
23          Do you see that?
24      A.   Yes.
25      Q.   And then in the second column it

48

1   states "We plan on contracting for installation."
2           You see that?
3       A.   Yes.
4       Q.   And we being Robert Wood Johnson?
5       A.   Correct.
6       Q.   Okay.  And then in the third column
7   it states, "As seen in Lawson's Statement Of Work
8   Lawson will be installing the software at both
9   sites, parentheses, New Brunswick and Hamilton."
10      A.   Correct.
11      Q.   You see that?
12      A.   Yes.
13      Q.   And is it your understanding that
14  Lawson installed the software for Robert Wood
15  Johnson?
16      A.   Yes.
17      Q.   Okay.  Thank you.
18          Okay.  You can put that document aside.
19          MR. CLEMENTS:  Videographer, how are
20  we doing on time?
21          THE VIDEOGRAPHER:  25 minutes.
22          MR. CLEMENTS:  Okay.  Good.
23          (Pause.)
24          THE VIDEOGRAPHER:  Oh, I'm sorry.
25  Actually, we have 20 minutes.

Irwin, Robert - RW Johnson  3/10/2010  12:00:00 PM

---

**49**

1      MR. CLEMENTS:  20 minutes.  Okay.

2      MR. SHRAGER:  It's enough for him to

3  finish.

4      MR. CLEMENTS:  Sorry?

5      MR. SHRAGER:  Nothing.

6      MR. CLEMENTS:  Court Reporter, could

7  you please mark this document as Exhibit Number

8  RWJ-6, please.

9      (Exhibit RWJ-6 marked for

10  identification.)

11      Q.   Okay.  I'm handing you what has been

12  marked as Exhibit Number RWJ-6.  Please take a

13  moment to review it and let me know when you're

14  finished.

15      MR. CLEMENTS:  For the record, this

16  document is entitled Lawson Software Americas,

17  Inc., Statement Of Work For Robert Wood Johnson

18  University Hospital, New Brunswick, New Jersey.  It

19  bears the Bates label RWJ 000086 through RWJ 0000124.

20      A.   I've reviewed it.

21      Q.   Okay.  Mr. Irwin, have you seen this

22  document before?

23      A.   Yes.

24      Q.   And does this appear to be a

25  Statement Of Work entered into by Lawson and Robert

---

**50**

1  Wood Johnson?

2      A.   Yes.

3      Q.   And does this Statement Of Work

4  pertain to the services that Lawson performed for

5  the implementation of software applications that

6  Robert Wood Johnson had licensed from Lawson?

7      A.   Yes.

8      Q.   Okay.  If you would, turn to Page

9  marked Bates number RWJ 000089.

10      A.   Okay.

11      Q.   And if you note Section 2.1, about

12  halfway down, it's -- the heading is titled Current

13  Application Landscape.  You see that?

14      A.   Yes.

15      Q.   And does this section reflect

16  preexisting software applications that Robert Wood

17  Johnson had in place at the time of the agreement?

18      A.   Some of them.

19      Q.   Okay.  Could you state which ones are

20  not accurate?

21      A.   No.  Robert Wood Johnson runs well

22  over a hundred software applications.  This is a

23  subset of the applications we run.

24      Q.   I see.  But all these applications on

25  this list were being run at Robert Wood Johnson at

---

**51**

1  the time of the agreement?

2      A.   Yes.

3      Q.   Okay.  And if you note under the

4  headings for New Brunswick on this page and under

5  Hamilton on the next page there's an MM and next to

6  it it says McKesson ESI, parentheses, Matkon.  You

7  see that?

8      A.   Yes.

9      Q.   And is this the procurement software

10  that you referred to earlier that Robert Wood

11  Johnson was using from Lawson?

12      A.   Yes.

13      Q.   Okay.  All right.  If you would turn

14  to Page Bates number RWJ 000090.

15      A.   Okay.

16      Q.   Okay.  And you see the heading 3.1,

17  Proposed Application Landscape.  You see that?

18      A.   Yes.

19      Q.   And underneath it it states again

20  Proposed Applications Scope.

21      A.   Yes.

22      Q.   Were all the software applications

23  listed in this section within the scope of the

24  project described in the Statement Of Work?

25      A.   Could you ask that again?

---

**52**

1      MR. SHRAGER:  Yeah.  That one didn't

2  work.

3      MR. CLEMENTS:  I apologize --

4      THE WITNESS:  That's okay.

5      MR. CLEMENTS:  -- for that question.

6      Q.   Were all the software applications

7  listed in this section covered within the scope of

8  this Statement Of Work?

9      A.   That was its intention.

10      Q.   Okay.  And looking over this list of

11  applications are there any that look like they were

12  not actually part of the Statement Of Work as it

13  was performed?

14      A.   They were all part of the Statement

15  Of Work.

16      Q.   Okay.  And you note the heading

17  Supply Chain Management underneath?

18      A.   Yes.

19      Q.   And within that there's requisitions,

20  Requisition Self-Service, purchase order, inventory

21  control, electronic data interchange and mobile

22  pricing management.  You see that?

23      A.   Yes.

24      Q.   So all of these applications were

25  part of this Statement Of Work?

---

Irwin, Robert - RW Johnson  3/10/2010  12:00:00 PM

**53**

1       A.   Yes.
2       Q.   Okay.  And you see under Electronic
3   Data Interchange, next to that it states "Up to
4   five transactions (such as EDI, PO invoice, et
5   cetera) with two training partners/vendors one of
6   which is GHX."
7            You see that?
8       A.   Yes.
9       Q.   And does that mean that five
10  transactions within EDI were part of this Statement
11  Of Work?
12      A.   That was the intention.
13      Q.   Okay.  And what would it mean that
14  these were within the Statement Of Work?
15      A.   That Lawson would help set them up
16  and provide training to my staff that we would then
17  be able to continue with other vendors past the
18  first two vendors.
19      Q.   Okay.  So Lawson would assist with
20  providing up to five transactions for two vendors
21  and then after that Robert Wood Johnson would be on
22  their own for the remaining --
23      A.   That's right.
24      Q.   -- vendors?
25           And do you know when five

**54**

1   transactions were set up?
2       A.   I don't believe all five were set up.
3   I do -- you know, the invoice -- let's see.  The PO
4   out to GHX was set up, the electronic invoicing
5   coming back in which I believe is the A 10 was set
6   up.  We haven't taken advantage of all five of the
7   EDI transactions that we would find deeper into
8   this document.
9       Q.   Okay.  And do you know who the other
10  trading vendor was besides GHX that was part of it?
11      A.   No.  It was to be determined by us.
12      Q.   Okay.
13      A.   So like Manny or I would choose who
14  that vendor is.
15      Q.   Did you ever choose another vendor?
16      A.   We have not.
17      Q.   I see.  But Lawson assisted with
18  setting up GHX?
19      A.   GHX.
20      Q.   Okay.
21      A.   The concern at the time was that
22  Hamilton might not go -- continue with GHX so they
23  would need another vendor like GHX but that never
24  happened.
25      Q.   Okay.  Do you know what percentage of

**55**

1   transactions that GHX accounts for for Robert Wood
2   Johnson?
3       A.   Only what Manny said this morning.
4       Q.   Okay.
5       A.   70, 80 percent.
6       Q.   Okay.
7            (Pause.)
8       Q.   Okay.  You could put that document
9   aside for now.  I might return to it a little bit.
10  I want to keep moving on.
11           MR. CLEMENTS:  Court Reporter, could
12  you please mark this document as Exhibit Number
13  RWJ-7.
14           I just want to go through these
15  documents fairly quickly.
16           (Exhibit RWJ-7 marked for
17  identification.)
18      Q.   I've handed you what's been marked as
19  Exhibit Number RWJ-7.  If you could please take a
20  moment to review it and let me know when you're
21  finished.
22           MR. CLEMENTS:  For the record, this
23  document is entitled Requisition Self-Service RSS
24  Training Guide, Lawson Software.  It bears a Bates
25  label RWJ 003998 through RWJ 004020.

**56**

1       A.   I've looked at it.
2       Q.   Okay.  Have you seen this document
3   before?
4       A.   Only briefly before I sent it off to
5   you.
6       Q.   Okay.  And does this appear to be a
7   training guide for Lawson's Requisition
8   Self-Service application for use by Robert Wood
9   Johnson?
10      A.   Yes.
11      Q.   Do you know who authored this
12  document?
13      A.   I believe Manny Matias authored this
14  document.
15      Q.   If it was not Mr. Matias would it
16  have been someone at Robert Wood Johnson?
17      A.   Yes.
18      Q.   So it was not authored by Lawson?
19      A.   No.
20      Q.   Did Lawson provide any assistance in
21  drafting this document?
22      A.   I don't know.
23      Q.   You see down at the bottom left
24  corner it says modified 7/27/2009.  Do you know if
25  that was the date this document was created?

Irwin, Robert - RW Johnson  3/10/2010  12:00:00 PM



57

1        MR. SHRAGER:  Modified?

2        A.   I don't know.

3        Q.   Do you have any idea when the

4   document might have been created?

5        A.   No.

6        Q.   Okay.  You can put that document

7   aside.

8        MR. CLEMENTS:  Court Reporter, could

9   you please mark this document as Exhibit Number

10  RWJ-8, please.

11       (Exhibit RWJ-8 marked for

12  identification.)

13       Q.   I'm handing you what has been marked

14  as Exhibit Number RWJ-8.  If you would, please take

15  a moment to review it.  Let me know when you're

16  finished.

17       MR. CLEMENTS:  For the record --

18       A.   I'm okay.

19       Q.   Okay.

20       MR. CLEMENTS:  And for the record

21  this document is entitled Lawson Implementation

22  Buyer Training Guide.  Bears Bates range RWJ 003860

23  through RWJ 003912.

24       Q.   Have you ever seen this document

25  before?

58

1        A.   Only in preparing the documents for

2   you.

3        Q.   Okay.  Does this document appear to

4   be a guide on Lawson's procurement software for --

5   for the purpose of training buyers at Robert Wood

6   Johnson?

7        A.   Yes, it does.

8        Q.   Do you know who authored this

9   document?

10       A.   Lawson to the best of my knowledge.

11       Q.   Do you know who at Lawson authored

12  this document?

13       A.   No.

14       Q.   Okay.  Do you know when this document

15  was provided to Robert Wood Johnson?

16       A.   No.

17       Q.   Do you know if this document was used

18  during any training provided to buyers at Robert

19  Wood Johnson?

20       A.   Can I just go tongue in cheek for a

21  minute?  I hope so.  Yes.  Sorry.

22       Q.   That's okay.

23       Do you know -- do you know who gave

24  the training?

25       A.   That would be Bart Fisher.

59

1        Q.   Okay.  Is this -- let me start over.

2        The training for these buyers would

3   be the same training that we discussed earlier that

4   Mr. Fisher provided to law -- excuse me -- to

5   Robert Wood Johnson?

6        A.   Yes.

7        Q.   Okay.  You can set that document

8   aside.

9        MR. CLEMENTS:  What are we up to now?

10  9?

11       MR. SHRAGER:  9.

12       MR. CLEMENTS:  Court Reporter, could

13  you please mark this document as Exhibit Number

14  RWJ-9.

15       (Exhibit RWJ-9 marked for

16  identification.)

17       Q.   Okay.  You've been handed what's been

18  marked as Exhibit Number RWJ-9.  Take a moment to

19  review it and let me know when you've had a chance

20  to finish.

21       MR. CLEMENTS:  For the record this

22  document is entitled System Admin Steps To Adding

23  An Item.  It bears the Bates label RWJ 004144

24  through RWJ 004165.

25       A.   Okay.

60

1        Q.   Have you ever seen this document

2   before?

3        A.   Only in preparing for the deposition.

4        Q.   Okay.  Does this appear to be a guide

5   providing instructions on methods to add items to

6   the Item Master in Lawson's procurement software?

7        A.   Yes.

8        Q.   Do you know who authored this

9   document?

10       A.   I would assume Lawson authored the

11  document.

12       Q.   If Lawson -- strike that question.

13       Do you know when this document was

14  created?

15       A.   No, I do not.

16       Q.   Do you know if this document was used

17  in conjunction with --

18       A.   Can I bring something up?

19       Q.   Yes.

20       A.   If you look at the detail on this

21  document, if you look at Page 004146, under the

22  C -- 1 IC 11 Item Master, if you see Prepared By?

23       Q.   Yes.

24       A.   That is a Robert Wood Johnson

25  employee.

61

1    Q.   Okay.

2    A.   And I see that his initials are on

3    another page, 004149.  That would lead me to

4    believe that Paul Febres created the document.

5    Q.   Okay.  All right.  Thank you.

6         And do you know if this document was

7    used in conjunction with any training that was

8    provided to Robert Wood Johnson personnel on --

9    A.   That was --

10    Q.   -- Lawson procurement --

11    A.   -- the intention --

12    Q.   -- software?

13    A.   -- of this -- the intention of this

14    document was to help train the buyers and the

15    storeroom to how to maintain the Item Master?

16    Q.   And do you know who provided that

17    training?

18    A.   From -- from Lawson it would be Bart

19    Fisher but it appears that one of my staff, Paul

20    Febres, has been an integral part of that.  Paul

21    was our technical rep on the Lawson project.

22    Technical analyst.

23    Q.   So it could be Paul Febres or Bart

24    Fisher or both in conjunction that performed the

25    training?

62

1    A.   Yes.

2    Q.   Okay.  I think we can put that

3    document aside and if we could take a break for the

4    videographer to change tapes.  I think we're just

5    about out of tape.

6    THE VIDEOGRAPHER:  This concludes

7    volume one, tape number one in the deposition of

8    Robert Irwin.  Going off the record.  The time is

9    3:12.,

10    (Recess taken at 3:12 p.m.)

11    (Exhibit RWJ-10 marked for

12    identification.)

13    THE VIDEOGRAPHER:  Back on the record

14    at 3:23.,

15    This begins volume one, tape number

16    two in the deposition of Robert Irwin.

17    BY MR. CLEMENTS:

18    Q.   Mr. Irwin, I handed you what's been

19    marked as Exhibit Number RWJ-10.  If you would,

20    please take a moment to review it and let me know

21    when you're done.

22    MR. CLEMENTS:  For the record, this

23    document is entitled Requisition Approval Training

24    Guide.  It bears a Bates label RWJ 004166 through

25    RWJ 004175.

63

1    A.   All right.

2    Q.   Have you seen this document before?

3    A.   Only in gathering the materials to

4    send to you.

5    Q.   Okay.  Does this document appear to

6    be a guide on Lawson's procurement software for

7    training those personnel at Robert Wood Johnson who

8    would be approving requisitions?

9    A.   Yes.

10    Q.   And do you know who authored this

11    document?

12    A.   No.

13    Q.   Do you know if it was someone at

14    Robert Wood Johnson?

15    A.   It appears that it was done by staff

16    at Robert Wood Johnson.

17    Q.   And how is it that you can tell that?

18    A.   On Page 4168 the -- where it says

19    unit work 160, says the host was done on our

20    systems.  It says dev host sap.  That's a -- that's

21    the computer at Hamilton.

22    Q.   Okay.

23    A.   All right.  See ham there?  And there

24    are other nomenclature further down in the

25    document.

64

1    On Page 004172 again it says hhtp sap

2    100 Hamilton rwjuh at edu.

3    Q.   Okay.  Do you know if this document

4    was used in conjunction with any training done at

5    Robert Wood Johnson?

6    A.   The purpose of this document would be

7    to train directors and vice-presidents to approve

8    requisitions that were generated by their staff.

9    Q.   Okay.  And was any such training done

10    at Robert Wood Johnson?

11    A.   There were training classes.  Not

12    everyone attended but there were training classes.

13    Q.   And who gave those training classes?

14    A.   Our staff.

15    Q.   Okay.

16    A.   Earlier we talked about the super

17    user.  Lawson trained the super user.  Super user

18    trained the staff.

19    Q.   Okay.  You can put that document

20    aside.

21    MR. CLEMENTS:  Court Reporter, could

22    you please mark this document as Exhibit Number

23    RWJ-11, please.

24    (Exhibit RWJ-11 marked for

25    identification.)

65

```
1    Q.   Okay, Mr. Irwin.  I've handed you
2    what's been marked as Exhibit Number RWJ-11.  If
3    you would please take a moment to review it and let
4    me know when you're done.
5         MR. CLEMENTS:  For the record, this
6    document is entitled Procurement Design Document
7    For Robert Wood Johnson University Health.  It bears
8    the Bates label RWJ 002452 through RWJ 002525.  Okay.
9    Q.   Have you seen this document before?
10   A.   Only in preparing the documents for
11   you.
12   Q.   Does this document appear to be
13   laying out the design configuration of Lawson's
14   procurement software as it was implemented at
15   Robert Wood Johnson?
16   A.   I haven't reviewed the document in
17   detail enough to answer that question.  You want to
18   try another question or...
19   Q.   Sure.  Do you have any reason to
20   believe that this document does not accurately
21   describe the design configuration that's used at
22   Robert Wood Johnson?
23   A.   I don't know whether it does or it
24   doesn't.
25   Q.   Okay.  Do you know who authored this
```

66

```
1    document?
2    A.   It says that Bart Fisher authored the
3    document.
4    Q.   And Bart Fisher is a Lawson employee?
5    A.   Yes, he is.
6    Q.   And he was the consultant that we've
7    discussed earlier?
8    A.   Yes.
9    Q.   And do you know when this document
10   was created?
11   A.   June 28th, 2009 based on what's
12   marked on the document.
13   Q.   And do you have any idea what the
14   purpose of this document might be?
15   A.   When it was first handed to me I
16   thought it was another training document.  I'm
17   starting to think that it wasn't.  It was used for
18   more than just training.
19   Q.   Okay.
20   A.   It appears to be the first set-up of
21   the software.
22   Q.   And when you say first set up do you
23   think there might have been some alterations --
24   A.   Since --
25   Q.   -- since then?
```

67

```
1    A.   -- that time.
2    Q.   And do you know what --
3    A.   Based --
4    Q.   -- alterations were performed since
5    that time?
6    A.   I do not know but based on this date
7    this would be the time frame for the training --
8    the test system to be set up so there would
9    definitely be changes since that date.
10   Q.   I see.  Based on what the results of
11   the test were?
12   A.   Right.
13   Q.   Okay.  All right.  That's all I have
14   for that document.
15        MR. CLEMENTS:  And why don't we just
16   check?  I think that may be all I have.
17        (Pause.)
18        MR. CLEMENTS:  Yeah, I have no
19   further questions.
20        MR. SHRAGER:  Mr. Graham, I assume
21   you do.
22        MR. GRAHAM:  Just a few questions,
23   yes.
24   CROSS-EXAMINATION BY MR. GRAHAM:
25   Q.   Mr. Irwin, can I have you take a look
```

68

```
1    at Exhibit 8 again?
2    A.   8?
3    Q.   It is entitled Lawson Implementation
4    Buyer Training Guide.
5    A.   Yes.
6    Q.   And you stated when Mr. Clements was
7    asking you that this was -- you believe this was
8    authored by Lawson?
9    A.   Yes.
10   Q.   Can I have you look at Page 2 which
11   is Bates number RWJ-003862.
12   A.   Yes.
13   Q.   Can I direct your attention to the
14   line that says Prepared By four lines from the top?
15   A.   Yes.
16   Q.   And it says P --
17   A.   Febres.
18   Q.   Febres.
19   A.   He's a Robert Wood employee.
20   Q.   Would that lead you to believe that
21   this document was actually authored by a Robert
22   Wood Johnson employee?
23   A.   Yes.
24        MR. GRAHAM:  I have no further
25   questions on that document.
```

69

1          MR. SHRAGER:  I almost got real

2   excited the way that was phrased.

3          Q.   I just want to ask you a couple of

4   questions about the installation and the

5   implementation.

6          A.   Okay.

7          Q.   So you stated that Lawson installed

8   the procurement system on Robert Wood Johnson's

9   hardware.  Is that right?

10         A.   Yes.

11         Q.   After installation but before

12  implementation were there any items in the Item

13  Master?

14         A.   I -- I didn't quite understand the

15  question.  After?

16         Q.   After the installation but before the

17  implementation were there any items in the Item

18  Master?

19         A.   No.

20         Q.   And let me make sure I got the steps

21  correctly.

22             It sounds like the way that the Item

23  Master was initially populated was employees from

24  Robert Wood Johnson extracted files from the old

25  Matkon system and then formatted the data and then

70

1   Bart Fisher or -- imported those into the Item

2   Master.  Is that correct?

3          A.   That's the way I understand it.

4          Q.   At that point were the items in the

5   Item Master associated with any vendors?

6          A.   No.  That's something I found out

7   recently; that in our old system all the items were

8   associated with vendors.  In Lawson we have to go

9   through a second step to associate them with

10  vendors.

11         Q.   Who did that second step in the

12  Lawson system of associating the items with the

13  vendors?

14         A.   We're still doing it.

15         Q.   You're still doing it.

16         A.   So we do it.

17         Q.   One more set of questions.

18             Regarding the GHX transactions, you

19  stated that Lawson helped you set up the purchase

20  order out and the electronic invoicing for GHX?

21         A.   (Witness indicates.)

22         Q.   What were the other three

23  transactions that you didn't have set up?

24         A.   I don't know all the -- the five EDI

25  transactions, all right?

71

1          Q.   Do you know what was -- what was

2   required to set the purchase order out transaction

3   up for GHX?

4          A.   No.

5          Q.   Do you know what was required to set

6   up the electronic invoicing from GHX?

7          A.   Let me re -- let me restate that.

8             I believe the electronic invoicing is

9   coming directly from Owens and Minor.  Not -- no.

10            The electronic invoice -- yeah.  The

11  electronic invoicing is coming from Owens and

12  Minor.  That's the only vendor we have on the 810.

13         Q.   Okay.  What information comes back

14  from Owens and Minor when they send an electronic

15  invoice through EDI?

16         A.   Oh, the PO number, the PO amount for

17  each line.

18         Q.   Okay.

19         A.   So it -- it -- it's really like a

20  paper invoice.  It has all the lines on it.

21         MR. GRAHAM:  That's all the questions

22  I have.

23         MR. CLEMENTS:  Okay.  I have just a

24  couple more questions.

25  REDIRECT EXAMINATION BY MR. CLEMENTS:

72

1          Q.   Okay.  Mr. Irwin, you said that

2   you're still working on -- excuse me.

3             You said that Robert Wood Johnson is

4   still working on associating items in Item Master

5   with vendors.  Is that correct?

6          A.   Correct.

7          Q.   And when did that process begin?

8          A.   It began with the go live on November

9   1st.

10         Q.   And who is responsible for doing this

11  work?

12         A.   Various members of the materials

13  management staff but it's being led by Manny.

14         Q.   And has Lawson had any involvement

15  in -- with this project of associating Item Master

16  items with vendors?

17         A.   It has been part of the follow-up

18  education that we've asked Lawson to provide.

19         Q.   And aside from that -- that

20  additional education that was provided by Lawson

21  for this purpose has Lawson provided any other

22  assistance for this project?

23         A.   That's pretty open-ended.  Yes.

24         Q.   And what -- what sort of assistance?

25         MR. SHRAGER:  That's all right.

Irwin, Robert - RW Johnson  3/10/2010  12:00:00 PM



73

1      **A.    The same type of assistance that had**
2      **been provided all along; education of the staff,**
3      **review of how the system is set up and how it**
4      **functions and a lot -- lately a lot of problem**
5      **resolution.  Because we had a vendor problem, we**
6      **have a lot of unmatched invoices and Lawson is**
7      **helping us match the invoices that are coming in**
8      **whether paper or electronic with the POs that we've**
9      **generated.**
10         Q.   Okay.
11         **A.   Okay?**
12         Q.   Okay.
13             MR. CLEMENTS:  I don't have any more
14     questions.
15             MR. GRAHAM:  None.
16             MR. SHRAGER:  Thank you, gentlemen.
17             MR. CLEMENTS:  All right.  Go off the
18     record.
19             THE VIDEOGRAPHER:  Here marks the end
20     of volume one, tape number two in the deposition of
21     Robert Irwin.
22             Going off the record.  The time is
23     3:37.,
24             (Counsel retains exhibits.)
25             (3:37 p.m.)

75

1                  JURAT
2              I, ROBERT G. IRWIN, do hereby
 .    certify that I have read the foregoing transcript
3     of my testimony taken on Wednesday, March 10, 2010
 .    and have signed it subject to the following
4     changes:
 .    PAGE   LINE                CHANGE
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
 .           _____
20              ROBERT G. IRWIN
21
 .    DATE: _____
22
23
 .    Sworn and subscribed to before me this
24     day of         , 20  .
25     NOTARY PUBLIC
 .
 .

74

1           CERTIFICATE   OF   OFFICER
2
3
4          I, PATRICIA J. RUSSONIELLO, a
5     Certified Court Reporter and a Notary Public of the
6     State of New Jersey, do hereby certify that prior
7     to the commencement of the examination the witness
8     was duly sworn by me.
9          I DO FURTHER CERTIFY that the
10     following is a true and accurate transcript of the
11     testimony as taken stenographically by and before
12     me at the date, time and place aforementioned and
13     that reading and signing of the deposition has been
14     requested.
15          I DO FURTHER CERTIFY that I am
16     neither a relative nor employee, nor attorney or
17     counsel to any parties involved; that I am neither
18     related to nor employed by any such attorney or
19     counsel, and that I am not financially interested
20     in the action.
21
22
23
 .           _____
24     **A NOTARY PUBLIC OF THE STATE OF NEW JERSEY**
 .     My Commission Expires: 4/20/2010
25     C.C.R. License No. XI00517

## CERTIFICATE OF SERVICE

I hereby certify that on the 11th day of August, 2010, I will electronically file the foregoing

**PLAINTIFF *e*PLUS INC'S OBJECTIONS TO DEFENDANT'S COUNTER DEPOSITION DESIGNATIONS, COUNTER-COUNTER DESIGNATIONS AND REVISED SUMMARY OF THE DEPOSITION OF ROBERT IRWIN**

with the Clerk of Court using the CM/ECF system which will then send a notification of such filing (NEF) via email to the following:

Daniel McDonald, *pro hac vice*
William D. Schultz, *pro hac vice*
Rachel C. Hughey, *pro hac vice*
Joshua P. Graham, *pro hac vice*
Andrew Lagatta, *pro hac vice*
Merchant & Gould P.C.
3200 IDS Center
80 South Eighth Street
Minneapolis. MN 55402
Telephone: (612) 332-5300
Facsimile: (612) 332-9081
lawsonscrvicc@)merchantgould.com

Robert A. Angle (VSB# 37691)
Dabney J. Carr, IV (VSB #28679)
Troutman Sanders LLP
P.O. Box 1122
Richmond, VA  23218-1122
Telephone:  (804) 697-1238
Facsimile:  (804) 698-5119
robert.angle@troutmansanders.com
dabney.carr@troutmansanders.com

*Counsel for Defendant Lawson Software, Inc.*


                    /s/
David M. Young (VSB #35997)
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4000
Facsimile:  (202) 346-4444
dyoung@goodwinprocter.com

LIBW/1736775.2