```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF VIRGINA
 2                    Richmond Division

 3

 4

 5    ePlus, Inc.,

 6                          Plaintiff,

 7    versus                          309 CV 620

 8    Lawson Software, Inc.

 9                          Defendant

10

11

12

13          before:  HONORABLE ROBERT E. PAYNE
                Senior United States District Judge
14

15

16                    August 10, 2010
                      Richmond, Virginia
17

18

19                    Phone Conference

20

21

22                  Gilbert F. Halasz, RMR
                    Official Court Reporter
23                    U. S. Courthouse
                      Richmond, Virginia
24                    (804) 916-2248

25
```

```
 1              THE COURT:  Hello.
 2              MR. MERRITT:  Hello, Judge Payne.  Can you
 3         hear us?
 4              THE COURT:  Yes, I can.  It always helps
 5         when you push the right button.
 6              All right.  This is ePlus against Lawson,
 7         3:09 CV 620.
 8              And there has been some papers filed at
 9         the request of ePlus following an argument on
10         ePlus' motion in limine.  Excuse me.  Lawson's
11         motion in limine number 3 to preclude
12         Dr. Russell Mangum from testifying at trial.
13              And you submitted a decision to read i4i
14         Limited Partnership.  There have been some
15         briefs filed.
16              First, there is a question of whether -- I
17         don't understand what the positions of the
18         parties are -- whether the parties actually
19         agreed that the deposition of experts would
20         serve as rebuttal expert reports.  It looks to
21         me like that the two of you are at odds on that
22         position.
23              What is the position of the plaintiff and
24         the support that you have for it?  And the
25         position of the defendant?
```

```
 1                 Please, starting, with the plaintiff.
 2                 But first, who is here for plaintiff and
 3      who for the defendant?
 4                 Starting with the plaintiff.
 5           MR. MERRITT:  Your Honor, this is Craig
 6      Merritt and Henry Willett from Christian and
 7      Barton on behalf of the plaintiff.
 8                 Mr. Robertson and Mr. Strapp are on the
 9      line as well.
10           MR. CARR:  Judge, this is Dabney Carr with
11      Troutman Sanders on behalf of Lawson Software.
12      And Dan McDonald and Rachel Hughey from
13      Richmond Coal are also on the line.
14           THE COURT:  Start with the first issue,
15      ePlus.
16           MR. MERRITT:  Your Honor, this is Craig
17      Merritt.
18                 Others can correct me if I have any of
19      this wrong, but I am advised that the parties,
20      I think primarily Mr. Robertson and
21      Mr. McDonald, had a discussion arising out of
22      the fact that the parties had agreed some time
23      ago that there would not be rebuttal written
24      expert reports.  As a consequence the idea was
25      that when these experts gave their depositions
```

```
 1        the parties would be able to explore further
 2        that which had been disclosed in their reports
 3        and to allow the experts an opportunity to
 4        respond to each other's criticisms and that
 5        whatever was in those transcripts would be
 6        considered part of the expert disclosures --
 7             MR. CARR:  Judge --
 8             MR. MERRITT:  -- and usable at trial.
 9             THE COURT:  What is the position of
10        Lawson?
11             MR. McDONALD:  Your Honor, this is Dan
12        McDonald.
13             My recollection of that -- and there was
14        nothing that ePlus supplied that is
15        inconsistent with my recollection -- is that to
16        streamline the case we stopped the third round
17        of experts.  We had two rounds.  We had the
18        original report and rebuttal expert, written
19        reports in this case.  We didn't have a third
20        round of surrebuttal reports.  And the
21        agreement was any surrebuttal would be covered
22        by the depositions as well as any inquires
23        people wanted to go into regarding the original
24        reports that the experts provided.  Certainly
25        there is nothing even about what I heard
```

```
 1        counsel for ePlus say that would indicate that

 2        the parties agreed that the original reports

 3        could be deficient and you could fix that by

 4        depositions that occurred later in the case.

 5        That was not the agreement at all.  It was we

 6        could ask about what the opening expert thought

 7        about the opposing party's rebuttal expert

 8        report when the opening expert was deposed.  So

 9        there is no agreement here that would allow

10        curing defects in the original report.  And I

11        would also note that ePlus did not raise that

12        in their opposition to this motion in the first

13        place.

14            MR. ROBERTSON:  Your Honor, this

15        Mr. Robertson.  Mr. McDonald and I had this

16        conversation.  I don't think we had this

17        agreement.

18            THE COURT:  What?  Say again.  I lost you.

19        I don't see --

20            MR. ROBERTSON:  This is Mr. Robertson.

21        And Mr. McDonald and I had this agreement with

22        respect to, you know, the expert reports and

23        how the depositions would serve as part of the

24        rule 26 disclosures.  Let me just say with

25        respect to damages which were focused on here
```

```
 1          today, there was Mr. Mangum's initial report,
 2          and then there is a response report a month
 3          later from Mr. Green.  Excuse me.  I should say
 4          Dr. Mangum, Dr. Green.  And no opportunity for
 5          Dr. Mangum to respond to Dr. Green's criticisms
 6          other than in his deposition.  So clearly the
 7          deposition by agreement was intended to provide
 8          an opportunity to respond to any criticisms.  I
 9          think that is what I heard Mr. Merritt and
10          Mr. McDonald just agree on.  So I think I am
11          trying to get down to the basic nub of the
12          question.
13               Problems with the initial report.  We are
14          trying to respond to criticisms and have an
15          opportunity to have rebuttal because the
16          schedule became so truncated.
17               THE COURT:  No, wait a minute.  Wait a
18          minute.  You are singing two different tunes
19          here.  There is a difference between whether
20          you are going to respond to something in
21          Mangum's, in his deposition, is going to
22          respond to some criticism of his report and
23          whether he was going to issue another report.
24          Those are two different things.
25               MR. ROBERTSON:  Well, we had an agreement,
```

```
 1        Your Honor, that there would not be a rebuttal
 2        report, but that the deposition could serve as
 3        the equivalent of a rebuttal report.  That was
 4        the essence of our agreement.  I am not hearing
 5        anything that Lawson is saying that contradicts
 6        that.
 7             THE COURT:  Wait a minute.  Wait a minute.
 8             MR. ROBERTSON:  The schedule that we had
 9        and what we were trying --
10             THE COURT:  Quit talking.  Stop talking.
11             Mr. McDonald, did you agree or not agree
12        that the deposition would serve as a rebuttal
13        report, that is, Mangum would have the opening,
14        response would be by Green, and the deposition
15        of Mangum would be a rebuttal report?  Did you
16        or did you not have that agreement?
17             MR. McDONALD:  We agreed, yes, Your Honor,
18        that the deposition would be -- I would call
19        really the surrebuttal, to be clear, because I
20        would view Green, our damages expert, as the
21        rebuttal witness.  And then Mr. Mangum would
22        have the chance to surrebut his report.  That's
23        what the agreement was.
24             THE COURT:  I think the term is opening
25        report, response report, and the reply,
```

1      rebuttal report.  But that is the term I am

2      going to use.

3              MR. McDONALD:  Okay.

4              THE COURT:  Now that is taken care of.

5              Now, what I perceived in the briefing was

6      that Lawson attacked Mangum's report in its

7      opening brief as lacking improper methodology

8      by use of litigation settlements and basing his

9      conclusions on speculation and guess work under

10     the basic arguments where the litigation

11     settlements were of minimum probative value.

12     They were, in substance, because of their

13     context in which they were arrived at, they

14     were of limited probative value because they

15     were years after the hypothetical negotiation

16     would have occurred.  That they, the reports,

17     ignores Mangum's report, ignores ePlus' own

18     valuation in 2002 of $12,000.  That lump sum

19     settlements under the Lucent decision are not

20     generally probative of a reasonable royalty on

21     a running basis.  That the royalty base did not

22     rely on actual sales but projected sales.  Not

23     based on any real data, but based on expert

24     reports for ePlus in the SAP case.  That there

25     was over inclusion in the royalty base by

1          including royalties on non accused products.

2          That there was no explanation of how he took

3          the reasonable royalty rate from a range of 2.5

4          to 3.7 percent to a different range of 5 to

5          6 percent.

6               That is basically what I understood the

7          attack on his original report to be.

8               Now, that said, Mr. Robertson, you wanted

9          to file a paper bringing -- or you wanted me to

10         pay attention to the decision in the I4Ii4i

11         Limited Partnership case.  Essentially I told

12         you all at the hearing that I thought that

13         Mangum's report failed Daubert and Kumho

14         because I thought it was speculative and that

15         on the key points, he did not explain how he

16         got from 2.5, range of 2.5 to 3.7 to a

17         different range of 5 to 6, which in essence

18         increases the royalty, doubles the royalty

19         claimed.

20              So you wanted me to read i4i.  I have read

21         i4i versus Microsoft.  And you wanted to argue

22         it.  So argue it.

23              MR. MERRITT:  Your Honor, this is Craig

24         Merritt.  I am going to address the case, if I

25         might.  We thought that the case -- and I

1    believe it is a little hard to read, the I4I
2    case -- and we think it is of some use to The
3    Court and very helpful in three ways, really.
4        First of all is as a general proposition
5    it is reasoning, is working to draw the line
6    between the question of admissibility under
7    rule 702 and the weight that is to be accorded
8    to an expert's testimony.  And the basic stance
9    of the case is that certainly there is a
10   clearly-acknowledged gatekeeper role under rule
11   702, but it is a cautionary case in that it
12   reminds us, I believe, that cross-examination
13   and the common sense of jurors retain an
14   important role and that they are trustworthy.
15   We think that basic stance is one that
16   shouldn't be lost when presented with a brief
17   like Mr. McDonald's, which is certainly an
18   excellent outline of a cross examination of
19   Dr. Mangum, but perhaps not grounds for not
20   admitting his testimony.
21       The other two points in the case are
22   narrower, and we also think very helpful.
23       You will recall, Judge Payne, that rule
24   702 was amended in 2000 after both Daubert and
25   Kumho, and the effort was made to give the

1       courts three factors to look at in determining

2       whether these materials should be admissible.

3       I think two of these are very much in play on

4       this motion, and they are more grasped by I4I.

5       First of all it talks at pages 853 and 854

6       about the application of the expert in the case

7       of the Georgia Pacific factors.

8             It reaffirms the obvious and well

9       recognized point that Georgia Pacific is the

10      means of analysis to be used in determining a

11      reasonable royalty in these cases.  But it

12      also, without saying so explicitly, it clearly

13      inputs it in the case that the Georgia Pacific

14      factors are not an exercise in mathematical

15      precision.  They are really a quantitive rather

16      than qualitative analysis.  And what the expert

17      is doing in I4I is the same thing that

18      Dr. Mangum is doing here.  He is trying to

19      identify those factors that tend to bias the

20      royalty rate up or down or are neutral.  We are

21      not aware of, and maybe someone is, but I don't

22      believe we are aware of any published

23      authority.

24            THE COURT:  We had an equipment

25      malfunction.

1          Okay.  Go ahead.

2          MR. MERRITT:  We are not aware of any

3     authority, for example, that would grab Georgia

4     Pacific factor five and say, here is the

5     mathematical formula by which you apply number

6     five to determine how to adjust a base rate up

7     or down.

8          All of these are looked at by economists

9     who apply reasonable economic assessment to

10    these.  It is a qualitative and not

11    quantitative analysis.  And I4I is a case in

12    which there was obviously a very substantial

13    verdict of $200 million and upholds that

14    approach.  So in terms of the reliability of

15    the approach that the ePlus expert on damages

16    is taking in this case we think I4I should give

17    The Court some comfort that his approach is an

18    analytical approach, is acceptable, and based

19    on reliable principles and methods.

20         The other point that we think is of some

21    value to The Court as it considers this is that

22    in looking back at the brief on Lawson's motion

23    in limine number 3 --

24         THE COURT:  Which brief?

25         MR. MERRITT:  The initial memorandum that

1    was submitted in support of the motion in

2    limine number 3.

3          THE COURT:  What page?

4          MR. MERRITT:  I am looking at page ten.

5          THE COURT:  All right.

6          MR. MERRITT:  Under part D at the top of

7    the page.  It is only a paragraph.  The heading

8    says, "Dr. Mangum's proposed royalty rate is

9    unsupported by the facts."  Now, the argument

10   under that is by and large a regurgitation of

11   points that are already made, not only in the

12   brief but in motions limine number one and two.

13         But to the extent Lawson is suggesting

14   that the argument on admissibility should be

15   framed around whether certain facts support or

16   fail to support an expert's opinion, we think

17   that i4i deals with that rather decisively.

18         If you look at the discussion that begins

19   at the bottom of page 855 and continues on to

20   page 856, the federal circuit -- and I will not

21   read it at great length, but I will read a

22   couple of passages -- it says this:  "Microsoft

23   is correct that an i4i expert could use other

24   data in his calculations.  The existence of

25   other facts, however, does not mean that the

1     facts used fail to meet the minimum standards

2     of relevance or reliability."

3          And then it goes on at the bottom of the

4     page.  I am looking at page 586.  "While data

5     was certainly imperfect and more or different

6     data might have resulted in a better or more

7     accurate estimate in the absolute sense, it is

8     not the district court's role under Daubert to

9     evaluate the correctness of facts underlying an

10    expert's testimony."

11         Then it cites the Microcam case and

12    continues.

13         "Questions about what facts are most

14    relevant or reliable to calculating a

15    reasonable royalty are for the jury.  The jury

16    was entitled to hear the expert testimony and

17    decide for itself what to accept or reject."

18         So, we believe that within the bounds that

19    are set out in i4i and discussed in some

20    detail, given the fact factually the case is

21    fairly close on point with this one, we believe

22    that it strikes a cautionary note that

23    confusing questions of weight with those of

24    admissibility is one that we should try to

25    avoid.

```
 1              And we wanted Your Honor to have that case

 2         simply because it is a recent federal circuit

 3         case.  It was not highlighted in the briefing

 4         or in the colloquy before The Court.  And we

 5         thought that whatever your decision is on this

 6         it would be useful and would certainly be of

 7         some controlling effect simply because it is a

 8         federal circuit decision.

 9           THE COURT:  Well now, that raises the

10         question you just are asserting that the

11         federal circuit interpretation of rule 702

12         applies here and not the law of the regional

13         circuit.  I don't understand that to be the

14         case.  Have you got any case that says that?

15           MR. MERRITT:  No, sir.  It is not the

16         case.  In fact, i4i was applying the rules of

17         the fifth circuit, which is an abuse of

18         discretion rule.  The fourth circuit has

19         exactly the same standard.  And we don't see

20         any distinction in the way the fourth and fifth

21         circuits would apply the test under rule 702.

22           THE COURT:  Fourth circuit applies the

23         test of Daubert and Kumho with great

24         stringency, I believe.  But I understand your

25         point.  So we are in agreement that the law of
```

```
 1        the regional circuit applies, not the federal

 2        circuit.

 3             MR. MERRITT:  That is correct.  I think

 4        that is a long-standing rule acknowledged by

 5        the federal circuit.  Whatever standards are in

 6        the fourth would apply in this matter,

 7        including the abuse of discretion standard of

 8        review.

 9             THE COURT:  Yes, I am talking about

10        interpretation of the law and the application

11        of it as well.

12             All right.  Anything else?

13             MR. MERRITT:  No, sir.

14             THE COURT:  Mr. McDonald?

15             Who is going to argue?

16             MR. McDONALD:  Did you ask for --

17             THE COURT:  Who is going to argue for the

18        defendant, for Lawson?

19             MR. McDONALD:  This is Dan McDonald, Your

20        Honor.

21             THE COURT:  Yes.

22             MR. McDONALD:  What I heard from ePlus,

23        there was a rather generic recitation of what

24        the law is regarding admissibility of experts.

25        And citing really some of the most generic
```

1          parts of that i4i case.

2               I would like to talk briefly about what

3          the actual facts were of that case, and how

4          they actually got to the damages, because it is

5          very different from what we have here.

6               They assert that is the bench mark.  But

7          the bench mark had nothing do with the

8          settlement agreements in other cases, or

9          efforts to convert lump sums into royalty

10         rates.  Instead the bench mark was looking at

11         the accused infringer's profit margin on the

12         products using the technology and applying

13         apportionment of profits to come up with a

14         starting point of exactly $96 per unit.

15              The expert then looked at Georgia Pacific

16         factors and decided some of the factors made it

17         appropriate to use that higher, but the amount

18         higher that the expert adjusted was $2 on top

19         of that 96, only about two percent of his bench

20         mark rate.

21              The flaw that we pointed out at page ten,

22         among other flaws, of our brief was that the

23         Georgia Pacific factors aren't an opportunity

24         for an expert to pay lip service to a

25         methodology while simply substituting their own

1    judgment to come up with a number that had no

2    analytical basis or connection to the facts of

3    the case.

4        Here the range was going from 2.5 to 3.7

5    at least.  Specifically we are talking about

6    right now, because, Your Honor, we did list the

7    other flaws in the report that we believe

8    exist.  I am just going to focus right now on

9    that leap from the 2.5 to 3.7 percent range

10   going all the way to 5 to 6 percent.  Nothing

11   about the i4i case would indicate that that is

12   a justified, analytically acceptable under

13   Daubert thing for a damages expert to do, to

14   make such a huge jump from his own range.

15       And the testimony, the deposition

16   testimony of Mr. Mangum, we don't believe it is

17   a way to fill in any missing parts of the base

18   report.  EPlus has not cited any new

19   information that came along after the original

20   report that would justify supplementation.  But

21   when you actually read the deposition it really

22   doesn't help him on these issues any way.

23       Page 312, for example, of the deposition

24   he admits that he is increasing the rate based

25   on his judgment.

```
 1              THE COURT:  Wait a minute.  Wait a minute.
 2              MR. McDONALD:  Five to six percent because
 3         he is not sure what effect the Georgia Pacific
 4         factors would even have on the bench mark.
 5         Even he doesn't know, he admits, really, what
 6         the right number should be based on his own
 7         analytical approach.
 8              THE COURT:  What page are you talking
 9         about?  What page of the deposition are you
10         talking about?
11              MR. McDONALD:  312.
12              THE COURT:  Let me find it.  I have the
13         page.  Give me the text.  What line?
14              MR. McDONALD:  Beginning of line 7.  This
15         is, obviously, starting in the middle of a very
16         long answer to a question.  But I am going to
17         zero in at line 7.  "I have identified a range,
18         talking about the 5 to 6 percent range, because
19         I am not exactly sure what in a precise way the
20         effect of those other factors are.  So it may
21         be that results in a royalty rate of 3.5.  It
22         might be that it is much as 6.  I wasn't sure."
23              That is what I am talking about.
24              THE COURT:  All right.
25              MR. McDONALD:  And i4i has nothing to do
```

```
 1        with either the bench mark start point we have

 2        in this case or the huge deviation from the

 3        expert's own professed range of bench mark to

 4        the ultimate opinion.

 5             THE COURT:  All right.

 6             Any response?

 7             MR. MERRITT:  Your Honor, just a couple of

 8        things.  First of all, it is helpful to

 9        remember that Mangum's deposition was taken

10        after all of the expert reports were filed.

11        And, in fact, after motion in limine number 3

12        was filed.

13             So counsel for Lawson were fully armed

14        with all of the arguments that they have made

15        to The Court and had the opportunity to explore

16        those in whatever depth they thought was

17        appropriate at Mr. Mangum's deposition, which

18        is not the usual case.

19             Given that fact, if counsel believes that

20        a weakness has been identified in any

21        particular part of the expert report, that is

22        fodder for cross examination, not a ground for

23        complete exclusion of the witness.

24             The second thing, there is a piece of this

25        that sort of slips that keeps being repeated.
```

1        When Dr. Mangum did his original analysis of

2        the SAP and Rebo settlements, which were pure

3        present value mathematics that we all learned

4        in the seventh grade.  Nothing subjective about

5        it.  He identified a range of 2 to 8 percent,

6        roughly, into which those licenses could have

7        fallen based on different assumptions as to the

8        length of time they would be effective.  So,

9        this idea that somehow he has doubled something

10       when in fact his 5 to 6 percent falls sort of

11       to the mid range of what the full underlying

12       mathematics of SAP and Rebo compute is

13       something that we are a little concerned about.

14           THE COURT:  He eliminated that,

15       Mr. Merritt.  It was actually 1.8 and 3.7 and

16       he eliminated both of them as outliers and got

17       himself down to 2 -- he is the one who chose to

18       put it in the range of 2.3 or 3.7.

19           MR. MERRITT:  That is absolutely correct.

20           THE COURT:  Because of mathematics being

21       inaccurate.

22           MR. MERRITT:  There were a series of steps

23       that took place starting with the simple

24       mathematical calculation that economists do

25       based on reasonable assumptions, not on pure

1    mathematical precision that are precisely the

2    things that Dr. Mangum did in this case.

3         Again, Lawson argues as if there is some

4    perfect algorithm by which this is done.  I

5    have not seen that case.  Maybe it is out

6    there.

7         THE COURT:  All right.

8         MR. MERRITT:  But as long as it is within

9    a reasonable degree of economic certainty and

10   he can articulate what he did, if he has not

11   articulated it well then on cross examination

12   counsel can highlight that and break it down

13   for the jury.

14        THE COURT:  Did he say that this was all

15   done to a reasonable degree of mathematical

16   certainty like you said?  Did he say reasonable

17   degree of economic certainty?  I didn't see

18   that in his opinion.

19        MR. MERRITT:  Someone who is more familiar

20   with his report would have to answer that

21   question, Your Honor.  I can't vouch it.

22        THE COURT:  I know it is not in his

23   report.  I don't see it in the highlighted

24   parts of his deposition that you all gave me.

25   So if he said it, I want to hear it now.

1          MR. ROBERTSON:  This is Mr. Robertson.

2          I don't think those words appear in his

3     report.  What he did say was he applied Georgia

4     Pacific factors as he understood them, and he

5     understood that to be the methodology.  That is

6     the accepted methodology you get.  He did it to

7     the best of his ability.  Identified eight

8     factors that he thought warranted an increase

9     in the royalty rate.  Did he do it with the

10    mathematical certainty --

11         THE COURT:  Nobody requires mathematical

12    certainty.  All right.  Thank you.

13         The law in this case is set by Daubert and

14    Kumho.  And the amendments to rule 702 did

15    occur after Daubert and Kumho were decided.

16    But they reflect an attempt by the rules

17    committee, as is clear from the record, to

18    embody the general notions of Daubert,

19    certainly not to embody the specific factors of

20    Daubert because Daubert was focused principally

21    upon the issue of scientific reliability.  And

22    Kumho made subsequently clear that the basic

23    rule of Daubert and responsibility of the trial

24    court was to apply in cases all kinds of

25    expertise permitted by the rules, scientific,

1           technical, and specialized knowledge.  But

2           Kumho made it also clear that the touchstone

3           used in Daubert for the scientific calculation

4           or analysis did not necessarily have to apply

5           to other kinds of analysis.

6                It is wise, I think, in assessing this

7           motion to go back to basics and see what the

8           Supreme Court said.  Sometimes people forget

9           what the Supreme Court said.  The Supreme Court

10          meant what it said, and it did so for a reason.

11          Here is the reason.  The reason is that for

12          years before Daubert junk science had become

13          the vogue, the popular way to present things,

14          and it became the rule that an expert was

15          permitted to testify by district courts because

16          the person was an expert, and permitted to

17          testify in a way that essentially said it is so

18          because I say it is so, and I am an expert.

19          And the Supreme Court said that is the end of

20          that.  That was, if you will go back and look

21          at the bottom line of the Bendectin decision in

22          the district court, court of appeals, that is

23          the fundamental frame work within which the

24          Supreme Court got this case.

25                The court made emphasis we were to focus

1      on whether scientific, technical, or other

2      specialized knowledge would assist the trier of

3      the fact to understand the evidence or to

4      determine a fact in issue.  And said that it is

5      the trial judge's job to insure that any and

6      all scientific testimony or evidence admitted

7      is not only relevant, but reliable.  And the

8      locus of the obligation was found in the rule

9      and was found in the part about whether the

10     knowledge will assist the trier of fact to

11     understand the evidence or determine a fact in

12     issue.

13         And the rule said the Supreme Court was to

14     assure that the testimony, whatever source it

15     came from, would be reliable and relevant.  It

16     then went on to point out, citing Judge

17     Becker's opinion in the Downing case, that

18     there is another component to relevance, and

19     that is fit.  Additional consideration, said

20     The Court, under rule 702 -- and another aspect

21     of relevancy is whether expert testimony

22     proffered in the case is sufficiently tied to

23     the facts of the case that it will aid the jury

24     in resolving a dispute.  This consideration has

25     been aptly described by Judge Becker as one of

1      fit.  Fit is not always obvious, and scientific

2      validity for one purpose is not only scientific

3      validity for other unrelated purposes.

4           The Court then went on to talk about the

5      measure of scientific testimony.  Has it been

6      tested?  Is the technique or theory tested?

7      Has there been peer review?  Is there a known

8      rate of error?  And then it allowed

9      consideration of general acceptance, which is

10     in part how the issue came to the Supreme

11     Court.  Because up until then the rule of

12     general acceptance and scientific community

13     enunciated in Frye had in fact been the

14     criterion for the admissibility of evidence in

15     the federal courts.

16          The Court made perfectly clear that the

17     focus of the trial judge's gatekeeping

18     responsibility is on method and principles not

19     upon the conclusions.  There is no question

20     about that.  That aspect of i4i is not at all

21     unusual.  It has in fact been clear, if it

22     weren't before then, since Daubert was decided.

23     That is found at 2797 and 2798 of 113 Supreme

24     Court.

25          So, too, is the concept that vigorous

```
 1        cross examination, presentation of contrary

 2        evidence, and careful instruction on the burden

 3        of proof are the traditional and appropriate

 4        means of attacking shaky but admissible

 5        evidence.  So that principle was not announced

 6        in i4i, and it is not new.  It is a fundamental

 7        precept by which all courts are required to

 8        judge the admissibility of evidence and to draw

 9        the line between the admissibility of evidence

10        and the conclusions being reached.

11            Kumho then took the matter further.  Kumho

12        held that the basic principles of Daubert, the

13        gatekeeping function, that is, applied to

14        scientific testimony, and indeed to all expert

15        testimony.  Indeed that wasn't even a subject

16        of disagreement by the time it got to the

17        Supreme Court.

18            And there they were really basically

19        dealing with in great measure with the

20        experience-based testimony.  But they once

21        again enunciated that the gatekeeping inquiry

22        must be tied to the facts of the particular

23        case, i.e., the fit.  Citing Downing and citing

24        the Daubert enunciation.

25            In Kumho itself the Supreme Court said as
```

```
 1        it cited itself from the Joyner decision,

 2        nothing in either Daubert or the federal rules

 3        of evidence requires a District Court to admit

 4        opinion that is connected to existing data only

 5        by the ipse dixit of the expert.  Ipse dixit

 6        means that it is so because I say it is so.

 7        That same precept has been adopted in Pugh

 8        against Louisville Ladder, Incorporated in 361

 9        federal appendix, and citing a number of cases,

10        including Joyner, holding that the district

11        court discretion includes the discretion to

12        find that there is, citing Joyner, simply too

13        great an analytical gap between the data and

14        the opinion proffered in deciding whether or

15        not the proper evidence is of the ipse dixit

16        variety.  In fact, the two text parts in

17        footnote four of that case, Pugh, make quite

18        clear the relationship and the nexus between

19        them.

20             In Bright against American Household

21        Products the fourth circuit pointed out that

22        Daubert aims to prevent expert speculation.

23        And to my knowledge those are the fundamental

24        rules by which rule 702 is to be applied.

25             Now, I have studied the deposition
```

1      testimony that was proffered, and I have

2      studied the report of Dr. Mangum.  And I

3      believe that there is a great difference

4      between Mangum's report and the i4i, as

5      Mr. McDonald pointed out.  There was a firm and

6      fixed and rationally-based bench mark that was

7      really unavailable in the i4i case.  Here the

8      bench mark is really two litigation

9      settlements.  For reasons which make -- I

10     understand that he articulated a reason, but I

11     never did -- I found it quite difficult to

12     understand.  Dr. Mangum just threw out the

13     other litigation-related settlements.  He just

14     picked the ones that had big numbers in them.

15         And the other three which he mentions in

16     his report he excludes from his analysis.  He

17     concludes that the Verian, the Sciquest and

18     Perfect Commerce agreements, which are also

19     settlements that were arrived at, Verian was

20     500,000 plus 2.5 percent running royalty on all

21     sales covered by the patents in suit in excess

22     of 15 million in a calendar year.  Sciquest was

23     a 2.4 million-dollar settlement.  Perfect

24     Commerce, according to him, was a lump sum

25     payment of $750,000.  And his basis for

1        throwing those out was not an economic basis.

2        His basis for throwing them out was a

3        conclusory ipse dixit pronouncement.  And it is

4        that he understood no discovery had occurred,

5        and it was that he understood that due to quick

6        settlements ePlus did not receive information

7        that would allow it to form an understanding as

8        to the amount of accused revenue for any of

9        these parties.  As a result, he says, the terms

10       of the agreements do not represent a complete

11       valuation of the specific use of the patents in

12       suit, but rather based on avoidance of

13       litigation.  He also -- he says the most that

14       can be said out of those is they provide

15       evidence of the willingness by ePlus to enter

16       into fixed payment and running royalty license

17       agreements.  So out of five possible settlement

18       agreements that he could have chosen to include

19       in his base he threw out for non economic

20       reasons the three lowest.

21            There is nothing that I know of that

22       permits an expert to pick and chose in

23       selecting the base in this fashion.

24            Now, the other thing is the base itself of

25       those that were selected are shaky under the

```
 1        law.  It's true that there are cases that allow
 2        settlement agreements and licenses and payments
 3        used in settlement agreements, or that come
 4        from settlement agreements, to be used in
 5        assessing the reasonableness of the royalty.
 6        But beginning a hundred years ago in Rude
 7        against Westcott the Supreme Court cautioned
 8        against the use of those and commented how
 9        unreliable they basically would be.  Subsequent
10        cases from all of the circuits, including the
11        federal circuits, counsels against the use of
12        these kinds of agreements.
13             But there are other cases that say they
14        can be used in certain circumstances.  The
15        fundamental message being they are of minimal
16        probative value in arriving at a determination
17        of a reasonable royalty.
18             In particular, the federal circuit has
19        held that lump sum settlement agreements are
20        particularly unsuited to use as a bench mark
21        for the calculation of running royalty
22        agreements.
23             Now, I am aware of the Rescue case and the
24        two cases in Texas that make the comment that
25        Rescue changes the nature of the analysis.
```

```
 1          There are a number of cases in Texas in the
 2     same district that hold -- and in other
 3     districts -- that hold that Rescue doesn't
 4     change the fundamental analysis established by
 5     the law of the previous federal circuit and
 6     other cases.
 7          In my judgment the conclusion that Rescue
 8     changes the law is an unwarranted one.  I do
 9     not believe that it does.  I don't think the
10     issue presented in Rescue is the same issue
11     that is presented here.  And I think that it is
12     giving Rescue far too much credence to
13     interpret it as changing the basic results by
14     which we determine whether license agreements
15     under, excuse me, arrived at under settlement
16     agreements are a good way to calculate running
17     royalties.  Nonetheless, I think we do have to
18     recognize that the general body of law,
19     confused though it may be, tends to allow the
20     use of lump sum payments out of settlement
21     agreements in certain circumstances.  Or,
22     excuse me, the use of royalty provisions out of
23     settlement agreements in calculating reasonable
24     royalties.  But I am -- but when you add the
25     fact that these are lump sum royalty, I mean
```

1          lump sum payments for the most part that in
2          fact have been converted by this man, Mangum,
3          into running royalty rates, and you consider
4          that the base he used is in every instance an
5          assumed base for the quantum of sales in
6          positing his analysis, and then you consider at
7          the same time that for no valid economic reason
8          that can be ascertained from the face of his
9          report that he has thrown out three out of five
10         settlement agreements; and when you consider
11         that ePlus itself valued these rights at a far
12         lesser figure then one has to but conclude that
13         the bench mark constructed by this expert bears
14         virtually no resemblance to the bench mark
15         constructed by the expert used by the expert in
16         i4i.  So I agree that while litigation
17         settlements have minimum probative value, they
18         can be considered.  But in the facts of this
19         case, the way he went about it, it establishes
20         a very shaky bench mark against which to start
21         his calculations, and the predicate settlements
22         also suffer from that, from the defect that are
23         not generally probative under Lucent, that is,
24         lump sum settlements are not generally
25         probative under Lucent of a reasonable royalty.

1

2          Further, I have been back and studied how

3     it is that this expert took a range of 2.5 to

4     3.7 and got it to 5.6.  That is a basic

5     doubling -- excuse me -- to a range of 5 to 6.

6     That is essentially a doubling of the royalty

7     rate.  He does it by saying that certain of the

8     factors of Georgia Pacific effectuate an

9     increase, certain factors are neutral, without

10    explaining what part of which one of those

11    factors accounts for a doubling or a

12    significant increase, nor does he explain how

13    he factors in the aggregate to actually achieve

14    an increase.  He just makes a bunch of general

15    statements about each of the factors, concludes

16    that it is either statistically neutral or

17    indicating a higher royalty rate.  He doesn't

18    say it requires arrival at a higher royalty

19    rate in every case.  He says it indicates or

20    suggests, thereby indicating to me a

21    considerable speculation.

22         What that all boils down to when you look

23    at his factors, I think it is 5 and 6, and then

24    8313 is this.  That is the quintessential

25    definition of an ipse dixit.  2.5 to 3.7 goes

1    to a range of 5 to 6 because I say so.  And I

2    am an expert.  And that is exactly what he has

3    done.  And that is a methodology flaw, not a

4    disagreement with his facts.  That is just a

5    methodology flaw that renders his analysis such

6    as to be sufficiently unreliable that it will

7    not be healthy -- help the finder of the fact

8    determine an issue or understand the evidence

9    or to determine a fact in issue.  And, in fact,

10   it posits a very real risk of the very threat

11   that is presented by having or allowing experts

12   to posit ipse dixit statements.

13       You get a person with a big credential who

14   comes in well dressed, is impressive, says it

15   is so because I say so, and the jury is

16   confused and apt to be -- and apt to be

17   impressed by the credential rather than the

18   analytical method.  And rule 403, which Daubert

19   says has to be applied in applying it, or has

20   to be considered in applying rule 702, says

21   that that kind of evidence is to be kept out.

22       So I view this as certainly not -- I don't

23   think it is The Court's job to make the

24   judgment about whether, about the factual

25   underpinnings or the validity val non of the

1     conclusions.  I know it is not.  We have been

2     taught to do this, to take that approach since,

3     at least since Daubert, if not before.  But

4     certainly since Daubert.  That is the approach

5     of taking in this circuit, and drummed in to

6     the heads of all district judges in every case

7     that is decided on this issue.  And it is the

8     methodology that is flawed.  I don't address

9     the conclusions.  For those reasons the motion

10    number 3 will be granted, and the motion number

11    1 and 2, therefore, are denied as moot.

12         I believe that solves, or that deals and

13    takes care of those motions; is that right?  Is

14    there anything left?  Is there anything left?

15         MR. McDONALD:  Well, settlement agreements

16    themselves, Your Honor, are subject of a motion

17    in limine number one.  Not sure by saying it is

18    moot are you saying the expert is the only way

19    that would come in?  They are not coming in any

20    way?  If that is right, we are fine.  But if

21    that is leaving the door open to those being

22    somehow presented to the jury and those million

23    dollar numbers getting in front of the jury we

24    still would want that motion decided and

25    granted as well.

1          THE COURT:  I think they ought to be able

2     to wear tee shirts that have "37 million" on

3     them, and walk in the door and say that we got

4     that in another case, so why don't you give it

5     to us here?  Don't you think that would be a

6     good result?  Come on, Mr. McDonald, of course

7     there is some way that perhaps this could come

8     in, this information could come in, other than

9     through Mr. Mangum that I don't understand.

10    Mr. McDonald?  That I don't know.

11         MR. McDONALD:  Sorry.  I think that is a

12    question for Mr. Robertson.

13         THE COURT:  Well, you were the one who

14    anticipated it.  So I was thinking maybe there

15    was something that is in the history of the

16    case that had intimated it and beyond my kin.

17         MR. McDONALD:  My recollection is their

18    opposition to motion number one was based on a

19    use by Mr. Mangum in the damages reports.  But

20    I am not going to say a hundred percent sure.

21    I think that was certainly the focus.  I am

22    confident of that.

23         THE COURT:  All right.

24         Mr. Robertson, is there any basis for

25    those settlement agreements to come in other

1        than through the Mangum analysis?

2             MR. ROBERTSON:  Yes, Your Honor, there is.

3        Let me be specific.  I don't think settlement

4        agreements per se need to come in.  But there

5        are two contentions made by Lawson in this

6        case.  One is that the patents are, the claims

7        at issue are obvious; and the secondary factors

8        for non obviousness include commercial success

9        and licensing.

10            And we should be able to introduce under

11       those factors -- and we always have in these

12       cases been able to introduce the fact that we

13       have licensed others, and that we had

14       commercial success, particularly if someone is

15       going to come out and parade the $12,000 number

16       that says that the context is known about, that

17       that is the value of patents, when the patent

18       actually now achieved close to $60 million in

19       royalties.

20            Secondly, Your Honor, Lawson has a latches

21       defense that says we didn't sue soon enough and

22       therefore we should recover nothing.  One of

23       the recognized ways to rebut a latches defense

24       is to show that you are out enforcing your

25       patents against others.  You don't have to sue

1          everybody all the time right away.

2              You know, we are a company of limited

3          resources.  So part of the evidence could be

4          that if Lawson is going to persist in this

5          latches defense, if that is it, that we were

6          out enforcing our patents against --

7              THE COURT:  Mr. McDonald, wait a minute.

8          Are you asserting that they are in latches or

9          that that there is a latches defense?

10             MR. McDONALD:  There is a latches defense.

11             THE COURT:  You understand the difference?

12             MR. McDONALD:  I am not sure if I

13         appreciate the question.  Sorry.

14             THE COURT:  In latches is an equitable

15         concept.  And you are in latches because of

16         certain conduct you have engaged in.  Latches

17         in a patent context is just -- is more along

18         the line of what Mr. Robertson is talking

19         about.  You didn't sue soon enough.

20             Are you talking about latches in the

21         patent sense or in the equitable sense?

22             MR. McDONALD:  In the patent case sense,

23         Your Honor.

24             THE COURT:  All right.

25             MR. McDONALD:  There is a case that deals

```
 1        with Mr. Robertson's argument.  Here it is.
 2        Eickerman versus Chaff case.
 3            THE COURT:  Whoa.  Wait a second.  None of
 4        that is raised in these motions in limine I am
 5        dealing with.  Or if it is, it was in the
 6        disappearing ink that when my eyes read it I
 7        didn't understand it to be the argument.  So if
 8        you all have issues on that you better file
 9        something on all that, because I don't have any
10        basis for -- and I don't think, number one,
11        your motion number one implicates that, as best
12        I can tell, Mr. McDonald.  But I will have to
13        say, I have viewed this as principally an
14        aspect of the report, with the Mangum report,
15        and I don't see -- in fact your brief links
16        them so closely together I don't see the
17        argument you are making now in that brief.  So
18        I don't see that any of the motions in limine
19        currently call for a decision on this issue.
20            MR. McDONALD:  Our motion in limine number
21        one was specific to the settlements and their
22        exclusion for any purpose.  Many of those cases
23        we cited, including the one Your Honor cited
24        earlier, the Rude Westcott decision, talk about
25        their admissibility and their lack of probative
```

1      value for any purpose in the case.  So our

2      motion was comprehensive.

3           THE COURT:  Well, Mr. McDonald, that is

4      one of the things that maybe you better go talk

5      to Mr. Carr about.  Because you are talking

6      about throughout this brief the royalty aspect

7      of it.  It is true that you said for any

8      purpose, but you have modified that by talking

9      about it in terms of just the royalties.

10     Except maybe to the extent you dealt with the

11     financial situation of the company.  But it is

12     something you are going to have to deal with in

13     objecting to documents.  It is not the subject

14     of this motion in limine.  It is not briefed in

15     that way, not presented that way, and not been

16     argued that way.

17          So I am not going into all that now.  You

18     didn't cite those cases in that brief.

19          So that takes care of all of one, number

20     one, number two and number three, I believe.

21          Now, as presented in the motion in limine

22     you all have a pretrial conference coming up.

23     You are having to make objections to documents.

24     You make your objections, and we will deal with

25     them when they come up.  Did we deal with

```
 1         the -- I need to sort of do an inventory to

 2         make sure where we stand.  I have several other

 3         cases, and some of them are patent cases.  And

 4         I am sometimes getting confused.  I dealt with

 5         the motion, Lawson one, two, three.

 6              Now, okay.  Lawson's four.  Has this been

 7         dealt with or not?

 8              MR. McDONALD:  Yes, Your Honor.

 9              THE COURT:  All right.

10              Five.  Lawson five limiting ePlus to one

11         expert witness on infringement and one on

12         validity.  I believe that I dealt with that at

13         the hearing, too, didn't I?

14              MR. MERRITT:  Yes, you did, Your Honor.

15              THE COURT:  Now, you all were -- wait a

16         minute -- you all were -- wait a minute.  Wait

17         a minute.  You all were to tell me, I believe,

18         what is the lady's name that argued?  Stoll,

19         something or another?

20              MR. McDONALD:  Ms Stoll-DeBell.

21              THE COURT:  Ms Stoll-DeBell was told to

22         tell me whether you all were going to have

23         other experts on validity and infringement, one

24         each.  And if so, what we were going to do

25         about handling discovery respecting them, et
```

 1    cetera.  I haven't heard word one, so I am

 2    deciding you decided to ride the horses you

 3    have got.

 4        MR. McDONALD:  No, we are planning on

 5    using additional experts.  We have been in

 6    negotiations with ePlus on an agreed time table

 7    for the service of the report and the

 8    depositions to get them all done before the

 9    trial.  I think we are going to be successful

10    with that.

11        THE COURT:  Okay.

12        MR. ROBERTSON:  This is Mr. Robertson.  We

13    didn't agree on a time table, Dan, let's be

14    fair.  We had a discussion about it yesterday.

15        THE COURT:  Wait a minute, Mr. Robertson.

16    He said, we were working with you.  He didn't

17    say -- and he said, I think we will be

18    successful.  You are saying you don't think you

19    will be.  That is a different animal.  But he

20    didn't say you reached an agreement.

21        MR. ROBERTSON:  You are accurate, Your

22    Honor.  Absolutely.

23        Obviously we would like to know who the

24    additional experts are as soon as possible.  We

25    would like to get a disclosure from and take

```
 1      their deposition in a meaningful way before

 2      trial.  The proposal has been made that they

 3      would give us, identify their validity expert

 4      by tomorrow.  They don't know when they would

 5      identify the source code expert they are

 6      aspiring to get and giving us a report.  We go

 7      from August 25 and produce the witnesses for

 8      deposition August -- the week of August 30.

 9           THE COURT:  Does that suit you?

10           MR. McDONALD:  That would suit me if we

11      could get that time.  I might have,

12      obviously -- two concerns I have.  I mean, it

13      is their burden on invalidity.  I would like to

14      be able to, obviously, respond to that.  So

15      that actually puts me in a tighter bind.

16      Secondly, I assume the spirit and letter of The

17      Court's scheduling order on the two disciplines

18      that what was not contemplated is that they get

19      to call another expert to get up and say, I

20      agree with Dr. Shamos.

21           THE COURT:  No, no.  They can't do that.

22           MR. McDONALD:  Secondly, I would think

23      your ruling on that, they are confined to the

24      second supplemental statement, means they still

25      can't go outside of that with respect to
```

1    another expert.  We have had a meet and confer.

2         THE COURT:  Obviously I have already ruled

3    on that.  I haven't given license to go

4    re-visit everything in the world.  I have

5    already ruled on it.  Come on.  You know, this

6    is why you don't ever get anywhere is because

7    you spend so much time arguing about how many

8    angels can stand on the head of a pin.  Come

9    on.

10        MR. ROBERTSON:  I am thankful; for the

11   clarification.

12        THE COURT:  Number 5 has been dealt with.

13   I need a schedule from you all.  I want it by

14   tomorrow.  And I want the source, both of the

15   experts, one on the source code one on the

16   invalidity.  I want them identified.  What is

17   today, Tuesday?  They have got to be both

18   identified not later than Thursday, and the

19   reports, you need to have the reports in time

20   to have a meaningful deposition and to allow

21   Mr. Robertson to deal with them, because I

22   frankly think this was all clear, but as I said

23   before, I believe that some of the problem was

24   created by The Court, so I have gone out of the

25   way to eliminate the problem.

```
 1              Now, motion in limine number 6,

 2       publications related to patent enforcement

 3       efforts, litigation and settlement agreements.

 4       Is this what you are talking about that is

 5       responsive to the latches defense,

 6       Mr. Robertson?  Or have I ruled on it?

 7            MR. ROBERTSON:  I think this has to do

 8       with the knowledge about the patents and

 9       knowledge about ePlus.  You ruled on this one.

10       I think you ruled on all the motions in limine.

11              Now, Your Honor, to be quite frank, I

12       think nothing remains unresolved.

13            MR. McDONALD:  One exception might be part

14       of limine on damages number two that relates to

15       the issue.  I think we are still trying to work

16       that out.  I am not sure.  I guess Rachel is

17       here.

18            MR. MERRITT:  This is Craig Merritt.  I

19       can address that.

20              We are working with Judge Dohnal directly

21       on that.  He has given the parties some

22       deadlines to get that worked out by next week.

23            THE COURT:  I am confused about what you

24       are talking about.

25            MR. MERRITT:  Judge, you will recall there
```

 1          was a question about the royalty base and

 2          whether SKU is associated with the loss of

 3          revenue and could be included.  You told us on

 4          July 28 to go and work that out and to involve

 5          Judge Dohnal if necessary.  We did that.  He

 6          has us on a schedule to get that worked out.

 7              THE COURT:  Here is what I don't

 8          understand.  Why is that pertinent in view of

 9          the fact Dr. Mangum won't be testifying?  I

10          understand what you just said about that, but I

11          don't understand why that is pertinent any

12          more.  You don't have any reasonable royalty

13          testimony that I can tell.

14              MR. ROBERTSON:  Judge, I understand your

15          ruling on Dr. Mangum.  Obviously we respect and

16          honor it.  But we should be able to put in to

17          the record what the royalty base is.  And then

18          argue to the jury, you know, whatever the

19          factors are.  The statute says we are entitled

20          to a reasonable royalty.  That is the floor.

21          Oh, obviously we don't have an expert to opine

22          on that any more, but we should be able to put

23          in front of the jury what the numbers are as

24          far as the sales go of each revenue.

25          Mr. Mangum apparently won't be the spokesperson

```
 1        for that, but, you know, I have that testimony

 2        through other witnesses.  And I have the data,

 3        and produced in discovery.  So that, you know,

 4        I understand that you are not permitting

 5        Dr. Mangum to opine on that, but the facts are

 6        the facts.  And the jury should be able to hear

 7        those facts, sir.

 8             THE COURT:  You can put in any admissible

 9        evidence, but how do you get it in?  That's

10        something you have to figure out.  I am not

11        asking you for an answer now.  Just so I

12        understand.

13             I haven't ruled on this at all.  One, two

14        three came up in the context of the way Mangum

15        dealt with them, as I remember.  And the

16        attack, let me see number 2.  The way I have

17        read this motion, it all relates to Mangum's

18        use of, and what he is going to testify about

19        this.  And it doesn't address how any evidence

20        relating to SKU can otherwise come in as part

21        of your damages cases to the extent the case --

22        to the extent you can prove it without Mangum.

23             MR. ROBERTSON:  Well, Your Honor --

24             THE COURT:  I don't think --

25             MR. ROBERTSON:  Sorry.
```

```
 1              THE COURT:  Do you think it does or not,
 2         Mr. Robertson?
 3              MR. ROBERTSON:  Your Honor, I am still,
 4         quite frankly, reacting to your ruling today,
 5         taking it all in and thinking through a lot of
 6         issues, and will be thinking about them in the
 7         next few days as we prepare to meet with you on
 8         Monday, August 16.  You know, I am just
 9         thinking out loud, Your Honor.  So let me --
10              THE COURT:  Well, here is a good idea.
11         Don't think out loud.  It is a good idea.
12              MR. ROBERTSON:  Okay.  I think I will
13         reflect.  I appreciate that, yes.
14              THE COURT:  All right.  Now, I am
15         considering that I dealt with these motions in
16         limine.  If you think otherwise, you have to
17         get them in front of me in some other way.
18              All right.  I think that is taken care of.
19              MR. ROBERTSON:  Thank you, sir.
20              THE COURT:  Thank you all very much.
21              MR. MERRITT:  Thank you, Your Honor.  Bye.
22
23    THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT.
24              Gilbert Frank Halasz, RMR
25              Official Court Reporter
```