# EXHIBIT D

Telephone Conference with Judge Payne  8/10/2010  2:51:00 PM

---

**Page 1**

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF VIRGINA
 2                       Richmond Division
 3
 4
 5    ePlus, Inc.,
 6              Plaintiff,
 7    versus              309 CV 620
 8    Lawson Software, Inc.
 9              Defendant
10
11
12         before: HONORABLE ROBERT E. PAYNE
                Senior United States District Judge
13
14
15
16            August 10, 2010
              Richmond, Virginia
17
18
19            Phone Conference
20
21
22        Gilbert F. Halasz, RMR
          Official Court Reporter
23        U. S. Courthouse
          Richmond, Virginia
24        (804) 916-2248
25
```

**Page 2**

 1    THE COURT:  Hello.
 2    MR. MERRITT:  Hello, Judge Payne.  Can you hear us?
 3
 4    THE COURT:  Yes, I can.  It always helps when you push the right button.
 5
 6    All right.  This is ePlus against Lawson,
 7    3:09 CV 620.
 8    And there has been some papers filed at
 9    the request of ePlus following an argument on
10    ePlus' motion in limine.  Excuse me.  Lawson's
11    motion in limine number 3 to preclude
12    Dr. Russell Mangum from testifying at trial.
13    And you submitted a decision to read i4i
14    Limited Partnership.  There have been some
15    briefs filed.
16    First, there is a question of whether -- I
17    don't understand what the positions of the
18    parties are -- whether the parties actually
19    agreed that the deposition of experts would
20    serve as rebuttal expert reports.  It looks to
21    me like that the two of you are at odds on that
22    position.
23    What is the position of the plaintiff and
24    the support that you have for it?  And the
25    position of the defendant?

**Page 3**

 1    Please, starting, with the plaintiff.
 2    But first, who is here for plaintiff and
 3    who for the defendant?
 4    Starting with the plaintiff.
 5    MR. MERRITT:  Your Honor, this is Craig
 6    Merritt and Henry Willett from Christian and
 7    Barton on behalf of the plaintiff.
 8    Mr. Robertson and Mr. Strapp are on the
 9    line as well.
10    MR. CARR:  Judge, this is Dabney Carr with
11    Troutman Sanders on behalf of Lawson Software.
12    And Dan McDonald and Rachel Hughey from
13    Richmond Coal are also on the line.
14    THE COURT:  Start with the first issue,
15    ePlus.
16    MR. MERRITT:  Your Honor, this is Craig
17    Merritt.
18    Others can correct me if I have any of
19    this wrong, but I am advised that the parties,
20    I think primarily Mr. Robertson and
21    Mr. McDonald, had a discussion arising out of
22    the fact that the parties had agreed some time
23    ago that there would not be rebuttal written
24    expert reports.  As a consequence the idea was
25    that when these experts gave their depositions

**Page 4**

 1    the parties would be able to explore further
 2    that which had been disclosed in their reports
 3    and to allow the experts an opportunity to
 4    respond to each other's criticisms and that
 5    whatever was in those transcripts would be
 6    considered part of the expert disclosures --
 7    MR. CARR:  Judge --
 8    MR. MERRITT:  -- and usable at trial.
 9    THE COURT:  What is the position of
10    Lawson?
11    MR. McDONALD:  Your Honor, this is Dan
12    McDonald.
13    My recollection of that -- and there was
14    nothing that ePlus supplied that is
15    inconsistent with my recollection -- is that to
16    streamline the case we stopped the third round
17    of experts.  We had two rounds.  We had the
18    original report and rebuttal expert, written
19    reports in this case.  We didn't have a third
20    round of surrebuttal reports.  And the
21    agreement was any surrebuttal would be covered
22    by the depositions as well as any inquires
23    people wanted to go into regarding the original
24    reports that the experts provided.  Certainly
25    there is nothing even about what I heard

Telephone Conference with Judge Payne  8/10/2010  2:51:00 PM

**5**

1  counsel for ePlus say that would indicate that
2  the parties agreed that the original reports
3  could be deficient and you could fix that by
4  depositions that occurred later in the case.
5  That was not the agreement at all. It was we
6  could ask about what the opening expert thought
7  about the opposing party's rebuttal expert
8  report when the opening expert was deposed. So
9  there is no agreement here that would allow
10  curing defects in the original report. And I
11  would also note that ePlus did not raise that
12  in their opposition to this motion in the first
13  place.
14      MR. ROBERTSON: Your Honor, this
15  Mr. Robertson. Mr. McDonald and I had this
16  conversation. I don't think we had this
17  agreement.
18      THE COURT: What? Say again. I lost you.
19  I don't see --
20      MR. ROBERTSON: This is Mr. Robertson.
21  And Mr. McDonald and I had this agreement with
22  respect to, you know, the expert reports and
23  how the depositions would serve as part of the
24  rule 26 disclosures. Let me just say with
25  respect to damages which were focused on here

**6**

1  today, there was Mr. Mangum's initial report,
2  and then there is a response report a month
3  later from Mr. Green. Excuse me. I should say
4  Dr. Mangum, Dr. Green. And no opportunity for
5  Dr. Mangum to respond to Dr. Green's criticisms
6  other than in his deposition. So clearly the
7  deposition by agreement was intended to provide
8  an opportunity to respond to any criticisms. I
9  think that is what I heard Mr. Merritt and
10  Mr. McDonald just agree on. So I think I am
11  trying to get down to the basic nub of the
12  question.
13      Problems with the initial report. We are
14  trying to respond to criticisms and have an
15  opportunity to have rebuttal because the
16  schedule became so truncated.
17      THE COURT: No, wait a minute. Wait a
18  minute. You are singing two different tunes
19  here. There is a difference between whether
20  you are going to respond to something in
21  Mangum's, in his deposition, is going to
22  respond to some criticism of his report and
23  whether he was going to issue another report.
24  Those are two different things.
25      MR. ROBERTSON: Well, we had an agreement,

**7**

1  Your Honor, that there would not be a rebuttal
2  report, but that the deposition could serve as
3  the equivalent of a rebuttal report. That was
4  the essence of our agreement. I am not hearing
5  anything that Lawson is saying that contradicts
6  that.
7      THE COURT: Wait a minute. Wait a minute.
8      MR. ROBERTSON: The schedule that we had
9  and what we were trying --
10      THE COURT: Quit talking. Stop talking.
11      Mr. McDonald, did you agree or not agree
12  that the deposition would serve as a rebuttal
13  report, that is, Mangum would have the opening,
14  response would be by Green, and the deposition
15  of Mangum would be a rebuttal report? Did you
16  or did you not have that agreement?
17      MR. McDONALD: We agreed, yes, Your Honor,
18  that the deposition would be -- I would call
19  really the surrebuttal, to be clear, because I
20  would view Green, our damages expert, as the
21  rebuttal witness. And then Mr. Mangum would
22  have the chance to surrebut his report. That's
23  what the agreement was.
24      THE COURT: I think the term is opening
25  report, response report, and the reply,

**8**

1  rebuttal report. But that is the term I am
2  going to use.
3      MR. McDONALD: Okay.
4      THE COURT: Now that is taken care of.
5      Now, what I perceived in the briefing was
6  that Lawson attacked Mangum's report in its
7  opening brief as lacking improper methodology
8  by use of litigation settlements and basing his
9  conclusions on speculation and guess work under
10  the basic arguments where the litigation
11  settlements were of minimum probative value.
12  They were, in substance, because of their
13  context in which they were arrived at, they
14  were of limited probative value because they
15  were years after the hypothetical negotiation
16  would have occurred. That they, the reports,
17  ignores Mangum's report, ignores ePlus' own
18  valuation in 2002 of $12,000. That lump sum
19  settlements under the Lucent decision are not
20  generally probative of a reasonable royalty on
21  a running basis. That the royalty base did not
22  rely on actual sales but projected sales. Not
23  based on any real data, but based on expert
24  reports for ePlus in the SAP case. That there
25  was over inclusion in the royalty base by

Telephone Conference with Judge Payne  8/10/2010  2:51:00 PM

25

1  on whether scientific, technical, or other
2  specialized knowledge would assist the trier of
3  the fact to understand the evidence or to
4  determine a fact in issue.  And said that it is
5  the trial judge's job to insure that any and
6  all scientific testimony or evidence admitted
7  is not only relevant, but reliable.  And the
8  locus of the obligation was found in the rule
9  and was found in the part about whether the
10 knowledge will assist the trier of fact to
11 understand the evidence or determine a fact in
12 issue.
13      And the rule said the Supreme Court was to
14 assure that the testimony, whatever source it
15 came from, would be reliable and relevant.  It
16 then went on to point out, citing Judge
17 Becker's opinion in the Downing case, that
18 there is another component to relevance, and
19 that is fit.  Additional consideration, said
20 The Court, under rule 702 -- and another aspect
21 of relevancy is whether expert testimony
22 proffered in the case is sufficiently tied to
23 the facts of the case that it will aid the jury
24 in resolving a dispute.  This consideration has
25 been aptly described by Judge Becker as one of

27

1  cross examination, presentation of contrary
2  evidence, and careful instruction on the burden
3  of proof are the traditional and appropriate
4  means of attacking shaky but admissible
5  evidence.  So that principle was not announced
6  in i4i, and it is not new.  It is a fundamental
7  precept by which all courts are required to
8  judge the admissibility of evidence and to draw
9  the line between the admissibility of evidence
10 and the conclusions being reached.
11     Kumho then took the matter further.  Kumho
12 held that the basic principles of Daubert, the
13 gatekeeping function, that is, applied to
14 scientific testimony, and indeed to all expert
15 testimony.  Indeed that wasn't even a subject
16 of disagreement by the time it got to the
17 Supreme Court.
18     And there they were really basically
19 dealing with in great measure with the
20 experience-based testimony.  But they once
21 again enunciated that the gatekeeping inquiry
22 must be tied to the facts of the particular
23 case, i.e., the fit.  Citing Downing and citing
24 the Daubert enunciation.
25     In Kumho itself the Supreme Court said as

26

1  fit.  Fit is not always obvious, and scientific
2  validity for one purpose is not only scientific
3  validity for other unrelated purposes.
4      The Court then went on to talk about the
5  measure of scientific testimony.  Has it been
6  tested?  Is the technique or theory tested?
7  Has there been peer review?  Is there a known
8  rate of error?  And then it allowed
9  consideration of general acceptance, which is
10 in part how the issue came to the Supreme
11 Court.  Because up until then the rule of
12 general acceptance and scientific community
13 enunciated in Frye had in fact been the
14 criterion for the admissibility of evidence in
15 the federal courts.
16     The Court made perfectly clear that the
17 focus of the trial judge's gatekeeping
18 responsibility is on method and principles not
19 upon the conclusions.  There is no question
20 about that.  That aspect of i4i is not at all
21 unusual.  It has in fact been clear, if it
22 weren't before then, since Daubert was decided.
23 That is found at 2797 and 2798 of 113 Supreme
24 Court.
25     So, too, is the concept that vigorous

28

1  it cited itself from the Joyner decision,
2  nothing in either Daubert or the federal rules
3  of evidence requires a District Court to admit
4  opinion that is connected to existing data only
5  by the ipse dixit of the expert.  Ipse dixit
6  means that it is so because I say it is so.
7  That same precept has been adopted in Pugh
8  against Louisville Ladder, Incorporated in 361
9  federal appendix, and citing a number of cases,
10 including Joyner, holding that the district
11 court discretion includes the discretion to
12 find that there is, citing Joyner, simply too
13 great an analytical gap between the data and
14 the opinion proffered in deciding whether or
15 not the proper evidence is of the ipse dixit
16 variety.  In fact, the two text parts in
17 footnote four of that case, Pugh, make quite
18 clear the relationship and the nexus between
19 them.
20     In Bright against American Household
21 Products the fourth circuit pointed out that
22 Daubert aims to prevent expert speculation.
23 And to my knowledge those are the fundamental
24 rules by which rule 702 is to be applied.
25     Now, I have studied the deposition

Telephone Conference with Judge Payne  8/10/2010  2:51:00 PM

33

1  lump sum payments for the most part that in
2  fact have been converted by this man, Mangum,
3  into running royalty rates, and you consider
4  that the base he used is in every instance an
5  assumed base for the quantum of sales in
6  positing his analysis, and then you consider at
7  the same time that for no valid economic reason
8  that can be ascertained from the face of his
9  report that he has thrown out three out of five
10 settlement agreements; and when you consider
11 that ePlus itself valued these rights at a far
12 lesser figure then one has to but conclude that
13 the bench mark constructed by this expert bears
14 virtually no resemblance to the bench mark
15 constructed by the expert used by the expert in
16 i4i.  So I agree that while litigation
17 settlements have minimum probative value, they
18 can be considered.  But in the facts of this
19 case, the way he went about it, it establishes
20 a very shaky bench mark against which to start
21 his calculations, and the predicate settlements
22 also suffer from that, from the defect that are
23 not generally probative under Lucent, that is,
24 lump sum settlements are not generally
25 probative under Lucent of a reasonable royalty.

34

2       Further, I have been back and studied how
3  it is that this expert took a range of 2.5 to
4  3.7 and got it to 5.6.  That is a basic
5  doubling -- excuse me -- to a range of 5 to 6.
6  That is essentially a doubling of the royalty
7  rate.  He does it by saying that certain of the
8  factors of Georgia Pacific effectuate an
9  increase, certain factors are neutral, without
10 explaining what part of which one of those
11 factors accounts for a doubling or a
12 significant increase, nor does he explain how
13 he factors in the aggregate to actually achieve
14 an increase.  He just makes a bunch of general
15 statements about each of the factors, concludes
16 that it is either statistically neutral or
17 indicating a higher royalty rate.  He doesn't
18 say it requires arrival at a higher royalty
19 rate in every case.  He says it indicates or
20 suggests, thereby indicating to me a
21 considerable speculation.
22      What that all boils down to when you look
23 at his factors, I think it is 5 and 6, and then
24 8313 is this.  That is the quintessential
25 definition of an ipse dixit.  2.5 to 3.7 goes

35

1  to a range of 5 to 6 because I say so.  And I
2  am an expert.  And that is exactly what he has
3  done.  And that is a methodology flaw, not a
4  disagreement with his facts.  That is just a
5  methodology flaw that renders his analysis such
6  as to be sufficiently unreliable that it will
7  not be healthy -- help the finder of the fact
8  determine an issue or understand the evidence
9  or to determine a fact in issue.  And, in fact,
10 it posits a very real risk of the very threat
11 that is presented by having or allowing experts
12 to posit ipse dixit statements.
13      You get a person with a big credential who
14 comes in well dressed, is impressive, says it
15 is so because I say so, and the jury is
16 confused and apt to be -- and apt to be
17 impressed by the credential rather than the
18 analytical method.  And rule 403, which Daubert
19 says has to be applied in applying it, or has
20 to be considered in applying rule 702, says
21 that that kind of evidence is to be kept out.
22      So I view this as certainly not -- I don't
23 think it is The Court's job to make the
24 judgment about whether, about the factual
25 underpinnings or the validity val non of the

36

1  conclusions.  I know it is not.  We have been
2  taught to do this, to take that approach since,
3  at least since Daubert, if not before.  But
4  certainly since Daubert.  That is the approach
5  of taking in this circuit, and drummed in to
6  the heads of all district judges in every case
7  that is decided on this issue.  And it is the
8  methodology that is flawed.  I don't address
9  the conclusions.  For those reasons the motion
10 number 3 will be granted, and the motion number
11 1 and 2, therefore, are denied as moot.
12      I believe that solves, or that deals and
13 takes care of those motions; is that right?  Is
14 there anything left?  Is there anything left?
15      MR. McDONALD:  Well, settlement agreements
16 themselves, Your Honor, are subject of a motion
17 in limine number one.  Not sure by saying it is
18 moot are you saying the expert is the only way
19 that would come in?  They are not coming in any
20 way?  If that is right, we are fine.  But if
21 that is leaving the door open to those being
22 somehow presented to the jury and those million
23 dollar numbers getting in front of the jury we
24 still would want that motion decided and
25 granted as well.