# EXHIBIT Q

NO. 04-1572

In The

# United States Court of Appeals
## For The Federal Circuit

# MICROSTRATEGY INCORPORATED,

*Plaintiff - Appellant,*

FILED
U.S. COURT OF APPEALS FOR
THE FEDERAL CIRCUIT

MAR 2 2 2005

JAN HORBALY
CLERK

*v.*

# BUSINESS OBJECTS, S.A. and
# BUSINESS OBJECTS AMERICAS, INC.,

*Defendants - Appellees.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA IN CASE NO. 01-CV-826,
JUDGE JEROME B. FRIEDMAN

_____

# NON-CONFIDENTIAL BRIEF OF DEFENDANTS-APPELLEES
# BUSINESS OBJECTS, S.A. and BUSINESS OBJECTS AMERICAS, INC.

_____

Daniel J. Furniss
Gary H. Ritchey
Joseph A. Greco
TOWNSEND AND TOWNSEND
   AND CREW LLP
379 Lytton Avenue
Palo Alto, California 94301
(650) 326-2400

*Date of Brief:  March 22, 2005*          *Counsel for Appellees*

Form 9

FORM 9. Certificate of Interest

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

MICROSTRATEGY INC.       v.   BUSINESS OBJECTS, S.A., et al.

No.   04-1572

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)
____Business Objects____ certifies the following (use "None" if applicable; use extra sheets if necessary):

1.   The full name of every party or amicus represented by me is:

Business Objects, S.A.

Business Objects Americas, Inc.

2.   The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

3.   All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Business Objects Americas, Inc. is a wholly owned subsidiary of

Business Objects, S.A.

4. ☒ There is no such corporation as listed in paragraph 3.

5.   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

See Attached List

March 18, 2005
Date

_Signature of Counsel_

Daniel J. Furniss
Printed Name of Counsel

60446661 v1

The names of all law firms and the partners and associates that appeared for Business Objects, S.A. and Business Objects Americas, Inc. in the trial court or are expected to appear in this Court are:

Daniel J. Furniss
Theodore G. Brown
Gary H. Ritchey
Joseph A. Greco
Ian L. Saffer
Thomas F. Fitzpatrick
TOWNSEND and TOWNSEND and CREW LLP
379 Lytton Avenue
Palo Alto, California 94301-1431
(650) 326-02400

Dana J. Finberg (VSB #34977)
David J. Sensenig (VSB #41102)
Ray W. King (VSB #22253)
LECLAIR RYAN, P.C.
707 E. Main Street, 11th Floor
Richmond, Virginia 23219
(804) 783-2003

Robert D. Luskin
Patton Boggs LLP
2550 M Street, NW
Washington, DC 20037
(202) 457-6000

60447998 v1

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. vii

STATEMENT OF RELATED CASES ................................................................. 1

STATEMENT OF THE ISSUES ......................................................................... 1

STATEMENT OF THE CASE ............................................................................. 2

STATEMENT OF FACTS ................................................................................... 5

I.  MICROSTRATEGY PRESENTS AN EXTREMELY
    DISTORTED, ONE-SIDED AND ULTIMATELY
    IRRELEVANT RECITATION OF ITS ACCUSATIONS
    AGAINST BUSINESS OBJECTS AS "FACTS" ................................. 5

    A.  MicroStrategy's Portrayal Of The Background Facts Is
        Highly Distorted, But Ultimately Irrelevant ............................... 5

    B.  The Actual Background Is Significantly More Mundane
        Than MicroStrategy's Portrayal ................................................... 6

    C.  What Is Tellingly Missing From MicroStrategy's Factual
        Statement Is Any Evidence Of Damages Or Causation ............ 7

II.  FACTS RELEVANT TO THE EXCLUSION OF EVIDENCE
     ON DAMAGES ................................................................................... 9

    A.  Restated Earnings ...................................................................... 10

    B.  SEC Investigation ...................................................................... 11

    C.  Class Action Lawsuits ................................................................ 12

    D.  Massive Layoffs ......................................................................... 12

    E.  Introduction of New Products ................................................... 13

i

III.   FACTS RELEVANT TO SUMMARY JUDGMENT OF NON-INFRINGEMENT ............................................................... 13

SUMMARY OF ARGUMENT............................................................... 17

ARGUMENT ............................................................... 18

I.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN EXCLUDING MICROSTRATEGY'S EVIDENCE ON DAMAGES............................................................... 18

      A.    The Standard Of Review ........................................................ 18

      B.    Daubert Requires The District Court To Exercise A Gatekeeping Function Regarding Expert Opinion Testimony ........................................................ 19

      C.    The District Court Properly Exercised Its Gatekeeper Function Under Daubert When It Excluded The Yurkerwich Expert Report On Damages ................................ 20

            1.    This Court Cannot Evaluate The Propriety Of The District Court's Actions Without Considering The Full Record That Was Before The District Court.......... 20

            2.    The Yurkerwich Report Was Excluded Because Of Multiple Deficiencies ...................................... 20

            3.    The District Court Properly Excluded The Yurkerwich Report For Failing To Consider Relevant Variables ....................................... 22

                  a)    Yurkerwich Simply Ignored The Relevant Variables ................................................ 22

                  b)    The Court Properly Considered The Record ....... 24

c)      The District Court Considered And Rejected MicroStrategy's Argument That Yurkerwich Had Used The Year 2000 As A Baseline To Account For MicroStrategy's Business Difficulties ........................................................ 24

4.      The District Court Properly Excluded The Yurkerwich Report For Failing To Show Causation ..................................................................... 27

5.      The District Court Properly Excluded The Yurkerwich Report For Failure To Disaggregate Damages Or To Consider The Value Or Useful Life Of The Individual Trade Secrets Allegedly Misappropriated. .......................................................... 28

D.      The District Court Properly Excluded Yurkerwich's Supplemental And Revised Expert Reports .............................. 30

1.      Factual Background ......................................................... 30

2.      The New Yurkerwich Reports Were Both Untimely And Methodologically Infirm ........................ 31

a)      The New Reports Were Untimely ....................... 31

b)      The New Reports Were Also Methodologically Infirm ...................................... 33

E.      The District Court Properly Excluded At Trial New Damages Theories That Had Not Been Properly Disclosed In Discovery ............................................................ 34

II.     THE DISTRICT COURT CORRECTLY DETERMINED THAT THE NON-SOLICITATION CLAUSE IN MICROSTRATEGY'S EMPLOYMENT CONTRACT WAS UNENFORCEABLE .......................................................................... 36

A.   The Restraint Is Ambiguous And Overbroad, And
     Therefore Greater Than Necessary To Protect
     MicroStrategy's Legitimate Business Interests ........................ 37

     1.   The Restraint Is Improperly Vague................................. 37

     2.   The Restrictive Covenant Is Overbroad.......................... 38

B.   The Restrictive Covenant Is Unduly Harsh And
     Oppressive ................................................................................. 40

C.   The Restraint Is Not Reasonable As Sound Public Policy....... 41

III.   THE DISTRICT COURT CORRECTLY DETERMINED
       THAT MICROSTRATEGY'S CONSPIRACY CLAIM WAS
       PREEMPTED ..................................................................................... 42

A.   MicroStrategy Should Be Precluded From Making
     Arguments Not Properly Raised In The Court Below ............. 42

B.   The District Court Correctly Found Preemption...................... 43

IV.   THE DISTRICT COURT ACTED CORRECTLY IN
      GRANTING JUDGMENT AS A MATTER OF LAW ON
      MICROSTRATEGY'S TORTIOUS INTERFERENCE CLAIM...... 46

A.   Summary of Argument............................................................... 46

B.   Virginia Law Requires Proof Of Causation ............................. 46

C.   MicroStrategy Failed To Meet Its Burden Of Proving
     That It Was Damaged By The Purported Wrongful
     Conduct...................................................................................... 48

D.   The District Court Acted Correctly In Granting Business
     Objects Judgment As A Matter Of Law.................................... 50

V.   THE DISTRICT COURT CORRECTLY GRANTED
     SUMMARY JUDGMENT OF NON-INFRINGEMENT OF
     U.S. PATENT NO. 6,260,050 ............................................................ 52

A.    Summary Of Argument ............................................................. 52

B.    The Patent, Claims, Claim Elements And Terms At Issue ...... 53

C.    The District Court Adopted MicroStrategy's Proposed
      Claim Construction .................................................................... 54

D.    MicroStrategy Concurred With And Verified The District
      Court's Claim Construction To Avoid The Prior Art, And
      Should Now Be Barred From Contesting That
      Construction .............................................................................. 55

E.    Summary Judgment Was Appropriate Because There
      Was No Dispute That The Accused Product Does Not
      Have A "Device Specific Style" Associated With  (Or
      Specified For) "Each User Device." ........................................ 59

      1.    The District Court Correctly Found That The Third
            Claim Limitation Is Not Met .......................................... 59

      2.    The District Court Correctly Found That The Fifth
            Claim Limitation Is Not Met .......................................... 62

F.    MicroStrategy's Call For A Finding Of Infringement
      Completely Ignores The Posture Of This Case ........................ 63

CONCLUSION ........................................................................................ 64

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF COMPLIANCE

STATEMENT REGARDING REDACTED MATERIAL

The redacted information on page 8 relates to customer data.  The redacted information on pages 13 - 17 relates to the operation of Business Objects' Broadcast Agent Publisher.  The redacted information on page 28 relates to Yurkerwich's damage figures.  The redacted information on page 30 relates to Yurkerwich's damage figures.  The redacted information on page 50 relates to customer information. The redacted information on pages 60 - 62 relates to the operation of Business Objects' Broadcast Agent Publisher.

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alston Studios, Inc. v. Lloyd V. Gress & Assoc.,*
    492 F.2d 279 (4th Cir. 1974)..................................................................... 37

*Barrett v. Atlantic Richfield Co.,*
    95 F.3d 375 (5th Cir. 1996)...................................................................... 32

*Bischoff v. Wethered,*
    76 U.S. (9 Wall.) 812 (1870) .................................................................... 59

*Blue Dane Simmental Corp. v. American Simmental Ass'n.,*
    178 F.3d 1035 (8th Cir. 1999)........................................................ 23, 26, 27

*Caldwell v. United States,*
    391 F.3d 1226 (Fed. Cir. 2004).................................................................. 43

*Carr v. Citizens Bank and Trust Co.,*
    228 Va. 644 (1985) ................................................................................... 47

*Children's Broadcasting Corp. v. The Walt Disney Co.,*
    245 F.3d 1008 (8th Cir. 2001).................................................................... 29

*Claar v. Burlington N. R.R. Co.,*
    29 F.3d 499 (9th Cir. 1994)....................................................................... 23

*Concord Boat Corp. v. Brunswick Corp.,*
    207 F.3d 1039 (8th Cir. 2000).................................................................... 23

*Cooper v. Whiting Oil Co., Inc.,*
    226 Va. 491 (1984) ................................................................................... 48

*Corti v. Storage Tech. Corp.,*
    304 F.3d 336 (4th Cir. 2002)..................................................................... 42

*Daubert v. Merrill Dow Pharmaceuticals, Inc.,*
    509 U.S. 579 (1993) ............................................................................ 19, 28

*DeJarnette v. Corning, Inc.,*
    133 F.3d 293 (4th Cir. 1998)........................................................... 50

*Eastern Auto Distrib., Inc. v. Peugeot Motors of Am., Inc.,*
    795 F.2d 329 (4th Cir. 1994)........................................................... 19

*El Aguila Food Products. v. Gruma Corp.,*
    301 F. Supp. 2d 612 (S.D. Tex. 2003) ............................................ 23

*Forshey v. Principi,*
    284 F.3d 1335 (Fed. Cir. 2002), *superceded on other grounds,*
    *Morgan v. Principi,* 327 F.3d 1357 (Fed. Cir. 2003)...................... 58

*Foti v. Cook,*
    263 S.E.2d 430 (Va. 1980)............................................................... 40

*General Elec. Co. v. Joiner,*
    522 U.S. 136 (1997)........................................................ 18, 19, 28

*Grant v. Carotek, Inc.,*
    737 F.2d 410 (4th Cir. 1984)........................................................... 36

*Hale v. Fawcett,*
    214 Va. 583 (1974) ........................................................................ 48

*Hartwell v. Danek Medical, Inc.,*
    47 F. Supp. 2d 703 (W.D. Va. 1999) ........................... 27-28, 46-47

*Hossaini v. Western Mo. Med. Ctr.,*
    140 F.3d 1140 (8th Cir. 1998).......................................................... 58

*Keener v. United States,*
    181 F.R.D. 639 (D. Mont. 1998)...................................................... 32

*Kumho Tire Co., Ltd. v. Carmichael,*
    526 U.S. 137 (1999)........................................................ 18, 19, 26

*LaPlace-Bayard v. Batlle,*
    295 F.3d 157 (1st Cir. 2002)........................................................... 32

*Lockheed Martin Federal Systems, Inc. v.*
*Cincinnati Bell Information Systems, Inc.,*
    46 Va. Cir. 228 (Va. Cir. Ct. 1998)............................................................ 45

*McAfee v. United States,*
    832 F.2d 152 (Fed. Cir. 1983)................................................................... 48

*Medcom, Inc. v. Arthur Weaver Co., Inc.,*
    232 Va. 80 (1986) .................................................................................... 47

*Modern Env'ts, Inc. v. Stinnett,*
    263 Va. 491 (2002) .................................................................................. 36

*Muth v. United States,*
    1 F.3d 246 (4th Cir. 1993)....................................................................... 42

*NSW Corp. v. Ferguson,*
    49 Va. Cir. 456 (1999) ....................................................................... 43, 46

*Palmer v. Connecticut Railway & Lighting Co.,*
    311 U.S. 544 (1941)................................................................................. 47

*Panther Coal Co. v. Looney,*
    185 Va. 758 (1946) .................................................................................. 48

*Power Distribution, Inc. v. Emergency Power Eng'g, Inc.,*
    569 F. Supp. 54 (E.D. Va 1983)........................................................... 38, 41

*Rambus, Inc. v. Infineon Techs. AG,*
    145 F. Supp. 2d 721 (E.D. Va. 2001) ...................................................... 32

*Roto-Die Co. v. Lesser,*
    899 F. Supp. 1515 (W.D. Va. 1995) ........................................................ 36

*Schiller & Schmidt, Inc. v. Nordisco Corp.,*
    969 F.2d 410 (7th Cir. 1992).................................................................... 20

*Schumate & Co., Inc. v. National Ass'n of Sec. Dealers, Inc.,*
    509 F.2d 147 (5th Cir. 1975).................................................................... 47

*Sierra Club v. Cedar Point Oil Co.*,
    73 F.3d 546 (5th Cir. 1996).................................................................. 33

*Smithers v. C & G Custom Module Hauling*,
    172 F. Supp. 2d 765 (E.D. Va. 2000) ........................................... 22

*Smithfield Ham & Products Co. v. Portion Pac, Inc.*,
    905 F. Supp. 346 (E.D. Va. 1995)................................................ 44

*Southern States Rack & Fixture v. Sherwin-Williams*,
    318 F.3d 592 (4th Cir. 2003)........................................... 32, 33, 35

*Spray-Rite Service Corp. v. Monsanto*,
    684 F.2d 1226 (7th Cir. 1982), *aff'd*,
    465 U.S. 752 (1984) ...................................................................... 29

*Stone Castle Financial, Inc. v. Friedman, Billings, Ramsey & Co.*,
    191 F. Supp. 2d 652 (E.D. Va. 2002) ..................................... 44, 45

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
    282 U.S. 555 (1931) ............................................... 28, 47, 51

*TFWS, Inc. v. Schaefer*,
    325 F.3d 234 (4th Cir. 2003)........................................................ 18

*Van Gaalen v. Sparks*,
    555 F. Supp. 325 (E.D. Va. 1983)................................................ 58

*Virginia Vermiculite, Ltd. v. W.R. Grace & Co.*,
    98 F. Supp. 2d 729 (W.D. Va. 2000) ...................................... 23-24

*Whitaker v. Van Fossan*,
    297 F.2d 245 (4th Cir. 1961)........................................................ 22

**Statute**

Virginia Civil Code § 59.1-341(A) .......................................................

**Federal Rules of Civil Procedure**

Rule 12(b)(6) ........................................................................................... 45

Rule 16(f) ................................................................................................ 31

Rule 26 ........................................................................................... 31, 51, 52

Rule 26(a)(2)(B) .................................................................................. 24, 32

Rule 26(e)(2) ......................................................................................... 2, 35

Rule 37 .................................................................................................... 52

Rule 37(c)(1) ........................................................................................ 2, 35

Rule 50(a)(1) ............................................................................................ 50

Rule 59(a) ................................................................................................ 43

**Other Authorities**

9A Charles A. Wright & Arthur R. Miller,
Federal Practice and Procedure § 2558, at 470 (2d ed. 1995) ................................. 58

## STATEMENT OF RELATED CASES

No appeal in or from the same civil action was previously before this Court or any other appellate court, and there is no related case pending in this or any other court.  Business Objects and MicroStrategy have filed notices of appeal from a December 3, 2004 ruling of the District Court denying their respective motions for costs and fees.  That appeal is presently stayed.

## STATEMENT OF THE ISSUES

With respect to MicroStrategy's tort claims, whether the District Court:

1.     Correctly exercised its gatekeeping function under *Daubert* to exclude a methodologically flawed expert report on damages that failed to, *inter alia*: (1) account for highly relevant variables, (2) show causation, and (3) apportion damages by cause of action or purported wrongful act.

2.     Correctly found to be void a vague and overbroad "non-solicitation" provision in MicroStrategy's employment agreement that effectively barred an ex-employee from any form of employment or act potentially detrimental to MicroStrategy's interests.

3.     Correctly found MicroStrategy's claim for conspiracy to be preempted under the Virginia Uniform Trade Secrets Act, where MicroStrategy admitted that its conspiracy claim was completely based on its trade secrets claim.

4.      Correctly precluded MicroStrategy, under Federal Rules of Civil Procedure 26(e)(2) and 37(c)(1), from presenting at trial damages theories that it had failed to set forth in its initial or supplementary response to a specific interrogatory from Business Objects asking for this information.

5.      Correctly determined at the conclusion of its evidence at trial that MicroStrategy had failed to present admissible evidence sufficient to show any causation of any damages, and therefore granted judgment as a matter of law to Business Objects on MicroStrategy's tortious interference cause of action.

With respect to MicroStrategy's patent infringement claim, whether the District Court:

1. Correctly found non-infringement where elements of the asserted claims required a device-specific style to be associated with (element 3) or specified for (element 5) a user device, and where the accused device associates a style with a publication independently from any user device, and moreover where MicroStrategy had relied upon this distinction to argue that its patent was not anticipated by prior art.

## STATEMENT OF THE CASE

On October 30, 2001, MicroStrategy sued Business Objects, S.A. and Business Objects Americas, Inc., (together "Business Objects") for infringement of U.S. Patents 6,260,050 ("the '050 patent") and 6,270,033 ("the '033 patent").

2

Subsequently, MicroStrategy amended its complaint to add four business tort claims:  misappropriation of trade secrets (Va. Code § 59.1-336 *et seq*.); tortious interference with employment agreements; computer fraud and abuse (18 U.S.C. § 1030); and conspiracy (Va. Code § 18.2-499 *et seq*.).  (A23403-48.)  The District Court bifurcated the patent and business tort claims.

At a hearing on September 19, 2002, the District Court exercised its gatekeeping function under *Daubert* to exclude MicroStrategy's methodologically flawed expert report on damages.  In a series of subsequent rulings, the District Court affirmed the exclusion of the expert report, and barred two supplemental expert damage reports from MicroStrategy on the grounds that they were untimely and suffered from the same methodological infirmities as the initial report.

On October 22, 2002, the District Court ruled that a vague and overbroad restrictive covenant in MicroStrategy's employment agreement was void as a violation of Virginia law and public policy.

Since causation of damages was an essential element of each of MicroStrategy's business tort claims (not including its claim for injunctive relief for misappropriation), and MicroStrategy had no evidence apart from the excluded opinion of its expert, Business Objects moved for summary judgment on the ground of no evidence of actual damages.  Business Objects also moved to dismiss the conspiracy claim as preempted by the Virginia Trade Secrets Act.  On

December 30, 2002, the District Court granted Business Objects' motion as to computer fraud and abuse, conspiracy, and the damages portion of MicroStrategy's misappropriation of trade secrets claim. The District Court, finding a dispute of fact regarding damages for tortious interference, denied Business Objects' motion as to that claim.

The case proceeded to jury trial on MicroStrategy's tortious interference claim on October 20, 2003. During trial, the District Court sustained Business Objects' objections to the introduction of new damages theories because MicroStrategy had never disclosed these theories in either its original response or supplemental response to Business Objects' interrogatory on precisely this issue. At the end of MicroStrategy's evidence, the District Court granted Business Objects' motion for judgment as a matter of law based on MicroStrategy's failure to introduce admissible evidence sufficient to show any causation of damages. The case continued as a bench trial on MicroStrategy's claim for injunctive relief for misappropriation of trade secrets. On August 6, 2004, the District Court issued a ruling finding that MicroStrategy had proven misappropriation only as to two specific documents, and issued an injunction directed to those documents.

MicroStrategy failed to provide an expert infringement report or to respond to interrogatories directed to its allegations of infringement of the '033 patent, but nevertheless refused to voluntarily dismiss it. On December 18, 2003, the District

Court granted Business Objects' motion and dismissed that claim without prejudice.

Business Objects and MicroStrategy filed cross-motions for summary judgment regarding the '050 patent.  On August 6, 2004, the Court granted Business Objects' motion on the ground of non-infringement.

## STATEMENT OF FACTS

**I.     MICROSTRATEGY PRESENTS AN EXTREMELY DISTORTED, ONE-SIDED AND ULTIMATELY IRRELEVANT RECITATION OF ITS ACCUSATIONS AGAINST BUSINESS OBJECTS AS "FACTS"**

### A.    MicroStrategy's Portrayal Of The Background Facts Is Highly Distorted, But Ultimately Irrelevant

MicroStrategy devotes twelve pages of its Brief to presenting an extraordinarily distorted view of the record as a whole — a view so skewed that any finder of fact would immediately have seen it as a gross exaggeration and distortion of the evidence admitted during trial.

Business Objects' natural tendency is to want to set the record straight.  For example, MicroStrategy specifically accuses Business Objects of having a "spy" in MicroStrategy's organization.  Yet as the District Court found (A9):

> Although MicroStrategy contends Business Objects had a "spy" inside MicroStrategy, this allegation rests on a use of that term in an email that was clearly intended to be playful.  The spy reference was followed by a "smiley face" emoticon. *See* ex. P1.  The spy in question was simply a friend of a Business Objects employee.  Tocanne Dep. at 88.  Such an exchange of information, while improper in many, if not most,

5

> instances, seems common in any industry and does not necessarily constitute the misappropriation of a trade secret. As noted, during the relevant time frame, MicroStrategy was in possession of Business Objects information.

Virtually every one of the sweeping assertions made by MicroStrategy in its recitation of purported "facts" could be similarly challenged, but doing so would require burdening this Court with a large and irrelevant portion of the factual record. MicroStrategy utterly fails to tie those "facts" into the legal determinations of the District Court that are the actual subject of its appeal. Accordingly, although noting its strong exception to MicroStrategy's skewed recitation of purported facts, Business Objects will confine itself to facts that have some actual relevance to the issues to be decided.

## B.    The Actual Background Is Significantly More Mundane Than MicroStrategy's Portrayal

MicroStrategy and Business Objects are competitors who sell business intelligence software. (A3-4.) Both companies engage in gathering competitive intelligence about the products and activities of the other company. During a time when MicroStrategy was having serious legal and financial difficulties and laying off hundreds of employees, Business Objects hired some 18 MicroStrategy employees or former employees who worked in sales or sales support. Some of these employees either brought with them or later acquired information that MicroStrategy claimed was confidential.

6

The District Court's thorough Findings of Fact and Conclusions of Law show a careful analysis of the factual record. (A2-62.) While critical of some of the activities of certain Business Objects employees, the District Court concluded that MicroStrategy had not proven its misappropriation case except as to only two of the many documents it had alleged to be misappropriated trade secrets, and enjoined Business Objects from possession or use of those documents. (A57-60.)

MicroStrategy's damages claims were dismissed either before trial or after its presentation of its evidence, since MicroStrategy could prove no damages.

### C. What Is Tellingly Missing From MicroStrategy's Factual Statement Is Any Evidence Of Damages Or Causation

MicroStrategy's recitation of facts is devoid of any evidence of damages caused by any purported misconduct of Business Objects. MicroStrategy fails to point to a single sale made by Business Objects, or a single sale lost by MicroStrategy, that was the result of the purported wrongful conduct. That omission is central to the real issues before this Court.

MicroStrategy's damages expert could not show any causation of damages, and ascribed all of MicroStrategy's declines in sales and all of Business Objects' increases in sales to the purported wrongful conduct. He ignored all other relevant factors, such as MicroStrategy laying off the majority of its sales force and slashing its marketing budget. The District Court properly found that this expert report must be excluded. And, absent the unsupported and improper opinions of its

**Confidential Material**
**Has Been Redacted**

expert, MicroStrategy's business tort claims failed because it could not prove the essential elements of causation or damages.

In its Brief, MicroStrategy alleges that Business Objects' sales increased. (Brief 17.)  But absent any causal connection to wrongful conduct, it is certainly not wrongful to be successful in the marketplace.  MicroStrategy also says that Business Objects sold to      of MicroStrategy's existing or targeted customers. (*Id.*)  But there is nothing intrinsically wrongful in taking a customer away from another company, and certainly not in succeeding in selling to a customer that another company had "targeted" — particularly where many of these targets were pre-existing Business Objects customers.

MicroStrategy attempts to trivialize the extent to which its own serious legal and business problems were the cause of its lost sales.  It also asserts that all of its problems were localized in the year 2000.  But its own Form 10-Ks, discussed below, show the fallacy of those assertions.

MicroStrategy tries to portray its serious financial difficulties as a "distraction." (Brief 18.)  This "distraction," however, caused the company to lose two-thirds of its employees, and led the marketplace to wonder if the company would go into bankruptcy.  And what customer would want to buy software from a company that might not be around in the future to support it?  MicroStrategy's

CEO, Michael Saylor, admitted on cross-examination that he had said to the press as follows:

> Q.  Did you ever say that the stress you felt at the time was similar to a father whose son had leukemia?
>
> A.  I might have said that, yeah.
>
> Q.  In fact, you said "my company caught leukemia"; isn't that right?
>
> A.  It's been a long time, but it sounds like something I might have said, yes.
>
> Q.  Little bit worse than a distraction, wouldn't you agree?
>
> A.  It was painful.

(A891 at 932:21–933:5.)

## II.    FACTS RELEVANT TO THE EXCLUSION OF EVIDENCE ON DAMAGES

Among the many deficiencies in the Expert Report of David E. Yurkerwich ("Yurkerwich Report"), two stand out in particular:  (1) its failure to consider any of the many variables which might have actually accounted for MicroStrategy's loss of business or Business Objects' increase in business, and (2) its failure to show any causal connection between the alleged wrongful conduct and the purported damages.

Yurkerwich ascribed every dollar which Business Objects made over what he calculated as a baseline growth rate to the purported wrongful conduct (the

unjust enrichment analysis). And Yurkerwich ascribed every dollar that MicroStrategy lost against what he calculated as a baseline growth rate to the purported wrongful conduct (the lost profits analysis). In other words, in the Yurkerwich analysis, the only factor that influenced whether the companies did better or worse than expected was the purported wrongful conduct — never mind about proving any actual causation — and no other factors mattered. It is no wonder that the District Court found that this analysis failed the red-face test. (A1772 at 431:4-16.)

The factors that Yurkerwich ignored included the following:

**A.    Restated Earnings**

On March 20, 2000, MicroStrategy announced that it was restating its earnings. Instead of the previously announced profit of $12.6 million for 1999, it actually lost between $34 and $40.3 million. It also announced a downward revision for its 1998 earnings. (A25223.) By the end of that day, its stock had lost some 62% of its value. (A25240.)

In April of 2000, MicroStrategy announced that its revenue for 1999 was being adjusted from $205.3 million to $151.3 million, and also announced that it had overstated its earnings for 1997 as well as for 1998 and 1999. (A25242.)

MicroStrategy's Form 10-K for the year ending December 31, 2000, shows the impact:

The revision of our 1999, 1998 and 1997 revenues and operating results has resulted in <u>substantial amounts of negative publicity about us and we believe that this publicity has caused some of our potential customers to defer purchases of our software or to do business with other vendors.</u>  <u>We may not be able to retain key employees and customers if they lose confidence in us</u>, and our vendors and lenders may reexamine their willingness to do business with us.

(A25283, emphasis added.)

In that same Form 10-K, MicroStrategy also warned: "[W]e expect to incur operating losses through at least the third quarter of 2001 and possibly longer." (A25284.)

By mid-2001, there was speculation that MicroStrategy might be forced to file for bankruptcy.  (A25348.)

## B.    SEC Investigation

On April 13, 2002, MicroStrategy announced that the SEC had begun an investigation into its accounting practices.  (A25226-32.)  This raised issues of fraud and put the company under a cloud.  (A25352.)  A settlement was reached in December 2000, on the basis of a permanent injunction and disgorgement of $10 million by three officers, and civil penalties.  (A25356.)  The settlement was approved in April 2001.  (A25358.)

## C.    Class Action Lawsuits

At least five class action lawsuits were filed against MicroStrategy. (A25224.)  MicroStrategy paid about $100 million to settle these suits, in a mixture of five-year promissory notes, stock, and five-year warrants.  (A25358; A25361.)

## D.    Massive Layoffs

In early 2000, MicroStrategy had approximately 2400 employees. (A25368.)  In August of 2000, MicroStrategy rescinded 236 job offers and laid off 234 employees, about 10% of its workforce.  (A25354.)  In the second quarter of 2001, MicroStrategy laid off an additional 597 employees, or about 33% of its total workforce.  (A25391.)  In the third quarter of 2001, MicroStrategy laid off an additional 229 employees.  (*Id.*)

As MicroStrategy acknowledged in its Form 10-K for 2001:

> Staffing levels for sales and marketing personnel decreased by approximately 64% in 2001 over 2000.  As part of the restructuring plans in the second and third quarter of 2001, we have reduced overall spending on marketing initiatives and advertising and have focused our marketing efforts solely on our core business intelligence product line.  While we intend to continue to market our MicroStrategy 7 and 7i software platforms and other technology in our suite of business intelligence products, we expect to continue to reduce our overall advertising and marketing efforts as a percentage of revenue going forward in order to better align our costs with anticipated revenues.

(A25398, emphasis added.)

Confidential Material
Has Been Redacted

As of December 31, 2001, MicroStrategy had gone from a total of about 2400 employees down to only 844 employees.  (A25385.)

### E.    Introduction of New Products

MicroStrategy introduced a major new product, MicroStrategy 7, in June 2000, and MicroStrategy 7i in April 2002.  (A25099.)  During this same period Business Objects was introducing new products and new versions of old products.

## III.    FACTS RELEVANT TO SUMMARY JUDGMENT OF NON-INFRINGEMENT

MicroStrategy's factual recitation regarding its patent infringement claims is thinly disguised argument.  Very simply, MicroStrategy's claims require that a device-specific style (*i.e.*, formatting) be associated with (claim element 3) or specified for (claim element 5) a specific user device (such as an email address or a cell phone).  (A68-69.)

The accused product, Broadcast Agent Publisher ("Publisher"), is a server-based publishing system designed to broadcast business information to a mass audience via email.  (A41905-10.)


In other words, no device-specific style is associated with or specified for a user device.  The accused product operates in this regard in the same manner as prior art cited to the District Court (art that was never before the PTO).  (A39642-47.)

**Confidential Material**
**Has Been Redacted**

MicroStrategy argued that the prior art did not invalidate the claims because

in the prior art the formatting was done independently of a specific user device.

(A42081-83.) But it now argues, for purposes of an infringement analysis, that the

claims should be interpreted as encompassing a situation where the formatting is

independent of the type of device to which the output is delivered.  Moreover, it

argues that there is an "association" of style to device that factually does not exist,

but which if it existed for the accused product, would necessarily exist for the prior

art.  The inconsistency in positions is obvious and impermissible.

The relevant, undisputed facts about the accused product are as follows:

Using Publisher,

Confidential Material
Has Been Redacted

**Confidential Material Has Been Redacted**

**Confidential Material Has Been Redacted**

# SUMMARY OF ARGUMENT

Because of the sheer number of decisions that MicroStrategy has chosen to appeal, each of Business Objects' arguments herein is already a mere summary of the more complete briefing made to the District Court.

Very simply, MicroStrategy could not prove any causation of damages for its tort claims.  It submitted an outrageous expert report that was properly excluded, and its attempt to ambush Business Objects at trial by making new damages arguments not set forth in its interrogatory responses was properly rejected by the District Court.  The District Court also properly found a vague and overly broad restrictive covenant in MicroStrategy's employment agreement to be void as against public policy, and found MicroStrategy's conspiracy claim to be preempted under Virginia law since it was predicated entirely on its misappropriation of trade secrets claim.  As to the patent case, MicroStrategy

avoided a finding of invalidity by arguing a more limited reach of its claims, and now seeks to alter its position to claim infringement.  In the accused product a device-specific style is not associated with (element 3) or specified for (element 5) a user device, and therefore there is no infringement.

In a nutshell, as shown by its thoughtful opinions, the District Court got it right.

## ARGUMENT

## I.   THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN EXCLUDING MICROSTRATEGY'S EVIDENCE ON DAMAGES

### A.   The Standard Of Review

Appellate courts apply an abuse of discretion standard when reviewing a trial court's decision to admit or exclude expert testimony.  *General Elec. Co. v. Joiner*, 522 U.S. 136, 139 (1997).  An appellate court must afford the district court's gatekeeping determinations under *Daubert* "the deference that is the hallmark of abuse-of-discretion review." *Id.* at 143.  "We give 'great deference' to a district court's decision to admit or exclude expert testimony under *Daubert*." *TFWS, Inc. v. Schaefer*, 325 F.3d 234, 240 (4th Cir. 2003) (citation omitted).

The Supreme Court also has emphasized that "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).

18

**B.**     **Daubert Requires The District Court To Exercise A Gatekeeping Function Regarding Expert Opinion Testimony**

Under the Supreme Court's decisions in *Daubert v. Merrill Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), and *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137 (1999), the district court serves a gatekeeper function for expert opinion testimony.  "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it.  Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." *Daubert,* 509 U.S. at 595 (citation omitted).   The proponent of the testimony must establish its admissibility by a preponderance of proof. *Id.* at 592 n. 10.

Expert testimony must be "more than belief or unsupported speculation." *See id.* at 590.  "[N]othing in Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *Joiner,* 522 U.S. at 146.  "A court may conclude that there is simply too great an analytical gap between the data and the opinion offered." *Id.*

"Scrutiny of expert testimony is especially proper where it consists of 'an array of figures conveying a delusive impression of exactness in an area where the jury's common sense is less available than usual to protect it.'" *Eastern Auto Distrib., Inc. v. Peugeot Motors of Am., Inc.,* 795 F.2d 329, 338 (4th Cir. 1994)

(citation omitted); *see also Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 415 (7th Cir. 1992) (Posner, J.).

### C. The District Court Properly Exercised Its Gatekeeper Function Under <u>Daubert</u> When It Excluded The Yurkerwich Expert Report On Damages

#### 1. This Court Cannot Evaluate The Propriety Of The District Court's Actions Without Considering The Full Record That Was Before The District Court

Respectfully, before this Court could possibly determine whether the District Court abused its discretion, this Court would need to consider the full record on which the District Court based its decision. That record consists of Business Objects' motion to exclude (A25066-476), MicroStrategy's opposition (A25963-26020), Business Objects' reply (A26180-274), the transcript of the hearing and the Order of the Magistrate Judge excluding the report (A1761-87, A27715-16), MicroStrategy's objections to the ruling (A28913-40), and Business Objects' response (A29808-30099). The District Court's final Order (A99-120) was predicated on that record. MicroStrategy, however, appears to want this Court to base its decision on its arguments instead of that record.

#### 2. The Yurkerwich Report Was Excluded Because Of Multiple Deficiencies

The Yurkerwich report was excluded because of multiple deficiencies. The Magistrate Judge found that: (1) the report "never linked any single misconduct to a specific amount of damage to MicroStrategy" (A1772 at 44:18-20), (2) "the

20

witness has not applied the principles and methods reliably to the facts of the case because he hasn't considered the facts" (A1773 at 46:5-7), (3) the report "didn't take into account any of these problems [MicroStrategy] had in 2000 and 2001" (*id.* at 47:2-3), (4) the "plaintiff's expert has engaged in a simplistic economic analysis that fails to account for many key variables" (*id.* at 47:6-8), (5) "[a]ttributing all of the defendant's gains and all of the plaintiff's losses . . . without identifying the specific harm caused by each action, without addressing the variable nature of the market, and MicroStrategy's internal problems makes the report speculative and unreliable" (*id.* at 47:8-14), (6) "the simplistic report that was prepared certainly did not consider the effect of competition or other factors on the plaintiff" (*id.* at 48:2-4), (7) "the plaintiff's expert did not consider the value or the period of use of the individual trade secrets alleged to have been misappropriated and failed to establish a causal link between the alleged harm and damages" (*id.* at 48:5-8), and (8) he "failed to segregate damages, and I think it would be extremely important in this case based on MicroStrategy's own documents to segregate damages" (*id.* at 48:15-18).

The Magistrate Judge further found that: "This report does not pass the red face test. It does not pass the Daubert test. It does not pass the Rule 702 test. [¶] As I told you, I read the report before I read any of the briefs, and I, frankly, was appalled at it." (A1772 at 43:14-18.) Based on his findings, the Magistrate Judge

concluded that "This report is quite misleading.  It has a greater potential to mislead than to enlighten, and I'm ordering it excluded."  (A1773 at 46:11-13.) The exclusion of such a methodologically flawed report was correct, and decidedly not an abuse of discretion.

### 3.   The District Court Properly Excluded The Yurkerwich Report For Failing To Consider Relevant Variables

#### a)   Yurkerwich Simply Ignored The Relevant Variables

Yurkerwich made a simplistic projection of expected sales based on sales in the year 2000, and ascribed all of MicroStrategy's losses below those projections and all of Business Objects' gains above those projections to the purported wrongful conduct.  He simply ignored every other factor that might have been responsible for those gains and losses. The law is clear that an expert report should be excluded where the expert fails to take into account relevant variables. *See, e.g., Whitaker v. Van Fossan,* 297 F.2d 245, 246-47 (4th Cir. 1961) ("even if he [the expert] were competent to render the opinion he ventured, it was not receivable if he failed to take into account every relevant factor."); *Smithers v. C & G Custom Module Hauling,* 172 F. Supp. 2d 765, 772 (E.D. Va. 2000) (expert failed to take into account variables which created doubt about the reliability of his opinions and rendered them inadmissible under *Daubert*); *Virginia Vermiculite,*

*Ltd. v. W.R. Grace & Co.*, 98 F. Supp. 2d 729, 736-38 (W.D. Va. 2000) (expert failed to consider relevant factors and alternative hypotheses).[1]

In *El Aguila Food Products. v. Gruma Corp.*, 301 F. Supp. 2d 612, 625 (S.D. Tex. 2003), a court excluded an expert report, finding, *inter alia*, that "there is no allowance in the damage model for a plaintiff to experience a loss . . . due to the plaintiffs' own fault." The same applies here. There can be no abuse of discretion in excluding a report wherein a purported expert failed to consider that MicroStrategy's business decline might have been attributable, for example, to its restatement of earnings, precipitous stock devaluation, SEC investigation, radical restructuring, or laying off two-thirds of its sales and marketing personnel. This is not a case of an expert failing to rule out "every possible alternative cause." This is a case where an expert ignored the most obvious and likely real causes of MicroStrategy's losses. (*See* A1768 at 27:2-8.)

---

[1] *See also, e.g., Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1056-57 (8th Cir. 2000); *Blue Dane Simmental Corp. v. American Simmental Ass'n.*, 178 F.3d 1035, 1040-41 (8th Cir. 1999); *Claar v. Burlington N. R.R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994).

### b)   The Court Properly Considered The Record

MicroStrategy accuses the Magistrate Judge of ignoring part of the record. (Brief 35.) MicroStrategy's argument is apparently based in its misinterpretation of a statement by the Magistrate Judge wherein he indicated that he was not considering at the September 19, 2002 hearing a separate, partially briefed motion to exclude an untimely supplemental expert report. As to the issue before him, Magistrate Judge Miller specifically stated that: "I have read all of the pleadings, including the sealed attachments." (A1762 at 4:1-2.)

### c)   The District Court Considered And Rejected MicroStrategy's Argument That Yurkerwich Had Used The Year 2000 As A Baseline To Account For MicroStrategy's Business Difficulties

The record plainly shows that the Magistrate Judge considered the argument that Yurkerwich had used the year 2000 as a baseline to account for MicroStrategy's business difficulties. The Magistrate Judge correctly rejected this argument, stating: "I find that to be a preposterous statement based on the July 17th — the contents of the July 17th, 2002, report, which I am considering." (A1772 at 44:12-14.) And preposterous for good reasons.

First, Federal Rule of Civil Procedure 26(a)(2)(B) specifically requires of an expert report that: "The report shall contain a complete statement of all opinions to be expressed and the reasons therefore." But the report never discusses

24

MicroStrategy's significant business problems in 2000 and 2001, let alone states or supports the use of the year 2000 as a baseline to account for these problems.

Second, any methodology that used the year 2000 as a baseline would be so flawed as to mandate exclusion. The logic of such a methodology depends on the assumption that all of MicroStrategy's business difficulties were over by the end of 2000, and had no lingering effects. It also presumes that the product lines were not altered, and the market place did not change. But a review of the facts recited above shows that this is not true. MicroStrategy's business difficulties continued into 2001 and beyond, in plain contradiction to the statement by MicroStrategy that "MicroStrategy resolved all of the matters related to the restatement by the end of December 2000, in a breathtakingly short nine-month period." (Brief 18.) In 2001, MicroStrategy had two major layoffs, laid off two-thirds of its sales and marketing force, sharply decreased its marketing budget, was forced to significantly restructure its business, and its continued viability as a business was questioned. No wonder its sales declined.

Third, the purported wrongful acts did not take place all on one day, which Yerkerwich's model assumes, but rather over a prolonged period. For example, MicroStrategy's former employees did not join Business Objects *en masse* but rather over about a two year time span, from March 2000 through early 2002, and the purported misappropriations also took place sporadically over a protracted

period.  Yurkerwich's simplistic use of the year 2000 as a baseline does not even make sense against the background of MicroStrategy's own accusations.  (A25086; A25104-105.)  Indeed, this is not a case where a simplistic "before and after" method could be used, since there is no clear "before" or "after."

The temporal complexity of the events was discussed in the responsive expert report submitted by Business Objects.  (A25477-527.)  As shown by the timeline in Exhibit F to that report (A25525), MicroStrategy's decline in business tracks its business problems, and the "but-for" revenue stream proposed by Yurkerwich makes no sense according to the facts.

Nevertheless, MicroStrategy still refers to "a conventional 'before-and-after' methodology" to calculate damages.  (Brief 19.)  What actually matters, however, is the "reasonableness of using such an approach, along with [the expert's] particular method of analyzing the date thereby obtained, to draw a conclusion regarding *the particular matter to which the expert testimony was directly relevant.*"  *Kumho Tire*, 526 U.S. at 154 (emphasis added).  An expert used a similar before-and-after methodology in *Blue Dane Simmental v. American Simmental Association*, 178 F.3d 1035, 1040 (8th Cir. 1999).  In upholding the exclusion of the expert report, the appellate court found:  "Although [the expert] utilized a method of analysis typical within his field, that method is not used to

make statements regarding causation without considering all independent variables that could affect the conclusion." *Id.* at 1040-41.

### 4.   The District Court Properly Excluded The Yurkerwich Report For Failing To Show Causation

The District Court correctly found that the report "never linked any single misconduct to a specific amount of damage to MicroStrategy" (A101) and that the report was speculative and unreliable where it attributed to the purported wrongful conduct "all of the defendants' gains and all of the plaintiff's losses . . . without identifying the specific harm caused by each action" (*id.*). Magistrate Judge Miller neither misapprehended the facts nor committed any error of law.

The Yurkerwich damages analysis is not based on any actual sales lost by MicroStrategy or gained by Business Objects because of the purportedly wrongful acts. Indeed, the purported facts play no actual role in Yurkerwich's methodology. Rather, his damage calculation treats all of MicroStrategy's losses below an arbitrary baseline as lost profits, and all of Business Objects' gains over an arbitrary baseline as unjust enrichment. The report fails to show that any of the purported wrongful conduct was the cause in fact of the damages claimed, or of any portion of the damages claimed.

The law plainly requires proof of causation of actual damages. "Under any theory of tortious injury, one requisite element of a claim is a 'causal connection between defendant's conduct and plaintiff's injury.'" *Hartwell v. Danek Medical,*

Confidential Material
Has Been Redacted

*Inc.*, 47 F. Supp. 2d 703, 707 (W.D. Va. 1999) (citing *Owens v. Bourns, Inc.*, 766 F.2d 145, 151 (4th Cir. 1985)).   As the Supreme Court explained in *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562 (1931): "The rule which precludes recovery of uncertain damages applies to such as are not the certain result of the wrong . . . ."

There is no showing that MicroStrategy lost even one sale because of the alleged wrongful acts, let alone support for damages totaling, as claimed in the excluded report,                 .   Similarly, there is no showing that Business Objects gained even one sale by virtue of the alleged wrongful acts, let alone that it was unjustly enriched, as claimed in the excluded report, by                     .

Causation in the excluded report was entirely speculative.   Expert testimony must be "more than belief or unsupported speculation." *Daubert*, 509 U.S. at 590. Further, "nothing in Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146.

> **5.     The District Court Properly Excluded The Yurkerwich Report For Failure To Disaggregate Damages Or To Consider The Value Or Useful Life Of The Individual Trade Secrets Allegedly Misappropriated.**

Magistrate Judge Miller correctly found that "the plaintiffs expert did not consider the value or the period of use of the individual trade secrets alleged to have been misappropriated" (A1773 at 48:5-8) and that he "failed to segregate

damages, and I think it would be extremely important in this case based on MicroStrategy's own documents to segregate damages" (*id.* at 48:15-18).

Nothing in the excluded Yurkerwich report specified what specific damages are claimed for each of the four tort causes of action asserted by MicroStrategy. Further, nothing in the Yurkerwich report addressed the specific value of any individual trade secret allegedly misappropriated. Nor did Yurkerwich consider the useful life span of any trade secret — rather, he arbitrarily calculated damages out four years.

In *Children's Broadcasting Corp. v. The Walt Disney Co.*, 245 F.3d 1008, 1018 (8th Cir. 2001), an expert opined (like Yurkerwich here) that any breach of contract and any misappropriation of trade secrets would have resulted in the same amount of damage. The court affirmed the exclusion of the testimony, noting "The assertion that any or all of the alleged wrongful acts would have caused the same outcome is dubious." *Id.*; *see also Spray-Rite Service Corp. v. Monsanto*, 684 F.2d 1226, 1243 & n. 13 (7th Cir. 1982), *aff'd*, 465 U.S. 752 (1984).

**Confidential Material**
**Has Been Redacted**

The District Court did not abuse its discretion in finding that the Yurkerwich Report was also deficient on this ground.[2]

### D.     The District Court Properly Excluded Yurkerwich's Supplemental And Revised Expert Reports

#### 1.     Factual Background

July 17, 2002, was the final day for submission of expert reports. Expert discovery closed on September 3, 2002. (A44814-17.) Trial was set to commence on October 8, 2002.

Despite this schedule, MicroStrategy served what it characterized as an updated expert report on September 3, 2002 ("Updated Report"). This new report contained new opinions based on new methodologies. Yurkerwich now opined that there was unjust enrichment of                 and lost profit damages of          over double the amount in his original report. (A26966.)

MicroStrategy then served what it characterized as a revised expert report on September 30, 2002 ("Revised Report"). The Revised Report was merely a self-serving and untimely attempt to justify the fatally flawed methodologies used in the July 17, 2002, and September 3, 2002, reports. It adopted and incorporated the

---

[2] There are a number of other methodological problems with the Yurkerwich Report not discussed above due to space limitations, but which were set out in the record that was before the District Court.

flawed methodologies from both of those reports, and suffered therefore from the shortcomings of both.

### 2.   The New Yurkerwich Reports Were Both Untimely And Methodologically Infirm

Once again, this Court must evaluate abuse of discretion against the record that was actually before the District Court.  That record includes Business Objects' motion to strike and related documents (A26959-27533; A28489-635; A28732-903), MicroStrategy's motions to file revised reports and for reconsideration and related documents (A28108-127; A28213-488, A28906-940, A30234-277), and the Magistrate Judge's opinion and subsequent motions (A1788-98; A28904-905; A29808-30099; A30234-277; A30327-837).

### a)   The New Reports Were Untimely

As an initial matter, the new reports were untimely.  Under the District Court's Scheduling Order and Rule 26, MicroStrategy was obligated to submit an expert report containing "all opinions to be expressed and the reasons and basis therefore" by July 17, 2002.  (A26965; A44814.)

Rule 16(f) provides in part that: "If a party or party's attorney fails to obey a scheduling or pretrial order . . . the judge, upon motion or the judge's own initiative, may make such orders with regard thereto as are just, and among others any of the orders provided in Rule 37(b)(2)(B), (C), (D)."  This rule provides broad

discretion to the court to sanction the conduct by exclusion of the evidence or other remedies.

Parties often attempt to evade scheduling orders and the disclosure requirements of Rule 26(a)(2)(B) by submitting "supplemental" expert reports after the deadline for disclosing expert opinions has passed. But "[s]upplementation under the Rules means correcting inaccuracies, or filling the interstices of an incomplete report based on information that was not available at the time of the initial disclosure." *Keener v. United States*, 181 F.R.D. 639, 640 (D. Mont. 1998). Here, Yurkerwich's new reports were not supplemental reports because they involved new theories that could have been presented by the scheduling deadline.

Untimely "supplemental" expert reports are routinely stricken. *See, e.g., Southern States Rack & Fixture v. Sherwin-Williams*, 318 F.3d. 592, 596-99 (4th Cir. 2003); *LaPlace-Bayard v. Batlle*, 295 F.3d 157, 161-62 (1st Cir. 2002); *Sierra Club v. Cedar Point Oil Co.*, 73 F.3d 546, 569-71 (5th Cir. 1996); *Barrett v. Atlantic Richfield Co.*, 95 F.3d 375, 379-82 (5th Cir. 1996); *Rambus, Inc. v. Infineon Techs. AG*, 145 F. Supp. 2d 721, 736 (E.D. Va. 2001).

Looking to the factors in *Southern States*, exclusion was proper. Certainly new opinions doubling the claimed damages were a surprise; that surprise could not be cured since discovery had closed; trial was set to commence in six weeks from the Updated Report and two weeks from the Revised Report, such that an

extension would have been required that would have disrupted the trial; and this new methodology was not based on new evidence.

MicroStrategy relies centrally on the final factor, the importance of the testimony. But in *Southern States,* the Fourth Circuit affirmed excluding just such "important" testimony noting that: "the court explained that 'this factor must be viewed from the perspective of both parties': 'The fact that the expert's testimony regarding the paint formula might have been helpful to [Southern States'] case in the eyes of the jury also points out why it should have been disclosed in a timely manner to [Sherwin-Williams].'" 318 F.3d. at 598-99.  Indeed, any other rule would allow a party to wait to formulate key opinions until the eve of trial and then ambush the other party, claiming that the opinions cannot be excluded because of their importance.  Here, MicroStrategy had ample time to present a proper report within the time limit set by the District Court, and has no excuse for its failure.

### b) The New Reports Were Also Methodologically Infirm

MicroStrategy appears to suggest that the new Yurkerwich reports were excluded solely because they were untimely.  But the record shows that they were also excluded because they suffered from the same methodological infirmities as the original report.  (*See, e.g.,* A116-17, 119.)  Therefore, completely apart from their untimeliness, the reports were properly excluded under *Daubert.*  This Court

is obliged to give great deference to the District Court's determination, and MicroStrategy has presented no valid reason for upsetting it.

## E. The District Court Properly Excluded At Trial New Damages Theories That Had Not Been Properly Disclosed In Discovery

Business Objects had served an interrogatory that directly and specifically asked MicroStrategy to identify its damages for tortuous interference, and the factual basis and methodology used to calculate such damages. MicroStrategy's initial response was to refer to the Yurkerwich Report. (A32545, Interrogatory No. 3.) After the exclusion of the Yurkerwich Reports, MicroStrategy tried to do an end run around the District Court's Orders by proffering the same excluded opinion testimony in the form of an interrogatory response. (A31794-96; 32554-581.) The District Court properly barred this prior to trial. (A125-26.) The Court affirmed that MicroStrategy would not be able to rely on such excluded testimony during argument on the motions *in limine*. (A1811 at 49:16-20.)

At trial, MicroStrategy sought to introduce new theories of damages that it had not disclosed in its responses to Business Objects' interrogatories; for example, a belated allegation and claim of damages regarding a so-called "enterprise license." Alerted by MicroStrategy's proposed trial graphics and opening statement, Business Objects made its objections in writing prior to the introduction of such evidence. (A32497-586.)

Rule 37(c)(1) mandates that a party who fails to properly supplement interrogatory responses: "is not, unless such failure is harmless, permitted to use as evidence at trial . . . information not so disclosed." An attempt to introduce new theories of damages at trial is anything but harmless. Certainly there was surprise, and no opportunity to cure the surprise. *Southern States*, 318 F.3d. at 596-99 (4th Cir. 2003). For example, Business Objects had no opportunity to take discovery or call witnesses relevant to these new theories. Discovery during trial would have been disruptive, and the belated introduction of such damages claims would have been highly prejudicial to Business Objects.

When MicroStrategy attempted to introduce such evidence at trial, the District Court heard argument on this issue, and properly barred MicroStrategy from introducing theories of damages that it had not properly set forth in its responses to Business Objects' interrogatories. The District Court found that there was simply no excuse for MicroStrategy's failure to properly supplement its responses before trial. (A821-28; A830-38; A899-901; A904-11.)

The District Court acted fully in accord with Federal Rules of Civil Procedure 26(e)(2) and 37(c)(1) in barring MicroStrategy's undisclosed theories.

## II.   THE DISTRICT COURT CORRECTLY DETERMINED THAT THE NON-SOLICITATION CLAUSE IN MICROSTRATEGY'S EMPLOYMENT CONTRACT WAS UNENFORCEABLE

"As a general rule, Virginia law does not look favorably upon restraints of trade." *Grant v. Carotek, Inc.*, 737 F.2d 410, 411 (4th Cir. 1984); *see also Roto-Die Co. v. Lesser*, 899 F. Supp. 1515, 1519 (W.D. Va. 1995). "[T]he employer bears the burden to show that the restraint is no greater than necessary to protect a legitimate business interest, is not unduly harsh or oppressive in curtailing an employee's ability to earn a livelihood, and is reasonable in light of sound public policy." *Modern Env'ts, Inc. v. Stinnett*, 263 Va. 491, 493 (2002). Moreover, "Virginia law requires that non-competition clauses be strictly construed against the employer." *Grant,* 737 F.2d at 411.

Here, the District Court found that MicroStrategy had failed to meet its burdens. The restrictive covenant at issue carries the title "Nonsolicitation," but on its face is much broader. It states:

> I agree that, for the period of one (1) year after termination of my employment with MicroStrategy for any reason, I will not, directly or indirectly, seek to influence any employees, agents, contractors or customers of MicroStrategy to terminate or modify their relationship with MicroStrategy.

(A94.)

MicroStrategy does not argue that the District Court applied the wrong test in evaluating this restrictive covenant — it simply disagrees with the Court's

conclusions. But as set forth below, this restrictive covenant fails the three-prong test used by Virginia courts to determine if a restraint is reasonable. *Alston Studios, Inc. v. Lloyd V. Gress & Assoc.*, 492 F.2d 279, 282-83 (4th Cir. 1974).

**A.    The Restraint Is Ambiguous And Overbroad, And Therefore Greater Than Necessary To Protect MicroStrategy's Legitimate Business Interests**

**1.    The Restraint Is Improperly Vague**

The scope of the restraint is anything but clear. As shown in Business Objects' briefing to the court below, the terms "indirectly," "influence," "modify" and "relationship" render the restraint ambiguous. (A26275-356; A27717-813.) For example, a technical employee who is hired by a MicroStrategy competitor to improve the competitor's product, or a marketing employee who is hired to design compelling advertisements, might be accused by MicroStrategy of violating the restrictive covenant, since the intended effect of their work is to bring business to their new employer. Similarly, a former employee who simply has lunch with a former colleague and tells that person that they like their new non-MicroStrategy job might be accused of "indirectly" seeking to get that employee to terminate their relationship with MicroStrategy. Or if the former employee discusses comparative salaries, such that the MicroStrategy employee feels underpaid and seeks a raise, the former employee might be accused of violating the restrictive covenant by

"indirectly" causing the MicroStrategy employee to seek to "modify" his or her

relationship with MicroStrategy by asking for a raise.

The restraint might read more narrowly, but as one court stated:

> . . . the provision could, without straining, be taken to prohibit much more. Therein lies the *in terrorem* effect on an employee, who must try to interpret the ambiguous provision to decide whether it is prudent, from a standpoint of possible legal liability, to accept a particular job or whether it might be necessary to resist plaintiff's efforts to assert that the provision covers a particular job. The mere act of subjecting the employee to such uncertainty offends "sound public policy," [citation omitted].

> Thus, the Court need not determine the exact reach of the covenant in order to conclude that it is overbroad. The fact that its reach is so difficult to determine and may so easily exceed in effect the permissible reach renders the covenant overbroad.

*Power Distribution, Inc. v. Emergency Power Eng'g, Inc.*, 569 F. Supp. 54, 58

(E.D. Va 1983).

## 2.    The Restrictive Covenant Is Overbroad

Since as a matter of law a restrictive covenant must be strictly construed

against the employer, it must be construed for the purposes of determining its

validity according to its full potential breadth.  Although titled non-solicitation, the

restrictive covenant goes far beyond that, and indeed far beyond even an ordinary

non-compete clause.  A MicroStrategy employee would be prohibited from taking

any employment with a competitor, since any such job intrinsically involves

competing for business with MicroStrategy and might therefore, directly or

"indirectly," seek to cause a MicroStrategy customer to terminate or modify their relationship with MicroStrategy.  A former MicroStrategy employee could not have any ongoing relationship with any MicroStrategy employee, or agent, or contractor and speak freely about any concerns about MicroStrategy, even based on public information, or laud the virtues of any alternative employers or products without being in violation of the restrictive covenant.  This goes too far.

MicroStrategy argues that "MicroStrategy has a legitimate interest in protecting its client base from former employees, <u>particularly where the former MicroStrategy employees were privy to critical confidential information</u>."  (Brief 49, emphasis added.)  But the restrictive covenant is not limited to situations where an employee was privy to confidential information about a customer.  It applies to any customer, whether or not the former MicroStrategy employee had confidential information about that customer, worked with that customer, or even knew that the entity was a MicroStrategy customer.

MicroStrategy argues that "the non-solicitation clause is strictly limited to MicroStrategy customers; it does not prevent them from competing for other customers."  (*Id.*)  But if, for example, a marketing person writes a piece extolling the virtues of their new employer's products, this would certainly "directly or indirectly" be to seek new business, and how could such a piece be targeted solely at entities who were not MicroStrategy customers?  How could a technical person

improve a competitor's product and then be assured that it would be sold only to non-customers of MicroStrategy?

MicroStrategy simply misses the point where it argues that there has been no showing that its former employees could not make a living. They have a right to make a living at their chosen profession, and it is against public policy to prevent that except by a restraint that is no broader than necessary to protect legitimate interests, and is not unduly harsh and oppressive.

MicroStrategy relies on *Foti v. Cook*, 263 S.E.2d 430 (Va. 1980). But the clause at issue in *Foti* was much more clear, and much narrower, than the one at issue here. It simply barred a former partner from offering to perform or performing services as a Certified Public Accountant to the partnership's clients. *Id.* at 433. The restrictive covenant at issue here is simply nothing like that in *Foti*.

## B.    The Restrictive Covenant Is Unduly Harsh And Oppressive

As the District Court properly found:  "The clause will restrict the former employee from obtaining any type of job in this industry for fear that it might modify that employer's relationship with MicroStrategy." (A96.)  It would also restrict former employees from maintaining social relationships with their former colleagues, bar them from commenting to any MicroStrategy employee, agent, contactor or customer in any negative way about MicroStrategy (even if this amounted to speaking about a story in the news) or in any positive way about any

40

competing company. Indeed, the competing company would not even have to be in MicroStrategy's line of business, in that a former employee would be in violation of the restrictive covenant in telling a MicroStrategy employee about a job opportunity in a completely unrelated area. Such a covenant is plainly unduly harsh and oppressive.

### C.    The Restraint Is Not Reasonable As Sound Public Policy

Sound public policy does not permit a contract to prohibit a party from engaging in any conceivable activity that might impair a former employer's interests. Yet that is what this provision does. As stated in *Power Distribution* (569 F. Supp. at 58 n.8):

> A covenant not to compete operates in restraint of trade. [citation omitted] The amount by which it restrains trade is not merely the amount of enforceable legal effect a court would give it if an employee challenged it, but the amount of effect it has on an employee's behavior. Where, as here, the amount of such restraint is not justified by the employer's legitimate business needs, the covenant offends public policy.

MicroStrategy's final argument -- that a different court has rendered a decision favorable to it -- is entitled to no weight. There is no published opinion, and in that record MicroStrategy's counsel specifically distinguished the provision that was before that court from the one before the District Court here (Addendum 3 at 15-16.) Further, with all due respect to that court, its analysis does not conform

41

to Virginia law in that it failed to properly consider what legitimate conduct would be prohibited by the overbroad provision.

Much narrower restraints than the one at issue here have been found to violate public policy, and the District Court was correct in finding this provision to be invalid.

## III.   THE DISTRICT COURT CORRECTLY DETERMINED THAT MICROSTRATEGY'S CONSPIRACY CLAIM WAS PREEMPTED

### A.   MicroStrategy Should Be Precluded From Making Arguments Not Properly Raised In The Court Below

Business Objects argued that MicroStrategy's conspiracy claim was preempted in a motion for summary judgment filed on September 27, 2002. (A27916; A29508-09.) In its Opposition, MicroStrategy simply ignored this issue. It was not until the District Court ruled against MicroStrategy in the Order of December 30, 2002 that MicroStrategy first sought to substantively brief this issue in a motion for reconsideration. (*See* A31368-70.)

It is well established in the Fourth Circuit that ordinarily an appellate court will not consider an issue not raised in the court from which the appeal is taken. *See Muth v. United States*, 1 F.3d 246, 250 (4th Cir. 1993); *Corti v. Storage Tech. Corp.*, 304 F.3d 336, 341 (4th Cir. 2002) (summarizing cases in concurring opinion). Here, there are no extraordinary circumstances which would permit

42

departure from the rule. MicroStrategy simply did not submit any argument or authority on this issue in opposition to Business Objects' motion.

MicroStrategy may argue that it raised its substantive arguments in its motion for reconsideration of the District Court's Order. But in *Caldwell v. United States*, 391 F.3d 1226, 1235 (Fed. Cir. 2004), an issue was first raised below not at trial but in a motion for reconsideration under Rule 59(a). Having failed to timely and properly raised the issue below, Caldwell was found to have waived the argument on appeal. The same result should apply here.

## B. The District Court Correctly Found Preemption

MicroStrategy specifically stated in a pleading to the District Court that: "The theft of trade secrets, computer fraud, and conspiracy claims are all predicated on the misappropriation of MicroStrategy's trade secrets." (A25987-88, emphasis added.) As held in *NSW Corp. v. Ferguson*, 49 Va. Cir. 456, 457 (1999): "[I]f all of the Plaintiff's claims are based on the misappropriation of trade secrets by improper means, his exclusive remedies are those set forth in the Virginia Trade Secrets Act."

MicroStrategy argues that the Virginia Uniform Trade Secrets Act ("VUSTA") does not preempt statutory causes of action. (Brief 53.) But the VUSTA states that it: "displaces conflicting tort, restitutionary, and other law of this Commonwealth providing civil remedies for misappropriation of a trade

secret." Va. Code § 59.1-341(A) (emphasis added). The VUSTA was enacted after the Virginia Conspiracy Statute ("VCA"), Va. Code § 18.2-499, and it can be reasonably presumed that the Virginia General Assembly had the VCA in mind when it provided that "other law" providing civil remedies for trade secret misappropriation was displaced by the VUSTA. Nothing in the statute restricts "other law" to common law as opposed to statutory cause of action, nor is there any way the plain language can reasonably be read to be so restricted. Further, the VUSTA specifically exempts certain categories of actions from preemption, but does not exempt causes of action based on statute as opposed to common law. Thus, under normal principles of statutory construction, MicroStrategy's VCA claim, since it is based exclusively on misappropriation, is preempted under the VUSTA.

MicroStrategy's discussion of *Smithfield Ham & Products Co. v. Portion Pac, Inc.*, 905 F. Supp. 346, 348-49 (E.D. Va. 1995), is misleading. The district court in *Smithfield* held that the VUSTA preempts alternative theories of common law recovery; but it did not hold that the VUSTA preempts *only* alternative theories of common law recovery. If anything, the discussion in *Smithfield* supports a finding of preemption here. *Id.* at 348.

MicroStrategy also relies on *Stone Castle Financial, Inc. v. Friedman, Billings, Ramsey & Co.*, 191 F. Supp. 2d 652 (E.D. Va. 2002). But that case is

44

readily distinguishable. In *Stone Castle*, in addressing a Rule 12(b)(6) motion to dismiss, the Court merely held that at that early stage violations of the VUSTA and the VCA could be pled as alternative theories of relief. *Id.* at 659. There was a dispute as to whether the information was a trade secret. In other words, the preemption issue was not yet ripe. But here, given the stage of the case and MicroStrategy's unequivocal representation that its conspiracy claim was predicated on the misappropriation of trade secrets, it was appropriate for the District Court to address and resolve the preemption issue.

MicroStrategy's argument that *Stone Castle* stands for the proposition that preemption should not apply "whenever it is still in doubt whether the Virginia trade secret claim will succeed" (Brief 54) would have the effect of completely nullifying the doctrine of preemption, since one could never be sure whether a trade secret claim would succeed until a final resolution is reached. *Stone Castle* does not stand for any such broad proposition.

MicroStrategy also cites in a footnote to *Lockheed Martin Federal Systems, Inc. v. Cincinnati Bell Information Systems, Inc.*, 46 Va. Cir. 228, 229 (Va. Cir. Ct. 1998), where a lower court stated that a claim for civil conspiracy is not preempted by the Uniform Trade Secrets Act. But this statement was made without any analysis or discussion, and the case has never been cited as authority.

The plain language of the VUSTA stating that it "displaces conflicting tort, restitutionary, <u>and other law of this Commonwealth</u>" leaves no room for doubt that it excludes statutory as well as common law causes of action. As held in *NSW Corp. v. Ferguson*, 49 Va. Cir. 456, 457 (1999): "[I]f all of the Plaintiff's claims are based on the misappropriation of trade secrets by improper means, his exclusive remedies are those set forth in the Virginia Trade Secrets Act."

## IV. THE DISTRICT COURT ACTED CORRECTLY IN GRANTING JUDGMENT AS A MATTER OF LAW ON MICROSTRATEGY'S TORTIOUS INTERFERENCE CLAIM

### A. Summary of Argument

Under Virginia law, MicroStrategy was required to prove by a preponderance of the evidence that Business Objects' purported tortious interference was a proximate cause of its claimed damages. At trial, MicroStrategy was unable to establish any causation of damages, and it has not shown to the contrary here. To be clear, the issue is not, as MicroStrategy suggests, that the District Court required it to disprove "all other possible reasons why it may have lost customers." (Brief 56.) Rather, the issue is that MicroStrategy was unable to link a single lost sale or any other form of damage to any purported wrongful conduct of Business Objects.

### B. Virginia Law Requires Proof Of Causation

"Under any theory of tortious injury, one requisite element of a claim is a 'causal connection between defendant's conduct and plaintiff's injury.'" *Hartwell*

46

*v. Danek Medical, Inc.*, 47 F. Supp. 2d 703, 707 (W.D. Va. 1999) (citing *Owens v. Bourns, Inc.*, 766 F.2d 145, 151 (4th Cir. 1985)). Proof of a causal connection is something different than proof of a certain amount of damages. *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562 (1931). As stated in *Palmer v. Connecticut Railway & Lighting Co.*, 311 U.S. 544, 561 (1941): "Certainty in the fact of damages is essential." And under Virginia law, vague, indefinite and speculative evidence is not sufficient to prove the fact of damages. *Medcom, Inc. v. Arthur Weaver Co., Inc.*, 232 Va. 80, 87 (1986).[3]

Further, as a matter of Virginia law, where a loss may result from multiple causes, the plaintiff must show with reasonable certainty the amount chargeable to the defendant. As stated in *Carr v. Citizens Bank and Trust Co.*, 228 Va. 644, 652 (1985): "If the proof is too uncertain to allow a jury to apportion the part for which the defendant is responsible, the issue should not be submitted to a jury."

Similarly: "When there is evidence of damage from several causes, as to a portion of which defendant cannot be held liable, the burden is on a plaintiff to

_____

[3] *See also Schumate & Co., Inc. v. National Ass'n of Sec. Dealers, Inc.*, 509 F.2d 147, 153 (5th Cir. 1975) ("Schumate could not recover any amount of damage, where the jury could only speculate either as to its occurrence or as to its causal relationship to the anticompetitive activity.").

present evidence which will show 'within a reasonable degree of certainty' the share of damages for which a defendant is responsible." *Hale v. Fawcett*, 214 Va. 583, 586 (1974) (holding that summary judgment should have been entered for the defendant where the proof was too uncertain to allow a jury to apportion the damages.); *see also Panther Coal Co. v. Looney,* 185 Va. 758, 771-72 (1946) (no recovery where plaintiff caused or materially contributed to his own damages, or where the plaintiff has not shown to a reasonable certainty what share of the damages were caused by the defendant).[4]

## C. MicroStrategy Failed To Meet Its Burden Of Proving That It Was Damaged By The Purported Wrongful Conduct

MicroStrategy failed to prove a causal connection between any information purportedly obtained through inducement of breach of the confidentiality provision of its employment agreement and any lost sale or other damages. MicroStrategy's damages theory at trial was nothing more than innuendo and speculation — an unwarranted assumption that Business Objects would not have made certain sales, or that MicroStrategy would not have lost certain sales, but for a purportedly induced breach of a confidentiality provision. But MicroStrategy simply had no actual evidence to back this up. As MicroStrategy's CEO admitted at trial:

---

[4]  *See also Cooper v. Whiting Oil Co., Inc.*, 226 Va. 491, 496 (1984).

> Q.   Mr. Saylor, sitting here today, you can't personally testify
> that MicroStrategy has lost any business from Business Objects
> because of the events at issue here in this courtroom; isn't that
> true?
>
> A.   I can't personally testify to that, you're correct.

(A898 at 960:11-15.)   Not only could Mr. Saylor not point to any actual lost

business, no other MicroStrategy witness could either.

There are multiple reasons why a given customer might have bought

Business Objects' products as opposed to those of MicroStrategy, including

quality, features, price, and concerns about ongoing support.  As MicroStrategy's

Chief Operating Officer, Mr. Bansal, admitted, probably the most important factor

is whether the software does "what the customer needs it to do technically."  (A801

at 601:16–602:4.)

Further, Mr. Bansal could not deny that the publicity surrounding

MicroStrategy's restatement of earnings may have affected its ability to sell its

products.

> Q.  Do you think the publicity surrounding the restatement had
> an adverse impact on MicroStrategy's ability to sell its
> software?
>
> A.  It might have.

(A862 at 834:13-16.)

In the one specific instance where MicroStrategy attempted to prove

causation of damages (a sale by Business Objects to Lands' End), its own

49

**Confidential Material
Has Been Redacted**

documents proved otherwise. Not only was MicroStrategy unable to show any causal connection between the purported wrongful conduct and Lands' End's decision to buy from Business Objects, MicroStrategy's own documents indicated that MicroStrategy lost the sale

(A29595.)

**D.    The District Court Acted Correctly In Granting Business Objects Judgment As A Matter Of Law.**

Under Federal Rule of Civil Procedure 50(a)(1), "[i]f during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion or judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without favorable finding on that issue." Such a judgment is proper if "there is no legally sufficient evidentiary basis for a reasonable jury to find for [the nonmoving] party on that issue." *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 297 (4th Cir. 1998) (brackets in original).

MicroStrategy failed at trial to show why any company that elected to buy from Business Objects as opposed to MicroStrategy did so, or to link any lost sale or other damage to the purported wrongful conduct. MicroStrategy cites cases that

stand for the proposition that it was not required to prove to a certainty that the wrongful conduct was the only cause of its purported damages. But that is *not the issue*. It was absolutely required to prove that the wrongful conduct was at least *a* cause of damages, and it utterly failed to do so.

Further, as discussed above, where there were multiple possible reasons why a given customer might not have purchased MicroStrategy's software, Virginia law places the burden on plaintiff to provide the jury with a reasonable basis on which it can apportion the part of the damages based on the wrongful conduct, and MicroStrategy failed to meet this burden. MicroStrategy's present argument really is that the jury should have been allowed to speculate as to the fact and amount of damages. But that is not the law. Here, no damages were shown which are "the certain result of the wrong." *Story Parchment*, 282 U.S. at 562.

At the close of MicroStrategy's evidence, Business Objects properly moved for judgment as a matter of law. (A32701-717.) The District Court considered briefing and heard argument on that motion. (A899-901; A904-11.) The District Court properly held: "So based on causation, number one, and based on Rule 26

and Rule 37, the court is going to grant the defendants' motion." (A911 at 1004:22-24.)[5]

## V.   THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT OF NON-INFRINGEMENT OF U.S. PATENT NO. 6,260,050

### A.   Summary Of Argument

MicroStrategy makes a terse and rather confusing argument on appeal that does not conform to the facts. In reality, the District Court adopted a paraphrased version of MicroStrategy's (not Business Objects') proposed claim construction, and that construction encompasses — contrary to MicroStrategy's present assertion — one or more user devices. MicroStrategy relied on the District Court's construction when distinguishing the prior art. In particular, MicroStrategy argued that in the prior art at issue the server could not determine a device-specific style for the output devices and thus did not meet the claims as construed. Business Objects does not infringe for exactly the reason that MicroStrategy asserted that the prior art does not anticipate — it is undisputed that in the accused product the server cannot determine a device-specific style for output devices.

---

[5] In accord with MicroStrategy's organization of its Brief, Business Objects addressed the issue of exclusion under Rules 26 and 37 in Argument Section I.E.

## B. The Patent, Claims, Claim Elements And Terms At Issue

MicroStrategy accused Business Objects of infringing Claims 1, 4, 8, 11 and 15 of U.S. Patent No. 6,260,050 ("the '050 patent"). Of these, Claims 1, 8 and 15 are independent claims, all using similar language. (A65.) There was no dispute that for the purpose of the District Court's analysis, a finding of non-infringement as to any one of the independent claims would apply to each of the claims. (A67.)

The '050 patent concerns taking information derived from an on-line analytical processing system and providing that information to users. This was not novel. The point of novelty generally concerned the idea that users might have multiple types of output devices, such as email, pagers, and facsimiles, and that an appropriate format could be specified for each different user output device. Even more particularly, since this was a crowded field, the novelty resided in the final element of the claims, which was added in order for the patents to issue over the prior art. (A60105-169.)

The District Court's ruling of non-infringement is based on elements 3 and 5 of Claim 8. (A70-71, A81.) Claim 8, with elements 3 and 5 shown, states:

> A method for generating output from an on-line analytical processing system to user output devices comprising the steps of:
>
> *   *   *

53

wherein each user device subscribed to that service is associated with a device-specific style that designates the format in which that particular type of user device is to output to the service outputs to a user to maintain the integrity of the service outputs;

\* \* \*

creating a device-specific formatted output for each user device subscribed to the service selected to receive the output according to a selection of predefined values specified for each of a plurality of predefined parameters provided by the style specified for the user output device;

(A495-96.)

Element three requires that a user device be associated with a device-specific style; element five similarly requires that a device-specific style be specified for each user device.

## C.   The District Court Adopted MicroStrategy's Proposed Claim Construction

One of the terms at issue during claims construction was "device-specific style." (A37689-92.)  MicroStrategy proposed the following construction: "One or more parameters that designate the format in which a particular type of output device receives service outputs." (A37689.)  The construction adopted by the District Court was:  "The format in which a particular type of output device receives and displays service output, consisting of values for a plurality of parameters." (A37692.)  Thus, the District Court's construction was a paraphrase

of that proposed by MicroStrategy, substantively modified only to confirm to the "plurality" aspect of the claim language.

MicroStrategy's argument confuses the District Court's analysis with its claim construction, and further confuses the issue of the number of output devices with the issue of the number of style parameters associated with a given output device. MicroStrategy's argument that the District Court limited the claims to multiple device types is not correct and, in regard to the infringement analysis, not even germane.

Interestingly, MicroStrategy avoids directly addressing the District Court's actual construction of "device-specific style" and never proposes what a supposedly correct construction would have been. Instead, MicroStrategy purports to interpret the District Court's construction and proceeds to attack out of context fragments of the District Court's analysis. MicroStrategy's failure to set forth a purportedly correct definition of "device-specific style" while attacking the District Court only in generalities should by itself be fatal to its appeal.

**D.     MicroStrategy Concurred With And Verified The District Court's Claim Construction To Avoid The Prior Art, And Should Now Be Barred From Contesting That Construction**

MicroStrategy not only proposed the claim construction to which it now objects, it specifically relied on that construction to distinguish anticipatory prior art. Business Objects cannot infringe for exactly the reasons that MicroStrategy

55

previously argued that the prior art did not anticipate — the accused software does not have a device-specific style associated with (or specified for) each output device. Rather, the accused software produces only a single type of output for a given publication, and does not associate a format to an output device or type of output devices.

The crux of the District Court's non-infringement opinion concerns the construction of "device-specific style." MicroStrategy's argument to the District Court against invalidity simply confirms that court's construction:

> This Court has construed the "device-specific style" language of the '050 patent to mean "[t]he format in which a particular type of output device receives and displays service output, consisting of values for a plurality of parameters." (Claim Construction Order at 27.) Specifically, this language requires the format to be associated with a particular type of output device, and to have more than one parameter style. (*Id.* at 26.)
>
> The PUSHing Information paper does not teach device-specific styles. Rather, the formatting disclosed in the paper is user-specified and bears no relationship to the type of device to which the output is delivered. (*E.g.*, Ex 24 at 10 & 13.) In other words, instead of the format being chosen based on the type of output device designated to receive service outputs, as required by the claims, the format is defined by the subscriber independently of the output devices.
>
> The formats disclosed in the paper (*e.g.*, delimited files, fixed length files, etc.) are entirely *device independent* (Ex. 95), which is different from the use of *device-specific* styles required by the patent. Furthermore, there is no indication in the PUSHing Information paper that the formats are chosen based on the requirements of the output devices (for instance, not sending HTML to a system that cannot receive and display

HTML formatted mail), and therefore used to "maintain the integrity of the service output."

\*   \*   \*

Because the paper fails to teach or enable device-specific styles as claimed by the patent, and because these styles are not inherent in the description provided by the paper (Ex. 95), the paper fails to anticipate the '050 patent.

(A42081-83, emphasis by underline added; *see also* A39644-46.)

In order to distinguish the prior art, MicroStrategy argued, *inter alia*, that "the formatting disclosed in the paper is user-specified and bears no relationship to the type of device to which the output is delivered." (A42081.) But MicroStrategy's own expert acknowledged that this also describes what the user (typically an administrator) does in regard to the accused product, where formatting occurs at the server, not the device, level. (A21312.) MicroStrategy should not now be heard to claim that the "association" between a user device and a format should be defined so broadly as to encompass the accused product where it took exactly the opposite position — "bears no relationship" — to avoid invalidity.

MicroStrategy plays fast and loose when it argued below for one construction to avoid invalidity and now argues for a different construction in an attempt to undue the District Court's finding of non-infringement. MicroStrategy's own arguments against anticipation mandate a finding that Business Objects does

not infringe, and MicroStrategy should be barred from arguing against its own

prior positions in this appeal.  Under the doctrines of judicial admission,  judicial

estoppel, or waiver, MicroStrategy should be foreclosed from attempting to refute

what it has already admitted.  *See McAfee v. United States*, 832 F.2d 152, 154 (Fed.

Cir. 1983) (citing "4 J. Wigmore, *Evidence* § 1064, at 67 (Chadbourn rev. 1972)

(pleadings are judicial admissions and a party may invoke the language of the

opponent's pleading to render the facts contained therein indisputable)"); *Hossaini*

*v. Western Mo. Med. Ctr.*, 140 F.3d 1140, 1142 (8th Cir. 1998) ("The doctrine of

judicial estoppel prohibits a party from taking inconsistent positions in the same or

related litigation."); *Van Gaalen v. Sparks*, 555 F. Supp. 325, 328 (E.D. Va. 1983)

("The doctrine of judicial estoppel states that 'a party will not be permitted to

maintain inconsistent positions or to take a position in regard to a matter which is

directly contrary to, or inconsistent with, one previously assumed by him.'")

(citation omitted); *Forshey v. Principi*, 284 F.3d 1335, 1358 (Fed. Cir. 2002)

(en banc) ("[T]he fact that the appellant specifically urged the legal rule that he

now challenges counsels against consideration of the issue."), *superceded on other*

*grounds*, 327 F.3d 1357, 1359-60 (Fed. Cir. 2003); Wright &  Miller, Federal

Practice and Procedure § 2558, at 470 (2d ed. 1995) ("The [invited error] rule,

which is a branch of the doctrine of waiver, holds that 'a party may not complain

on appeal of errors that he himself invited . . . the court . . . to commit'" (citation omitted)).

**E.     Summary Judgment Was Appropriate Because There Was No Dispute That The Accused Product Does Not Have A "Device Specific Style" Associated With  (Or Specified For) "Each User Device."**

**1.     The District Court Correctly Found That The Third Claim Limitation Is Not Met**

The third limitation of Claim 8 calls for each *user device* to be associated with a device-specific style that designates format.  MicroStrategy has admitted that "user device" and "output device" are used synonymously in the patent.  (A40616 at n. 14.)  The District Court defined "output device" as "[a]n electronic mailbox, web page, personal digital assistant, pager, facsimile, printer, mobile phone, telephone, or other communication device that receives service output."  (A37688.)  By definition, therefore, a computer server is not a user device.

The undisputed evidence regarding the accused product is that in no case is any user device associated with a device-specific style that designates formats.  MicroStrategy has attempted to blur over the technical issues, but they are critical.  As the Supreme Court noted over a century ago "slight verbal variations, scarcely noticeable to a common reader, would be detected by an expert in the art."  *Bischoff v. Wethered*, 76 U.S. (9 Wall.) 812, 815 (1870).  Here, MicroStrategy used specific claim language that it cannot simply be allowed to ignore.  Publisher,

59

**Confidential Material
Has Been Redacted**

simply does not operate in the manner claimed in the '050 Patent.  Therefore, there

is no infringement.

    To elaborate,

**Confidential Material
Has Been Redacted**

MicroStrategy ignores the plain language of the claim requiring that "each user device subscribed to that service is associated with a device-specific style" and argues that such an association should be found even though the facts are exactly to the contrary.   As the District Court correctly found on the facts: "Publisher does not carry an association between a device and a device style

Confidential Material
Has Been Redacted

because it assumes that all devices subscribed to a publication are of the same device type." (A73.)

### 2.    The District Court Correctly Found That The Fifth Claim Limitation Is Not Met

The fifth limitation of Claim 8 plainly calls for device-specific formatting for each *user device*.  As MicroStrategy has admitted, a user device is the same as an output device, and the plain meaning of output device in the '050 patent and as construed by the District Court does not include a server or a publication.

Further, the fifth element does not contain the term "associated."  Rather, it refers to "the style *specified* for the user output device."  (A496 at 19:6-11, emphasis added.)  MicroStrategy's attempt to twist the meaning of "associated" in element three to link two independent associations together completely fails when element five is considered, since the undisputed facts are that there is no style *specified* for a user output device in the accused product.

The District Court correctly found that element five requires that the system must know, for each device, what formatting style it requires. (A85.) The undisputed facts are that the accused device does not do this. Therefore, there is no infringement.

## F.   MicroStrategy's Call For A Finding Of Infringement Completely Ignores The Posture Of This Case

MicroStrategy's request that this Court enter judgment of infringement ignores the posture of this case. Business Objects contested infringement based on claim elements 3, 4, 5 and 7. (A39613-40596; A42767-43566; A41849-60.) The District Court's ruling of non-infringement is based on elements 3 and 5. (A70-71, A81.) Since the District Court did not rule on elements 4 or 7 (A82), even if this Court were to decide in MicroStrategy's favor as regards elements 3 and 5, infringement issues would remain to be decided by the District Court.

## CONCLUSION

MicroStrategy has failed to show that any decision by the District Court was

erroneous.  The District Court's rulings should be affirmed.

Dated:  March 18, 2005

Respectfully Submitted

Daniel J. Furniss
Gary H. Ritchey
Joseph A. Greco
Townsend and Townsend and Crew LLP
379 Lytton Avenue
Palo Alto, CA  94301
Telephone:  (650) 326-2400

Attorneys for Business Objects, S.A. and
Business Objects Americas, Inc.

**Co-Counsel**:

Robert D. Luskin
Patton Boggs LLP
2550 M Street, NW
Washington D.C.  20037
Telephone:  (202) 457-6000

Dana J. Finberg
LeCLAIR RYAN, PC
Eleventh Floor
707 East Main Street
Richmond, Virginia  23219
Telephone:  (804) 783-2003

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 22nd day of March, 2005, two bound copies of the Non-Confidential Brief of Appellees were served via UPS Ground Transportation to the following:

Carter G. Phillips
Kathi A. Cover
Brian T. Fitzpatrick
SIDLEY AUSTIN BROWN & WOOD LLP
1501 K Street, NW
Washington, DC  20005

*Counsel for Appellant*

I also certify that on this 22nd day of March, 2005, the original and four (4) bound copies of the Non-Confidential Brief of Appellees were hand filed at the Office of the Clerk, United States Court of Appeals for the Federal Circuit.

Filing and service were performed under instruction of Counsel.

The Lex Group DC
1750 K Street, NW
Suite 475
Washington, DC  20006
(202) 955-0001

## CERTIFICATE OF COMPLIANCE

Counsel for Defendants-Appellees hereby certifies that the foregoing brief complies with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure. Based on the word count tool in Microsoft Word 2000, the number of words in the foregoing brief, excluding the sections excludable under Rule 32(a)(7)(B)(iii) of the Federal Rules of Appellate Procedure and Federal Circuit Rule 32(b), is   13,995.

Dated: March 18, 2005

Respectfully Submitted,

Townsend and Townsend and Crew LLP

By: _____

Daniel J. Furniss

Attorneys for Business Objects, S.A. and
Business Objects America, Inc.

60408564v1