# EXHIBIT 15

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| *e*PLUS, INC., | **)** | |
| | **)** | |
| | **)** | Civil Action No. 3:09-cv-620 |
| Plaintiff, | **)** | |
| | **)** | |
| v. | **)** | |
| | **)** | |
| LAWSON SOFTWARE, INC. | **)** | |
| | **)** | |
| | **)** | |
| Defendant. | **)** | |

**REPORT OF EXPERT PRESTON W. STAATS, PH.D**
**<u>CONCERNING INVALIDITY</u>**

.

This report is submitted pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure and the Court's Order, and is in opposition to the Report of Brooks L. Hilliard Relating to Patent Validity ("Hilliard Rep.")

## I.      INTRODUCTION

1.      My name is Preston W. Staats.  I was involved in the computer industry, and specifically the electronic procurement industry, for over 25 years.  I am over eighteen years of age, and I am competent to testify as the opinions set forth herein.

2.      I have been retained by counsel for Lawson Software, Inc. ("Lawson") as a technical expert witness with respect to the above-captioned matter.  I am being compensated in the amount of $300 per hour plus reasonable expenses including travel expenses.

3.      I have been asked to provide an expert technical analysis as to whether U.S. Patent No. 6,023,683 ("the '683 patent"), U.S. Patent No. 6,055,516 ("the '516 patent"), and U.S. Patent No. 6,505,172 ("the '172 patent") (collectively, "the patents-in-suit"), as interpreted by the Court, are invalid under 35 U.S.C. § 102 and/or § 103 in view of the prior art discussed herein.

## II.      MATERIALS REVIEWED

4.      In performing my analysis of the patetns-in-suit and the prior art, I have reviewed the following material:

      i.     the Stipulated Protective Order;

      ii.     the *Markman* Opinion and Order;

      iii.     U.S. Patent No. 6,023,683 patent and associated prosecution history;

      iv.     U.S. Patent No. 6,055,516 patent and associated prosecution history;

      v.     U.S. Patent No. 6,505,172 patent and associated prosecution history;

      vi.     U.S. Patent No. 5,712,989;

      vii.     *Fisher RIMS: A Revolutionary Electronic Requisition and Inventory Management System*

2

    viii.    the Fisher annual reports from 1992, 1993, and 1994;

    ix.    the deposition transcript of James Johnson

    x.    the deposition transcript of Douglas Momyer;

    xi.    the deposition transcript of Robert Kinross;

    xii.    the deposition transcript of Kenneth Farber;

    xiii.    the report of Brooks L. Hilliard regarding validity;

    xiv.    the report of Alfred Weaver regarding infringement;

    xv.    5799-IBM Technical Viewer/2;

    xvi.    IBM Technical Viewer/2, General Information Manual;

    xvii.    IBM Technical Viewer/2 Brochure;

    xviii.    the declaration of Pamela Eng;

    xix.    the P.O. Writer Plus V.10 Manual;

    xx.    the J-CON Manual;

    xxi.    portions for the SAP trial transcript;

    xxii.    the declaration of Lauren Fielder (McEneny);

    xxiii.    Gateway 2000/MRO Manual; and

    xxiv.    any other documents cited in this report.

## III.    BACKGROUND & QUALIFICATIONS

5.    My background and experience qualify me as an expert in this case.  In 1965, I earned by Bachelor of Science in Electrical Engineering from Rice University, where I was a three-time recipient of the Outstanding Engineering Award and was on the Dean's List Academic Honor Roll for seven straight semesters.  In 1974, I earned my Doctor of Philosophy in Electrical Engineering also from Rice University, where I received the Rice Fellowship and the Fannie & Joh Hertz Engineering Scholarship.

6.      In 1977, I co-founded Cooperative Computing, Inc. ("CCI"). CCI's principal goal was to provide state of the art computer software, computer hardware, & computer services to the automotive parts distribution & sales industry. CCI developed all of the software provided to its customers; the only software purchased outside was the operating system used to operate the computers. I was responsible for designing many of the software application areas including all accounting functions and many of the inventory control and inventory management functions. I programmed many of the applications as well as testing both software developed by me and people reporting directly to me. I was also responsible for all aspects related to the hardware CCI sol customers, all customer installation, and support areas of the company.

IV.     SUMMARY OF OPINIONS

7.      Claim 6 of the '683 patent and claim 1 of the '172 patent are invalid under 35 U.S.C. § 102 as anticipated by Fisher RIMS.

8.      Claims 3, 6, 26, 28, and 29 of the '683 patent, claims 1, 2, 6, 9, 21, 22, and 29 of the '516 patent, and claim 1 of the '172 patent are invalid under 35 U.S.C. § 103 as obvious in light of Fisher RIMS in combination with IBM TV/2.

9.      Claims 3, 6, 26, 28, and 29 of the '683 patent are invalid under 35 U.S.C. § 102 as anticipated by P.O. Writer Plus V.10.

10.     Claim 6 of the '683 patent is invalid under 35 U.S.C. § 102 as anticipated by J-CON.

11.     Claims 3, 6, 26, 28, and 29 of the '683 patent and claim 1 of the '172 patent are invalid under 35 U.S.C. § 103 as obvious in light of P.O. Writer Plus in combination with J-CON.

12.     Claims 1, 2, 6, and 9 of the '516 patent are invalid under 35 U.S.C. § 102 as anticipated by U.S. Patent No. 5,319,542 ("the '542 patent").

13.     Claim 26 of the '683 patent is invalid under 35 U.S.C. § 102 as anticipated by Gateway 2000/MRO.

14.     Claims 3, 6, 26, 28, and 29 of the '683 patent, claims 1, 2, 6, 9, 21, 22, and 29 of the '516 patent, and claim 1 of the '172 patent are invalid under 35 U.S.C. § 103 as obvious in light of Fisher Rims in combination with U.S. Patent No. 4,922,940 ("the '940 patent").

15.     Claims 3, 6, 26, 28, and 29 of the '683 patent are invalid under 35 U.S.C. § 103 as obvious in light of J-CON in combination with the '940 patent.

## V.     FISHER RIMS AND IBM TV/2

### A.     <u>Fisher RIMS</u>

16.     For purposes of this report, my understanding of Fisher RIMS is based on U.S. Patent No. 5,712,989 ("the '989 patent" or "the RIMS patent") (ePLUS0137677-ePLUS0137718), *Fisher RIMS: A Revolutionary Electronic Requisition and Inventory Management System* ("RIMS Brochure") (L0260595-L260606), the Fisher RIMS trademark application (L0260589-L0260594), the Fisher annual reports from 1992, 1993, and 1994 (Kinross Ex. 4), the testimony of James Johnson and Douglas Momyer (named inventors on the '989 patent and two of named inventors on the patents-in-suit), and the testimony of Robert Kinross (one of the named inventor on the patents-in-suit).

17.     Mr. Hilliard provides opinions regarding Fisher RIMS generally at pages 20-39 and 142-145 of his Report.  I understand that evidence will be presented showing that Fisher RIMS, as described in the '989 patent and RIMS brochure, is prior art under 35 U.S.C. § 102(a), (b), and (e).

18.     I understand Fisher RIMS is prior art under 35 U.S.C. § 102(a) because it was known in this country before the invention of the patents-in-suit.  I also understand it is prior art under 35 U.S.C. § 102(b) because it was on sale and in public use in this country more than one

year before the filing dates of the patents-in-suit.  One of the inventors, Mr. Kinross, affirmed that Fisher RIMS was known at the time Fisher filed for the '683 patent, because by 1992 "Fisher would participate in tradeshows and have representatives from the information systems and services department to talk to customers about what system capabilities Fisher had.  So they were actively marketing Fisher capabilities as value-added systems." (Kinross Dep. at 23-25.)  Fisher RIMS as it existed prior to April of 1993 had the claimed features at issue, including (1) the product types from different sources listed in Table 1 of the '989 patent, (2) data for items from third parties other than Fisher, (3) cross-referencing that could take a competitor's number and cross-reference it to a Fisher part number, (4) cross-referencing as described at columns 31-34 of the '989 patent, which used cross-referencing tables to perform converting, and (5) searching a part database by part number.  (Kinross Dep. at 23, 43, 45, 46, 48-50, 55.)

19.     I understand that the '989 patent is prior art under 35 U.S.C. § 102(e) because it was granted on an application that was filed by a different inventive entity than the inventive entity of the patents-in-suit and that it was filed in the United States before the invention of the patents-in-suit.

20.     Mr. Hilliard states that the Examiner at the U.S. Patent and Trademark Office ("PTO") who examined the patents-in-suit was "clearly aware of the RIMS system and the '989 Patent."  (Hilliard Report at ¶ 53).  I agree that the PTO was aware of the '989 patent.  However, knowing that a system exists, and knowing it is prior art, are two different things.  While the patents talk about Fisher RIMS, they do not describe Fisher RIMS as prior art, or provide a date by which the Fisher RIMS was publicly available or known.  The disclosure of the '989 patent in the patents-in-suit indicates it was "incorporated by reference."  This is not the same thing as disclosing prior art.  To disclose prior art, applicants for a patent fill out a special form, called Patent Office Form 1449.  The PTO examiner then initials each reference cited, to show he

looked at it and understood it was prior art.  The inventors here provided such a form to the

Patent Office, and listed *other* material on it, including patents and brochures for other products.

However, none of the forms filed with the PTO on behalf of the inventors for the three patents-

in-suit disclosed the RIMS patent or the RIMS brochure in a Form 1449.  Nor did the inventors

or their attorneys disclose to the PTO the fact that the RIMS system was offered for sale more

than one year before the patent application was filed, nor did they disclose who knew about the

RIMS system, or when.  Confirming that there was no such disclosure, there are no documents

for any of the patents-in- suit which show the examiner initialing any disclosure regarding the

RIMS patent or system, and no such disclosures show up on the patents-in-suit as among the

"References Cited."  Therefore, I do not see how Mr. Hilliard can assume the examiner

considered the RIMS system to be prior art.

21.     One of the inventors, Mr. Kinross, agrees with me that no information about

Fisher RIMS shows up on any of the patents-in-suit as a reference cited by the PTO.  (Kinross

Dep. pp. 33 -34).  I am not aware of any aspect of the patent process which would indicate that

the PTO considered Fisher RIMS prior art, either alone or in combination with IBM TV/2 or

other prior art, in deciding to allow the claims.

22.     Fisher RIMS included all the limitation of claim 6 of the '683 patent.

**B.     IBM TV/2**

23.     Mr. Hilliard addresses the IBM TV/2 prior art at least at ¶¶ 265-276 of his

Report.  For purposes of this report, my understanding of IBM TV/2 is based on 5799-IBM

Technical Viewer/2 (ePLUS0210933-ePLUS0210938), IBM Technical Viewer/2, General

Information Manual (G0000012-G0000029), IBM Technical Viewer/2 Brochure (L0132131-

L0132134), and the declaration of Pamela Eng, who was involved with the design of IBM TV/2.

24.     I understand that IBM TV/2 is prior art under 35 U.S.C. § 102(a) and (b) because it was in public use, known to others, and on sale in the United States before the invention date of the patents-in-suit and more than one year prior to the date of the application for patents-in-suit. This is shown in part by documents related to the TV/2 system, in part by IBM witnesses who described the TV/2 product as it was made available to Fisher, and in part by statements in the patents at issue. The 5799-IBM Technical Viewer/2 publication states it was created on March 30, 1992 (ePLUS0210933), and the IBM Technical Viewer/2 General Information Manual bears a copyright date of 1991 (G0000013); both at least a year before the filing date of the application for the '683 patent. The 5799-IBM Technical Viewer/2 publication provides reference prices and instructs the reader to contact the local price source; meaning the TV/2 was on sale at least as early as March 1992. (ePLUS0210933.) The IBM Technical Viewer/2 General Information Manual states that its purpose is to enable people to evaluate the TV/2 for use within their organization; meaning the Manual was freely available to the interested public. (G0000015.) I also understand that the patents-in-suit admit that the TV/2 system was "available from IBM" at least as early as the filing date of the patents-in-suit. (*See, e.g.*, ('516 patent) at 4:11-12.)

C.     **Combining Fisher RIMS and IBM TV/2 Would Hve Been Obvious in 1993.**

25.     At page 140 of his Report, Mr. Hilliard states that "A Person of Ordinary Skill in the Art Would Not be Motivated to Combine the RIMS or J-Con Single-Source Systems With any of the Other Asserted Prior Art Systems to Arrive at the Claimed Inventions." I understand this to mean that Mr. Hilliard asserts that one of ordinary skill would not combine the RIMS and TV/2 systems. I disagree.

26.     I understand that a patent is invalid under 35 U.S.C. § 103 if "differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having

8

ordinary skill in the art to which said subject matter pertains."  I understand if one of ordinary skill in the art can implement a predictable variation prompted by market forces or design incentives, such a variation is obvious.  If a technique has been used to improve one device, and one of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond ordinary skill.

27.    Stated differently, the proper question is whether one of ordinary skill, facing the wide range of needs created by developments in the field of endeavor, would have seen a benefit to combining the teachings of the prior art.  Where there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, it is obvious to pursue the known options within the grasp of one of ordinary skill.  In many cases a person of ordinary skill will be able to fit the teachings of multiple prior art references together like pieces of a puzzle.  Such a combination is more likely to be obvious where it simply arranges old elements with each performing the same function it had been known to perform and yields no more than what one would expect from such an arrangement.  I further understand that contemporaneous development of similar variations of a device or method by other parties is indicative of obviousness.

28.    In establishing obviousness, one must avoid the "temptation to read into the prior art the teachings of the invention in issue" and "guard against slipping into the use of hindsight."

29.    In evaluating the issue of obviousness, secondary considerations of non-obviousness should be considered including considering whether any of the following factors exist:  (1) the invention's commercial success, (2) long felt but unresolved needs, (3) the failure of others, (4) skepticism by experts, (5) praise by others, (6) teaching away by others, (7) recognition of a problem, and (8) copying of the invention by competitors.  However, for secondary considerations to be relevant, there must be a "nexus" between the merits of the

claimed invention and the evidence of secondary considerations.  In some cases, the evidence of

obviousness is so strong that it cannot be overcome by evidence of secondary considerations.

30.     I agree with Mr. Hilliard that the a person of ordinary skill in the art relevant to

the patents-in-suit is a person in the field of computer science with an undergraduate Bachelor of

Science degree, or equivalent, with some programming experience, and with an understanding of

basic supply chain management in the 1993 to mid-1994 time frame.  (Hilliard Rep. at ¶ 23

31.     IBM TV/2 documents include an explicit motivation to combine Fisher RIMS

and IBM TV/2.  The IBM Technical Viewer/2 Brochure teaches:

> You can also create a 'shopping list' just by selecting items and passing
> that list to another application.  For example, you might select parts to be
> ordered from the exploded drawings in the parts catalogue.  The part list
> could then be sent directly to your parts ordering system . . . .

(IBM TV/2 Brochure at L0132133.)  It also teaches:

> Technical Viewer/2 is suitable for whole ranges of uses and industries in
> which information is supplied in large quantities and updated regularly,
> and where uses need fast access to precise details.
>
> Potential uses include:
>
> . . .

- ● Integrating part catalogues with dealers' computer systems such as order
  entry, inventory management and customer records

(IBM TV/2 Brochure at L0132134.)

32.     Fisher RIMS, as described in the '989 patent, is a part ordering system, allows

order entry, and allows inventory management.  ('989 patent at 1:5-7 ("This invention generally

relates to systems for requisition and inventory management."), 1:4-17 (Background explaining

that the RIMS system is a requisition system, which generally "process purchase orders for items

and track inventory."), 8:25-38 (discussing RIMS Parts Master record, which includes "part

number"); Johnson Dep. at 67-72 (discussing ability of RIMS system to generate purchase orders

for parts).)  Moreover, IBM TV/2 system was designed with an applications program interface

10

(API) for interfacing IBM TV/2 system with other systems such as parts ordering systems.  Thus, there is reason for one of ordinary skill to combine Fisher RIMS and IBM TV/2 in 1993.

33.     Fisher RIMS and IBM TV/2 were both designed to operate on the IBM OS/2 operating system platform.  ('683 patent at 4:10-25, 5:18-27; L0132129.)  This further demonstrates that it would have been obvious to one of ordinary skill seeking to have a system with both extended searching capabilities and a requisition/purchasing system to combine Fisher RIMS with IBM TV/2.  The patents-in-suit disclose that the preferred embodiment of the invention is implemented by combining the RIMS system and the TV/2 system.  ('683 patent at 4:1-8.)

34.     One of the inventors of the patents-in-suit, Mr. Kinross, admitted that "nothing unusual or unexpected happened" when combining Fisher RIMS and IBM TV/2.  (Kinross Dep. at 142.)  He also testified:

> That other than just knowing the architecture of the RIMS systems, is there anything else that was extraordinary about creating a communications system between TV/2 system and the RIMS system?
>
> No, we used facilities that were known at the time to affect that communication.
>
> Did you do the same thing you think anybody else of skill in the field would have done that caused the Technical Viewer/2 system to communicate with the RIMS system?
>
>         * *
>
> The interface between technical viewer and the RIMS system used well-known documented capabilities, so it wasn't anything that was unique that we used to affect that communication.

(Kinross Dep. at 111-113.)  Kinross admitted that IBM TV/2 "as it existed before you merged it with the RIMS system" could search INF files "off the shelf" and that "parts catalogs can be stored in INF files."  (Kinross Dep. at 114-115.)  The programming done for the interface "would be understood by anyone skilled in the art of the CICS programming."  (Kinross Dep. at 141.)

STAATS EXPERT REPORT ON INVALIDITY                                      CASE NO.3:09cv620

35.    Fisher RIMS in combination with IBM TV/2 includes all the elements of claims 3, 6, 26, 28, and 29 of the '683 patent, all the elements of claims 1, 2, 6, 9, 21, 22, and 29 of the '516 patent, and all the elements of claim 1 of the '172 patent.

**E.    The '683 Patent**

**1.    Claim 3 of the '683 Patent**

**a.    an electronic sourcing system**

36.    Virtually all of Mr. Hilliard's attempts to distinguish Fisher RIMS from the asserted claims are based on the premise that Fisher RIMS is a "single-source system" rather than an "electronic sourcing system" as defined by the Court.  (Hilliard Rep. at ¶ 57.)  Mr. Hilliard claims that the RIMS system does not enable a prospective buyer to find and locate goods to purchase from different source or to compare product offerings of different sources to make a purchasing decision.  (Hilliard Rep. at ¶ 57.)  The Fisher RIMS disclosures and the inventor testimony show Mr. Hilliard is wrong.

37.    Fisher RIMS, as disclosed in the '989 patent, is "an electronic sourcing system." The Court interpreted "electronic sourcing system to mean "an electronic system for use by a prospective buyer to locate and find items to purchase from sources, suppliers or vendors." (Memorandum Opinion at 28 (Docket No. 204).)

38.    The '989 patent discloses that Fisher RIMS was an electronic system that could be used to locate items for requisition and purchase.  ('989 patent at Abstract, 1:15-24.)

39.    Additionally, the Fisher RIMS product literature describes the RIMS system as a supply chain management system for supplying products from sources to a laboratory.  (RIMS Brochure at L0260596.)

40.    Mr. Hilliard contends that Fisher RIMS "was not an 'electronic sourcing system' since it did not enable a prospective buyer to locate and find goods to purchase from different

vendor sources or to compare product offerings of different sources to make purchasing decisions." (Hilliard Rep. at 67.) Specifically, Mr. Hilliard contends that RIMS does not meet this definition for two reasons: 1) RIMS was used by a customer service representative for the distributor (and thus is not used by a prospective buyer) (Hilliard Rep. at ¶¶ 56, 57); and 2) RIMS was a "single source system" meaning that the RIMS allowed the customer to purchase items from only one source, the distributor (Hilliard Rep. at ¶ 58). I disagree with both of Mr. Hilliard's contentions.

41.     First, the '989 patent discloses that Fisher RIMS may be operated by a Customer Service Representative, or CSR. The CSR acts on behalf of the customer, i.e., prospective buyer. "The CSR will ordinarily receive a written or oral request from an employee of the Customer to requisition one or more items." ('989 patent at 6:39-42.) Therefore, regardless of by whom the CSR is employed, as a practical matter the CSR acts on behalf of prospective buyers to locate and find goods to buy.

42.     Moreover, the RIMS Brochure that Fisher provided to the Trademark Office as proof it was selling RIMS as early as 1992 states, "Your requisition or purchase order can be entered remotely *by the people in your organization who will be using the product, or* your Fisher CSR can enter it directly into the Fisher RIMS PC." (Fisher RIMS Brochure at L0260600.) Thus, Fisher touted that the system could be used directly by prospective buyers, or through CSRs.

43.     The system does not change depending on who is at the keyboard typing. Fisher RIMS could be used by whoever is typing at the keyboard, be they a customer or a CSR. Therefore, the distinction Mr. Hilliard tries to draw between the Fisher RIMS and the patents-in-suit is non-existent. Indeed, even though the patents-in-suit are "electronic sourcing systems" for

use by prospective buyers, one of the "preferred" embodiments of the patents-in-suit involves a

CSR operating the electronic sourcing system on behalf of a prospective buyer:

> ## DETAILED DESCRIPTION OF THE INVENTION
>
> FIGS. 1A and 1B show preferred embodiments of the electronic sourcing system **5** of the present invention. As shown in FIG. 1A, a local computer **20**, which is preferably located at or near a Customer site and the site of Just-In-Time ("JIT") Inventory, is preferably used by an on-site Customer Service Representative ("CSR") dedicated to a Customer to assist that Customer in requisitioning items needed.
>
> Local computer **20** includes conventional color monitor

('683 patent at 3:51-56 (emphasis added).)  ePlus's infringement expert agrees that an electronic

sourcing system that is operated by a CSR falls within the scope of the asserted claims.  (Weaver

Dep. at 30:14-31:2.)  Thus, Fisher RIMS was for use by prospective buyers.  Clearly, who is

pushing the keys on the system does not dictate whether the system is an electronic sourcing

system or not.  Fisher RIMS was for use by prospective buyers.

44.     Second, I disagree with the fundamental premise underlying Mr. Hilliard's

argument, namely that an "electronic sourcing system" must allow the buyer to locate and find

goods from different sources or compare product offerings.  (Hilliard Rep. at ¶ 67.)  The Court's

definition of "electronic sourcing system" does not require that the prospective buyer be able to

purchase items from two different third party vendors, nor does it require product comparisons.

Rather, the definition requires only that a buyer be able to "locate and find items to purchase

from sources, suppliers **or** vendors."  (Memorandum Opinion at 28 (Docket No. 204) (emphasis

added).)  The '989 patent defines a "source" as the inventory that will be used to fill a requisition:

> After all of the items for a requisition have been entered, the next step is that of sourcing the requisition. Sourcing the requisition is the process of determining what inventory will be used to fill the requisition.

STAATS EXPERT REPORT ON INVALIDITY                                    CASE NO.3:09cv620

('989 patent at 11:26-30).  Thus, while a third party vendor could be a source, not all sources are third party vendors.  Fisher RIMS clearly meets the Court's definition.  For example, items Fisher RIMS included one of several different product types:

TABLE 1

| PRODUCT TYPE | DESCRIPTION | |
|---|---|---|
| 01 | Distributor owned item in JIT warehouse located at or near the Customer's site | 60 |
| 02 | This price type is not currently used, but has been reserved for | 65 |

TABLE 1-continued

| | PRODUCT TYPE | DESCRIPTION |
|---|---|---|
| 5 | | Distributor-owned items in Distributor's warehouse 30 which have been segregated in some fashion for a particular Customer. |
| 10 | 03 | Distributor catalog item; stored in Distributor's warehouse |
| | 04 | 3rd party item that Distributor orders |
| | 05 | 3rd party item which CSR or Customer orders |
| | 06 | Customer owned item located in Customer warehouse at or near Customer site |
| 15 | | |

For items with Product Type 01 (distributor owned), the RIMS system used the distributor's inventory (as the "source") to fill the requisition.  For items with Product Type 04, the RIMS system used a third party vendor's inventory (vendor 38) (as the "source") to fill the requisition -- these items were ordered by the distributor for direct shipment from a vendor to the customer. ('989 patent at 5:37-45, Table 1.)  For items with Product Type 06, the RIMS system used the customer's inventory (as the "source") to fill the requisition:

The product type which was determined when the STOCK NBR was entered on the Requisition Management data screen is now used to source the item. Items of product type 06 are sourced from the Customer-owned Inventory 54; items of product type 01 are sourced from Distributor-owned inventory 52.

15

('989 patent at 11:47-53.)  Although items with Product Type 06 are described as being

"customer owned," they still constitute items that may be purchased by a prospective buyer using

the RIMS system.  The '989 patent described that items with Product Type 06 could be

purchased by a customer's requisitioning department (i.e., the prospective buyer) from the

customer's purchasing department (i.e., the seller/supplier):

> If the line item has a product type of 06, control is passed
> to block 334. As shown in steps 334 and 336, a Purchase
> Order record internal to the Customer may (at the option of
> the Customer) be created and printed out on printer 43 at this
> stage, recording a sale from the Customer's purchasing
> department to the requisitioning department or account. This
> internal purchase order can be used by the Customer's host
> computer in making accounting adjustments. Since the
> implementation of such an internal sale will vary depending
> on the Customer's own accounting software in a manner
> easily understood by one skilled in the art, these steps will
> not be further described here.

('989 patent at 18:4-15 (emphasis added).)  Thus, the RIMS system as described in the '989

patent was not a so-called "single source system" -- to the contrary, it included at least three

different sources for items:  a distributor's inventory, a third party vendor's inventory, and a

customer purchasing department's inventory:

> Sourcing is performed on both local computer 40 and host
> computer 10. Sourcing in the preferred embodiment of the
> system of the present invention can involve up to four
> different product types: 01—local Distributor-owned JIT
> items; 03—Distributor catalog items; 04—third-party items
> which are ordered by the Distributor; Type 06—Customer-
> owned JIT items. (Product type 05 comprises third-party
> items which are not sourced by the system of the present
> invention.) Any particular requisition may involve all of
> these product types, only a single product type, or any
> combination of product types.

('989 patent at 11:36-47.)  Therefore, the RIMS system is, contrary to Mr. Hilliard's assertions,

an electronic sourcing system as construed by the Court.

       b.      **at least two product catalogs containing data relating to items associated with the respective sources**

45.     Mr. Hilliard asserts that neither the Fisher RIMS nor IBM TV/2 search program included the functionality of "at least two product catalogs associated with different sources." (Hilliard Rep. at ¶ 328.)  I disagree because the IBM TV/2 disclosures describe not just a "search program," but a search program that is used with "at least two product catalogs containing data relating to items associated with the respective sources."  The Court interpreted "product catalog" to mean "an organized collection of items and associated information, published by a vendor (which includes suppliers, manufacturers, and distributors), which preferably includes a part number, price, catalog number, vendor name, vendor ID, a textual description of the item, and images of or relating to the item."  (Memorandum Opinion at 11 (Docket No. 204).)

46.     Mr. Hilliard apparently seeks to rely on a very narrow description of IBM TV/2 and contends that "the TV/2 program did not include any catalogs at all."  (Hilliard Rep. at ¶¶ 328, 331.)  He seems to be deliberately ignoring the fact the descriptions of the IBM TV/2 do not describe just a search program, but a system that includes a search program *and* the information searched by the program, including catalogs.  The IBM TV/2 General Information Manual discloses that it "is an electronic documentation program that any organization can use to produce and display large amounts of information.  In particular, information providers (such as manufacturers) *can use the program to make parts catalogs and service manuals available to users* (for example, their sales and service agents) in an electronic (online) format."  (IBM TV/2 General Information Manual at G0000019 (emphasis added).)  "You can search through parts catalogues, service manuals, stock lists, schematics, user documentation . . ."  (IBM TV/2 Brochure at L0132132.)

47.     The IBM TV/2 Brochure also confirms that IBM TV/2 managed published catalogs for use in an electronic sourcing environment. "TV2 can search in seconds through documents on CD-ROM and display the answer, complete with diagrams or pictures.  It can also

17

produce lists of references to the selected topic or useful information on the same subject.  You

can also create a 'shopping list' just by selecting items and passing that list to another application.

For example, you might select parts to be ordered from the exploded drawing in a parts

catalogue.  The parts list could then be sent directly to your parts ordering system - all without

moving from your PS/2." (TV2 Brochure at L0132133.)  The catalogs managed by IBM TV/2

could include a variety of information, including photographs, diagrams, tables, indices, part

numbers, and other information:  "Technical Viewer/2 enables information providers to develop

applications around the information to give added value to the user.  For example, in addition to

finding a part number from a parts catalog, users can extract that information and transfer it

electronically to their data processing system.  They can then make immediate online requests

for stock availability and price information."  (IBM TV/2 General Information Manual at

G0000020.)  Mr. Hilliard does not even mention these explicit disclosures describing use of the

TV/2 program with catalogs.

48.    It would be obvious to combine the use of multiple catalogs in IBM TV/2 with

Fisher RIMS for all the reason stated herein, plus the fact that the RIMS system (contrary to Mr.

Hilliard's statements) does use data from multiple sources.  (Hilliard Rep. at ¶¶ 58, 61, 62.)  As

described herein, Fisher RIMS, as disclosed in the '989 patent, includes data related to items

from multiple suppliers and distributors.  The data can include third-party catalog data, including

data that is not procured through the distributor.  The data is contained in a database, and is

associated with sources, whether distributors, manufacturers, vendors, or the customer.  The

collections of items are contained in at least a Part Master Table, which is included as part of the

RIMS system.  ('989 patent at Fig. 1, 3:10-14, 3:18-28, 3:65–4:1, 4:21-26, 8: 24-40, 31:60-34:67,

Table I, Table VI, Table XVII, Table XVIII.)  The cross reference tables use data derived from

"catalogs of other Distributors."  ('989 patent at 32:22.)  This confirms that it would be natural

18

and logical for one of ordinary skill to combine the multiple-catalog search capability of IBM TV/2 with Fisher RIMS, which also deals with a catalog and multiple sources for products.

49.     Fisher RIMS includes collections of data relating to items that are (1) provided by the Distributor (2) available through third parties, and (3) owned by the customer.  Products are identified by product types as coming from several sources including (01) Distributor owned items in a JIT warehouse, (03) Distributor catalog items stored at a Distributor warehouse, (04) third party items ordered by the Distributor, (05) third party items ordered by the CSR or customers, and (06) Customer owned and located at or near customer site. ('989 patent at 5:20-6:15.)  Products of Type 04 will also have vendor numbers identified with them. ('989 patent at 15:5-40.)  Host computer also can search a table containing Distributor catalog numbers. ('989 patent at 33:15-16.)

50.     The Fisher RIMS Brochure discloses that Fisher RIMS database included information from multiple sources, including both Fisher catalog items and other supplier or customer items.  (Fisher RIMS Brochure at L0260598, L0260604.)

### c.     means for selecting the product catalogs to search

51.     Mr. Hilliard asserts that IBM TV/2 system does not include means for performing the step of "selecting the product catalogs to search."  (Hilliard Rep. at ¶ 271.)  I disagree.  The Court interpreted  the corresponding structure for the "means for selecting the product catalog to search" as "a user interface that allows the user to select a catalog; a catalog module that selects product catalogs based on preferences or history; a catalog search module that identifies product catalogs or a combination thereof; and their equivalents."  (Memorandum Opinion at 44-45 (Docket No. 204).)  The TV/2 system has such structure.

52.     IBM TV/2 includes a capability to search all or a subset of data available within that document system.  It has "A search facility that can locate every occurrence of a word or

phrase in either the current topic, a list of selected topics, the complete document, or another

document."  (IBM TV/2 General Information Manual at G0000023.)  Ms. Eng confirmed that

TV/2 could search one or more of the documents or catalogs in its database.  (Eng Decl. at ¶¶ 7-

8.)

53.      It would be obvious to combine this capability of IBM TV/2 with Fisher RIMS

system.  Fisher RIMS, as disclosed in the '989 patent, enabled entering a vendor number from a

third-party supplier into a requisition management data screen.  The Part Master is searched for

items having that vendor number.  ('989 patent at 8:25-39.)  Fisher RIMS also enabled entering a

stock number into a requisition management data screen, which results in a search of the Part

Master table.   ('989 patent at 8:40-9:47.)  The ability to expand this search capability to include

the ability in the TV/2 system to search selected catalogs is a logical, obvious combination to one

of ordinary skill in 1993, especially in view of the other reasons described herein to combine the

RIMS and TV/2 systems.

**d.      means for searching for matching items among the selected
product catalogs**

54.      Mr. Hilliard disputes whether IBM TV/2 also included a capability of searching

for matching items among selected product catalogs before it began working with Fisher

Scientific.  (Hilliard Rep. at ¶ 272.)  Hilliard asserts that the IBM TV/2 does not include means

for "searching for matching items among the selected product catalogs."  I disagree.

55.      The Court interpreted the corresponding structure for "means for searching for

matching items among the selected product catalogs" to be "search programs and modules

operating on a computer system with access to data in a database or other file system, and their

equivalents."  (Memorandum Opinion at 45 (Docket No. 204).)

56.      The IBM TV/2 materials and testimony show that it had the structure described

by the Court that provided preexisting capability for such searching: "A search facility that can

20

locate every occurrence of a word or phrase in either the current topic, a list of selected topics, the complete document, or another document."  (IBM TV/2 General Information Manual at G0000023.)  Ms. Eng, who marketed TV/2 for IBM, testified that:

- TV/2 was a search engine connected to a database located on a CD-ROM or hard disc. The TV/2 database stored multiple technical documents and/or product catalogs of item data. The documents in the TV/2 database could come from multiple sources, including manufacturers and/or distributors. TV/2 was capable of searching for item data in multiple documents or catalogs.

- TV/2 could search selected portions of the TV/2 database.

- A TV/2 user could select to search one or more of the documents or catalogs in the TV/2 database.

- TV/2's search engine could find items in the database that matched search criteria, such as part numbers, part names, or keywords. For example, you could search for all items with the term "battery" in the part name and the search engine would return as results all occurrences of batteries stored in the database.

(Eng Decl. at ¶¶ 6-9.)

57.      It would be obvious to combine this structure of IBM TV/2 with Fisher RIMS. Fisher RIMS discloses searching the Part Master Table for items that match the entered catalog or stock number.  If the entered stock number is found (a match), the Requisition Item Table in local database 50 is updated with information including a description of the item.  For product types 01 or 03, in response to a data block received from the local computer 40, the host computer 10 will search for items in one or more cross reference tables.  When a match is found, the item is converted and a data block is transmitted back to the local computer to again update the requisition Item Table with information about the matching item.  ('989 patent at 6:18–11:23 (particularly 8:25-9:2).)  One of ordinary skill thus would recognize the obvious benefit to combining this functionality with IBM TV/2.  The RIMS patent even talks about searching other distributor catalogs to prepare cross reference tables.  ('989 patent at 32:22.)

e.      **means for building a requisition using data relating to selected matching items and their associated source(s)**

21

58.     Mr. Hilliard contends that Fisher RIMS does not build requisitions "using data relating to selected matching items and their associated source(s)" because "[t]he requisitions built by the RIMS system did not include any source-related data."  (Hillard Rep. at ¶ 71.) This does not appear to dispute that Fisher RIMS could build requisitions.  RIMS stands for Requisition and Inventory Management System.  Mr. Hilliard ignores the showing above that IBM TV/2 generated data relating to selected matching items and their associated sources and taught transferring that data to a parts ordering system, which at least in the case of Fisher RIMS included requisitions as a precursor step to ordering products.  Mr. Hilliard also reasserts his assertions that RIMS does not build requisitions based on multiple source item information to support his conclusion.  (Hilliard Rep. at ¶ 72.)  As shown above, Fisher RIMS extensively taught the use of item data from multiple sources, so it satisfies this element.  Moreover, IBM TV/2 also taught connection of catalog search results to a parts ordering system, and thus the combination of Fisher RIMS and TV/2 teaches this element.

59.     Mr. Hilliard does not appear to dispute that the Fisher RIMS, as disclosed in the '989 patent, included "means for building a requisition using data relating to selected matching items and their associated source(s)."  The Court interpreted the function of this limitation is "building a requisition using data relating to selected matching items and their associated source(s)" and the corresponding structure is "a requisition module operating on a computer system having access to data in the database, and its equivalents."  (Memorandum Opinion at 46-47 (Docket No. 204).)  As the patents-in-suit admit, Fisher RIMS included such a requisition module.  Instead, Mr. Hilliard appears to assert that the requisitions "built by the RIMS system did not include any source-related data."  (Hilliard Rep. at ¶ 71.)  This is not true, as shown above Fisher RIMS uses source-related data.

60.     In Fisher RIMS, a customer or a CSR enters a stock number.  The system checks
to see if the part is listed in Part Master (type 01 or type 06).  If it is not in the Part Master, the
system considers it a type 03 (meaning that the part would be from a remote warehouse).  A
customer or CSR could then override that type designation to assign a type 04 or 05 to that item,
indicating that it was to be ordered from a third party.  Items assigned to all of these types could
be placed on a requisition, resulting in a requisition from multiple sources of items selected from
search results.  ('989 patent at Fig. 2A, Fig 2B, 6:18–11:23 (specifically 8:25–9:15).)

61.     The Fisher RIMS system product literature publicly advertised that RIMS would
generate a single requisition for multiple items: "Your Fisher Customer Service Representative
can enter everything that a lab needs on the same requisition, simplifying both ordering and
tracking."  (Fisher RIMS Brochure at L0260604.)

62.     IBM TV/2 taught connection of catalogs to a requisitioning system.  "Technical
Viewer/2 enables information providers to develop applications around the information to give
added value to the user.  For example, in addition to finding a part number from a parts catalog,
users can extract that information and transfer it electronically to their data processing system.
They can then make immediate online requests for stock availability and price information."
(IBM TV/2 General Information Manual at G0000020.)  IBM TV/2 could also "integrat[e] parts
catalogues with dealers' computer systems such as order entry, inventory management and
customer records."  (IBM TV/2 Brochure at L0132134.)

      **f.**     **means for processing the requisition to generate one or more
purchase orders for the selected matching items**

63.     Fisher RIMS, as disclosed in the '989 patent, includes "means for processing the
requisition to generate one or more purchase orders for the selected matching items."  The Court
interpreted the function of this limitation is "processing the requisition to generate one or more
purchase orders for the selected matching items" and the corresponding structure is "a purchase

23

order generation module operating on a computer system having access to the requisition; and its equivalents."  (Memorandum Opinion at 47 (Docket No. 204).)

64.    Mr. Hilliard contends that Fisher RIMS does not include "means for processing the requisition to generate one or more purchase orders for the selected matching items" because (1) "in the event an outside vendor purchase order is ultimately generated, it is generated at the Distributor's host computer and the sourcing determination is made by the Distributor, not by the customer" and (2) "the Distributor's host computer could not generate multiple purchase orders from a single requisition."  (Hilliard Rep. at ¶ 72).)  The teachings of the Fisher RIMS system and the inventor testimony show this is incorrect.

65.    Fisher RIMS generated purchase orders based on information included on accepted requisitions.  It generated one or more purchase orders depending upon the variety of product types on the requisition and how they were sourced.  "As described in the diagram Figures 5A and 5B for items of product types 01, 03, and 04, local computer 40 uses purchase order build program 112 to create a purchase order between the customer and the distributor from the data in the requisition header and item tables."  ('989 patent at Fig. 2A, Figs. 4A- 4D, Fig. 5A, Fig. B, 11:26–21: 67 (specifically 17: 35- 42,18:5-9).)

66.    The Fisher RIMS product literature also indicates that purchase orders could be created for multiple suppliers of items: "And purchase orders to any supplier can be printed in your PO format and sent out from FISHER RIMS." (Fisher RIMS Brochure at L0260602.)  The patents-in-suit define a "purchase order" to include internal purchase orders. They describe:

[T]he generation of the following **three purchase orders**:

    A.  line 002 would be ordered from on-site distributor-owned inventory;

    B.  line 004 would be ordered from on-site **customer-owned inventory (a transfer internal to the customer)**;

C.  lines 001 and 003 would be ordered, respectively, from Distributor's "del" and "edc" warehouses."

('172 patent at 15:45-53 (emphasis added).)  Further, the '989 patent recognizes that an internal purchase order "record[s] a sale form the Customer's purchasing department to the requisitioning department account."  ('989 patent at 18:5-9.)

67.    Listed inventor James Johnson admitted that RIMS as it existed in April of 1993 generated at least two of these three types of purchase orders as described.  (Johnson Dep. at 114-115.)  One of skill in the art reading the Patents would understand that a "transfer internal to the customer" is a purchase order, because the Patents say so.

68.    Mr. Hilliard asserts that Dr. Shamos admitted that the Distributor host computer could not generate multiple purchase orders.  (Hilliard Rep. at ¶ 72.)  However, the cited section of the Shamos transcript does not support this conclusion.  Dr. Shamos instead testified that the CSR Would not generate certain purchase orders.  Some orders would be generated at Fisher rather than by the CSR, but they were still generated from Fisher RIMS.  This testimony is consistent with Fisher RIMS generating multiple purchase orders from a requisition.

69.    In any event, the claims refer to generating "***one or more*** purchase orders," which includes a system that generates one purchase order from a requisition.  There seems to be no dispute that Fisher RIMS generates at least one purchase order for a requisition, and therefore would satisfy this element.

g.    **means for converting data related to a selected matching item and an associated source to data relating to an item and a different source**

70.    Mr. Hilliard contends that Fisher RIMS does not include "means for converting data related to a selected matching item and an associated source to data relating to an item and a different source" because "the RIMS system did not include data relating to a 'selected matching item and an associated source.'"  (Hilliard Rep. at ¶ 73.)  I disagree because, as discussed above,

25

Fisher RIMS, including specifically its converting function, invoked cross-reference tables, and thus does include data relating to a "selected matching item and an associated source."

> numbers of Distributor's vendor and other distributors (which are identified by a competitor number) for items which have been determined to be equivalent. This relational
> 0  database is created by the Distributor by, for example, reviewing the catalogs of other distributors and determining which items are equivalent to items in the Distributor catalog.
>
> Additionally, as discussed above, host database 20 also

('989 patent at 32:14-24.)  This express teaching discloses not only converting, but the existence in the Fisher RIMS databases of information about products from multiple sources and catalogs from multiple sources used for converting.

71.     Fisher RIMS, as disclosed in the '989 patent, includes "means for converting data related to a selected matching item and an associated source to data relating to an item and a different source."  The Court interpreted the function of this limitation is "converting data relating to a selected matching item and an associated source to data relating to an item and a different source" and the corresponding structure is "one or more non-catalog databases identifying cross-referenced items, identical items, or generally equivalent items; one or more cross-reference tables or file identifying cross-referenced items, identical items or generally equivalent items; one or more codes corresponding to cross-referenced items, identical items or generally equivalent items; and their equivalents."  (Memorandum Opinion at 48 (Docket No. 204).)  The Court interpreted the step of "converting data related to a selected matching item and an associated source to data relating to an item and a different source" to mean "substituting data relating to a selected matching item and an associated source to data relating to an item and a different source."  (Memorandum Opinion at 31 (Docket No. 204).

72.     Mr. Hilliard does not appear to dispute that the RIMS patent discloses converting or substituting equivalent products.  In fact, the disclosure of this element is extensive in the RIMS patent.  Fisher RIMS included a cross-reference table separate from the Part Master that could be used to convert customer stock numbers to Distributor catalog numbers.  ('989 patent at 3:32-36, 8:24-40, 31:60–34:67, Tables XVII, Table XVIII.)  For example, a cross reference table is illustrated at col. 34:5-8 of the '989 patent in which the same item is available from two different vendors, with the local part number, vendor, and vendor part number illustrated.

73.     The Fisher RIMS product literature describes cross-referencing customer stock numbers to catalog numbers for all suppliers of the product: "Cross-references your stock numbers and all supplier numbers."  (Fisher RIMS Brochure at L0260598.)  The express teaching of the '989 patent describes that a data block:

> contains a line representing a requisition for 1000250 (Corning's part number) for the beaker, a match will be found in the vendor cross-reference file in host database 20 and that item *converted* to 02540K for sourcing 306 and pricing 308.

('989 patent at 33:19-23 (emphasis added).)  The number "02540K" is the "distributor's catalog number."  ('989 patent at 32:5-6.)  This clearly teaches that the cross reference table is used by the system for substituting one product for another from a different source.

### 2.    Claim 6 of the '683 Patent

74.     Fisher RIMS, as disclosed in the '989 patent, includes all the elements of claim 6 of the '683 patent.

### a.    an electronic sourcing system

75.     Mr. Hilliard states that RIMS does not disclose an electronic sourcing system for claim 6 of the '683 patent either.  (Hilliard Rep. at ¶74.)  For the same reasons discussed with respect to claim 3, Fisher RIMS is "an electronic sourcing system."

76.     Additionally, as discussed with respect to claim 3, IBM TV/2 was an electronic documentation system that was configured to connect to an electronic sourcing or procurement system.

### b.     a database containing data relating to items associated with at least two sources

77.     Fisher RIMS, as disclosed in the '989 patent, includes "a database containing data relating to items associated with at least two sources."

78.     Mr. Hilliard contends that Fisher RIMS does not include "a database containing data relating to items associated with at least two sources" because (1) "the data in the part master database did not include any source-related information" and (2) "the products in the parts master database were all intended to be acquired by the customer from a single source: the Distributor."  (Hilliard Rep. at ¶ 74.)  These are similar arguments to Mr. Hilliard's arguments regarding whether the RIMS system includes products from multiple sources, and my response is generally the same for the reasons stated above.

79.     Fisher RIMS included a database containing data related to items from multiple sources, such as suppliers and distributors.  The data could include third-party data, including data that is not procured through the distributor.  The data was contained in a database, and was associated with sources, whether distributors, manufacturers, vendors, or the customer.  The data was contained in at least a local Part Master Table and a remote inventory database, which were both included as part of Fisher RIMS.  ('989 patent at Fig. 1, 3: 10-14, 3:18-28, 3:65–4:1, 4:21-26, 8: 24-40, 31:60–34:67, Table I, Table VI, Table XVII, Table XVIII.)

80.     For example, Fisher RIMS included a database relating to items that are (1) provided by the Distributor (2) available through third parties, and (3) owned by the customer.  Products are identified by product types as coming from several sources including (01) Distributor owned items in a JIT warehouse, (03) Distributor catalog items stored at a Distributor

28

warehouse, (04) third party items ordered by the Distributor, (05) third party items ordered by the CSR or customers, and (06) Customer owned and located at or near customer site. ('989 patent at 5:20-6:15.)  Products of Type 04 would also have vendor numbers identified with them. ('989 patent at 15:5-40.)  Host computer also could search a table containing Distributor catalog numbers. ('989 patent at 33:15-16.)

81.     The Fisher RIMS Brochure similarly discloses that the RIMS database included information from multiple sources, including both Fisher catalog items and items from other suppliers, or customer items.  (Fisher RIMS Brochure at L0260598, L0260604.)

82.     In addition, the TV/2 General Information Manual discloses that it included a database with item information from multiple sources useable to produce and display large amounts of information.  "In particular, information providers (such as manufacturers) can use the program to make parts catalogs and service manuals available to users (for example, their sales and service agents) in an electronic (online) format."  (IBM TV/2 General Information Manual at G0000019.)  "You can search through parts catalogues, service manuals, stock lists, schematics, user documentation . . ."  (IBM TV/2 Brochure at  L0132132.)

83.     The IBM TV/2 Brochure also confirms that the TV/2 system managed published catalogs for use in an electronic sourcing environment.  "TV2 can search in seconds through documents on CD-ROM and display the answer, complete with diagrams or pictures. It can also produce lists of references to the selected topic or useful information on the same subject.  You can also create a 'shopping list' just be selecting items and passing that list to another application. For example, you might select parts to be ordered from the exploded drawing in a parts catalogue.  The parts list could then be sent directly to your parts ordering system - all without moving from your PS/2." (IBM TV2 Brochure at L0132133.)  The database of catalogs and other

documents managed by IBM TV/2 could include a variety of information, including

photographs, diagrams, tables, indices, part numbers, and other information:

> Technical Viewer/2 enables information providers to develop applications around the information to give added value to the user.  For example, in addition to finding a part number from a parts catalog, users can extract that information and transfer it electronically to their data processing system.  They can then make immediate online requests for stock availability and price information.

(IBM TV/2 General Information Manual at G0000020.)

      84.     Fisher RIMS included at least two databases with item information that included

many of fields of information about items from multiple sources.  The local database stored

information regarding items that included:  customer part number, manufacturer or supplier part

number, distributor's part number, default unit of measure, product type (01-06), cross-reference

number, unit price and a text description of the item.  ('989 patent at 8:25-39, 8:62-9:2, 10:18-

21.)  The host database also included the following:

> tor warehouses. Other portions of database **20** includes item records for each Product regularly sold by the Distributor. Each item record preferably includes information such as Distributor's catalog or part number for the Product, Distributor's list price, Distributor's current cost, Distributor's supplier (vendor) for the Product and a code identifying the Product as part of a product grouping to be treated similarly for customer discounting purposes. Database **20** also preferably includes discount records, by customer, that enable the host computer **10** to calculate at any time a net price for a particular Product to a particular customer in a manner well known to those of ordinary skill in the art. As described below, database **20** may contain cross-references from Distributor's catalog number to its vendor's part number and to similar catalog numbers of other suppliers or distributors for the same Product, either as a part of the item record, in a separate cross-reference file or both.

('989 patent at 3:21-37.)

           c.    **means for searching for matching items in the database**

      85.     Fisher RIMS, as disclosed in the '989 patent, includes "means for searching for

matching items in the database."  The Court interpreted the function of this limitation is

"searching for matching items in the database" and the corresponding function is "search programs and modules operating on a computer system with access to data in a database or other file system, and their equivalents."  (Memorandum Opinion at 46 (Docket No. 204).)

86.     This is the same structure, and the search, as explained above, that occurs in a database including the Part Master Table.

87.     Mr. Hilliard does not appear to dispute that Fisher RIMS includes "means for searching for matching items in the database."  (Hilliard Rep. at ¶ 75.)  Nor is it clear that he disputes that IBM TV/2 included such a means.  However, because he does dispute "means for searching for matching items among the selected product catalogs," I address the "means for searching for matching items in the database" element here briefly, in case it is necessary.  My discussion regarding "means for searching for matching items among the selected product catalogs" also supports my opinion regarding "means for searching for matching items in the database."

88.     Additionally, IBM TV/2 as it existed before Fisher began working with IBM included a capability to search all or a subset of data available within that document system: "A search facility that can locate every occurrence of a word or phrase in either the current topic, a list of selected topics, the complete document, or another document."  (IBM TV/2 General Information Manual at G0000023.)

> **d.     means for building a requisition using data relating to selected matching items and their associated source(s)**

89.     For the same reasons discussed with respect to claim 3, Fisher RIMS included "means for building a requisition using data relating to selected matching items and their associated source(s)."

90.     Mr. Hilliard contends that Fisher RIMS does not build a requisition "using data relating to selected matching items and their associated source(s)" because "the item data is not associated with sources."  (Hilliard Rep. at ¶ 74.)  I disagree for the reasons stated above.

91.     Additionally, as discussed above with respect to claim 3, IBM TV/2 taught connection of catalogs to a requisitioning system.  "Technical Viewer/2 enables information providers to develop applications around the information to give added value to the user.  For example, in addition to finding a part number from a parts catalog, users can extract that information and transfer it electronically to their data processing system.  They can then make immediate online requests for stock availability and price information."  (IBM TV/2 General Information Manual at G0000020.)  TV/2 could also "integrat[e] parts catalogues with dealers' computer systems such as order entry, inventory management and customer records."  (IBM TV/2 Brochure at L0132134.)

> **e.     means for processing the requisition to generate one or more purchase orders for the selected matching items**

92.     Mr. Hilliard disputes this element is in the RIMS system.  (Hilliard Rep. at ¶ 74.) For the same reasons discussed with respect to claim 3, Fisher RIMS included "means for processing the requisition to generate one or more purchase orders for the selected matching items."

> **f.     means for converting data relating to a selected matching item and an associated source to data relating to an item and a different source**

93.     Mr. Hilliard disputes this element is in the RIMS system.  (Hilliard Rep. at ¶ 74.) For the same reasons discussed with respect to claim 3, Fisher RIMS included "means for converting data relating to a selected matching item and an associated source to data relating to an item and a different source."

> **3.     Claim 26 of the '683 Patent**

94.     Mr. Hilliard addresses claim 26 at ¶ 75 (RIMS) and ¶ 270 (TV/2) of his report. The method claims 26, 28, and 29 are not limited to "electronic sourcing system" as defined by the Court.  Thus, Mr. Hilliard's arguments that the CSR is not a "prospective buyer" do not apply to these claims.  Likewise, Mr. Hilliard's arguments regarding single versus multiple-source systems are inapplicable here as related to "electronic sourcing system."

> **a.      maintaining at least two product catalogs containing data relating to items associated with the respective sources**

95.     Mr. Hilliard disputes that IBM TV/2 performed this step.  (Hilliard Rep. at ¶ 270.)  For the same reasons discussed with respect to claim 3, use of the IBM TV/2 performs the step of "maintaining at least two product catalogs containing data relating to items associated with the respective sources."  Apparently, Mr. Hilliard seeks to narrowly construe IBM TV/2 because it  "was not sold with catalogs."  (Hilliard Rep. at ¶ 270.)  However, the system was clearly sold for use with catalogs, so this is an irrelevant distinction.

> **b.      selecting the product catalogs to search**

96.     As discussed above with respect to claim 3, IBM TV/2 describes "selecting the product catalogs to search."

97.     Mr. Hilliard contends that TV/2 does not "select[] the product catalogs to search" without further explanation.  (Hilliard Rep. at ¶ 271.)  I disagree for the same reason I stated above with respect to the limitation "means for selecting the product catalog to search" with respect to claim 3.

> **c.      searching for matching items among the selected product catalogs**

98.     Mr. Hilliard contends that IBM TV/2 does not "search[] for matching items among the selected product catalogs."  (Hilliard Rep. at ¶ 272.)  I disagree.

99.     IBM TV/2 as it existed before Fisher began working with IBM practiced "searching for matching items among the selected product catalogs."  The Court interpreted "matching items" to mean "the search results."  (Memorandum Opinion at 17 (Docket No. 204).) As the Court had already interpreted "product catalog" and "matching items," it determined that "searching for matching items among the selected product catalogs" required no further interpretation.  (Memorandum Opinion at 22 (Docket No. 204).)

100.     The TV/2 General Information Manual that predates IBM's work with Fisher discloses that it "is an electronic documentation program that any organization can use to produce and display large amounts of information.  In particular, information providers (such as manufacturers) can use the program to make parts catalogs and service manuals available to users (for example, their sales and service agents) in an electronic (online) format."  (IBM TV/2 General Information Manual at G0000019.)  "You can search through parts catalogues, service manuals, stock lists, schematics, user documentation . . ."  (IBM TV/2 Brochure at L0132132.)

101.     The IBM TV/2 Brochure also confirms that the TV/2 system managed catalogs for use in an electronic sourcing environment. "TV2 can search in seconds through documents on CD-ROM and display the answer, complete with diagrams or pictures. It can also produce lists of references to the selected topic or useful information on the same subject.  You can also create a 'shopping list' just be selecting items and passing that list to another application.  For example, you might select parts to be ordered from the exploded drawing in a parts catalogue.  The parts list could then be sent directly to your parts ordering system - all without moving from your PS/2." (TV2 brochure at L0132133.)  The catalogs managed by IBM TV/2 could include a variety of information, including photographs, diagrams, tables, indices, part numbers, and other information:

> Technical Viewer/2 enables information providers to develop applications around
> the information to give added value to the user.  For example, in addition to

34

finding a part number from a parts catalog, users can extract that information and transfer it electronically to their data processing system.  They can then make immediate online requests for stock availability and price information.

(G0000020)

102.    Mr. Hilliard relies on pages 78- 79 of Charles Gounaris's deposition as proof that

IBM TV/2 "lacked the search functionality required for the electronic sourcing system" as of

March 8, 1994."  (Hilliard Rep. at ¶ 272.)  The cited testimony, however, merely asked Mr.

Gounaris to confirm a statement in a document shown to him:

```
11  Q   At the bottom, as part of the Section 1.1 of
12  project scope, you see there's a special note there?
13     A   Yes.
14     Q   It states, the search functions noted above
15  are not currently available in Technical Viewer.  Did
16  I read that right?
17     A   Yes.
18     Q   Okay.
19     A   And it says they're scheduled for a future
20  release of the software.
21     Q   So at this point in time, revised as of
22  March 8th, 1994, Technical Viewer didn't have the
                             79
 1  search functions that are identified there; isn't that
 2  what the document represents?
 3     A   You know, what it says is --
 4     Q   It's a simple question, sir.  Yes or no --
 5     A   Oh, yes, I believe so.
 6     Q   -- isn't that what the document represents?
 7     A   It says that the functions that were
 8  described above were not available at that time,
 9  correct.
10     Q   Thank you.
```

(Gounaris Dep. at 78:11-79:10.)  This exchange does not say anything about whether IBM TV/2

could search for matching items among selected product catalogs.  Ms. Eng, on the other hand,

specifically stated that IBM TV/2 could search for matching items among selected product

catalogs before IBM began working with Fisher.  (Engh Decl. at ¶¶ 7-9.)

### d.    building a requisition using data relating to selected matching items and their associated source(s)

103.    Fisher RIMS, as disclosed in the '989 patent, practiced "building a requisition using data relating to selected matching items and their associated source(s)."  Mr. Hilliard stated that the requisitions built by the RIMS system were not built using data relating to slected matching items and their associated sources.  (Hilliard Rep. at ¶ 71.)  As shown above, this is not true.  Fisher RIMS built requisitions for selected items that matched a criteria, a part number, and the items were associated with various sources.  Moreover, IBM TV/2 also taught transfer of data describing selected matching items and their associated sources to a system such as RIMS that could build requisitions, as discussed above.

104.    In Fisher RIMS, a CSR entered a stock number.  The system checked the Part Master for the number and the Product Type (type 01 or type 06).  If the part number was not in the Part Master as a type 01 or 06, the system made it a type 03 (meaning that the part would be from a remote warehouse).  A CSR could then override that type designation to assign a type 04 or 05 to that item, indicating that it was to be ordered from a third party.  Items assigned to all of these types could be placed on a requisition, resulting in a requisition from multiple sources of items selected from search results.  ('989 patent at Fig. 2A, Fig. 2B, 6:18–11:23 (specifically 8:25-9:15).)  The requisition would indicate the source at least through the Product Type field.

105.    The Fisher RIMS product literature publicly advertised that Fisher RIMS would generate a single requisition for multiple items: "Your Fisher Customer Service Representative can enter everything that a lab needs on the same requisition, simplifying both ordering and tracking." (Fisher RIMS Brochure at L0260604.)

106.    Mr. Hilliard contends that Fisher RIMS does not "build[] a requisition using data relating to selected matching items and their associated source(s)" because "there was no capability to search for matching items among selected product catalogs, and the item data in the

36

    

database did not have associated source-related information."  (Hilliard Rep. at ¶ 75.)  As shown above, Fisher RIMS combined with IBM TV/2 could build such requisitions and could search for matching items among selected product catalogs.  Therefore, I disagree.

> **e.    processing the requisition to generate one or more purchase orders for the selected matching items**

107.    Mr. Hilliard contends that Fisher RIMS does not "process[] the requisition to generate one or more purchase orders for the selected matching items" without further explanation.  (Hilliard Rep. at ¶ 75.)  I disagree for the reasons stated below and in previous discussion of the means for generating purchase orders regarding claim 3 of the '683 patent.

> **f.    determining whether a selected matching item is available in inventory**

108.    Fisher RIMS, as disclosed in the '989 patent, practiced "determining whether a selected matching item is available in inventory."  IBM TV/2 taught connecting the IBM TV/2 system to a requisitioning and purchasing system for requesting stock availability and price information.

109.    Mr. Hilliard contends that Fisher RIMS does not "determin[e] whether a selected matching item is available in inventory" because "it [could not] determine whether the item was available in the Distributor Warehouse 30 or in a third-party supplier's inventory."  (Hilliard Rep. at ¶ 75.)  I disagree.  Mr. Hilliard acknowledges that "[t]he local system at the customer's facility could determine whether an item was available in the local JIT inventory."  (Hilliard Rep. at ¶ 75.)  Mr. Hilliard arbitrarily limits "inventory" to the Distributor Warehouse or third party supplier's inventory.  Claim 26, however, does not qualify what type of or whose inventory is checked; it only requires checking whether a selected matching item is available in inventory.  The "I" in RIMS stands for inventory, and the RIMS disclosures clearly teach checking inventory for selected items.

110.     The Fisher RIMS system included a sourcing component that allowed its users to determine whether a product was available in inventory, whether locally or at a remote warehouse.  If the item is unavailable either locally or in remote inventory, the RIMS system would allow the item to be backordered.  Various computer implemented processes are described for determining availability of various product types.  ('989 patent at 12:33-60, 13:38-53, 14:48-67. 15:1-5, 18:40-50, 22 22:36-47, Table XXII, Table XXIII.)

111.     Fisher RIMS checked the current inventory both (1) at the customer location, and (2) at other locations tracked by the host database.  At the customer location, the local database 50 contains items that are both types 01 and 06, which are Fisher-owned items and customer-owned items, respectively.  The local database contains the parts master that we are saying is not a catalog, but nevertheless includes information about inventory locally.  The host database 20 contains items that are types 03 and 04, both of which are purchased from the distributor (Fisher).  Determining inventory from these data collections, which are owned by the distributor (a third party respective to the customer) is discussed at col. 22:37-53 of the '989 patent.

112.     The Fisher RIMS system product literature publicly advertised the system's ability to determine whether a product was available in inventory.  As described in the Fisher RIMS Brochure, Fisher RIMS "provides ready-access to all inventory data through your PC" and "tracks on-site Fisher-owned and/or customer owned inventory."  (Fisher RIMS Brochure at L0260598.)

113.     IBM TV/2 taught electronic connection of the IBM TV/2 system to a data processing system used for inventory tracking and stock requisitioning.  "Technical Viewer/2 enables information providers to develop applications around the information to give added value to the user.  For example, in addition to finding a part number from a parts catalog, users can extract that information and transfer it electronically to their data processing system.  They

38

can then make immediate online requests for stock availability and price information."  (IBM TV/2 General Information Manual at G0000020.)

114.     The combination of Fisher RIMS and IBM TV/2 prior art systems render claim 26 of the '683 patent obvious in my opinion for the reasons set forth above.

### 4.     Claim 28 of the '683 Patent

#### a.     maintains at least two product catalogs containing data relating to items associated with the respective sources

115.     For the same reasons discussed with respect to claim 3, IBM TV/2 "maintains at least two product catalogs containing data relating to items associated with the respective sources."

116.     For the same reasons discussed with respect to claim 3, Fisher RIMS included organized collections of data related to items from multiple suppliers and distributors.

#### b.     selecting the product catalogs to search

117.     For the same reasons discussed with respect to claim 26, IBM TV/2 taught "selecting the product catalogs to search."  Additionally, Fisher RIMS taught selecting portions of a database for searching catalog and inventory items, as discussed above.

#### c.     searching for matching items among the selected product catalogs

118.     For the same reasons discussed with respect to claim 26, IBM TV/2 practiced "searching for matching items among the selected product catalogs."  Additionally, Fisher RIMS included searching for matching items in a database containing catalog items.

#### d.     building a requisition using data relating to selected matching items and their associated source(s)

119.     For the same reasons discussed with respect to claim 26, Fisher RIMS practiced "building a requisition using data relating to selected matching items and their associated

source(s)."  Additionally, as discussed above, TV/2 discloses connection with an online requisitioning and purchasing system.

> **e.   processing the requisition to generate one or more purchase orders for the selected matching items**

120.    For the same reasons discussed with respect to claim 26, Fisher RIMS practiced "processing the requisition to generate one or more purchase orders for the selected matching items."

> **f.   converting data relating to a selected matching item and an associated source to data relating to an item and a different source**

121.    Fisher RIMS, as disclosed in the '989 patent, practiced "converting data relating to a selected matching item and an associated source to data relating to an item and a different source."  The Court interpreted this limitation to mean "substituting data relating to a selected matching item and an associated source to data relating to an item and a different source." (Memorandum Opinion at 31 (Docket No. 204).)

122.    For the same reasons discussed with respect to claim 3, Fisher RIMS practiced "converting data relating to a selected matching item and an associated source to data relating to an item and a different source."

123.    Mr. Hilliard contends that Fisher RIMS does not "convert[] data relating to a selected matching item and an associated source to data relating to an item and a different source" without further explanation.  (Hilliard Rep. at ¶ 75.)  I disagree for the same reason I stated above.

124.    The combination of the RIMS and TV/2 prior art systems renders claim 28 of the '683 patent obvious in my opinion for the reasons set forth above.

> **5.   Claim 29 of the '683 Patent**

>> **a.   the method of claim 28**

125.    As already discussed, Fisher RIMS practiced "the method of claim 28."

126.    Additionally as already discussed, IBM TV/2 practiced several limitation of "the method of claim 28."

      **b.    determining whether a selected matching item is available in inventory**

127.    For the same reasons discussed with respect to claim 26, Fisher RIMS practiced "determining whether a selected matching item is available in inventory."

128.    Additionally, for the same reasons discussed with respect to claim 26, IBM TV/2 enabled determining whether search results are available in stock, and satisfies this element of the claim.

129.    The combination of the RIMS and TV/2 prior art systems renders claim 29 of the '683 patent obvious in my opinion for the reasons set forth above.

    **E.    <u>The '516 Patent</u>**

      **1.    Claim 1 of the '516 Patent**

        **a.    an electronic sourcing system**

130.    Mr. Hilliard again asserts for purposes of the claims of the '516 patent that the RIMS system is not an "electronic sourcing system."  (Hilliard Rep. at ¶ 84.)  For the same reasons discussed with respect to claim 3 of the '683 patent, Fisher RIMS was "an electronic sourcing system."  Additionally, as discussed above, IBM TV/2 was an electronic documentation system that was configured to connect to an electronic sourcing or procurement system.

        **b.    a collection of catalog items stored in an electronic format**

131.    Mr. Hilliard  generally asserts that IBM TV/2 does not anticipate any claim. (Hilliard Rep. at ¶ 117.)  He further asserts that the IBM TV/2 search program lacked a collection of vendor catalogs.  (Hilliard Rep. at ¶ 307.)  As described above regarding the "at least two catalogs" limitation of claim 3 of the '683 patent, the TV/2 discloses multiple catalogs

searched by the search program.  TV/2 discloses a database including a "collection of catalog items stored in an electronic format."  The Court interpreted "catalog" to mean "an organized collection of items and associated information, published by a vendor (which includes suppliers, manufacturers, and distributors), which preferably includes a part number, price, catalog number, vendor name, vendor ID, a textual description of the item, and images of or relating to the item." (Memorandum Opinion at 11 (Docket No. 204).)

132.    The TV/2 General Information Manual discloses that it "is an electronic documentation program that any organization can use to produce and display large amounts of information.  In particular, information providers (such as manufacturers) can use the program to make parts catalogs and service manuals available to users (for example, their sales and service agents) in an electronic (online) format."  (IBM TV/2 General Information Manual at G0000019.)  "You can search through parts catalogues, service manuals, stock lists, schematics, user documentation . . ."  (IBM TV/2 Brochure atL0132132.)

133.    The IBM TV/2 Brochure also confirms that the IBM TV/2 system managed catalogs for use in an electronic sourcing environment. "TV2 can search in seconds through documents on CD-ROM and display the answer, complete with diagrams or pictures. It can also produce lists of references to the selected topic or useful information on the same subject.  You can also create a 'shopping list' just be selecting items and passing that list to another application. For example, you might select parts to be ordered from the exploded drawing in a parts catalogue.  The parts list could then be sent directly to your parts ordering system - all without moving from your PS/2." (TV2 brochure, L0132133.)  The catalogs managed by TV/2 could include a variety of information, including photographs, diagrams, tables, indices, part numbers, and other information:

> Technical Viewer/2 enables information providers to develop applications around
> the information to give added value to the user.  For example, in addition to

finding a part number from a parts catalog, users can extract that information and transfer it electronically to their data processing system.  They can then make immediate online requests for stock availability and price information.

(G0000020.)

### c.    a first set of pre-determined criteria associated with said collection of catalogs

134.    Mr. Hilliard addresses TV/2 and the claims of the '516 patent at pp. 137-139 of his Report.  It is unclear as to whether he disputes some of the elements of the claims of the '516 patent individually, including this one.  I will address it because Mr. Hilliard generally states that the TV/2 does not anticipate the '516 patent.  (Hilliard Rep. at 117.)  IBM TV/2 includes "a first set of pre-determined criteria associated with said collection of catalogs."   I understand criteria in the context of this claim to mean information about the catalogs which would assist in selection of catalogs to search.

135.    IBM TV/2 could perform a search through one or more documents according to a search criteria to select a portion of the overall TV/2 database, for example a document or topic to be searched: "A search facility that can locate every occurrence of a word or phrase in either the current topic, a list of selected topics, the complete document, or another document."  (IBM TV/2 General Information Manual at G0000023; Eng. Decl. at ¶¶ 6-9.) A list of selected topics would appear to correspond to the first set of criteria, since it would literally include a list of preselected catalogs.

### d.    a second set of pre-determined criteria associated with items from each of said catalogs

136.    IBM TV/2 included a second set of pre-determined criteria associated with items stored in a database.  IBM TV/2 could perform a search through one or more documents according to further search criteria to select specific items in the selected portions of the database, for example by keyword: "A search facility that can locate every occurrence of a word

or phrase in either the current topic, a list of selected topics, the complete document, or another document." (IBM TV/2 General Information Manual at G0000023.) Selected topics could also include a list of preselected items.

137.    Additionally, Fisher RIMS, as disclosed in the '989 patent, taught using various sets of search criteria associated with items in a database of catalog and inventory items. Fisher RIMS used a catalog number or a stock number associated with each item as criteria for selecting data to search. ('989 patent at 8:10-12, 24-29, 8:64 – 9:2 (ePLUS0137694-95).) Additionally, a user could edit product type information associated with an item, which would affect searching of a host database for item information relating to items that are not locally stocked. ('989 patent at 9:49-65.)

138.    Fisher RIMS, as disclosed in the '989 patent, taught entering a catalog number from a third-party supplier into a requisition management data screen. The Part Master was searched for items having that catalog number. ('989 patent at 8:25-39.) Fisher RIMS also taught entering a stock number into a requisition management data screen, which results in a search of the Part Master table. ('989 patent at 8:40-9:47.) RIMS thus also appears to satisfy this element.

       e.     **a catalog selection protocol, said catalog selection protocol relying on said first set of pre-determined criteria to select less than said entire collection of catalogs, and including matching a vendor identification code with a subset of said collection of catalogs, wherein said subset of catalogs includes both a vendor catalog from a predetermined vendor and a second catalog from a predetermined third party that is one of a manufacturer and a competing vendor, said predetermined third party selling items corresponding to items in said vendor catalog**

139.    Mr. Hilliard does not appear to dispute this element individually, but in view of his general statements I will address it. IBM TV/2 included "a catalog selection protocol, said catalog selection protocol relying on said first set of pre-determined criteria to select less than

44

said entire collection of catalogs, and including matching a vendor identification code with a subset of said collection of catalogs, wherein said subset of catalogs includes both a vendor catalog from a predetermined vendor and a second catalog from a predetermined third party that is one of a manufacturer and a competing vendor, said predetermined third party selling items corresponding to items in said vendor catalog." The Court found that "subset" means "less than all of a set" and "protocol" means "a procedure." (Memorandum Opinion at 6 (Docket No. 204).)

140.    IBM TV/2 taught a procedure for selecting one or more, but less than all, catalogs to search (e.g., by topic or set of documents), for occurrences of a word or phrase. "A search facility that can locate every occurrence of a word or phrase in either the current topic, a list of selected topics, the complete document, or another document." (IBM TV/2 General Information Manual at G0000023.) If two catalogs of competing vendors were included in the TV/2 system, those catalogs would be included within the same topic or could both be selected, and therefore could be searched simultaneously. (Eng. Decl. at ¶ 8 ("A TV/2 user could select to search one or more of the documents or catalogs in the TV/2 database.").) The list of selected topics could be a list of catalogs, and the description makes clear that the list could include less than all topics or catalogs.

141.    The RIMS patent teaches searching selected databases based on product type, or other source-related information: "In the validation step, host computer 10 checks the customer account number, item stock number *(using the product type information to determine what database and host databases 20 to search)* . . ." ('989 patent at 18:63-67 (emphasis added).) Fisher RIMS, as disclosed in the '989 patent, taught entering a catalog number from a third-party supplier into a requisition management data screen. The Part Master was searched for items having that catalog number. ('989 patent at 8:25-39.) Fisher RIMS also taught entering a stock

number into a requisition management data screen, which results in a search of the Part Master table.   ('989 patent at 8:40-9:47.)   RIMS also taught a cross reference table that is created by reviewing catalogs of various distributors who supply equivalent products and thus may be competitors.   ('989 patent at 32:22.)

142.     ePlus's infringement expert Dr. Weaver testified that any keyword used to search a catalog database will satisfy this claim element.   (Weaver Dep. at 197:19-198:11.)   As described above, both TV/2 and RIMS allowed for searching their databases by keywords, including at least part numbers.

> **f.     a search program, said search program relying on said second set of criteria to select specific items from said catalogs determined from said catalog selection protocol**

143.     Mr. Hilliard admits that TV/2 has a search program, but apparently disputes whether it meets the description of this element.   Mr. Hilliard contends that Fisher RIMS does not include a "'search program' enabling the selection of 'specific items from said [subset of] catalogs determined from said catalog selection protocol," without further explanation.   (Hilliard Rep. at ¶ 85.)   I disagree.   IBM TV/2 taught "a search program, said search program relying on said second set of criteria to select specific items from said catalogs determined from said catalog selection protocol."   Additionally, Fisher RIMS, as disclosed in the '989 patent, included a search program for selecting specific items based upon predetermined selection criteria (such as part or catalog number) from a database of items for requisitioning and purchase.   ('989 patent at 6:18–11:23 (particularly 8:25-9:2).)

144.     IBM TV/2 included a search program that is configured to perform a keyword search within a selected topic or set of documents: "A search facility that can locate every occurrence of a word or phrase in either the current topic, a list of selected topics, the complete document, or another document."   (IBM TV/2 General Information Manual at G0000023; Eng.

Decl. at ¶ 9 ("TV/2's search engine could find items in the database that matched search criteria, such as part numbers, part names, or keywords. For example, you could search for all items with the term 'battery' in the part name and the search engine would return as results all occurrences of batteries stored in the database.").)

145.    Additionally, Fisher RIMS taught searching the Part Master Table for items that match the entered catalog or stock number.  If the entered stock number is found (a match), the Requisition Item Table in local database 50 is updated with information including a description of the item.  For product types 01 or 03, in response to a data block received from the local computer 40, the host computer 10 will search for items in one or more cross reference tables. When a match is found, the item is converted and a data block is transmitted back to the local computer to again update the requisition Item Table with information about the matching item. ('989 patent at 6:18–11:23 (particularly 8:25-9:2).)

146.    ePlus's infringement expert Dr. Weaver testified that any second keyword used to search a catalog database will satisfy this claim element.  (Weaver Dep. at 197:19-198:11.)  As described above, both TV/2 and RIMS allowed for searching their databases by keywords including part numbers in RIMS and keywords and other numbers and fields in TV/2.

### 2.    Claim 2 of the '516 Patent

#### a.    an electronic sourcing system as recited in claim 1

147.    As already discussed, Fisher RIMS was "an electronic sourcing system."

#### b.    wherein catalogs comprising said collection of catalogs are stored in separate databases

148.    Mr. Hilliard contends that Fisher RIMS does not include "wherein catalogs comprising said collection of catalogs are stored in separate databases" because "[t]he local computer had a single database 50."  (Hilliard Rep. at ¶ 86.)  I disagree because the claims do not require that the catalog database be located at any specific place.  Rather they require only that

47

the catalogs be part of the claimed electronic sourcing system.  In any event, the RIMS patent specifically discloses multiple databases or tables within the local database.

149.    Fisher RIMS, as disclosed in the '989 patent, included data stored in a number of separate databases.  The Fisher RIMS system could use several local or host databases.  ('989 patent at Fig. 1, 3:10-15.)  IBM TV/2 discloses use of a collection of catalogs that could be stored in a local database, on a local area network server, or on a CD-ROM, or a combination thereof.  (IBM TV/2 General Information Manual at G0000025-G0000028.)

150.    Mr. Hilliard attempts to make a distinction between the local computer and the host computer and states that the host computer is not part of RIMS.  His argument does not make any sense.  The words of the RIMS patent show that the host computer was an integral part of the sourcing system described in the '989 patent.  ('989 patent at 2:62-65 (The requisition and inventory management sytem of the present invention, which is shown in FIG. 1, employs at least two computers--a host computer 10 located at a Distributor site and a local computer 40 . . . ."  Further, a host computer 10 with host databases 20 are also described as part of the electronic sourcing system of the atents-in-suit.  ('683 patent at 5:9-17; 10:46-48, 14:6-11).

### 3.    Claim 6 of the '516 Patent

#### a.    an electronic sourcing system as recited in claim 1

151.    As already discussed, Fisher RIMS was "an electronic sourcing system."

#### b.    wherein said second set of predetermined criteria includes at least one of a catalog number and item textual information

152.    Fisher RIMS, as disclosed in the '989 patent, included "wherein said second set of predetermined criteria includes at least one of a catalog number and item textual information." Fisher RIMS used a catalog number or a stock number associated with each item as criteria for selecting data to search. ('989 patent at 8:10-12, 24-29, 8:64-9:2.)  Additionally, a user could edit product type information associated with an item, which would affect searching of a host

48

database for item information relating to items that are not locally stocked.  ('989 patent at 9:49-65.)

153.    Furthermore, IBM TV/2 taught using item textual information (word or phrase) to search a catalog:  "A search facility that can locate every occurrence of a word or phrase in either the current topic, a list of selected topics, the complete document, or another document." (IBM TV/2 General Information Manual at G0000023; Eng. Decl. at ¶ 9 ("TV/2's search engine could find items in the database that matched search criteria, such as part numbers, part names, or keywords.").)  Thus, the TV/2 system also satisfies this element.

154.    Mr. Hilliard does not appear to dispute that Fisher RIMS includes "wherein said second set of predetermined criteria includes at least one of a catalog number and item textual information."

### 4.    Claim 9 of the '516 Patent

#### a.    an electronic sourcing system

155.    For the same reasons discussed with respect to claim 3 of the '683 patent, Fisher RIMS was "an electronic sourcing system."  Additionally, as discussed with respect to claim 3 of the '683 patent, IBM TV/2 was an electronic documentation system that was configured to connect to an electronic sourcing or procurement system.

#### b.    a collection of catalog items stored in an electronic format

156.    For the same reasons discussed with respect to claim 1, IBM TV/2 included a collection of catalogs stored in an electronic database.  For the same reasons discussed with respect to claim 1, Fisher RIMS, as disclosed in the '989 patent, includes a collection of items stored in an electronic format, in a database.

#### c.    a first identification code associated with a first item in a first catalog

157.     IBM TV/2 included a first identification code associated with a first item stored in a database.  Fisher RIMS associated items with specific criteria such as stock numbers, catalog numbers, or part numbers. ('989 patent at Table VI, 6:31-34, 8:10-45.)  IBM TV/2 taught items including information that could serve as identification codes, such as part numbers, stored in catalogs alongside associated catalog and ordering information.  (TV/2 General Information Manual at G0000019, G0000023.)

158.     Other than his dispute regarding catalogs, Mr. Hilliard does not appear to dispute that Fisher RIMS includes "a first identification code associated with a first item in a first catalog."

> **d.      a second identification code associated with a second item in a second catalog, said first item and said second item being generally equivalent, and wherein a selection of one identification code from one of said first and second catalogs provides the other identification code from the other of said catalogs**

159.     Fisher RIMS, as disclosed in the '989 patent, included a second identification code associated with a second item, said first item and said second item being generally equivalent, and wherein a selection of one identification code provides the other identification code.  Additionally, IBM TV/2 taught storage of items in a variety of different catalogs, as well as selection of one or more catalogs based on document, topic, or group of topics.

160.     Fisher RIMS included a cross-reference table that could be used to convert customer stock numbers to Distributor catalog numbers to identify additional vendors from which a distributor can order items on a customer's behalf.  ('989 patent at 3:32-36, 8:24-40, 31:60-34:67, Table XVII, Table XVIII.)  For example, a cross reference table is illustrated at col. 34:5-8 of the '989 patent in which the same item is available from two different vendors, with the local part number, vendor, and vendor part number illustrated.  The parts were identified as equivalent between various distributors.  ('989 patent at 32:22.)

50

161.    The Fisher RIMS product literature describes cross-referencing to convert customer stock numbers to catalog numbers for all suppliers of the product: "Cross-references your stock numbers and all supplier numbers."  (Fisher RIMS Brochure at L0260598.)  ePlus's infringement expert, Dr. Weaver, testified that this same type of converting satisfies claim 9 of the '516 patent.

162.    At least as discussed previously, IBM TV/2 included a database containing a variety of different catalogs of information.

163.    A cross-reference table in Fisher RIMS contained information received from external to Fisher RIMS and which was useable to cross-reference items that are not stocked by the customer or distributor.  ('989 patent at 32:14-24.)   The '989 patent teaches the desirability (and in fact the use) of including data in a cross-reference table linking information about items that originates from catalogs external to the RIMS system.

164.    Mr. Hilliard contends that Fisher RIMS does not include "selection of [either a first identification code associated with a first item in a first catalog or a second identification code associated with a second item in a second catalog] provides the other identification code from the other of said catalogs" because "[t]here is only one database of items available to the CSR at the local computer[, and] [t]he items in the database are JIT items sourced from a single Distributor (as well as items already owned by the customer, which do not need to be sourced at all)."  (Hilliard Rep. at ¶ 87.)  I disagree that there is only one database of times available to the CSR.  The RIMS patent makes clear that the CSR has access to both the host database 20 and the local database 50 and that these contain cross-reference tables and multiple databases.  ('989 patent at 3:10-15, 31-37, 8:35-39; 18:64-65.)  I also disagree that the items in the RIMS system were sourced from a single distributor for the reasons described above.

**5.    Claim 21 of the '516 Patent**

### a. an electronic sourcing system

165.    For the same reasons discussed with respect to claim 3 of the '683 patent, Fisher RIMS was "an electronic sourcing system."

### b. a requisition module including data fields, user-generated criteria entered into at least one of said data fields to generate at least partial criteria corresponding to a desired item

166.    Mr. Hilliard contends that the Fisher RIMS system does not satisfy all elements of claim 21.  (Hilliard Rep. at ¶ 88.)  However, he does not appear to dispute that Fisher RIMS included "a requisition module including data fields, user-generated criteria entered into at least one of said data fields to generate at least partial criteria corresponding to a desired item."  In any event, that element is found in Fisher RIMS.

167.    Fisher RIMS, as disclosed in the '989 patent, included "a requisition module including data fields, user-generated criteria entered into at least one of said data fields to generate at least partial criteria corresponding to a desired item."

168.    The Fisher RIMS system included a requisition management module and data screens for a user to enter search criteria. ('989 patent at Fig. 2A, 6:31-34, 8:24-29,  8:46-51.) This is the same requisition module disclosed in the patents-in-suit.  ('516 patent at 1:15-21, 4:6-10.)

### c. a catalog collection searching module, said searching module including a collection of catalogs of items stored in an electronic format, a catalog selection criteria used to select less than said entire collection, said searching module being used to generate additional search-module criteria for said data fields of said requisition module

169.    Mr. Hilliard contends that Fisher RIMS does not include "'a collection of catalogs of items,' nor employ 'a catalog selection criteria used to select less than [the] entire collection,. or include a 'catalog collection searching module'" without further explanation.  (Hilliard Rep. at

¶ 88.)  However, he does not appear to dispute that such a searching module is found in IBM TV/2.  In any event, this element is found in IBM TV/2.

170.    IBM TV/2 includes a "a catalog collection searching module, said searching module including a collection of catalogs of items stored in an electronic format, a catalog selection criteria used to select less than said entire collection, said searching module being used to generate additional search-module criteria for said data fields of said requisition module."

171.    As discussed previously, IBM TV/2 taught a procedure for selecting one or more catalogs to search (e.g., by topic or set of documents), for occurrences of a word or phrase.  "A search facility that can locate every occurrence of a word or phrase in either the current topic, a list of selected topics, the complete document, or another document."  (IBM TV/2 General Information Manual at G0000023.)  Two catalogs of competing vendors may be included in IBM TV/2, and those catalogs could both be selected as part of a list, and therefore could be searched simultaneously.  Additionally, based on the results of such a search, a user could select one or more portions of the search results formed as a hyperlink, which acts as additional search criteria linking the user to additional information relating to that topic (e.g., parts assemblies).  (TV/2 General Information Manual at G0000024.)  As discussed previously, it would have been obvious to combine the TV/2 system with such catalogs with the RIMS system.

> **d.    a multiple purchase order generation module, said purchase order generation module creating multiple purchase orders from a single requisition created with said user-generated criteria and said search-module criteria**

172.    In addressing the '683 patent, Mr. Hilliard disputes that Fisher RIMS processed requisitions to generate one or more purchase orders for selected matching items.  (Hilliard Rep. at ¶ 72.)  It is not clear whether Mr. Hilliard disputes the "multiple purchase order generation module" recited in the '516 patent.  In any event, Fisher RIMS, as disclosed in the '989 patent, included "a multiple purchase order generation module, said purchase order generation module

creating multiple purchase orders from a single requisition created with said user-generated

criteria and said search-module criteria."

173.   Fisher RIMS processed requisitions to generate multiple purchase orders.  For

example, multiple items from different third-party sources could be included on a requisition

managed by the requisition module.  For these items, of product type 04, a purchase order could

be created that is specific to each external vendor.  ('989 patent at 19:38-47.)  Additionally:

> As described in the diagram figures 5 A and 5 B for items of product types 01, 03, and 04, local computer 40 uses purchase order build program 112 to create a purchase order between the customer and the distributor from the data in the requisition header and item tables.

('989 patent at Fig. 2A, Figs. 4A- 4D, Fig. 5A, Fig. 5B, 11:26–21: 67 (particularly 17: 35-48,

18:5-9).)  The RIMS system could generate internal purchase orders as well, used for transfers

among Customer departments:

> a Purchase Order record internal to the Customer may (at the option of the Customer) be created and printed out on printer 43 at this stage, recording a sale from the Customer's purchasing department to the requisitioning department or account. This internal purchase order can be used by the Customer's host computer in making accounting adjustments. Since the implementation of such an internal sale will vary depending on the Customer's own accounting software in a manner easily understood by one skilled in the art, these steps will not be further described here.

('989 patent at 17:35-48, 18:5-18:16.)  A combination of these product types could generate

multiple purchase orders to different sources, including a customer department, the Distributor,

or one or more third parties.

174.   The Fisher RIMS product literature confirms that Fisher RIMS created multiple

purchase orders: "And purchase orders to any supplier can be printed in your PO format and sent

out from FISHER RIMS."  (RIMS Brochure at L0260602.)

175.   The patents-in-suit describe purchase orders as follows:

> purchase orders, as represented by step 114 in FIG. 3. For
> example, the requisition represented by the Requisition Item
> Table 46 of Appendix IX, if accepted without further revi-
> sion by pressing function key F6 ("ACCEPT"), would result
> in the generation of the following three purchase orders:
>   A. Line 002 would be ordered from on-site distributor-
>      owned inventory;
>   B. Line 004 would be ordered from on-site customer-
>      owned inventory (a transfer internal to the customer);
>      and
>   C. Lines 001 and 003 would be ordered, respectively,
>      from Distributor's "DEL and "EDC" warehouses.
> Of these three purchase orders, Orders A (type "01") and
> C (type "03") are shared between host computer 10 and local
> computer 20 (as shown in FIG. 3). Upon execution of Order

('172 patent at 15:35-41.)  The RIMS patent and brochure disclose generating at least orders A

and B from this list from a single requisition, and thus discloses generation of multiple purchase

orders.

> **e.    wherein each of at least two catalogs include a generally
>         equivalent item from a different source, said requisition
>         module working in combination with said catalog searching
>         module to determine multiple sources for said item**

176.    Mr. Hilliard contends that Fisher RIMS does not include "at least two catalogs

[that] include a generally equivalent item from a different source" because "[t]he RIMS system

was a sole-source system."  (Hilliard Rep. at ¶ 88.)  I disagree.  As explained above regarding

"electronic sourcing system," the RIMS system was not a sole source system.

177.    Moreover, Fisher RIMS, as disclosed in the '989 patent, included generally

equivalent items available from different sources, and could determine different sources from

which the item could be obtained.  IBM TV/2 included catalogs of items from which multiple

sources could be derived in conjunction with RIMS.

178.    The Fisher RIMS system included a cross-reference table that could be used to

convert customer stock numbers to Distributor catalog numbers to identify additional vendors

STAATS EXPERT REPORT ON INVALIDITY                              CASE NO.3:09cv620

from which a distributor can order items on a customer's behalf.  ('989 patent at 3:32-36, 8:24-40, 31:60–34:67, Table XVII, Table XVIII.)  For example, a cross reference table is illustrated at col. 34:5-8 of the '989 patent in which the same item is available from two different vendors, with the local part number, vendor, and vendor part number illustrated.

179.   The '989 patent describes cross-referencing items that are "essentially equivalent," namely the same part that has different part numbers from different vendors:

> The Distributor. other distributors and the Customer will frequently use different identifying part numbers for items which are **essentially equivalent**. e.g., a 250 ml PYREX Griffin beaker. manufactured by Corning (who designates it as part number 1000 250) could have a Distributor's catalog number 02 540K and competitor's part numbers B2650250. 13912207, and 029827. Distributor and competitors may also have similar products from other vendors (e.g .• a 250 rn1 KlMAX Griffin beaker from Kimble).

('989 patent at 31:67-32:9 (emphasis added).)

180.   The Fisher RIMS product literature describes cross-referencing to convert customer stock numbers to catalog numbers for all suppliers of the product: "Cross-references your stock numbers and all supplier numbers."  (Fisher RIMS Brochure at L0260598.)

181.   At least as discussed previously, IBM TV/2 included a database containing a variety of different catalogs of information.

182.   A cross-reference table in the RIMS system contained information received from external to RIMS and which was useable to cross-reference items that are not stocked by the customer or distributor, that may come from catalogs.  ('989 patent at 32:14-24.)   The '989 patent therefore teaches the desirability (and in fact the use) of including data in a cross-reference table linking items from catalogs external to the RIMS system, including catalogs from different sources.  This further shows the obviousness to one of ordinary skill of combining the RIMS system with a system such as TV/2 that can provide information about items in various catalogs.

183.    Mr. Hilliard contends that Fisher RIMS does not include the "capability for a requisition module to 'work[] in combination with [the] catalog searching module to determine multiple sources for [an] item'" because "there is no 'catalog collection searching module,' and only one source of items."  However, IBM TV/2 provides such a catalog collection searching module, so Fisher RIMS in combination with IBM TV/2 satisfies this element for the reasons stated previously.

> f.    **wherein said multiple sources is limited by said catalog searching module providing a match according to said user-generated criteria, said search-module criteria and a determination system that located items are generally equivalent**

184.    Mr. Hilliard does not appear to directly address this element in his report, but in view of his general statements I will address it.  Fisher RIMS, as disclosed in the '989 patent, includes "wherein said multiple sources is limited by said . . . searching module providing a match according to said user-generated criteria, said search-module criteria and a determination system that located items are generally equivalent."  Although Fisher RIMS did not explicitly teach catalogs, IBM TV/2 did explicitly teach use of catalogs within an analogous searching arrangement.

185.    Fisher RIMS discloses searching the Part Master Table for items that match the entered catalog or stock number.  If the entered stock number is found (a match), the Requisition Item Table in local database 50 is updated with information including a description of the item.  For product types 01 or 03, in response to a data block received from the local computer 40, the host computer 10 will search for items in one or more cross reference tables.  When a match is determined, the item is converted and a data block is transmitted back to the local computer to again update the requisition Item Table with information about the matching item.  ('989 Patent, 6:18–11:23; particularly see 8:25-9:2.)

186.    At least as discussed previously, IBM TV/2 included a database containing a variety of different catalogs of information.

187.    A cross-reference table in Fisher RIMS contained information received from external to Fisher RIMS and which was useable to cross-reference items that are not stocked by the customer or distributor.  ('989 patent at 32:14-24.)   The '989 patent therefore teaches the desirability (and in fact the use) of including data in a cross-reference table linking items from catalogs external to the RIMS system.

        g.    **wherein said determination system includes a cross reference table matching an identification code from a first located item with a second identification code from a second located item**

188.    Mr. Hilliard disputes that IBM TV/2 and Fisher RIMS disclose the elements of the claims of the '516 patent, even though he does not appear to dispute that Fisher RIMS included "wherein said determination system includes a cross reference table matching an identification code from a first located item with a second identification code from a second located item."

189.    In any event, Fisher RIMS, as disclosed in the '989 patent, included "wherein said determination system includes a cross reference table matching an identification code from a first located item with a second identification code from a second located item."

190.    Fisher RIMS included a determination system including a cross-reference table that could be used to convert customer stock numbers to Distributor catalog numbers to identify additional vendors from which a distributor can order items on a customer's behalf.  ('989 patent at 3:32-36, 8:24-40, 31:60–34:67, Table XVII, Table XVIII.)  For example, a cross reference table is illustrated at col. 34:5-8 of the '989 patent in which the same item is available from two different vendors, with the local part number, vendor, and vendor part number illustrated.

        **6.    Claim 22 of the '516 Patent**

### a.   An electronic sourcing system as recited in claim 21

191.   As already discussed, Fisher RIMS, as disclosed in the '989 patent, is "an electronic sourcing system."

### b.   wherein said determination system includes an identical identification code for each of said located items

192.   Mr. Hilliard disputes that IBM TV/2 and Fisher RIMS disclose the elements of the claims of the '516 patent, even though he does not appear to dispute that Fisher RIMS includes "wherein said determination system includes an identical identification code for each of said located items."

193.   In any event, Fisher RIMS, as disclosed in the '989 patent, included "wherein said determination system includes an identical identification code for each of said located items."

194.   The Fisher RIMS system, as disclosed in the '989 Patent, disclosed a cross reference table including an identical identification code for different located items.  For example, a cross reference table is illustrated at col. 34:5-8 of the '989 patent in which the same item is available from two different vendors, with the local part number, vendor, and vendor part number illustrated.  The code BEAKER250 is identical for both vendor items.

### 7.   Claim 29 of the '516 Patent

### a.   an electronic sourcing system

195.   For the same reasons discussed with respect to claim 3 of the '683 patent, Fisher RIMS was "an electronic sourcing system."

### b.   a collection of catalog items stored in an electronic format

196.   For the same reasons discussed with respect to claim 1 of the '516 patent, Fisher RIMS included "a collection of catalog items stored in an electronic format."

### c.   a first set of pre-determined criteria associated with said collection of catalogs

197.    For the same reasons discussed with respect to claim 1, Fisher RIMS included "a first set of pre-determined criteria associated with said collection of catalogs."

> **d.    a second set of predetermined criteria associated with items from each of said catalogs**

198.    For the same reasons discussed with respect to claim 1, Fisher RIMS included "a second set of predetermined criteria associated with items from each of said catalogs."

> **e.    a catalog selection protocol, said catalog selection protocol relying on said first set of predetermined criteria to select less than said entire collection of catalogs, and including matching a vendor identification code with a subset of said collection of catalogs, wherein said subset of catalogs includes both a vendor catalog from a predetermined vendor and a second catalog from a predetermined third party**

199.    For the same reasons discussed with respect to claim 1, Fisher RIMS included "a catalog selection protocol, said catalog selection protocol relying on said first set of predetermined criteria to select less than said entire collection of catalogs, and including matching a vendor identification code with a subset of said collection of catalogs, wherein said subset of catalogs includes both a vendor catalog from a predetermined vendor and a second catalog from a predetermined third party."

> **f.    a search program, said search program relying on said second set of criteria to select specific items from said catalogs determined from said catalog selection protocol**

200.    For the same reasons discussed with respect to claim 1, Fisher RIMS included "a search program, said search program relying on said second set of criteria to select specific items from said catalogs determined from said catalog selection protocol."

> **g.    a cross-reference table linking a vendor item catalog number from said vendor catalog with an item catalog number from said predetermined third party**

201.    Mr. Hilliard disputes that IBM TV/2 and Fisher RIMS disclose the elements of the claims of the '516 patent, even though he does not appear to dispute that Fisher RIMS

included "a cross-reference table linking a vendor item catalog number from said vendor catalog with an item catalog number from said predetermined third party."

202.    In any event, Fisher RIMS included "a cross-reference table linking a vendor item catalog number from said vendor catalog with an item catalog number from said predetermined third party."  The Court interpreted "cross-reference table" to mean "a table that links vendors items determined to be equivalent between two of more different vendors."  (Memorandum Opinion at 26 (Docket No. 204).)  These tables are described at '989 10:39-63 and 32:10-34:67.

### G.    The '172 Patent

203.    Fisher RIMS, as disclosed in the '989 patent, included all the elements of claim 1 of the '172 patent.

#### 1.    Claim 1 of the '172 Patent

##### a.    an electronic sourcing system

204.    Mr. Hilliard at ¶¶ 77-83 of this Report disputes that Fisher RIMS discloses all the elements of claim 1 of the '172 patent.  In ¶ 77 he again disputes that Fisher RIMS was electronic sourcing system.  For the same reasons discussed with respect to claim 3 of the '683 patent, Fisher RIMS was "an electronic sourcing system."  As also discussed above, IBM TV/2 was an electronic documentation system that was configured to connect to an electronic sourcing or procurement system.

205.    IBM TV/2 was an electronic documentation system that was configured to connect to an electronic sourcing or procurement system.  As previously mentioned, TV/2 disclosed:

> Technical Viewer/2 is suitable for whole ranges of uses and industries in which information is supplied in large quantities and updated regularly, and where uses need fast access to precise details.

> . . .

Integrating part catalogues with dealers' computer systems such as order entry, inventory management and customer records

(IBM TV/2 Brochure at L0132134.)

>    **b.    a database containing data relating to items associated with at least two vendors maintained so that selected portions of the database may be searched separately**

206.    Fisher RIMS, as disclosed in the '989 patent, included "a database containing data relating to items associated with at least two vendors maintained so that selected portions of the database may be searched separately."

207.    Fisher RIMS included organized collections of data related to items from multiple, sources of inventory, suppliers, and distributors.  The data could include third-party data, including data that is not procured through the distributor.  The data was contained in a database, and was associated with sources of inventory, whether from distributors, manufacturers, vendors, or the customer.  The item data was contained in at least a local Part Master Table and a remote inventory database, which are both included as part of the RIMS system.  ('989 patent at Fig. 1, 3:10-14, 3:18-28, 3:65-4:1, 4:21-26, 8:24-40, 31:60-34:67, Table I, Table VI, Table XVII, Table XVIII.)

208.    For example, Fisher RIMS included organized collections of data relating to items that are (1) provided by the Distributor (2) available through third party vendors, and (3) owned by the customer.  Products are identified by product types as coming from several sources including (01) Distributor owned items in a JIT warehouse, (03) Distributor catalog items stored at a Distributor warehouse, (04) third party items ordered by the Distributor, (05) third party items ordered by the CSR or customers, and (06) Customer owned and located at or near customer site. ('989 patent at 5:20-6:15.)  Products of Type 04 will also have vendor numbers identified with them. ('989 patent at 15:5-40.)  Host computer also could search a table containing Distributor catalog numbers. ('989 patent at 33:15-16.)

62

209.   IBM TV/2  included "a database containing data relating to items associated with at least two vendors maintained so that selected portions of the database may be searched separately."  It included a capability to search all or a subset of data available within that document system: "A search facility that can locate every occurrence of a word or phrase in either the current topic, a list of selected topics, the complete document, or another document." (IBM TV/2 General Information Manual at G0000023.)  The data available in the system included catalogs:  "In particular, information providers (such as manufacturers) can use the program to make parts catalogs and service manuals available to users (for example, their sales and service agents) in an electronic (online) format."  (TV/2 General Information Manual at G0000019.)

210.   Mr. Hilliard contends that Fisher RIMS does not include "a database containing data relating to items associated with at least two vendors" because (1) "[t]here is no source-related information in the RIMS database as the Distributor was the sole source for the items" and (2) "the item records in the databases related strictly to products already owned by the customer or Distributor, not to products being offered for sale by other vendors."  (Hilliard Rep. at ¶ 78.)  This is the same argument he makes for the catalog claim elements and I disagree for all of the reasons set forth above.  Additionally, a distributor is a type of vendor.  The items in the RIMS databases included items offered by the distributor and vendors 37 and 38 as described above.

211.   Mr. Hilliard contends that Fisher RIMS does not include a database "maintained so that selected portions of the database may be searched separately" because "[t]he RIMS system at the local computer could only perform a part number lookup."  (Hilliard at ¶ 79.)  I disagree (as described above) because a part number lookup is a type of search, and in fact is called a search in the RIMS patent.  Dr. Weaver, ePlus's infringement expert, agrees.  Moreover,

to the extent (as I understand Mr. Weaver contends) that searching only particular fields of an item database is considered searching "selected portions," then the part number search would be such selective searching.

212.    IBM TV/2 included "at least two product catalogs containing data relating to items associated with the respective sources."  The Court interpreted "product catalog" to mean "an organized collection of items and associated information, published by a vendor (which includes suppliers, manufacturers, and distributors), which preferably includes a part number, price, catalog number, vendor name, vendor ID, a textual description of the item, and images of or relating to the item."  (Memorandum Opinion at 11 (Docket No. 204).)

213.    The IBM TV/2 General Information Manual discloses that it "is an electronic documentation program that any organization can use to produce and display large amounts of information.  In particular, information providers (such as manufacturers) can use the program to make parts catalogs and service manuals available to users (for example, their sales and service agents) in an electronic (online) format."  (IBM TV/2 General Information Manual at G0000019.)  "You can search through parts catalogues, service manuals, stock lists, schematics, user documentation . . ."  (IBM TV/2 General Information Manual at G0000023.)

214.    The IBM TV/2 Brochure also confirms that the TV/2 system managed published catalogs for use in an electronic sourcing environment. "TV2 can search in seconds through documents on CD-ROM and display the answer, complete with diagrams or pictures. It can also produce lists of references to the selected topic or useful information on the same subject.  You can also create a 'shopping list' just be selecting items and passing that list to another application. For example, you might select parts to be ordered from the exploded drawing in a parts catalogue.  The parts list could then be sent directly to your parts ordering system - all without moving from your PS/2." (IBM TV2 Brochure at L0132133.)  The catalogs managed by TV/2

could include a variety of information, including photographs, diagrams, tables, indices, part numbers, and other information:

> Technical Viewer/2 enables information providers to develop applications around the information to give added value to the user. For example, in addition to finding a part number from a parts catalog, users can extract that information and transfer it electronically to their data processing system. They can then make immediate online requests for stock availability and price information.

(IBM TV/2 General Information Manual at G0000020.)

### c.   means for entering product information that at least partially describes at least one desired item

215.   Fisher RIMS, as disclosed in the '989 patent, included "means for entering product information that at least partially describes at least one desired item." The Court interpreted the function of this limitation is "entering product information that at least partially describes at one desired item" and the corresponding structure is "a user interface operating on a computer through which a user may provide input; and one or more software modules that provide product information describing an item or a combination thereof, and their equivalents." (Memorandum Opinion at 48-49 (Docket No. 204).)

216.   Fisher RIMS taught entering a catalog number from a third-party supplier into a requisition management data screen. The catalog number could be used by the RIMS system to search the Part Master table for items identified by that number. ('989 patent at 8:25-39.) Fisher RIMS also taught entering a stock number into a requisition management data screen, which results in a search of the Part Master table for items associated with that stock number. ('989 patent at 8:40-9:47.)

217.   IBM TV/2 included "means for entering product information that at least partially describes at least one desired item." As described above, IBM TV/2 had a user interface operating on a computer through which a user may provide input.

> **d.      means for searching for matching items that match the entered product information in the selected portions of the database**

218.      Fisher RIMS, as disclosed in the '989 patent, included "means for searching for matching items that match the entered product information in the selected portions of the database."  The Court interpreted the function of this limitation is "searching for matching items that match the entered product information in the selected portions of the database" and the corresponding structure is "search programs and modules operating on a computer system with access to data in a database or other file system, and their equivalents."  (Memorandum Opinion at 49 (Docket No. 204).)

219.      Fisher RIMS taught searching the Part Master Table for items that match the entered catalog or stock number.  If the entered stock number was found (a match), the Requisition Item Table in local database 50 was updated with information including a description of the item.  For product types 01 or 03, in response to a data block received from the local computer 40, the host computer 10 would search for items in one or more cross reference tables.  When a match is found, the item was converted and a data block is transmitted back to the local computer to again update the requisition Item Table with information about the matching item.  ('989 patent at 6:18–11:23 (particularly 8:25-9:2).)

220.      IBM TV/2 included "means for searching for matching items that match the entered product information in the selected portions of the database."  The IBM TV/2 materials show that it had preexisting capability for such searching: "A search facility that can locate every occurrence of a word or phrase in either the current topic, a list of selected topics, the complete document, or another document."  (IBM TV/2 General Information Manual at G0000023; Eng Decl. at ¶ 9.)

> **e.      means for generating an order list that includes at least one matching item selected by said means for searching**

221.    Mr. Hilliard contends that Fisher RIMS does not include "means for generating an order list that includes at least one matching item selected by said means for searching" because "[t]he local computer did not generate an order list that was transmitted to the requisition program [as] [i]t only built a requisition."  (Hilliard Rep. at ¶ 80.)  I disagree.

222.    Fisher RIMS, as disclosed in the '989 patent, included "means for generating an order list that includes at least one matching item selected by said means for searching."  The Court interpreted the function of this limitation is "generating an order list that includes at least one matching item selected by said means for searching" and the corresponding structure is "a user interface operating on a computer through which a user may select from results from a search program or a search program that generates an order list of matching items, and their equivalents."  Memorandum Opinion at 50 (Docket No. 204).)  The Court interpreted "order list" to mean "a list of desired catalog items."  (Memorandum Opinion at 14 (Docket No. 204).)  IBM TV/2 also disclosed a "means for generating an order list that includes at least one matching item selected by said means for searching" as construed by the Court.

223.    The Fisher RIMS system, as disclosed in the '989 patent, included a requisition screen that allowed a user to search for and select a number of items for inclusion on a requisition.  The items are from the Distributor's catalog and from third party distributor and vendor catalogs, depending on product type and whether the item was obtained from the converting process.  The items as listed on the requisition screen constituted an order list, at least because they included items selected from search results, and were not yet part of a finalized requisition.  ('989 Patent at col. 6:39-64.)

224.    TV/2 also discloses a "means for generating an order list that includes at least one matching item selected by said means for searching" as construed by the Court.  The IBM TV/2 system includes the capability of returning a list of selected search results from searching

catalogs to a purchasing system, for checking inventory or purchasing as necessary:  "You can also create a 'shopping list' just by selecting items and passing that list to another application. For example, you might select parts to be ordered from the exploded drawing in a parts catalogue. The parts list could then be sent directly to your parts ordering system."  (IBM TV/2 Brochure at L0132133).

> **f.      means for building a requisition that uses data obtained from said database relating to selected matching items on said order list**

225.    Mr. Hilliard apparently disputes this element because he disputes the presence of an "order list" in the RIMS and TV/2 systems.  (Hilliard Rep. at ¶ 80.)  For the same reasons discussed with respect to claim 3 of the '683 Patent,  Fisher RIMS included "means for building a requisition that uses data obtained from said database relating to selected matching items on said order list."  The Court interpreted the function of this limitation is "building a requisition that uses data obtained from said database relating to selected matching items on said order list" and the corresponding structure is "a requisition module operating on a computer system having access to data in the database, and its equivalents."  (Memorandum Opinion at 50-51 (Docket No. 204).)   This is the same structure as construed for the "means for building a requisition" element of claim 3 of the '683 patent.   As discussed above, IBM TV/2 was constructed to interface with such a requisition system.

> **g.      means for processing said requisition to generate purchase orders for said selected matching items**

226.    Mr. Hilliard disputes this element at ¶ 81 of his Report.  For the same reasons discussed with respect to claim 3 of the '683 Patent,  Fisher RIMS included "means for processing said requisition to generate purchase orders for said selected matching items."  The Court interpreted the function of this limitation is "processing a requisition to generate orders for selected matching items" and the corresponding structure is "a purchase order generation module

68

operating on a computer system having access to the requisition, and its equivalents."
(Memorandum Opinion at 51 (Docket No. 204).)  This is the same structure as construed for the
"means for processing the requisition to generate one or more purchase orders for the selected
matching items" element of claim 3 of the '683 patent.

## V.    P.O. WRITER PLUS V.10 AND J-CON

### A.    <u>P.O. Writer Plus V.10</u>

227.    For purposes of this report, my understanding of P.O. Writer Plus V.10 is based
on the P.O. Writer Plus V.10 Manual (L0126155-L0127601).

228.    I understand that the P.O. Writer Plus V.10 is prior art under 35 U.S.C. § 102(b)
because it was in public use, on sale, and described in a printed publication in the United States
more than one year prior to the date of the application for the patents-in-suit.  The P.O. Writer
Plus V.10 was in public use and on sale by June 9, 1993, approximately one year and four
months prior to the filing date of the application of the '683 patent.  (SAP Trial Tr. at 2060:19–
2061:14.)  The P.O. Writer V.10 was described in a printed publication, the P.O. Writer Plus
manual, by April 1993, approximately one year and six months prior to the filing date of the
application of the '683 patent.  (SAP Trial Tr. at 2061:15–2064:5.)

229.    I understand that the P.O. Writer Plus V.10 manual is a printed publication.  The
manual was sent to anyone who requested a trial of the systems.  (SAP Trial Tr. at 2061:15–
2062:20.)  The manual could then be returned or purchased.  (SAP Trial Tr. at 2061:15-2062:20
and 2091:24-2092:7).  Any member of the interested public could received and review a copy of
the manual by simply taking a trial of P.O. Writer Plus V.10.  Furthermore, although the manual
is split into multiple volumes, it is a single publication.  (Decl. of Lauren Fielder at ¶¶ 4-5.)

230.    Even if the P.O. Writer Plus V.10 Plus Manual is not considered a single
publication, I understand that the volumes should be considered together for purposes of

anticipation under 35 U.S.C. § 102.  One volume of the P.O. Writer Plus manual is entitled "Guided Tour, Version 10.0."  (P.O. Writer Plus V.10 Plus Manual at L0126514–L0126695.)  This volume was an overview of the entire P.O. Writer Plus V.10.  (SAP Trial Tr. at 2064:3-5.)  A person of ordinary skill in the art would inherently know to look at the additional volumes to better the understand the function of the P.O. Writer Plus V.10 modules.

231.    P.O. Writer Plus V.10 included all the elements of claims 3, 6, 26, 28, and 29 of the '683 patent.

**B.    J-CON**

232.    For purposes of this report, my understanding of J-CON is based on the J-CON Manual (L0123414-L0124584).

233.    I understand that J-CON is prior art under 35 U.S.C. § 102(a) and (b) because it was described in a printed publication in the United States before the invention of the patents-in-suit and because it was in public use and on sale in the United States more than one year prior to the date of the application for the patents-in-suit and before the invention date of the patents-in-suit.  The J-CON manual bears a date of April 1994, approximately six months before the filing date of the application for the '683 patent.  (P.O. Writer Plus V.10 Manual at L0123414.)  I understand there is no evidence or contentions that the alleged invention of the patents-in-suit predates April 1994.

234.    The J-CON systems described in the J-CON manual existed in 1992.  (SAP Trial Tr. at 1812:1-24 (ePLUS0201429).)  By 1993, several thousand auto stores had purchased and were using the J-CON system described in the J-CON manual.  (SAP Trial Tr. at 1835:9-19.)  Thus, the J-CON system described in the J-CON manual was publicly used and sold more than one year before the filing date of the application of the '683 patent.

235.    J-CON included all the elements of claim 6 of the '683 patent.

### C.    The Combination of J-CON and P.O. Writer

236.    There existed a reason to combine P.O. Writer Plus V.10 with J-CON.  P.O. Writer Plus V.10 allowed users to search for items from multiple vendors.  To the extent that it is determined that J-CON is a single-source system, and that the claims require a multiple source system, then a person of ordinary skill in the art would have been motivated by the state of the industry at the time of the invention to combine the multi-vendor capability of P.O. Writer Plus V.10 with J-CON.

237.    J-CON in combination with P.O. Writer Plus V.10 included all the elements of claims 3, 6, 26, 28, and 29 of the '683 patent and all the elements of claim 1 of the '172 patent.

### D.    The '683 Patent

#### 1.    Claim 3 of the '683 Patent

##### a.    an electronic sourcing system

238.    P.O. Writer Plus V.10 and J-CON were both "an electronic sourcing system." The Court interpreted "electronic sourcing system" to mean "an electronic system for use by a prospective buyer to locate and find items to purchase from sources, suppliers or vendors." (Memorandum Opinion at 28 (Docket No. 204).)

239.    P.O. Writer Plus V.10 was an electronic sourcing system: "P.O. WRITER PLUS reduces clerical effort and provides management information which will allow you to decrease purchase prices, reduces inventory, increase on-time deliveries, and improve overall vendor performance."  (P.O. Writer Plus V.10 Manual at L0126506, L0126531.)  As part of creating a requisition from a catalog, P.O. Writer Plus V.10 allowed the user to locate and find items by partial description: "Another way to view a catalog is using STARTING WITH feature.  For example, if you would like to see only those items whose description begins with PEN, you would enter PEN in the ITEM DESCRIPTION – STARTING WITH field."  (P.O. Writer Plus

V.10 Manual at L0127527.)  Additionally, P.O. Writer Plus V.10 allowed the user to sort and display items: "Move cursor to the Item Description sort and display all the items whose description begins with the letter C."  (P.O. Writer Plus V.10 Manual at L0126549.)  P.O. Writer Plus V.10 had a purchase order creation submodule to create purchase orders including vendor information.  (P.O. Writer Plus V.10 Manual at L0126756.)

240.    Mr. Hilliard admits that P.O. Writer Plus V.10 is a so-called multiple source system, but contends that P.O. Writer Plus V.10 is not "an electronic sourcing system" because "after creating a requisition in the Requisitioning module, the process requires the user to back out to the Main Menu and select the Requisition Interface module to 'turn Purchase Requisitions into Purchase Orders' as part of a wholly separate processing step."  (Hilliard Rep. at ¶ 105.)  I disagree for the reason stated above.  I further disagree because the Court's interpretation does not requires that creating a requisition and turning the requisition into a purchase order occur in the same process, or even the same module.  Mr. Hilliard does not dispute that a prospective buyer could use P.O. Writer Plus to locate items to purchase from a source.  This is all that is required under the Court's interpretation.

241.    J-CON is an electronic sourcing system.  (J-CON Manual at L0123423.)  J-CON enabled a user to search for an item using, for example, wild cards in manufacturer or part number data fields.  (J-CON Manual at L0123672-L0123673.)  Located items could be added as line items on an order.  (J-CON Manual at L0123471.)  A requisition (ticket) could be generated based on an order.  (J-CON Manual at L0123471.)  Purchase orders could be generated to replenish items based at least in part on the items included on the generated requisitions (tickets). (J-CON Manual at L0123687-L0123690, L0123693-L0123700, L0123701-L0123707.)

242.    Mr. Hilliard contends that J-CON is not "an electronic sourcing system" because (1) "[i]t is used by a seller to sell products out of its own inventory" and (2) "[a]ll products sold

to the parts store customers are obtained from a single source: the automotive parts retailer."
(Hilliard Rep. at ¶ 215.)  I disagree for the same reasons stated above.  I further disagree because
primary, alternate, or third-party vendors could be associated with each of the computed
purchase orders.  (J-CON Manual at L0123695-L0123698.)

> b.   at least two product catalogs containing data relating to items
>       associated with the respective sources

243.   P.O. Writer Plus V.10 included "at least two product catalogs containing data
relating to items associated with the respective sources."  The Court interpreted "product catalog"
to mean "an organized collection of items and associated information, published by a vendor
(which includes suppliers, manufacturers, and distributors), which preferably includes a part
number, price, catalog number, vendor name, vendor ID, a textual description of the item, and
images of or relating to the item."  (Memorandum Opinion at 11 (Docket No. 204).)

244.   P.O. Writer Plus V.10 had an electronic database for storing multiple catalogs.
(P.O. Writer Plus V.10 Manual at L0126661-62).  Vendors published catalogs for loading into
P.O. Writer Plus V.10: "Bayless Stationer publishes a catalog of office supplies they sell."  (P.O.
Writer Plus V.10 Manual at L0126575.)  The user is able to display all the items from a vendor
catalog: "For example, say you want to display all the items in the Bayless Catalogue whose
description starts with letters 'P'."  (P.O. Writer Plus V.10 Manual at L0126576.)  P.O. Writer
Plus V.10 displayed the Item No., Description, Unit of Measure, and Commodity for the item.
(P.O. Writer Plus V.10 Manual at L0126577.)  Multiple catalogs could be stored in the P.O.
Writer Plus V.10 and selected by Catalogue ID: " Items from a specific Catalog can be displayed
by entering a Catalogue ID at the top of the screen."  (P.O. Writer Plus V.10 Manual at
L0126661.)

245.   Mr. Hilliard contends that P.O. Writer Plus V.10 does not include "at least two
product catalogs containing data relating to items associated with the respective sources" because

(1) "in the PO WRITER Item Master File are not associated with a vendor or source" and (2) "even if items were grouped with a supposed catalog ID, such as 'Best Buy,' this did not indicate that the items would be purchased from Best Buy."  (Hilliard Rep. at ¶¶106, 107.)  I disagree for the reasons stated above.  I further disagree because, as to Mr. Hilliard's first point,  he himself acknowledges that items in the P.O. Writer Plus V.10 may be associated with a Catalog ID and that Catalog ID may be coded by vendor.  (Hilliard Rep. at ¶ 106.)  Accordingly, P.O. Writer Plus V.10 associated items with sources.  As to Mr. Hilliard's second point, there is no requirement in the claim or in the Court's interpretation that an item ultimately be purchased from the source with which it is associated.

### c.      means for selecting the product catalogs to search

246.    P.O. Writer Plus V.10 included "means for selecting the product catalogs to search."  The Court interpreted the function of this limitation is to "select the product catalog to search" and the corresponding structure is "a user interface that allows the user to select a catalog; a catalog module that selects product catalogs based on preferences or history; a catalog search module that identifies product catalogs or a combination thereof; and their equivalents." (Memorandum Opinion at 44-45 (Docket No. 204).)

247.    P.O. Writer Plus V.10 displays a list of CATALOGUE ID'S: "To display a list of valid CATALOGUE ID'S, press SHIFT F4." (L0126944).  The customer then selects a catalogue from the list: "To select BEST BUY, press SHIFT-F3." (P.O. Writer Plus V.10 Manual at L0126944).  Alternatively, a catalog could be selected by typing in its Catalogue ID: "For example, say you want to display all items in the Bayless Catalogue whose description begins with the letters 'P'.  With the cursor in the CATALOG ID field: –Type Bayless  –TAB to the ITEM DESCRIPTION FIELD-STARTING WITH  – Type P [ENTER]." (P.O. Writer Plus V.10 Manual at L0126576.)

### d.    means for searching for matching items among the selected product catalogs

248.    P.O. Writer Plus V.10 included "means for searching for matching items among the selected product catalogs."  The Court interpreted the function of this limitation is "searching for matching items among the selected product catalogs" and the corresponding structure is "search programs and modules operating on a computer system with access to data in a database or other file system, and their equivalents."  (Memorandum Opinion at 45 (Docket No. 204).)  J-CON could search for and display all parts matching search criteria.  (L0123472-L0123473.)

249.    In P.O. Writer Plus V.10, selected catalog can be searched for items.  (P.O. Writer Plus V.10 Manual at L0127033; L0127035.)  Specifically, a selected catalog can be searched for items beginning with a specified letter using the ITEM DESCRIPTION SEQUENCE – STARTING WITH.  (L0126945.)  Alternatively, a selected catalog can be searched using the ITEM DESCRIPTION FIELD-STARTING WITH.  (P.O. Writer Plus V.10 Manual at L0126576.)

250.    J-CON could search for and display all parts matching search criteria.  (J-CON Manual at L0123472-L0123473.)

### e.    means for building a requisition using data relating to selected matching items and their associated source(s)

251.    P.O. Writer Plus V.10 and J-CON both include "means for building a requisition using data relating to selected matching items and their associated source(s)."  The Court interpreted the function of this limitation is "building a requisition using data relating to selected matching items and their associated source(s)" and the corresponding structure is "a requisition module operating on a computer system having access to data in the database, and its equivalents."  (Memorandum Opinion at 46-47 (Docket No. 204).)

252.    P.O. Writer Plus V.10 enables a user to build a requisition directly from a catalog. (P.O. Writer Plus V.10 Manual at L0127525-L0127531.)  The user selects and searches a catalog from a particular source for items to include on a requisition.  (P.O. Writer Plus V.10 Manual at L0126944, L0126576, L0126661.)  The item number, description, unit of measure, and price are transferred from the catalog onto the requisition.  (P.O. Writer Plus V.10 Manual at L0127526, L0127530, L0127536.)  Thus, the item number, description, unit of measure, and price, which are information associated with the source of the selected catalog, are used in building the requisition.  Moreover, the requisitions include a vendor name.  (P.O. Writer Plus V.10 Manual at L0126971.)

253.    Mr. Hilliard contends that P.O. Writer Plus V.10 does not include "means for building a requisition using data relating to selected matching items and their associated source(s)" because "[t]he PO WRITER system Requisition Module, as described in the manuals, does not include nor use vendor data in the process of creating a requisition."  I disagree for the reasons stated above.  I further disagree because P.O. Writer Plus V.10 uses data from item records to populate the requisition.  The item records also include catalog identifiers that associate the item record data with sources.  There is no requirement that the catalog identifies or other vendor identification appear on the requisition.

254.    Mr. Hilliard also contends that J-CON does not include "means for building a requisition using data relating to selected matching items and their associated source(s)."  I disagree.

255.    Using PartSource, J-CON displays parts matching supplier code or part number (item number) search criteria: "When you use a wild card and PartSource finds more than one part that matches, it displays all the parts, along with their descriptions and list prices."  (J-CON Manual at L0123473.)  The user may select a part and add the part number to a requisition

(ticket) : "You highlight the part that you want to sell and press <Enter>.  J-CON adds the part to the ticket."  (J-CON Manual at L0123475.)  Alternatively, using PartFinder, J-CON displays parts that match vehicle application search criteria: "When you look up a part with PartFinder, you specify its group and subgroup, as well as the vehicle's year, make, and model.  J-CON then displays a list of possible parts . . . ."  (J-CON Manual at L0123603.)  The user may select a part and add the part number to a requisition (ticket) and may add other parts or display all the parts chosen up to that point.  (J-CON Manual at L0123606).

> **f.    means for processing the requisition to generate one or more purchase orders for the selected matching items**

256.    P.O. Writer Plus V.10 and J-CON both include "means for processing the requisition to generate one or more purchase orders for the selected matching items."  The Court interpreted the function of this limitation is "processing the requisition to generate one or more purchase orders for the selected matching items" and the corresponding structure is "a purchase order generation module operating on a computer system having access to the requisition; and its equivalents."  (Memorandum Opinion at 47 (Docket No. 204).)

257.    P.O. Writer enables a user to process requisitions to generate purchase orders: "The P.O. WRITER PLUS Requisitioning Interface allows the Purchasing Department to convert requisitions into Purchase Orders quickly and efficiently."  (P.O. Writer Plus V.10 Manual at L0126966.)  Information from the requisitions is maintained in the purchase order: "The fields in the Requisition Header coincide with the Purchase Order Header."  (P.O. Writer Plus V.10 Manual at L0127531.)  One or more purchase orders can be generated for each requisition: "Requisitions can be turned into Purchase Orders . . . on a one-to-one basis [and] can also be consolidated or split automatically."  (P.O. Writer Plus V.10 Manual at L0126966.)

258.    Mr. Hilliard contends that P.O. Writer Plus V.10 does not include "means for processing the requisition to generate one or more purchase orders for the selected matching

items" because "after creating a requisition, a user was required to start a separate P.O. Create operation and had to manually input a requisition number into a field on a purchase order display." (Hilliard Rep. at ¶ 114.) I disagree for the reasons stated above. I further disagree because neither the claim not the Court's interpretation require that a requisition is automatically turned into a purchase order. According to the Court's interpretation, the purchase order generation module need only have access to the requisition. As Mr. Hilliard himself acknowledges, a requisition number is entered during the P.O. Create process. (Hilliard Rep. at ¶ 114.) Using this number, the P.O. Create process accesses the corresponding requisition in order to process it in creating purchase orders.

259.    Mr. Hilliard also contends that J-CON does not include "means for processing the requisition to generate one or more purchase orders for the selected matching items" because "there was no requisition built by the system." (Hilliard Rep. at ¶ 229.) I disagree.

260.    J-CON allows the user to create a ticket by accepting a set of items on an order. (J-CON Manual at L0123495.) Purchase orders can be generated to replenish items based at least in part on the items included on the generated requisitions (tickets). (J-CON Manual at L0123687-L0123690, L0123693-L0123700, L0123701-L0123707.) The generated purchase orders can include purchase orders to a variety of suppliers. (J-CON Manual at L0123693.) For example, in J-CON, items could be identified as requiring a special order when building a ticket. (J-CON Manual at L0123608.) The item could be ordered from a primary, secondary, or occasional vendors. (J-CON Manual at L0123693.) As another example, if a part was not available in the user's inventory, the user could do a supplier inventory search for an item on a ticket. (L0123547.) If the part was available in the supplier's inventory, a purchase order could be generated for that part: "You use Warehouse Inquiry to display price and availability information on parts at your warehouse and to order parts that you inquire about." (J-CON

Manual at L0123547.)  "Your warehouse" refers to the user's default vendor: "When your system was set up, the implementor set up a default vendor for inquiry."  (J-CON Manual at L0123547.) The user can also select alternate suppliers: "To call a vendor other than the default vendor, at SEQ# or CUSTOMER # field, enter 'IQV*n*', where *n* is the vendor number of the [alternate] vendor you want to call."  (J-CON Manual at L0123547.)

> **g.** **means for converting data related to a selected matching item and an associated source to data relating to an item and a different source**

261.    P.O. Writer Plus V.10 and J-CON both include "means for converting data related to a selected matching item and an associated source to data relating to an item and a different source."  The Court interpreted the function of this limitation is "converting data relating to a selected matching item and an associated source to data relating to an item and a different source" and the corresponding structure is "one or more non-catalog databases identifying cross-referenced items, identical items, or generally equivalent items; one or more cross-reference tables or file identifying cross-referenced items, identical items or generally equivalent items; one or more codes corresponding to cross-referenced items, identical items or generally equivalent items; and their equivalents."  (Memorandum Opinion at 48 (Docket No. 204).)  The Court interpreted the step of " converting data related to a selected matching item and an associated source to data relating to an item and a different source" to mean "substituting data relating to a selected matching item and an associated source to data relating to an item and a different source."  (Memorandum Opinion at 31 (Docket No. 204).)

262.    Mr. Hilliard contends that P.O. Writer Plus V.10 does not include "means for converting data related to a selected matching item and an associated source to data relating to an item and a different source."  I disagree.

263.     During the process of locating items, generating a requisition, and processing a purchase order, P.O. Writer Plus V.10 converts the source associated with item in the catalog to a source based on the last purchase or user input.  At the beginning of the process, items are associated with Catalog ID's (which are supplier names).  (P.O. Writer Plus V.10 Manual at L0126575-76.)  Although the information such as item number, description, unit of measure, and price associated with the source are transferred to the requisition, the vendor name is not.  (P.O. Writer Plus V.10 Manual at L0127526, L0127530, L0127536.)  In generating the purchase order, a vendor can be automatically added to the line item in the requisition based on the last purchase of a given item.  (P.O. Writer Plus V.10 Manual at L012976-80).  If the added vendor is different than then vendor associated with catalog in which the item was located, P.O. Writer has substituted the vendor from which the item will be purchased for the vendor identified by the Catalog ID.

264.     J-CON InterChange tracks "competitive parts" that match a selected item: "InterChange is an optional product that you use to find an equivalent (or InterChange) part for a competitive part." (J-CON Manual at L0123621).  The system will displays all possible matching competitive parts: "After you enter the competitive part number and the group or manufacturer to search, J-CON displays the InterChange parts for the competitive part."  (J-CON Manual at L0123625).  Multiple competitive part may be selected from different manufacturers and entered onto a ticket: "You can sell one or more of the InterChange parts displayed, or you can search again using different manufactures or a different competitive part number."  (J-CON Manual at L0123627).  A part may also be deleted from selection, and another part selected.  (J-CON Manual at L0123627).

265.     Additionally, J-CON Warehouse Inquiry would suggest a Substitute or Can-Use part if a supplier did not have the ordered part.  (J-CON Manual at L0123551.)  A substitute part

STAATS EXPERT REPORT ON INVALIDITY                                    CASE NO.3:09cv620

is one that can be used in place of the original part, and the cost is about the same.  If the warehouse is out of the part you ordered and had enough of the substitute part to fill the order, Inquiry automatically uses the substitute part."  (J-CON Manual at L0123551.)  "Can-Use parts are parts that can be used in place of the original part, but there is a significant difference in cost between the two.  If the warehouse is out of the part you ordered and has enough of the can-use part to fill the order, Inquiry automatically uses the can-use part."  (J-CON Manual at L0123551.)  It is understood in the procurement industry that substitute or can-use items generally come from suppliers other than the supplier of the initially ordered part.

266.    Mr. Hilliard contends that J-CON does include "means for converting data related to a selected matching item and an associated source to data relating to an item and a different source" because (1) "sources are 'invisible' to a user looking up parts" and (2) "both parts come out of the retailer's inventory."  (Hilliard Rep. at ¶ 232.)  I disagree for the reasons stated above.  I further disagree because neither the claim nor the Court's claim construction require that the sources are "visible" to a user looking up part.

### 2.    Claim 6 of the '683 Patent

#### a.    an electronic sourcing system

267.    For the same reasons discussed with respect to claim 3, both P.O. Writer Plus V.10 are both "an electronic sourcing system."

#### b.    a database containing data relating to items associated with at least two sources

268.    P.O. Writer Plus V.10 and J-CON both include "a database containing data relating to items associated with at least two sources."

269.    As discussed with respect to claim 3, P.O. Writer Plus V.10 includes multiple catalogs in electronic format.  This means the P.O. Writer Plus V.10 also includes a database of items associated with two sources.

270.    Mr. Hilliard does not dispute that P. O. Writer includes "a database containing data relating to items associated with at least two sources."

271.    Each item in J-CON has a jobber information file entry, which includes information about the manufacturer of the item: "When you add parts, you enter information about the part such as manufacturer, part number, part description, prices, and movement codes in part information fields." (J-CON Manual at L0123986.)  The items are also associated with a group (subline) that is associated with a particular supplier.  (J-CON Manual at L0124082, L0123978.)  Different items may be associated with different manufacturers and different sublines/suppliers.  (J-CON Manual at L0123978; L0124078-82.)

272.    J-CON includes PartFinder/CD that contained manufacturer catalogs: "While JIF and PartSource information are part of your system, PartFinder/CD, which contains all the part catalog information, is a compact disk and does not take up any space on you system." (J-CON Manual at L0123613.)  The PartFinder/CD included parts not necessarily included in the jobber information file.  (J-CON Manual at L0123613, L0123655.)  The user could select manufacturers to copy onto its system.  (J-CON Manual at L123655.)

273.    Mr. Hilliard contends that J-CON does not include "a database containing data relating to items associated with at least two sources" for the same reasons he stated with respect to claim 3.  (Hilliard Rep. at ¶ 233.)  However, claim 3 requires "product catalogs," which has a specific meaning provided by the Court, while claim 6 only requires a database with items from multiple sources.  The J-CON system includes a database of items from both primary and alternative manufacturers.  (J-CON Manual at L0123613).  These are items from different sources.

        c.    **means for searching for matching items in the database**

274.     P.O. Writer Plus V.10 and J-CON both include "means for searching for matching items in the database."  The Court interpreted the function of this limitation is "searching for matching items in the database" and the corresponding function is "search programs and modules operating on a computer system with access to data in a database or other file system, and their equivalents."  (Memorandum Opinion at 46 (Docket No. 204).)

275.     As discussed with respect to claim 3, P.O. Writer Plus V.10 includes means for searching for matching items in catalogs stored in electronic format.  This means that P.O. Writer Plus V.10 also includes means for searching a database for matching items.

276.     Mr. Hilliard does not appear to dispute that P.O. Writer Plus V.10 includes "means for searching for matching items in the database."

277.     Using PartSource, J-CON displays parts matching supplier code or part number (item number) search criteria: "When you use a wild card and PartSource finds more than one part that matches, it displays all the parts, along with their descriptions and list prices."  (J-CON Manual at L0123473.)  Alternatively, using PartFinder, J-CON displays parts that match vehicle application search criteria: "When you look up a part with PartFinder, you specify its group and subgroup, as well as the vehicle's year, make, and model.  J-CON then displays a list of possible parts . . . ."  (J-CON Manual at L0123603.)

278.     Mr. Hilliard does not appear to dispute that J-CON includes "means for searching for matching items in the database."

       **d.**     **means for building a requisition using data relating to selected matching items and their associated source(s)**

279.     For the same reasons discussed with respect to claim 3, P.O. Writer Plus V.10 and J-CON both include "means for building a requisition using data relating to selected matching items and their associated source(s)."

e. **means for processing the requisition to generate one or more purchase orders for the selected matching items**

280. For the same reasons discussed with respect to claim 3, P.O. Writer Plus V.10 and J-CON both include "means for processing the requisition to generate one or more purchase orders for the selected matching items."

f. **means for converting data relating to a selected matching item and an associated source to data relating to an item and a different source**

281. For the same reasons discussed with respect to claim 3, P.O. Writer Plus V.10 and J-CON both include "means for converting data relating to a selected matching item and an associated source to data relating to an item and a different source."

3. **Claim 26 of the '683 Patent**

a. **maintains at least two product catalogs containing data relating to items associated with the respective sources**

282. For the same reasons discussed with respect to claim 3, P.O. Writer Plus V.10 "maintains at least two product catalogs containing data relating to items associated with the respective sources."

b. **selecting the product catalogs to search**

283. P.O. Writer Plus V.10 practiced "selecting the product catalogs to search."  It displays a list of CATALOGUE ID'S: "To display a list of valid CATALOGUE ID'S, press SHIFT F4."  (P.O. Writer Plus V.10 Manual at L0126944).  The customer then selects a catalogue from the list: "To select BEST BUY, press SHIFT-F3."  (P.O. Writer Plus V.10 Manual at L0126944).  Alternatively, a catalog can be selected by typing in its Catalogue ID: "For example, say you want to display all items in the Bayless Catalogue whose description begins with the letters 'P'.  With the cursor in the CATALOG ID field: –Type Bayless  –TAB to

the ITEM DESCRIPTION FIELD-STARTING WITH  – Type P [ENTER]."  (P.O. Writer Plus V.10 Manual at L0126576.)

284.    Mr. Hilliard does not appear to dispute that P.O. Writer Plus V.10 practiced "selecting the product catalogs to search."

### c.    searching for matching items among the selected product catalogs

285.    P.O. Writer Plus V.10 practiced "searching for matching items among the selected product catalogs."  The Court interpreted "matching items" to mean "the search results." (Memorandum Opinion at 17 (Docket No. 204).)  As the Court had already interpreted "product catalog" and "matching items," it determined that "searching for matching items among the selected product catalogs" required no further interpretation.  (Memorandum Opinion at 22 (Docket No. 204).)

286.    In P.O. Writer Plus V.10, a selected catalog can be searched for items beginning with a specified letter using the ITEM DESCRIPTION SEQUENCE – STARTING WITH. (L0126945.)  Alternatively, a selected catalog can be searched using the ITEM DESCRIPTION FIELD-STARTING WITH.  (P.O. Writer Plus V.10 Manual at L0126576.)

287.    Mr. Hilliard does not appear to dispute that P.O. Writer Plus V.10 practiced "searching for matching items among the selected product catalogs."

### d.    building a requisition using data relating to selected matching items and their associated source(s)

288.    P.O. Writer Plus V.10 and J-CON both practice "building a requisition using data relating to selected matching items and their associated source(s)."

289.    Mr. Hilliard contends that P.O. Writer Plus V.10 does not "build[] a requisition using data relating to selected matching items and their associated source(s)" without further explanation.  (Hilliard Rep. at ¶ 121.)  I disagrees.

290.     P.O. Writer Plus V.10 enables a user to build a requisition directly from a catalog. (L0127525-31.)  The user selects and searches a catalog from a particular source for items to include on a requisition.  (P.O. Writer Plus V.10 Manual at L0126944, L0126576, L0126661.) The item number, description, unit of measure, and price are transferred from the catalog onto the requisition.  (P.O. Writer Plus V.10 Manual at L0127526, L0127530, L0127536.)  Thus, the item number, description, unit of measure, and price, which are information associated with the source of the selected catalog, are used in building the requisition.  Moreover, the requisitions include a vendor name.  (P.O. Writer Plus V.10 Manual at L0126971.)

291.     Mr. Hilliard also contends that J-CON does not "build[] a requisition using data relating to selected matching items and their associated source(s)" because "[t]he disclosures contained in the J-CON documents describe the use of the seller's J-CON system for selection of items being sold by an over-the-counter seller using the J-CON Point-of-Sale functionality, not the customer's preparation of a requisition of items to be sourced from one or more catalog suppliers."  (Hilliard Rep. at ¶ 237.)  I disagree.

292.     J-CON enables a user to select parts returned from a search and to add the selected part to a requisition (ticket).  (J-CON Manual at L0123473, L0123606.)  Using PartSource, J-CON displays parts matching supplier code or part number (item number) search criteria: "When you use a wild card and PartSource finds more than one part that matches, it displays all the parts, along with their descriptions and list prices."  (J-CON Manual at L0123473.)  The user may select a part and add the part number to a requisition (ticket) : "You highlight the part that you want to sell and press <Enter>.  J-CON adds the part to the ticket." (J-CON Manual at L0123475.)  Alternatively, using PartFinder, J-CON displays parts that match vehicle application search criteria: "When you look up a part with PartFinder, you specify its group and subgroup, as well as the vehicle's year, make, and model.  J-CON then displays a list

of possible parts . . . ."  (J-CON Manual at L0123603.)  The user may select a part and add the

part number to a requisition (ticket) and may add other parts or display all the parts chosen up to

that point.  (L0123606).

> e.    **processing the requisition to generate one or more purchase orders for the selected matching items**

293.    P.O. Writer Plus V.10 and J-CON both  practice "processing the requisition to

generate one or more purchase orders for the selected matching items."

294.    Mr. Hilliard contends that P.O. Writer Plus V.10 does not "process[] the

requisition to generate one or more purchase orders for the selected matching items" without

further explanation.  (Hilliard Rep. at ¶ 121.)  I disagree.

295.    P.O. Writer Plus V.10 enables a user to process requisitions to generate purchase

orders: "The P.O. WRITER PLUS Requisitioning Interface allows the Purchasing Department to

convert requisitions into Purchase Orders quickly and efficiently."  (P.O. Writer Plus V.10

Manual at L0126966.)  Information from the requisitions is maintained in the purchase order:

"The fields in the Requisition Header coincide with the Purchase Order Header."  (P.O. Writer

Plus V.10 Manual at L0127531.)  One or more purchase orders can be generated for each

requisition: "Requisitions can be turned into Purchase Orders . . . on a one-to-one basis [and] can

also be consolidated or split automatically."  (P.O. Writer Plus V.10 Manual at L0126966.)

296.    Mr. Hilliard also contends that J-CON does not "process[] the requisition to

generate one or more purchase orders for the selected matching items."  I disagree.

297.    J-CON allows the user to create a ticket by accepting a set of items on an order.

(L0123495.)  Purchase orders can be generated to replenish items based at least in part on the

items included on the generated requisitions (tickets).  (J-CON Manual at L0123687-L0123690,

L0123693-L0123700, L0123701-L0123707.)  The generated purchase orders can include

purchase orders to a variety of suppliers.  (J-CON Manual at L0123693.)  For example, in J-

87

CON, items could be identified as requiring a special order when building a ticket.  (J-CON Manual at L0123608.)  The item could be ordered from a primary, secondary, or occasional vendors.  J-CON Manual at L0123693.)  As another example, if a part was not available in the user's inventory, the user could do a supplier inventory search for an item on a ticket.  J-CON Manual at L0123547.)  If the part was available in the supplier's inventory, a purchase order could be generated for that part: "You use Warehouse Inquiry to display price and availability information on parts at your warehouse and to order parts that you inquire about."  J-CON Manual at L0123547.)  "Your warehouse" refers to the user's default vendor: "When your system was set up, the implementor set up a default vendor for inquiry."  J-CON Manual at L0123547.) The user can also select alternate suppliers: "To call a vendor other than the default vendor, at SEQ# or CUSTOMER # field, enter 'IQV$n$', where $n$ is the vendor number of the [alternate] vendor you want to call."  J-CON Manual at L0123547.)

### f.    determining whether a selected matching item is available in inventory

298.    P.O. Writer Plus V.10 and J-CON both practice "determining whether a selected matching item is available in inventory."

299.    In P.O. Writer Plus V.10, the user can create a requisition from a catalog.  (P.O. Writer Plus V.10 Manual at L0127032.)  The user searches the catalog for items based on various criteria.  (P.O. Writer Plus V.10 Manual at L0127033, L0127035.)  A list of items is displayed as a result of the search.  (P.O. Writer Plus V.10 Manual at L0127034, L0127036.) The user can select an item and elect to display "available inventory."  (P.O. Writer Plus V.10 Manual at L0127040.)

300.    Mr. Hilliard contends that P.O. Writer Plus V.10 does not "determine[] whether a selected matching item is available in inventory" because "the optional inventory functionality of the PO WRITER system, as described, relates to an organization's internal 'stock' inventory and

not to an outside vendor's external inventory."  (Hilliard Rep. at  ¶ 122.)  I disagree for the reason

stated above.  I further disagree because Mr. Hilliard himself acknowledges that P.O. Writer Plus

V.10 checks "current 'on-hand inventory'" and "the purchasing organization's own internal

inventory."  (Hilliard Rep. ¶¶ at 122, 123.)  Mr. Hilliard arbitrarily limits "inventory" to an

outside vendor's external inventory.  Claim 26, however, does not qualify what type of or whose

inventory is checked; it only requires checking whether a selected matching item is available in

inventory.

301.    J-CON was able to determine whether an item was available in various different

inventories.  First, J-CON enables a user to determine whether and how many of a particular item

was available in stock.  (J-CON Manual at L0123608.)  A field on the part display screen is

"AVL: quantity available," which indicates "[t]he quantity available."  (J-CON Manual at

L0123608.)  Using the JIF Inquiry while building a requisition, J-CON would also "display price

and availability information on parts in your inventory or Part Source files."  (J-CON Manual at

L0123541.)  Second, a field on the point-of-sale screen includes "part available at other

locations," which "[i]f you have a multi-store system, and the part is not available at your

location, [will display] the quantity available at the other locations."  (J-CON Manual at

L0123455.)  Third, using Warehouse Inquiry, J-CON could also determine whether a part was in

a supplier's inventory:  "You use Warehouse Inquiry to display price and availability information

on parts at your warehouse and to order parts that you inquire about."  (J-CON Manual at

L0123547.)  "Your warehouse" refers to the user's default vendor: "When your system was set

up, the implementor set up a default vendor for inquiry."  (J-CON Manual at L0123547.)

302.    Mr. Hilliard contends that J-CON does not "determine[] whether a selected

matching item is available in inventory" because "[t]he J-CON system had no capability to check

an external vendor's inventory at all."  (Hilliard Rep. at ¶ 240.)  I disagree for the reason stated

above.  I further disagree because Mr. Hilliard himself acknowledges that "[t]he inventory check performed by the J-CON system was with respect to the merchant's own internal inventory." (Hilliard Rep. at ¶ 240.)  Mr. Hilliard arbitrarily limits "inventory" to external vendor's inventory.  Claim 26, however, does not qualify what type of or whose inventory is checked; it only requires checking whether a selected matching item is available in inventory.  Moreover, J-CON was able to check an external vendor's inventory.  The J-CON manual states that J-CON could check price and availability of an item at the user's primary vendor or an alternate vendor. (J-CON Manual at L0123547.)

### 4.   Claim 28 of the '683 Patent

#### a.   maintains at least two product catalogs containing data relating to items associated with the respective sources

303.   For the same reasons discussed with respect to claim 3, P.O. Writer Plus V.10 "maintains at least two product catalogs containing data relating to items associated with the respective sources."

#### b.   selecting the product catalogs to search

304.   For the same reasons discussed with respect to claim 26, P.O. Writer Plus V.10 practiced "selecting the product catalogs to search."

#### c.   searching for matching items among the selected product catalogs

305.   For the same reasons discussed with respect to claim 26, P.O. Writer Plus V.10 practiced "searching for matching items among the selected product catalogs."

#### d.   building a requisition using data relating to selected matching items and their associated source(s)

306.   For the same reasons discussed with respect to claim 26, P.O. Writer Plus V.10 and J-CON both practice "building a requisition using data relating to selected matching items and their associated source(s)."

        **e.**      **processing the requisition to generate one or more purchase orders for the selected matching items**

307.    For the same reasons discussed with respect to claim 26, P.O. Writer Plus V.10 and J-CON both practice "processing the requisition to generate one or more purchase orders for the selected matching items."

        **f.**      **converting data relating to a selected matching item and an associated source to data relating to an item and a different source**

308.    P.O. Writer Plus V.10 and J-CON both practice "converting data relating to a selected matching item and an associated source to data relating to an item and a different source."  The Court interpreted this limitation to mean "substituting data relating to a selected matching item and an associated source to data relating to an item and a different source." (Memorandum Opinion at 31 (Docket No. 204).)

309.    Mr. Hilliard contends that P.O. Writer Plus V.10 does not "convert[] data relating to a selected matching item and an associated source to data relating to an item and a different source" without further explanation.  (Hilliard Rep. at ¶ 127.)  I disagree.

310.    During the process of locating items, generating a requisition, and processing a purchase order, P.O. Writer Plus V.10 converts the source associated with item in the catalog to a source based on the last purchase or user input.  At the beginning of the process, items are associated with Catalog ID's (which are supplier names).  (P.O. Writer Plus V.10 Manual at L0126575-76.)  Although the information such as item number, description, unit of measure, and price associated with the source are transferred to the requisition, the vendor name is not.  (P.O. Writer Plus V.10 Manual at L0127526, L0127530, L0127536.)  In generating the purchase order, a vendor can be automatically added to the line item in the requisition based on the last purchase of a given item.  (P.O. Writer Plus V.10 Manual at L012976-L012980).  If the added vendor is different than then vendor associated with catalog in which the item was located, P.O. Writer has

91

substituted the vendor from which the item will be purchased for the vendor identified by the Catalog ID.

311.    J-CON locates interchangeable parts from different catalogs are associated with a "competitive part number" in the cross-referencing module InterChange.  (J-CON at L0123625)  J-CON InterChange tracks "competitive parts" that match a selected item: "InterChange is an optional product that you use to find an equivalent (or InterChange) part for a competitive part." (J-CON at L0123621).  The system will displays all possible matching competitive parts: "After you enter the competitive part number and the group or manufacturer to search, J-CON displays the InterChange parts for the competitive part."  (J-CON at L0123625).  Multiple competitive part may be selected from different manufacturers and entered onto a ticket: "You can sell one or more of the InterChange parts displayed, or you can search again using different manufactures or a different competitive part number."  (J-CON at L0123627).  A part may also be deleted from selection, and another part selected.  (J-CON at L0123627).

312.    Mr. Hilliard contends that J-CON does not "convert[] data relating to a selected matching item and an associated source to data relating to an item and a different source" because "although the alternate part is a substitute for the desired part, it is still coming from the same source, the J-CON system retailer's stock."  (Hilliard Rep. at ¶ 241.)  I disagree for the reasons stated above.  I further disagree because Mr. Hilliard himself acknowledges that in J-CON an "alternate part is a substitute for the desired part."  (Hilliard Rep. at ¶ 241.)  The alternate part is from a different manufacturer than the desired part.

### 5.    Claim 29 of the '683 Patent

#### a.    the method of claim 28

313.    As already discussed, P.O. Writer Plus V.10 practiced "the method of claim 28."

#### b.    determining whether a selected matching item is available in inventory

314.   For the same reasons discussed with respect to claim 26, P.O. Writer Plus V.10 and J-CON both practice "determining whether a selected matching item is available in inventory."

**E.**   **The '172 Patent**

**1.**   **Claim 1 of the '172 Patent**

**a.**   **an electronic sourcing system**

315.   For the same reasons discussed with respect to claim 3 of the '683 patent, P.O. Writer and J-CON both are "an electronic sourcing system."

**b.**   **a database containing data relating to items associated with at least two vendors maintained so that selected portions of the database may be searched separately**

316.   P.O. Writer Plus V.10 includes "a database containing data relating to items associated with at least two vendors maintained so that selected portions of the database may be searched separately."

317.   The P.O. Writer system had an electronic database for storing multiple catalogs. (P.O. Writer Plus V.10 Manual at L0127571, L0126552, L0126661-L012662).

318.   Mr. Hilliard contends that P.O. Writer Plus V.10 does not include "a database containing data relating to items associated with at least two vendors maintained so that selected portions of the database may be searched separately" because "[a]lthough items may be associated with a Catalog ID and that Catalog ID may be by vendor, it is not necessary to set up a Catalog ID by vendor."  (Hilliard Rep. at ¶ 129.)  I disagree for the reasons stated above.  I further disagree because, as to Mr. Hilliard's first point,  he himself acknowledges that items in the P.O. Writer Plus V.10 may be associated with a Catalog ID and that Catalog ID may be coded by vendor.  (Hilliard Rep. at ¶ 106.)  Accordingly, P.O. Writer Plus V.10 associates items with sources.  As to Mr. Hilliard's second point, there is no requirement in the claim or in the

Court's interpretation that an item ultimately be purchased from the source with which it is associated.

          **c.**     **means for entering product information that at least partially describes at least one desired item**

319.    P.O. Writer Plus V.10 and J-CON both include "means for entering product information that at least partially describes at least one desired item." The Court interpreted the function of this limitation is "entering product information that at least partially describes at one desired item" and the corresponding structure is "a user interface operating on a computer through which a user may provide input; and one or more software modules that provide product information describing an item or a combination thereof, and their equivalents." (Memorandum Opinion at 48-49 (Docket No. 204).)

320.    In P.O. Writer Plus V.10, the user can search as selected catalog for items beginning with a specified letter using the ITEM DESCRIPTION SEQUENCE – STARTING WITH. (P.O. Writer Plus V.10 Manual at L0126945.) The selected catalog could also be search by Item Number sequence, Item Description sequence, and Commodity Code sequence. (P.O. Writer Plus V.10 Manual at L0127525).

321.    Mr. Hilliard does not appear to dispute that P.O. Writer Plus V.10 includes "means for entering product information that at least partially describes at least one desired item."

322.    J-CON includes mechanisms and screen displays for entering product information that was descriptive of items in the parts database. (J-CON Manual at L0123613). Using PartSource, J-CON displays parts matching supplier code or part number (item number) search criteria: "When you use a wild card and PartSource finds more than one part that matches, it displays all the parts, along with their descriptions and list prices." (J-CON Manual at L0123473.) Alternatively, using PartFinder, J-CON displays parts that match vehicle application

search criteria: "When you look up a part with PartFinder, you specify its group and subgroup, as well as the vehicle's year, make, and model.  J-CON then displays a list of possible parts . . . ." (J-CON Manual at L0123603.)

           **d.**   **means for searching for matching items that match the entered product information in the selected portions of the database**

      323.    P.O. Writer Plus V.10 and J-CON both include "means for searching for matching items that match the entered product information in the selected portions of the database."  The Court interpreted the function of this limitation is "searching for matching items that match the entered product information in the selected portions of the database" and the corresponding structure is "search programs and modules operating on a computer system with access to data in a database or other file system, and their equivalents."  (Memorandum Opinion at 49 (Docket No. 204).)

      324.    P.O. Writer Plus V.10 displays a list of CATALOGUE ID'S.  (P.O. Writer Plus V.10 Manual at L0126944).  The customer then selects a catalogue by scrolling through the list and pressing SHIFT-F3.  (L0126944).  The selected catalog can then be searched for items beginning with a specified letter using the ITEM DESCRIPTION SEQUENCE – STARTING WITH.  (P.O. Writer Plus V.10 Manual at L0126945.)  The selected catalog could also be search by Item Number sequence, Item Description sequence, and Commodity Code sequence.  (P.O. Writer Plus V.10 Manual at L0127525).  The system will then display all the items in the selected catalog that meet the searched for criteria.  (P.O. Writer Plus V.10 Manual at L0126946.)

      325.    Mr. Hilliard does not appear to dispute that P.O. Writer Plus V.10 includes "means for searching for matching items that match the entered product information in the selected portions of the database."

95

326.    J-CON enables a user to enter a partial manufacturer or part number.  (J-CON Manual at L0123472.)  The system searches for all parts that match the partial information.  (J-CON Manual at L0123473.)  If more than one matching part is found, the system displays all the matching parts.  (J-CON Manual at L0123473.)  Using PartSource, J-CON displays parts matching supplier code or part number (item number) search criteria: "When you use a wild card and PartSource finds more than one part that matches, it displays all the parts, along with their descriptions and list prices."  (J-CON Manual at L0123473.)  Alternatively, using PartFinder, J-CON displays parts that match vehicle application search criteria: "When you look up a part with PartFinder, you specify its group and subgroup, as well as the vehicle's year, make, and model. J-CON then displays a list of possible parts . . . ."  (J-CON Manual at L0123603.)

### e.    means for generating an order list that includes at least one matching item selected by said means for searching

327.    P.O. Writer Plus V.10 and J-CON both include "means for generating an order list that includes at least one matching item selected by said means for searching."  The Court interpreted the function of this limitation is "generating an order list that includes at least one matching item selected by said means for searching" and the corresponding structure is "a user interface operating on a computer through which a user may select from results from a search program or a search program that generates an order list of matching items, and their equivalents."  Memorandum Opinion at 50 (Docket No. 204).)  The Court interpreted "order list" to mean "a list of desired catalog items."  (Memorandum Opinion at 14 (Docket No. 204).)

328.    Mr. Hilliard contends that P.O. Writer Plus V.10 does not include "means for generating an order list that includes at least one matching item selected by said means for searching" because "[i]f the user starts with a requisition, from the search results generated in that process, the system builds a requisition, not an order list."  (Hilliard Rep. at ¶ 130.)  I disagree.

329.    The P.O. Writer system displays all the items in a selected catalog that meet the searched for criteria.  (P.O. Writer Plus V.10 Manual at L0126946.)  The user then types in the desired quantity next to the desired item and presses F7 to select the item.  (P.O. Writer Plus V.10 Manual at L0126948.)  The user may then select another catalog and repeat the process to items from a another catalog.  (P.O. Writer Plus V.10 Manual at L0126948.)  The system then displays a screen with all the selected items.  (P.O. Writer Plus V.10 Manual at L0126949.)

330.    J-CON displays parts matching a search criteria.  (J-CON Manual at L0123473, L0123603.)  The user may build a ticket be selecting items from the search results.  (J-CON Manual at L0123473, L0123606).  Once the ticket contains all the desired item, it may be released: "After you have entered all the line items for a ticket, you are ready to release it."  (J-CON Manual at L0123495.)  Unless and until the ticket is released, it is only a list of desired items (an order list) and is not yet a requisition.

       **f.**     **means for building a requisition that uses data obtained from said database relating to selected matching items on said order list**

331.    For the same reasons discussed with respect to claim 3 of the '683 Patent,  P.O. Writer Plus V.10 and J-CON both include "means for building a requisition that uses data obtained from said database relating to selected matching items on said order list."  The Court interpreted the function of this limitation is "building a requisition that uses data obtained from said database relating to selected matching items on said order list" and the corresponding structure is "a requisition module operating on a computer system having access to data in the database, and its equivalents."  (Memorandum Opinion at 50-51 (Docket No. 204).)   This is the same structure as construed for the "means for building a requisition" element of claim 3 of the '683 patent.

       **g.**     **means for processing said requisition to generate purchase orders for said selected matching items**

332.    For the same reasons discussed with respect to claim 3 of the '683 Patent,  P.O. Writer Plus V.10 and J-CON both include "means for processing said requisition to generate purchase orders for said selected matching items."  The Court interpreted the function of this limitation is  "processing a requisition to generate orders for selected matching items" and the corresponding structure is "a purchase order generation module operating on a computer system having access to the requisition, and its equivalents."  (Memorandum Opinion at 51 (Docket No. 204).)  This is the same structure as construed for the "means for processing the requisition to generate one or more purchase orders for the selected matching items." element of claim 3 of the '683 patent.

## VII.   U.S. PATENT NO. 5,319,542

333.    The '542 patent includes all the elements of claims 1, 2, 6, and 9 of the '516 patent.

334.    I understand that the '542 patent is prior art under 35 U.S.C. § 102(a) and (e).  It is prior art under 35 U.S.C. § 102(a) because it issued before the invention of the patents-in-suit. The '542 patent issued on June 7, 1994, approximately four months prior to filing date of the application for the '683 patent.  ('542 patent at cover.)  The '542 patent is prior art under 35 U.S.C. § 102(e) because it was filed by a different inventive entity that the patents in suit and it was filed before the invention of the patents-in-suit.  The '542 patent was filed on September 27, 1990, approximately four years prior to filing date of the application for the '683 patent, in the United States by another.  ('542 patent at cover.)  I understand there is no evidence that the alleged invention of the patents-in-suit predates either June 7, 1994 or September 27, 1990.

### A.    The '516 Patent

#### 1.    Claim 1 of the '516 Patent

##### a.    an electronic sourcing system

98

335.    The '542 patent discloses "an electronic sourcing system."  The '542 patent expressly describes an "electronic catalog ordering process and system" for procuring commercial parts and services from supplier catalogs.  (3:16-27.)

### b.    a collection of catalog items stored in an electronic format

336.    The '542 patent discloses "a collection of catalog items stored in an electronic format."  The Court interpreted "catalog" to mean "an organized collection of items and associated information, published by a vendor (which includes suppliers, manufacturers, and distributors), which preferably includes a part number, price, catalog number, vendor name, vendor ID, a textual description of the item, and images of or relating to the item." (Memorandum Opinion at 11 (Docket No. 204).)

337.    The '542 patent discloses that a supplier creates three separate catalogs: a Master Catalog; a Public Catalog; and Private Catalog.  Each of these catalogs includes products and services that could be ordered from a supplier.  (Fig. 1, 2:20-26, 3:16-27.)

### c.    a first set of pre-determined criteria associated with said collection of catalogs

338.    The '542 patent discloses "a first set of pre-determined criteria associated with said collection of catalogs."  It discloses three separate databases associated with specific criteria: a Master Catalog; a Public Catalog; and Private Catalog.  A user can elect to search either the Public Catalog or the Private Catalog.  (Fig. 1, 2:20-26, 5:42-45, 7:5-29.)

339.    Mr. Hilliard does not appear to dispute that the '542 patent discloses "a first set of pre-determined criteria associated with said collection of catalogs."

### d.    a second set of pre-determined criteria associated with items from each of said catalogs

340.   The '542 patent discloses "a second set of pre-determined criteria associated with items from each of said catalogs."  It discloses a user searching for items in the selected private or public catalogs.  (Fig. 3, 5:42-45.)

341.   Mr. Hilliard does not appear to dispute that the '542 patent discloses "a second set of pre-determined criteria associated with items from each of said catalogs."

> **e.    a catalog selection protocol, said catalog selection protocol relying on said first set of pre-determined criteria to select less than said entire collection of catalogs, and including matching a vendor identification code with a subset of said collection of catalogs,  wherein said subset of catalogs includes both a vendor catalog from a predetermined vendor and a second catalog from a predetermined third party that is one of a manufacturer and a competing vendor, said predetermined third party selling items corresponding to items in said vendor catalog**

342.   The '542 patent discloses "a catalog selection protocol, said catalog selection protocol relying on said first set of pre-determined criteria to select less than said entire collection of catalogs, and including matching a vendor identification code with a subset of said collection of catalogs,  wherein said subset of catalogs includes both a vendor catalog from a predetermined vendor and a second catalog from a predetermined third party that is one of a manufacturer and a competing vendor, said predetermined third party selling items corresponding to items in said vendor catalog."  The parties agreed, as acknowledged by the Court, that "subset" means "less than all of a set" and "protocol" means "a procedure." (Memorandum Opinion at 6 (Docket No. 204).)

343.   Mr. Hilliard contends that the '542 patent does not disclose "a catalog selection protocol" "relying on said first set of pre-determined criteria to select less than said entire collection of catalogs, and including matching a vendor identification code with a subset of said collection of catalogs, wherein said subset of catalogs includes both a vendor catalog from a predetermined vendor and a second catalog from a predetermined third party that is one of a

STAATS EXPERT REPORT ON INVALIDITY                                    CASE NO.3:09cv620

manufacturer and a competing vendor, said predetermined third party selling items corresponding to items in said vendor catalog" because "the system disclosed in the King Patent, at a minimum, lacks (1) vendor identification codes, and (2) the ability to define a .subset. of at least two catalogs to search (since it could only search one catalog at a time)."  I disagree.

344.    The '542 patent discloses selecting either the Public Catalog or the Private Catalog to search.  In at least the case of the Public Catalog, that catalog included a searchable set of supplier catalogs.  The user could search and compare items from different suppliers.  ('542 Patent, col. 3:52-58; col. 4:3-5; col. 5:42-45, col. 6:5-7 & col. 7:5-29, col. 7:36-38 (ePLUS0130304 & ePLUS130305).)

> **f.      a search program, said search program relying on said second set of criteria to select specific items from said catalogs determined from said catalog selection protocol**

345.    The '542 patent discloses "a search program, said search program relying on said second set of criteria to select specific items from said catalogs determined from said catalog selection protocol."  It discloses a user searching for items in the private or public catalogs.  The user could search for information in a catalog based on user-defined criteria.  ('542 Patent, Fig. 3, col. 5:42-45; col. 8:1-6.)

346.    Mr. Hilliard contends that the '542 patent does not disclose this limitation because it does not disclose the previous limitation.  (Hilliard Rep. at ¶ 263.)  I disagree for the reasons stated above.

> **2.      Claim 2 of the '516 Patent**

> **a.      an electronic sourcing system as recited in claim 1**

347.    As already discussed, the '542 patent discloses "an electronic sourcing system as recited in claim 1."

> **b.      wherein catalogs comprising said collection of catalogs are stored in separate databases**

STAATS EXPERT REPORT ON INVALIDITY                                    CASE NO.3:09cv620

348.    The '542 patent discloses "wherein catalogs comprising said collection of catalogs are stored in separate databases."  It discloses locating different private catalogs on separate computer systems.  (2:56-64, 7:5-29.)

349.    Mr. Hilliard does not appear to dispute that the '542 patent discloses "wherein catalogs comprising said collection of catalogs are stored in separate databases."

### 3.    Claim 6 of the '516 Patent

#### a.    an electronic sourcing system as recited in claim 1

350.    As already discussed, the '542 patent discloses "an electronic sourcing system as recited in claim 1."

#### b.    wherein said second set of predetermined criteria includes at least one of a catalog number and item textual information

351.    The '542 patent includes "wherein said second set of predetermined criteria includes at least one of a catalog number and item textual information."  It discloses that the items in the catalogs may be associated with a specific part number.  The catalog information associated with each item could include part numbers and descriptions.  (4:55-60, 5:19-21.)

352.    Mr. Hilliard does not appear to dispute that the '542 patent discloses "wherein said second set of predetermined criteria includes at least one of a catalog number and item textual information."

### 4.    Claim 9 of the '516 Patent

#### a.    an electronic sourcing system

353.    For the same reasons discussed with respect to claim 1, the '542 patent discloses "an electronic sourcing system."

#### b.    a collection of catalog items stored in an electronic format

354.    For the same reasons discussed with respect to claim 1, the '542 patent discloses "a collection of catalog items stored in an electronic format."

102

        c.      **a first identification code associated with a first item in a first catalog**

355.    The '542 patent discloses "a first identification code associated with a first item in a first catalog."  It discloses a user searching for items in the private or public catalogs.  The user can search for an item according to any of a variety of criteria associated with an item.  (Fig. 3, 4:55-60, 5:42-45.)

356.    Mr. Hilliard does not appear to dispute that the '542 patent discloses includes "a first identification code associated with a first item in a first catalog."

        d.      **a second identification code associated with a second item in a second catalog, said first item and said second item being generally equivalent, and wherein a selection of one identification code from one of said first and second catalogs provides the other identification code from the other of said catalogs**

357.    The '542 patent discloses "a second identification code associated with a second item in a second catalog, said first item and said second item being generally equivalent, and wherein a selection of one identification code from one of said first and second catalogs provides the other identification code from the other of said catalogs."

358.    The '542 patent discloses accessing multiple catalogs.  (2:20-26, 4:55-60,7:50-52, 8:34-36.)  Generally equivalent items can be displayed simultaneously.  (2:20-26.)  Once displayed, the criteria associated with one item from a first catalog is associated with and can be compared to an item from a second catalog.  (7:36-38.)

359.    Mr. Hilliard does not appear to dispute that the '542 patent discloses "a second identification code associated with a second item in a second catalog, said first item and said second item being generally equivalent, and wherein a selection of one identification code from one of said first and second catalogs provides the other identification code from the other of said catalogs."

## VIII.  GATEWAY 2000/MRO

360.    For purposes of this report, my understanding of Gateway 2000/MRO is based on the Gateway 2000/MRO Manual (L01276030-L127886).

361.    Gateway 2000/MRO includes all the elements of claim 26 of the '683 patent.

362.    I understand that Gateway 2000/MRO is prior art under 35 U.S.C. § 102(b) because it was in public use, on sale, and described in a printed publication in the United States more than one year prior to the date of the application for the patents-in-suit.  The Gateway system describe in the Gateway manual was in public use and on sale in May 1991, approximately three years and five months before the filing date of the application for the '683 patent.  (SAP Trial Tr. at 2218:10-14 (ePLUS0201533).)  The Gateway manual bears the date May 1991, the date it was published.  (SAP Trial Tr. at 2217:3-17 (ePLUS0201532).)

363.    I understand the Gateway 2000/MRO manual is a printed publications.  The manual was sent to anyone who purchased or requested a trial of the systems.  (SAP Trial Tr. at 2061:15–2062:20 (ePLUS0201492).)  Any member of the interested public could receive and review a copy of the manual by simply taking a trial of the Gateway system.

X.      Gateway 2000/MRO discloses all the elements of claim 26 of the '683 patent.

### A.      The '683 Patent

#### 1.      Claim 26 of the '683 Patent

##### a.      maintains at least two product catalogs containing data relating to items associated with the respective sources

364.    Gateway 2000/MRO "maintains at least two product catalogs containing data relating to items associated with the respective sources."  The Court interpreted "product catalog" to mean "an organized collection of items and associated information, published by a vendor (which includes suppliers, manufacturers, and distributors), which preferably includes a part

number, price, catalog number, vendor name, vendor ID, a textual description of the item, and

images of or relating to the item."  (Memorandum Opinion at 11 (Docket No. 204).)

365.    Gateway 2000/MRO stored multiple catalogs in a database.  Catalogs can be

created in the Gateway system for any group of commonly ordered items.  To create a catalog

within the Gateway system, a catalog identifier, vendor name, and catalog description can be

associated with a number of catalog items.  (Gateway 2000/MRO Manual at L0127660,

L0127872, L0127876.)

366.    Mr. Hilliard contends that Gateway 2000/MRO does not maintain catalogs

because "the 'catalogs' of the Gateway system are a list of items, each of which include some

attributes, one of which is an additional text description called 'supplier' that neither dictates nor

necessarily influences the determination of what the actual supplier (*i.e.*, vendor) will really be

when the item is purchased."  (Hilliard Rep. at 164.)  I disagree because the Court's interpretation

of "catalog" does not require that a catalog be associated with the supplier from which items in

the catalog are ultimately purchased.  A person of ordinary skill in the art would understand that

an item located in  the catalog of one supplier (such as a pen from OfficeMax) could be

purchased from another supplier (such as Staples).

**b.    selecting the product catalogs to search**

367.    Gateway 2000/MRO practiced "selecting the product catalogs to search."

368.    Gateway 2000/MRO enables a user to select a catalog by name.  "To select a

catalog, move the lightbar to the desired catalog and press enter.  The items listed in this catalog

will be displayed for selection."  (Gateway 2000/MRO Manual at L0127660.)

369.    Additionally, a user can select a vendor to be associated with a requisition, by

searching for a vendor identifier or name, and confirming selection of a vendor name.  (Gateway

2000/MRO Manual at L0127651).  By selecting a particular vendor associated with the requisition, searched items would be limited to that vendor's offerings.

370.    Mr. Hilliard contends that Gateway 2000/MRO does not "select[] the product catalogs to search" because the Gateway 2000/MRO does not create a requisition.  I disagree for the reasons stated below with respect to the limitation "building a requisition using data relating to selected matching items and their associated source(s)."

                **c.**    **searching for matching items among the selected product catalogs**

371.    Gateway 2000/MRO practiced "searching for matching items among the selected product catalogs."  The Court interpreted "matching items" to mean "the search results." (Memorandum Opinion at 17 (Docket No. 204).)  As the Court had already interpreted "product catalog" and "matching items," it determined that "searching for matching items among the selected product catalogs" required no further interpretation.  (Memorandum Opinion at 22 (Docket No. 204).)

372.    Mr. Hilliard contends that Gateway 2000/MRO does not "search[] for matching items among the selected product catalogs."  (Hilliard Rep. at ¶¶ 171-72.)  I disagree.

373.    Gateway 2000/MRO enables a user to search and select items once a catalog was selected.  For line items in a requisition, a user can enter a description, a stock number, or a keyword for searching among stocked items.  Specifically, once a vendor is assigned to a requisition, a user can search for items by text description, stock items, or keyword, to place those items on a requisitions.  (Gateway 2000/MRO Manual at L0127657-L0127659.)

374.    To search within a catalog, a user interface can be presented illustrating the contents of that catalog for selection of items to be included on a requisition.  "When a catalog has been selected, the items listed in that catalog will be displayed on the screen in a catalog

items window.  To choose from a catalog position the lightbar to the desired item and press enter."  (Gateway 2000/MRO Manual at L0127661.)

> **d.    building a requisition using data relating to selected matching items and their associated source(s)**

375.    Gateway 2000/MRO practiced "building a requisition using data relating to selected matching items and their associated source(s)."  It enables a user to select items to add to a requisition. As items are selected, they are added to requisition lines. (Gateway 2000/MRO Manual at L0127651, L0127657-L0127659, L0127660-L0127661.)

376.    Mr. Hilliard contends that Gateway 2000/MRO does not "build[] a requisition using data relating to selected matching items and their associated source(s)" because "when operated normally (*i.e.*, without manual input of vendor information by the user), the Gateway system built requisitions that were entirely devoid of source-related information."  (Hilliard Rep. at ¶¶ 167-168.)  I disagree.  Mr. Hilliard himself acknowledges that in Gateway 2000/MRO, item description is transferred from the catalog to the requisition.  (Hilliard Rep. at ¶ 168.)  This items description is data related to a source.

> **e.    processing the requisition to generate one or more purchase orders for the selected matching items**

377.    Gateway 2000/MRO practiced "processing the requisition to generate one or more purchase orders for the selected matching items."  It automatically moves information from a requisition to a purchase order: "If a requisition has already been entered, the data from the requisition will move forward into the purchase order automatically."  (Gateway 2000/MRO Manual at L0127697, L0127710.)

378.    Mr. Hilliard contends that Gateway 2000/MRO does not "process[] the requisition to generate one or more purchase orders for the selected matching items" because it does not build requisitions.  (Hilliard Rep. at ¶ 173.)  I disagree for the reasons stated above.

    **f.  determining whether a selected matching item is available in inventory**

379.  Gateway 2000/MRO practiced "determining whether a selected matching item is available in inventory."

380.  Mr. Hilliard contends that Gateway 2000/MRO does not "determine[e] whether a selected matching item is available in inventory."  (Hilliard Rep. at ¶ 180.)  I disagree.

381.  However, even Mr. Hilliard himself acknowledges that, at least as of 1993, the Gateway system included inventory control.  For example, in the document referenced by Mr. Hilliard, the Gateway Inventory Processes User Manual (dated December 1993), specifically describes how to check inventory: "Selecting this option will access an Item Brower window which searched stock items by keyword or by commodity. . . . An Item Browser window containing all the inventory items defined in the search will appear."  (Gateway Inventory Manual at IP3.97 (L0128317-18).)  The Line Item Browser displays the quantity available in stock of a particular item at the selected location.  (Gateway Inventory Manual at L0128317-18.)  The Gateway 2000/MRO inventory management function is used in conjunction with its requisition and purchase order generation functions: "After a requisition has be used to generate a purchase order. . . . In addition, the supply request function is fully integrated with GATEWAY's inventory process for efficient materials management throughout the manufacturing environment."  (Gateway Inventory Manual at IP3.97 (L0128300).)

382.  Mr. Hilliard acknowledges that Gateway could in fact check internal stock levels. (Hilliard Rep. at ¶180.)  This feature would satisfy the claim element.

**IX.  U.S. PATENT NO. 4,922,940**

383.  I understand that the '940 patent is prior art under 35 U.S.C. § 102(a) and (e).  It is prior art under 35 U.S.C. § 102(a) because it issued before the invention of the patents-in-suit. The '940 patent issued on February 12, 1991, approximately three-and-a-half years prior to filing

date of the application for the '683 patent.  The '542 patent is prior art under 35 U.S.C. § 102(e) because it was filed before the invention of the patents-in-suit.  The '542 patent was filed on March 13, 1989, approximately five-and-a-half years prior to filing date of the application for the '683 patent, in the United States by another.

384.    At the time of the invention of the patents-in-suit, there were reasons to combine the '940 patent with Fisher RIMS and J-CON.  The '940 patent teaches a system that "assists a user with locating and purchasing goods or services sold by a plurality of vendors." (Abstract.) Consolidating information about multiple vendors removed the need for customers to consult hundreds or thousands of vendor catalogs to find the best price for an item.  (the '940 patent at 1:14-60.)  Combining the '940 patent with Fisher RIMS or J-CON would have solved the recognized problem of consolidating multiple vendor catalogs into a procurement system.

385.    Mr. Hilliard contends that the PTO Examiner was aware of the '940 patent when the patents-in-suit were originally allowed.  (Hilliard Rep. at ¶ 147.)  I agree, but Mr. Hilliard ignores that importance of the Examiner's consideration of the '940 patent.  For example. the Examiner only found the '516 patent allowable over the '940 patent because the '940 patent did not disclose "converting items found in one vendor's catalog to equivalent products in another vendor's catalog."  (Office Action at  L0132653- (particularly L0132655-L0132660).)  This limitation is added by both Fisher RIMS and J-CON.

386.    Fisher RIMS in combination with the '940 patent includes all the elements of claims 3, 6, 26, 28, and 29 of the '683 patent, all the elements of claims 1, 2, 6, 9, 21, 22, and 29 of the '516 patent, and all the elements of claim 1 of the '172 patent.

387.    J-CON in combination with the '940 patent includes all the elements of claims 3, 6, 26, 28, and 29 of the '683 patent.

A.    **The '683 Patent**

1.     **Claim 3 of the '683 Patent**

    a.     **an electronic sourcing system**

388.    As discussed above, Fisher RIMS and J-CON are "an electronic sourcing system."

    b.     **at least two product catalogs containing data relating to items associated with the respective sources**

389.    Mr. Hilliard does not appear to dispute that the '940 patent discloses this limitation.  Indeed, the'940 patent discloses "at least two product catalogs containing data relating to items associated with the respective sources."  The Court interpreted "product catalog" to mean "an organized collection of items and associated information, published by a vendor (which includes suppliers, manufacturers, and distributors), which preferably includes a part number, price, catalog number, vendor name, vendor ID, a textual description of the item, and images of or relating to the item."  (Memorandum Opinion at 11 (Docket No. 204).)  It discloses a database containing information about products and services and the vendors who sell them.  The information is the equivalent of thousands of catalogs of individual suppliers.  (1:65-67.)

    c.     **means for selecting the product catalogs to search**

390.    Mr. Hilliard does not appear to dispute this element individually, but in view of his general statements regarding the "catalog selection protocol" limitation of claim 1 of the '516 patent, I will address it.  (Hilliard Rep. at ¶¶ 150-151.)

391.    The '940 patent discloses "means for selecting the product catalogs to search." The Court interpreted the function of this limitation is to "select the product catalog to search" and the corresponding structure is "a user interface that allows the user to select a catalog; a catalog module that selects product catalogs based on preferences or history; a catalog search module that identifies product catalogs or a combination thereof; and their equivalents."  (Memorandum Opinion at 44-45 (Docket No. 204).)  It discloses that the database includes at

least two type of products: goods or services.  By selecting one, the system would limit its search to information about the selected product.  (5:10-15.)

> **d.    means for searching for matching items among the selected product catalogs**

392.    Mr. Hilliard does not appear to dispute this element individually, but in view of his general statements regarding the "search program" limitation of claim 1 of the '516 patent, I will address it.  (Hilliard Rep. at ¶ 151.)

393.    The '940 patent discloses "means for searching for matching items among the selected product catalogs."  The Court interpreted the function of this limitation is "searching for matching items among the selected product catalogs" and the corresponding structure is "search programs and modules operating on a computer system with access to data in a database or other file system, and their equivalents."  (Memorandum Opinion at 45 (Docket No. 204).)  It discloses that the system searches for products based on the selection of the product type.  (5:10-15.)

> **e.    means for building a requisition using data relating to selected matching items and their associated source(s)**

394.    As discussed above, Fisher RIMS and J-CON include "means for building a requisition using data relating to selected matching items and their associated source(s)."

> **f.    means for processing the requisition to generate one or more purchase orders for the selected matching items**

395.    As discussed above, Fisher RIMS and J-CON include "means for processing the requisition to generate one or more purchase orders for the selected matching items."

> **g.    means for converting data related to a selected matching item and an associated source to data relating to an item and a different source**

396.    As discussed above, Fisher RIMS and J-CON include "means for converting data related to a selected matching item and an associated source to data relating to an item and a different source."

## 2.     Claim 6 of the '683 Patent

### a.     an electronic sourcing system

397.     As discussed above, Fisher RIMS and J-CON are "an electronic sourcing system."

### b.     a database containing data relating to items associated with at least two sources

398.     As discussed above, Fisher RIMS and J-CON include "a database containing data relating to items associated with at least two sources."

399.     Mr. Hilliard does not appear to dispute that the '940 patent discloses this limitation.  Indeed, the '940 patent also discloses "a database containing data relating to items associated with at least two sources."  It discloses a database containing information about products and services and the vendors who sell them.  The information is the equivalent of thousands of catalogs of individual suppliers.  (1:65-67.)

### c.     means for searching for matching items in the database

400.     As discussed above, Fisher RIMS and J-CON include "means for searching for matching items in the database."

401.     Mr. Hilliard does not appear to dispute this element individually, but in view of his general statements regarding the "search program" limitation of claim 1 of the '516 patent, I will address it.  (Hilliard Rep. at ¶ 151.)  Indeed, the '940 patent discloses "means for searching for matching items in the database."  It discloses that the system searches for products. (6:11-15.)

### d.     means for building a requisition using data relating to selected matching items and their associated source(s)

402.     As discussed above, Fisher RIMS and J-CON include "means for building a requisition using data relating to selected matching items and their associated source(s)."

### e.     means for processing the requisition to generate one or more purchase orders for the selected matching items

403.     As discussed above, Fisher RIMS and J-CON include "means for processing the requisition to generate one or more purchase orders for the selected matching items."

      **f.**     **means for converting data relating to a selected matching item and an associated source to data relating to an item and a different source**

404.     As discussed above, Fisher RIMS and J-CON include "means for converting data relating to a selected matching item and an associated source to data relating to an item and a different source."

      **3.**     **Claim 26 of the '683 Patent**

      **a.**     **maintains at least two product catalogs containing data relating to items associated with the respective sources**

405.     For the same reasons discussed with respect to claim 3, the '940 patent "maintains at least two product catalogs containing data relating to items associated with the respective sources."

      **b.**     **selecting the product catalogs to search**

406.     As discussed above with respect to claim 3, the '940 patent discloses "selecting the product catalogs to search."

      **c.**     **searching for matching items among the selected product catalogs**

407.     The '940 patent discloses "searching for matching items among the selected product catalogs."  It discloses that the system searches for products based on selection of the product type.  (5:10-15.)

      **d.**     **building a requisition using data relating to selected matching items and their associated source(s)**

408.     As discussed above, Fisher RIMS and J-CON practice "building a requisition using data relating to selected matching items and their associated source(s)."

      

> **e.** **processing the requisition to generate one or more purchase orders for the selected matching items**

409.    As discussed above, Fisher RIMS and J-CON practice "processing the requisition to generate one or more purchase orders for the selected matching items."

> **f.** **determining whether a selected matching item is available in inventory**

410.    As discussed above, Fisher RIMS and J-CON practice "determining whether a selected matching item is available in inventory."

> **4.** **Claim 28 of the '683 Patent**

> **a.** **maintains at least two product catalogs containing data relating to items associated with the respective sources**

411.    For the same reasons discussed with respect to claim 3, the '940 discloses "maintains at least two product catalogs containing data relating to items associated with the respective sources."

> **b.** **selecting the product catalogs to search**

412.    For the same reasons discussed with respect to claim 26, the '940 patent discloses "selecting the product catalogs to search."

> **c.** **searching for matching items among the selected product catalogs**

413.    As discussed above, Fisher RIMS and J-CON practice "searching for matching items among the selected product catalogs."

414.    For the same reasons discussed with respect to claim 26, the '940 patent practiced "searching for matching items among the selected product catalogs."

> **d.** **building a requisition using data relating to selected matching items and their associated source(s)**

415.    As discussed above, Fisher RIMS and J-CON practice "building a requisition using data relating to selected matching items and their associated source(s)."

114

      **e.**     **processing the requisition to generate one or more purchase orders for the selected matching items**

416.    As discussed above, Fisher RIMS and J-CON practice "processing the requisition to generate one or more purchase orders for the selected matching items."

      **f.**     **converting data relating to a selected matching item and an associated source to data relating to an item and a different source**

417.    As discussed above, Fisher RIMS and J-CON practice "converting data relating to a selected matching item and an associated source to data relating to an item and a different source."  The Court interpreted this limitation to mean "substituting data relating to a selected matching item and an associated source to data relating to an item and a different source." (Memorandum Opinion at 31 (Docket No. 204).)

     **5.**     **Claim 29 of the '683 Patent**

      **a.**     **the method of claim 28**

418.    As already discussed, Fisher RIMS and J-CON practice "the method of claim 28."

      **b.**     **determining whether a selected matching item is available in inventory**

419.    As discussed above, Fisher RIMS and J-CON practice "determining whether a selected matching item is available in inventory."

    **B.**     <u>**The '516 Patent**</u>

     **1.**     **Claim 1 of the '516 Patent**

      **a.**     **an electronic sourcing system**

420.    As discussed above, Fisher RIMS and J-CON are "an electronic sourcing system."

      **b.**     **a collection of catalog items stored in an electronic format**

421.    Mr. Hilliard does not appear to dispute that the '940 patent discloses this limitation.  Indeed, the '940 patent discloses a database including a "collection of catalog items

115

stored in an electronic format."  The Court interpreted "catalog" to mean "an organized collection of items and associated information, published by a vendor (which includes suppliers, manufacturers, and distributors), which preferably includes a part number, price, catalog number, vendor name, vendor ID, a textual description of the item, and images of or relating to the item." (Memorandum Opinion at 11 (Docket No. 204).)

422.    The '940 patent discloses a database containing information about products and services and the vendors who sell them.  The information is the equivalent of thousands of catalogs of individual suppliers.  (1:65-67.)

> **c.    a first set of pre-determined criteria associated with said collection of catalogs**

423.    The '940 patent discloses "a first set of pre-determined criteria associated with said collection of catalogs."  It discloses that the database includes at least two types of products: goods or services.  By selecting one, the system would limit its search to information about the selected product.  (5:10-15.)  Mr. Hilliard does not appear to dispute that the '940 patent discloses this limitation.

> **d.    a second set of pre-determined criteria associated with items from each of said catalogs**

424.    The '940 patent discloses a second set of pre-determined criteria associated with items stored in a database.  It discloses that the system searches for products based on information entered by the user.  (6:10-15.)  Mr. Hilliard does not appear to dispute that the '940 patent discloses this limitation.

> **e.    a catalog selection protocol, said catalog selection protocol relying on said first set of pre-determined criteria to select less than said entire collection of catalogs, and including matching a vendor identification code with a subset of said collection of catalogs,  wherein said subset of catalogs includes both a vendor catalog from a predetermined vendor and a second catalog from a predetermined third party that is one of a manufacturer and a competing vendor, said predetermined**

> **third party selling items corresponding to items in said vendor catalog**

425.     Mr. Hilliard contends that the '940 patent does not disclose ""a catalog selection protocol" "relying on said first set of pre-determined criteria to select less than said entire collection of catalogs, and including matching a vendor identification code with a subset of said collection of catalogs,  wherein said subset of catalogs includes both a vendor catalog from a predetermined vendor and a second catalog from a predetermined third party that is one of a manufacturer and a competing vendor, said predetermined third party selling items corresponding to items in said vendor catalog."  (Hilliard Rep. at ¶ 150.)  I disagree.

426.     The '940 patent discloses this limitation.  The parties agreed, as acknowledged by the Court, that "subset" means "less than all of a set" and "protocol" means "a procedure." (Memorandum Opinion at 6 (Docket No. 204).)

427.     The '940 patent discloses that the database includes at least two type of products: good or services.  By selecting one, the system would limit its search to information about the selected product.  (5:10-15.)  The selected products are associated with multiple vendors.  (5:25-27.)  The individual vendors each have their own catalog.  (3:66-68.)

> **f.     a search program, said search program relying on said second set of criteria to select specific items from said catalogs determined from said catalog selection protocol**

428.     Mr. Hilliard contends that the '940 patent does not disclose "a search program, said search program relying on said second set of criteria to select specific items from said catalogs determined from said catalog selection protocol" because it does not disclose a "catalog selection protocol."  (Hilliard Rep. at 151.)  As discussed above, Mr. Hilliard is wrong with respect to that limitation, and is there also wrong with respect to this "search program" limitation.

429.     Furthermore, the '940 patent discloses that the database includes at least two types of products: goods or services.  By selecting one, the system would limit its search to information about the selected product.  (5:10-15.)  The selected products are associated with multiple vendors.  (5:25-27.)

### 2.     Claim 2 of the '516 Patent

#### a.     an electronic sourcing system as recited in claim 1

430.     As discussed above, Fisher RIMS is "an electronic sourcing system as recited in claim 1."

#### b.     wherein catalogs comprising said collection of catalogs are stored in separate databases

431.     As discussed above, Fisher RIMS includes data stored in a number of separate databases.

### 3.     Claim 6 of the '516 Patent

#### a.     an electronic sourcing system as recited in claim 1

432.     As discussed above, Fisher RIMS and J-CON are "an electronic sourcing system as recited in claim 1."

#### b.     wherein said second set of predetermined criteria includes at least one of a catalog number and item textual information

433.     As discussed above, Fisher RIMS and J-CON include "wherein said second set of predetermined criteria includes at least one of a catalog number and item textual information."

### 4.     Claim 9 of the '516 Patent

#### a.     an electronic sourcing system

434.     As discussed above, Fisher RIMS is "an electronic sourcing system."

#### b.     a collection of catalog items stored in an electronic format

435.    For the same reasons discussed with respect to claim 1, the '940 patent discloses "a collection of catalog items stored in an electronic format."

        **c.**    **a first identification code associated with a first item in a first catalog**

436.    Mr. Hilliard contends that the '940 patent does not disclose "a first identification code associated with a first item in a first catalog" without explanation.  (Hilliard Rep. at ¶ 153.) I disagreed because the '940 patent discloses that the system searches for products based on information entered by the user.  (6:10-15.)

        **d.**    **a second identification code associated with a second item in a second catalog, said first item and said second item being generally equivalent, and wherein a selection of one identification code from one of said first and second catalogs provides the other identification code from the other of said catalogs**

437.    Mr. Hilliard contends that the '940 patent does not disclose a "a second identification code associated with a second item in a second catalog" corresponding to "general equivalents."  (Hilliard Rep. at ¶ 153.)  I disagree because the '940 patent discloses that the system searches for products based on information entered by the user.  (6:10-15.)  The system provides information about resulting products from multiple vendors.  (6:26-37.)

     **5.**    **Claim 21 of the '516 Patent**

        **a.**    **an electronic sourcing system**

438.    As discussed above, Fisher RIMS is "an electronic sourcing system."

        **b.**    **a requisition module including data fields, user-generated criteria entered into at least one of said data fields to generate at least partial criteria corresponding to a desired item**

439.    As discussed above, Fisher RIMS includes "a requisition module including data fields, user-generated criteria entered into at least one of said data fields to generate at least partial criteria corresponding to a desired item."

        

       **c.**     **a catalog collection searching module, said searching module including a collection of catalogs of items stored in an electronic format, a catalog selection criteria used to select less than said entire collection, said searching module being used to generate additional search-module criteria for said data fields of said requisition module**

440.    Mr. Hilliard does not appear to dispute this element individually, but in view of his general statements regarding the "catalog selection protocol" of claim 1, I will address it. (Hilliard Rep. at ¶ 151.) The '940 patent discloses this limitation. It discloses a database containing information about products and services and the vendors who sell them. The information is the equivalent of thousands of catalogs of individual suppliers. (1:65-67.) The database includes at least two type of products: good or services. By selecting one, the system would limit its search to information about the selected product. (5:10-15.)

       **d.**     **a multiple purchase order generation module, said purchase order generation module creating multiple purchase orders from a single requisition created with said user-generated criteria and said search-module criteria**

441.    As discussed above, Fisher RIMS includes "a multiple purchase order generation module, said purchase order generation module creating multiple purchase orders from a single requisition created with said user-generated criteria and said search-module criteria."

       **e.**     **wherein each of at least two catalogs include a generally equivalent item from a different source, said requisition module working in combination with said catalog searching module to determine multiple sources for said item**

442.    Mr. Hilliard does not appear to dispute this element individually, but in view of his general statements regarding the "general equivalents" of claim 9, I will address it. (Hilliard Rep. at ¶ 153.) The '940 patent discloses "wherein each of at least two catalogs include a generally equivalent item from a different source, said requisition module working in combination with said catalog searching module to determine multiple sources for said item." It discloses that the system searches for products based on information entered by the user. (6:10-

120

15.)  The system provides information about resulting products from multiple vendors.  (6:26-37.)

        **f.**      **wherein said multiple sources is limited by said catalog searching module providing a match according to said user-generated criteria, said search-module criteria and a determination system that located items are generally equivalent**

443.     Mr. Hilliard does not appear to dispute this element individually, but in view of his general statements regarding the "catalog selection protocol" of claim 1, I will address it. (Hilliard Rep. at ¶ 151.)

444.     The '940 patent discloses "wherein said multiple sources is limited by said catalog searching module providing a match according to said user-generated criteria, said search-module criteria and a determination system that located items are generally equivalent."  It discloses that the system searches for products based on information entered by the user.  (6:10-15.)  The system provides information about resulting products from multiple vendors.  (6:26-37.)

        **g.**      **wherein said determination system includes a cross reference table matching an identification code from a first located item with a second identification code from a second located item**

445.     As discussed above, Fisher RIMS includes "wherein said determination system includes a cross reference table matching an identification code from a first located item with a second identification code from a second located item."

      **6.**      **Claim 22 of the '516 Patent**

        **a.**      **An electronic sourcing system as recited in claim 21**

446.     As discussed above, Fisher RIMS is "an electronic sourcing system."

        **b.**      **wherein said determination system includes an identical identification code for each of said located items**

STAATS EXPERT REPORT ON INVALIDITY                CASE NO.3:09cv620

447.    As discussed above, Fisher RIMS, as disclosed in the '989 patent, includes "wherein said determination system includes an identical identification code for each of said located items."

### 7.    Claim 29 of the '516 Patent

#### a.    an electronic sourcing system

448.    As discussed above, Fisher RIMS, as disclosed in the '989 patent, is "an electronic sourcing system."

#### b.    a collection of catalog items stored in an electronic format

449.    As discussed above, Fisher RIMS includes "a collection of catalog items stored in an electronic format."

450.    For the same reasons discussed with respect to claim 1, the '940 patent includes "a collection of catalog items stored in an electronic format."

#### c.    a first set of pre-determined criteria associated with said collection of catalogs

451.    For the same reasons discussed with respect to claim 1, the '940 patent discloses "a first set of pre-determined criteria associated with said collection of catalogs."

#### d.    a second set of predetermined criteria associated with items from each of said catalogs

452.    For the same reasons discussed with respect to claim 1, the '940 patent includes "a second set of predetermined criteria associated with items from each of said catalogs."

#### e.    a catalog selection protocol, said catalog selection protocol relying on said first set of predetermined criteria to select less than said entire collection of catalogs, and including matching a vendor identification code with a subset of said collection of catalogs, wherein said subset of catalogs includes both a vendor catalog from a predetermined vendor and a second catalog from a predetermined third party

453.    For the same reasons discussed with respect to claim 1, the '940 patent discloses "a catalog selection protocol, said catalog selection protocol relying on said first set of predetermined criteria to select less than said entire collection of catalogs, and including matching a vendor identification code with a subset of said collection of catalogs, wherein said subset of catalogs includes both a vendor catalog from a predetermined vendor and a second catalog from a predetermined third party."

**f.    a search program, said search program relying on said second set of criteria to select specific items from said catalogs determined from said catalog selection protocol**

454.    For the same reasons discussed with respect to claim 1, the '940 patent discloses "a search program, said search program relying on said second set of criteria to select specific items from said catalogs determined from said catalog selection protocol."

**g.    a cross-reference table linking a vendor item catalog number from said vendor catalog with an item catalog number from said predetermined third party**

455.    As discussed above, Fisher RIMS includes "a cross-reference table linking a vendor item catalog number from said vendor catalog with an item catalog number from said predetermined third party."

**C.    The '172 Patent**

**1.    Claim 1 of the '172 Patent**

**a.    an electronic sourcing system**

456.    As discussed above, Fisher RIMS is "an electronic sourcing system."

**b.    a database containing data relating to items associated with at least two vendors maintained so that selected portions of the database may be searched separately**

457.    As discussed above, Fisher RIMS includes "a database containing data relating to items associated with at least two vendors maintained so that selected portions of the database may be searched separately."

458.    The '940 patent discloses "a database containing data relating to items associated with at least two vendors maintained so that selected portions of the database may be searched separately."  It discloses a database containing information about products and services and the vendors who sell them.  The information is the equivalent of thousands of catalogs of individual suppliers.  (1:65-67.)  Mr. Hilliard does not appear to dispute that the '940 patent discloses this claim.

> c.    **means for entering product information that at least partially describes at least one desired item**

459.    As discussed above, Fisher RIMS includes "means for entering product information that at least partially describes at least one desired item."

460.    The '940 patent discloses "means for entering product information that at least partially describes at least one desired item."  It discloses that a user can enter specifications for a product.  (6:11-15.)  Mr. Hilliard does not appear to dispute that the '940 patent discloses this claim.

> d.    **means for searching for matching items that match the entered product information in the selected portions of the database**

461.    As discussed above, Fisher RIMS includes "means for searching for matching items that match the entered product information in the selected portions of the database."

462.    Mr. Hilliard does not appear to dispute this element individually, but in view of his general statements regarding the "search program" limitation of claim 1 of the '516 patent, I will address it.  (Hilliard Rep. at ¶ 151.)  The '940 patent discloses "means for searching for matching items that match the entered product information in the selected portions of the

124

database."  The Court interpreted the function of this limitation is "searching for matching items that match the entered product information in the selected portions of the database" and the corresponding structure is "search programs and modules operating on a computer system with access to data in a database or other file system, and their equivalents."  (Memorandum Opinion at 49 (Docket No. 204).)

463.    The '940 patent discloses that the system searches for products based on the selection of the product type.  (5:10-15.)

> **e.     means for generating an order list that includes at least one matching item selected by said means for searching**

464.    As disclosed above, Fisher RIMS includes "means for generating an order list that includes at least one matching item selected by said means for searching."

> **f.     means for building a requisition that uses data obtained from said database relating to selected matching items on said order list**

465.    As disclosed above, Fisher RIMS includes "means for building a requisition that uses data obtained from said database relating to selected matching items on said order list."

> **g.     means for processing said requisition to generate purchase orders for said selected matching items**

466.    As disclosed above, Fisher RIMS  includes "means for processing said requisition to generate purchase orders for said selected matching items."

## X.     SECONDARY INDICIA OF NON-OBVIOUSNESS

467.    At ¶¶ 335-343 of his Report, Mr. Hilliard discusses various factors that he contends indicate that the patents-in-suit are not obvious.  I disagree.

468.    Regarding commercial success of the patented products, a product can achieve commercial success for a number of reasons that have nothing to do with it being an innovative product.  A company could do a similar thing to your competitor, just better.  A company could

do the similar thing more cheaply.  A company could have a better sales force.  A company could be willing to make software changes to accommodate a customer's unique requirements

469.    Most frequently companies that purchase computer systems are more interested in systems that are evolutionary, not revolutionary.  This is a safer business decision for most managers.  Hence, commercial success does not equate to non-obviousness.

470.    Moreover, I understand that ePlus's product was not commercially successful.  In fact, the ePlus division that sold the product covered by the patents-in-suit has never been profitable.

```
18   Q.   Is the ePlus systems group or division
19   currently profitable?
20      A.   No.
21      Q.   Has it ever been profitable?
22      A.   No.
```

(Farber Dep. at 173:18-22.)

471.    Regarding evidence of licensing, it appears to me that the licensing examples provided by Mr. Hilliard are primarily the result of litigation, either winning a case or settling a case.  I would not consider licensing of the type above to be "voluntary" licensing that demonstrates any non-obviousness.

472.    Regarding customer skepticism, customers can be skeptical of a computer system for a lot of reasons including whether it is worth the cost for the benefit realized.  The CEO of Fisher's comments could well be self serving to justify slower and lower initial sales or for other, un-named, reasons for customer resistance to installing the Fisher system.

473.    Regarding meeting unsolved needs, the Lawson comments appear to be typical sales hype that many organizations engage in.  They can hardly be an objective measure of this criterion.

126

474.    Regarding industry awards, this is not necessarily indicative of much of anything. Many conferences & magazines must justify their existence & attract attendees, exhibitors, subscribers, & advertisers.  One way to encourage these is through awards.  As an example, I attend each year the Consumer Electronics conference in Las Vegas.  They give out more awards for products than you can imagine.  Some are quite legitimate, and some make you just shake your head and wonder why and if anyone really cares.  Some companies actively court awards & recognitions.  Frequently you must actually apply for some of these types of things.  Some companies could care less and just work on running their business.  Customers who actually wish to buy products usually know the difference.  Hence winning an award might be indicative of an innovative product, but it could equally be indicative of a good sales campaign.  The press releases mentioned by Mr. Hillard are an example of this type of non-obviousness, but these are put out primarily to impress investors or to impress potential customers, aid sales.


/s Preston W. Staats

_____

Preston Staats