# EXHIBIT 1

```
 1           IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF VIRGINA
 2                     Richmond Division

 3

 4

 5   ePlus, Inc.,

 6                    Plaintiff,

 7   versus                        309 CV 620

 8   Lawson Software, Inc.

 9                    Defendant

10

11

12

13        before:   HONORABLE ROBERT E. PAYNE
            Senior United States District Judge
14

15

16              August 10, 2010
                Richmond, Virginia
17

18

19              Phone Conference

20

21

22           Gilbert F. Halasz, RMR
             Official Court Reporter
23             U. S. Courthouse
               Richmond, Virginia
24              (804) 916-2248

25
```

```
 1        testimony that was proffered, and I have
 2        studied the report of Dr. Mangum.  And I
 3        believe that there is a great difference
 4        between Mangum's report and the i4i, as
 5        Mr. McDonald pointed out.  There was a firm and
 6        fixed and rationally-based bench mark that was
 7        really unavailable in the i4i case.  Here the
 8        bench mark is really two litigation
 9        settlements.  For reasons which make -- I
10        understand that he articulated a reason, but I
11        never did -- I found it quite difficult to
12        understand.  Dr. Mangum just threw out the
13        other litigation-related settlements.  He just
14        picked the ones that had big numbers in them.
15             And the other three which he mentions in
16        his report he excludes from his analysis.  He
17        concludes that the Verian, the Sciquest and
18        Perfect Commerce agreements, which are also
19        settlements that were arrived at, Verian was
20        500,000 plus 2.5 percent running royalty on all
21        sales covered by the patents in suit in excess
22        of 15 million in a calendar year.  Sciquest was
23        a 2.4 million-dollar settlement.  Perfect
24        Commerce, according to him, was a lump sum
25        payment of $750,000.  And his basis for
```

```
 1       throwing those out was not an economic basis.
 2       His basis for throwing them out was a
 3       conclusory ipse dixit pronouncement.  And it is
 4       that he understood no discovery had occurred,
 5       and it was that he understood that due to quick
 6       settlements ePlus did not receive information
 7       that would allow it to form an understanding as
 8       to the amount of accused revenue for any of
 9       these parties.  As a result, he says, the terms
10       of the agreements do not represent a complete
11       valuation of the specific use of the patents in
12       suit, but rather based on avoidance of
13       litigation.  He also -- he says the most that
14       can be said out of those is they provide
15       evidence of the willingness by ePlus to enter
16       into fixed payment and running royalty license
17       agreements.  So out of five possible settlement
18       agreements that he could have chosen to include
19       in his base he threw out for non economic
20       reasons the three lowest.
21            There is nothing that I know of that
22       permits an expert to pick and chose in
23       selecting the base in this fashion.
24            Now, the other thing is the base itself of
25       those that were selected are shaky under the
```

1   law.  It's true that there are cases that allow
2   settlement agreements and licenses and payments
3   used in settlement agreements, or that come
4   from settlement agreements, to be used in
5   assessing the reasonableness of the royalty.
6   But beginning a hundred years ago in Rude
7   against Westcott the Supreme Court cautioned
8   against the use of those and commented how
9   unreliable they basically would be.  Subsequent
10  cases from all of the circuits, including the
11  federal circuits, counsels against the use of
12  these kinds of agreements.
13      But there are other cases that say they
14  can be used in certain circumstances.  The
15  fundamental message being they are of minimal
16  probative value in arriving at a determination
17  of a reasonable royalty.
18      In particular, the federal circuit has
19  held that lump sum settlement agreements are
20  particularly unsuited to use as a bench mark
21  for the calculation of running royalty
22  agreements.
23      Now, I am aware of the Rescue case and the
24  two cases in Texas that make the comment that
25  Rescue changes the nature of the analysis.

| | |
|---|---|
| 1 | There are a number of cases in Texas in the |
| 2 | same district that hold -- and in other |
| 3 | districts -- that hold that Rescue doesn't |
| 4 | change the fundamental analysis established by |
| 5 | the law of the previous federal circuit and |
| 6 | other cases. |
| 7 | In my judgment the conclusion that Rescue |
| 8 | changes the law is an unwarranted one. I do |
| 9 | not believe that it does. I don't think the |
| 10 | issue presented in Rescue is the same issue |
| 11 | that is presented here. And I think that it is |
| 12 | giving Rescue far too much credence to |
| 13 | interpret it as changing the basic results by |
| 14 | which we determine whether license agreements |
| 15 | under, excuse me, arrived at under settlement |
| 16 | agreements are a good way to calculate running |
| 17 | royalties. Nonetheless, I think we do have to |
| 18 | recognize that the general body of law, |
| 19 | confused though it may be, tends to allow the |
| 20 | use of lump sum payments out of settlement |
| 21 | agreements in certain circumstances. Or, |
| 22 | excuse me, the use of royalty provisions out of |
| 23 | settlement agreements in calculating reasonable |
| 24 | royalties. But I am -- but when you add the |
| 25 | fact that these are lump sum royalty, I mean |

```
 1          lump sum payments for the most part that in
 2          fact have been converted by this man, Mangum,
 3          into running royalty rates, and you consider
 4          that the base he used is in every instance an
 5          assumed base for the quantum of sales in
 6          positing his analysis, and then you consider at
 7          the same time that for no valid economic reason
 8          that can be ascertained from the face of his
 9          report that he has thrown out three out of five
10          settlement agreements; and when you consider
11          that ePlus itself valued these rights at a far
12          lesser figure then one has to but conclude that
13          the bench mark constructed by this expert bears
14          virtually no resemblance to the bench mark
15          constructed by the expert used by the expert in
16          i4i.  So I agree that while litigation
17          settlements have minimum probative value, they
18          can be considered.  But in the facts of this
19          case, the way he went about it, it establishes
20          a very shaky bench mark against which to start
21          his calculations, and the predicate settlements
22          also suffer from that, from the defect that are
23          not generally probative under Lucent, that is,
24          lump sum settlements are not generally
25          probative under Lucent of a reasonable royalty.
```

```
 1
 2          Further, I have been back and studied how
 3     it is that this expert took a range of 2.5 to
 4     3.7 and got it to 5.6.  That is a basic
 5     doubling -- excuse me -- to a range of 5 to 6.
 6     That is essentially a doubling of the royalty
 7     rate.  He does it by saying that certain of the
 8     factors of Georgia Pacific effectuate an
 9     increase, certain factors are neutral, without
10     explaining what part of which one of those
11     factors accounts for a doubling or a
12     significant increase, nor does he explain how
13     he factors in the aggregate to actually achieve
14     an increase.  He just makes a bunch of general
15     statements about each of the factors, concludes
16     that it is either statistically neutral or
17     indicating a higher royalty rate.  He doesn't
18     say it requires arrival at a higher royalty
19     rate in every case.  He says it indicates or
20     suggests, thereby indicating to me a
21     considerable speculation.
22          What that all boils down to when you look
23     at his factors, I think it is 5 and 6, and then
24     8313 is this.  That is the quintessential
25     definition of an ipse dixit.  2.5 to 3.7 goes
```

```
 1       to a range of 5 to 6 because I say so.  And I
 2       am an expert.  And that is exactly what he has
 3       done.  And that is a methodology flaw, not a
 4       disagreement with his facts.  That is just a
 5       methodology flaw that renders his analysis such
 6       as to be sufficiently unreliable that it will
 7       not be healthy -- help the finder of the fact
 8       determine an issue or understand the evidence
 9       or to determine a fact in issue.  And, in fact,
10       it posits a very real risk of the very threat
11       that is presented by having or allowing experts
12       to posit ipse dixit statements.
13            You get a person with a big credential who
14       comes in well dressed, is impressive, says it
15       is so because I say so, and the jury is
16       confused and apt to be -- and apt to be
17       impressed by the credential rather than the
18       analytical method.  And rule 403, which Daubert
19       says has to be applied in applying it, or has
20       to be considered in applying rule 702, says
21       that that kind of evidence is to be kept out.
22            So I view this as certainly not -- I don't
23       think it is The Court's job to make the
24       judgment about whether, about the factual
25       underpinnings or the validity val non of the
```

```
 1    conclusions.  I know it is not.  We have been
 2    taught to do this, to take that approach since,
 3    at least since Daubert, if not before.  But
 4    certainly since Daubert.  That is the approach
 5    of taking in this circuit, and drummed in to
 6    the heads of all district judges in every case
 7    that is decided on this issue.  And it is the
 8    methodology that is flawed.  I don't address
 9    the conclusions.  For those reasons the motion
10    number 3 will be granted, and the motion number
11    1 and 2, therefore, are denied as moot.
12         I believe that solves, or that deals and
13    takes care of those motions; is that right?  Is
14    there anything left?  Is there anything left?
15         MR. McDONALD:  Well, settlement agreements
16    themselves, Your Honor, are subject of a motion
17    in limine number one.  Not sure by saying it is
18    moot are you saying the expert is the only way
19    that would come in?  They are not coming in any
20    way?  If that is right, we are fine.  But if
21    that is leaving the door open to those being
22    somehow presented to the jury and those million
23    dollar numbers getting in front of the jury we
24    still would want that motion decided and
25    granted as well.
```

```
 1          THE COURT:  I think they ought to be able
 2     to wear tee shirts that have "37 million" on
 3     them, and walk in the door and say that we got
 4     that in another case, so why don't you give it
 5     to us here?  Don't you think that would be a
 6     good result?  Come on, Mr. McDonald, of course
 7     there is some way that perhaps this could come
 8     in, this information could come in, other than
 9     through Mr. Mangum that I don't understand.
10     Mr. McDonald?  That I don't know.
11          MR. McDONALD:  Sorry.  I think that is a
12     question for Mr. Robertson.
13          THE COURT:  Well, you were the one who
14     anticipated it.  So I was thinking maybe there
15     was something that is in the history of the
16     case that had intimated it and beyond my kin.
17          MR. McDONALD:  My recollection is their
18     opposition to motion number one was based on a
19     use by Mr. Mangum in the damages reports.  But
20     I am not going to say a hundred percent sure.
21     I think that was certainly the focus.  I am
22     confident of that.
23          THE COURT:  All right.
24          Mr. Robertson, is there any basis for
25     those settlement agreements to come in other
```

```
 1      than through the Mangum analysis?
 2              MR. ROBERTSON:  Yes, Your Honor, there is.
 3      Let me be specific.  I don't think settlement
 4      agreements per se need to come in.  But there
 5      are two contentions made by Lawson in this
 6      case.  One is that the patents are, the claims
 7      at issue are obvious; and the secondary factors
 8      for non obviousness include commercial success
 9      and licensing.
10              And we should be able to introduce under
11      those factors -- and we always have in these
12      cases been able to introduce the fact that we
13      have licensed others, and that we had
14      commercial success, particularly if someone is
15      going to come out and parade the $12,000 number
16      that says that the context is known about, that
17      that is the value of patents, when the patent
18      actually now achieved close to $60 million in
19      royalties.
20              Secondly, Your Honor, Lawson has a latches
21      defense that says we didn't sue soon enough and
22      therefore we should recover nothing.  One of
23      the recognized ways to rebut a latches defense
24      is to show that you are out enforcing your
25      patents against others.  You don't have to sue
```

```
 1      everybody all the time right away.
 2              You know, we are a company of limited
 3      resources.  So part of the evidence could be
 4      that if Lawson is going to persist in this
 5      latches defense, if that is it, that we were
 6      out enforcing our patents against --
 7              THE COURT:  Mr. McDonald, wait a minute.
 8      Are you asserting that they are in latches or
 9      that that there is a latches defense?
10              MR. McDONALD:  There is a latches defense.
11              THE COURT:  You understand the difference?
12              MR. McDONALD:  I am not sure if I
13      appreciate the question.  Sorry.
14              THE COURT:  In latches is an equitable
15      concept.  And you are in latches because of
16      certain conduct you have engaged in.  Latches
17      in a patent context is just -- is more along
18      the line of what Mr. Robertson is talking
19      about.  You didn't sue soon enough.
20              Are you talking about latches in the
21      patent sense or in the equitable sense?
22              MR. McDONALD:  In the patent case sense,
23      Your Honor.
24              THE COURT:  All right.
25              MR. McDONALD:  There is a case that deals
```