```
 1            IN THE UNITED STATES DISTRICT COURT

 2           FOR THE EASTERN DISTRICT OF VIRGINIA

 3                    RICHMOND DIVISION

 4
    ---------------------------------------
 5                                         :
    ePLUS, INC.                            :   Civil Action No.
 6                                         :   3:09CV620
    vs.                                    :
 7                                         :
    LAWSON SOFTWARE, INC.                  :   September 7, 2010
 8                                         :
    ---------------------------------------
 9


10
         COMPLETE TRANSCRIPT OF THE MOTIONS HEARING
11
         BEFORE THE HONORABLE ROBERT E. PAYNE
12
               UNITED STATES DISTRICT JUDGE
13


14  APPEARANCES:

15  Scott L. Robertson, Esquire
    Michael G. Strapp, Esquire
16  Jennifer A. Albert, Esquire
    Goodwin Procter, LLP
17  901 New York Avenue NW
    Suite 900
18  Washington, D.C.  20001

19  Craig T. Merritt, Esquire
    Henry I. Willett, III, Esquire
20  Christian & Barton, LLP
    909 East Main Street
21  Suite 1200
    Richmond, Virginia  23219-3095
22  Counsel for the plaintiff

23

24               Peppy Peterson, RPR
                 Official Court Reporter
25            United States District Court
```

```
 1   APPEARANCES:  (cont'g)

 2   Dabney J. Carr, IV, Esquire
     Troutman Sanders, LLP
 3   1001 Haxall Point
     Richmond, Virginia  23219
 4
     Daniel W. McDonald, Esquire
 5   Kirstin L. Stoll-DeBell, Esquire
     Merchant & Gould, PC
 6   80 South Eighth Street
     Suite 3200
 7   Minneapolis, Minnesota  55402
     Counsel for the defendant
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2

 3           THE CLERK:  Civil action number 3:09CV00620, ePlus

 4   Incorporated versus Lawson Software Incorporated.  Will counsel

 5   please state their names for the record and identify the

 6   parties they represent.

 7           MR. MERRITT:  Craig Merritt for ePlus, Your Honor.

 8           MR. ROBERTSON:  Scott Robertson from Goodwin Procter

 9   for plaintiff, ePlus.

10           MR. CARR:  Dabney Carr for Lawson Software.

11           MR. McDONALD:  Dan McDonald for Lawson Software.

12           MR. STRAPP:  Michael Strapp, Goodwin Procter, for

13   ePlus.

14           MS. ALBERT:  Jennifer Albert, Goodwin Procter, for

15   ePlus.

16           MR. WILLETT:  Henry Willett, Christian Barton, for

17   ePlus.

18           THE COURT:  We'll see if we can do something to get

19   it a little colder in here for you.

20           MS. STOLL-DeBELL:  Sorry.  Kirstin Stoll-DeBell with

21   Merchant & Gould for defendant Lawson Software.

22           THE COURT:  Would you ask if they can do something

23   for moderation.

24           THE CLERK:  Yes, sir.

25           THE COURT:  I can't understand why we can't find a
```

1    happy medium in here.

2            THE CLERK:  You don't think if we let arguments go on

3    for awhile it will get a little warmer?

4            THE COURT:  I thought the presence of all these

5    bodies would do it, but I'm not hopeful.  All right.  We have

6    the Green issue, the all-damages-at-trial issue, and the expert

7    reports of Staats and Knuth issue.  Are there any other issues

8    we need to solve today?

9            MR. McDONALD:  No, Your Honor.

10            THE COURT:  All right.  Let's take Mr. Green's report

11    issue.

12            MR. STRAPP:  Good morning, Your Honor.  I'd like to

13    make three points regarding our motion to strike Green to focus

14    Your Honor's attention on what we consider to be the most

15    important themes in these motions.

16            First, we believe that the benchmark for Mr. Green's

17    reasonable royalty analysis is the Lawson/IBM agreement which

18    the Court has already excluded from evidence.

19            Second, we believe that Mr. Green's analysis of what

20    he considered to be the most significant *Georgia-Pacific*

21    factors have also been excluded under the Court's rulings.

22            And third, we believe that under the standard set

23    forth in the Court's ruling excluding Dr. Mangum, ePlus's

24    expert, that Mr. Green's opinions must also be excluded.

25            First, with respect to the Lawson/IBM agreement, Mr.

1    Green's analysis is focused on the amounts that would be

2    reasonable for ePlus and for Lawson to accept in a hypothetical

3    negotiation.  That is the foundation and centerpiece of his

4    opinion.  But the benchmark for Mr. Green's opinion about what

5    this hypothetical negotiation would result in are the royalty

6    rates in the excluded Lawson/IBM agreement.

7         Specifically, Mr. Green concludes that Lawson would

8    have only accepted a range of about 600,000 to $900,000 as the

9    conclusion for his hypothetical negotiation by using, and he

10   says, quote, the rates that Lawson actually pays to IBM for the

11   use of its technology including software and the Websphere

12   agreement of one percent and 3.25 percent.  That's on page 22

13   of Mr. Green's report.

14        The Court, in ruling on ePlus's motion *in limine*

15   number seven, has decided already that this Lawson/IBM

16   agreement that Mr. Green relies upon is, quote, irrelevant and

17   that any marginal relevance about the agreement is

18   substantially outweighed by the risk of jury confusion and

19   unfair prejudice, and, thus, is excluded by Federal Rule of

20   Evidence 403.

21        The second point that I'd like to make is that

22   Green's analysis of what he considers to be the most

23   significant *Georgia-Pacific* factors has also been excluded.

24   Mr. Green opines about two *Georgia-Pacific* factors in

25   particular that he stresses are, quote, the most significant.

1          First, *Georgia-Pacific* factor two, that's a factor

2     that takes into account the rates that Lawson has paid for the

3     use of other patents comparable to the patents-in-suit, and

4     analyzing this figure, Mr. Green reviews ten different Lawson

5     software and technology acquisition agreements, and he

6     concludes, based upon his review of these agreements, that

7     Lawson and ePlus would have agreed to a lump sum royalty

8     structure.  The Court has ruled that each one of those ten

9     agreements Mr. Green relies upon is excluded from evidence.

10         The second factor which Mr. Green considers, quote,

11    the most significant, is *Georgia-Pacific* factor number nine.

12    That's a factor that compares the utility and advantages of the

13    patented technology versus older modes and older ways of

14    accomplishing what's described in the patent.

15         Now, Mr. Green's analysis of this factor is based on

16    his review of a reexamination filing.  The Court has already

17    ruled that the reexaminations shall not come into evidence at

18    trial, and Mr. Green concludes, based on reviewing these

19    reexamination filings, that the older ways of doing the

20    procurement type of technology described in the patent were the

21    same as what's described in the patent.  In other words, the

22    patented technology is, quote, in his opinion, not a

23    significant improvement over older modes and devices.

24         And this is a basis for his opinion that the amount

25    that the parties would have agreed to in their hypothetical

1  negotiation is lower than it otherwise would have been.

2  THE COURT:  Isn't there an expert, some other expert

3  that testifies to that that he's using as a basis for his

4  opinion?

5  MR. STRAPP:  No.  He has said in his deposition

6  testimony that the sole and exclusive basis for his opinion was

7  his review of a reexamination filing drafted by Lawson's

8  attorneys.  The Court has ruled that his opinions about

9  *Georgia-Pacific* factor nine are, therefore, not admissible in

10  evidence.

11  The third point I'd like to make is that under the

12  Court's ruling excluding Dr. Mangum --

13  THE COURT:  Why can't he just use the other 13

14  factors?

15  MR. STRAPP:  Well, Your Honor, his opinion is -- has

16  two parts to it.  First, he has an analysis of a hypothetical

17  negotiation, and then he has a review of *Georgia-Pacific*

18  factors.  His hypothetical negotiation is now fatally flawed

19  because it's based on royalty rates from an agreement that's

20  been excluded.

21  His analysis of the *Georgia-Pacific* factors, it's

22  true, produced several factors.  He decides that certain of

23  those are the most important and are critical to his analysis

24  that the reasonable royalty would be a lump sum structure and

25  that the amount that the parties would have agreed to would

1    have only been $800,000, and the two factors, two of the

2    factors that he considers the most significant are factors two

3    and factors nine.  Those are now inadmissible.

4            We believe that this undermines his opinion such that

5    he would no longer be able to provide reliable expert testimony

6    under Rule 702.  He no longer has sufficient facts or data upon

7    which to base his opinions.

8            The third point I'd like to make is that the Court

9    has already excluded Dr. Mangum based, in part, on what the

10   Court considered to be his shaky benchmark, the litigation

11   agreement, the SAP and Ariba agreements.  Well, compare Dr.

12   Mangum, and contrast that with Mr. Green.  Dr. Mangum, the

13   Court has said, has a shaky benchmark.  Mr. Green has no

14   benchmark whatsoever.  The Lawson/IBM agreement is no longer in

15   evidence.

16           The second point, the Court said that Dr. Mangum's

17   analysis of the *Georgia-Pacific* factors was speculative, and

18   that was another reason that the Court excluded Dr. Mangum.

19           Well, again, compare and contrast Dr. Mangum with Mr.

20   Green.  Dr. Mangum's analysis of the *Georgia-Pacific* factors is

21   speculative.  Mr. Green can't even testify about what he

22   considers to be the most significant *Georgia-Pacific* factors.

23           In sum, we believe that if Dr. Mangum has been

24   excluded, Mr. Green must also be excluded.

25           I'd like to say --

1          THE COURT:  For different reasons.

2          MR. STRAPP:  I'm sorry, Your Honor.

3          THE COURT:  But different reasons.

4          MR. STRAPP:  Correct.  The last point I'd like to

5    make is that if -- if Mr. Green is permitted to testify at

6    trial, we believe that Dr. Mangum should be allowed to offer

7    rebuttal testimony.  Lawson agreed during the August 10th

8    hearing with Your Honor that the parties had an agreement that

9    experts could provide rebuttal opinions in deposition

10   testimony, and Dr. Mangum has provided rebuttal opinions to Mr.

11   Green's opinions in his deposition testimony.  So to the extent

12   that --

13         THE COURT:  Your papers say they've agreed to this.

14   Their papers don't say that.  Why do your papers say they've

15   agreed to that when their papers say they don't?  Can you help

16   me?

17         MR. STRAPP:  Yes, Your Honor.

18         THE COURT:  Or did I just misread their papers?

19         MR. STRAPP:  What we were referring to in our papers,

20   was --

21         THE COURT:  Were you referring to what was said on

22   that conference call?

23         MR. STRAPP:  Exactly, Your Honor.

24         THE COURT:  Then it would have been a good idea to

25   footnote that and say, based on that, no matter what they say

1     in their written papers now, that's what they said then.  I

2     don't have to go back and root and read through something that

3     makes me think that I just missed entirely a point that they

4     were making or concession they were making.

5                MR. STRAPP:  Right.  Your Honor --

6                THE COURT:  You won't do that anymore, will you?

7                MR. STRAPP:  Correct.

8                THE COURT:  That's the fundamental problem with most

9     of the papers in this case.  Both sides.

10               MR. STRAPP:  What we were referring to, as Your Honor

11    suggests, is to the statement made during the August 10th

12    hearing, and at page seven of that hearing, Your Honor asked

13    Mr. McDonald, quote, Mr. McDonald, did you agree or not agree

14    that the deposition would serve as a rebuttal report, that is,

15    Mangum would have the opening, response would be by Green, and

16    the deposition of Mangum would be a rebuttal report?  Did you

17    or did you not have that agreement?

18               Mr. McDonald:  We agreed, yes, Your Honor, that the

19    deposition would be -- I would call really the surrebuttal, to

20    be clear, because I would view Green, our damages expert, as

21    the rebuttal witness.  And then Mr. Mangum would have the

22    chance to surrebut his report.  That's what the agreement was.

23               That's what we were referring to in our papers.

24               THE COURT:  All right.  Thank you.

25               MR. McDONALD:  Morning, Your Honor.  I have some

1    slides here.  May I hand up a hard copy of the slides?

2              THE COURT:  All right.

3              MR. McDONALD:  If you go to slide 20, Your Honor, the

4    first tab, I think 20 is where this section regarding Mr. Green

5    begins.  I'll address all three of the points raised by ePlus's

6    counsel to show why Mr. Green's testimony should be allowed

7    here.

8              If you go to the next slide, number 21, I believe,

9    ePlus's briefing does not challenge Mr. Green's methodology as

10   we pointed out and ePlus, apparently, does not dispute.  He did

11   take fundamentally different approaches to the issues from

12   Mr. Mangum that avoided the pitfalls of Mr. Mangum's report.

13   One is he did come up with analytically sound benchmarks for

14   determining the range of royalties --

15             THE COURT:  The IBM agreement is out, though.  So

16   that's the lynchpin of his analysis.  How can he have a basis

17   for his hypothetical opinion?

18             MR. McDONALD:  Because there is another range of

19   benchmarks that he came up with based on ePlus's expected rate

20   of return from their own documents that was --

21             THE COURT:  Where is it?

22             MR. McDONALD:  If you go to Exhibit F.

23             THE COURT:  Do you say anything about it in the text?

24             MR. McDONALD:  Yes.

25             THE COURT:  Where is it in the text?

 1             MR. McDONALD:  At page 21.  There's a section there,

 2   section one, ePlus.

 3             THE COURT:  That is the starting point for ePlus, not

 4   for Lawson.

 5             MR. McDONALD:  That's right.

 6             THE COURT:  Their argument is that the way he framed

 7   it was -- his analysis was that each one of them had a starting

 8   point.  ePlus had one, Lawson had one.  Lawson's starting point

 9   was the IBM agreement.  It's out.  There's nothing left.  So

10   you've got nothing in juxtaposition to the ePlus, and so his

11   fundamental premise for the negotiation, having been gutted, is

12   gone, and that the rest that's left is unreliable.  Why isn't

13   that right?

14             MR. McDONALD:  Well, there is --

15             THE COURT:  You can't use ePlus's starting point.

16   You can't convert what he said into using ePlus's starting

17   point into Lawson's starting point.

18             MR. McDONALD:  Separately from --

19             THE COURT:  If you're going to do that, just quit,

20   because I haven't any time for that.

21             MR. McDONALD:  I can show you in his report where he

22   says --

23             THE COURT:  Show me.

24             MR. McDONALD:  At pages 40 to 41.

25             THE COURT:  Okay, now, where on 40?

1          MR. McDONALD:  Where he talks about the range --

2          THE COURT:  Let me see the text.  I'm through

3    listening to you all's arguments.  I want to see it, because

4    I'm telling you what we have here is a situation in which every

5    time I go to check something, there's nothing there, and I'm

6    tired of it.  We're through with it.  You can make your point

7    and show me exactly where it appears.

8          MR. McDONALD:  At the bottom of page 40, the very

9    last sentence begins, "a lump sum royalty of almost $800,000 is

10   reasonable in comparison to other financial metrics."

11         Then at the top of page 41, there are three bullet

12   points.

13         THE COURT:  Wait a minute.  Okay.

14         MR. McDONALD:  Where he compares that metric to

15   Lawson's actual license and maintenance revenues as a

16   percentage is the first bullet point.  He says it's about

17   .6 percent based on Lawson's actual license and maintenance

18   revenues since 2004.

19         The second bullet point, he says, that amounts to two

20   percent of Lawson's operating profits from licenses maintenance

21   revenues relating to procurement products.

22         Then the third point, it's 800,000 is the midpoint

23   that ePlus would have sought from Lawson.  Then he's got the

24   second half of that sentence, and that's the part that you have

25   said was inappropriate.  It's consistent with the midpoint of

1  the present value of Lawson's range.  So that's the part that's

2  out.

3          But the prior two bullet points and the first half of

4  that last one -- I'll focus on the first two, because the first

5  two bullet points have to do with from the perspective of

6  Lawson, would that $800,000 figure be reasonable even if the

7  IBM license or any of the other license agreements are not

8  considered regardless of whether the Lawson range that Mr.

9  Green developed is considered --

10          THE COURT:  He didn't say that.  He doesn't say that.

11  That's what you're saying.  He doesn't say that.  He links them

12  inextricably together, and one is the foundation and the mortar

13  for his opinion, and it's like a three-cornered stool and one

14  of them is gone.  When you sit on it, the whole thing

15  collapses.

16          MR. McDONALD:  Well --

17          THE COURT:  You can't make a silk purse out of a

18  sow's ear.

19          MR. McDONALD:  Well, if the situation -- and as I

20  understand the evidence is there is no range for Lawson.  ePlus

21  has not pointed to any other range that Mr. Green or any other

22  expert could use.

23          I don't think the law stands for the proposition that

24  if there is no range that can be developed under the evidence

25  from the licensee's perspective, you don't have -- you can't

1   analyze royalties, period.

2        THE COURT:  I absolutely think that's correct, but

3   that isn't what your man did.  That's what you're trying to

4   work out now.  You are constrained by what your man said.  Your

5   man said something.  He took the risk that what he was saying

6   was wrong.  He tried to convert, use a lump sum, tried to use

7   something, and he knew that he had a risk in doing it, or you

8   should have known that he had a risk in doing it.

9        He chose to run the risk.  He built his house of

10  cards.  One of the pieces fell, and he doesn't have anything

11  left.  That's what they say.  Why isn't that right?  Don't tell

12  me what you could have done under the law, because I agree

13  there's lots of ways to do things.  It's what he did that's the

14  issue.

15        MR. McDONALD:  I think literally what he said at

16  pages 40 to 41, the $800,000 figure was reasonable in

17  comparison to three financial metrics.  One of them, you've

18  said, or half of one of them is out.  I don't think he was

19  saying, I have to rely on all three of those to find that

20  figure reasonable from Lawson's perspective.

21        I think the first two bullet points are not dependent

22  on the license-related range that he came up with as literally

23  stated in his report.  So that's how I would address or respond

24  to that issue.

25        THE COURT:  All right.

1          MR. McDONALD:  I do think it satisfies the

2     requirements that Mr. Green -- even if you throw the IBM

3     license out, he did consider this from both sides, from the

4     licensor and the licensee's side.  I think that page 41

5     analysis shows that.

6          You got the charts -- or pages 30, 37, and 38, as

7     well as charts, Exhibit E and J, also present the evidence from

8     Lawson's perspective that would support the reasonableness of

9     this lump sum royalty he came up with.

10          There's no dispute, I think, that the evidence would

11     support that it's reasonable from the ePlus perspective, and I

12     do think it's still helpful to the jury to present that

13     evidence.

14          THE COURT:  All right.

15          MR. McDONALD:  Are there other questions that you

16     have --

17          THE COURT:  Anything else?

18          MR. McDONALD:  Just that it's not a methodological

19     flaw, Your Honor, that is in here.  It's a fact issue with

20     respect to the non-infringing alternatives.  His testimony was

21     he had looked at the prior art as described in the re-exams,

22     but evidence will come in through the fact witnesses --

23          THE COURT:  No, no, no.  That's what he said.  That's

24     what he staked out.  He didn't relate his opinion to anybody

25     else's comments.  He related it to the re-exam according to

1    them.  Show me where he did not relate it to the re-exam.  They

2    showed me where he did.  They may be mistaken.

3           MR. McDONALD:  At page 32 of his report is where he

4    talks about these alternatives, the older modes or devices.

5    That's *Georgia-Pacific* factor number nine.  In that section, he

6    makes it clear that he's --

7           THE COURT:  Where are we talking about so I can see?

8           MR. McDONALD:  Page 32 on *Georgia-Pacific* factor

9    number nine.

10          THE COURT:  What text are we talking about?

11          MR. McDONALD:  In the second paragraph there, you see

12   he says, "I understand that the purported benefit of this

13   patented technology is the integration of catalogs, requisition

14   and purchasing functions.  Each of these functions had occurred

15   independently or in pairs in prior systems."

16          Then he goes -- continues to specify the aspects of

17   those prior systems.  The next paragraph, "I understand that

18   there are numerous low-cost alternatives to the use of the

19   patented technology."  He's not relying here on the re-exams.

20          THE COURT:  I thought that he said at the deposition

21   he -- when asked about this comment, he said that he was

22   relying on the re-exams for papers to reach -- to base those

23   conclusions.  Isn't that what the argument was, or did I

24   misunderstand?

25          MR. McDONALD:  He testified that he actually had

1    looked at the prior art descriptions and the reexamination

2    papers.  That's where he developed an understanding of that.

3    But that was -- his report is not going to be based on him

4    testifying about what the re-exams say.

5         He is saying, I understand this.  This is what the

6    expert can do, and, in fact, the prior ruling was that his

7    admissibility on this point would be subject to laying a

8    foundation for the prior art evidence to come in whether it's

9    through fact witnesses or expert witnesses, and the Court

10   already ruled on that.

11        THE COURT:  Well, that's until I misunderstood what

12   you all were trying to accomplish here in this and how you were

13   approaching the issue.

14        MR. McDONALD:  I think that was a reasonable way to

15   decide that because he's a damages expert.  He's not an expert

16   on prior art and technology.  It's appropriate for him to say,

17   this is my understanding of the evidence that will come in, I'm

18   not going to testify on that myself, but if that's the

19   evidence, that would support my opinion.

20        THE COURT:  He can't give that opinion.  All right,

21   anything else?

22        MR. McDONALD:  No.  Thank you.

23        THE COURT:  He says that the factor number nine

24   analysis is not based on the re-exams.  As I understand your

25   papers and your argument, you said that at Mr. Green's

```
 1   deposition, he acknowledged that the Georgia-Pacific factor

 2   nine analysis appearing on page -- beginning on page 32, and I

 3   guess it's ending on what?

 4           MR. STRAPP:  Page 36.

 5           THE COURT:  36 here was based on the reexamination

 6   papers only.

 7           MR. STRAPP:  Your Honor, I might have been mistaken,

 8   but I thought I heard Mr. McDonald say that the basis of Mr.

 9   Green's analysis was his review of what had been filed at the

10   reexaminations.

11           I think what Mr. McDonald is suggesting is that Mr.

12   Green should be permitted to get up at trial, and if the

13   evidence has already come in through other means at trial, then

14   say, oh, that evidence supported the opinion which I had

15   gleaned from the reexamination filings upon first review, and

16   we believe that would be inappropriate.

17           Under Rule 26, an expert is required to disclose all

18   the bases for his expert opinion, and to the extent that Mr.

19   Green's only basis, when he filed, when he served this expert

20   report upon ePlus, was a reexamination filing, and the Court

21   has ruled, in granting ePlus's motion in limine number seven,

22   that his opinions about this subject are inadmissible, that we

23   don't think Mr. Green should be permitted to testify about this

24   at trial.  This is one of several problems that we've

25   identified with his expert report.
```

1          THE COURT:  All right.  Thank you.  The motion to

2    exclude Mr. Green's report will be granted.  I have been

3    through all of the papers again and his report and the earlier

4    information, and the points that ePlus makes are well-taken.

5          I will recount for purposes of analysis the bases of

6    the law as it was developed in consequence of the *Daubert* and

7    *Kumho* decisions, and as it appeared subsequent to the 1993

8    revisions to the Federal Rules of Civil Procedure, and we will

9    begin with the Federal Rules of Civil Procedure.

10          For some reason there seems to be a notion that these

11   rules don't mean what they say, but they do.  Rule 26(a)(2),

12   disclosure of expert testimony, says, "unless otherwise

13   stipulated or ordered by the Court, the disclosure," disclosure

14   of experts, and it refers back to rule A, capital A of sub (2)

15   which says, "In addition to the disclosures required by

16   Rule 26(a)(1), a party must disclose to the other parties the

17   identity of any witness it may use at trial to present evidence

18   under Federal Rule of Evidence 702, 703, or 705."

19          So that "disclose must be accompanied by a written

20   report, prepared and signed by the witness, if the witness is

21   one retained or specially employed to provide expert testimony

22   in the case...the report must contain," and then it sets forth

23   a number of things that the report must contain.  The facts or

24   data considered by the expert in forming the opinions, the

25   complete statement of all the opinions he will express and the

1    basis and reasons for those opinions, and then it goes into the

2    exhibits that will be used to summarize or support them, the

3    qualifications of the witness, other cases testified to,

4    statement of compensation.

5            Those requirements, particularly Roman (i), (ii), and

6    (iii), are there for a very good reason, and the reason was

7    this:  If you will look at the reports of the committee and all

8    the background literature that prompted this change, we had a

9    situation obtaining before 1993 in which experts would give

10   some kind of report.  The other side would give a report.

11   There would be depositions taken, and the depositions often

12   reflected something entirely different than what was in the

13   report, but not always.

14           And it even gravitated to the point that the

15   witnesses would, at trial, either in direct or rebuttal, come

16   up with theories and concepts that were roughly related to what

17   they had said in the beginning, but the reasoning was all

18   wrong, all different, all skewed.

19           In those days, the way one discovered expert

20   testimony was to ask interrogatories, interrogatories that are

21   permitted by the rule today, they are still permitted, but the

22   committee said, stop that nonsense.  The expert must put what

23   he is going to say in his or her report, and they must state

24   the complete opinion and the basis and the reasons therefor,

25   the facts they considered in forming the opinion, not just the

1   ones relied on.

2          Now, I will tell you I'm fully aware that there is

3   afoot a proposal in the federal rules committee to change the

4   word "considered" to "relied on," but that isn't what this

5   says.  And my guess is the rule will be changed, but that's not

6   the rule we have here now.

7          And the reason for all that was to stop what I call

8   the evolving and revolving opinions of experts.  That process

9   made an utter mockery of the evidentiary rules and trials and

10  the system.  So this concept was designed, this rule was

11  designed to bring reason back into the system, and if you don't

12  live by that rule, you die.  That's what's important to

13  remember.

14         In 1993, *Daubert* was decided.  *Daubert* was decided in

15  context of an attack upon a decision -- or focused on the issue

16  whether the old *Frye* rules that had been in effect since

17  1920-something, were of general acceptance in the scientific

18  community, was the guidepost for the admission of expert

19  opinions.

20         Once again, there's historical background to this.

21  This is the first case in the Supreme Court to blast junk

22  science and to say, judges of the federal courts, stop it.

23  Judges had gotten into the habit of allowing experts to testify

24  to anything without exercising much control at all over whether

25  there was any rhyme, reason, method to the expert's opinion.

1    They just didn't go to the trouble of doing it.  And if you had

2    an eminence about you or your résumé or you testified you were

3    an expert or you had testified in a number of cases, then the

4    courts tended, in most places, to let the opinions in, and the

5    Supreme Court in *Daubert* announced that this is stopping, and

6    here's what you're going to do.  You've got a rule, you have a

7    gatekeeping function, district courts, and it is your job to

8    keep out expert junk, and junk can be true junk, concocted

9    junk, or junk can be unsound methodology that offends the basic

10   rules that let us let evidence in.

11          Rule 702, which is predicated upon concepts of

12   relevance an reliability that are described in the *Daubert*

13   opinion, says that we are not to allow speculation and

14   unsupported speculation, and then it goes on to describe how

15   one assesses method.  The lynchpin of relevance, of course, is

16   the requirement in Rule 702 that the evidence or testimony will

17   assist the trier of fact to understand the evidence or to

18   determine the fact in issue.

19          There is another component of relevance that is

20   critically important when doing the case-by-case analysis

21   required by the *Daubert* gatekeeping function, and that is the

22   concept of fit.  Fit is a function or an aspect of relevance,

23   and that is whether the expert testimony proffered in the case

24   is sufficiently tied to the facts of the case that it will aid,

25   i.e. -- remember, aiding the jury is a relevance component.  It

will aid the jury in resolving a factual dispute.  One of the
two predicates of relevance is understanding the evidence.  The
other is deciding a fact in issue.

So if the evidence doesn't fit, it's not relevant
either.  Then the reliability component focuses upon the
methodology, and *Daubert* says the gatekeeping function is to be
conducted in perspective of both of the concepts embodied in
Rule 702, relevance and reliability.  Subsequently, Rule 702
was amended to incorporate these basic concepts in its text.

The rule also says, that is *Daubert* also says that
other rules of evidence have to be considered when deciding
expert issues, and, notably, among them is Rule 403.  It has a
particular significance in the case of expert reports because
experts can -- reports can create confusion and delay and
create unfair prejudice if not tethered to the relevance
requirements and the reality requirements.

*Kumho Tire Company v. Carmichael* in 1999 said that
the concepts of *Daubert*, including the gatekeeping function,
are relevant to all kinds of expert testimony, whether
scientific, technical, information by training, or information
by experience as well, and it held as well that some of the
formulations used to test scientific evidence had equal
applicability or analogous applicability on a case-by-case
basis in testing other kinds of expert opinions.

But both cases taken together direct that judges not

1   allow speculation and that method is extremely important, and

2   the cases in our circuit have continued to go that way.  The

3   cases in the federal circuit have gone that way.

4          Against that background, we consider the motion to

5   exclude the Green report.  The Green report has, as a

6   fundamental premise, the Lawson/IBM agreement which has been

7   excluded by virtue of the ruling on motion *in limine* number

8   seven.  That document and agreement formed the lynchpin of the

9   hypothetical negotiation analysis structured by Mr. Green in

10  his report.  He chose to do his report two ways.  One was where

11  Lawson would start from, one was where ePlus would start from

12  in the hypothetical negotiation.

13         He chose to use the IBM/Lawson agreement as the

14  lynchpin of the starting point or the starting point for

15  Lawson, and he then went on and, as counsel points out, he

16  talks about lump sum royalty, that he picked that range of 600

17  to 800 million out of the IBM agreement construct, and says so,

18  and then he says on page 40 and 41 that a lump sum royalty of,

19  at most, 800,000 is reasonable in comparison to other financial

20  metrics, and he puts three in there, and they are correlative,

21  constituent elements of his analysis if you read the whole

22  section upon which he predicates his hypothetical negotiation,

23  and when the IBM agreement was excluded, the predicate for his

24  opinion was eliminated.

25         As such, the opinion and his opinion and his report

1   no longer have any fit as used in *Daubert* and are of

2   marginal -- what remains is of marginal relevance, although of

3   some relevance, but it is, in fact, analogous to a three-legged

4   stool, one leg of which has been destroyed.  You can't sit on

5   one of those stools, and that's exactly what his hypothetical

6   negotiation amounts to.

7           In addition to that, two of the most significant,

8   what he regarded as the most significant factors in the

9   *Georgia-Pacific* analysis, factor two and factor nine, were

10  eliminated by virtue of other motions *in limine*.  The rates for

11  ten -- he used the rates for ten or so comparable patents in

12  *Georgia-Pacific* two to arrive at his conclusion of a lump sum

13  royalty, and all of those are gone.

14          In *Georgia-Pacific* nine, he bases his analysis upon

15  the reexamination proceedings which have been excluded as well,

16  and he testified at his deposition that all the information

17  came from the *ex parte* reexamination request for the '516

18  patent.  And he was asked, "So as of the date you filed your

19  report, the basis, sole basis for your opinion concerning

20  non-infringing alternatives was your review of the

21  reexamination files.

22          Answer:  Fundamentally yeah.  I had gone through and

23  tried to understand some other information regarding some of

24  these companies and what they were doing, but, yeah,

25  fundamentally it was the reexamination files that I was aware

1    of."

2            Those are out, and so two of the most significant

3    components of his opinion on the *Georgia-Pacific* factors are

4    out.

5            Even if -- so what's left is this:  He's got his most

6    important factors in his analysis out.  The rest then becomes

7    speculative and contains no fit.  And the relevance is

8    marginal, and the reliability of an analysis that says, I can

9    render the same opinion if you take the premise of one part of

10   it and the guts of another part of it out, simply has no place

11   in a *Daubert* analysis, and that's precisely what Mr. Green has

12   done.

13           Taken as a whole, the remaining method for his

14   bootstrap opinion that counsel would have him offer absent the

15   stricken parts of it is of no moment, and in addition to that,

16   that isn't the opinion he really offered in the first place in

17   compliance or in an effort to comply with Rule 26(a)(2).

18           So, that motion will be granted for those reasons.  I

19   may issue an opinion.  It depends upon how much time I have

20   left after dealing with all of the papers that you all have.

21           Lawson's motion to preclude ePlus from presenting any

22   new damages theories or seeking damages at trial, I think I'd

23   just like to hear from ePlus first on this because I don't see

24   in the papers where your disclosures or your discovery

25   responses allow you to go anywhere other than with the Mangum

1    report which is out.

2          I think as a general proposition, it is clearly the

3    case that a case can be presented under the law on the issue of

4    damages and reasonable royalty without an expert opinion.  I

5    don't think there's any law that I know of that requires an

6    expert, but that isn't the issue as I see it here.

7          The issue is whether, with Mangum gone, ePlus made,

8    can be shown to have made any compliance with Rule 26(a)'s

9    damage calculation compliance or the response to the

10   interrogatories that Lawson asked on the issue.  Therefore, the

11   question is whether as to this case on this record there exists

12   some predicate that would allow the introduction of any

13   evidence that was presaged by what it must be presaged by and

14   that is disclosure as to your damages, not just your theory but

15   your method of computation and your actual computation and

16   answers to interrogatories about those damages.

17         So I'll hear from ePlus on that at this time.  And

18   I'd like to see exactly what parts of the record contain that

19   information so I can understand it.

20         MR. MERRITT:  Good morning, Your Honor.

21         THE COURT:  Morning.

22         MR. MERRITT:  Craig Merritt for ePlus.  I do have a

23   low-tech handout, if I might hand it up.

24         THE COURT:  I'm a low-tech reader.

25         MR. MERRITT:  I'm a low-tech reader myself.  The

1  other thing, Your Honor, as I address this that might be

2  helpful for you to have in front of you, if you don't already

3  have it, is Lawson's opening brief.

4         THE COURT:  I have it.

5         MR. MERRITT:  Judge, what I would like to do in

6  answering your very pointed and very clear question is to frame

7  this for a moment by talking about the legal standards and the

8  rules -- I think the rules do matter -- and then talk

9  specifically about the three nondisclosures that Lawson lays at

10  the feet of ePlus and talk about each of those three separately

11  and distinctly.

12         First, on the question of standards, I understand

13  this morning that we're proceeding under Rule 37(c), and Lawson

14  cites 37(c)(1) at page four of its brief.  I would be remiss

15  before talking about the discovery rules if I didn't state that

16  this is an issue-dispositive motion.  This motion takes damages

17  out of this case.

18         Now, typically Lawson would be moving under Rule 56

19  or at trial under Rule 50, and not deciding this, not taking

20  damages out under one of those rules, really has two

21  consequences for ePlus that we believe should be approached

22  with some caution.

23         First of all, in this court, if Lawson takes out

24  damages under Rule 37 as opposed to Rule 56, Lawson has never

25  really had to state why the evidence doesn't support a jury

1    finding of damages.  ePlus doesn't have to respond by

2    marshaling the evidence.  ePlus doesn't get the benefit of

3    inferences drawn in its favor that it would get as a nonmoving

4    party under Rule 56.

5           The other thing that happens in deciding this under

6    Rule 37 rather than Rule 56, the deadline for which passed

7    sometime ago, is that ePlus loses a standard of appellate

8    review that's much more favorable, frankly.  Should the Court

9    believe this doesn't go to the jury, anything the Court does

10   would be decided under an abuse-of-discretion standard under

11   Rule 37 as opposed to the less deferential *de novo* standard

12   under Rule 56.

13          I say that simply as a cautionary note that if this

14   is a form of disguised dispositive damages motion, we need to

15   think about whether this is the way this result should be

16   accomplished on the particular record of this case.

17          Now, at page four of Lawson's opening brief, Lawson

18   sets out Rule 37(c)(1), and that is the source of the remedy

19   they are seeking this morning, and it says that if a party

20   fails to provide information or identify a witness as required

21   by Rule 26(a) or 26(e), the party is not allowed to use the

22   information or witness to supply evidence on a motion at a

23   hearing or at trial unless the failure was substantially

24   justified or is harmless.

25          I'd like to focus on the phrase "as required by

1  Rule 26(a) or Rule 26(e)" for a moment.  Rule 26(a)(1)(iii) is

2  cited at page two of Lawson's brief, at the very top of page

3  two.  I won't read it in its entirety, but I'd like to point

4  out a couple of aspects of it.  It does require as part of the

5  initial disclosure that the party bearing the burden on a claim

6  provide a computation of its damages, but then it goes on to

7  say this:  "Must also make available for inspection and copying

8  as under Rule 34 the documents or other evidentiary material,

9  unless privileged or protected from disclosure, on which each

10  computation is based."

11         That passage presupposes the timely availability of

12  the evidentiary material.  In other words, the duty that that

13  statute imposes is clear.  The question in this case that I

14  want to explore with the Court for a few minutes is when was

15  ePlus first in a position to discharge that duty.  We

16  acknowledge the legal duty.  26(e), which is not cited in

17  Lawson's brief but is actually the failure that we're charged

18  with, the failure to timely supplement, under 26(e)(1), a party

19  who has made a disclosure under 26(a) or a party who has

20  responded to any other discovery question, and I am

21  paraphrasing, not reading literally, must supplement or correct

22  its disclosure response.

23         (e)(1)(A) says the following.  This is subsection

24  capital A.  "In a timely manner if the party learns that in

25  some material respect the disclosure or response is incomplete

1    or incorrect," and then there's a phrase that Lawson never

2    mentions in its brief, "and if the additional or corrective

3    information has not otherwise been made known to the other

4    parties during the discovery process or in writing."

5           The rules do matter, and reading them as a whole does

6    matter.  Now, with those rules read as a whole, I'd like to try

7    to respond to the three things Lawson has charged us with in

8    its motion.

9           Supposedly ePlus has failed to disclose three

10   distinct things:  Number one is its theory of damages.  Number

11   two is information regarding the royalty base, and number three

12   is information regarding the royalty rate, and we know that

13   because it comes right out of the first two sentences of the

14   first page of the brief they filed on this.  Those are the

15   three things with which we are charged; nothing regarding

16   damages contentions or theories, nothing about a royalty rate,

17   nothing about a royalty base.

18          I'd like to look at each of those three things and

19   see what the state of the record is on those at this point in

20   answer to Your Honor's question.

21          First on theory of damages, theory of damages, and I

22   take it from -- I'm inferring from some of the Court's comments

23   before I stood up that this may be of less concern to the

24   Court, but I want to address it anyway.

25          At page two of Lawson's own brief, they have the

1    initial disclosure that was made by ePlus.  It says, in no

2    uncertain terms, that ePlus will seek at least a reasonable

3    royalty.  The response to interrogatory number 17 that's also

4    cited says that ePlus will seek no less than a reasonable

5    royalty.  That was disclosed August 11, 2009, and October 12,

6    2009.  We're pushing on -- well, we're past the one-year

7    anniversary of the time ePlus said it was going to seek no less

8    than a reasonable royalty.

9         It's clear from the record that the *Georgia-Pacific*

10   factors, which have been the law controlling reasonable royalty

11   since 1970, are very well-known to the patent bar, and you have

12   some of the finest patent practitioners in the country in this

13   court.  I do not include myself among them, but I'm happy to be

14   here with them, and it's very interesting.

15        If you look at the exhibit that I've handed up to you

16   in the book, which is -- I'm sorry, Your Honor.  It's not in

17   the book.  This is an exhibit attached to our opposition brief.

18   I apologize.  It is Exhibit M to our opposition brief.

19        Exhibit M is a third amended notice of deposition

20   that Lawson sent to ePlus in December of 2009.  If you work

21   your way back in the notice to page six, after the obligatory

22   endless definitions that we all seem to have to put at the

23   front of these things, you'll get to the list of topics to be

24   covered.

25        As early as December 2009, Lawson was taking 30(b)(6)

1    depositions of ePlus witnesses on a number of topics, many of
2    which included the *Georgia-Pacific* factors.  Number one goes to
3    the competition factor, two number goes to competition.  Number
4    eight goes to licensing practices.  You can go through this,
5    and I won't go through it step by step.  There are also topics
6    that aim at non-*Georgia-Pacific* factors.
7            The point is the idea that the theory of this case
8    and the reasonable royalty as the basis for discovery was not
9    disclosed is simply untenable based on the discovery record and
10   the parties' own conduct in thoroughly discovering all of the
11   *Georgia-Pacific* factors.
12           THE COURT:  Did they take a 30(b)(6) witness of ePlus
13   on the topic of reasonable royalty?
14           MR. MERRITT:  They took --
15           THE COURT:  Or damages.
16           MR. MERRITT:  They took the 30(b)(6) deposition of
17   Ken Farber in December of 2009 who is an ePlus executive, and
18   they went through a number of these *Georgia-Pacific* factors
19   that he was presented on, to testify on.  He was asked, for
20   example, about the prior licensing activities, all of the
21   things that go to the determination of a reasonable royalty.
22           I don't believe he was asked what he believed a
23   reasonable royalty would be, and they probably wouldn't have
24   wanted to hear the answer anyway, and he wasn't an expert, but
25   the underlying facts, the *Georgia-Pacific*-related facts were

1    fully explored with that witness.

2              THE COURT:  Which *Georgia-Pacific* factor is covered

3    by which of the topics?

4              MR. MERRITT:  Well, I'll give you the ones I was able

5    to pull up last night looking at this just quickly.  Topic one

6    and topic two on this notice --

7              THE COURT:  Are on *Georgia-Pacific* what?

8              MR. MERRITT:  Factor number five.

9              THE COURT:  What else?

10             MR. MERRITT:  Number eight would go to factors three

11   and four.

12             THE COURT:  Isn't six some *Georgia-Pacific* --

13             MR. MERRITT:  Yes, it is.  I passed over it by

14   mistake.

15             THE COURT:  Which one is that one?

16             MR. MERRITT:  Factor number four.

17             THE COURT:  Any others?

18             MR. MERRITT:  Number nine would go to factor number

19   five.  Number 23, page nine, would go to factor number eight.

20   I won't represent that there are others, but I will represent

21   it was getting pretty late last night when I looked at this,

22   and I may have missed a few, but those are the ones that

23   immediately came to mind just looking at this.

24             The point of this is that from the standpoint of the

25   disclosure of the theory of damages -- let's set aside the

1  calculation, the rates, the underlying facts --

2          THE COURT:  I don't think there's any dispute over

3  the fact the theory was disclosed.

4          MR. MERRITT:  Well, the only reason I even respond to

5  it --

6          THE COURT:  Is because they made some statement in

7  one of the briefs that you don't even know what your new theory

8  is.

9          MR. MERRITT:  Absolutely.  It's clearly the same --

10          THE COURT:  I understand that.

11          MR. MERRITT:  The other thing is, just so, again, the

12  record is clear on this, with regard to theory, there's a

13  statement in Lawson's reply brief, their memorandum, at page

14  two, that this Court's ruling on Dr. Mangum was a ruling on

15  ePlus's theory of damages.  We don't understand --

16          THE COURT:  So don't argue that.

17          MR. MERRITT:  Your Honor, I will address then the

18  royalty base disclosures next.

19          THE COURT:  Where is the royalty base disclosed in

20  answer to any disclosure or any interrogatory answer or

21  otherwise in discovery?

22          MR. MERRITT:  Let me take that on.  First of all,

23  let's remember what royalty base is.  The royalty base is the

24  revenues that Lawson attains or garners by selling the accused

25  products that are related to its infringing activities.

1          Now, it's very interesting to remember, and memory,

2     for all of us, is short on this --

3          THE COURT:  Memory is what?

4          MR. MERRITT:  Memory is short on some of these

5     things, it is for me, but looking back at this, the question

6     is, assuming there's a duty to disclose, and there is, clearly,

7     under 26(e), when could ePlus first have discharged that duty

8     given the development of discovery and the facts in this case?

9          THE COURT:  The answer to that, Mr. Merritt, is ePlus

10    could have discovered it and had it basically ready by the time

11    they filed the lawsuit.  It had filed lawsuits all over the

12    country, litigated the issue twice.

13         You can get sales revenues from a number of different

14    places, and you can basically put it together, not with the

15    precision that Mangum did, but they could have done it before

16    they filed the lawsuit, couldn't they?

17         MR. MERRITT:  No, sir.

18         THE COURT:  No?

19         MR. MERRITT:  No, sir.

20         THE COURT:  Isn't Lawson a public company?

21         MR. MERRITT:  Lawson is a public company.

22         THE COURT:  Doesn't it file these financial records

23    and audited financials, it has revenues and everything in it?

24         MR. MERRITT:  It absolutely files a 10-K.

25         THE COURT:  But it doesn't have it by product?

1           MR. MERRITT:  It doesn't break down to the level that

2    you could fairly say that this is the accused revenue stream.

3    It would be sheer speculation to do that, and this actually

4    leads to the point I just want to take a moment to revisit.  If

5    we look again at Lawson's opening brief at page two, they begin

6    sort of a timeline of the various disclosures that were made.

7           THE COURT:  Is your theory here that these

8    disclosures were made, they were just made in -- they weren't

9    made in Rule 26(a) disclosures, they weren't made in the

10   interrogatory answer, that is the royalty base, but they were

11   made in Mangum's report so the factual data is there?  Is that

12   the point, it's otherwise made available in the discovery?

13          MR. MERRITT:  That is the bottom line, and the point

14   I wanted to connect that with, so that the Court would not feel

15   that there was any lack of diligence here, you may recall some

16   of the motion practice we had as late as March and April of

17   last year trying to extract revenue data from Lawson.

18          The revenue data that was disclosed on May 3rd --

19   Mangum's report, in that regard, truly is just a summary of

20   numbers.  It requires no opinion to add up numbers.  That was

21   disclosed.  That was disclosed on May 3rd based on information

22   that was being received as late as April 30th.  And, in fact,

23   as you'll see, and you don't have the entire report here, but

24   in the handout that I handed up to you behind tab L, first page

25   or two of Mangum's report at page -- we're behind tab L in what

1   I've handed up.  Page three of that initial report, Dr. Mangum

2   had to drop a footnote to part roman numeral (iii) that says,

3   "I understand Lawson produced additional financial information

4   to ePlus on Friday, April 30th.  I've not yet had an

5   opportunity to review this new information.  Accordingly, I'll

6   supplement and update this report at a later date as

7   appropriate to reflect the new information."

8              THE COURT:  Did he?

9              MR. MERRITT:  He did.  He did it behind tab M.  There

10  is a May 14th supplementation based on additional information

11  received from Lawson, and behind tab N, as late as June 13th, a

12  second supplementation based on the continuing receipt of

13  licensing and maintenance information from Lawson.

14             My only point on this is -- you have already cut to

15  the chase.  Yes, we do believe that factually the disclosure of

16  the revenue was made in the Mangum report which was

17  incorporated by reference into the supplemental interrogatory

18  response.  We understand --

19             THE COURT:  Where did the Lawson revenue base come

20  from that is in the report?

21             MR. MERRITT:  The Lawson revenue base came from --

22             THE COURT:  Those figures.  Sorry, I didn't ask the

23  right question.  Where did the figures come from?

24             MR. MERRITT:  The figures were produced by Lawson as

25  a series of spreadsheets that continued to go through various

1    iterations through the spring of 2010 and finally landed in a

2    reasonably usable form a few days before the expert report had

3    to be submitted.  So assuming --

4            THE COURT:  Did Mangum manipulate any of the data

5    that was provided by Lawson as a revenue base, as revenue from

6    the accused products in order to get to the figures that are

7    shown as the royalty base in Mangum's report, or did he just

8    take those figures and put them in there saying, this is where

9    I got them?

10           MR. MERRITT:  I believe it's the latter.  What he

11   did, to the best of my understanding, is that Lawson provided

12   spreadsheets that had revenues associated with certain

13   stock-keeping units, or SKUs, that, we believe, under our

14   version of the evidence, and there's an evidentiary dispute on

15   this, are associated with infringing activity.

16           So he simply took the SKUs and added up the numbers

17   that were provided by Lawson.  It's a summary.  It's like a

18   Rule 1006 summary of an underlying chart.  That's the revenue

19   information.

20           Now, there are some questions that have been raised

21   by Lawson, one by a motion *in limine* on the SKU.

22           THE COURT:  I have that one still pending, I think,

23   don't I?

24           MR. MERRITT:  Yes, sir.  Another that keeps being

25   floated indirectly, we don't understand why it keeps being

1    floated but was never the subject of summary judgment if Lawson

2    believes there's a legal basis for it as to the inclusion of

3    maintenance and services revenues, but in terms of just what

4    Mangum did, he took the SKUs that we allege are associated with

5    infringing activity, he took the information provided by Lawson

6    and added it up.

7              THE COURT:  And that information came off those

8    spreadsheets.

9              MR. MERRITT:  Yes, sir.

10             THE COURT:  So he had to take the information about

11   accused product A and add it to information about accused

12   product B, et cetera, so he did the math figures?

13             MR. MERRITT:  Yes, sir.

14             THE COURT:  Is that the manipulation he did?

15             MR. MERRITT:  Yes, sir.  In sum and substance, that

16   is what I understand he did.

17             THE COURT:  And in no other place in the record is

18   that disclosed; is that correct?

19             MR. MERRITT:  I think that's correct.

20             THE COURT:  But the root of it all came from Lawson

21   in the first place.

22             MR. MERRITT:  Lawson's own information.

23             THE COURT:  He added it together and did a

24   mathematical calculation to come up with what you would like to

25   present.  In essence, what I'm asking you to do here today is,

1  what are you going to prove?  Let me hear it.  Let me see

2  whether or not it did get disclosed.  So you're going to offer

3  the proof of these figures.  How are you going to offer them?

4  How are you going to prove that?

5          MR. MERRITT:  Lawson has a witness who we could call

6  adversely.

7          THE COURT:  You're going to call a Lawson witness and

8  say --

9          MR. MERRITT:  The Lawson witness, the witness who

10  provided the underlying charts.

11          THE COURT:  You've deposed that witness, have you?

12          MR. MERRITT:  That witness has been deposed.

13          THE COURT:  And they were in attendance at the

14  deposition.

15          MR. MERRITT:  Yes, sir.

16          THE COURT:  So that information is also available,

17  not only to them but to the deposition of their witness and the

18  mathematical results produced by Mangum.

19          MR. MERRITT:  Yes, sir.  That's all as available at

20  this point to Lawson's counsel as it is to us and has been

21  since the deposition was taken and the documents were produced.

22          So if the test is whether the supplementation to

23  interrogatory number 17 should be the place where that is

24  captured, then we lose.  If the test is, as we believe it is

25  under Rule 26(e), whether this has been fairly disclosed in the

1    discovery process, we don't believe there's a basis for

2    Lawson's motion on that.

3         THE COURT:  The other part that occurs to me is that

4    it looks to me like your answers to interrogatories used

5    Mangum's report as a supplement to interrogatory number 17.

6         MR. MERRITT:  It's a written disclosure.  I suppose

7    we could have taken and made a Xerox copy and put it under 17.

8         THE COURT:  No, no, but your interrogatory answer

9    says, we're getting experts ready to do this now, and then he

10   delivered the report.  I'm not sure that's adequate, but nobody

11   complained about it at the time.

12        MR. MERRITT:  Nobody complained about it, and,

13   honestly, I don't know, given the timeline of revenue

14   information that was being produced, what could have been done

15   more quickly.  With an expert deadline looming on May 3rd,

16   obviously, you work towards that.  You're still getting

17   information in the final days of April.

18        I suppose if someone with perfect 20/20 hindsight had

19   wanted to do something more with the interrogatory response

20   other than incorporate Mangum, then I'll take the fall for not

21   advising my client to have done that.

22        THE COURT:  Well, I think this:  Just from reading

23   all the papers, it seems to me as if the royalty base raw

24   figures were disclosed and known to Lawson from their own

25   information, but the real problem in the case is what about the

1    rate.  That's where the rub is insofar as I can tell.  I may be

2    wrong about it, and I think that's really what they're going to

3    testify -- I mean what their principal complaint is, and to me,

4    it sounds like a pretty good one.  So where is the royalty rate

5    disclosed other than Mangum?

6          MR. MERRITT:  Let me take that one on.  First of all,

7    the only rate that has been disclosed by ePlus in this case is

8    in the Mangum report.  There is no dispute about that.  And

9    we're not going to try to characterize anything else in the

10   record as a disclosure of a rate because there has not been

11   one.

12         As Your Honor knows, on August 10th, the Court opined

13   that Dr. Mangum's opinion was going to be excluded, and it's

14   out, and we understand that it's out.  What ePlus proposes to

15   do, and we believe the federal circuit law permits it -- in

16   fact, we believe that in the *Dow Chemical* case the federal

17   circuit found it to be error when a district court did not

18   permit it -- would be to present evidence to the jury on as

19   many of the *Georgia-Pacific* factors as the record will support

20   and let the jury determine a reasonable royalty from those data

21   points.

22         And we believe --

23         THE COURT:  I understand what you are saying in

24   general, but what actually are you talking about presenting?  I

25   think I understand the concept, and I think *Dow Chemical* is

1    correct that -- I mean you cite *Dow Chemical* correctly that

2    that is a mode that is permissible of sorts.  I'm not sure it's

3    exactly -- I agree with everything you said.

4            MR. MERRITT:  Understood.  Judge, just by way of

5    overview, all of these, by the way, are witnesses whose

6    depositions have been taken, many of whom were 30(b)(6)

7    representatives of their own companies.  So these are not

8    people on the fringe somewhere on the fly.  Mr. Farber of ePlus

9    can talk about licensing history.

10           THE COURT:  What's he going to say?

11           MR. MERRITT:  Well, we understand there's a question

12   about settlement.  We think the way to do that is to have a

13   witness put in the terms and conditions of prior licenses on

14   these patents without making reference to the fact that they

15   were arrived at by virtue of litigation settlement.

16           THE COURT:  I thought I held you couldn't do that.

17           MR. MERRITT:  Your Honor, the only motion that

18   there's been on that was Lawson's motion *in limine* number one.

19   The Court determined, after its ruling on Mangum, that that had

20   been mooted.  The effect of mooting that is unknown, but it's

21   certainly not been stated in an order of the Court that that is

22   excluded --

23           THE COURT:  It may not be moot any longer.  That's

24   another consequence.

25           MR. MERRITT:  We understand that, but as the record

1   currently stands --

2            THE COURT:  You said you put in the license terms but

3   don't say it came in the settlement.

4            MR. MERRITT:  That's correct.  A district court in

5   Texas has actually permitted that, and I'm sorry I don't have

6   the case off the top of my head.

7            THE COURT:  Was it an Eastern District of Texas?

8            MR. MERRITT:  I believe it is, Judge.

9            THE COURT:  The Eastern District of Texas is getting

10  like what used to be the intermediate Missouri appellate court

11  when I was in law school.  If you wanted a decision on any

12  issue, no matter what side it was, go to the Missouri appellate

13  court, and you could find a case on it.

14           MR. MERRITT:  Judge, they used to tell us that about

15  California law, too.  Taking California law in a Virginia state

16  court was always a thrill-seeking exercise.

17           THE COURT:  At one time, you could go to Virginia and

18  find from the Supreme Court of Virginia any fact scenario on

19  contributory negligence or what constituted the violation of

20  the crossing law at railroads, but that's pretty much ended

21  now.

22           MR. MERRITT:  Judge, given the fact I'm still

23  actively in practice, I'd rather not comment on that.  I have

24  my own thoughts, but I think I'll keep them to myself.

25           THE COURT:  I'm saying they moved away from that.

1   All right, so he's going to testify about the prior license

2   terms in what?  What are they, SAP --

3            MR. MERRITT:  Ariba, SAP, Perfect Commerce, SciQuest,

4   and Verian, and that takes away, by the way, some of the

5   concerns Your Honor had about selectivity among these on the

6   part of Dr. Mangum, although we respectfully, of course, object

7   to the Court's ruling.

8            THE COURT:  You don't have to keep saying that.  I

9   know you object to it.  I think if the federal circuit can't

10  get that, they've got some real troubles.  So you've objected

11  and preserved the record.  SAP, Ariba, SciQuest.

12           MR. MERRITT:  Perfect Commerce and Verian,

13  V-e-r-i-a-n.  The terms and conditions of those agreements

14  involve these patents-in-suit.  Now, just as an aside, this is

15  sort of a thought experiment I've been trying to do and I can't

16  get a good answer to it, but it's an interesting one.

17           What happens in the first case?  What happens in a

18  case where Mr. Carr is a patentee, and he has one competitor,

19  Mr. McDonald.  He's just gotten his new patent, and he believes

20  Mr. McDonald is infringing, and he sues him, and he goes into

21  court, and there is no licensing history.  He's never licensed

22  it, he's never sued anybody.

23           THE COURT:  You take licenses from comparable

24  technologies or products, don't you, in the field?  Isn't that

25  what the rule is?

1           MR. MERRITT:  If you can find them, if they're not

2      like these IBM licenses were in this case or whatever, but it

3      raises a very interesting question, and I just raise it because

4      if there is information in licenses on these patents that are

5      data points that we can give to the jury without the prejudice

6      of saying, hey, guess what, these folks had a similar defendant

7      in here and had a nice day, that's the real prejudice.

8           THE COURT:  That, however, is another whole issue in

9      connection with that that was raised in respect of their motion

10     *in limine* number one which I had held was moot in view of the

11     other one, and that is whether they are reliable or not without

12     regard to the 403 type analysis, are they reliable because --

13     what is it -- *Rude v. Westcott* and other cases, and then there

14     is one or two federal circuit cases that say, well, you can

15     draw a distinction under certain circumstances where there's

16     been an actual verdict and a reasonable royalty rate arrived at

17     and use that as a factor, but that isn't what happened in any

18     of these.  There was a lump sum in these, wasn't there?

19          MR. MERRITT:  Yes, sir, although I do believe --

20          THE COURT:  One of them had a running royalty of five

21     percent after 15 million in sales or something like that, I

22     believe.

23          MR. MERRITT:  Yes, sir.

24          THE COURT:  Was that SAP or Ariba?

25          MR. MERRITT:  I believe it was neither SAP nor Ariba,

1    as I recall.  It was one of the other three.

2              THE COURT:  All right.

3              MR. MERRITT:  In any event, we know that's not been

4    decided, at least as a matter of record by the Court, and we'd

5    like to have a discussion of that if one is available.

6              THE COURT:  What else?  Farber.

7              MR. MERRITT:  Farber can talk about factor three to

8    the extent he can talk about licensing terms; factor four,

9    license or established policy; factor five, the commercial

10   relationship between these two parties can be addressed by a

11   number of witnesses.  Mr. Farber, and at least three witnesses

12   we could call adversely from Lawson.  Mr. Lohkamp.

13             THE COURT:  Is there any dispute they are

14   competitors?

15             MR. MERRITT:  I don't believe so.

16             THE COURT:  So that's three, four, and five.

17             MR. MERRITT:  Factor six, the effect of selling the

18   patented specialty and promoting sales of other products, Mr.

19   Christopherson and Mr. Lohkamp could be called adversely from

20   Lawson on that.  Again, these are all people who have given

21   depositions and have talked about these things, so, you know,

22   people know what issues they are able to speak to.

23             Factor seven, the duration of the patent and the term

24   of the license, that, of course, the duration of the patent

25   would be evident from the face of each of the patents

1    themselves, whatever witness introduces those.

2          Factor eight, establish profitability of the products

3    made under the patent, commercial success and current

4    popularity, we have at least four witnesses from Lawson who've

5    testified to that; Christopherson, Lohkamp.

6          THE COURT:  What factor is it?

7          MR. MERRITT:  Factor eight.

8          THE COURT:  What is it?  What are they going to say?

9          MR. MERRITT:  Establish profitability of the products

10   made under the patent.  These witnesses have been asked about

11   Lawson's 10-Ks, about various Excel charts that have been

12   provided by Lawson.  They've been asked about Lawson business

13   forecasts that have been produced.  All of these things go to

14   this factor.

15         Factor nine, the utility and advantages of the patent

16   property over old modes and devices, there's expert testimony

17   on that from Dr. Weaver and Mr. Hilliard that's still good

18   testimony and in evidence.

19         Factor ten, the nature of the patented invention, the

20   character of the commercial embodiment, the benefit to those

21   who have used the invention, there are witnesses from both

22   parties who can speak to that including Farber, Frank, Oliver,

23   Lohkamp.  There are press releases and all sorts of materials

24   that have been produced that go to that factor that these

25   witnesses can be shown.

1          Factor 11 is the extent to which the infringer has

2    made use of the invention and the value of the use.  We have at

3    least four witnesses from Lawson who can speak to that as

4    adverse witnesses in our case.

5          THE COURT:  How are you going to figure the value of

6    the use?  How are you going to do that?

7          MR. MERRITT:  Well, we know what the revenues are.

8    We know what their gross profitability is on a range of

9    products.  It's been an interesting thing in this case because

10   Lawson takes the position that you can't determine the

11   profitability of the accused products, that they have no means

12   of doing that.

13         THE COURT:  I bet you if the president of the company

14   wanted it, they could get it.

15         MR. MERRITT:  Let me show you something.  It's

16   fascinating.

17         THE COURT:  Although that's somewhat like saying

18   everybody knows the Prussians kept the marching orders from the

19   Franco-Prussian War, so I better maybe not give that line.

20         MR. MERRITT:  Judge, if you will look at the handout

21   that I gave you behind tab K, the one that I handed up when I

22   first stood up in the little binder, tab K, you have here an

23   April 21st deposition of Kenneth White who was a 30(b)(6)

24   witness on, among other things, financial matters.

25         The first thing you see -- second page is actually

1    page 24 of his deposition transcript, and there's a remarkable

2    passage that starts at line 15.  "If Harry Debes, the CEO of

3    Lawson, walked into your office one day and asked you whether

4    the S3 supply chain management suite was profitable, how would

5    you answer his question?"

6                The question is objected to.

7                "Answer:  What I'd probably do is I would -- I'd tell

8    him, no, we don't have the ability to do profit on a

9    product-by-product basis.

10               Question:  So it's your testimony that if the CEO or

11   CFO of Lawson approached you to understand whether the S3

12   supply chain management suite was profitable, you would not be

13   able to answer that question?"  Ms. Hughey objects.  Then

14   there's an answer.

15               "Again, to answer your question, um, based on what I

16   would explain to Harry or to Stefan, I would say, Stefan and

17   Harry, I have revenues by product, but our costs are gathered

18   on functional, geographical, or business-unit basis.  I can't

19   necessarily get you a product by product profitability.

20               Question:  How does Lawson make business decisions

21   about whether to continue manufacturing and selling products if

22   it has no ability to track the profitability of its products?

23               Answer:  I don't know that answer."

24               Now, given that --

25               THE COURT:  Don't many companies just allocate costs

1   on an allocated basis across the board?

2           MR. MERRITT:  They may, but the only point --

3           THE COURT:  Did anybody ask him if that's what they

4   did?

5           MR. MERRITT:  Well, they say they allocate them but

6   not on a product-by-product basis, so, apparently, you don't

7   know if a particular product is profitable or not.  My point on

8   that is in terms of evidence we would present, we have evidence

9   of the revenue stream that's generated by the product.  We have

10  evidence of the general gross profitability across a range of

11  products.  We don't have granular profitability at the

12  product-by-product level because the testimony Lawson's

13  30(b)(6) witnesses have given us is that's not available and

14  can't be done.  So to that extent, we're a little bit hamstrung

15  on that point.  But, again, just --

16          THE COURT:  Just curious why you didn't go take the

17  deposition of the chief executive officer and ask him why -- if

18  that was true, why he put up with that and how does he tell his

19  shareholders about how he's spending his money, their money.

20          MR. MERRITT:  Well --

21          THE COURT:  That is bizarre, but, anyway, that's the

22  record.

23          MR. MERRITT:  In any event, that is the record.

24          THE COURT:  Okay, you've got three, four, five, six,

25  seven, eight, nine, 10, 11.

1           MR. MERRITT:  And then factors 12, 13, and 14, 14,

2    the opinion testimony has been stricken.  12 and 13, 12 is the

3    portion of profit or selling price customarily allowed for use

4    of the invention.  We have no evidence on that.

5           13, the portion of realizable profit attributable to

6    the invention is distinguished from non-patented elements, et

7    cetera.  We have no evidence on that in part for the reason I

8    just explained to the Court.  But in sum and substance, a very

9    significant number of these *Georgia-Pacific* factors are present

10   in the factual record and fully disclosed to everyone.

11          THE COURT:  What is the *Dow Chemical* case you are

12   talking about?  Have you got it right here?

13          MR. MERRITT:  Yes, sir, I do.  I have so many things

14   up here, it will take me a moment to pull it up.  The case is

15   Dow Chemical versus, I believe it's MMM or EEE.  Here it is.

16   *Dow Chemical v. MEE Industries*, 341 F.3d 1370.  It's a 2003

17   decision.

18          THE COURT:  I know the case.  I just don't have it.

19          MR. MERRITT:  I'm sorry.  I can hand you up my one

20   copy.

21          THE COURT:  Do you mind?

22          MR. MERRITT:  No, sir.

23          THE COURT:  I just need to refresh my memory.

24          MR. MERRITT:  I will turn it to the damages

25   discussion.

1           THE COURT:  Thank you.  They held that the opinion by

2      this guy Pirc was admissible, didn't they?

3           MR. MERRITT:  They held that the opinion by Pirc was

4      inadmissible --

5           THE COURT:  The district court held it.

6           MR. MERRITT:  Dow Chemical, on appeal, didn't

7      challenge that.  Dow Chemical made the argument that even

8      without Pirc, we should be able to try this case and put on

9      evidence of the *Georgia-Pacific* factors --

10          THE COURT:  What I'm talking about is they say -- the

11     Court says, "Rather Dow urges that reasonable royalty damages

12     can be awarded even without such testimony; that there is a

13     presumption of damages where infringement has been established;

14     and that there is other evidence in the record, including the

15     evidence supporting Pirc's excluded opinions, that the district

16     court must consider."  So they never did hold -- they never did

17     get to the point of Pirc's opinion --

18          MR. MERRITT:  That's correct.  Because Dow didn't

19     challenge that exclusion of Pirc on appeal.

20          THE COURT:  What happened when this case went back?

21          MR. MERRITT:  I don't know, Judge.  Someone else here

22     may know.  I do not.

23          THE COURT:  They sure just didn't drop it.  They

24     probably settled, I guess.

25          MR. MERRITT:  I simply don't know the answer to that

1   question.

2           THE COURT:  All right.

3           MR. MERRITT:  In any event, what I think this

4   exercise is showing, and I just go back to -- I go back to my

5   original point.  It's interesting that our discussion has

6   really not been about anything that has not been disclosed.

7   Our discussion has been, really, about whether there's

8   sufficient factual evidence in the record to permit this to go

9   forward and for a jury to decide it.

10          That's why I expressed my initial concern about a

11  Rule 37 motion being kind of a backdoor decision about

12  sufficiency of evidence, and we do have a concern about that.

13  We think the evidence is sufficient.  This is all based on

14  discovery that's been taken in the case with all counsel

15  present.  So that is our position on that.

16          THE COURT:  Tell me how you're going to argue to the

17  jury what the reasonable royalty rate should be and why isn't

18  the presence of all this just utterly prejudicial and confusing

19  on this record since they don't have any idea what a reasonable

20  royalty rate should be?  If you lose on the issue of GP,

21  *Georgia-Pacific* three, and motion *in limine* number one is not

22  moot but you lose it, you don't have any royalty rate

23  particularly to point to.  How do you prove -- how do you argue

24  to the jury what a reasonable royalty rate is?

25          They're going to come back, and they're going to say,

1   Judge, you said a reasonable royalty rate, and any figure, any

2   guidance for us on that?  You have to remember what you've read

3   or heard in the case.  That's what I'd tell them.

4          MR. MERRITT:  The guidance would be that you can't

5   reach a number that's not supported by the record.  And so they

6   will have the total revenues that Lawson makes from selling

7   these products, they'll have profitability information.  They

8   will have some sense that there is a ceiling on this.

9          I assume that a jury is not going to award more than

10  somebody's profits on this, but under the law, on appeal of

11  jury verdicts we've looked at in patent cases, infringement

12  verdicts, as long as there is support in the record that it can

13  be tethered to, are given a great deal of deference, and it's

14  often the case that you have either competing royalty rates

15  through experts, neither of which is chosen by a jury --

16         THE COURT:  But they set a range.

17         MR. MERRITT:  They do set a range.  Certainly this

18  evidence of revenues, profits, et cetera, we think it would be

19  enhanced, frankly, by data points from other licenses of

20  these --

21         THE COURT:  How can I do that if I do what you urged

22  me to do earlier, and that is find that *Georgia-Pacific* factor

23  number two in the Green opinion is excluded, and that's one of

24  his most significant factors?  In other words, don't you all

25  have to play by the same rules you want me to hold them to?

1    And then what happens?  Does Mr. Green come in because all of a

2    sudden *Georgia-Pacific* factor number two, and I was wrong in

3    ruling on the motion *in limine* about rates for comparable

4    patents being out?  Does that bring Mr. Green back into the

5    fold, or what does it do?  You realize there's a lot of --

6    several different edges to this sword.

7            MR. MERRITT:  There are, Your Honor, and I would

8    simply point out two things on that.  First of all, the rates

9    that Green was referring to were for patents other than the

10   patents-in-suit, and we do think that's an important

11   distinction.  The actual history of patents-in-suit, we

12   understand you may have some views as to whether they

13   ultimately get in, but in terms of which is more relevant to

14   this case --

15           THE COURT:  I'll let you all brief that.

16           MR. MERRITT:  We believe that's appropriate.

17           THE COURT:  You don't have in front of you --

18           MR. MERRITT:  The other thing I will mention is I

19   listened very carefully to Mr. McDonald's argument on Green,

20   and he acknowledged, and we think it is a correct statement of

21   the law, if there's no range that has been articulated by the

22   expert, that doesn't mean there are no damages.  He said that

23   in response to one of your questions, and we --

24           THE COURT:  I want to disapprise ePlus of this:  That

25   statute -- what is it -- 284?

```
1              MR. MERRITT:  Yes, sir.

2              THE COURT:  That statute doesn't supplant the rules

3    of procedure.

4              MR. MERRITT:  We agree.

5              THE COURT:  It says, and that argument I think maybe

6    got abandoned by the time the rebuttal brief got there, but the

7    mere fact that statute says that doesn't control what pretrial

8    orders say and rules say, so I'm not going to be considering

9    that anymore.  So if you have anything on that topic, just keep

10   it, if you will.

11             MR. MERRITT:  All right.

12             THE COURT:  Anything else?

13             MR. MERRITT:  No, sir.

14             THE COURT:  Why don't we take a little break?

15

16             (Recess taken.)

17

18             THE COURT:  All right, Mr. McDonald.

19             MR. McDONALD:  Thank you, Your Honor.  I'd like to

20   bring us back to basics here about what we're really talking

21   about, and Rule 37(c)(1) is what we're talking about and

22   whether that sanction should apply here in precluding this

23   evidence of damages.

24             And as set forth in the *Southern States* decision,

25   they say the basic purpose of that rule is to prevent surprise
```

1   and prejudice to the opposing party.  That's what we're talking

2   about here today, because even after all the questions Your

3   Honor grilled ePlus counsel on, what are you going to say to

4   the jury, what is the damages in terms of Rule 26, what is the

5   computation of damages, we still don't know.  We don't have a

6   royalty rate, we don't have a royalty base.  We still don't

7   know what they're going to ask the jury, and here we are.

8   Discovery is long closed, experts reports are long done.  We're

9   on the eve of trial.

10       THE COURT:  He said you do know the royalty base, it

11  came from you and it was fully discussed in depositions and it

12  is -- it is articulated they're not going to deviate from the

13  figures in the Mangum report, so that you do know the royalty

14  base that they're going to rely on.  So you can't really claim

15  surprise as to what the royalty base is or the royalty theory.

16  What do you say about that?

17       MR. McDONALD:  Well, what I say is, Mangum has his

18  own opinion on that.  He didn't simply cut and paste our

19  figures.  We answered some discovery about certain sales

20  numbers, but as you know, we have a dispute over which of those

21  SKUs should be in the case.  We do have a dispute over

22  maintenance and service revenues and things like that.

23       The point is, if you put aside Mangum's report, where

24  was the disclosure of this ever, and who's going to say that

25  this is the total --

1          THE COURT:  What they're saying, as I understand it,

2     is that they used Mangum's report as a supplementary response

3     to interrogatory number 17 and to their disclosure obligations,

4     and if you look at the information in answers that you gave --

5     that you supplied in your brief to the Rule 26 disclosure and

6     to the interrogatory, it looks to me like that they did.

7          And then they say, well, there's no foul under -- no

8     violation of Rule 26(a) if it was otherwise provided in

9     discovery, and it was otherwise provided in the ways they've

10    outlined, and it looks to me like it was otherwise provided.

11    We're talking about the royalty base now.

12         You know what the theory is.  You're not surprised by

13    the theory, are you?  There is reasonable royalty, whatever

14    that may be.

15         MR. McDONALD:  The idea of a reasonable royalty,

16    that's right, although their disclosures don't limit them to

17    that.

18         THE COURT:  Well, I know, but they're limited now

19    because they haven't made --

20         MR. McDONALD:  So we know that.

21         THE COURT:  We can't -- it would be reversible error

22    for me to find that they hadn't disclosed their theory to you,

23    and so it sounds like they did satisfy, although not in the

24    conventional way, but they satisfied the requirements of the

25    rule that it be available, and they can't be sanctioned for not

1   providing the royalty base.

2          MR. McDONALD:  I still don't have an identification

3   of who the witness is, and that's one of the questions we asked

4   them.  That was our interrogatory in damages, who is the

5   witness who's going to testify about this.  They still haven't

6   said who that's going to be.

7          THE COURT:  The pretrial order has a list of the

8   witnesses?

9          MR. McDONALD:  I still do not know which witness

10  they're going to call on this royalty base issue.  They've

11  never disclosed who that's going to be.

12         THE COURT:  He said --

13         MR. McDONALD:  I don't think that's the main

14  battleground here, but I still think it's very unclear what

15  they're going to do on that front.

16         THE COURT:  They're going to put on evidence as to

17  each of the factors that he identified, and he mentioned the

18  witnesses.  I didn't write them down, but he mentioned the

19  witnesses who would be testifying.

20         MR. McDONALD:  None of those had to do with the base,

21  though.  I didn't hear him say which witness was going to

22  testify about the base.

23         THE COURT:  The base is already there.  Then they're

24  going to put on the *Georgia-Pacific* factors.  You've got the

25  base, and you haven't been surprise by the base figures.

1            MR. McDONALD:  Let's talk about the rate.

2            THE COURT:  The rate issue here, it seems to me,

3    that's where the rub is.

4            MR. McDONALD:  Rule 26(a)(1), I just got it here.  It

5    requires a computation of each category.  The word "theory"

6    isn't in here.  Talking about was it a theory or not.  I think

7    royalty would be called a category for purposes of the rule

8    here just to try to match things up.

9            You have to provide a computation.  It's not enough

10   just to say, here's a category.  You have to give the

11   computation, and, obviously, the royalty rate is critical to

12   that.  We have all these myriad facts in this case, all sorts

13   of data points here and there that they have cited to now in

14   their recent brief they did not cite in their disclosures

15   during discovery.

16           Our expert and their expert were working off

17   purportedly the same set of facts.  Our expert said it should

18   be a lump sum of $800,000.  Their expert said it should be this

19   running royalty of about $28 million or so.  It's not enough

20   just to say, here's a bunch of facts, figure out the rate

21   yourself, because there's, obviously, a lot of different

22   conclusions people can draw from the --

23           THE COURT:  What about the Dow case?

24           MR. McDONALD:  Which one?

25           THE COURT:  *Dow v. MME Industry,* and it says they

1    remanded it for the district judge -- it wasn't a jury, it was

2    a district judge, it looks like -- "the district court

3    expressed an inability to calculate damages after excluding the

4    testimony of Dow's damages expert.  Dow does not appeal the

5    district court's exclusion of its expert reasonable royalty

6    testimony.  Rather, Dow urges that reasonable royalty damages

7    can be awarded even without such testimony; that there is a

8    presumption of damages where infringement has been established;

9    and that there is other evidence in the record, including the

10   evidence supporting Pirc's excluded opinions that the district

11   court must consider, we agree."

12          Now, that's the federal circuit law.  It is, to me, a

13   very incomplete analysis because it does not say how one

14   calculates a rate in the absence of any evidence about a rate,

15   but I don't know what rates, what other information in the

16   record from the excluded report was there.  There may have been

17   rates from other license agreements.  Here, there isn't that.

18          MR. McDONALD:  That's right.  And I believe in that

19   case, the *Dow* case, I believe the defendant did have some

20   evidence on standard industry rates if I remember right, but I

21   apologize, I don't have the specific cite to that.

22          THE COURT:  I remember reading the case earlier, but

23   I didn't find anything about the existence of other --

24          MR. McDONALD:  I'll see if I can find that cite for

25   you --

1          THE COURT:  -- rates in the opinion here.  I may have

2     missed it in my quick review of it when I called and asked for

3     it and had it handed up, but I didn't see anything.  Does that

4     make a difference?

5          MR. McDONALD:  It might be, but I think the main

6     issue in *Dow* is that Rule 37(c)(1) wasn't even at issue.  There

7     was no issue of have they made their proper disclosures here

8     under the rules, do we apply what the rules mandate should be

9     applied when somebody has information helpful to their own case

10    that they don't disclose properly in discovery.

11         THE COURT:  Part of that, they say, is your fault

12    because the first time they even could have answered or

13    complied with the 26 computation rule, 26(a)(1) computation

14    disclosure is when they had information that they could get

15    only from you all, and you all stalled in giving it to them

16    until April 30th, right before the expert reports were due, and

17    they didn't have any way of doing it.

18         MR. McDONALD:  They had our sales information

19    earlier.  We supplemented our sales a number of times in part

20    because you have quarterly deadlines that come up, and so

21    Lawson has additional information.

22         THE COURT:  What is this nonsense in your company

23    about not being able to find out what profit by product is?

24         MR. McDONALD:  They have profitability disclosed in

25    their 10-Q and 10-K --

1          THE COURT:  But not by product.

2          MR. McDONALD:  No.  They don't keep it that way, as

3    the testimony indicated.  Lawson is a different company than

4    ePlus.  ePlus has this one little piece of it.  It's a hardware

5    leasing company, and it's got one or two percent of it that

6    sells this procurement software.  Lawson sells a whole suite of

7    business software products for human resources, for your

8    financial department, talent management they called something.

9          THE COURT:  But when Ford sells Escapes, Explorers,

10   Expeditions, Focuses, Tauruses and all those things, it's been

11   my experience, on the bench and in private practice, that

12   companies are generally able to figure out what the

13   profitability of a particular product is.

14         Now, it wasn't unusual in the past for me to see

15   costing done on a gross basis, that is they will take cost and

16   they'll have an overhead -- they'll just assign a fixed burden

17   to a particular unit, and that goes against all -- that

18   particular percentage goes against all of their products when

19   they are a diverse company.

20         Carpet companies, I know, have done that for years

21   with -- they have 150, 200 different lines of carpets, and they

22   don't calculate the costs by machine to run that thing, but

23   they take the mill costs and allocate them and say that this is

24   what the cost is, and each product here gets the same cost

25   allocated to it.  Surely your company does something like that.

1          MR. McDONALD:  That's right.

2          THE COURT:  Where is it?  Your man said he didn't

3   know that.

4          MR. McDONALD:  The question was profitability for a

5   particular product.

6          THE COURT:  That's what I mean.

7          MR. McDONALD:  He wasn't asked whether they took the

8   general allocation or not.

9          THE COURT:  What you do --

10          MR. McDONALD:  The jury's got some charts, too, where

11   he shows they were able to allocate --

12          THE COURT:  That's what you do.  You take the sale

13   price of the product, and you allocate the charged amount, just

14   say allocated X percent, and you figure out what that is of

15   your cost, and you subtract it from your gross.  You've got

16   your net profit.

17          MR. McDONALD:  They've got that information.  They

18   cited a couple basic --

19          THE COURT:  Did you give it to them?

20          MR. McDONALD:  -- the financial fellow's deposition,

21   you know, where he was answering the question like a

22   bean-counter was asking that specific question, but you haven't

23   had any motions before this Court that we haven't disclosed our

24   profitability.  We have disclosed it in a way that Lawson keeps

25   those records.

1          With the suite sales, I just want to clarify, it's

2     not quite the same as having a bunch of different cars, because

3     when Lawson goes to a customer, typically the customer is going

4     to buy a collection all at one time of the HR unit and the

5     financial, et cetera.  So they buy those things together kind

6     of off -- it's not a la carte.

7          THE COURT:  That sounds to me like obfuscation.

8     Here's the point:  It seems to me like you complained about the

9     theory, and you know what the theory is.  You complained about

10    the category.  The category is reasonable royalty.  You know

11    what that is, so you haven't been surprised.  You know what the

12    royalty base is because it comes from your own figures, and

13    they've given that to you in a number of different ways.

14         Now -- and that includes the underlying data that was

15    in the testimony that's been excluded from whatever -- Mangum's

16    testimony, so you're not surprised by that.  It's the royalty

17    rate that I think is the focal point of the inquiry.  Don't you

18    agree with that?

19         MR. McDONALD:  I think that's the focal point.

20         THE COURT:  All right, now, have you ever been in a

21    case where you try just -- you say, here's the royalty base,

22    and, jury, you go fix a rate?

23         MR. McDONALD:  No.

24         THE COURT:  I don't know how to do that.

25         MR. McDONALD:  It would be asking -- it would be

1    forcing the jury to speculate on damages.  I think the most

2    analogous case on this and why you shouldn't do that is the

3    *Boston Scientific* case that we have in our papers, because the

4    facts were a little different because the plaintiff actually

5    chose not to call their damages expert.  But they tried to rely

6    on some evidence in the case, including some other license

7    agreements, as the evidence and just go to the jury on that.

8    And the judge said, no, I'm not going to let you do that,

9    because you're forcing the jury to speculate on damages, and I

10   can't let the jury do that.

11            And that's particularly important, she said.  It's

12   exacerbated by the fact that the base at issue was so large.

13            THE COURT:  Is that Judge Saris's case?

14            MR. McDONALD:  Northern District of California.  It

15   was 550 F.Supp. at 1102.  So she said, without the expert, it's

16   too speculative to go to the jury.  There the sales amount was

17   stipulated to be 1.8 billion dollars.  It's more than here, but

18   here the base that ePlus is going after is in the range of 4-

19   or $500 million.

20            THE COURT:  This *Boston Scientific* case, though,

21   wasn't on a motion.  It was on a Rule 37 motion, wasn't it?

22   Wasn't it a Rule 50 motion?

23            MR. McDONALD:  Yeah, I think so.  But I think the

24   logic still applies here, is that they are asking the jury to

25   speculate.  Here the Court has this gatekeeper role that they

1    are applying to scrutinize these damages experts to come in and

2    make sure that the way they fit the facts to their damages has

3    a firm and acceptable methodology, it's relevant to the facts.

4    Here you meticulously carried out the gatekeeper role, and then

5    ePlus says, well, let's just tear down the gates and the fences

6    all around the gates and just let the jury run with it and do

7    whatever they want.

8              THE COURT:  Let mustangs run the plains.

9              MR. McDONALD:  Exactly.  And we're busy here at this

10   one doorway when there's no fence around the door, so who cares

11   what's going on at the doorway if they're running around the

12   side doors and back fence anyplace they want.  Obviously, it

13   lets things go amuck, and to say that they're going to be able

14   to do this through these witnesses, I think that's totally off

15   base.

16             When they bring up, for example, these other

17   settlement agreements, those were all lump sums.  And so what

18   is the jury supposed to do with that?  Mr. Mangum had

19   speculative sales numbers, but he at least tried to convert it

20   into a percentage.  There is no witness, no witness, Your

21   Honor, who will be able to take those lump sums and convert

22   those into percentages.

23             How do I know that?  Their 30(b)(6) witness on the

24   licensing, Mr. Farber, in his deposition, when I asked him

25   about those other deals, he admitted he was unaware of what

1    Ariba's or SAP's sales were, the two big ones.  He had no idea

2    what their actual sales were.

3         When we tried to ask other questions about the

4    negotiations, he was precluded due to attorney/client

5    privilege.  We've got no information anywhere in the record and

6    no witnesses who are going to be able to take those lump sum

7    numbers and do anything that would be helpful to the jury

8    coming up with an appropriate figure here.

9         So for them to rely again on settlement agreements

10   that we've already shown in prior briefing, the vast majority

11   of case law there says should never see the light of day on the

12   damages issue starting with the *Rude v. Westcott* decision but

13   going well beyond that, and so they're going to throw those

14   numbers out in front of the jury, throw Lawson's gross sales in

15   front of the jury, throw Lawson's gross profits, I guess, in

16   front of the jury and just say, you decide now what the right

17   number is.

18        That is totally outside of the bounds of what's

19   acceptable here.  When we're looking at Rule 37(c)(1) now, to

20   bring it back to there, we're comparing the prejudice to Lawson

21   versus was ePlus substantially justified.  There's five

22   factors, but that's really --

23        THE COURT:  Yes, but you can cross-examine on each

24   one of these witnesses.  You actually were -- some of them are

25   your witnesses, and you took the depositions of the other ones,

1  so you are perfectly able to cross-examine on all the

2  *Georgia-Pacific* factors here.

3  　　　　　MR. McDONALD:  Well, then, I guess we ought to throw

4  away 26(a)(1)(iii) because you basically said they don't have

5  to disclose a single fact that's tied into damages, because

6  they didn't.  They didn't disclose anything about the

7  computation or the documents that would underlie that.  They're

8  basically saying that rule is meaningless, and you're saying,

9  when we serve an interrogatory number 17 that says give us the

10  specific support for your reasonable royalty rate, tell us who

11  the witnesses are, who are the documents (sic), that they can

12  totally ignore that and it doesn't matter.  That would be the

13  natural, the necessary consequences of what you are saying.  I

14  think the business objects --

15  　　　　　THE COURT:  That's what they're saying.

16  　　　　　MR. McDONALD:  Excuse me.  I apologize.  Don't want

17  to go too far.  I think that *Business Objects* case makes it

18  very clear.  There the issue wasn't whether the facts were out

19  there somewhere in the discovery.  The Court said they were

20  seeking to introduce evidence of damages not disclosed in

21  response to that interrogatory.  That's the words at page 1356

22  out of the *Business Objects* decision.

23  　　　　　The question isn't whether the facts are in the ether

24  somewhere.  You have to disclose them specific to the damages

25  interrogatory, to the damages disclosures.  That's the problem

1    here.

2           Everything that ePlus has shown you today really

3    proves one thing.  It proves there was no justification for

4    them to not disclose that proposed royalty rate, a rate that

5    they were seeking many months ago.  They have these facts, they

6    had their prior cases, they had a lot of experience, they've

7    had other damages experts in their prior cases, all these

8    things at their disposal.

9           They had a lot of testimony from Lawson.  As we had

10   pointed out in our briefing regarding Mr. Mangum, the vast

11   majority of even the Lawson testimony that Mr. Mangum relied on

12   goes back to 2009.  It wasn't late-showing-up depositions.  It

13   was information they've had for a long time.  Everything that

14   ePlus went through today shows you they had no justification

15   for not answering that question with some specifics during the

16   fact discovery period much earlier with respect to their

17   initial disclosures, with respect to interrogatory number 17.

18   No computations, no documents, and no witnesses were placed in

19   there the way they are talking about it today.

20          So if we could go forward a couple of slides here.

21   This is just our interrogatory 17, very specific here.  I think

22   I heard ePlus --

23          THE COURT:  Excuse me a minute.  I'm trying to find

24   the section here that he was relying on.

25          MR. McDONALD:  Supplementation --

1          THE COURT:  About other disclosures otherwise

2     disclosed.

3          MR. McDONALD:  Can you go to slide number six here,

4     please.  I've got that here.

5          THE COURT:  That's 26(e), isn't it?

6          MR. McDONALD:  One before this one.

7          THE COURT:  Parties who have made disclosures under

8     Rule 26(a).

9          MR. McDONALD:  I think I have it up on the screen

10    right now.  Is that the one?

11         THE COURT:  Then it says, and it "must supplement or

12    correct its disclosure or response:  (A), in a timely manner if

13    it learns that in some material respect the disclosure or

14    response is incomplete or incorrect, and if the additional or

15    corrective information has not otherwise been made known to the

16    other parties during the discovery process or in writing."

17         In other words, the rule allows a fair leeway in

18    complying with the (e)(1) supplementations -- supplementation

19    of responses under 26(a)(1) which -- it just says 26(a) or

20    26(e), so why haven't they satisfied all of that except with

21    respect to the rate?

22         MR. McDONALD:  Well, A, rate is a big deal.

23         THE COURT:  I understand that, but I'm trying to make

24    an analytical approach to it here.  They disclosed it all

25    except as to the rate.  In other words, this "has not otherwise

1   been made known to the other parties during the discovery

2   process or in writing" takes care of the base and the theory

3   issue, but it doesn't take care of the rate, you say.

4            MR. McDONALD:  Right.  But even beyond that --

5            THE COURT:  Do you agree with that?

6            MR. McDONALD:  Yes, that's right.  Still doesn't take

7   care of the rate.

8            THE COURT:  Do you agree that it's been otherwise

9   made known to you as to the base and the theory?  You have to

10  say yes.

11           MR. McDONALD:  Well, the theory, we know that they

12  wanted at least a reasonable royalty, so I don't think that's,

13  you know, really putting us on notice of what they want.  I

14  want at least the minimum.  That's not disclosing anything

15  really.

16           THE COURT:  Sometimes admission is good for the soul,

17  just like confession is.

18           MR. McDONALD:  We knew that they were seeking at

19  least a reasonable rate.

20           THE COURT:  You knew what the base was that they were

21  going against because you provided the basic sales figures, and

22  you do have some dispute about whether the base can include

23  certain SKUs, et cetera, or not, but that's an issue for later

24  in the day, but apart from that, you know what the base is.

25  The real issue is you don't know the rate, and you don't know

1   it even today.

2           MR. McDONALD:  That's the most important --

3           THE COURT:  Isn't that what your rub is?

4           MR. McDONALD:  That is exactly right.  Even with

5   their supplementations, they never tied -- the discovery

6   requirements require them to indicate what they are going to

7   rely on to prove damages.  That's what Rule 26 and our

8   interrogatory require.  None of that stuff that was disclosed

9   was anything they designated as something they were relying on.

10          THE COURT:  They now have put in exhibits, designated

11  exhibits for the trial; right?  You have gone through that

12  process.

13          MR. McDONALD:  Sure.

14          THE COURT:  What do the exhibits from the trial tell

15  you about what the rate is?  The proposed trial exhibits --

16  excuse me -- tell you?

17          MR. McDONALD:  Nothing.

18          THE COURT:  They haven't even yet told you -- how

19  about their contentions of fact?  In the contentions of fact,

20  do they tell you, we now contend that based on these factors

21  that Mr. Merritt is arguing today, the royalty rate ought to be

22  seven percent or between two and ten or something?

23          MR. McDONALD:  No.

24          THE COURT:  Nothing?

25          MR. McDONALD:  Nothing.  You asked that question to

1    Mr. Merritt a number of times, what's the rate.  Remember what

2    his answer was?  Did he ever give you a number?  No.  Well,

3    we're going to do this, and we're going to do that, we're going

4    to do the soft shoe and the waltz up there, but he never gave

5    you the number.

6              THE COURT:  Looks like the two-step you were doing.

7              MR. McDONALD:  I guess.  It's behind the podium, so

8    actually I guess I'm glad you didn't see any of it.

9              Even today, we do not know, Your Honor.  That's

10   really the crux of it.  That percentage is a huge issue, and

11   that --

12             THE COURT:  Several hundred million dollars, you say?

13             MR. McDONALD:  Times 400-, $500 million, whatever

14   that number is, so eight times B equals C.  Well, if A is the

15   base, B is pretty important to know, and that *Boston Scientific*

16   and we know that, but that *Boston Scientific* case really

17   highlights how that exacerbates the fact that you're doing

18   something you shouldn't be doing which is to ask that jury to

19   speculate, pick a number as a percentage times a huge number,

20   and my client is supposed to prepare now for a trial that's a

21   couple weeks away, maybe slightly longer, and they don't even

22   know what that is.

23             We also don't know which are going to be the key

24   facts they would rely on to support that, and we've never had a

25   chance to take discovery to go after those particular key facts

1    now.  I mean, obviously, just like the experts did, some facts

2    are more important than others.  We've got no idea which ones

3    --

4              THE COURT:  Suppose I were to tell them to give you a

5    computation by tomorrow, let you take the depositions in the

6    next week or so, and as a sanction, confine them to a royalty

7    of one percent, that they were -- I would tell the jury that if

8    you find anything as a royalty of one percent at most or two

9    percent or three percent, is that a permissible approach to

10   this or not, or is that just so outside the bounds of the usual

11   course of administration of sanctions that one should not take

12   an approach such as that?

13             MR. McDONALD:  I can always --

14             THE COURT:  You can also say, that's goofy.

15             MR. McDONALD:  I can always count on you to ask me

16   questions I did not anticipate, and here's at least one of them

17   today.  My initial reaction is, it would be very tough to

18   defend that because where did the number come from, whether one

19   percent --

20             THE COURT:  Tough to defend on appeal, you mean?

21             MR. McDONALD:  Yeah.  I guess that's what I mean.

22   Because if that number doesn't come from a particular place, it

23   seems to me like we're all asking for trouble to have that in

24   there.

25             37(c)(1) gives you very clear grounds, and you've got

1  precedent just to say it's all or nothing.  So that, to me, is

2  the safe place to go with that.

3          THE COURT:  All right.  Anything else?

4          MR. McDONALD:  Let me check my notes here, Your

5  Honor, please.

6          THE COURT:  Sure.

7          MR. McDONALD:  If we could go to slide, I believe it

8  would be 14.  One more past this one.  I just want to point

9  something here with this list of evidence that they've given us

10 that we're supposedly -- we are sophisticated counsel or

11 company or whatever, we should have seen this coming, I guess.

12          Well, a lot of the evidence -- what this slide here

13 highlights is a lot of the evidence they now cite was evidence

14 that Mr. Mangum totally ignored in his expert report.  The

15 Lawson profitability information, he didn't even talk about it.

16 So if you're wondering why this hasn't been a bigger issue

17 before now, well, now you know.

18          The commercial success of the patents, that's another

19 thing they've talked about.  All of a sudden now this is one of

20 the things they're going to put in front of a jury.  Again, Mr.

21 Mangum didn't talk about it.  Also, their motion *in limine*, I

22 believe it was number nine --

23          THE COURT:  Did anybody else talk about it?

24          MR. McDONALD:  No, I don't think so, because

25 nobody -- you need a nexus under the law even to make it

1    relevant to obviousness.  Now, it was talked about in the

2    context of obviousness.  I do correct myself there.

3            When they say we answered an interrogatory that

4    talked about commercial success, they leave out the part that

5    the interrogatory actually had to do with obviousness, patent

6    invalidity, not damages.  So it was disclosed in that context,

7    but they filed --

8            THE COURT:  That can be also otherwise disclosed in

9    the discovery process.

10           MR. McDONALD:  Yes.

11           THE COURT:  In answer -- a fact that appears in an

12   answer to one question might just as well be probative of

13   another area.  So the mere fact that it appears in a different

14   interrogatory doesn't, I don't think, help you too much.

15           MR. McDONALD:  Well, when their own expert doesn't

16   even pay attention to it, though, it's pretty important, and

17   when their own brief on motion *in limine* number nine to keep

18   out evidence of their own commercial embodiment, when we

19   brought up the issue, well, it might be relevant to damages,

20   they said, well, we don't see how that would be relevant to

21   damages, so what's the point of having this in for that reason.

22   It's too prejudicial for that reason as well.

23           So they're talking about doing a 180 here on facts

24   that previously had nothing to do with damages.  All of a

25   sudden now they're the kingpins of their case, and it's two

1    weeks from trial.  That's exactly the sort of thing that Rule

2    37(c)(1) is designed to prevent.

3                 THE COURT:  All right.

4                 MR. McDONALD:  Thank you.

5                 THE COURT:  All right, Mr. Merritt.  Anything else

6    that you have?

7                 MR. MERRITT:  Your Honor, I know this isn't my

8    motion, but there are a couple of points if I may address them.

9                 THE COURT:  Well, I restructured the argument, and if

10   Mr. McDonald feels like he'd like to say something in response

11   to what you say, he can have the last word.  I'm interested in

12   making sure, the best I can, of getting this right.

13                I think we're down to the real issue about what is it

14   that was ever disclosed about the royalty rate other than in

15   those -- I think there are rates -- there are no rates in any

16   of the settlement papers except the one that's a running

17   royalty of five percent over $15 million, and even then there

18   was a lump sum one I believe.

19                Anyway, what's -- I think we're down to what the

20   issue -- the reasonable royalty rate and how are they

21   prejudiced or not by the failure to say what that is.  You

22   haven't said it yet, have you?

23                MR. MERRITT:  I have not.  And in direct answer to

24   the question, Your Honor, I'm not sure that we would have to

25   suggest a particular rate to the jury based on our reading of

1    the federal circuit cases, and we are getting down to the

2    narrow point here:  What are you entitled to present to the

3    jury and what are they entitled to derive from the evidence in

4    the record.

5           Frankly, we've all passed that point from different

6    directions in this.  If that's what this is down to, I know,

7    I'm assuming a part of what you are suggesting that we do by

8    tomorrow was maybe said in partial jest, but clearly it's the

9    gut issue.  I think the parties ought to brief that.  Let's

10   take a hard look --

11          THE COURT:  Brief what?

12          MR. MERRITT:  What we are permitted to put before the

13   jury and what we're permitted to argue in closing and see what

14   the law gives us guidance on on that.  We believe, based on

15   what we've looked at so far, that we can put in evidence that

16   relates to the *Georgia-Pacific* factors and that a jury is able

17   to take that, without us suggesting or telling them what the

18   rate should be, and arrive at a royalty.

19          Remember, royalty can also be a lump sum.  There's no

20   magic under the law in having a rate.  So we think we should

21   just be careful about that issue and make sure we've got a

22   handle on the law, and we've given the Court the benefit of

23   what the law really provides.

24          THE COURT:  They teed that up in their papers with

25   the *Boston Scientific* decision, and I don't remember seeing any

1    response from you all -- and the ones also on the *Boston*

2    *Scientific*, the page that discusses *Boston Scientific*, where is

3    that?  On page 13?

4            MR. MERRITT:  I'm trying to recall where that is,

5    Your Honor.

6            THE COURT:  13 of their brief, and then there's

7    *Lindemann*, federal circuit, held that 284 does not mean that a

8    patentee who puts on little or no satisfactory evidence of a

9    reasonable royalty and, therefore, contravenes section 284 is

10   entitled to damages I think is the --

11           MR. MERRITT:  *Lindemann* and *Boston Scientific* we

12   discuss at pages two and three of our brief in opposition.  We

13   like the statement of law in *Lindemann* very much.  It starts at

14   the bottom of page two of our brief and continues on three,

15   that "when a 'reasonable royalty' is the measure" of damages,

16   and the bracket is our insertion, "the amount may again be

17   considered a factual inference from the evidence, yet there is

18   room for exercise of a common-sense estimation of what the

19   evidence shows would be a 'reasonable' award."

20           And then the Court in *Lindemann* goes on, "One

21   challenging only the Court's finding as to amount of damages

22   awarded under the 'reasonable royalty' provision of section

23   284, therefore, must show that the award is, in view of all the

24   evidence, so outrageously high or so outrageously low as to be

25   unsupportable as an estimation of the reasonable royalty."

1        Now, that doesn't say directly, but we are inferring

2   from that statement that there is fairly broad latitude on the

3   part of the jury to take a set of facts and to consider those,

4   including profits, revenues, other things, even without, and

5   again I go back to the hypothetical, what about the first case

6   where there's no history of a royalty and if there's no

7   comparable patents out there.  A jury must have some ability,

8   under section 284, to use the remaining *Georgia-Pacific* factors

9   without being directed to a particular rate to derive a

10  reasonable royalty.

11        THE COURT:  You cite *SmithKline*.  It says, "the

12  factual determination of a reasonable royalty, however, need

13  not be supported, and, indeed, frequently is not supported by

14  the specific figures advanced by either party," but in that

15  case and in every case I've seen where that was an issue, there

16  was at least something to guide the jury in the exercise of a

17  decisional process, and I don't see that *SmithKline* or

18  *Lindemann* really say you can send to a jury just the raw data

19  and have no basis for what the reasonable royalty would be.

20        MR. MERRITT:  I guess what we're saying is --

21        THE COURT:  Even now they don't know what you want,

22  and I don't know.

23        MR. MERRITT:  Well, we do not believe, when it comes

24  to a specific rate, that there is any authority for the

25  proposition that under these circumstances, we must state a

1    rate.

2            THE COURT:  Well, do you propose to go to the jury

3    with an argument that's sort of like a personal injury case,

4    that we've been infringed, here are the bottom line facts and

5    you just do what you think is right, and then I have to deal

6    with it on a post-trial motion from you if they come back at

7    half a dollar or from them if they come back at $500 million as

8    outrageously high or low?  You think that's the way it can go?

9            MR. MERRITT:  In a general sense, yes.  In terms of

10   the post-trial handling of that by the Court, even if we gave

11   specific rates, alternative rates through Mangum and Green who

12   are both gone now, there's still the possibility that a jury

13   could run in the wrong direction either way.  I don't know how

14   we eliminate that.

15           THE COURT:  I understand that, but I'm saying, in

16   other words, you're going to treat this like a personal injury

17   case and say, give me what you think is fair.

18           MR. MERRITT:  Well, I think it's not that loose.

19   This is not like pain and suffering.  The fact is you're going

20   to have a revenue base that will, by definition, contain at the

21   top end what can be awarded.  You're going to have

22   profitability information such as it is even though it's

23   product specific that's going to show what the profitability of

24   this is which will be another containing factor.

25           You've got some tests that are in federal circuit law

1  which -- some of which have been criticized, by the way.  The

2  federal circuit, as we know, you can find cases that are

3  intentioned on some of these points, but there's a 25 percent

4  of profits rule of thumb that's been used in the past to look

5  and see if a verdict is within a reasonable rate.

6          THE COURT:  Do I tell a jury that as a practical

7  matter, you should award damages no more than 25 percent of the

8  profits?

9          MR. MERRITT:  No, sir.  We don't believe you should,

10 but --

11         THE COURT:  How does that play into this then?

12         MR. MERRITT:  If a jury did come back with a figure

13 that was too high, the Court felt was not supported in any way

14 by the evidence -- let's say we took the $600 million in

15 revenues that these folks made from these products, and the

16 jury came back and said, we're going to give you all

17 $600 million that they made of these products --

18         THE COURT:  You'd choke on that, wouldn't you?

19         MR. MERRITT:  We'd choke on that.  We'd know what the

20 likely result of that would be.  However, the Court could look

21 at that, and you could put us on terms, and it might use

22 something -- and I'm not suggesting it's correct, but you might

23 use something like the 25 percent of profits rule.  In other

24 words, there are ways to give the jury the latitude to use the

25 evidence but to make sure that at the end of the day the jury

1   doesn't run out of bounds.  But whether or not -- we are not

2   aware of anything --

3          THE COURT:  They don't even know what you're going to

4   be doing.  You haven't structured this even in your proposed --

5   your contentions in the final pretrial order, Mr. McDonald

6   says.  You haven't outlined even what you're going to do here

7   at this stage of the game.  I mean, we still, right now, have a

8   trial set for one week from today, yesterday.

9          MR. MERRITT:  Your Honor, all I can tell you is we

10  have disclosed the facts that we believe would support a

11  *Georgia-Pacific* instruction that would allow a jury to look at

12  those and support a verdict.  We, at this point, do not plan to

13  propose a rate to the jury, but we do believe we can put

14  evidence in from which a jury can derive a rate.  We think the

15  law permits that.  We can understand why this is a --

16         THE COURT:  Are you going to ask for a rate, or are

17  you going to ask for a lump sum?

18         MR. MERRITT:  We are going to say, these are the

19  facts, and we are asking you to go back and award a royalty

20  that you believe is supported by the evidence.

21         THE COURT:  Either lump sum -- do I tell them it can

22  be either a lump sum amount or a percentage?

23         MR. MERRITT:  If, at the close of our evidence, Your

24  Honor, you believe that instruction is properly supported, you

25  could.

1          THE COURT:  But isn't that what you have to tell a

2    jury if you're doing it the way you're doing it?

3          MR. MERRITT:  Yes, sir.

4          THE COURT:  In other words, they have -- there are

5    two kinds of royalties that can be awarded.  A reasonable

6    royalty can be a paid-up royalty in which event you can tell

7    the jury, you can impose a reasonable royalty of some amount,

8    and for that amount, then the consequence of that would be that

9    Lawson would have a license to practice this patent until it

10   expires; isn't that what you would tell them?

11         MR. MERRITT:  Yes, sir.

12         THE COURT:  And alternatively, you could establish a

13   royalty rate of some percentage, and what would I tell them it

14   would be a percent of; sales, revenues, profits, what?  How do

15   I do that?  Ordinarily, it's profits, isn't it?

16         MR. MERRITT:  Yes.  You can determine what percentage

17   of the profits you think could be awarded as a reasonable --

18         THE COURT:  I don't mean ordinarily, but it's one of

19   the ways because it's much easier to do it on sales because

20   it's a lower -- it's a different figure because --

21         MR. MERRITT:  It's easier to measure.

22         THE COURT:  Because you know what the sales are.  You

23   don't have a variable of cost accountancy coming in and

24   changing what the amount is.  All right.  Anything else?

25         MR. MERRITT:  The only other -- these are very quick

1    points, and I don't want to belabor them because I do think

2    we've gotten to the main point on this and identified it.

3    There were two statements that were made.  I simply want to

4    make sure you are deciding this, Your Honor, on a correct

5    record.

6            The statement was made that Mr. Farber, when he was

7    testifying -- Mr. Farber is an ePlus witness -- about licensing

8    history, that he, in effect, asserted the attorney/client

9    privilege and didn't respond to those questions.  At least

10   that's the way I understood the argument and the way I

11   understand what's in the reply brief as well that Lawson filed

12   at page three.

13           Just so that you'll be comfortable that he did not do

14   that, we have included behind tab B, which I handed up, the

15   relevant passage of Mr. Farber's deposition.  What he was

16   actually being asked during the deposition was about the

17   licensing negotiations for SAP and Ariba.  The point he was

18   making was that at the time of those negotiations, because of a

19   protective order that was in place, the revenues of SAP and

20   Ariba were attorneys' eyes only, and he, as an ePlus executive

21   was not permitted to see them.

22           At one point he misspoke, as a layman will sometimes

23   do, and he used the term attorney/client in juxtaposition with

24   confidential, but, clearly, there was no objection to his

25   testimony based on attorney/client privilege, nor did he assert

1    it.  We wanted that to be clear.

2         The other thing, a point was made about ePlus talking

3    out of both sides of its mouth in connection with an earlier

4    motion to exclude evidence.  If you want to, Your Honor, just

5    to confirm what the state of the record is on that, behind tab

6    A, there are several orders that you entered on these various

7    motions *in limine*.

8         The very last one, the last two pages behind tab A is

9    the order that you entered with regard to motion *in limine*

10   number nine that ePlus filed which is to preclude Lawson from

11   proffering testimony, evidence, or argument improperly

12   comparing the accused products in the commercial embodiments of

13   ePlus and its predecessors for the purpose of proving

14   non-infringement.

15        That motion was limited in that regard, and that is

16   the order that you entered granting that motion and that motion

17   alone.  It did not mean that that evidence would not be useful

18   by the parties for other issues in the case.  So to the extent

19   that it was suggested otherwise, we simply wanted you to have

20   an accurate record on what your prior ruling had been.  Those

21   are my only comments unless the Court has any further

22   questions.

23             THE COURT:  All right.

24             MR. MERRITT:  Thank you, Judge.

25             THE COURT:  Mr. McDonald, you do have the last word.

1           MR. McDONALD:  I'll try to keep it short, Your Honor.

2           THE COURT:  Excuse me, before you start.  What are

3    you suggesting briefing on?  What did you want to file a brief

4    on?

5           MR. MERRITT:  You have asked the question, Your

6    Honor, what -- I suppose one way to articulate it is, what is

7    the minimal argument that federal circuit law would permit us

8    to make to the jury on the question of a reasonable rate, do we

9    have to give them a rate, do we allow them to derive a rate.

10          It seems to me that that may be the point we're

11   coming down to on all of this, and I'm not sure it's been

12   grappled with directly.  It's been touched on in the parties'

13   briefs clearly, but I'm not sure it's been grappled with

14   directly and fully, and it's a significant and important point

15   that you may want us to take our best shot at before having to

16   rule on that.

17          THE COURT:  All right.  I understand.

18          MR. McDONALD:  Your Honor, just three points.  One,

19   with respect to the order on the commercial embodiments that's

20   their tab A, the last order of Exhibit A, actually the Court

21   did rule on using that information for purposes other than

22   infringement.

23          Quote, to the extent that the proposed comparisons

24   are offered for the alternative purpose of proving commercial

25   success, the motion, motion to exclude, is granted because the

1    comparisons are of marginal relevance, and any probative value

2    would be substantially outweighed by the risk of jury confusion

3    and unfair prejudice under Federal Rule of Evidence 403.  That

4    was ePlus's request to keep out that information, so I want to

5    clarify that.

6         On Mr. Farber's testimony, I did read and follow

7    along with Mr. Merritt, and as I read it, I understood what he

8    was saying.  The witness did refer to attorney/client

9    privilege, but I understand what he's saying.  That probably

10   wasn't really the right thing for him to say.  The point,

11   though, was he didn't get to see the information, and so how is

12   he going to testify.  That's the point.

13        If we're talking about the circumstances of the Ariba

14   and the SAP settlements and he doesn't know the information,

15   Mr. Mangum's not testifying, nobody else can testify as to the

16   actual facts either.

17        Finally, so Mr. Merritt is now saying they are not

18   going to provide a computation of damages ever, right through

19   the closing arguments.  Rule 26(a)(1)(A) requires a party must

20   provide a computation of each category of damages.  ePlus's

21   steadfast refusal, even as of today, and promise to the Court

22   that even through closing arguments they will never comply with

23   that rule pretty much mandates, in my opinion, that that

24   damages theory should be excluded from trial under

25   Rule 37(c)(1).  Thank you.

1          THE COURT:  When all is said and done, the issue here

2     is a fairly simple one.  The fact of the matter is that this

3     motion is brought under Rule 37(c).  37(c)(1) has a test that's

4     applied in the Fourth Circuit.  The Fourth Circuit says, we

5     consider the surprise to the party against whom the evidence

6     would be offered, the ability of that party to cure the

7     surprise, the extent to which allowing the evidence would

8     disrupt the trial, the importance of the evidence, and the

9     non-disclosing party's explanation for its failure to disclose

10    the evidence.

11          In essence, what we have is no disclosure under

12    26(a)(1) other than that there was -- the plaintiff was seeking

13    a theory of at least a reasonable royalty and that an expert

14    would be, was being retained to work on that and get that

15    straight.

16          The same basic answers were given to the

17    interrogatory.  Rule 26(e)(1) deals with supplementation of

18    responses.  It said, "A party who has made a disclosure under

19    Rule 26(a), or who has responded to an interrogatory, request

20    for production, or request for admission, must supplement or

21    correct its disclosure or response, (A), in a timely manner if

22    the party learns that in some material respect the disclose or

23    response is incomplete or incorrect, and," "and if the

24    additional or corrective information has not otherwise been

25    made known to the parties during the discovery process or in

1    writing."

2            So what is it that we're talking about that wasn't

3    disclosed?  The royalty base is alleged in the -- the theory is

4    alleged as non-disclosed.  The base is alleged as

5    non-disclosed, and the rate is alleged as non-disclosed, and

6    the amount is alleged as non-disclosed, that is application of

7    a rate to a base, either in the satisfaction of Rule 26(a)(1),

8    which is computation of the damages, and that rule, (iii) says,

9    "computation of each category of damages claimed by the

10   disclosing party who must also make available for inspection

11   and copying the documents or other evidentiary material on

12   which each computation is based, including materials bearing on

13   the nature and extent of injuries suffered."

14           So it looks to me as if the supplementation was

15   accomplished here by the Mangum report, both as to the

16   computation and the interrogatory answer.  The Mangum report

17   has been stricken as not in compliance with the precepts of

18   *Daubert* and *Kumho*.

19           I don't think that applying -- I think applying the

20   *Southern States* test, because that's the test that's applied,

21   whereas here the allegation is that a party did not satisfy its

22   disclosure obligations.  If a party fails to provide

23   information or identified witnesses required by Rule 26(a) or

24   (e), the party is not allowed to use that information or

25   witness to supply evidence on a motion at a hearing or at trial

1    unless the failure was substantially justified or is harmless.

2         And in addition to or instead of that sanction, the

3    Court can do alternate sanctions and may impose other

4    appropriate sanctions including any of the orders entered in

5    37(b)(2)(A)(i) through (vi), and that includes prohibiting the

6    disobedient party from supporting or opposing designated claims

7    or defenses or from introducing designated matters in evidence.

8         That is a drastic sanction foreclosing the testimony

9    or prohibiting information in evidence.  I don't think there's

10   any surprise in the disclosure of the theory, and there's no

11   surprise in the disclosure of the royalty base given the record

12   in this case, for it was disclosed in a number -- it comes from

13   Lawson's own figures, and Mangum has that information in his

14   report.

15        So I don't think there's any need to go through the

16   analysis of the ability to cure the surprise or disruption or

17   importance of the evidence and explanation for failure to

18   disclose, but much of the failure to disclose the royalty base

19   lies at Lawson's own feet for dragging its heels in providing

20   financial information that it was requested to provide.

21        The evidence is, however, important because it has a

22   bearing on the ultimate damages in the case and the remedy that

23   is presumptively one under 284 of the statute, and I'm not sure

24   that evidence of the base would provide for disruption at

25   trial.

1          That brings us to the question of the royalty rate or

2     the reasonable royalty.  The reasonable royalty amount can be a

3     lump sum amount, or it can be a percentage.  It has to be a

4     percentage of something.  As of this time, Lawson does not know

5     what ePlus will actually claim.  Therefore, we're on the eve of

6     trial and the pretrial order has been prepared, and the

7     contentions of fact that are recited in it and the contentions

8     of law contain no indication of what Lawson would be required

9     to meet, and in terms of what an amount -- that is claimed

10    either by lump sum or otherwise.

11         I believe there would be a significant disruption of

12    the trial in this fashion and a significant prejudice to Lawson

13    in this fashion.  As in *Boston Scientific* and the other cases

14    cited by Lawson on pages 13 and following of its brief and is

15    taught by *Lindemann* itself, where the record lacks any evidence

16    of a reasonable royalty rate, the federal circuit has approved

17    awarding of zero damages, and nothing in 284 exonerates a

18    patentee from putting on evidence in support of an assertion,

19    nor does nothing in 284 -- is there anything in 284 that

20    changes the fundamental application of the disclosure and

21    discovery Rules 26(a) and 26(e).

22         The evidence is critically important.  The

23    explanation for failing to disclose the evidence is offered

24    by -- of the base is very hard to get a handle on, but it's --

25    I mean of the rate.  ePlus has had jury awards of 37- and

1  $17 million in settlements of a whole lot of other figures, so

2  it could have posited a lump sum figure as a potential

3  alternative.  It chose not to do that.

4          I realize that it may be difficult to connect the

5  two, and I realize that the base here is sufficient that

6  perhaps a rate is a better rate, particularly if you can get a

7  rate of the kind that Mr. Mangum was urging as applied against

8  that base, but, in essence, it's fairly plausible, even after

9  Mangum was excused, to supplement an interrogatory answer and

10  say, we're going to at least ask for this, or, we're going to

11  ask for that, and explain why, and I think at this stage of the

12  proceeding, there would be a substantial disruption of the

13  trial proceedings.

14          I would have to allow Lawson to take depositions.

15  The parties, I will note, have so inundated the Court with

16  paper and objections to things that it may be necessary to put

17  the trial off, but it's not going to be put off by more than a

18  week, and I'm not sure of that right now.  So I believe that

19  applying the *Southern States* calculus on balance yields the

20  result that there will be no evidence permitted on the damages

21  under the facts of this case.

22          That is not to say that in all cases a party has to

23  have an expert to present its damages case.  I think clearly

24  *Dow* teaches us that is not the case, but a party must do what

25  is required by the rules.

1            As I said, these rules were changed.  This whole

2    concept of disclosure was put in in 1993 for a reason.  This

3    one has a reason different than the experts.  The reason here

4    is to let the parties know at the outset of the case what the

5    parameters of risk are all about, and the supplementation

6    responses, requirements were imposed and underscored in order

7    to make sure that the parties were kept abreast of the key

8    issues in the case, one of which is damages as is evidenced by

9    its occupying a separate disclosure provision in 26(a) and by

10   the common-sense fact and knowledge that it's the money that

11   drives most litigation in any event.  That's particularly true

12   in patent cases.

13           So I think on these facts, on this record, in the

14   circumstances that this is presented, Lawson's motion has to be

15   granted, and I understand the teaching of *Lindemann* and *Dow*

16   *Chemical against MME* and the other cases cited by the

17   plaintiffs in their brief, but this is a case where the

18   inattention to the rules have created significant prejudice

19   that I can't figure out a way to undo to Lawson.  So that

20   motion will be granted.  It is now what, quarter to 1:00?

21           THE CLERK:  Yes.

22           THE COURT:  I need to talk with you all about this

23   SKU question, and we have another expert -- whole issue of

24   other expert reports as well, and I want to know some things

25   about the trial that I have some questions on, so we'll take an

1    hour recess for lunch, and we'll be back and I'll hear the rest

2    of it.  Thank you very much.

3

4            (Luncheon recess.)

5

6            THE COURT:  All right, we have the motion in ePlus to

7    strike the expert reports of Staats and Knuth.

8            MR. ROBERTSON:  Good afternoon, Your Honor.  Scott

9    Robertson for ePlus.  Let me start by saying what we're not

10   going to do here today, and that is reargue the motion *in*

11   *limine* number five and get into what a discipline is again,

12   Your Honor.

13           We accept the Court's ruling, and the question

14   becomes, what did we understand was going to occur with the

15   Court's order that the defendant may use one additional expert

16   on the topic of source code and one additional expert on

17   invalidity as to 102 and 103 issues, and what we decidedly did

18   not expect was what has, in fact, occurred here, and, indeed,

19   Your Honor will recall on at least a couple of occasions, I

20   expressed my concern out of an abundance of caution with the

21   Court as to this issue of doing overlapping reports or me-too

22   reports or submitting reports on the same subject matter that

23   had already occurred, and what we found here, Your Honor, was

24   that's the situation we're in now.

25           If, at the end of that hearing, Lawson had stood up

1    and said, well, here's what we expect to do, Your Honor, in

2    light of your ruling, and that is, we're going to wait about a

3    month, and then we're going to issue a report that is 127 pages

4    long with 474 paragraphs --

5              THE COURT:  Who is that?

6              MR. ROBERTSON:  That is Dr. Staats.

7              THE COURT:  We're talking about Staats now?

8              MR. ROBERTSON:  Yes, sir.  That is identical on all

9    the topics and the issues with respect to this anticipation and

10   obviousness that Dr. Shamos had already opined on and that the

11   plaintiff had taken Dr. Shamos's deposition in reliance on

12   those opinions being offered.  We had prepared Mr. Hilliard's

13   responsive rebuttal report in reliance that those were going to

14   be the opinions.

15             We then deposed Dr. Shamos, and then Dr. Shamos

16   offered surrebuttal opinions with respect to that.  And then

17   what we're going to do, Your Honor, Lawson counsel would say,

18   is right on the eve of trial, we're going to submit this report

19   that completely swaps out Dr. Shamos for Dr. Staats.

20             And in Mr. McDonald's rather lengthy letter to you,

21   he actually concedes that it's true that the subject matter of

22   the Staats report substantially overlaps, if not entirely

23   overlaps, the Shamos report.

24             So here we find ourselves, Your Honor, potentially on

25   the eve of trial, with a completely new expert who we have not

1    deposed, who we have not filed a rebuttal report, who now has

2    changed and modified and expanded on his opinions with respect

3    to all of the prior art that Dr. Shamos had previously opined.

4    We were offered a one-time-only deposition of Dr. Staats three

5    business days after we received his report which we were not in

6    a position to take, and we don't have a rebuttal report for Mr.

7    Hilliard prepared, and if we have to, it's going to take great

8    time and expense to go through this 127-page report with 474

9    separate paragraphs.

10           Now, I didn't certainly expect that.  I don't think

11   the Court expected that that was going to be the result of your

12   order in motion *in limine* number five, that the defendant would

13   get to simply drop its invalidity expert and introduce someone

14   wholly new who, remarkably, however, as an independent expert,

15   came up with the same ultimate conclusions that Dr. Shamos

16   found with respect to all this prior art that's been offered.

17           Now, to be sure, Dr. Staats has expanded on many of

18   the opinions of Dr. Shamos, and has, in fact, done what really

19   would be characterized as a sur-surrebuttal to Mr. Hilliard who

20   will now not have an opportunity to respond to those arguments

21   unless, of course, the Court permits him to do so.  I would

22   suggest that this certainly was not what the Court intended

23   when it was going to permit an additional expert on these

24   issues of anticipation and obviousness.

25           And the prejudice to us at this late date as we're

1   trying to prepare for a potential trial where we would need

2   rebut him and go take his deposition, probably do it the week

3   before the trial or even during our case in chief, I think, is

4   clear and manifest, Your Honor.

5          So respect to Dr. Staats and his effort at the last

6   minute to run away from Dr. Shamos, who we had been relying on

7   since he was disclosed and provided an expert report back in

8   May, we think is wholly improper and clearly could not have

9   been what the Court intended.

10         Now, to be fair, Mr. Knuth, if that's how you

11  pronounce his name -- I believe it is -- is in a slightly

12  different situation.  The problem with Mr. Knuth's report,

13  which, again, is 40 pages long and 125 paragraphs, the problem

14  with his report, however, is instead of doing what the Court

15  directed, that is meet Mr. Niemeyer's expert report, who was

16  our source code report, he goes well beyond that and treads on

17  top of and overlapping with Dr. Shamos's opinions.

18         And we went through at some length, Your Honor --

19  this was fairly hastily prepared because I attempted to bring

20  it to the Court's attention the day after we obtained these

21  reports, but at page ten of our initial brief through page 13,

22  we show a number of instances, sir, where Mr. Knuth's opinions

23  substantially overlap with Dr. Shamos's opinions.

24         Now, Mr. Knuth also expresses opinions with respect

25  to non-infringement positions.  You will recall, and it's

1   represented in the papers, that Lawson concedes that Mr.

2   Niemeyer made no non-infringement arguments.  He doesn't even

3   address the claims, he doesn't address any of the contentions

4   or the Court's construction.  He simply looked at and

5   interpreted the source code that is the accused source code for

6   the accused product in this case.

7            Now, to be sure, Mr. Knuth, in some instances, in

8   some of the 125 paragraphs, does, in fact, respond to some of

9   the positions and opinions of Mr. Niemeyer.  Again, Mr.

10  Niemeyer will not have, unless the Court permits, an

11  opportunity to respond to those, but to the extent that Mr.

12  Knuth opines on non-infringement positions or, indeed, he goes

13  on to opine on invalidity positions, that does not properly

14  meet Mr. Niemeyer's report as the Court suggested was the

15  proper scope of any report.

16           Of course, again, we're confronted with the same

17  situation that these reports are provided to us on the eve of a

18  trial, warrant a response, otherwise ePlus would be seriously

19  prejudiced, and warrant the ability to take a deposition of at

20  least Mr. Knuth if, in fact, he's going to go forward on his

21  source code opinions.

22           Of the approximately 125 paragraphs in the report, I

23  would suggest that about 60 or more are improper.  Now, I'm

24  probably a little biased here, but we have outlined a number of

25  them, and in particular, one of my concerns is with respect to

1   his invalidity opinions.  He attempts to get in through the

2   back door facts and opinions that this Court has already

3   excluded.

4           You will recall that there was a motion *in limine*

5   with respect to version 5.0 and 6.0, and the Court has allowed

6   evidence with respect to those systems for very limited

7   purpose, and that was one element of one claim of the '683

8   patent.

9           Now, to be sure, Mr. Knuth does not expressly

10  reference 5.0 and 6.0.  In fact, Mr. McDonald said that in his

11  letter to the Court.  He was very careful to say that, because

12  what he continues to do is talk about the prior systems, quote

13  unquote, of Lawson, and continues to say that the prior systems

14  could do X or the prior systems could do Y, and, indeed, you

15  will recall that when we received the report initially, it

16  referenced version 7.0.

17          Now, I had raised that issue again with the Court in

18  a conference call, and it was represented that they would not

19  be offering 7.0 in this report, so we were surprised to see it.

20          Now, afterwards, they did, the next day, produce a

21  redacted version, but all it simply does is sanitize the report

22  by referencing the 7.0.  It still has numerous references to

23  these prior systems --

24          THE COURT:  You mean by deleting 7.0?

25          MR. ROBERTSON:  By deleting the words.  In fact, Your

1    Honor, I can hand you up a copy, if I could, of the redacted

2    version which I believe opens at appendix D.  In many

3    instances, all they've done is just delete the reference to

4    7.0.

5            As you will see -- maybe I can give you some specific

6    examples -- starting at page 12 of our initial brief, at the

7    bottom of the page, you'll see there's comparisons between

8    opinions that Dr. Shamos has already given and these opinions

9    that Dr. Knuth gives on invalidity, again not meeting what Mr.

10   Niemeyer addressed because Mr. Niemeyer never addressed any

11   invalidity issues.

12           Here's what he says:  I'm aware of earlier versions

13   of the F3 software that included these modules dating back to

14   at least the 1980s.  They are talking about the 5.0 versions

15   and 6.0 versions and other prior versions before 2002 that Your

16   Honor said could not be admitted for any purpose other than

17   this one narrow issue.

18           I can cite many more examples.  In fact, they go on

19   to the next page in which he continues to refer to these prior

20   systems and the functionality, but Your Honor had ruled that it

21   would be confusing, it's irrelevant, and it certainly does not

22   meet the Niemeyer report who never addressed these issues at

23   all.

24           So here we find ourselves, Your Honor, potentially on

25   the eve of trial, where we would be severely prejudiced if we

1    have to go out and respond to these.  I don't think it was in

2    the spirit of the letter of the Court's rulings on these

3    issues.  Thank you.

4              MS. STOLL-DeBELL:  Good afternoon, Your Honor.

5              THE COURT:  Afternoon.

6              MS. STOLL-DeBELL:  I think we need to go back and

7    look at where we started from, and when I was here arguing

8    before you on our motion *in limine* number five, we had two

9    complaints about ePlus's multiple experts.  The first was that

10   there would be overlap between Mr. Niemeyer and Dr. Weaver on

11   the infringement issues, and I have never conceded that Mr.

12   Niemeyer is not giving infringement opinions.  I can see that

13   he doesn't use the word infringement, but I do believe gives

14   infringement opinions, and I do believe that there's overlap

15   between him and Dr. Weaver.

16             Our second complaint was the prejudice that would be

17   caused to Lawson by ePlus having three technical experts when

18   Lawson only had one, and we only had one because we were

19   following scheduling order one-expert-per-discipline rule, and

20   I believe I referred to it as the parade of ePlus's technical

21   experts and our concern that the jury would find their

22   positions to be more credible simply because they've got three

23   experts and we have one.

24             And so what I understand Your Honor to order, what we

25   all understood Your Honor to order, was to allow us essentially

1    to replace some of Dr. Shamos's opinions with two additional

2    experts so that we would have the same number of experts as

3    ePlus.  There would be balance in the sides.

4          To talk first about Dr. Staats, we believe we were

5    following two guidelines that you gave us.  The first was that

6    we were to rebut Mr. Hilliard's report, and the second was that

7    we needed to stay within the confines of our second

8    supplemental invalidity contentions.  I think that was

9    abundantly clear to us that we needed to do that, and, in fact,

10   we did, Your Honor.  Had we stepped outside, even with a toe

11   outside of that contention, you would have heard about it from

12   ePlus, but we didn't.

13         And so if you look at those things, I mean, if we

14   have to stay within the confines of the second supplemental

15   invalidity contention and rebut Mr. Hilliard, I mean, if we

16   couldn't overlap what Dr. Shamos said, there would have been

17   nothing for Dr. Staats to say because Dr. Shamos gave an

18   opinion on everything that was in those second supplemental

19   invalidity contentions, and more, which was stricken.  So, you

20   know, if you follow what ePlus says, then really there was no

21   relief for Lawson at all because there was nothing that Dr.

22   Staats would be permitted to say.

23         If we can go to slide five.

24         THE COURT:  Is that the same book he handed up?

25         MS. STOLL-DeBELL:  It is.

1          MR. CARR:  There's a tab in the book.

2          MS. STOLL-DeBELL:  There should be numbers on the

3    bottom.

4          THE COURT:  Staats, Knuth; which one?

5          MS. STOLL-DeBELL:  Number five.  So, you know, I

6    guess, I would direct you to look first at slide number two.

7    That is where we started, Your Honor.  We had one technical

8    expert to deal with all of the issues in this case.  We believe

9    the relief that you granted us was to give us two additional

10   experts, and we did, in fact, do that.

11         We are, in effect, replacing of some Dr. Shamos's

12   invalidity opinions with Dr. Staats, and we do not intend to

13   have overlapping testimony.  Dr. Staats will talk about all of

14   the 102 and 103 invalidity issues with the exception of the

15   Lawson version five and version six for that one element of

16   claim six of the '683.

17         The reason that we left that with Dr. Shamos is he's

18   already going to be giving testimony about Lawson's software,

19   and so it seemed to us much more efficient to have Dr. Shamos

20   talk about the prior version of Lawson software which is

21   similar for that one particular element of that one claim, and,

22   frankly, we needed to find two additional experts after you

23   entered your order, we needed to have them review the prior

24   art, they needed to get up to speed, they needed to prepare

25   expert reports, and so for that reason, it seemed to make sense

 1    to have Dr. Shamos stick with that one particular aspect of

 2    section 102 and 103, but otherwise it will be Dr. Staats.

 3              Now, ePlus, I mean they admit that Dr. Staats is

 4    giving the same 102 and 103 invalidity opinions as Dr. Shamos.

 5              THE COURT:  Same result, different reasons, they say.

 6              MS. STOLL-DeBELL:  I don't think it is different

 7    reasons.  There are two different men who prepared two expert

 8    reports, but I think the reasoning is fundamentally the same.

 9    If you go to slide eight, I think the one example that they

10    gave to show that it was what they called dramatically

11    different reasoning related to the means for searching for

12    matching items element of claim three.

13              I believe that both experts have fundamentally the

14    same reasoning.  They both say that PO Writer searched, did key

15    word searching and could search for item description.

16              Dr. Shamos said that at paragraph 183 of his expert

17    report.  Dr. Staats says that at paragraph 249.  They both cite

18    the same PO Writer manual.  They cite to the same section of

19    that manual, and they even cite to the same page which has

20    Bates number L0126945.

21              So, I mean, they both say this prior art reference

22    could search for matching items.  They didn't use exact words.

23    That's because they each prepared their own report as is

24    required by the rules.  I don't think it would be proper for us

25    to have Dr. Staats get up and testify about a report prepared

1    by Dr. Shamos.  So, there is going to be some --

2                THE COURT:  Excuse me one minute.

3

4                (Brief interruption.)

5

6                MS. STOLL-DeBELL:  In any event, I think their

7    reasoning is fundamentally the same.  I think their reports are

8    not verbatim because two different men prepared them, but, you

9    know, they are citing the same sections, they are saying it

10   does the same thing, and it's just not fundamentally different.

11   And I think that's the only example they gave of that, Your

12   Honor, out, you know, I don't know, however many hundreds of

13   pages of Dr. Staats' report there were.

14               THE COURT:  All right.

15               MS. STOLL-DeBELL:  So with that, do you have any

16   questions about Dr. Staats' report?

17               THE COURT:  No.

18               MS. STOLL-DeBELL:  Okay.  Moving on to Mr. Knuth, I

19   think we had one guideline we were supposed to follow with

20   that, and that is to rebut Mr. Niemeyer.  As I argued to you

21   when we were here before, we believe that there are substantial

22   overlap between Mr. Niemeyer's report and Dr. Weaver's report.

23   Both of them were talking about Lawson's accused software and

24   how it works.

25               One of the big issues for the infringement case is

1    whether Lawson software has catalogs.  You've probably heard

2    about it already, and it's going to be a central theme of this

3    case and maybe the most important and definitive issue in this

4    case.

5              Mr. Niemeyer talks about Lawson software having

6    catalogs.  He doesn't say the claim requires a catalog.  He

7    doesn't quote your definition of catalog, but he says it's got

8    catalogs.  And then Dr. Weaver talks about the catalogs and how

9    that meets the claim elements.  And so as we're trying to rebut

10   Mr. Niemeyer, it becomes intertwined with Dr. Weaver.

11             I've got a good example of this.  If you go to slide

12   ten, these are all paragraphs from Mr. Knuth's expert report,

13   and he is basically rebutting Mr. Niemeyer's opinion that

14   Lawson software has catalogs, and through that he needs to --

15   he needed to get into or rebut some of the things that Dr.

16   Weaver said as well, and so I think we did follow your

17   guidelines is what I'm saying.  We did rebut Mr. Niemeyer, and

18   that required some rebuttal of Dr. Weaver, too, because they

19   are so intertwined.  They are both basically saying the same

20   thing.

21             THE COURT:  All right.

22             MS. STOLL-DeBELL:  Regarding version seven, we think

23   it is relevant, but we're trying to avoid this motion, Your

24   Honor.  We were trying to get ready for trial.  They were upset

25   by it, and we volunteered to pull it out to avoid this all, and

1    it wasn't good enough, and they are still arguing about it.

2              The fact of the matter is we pulled it out, Mr. Knuth

3    will not talk about it at trial, and it ultimately didn't work

4    and they still brought the motion, but it's out.

5              THE COURT:  All right.

6              MS. STOLL-DeBELL:  Then, finally, Mr. Knuth is not

7    giving invalidity opinions.  He's just not.  He's talking about

8    how Lawson software works.  To the extent that he had brief

9    references to Lawson's older software, again, it was to rebut

10   Mr. Niemeyer and to rebut Dr. Weaver, and a good example of

11   that is on slide 11.

12             Mr. Niemeyer talks about this software program called

13   PO 536, and that is a way that Lawson came up with to

14   automatically load data into their item master database, and

15   you can see that as the first quote up there, paragraph 40.

16             Dr. Weaver also talks about PO 536, this automatic

17   loading of catalog data, again showing that they both talk

18   about the same thing, and he says that was first done in 2001.

19             Mr. Knuth came back and rebutted what Mr. Niemeyer

20   said about that.  He said, by the way, that's not true, it

21   wasn't first done in 2001, we've been doing this functionality,

22   and he went through and talked about how they've been doing it

23   for a long time.

24             I think it was proper.  I think it's rebuttal to

25   correct the record and to correct the incorrect statements that

1    were made by Mr. Niemeyer and Dr. Weaver.

2           Finally, this deposition issue, when we were on the

3    phone with you, and I think all along we told ePlus we would

4    have the expert reports prepared by August 25th and that we

5    would make these experts available to them for a deposition the

6    week of September 30 -- or August 30 through September 3rd.  We

7    did, in fact, do that.  We gave them as much notice as we

8    could.  We booked travel.  I had travel.  They had depositions

9    set at ePlus's counsel's office in D.C.

10          I asked him twice, are you sure, we're making these

11   witnesses available, they've got travel plans.  Mr. Knuth was

12   on a family vacation.  He had plans to leave there so they

13   could take his deposition, and they refused.  So for them to

14   get up and say they haven't had an opportunity to depose these

15   experts is just wrong.  We did everything that we could to make

16   them available, and they refused to take them, and I don't

17   think they should be permitted to stand up here and say that

18   they are prejudiced because they can't take the depositions

19   when clearly they could.

20          THE COURT:  All right.

21          MS. STOLL-DeBELL:  Are there any questions I can

22   answer?

23          THE COURT:  No, thank you.

24          MR. ROBERTSON:  I'll be brief, Your Honor.  Your

25   Honor made something perfectly clear, and that was there was to

1    be no overlapping opinions.  As I suggested to you starting at

2    page ten of our initial brief, we've got side by side Mr.

3    Knuth's opinions on non-infringement and Dr. Shamos's opinions

4    on non-infringement.

5           Right now I don't know who is offering what, but

6    they're clearly overlapping.  Dr. Niemeyer, Mr. Niemeyer never

7    opined on any opinions regarding infringement.  How do we know

8    that?  Well, two things.  Here's Mr. Shamos's or Dr. Shamos's

9    report at paragraph 179.  Quote, Mr. Niemeyer does not express

10   any opinions relating to infringement.

11          That's Dr. Shamos.  Here's Mr. Knuth and his most

12   recent report.  Mr. Niemeyer does not state any ultimate

13   conclusions regarding infringement.  That's Mr. Niemeyer.  So

14   what are they doing responding if Mr. Knuth's report was only

15   to address Niemeyer?  What is he doing responding to Dr. Weaver

16   repeatedly throughout that?

17          What Mr. Niemeyer was doing was simply looking at

18   that time source code and saying the source code tells me the

19   system has this functionality.  He did not make --

20          THE COURT:  What are you upset about if they don't

21   have Staats and Shamos testifying to the same thing?  Did you

22   nail Shamos down pretty good, and you felt like you had a good

23   opportunity to blow him out of the water, and now they've got

24   somebody that's come in and corrected the foul-ups that he made

25   in his deposition and giving them a better case?  Is that what

1    this is all about on Staats?

2         MR. ROBERTSON:  No, sir.  I mean, do we --

3         THE COURT:  I would think that's what it would be

4    about.

5         MR. ROBERTSON:  Do we feel we made some progress

6    pinning Dr. Shamos's ears back?  I think we did.

7         THE COURT:  If I were making the argument, I'd say,

8    look, I had this guy nailed, and then they come in and they

9    don't like what he did, and, wham, they're replacing him, but

10   that doesn't seem to be the complaint, is it?

11        MR. ROBERTSON:  No, that is the complaint, Your

12   Honor.

13        THE COURT:  It is the complaint?

14        MR. ROBERTSON:  This is significant bait-and-switch

15   on us after we pinned down and spent considerable resources

16   pinning down Dr. Shamos with respect to his report, and now

17   here we are, and we have to do a complete do-over if this gets

18   allowed at additional considerable expense by having to have

19   our expert go back and look at it.

20        Dr. Staats, in his report, also addressed more than

21   165 times Mr. Hilliard's rebuttal report, and Mr. Hilliard now

22   doesn't get to respond to that.

23        My last final point is Mr. Niemeyer, neither Mr.

24   Niemeyer nor Dr. Weaver have discussed this Lawson's prior art

25   system, so I don't understand why Mr. Knuth needed to go back,

 1    especially in light of this Court's rulings with regard to the

 2    prior versions and reference those.  Thank you.

 3         THE COURT:  I issued the opinion or the order that I

 4    issued allowing the extra experts for Lawson, and it never

 5    crossed my mind that one expert would be substituted for

 6    another, nor do I think that anything I said or did reasonably

 7    could have led to that result, and there was to be an expert

 8    who was to address just the source codes.

 9         Now, what's happened is that Lawson has taken

10    advantage of the situation, has gone well beyond what it is

11    that I ordered and contemplated.  I think I made that clear,

12    and the bottom line is that Staats and Knuth aren't going to

13    testify.  I'm going back to where I was.  I didn't give you all

14    free rein to go out and get new experts and change the game at

15    the end of the time.  I was trying to allow some equity into a

16    situation.

17         If, in fact, Knuth can testify just to source code,

18    then I suppose it's all right to let him testify to that.  Is

19    there a part of his report where he testifies just to source

20    code, and that's all, and responds to Hilliard -- is it

21    Hilliard or Niemeyer?  Niemeyer is the source code.  Responds

22    to Niemeyer?

23         MR. ROBERTSON:  There are paragraphs, to be fair,

24    Your Honor, that do that.  Now, we might have a debate over

25    which ones fairly respond to Niemeyer and which don't --

1          THE COURT:  I'm talking about source code.  I don't

2     want him to get into prior versions, I don't want him to get

3     into infringement or invalidity.  What happens is when you get

4     leeway from the Court, you better stay within it or you get

5     smacked, and I'm not going back, and I'm not going to have the

6     effort to be equitable turned into a 180-degree turn.  I think

7     that results in the application of the principle that he who

8     seeks equity must do equity, and not that that's a guiding

9     precept here, but, in essence, that's what I was trying to

10    accomplish, and when you overstep the bounds at this stage of

11    the proceeding, the only thing I can do is cut it out.

12          If Knuth can testify only on the meaning of the

13    source codes, then he can testify.  And that's all.  The other

14    guy, Staats, is not going to testify at all.  Shamos has

15    covered it all.  You keep Niemeyer and Weaver out of the same

16    patch of ground, and if you let them go in the same patch of

17    ground, they're going to walk right out that door.  Now, I mean

18    you stomp all over that, and then there won't be any problem

19    with it.

20          MR. ROBERTSON:  I understand, sir.

21          THE COURT:  That solves the problem.

22          MR. ROBERTSON:  I would like to have a reasonable

23    opportunity to review the report, respond to it, and take his

24    deposition.

25          THE COURT:  What have you been doing?  You've been

1  studying to write these papers, so you've had time to review

2  it.

3              MR. ROBERTSON:  I've had some limited time to review.

4              THE COURT:  Are you telling me that you worked all

5  over the Labor Day weekend?

6              MR. ROBERTSON:  Well, yeah, we were working over

7  Labor Day weekend, Your Honor.

8              THE COURT:  When do you want to take his deposition?

9              MR. ROBERTSON:  Well, I'd like to take it -- I'd like

10  to discuss it with the Court, the potential trial dates, and

11  see if we can do it within a reasonable time frame prior to

12  that so it doesn't interfere with case preparation or case in

13  chief.  I had a discussion with Mr. McDonald during the recess,

14  and we wanted -- I understand the Court wanted to address some

15  of those issues.

16              THE COURT:  I've ruled on that.  Now, you can take

17  his deposition, and I'll work out a time.  So, by the way, I

18  don't think I said -- I intended to and I had a note to do it,

19  but I don't know that I actually said in ruling on the motion

20  to preclude damages evidence that for the same kinds of reasons

21  set forth in *Boston Scientific* and the other cases cited on

22  pages 13, 14 of the brief of Lawson, I believe there's a

23  significant prejudice that emanates from having everything just

24  thrown at the jury with no guidance and no structure, and that

25  we leave a jury confused because there's no evidentiary

1  parameters to the opinion that they can possibly glean from

2  what can be offered, and to that, what I said earlier, I add

3  that.

4          Now, I would like to know something.  I haven't had

5  the time to completely go through -- I've read the pretrial,

6  final pretrial order.  I haven't gone through all those

7  appendices.  How many depositions and deposition designations

8  are objected to?  Approximately.  A, how many depositions are

9  you offering and how much --

10          MR. ROBERTSON:  I think there are nine in total, Your

11  Honor.

12          THE COURT:  How many pages?

13          MR. ROBERTSON:  There's a few that are considerable,

14  Your Honor, to be fair.

15          THE COURT:  Why are you doing that?  Why don't you

16  have the witnesses?

17          MR. ROBERTSON:  Most of these witnesses are coming

18  live, I think for both parties, with the exception of some

19  third parties.

20          THE COURT:  Why don't you just confine the

21  depositions to the people you can't get here?

22          MR. ROBERTSON:  That's what we've done, sir.

23          THE COURT:  And you still have long depositions?

24          MR. ROBERTSON:  There's one or two in particular.

25          THE COURT:  How long?  What do you call long?

1            MR. ROBERTSON:  One is a third-party witness the
2    defendant is calling --
3            THE COURT:  I'm talking about you.  They can do their
4    own.
5            MR. ROBERTSON:  20, 30 minutes total for most of our
6    third party --
7            THE COURT:  How much of that testimony is objected
8    to?
9            MR. ROBERTSON:  Not a lot, Your Honor.
10           THE COURT:  So it's not going to take me long to rule
11   on those objections then.
12           MR. ROBERTSON:  Not on those third-party customer
13   depositions.
14           THE COURT:  On any of yours.  I'm talking about
15   yours.
16           MR. ROBERTSON:  That's it, Your Honor.
17           THE COURT:  How many exhibits did Lawson offer that
18   you are objecting to?
19           MR. ROBERTSON:  Well, I'm going to give you my best
20   estimate because I asked this very question, and the
21   information I had on Friday, it was maybe -- over the weekend
22   I've lost track.  It was about 280 exhibits being offered.
23   There are about --
24           THE COURT:  Of yours?
25           MR. ROBERTSON:  No, of Lawson.

1          THE COURT:  All right, you're doing Lawson.  How many

2     of that 280 did you object to?

3          MR. ROBERTSON:  Let me be clear.  We have about 110

4     objections, but, Your Honor, many of the exhibits on the

5     exhibit list -- let me just give you an example -- of Lawson,

6     are, we think are exhibits that have already been handled by

7     motions *in limine* in court.  For example, something concrete

8     specific, they have the reexaminations still on the list.

9          THE COURT:  That's out.

10         MR. ROBERTSON:  To be fair, they've indicated on a

11    number of these that they recognize they are excluded.  I don't

12    want to speak for them, but I understand the argument to be

13    that they want to have them on the list so they preserve the

14    issue for appeal.  I think Federal Rule of Evidence 103(a)

15    takes care of that, because it's the subject of an order and it

16    is preserved.

17         THE COURT:  I'm perfectly happy to have them on the

18    list and to say that the motion *in limine* disposed of them, and

19    then I don't have to deal with them.  If you take those out,

20    how many objections, documents, exhibits do you object to?

21         MR. ROBERTSON:  Of the 280, I think it brings it down

22    to about 60.

23         THE COURT:  Are the 60 susceptible to grouping?

24         MR. ROBERTSON:  Yes.  In fact, we have tried to group

25    some of those, and, you know, would be probably able to present

1    that grouping to the Court.  I mean, certainly during pretrial,

2    we would treat them in any kind of argument as grouped

3    together, so for the convenience of the Court, it would suggest

4    that a ruling on the logic behind this grouping would pertain

5    to more than one document.  I don't think we need to go

6    document by document, that's for sure.

7              THE COURT:  Now, Mr. McDonald, how many -- wait a

8    minute.  Mr. Robertson, how many exhibits did you all --

9              MR. ROBERTSON:  We have approximately 390, Your

10   Honor.

11             THE COURT:  And how many of those did they object to?

12             MR. ROBERTSON:  Ballpark is about 170, I think.

13             THE COURT:  Are any of them of the category that are

14   on the list because they want to make sure that they know they

15   are covered by the motion *in limine*?

16             MR. ROBERTSON:  I don't think we have any on our list

17   they would contend are being excluded based on a prior ruling

18   of the Court.  Objections can be grouped together, and we have

19   grouped them together.

20             THE COURT:  What are you going to do with 390

21   exhibits?

22             MR. ROBERTSON:  Well, Your Honor, a fair amount of

23   exhibits may have pertained, or at least 20 or 30 may have

24   pertained to the damages case, so I suppose they can be

25   removed.

1        THE COURT:  Excuse me a minute.  Are they ready?  We

2   don't have the lawyers here yet.  Okay.  Go ahead.

3        MR. ROBERTSON:  We also worked out, I think, a

4   stipulation with respect to one of the accused products.  Just

5   to be specific, there's an S3 product that's being accused and

6   an M3 product.  The parties have been working hard together to

7   come to a stipulation that says, to the extent the jury finds

8   infringement of the S3 product, there would be infringement of

9   the M3 product.  To the extent that the jury finds no

10  infringement of the S3 product, there would be no infringement

11  of the M3 product.

12       I think we're down to -- I think we may be in

13  agreement on that.  That removes another 20 or 25 exhibits.  We

14  are continuing to work to try to get these down to a manageable

15  number.

16       THE COURT:  If you all will leave the papers where

17  you are and make room for the lawyers to sit there for a

18  minute.

19

20       (Recess taken.)

21

22       THE COURT:  The reason I'm asking these questions is

23  to ascertain when the best time to have the final pretrial

24  conference is, and what, if anything, has to be done about

25  sliding the trial date a little bit.  But the question I didn't

```
 1    ask you that is pertinent to that is whether these depositions
 2    that you're going to offer on both sides are on videotape,
 3    because I'm going to rule off of the transcript, but you have
 4    to edit the videotape to conform to the ruling.  So are they on
 5    videotape?  Are all of them or some of them or --
 6              MR. ROBERTSON:  I think all of them are, Your Honor.
 7              THE COURT:  From both sides?
 8              MR. McDONALD:   Yes.  We have two, and I think one of
 9    them may not have been.
10              MR. ROBERTSON:  That was telephonic, so I don't think
11    we videotaped it.
12              THE COURT:  How long are your depositions for Lawson?
13              MR. McDONALD:  The one that's not videotaped is very
14    short.  The other one that is videotaped is somewhat longer.
15    I'm not sure if I can tell you in minutes.
16              THE COURT:  Half an hour, hour?
17              MR. McDONALD:  Somewhere between half hour and
18    45 minutes.
19              THE COURT:  How many objections did they lodge to
20    your two depositions?
21              MR. McDONALD:   I think there was a significant
22    number.  Does that sound right?  I was talking McLaughlin and
23    Fielder.  That's the number of objections.
24              MR. ROBERTSON:  Fielder is a fair amount of
25    objections, Your Honor.
```

1          THE COURT:  But if it's only 30 minutes, I ought not

2    have too much trouble.  All right, I don't think it will take

3    longer than a day to do the final pretrial conference.  Do you?

4    You're going to have to -- let me ask you, you know, Judge

5    Merhige had a rule, the wisdom of which I have just decided --

6    it has eluded me, but now I understand it.  If you don't use an

7    exhibit at trial, it's out.  It's not in the record anymore.

8          I haven't ever done that before, but I'm about ready

9    to do it.  This is too many exhibits for a case like this.

10   500, 600 exhibits?  Good grief.  I've tried a 13-party

11   multi-defendant case with fewer exhibits than that.  So why do

12   you have so many exhibits?  Mr. Robertson, you have 390.

13         MR. ROBERTSON:  I think now we're going to be below

14   300, and we're going to make an effort to whittle it down even

15   more than that, but it's a fact-intensive case involving a lot

16   of different facts that point to the infringement, and we need

17   to draw upon that from a number of different documents and a

18   number of different source code.

19         There are some documents that were fairly voluminous

20   that we'll be removing, but still, with the infringement case,

21   there is about -- excuse me.

22         THE COURT:  Do you want to get some water?  Do you

23   want a cough drop?

24         MR. ROBERTSON:  Water will do.  We're going to make

25   an effort, Your Honor, to get it down as small as we can, and

1    then I think -- certainly we don't want to be cumulative and

2    gild the lily, but there's a number of documents that are

3    relevant to the infringement case.

4         THE COURT:  You know, Rule 611 is one of the most

5    often used rules in the Eastern District of Virginia.

6         MR. ROBERTSON:  I was not aware of that.  One of the

7    things we're going to try to do is Federal Rule of Evidence

8    1006 summaries for a number of these documents.

9         THE COURT:  That's fine.  All right.  I'm not sure

10   this is going to be a particularly long final pretrial

11   conference in any event.  So we have the time reserved on the

12   13th to start the trial, but do we know, Mr. Neal, if this --

13   do we a motion to dismiss tomorrow?

14        THE CLERK:  Yes, sir.

15        THE COURT:  Cullen?

16        THE CLERK:  Yes, sir.

17        THE COURT:  That's 9:30, isn't it?

18        THE CLERK:  Correct.  Actually, no, it's not correct.

19   10 o'clock, I have.  It might take an hour and a half, multi

20   defendants.

21        THE COURT:  Oh, yeah.  I do remember.  It's a lengthy

22   RICO case, isn't it?

23        THE CLERK:  Yes, sir.

24        THE COURT:  Then the suppression motion is going to

25   take most of the morning --

1          THE CLERK:  That's scheduled for two hours at least.

2          THE COURT:  And I have to do that.

3          THE CLERK:  You have a competency hearing at one

4     o'clock.

5          THE COURT:  Wednesday and Thursday, I can't do it,

6     but I don't think it's going to take you too long to conform

7     your rulings on objections, so we could have the pretrial

8     conference the 13th and start, say, the 15th.  But you have a

9     problem with a deposition, I believe, you need to take of Mr.

10    Knuth on the subject of the source codes.  How long will that

11    take to take?

12         MR. ROBERTSON:  I don't anticipate it would take

13    longer than seven hours, Your Honor, but, Your Honor, you did

14    ask on a conference call we had, I believe last Friday, to

15    check on certain dates and availability.  I did check on the

16    week of the 20th, and then you had also suggested that because

17    the WiAV case had settled that there might be some openings on

18    that.

19         One of the issues I have is, and I want to bring it

20    to the Court's attention, because I did reach out to all of the

21    witnesses.  Dr. Weaver, you know, has been in some ill health

22    because of cervical spinal issues, actually had scheduled a

23    procedure, a nerve block for the week after the trial was

24    supposed to conclude if it started on the 13th.

25         It's long-standing, would be difficult to move, and,

1    quite frankly, he doesn't want to move it because he wants to

2    relieve the pain he's been suffering for a long time.

3            THE COURT:  Where is his doctor?

4            MR. ROBERTSON:  Charlottesville, I believe.

5            THE COURT:  He can't move it up?

6            MR. ROBERTSON:  I can look into that, but, I mean, he

7    told me it was a long-standing situation.  I also have an issue

8    with one of my inventors who had taken time off from work for

9    the week of the 13th.  Now he's having difficulty getting time

10   off for the week of the 20th.  I have spoken to Mr. McDonald --

11           THE COURT:  What does he do?

12           MR. ROBERTSON:  He's a computer consultant, I

13   believe.  He works for a company -- it's not independent.

14           THE COURT:  Well, if he's going to be available on

15   the 13th, he can be available the week of the 20th.  That

16   shouldn't be any problem.

17           MR. ROBERTSON:  We have the issue with Dr. Weaver.

18           THE COURT:  That's a legitimate issue.

19           MR. ROBERTSON:  I was talking to Mr. McDonald about,

20   you know, towards the end of October.  Full disclosure here,

21   the one other issue that is standing out there is that Mr.

22   Hilliard, his wife is a state court judge in Arizona.  In fact,

23   she sits in the former Sandra Day O'Connor seat before she was

24   elevated to the bench.  She has not had a vacation in a year,

25   and she scheduled a vacation in mid October.  Dr. -- Mr.

1    Hilliard informs me that while he can't --

2          THE COURT:  It's not unusual that judges don't have

3    vacations.

4          MR. ROBERTSON:  He has told me that under penalty of

5    divorce, if he does not go on this long-planned, over a year,

6    vacation -- in fact, her whole staff and her law clerks are

7    taking that same period off.  So he can't really move that, but

8    he could be available, as he indicated to me, the second week

9    which is really when he would be necessary since he is our

10   rebuttal to the defendant's invalidity case.

11         THE COURT:  I think WiAV was set to start on the 18th

12   of October is what I was talking about.  Isn't that right?

13         MR. WILLETT:  That's correct, Your Honor.  Jury

14   selection on the 14th and opening statements starting on the

15   18th.

16         THE COURT:  The 18th, and we stopped -- we will not

17   have the 21st.

18         MR. WILLETT:  That's correct.

19         THE COURT:  21st is a bench/bar conference here that

20   I'm leading.

21         MR. ROBERTSON:  I've just been informed that Mr.

22   Hilliard and his wife are gone from the 14th through the 28th.

23         THE COURT:  Where are they going?

24         MR. ROBERTSON:  Europe.

25         THE COURT:  Well, the 28th is a Thursday.

1          MR. ROBERTSON:  We could start on the 25th, is what I

2    was suggesting, Your Honor, and then the second week he could

3    be back.

4          THE COURT:  Except that I have a very long trial

5    starting in November.  You're not the only people on the

6    docket.

7          MR. ROBERTSON:  Understood, Your Honor.

8          THE COURT:  So why don't we just go on the 13th then,

9    and you all can take -- or the 14th.  I'll do the pretrial

10   conference on the 13th.  You all can pick the jury on the 14th

11   and take the deposition of Mr. Knuth this week, take it over

12   the weekend, and we can go ahead and stay reasonably to the

13   schedule.

14         MR. ROBERTSON:  I'd prefer the 20th, Your Honor, if

15   you were going to do that.  That way Dr. Weaver can still be

16   here.

17         THE COURT:  I thought you said Dr. Weaver was going

18   to have a procedure the 20th.  The 13th is the first week, the

19   20th is the second week.  Do you have any problems with

20   starting it toward the end of October?

21         MR. McDONALD:  I didn't really check late October.  I

22   know we talked about mid October for things, but as far as I

23   know, I don't have any issues that I can't deal with, Your

24   Honor.  I know the closer we are to September 20th, the better,

25   because that was communications I was able to have over the

1   weekend.

2           THE COURT:  September 20th, and then starting

3   October 18th for those two weeks.

4           MR. McDONALD:  I don't think I have any problems with

5   that.

6           THE COURT:  But he can't do it because one of his

7   experts is out of town.  What we could do is start on the 18th,

8   and then your fellow could come back, fly into Washington here

9   and/or Richmond to come to testify on the 29th.

10          MR. ROBERTSON:  I'll check, Your Honor.  I haven't --

11  I can't speak for him right this second.  I will make every

12  effort if that, in fact, does not interfere with the plans,

13  travel plans.

14          THE COURT:  The real problem with that, Mr.

15  Robertson, is he might be *non compos mentis* after a flight of

16  seven and a half hours.  The time might not be very impressive.

17  I would think that, having just done it, I think -- how old is

18  he?

19          MR. ROBERTSON:  He's in his early sixties.

20          THE COURT:  So he's a young man.

21          MR. ROBERTSON:  Yes, sir.

22          THE COURT:  The other thing is that I have a long

23  four-day criminal trial at the end of October that, for now, is

24  going.

25          THE CLERK:  What date is that?

1          THE COURT:  26th.  Is that still on?

2          THE CLERK:  Are you talking about the --

3          THE COURT:  Erickson.

4          THE CLERK:  It's still on, yes, sir.

5          THE COURT:  Also Cunningham, but I think that's going

6     away.

7          MR. McDONALD:  Your Honor, given Mr. Weaver's

8     situation, I think you mentioned one possibility is maybe at

9     least starting the middle of the week of the 13th of September.

10    If you did that, I think maybe Mr. Weaver could testify before

11    his surgery, because that's the week of the 20th, and we can

12    kind of stay closer to the schedule.  I know my people are

13    still available.

14         THE COURT:  Why don't we do that.  You make Mr. Knuth

15    available.  Is he only going to testify on very limited parts

16    of his report?  You make him available even if it has to be

17    Saturday and Sunday.  Then we'll have -- I've got -- we'll

18    start this pretrial conference at -- how long into your case

19    does Weaver testify, does he go, and is he supposed to sit

20    through the testimony of the other case in order to be

21    available for rebuttal, or what is all this -- what does this

22    do to your case, I guess, is part of what I'm trying to find

23    out.  Are you planning on having him sit through the whole

24    trial, A?  Let's try that.

25         MR. ROBERTSON:  I don't think so, Your Honor, no.

1      THE COURT:  When in your case are you going to put

2 him on?

3      MR. ROBERTSON:  Typically maybe perhaps the beginning

4 of day three.  He is a rebuttal witness, Your Honor, so there

5 is probably aspects of testimony he's going to need to see, but

6 to answer your question, I don't think I'm going to be having

7 him sit here the entire time.

8      He also probably will want permission, if Your Honor

9 would allow, to occasionally get up from the witness chair.

10 Sometimes he does that so he can --

11      THE COURT:  He can stand up.  He can do anything he

12 wants to do.  Chief Justice Rehnquist used to stand up and go

13 behind the curtains his back hurt so bad.

14      I'm still lost.  If he's having this problem, when is

15 he having the procedure, and how long is he out of commission?

16      MR. ROBERTSON:  He indicates to me he won't be out of

17 commission very long.

18      THE COURT:  What is very long?  I don't have that on

19 my calendar.

20      MR. ROBERTSON:  He indicated to me it wasn't going to

21 be a problem for him to attend the trial if scheduled during

22 the WiAV slot, but then I have the Hilliard problem although he

23 could come back for the second week.

24      THE COURT:  I thought he couldn't because he doesn't

25 get back until the 29th.

1          MR. ROBERTSON:  I don't have a calendar in front of

2      me.

3          THE COURT:  What's wrong with you people coming to

4      court without your calendars?  Is it some problem because you

5      keep electronics and we take all your electronics?  Is that

6      what your problem is?

7          MR. ROBERTSON:  I think I was perhaps mistaken --

8          THE COURT:  Do we have a calendar that he can look

9      at?

10          THE CLERK:  Sure.

11          MR. ROBERTSON:  My understanding was, Your Honor, I

12      guess what I was targeting was the week of the 25th and the

13      week of November 1st, and that way Mr. Hilliard could be back

14      for the week of November 1st.

15          THE COURT:  The real problem with that is I have a

16      criminal, four-day criminal trial in there.  I don't know

17      whether it's going or not.  Can you call the docket on that

18      case?

19          THE CLERK:  What is the case number?

20          THE COURT:  I don't have any idea.  Look on

21      October 26th, his calendar, and give him the docket number of

22      the case.

23          MR. McDONALD:  U.S. v. Darrel?

24          THE COURT:  Erickson, October 26th.  Bring him his

25      book.  3:10CR6.  Is that Ms. Cardwell's case.

1            THE CLERK:  No, sir, that's Ms. Taylor's case.  That

2    was gone.

3            THE COURT:  We had to put that off because the

4    witness was in Iraq or something.  I think that's --

5            THE CLERK:  You had a motion to suppress in that

6    also.

7            THE COURT:  She withdrew that.

8            THE CLERK:  Okay.

9            THE COURT:  I think that case is going to trial, and

10   it's set in that particular slot, so that week is not

11   available.

12           THE CLERK:  That case is definitely going to trial.

13           THE COURT:  Yes, it is.  I know it is.  All right.

14   You can do without Hilliard, or you can start early.  You can

15   start next week sometime, or it has to go into -- I have to

16   start it -- how long is your case going to take, Mr. McDonald,

17   do you think?

18           MR. McDONALD:  About four days, Your Honor.

19           THE COURT:  How long is yours going to take?

20           MR. ROBERTSON:  About five days, Your Honor.

21           THE COURT:  I think what I'm going to do is give you

22   all each three days, and that's going to be the end of it.

23   It's out of hand.  You didn't take that long to try it before

24   Judge Brinkema when you had damages.

25           MR. ROBERTSON:  Judge Brinkema's case was bifurcated,

1    so we didn't have --

2              THE COURT:  How about the Ariba case?

3              MR. ROBERTSON:  That was the Ariba case.

4              THE COURT:  I mean the SAP case.

5              MR. ROBERTSON:  Bifurcated.

6              THE COURT:  How long did you take to try that?

7              MR. CARR:  I believe that went to day 15, Your Honor.

8              THE COURT:  That's just too long to be talking about

9    trying a patent case.

10             MR. ROBERTSON:  Your Honor, to be fair, I think four

11   of those 15 days were the jury deliberating.

12             THE COURT:  All right.  Then that's going to move you

13   to -- that moves you to early December.  So, what do you want

14   to try to look for?  If I give you, carve out two weeks in

15   November, can you do that and confine it to two weeks?

16             MR. ROBERTSON:  Yes.

17             THE COURT:  That's all you're going to get.  It's

18   going to be done and over.  That means instructing the jury and

19   arguing at the end of the second week.

20             MR. ROBERTSON:  Understood.

21             THE COURT:  So you're going to have to split the time

22   accordingly, because I can't go beyond that.  Otherwise, you're

23   going into next year.

24             MR. ROBERTSON:  Understood.

25             MR. McDONALD:  I'm sorry, what were the dates, the

1  two weeks, Your Honor?

2          THE COURT:  Start November 1st.

3          MR. McDONALD:  Ms. Stoll-DeBell's son has eye surgery

4  on the 2nd.  At this point, that's an issue.

5          MS. STOLL-DeBELL:  We've already waited for four

6  months to get the surgery date that we have.  So --

7          THE COURT:  I don't want you to have to wait for a

8  child's surgery.  It's very hard to get.

9          MS. STOLL-DeBELL:  It is.  It's ridiculous how long

10  you have to wait, actually.

11          THE COURT:  If you think it's bad now, you wait.  I'm

12  not going to make her give up -- she's in the trial.  I'm not

13  going to make her give up her child's surgery.  I expect you

14  have to be with him a little bit after it's over.

15          MS. STOLL-DeBELL:  He's only one and a half, so, yes,

16  Your Honor.

17          THE COURT:  So that kind of brackets things, folks.

18          MR. ROBERTSON:  What was the date in December Your

19  Honor was suggesting?

20          THE COURT:  Well, I hate to do that because you're

21  going to be really time limited there because I'm leaving on

22  either the 16th or 17th.  Looks like maybe it's the 17th, and

23  the first week would be the 29th of November through

24  December 3rd, and then the next week would be the 6th through

25  the 10th with some possibility of overlapping into the 13th,

1  but --

2          MR. McDONALD:  I think we can make that work, Your

3  Honor.

4          THE COURT:  Is your child going to be in a position

5  by that time where you can --

6          MS. STOLL-DeBELL:  Yes.

7          THE COURT:  -- be back in business?

8          MS. STOLL-DeBELL:  Yes.

9          THE COURT:  I'm still willing to try to do it next

10 week.

11         MR. ROBERTSON:  Given how I think things are right

12 now, that's very difficult, particularly with this -- this

13 Knuth deposition is going to be pretty dense even limited to

14 source code.

15         THE COURT:  Tense or dense?

16         MR. ROBERTSON:  Dense, sir, complex.

17         THE COURT:  I thought you used that just to describe

18 judges, not to describe depositions.  All right, but we need to

19 do the final pretrial conference then.

20         MR. McDONALD:  Your Honor, I know we'll probably

21 reduce the issues for the pretrial conference in view of

22 today's ruling.

23         THE COURT:  I think so.

24         MR. McDONALD:  So it doesn't matter how quick we can

25 do that, given the trial date, I don't know if you want to move

1    it out further or less, but I know we can consolidate things if

2    we had a little time.

3          MR. ROBERTSON:  I will say the parties have been

4    meeting and conferring almost on a daily basis, and we've been

5    making substantial progress.

6          THE COURT:  I hate to let you stop making substantial

7    progress, so I'd like to go and get the pretrial conference

8    done while it's all fresh in your mind and I know you've got

9    some time available, and I realize you may have some minor

10   adjustments based on the Knuth deposition, but let's get the

11   final pretrial conference done the week of the 13th sometime.

12   How about the 14th or the 15th, either one, or the 16th?

13         MR. McDONALD:  Yes, Your Honor, that's fine with us.

14         MR. ROBERTSON:  Fine for plaintiff, Your Honor.

15         THE COURT:  Let me tell you something.  Just in case

16   it has to go over, let's do it on the 15th, and if it goes

17   over, then you've got -- I don't have to change sentencings.

18         THE CLERK:  Beginning at what time?

19         THE COURT:  Why don't we begin at 10 o'clock, because

20   I have a supervised release at that time and it won't take

21   long.  November 29th is the -- that's the Monday after

22   Thanksgiving.

23         THE CLERK:  Correct.

24         THE COURT:  That really is not a good time for

25   witnesses and everybody else to be traveling and yours and

1    everything, so why don't we start on December 1st.  Just know

2    that this case will be over by the 14th even if we have to go

3    on Saturdays, okay?

4            THE CLERK:  Your Honor, considering the time of the

5    year that it is, we may want to have additional jurors.

6            THE COURT:  Okay.

7            THE CLERK:  So we're going to start on the 1st?

8            THE COURT:  The 1st.  I think it's kind of hard on

9    jurors to get them in here and get them going the day after

10   Thanksgiving.

11           THE CLERK:  And run through the 15th, is that what

12   you said?

13           THE COURT:  14th.  And you all can talk about how you

14   want to divide up the time.  Is there anything else that needs

15   to be done today?

16           MS. STOLL-DeBELL:  Yes, Your Honor.  I just want to

17   clarify that we still need to call Dr. Staats as a fact witness

18   and wanted to make sure that your order was limited to him

19   testifying as an expert.

20           THE COURT:  Expert.  I didn't -- that motion wasn't

21   directed to him testifying as a fact witness.

22           MS. STOLL-DeBELL:  I just wanted to clarify, make

23   sure we're all on the same page.

24           THE COURT:  That was my understanding.  Now, this SKU

25   business, I've been studying this.  I don't see how I can rule

1   on that until I hear the evidence, because each of you have a

2   different view, but, in essence, you have to approve the

3   predicate in your case in chief, and if you don't, then some of

4   them may fall out, some of them may not, but the issue is

5   accused products, not accused SKUs, and the fact of the matter

6   is that you have control over the SKUs yourself on your side,

7   and I think with the damages, with there being no damages in

8   the case, the nature of the situation changes considerably, and

9   the issue really becomes what is it that infringes and then

10  what is it that is subject to the injunction that is going to

11  issue if there's infringement that's proved.  And I think that

12  just requires some factual evidence that it would be premature

13  to rule on that issue right now.  It would amount to summary

14  judgment on infringement, I think.  Does anybody disagree with

15  that?

16          MR. ROBERTSON:  I think your ruling, Your Honor, on

17  the damages issue potentially may resolve the SKU issues.  I'd

18  like to go back and discuss with my colleagues, but Mr.

19  McDonald and I talked about it during the break, and it may be

20  mooted in some sense.

21              In another sense, part of the commercial success of

22  the accused products, that being, in essence, the royalty base

23  that we discussed at length today, is relevant to one of the

24  factors of nonobviousness.  So maybe perhaps we can come to

25  agreement on it and remove that issue from the Court's plate.

1          THE COURT:  All right.  For now I'm denying that -- I

2     think it's your motion number two?  Yeah, Lawson's motion

3     number two, I believe it is.  Whichever one it is, I'm denying

4     it as without prejudice to raising a motion at trial on Rule 50

5     if it's appropriate.  All right, is there anything else?

6          MR. ROBERTSON:  Not for the plaintiff, Your Honor.

7          THE COURT:  Let's plan to do this:  Let's plan to

8     select the jury on the 29th in the afternoon on that case.

9     Then you can start your trial or evidence.

10         THE CLERK:  29th, you said the afternoon.  Did you

11    say a time?

12         THE COURT:  Let's start at 1:30.

13         THE CLERK:  All right, sir.

14         THE COURT:  All right, is there anything else that we

15    need to do?  All right, we'll be in adjournment.  Thank you.

16

17              (End of proceedings.)

18

19

20         I certify that the foregoing is a correct transcript

21    from the record of proceedings in the above-entitled matter.

22

23

24    _____/s/_____          _____

      P. E. Peterson, RPR                Date

25