1              IN THE UNITED STATES DISTRICT COURT

2             FOR THE EASTERN DISTRICT OF VIRGINIA

3                      RICHMOND DIVISION

4

5    --------------------------------------
                                          :
6    ePLUS, INC.                          :    Civil Action No.
                                          :    3:09CV620
7    vs.                                  :
                                          :
8    LAWSON SOFTWARE, INC.                :    September 27, 2010
                                          :
9    --------------------------------------

10

11      COMPLETE TRANSCRIPT OF THE FINAL PRETRIAL CONFERENCE

12           BEFORE THE HONORABLE ROBERT E. PAYNE

13               UNITED STATES DISTRICT JUDGE

14
     APPEARANCES:
15
     Scott L. Robertson, Esquire
16   Michael G. Strapp, Esquire
     Jennifer A. Albert, Esquire
17   Goodwin Procter, LLP
     901 New York Avenue NW
18   Suite 900
     Washington, D.C.  20001
19                                        Volume I of II
     Craig T. Merritt, Esquire
20   Christian & Barton, LLP
     909 East Main Street
21   Suite 1200
     Richmond, Virginia  23219-3095
22   Counsel for the plaintiff

23

24               Peppy Peterson, RPR
                Official Court Reporter
25            United States District Court

```
 1    APPEARANCES:  (cont'g)

 2    Dabney J. Carr, IV, Esquire
      Robert A. Angle, Esquire
 3    Troutman Sanders, LLP
      Troutman Sanders Building
 4    1001 Haxall Point
      Richmond, Virginia  23219
 5
      Daniel W. McDonald, Esquire
 6    Kirstin L. Stoll-DeBell, Esquire
      William D. Schultz, Esquire
 7    Merchant & Gould, PC
      80 South Eighth Street
 8    Suite 3200
      Minneapolis, Minnesota  55402
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2

3          THE CLERK:  Civil action number 3:09CV00620, ePlus,

4    Incorporated versus Lawson Software, Incorporated.  Mr. Scott

5    L. Robertson, Mr. Craig T. Merritt, Jennifer A. Albert, and Mr.

6    Michael Strapp represent the plaintiff.  Mr. Daniel W.

7    McDonald, Mr. Robert Angle, Mr. Dabney J. Carr, IV, and Ms.

8    Kristen Stoll-DeBell represent the defendant.  Are counsel

9    ready to proceed?

10          MR. ROBERTSON:  Yes, Your Honor.

11          MR. McDONALD:  Your Honor, I'm not sure if Mr.

12    Schultz was mentioned.  He's a new person on our team here that

13    hasn't been in court.  May I introduce Mr. Schultz of Merchant

14    and Gould.

15          THE COURT:  Sure.  Glad to have you.  I started

16    practicing law in 1967.  18 years ago I took this job.  I've

17    been through a lot of cases and a lot of litigation.  I've

18    never seen anything like this.  It is the most remarkable

19    exercise of a lack of discipline that I have seen ever in my

20    whole time on the bench.

21          How many exhibits does the plaintiff have?

22          MR. ROBERTSON:  We have a little over 300, Your

23    Honor.

24          THE COURT:  100.  That's all you get.  You're

25    through.  I told you.  Where do you think you can do this?

1    Where do you get by with this kind of stuff?  How many do you

2    have?

3                MS. STOLL-DeBELL:  We have 89, Your Honor.  76 are

4    stipulated.

5                THE COURT:  89.  Is that not enough?  Why do you need

6    300 exhibits to do anything with?

7                MR. ROBERTSON:  We are the plaintiff, Your Honor.  We

8    do have the burden of proof, and there's a lot of documentation

9    necessary to the infringement case.

10                THE COURT:  I've never seen an infringement case that

11    takes documents of that volume ever.  I'm going to start taking

12    a look at them, and you're going to probably end up having it

13    just curtailed to some arbitrary number because you can't

14    control yourself.

15                Get the first volumes of books and put them up here,

16    please.  You all come up here and do it so Mr. Neal doesn't

17    have to do it.

18                THE CLERK:  I don't mind.

19                THE COURT:  Give me the first in order, a number of

20    them that can fit here.

21                MR. ROBERTSON:  Your Honor, if I can make a

22    suggestion for the convenience of the Court, and that is, Mr.

23    McDonald and I have talked about this, at your suggestion at

24    the last hearing, perhaps grouping some of these exhibits

25    together that make logical sense that pertain to certain

1   issues.  That way we wouldn't have to repeat a lot of the

2   arguments, and we can deal with the exhibits that are similar

3   kind, and I prepared a document that addresses those groupings.

4           THE COURT:  Let me have it, please.  Thank you.

5           MR. ROBERTSON:  Can I make one more request, Your

6   Honor, if possible?  Since we got a lot of these exhibits right

7   here, would it be possible to work from the bench here as we

8   address some of these issues as you raise?

9           We'll be spinning around a lot, and I've split some

10  of the issues with my colleagues, and I just don't want to have

11  a musical chair kind of event going on here as we go back and

12  forth.

13          THE COURT:  The only reason I'm in here is because I

14  don't have any room anywhere else to put it.  We usually have

15  these in the conference room.  You don't need to stand up.  You

16  need to speak up when you are talking.  You can turn around, do

17  what you need to do.

18          I guess I need the rest of these up here if you're

19  going to do it this way.  13 volumes of exhibits.

20          MR. CARR:  Your Honor, do you want the plaintiff's

21  exhibits?

22          THE COURT:  Yes, just the plaintiff's.  That's all

23  I'm taking.

24          MR. CARR:  There are several very large exhibits that

25  I don't think you will want up there, but these four boxes that

1   are there, those are the ones you probably want.  There's six

2   exhibits that take up about ten boxes, and I think we can

3   probably talk about them without you actually having them up.

4           THE COURT:  Thanks, Mr. Carr.  We ought to be able to

5   get all 13 of them up here somewhere.  Thank you very much.

6           Starting with the pretrial order, Roman numeral

7   III-A, are there any objections to any of these witnesses?  Do

8   I have anything to deal with with Appendix 1 to the pretrial

9   order?  None, all right.

10          Next is appendix -- I don't have -- okay, Appendix 2

11  is Lawson's witnesses.  Any objection to any of these

12  witnesses?  All right, none.

13          All right, we have ePlus's exhibits as to which there

14  are no objections and ePlus exhibits as to which Lawson objects

15  on the grounds stated therefor.  In order to deal with that,

16  what you are saying is you suggest we go through groupings.

17  Group one is UNSPC white papers; is that right?  What is a

18  UNSPC white paper?  It's your objection.  Speak up.

19          MS. STOLL-DeBELL:  Your Honor, our objection is that

20  these --

21          THE COURT:  Pull that thing a little closer to you

22  so the court reporter and I can hear.  If you'd like to, you

23  can kind of move that screen off a little bit toward Mr.

24  Schultz -- there you go.  All right.  Now, what is a UNSPC

25  white paper?

1               MS. STOLL-DeBELL:  These are three third-party

2    documents, Your Honor, relating to UNSPSC codes.

3               THE COURT:  What is that?

4               MS. STOLL-DeBELL:  It is a way of categorizing

5    products.

6               THE COURT:  Who is UNSPC?

7               MS. STOLL-DeBELL:  UNSPSC, it is -- I think it was

8    developed jointly by Dunn & Bradstreet and maybe the United

9    Nations, but it's --

10              THE COURT:  Who did these documents come from?  You

11   said it's a third party.  Who generates them?

12              MS. STOLL-DeBELL:  There are -- they were generated

13   by different parties.  I think one is from the UNSPSC website,

14   and the others come from another third party.  I can't recall

15   exactly who it is, but it's not any of the parties in this

16   suit.  It's our position these documents are hearsay and that

17   they can't be authenticated.

18              THE COURT:  And that what?

19              MS. STOLL-DeBELL:  They cannot be authenticated.  I

20   think the other two, Your Honor, PX-11 and PX-32, are from a

21   company called Granada Research.

22              THE COURT:  Wait a minute.  PX-11 is the first one

23   listed.

24              MS. STOLL-DeBELL:  Yes.

25              THE COURT:  There are three of them listed.

1              MS. STOLL-DeBELL:  Yes.

2              THE COURT:  11, 31, and 32.  So I'm going to pull 11

3    out here.  United Nations Standard Products and Services Code.

4    The objection is that it's hearsay.

5              MS. STOLL-DeBELL:  I do think they are all similar.

6    They relate to similar subject matter.

7              THE COURT:  You think what?

8              MS. STOLL-DeBELL:  They are all similar, all three of

9    those exhibits.

10             THE COURT:  All right.  Mr. Robertson?

11             MR. ROBERTSON:  Yes, Your Honor.

12             THE COURT:  Whoever is going to answer.  If you're

13   not going -- make sure you give your name so the court reporter

14   knows who it is -- she'll have it down.  You don't even have to

15   stand up if you don't want to.  I just need to be able to hear,

16   she needs to be able to hear you.

17             MR. ROBERTSON:  Thank you, Your Honor.

18             THE COURT:  PX-11, I've got it right here.  It's a

19   several-page document, and it says it's Standard Products and

20   Services Code.

21             MR. ROBERTSON:  Yes, sir.  As Your Honor may recall,

22   one of the claim elements at issue in the case is converting

23   means or the ability to convert from one product to another

24   product.  What the UNSPSC is is a code that was created by the

25   United Nations and Dunn & Bradstreet in order to be able to

1    link together a hierarchy of similar types of products.

2              Lawson uses it in its software in order to be able to

3    make those kind of substitutions.  Dr. Weaver has cited it in

4    his report both in the Ariba and in the SAP case.  There is

5    Lawson documents who instruct --

6              THE COURT:  You say Lawson uses this code?

7              MR. ROBERTSON:  Yes, sir.

8              THE COURT:  Where did this document come from?

9              MR. ROBERTSON:  It came from the UNSPSC website.  Dr.

10   Weaver obtained it.  We've had it in the other cases.

11   Everybody does it this way, Your Honor.  ePlus does it this

12   way, Ariba does it this way.

13             THE COURT:  Does what this way?

14             MR. ROBERTSON:  They employ this code to be able to

15   search for similar products.  In fact, at page 11 of the

16   document, that is PX-11 at the bottom, it explains that the

17   UNSPSC is a hierarchal classification having five levels.  The

18   levels allow users to search products more precisely because

19   searches will be confined to logical categories.

20             You can see on the next page, Your Honor, at page 12,

21   as you drill down over this hierarchy of ten separate numbers,

22   you get down to a level where you have a group of substitutable

23   products or services.  There will be a Lawson video we'll be

24   discussing later, Your Honor, where a Lawson trainer instructs

25   users how to access the UNSPS website to download these codes

1    into their system.

2           So this is evidence of the infringing activity and

3    permits the jury to understand how this code is used to satisfy

4    certain of the claim elements.

5           THE COURT:  How is it evidence of infringing

6    activity?

7           MR. ROBERTSON:  Because when you link together the

8    evidence that shows the UNSPSC codes being used to identify

9    substitutable products and you hear Dr. Weaver's testimony how

10   this is employed, and then you'll also hear evidence from a

11   Lawson employee that they utilize this UNSPC code for doing it,

12   you put together evidence that shows they are satisfying this

13   critical element we need to establish to prove infringement.

14          THE COURT:  Why didn't you get these documents from

15   Lawson?

16          MR. ROBERTSON:  Lawson didn't produce them.

17          THE COURT:  I thought you said they admitted using

18   them.

19          MR. ROBERTSON:  They instruct their users to use

20   them.  They didn't produce them to us, Your Honor.  Dr. Weaver

21   obtained it from the UNSPSC website.  We do believe that they

22   are not hearsay under Rule 803(17) as they are commercial

23   publications.

24          THE COURT:  They are what?

25          MR. ROBERTSON:  It's a commercial publication, Your

1   Honor, that's commonly relied upon in the industry.  In fact, I

2   believe I have deposition testimony, if you give me a minute,

3   Your Honor.

4           THE COURT:  You're going to have Dr. Weaver say that,

5   and you're going to have their customers say that, Lawson

6   customers say they rely on it?

7           MR. ROBERTSON:  Here's Mr. Yuhasz, a customer from

8   Novant.

9           "Question:  And you understand UNSPSC to be a

10  classification system for particular items?

11          Answer:  Yes.

12          Okay.  And does Lawson RFS system -- that's one of

13  the products -- that we're going to see today, does that have

14  the capability of using those UNSPSC codes?

15          Yes.

16          Question:  Can I search using UNSPSC codes on the

17  Lawson requisition?

18          Answer:  Yes.

19          Self-service system that we are going to see today.

20          Yes."

21          It goes on for several more pages, Your Honor, but I

22  think --

23          THE COURT:  But did he identify these exhibits, 11,

24  31, 32?

25          MR. ROBERTSON:  No, Weaver, Dr. Weaver identified

1    them.

2            THE COURT:  I know he did, but when you asked this

3    man, this customer, did he also identify them?

4            MR. ROBERTSON:  No, he did not, Your Honor, but the

5    fact is --

6            THE COURT:  Why not?

7            MR. ROBERTSON:  I don't know that he had the

8    documents, Your Honor.  It wasn't produced pursuant to the

9    subpoena that we issued to Novant.

10            THE COURT:  Does that mean you couldn't have asked

11   him about it when Dr. Weaver found it?

12            What's the basis of your lack of authentication if

13   Weaver can authenticate them?  You don't have one, do you?

14            MS. STOLL-DeBELL:  Right.  But they are hearsay.

15   They haven't shown --

16            THE COURT:  That's different than authentication.

17   I'm dealing with authentication.  Authentication is overruled.

18            MS. STOLL-DeBELL:  The deposition testimony that he

19   just read for you said that Lawson has the ability to use

20   UNSPSC codes.

21            THE COURT:  He says 803(17) is the exception.

22            MS. STOLL-DeBELL:  But for that exception to apply,

23   he needs to show that it is relied on generally by the public

24   or at least a relevant group.

25            THE COURT:  I thought Weaver was going to say that.

1    I thought he just said Weaver is going to say that.

2            MS. STOLL-DeBELL:  I don't think that Dr. Weaver has

3    the expertise to be able to say that.  I think what's relevant

4    here is do Lawson's customers rely on this, does Lawson rely on

5    it, does ePlus rely on it, and we don't have that information,

6    Your Honor.

7            THE COURT:  Who are you going to use to show

8    generally used and relied on by the public or by persons in

9    particular occupations?  Who is going to say that?

10           MR. ROBERTSON:  One of their witnesses, Your Honor.

11   There's a Plaintiff's Exhibit 112, which is a Lawson inventory

12   control user guide, which specifically references use of the

13   UNSPSC.  There's also this Lawson training video where it's

14   instructing Lawson customers to download the UNSPSC codes from

15   the website.  That's Plaintiff's Exhibit 404.

16           THE COURT:  That shows that Lawson uses it.  That

17   doesn't make it admissible under 803(17).  You've got to show

18   it's generally used.  Who's going to do that?  She says Weaver

19   can't.

20           MR. ROBERTSON:  Well, Weaver's seen it and

21   experienced it in both Ariba and SAP, and Mr. Farber, who is

22   the president of ePlus Systems, uses it in the ePlus system,

23   and he is familiar with the industry and understands that

24   everybody in the industry --

25           THE COURT:  Then the short answer to that question

1   is, Mr. Farber is going to say that it's -- provide the

2   foundation for that; is that right?

3          MR. ROBERTSON:  Yes, sir.

4          THE COURT:  Okay, that's all you had to say.

5   Objection overruled for the hearsay with foundation.  That

6   means you have to have foundation with it.  403, now, you

7   really have a 403 objection?

8          MS. STOLL-DeBELL:  Yes, Your Honor.  I think this is

9   cumulative evidence.  To the extent that Lawson uses the UNSPSC

10  codes, it's talked about in our manual.  We've got source code

11  experts who are going to talk about how that's done, two source

12  code experts, and I think what this third party says about it

13  is prejudicial and cumulative and not necessary that it come

14  in.

15         THE COURT:  Overruled.  Same thing for 11, 31, and

16  32?  What's MD?

17         MS. STOLL-DeBELL:  Multiple documents, Your Honor.

18         THE COURT:  What does that mean?

19         MS. STOLL-DeBELL:  That there's more than one

20  document in the exhibit.

21         THE COURT:  That's for number 32.  Is that an

22  authentication -- I don't know that rule.  I don't know Federal

23  Rule of Evidence MD.  Does that mean it's -- is that sort of a

24  sub -- an abbreviation to say this is one aspect of the

25  authentication issue?

1          MS. STOLL-DeBELL:  In this case, yes, but I'm going

2     to withdraw that objection.  I think we have some multiple

3     document objections that we'll get into later, and we can

4     explain what the basis is for those, but for purposes of this

5     exhibit, I'm withdrawing that.

6          THE COURT:  All right.  The next category -- and I've

7     written on here what I've ruled on the white papers.  Industry

8     analyst reports.  There are probably, what, ten of them?  Ten.

9          MR. ROBERTSON:  Your Honor, I can withdraw

10    Plaintiff's Exhibit Number 187, Plaintiff's Exhibit Number 461.

11    I don't know how you'd like to proceed, Your Honor, if you'd

12    like to go through what the general objections are first, and

13    I'll tell you the reasons for their citation inclusion.

14         THE COURT:  What are the research reports offered

15    for?  It looks like it's the same objection as to all of them

16    except the last five have a Rule 26 objection attached to them.

17    I guess R-26 means an objection under Federal Rule of Civil

18    Procedure 26.  Is that what it means?

19         MS. STOLL-DeBELL:  Yes.

20         THE COURT:  All right.  The objection is it's not

21    relevant, it's prejudicial, and it's hearsay and not

22    authenticated.  What are these things?  Take 17 first.

23         MR. ROBERTSON:  Yes, Your Honor.  In fact, they're

24    relevant to several different issues that are involved in the

25    case.  Number one, for proving willfulness we need to prove

1    notice, and a lot of these industry analysts reports, which we

2    have testimony from witnesses, for example, at Lawson, that

3    subscribe to and receive, for example, the Gartner report, the

4    Aberdeen reports, some of these other market analysis reports.

5    In fact, I took the deposition of a Mr. Frank --

6              THE COURT:  Okay.  So you've got people at Lawson who

7    received all of them?

8              MR. ROBERTSON:  No, sir.  Some of them will be

9    identified by Mr. Farber.  There are also evidence of

10   competition between Lawson and ePlus because they both

11   reference -- many of them reference ePlus and Lawson together.

12   Apparently that's an issue, because Lawson has continued to

13   argue that we're not competitors in the marketplace, and

14   they're also -- many of them are relevant to the issue of the

15   secondary considerations of nonobviousness.

16             Many of them talk about our product and its success

17   in the marketplace, and even some of our competitors' success,

18   for example, that have taken licenses, and it also identifies

19   another secondary consideration as long-felt need under the

20   *Graham v. John Deere* case, a copy of which I brought with me.

21   The Supreme Court, in that 1966 case, has said, when

22   obviousness is raised as a defense, the Court and the jury, you

23   must consider the secondary conditions or secondary factors of

24   nonobviousness.

25             THE COURT:  All these things are hearsay.

1          MR. ROBERTSON:  Again, Your Honor --

2          THE COURT:  Aren't they?

3          MR. ROBERTSON:  No, sir.  I think once again --

4          THE COURT:  They are not hearsay?

5          MR. ROBERTSON:  We think there's an exception to the

6    hearsay rule.

7          THE COURT:  Okay, then the answer is, yes, they are

8    hearsay and I rely on.

9          MR. ROBERTSON:  803(17), Your Honor, which is the

10   same thing.  In fact, for example, Gartner report is mentioned

11   in the first page of Lawson's 2010 annual report that came out

12   just last month, and I deposed a couple of witnesses with

13   respect to these industry reports.  If I might just briefly

14   read, Your Honor.

15         "Do you do any market research with respect to

16   business opportunities in the industry sectors you've been

17   talking about?

18         Yes.

19         Are there any industry reports that Lawson relies

20   upon to understand the needs of the ERP market?"

21         That's enterprise resource planning.

22         "Yes.

23         Can you give me some examples?

24         The examples would be through our relationships with

25   some of the industry analysts, the Gartner Group, Forrester,

1    just to name a few.

2              Aberdeen?

3              Yes, in the past.

4              Which of those three we just mentioned do you

5    consider to be the most reliable as information about the

6    market?

7              Gartner."

8              THE COURT:  Who are you deposing?

9              MR. ROBERTSON:  Excuse me?

10             THE COURT:  Who is saying that?

11             MR. ROBERTSON:  That's the executive vice president

12   of Lawson, Mr. Frank.

13             "How often does the company receive reports from

14   Gartner?

15             On an ongoing basis.

16             Do you know how frequent" --

17             THE COURT:  That takes care of Gartner.  What about

18   the rest of them?

19             MR. ROBERTSON:  He testified that he's used Aberdeen

20   in the past.  But, again, Mr. Farber, also --

21             THE COURT:  I don't see Aberdeen.  Which one is it?

22             MR. ROBERTSON:  Maybe I made a mistake, Your Honor.

23   There's another section where we have some of these industry

24   analyst reports in the next section which is --

25             THE COURT:  I am not talking about the next section.

1    I'm talking about this one.

2          MR. ROBERTSON:  I don't see the Aberdeen one here,

3  Your Honor.

4          THE COURT:  Okay, so it comes in under 803(17), you

5  say.  As to their hearsay and authentication, you're going to

6  put on through your witnesses or theirs; is that right?

7          MR. ROBERTSON:  Yes, Your Honor.  I might just make

8  an observation.  I don't expect you to recall this, but we had

9  an agreement that was entered into by stipulation by the Court

10 in the initial pretrial order that says anything produced by a

11 party is deemed authentic.

12         THE COURT:  You say that's in the initial pretrial

13 order?

14         MR. ROBERTSON:  Yes, sir.

15         THE COURT:  Well, then, this was all produced by

16 Lawson?

17         MR. ROBERTSON:  457, 458, 459, 462, 463, 465, 466,

18 all produced by Lawson.

19         THE COURT:  Why doesn't the stipulation cover your

20 authentication exhibit?

21         MS. STOLL-DeBELL:  It does, Your Honor.

22         THE COURT:  Okay, well, don't make things like that.

23 Okay.  901 is overruled for all exhibits covered by stipulation

24 or by the pretrial order, and that's 457 through -66; is that

25 right?  With the exception of 61.  What about 17 and -- 61 is

1    withdrawn, exhibit is withdrawn.  17 and -- 17.

2              MR. ROBERTSON:  Your Honor, ePlus produced those in

3    the litigation.

4              THE COURT:  So it's not -- who are you going to have

5    authenticate it?

6              MR. ROBERTSON:  Mr. Farber.

7              THE COURT:  Okay.  So it's overruled subject to

8    foundation.  Why isn't it covered under 803(17)?

9              MR. McDONALD:  Your Honor, if we can take some of

10   these one at a time, because they are a little different.  I'll

11   start with the first one, PX-17, which is one of the ones that

12   was not produced by Lawson.  We don't have an 803 objection for

13   that one.  We understand this could be an exception to the

14   hearsay issue.

15             THE COURT:  So you agree that it's admissible.

16             MR. McDONALD:  No, no.  I'm talking about that

17   specific objection.  There's some other issues with this one I

18   wanted to address.

19             THE COURT:  He says it's 803(17).  It cleans it all

20   out.

21             MR. McDONALD:  We didn't actually enlist 803 as an

22   objection to PX-17.

23             THE COURT:  The point is, 803(17) responds to all of

24   your hearsay objections and, therefore, it's admissible under

25   803(17).  What is your response to that?

1              MR. McDONALD:  We don't have any other or any

2      problems with the 803.

3              THE COURT:  Okay, so all of these come in under

4      803(17); right?  All right.  So all the hearsay and relevance

5      are overruled.

6              MR. McDONALD:  Just hearsay is what we were talking

7      about there, Your Honor, not relevance; right?

8              THE COURT:  What about Rule 26 down here on these, on

9      these Exhibits 462, -63, -65, -66?  What is that objection?

10     What does that mean?

11             MS. STOLL-DeBELL:  I think --

12             THE COURT:  Rule 26 is a disclosure rule.

13             MS. STOLL-DeBELL:  Right.  So those documents, I

14     think to the extent that they want to use them as evidence of

15     secondary considerations, those documents were not disclosed to

16     us in their interrogatory responses, and we had two

17     interrogatories relating to secondary considerations asking for

18     all documents, all testimony, all arguments that they were

19     going to use to support their arguments of secondary

20     considerations, and they did, in fact, list a lot of documents,

21     Your Honor, in their interrogatory responses.  They just didn't

22     happen to be these.

23             Now, I guess to the extent that they are relevant to

24     something like competition between Lawson and ePlus --

25             THE COURT:  And notice.

```
 1              MR. ROBERTSON:  I'm sorry, sir?

 2              THE COURT:  And notice.

 3              MS. STOLL-DeBELL:  Right.  I mean, I think how we'd

 4    like to do it, we categorized these by issues we thought they

 5    were relevant to, and so with regard to relevance, you know,

 6    Mr. McDonald would like to address the notice issue.  I would

 7    like to address the secondary considerations issues, and then

 8    Mr. Schultz would like to address the competition with Lawson

 9    issue with regard to relevance.

10              THE COURT:  Go ahead.

11              MR. McDONALD:  On the notice issue, Your Honor, I

12    would note that actually Roman numeral V lists the ones that

13    even they apparently have grouped under the notice issue, and

14    these aren't in there.  I think previously the only one in this

15    list that they really had indicated to us they might use as

16    evidence of willfulness was Plaintiff's Exhibit 17, and so we

17    could address that in the context of, I guess, Roman numeral V

18    as well --

19              THE COURT:  Let's address it right now.

20              MR. McDONALD:  These documents in Exhibit 17 is an

21    example of one that was not produced by Lawson.  Lawson

22    produced at least a couple million documents in this case, and

23    these particular documents that they are relying on to try to

24    show Lawson knew about their patents or knew about infringement

25    claims by other companies, Lawson has never seen these
```

1   documents.  In fact, all of our witnesses --

2              THE COURT:  What does that have to do with whether

3   they are relevant or not?  You are addressing relevance on the

4   notice issue.

5              MR. McDONALD:  It has to do with the relevance --

6              THE COURT:  If you've never seen it.  If it's

7   admissible and it shows -- they can show that you received it

8   and it was -- or that it's out in the industry, why can't it

9   come in?

10             MR. McDONALD:  We are talking specifically about for

11  notice for willfulness.

12             THE COURT:  Whether you produced it is not the issue.

13  The issue is whether or not you know about it.  Are you going

14  to have somebody say they know about what's in here or what?

15             MR. ROBERTSON:  Your Honor, the witnesses have denied

16  notice about it, and Your Honor denied a motion *in limine* with

17  respect to these notice documents.  We think the circumstantial

18  evidence, the shear, in a sense, Your Honor, volume of the

19  number of these documents that either were in Lawson's

20  possession --

21             THE COURT:  This one wasn't.  17 wasn't.  He says 17

22  wasn't produced by them.

23             MR. ROBERTSON:  It wasn't produced by them.  It was

24  produced by us.

25             THE COURT:  That's fine, but did you then establish

1   that it was known to Lawson?

2          MR. ROBERTSON:  The witnesses denied knowing anything

3   about ePlus --

4          THE COURT:  Then how is it relevant?  How does it

5   prove notice if they didn't know about it?

6          MR. ROBERTSON:  Well, it shows -- relevant to this

7   competition issue.

8          THE COURT:  We are talking about notice.  Quit

9   shifting the ground.  I can rule on one thing at a time.

10  Multi-task objections are not a good thing.  Let's go.

11         MR. ROBERTSON:  I don't have evidence that anybody at

12  Lawson saw it for purposes of notice, Your Honor.

13         THE COURT:  Okay.  So the objection is sustained as

14  to notice.  Does it have anything to do with competition?

15         MR. ROBERTSON:  Yes, it does, Your Honor.

16         THE COURT:  Who is going to address competition?

17  Let's go.

18         MR. SCHULTZ:  I will address competition, Your Honor.

19  With respect to competition, the only relevance with respect to

20  competition relates to whether there's an injunction after the

21  Court finds --

22         THE COURT:  What does that have to do with anything?

23         MR. SCHULTZ:  It has to do with when it's introduced.

24         THE COURT:  No, we're going to have special -- the

25  answer is going to be, all the things I need for injunction the

1    jury is going to answer questions on.  So it's going to be

2    decided.

3              MR. SCHULTZ:  If that's the case, Your Honor, that's

4    the issue with respect to competition.  We believe it's not

5    relevant in front of the jury for any other reason other than

6    competition.

7              THE COURT:  Okay, objection overruled on competition.

8    So it's admissible -- 17 is admissible on competition.  Is

9    there any issue on secondary considerations of nonobviousness,

10   long-felt need?

11             MS. STOLL-DeBELL:  Are we talking about with respect

12   to --

13             THE COURT:  17.  He said it's admissible for that

14   purpose, too.  Do you object to its -- that's why it's

15   relevant, in other words.  That addresses your relevance

16   objection.

17             MS. STOLL-DeBELL:  Yes, Your Honor.  I mean, talking

18   generally about ePlus's product, which Exhibit 17 relates to,

19   for it to be relevant to secondary considerations, they need to

20   be able to show that there's a nexus between that evidence and

21   the claimed invention.  That is an absolute requirement for any

22   secondary considerations.  When we look at ePlus's product,

23   they don't have any way to show that their product is covered

24   by the claims in this case.

25             THE COURT:  This is part of how they're going to

1   offer -- you're saying there's no foundation because it doesn't

2   infringe?

3          MS. STOLL-DeBELL:  We are talking about ePlus's

4   product, so if they're going to look at that and say, it shows

5   commercial success, they need to show their own product is

6   covered by the patent claim.  So essentially they do need to do

7   the same analysis between the claims in their product as they

8   do with Lawson.

9          They have to show their product meets the claimed

10  invention, and they can't do so.  They don't have any expert

11  testimony on this issue whatsoever.  It's a complicated case,

12  Your Honor.  We're talking about these software inventions, and

13  Dr. Weaver says nothing about it.  Neither does Mr. Niemeyer.

14  There's no way for them to get that evidence in.

15         THE COURT:  Okay, can't come in on secondary

16  considerations for that reason.  Mr. Robertson, why can it?

17         MR. ROBERTSON:  First of all, there's no requirement

18  that there be this nexus that we have to prove our own product

19  is covered by our patents through some sort of expert testimony

20  which is the suggestion.

21         THE COURT:  Do you have to prove it's covered by the

22  patent?

23         MR. ROBERTSON:  Well -- no, I don't think we have to,

24  but I think there will be testimony --

25         THE COURT:  How do you prove the nexus?  What nexus

1    are you talking about proving, and how are you going to prove

2    it?

3              MR. ROBERTSON:  Well, the way the argument was raised

4    is in the context of proving our own product is covered by the

5    patent.  There will be testimony from the inventors that the

6    patent specification itself was a blueprint for a commercial

7    embodiment that they then created, and ePlus acquired that

8    company that had those products and maintained it on a

9    continuum.

10             So the inventors will address the issue, and Mr.

11   Farber, certainly, president of ePlus Systems who has a

12   technical background and understands the functionality of its

13   own product can address that as well.

14             I can cite for the Court a number of federal circuit

15   court cases which have indicated simple testimony from an

16   executive of the company indicating that the product is covered

17   is sufficient.  If the Court would like some cites, I think I

18   even brought some of the cases with me.

19             THE COURT:  I don't need any cites for that.  It

20   doesn't have to be proved by expert testimony.

21             MR. ROBERTSON:  I'm sorry, sir?

22             THE COURT:  It doesn't have to be proved by expert

23   testimony.  For that matter, infringement doesn't have to be

24   proved by expert testimony, does it, in every case?  Now, most

25   cases you have to, but is there some rule that says you can't

1    prove infringement if you don't have expert testimony?  Isn't

2    that right?

3            MS. STOLL-DeBELL:  I think as a general proposition

4    that's probably right, but you need to look at the technology

5    here.  If you're talking about a simple mechanical device,

6    maybe that is true, but in this case, it is a complicated

7    software invention, and, Your Honor, I would cite your decision

8    from the WiAV case where you said that looking at claims

9    compared to a product in a complicated technical case is

10   something that should be done by an expert.  I think the same

11   situation is true here.

12           Additionally, I want to bring to your attention your

13   order on ePlus's motion *in limine* number nine where they filed

14   a motion to exclude evidence relating to their commercial

15   products, and you granted the motion, and it wasn't just with

16   respect to infringement but also with respect to secondary

17   considerations, and I can read for you what the order says.

18           THE COURT:  Do that since you have it there.

19           MS. STOLL-DeBELL:  "To the extent that the proposed

20   comparisons are offered for the alternative purpose of proving

21   commercial success, the motion is granted because the

22   comparisons are of marginal relevance, and any probative value

23   is substantially outweighed by the risk of jury confusion."

24           THE COURT:  Already ruled on, Mr. Robertson, she

25   says.

1          MS. STOLL-DeBELL:  And further, in --

2          THE COURT:  Wait a minute.  If you've got the winner,

3    why don't you let the horses run ahead, see if it can stand --

4          MS. STOLL-DeBELL:  I'm sorry, Your Honor.  Mr.

5    McDonald will cover the microphone.

6          MR. McDONALD:  I'm too slow, sorry.

7          THE COURT:  You lost a long time ago, she says.  Why

8    isn't she right?  Sort of sounds like it.

9          MR. ROBERTSON:  Your Honor, it's not accurate.  Our

10   motion *in limine* asked for a ruling that they could not compare

11   their commercial system to our commercial system.  That is

12   black letter patent law.  You need to compare their commercial

13   embodiment --

14         THE COURT:  What does the order say?  Read the order

15   again.

16         MS. STOLL-DeBELL:  I need to back up.  It says, "It

17   is hereby ordered the motion is granted because the parties

18   agree that a comparison between the accused product and

19   plaintiff's commercial embodiment cannot properly be used for

20   the purpose of proving infringement or non-infringement.

21         To the extent that the proposed comparisons are

22   offered for the alternative purpose of proving commercial

23   success, the motion is granted because the comparisons are of

24   marginal relevance, and any probative value is substantially

25   outweighed by the risk of jury confusion."

1          And I think if you go back further, Your Honor, and

2     you look at the briefing that was done on this, that was what

3     they argued.  They said, look, even if it's relevant for other

4     things, the jury's going to be confused, they're going to

5     perform this comparison anyway.

6          They had a statement in a reply brief that their

7     demonstration flat out should not be admitted for any purpose.

8     I can pull that up and read it for you if you give me a second,

9     but the fact of the matter is they actually won.  They won

10    their motion to keep their product out, and now they want to

11    put it back in.

12         MR. ROBERTSON:  Your Honor, that's just not what we

13    asked for.

14         THE COURT:  I have a recollection that is what was

15    asked for in the briefing, and I think that's why that was put

16    in there, actually, if I remember correctly, into that order.

17    I don't have a perfect memory, but it sounds to me like that it

18    was dealt with in context of the motion number nine.  You

19    prevailed, the ruling obtained, and it had a consequence you

20    didn't like.  Now you want it reversed.  That's what it sounds

21    like.

22         MR. ROBERTSON:  I'm sorry it sounds that way.  The

23    key phrase in the order is a comparison between our system and

24    their system can't be used for secondary considerations.

25    That's not what we want to do.  We're not going to compare the

1    two systems.

2           We should be able to tell the jury that we have a

3    product out there in the marketplace, and our product has been

4    successful, and be able to at least show them information about

5    our product so that they understand competitive harm that we

6    are sustaining by the infringing activities of the defendant.

7           That's relevant to the willfulness that's going to be

8    at issue here.  It's relevant to whether they know about us and

9    the competition that's in the marketplace.  So that's what we

10   want to do with respect to that.  We don't want to get here,

11   and we're not going to get up and say, look at our system and

12   look at their system, and that would be evidence of commercial

13   success.  I don't think that comparison has any relevance to

14   commercial success.

15          But, again, the success of a product and the fact

16   that we're competing out there is relevant to the obviousness

17   issue, and it's relevant to the willfulness issue under the

18   *Read v. Portec* factors that the federal circuit looks to.

19          MS. STOLL-DeBELL:  Your Honor, I found that quote

20   from their reply brief.  It's docket 328 at page two, and it

21   says, quote, At a minimum, therefore, ePlus's demonstration

22   system of its commercial embodiment, produced in discovery,

23   should be excluded from evidence.  Defendant does not proffer

24   any reason why this demonstration system would be relevant for

25   any of the limited purposes identified in its opposition brief.

1  The ePlus demonstration system would only be used, improperly,

2  to suggest comparison with defendant's accused products, and in

3  that respect would confuse and mislead the jury as to the

4  proper infringement analysis, end quote.  So they did ask to

5  have it --

6          THE COURT:  You asked for it, didn't you?

7          MR. ROBERTSON:  First, specifically, it was only

8  addressed to the demo system, not all these other issues and

9  other pieces of evidence we're taking about.  I did not want

10 the demonstration system put side by side with their system and

11 the jury becoming confused, because perhaps, quite frankly, the

12 look and feel of them are a little bit different.

13         In their functionality, they are really not different

14 at all, but the jury would have been confused if they had our

15 demo system right next to their demo system.

16         I didn't hear secondary considerations mentioned once

17 in that quote.  I mean perhaps I missed it, but I didn't think

18 I heard it.  So that was a very focused and specific request,

19 Your Honor, and, again, we're not planning on putting the demo

20 systems up side by side with the Lawson system.

21         MS. STOLL-DeBELL:  Your Honor, I'm sorry.  I had a

22 couple other things I wanted to raise if that's okay.

23         THE COURT:  Go ahead.

24         MS. STOLL-DeBELL:  First, they don't have a fact

25 witness who can compare their demo or their --

1           THE COURT:  We're not going to use their demo.  He

2      said he's not going to offer it; right?

3           MR. ROBERTSON:  Yes, sir.

4           THE COURT:  That keeps it out.  That order does,

5      right?  Yes.  Don't fight the obvious.  You just got up and

6      said it did.  You said that order applied to that.

7           MR. ROBERTSON:  I'm not going to object to it.

8           THE COURT:  So you're not offering it.  That's it.

9           MS. STOLL-DeBELL:  For the record, I think it's on

10     PX-504 on the list today.

11          THE COURT:  He's not talking about that exhibit or

12     that demo system.

13          MS. STOLL-DeBELL:  They don't have a witness who can

14     say that their product today is covered by the claims.  He's

15     mentioned two possibilities.  He said the inventors can talk

16     about it.  The inventors don't work for ePlus.  They have never

17     worked for ePlus.  They worked for Fisher back in the early

18     1990s when Fisher was developing its own product.

19          THE COURT:  I understand, but he said that they

20     say -- what was it in the specification was the forerunner of a

21     specific product, the blueprint for a specific product that was

22     made by company X which company X ePlus bought, and it's that

23     product that he's going to talk about as evidence of secondary

24     consideration.  Isn't that what you said, Mr. Robertson?

25          MR. ROBERTSON:  To be sure, Your Honor --

1          THE COURT:  Yes or no?

2          MR. ROBERTSON:  Yes.  It's a continuum.

3          THE COURT:  And that's what he said.  Why can't he

4     put that in?  And if Farber knows about that, why can't Farber

5     testify to it?  He's the president of the company, and that's

6     sufficient.

7          MS. STOLL-DeBELL:  Because that's expert testimony.

8     For Farber to get up and say, look, our product meets these

9     elements of these 12 different claims --

10         THE COURT:  He's not going to say that.  He doesn't

11    have to show that it meets the patent.  He has to show where it

12    came from.  That's all he's showing, I think.

13         MS. STOLL-DeBELL:  If that's all he's showing, they

14    haven't proven a nexus, Your Honor, which the federal circuit

15    has said over and over and over again, and, frankly, the

16    Supreme Court has, too, that for secondary considerations to be

17    relevant, you have to show that those secondary considerations

18    are for the claimed invention.

19         THE COURT:  You show me a case that says that the

20    nexus has to be shown by proving that what's offered as

21    evidence of commercial success has to meet every element of the

22    claim that's in issue.  Show me that case, and then I'll be

23    able to get myself sorted out with respect to it.  Do you

24    believe that's the law?  You said you didn't think it was.

25         MR. ROBERTSON:  No, and I brought with me several

1   cases that show it's not law.  One leading case is *Ryko*,

2   R-y-k-o, *Manufacturing v. Nu-Star*, N-u-S-t-a-r, 950 F.2d 714.

3   I've got a copy of the case if Your Honor would like it, but

4   the parenthetical was that the chief executive officer provided

5   testimony merely by affidavit that the car wash industry had

6   not solved its long-standing problems with automatic aviators,

7   or activators, excuse me, until a patented invention was

8   introduced.  So the Court found sufficient prima facia

9   evidence --

10           THE COURT:  Until what?

11           MR. ROBERTSON:  The Court found --

12           THE COURT:  Until what?  You slipped through that.

13           MR. ROBERTSON:  Until the patented invention was

14   introduced.

15           THE COURT:  Okay.  So that means the nexus is

16   provided by, covered by the patent.  Doesn't it say that?

17           MR. ROBERTSON:  Yes, sir.

18           THE COURT:  So the guy got up and he said, our

19   patented product, which is covered by our patent, the patent

20   that's at issue.  How come that doesn't prove her point rather

21   than yours?

22           MR. ROBERTSON:  It met a long-felt need.  We're

23   talking about a secondary consideration, and he wasn't an

24   expert.  He was just the chief executive officer.

25           THE COURT:  That isn't the point she's making.  She's

1   saying there's no connection at all from Farber or anybody

2   else.  That's the point she's making, not that you have to have

3   an expert to do it.  She folded her tents on the expert issue

4   some time ago.

5           MR. ROBERTSON:  I don't understand, Your Honor.

6   Farber can testify as to that.  He's the president of the

7   company.  He's got a technical background.

8           THE COURT:  But it does have to show, he does have to

9   show that the product that you are talking about, your own

10  product, is covered by the patent; right?

11          MR. ROBERTSON:  Yes.

12          THE COURT:  Okay.  Now, do you believe that Farber

13  can't testify to that?

14          MS. STOLL-DeBELL:  I believe --

15          THE COURT:  Or are you persisting in the view that an

16  expert has to testify to that?

17          MS. STOLL-DeBELL:  Mr. Robertson is saying that he's

18  qualified, he's got a technical background.  My position is

19  that Mr. Farber is going to get up and take the ePlus patent

20  and compare it to the claims which, I believe, is required, and

21  I can show you some case law on that.  That is expert

22  testimony.  That expert testimony --

23          THE COURT:  All he has to do is say, look, we've got

24  an expert over here that tells us we've been selling this as

25  patented, as a patented product, it's covered by it, I'm told

1    that, boom.  I think you are pushing that point too far.

2    Overruled.  It can come in on secondary considerations but not

3    the demonstration model which has already been ruled on.

4           That's it.  Let's go.  I'm not going to sit here and

5    do this all day long.  We are turning mother's picture to the

6    wall and moving on.

7           MS. STOLL-DeBELL:  Okay.  If I can just raise one

8    additional point.  Their briefing on that motion *in limine*

9    number nine was not just limited to the demonstration system.

10   That was a quote I pulled out to read to you, but I can read

11   another one where they are arguing their entire commercial

12   product should not be in, whether it's user manuals or the

13   actual demonstration system.

14          THE COURT:  What does it say?

15          MS. STOLL-DeBELL:  It says, quote, Throughout

16   discovery in this matter, Lawson has requested and received

17   numerous documents, demonstration systems, and other

18   information related to ePlus's and its predecessors' electronic

19   procurement products and commercial embodiments covered by the

20   patents-in-suit.  The details and features of ePlus's and its

21   predecessors' electronic procurement products and commercial

22   embodiments, however, are not relevant to the infringement

23   issues to be decided in the trial of this case.

24          THE COURT:  He's not talking about offering it for

25   infringement.  He's talking about for other reasons.  Okay.

1    Objection overruled.  17 is coming in.  Anything else on this

2    list, Roman numeral II?  Everything else is coming in.  Hearsay

3    objections are taken care of.  The documents are offered for

4    notice respecting willfulness, competition in the marketplace,

5    secondary considerations of nonobviousness, and long-felt need.

6           Number 17 is admissible on competition and secondary

7    considerations.  All the others, the objections to authenticity

8    and Rule 26 are overruled.  The hearsay is overruled, and the

9    relevance are overruled.

10           Roman numeral III.

11           MR. McDONALD:  Just to clarify, Your Honor, on the

12    notice issue with respect to the documents that were not from

13    Lawson --

14           THE COURT:  There's only one.  That's 17.  It's

15    coming in.  He can lay a foundation to show --

16           MR. McDONALD:  I believe 187 was also --

17           THE COURT:  I think he withdrew 187.

18           MR. McDONALD:  I'm sorry, yes.

19           THE COURT:  Number three, documents relating to

20    secondary considerations of nonobviousness.  Authentication,

21    there are objections to 29, 41, 901 -- excuse me, I'm sorry.

22    295 and 412.  Are those covered by the stipulation in the

23    pretrial order?

24           MR. ROBERTSON:  We produced it, Your Honor.

25           THE COURT:  You produced all those.

1          MR. ROBERTSON:  29, Your Honor, we produced.  41 we

2    produced.

3          THE COURT:  Let's take the ones they produced.

4          MR. ROBERTSON:  Your Honor, looking through this, I

5    think that we produced all of these.

6          THE COURT:  Okay.  So that stipulation doesn't cover

7    that.  How are you going to prove authentication of these

8    documents?  What are they?  First, let's describe them.

9          MR. ROBERTSON:  Sure.  Generally, Your Honor, there

10   are a number of documents that show that ePlus has received

11   various industry recognition, commercial success documents

12   that, again, show long-felt need, documents that go to the

13   licensing of the patents which are all secondary considerations

14   of nonobviousness.

15         Many of these things also are relevant to the notice

16   issue, Your Honor, and they were relied upon by our expert on

17   validity, Mr. Hilliard, as showing awards and industry

18   recognition, award for --

19         THE COURT:  Well, the fact that he relied on them

20   doesn't mean they come into evidence.  It means he can base his

21   opinion on them, but they don't come into evidence merely

22   because they are something that an expert typically relies on

23   in that kind of discipline.  So they don't come in that way.

24   If that's what you're trying to say, they are all gone.

25         MR. ROBERTSON:  No, I understand.

1          THE COURT:  Do you want to try some other argument

2    and leave that one behind?

3          MR. ROBERTSON:  Well, these were in the possession of

4    my client, so Mr. Farber can address them, and a couple of

5    these were awards that the inventors received --

6          THE COURT:  So you're going to authenticate them

7    through your client and through the inventors; is that right?

8          MR. ROBERTSON:  Yes, sir.

9          THE COURT:  Any other objection?  If they do that, is

10   that okay?

11         MS. STOLL-DeBELL:  That's okay on our authentication

12   objection, Your Honor, but, you know, if we want to take these

13   one by one, I can talk about what our issues are --

14         THE COURT:  I don't.  I want to take them by groups,

15   because I think you all told me these are the groups you agreed

16   I can take them by.  Authentication is overruled.

17         MS. STOLL-DeBELL:  But we have relevance and 403

18   objections, Your Honor.

19         THE COURT:  I'm not dealing with that yet.  These are

20   all the same kind of documents that show, they say, long-felt

21   need and commercial success.  They are documents that show

22   awards received and the success, their success in the

23   marketplace.  Is that right, Mr. Robertson?  Have I basically

24   categorized them correctly?

25         MR. ROBERTSON:  You have, sir.

1          THE COURT:  Why aren't they relevant then for the

2    purposes, and they are offering them for the purposes of

3    commercial success, long-felt need.

4          MS. STOLL-DeBELL:  If we can start with PX-29, Your

5    Honor, that one talks about the benefits of e-procurement, but

6    it doesn't mention ePlus, it doesn't mention any patents.  I

7    don't think it mentions Lawson, so I don't know how it is

8    relevant in any way to whether the invention was commercially

9    successful.

10          THE COURT:  How does that relate to commercial

11   success if it doesn't even mention you or your product?

12          MR. ROBERTSON:  It addresses long-felt need in the

13   industry, Your Honor.  It's a white paper addressing the need

14   and recognition that you need electronic procurement to make

15   cost savings in the industry.  The old paper process is costly,

16   involves too many people, and so it's a recognition in the

17   industry that the type of product that my client invented and

18   owns has secondary considerations that show it to be

19   nonobvious.

20          MS. STOLL-DeBELL:  First of all, the document is

21   dated 2001, so if we're looking at long-felt need, the relevant

22   time frame for that is around the time the invention was

23   created or before that, and I have a case for that --

24          THE COURT:  When was that?  I don't have that date in

25   my mind.

1              MS. STOLL-DeBELL:  1994 is when the patents were

2  filed.

3              THE COURT:  '84 or '94?

4              MS. STOLL-DeBELL:  '94, and this document is dated --

5              THE COURT:  Seven years later.

6              MS. STOLL-DeBELL:  Yes.

7              THE COURT:  How can it show long-felt need, Mr.

8  Robertson, if it's seven years after your patent was granted?

9              MR. ROBERTSON:  Because it's talking historically

10  about how e-procurement has largely been responsible for

11  replacing indirect procurement, corporate spotlight, and the

12  cost savings and opportunities inherent, and Aberdeen -- this

13  is an industry analyst -- has identified indirect procurement

14  as a significant opportunity for --

15              THE COURT:  Does it tie it back to 1994?

16              MR. ROBERTSON:  It's talking about what's developed

17  historically --

18              THE COURT:  Does it take it back to 1994?  Show me

19  what page.

20              MR. ROBERTSON:  Your Honor, I can't find it --

21              THE COURT:  Objection sustained.

22              MS. STOLL-DeBELL:  The next one, Your honor, I have

23  on the list is PX-41.  This document talks about the benefits

24  of SRM software which, I guess, is -- they call it supplier

25  relationship management software.  I'm not sure that's even the

1    kind of software that's at issue in this case, so this --

2              THE COURT:  Well, if you're not sure, who is?  You've

3    been at it long enough --

4              MS. STOLL-DeBELL:  I don't think it is.

5              THE COURT:  -- and smarter than a cut cat anyway.

6    How come you can't tell me that it is or isn't?

7              MS. STOLL-DeBELL:  I don't think it is.  I certainly

8    don't think it's what the claims are talking about, but, again,

9    this suffers from the same problems as the last document.  It

10   does not mention ePlus, it does not mention the patents, it's

11   dated 2001.  It just is --

12             THE COURT:  It says analysis, 2003 to '07, August of

13   2003, PX-41.  Is that the one you're talking about?

14             MS. STOLL-DeBELL:  I'm sorry.  I have in my notes

15   2001.  You're right, it's 2003, so it's even later.

16             THE COURT:  How do you get this dog in?  Don't you

17   want to put that one back in the kennel?

18             MR. ROBERTSON:  I'll withdraw it, Your Honor.

19             THE COURT:  All right, withdrawn.

20             MS. STOLL-DeBELL:  The next -- Your Honor, if you can

21   just give me a minute.  We had a little bit different list than

22   they did.

23             So, Your Honor, this document is about ePlus, 284.

24   It's talking about how ePlus was named to *iSource Business*

25   *Magazine's* top 100.  Yeah, it's about the company.  It's not

1    about the patented invention.

2            THE COURT:  That doesn't necessarily mean it's

3    irrelevant or inadmissible.

4            MS. STOLL-DeBELL:  Well, I don't think it's relevant

5    for secondary considerations --

6            THE COURT:  What is it, 284?

7            MS. STOLL-DeBELL:  Yes.

8            THE COURT:  275 must be the bestseller of all times.

9    It takes up four volumes.  What is it, the functional

10   equivalent of *War and Peace*?  All right, 284.  This is a

11   document that talked about what a hot ticket company ePlus is.

12           MS. STOLL-DeBELL:  That's right.  And --

13           THE COURT:  And you object to it why?  It's 2003.

14           MS. STOLL-DeBELL:  It's irrelevant to secondary

15   considerations because of the date, because it's talking about

16   enterprise cost management platform which is not the software

17   at issue in this case, and so it's not relevant and it's

18   prejudicial to put an award up there that doesn't relate to the

19   software they claim is covered by the claims.

20           THE COURT:  You mean the mere fact that the commander

21   got the medal of honor doesn't prove anything in the case; is

22   that right?

23           MS. STOLL-DeBELL:  Yes.

24           THE COURT:  Sounds good to me.  How come this

25   self-laudatory publication can come in?

1          MR. ROBERTSON:  Well, it's a quote about *iSource*

2    *Business Magazine's* top 100 naming ePlus to that top 100 list

3    --

4          THE COURT:  So what?

5          MR. ROBERTSON:  -- for the products that are at issue

6    in this case.

7          THE COURT:  Where?  She says it's not.  She says you

8    are talking about enterprise cost management and not the other

9    products, so help us out.

10         MR. ROBERTSON:  Third paragraph, Your Honor, second

11   full sentence.  "The company offers a suite of electronic

12   procurement, product and catalog content management."  That's

13   what we're talking about.  Then Mr. Farber, in the fourth

14   paragraph, testifies, "We are honored to be recognized for our

15   contributions to cost-effective sourcing and procurement and

16   for the value we provide to enterprises that use these products

17   and services."

18         So it is -- Mr. Farber will testify it's directly

19   about the product --

20         THE COURT:  What are you offering it for?

21         MR. ROBERTSON:  Commercial success, secondary indicia

22   of nonobviousness, Your Honor.

23         MS. STOLL-DeBELL:  Your Honor, I think that first of

24   all, we need to remember this is an ePlus press release, and as

25   most press releases --

1           THE COURT:  It's self-laudatory.

2           MS. STOLL-DeBELL:  -- it's self-laudatory, but it

3   also says, look, we offer all this stuff, and it's -- this kind

4   of language about their procurement software is in every press

5   release.  This is what we do.

6           The first sentence talks about its inclusion in this

7   award, why it was included in the award or this list of

8   *Magazine's* top 100, and it says, enterprise cost management

9   platform.  So it's -- it may be an award, but it's not relevant

10  to this case, and it's prejudicial to Lawson --

11          THE COURT:  Where does it say that?

12          MS. STOLL-DeBELL:  Third paragraph, first sentence.

13          THE COURT:  It came in -- it got the award because of

14  enterprise cost management platform; right?

15          MS. STOLL-DeBELL:  That's my understanding of reading

16  this.  Then it talks about --

17          THE COURT:  Then it goes on to describe the company.

18          MS. STOLL-DeBELL:  Yes.

19          THE COURT:  Your basic argument is it's prejudicial;

20  while there may be marginal relevance to the substance about

21  the products they offer, it's prejudicial to present that

22  testimony in the context of this award document; is that right?

23          MS. STOLL-DeBELL:  I wouldn't even say -- I don't

24  think it's of any probative value.

25          THE COURT:  You can put a dog out here in the middle,

1   and mostly it would be relevant under the federal rules if you

2   could have anybody get up and say it had something to do with

3   something.  So it is -- you don't even agree it's of marginal

4   relevance, okay.

5           MS. STOLL-DeBELL:  It certainly is prejudicial.

6           THE COURT:  Why isn't she right?

7           MR. ROBERTSON:  Enterprise --

8           THE COURT:  It says, "ePlus's inclusion in the list

9   reflects the effectiveness and maturity of its enterprise cost

10  management platform," which is not, she says, in this case; is

11  that right or wrong?

12          MR. ROBERTSON:  Respectfully, that is wrong, and Mr.

13  Farber is going to tell you --

14          THE COURT:  What's wrong?

15          MR. ROBERTSON:  Innovative enterprise-wide solutions

16  and services is a generic term, platform upon which this

17  procurement product is included.

18          THE COURT:  Wait just a minute.  You're not answering

19  the question she raised.  The first sentence says, in the third

20  paragraph, "ePlus's inclusion in the list," that is you've got

21  the list and the big award here, "reflects the effectiveness

22  and maturity of its enterprise cost management platform."  She

23  says that isn't involved in the case.  What do you say as to

24  that?

25          MR. ROBERTSON:  It is involved in the case.

1          THE COURT:  How?

2          MR. ROBERTSON:  Because that platform is the product

3    that Mr. Farber then grills down and says in the second

4    paragraph exactly what the company is offering as part of that

5    innovative enterprise-wide solution.  The solution and the

6    services he is referring to are then detailed in the next, the

7    third and the fourth paragraph where he gets very specific

8    about what the products are.  And the products that he is

9    talking about are the products --

10         THE COURT:  Does he have an inability to remember

11   this?

12         MR. ROBERTSON:  Does he have an inability?  No, he

13   remembers it quite well.

14         THE COURT:  I don't think that he says any such thing

15   as that.  How does he explain where a patented -- an infringed

16   product, or a patented product, excuse more, or something you

17   all do is in the enterprise cost management platform?  Where

18   does he say that in this document?

19         MR. ROBERTSON:  He can explain this document when he

20   testifies, Your Honor.

21         THE COURT:  Good.

22         MR. ROBERTSON:  What he's going to say is, when he's

23   referring to enterprise-wide solutions and services, and he

24   details that the company offers a suite of electronic

25   procurement products and catalog content management, that is

1    the innovative enterprise-wide solution and services.  He

2    doesn't come right out and say it's patented, but that's the

3    product that is covered by the patent.

4                 THE COURT:  Okay.  Objection sustained, Rule 403.  He

5    can testify about it, but we're not going to put it in the

6    context of an award that doesn't specifically identify itself

7    as fitting into the category of a product or a patent issue

8    that's involved in this case.  Let's go.

9                 MS. STOLL-DeBELL:  Next one is PX-285.

10                THE COURT:  This is another --

11                MS. STOLL-DeBELL:  Similar thing.  It's another award

12    ePlus won.  If you look at the second paragraph, Your Honor, it

13    says they won this award based upon a weighing of a number of

14    factors -- I'm on the fourth line -- "including overall dollar

15    increase in revenue, revenue growth in proportion to their own

16    size, profitability posture and improvements, and market share

17    gains."

18                THE COURT:  I think he probably wants to withdraw

19    this exhibit, don't you?

20                MR. ROBERTSON:  Your Honor --

21                THE COURT:  Really, come on.  We're not going -- you

22    aren't linking this to --

23                MR. ROBERTSON:  The third paragraph says, "The

24    company offers a suite of electronic procurement, product and

25    catalog content management."  That's the product that is the

1    commercial embodiment of the patent that they are offering.

2    That's why they got this award among --

3           THE COURT:  That's not what it says.  It says you get

4    it because you increase your revenue.

5           MR. ROBERTSON:  By selling the patented product.

6           THE COURT:  Get a handle on what's actually

7    admissible, and let's use that stuff.  If your man can testify,

8    fine, but the objection is sustained as to the document under

9    403.  286.

10          MS. STOLL-DeBELL:  Next one is 286, Your Honor.  It's

11   the same thing.  It talks about some kind of award they got.

12   The first paragraph says it's for leadership, financial

13   stability, and sustained growth.  It's the same thing.  Not

14   relevant, prejudicial.

15          THE COURT:  It's the same thing, isn't it, as 285,

16   Mr. Robertson?

17          MR. ROBERTSON:  Well, it just simply says that the

18   award was --

19          THE COURT:  I know what it said.

20          MR. ROBERTSON:  Enterprise cost management which

21   includes expertise in e-procurement, content management, and

22   supplier enablement.  Those are the issues that are involved in

23   the commercial embodiment, Your Honor, and Mr. Farber can

24   certainly testify about that in relationship to this --

25          THE COURT:  He can do it, and he can say, we've

1    received awards and been recognized in the industry, but this

2    press release talks about how well they've done financially

3    and --

4              MR. ROBERTSON:  In the supply and demand area, Your

5    Honor.

6              THE COURT:  I understand, but, you know, that's so

7    amorphous that it's of marginal relevance, and it's

8    outweighed -- it makes it look like you got an award for the

9    specific product when you sell a whole lot of other things, and

10   it's unfair.  It opens up the ground for all kinds of

11   cross-examination and side issues that 403 is designed to cut

12   out.  That's true for 29, 284, 285, and 286.

13             MS. STOLL-DeBELL:  The next one is PX-287, Your

14   Honor.  It's a white paper relating to ePlus's commercial

15   product.  We had objected to it based upon our belief they

16   can't show a nexus, but I -- for that reason, it's not

17   relevant.  It basically talks about what one of their products

18   is and what it does.

19             THE COURT:  Who is going to show the nexus?

20             MR. ROBERTSON:  First all, it's relevant to the

21   operations and functionality of our product which Mr. Farber

22   wants to be able to address on this competition issue.

23             THE COURT:  Objection is overruled assuming there's a

24   foundation by Farber.  289 -- I mean 294.  Riding Ariba.  What

25   does Ariba have to do with anything?  Ariba -- this is Ariba

1  gets an Aberdeen award.  Now we've even won an award for Ariba.

2  Why do we want that?

3           MR. ROBERTSON:  Because Ariba was an infringer and

4  it's a licensee, and it shows commercial success in the

5  industry of these products.

6           THE COURT:  This doesn't show that.

7           MS. STOLL-DeBELL:  It doesn't even say what product

8  was implemented.

9           MR. ROBERTSON:  It says it in the first sentence,

10 Your Honor, successful implementation of Ariba's e-procurement

11 software.

12          THE COURT:  So then you have to prove that in order

13 to -- that that means what they -- the products they sold that

14 infringed; right?

15          MR. ROBERTSON:  I think Mr. Farber can say he

16 understands what product were in the marketplace.  Ariba was

17 one.  He was at the trial, the entire Ariba trial.  He knows

18 what product was accused, and he knows that they are a licensee

19 who paid them a significant amount of royalties.

20          THE COURT:  Sustained, 403.  295.  Is this more of

21 the same?  Why can't you -- if you all are just putting these

22 things in and they are all of the same ilk, why don't we just

23 agree that they would all be covered by the same ruling?

24          MR. ROBERTSON:  Your Honor, this one actually has to

25 do with the first commercial embodiment of the patents.

1          THE COURT:  PX-295.

2          MR. ROBERTSON:  Yes.  This Cornerstone product was

3    the first product, first commercially available product that

4    the inventors created right after the patent.  That's what

5    Cornerstone was.  So this is the invention.

6          THE COURT:  295, okay.  First one is the

7    authenticity.  Do you have any real objection to authenticity?

8    Do you want to withdraw that?

9          MS. STOLL-DeBELL:  No, yeah, I'll withdraw that.

10          THE COURT:  Okay, it's withdrawn.

11          MS. STOLL-DeBELL:  So our issues, Your Honor, this is

12    similar to what we had before.  Most of this stuff, it's a

13    whole bunch of documents put together in one exhibit.  Most of

14    it just talks about what the product was, both Cornerstone,

15    also ProcureNet and SupplyLink, three different products.

16    There is one page in there that talks about an award.

17          THE COURT:  This is not a document that belonged

18    together.  Somebody just stuck it together?

19          MS. STOLL-DeBELL:  It seems to me to be a whole bunch

20    of different documents put together.  We do have that multiple

21    document objection.

22          MR. ROBERTSON:  It's a printout from a website, Your

23    Honor, that all were linked together, so when it printed out,

24    it prints them out all together.  It shows -- this was an

25    internet archive that shows when these inventors came out with

1    their first invention.  The SupplyLink was just them taking

2    Cornerstone and applying it to the internet once the internet

3    opened up for commerce.  So it was grouped together, Your

4    Honor, just because it was printed out --

5              THE COURT:  What part of all of that brings it within

6    some kind of rule of evidence that allows it to be admitted as

7    a valid document when they say they object to it as a

8    compilation that doesn't -- that just is printed out from some

9    source that doesn't connect to anything?

10             MR. ROBERTSON:  It was all from the same source.

11             THE COURT:  That and a nickel will get you a Coke.

12             MR. ROBERTSON:  I can break it up, Your Honor.

13             THE COURT:  Break it up.  What do you want to break?

14             MR. ROBERTSON:  I'll do it along the lines that shows

15   that each page is a one-of-three --

16             THE COURT:  I'm not going to sit here and go through

17   it while you do that.  Why don't you see if you can revise the

18   exhibit and take away that objection.

19             As a basic proposition, if they have somebody who's

20   going to testify about the first commercial embodiment of the

21   invention, that person can use this document to testify and

22   explain what it is.  That makes it relevant, and it eliminates

23   the 403 objection, it eliminates the hearsay objection because

24   it's offered for a non-hearsay purpose, not the truth of what's

25   in it but to show what the product is.

1           However, the fact that somebody has glommed together

2    a whole bunch of documents, some of which are press releases,

3    some of which are at times different than the first commercial

4    embodiment, precludes it as a valid exhibit even if it's proved

5    to be authentic from a website.  It's confusing, and 403 would

6    keep it out.  If you can restructure it in some way, then go to

7    it.

8           MR. ROBERTSON:  I will restructure it, Your Honor,

9    but many of these, for example, identify awards that the

10   inventors won for their first commercial embodiment which was

11   ProcureNet.

12          THE COURT:  You just go ahead and have them testify

13   about the fact they won awards, and you can have them say, this

14   is the award we won, but you can't stick all that stuff

15   together and put it in a document and make it look like it's

16   something.  Where did you get the idea you can do that?

17          MR. ROBERTSON:  Your Honor, I agree I will break it

18   apart, and I will just rely then on the most relevant of those.

19   Some had described what the early functionality was, and others

20   describe the awards they received.

21          THE COURT:  As long as you do it with a witness,

22   that's okay.

23          MS. STOLL-DeBELL:  Your Honor, regarding the award

24   issue, I'm not sure because it is a whole bunch of documents

25   together.  I thought there was one award they won, and I don't

1    think it's tied to --

2             THE COURT:  Let's just wait and see what they say.

3             MS. STOLL-DeBELL:  Okay.

4             THE COURT:  If they won it, they won it, and they can

5    say, this is the award we won.  That's okay.  But it takes

6    testimony, so you're going to revise that and build a

7    foundation.

8             308.  Basically everything on this list, category

9    Roman numeral III, doesn't have too much merit to it and can't

10   get in.  Maybe you'd like to reflect on whether you want it.

11   What is the next one?

12            MS. STOLL-DeBELL:  It's some kind of --

13            THE COURT:  What is it, 308?

14            MS. STOLL-DeBELL:  This is just an ePlus white paper

15   relating to e-procurement, and I'm not sure what it's relevant

16   for.  I don't think it is.

17            THE COURT:  Okay, 308.  Why is this relevant to

18   anything in the case?

19            MR. ROBERTSON:  It's a white paper, Your Honor, from

20   my client that shows how they automated procurement.  So it's

21   describing functionality of their commercial embodiment, shows

22   that we're in the marketplace and have a product and also

23   contains the patent numbers.  You'll see at the last page of it

24   which --

25            THE COURT:  This would have been one that should be

1   just as well left alone, shouldn't it?

2           MS. STOLL-DeBELL:  Well, Your Honor, I think as you

3   see, they've got a lot of exhibits, and a lot of them relate to

4   damages, and they haven't pulled those out.  This they were

5   going to use to show marking.  That's not an issue anymore.

6   Whether they marked or not is not relevant, and it doesn't make

7   sense to waste the jury's time showing that they marked their

8   product.  It doesn't matter.

9           THE COURT:  I don't think that's why he was offering

10  it.

11          MS. STOLL-DeBELL:  I think that was originally why it

12  was put on the list.

13          THE COURT:  Now he's come up with some other reason.

14          MS. STOLL-DeBELL:  Yeah.

15          THE COURT:  It happens.  Such is the nature of

16  litigation and life.  We're addressing why it's being offered

17  now.

18          MS. STOLL-DeBELL:  I don't know what issue it shows.

19  So it shows their product.  We've got Farber testifying about

20  it.  Why do --

21          THE COURT:  You mean it's cumulative?

22          MS. STOLL-DeBELL:  Pardon me?

23          THE COURT:  Cumulative?

24          MS. STOLL-DeBELL:  Yes, it's cumulative.

25          THE COURT:  Okay, overruled.  401, 402, and 403 are

1   all overruled assuming you get a foundation for it.

2           412.  You haven't pulled out the damage exhibits,

3   Mr. Robertson?

4           MR. ROBERTSON:  That's not accurate, Your Honor.  If

5   I can get a stipulation from them, but one of the things we

6   need --

7           THE COURT:  Get a stipulation of what?

8           MR. ROBERTSON:  On the commercial success of the

9   infringing product and the revenues they've generated from the

10  infringing systems.  Now, there are some summary documents,

11  Your Honor.  There are spreadsheets that are very, very

12  voluminous.  I will admit that.  They are produced in the

13  manner, I gather, from which the data is maintained at Lawson.

14  They generated these spreadsheets at our request with respect

15  to what was being accused in the case, and they create a very

16  large document.

17          What we did for that, Your Honor, which is recognized

18  by the Federal Rules of Civil Procedure and endorsed by the

19  federal circuit, is we created a Federal Rule of Evidence 1006

20  summary.  The voluminous documents, and you're going to see

21  some other ones, Your Honor, don't have to come into evidence,

22  as you know, under Federal Rule 1006 when you take a large set

23  of documents --

24          THE COURT:  As long as they are tendered so that the

25  other side can look at them and be prepared to cross-examine on

 1   them, then they'll come in.

 2           MR. ROBERTSON:  That's right, Your Honor.

 3           THE COURT:  So what does this have to do with number

 4   412?

 5           MS. STOLL-DeBELL:  It doesn't.

 6           THE COURT:  All right.

 7           MS. STOLL-DeBELL:  Our issue with 412 --

 8           MR. ROBERTSON:  Your Honor, I'll withdraw 412.

 9           THE COURT:  Exhibit withdrawn.  443.

10           MR. ROBERTSON:  Your Honor, I might be able to

11   withdraw 443 and 444, but let me just raise an issue here.

12   Licensing also, under the *Graham v. John Deere* case, is

13   relevant --

14           THE COURT:  To show commercial success.

15           MR. ROBERTSON:  Yes, sir.  So you have license

16   agreements on this list.  We also have --

17           THE COURT:  Is that what this is?

18           MR. ROBERTSON:  No.  These are printouts from our

19   licensees showing that they have licensed our patents.  If the

20   license agreements come in, I can withdraw these.  I think any

21   prejudice that the defendant was concerned about with regard to

22   the license agreements is now completely mitigated with respect

23   to the fact that we're not going to be putting a damages case

24   on in front of the jury, and the jury won't be able to give us

25   a damages award during this trial.  So I think if the license

1    agreements are going to come in, I'll withdraw these.

2              THE COURT:  Can't the fact of licensing come in to

3    show commercial success?

4              MR. McDONALD:  Your Honor, I've got a couple of cases

5    that I can hand up copies that require a very specific nexus

6    for admissibility of licenses.  You have to establish which

7    claims are incorporated in the licensing program and actually

8    tie it to the claims, and so they have no witnesses who can

9    testify that the SciQuest -- I mean, they said, we settled

10   those cases so quickly, we didn't even know what those guys

11   were selling.  That's the SciQuest and the Verian and the

12   Perfect Commerce.

13             Nobody can testify as to what they were selling and

14   make a nexus here.  One thing to keep in mind about the nexus

15   is, there were 78 claims of the three asserted patents in this

16   case.  We're down to 12 now that are actually asserted at this

17   point, and to say, well, it's covered by a patent, one of these

18   patents, or the license refers to the patents, doesn't tell you

19   that the claims that we are saying are invalid are claims that

20   were commercially successful.  So there's no witness that can

21   really tie any of these licenses in this case to the asserted

22   claims.

23             THE COURT:  All right.

24             MR. ROBERTSON:  Your Honor, licensing in and of

25   itself is a secondary consideration of nonobviousness.  It's

1   not a commercial success secondary consideration.  That would

2   actually be the royalty revenues that we have received pursuant

3   to these licenses.  So this nexus requirement doesn't exist.

4            THE COURT:  But what he's saying is that you have to

5   show that the license covers a claim in suit, and I think he's

6   right about that.

7            MR. ROBERTSON:  It covers all of the claims of all

8   three patents, Your Honor, so it certainly encompasses the

9   claims that are at issue in this lawsuit.

10           THE COURT:  Okay.  If it covers all of them, what

11  difference does it make?  Why isn't the nexus there?

12           MR. McDONALD:  If they actually had a witness who is

13  going to say it's covered by all 78 claims, that might be the

14  situation, but that's not our situation.

15           THE COURT:  No, no, no.  It says it covers all

16  claims -- he's saying that the license covers all of the claims

17  that are at issue here.  That's enough, he says.  Why isn't he

18  right?

19           MR. McDONALD:  Under the law, the *G.PAK* case,

20  *Muniauction*, *G.PAK* talks about you have to establish which

21  claims are incorporated into the licensing program to show that

22  the specific invention claimed here --

23           THE COURT:  He's going to show all of them.  He's

24  going to show that all of the claims are incorporated into the

25  licensing -- I come here, and I say, all of my -- I've got

1    great licenses here.  I have all these licenses from these five

2    companies.  That shows something.  What does it show,

3    Mr. Robertson?  What does the fact that I have -- that you have

4    licenses that cover all of these claims and you license them

5    out in the commercial world, what does that go to show?

6              MR. ROBERTSON:  It shows industry recognition,

7    industry acquiescence in the face of the past.

8              THE COURT:  What does that show?

9              MR. ROBERTSON:  It shows that they are nonobvious.

10   That's one of the factors to consider.  I got a bench brief

11   here on the admissibility of the prior license agreements if

12   the Court would like to look at it, but licensing under the

13   *Eibel Process* case, which is a Supreme Court case, says that

14   the fact that the patent holder was able to license the patents

15   is weighty evidence.

16             THE COURT:  Evidence of what?

17             MR. ROBERTSON:  Of nonobviousness.  That others have

18   taken licenses.  There is the *Minnesota Mining* case which is a

19   federal circuit case, 976 F.2d 1559 --

20             THE COURT:  I understand.  I think it's clear that

21   there are cases that hold that licensing of a patent can show,

22   can be used to show nonobviousness.  That isn't the point Mr.

23   McDonald is making.

24             The point is you have a patent, you have a patent

25   license that covers, let's just say for purposes of the

1    discussion, a hundred claims.  You are accusing, in this case,

2    only 13 of those products as being infringed by his products.

3         He's saying that unless you show a nexus, that, in

4    fact, it's confusing to the jury and may not have any -- or the

5    probative value is outweighed by the prejudicial effect.  Isn't

6    that your argument, Mr. McDonald?

7         MR. McDONALD:  Yes.

8         THE COURT:  Why isn't that argument right now?

9    That's the point that needs to be addressed.

10        MR. ROBERTSON:  Two practical considerations, Your

11   Honor.  Number one is when you complete a case and you're going

12   to license the infringer, the infringer wants and demands a

13   license to every patent and every claim of that patent.  They

14   don't take less than the whole, because they want to be done

15   with the case.  It's a practical reality that faces every

16   patent owner every time they enter into a license agreement.

17   That took place in this case.

18        Secondly, if I had my druthers, Your Honor, I would

19   have sued them on every single claim, but Your Honor early on

20   told me I needed to narrow my case to 13.  So I feel a little

21   bit --

22        THE COURT:  I told you you needed to narrow it.  You

23   narrowed it to 13.

24        MR. ROBERTSON:  All right, Your Honor.  In fact, I

25   have now narrowed it to 12, because I'm withdrawing one claim

1  because --

2          THE COURT:  I'm going to give you an award like some

3  of those exhibits that I excluded.

4          MR. ROBERTSON:  Thank you very much.  So I find

5  myself in a situation where I can't license someone to less

6  than all of them, and they certainly include as a subset the 12

7  ones that we have chosen at the Court's suggestion to include

8  in this case.  So I'd rather, if I could avoid, not get

9  whipsawed on that for having agreed with Your Honor that it

10  made sense to narrow them.

11          I would certainly expect, at the conclusion of this

12  case, if we are successful, and we resolve this by settlement,

13  you're going to see Lawson, just like every other licensee that

14  we have licensed, say they want a license to every claim of all

15  three patents so that they are done with us once and for all,

16  because they would never take less than a whole.  That's just a

17  practical reality in the marketplace, Your Honor.

18          MR. McDONALD:  The problem, Your Honor, is the

19  not-so-hypothetical situation is they sue somebody for

20  infringement, and they settle the case by taking a license even

21  though the product may not be covered by the claims.  They just

22  settle the case to get rid of it, and by reducing the number of

23  claims, it actually would have been easier for ePlus to come in

24  with somebody to say, look, the specific asserted claims are,

25  in fact, practiced by these licensees, and they paid money to

1    ePlus for the right to practice those specific claims.

2           The *Iron Grip Barbell* case says, the mere existence

3    of a license under the patents is insufficient to overcome

4    obviousness.  You have to show that nexus that's specific to

5    the claim.  They note in that case it's often cheaper to take a

6    license than to defend the case.  So just the fact that they

7    work it out -- and, sure, all these licenses in all these cases

8    talk about a license under all the claims of the patents.  That

9    is not enough to show the nexus.

10          THE COURT:  That doesn't apply to the license where

11   they had $37 million to go with it.

12          MR. McDONALD:  Even that was settled on appeal.

13          THE COURT:  So what?

14          MR. McDONALD:  It's not a final adjudication that

15   they were using any of the claims of the patents let alone the

16   12 asserted claims.

17          THE COURT:  Actually, it is a final adjudication.

18   The final adjudication occurred in the district court, and the

19   fact that you settled is tough, but the judgment of

20   infringement is there.  That's the *Bank of America* case, and it

21   hasn't been eradicated unless somebody removed it.  I'm not

22   sure that has a whole lot to do with the case, with this issue.

23   All right, Mr. Robertson, why do you get in this over the

24   *Barbell* case?  How do you get it in?

25          MR. ROBERTSON:  I'd like to see a copy --

1          THE COURT:  Why don't you do that while we take a

2     little break.

3

4          (Recess taken.)

5

6          THE COURT:  All right.  You were going to read about

7     barbells, but we got into this because you were going to

8     withdraw 443 and 444 of your exhibits if you could get

9     licensing, license agreements in.  And then you -- I don't know

10    where we are now.

11         MR. ROBERTSON:  Let me just say I've had an

12    opportunity to take a look at the *Iron Grip Barbell* case.  I

13    observe -- I observe for all of these cases, I've never seen a

14    situation in any of the cases where there were just a

15    requirement to prove a nexus to certain claims in a license

16    agreement that were being asserted in another case.

17         What the -- the license in the *Iron Grip* case was a

18    license to the entire patent.  As I indicated to the Court,

19    it's typical, if not incredibly unusual, that a license would

20    ever give less than all the claims in the patent, and the

21    nexus, I think, would be shown several ways, certainly by Mr.

22    Farber testifying as to his understanding as a person in the

23    marketplace, as a corporate representative in both Ariba and

24    SAP, as to his understanding of what -- and he negotiated the

25    licenses -- what, in fact, they covered, and it should subsume,

1    Your Honor, the claims that are at issue in this lawsuit, and

2    so I think that establishes the nexus.

3         My colleague, Ms. Albert, also points out to me that

4    several of the claims that were asserted and found to be

5    infringed in Ariba are also at issue in this case, and I

6    believe there's an overlap with respect to some of the claims

7    in SAP, but I'm not certain as I stand here right now.

8         Certainly, if we had to get down to the specific

9    granularity of the claim, I think that is evidence of the

10   nexus.  I don't think the case law requires that.  I think the

11   fact that they are patent licenses to the entire patents that

12   include these claims and Mr. Farber's understanding of the

13   circumstances and negotiations for those licenses should

14   satisfy that, and I will just note again that the *John Deere*

15   case says that this evidence, if available, must be considered

16   including licensing.

17        So, Your Honor, I would respectfully request that

18   these licenses be admitted since the prejudice that the Court

19   was concerned about prior and the issue with respect to damages

20   is no longer present.

21        MR. McDONALD:  Well, when we were here last time

22   talking about Mr. Farber's testimony, I remember some

23   interaction about a part of his deposition where he had said

24   something about attorney/client privilege and he couldn't talk

25   about the settlements because of that and clarified that what

1   he really meant was that it was confidential information so he

2   didn't get to see it from the Ariba and the SAP cases.

3         So when Mr. Robertson says he can testify about it,

4   he hasn't testified yet, and when I tried to ask about the

5   circumstances of those settlements, he said he was not privy to

6   confidential information of SAP and Ariba.  It was regarding

7   the sales information, but there's other attorneys'-eyes-only

8   information regarding the intricacies of the products that we

9   have never had a chance to see and he didn't testify about.

10         So I don't see how he's going to be able to testify

11   about that.  We've never had a chance to probe that, and it was

12   not in their contention answers as something they were going to

13   do here to show, through Mr. Farber, that these products were

14   covered by the patents.

15         And by the way, just to clarify, I'm not saying that

16   patents have to be to certain claims of the patent.  That's not

17   what this nexus is about.  It's about the fact the license

18   alone doesn't really tell you what's going on.  If somebody

19   simply buys a license to get away from a lawsuit but they don't

20   actually practice the claimed invention, that's the issue.

21         That's the gap in the evidence here, and that's the

22   nexus that is needed here when you have licenses, especially

23   here, specifically in the context of settling a case.  That's

24   what the *Iron Barbell* case talks about, is when you have

25   settlements, you have to take a look about that.

1      Moreover, recall at the summary judgment we filed on

2  the marking issue that said, oh, SAP didn't have to mark, and,

3  therefore, that's proof of a failure to mark.  It was ePlus

4  that came back in response to that motion and said, we can't

5  prove, nobody can prove that SAP is practicing the claims of

6  this invention.

7      So their failure to mark doesn't prove anything,

8  because they're not using the invention.  There's no evidence

9  that they're using any of the claims, and now they're taking

10  the exact opposite position on that issue, and they have no

11  evidence that SAP or Ariba is actually practicing the claimed

12  invention.

13      MR. ROBERTSON:  Mr. Farber's certainly seen all these

14  license agreements, he certainly testified about them, he

15  negotiated them.  I think he maybe even executed them.  What he

16  testified at his deposition was he hadn't seen the revenue

17  figures from Ariba and SAP because that was -- he mistakenly

18  said he thought was attorney/client privilege.  It was actually

19  confidential information of a third party that he could not see

20  under the protective order.

21      Mr. Farber certainly knows the situations involving

22  why these patents were negotiated, how they were, and what the

23  products were at issue, and Ariba was found --

24      THE COURT:  So are you telling me you're going to get

25  in here, and you're going to have them testify, have him

1    testify that there was litigation and they settled the

2    litigation and they had a license?  Is that what you are going

3    to do?

4           MR. ROBERTSON:  Even the *Iron Barbell* case doesn't

5    say that because it was a result of a settlement, a settlement

6    of litigation that it's precluded.

7           THE COURT:  That wasn't raised, though, was it?

8           MR. ROBERTSON:  It was noted that two of the licenses

9    were taken in settlement of litigation, so it was -- they were

10   aware -- that was not the basis.  So that doesn't automatically

11   preclude it.  I haven't seen a case that said just because

12   there's settlement agreements and a license results that --

13          THE COURT:  Why would a case -- why would it be

14   probative that if I settled a case to buy peace, that that

15   shows -- you are offering this for obviousness; right?  On the

16   issue of obviousness; right?  Nonobvious, the converse; right?

17          MR. ROBERTSON:  Yes, sir.

18          THE COURT:  Why would that show that it's nonobvious?

19   I mean, license agreements offered in the commercial sphere

20   where people give and take and do a structure for an agreement

21   in a business context tend to show that they think it's -- it

22   tends to show probative -- it's probative of commercial

23   success.  Why is a license negotiated under extorted conditions

24   of a lawsuit, why does it have the same probative effect?

25          MR. ROBERTSON:  I disagree with the characterization

```
 1   in this sense, Your Honor:  It could be a factor, but it's not
 2   the only factor.
 3             THE COURT:  What characterization do you disagree
 4   with?
 5             MR. ROBERTSON:  There's always mixed motivation in
 6   entering into a license agreement.  Even when it's an
 7   arm's-length transaction, the infringer who enters into it
 8   voluntarily does so because he understands ultimately that the
 9   threat of litigation is there.  So that factor is always
10   present whether it's in the context of litigation or not.
11             Some people say a patent is only an invitation to a
12   lawsuit anyway, because the only way the patent owner can
13   obtain a license is to have a threat of litigation hanging out
14   there over a willing licensor who wants to be able to practice
15   the patent.  That's what you found both in SAP, that's what you
16   found in Ariba.
17             Can that be brought up and perhaps the jury gives the
18   licenses less weight?  Certainly.  Can Mr. Farber be asked
19   about that in cross-examination?  Yes.  And maybe it's not the
20   strongest factor of nonobviousness, Your Honor, but it still is
21   a factor that has some tendency to establish a factor issue
22   which is obviousness.
23             THE COURT:  I think the licenses can come in.  I
24   think John Deere allows them in.  So what does that do to
25   PX-443 and 444?
```

1          MR. ROBERTSON:  I withdraw them.

2          MR. McDONALD:  Your Honor, could we at least ask that

3    for the licenses, if they're going to come in, that the amounts

4    of them be redacted so the jury doesn't see that $37 million

5    figure, that $17 million from SAP?  It seems like that, in

6    particular, is going to be prejudicial and inflammatory.

7          MR. ROBERTSON:  Your Honor, the royalty revenues go

8    to commercial success under the *John Deere* case, and also the

9    other licenses, as Your Honor has pointed out, there's one that

10   was Verian for $600,000.  Now, that's going to come in as well,

11   and I explained -- if I could just explain, the Court noted

12   that at some point, the fact that license is so small is

13   because Verian's revenue base is only $6 million.  So that's

14   almost a ten percent royalty on that one license.

15          But those facts can come in.  The jury can't do

16   anything anymore about awarding damages that they would think

17   would be disproportionate to what we can establish.  That's out

18   of the case.  So that prejudice isn't there, but the value of

19   the licenses show that the technology is important.

20          THE COURT:  Anything else?

21          MR. McDONALD:  No, Your Honor.

22          THE COURT:  I don't think it's necessary to redact

23   the financial information from the licenses.  It's pertinent

24   with respect to the commercial success.  All right, four,

25   Lawson RFP responses to prospective customers, Exhibits 130,

1    275, 500, and 515.

2           MR. SCHULTZ:  These documents are what ePlus has

3    designated as 1006 specifically relating to PX-130 and PX-500.

4    Excuse me, 515.

5           THE COURT:  It says that 515 is a 1006 summary.  The

6    other is, what, backup information, 130, 275, and 500; is that

7    what it is to 515?

8           MR. SCHULTZ:  275 and 500 are the backup information.

9           THE COURT:  To 515.

10          MR. SCHULTZ:  To 515, and also to 130.  275 is to

11   130.  500 is to 515.

12          THE COURT:  Is 130 a 1006 summary as well?  It

13   doesn't say it is.

14          MR. ROBERTSON:  It's not, Your Honor.  It was used in

15   a deposition which testimony has been designated.  It was an

16   excerpt from a very large, voluminous document that we didn't

17   want to be able to use the entire document at deposition.  So

18   we used certain excerpts to obtain admissions from a corporate

19   designee for Lawson.

20          MR. SCHULTZ:  Your Honor, if I could address

21   Exhibit 130 based on what Mr. Robertson just said --

22          THE COURT:  Wait just a minute.  Let me look at it.

23   130 is a several-page document that has various pages in it.

24          MR. SCHULTZ:  Exhibit 130 is a cutout of the parts of

25   Exhibit 275 that counsel for ePlus chose to use in the

1   deposition of Todd Dooner.  In that deposition, the question

2   was, "Are you familiar with something called an RFP process?"

3   The answer to that question was, "No."

4          The witness also did not authenticate Exhibit

5   Number 8 that Mr. Robertson referenced.  The only way that

6   that -- it's a hearsay document, but they're not using it as a

7   1006 compilation because it's a document that was put together

8   by counsel for ePlus.  In particular, I'll read my objection

9   and Ms. Albert's --

10          THE COURT:  This document is a Lawson document.

11          MR. SCHULTZ:  No, it's not.  It's a compilation that

12   was put together by ePlus's counsel.  Here is my objection to

13   the document.

14          THE COURT:  Wait a minute.  You're saying that 130 is

15   part of 275.  Is that what you're saying?

16          MR. SCHULTZ:  I'm saying that it's pages that are

17   taken out of 275.

18          THE COURT:  Well, okay, that's the answer, yes.  I'm

19   just trying to figure out what you're talking about.  All

20   right.  275 is this four-volume work; right?

21          MR. SCHULTZ:  That's correct.

22          THE COURT:  What is 275?

23          MR. SCHULTZ:  275 is a document that Lawson produced

24   that is RCF Express.  It's a large document that relates to RFP

25   responses that Lawson has.

1            THE COURT:  So 275 was prepared by Lawson; right?

2            MR. SCHULTZ:  That's correct.

3            THE COURT:  And 130 is excerpts of 275; right?

4            MR. SCHULTZ:  That's correct.

5            THE COURT:  So the text of 130 is text that was

6    prepared by Lawson; right?

7            MR. SCHULTZ:  The actual text -- the compilation is

8    not.

9            THE COURT:  Answer the question.  Let's get your

10   tongue around yes and no and learn how to use it if you're

11   going to stay here.  The answer to the question is that the

12   text of the parts of 130 that came from 275 is text that's

13   prepared by Lawson; right?

14           MR. SCHULTZ:  Yes.

15           THE COURT:  And your objection to this is that the

16   selections of text that comprise 130 is not -- is what?  It's

17   hearsay?

18           MR. SCHULTZ:  It's hearsay.

19           THE COURT:  Why?

20           MR. SCHULTZ:  Because it's not a document from -- it

21   is hearsay because it's an out-of-court statement that was

22   prepared by counsel for ePlus.

23           THE COURT:  No, it isn't that.  It's excerpts -- he

24   can put in all of 275, couldn't he?

25           MR. SCHULTZ:  He could put in all of 275, that's

1    correct.

2          THE COURT:  Then he could take from 275 a question

3    such as -- or a statement such as the one that appears on the

4    front page, and that wouldn't make it hearsay, would it?

5          MR. SCHULTZ:  If it's ePlus who is preparing the

6    document --

7          THE COURT:  No, no.  I didn't ask you about preparing

8    the document.  He can take this one quote -- let's call this a

9    quote.  He can take the one statement on the first page of

10   Exhibit 130 and use it to present evidence.

11         MR. SCHULTZ:  I agree with that.

12         THE COURT:  It wouldn't be hearsay, would it?

13         MR. SCHULTZ:  I agree with that.

14         THE COURT:  Okay.  The fact that he does that with

15   the first one and the second one and the third one doesn't make

16   it any more hearsay, does it?  No, it doesn't.

17         MR. SCHULTZ:  Correct.

18         THE COURT:  Now, so we don't have a hearsay issue

19   here.  We have a document, it seems to me, that the issue is

20   really a fairness question, because they have extracted text

21   out of context, I believe, is the objection.  Let's see.  Okay,

22   I have to give -- I don't use Rule 106 too much.  What is that?

23         MR. SCHULTZ:  Completeness, Your Honor.

24         THE COURT:  Okay, completeness, that's your

25   objection.  And then relevance and prejudice and then hearsay.

1    So the hearsay is overruled.

2         MR. SCHULTZ:  Your Honor, with respect to 275, we

3    also withdraw our hearsay objection to that document.

4         THE COURT:  Yes, I would think so.  And your

5    authentication.

6         MR. SCHULTZ:  That's correct.  And also the MD, the

7    multiple document, that is not a multiple document.

8         THE COURT:  And what is F?

9         MR. SCHULTZ:  F is foundation.  We also withdraw

10   that.

11        THE COURT:  And now he says that if you're going to

12   use 130, you have to use it in context of 275.

13        MR. ROBERTSON:  Yes, Your Honor.  Let me --

14        THE COURT:  Why isn't he right about that, because

15   you pulled this thing out and extracted different parts of it?

16   Why don't you have to take the document with the witness, or

17   take the document and say, this is part of this whole thing?

18   Why don't you have to do that?

19        MR. ROBERTSON:  I likely might, but let me just give

20   you a little bit of background on this very briefly, Your

21   Honor.  What 275 is, RFP Express is a collection, a compendium

22   of stock Lawson responses to customer inquiries about the

23   functionality of their products.

24        During a deposition, a witness identified that Lawson

25   prepares a large archive of standard answers to common

1   questions customers ask about this product and many others.

2   That's how the document was produced to us.  Each one is sort

3   of a standalone answer to a question.

4           THE COURT:  Like an FAQ on a computer.

5           MR. ROBERTSON:  Exactly.

6           THE COURT:  Go to the website and you can't get

7   anybody to help you, so you have to go -- unless you really

8   know how to navigate and go to the contact line somewhere and

9   go find somebody on the telephone, you have to go use the FAQs

10  first; right?

11          MR. ROBERTSON:  Yes.  The way this industry works,

12  Your Honor, is the customers put out a request for a proposal,

13  and it goes to multiple companies.  It can go to Lawson, it can

14  go to ePlus, and you'll see some of these in a little bit,

15  specific ones, and they have to answer the question.  It may be

16  the questions involve the absolute relevant functionality

17  that's at issue in this case.  Do you have the capability of

18  providing us with multiple vendor catalogs; yes, we do.  Do you

19  have the capability of providing us with multiple purchase

20  orders from a single requisition, things that are exactly at

21  issue in this case.

22          I deposed the executive vice president on this, and

23  if I can just briefly read you some excerpts, I won't read too

24  much.  But it said, "You mentioned in one of your answers that

25  there's a library of FRPs.  Do you recall that testimony?

1          I stated there's a library of FRP responses.

2          What is it?

3          It's a library of approved responses, templated

4    responses to standard types of questions, common types of

5    questions that we receive.

6          Question:  So it's not unusual in this RFP process

7    for customers to have the same type of questions about the

8    features and functionality of the product," and I mentioned the

9    accused products.

10         He goes on to say how these are vetted by the legal

11   department and vetted by the engineers, and I asked, "It's not

12   Lawson's intent to mislead anybody about the features and

13   functionality of this software product; is that right?

14         That's correct.

15         So if we're looking at a response to an RFP with

16   respect to the features and functionalities of the products at

17   issue, we should be able to rely on the accuracy of that

18   information?

19         That's correct."

20         So when we had the deposition, we took out some of

21   these stock answers which are responses to standard questions

22   that are relevant to the accused software.

23         THE COURT:  That's what 130 is.

24         MR. ROBERTSON:  Yes, sir.

25         THE COURT:  They are individually admissible, but

1   they are admissible in context of a question.  So you can't

2   just pop the answer out.  You have to have the question and the

3   answer.  So what you do is mark 275 with little tabs, and

4   you've got the witness up here, and you have him go right

5   through it.

6           MR. ROBERTSON:  Your Honor, 130 was only marked as a

7   separate exhibit because you're going to hear that we've

8   designated some of Mr. Dooner's testimony that related to that

9   specific exhibit.  So we wanted to have the exhibit be there to

10  put those specific questions as to those specific pages in

11  context of the deposition testimony.

12          THE COURT:  So they'll be used with the Dooner

13  deposition, and the Dooner deposition is going to provide

14  foundation; right?

15          MR. SCHULTZ:  The Dooner deposition does not provide

16  foundation.  In fact, he specifically says he does not know

17  what the document is.

18          THE COURT:  What document?

19          MR. SCHULTZ:  130.

20          THE COURT:  I know, but that's because they took out

21  the question.  He knew what the big document was.

22          MR. SCHULTZ:  No, that's incorrect.  Mr. Dooner does

23  not know what the RFP Express is.  He is a technical developer.

24  He has no idea what they do in marketing.

25          MR. ROBERTSON:  He was asked questions about whether

1   or not the functionality that is described there as being

2   representative of true and accurate information was --

3            THE COURT:  Did he adopt these answers?

4            MR. ROBERTSON:  In large part, yes, he did.

5            MR. SCHULTZ:  May I read his testimony?

6            THE COURT:  I'm going to tell you something.  What

7   I'm going to do is I'm going to ask the marshal to go open up

8   that door back there very soon if I have to get into this kind

9   of detail.  Now, what is it?

10           MR. SCHULTZ:  His testimony is that he's not familiar

11  with RFP Express.

12           THE COURT:  I know that, but that doesn't make any

13  difference.  If he read this statement, whether he's familiar

14  with it or where it came from or not, and he adopted it as his

15  own and said, this is correct, then that's a different issue,

16  and I think that's what Mr. Robertson is saying, but if he

17  didn't, then I want to know about it.

18           MR. ROBERTSON:  I have a suggestion, Your Honor.

19  Since Mr. Dooner is coming live, and we have 275 which you

20  indicated I can flag, I will just flag it.  I'll withdraw 130.

21  We're spending too much time.

22           MR. SCHULTZ:  500 and 515.  515 is the summary of

23  500.  Under 1006, 515 is being offered.  In order to have a

24  1006 admission, the underlying document has to be admissible.

25  There are two reasons why the document cannot be admissible in

1    the court.

2          First, in the contention interrogatories ePlus

3    disclosed regarding infringement contentions, it listed eight

4    specific RFPs and also in the contentions with respect to Dr.

5    Weaver.  The document, Exhibit PX-500, lists multiple documents

6    that were not included with respect to ePlus's contention

7    interrogatories and, therefore, should not be included at this

8    point.

9          In addition to that, the parties agreed on August 4th

10   that they would only agree to the admission of 12 additional

11   exhibits that were inadvertently not placed on the original

12   exhibit list.  What ePlus did is they combined approximately 28

13   documents in Exhibits 500 and 501 to get around that rule and

14   get around the stipulation of counsel.

15         For those two reasons, the underlying document is not

16   admissible, and, therefore, the 1006 summary should not be

17   admissible.

18         THE COURT:  I don't understand what they did wrong.

19   Tell me what they did wrong again.

20         MR. SCHULTZ:  Sure.  In their contention

21   interrogatories, ePlus lists -- let me go back.  Exhibit 500 is

22   a compilation of RFP responses.

23         THE COURT:  You mean is taken from Exhibit 275?

24         MR. SCHULTZ:  No.  275 is a completely separate

25   issue.  Exhibit 500 is actual customers that Lawson has

1    responded to.  There are approximately 28 customers and 28 RFPs

2    that are included in Exhibit 500.

3         ePlus only listed eight in response to its contention

4    interrogatories regarding what had constituted infringement.

5    It did not list any of the other RFPs that it now lists as an

6    exhibit.  That's the first issue.

7         THE COURT:  All right.  So what do you say about

8    that, Mr. Robertson?

9         MR. ROBERTSON:  The eight that were identified in the

10   contention interrogatory were the eight that were identified in

11   Dr. Weaver's report.  He didn't have to go through all 500,

12   Exhibit 500 because he used what he needed for purposes of his

13   report.  500 is going to be relevant.

14        We need to go, and we need to cross certain Lawson

15   individuals with respect to other admissions contained in there

16   about the functionality of their products.

17        As Your Honor indicated earlier, we don't need to

18   prove infringement solely through an expert.  We're going to

19   have lots of admissions as to the functionality of these

20   products from Lawson individuals.  So there's no question about

21   its relevance, its authenticity.

22        I might just raise one further issue.

23        THE COURT:  I thought you said -- I don't think they

24   objected to the authenticity.

25        MR. ROBERTSON:  One further point I'd like to make,

1  Your Honor.  This may tax your memory a little bit, but we were

2  -- back in March, we had a motion to compel on this whole issue

3  of implementation on a customer-by-customer basis, and at that

4  time, Your Honor granted the motion to compel and said if there

5  were any arguments with respect to implementation on the

6  customer-by-customer basis and they didn't answer that

7  interrogatory, then the door would be shut on that and there'd

8  be no further questions on it.

9         We have this document, which is a compilation, and we

10  also --

11         THE COURT:  Which document?

12         MR. ROBERTSON:  500, which is the complete

13  compilation of the RFPs we have, and we produced from it this

14  FRE 1006 summary.  So there's no question it's available to

15  them.  I mean, it's their own documents from documents they

16  produced.

17         The FRE summary, which is 515, is simply the summary

18  of those admissions in those RFPs that tend to prove that the

19  accused product here infringes because it satisfies the claims

20  elements.

21         THE COURT:  So 515 -- I mean 500 is all Lawson

22  documents.

23         MR. ROBERTSON:  Yes, sir.

24         THE COURT:  And it's a list, a number of documents.

25  It doesn't fit -- they don't belong together.  You just put

1    them together.

2         MR. ROBERTSON:  We put them together so they would be

3    together for the FRE compilation, because they are all similar

4    type of documents.  They are all responses to RFPs, and so the

5    compilation under the rule --

6         THE COURT:  What you would have done is taken 500 and

7    have -- how many are there?  How many documents are there?

8         MR. ROBERTSON:  I think it was represented 28, and I

9    don't have --

10        THE COURT:  So you could do 500-A for one of them and

11   500-B and then 500-AA and 500-BB, and you'd have all 28 of them

12   listed there; right?  And then there wouldn't be commingled

13   assembled documents.  They would be separate documents; right?

14        MR. ROBERTSON:  Yes, sir.

15        THE COURT:  Okay, do that.

16        MR. SCHULTZ:  Your Honor, that goes against the

17   stipulation of the parties that we could only have 12

18   additional exhibits.  They listed 28.

19        THE COURT:  What do you mean, 12 additional exhibits?

20        MR. SCHULTZ:  The parties stipulated that after the

21   exhibit list was going to be filed with the Court, they could

22   only -- only with inadvertent exhibits that were omitted, we

23   would be limited to 12.  There was a heated discussion back and

24   forth --

25        THE COURT:  Why is this inadvertent?  This was put

1    in, and it wasn't inadvertent.  They just did it wrong.

2            MR. SCHULTZ:  If it wasn't inadvertent, then it

3    wasn't against -- it was against the stipulation of the

4    parties.

5            THE COURT:  Oh, come on.  That's how many angels can

6    stand on the head of a pin.

7            MR. SCHULTZ:  The bigger issue, Your Honor, is that

8    fact that --

9            THE COURT:  Don't be taking up time talking like that

10   about things like that.

11           MR. SCHULTZ:  These 28 documents were not in their

12   contention interrogatories.  They are precluded because they

13   were not in those interrogatories.

14           THE COURT:  Where is your objection on that?  I don't

15   see that.

16           MR. SCHULTZ:  That's the relevance.

17           THE COURT:  Relevance doesn't have anything to do

18   with -- you're arguing that they violated Rule 26 or they

19   violated -- they answered an interrogatory, and they didn't

20   disclose it in an interrogatory; right?

21           MR. SCHULTZ:  That's correct.

22           THE COURT:  So that's a Rule 37 issue, not a

23   relevance issue.  It's relevant if it's relevant, and relevant

24   evidence can be evidence that gets excluded because Rule 37

25   calls for its exclusion because they didn't do what they were

1    supposed to do in discovery, but the test for admissibility in

2    that situation is not the relevance test.  It is the test of

3    Rule 37.  Isn't that the correct analysis to be made?

4              MR. SCHULTZ:  Yes.

5              THE COURT:  And is that what your principal complaint

6    is?

7              MR. SCHULTZ:  Yes, it is.

8              THE COURT:  Then assert it.  All right,

9    Mr. Robertson, address that.

10             MR. ROBERTSON:  Your Honor, contention

11   interrogatories, none of the parties here identified every

12   single exhibit that they were going to offer on every single

13   issue in that case.  All 100 of the Lawson exhibits are not in

14   all of their contention interrogatories, and we had one that

15   specifically said, give us every document you're going to use

16   in evidence to support your defenses.

17             So the parties put together contention

18   interrogatories that relied on documents, and Dr. Weaver relied

19   on samples of these --

20             THE COURT:  But you have an obligation to update the

21   answers to your interrogatories, don't you?

22             MR. ROBERTSON:  I don't know that this was called for

23   in the updated interrogatories, Your Honor --

24             THE COURT:  Start with the answer to the question.

25             MR. ROBERTSON:  Yes, we have an obligation to update

1    our interrogatories.

2              THE COURT:  Why didn't you update them if you were

3    going to use them?

4              MR. ROBERTSON:  I don't think this actually raises

5    any new issue that's not contained already in the infringement

6    response to the interrogatories.

7              THE COURT:  What did the interrogatory say?  Do you

8    have it?  May I see the interrogatory, Lawson, that you say

9    they have offended?

10             MR. ROBERTSON:  While they are looking for that, Your

11   Honor, I do know, my colleague reminded me that with this range

12   and in that request for --

13             THE COURT:  What range?

14             MR. ROBERTSON:  Excuse me.  Let me start over.  With

15   respect to the implementation interrogatory that Your Honor

16   granted the motion to compel on, part of the response was,

17   here's a base range of all of these RFPs and all of these SOWs.

18   SOWs are statements of war which actually reflect the contract

19   once the customer awards the bid to Lawson in response to a

20   request for proposal.  So they gave us this and said, here --

21             THE COURT:  They gave us what?

22             MR. ROBERTSON:  The base range --

23             THE COURT:  500?

24             MR. ROBERTSON:  Yes, sir.

25             THE COURT:  They gave you a base range.  You went to

1    look in the base range and found what is now Exhibit 500; is

2    that what you are saying?

3              MR. ROBERTSON:  With the SOWs as well which is

4    another large voluminous document you're going to see as well.

5              THE COURT:  Where is the interrogatory that you are

6    complaining of that they've offended that gives rise to a

7    sanction under Rule 37, unmade except now?

8              MR. SCHULTZ:  I'm talking about the infringement

9    contentions.

10             THE COURT:  What does it say?

11             MR. SCHULTZ:  It's ePlus is required under the

12   Court's ruling to place its contentions with respect to what

13   constitutes infringement within --

14             THE COURT:  They don't have to say everything they

15   are using to prove infringement.  They have to say what is the

16   infringement.  If that's the interrogatory, contention

17   interrogatory you are talking about, the interrogatory didn't

18   say list all the evidence you're going to produce to prove

19   infringement, did it?  It would be an usual one if it did.

20             MR. SCHULTZ:  What I'm saying, Your Honor, is in the

21   infringement contentions, they list eight RFPs, and they limit

22   it to eight.  Now, after the parties have agreed that that's

23   what it was going to be limited to, they've now changed the

24   rules of the game.

25             THE COURT:  You have here an issue that is an issue

1    of discovery.  It's an issue alleged that if this can't come in

2    because it offends -- they violated the discovery protocols or

3    rules, and in so doing, you are entitled, Lawson, to Rule 37

4    sanctions.

5          It's not been properly teed up for decision here.  I

6    have to see the interrogatory and the answer in order to make

7    that decision as to whether or not this evidence that they are

8    proffering now actually offends the rule.  I don't have that,

9    so I can't make the ruling now.

10         MR. ROBERTSON:  Your Honor, to bring one thing to

11   your attention, you may recall that there was a motion filed to

12   exclude Dr. Weaver and his theories after his expert report

13   came out, and Your Honor ruled on that, that, well, the

14   theories are articulated and a lot of evidence was cited, we

15   weren't precluded from actually having additional evidence as

16   long as it was in support of the same positions that Dr. Weaver

17   had taken throughout this case, and so the eight he's

18   referencing are the ones Dr. Weaver used to form his opinion.

19   The additional ones now we want to use with Lawson witnesses.

20         MR. SCHULTZ:  Your Honor, based on what Mr. Robertson

21   is saying, is if it's an agreement between the parties that as

22   long as there was a disclosure with respect to a certain topic

23   area, that there are other documents that are related to that

24   topic area, that relate to that, we would stipulate to that,

25   and that would resolve this objection.

1          MR. ROBERTSON:  What they are asking right now *sub*

2   *silentio*, Your Honor, is that you should overrule your ruling

3   on the Shamos report and the second supplemental statement.

4          THE COURT:  Even I figured that out.

5          MR. ROBERTSON:   Thank you, Your Honor.

6          THE COURT:  I'm ruling one thing at a time, one issue

7   at a time, and I'll have to see what it says.  All right.

8   You're going to have to brief it and submit it to me, because

9   it's not properly raised now.  I can't rule on an

10  interrogatory -- I mean on an objection that somebody didn't

11  timely -- didn't supplement an interrogatory without knowing

12  what the interrogatory said and what the interrogatory response

13  said.

14         MR. SCHULTZ:  I understand, Your Honor.

15         THE COURT:  If anybody has got it, I'll be glad to

16  take a crack at it, but I can't do that.  You all are

17  summarizing what they say.

18         What about the rest of these?  Rule 106, to the

19  extent it requires that the underlying documents be admissible,

20  is satisfied, as I understand it, because all these documents

21  are Lawson's own documents constituting RFPs.  They're just

22  going to be broken down so that they'll know each one is a

23  separate RFP.  So that objection to 106 -- or that basis of

24  objection to the Rule 106 component is overruled.  Nor does it

25  seem to me that there's an issue on relevance or 403, and the

1    multiple document is taken care of by sub labeling, so I'm

2    overruling the relevance issues.

3           MR. SCHULTZ:  Your Honor, just for the record, the

4    403 objection was related to cumulative because there are

5    multiple documents that relate to the same thing.  It's going

6    to be having one RFP after another relating to the exact same

7    thing.

8           THE COURT:  Overruled.  We're going to put it in a

9    summary.  That's taken care of.  If you all really want to

10   press this lack of compliance with the supplementation, then

11   you have to tee up in some way that makes sense, but I don't

12   have it in front of me now.  I don't know how to rule on it,

13   and, frankly, my ruling would be it's too late to go through

14   all that.  You haven't done it.  You didn't do it even as part

15   of the pretrial order, so I don't know why I'm even having to

16   deal with it.  I think it's a Johnny-come-lately, so I don't

17   even want to -- I don't think I'm even going to deal with it.

18   If you really thought that was a real problem, you'd have

19   brought it up in the right way, Lawson, so it's out.

20          Notice of patents, willfulness, and inducement.

21   What's all this?

22          MR. McDONALD:  Your Honor, we touched on this back on

23   the second grouping with the one exhibit, PX-17, when we were

24   talking about how ePlus was saying they were going to try to

25   prove willfulness, and there were documents -- PX-17 was one of

1    them -- and this list here in this group five is another group

2    of documents that did not come out of Lawson's own files, out

3    of the millions of documents that Lawson had.

4            No witness has said they looked at these particular

5    documents, but ePlus wants to use them to say, well, they were

6    on some website somewhere like a smartmoney.com or

7    infoworld.com, et cetera, and so it's out in the ether, the

8    media ether somewhere, and, therefore, Lawson must have known

9    about it.

10           This flies in the face of the -- to prove

11   willfulness, you need to have not constructive notice but

12   actual notice to the accused infringement.  So we don't think

13   these should be admissible for purpose of willfulness.  I don't

14   think they are really offering them for any other purpose.

15           THE COURT:  It says notice of patent, willfulness,

16   and inducement.  Is notice of the patent pertinent to any issue

17   other than willfulness, Mr. Robertson?

18           MR. ROBERTSON:  Yes, it is, Your Honor.

19           THE COURT:  What?

20           MR. ROBERTSON:  It's relevant to the issue of

21   inducement.  In fact, notice or even just reckless indifference

22   to our patents is relevant because that's a required element of

23   induced infringement which are claimed are being brought when

24   Lawson assists its customers, aids, abets, and provides them

25   implementation services, et cetera.  So induced infringement is

1    at issue, and that is an element we need to prove.

2         MR. McDONALD:  On that note, Your Honor, we'd

3    stipulate that we have notice of infringement by May of '09

4    when they sued us.  So if he wants to prove we used to induce

5    to infringe before May of '09, that's not relevant anymore

6    because damages is out of the case.  We'll stipulate that we

7    had notice of infringement over a year ago.

8         MR. ROBERTSON:  On the issue of willfulness, Your

9    Honor, it is also relevant under the *Read v. Portec* factors.

10   These are factors the federal circuit looks at to determine

11   whether the conduct was willful, the duration of the

12   infringement.

13        THE COURT:  This doesn't have anything to do with the

14   duration.  You can establish duration without getting into this

15   stuff.  What is this stuff?  This does -- it raises the hair on

16   the back of my neck to the level that I'd like to understand

17   more about it, but it doesn't raise my hackles.

18        MR. ROBERTSON:  That's good to know, Your Honor.  Let

19   me see if I can try and explain.  You may recall there was

20   actually a motion *in limine* number six --

21        THE COURT:  I do recall that, but what it was, I

22   don't know.

23        MR. ROBERTSON:  It was directed to these documents.

24   In fact, it was entitled motion *in limine* number six to exclude

25   evidence of publications related to ePlus's patent enforcement

1    efforts, litigation, and this one is the settlement agreements.

2    It was denied as moot at the time.  We moved for

3    reconsideration.  Your Honor denied the motion for

4    reconsideration.  The issue that has to go to this is, yes,

5    Lawson --

6              THE COURT:  I denied wholesale an effort to wholesale

7    throw out a whole category as moot.  I didn't deny particular

8    documents, objections to documents.

9              MR. ROBERTSON:  Understood, Your Honor.  I just

10   wanted to bring to your attention that this was raised and

11   argued before.  What we argued at the time was, yes, the

12   witnesses at Lawson were very well prepped to say they didn't

13   know about ePlus or they didn't know about any of our efforts

14   to enforce.  We said, you know, you have to be living under a

15   rock not to have heard about the litigation enforcement efforts

16   that we had out in the marketplace because it made --

17             THE COURT:  Well, look, I was in the court where

18   these things happened, and I don't consider myself living under

19   a rock, and until Judge Spencer visited this case upon me I

20   didn't know anything about it.

21             MR. ROBERTSON:  People in the industry took note of

22   this, Your Honor.

23             THE COURT:  I know you say that, but how do you prove

24   that?  You have to prove it.

25             MR. ROBERTSON:  Because the circumstantial evidence,

1    and Mr. Farber will talk about this, that this gained a lot of

2    notoriety.  There are articles in the *New York Times* here about

3    that, and so for them to say that they didn't know about it, I

4    think the jury can consider the enormity of the publicity that

5    this gained and find it's just not credible for someone in this

6    industry that competes head to head with ePlus, and we'll see

7    that when we get to the next category, would not be aware of --

8            THE COURT:  Did you ask any of the witnesses, do you

9    read the *New York Times* regularly, do you read the trade

10   publications regularly, what do you keep up with?  Now, did you

11   read them during the period of time when all this came out?  In

12   other words, it is possible to lay the foundation that you are

13   talking about.  My question is, did you lay it?

14           MR. ROBERTSON:  I think we did, Your Honor, with

15   respect to several of the industry analyst reports that we've

16   been talking about here.  You'll recall we talked about the

17   Aberdeen and Gartner report and the Forrester report, all of

18   these are the type of reports that were picking up in the press

19   because they were involved in this specific --

20           THE COURT:  Okay, but do you have evidence from

21   somebody in the position up there to know, a responsible

22   person, I'm not sure who it is, but somebody in the -- I don't

23   want to use control group, but in the knowledgeable group who

24   regularly read this and got Gartner, he'd say, yeah, I got

25   Gartner, I got it every week, read it, took it to bed with me,

1  got up in the morning and read it, studied it, knew what its

2  contents were, yep.  How about this one, did you pick up this

3  little notice here about an Ariba?  Nope, didn't pick it up,

4  didn't know anything about it.

5        All of that is permissible evidence of what you're

6  talking about, but if all you're doing is to say there was this

7  large press about it, and you haven't connected that Lawson

8  read regularly the large press that it floated in, then I don't

9  think you get anywhere with it.

10       MR. ROBERTSON:  I asked a witness, I believe it was

11  Mr. Frank, and I think there were others, on whether or not

12  they regularly received these kinds of industry analyst

13  reports.  The answer was yes.

14       THE COURT:  And you gave them by name, *SmartMoney*,

15  press releases, Gartner, article from *Supply & Demand Chain*, IT

16  Management, InfoWorld, *New York Times*, Computerworld,

17  Industryviews, did you ask him about all those?

18       MR. ROBERTSON:  I asked him, and the other witnesses

19  were asked generically about those kind of reports, that they

20  were widely circulated through the company by email, that lots

21  of people read them, they relied on them for their competitive

22  analysis.

23       THE COURT:  Did you establish, for example, that they

24  do competitive intelligence gathering?

25       MR. ROBERTSON:  Yes, sir.

1          THE COURT:  That this company does this, this is what

2     we do, we are a really good competitive intelligence gatherer,

3     we keep up with everyone we compete with.  Did you ask them

4     then, do you have a list of who you competed with, is ePlus on

5     that list?

6          MR. ROBERTSON:  We did.

7          THE COURT:  Okay, so if you lay the foundation, you

8     can get this kind of information in.  If you do not, you can't

9     get it in.

10          MR. ROBERTSON:  I understand, Your Honor.

11          THE COURT:  Isn't that the bottom line?

12          MR. ROBERTSON:  I think that's right, Your Honor.  I

13     intend to lay that foundation.  I think we've already made

14     strides in that way along the deposition testimony.  These

15     depositions were seven hours.  It's tough to go over all of

16     this when you have to cover a lot of different witnesses.

17          THE COURT:  Mr. Robertson, the way to deal with that

18     little problem is that if you have a need to go more than seven

19     hours with somebody, you say to the other side, how about let's

20     go more than seven hours.  They say no.  You say, we want to go

21     more than seven hours and we need to, and the Court says yes.

22     And I have never, ever but once that I know of said you can't

23     have more than seven hours, and that's because somebody was

24     sick.

25          MR. ROBERTSON:  Perhaps I should have done that, Your

1   Honor.

2          THE COURT:  Did you do that?

3          MR. ROBERTSON:  No, sir.

4          THE COURT:  Then don't cry about it.  Let's move on.

5          MR. ROBERTSON:  The only other point, we were

6   specifically going to ask the general question, or the general

7   question was asked, did you hear about it through industry

8   publications or otherwise.

9          THE COURT:  What?

10         MR. ROBERTSON:  Did you hear about it through

11  industry publications or otherwise, ePlus's success with

12  respect to enforcing its patents against Ariba, settling with

13  SAP.

14         THE COURT:  And what answers did you get?

15         MR. ROBERTSON:  Everyone said, no, we didn't know

16  about it.

17         THE COURT:  The whole company just is see no evil,

18  hear no evil?

19         MR. ROBERTSON:  That was the corporate designee's

20  testimony.  Interestingly, though, when the motion *in limine*

21  was raised with respect to this, Lawson came forward with an

22  affidavit from a woman there who said there was only one report

23  that they say wasn't circulated.

24         Now, she was silent as to the rest.  I found that

25  very interesting, that someone would come forward with an

1    affidavit to say only one wasn't circulated --

2            THE COURT:  I'm sure you know what you're talking

3    about, but it presupposes a level of knowledge I don't have.

4    So I'm not able to follow your argument.

5            MR. ROBERTSON:  Let me restate then, because that's

6    my failing.  When this issue about these publications that were

7    out there for notice with respect to the enforcement activities

8    of ePlus was raised, in support of that motion, I think it was

9    in reply actually, they came forward with an affidavit that --

10   with a list of all of these, they said --

11           THE COURT:  All of what?

12           MR. ROBERTSON:  All of these publications, these

13   press releases, these industry analyst reports that are being

14   identified here for purposes of notice, they only averred that

15   one affirmatively wasn't circulated through the company.  I

16   found that interesting --

17           THE COURT:  In other words, they were confronted with

18   a list that has everything on it that's under heading number

19   five, and they did an affidavit that said, well, item number X

20   wasn't circulated, thereby permitting the inference that

21   everything else on the list was circulated.  Is that what you

22   are saying?

23           MR. ROBERTSON:  Yes.  Item number X was PX-325.

24           THE COURT:  Is that a particularly hot item because

25   it identified the Ariba settlement?

1      MR. ROBERTSON:  It was -- yes, it was one of several,

2  but it was one that -- and Gartner is a report and publication,

3  of course, they admit receiving.

4      THE COURT:  Okay.  So why, if they lay the proper

5  foundation that you all regularly got these things and people

6  regularly read them and they did competitive intelligence

7  gathering like all companies do, or most companies do, and this

8  was among that database, and your people say, well, we didn't

9  know anything about that, why can't they go prove that in fact

10  the things they regularly read had all this information in it

11  and that it is reasonable for the jury to infer that they, in

12  fact, had actual knowledge of this situation reflected in those

13  articles, and why wouldn't that be probative evidence?

14      MR. McDONALD:  Well, Your Honor, there's two groups

15  that met that item X which I'll talk about, and then we've got

16  everything else on this list --

17      THE COURT:  Item X is Plaintiff Exhibit 325.

18      MR. McDONALD:  That's the Gartner publication.

19  That's different because Lawson said, we do -- I think the word

20  is subscribe to Gartner, but the deal is that's a situation

21  where you can go to their website and download stuff, almost

22  like a LexisNexis type of subscription.  So just because you're

23  a member doesn't mean you've read everything in the database.

24      So that declaration was specific about Gartner

25  because that's the only one on this list which Lawson, anybody

1    from Lawson even said they pay attention to.  Nobody said, for

2    example, they pay attention to this first one, PX-42,

3    smartmoney.com or the press release --

4         THE COURT:  Whether they pay attention to it is one

5    thing.  It's whether they get it and read it.

6         MR. McDONALD:  No evidence that they got any of those

7    other things, read them either regularly --

8         THE COURT:  He says he's got the information that

9    says they did.  Then you say they didn't.  So how am I to deal

10   with that?  The way I deal with that is, I'd say, they come in

11   if you establish a foundation.  If you don't, it doesn't come

12   in.  That's how I usually do it.  Why would I not follow that

13   approach here?  I can't rule on it ahead of time because you

14   two can't agree on what was asked.  You want me then to go read

15   everything?  I'm not going to go do that.

16        MR. McDONALD:  I would challenge Mr. Robertson to see

17   if he would agree that with the exception of the Gartner

18   publication, they've got absolutely no evidence that anybody

19   from Lawson regularly or sporadically reads these other

20   publications.

21        THE COURT:  Okay, Mr. Robertson, do you have that

22   evidence or not?

23        MR. ROBERTSON:  No one reads the *New York Times*, Your

24   Honor?

25        THE COURT:  Do you have evidence -- look, we can't

1    say the *New York Times* is out there, and, boy, it's incredible

2    that nobody reads it.  Let me tell you, there are an awful lot

3    of people who don't read the *New York Times* anymore.  I read

4    the *New York Times* every day for the whole time I was in

5    practice, and there came a time when I only went there when I

6    really wanted to because of reasons I don't need to get into

7    now.

8            MR. ROBERTSON:  Your Honor, the answer is --

9            THE COURT:  And I read the *Wall Street Journal* and

10   still do regularly, but I don't read it every day.

11           MR. ROBERTSON:  Understood, sir.

12           THE COURT:  So you can't get anywhere with that kind

13   of evidence.  He says you have no evidence in the record that

14   shows that anybody, except as to Gartner, read regularly any of

15   the publications contained in Roman numeral V.  Do you or do

16   you not?

17           MR. ROBERTSON:  I can't speak to every single one,

18   Your Honor, but let me be frank.  I'm certain we don't have it

19   with respect to every single one.  I don't know right now which

20   ones I do, but I heard your foundational ruling.

21           THE COURT:  Okay.

22           MR. McDONALD:  It's a matter of hopefully working

23   this out before the witness is on the stand and these things

24   start coming out.

25           THE COURT:  Well, you know, we can't always do that,

 1   but that's what cautionary instructions and foundation and all

 2   this stuff is about, and it sounds to me like maybe there

 3   hasn't been the background examination, the foundation on

 4   examination.

 5          The ruling on these documents is that they are

 6   admissible if a proper foundation is laid to show that the

 7   Lawson people subscribed to or read or otherwise kept

 8   abreast -- I've seen companies that, for example, there are

 9   squibs -- somebody is tasked with the responsibility of

10   providing squibs from different newspapers about particular

11   topics.  I know my law firm used to do that, and we would

12   circulate it, and I've seen other evidentiary people, other

13   evidentiary pieces where companies have people who say, on

14   these topics we keep abreast, and they are circulated.  Then

15   they'll have September 7th, *New York Times*, boom, and then it

16   has a little squib about the article, whether it's the actual

17   article or excerpt from the article or summary, those kinds of

18   things.  That's a way to keep abreast.

19          There are other ways to keep abreast.  I don't know.

20   I know that the brokerage industry has regular calls, morning

21   call every morning, and a lot of that stuff doesn't get passed

22   around in written form, but every morning that information

23   comes out, and there's a record of what morning call topics

24   there are.  So there's lots of ways to prove this thing, and

25   I'm not trying to circumscribe the proof, but it has to be

1    there.

2        MR. McDONALD:  Your Honor, just to clarify then,

3    there are certain issues with individual ones of these

4    exhibits, but if I understand your ruling right, we can address

5    those if and when they come up during trial.

6        THE COURT:  I'm going to take the issues.  What else?

7        MR. McDONALD:  Well, for example, on this Gartner

8    publication, there's a couple --

9        THE COURT:  Wait a minute.  Which exhibit?  Give me

10   the number.

11       MR. McDONALD:  PX-325 just as an example.  That is

12   the one that we were specific about because there was evidence

13   that we have this subscription, and what that declaration

14   showed is that Lawson had gone through to find all the things

15   they had downloaded from Gartner, and this particular article

16   was not part of it.  So we actually had affirmative evidence

17   that, you know, we did not download that one, A, and B --

18       THE COURT:  You can put that in.

19       MR. McDONALD:  And then, B, that one on page two,

20   it's got some prejudicial language in it that's actually

21   inconsistent with the *Seagate* ruling from the federal circuit

22   en banc on willfulness, because it talks about you should

23   review your software for patents known to be in dispute

24   regarding these infringement issues.  I don't know if you have

25   that handy or you want to pull that up.

1    THE COURT:  I was looking for the exhibit.  I can't

2 find it.  Okay, here it is.  These numbers are... 325.  What

3 now?

4    MR. McDONALD:  On page two of that, there's a

5 statement in there about this ePlus/Ariba settlement and some

6 recommendations that this Gartner is making, and this is the

7 document I'm saying that we don't have a record of seeing it

8 anyway, but this is particularly prejudicial here under the

9 recommendation section because the context here is we now have

10 the federal circuit saying en banc that a company doesn't have

11 a duty to go out and get advice of counsel or review for

12 patent.  That is not an affirmative duty that they have.  They

13 used to, but they don't anymore.  And then you have this

14 statement here, the second bullet point under recommendations

15 for ISV that says, undertake an extensive review of your --

16    THE COURT:  What is the reason for that kind of

17 thinking?

18    MR. McDONALD:  Pardon?

19    THE COURT:  What's the reason for that kind of

20 thinking, that you don't have to go check, see if you are

21 infringing other patents?

22    MR. McDONALD:  Well, there's a mountain of patents

23 out there.  They realized that they were setting up something

24 that was different from any other area of law in terms of

25 triggering willfulness.  We don't impose duties on people to go

1    find out about problems they are not already aware of.

2              THE COURT:  Oh, my Lord.  You're telling me that that

3    case stands for -- it's okay to be willfully blind?  I don't

4    think -- give me that case again.  I don't think that's what it

5    held.  Give it to me again.  I'll go read it.

6              MR. McDONALD:  Maybe after lunch, Your Honor, I'll

7    give you the specific cite.

8              THE COURT:  I don't think -- I remember what you are

9    talking about.  Somebody else cited the case.

10             MR. McDONALD:  The old standard used to say there's a

11   duty of due care that accused infringers would have that they

12   need to go seek and obtain advice of counsel if they're aware

13   of an issue there.

14             THE COURT:  That issue had to do with getting advice

15   of counsel as opposed to keeping up.  There's a big difference,

16   if I remember the case.  Don't over-cite a case.  That causes

17   trouble.

18             MR. McDONALD:  Right.  That's what I meant, is to

19   talk about in context of getting advice of counsel.

20             THE COURT:  Well, it doesn't say anything about

21   getting advice of counsel.

22             MR. McDONALD:  Well, it says, review your software's

23   functions against patents known to be in dispute.  Known to be

24   in dispute, I guess maybe that doesn't apply here anyway

25   because I don't think there's any dispute here that Lawson

1    wasn't aware of their disputes specific to them.

2              I mean, I think what ePlus is trying to say is we

3    heard about somebody else getting sued, so we should have

4    assumed that maybe we would be next or something, but that's

5    not known to be in dispute.  But if you put something like this

6    in front of the jury, I think this specifically is prejudicial.

7              THE COURT:  You can handle that by redacting it.

8    That recommendation isn't an industry standard, is it,

9    Mr. Robertson?

10             MR. McDONALD:  No evidence of that.

11             MR. ROBERTSON:  Your Honor, I think you are exactly

12   right that the *Seagate* case doesn't stand for that proposition.

13   There's going to be a proper instruction to the jury on the

14   issue of willfulness.

15             THE COURT:  That's not the issue.  The issue is

16   here's a set of specific advice, which probably is pretty good

17   advice, but whether or not it's risen to the standard of

18   industry standard or not, and you tell the jury, give them this

19   document, and then if it comes in, then you can also argue,

20   well, did they undertake an extensive review of the software's

21   functions against patents known to be in dispute?  No, they

22   knew this was in dispute.

23             I mean, I think he's got a point on the need to

24   redact some of this stuff.  It's one thing to issue it.  You

25   want this document for notice.  If you lay the foundation, you

1    can get it in for notice, but you can't use it to set up a set

2    of rules that nobody -- that we don't have anything in the

3    record that establishes is an industry set of practices,

4    because then what you are doing is actually working in

5    constructive notice in sort of a backdoor way, and it just

6    creates all kinds of other problems that they have a right then

7    to come in and redress.

8            I think this is a good -- he's right that you need to

9    go through these documents and redact the things that don't go

10   to the notice point that you want to make.

11           MR. ROBERTSON:  The notice is relevant to the

12   willfulness issue.

13           THE COURT:  I know the notice is relevant to the

14   willfulness, but the notice is notice of what?

15           MR. ROBERTSON:  Notice that you have to take --

16   exercise due care once you're aware of the patents and the fact

17   that this was --

18           THE COURT:  But you are offering it to show notice

19   that they were aware of your patent.

20           MR. ROBERTSON:  And didn't take reasonable steps to

21   avoid infringement.

22           THE COURT:  Who is it to say -- this publication says

23   this is a reasonable step, but I don't know that this is a

24   reasonable step, and you don't have any evidence to say that

25   the industry says this is a reasonable step, do you?

1          MR. ROBERTSON:  I have evidence from their witness

2    that says they rely on this report for their competitive -- on

3    these types of reports for their competitive analysis, and they

4    utilize them in making decisions about the company.

5          THE COURT:  That's not the same question.  You know,

6    if you want to ask the question -- look, think ahead when you

7    get an exhibit.  You go look at it, you say, useful for this,

8    I'm going to ask this question.  Then you can do it.

9          What you can't do is establish general information

10   and then come in and say, I've gotten -- I've touched all the

11   bases.  What happens is, with that particular information is

12   that you left yourself standing about this far from home plate,

13   and you didn't score.  So if you'd asked the question, do you

14   use these kinds of publications to help you guide what it is

15   you do, okay, and he said, yeah, we do that, then maybe it can

16   come in.  That's what I'm taking about.

17         What I'm letting you do is put this document in, all

18   these documents in for the purpose of notice if you establish a

19   foundation -- the notice being that you had a patent and they

20   should have -- and it's pertinent to their willful infringement

21   of it, their state of mind in disregarding your patent's

22   rights.  But I'm not letting it in for subsidiary stuff, and

23   you all have a duty to go out and talk with each other and

24   effectuate a proper redaction of the document.  Then after

25   doing that, if you still have something that you need to fight

1  over, you can let me know, but I guarantee you you'll come to

2  the right result now that you know the general rule.

3       MR. ROBERTSON:  Yes, Your Honor.  Can I raise one

4  point of clarification?

5       THE COURT:  What?

6       MR. ROBERTSON:  With respect to something Your Honor

7  said, and that was it was represented that there was this

8  affidavit that said with respect to this one Gartner report, it

9  hadn't been circulated.  My response to that is we identified

10  this Gartner report in our interrogatories supporting our

11  notice arguments and our willfulness arguments.

12       They had every opportunity to come forward with any

13  kind of rebuttal.  This affiant, this woman who provided this

14  affidavit was never identified in their initial disclosures,

15  never identified in interrogatory answers, and gave an

16  affidavit for the first time well after the close of fact

17  discovery.

18       THE COURT:  The affidavit can't come into evidence.

19       MR. ROBERTSON:  Then the witness shouldn't appear

20  live either.

21       THE COURT:  Why's that?

22       MR. ROBERTSON:  Because they've never identified her

23  in initial disclosures --

24       THE COURT:  What kind of ruling is that asking for?

25       MR. ROBERTSON:  Because we asked who their witnesses

 1   were going to be --

 2            THE COURT:  What kind of ruling are you asking for?

 3            MR. ROBERTSON:  Rule 37.

 4            THE COURT:  Right.  Did you do that?  When I went in

 5   here and asked you -- the first thing I asked was, I said, is

 6   there an objection to any of the witnesses listed.  It was the

 7   first section of the -- nobody spoke up.

 8            MR. ROBERTSON:  She's not on the witness list, Your

 9   Honor.

10            THE COURT:  Well, then, she can't testify.  Why are

11   we talking about that?

12            MR. ROBERTSON:  Because the suggestion was made she

13   could, and Your Honor said, then go ahead.  So I just wanted to

14   clarify that.

15            THE COURT:  I assumed that she was on the witness

16   list.  Do you think I threw everything in the pretrial order

17   out because of that?  No, I didn't.

18            Maybe it's a good time since we finished this topic

19   to go to lunch.  One hour.

20

21            (Luncheon recess.)

22

23            THE COURT:  Okay, we're on VI, Roman numeral VI.

24            MR. ROBERTSON:  I believe that's the settlement

25   agreement, Your Honor.

1          THE COURT:  License agreements.  Well, we've really

2    just covered those, haven't we?  I am concerned, though, about

3    the fact that they come in the form of a settlement agreement.

4    Is there some way we can extract the information without

5    throwing the exhibits in that show settlement?

6          MR. ROBERTSON:  Settlement agreements and license

7    agreements is the title.  I can redact settlement.  It's a

8    grant of a license is what's going on --

9          THE COURT:  I understand.  I'm talking about the

10   content.

11         MR. ROBERTSON:  Would you like me to summarize them

12   in an FRE 1006 perhaps?

13         THE COURT:  Well, what do they look like?  I just

14   don't know what they look like.  43 is one of them.  I've got

15   the book of 300s here.  Let's see what 320 looks like.

16         Well, I guess I'll just give a limiting -- the

17   redaction of that thing to make it -- to take the settlement

18   context out of it would basically just make it impossible to

19   understand, I fear.  I'll just give a limiting instruction that

20   the fact that these people settled these cases is of no moment

21   here.  It's sort like an instruction we give for codefendants'

22   plea agreement in a criminal case, that you can't consider it

23   for any purpose, whether or not -- you can't consider it in any

24   way as suggesting that Lawson has any liability here.  If you

25   all want to draft up something, I'll be glad to take a look at

1    it.

2           MR. McDONALD:  Your Honor, one issue that's relevant

3    to that, we weren't sure a step in the process today was the

4    right time to bring it up, but maybe now is the right time

5    because there is the issue of the limiting instruction before

6    the jury, and we were on the phone with you a couple weeks ago,

7    and an issue came up as to the jury and judge issues that

8    remain for the case after the ruling excluding damages.

9           THE COURT:  I thought you were going to talk about

10   that and let me know what you think.

11          MR. McDONALD:  We did talk about it, and I think

12   you'll see it in the pretrial order to some extent here.  We

13   agreed -- I mean, I'm not sure the law is crystal clear on

14   whether there's still a right or not, but we were still able to

15   at least reach an agreement that we would still try to the jury

16   the issues of infringement and invalidity.  So whether it's by

17   constitutional right or by agreement, I think we're in

18   agreement those issues go the jury.

19          I think we also agree that it's for the Court to

20   decide injunctive relief in the entitlement to attorneys' fees,

21   because I think that's something that both of us put on the

22   judge side of the pretrial issues to be tried.

23          The one place that we did not agree on is with

24   respect to willfulness.  We believe that because willfulness is

25   not an issue for the jury on treble damages anymore because

1    there aren't any damages to treble, it's only relevant and it's

2    really only a subsidiary finding regarding attorneys' fees

3    because the statute, Section 285, doesn't say you get fees when

4    there's willfulness.

5         It says you get fees when the Court determines

6    there's an exceptional case, and there are cases that say

7    willfulness is certainly going to be a factor there, but there

8    are many cases where despite even if there was a willfulness

9    finding, the Court denies fees, and that decision is affirmed

10   under the totality of the circumstances.

11        There's also kind of a special consideration here in

12   that very relevant to the willfulness issue is whether there

13   are objectively and subjectively good-faith bases for Lawson to

14   believe that the patents are invalid.  Well, right now every

15   one of the claims of all of the patents stand rejected at

16   various stages in the process, but all stand rejected as of

17   today at the Patent Office in these reexams that are pending.

18        We think that that's certainly very important

19   evidence ultimately for the Court to consider here.  We

20   understand the Court has excluded that from the jury, but as a

21   practical matter, the jury is going to be making a finding on

22   willfulness really without having all the facts, including some

23   of the most relevant facts, and it's really not going to be a

24   particularly helpful finding for the Court --

25        THE COURT:  What point are you making?

1            MR. McDONALD:  Pardon?

2            THE COURT:  What point do you want me to address?

3            MR. McDONALD:  Ultimately what my point is, I believe

4    willfulness should be tried to the Court which could affect and

5    make it a little easier on a lot of these rulings about the

6    evidence related to willfulness.

7            MR. ROBERTSON:  May I address that, Your Honor?

8            THE COURT:  You think willfulness is a jury question.

9            MR. ROBERTSON:  No question about it.  I've got

10   several cases here.  I can cite them to the Court, but let me

11   just cite a few.

12           THE COURT:  I think Mr. McDonald agrees that

13   ordinarily it's a question for the jury.  He's talking about in

14   context of the absence of damages which cannot be trebled.

15           MR. ROBERTSON:  Totality-of-the-circumstances test,

16   Your Honor, so what he's suggesting is that somehow we have to

17   come back and hear a lot of evidence without willfulness all

18   again after the jury's left.  That is not going to be very

19   efficient, but more importantly, it's a constitutional right,

20   I'm sure you understand, under the Seventh Amendment, and we

21   requested a jury trial on all issue triable to a jury, which

22   included all fact issues, and the case law is consistent that

23   willfulness, under federal circuit cases, and I can provide you

24   five or six right now that say that's a question of fact for

25   the jury, and we would like our constitutional right to a jury

1    trial on the issue of willfulness.  And we think it's also

2    going to be the most efficient way to proceed.

3         MR. McDONALD:  I believe there is some case law out

4    there, and I won't allege that it's real clear-cut, frankly,

5    under these circumstances, but I have seen some case law that

6    indicates that the form of relief is what dictates the right to

7    a judge or jury trial and also some case law that indicates you

8    determine that form of relief at the stage before trial, not

9    just at the pleadings stage where they allege damages, but at

10   this stage now where there's a determination.

11        At this point, there's no right to damages.  It

12   becomes a case that's equitable.  So from that starting point,

13   there wouldn't be a right, a constitutional right to a jury

14   trial.  We can, however, agree to try the issues, the parties

15   can, and the Court may act on that agreement of the parties,

16   but that doesn't mean everything should be tried.  Really it

17   should only be those issues that are agreed, and, moreover, I

18   just think it's a special case here with the specific issues we

19   have given the history and given the importance of these

20   reexams and the fact that treble damages is just not in the

21   case.

22        MR. ROBERTSON:  Your Honor, it's simply not the law

23   with respect to willfulness.  "Liability for willfulness of

24   infringement turns on consideration of intent, state of mind,

25   and culpability.  We need not belabor that these are questions

1    of fact."  That is the *National Presto* case, Your Honor, and I

2    can give you the citation for that if you'd like which is 76

3    F.3d 1185, a federal circuit 1996 case.  I can also say to you

4    --

5            THE COURT:  How did that come up?  Did it involve a

6    situation where there was no longer an issue of damages?

7            MR. ROBERTSON:  It did not, Your Honor, but that's

8    not dispositive as to whether or not we have a constitutional

9    right.  I thought we had an agreement on the question.  I

10   thought I had an agreement with Mr. McDonald who didn't raise

11   with me the issue of willfulness.  He agreed that we should

12   have a jury trial.  This is the first time I'm really hearing

13   this.  I can brief it.  Your Honor suggested at one point if we

14   can't reach agreement, we should brief it.

15           THE COURT:  That's what I thought I told you to do.

16           MR. ROBERTSON:  I thought we had reached agreement,

17   Your Honor.  So I apologize.  But the two lead cases are --

18           THE COURT:  What?

19           MR. ROBERTSON:  -- *In re: Lockwood* and *In re:*

20   *Technology Licensing Corp.,* which are both cases that were

21   petitions for mandamus when a jury question was denied with

22   respect to the fact issues.

23           We could waive it, but under that case law, if we

24   don't agree to voluntarily waive it, we're entitled to jury

25   trial on fact issues, and we want one, and we want one in our

1    willfulness case.  And we think again, given that these are

2    questions that are unique to factual questions and the jury is

3    going to be hearing this evidence, it's a question that the

4    jury can process the information and make a finding, and then

5    the Court can act on it and determine whether or not it's going

6    to grant enhanced damages or not.

7              The other point I would make is, Your Honor, while I

8    understand the present status of our damages case, and I'm

9    certainly not going to sit here and reargue that, district

10   courts make decisions, and appellate courts review them, and

11   obviously we're going to be pressing, if we have to on appeal,

12   if this case doesn't resolve itself, review of your ruling on

13   damages.

14             If the case is then remanded, we'd simply have to

15   have a damages trial, and at that point, that would be, I

16   think, a fairly truncated affair.  So at this point, we have no

17   intent -- my client hasn't authorized me to waive our right to

18   a jury trial.

19             THE COURT:  I'm not sure what the point of all that

20   last statement was, but I believe that willfulness is an issue

21   that is triable to the jury ordinarily, and I don't think the

22   fact that there's an absence of damages deprives, changes the

23   equation.

24             There is some law that I remember that deals with

25   structuring, or that addresses the availability of a jury trial

1  in terms of the relief sought.  One of the cases is a Supreme

2  Court case.  Is it the *Dairy Queen* case I'm thinking of?

3        MR. McDONALD:  I believe *Dairy Queen v. Wood* is

4  relevant to this.  I think that was a case that involved

5  equitable and legal issues, and they decided the common issues

6  should go to a jury if it was overlapping between legal and

7  equitable, but there is discussion I believe in that case that

8  to determine whether you get a judge or jury trial, you look at

9  the form of relief, was it traditionally in a court of law or

10  court of equity.

11        MR. ROBERTSON:  There's also, Your Honor, the *Beacon*

12  *Theatres v. Westover* --

13        THE COURT:  *Beacon Theatres* is what I think I was

14  talking about.

15        MR. ROBERTSON:  They are both cited in the two cases

16  I mentioned, *In re: Licensing Technology* and *In re: Lockwood*,

17  and the analysis turns on whether it was triable as a question

18  of fact at the time that the Seventh Amendment was adopted,

19  traditionally at law or traditionally at equity, and it's

20  interesting in a patent case, but it turns on the -- the patent

21  owner is the -- owns the right and can control the outcome, is

22  what that decision says, by asking for it and requesting it.

23  It does not turn on whether or not there's injunctive relief as

24  the only thing remaining in the case.

25        THE COURT:  They decided that?

1          MR. ROBERTSON:  It's -- to be perfectly candid, Your

2   Honor, it is dicta in the *In re: Licensing Technology* case, but

3   it's pretty strong dicta based exactly on a fact pattern in

4   which the damages case was struck, but then the -- or struck in

5   large part, and then the patent owner waived the jury right to

6   trial by voluntarily dropping his case.

7          It turned on whether it was voluntary or involuntary,

8   and, quite frankly, Your Honor, as you know, it was most

9   certainly involuntarily in this case.  I would suggest that

10  those cases would be very instructive on this point.

11         THE COURT:  You're going to have to brief it if you

12  don't agree, and so since you think that the right has been --

13  there isn't any right to a jury trial on the willfulness issue,

14  you start, Mr. McDonald.  How long will it take you to file a

15  brief?

16         MR. McDONALD:  One week, Your Honor?

17         THE COURT:  All right.

18         MR. ROBERTSON:  I'm sorry, Your Honor.  Lawson's

19  briefing first?

20         THE COURT:  Don't you think, or do you want to brief

21  first?

22         MR. ROBERTSON:  I'd like to brief first, Your Honor,

23  because I think it's our right, and I think I'd like to

24  demonstrate --

25         THE COURT:  He's asserting that you don't have the

```
 1    right.  Yes, it is your right -- I mean -- he is the movant.

 2    He's the one who is saying actively you shouldn't have the

 3    right.  Ordinarily I would consider him the movant.

 4              MR. ROBERTSON:  All right, Your Honor.

 5              THE COURT:  Yours is sort of -- your posture would be

 6    sort of a requesting declaratory relief on the point.  I'm

 7    going to let him go first.  When do you want to go?

 8              MR. ROBERTSON:  I'm sorry, when was --

 9              MR. McDONALD:  I thought I asked for a week or ten

10    days, Your Honor.

11              THE COURT:  Let's get a date.

12              MR. McDONALD:  October 7th, I believe that would be.

13              THE COURT:  All right.  And then when do you want

14    your reply?  You can be reviewing it in the meantime, can't

15    you?

16              MR. ROBERTSON:  Yes.  Could I have seven days to

17    respond?

18              THE COURT:  What?

19              MR. ROBERTSON:  Seven days to respond.

20              THE COURT:  So that would be the 14th?

21              MR. ROBERTSON:  I'm advised by my colleagues, with

22    all our commitments, if I could have the same indulgence of ten

23    days, Your Honor.

24              THE COURT:  So what's that, the 18th, 19th?  Just

25    tell me.
```

1          MR. ROBERTSON:  I don't have a calendar in front of

2     me.

3          THE COURT:  You weren't going to be doing anything

4     for two weeks.  You were going to be trying this case.  What

5     are you talking about, all your commitments?  What have you

6     done, gone out and taken a vacation?

7          MR. ROBERTSON:  October 18th, Monday.

8          THE COURT:  Sure.  You file your reply on the 22nd.

9          MR. McDONALD:  Thank you, Your Honor.

10          THE COURT:  All right, I'll decide it on the papers

11     unless I think I need argument on it.  All right.  That brings

12     us to Roman numeral VII.  How many Roman numerals are there,

13     for Pete's sake?

14          MR. SCHULTZ:  Roman numeral VII, Your Honor.

15          THE COURT:  ePlus's competition with Lawson.

16          MR. SCHULTZ:  We will withdraw our objections to

17     PX-139 and PX-468, and we will also withdraw our hearsay and

18     foundation objections to 140.  Your Honor, there's two issues

19     with respect to --

20          MR. ROBERTSON:  I might be able to save us a little

21     bit of time here.  I'll withdraw PX-139.  I'll withdraw PX-144.

22     I'll withdrawn PX-300, and I'll withdraw PX-335.

23          THE COURT:  Okay.  Relevance objection to 140.

24     ePlus's RFP response to Indalex.

25          MR. SCHULTZ:  Your Honor, I can group all of these

1  documents into one category with the exception of PX-314.  314,

2  with respect to hearsay, it is a document that is prepared by

3  Wolters Kluwer, and there's no foundation with respect to any

4  exception to the hearsay rule.

5      THE COURT:  How do you qualify -- who is Wolters

6  Kluwer?

7      MR. SCHULTZ:  Wolters Kluwer is a company that ePlus

8  was responding to -- well, this document is Wolters Kluwer,

9  it's an RFP request that goes through the requirements that a

10  company would need to do in order to respond to an RFP from

11  Wolters Kluwer.

12      MR. ROBERTSON:  Your Honor, I'll withdraw it.

13      THE COURT:  Exhibit 314 withdrawn.

14      MR. SCHULTZ:  With respect to the other documents,

15  Your Honor, Lawson's objection to the documents and ePlus's

16  competition with Lawson is twofold.  First, we do not believe

17  that it is relevant with respect to anything dealing with

18  notice, and I'm not sure if ePlus is arguing that these are

19  relevant to notice, but if they're not relevant to notice, we

20  just want confirmation as to that.

21      THE COURT:  He's basically saying he's got a

22  relevance objection to all of them; right?

23      MR. SCHULTZ:  Correct, the relevance objection as to

24  the notice aspect.  They list them here as competition, but we

25  do object to these on the relevance grounds with respect to

1     notice.

2          THE COURT:  Do you object to them with respect to

3     competition?

4          MR. SCHULTZ:  With respect to the competition, Your

5     Honor -- with respect to competition, we believe that it is

6     something for the Court to decide, that it is cumulative with

7     respect to the jury, that there's multiple documents here that

8     say the same thing, that the jury does not need to hear this.

9          The only reason that the competition documents are

10    relevant relates to the injunction issue which the Court has

11    the decision on.  We've addressed this already, and Your Honor

12    has said that the Court would ask questions of the jury.  We

13    respect that ruling; however, the relevance that I'm interested

14    in at this point is the notice issue.

15         THE COURT:  Okay.

16         MR. ROBERTSON:  Your Honor, 468 is specifically a

17    memorandum from a Lawson individual --

18         THE COURT:  Objection to that is withdrawn.

19         MR. ROBERTSON:  He asked me about notice on that one.

20         MR. SCHULTZ:  I'm talking about all of these

21    documents with respect to notice.  If I could clarify, maybe

22    the Judge had not ruled with respect to the competition

23    documents, but we had previously discussed that issue.

24         THE COURT:  I haven't ruled with respect to the

25    competition documents, but we did have a discussion on

1   competition, and you said it was a question that related to

2   something the Court had to decide, and I said we're going to

3   submit questions to the jury that I can use in framing an

4   injunction.

5           MR. ROBERTSON:  Your Honor, we do think this is

6   relevant to competition.  This is direct competition.

7           THE COURT:  What does competition have to do with it?

8           MR. ROBERTSON:  Well, one, it's called into the

9   injunction certainly.

10          THE COURT:  What else?

11          MR. ROBERTSON:  It's relevant to willfulness, Your

12  Honor, under several cases including one here in the Eastern

13  District of Virginia which talks about whether or not, under a

14  number of multifactor tests for determination of willfulness,

15  whether or not the defendant had any motivation for harm, and

16  the evidence of that often is evidence of competition.

17          Judge Ellis had a decision in the Alexandria

18  Division, a case where I was counsel actually, and found, when

19  he went through these factors, and these are the *Read v. Portec*

20  factors I've been discussing this morning, that there was no

21  motivation for harm because the two parties did not compete

22  with each other.  Certainly by implication, if there was

23  competition, that would have provided some evidence of harm.

24          There's also --

25          THE COURT:  Do you need more than just the fact that

1  they're competitors to draw an inference of motivation to harm?

2          MR. ROBERTSON:  I could probably whittle these down,

3  Your Honor, but there have been so many representations in this

4  case that ePlus and Lawson don't compete with each other.

5  These are specific customers that we're going toe to toe with

6  Lawson, and some of the RFPs even mention that Lawson is our

7  competition in the effort for the bid.  I'm not going to

8  belabor this point, but I would like --

9          THE COURT:  If they contest that you all compete, you

10 are entitled to prove that you can compete, and competition is

11 relevant.  I mean --

12          MR. ROBERTSON:  The only other thing I would note,

13 Your Honor --

14          THE COURT:  So you take the view that it's relevant

15 not only for the injunction but for a determination of

16 willfulness.  What, if anything, does the presence of

17 competition or not have to do with notice?

18          MR. ROBERTSON:  The presence of competition for

19 notice?

20          THE COURT:  That's what he was saying, I believe,

21 that he wanted a clarification whether you were offering the

22 fact of competition for notice.  I'm having -- I'm not sure I

23 understand why competition, the fact of competition would be

24 pertinent to notice except that perhaps you keep track of what

25 competitors do.  I don't know.  Maybe there's testimony to that

1    effect.

2          MR. ROBERTSON:  For example, Your Honor, Plaintiff's

3    Exhibit 316 is an email relating directly to a meeting that

4    took place between Lawson personnel, ePlus personnel for a

5    proposal to Blue Cross/Blue Shield of North Carolina, and the

6    memorandum, 468, from Mr. Lohkamp --

7          THE COURT:  What does that have to do with notice,

8    though?

9          MR. ROBERTSON:  Because in this memorandum from a

10   Lawson executive, he states that Lawson's competition is ePlus.

11   So he's acknowledging that he's aware of us in the marketplace

12   and that we're directly competing, and so he's on notice.

13         THE COURT:  Notice of what?

14         MR. ROBERTSON:  Notice of the fact that we have a

15   product out there in the marketplace.

16         THE COURT:  What does that have to do with anything

17   other than the desire to injure you?

18         MR. ROBERTSON:  Notice is relevant to the willfulness

19   issue, and notice is also --

20         THE COURT:  Notice of what?  Altogether too often,

21   lawyers use the catchword when offering something for, say, a

22   non-hearsay purpose or for other, in product liability cases,

23   they use the catchword notice, but the pertinent thing is

24   notice of what, and that's what I'm having trouble grasping.

25         MR. ROBERTSON:  Notice that we were in the

1    marketplace, that would be circumstantial evidence of notice

2    they should perhaps have been aware of our patents.  Often we

3    put in our RFPs that we have patented technology and list

4    those, and many of these were made available to Lawson or that

5    Lawson was receiving copies.  We're informed often who our

6    competition is, and on several of these it's, indeed, Lawson.

7             THE COURT:  But what evidence do you have that Lawson

8    got notice of your RFPs that said you had patents?

9             MR. ROBERTSON:  Well, there's, for example,

10   Plaintiff's Exhibit 316 which said that there was actually a

11   meeting between them.  There are several of these --

12            THE COURT:  That shows they knew they were competing

13   for the same business, but what is it that you have that says

14   that they have notice of your patent?

15            MR. ROBERTSON:  Just --

16            THE COURT:  What you were saying is that often the

17   RFP or the information, the bid you submit has information in

18   it that says that you have these patents, and that's certainly

19   notice to them of the fact that -- that you have patents on

20   this technology if they got it.  So I'm having trouble

21   understanding what evidence you have that contains that kind of

22   information.

23            MR. ROBERTSON:  I don't have that specific evidence

24   as I sit here --

25            THE COURT:  Okay.  Well, don't make those points

1   then, because that doesn't help.  It just distracts from the

2   main mission here.

3            MR. ROBERTSON:  I understand, Your Honor.

4            THE COURT:  So, anyway, you are offering this

5   evidence to show that you are competitors.  Competition has to

6   do with the propriety or not of an injunction and with respect

7   to willfulness.

8            Are you intending to offer the fact that you all

9   compete as evidence of notice of some kind; if so, notice of

10  what?  Because if you aren't, then the discussion is ended.

11           MR. ROBERTSON:  I'll withdraw that representation,

12  Your Honor.

13           THE COURT:  Then the competition evidence is not

14  being offered to prove notice of anything.  So it's offered to

15  prove competition, and that being the fact, then all of the

16  exhibits are in; is that right?

17           MR. SCHULTZ:  That's correct.

18           THE COURT:  All right.

19           MR. SCHULTZ:  Your Honor, just to clarify, there was

20  an additional objection on hearsay as to -- excuse me.  314 you

21  withdrew.  Never mind.

22           THE COURT:  All right, Roman numeral VIII, ePlus's

23  commercial products, notice of patented products.  Okay.

24           MS. STOLL-DeBELL:  Your Honor, first of all, I think

25  you sustained our objection to PX-504 which is the

1    demonstration of ePlus's software when we were discussing

2    this --

3              THE COURT:  Is that the one that was referred to in

4    that motion *in limine* brief?

5              MS. STOLL-DeBELL:  Yes, Your Honor.

6              THE COURT:  And in the order.

7              MS. STOLL-DeBELL:  Yes.

8              THE COURT:  That you read from earlier?

9              MS. STOLL-DeBELL:  Yes.

10             THE COURT:  Do you agree that it was?

11             MS. ALBERT:  Yes, we withdraw that exhibit.  I can

12   also streamline this a bit.  We'll withdraw PX-423, PX-424,

13   PX-425.

14             THE COURT:  All right.

15             MS. STOLL-DeBELL:  So the remainder of these

16   exhibits, Your Honor, are just talking about the technical

17   details of ePlus's products.  We had objections to similar

18   exhibits earlier this morning.  You overruled our objections,

19   and, so, you know, if you want, we can get back into it, or we

20   can just live with the same ruling.

21             MR. McDONALD:  We're learning extremely slowly,

22   Judge, but we are learning.

23             THE COURT:  All right, the objections to relevance

24   and 403 are overruled.  What about the authenticity objections?

25             MS. ALBERT:  These are all ePlus documents, and we

1    can have an ePlus witness authenticate all of them.

2              MS. STOLL-DeBELL:  I think those were withdrawn

3    already anyway, Your Honor.

4              THE COURT:  Okay, yes.  What's the 102 and Rule 26?

5              MR. McDONALD:  Are we on Roman numeral number IX,

6    Your Honor?

7              THE COURT:  I'm talking about still on VIII.  Is

8    there any objection to Rule 26?

9              MS. STOLL-DeBELL:  No.  They withdrew those exhibits,

10   Your Honor.

11             THE COURT:  All right, thank you.  Then the

12   objections -- I mean the -- Roman numeral IX, Lawson training

13   program, materials for customers.

14             MS. ALBERT:  Your Honor, I can streamline this

15   category again.  We will withdraw PX-246, PX-345, and PX-348.

16             THE COURT:  391, 393, and 404.

17             MS. STOLL-DeBELL:  Your Honor, these are -- they call

18   them webinars, but they are --

19             THE COURT:  Call them what?

20             MS. STOLL-DeBELL:  Webinars.  They are an internet --

21             THE COURT:  Is that sort of like a seminar on the

22   web?

23             MS. STOLL-DeBELL:  Yes, that's what it is exactly.

24   So they are recorded seminars over the web.  The real issue

25   with these is they are long.  PX-391 --

1          THE COURT:  Which one of those rules deal with

2    length?

3          MS. STOLL-DeBELL:  I think it's prejudicial and

4    cumulative, and it's unnecessary.  It's Lawson demonstrating

5    its product.  We're going to see other demonstrations.

6          THE COURT:  Are these the same demonstrations that I

7    already ruled on?

8          MS. STOLL-DeBELL:  No.

9          MS. ALBERT:  Your Honor, these are highly relevant.

10   One of the issues in the case is Lawson's inducement of the

11   infringement of its customers.  These are Lawson

12   representatives holding training sessions that are provided to

13   its customers.  PX-391 -- we've been trying to work with Lawson

14   counsel, and we indicated that we do not intend to play the

15   entire video at trial, and we've tried to work with them --

16         THE COURT:  How long are they?

17         MS. ALBERT:  The PX-391 is 25 minutes, PX-393 is

18   29 minutes, and PX-404, I believe, is two hours, but, again, we

19   intend to play limited excerpts that go to specific issues

20   regarding the infringing functionality that's at issue here in

21   the case.

22         THE COURT:  How long are the segments of each that

23   you propose to play?

24         MS. STOLL-DeBELL:  Your Honor, I've asked --

25         THE COURT:  Wait a minute.  Let her answer that.

1          MS. ALBERT:  I think we can probably whittle it down

2     to about ten minutes per video, and I've represented to Lawson

3     that I would identify the excerpted portion for them when we

4     reach a decision as to which particular segments we would like

5     to play, and she indicated that she would continue to work with

6     me on that.

7          THE COURT:  Okay.

8          MS. ALBERT:  For example --

9          THE COURT:  So what are they -- is there a really a

10    hearsay objection to these things?  Statement by a party.  Is

11    there really -- don't you want to put that one back in the

12    barn?

13         MS. ALBERT:  These are Lawson's own documents.

14         THE COURT:  I'm talking to her.  Don't you want to

15    put that back in the barn before I have to rule on it?

16         MS. STOLL-DeBELL:  Your Honor, I just want to see

17    what they want to play so I can look at it and decide whether

18    we have objections or not.

19         THE COURT:  But one of the things you can't do is

20    have a hearsay objection to your own statements.

21         MS. STOLL-DeBELL:  So here's the issue with that,

22    Your Honor.  These are not just Lawson customers, and you'll

23    see we have on there that hearsay objection is only to

24    customers that are talking, because it is a seminar, and there

25    are third parties, non-Lawson people, and some of these are

1    talking.  So that's what our hearsay objection is to, and until

2    I can see what portions they want to play, I don't know if

3    there's customers talking or not.  If it's just Lawson people

4    talking, I don't have a hearsay objection to that.

5            THE COURT:  Okay.  So, now, how long will it take you

6    to get down to ten minutes per video?

7            MS. ALBERT:  I can probably do that by the end of the

8    week.

9            THE COURT:  Do that, and then you talk with each

10   other and see what you come up with and we'll see what's left.

11           MS. ALBERT:  PX-391 and 393 do not have any

12   third-party statements on them whatsoever.  They are only the

13   Lawson presenters.

14           PX-404, it does have limited questions that were

15   raised by customers, but then the Lawson trainer answers the

16   questions.  Those questions aren't being offered for the truth

17   of the matter asserted.  The answer to the question on the part

18   of the Lawson trainer is an admission by a party opponent, so

19   that would not be hearsay.

20           THE COURT:  It may or may not be an admission.  It

21   may also just be a statement by somebody authorized to make the

22   statement, and if that's the case, it may not even be hearsay.

23   So the hearsay objections to those three are all overruled, and

24   901, do you really have any authenticity objections?

25           MS. STOLL-DeBELL:  I don't think so.

```
 1              THE COURT:  I don't think so either.  You better

 2  not -- you don't think she's going out there and --

 3              MS. STOLL-DeBELL:  No.

 4              THE COURT:  Okay, they are withdrawn.  What is the

 5  end of the week?  What day is that?

 6              MS. ALBERT:  Friday.  I mean --

 7              THE COURT:  Yep, it sure is.  Or Saturday.  You never

 8  know.

 9              MS. ALBERT:  I think it's October 1st.

10              THE COURT:  So you're going to give it to them by

11  October 1st.

12              MR. McDONALD:  We will stipulate that Friday is the

13  end of the business week.

14              THE COURT:  That's a start somewhere.  We've got

15  something agreed to, but I know it's a qualified stipulation,

16  because you said the end of the business week.  You didn't say

17  week.  All right, when are you going to tell them if you have

18  any objections if they give them to you by Friday?

19              MS. STOLL-DeBELL:  Can I have a week which is

20  October 8th?

21              THE COURT:  Okay.  So Exhibits 246, 345, and 348 are

22  withdrawn.  On 391, 393, and 404, you're going to whittle them

23  down to about ten minutes or so, notify her of the excerpts on

24  the 1st of October.  You're going to notify her of any

25  objections on the 8th of October, and you're going to work them
```

1    out.  Okay?  Everybody is shaking their head yes.

2           Ten, contract documents between Lawson and its

3    customers.

4           MS. STOLL-DeBELL:  So, Your Honor, I would actually

5    put -- I categorize these slightly differently.  I had a

6    category for documents relating to products they have not

7    accused of infringement.  PX-253 relates to that.  It relates

8    to this LSF or System Foundation, and then on the next page as

9    part of category 11, PX-455, 456, and 506 relate to both System

10   Foundation, something called Smart Office and ProcessFlow 9.

11          THE COURT:  Why are we having evidence on things that

12   aren't accused of infringement?

13          MR. ROBERTSON:  They are accused, Your Honor, and

14   you've already ruled on this.  This was Lawson's motion *in*

15   *limine* that you said was denied as moot and you needed to hear

16   the evidence.  This has to do with all the same functionality

17   they are talking about.

18          The witnesses will say that Lawson System Foundation

19   is sold with the infringing system, is necessary to the

20   infringing system, and can't operate without it.  It is part

21   and parcel of the infringing system.  They just want it out of

22   the case.  Your Honor ruled on this.

23          THE COURT:  Why would it be denied as moot as opposed

24   to being denied without prejudice to dealing with it?

25          MR. ROBERTSON:  Well, it was denied as moot because

1    you said in open court that you needed to hear the evidence.

2              THE COURT:  I know, but why would I have said it is

3    moot?  It's certainly not moot.

4              MR. ROBERTSON:  I am sorry, sir.  I'm informed now

5    that it was denied without prejudice.

6              THE COURT:  Okay.  Well, I understand that.  Is that

7    the same issue that we're talking about?

8              MS. STOLL-DeBELL:  Yes, Your Honor, and we were

9    talking about the SKUs.  It came up in the context of that,

10   which products were accused because they were trying to include

11   some SKUs in their damages case relating to System Foundation

12   and ProcessFlow, and you asked Mr. Strapp to show you where in

13   Dr. Weaver's report does he accuse System Foundation or

14   ProcessFlow of infringement, and he pointed to that footnote,

15   and I've got a copy of the report here I can show you.  But Dr.

16   Weaver mentions it in a single footnote and says the accused

17   products run on that platform, but the platform itself doesn't

18   make the fact of infringement more or less probable.  It's the

19   same as saying it runs on a computer or you need a monitor to

20   see it.  Yes, the products run on it, but it doesn't impact

21   infringement either way.

22             It wasn't in Dr. -- they didn't do an analysis of

23   those products, System Foundation or ProcessFlow, against the

24   claims.  He says, look, it runs on this platform.  The accused

25   product, S3, runs on this platform, and as far as Smart Office,

1    it's a user interface that you can use to view the accused

2    products.  Dr. Weaver doesn't mention Smart Office at all.

3             Their other expert, Mr. Niemeyer, he has one sentence

4    about each of these things in his report, and I have that, and

5    I can show you as well.

6             THE COURT:  That could be a big thing depending on

7    what the one sentence says.

8             MS. STOLL-DeBELL:  It says Smart Office is a user

9    interface that can be used to view the accused products.  You

10   don't need to use it.  Just makes it look a little bit

11   different.

12            THE COURT:  Why are these accused products -- I have

13   to tell you, I didn't go back and review all the *motions in*

14   *limine* in preparation for today as you all did, obviously, and

15   the rulings, but didn't this come up in respect of a damage

16   issue?  And isn't that what I ruled on, and didn't it have to

17   do with the convoyed sales and -- I've lost the other term that

18   relates to the damages.  What do you call it?

19            MR. ROBERTSON:  It was argued by --

20            THE COURT:  What's that term?

21            MR. ROBERTSON:  Entire market value.

22            THE COURT:  Entire market value, thank you very much.

23   Entire market value rule, and isn't that -- that issue is out

24   of the case now with the damages, isn't it?

25            MR. ROBERTSON:  In our view, Your Honor, that was

1    never an issue.  That is how it was argued to Your Honor, but

2    we never argued that the Lawson Software Foundation was an

3    entire market value or convoyed sale or anything of the sort.

4    We never argued that selling the procurement, the S3

5    procurement software drives sales of the LSF.  What we always

6    argued is you needed the LSF, you have to have the LSF to make

7    the infringing system.

8             THE COURT:  Okay, now, to make the system -- you have

9    to have a computer to run the system.  Does the computer

10   infringe?

11            MR. ROBERTSON:  Well, it's part of the infringing

12   system when they implement the system.

13            THE COURT:  So they can't use a computer?  What am I

14   going to do; enjoin them against using a computer?

15            MR. ROBERTSON:  Enjoin the use of the infringing

16   system on a computer.  That's --

17            THE COURT:  They can still take the same computer and

18   go out and use it as a word processor and go check Google and

19   do all that stuff.

20            MR. ROBERTSON:  They can do that, but they can't run

21   the procurement system without LSF or the ProcessFlow or any of

22   the things they're trying to take out now.  They can't run the

23   infringing system, and that's what their witnesses will testify

24   to if you will allow them to.

25            THE COURT:  Does your man say that they infringe?

1          MR. ROBERTSON:  Yes.

2          THE COURT:  Who?

3          MR. ROBERTSON:  Dr. Weaver.

4          THE COURT:  Can I see his testimony?

5          MS. STOLL-DeBELL:  May I hand it up, Your Honor?  I

6   have both Dr. Weaver's expert and Mr. Niemeyer's, and I folded

7   them back so you can see what pages.

8          THE COURT:  Thank you.

9          MR. ROBERTSON:  Your Honor, Dr. Weaver also relies on

10  the numerous documents related to LSF saying --

11         THE COURT:  Wait a minute.  Let's take one thing at a

12  time.  Show me where in the report he says that.

13         Now, I have Dr. Weaver's -- I have Niemeyer's in

14  front of me.  I'll go to Weaver's.  Is that what you want me to

15  do?  We have Weaver on page -- what is it, 15?

16         MS. STOLL-DeBELL:  I believe page 15, footnote one.

17         THE COURT:  It says, "Lawson System Foundation and

18  ProcessFlow 9 prerequisite modules that must be licensed with

19  modules for any of the above four deployment scenarios," citing

20  some depositions.

21         It says, "Lawson's System Foundation is the technical

22  foundation required to run Lawson S3 applications.  Lawson

23  ProcessFlow is included within Lawson Business Process

24  Management, another component of the required Lawson platform."

25  Is that the opinion that says that Lawson System Foundation and

1    ProcessFlow 9 infringe?

2              MR. ROBERTSON:  It's in every claim he did an

3    analysis on, Your Honor.

4              THE COURT:  What's in every claim?

5              MR. ROBERTSON:  The opinion that Lawson Software

6    Foundation is necessary, part and parcel, is required to have

7    an infringing system.  He cites to the deposition testimony of

8    numerous Lawson witnesses who say, so -- "Question:  So you

9    need the licensed Lawson System Foundation in order to use any

10   of the applications that we've been talking about today," which

11   were the procurement applications plus other applications.

12             "Yes.

13             Version nine.

14             Above.

15             Yes.

16             There's a separate license fee associated with this

17   Lawson System Foundation?

18             Yes.  Cited in Weaver report."

19             The Hager deposition transcript, "LSF is the platform

20   on which both M3 and S3 run."

21             Those are the systems cited in --

22             THE COURT:  Why does that make them infringing as

23   themselves?

24             MR. ROBERTSON:  The system has to perform, for

25   example, the steps of the patent or it has to have the

1    architecture in order to do what the apparatus claim said.  The

2    Lawson Software Foundation is a necessary part of that

3    architecture.  That's what the witness said.  You can't run it

4    without that foundation --

5             THE COURT:  That doesn't mean that it infringes.

6             MR. ROBERTSON:  It does mean when it completes and

7    makes a fully operational system.  That is --

8             THE COURT:  I'm not following your statement.  Show

9    me where Weaver says that the Lawson System Foundation and

10   ProcessFlow 9 infringed a claim of the patent and how.

11            MR. ROBERTSON:  Your Honor, what he's saying

12   repeatedly, and I don't know if we have the Weaver report here,

13   but -- excerpts, I think, but what he's saying is you can't

14   have a Lawson System Foundation, you can't have an operational

15   system without the Lawson System Foundation and the ProcessFlow

16   9.  You need to have them as part of the modules that build an

17   operational system.

18            THE COURT:  I have software.  The software infringes.

19   The whole software infringes.  In order to be able to run the

20   software, I have to have a computer.  The computer doesn't

21   infringe the patent.  It just helps, it makes useful my

22   product, the product that -- helps me use the product that does

23   infringe.

24            MR. ROBERTSON:  Your Honor, I respectfully challenge

25   the premise.  When you put -- the software alone sitting there

1    doesn't do anything with respect to, say, for perhaps

2    performing the steps of the method claims.  The software

3    sitting there alone doesn't make a fully functional apparatus.

4    It might as well be a doorstop or a paperweight.

5            When you put it on a computer and it's operating,

6    that is an implementation of an infringing system, and when the

7    infringing system requires a foundational software for it to

8    perform, that's also a part of the infringing system.

9            These things come in many separate models, Your

10   Honor, and are put together, and when they are put together,

11   they form infringing systems.  You will see various ways that

12   they can put together these modules to come up with an

13   implementation that either constitutes an infringing system or

14   then can perform the steps of --

15           THE COURT:  Do you have a case that holds what you

16   are saying?

17           MR. ROBERTSON:  I'm sure I can find one.

18           THE COURT:  You better find one, because -- and you

19   better give it to me.  You better brief that issue on the same

20   schedule you brief any other ones.  You start off on

21   October 8th, or --

22           MS. STOLL-DeBELL:  I would note also that this System

23   Foundation, ProcessFlow are used with things that don't relate

24   to the accused software at all.  So it is just like a computer.

25   Like our human resources software runs on System Foundation.

1   It is just like the computer.  It's something that is needed to

2   run the accused software, but that doesn't mean it infringes

3   it, and it doesn't mean that we even need to get into it at

4   trial.

5           If it was so important, Mr. Niemeyer would have

6   explained something more than one little sentence in there.  If

7   it was so important, Dr. Weaver would have said more than you

8   need it to run the software --

9           THE COURT:  I have to agree with you.  I'm baffled by

10  this.  You're going to have to brief and show me how -- A,

11  you're going to have to show me the case law that says you can

12  do what you're trying to do, and, B, you have to show me in

13  Weaver's and Niemeyer's report where they say that, because all

14  I see is one sentence.

15          MR. ROBERTSON:  I will do that, Your Honor.  Mr.

16  Niemeyer remembers just looking at source code, didn't talk

17  about infringement, didn't talk about claims.  That's why his

18  report was fairly focused.

19          Let me just say one other thing, though.  I'd agree

20  with Ms. Stoll-DeBell that when the Lawson Software Foundation

21  is being used with some other modules to make that system

22  operate, it's not an infringement, but when it's being used to

23  make the procurement system operate, that is an infringing

24  system.

25          So we don't accuse it standing alone, or we don't

1    accuse it when it's being used to perform some other software

2    function such as financial accounting or human resources or

3    that.  We don't say that's an infringing system.  We never

4    claimed damages for it when it's on a system that doesn't

5    involve this procurement functionality.

6            THE COURT:  Let's play this out and assume you are

7    right.  Assume you prove that there's infringement of the other

8    things that are charged as infringing.  I issue an injunction

9    against using those.  I do not issue an injunction against the

10   Lawson platform, Lawson System Foundation and ProcessFlow.

11   They can use that to do anything else.

12           MR. ROBERTSON:  I would agree with that.  I would not

13   ask for an injunction that would ask to enjoin Lawson Software

14   Foundation, for example, when it's being used with financial

15   accounting.

16           THE COURT:  How would I enjoin it when it is being

17   used with anything else that's infringed?  As long as I say you

18   can't use the infringing product, period, it doesn't make any

19   difference whether you use it with a hamburger patty or a

20   George Foreman grill or a computer or these foundations, does

21   it?  If you use it, you are, in fact, violating the injunction;

22   isn't that right?

23           MR. ROBERTSON:  No, in this sense, Your Honor,

24   because it's not an infringing apparatus or it's not performing

25   the steps of the method claim without being able to access and

1   utilize the foundation.  You can't build a house without a

2   foundation, and once you do, the house is a complete house.

3   That's what's going on here.

4            So we would not ask to enjoin Lawson System

5   Foundation when it's being used with something that doesn't

6   create an entire infringing system.  It's like putting together

7   a house.  You need that foundation, otherwise the house can't

8   stand up.  But if the foundation were used to build something

9   else and the patent covered houses that could be utilized by

10  people, that is a use in an infringing system.

11           THE COURT:  I don't envision any circumstance in

12  which I would enjoin the Lawson System Foundation and

13  ProcessFlow 9 at all.  I would enjoin the use of anything that

14  infringes, and if they used it on that process, of course it

15  would be an infringement, but it wouldn't make any difference

16  if they used it on some other process.  It would still be an

17  infringement and a violation -- a violation of the injunction

18  in either case.

19           I do not understand your position, and you have to

20  show me a case that says you are right, because I don't think

21  you're right, and I don't see the facts in Weaver's report.

22  I've read Weaver's report.  I see one footnote that deals with

23  it, but that's all that's been cited to me.  Maybe there's

24  something else.  You say you don't have the report with you, so

25  brief it, and brief it on the same schedule that the others

1    were briefed on, only this time you go first and last; okay?

2              MR. ROBERTSON:  All right, thank you, Your Honor.

3              THE COURT:  Can you give that back to Ms.

4    Stoll-DeBell.  So Roman numeral X is briefing; right?

5              MR. ROBERTSON:  There is this Plaintiff's

6    Exhibit 501.

7              THE COURT:  Say again.

8              MR. ROBERTSON:  Plaintiff's Exhibit 501 which is also

9    under this category --

10             THE COURT:  We were discussing only 253, weren't we?

11             MR. SCHULTZ:  Your Honor, with respect to 501, we're

12   withdrawing that objection.

13             THE COURT:  All right, objection withdrawn.

14             MR. ROBERTSON:  We'll represent, this was like the

15   RFP documents.  It is a multiple, voluminous document.  We've

16   compiled it together.  I will do the same thing I represented

17   I'd do with respect to the multiple RFPs, and we may be

18   submitting for consideration an FRE 1006 summary just so this

19   voluminous document does not have to go before the jury.

20             THE COURT:  What now?  You're going to submit another

21   objection -- I mean another exhibit?

22             MR. ROBERTSON:  It's just --

23             THE COURT:  Is that what you said?

24             MR. ROBERTSON:  It's just a summary compilation, Your

25   Honor, of this voluminous exhibit.

1          THE COURT:  You knew that before you did your

2    exhibits.  So why didn't you submit a 1006 summary beforehand?

3    Do you object to him submitting a 1006 summary at this stage?

4          MR. SCHULTZ:  We do.

5          THE COURT:  Surprise.

6          MR. SCHULTZ:  We think it's cumulative.  If he wants

7    to get in the evidence, he can go through individually on each

8    of the statements at work.

9          MR. ROBERTSON:  Your Honor, I didn't do one.  It was

10   an oversight on my part.  I apologize.  I thought it would be

11   helpful to summarize for ease of the jury's view and for moving

12   this trial along, but I won't represent to you that I didn't

13   have an opportunity to do it.  I just overlooked it, and that's

14   what it says.

15         THE COURT:  Do you want expiation for your sins?

16         MR. ROBERTSON:  No, thank you, Your Honor.  They are

17   too numerous to name.

18         THE COURT:  I was just talking about that one.  It

19   probably would help the jury to have it, don't you think?

20   Wouldn't it make it easier for you to cross-examine?

21         MR. SCHULTZ:  We'll take a look at it.

22         THE COURT:  Why don't you all see if you can work it

23   out, because I think probably it will facilitate what you want

24   to do with it and probably will make it easier for everybody to

25   understand.  So I'd take a look at doing a 1006 summary of it

1   if I were you all and see if you can do it.

2          All right, this brings us to number 11.  Documents

3   relating to functionality of Lawson's software/infringement.

4   Why wouldn't they come in?  I understand there may be some

5   hearsay objection, but I don't understand why they are not

6   relevant.

7          MS. STOLL-DeBELL:  So the last three, Your Honor, are

8   the ones we just talked about that they're going to brief, 455,

9   456, and 506.

10          THE COURT:  Yes, but we were briefing on another

11   subject.

12          MS. STOLL-DeBELL:  I'm not sure why they -- I think

13   those relate to those non-accused products, Smart Office.

14          THE COURT:  Your objection to relevance is that

15   they're not accused.

16          MS. STOLL-DeBELL:  That's right.

17          THE COURT:  Same issue.

18          MS. STOLL-DeBELL:  Seems like we already covered

19   that, and we don't need to go over that again.

20          THE COURT:  So that's the same issue as to be

21   briefed; right?

22          MS. STOLL-DeBELL:  Yes.  Then 342, these are not

23   Lawson documents.

24          THE COURT:  342, okay, that's a software newsletter.

25   Who is IDII?

1          MS. STOLL-DeBELL:  I have no idea.

2          THE COURT:  Including an article on Lawson

3  e-procurement for health care.

4          MR. ROBERTSON:  Your Honor, let me help out here.

5  These are cited by Dr. Weaver in his report.  They don't have

6  to come into evidence, but he does rely on them, and he can

7  rely on hearsay, so we can withdraw them as an exhibit --

8          THE COURT:  As long as they are of the kind that a

9  person in his discipline usually relies upon, he can rely upon,

10  but they don't come into evidence.  So the exhibits are

11  withdrawn; right?  342 and 343; is that right?

12         MR. ROBERTSON:  Yes, sir.

13         THE COURT:  Okay.  You do agree, don't you, that he

14  can rely on them if they're of the type that people in his

15  discipline can rely on but that they don't come into evidence?

16  Do you agree with that, Ms. Stoll-DeBell?

17         MS. STOLL-DeBELL:  Yes.

18         MR. SCHULTZ:  437, Your Honor, is a document that was

19  not produced by ePlus in discovery, and it does not

20  specifically relate to any of the products that are accused of

21  infringement.  It is a Lawson website printout.

22         THE COURT:  Why would they be producing your

23  documents?

24         MR. SCHULTZ:  They went onto the website and printed

25  it out.

1          THE COURT:  You didn't print it out, either.

2          MR. SCHULTZ:  Because it's not relevant.

3          THE COURT:  I think the fact that you didn't produce

4    it is sort of an objection that doesn't make much difference

5    one way or the other except that it doesn't fall within your

6    stipulation on authentication.

7          MR. ROBERTSON:  I'll withdraw it, Your Honor.

8          THE COURT:  Okay.  Exhibit withdrawn.  All right, 12,

9    miscellaneous.

10         MS. STOLL-DeBELL:  We're withdrawing our objections

11   to both of these.

12         THE COURT:  Objection is withdrawn.  13, rebuttals to

13   Lawson's invalidity contentions.  Before we do this, you need

14   to get back to the topic that we left unaddressed, the PTO

15   reexamination evidence that relates to willfulness you said.

16         MR. McDONALD:  Right.

17         THE COURT:  We need to go back to that.  I need to

18   assess that because I didn't do it.  We got off on another

19   topic.  Then I think we went to lunch.

20         Okay, rebuttals to Lawson's invalidity contentions.

21   There are 420, 421, 422, and 505.  Let's take the easy one, the

22   declaration of Ross Dworkin.  How does an affidavit come into

23   evidence?

24         MR. ROBERTSON:  Your Honor, we'll -- that was relied

25   on by our expert on invalidity.  Mr. Dworkin was an inventor in

153

1    one of the prior art patents.  Several years ago he gave a

2    declaration about the functionality of what was disclosed in

3    his patent and how the system operated.

4              Our expert relies on it when they attempt to combine

5    Mr. Dworkin's patent with some other references so it doesn't

6    come into evidence, but we believe it is cited in the report,

7    and it will be of the type that an expert would rely on.

8              THE COURT:  Why would an expert -- what is -- what

9    kind of proof do you have that says that experts rely on

10   affidavits given in litigation?  What kind of proof is that

11   other than he did it?

12             MR. ROBERTSON:  Well, I believe he also talked to Mr.

13   Dworkin, and he can understand because there's a question of

14   whether you would combine the Dworkin patent with the other

15   patents they want to combine it, and he's going to say, no,

16   that wouldn't render the patents obvious or invalid, and that

17   is certainly information that he can then look at and say the

18   functionality --

19             THE COURT:  Who is the "he"?  Two people involved.

20   I'm not sure who the inventor --

21             MR. ROBERTSON:  Mr. Hilliard, sorry, our validity

22   expert.

23             THE COURT:  What about Dworkin?  In other words, I

24   guess the bottom line is, I'm unaware of what record you have

25   made or can make that shows that an affidavit is something of

1    the kind that an expert usually relies upon in his practice of

2    his profession.  I've never seen that done, but there's lots I

3    haven't seen, so what have you done to establish that?

4            MR. ROBERTSON:  Experts can rely on testimony, Your

5    Honor, for example, and review a transcript.

6            THE COURT:  Yes, testimony where somebody is

7    represented and cross-examination obtains.  I'm unaware of

8    experts relying on affidavits, but maybe they are.

9            MR. ROBERTSON:  I'll see if I can find the citation

10   for you, Your Honor, but I don't think it's been unusual, and

11   the experts testified about the Dworkin declaration.  That's

12   been part of his report in the past two trials, so I didn't

13   know this was going to be an issue.

14           THE COURT:  They made it an issue.

15           MR. ROBERTSON:  I did know I wanted to withdraw the

16   exhibit.

17           THE COURT:  All right, the exhibit is withdrawn.

18   That leaves us with 420, -21, and -22.  You're going to

19   withdraw your objections and move right on, or what?

20           MS. STOLL-DeBELL:  No, Your Honor, not to these.

21           THE COURT:  Oh, they must be hot tickets.

22           MS. STOLL-DeBELL:  These are -- I think they're

23   printouts from the USPTO's website.  I think two of them are

24   dated 2010.  What they want to use these for, I think, is to

25   show that the Patent Office examiner actually found the '989

1    patent as part of his search results when he was prosecuting

2    the application at issue.  That's the '683 patent.  But these

3    documents just don't show it.

4            They have the classes and subclasses of the

5    examiner's search, and the '989 patent as issued by the Patent

6    Office is not classified in those classes, and I have a

7    certified copy of that patent here I can show you, Your Honor.

8    It is a different class, and so what they've done is they've

9    gone back and said, well, the PTO abolished the class the '989

10   patent was in, and they moved it into another class, and

11   they're going to try to use these website printouts to show

12   that, but the fact of the matter is when the '989 patent

13   issued, it had this other class, and they've got nothing to

14   show how and when, if the Patent Office even reclassified it at

15   all.  They've got no witness and nobody to lay a foundation for

16   these documents.  They are hearsay.

17           THE COURT:  But you didn't object on the basis of

18   hearsay.

19           MS. STOLL-DeBELL:  Actually I did, Your Honor, but I

20   think with as many exhibits as there are --

21           THE COURT:  They just dropped --

22           MS. STOLL-DeBELL:  There were mistakes, frankly, in

23   the appendices that we filed.

24           THE COURT:  Okay.

25           MS. STOLL-DeBELL:  So we have always said that these

1    are hearsay and they can't be authenticated, they've got no

2    witness, they can't prove that the patent was in the class they

3    say it was in, and especially since the certified copy from the

4    Patent Office puts it in a different class.

5              THE COURT:  Do you agree they made a hearsay

6    objection and it got dropped in the typing of one of these

7    appendices?

8              MS. ALBERT:  No, Your Honor.  I believe we have a

9    specific email from Lawson counsel that they are withdrawing

10   the hearsay objection because these actually are not hearsay

11   because they are governmental publications that come in under

12   an exception to the hearsay rule.

13             THE COURT:  Then they are hearsay, but they are

14   covered by an exception.

15             MS. ALBERT:  Exactly.

16             THE COURT:  She says, Mrs. Stoll-DeBell, you all

17   dropped the hearsay objection.  Did you drop the hearsay

18   objection?  I understand as much paper as you all are dealing

19   with, people are going to make mistakes, and if you dropped it

20   and that was an error when you said it, that's okay.  Just tell

21   me.  Did you drop it or not?

22             MS. STOLL-DeBELL:  I don't think I did, but Mr.

23   McDonald thinks I should.

24             MR. McDONALD:  We're going to drop it now.

25             MS. STOLL-DeBELL:  I'm dropping it now, Your Honor.

1    Whether I did or not before...

2              THE COURT:  Pay attention to her, Mr. McDonald.  She

3    knows what she's doing over there.

4              Anyway, I'll take that out.  Now, so the issue is

5    relevance and authentication.

6              MS. ALBERT:  I think for authenticity, also under

7    902(5), they are official publications of government agencies,

8    so extrinsic evidence of authenticity is not required.

9              THE COURT:  What do you say?

10             MS. STOLL-DeBELL:  Well, I don't think they are

11   official publications.  I think the official publication is a

12   certified copy of the '989 patent which shows the class was

13   class 325 which is the opposite of what they're trying to

14   prove.

15             THE COURT:  Okay.  Help me -- go back to square one

16   here.  Let me get the documents.  You all are trying to prove

17   what with these documents?

18             MS. ALBERT:  Well, Lawson has an invalidity defense

19   relating to the inventors' '989 patent.  They claim that patent

20   anticipates and/or renders obvious some of the claims.

21             They also contend that the examiner of the

22   patents-in-suit, when he was examining the patent applications,

23   was not aware of the '989 patent, and these documents are

24   official records of the Patent Office that show that the

25   classification in which the '989 patent was originally

1    classified was changed to class 705, and PX-422 --

2              THE COURT:  When?

3              MS. ALBERT:  It was during the pendency of the

4    applications for the patents-in-suit.

5              THE COURT:  Let's go back.  How do they know what the

6    patent examiner found in the first instance?

7              MS. ALBERT:  Because in the prosecution file

8    histories for the patents-in-suit that have been stipulated,

9    there are search notes at the back of the examiner's file

10   history that shows which classifications the examiner

11   searched --

12             THE COURT:  So he searched the classifications by

13   number.

14             MS. ALBERT:  Right.

15             THE COURT:  And what he didn't find was the '989; is

16   that right?

17             MS. ALBERT:  Not quite.  He searched class 705 two

18   times after the '989 patent issued, and the '989 patent is

19   currently classified in class 705 which is shown by PX-422.

20   That's the '989 patent.  The current class that it's in is

21   class 705, and the examiner searched that class twice after the

22   '989 patent issued.

23             Under federal circuit law, *Polaroid Corporation v.*

24   *Eastman Kodak*, 787 F.2d 1556, that's a federal circuit case

25   from 1986, that case stands for the proposition that under the

1    law, the examiner is presumed to have considered every patent

2    that is contained in a classification that the examiner

3    searched.  And this federal circuit law is also codified in the

4    *Manual of Patent Examining Procedure* at section 717.05.

5            So our point is, by these exhibits, that the examiner

6    did, in fact, search the art unit where the '989 patent can be

7    found, and under the law, the examiner is presumed to have

8    considered the '989 patent by virtue of searching the

9    classification where the '989 patent is found.

10           MS. STOLL-DeBELL:  May I hand up a certified copy of

11   the '989 patent, Your Honor?

12           THE COURT:  I have to tell you, this is one of the

13   silliest rules I have ever heard of.  Presumed to be perfect in

14   a world where -- what percent of the reexaminations are

15   granted?

16           MS. ALBERT:  Over 95 percent.

17           THE COURT:  95 percent, and we have a 1986 case

18   presuming perfection, and we have proof today that 95 percent

19   of the patents reexamined are found to be invalid?

20           MS. ALBERT:  I don't think that's the case, Your

21   Honor.  I think 95 percent of requests for reexamination are

22   granted.

23           THE COURT:  Well, that's true.  You're right.  Okay,

24   I've got a certified copy of the '989 patent.  Now, what about

25   it?

1          MS. STOLL-DeBELL:  It shows it was issued in class

2    305 which is many months after they say that class was

3    abolished, and the point here is they have no evidence to show,

4    and they can't --

5          THE COURT:  Where is the class 305?  Where does it

6    say that?

7          MS. STOLL-DeBELL:  I highlighted it in pink for Your

8    Honor on the second page.  It says class three, U.S. class,

9    line 52 on the cover page of the patent.

10         THE COURT:  I don't see it.  It says 395, 228.

11         MS. STOLL-DeBELL:  Exactly.

12         THE COURT:  I thought you said 305.

13         MS. STOLL-DeBELL:  I'm sorry.  I misspoke.

14         THE COURT:  I may have misheard.  U.S. class 395/228,

15   and then he did these others, but among them was not the 705;

16   is that right?

17         MS. ALBERT:  Well, that's the whole point of PX-422,

18   that after --

19         THE COURT:  Wait a minute.  Is that right?  705 is

20   not in here.

21         MS. ALBERT:  It's right that on the certified copy

22   705 is not on there.  That is the point of offering PX-422,

23   because the classifications in the Patent Office changed, and

24   that class became class 705.

25         THE COURT:  Yes, but when did that happen?

1          MS. ALBERT:  It happened in 1997, and so now --

2          THE COURT:  And this patent issued in 1998?

3          MR. McDONALD:  That's right.

4          THE COURT:  Why isn't this presumptive evidence?  Why

5     isn't the certified copy presumptive evidence that he didn't

6     search 705?  I think it shows that he didn't do 705.

7          MS. ALBERT:  The class changed in '97.  The examiner

8     searched, and class 395 became class 705.  It was just a number

9     change within the Patent Office.  I'm not sure why the printed

10    copy of the '989 still has the old classification on it.

11    That's why I would like to introduce the one, the current one

12    from the Patent Office website that actually shows that it is

13    in class 705.

14         THE COURT:  I think that evidence is speculative and

15    prejudicial and goes against the grain of an official document

16    issued by the United States Patent Office and that just

17    offering the document could not possibly do anything but create

18    prejudice and confusion, and the only way that could ever come

19    in is if somebody came here to testify about it all.  I

20    understand the point for which it's being offered, but the mode

21    for which that is being proved can't fly.  So I sustain the

22    objection to 420 and -21.

23         MS. STOLL-DeBELL:  And -22.

24         THE COURT:  And -22.  Okay.

25         MS. STOLL-DeBELL:  Okay, Your Honor, the next group

1    of documents is group 14.  These are all of Lawson's revenue

2    spreadsheets, and they are huge, so I don't think we need to

3    pull them up.  These are the damages documents that they

4    decided they don't want to withdraw, and they say they're

5    obviously not relevant to damages anymore, but now they say

6    they are relevant to commercial success.

7              THE COURT:  Of what?

8              MS. STOLL-DeBELL:  I guess they're now saying for the

9    first time that Lawson's product shows commercial success.  We

10   asked a specific interrogatory, and we said, tell us what

11   products you are going to use to show commercial success.  They

12   listed -- they did not list Lawson's.  It's interrogatory

13   number eight, and I have a copy for you if you'd like to see

14   that.

15             THE COURT:  Let me see that.  Number what, Ms.

16   Stoll-DeBell?

17             MS. STOLL-DeBELL:  I believe it's number eight.

18             THE COURT:  Interrogatory eight?

19             MS. STOLL-DeBELL:  Yes.

20             THE COURT:  "Identify any commercial products that

21   you intend to rely upon to support an assertion of commercial

22   success of the invention allegedly disclosed in the

23   patents-in-suit and any facts or documents that you contend

24   evidence the nexus between the alleged success and the

25   invention disclosed in the patents-in-suit, and identify the

1   person most knowledgeable about the nexus as well as the volume

2   sales and revenues of any such commercial product."  There's a

3   bunch of objections and then the answer.

4           MS. STOLL-DeBELL:  Right, and in their answer, they

5   identify their own products.  They identify Ariba and SAP.  I

6   think that might be it, but they certainly don't say Lawson's

7   products show commercial success.

8           THE COURT:  It says, "The patentee's patented

9   products, SupplyLink, Cornerstone, ProcureNet, Content Plus,

10  Procure Plus, Catalog Plus, and Supplier Portal have all

11  achieved industry recognition and commercial success.

12  Moreover, licensees of the patents-in-suit, Ariba and SAP, have

13  also marketed and sold products practicing the patented

14  inventions which products have achieved commercial success.

15  These products include," and they list Ariba products and SAP

16  products.  Then they talk about various experts talking about

17  what they're going to talk about.

18           Now, was there any --

19          MS. STOLL-DeBELL:  They are supplemented twice, Your

20  Honor, but those are both included on that page for you.

21          THE COURT:  So there is no supplement to it.  Your

22  position is -- here you've objected as irrelevant, and under

23  403 all the way down, 1006 for most of them, and then motion *in*

24  *limine* on all of them, and then MD on one of them, and I don't

25  see any objection based on Rule 37.

1              MS. STOLL-DeBELL:  Well, Your Honor, let me just say

2       that these documents were going to be used for damages, and

3       that changed dramatically two weeks ago.  Since then, we've

4       been negotiating back and forth trying to resolve some of these

5       issues, and it became clear to me for the first time that they

6       were going to say that Lawson's sales showed commercial

7       success.

8              So that's why, Your Honor.  And I went back, because

9       it was -- I had never heard that before, and I went back and

10      looked, and they didn't tell us they were going to do that

11      until now.  These are huge amounts of documents.  Damages are

12      out of the case.  They didn't tell us they were going to do

13      that, and even if they had, they still need to show a nexus

14      that the sales of Lawson were related to our use of the

15      patented feature, not just that we sold a lot of stuff.

16             So I don't think they can meet the first hurdle

17      because they didn't disclose it, and they should be precluded

18      under Rule 37.  But even if they had, I don't think they have

19      enough to prove what they need to prove for secondary

20      considerations.

21             THE COURT:  All right.

22             MR. STRAPP:  Your Honor, first with respect to this

23      newly asserted Rule 26/Rule 37 objection which we had never

24      heard before we stepped into court today, we answered another

25      interrogatory.  There was an all-inclusive interrogatory that

165

1   Lawson propounded, and I have a copy I can hand up to Your

2   Honor.

3           THE COURT:  I have their interrogatories here.  What

4   are they?

5           MR. STRAPP:  It's interrogatory number six.

6           THE COURT:  That Lawson propounded or you propounded?

7           MR. STRAPP:  Excuse me, that Lawson propounded to

8   ePlus.

9           THE COURT:  I've got second supplemental answers, and

10  interrogatory number six, is that what you want?

11          MR. STRAPP:  Yes.  Interrogatory number six asks for

12  all facts to identify things and testimony that you contend

13  constitute objective evidence of nonobviousness.  The corrected

14  answer to interrogatory number six is several pages long.

15          THE COURT:  I have a supplemental answer.  Is that

16  what you are talking about?  I don't see any corrected answer.

17          MR. STRAPP:  Can I hand up a copy?

18          THE COURT:  Maybe I ought to go back.  I've got the

19  corrected answer.  It begins on page ten?

20          MR. STRAPP:  Yes.

21          THE COURT:  Where do you mention Lawson's products in

22  there?

23          MR. STRAPP:  We mentioned Lawson's products in a

24  couple of places.  If you turn to page 15, the paragraph that

25  begins "moreover" at the top of the page.

1          THE COURT:  Okay.  Where does it say that?

2          MR. STRAPP:  Says, "Moreover, the patented inventions

3    have been commercially successful.  The commercial success of

4    the patented inventions may be demonstrated by the commercial

5    success of the patentee's products as well as through the

6    commercial success of infringers' infringing activities and

7    licensees' activities."

8          We also make reference on page 13, the last full

9    paragraph, or the paragraph that begins in E mentioned that --

10         THE COURT:  Just a minute.  Let me get there.  All

11   right.

12         MR. STRAPP:  States, "Indeed, Lawson has recognized

13   benefits achieved by automating e-procurement process as

14   claimed in the patented invention."  And if I could also direct

15   Your Honor back to interrogatory number eight --

16         THE COURT:  Just a minute, I'm trying to look.  The

17   question I was asking, interrogatory number six, that deals

18   with nonobviousness.

19         MR. STRAPP:  Right.  That's the reason for which we

20   want to offer these particular exhibits that we're discussing.

21         THE COURT:  Number eight deals with commercial

22   success.

23         MR. STRAPP:  Commercial success is one of several

24   secondary considerations that go to nonobviousness.

25         THE COURT:  Yes, but when you ask the specific one,

1    that's the one that counts.

2          MR. STRAPP:  The other point I wanted to make, Your

3    Honor, directly to the issue you are addressing in

4    interrogatory eight, at two places we incorporate by reference

5    and refer to the answer to interrogatory number six, that's

6    both at the beginning of the answer to interrogatory number

7    eight and at the end of the answer to interrogatory number

8    eight.

9          And a second point is that in the second supplemental

10   answer to interrogatory number eight, ePlus incorporates by

11   reference its rebuttal expert report on validity.  That was a

12   report done by its expert, Brooks Hilliard, who mentions the

13   commercial success of Lawson's infringing activities and

14   specifically products that have been sold that ePlus accuses of

15   infringement.  I also wanted to address the nexus issue.

16         THE COURT:  Why does their success show anything?

17         MR. STRAPP:  Well, Your Honor --

18         THE COURT:  Unless you prove infringement.

19         MR. STRAPP:  I do agree that if we do not prove

20   infringement, it's not relevant, but if we do prove

21   infringement, there's a nexus by definition, and that goes to

22   nonobviousness because --

23         THE COURT:  No, because then you get into all this

24   whole issue about what part of it -- this is a multicomponent

25   operation, and you've got to show what component, what part of

1    it contributed.  Do you have somebody that does that?

2         MR. STRAPP:  Yes.  What we've done is -- this goes

3    back to some of the damages issues that we had raised in

4    previous hearings with Your Honor.  What we did is we asked

5    Lawson to provide us with revenue information that was limited

6    to the products that we had accused of infringing, and that

7    royalty-based information was the subject of several motions

8    and was also the subject of much correspondence, but eventually

9    we received revenue spreadsheets that were generated from

10   Lawson's own data and that were generated by Lawson, and it's

11   that revenue that's limited to the products that are accused by

12   ePlus of infringement that we would like to show for two

13   reasons.

14        One, the commercial success of the infringer, which

15   we've already discussed, but we believe that it's also relevant

16   to willfulness, and the reason why is that under *Read v.*

17   *Portec* -- that's the 1992 federal circuit case we mentioned

18   earlier -- one of the factors that can be considered under a

19   willfulness analysis is the defendant's size and financial

20   conditions, and financial condition and -- the size and

21   financial condition is reflected by approximately $600 million

22   that Lawson has made in sales just of the accused products.

23        THE COURT:  What does the defendant's size and

24   financial condition have to do with willfulness?  What does

25   that prove?  Can you help me with that?

1          MR. STRAPP:  Yeah.  Well, first of all, if the

2     defendant is of a certain size or certain condition, they are

3     competing with ePlus, shows they are aware of ePlus, they are

4     taking sales from ePlus.  If they were a small player in the

5     marketplace, ePlus wouldn't be able to look to Lawson and say

6     Lawson is taking sales away from ePlus, but ePlus and Lawson

7     are competing in the same mid market Fortune 1000 type

8     companies.  They're going head-to-head against customers.

9          THE COURT:  Does anybody say that?

10          MR. STRAPP:  Well, yeah.  The *Read v. Portec* case --

11          THE COURT:  No.  You can't just take a factor and

12     draw it out of a case and then say it applies in your case.

13     You have to have some witness make it applicable or some proof

14     to make it applicable.  So who says that in your case?

15          MR. STRAPP:  We intend to put on the president of

16     ePlus, the systems and content -- that's Mr. Farber -- who will

17     talk about the fact that these companies are competing in the

18     same type of marketplace for the same types of customers, that

19     Lawson has been -- then we will put on evidence through one of

20     Lawson's witnesses who we intend to call adversely.  That's

21     Kenneth White.  He's in charge of the revenue recognition at

22     Lawson, sort of an accountant/controller type of position, and

23     he was the person at Lawson who was in charge of compiling the

24     data that's reflected in these spreadsheets from data that's

25     regularly maintained in the ordinary course of business at

1    Lawson.  What we've done --

2              THE COURT:  You haven't yet answered my question

3    about who is going to testify about that factor.  All you did

4    was said your man is going to testify about competition, and

5    then you described what this guy did, White did.  What is it --

6              MR. STRAPP:  We will put on Lawson's witness

7    adversely to testify about the commercial success that Lawson

8    has enjoyed from its sales of the infringing -- the accused

9    infringing products.  And we will also --

10             THE COURT:  That's not my question.

11             MR. STRAPP:  Sorry.

12             THE COURT:  You have cited a factor from the case.

13   If you will look at the case, you'll find, I believe, that

14   somebody in the case sponsored that as a factor.  Who, in your

15   evidence, is going to sponsor this as a factor?  It's not in

16   anybody's testimony, is it?  Do you have any expert that's

17   going to testify about it?  You haven't said Mr. Farber is

18   going to testify about it, and you haven't said Mr. White is.

19             What you said is they're going to testify to the

20   underlying fact of the size.  You have to realize something.

21   Just because somebody says something in the case doesn't get it

22   into evidence because you, as lawyers, can make a logical

23   deduction that it ought to go there.  You have to have a

24   witness or something to put it in the case.

25             MR. STRAPP:  Our intention is to put the underlying

1    facts relevant to this factor as it goes to willfulness and

2    also relevant as it goes to commercial success in through fact

3    witnesses, including Lawson's witnesses and ePlus's witnesses,

4    and then once that -- once those facts are in evidence, to

5    argue to the jury that it shows nonobviousness.

6           It's a secondary consideration of nonobviousness to

7    show that's a factor that goes to the issue of willfulness.

8    That's the intention.

9           Now, one other point I wanted to make to Your Honor

10   is that with respect to what we have done, several -- as

11   Lawson's counsel noted, several of these spreadsheets are

12   voluminous.  These are the spreadsheets as we got them from

13   Lawson, and spreadsheets are unwieldy and difficult to present

14   to the jury because they have several fields of data, they are

15   very wide documents, they're hard to decipher.

16          What we have done is simple math.  We put together a

17   summary calculation that just takes the numbers from the

18   spreadsheet --

19          THE COURT:  Who did that?

20          MR. STRAPP:  Dr. Mangum did that.  Now, the summary

21   isn't his opinion about what the royalty rate is, doesn't have

22   anything to do with the *Georgia-Pacific* analysis, it doesn't

23   have anything to do with his expertise as a damages expert.

24          It's, rather, a simple principle of basic math, of

25   addition, of taking numbers, putting them from one spreadsheet

1   into a chart that is of manageable size and can be presented to

2   the jury.

3          THE COURT:  What do they show?

4          MR. STRAPP:  They show that Lawson has enjoyed, in

5   the relevant time period for which we assert damages, from the

6   relevant time period, from 2003 through 2010, that Lawson has

7   made approximately $600 million in total revenue selling the

8   accused infringing products.

9          Of that, there's three components.  One is license

10  revenue, one is maintenance revenue, and one is service

11  revenue.  These spreadsheets reflect that underlying raw data

12  that's now been summarized in short charts.

13         THE COURT:  So he's going to testify as to what the

14  revenue is.

15         MR. STRAPP:  That's correct.  That's all we intend to

16  put on.  We don't intend to put on evidence of royal rates or

17  *Georgia-Pacific* factors here through these witnesses.  We just

18  intend to put on evidence of a chart saying this is the amount

19  of money you've made over this time period selling these

20  products.

21         THE COURT:  All right.  I think I understand.

22         MS. STOLL-DeBELL:  There's a lot there to respond to,

23  Your Honor.

24         THE COURT:  First thing is he says in his answer to

25  number six and in the answer to number eight he incorporates

1    six, and so you were on notice that they were going to claim

2    the revenues from your success as evidence of commercial

3    success.

4              MS. STOLL-DeBELL:  So let's look at page 13 of their

5    interrogatory response, Your Honor.  That was one of the two

6    places he cited.  This paragraph is not about commercial

7    success.  It is about Lawson recognizing the benefits of the

8    invention which is a totally separate secondary consideration.

9              There is a document relating to M3 where it says

10   something good about e-procurement software.  That does not

11   have anything to do with commercial success or Lawson sales.

12   So that does not disclose to us they're going to use our,

13   frankly, voluminous sales figures to show -- somehow try and

14   show commercial success.

15             The other place he cited is on page 15, and he talks

16   about --

17             THE COURT:  Just a minute.  Let me get there.  That's

18   the "moreover" paragraph.

19             MS. STOLL-DeBELL:  Yes.

20             THE COURT:  "Moreover, the patented inventions have

21   been commercially successful.  The commercial success of the

22   patented inventions may be demonstrated by the commercial

23   success of the patentee's products as well as through the

24   commercial success of the infringer's infringing activity and

25   licensee's activities."

1          MS. STOLL-DeBELL:  And then he goes on to talk about

2    SAP and I think Ariba also.  So when he says infringer, they're

3    talking about Ariba and SAP which are listed in response to

4    interrogatory number eight.  That says nothing about Lawson,

5    Your Honor.  We were not put on notice that they were going to

6    now try and say that our sales show commercial success.  You'll

7    see he talks about Ariba and SAP in response to interrogatory

8    number eight.

9          THE COURT:  All right.

10         MS. STOLL-DeBELL:  At like page 20.

11         THE COURT:  Anything else?

12         MS. STOLL-DeBELL:  Yes.  If we're going to start

13   looking at our sales and say that shows commercial success of

14   their patent, then I think we need to bring in our old products

15   and show that they sold just as well, the old products that

16   don't infringe sold just as well --

17         THE COURT:  That's another issue for another day.

18   Let's get to the objections here, or are you saying it's a 403

19   analysis, too?

20         MS. STOLL-DeBELL:  I am saying it's a 403.  I think

21   it wasn't disclosed to us.  Had it been, we would have brought

22   in all of that evidence, but we didn't know they were going to

23   say that, so we haven't done it.  So it is a 403 issue.

24         THE COURT:  All right.

25         MS. STOLL-DeBELL:  Another 403 issue is the fact that

1    they want to throw up the sales spreadsheet that says we sold

2    $600 million worth of product.  I think it's very prejudicial

3    to put that in front of the jury and unnecessary, and I would

4    note also that their $600 million figure includes sales for

5    Lawson System Foundation and ProcessFlow which is a whole other

6    issue that is still open.  That 600 million is not for the,

7    just for the accused products.

8            THE COURT:  Anything else?

9            MR. STRAPP:  Yes.  Just first as to the disclosure

10   point, I think I mentioned that in the answer to interrogatory

11   number eight, the second supplemental answer, we incorporated

12   by reference a copy of the rebuttal expert report on validity.

13   That was served on June 9th, 2010, and that report specifically

14   makes mention of Lawson's sales of the infringing --

15           THE COURT:  Let me see what part of it you are

16   talking about.

17           MR. STRAPP:  I don't have a copy here.

18           THE COURT:  I can't make a decision on that unless

19   you tell me what it is.  My experience with those reports was

20   that there's a lot of verbiage in there, and it depends on what

21   the context is.  You are relying on it.  What did you say?

22   What did you say in that report?

23           MR. STRAPP:  We said that we intended to rely on

24   Lawson's commercial success selling the accused products as

25   evidence of nonobviousness.

1          MS. STOLL-DeBELL:  Your Honor, I don't think it

2     matters what it says because it wasn't in their interrogatory

3     responses, and so even if it was in their expert report, it's

4     too late.  That was the rule that was applied to Dr. Shamos,

5     and many things that were said in his expert report were

6     excluded from this case because they were not in our second

7     supplemental interrogatory contentions.  So I think the same

8     rule should apply for Mr. Hilliard.

9          THE COURT:  When were these answers filed?

10          MS. STOLL-DeBELL:  The supplemental --

11          THE COURT:  18 May.  Anything else?  Okay.  Objection

12     sustained.  Those statements in interrogatory six do not

13     forecast a reliance on the commercial success of Lawson, and

14     they clearly actually key into Ariba and SAP, and when you read

15     the answer to interrogatory eight, you quite clearly pick that

16     up, and to the extent they incorporate an after-filed report,

17     it's too late.  The same rule applies to Hilliard as applies to

18     Shamos.  So all objections are sustained.

19          We will resume in just a moment.  We're going to take

20     a recess and change court reporters.

21

22          (Recess taken.)

23

24          THE COURT:  Somebody had asked about what we were

25     going to do.  I'm going to try to knock off a little bit after