1  five and come back tomorrow, which is the 28th.  I

2  will start things at 9:30 and be finished by 11.  I

3  will get to you-all at 11:00 if we don't finish before

4  then.

5           MR. ROBERTSON:  Your Honor, before we get

6  started, can I just make one point of clarification

7  just for fairness?

8           In response to the last argument, the Court

9  had suggested that we should have submitted --

10 incorporated our rebuttal expert report in this

11 interrogatory concerning the commercial success of the

12 infringing product.

13          Where we do reference that is in Mr. Brooks

14 Hilliard's report.  We didn't have the report with us

15 today.  I apologize for that, but I didn't know that

16 that was going to be the basis of the argument.

17          THE COURT:  I didn't say that.  I said you

18 can't incorporate an after-filed report just like

19 Shamos can't.

20          MR. ROBERTSON:  Let me just -- we didn't have

21 the report.  In fact, we just received their

22 invalidity report.  We had until June 9 to rebut it,

23 so there was no way I could submit a report on May 18.

24          THE COURT:  So, then they didn't even have

25 the answer that you had purported to incorporate by

1    that time.  You didn't even know what he was going to

2    say.  So that's even worse.

3            Just for the record on this issue, this is an

4    issue that deals with Rule 37 sanctions, and the

5    Southern States format calls for analysis, and the

6    analysis is that the plaintiff is surprised and

7    prejudiced.  There's no way really to cure it.  And

8    it's on an important matter, and it's a fairly

9    significant piece of evidence.  And the balance under

10   the Southern States Rambus test calls for preclusion

11   of the testimony.

12           All right.  No. 15, rebuttal exhibits for

13   impeachment purposes now.

14           MR. SCHULTZ:  Your Honor, I note that these

15   documents, the headline here, is for impeachment

16   purposes.

17           THE COURT:  They can use what they need for

18   impeachment.  They don't always know what people are

19   going to say.  We haven't gotten that refined yet.

20           MR. SCHULTZ:  It's our position, Your Honor,

21   that if these are used for impeachment purposes, if

22   the witness is going astray, fine, but they shouldn't

23   be admitted as exhibits that go back to the jury.

24           THE COURT:  They ordinarily don't go back to

25   the jury.  But it sort of depends on what -- I mean,

1    impeachment testimony doesn't go back to the jury, but

2    it can be, for example, if somebody doesn't

3    acknowledge what's in an exhibit, there are occasions

4    when the exhibit goes back to the jury on an

5    impeachment issue.  It just sort of depends on how it

6    happens.  I suggest we deal with that if and when it

7    happens.

8              MR. SCHULTZ:  We agree.

9              THE COURT:  Okay.  Good.  So that takes care

10   of all of the Lawson exhibits, right?  I mean Lawson's

11   objections to ePlus's exhibits?

12             MR. McDONALD:  We're both standing up at the

13   same time.  We talked over the break.  There are two

14   exhibits, Plaintiff's Exhibit 40 and Plaintiff's

15   Exhibit 344, that I think were listed in the pretrial

16   order as objected to but plaintiff has withdrawn them.

17             MS. ALBERT:  That's correct, Your Honor.  The

18   plaintiff withdraws PX 40 and PX 344.

19             THE COURT:  Okay.  What heading, what topic

20   are they under?

21             MS. ALBERT:  They were not included in that

22   outline because we had withdrawn them, but

23   inadvertently in the appendices to the pretrial order

24   they are still reflected in the appendix.

25             THE COURT:  Okay.  Well, this outline has my

rulings on it, and it will be attached to your appendix on that, and it will become the ruling because I'm not going to retranscribe them here. So this Appendix 3 now will have to it Appendix 3A, which will be the controlling document. Does that help you all?

MS. ALBERT: Yes, Your Honor.

THE COURT: You'll get a copy of all this. Okay.

I guess it's actually Appendix 4A. Appendix 3 is exhibits to which there are no objections to. So it will be Appendix 4A.

Okay. Appendix 5 is exhibits as to which there are no objections; is that right?

Appendix 6 is exhibits as to which there are objections, right?

MS. STOLL-DeBELL: Yes.

THE COURT: Do you all have one of those little outlines for me or do I use Appendix 6?

MS. STOLL DeBELL: Your Honor, there are not very many for Lawson. And, actually, we're going to withdraw DX 56.

THE COURT: Hold on. Okay. DX 56, exhibit withdrawn.

Now I need the Lawson exhibits. We can get

1  rid of these and get the Lawson exhibits.  Does

2  somebody want to get to work over here so I can see

3  them?

4        I don't want those big, long exhibits.

5  Lawson, come up and get yours.  Do some weightlifting.

6  I mean ePlus.  Come up and get yours.

7        Okay.  So what I need is the volumes that

8  have 97, 98, 111, 112, 121, 122, 123, 36, 37, 291

9  and -- I guess I need them all because they are all

10 over the ballpark the way you have them ordered, I

11 see.

12       How many do you have?

13       MR. CARR:  I think it's going to be just a

14 few binders.  Those two binders have everything.

15       THE COURT:  So you're only going to do the

16 first page?  Is that what you're talking about?  Is

17 that all you've got?

18       MS. STOLL-DeBELL:  No.  371 on the last page

19 and 291 on the last page.

20       THE COURT:  Look here at what I've got.  I've

21 got three pages of objections.  It's on Appendix 6.

22 Is this the list?  That's what I'm working with.  Take

23 a look at it and see.

24       MR. STRAPP:  Pages 2 and 3 of the list of

25 objections are objections as to which Lawson agrees

1    the exhibits have already been agreed by court order.

2           THE COURT:  So all that's left is the one

3    page?

4           MS. STOLL-DeBELL:  Yes, sir.

5           THE COURT:  Thank you, ma'am.

6           Okay.  I guess we start with 97 and 98.

7           MS. ALBERT:  DX 97 and DX 98 are related

8    issues.  They are manuals that relate to this J CONN

9    prior art, alleged prior art system.

10          I am going to withdraw our Rule 26 objections

11   to both of those.  But these should be excluded per

12   your order on ePlus' motion in limine No. 2 as they

13   were not cited in Lawson's second supplemental

14   invalidity contentions.

15          MS. STOLL-DeBELL:  Your Honor, I believe you

16   reserved judgment on this issue as to these specific

17   manuals, and that is because we argued that -- and I

18   can pull up your order on that.  So you granted their

19   motion to strike.

20          These J CONN manuals are -- I think we've

21   heard a number of times today that the parties can use

22   additional evidence in support of arguments that were

23   disclosed.  And that's what this falls under.  These

24   are some additional J CONN manuals relating to the J

25   CONN prior art system that we did disclose in our

1    second supplemental invalidity contentions.

2         THE COURT:  What does the order say on motion

3    in limine No. 2?

4         MS. ALBERT:  The order says that for the

5    reasons set forth on the record, plaintiff's motion in

6    limine No. 2 to enforce the Court's prior orders of

7    May 24, 2010, and May 25, 2010, and exclude any expert

8    opinion, other testimony or argument pertaining to

9    alleged prior art and invalidity theories not set

10   forth in the defendant's court ordered second

11   supplemental statement is granted.

12        As to both these two documents, they are not

13   disclosed in the second supplemental invalidity

14   contentions.  So this is about the fourth bite at the

15   apple for arguing to get in evidence that the Court

16   excluded three times already.

17        THE COURT:  I think at one point in time I

18   did reserve judgment on something, but I also thought

19   that that order subsequently took care of the

20   reservation of judgment, but I have to say I'm not

21   sure about that.  So --

22        MS. STOLL-DeBELL:  Your Honor, in your order,

23   Docket No. 230, that was your order on their motion to

24   strike certain things from Dr. Shamos' report.

25        THE COURT:  What was that?  The thing she

1   just read?

2          MS. ALBERT:  This is the order on motion in

3   limine No. 2, which was --

4          THE COURT:  After that.

5          MS. ALBERT:  Was after that.  Subsequent.

6          THE COURT:  In other words, I did something

7   on the motion to strike.  I said I'm going to hold it

8   in abeyance until I understand more.  Then I got the

9   motion in limine, and I ruled on the motion in limine,

10  and I kept it out, I think.  But I'm not sure that's

11  right.  And you're shaking your head no.  And you-all

12  are much closer to it than I am.

13         MS. STOLL-DeBELL:  Your Honor, I think we

14  argued it, and I argued again that this is not new

15  prior art reference.  We disclosed J CONN.  The J CONN

16  system.  It's the second supplemental invalidity

17  statement.  I can hand it up and show you.  We said

18  we're going to rely on the J CONN system as prior art.

19         Now, we did not cite those specific documents

20  in the second supplemental invalidity statement, but

21  they are J CONN manuals.  They are just additional

22  evidence in support of an argument that was properly

23  and fully disclosed.  It's the same thing as what

24  Dr. Weaver -- he had a whole bunch of additional

25  evidence.  Your Honor looked at it and said it's just

1    additional evidence in support --

2              THE COURT:  Of the same disclosed theory.

3              MS. STOLL-DeBELL:  This is the same issue.

4    We've always said J CONN is a system we're relying on.

5    And these are J CONN manuals.

6              MS. ALBERT:  Your Honor, Dr. Shamos, their

7    expert, doesn't even rely on these two manuals for any

8    opinions, nor are they in the second supplemental

9    invalidity contentions.  So how are we properly on

10   notice of these documents?

11             THE COURT:  Wait a minute.  They're not in

12   there, but the J CONN is identified as prior art,

13   right?

14             MS. STOLL-DeBELL:  Yes, Your Honor.

15             THE COURT:  In the second supplemental

16   contentions?

17             MS. STOLL-DeBELL:  Yes, the J CONN system.

18   Actually, Dr. Shamos cites to the manual we cited in

19   the second supplemental in support of J CONN plus

20   these two.  But they are all J CONN manuals.  We've

21   always said from the very beginning of time we're

22   going to rely on J CONN.  These are just additional

23   evidence.

24             And plaintiff's Dr. Weaver is allowed to rely

25   on additional evidence, and Dr. Shamos should, too.

1   They know J CONN is in this case.  It's always been in

2   this case.  There's no surprise here.

3           MS. ALBERT:  He hasn't disclosed any opinions

4   regarding these two documents.

5           THE COURT:  What does he say about these

6   documents?

7           MS. STOLL-DeBELL:  I can bring up a printed

8   copy of his claim chart where he cites to them if

9   you'd like, Your Honor.

10          THE COURT:  Show them to her.

11          MS. ALBERT:  Can you point to a page?

12          THE COURT:  What she's doing now is she's

13  walking.

14          MS. STOLL-DeBELL:  Can I hand up --

15          THE COURT:  Okay.

16          MS. STOLL-DeBELL:  Your Honor, if you'll give

17  me just a minute to look it up.

18          THE COURT:  Okay.

19          MS. STOLL-DeBELL:  I didn't realize they were

20  saying this wasn't cited.

21          THE COURT:  The more I think about it, the

22  more what I reserved judgment on was very early in the

23  process, and these motions in limine came after that,

24  and we're on a more specific briefing of what I had

25  reserved judgment on, but I just don't have a

1   recollection beyond that.

2          MR. ROBERTSON:  May I make a suggestion then?

3   Why don't we reserve on this and show you the

4   transcript where you specifically ruled on that when

5   you granted motion in limine No. 2, which is quite

6   specific, that nothing further can come in if it

7   wasn't in the second supplemental.  I feel like we've

8   fought this battle four times now.

9          THE COURT:  Wait a minute.  So has she.

10         MR. ROBERTSON:  I know, but Your Honor has

11  ruled three times.

12         THE COURT:  I know, but the fourth time is a

13  charm.

14         MR. ROBERTSON:  Well, your Honor, then I have

15  a few ones I'd like to reopen, like the damages issue.

16         MS. STOLL-DeBELL:  Well, let's open

17  Dr. Shamos' invalidity contention, too.

18         MR. ROBERTSON:  Let's have some closure, Your

19  Honor.

20         THE COURT:  I've got a better idea.  Why

21  don't we dismiss this case without prejudice.  Let you

22  refile it and start all over again.  All right.

23         MS. ALBERT:  Your Honor, I thought that your

24  ruling on the original motion going back to what

25  Dr. Shamos can testify about is only prior art that

1    was disclosed in the second supplemental invalidity

2    contentions.

3            They are conceding that these two documents

4    are not disclosed in the second supplemental --

5            THE COURT:  I think she actually is not

6    conceding that.  I think she's saying they are

7    disclosed.

8            MS. STOLL-DeBELL:  I said the J CONN system

9    was disclosed as prior art in our second supplemental.

10   These two specific documents were not cited, but J

11   CONN as a system was.

12           THE COURT:  It is cited in Shamos's report?

13           MS. STOLL-DeBELL:  It is.  So if you look at

14   page 1, if you go to the P.O. Writer, J CONN tab, page

15   1.

16           THE COURT:  The '172 patent?

17           MS. STOLL-DeBELL:  Yes, Your Honor.  You will

18   see there are sort of column headings that are

19   letters, and then row headings that are numbers.  So

20   if you go to that green column, it's column S, row 15.

21   It says, "Shamos Opinion Re: J CONN."  And there are

22   some folks from different manuals.

23           The last two there like the last one is

24   125142.  I believe that is Exhibit 98.

25           THE COURT:  What about 97?

1          MS. STOLL-DeBELL:  I can find a cite for

2     that.  It's in here.  I think the one before it is --

3     if you go to the next page, page 2, Your Honor, column

4     S, line 17.

5          THE COURT:  Yes.

6          MS. STOLL-DeBELL:  I'm sorry.  I think I have

7     slight dyslexia.  Hold on.  I'll find it.

8          THE COURT:  Here's what we're going to do on

9     this.  I want to make sure I get it right.  We file a

10    briefing on the same schedule as the other briefing we

11    did, whatever those dates were.  And let's see.  These

12    are your objections, right?

13         MS. ALBERT:  Yes, sir.

14         THE COURT:  You go first.  You respond.  You

15    go second.

16         I think what we may be talking about here

17    is that -- I'm wondering whether what we're talking

18    about is whether I had the Shamos report when I made

19    the ruling, and I said these things weren't disclosed

20    originally, and that's why they couldn't come in.

21    These contentions weren't.

22         And I believe that, as I'm reflecting upon

23    it, there was something substantively -- it wasn't

24    just that the evidence wasn't disclosed, it was that

25    it was a new substantive theory that was being raised

1    by virtue of these references, and I believe that's

2    what I was keeping out.

3            I do believe this, though, that if your

4    expert is permitted, Weaver, to cite in support of

5    your contentions on infringement evidence, ePlus, that

6    wasn't cited in the infringement contentions, but

7    support theories that were disclosed, then the same

8    rule has to apply to them.

9            And if that's where we are, then I may have

10   made a mistake, and if I did, I'm going to correct it.

11   That's the way it is.  Because that rule has to apply

12   both ways.

13           MR. ROBERTSON:  I understand, Your Honor.

14   But you have to remember that these two situations

15   were very different procedural postures because

16   Weaver, you ruled in their motion in limine, did

17   adequately disclose early on in December all of his

18   theories and with numerous exhibits.  But you then

19   said the discovery proceed for another five months,

20   and he was permitted to do that.

21           Very different situation.  They didn't

22   adequately disclose their invalidity contentions.  You

23   ordered them as a result of motion practice to do the

24   second supplemental statement.

25           Then, Your Honor, they filed the Shamos

 1   report.  And we filed a motion with respect to the

 2   Shamos report.  You ruled then that it was going to be

 3   confined to the second supplemental.  Then they

 4   continued to try to add additional exhibits, and we

 5   brought the motion in limine.  So they are very

 6   different procedural postures.

 7           THE COURT:  I'm sure you'll synthesize all

 8   that for me.

 9           MR. ROBERTSON:  Because it does apply to a

10   number of these exhibits that we have objections to.

11           THE COURT:  I understand.

12           MR. ROBERTSON:  You might want to reserve on

13   those until we can document for Your Honor.  And if I

14   might be permitted, I'd like to be able to quote Judge

15   Payne on Judge Payne from that last hearing when you

16   rather express as to what you were ruling and the

17   reason for it.

18           THE COURT:  That's always a dangerous thing

19   to do.  But the bottom line here is that we really

20   have to do what's right.  And if I made a mistake, I'm

21   going to try to correct it here.  If I blew it, I've

22   got to get it right as best I can.  I don't proclaim

23   to be infallible, and I know you-all are going to try

24   to add to that reputation if it goes up on appeal.  So

25   that's okay.  But I'd like to do what I can to save

1    the Federal Circuit trouble.  All right.  Let's go.

2           MS. STOLL-DeBELL:  So I think those will be

3    reserved.  Again, it's our position that it's

4    additional evidence in favor of an old theory.  And I

5    think that's what you said at the hearing.

6           But moving on, so that's 97 and 98.

7           THE COURT:  97 and 98 are reserved on the

8    motion in limine issue.  On the Rule 26 issue it's

9    withdrawn by the plaintiff.  Right?

10          MS. STOLL-DeBELL:  Right.

11          THE COURT:  Okay.

12          MS. ALBERT:  DX 111.

13          THE COURT:  By the way, put these things in

14   separate briefs.  Don't put them in the same brief.

15   We're doing briefing, and whoever has the burden gets

16   to go on the first date, but keep them separately so

17   we can deal with them separately.

18          All right.  Yes, ma'am.  111 and 12.

19          MS. ALBERT:  DX 111 relates to a document

20   concerning this IBM Technical Viewer 2 product, which

21   if Your Honor would recall, Lawson contends that the

22   combination of the inventor's prior RIMS system, plus

23   the Technical Viewer 2 allegedly invalidates some of

24   the claims.  DX 111 actually is not relevant because

25   it postdates the priority date of the patents, which

1   is August 10, 1994.  And DX 111 is dated after

2   November of 1994.  So it can't be relevant to prior

3   art because it doesn't reflect anything that is prior

4   in time to the priority date of the patents-in-suit.

5           Additionally, we have an objection under Rule

6   403 that it would be misleading and confusing to the

7   jury and confusing the jury as to the functionality of

8   the TV2 product when the functionality that's

9   described in the document postdates the priority date

10  of the patents-in-suit.  So it reflects subsequent

11  functionality, not alleged prior functionality.

12          THE COURT:  That would be confusing.

13          MS. ALBERT:  Correct.

14          THE COURT:  Okay.

15          MR. SCHULTZ:  The document does have a 1994

16  date on it; however, it discusses the creation date of

17  1992 of the document.

18          THE COURT:  Where?

19          MR. SCHULTZ:  First page, middle of the page,

20  it says, "created" right under RPQ number.

21          MS. ALBERT:  Your Honor --

22          THE COURT:  Wait a minute.  Okay.  I see.

23  Created 1992-03-30.  Revised 1994-11-23.  So this

24  document, it reflects a revision in '94 even though it

25  was originally created in '93.  Do you agree with

1   that?

2           MR. SCHULTZ:  Yes.

3           THE COURT:  If the revision, if the part that

4   was revised, is the alleged prior art, then it can't

5   be prior art.  Is that your point?

6           MS. ALBERT:  Yes, my point is --

7           THE COURT:  All right.  Where is the --

8   excuse me.  Go ahead.  Finish what you were saying.

9           MS. ALBERT:  Well, it says at the very top of

10  the document that it's withdrawn effective 1994-11-23.

11  Discontinued effective 1994-11-23.  So, obviously, the

12  document on its face postdates the priority date of

13  the patents-in-suit.

14          THE COURT:  What's the priority date?

15          MS. ALBERT:  August 10, 1994.

16          THE COURT:  Well, but I guess your point is

17  if what was in there as of '92 then, that doesn't

18  postdate it; is that right?

19          MR. SCHULTZ:  That's correct.

20          THE COURT:  So the issue is what is the text

21  we're talking about, and how do we know what was

22  extant in '92 and what was added in '94.

23          MR. SCHULTZ:  The document, if you look to

24  page 6 of 6.

25          THE COURT:  Six?

1        MR. SCHULTZ:  Yes.  Has the announce date of

2   1992, March 30.  And it goes through the dates.  And,

3   further, we're going to have Mr. Chuck Gounaris, who

4   is going to testify to this document, and he can go

5   through the iterations --

6        THE COURT:  I know you know what you're

7   talking about, but I don't have the background that

8   you do.  So show me where the date is that you're

9   talking about.

10       MR. SCHULTZ:  Yes.  Page 6 at the bottom

11  where it says, "Additional information."

12       THE COURT:  Yes.

13       MR. SCHULTZ:  It goes through the dates of

14  the software.

15       THE COURT:  It says the announce date was

16  3-30-92.  That's the availability date.  And the

17  withdrawal date was 1994, right?

18       MR. SCHULTZ:  That's correct.

19       THE COURT:  So doesn't that show that this

20  was extant as of the priority date of 8-10-94 or not?

21       MS. ALBERT:  It does not show that.

22       THE COURT:  Why not?

23       MS. ALBERT:  Because the TV2 product was

24  modified.  This document reflects on its face that it

25  was modified over time, and this is a postdate --

```
 1           THE COURT:  How does it do that other than of

 2    the dates we're talking about?

 3           MS. ALBERT:  Well, the part that Mr. Schultz

 4    just referred you to.  And --

 5           THE COURT:  No, wait a minute.  Let's get

 6    this right here.  As I read this, it says what's in

 7    here it came into existence in 1992 and was available

 8    then.  And it stayed that way until 1994 when it was

 9    withdrawn.

10           To me, that says it was, if it qualifies

11    otherwise as being art that's pertinent, and it was

12    art that was pertinent before 1994, or it would be

13    before 1994 August 10 because it was in effect as of

14    March of 1992.  Now, what's wrong with that analysis?

15           MS. ALBERT:  Respectfully, Your Honor, you're

16    going to hear testimony from multiple witnesses.  The

17    inventors, Mr. Gounaris, who Mr. Schultz referred to,

18    Ms. Eng, they all testified that there were

19    modifications that were made to the TV2 product

20    specifically for this project for Fisher-Scientific to

21    come up with the patented systems.  And that activity

22    took place in 1993 and 1994.

23           So I don't see how a document that's dated in

24    November of 1994 reflects functionality of a product

25    prior to the time that the IBM folks started working
```

1    with Fisher-Scientific to come up with the patented

2    systems.   There's nothing in the document that says

3    TV2 had this functionality in 1992.

4            THE COURT:  No, but what it says is -- to me

5    it says this was the way it was until 1994.   There

6    were no other revisions, and it was withdrawn in 1994

7    and discontinued.   So it establishes on its face that

8    this was the way it was 1992 to 1994.   And if this is

9    consistent with the methodology of issuing regulations

10   and changes generally in places that do that, it would

11   seem to me to be supported by a general understanding

12   that that's what this means.

13           MS. ALBERT:  On page 6 of 6.

14           THE COURT:  Right.

15           MS. ALBERT:  Above the section that

16   Mr. Schultz referred you to.

17           THE COURT:  Right.

18           MS. ALBERT:  It says, "Revision No. 5."

19           THE COURT:  Uh-huh.

20           MS. ALBERT:  Reflecting that this is the

21   fifth iteration of the product.   So it was not static

22   over time from 1991 or 1992 through 1994.

23           THE COURT:  I see.   And you say there's other

24   evidence that the people who worked on these changes

25   are going to establish that they did so in '93 and

1   '94?

2           MS. ALBERT:  That's correct.

3           THE COURT:  I mean '93 and '94.

4           MS. ALBERT:  Correct.

5           THE COURT:  Okay.  It looks to me like she's

6   got a point there if it's the fifth revision and

7   there's testimony to that effect.  I don't see how

8   this could come in without testimony establishing its

9   bona fides.  You can't make that decision from the

10  face of it.

11          MR. SCHULTZ:  There will be testimony from

12  Mr. Chuck Gounaris, who will testify as to this

13  document and will testify to any iterations that took

14  place and --

15          THE COURT:  Well, I'm going to reserve until

16  you get a foundation because you need a foundation on

17  this.  It won't fly on its own.

18          112.

19          MS. ALBERT:  112 is a video exhibit relating

20  to this Technical Viewer 2 System.  We have an

21  objection based on ePlus' motion in limine No. 2 and

22  your order that this specific document was not

23  disclosed in the second supplemental invalidity

24  contentions per your order, and, therefore, it's

25  excluded under your ruling on ePlus' motion in limine

1   No. 2.

2          THE COURT:  Okay.  So that's reserved for

3   your briefing.  It's the same as the earlier one in

4   '97 and '98.

5          MS. ALBERT:  In addition, we have an

6   objection.  This one is not disclosed in Dr. Shamos'

7   report, nor is it disclosed in response to -- we had a

8   contention interrogatory that we served on Lawson.

9   Interrogatory No. 9, which I can hand up to you.  It

10  asked that Lawson describe in detail all facts and

11  identify all documents that Lawson contends support or

12  tend to support its defenses, affirmative defenses,

13  and counterclaims, if any, in this action.

14         They cited to some specific documents

15  relating to IBM TV2, but they did not cite to this

16  particular one.

17         THE COURT:  You mean the video.  They didn't

18  cite to the video.

19         MS. ALBERT:  So we have an objection based on

20  Rule 26 on this.  And we also have a relevancy

21  objection since it hasn't been disclosed or cited in

22  any expert report, interrogatory answer, or the second

23  supplemental invalidity contentions.

24         MR. SCHULTZ:  Let me start with the relevancy

25  objection, Your Honor.  It goes to TV2.  It's further

1    support with respect to the documents that were set

2    forth in the invalidity contentions.   Essentially,

3    what it has is screen shots within it that are the

4    same as are in the brochure that is cited in the

5    invalidity contentions.

6         Your Honor, it is not by itself by Bates

7    number cited in the invalidity contentions; however,

8    as we've already had discussion on, TV2 System has

9    been cited.   It's been gone through in depth, and this

10   is further support of the TV2 reference.

11        MS. ALBERT:  Also, respectfully, Your Honor,

12   this particular document is undated.   So there's no --

13   or the video is undated.   So there's no way to really

14   corroborate that it is indeed prior art.

15        MR. SCHULTZ:  Your Honor, there is evidence

16   of that.   I can pull out the testimony from the SAP

17   trial.   We'll have the testimony of Pamela Eng, who is

18   actually in the video and helped create the video.

19   She actually was pregnant after the time that the

20   video was created, and she can date the video based on

21   that that it was made in 1992 or before.   So, yes, we

22   have the evidence and the corroboration with respect

23   to the prior art aspect of the video.

24        MS. ALBERT:  Your Honor, naked testimony

25   cannot be used as corroboration.

1        MR. SCHULTZ:  Your Honor, there's other

2   documents that further corroborate the fact that the

3   video was dated prior to 1992 including the 1991

4   brochure and general information manual with respect

5   to the TV2 System.

6        Ms. Eng by herself was selling this system at

7   trade shows throughout the United States.  She can

8   testify there is corroborating evidence.  The

9   objection has no merit.

10        MS. ALBERT:  Well, I mean, he hasn't

11   addressed by Rule 26 objection that it wasn't cited in

12   response to a contention interrogatory.

13        MR. SCHULTZ:  Your Honor, I did address that

14   issue.  That by its reference, by its Bates number was

15   not included there; however, the TV2 reference was.

16   ePlus was on notice of the TV2 System and it goes to

17   the same issue that we've already addressed.

18        THE COURT:  So the issue is being reserved

19   and there's going to be briefing.

20        MR. SCHULTZ:  Correct.

21        MS. ALBERT:  Well, we have a specific

22   contention interrogatory that asked that you identify

23   every document that you had relied on to support your

24   affirmative defenses.  You have a listing of documents

25   about TV2, and it does not include this document.  And

 1   I can hand that up to the Court.

 2          THE COURT:  I don't need to.  It seems to me

 3   he doesn't dispute that.  He said it wasn't in there.

 4   So the question is:  Are you surprised?  Are you

 5   prejudiced?  Can it be cured?  Is there a problem

 6   applying the Southern States analysis?

 7          MS. ALBERT:  We are surprised.

 8          THE COURT:  How is it going to foul up the

 9   trial?  How are you surprised?

10          MS. ALBERT:  Well --

11          THE COURT:  Given that you knew everything --

12   you knew everything he's talking about, he says, about

13   Ms. Eng, and about the system.  So how are you

14   surprised, I guess, is the question.

15          MS. ALBERT:  It wasn't disclosed anywhere.

16          THE COURT:  I know.

17          MS. ALBERT:  Not in the contention

18   interrogatories, not in the second supplemental

19   invalidity contentions that Your Honor ordered that

20   they disclose everything that they would rely on,

21   their invalidity positions.  It wasn't relied on by

22   Dr. Shamos, and our expert didn't have an opportunity

23   to rebut this particular exhibit because it was never

24   disclosed to us that they intended to rely on it.

25          MR. SCHULTZ:  Your Honor, it's the same

1    expert that they had in the <u>SAP</u> trial.  It's fully

2    disclosed that the TV2 System is a piece of prior art

3    that Lawson is relying upon in this case.

4          THE COURT:  Was this same issue litigated in

5    the <u>SAP</u> trial?

6          MR. SCHULTZ:  It was.

7          THE COURT:  So how are you surprised?  If you

8    have tried it once, you can't really be surprised.

9    And you can cure the surprise because you know how to

10   deal with it.  So how is it going to foul up the

11   trial?  Just get your guy to testify about it.  Is it

12   the same expert you had in the <u>SAP</u> trial or a

13   different one?

14         MS. ALBERT:  It's the same expert, but the

15   issue of obviousness of RIMS and TV2 was not actually

16   before the jury in the <u>SAP</u> case.

17         THE COURT:  They didn't testify about that?

18         MS. ALBERT:  Right.

19         THE COURT:  All right.  It seems to me as if

20   you were asked to disclose those things in a

21   contention interrogatory and you didn't.  And you

22   admittedly didn't.  And while they had some general

23   knowledge about Ms. Eng and what she did and about the

24   viewer, this particular piece of evidence is different

25   than the other evidence that they were told about and

1    that you were going to use.

2           Now, tell me this:  What's different about

3    this video than what they already knew?

4           MR. SCHULTZ:  There's really nothing that's

5    different.

6           THE COURT:  Well, why isn't it cumulative?

7    Why do we need it anyway?

8           MR. SCHULTZ:  It shows the operation of the

9    system that is shown in photographs in the brochure.

10   It's testimony that the jury can take a look at and

11   actually see the operation of the system that they can

12   only see the photographs of in the brochure.

13          We have in our responses to the invalidity

14   contentions a paragraph that Pamela Eng will testify

15   with respect to this issue.  So there should not be

16   any surprise.

17          THE COURT:  To what issue?

18          MR. SCHULTZ:  To the TV2 issue.

19          THE COURT:  I mean to the video or just to

20   the issue of what TV2 is about.

21          MR. SCHULTZ:  She's just testifying -- the

22   video is not disclosed per se in these documents.  I

23   agree with that, Your Honor.  I'm just saying there's

24   no surprise because the whole system is at issue

25   already.

1          THE COURT:  So it's really a repetition.

2    It's a moving version of what there is in the still

3    version; is that what you're saying?

4          MR. SCHULTZ:  It's more descriptive to the

5    jury to see what actually TV2 was at the time.

6          THE COURT:  Okay.  Anything else?

7          MS. ALBERT:  No, Your Honor.

8          THE COURT:  I think the objection is

9    overruled on both points, Rule 26 and relevance, but

10   I'm still reserving on the other issue subject to the

11   brief.

12         All right.  121.

13         MS. ALBERT:  Your Honor, DX 121 is one

14   isolated chapter out of some larger document.  The

15   document is undated.

16         THE COURT:  Excuse me.  Where does this

17   document come from?  Do you know?

18         MS. ALBERT:  It came from Lawson.

19         THE COURT:  Lawson produced it.  Okay.

20   Excuse me.  So it's part of something larger.  Clearly

21   it is.

22         MS. ALBERT:  It doesn't indicate on its face

23   the version of -- this relates to the purchase of

24   what's called P.O. Writer, alleged prior art.

25         THE COURT:  But it's prior art issue, and it

1    relates to the P.O. Writer.  Clearly, it's part of

2    something larger because it beings with paragraph 2.

3    You don't know the date, is that what you said?

4         MS. ALBERT:  The date is not identified.  It

5    doesn't identify on its face the version that it

6    relates to.  You can't tell whether it's even prior

7    art or not.  We have an objection under Federal Rule

8    106 that in fairness you should have the entire

9    document made available.  Our expert did not have

10   access to the entire document.

11        THE COURT:  Are you relying on the best

12   evidence rule?  You cite it.  Do you really mean that?

13        MS. ALBERT:  Well, it's not the best evidence

14   in that it's not the complete document.

15        THE COURT:  So it's really a 106 objection?

16        MS. ALBERT:  It is a 106 objection.

17        THE COURT:  All right.  Well, 102 is

18   overruled.  All right.

19        MS. STOLL-DeBELL:  Your Honor, these were

20   documents that were used in the SAP trial.  If you

21   look at them, they have SAP Bates numbers, and I

22   believe we got them from ePlus.  So that's a first

23   response.

24        The second is that the first time we ever

25   heard any complaint about these being incomplete is

1      when the objections to the exhibits came out.  So

2      these documents were used during the deposition of

3      Laurene Fielder.  We have deposition designations

4      relating to them.  She did give them a date.  I can

5      cite testimony for you.

6               THE COURT:  What did she say the date was?

7               MS. STOLL-DeBELL:  April of '93, which is the

8      date of all of the volumes in the P.O. Writer manual.

9      Had they raised this issue -- in fact, they used

10     Exhibit 121 in their deposition of Ms. Fielder as

11     their exhibit.  It was Exhibit 5 during that

12     deposition.  The witness didn't say it's incomplete.

13     They didn't say it's incomplete.  It wasn't raised

14     until it was too late.

15              THE COURT:  It's incomplete on its face.

16              MS. STOLL-DeBELL:  They didn't complain about

17     it being incomplete, Your Honor.  And I would further

18     point out that Rule 106 is a rule of completeness, and

19     the proper remedy there is if they think it's

20     incomplete, they can introduce the rest of it.  She

21     hasn't said that the rest of it is necessary to give a

22     full context of what this is talking about.  It's not,

23     your Honor.

24              THE COURT:  I believe the rule says the

25     adverse party may require the introduction at that

```
 1   time.  I don't think it requires them to do it.  I
 2   think she can say, Pony up the rest of it, can't you?
 3            MS. ALBERT:  Yes.  And, Your Honor,
 4   respectfully, our expert did point out in his report
 5   that this was an incomplete, undated document.
 6            THE COURT:  Well, you used it at the trial.
 7            MS. ALBERT:  We did not use it at trial.
 8   It's been used against ePlus.  And, respectfully, they
 9   have had access to this.  The proffering witness is
10   their consultant, their paid consultant.  They could
11   have obtained the entire document from her.  It is
12   unduly prejudicial to us not to have the complete
13   document.  We don't know what the rest of the document
14   says about the operation of the system.
15            THE COURT:  How was it used against you in
16   the SAP trial?
17            MS. ALBERT:  Well --
18            THE COURT:  And how did it hurt you?
19            MR. ROBERTSON:  It was offered as a
20   defendant's exhibit, Your Honor.  Judge Spencer didn't
21   go through an exercise that we're enjoying here today.
22   He basically admitted 99 percent of the exhibits.
23            THE COURT:  You enjoy that better than this?
24   Is that what you're saying?
25            MR. ROBERTSON:  It was never challenged.  I
```

1    don't even know if it was introduced or discussed with

2    the witness at the trial.   The exhibits came in.

3    That's where we are on that.

4        I think asking a question at a deposition

5    about an exhibit doesn't preclude you from challenging

6    it later based on Federal Rules of Evidence.

7        I did want to clarify one thing for my

8    colleague because I was at the deposition.   Ms.

9    McEneny is not one of the paid witnesses by Lawson.

10   She was cooperating and working with Lawson, and they

11   could have asked her.   There's lots of communications

12   back and forth, but I didn't want to leave you with

13   that impression.   She obviously misspoke.

14       THE COURT:   All right.

15       MS. ALBERT:   But she was their witness.   They

16   are offering her deposition testimony at trial.

17       THE COURT:   Okay.

18       MS. STOLL-DeBELL:   I'm sorry.   It was their

19   deposition of her.   They brought that document.   They

20   used it as an exhibit.   We don't have the rest.   I

21   have a Fourth Circuit case here, Your Honor, which

22   talks about when there isn't the rest.   And in this

23   Fourth Circuit case, the rest was destroyed.   The

24   court allowed it in because neither party was

25   responsible.

1          THE COURT:  The proof of record was that it

2    was destroyed.  There wasn't any more.

3          MS. STOLL-DeBELL:  That's true.  We're

4    talking about a manual that's dated 1993.  If we had

5    it, we would have put it in.  We don't.  But what we

6    do have is complete.  It was used in the SAP trial.

7          THE COURT:  Whose manual is it?

8          MS. STOLL-DeBELL:  It's P.O. Writer.

9          THE COURT:  Who owns P.O. Writer?

10          MS. STOLL-DeBELL:  American Tech.  Something

11   like that.

12          THE COURT:  Did you ask them for it?

13          MS. STOLL-DeBELL:  I believe we got what was

14   from the SAP trial.  We did.  It's my understanding we

15   did ask for it.  We have what we could get.  It's a

16   very old document, and I don't think that --

17          THE COURT:  In other words, do you bring

18   it within -- I don't remember the name of the Fourth

19   Circuit case, but there's a case that says, and I

20   think maybe more than one, it basically says if the

21   record shows that it's not possible to satisfy the

22   rule of completeness, then you can let it in and let

23   testimony take care of the validity *vel non* of it as

24   to its reliability.  Isn't that essentially what that

25   case said?

1           MS. STOLL-DeBELL:  It is.  It says, Rule 106

2    is for adding additional things.  I can give you the

3    cite.  It's <u>United States v. Ferguson</u>.

4           THE COURT:  Yes.  But my question is:  What

5    record do you have to tell me that you can't get the

6    rest of the document?

7           MS. STOLL-DeBELL:  It's my understanding,

8    Your Honor, that we did ask American Tech for it.  And

9    I would further point out that they did not complain

10   about it.  Had they come back and said at any point,

11   "This isn't complete," then we would have known it was

12   an issue.  Now we're before trial and it's too late

13   for us to do anything about it.

14          THE COURT:  Well, that isn't really a

15   pertinent point, I don't think, Ms. Stoll-DeBELL.

16   They weren't using it.  If you were going the use it,

17   it's your responsibility to recognize it's part of the

18   document.  In fact, they asked about it in a

19   deposition, but it doesn't keep them from objecting to

20   it here.

21          MS. STOLL-DeBELL:  Your Honor, they haven't

22   even alleged that the remaining chapters would make

23   any difference at all anyway.  Chapter 2 was a

24   tutorial about the entire software system.  That's DX

25   122.  It goes through the purposes to show people who

1    are buying this how to use it.  That in itself is

2    complete.  It is the tutorial.  That's what

3    Ms. Fielder said during her deposition.

4            MS. ALBERT:  The fact that we don't know what

5    we don't know --

6            THE COURT:  Can't be used against you.

7            MS. ALBERT:  Right.  If our expert doesn't

8    have --

9            THE COURT:  Leave that one alone.

10            MS. ALBERT:  -- the complete document.

11            THE COURT:  You can leave that one alone.  I

12    understand the point.

13            You say this witness provided the date for

14    it?

15            MS. STOLL-DeBELL:  Yes, Your Honor.  She was

16    very clear.  There are different volumes of this P.O.

17    Writer manual.  The whole thing is actually quite big.

18    So we have just put into evidence sections that we

19    believe are relevant to the claims.  She very clearly

20    in her deposition gave a '93 date for every single

21    volume of these manuals.

22            MS. ALBERT:  Without having a date on its

23    face, how can you corroborate or cross-examine her

24    knowledge of something?  She's saying now 17 or so

25    years later after the fact that she thinks this is

1  from 1993, but there's no date anywhere on the

2  document, and it's being used to invalidate our

3  patents.  They should have a higher burden to show

4  that something is prior art.

5          THE COURT:  Excuse me.  I thought you said

6  she was pregnant in the film.

7          MS. STOLL-DeBELL:  No, Your Honor.

8          THE COURT:  That's the other one.

9          MS. STOLL-DeBELL:  That was Ms. Eng and that

10  was TV2.

11          THE COURT:  I'm sorry.

12          MS. STOLL-DeBELL:  We're talking about Ms.

13  Fielder and P.O. Writer.

14          Let me first say that Ms. Albert keeps

15  talking about this corroboration requirement.  That is

16  this rule in patent law that you cannot invalidate

17  claims based upon the oral testimony of a single

18  witness.  We're not talking about that here.  We have

19  Ms. Fielder and we have thousands of pages of manuals,

20  most of which have this 1993 date on it.  It happens

21  that this doesn't, but she remembers clearly and

22  testified under oath that they were all released at

23  the same time.  They all were released in whatever,

24  April of 1993.  So she's testified under oath she

25  remembers.  She testified in the SAP trial.

1          THE COURT:  What is the objection column

2  "I-N-A-C-C" mean?

3          MS. ALBERT:  Inaccurate description.

4          THE COURT:  Of the document?

5          MS. ALBERT:  Yes.  We don't agree that it's

6  Version 10 because there's nowhere on the document on

7  the face of it that says it's a Version 10 document.

8          And, respectfully, what my colleague is

9  trying to do is bootstrap by oral testimony an

10 undated, incomplete document and trying to corroborate

11 it as prior art with naked oral testimony of a witness

12 17 years after the fact.  That is not sufficient under

13 the law.

14         MS. STOLL-DeBELL:  Your Honor, she testified

15 that this was for Version 10, this document, and it

16 was dated April of '93.  She said, Yes, I recognize

17 these pages from the purchasing manual at that point

18 in time.

19         And the question was:  "Now, when you say 'at

20 that point in time' what are you referring to?"

21         Her answer is:  "Spring of '93."

22         "Question:  Is that referring to Version 10

23 of the P.O. Writer Plus software?"

24         She answers, "That's correct.  This

25 specifically would be relating to the purchasing

1   module."

2           Also I'm looking at the --

3           THE COURT:  How can she remember that it was

4   1993 spring?

5           MS. STOLL-DeBELL:  Because all of these

6   things go together.  They were one big manual.

7           THE COURT:  All of what things?

8           MS. STOLL-DeBELL:  All of the P.O. Writer

9   volumes, many of which are stipulated and in evidence

10  now.  So they had a software program that was broken

11  into different modules and you could purchase

12  different modules.

13          THE COURT:  Are you saying there's other

14  documents from which she looked at and said, "I can

15  tell from them that this is a 1993 document"?

16          MS. STOLL-DeBELL:  She was saying, This is

17  part of the Version 10 software manual, yes.  This is

18  the purchasing module for that manual.  It's Version

19  10.  It's dated April of '93 just like all of the

20  other volumes of the Version 10 software were dated

21  April of '93.

22          THE COURT:  All right.

23          MS. ALBERT:  The witness testified that they

24  released versions regularly, like once a year.  And we

25  have no way to tell whether this is from a chapter

1  from a Version 10 manual or a chapter from a later

2  version that's not prior art to the patents-in-suit.

3          And, moreover, I still maintain our objection

4  that it's an incomplete document.  And if we had had

5  the complete document, there may be other portions in

6  there that would actually be inconsistent with the

7  invalidity contentions that Lawson is putting forth

8  here.

9          THE COURT:  I'm going to reserve the judgment

10  until I hear the testimony about the foundation as to

11  the date because I think that it is a problem, and

12  it's hard to understand from what you-all are saying

13  exactly how she can date it, but that's a critical

14  issue here, particularly given what date she says it

15  is.

16          All right.  122.

17          MS. ALBERT:  DX 122, if you can turn to the

18  second page of the exhibit, which is L0126502, it

19  indicates that this exhibit should have five chapters

20  and two appendices.  And it, clearly, on its face does

21  not have five chapters and two appendices.  It's just

22  Chapter 1.  And we don't have the rest of the

23  document.  So we have a Rule 106 objection, and also

24  we object on the basis of Rule 403 that it's unduly

25  prejudicial because they're trying to rely on it as

1    prior art to invalidate our claims, and we don't have

2    the full document to explain the functionality of the

3    product.

4             THE COURT:  Do we know the date of it?

5             MS. STOLL-DeBELL:  Yes, Your Honor.  The date

6    is on the front page of Exhibit 122.  And this is a

7    good example of how she knows that the date of 121 is

8    April of '93 because this is the first chapter of the

9    purchasing manual.  And it says Chapter 2 is the

10   tutorial.  You'll see it says April of '93.  And

11   Exhibit DX 121 is Chapter 2.  So right there you can

12   connect these documents up and see that the date of

13   Exhibit 121 is April of '93.

14            MS. ALBERT:  These documents do not get

15   connected because the Bates numbers are not in order.

16            THE COURT:  Well, doesn't the text tell us --

17            MS. ALBERT:  I still don't know if Chapter 2

18   in DX 121 is from a later version of P.O. Writer than

19   the version they're trying to rely on.  There's no

20   indication on the face of DX 121 whether it relates to

21   Version 10 that they rely on for their invalidity

22   contentions or whether it relates to a later version.

23   And the witness did testify that they had versions

24   every year including subsequent versions.

25            MS. STOLL-DeBELL:  But she also testified,

218

1    Your Honor, that this is Version 10.  It seems to me

2    that this is something that should go to the jury as a

3    question of fact.  She said under oath --

4              THE COURT:  Excuse me.  On DX 122 it says,

5    Software Revision 10.0.

6              MS. ALBERT:  I know.  I don't contend that DX

7    122 is not from Version 10.  What I contend on DX 122

8    is that on the face of the document itself it's

9    supposed to have five chapters and two appendices, and

10   it only includes Chapter 1.

11             THE COURT:  What parts of the index suggest

12   to you that there might be something pertinent about

13   the functionality that's at issue here in the missing

14   sections?

15             MS. ALBERT:  Well, Chapter 3 relates to

16   implementing P.O. Writer Plus.  Chapter 4 relates to

17   using P.O. Writer Plus purchasing manual.  That's

18   directly in issue.

19             MS. STOLL-DeBELL:  Your Honor, first of all,

20   we have a subpoena to Ms. Fielder.  We tried to get

21   the documents that she had.  She didn't have it.  It

22   doesn't exist anymore.  It's very old.  That should

23   not mean that this whole thing should be excluded.

24   And I would further point out that this is prior art,

25   and we need to show that this system has all the

1   features of their claim.

2            So if there's additional chapters like

3   Chapter 3, it would only help us because it may give

4   additional detail to the arguments that we're making.

5            THE COURT:  It might hurt you, too.  You

6   never know.  You can't ever say that what's not there

7   is going to help you because you never know what's

8   there, and it could just as well hurt you.  You can't

9   do that.

10            I'm going to hear her testimony.  She's going

11   to come testify?

12            MS. STOLL-DeBELL:  She's a deposition

13   designation, Your Honor.

14            THE COURT:  I'll read it and see.  You show

15   me where it is and I will look at it and see.

16            MS. STOLL-DeBELL:  Okay.

17            THE COURT:  But I'm disinclined to allow it,

18   but I need to read it.  So she's not coming to

19   testify.  It's all in the deposition.

20            MS. STOLL-DeBELL:  Yes.

21            THE COURT:  You need to give me the

22   deposition with the pages where she establishes the

23   foundation of both these documents.

24            MS. STOLL-DeBELL:  We will, Your Honor.

25            MS. ALBERT:  But that still won't address the

220

1   issue of the incompleteness of the document.

2           THE COURT:  It may or may not.

3           All right.  123.

4           MS. ALBERT:  I believe Lawson withdrew that

5   exhibit.

6           MS. STOLL-DeBELL:  I believe we did too, Your

7   Honor.

8           THE COURT:  All right.

9           MS. STOLL-DeBELL:  We withdraw 124, too, Your

10  Honor.

11          THE COURT:  Withdrawn on what?  It's not on

12  there.  Next one I've got is 136.

13          MS. ALBERT:  136 and 139.

14          THE COURT:  By the way, you need to take out

15  the things you have withdrawn from your exhibit books

16  when you get them at trial.  I still have 124 in mine

17  even though you withdrew it, but it's not on the list.

18  Just have somebody go back and check through to get

19  ready.  That's one of the little things you do.

20          Okay.  136.

21          MS. ALBERT:  136 and 139 are the same issues.

22  Dr. Shamos -- they don't rely on either of those

23  manuals for any invalidity theory.  So our objection

24  is based on Rule 401 and 402.

25          THE COURT:  What does this have to do with,

1  Ms. Stoll-DeBell, if you don't rely on it for any

2  invalidity theory?  136 and 139.

3          MS. STOLL-DeBELL:  We did cite the entire

4  P.O. Writer manual including these in our second

5  supplemental invalidity contentions, and it was listed

6  in Dr. Shamos' report as a document considered.

7          As far as 136 goes, that is a manual talking

8  all about the stuff that's at issue in this suit.

9  Requisitions --

10          THE COURT:  What does the man testify about?

11  Shamos.

12          MS. STOLL-DeBELL:  He didn't have any

13  specific cites to this document in his report.  He

14  listed it as a document considered.

15          THE COURT:  Well, did he consider it and

16  reject or consider it and didn't comment or it or

17  what?

18          MS. STOLL-DeBELL:  He considered it and

19  didn't comment on it.

20          THE COURT:  So we don't have a sponsor for

21  it.  There is no way a jury can figure out what this

22  means.  So without a foundation, there's no way to use

23  136.

24          MS. STOLL-DeBELL:  We do have a foundation.

25  Ms. Fielder testified about it in her deposition.  She

1    authenticated it.

2         THE COURT:  But if nobody is going to testify

3    about it and explain what it is in your invalidity

4    theory, why does it even come in?  It just confuses

5    the jury to have a bunch of paper that they can't

6    understand.  They can't understand this.

7         MS. STOLL-DeBELL:  Well, I think it's just

8    additional support.  Dr. Shamos talked about how P.O.

9    Writer does requisitions from catalogs, for example.

10   This is just a manual that says the same thing.  I

11   mean, he cited one of the other P.O. Writer manuals.

12        It's our position he can talk about it.  It

13   was listed in his report.  What he will say about it

14   is all disclosed in his report.

15        THE COURT:  What does he say about it?

16   That's the point.  If he said something about it, then

17   it can come in.  If he didn't, it's not going to come

18   in.

19        MS. STOLL-DeBELL:  He didn't cite to this

20   specific manual.

21        THE COURT:  Okay.  But he did to 139, right?

22        MS. STOLL-DeBELL:  No.  139 is more just to

23   give a date on P.O. Writer.  It was the upgrade kit

24   that was used by P.O. Writer users to go from Version

25   9 to Version 10.  Ms. Fielder talked about that.

1          THE COURT:  What did he say about 136,

2     Shamos?

3          MS. STOLL-DeBELL:  He cited it as a document

4     considered.

5          THE COURT:  Okay.  It made it among the list

6     of documents considered, but he didn't give any

7     opinion about it.  So he can't testify at trial about

8     it because he didn't give an opinion about it in his

9     report.

10         Objection sustained as to 136.

11         139.

12         MS. STOLL-DeBELL:  It really just goes to the

13    date of P.O. Writer.  I don't imagine that Dr. Shamos

14    will testify about this.  It was used to go from

15    Version 9 to Version 10.  That's what Ms. Fielder says

16    about it.

17         THE COURT:  Well, then it's pertinent to the

18    extent that her testimony on 111 and 112 --

19         MS. STOLL-DeBELL:  We're not going to use

20    Dr. Shamos to give the date.  That's coming in through

21    Ms. Fielder and these documents.  He is assuming it's

22    prior art in talking about why it meets the claim

23    element.

24         MS. ALBERT:  It's not relied on for any

25    invalidity theory.  It's just going to confuse the

1  jury to have another extensive manual in the record

2  that's not relevant to any of the functionality that's

3  relied on for their invalidity contention.

4          THE COURT:  Nobody is going to explain what

5  this thing is?

6          MS. STOLL-DeBELL:  Yes, Ms. Fielder explains

7  what it is in her deposition.

8          THE COURT:  I'll consider it along with 111

9  and 112.

10          291.

11          MR. STRAPP:  Your Honor, 291 is a document

12  from 2001.  It's an ePlus document.  It was created by

13  ePlus after it had purchased the assets of a company

14  called ProcureNet.  ProcureNet was the company that

15  had the assets, among which were the patents that are

16  now asserted in this litigation.

17          And the evidence that's going to be put on at

18  trial will show that ePlus needed for accounting

19  reasons to allocate the purchase price that it had

20  paid for ProcureNet over all the assets that it had

21  purchased from ProcureNet.  It didn't purchase the

22  entire company.  It only purchased certain assets of

23  ProcureNet.

24          Furthermore, the evidence will show with

25  respect to this document that when ePlus was valuing

1    the patents that it had purchased from ProcureNet,

2    there was no attempt made by ePlus to assess the

3    intrinsic value of the patents, and that instead when

4    ePlus valued the patents in the context of this

5    document, the valuation was simply done by assigning

6    the administrative costs involved in transferring

7    ownership rights from ProcureNet to ePlus.

8             We'll also put on evidence to show --

9             THE COURT:  What does all this have to do

10   with it?

11            MR. STRAPP:  Well, I think that the reason I

12   point that out, Your Honor, is that in this document

13   there's a figure of $12,000 given, and it's my

14   understanding that Lawson would like to introduce this

15   document to argue to the jury that these patents are

16   worth $12,000.

17            THE COURT:  What's that got to do with

18   anything?

19            MS. STOLL-DeBELL:  Your Honor, we've heard

20   all day today about how relevant procurement is, and

21   all of their products, and how great their patents

22   are, and licensees are paying $37 million for them,

23   and they are commercially successful, and they are

24   wonderful.

25            ePlus valued those patents at $12,000, and

1    they are bringing all of this commercial success

2    evidence in, and we have the right to rebut that and

3    say, You valued these patents for $12,000.  So they

4    are not commercially successful.

5            THE COURT:  That's when you bought them.

6    It's what happened after that that counts for the

7    commercial success, isn't it?

8            MS. STOLL-DeBELL:  No.  They start all the

9    way at Fisher in 1994, and they rely on Fisher.

10           THE COURT:  When did they buy ProcureNet?  In

11   other words, you buy a dog, and the dog gets valuable

12   right after you buy it because of something you do.

13   Then that shows that it's commercially successful from

14   X date.

15           MS. STOLL-DeBELL:  But they contend that even

16   today that before that date, they were successful.

17   Fisher won awards.  We saw all take cornerstone stuff

18   they are going to break up.

19           THE COURT:  Is that ProcureNet?

20           MS. STOLL-DeBELL:  Yes.

21           THE COURT:  Fisher is ProcureNet?

22           MS. STOLL-DeBELL:  Yes.  So it's my

23   understanding that it went Fisher, ProcureNet, ePlus.

24           THE COURT:  But the same invention?

25           MS. STOLL-DeBELL:  I think they would say

1    yes.

2              THE COURT:  Yes.  You don't agreed, but

3    that's what their theory is.

4              MS. STOLL-DeBELL:  I believe that's their

5    theory.

6              So they talk about commercial success all

7    along including before this timeframe.

8              THE COURT:  So why isn't it admissible to

9    rebut your case on commercial success?

10             MR. STRAPP:  Well, Your Honor --

11             THE COURT:  How does it come in?  How are you

12   going to get it in, Ms. Stoll-DeBell?

13             MS. STOLL-DeBELL:  Mr. Farber.  He was there.

14   He testified about it in his deposition.  We asked him

15   about it, and we're going to use it with him, and he

16   can talk about it.

17             THE COURT:  All right.  Okay.

18             Excuse me.  Go ahead.

19             MR. STRAPP:  Your Honor, we understand what

20   they want to do with this document is to suggest that

21   this patent wasn't commercially successful because it

22   was valued -- the administrative cost of transfer of

23   ownership is valued at $12,000.  And, respectfully,

24   we'd be willing to withdraw our objection.  We'll put

25   it on through Mr. Farber, and he'll explain what this

228

1   document is about.  He'll also explain after the

2   fact --

3           THE COURT:  So did you withdraw your

4   objection?  I don't need to rule on it?

5           MR. STRAPP:  Yes, we will withdraw our

6   objection.

7           THE COURT:  Okay.  That's good because I was

8   going to overrule it anyway.  So you did well.

9           All right.  371.  What's this?  The English

10  Dictionary?

11          MS. STOLL-DeBELL:  I can talk about this,

12  Your Honor.

13          MR. ROBERTSON:  It's our objection, if you

14  don't mind.

15          MS. STOLL-DeBELL:  Sure.  Go ahead,

16  Mr. Robertson.

17          MR. ROBERTSON:  Thank you.

18          THE COURT:  Well, it's got him to his feet,

19  too.  Holy mackerel.  This must be a hot ticket.

20          MR. ROBERTSON:  I can just stretch my legs is

21  what I'm hoping to do.

22          Yes, Your Honor.  Apparently, Lawson wants to

23  offer into evidence --

24          THE COURT:  What?

25          MR. ROBERTSON:  Apparently, Lawson wants to

1    offer into evidence an excerpt from the Compact Oxford

2    English Dictionary on the term "published."  And from

3    what I can understand from this, the suggestion is

4    that Your Honor may recall that in your Markman

5    ruling, you construed the term "catalog" back in

6    February, I believe it was, after two days of hearing

7    on this.  And at the time when Lawson was arguing that

8    a catalog has to be published by a vendor we had a

9    discussion because I suggested to the Court that that

10   was going to be rife with mischief and that that was

11   going to turn into a non-infringement argument at the

12   time.

13        And I don't think you will recall this, but

14   you then went on to say that if you discover that the

15   suggestion in that catalog was some sort of gotcha for

16   a non-infringement argument.  At the time you said in

17   the context of a summary judgment, but they didn't

18   move for summary judgment on it.  But now what they've

19   done or what they're trying to do is actually

20   introduce a dictionary definition.

21        Why they selected this one dictionary when

22   there are hundreds of dictionaries out there that have

23   "published" I assume is because they like the

24   definition.  But I gather they are trying to suggest

25   that they get a construction of the Court's

1    construction by importing now into it a further

2    discussion of what "published" is.

3              I'm not even certain since it goes on for

4    quite awhile exactly what it is, even in the excerpted

5    version.  But what we have run into now, Your Honor,

6    with this, what I think is a gotcha, is all sorts of

7    suggestions --

8              THE COURT:  What's this last page here?

9              MR. ROBERTSON:  I think that's --

10             THE COURT:  That looks like something from

11   Beowulf or something.

12             MR. ROBERTSON:  I assume that that's the

13   excerpt that they want to get to the jury.  So,

14   obviously, it's hearsay.  Obviously, it's been

15   cherry-picked.  Clearly, it's inappropriate to use a

16   dictionary definition with the jury to construe a

17   court's construction, which is a matter of law.

18             It should be irrelevant.  It should be

19   hearsay.  They should not be able to just select the

20   ones that they want.  But more importantly, Your

21   Honor, and this is an issue I want to raise with you,

22   they are now arguing that the construction published

23   by a vendor that they urge the Court to import into

24   catalog is their non-infringement position, and they

25   have even gone so far as to suggest when

231

1    cross-examining our experts that we'll never know when

2    the item information that is maintained in the

3    database is published by a vendor.   We cannot possibly

4    know it.   Therefore, it's insolubly indefinite.

5           So they argue for you to import this term and

6    suggest that this was the correct construction, and

7    now they're arguing either, We'll never know if it's

8    infringed or it renders the claim so insolubly

9    ambiguous it's indefinite.

10          Now, this was exactly the gotcha, Your Honor,

11   that I was suggesting that was being -- that was

12   occurring that day.   And I think it's inappropriate.

13   The construction doesn't need a construction.   And

14   certainly they shouldn't be able to rely on a hearsay

15   document that they've cherry-picked from dozens of

16   things to urge a construction on the Court's

17   construction.   It's totally inappropriate under the

18   law.   So we have a relevancy objection, too.

19          Now, I think this is so important, Your

20   Honor, that it's going to come up during the course of

21   the trial.   I would like to be able to address this

22   and be able to show you where this is now being used

23   to try and manufacture invalidity and non-infringement

24   arguments that the Court never anticipated, but I was

25   wary about at that time.

1          With respect to this specific exhibit, I

2     would respectfully request that the objection be

3     sustained.   There's no basis for them to be arguing to

4     the jury on the basis of a dictionary definition when

5     the Court has already construed the claim.

6          And I would also suggest, Your Honor, that if

7     this starts to come up, I would like to address this

8     in briefing for Your Honor, that it would be

9     inappropriate to urge a construction on the Court and

10    then argue, Hey, we caught you.   Now it's ambiguous or

11    now you can never prove it's infringed.

12         It has its simple meaning, which I think the

13    Court must understand is you're getting the

14    information from a vendor.   You're getting something

15    like an item ID number or you're getting pricing

16    information, which will be what the evidence is, but

17    it never meant, and the Court's construction couldn't

18    be fairly read to mean that I have to import a CD ROM

19    that loads all the pictures in there or loads all the

20    information, and that's the only way it would be

21    published.

22              THE COURT:   You're published now, aren't you?

23              MR. ROBERTSON:   Publishing?

24              THE COURT:   Right now.

25              MR. ROBERTSON:   By providing you with

1    information?

2         THE COURT:  Yes.  You just published all your

3    thoughts.

4         MR. ROBERTSON:  You know, Your Honor, I think

5    that's essentially what we want.  I don't think it has

6    to have all the baggage they're now suggesting it

7    means.  So I certainly don't think we need a

8    construction of a construction.

9         THE COURT:  Well, that's what they say.

10   "Made generally known, publicly announced or

11   declared."

12        MR. ROBERTSON:  Why would we need a further

13   construction of a construction?  Remember, the Court

14   already ruled on a motion in limine.

15        THE COURT:  You can call a vendor, and the

16   vendor can give you the answer, and he can publish the

17   answer to you over the telephone.

18        MR. ROBERTSON:  I think that's exactly right,

19   Your Honor.  It could be published in a variety of

20   ways.

21        THE COURT:  It can be published really only

22   two ways.

23        MR. ROBERTSON:  How is that, sir?

24        THE COURT:  In writing or verbally.  It can

25   be in writing electronically or on paper.  How many

1  other ways of publishing are there?

2          MR. ROBERTSON:  I can't think of any right

3  now, Your Honor, but I have seen the arguments as to

4  what they think that word has, and it's more than just

5  providing information or disseminating information.

6          With respect to this one exhibit, Your Honor,

7  I certainly don't think it should go back to the jury

8  so they can sit there and figure out how to construe

9  the Court's construction.  That is a matter purely for

10  the Court.

11          MS. STOLL-DeBELL:  Let me start off by saying

12  we intend to use this for impeachment of Dr. Weaver

13  who has a tortured definition of "publish."

14          THE COURT:  What is his definition?

15          MS. STOLL-DeBELL:  He says "publish" means

16  originate.  So if I write a book and don't show it to

17  anyone, he would say that's published by me even if I

18  didn't send it to a publishing house and publicly

19  disseminate it.

20          So I used this definition in his deposition

21  to challenge his view of what "published" means.

22          THE COURT:  That "published" means originate?

23          MS. STOLL-DeBELL:  Yes.

24          THE COURT:  You're going to have a lot of fun

25  with him, aren't you?

1      MS. STOLL-DeBELL:  I don't think so, yes,

2  Your Honor.  But we don't intend to send this back to

3  the jury.  It's impeachment.  We can withdraw it.

4      THE COURT:  That would be a good thing.

5      MS. STOLL DeBELL:  We're not claiming the

6  claim is indefinite for the word "catalog" either.  I

7  wasn't following what his argument was.

8      THE COURT:  Were you working on a gotcha?

9      MS. STOLL-DeBELL:  To the extent that I'm

10  trying to win this case, Your Honor, yes, I intend to

11  --

12      THE COURT:  The exhibit is withdrawn.

13      That takes care of all your exhibits, right?

14      MS. STOLL-DeBELL:  Yes.

15      THE COURT:  What else is left to do here so

16  we can decide how we're going to handle things

17  tomorrow?

18      MR. ROBERTSON:  A couple housekeeping matters

19  I'd like to address tomorrow, Your Honor, but we have

20  the depositions.  I think some time well spent would

21  be -- we've had some discussions about perhaps just

22  having the Court rule --

23      THE COURT:  About what?

24      MR. ROBERTSON:  Just having the Court rule on

25  papers that have been submitted with some of the

236

1  objections to the deposition testimony.  I think there

2  are --

3          THE COURT:  Did you do what I told you to do,

4  which is give me a marked transcript that has them?

5          MR. ROBERTSON:  Yes, sir.

6          THE COURT:  We're going to sit down and go

7  through the objections tomorrow.  If I have to do it,

8  you have to do it.

9          MR. ROBERTSON:  That's fair enough, Your

10  Honor.

11          There were some other issues I'd like to

12  raise with you, housekeeping matters, tomorrow, but

13  one of the things that Mr. McDonald asked me to do

14  during one of the recesses was to make a

15  representation to the Court that to the best of our

16  knowledge this document we handed up to you today,

17  this outline of Lawson's objections to ePlus'

18  exhibits, which we created, it faithfully incorporated

19  all of Lawson's objections.

20          We believe it does.  We've had some time to

21  try and check and confirm, but I told Mr. McDonald

22  that if we omitted one of their objections to our

23  exhibits, that I would meet with him and try to

24  resolve it, and if not, we'll bring it promptly to the

25  Court's attention.

237

1          THE COURT:  That will be fine.  We're dealing

2   with a lot of things.  If we have a problem, we'll

3   deal with them.

4          You-all need to come get your book of

5   exhibits.  These belong to Ms. Stoll-DeBell.  Leave my

6   stuff right here on my desk if you will.

7          We will see you-all in the morning at 11.

8          MR. ROBERTSON:  You said 9:30, Your Honor.

9          THE COURT:  9:30 is a criminal matter.  Would

10  you like to come over for that?

11          All right.

12

13          (The proceedings were adjourned at 5:31 a.m.)

14

15          I, P.E. Peterson, certify that the foregoing

16  is a true and accurate transcription of my

17  stenographic notes.

18                    /s/                    10/04/10
                _____    _____
19                P.E. PETERSON, RPR, CCR      DATE

20

21          I, Diane J. Daffron, certify that the

22  foregoing is a true and accurate transcription of my

23  stenographic notes.

24
                      /s/                    10/04/10
                _____    _____
25                DIANE J. DAFFRON, RPR, CCR    DATE