# EXHIBIT B

**Page 1**

```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
        (Richmond Division)
ePLUS, inc.,
        Plaintiff,
  -against-              Civil Action No.
                         3:09-cv-620(JRS)
LAWSON SOFTWARE, INC.,
        Defendant.

            June 10, 2010
            10:44 a.m.

    Videotaped Deposition of LAURENE McENENY,
taken pursuant to Subpoena, at the offices of
Goodwin Procter LLP, 620 Eighth Avenue, New
York, New York, before ERIC J. FINZ, a Shorthand
Reporter and Notary Public within and for the
State of New York.

JOB NO.: 24-180169
Pages: 1 - 233
```

**Page 2**

```
APPEARANCES:
    GOODWIN PROCTER LLP
      Attorneys for Plaintiff
        Exchange Place
        Boston, Massachusetts 02109

    BY:  SRIKANTH K. REDDY, ESQUIRE

        -AND-

    GOODWIN PROCTER LLP
        901 New York Avenue, Northwest
        Washington, DC 20001

    BY:  SCOTT L. ROBERTSON, ESQUIRE

    MERCHANT & GOULD
      Attorneys for Defendant
        80 South Eighth Street
        Minneapolis, Minnesota 55402

    BY:  RACHEL C. HUGHEY, ESQUIRE


    MARCUS BRODY FORD KESSLER & SAHNER LLC
      Attorneys for the Witness
        5 Becker Farm Road
        Roseland, New Jersey 07068
    BY:  TODD M. SAHNER, ESQUIRE


ALSO PRESENT:

    DOUGLAS HUEBNER, Videographer
```

**Page 3**

THE VIDEOGRAPHER: This is the video operator speaking, Douglas Huebner of Merrill Legal Solutions. Today is June 10, 2010, and the time is 10:44.

We are at the offices of Goodwin Procter, 620 Eighth Avenue, New York, New York, to take the video deposition of Laurene McEneny, in the matter of ePlus, Inc. versus Lawson Software, Inc., in the United States District Court, Eastern District of Virginia, Richmond Division, Case No. 3:09-cv-620.

Will counsel please introduce themselves for the record.

MR. REDDY: Srikanth Reddy from the law firm of Goodwin Procter on behalf of the plaintiff ePlus, Inc.

MR. ROBERTSON: Scott Robertson from Goodwin Procter for plaintiff.

MS. HUGHEY: Rachel Hughey from Merchant & Gould for defendant Lawson Software.

MR. SAHNER: Todd M. Sahner from Marcus Brody on behalf of the witness.

THE VIDEOGRAPHER: Will the court

**Page 4**

reporter please swear the witness.

L A U R E N E   M c E N E N Y, having been first duly sworn by the Notary Public (Eric J. Finz), was examined and testified as follows:

EXAMINATION BY
MR. REDDY:

Q. Good morning. Would you please state your full name for the record?

A. **My name is Laurene Jean, maiden name, which I used in business is Fielder, and my married name is McEneny.**

Q. Do you have a preference of Ms. McEneny versus Ms. Fielder?

A. **That's fine.**

Q. I'll try to make sure I get that correct. I was hoping you'd say Fielder.

A. **Before we sold the company I would have, but now I'm officially a one name person here.**

Q. My name is Srikanth Reddy, I represent the plaintiff in this matter, ePlus, Inc.

Ms. McEneny, do you understand that your answers today are being given under oath

Page 5

1  and that you are under the same obligation as
2  you would have been in court to answer
3  truthfully and completely?
4      A.   Yes.
5      Q.   And have you ever given a
6  deposition before?
7      A.   No.
8      Q.   And so in that case I'll go over
9  some different rules, and if at any time you
10 have any questions about the process or anything
11 you should certainly feel free to ask those. If
12 any of my questions are unclear just let me know
13 and I'll try to clarify them.
14          Will you do that?
15     A.   Sure.
16     Q.   If you need to take a break at any
17 time, just let me know. I may ask you to wait
18 if we are in the middle of a question, but
19 otherwise we'll certainly take a break if you
20 need to.
21         Do you understand that?
22     A.   Um-hum.
23     Q.   And because the court reporter is
24 typing all the questions and all the responses,
25 he generally needs an audible response. So

Page 6

1  um-hum --
2      A.   Yes.
3      Q.   -- as opposed to yes, might be a
4  little bit more helpful. Thank you.
5          Are you taking any medication or
6  drugs that would affect your ability to answer
7  questions truthfully and accurately here today?
8      A.   No.
9      Q.   Is there any reason that you feel
10 you would not be able to give truthful answers
11 to my questions today?
12     A.   No.
13     Q.   Your counsel, Mr. Sahner, who I
14 understand is Mr. Sahner, he may object from
15 time to time. But unless he specifically
16 instructs you not to answer one of my questions,
17 I expect you to answer my question.
18         Do you understand that?
19     A.   Yes.
20     Q.   And the court reporter here, again,
21 he needs to take down everything we say. So he
22 can't take down nonverbal responses or shakes of
23 your head. So just make sure that you verbally
24 respond to each of my questions. Do you
25 understand that?

Page 7

1      A.   Yes.
2      Q.   And are you represented by counsel
3  here today?
4      A.   Yes.
5      Q.   And who is that representing you?
6      A.   Todd Sahner.
7          MR. REDDY: Ms. McEneny, I'm
8  handing to the reporter what I would like
9  him to mark as Exhibit No. 1.
10         (McEneny Exhibit 1 for
11 identification, Subpoena.)
12     Q.   You can take a couple, however much
13 time you need to familiarize yourself with that
14 document. And look up at me after you've had a
15 chance to do so.
16     A.   Is this the one that was sent to me
17 originally, or is this something different?
18     Q.   It should fairly and accurately
19 depict what was sent to you. Perhaps if you
20 want to take a look just to confirm.
21     A.   This looks identical.
22         Okay.
23     Q.   So have you seen this document
24 before?
25     A.   I believe this is the same document

Page 8

1  that I was given when I was subpoenaed.
2      Q.   And if I can direct your attention
3  to page number 7. The heading says "schedule A,
4  documents."
5      A.   Um-hum.
6      Q.   Do you see that there are five
7  requests for production listed there?
8      A.   Yes.
9      Q.   And have you produced documents in
10 response to this subpoena?
11     A.   Yes, I have.
12     Q.   And what did you produce?
13     A.   Can I look? I brought a file of
14 what I sent you. Is that okay?
15     Q.   Yes, that's appropriate, sure.
16     A.   I mailed to you a letter, let's
17 see, all documents provided to Lawson, so
18 basically I sent a letter. And it had the --
19 some email correspondence with Rachel Hughey.
20 And a copy of an engagement letter that they had
21 sent. And, let's see what else was in here.
22         And also I sent a USB, a ScanDisk
23 with some attachments that Rachel had sent,
24 which was a subpoena that their firm had sent me
25 a letter, the SAP trial transcript, day one and

Page 9

1  day two, and -- so basically the content of what
2  she sent.
3      Q.   I don't mean to interrupt you, but
4  perhaps to speed the process along, I can
5  represent that all the documents you produced to
6  us have been produced in this litigation and
7  given to Lawson Software. I kind of wanted to
8  go through the specific requests that were made.
9           Have you provided any documents to
10 Lawson during the course of this litigation?
11     A.   The only things, I gave you
12 everything I would have given them.
13     Q.   And are there any existing
14 agreements or contracts between you and the
15 defendant Lawson Software?
16     A.   No.
17     Q.   And have you invoiced or billed
18 Lawson Software for anything with regards to
19 this litigation?
20     A.   No.
21     Q.   And has Lawson provided any
22 documents to you during the course of this
23 matter?
24     A.   Only the things I've given you.
25     Q.   And did you review the documents

Page 10

1  that Ms. Hughey sent to you during the course of
2  the litigation?
3      A.   I did read it briefly. I haven't
4  studied it.
5      Q.   And do you recall specifically what
6  documents she had sent you?
7      A.   She sent me, basically my testimony
8  from the original trial, which was the ePlus/SAP
9  trial. So I did read through that.
10     Q.   Do you know why she sent you those
11 specific documents?
12     A.   No, not really.
13     Q.   Did you have any conversations or
14 any discussions with anybody from Lawson
15 Software or the law firm of Merchant & Gould
16 with regards to this litigation?
17     A.   Other than what I shared. I mean,
18 Rachel contacted me, which I summarized our
19 conversation for you and provided that. They
20 asked if I would be interested in being an
21 expert witness, and I indicated I'm not.
22     Q.   And other than the conversations
23 that were summarized in the documents that you
24 provided, were there any other conversations or
25 discussions that you had with Ms. Hughey or any

Page 11

1  other attorney from the Merchant & Gould law
2  firm or from anybody from Lawson Software with
3  regards to this matter?
4      A.   Everything that's happened has been
5  documented and provided to you.
6      Q.   Have you had any conversations with
7  anybody concerning the patents that are at issue
8  in this matter?
9      A.   When you say anybody, my husband,
10 yeah, we've talked about it.
11     Q.   Other than your husband, have you
12 had discussions with anybody with regards to the
13 patents that are at suit in this litigation?
14          THE WITNESS: Does that include our
15     conversation?
16          MR. SAHNER: Our conversations are
17     privileged.
18     A.   Then no.
19     Q.   I'm not asking about the specific
20 subject matter of anything you may have
21 discussed with your counsel. But are you
22 familiar with the patents that are at suit in
23 this litigation?
24     A.   I read them very carefully years
25 ago. I have not looked at them. I only looked

Page 12

1  at my testimony.
2      Q.   And when you say that you read them
3  carefully, how many patents are you referring
4  to?
5      A.   I don't really recall how many
6  patents were in question. This was a few years
7  ago when I was involved in the ePlus versus SAP
8  case.
9      Q.   When you say those patents, are you
10 referring to the patents that were at suit in
11 the SAP litigation?
12     A.   Correct.
13     Q.   Were there any patents other than
14 those patents that were at suit in the SAP
15 litigation assigned to ePlus that you reviewed?
16     A.   No.
17     Q.   Now, when you say that you
18 discussed the patents in suit with your husband,
19 what was the general substance of those
20 conversations?
21          MR. SAHNER: I just want to caution
22     the witness, your discussions with your
23     husband are privileged. What that means is
24     that you don't have to disclose what you
25     said, but you can disclose just the general

21

1   Q.   Just here testifying today, do you
2   recall the specific functionality that might
3   have been added from version 1 to version 12?
4   A.   I remember some of it.
5   Q.   Now, you testified that you no
6   longer are employed by or have any interest with
7   P.O. Writer -- I'm sorry, with Purchasing Net;
8   correct?
9   A.   Correct.
10  Q.   Have you retained any documents
11  from either Purchasing Net or American Tech that
12  were generated while you were affiliated with
13  those two companies?
14  A.   I probably have a few things. Some
15  files. I have kept a couple of folders on
16  customers, you know, we were working with just
17  to make sure if anybody had any questions that
18  they wanted to call me, you know, they could.
19  So just trying to be helpful to the staff that
20  was left behind. We sold the company, so still
21  felt some responsibility to the people.
22  Q.   So other than the customer folders,
23  are you aware of any other documents that you
24  might have retained from Purchasing Net?
25  A.   You know, I'm not really sure, we

22

1   do have some things in the garage. And the
2   reason is Tim is writing a book, and I know he
3   saved some things. But I honestly don't know
4   what he has specifically.
5   Q.   Now, I think you testified that
6   version 1 of the P.O. Writer software was
7   released in 1984; correct?
8   A.   I believe that's correct.
9   Q.   Do you recall when the second
10  version of P.O. Writer was released?
11  A.   Probably about a year later, but I
12  don't know the exact date.
13  Q.   So during that time frame, the
14  company was known as American Tech, correct?
15       So in general I'll try to refer to
16  it as American Tech for the company that you and
17  your husband started, which became Purchasing
18  Net in 2000 and which you subsequently sold in
19  2009.
20  A.   Um-hum.
21  Q.   Does that make sense?
22  A.   That's fine.
23  Q.   And if you have any questions at
24  any time as to what entity I'm referring to, you
25  could certainly feel free to ask.

23

1   A.   To me it would be the same, it was
2   just a name change.
3   Q.   Did American Tech have a general
4   policy with regards to the schedule by which it
5   would release different versions of the P.O.
6   Writer project?
7   A.   Generally we did one major release
8   per year.
9   Q.   So between 1984 and 1995, that's
10  twelve years actually, correct? I'm sorry, I'll
11  withdraw that question as well.
12       So the twelve DOS versions of the
13  P.O. Writer software, were each of those
14  versions released between 1984 and 1995?
15  A.   Yes.
16  Q.   Now, if I can start with -- I'm
17  sorry, so I think you testified that version
18  number 2 was released in 1985; correct?
19  A.   I'd have to double-check, but that
20  sounds right.
21  Q.   Was version 3 -- when was version 3
22  released then?
23  A.   Generally they would be one major
24  release per year. That was the general
25  practice. So if you ask me about 3 then 4 then

24

1   5, they kind of fall along that line. It was
2   the general practice to try and do that.
3   Q.   Now, when was version 10 of the
4   P.O. Writer product released?
5   A.   It was released in the -- well, can
6   I check my notes? I want to double-check to
7   make sure I get this right.
8   Q.   Sure.
9   A.   Should be '83, but let me just
10  double-check.
11       Yes, '83. I'm sorry, '93.
12  Q.   When you say you were checking your
13  notes, the notes you were checking was your
14  testimony from the SAP case; is that correct?
15  A.   That's right.
16  Q.   Now, other than your testimony from
17  the SAP case, is there anything else that you
18  have to corroborate that version 10 of the P.O.
19  Writer product was released in 1993?
20  A.   No. Just everything I testified to
21  originally would still be true.
22       MR. REDDY: I'm handing to the
23  reporter what I'll ask him to mark as
24  McEneny Exhibit No. 2.
25       (McEneny Exhibit 2 for

**89**

1  that there was not a prohibition against
2  duplication of either the software or the
3  manuals with respect to the trial version of the
4  software?
5         MS. HUGHEY: Objection; asked and
6  answered.
7      A.   Yeah, I think I've already answered
8  that.
9      Q.   What was your answer?
10     A.   My answer is I believe that it was
11 most probable that there was some kind of
12 wording to protect us on that. But I couldn't
13 say for sure unless I had the agreement in front
14 of me.
15     Q.   If I could return for a moment to
16 Exhibit No. 2, which was I believe the guided
17 tour.
18     A.   Okay. Got it.
19     Q.   And the page which we've been
20 referring to as L 126664. Which were the
21 results from the purchase requisitioning
22 section.
23     A.   Okay.
24     Q.   So if a user selected an item from
25 this list, at this point was there any way that

**90**

1  a user could cross-reference this item with
2  other items in the P.O. Writer database?
3         MS. HUGHEY: Objection; vague.
4      Q.   You can answer if you understand
5  the question.
6      A.   On this screen, they're looking at
7  a list of items that match their search
8  criteria. If they were to select the
9  combination, the ship forward to look for
10 additional information, that's shown on the next
11 page, the 665.
12        The only way in this version that
13 they could cross-reference is if they chose, as
14 a customer, to implement the user defined fields
15 or to provide additional information in the
16 extended description area as to what a
17 cross-reference might be. So that would
18 strictly be how that particular customer might
19 have chosen to implement the product.
20     Q.   And as we discussed earlier, that
21 additional line information, the user defined
22 fields within the additional line information,
23 was entirely up to the user to enter whatever
24 information they wanted to in those fields;
25 correct?

**91**

1      A.   That's correct.
2      Q.   And those user defined fields could
3  not have been searched in the version 10 of the
4  P.O. Writer Plus system; correct?
5         MS. HUGHEY: Objection;
6  mischaracterizes the witness' testimony.
7      A.   The user defined fields could not
8  be searched to do an item look up. And to my
9  knowledge, and based on what's in this document,
10 they couldn't be searched in this version.
11 That's my understanding after looking at this
12 document.
13        So they were there for reference.
14     Q.   You can set that document aside.
15        (McEneny Exhibit 5 for
16 identification, document entitled "Tenth
17 Edition," production numbers L 126501
18 through L 126513.)
19        MR. REDDY: I've handed a document
20 to be marked as Exhibit No. 5, which is a
21 document Bates labelled L 126501 through
22 126513. And at the top it states "tenth
23 edition," in parentheses, April 1993.
24     Q.   If you can take a few moments to
25 familiarize yourself with that document.

**92**

1         And do you recognize the collection
2  of approximately twelve pages of documents?
3      A.   Yes, I recognize these as pages
4  from the purchasing manual at that point in
5  time.
6      Q.   Now, when you say that point in
7  time, what are you referring to?
8      A.   Spring of '93.
9      Q.   And is that referring to version 10
10 of the P.O. Writer Plus software?
11     A.   That's correct. This specifically
12 would be relating to the purchasing module.
13     Q.   Now, if I can direct your attention
14 to the third page of the document. It states
15 "no part of this work may be reproduced or used
16 in any way for or by any means, graphic,
17 electronic or mechanical, including
18 photocopying, recording, taping or information
19 storage and retrieval systems, without express
20 permission from American Tech, Inc."
21        Did I read that correctly?
22     A.   Yes.
23     Q.   Now, was that prohibition against
24 copying of the manual placed on every manual
25 sent by American Tech with respect to version 10

VIDEOTAPED DEPOSITION OF LAURENE McENENY
CONDUCTED ON THURSDAY, JUNE 10, 2010

32 (Pages 125 to 128)

### Page 125

1        (Lawson Exhibit 102 for
2    identification, document, production
3    numbers L 0126482 through L 0126500.)
4    Q.   I'm handing you what's been marked
5  Lawson Exhibit 102.  Bates range L 0126482 to
6  500.
7        Do you recognize this document?
8    A.   I do.
9    Q.   What is this document?
10   A.   **This is the users manual for our
11  EDI interface.**
12   Q.   And again, do you see on the front
13  of the page that it says version 10.0?
14   A.   Yes.
15   Q.   Does this accurately represent the
16  product that was sold to customers prior to
17  August 10, 1993?
18   A.   Yes.
19   Q.   Is this a document that was
20  provided to customers prior to August 10, 1993?
21   A.   Yes.
22   Q.   You can put that aside.
23        (Lawson Exhibit 103 for
24    identification, document, production
25    numbers L 0126501 through L 0126513.)

### Page 126

1    Q.   I'm handing you what's been marked
2  Lawson Exhibit 103.  The Bates range is L
3  0126501 to L 0126513.
4        Do you recognize this document?
5    A.   Yes, I do.
6    Q.   What is it?
7    A.   **It's the section of the purchasing
8  manual for P.O. Writer Plus.**
9    Q.   Does this accurately represent the
10  product that was sold to customers prior to
11  August 10, 1993?
12   A.   Yes.
13   Q.   Is this a document that was
14  provided to customers prior to August 10, 1993?
15   A.   Yes.
16   Q.   And do you see the page L 0126501,
17  it says tenth edition, April 1993, software
18  revision 10.0?
19   A.   Yes.
20   Q.   Is that consistent with what you've
21  already told me about the other documents we've
22  discussed?
23   A.   Yes.
24   Q.   Okay.  You can put that aside.
25        (Lawson Exhibit 104 for

### Page 127

1    identification, Subpoena.)
2    Q.   I'm handing you what's been marked
3  Lawson Exhibit 104.  It is not a manual.  I'm
4  going a little bit out of order because I wanted
5  to preserve the numbering of my documents.
6        Do you recognize that document?
7    A.   Yes, I do.
8    Q.   What is this document?
9    A.   **This was the subpoena emailed to me
10  by you to appear here today.**
11   Q.   Okay, I have no further questions
12  on that document.
13        (Lawson Exhibit 105 for
14    identification, document, production
15    numbers L 0126702 through L 0126717.)
16   Q.   I'm handing you what's been marked
17  Lawson Exhibit 105.  It's Bates number L 0126702
18  to L 0126717.
19        Do you recognize this document?
20   A.   I do.
21   Q.   What is this document?
22   A.   **The users manual for the P.O.
23  Writer Plus fax module.**
24   Q.   Does this accurately represent the
25  product that was sold to customers prior to

### Page 128

1  August 10, 1993?
2    A.   Yes.
3    Q.   Is this a document that's provided
4  to customers prior to August 10, 1993?
5    A.   Yes.
6    Q.   Okay, I have no further questions
7  on that document.
8        MR. SAHNER:  Can we go off the
9    record for one second.
10       THE VIDEOGRAPHER:  Going off the
11   record at 2:44.
12       (Discussion off the record.)
13       THE VIDEOGRAPHER:  Back on the
14   record, 2:45.
15       (Lawson Exhibit 106 for
16   identification, document, production
17   numbers L 0127297 through L 0127504.)
18  BY MS. HUGHEY:
19   Q.   I'm going to hand you what's been
20  marked Lawson Exhibit 106.  It's marked L
21  0127297 to L 0127504.
22       Do you recognize this document?
23   A.   Yes, I do.
24   Q.   What is this document?
25   A.   **It's the users manual for the P.O.**