
# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| ePLUS, INC., | ) |
| | ) |
| | ) Civil Action No. 3:09-cv-620 |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| LAWSON SOFTWARE, INC. | ) |
| | ) |
| | ) |
| Defendant. | ) |

# REPORT OF EXPERT MICHAEL I. SHAMOS, PH.D, J.D. <u>CONCERNING INVALIDITY</u>

### The J-CON system

195. During reexamination of all three patents-in-suit, the Patent Office found that the J-CON Manual qualifies as prior art. (*See, e.g.,* Final Rejection in the '683 Patent Reexamination at 4-8; '516 Reexam Order at 14-15; Non-Final Rejection in the '172 Patent Reexamination at 7).

196. The J-CON Manual describes an electronic-sourcing system, the J-CON ("Jobber-Connection") system, that was designed for use in the operation and management of automotive parts stores (automotive parts stores were called "Jobbers" in the J-CON literature). The J-CON system maintained a library of automotive parts catalogs from many sources in an electronic database, portions of which could be selected and searched for a desired automotive part. (The J-CON Manual at Ch. 3, Sec. 2, Pages 1 & 11 & Ch. 5, Sec. 3, Page 1; Final Rejection in the '683 Patent Reexamination at 10 & 33; Non-Final rejection in the '172 Patent Reexamination at 22).

197. Upon selection of desired parts from database search results, the J-CON system could transfer the relevant automotive parts information for the selected parts from the database onto an electronic requisition (called a "ticket" in the J-CON literature). (The J-CON Manual at Ch. 3, Sec. 2, Pages 1, 4 & 8-9; Final Rejection in the '683 Patent Reexamination at 11-12 & 34; Non-Final rejection in the '172 Patent Reexamination at 23). For a selected item on the requisition, the J-CON system could electronically determine the current availability in the inventory of the automotive parts store, any sister stores associated with the automotive parts store, and/or independent distributors to the automotive parts store. (The J-CON Manual at Ch. 2, Sec. 10, Page 15 & Ch. 3, Sec. 2, Pages 6 & 10; Final Rejection in the '683 Patent Reexamination at 13 & 34; Non-Final rejection in the '172 Patent Reexamination at 25-26).

198. The J-CON system user could determine the price of parts from data maintained in its local automotive parts database and/or by electronically communicating with its distributor(s). (The J-CON Manual at Ch. 3, Sec. 2, Page 4; Non-Final rejection in the '172 Patent Reexamination at 25).

199. The J-CON system could perform a cross-referencing or converting of data relating to an item on the requisition to determine an alternative source for the same item and/or

an acceptable substitute for the item initially selected. (The J-CON Manual at Ch. 3, Sec. 2, Pages 6 & 11 & Ch. 3, Sec. 4, Pages 1-5; Final Rejection in the '683 Patent Reexamination at 13-14 & 35-36; Non-Final rejection in the '172 Patent Reexamination at 25-26).

200. Finally, the J-CON system could generate multiple purchase orders from a single requisition. (The J-CON Manual at Ch. 4, Sec. 3, Page 1 & Ch. 4, Sec. 4, Pages 1-7; Final Rejection in the '683 Patent Reexamination at 12; Non-Final rejection in the '172 Patent Reexamination at 23-24).

201. The J-CON Manual was not cited by the applicant or considered by the Examiner during prosecution of the patents-in-suit.

202. In the '516 Reexam Order, the Patent Office found "the J-CON Manual raises a substantial new question with respect to claims 1-29 of the '516 Patent. With respect to claim 16 of the '516 Patent, the J-CON Manual is seen to teach of a converting means for converting data relating to an item from a first catalog to data relating to an item from a second catalog [see Ch. 2, Sec. 1, Page 2, wherein "Interchange is J-CON's electronic cross-reference for parts ..."; also see Ch. 3, Sec. 1, Page 1, wherein "Interchange cross-references parts in lines you don't stock (called competitive parts) to parts in lines you do stock (called Interchange parts)." With these sections, the J-CON Manual can be interpreted as converting data relating to an item from a first catalog to data relating to an item from a second catalog, as required in claim 16. Further, as noted above, this feature was the only feature mentioned in the original prosecution to be that of allowable subject matter for each of the claims. Therefore, the J-CON Manual is seen to raise a substantial new question of patentability that was not present in the prosecution of the application which became the '516 Patent. Further, there is a substantial likelihood that a Page 17 reasonable examiner would consider this teaching important in deciding whether or not the claims are patentable. Accordingly, the J-CON Manual raises a substantial new question of patentability as to claims 1-29, which question has not been decided in a previous examination of the '516 Patent." ('516 Reexam Order at 15-16).

most part straightforward and providing communication between the two was well within the capability of one of ordinary skill in the art. (ePLUS0221672-1693; ePLUS0214243-4265). Most of the time and work that was done on the interface was directed to optimizing the connection to achieve the desired performance and speed, or otherwise enhance or add features. However, none of these changes relate to the limitations of the claims at issue. The changes that were made to each of these systems were not radical and the systems when combined were not dramatically different from what they were before they were combined. In other words, they were the minor, obvious types of changes that are typically required when combining two programs to operate together. Several of these changes related not to making the systems work together, but rather to making the combined system work faster and better. However, such performance improvements are not part of the claimed invention, and thus are irrelevant to the obviousness issue. The most-time consuming part of the process was scanning in Fisher's 2000 page catalog and then cleaning up and formatting the scanned material and building in additional type of searching capabilities into TV/2, such as Boolean and sub-set searches. None of these specific details are required by the asserted claims. Building the interface, which was actually between three systems (TV/2, RIMS, and SPS), was estimated to take about 200 hours, which was a small fraction of the total time spent to build Fisher's sourcing system. (ePLUS0214259-4263). The fact that the process of building the commercial embodiment of the claimed invention was straightforward further supports obviousness.

### The Combination of RIMS Plus Dworkin '940 Renders the Asserted Claims Obvious

223. It is my opinion that RIMS as disclosed in the '989 patent anticipates all the Asserted Claims.

224. To the extent that RIMS as disclosed in the '989 patent is not deemed to anticipate any Asserted Claim, it is my opinion that such claim would have been obvious in view of the combination of the Fisher RIMS system as described in the '989 patent and the RIMS brochure together with the Dworkin '940 patent. Such a combination teaches all of the elements of asserted claims 3, 6, 26, 28, and 29 of the '683 patent, asserted claims 1, 2, 6, 9, 21, 22, and 29

of the '516 patent, and asserted claim 1 of the '172 patent as shown in Exhibits 3 and 4). As such, the combination RIMS and the '940 patent renders these claims invalid under 35 U.S.C. §103.

225. One of skill in the art would have been motivated to combine the Fisher RIMS system with the '940 patent. The alleged improvement of RIMS over prior art sourcing systems was its ability to track just-in-time (JIT) inventory. '989 patent, 1:49-50. It therefore teaches combining inventory tracking with prior art sourcing systems.

226. The RIMS system allowed a user to purchase goods offered by plurality of sources (for example, Fisher and Promega as described above and as set forth in detail in Exhibit 3). However, I understand that in trying to distinguish the asserted claims from the RIMS system, ePlus will argue that the RIMS system was actually a "single source system" – that is, it allowed the customer to purchase only from the distributor that ran the RIMS system. While I disagree that RIMS was a "single source system" and dispute that the asserted claims require purchases to be made from different entities as interpreted by ePlus, it is my opinion that even if these were true, there was reason to combine the so-called single source system of RIMS with the '940 patent, which disclosed a system that "assists a user with locating and purchasing goods or services sold by a plurality of vendors." ('940 patent, Abstract.)

227. By 1988, there were over fifty different automated order-entry/material management systems in the marketplace. (L0343536). As order efficiency decreased and logistical costs increased with multiple, incompatible systems, customers became interested in multi-vendor systems. (L0343536-537; L0340565). A multi-vendor system could reduce logistical costs by 10% and provide the advantages of consolidated data. (L0340565). Consolidating information about multiple vendors removed the need for customers to consult hundreds or thousands of vendor catalogs to find the best price for an item. ('940 patent, 1:14-60.) Baxter Healthcare offered a multiple-vendor electronic sourcing system in the late-1980s, years before the patents-in-suit were filed. Thus, even if the Fisher RIMS system as described in

SHAMOS EXPERT REPORT ON INVALIDITY                         CASE NO.3:09cv620

the '989 patent was single-source and the asserted claims require purchases from multiple sources, market pressure would provide a motivation to combine RIMs with the '940 patent.

228.  During prosecution of the '683 and '516 patents, the Patent Office found that the '940 disclosed all of the claim elements except: 1) converting items found in one vendor's catalog to another vendor; and 2) searching only portions of a catalog database. During the prosecution of the '172 patent, the Applicant argued that Dworkin did not teach a single requisition that could include multiple items and be sourced to different vendors. It is my opinion that the RIMS system teaches these missing elements (as described more fully in Exhibits 3 and 4). Additionally, the '940 patent at least implicitly recognized a need to search a subset of the database – it required a user to first select a category of items to search (hardware vs. software). Thus, it would have been obvious to combine the teaching of RIMS that allowed users to search portions of the RIMS database (see exhibit 3). Further, the '940 patent recognized that items might have two product numbers (a number identifying the product in the database and a manufacturer's model number), thus it would have been obvious to combine the '940 patent with the cross-reference table in RIMS to associate these different numbers together. Finally, to the extent that the '940 patent is deemed not to teach a single requisition that could include multiple items and generate multiple purchase orders (I believe it does teach this element as shown in Exhibit 3), it would have been obvious to combine it with RIMS which teaches multiple purchase orders from a single requisition ('989 patent, Fig. 5A).

### The Combination of J-CON Plus Dworkin '940 Renders the Asserted Claims Obvious

229.  It is my opinion that J-CON anticipates all the Asserted Claims.

230.  To the extent that J-CON is not deemed to anticipate any Asserted Claim, it is my opinion that such claim would have been obvious in view of the combination of J-CON with the Dworkin '940 patent. The combination teaches all of the elements of asserted claims 3, 6, 26, 28, and 29 of the '683 patent, asserted claims 1, 2, 6, 9, 21, 22, and 29 of the '516 patent, and asserted claim 1 of the '172 patent as shown in Exhibits 3 and 4). As such, the combination of J-Con and the '940 patent renders these claims invalid under 35 U.S.C. §103.

231. One of skill in the art would have been motivated to make the combination because

232. One of skill in the art would also have been motivated to make the combination because the '940 patent states, "It is another object to provide a system and method which facilitates the processing of orders for goods or services transmitted by a user." 3:9-11. This capability is provided by J-CON.

233. Furthermore, the '940 patent provided the multi-source capability demanded by the industry at and before the time of the invention.

234. Additionally, the J-CON system included features that one or ordinary skill in the art would have been motivated to use with the '940 invention, including the ability to electronically determine the current availability in the inventory at multiple locations, to perform a cross-referencing of data relating to an item on a requisition to determine an alternative source for the same item and/or an acceptable substitute for the item initially selected, and the ability to generate multiple purchase orders from a single requisition (as described above and in detail in Exhibit 3).

### The Combination of J-CON and P.O. Writer Renders the Asserted Claims Obvious

235. It is my opinion that J-CON anticipates all the Asserted Claims. It is also my opinion that P.O. Writer anticipates all of the asserted claims.

236. To the extent that J-CON and/or P.O. Writer are not deemed to anticipate any Asserted Claim, it is my opinion that such claim would have been obvious in view of the combination of J-CON with P.O. Writer. The same reasons for making the previous two combinations apply to combining the J-CON system as described in the "J-CON Manual" with P.O. Writer Plus V. 10 as described in the P.O. Writer Plus Manual. The P.O. Writer Plus V. 10 system provided the multi-vendor capability demanded by the industry at and before the time of the invention. The J-CON system included features that one or ordinary skill in the art would have been motivated to use with the PO Writer system, including additional details about

performing a cross-referencing of data relating to an item on a requisition to determine an alternative source for the same item and/or an acceptable substitute for the item initially selected.

### The Combination of J-CON and Gateway Renders the Asserted Claims Obvious

237. It is my opinion that J-CON anticipates all the Asserted Claims. It is also my opinion that the Gateway 2000/MRO system anticipates all of the asserted claims.

238. To the extent that J-CON and/or Gateway are not deemed to anticipate any Asserted Claim, it is my opinion that such claim would have been obvious in view of the combination of J-CON with Gateway. The same reasons for making the previous three combinations apply to combining the J-CON system with the Gateway system.

239. Additionally, the J-CON system had a sophisticated system for keeping track of equivalent items, dividing them into "Replaced Parts," "Substitute Parts," and "Can-Use Parts" and a number of different methods of converting among item numbers and substituting alternate parts that one of ordinary skill would have been motivated to use with the Gateway system. (See, e.g., L0124837; L0123551). Similarly, the Gateway Manual discloses in detail how to select a subset of catalogs from a collection of catalogs and then limit a search for items to the selected subset of catalogs, which one of ordinary skill would have been motivated to use with J-CON system. (See, e.g., SAP_2531709-10, SAP_2531615-16, L0128380).

### Secondary Considerations

240. I understand that ePlus contends that secondary considerations demonstrate that the invention is not obvious. (See, e.g., "Plaintiff ePlus Inc.'s First Supplemental Answers and Objections to Defendant Lawson Software, Inc.'s Second Set of Interrogatories" (hereinafter, "Rog. 6").) I understand that ePlus will allege commercial success, demand for the patented product, and praise by others. While I reserve the right to reply to these arguments after I have reviewed ePlus's expert report, the evidence ePlus intends to present (as I currently understand it) does not demonstrate a nexus between these secondary considerations and the claimed invention.