# EXHIBIT C

## Page 1

```
 1        UNITED STATES DISTRICT COURT
 2        EASTERN DISTRICT OF VIRGINIA
 3              (Richmond Division)
 4   ePLUS, inc.,
 5              Plaintiff,
 6   -against-           Civil Action No.
 7                       3:09-cv-620(JRS)
 8   LAWSON SOFTWARE, INC.,
 9              Defendant.
10
              June 10, 2010
11            10:44 a.m.
12
13        Videotaped Deposition of LAURENE McENENY,
14   taken pursuant to Subpoena, at the offices of
15   Goodwin Procter LLP, 620 Eighth Avenue, New
16   York, New York, before ERIC J. FINZ, a Shorthand
17   Reporter and Notary Public within and for the
18   State of New York.
19
20
21
22
23
24   JOB NO.: 24-180169
25   Pages: 1 - 233
```

## Page 2

```
 1   APPEARANCES:
 2      GOODWIN PROCTER LLP
        Attorneys for Plaintiff
 3         Exchange Place
           Boston, Massachusetts 02109
 4
        BY: SRIKANTH K. REDDY, ESQUIRE
 5
           -AND-
 6
        GOODWIN PROCTER LLP
 7         901 New York Avenue, Northwest
           Washington, DC 20001
 8
        BY: SCOTT L. ROBERTSON, ESQUIRE
 9
10      MERCHANT & GOULD
        Attorneys for Defendant
11         80 South Eighth Street
           Minneapolis, Minnesota 55402
12
        BY: RACHEL C. HUGHEY, ESQUIRE
13
14      MARCUS BRODY FORD KESSLER & SAHNER LLC
        Attorneys for the Witness
15         5 Becker Farm Road
           Roseland, New Jersey 07068
16      BY: TODD M. SAHNER, ESQUIRE
17
18
19   ALSO PRESENT:
20
        DOUGLAS HUEBNER, Videographer
```

## Page 3

```
 1        THE VIDEOGRAPHER: This is the
 2   video operator speaking, Douglas Huebner of
 3   Merrill Legal Solutions. Today is June 10,
 4   2010, and the time is 10:44.
 5        We are at the offices of Goodwin
 6   Procter, 620 Eighth Avenue, New York, New
 7   York, to take the video deposition of
 8   Laurene McEneny, in the matter of ePlus,
 9   Inc. versus Lawson Software, Inc., in the
10   United States District Court, Eastern
11   District of Virginia, Richmond Division,
12   Case No. 3:09-cv-620.
13        Will counsel please introduce
14   themselves for the record.
15        MR. REDDY: Srikanth Reddy from the
16   law firm of Goodwin Procter on behalf of
17   the plaintiff ePlus, Inc.
18        MR. ROBERTSON: Scott Robertson
19   from Goodwin Procter for plaintiff.
20        MS. HUGHEY: Rachel Hughey from
21   Merchant & Gould for defendant Lawson
22   Software.
23        MR. SAHNER: Todd M. Sahner from
24   Marcus Brody on behalf of the witness.
25        THE VIDEOGRAPHER: Will the court
```

## Page 4

```
 1   reporter please swear the witness.
 2   L A U R E N E   M c E N E N Y,
 3   having been first duly sworn by the Notary
 4   Public (Eric J. Finz), was examined and
 5   testified as follows:
 6        EXAMINATION BY
 7   MR. REDDY:
 8        Q.  Good morning. Would you please
 9   state your full name for the record?
10        A.  My name is Laurene Jean, maiden
11   name, which I used in business is Fielder, and
12   my married name is McEneny.
13        Q.  Do you have a preference of
14   Ms. McEneny versus Ms. Fielder?
15        A.  That's fine.
16        Q.  I'll try to make sure I get that
17   correct. I was hoping you'd say Fielder.
18        A.  Before we sold the company I would
19   have, but now I'm officially a one name person
20   here.
21        Q.  My name is Srikanth Reddy, I
22   represent the plaintiff in this matter, ePlus,
23   Inc.
24        Ms. McEneny, do you understand that
25   your answers today are being given under oath
```

### Page 21

1  Q. Just here testifying today, do you
2  recall the specific functionality that might
3  have been added from version 1 to version 12?
4  A. I remember some of it.
5  Q. Now, you testified that you no
6  longer are employed by or have any interest with
7  P.O. Writer -- I'm sorry, with Purchasing Net;
8  correct?
9  A. Correct.
10 Q. Have you retained any documents
11 from either Purchasing Net or American Tech that
12 were generated while you were affiliated with
13 those two companies?
14 A. I probably have a few things. Some
15 files. I have kept a couple of folders on
16 customers, you know, we were working with just
17 to make sure if anybody had any questions that
18 they wanted to call me, you know, they could.
19 So just trying to be helpful to the staff that
20 was left behind. We sold the company, so still
21 felt some responsibility to the people.
22 Q. So other than the customer folders,
23 are you aware of any other documents that you
24 might have retained from Purchasing Net?
25 A. You know, I'm not really sure, we

### Page 22

1  do have some things in the garage. And the
2  reason is Tim is writing a book, and I know he
3  saved some things. But I honestly don't know
4  what he has specifically.
5  Q. Now, I think you testified that
6  version 1 of the P.O. Writer software was
7  released in 1984; correct?
8  A. I believe that's correct.
9  Q. Do you recall when the second
10 version of P.O. Writer was released?
11 A. Probably about a year later, but I
12 don't know the exact date.
13 Q. So during that time frame, the
14 company was known as American Tech, correct?
15     So in general I'll try to refer to
16 it as American Tech for the company that you and
17 your husband started, which became Purchasing
18 Net in 2000 and which you subsequently sold in
19 2009.
20 A. Um-hum.
21 Q. Does that make sense?
22 A. That's fine.
23 Q. And if you have any questions at
24 any time as to what entity I'm referring to, you
25 could certainly feel free to ask.

### Page 23

1  A. To me it would be the same, it was
2  just a name change.
3  Q. Did American Tech have a general
4  policy with regards to the schedule by which it
5  would release different versions of the P.O.
6  Writer project?
7  A. Generally we did one major release
8  per year.
9  Q. So between 1984 and 1995, that's
10 twelve years actually, correct? I'm sorry, I'll
11 withdraw that question as well.
12     So the twelve DOS versions of the
13 P.O. Writer software, were each of those
14 versions released between 1984 and 1995?
15 A. Yes.
16 Q. Now, if I can start with -- I'm
17 sorry, so I think you testified that version
18 number 2 was released in 1985; correct?
19 A. I'd have to double-check, but that
20 sounds right.
21 Q. Was version 3 -- when was version 3
22 released then?
23 A. Generally they would be one major
24 release per year. That was the general
25 practice. So if you ask me about 3 then 4 then

### Page 24

1  5, they kind of fall along that line. It was
2  the general practice to try and do that.
3  Q. Now, when was version 10 of the
4  P.O. Writer product released?
5  A. It was released in the -- well, can
6  I check my notes? I want to double-check to
7  make sure I get this right.
8  Q. Sure.
9  A. Should be '83, but let me just
10 double-check.
11     Yes, '83. I'm sorry, '93.
12 Q. When you say you were checking your
13 notes, the notes you were checking was your
14 testimony from the SAP case; is that correct?
15 A. That's right.
16 Q. Now, other than your testimony from
17 the SAP case, is there anything else that you
18 have to corroborate that version 10 of the P.O.
19 Writer product was released in 1993?
20 A. No. Just everything I testified to
21 originally would still be true.
22     MR. REDDY: I'm handing to the
23     reporter what I'll ask him to mark as
24     McEneny Exhibit No. 2.
25     (McEneny Exhibit 2 for

**Page 89**

1  that there was not a prohibition against
2  duplication of either the software or the
3  manuals with respect to the trial version of the
4  software?
5      MS. HUGHEY: Objection; asked and
6  answered.
7      A.  Yeah, I think I've already answered
8  that.
9      Q.  What was your answer?
10     A.  My answer is I believe that it was
11 most probable that there was some kind of
12 wording to protect us on that. But I couldn't
13 say for sure unless I had the agreement in front
14 of me.
15     Q.  If I could return for a moment to
16 Exhibit No. 2, which was I believe the guided
17 tour.
18     A.  Okay. Got it.
19     Q.  And the page which we've been
20 referring to as L 126664. Which were the
21 results from the purchase requisitioning
22 section.
23     A.  Okay.
24     Q.  So if a user selected an item from
25 this list, at this point was there any way that

**Page 90**

1  a user could cross-reference this item with
2  other items in the P.O. Writer database?
3      MS. HUGHEY: Objection; vague.
4      Q.  You can answer if you understand
5  the question.
6      A.  On this screen, they're looking at
7  a list of items that match their search
8  criteria. If they were to select the
9  combination, the ship forward to look for
10 additional information, that's shown on the next
11 page, the 665.
12         The only way in this version that
13 they could cross-reference is if they chose, as
14 a customer, to implement the user defined fields
15 or to provide additional information in the
16 extended description area as to what a
17 cross-reference might be. So that would
18 strictly be how that particular customer might
19 have chosen to implement the product.
20     Q.  And as we discussed earlier, that
21 additional line information, the user defined
22 fields within the additional line information,
23 was entirely up to the user to enter whatever
24 information they wanted to in those fields;
25 correct?

**Page 91**

1      A.  That's correct.
2      Q.  And those user defined fields could
3  not have been searched in the version 10 of the
4  P.O. Writer Plus system; correct?
5      MS. HUGHEY: Objection;
6  mischaracterizes the witness' testimony.
7      A.  The user defined fields could not
8  be searched to do an item look up. And to my
9  knowledge, and based on what's in this document,
10 they couldn't be searched in this version.
11 That's my understanding after looking at this
12 document.
13         So they were there for reference.
14     Q.  You can set that document aside.
15         (McEneny Exhibit 5 for
16 identification, document entitled "Tenth
17 Edition," production numbers L 126501
18 through L 126513.)
19     MR. REDDY: I've handed a document
20 to be marked as Exhibit No. 5, which is a
21 document Bates labelled L 126501 through
22 126513. And at the top it states "tenth
23 edition," in parentheses, April 1993.
24     Q.  If you can take a few moments to
25 familiarize yourself with that document.

**Page 92**

1         And do you recognize the collection
2  of approximately twelve pages of documents?
3      A.  Yes, I recognize these as pages
4  from the purchasing manual at that point in
5  time.
6      Q.  Now, when you say that point in
7  time, what are you referring to?
8      A.  Spring of '93.
9      Q.  And is that referring to version 10
10 of the P.O. Writer Plus software?
11     A.  That's correct. This specifically
12 would be relating to the purchasing module.
13     Q.  Now, if I can direct your attention
14 to the third page of the document. It states
15 "no part of this work may be reproduced or used
16 in any way for or by any means, graphic,
17 electronic or mechanical, including
18 photocopying, recording, taping or information
19 storage and retrieval systems, without express
20 permission from American Tech, Inc."
21         Did I read that correctly?
22     A.  Yes.
23     Q.  Now, was that prohibition against
24 copying of the manual placed on every manual
25 sent by American Tech with respect to version 10

93

1  of the P.O. Writer product?
2     A.   I don't know if this appeared on
3  every manual.
4     Q.   Do you have any reason to believe
5  that that prohibition did not exist on each of
6  the manuals that were released?
7     A.   I couldn't speak to that. All I
8  know is it's on this one. I really don't know
9  if it's on the others.
10    Q.   Why was this information contained
11 in the manual?
12    A.   Again, I'm sure, like I said
13 earlier, it's kind of our practice to try and
14 protect ourselves.
15    Q.   When you say protect yourselves,
16 what do you mean by that?
17    A.   So people don't copy the software
18 and the users manuals.
19    Q.   So in general did American Tech
20 have a practice of trying to prevent people from
21 copying the software and the users manuals --
22 and the user manuals?
23    A.   Well, yes, we did. We didn't want
24 a company to buy one copy of our product and pay
25 for it and get the password, and then copy the

94

1  software and copy the manuals and, you know,
2  send it to other facilities or friends and
3  family or whatever. So that's a large concern
4  of any software company.
5     Q.   If I can direct your attention to
6  the document in the manual, it's 1-1. I
7  actually need to reference the SAP number, which
8  is 803288. I believe it's 1-1. And the heading
9  is "getting started."
10    A.   Yes.
11    Q.   If I can direct your attention to
12 the paragraph that begins "the purchasing module
13 is the foundation of the P.O. Writer Plus family
14 of programs."
15    A.   Yes.
16    Q.   Do you see that paragraph?
17    A.   I do.
18    Q.   And there are several other modules
19 that are located in that paragraph; is that
20 correct?
21    A.   That's correct.
22    Q.   Are these the other modules that we
23 discussed earlier that a customer had the option
24 of purchasing after they purchased the
25 purchasing module?

95

1     A.   That's correct. There are other --
2  this represents -- yes, these are the other
3  modules that were available.
4     Q.   Are there any other modules that
5  were available, to your knowledge, with respect
6  to version 10 of the program that aren't stated
7  in this specific paragraph?
8     A.   You know, I probably want to map
9  this to the license agreement at the time.
10         Vendor performance is listed in the
11 manual and on the license agreement it's called
12 supplier performance. It's the same module.
13         Accounts payable interface is AP
14 interface module.
15         Inventory control is the same.
16         Requisitioning is purchase
17 requisitioning module in the license agreement.
18         Ad hoc reporting is the same.
19         DD interface utility is there.
20         Remote requisitioning is listed in
21 the purchasing manual, and not called out
22 specifically on the license agreement.
23         And remote requisitioning interface
24 is listed in the manual and not called out
25 specifically on this license agreement that we

96

1  had for Bank United.
2         Fax/EDI interface, X12 translation.
3         And the bar code interface.
4         So it looks like these were the
5  modules available at that time.
6     Q.   Now, I notice that you were looking
7  at Fielder Exhibit No. 4, which was the two-page
8  document indicating a note report to Bank United
9  of Texas; is that correct?
10    A.   I was actually looking at the
11 second page of that, it's the P.O. Writer Plus
12 license agreement that lists the modules on the
13 top left side.
14    Q.   And this specific license agreement
15 was signed in January of 1994; correct?
16    A.   This one was, that's correct.
17    Q.   And was this the standard license
18 agreement used by American Tech with respect to
19 the P.O. Writer Plus product as of January 1994?
20    A.   Well, the manual was released in
21 '93. This particular license agreement was
22 signed in '94. And I don't see a date on this
23 license agreement. So the only thing I could
24 tell you is that this is what we were using on
25 January 24th of '94.

**Page 97**

1  Q. Did American Tech have a practice
2  of writing different license agreements for
3  different customers?
4  A. We had a practice of having a
5  general license agreement. But occasionally a
6  customer would want to make a modification to
7  it. They would get their attorneys involved or.
8  So occasionally. It was not -- it was not the
9  norm that we would change the license agreement
10 but occasionally we would.
11  Q. But the license agreement that's
12 depicted in this specific exhibit, is that your
13 understanding that this was the standard license
14 agreement used by American Tech in January of
15 1994?
16  A. This looks like the standard used
17 in 1994, yeah.
18  Q. Okay. Now, returning to Exhibit
19 No. 5.
20  A. Um-hum.
21  Q. And that specific paragraph we were
22 talking about. With respect to each of those
23 modules. So each of those -- a user wishing to
24 use those modules would have to purchase and
25 license that module separately; is that correct?

**Page 98**

1  A. That's correct.
2  Q. You can set that document aside.
3       (McEneny Exhibit 6 for
4       identification, document, production
5       numbers L 126718 through L 126964.)
6  Q. You've been handed a document which
7 is marked as Exhibit No. 6. It's a document
8 Bates labelled L 126718 to L 126964. And I'm
9 not going to ask you to go through it page by
10 page. But if you can maybe peruse it and look
11 up at me after you've had a chance to do so.
12      It's actually only one specific
13 section of this document that I'd like to
14 discuss with you. If I can direct you to, at
15 the manual, it's at 2-221.
16      And before you investigate that
17 page further, can I just ask generally do you
18 recognize this document that's been marked as
19 Exhibit No. 6?
20  A. Yes, I do.
21  Q. And what do you recognize it to be?
22  A. As chapter 2 of the purchasing
23 module users manual, which was a self-paste
24 tutorial, to teach users how to use this
25 particular module.

**Page 99**

1  Q. Now, directing you again to page
2 2-221 of the document.
3  A. Um-hum.
4  Q. The heading states "creating POs
5 from a catalog."
6  A. Correct.
7  Q. What is the purpose of this
8 section?
9  A. Is to train an end user on how to
10 use a feature in the product that would allow
11 them to search the item master by catalog and
12 pick items and create a purchase order.
13  Q. So a user, with respect to this
14 specific section, would take items from the
15 catalog and enter them directly on to a purchase
16 order; is that correct?
17  A. That was a feature in the product,
18 that's correct.
19  Q. Now, if I can direct your attention
20 to the page that's 2-229. At the top of the
21 page is a screenshot.
22      And the screenshot depicts I
23 believe two items that will be purchased from a
24 specific vendor; is that correct?
25  A. That's correct.

**Page 100**

1  Q. Now, if I can direct your attention
2 to the note field, the first sentence states
3 "items in the Best Buy catalog can be purchased
4 from any vendor."
5      Did I read that correctly?
6  A. Yes, you did.
7  Q. So by purchased from any vendor,
8 does that mean that the user can select the
9 supplier for that specific item?
10  A. Yes, that's correct.
11  Q. Now, with respect to the second
12 sentence, it states "also, the catalog
13 designation does not determine the vendor for
14 the purchase order."
15      Did I read that correctly?
16  A. Yes, you did.
17  Q. Now, the catalog designation that
18 that's referring to, is that the same thing as
19 the catalog ID from the item master that we
20 discussed previously?
21  A. Yes.
22  Q. Now, when the statement says that
23 the catalog designation does not determine the
24 vendor for the purchase order, is that because
25 the user is the person who ultimately decides

**101**

1  who the vendor will be for that item?
2      A.   That's because the system would
3  allow the user to determine that.
4      Q.   So my question was, the statement
5  says that the catalog designation does not
6  determine the vendor for the purchase order.  Is
7  the reason for that because the user who
8  ultimately decides who the vendor will be can
9  select whom the vendor will be?
10     A.   The reason is because we also allow
11 the user to determine that.  So I could have two
12 items in a catalog called Staples, and I could
13 use Staples to select the item.  And then I
14 could continue on and place the order with
15 Staples if I wanted.  But I also was not limited
16 by the software.
17          And that's the point I think we're
18 trying to make here, you could, you being the
19 buyer, because that's who would use this module,
20 you could check -- change the vendor to, in this
21 example, Best Buy.
22          So the way the software worked is
23 you had the ability as an end user to specify
24 any supplier that you wanted.
25     Q.   But the catalog information, the

**102**

1  catalog ID field that was from the item master,
2  that catalog ID was not associated with any
3  specific vendor in the system; correct?
4          MS. HUGHEY:  Objection; vague.
5      A.   That's right.  The catalog ID and
6  the item master is really a way to group items
7  together, to make it easy for a user to select
8  those items.
9      Q.   And the user is the one that sets
10 and determines what the catalog will be;
11 correct?
12     A.   A user could be a requisitioner,
13 part of that community, or a user could be a
14 buyer.  And they both can use the same catalog
15 ID.  So again, that's only one catalog ID in the
16 item master file.
17     Q.   So there was no way to associate
18 the catalog ID with the vendor master file;
19 correct?
20          MS. HUGHEY:  Objection; vague.
21     A.   The only way that you could
22 associate it was through use of the user defined
23 fields or through providing additional
24 information in the extended description field,
25 which would be a reference.

**103**

1      Q.   In either respect, using either the
2  user defined fields or the extended description
3  field, that does not draw from the vendor master
4  file; correct?
5      A.   That's correct.
6      Q.   Now, if I can direct your attention
7  to the third paragraph here.  It states "the
8  vendor field contains the last vendor that the
9  first item on this PO (in this case A2000 ) was
10 purchased from.  The last PO created for A2000
11 was from vendor number 12345-Best Buy Supply.
12 If the last PO for A2000 was for vendor number
13 NAPC-1, (North American Packaging) NAPC-1 would
14 be displayed in the vendor field."
15          Did I read that correctly?
16     A.   Yes, you did.
17     Q.   So does that paragraph indicate
18 that the vendor for this specific purchase order
19 is determined solely from the last vendor for
20 that specific item?
21     A.   In this example, yes.
22     Q.   And the only other way that the
23 vendor could be changed is if the user manually
24 selected a different vendor; is that correct?
25     A.   That's correct.

**104**

1      Q.   And then if I can direct your
2  attention two pages further.  It's page 2-231 in
3  the manual.  And the heading states "major
4  points to remember."
5          And when you decide in this manual,
6  what was the purpose of the major points to
7  remember highlight?
8      A.   Just to summarize some of the key
9  concepts for the user.  Things that they would
10 have learned in that chapter.
11     Q.   Now, if I can direct your attention
12 to the second to last point to remember, it
13 states "the catalog designation does not
14 determine the vendor for the purchase order.
15 The default vendor is determined by the previous
16 purchase for the first item on the purchase
17 order."
18     A.   For this tutorial lesson, that is a
19 key major point to remember.
20     Q.   You can put that document aside as
21 well.
22          MR. REDDY:  If we can maybe take
23 just a quick two minute break I think I may
24 be done.
25          MR. SAHNER:  We can take a

### Page 109

1  trial?
2  A.  No.
3      MR. REDDY: In that case I don't
4  have any further questions at this time. I
5  may have some additional questions based on
6  Ms. Hughey's questioning.
7      EXAMINATION BY
8      MS. HUGHEY:
9  Q.  Hello, Ms. McEneny, I'm going to be
10 asking you some questions. You understand that
11 I represent Lawson.
12 A.  Yes.
13     (Lawson Exhibit 95 for
14     identification, document, production
15     numbers ePLUS 0219927 through ePLUS
16     0219937.)
17 Q.  I'm going to hand you what's been
18 marked as Exhibit 95.
19     Do you recognize this document?
20 A.  I do.
21 Q.  What is this document?
22 A.  This is a brochure that we used to
23 sell our client support program.
24 Q.  Can you turn to page ePlus 0219928
25 of the document that's been marked Lawson

### Page 110

1  Exhibit 95, which for the record has a range
2  ePLUS 0219927 to 0219937. So this is the second
3  page of the document.
4      Do you see where it says "new
5  releases automatically."
6  A.  Yes.
7  Q.  Is this consistent with your
8  testimony that you did about one major release a
9  year?
10 A.  Yes.
11 Q.  So would it be fair to say that
12 version 9.0 would have been released sometime in
13 the spring or summer of 1992?
14 A.  Yes.
15 Q.  And version 10 would have been
16 released sometime in the spring or summer of
17 1993?
18 A.  Correct.
19 Q.  Why do you have a regular release
20 date?
21 A.  One of the -- one of the reasons --
22 well, let's put it this way, a big part of our
23 revenue would come from support revenue. And so
24 in addition to just supporting customers, we
25 also included major releases as a major feature.

### Page 111

1  So that was our decision to just improve the
2  value of this program, because it was pretty
3  much a major revenue stream for the company.
4      (Lawson Exhibit 96 for
5      identification, document, production
6      numbers ePLUS 0219612 through ePLUS
7      0219619.)
8  Q.  I'm going to hand you what's been
9  previously marked as Lawson Exhibit 96. And
10 this is numbered ePLUS 0219612 to 619.
11     Do you recognize this document?
12 A.  Yes.
13 Q.  What is this document?
14 A.  This was a direct mail piece that
15 we had printed and we would send to prospects
16 and customers.
17 Q.  Can you turn to page ePLUS 0219616.
18 The third page of this document.
19     What is this document showing?
20 A.  This is the insert that would be in
21 this particular brochure. And it is listing the
22 modules, the prices that they're being sold at,
23 and a special discount offer that we had at that
24 time.
25 Q.  And so is it consistent to say that

### Page 112

1  purchasing, receiving, vendor performance,
2  inventory control, AP interface, report writer,
3  data interface utility, EDI interface, remote
4  requisitioning and bar code interface were on
5  sale as of December 31, 1989?
6  A.  Yes.
7  Q.  You can put that aside.
8      (Lawson Exhibit 97 for
9      identification, document, production
10     numbers ePLUS 0219493 through ePLUS
11     0219494.)
12 Q.  I'm handing you what's been marked
13 Lawson Exhibit 97, which has the Bates range
14 ePLUS 0219493 to 94. And this is Exhibit 1 in
15 that binder I handed you.
16     Do you recognize this document?
17 A.  I do.
18 Q.  What is this document?
19 A.  The first page is -- are notes from
20 our contact management system. And the second
21 page is a P.O. Writer Plus license agreement for
22 a law firm in Chicago, Kirkland & Ellis.
23 Q.  Is this document consistent with
24 your testimony that Lawson version 10 -- I'm
25 sorry, strike that.

113

1 Is this consistent with your
2 testimony that P.O. Writer version 10 was on
3 sale as of at least June 9, 1993?
4     MR. REDDY: Objection;
5 mischaracterizes testimony.
6     MS. HUGHEY: Let me rephrase.
7 Q. Does this document reflect when
8 P.O. Writer version 10.0 was on sale?
9     MR. REDDY: Objection; leading.
10    MS. HUGHEY: Let me rephrase.
11 Q. Does this document reflect when
12 P.O. Writer version 10 was on sale or not?
13 A. Yes, it does.
14 Q. And when was P.O. Writer version 10
15 on sale?
16 A. We started shipping in the spring.
17 I can -- you want me to just explain what this
18 is?
19 Q. Yes.
20 A. On the first page, on the bottom is
21 a note from January 7th of '93. And it's simply
22 stating that we shipped purchased versions, as
23 opposed to shipped trial version, that would be
24 the definition in how we would keep the notes.
25 And that's a version 9 multiuser version for

114

1 between five and seven users. PM indicates it's
2 a purchasing multiuser version, and then behind
3 that's the serial number.
4     So they are purchasing and
5 receiving a fax interface. Then a note was
6 entered on February 8th, we received a fax copy
7 and a check. So they bought the software.
8     And then above that, the top note
9 then indicates on June 9, '93, we shipped them,
10 it says CSP rollout version. What that stands
11 for is client support program rollout version.
12 So that would mean that they were entitled to
13 software and this was the software we shipped
14 them. So they may have decided they, you know,
15 wanted their upgrade then. But that's what that
16 would indicate to me.
17 Q. So did you ship Kirkland & Ellis
18 version 10.0 software on June 9, 1993?
19 A. That's what this indicates.
20 Q. And when was version 10 released?
21 A. I don't know the exact date. But
22 it was in the spring of '93.
23 Q. Was version 10 released before
24 August 10, 1993?
25 A. Yes, it was.

115

1 Q. And was version 10 sold before
2 August 10, 1993?
3 A. Yes.
4 Q. Was version 10 used by customers
5 before August 10, 1993?
6 A. I would say yes, it was. I think
7 there is some other exhibits perhaps that maybe
8 where there were support questions. I think
9 you'd want to refer to the testimony. So I'll
10 just say that I would look and see if there is
11 support notes.
12 Q. Did you demonstrate the version 10
13 product before August 10, 1993?
14 A. Absolutely.
15 Q. Were version 10 manuals shipped to
16 customers before August 10, 1993?
17 A. Yes.
18 Q. Was that the document that you
19 would provide to any customer who would buy
20 version 10, the manual?
21 A. Yes.
22 Q. How long was the P.O. Writer
23 manual?
24    MR. REDDY: Objection; vague as to
25 which manual.

116

1 Q. My understanding is that in the
2 spring of 1993 you released version 10.0. Is
3 that accurate or not?
4 A. Yes.
5 Q. Did a manual -- did you have a
6 manual that went along with that version 10.0
7 product?
8 A. The way the manuals were structured
9 is the major modules had a manual. And there
10 would be a module -- a manual for each module
11 that would have been available at that point in
12 time.
13 Q. Approximately how many volumes were
14 there?
15 A. Volumes? Well, there would be one
16 for each major module. So there would be
17 purchasing manual, receiving manual, inventory
18 control manual. Because again, the way we sold
19 the product is you didn't have to buy the whole
20 suite, you bought -- you tried what you wanted
21 to use, if you bought it, you kept the manual,
22 kept the software. So it was packaged that way.
23    But there were prerequisites, you'd
24 have to have a purchasing module to make
25 everything else work. So everybody had at least

VIDEOTAPED DEPOSITION OF LAURENE McENENY
CONDUCTED ON THURSDAY, JUNE 10, 2010

32 (Pages 125 to 128)

**Page 125**

1   (Lawson Exhibit 102 for
2   identification, document, production
3   numbers L 0126482 through L 0126500.)
4   Q.   I'm handing you what's been marked
5   Lawson Exhibit 102. Bates range L 0126482 to
6   500.
7        Do you recognize this document?
8   A.   I do.
9   Q.   What is this document?
10  A.   This is the users manual for our
11  EDI interface.
12  Q.   And again, do you see on the front
13  of the page that it says version 10.0?
14  A.   Yes.
15  Q.   Does this accurately represent the
16  product that was sold to customers prior to
17  August 10, 1993?
18  A.   Yes.
19  Q.   Is this a document that was
20  provided to customers prior to August 10, 1993?
21  A.   Yes.
22  Q.   You can put that aside.
23       (Lawson Exhibit 103 for
24  identification, document, production
25  numbers L 0126501 through L 0126513.)

**Page 126**

1   Q.   I'm handing you what's been marked
2   Lawson Exhibit 103. The Bates range is L
3   0126501 to L 0126513.
4        Do you recognize this document?
5   A.   Yes, I do.
6   Q.   What is it?
7   A.   It's the section of the purchasing
8   manual for P.O. Writer Plus.
9   Q.   Does this accurately represent the
10  product that was sold to customers prior to
11  August 10, 1993?
12  A.   Yes.
13  Q.   Is this a document that was
14  provided to customers prior to August 10, 1993?
15  A.   Yes.
16  Q.   And do you see the page L 0126501,
17  it says tenth edition, April 1993, software
18  revision 10.0?
19  A.   Yes.
20  Q.   Is that consistent with what you've
21  already told me about the other documents we've
22  discussed?
23  A.   Yes.
24  Q.   Okay. You can put that aside.
25       (Lawson Exhibit 104 for

**Page 127**

1   identification, Subpoena.)
2   Q.   I'm handing you what's been marked
3   Lawson Exhibit 104. It is not a manual. I'm
4   going a little bit out of order because I wanted
5   to preserve the numbering of my documents.
6        Do you recognize that document?
7   A.   Yes, I do.
8   Q.   What is this document?
9   A.   This was the subpoena emailed to me
10  by you to appear here today.
11  Q.   Okay, I have no further questions
12  on that document.
13       (Lawson Exhibit 105 for
14  identification, document, production
15  numbers L 0126702 through L 0126717.)
16  Q.   I'm handing you what's been marked
17  Lawson Exhibit 105. It's Bates number L 0126702
18  to L 0126717.
19       Do you recognize this document?
20  A.   I do.
21  Q.   What is this document?
22  A.   The users manual for the P.O.
23  Writer Plus fax module.
24  Q.   Does this accurately represent the
25  product that was sold to customers prior to

**Page 128**

1   August 10, 1993?
2   A.   Yes.
3   Q.   Is this a document that's provided
4   to customers prior to August 10, 1993?
5   A.   Yes.
6   Q.   Okay, I have no further questions
7   on that document.
8        MR. SAHNER:  Can we go off the
9   record for one second.
10       THE VIDEOGRAPHER:  Going off the
11  record at 2:44.
12       (Discussion off the record.)
13       THE VIDEOGRAPHER:  Back on the
14  record, 2:45.
15       (Lawson Exhibit 106 for
16  identification, document, production
17  numbers L 0127297 through L 0127504.)
18  BY MS. HUGHEY:
19  Q.   I'm going to hand you what's been
20  marked Lawson Exhibit 106. It's marked L
21  0127297 to L 0127504.
22       Do you recognize this document?
23  A.   Yes, I do.
24  Q.   What is this document?
25  A.   It's the users manual for the P.O.

141

1    Q.   Is it your understanding that this
2  was the manual for the version 10.0 product?
3    A.   **Yes.  This is the guided tour for**
4  **the 10.0 product.**
5    Q.   Does this accurately represent the
6  product that was sold to customers prior to
7  August 10, 1993?
8    A.   Yes.
9    Q.   Is this a document that was
10 provided to customers prior to August 10, 1993?
11   A.   Yes.
12   Q.   And then I'd also like you to turn
13 to McEneny Exhibit 6.  I think it begins at the
14 top "purchasing tutorial."
15   A.   Yes.
16   Q.   And I think we spoke already
17 that -- one second.
18       MS. HUGHEY:  Could we take a
19   two-minute break so I can arrange myself?
20       MR. REDDY:  Sure.
21       THE VIDEOGRAPHER:  Going off the
22   record at 3:03.
23       (A recess was taken.)
24       THE VIDEOGRAPHER:  Back on the
25   record, 3:12, this is the beginning of tape

142

1  3.
2  BY MS. HUGHEY:
3    Q.   Ms. McEneny, can you please take a
4  look at McEneny Exhibit 6, please.  And I
5  believe we previously talked about this
6  document.
7    A.   Yes.
8    Q.   Did P.O. Writer have a purchasing
9  module in 1993?
10   A.   Yes.
11   Q.   Can you take a look at page L
12 0126962.  And I suppose before you do that I
13 should ask, what is this document again?
14   A.   **This is the tutorial for the**
15 **purchasing module of P.O. Writer Plus.  And you**
16 **want 6962?**
17   Q.   That's right, 6962.
18       MR. REDDY:  I'm sorry, just for my
19   benefit, do you mind telling me what page
20   in the manual that is?
21       MS. HUGHEY:  Page 4-242.
22   Although -- I'm sorry, I'm at the wrong
23   page myself.  962 are the last three
24   digits.
25       MR. REDDY:  I'm sorry, of the

143

1  actual manual, not the Bates number.
2       MS. HUGHEY:  Yes, I can do that.
3   It's like third to last page.
4       THE WITNESS:  I think it's 2-242.
5       MS. HUGHEY:  That's right.
6    Q.   Do you see there is an example on
7  that page?
8    A.   Um-hum.
9    Q.   Do you see the example is dated
10 March 18, 1993?  It's right at the top.
11   A.   Yes.
12   Q.   Does this accurately represent the
13 product that was sold to customers prior to
14 August 10, 1993?
15   A.   Yes.
16   Q.   Is this a document that was
17 provided to customers prior to August 10, 1993?
18   A.   Yes.
19   Q.   The next exhibit I'd like you to
20 look at is McEneny Exhibit 2.
21       MR. ROBERTSON:  I think you asked
22   these questions already with Exhibit 2 and
23   Exhibit 6?
24       MS. HUGHEY:  I don't believe I did.
25   I didn't check them.

144

1       MR. ROBERTSON:  Remember we had the
2   confusion about whether it was Defendant's
3   Exhibit 2 or McEneny Exhibit 2?
4       MS. HUGHEY:  I started on it before
5   the break but I never got to it.
6    Q.   What is this document?
7    A.   **It's the guided tour for P.O.**
8  **Writer Plus version 10.**
9    Q.   And do you see the first page says
10 version 10.0?  The very first page, the one you
11 just flipped.
12   A.   Yes.
13   Q.   Does this accurately represent the
14 product that was sold to customers prior to
15 August 10, 1993?
16   A.   Yes.
17   Q.   Is this a document that was
18 provided to customers prior to August 10, 1993?
19   A.   Yes.
20   Q.   Is it accurate to say that the
21 version 10 P.O. Writer manual was a set of
22 volumes or not?
23       MR. REDDY:  Objection; leading.
24   Q.   You can answer.
25   A.   **A set of volumes?**

**145**

1  Q. Yes.
2  A. Together the manuals made up the
3  volumes. I guess library, whatever you would
4  call it. Teaching people how to operate the
5  product.
6  Q. Do you consider the different
7  volumes to be a single publication or not?
8      MR. REDDY: Objection.
9  A. Yes.
10     MR. REDDY: Calls for a legal
11 conclusion.
12 A. We do consider these to be a single
13 publication. You wouldn't ship a version 10
14 purchasing manual with a version 11
15 requisitioning. They were, you know, version 10
16 worked together, it was released and tested so
17 that it operated together. So they definitely
18 went out as a single version set for whatever
19 modules the customer bought.
20 Q. Okay. Was the version 10 P.O.
21 Writer manual shipped to customers prior to
22 August 10, 1993?
23 A. Yes.
24 Q. Was the P.O. Writer manual publicly
25 available and distributed to customers prior to

**146**

1  August 10, 1993?
2  A. Yes.
3  Q. Did you attend trade shows?
4  A. Yes.
5  Q. Did you have the manuals at trade
6  shows?
7  A. We did.
8  Q. Did you demonstrate version 10
9  prior to August 10, 1993?
10 A. Yes.
11 Q. When you were at trade shows, did
12 you have the version 10 manuals at trade shows
13 prior to August 10, 1993?
14 A. Yes.
15 Q. Is it accurate to say that you
16 would sell version 10 to any customer who asked
17 to bought it or not -- strike that.
18     Is it accurate to say that you
19 would sell a version 10 product to any customer
20 or not?
21 A. Yes.
22 Q. Did you do anything to stop your
23 competitors from reviewing the version 10
24 manuals?
25 A. Did we do anything? Well, we tried

**147**

1  to prevent them from doing that. But, you know,
2  at trade shows for example we would lock them up
3  at night. So yes.
4  Q. But during the day if somebody came
5  by and wanted to look at the manual, is there
6  anything that you would do to stop them, would
7  you ask them for identification?
8  A. We knew who our competitors were.
9  If they were standing in our booth trying to
10 read our manual we would probably ask them to
11 leave.
12 Q. If they were a potential customer
13 you would probably let them read the manual; is
14 that correct?
15 A. Oh, absolutely.
16 Q. Earlier we spoke about the
17 copyright limit on some of the manuals. I
18 believe it was -- just grab the ad hoc reporting
19 manual as an example, that's Lawson Exhibit 99.
20 It's a pretty little one.
21 A. There we go.
22 Q. And the second page, L 0126397.
23 A. Um-hum.
24 Q. The third paragraph says "no part
25 of this work may be reproduced," and so on,

**148**

1  we've already discussed this paragraph.
2  A. Um-hum.
3  Q. Is it fair to say that you did not
4  want your competitors to obtain your manuals?
5  A. Sure.
6  Q. Is it fair to say that if your
7  customers had made copies of your manuals for
8  their personal use that would not have been a
9  problem?
10     MR. REDDY: Objection; leading.
11 A. If a customer made a copy for their
12 own personal use to give to a user that they had
13 a license for, that wouldn't have been a problem
14 for us. What would have been a problem is if
15 they made a copy of the manual and the software
16 and gave it to somebody, therefore we wouldn't
17 get the revenue for it. That would be a
18 problem. Or if they would give it to a
19 competitor who would read it and look at our
20 ideas, that would be a problem. But generally
21 speaking if it's just to support a user who's
22 licensed, it wouldn't have been a problem.
23 Q. Is it accurate to say that this
24 statement placed no limitation on who could be
25 shown the manual?