# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| ePLUS, INC., | ) | |
| | ) | |
| | ) | Civil Action No. 3:09-cv-620 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LAWSON SOFTWARE, INC. | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT OF EXPERT MICHAEL I. SHAMOS, PH.D, J.D.**
<u>**CONCERNING INVALIDITY**</u>

obvious choice to integrate with the TV/2 system, since RIMS was a type of order entry, inventory management, and customer record system.

c. "You can also create a 'shopping list' just by selecting items and passing that list to another application. For example, you might select parts to be ordered from the exploded drawing in a parts catalogue. The parts list could then be sent directly to your parts ordering system." (L0132133). Again, because the RIMS system was a parts ordering system, one of ordinary skill reading this material would conclude that the TV/2 system was designed to interface with systems just like the RIMS system.

### P.O. Writer Plus V.10

180. During reexamination of all three patents-in-suit, the Patent Office found that the P.O. Writer Manual qualifies as prior art. (*See, e.g.*, Final Rejection in the '683 Patent Reexamination at 4-8; '516 Reexam Order at 14-15; Non-Final Rejection in the '172 Patent Reexamination at 6-7).

181. The P.O. Writer Plus system was an electronic sourcing system that included an electronic database that retained and retrieved product information from multiple vendors, including information such as an item number, item description, inventory location, price, commodity code, unit of measure, and vendor identification. (The P.O. Writer Manual, Guided Tour at 22 & 130-31; Final Rejection in the '683 Patent Reexamination at 21 & 60; Non-Final Rejection in the '172 Patent Reexamination at 18-19). Product information could be maintained within the P.O. Writer Plus system as product catalogs organized in various ways, including by vendor or by product type.

182. The P.O. Writer Plus system allowed a user to select product catalogs to search, resulting in a search of less than the entire data set in the database. The system allowed a user to search for matching items among selected product catalogs by specifying various search criteria including item number, commodity code, and keyword associated to the item description. (The

P.O. Writer Manual, Guided Tour at 46-47; Final Rejection in the '683 Patent Reexamination at 21 & 60; Non-Final Rejection in the '172 Patent Reexamination at 19).

183. After a desired item was selected from the results of a database search, the P.O. Writer Plus system was capable of transferring the relevant product information for the selected item from the database onto an electronic requisition. (The P.O. Writer Manual, Guided Tour at 47-49 & 117-47; Final Rejection in the '683 Patent Reexamination at 21 & 60; Non-Final Rejection in the '172 Patent Reexamination at 19). For a selected item in the requisition, the P.O. Writer Plus system was capable of: (1) determining the availability of the item in the inventory of the customer; (2) utilizing EDI transactions or issuing RFQs to multiple vendors to ascertain, record, and retrieve the availability of the selected item from a prospective vendor; (3) determining the price of an item; (4) cross-referencing or converting data relating to the selected item to a generally equivalent item from a different source; and (5) generating multiple purchase orders from a single requisition. (The P.O. Writer Manual, Guided Tour at 49 & 149-53; Final Rejection in the '683 Patent Reexamination at 22-23, 60-61, 70, 102; Non-Final Rejection in the '172 Patent Reexamination at 19-21).

184. The P.O. Writer Manual was not cited by the Applicant or considered by the Examiner during prosecution of the patents-in-suit.

185. In the '516 Reexam Order, the Patent Office found: "it is agreed that the consideration of the P.O. Writer raises a substantial new question with respect to claims 1-29 of the '516 Patent. With respect to independent claim 16 of the '516 Patent, the P.O. Writer reference is seen to teach of a converting means for converting data relating to an item from a first catalog to data relating to an item from a second catalog [see the P.O Writer Plus, Requisition Interface, Exhibit 15, pages 11 through 15, particularly on page 11, which states 'When Requisitions come into Purchasing, they must first be split up by a buyer or by vendor. ... Some requisitions will need to be split because there are multiple items that are purchased from different vendors. The P.O. Writer Plus Requisitioning Interface does all of this automatically!. .. Assignment of vendors and buyers is based on the last purchase of a given item.']. With this

section, the P.O Writer reference can be interpreted as converting data relating to an item from a first catalog to data relating to an item from a second catalog, as required in independent claim 16. As noted above, this feature was the only mentioned in the original prosecution to be that of allowable subject matter for each of the claims in the original prosecution. Therefore, the P.O. Writer is seen to raise a substantial new question of patentability that was not present in the prosecution of the application which became the '516 Patent. Further, there is a substantial likelihood that a reasonable examiner would consider this teaching important in deciding whether or not the claims are patentable. Accordingly, the P.O. Writer raises a substantial new question of patentability as to claims 1-29, which question has not been decided in a previous examination of the '516 Patent." ('516 Reexam Order at 14-15).

### The SABRE System

186. During reexamination of the patents-in-suit, the Patent Office found that the Practical Guide to SABRE qualifies as prior art. (*See, e.g.,* Final Rejection in the '683 Patent Reexamination at 4-8; '516 Reexam Order at 15-16; Non-Final Rejection in the '172 Patent Reexamination at 5).

187. American Airlines' SABRE system maintained a massive collection of catalogs of travel offerings in the SABRE system information database, portions of which could be selected and searched to locate, for example, a particular desired flight or flights using multiple search criteria. (The Practical Guide to SABRE at 2, 51 & 377; Final Rejection in the '683 Patent Reexamination at 16 & 47; Non-Final Rejection in the '172 Patent Reexamination at 14). Upon selection of a desired flight from the results of a database search, the SABRE system could transfer the relevant flight segment information to an electronic itinerary (called a "Passenger Name Record" or "PNR" in the SABRE literature). (The Practical Guide to SABRE at 7, 9-11 & 15-16; Final Rejection in the '683 Patent Reexamination at 17 & 47; Non-Final Rejection in the '172 Patent Reexamination at 14).

188. For a selected flight segment on the itinerary, the SABRE system could: (1) determine the seat availability in airlines' inventory; (2) determine the price of the airline seat on

## The J-CON system

195. During reexamination of all three patents-in-suit, the Patent Office found that the J-CON Manual qualifies as prior art. (*See, e.g.,* Final Rejection in the '683 Patent Reexamination at 4-8; '516 Reexam Order at 14-15; Non-Final Rejection in the '172 Patent Reexamination at 7).

196. The J-CON Manual describes an electronic-sourcing system, the J-CON ("Jobber-Connection") system, that was designed for use in the operation and management of automotive parts stores (automotive parts stores were called "Jobbers" in the J-CON literature). The J-CON system maintained a library of automotive parts catalogs from many sources in an electronic database, portions of which could be selected and searched for a desired automotive part. (The J-CON Manual at Ch. 3, Sec. 2, Pages 1 & 11 & Ch. 5, Sec. 3, Page 1; Final Rejection in the '683 Patent Reexamination at 10 & 33; Non-Final rejection in the '172 Patent Reexamination at 22).

197. Upon selection of desired parts from database search results, the J-CON system could transfer the relevant automotive parts information for the selected parts from the database onto an electronic requisition (called a "ticket" in the J-CON literature). (The J-CON Manual at Ch. 3, Sec. 2, Pages 1, 4 & 8-9; Final Rejection in the '683 Patent Reexamination at 11-12 & 34; Non-Final rejection in the '172 Patent Reexamination at 23). For a selected item on the requisition, the J-CON system could electronically determine the current availability in the inventory of the automotive parts store, any sister stores associated with the automotive parts store, and/or independent distributors to the automotive parts store. (The J-CON Manual at Ch. 2, Sec. 10, Page 15 & Ch. 3, Sec. 2, Pages 6 & 10; Final Rejection in the '683 Patent Reexamination at 13 & 34; Non-Final rejection in the '172 Patent Reexamination at 25-26).

198. The J-CON system user could determine the price of parts from data maintained in its local automotive parts database and/or by electronically communicating with its distributor(s). (The J-CON Manual at Ch. 3, Sec. 2, Page 4; Non-Final rejection in the '172 Patent Reexamination at 25).

199. The J-CON system could perform a cross-referencing or converting of data relating to an item on the requisition to determine an alternative source for the same item and/or

an acceptable substitute for the item initially selected. (The J-CON Manual at Ch. 3, Sec. 2, Pages 6 & 11 & Ch. 3, Sec. 4, Pages 1-5; Final Rejection in the '683 Patent Reexamination at 13-14 & 35-36; Non-Final rejection in the '172 Patent Reexamination at 25-26).

200.   Finally, the J-CON system could generate multiple purchase orders from a single requisition. (The J-CON Manual at Ch. 4, Sec. 3, Page 1 & Ch. 4, Sec. 4, Pages 1-7; Final Rejection in the '683 Patent Reexamination at 12; Non-Final rejection in the '172 Patent Reexamination at 23-24).

201.   The J-CON Manual was not cited by the applicant or considered by the Examiner during prosecution of the patents-in-suit.

202. In the '516 Reexam Order, the Patent Office found "the J-CON Manual raises a substantial new question with respect to claims 1-29 of the '516 Patent. With respect to claim 16 of the '516 Patent, the J-CON Manual is seen to teach of a converting means for converting data relating to an item from a first catalog to data relating to an item from a second catalog [see Ch. 2, Sec. 1, Page 2, wherein "Interchange is J-CON's electronic cross-reference for parts ..."; also see Ch. 3, Sec. 1, Page 1, wherein "Interchange cross-references parts in lines you don't stock (called competitive parts) to parts in lines you do stock (called Interchange parts)." With these sections, the J-CON Manual can be interpreted as converting data relating to an item from a first catalog to data relating to an item from a second catalog, as required in claim 16. Further, as noted above, this feature was the only feature mentioned in the original prosecution to be that of allowable subject matter for each of the claims. Therefore, the J-CON Manual is seen to raise a substantial new question of patentability that was not present in the prosecution of the application which became the '516 Patent. Further, there is a substantial likelihood that a Page 17 reasonable examiner would consider this teaching important in deciding whether or not the claims are patentable. Accordingly, the J-CON Manual raises a substantial new question of patentability as to claims 1-29, which question has not been decided in a previous examination of the '516 Patent." ('516 Reexam Order at 15-16).

the '989 patent was single-source and the asserted claims require purchases from multiple sources, market pressure would provide a motivation to combine RIMs with the '940 patent.

228. During prosecution of the '683 and '516 patents, the Patent Office found that the '940 disclosed all of the claim elements except: 1) converting items found in one vendor's catalog to another vendor; and 2) searching only portions of a catalog database. During the prosecution of the '172 patent, the Applicant argued that Dworkin did not teach a single requisition that could include multiple items and be sourced to different vendors. It is my opinion that the RIMS system teaches these missing elements (as described more fully in Exhibits 3 and 4). Additionally, the '940 patent at least implicitly recognized a need to search a subset of the database – it required a user to first select a category of items to search (hardware vs. software). Thus, it would have been obvious to combine the teaching of RIMS that allowed users to search portions of the RIMS database (see exhibit 3). Further, the '940 patent recognized that items might have two product numbers (a number identifying the product in the database and a manufacturer's model number), thus it would have been obvious to combine the '940 patent with the cross-reference table in RIMS to associate these different numbers together. Finally, to the extent that the '940 patent is deemed not to teach a single requisition that could include multiple items and generate multiple purchase orders (I believe it does teach this element as shown in Exhibit 3), it would have been obvious to combine it with RIMS which teaches multiple purchase orders from a single requisition ('989 patent, Fig. 5A).

### The Combination of J-CON Plus Dworkin '940 Renders the Asserted Claims Obvious

229. It is my opinion that J-CON anticipates all the Asserted Claims.

230. To the extent that J-CON is not deemed to anticipate any Asserted Claim, it is my opinion that such claim would have been obvious in view of the combination of J-CON with the Dworkin '940 patent. The combination teaches all of the elements of asserted claims 3, 6, 26, 28, and 29 of the '683 patent, asserted claims 1, 2, 6, 9, 21, 22, and 29 of the '516 patent, and asserted claim 1 of the '172 patent as shown in Exhibits 3 and 4). As such, the combination of J-Con and the '940 patent renders these claims invalid under 35 U.S.C. §103.

231. One of skill in the art would have been motivated to make the combination because

232. One of skill in the art would also have been motivated to make the combination because the '940 patent states, "It is another object to provide a system and method which facilitates the processing of orders for goods or services transmitted by a user." 3:9-11. This capability is provided by J-CON.

233. Furthermore, the '940 patent provided the multi-source capability demanded by the industry at and before the time of the invention.

234. Additionally, the J-CON system included features that one or ordinary skill in the art would have been motivated to use with the '940 invention, including the ability to electronically determine the current availability in the inventory at multiple locations, to perform a cross-referencing of data relating to an item on a requisition to determine an alternative source for the same item and/or an acceptable substitute for the item initially selected, and the ability to generate multiple purchase orders from a single requisition (as described above and in detail in Exhibit 3).

### The Combination of J-CON and P.O. Writer Renders the Asserted Claims Obvious

235. It is my opinion that J-CON anticipates all the Asserted Claims. It is also my opinion that P.O. Writer anticipates all of the asserted claims.

236. To the extent that J-CON and/or P.O. Writer are not deemed to anticipate any Asserted Claim, it is my opinion that such claim would have been obvious in view of the combination of J-CON with P.O. Writer. The same reasons for making the previous two combinations apply to combining the J-CON system as described in the "J-CON Manual" with P.O. Writer Plus V. 10 as described in the P.O. Writer Plus Manual. The P.O. Writer Plus V. 10 system provided the multi-vendor capability demanded by the industry at and before the time of the invention. The J-CON system included features that one or ordinary skill in the art would have been motivated to use with the PO Writer system, including additional details about

performing a cross-referencing of data relating to an item on a requisition to determine an alternative source for the same item and/or an acceptable substitute for the item initially selected.

### The Combination of J-CON and Gateway Renders the Asserted Claims Obvious

237.  It is my opinion that J-CON anticipates all the Asserted Claims. It is also my opinion that the Gateway 2000/MRO system anticipates all of the asserted claims.

238.  To the extent that J-CON and/or Gateway are not deemed to anticipate any Asserted Claim, it is my opinion that such claim would have been obvious in view of the combination of J-CON with Gateway. The same reasons for making the previous three combinations apply to combining the J-CON system with the Gateway system.

239.  Additionally, the J-CON system had a sophisticated system for keeping track of equivalent items, dividing them into "Replaced Parts," "Substitute Parts," and "Can-Use Parts" and a number of different methods of converting among item numbers and substituting alternate parts that one of ordinary skill would have been motivated to use with the Gateway system. (See, e.g., L0124837; L0123551). Similarly, the Gateway Manual discloses in detail how to select a subset of catalogs from a collection of catalogs and then limit a search for items to the selected subset of catalogs, which one of ordinary skill would have been motivated to use with J-CON system. (See, e.g., SAP_2531709-10, SAP_2531615-16, L0128380).

### Secondary Considerations

240.  I understand that ePlus contends that secondary considerations demonstrate that the invention is not obvious. (See, e.g., "Plaintiff ePlus Inc.'s First Supplemental Answers and Objections to Defendant Lawson Software, Inc.'s Second Set of Interrogatories" (hereinafter, "Rog. 6").) I understand that ePlus will allege commercial success, demand for the patented product, and praise by others. While I reserve the right to reply to these arguments after I have reviewed ePlus's expert report, the evidence ePlus intends to present (as I currently understand it) does not demonstrate a nexus between these secondary considerations and the claimed invention.