# EXHIBIT B

*Final Jury Instructions*

## THE LAW APPLICABLE TO THIS CASE

Now that you have heard all of the evidence, it is the judge's duty to give you the instructions of the court concerning the law applicable to this case.

It is your duty as jurors to follow the law as the judge states it to you, and to apply that law to the facts as you find them from the evidence in the case.

Counsel may quite properly refer to some of the governing rules of law in their arguments. If, however, any difference appears to you between the law as stated by counsel and that stated by the judge in these instructions, you, of course, are to be governed by the instructions.

If any reference by the judge or by counsel to matters of evidence does not coincide with your own recollection, it is your recollection which should control during your deliberations.

You are not to single out one instruction alone as stating the law, but must consider the instructions as a whole. Neither are you to be concerned with the wisdom of any rule of law stated by the judge.

Regardless of any opinion you may have as to what the law is or ought to be, it would be a violation of your sworn duty to base a verdict upon any view of the law other than that given in the instructions of the judge, just as it would also be a violation of your sworn duty, as judges of the facts, to base a verdict upon anything other than the evidence in the case.

In deciding the facts of this case you must not be swayed by sympathy for any party nor bias or prejudice or favor to any party. Our system of law does not permit jurors to be governed by sympathy, bias, guesswork or speculation. Your verdict must be based solely upon the evidence and instructions of the Court.

Justice through trial by jury must always depend upon the willingness of each individual juror to seek the truth as to the facts from the same evidence presented to all the jurors; and to arrive at a verdict by applying the same rules of law, as given in the instructions of the judge.

## Evidence Received in the Case--Stipulations, Judicial Notice, and Inferences Permitted

The evidence in this case consists of the sworn testimony of the witnesses, regardless of who may have called them, all exhibits received in evidence, regardless of who may have produced them.

Any proposed testimony or proposed exhibit to which an objection was sustained by the Court and any testimony or exhibit ordered stricken by the Court, must be entirely disregarded.

Anything you may have seen or heard outside the courtroom is not proper evidence and must be entirely disregarded.

Questions of the lawyers are not evidence. Only a witness' answers to a lawyer's question is evidence. Objections, statements and arguments of counsel are also not evidence.

You are to base your verdict only on the evidence received in the case. In your consideration of the evidence received, however, you are not limited to the bald statements of the witnesses or to the bald assertions in the exhibits. In other words, you are not limited solely to what you see and hear as the witnesses testify or as the exhibits are admitted. You are permitted to draw from the facts which you find have proved such reasonable inferences as you feel justified in the light of your experience and common sense.

## NOTE TAKING

During this trial, I permitted you to take notes. Many courts do not permit note-taking by jurors, and a word of caution is in order. There is always a tendency to place undue importance to matters which one has written down. Some testimony which is considered unimportant at the time presented, and thus not written down, takes on greater importance later in the trial in light of all the evidence presented. Therefore, you are instructed that your notes are only a tool to aid your own individual memory and you should not compare your notes with other jurors in determining the content of any testimony or in evaluating the importance of any evidence. Your notes are not evidence, and are by no means a complete outline of the proceedings or a list of the highlights of the trial. Above all, your memory should be your greatest asset when it comes time to deliberate and render a decision in this case.

3

## QUESTIONS BY THE COURT

During the course of a trial, the judge occasionally asks questions of witnesses, in order to bring out facts not then adequately explained by their testimony and to expedite the presentation of evidence. Do not presume that the judge holds any opinion on the matters to which the judge's questions may have related. Remember at all times that you, as jurors, are at liberty to disregard all questions by the judge regarding the facts in determining the weight of the evidence, but you are governed by the judge's instructions as to the law applicable to this case.

Nothing the judge says, nor any ruling of the judge, nor any remark which the judge has made is to be taken as an indication that the judge has any opinion of the facts of the case. It is the judge's function to determine the law. The determination of the facts and the weight of the evidence is your function.

4

# OBJECTIONS AND RULINGS

It is the sworn duty of the attorney on each side of a case to object when the other side offers testimony or exhibits which that attorney believes is not properly admissible. Only by raising an objection can a lawyer request and obtain a ruling from the Court on the admissibility of the evidence being offered by the other side. You should not be influenced against an attorney or his or her client because the attorney has made objections.

Do not attempt, moreover, to interpret my rulings on objections as somehow indicating to you who I believe should win or lose the case.

5

## EVIDENCE BINDERS AND DEMONSTRATIVE EXHIBITS

The lawyers have made sure that all the binders include only the admitted evidence in this case. The numbers on the spine of the binders correspond to the exhibits that are enclosed in that binder. In addition, the lawyers have provided indexes of the admitted evidence with descriptions in list form, so that you can easily locate the particular exhibit desired.

Both sides have shown you demonstrative exhibits during the trial. These exhibits were shown to make testimony or documentary evidence, such as the patents at issue, clearer. Each one has been labeled as a demonstrative exhibit and will be provided to the jury with a separate index. You should understand that these demonstrative exhibits are not themselves evidence, and you cannot base your decisions on them. However, you may use any demonstrative exhibits that you find to be accurate and reliable to help you understand and analyze the testimony and exhibits presented during the trial.

## DIRECT AND CIRCUMSTANTIAL EVIDENCE

Generally speaking, there are two types of evidence that are generally presented during a trial--direct evidence and circumstantial evidence. "Direct evidence" is the testimony of a person who asserts or claims to have actual knowledge of a fact, such as an eyewitness. "Indirect or circumstantial" evidence is proof of a chain of facts and circumstances indicating the existence or nonexistence of a fact.

As a general rule, the law makes no distinction between the weight or value to be given to either direct or circumstantial evidence. Nor is a greater degree of certainty required of circumstantial evidence. You are simply required to find the facts in accordance with the appropriate burdens of proof in the case, both direct and circumstantial.

## JURY'S MEMORY CONTROLS

If any reference to witness testimony or the exhibits by the Court or by counsel does not coincide with your own memory of that evidence, it is your memory of the evidence which controls during your deliberations and not that of the Court or of counsel.

8

## CREDIBILITY OF WITNESSES - GENERALLY

You, as jurors, are the sole judges of the credibility of the witnesses and the weight their testimony deserves. You may be guided by the appearance and conduct of the witness, or by the manner in which the witness testifies, or by the character of the testimony given, or by the evidence to the contrary of the testimony given.

You should carefully scrutinize all the testimony given, the circumstances under which each witness has testified, and every matter in evidence which tends to show whether a witness is worthy of belief. Consider each witness's intelligence, motive, state of mind, and demeanor and manner while on the stand. Consider the witness's ability to observe the matters as to which he or she has testified, and whether he or she impresses you as having an accurate recollection of these matters. Consider also any relation each witness may bear to either side of the case; the manner in which each witness might be affected by the verdict; and the extent to which, if at all, each witness is either supported or contradicted by other evidence in the case.

Inconsistencies or discrepancies in the testimony of a witness, or between the testimony of different witnesses, may or may not cause the jury to discredit such testimony. Two or more persons witnessing an incident or a transaction may see or hear it differently; and innocent misrecollection, like failure of recollection, is not an uncommon experience. In weighing the effect of a discrepancy, always consider whether it pertains to a matter of importance or an unimportant detail, and whether the discrepancy results from innocent error or intentional falsehood.

After making your own judgment, you will give the testimony of each witness such credibility, if any, as you may think it deserves. You may also, in short, accept or reject the testimony of any witness in whole or in part.

Also, the weight of the evidence is not necessarily determined by the number of witnesses testifying to the existence or non-existence of any fact. You may find that the testimony of a single witness or a small number of witnesses as to any fact is more convincing than the testimony of a larger number of witnesses to the contrary.

9

## CREDIBILITY OF WITNESSES - EXPERTS

The rules of evidence may limit the ability of witnesses to testify as to opinions or conclusions. Greater latitude is given to those who we call "expert witnesses." Witnesses who, by education or experience, have become experts in some art, science, profession, or calling, may state an opinion as to relevant and material matter, as to which they possess expertise, and may also state their reasons for the opinion.

Opinion testimony by qualified expert witnesses is competent evidence. You should consider each expert opinion received in evidence in this case, and give each such opinion the weight you find it deserves. If you should decide that the opinion of an expert witness or his or her qualifications are not supported by sufficient education or experience, or if you should conclude that the reasons in support of the opinion are not sound, or that the opinion is outweighed by other evidence, you may disregard the opinion entirely.

## CREDIBILITY OF WITNESSES - IMPEACHMENT

The testimony of a witness may be discredited or, as we sometimes say, impeached by showing that he or she previously made statements which are different than or inconsistent with his or her testimony here in court.  The earlier inconsistent or contradictory statements are admissible only to discredit or impeach the credibility of the witness and not to establish the truth of these earlier statements made somewhere other than here during this trial. It is the province of the jury to determine the credibility, if any, to be given the testimony of a witness who has made prior inconsistent or contradictory statements.

If a person is shown to have knowingly testified falsely concerning any important or material matter, you obviously have a right to distrust the testimony of such an individual concerning other matters.  You may reject all of the testimony of that witness or give it such weight or credibility as you may think it deserves.

11

## DEPOSITION TESTIMONY AS EVIDENCE

During the trial, certain testimony has been presented by way of deposition. The deposition consisted of sworn, recorded answers to questions asked of the witness in advance of the trial by one or more of the attorneys of the parties to this case. The testimony of a witness who, for some reason is not present to testify from the witness stand, may be presented in writing under oath or on a videotape. Such testimony is entitled to the same consideration and is to be judged as to credibility, and weight, and otherwise considered by you, insofar as possible, in the same way as if the witness had been present and had testified from the witness stand.

## BURDENS OF PROOF

In any legal action, facts must be proved by a required standard of evidence, known as the "burden of proof." In a patent case such as this, there are two different burdens of proof that are used. These different burdens are related to the particular issues being litigated.

The first burden of proof applies to the party, like ePlus, that alleges infringement. To prevail on a patent infringement claim, the plaintiff must prove infringement by a preponderance of the evidence. Another way to describe this standard is that plaintiff must persuade the jury that what the party seeks to prove, that is infringement, is more probably true than not true.

The second burden of proof standard is a higher one. This burden applies to the plaintiff's claim that defendant acted willfully in infringing plaintiff's patents and also to defendant's claims that plaintiff's patents are invalid. This standard is called proof by clear and convincing evidence, which means that the party with the burden prevails if it can persuade the jury that it is highly probable that what the party seeks to prove is true.

You may have heard of a burden of proof that is used in criminal cases called "beyond a reasonable doubt." That requirement is the highest burden of proof. It does not apply to a patent case such as this one, and you should, therefore, put it out of your mind.

I will now give you some background about the nature of this case and the issues you will be deciding. For each issue, I will instruct you as to the burden of proof that will apply.

13

## THE PARTIES' CONTENTIONS ON INFRINGEMENT

## PLAINTIFF'S CONTENTIONS

### DIRECT INFRINGEMENT

ePlus contends that Ariba infringes claims 1, 14, and 31 of the '683 patent, claims 16, 17, and 21 of the '516 patent, and claims 1 and 5 of the '172 patent, by its making, use, sale, or offer for sale of various products and services for electronic sourcing and procurement, including a product known as Ariba Buyer. This is called direct infringement. ePlus seeks to prove direct infringement by proving that it is more probable than not that Ariba's electronic sourcing system contains each and every limitation of one or more of the claims of one or more of the patents in suit.

### INDIRECT INFRINGEMENT

ePlus also contends that Ariba indirectly infringes claims 1, 14, and 31 of the '683 patent, claims 16, 17, and 21 of the '516 patent, and claims 1 and 5 of the '172 patent by encouraging others to directly infringe.

To prove that Ariba induced someone else to infringe the patent claims, ePlus must prove that it is more probable than not that Ariba encouraged or instructed another person to use a product or perform a process in a manner that infringes, and that Ariba knew or should have known that the encouragement or instructions would likely result in the other person doing that which you have found to be an infringement.

### WILLFUL INFRINGEMENT

ePlus claims that Ariba has knowingly and willfully infringed the claims of the three patents in suit. To prove willful infringement of a patent, ePlus must prove that Ariba knew of the patent, and that Ariba did not have a reasonable belief either that the patent was invalid or that it did not infringe the patent.

ePlus's willful infringement claim requires a higher burden of proof -- the clear and

convincing evidence standard -- than ePlus's other claims, which require proof by the more probable than not standard.  I will explain in more detail at the end of the case how you decide willful infringement

## DEFENDANT'S CONTENTIONS

### NO INFRINGEMENT

Ariba contends that it does not directly infringe any of the claims at issue (claims 1, 14 and 31 of the '683 patent; claims 16, 17 and 21 of the '516 patent; and claims 1 and 5 of the '172 patent) by its making, use, sale or offer for sale any of the accused products and does not indirectly infringe any claim at issue in that it does not induce customers to infringe claims 1, 14 and 31 of the '683 patent; claims 16, 17 and 21 of the '516 patent; and claims 1 and 5 of the '172 patent.

### NO WILLFUL INFRINGEMENT

Lastly, Ariba maintains that it has not willfully infringed the patents-in-suit.

## THE PARTIES' CONTENTIONS ON INVALIDITY

### DEFENDANT'S CONTENTIONS

Ariba contends that claims of the three patents in suit are invalid for a number of reasons. Although the '683, '516, and '172 patents were granted by the Patent and Trademark Office, it is your job to determine whether or not the legal requirements of patentability were met; that is, it is your job to determine whether or not the patents are invalid.

I will now explain to you briefly the legal requirements for each of the grounds on which Ariba relies to contend that the '683, '516, and '172 patent claims are invalid.

### ANTICIPATION

Ariba contends that the inventions covered by claims 16 and 17 of the '516 patent, and claim 1 of the '172 patent, are not new. An invention that is not new is said to be "anticipated" by the prior art. In order to prove that a claim is anticipated by the prior art, Ariba must prove by clear and convincing evidence that each and every limitation of the claim is present in a single item of prior art.

### OBVIOUSNESS

Ariba contends that the inventions claimed in claims 1, 14 and 31 of the '683 patent, claim 21 of the '516 patent, and claim 5 of the '172 patent are invalid for obviousness. A patent claim will be invalid, even if it is not anticipated by the prior art, if the claimed invention would have been obvious to a person of ordinary skill in the field of the invention at the time it was made. The ordinary skilled person is a person of average education and training in the field of the invention and is presumed to be aware of all of the relevant prior art. You have heard evidence about the skill and experience of such a skilled person during the course of the trial.

In order to prove invalidity based on obviousness, Ariba must prove by clear and convincing evidence that the invention claimed in the patent would have been obvious to a person of ordinary skill in the art at the time the invention was made.

### PLAINTIFF'S CONTENTIONS

ePlus contends that none of the claims at issue is invalid.

## THE CLAIMS OF THE PATENTS IN SUIT

The claims of a patent are the numbered sentences at the end of the patent.  The claims describe the invention made by the inventor and describe what the patent owner owns and what the patent owner may prevent others from doing.  Claims may describe products, such as machines or chemical compounds, or processes for making or using a product.

Claims are usually divided into parts or steps, which have been referred to as the elements of the claim.  For example, a claim that covers the invention of a table may recite the tabletop, four legs and the glue that secures the legs to the tabletop.  The tabletop, legs and glue are each separate elements, which helps define and limit the scope of the claim.  An element may also be called a "limitation."

## CONSTRUCTION OF THE CLAIMS

In deciding whether or not an accused process or product infringes a patent, the first step is to understand the meaning of the words used in the patent claims.

It is my job as Judge to determine what the patent claims mean and to instruct you about that meaning. You must accept the meanings I give you and use them when you decide whether or not the patent is infringed, and whether or not it is invalid.

Before I instruct you about the meaning of the words of the claims, I will explain to you the different types of claims that are at issue in this case.

It may be helpful to refer to the copies of the patents in suit that you have been given as I discuss the claims at issue here.

## INDEPENDENT AND DEPENDENT CLAIMS

There are two kinds of patent claims:  independent claims and dependent claims.  An independent claim does not refer to any other claim of the patent.  Thus it is not necessary to look at any other claim to determine what an independent claim covers.  Claim 1 of the '683 patent, for example, is an independent claim.

A dependent claim refers to at least one other claim in the patent.  A dependent claim includes each of the limitations of the other claim or claims to which it refers, as well as the additional limitations recited in the dependent claim itself.  Therefore, to determine what a dependent claim covers, it is necessary to look at both the dependent claim and the other claim or claims to which it refers.

For example, claim 17 of the '516 Patent is a dependent claim.  It refers to claim 16.  To determine what dependent claim 17 covers, the words of that claim and the words of claim 16 must be read together.

## MEANS-PLUS-FUNCTION CLAIM LIMITATIONS

Some patent claim limitations may describe a "means" for performing a function, rather than describing the structure that performs the function. For example, let's say that a patent describes a table in which the legs are glued to the tabletop.   One way to claim the table is to recite the tabletop, four legs and glue between the legs and the tabletop.  Another way to claim the table is to recite the tabletop and the legs, but, rather than recite the glue, recite a "means for securing the legs to the tabletop." This second type of claim limitation is called a "means plus-function" limitation.  It describes a means for performing the function of securing the legs to the tabletop, rather than expressly reciting the glue.

When a claim limitation is in means-plus-function form, it covers the structures described in the patent specification for performing the function stated in the claim, and also any structure that is equivalent to the described structures.  In our example, the claim covers a table using glue to secure the legs to the tabletop, as described in the patent, and any equivalent structure that performs the function of securing the legs to the tabletop.

Claims 1 and 14 of the '683 Patent, claim 16 of the '516 Patent, and claims 1 and 5 of the '172 Patent include means-plus-function limitations. In instructing you about the meaning of a means-plus-function claim limitation, I will tell you, first, the function that each of the means-plus-function claim limitations performs; and second, the structure disclosed in the patent specification that corresponds to each means-plus-function limitation:

"Means for selecting the product catalogs to search;"

Claim 1 of the '683 Patent contains the means-plus-function element "means for selecting the product catalogs to search." The function of this element is to select the product catalogs to search.  The corresponding structures, materials, or acts, of this element are disclosed as a user interface that allows the user to select a catalog; a catalog module that selects product catalogs based on preferences or history; a catalog search module that identifies product catalogs or a combination thereof; and their equivalents.

See, for example: '683 Patent, Col. 4:5-9; Col. 5:9-27; Col. 8: 40-56; Col. 9:52-col. 10:20; Figs. 1-2 (describing search program 50 and requisition/procurement system 40).

"Means for searching for matching items among the selected product catalogs;"

Claim 1 of the '683 Patent contains the means-plus-function element "means for searching for matching items among the selected product catalogs." The function of this element is searching for matching items among the selected product catalogs." The corresponding structures, materials, or acts, of this element are disclosed as search programs and modules operating on a computer system with access to data in a database or other file system, and their equivalents.

See, for example: '683 Patent, Col. 4:1- col. 6:38; Col. 7:61-col. 12:37; Figs. 1-2; Appendices III-V and VII  (describing local computer 20, search program 50, TV/2, and search program 250).

"Means for building a requisition using data relating to selected matching items and their associated source(s);"

Claims 1 and 14 of the '683 Patent contains the means-plus-function element "means for building a requisition using data relating to selected matching items and their associated source(s)." The function of this element is building a requisition using data relating to selected matching items and their associated source(s). The corresponding structures, materials, or acts, of this element are disclosed as a requisition module operating on a computer system having access to data in the database, and its equivalents.

See, for example: '683 Patent, Col. 1:25-37; Col. 3:3-19; Col. 6:40-65; Col. 7:36-col. 8:14; Col. 15:46-49; Figs. 1-3 (describing various embodiments of requisition modules including requisition/purchasing system 40, requisition management ("REQI") module 44A and requisition maintenance program 44C).

"Means for processing the requisition to generate one or more purchase orders for the selected matching items;"

Claim 1 of the '683 Patent contains the means-plus-function element "means for processing the requisition to generate one or more purchase orders for the selected matching items." The function of this element is processing the requisition to generate one or more purchase orders for the selected matching items. The corresponding structures, materials, or acts, of this element are disclosed as a purchase order generation module operating on a computer system having access to the requisition; and its equivalents.

See, for example: '683 Patent, Col. 1:37-59; Col. 3:3-24; Col. 10:43-54; Col. 15:20-59; Figs. 1-3 (describing systems and processes that operate to generate purchase orders including requisition/purchasing system 40).

"Means for determining whether a selected matching item is available in inventory;"

Claim 1 of the '683 Patent contains the means-plus-function element "means for determining whether a selected matching item is available in inventory." The function of this element is to determine whether a selected matching item is available in inventory. The corresponding structures, materials, or acts, of this element are disclosed as one or more inventory databases; connections to one or more inventory databases; an inventory request module; or a combination thereof, and their equivalents.

See, for example: '683 Patent, Col. 3:19-22; Col. 10:48-49; Col. 14:6-26; Col. 18:17-18; Figs. 1-3 (describing inventory determination systems and method including inventory sourcing module 44B and inventory databases 42B).

"Means for converting data relating to a selected matching item and an associated source to data relating to an item and a different source;"

Claim 14 of the '683 Patent contains the means-plus-function element "means for converting data relating to a selected matching item and an associated source to data relating to an item and a different source." The function of this element is converting data relating to a selected matching item and an associated source to data relating to an item and a different source. The corresponding structures, materials, or acts, of this element are disclosed as one or more non-catalog databases identifying cross-referenced items, identical items or generally equivalent items; one or more cross-reference tables or files identifying cross-referenced items, identical items or generally equivalent items; one or more codes corresponding to cross-referenced items, identical items or generally equivalent items; and their equivalents.

See, for example: '683 Patent, Col. 4:60-col. 5:8; Col. 10:43-54; Col. 14:35-45; Appendices VIII-X; Col. 16:14-32; Col. 17:19-54.

"Means for searching for matching items among the selected data;"

Claim 14 of the '683 Patent contains the means-plus-function element "means for searching for matching items among the selected data." The function of this element is searching for matching items among the selected data. The corresponding structures, materials, or acts, of this element are disclosed as search programs and modules operating on a computer system with access to data in a database or other file system, and their equivalents.

See, for example: '683 Patent, Col. 4:1-col. 6:38; Col. 7:61-col. 12:28; Col. 18:18-50; Figs. 1-2; Appendices III-V and VII (describing local computer 20, search program 50, TV/2, and search program 250).

"Means for processing the requisition to generate purchase orders using data relating to the selected matching items and their associated source(s);"

Claim 14 of the '683 Patent contains the means-plus-function element "means for processing the requisition to generate purchase orders using data relating to the selected matching items and their associated source(s)." The function of this element is processing the requisition to generate purchase orders using data relating to the selected matching items and their associated sources. The corresponding structures, materials, or acts, of this element are disclosed as a purchase order generation module operating on a computer system having access to data in the database, and its equivalents.

See, for example: '683 Patent, Col. 1:37-59; Col. 3:3-24; Col. 10:43-54; Col.. 15:20-59; Figs. 1-3 (describing systems and processes that operate to generate purchase orders including requisition/purchasing system 40).

"Converting means for converting data relating to said item from said first catalog to data relating to said item from said second catalog;"

Claim 16 of the '516 Patent contains the means-plus-function element "Converting means for converting data relating to said item from said first catalog to data relating to said item from said second catalog;" The function of this element is converting data relating to said item from said first catalog to data relating to said item from said second catalog. The corresponding structure, material and acts for performing this function are one or more non-catalog databases identifying cross-referenced items, identical items or generally equivalent items; one or more cross-reference tables or files identifying cross-referenced items, identical items or generally equivalent items; one or more codes corresponding to cross-referenced items, identical items or generally equivalent items and any structural equivalents thereof.

See, for example: '516 Patent, Col. 4:66-col. 5:14; Col. 10:22-25; Col. 14:42-49; Appendices VIII-X; Col. 16:24-32; Col. 17:23-54.

"means for entering product information that at least partially describes at least one desired item;"

Claim 1 of the '172 Patent contains the means-plus-function element "means for entering product information that at least partially describes at least one desired item." The function of this element is entering product information that at least partially describes at least one desired item. The corresponding structures, materials, or acts, of this element are disclosed as a user interface operating on a computer through which a user may provide input; and one or more software modules that provide product information describing an item or a combination thereof, and their equivalents.

See, for example: '172 Patent, Col. 4:6-col. 6:28; Col. 7:66-col. 8:19; Col. 9:55-col. 12:28; Col. 18:23-50; Figs. 1-2 (describing local computer 20, graphical user interface 254, search program 50, interface 60, TV/2 and search program 250).

"means for searching for matching items that match the entered product information in the selected portions of the database;"

Claim 1 of the '172 Patent contains the means-plus-function element "means for searching for matching items that match the entered product information in the selected portions of the database." The function of this element is searching for matching items that match the entered product information in the selected portions of the database. The corresponding structures, materials, or acts, of this element are disclosed as search programs and modules operating on a computer system with access to data in a database or other file system, and their equivalents.

See, for example: '172 Patent, Col. 4:6-col. 6:28; Col. 7:66-col. 9:37; Col. 9:55-col. 12:28; Figs. 1-2; Appendices III-V and VII (describing local computer 20, search program 50, TV/2 and search program 250).

23

"means for generating an order list that includes at least one matching item selected by said means for searching;"

Claim 1 of the '172 Patent contains the means-plus-function element "means for generating an order list that includes at least one matching item selected by said means for searching." The function of this element is generating an order list that includes at least one matching item selected by a search module. The corresponding structures, materials, or acts, of this element are disclosed as a user interface operating on a computer through which a user may select from results from a search program or a search program that generates an order list of matching items, and their equivalents.

See, for example: '172 Patent, Col. 4:6-col. 6:28; Col. 7:66-col. 8:13; Col. 9:55-col. 12:28; Col. 18:23-50; Appendix VI, Figs. 1-2 (describing local computer 20, graphical user interface 254, search program 50, interface 60, TV/2 and search program 250).

"means for building a requisition that uses data obtained from said database relating to selected matching items on said order list;"

Claim 1 of the '172 Patent contains the means-plus-function element "means for building a requisition that uses data obtained from said database relating to selected matching items on said order list." The function of this element is building a requisition that uses data obtained from said database relating to selected matching items on said order list. The corresponding structures, materials, or acts, of this element are disclosed as a requisition module operating on a computer system having access to data in the database, and its equivalents.

See, for example: '172 Patent, Col. 1:25-37; Col. 3:3-19; Col. 6:40-65; Col. 7:36-col. 8:14; Col. 15:46-49; Figs. 1-3 (describing various embodiments of requisition modules including requisition/purchasing system 40, requisition management ("REQI") module 44A and requisition maintenance program 44C).

"means for processing said requisition to generate purchase orders for said selected matching items;"

Claim 1 of the '172 Patent contains the means-plus-function element "means for processing said requisition to generate purchase orders for said selected matching items." The function of this element is processing a requisition to generate purchase orders for selected matching items. The corresponding structures, materials, or acts, of this element are disclosed as a purchase order generation module operating on a computer system having access to the requisition, and its equivalents.

See, for example: '172 Patent, Col. 1:42-55; Col. 3:19-23; Col. 10:53-55; Col. 15:39-61; Figs. 1-3 (describing systems and processes that operate to generate purchase orders including requisition/purchasing system 40).

"means for determining whether a selected matching item is available in inventory;"

Claim 5 of the '172 Patent contains the means-plus-function element "means for determining whether a selected matching item is available in inventory." The function of this element is determining whether a selected matching item is available in inventory. The corresponding structures, materials, or acts, of this element are disclosed as one or more inventory databases, connections to one or more inventory databases, an inventory request module or a combination thereof, and their equivalents.

See, for example: '172 Patent, Col. 3:19-24; Col. 10:21-54; Col. 14:29-38; Figs. 1-3 (describing inventory determination systems and method including inventory sourcing module 44B and inventory databases 42B).

## "COMPRISING" CLAIMS

The beginning portion, or preamble, of certain claims of the patents in suit use the word "comprising." "Comprising" means "including" or "containing." A claim that uses the word "comprising" or "comprises" is not limited to products or processes having only the elements or steps that are recited in the claim, but also covers products or processes that add additional elements or steps.

Let's take our example of the claim that covers a table. If the claim recites a table "comprising" a tabletop, legs and glue, the claim will cover any table that contains these structures, even if the table also contains other structures, such as a leaf or wheels on the legs. All of the claims at issue in this lawsuit use the "comprising" language.

## COURT'S CONSTRUCTION OF THE CLAIMS AT ISSUE

I have now instructed you as to the types of claims at issue in this case. I will next define the meaning of the words used in the patent claims at issue. You must use the definitions I provide to you in your consideration of infringement and invalidity issues.

"Searching within selected product catalogs."

This element does not require that the catalogs that are being searched be connected in a series or chain. Selected catalogs may be searched as a group. In addition, selected catalogs may even be stored in separate databases. Finally, the claims contemplate a system through which a user could select just one catalog to search from the two or more catalogs that are available.

Order of "selecting" and "searching."

Although the claims at issue do not recite an order, the plain language of the patents clearly implies that the selection of what is to be searched must occur before any search. The Court finds that "selecting" and "searching" need not be performed by separate functional capabilities.

"Determining whether a selected matching item is available in inventory."

Claim 1 of the '683 Patent and claim 5 of the '172 Patent must allow the user to check inventory at any time after a search has been conducted, including before an order is placed.

"Means for converting data."

Means for converting data is the process of changing from one form or format to another; where information is concerned, a changeover that affects form but not substance. You must read alongside this definition the definition of a "conversion table:; "a table listing a set of characters or numbers and their equivalents in another coding scheme." The definition of "equivalent" for these purposes is "having identical or similar effects; corresponding or practically equal in effect." The "converting" or "cross-referencing" does not require the automatic replacement of ordered items and can be satisfied by user-initiated replacements of selected matching items, which the system accomplishes through cross-referencing tables. Cross-referenced searching for equivalent items qualifies as converting and this process need not occur automatically, either as a function of the original search or after a user has placed an order.

"Matching items" means the search results.

"Selected matching items" means the requisition items.

27

## PATENT INFRINGEMENT GENERALLY - DIRECT INFRINGEMENT

A patent owner has the right to stop others from using the invention covered by its patent claims during the life of the patent.  If any person makes, uses, sells or offers to sell what is covered by the patent claims without the patent owner's permission, that person is said to infringe the patent.  This type of infringement is called "direct infringement."  In addition to enforcing a patent against a direct infringer, a patent owner also has the right to enforce the patent against those who are known as "indirect infringers."

In reaching your decision on infringement, keep in mind that only the claims of a patent can be infringed.  You must compare patent claims 1, 14, and 31 of the '683 patent, claims 16, 17, and 21 of the '516 patent, and claims 1 and 5 of the '172 patent, as I have defined those claims, to the accused products or processes, and determine whether or not there is infringement.  You should not compare Ariba's products or processes with any specific example set out in the patents in suit, or with ePlus's products or processes.  The only correct comparison is with the language of the claim itself, as I have explained its meaning to you.

You must consider each claim individually and must reach your decision as to each assertion of infringement based on my instructions about the meaning and scope of the claims, the legal requirements for infringement, and the evidence presented to you by the parties.  I will first discuss direct infringement.

Whether or not Ariba knew that what it was doing was an infringement does not matter.  A person may be found to be a direct infringer of a patent even if he or she believes in good faith that what he or she is doing is not an infringement of any patent, and even if he or she does not even know of the patent.

In this case, ePlus asserts that Ariba's electronic sourcing system directly infringes claims 1, 14, and 31 of the '683 patent, claims 16, 17, and 21 of the '516 patent, and claims 1 and 5 of the '172 patent.  It is your job to determine whether or not ePlus has proved by the more probable than not standard that defendant has directly infringed any of these claims of the three patents in suit.

## INFRINGEMENT - EVERY CLAIM LIMITATION MUST BE PRESENT

In order to infringe a patent claim, a product or process must include every limitation of the claim. If Ariba's electronic sourcing system omits even a single structure or step recited in a claim, then you must find that Ariba has not infringed that claim.  You must consider each of the claims of the three patents in suit separately.

A claim limitation is present if it exists in the accused product or process just as it is described in the claim language, either as I have explained that language to you or, if I did not explain it, as you understand it.

## INFRINGEMENT - MEANS-PLUS-FUNCTION CLAIM LIMITATIONS

As I told you, a means-plus-function claim limitation describes a means for performing a particular function.

To prove that an accused product includes a structure that is covered by a means-plus-function limitation, a patent owner must prove two things by the preponderance of the evidence standard. First, that the accused product contains a structure that performs the identical function to the function recited in the means-plus-function limitation. Second, that the structure of the accused product that performs that function is identical to the corresponding structure disclosed in the patent specification, or an equivalent thereof.

## DETERMINATION OF INFRINGEMENT

Taking each claim of the three patents in suit separately, if you find that ePlus has proved that it is more probable than not that each and every limitation of the claim is present in Ariba's accused electronic sourcing system, then you must find that Ariba's electronic sourcing system infringes that claim.

## INFRINGEMENT OF DEPENDENT CLAIMS

My instructions on infringement so far have related to independent claims. As I told you, the three patents in suit also contains dependent claims. A dependent claim includes each of the limitations of the independent claim to which it refers, plus additional elements.

If you find that an independent claim of any of the three patents has been infringed, you must separately determine whether the dependent claims have also been infringed.

## CAPABLE OF INFRINGEMENT

The fact that a product may be used in a manner so as not to infringe the patent is not a defense to a claim of infringement if the product is also reasonably capable of being used in a manner that infringes the patent. If a particular product can be altered without undue difficulty to operate in an infringing manner, the product, as sold, may be found to infringe. In considering whether such product infringes, the jury must carefully consider the specific patent claim the product is alleged to infringe and whether the defendant designed the accused product so that it could, without undue difficulty, be altered or assembled to operate in a manner that infringes the patent claim at issue.

**ACCUSED INFRINGER'S PATENTS NOT A DEFENSE TO INFRINGEMENT**

During this case, you have heard evidence about whether the defendant Ariba may have obtained its own patents relating to its accused electronic sourcing systems and methods. Such evidence is not relevant to the issue whether Ariba infringes the claims of the ePlus patents in this case. It is not a defense to infringement that a defendant may have obtained its own patents relating to its accused systems or methods. This is because the nature of a patent is that it grants to the patentee the right to exclude others from making, using, selling, or offering for sale the invention, but it does not provide the patentee with an affirmative right to make, use, sell, or offer for sale products or systems that incorporate the patented invention. In other words, the existence of one's own patent does not constitute a defense to infringement of a patent belonging to another.

## INDIRECT INFRINGEMENT

As I have told you, in addition to enforcing a patent against a direct infringer, a patent owner may also enforce the patent against indirect infringers. The act of encouraging or inducing others to infringe a patent is called "inducing infringement."

There can be no indirect infringement unless someone is directly infringing the patent. Thus, in order to prove that Ariba is inducing another person to infringe, ePlus must prove that it is more probable than not that the other person is directly infringing at least one claim of the patent.

In this case, ePlus accuses Ariba of inducing the infringement of claims 1, 14, and 31 of the '683 patent, claims 16, 17, and 21 of the '516 patent, and claims 1 and 5 of the '172 patent. ePlus must prove that it is more probable than not that Ariba has induced the infringement of any of these claims.

## INDIRECT INFRINGEMENT - CIRCUMSTANTIAL EVIDENCE

As I stated, in order to prove that Ariba indirectly infringed by inducing infringement by others, ePlus must prove by the more probable than not standard that at least one other person directly infringed a claim of the patents-in-suit, and that Ariba induced that infringement. Proof of Ariba's indirect infringement may be shown through either circumstantial or direct evidence, and likewise proof of the direct infringement by another may be shown through circumstantial or direct evidence.

## INDUCING PATENT INFRINGEMENT

A person induces patent infringement if he or she purposefully causes, urges or encourages another to infringe a patent. Inducing infringement cannot occur unintentionally. This is different from direct infringement, which, as I've just told you, can occur unintentionally. In order to prove inducement, the patent owner must prove that it is more probable than not that the accused inducer knew of the patent and encouraged or instructed another person to use a product or perform a process in a manner that infringes the patent. The patent owner must also prove that it is more probable than not that the other person infringed the patent.

ePlus asserts that Ariba induced patent infringement. ePlus must prove four things by the more probable than not standard:

First, Ariba encouraged or instructed another person how to use a product or perform a process in a manner that you, the jury, find infringes any one of the claims of any one of the three patents in suit.

Second, Ariba knew of the patent.

Third, Ariba knew or should have known that its encouragement or instructions would likely result in the other person doing that which you find to be an infringement of the patent.

Fourth, the other person infringed the patent.

If, and only if, you are persuaded of each of these four things may you find that Ariba induced patent infringement.

## WILLFUL INFRINGEMENT

ePlus also contends that Ariba has willfully infringed the claims of the three patents in suit. If you find on the basis of the evidence and the law as I have explained it, that Ariba directly or indirectly infringes at least one claim of one of the three patents in suit, you must then decide whether or not Ariba's infringement of that patent was willful.

When a person becomes aware that a patent may have relevance to his or her activities, that person has a duty to exercise due care and investigate whether or not his or her activities or proposed activities infringe any valid, enforceable claim of the patent. If that person did not do this and is found to have infringed the patent claims, then the infringement was willful.

Although, as I explained before, ePlus must prove infringement by the more probable than not standard, the burden of proving that the infringement was willful is the clear and convincing evidence standard.

To establish willful infringement, ePlus must prove two things by the clear and convincing evidence standard. First, ePlus must prove that Ariba was aware of the patent at issue. Second, ePlus must prove that Ariba proceeded with the activities that are accused of infringement without a good faith belief that the patent was either invalid, not infringed, or both.

In determining whether or not Ariba has acted in good faith, you should consider all of the circumstances in evidence, including whether when Ariba became aware of the patents in suit, Ariba tried to "design around" the patents by designing an electronic sourcing system that Ariba believed did not infringe the patent claims.

The fact that you may have determined that Ariba was wrong and that one, some or all of the three patents in suit is infringed does not mean that Ariba's infringement was willful. All that is required to avoid a finding of willful infringement is that Ariba had a good faith belief that it did not infringe or that the patent was invalid, and that Ariba's belief was reasonable under all of the circumstances.

38

## VALIDITY IN GENERAL

Only a valid patent may be infringed. For a patent to be valid, the invention claimed in the patent must be new, useful and non-obvious.  A patent cannot take away from people their right to use what was known or what would have been obvious when the invention was made. The terms "new," "useful" and "non-obvious" have special meanings under the patent laws.  I will explain these terms to you as we discuss Ariba's grounds for asserting invalidity.

The invention claimed in a patent must also be adequately described. In return for the right to exclude others from making, using, selling or offering for sale the claimed invention, the patent owner must provide the public with a complete description in the patent of the invention and how to make and use it.

Once a patent has been approved and issued by the Patent and Trademark Office, it is presumed to be valid.  However, a party who has been accused of infringement may challenge the validity of a patent in court.

Ariba has challenged the validity of the claims of the three patents in suit on two grounds. , are anticipated in light of the RIMS patent (DX 115) Specifically, Ariba argues that claims 16 and 17 of the '516 patent and claim 1 of the '172 patent is also are invalid because they were anticipated in prior art.  Ariba also claims that all of the other claims, that is claims 1, 14 and 31 of the '683 patent, claim 21 of the '516 patent, and claim 5 of the '172 patent, on the basis of the Doyle and RIMS Patents) are invalid based on obviousness. under which ation in light of the Doyle Patent DX b.  To overcome the presumption of validity, Ariba must prove that the patents at issue are invalid by clear and convincing evidence.

I will now explain to you each of Ariba's grounds for invalidity in detail.  In making your determination as to invalidity, you should consider each claim separately.

## ANTICIPATION/LACK OF NOVELTY

A person cannot obtain a patent on an invention if someone else has already made the same invention.  In other words, the invention must be new.  If an invention is not new, we say that it was "anticipated" by the prior art.  An invention that is "anticipated" by the prior art is not entitled to patent protection.  A party challenging the validity of a patent must prove anticipation by clear and convincing evidence.

In order for a patent claim to be anticipated by the prior art, each and every limitation of the claim must be present within a single item of prior art.  You may not find that the prior art anticipates a patent claim by combining two or more items of prior art.

A patent will not be an anticipation unless it contains a description of the invention covered by the patent claims that is sufficiently detailed to teach a skilled person how to make and use the invention without undue experimentation.  That means that a person skilled in the field of the invention reading the printed publication or patent would be able to make and use the invention using only an amount of experimentation that is appropriate for the complexity of the field of the invention and for the level of expertise and knowledge of persons skilled in that field.

In deciding whether or not a single item of prior art anticipates a patent claim, you should consider that which is expressly stated or present in the item of prior art, and also that which is inherently present.  Something is inherent in an item of prior art if it is always present in the prior art or always results from the practice of the prior art, and if a skilled person would understand that to be the case.

In this case, defendant contends that claims 16 and 17 of the '516 patent, and claim 1 of the '172 patent, are invalid because they are anticipated.  If you find that Ariba has proved by clear and convincing evidence that a claim is anticipated, then you must find that the claim is invalid.

## THE SCOPE AND CONTENT OF THE PRIOR ART

Under the patent laws, a person is entitled to a patent only if the invention claimed in the patent is new and unobvious in light of what came before. That which came before is called "prior art." The Doyle and RIMS patents are prior art. Determining the scope and content of the prior art means that you should determine what is disclosed in the prior art relied on by Ariba. You must decide whether this prior art was reasonably relevant to the particular problem the inventor faced in making the invention covered by the patent claims. Such relevant prior art includes prior art in the field of the invention, and also prior art from other fields that a person of ordinary skill would look to when attempting to solve the problem.

## OBVIOUSNESS

As I mentioned earlier, an inventor is not entitled to a patent if his or her invention would have been obvious to a person of ordinary skill in the field of the invention at the time the invention was made.

Unlike anticipation, obviousness may be shown by considering more than one item of prior art. The two pieces of prior art upon which Ariba relies are the RIMS patent, Exhibit #DX115, and the Doyle patent, Exhibit #DX128. The question is, would it have been obvious for a skilled person who knew of this prior art to make the claimed invention? If the answer to that question is yes, then the patent claims are invalid.

Ariba contends that the inventions claimed in claims 1, 14 and 31 of the '683 patent, claim 21 of the '516 patent, and claim 5 of the '172 patent would have been obvious to a person of ordinary skill in the field of the invention at the time the invention was made in light of the RIMS item of prior art combined with the Doyle item of prior art. If you find that Ariba has proved obviousness by clear and convincing evidence, then you must find that the claims are invalid for obviousness.

Obviousness is determined from the perspective of a person of ordinary skill in the field of the invention. The issue is not whether the claimed invention would have been obvious to you, to me as a judge, or to a genius in the field of the invention. Rather, the question is whether or not the invention would have been obvious to a person of ordinary skill in the field of the invention.

In deciding obviousness, you must avoid using hindsight; that is, you should not consider what is known today or what was learned from the teachings of the patent. You should not use the patent as a road map for selecting and combining items of prior art. You must put yourself in the place of a person of ordinary skill at the time the invention was made.

You must also keep in mind that the test for obviousness is not whether or not it would have been obvious to try to make the invention, but rather whether or not the invention would have been obvious to a person of ordinary skill in the inventor's field at the time the invention was made.

42

In determining whether or not these claims would have been obvious, you should make the following determinations:

First, what is the scope and content of the prior art?

Second, what differences, if any, are there between the invention of the claims of the patent and the prior art?

Third, what was the level of ordinary skill in the art at the time the invention was made?

Fourth, are there any objective indications of non-obviousness?

Against this background, you must decide whether or not the invention covered by the patent claims would have been obvious.

I will now describe in more detail the specific determinations you must make in deciding whether or not the claimed invention would have been obvious.

**DIFFERENCES BETWEEN THE INVENTION OF THE CLAIMS AND THE PRIOR ART**

In determining the differences between the invention covered by the patent claims and the prior art, you should not look at the individual differences in isolation. You must consider the claimed invention as a whole and determine whether or not it would have been obvious in light of all of the prior art.

In deciding whether to combine what is described in various items of prior art, you should keep in mind that there must be some motivation or suggestion for a skilled person to make the combination covered by the patent claims. You should also consider whether or not the prior art "teaches away" from the invention covered by the patent claims. The question to be answered is: Would someone reading the prior art be discouraged from following the path taken by the inventor?

## LEVEL OF ORDINARY SKILL

Obviousness is determined from the perspective of a person of ordinary skill in the art. This person is presumed to know all of the prior art, not just what the inventor may have known. When faced with a problem, this ordinary skilled person is able to apply his or her experience and ability to the problem and also to look to any available prior art to help solve the problem.

Factors to consider in determining the level of ordinary skill in the art include the educational level and experience of people working in the field, the types of problems faced by workers in the art and the solutions found to those problems, and the sophistication of the technology in the field.

### OBJECTIVE INDICATIONS CONCERNING OBVIOUSNESS

You also must consider what are referred to as objective indications of non-obviousness. Some of these indications of non-obviousness are:

1.      Commercial success of products covered by the patent claims or made by a process covered by the patent claims.

2.      A long-felt need for the invention.

3.      Failed attempts by others to make the invention.

4.      Copying of the invention by others in the field.

5.      Praise of the invention by the infringer or others in the field.

The presence of any of these objective indications may suggest that the invention was not obvious.  These objective indications are only relevant to obviousness if there is a connection, or nexus, between them and the invention covered by the patent claims.  For example, commercial success is relevant to obviousness only if the success of the product is related to a feature of the patent claims.  If the commercial success is the result of something else, such as innovative marketing, and not to a patented feature, then you should not consider it to be an indication of non-obviousness.

46

## Verdict - Election of Foreperson--Duty to Deliberate--Unanimity--Punishment--Form of Verdict--Communication with the Court (Civil)

Upon retiring to your jury room to begin your deliberation, you will elect one of your members to act as your foreperson.  The foreperson will preside over your deliberations and will be your spokesperson here in court.

Your verdict must represent the collective judgment of the jury.  In order to return a verdict, it is necessary that each juror agree to it.  Your verdict, in other words, must be unanimous.

It is your duty as jurors to consult with one another and to deliberate with one another with a view towards reaching an agreement if you can do so without violence to individual judgment.  Each of you must decide the case for himself and herself, but do so only after an impartial consideration of the evidence in the case with your fellow jurors.  In the course of your deliberations, do not hesitate to reexamine your own views and to change your opinion if convinced it is erroneous.  Do not surrender your honest conviction, however, solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

Remember at all times that you are not partisans.  You are judges--judges of the facts of this case.  Your sole interest is to seek the truth from the

47

evidence received during the trial.

Your verdict must be based solely upon the evidence received in the case. Nothing you have seen or read outside of court may be considered. Nothing that I have said or done during the course of this trial is intended in any way, to somehow suggest to you what I think your verdict should be.

A Special Verdict form has been prepared for your convenience. On that form you will record your decisions. Nothing said in the instructions and nothing in the Special Verdict form is to suggest or convey to you in any way or manner any intimation as to what verdict I think you should return. What the verdict shall be is the exclusive duty and responsibility of the jury. As I have told you many times, you are the sole judges of the facts.

You will take [this] verdict form to the jury room and, when you have reached unanimous agreement as to your verdicts, you will have your foreperson write your verdict, date and sign the form, and then return with your verdict to the courtroom.

If it becomes necessary during your deliberations to communicate with the Court, you should send a note, signed and dated by your foreperson or by one or more members of the jury, through the court security officer. No member of the jury should ever attempt to communicate with the Court by any

48

means other than a signed writing and the Court will never communicate with any member of the jury on any subject touching the merits of the case other than in writing or orally here in open court.

Bear in mind also that you are never to reveal to any person—not even to the Court—how the jury stands, numerically or otherwise, on the question of whether or not ~~the government~~ has sustained its burden of proof until after you have reached a unanimous verdict.

49