# EXHIBIT 25

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION

_____

ePLUS, INC.

        Plaintiff,

vs.                                      CASE NO.
LAWSON SOFTWARE, INC.,          3:09cv620
        Defendant.

_____

VIDEOTAPED DEPOSITION OF ALFRED WEAVER, Ph.D., WITNESS

Day 1 of 2

July 20, 2010

9:24 a.m.

Taken at:

BOAR'S HEAD INN

Blue Ridge Room

200 Ednam Drive

Charlottesville, Virginia  22903

REPORTED BY:  Lisa M. Blair, RPR

Page 2

1  APPEARANCES:
2
3  Jennifer A. Albert, Esquire
4  GOODWIN PROCTER
5  901 New York Avenue, NW
6  Washington, DC  20001
7  202.346.4322
8  Counsel for the Plaintiff
9
10 Kirstin L. Stoll-DeBell, Esquire
11 MERCHANT & GOULD
12 1050 17th Street, Suite 1950
13 Denver, Colorado  80265
14 303.357.1670
15 Counsel for the Defendant
16
17 ALSO PRESENT:
18 Jeff Hvass, Lawson
19 Art Brown, Videographer
20
21
22
23
24
25

Page 3

1              I N D E X
2
3  ALFRED WEAVER, Ph.D.              PAGE
4    By Ms. Stoll-DeBell          5
5
6
7
8           E X H I B I T S
9
10 EXHIBITS                          PAGE
11 1  Initial Infringement Expert Report   4
12    of Alfred C. Weaver, PhD and
13    attachments
14 2  Expert Report of Alfred C. Weaver,   4
15    PhD Relating to Patent Validity
16 3  United States Patent No. 6,023,683   4
17 4  United States Patent No. 6,055,516   4
18 5  United States Patent No. 6,505,172   4
19    B1
20 6  United States Patent No. 5,712,989  46
21
22
23
24
25

Page 4

1         (Exhibit Numbers 1, 2, 3, 4 and 5
2  were pre-marked for identification)
3         THE VIDEOGRAPHER:  This is the case of
4  ePlus, Inc. versus Lawson Software, Inc. in cause
5  number CA3:09cv620.  This will be the deposition of
6  Alfred Weaver.
7         This deposition is taking place at the
8  Boar's Head Inn, 200 Ednam Drive, Charlottesville,
9  Virginia, 22903.  This deposition is being taken on
10 behalf of the defendant.
11        My name is Art Brown.  I have been
12 subcontracted by Pro-Systems Court Reporting & Video
13 Services, 4305 Bryant Avenue South in Minneapolis,
14 Minnesota, 55409.
15        Today's date and the current recording
16 time will appear on the screen.  Today is Tuesday,
17 July 20, 2010, and the approximate recording time is
18 9:24 a.m.
19        Would counsel please identify yourself
20 and the party you are representing, starting with the
21 plaintiff's counsel.
22        MS. ALBERT:  Jennifer Albert with Goodwin
23 Procter, representing the plaintiff, ePlus,
24 Incorporated and Dr. Weaver.
25        MS. STOLL-DeBELL:  Kirsten Stoll-DeBell with

Page 5

1  the law firm of Merchant & Gould, representing the
2  defendant, Lawson Software, Inc.
3         THE VIDEOGRAPHER:  Would the court reporter
4  please swear the witness.
5         ALFRED WEAVER, Ph.D., a Witness,
6  called by the Defendant, first being duly sworn,
7  testified as follows:
8         THE VIDEOGRAPHER:  We are on the record at
9  9:25 a.m.  Counsel may proceed.
10        EXAMINATION BY MS. STOLL-DeBELL:
11 Q.   Good morning, Dr. Weaver.
12 A.   **Good morning.**
13 Q.   Will you state your business address for
14 the record?
15 A.   **My university business address is 151
16 Engineer's Way, Charlottesville, Virginia, 22904.**
17 Q.   And Dr. Weaver, I understand that you
18 have a medical condition?
19 A.   **That's correct.**
20 Q.   Can you tell me a little bit about that?
21 A.   **Yes.  I have some congenital cervical
22 spine problems.  The nerves of the spine rub up
23 against the calcium deposits and cause these muscles
24 to stiffen.  So the longer I sit, the more pain I feel
25 in the shoulder.  So I need breaks to loosen up my**

Page 54

1   A.   At -- no; at the seller's location -- or
2   availability.  It's not an actual count; it's an
3   indication of availability.  So out of stock,
4   backordered, ships today, ships tomorrow, you'll have
5   it by Friday; that's what I think of as inventory.
6       Q.   What about -- what if I use the term
7   stock items, what does that mean to you?
8       A.   Well, to me it sounds like that's
9   customer-owned inventory.
10      Q.   So is Lawson's software capable of
11  storing data about a customer's stock item?
12      A.   I didn't look into that.
13      Q.   When -- you're familiar with the search
14  results you see using RSS, and are you familiar
15  with -- you'll see some items have a check by them,
16  and some items have a check and a plus mark by them?
17      A.   Okay.
18      Q.   Do you remember that?
19      A.   I do recall that.
20      Q.   Okay.  Do you know what those mean?
21      A.   I'm not sure now.
22      Q.   Well, I'll tell you my understanding, and
23  you can tell me whether that's consistent with what
24  you understand.
25          My understanding is Lawson's software

Page 55

1   deals with -- or Item Master specifically stores
2   information about two kinds of items:  Non-stock
3   items, which would be things you order from a
4   third-party vendor, and inventory or stock items.  I
5   believe they actually call them inventory items.  And
6   those would be items that are actually customer owned
7   that are stocked at the customer location.  And then
8   my understanding further is that by looking at the
9   check or the check and the plus, that will tell you
10  whether it's an inventory versus a non-stock item.
11          Does that sound consistent with your
12  understanding of how Lawson's software works?
13      A.   A discussion of stock and non-stock is
14  familiar, but I don't -- I don't have -- I have not
15  studied -- I don't have an example of the checkmarks.
16      Q.   So I'm just trying to understand -- well,
17  what I ultimately want to know is your opinion
18  about -- about these customer-owned stock items, and
19  whether those fall within the scope of the claims.
20      A.   I don't know.
21      Q.   You didn't analyze that?
22      A.   No.
23      Q.   When you looked at Lawson's software, did
24  you understand -- well, let's talk even about the demo
25  system.

Page 56

1       A.   Okay.
2       Q.   And let me back up.  Did you review a
3   demonstration laptop with Lawson's S3 software --
4       A.   Yes.
5       Q.   -- that was produced by Lawson in this
6   case?
7       A.   Yes.
8       Q.   And you ran some demonstrations --
9       A.   Right.
10      Q.   -- based on that demo laptop?
11      A.   I did.
12      Q.   And there was item data in the Item
13  Master on that demo laptop?
14      A.   Yes.
15      Q.   And do you agree that some of that item
16  data in the item after it was in the laptop included
17  items that are non-stock and stock items?
18      A.   I don't recall.
19      Q.   Did you, in doing your demonstrations
20  that you did and in forming your opinions, consider
21  whether or not the items that you were looking at were
22  stock versus non-stock?
23      A.   No.
24      Q.   Did you assume for your opinion that all
25  of the items in Item Master were accused of infringing

Page 57

1   the claims?
2       A.   The items don't infringe a claim.
3       Q.   Did the demo system you reviewed track
4   company-owned stock items?
5       A.   I don't recall there being a difference
6   between company owned and not owned.
7       Q.   If -- if Item Master was loaded only with
8   customer-owned stock items, would that constitute a
9   catalog or multiple catalogs in the context of the
10  asserted claims?
11      A.   If the -- if the information came from
12  vendor catalogs, then yes.
13      Q.   Even if the -- even if the items that are
14  actually being stored are actually customer-owned
15  items?
16      A.   If the information came from vendor
17  catalogs, then yes.
18      Q.   Let's look at Exhibit 1, which is your
19  infringement report.  And paragraph 64 is what I'd
20  like you to go to.  And I'm sort of one, two -- the
21  seventh line down you talk about items maintained in
22  Item Master and vendor item tables.  And then you put
23  for non-stock items constitutes an organized selection
24  of items and associated information?
25      A.   Yes.

(Pages 54 to 57)

Page 66

1  fields, but not all of them; is that published by a
2  vendor?
3     A.   Yes.
4     Q.   What if you take some of the fields and
5  you make changes to them, is that published by a
6  vendor?
7     A.   I think now you're into a gray area.
8     Q.   What if you don't take all of the fields
9  from an item in a vendor catalog, is that published by
10 a vendor?
11    A.   Yes.
12    Q.   Let's say you just take -- I don't
13 know -- the description and the part number --
14    A.   Yes.
15    Q.   -- but you don't take images and you
16 don't take other things?
17    A.   Yeah, I think that's still published by a
18 vendor.
19    Q.   So is one field enough to be published by
20 a vendor?
21       MS. ALBERT: Calls for a legal conclusion.
22 The judge has entered a claim construction.
23    A.   Gray area.
24    Q.   So I think now I want to -- I want to
25 talk about your opinion with regard to sort of the

Page 67

1  line between the different catalogs in Item Master.
2  It's your opinion that it does, in fact -- or is
3  capable of containing multiple catalogs; is that
4  correct?
5     A.   Yes.
6     Q.   And maybe it's easier to put it in the
7  context of the demo system that you looked at. My
8  question to you is, how do you tell where one catalog
9  begins and -- or one ends and another begins within
10 that Item Master?
11    A.   If you search for a vendor name, you will
12 get results in which that vendor name -- well, you
13 will only get results that match that vendor name. So
14 you'll get items that are distributed, supplied by
15 that vendor and other distributors.
16    Q.   So are you saying that all items from a
17 vendor constitute a catalog within the Item Master
18 database?
19    A.   In the Item Master database, each item
20 has a description in the Item Master, plus some other
21 tables like the vendor tables. So one can identify
22 items by keywords. And so, if we have a keyword that
23 identifies a vendor, then the database index will
24 point to those records in which that vendor name
25 appears. And then when the search completes, we have

Page 68

1  a list of items that contain that vendor name.
2     Q.   So you did an example where you did a
3  search for Dell?
4     A.   I did.
5     Q.   And I think it returned four items?
6     A.   I think that's right.
7     Q.   So would you say those four items are the
8  Dell catalog within the Item Master database?
9     A.   Well, in that example there was both Dell
10 and Diablo were distributors. So we were seeing the
11 Dell catalog, and we were seeing two items from
12 Diablo, because they are Dell products.
13    Q.   So when you did a search for Dell, you're
14 saying you came back with items that are a part of
15 both Dell's catalog and Diablo's catalog?
16    A.   Yes.
17    Q.   How could you tell those items were part
18 of Diablo's catalog?
19    A.   They were labeled.
20    Q.   I think -- where were they labeled?
21    A.   They were -- I don't remember the label
22 name, but it was -- it was -- Diablo was the source,
23 the seller of the Dell items.
24    Q.   So if you did a search for Diablo, what
25 would happen?

Page 69

1     A.   I didn't do one, so I'm not sure.
2     Q.   You ran that search both in the RQ module
3  and also in the RSS module --
4     A.   That's right.
5     Q.   -- is that correct?
6     A.   That example was done with both.
7     Q.   And the RQ module you, I think, received
8  four -- four item entries or four results, and none of
9  those identified Dell or Diablo --
10       MS. ALBERT: Object to the form.
11    Q.   -- is that correct?
12       MS. ALBERT: Mischaracterizes the
13 demonstration.
14    A.   This is -- this can't be a memory test
15 for me.
16    Q.   Well --
17    A.   We can run the demo, and then we'll both
18 know the answer.
19    Q.   Yeah, I wanted to run the demo, but
20 apparently that's being objected to. So what I
21 intended to do -- and we will, I think, address this
22 maybe on a break. What I intended to do is just to
23 put the system up, go through the demos that you did,
24 and ask you questions about it. So it wasn't, in
25 fact, a memory test.

(Pages 66 to 69)

Page 70

1   **A.  I see.**
2   Q.  Because I don't -- I don't expect you to
3   remember everything, but I do want to know what your
4   opinions are. I do want to understand how you -- how
5   you delineate one catalog from another --
6   **A.  Okay.**
7   Q.  -- in Item Master.
8      MS. ALBERT: And Counsel, as I explained, we
9   had an agreement with Lawson's counsel that we were
10  not going to have Dr. Weaver perform demonstrations on
11  the fly with the demonstration system. You know, I
12  explained that I don't appreciate being ambushed at
13  the deposition when we had a prior agreement. We had
14  understood we had resolved this issue with
15  Mr. Schultz. We told him that Dr. Weaver would not be
16  prepared to do live demonstrations of your
17  demonstration system. As I explained to Mr. Schultz,
18  the demonstration system is flawed. We have had much
19  correspondence over the course of discovery in this
20  case. For example, the demonstration system times out
21  frequently. You can't always get the virtual machines
22  running. The Punchout connections frequently don't
23  work properly. There is inadequate item data in the
24  Item Master. Some of the data has been miscoded. For
25  example, you could type in stents and get rectal

Page 71

1   probes. That was one thing that happened. We had
2   much correspondence over the course of the case
3   regarding the flaws of the demonstration system that
4   was produced in discovery. We had a conference call
5   with a Lawson implementation professional, who
6   assisted us with loading additional sample data into
7   the system. That took weeks to do. We're not
8   prepared to do demonstrations on the fly. As we
9   explained, and as Dr. Weaver set forth in his report,
10  he had some demonstrations that were prepared at his
11  instructions and under his direction, but as I
12  informed Mr. Schultz, he himself did not prepare those
13  demonstrations. He provided instructions and
14  directions for their preparation.
15     Now, if you want to go through the
16  videos that we produced in conjunction with
17  Dr. Weaver's report, we can do that. But the
18  demonstration system itself is -- is flawed. And, you
19  know, if you want -- I mean, if we want to waste time
20  trying to get that thing to work properly during the
21  deposition, I just don't think it's a proper use of
22  Dr. Weaver's time. And, you know, I wish that you had
23  told me in advance what exactly your intentions were,
24  because we would have had an opportunity to seek a
25  protective order from the court.

Page 72

1      MS. STOLL-DeBELL: Are you done?
2      MS. ALBERT: I think so.
3      MS. STOLL-DeBELL: Okay. I -- it's my
4   understanding -- and I have e-mails to show that we
5   notified you that we intended to do a live
6   demonstration.
7      MS. ALBERT: That is not correct.
8      MS. STOLL-DeBELL: Well, we disagree on
9   that, and we may end up taking it to the court today.
10  Yeah, it's -- I have e-mails saying -- confirming that
11  we wanted to do a live demonstration. We flew out
12  Mr. Hvass not once, but twice, actually, because we
13  had, you know, a tragic situation with Dr. Weaver's
14  mother. But we brought him out to run this system,
15  because you told Mr. Schultz that you were not capable
16  of running it, and Dr. Weaver was not capable of
17  running it.
18     We have every right to be able to cross
19  examine Dr. Weaver on how the system works, and on the
20  demonstrations that he does. I don't know what you
21  intend to do at trial, but we -- we cannot effectively
22  defend ourselves if we can't cross examine him and run
23  the software. We can't just be limited to the demo
24  that you-all did that serves your purposes, and
25  frankly I think it's deceptive. It's just -- it's

Page 73

1   ridiculous. He's your infringement expert. And the
2   fact that you will not allow him to look at a
3   demonstration during his deposition is unbelievable,
4   frankly. And the fact that you would think we don't
5   want to do it, I mean, it's just crazy. I want to
6   understand what his opinions are -- his opinions about
7   infringement of my client's software.
8      MS. ALBERT: We were not informed that you
9   were bringing Mr. Hvass to the deposition to run the
10  system. We were not informed that there would be a
11  live demonstration over our objections. I told
12  Mr. Schultz that I would bring the system for your
13  inspection. He did not inform me that you were
14  intending to do a demonstration. I informed him that
15  we were not able to do a demonstration at the
16  deposition. I have no objection to your questioning
17  Dr. Weaver about the demonstrations that were provided
18  to you, but I think it's -- it's a fool's errand to
19  try to run the demonstration system when we don't have
20  an opportunity to inspect in advance what exactly it
21  is that you're going to ask be conducted, because the
22  demonstration system is flawed in much of the data
23  that was entered. And this has been the subject of
24  numerous correspondence and prior meet-and-confers
25  over the course of discovery.

(Pages 70 to 73)

Page 74

1   MS. STOLL-DeBELL: Well, first of all, with
2   regard to Mr. Hvass, you did know he was coming.
3   MS. ALBERT: No, we did not.
4   MS. STOLL-DeBELL: In fact, I think
5   Mr. Robertson is paying for his travel for the last
6   trip.
7   MS. ALBERT: We were not informed -- I'm
8   sorry. We were not informed that someone was going to
9   be here to conduct the demonstration. I was not ever
10  informed of that.
11  MS. STOLL-DeBELL: Okay. Well,
12  Mr. Robertson was. And I know there are e-mails about
13  Mr. Hvass coming out for that.
14  MS. ALBERT: I was not informed -- I was not
15  informed that you would have a representative here to
16  conduct a demonstration.
17  MS. STOLL-DeBELL: And then with regard to
18  the system being flawed, you, in fact, put your own
19  data into it, didn't you?
20  MS. ALBERT: As we had had numerous
21  meet-and-confers, numerous conversations with counsel,
22  you know, we've addressed the issue to the court
23  before. Yes, you're -- you're aware that we had to
24  load additional data in, in order to show the full
25  capability of the system, because in many situations

Page 75

1   there was inadequate data in the system, or it was
2   mis-coded. That's been documented over the course of
3   discovery.
4       We did consult with a Lawson
5   implementation specialist, who walked us through the
6   process of how to format the data and use the catalog
7   load utilities that are included in the software.
8   And, in fact, I think the instructions that she
9   provided to us weren't exactly accurate. It took us
10  many weeks to load that. We did -- finally were able
11  to load a small sample of additional data.
12  THE VIDEOGRAPHER: Two minutes.
13  MS. STOLL-DeBELL: Okay. Well, I think what
14  we should do is resolve this off the record. We
15  obviously have very different views of what happened.
16  And I think, you know, we can decide whether to take
17  it to the court. But for now, let's -- instead of
18  making Dr. Weaver sit here with his painful back,
19  we'll take a break now, and then we'll -- I'll do the
20  best I can without -- and he will, too -- without
21  having it in front of him.
22  THE VIDEOGRAPHER: We're off the record at
23  approximately 11:38 a.m.
24          (Whereupon, a recess was taken).
25  THE VIDEOGRAPHER: We're on the record at

Page 76

1   approximately 12:03 p.m. Counsel may proceed.
2   BY MS. STOLL-DeBELL:
3       Q.   I think we -- when -- before we took a
4   break we were talking about published by a vendor --
5       A.   Yes.
6       Q.   -- and what that meant. So in the
7   context of the Item Master on the demo that you used,
8   did some of the items in that Item Master originate
9   from a manufacturer?
10      A.   **I had nothing to do with the formation of**
11  **the database.**
12      Q.   Okay.
13      A.   **The database was simply delivered.**
14      Q.   Now, data was added to it by ePlus,
15  though; isn't that right?
16      A.   **Yes.**
17      Q.   Did you have any -- did you do anything
18  in connection with that?
19      A.   **When the original data set proved to be**
20  **both inadequate and inaccurate, it was my advice that**
21  **additional data be acquired and loaded. I did not do**
22  **that myself.**
23      Q.   Did you -- did you decide what data
24  needed to be loaded?
25      A.   **I explained that we needed to have data**

Page 77

1   **from multiple catalogs so that we could show the**
2   **searching capabilities.**
3       Q.   Anything else that you said needed to be
4   added?
5       A.   **Well, we went through all of the claims**
6   **looking at all of the elements. For instance, we**
7   **needed to be able to show the category search and the**
8   **operation of the UNSPSC codes, searching -- being able**
9   **to search a catalog, being able to Punchout, being**
10  **able to bring back Punchout items into the Lawson**
11  **shopping cart.**
12      Q.   So is this all data that you had added,
13  or is this just what you wanted to show?
14      A.   **This is what I wanted to show.**
15      Q.   Okay. So I -- I'm interested in what
16  data you said needed to be added, in addition to the
17  data that Lawson provided on the demo laptop?
18      A.   **Multiple vendor catalogs and enabled for**
19  **searching by -- in multiple ways, including by vendor**
20  **name.**
21      Q.   Searching -- okay. Multiple data
22  catalogs and searching by vendor name?
23      A.   **That's right.**
24      Q.   Okay. Let's start with the multiple data
25  catalogs. How do I tell what is part of what catalog

(Pages 74 to 77)

Pro-Systems Court Reporting    612.823.2100

Page 78

1  in Item Master in the demo that you used?
2  **A.  If I search for Dell, it will return Dell**
3  **items.**
4  Q.  Now, it's actually -- when you did your
5  demonstration of RQ, for example, you searched by item
6  description?
7  A.  Yes.
8  Q.  And so, it returned items that had Dell
9  in the item description?
10  A.  That's correct.
11  Q.  Now, I think of the four items that were
12  returned, is that Dell's catalog?
13  **A.  Well, in that case it was Dell and**
14  **Diablo.  And my understanding is that the vendor name**
15  **field had not been configured for searching.  So**
16  **you're right that when I searched for Dell, I'm**
17  **finding Dell in the item description.  Had it been**
18  **configured to allow vendor name searching, then I**
19  **would have gone to vendor catalogs directly.**
20  Q.  Okay.  So do you agree that Item Master
21  does not have a field for vendor name?
22  **A.  Not in that particular table, but there**
23  **is a vendor table associated with that database.**
24  MS. ALBERT: Okay.  Sorry.  Is this screen
25  being shown on the deposition?

Page 79

1  THE VIDEOGRAPHER: Not on my camera. I'm
2  just focused on him.
3  MS. STOLL-DeBELL: It's actually not.
4  MS. ALBERT: Because I was wondering why we
5  were going to this particular screen.  You know, I
6  just don't want the record to reflect anything yet
7  when it hasn't been introduced yet.
8  MS. STOLL-DeBELL: And actually, you know, I
9  need to actually set up a WebEx to have this recorded,
10  and it's not.  So it's not being recorded right now in
11  any way, shape or form.  And I actually didn't even
12  know it was up there.
13  MS. ALBERT: Okay.
14  MS. STOLL-DeBELL: So --
15  MS. ALBERT: I was just objecting to it
16  being on the screen if it was being recorded, and it
17  wasn't really part of the testimony.
18  THE VIDEOGRAPHER: The videography is only
19  on the witness.
20  MS. ALBERT: Okay.
21  MR. HVASS: I'll just turn it off.
22  MS. STOLL-DeBELL: What we had planned to
23  do, Jennifer -- just like all of the other demos that
24  we had done -- is have the actual screen shots
25  recorded via WebEx.  And we can certainly do that for

Page 80

1  his recorded demos, if you want, although we're just
2  playing something that's been recorded already.  So I
3  don't really see too much of a point in that, frankly.
4  MS. ALBERT: Okay.
5  MS. STOLL-DeBELL: If we do a live demo,
6  then I think we all want it recorded.
7  MS. ALBERT: Okay.  Fair enough.
8  MS. STOLL-DeBELL: Does that sound like a
9  plan to you?  Do you see any reason we should
10  re-record something?
11  MS. ALBERT: No.  That's fine.  I just
12  didn't necessarily want somebody -- yeah.  I just
13  didn't know if it was being recorded, like a split
14  screen or something, and it was not really related to
15  the testimony at the time.
16  MS. STOLL-DeBELL: Okay.  With that, would
17  you mind reading back?  I totally lost track of where
18  we were.
19  COURT REPORTER: The last question was, "So
20  do you agree that Item Master does not have a field
21  for vendor name?"
22  And the answer was: "Not in that
23  particular table, but there is a vendor table
24  associated with that database."
25  Q.  Can you explain what you were talking

Page 81

1  about, please?
2  **A.  In the Neimeyer report, he points out how**
3  **the Item Master is structured, and that as a part of**
4  **the overall database system, there is a separate table**
5  **that contains vendor information.  So if -- if the**
6  **vendor name is configured such that it can be**
7  **searched, then there in the vendor table is the name.**
8  **The vendor table is the place where that can be**
9  **searched.  And as we've already pointed out, if the**
10  **name -- if the vendor name appears in other places in**
11  **Item Master, then it could be searched that way as**
12  **well.**
13  Q.  I'm sorry, say that again.
14  **A.  All of it?**
15  Q.  No; just the last sentence.
16  **A.  Oh, okay.  And as we -- as we have seen,**
17  **if we search for vendor name in the Item Master, we'll**
18  **find that if that field is in the description, or if**
19  **the user has taken a user field and defined that to be**
20  **a vendor name field -- so if the vendor information**
21  **has been made searchable.**
22  Q.  Are you aware that Lawson witnesses
23  testified that it's not possible to use a user field,
24  set that up for vendor name?
25  **A.  No.**

(Pages 78 to 81)

Page 82

1  Q.  In Item Master, I'm sorry.
2  A.  I heard the opposite.
3  Q.  So you think it is possible to use the
4  user definable field of Item Master, and set that up
5  as a vendor name?
6  A.  Yes.
7  Q.  And I think you said you can search in
8  the demo system vendor name in the vendor item tables;
9  is that right?
10  A.  If it's enabled to do that.
11  Q.  Is that PO13 that you use to do that, to
12  search the vendor item tables?
13  A.  I don't remember.
14  Q.  Do you remember how you searched the
15  vendor item tables?
16  A.  From a text box.
17  Q.  Do your demos that you did for us show
18  searching vendor item tables?
19  A.  Yes.  They show searching by vendor name.
20  Q.  Okay.  Which demo showed that?
21  A.  The Dell.
22  Q.  Both the RQ and the RSS example?
23  A.  Yes.
24  Q.  But you're really searching just the item
25  description, aren't you?

Page 83

1  A.  In this demo, because of the lack of
2  functionality in the system that was delivered, that's
3  correct.
4  Q.  What do you mean, lack of functionality?
5  A.  That -- my understanding is that the
6  search for the vendor name was not enabled.
7  Q.  Enabled in what?
8  A.  In the demonstration system that was
9  provided to ePlus.
10  Q.  So how -- how would you enable it?
11  A.  You need a system person to do that.
12  Q.  Okay.  So it's your position you can
13  search Item Master by item name if it's enabled?
14  A.  You can search the database by vendor
15  name, because there is a vendor table.  And there was
16  deposition testimony from Lawson's clients saying that
17  that could be done, and that they had done that.
18  Q.  So -- and maybe I misunderstood you.  So
19  I'm just trying to -- it seems like you said vendor
20  name searching wasn't enabled in the demo, but then
21  your demo showed vendor name searching for RQ and RSS.
22  So I must have gotten that wrong, right?
23       MS. ALBERT:  Object to the form;
24  mischaracterizes his testimony, and asked and
25  answered.

Page 84

1  A.  In the demo system, vendor name searching
2  was not enabled.  So when I put in a vendor name and
3  do a search on a vendor name, I will get results if
4  the vendor name is included in the item description,
5  or in some other field that has been enabled for
6  keyword searching.
7  Q.  Okay.  By searching, like, the
8  description field?
9  A.  As an example; or any of the fields that
10  are enabled for searching.
11  Q.  And in the demos that you actually did,
12  you were searching description field, weren't you?
13  A.  I didn't look at all of the fields to see
14  which ones were enabled, but the description certainly
15  was.
16  Q.  Okay.  And especially for RQ, that was
17  what you searched?
18  A.  Yes.
19  Q.  When you do a search catalog in RSS, do
20  you agree that that is searching the Item Master
21  tables?
22  A.  And any -- any related tables, yes.
23  Q.  What related tables does it search?
24  A.  It's capable of searching a vendor table.
25  Q.  But you're saying that -- that is what

Page 85

1  was not enabled in the demo system?
2  A.  Correct.
3  Q.  But you don't know how to enable that?
4  A.  I don't.
5  Q.  Do you agree that a vendor -- a vendor
6  number is not a field in the Item Master tables?
7  A.  I think that's correct.
8  Q.  Do you agree that a catalog number is not
9  a field in the Item Master tables?
10  A.  I think that's correct.
11  Q.  Do you agree that item records in the
12  Item Master tables are not associated with a vendor?
13  A.  They are associated through the vendor
14  table.
15  Q.  How?
16  A.  There is a linkage between the Item
17  Master and the vendor table.
18  Q.  Is there a link actually in the Item
19  Master table?
20  A.  Well, I don't know where it is.
21  Q.  If I told you it's only in the vendor
22  item table, does that sound right to you?
23       MS. ALBERT:  Object to the form; lacks
24  foundation.
25  A.  I know there's a vendor item table.  I

(Pages 82 to 85)

**Page 86**

1  know that it can be searched.
2     Q.    If you do a search of the vendor item
3  table, can you automatically add the results of that
4  search to a requisition?
5     A.    I think you need -- you need the
6  information in the Item Master to do that.
7     Q.    Do you agree that you cannot search for
8  all of the items offered by a specific vendor in any
9  database in Lawson's software?
10    A.    With our demonstration system, we were
11 able to search for all of the, say, Dell items. So
12 yes, we were able to do that in the demonstration
13 system.
14    Q.    That was only because they all said Dell
15 in the description, right?
16    A.    Yes.
17    Q.    So if I went in and changed the
18 description to take Dell out, but it still said
19 Inspiron 8100, and then did a search for Dell, that
20 would not pull up all the items from Dell, would it?
21    A.    Right.  If you took out the vendor name,
22 it wouldn't be there to be found.
23    Q.    But many -- oh.
24    A.    This is, of course, the demonstration
25 system that you're talking about.

**Page 87**

1     Q.    And many of the items in the Item Master
2  and the demonstration system do not include the
3  vendor's name in the item description?
4     A.    Some do not.
5     Q.    Many do not?
6     A.    I think that --
7        MS. ALBERT:  Object to the form; lacks
8  foundation.
9     A.    I think that's true; many do not in the
10 demonstration system.
11    Q.    Now, isn't there a limit on the number of
12 characters that you can put into the item description
13 field?
14    A.    I think so.
15    Q.    30 or 32, something like that?
16    A.    Yeah, I don't remember the number, but
17 there is a limit.
18    Q.    And did you hear the testimony from some
19 of the Lawson customers saying that it was a little
20 bit difficult to describe the items and keep that
21 description within that size limit?
22       MS. ALBERT:  Object to the form; lacks
23 foundation, mischaracterizes the customer's testimony.
24    A.    I read a comment similar to that.
25    Q.    So if the vendor name is not within the

**Page 88**

1  item description field of Item Master, then it would
2  not be possible to search for all items offered by a
3  specific vendor?
4     A.    By using the Item Master in the vendor
5  table, it is possible.
6     Q.    Even if the item description does not
7  include the vendor name?
8     A.    Yes.
9     Q.    And the result -- so you're saying a
10 search of the entire database together, including --
11    A.    Yes.
12    Q.    -- Item Master, vendor item tables?
13    A.    Yes.
14    Q.    Is there anything else that would be
15 searched there?
16    A.    There is a third table identified in
17 Mr. Neimeyer's report, but the Item Master and the
18 vendor table are the ones that drive this discussion.
19    Q.    So is it possible to just search those
20 two tables, but not the rest of the tables in the
21 database?
22    A.    I'm not sure.
23    Q.    Just to make sure I got an answer to
24 this -- maybe I did -- so I think what you're saying
25 is if you -- you can search for all items offered by a

**Page 89**

1  specific vendor if you search the entire database,
2  including Item Master and the vendor item tables?
3     A.    It's not that it searches the entire
4  database because of the index to the Item Master, but
5  you can achieve the goal of -- of finding all vendor
6  products.
7     Q.    When you use an index for searching,
8  aren't you still getting results for a search of all
9  of the items within the database?
10    A.    It doesn't work -- it doesn't work like
11 that.  Each individual item in the database has
12 certain keywords, index for searching.  So the index
13 points to the items.  So if I am retrieving items
14 related to a particular keyword, like laptop, then I
15 don't search the whole database.  I just look at the
16 items that are indexed with the keyword laptop.
17    Q.    Is the index built by searching the
18 entire database for items that meet the keyword
19 laptop?
20    A.    The index is built at system generation
21 time.
22    Q.    Based upon looking at all of the records
23 in the Item Master database?
24    A.    As this index is built, each item record
25 is examined for the keywords that are enabled for

Page 90

1  searching, and the index is built to reflect that. So
2  the index points to all instances of -- of a
3  searchable -- of a searchable keyword or
4  characteristic.
5     Q.  Okay. But it looks at every item in the
6  database?
7     A.  At the moment that the index is built, it
8  is built by going through the items in the database,
9  but at the time of search it does not.
10    Q.  And I'm still not sure I totally got an
11 answer to the question, so I'm going to ask you again.
12       I think you're saying -- setting aside
13 the index issue -- you can search to find all items
14 offered by a vendor if you search the database,
15 including Item Master and vendor item tables?
16       MS. ALBERT: Asked and answered three times.
17    A.  Yes.
18    Q.  Let's -- when you do such a search to get
19 all items offered by a vendor, can you add the results
20 of that search to a requisition?
21    A.  You could do them one at a time.
22    Q.  Can you do it automatically?
23    A.  No.
24    Q.  How would you do it?
25    A.  You would select an item that's a result

Page 91

1  of the search and move that into your shopping cart.
2     Q.  So we're talking about RSS?
3     A.  Yes.
4     Q.  If you're not using RSS, if you're just
5  using RQ, can you use the results of a search of the
6  entire database to find items that are offered by a
7  vendor? Can you use the results of that, and put that
8  in your requisition?
9        MS. ALBERT: Object to the form of the
10 question. Mischaracterizes how the system works.
11    A.  Could you say that again?
12    Q.  Yes. So we talked about running a search
13 to find all items offered by a vendor by searching the
14 entire database, including Item Master and vendor item
15 tables.
16       And so, my question is: Can you -- in
17 RQ, not RSS -- can you add the results of that search
18 to a requisition?
19       MS. ALBERT: Same objection.
20    A.  You said searching the entire database.
21 And my testimony is that that is not what is
22 happening, because of the index. So I'm disagreeing
23 with the premise of your question.
24    Q.  Okay. With that said, can you take the
25 results of that search and add it to a requisition in

Page 92

1  RQ?
2     A.  I believe you can do this one at a time.
3     Q.  Why don't we -- why don't we look at your
4  first demo, the RQ demo for Dell. And I'm going to
5  have Mr. Hvass bring that up.
6        MR. HVASS: Do you want to go through the
7  whole thing?
8        MS. STOLL-DeBELL: I'd like to see the
9  search results. Maybe page through it a little bit.
10       MS. ALBERT: It's just a little bit hard to
11 see from here.
12       MR. HVASS: Yeah, that's the interesting
13 part. There's the sign-on, the request and the lines.
14       MS. STOLL-DeBELL: You can maybe just play
15 it from here. So now it looks like we're putting in
16 just preliminary information.
17       MR. HVASS: Also line search.
18       MS. STOLL-DeBELL: Okay. Now you're doing
19 the line search.
20       Okay. Can you pause it?
21       MR. HVASS: Uh-huh (affirmative).
22 BY MS. STOLL-DeBELL:
23    Q.  What is this showing? And this is after
24 you click the line search button.
25    A.  I can barely see it.

Page 93

1     Q.  Well, I don't think you need to --
2     A.  I don't need to see it?
3     Q.  I'm not interested in specifically what
4  the words say, but more just generally what this list
5  of items is that comes up after you click the search
6  button in the line search.
7     A.  It says, active items at requisition
8  location.
9     Q.  Requesting location?
10    A.  At requesting -- I have to get closer to
11 that screen to read it accurately.
12    Q.  Okay. Do you know what that is, though,
13 generally what that's showing?
14    A.  It's the results of your previous click.
15    Q.  So is it a listing of the items in the
16 Item Master file?
17    A.  Yes.
18    Q.  Is it a listing of items in the vendor
19 item tables?
20    A.  I don't think so.
21    Q.  Okay. Go ahead. Now it looks like
22 you're clicking the search button --
23    A.  Okay.
24    Q.  -- is that right? Choosing filter?
25       MS. ALBERT: Well, are you testifying,

(Pages 90 to 93)

Page 94

1  Counsel, or are you going to ask Dr. Weaver the
2  questions?
3      MS. STOLL-DeBELL: Well, if he wants to read
4  what is happening, it's his demo, but I think it's a
5  little bit hard for him to see.
6      MR. HVASS: Do you want to go back a little
7  bit?
8      MS. STOLL-DeBELL: Yeah.
9  BY MS. STOLL-DeBELL:
10     Q.   Do you -- can you describe for me what
11  search you just did?
12     A.   That was a search for items that
13  contained the name Dell.
14     Q.   And it looks like you got four results;
15  is that right?
16     A.   Right.
17     MR. HVASS: There's a Dell.
18     MS. STOLL-DeBELL: Okay. Do you want to
19  pause it there.
20     MR. HVASS: Uh-huh (affirmative).
21     Q.   So these are all items being offered by
22  Dell; is that right?
23     MS. ALBERT: Object to the form;
24  mischaracterizes the demonstration.
25     A.   These are the items that included the

Page 95

1  word Dell in their description.
2      Q.   So is this -- and this was a search of
3  what tables?
4      A.   The Item Master.
5      Q.   Only Item Master?
6      A.   Perhaps it had the vendor table. I'm not
7  sure.
8      Q.   And so is this the Dell catalog within
9  the Item Master database in the demo laptop?
10     MS. ALBERT: Object to the form; asked and
11  answered.
12     A.   Yes.
13     Q.   Now, is there a Diablo catalog in the
14  Item Master in the demo laptop?
15     A.   We saw items from Diablo. So the Diablo
16  information is there, but we may not be able to see a
17  Diablo catalog unless the Diablo vendor has been
18  enabled for searching.
19     Q.   In the vendor item tables?
20     A.   Yes.
21     Q.   Now, these four items, the item number
22  there is a four-digit number, if you recall; is that
23  right?
24     A.   It looks to be at a distance.
25     Q.   And is it your understanding that that is

Page 96

1  what is called a Lawson item number?
2      A.   Yes.
3      Q.   Which is different than a vendor item
4  number?
5      A.   Yes.
6      Q.   And I think if we play through the rest
7  of this demo it will show that at least one of those
8  Lawson items has two vendor item numbers associated
9  with it, one from Dell and one from Diablo; is that
10  your recollection?
11     A.   That's my recollection.
12     Q.   So those items are actually -- you can
13  purchase them within this demo Item Master from Dell
14  or Diablo; is that right?
15     A.   Yes.
16     Q.   So I'm having a hard time understanding
17  how that is a Dell catalog that's being shown, if you
18  can purchase that item from either Dell or Diablo?
19     A.   Because the Dell keyword appears in the
20  description of both the Dell catalog and the Diablo
21  catalog.
22     Q.   So I understand how you got the search
23  results, but how is it that you can call that a Dell
24  catalog when you could purchase those items from
25  Diablo?

Page 97

1      MS. ALBERT: Object to the characterization
2  of the catalogs. I think that you're
3  mischaracterizing what he said it was in his report.
4      MS. STOLL-DeBELL: Okay. Well, he can tell
5  me if I am.
6      A.   So Dell has a catalog of things that they
7  offer. Diablo has a catalog of things that they
8  offer. So when I search for Dell on this
9  demonstration system, I can bring up all items with
10  Dell in the description. That includes both Dell
11  items sold by Dell and Dell items sold by Diablo.
12     Q.   So how would I select to search Diablo's
13  catalog?
14     A.   Well, if vendor name searching were
15  enabled, we could search for Diablo.
16     Q.   Did you see any of Lawson's customers who
17  enabled vendor name searching?
18     A.   The deposition testimony said it could be
19  done.
20     Q.   Do you have any evidence to show that
21  anyone has actually enabled vendor name searching?
22     A.   I don't have an example of that, but
23  again, the testimony of Lawson's customers says it can
24  be done, and Lawson's documentation says it can be
25  done.

(Pages 94 to 97)

Page 98

1  Q.  Okay. And it would be done by assigning
2  a user definable field for a vendor name?
3  A.  That would be a way, yes.
4  Q.  Okay. Is there another way?
5  A.  Making the vendor name searchable.
6  Q.  In the vendor item tables?
7  A.  Making the vendor name searchable in the
8  system. And the vendor name is in the vendor table.
9  Q.  Other than using a user definable field
10 in Item Master, how would -- how would one do that?
11 A.  Well, I think that's the -- that the
12 straightforward way. Again, deposition testimony says
13 that you can -- you can enable searching by vendor
14 name.
15 Q.  Okay. And when you say that, are you
16 talking about setting a user definable field that way,
17 or something else?
18 A.  That is a way.
19 Q.  Okay. So other than using a user
20 definable field, what other way is there to enable
21 vendor searching -- vendor name searching?
22 A.  To enable vendor name searching as a
23 system setup choice.
24 Q.  And how do you do that, other than the
25 user definable field?

Page 99

1  A.  I have not seen it done. I have just
2  read testimony that says it can be done.
3  Q.  The user definable fields that you can
4  set, are those searchable?
5  A.  They can be made searchable.
6  Q.  Can you take the results of a search of
7  the vendor item tables -- not Item Master, but the
8  vendor item tables, can you take the results of those
9  and add them to a requisition?
10    MS. ALBERT: Asked and answered.
11 A.  No. You need the information in the Item
12 Master.
13 Q.  When you were running demonstrations on
14 the demo laptop, did you ever generate an actual
15 purchase order?
16 A.  Yes. Well, I guess it comes down to the
17 semantics of actual. Running the system produced
18 screen shots of requisitions and purchase orders so
19 they were actually there. They were not printed out
20 and acted upon.
21 Q.  Do you have -- do you agree that as sold,
22 Lawson's Item Master database is empty?
23 A.  As sold, it's empty. And the first thing
24 that happens is a customer with Lawson's assistance,
25 if needed, loads the Item Master with vendor catalog

Page 100

1  data.
2  Q.  Do you agree that not all customers use
3  Lawson's assistance to load data into Item Master?
4  A.  What I read in the deposition testimony
5  was that the vast majority of Lawson's customers do
6  use Lawson's assistance, because it's a complicated
7  task.
8  Q.  But not all of them do?
9  A.  Well, I don't know whether all of them
10 need Lawson's assistance. What I read was the vast
11 majority need assistance.
12 Q.  Do you agree that Lawson does not decide
13 what item data will be loaded into its customer's Item
14 Master?
15 A.  The customers do choose what items or
16 groups of items that they want to load, but the
17 loading of that data is done often with Lawson's
18 assistance. And Lawson is providing training and
19 training manuals and publications that explain how to
20 do this.
21 Q.  And I think -- well, I think we got into
22 this a little bit earlier, but we'll go back. If -- I
23 think you said if it's one -- one item in Item Master,
24 it wouldn't be multiple catalogs --
25 A.  Right.

Page 101

1  Q.  -- is that right? And if it's more than
2  one item but they're all from the same vendor, there
3  wouldn't be multiple catalogs?
4     MS. ALBERT: Asked and answered.
5  A.  Correct.
6  Q.  And so, the customer decides what items
7  from what vendors will be loaded into Item Master, not
8  Lawson?
9  A.  The customer makes that decision, and
10 Lawson helps the customer implement that decision.
11 Q.  So the customer gives Lawson the data
12 they want loaded, and Lawson helps them actually get
13 it into the system; is that what you're saying?
14 A.  That is a way, yes. I mean, you could
15 also transfer data from Legacy Systems. You can have
16 Lawson host the whole site for you. You can have
17 Lawson providing their assistance in getting your
18 system set up.
19 Q.  Do you have any evidence to show that
20 Lawson ever made any decisions about what specific
21 item data will be loaded into Item Master?
22 A.  The customer makes that decision, and it
23 can implemented with Lawson's help.
24 Q.  And it can be loaded in multiple
25 different ways?

(Pages 98 to 101)

Page 134

1  constitutes multiple product catalogs, does it?
2      A.  Well, if it came from multiple vendors,
3  it does.
4      Q.  So you have to figure out whether it came
5  from multiple vendors --
6      A.  Well, that --
7      Q.  -- to determine infringement?
8      A.  If it did come from multiple vendors,
9  then this is an instance of infringement.
10     Q.  And if it didn't, it's not; is that
11 right?
12     A.  I'm thinking.
13     Q.  I'm sorry.
14     A.  I think we can't do better than the
15 court's definition.  So what you need to determine is
16 whether the organized collection of items and
17 associated information published by a vendor,
18 etcetera, etcetera.  So if the data meets the court's
19 definition, then that and everything else you need to
20 prove infringement, that might infringe a claim.
21     Q.  Do you agree that ePlus is not accusing
22 any of Lawson's software prior to version 8.0.3 of
23 infringing the asserted claims?
24     A.  That's what I've been told.
25     Q.  What change in version 8.0.3 that

Page 135

1  triggered infringement?
2      A.  Well, I think I'll have to -- I mean, at
3  the high level, the -- I can't do this by memory.  I
4  think two examples are keyword search and categories.
5  There's probably more, but as a memory test, I'm --
6  I'm not very good at that.
7      Q.  We'll talk about those two, and then if
8  you think of additional things later, you can tell me;
9  how does that sound?
10     A.  Okay.
11     Q.  Okay.  So keyword search -- and that is
12 something that's part of RSS; is that right?
13     A.  Yes.
14     Q.  But not RQ?
15     A.  Right.
16     Q.  How is the keyword search of RSS
17 different than the search that was in RQ, or that is
18 in RQ?
19     A.  There's a search element and an advance
20 search element.  So search element allows you to put
21 keywords in a text box and look it up among those
22 fields that have been enabled for searching.  The
23 advanced search lets you do that, plus also provides a
24 separate text box for words that you wish to ignore.
25     Q.  What about keyword search in RSS

Page 136

1  triggered infringement of these asserted claims?
2      A.  Well, it's an enabler for selecting the
3  product catalogs, and for doing searches across
4  product catalogs or within product catalogs.
5      Q.  So in RQ, you can't select product
6  catalogs to search?
7      A.  Let me see what I wrote.
8          MS. ALBERT:  What's the time?
9          THE VIDEOGRAPHER:  We have remaining 13
10 minutes.
11         MS. STOLL-DeBELL:  For three and-a-half
12 hours?
13         THE VIDEOGRAPHER:  That would be about three
14 hours and 50 minutes when we conclude these 13
15 minutes.
16         MS. ALBERT:  Three hours and 50, five-zero?
17         THE VIDEOGRAPHER:  50.
18         MS. STOLL-DeBELL:  Just finish up this line
19 of questioning.
20     A.  (Witness perusing document).
21     Q.  So I think you talk about searching RQ-10
22 at paragraph 353, if that's helpful.  That describes
23 your demo of RQ.
24     A.  Okay.  I was looking at -- I thought the
25 question was:  What did the keyword search enable; am

Page 137

1  I incorrect?
2      Q.  No.  I think that's right.  I'm trying to
3  understand what is -- what is it about the keyword
4  search --
5      A.  Sure.
6      Q.  -- that triggered infringement?
7      A.  So --
8      Q.  And whether -- yeah.
9      A.  Okay.  So --
10     Q.  Yeah.
11     A.  -- starting at paragraph 108 on page 45.
12     Q.  Okay.
13     A.  So for S3, "Catalogs can be selected by
14 inputting manufacturer codes, partial descriptions of
15 items, classification codes/categories, unit of
16 measure, vendor, manufacturer, and other item
17 attributes."
18         So that -- that's an example of what
19 keyword search enables.
20     Q.  Okay.
21     A.  Let's see.  Still on paragraph 108 on the
22 next page, 46, Lawson represents to its customers that
23 S3 can search by vendor catalog number, partial
24 description of item, manufacturer catalog number,
25 classification code, vendor name, manufacturer name.

(Pages 134 to 137)

Page 138

 1  So that's enabled by keyword search.
 2      Q.   Okay.
 3      A.   A couple of sentences later, the accused
 4  Lawson systems have the ability to search for items by
 5  vendor catalog number, partial description,
 6  manufacturer code, classification code, vendor name
 7  and manufacturer name.
 8           And then two lines down from there from
 9  the deposition of the representative from South
10  Jersey, the S3 Procurement system can search for all
11  items associated with a particular vendor by item
12  number, description, UPC code, manufacturer name, and
13  other item attributes.
14           Toward the end of paragraph 109, S3
15  Procurement system can select search catalog, and then
16  inputting a query to search among the catalogs in the
17  internal database.  So those are examples of what the
18  keyword search enables.
19      Q.   Okay.  In RQ, not RSS, it allows you to
20  search by item number or item description; do you
21  agree with that?
22      A.   What -- you were about to refer --
23      Q.   Paragraph 353 is your example.  And we
24  had it up -- we showed it up there, too, for a little
25  bit.

Page 139

 1      A.   I found that.  Let me just read that.
 2           (Witness perusing document).
 3           Okay.  I've read this section.
 4      Q.   So do you agree that the RQ module that
 5  does not include RSS -- RQ -- allows you only to
 6  search two fields: Item number and item description?
 7      A.   So after I did my demo -- my
 8  experimentation and my demo and wrote this section, I
 9  have in paragraph 356, the first drop-down menu allows
10  me to filter my search using any of the various
11  pre-determined criteria associated with the items in
12  the catalog stored in the Item Master database -- item
13  description, item number, manufacturer, unit of
14  measure, etcetera.  So there is the ability to select
15  other fields in the Item Master database.
16      Q.   To search in RQ?
17      A.   To filter the search, yes.
18      Q.   And so, it's your opinion that the search
19  functionality within RQ meets the searching elements
20  of the asserted claims?
21      A.   Yes.
22           MS. STOLL-DeBELL:  Why don't we stop for
23  today.
24           MS. ALBERT:  All right.
25           THE VIDEOGRAPHER:  We're off the record at

Page 140

 1  approximately 2:04 p.m.
 2
 3  AND FURTHER THIS DEPONENT SAITH NOT
 4      (The deposition was suspended at 2:04 p.m.)

Page 141

 1           CERTIFICATE OF DEPONENT
 2  I hereby certify that I have read and examined the
 3  foregoing transcript, and the same is a true and
 4  accurate record of the testimony given by me.
 5  Any additions or corrections that I feel are
 6  necessary, I will attach on a separate sheet of
 7  paper to the original transcript.
 8
 9
10           _____
11              Signature of Deponent
12
13  I hereby certify that the individual representing
14  himself/herself to be the above-named individual,
15  appeared before me this _____ day of _____,
16  2010, and executed the above certificate in my
17  presence.
18
19
20           _____
21           NOTARY PUBLIC IN AND FOR
22
23           _____
24                   County Name
25  MY COMMISSION EXPIRES:

(Pages 138 to 141)