# EXHIBIT 26

Page 143

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION

_____

ePLUS, INC.

        Plaintiff,

vs.                                    CASE NO.

                                        3:09cv620

LAWSON SOFTWARE, INC.,

        Defendant.

_____

VIDEOTAPED DEPOSITION OF ALFRED WEAVER, Ph.D., WITNESS

Day 2 of 2

July 21, 2010

9:18 a.m.

Taken at:

BOAR'S HEAD INN

Blue Ridge Room

200 Ednam Drive

Charlottesville, Virginia   22903

REPORTED BY:   Lisa M. Blair, RPR

Page 144

1  APPEARANCES:
2
3  Jennifer A. Albert, Esquire
4  GOODWIN PROCTER
5  901 New York Avenue, NW
6  Washington, DC 20001
7  202.346.4322
8  Counsel for the Plaintiff
9
10 Kirstin L. Stoll-DeBell, Esquire
11 MERCHANT & GOULD
12 1050 17th Street, Suite 1950
13 Denver, Colorado 80265
14 303.357.1670
15 Counsel for the Defendant
16
17 ALSO PRESENT:
18 Jeff Hvass, Lawson
19 Art Brown, Videographer
20
21
22
23
24
25

Page 145

1           INDEX
2  ALFRED WEAVER, Ph.D.                     PAGE
3    By Ms. Stoll-DeBell            147, 288
4    By Ms. Albert                  275
5          EXHIBITS
6  EXHIBITS                                 PAGE
7  7   Declaration of Alfred Weaver, PhD    158
8       in Opposition to Defendants' Motion
9       Motion for Summary Judgment of
10      Noninfringement
11 8   Declaration of Alfred C. Weaver, PhD 158
12      in Support of ePlus's Motion for
13      Partial Summary Judgment of Infringement
14      and Validity of U.S. Patent Nos. 6,023,683
15      and 6,055,516
16 9   Initial Infringement Expert Report of 158
17      Alfred Weaver, PhD
18 10  Application Design Document for S3    181
19      Item Search Center
20 11  Memorandum Opinion                    202
21 12  Deposition of Louis Hilliard          221
22 13  5.05.10 Alfred Weaver Expert          277
23      Report Exhibits
24 14  Expert Report of Alfred Weaver        277
25      Relating to Patent Validity

Page 146

1      THE VIDEOGRAPHER: This is the case of
2  ePlus, Inc. versus Lawson Software, Inc. in Cause
3  Number CA3:09cv620. This will be the deposition of
4  Alfred Weaver.
5      This deposition is taking place at the
6  Boar's Head Inn, 200 Ednam Drive, Charlottesville,
7  Virginia, 22903. This deposition is being taken on
8  behalf of the defendant.
9      My name is Art Brown. I have been
10 subcontracted by Pro-Systems Court Reporting and video
11 Services, 4305 Bryant Avenue South in Minneapolis,
12 Minnesota, 55409.
13     Today's date and current recording time
14 will appear on the screen. Today is Wednesday, July
15 21st, and the approximate recording time is 9:18 a.m.
16     Would counsel please identify yourself
17 and the party you are representing, starting with the
18 plaintiff's counsel.
19     MS. ALBERT: Jennifer Albert with the law
20 firm of Goodwin Procter. I'm representing the
21 plaintiff, ePlus, Incorporated, and the witness,
22 Dr. Weaver.
23     MS. STOLL-DeBELL: Kirsten Stoll-DeBell with
24 the law firm of Merchant & Gould. And I represent the
25 defendant, Lawson Software, Inc.

Page 147

1      THE VIDEOGRAPHER: Would the court reporter
2  please swear the witness.
3      ALFRED WEAVER, Ph.D., a Witness,
4  called by the Defendant, first being duly sworn,
5  testified as follows:
6      EXAMINATION BY MS. STOLL-De-BELL:
7  Q.  Good morning, Dr. Weaver.
8      THE VIDEOGRAPHER: Excuse me. We're on the
9  record at approximately 9:19 a.m. Counsel may
10 proceed.
11 Q.  Good morning, Dr. Weaver.
12 A.  And good morning again.
13 Q.  How are you feeling today?
14 A.  I'm feeling good. Thank you.
15 Q.  You look like you're feeling good.
16 A.  Yes.
17 Q.  Yesterday we were talking about something
18 you called enabling vendor name searching.
19 A.  Yes.
20 Q.  And I believe you said that could be done
21 by setting one of the user definable fields in Item
22 Master, setting that as a vendor name; is that right?
23 A.  That's right.
24 Q.  Where in your report do you give the
25 opinion that you can enable vendor name searching by

(Pages 144 to 147)

Pro-Systems Court Reporting    612.823.2100

Page 156

1    **A. The ones I remember are RFP questions**
2    **like: Can the Lawson Software search by vendor name?**
3    **And the answer is yes.**
4    Q. Okay. So it didn't specify which tables
5 would be searched, or how you could use the results of
6 those searches?
7    **A. I don't think so.**
8    Q. You -- you gave us several demonstrations
9 as part of your expert report?
10    **A. Yes.**
11    Q. Who actually -- well, did you run the
12 software for those demos?
13    **A. I didn't press the keys, but I was**
14 **present as we discussed what kind of demonstration we**
15 **need to make.**
16    Q. Okay.
17    **A. And we did some trial runs, and I**
18 **commented about whether that was good or bad, whether**
19 **it showed what we needed to show. And often we re-ran**
20 **the demonstration to make it sharper. So I directed**
21 **and saw the demonstrations.**
22    Q. Who actually ran the software?
23    **A. I don't know. I mean, sometimes it**
24 **was -- it was Ms. Albert. And I'm trying to think if**
25 **we had anybody else in the room. I don't remember.**

Page 157

1    Q. Okay. Was Mr. Neimeyer there?
2    **A. He was there four days, yes.**
3    Q. And so, was that the whole time that you
4 spent doing the demos, or was there additional time he
5 wasn't there?
6    **A. There was additional time he wasn't**
7 **there.**
8    Q. If it wasn't Ms. Albert running the
9 software, who else could it have been?
10    **A. Technical staff.**
11    Q. For her law firm?
12    **A. I didn't ask.**
13    Q. Okay. Was it employees of her law firm,
14 though?
15    **A. Well, I would think so.**
16    Q. In connection with reviewing the
17 materials and forming the opinions in this case, did
18 you review Lawson's source code?
19    **A. Only little pieces that were explained in**
20 **Patrick Neimeyer's report.**
21    Q. How did you decide which pieces of code
22 you would look at?
23    **A. I read all of the Neimeyer report.**
24    Q. So it was only code that was actually set
25 forth in his report that you reviewed?

Page 158

1    **A. Yes.**
2    Q. Are you capable of reviewing source code
3 and understanding it?
4    **A. Yes.**
5    Q. Why did you not do so in this case?
6    **A. I didn't think it was necessary.**
7    Q. Why?
8    **A. Because I thought we could observe the**
9 **functionality in the demos.**
10    Q. And that would be good enough for you to
11 give an opinion?
12    **A. Yes.**
13    MS. STOLL-DeBELL: I'm going to have you
14 mark a couple of exhibits.
15    (Exhibit Numbers 7, 8 and 9 were marked
16 for identification)
17    Q. I'm going to go ahead and hand these to
18 you so you can start looking at them.
19    **A. (Witness perusing documents).**
20    Q. Why don't we look at Exhibit 8 first.
21    MS. ALBERT: Just for the record, that one
22 is the declaration of Alfred C. Weaver, PhD, in
23 support of ePlus's Motion for Partial Summary Judgment
24 of Infringement and Validity of U.S. Patent Number
25 6,023,683 and 6,055,516 given in the ePlus versus SAP

Page 159

1 case.
2    MS. STOLL-DeBELL: Yes.
3    Q. I just have a few questions about this.
4 This is one of the declarations that you gave during
5 the ePlus lawsuit against SAP for patent infringement;
6 is that right?
7    **A. That's correct.**
8    Q. And these same three patents were at
9 issue in that SAP lawsuit as are issued in this
10 current lawsuit against Lawson?
11    **A. That's correct.**
12    Q. And if you go to page 10 of this
13 declaration -- let's go to page 10. And in paragraphs
14 33, 34, 35, I think you're giving the opinion that
15 SAP's SRM and ERP products infringe the claims of the
16 '683 and '516 patents; is that right?
17    **A. Yeah.**
18    MS. ALBERT: The document -- the opinions
19 are what they're stated in the document. I object to
20 your characterization; and also give Dr. Weaver,
21 please, an opportunity to review.
22    **A. So this is a document from maybe**
23 **2005-2006. I haven't seen it since that time. So if**
24 **you want to ask questions about it, I'll have to**
25 **review it first.**

Page 168

1  **A.   I believe so.**
2  Q.   Okay.  Yesterday we were talking about
3  the changes that Lawson made to its software that
4  triggered ePlus's infringement allocations.  And you
5  had mentioned, I think, two things.  One is the
6  keyword searching functionality of RSS, and the second
7  was the category searching functionality?
8  **A.   Yes.**
9  Q.   So I want to talk about that now --
10 **A.   Okay.**
11 Q.   -- a bit more.  We just barely got into
12 that when we stopped yesterday.
13       So you did -- one of your demos you did a
14 search for Dell -- I think Dell and Dimension --
15 within the RQ-10 module; do you recall that?
16 **A.   Yes.**
17 Q.   And do you recall that in that search
18 engine of RQ you have the choice of searching by item
19 number or description?
20 **A.   Yes.  If we want to talk about that, why**
21 **don't we put that on the screen?**
22 Q.   Okay.  We can do that.
23      MS. ALBERT:  And I'll just ask for
24 clarification.  Are you saying that that was the
25 capability of the demonstration system as provided to

Page 169

1  ePlus by Lawson?
2       MS. STOLL-DeBELL:  Yes.  That's what --
3  that's what you can see in the demo if you look
4  through it, that you had a choice of item or
5  description.
6  Q.   My question, I think, is a broad one.
7  And if you want to see it, certainly we can put it up,
8  but you may be able to answer without that.  Is it
9  your view that that searching capability falls within
10 the scope of the asserted claims?
11 **A.   Let's see it.**
12 Q.   Okay.  While Jeff works on that -- and I
13 think actually what I'd like to do is do you have --
14 we probably don't have the demos recorded on here.
15      MR. HVASS:  Not on this one, but I have it
16 here in mine.
17      MS. STOLL-DeBELL:  We'll come back to this.
18 We'll set it up during a break, and we'll come back.
19 Q.   What is it about this keyword search
20 functionality that triggered infringement?
21 **A.   Well, the keyword search is a mechanism**
22 **by which you can select product catalogs.**
23 Q.   Is there something you're looking for I
24 can help you find?
25 **A.   I was going to reread my section on**

Page 170

1  **including multiple product catalogs and selecting**
2  **product catalogs to search.**
3       MR. HVASS:  I have the recording right here.
4  Q.   What page are you looking at?
5  **A.   I'm starting on page 45.**
6       MR. HVASS:  It will brighten as it warms up.
7       MS. STOLL-DeBELL:  We'll do this first.
8  Q.   Now what are you looking for?
9  **A.   I'm still looking for a discussion of the**
10 **RQ module, and I'm not finding it.**
11 Q.   That sounds about right to me.
12 **A.   In the -- in the demonstrations --**
13 Q.   So now my question again is:  What is it
14 about the keyword searching that triggered
15 infringement?
16 **A.   Well, keyword searching allows you --**
17 **it's a mechanism for selecting catalogs, and it's a**
18 **mechanism for finding data items.**
19 Q.   So keyword searching is not available in
20 the RQ module, though; isn't that correct?
21 **A.   Well, I think we did a search.  Can we**
22 **run the demo?**
23 Q.   Here.  It's right here.
24 **A.   Oh, okay.  Now, which one is this?**
25 Q.   This is the RQ demo, Dell Dimension demo.

Page 171

1  I think it's the only demo you did in RQ, which I
2  think is at paragraph 353.
3       MS. ALBERT:  Can you just pop -- you may
4  want to rewind, pause, while Dr. Weaver is looking it
5  up.
6  **A.   Which paragraph?**
7  Q.   Well, I'm going from my memory -- which
8  is usually pretty good -- but I'm thinking it's, like,
9  around 353.  Oh, look, I'm right.  I think I remember
10 your report better than you do, Dr. Weaver.
11 **A.   All right.  So this is the demo**
12 **corresponding to my report paragraphs 353 to 359.**
13 Q.   Yes.  That's my understanding.
14 **A.   Yes.**
15      MR. HVASS:  Play them?
16      MS. STOLL-DeBELL:  Yes, please.
17 Q.   And in here I believe you demonstrate a
18 search in the RQ module?
19 **A.   Yes.**
20 Q.   And the searching mechanism in RQ is
21 different than what it is in RSS; would you agree with
22 that?
23      MS. STOLL-DeBELL:  Can you speed it up a
24 little bit?
25 Q.   So what are you doing here?

(Pages 168 to 171)

Page 172

1  A.  Filling in information about the
2  requester.
3  Q.  Okay. And now what are you doing?
4  A.  Now we're getting ready to look at the
5  Item Master database.
6     MS. STOLL-DeBELL: Can you pause that, Jeff?
7  Q.  What is that, that I'm looking at right
8  now?
9  A.  That is the first 25 items in the Item
10 Master. There are more.
11    MS. STOLL-DeBELL: Okay. Go ahead and hit
12 play, please. Thank you.
13 Q.  Now what are you doing?
14 A.  Now I'm going to do a search of the Item
15 Master.
16 Q.  Through RQ?
17 A.  Through RQ-10.
18 Q.  Okay. And --
19 A.  So there's -- stop.
20    MS. STOLL-DeBELL: Can you hit pause.
21    MR. HVASS: Uh-huh (affirmative).
22 A.  Thank you. So there's a choice between
23 find and filter.
24 Q.  Okay.
25 A.  Find is going to display the first

Page 173

1  occurrence --
2  Q.  Okay.
3  A.  -- of the term. Filter is going to
4  display all occurrences of the search criteria.
5  Q.  Okay.
6  A.  So at this point I'm going to choose the
7  description field.
8  Q.  Okay. So we just saw that you can choose
9  between item number or description; is that right?
10 A.  Just open that.
11    MS. ALBERT: And object to the form of the
12 question given the limitations of the demonstration
13 system that were produced to ePlus that didn't have
14 the full capabilities enabled.
15    MS. STOLL-DeBELL: I disagree with you, but
16 your objection is noted.
17       Okay. Yeah, hit pause.
18 Q.  So again in this demo you have a choice
19 between item number or description to search in RQ; is
20 that correct?
21 A.  So let's go back.
22 Q.  It's a little bit difficult, but we'll
23 try.
24 A.  So there is item description and tracked.
25 Q.  Okay.

Page 174

1  A.  And you're right that the choice that I
2  made here is description.
3  Q.  Okay. And the choices that are shown are
4  item, description or tracked?
5  A.  Yes.
6     MS. ALBERT: In this particular
7  demonstration system --
8     MS. STOLL-DeBELL: Obviously that's what
9  we're looking at.
10    MS. ALBERT: -- that was produced to ePlus.
11 Q.  Now, what does tracked mean?
12 A.  Items that are tracked. I didn't
13 experiment with tracked.
14 Q.  Okay. So this is the keyword searching
15 that was available in the demo -- in the demo that you
16 reviewed to search Item Master through RQ; is that
17 correct?
18 A.  Yes, that's right.
19 Q.  Is this keyword searching?
20 A.  Yes.
21 Q.  Ms. Albert keeps objecting that we didn't
22 have the full functionality in the demo. What
23 additional search functionality do you think there
24 could possibly be, doing this kind of search through
25 RQ?

Page 175

1  A.  You could search all kinds of different
2  fields; however, given that I have only seen one
3  version of this, you know, I can imagine lots of
4  additional functionality that could be here. I have
5  no way to compare this with the -- since this is a
6  demo system, I don't know what, if any -- anything --
7  might be missing from it.
8  Q.  Now, ePlus deposed four of Lawson's
9  customers. And did any of those customers have any
10 additional search functionality through RQ?
11 A.  I believe they did.
12 Q.  Okay. What other fields could be
13 searched through RQ?
14 A.  I could go back and re-read their
15 depositions and pull it out for you.
16 Q.  So at this point in time you don't recall
17 what those were?
18 A.  Right.
19 Q.  So to sort of pull this back to where we
20 started with the keyword searching being one of the
21 things that triggered infringement?
22 A.  Yes.
23 Q.  When you say that, you also include this
24 kind of keyword searching through RQ?
25 A.  Yes.

Page 176

1   Q.   In RSS it's possible to search many more
2   additional fields of Item Master; is that true?
3   **A.   Did you say many fields in addition to**
4   **Item Master?**
5   Q.   Many -- to search additional fields of
6   Item Master in addition to what is shown here?
7   **A.   Okay. I misheard. Glad I clarified.**
8   **Yes, additional fields of Item Master.**
9       MS. ALBERT:  Well, you mean in the
10  demonstration system that was provided to ePlus?
11      MS. STOLL-DeBELL:  Yes.
12  **A.   Yes. In the system that we were given,**
13  **there were additional fields.**
14  Q.   That could be searchable?
15  **A.   That could be searched.**
16  Q.   Through RSS?
17  **A.   Through RSS.**
18  Q.   So in your opinion, being able to search
19  just the description field and the item number field
20  satisfies the searching elements of the asserted
21  claims?
22  **A.   It will allow you to select product**
23  **catalogs, and it will allow you to find the items.**
24  Q.   Let's move on and talk about the second
25  thing that you said triggered infringement.  I believe

Page 177

1   you said category searching; is that right?
2   **A.   Yes.**
3   Q.   Tell me what you mean by that.
4   **A.   The introduction of the category**
5   **hierarchy tree in which items can be assigned a code**
6   **like a UNSPSC code to form a hierarchy of segment**
7   **family class and commodity, to use the UNSPSC**
8   **terminology.**
9   Q.   So it was the ability to search for
10  categories within the hierarchy of categories?
11  **A.   Yes.**
12  Q.   That triggered infringement?
13  **A.   Yes.**
14  Q.   There are also other category fields
15  within Item Master, such as the inventory or
16  purchasing classes; are you familiar with those?
17  **A.   Yes.**
18  Q.   And I believe they have at least a
19  two-tier hierarchy?
20  **A.   Uh-huh (affirmative).**
21  Q.   Do you agree with that?
22  **A.   Yes.**
23  Q.   And can you search by those classes?
24  **A.   Yes.**
25  Q.   Does that fall within what you would call

Page 178

1   category searching?
2   **A.   Yes.**
3   Q.   So it's not just the UNSPSC code in
4   Lawson Software?
5   **A.   Not just that.**
6   Q.   There's also a generic name field; are
7   you familiar with that?
8   **A.   No.**
9   Q.   So you didn't look at the generic name
10  field in forming your opinions in this case?
11  **A.   I don't recall it by that name, no.**
12  Q.   Do the patents talk about UNSPSC codes?
13  **A.   Not by that name.**
14  Q.   Do they talk about category searching?
15  **A.   They talk about cross-referencing, which**
16  **is a way of describing categories.**
17  Q.   How is cross-referencing a way of talking
18  about categories?
19  **A.   In the patents, the idea is that if**
20  **there's an item available from one vendor and a same**
21  **or similar item available from another vendor, the**
22  **cross-reference table links those two. So saying that**
23  **the -- the item is generally equivalent or**
24  **substitutable; and so, they must be in the same**
25  **category if they're going to be generally equivalent.**

Page 179

1   Q.   If Lawson removed the UNSPSC field from
2   its software, would it still infringe the asserted
3   claims, in your opinion?
4   **A.   There are other ways of searching by**
5   **categories. So just removing UNSPSC would not remove**
6   **the capability of category search.**
7   Q.   Okay. We already talked about the
8   inventory and purchasing classifications as being a
9   way of searching by category. Are there any other
10  ways that you're aware of that Lawson software allows
11  the search for item by category?
12  **A.   You can use codes other than the UNSPSC**
13  **codes.**
14  Q.   How -- how would you do that?
15  **A.   You would use a different standard.**
16  Q.   As sold, does Lawson Software have that
17  different standard setup?
18  **A.   I don't think so.**
19  Q.   So it would have to be specially
20  configured by someone to make that work?
21  **A.   Or -- or you would just use a different**
22  **set of codes.**
23  Q.   Okay.
24  **A.   You can manually code these items.**
25  Q.   In fact, you have to, don't you?

(Pages 176 to 179)

Page 204

1   Q.   The RIMS system allowed -- allowed
2   searching of item numbers; do you agree with that?
3   **A.   We're going back to the '989 patent.**
4   Q.   Yes.
5   **A.   And again, it's been months since I've**
6   **studied that.**
7   Q.   Okay. So you would need an hour to read
8   it before you could answer my question?
9   **A.   That's correct.**
10  Q.   Looking at Lawson's S3 software, do you
11  agree that it's possible for a user to change the
12  vendor for an item that is being requisitioned?
13  **A.   Sure; by -- by doing a search for**
14  **something like laptops from the matching items,**
15  **choosing one, putting that in the shopping cart, for**
16  **any reason changing your mind, putting another one in**
17  **the shopping cart, deleting the first one. So yes,**
18  **you can change vendors.**
19  Q.   And in your RQ example -- I think you did
20  that also -- didn't it first select vendor 122, and
21  then you went in and changed it to vendor 124?
22  **A.   Let's have a look.**
23      MS. STOLL-DeBELL:   Can you bring that up,
24  Jeff?
25      MR. HVASS:   Uh-huh (affirmative).

Page 205

1       MS. STOLL-DeBELL:   I think we probably -- we
2   could probably just play it from where we were before.
3   Q.   While he's doing that, I'll ask you
4   another question, and we'll come back.
5       Does Lawson's software allow for a vendor
6   to be selected by default?
7       MS. ALBERT:   Vague and ambiguous.
8   **A.   I don't know what that means.**
9   Q.   In the example that you ran in RQ, I
10  think when you selected that Dell laptop it had
11  already determined that it was going -- Dell was going
12  to be the vendor; is that right?
13  **A.   There was a choice of Dell and Diablo.**
14  Q.   Okay. Let's go -- we're going to watch
15  it.
16      MR. HVASS:   Requisition now.
17  Q.   Okay. So this is where you're doing
18  what?
19  **A.   This is --**
20      MS. ALBERT:   Asked and answered.
21  **A.   -- choosing the item description.**
22  Q.   To search by?
23  **A.   And to search for Dell.**
24  Q.   Okay. And you did that -- can you pause
25  it? How many results did you get?

Page 206

1   **A.   We got four results out of the database**
2   **that Lawson provided in the demo system.**
3   Q.   Okay. Do your results indicate which
4   vendor is associated with each of those items?
5   **A.   If you click on any of those items, they**
6   **do.**
7   Q.   Okay. But right now you can't tell who
8   the vendor is?
9   **A.   Not on that screen, but just pick one and**
10  **click on it.**
11  Q.   Okay. Before you start that up, Jeff,
12  you'll see on the left-hand side there's an item
13  number?
14  **A.   I do.**
15  Q.   That's the Lawson item number, right?
16  **A.   That's right.**
17  Q.   And there are four different Lawson item
18  numbers here?
19  **A.   There are.**
20      MS. STOLL-DeBELL:   If you want to hit play,
21  Jeff, please.
22      MR. HVASS:   Uh-huh (affirmative).
23  Q.   Now, what are you doing here?
24  **A.   We're going to add another search**
25  **criteria.**

Page 207

1   Q.   Another keyword?
2   **A.   Yes.**
3   Q.   So you're choosing to search by
4   description again, right?
5   **A.   That's correct.**
6   Q.   And your second keyword is Dimension?
7   **A.   Correct. What was that?**
8       MS. ALBERT:   That didn't happen on -- I
9   don't think that was --
10      THE WITNESS:   That did not --
11      MR. HVASS:   No. Hold on.
12      MS. ALBERT:   What happened there?
13      MR. HVASS:   It's my -- I went offline.
14      MS. STOLL-DeBELL:   It's just his computer.
15  We're just playing his recorded video. This is not
16  live. This is his recorded video.
17      Okay. Will you hit pause?
18      MR. HVASS:   Uh-huh (affirmative).
19  Q.   Yeah. So this is the actual screen shot
20  recordings that you did and produced with your report.
21      THE WITNESS:   Okay. Just back it up a tab
22  so that we see, once again, how we got here.
23      MR. HVASS:   Gotcha.
24      MS. STOLL-DeBELL:   It's sort of difficult to
25  maneuver through these.

(Pages 204 to 207)

Page 208

1    MR. HVASS: I just have to turn live before
2 I back it up. Back a little bit further.
3    Q.   Okay. So again, we're seeing you put in
4 a second keyword, Dimension?
5    A.   That's right.
6    Q.   And search by Dell and Dimension?
7    A.   That's right.
8    Q.   Okay. And then we get two results?
9    A.   That's correct.
10   Q.   With two different Lawson item numbers?
11   A.   That's right.
12   Q.   And it looks like two different model
13 numbers for the Dell computer. I think one is 8100?
14   A.   A Dimension 8100 and a Dimension --
15   Q.   4100?
16   A.   -- 4100.
17   Q.   Okay. And then you clicked on the 8100,
18 right?
19   A.   That's right.
20   Q.   And clicked add.
21       MS. STOLL-DeBELL: Okay. Will you pause
22 that, Jeff?
23       MR. HVASS: Uh-huh (affirmative).
24       MS. STOLL-DeBELL: Okay. Thank you.
25   Q.   So this looks like down in the line

Page 209

1 detail tab that it has selected a vendor item number
2 for this particular Lawson item number; is that right?
3    A.   That's what it looks like.
4    Q.   And that vendor number is 6010122?
5    A.   Yes.
6    Q.   Now, can you tell from this who the
7 vendor is?
8    A.   Not from this screen.
9    Q.   Okay. Before you start, that vendor item
10 number, was that selected by default?
11   A.   It was selected by the Lawson system.
12   Q.   And it must have been pre-selected for it
13 to come up here; is that right?
14       MS. ALBERT: Object to the form; lacks
15 foundation.
16   A.   I didn't express an opinion about vendor
17 item numbers.
18   Q.   Do you know why it shows that specific
19 vendor item number for this particular Lawson item?
20   A.   No.
21       MS. STOLL-DeBELL: Okay. Can we hit play,
22 Jeff, please?
23       MR. HVASS: Uh-huh (affirmative).
24       MS. STOLL-DeBELL: Thank you.
25   Q.   So now it looks like you clicked on the

Page 210

1 purchasing tab, which moved away from the line detail
2 tab; is that right?
3    A.   That's right.
4    Q.   Okay. And here we see the vendor is who?
5    A.   Dell.
6    Q.   And it has a vendor number -- it looks
7 like 122; is that right? I'm pretty sure that's
8 right. It's a little fuzzy.
9    A.   A little fuzzy, but okay, we'll go with
10 that.
11   Q.   We'll go with that.
12       Okay. So who selected Dell Computer as
13 the vendor for this item?
14   A.   The Dell Computer vendor is associated
15 with this item number 6010.
16   Q.   Okay.
17       MS. STOLL-DeBELL: All right. Let's go
18 ahead and hit play.
19   Q.   It looks like you went back to line
20 detail. I'm not quite sure why.
21       Okay. Now you clicked -- you clicked the
22 vendor item number search tab; is that right?
23   A.   Yes. Would you just go back a tad and
24 let me see that? But yes, that is my recollection.
25 But we'll prove it right here.

Page 211

1    Q.   Okay.
2    A.   It's tricky, isn't it?
3    Q.   It's very, very difficult to manage and
4 move through these demos.
5    A.   Okay.
6    Q.   Very difficult. So now I'm complaining
7 about something.
8        Okay. So now you hit the vendor item
9 number search?
10   A.   Yes.
11   Q.   And it looks like it pulls up two vendor
12 item numbers that are associated with this Lawson item
13 number; is that right?
14   A.   Well, we don't have the Lawson item
15 number displayed.
16   Q.   Well, I think it is, isn't it, in the
17 second to right-hand column?
18   A.   You're right. It is.
19   Q.   Okay. So for Lawson item number 6010,
20 which is the description of a Dell Dimension 8100,
21 there are two vendor item numbers associated with
22 that.
23   A.   Okay.
24   Q.   Is that right?
25   A.   Yes. They're different.

(Pages 208 to 211)

Page 212

1  Q. Okay. Yes. We have -- one is vendor 122
2  and vendor item number 6010122?
3  A. Correct.
4  Q. And the second one is vendor 124, and the
5  vendor item number is 6010-124?
6  A. Correct.
7  Q. Okay. So the system must have selected
8  the -- Dell to be the vendor for this Lawson item --
9      MS. ALBERT: Object.
10  Q. -- because it -- that is what was
11  displayed when you first clicked on that Lawson item
12  number; is that right?
13     MS. ALBERT: Object to the form; lacks
14  foundation.
15  **A. The vendors of the two items are**
16  **different.**
17  Q. Right. So when you did a search for Dell
18  and Dimension in Item Master, you got two Lawson item
19  numbers?
20  **A. Right.**
21     MS. ALBERT: Object to the form of the
22  question that the search was in Item Master.
23  Q. I think he already answered that, but we
24  can confirm.
25     MS. ALBERT: Well, I object that the

Page 213

1  search -- I object to your characterization that the
2  search is only a search of Item Master.
3  Q. In any event, we got two results, two
4  Lawson item numbers, right? 6010 and I don't remember
5  what the other one was.
6  **A. Well, just go back.**
7     MS. STOLL-DeBELL: Can you go back?
8     MR. HVASS: Uh-huh (affirmative).
9  Q. Yes. So we have two Lawson item numbers,
10  right; 6010 and 6011?
11  **A. That's right, for two different Dell**
12  **Dimension items.**
13  Q. Right. Yeah. So the first one is the
14  8100, and the second one is the 4100?
15  **A. Right.**
16  Q. But this does not show that there are,
17  in, fact, two vendor item numbers associated with that
18  first Lawson item, 6010; do you agree with that?
19  **A. Right, not on the screen.**
20  Q. Okay. And when you click on the 6010, it
21  populates the Dell vendor item number, 122; do you
22  agree with that?
23  **A. Yes.**
24  Q. So somehow the system made a decision to
25  choose the Dell vendor item number and not the other

Page 214

1  vendor item number; do you agree with that?
2  **A. Yes. That -- that was populated with the**
3  **6010.**
4  Q. 122 as the vendor item number?
5  **A. Oh, as the vendor item number, yeah.**
6     MS. STOLL-DeBELL: We can hit play so he can
7  see that.
8     MS. ALBERT: And obviously, Counsel, we're
9  limited in our ability to show the system's operations
10  based upon the data that Lawson produced to ePlus in
11  the demonstrations.
12     MS. STOLL-DeBELL: Ms. Albert, you had the
13  laptop. You could have loaded anything -- and, in
14  fact, did load anything -- you wanted on there.
15     MS. ALBERT: Well, I don't know if you want
16  me to get into that all again, but --
17     MS. STOLL-DeBELL: Okay. So what we have
18  here, if you hit pause -- you did hit pause.
19  Q. Is it automatically selected vendor item
20  number 6010122, right, when you selected item number
21  6010 in your search result?
22  **A. Yes.**
23  Q. But there is another vendor item number
24  associated with vendor 124, which happens to be
25  Diablo; is that correct?

Page 215

1  **A. Right. Which is not shown here.**
2  Q. Which is not shown here. But, in fact,
3  if we go forward in your demo you change the vendor
4  from Dell to Diablo?
5  **A. That's right.**
6  Q. And so, the Lawson system is selecting
7  for this item Dell as the vendor by default?
8  **A. In -- in this example with this data,**
9  **that's what happened.**
10  Q. And then the user being you in this case
11  had -- had the ability -- and did, in fact, select a
12  different vendor for the requisition?
13  **A. That's right.**
14  Q. And is it your opinion that even though a
15  user has the ability to change the vendor on a
16  requisition, that this software still infringes the
17  asserted claims?
18  **A. All of the asserted claims?**
19  Q. That's probably not all, because not all
20  of them require requisitions, right?
21  **A. Right.**
22  Q. The asserted claims that require
23  requisitions.
24  **A. Yes.**
25  Q. I want to talk about claim 1 of the '172

(Pages 212 to 215)

Page 216

1  patent.
2      THE VIDEOGRAPHER:  Six minutes left.
3      Q.   Okay.  We can get through this pretty
4  quickly.
5          You probably can answer this question
6  without looking at claim 1, but it's my understanding
7  claim 1 requires an order list.  It's the last element
8  at the bottom of column 23, a means for generating an
9  order list?
10     A.   That's right.
11     Q.   And I believe it's your opinion that the
12 shopping cart in RSS is the order list?
13     A.   That's correct.
14     Q.   Now, the RQ module doesn't have a
15 shopping cart; do you agree with that?
16     A.   Right.
17     Q.   Do you -- is it your opinion that RQ has
18 an order list?
19     A.   Yes.
20     Q.   What's the order list in RQ?
21     A.   Well, we saw the -- when we did the Dell
22 Dimension, there were two items returned.
23     Q.   Uh-huh (affirmative).
24     A.   Four items and then two Items.  So that's
25 part of the list.  And it can be changed.

Page 217

1      Q.   Okay.  So the first search returned four
2  items for Dell, right?
3      A.   Right.
4      Q.   And the second search returned two items
5  for Dell dimension.
6      A.   Right.
7      Q.   That search result is the order list?
8      A.   The search result is the hit list.  But
9  when you -- when you select your items from the hit
10 list, then those selected items are the order list
11 that then later becomes a requisition and a purchase
12 order.
13         MS. STOLL-DeBELL:  Jeff, can you just go
14 back?
15         MR. HVASS:  I'm bringing it up.
16         MS. STOLL-DeBELL:  He's on it.
17     Q.   While he's doing that, I'm trying to find
18 where in your report you say that -- I recall a
19 requisition, but that screen in RQ constitutes an
20 order list.  It was my understanding you called the
21 shopping cart order list from RSS?
22     A.   I did.
23     Q.   Okay.  Yeah, that's all I recall from
24 your --
25         THE VIDEOGRAPHER:  Three minutes.

Page 218

1          MS. STOLL-DeBELL:  Do you want to change the
2  tape while he's looking.
3          THE VIDEOGRAPHER:  We're off the record at
4  approximately 11:25 a.m.
5          (Whereupon, a recess was taken).
6          THE VIDEOGRAPHER:  We're on the record at
7  approximately 11:27 a.m.  Counsel may proceed.
8  BY MS. STOLL-DeBELL:
9      Q.   So you were looking for the place where
10 you talk about how RQ meets the generating an order
11 list element.  And it looks like you are now on page
12 66 of your 172 claim chart?
13     A.   That's right.
14     Q.   Okay.
15     A.   And so, you're correct that the order
16 list is a shopping cart, and --
17         MS. ALBERT:  Can you just play the
18 demonstration?
19     Q.   Okay.  So -- yeah.  Before I do that, so
20 is there a shopping cart in RQ?
21     A.   Not by that name.
22     Q.   Okay.  Is there an order list in RQ?
23     A.   I don't have an opinion on that.
24         MR. HVASS:  Do you want to continue?  I'm
25 sorry.

Page 219

1          MS. STOLL-DeBELL:  I'm deep in intense
2  thought.
3      Q.   Okay.  So you don't have an opinion about
4  whether the RQ module, as used by itself without RSS,
5  meets the means for generating an order list element?
6      A.   I don't have an opinion on that.
7      Q.   So you're not going to say it infringes?
8      A.   Correct.
9      Q.   Which is just as good as saying it
10 doesn't infringe?
11     A.   Yes.
12     Q.   So is your opinion with respect to
13 infringement of claim 1 of the '172 only with respect
14 to RSS with regard to S3 software?
15     A.   Yes; the shopping cart.
16     Q.   Okay.  In the demonstrations that you did
17 in RSS, the first thing that we saw was profile page,
18 which I believe is the requisition header; does that
19 sound right to you?
20     A.   That sounds right.
21     Q.   And then you can click shopping and go to
22 -- what -- category searches or search catalog or that
23 type of thing --
24     A.   Yes.
25     Q.   -- to find things to put into a

(Pages 216 to 219)

Page 220

1   requisition?
2       A.   Yes.  Shopping cart.
3       Q.   Which will end up in a requisition?
4       A.   Right.  Which is an order list, which
5   then becomes a requisition, which becomes a purchase
6   order.
7       Q.   And it's your opinion that it becomes a
8   requisition when you click check out?
9       A.   That's what submits it to the requisition
10  module.
11      Q.   Okay.  To create a requisition?
12      A.   Correct.
13      Q.   Okay.  I'm going to move on to another
14  topic.  So I don't know if you want to take a short
15  break now?
16      A.   This would be a good time.  Thank you.
17          MS. STOLL-DeBELL:  Okay.  Sure.
18          THE VIDEOGRAPHER:  We're off the record at
19  approximately 11:30 a.m.
20          (Whereupon, a recess was taken).
21          THE VIDEOGRAPHER:  We're on the record at
22  11:42 a.m.  Counsel may proceed.
23  BY MS. STOLL-DeBELL:
24      Q.   Okay.  So Dr. Weaver, I think I asked you
25  earlier about whether some of the claims of the '516

Page 221

1   patent require that two catalogs be searched
2   simultaneously?
3       A.   Yes.
4       Q.   And you said that they do not.  We were
5   looking at claim 1 specifically.
6           I'm going to hand you what has been
7   marked as Exhibit 12.
8           (Exhibit Number 12 was marked for
9   identification)
10          MS. STOLL-DeBELL:  Ms. Albert, you have
11  copies right there.
12      Q.   This is the deposition transcript from
13  the deposition of Brooks Hilliard, who is an expert
14  for ePlus as well; and ask you to go to page 175, line
15  11 of this transcript.  And at line 11 I asked him the
16  question: "Do you agree that the '516 patent claims
17  require that the user select at least two product
18  catalogs to be searched simultaneously?"  And then he
19  says he needs to refresh his memory.  And he answers
20  at line 22, "Well, it requires that be able to search
21  a subset of the catalogs -- of the collection of
22  catalogs, and be able to do that, those catalogs and
23  the subset, be able to search them simultaneously.
24  And then I asked him at line 2 of page 176, "And the
25  subset, is it your opinion that the subset needed to

Page 222

1   include at least two product catalogs?"  And he said
2   yes.
3           So he -- it's his opinion that you need
4   to search two catalogs simultaneously for claim 1,
5   which is the opposite of your opinion; isn't that
6   right?
7       A.   Yes.
8       Q.   Who's right?
9       A.   The court said that -- when it comes to
10  the court, we want to be very accurate, don't we?
11      Q.   We do.
12      A.   So let's find --
13      Q.   I think it was page 41 that talks about
14  that, but Ms. Albert can maybe check that and make
15  sure I'm right.
16          MS. ALBERT:  I don't know that the
17  description at page 41 deals with claim 1 of the '516.
18          MS. STOLL-DeBELL:  I don't think it does.
19  My understanding is that when the court said it didn't
20  require two catalogs to be searched simultaneously, he
21  was referring to claim 3 of the '683, and not the
22  claims of the '516.
23          MS. ALBERT:  I think you're --
24          MS. STOLL-DeBELL:  Does that sound right?
25          MS. ALBERT:  -- referring to claim 3, as

Page 223

1   well as claims 26 and 28 and 29.
2           But I don't dispute that this
3   particular page, 41, of the Markman does not deal with
4   claim 1 of the '516 patent.
5       Q.   And this is the one where the court is
6   saying the correct construction must allow for
7   searching only one catalog, rather than searching two
8   or more at the same time?
9       A.   It does say that.
10      Q.   Okay.  And I -- I don't see anywhere else
11  in the order where he says that same rule applies to
12  any of the claims in '516; do you?
13      A.   I'd have to read the whole thing to know.
14      Q.   Okay.  Well, let's set that aside.  I
15  think your opinion generally is that the UNSPSC code
16  functionality of Lawson's S3 software causes it to
17  meet the converting and cross-reference table elements
18  of the asserted claims; is that right?
19      A.   That's correct.
20          MS. STOLL-DeBELL:  Can you switch over to
21  the demo?
22          MR. HVASS:  Sure.
23          MS. STOLL-DeBELL:  I'm going to pull up --
24  it's actually a screen from the live demo that shows
25  an Item Master record.

(Pages 220 to 223)

Page 224

1    MS. ALBERT: Okay. Can you clarify?
2    MS. STOLL-DeBELL: Well, you'll see it when
3 it comes up.
4    MS. ALBERT: I know, but what demo are you
5 referring to?
6    MS. STOLL-DeBELL: It's hooked up to the
7 demo laptop that Lawson produced to ePlus. And all
8 that it's showing here is you'll see at the top it
9 says Item Master IC 11.1; do you see that?
10   A.   Yes.
11   Q.   And then this is for item number 0517; do
12 you see that?
13   A.   Yes.
14   Q.   And it's some kind of ear plugs. Ear
15 plugs, brand name Spark. But it's not about this
16 item. I'm just -- this is -- this is the Item Master
17 record for that particular item number 0517; does that
18 look right to you?
19   A.   That's what it says.
20   Q.   Okay. And you'll see in the bottom of
21 this screen we're at the classes tab; is that right?
22   A.   Yes.
23   Q.   And it has the actual UNSPSC field where
24 you would enter the code for that particular item; do
25 you see that?

Page 225

1    A.   I do see that.
2    Q.   And so, for segment it says 46, and
3 family says 18, and class says 19, and commodity says
4 01; is that right?
5    A.   That's correct.
6    Q.   And then there's a description in blue
7 that says ear plugs at the bottom?
8    A.   Correct.
9    Q.   So it seems that specific eight-digit
10 code is for ear plugs?
11   A.   **It's being assigned to earplugs, right.**
12   Q.   So my question to you is if Lawson -- and
13 this is the functionality that you say causes Lawson
14 to infringe the converting and cross-reference table
15 elements; is that right?
16   MS. ALBERT: Object to the form of the
17 question; mischaracterizes his opinions.
18   A.   That was not accurate.
19   Q.   Okay. What did I say that was wrong?
20   A.   **What I said is that the use of the UNSPSC**
21 **codes allows the user to find generally equivalent**
22 **items.**
23   Q.   Okay. So is this what enables the system
24 to be able to do what you say it is that causes
25 infringement of those elements?

Page 226

1    A.   **Right. This is the -- the mechanism for**
2 **defining and revealing the UNSPSC codes for an item.**
3    Q.   If Lawson was to take out the lower half
4 of this classes screen so that -- so that it was no
5 longer possible to input UNSPSC codes or any other
6 numerical system that has, you know, a hierarchical
7 category set forth in there, that was gone, would you
8 still say that the software infringes the asserted
9 claims?
10   A.   Asked and answered previously.
11   MS. STOLL-DeBELL: **I think before he said he**
12 **wasn't sure what I was talking about. So I'm showing**
13 **you specifically in the software what it is that I'm**
14 **talking about removing.**
15   A.   **The UNSPSC is the element that allows you**
16 **to do the selection of generally equivalent items. If**
17 **there are other mechanisms that allow you to do that,**
18 **that would still infringe. But if this is the only**
19 **one that permits that, then taking this out would make**
20 **it non-infringing.**
21   Q.   Okay. So if -- I don't think I got an
22 answer to my question. I want to know if you take out
23 the UNSPSC field of this software, will there be
24 functionality that would allow you to still assign
25 generally equivalent items?

Page 227

1    MS. ALBERT: Asked and answered.
2    A.   **So if there are other mechanisms that**
3 **allow you to find generally equivalent items, then**
4 **that would solve the infringement issue.**
5    Q.   Are there other mechanisms --
6    A.   This is the --
7    Q.   -- in the absence of this UNSPSC?
8    A.   This is the one that's in my report.
9    Q.   So you don't know?
10   A.   Correct.
11   Q.   So your report relies exclusively on the
12 UNSPSC codes to prove infringement of the converting
13 and cross-reference elements?
14   A.   That's in my report.
15   Q.   And that's your exclusive basis for
16 asserting Lawson's software infringes the asserted
17 claims?
18   A.   It's the example I used.
19   Q.   The only example?
20   A.   The only example.
21   Q.   We can look at -- let's look at the '516
22 patent, and let's go to the column 26. I think claims
23 21 and 29 are the ones -- the only asserted claims
24 that specifically call it a cross-reference table;
25 does that sound right to you?

(Pages 224 to 227)

Page 248

1  Q. Well, you do give opinions that Lawson is
2  liable for indirect infringement; isn't that right?
3  A. Yes.
4  Q. Throughout your 800 pages there is
5  multiple accusations of indirect infringement?
6  A. Yes.
7  Q. So my question is: What -- when does
8  that indirect infringement that you give an opinion
9  on, when did that start?
10     MS. ALBERT: Asked and answered.
11  A. I'm not a lawyer.
12  Q. So you can't answer?
13  A. I can't answer.
14  Q. Do you assert that Lawson is liable for
15  indirect infringement before it had actual notice of
16  the patents?
17     MS. ALBERT: Asked and answered multiple
18  times.
19  A. I'm not a lawyer.
20  Q. Can't answer?
21  A. Can't answer.
22  Q. Just a couple more questions, and we'll
23  take a break.
24  A. I thought we were done.
25  Q. That's fine. Do you want to take a break

Page 249

1  now, and we'll come back?
2  A. Sure.
3     MS. STOLL-DeBELL: Okay.
4     THE VIDEOGRAPHER: We're off the record at
5  approximately 12:28 p.m.
6        (Whereupon, a recess was taken).
7     THE VIDEOGRAPHER: We're on the record at
8  approximately 12:41 p.m. Counsel may proceed.
9     MS. STOLL-DeBELL: Before we went off the
10  record, you asked about how much longer I think I
11  need.
12     THE WITNESS: Yes.
13     MS. STOLL-DeBELL: And I'm guessing between
14  30 and 45 minutes. Now, that goes over the seven-hour
15  time frame by a couple of minutes. And so, I suppose
16  if we're going to have an argument about this,
17  Jennifer, we should figure that out now. I don't
18  think it's unreasonable. I think you took a lot of
19  time to look through your report, which is huge. And
20  so, you know, hopefully we can agree to go through and
21  let me finish asking you questions and be done. But
22  that's up to you-all.
23     THE WITNESS: The point of dividing the
24  deposition into two days was to accommodate my medical
25  issues. So my medical issues have re-emerged. And

Page 250

1  so, I'm willing to do my duty and go the seven hours,
2  but then I need to quit.
3     MS. STOLL-DeBELL: Okay. I suppose we
4  probably are going to have to get on the phone with
5  the court, who was not happy at all by how huge your
6  expert report was. Had you not spent forever looking
7  through things, we would have easily made the
8  seven-hour time period.
9     MS. ALBERT: Well, I object to that
10  characterization, Counsel. Had you more efficiently
11  directed Dr. Weaver to the sections of the report that
12  are relevant, it might have speeded it up a little
13  bit.
14     And also, the volume of Dr. Weaver's
15  report was in part necessitated by Lawson's counsel
16  requirement that we not use shortcuts when we prepared
17  the report, such as "see claim 1 above," and
18  explicitly directed us to enumerate all of our
19  contentions for every single claim, you know, verbatim
20  for each claim, regardless of whether it was
21  duplicative of contentions that were enumerated in an
22  earlier claim. So, you know, I don't -- that's not
23  necessarily our fault that the report is voluminous.
24     I mean, why don't we try to proceed
25  with your questions and see how long it takes.

Page 251

1     MS. STOLL-DeBELL: Okay. Let's do that.
2     MS. ALBERT: And see if you can get done
3  efficiently.
4  BY MS. STOLL-DeBELL:
5  Q. Okay. You did a couple of demonstrations
6  on Lawson's Punchout?
7  A. I did.
8  Q. Using the demo laptop that Lawson
9  produced?
10  A. That's correct.
11  Q. And I believe there were two Punchout
12  sites that were enabled on that --
13  A. Dell and Staples.
14  Q. Dell and Staples.
15     And you had several examples where you --
16  I think in some of them you went to Dell, some of them
17  you went to Staples.
18  A. Yes.
19  Q. Some of them you went to both. My
20  questions are, I think, very general.
21     When you used that demo laptop to
22  Punchout to, for example, the Staples website, and
23  search for items on the Staples website, is that the
24  Lawson Software search engine that is being used to
25  search for items on the Staples Punchout site?

(Pages 248 to 251)

Page 252

1    A.    No. That would be the Staples search
2    engine searching the special Staples site that has
3    been constructed so that it's connected to Lawson, and
4    the customer is using it.
5    Q.    Does Lawson have anything to do with
6    setting up the structure of -- how about the content
7    of the Staples Punchout site?
8    A.    The content, which items are made
9    available, all of that is enabled by the Lawson
10   communications protocols. Lawson doesn't dictate what
11   Staples shows, but the connection between Staples's
12   special website and Lawson has to meet Lawson's
13   standards for data transmittal back and forth.
14   Q.    Okay. Because at the Punchout site if a
15   customer user chooses an item, data regarding that
16   item will be sent back to Lawson Software to be added
17   to the shopping cart; is that right?
18   A.    After the -- after the Punchout shopping
19   cart is full, and you check out of that system, the
20   contents of the Punchout shopping cart are returned to
21   the Lawson shopping cart.
22   Q.    Okay. So that's the data you're talking
23   about being sent back?
24   A.    Yes.
25   Q.    Does Lawson Software dictate what items

Page 253

1    are made available at the Punchout site?
2    A.    No.
3    Q.    Does Lawson Software dictate how those
4    items are organized at the Punchout site?
5    A.    No.
6    Q.    Does Lawson Software dictate what
7    searching functionality is offered at the Punchout
8    site?
9    A.    No.
10   Q.    Does Lawson Software dictate what
11   availability -- inventory availability information is
12   offered at the Punchout site?
13   A.    No.
14   Q.    And the -- I'm not even sure what word
15   you used, but specifications, maybe, if that's the
16   right word, what Lawson dictates as far as connecting
17   to the Punchout site is really about -- about just
18   that, connecting and communicating data from the
19   Punchout site back to Lawson Software?
20   A.    Well, it's a little more than that. So
21   Lawson is responsible for validating the integrity and
22   security of the Punchout site. So there's an
23   information protocol exchange to be sure that Lawson
24   is connecting with a legitimate Punchout site. And
25   then there are standard protocols invoked for

Page 254

1    returning the Punchout shopping cart to Lawson's
2    shopping cart.
3    Q.    You talked about integrity?
4    A.    Yes.
5    Q.    What do you mean by that?
6    A.    It's a common problem in computer
7    security to have spoof sites. And so, the protocols
8    involved are testing -- by providing keys and codes
9    and passwords -- testing whether or not the site that
10   you're connecting to is legitimate.
11   Q.    I understand. To access a Punchout site
12   from Lawson Software there are logos for each of the
13   different Punchout sites?
14   A.    There were in the demo system that I
15   used.
16   Q.    Okay. And those logos in the demo system
17   are really hyperlinked to the Punchout site --
18   A.    Yes.
19   Q.    -- is that right?
20   A.    You can click on the icon, and then you
21   go to the Punchout site, which then continues to
22   display both the Lawson logo and the logo of the
23   Punchout site.
24   Q.    In the demo system that you looked at?
25   A.    In the demo system that I used.

Page 255

1    Q.    Do you agree that for customers who do
2    use Punchout, that they actually put their own logo on
3    the Punchout site, as opposed to Lawson's logo?
4    A.    Well, I just said the Lawson logo and the
5    Punchout logo appear on the Punchout site.
6    Q.    And for customers in actual use, it would
7    be the customer's logo and the Punchout site's logo
8    that appear; do you agree with that?
9    A.    And the Lawson logo.
10         MS. ALBERT: Lacks foundation.
11   Q.    Not the Lawson logo; do you disagree with
12   me?
13   A.    I'm saying that on the sites I visited,
14   the Lawson logo and the Punchout logo appeared on the
15   Punchout site.
16   Q.    Okay. Do you know what logos appear on a
17   Punchout site when it's a customer who is using the
18   software?
19   A.    I was the customer using the demo
20   software.
21   Q.    Well, you were using demo software,
22   right?
23   A.    Exactly. Supposedly, that software is
24   representative of the real system.
25   Q.    You did two demos for claim 1 of the '516

(Pages 252 to 255)

Weaver, Ph.D, Alfred Vol. II  7/21/2010

30

### Page 256

1  patent. You -- and I think we may have looked at --
2  no, we looked at one. We looked at one through RQ --
3     A.  Uh-huh (affirmative).
4     Q.  -- today where you searched for Dell and
5  Dimension. And then you did the same search through
6  RSS.
7        Let's look at the '516 patent, actually.
8  My understanding of claim 29 of the '516 is the same
9  as claim 1, except that it has an additional element,
10 being the cross-reference table element.
11    A.  Would you repeat the question?
12    Q.  Sure. I wanted you to confirm my
13 understanding that claim 29 is the same as claim 1,
14 except that it includes an additional element, mainly
15 the cross-reference table element?
16    A.  That's incorrect.
17    Q.  Okay. How are they different?
18    A.  The fourth element of claim 29 is
19 different from the fourth element of claim 1.
20    Q.  Okay. How are they different?
21    A.  So the fourth element of claim 29 ends in
22 the words, "and the second catalog from a
23 predetermined third party."
24    Q.  Okay.
25    A.  And in the fourth element of claim 1, we

### Page 257

1  see those words, "and a second catalog from a
2  predetermined third party," but there is additional
3  text, "and a second catalog from a predetermined third
4  party that is one of the manufacturer and a competing
5  vendor. Said predetermined third party settlement
6  items corresponding to items in said vendor catalog."
7     Q.  Okay. So claim 1, the fourth element,
8  has additional requirements --
9     A.  Yes, it does.
10    Q.  -- as compared to claim 29?
11    A.  That's correct.
12    Q.  Okay. Is it your opinion that -- let's
13 talk about just the RQ demo -- Dell Dimension demo
14 that we watched a couple of times, actually, during
15 your deposition.
16    A.  Okay.
17    Q.  Does that show infringement of claim 29?
18 I think your opinion in your report says it shows
19 infringement of claim 1.
20    A.  Yes. Can we see that demo?
21    Q.  Sure. It's going to take -- I mean, it's
22 ten minutes long to watch it.
23    A.  Maybe we could speed it up.
24    Q.  Is there a specific part you want to see?
25    A.  Yeah. I want to see -- let's see how I

### Page 258

1  did the substitution.
2     Q.  And when you talk about substitution, are
3  you talking about substituting one item for another?
4     A.  Right.
5     Q.  I don't -- I don't think you did, but we
6  can watch it.
7     A.  Well, we did lots of demos --
8     Q.  Yeah.
9     A.  -- of which only I think seven were -- I
10 mean, I did lots of demos, you know, practice. I
11 think seven were included with my report. They kind
12 of run together.
13       MS. ALBERT: I thought you showed him
14 earlier today about the substitution of that vendor
15 item for the other one. I mean, I don't know if
16 that's what you're referring to.
17    Q.  Yeah, I'm not sure if that's what he's
18 referring to, either. Maybe it is.
19    A.  It depends on which demo we're talking
20 about.
21    Q.  Okay. In that demo, you did not search
22 by UNSPSC code?
23    A.  Which demo?
24    Q.  The RQ demo for Dell and Dimension.
25    A.  Is that the one we're about to see?

### Page 259

1     Q.  Yes.
2        MS. STOLL-DeBELL: I'm wondering if we
3  should watch RSS, though. Let's watch the RSS version
4  of that --
5        MR. HVASS: Okay.
6        MS. STOLL-DeBELL: -- which is --
7        MR. HVASS: Is that the --
8        MS. STOLL-DeBELL: I'm going to give you a
9  Bates number.
10       MR. HVASS: I don't know if Bates number
11 would be the right one. That was categories?
12       MS. STOLL-DeBELL: No. It's an actual
13 search catalog in RSS.
14       MR. HVASS: It might be this one.
15       MS. STOLL-DeBELL: I think it's 942184.
16       MR. HVASS: See what it looks like. That's
17 categories. Hold on.
18       MS. STOLL-DeBELL: Yeah. 942184; that
19 should be the Bates number on file that we want to
20 watch.
21       MR. HVASS: Okay. Your numbers don't match
22 the numbers up here.
23       THE WITNESS: Oops.
24       MS. STOLL-DeBELL: Is there an issue?
25       MS. ALBERT: There is a couple that

(Pages 256 to 259)

Page 260

1  Dr. Weaver wanted to alert you of corrections.
2       MS. STOLL-DeBELL: Are you on e-mail, Jeff,
3  that I could send you the one I want to watch?
4       MR. HVASS: No. I think it's here.
5       MS. STOLL-DeBELL: Okay.
6       MR. HVASS: I just have to bring this one
7  down. And then it's one actually -- you want one
8  that --
9       MS. STOLL-DeBELL: It's an actual search
10 catalog in RSS.
11      MS. ALBERT: Is there one 942356?
12      MS. STOLL-DeBELL: I think it might be that
13 one.
14      MR. HVASS: Let's just grab it. I'll know
15 real quick here.
16      MS. STOLL-DeBELL: It's so impossible to
17 navigate through these things. I don't know why.
18      MR. HVASS: That's not the one, either.
19      THE WITNESS: There was --
20      MS. STOLL-DeBELL: So we had two of the
21 same, but they had different Bates numbers. So I
22 think it also has a Bates number of 942356. I think
23 that's the same one. Do you know why they had two
24 Bates numbers?
25      MR. HVASS: Do you want -- this is a

Page 261

1  Punchout.
2       MS. STOLL-DeBELL: No, that's not it.
3       MR. HVASS: You just want a straight cell
4  service?
5       MS. STOLL-DeBELL: Yeah.
6       MR. HVASS: Let's go down one more. I have
7  seven of them.
8       MS. STOLL-DeBELL: It's either 942356 or
9  942184.
10      MR. HVASS: Okay. That's another shop by
11 brand. Okay. I'll go with the second one.
12      MS. STOLL-DeBELL: Oh, that's it, 942356.
13      MR. HVASS: Okay. Let's try and -- okay.
14 Let's speed it up a bit. Okay. We're into the system
15 now, and it's starting the procedure of cell service.
16  BY MS. STOLL-DeBELL:
17      Q.  So I think what we're going to see here
18 is your demo in RSS where you search for Dell and
19 Dimension?
20      A.  Okay.
21      Q.  Doing a -- yes, I think that's right. So
22 it looks like you're in the advanced search of RSS; is
23 that right?
24      A.  That's right.
25      Q.  And you're typing Dell as the keyword?

Page 262

1       A.  Correct.
2       Q.  Okay. And expanded search results is
3  checked, right?
4       A.  Yes.
5       MS. STOLL-DeBELL: You can just keep playing
6  through, I think.
7       Q.  If you want him to stop, just say so,
8  Dr. Weaver.
9       A.  Okay. Thank you.
10      Q.  We're just looking at the search results
11 here, right?
12      A.  Correct.
13      Q.  And then you selected to look at vendor
14 item 6010-122, right?
15      A.  Oh, there it is at the bottom, right.
16      Q.  Okay. And that's just additional details
17 on that?
18      A.  (Indicating in the affirmative).
19      Q.  Okay. And now we're looking at vendor
20 item -- the details for 6010-124. Can you pause that?
21      MR. HVASS: Uh-huh (affirmative).
22      Q.  Is that right?
23      A.  6010-124, yes.
24      Q.  And so, that is the vendor item that is
25 sold by Diablo; is that right?

Page 263

1       A.  Correct.
2       Q.  Now you're adding an additional keyword
3  -- a second keyword for Dimension; is that right?
4       A.  Right; Dimension 8100.
5       Q.  Okay. So it looks like we got results
6  returned for two vendor items?
7       A.  Yes.
8       Q.  And that's just an additional detail
9  again for that same vendor item we looked at before?
10      A.  Yes.
11      Q.  And this is additional detail on another
12 vendor item?
13      A.  Yes. This is the Diablo.
14      Q.  And we're probably -- are we coming to
15 the part you're interested in now?
16      A.  Yes.
17      MR. HVASS: That's it for that one. That --
18 so ends the player.
19      MS. STOLL-DeBELL: Okay.
20      MR. HVASS: We can go back to it, if you
21 want me to stop again.
22      Q.  So my question is, I guess -- let me put
23 it this way to try and speed things up: If you do a
24 keyword search in search catalog like you just did in
25 that demo, you're not going to be able to show that

(Pages 260 to 263)

Page 264

1  infringes claim 29, are you, because you haven't done
2  a UNSPSC search?
3      A.   Of '516?
4      Q.   Yes.
5      A.   **Not in that demo.  Of course, there were**
6  **other demos.**
7      Q.   Well, I didn't see that you did one for
8  claim 29.
9      A.   **We'll know very quickly.**
10     Q.   Okay.  Hopefully very quickly.
11     A.   **Very quickly.  Claim 29 -- I knew there**
12 **was a claim 29, but it was the '683 patent.**
13     Q.   Right.  There are two.
14     A.   **Right.**
15     Q.   I think you did do a demo for claim 29 of
16 the '683?
17     A.   **Correct.**
18          **You're right.  There's not a demo for**
19 **claim 29 of the '516.**
20     Q.   Okay.  Is it possible with Lawson
21 Software to do a category search at the same time you
22 do a keyword search?
23     A.   **Yes.**
24     Q.   How do you do that?
25     A.   **You put in a keyword.**

Page 265

1      Q.   And that searches by category, too?
2      A.   **It can.**
3      Q.   Is it possible to search by UNSPSC code
4  at the same time you do a keyword search?
5      A.   **You could put in the UNSPSC code as the**
6  **keyword.**
7      Q.   And that would pull up items?
8      A.   **If they are -- if they are coded, yes.**
9      Q.   Is that one of the fields that is
10 searchable in Item Master through search catalog?  I
11 know you can search it when you go through categories.
12     A.   **Yeah, I think so.**
13     Q.   So if you did -- if you did just a
14 category search in RSS, would it meet the requirements
15 of claim 29?
16     A.   **Your question is too vague to answer,**
17 **because we'd have to look at every element of the**
18 **claim.**
19     Q.   Why did you not do a demo for claim 29?
20     A.   **I think we ran out of time.  There is**
21 **also the question of the difficulty of using the**
22 **Lawson demo package.  The initial data was very**
23 **sparse.  The re-loaded data all came from a single**
24 **vendor.  So there are things which you couldn't**
25 **demonstrate with that.  Even with help from a Lawson**

Page 266

1  **consultant it was very difficult to add information.**
2  **So I would say the combination of the incomplete**
3  **Lawson Software, coupled with the time pressure of**
4  **finishing this report is why there were numerous**
5  **demos.**
6      Q.   Okay.  Now, you did get additional data
7  -- your own data loaded into the system, though, to
8  address some of the things you wanted to see, right?
9      A.   **Yes.  I think we were partially**
10 **successful in getting -- getting some data in.**
11     Q.   Okay.  And that was data from different
12 vendors --
13     A.   **Yes.**
14     Q.   -- for items?
15          And it looks like you -- did you code a
16 bunch of items with the UNSPSC codes, too?
17     A.   **Yes.**
18     Q.   So after you had put your own data in,
19 were there any deficiencies or problems with it after
20 that?
21     A.   **Oh, sure.  Lots of things going on that**
22 **you can't control.**
23     Q.   I think -- I think the last thing I
24 wanted to do is just run through -- run through your
25 RQ search of Dell and Dimension, but do it actually on

Page 267

1  the demo laptop, as opposed to watching your
2  recording.  I had some additional questions for that.
3  And I think that's what we're showing up here.
4          MS. ALBERT:  Okay.  Well, just -- can I -- I
5  mean, I want to object to the live demonstration
6  again.  We had resolved this issue with Mr. Schultz,
7  and we had told him that we were not prepared to demo
8  a live system.  I'm not -- have you -- now, you were
9  provided an opportunity to inspect the system last
10 night.  And I don't know whether or not you have
11 modified any of the data in the system.
12         MS. STOLL-DeBELL:  We did not intentionally
13 modify the data in the system.  We looked at it and
14 tried to figure out what additional data you-all
15 loaded to it.  So it was our intent to just look at
16 it.
17         THE WITNESS:  Is that the same as not
18 changing it?
19         MS. STOLL-DeBELL:  Yeah.
20         MS. ALBERT:  And, you know, I have my
21 continuing objections to the inadequacies of the
22 system that was provided, the inadequacies of the data
23 set that was provided by Lawson, the fact that the
24 data set provided by Lawson had many miscoding
25 problems, such as the vendor item descriptions for

(Pages 264 to 267)

Page 268

1  product items did not match the item descriptions
2  associated with the corresponding item numbers from
3  Item Master. Some items failed to display any vendor
4  item number when selected in Requisition Self Service.
5  Some items were associated with the wrong vendor in
6  Requisition Self Service. Some items -- many of the
7  items in the Item Master set provided by Lawson did
8  not have UNSPSC codes. The demo system produced to
9  ePlus was not enabled to demonstrate the full
10 functionality that we saw during the demonstrations
11 that were conducted during discovery; for example,
12 Mr. Lohkamp's demo system included images of items,
13 but Lawson failed to include images in the demo system
14 produced to ePlus. Customer systems included images
15 of items. Custom systems included the capability to
16 search by vendor name. That particular field was not
17 enabled, or there was no vendor name field enabled in
18 the demo system.
19       MS. STOLL-DeBELL: Okay. Ms. Albert, I hate
20 to interrupt you, but you're running out all of my
21 time, and you've made all these objections over and
22 over and over again. I understand you object to the
23 system. I dispute your objections, but it doesn't
24 seem to me that it serves anybody's purpose for you to
25 go through those all again when we're running out of

Page 269

1  time. You're telling me I'm limited to seven hours.
2       MS. ALBERT: Well, I mean, it serves my
3  purpose that I want the record to reflect that we're
4  objecting to this.
5       MS. STOLL-DeBELL: Okay. I know you do. We
6  spent 15 minutes discussing this yesterday.
7       MS. ALBERT: Okay. That's fine.
8       MS. STOLL-DeBELL: I just want to run
9  through this demo. I understand you object.
10      MS. ALBERT: Okay. That's fine.
11      MS. STOLL-DeBELL: Let's deal with this
12 later, and let's try and finish this deposition so
13 Dr. Weaver can move on.
14 BY MS. STOLL-DeBELL:
15   Q.   All right. So we are on the demo laptop
16 we gave to you-all, and we're in RQ-10; does that look
17 right?
18   A.   **RQ-10, yes.**
19   Q.   Okay. And I think -- I think what you
20 did is you just filled in some of this basic
21 requisition information into this header field?
22   A.   **Correct.**
23   Q.   Do you mind if Mr. Hvass just does that?
24   A.   **That's fine.**
25        MS. ALBERT: So can he explain what he's

Page 270

1  doing?
2    Q.   I think he selected company number one.
3         MR. HVASS: I selected RQ-1, and it fills
4  out and defaults in the company, requesting location,
5  and the from company automatically from the default of
6  the requester. And then I want to go to line to
7  follow counsel's next questions.
8    Q.   So that looks basically like what you did
9  in the demo you recorded?
10   A.   **Yes.**
11   Q.   Okay. And then I believe that you
12 clicked the line item search button, which pulled up a
13 listing of items in Item Master?
14   A.   **The first 25 items in the Item Master.**
15   Q.   The first 25, right.
16        Okay. Let's stop there. Now, from this
17 listing of items in Item Master, at least the first
18 25, can you tell which items are part of which
19 catalog?
20        MS. ALBERT: Asked and answered. You asked
21 these same questions when we were reviewing his
22 recorded demonstration.
23   A.   **Do you want me to repeat my answer?**
24   Q.   Sure.
25   A.   **No, not from this screen.**

Page 271

1    Q.   And then I think you did an actual search
2  by clicking the search button; is that correct?
3    A.   **Correct.**
4    Q.   And then you clicked -- you chose to
5  filter instead of find?
6    A.   **That's correct.**
7    Q.   And then you chose to search by
8  description instead of item retract?
9    A.   **Correct.**
10   Q.   And you chose like instead of equals?
11        MS. ALBERT: And all of these questions were
12 asked -- you've already asked all of these questions
13 previously with Dr. Weaver's recorded demonstration.
14 So I don't really see why we're repeating it again.
15   Q.   Okay. And then you did -- no. No. No.
16 Don't search that.
17        Then you did Dell and you added another
18 key by pressing the plus sign?
19   A.   **Well, we did that filter first and then**
20 **came back to this.**
21   Q.   Okay. And so, we can do that, if you'd
22 like.
23   A.   **Sure.**
24   Q.   You would like to do that?
25   A.   **Sure.**

(Pages 268 to 271)

Page 272

1  Q.  Okay.  Then -- so we're going to run that
2  search.
3      Okay.  And so, we got four results back.
4  It's the ones we saw before:  Item 6010, 6011, 6020
5  and 6025, right?
6  **A.  Yes.**
7  Q.  Okay.  And then you did another search
8  again, and you added another keyword by hitting the
9  plus sign?
10 **A.  That's right.**
11 Q.  Chose description?
12 **A.  Yes.**
13 Q.  Chose like instead of equals, and put in
14 Dimension?
15 **A.  Correct.**
16 Q.  And before you --
17    MS. ALBERT:  You need to spell it right.
18    MR. HVASS:  Yeah.
19    MS. STOLL-DeBELL:  He's had problems with
20 dimension.
21    (Laughter)
22    MR. HVASS:  There we go.  Got it right.
23 Q.  Okay.  So my question is:  In doing the
24 second search, is it your opinion that you are
25 searching only those items with Dell in its

Page 273

1  description to find items that also say Dimension?
2  **A.  Yeah.  The way the search index works,**
3  **Dell and Dimension are going to become keywords.  So**
4  **it's going to find items in which both Dell and**
5  **Dimension are in the description.**
6  Q.  And does it -- in looking for that second
7  keyword Dimension, does it only look at items that
8  also have Dell, or does it look at all items that have
9  Dimension, and then -- and then return a result that
10 has both?
11 **A.  Only.**
12 Q.  Does that make sense?
13 **A.  No; only items that contain both Dell and**
14 **Dimension in the item description.**
15 Q.  So is it searching a smaller subset in
16 the -- when it searches for that second keyword?
17 **A.  Smaller than what?  Smaller than --**
18 Q.  Smaller than what was --
19 **A.  -- the whole collection?**
20 Q.  Yes.  Smaller than what was searched when
21 you did your first search just for Dell?
22 **A.  It's searching using the index to find**
23 **the items that have both Dell and Dimension in the**
24 **item description.**
25 Q.  So it's looking at less than what it

Page 274

1  looked at when you did your first search just for
2  Dell?
3     MS. ALBERT:  Asked and answered multiple
4  times now.
5  Q.  Is the answer yes?
6  **A.  Yes.**
7  Q.  I'm just trying to understand what you're
8  saying.
9  **A.  It -- it looks at the Item Master index,**
10 **and finds items that contain both Dell and Dimension.**
11 Q.  And so, would you say it's -- in looking
12 for Dimension, it's only searching the Dell catalog?
13    MS. ALBERT:  I think --
14 **A.  I've explained it.  It looks at the Item**
15 **Master index to find items that contain both Dell and**
16 **Dimension in the item description.**
17 Q.  Okay.  So it's -- it's not searching a
18 Dell catalog.  It's searching the index; is that what
19 you're saying?
20 **A.  It's searching the index.  And the index,**
21 **of course, represents those items that have been**
22 **chosen for keyword searching.**
23    THE WITNESS:  By my clock, the time is up.
24    MS. STOLL-DeBELL:  Are you stopping the
25 deposition?

Page 275

1     MS. ALBERT:  How much more do you have?  I
2  mean, I have some questions, too.  So --
3     MS. STOLL-DeBELL:  I probably don't have
4  that much.  If you want to take a short break, I can
5  go through my notes, get organized.  I don't think
6  I -- I truly don't think I have very much at all.
7     MS. ALBERT:  Okay.  That's fine.  We can
8  take a break.  I mean, I have a few questions to ask.
9     THE VIDEOGRAPHER:  We're off the record at
10 approximately 1:17 p.m.
11    (Whereupon, a recess was taken).
12    THE VIDEOGRAPHER:  We're on the record at
13 approximately 1:21 p.m.  Counsel may resume.
14    MS. STOLL-DeBELL:  Okay.  I think that I'll
15 turn it over to Ms. Albert.
16    MS. ALBERT:  Okay.  Thank you.
17    THE WITNESS:  Thank you.
18    EXAMINATION BY MS. ALBERT:
19 Q.  I'll try to make mine brief, Dr. Weaver.
20 Do you have any typographical errors or errors that
21 you want to correct to any of your reports?
22 **A.  Yes.  In going through the expert report,**
23 **I think I found four places that needed correction.**
24    MS. ALBERT:  And just for the record,
25 Dr. Weaver had marked on his own copies in his own

(Pages 272 to 275)