# EXHIBIT C

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | | |
|---|---|---|
| *e*PLUS, INC., | **)** | |
| | **)** | |
| | **)** | Civil Action No. 3:09-cv-620 |
| Plaintiff, | **)** | |
| | **)** | |
| v. | **)** | |
| | **)** | |
| LAWSON SOFTWARE, INC. | **)** | |
| | **)** | |
| | **)** | |
| Defendant. | **)** | |

## REBUTTAL REPORT OF EXPERT MICHAEL I. SHAMOS, PH.D, J.D.
## <u>CONCERNING NON-INFRINGEMENT</u>

.

## BACKGROUND & QUALIFICATIONS

1.      My name is Michael I. Shamos.  I previously submitted an expert report addressing validity of U.S. Patent 6,505,172 ("the '172 Patent"), claims 1, 2, 6, 9, 21, 22 and 29 of Johnson et al. U.S. Patent  6,055,516 ("the '516 Patent"), and claims 3, 6, 26, 28 and 29 of Johnson et al. U.S. Patent 6,023,673 ("the '673 Patent") (collectively, the "Asserted Claims" of the "Patents"), dated May 3, 2010, in this matter. To avoid unnecessary duplication, that document and its attachments are to be considered a part of this report.

2.      I have been asked by counsel for Lawson to review the expert reports of Plaintiff's experts, Dr. Alfred Weaver and Craig Niemeyer, and in particular the technical basis upon which plaintiff's experts conclude that Lawson's accused products infringe the Asserted Claims of the Patents. In so doing, I have considered the materials referred to in those reports and the exhibits thereto, and the materials listed in Exhibit 5[1] to this report.

3.      I have been asked to provide an opinion as to whether ePlus has shown that the accused Lawson software infringes the Asserted Claims, and to reply in detail to the opinions offered in the Weaver and Niemeyer Reports.

4.      For the purposes of this report, I have assumed that the Asserted Claims are valid, even though my earlier referenced report concluded that they are not. Nothing in this report should be interpreted as altering the conclusions of my earlier report.

5.      I have utilized the claim constructions set forth in the Court's Memorandum Opinion dated April 30, 2010 in arriving at my opinions.

6.      The individuals named as inventors in the Patents are referred to collectively herein as the "Applicants."  All the Patents name the same set of inventors.

7.      It may be necessary for me to revise or supplement this report, or file a supplement or responsive report, based on any responsive report of Plaintiff, and I reserve the right to do so, as permitted by the Court.

---

[1] The number of exhibits hereto begins with 5 to avoid confusion with my earlier report, whose exhibits were numbered 1-4.

SHAMOS REBUTTAL REPORT ON NON-INFRINGEMENT                         CASE NO.3:09cv620

8.      I further understand that, as of the date this report is to be served, fact and expert discovery are continuing, and on that basis it may be necessary for me to supplement this report. If asked at hearings or trial, I am prepared to explain in detail, with appropriate visual aids, the operation of the systems and methods described in the Patents, and that of the Lawson's software. These may include, among other things, *Report of Expert Michael I. Shamos Concerning Invalidity*, dated May 3, 2010 ("my Invalidity Report"), *Initial Infringement Expert Report of Alfred C. Weaver, PhD,* dated May 3, 2010 ("Weaver Report"), *Rule 26(a)(2)(B) Report Of Patrick Niemeyer,* dated May 3, 2010 ("Niemeyer Report"), S3 Supply Chain Management Suite within S3, including specifically the Requisition module, the Purchase Order module, and the Inventory Control module, the Requisition Self-Service application for S3, the Procurement Punchout application for S3, the EDI module for S3, and the M3 Procurement System (collectively the "Accused Software"), and the characteristics, functions, operation, and structure of procurement software. Such testimony may also include appropriate background material on computer software, hardware, and computer programming.  I am also prepared to testify on matters raised in cross-examination; to rebut, as necessary, matters raised (in reports, depositions, and/or court testimony) by plaintiff's experts, and to address other related matters raised at trial.

9.      I am informed that Lawson intends to file a motion to strike portions of the Weaver and Niemeyer Reports because they were not adequately or timely disclosed in Plaintiff's infringement contentions.  In the interest of caution and without prejudicing Lawson's motion to strike, I address and rebut these portions of both reports.

### SUMMARY OF OPINIONS

10.      After examining the structure and operation of the Accused Software, I conclude that it does not infringe any of the Asserted Claims, and nothing in the Weaver and Niemeyer reports establishes any infringement by Lawson.  This conclusion is based upon my

SHAMOS REBUTTAL REPORT ON NON-INFRINGEMENT                    CASE NO.3:09cv620

understanding of the patent claims, taking into account both the knowledge of one of ordinary skill in the art at the relevant time, and the Court's Markman ruling.

MIL 5
MIL 3

11. ~~Because of the strength of the non-infringement arguments contained herein, I also conclude that Lawson had an objectively-reasonable basis to believe it does not infringe the claims of the patents in suit, even after it became aware of the patents, and thus under an objective standard it did not proceed in the face of a high risk of infringement.~~

MIL 5
MIL 3

12. ~~Additionally, as detailed in my Expert Report Concerning Invalidity, incorporated by reference herein, I gave the opinion that the Asserted Claims are invalid based on a number of prior art references.  For this additional reason, I conclude that that Lawson had an objectively-reasonable basis to believe it does not infringe any valid claim of the Patents, even after it became aware of the patents, and thus under an objective standard it did not proceed in the face of a high risk of infringement.~~

## LEGAL PRINCIPLES

13. As an expert assisting the Court in determining infringement, I am obliged to follow existing law.  Among the legal principles I have relied upon in this report are:

a. To prove infringement of an apparatus claim, a plaintiff must show that a defendant "makes, uses, offers to sell, or sells," within the United States, or imports into the United States, an accused device that reads on every limitation of the claim, either literally or by equivalents.

b. A method claim is directly infringed only by a party who performs all the steps of the method or who directly controls another in performing those steps of the method not performed by the party.

c. The Doctrine of Equivalents protects the patentee against "copyists who 'make unimportant and insubstantial changes and substitutions in the patent which, though adding nothing, would be enough to take the copied matter outside the claim, and hence outside the reach of law'."  The Doctrine of Equivalents is sometimes articulated as meaning that there is infringement if an element performs substantially the same function, in substantially the same

way, and obtains substantially the same result as that literally taught by the claims of the patent or the element constitutes an insubstantial change from the claimed invention.

d.  For "means plus function claims" subject to 35 U.S.C. §112(6), infringement requires that the disclosed structure in the accused device perform the identical function recited in the claim and be identical or equivalent to the corresponding structure in the specification.  An equivalent structure is one which performs the claimed function in substantially the same way to achieve substantially the same result as the corresponding structure described in the specification.

e.  A device or method literally and directly infringes a claim of a patent if all of the asserted claim elements are found in or performed by the accused device or method.  A device may be found to infringe an apparatus claim if it is reasonably capable of satisfying the claim limitations, even if it is also capable of operating in non-infringing modes.

f.  If a defendant does not make or use every element of a claim, he is still liable for infringement if he caused the device to be made or used by another by directing or controlling the actions of a third party.  The defendant and the third party then become joint infringers.  Providing software which controls the action of a remote computer or having a server deliver instructions that control a remote computer can result in joint infringement.  A defendant cannot escape liability for direct infringement of a method claim by having someone else perform a claimed operation on its behalf.

g.  A defendant induces infringement by actively and knowingly aiding and abetting another person to make, use, offer to sell or sell a product or use a method, within the United States, or import a product into the United States, that infringes an asserted claim.  The plaintiff must show that the defendant knew or should have known that his actions would induce actual infringement which includes the requirement that he knew of the patent.

h. To find that a defendant has contributorily infringed, the plaintiff must show that: 1) there has been a direct act of infringement; 2) the defendant knows that its products can be used

in a device or method that would directly infringe; 3) the product used in the device or method is a staple article or commodity of commerce not suitable for substantial non-infringing use.

## LEVEL OF SKILL IN THE ART

14.     The Asserted Claims of the Patents are drawn to electronic sourcing systems that permit searching of parts catalogs and preparing requisitions and purchase orders.  In order to make and use the claimed inventions without undue experimentation, one of skill in the art would need an undergraduate degree in computer science, or equivalent work experience, and, in addition, two years' experience designing or programming electronic ordering systems.

## LAWSON'S SUPPLY CHAIN MANAGEMENT SOFTWARE

MIL 2

15.     "Founded in 1975, Minneapolis-based Lawson Software specializes in enterprise-wide accounting, human resources, distribution, and materials management application software for businesses worldwide. Lawson continually evaluates and implements the latest technologies to increase client's productivity."  (Inventory Control Procedures Manual (Release 6.0) (January 1, 1994) (© 1993) (L0012837-13145) at L0012849).

16.     Software requires computer hardware on which to operate.  I am informed that Lawson does not sell computers or computer hardware.  I do not believe that Plaintiff contends anything to the contrary.

17.     Moreover, Lawson's customers, not Lawson, use the software once it is installed and operational.  I do not believe that Plaintiff contends anything to the contrary.

### The S3 Inventory Control, Requisition, and Purchase Order Modules

MIL 2

18.     As of the late 1980s, Lawson was offering e-procurement/distribution software that included an inventory control module (IC), a requisitions module (RQ), and a purchase order module (PO).  (Lawson Dep. at 32:8-22).  I understand Plaintiff agrees this software is non-infringing (as it must be for its patents to be valid).  I will refer to the prior systems herein as "non-infringing prior software" or the like to emphasize that Plaintiff does not contend that these systems infringe any of the claims of the Patents.  Lawson's Versions 5.0 and 6.0 procurement

software, which was available prior to August 10, 1994, included Order Entry, Requisition, Inventory Control, and Purchase Order modules. (L0012852). Although the discussion below cites to the Version 6.0 and Version 9.0. documentation, I understand that Version 5.0 worked generally as described below. (Lawson Dep. (rough draft) at19:5-9, 33:17-34:7, and 59:18-60:9); *see also* my opening report at paragraphs 117-144.

**MIL 2**
**MIL 3**

19.    The following discussion regarding Lawson's prior non-infringing software supports my opinions, disclosed in detail herein, that Lawson does not directly infringe the Asserted Claims, does not possess the requisite intent for indirect infringement of the Asserted Claims, even after it became aware of the Patents, and has an objectively-reasonable basis to believe it does not infringe the claims of the Patents.

**MIL 2**

20.    .Lawson has been distributing its Requisition module since well before the priority date of the Patents.  The purpose of Lawson's Requisition module is to allow employees of Lawson's customer to request things they need for their department or things they need to perform their business.  It provides for requesting two types of items: 1) items in stock or in inventory at the customer; and 2) special order items (things that need to be ordered from a vendor).  (*See, e.g.,* Christopherson Dep. at 114:1-114:22.)

**MIL 5**

21.    I have seen no evidence that Lawson copied any aspect of Plaintiff's software or product features when developing its products at any time.  Dr. Weaver and Mr. Niemeyer provide no evidence that any aspect of Lawson's products or code was derived in any respect from access to or knowledge of Plaintiff's products, code, documentation, or Patents.  Lawson created its own products and software code.  I understand there are no allegations of any copying by Lawson of any aspect of Plaintiff's products or features.

**MIL 2**

22.    "The Lawson Requisitions system is a software package that is integrated with the Lawson Purchase Order and Inventory Control systems.  Following are some of the major features and benefits of the Lawson Requisitions system.

a.    You can generate requisitions from the Lawson Inventory Control system. . . .

MIL 2

b. ~~You can request stock items, non-stock items, special items, and services on a single requisition. . . .~~

c. ~~You can quickly create purchase orders from requisitions using a one step process.~~

d. ~~You can split requisitions among multiple purchase orders. Buyer review is available before creation of a purchase order, which enables you to combine multiple requisitions for the same line item to one purchase order.  (Requisitions Procedures Manual (Release 6.0) (January 1994) (© 1994) at Introduction, v) (L0009725-0009773) at L0009729).~~

e. "The Lawson Requisition application lets you create requests with demand on stock and demand on vendors, replenish part locations, and process and manage requisitions."  (Requisition User Guide (Version 9.0) (November 2006) at 11 (L0044880); Christopherson Depo at 114:1-22).

MIL 2

23. ~~The Requisition module has had essentially the same basic structure, function, and operation since at least Version 5.0 through the current release.  ((See, e.g., Requisitions Procedures Manual (Release 6.0) (January 1994) (© 1994) at Introduction, v) (L0009725-0009773); Requisition User Guide (Version 9.0) (November 2006); Summary of 5.0 and 6.0 Differences—IC, PO & RQ at 6 (L0017235).)~~

MIL 2

24. ~~Lawson has been selling its Inventory Control module since well before the priority date of the Patents.~~  The purpose of Lawson's Inventory Control module is to set up items within the Item Master database, which was intended ~~from inception~~ to provide customers with away to manage their inventory of products (as opposed to providing a list of products offered for sale by vendors) and to control how many of each item the customer actually has. "So you might do periodic inventory to make sure that what your stock says is in the computer is actually what you do have." (*See, e.g.,* Christopherson Dep. at 120:3-120:11)  In addition to setting up the Item Master database, the Inventory Control module essentially keeps track of the customer's inventory, where is the inventory at.  Customers may have more than one supply

room, may have distribution centers, and the IC module keeps track of the current stock level of those locations.  (*See, e.g.,* Christopherson Dep. at 122:8-122:14).

MIL 2

25.     The Inventory Control system ~~"maintains and controls inventory for up to 9,999 different companies.  At a minimum the Inventory Control system provides the information necessary to support buying and selling operations.  Controlling the inventory, knowing exactly what is in stock and where it is, is the first step.  The second step is to manage the inventory by having the right amount of inventory available at the right time, reducing your inventory investment, while maintaining the desired customer service level.  Lawson's Inventory Control System can have a significant impact on the success of your business."  (Inventory Control Procedures Manual (Release 6.0) (January 1994) (© 1994) at vii (L0012843).)  It~~ "lets you define items and manage inventory.  The application receives items that you purchase from a vendor or replenish form another location and moves out items by issue, transfer or allocation." (Inventory Control User Guide (Version 9.0.1) (November 2008) at 13 (L0032261); Christopherson Depo at 120:3-11, 8-14.)

MIL 2

26.     ~~The Inventory Control module has had essentially the same basic structure, function, and operation since at least Version 5.0 through the current release.  (See, e.g., Inventory Control Procedures Manual (Release 6.0) (January 1994) (© 1994); Inventory Control User Guide (Version 9.0.1) (November 2008); Summary of 5.0 and 6.0 Differences—IC, PO & RQ at 1-3 (L0017230-32).)~~

MIL 2

27.     ~~Lawson also has been selling its Purchase Order module since well before the priority date of the Patents.~~  Lawson's Purchase Order module functions in a number a different ways.  A customer that does not use requisitions may use it to purchase an item or set of items or set of goods, services, etc. from a vendor.  It may also be used with the Requisition module, which is how most of Lawson's customers use it.  In this scenario, once a requisition has been approved, the PO module takes the approved requisition and creates the purchase order or purchase orders that are required to fulfill on the requisition, if the item is not in stock.  If the item is in stock, it is just taken from stockroom, "unless of course you need some from the

stockroom, maybe you hit a minimum threshold of stocking levels and stuff, in which case the purchase order would go out." (*See, e.g.,* Christopherson Dep. at 124:17-125:17).

28.    ~~"The Lawson Purchase Order system is designed to assist Purchasing agents, Accounts Payable and Receiving clerks, and Accounting and Inventory Management personnel in buying inventory and internal supplies while minimizing inventory cost. You also have the ability to match vendor invoices to purchase orders. You can set up the system quickly and easily, especially if you use it with the Lawson Accounts Payable system. Once the invoice is approved and you release the invoice batch, the invoice becomes the responsibility of the Lawson Accounts Payable system." (Purchase Order Procedures Manual (Release 6.0) (January 1994) (© 1994) (L0013146-0013295 at L0013151.)~~ "The Lawson Purchase Order application lets you create and issue purchase orders, and manage the receiving process." (Purchase Order User Guide (Version 9.0.1 (November 2008) at 11 (L0044092); Christopherson Depo at 122:19-124:6.) "You can also create purchase orders from another application such as Inventory Control, Requisitions, or Order Entry." (Purchase Order User Guide (Version 9.0.1 (November 2008) at 115 (L0044196).) "The Purchase Order application receives order requests from other applications and creates purchase orders from those requests." (Purchase Order User Guide (Version 9.0.1 (November 2008) at 146 (L0044227).)

29.    ~~The Purchase Order module has had essentially the same structure, function, and operation since at least Version 5.0 through the current release. (Purchase Order Procedures Manual (Release 6.0) (January 1994) (© 1994) (L0013146-0013295); Purchase Order User Guide (Version 9.0.1 (November 2008); Summary of 5.0 and 6.0 Differences—IC, PO & RQ at 3-6 (L0017232-35).)~~

30.    The following discussion regarding the Item Master database supports my opinions, disclosed in detail herein, that Lawson's Accused Software does not comprise multiple product catalogs, means for selecting product catalogs, catalog selection protocols, and the like.

31.    ~~Lawson's Inventory Control module has always included a database ("Item Master") that allows customers to upload or enter data regarding items that could be ordered~~

9

MIL 2

MIL 2

MIL 2

~~using the Requisition and Purchase Order modules:  "The item master file consists of item information that is not location specific such as the item description, generic name, freight class, sales class, inventory class, purchasing class, tax code, units of measure, etc.  This is where you indicate if an item is tracked for inventory by lot and serial number. To define a non-inventory item, set the Inventory Tracking indicator to (N)o. Run IC211 (Item Master Listing) for a listing of established item master records."  (Inventory Control Procedures Manual (Release 6.0) (January 1994) (© 1994) at 3.37 (L0012922).~~  "An Item Master is a file which holds information about an item, regardless of where that item is used.  You can assign item masters to an item group so several companies can share an item, so long as they share an item group.  Information stored in the item master includes unit of measure and packaging information.  Items are then assigned to specific locations."  (Inventory Control User Guide (Version 9.0.1) (November 2008) at 70 (L0032318); Christopherson Depo. 120:3-11.)

32.   Item Master is a single database.  (Dooner Depo. at 54:11-18 (Q. Well, if someone had, you know, a large volume of data, could they implement their item master using multiple database instances?  A. They would have to be cloned, so they couldn't put half the information in one database and half in the other.  Q. Why not?  A. It wouldn't work.").)

33.   ~~The Item Master database has had essentially the same basic structure, function, and operation since at least Version 5.0 through the current release of the Inventory Control module.  (See, e.g., Inventory Control User Guide (Version 9.0.1) (November 2008); Inventory Control Procedures Manual (Release 6.0) (January 1994) (© 1994); Summary of 5.0 and 6.0 Differences—IC, PO & RQ at 1-3 (L0017230-32).)~~

34.   As sold, the Item Master database does not contain any data – it is empty.  (See, e.g., Christopherson Depo at 120:12-21; 446:7 to 446:16; Dooner Dep. at 50:5-50:20.)  Lawson's customers select the data that they want to include in item master.  (See, e.g., Christopherson Depo at 142:6-143:4;  Lohkamp Dep. at 34:18- 36:9; ~~Inventory Control Procedures Manual (Release 6.0) (January 1994) (© 1994) at 2.7 (L0012879);~~ (Inventory Control User Guide (Version 9.0.1) (November 2008) at 73-77 (L0032321-25).)

MIL 2

MIL 2

10

MIL 2

35.     There are number of different ways that Lawson's customers may upload data to the Item Master database in the Accused S3 Software, including the following:  1) manually entering the data; 2) importing flat files using IC911 or systems utilities; 3) importing the data using the EDI application; and 4) transferring the data using PO536.  (*See, e.g.,* Dooner Dep. at 174:21-175:6).  ~~Such importing of data has been around for decades.  The first two ways were used in at least Version 5.0 through the current release of the Inventory Control module.  Thus, the Lawson system could ingest item data from other sources, such as vendor catalogs, since long prior to 2002, and in fact long before the 2004 priority date of the Patents.~~  The EDI and PO536 alternatives  also facilitate loading item data, but save time when loading data into Item Master.  (Christopherson Dep. at 286:4-287:17).  Importing catalog data by electronic data interchange (EDI), and specifically using the ANSI X12 832 standard specifically designed for importing parts or catalog data, for example, is disclosed in the prior art King '542 patent at 5:17-28.

MIL 2

36.     That data that is imported may originate from a number of different sources including a vendor catalog or the customer itself.  Often, the data that Lawson's customers upload to Item Master originates from the customer's prior (non-Lawson or legacy) procurement system.  (Christopherson Dep. at 391:18 to 392:8; ~~Inventory Control Conversion Manual (Release 6.0) (February 1994) (© 1994);~~ Lawson Supply Chain Management Conversion Guide (Version 9.0.1) (November 2008) at 34-37 (L0327441-44).)

37.     ~~Early, pre-1994 versions of Lawson's systems allowed for importing item data from other databases.  "Import the database from a comma-delimited file using Import Comma-Delimited File utility.  The fields in the comma-delimited file must be in the same order they are in the database to which you are loading them."  (Universe for UNIX Database Administration (Release 2.1) (March 1994) (© 1994) at 92 (L0025819).)~~  "Input programs are used to import data from a non-Lawson system into Lawson.  In general, data is imported through a two-step process.  First, the data residing in the non-Lawson system is placed in a flat file and directory specified by the Lawson input program.  Second, the input program reads the non-Lawson data

in the flat file and loads the information into the Lawson applications." (Procurement Management Technical Guide (Version 8.0.3) (October 2003) at 9 (L0042499)  To interface a non-Lawson file of valid attributes, "1. Prepare a comma separated value (CSV) file containing the item attribute information you want to interface. . . . 2. Transfer the CSV file to the server where your environment resides.  3.  Use the Import commoner to load the item data from the CSV file into the Attribute file."  (Inventory Control User Guide (Version 9.0.1) (November 2008) at 224 (L0032472).)

<span style="border:1px solid red; color:red">MIL 2</span>

38. ~~Regardless of how a customer chooses to upload the data to Item Master, the type of data it contains has been the same since at least Version 5.0 through the current release of the Inventory Control module as described below.  (See, *e.g.,* Inventory Control User Guide (Version 9.0.1) (November 2008); Inventory Control Procedures Manual (Release 6.0) (January 1994) (© 1994); Summary of 5.0 and 6.0 Differences—IC, PO & RQ at 1-3 (L0017230-32).)~~

<span style="border:1px solid red; color:red">MIL 2</span>

39. ~~Both~~ Lawson's ~~non-infringing prior software and its~~ accused systems included standard and custom fields for each item within the item master file:  ~~"Use ICI1 (Item Master) to add items to the item master file. All inventory items must be setup on this screen. This screen requires you to type the Item Group, Item identifier, first Description line and Stock UOM (unit of measure)." (Inventory Control Procedures Manual (Release 6.0) (January 1994) (© 1994) at 3.38 (L0012923).)  Custom fields could be added for items within the Item Master File:  "You can use this screen as is or customize the field names to meet your specific needs. For example, you can set up these fields to represent size, style, color, manufacturer name, version number, release date, etc." (L0012931).  (Inventory Control Procedures Manual (Release 6.0) (January 1994) (© 1994) at 3.46 (L0012931).)~~  "To set up the item master 1.  Access the Item Master (IC11.1).  2.  Select the item group.  3.  Type the item number.  4.  Type the item description.  5. On the Main Tab, consider the following field.  [List of fields]  6.  On the Classes tab, add item classification Information.  Consider the following fields  [List of fields]  7.  On the UOM tab, add valid units of measure of the item.  Consider the following fields.  [List of fields]  8.  On the Packing tab, define the packing weights and cubic dimensions for each unit of measure.

Consider the following field.  [List of fields].  9.  Choose the Account tab to select the default issue account and subaccount for the item.  Consider the following fields.  [List of fields] Choose the User Field tab to add user-defined information for the item.  11.  On the Sale tab, define the Order Entry setup values that you can assign to an item.  Consider the following fields.  [List of fields]  12.  Choose the Add form action."  (Inventory Control User Guide (Version 9.0.1) (November 2008) at 73-77 (L0032321-25).)

 40. The following discussion regarding the Item Master database supports my opinions, disclosed in detail herein, that Lawson's Accused Software does not meet the converting, means for converting, or cross-reference claim limitations.

 41. ~~Lawson's prior non-infringing systems used category classifications including UPC codes, inventory classes, and generic items.  The following is a screen shot displaying an item (Item No. 1013, for cheddar cheese) for Item Group (ABC Foods) in the Item Master File. The screen shot shows several ways to hierarchically categorize items including for example the inventory classes (shown with 2 levels) and a UPC code.  First they added the item, then edited the field defaults. They performed a (C)hange function to assign a generic name and establish inventory tracking.  ABC Foods can inquire on items by generic name in IC30.1 (Item Search). Also, because the item is set up for inventory tracking, ABC Foods will need to set up an item location record for each location that stocks the item.  (Inventory Control Procedures Manual (Release 6.0) (January 1994) (© 1994) at 3.39 (L0012924).)~~

MIL 2

SHAMOS REBUTTAL REPORT ON NON-INFRINGEMENT    CASE NO.3:09cv620

The same fields are available in Version 9.0. (Inventory Control User Guide (Version 9.0.1) (November 2008) at 73-77 (L0032321-25).) "Generic names group similar items under one name and are used as an alternative to brand names or trademarks." (Inventory Control User Guide (Version 9.0.1) (November 2008) at 45 (L0032293).) "The first line of any use field is searchable when running an item search. …You define what kind of information is entered in those fields. (Inventory Control User Guide (Version 9.0.1) (November 2008) at 47 (L0032295).)

MIL 2

42. Both Lawson's non-infringing prior software and its accused systems allow customers (e.g. ABC Foods) to define a hierarchy of classifications for items within item master. "Classes further define items in the item master file for inquiry, processing, and reporting purposes. The set up procedure for each class type is exactly the same. Use all class types to access items in IC30.1 (Item Search). Use inventory classes to select items for reporting purposes and sales classes for pricing and sales analysis. Purchasing classes are used extensively in the Lawson Purchase Order system." (Inventory Control Procedures Manual (Release 6.0) (January 1994) (© 1994) at 3.20 (L0012905); see Inventory Control User Guide (Version 9.0.1) (November 2008) at 44 (L0031997).) "Inventory Class: A user-defined subdivision of inventory by product grouping viewed from an inventory perspective. A major class and a minor class are available for further subdivision if desired. You can use inventory classes as a selection criteria in the item search inquiry program and in several report programs including the movement analysis report." (Inventory Control Procedures Manual (Release 6.0) (January 1994) (© 1994) at Glossary.4 (L0013133); see Inventory Control User Guide (Version 9.0.1) (November 2008) at 45 (L0032293) and 76 (L0032029).).

MIL 2

43. For example, as shown in the screen shot below, ABC Foods could define a major inventory class for fruit and minor inventory classes to classify varieties of fruit (e.g., apples, pears, etc.). (Inventory Control Procedures Manual (Release 6.0) (January 1994) (© 1994) at 3.21 (L0012906).)

SHAMOS REBUTTAL REPORT ON NON-INFRINGEMENT                    CASE NO.3:09cv620

~~The same fields are available in Version 9.0.  (Inventory Control User Guide (Version 9.0.1) (November 2008) at 44 (L0031997).)  The classifications based on UNSPSC codes, offered in Version 9.0, have the same function as the inventory classes described above.  (Inventory Control User Guide (Version 9.0.1) (November 2008) at 46 (L0031999).)~~  UNSPSC codes were not developed by Plaintiff or Lawson, they are simply a new way of doing what has been done for many years: classify products.  Typically Lawson does not perform the import of UNSPSC codes for its customers.  (*See, e.g.,* Christopherson Dep. at 156:2-157:15).  The UNSPSC table includes only the numerical code associated with a textual description of the category – it does not include item information.  (*See, e.g.,* Christopherson Dep. at 157:16-159:4).  Lawson's customers have the ability to edit or add codes to the UNSPSC codes.  (Inventory Control User Guide (Version 9.0.1) (November 2008) at 64 (L0032017).)  Lawson's customers assign UNSPSC codes to items.  (*See, e.g.,* Lohkamp Dep. at 292:11 to 293:18).

44.    In addition to defining classes, the Lawson's ~~prior art and~~ accused Inventory Control module allow customers to define generic names for items within the Item Master File ~~"to optionally group similar inventory items together under one name. Generic names appear on~~

MIL 2

SHAMOS REBUTTAL REPORT ON NON-INFRINGEMENT                    CASE NO.3:09cv620

~~selected inventory reports and can be used to access specific items in IC30.1 (Item Search)."~~ ~~(Inventory Control Procedures Manual (Release 6.0) (January 1994) (© 1994) at 3.22~~ ~~(L0012907).)~~  "Generic names group similar items under one name and are used as an alternative to brand names or trademarks."  (Inventory Control User Guide (Version 9.0.1) (November 2008) at 45 (L0032293).)  "The first line of any use field is searchable when running an item search. . . . .You define what kind of information is entered in those fields."  (Inventory Control User Guide (Version 9.0.1) (November 2008) at 47 (L0032295).)

MIL 2

45.   ~~For example, as shown in the screen shot from Version 6.0 below, ABC Foods~~ ~~could set up Generic Names for each department in the store. This way they can access all items~~ ~~in a particular department at once. For example, they can access all bakery goods in IC30.1 (Item~~ ~~Search) using the generic name BAKERY.  (Inventory Control Procedures Manual (Release 6.0)~~ ~~(January 1994) (© 1994) at 3.23 (L0012908).)~~



46.   The following discussion regarding searching supports my opinions, disclosed in detail herein, that Lawson's Accused Software do not satisfy the means for selecting product catalogs, selecting catalogs, catalog selection protocols, and other similar claim limitations.

SHAMOS REBUTTAL REPORT ON NON-INFRINGEMENT                    CASE NO.3:09cv620

**MIL 2**

47. ~~Both~~ Lawson's ~~non-infringing prior software and its~~ accused systems allow customers to include items from multiple different vendors: Vendors are assigned vendor numbers. ~~(Inventory Control Procedures Manual (Release 6.0) (January 1994) (© 1994) at 4.8 (L0012969);~~ see Inventory Control User Guide (Version 9.0.1) (November 2008) at 31 (L0032279).)

48. The Item Master table does not have a field identifying a vendor name (or supplier name or distributor name). (*See, e.g.,* Lohkamp Dep. at 290:11 to 292:10; Dooner Dep. at 53:16 to 54:3; LE00192055-62).

**MIL 2**

49. ~~Both~~ Lawson's ~~non-infringing prior software and its~~ accused systems included vendor agreements or vendor item tables. The vendor agreements are associated with a particular supplier that the Lawson customer has entered into an agreement with and include negotiated prices for items that may be purchased by Lawson's customer. (*See, e.g.,* Lohkamp Dep. at 144:21-145:7; 284:20 to 285:6). The vendor agreements are maintained in the PO module and are different from Item Master in the IC module. (*See, e.g.,* Lohkamp Dep. at 286:8 to 287:4; Dooner Dep. at 138:7-141:1; 172:5-173:3).

**MIL 2**

50. ~~Both~~ Lawson's ~~non-infringing prior software and its~~ accused systems provide a link between Lawson items in the Item Master table and vendor items in the vendor item tables. ~~(Purchase Order Procedure Manual (Release 6.0) (January 1994) (© 1994) at 3.21 (L0013209);~~ see Purchase Order User Guide (Version 9.0.1) (November 2008) at 63-64 (L0044145).) "A vendor item links an Item Master record (non-stock or inventory item) to a specific vendor … You can assign multiple vendor items for the same vendor to one Lawson item." (Purchase Order User Guide (Version 9.0.1) (November 2008) at 43 (L0044124))

**MIL 2**

51. ~~Both~~ Lawson's ~~non-infringing prior software and its~~ accused systems allow for cross-referencing an item number with a customer item number. ~~(Order Entry Procedures Manual (Release 6.0) (October 1994) (© 1994) at Introduction. vii (L0012606);~~ see Purchase Order User Guide (Version 9.0.1) (November 2008) 63-64 (L0044145).)

17

MIL 2

52. ~~Both~~ Lawson's ~~non-infringing prior software and its~~ accused systems sometimes referred to Item Master as a "catalog." ~~(Requisitions Procedures Manual (Release 6.0) (January 1994) (© 1994) at 22 (L0009753);~~ see Requisition User Guide (Version 9.0) (November 2006) at 189 (L0045058).)  That does not imply that it is a "catalog" as that term has been construed by the Court.

MIL 2

53. ~~Both~~ Lawson's ~~non-infringing prior software and its~~ accused systems include the ability to search the Item Master File using a number of different queries.  For example, searches can be done for items by generic name, by class types, by the first user-defined field (IC30.1 - Item Search). ~~(Inventory Control Procedures Manual (Release 6.0) (January 1994) (© 1994) at 3.32 (L0012917), 3.46 (L0012931), and 3.39 (L0012924);~~ see Inventory Control User Guide (Version 9.0.1) (November 2008) at 47 (L0032295).)  Users can search for items by an item code. ~~(Requisitions Procedures Manual (Release 6.0) (January 1994) (© 1994) at 4.3 (L0013226);~~ see Inventory Control User Guide (Version 9.0.1) (November 2008) at 47 (L0032295).)  ~~The item code is a "Key Field" (Purchase Order Use Text (Release 6.0 (1993) at 106 (L0015722)) that the system uses to access the data file information.  (Purchase Order Use Text (Release 6.0 (1993) at Terminology (L0015617).)  Alternatively, Version 6.0 of the Lawson's Purchase Order Module enabled a user to search for items by the item number in the Item Master or by the vendor item.  (Purchase Order Use Text (Release 6.0 (1993) at 649-51 (L0016265-67) Christopherson Dep. at 151:12 to 153:9, 165:9-166:2; Dooner Dep. at 23:19-24:8, 43:15-45:10).~~

54. It is not possible to search the Item Master table by vendor name (or supplier name or distributor name), for the simple reason that the table contains no such field.  (*See, e.g.,* Lohkamp Dep. at 292:11-293:18, 197:8-199:8; Christopherson Dep. at 143:21-144:14; Dooner Dep. at 45:21-46:5).

55. Although it is possible to view associated vendor items with an item master record in a maintenance screen, one cannot do anything with the information other than view it – one cannot create a requisition or purchase order.  (Dooner Dep. at 150:15-151:2; 208:13-210:1)

56.     Although the Accused Software needs item data to operate, it does not need to have item data from different vendors or suppliers.  It would operate perfectly well if all of the items were from a single source.  Lawson does not control or direct customers to load item data from different sources; that decision is up to the customers.

57.     Although a user may choose to search different fields of item records in item master or search for various item attributes, all of the item records in item master available to the user are searched to find matches to these attributes.  (*See, e.g.,* Dooner Dep. at 331:15-20).

58.     However, the Item Master table is not capable of being searched by vendor name (or distributor name or supplier name) and these are not fields within the Item Master table.  Vendor/supplier is not a separate search field in the Item Master database.  As explained below, vendor/supplier, can at most be used to filter search results of vendor items, that is, to eliminate results already located from the list of responsive items to another type of search query.

59.     ~~Both~~ Lawson's ~~non-infringing prior software and its~~ accused Requisition modules enable users to create a requisition from a standard order.  ~~(Requisition Procedures Manual (Release 6.0) (January 1994) (© 1994) at 10 (L0009741);~~ see Requisition User Guide (Version 9.0) (November 2006) at 11 (L0044880).)  An order can be created from items retrieved from the database by item number.  ~~(Purchase Order Procedure Manual (Version 6.0) (January 1994) (© 1994) at 4.3 (L0013226); Purchase Order Use Text (Release 6.0 (1993) at 103-06 (L0015719-22);~~ see Requisition User Guide (Version 9.0) (November 2006) at 12 (L0044881) and 14 (L0044883).)  Items in the Item Master File (inventory and non-stock items) can be added to requisitions:  ~~"The Lawson Requisitions system interfaces with the Lawson Inventory Control system for requisitioning stock and non-stock items. To set up the inventory structure. . . . 1.  Use IC00 (Item Group) to define item groups.  An item group identifies defaults and parameters for a specific group of inventory items defined in the item master file. 2.  Use IC01 (Company) to define your company in the Lawson Inventory Control system.  3.  Use IC02 (Location) to define inventory locations.  You must define a delivering location in the Inventory system. You do not have to define a requesting location. 4.  Use IC11 (Item Master) to define non-stock items.  Use~~

MIL 2

IC11 and IC12 (Item Location) to define inventoried items." (Requisition Procedures Manual (Release 6.0) (January 1994) (© 1994) at 1 (L0009734); see Requisition User Guide (Version 9.0) (November 2006) at 12 (L0044881) and 14 (L0044883).)

MIL 2

60.   Both Lawson's non-infringing prior software and its accused Requisition modules allowed users to create purchase orders from one or more requisitions.  (Requisition Procedures Manual (Release 6.0) (January 1994) (© 1994) at 16-18 (L0009747-49); see Purchase Order User Guide (Version 9.0.1) (November 2008) at 60 (L0044141).)  "To create a purchase order from a requisition for inventoried items, the Create PO field in RQ1.0.3 (Requisition Line Detail) must be Yes.  The system sets this field for non-stock, special order, and service items. There are two ways to create purchase orders from requisitions:

  a.   Create a purchase order directly from one requisition. See "Creating a Purchase Order from One Requisition."

  b.   Select items from several requisitions to create a purchase order.  See "Selecting Items to Create a Purchase Order." (Requisition Procedures Manual (Release 6.0) (January 1994) (© 1994) at 16 (L0009747).)

MIL 2

61.   Both Lawson's non-infringing prior software and its accused systems allow purchase orders to be issued to multiple vendors:  (Purchase Order Procedure Manual (Version 6.0) (January 1994) (© 1994) at 1.6 (L0013161) ); see Purchase Order User Guide (Version 9.0.1) (November 2008) at 146-49 (L0044227-30).)

| Feature | Advantage | Benefit |
|---|---|---|
| Vendor information tracking | Tracks each vendor's purchase-from locations, the complete vendor history, and vendor history by purchase-from location. | Maintains control over vendor files. |
|  | Tracks PO specific information including shipping information, payment terms, and purchasing limits. |  |

| Extensive line item information | includes this information for line items:<br>• item number<br>• vendor item number<br>• item description<br>• valid units of measure<br>• weight<br>• volume<br>• comments<br>• delivery date range<br>• unit cost defaults or manual pricing<br>• ship-to locations by line item<br>• certification/inspection required flags | Defaults general ledger distributions for inventoried items and allows entry for non-inventoried items. |

(Purchase Order Procedure Manual (Version 6.0) (January 1994) (© 1994) at 1.7 (L0013162) , at 3.16 (L0013204); see Purchase Order User Guide (Version 9.0.1) (November 2008) at 34 (L0044903), 146-49 (L0044227-30).)

62.    Both Lawson's non-infringing prior software and its accused systems track inventory of items in the Item Master File:

<div style="border:1px solid red">MIL 2</div>

**Inventory Control Features**

Listed below are the Lawson Inventory Control system major features, their advantages, and benefits.

| Feature | Advantage | Benefit |
|---|---|---|
| User Definable Maintenance Screen Formats | The system allows you to create maintenance and inquiry screen formats to meet your specific needs. | Customize your own item set up process to streamline the process of adding and maintaining inventory items. |

SHAMOS REBUTTAL REPORT ON NON-INFRINGEMENT                    CASE NO.3:09cv620

| Multiple Levels of Stock-On-Hand (SOH) Balance Control | The system tracks SOH balances by location, bin, lot, serial number and unit of measure. Item availability is based on supply, demand, and SOH quantities. | Quickly access stock detail information such as: item bins, SOH quantities, lot/sublots, lot holds, inspection/allocated totals and freeze status. |
|---|---|---|

(Inventory Control Procedures Manual (Release 6.0) (February 1994) (©1994) at Introduction.vii (L0012852).) "The Item Location is a file of items that are stocked at a specific location. The item location tracks item costs and quantities … At least one item location record is required for each item master record." (Inventory Control User Guide (Version 9.0.1) (November 2008) at 82 (L0032330).

63.    ~~Both~~ Lawson's ~~non-infringing prior software and its~~ accused systems track inventory in multiple locations:  ~~"Locations define places within a company where you store inventory.  They can represent physical places such as cities, buildings, warehouses or they can represent logical classifications such as administration, supplies, finished goods, etc." (Inventory Control Procedures Manual (Release 6.0) (February 1994) (©1994) at 2.4 (L0012876);~~ <u>see</u> Inventory Control User Guide (Version 9.0.1) (November 2008) at 82 (L0032330).)

**The Requisition Self-Service Application**

64.    "Lawson Requisition Self-Service application lets you create requests with demand on stock and demand on vendors.  You can process, view, and modify requests." (Lawson Requisition Self-Service User Guide (Version 9.0.1) (May 2009) at 7 (L0045480).)

65.    The Requisitions Self-Service module ("RSS") provides a new user interface for functionality that was in the prior Lawson systems.  New windows type user interface or GUI was part of incremental advances in computerized purchasing systems.  ePlus patents make a passing reference to GUIs, but actually show only text-based user interfaces.

66.    The Requisitions Self-Service module works on top of the Requisitions module.  While the Requisitions module requires training, it's not designed for every user, RSS requires a very minimal amount of training if any training.  So instead of having to go to the office administrator, anyone in the company could go with Requisitions Self-Service with a minimal

MIL 2

amount of training and do the same basic thing, again, request things that are in inventory or special order items. "That in turn, once they are done with creating -- we change terms, many times it means the same thing behind the scenes, but instead of creating a requisition, they're filling up a shopping cart. When they're done with their shopping cart and they want to check out, that means they're going to get approval. It's interacting with RQ, Requisitions, behind the scenes. It creates a requisition and then follows that process." (Christopherson Dep. at 115:20-117:2).

67.     As mentioned above, the "shopping cart" of RSS *is* the requisition. "The shopping cart displays the total number of items and the total transaction amount for a requisition (in base currency). The shopping cart dynamically builds quantity and amount for items in the cart. . . . Buttons at the bottom of the cart are available once items have been added." (Lawson Requisition Self-Service User Guide (Version 9.0.1 (May 2009) at 33 (L0045506).) Unlike an order list, which does not necessarily represent what will be on the requisition, the Lawson shopping cart represents exactly what is on the requisition because it is the requisition. Selecting "checkout" on the shopping cart releases the requisition to the next stage of processing: "Checkout - Saves items in the cart to be requisition lines and moves the requisition to the next processing stage (for example, releases the requisition)." (L0045506).

### The Procurement Punchout Application

68.     "Lawson Procurement Punchout lets users of Lawson Requisition Self-Service order supplies from a specific vendor's website. With Lawson Procurement Punchout, a vendor page is linked to a shopping icon (called Punchout) on the Lawson Requisition Self-Service home page. When the use chooses a specific vendor, that vendor's website catalog appears. From this catalog, Lawson Requisition Self-Service users choose items to order. By separate agreement between the customer and the vendor, the vendor displays the customer's special cost information for catalog items and can limit the catalog items that are displayed." (Purchase Order User Guide (Version 9.0.1) (November 2008) at 155 (L0044236).)

69.     Lawson has no control over the vendor websites.  Any searching or transmitting is done by vendors, not Lawson.  Databases providing catalog info are not provided by Lawson. Lawson's system in effect provides a phone for user to call vendor websites and bring information back.  (Christopherson Dep. at 184:22-185:20).

70.     Procurement Punchout "essentially is nothing more than a communication system that allows to communicate outside of the Lawson Requisition system, Requisitions Self-Service specifically, using the cXML standard that was created back in 1999.  It's used to communicate out to vendors, vendor websites. . . .  So if you take an interaction with, let's say, Office Depot, and I punchout Office Depot, and I see a website that looks like it's Office Depot's website, what items are there is between the customer and Office Depot.  Maybe all of Office Depot.  Usually it's not, it's a subset of those items.  As you fill your shopping cart, and you decide to check out, it's not actually doing a checkout; it's returning all those items into our system, into the Requisitions Self-Service, to create a requisition."  (Christopherson Dep. at 115:20-117:2, 124:19-125:17).

71.     I understand that Punchout used by small percentage (less than 10%) of Lawson customers and that it is offered because some customers want what the Lawson system does not provide—the ability to search vendor catalogs.  The fact that Lawson provides punch out as an option confirms that its RSS and PO systems do not provide such catalog searching capability and do not infringe the Asserted claims.  (Lohkamp Dep. at 90:8-12).

72.     Lawson has agreements with about 15-20% of vendors, but those agreements do not give Lawson any control over their websites.  They only set up testing to confirm the website is compatible.  (Lohkamp Dep. at 41:10-20).

73.     Other third-party websites include SciQUEST, Ariba, and Perfect Commerce. Those companies maintain catalogs to ensure they are up to date, which is an involved process. Lawson does not engage in that business.   (Christopherson Dep. at 56:15-20 (this supports the first and third statements). Those customers who seek such catalogs cannot access them within

the Lawson system, and thus may use Punchout to access them.  Again, this just reinforces the fact that Lawson does not provide the claimed catalog technology.

74.      Some third party vendors, including Ariba, SciQuest and Perfect Commerce, are licensees of the ePlus patents.  They provide catalogs for customers to shop, as the claims require.  Some Lawson customers use Punchout to access these licensed websites.  This further confirms that the Lawson system is not infringing, but rather provides a tool to access catalog aggregation sites which actually use the claimed technology.  Lawson's system does not compete with the patented technology, but rather creates a market for it.

**The EDI Module**

MIL 2

75.      "EDI is the paperless exchange of documents between trading partners. Companies that use Lawson's EDI capability can communicate instantly with suppliers and vendors.  Data is transmitted from one company's computer to another electronically.  The basic transaction for all EDI purchasing is the electronic purchase order.  With electronic purchase orders, EDI users can order materials from vendors electronically."  (Purchase Order Procedure Manual (Version 6.0) (January 1994) (© 1994) at 5.3 (L0013273); Purchase Order User Guide (Version 9.0.1) (November 2008) at 155 (L0044236))

76.      EDI was not developed by Lawson or ePlus.  It is a set of industry standards about how systems should format information that is transferred electronically so that the recipient of the information understands what it is.  EDI 832 specifically is an industry standard for communicating catalog or part information electronically.  It was not developed by Plaintiff or Lawson.  Like other EDI standards, the point of the 832 standard is to allow all companies to freely communicate information without having to pay a license fee.  This facilitates the usefulness of all products on the market, as they can all communicate with this common language.  This benefits customers because they are not locked in to one company's system just

MIL 5

because it cannot communicate catalog information with other systems.  Lawson's use of EDI is not an appropriate basis for Plaintiff to contend Lawson infringes.  Plaintiff is in effect trying to

~~make EDI proprietary to it, when it neither developed nor owns the technology, and in fact~~
~~Plaintiff has benefited from EDI's open and royalty-free availability for all to use.~~

77.     "EDI works primarily with Purchase Order.  And that goes back to a standard that was -- I don't recall when it was created, but I know it was in existence into the '80s.  It's another communication vehicle to send in this case purchase orders to vendors and then to get acknowledgment of receipt.  So there's certain message formats that they exchange information; maybe advanced shipping notices, maybe delays in shipping.  Receipts of the goods would go from the customer then back to the vendor."  (Christopherson Dep. at 126:1 to 126:14).

78.     EDI also enables Lawson's customer to upload to Item Master and the vendor item tables an EDI 832 file from a vendor.   (*See, e.g.,* Lohkamp Dep. at 341:6- 343:12).

## The M3 Procurement System

**AGR**

79.     ~~M3 is a product Lawson obtained as part of acquisition of Intentia, a Swedish company .  Plaintiff accuses the E-procurement application of M3 of infringing the Asserted Claims.~~

**AGR**

80.     ~~The M3 system is based on Intentia's MPM system that was called Movex.  I understand that MPM ("Manufacturing Process Management") was the prior name for ERP ("Enterprise Resource Planning").  M3 stands for Make, Move, Maintain, and is intended to be used for customers who have products that they are selling or renting.  There are approximately 170 applications in the M3 suite.~~

**AGR**

81.     ~~I understand that the e-procurement portion of Lawson's M3 system is separately licensed from its other products.~~

**AGR**

82.     ~~Lawson's M3 e-Procurement is more manufacturer-focused, in contrast to the S3 system which focuses on service industries.  It continues to be sold primarily in Europe, and few sales of the products at issue have occurred in the U.S.  It runs on an application server, interacts with company employees and purchases over the company's Intranet and interacts with suppliers over the Internet.  On the back end, it interacts with external databases and ERP systems.  It is called a buy-side application because it provides a <i>Buy Center</i> through which the~~

~~company operating the site enables its employees to purchase supplies from registered vendors. Suppliers make products available for purchase through the system by maintaining products offers through the <i>Supply Center</i>." (Lawson M3 e-Procurement 13.1.1.3.0 Installation and Setup Guide at 8 (L0061753).)~~

**AGR**

83.   ~~Of Lawson's worldwide customers for the M3 E-Procurement software, only one has a location in the United States.  (Billgren Dep. at 63:12-63:20).  I understand sales in the U.S. have been very limited.~~

**AGR**

84.   ~~Essentially the same discussion regarding noninfringement applies to the M3 system.  Lawson does not upload or maintain the item data that part of the Buy Center of M3's E-procurement software.  (*See, e.g.,* Billgren Dep. at 85:12-86:2, 86:3-86:20, 137:9-138:19, 235:7-235:19).  The suppliers, not Lawson or its customers, maintain the item data.  (*See, e.g.,* Billgren Dep. at 85:12-86:2, 137:9-138:19).  Lawson does not assist the suppliers with this process.  (*See, e.g.,* Billgren Dep. at 235:7-235:19).  M3 is software, and Lawson does not sell computers to run M3.  Lawson also does not supply the data that is uploaded into the system.  Unlike a service provider that is selling products—thus necessitating data—Lawson sells the software.  Lawson's customers then provide the data.~~

**AGR**

85.   ~~I have seen no evidence that Lawson or Intentia copied any aspect of ePlus's software or product features when developing the M3 products at any time.  Dr. Weaver provides no evidence that any aspect that the M3 product or code was derived in any respect from access to or knowledge of ePlus's products, code, documentation, or patents.  I understand there are no allegations of any copying by Lawson of any aspect of ePlus's products or features with respect to M3.~~

## REBUTTAL TO THE WEAVER REPORT

86.   Following is rebuttal to the statements made and opinions expressed in the Weaver Report.  The fact that I may not respond to any particular statement or opinion in the Weaver Report should not be taken to imply that I agree with any such statement or opinion.

87.     Exhibit 6, which is an integral part of this report, contains an element-by-element and step-by-step summary chart, for each Asserted Claim and each item of Accused Software, explaining why no infringement has occurred.

88.     The Weaver Report runs off the rails with its very first statement concerning infringement in paragraph 43, to-wit, that "Lawson makes, uses, sells and offers for sale electronic sourcing systems (*i. e.,* electronic systems for use by prospective buyers to locate and find items to purchase from sources, supplies or vendors)."  A "system" is an apparatus.  The claimed systems all require computers.  Lawson neither makes, sells or offers for sale any apparatus at all.  Lawson does not make, offer for sale, or sell computers.  Furthermore, Dr. Weaver has not shown that Lawson uses any apparatus to locate and find items to purchase from sources, supplies or vendors.  Dr. Weaver's statement is incorrect and it cannot serve as the basis for any valid opinion.  Yet it appears fundamental to his opinions, and thus is grounds to reject all of his opinions.

89.     The same is true of paragraphs 44-47, each of which alleges inferentially that Lawson makes, uses, sells and offers for sale infringing systems.  Yet there is no demonstration in the entire Weaver Report and exhibits that Lawson does so.  In particular, there is no showing that Lawson makes, uses, offers for sale, or sells systems including both the accused software and the computers required by the claims to implement the claimed systems and methods.  For this further reason and the reasons given below, I disagree with each of the conclusions reached by Dr. Weaver in paragraphs 44-47.

90.     Dr. Weaver quotes accurately from LE00206849 in paragraph 49.  That document states that Lawson Requisitions "enables users to view on-line catalogs for stock and non-stock items, select items from that catalog or a template and add additional comments to their requisitions."  However, any inference that the word "catalog" in that quotation has the meaning ascribed to that term in the Court's Markman order is unwarranted and indeed misleading, as the document was drafted well before the Court construed the term "catalog" as used in the Patents.

91.     Although Dr. Weaver in paragraph 28 purports to have used the Court's constructions, he repeatedly throughout the Report uses quotations including "catalog" from documents that were created before it was construed by the Court, and that do not use that term as it was construed by the Court.  Therefore, no valid opinion can be based on these quotations.

92.     In paragraph 55, Dr. Weaver correctly observes that the catalogs users visit on vendor websites through the use of the punchout feature are "vendor-managed."  This is in contrast to the Item Master Lawson provides to customers, which is not "vendor managed."  I do not believe Dr. Weaver disputes that the Item Master Lawson provides to customers is not vendor managed.  However, the vendor website catalogs that are "vendor managed" are not created, controlled, or maintained by Lawson, and thus cannot provide a basis to find that Lawson infringes.

93.     Dr. Weaver implies that Punchout may be used without RSS.  This is not correct.  Punchout is integrated with RSS, which may be integrated with IC, RQ, and PO.

AGR

94.     ~~With respect to M3 in paragraph 60, I agree that supplier catalogs can be searched, but I do not agree that any such searching or any means for searching meets the limitations of any Asserted Claim, at least because no mechanism is provided to search portions or subsets of the catalogs.~~

95.     In paragraph 63, Dr. Weaver asserts that "All of the various accused Lawson systems are capable of including multiple product catalogs/data relating to items associated with multiple vendors."  This is misleading.  It is true that data about items available from different vendors can be loaded into systems on which the Lawson software runs.  However, if this is done then the items become part of a single database, not separately searchable by vendor, and that database is not created or maintained by Lawson. The Lawson Item Master database is capable of receiving item information from a variety of sources, just as an address book could include information from more than one phone book.  That does not make an address book multiple phone books.  Similarly, the Item Master is not multiple catalogs simply because it is capable of receiving data that originated from catalogs.

96.     Paragraph 64 contains the misleading statement that data in the database therefore constitutes multiple vendor product "catalogs."  This is incorrect.  While the Item Master may be assembled from data from various sources, the resulting database does not "constitute" multiple catalogs.  It is a single database not separately searchable by vendor, supplier or distributor.  Dr. Weaver's citation of deposition testimony on this point does not support his conclusions and is unavailing.  While the witnesses agree that the database may contain data on many thousands of items from thousands of vendors, no one stated that the database comprised multiple catalogs.

97.     Dr. Weaver then engages in sleight-of-hand, turning a "no" deposition response into a "yes."  He cites the Lohkamp deposition as supposedly supporting his assertion that "the Lawson procurement application 'allows individual departments and users to establish custom catalogs' which can be 'established ... by vendor."  Actually, Mr. Lohkamp testified to the opposite.  He was asked at 118:14: "Q It indicates here that the Lawson procurement application 'Allows individual departments and users to establish custom catalogs.'  Do you see that?  A Yes."  That is, Mr. Lohkamp admitted that yes, he saw the quotation.  He was then asked at 118:19: "Q.  Is that an accurate statement today?  A.  I'd say no."  It other words, it is *not* true that individual departments and users could establish custom catalogs.  Somehow Dr. Weaver has transmuted this "no" into a "yes."  The document Mr. Lohkamp was discussing was a non-Lawson document prepared by a third party in 2002.

98.     Mr. Lohkamp later explained that "templates" could be established for ordering regularly needed items, but that does not constitute establishing separate catalogs, or even separately searchable portions of the database.

99.     This usage of "templates" also shows the flaw in Dr. Weaver's analysis in paragraph 66, which claims incorrectly that "Individual departments and users can establish custom catalogs that reflect their unique ordering patterns. Furthermore, you can establish catalogs for certain days of the week, by item classification, vendor or other criteria."  These are not "catalogs," as construed by the Court, because they are not published by a vendor.  They are templates set up by individual users and departments.

100.     Likewise, in paragraph 67 Dr. Lawson cites the use of the word "catalog" in a Lawson document, but it is not used there in the sense construed by the Court.  I further note that RFP responses are not necessarily indicative of how Lawson's software actually functions. Rather, they are responses to customer's questions that are prepared mostly by salespeople.  (*See, e.g.,* Christopherson Dep. at 327:2-328:9).

101.     Paragraphs 68-82, which occupy over nine pages of the Weaver Report, are alleged to serve as the basis for his opinion, in paragraph 82, that the Lawson "systems" "include multiple product catalogs and/or item data associated with multiple sources."  It seems to me that if Lawson's system uses catalogs, it would not takeover nine pages to explain why.  The Patents, in contrast, succinctly explain how users are provided a group of vendor catalogs to choose from to search for products.  See e.g. '683 patent col. 4, 9- 10.  The Lawson systems, as delivered, look nothing like the system described in the patents, and contain no such catalogs or data.  The Lawson system, unlike the system described in the Patents, gives no choice of catalogs for the user to search in.  While a user may choose to load item data from multiple sources into its own Lawson database, that database then consists of a single collection of items, not multiple catalogs.

102.     As the Patents recognize, it was well known in the prior art to search single catalogs comprising products of many vendors.  Indeed, the prior art RIMS system (described in the '989 patent) allowed searching of a database including products from multiple vendors and a Distributor.  A single collection of items does not become multiple catalogs simply because it includes items from more than one vendor.

103.     Paragraphs 83-85 simply establish the fact, not disputed, that Lawson software with the EDI module has the capability of ingesting catalog data from suppliers via electronic data interchange.  This proves nothing about whether the Lawson systems as loaded by customers use multiple catalogs.

104.     Paragraphs 86-93 deal with the Lawson "punchout" capability, by which a user is able to search a catalog maintained by a third-party vendor at the vendor's own website.  The

very name "Punchout" illustrates the flaw in Dr. Weaver's reasoning, which is that he relies on elements outside the Lawson system and outside Lawson's control to improperly find that Lawson infringes.  The Lawson documentation explains that the "out" portion of "punchout" means that the user is outside the Lawson software while browsing: "Lawson Procurement Punchout enables users of Lawson Requisitions Self-Service to order supplies from specific vendor's web sites. Within Lawson Procurement Punchout, a vendor's web site is represented by an icon on the Lawson Requisitions Self-Service home page. When the user clicks on the vendor icon (called "punching out") that vendor's web site catalog appears in a separate browser session." L0046299.  It is clear from this description, that even if the punchout vendor maintains a "catalog" within the Court's construction, that "catalog" is not on the user's website and is not maintained by the Lawson software controlled by Lawson.

105.    There is no basis at all for Dr. Weaver's opinion in paragraph 93 that "Lawson makes the infringing S3 procurement systems as integrated with the RSS and Procurement Punchout applications which systems include multiple vendor catalogs."  The above analysis demonstrates the flaw in this analysis in part.  The "system" as claimed is an apparatus.  Lawson makes no system.  Furthermore, it is clear from the documents and testimony cited by Dr. Weaver that the websites that can be visited by Punchout users are not integrated with any item data in any database in the Lawson software.  For example, no collective searching can be performed – the user is forced to employ whichever search facilities are offered at a particular vendor's website, if any.  Lawson has no control over whether or how third party vendors provide search capabilities at their websites.

106.    Paragraph 94 observes that Lawson provides hosting services for a limited number of customers.  However, in this regard Lawson is no different from any other application service provider or service bureau.  All actions performed by a customer, including the ingestion of catalog data and ordering products, are performed by the customer, and not Lawson.  Furthermore, such activities are not directed or controlled by Lawson, and Dr. Weaver has not cited any evidence that they are.

SHAMOS REBUTTAL REPORT ON NON-INFRINGEMENT                    CASE NO.3:09cv620

107.    Paragraph 94 states that on one occasion Lawson performed loading of item data into a client database, i.e., for Jackson.  First, the loading of item information into a database is not an act of infringement under any of the Asserted Claims.  Furthermore, there is no evidence that any such activity was performed by Lawson in any other capacity than as an agent of Jackson, pursuant to Jackson's direction and control..

108.    Paragraphs 95-98 are devoted to the Lawson M3 e-Procurement system.  As indicated above, M3 has a very small number of installations in the U.S.  In paragraph 95, Dr. Weaver asserts that "one or more catalogs need to be established for each supplier with which the system user does business."  He cites the supposed deposition testimony of Mr. Billgren at 140:10-141:11 as supporting his view.  What actually occurred at the deposition, as revealed by the transcript, is that Mr. Billgren was asked a complex question quoting from a document and having five parts: "Q Do you see under item 6, that item reads, 'Set up each supplier as described in setting up suppliers on page 107.  For each supplier you will need to do the following. 1, set up one or more supplier companies. 2, create one or more users for each supplier. 3, define one or more agreements for each supplier. 4, establish one or more catalogs, each of which is configured with product groups, location availability, company availability, and an approval procedure. 5, test the solution by publishing products for one or more catalogs.'. So in order to deploy the e-Procurement solution, you need to have catalogs that are associated with a supplier; is that correct?"  Mr. Billgren answered, "Yes. If you want to do requisitions from said supplier."

109.    From this exchange, Dr. Weaver incorrectly took away that separate catalogs would be established for each of the suppliers, even though Mr. Billgren never said that.  The document that Mr. Billgren was being questioned about, "Lawson M3 e-Procurement 13.1.1.3.0 Deployment Guide" (L0061536), makes it clear that no such separate catalogs need to be created.  In fact, Mr. Billgren was merely answering the obvious, which is that if a user needs to create a requisition for products from a supplier, then that supplier's products need to be in the database.  The "setting up" of the catalog does not mean creating a new and separate catalog, but ingesting the data from the catalog into the single database searched by the Lawson software.

33

AGR

110. ~~Nothing in paragraphs 95-98 establishes anything to the contrary. Thus Dr. Weaver has no basis for his opinion, expressed in paragraph 98, that Lawson makes the M3 e-Procurement systems covered by the patent claims and such systems include multiple product catalogs.~~

111. Likewise, there is no basis for Dr. Weaver's opinion in paragraph 99 that "the accused Lawson systems literally satisfy the elements of the asserted patent claims requiring multiple product catalogs, collections of catalogs and item data associated with multiple vendors." The database can contain *data* associated with multiple vendors. However, that does not meet the "multiple catalogs" limitation of any Asserted Claim.

112. Paragraphs 100-105 are devoted to a repetition of the argument that because the database includes information about products of multiple vendors, it must comprise multiple catalogs. This is flawed for the same reasons discussed above. Thus there is no basis for Dr. Weaver's opinion, expressed in paragraph 105, that "each of the accused Lawson systems is capable of including and includes multiple product catalogs, or a collection of catalogs, associated with respective sources literally satisfying the Court's construction of the term 'catalog'." A correct statement would been that "none of the accused Lawson systems is capable of including, nor do they include, multiple product catalogs, or a collection of catalogs, associated with respective sources literally satisfying the Court's construction of the term 'catalog'" – precisely the opposite of Dr. Weaver's conclusion.

113. In paragraph 105 of his report, Dr. Weaver has utterly failed to show the presence of "multiple catalogs" because he has not shown the presence of multiple "organized collections," as opposed to a single organized collection. Further, as described above and below, Lawson's Item Master database does not meet the Court's construction of "catalog" at least because it is not published by a vendor.

114. During prosecution of the '683 patent, Applicants pointed out to the examiner, in response to a prior art rejection, that "Applicants' claimed invention permits access to complete catalogs, and multiple catalogs from a single source or multiple sources. See, e.g., specification

34

at page 8."  Applicants went on: "This represents a distinct advantage over the teaching of King where the Customer appears to be limited to searching the Private catalog or the Public Catalog, with no option of choosing to search both, or choosing to search selected portions only, or choosing to search multiple catalogs at the same time."  Response to First Office Action, April 6, 1988.  However, the Lawson system operates on a single collection of items, and does not permit "access to complete catalogs, and multiple catalogs from a single source or multiple sources." Plaintiff is now attempting to recover what it expressly disclaimed during prosecution. Furthermore, the options allegedly permitted by the invention mentioned to overcome the King rejection, are not available to a user of the Lawson software.

115.    Paragraphs 106-154 (20 pages) are devoted to an ultimately futile effort to show that the Lawson software comprises a "means for selecting the product catalogs to search" element.  At the simplest level, the reason the effort is futile is that the database comprises only a single collection of items (which admittedly may include products of multiple vendors).  With only a single collection of items to search, there cannot be any "means for selecting the product catalogs to search."  The length of his analysis again suggests Dr. Weaver is trying to fit a square peg in a round hole.  In contrast, the Patents show a very direct and simple way of selecting the catalogs to search, at cols. 9-10.  The patents describe a way of searching vastly different from what Dr. Weaver describes in the Lawson system as purportedly doing the same thing.

116.    In paragraph 106, Dr. Weaver correctly quotes the Court's structure corresponding to the "means for selecting the product catalogs to search" element as "a user interface that allows the user to select a catalog; a catalog module that selects product catalogs based on preferences or history; a catalog search module that identifies product catalogs or a combination thereof; and their equivalents."  From that construction alone, it is apparent that no such means exists in the Lawson software.  There is no "user interface that allows the user to select a catalog," no "catalog search module that identifies product catalogs or a combination thereof," or any equivalent of them.  Dr. Weaver has utterly failed to show how any user

interface exists that would allow a user to select a product catalog based on preferences or history." Indeed, he could not possibly do so since there is only one catalog.

117. Instead, the "evidence" Dr. Weaver cites in paragraph 106 is no more than Plaintiff's infringement contentions, which are surely not evidence. However, the contentions themselves deserve further exploration. Dr. Weaver cites to pages 46-53 of his Appendix 1. Page 47 insists that "Catalogs can be selected by inputting manufacturer codes, partial descriptions, classification codes/categories, manufacturer name, unit of measure, vendor, and other item attributes." Even assuming this to be true, it does not establish that any selection of catalogs is occurring. Suppose, *arguendo*, that inputting a "vendor" would result in only products of that vendor being returned by the search. However, since the Lawson software maintains only one collection of items, it searches that entire collection to decide which items to report. No "selection" has occurred. All vendors' items, even if they existed in separate collections segregated by vendor, which they do not, would be searched. The reason is that there is no evidence that "vendor," as a search variable, is treated any differently than any other product attribute, such as "color" or "weight." Just because a user can constrain a search to return only "red" items does not imply that there are separate "red", "green" and "blue" catalogs. Likewise, the ability to specify that all products other than those of a certain vendor are to be discarded does not mean that a separate catalog is maintained for that vendor.

118. The Lawson software does not permit searching by vendor. Dr. Weaver cites to three pages of Dooner deposition Exhibit 5 ("Application Design Document for *S3 Item Search Center*"), LE00192060-62. These pages list in detail the search fields that can be specified by a user. The footnote on page LE00192062 states that an asterisk indicates an element that "can only be used in combination with a search value to filter the results of a search." The element "VENDOR" has such an asterisk. Further, the database this is referring to for a "VENDOR" field is POITEMVEN, which are the vendor item tables (NOT Item Master). This means that the user *cannot* restrict searching to a particular vendor. At most, the search is performed on the

SHAMOS REBUTTAL REPORT ON NON-INFRINGEMENT                              CASE NO.3:09cv620

entire collection and the results, after the search is completed, are filtered to remove those items that do not correspond to "VENDOR."  Thus the required "means for selecting" does not exist.

119.    Thus the statement in paragraph 107 that "the accused Lawson systems receive information inputted via the user interface relating to a user's selection of product catalogs to search from among the available product catalogs" is incorrect.  No such selection can occur at least because (1) there is only one collection of items; and (2) specifying a VENDOR does not cause any selection.

120.    Paragraph 108 contains incorrect statements about the S3 software.  Dr. Weaver, states that "catalogs can be selected by … vendor," but there is no evidence to support that assertion.  He cites a number of documents and deposition transcripts, which I will analyze in turn.  The "Response to Request for Proposal CML Healthcare" (L0068848-943) at L0068884 contains Lawson's response to a request for proposal.  In response to the questions, "Does the system have the ability for expanded item search by; vendor catalogue #, partial description, manufacturer code, classification code, vendor name, manufacturer name?," Lawson placed an "X" in a box.  This is not evidence of a "means for selecting the product catalogs to search."  As explained above, the ability to filter a search by vendor in Lawson does not cause any selection to occur.  Moreover, a response to an RFP about the "ability" of the system proves nothing about whether such a system was ever made, used, or sold in fact.

121.    Also in paragraph 108, Dr. Weaver also cites 152:14-153:9; 174:22-175:12 of the Christopherson deposition.  The first portion deals with which fields in the database are searchable.  There is no mention of "VENDOR."  However, as explained above, being able to filter searches by VENDOR does not cause catalog selection to occur.  The second portion has nothing to do with VENDOR at all.

122.    Also in paragraph 108, Dr. Weaver further cites the Matias deposition at 17:9-24.  Mr. Matias was asked, "If a requester wants to purchase a particular item or put in a request for that item to be purchased would they base their choice of which item they need on that item

description?"  In response, Mr. Matias replied, "description, manufacture number, catalog number," none of which is VENDOR.

 123. Also in paragraph 108, Dr. Weaver cites the Dooner deposition Exhibit 5 at LE00192060-62.  This is the same document cited on page 106 that was dealt with above.

 124. In paragraph 108, Dr. Weaver also cites Raleigh Dep. Ex. 20 (Lawson's Response to RFP of Jackson Health System) (L0096023-329) at L0096172.  This is similar to the CML Healthcare response.  Opposite the requirement "Expanded item search by: Vendor name," Lawson responded "Yes."  As explained above, the ability to filter by vendor a search already performed does not imply catalog selection.

 125. Also in paragraph 108, Dr. Weaver also cites five portions of the Cimino deposition.  The first four do not relate to vendor.  The last, 142:5-23, establishes conclusively that no catalog selection occurs when a vendor code is specified.  Mr. Cimino testified that the entire active database is searched in response.

 126. In paragraph 109, Dr. Weaver cites the "Search Catalog" selection allegedly described in the Lohkamp deposition.  It is odd that Dr. Weaver would cite this testimony since it establishes positively that the collection *cannot* be searched by vendor.  At 197:17, the following exchange occurred:

"Q.  And one of the things that you can do when you do the -- click on that drop-
down menu is specify that you want to search a particular catalog, correct?
A Specify to search a catalog, yes.
Q And after I do that, I could then specify.
what catalog I want to search?
A No.
Q What do I do once I click on that search catalog?
A I'm presented with a search box.
Q And what can I -- what can I input in that search box?
A I can search keywords to -- to find products.
Q Could I -- could I search a vendor?
A No."

Therefore, a catalog cannot be selected except by visiting a specific vendor's website by leaving the Lawson software and using sites outside Lawson's control.

SHAMOS REBUTTAL REPORT ON NON-INFRINGEMENT    CASE NO.3:09cv620

127.    In paragraph 110, Dr. Weaver asserts that "Merely because there may be a single catalog database instance within an accused S3 procurement system does not mean that there are not multiple product catalogs within that single database instance." That may be true as a general statement about databases. It is possible for a database to contain multiple separate catalogs. But that is not true of the Lawson database.

128.    Paragraph 111 addresses the "selecting" limitation, but Dr. Weaver focuses on simultaneity of searching, which is not relevant to that limitation. Lawson does not argue with the Court's finding that simultaneity is not a requirement of the claims, so this observation is irrelevant. The claim element being discussed is a "means for selecting," not a "means for searching." Lawson does not argue that any "selection," which in any event does not occur in the Accused Products, need or need not be simultaneous. There is no basis for Dr. Weaver's opinion in paragraph 111 that "the accused Lawson S3 procurement systems literally satisfy this claim element."

129.    Paragraphs 112-114 address the punchout feature by which a user can leave the Lawson software and search a vendor's website for products. Accusing Lawson in this manner makes no more sense that accusing Microsoft of infringing because its Internet Explorer because it allows escape to a vendor site to perform searching. By the words of the claims, the "means for selecting" must select from among catalogs that are part of the "system." The punchout vendor catalogs are not part of the Lawson "system" and are not made, used, sold or offered for sale by Lawson.

130.    ~~Paragraph 115 asserts that the Billgren deposition at 270:7-16 establishes that catalogs can be selected with the accused M3 software because the software accepts "IBM" in the supplier input box. As explained above, this is only a post-search filter and does not cause catalog selection. (See, e.g., Dr. Weaver's demonstration at ePLUS0943019, showing that the "Supplier" specification is only a filter.) Therefore, there is no basis for Dr. Weaver's opinion in paragraph 116 that "the structures of the accused Lawson systems are identical to the structures described in the patent specification for performing the recited function as described above and~~

AGR

39

~~as further described in Appendix 1 at 46-53.  Neither is there any basis for Dr. Weaver to~~
~~conclude that  the accused systems literally satisfy the "selecting the product catalogs to search"~~
~~element of claims 26 and 28 of the '683 Patent."  No such selection occurs.~~

131.    Paragraphs 117-152 are devoted to a discussion of a proposed claim construction by Lawson that was not adopted by the Court.  Therefore I need not address these paragraphs.

132.    In paragraph 153, Dr. Weaver asserts that "a user can select to search a first catalog and then select to search a second catalog thus accomplishing "selecting two or more product catalogs from a list of available catalogs displayed to a user," as recited in Lawson's proposed construction for the element of claim 3 of the '683 Patent."  Even though this proposed construction was not adopted by the Court, I point out that no catalog at all can be selected, so there is no selecting of a first catalog followed by selecting a second catalog.

133.    Therefore, there is no basis for Dr. Weaver's opinion in paragraph 154 that "the accused Lawson systems satisfy each step of the algorithm proposed by Lawson for the "means for selecting the product catalogs to search" element of claim [sic] '683 Patent."

134.    Paragraphs 155-170 are devoted to a discussion of database indexing.  Indeed, as a hypothetical proposition it is possible in a sense to avoid searching an entire database each time by creating indexes that allow particular records containing specific data to be located quickly.  In this regard a database index is similar to the index of a book, which makes it unnecessary to scan the entire book to locate the occurrence of a word each time a search is performed.  Of course, if the word being searched for is not in the index, the index is of no help.

135.    Dr. Weaver has assumed, with no evidence at all, that the VENDOR field in the database is indexable.  In fact, the Lawson documentation makes it clear that the VENDOR field cannot be searched on, but is used *after* a search to filter the results.  Therefore, even if the VENDOR fields were indexed, the index would not be referred to during a search, and could not be used to restrict the search to any particular portion of the database.

136.    Dr. Weaver's analysis contradicts the description of searching selected portions of a database in the patents in suit.  The RIMS prior art system described in the patents in suit used

40

a Parts Master database, which uses relational databases that one of ordinary skill would recognize could use indices to facilitate searching.  Yet nowhere in the Patents do they describe such searching in the RIMS database as the selected portions searching that the claims talk about.  The only selected searching disclosed in the patents in suit involves selecting catalogs to search, and does not involve searching indices.

137.    Nothing in the Niemeyer Report alters this conclusion.

138.    Therefore, there is no basis for the statement in paragraph 169 that specifying VENDOR is "a search of selected portions of the database."

139.    Likewise, there is no basis for Dr. Weaver's opinion in paragraph 170 that "The accused Lawson S3 procurement systems therefore literally satisfy the claim elements requiring searches be conducted among selected product catalogs (claims 3, 26, 28 and 29 of the '683 Patent), or selected portions of the item database (claim 1 of the '172 Patent), or that require a selection of less than the entire collection of catalogs (claims 1, 2, 21 and 29 of the '516 Patent)."

140.    Paragraph 171 deals with a proposed construction by Lawson that was not adopted by the Court.  Therefore, I need not address that paragraph.

141.    Paragraph 172-188 are concerned with "converting" and the use of UNSPSC codes.

142.    Claims 3 and 6 of the '683 patent require "means for converting data related to a selected matching item and an associated source to data relating to an item and a different source."  Claim 28 of the '683 patent requires the step of "converting data related to a selected matching item and an associated source to data relating to an item and a different source."  The Court's construction for that phrase is "substituting data relating to a selected matching item and an associated source to data relating to an item and a different source."

143.    The Court interpreted the "means for converting" element as follows.  The function of this element is "converting data relating to a selected matching item and an associated source to data relating to an item and a different source."  The structure is one or more non-catalog databases identifying cross-referenced items, identical items, or generally equivalent

41

items; one or more cross-reference tables or file identifying cross-referenced items, identical items or generally equivalent items; one or more codes corresponding to cross-referenced items, identical items or generally equivalent items; and their equivalents.  See e.g. '683 Patent at 4:60-5:8; 10:43-54; 14:35-45; 16:14-32; 17:19-54, appendices VIII-X.

144.   Claim 21 of the '516 Patent requires: "a determination system that located items are generally equivalent; and wherein said determination system includes a cross reference table matching an identification code from a first located item with a second identification code from a second located item."  Claim 29 of the '516 patent requires "a cross reference table linking a vendor item catalog number from said vendor with an item catalog number from said predetermined third party."

145.   The Court interpreted "cross-reference" table to mean "a table that links vendor's items determined to be equivalent between two or more different vendors."

146.   Lawson's systems do not use UNSPSC codes to substitute one item for another item   A Lawson user is able to search for items having a particular UNSPSC code.  The search would return those items having that code.  The user is then free to order any of them, none of them, or any combination of them.  The user may also add one or more of the search results to a shopping cart, then change his mind and remove the item and add a different one.  No substitution or "conversion" is performed by Lawson's software.

147.   In paragraph 174, Dr. Weaver asserts that "In the accused Lawson S3 Procurement systems, each item data record in the Item Master database is preferably mapped to a universal product commodity classification code"  This is not correct, and Dr. Weaver provides no citation to support it.  The Requisition Self-Service ("RSS") application is the only S3 software that exposes the UNSPSC codes for use – it is the only one that allows category searches based on these codes.  Moreover, Dr. Weaver cites no proof that customers in fact use the UNSPSC codes to map each item data record in the Item Master.  Having the feature available and using it are two different things

148.    Dr. Weaver seems to argue that the results of a UNSPSC category search satisfy the cross-reference table limitations.  This is not true.  First, items with the same UNSPSC code are not necessarily equivalent, as alleged in paragraph 177.  To use Dr. Weaver's example, there are many different types of wooden pencils with different colors of lead and different levels of hardness and softness.  A #4 red pencil is not generally equivalent to standard black #2 pencil, particularly if you are using it to take a standardized test, but both items would have the same UNSPSC code.

149.    ~~Second, while RSS allows a user to search by UNSPSC category, e.g. to search for all items that are "wooden pencils" (and thus have code 44121706), this is the same type of category search that Lawson's non-infringing prior software allowed users to do.  Versions 5.0 and 6.0 allowed users to assign inventory classes to items, which inventory classes had at least two levels in a hierarchical classification.  For example, users could set up a major class to be "fruit" and minor classes to be apples, oranges, etc. as shown in the screen shot from Version 6.0 below:~~

MIL 2



150.    ~~Users could search for items by either major or minor inventory classes.  That is, you could search for all items that had "apple" in their minor classes.  Like the results of the category search based on UNSPSC codes, the results of this search would return all items that~~

MIL 2

SHAMOS REBUTTAL REPORT ON NON-INFRINGEMENT                    CASE NO.3:09cv620

~~are apples. I see no meaningful difference between the inventory class categorical search of the~~
~~prior systems and the UNSPSC category search of the accused RSS system.~~

151.    Dr. Weaver points to words from the UNSPSC White Paper to the effect that the lowest level of UNSPSC classification is supposed to define a group of "substitutable" products or services. However, the words used in this third-party document cannot define whether or not infringement is occurring. Nevertheless, I do not dispute that portions of the Lawson software make available the use of UNSPSC codes, as alleged by Dr. Weaver in paragraph 179. However, the codes are not used to perform the functions as recited in the Asserted Claims, and there is no proof of whether and how they are used by customers.

152.    Dr. Weaver states in paragraph 184 that "when a user conducts a hierarchical Categories search using the search engine, the search engine performs a lookup and the mapping, or cross-referencing, of the product categories in the hierarchy tree to the associated commodity code will retrieve all item data records in the database which are mapped to the commodity code associated with the product category in the category hierarchy." This is incorrect. No mapping or "cross-referencing" occurs. The UNSPSC code associated with an item is no different from any other attribute of the item. If one were to search for all items whose descriptions included the word "pencil," there would likewise be no mapping or cross-referencing. The search engine would simply examine each "description" attribute to determine whether or not it contained "pencil." So it is with UNSPSC codes.

153.    Dr. Weaver argues in paragraph 185 that the means for converting, converting, and cross-reference table claim elements set forth above are "satisfied by the cross-reference table in the accused systems which maps a catalog item to a [UNSPSC] commodity code and maps a commodity code to each product category in the Categories search hierarchy tree. For a selected matching item found in conducting searches of selected product catalogs or selected portions of the database, the commodity code associated with such item serves as a link or cross-reference to similar, identical, substitutable or generally equivalent items in other products

catalogs associated with other sources that are also cross-referenced to the same commodity classification code."  This is not correct.

154.    Lawson's UNSPSC table is not a cross-reference table because it does not include vendor information or item information.  It is nothing more than a list of UNSPSC codes, each of which is linked to a description of what the code means.  To use Dr. Weaver's example of paragraph 176, Lawson's UNSPSC table would link code number "44121706" to "wooden pencils," but it would not say which items in Item Master are "wooden pencils" or have code "44121706" in their record and it would not say what vendor items in the vendor agreements are wooden pencils.  Thus this table does not meet the Court's definition of cross-reference table.

155.    Dr. Weaver never identifies any Lawson structure whatsoever that constitutes a cross-reference table.  In paragraph 185, he appears to say that the cross-reference table is the cross-reference table, which is circular.  No such table exists in the Item Master database.  The Court construed "cross-reference table" as a "table that links vendors items determined to be equivalent between two or more vendors."  First, UNSPSC codes do not necessarily identify equivalent items.  Second, the UNSPSC codes in the Item Master table are not tied to vendors.

156.    With regard to the means for converting and converting elements, Dr. Weaver does not even allege that Lawson's software substitutes one item in the results of a UNSPSC category search for another item in the UNSPSC search.  Instead, a human being had to do this.  In Dr. Weaver's example, he does a category search for halogen lamps (paragraphs 295-299).  The results of his search include both 120-Watt and 150-Watt lamps.  I would argue that these different items are not generally equivalent.  Dr. Weaver decides to add a 120-Watt lamp to his shopping cart.  Then he changed his mind, deleted the 120-Watt lamp from his shopping cart and added the 150-Watt bulb to his shopping cart.  He states that this shows Lawson's software substitutes one product for another.  I disagree.  In his example, Dr. Weaver substitutes items, not Lawson's software.  In fact, Lawson's software is not capable of using categories or UNSPSC codes to substitute one product for another.  The disclosure for the converting claim elements occurs primarily in the '989 patent, which is incorporated by reference into the Patents.

When the '989 patent discusses converting, it does so in the context of the computer system doing the converting or substituting, not a person. *(See, e.g.,* '989 patent at col. 33:9-14 ("In the present system. the ordered item is likely not to be found in that file because (as described below) the local computer 40 will normally convert Customer stock numbers to Distributor catalog numbers using the Local Cross Reference Table before the data block is sent (see block 282 in FIG. 4C)."; Col. 33:34-37 ("The host computer 10 will then search the competitor cross-reference file and identify B2650250 as a competitor's designation for the same PYREX beaker, convert the line to 02 540K and then proceed to sourcing 306 and pricing 308.").

157.    The conclusion drawn by Dr. Weaver in paragraph 186 that "the accused Lawson S3 procurement systems have the capability of identifying items from a second vendor's catalog that are similar, generally equivalent, substitutable or identical to an item in a first vendor's catalog through the search engine lookup that cross-references each item data record to a universal commodity code and cross-references each commodity code to a product category in the category hierarchy tree" is incorrect.  No cross-referencing occurs.  Whether or not any Lawson software has the capability of identifying generally equivalent items is not the relevant criterion, but whether it does so in accordance with the Asserted Claims, which it does not.

158.    For similar reasons, Lawson's S3 software does not have a determination system that items are generally equivalent as is required by claim 21 of the '516 patent.  Dr. Weaver alleges that this limitation is met by the category and UNSPSC fields in Item Master.  I disagree for the reasons discussed above.  Additionally, Lawson's software does not determine anything. It merely allows a person to assign a category or code to items in Item Master.

AGR

159.    ~~Likewise, the M3 system does not use UNSPSC codes for substitution either. Therefore, there is no basis for Dr. Weaver's opinion in paragraph 187 that M3 performs and cross-referencing as claimed~~.

160.    There is no basis for Dr. Weaver's opinion in paragraph 188 that "all of the accused Lawson systems maintain a cross-reference table or file identifying cross-referenced items, identical items or generally equivalent items or one or more codes corresponding to cross-

referenced items, identical items or generally equivalent items."  No such cross-reference table or file exists as claimed.

161.    Paragraphs 190-201 deal with the construction of various claims terms as Dr. Weaver alleges they apply to the Lawson software.

162.    Paragraph 192 discusses the term "subset."  I agree that the Court has construed "subset" to mean "less than all of a set."  However, Dr. Weaver has not been able to establish that any "catalog selection protocol (or procedure)" at all is embodied in the Lawson software. Neither has he been able to show that the software operates on a "collection of catalogs." Therefore, no protocol selects less than all of such non-existent collection.

163.    Paragraph 195 discusses the term "order list."  Claim 1 of the '172 patent requires:  "means for generating an order list that includes at least one matching item selected by said means for searching [and] means for building a requisition that uses data obtained from said database relating to selected matching items on said order list."

164.    The Court defined "matching items" as "search results," "order list" as "a list of desired catalog items," and "selected matching items" as "requisition items."

165.    The Court defined the "means for generating an order list" as follows.  The function of this element is generating an order list that includes at least one matching item selected by said means for searching.  The structure is a user interface operating on a computer through which a user may select from results from a search program or a search program that generates an order list of matching items, and their equivalents.  See e.g., '172 Patent at 4:6-6:28; 7:66-8:13; 9:55-12:28; 18:23-50; Appendix VI, FIGS. 1-2 (describing local computer 20, graphical interface 254, search program 50, interface 60, TV/2 and search program 250).

166.    The Court defined the "means for building a requisition" element as follows:  the function of this element is building a requisition that uses data obtained from said database relating to selected matching items on said order list.  The structure is requisition module operating on a computer system having access to data in the database, and its equivalents.  See e.g., '172 Patent at 1:30-40; 3:7-28; 6:45- 7:3; 7:41-8:19; FIGS 1-3 (describing various

embodiments of requisition modules including  requisition/purchasing system 40, requisition management ("REQI" ) module 44A and requisition maintenance program 44C).

167.    In other words, claim 1 of the '172 patent requires that the system has the capability to add one or more search results to an order list (a list of desired items) and then to generate a requisition from at least some items on the order list.  Dr. Weaver argues that the shopping cart of the RSS application is the order list.  This is incorrect.

168.    First, Lawson's RSS application is the only accused S3 software that has a shopping cart.

169.    Second, the RSS shopping cart *is* the requisition in Lawson's software.  A user selects search results from a search of Item Master, and those search results are added directly to a requisition table associated with a requisition header (called the shopping cart).  *See* Lawson Requisitions Self-Service User Guide, p. 33 (L0045506).  Unlike an order list, which does not necessarily represent what will be on the requisition, the Lawson shopping cart represents exactly what is on the requisition because it is the very requisition itself.  Selecting "checkout" on the shopping cart releases the requisition to the next stage of processing:  "Checkout - Saves items in the cart to be requisition lines and moves the requisition to the next processing stage (for example, releases the requisition)."  (L0045506).

170.    Likewise, because there is no "order list," there can be no "means for generating an order list that includes at least one matching item selected by said means for searching," as alleged by Dr. Weaver in paragraph 201.

171.    Paragraphs 202-359 are devoted to narratives of demonstrations conducted at Dr. Weaver's direction allegedly establishing infringement.  None of these demonstrations actually does so.

172.    Paragraphs 202-260 are directed to a demonstration supposedly establishing infringement of '683 claim 26 by S3.  However, multiple steps of that claim are not performed, as detailed above and in Exhibit 6.

173.     Paragraphs 261-285 are directed to a demonstration supposedly establishing infringement of '683 claim 28 by S3.  However, multiple steps of that claim are not performed, as detailed above and in Exhibit 6.

174.     Paragraphs 286-316 are directed to a demonstration supposedly establishing infringement of '683 claim 29 by S3.  However, multiple steps of that claim are not performed, as detailed above and in Exhibit 6.

**AGR**

175.     ~~Paragraphs 317-341 are directed to a demonstration supposedly establishing infringement of '683 claim 28 by M3.  However, multiple steps of that claim are not performed, as detailed above and in Exhibit 6.~~

176.     Paragraphs 342-359 are directed to a demonstration supposedly establishing infringement of '516 claim 1 by S3.  However, multiple elements of that claim are not present, as detailed above and in Exhibit 6.  The discussion concerning the "first set of criteria" and "second set of criteria" limitations is hopelessly vague.  The only material in the Weaver Report that addresses these limitations appears in paragraphs 346 and 349.  Dr. Weaver claims to have utilized a "catalog selection protocol" to select "Dell items."  However, it is clear from his screenshots (ePLUS 0942293-355).that this is not the case.  The reason is that the "dell" search also retrieved "Diablo" items, so it did not select the "Dell" catalog as Dr. Weaver asserts.

177.     Furthermore, Dr. Weaver has not identified any "predetermined third party," as required by '516 claim 1.  He also has not shown how any "second set of criteria" further restricts any search.  Instead of using a second set of criteria, he has entered an entirely new set of first criteria, namely "Dell, Dimension 100."  Therefore, he has not shown that the limitations of '516 claim have been met.

## REBUTTAL TO THE NIEMEYER REPORT

178.     Following is rebuttal to the statements made and opinions expressed in the Niemeyer Report.  The fact that I may not respond to any particular statement or opinion in the Niemeyer Report should not be taken to imply that I agree with any such statement or opinion.

179.    Mr. Niemeyer does not express any opinions relating to infringement, but rather gives his opinion regarding how Lawson's Accused S3 RSS software and M3 E-Procurement software works based on his review of source code.

180.    In several instances, Mr. Niemeyer refers to vendors that supply items to Lawson's customers as "Lawson Partners."  (*See, e.g.,* Niemeyer Report at paragraphs 38, 45). This is not accurate.  The vendors may be partners of Lawson's customers, but they are not Lawson's partners.

181.    In several instances, Mr. Niemeyer refers to Item Master and the databases within Lawson's software as "catalogs."  (*See, e.g.,* Niemeyer Report at paragraphs  49, 53).  However, he does not analysis of whether anything with Lawson's accused software meets any of the terms as construed by the Court, including the terms "catalog" and "product catalog."  As discussed above with respect to the Weaver Report, any inference that the word "catalog" in any quotation from any of Lawson's documents has the meaning ascribed to that term in the Court's Markman order is unwarranted.

182.    There is no significance to the opinion expressed in paragraphs 150-154 concerning the location of the punchout vendor's window on the user's screen.  The punchout vendor's catalog is not maintained by Lawson or its customer, and is not searched by any software of Lawson or its customer.

### FURTHER OPINIONS[2]

### Opinion 1:  Lawson Does Not Infringe the Asserted Claims Because Lawson's Accused Software Does Not Have or Maintain "At Least Two Product Catalogs" or a "Collection Of Product Catalogs" As Is Required By Claims 3, 26, 28-29 of the '683 Patent And Claims 1-2, 6, 9, 21, 22, And 29 of the '516 Patent

183.    Eleven of the thirteen Asserted Claims require multiple product catalogs. Specifically, claim 3 of the '683 Patent recites an electronic sourcing system that requires "at least two product catalogs containing data relating to items associated with the respective sources

---

[2] The analysis below provides specific opinions directed to the claims at issue.  It is not meant to imply that the prior sections of this report do not contain opinions.

…"  Claims 26 and 28-29 of the '683 Patent recite a method including a step of "maintaining at least two product catalogs on a database containing data relating to items associated with the respective sources …."  Claims 1-2, 6, 9, 21, 22, and 29 of the '516 Patent recite an electronic sourcing system that requires "a collection of catalogs of items stored in an electronic format ...."  I will refer to claims 3, 26, 28-29 of the '683 patent and claims 1-2, 6, 9, 21, 22, and 29 of the '516 patent as the "Catalog Claims."

184.   The Court construed "catalog" and "product catalog" to mean "an organized collection of items and associated information, published by a vendor (which includes suppliers, manufacturers, and distributors), which preferably includes a part number, price, catalog number, vendor name, vendor ID, a textual description of the item, and images of or relating to the item."

185.   Dr. Weaver has alleged that the S3 Inventory Control module's Item Master meets these claim limitations.  I disagree.  Item Master does not even meet the Court's definition of a product catalog, let alone multiple product catalogs.

186.   At the outset, Lawson does not provide its customers with any item data.  As described above, Item Master is the internal item database for the S3 SCM software at issue (i.e., the Inventory Control module, the Requisition module, and the Purchase Order module), S3 RSS (Requisition Self-Service application), S3 EDI, and S3 Procurement Punchout (collectively "Accused S3 Software").  As Lawson sells its software, the Item Master database is empty.  For this reason alone, Lawson's Accused S3 Software[3] does not directly infringe the Catalog Claims.

187.   After Lawson's customers have selected item data and uploaded it to Item Master, it is the customer, not Lawson, that maintains this data.  Furthermore, the customers do not act at Lawson direction and control.  For these additional reasons, Lawson's Accused S3 Software does not directly infringe claims 26 and 28-29 of the '683 patent.

188.   Dr. Weaver acknowledges that Lawson's S3 Software, as sold, does not contain any data in Item Master.  However, he argues that Lawson nevertheless directly infringes the

---

[3]   Item Master is the internal item database for the S3 SCM software at issue (i.e., the Inventory Control module, the Requisition module, and the Purchase Order module), S3 RSS (Requisition Self-Service application), S3 EDI, and S3 Procurement Punchout (collectively "Accused S3 Software").

SHAMOS REBUTTAL REPORT ON NON-INFRINGEMENT                    CASE NO.3:09cv620

Catalog Claims because Lawson offers services to assist its customers in installing and maintaining the Accused Software (by providing software updates, patches etc.). Regardless, Lawson does not provide, select or control the item data for Item Master (or Punchout), which is what is required by the Catalog Claims. Helping customers, however, is not making, selling, using, or offering for sale a system which includes catalogs. Dr. Weaver fails to provide any evidence that Lawson performs any act of direct infringement through assisting customers.

189.    Dr. Weaver states that Lawson employees actually assist its customers in uploading item data. I am informed that this is the exception, not the rule. Even if such assistance occurs, it is not at the direction and control of Lawson, but of the customer who selects the item information to load.

190.    Dr. Weaver argues that because Lawson provides services to transfer item data from non-Lawson systems, it directly infringes the claims. Even if Lawson provides such assistance, it is not at the direction and control of Lawson, but of the customer. It does not show how Lawson makes, uses, sells, or offers for sale a claimed electronic sourcing system with vendor-published catalogs. Lawson's services in those limited circumstances involve data specified by the customer, loaded under the control and direction of the customer.

191.    Dr. Weaver also argues that Lawson directly infringes these claims because it provides instructions, user manuals, training, and support to its customers to assist in uploading item data into Item Master. He appears to ignore the fundamental difference between direct and induced infringement. ~~However, I understand that the Federal Circuit has held that providing such instructions and assistance is not sufficient to prove direct infringement in the absence of control of the party that provides the missing claim element.~~ *~~Muniauction, Inc. v. Thompson,~~* ~~532 F.3d 1318 (Fed. Cir. 2008). Lawson does not control what item data its customers choose to upload to Item Master and does not provide the actual data. Thus, Lawson's guidance to customers does not establish direct infringement.~~

<div style="border:1px solid red">MIL 5</div>

192.    ~~ePlus implicitly acknowledges that, before Lawson began offering its version 8.0.3 system that makes importing item information easier, Lawson's system did not infringe~~ any

<div style="border:1px solid red">MIL 5</div>

SHAMOS REBUTTAL REPORT ON NON-INFRINGEMENT                    CASE NO.3:09cv620

~~of the claims at issue.  Expert Report of Russell Mangum at 7 (May 3, 2010).  Before 8.0.3, however, customers could load catalog information as they chose, by other means.  The change with 8.0.3 actually made it easier for customers to load item information themselves, taking Lawson farther out of the loop rather than more involved when it comes to uploading item information.  Dr. Weaver fails to show how simply making it easier to do something that Lawson's customers could do all along, namely load item information into the Item Master, takes the Lawson system from not infringing the catalog claims to infringing the catalog claims.  In my opinion, since ePlus conceded that Lawson systems before 8.0.3 did not infringe, the accused systems are essentially the same and thus do not infringe either.~~

193.    Dr. Weaver argues that Lawson directly infringes the catalog claims because its software includes utilities that assist customers in uploading item data to Item Master, including for example PO536 and EDI.  These utilities are no different than the user manuals or training discussed above.  The key issue is whether Lawson controls what item data is loaded, or even whether such data is loaded.  It does not, so it does not directly infringe.

194.    Dr. Weaver argues that Lawson hosts on its servers the Accused S3 Software for some customers.  I am informed that this is the exception, not the rule, and Dr. Weaver cites proof of only one instance in which it happened.  In any event, Lawson is merely providing storage and computer services (much like renting physical storage space) and does not control the content or the maintenance of the item data within the customer's Item Master.

**MIL 5**

195.    Dr. Weaver argues that Lawson's Digital Depot provided item data or catalogs.  However, I understand that there will be testimony at trial that Lawson never sold Digital Depot and it was discontinued well before the earliest beginning damages date alleged in this lawsuit.  ~~Even offering a product for sale before the damages date is not actionable infringement.~~

196.    Regardless of who uploads the data to and/or who maintains the data in Item Master, it does not meet the multiple catalog claim limitations referenced above.  Although Lawson sometimes refers to Item Master as a single "catalog," it is not a "catalog" as defined by the Court because, among other reasons, it is not published by a vendor or a supplier or a

manufacturer or a distributor of the items within the database. The database structure itself is created by Lawson and is embodied in the Lawson software. However, Lawson is not a "vendor" with the meaning of the claims because it does not make, supply, or sell items. The item data within Item Master is also not published by a vendor, supplier, manufacturer or distributor. Rather, the data is selected, prepared, and uploaded by Lawson's customer.

197.   Dr. Weaver cites marketing materials which refer to the ability in the Lawson system to upload vendor catalogs. Whether the system has the capacity to hold an entire vendor catalog is a very different question from whether customers do that in fact. As an empty database, it is not a surprise that the Item Master could handle data from a vendor catalog, depending on the size of the catalog. That is like saying an empty address book could be "uploaded" with an entire phonebook. If the address book is big enough and the phonebook small enough, it is a truism to say that the phonebook could be loaded into the address book. But the reality is that people do not load whole phonebooks into their address books, and whether thy do so or not is their choice, not the decision of the seller of the address book. Nor does the possibility that an address could include phone book information make the address book into a phonebook. Similarly, the Item Master is not a "catalog" as defined by the court, or multiple catalogs, simply because catalog information can be loaded into it.

198.   Lawson employees testified about why it would make little sense for a customer to load an entire vendor catalog into the Item Master. The Item Master is designed for tracking the products customers buy, not what some vendors want to sell. The Item Master includes information about inventory in stock, persons authorized to purchase items, and other information which goes beyond what is in a vendor catalog, as it is specific to the Lawson customer. Loading a complete vendor catalog, which by definition will include many items customers do not buy, and which would burden the customer with keeping that catalog up to date when the vendor adds or drops items, or changes price or features of items, is not what Lawson customers want. Also, by keeping the Item Master focused on products a customer normally buys, the risk is reduced of an employee buying an authorized product. Lawson customers

54

overwhelmingly use the Lawson system to load the selected group of items they want to buy, and choose not to load entire catalogs.  Thus, the fact that theoretically customers could load the Item Master with a complete vendor catalog does not prove that Lawson makes, sells offers for sale or uses a system that includes "catalogs" as defined by the Court.

199.    Dr. Weaver argues that "published" means "originated" and the item data within Item Master originates from a vendor.  (*See, e.g.,* paragraph 75 of the Weaver Report).  I disagree that this means in any way that the Item Master is "published by a vendor."    The ordinary meaning of "publish" is to "prepare and publicly distribute something (e.g., printed material)," whereas "to originate" something means "to create" it.  The Item Master is not published at all, unless somehow it is distributed by the customer.  But Lawson's customer is not a vendor, supplier, manufacturer or distributor of the items within Item Master; rather it is the purchaser or consumer of those items.

200.    The specifications of the Patents confirm that Dr. Weaver's interpretation of "published" is wrong.  Fig. 1A of all three patents shows a catalog database, 36, which corresponds to the published catalogs.  See e.g. '683 patent col. 4 ll. 46-60.  This database is different from the RIMS system requisition, inventory, and customer specific databases, at 42A, 42B, and 42C in Fig. 1A.  Those databases include the Parts Master of the RIMS system,  which (like Lawson's Item Master) includes item data which may "originate" with a vendor, yet they are not described as catalogs or published by vendors, and indeed are treated separately from published catalogs.  The patent makes it clear to one of ordinary skill that a "published" catalog is prepared and distributed by the vendor, and does not include item information which may have originated with a vendor.

201.    But even if "publish" includes "originate," there is a difference between originating a database and originating individual data items that are loaded into the database. Furthermore, the items within Item Master are not necessarily even created by a "vendor." Lawson's customer may choose to upload data from another non-Lawson (legacy) software application (in which case the data originates from the customer) or it may choose to manually

enter item data (also originates from the customer), neither of which would be created by a "vendor." Under Dr. Weaver's strained definition of "publish" that includes "originate," one would have to know where data originated from before knowing whether there is infringement or not. Neither Lawson nor a customer may even know the origin particular item data loaded into a system, especially if the data is transferred from another system. This would render the claim indefinite, and further showing why "publish" does not include "originate."

202.    Setting aside the "published" requirement, Dr. Weaver argues that all the items from a common vendor constitute a catalog. However, Item Master does not have multiple organized collections of items, wherein each organized collection is associated with a vendor, which is what is required by the Court's definition of "product catalog." While Item Master may include multiple items from multiple vendors, suppliers, distributors and manufacturers, it is not organized by vendor. Vendor is used only as a post-search filter. The items in Item Master are called "Lawson Items," which are essentially generic items, each of which may be associated with multiple vendor items in the Vendor Agreements. There is a one-to-many relationship between Lawson Items and vendor items. The vendor agreements have a field identifying the Lawson Item that is associated with each vendor item in the Vendor Agreement. Item master records do have a field for manufacturer name, but again, the database is not organized by manufacturer.

203.    Moreover, the Catalog Claims require more than one catalog. As described above Item Master is a single collection of items comprising at most one catalog (See Lohkamp deposition, 118:22-119:1). Dr. Weaver acknowledges as much in paragraph 110 of his report. Although Lawson sometimes refers to Item Master as a "catalog," (and not in the sense construed by the Court) ePlus does not point to any evidence that Lawson Item Master is referred to as comprising multiple catalogs.[4] Lawson's RFP responses also refer to Item Master a single thing, a "catalog." (*See* paragraphs 51 and 53 of the Weaver Report). Within the RSS

---

[4]      When Lawson documents reference "multiple" catalogs, they appear to be including the Procurement Punchout application that provides hyperlinks to one or more third party vendor catalogs. (*See, e.g.,* Weaver Report, paragraph 49).

SHAMOS REBUTTAL REPORT ON NON-INFRINGEMENT                    CASE NO.3:09cv620

application, to search Item Master, a user selects "Search Catalog."  (Weaver Report, paragraph 109).  This is consistent with my understanding that the Item Master is treated as a single collection of items in the Lawson system, not as multiple catalogs.

204.     As described above, the Item Master in Lawson's Inventory Control module has been essentially the same since at least the early 1990s, going all the way back to Versions 5.0 and 6.0.  In an attempt to find some difference between Lawson's non-infringing prior software and the Accused Software, Dr. Weaver's Report places significant emphasis on Lawson's PO536 application, which was introduced in 2001.  PO536 is a tool to allow Lawson's customers to load vendor price information automatically into the Inventory Control module.  (See paragraph 69-73 of the Weaver Report).  However, the method of loading item data into Item Master is not relevant to issue of whether Item Master constitutes multiple product catalogs because the claim elements do relate to how catalogs are loaded.  The relevant inquiry, at least for direct infringement, is whether Item Master comprises multiple product catalogs as defined by the Court, which it does not.

205.     Similarly, Lawson's EDI module provides a method for transferring item data into Item Master using a EDI 832, which is a communication mechanism that has been around since the 1980s.  For purposes of direct infringement at least, how the data got into item master is irrelevant.

206.     Nevertheless, as described above, the methods of uploading data to Item Master have been very similar since the early 1990s as well.

207.     In sum, Item Master does not satisfy the Court's definition of "catalog," let alone multiple catalogs as required by the Catalog Claims.

208.     Dr. Weaver also alleges that Lawson's "vendor item tables" constitute a catalog or collection of catalogs (he does not clearly articulate which).  (Weaver Report, paragraphs 48 and 64).  Vendor item tables, which are also called vendor agreements, include items selected by Lawson's customer which are available from a specific vendor and include an agreed price for each item.  The Item Master table is separate from the vendor item tables (also referred to as

vendor agreements).  The vendor item tables do not meet the definition of product catalogs because they are not published by vendors for similar reasons to those discussed above.

209.    Additionally, although the vendor item tables may be searched for items meeting specific criteria, the results of such a search may not be used to create a requisition.  However, this is what is required by claims 3, 26, 28-29 of the '683 patent and claim 21 of the '516 Patent. For example, claim 3 of the '683 patent requires a "means for building a requisition using data relating to selected matching items" that result from "searching . . . selected product catalogs...."

210.    As such, the vendor item tables do not satisfy the Court's definition of "catalog," let alone catalogs that may be searched to find items to add to a requisition as required by the Catalog Claims.

211.    Dr. Weaver also states that "through the Procurement Punchout application, Lawson enables the S3 Procurement systems to access vendor website catalogs (including multi-supplier catalogs) of Lawson Procurement Punchout Trading partners and digital marketplaces." (Weaver Report, paragraph 55).  Dr. Weaver argues that Lawson's S3 Procurement Punchout has multiple catalogs, which may include Item Master and one or more vendor website catalogs.  As detailed above, Item Master is not a catalog as defined by the Court.  The fact that Lawson offers customers the Punchout option only highlights that the Lawson system does not provide customers with access to multiple vendor catalogs.  Punchout provides such access, although not within the Lawson system.  Regarding the punchout sites, as Dr. Weaver notes, Lawson's Punchout application essentially provides one or more icon/hyperlinks to third party websites. The third parties are typically vendors, suppliers, or distributors, like OfficeMax or Staples, who independently create and operate websites for customers to access.  Lawson does not dictate or control or otherwise have any say about the content of the third party's website or the searching or other functionality that may or may not be available at such sites.  The third party Punchout partner's website is not downloaded to or stored in Lawson's Accused S3 Software.  ~~Thus, even if a vendor website may provide a catalog of items selected by the vendor, it is not provided by, maintained by, or controlled by Lawson.  Such control is a requirement for infringement, as~~

**MIL 5**

infringement cannot be proven if no single entity meets all the limitations of the claims. It is not enough for infringement to show that Lawson sells a system that includes some claimed elements, while an independent entity provides access to other claim elements. *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1329 (Fed. Cir. 2008). For at least these reasons, Lawson's S3 Procurement Punchout application does not have or maintain multiple product catalogs as required by the aforementioned Catalog Claims.

212.   Moreover, I understand that some of the third party website providers, including Ariba and SciQuest, are already licensed and authorized by ePlus. ePlus is not entitled to double-dip and claim infringement as a result of customers accessing such authorized systems by punching out of Lawson's system.

213.   Dr. Weaver argues that Lawson controls the third party websites (and thus directly infringes) because it has contracts with the third parties (Punchout partners) that own these websites. I disagree completely. First, the existence of a contract, by itself, is not sufficient to prove control for purposes of direct infringement. The contracts are very limited, related primarily to testing to confirm compatibility, and provide Lawson with no control over the third party websites. Dr. Weaver does not address the substance of the contracts or even allege that such contract gives Lawson the right to control the third party websites, which they do not. Because the essential element of control is not provided by the contracts, they are irrelevant. Second, in most cases, Lawson does not have contracts with the third parties offering these website. For example, Lawson does not have contracts with at least the following third parties: Dell, Office Depot, Staples, Fisher Scientific, Cardinal, Grainger, Steelcase, and McKesson. (*See, e.g.,* Lohkamp Dep. at 41:10-41:20). In any event, even if a contract existed granting permission for Lawson customers to access third-party vendor sites, that would not constitute control by Lawson at all.

214.   Dr. Weaver argues that Lawson's Procurement Punchout product directly infringes the Catalog Claims, even though Lawson does not own or control these websites, because Lawson provides its customers with a Procurement Punchout Trading Partner List,

<div style="text-align:center">MIL 5</div>

"delivers generic Punchout transaction sets and cXML PO formats for the listed trading partners." However, this is analogous to providing training and user manuals teaching a customer how to connect, or even merely providing a phone for communicating with third party vendors. The pertinent issue is whether Lawson owns or controls the third party websites, not whether Lawson facilitates communications with third parties. Lawson does not control the third party websites, so it does not infringe.

215.    For these reasons, Lawson's Accused S3 Software does not infringe claims 3, 26, 28-29 of the '683 patent and claims 1-2, 6, 9, 21, 22, and 29 of the '516 patent, as alleged by Dr. Weaver.

216.    ~~For the same reasons, Lawson's Accused M3 software does not infringe these claims.~~

AGR

**Opinion 2:  Lawson Does Not Infringe the Asserted Claims Because Lawson's Accused Systems Do Not Allow A User To "Select Product Catalogs To Search" or "Select Less Than The Entire Collection Of Catalogs" For Searching As Is Required by Claims 3, 26, and 28-29 of the '683 Patent, Claims 1-2, 6, 22, and 29 of the '516 Patent, and Claim 1 of the '172 Patent**

217.    Ten of the Asserted Claims require a selection of product catalogs or database portions to be made for searching. Specifically, claim 3 of the '683 Patent recites an electronic sourcing system that includes "means for selecting the product catalogs to search [and] means for searching for matching items among the selected product catalogs..." Claims 26 and 28-29 of the '683 Patent recite a method including "selecting the product catalogs to search [and] searching for matching items among the selected product catalogs…" Claims 1-2, 6, and 29 of the '516 Patent recite an electronic sourcing system that includes "a catalog selection protocol, said catalog selection protocol relying on said first set of predetermined criteria to select less than said entire collection of catalogs … and, a search program, said search program relying on said second set of criteria to select specific items from said catalogs determined from said catalog selection protocol." Claim 22 of the '516 patent recites "a catalog selection criteria used to select less than said entire collection . . . ." And claim 1 of the '172 patent requires "a database

containing data relating to items associated with at least two vendors maintained so that selected portions of the database may be searched separately…"   I will refer to claims 3, 26, and 28-29 of the '683 patent, claims 1-2, 6, 22, and 29 of the '516 patent, and claim 1 of the '172 patent as "Catalog Selection Claims."

218.   The Court interpreted the "means for selecting" element of claim 3 as follows: The function of this element is to select the product catalogs to search.  The structure is "a user interface that allows the user to select a catalog; a catalog module that selects product catalogs based on preferences or history; a catalog search module that identifies product catalogs or a combination thereof; and their equivalents.  See e.g., '683 Patent at 4:5-6; 5:9-27; 8:40-56; 9:52-10:20; FIGs. 1-2 (describing search program 50 and requisition/purchasing system 40).  See e.g., '683 Patent at 4:5-6; 5:9-27; 8:40-56; 9:52-10:20; FIGs. 1-2 (describing search program 50 and requisition/purchasing system 40)."

219.   The Court interpreted "means for searching" element of claim 3 as follows:  The function if this element is searching for matching items among the selected product catalogs. The structure is "search programs and modules operating on a computer system with access to data in a database or other file system, and their equivalents.  See e.g., '683 Patent at 4:1-6:38; 7:61-12:37; FIGS. 1-2; APP. III-V and VII (describing local computer 20, search program 50, TV/2, and search program 250)."

220.   The Court interpreted "matching items" as the "search results."

221.   While the claims require the ability to select less than all of the catalogs or database for searching, the Court held that these claims did not require the ability to select more than one catalog for searching at the same time.  Rather, it was sufficient to select to search one catalog out of a database containing multiple catalogs.

222.   Dr. Weaver states that Lawson's S3 Software meets these claims elements because "A user of the accused Lawson systems can select catalogs to search through a graphical user interface from among (1) catalogs hosted by Lawson suppliers trading partners, (2) an internal database containing multiple supplier catalogs, and (3) digital marketplaces with

multiple suppliers' catalog data.  (*See, e.g.,* Weaver '683 Chart at 46).  In am informed that the first and third options are third party catalogs available only with the Procurement Punchout application involving access to item data outside Lawson's control (or in the case of the Lawson digital marketplace, a system that was never sold).  The second option refers to the Item Master database discussed above.

223.    Regarding Item Master, Dr. Weaver makes several arguments in an effort to shows that the selection-related limitations are met.

224.    First, he states that catalogs may be selected within Item Master by searching by fields or attributes, such as by inputting manufacturer codes, item description, categories, units of measure, vendor, and manufacturer.  (Weaver Report, paragraph 108).  As described above, Item Master may not be searched by vendor name or vendor ID.  VENDOR is used only as a post-search filter.  Moreover, the claims require that the search results be used to form an order list for requisitions, and Dr. Weaver fails to show that this occurs.  In any event, I disagree that searching a database, including Item Master, by attribute or field satisfies the selecting catalogs to search claim elements.

225.    Dr. Weaver's argument goes too far.  He essentially argues that any group of items with the same attribute constitutes a catalog.  Under his analysis, all items that have the same unit of measure, e.g. one dozen per box, constitute a catalog.  Such an argument is inconsistent with the Court's interpretation of "catalog," the Patents, and Dr. Weaver's own opinions because it fails to recognize the requirement that the catalogs be published by vendors. His definition would encompass the RIMS Parts Master as having multiple catalogs, which groups items by product type codes to separately identify Distributor, third party, and other sources of products.  Product type can indicate what databases to search.  '989 18:65-67. However, the patents show the RIMS Parts Master as being a database different from the claimed catalog database.

226.    Using another example, if I run a search looking for all items that have the keyword "computer" in the item description field, the search results will return every item that is

a computer regardless of who it manufactured it. Such results do not meet the definition of "catalog" because they are not even associated with a single vendor, let along published by a single vendor.

227. Even if the foregoing were not enough, Lawson's search engine has had the capability to search Item Master by attribute or field going back to at least the early 1990s, in Versions 5.0 and 6.0, well before the invention date of the Patents. ePlus at least implicitly concedes that Lawson systems prior to version 8.0.3 do not infringe. ePlus fails to show how Lawson's accused products are different from the Lawson non-infringement systems as to this element.

228. Dr. Weaver states that Item Master has multiple catalogs because it has the capability of including items from multiple vendors and that a group of items from the same vendor constitutes a catalog. This argument also fails because Item Master and its items are not published by a vendor and are not organized by vendor.

229. Dr. Weaver states that a user may select product catalogs to search within Item Master by searching Item Master for all items from a vendor. Item Master may not be searched by vendor name, supplier name, or distributor name (and does not track this data as described above). However, it is possible to search Item Master by manufacturer name. This is the example Dr. Weaver uses. However, a "manufacturer" is not a "vendor." In his example, he runs two searches. First he searches Item Master using the keyword "Dell." The results of this search include several computers manufactured by Dell. He then runs a second search with two keywords: "Dell" and "Dimension." The search results include computers manufactured by Dell that have the Dimension model name. He argues that this shows searching for items matching the "Dimension" keyword within the selected (Dell) catalog of Item Master. However, this is not how Lawson's system works. For Dr. Weaver's first search, Lawson's search engine searches every record in Item Master to locate those items that have Dell listed as the manufacturer. For Dr. Weaver's second search, the search engine searches every record in Item Master to locate those items that have Dell listed as the manufacturer AND include the term

"Dimension."  Selected portions of the database or selected vendor catalogs are not searched in either instance.  This is not what the claims require.

230.    To meet the claim limitations, in the second search Lawson's search engine would need to search ONLY those item records that list Dell as the manufacturer (i.e. the selected product catalogs), but NOT search item records that list another manufacturer (i.e., product catalogs that were not selected).   Although the results of the search will be the same (both return Dell Dimension computers), the WAY in which they arrive at the results is very different.  The claimed limitation is arguably more efficient than Lawson's search engine because it searches less information (fewer records) than Lawson, which searches every record in Item Master every time.  What the difference really highlights, however, is that the patents take a fundamentally different approach because they address the need to search multiple voluminous vendor catalogs, whereas the Lawson system does not need such efficiencies because Lawson customers typically include far less data in the Item Master than would normally be included in voluminous multiple vendor catalogs.

231.    To put it another way, the claims require two phased steps or two modules.  The first (means for selecting, selection, or catalog selection protocol) requires a selection of (or search for) less than the entire catalog collection or database and the second (means for searching among selected catalogs, searching amount selected catalogs, or search program), which is contingent on the first, requires a search of only those selected catalogs or portions of the database (the results of the first search).  Lawson's search engine does not perform two steps and does not have these two modules.  It is not capable of selecting less than all of the item records to search.  Dr. Weaver's example actually runs two separate searches, each of which searches every item record in Item Master.

232.    Dr. Weaver argues that Lawson's search engine does not search the entire Item Master because it utilizes search indexes for searching.  He says a search of the search index constitutes a search of selected portions of the database.  (Weaver Report, paragraphs 155-169).  This argument fails for a number of reasons.

SHAMOS REBUTTAL REPORT ON NON-INFRINGEMENT                           CASE NO.3:09cv620

233.    First, using search indexes to search databases has been around forever and has nothing to do with the Patents (the specifications mention nothing about search indices).  On the contrary, the patents lay out clearly what is meant by selecting catalogs to search, and it does not have anything to do with index based searching.  '683 9:52-10:7 describes selecting from a menu of several catalogs (four are shown in the example). That is what searching selected portions of the database is, not what Lawson's system does with search indices, which are not discussed in the Patents as having anything to do with searching selected portions of a database.

234.    Second, the claims require selecting "catalogs" to search.  For this argument to work, Dr. Weaver must be taking a search index to define a "catalog."[5]  However, none of the Item Master indices relate to or published by or are organized by vendor, supplier or distributor. There is a manufacturer index for Item Master, however, this index is not a catalog because it is not published by the manufacturer and does not have any item information (part number, price, catalog number, vendor name, vendor ID, a textual description of the item, and images of or relating to the item).  Rather for each manufacturer name, it has a location (like a page number) to each item record that lists this manufacturer.  Thus, the manufacturer index is not a "catalog" as defined by the Court.  Other than the manufacturer index, none of the other indices have any relationship to vendors, suppliers, distributors or manufacturers.  Thus they do not constitute catalogs as defined by the Court.

235.    Even if VENDOR were an indexed field, the Lawson software does not search on VENDOR.  It only uses VENDOR as a post-search filter.  Therefore, it does not serve to select any catalog.

236.    Dr. Weaver gives an example of how he believes the indices work at paragraphs 163-169.  This example suffers from the same problem described above.  In this example Dr. Weaver is looking for items that have "Manufacturer B" in the manufacturer name field and "keyboard" in the item description field.  He admits that the indices are created by reviewing all

---

[5] Dr. Weaver's application of "catalog" to Lawson's Accused Software is a moving target.  At times, he says all items with the same manufacturer in Item Master are a catalog.  At other times, he says all items with the same attribute, regardless of what that attribute is, constitute a catalog.  At still other times, he argues that a search index defines a catalog.

of the item records within Item Master.  So to create the manufacturer index, the search engine reviews every single record in Item Master, to create a list which lacks catalog information..  In Dr. Weaver's example, Item Master has 30 item records and each one is included in the manufacturer index.  (Weaver Report, paragraph 166).  Similarly all 30 records are included in his keyword index.  (Weaver Report, paragraph 167).  Thus, to find items associated with Manufacturer B, Lawson's search engine reviews all of the item records within Item Master to produce search results.  To find items with keyboard in the description, Lawson's search engine reviews all of the item records within Item Master to produce search results.  Dr. Weaver also correctly states that the search engine will review the manufacturer search index to identify all items that include Manufacturer B and review the keyword search index to identify all items that include "keyboard" and return as search results only those items that have both.  However, this is not searching a selected catalog or portion, and I disagree with the rest of his statements.

237.    Dr. Weaver's example in paragraphs 163-169 is useful to demonstrate why Lawson's search engine does not meet the claimed selecting catalogs to search limitations.  As discussed above, the claims require a two-phased process, where first the software identifies all records that have vendor B, and then searches ONLY the results of this first search to find records that also have the keyword "keyboard."  Under this scenario, the search engine would not consider item 6, 7, 10, 11, 12, or 13 because they do not have Manufacturer B (they have Manufacturer A or C).  This is not how Lawson's search engine works.  Rather it reviews all records (including item 6, 7, 10, 11, 12, and 13) in both indices to see which records have both Manufacturer B and Keyboard.  Thus, index or no index, Lawson's search engine does not meet the claimed limitations.  In any event, indexing is not relevant to the VENDOR field.

238.    Regarding the S3 Procurement Punchout, Dr. Weaver asserts that the user interface allows a user to select one or more product catalogs by clicking the vendor icons.  I disagree.  As discussed in detail above, the user-interface for Punchout does not include catalogs. It provides nothing more than a hyperlink to a third-party's website.  Even if the punchout websites are considered to be "catalogs," they are not Lawson's catalogs because Lawson does

not provide, supply, manage or control the third party's website.  Additionally, Lawson's S3 search engine described above is not used and is not capable of being used to search the third party punchout website.  Lawson's software does not otherwise have a search engine capable of searching the third party's website.  Whether third party vendors provide such searching capabilities is outside Lawson's control.  All searching is provided for and controlled by third parties.  As such, Lawson's S3 Procurement Punchout application does not meet the selecting and searching claim elements.

239.   For these reasons, Lawson's Accused S3 Software does not infringe claims 3, 26, and 28-29 of the '683 patent, claims 1-2, 6, 22, and 29 of the '516 patent, and claim 1 of the '172 patent.

**Opinion 3: Lawson Does Not Infringe the Asserted Claims Because Neither Lawson's UNSPSC Code Database nor Item Master Meet the Court's Definition of "means for converting" or "converting" or "cross-reference table" as is Required by Claims 3, 6, and 28 of the '683 Patent and Claims 21 and 29 of the '516 Patent**

240.   See the discussion above regarding paragraphs 172-188 of the Weaver Report.

241.   The patents in suit contain little disclosure of converting or cross reference tables.  They do, however, incorporate by reference the RIMS '989 patent, which has extensive discussion of converting and cross reference tables.  '989 cols. 31-34 describe cross reference tables. The tables are used to convert Customer stock numbers to Distributor catalog numbers. '989 33:9-14.  The following Table, XVII, provides the user of the system to view a portion of the cross reference table.  Id. 32:38-40.

SHAMOS REBUTTAL REPORT ON NON-INFRINGEMENT                    CASE NO.3:09cv620

**TABLE XVII**

| | | | | | |
|---|---|---|---|---|---|
| | *** CROSS REFERENCE NUMBER LIST *** | | | | |
| SEL | CRN | PT VENDOR NBR | VENDOR | CATALOG NBR | UNIT |
| | PJJ XREF 001 | 06 VN00000001 | A181-06 | | EA |
| | ⇒ | TEST TUBE | | ⇐ | CS |
| | PJJ XREF 002 | 01 VN00000073 | T555 | | |
| | ⇒ | TISSUEPREP 2 4X5LB/CS | | ⇐ | |
| | PJJ XREF 003 | 01 VN00000073 | T555 | | CS |
| | ⇒ | TISSUEPREP 2 4X5LB/CS | | ⇐ | |
| | T555R | 01 VN00000073 | T555 | | CS |
| | ⇒ | TISSUEPREP 2 4X5LB/CS | | ⇐ | |
| | ⇒ | | | ⇐ | |
| | ⇒ | | | ⇐ | |
| RESPONSE: | KEY(S): | | | | |
| END OF CRN DATA | | | | | |
| F3: RETURN; PF5: XREF MAINT; PF7: PAGE BACKWARD; PF8: PAGE FORWARD | | | | | |

242.     Nowhere in the description of converting or cross reference tables in the patents in suit or the '989 patent incorporated by reference is it even suggested to one of ordinary skill in the art that the use of UNSPSC codes in an item master product description would constitute cross reference tables or provide a means for converting items.  Dr. Weaver's analysis has no support in the patents in suit.

243.     UNSPSC codes are not effective in identifying substitute products.  The classification system is too generic to identify products sufficiently similar to be substitutes for each other.  For example, one UNSPSC code is for printer cartridges.  However, anyone trying to buy a printer ink cartridge at a store knows that there are many different cartridges, and most are not compatible or substitutable with each other.  Relying on UNSPSC codes to pick a printer ink cartridge would be a disaster.

**MIL 2**

244.     ~~Lawson's software is no different in this respect from its own prior  non-infringing systems or other systems which have existed for decades.  Thus, since Plaintiff admits that the Lawson prior systems do not infringe, I do not see how Dr. Weaver has explained any differences in any relevant respect significant enough to show why Lawson's later system (8.0.3) infringes.~~

**Opinion 4: Lawson Does Not Infringe the Asserted Claims Because Lawson's Accused Software Does Meet the Requirements of Claim 9 of the '516 Patent**

245.    The first element of claim 9 is "a collection of catalogs of items stored in an electronic format."  This element is identical to the first element of claim 1 of the '516 Patent. The Lawson system does not comprise a "collection of catalogs" as required by these claims. See the discussion of paragraphs 100-105 of the Weaver Report, above.  Lawson's system does not have a collection of catalogs, either as sold or as used by customers, and thus claim 1 of the '516 patent is not infringed.

**Opinion 5: Lawson Does Not Infringe the Asserted Claims Because Lawson's Accused Software Does Not Have An Order List as is Required by Claim 1 of the '172 Patent**

246.    See the discussion above regarding paragraphs 195-196 of the Weaver Report.

**Opinion 6: Lawson Does not Make, Sell or Offer Computers for Sale and Thus Does Not Infringe Any of the System Claims.**

247.    All of the Asserted Claims, except claims 26, 28, and 29 of the '683 patent are system claims requiring and "electronic sourcing system."

248.    All of the means plus function claims require a computer or computer system.

249.    Claim 3 of the '683 patent requires a "means for searching for matching items among the selected product catalogs...."  The Court interpreted this element as requiring the following structure that includes a computer system: "search programs and modules operating on a computer system with access to data in a database or other file system, and their equivalents. See e.g., '683 Patent at 4:1-6:38; 7:61-12:37; FIGS. 1-2; APP. III-V and VII (describing local computer 20, search program 50, TV/2, and search program 250) ."

250.    Claim 6 of the '683 patent requires a "means for searching for matching items in the database..."  The Court interpreted this element as requiring the following structure that

includes a computer system: "search programs and modules operating on a computer system with access to data in a database or other file system, and their equivalents.  See e.g., '683 Patent at 4:1-6:38; 7:61-12:37; FIGS. 1-2; APP. III-V and VII (describing local computer 20, search program 50, TV/2, and search program 250)"

251.    Claims 3 and 6 of the '683 patent require a "means for building a requisition using data relating to selected matching items and their associated source(s)."  The Court interpreted this element as requiring the following structure that includes a computer system: "a requisition module operating on a computer system having access to data in the database, and its equivalents."

252.    Claims 3 and 6 of the '683 patent require a "means for processing the requisition to generate one or more purchase orders for the selected matching items..."  The Court interpreted this element as requiring the following structure that includes a computer system: "purchase order generation module operating on a computer system having access to the requisition; and its equivalents.  See e.g., '683 Patent at 1:37-59; 3:3-24; 10:43-54; 15:20-59, FIGS. 1-3 (describing systems and processes that operate to generate purchase orders including requisition/purchasing system 40)."

253.    Claim 1 of the '172 patent requires a "means for entering product information that at least partially describes at least one desired item..."  The Court interpreted this element as requiring the following structure that includes a computer system: "a user interface operating on a computer through which a user may provide input; and one or more software modules that provide product information describing an item or a combination thereof, and their equivalents. See e. g., '172 Patent at 4:6-6:28; 7:66-8:19; 9:55-12:28; 18:23-50; FIGS. 1-2 (describing local computer 20, graphical interface 254, search program 50, interface 60, TV/2 and search program 250)."

254.   Claim 1 of the '172 patent requires a "means for searching for matching items that match the entered product information in the selected portions of the database..."  The Court interpreted this element as requiring the following structure that includes a computer system: "search programs and modules operating on a computer system with access to data in a database or other file system, and their equivalents.  See e.g., '172 Patent at 4:6-6:28; 7:66-8:19; 9:55-12:41; FIGS. 1-2; Appendices III-V and VIII (describing local computer 20, search program 50, TV/2 and search program 250) ."

255.   Claim 1 of the '172 patent requires a "means for generating an order list that includes at least one matching item selected by said means for searching..."  The Court interpreted this element as requiring the following structure that includes a computer system: "a user interface operating on a computer through which a user may select from results from a search program or a search program that generates an order list of matching items, and their equivalents.  See e.g., '172 Patent at 4:6-6:28; 7:66-8:13; 9:55-12:28; 18:23-50; Appendix VI, FIGS. 1-2 (describing local computer 20, graphical interface 254, search program 50, interface 60, TV/2 and search program 250) ."

256.   Claim 1 of the '172 patent requires a "means for building a requisition that uses data obtained from said database relating to selected matching items on said order list..."  The Court interpreted this element as requiring the following structure that includes a computer system: "requisition module operating on a computer system having access to data in the database, and its equivalents.  See e.g., '172 Patent at 1:30-40; 3:7-28; 6:45-7:3; 7:41-8:19; FIGS 1-3 (describing various embodiments of requisition modules including  requisition/purchasing system 40, requisition management ("REQI" ) module 44A and requisition maintenance program 44C)."

257.     Claim 1 of the '172 patent requires a "means for processing said requisition to generate purchase orders for said selected matching items..."  The Court interpreted this element as requiring the following structure that includes a computer system: "a purchase order generation module operating on a computer system having access to the requisition, and its equivalents.  See e.g., '172 Patent at 1:42-55; 3:23-28; 10:53-55; 15:39-61; FIGS 1-3 (describing systems and processes that operate to generate purchase orders including requisition/purchasing system 40).)."

258.     Lawson does not make, sell or offer for sale computers, computer systems, or computer hardware.  Dr. Weaver does not allege otherwise.  For these reasons alone, Lawson does not directly infringe claims 3 and 6 of the '683 patent, claims 1, 2, 6, 9, 21, 22, or 29 of the '516 patent, or claim 1 of the '172 patent.

**Opinion 7: Lawson Does not Practice the Claimed Methods**

259.     Claims 26 and 28-29 of the '683 Patent claim methods.  In addition to the foregoing, Lawson does not infringe these method claims because it does not perform the following steps of these methods:  maintaining at least two products catalogs on a database containing data relating to items associated with the respective sources; selecting the product catalogs to search; searching for matching items among the selected product catalogs; building a requisition using data relating to selected matching items and their associated source(s); processing the requisition to generate one or more purchase orders for the selected matching items; determining whether a selected matching item is available in inventory; and converting data relating to a selected matching item and an associated source to data relating to an item and a different source.  Lawson sells software.  It does not maintain product catalogs, requisition items, build requisitions, issue purchase orders etc.  As such, it does not infringe these claims.

**Opinion 8:  Lawson Does Not Indirectly Infringe the Asserted Claims**

260.    Paragraphs 360-376 are directed to a discussion of indirect infringement.  Indirect infringement requires the existence of some direct infringer.  Because there is no claim all of whose elements are present or all of whose steps are performed, there can be no direct infringement, and thus no indirect infringement.

261.    Dr. Weaver fails to show a customer who is directly infringing.  Absent proof of direct infringement, there can be no inducement to infringe.

262.    Additionally, Lawson is not liable for either inducing or contributory infringement because it lacks specific intent to cause infringement.  Plaintiff has no evidence that anyone at Lawson knew of the Patents until this lawsuit was filed in May 2009.  Thus, there can be no indirect infringement prior to the filing of the instant lawsuit.

263.    ~~Continuing after May 2009, Lawson had an objective good faith basis to believe its Accused Software does not infringe the Patents as described above, and thus did not know (and should not have known) that its actions would induce infringement or contribute to infringement, particularly in view of the following:~~

a. ~~Lawson has been selling the IC, RQ, and PO modules for many years, going back to at least the early 1990s and well before the priority date of the Patents – most of the accused features were part or similar to Lawson's non-infringing prior software;~~

b. ~~Lawson's software uses the Item Master database instead of multiple catalogs, and has done this for many, many years;~~

c. ~~Plaintiff's original inducement contentions of Sept. 2009 were based on Digital Depot, which Lawson stopped offering years earlier, and Punchout, which as shown above, Lawson does not control;~~

d. ~~By the time Plaintiff filed this suit the Patent Office had issued a final office action rejecting claims of the '683 patent, which is based on the same application as the '172 and '516 patents;~~

*[margin annotations: MIL 5 / MIL 3; MIL 2; MIL 2; MIL 2; MIL 1]*

73

MIL 1

e. ~~On October 23, 2009, the Patent Office rejected all claims of the '172 patent finding that claims 1 and 3-5 were anticipated by the '989 Patent and that claims 1-5 were anticipated by each of the P.O. Writer Manual, the Practical Guide to SABRE, the J-CON Manual, and the Gateway Manual; and~~

MIL 1

f. ~~On January 15, 2010, the Patent Office granted reexamination finding that the following references were prior art and raised a substantial new question of patentability as to all claims of the '516 patent:  Claims 1-29 of the '516 Patent to be unpatentable over the Johnson'989, King'542, P.O. Writer; Practical Guide to SABRE; and J-CON.  It is again noteworthy that, once the '989 Patent was identified as prior art, the PTO relied on it as raising new questions of patentability.~~

MIL 3

g. ~~Lawson has developed legitimate invalidity defenses as detailed in my Expert Report Concerning Invalidity, incorporated by reference herein.~~

264.    Additionally, Lawson's customers can use Lawson's accused software in a manner that would not infringe any claim even under Dr. Weaver's infringement analysis.  That is, Dr. Weaver alleges that Lawson's software is capable of including collections of catalogs because it is capable of including items from multiple different sources or vendors.  However, it does not require items from different sources.  Lawson's customers could choose to load item data from a single source that relates to a single vendor or manufacturer or supplier and the software would work fine.  The other functions and steps cited by Dr. Weaver as possibilities similarly are not necessarily used or practiced in fact by customers.  Thus, Lawson's actions are not shown to induce any customer to practice the steps or use the functionality relied upon by Dr. Weaver to prove infringement.

265.    Dr. Weaver alleges that it is the item data loading procedures (PO536) that triggered infringement, if this is the case, there are other ways that Lawson's customers can and do load item data (including manual entry and flat file conversions mentioned above).  These are substantial non-infringing uses.  Moreover, the data loading procedure can be used to load data

other than data from vendor catalogs, such as data from legacy purchasing systems. The mere fact that Lawson offers this functionality does not induce customers to use it to load vendor catalog data, so this does not show inducement to infringe either.

## Opinion 9:  Lawson Does Not Infringe the Asserted Claims Under the Doctrine of Equivalents

266.    I understand that Plaintiff's infringement contentions did not assert infringement under the doctrine of equivalents. Similarly, although Dr. Weaver's report mentions "doctrine of equivalents" he does not provide any specific infringement allegations based on the doctrine of equivalents, making it very difficult for me to rebut. He does not identify any claim elements for which he relies on the doctrine of equivalents, let alone disclose his opinions regarding how Lawson's software performs substantially the same function, in substantially the same way, and obtains substantially the same result as that literally taught by the claims of the patent. As such, I can only respond in kind by noting that the Asserted Claims were amended during prosecution and thus the doctrine of equivalents will be limited by prosecution history estoppel. Further, Plaintiff may not use the doctrine of equivalents to capture that which is in the prior art.

### CONCLUSIONS.

267.    For the reasons stated above, Dr. Weaver has not demonstrated that any Asserted Claim is infringed by any version of the Lawson software.


Executed on June 3, 2010, in Pittsburgh, PA.


_Michael Ian Shamos_
Michael Ian Shamos, Ph.D., J.D.

**Exhibit 5**
**Materials Considered**


**Deposition Transcripts**

Billgren, Henrik (Oct. 21, 2009), and exhibits thereto and Demo CD taken during Oct. 22, 2009
    Billgren Deposition
Christopherson, Dale (Oct. 19-20, 2009), and exhibits thereto
Cimino, Lynn (March 2, 2010), and exhibits thereto
Dooner, Todd (March 1-2, 2010), and exhibits thereto
Eng, Pamela (SAP Case)
Frank, Jeff (Oct. 9, 2009), and exhibits thereto
Gounaris, Charles (SAP Case), ePLUS0201227-0201309
Irwin, Robert (March 10, 2010)
Johnson, James (Dec. 9, 2009), and exhibits thereto
Kinross, Robert (Dec. 9, 2009) and exhibits thereto
Lohkamp, Keith (Oct. 20-21, 2009), and exhibits thereto
Matias, Manuel (March 10, 2010)
Momyer, Douglas (Dec. 9, 2009) and exhibits thereto
Oliver, Kristy, and exhibits thereto
Raleigh, Hannah (March 4, 2010), and exhibits thereto
Tolkmit, Guenther (October 26, 2009) and exhibits thereto
Weaver, Alfred (SAP Case), pp 2772-2775
Yuhasz and Williams (Feb. 19, 2010), and exhibits thereto

**Documents (including books and articles)**

American Airlines "SABRE" Claim Chart, L0131537-544
American Airlines "SABRE" Claim Chart, L0131545-553
Ariba Procurement Solution, ePLUS0082349-90
Ariba Rides Aberdeen Award, ePLUS0133477-78
Baxter Healthcare Corporation: ASAP Express, Harvard Business School 9-188-080
Bidgoli, The Internet Encyclopedia, article by Robert Goffman on "Electronic Procurement"
CCI's J-CON Claim Chart, L0131512-536
Complex Indirect Procurement: The Final Frontier for Savings, ePLUS0115274-77
Detailed Request for *Ex Parte* Reexamination of U.S. Patent No. 6,055,516
Easylink, Tripsearch, Recheck, Bargainfinder Plus, Satellite Ticket Printers, Remote Coupon
    Print, Microfiche, L0131856-874
email from Mary Anderson to Amy Crouse, ePLUS0134656-58
ePlus Achieves Two Consecutive Quarters of Top Ranking in Aberdeen's Supply Chain Top
    Fifty, ePLUS0026955-57
ePlus Named to iSource Business Magazine's Top 100, ePLUS0027032-33
ePlus Named to 2004 Supply & Demand Chain Executive Magazine's Top 100, ePLUS0026860-
    81
ePlus v. SAP Trial Transcript, ePLUS0200965-1010, ePLUS0201011-1062
Farsani et al., Designing a Catalog Management System – An Ontology Approach
Final Rejection from the '172 Reexam
Fisher Electronic Sourcing Assessment and Proposal, ePLUS0216394-0216418
Fisher Electronic Sourcing Assessment and Proposal, ePLUS0218032-0218056
Fisher Scientific From Laboratory Equipment to E-Commerce, ePLUS0134651-53
Gateway DOS Product Overview, L0128368-395
Gateway Inventory Processes User Manual December 1993, L0128209-128356
Gateway Purchasing Manual December 1993, L0127887-128208

76

Gateway – The Newsletter for Purchasing Administration, January 1991, L0128357-361
Gateway – The Newsletter for Purchasing Administration, April 1991, L0128362-366
Gateway 2000/MRO Claim Chart, L0131596-667
Gateway 2000/MRO Screen Shots, L0128494-564
Gateway 2000/MRO Version May 1991, L0127602-886
Guided Tour Version 10.0 (P.O. Writer), L0131668-855
IBM Technical Viewer/2, ePLUS0210933-938
IBM Technical Viewer/2, ePLUS0509238-251
IBM Technical Viewer/2, L013122-130
IBM Technical Viewer/2, L013131-134
IBM Technical Viewer/2 General Information Manual, ePLUS0210933-938
IBM Technical Viewer/2 General Information Manual, ePLUS0210933-938, EPFS75-91
IBM Technical Viewer/2, ePLUS0425536-0425549
iEC Award – Best Internet Infrastructure – Fisher Technology Group, ePLUS0134639-40
Indirect Purchasing – A Competitive Advantage?, ePLUS0240737-39
*Inter Partes* Reexamination Communication (6,505,172). mailed October 23, 2009
J-CON Manual Volume 1, L0123413-124584
J-CON RDB Guide, L0125035-221
J-CON System User's Manual Volume 3, L0124585-125034
Lawson Software Accounts Receivable Procedures Manual for Unix Release 6.0, L0011849-
    12144
Lawson Software Cost Allocations Procedures Manual Release 6.0, L0011761-848
Lawson Software General Ledger Conversion Manual Release 6.0, L0011698-760
Lawson Software Inventory Control Conversion Manual Release 6.0, L0012800-037
Lawson Software Inventory Control Procedures Manual Release 6.0, L0012837-3145
Lawson Software Purchase Order Conversion Manual Release 6.0, L0012492-517
Lawson Software Purchase Order Procedures Manual, L0013146-295
Lawson Software Purchase Order Release 6.0 User Text, L0015615-6422
Lawson Software Requisitions Procedures Manual, L0009725-773
Lawson Software RQ Screens, L0017410-411
Lawson Software RQ Screens, L0017412-415
[Lawson Software] Summary of 5.0 and 6.0 Differences, L0017230-236
Lawson Software Universe CASE and 4GL, L0017891-8119
Lawson Software Universe for Unix Developer's Workbench Release 2.1, L0017726-890
Lawson Software Universe for Unix Getting Started Release 2.1, L0013572-711
Lawson Software Universe Release Notes Release 2.1, L0014416-532
Office Action, Examiner's Answer for '683 Reexam, dated 02/26/10
Pilot and Comprehensive Electronic Sourcing Program System, ePLUS0214268-0214289
Pilot and Comprehensive Electronic Sourcing Program System, ePLUS0221672-0221693
P.O. Writer Ad Hoc Reporting Version 10.0, L0126396-402
P.O. Writer Bar Code Interface Version 10.0, L0126403-422
P.O. Writer Data Interface Utility Version 10.0, L0126423-481
P.O. Writer EDI Interface User's Guide Version 10.0, L0126482-500
P.O. Writer Guided Tour Version 10.0, L0126514-6701
P.O. Writer Inventory Control Version 10.0, L0126147-395
P.O. Writer Plus, Version 10 Claim Chart, L0131554-595
P.O. Writer Plus Fax Module, Version 10.0, L0126702-6717
P.O. Writer Purchase Requisitioning System Administrator's Guide Version 10.0, L0127256-296
P.O. Writer Purchasing Tenth Edition (April 1993) Software Revision 10.0, L0126501-513
P.O. Writer Purchasing Tutorial, L0126718-964
P.O. Writer Receiving, L0127297-504
P.O. Writer Requisition Interface, L0126965-980
P.O. Writer Requisitioning Manual Version 10.0, L0127505-601
P.O. Writer Security Administrator's Guide Version 10.0, L0126981-999

P.O. Writer Stock Requisitioning and Kitting System Administrator's Guide Version 10.0, L0127000-7019
P.O. Writer Stock Requisitioning and Kitting System Version 10.0, L0127020-7102
P.O. Writer Supplier Rating Report, L0127103-7137
P.O. Writer System Administrator's Guide, L0127138-7227
P.O. Writer Version Upgrade Kit, L0127228-7255
Practical Guide to SABRE Reservations and Ticketing, L0125223-723
Prior Art Search – Electronic purchase order system, Google Answers, http://answers.google.com/answers/threadview?id=527697
Proposal to Fisher, ePLUS0219699-0219717
Reality Purchase Order Module, EP019996-20239
Reexamination of U.S. Patent 6,505,172, L0122971-23087, L0123088-3251
Reexamination of U.S. Patent 6,505,172 (corrected), L0123252-412
Reexamination Appeal, L0128434-476, L0128477-480, L0128481-493, L0128565-9624, L0129625-130476
Request for *Ex Parte* Reexamination Patent No. 6,023,683, L0130477-1223, L0131224-511
Reservations and Ticketing with SABRE, L0125724-6046
Response to Non-final Office Action (Reexamination of 6,505,172)
Response to Request for Reexam for '516
SABRE Savvy, L0126014-146
SABRE Total Access Workbook, L0126047-6103
SAP Achieves Top Spot in Supplier Relationship Management Market, http://www.sap.com/about/newsroom/press-releases/press.epx?pressid=2759
Short et al., Beyond Business Process Redesigning Redefining Baxter's Business Network, MIT Sloan Management Review
Solid Foundation for Web-Based Buying, A, ePLUS0134592-655
Speed-Creating Requisitions, L0009741
Technical Viewer 2, ePLUS0509238-0509251
Third Party Comments After Patent Owner Response, '172 Reexam
To enter a requisition return, L0009747-49
TV/2 Delivery Agreement, ePLUS0524059-0524068
Videotape from Pamela Eng, L0290560
S3 Demo Laptop and L0135748
G0000012-0000029
G0000362-0000375

ePlus Claim Chart references for '172 Patent:
L0000949
L0000971
L0001888
L0006359
L0043347
L0045474
L0046221
L0046293
L0052019
L0061098
L0061536
L0065569
L0068848
L0134163
L0134169
L0134173
L0134175
L0134182

L0135034
L0135319
LE00124594
LE00181432
LE00187614
LE00215560
LE00217620
LE00231983
LE00239153
LE00352046
ePLUS0240827
ePLUS0240895
ePLUS0241026
ePLUS0241302
ePLUS0240737
ePLUS0241625
ePLUS0241397
ePLUS0621206
ePLUS0241502
ePLUS0241483
ePLUS0444140
ePLUS0241043
ePLUS0241541
ePLUS0621234

ePlus Claim Chart references for '516 Patent:
ePLUS0240726 to 736
ePLUS0240737-739
ePLUS0240822
ePLUS240895-928
ePLUS0241026-28
ePLUS241043-45
ePLUS0241049-051
ePLUS0241302-303
ePLUS0241397-416
ePLUS0241403-404
ePLUS0241625-656
ePLUS0621206-233
ePLUS0624206-233
L0000812 to 822
L0000949-967
L0000971-992
L0001888
L0001892
L0032249 - 549
L0037128 - 375
L0043347 - 380
L0045474 - 533
L0046221 - 292
L0046293 - 332
L0046359 - 363
L0052019 - 296
L0061536 - 745
L0065569 - 571
L0068848 - 943

SHAMOS REBUTTAL REPORT ON NON-INFRINGEMENT            CASE NO.3:09cv620

L0135034 -092
L0135319 - 328
LE00124594 - 617
LE00181432 - 459
LE00187614 - 632
LE00215560
LE00216433 - 453
LE00217620-635
LE00231983-984
LE00239153-183
LE00352046-342

ePlus Claim Chart references for '683 Patent:
ePLUS0240726
ePLUS0240737
ePLUS0240822
ePLUS0240823
ePLUS0240895
ePLUS0241026
ePLUS0241032
ePLUS0241043
ePLUS0241049
ePLUS0241302
ePLUS0241397
ePLUS0241541
ePLUS0241625
ePLUS0444140
ePLUS0621206
ePLUS0621234
L0000949
L0000971
L0001888
L0032249
L0043347
L0045474
L0046221
L0046293
L0046359
L0052019
L0061098
L0061536
L0065569
L0068848
L0111978
L0134163
L0135034
L0135319
LE00124594
LE00163483
LE00181432
LE00187614
LE00215560
LE00216433
LE00217620
LE00231983

SHAMOS REBUTTAL REPORT ON NON-INFRINGEMENT                    CASE NO.3:09cv620

LE00239153
LE00352046

**Expert Reports**

Expert Report of Alfred C. Weaver, Ph.D. Relating to Patent Validity (SAP Case),
      ePLUS0489389-437
Rebuttal Expert Report of Alfred C. Weaver, Ph.D. ePLUS0529463
Declaration of Alfred C. Weaver dated November 7, 2005, ePLUS0234532
Expert Report of Brooks L. Hilliard Relating to Patent Validity (SAP Case), ePLUS0489174-383
Expert Report of harry F. Manbeck, Jr.
Initial Infringement Expert Report of Alfred C. Weaver, PhD, dated May 3, 2010, and
      documents referenced therein
Initial Infringement Expert Report of Alfred C. Weaver, Ph.D. (SAP Case), ePLUS0445053-362
Initial Invalidity Expert Report of Professor Daniel A. Menascé (SAP Case), ePLUS0462802-
      3027
Noninfringement Expert Report of Professor Daniel A. Menascé (SAP Case), ePLUS0444483-
      699
Rebuttal Invalidity Expert Report of Professor Daniel A. Menascé (SAP Case), ePLUS0489438-
      541
Rule 26(a)(2)(B) Report Of Patrick Niemeyer, dated May 5, 2010, and documents referenced
      therein
Supplemental Post-*Markman* Expert Report of Brooks L. Hilliard Relating to Patent Validity
      (SAP Case), ePLUS0489627-821

**Litigation Documents**

Complaint for Patent Infringement
Declaration of Alfred C. Weaver, Ph.D. in Support of ePlus's Proposed Claim Constructions for
      Certain Claim Terms in U.S. Patent Nos. 6,023,683 and 6,505,172, and exhibits thereto
Declaration of Charles Gounaris dated May 5, 2010 (L0345244-245)
Defendant Lawson Software Inc.'s Brief in Support of Its Motion to Strike ePlus's Expert
      Declaration and Supplemental Brief
Defendant Lawson Software Inc.'s Opening Claim Construction Brief with Appendix A and
      Exhibits A-L
Defendant Lawson Software Inc.'s Reply Brief in Support of Its Motion to Strike ePlus's Expert
      Declaration and Supplemental Brief
Defendant Lawson Software Inc.'s Responses to ePlus, Inc's First Set of Interrogatories (Nos. 1-
      14), dated 08/24/09
Defendant Lawson Software Inc.'s Responsive Claim Construction Brief with Exhibits
Defendant Lawson Software Inc.'s Second Supplemental Answer to Plaintiff ePlus, Inc's
      Interrogatory No. 2 dated 04/12/10
Defendant Lawson Software Inc.'s Second Supplemental Initial Statement of Invalidity Defenses
Defendant Lawson Software Inc.'s Supplemental Initial Statement of Invalidity Defenses
Defendant Lawson Software Inc.'s Supplemental Responses to Plaintiff ePlus, Inc's
      Interrogatory Nos. 2, 4 and 10, dated 09/18/09
Defendant Lawson Software Inc.'s Supplemental Responses to Plaintiff ePlus, Inc's
      Interrogatory Nos. 4, 5, 6, 8, 10, 12, 14, 16 and 17, dated 10/09/09
Defendant Lawson's Claim Construction Presentation, January 22, 2009 [sic]
ePlus's Supplemental Responses to Lawson's Interrogatory Nos. 19-20
Lawson Software, Inc.'s Answer and Counterclaims
Lawson Software, Inc.'s Identification of Claim Terms Requiring Construction
Letter to Michael Strapp from Will Schultz dated 01/26/10
Plaintiff ePlus, Inc.'s Answers and Objections to Defendant Lawson Software, Inc.'s First Set of
      Interrogatories

Plaintiff ePlus, Inc.'s Brief in Opposition to Defendant Lawson Software Inc.'s Motion to Strike Expert Declaration and Supplemental Brief
Plaintiff ePlus, Inc.'s Claim Chart and Appendix A-C dated December 22, 2009
Plaintiff ePlus, Inc.'s First Supplemental Answers and Objections to Defendant Lawson Software, Inc.'s Second Set of Interrogatories
Plaintiff ePlus, Inc.'s First Supplemental Answers and Objections to Defendant Lawson Software, Inc.'s Second Set of Interrogatories (No. 6)
Plaintiff ePlus, Inc.'s Opening Claim Construction Brief, Declaration of Young with Exhibits
Plaintiff ePlus, Inc.'s Responsive Claim Construction Brief with Exhibits 20-22, Supplemental Declaration of Young
Plaintiff ePlus, Inc.'s Supplemental Memorandum in Support of Its Construction of Certain Means-Plus-Function Claim Elements with Exhibits 1-8 and Declaration of Weaver
Plaintiff's Claim Construction Presentation, January 22, 2010
Plaintiff's Identification of Asserted Twenty Claims
Plaintiff's Identification of Thirteen Claims to be Asserted
Protective Order of August 27, 2009
ePlus's Response to Defendant's Expert Declaration dated March 29, 2010
Defendant's Second Supplemental Response to ePlus, Inc.'s Interrogatory No. 2 dated April 12, 2010
Defendant's Third Supplemental Response to ePlus, Inc.'s Interrogatory No. 2 dated April 26, 2010
ePlus, Inc.'s First Supplemental Objections and Answers to Fifth Set of Interrogatories with Appendix A-C dated May 18, 2010
Memorandum Opinion regarding Claim Construction dated April 30, 2010
April 19, 2010 Letter to Michael Strapp from William Schultz
April 23, 2010 Letter to Andrew Stein from Kristin Drieman

**Litigation Documents (Prior Litigation)**

Claim Constructions Pursuant to November 17, 2005 *Markman* Hearing, ePLUS0235079-094
Memorandum Opinion (Markman, Ariba Case), ePLUS0232958-980

**Other Litigation Documents**

L0021190
L0068240
L0100055
L0104143
L0104590
L0108835
L0092739
L0294084
L0344796
L0345088
L0345051
L0126104-0126146
L0128367-0128395
L0135741
L0135742
L0135743
L0135744
L0135745
L0135746
L0258429

SHAMOS REBUTTAL REPORT ON NON-INFRINGEMENT                    CASE NO.3:09cv620

L0262982
L0290529
L0290559
L0340559-0340571
L0343527-0343543
L0344717
L0345049
LE00146786
LE00206653
LE00507377
LE00394180
LE01446355
LE01146578
LE02388390
LE01845482
LE01840240
LE01146524
LE01858064
LE02003516
LE02412234
LE02932685
LE02511014
Order Entry Conversion, L0012518-0012553
Order Entry Procedures, L0012600-0012700
RIMS Trademark File History, L0260585-00260624
TV/2 Implementation Agreement, ePLUS0214243-0214265

ePLUS0009339-0009340
ePLUS0009390-0009391
ePLUS0027401
ePLUS0028482
ePLUS0030545
ePLUS0037014-0037015
ePLUS0047323-0047324
ePLUS0113980
ePLUS0113995
ePLUS0229212-0229220
ePLUS0274902
ePLUS0274903
ePLUS0442856
ePLUS0442857
ePLUS0529214
ePLUS0529218
ePLUS0241049
ePLUS0241032
ePLUS0241043
ePLUS0241026
ePLUS0444140
ePLUS0427802
ePLUS0942183
ePLUS0942184
ePLUS0942185
ePLUS0942292
ePLUS0942293
ePLUS0942356

SHAMOS REBUTTAL REPORT ON NON-INFRINGEMENT                    CASE NO.3:09cv620

ePLUS0942357
ePLUS0942358
ePLUS0942359
ePLUS0947412
ePLUS0947616
ePLUS0947649
ePLUS0942600
ePLUS0942601
ePLUS0942827
ePLUS0942828
ePLUS0942829
ePLUS0942830
ePLUS0942831
ePLUS0942970
ePLUS0942971
ePLUS0947537
ePLUS0947538
ePLUS0947578
ePLUS0947579
ePLUS0947865
ePLUS0947887
ePLUS0947888
ePLUS0948441
ePLUS0948532
ePLUS0948757
ePLUS0948787
ePLUS0948869
ePLUS0948926
ePLUS0948927
ePLUS0948949
ePLUS0948999

**Patents and Patent Applications**

Brockwell et al. U.S. Patent 5,063,506
Doyle et al. U.S. Patent 5,694,551
Dworkin et al. U.S. Patent 4,992,940
Gardner et al. U.S. Patent 5,758,327
Geier et al. U.S. Patent 4,984,155
Johnson et al. U.S. Patent 5,712,989
Johnson et al. U.S. Patent 6,023,683 and its prosecution history
Johnson et al. U.S. Patent 6,055,516 and its prosecution history
Johnson et al. U.S. Patent 6,505,172 and its prosecution history
King Jr. et al. U.S. Patent 5,319,542
Linnett et al. U.S. Patent 5,301,326
Roberts et al. U.S. Patent 5,324,922
Shavit et al. U.S. Patent 4,799,156
Shoquist et al. U.S. Patent 5,361,199
Spiegelhoff et al. U.S. Patent 5,402,336
Zellweger U.S. Patent 5,630,125

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Richmond Division**

| | | |
|---|---|---|
| *e*PLUS, INC., | ) | |
| | ) | |
| | ) | Civil Action No. 3:09-cv-620 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LAWSON SOFTWARE, INC. | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on June 3, 2010, I caused the following documents:

1. Rebuttal Report of Expert Michael I. Shamos, Ph.D., J.D., Concerning Non-Infringement with Exhibits 5-6;
2. Rebuttal Expert Report of Ernest B. Lipscomb, III Under Rule 26(a)(2)(B) of The Federal Rules of Civil Procedure with Exhibits A-C; and
3. Certificate of Service

to be served on the following individuals via electronic mail:

Goodwin Proctor ePlus team at ePlusGoodwinService@goodwinprocter.com
Craig Merritt at cmerritt@cblaw.com
Henry Willett at hwillett@cblaw.com
Kimberly Perkins at kperkins@cblaw.com
Leslie Blacka at lblacka@cblaw.com
Perry Coburn at pcoburn@cblaw.com
Stephanie VanBuren at svanburen@cblaw.com


Dated:  June 3, 2010                                    s/Kristin M. Drieman
                                                       Kristin M. Drieman