# EXHIBIT 8

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                FOR THE EASTERN DISTRICT OF VIRGINIA

 3                          RICHMOND DIVISION

 4

 5     ----------------------------------------
                                              :
 6      ePLUS, INC.                           :    Civil Action No.
                                              :    3:09CV620
 7      vs.                                   :
                                              :
 8      LAWSON SOFTWARE, INC.                 :    January 12, 2011
                                              :
 9     ----------------------------------------

10

11              COMPLETE TRANSCRIPT OF THE JURY TRIAL

12             BEFORE THE HONORABLE ROBERT E. PAYNE

13          UNITED STATES DISTRICT JUDGE, AND A JURY

14
       APPEARANCES:
15
       Scott L. Robertson, Esquire
16     Michael G. Strapp, Esquire
       Jennifer A. Albert, Esquire
17     David M. Young, Esquire
       Goodwin Procter, LLP
18     901 New York Avenue NW
       Suite 900
19     Washington, D.C.  20001

20     Craig T. Merritt, Esquire
       Christian & Barton, LLP
21     909 East Main Street
       Suite 1200
22     Richmond, Virginia  23219-3095
       Counsel for the plaintiff
23

24                     Peppy Peterson, RPR
                      Official Court Reporter
25                 United States District Court
```

1  exhibits and testimony right now is admitted for the
2  limited purpose of whether or not Lawson may have
3  knowledge of ePlus and their patents.  EPlus as a
4  competitor and their patents.
5  BY MR. STRAPP:
6  Q   Mr. Farber, can you just tell me briefly what this
7  document is?
8  A   Sure.  This is a document, which I believe
9  describes at a high level a little bit about the
10 functionality and features of the Procure Plus
11 product.
12 Q   Can I direct your attention to the bottom
13 right-hand corner of the first page of this document?
14 A   Yes.
15 Q   Do you see there a list of U.S. patent numbers?
16 A   I do.
17 Q   Do you recognize any of those patents numbers as
18 patents that are at issue in this case?
19 A   Yes.
20 Q   Are those the first three patents listed there?
21 A   Yes, they are.
22 Q   Can you explain to me why it is that ePlus has
23 decided to mark this particular Procure Plus brochure
24 with the three patents numbers that are at issue in
25 this case?

1  A    Well, it's my understanding from working with our
2  counsel that when you have a patents marking, it is a
3  necessity, and it's a form of providing general notice
4  to the industry that you have patents.
5       So we mark things that are publicly disseminated.
6  Q    Let me ask you to turn to Plaintiff's Exhibit 417,
7  please.  What is this document, Mr. Farber?
8            MR. McDONALD:  For the record, I have the
9  exact same objections.  I think I know what you're
10 going to say, but I just want to make sure you know I
11 have the same objections to this one.
12           THE COURT:  Are these the same kind of
13 documents, it's just another kind of product?
14           MR. STRAPP:  Correct.  We've discussed --
15           THE COURT:  Is that what it is?
16           MR. McDONALD:  Yes, it is, Your Honor, and I
17 guess you did have a limiting instruction.  So I'd at
18 least request the same limiting instruction.
19           THE COURT:  Well, this Exhibit 417 and this
20 testimony is, again, limited to -- for you to consider
21 as evidence respecting whether Lawson is on notice of
22 ePlus as a competitor and its patents that are at
23 issue in this case.  That's the only purpose that this
24 is admitted to.
25 BY MR. STRAPP:

1  Q   Mr. Farber, this is Plaintiff's Exhibit 417?
2  A   It's a similar document and brochure that shows up
3  in written form and on the website that relates to our
4  product information management solutions.
5  Q   Which product specifically does this relate to?
6  A   Catalog and Content Plus.
7  Q   Can you take a look at the bottom right-hand
8  corner of this document, please?
9  A   Yes.
10 Q   Do you see there a list of U.S. patent numbers?
11 A   I do.
12 Q   Do you see the same three U.S. patent numbers
13 listed first there that we had discussed with respect
14 to Plaintiff's Exhibit 443?
15 A   Yes.
16 Q   I'm sorry, 448.
17     Are these the three patents that are at issue in
18 this lawsuit?
19 A   Yes, that's the '683, the '516, and the '172
20 patent.
21 Q   What types of additional documents or other
22 documents, if any, does ePlus mark with '683, '516 and
23 '172 patents?
24 A   We mark the products themselves so that when
25 people utilize the system, they see the patents as

1   soon as they login.  Anybody that goes to our website
2   sees markings at numerous locations on our website.
3   Our printed materials, our documentation, information
4   that we hand out at things like trade shows are also
5   marked.  So it's basically we try to mark everything
6   that's publicly disseminated.
7   Q   Since when has ePlus marked its products and its
8   literature?
9   A   I think that was since 2002, if I'm not mistaken.
10  Q   What types of customers does ePlus target for
11  these Procure Plus and Content Plus products?
12  A   In terms of who we try to attract and sell to, I
13  would say the mid market.
14  Q   What do you mean by "mid market"?
15  A   Well, similar type customers that Lawson, you
16  know, talked about earlier in the week.  You know,
17  they're not necessarily the largest.  They're not
18  necessarily the smallest.  They fall within a range.
19  It can be, you know, a company that may be in revenue,
20  does, you know, 50 million to 2 1/2 billion.  That's a
21  very wide range, but that's what's considered mid
22  market in industry terms.
23  Q   Do you know whether or not ePlus competes with
24  Lawson for sales of its e-Procurement software?
25  A   Yes.

1  the RFP process from Lawson consistent with your
2  understanding of how the RFP process works for
3  e-Procurement software?
4  A    Yes, I believe so.
5  Q    When ePlus receives an RFP, does ePlus itself
6  draft a response and ensure that the response that it
7  gives to the RFP is accurate?
8  A    Yes, ePlus would draft the response, yes.
9  Q    In addition to industry analyst reports, what
10 other types of media or publications do you follow to
11 try to keep abreast of trends or developments in the
12 e-Procurement industry?
13 A    In addition, to analysts reports?
14 Q    Correct.
15 A    There's a lot of sources.  You know, we do --
16 besides the reports, you get to have briefings with
17 the analysts.  We actually sit down and they disclose
18 some information to you about competition.  There's
19 times where we follow -- not times.  We do follow a
20 number of different trade magazines.  There's web
21 based information such as blogs that are written now
22 in this discipline of procurement sourcing and catalog
23 management.
24      There's the competitors websites that we looked at
25 very often to see what the competitors are doing and

1  try to gain insight based on whatever public
2  information is available to help us position our
3  products and solutions.
4  Q    Do you know whether in these types of publications
5  you've been discussing there's ever been any mention
6  of ePlus or its patents?
7  A    Yes.
8  Q    What are you referring to specifically?
9  A    There have been authors that have written things
10 on blogs, on websites.  There have been newspaper
11 articles, trade magazines widely published --
12           MR. McDONALD:  Your Honor, we already went
13 through these issues as to foundations for some
14 exhibit that's been excluded.  Now he's talking about
15 the same thing.  That has been excluded.
16           THE COURT:  It sounds to me like it.
17           MR. STRAPP:  Your Honor, I wasn't planning to
18 go into any detail about these exhibits or show them,
19 obviously.  I was just asking about his personal
20 knowledge as the president of ePlus, what does he do
21 to keep abreast of industry developments.
22           THE COURT:  What's that got to do with
23 anything in the case?
24           MR. STRAPP:  It's relevant to understanding
25 how the marketplace works and how people in the

1  recommendations for ISVs.  Is ISV a term that's used
2  in the supply chain management industry?
3  A   It's used in the computer industry.
4  Q   What does it refer to?
5  A   It means independent software vendors.  Those
6  vendors that develop and install software.
7  Q   Is ePlus an ISV?
8  A   Yes.
9  Q   Is Lawson an ISV?
10 A   Yes.
11 Q   What recommendations is Gartner providing to
12 companies like ePlus and Lawson in this particular
13 Gartner research report?
14 A   What Gartner is recommending is to make sure that
15 your innovations are patented, which is the marking
16 that we talked about earlier, and then do an extensive
17 review of the functionality of your software against
18 patents that are known to be in dispute.
19           MR. McDONALD:  Your Honor, we don't need this
20 witness to read this document to us.  I object.
21           THE COURT:  I think that's enough.
22           MR. STRAPP:  I have no further ear questions.
23 Thank you for your time, Mr. Farber.
24           THE COURT:  Cross-examination.
25

1  A    I do.
2  Q    This document wasn't publicly distributed, was
3  it?
4  A    I disagree with you.  I believe it was.
5  Q    What's your basis for believing this document that
6  was designated by ePlus was confidential and
7  proprietary was publicly distributed?
8  A    Because I'm familiar with the document, and I know
9  of certain instances of where it was used, and I know
10 that it was freely distributed in certain trade shows
11 and to certain customers, and the information as
12 depicted here is also on our website.
13 Q    Well, you mentioned distributing information to
14 customers.  Is it true that from time to time you've
15 distributed information to customers, but you want to
16 limit the distribution of it so it doesn't go beyond
17 the customers?
18 A    And we usually have a nondisclosure in place for
19 that, yes.
20 Q    So this is something that you might have disclosed
21 to a customer with the intent that it not be further
22 distributed to other companies such as Lawson,
23 correct?
24 A    No, I don't believe I said that.
25 Q    But I'm asking you, isn't it true when you put a

1  REDIRECT EXAMINATION
2  BY MR. STRAPP:
3  Q    I'm going to ask Lawson to put back up on the
4  screen the press release that was shown to you,
5  Mr. Farber.
6      Mr. Farber, what's the purpose of ePlus' press
7  releases generally?  Why does ePlus issue press
8  releases?
9  A    A press release is issued to, you know, let the
10 industry know what's going on at ePlus and what we
11 think are notable events.
12 Q    Do you see at the top of this document there's a
13 date, July 21, 2003?  Do you see that?
14 A    Yes.
15 Q    Right above it, it says "market wire."  What's
16 your understanding of market wire?  What does that
17 imply about where this was disseminated to?
18 A    Market wire is a public relations organization
19 that picks up will press releases and then
20 redistributes them on their own vehicles of
21 communication.
22 Q    So who would have been the target audience of a
23 press release about ePlus' patent and the subject
24 matter of the patent?
25 A    Well, it would have had a very broad distribution.

FARBER - REDIRECT                    1353

1   Certainly, you know, to ISVs and certain customers
2   that look at the releases.  The financial world as
3   well.
4   Q   This press release specifically mentions one of
5   the patent numbers that's at issue in this case,
6   doesn't it?  The '172?
7   A   Yes.
8   Q   You were asked a few questions by Mr. McDonald
9   regarding marking.  Do you recall that?
10  A   Yes.
11  Q   Does ePlus mark any of its products or patent
12  literature that is disseminated publicly without
13  restriction?
14  A   Yes.
15  Q   Which particular --
16          MR. McDONALD:  Objection.  This is already
17  covered.
18          THE COURT:  Overruled.
19  Q   Which particular products or product literature
20  are marked with a patent that aren't restricted in any
21  way?
22  A   Sales brochures, sales presentations that are
23  provided at either a prospect's or industry conference
24  that we speak at.
25  Q   Trade shoes?

1  A    Trade shoes.  Information that's, you know, widely
2  available and nonrestricted on our websites.
3  Q    For example, at an industry trade show, can anyone
4  walk up, take a product brochure and walk away?
5  A    Absolutely.
6  Q    Can anyone go to the ePlus website and see the
7  patent numbers marked there?
8  A    Yes.
9           MR. STRAPP:  No further questions.
10          THE COURT:  All right.  You may step down,
11 sir.
12          (The witness was excused from the witness
13 stand.)
14          MR. ROBERTSON:  Your Honor, we have a few
15 housekeeping matters to take care of, a few
16 stipulations to read into the record.  If you'd like,
17 I can do that now.
18          THE COURT:  The lunches are here.  I think
19 I'll let you-all clean up and get things straightened
20 out.  We'll take one hour for lunch.  You can take
21 your notebooks with you.
22          (The jury is out.)
23          THE COURT:  Do you have something,
24 Mr. Robertson, you wanted to give me that I had asked
25 for or something and I told you to do it after the