# EXHIBIT 4

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION

ePLUS, INC.,            )
          Plaintiff,    )
     v.                 ) No. 3:09cv620
LAWSON SOFTWARE, INC.,  )
          Defendant.    )

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Washington, D.C.

Wednesday, December 16, 2009

30(b)(6) Videotape Deposition of ePLUS, INC., by and through its designee, KENNETH GARY FARBER, and in his individual capacity, called for examination by counsel for Defendant in the above-entitled matter, the witness being duly sworn by CHERYL A. LORD, a Notary Public in and for the District of Columbia, taken at the offices of TROUTMAN SANDERS LLP, 401 9th Street, Suite 1000, Washington, D.C., at 12:09 p.m., and the proceedings being taken down by Stenotype by CHERYL A. LORD, RPR, CRR.

|  | Page 110 | | Page 112 |
|---|---|---|---|
| 1 | BY MR. McDONALD: | 1 | analysis of any other competitors; is that right? |
| 2 | Q.  Those are the ones you already have | 2 | A.  That's correct. |
| 3 | licensed now. | 3 | Q.  Has ePlus undertaken any efforts to |
| 4 | Right? | 4 | monitor whether or not its licensees mark any |
| 5 | A.  Some that have licensed, and -- well, | 5 | products with the patent numbers involved in this |
| 6 | certainly the ones that have licensed, and the 4 | 6 | lawsuit? |
| 7 | defendants in suit in this particular matter. | 7 | A.  Yes. |
| 8 | Q.  Well, 3 of the 4 you have licensed in this | 8 | Q.  What does ePlus do to monitor the patent |
| 9 | case, too. | 9 | marking of its licensees? |
| 10 | Right? | 10 | A.  Well, for starters, I would -- I would |
| 11 | A.  That's correct, yes. | 11 | hope that the licensees are honoring the agreements, |
| 12 | Q.  So there aren't any unlicensed users of | 12 | but more importantly, we have had counsel involved in |
| 13 | your patents that are competing with Lawson and | 13 | ensuring or notifying the licensees of their |
| 14 | ePlus, are there? | 14 | responsibilities as it relates to marking and |
| 15 | MR. ROBERTSON:  Objection, calls for a | 15 | coordinating those efforts on our behalf. |
| 16 | legal conclusion. | 16 | Q.  Have any communications been sent on |
| 17 | Also, please don't reveal any | 17 | behalf of ePlus to any licensees beyond the |
| 18 | attorney-client communications. | 18 | agreements themselves reminding them of marking |
| 19 | A.  I wouldn't have the knowledge.  I have not | 19 | requirements? |
| 20 | undertaken the analysis to make that determination. | 20 | A.  I believe so, yes. |
| 21 | BY MR. McDONALD: | 21 | Q.  Which of the licensees have received such |
| 22 | Q.  So as far as ePlus knows, there are no | 22 | communications? |
| 23 | competitors to ePlus and Lawson that are using the | 23 | A.  I would hope all of them have.  I don't |
| 24 | patented technology without ePlus's permission. | 24 | know for sure that every single one had. |
| 25 | Right? | 25 | Q.  Are there written communications to that |

|  | Page 111 | | Page 113 |
|---|---|---|---|
| 1 | MR. ROBERTSON:  Same objection. | 1 | effect, give them notice? |
| 2 | A.  I'd have to repeat the same answer. | 2 | A.  I believe there was. |
| 3 | BY MR. McDONALD: | 3 | Q.  Can you tell me what you recall about the |
| 4 | Q.  Okay.  I just wanted to clarify, try to | 4 | written communications you're aware of. |
| 5 | ask it a little differently, because I put at the | 5 | A.  Just a reminder to -- to ensure that they |
| 6 | beginning, as far as ePlus knows. | 6 | were following the agreement and marking |
| 7 | A.  Well, we won't know and don't know. | 7 | appropriately where- -- whereby it was specified for |
| 8 | We have competitors.  I mentioned to you, | 8 | them to do so. |
| 9 | there are -- there are dozens and dozens of | 9 | Q.  Who wrote or sent those letters? |
| 10 | competitors. | 10 | A.  That was all managed by our counsel. |
| 11 | Have we undertaken the time to do detailed | 11 | Q.  Is that Mr. Robertson? |
| 12 | analysis or asked counsel to do so? | 12 | A.  I don't know if it was Mr. Robertson or |
| 13 | We haven't yet, so we don't have that | 13 | Ms. Albert that sent it out or anybody -- or somebody |
| 14 | knowledge, and I can't make that statement without | 14 | else in their firm. |
| 15 | having asked our counsel to go through that analysis. | 15 | Q.  Okay.  Somebody at Mr. Robertson's law |
| 16 | Q.  So as -- as you sit here today, ePlus has | 16 | firm? |
| 17 | no basis to allege that any competitors are | 17 | A.  That's correct. |
| 18 | infringing. | 18 | Q.  Did SAP get such communications? |
| 19 | Correct? | 19 | A.  I don't know.  I don't -- there were |
| 20 | MR. ROBERTSON:  Calls for a legal | 20 | differentiations in each agreement as it related to |
| 21 | conclusion and object to the form. | 21 | the marking provision, so I don't know specifically |
| 22 | A.  Yeah, I don't think I'm in a position to | 22 | what their provision was and what they had to do as |
| 23 | be able to know the answer to that question. | 23 | it related to marking. |
| 24 | BY MR. McDONALD: | 24 | Q.  You say, differentiations, are you saying |
| 25 | Q.  That's because you haven't undertaken any | 25 | there's different marking requirements in different |

(Pages 110 to 113)

```
                                                              Page 114
 1   license agreements?
 2       A.  There may have been to my recollection.
 3       Q.  Did Ariba get any communications outside
 4   the agreement relating to patent marking?
 5       A.  Again, they may have.
 6           We asked counsel to, you know, follow up
 7   and ensure that we were marking and pretty much left
 8   it up to them to manage that for us.
 9       Q.  Have you seen copies of any actual letters
10   sent to any licensees saying in effect, don't forget
11   to patent-mark?
12       A.  I may have seen one, maybe 2, just as a --
13   as a sample.
14       Q.  You say, may have.
15           I mean, do you believe you actually did
16   see 1 or 2?
17       A.  I think I may have seen one.  My
18   recollection is that I've seen one.
19           How is that?
20       Q.  You saved me another question.
21       A.  Okay.
22       Q.  Approximately when did you see that
23   letter?
24       A.  I think -- I believe I saw -- I don't know
25   if I actually -- I had seen the letter or I received
```

```
                                                              Page 115
 1   correspondence from -- from one of the associates at
 2   Goodwin stating that one of the licensees was coming
 3   out with a new release that they were going to mark.
 4       Q.  Approximately when was that?
 5       A.  It was in the past few months ago, I think
 6   is when the new release was coming out.
 7       Q.  Has ePlus undertaken any steps beyond the
 8   communication you've described so far to actually
 9   look at products of licensees to see if they have the
10   patent numbers on them?
11       A.  ePlus doesn't have access to, you know,
12   the licensees' products to validate that, which is
13   one of the reasons that we go to counsel for that.  I
14   think at one point in time I checked one of the
15   Websites over the last number of months to see if
16   they had anything on their Website related to the
17   patent.
18       Q.  Whose Website did you check?
19       A.  I believe -- my recollection was that it
20   was SciQuest.
21       Q.  Did you find anything at the SciQuest
22   Website regarding patent marking?
23       A.  I believe I recall seeing a notification
24   of the licensed patents from ePlus on their legal
25   section of their Website.
```

```
                                                              Page 116
 1       Q.  Have you ever visited the Websites for SAP
 2   or Ariba?
 3       A.  No.
 4           I haven't had the time to do any of that.
 5       Q.  Why is it that you specifically checked
 6   the SciQuest Website for that?
 7       A.  I think that was the one that in the last
 8   number of months had indicated they were coming out
 9   with a new release, and it was just curiosity on my
10   part.  So it was one of those things where I got one
11   correspondence and it kind of led me to say, well,
12   let me look and see, but that was the extent of it.
13       Q.  So is -- is SciQuest also the subject of
14   that communication that you were describing earlier
15   regarding somebody was coming out with a new product
16   that was going to be marked?
17       A.  I believe it was them, yeah, yeah.
18       Q.  How does ePlus actually implement patent
19   marking on its products?
20       A.  On specific products, we mark them on
21   the -- what we call the splash screens, which is when
22   a user goes into the system, you have the main screen
23   of the system, and then you have a legal notification
24   at the center bottom of the screen that lists the
25   patents.
```

```
                                                              Page 117
 1       Q.  Which products have that splash screen
 2   marked with a patent number?
 3       A.  The products that have patents associated
 4   with them, so a procurement and content, it's our
 5   procurement and content solutions.
 6           We also hold patents in document
 7   management and our digital paper solution, so there's
 8   a patent on that system as well specific to that
 9   environment.
10       Q.  Does ePlus sell a specific module or
11   system for what's called punchout in e-procurement?
12       A.  Well, we don't sell a system for punchout,
13   no.
14       Q.  How is it that you help -- I mean, do
15   ePlus customers have the capability of using
16   punchout?
17       A.  The system has a capability of doing
18   punchout for our customers.
19       Q.  Which system has that capability?
20       A.  It's our catalog and our procurement
21   solution.
22       Q.  So those are under the brand names catalog
23   plus and procure plus?
24       A.  Procure plus.
25       Q.  Do those always come with a punchout
```

(Pages 114 to 117)