# EXHIBIT 1

1 | have an excerpt in front of me.
2 |     THE COURT: Does it have -- I think they are
3 | entitled to know, and I'd like to know, too, does it
4 | have a headnotes so we can all make an easy jump
5 | there?
6 |     MR. ROBERTSON: I just have an excerpt from
7 | it.
8 |     THE COURT: Ms. Haggard has given me pages 15
9 | and 16 of the report. Maybe that's what you're
10 | talking about. Read me what yours starts with.
11 |     MR. ROBERTSON: The District Court did not
12 | err in finding the defendant's expert report on the
13 | alleged obviousness of the asserted claims of the
14 | patent at issue was deficient for purposes of
15 | disclosure under Rule 26.
16 |     THE COURT: All right. Hold on. Well, I
17 | think I see. Invalidity obviousness starts on page 12
18 | of the printout. And that would be on page --
19 |     MS. STOLL-DeBELL: Your Honor --
20 |     THE COURT: 1372. And now I need -- what
21 | you're reading from is Dr. Patterson's testimony
22 | headnote 15? And then it says, "The District Court
23 | did not err in finding that Dr. Patterson's report on
24 | the alleged obviousness of the '704 patent was
25 | deficient for purposes of disclosure under Rule 26."

2322

1       MS. STOLL-DeBELL:  Your Honor, I'm not sure
2  what you're looking at.  We don't have a copy.
3       MR. ROBERTSON:  Your Honor, I don't even have
4  a copy of the case.  I have a copy of an excerpt that
5  I had from a memo that was prepared, which I was
6  quoting from, but it's at that --
7       THE COURT:  That's where I was starting.
8       Now, excuse me, Ms. Stoll-DeBell.  What would
9  you like to say because you-all were talking over
10 behind Mr. Robertson and while he and I were talking,
11 and I didn't hear.
12      MS. STOLL-DeBELL:  I apologize for that.
13      I don't have a copy of what you're looking
14 at.
15      THE COURT:  Why do you need a copy of any law
16 when it's cited?
17      MS. STOLL-DeBELL:  I would like to be able to
18 respond to it.
19      THE COURT:  You do?
20      MS. STOLL-DeBELL:  I do, yes.
21      THE COURT:  Does anybody have a copy for her?
22      MR. ROBERTSON:  It is the *Innogenetics* case.
23      THE COURT:  And the text, just so you won't
24 have to go through the agony I went through -- are you
25 going to print her a copy?

Shamos - Direct                                                    2492

1   the patent as performing this function.  And so since TV/2
2   includes TV/2, it's automatically there.
3   Q   Let's go to slide 90, please, and the last two elements of
4   claim one of the '172 patent.
5   A   Yes.
6   Q   Why don't you walk us through first that fifth element
7   that you labeled --
8   A   I think it was agreed that the means in this claim are the
9   same as the corresponding means in the '683 patent, claim
10  three.  So we've already been through '683-3.
11  Q   This relates to means for building a requisition, at least
12  that's a short form of the means; correct?
13  A   Yes.  And the same thing is true for means of processing
14  said requisition.  It's the same means as in the '683 patent,
15  claim three.
16  Q   So you've already shown us why those two elements of '683,
17  claim three, were satisfied using the Court's construction of
18  the means clauses; correct?
19  A   Yes.
20  Q   And so that same analysis shows that the Court's
21  construction of these two elements of claim one of the '172
22  patent are met; is that correct or not?
23  A   That's correct.
24  Q   So now we've walked through all 12 of the asserted claims
25  with the RIMS plus TV/2 foundation, haven't we?

1  Q    So what are you trying to say with the last element of
2  this slide?
3  A    Well, if these elements are in RIMS alone --
4  Q    Which elements are you talking about now?
5  A    At least two catalogs and collection of catalogs, then
6  RIMS anticipates the asserted claims because RIMS has
7  everything else.
8  Q    So you wouldn't even need to combine it with TV/2 in order
9  to validate the claims; is that what that means?
10 A    (No response.)
11 Q    Is it...
12          MR. McDONALD:  I have no further questions.  Thank
13 you, Dr. Shamos.
14          MR. ROBERTSON:  Your Honor, given the lateness of the
15 day, if I made a representation that if we recessed and I could
16 focus my cross-examination and shorten it considerably and
17 thereby spare everybody more time with me fumbling around,
18 would the Court be willing to entertain such a representation?
19          THE COURT:  Yes, but it's an insufficient one because
20 it hasn't been quantified at all.  And as all Paul Bryant said
21 years ago, that and a nickel will get you a Coke.
22          But I do think that the jury has been here long
23 enough today, and there's no sense in getting started with a
24 couple lines of questions and then letting them go home -- I
25 mean having them go, so we'll let them go home now, have a

SHAMOS - CROSS                         2546

1  A    Yes.
2  Q    And you're aware that the RIMS system starting
3  perhaps in the late '80s all the way up until the year
4  2000 went through many iterations, correct, many
5  different versions?
6  A    Yes.
7  Q    Which version are you relying on when you are
8  rendering your opinions?
9  A    That described in the '989 patent.
10 Q    So it's only confined to the '989 patent, right?
11 You're not relying on and you didn't offer any
12 testimony with respect to any versions that were in
13 commercial use between the late '90s and 1994, for
14 example, right?
15 A    I don't have personal knowledge, but there was
16 testimony that the '989 patent fairly described the
17 actual RIMS system as it was distributed.
18 Q    There was also testimony from the inventors in
19 their deposition that many of the functionalities in
20 the '989 patent were never implemented.  Do you recall
21 reviewing that?
22 A    Yes.
23 Q    So what you're relying on when you offer your
24 opinions, though, is just the '989 patent; isn't that
25 right?

1  it says.
2  Q   So with respect to the evidence you presented,
3  though, did you present anything outside of the '989
4  patent to support your opinions?
5  A   Not in this courtroom.
6  Q   Let's talk about the TV/2 search program for a
7  minute, if we can.  Do you recall talking about that
8  system?
9  A   Yes.
10 Q   In preparing your report, nowhere in your report
11 do you ever indicate that you saw a TV/2 search
12 program in operation, correct?
13 A   Correct.
14 Q   Nowhere in your report did you say that you ever
15 reviewed any TV/2 source code, correct?
16 A   Correct.
17 Q   Nowhere in your report did you indicate that you
18 ever saw any user guides with respect to TV/2?
19 A   Well, it depends on what a user guide is, but I
20 revealed in my report exactly what TV/2 documents I
21 looked at.  Whether you want to characterize the
22 general information manual as a user guide or not is
23 up to you.
24 Q   You never saw any demonstrations of the TV/2,
25 correct?

1  Q    And that would be true on any claim that has this
2  antecedent basis where there is an element that
3  includes a catalog and then there are other claims
4  that would require the antecedent basis of a catalog;
5  isn't that right?
6         MR. McDONALD:  I object to the form, Your
7  Honor.  I think that's confusing.
8         MR. ROBERTSON:  I'll rephrase.  I think it
9  was, too.
10 Q    If there's a requirement of a catalog and then
11 there's a subsequent element that relies on the fact
12 that a catalog is in the claim, it couldn't satisfy
13 that element, right?
14 A    Right.
15 Q    Isn't it true that the TV/2 reference does not
16 disclose or suggest at least two catalogs a generally
17 equivalent item from a different source said
18 requisition module working in combination with said
19 catalog searching module to determine multiple sources
20 for said item?
21 A    I wasn't expecting the question to be that long.
22 Can you repeat that?
23 Q    The TV/2 reference does not disclose or suggest at
24 least two catalogs including a generally equivalent
25 item from a different source said requisition module

```
 1  working in combination with said catalog searching
 2  module to determine multiple sources for an item,
 3  correct?
 4  A    Well, it certainly doesn't have all of that, no.
 5  Q    And the TV/2 reference doesn't disclose or suggest
 6  that the determination system including a cross
 7  reference table matching an identification code from a
 8  first located item with a second identification code
 9  from a second located item, right?
10  A    Right.
11  Q    And you would agree, wouldn't you, that there had
12  to be an interface created between the TV/2 search
13  programs and the RIMS system for an electronic
14  sourcing system; is that right?
15  A    Well, what I agree with is to integrate the two,
16  one would have to create an interface, yes.
17  Q    And you would agree also that additional search
18  capabilities were added to the TV/2 search program for
19  the Fisher electronic sourcing system; isn't that
20  right?
21  A    That's my understanding.
22  Q    Is it your understanding that TV/2 search program
23  could not do Boolean search functionalities when IBM
24  presented it to Fisher-Scientific?
25            MR. McDONALD:  Objection, Your Honor.
```

1  vendor that is not a Fisher vendor, correct?
2  A    Well, of course, they are.
3  Q    Well, it's the distributors who has the product,
4  isn't it?
5  A    No, the distributor is just the intermediary.  The
6  distributor for product type 4, the distributor orders
7  the part or item from whatever is manufacturing it or
8  whoever is vending it.
9  Q    But it's the distributor who actually is selling
10 it, isn't it?
11 A    Well, the distributor buys it from somebody else,
12 and then the distributor sells it to the customer.
13 Q    But that doesn't go through the RIMS system, isn't
14 that right, for 04 type products?
15 A    I don't know what you mean that it doesn't go
16 through the RIMS system.  It goes through the system
17 that's described in the patent.
18 Q    But then the customer service representative has
19 to go out and actually outside of the RIMS system
20 order that product, right?
21 A    Well, that's one way of doing it.
22 Q    Well, isn't that the way it's taught in the
23 patent?
24 A    It's in the preferred embodiment.
25 Q    Human intervention is actually doing it, correct?

1  It's not happening as part of an electronic process?
2  A    There's a flow chart in figure 5.  That flow chart
3  can be implemented electronically.  It can be
4  implemented by computer.
5  Q    But when you go to order that product, you
6  understand, and what's disclosed in the patent you
7  called preferred embodiment, the CSR then goes and
8  actually contacts and obtains that product from the
9  vendor; isn't that right?
10 A    Well, that's one way of doing it, but when the
11 distributor receives an order for a part that he does
12 not have or does not stock, he goes and orders it.  He
13 can order it by having somebody pick up the phone or
14 he can order it through electronic data exchange or
15 whatever other interfaces he may have to its
16 suppliers.
17 Q    And that's not part of the electronic sourcing
18 system that's claimed in the '683 patent, is it?
19 That's all part of an electronic sourcing system, not
20 somebody stopping all of a sudden saying I'm going to
21 pick up the telephone and call a vendor and purchase
22 an item; isn't that right?
23 A    Well, I would agree that for the
24 means-plus-function claims, the means isn't a human
25 being.