# EXHIBIT 2

1    A    Sure.  The -- basically the RIMS system would keep track

2    of the inventory that was in the stockroom.  That inventory

3    could be both customer-owned or Fisher-owned and could keep

4    track of who pulled the product out, and would also -- keeping

5    track of the inventory, also determine if the inventory,

6    specific product had to be restocked.

7         So there was a component of the system that would allow us

8    to, based upon the order point and reorder quantity, would

9    actually reorder and transmit orders to Fisher to refill,

10   refill the stockroom for the products and how much was needed

11   in them.

12   Q    Did you help develop the RIMS system?

13   A    Yes, I did.

14   Q    When did you work on that RIMS system?

15   A    1989 would be probably when we started.  I think we had

16   our first installation around 1981.

17   Q    Did that RIMS system that you've generally described at a

18   high level go through various iterations or versions?

19   A    Oh, sure.  The first version that was put out there really

20   handled -- only handled recording of requisitions without

21   dealing with the inventory management.

22   Q    Let me just stop you there and say, approximately how many

23   iterations or variations did the system go through?

24   A    Dozens if not more than that.  The Fisher RIMS system was

25   in existence from 1991 all the way through until I left in

Momyer - Direct

1    Q    So this just in time has often been referred to as JIT?

2    A    JIT, yes.

3    Q    This ability to replenish product quickly, was that

4    something desirable on Fisher's part in order to service their

5    customers?

6    A    Absolutely.  Once again, it was value both to Fisher as

7    well as their customer.  As a result, I think it created a good

8    relationship, a good business partnership.

9    Q    On Plaintiff's Exhibit Number 10, this patent involving

10   just-in-time requisition and inventory management system, is

11   that something that you -- subject matter associated with this

12   commercial system you were discussing known as RIMS?

13   A    Yes.

14   Q    And I understood you to say that there were multiple

15   variations and iterations of RIMS; is that right?

16   A    That's correct.

17   Q    Are all those variations described in this patent, this

18   '989 patent, Plaintiff's Exhibit Number 10?

19   A    No.

20   Q    Let me just go back.  I should have done this earlier.

21   Are you one of the named inventors on this patent as well?

22   A    Yes, I am, number two.

23   Q    And there's also a Mr. James Johnson named on this '989

24   patent, Plaintiff's Exhibit Number 10; do you see that?

25   A    Yes, I do.

1    Q    Do you know just from memory whether or not Mr. Johnson is

2    also a named inventor on Plaintiff's Exhibit Number 1, 2, and

3    3, the three patents issued in this case?

4    A    Yes, he is.

5    Q    I want to focus a little bit briefly on this RIMS system

6    and its functionality that you were talking to.  You mentioned

7    in the prior non-computerized world where someone would have to

8    pick up the phone and call in, there was a customer service

9    representative or a CSR.

10   A    That's correct.

11   Q    Was the CSR required in this RIMS system you are talking

12   about that Fisher utilized?

13   A    Yes, it was.  The RIMS system was entirely dependent upon

14   an on-site customer service rep to operate.

15   Q    What was the responsibility of that customer service

16   representative or CSR?

17   A    Twofold.  To manage the stockroom, or -- as well as take

18   the requisitions that the customers had for the, primarily for

19   the inventory that was in the stockroom.

20   Q    And what happened if one of the customers needed some

21   just-in-time inventory with this RIMS system?  How would that

22   work?

23   A    The customer would have to contact in some manner the

24   on-site customer service rep, and that contact would be

25   numerous ways.  They could make a phone call from the facility,

1  technical people in utilizing the RIMS system you have

2  been discussing?

3  A   No.  No, it would not have been.

4  Q   Do you know whether or not, if you want to just

5  peruse the document, whether it's actually discussing

6  all the features of the RIMS system?  I can direct you

7  to the page that ends 598, for example.

8  A   Some of them features were in the RIMS system.

9  Many of them were put in various releases of the

10 product.  Some of the features were not actually

11 employed.

12 Q   When you say not actually employed, you mean never

13 employed by the RIMS system?

14 A   No.

15 Q   When you say no, you mean that statement I just

16 made was correct?

17 A   That's correct.  The statement you made is

18 correct.  We never did those.  I think we had some

19 aspirations to do them, but we never pulled them off.

20 Q   So could you just give me an example, if you

21 would?

22 A   Under requisition management features, four down,

23 "Allows flexible remote requisitioning by formatted

24 screen," we really never provide for remote

25 requisitioning in the system.

1  Q    Anything else?

2  A    The third point down in that requisition

3  management features, that's really kind of a bold

4  statement there.  We did not interface all types of

5  purchases.  We did have some interfaces.  As I can

6  recall we had two interfaces that we developed, but it

7  wasn't all types.  So it was somewhat restrictive.

8       Under "Inventory Control Features," if you take a

9  look at "Utilizes customized bar codes and labels to

10 expedite your receiving process," that feature was

11 talked about but never implemented.

12      And then finally under "System Customization

13 Features," we did utilize some file transfers, but we

14 never got to the point we used EDI.

15 Q    Was the RIMS system then, the RIMS system that

16 Fisher created, and I think I understood you to say

17 went through many iterations, was that ever made

18 publicly available, the technical information?

19 A    No.

20 Q    If I wanted to learn more about the RIMS system in

21 the early '90s, would I have been able to do so?

22 A    If you were an employee of Fisher.

23 Q    Was it maintained proprietary and confidential to

24 Fisher?

25 A    Yes.

1   Q    Could anybody obtain copies of the RIMS software

2   in the 1990s?

3   A    No.

4   Q    Did you need a password to get into the RIMS

5   software?

6   A    Yes, you had to log into the system.

7   Q    Were there product manuals associated with the

8   RIMS software?

9   A    There were operating manuals, but they were

10  exclusively for use of the Fisher personnel.

11  Q    Were they maintained proprietary to Fisher and

12  confidential?

13  A    Yes.

14  Q    Could Fisher's customers get copies of those

15  manuals?

16  A    They shouldn't have.

17  Q    Were they identified as being confidential to

18  Fisher?

19  A    Yes.

20       MR. ROBERTSON:  Your Honor, I'm about to get

21  into the electronic sourcing system and problems that

22  were solved.  If I could ask your indulgence, Your

23  Honor, I could seriously use a short biological break.

24       THE COURT:  I think all these people over

25  here have been here for a long time, and they could

1  the requisition purchasing systems, including RIMS,

2  for the ability to have a catalog be able to search

3  multiple catalogs and then move that information into

4  the requisition purchasing system.

5  Q    Are there any other problems that have been

6  identified with these requisition and purchasing

7  systems including RIMS in this section of the patent?

8  A    Yes.  As you look down column 2, maybe line 10,

9  computer systems for searching vendor catalogs are

10 limited, and only one such vendor catalog is

11 accessible to the user at any given time.  They were

12 also limited in they can only create a particular

13 vendor catalog database.

14 Q    You have to go a little slower, Mr. Momyer.

15 A    Sorry.  They were also limited in that they can

16 only create an order within the particular vendor

17 catalog database.  They cannot source items to be

18 requisitioned from a database containing multiple

19 catalogs or interact with the requisition purchasing

20 system or create a purchase order or orders including

21 the items located from the sourcing operation.

22 Q    Now, you discussed this RIMS system throughout out

23 the patent.  Let me ask you to go to column 4 at the

24 top.  Did you indicate to the Patent Office that this

25 RIMS system was necessary to your electronic sourcing

1    Q    What box?

2    A    200.

3    Q    The search program?

4    A    Yes.  250 is the search program.  I'm sorry.  I

5    thought you said what box was it on.

6    Q    Why do you need all four of these functionalities

7    in order to search multiple catalogs?

8    A    Well, the search program in and of itself doesn't

9    really do what we needed to do.  And that's one reason

10   why we needed to develop a shell to control the search

11   program to fulfill the requirements that we needed for

12   searching.

13   Q    Is there a box identified in this figure 1B that

14   illustrates how you have the ability to determine

15   whether an item that you were selecting was available

16   in the vendor's inventory?

17   A    It would be on the 260, work in process

18   requisition.

19   Q    Did the host computer have the ability to provide

20   information with respect to vendor availability?

21   A    Yeah, you would start with a work in progress

22   requisition, go to requisition purchasing program,

23   back up to the host program.  The flow would be work

24   in process, requisition, past the requisition

25   purchasing program and say, Here's a list of programs.

1    The sourcing of the item would occur in 240 and

2    communicate up to the host, 210.

3    Q    If we could just for a moment remove all the color

4    from figure 1B.  And I'd like you to tell us in the

5    development of your electronic sourcing system

6    inventions, which of these boxes had to be created or

7    modified from the existing RIMS system or the TV/2

8    program?

9    A    Okay.  The shell program actually had to be

10   developed.  We had to make some modifications to that.

11   We had no graphical user interface at all for any of

12   the RIMS system or started off as kind of a base code

13   for that.  There was no work in process, obviously,

14   since we weren't pulling anything from a catalog.

15       There were pretty substantial changes to the

16   requisition and purchasing program.  I'm talking about

17   the whole work flow, in that place, as well as

18   handling the multi line, multi P.O. requisition.

19       There would have been changes to the search

20   program.  We had to make a catalog database.  There

21   were changes that were made to that as well.  And

22   complete requisitions would have been different and

23   change would have had to have been made to that.

24       The other area I think we probably should -- the

25   communication between the local computer and the host

1    computer would have been changed as well to allow us

2    to talk to the host, and the format to which we talked

3    to the host would have changed.

4    Q    As far as your invention, you wouldn't need to

5    reinvent what a keyboard was for a computer, did you?

6    A    No.

7    Q    You didn't need to reinvent what a printer was for

8    your invention, correct?

9    A    That's correct.

10   Q    You could use those tools as part of your overall

11   invention, correct?

12   A    That's correct.

13   Q    You didn't need to reinvent the computer in order

14   to do your invention, correct?

15   A    That is correct.

16   Q    Let me direct you, if I could, to figure 1A, which

17   is another embodiment disclosed in the patent.  Are

18   you familiar with this figure?

19   A    Yes.

20   Q    You talked before about this networked environment

21   in figure 1B.  What is being illustrated in figure 1A?

22   A    This is where actually all of the system is

23   running on, well, two levels.  One is at the local

24   computer level.  And the other is at the host level.

25   Q    I'm sorry.  I didn't hear what you said.

1    would acquire the product from another source, a manufacturer,

2    for example; correct?

3    A    Correct.

4    Q    Then they would turn around and then, in effect, resell

5    that product to the Fisher customers; is that how that worked?

6    A    That's correct.

7    Q    So that Fisher catalog had items that were actually made

8    by Fisher as well; correct?

9    A    That's correct.

10   Q    And then products made by somebody else that Fisher

11   resold; right?

12   A    Which is typical distributor operation.

13   Q    Now, did you consider that database at the host in the

14   RIMS system to be multiple catalogs published by vendors?

15   A    No.  It was a single parts table.

16   Q    Okay.  Did you consider it to be a single catalog

17   published by Fisher as a vendor?

18   A    Once again, I didn't, wouldn't consider it a catalog

19   because I have -- in my mind, a catalog involves some larger

20   textual description as well as some image or picture that

21   represents, gives further meaning to the product.

22   Q    It is the reason why you have that description of a

23   catalog in your mind, because that additional information helps

24   people select the products in the catalog to buy?

25   A    That's right.

1    Q    Now, isn't it true that wasn't really a change from the

2    old RIMS system, the idea of generating requisitions in terms

3    of getting to the patents involved in this suit?

4              THE COURT:  Wait a minute.  That question was all

5    right until you add the prepositional phrase that you tacked on

6    at the end, so do it over again.

7              MR. McDONALD:  All right.

8              THE COURT:  Then it became a different issue.

9    Listen, are we going to pay attention to the questions over

10   there, folks, get with it?  Let's go.

11   Q    Mr. Momyer, would you agree that the RIMS system, the old

12   RIMS system that predates the patents here, that could build

13   requisitions?

14   A    For a single source.

15   Q    Well, we'll get to the source issue in a moment, okay, but

16   can just you answer --

17             THE COURT:  The answer is yes for a single source; is

18   that right?

19             THE WITNESS:  Yes.

20   Q    Isn't it true that the RIMS system had in it the data that

21   would relate to products that came from third-party vendors

22   other than Fisher?

23   A    You would always order products through Fisher.  So those

24   third-party products would have been purchased through Fisher.

25   Q    So those third-party products were -- there was a

Momyer - Cross                                              344

1    third-party source for those products that Fisher acquired them

2    from; right?

3    A    Third party being parts that weren't in the Fisher parts

4    master.

5    Q    With that definition, are you agreeing with me then that

6    the RIMS system did allow Fisher to source products from

7    third-party sources?

8    A    No.

9    Q    So where did Fisher get those other products from?

10   A    The RIMS system lodges source from Fisher.  The Fisher

11   host system would determine where you would buy those products

12   from.

13          THE COURT:  You are using the word "you" in your

14   answer.  I understood from your testimony earlier that it was

15   the Fisher customer representative who had access to the

16   catalog.  Is that the "you" you are talking about, or are you

17   talking about some other "you"?

18          THE WITNESS:  I apologize.  I wasn't sure where I

19   used the word "you."

20          THE COURT:  You said you would source it.  I thought

21   -- the customer rep was the one doing the sourcing, wasn't he?

22          THE WITNESS:  Yes.

23          THE COURT:  I would call you.  You are the customer

24   rep.  You say -- I say, I want a beaker.

25          THE WITNESS:  Yes.

1    confused.

2

3              (End of sidebar discussion.)

4

5    Q    Now, is it true -- I'd like to move to the issue of

6    generating purchase orders, Mr. Momyer; all right?

7    A    Okay.

8    Q    Now, in the old RIMS patent, that describes that the local

9    computer in the RIMS system can create purchase orders;

10   correct?

11   A    The local -- no.  The local computer cannot create

12   purchase orders.

13             THE COURT:  In the RIMS patent; is that what the

14   question was?

15             MR. McDONALD:  That's right.

16             THE COURT:  In the RIMS patent or system, the local

17   computer cannot generate purchase orders; is that what you are

18   saying?

19             THE WITNESS:  That's correct.

20   Q    Could you turn now in Exhibit 10, the RIMS '989 patent, to

21   column 17.

22   A    Okay, '989.

23             THE COURT:  What is it, sir?

24             THE WITNESS:  Which exhibit is that?

25             MR. McDONALD:  Exhibit 10.

1          THE COURT:  It's the original RIMS patent on ten, and

2     what page and line and so forth?

3          MR. McDONALD:  Column 17.  I believe that's page 23.

4     If you go to the sentence beginning -- paragraph beginning at

5     line 35 of column 17.  Blow up that paragraph, please.

6          THE COURT:  In either event, Mr. McDonald, is that

7     the paragraph?

8          MR. McDONALD:  Yes.

9          THE COURT:  How far do you want to go?

10          MR. McDONALD:  The full paragraph, to about line 42.

11     Q    It's also up on the screen, Mr. Momyer.  It might be a

12     little bigger print on the screen.

13     A    I see that.

14     Q    Okay.  Now, do you see in the second sentence of the

15     paragraph, as described in the diagram, figures 5A and 5B, for

16     items of product types 01, 03, and 04, local computer 40 uses

17     purchase order build program 112 to create a purchase order

18     between the customer and the distributor from the data in the

19     requisition header and item tables.  Do you see that?

20     A    2A?  Yes, I see that.  It's --

21          THE COURT:  Your only question was, do you see it.

22     You answered that yes, so if you have another question --

23          THE WITNESS:  Okay, sorry.

24     Q    So the local computer would create a purchase order

25     between the customer and the distributor from data; correct?

1    A    No.  It would pass data up to a host program which are

2    figure 2B, number 120 purchase order.  That's what would build

3    the purchase order.

4    Q    So this sentence that I just read made it sound like it's

5    the local computer --

6              THE COURT:  Wait a minute now.  You're not

7    testifying.

8    A    I understand that.  I understand how that reads, but it's

9    a transaction -- purchase order build program initiates the

10   purchase order program.

11   Q    Okay.

12   A    Which is on the host and builds on the host.

13   Q    So we're talking about the RIMS system now; correct?

14   A    Correct.

15   Q    The RIMS system includes both the local computer and a

16   host computer; right?

17   A    The invention does say that, yes.

18   Q    So the RIMS system, as a whole, generates purchase orders;

19   correct?

20             MR. ROBERTSON:  Object to the form of the question,

21   Your Honor.

22             THE COURT:  What do you say?

23             MR. McDONALD:  I think it's a good form.

24             THE COURT:  You all really helped me with that one.

25             MR. ROBERTSON:  Well --

MOMYER - REDIRECT                              393

1   Q    Yes.   The first paragraph.   I'm sorry.   From line

2   26 to looks to be about 31.

3   A    After all of the items for a requisition have been

4   entered, the next step is that of sourcing the

5   requisition.   Sourcing the requisition is the process

6   of determining what inventory will be used to fill the

7   requisition.   Pricing is also performed in this step

8   when it's called for.   Example, except for all product

9   types -- for all product types except for 05 and 06.

10  Q    Except for 05 and 06.   Is that consistent or

11  inconsistent with what you told Mr. McDonald?

12  A    I don't remember what I told Mr. McDonald.

13  Q    That's a fair question.   Is it consistent with

14  your understanding as to how product types 05 and 06,

15  the sourcing could happen except for those two -- let

16  me rephrase that.   That was a horrible question.   Is

17  this section that you read consistent with your

18  understanding as to how the RIMS system operated?

19  A    Yes.

20  Q    Let me direct you to column 18 of the '989 patent

21  in Plaintiff's Exhibit No. 10 starting at about line

22  51 and going down to line 54.   And if you could read

23  that, please, for the jury.

24  A    After the purchase order data block is described

25  in step 338 is transmitted to host computer over the

1   data link described above local computer 40 waits for

2   a response from the host as shown in block 340.

3   Q    What if anything does that have to do with

4   generating P.O. orders, if anything?

5   A    Well, that's the process that RIMS was using to

6   transmit information to the host to the build the

7   P.O.s.  So all of the items that were on a requisition

8   would have been put in a data block along with the

9   affinity of the customer and passed up to the host

10  computer, which would then proceed to build a purchase

11  order.

12  Q    Was it your understanding that the RIMS system

13  operated by having the host generate the purchase

14  order?

15  A    Yes.

16  Q    Can you go to column 31?

17            THE COURT:  Why don't you stop a minute.

18  While we're here, pull the thing up.  You see these

19  after the purchase order data block described in step,

20  and then there's a number 338, and is transmitted to

21  host computer, and then there is the number 10, and it

22  continues, and there are numbers interspersed there.

23  What those numbers are references back to a particular

24  figure that are being talked about.  In this instance

25  there are references back to figure 8.  And it is a

1    A    Yes.

2    Q    Were you involved in that, sir?

3    A    Yes, I was.

4    Q    We'll talk about some of those modifications or

5    changes that needed to happen in a minute, but at a

6    high level can you us tell us, if you can give me a

7    list, say, of some of the things that needed to happen

8    with this TV/2 program that you were personally

9    involved in?

10   A    Well, the first was the ability to have multiple

11   catalogs in the system.  We felt that was a very

12   unique requirement that we had that would enable the

13   end user to select and deselect catalogs to be

14   searched.

15   Q    Can we just run through the list first maybe of

16   everything you might recall that needed to be modified

17   with respect to TV/2, then we'll come back and go at

18   it in a little greater detail?

19   A    The catalogs, there was a footer bar that we

20   needed to provide for easy navigation through the

21   system.  Among the features of the footer bar were

22   creating an order list and being able to view the

23   order list, being able to accept the order.

24        We also needed specialized search functions that

25   would customize the search for electronic commerce,