# EXHIBIT 3

1   Q    Now, I want to turn to the RIMS system, if you could.  Did

2   you review the Johnson '989 patent relating to the RIMS system

3   that's relied upon by Lawson for its invalidity positions?

4   A    Yes, I did.

5   Q    And you indicated that you had reviewed the testimony of

6   the Fisher Scientific inventors relating to the RIMS system?

7   A    I have.

8   Q    Did you review Ms. Eng's trial testimony from the prior

9   trial between ePlus and SAP concerning the work that IBM did

10  for Fisher Scientific?

11  A    Yes.

12  Q    Did you review Ms. Eng's deposition testimony in this

13  case?

14  A    Yes, I did -- deposition testimony, yes.

15  Q    Did you review Mr. Gounaris's 's trial testimony from the

16  prior trial between ePlus and SAP concerning IBM's work for

17  Fisher Scientific?

18  A    I was actually in attendance for both Ms. Eng's and Mr.

19  Gounaris's testimony, so I was there, and I've also reviewed

20  their testimony since.

21  Q    Now, does the description of the system in the '989 patent

22  serve to substantiate the details of any particular commercial

23  version of the Fisher RIMS system that was allegedly publicly

24  used prior to August of 1994?

25  A    According to the testimony of the inventors in their

Hilliard - Direct

1    depositions and in the prior trial, no, it does not.  There are

2    features and functions that are described in the '989 patent

3    that were never implemented into the RIMS system, and there are

4    RIMS system features and functions that were added that were

5    not described in the '989 patent, and that this evolved over

6    time.  There were several versions of RIMS that evolved over a

7    period of time starting prior to 1994 and continuing beyond

8    1994.

9    Q    Did Lawson provide any evidence of any Fisher Scientific

10   customer who had a RIMS system installed having all the

11   features described in the '989 patent?

12   A    No.

13   Q    Let's turn now to the functionality of the RIMS system as

14   described in that '989 patent, and can you just describe at a

15   high level the functionality of that system?

16   A    Yes.  The RIMS system, as described in the '989 patent, is

17   a seller's system.  It's not a buyer's system like the

18   patents-in-suit, so it's operated by a customer service

19   representative who is an employee of Fisher.

20        When it's installed at a Fisher customer, according to the

21   inventors, a Fisher customer service representative operates

22   the Fisher RIMS system and takes requests from buyers who work

23   for the customer and enter it into the system, but -- and then

24   the system determines where the items that that customer wants

25   are.  They could be in a local, what's called just-in-time

1    inventory, they could be at a distributor, the Fisher

2    distributor's inventory, the corporate inventory.  They could

3    be something that Fisher is going to purchase from an outside

4    vendor and then deliver and resell to the buyer.

5        So it creates a requisition, and it completes that

6    transaction, all done by the Fisher CSR, and it delivers the

7    item and manages the inventory.  RIMS stand for requisition and

8    inventory management system, and that's what it is.  It's a

9    requisition and inventory management system that works from the

10   seller's standpoint.  It's a seller's system.

11   Q    Now, so you indicated that the distributor's customer

12   service representative was the user of the RIMS system.  How is

13   that relevant to your analysis as to whether the RIMS system is

14   an electronic sourcing system as required by the system claims

15   at issue here?

16   A    Well, we have a construction that I have referred to and

17   understood as to what an electronic sourcing system is, and

18   it's a buyer's system.

19         MS. ALBERT:  Can we put the juror's glossary of claim

20   terms up on the screen.

21   Q    And if you look about the middle of the page, has the

22   Court construed the term electronic sourcing system?

23   A    Yes, it has.

24   Q    What is the Court's construction of that claim term?

25   A    It's an electronic system for use by a prospective buyer

1    to locate and find items to purchase, to purchase from sources,

2    suppliers, or vendors, and in this case, I believe sources,

3    suppliers, and vendors are synonymous.

4    Q    And how is it relevant to the issue of whether the RIMS

5    system satisfies the claim requirement of an electronic

6    sourcing system, of whether or not the user of the system is

7    the distributor's customer service representative?

8    A    The RIMS system is a seller's system.  It's not for use by

9    the prospective buyer.  It's for use by the Fisher customer

10   service representative or CSR.

11   Q    Could the RIMS system be used to purchase goods from

12   multiple different sources, suppliers, or distributors?

13   A    No.  Only from Fisher.

14   Q    Now, did the RIMS system have a database?

15   A    Yes.

16   Q    Did it have a database with records of items?

17   A    Yes.

18   Q    Do you have an opinion as to whether or not that database

19   constitutes a database with multiple vendor catalogs?

20   A    I do have an opinion, yes.

21   Q    What is your opinion?

22   A    It does not.

23   Q    Why not?

24   A    It is not -- the items have no vendor or source

25   association with them as a catalog item would, because all of

1   ultimately sell to the buyer, but it is not where the customer

2   buys the item.

3   Q    Was there any way to select product catalogs to search

4   within the RIMS system?

5   A    Well, the RIMS system doesn't have catalogs, but even if

6   you were to construe its parts master to be a catalog, and I

7   wouldn't construe it that way because it doesn't have -- the

8   items aren't related to vendors, but even if you were to

9   construe it that way, it would only have one, so you can't

10  select which one you want from multiple, because it would only

11  have one.

12  Q    Did the RIMS system include a search program?

13  A    No.

14  Q    Is the presence or absence of a search program relevant to

15  any claims at issue here?

16  A    Several of the claims.

17          MS. ALBERT:  Mike, could we see the jurors' claim

18  term glossary at page four.

19  Q    In the middle of that glossary, there's a claim element,

20  means for searching for matching items among the selected

21  product catalogs; do you see that?

22  A    I do.

23  Q    And what structures has the Court defined would satisfy

24  that claim limitation?

25  A    Well, it says the materials X of this element are

Hilliard - Direct                                                    2682

1    disclosed as search programs and modules operating on a

2    computer system with access to the given database and their

3    equivalents, and then it cites the columns and rows within the

4    patent where those corresponding structures, materials, or acts

5    are referenced.

6    Q    So if the RIMS system as described in the '989 patent does

7    not have a search program, would that system satisfy this claim

8    requirement?

9    A    It would -- for that reason alone, it wouldn't satisfy the

10   claim element.  It also wouldn't because it can't search among

11   selected catalogs because you can't select a catalog.

12   Q    And this particular claim element, what claim is it

13   relevant to?

14   A    '683, claim three.

15        MS. ALBERT:  And, Mike, if we can continue to look

16   down further on the claim glossary, down below that, there's

17   another element, means for searching for matching items that

18   match the entered product information in the selected portions

19   of the database, and that element comes from the '172 patent,

20   claim one.

21   Q    Do you see that, Mr. Hilliard?

22   A    I do.

23   Q    What structures has the Court defined as being required in

24   order to satisfy this claim requirement?

25   A    Once again, there's reference to the columns and rows

1    within the '172 patent that identify the specific corresponding

2    structures, materials, or acts.

3    Q    And what is the text of the Court's definition there?

4    A    The corresponding structures, materials, or acts of this

5    element is disclosed as search programs and modules operating

6    on a computer system with access to data in a database or other

7    file system and their equivalents.  And as I say, it refers to

8    the specific places within the '172.

9    Q    So if the RIMS patent as described in the '989 patent does

10   not have any description of a search program, would that system

11   in the '989 patent satisfy this claim requirement?

12   A    No.

13   Q    Could the RIMS system at the customer's facility build a

14   requisition from data relating to selected matching items found

15   in conducting searches of vendor catalogs and their associated

16   sources?

17   A    No, it can't do that for a number of reasons.  There are

18   no catalogs, you can't select a catalog, you can't search --

19   without a search, there are no matching items and so forth.

20            THE COURT:  Ms. Albert, how much longer do you have

21   with this witness?

22            MS. ALBERT:  I probably have another area.

23            THE COURT:  Well, I think probably we ought to take

24   lunch.  Their lunches are here, so take your notebooks with

25   you, please.

HILLIARD - DIRECT                    2686

1  A    This is a requisition screen from the RIMS system.

2  Q    I'm sorry.  Go ahead.

3  A    It shows the account number, which is a

4  department, and line items.

5  Q    Now, do the line items that are listed in that

6  requisition include information relating to the

7  sources from which the item are to be procured?

8  A    No, there's no source information.  There's only

9  one source in the Fisher RIMS system.

10 Q    Why didn't the requisition built by the RIMS

11 system need to include vendor information?

12 A    There's only one vendor.

13 Q    Does the electronic sourcing system of the ePlus

14 patents require that the requisition line items have

15 associated source or vendor information?

16 A    Yes.

17 Q    Why is that necessary?

18 A    Well, because in the patents-in-suit they call for

19 the ability of the buyer to go through catalogs and to

20 select the sources from which he or she wants to buy.

21 And so the requisition needs to reflect the sources

22 that are selected or vendors - source and vendor I'm

23 using interchangeably - that the buyer has selected.

24 Q    Then does the system take that requisition and

25 need to be able to generate purchase orders using the

HILLIARD - DIRECT                    2687

1   data in that requisition?

2   A    Yes.  The '683 patent, Claim Three, and many of

3   the other claims all talk about generating multiple

4   purchase orders from the requisition, and the reason

5   for multiple purchase orders is that the individual

6   line items in the requisition are each associated with

7   vendors, and you have to have a separate purchase

8   order for reach vendor.

9   Q    So is it necessary to the functionality of being

10  able to process that requisition to generate purchase

11  orders, is it necessary to have requisitions with

12  associated vendor information?

13  A    Yes, otherwise you wouldn't know what vendors to

14  issue the purchase orders to.  Or the system wouldn't

15  know, pardon me.

16  Q    Did the RIMS system generate a purchase order from

17  a requisition?

18  A    The RIMS system generated a purchase order block

19  at the RIMS system, which is the on-site system

20  operated by the Fisher customer service rep or CSR,

21  and that purchase order block then went to the Fisher

22  warehouse where a purchase order could conceivably be

23  generated, but it would be generated with manual

24  intervention.

25  Q    Can we look at some figures in the '989 patent

1   that concern this purchase order functionality?  And

2   if we could look at DX 7 at figure 5A.

3        Can you explain, Mr. Hilliard, what happens in the

4   system after the CSR accepts the requisition and when

5   you reach the decision block labeled 332 there?

6   A    Yes.  Can we blow up this section?  Yes, a

7   decision block shows that -- the diamond refers to a

8   decision.  So there's a question as to whether the

9   item on the requisition is of type 1, 3 or 4.

10            MR. McDONALD:  Your Honor, I object.  This is

11  outside the scope of Mr. Hilliard's report.

12            MS. ALBERT:  Your Honor --

13            THE COURT:  I don't have Mr. Hilliard's

14  report here.  Does somebody have it for me so I can

15  see where it is?

16            MS. ALBERT:  Your Honor, Mr. Hilliard was

17  questioned at length about this figure in the course

18  of his deposition, and we have a stipulation with Mr.

19  McDonald that the experts can testify concerning

20  opinions that were elicited from them in the course of

21  the deposition.

22            MR. McDONALD:  We have talked about that.

23  That's not the case.  That was for the initial --

24            THE COURT:  I didn't hear you.  Talk about it

25  and what?  We have talked about it and what?

HILLIARD - DIRECT                    2693

1  to figure 5A.

2          THE COURT:  Figure 5A is the one he's

3  testifying about?

4          MS. ALBERT:  That's correct, Your Honor.

5          THE COURT:  Well --

6          MR. McDONALD:  That's actual in figure 5B,

7  Your Honor.

8          THE COURT:  Ms. Albert, is it 5A or 5B?

9          MS. ALBERT:  I think 5B is a continuation of

10  figure 5A.  These specific quotations might be.

11          THE COURT:  All right.  Anything else?

12          MS. ALBERT:  That's all I connote at this

13  current time.

14          THE COURT:  This is the hour of decision.

15          All right.  Anything else, Mr. McDonald?

16          MR. McDONALD:  No, Your Honor.

17          THE COURT:  It looks to me like in paragraphs

18  81 through 83 and in 72, he is covering in fair detail

19  the very topic he's addressing now.  And while he may

20  not have cited a specific figure in his report, he's

21  doing everything but citing the figure in his report.

22  So I overrule the objection to the testimony.

23          MS. ALBERT:  Thank you, Your Honor.

24  BY MS. ALBERT:

25  Q   So I think the pending question was could you

1    explain what happens in the RIMS system after the CSR

2    accepts a requisition and at the point where you reach

3    the decision block 332?

4    A    Yes.  The diamond-shaped block indicates that

5    there's a logic decision that's made by the Fisher

6    RIMS system to determine whether the item that's being

7    requisitioned is a type 1 item, which is a

8    distributor-owned item that's located at the Just In

9    Time location at the customer's site, a type 3 item,

10   which is a distributor-owned item that's located at

11   the warehouse, or a type 4 item, which is an item that

12   the distributor buys and resells to the customer.

13       If so, the system creates a purchase order data

14   block, as I mentioned in response to your prior

15   question, over here on the right.  And if not, the

16   system generates what's called a customer internal

17   P.O., although that internal P.O. is really not a

18   purchase order.  It's a material transfer request.

19   Q    What's the difference between a material transfer

20   request and a purchase order?

21   A    In a purchase order something is going to be

22   purchased as is the case with the type 1, 3 or 4.  The

23   other types that are active are the 5 and 6.  Five

24   being an item that's not handled by the system and 6

25   being a -- so I'm going to ignore 5 for a moment.  Six

1   being a customer-owed item that's located at the Just

2   In Time warehouse at the customer's location.

3        Now, in the case of that type 6, since it's a

4   customer-owned item, there is no purchase.  The

5   customer doesn't need to purchase that item because

6   the customer already owns that item.  So this is

7   really a material transfer, not a purchase.  Although,

8   there's a reason, I believe, why it's called that in

9   this patent.

10  Q    Does this diagram show the RIMS system generating

11  multiple purchase orders from a single requisition?

12  A    No, it does not.  It shows on the right-hand side

13  a purchase order block, which is sent to the host

14  system, and the left-hand side the initiation of

15  basically a material transfer that transfers the

16  customer's own inventory from one department to

17  another.  No purchase or sale occurs.

18  Q    Now, I want to turn to the converting

19  functionality that's required by some of the claims.

20  Is there any description in the '989 patent of using

21  the RIMS system to convert a selected matching item

22  associated with one vendor to another item from a

23  different vendor by means of cross referencing

24  functionality?

25  A    No, there isn't.

1  Q   What about the cross reference tables at the

2  Fisher mainframe computer.  Would those satisfy the

3  claim requirements?

4  A   No, they don't.  The cross reference tables are

5  basically a table that's in there for the purpose of

6  allowing Fisher to supply a Fisher item in place of an

7  item that has a competitor's product number.  There's

8  no alternative vendor.  The only vendor to the

9  customer is Fisher.  So you can't -- the system

10  doesn't provide for the conversion of an item from one

11  vendor to another vendor because -- to include the

12  item of another vendor because it's all one vendor.

13         MS. ALBERT:  Mike, could we take a look at

14  Claim Three of the '683 patent?

15  Q   You see at the bottom there there's this claim

16  element means for converting data relating to a

17  selected matching item and an associated source to

18  data relating to an item in a different source?  Do

19  you see that?

20  A   Yes.

21  Q   Has the Court construed the meaning of the term

22  "selected matching item"?

23  A   Yes, it has.

24  Q   Do you know what that construction is?

25  A   A selected matching item is an item that is the

HILLIARD - DIRECT                     2697

1    result of -- that's found as a result of a search,

2    something that the patent refers to as a hit.

3            MR. McDONALD:  Your Honor, I object.  The

4    Court has defined the term "matching item," and you

5    did want use the word "hit."

6    Q   Why don't we look at the Court's construction.

7            MS. ALBERT:  I want to go back, Mike, to the

8    first page, and I want to blow up the second to the

9    last item there; selected matching items.

10   Q   What's the Court's construction for selected

11   matching items?

12   A   These are requisition items.

13   Q   So could we go back to Claim Three for a moment,

14   please?  So with respect to this means for converting

15   data requirement, does that relate to requisition

16   items and an associated source?

17   A   No, there's no associated source.  There's only

18   one source.  There's only one vendor.  And there's no

19   different source because, once again, there's only one

20   vendor.

21   Q   So would the RIMS system satisfy that claim

22   requirement?

23   A   No.

24   Q   We saw earlier the requisitions that are actually

25   built by the RIMS system.  Did those requisitions

HILLIARD - DIRECT                    2710

1    these items fit that characterization.

2    Q    Have you reviewed any evidence that would

3    substantiate whether or not IBM had ever had a

4    commercial version of the TV/2 search program prior to

5    IBM's work with the inventors on the electronic

6    sourcing system project?

7    A    There was no evidence at all to that effect.

8    Q    Now, can you describe at a high level the nature

9    of this Technical Viewer/2 search program?

10   A    Yes.  It's a piece of software that allows the

11   user or buyer to search through electronic information

12   to find information that's included in that electronic

13   document and to view the items that were found as a

14   result of the search.

15   Q    Was TV/2 an electronic sourcing system?

16   A    No.

17   Q    Why not?

18   A    It doesn't have any of the characteristics of an

19   electronic sourcing system.  There's no -- well, can

20   we put up the construction?

21   Q    Well, sure.

22        MS. ALBERT:  Can we look at the glossary of

23   claim terms.  Blow up that middle one, electronic

24   sourcing system.

25   Q    So what characteristics are missing from the TV/2

1   program that are required in order to constitute an

2   electronic sourcing system?

3   A    An ability to complete the process described in

4   that description.  You can find items, but there is no

5   purchasing capability from sources, suppliers or

6   vendors.  There's nothing relating to sources,

7   suppliers or vendors at all in the TV/2 system.

8   Q    Did the TV/2 program prior to 1994 include any

9   product catalogs in its database?

10  A    No, it didn't come with a database.

11  Q    Did TV/2 prior to August of 1994 have multiple

12  product catalogs?

13  A    No.

14  Q    Was there any capability using TV/2 to search for

15  items and build a requisition using those search

16  results?

17  A    No, there's no requisition logic in TV/2 at all.

18  It's simply a search and display engine.

19  Q    Could we take a look at DX 107, and the Bates

20  number on the page I would like to refer you to is

21  G33.

22         MS. ALBERT:  Could we blow up the left-hand

23  column there?

24  Q    Under some of the possibilities, we see some

25  potential uses include -- and about three bullet

HILLIARD - DIRECT                2712

1    points down there's a reference to integrating parts

2    catalogs with dealers' computer systems such as order

3    entry, inventory management and customer records.

4    Does that describe how to use search results to build

5    a parts list which could be sent to a parts ordering

6    system?

7    A    No, it just says this is a possibility and a

8    potential use.  It doesn't say that the TV/2 system

9    has this capability, and, in fact, it didn't have that

10   capability.

11   Q    Do you have a slide illustrating the deficiencies

12   of the TV/2 program as related to the requirements of

13   the ePlus patent claims?

14   A    Yes.

15            MS. ALBERT:  Could we take a look at slide 75

16   in slide deck 93?

17   Q    Could you summarize your analysis of the

18   deficiencies of the TV/2 program as applied to the

19   claims?

20   A    Yes.  It's not a corresponding system as we have

21   just discussed.  It's simply a search program.  It

22   does not have multiple product catalogs.  It doesn't

23   even have one product catalog.  It has no requisition

24   capability and no ability to generate purchase orders.

25   Q    Now, was TV/2 modified in order to be integrated

1    into the electronic sourcing system of

2    Fisher-Scientific?

3    A    Yes.  Fisher engaged IBM to undertake a project to

4    modify TV/2 to work with software Fisher was

5    developing that ultimately became something called

6    Supplylink or Cornerstone.  And that involved

7    significant modifications to TV/2, which both

8    Mr. Gounaris and Ms. Eng described in their deposition

9    testimony and in their trial testimony in the *SAP*

10   trial.

11   Q    Now, I would like to turn to your opinions with

12   respect to each of the asserted claims and Lawson's

13   contentions regarding the RIMS system as disclosed in

14   the '989 patent and the combination of the RIMS system

15   in the '989 patent and the TV/2 search engine.

16        Have you prepared some slides -- well, have you

17   prepared a slide that summarizes some of your opinions

18   with respect to the combination of the RIMS and TV/2

19   systems?

20   A    Yes.

21   Q    Will you take a look at slide 107 in slide deck

22   93?  So can you summarize your opinions with regard to

23   the deficiencies in the combination of the RIMS and

24   TV/2 programs as related to the requirements of the

25   patent claims?

1  A    Yes, I've tried to take requirements -- in most

2  cases, these requirements relate to multiple claims,

3  but neither system was an electronic sourcing system.

4  Neither system had multiple product catalogs.  In

5  fact, it would be my opinion that neither system had

6  even a single product catalog.

7      Neither system had a means for selecting product

8  catalogs to search.  Neither system had a means for

9  generating an order list that includes at least one

10 matching item selected by said means for searching

11 since there was no means for searching product

12 catalogs.

13     Neither system built requisitions using data

14 related to selected matching items and their

15 associated sources.

16     Neither system generated purchase orders from the

17 requisitions that used selected matching items and

18 their associated sources.

19     Neither system had the ability to determine

20 whether a selected matching item was available in the

21 inventory of the catalog vendor from whom the buyer

22 wanted to purchase.

23     Neither system had the capability to convert data

24 relating to a selected matching item from one source

25 to a comparable or equivalent selected matching item

1    and a different source since the TV/2 system had no

2    sources at all, and the only source in the RIMS system

3    was Fisher itself.

4    Q   Now, you mentioned these modifications that were

5    made during the electronic sourcing system project.

6    What modifications do you understand had to be made to

7    the prior RIMS system as it existed prior to the work

8    on this electronic sourcing system project to render

9    it useful and to have the functionality required by

10   the electronic sourcing system of the patent?

11   A   Well, I've relied on the deposition testimony of

12   the inventors who were involved in the project.   And

13   the description that they gave of what had to be done

14   I wouldn't even call modifications.

15       They, essentially, tore the RIMS system limb from

16   limb and reused some code, but, essentially, it was a

17   whole new development.   They had to develop -- since

18   the RIMS system was a seller oriented system --

19           MR. McDONALD:   I object.   I think we're very

20   vague here as to the timing of whether any of these

21   changes even relate to the claims in the case.   I

22   think it's irrelevant.

23           MS. ALBERT:   I think my question specifically

24   said the RIMS system as it existed prior to the

25   inventors' work on the electronic sourcing system of