IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division



ePLUS, INC.

    Plaintiff,

v.                                                    Civil No. 3:09cv620

LAWSON SOFTWARE, INC.,

    Defendant.

## MEMORANDUM OPINION

This matter is before the Court on DEFENDANT LAWSON
SOFTWARE, INC.'S MOTION *IN LIMINE* NO. 3 TO PRECLUDE DR. RUSSELL
W. MANGUM III FROM TESTIFYING AT TRIAL (Docket No. 257). For
the reasons set forth on the record on August 10, 2010,[1] as
further explicated by this Memorandum Opinion, the motion was
granted and Dr. Mangum was precluded from testifying at trial.

## BACKGROUND

This action filed by ePlus, Inc. ("ePlus") against Lawson
Software, Inc. ("Lawson") seeks damages for patent infringement
and an injunction against further infringement. To prove
damages, ePlus proffered the testimony of Dr. Russell W. Mangum

---

[1] At that time, the trial of the case was set for September 13,
2010, and, therefore, the Court thought it appropriate to inform
the parties of the decision so they could better prepare for the
Final Pretrial Conference which was set for August 16, 2010.
This memorandum supplements the oral decision given on August
10, 2010.

III in support of a claim for reasonable royalties. Following the filing of all expert reports and the deposing of the experts, Lawson filed this motion seeking to preclude Dr. Mangum from testifying at trial.

The text of the motion seeks preclusion only on the theory that Dr. Mangum's opinion is based on irrelevant settlement agreements. The supporting memorandum seeks preclusion for the additional reason that Dr. Mangum's opinion "is based on assumptions and guesswork rather than the reliable, scientific analysis required by the Federal Rules of Evidence and Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993)." In reply to the opposition filed by ePlus and the positions asserted therein, Lawson also challenged the report and testimony of Dr. Mangum on the related ground that he "relies on an over-inclusive royalty base and his proposed royalty rate is unsupported even by the irrelevant license agreements he relies on." After briefing was concluded and oral argument heard, the Court indicated that it was inclined to grant the motion. At ePlus' request, the Court heard additional argument on August 10, 2010 at which time the motion was granted. An Order to that effect (Docket No. 410) was entered on August 11, 2010.

Dr. Mangum's proffered damages testimony was addressed to the appropriate reasonable royalty rate for Lawson's alleged infringement on the three patents-in-suit. Dr. Mangum's

2

methodology for arriving at an appropriate royalty rate began with the establishment of a baseline royalty rate. Thereafter, Dr. Mangum opined that a reasonable royalty rate for each of the three patents-in-suit would be "in the range of 5% to 6% of net revenues" derived from Lawson's sale of the accused products and of services related thereto. Dr. Mangum concluded that Lawson's sale of accused products and the related services from November 1, 2003 to September 30, 2010 were estimated to be $401,358,040. He then applied a 5% royalty rate to those sales and calculated that, at that rate, the total royalties would be approximately $20,670,902 (increasing to $24,764,685 with prejudgment interest). At the 6% royalty rate, the calculated reasonable royalties were thought by Dr. Mangum to be approximately $24,081,482 (increasing to $29,717,623 with prejudgment interest).

Dr. Mangum's analysis purported to follow the structure established by Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116 (S.D.N.Y. 1970) and, indeed, the report was outlined with those factors as topic headings. The report began with Georgia-Pacific Factor 15 which is the hypothetical negotiation. In essence, Factor 15 requires arriving at royalty that a licensor and a licensee would have agreed upon at the time infringement began if both had been reasonably and voluntarily trying to reach a settlement. In sum, a royalty, to

3

be reasonable, should approximate that which hypothetically could have been agreed upon under that scenario. In this case, according to Dr. Mangum, the negotiation would have occurred in the weeks or months before the first infringement, "concluding just prior to May 2002."

Dr. Mangum used Georgia-Pacific Factor 1 as the basis for determining the baseline royalty rate that would have been produced as the result of the hypothetical negotiation. Georgia-Pacific Factor 1 is: the royalties received by the patentee for the licensing of the patent-in-suit as proving or intending to prove an established royalty.[2] Dr. Mangum identified five instances in which the patents-in-suit, collectively, were licensed. Each of those licenses were made pursuant to settlement agreements that ensued the commencement, or conclusion, of patent infringement suits filed by ePlus.

Three of those settlements, the Verian settlement, the SciQuest settlement and the Perfect Commerce settlement, occurred very shortly after the patent litigation began. Verian paid ePlus $500,000 plus a 2.5% running royalty on all sales covered by the patents-in-suit in excess of $15 million within a calendar year. SciQuest agreed to pay ePlus $2.4 million, and

---

[2]     This opinion uses the articulation of the Georgia-Pacific factors given by Dr. Mangum in his report, rather than citing directly to the Georgia-Pacific decision.     Neither party contends that Dr. Mangum misstated the factors.

Perfect Commerce agreed to pay a lump sum payment of $750,000.
Dr. Mangum did not include these licenses in analyzing Factor 1
to find the royalty rate that would have come from the
hypothetical negotiation. That, according to Dr. Mangum, was
because those cases were all settled very shortly after the
commencement of litigation and before any discovery had occurred
which, according to Dr. Mangum, precluded ePlus from obtaining
"information that would allow it to form an understanding as to
the amount of accused revenue for any of these three parties."
Dr. Mangum then opined that:

> [a]s a result, the terms of the agreements
> [with Verian, SciQuest and Perfect Commerce]
> do not represent a complete valuation of the
> specific use of the patents-in-suit, but
> rather were based on the avoidance of
> litigation. In addition, the terms in the
> Verian, SciQuest and Perfect Commerce
> agreements do not provide sufficient
> information for determining the royalty that
> would result from an arm's length
> (hypothetical) negotiations between a
> willing licensor and a willing licensee.

At most, according to Dr. Mangum, those agreements provided
evidence of willingness by ePlus and others to enter into fixed
payment and running royalty license agreements relating to the
patents-in-suit.

Thus, the core of Dr. Mangum's analysis became the
settlement agreements reached in two litigated cases, the so-
called Ariba and SAP agreements. The Ariba agreement was

reached after a jury returned a verdict of infringement.   Ariba
agreed to pay $37 million in three different installments for a
paid up license for all three ePlus patents.   Ariba also agreed
to cross-license ePlus on all Ariba patents.   The SAP agreement
occurred after a hung jury mistrial was declared.   SAP agreed to
a one time payment of $17.5 million.   In return, ePlus granted
SAP rights to all of its U.S. and foreign patents, and SAP
agreed to not to pursue ePlus for infringement of any SAP patent
as of the date of the agreement or any patent acquired within
five years after the date of the agreement.

Dr. Mangum then converted these lump sum payments by Ariba
and SAP into a running royalty rate by using an expert report
from the SAP litigation that was based on Ariba's sales, past
and projected.   The record shows that Dr. Mangum simply adopted
the figures from the expert in SAP as part of his opinion.
Thereafter, Dr. Mangum used the expert report from the SAP
litigation as to Ariba's 2003 sales figure as an assumed basis
for projecting future Ariba sales income, annually from 2005
through 2017, without explaining why it was appropriate to do
so.   He then applied compounding and discount factors, and
established a present value cash flow.   Then, Dr. Mangum
converted the result into four different effective running
royalty rates based on four different assumptions respecting the
remaining effective life of the technology.   Depending on the

6

life of the technology, those running royalty rates ranged from a low of 3.0% to a high of 8.3%. Dr. Mangum then set aside the extremes (3.0% and 8.3%) leaving a range of 3.3% to 4.2%, with a mid point of 3.8%.

He followed the same methodology as to the SAP agreement and concluded that the effective running royalty rates that could be converted from the lump sum payment required by the SAP agreement would range from a low of 1.8% to a high of 3.2%. Again setting aside the extremes (1.8% and 3.2%), Dr. Mangum concluded that the range of running royalty rates would be 2.0% to 2.4%, with a mid point of 2.2%.

Because Dr. Mangum concluded that the Ariba settlement involved a contribution of its intellectual property rights and occurred in circumstances in which Ariba was paying the maximum it could afford to pay without declaring bankruptcy, Dr. Mangum concluded that the running royalty rates he had calculated for the Ariba lump sum payments understated, in an unarticulated quantum, the amounts that would be reached in a hypothetical negotiation between ePlus and Lawson. Dr. Mangum also explained that the SAP agreement involved situations different from the hypothetical agreement to a larger extent than did the Ariba agreement. First, he considered that SAP, contrary to Ariba, had not been found liable of infringement, there having been a hung jury in the case. That, in turn, meant to him that SAP's

claims of patent noninfringement and invalidity were unadjudicated, unlike in Ariba where the jury had returned a verdict in favor of ePlus. Dr. Mangum also noted that SAP had filed for re-examination of one of the patents-in-suit. Finally, he concluded that, because of those (and other differences which the Court finds difficult to understand), the amount that SAP had paid to ePlus for the agreement was not as "closely tied to the patents-in-suit as the Ariba agreement, and should be given less weight." However, Dr. Mangum did not express the quantum of that lesser weight. He did find that, the running royalty rates that he had calculated "likely underestimate the net value attributable just to the patents-in-suit" because SAP had given expensive patent rights to ePlus as part of the settlement.

Dr. Mangum then turned to a discussion of the other Georgia-Pacific factors as the basis for increasing the royalty rate produced by the hypothetical negotiation from a range of 2.2% to 3.8% to 5% to 6%.

Dr. Mangum discounted Georgia-Pacific Factor No. 2 (the rates paid by the licensee for the use of other patents comparable to the patents-in-suit) because there were none. He then concluded that Georgia-Pacific Factor Nos. 3, 4, 7 and 14 were neutral in the calculation of royalty rates. In other

words, those factors neither increased nor decreased the rate that came out of the hypothetical negotiation.

Dr. Mangum next purported to articulate the effects of Georgia-Pacific Factor Nos. 5, 6 and 8 through 13. For each of those factors, Dr. Mangum's analysis concluded with phrases such as "evaluation of this factor [5] indicates a higher royalty rate."[3] In no instance, did Dr. Mangum's evaluation purport to indicate the extent to which those factors (Georgia-Pacific Factor Nos. 5, 6 and 8 through 13) would increase the royalty rate that he had arrived at by converting the Ariba and SAP lump sum payments into a running royalty which he used as the baseline royalty rate for his opinion. Instead, Dr. Mangum opined only "that the reasonable royalty applicable to Lawson's use of the patented technology falls in the range of 5% to 6%." In so doing, he expressed the view that Georgia-Pacific Factor Nos. 5, 6 and 8 through 13 somehow operated to increase the royalty calculation range from 2.2% to 3.8% to a range of 5% to 6%, thereby, in effect, virtually doubling the royalty rate.

---

[3] Likewise, Dr. Mangum determined that evaluation of Factor 6 and Factor 8, analyzed separately, "indicates a higher royalty rate," while evaluation of Factors 9, 10, and 11, discussed together, "suggests a higher royalty rate." Finally, Dr. Mangum concluded that evaluation of Factors 12 and 13, discussed together, "suggests a higher royalty rate, other things being equal."

9

## DISCUSSION

Federal Rule of Evidence 702 permits the testimony of experts on a variety of subjects, including damage evidence if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is a product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case." These conditions are the codification of concepts announced in Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993). Daubert established clearly that a trial judge has the obligation to ensure that expert evidence is relevant and reliable before it is tendered to a jury. The relevance requirement is grounded in that part of FRE 702 which requires that expert evidence must "assist the trier of fact to understand the evidence or to determine a fact in issue." In Daubert, the Court also explained that "'an additional consideration under Rule 702 – and another aspect of relevancy – is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" Daubert, 509 U.S. at 591 (quoting United States v. Downing, 753 F.2d 1224, 1242 (3d Cir. 1985)) (emphasis added). That consideration commonly is referred to as "fit." Id.

Daubert also established the need for expert testimony to be reliable, outlining several steps to aid in that inquiry

where the testimony was scientific in nature. The reliability component is grounded in that part of FRE 702 requiring an expert's testimony to pertain to scientific, technical or specialized knowledge.

The Court made clear that, in exercising the gatekeeping responsibility, a trial court must focus on the principles and methodology used by the expert, not on the validity of the expert's conclusions. Id. at 595. And, it is also essential that, in exercising the gatekeeping duty, the trial court must remain mindful of other applicable rules of evidence including, FRE 403. In sum, keeping in mind all of the rules of evidence, it is the trial judge's responsibility to ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Id. at 597.

Six years after deciding Daubert, the Supreme Court once again confronted the issue of the gatekeeping function in Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999). In Kumho, the Court determined that the basic principles of Daubert apply to all expert testimony whether it is scientific in nature, technical in nature or based on other specialized knowledge. Kumho, 526 U.S. at 148.

Further, in Kumho, the Court, quoting its decision in General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997), reiterated that "'nothing in either Daubert or the Federal Rules

of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.'" Id. at 157. *Ipse dixit* is defined to mean: "he himself said it" or "she herself said it" or "something asserted but not proved" Black's Law, New Pocket Edition, 1996; "he himself said it" or "an assertion without proof;" Dictionary.com; and "an unproven assertion resting on the bare authority of some speaker;" or a "dogmatic statement," Oxford English Dictionary.

The reason which underpins the well-known prohibition against *ipse dixit* testimony by experts is, of course, that "conclusions and methodology are not entirely distinct from one another." Joiner, 522 U.S. at 146. As the Court, in Joiner, made clear, the prohibition against allowing *ipse* dixit testimony by experts merely clarifies that the district court's broad discretion includes the discretion to find that there is "'simply too great an analytical gap between the data and the opinion proffered.'" Pugh v. Louisville Ladder, Inc., 361 F. App'x 448, 454 n.4 (4th Cir. 2010) (quoting Joiner, 522 U.S. at 146); Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 202 (4th Cir. 2001); Westfield Ins. Co. v. Harris, 134 F.3d 608, 613 (4th

Cir. 1998); <u>Phelan v. Synthes (U.S.A.)</u>, 35 F. App'x 102, 107 (4th Cir. 2002).[4]

The framework for analysis of Lawson's motion, therefore, is provided by FRE 702 and the decisions of the Supreme Court in <u>Daubert</u>, <u>Joiner</u>, and <u>Kumho</u>. Application of those principles to the facts of this case require that Dr. Mangum's testimony be excluded.

First, Dr. Mangum's reasonable royalty calculation is predicated upon license agreements that are contained in settlement agreements that ensued litigation. At one time, it was the rule that settlement agreements simply could not be considered at all in the reasonable royalty calculus. <u>Rude v. Westcott</u>, 130 U.S. 152, 164 (1889) ("It is clear that a payment of any sum in settlement of a claim for an alleged infringement cannot be taken as a standard to measure the value of the improvements patented, in determining the damages sustained by the owners of the patent in other cases of infringement."). It is now, however, well-settled that settlement agreements entered into in the context of litigation may be considered, but that they have minimal probative value respecting the calculation of reasonable royalties. <u>See</u> <u>e.g.</u> <u>ResQNet.com, Inc. v. Lansa, Inc.</u>, 594 F.3d 860, 872 (Fed. Cir. 2010).

---

[4] The prohibition does not shift the focus of the <u>Daubert</u> test to expert's conclusions. <u>Id.</u>

The minimal probative value that can be attributable to settlement agreements that ensue litigation is even less where, as here, the settlement agreements occurred years after the hypothetical negotiation called for by Georgia-Pacific analysis would have occurred. Moreover, in this case, the two settlement agreements used by Dr. Mangum call for lump sum payments and they include extensive cross-licensing agreements respecting numerous patents. Thus, they differ considerably from the factual predicates present here where the hypothetical negotiation does not involve a lump sum payment or cross-licensing of a wide variety of patents. The disparity of circumstances between the settlement agreement lump sum licenses and the hypothetical negotiation for a running royalty and the temporal differences make it difficult to find that the "fit" component is met. And, that further diminishes the relevance of using the Ariba and SAP settlements as the linchpin for the baseline royalty.

It also is settled that lump sum settlement agreements have minimal, if any, probative value in establishing a reasonable running royalty. Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1329-30 (Fed. Cir. 2009); see Wordtech Sys., Inc. v. Integrated Network Solutions, Inc., 609 F.3d 1308, 1319-20 (Fed. Cir. 2010). Even when a lump sum royalty agreement can be extrapolated to suggest a reasonable running royalty, the

methodology must itself be sound and not speculative and not far removed from the facts of the case as it is here.

Second, Dr. Mangum's royalty base is calculated by using sales figures extracted from an expert report filed in previous litigation, in particular, the SAP and Ariba litigations. Those figures are then used to extrapolate the base for a running royalty rate calculated using the lump sum payments in Ariba and SAP. Thus, it is difficult to perceive a "fit" between a hypothetically negotiated reasonable royalty rate in the context of this case and the assumptions used by Dr. Mangum to arrive at the royalty base on which he produced the royalty rates which he sponsors.

Further, Dr. Mangum does not explain why it was sound to project that the Ariba and SAP sales figures will continue for more than a decade into the future. That is particularly problematic where, as here, the early years of the projection period fall in a period of economic decline unprecedented since the Great Depression. Use of projections is a relatively sound economic method, but ePlus has cited no authority which permits use of that method by an expert who does not explain why use of the method is sound in perspective of the economic realities which appear during the projection period. The Court could find no such authority.

Third, Dr. Mangum's royalty calculations utterly ignore three litigation settlements that significantly would reduce the royalty rate under the methodology that he used. The reason given for disregarding these settlement terms, all of which involved lump sum payments and one of which also contained a contingent running royalty of 2.5%, is that the settlements were based "on avoidance of litigation." Of course, that ignores that the SAP settlement was agreed to after a jury could not reach a verdict and the Ariba settlement occurred while the case was on appeal. Thus, in both situations, avoidance of further litigation would certainly appear to be a motivating factor in arriving at the settlement agreements that Dr. Mangum chose to use to determine the predicate for his calculations. It also ignores the fact that many, if not most, settlements are animated, in large part, by a desire to avoid the expense of litigation. The frailty of that reasoning suggests strongly that it was the small amount of the settlements, rather than the avoidance of litigation that kept Dr. Mangum from including the Verian, SciQuest and Perfect Commerce settlements in his calculus. More importantly, Dr. Mangum's given reason for excising those three settlements from his royalty calculations

was not explained to be a valid principle of economic analytical method.[5]

Fourth, Dr. Mangum's calculations run contrary to the command of the Supreme Court in Joiner (when applying Daubert), as well as to the reiteration of the Joiner principle in Kumho, that "nothing in either Daubert or the Federal Rules of Evidence requires the district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." Joiner, 522 U.S. at 146. In particular, in this case Dr. Mangum used the dubious royalty base and the marginally useful litigation settlements to arrive at the conclusion that the hypothetical negotiation would produce a baseline royalty rate in the range of 2.5% to 3.7%. Then, he opined that Georgia-Pacific Factor Nos. 5, 6 and 8 through 13 would suggest some unarticulated quantum of "higher" royalty rate. He articulated as well that he had considered each of the factors in the cumulative relative rate and then stated that the reasonable royalty rate which the hypothetical negotiation would produce here would be in the range of 5% to 6% without explaining at all how it was that the application of any one or all of those factors would permit an increase in the base royalty rate of approximately 100%. That is the quintessential

---

[5] Dr. Mangum also ignored, without explanation, the fact that, after ePlus acquired the patents-in-suit, it valued the patent rights at $12,000, combined.

17

*ipse dixit*. It is so because I, the expert, say it is so. I need not offer an explanation for why it is so. It is precisely that kind of opinion that Daubert, Kumho, and Joiner require the district courts to exclude.

Finally, all of the foregoing flaws, the questionable royalty base, the use of questionable, minimally probative settlement agreements to arrive at a royalty rate, and the conversion of lump sum royalty rates to running royalty rates using a speculative royalty base, together with the *ipse dixit* nature of the ultimate opinion which doubles the royalty rate arrived at in the hypothetical negotiation, quite simply fails the "fit" requirement for the facts of this case.

Taken as a whole, Dr. Mangum's opinions are speculative and not based in sound economic precepts that are explained so that a jury could understand why it is reasonable to award such a royalty rate as that called for in Dr. Mangum's conclusions. That kind of testimony does not assist a jury to determine a disputed issue or to understand other evidence. Indeed, it merely confuses the finder of the fact and asks the jury to accept the expert's view merely because it was expressed by an expert.

For all of those reasons, Dr. Mangum's testimony is neither relevant nor reliable. And, indeed, because of its defects, singular and collective, his testimony is likely to confuse a

jury and, its prejudicial consequences substantially outweigh its probative value.

ePlus argues that the decision of the Federal Circuit in i4i Ltd. Partnership v. Microsoft, 598 F.3d 831 (Fed. Cir. 2010), compels a different result. In i4i, the expert arrived at a royalty rate of $96 per unit which he thought would be produced by the hypothetical negotiation. Then, after a generalized assessment of Georgia-Pacific Factors 3, 5, 6, and 9, he increased the rate by $2, to $98 per unit. The expert opined that Factor 3 would have lowered the base rate, while Factors 5, 6 and 9 would have raised the base rate.

ePlus points out that, in i4i, the Federal Circuit held that the royalty rate evidence was sufficient under Daubert. However, in i4i, the Federal Circuit did not have before it an expert opinion that increased the baseline royalty range by 100%. Rather, the baseline was increased by only $2, an increase of 2.0833% ($2 is 2.0833% of $96). Moreover, the decision in i4i does not reflect that the $2 increase was the subject of the defendant's appeal. Rather, the opinion reflects that the defendant's argument, and the ensuing decision, was focused on how the baseline was calculated, not on the increase. And, the Federal Circuit held that the defendant's complaints were directed to the expert's conclusions rather than to his methodology.

Here, the attack on the doubling of the baseline is predicated on the expert's methodology. And, nothing in i4i can be construed to approve the *ipse dixit* method used by Dr. Mangum to double the baseline royalty. ePlus argues that exact, to-the-penny, quantification is not required, and that is no doubt correct. But, here, Dr. Mangum has increased the royalty pre-interest damages from approximately $10 million to $20 million, merely on his say so. ePlus has cited no authority which approves use of generalized application of the Georgia-Pacific factors to double the baseline royalty rate, either with or without articulation of the extent to which each factor supported such an increase. Nor could the Court locate any such authority.

Indeed, to allow the opinion of Dr. Mangum into evidence is to sanction a return to the practice that allowed experts to give *ipse dixit* opinion testimony which widely prevailed before the Supreme Court decided Daubert, Joiner and Kumho and before FRE 702 was amended. The Court declines the invitation to do that. To do so would be to abdicate the gatekeeping duty imposed by Daubert and its progeny.

## CONCLUSION

For the foregoing reasons and those stated on the record on August 10, 2010, DEFENDANT LAWSON SOFTWARE, INC.'S MOTION *IN LIMINE* NO. 3 TO PRECLUDE DR. RUSSELL W. MANGUM III FROM TESTIFYING AT TRIAL (Docket No. 257) was granted.

An Order already has issued (Docket No. 410) on August 11, 2010.

It is so ORDERED.

_____/s/_____*REP*___

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: January *20* , 2011