# EXHIBIT 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE EASTERN DISTRICT OF VIRGINIA

 3                     RICHMOND DIVISION

 4

 5     --------------------------------------
                                           :
 6     ePLUS, INC.                         :    Civil Action No.
                                           :    3:09CV620
 7     vs.                                 :
                                           :
 8     LAWSON SOFTWARE, INC.               :    January 4, 2011
                                           :
 9     --------------------------------------

10

11            COMPLETE TRANSCRIPT OF THE JURY TRIAL

12           BEFORE THE HONORABLE ROBERT E. PAYNE

13          UNITED STATES DISTRICT JUDGE, AND A JURY

14

15     APPEARANCES:

       Scott L. Robertson, Esquire
16     Michael G. Strapp, Esquire
       Jennifer A. Albert, Esquire
17     David M. Young, Esquire
       Goodwin Procter, LLP
18     901 New York Avenue NW
       Suite 900
19     Washington, D.C.  20001

20     Craig T. Merritt, Esquire
       Christian & Barton, LLP
21     909 East Main Street
       Suite 1200
22     Richmond, Virginia  23219-3095
       Counsel for the plaintiff
23

24                  Peppy Peterson, RPR
                   Official Court Reporter
25               United States District Court
```

1          THE COURT:  I just don't want the jury thinking they

2    have to compare ePlus's products with the Lawson products,

3    because that's a flaw in the whole analysis.

4          MR. ROBERTSON:  I'm not going to be asking this

5    witness to do that, nor will I be asking any witness, sir.

6    Q    Now, I'm sorry.  Maybe you answered this question, but who

7    has responsibility for these two products and these two

8    companies you mentioned, Content(plus) and Procure(plus)?

9    A    That would be two subsidiaries, ePlus Systems and ePlus

10   Content.

11   Q    Now, you are familiar with a gentleman named Mr. Farber

12   who is sitting here at the table?

13   A    I am.

14   Q    Who is Mr. Farber?

15   A    He is the president of both of those subsidiaries.

16   Q    Does he have responsibilities for those products?

17   A    Yes, he does.

18   Q    So then I can ask Mr. Farber specifically as to that issue

19   in competition, but let me just ask you, when you acquired this

20   capability for this software services, consulting, and provided

21   this eProcurement software, do you know approximately when that

22   happened?

23   A    I believe it was 2001 when we acquired ProcureNet.

24   Q    What was ProcureNet, if you recall?

25   A    We acquired some of the assets of ProcureNet including

1   three of the patents.  I don't know exactly the extent of the

2   business.

3   Q    Did it also include this eProcurement software solution

4   you were discussing?

5   A    Yes.

6   Q    Do you know whether or not Mr. Farber was part of

7   ProcureNet in 2001 when those assets were acquired?

8   A    Yes, he was.

9   Q    Do you know whether or not part of the assets that were

10  acquired from this ProcureNet company in 2001 included the

11  patents at issue in this case?

12  A    Yes, they were.

13  Q    Is ePlus still headquartered in Herndon, Virginia?

14  A    Yes, it is.

15  Q    How long have they been here?

16  A    Since its inception in 1990.

17  Q    Do you have any other offices in Virginia?

18  A    Yes, we do.  We have one in Glen Allen, Virginia.

19  Q    How about outside of Virginia?

20  A    We have offices in Massachusetts, New Jersey, Maryland,

21  North Carolina, Texas, and California.

22  Q    Is ePlus a public company?

23  A    Yes, it is.

24  Q    Where is it publicly traded?

25  A    It's traded on the NASDAQ under the ticker symbol PLUS.

Momyer - Direct

1    Q    That's not described in claim three, for example.

2    A    No, it's not.

3    Q    One of the claims that is asserted in this case is claim

4    26 which is a method for doing a certain process; do you see

5    that?

6              THE COURT:  Bottom of 26.

7    A    Yes, I see it.

8    Q    Does that claim contain the capability described as being

9    able to determine whether something is available in inventory?

10   I want you to focus on the last step.

11   A    Yes, it does.

12   Q    So do you understand, then, as an inventor on this patent

13   as well as the other patents, that there are different ways to

14   claim aspects of your invention and that each claim stands

15   independently and needs to be considered on its own merits?

16   A    Yes.

17   Q    Did you ever commercially develop a workable prototype of

18   the subject matter of the invention that's described in this

19   electronic sourcing system method?

20   A    Commercially available?

21   Q    Well, commercial embodiment, something that would -- you

22   know, a prototype that actually could function?

23   A    Yes.  A prototype was developed.

24   Q    Did there come a time when a product was developed for

25   Fisher Scientific involving the subject matter of this patents?

1    A    Yes.

2    Q    What was the first product called?

3    A    The first product would have been called electronic

4    sourcing.  First product would have been SupplyLink.

5    Q    Do you recall approximately when SupplyLink came into

6    existence?

7    A    1995.

8         THE COURT:  Are you saying SupplyLink.

9         THE WITNESS:  Yes.  S-u-p-p-l-y, l-i-n-k.

10   Q    Subsequent to that, was there another commercial

11   embodiment that was able to actually access and utilize the

12   internet?

13   A    (No response.)

14   Q    Let me ask you if you are familiar with a product known as

15   Cornerstone.

16   A    Yes.

17   Q    What is Cornerstone?

18   A    Cornerstone was -- which is a product really similar in

19   functionality to SupplyLink but was based -- was built using

20   web-based technology.

21   Q    Now, was this tool that you've described with the

22   capability that you have given us at a high level, was that a

23   tool that was used by Fisher Scientific in any way?

24   A    SupplyLink?

25   Q    Well, no, just the subject matter we're talking about, the

1    electronic sourcing systems and methods?

2    A    Yes.

3    Q    Prior to development, before computers came along, how did

4    Fisher sell its product?

5    A    Now, are we talking about before a computer at a

6    customer's site or talking about before the age, electronic

7    age?

8    Q    We're talking about before -- well, we had the computers

9    at the customers' sites, I think I know where you're going on

10   this, this RIMS system, but even before that.

11   A    Okay.

12   Q    How did Fisher sell its product?

13   A    This is assuming that there is a system at a Fisher

14   location that allows the taking of orders, electronically

15   taking of orders, and processing those orders through to

16   fulfillment which would be creating an invoice.

17        What typically would happen would be we would have to --

18   we would have several ways to get orders.  The first way would

19   be a customer would call in to a call center, and Fisher would

20   have call centers throughout the United States, and a customer

21   service rep would answer the phone and communicate with the

22   customers who would then identify who they were, identify the

23   products that they were interested in at which point the

24   customer service rep would then enter that order into the

25   Fisher system.

```
 1            IN THE UNITED STATES DISTRICT COURT

 2          FOR THE EASTERN DISTRICT OF VIRGINIA

 3                  RICHMOND DIVISION

 4

 5    ---------------------------------------
                                          :
 6    ePLUS, INC.                         :    Civil Action No.
                                          :    3:09CV620
 7    vs.                                 :
                                          :
 8    LAWSON SOFTWARE, INC.               :    January 12, 2011
                                          :
 9    ---------------------------------------

10

11          COMPLETE TRANSCRIPT OF THE JURY TRIAL

12         BEFORE THE HONORABLE ROBERT E. PAYNE

13        UNITED STATES DISTRICT JUDGE, AND A JURY

14

15    APPEARANCES:

      Scott L. Robertson, Esquire
16    Michael G. Strapp, Esquire
      Jennifer A. Albert, Esquire
17    David M. Young, Esquire
      Goodwin Procter, LLP
18    901 New York Avenue NW
      Suite 900
19    Washington, D.C.  20001

20    Craig T. Merritt, Esquire
      Christian & Barton, LLP
21    909 East Main Street
      Suite 1200
22    Richmond, Virginia  23219-3095
      Counsel for the plaintiff
23

24              Peppy Peterson, RPR
              Official Court Reporter
25          United States District Court
```

FARBER - DIRECT                    1302

1    of ePlus?

2    A    Sure.   Those divisions are responsible for

3    developing, supporting and selling applications that

4    are involved in the procurement and catalog management

5    fields.

6    Q    What are the primary software products that are

7    developed and sold by ePlus Systems and ePlus Content

8    Services?

9    A    They are referred to as Procure Plus and Content

10   Plus.

11   Q    Can you just give us a brief high level overview

12   of Procure Plus and Content Plus?

13   A    Sure.   The products work in conjunction with one

14   another, and it provides the ability for our customers

15   and end users to be able to select items from multiple

16   vendors from a catalog, compare those items, decide

17   which ones they would like to purchase from vendors,

18   put those items on a requisition, and the system goes

19   through a work flow for corporate approval.   Inventory

20   is checked to make sure that the items are available

21   in inventory or if they are backordered, if you will.

22       Then the items are placed -- there's usually a lot

23   of different line items on a requisition that somebody

24   orders.   They're not just ordering like a blue pen.

25   They may order different items from different vendors,

FARBER - DIRECT                1303

1   and then the system distributes those items once

2   approved from one single requisition that creates

3   multiple purchase orders to the suppliers and vendors

4   that they're ordering from.

5   Q   Can you turn, please, to Plaintiff's Exhibit 448

6   in your binder in front of you?

7   A   Okay.

8            MR. McDONALD:  I'm going to object to this

9   line of questioning to the extent it goes into any

10  detail about the ePlus products because that's not

11  really relevant to the infringement issue because it

12  compares the Lawson products to the patent.

13           MR. STRAPP:  Your Honor, I don't intend to go

14  into any detail about the products.

15           THE COURT:  Why are you offering it?

16           MR. STRAPP:  It will become apparent in

17  the --

18           THE COURT:  Can you make it apparent now in a

19  word?

20           MR. STRAPP:  Yes.  The bottom right-hand

21  corner of the document, list the patents, I want to

22  demonstrate that these products are marked with the

23  patents that are in suit in this case.

24           THE COURT:  All right.

25           MR. McDONALD:  That's not an issue in the

1   case anymore, Your Honor.

2          MR. STRAPP:  Marking goes to constructive

3   knowledge of the patents, which is relevant to the

4   issue we just discussed.

5          MR. McDONALD:  It is not relevant to notice

6   to Lawson.  It's just general public marking.  That is

7   not appropriate.

8          MR. STRAPP:  Your Honor, the witness will

9   testify that the various products are marked, and we

10  have testimony from Lawson witnesses that they have

11  seen those products at trade shows back as far as

12  2003.  That information is relevant to knowledge.

13         MR. McDONALD:  The Lawson people have already

14  testified.  They never testified to that.

15         THE COURT:  I think one of them testified

16  that he went to a trade show and looked at their

17  products.

18         MR. McDONALD:  He said he saw the booth, but

19  they never saw the products or any patent markings.

20         THE COURT:  He says there's no foundation

21  because you haven't established that they actually

22  looked at the products that have the marking.

23         MR. STRAPP:  Your Honor, first of all,

24  circumstantial evidence is relevant to indirect

25  infringement.

1   Q    Mr. Farber, this is Plaintiff's Exhibit 417?

2   A    It's a similar document and brochure that shows up

3   in written form and on the website that relates to our

4   product information management solutions.

5   Q    Which product specifically does this relate to?

6   A    Catalog and Content Plus.

7   Q    Can you take a look at the bottom right-hand

8   corner of this document, please?

9   A    Yes.

10  Q    Do you see there a list of U.S. patent numbers?

11  A    I do.

12  Q    Do you see the same three U.S. patent numbers

13  listed first there that we had discussed with respect

14  to Plaintiff's Exhibit 443?

15  A    Yes.

16  Q    I'm sorry, 448.

17       Are these the three patents that are at issue in

18  this lawsuit?

19  A    Yes, that's the '683, the '516, and the '172

20  patent.

21  Q    What types of additional documents or other

22  documents, if any, does ePlus mark with '683, '516 and

23  '172 patents?

24  A    We mark the products themselves so that when

25  people utilize the system, they see the patents as

1    soon as they login.  Anybody that goes to our website

2    sees markings at numerous locations on our website.

3    Our printed materials, our documentation, information

4    that we hand out at things like trade shows are also

5    marked.  So it's basically we try to mark everything

6    that's publicly disseminated.

7    Q    Since when has ePlus marked its products and its

8    literature?

9    A    I think that was since 2002, if I'm not mistaken.

10   Q    What types of customers does ePlus target for

11   these Procure Plus and Content Plus products?

12   A    In terms of who we try to attract and sell to, I

13   would say the mid market.

14   Q    What do you mean by "mid market"?

15   A    Well, similar type customers that Lawson, you

16   know, talked about earlier in the week.  You know,

17   they're not necessarily the largest.  They're not

18   necessarily the smallest.  They fall within a range.

19   It can be, you know, a company that may be in revenue,

20   does, you know, 50 million to 2 1/2 billion.  That's a

21   very wide range, but that's what's considered mid

22   market in industry terms.

23   Q    Do you know whether or not ePlus competes with

24   Lawson for sales of its e-Procurement software?

25   A    Yes.

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE EASTERN DISTRICT OF VIRGINIA

 3                     RICHMOND DIVISION

 4

 5     ---------------------------------------
                                           :
 6     ePLUS, INC.                         :    Civil Action No.
                                           :    3:09CV620
 7     vs.                                 :
                                           :
 8     LAWSON SOFTWARE, INC.               :    January 18, 2011
                                           :
 9     ---------------------------------------

10

11              COMPLETE TRANSCRIPT OF THE JURY TRIAL

12            BEFORE THE HONORABLE ROBERT E. PAYNE

13          UNITED STATES DISTRICT JUDGE, AND A JURY

14

       APPEARANCES:
15
       Scott L. Robertson, Esquire
16     Michael G. Strapp, Esquire
       Jennifer A. Albert, Esquire
17     David M. Young, Esquire
       Goodwin Procter, LLP
18     901 New York Avenue NW
       Suite 900
19     Washington, D.C.  20001

20     Craig T. Merritt, Esquire
       Christian & Barton, LLP
21     909 East Main Street
       Suite 1200
22     Richmond, Virginia  23219-3095
       Counsel for the plaintiff
23

24              Peppy Peterson, RPR
                Official Court Reporter
25            United States District Court
```

1        MR. ROBERTSON:  Objection, Your Honor.  This has been

2    gone over in direct examination already.

3        MR. McDONALD:  I'm trying to tie it into this

4    timeline, Your Honor.  Now that we have some clarity on the

5    timing of everything, I think it's helpful to put it in the

6    context.

7        MR. ROBERTSON:  Same timeline.

8        THE COURT:  It seems to me like we're plowing old

9    ground, Mr. McDonald, and remember what I told you before we

10   started today?  Let's go ahead.

11   Q    I'd like to now turn, Mr. Kinross, to how much demand

12   there was for the system.  We can take this off the screen

13   now -- for the system that corresponds to the patents that have

14   been asserted in this case.

15        Now, the SupplyLink was the brand name used for the system

16   described in the three patents in this case; right?

17   A    Yes.

18   Q    Is it true that only a small portion of RIMS customers

19   ever adopted the SupplyLink system to use with RIMS?

20   A    Well, I think the system would have replaced RIMS, not

21   been used with RIMS.

22   Q    Well, did some portion of RIMS customers adopt the

23   SupplyLink system to use with RIMS?

24   A    Well, no.  If you are getting SupplyLink, you don't need

25   RIMS anymore.

2532

1        IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA
2               RICHMOND DIVISION

3    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                                        :
4    ePLUS, INC.,                       :
                                        :
5                      Plaintiff,       :
      v.                                :   Civil Action
6                                       :   No. 3:09CV620
     LAWSON SOFTWARE, INC.,             :
7                                       :   January 20, 2011
                       Defendant.       :
8    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _:

9

10          COMPLETE TRANSCRIPT OF **JURY TRIAL**
           BEFORE THE HONORABLE ROBERT E. PAYNE
11        UNITED STATES DISTRICT JUDGE, AND A JURY

12

13

14   APPEARANCES:

15   Scott L. Robertson, Esq.
     Jennifer A. Albert, Esq.
16   **Michael T. Strapp, Esq.**
     GOODWIN PROCTOR
17   901 New York Avenue, NW
     Washington, D.C.   20001
18

19   Craig T. Merritt, Esq.
     CHRISTIAN & BARTON
20   909 E. Main Street, Suite 1200
     Richmond, VA   23219-3095
21
             Counsel for the plaintiff ePlus
22

23

24             DIANE J. DAFFRON, RPR
              OFFICIAL COURT REPORTER
25           UNITED STATES DISTRICT COURT

1          THE WITNESS:  That's correct.

2          THE COURT:  And that is an award?

3          THE WITNESS:  It's a recognition award, and it's this

4    publication, an organization that evaluates submissions and

5    looks at how individuals or companies are using solutions.

6          THE COURT:  Excuse me.

7          MR. McDONALD:  Thank you, Your Honor.  I think the

8    sequence that we had talked about was that they first need to

9    lay a foundation and show a connection to the patented

10   inventions before they go into any detail about any of these

11   awards that might be for a corporation as a whole, things like

12   that, so I object to the question unless there's some

13   connection specifically to the claimed invention.

14   Q    Mr. Farber, do you recall when you were here earlier in

15   this case you talked about Procure+ and Content+?

16   A    I do.

17   Q    Are those products that are developed and sold by ePlus?

18   A    Yes.

19   Q    Are those products that ePlus believes incorporates the

20   patented technology?

21   A    Yes.

22         MR. McDONALD:  Objection, Your Honor, lack of

23   foundation.  This witness isn't qualified to testify as to the

24   scope of the claims or whether the products are covered by

25   that.  In fact, we tried to inquire into that in deposition and

Farber - Direct                                                    2635

1    weren't able to.

2              THE COURT:  You shut it down in deposition?

3              MR. STRAPP:  I never shut them down in depositions on

4    that particular issue that I can recall.

5              MR. McDONALD:  He indicated he wasn't able to do the

6    analysis, that the lawyers had to do it, and he couldn't.

7    That's what I mean by that.

8              MR. STRAPP:  Let me maybe --

9              THE COURT:  He's not asserting -- what he's doing

10   is -- what he contends, he understands the claims -- I mean the

11   patents to be practiced in his own products; is that right?

12             MR. STRAPP:  That's correct.

13             THE COURT:  He's qualified to testify to that.

14             MR. McDONALD:  I think we need to lay a foundation,

15   because he did say in the deposition he had to turn that over

16   to the lawyers, Your Honor, he couldn't do it himself.

17             MR. STRAPP:  He's talking about --

18             THE COURT:  Did he or not?  Did he do that?

19             MR. ROBERTSON:  Your Honor, I was at the deposition,

20   and I don't recall that at all.

21             THE COURT:  Go over there and look at the deposition

22   transcript.  If you did that, maybe it's quitting time,

23   Lucille.

24             MR. STRAPP:  I'll move on to a different area.

25             MR. ROBERTSON:  Wait a minute.

1          MR. McDONALD:  Page 396, Your Honor, he said, I don't

2     try to interpret everything back to our patented claims because

3     I'm not a lawyer, and I don't, you know, know all the legal

4     aspects of it.

5          MR. ROBERTSON:  Could we have the question --

6          MR. STRAPP:  Your Honor, let me read the question

7     there.  That question was, what information did you learn about

8     the functionality of Lawson's product line from going to their

9     website.

10         It has absolutely nothing to do with the ePlus

11    products.  So I think -- if there's no deposition testimony

12    that Mr. McDonald is referring to, we should be permitted to go

13    forward.

14         MR. McDONALD:  He was saying there, I'm not a lawyer

15    and I don't understand the legal aspects of interpretation.

16    He's saying he's not qualified to do this construction

17    approach.  We didn't ask the question over and over again once

18    he made the record of that.

19         THE COURT:  That was a different question.

20    Overruled.  It's not even related to this one except very

21    marginally.  This witness can testify that as far as he's

22    concerned, the patents -- the products that he sells, that he's

23    talking about, ePlus something, do or do not use the patents.

24         MR. McDONALD:  I also object.  He hasn't laid any

25    foundation that he's used the Court's claim constructions or

```
1    anything for purposes of that.  His personal understanding

2    would not establish the nexus necessary.

3              THE COURT:  He's the guy that runs the company.

4    Q    Mr. Farber, could you please state again, which of the two

5    products you are referring to that, in your understanding,

6    practice the patented technology of the patents-in-suit?

7    A    It's Procure+ and Content+.

8    Q    And those were the products that we saw during your

9    testimony earlier that are marked with the patent numbers on

10   the front of the brochures?

11             THE COURT:  Did he sell that.

12   Q    Okay.  Does ePlus sell Procure+ and Content+?

13   A    Yes, we do.

14   Q    And has ePlus received any industry recognition or awards

15   for Procure+ and Content+?

16   A    Yes, we have.

17   Q    Can you describe what some of those industry recognitions

18   and industry awards are.

19   A    So the one that I was just previously describing from

20   supply chain was a Pros to Know, submission that we put in for

21   one of our clients which was Unicco.  They are a janitorial

22   facility management company, and we put them in for their use

23   of our solutions and how they use our solutions within their

24   environment and the benefits that they've derived from that.

25   Q    And have you been recognized for your -- have Procure+ and
```

1    on this topic.

2

3                    CROSS-EXAMINATION

4    BY MR. McDONALD:

5    Q    Good morning Mr. Farber.  Good afternoon.

6    A    It's close.

7    Q    You mentioned ProcureNet.  They were the company that was

8    the spinoff from Fisher that took these patents as part of that

9    spinoff; is that right?

10                  MR. STRAPP:  Objection.  Lack of foundation, beyond

11   the scope of the direct.

12                  THE COURT:  I think he testified to it earlier.

13                  MR. STRAPP:  He didn't mention Fisher, I don't think,

14   at all.

15                  THE COURT:  Not with you, but in the earlier part of

16   his testimony.

17   A    Well, what I testified to was that ePlus acquired the

18   assets of ProcureNet.

19   Q    Those assets included the three patents in this case;

20   correct?

21   A    That's correct.

22   Q    And you've testified today about the money that was made

23   in connection with these patents; right?

24   A    From the licensing perspective, yes.

25   Q    And ProcureNet, did they, as I understood it, use the

Farber - Cross                                                      2640

1    patented technology?

2    A    Yes.

3    Q    ProcureNet didn't make, did not make money on these

4    patents, did they?

5    A    I don't know.  I wasn't involved in the financials of the

6    company at that time.  I do know that they did license a number

7    of different companies and used it internally.

8    Q    You were an executive of ProcureNet, weren't you?

9    A    For just under a year, yes.

10   Q    You were senior vice president of business development?

11   A    That's correct.

12   Q    Isn't it true that in the years leading up to the sale of

13   the patents from ProcureNet to ePlus, that ProcureNet lost tens

14   of millions of dollars?

15   A    I don't believe it was tens of millions.  I don't know for

16   sure.

17            MR. McDONALD:  May I approach, Your Honor, with

18   Plaintiff's Exhibit 16?  It was a Plaintiff's Exhibit.  They

19   withdrew it, but it's Plaintiff's Exhibit 16.

20            THE COURT:  If they withdrew it --

21            MR. STRAPP:  Your Honor, I object to this.

22            MR. McDONALD:  I'm using it for impeachment.

23            MR. STRAPP:  He hasn't established he's impeaching

24   any particular testimony.

25            MR. McDONALD:  Or refresh his recollection.

1           IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF VIRGINIA

3                   RICHMOND DIVISION

4

5    ---------------------------------------
                                         :
6    ePLUS, INC.                         :    Civil Action No.
                                         :    3:09CV620
7    vs.                                 :
                                         :
8    LAWSON SOFTWARE, INC.               :    January 27, 2011
                                         :
9    ---------------------------------------

10

11          COMPLETE TRANSCRIPT OF THE JURY TRIAL

12         BEFORE THE HONORABLE ROBERT E. PAYNE

13        UNITED STATES DISTRICT JUDGE, AND A JURY

14

15   APPEARANCES:

     Scott L. Robertson, Esquire
16   Michael G. Strapp, Esquire
     David M. Young, Esquire
17   Goodwin Procter, LLP
     901 New York Avenue NW
18   Suite 900
     Washington, D.C.  20001
19
     Craig T. Merritt, Esquire
20   Christian & Barton, LLP
     909 East Main Street
21   Suite 1200
     Richmond, Virginia  23219-3095
22   Counsel for the plaintiff

23

24               Peppy Peterson, RPR
                Official Court Reporter
25            United States District Court

1    Obviously, we'd like to be heard on those just as a matter of

2    course to be able to make sure the record is consistent.

3              THE COURT:  There's no need for them where a verdict

4    has been returned in your favor.

5              MR. ROBERTSON:  Well --

6              THE COURT:  You have to figure out which of the

7    verdicts, which of the verdicts I need to focus on.

8              MR. ROBERTSON:  I think technically, Your Honor, we

9    could argue that notwithstanding that the jury found against us

10   on some of the infringement issues, we should be entitled to

11   judgment as a matter of law on infringement.  I think the Court

12   can probably do that on the papers and we need not delay

13   ourselves.  I think I understand what the Court is thinking is

14   coming from that, but --

15             THE COURT:  It's not coming from anywhere except that

16   I don't believe that judgment as a matter of law is any longer

17   appropriate on a case where a verdict has been returned in

18   one's favor.

19             MR. ROBERTSON:  Let us review that.  If you want to

20   just focus on the remedy of the injunction --

21             THE COURT:  I want to schedule whatever hearing has

22   to be had and get it on my book.  I don't have a lot of time,

23   and I want to get you in and done while it's relatively fresh

24   in everybody's minds.

25             MR. ROBERTSON:  My conversation with Mr. Carr during

 1    the recess, and I understand he talked to Mr. McDonald, was we

 2    don't think it would be necessary to have any witnesses appear

 3    to testify.  We think that the record is the record, and we can

 4    rely on that.  We think we could simply brief the issue and

 5    argue it.

 6            Obviously the Court knows that there are four factors

 7    under *eBay v. MercExchange*.  Obviously, I'm quite familiar with

 8    that case since I was the plaintiff's counsel in that case that

 9    went to the Supreme Court.  We have irreparable injury and no

10    adequate remedy at law, we think that's where we are given the

11    Court's ruling on the damages issue.

12            Then there's the balancing of the hardships, and

13    there's the public interest, and we think we could put together

14    briefing with that, with respect to that, and that we think

15    that we would ask for an injunction hearing at the Court's

16    first possible opportunity but within the next three weeks.  We

17    would anticipate that it would take a half day, Mr. Carr, to

18    present arguments?

19            MR. CARR:  If we don't have any witnesses, a half day

20    for arguments I thought sounded acceptable.  Mr. McDonald, do

21    you have any comment on that?

22            MR. McDONALD:  On the witnesses issue, I would like

23    to have a chance to talk that over with the Lawson people.  I

24    think on the issue of irreparable harm, now that we've got a

25    specific answer from the jury to talk about that situation,

1   which products would be subject to the injunction potentially

2   and which ones wouldn't and what is the impact on Lawson from

3   doing that, I think there is a possibility we'd want to bring

4   in a witness to talk about the harm to Lawson if an injunction

5   is granted.

6           We would like to present evidence on the public

7   interest issue as well, and in particular, regarding the

8   current status of the rejections of these patents on re-exam.

9   I don't know that we necessarily need a witness for that.  We

10  could probably submit that on the papers.  If the Court would

11  like the assistance of an expert to summarize what's going on

12  there and how that might relate to injunctive relief, we could

13  present an expert on that.

14          MR. ROBERTSON:  Obviously, Your Honor, I think you

15  know our position with respect to the reexams.

16          MR. McDONALD:  I cannot hear Mr. Robertson.

17          MR. ROBERTSON:  I'm sorry, Mr. McDonald.  Obviously,

18  Your Honor knows our position with respect reexams.  They are

19  not before the Court, they are not in evidence, and they are

20  not relevant to these proceedings.

21          THE COURT:  I'm sorry, I still can't --

22          MR. ROBERTSON:  They are two separate proceedings,

23  Mr. McDonald, and we don't think they've been introduced in

24  evidence, we don't think they're appropriate at this time, but

25  I'm sure you will be briefing that, and I'll be responding to

1    that for the Court.

2              THE COURT:  Well, he says that Lawson wants a witness

3    on the issue of injury; is that right?

4              MR. McDONALD:  Yes, Your Honor.  I'd at least like to

5    talk to them about that in view of the verdict and see if there

6    is evidence that would be of assistance to the Court on that

7    issue.  I think it's a distinct possibility.

8              THE COURT:  I'm having trouble to some extent because

9    I haven't thought through the results of this verdict form

10   findings, but you are much more familiar with all these

11   products and systems than I am, but what would you see as the

12   scope of the injunction here, Mr. Robertson, based on what you

13   know?  Now, I'm not going to hold you to anything because you

14   have the right to reflect upon it, but I'm trying --

15             MR. McDONALD:  Well, it appeared to me that it would

16   be specific to the RSS and punchout configurations.

17             MR. ROBERTSON:  Well, the configurations that were

18   found to be infringing were configuration two, three, and five.

19   I think those are specifically defined, and the evidence is

20   what the evidence was, and the jury verdict spelled that out.

21   So that's what we'd be seeking as the scope of the injunction,

22   those configurations that included those modules and

23   applications, including the Lawson system foundation and

24   process flow in combination with the modules that were found to

25   infringe.  I think there's 11 separate claims for three

1    separate configurations.  That would be one.

2         Now, remember, Your Honor, the injury to Lawson is

3    almost entirely irrelevant here.  It's the irreparable harm to

4    ePlus.  It's the no adequate remedy for ePlus.  It only comes

5    into play, if at all, in the balancing of the hardships, and

6    it's hardly the place of the now-adjudicated infringer to come

7    forth and say that the actions the jury have found to infringe

8    will cause me a hardship.  That is the consequences of the

9    infringement.

10        THE COURT:  But isn't the message of eBay that we are

11   to consider the standard formulation of injunctive relief which

12   includes the irreparable injury to you, the effect of the

13   injury to the other party, of course the likelihood of success

14   is no factor here because it's already happened, and there

15   aren't any other factors that come into account respecting the

16   adequacy vel non of the remedy at law and any public interest

17   factors.

18        MR. McDONALD:  That's right, Your Honor.  The fact

19   that these patents have all been licensed as lump sum licenses

20   where none of their -- all of their licensees have suddenly

21   written them a check and continue to sell these technologies

22   out there and that this business is less than two percent of

23   ePlus's business certainly indicate that there is a situation

24   where there is no irreparable harm to ePlus.

25        We want to show the balance of harm there with that

1    very minimal harm to them in contrast to whatever impact there

2    would be on Lawson, which I do need to talk to them about, and

3    see what that issue might be, if there's particular customers

4    out there that are hospitals or something where if they were in

5    the throes of offering the system or implementing the system

6    someplace and that had to come to a halt, would that have an

7    impact on hospitals could be something that might be relevant

8    to the Court's analysis.

9              MR. ROBERTSON:  Well, Your Honor, first of all, the

10   hardship to Lawson only comes in, if at all, on this one

11   factor, this balancing of the hardships, and typically the fact

12   that the infringer built his entire business upon a foundation

13   of infringement is not something that -- otherwise, that would

14   be dispositive in every case, because an injunction is going to

15   have some hardship, no doubt, on the infringer.  That's what we

16   have here.

17             THE COURT:  I think I understand all that.  I just

18   want to know what evidence I'm going to have to deal with, and

19   is there anything unusual about the scope of the injunction

20   that I'm going to have to deal with.

21             MR. ROBERTSON:  I don't think there is anything

22   unusual.  I think it's been crystalized fairly nicely with the

23   fact the way the evidence came in, the configurations and the

24   specific modules that are implicated.

25             THE COURT:  So you don't envision any more evidence.

1    You're just going to use the trial evidence, but Mr. McDonald

2    wants probably some evidence, at least on the public interest

3    and on the harm to Lawson.

4           MR. McDONALD:  To Lawson and potentially it's

5    potential customers here as well, yes.

6           MR. ROBERTSON:  All right, well, this changed

7    dramatically from when I talked to Mr. Carr about an hour ago,

8    so I would just --

9           THE COURT:  Look, just settle down.

10          MR. ROBERTSON:  I understand.  Sir, I need to take

11   into account what evidence -- I mean I understand Mr. McDonald

12   is formulating this right now.  I would need to take into

13   account what he would be offering, and I'd need to be able to

14   determine if I need to have rebuttal witnesses in light of

15   that.

16          You know, of course, there's going to be someone who

17   is going to come in and say, yes, we'll be inconvenienced if we

18   have to stop using the Lawson software.  That can be

19   accommodated in a number of ways.  You can have a phase-out

20   accomodation, say six months, whatever.  My client, who

21   competes with Lawson, could offer services, perhaps even at a

22   discounted rate in order to be able to replace that kind of

23   thing.  That happens all the time.

24          MR. McDONALD:  When we're talking about an

25   injunction, I think there's some software cases out there that

1    maintaining, stop servicing, stop upgrading, stop doing all the

2    things that constitute the aiding and abetting and assisting of

3    those --

4              MR. McDONALD:  Yes, I don't think you do enjoy the

5    customer, Your Honor, and we will be able to supply some case

6    law and very analogous situations, for example, where parties

7    are precluded from getting past damages if they failed to mark

8    the patent number for example, and the Courts don't say, okay,

9    well, even though you can't get damages for those systems sold

10   before, we're still going to enjoin your ability to continue to

11   service those customers in a software system context.  So I

12   think that's an issue we obviously have to brief.

13             THE COURT:  Has the Federal Circuit ruled on that?

14             MR. ROBERTSON:  Absolutely.  There's a number of

15   cases, Your Honor.  What Mr. McDonald said, I think, is exactly

16   right in the sense he said it's going forward.  So going

17   forward, stop maintaining, stop servicing, stop implementing,

18   and stop upgrading.

19             THE COURT:  All right, I think I understand.  I think

20   this:  We ought to have all of the evidence on before we have

21   any briefing, so, Mr. McDonald, you tell him -- since you say

22   you don't want any evidence --

23             MR. ROBERTSON:  Well, Your Honor, let me just say,

24   this is a very fluid situation.  If he's going to be offering

25   evidence, I might need to have some rebuttal evidence.

```
 1              THE COURT:  I didn't say anything about rebuttal
 2   evidence yet.  Do you want me to hear me out, give me one
 3   minute?
 4              MR. ROBERTSON:  Yes, sir.  I'm sorry.
 5              THE COURT:  I have in mind that since you don't want
 6   to put on any evidence in direct on your opening, you would let
 7   him put on whatever evidence he's going to put on, and then you
 8   would put on any rebuttal evidence from what you said.  Now, if
 9   you think you don't want to do that, you want to do it another
10   way, that's all right.
11              MR. ROBERTSON:  There's been some issue here about
12   competition.  I think we've established that we're in
13   competition, but I could forth further evidence to show that
14   ePlus directly completes with Lawson.
15              THE COURT:  Well, then, that's direct evidence that
16   you need to put on.
17              MR. ROBERTSON:  I think that's right, Your Honor.  If
18   it's still being denied or still in controversy, then I think
19   that would be something --
20              THE COURT:  They'd deny it, I'm sure.  They haven't
21   admitted anything.
22              MR. MERRITT:  Your Honor, before we move on that,
23   there's a subtlety in this I want to be sure I'm not missing.
24   When Mr. Robertson stands up to seek the injunction, even
25   though he's not bringing live witnesses to court necessarily, I
```

```
 1
 2              (Discussion off the record.)
 3
 4              THE COURT:  It will take one day, you think?
 5              MR. ROBERTSON:  Yes.
 6              MR. CARR:  I would think so.  Dan, do you agree?
 7              MR. McDONALD:  The question was how long would an
 8   evidentiary hearing take?
 9              THE COURT:  Yes.
10              MR. McDONALD:  Yes, I think one day or less.
11              THE COURT:  I'll hear you on March 3rd beginning at
12   9:30 in the morning.  I regard that each of you in this
13   instance, when you file what I have dictated that you file,
14   directed that you file, will be satisfying your obligations to
15   update your discovery on the issue of injunctive relief because
16   injunctive relief has been effectively severed from the case by
17   virtue of the pretrial proceedings.  I think you will have
18   satisfied your Rule 26 updates when you file these things, and
19   that's what I'm looking for.
20              Now, the 3rd of March.  All right, then, when would
21   you give me a brief, Mr. Robertson, an opening brief and
22   findings of facts and conclusion of law post-trial?
23              MR. CARR:  What's the day of the week, the 3rd of
24   March?
25              THE COURT:  It's a Thursday.
```