# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | | |
|---|---|---|
| *e*PLUS INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:09-CV-620 (REP) |
| | ) | |
| v. | ) | |
| | ) | |
| LAWSON SOFTWARE, INC., | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**RULE 26 EXPERT DISCLOSURE AND DECLARATION OF
LARRY W. EVANS IN SUPPORT OF
PLAINTIFF'S MOTION FOR ENTRY OF PERMANENT INJUNCTION**

# TABLE OF CONTENTS

Page

I.      BACKGROUND, EDUCATION AND EXPERIENCE ................................................................1

II.     MATERIALS REVIEWED ........................................................................................11

III.    SUMMARY OF OPINIONS .......................................................................................13

IV.     EPLUS SHOULD BE ENTITLED TO PERMANENT INJUNCTIVE RELIEF UNDER THE
        TRADITIONAL FOUR-FACTOR TEST ......................................................................14

        A.   Factual Background Relevant to Opinions ................................................. 14

        B.   The Claimed Inventions ........................................................................... 14

        C.   Competition in the Marketplace for the Patented Technology ...................... 23

        D.   ePlus's Efforts to Enforce its Patent Rights .............................................. 29

        E.   ePlus's Licensees and License Terms ........................................................ 30

        F.   The Supreme Court Decision and the Four-Factor Test ............................... 33

        G.   ePlus Has Suffered Irreparable Harm, and Will Continue to Suffer Irreparable Harm,
             Unless Lawson's Unauthorized Use of ePlus's Patents Is Enjoined ............................ 35

        H.   The Balance of Hardships Weighs in ePlus's Favor .................................... 41

        I.   The Public Interest Favors Entry of a Permanent Injunction ........................ 43

V.      CONCLUSION .......................................................................................................46

I, Larry W. Evans, submit this expert disclosure and declaration on behalf of Plaintiff ePlus, Inc. in the above-referenced litigation.

## I.      BACKGROUND, EDUCATION AND EXPERIENCE

1.      I have been retained by counsel for *e*Plus, Inc. ("ePlus") to render an expert opinion concerning reasons supporting the grant of a permanent injunction to preclude Defendant Lawson Software, Inc. ("Lawson" or "Defendant") from continuing infringement of claims 3, 26, 28 and 29 of U.S. Patent No. 6,023,683 (the "'683 Patent") and claim 1 of U.S. Patent No, 6,505,172 (the "'172 Patent") utilizing the traditional four-factor test set forth in the Supreme Court's decision in *MercExchange, L.L.C. v. eBay, Inc.*, 547 U.S. 388 (2006).  Specifically, I have considered the issues of whether, absent issuance of an injunction to preclude Lawson's continuing infringement of *e*Plus's patent rights, *e*Plus will suffer irreparable harm that cannot be fully remedied by money damages. Additionally, I have also analyzed issues relating to the balance of hardships as between *e*Plus and Lawson, as well as issues relevant to the "public interest."  If called upon to testify at a hearing relating to injunctive relief in this matter, I expect to testify with regard to the opinions, and the bases and reasons therefor, expressed below.

2.      My address is 3811 Via Del Campo, San Clemente, California 92673.

3.      I am being compensated for my time with respect to expert services provided to *e*Plus's counsel in this case at my normal billing rate of $550.00 per hour.  No part of my compensation depends on the outcome of this matter.

4.      The opinions expressed in this disclosure and declaration are based on my more than 45 years of experience in corporate intellectual property management and licensing.  This experience has included, *inter alia*, (a) securing intellectual property protection, (b) managing intellectual property portfolios, (c) enforcing intellectual property rights and license contractual rights, (d) licensing patents, trademarks and technology (both as licensor and as licensee), (e) enforcing and defending

disputes and litigation arising from patent infringement or license agreement breaches, and (f) overall management of an active and successful intellectual property licensing business.

5.      In terms of my background and experiences which qualify me as an expert for purposes of my opinions set forth herein, I have a Bachelor of Science degree in Chemical Engineering from Purdue University and a Juris Doctor degree from the George Washington University School of Law. I have been admitted to practice before the United States Patent and Trademark Office since 1962, and have been a member of the Minnesota Bar since 1965.

6.      For more than 45 years, I have been involved in the licensing of patents, trademarks and technology.  I estimate that over those more than 45 years, I have been involved in the negotiation of more than 400 licenses, as licensor or as licensee.  The subject matters of these licenses have included:  refining and petrochemical technology, gasoline compositions, tires, batteries and accessories for service stations (TBA), foundry products, coating methods and compositions, activated carbon, health care products, monoclonal antibodies, electrical connectors, batteries, capacitors, photovoltaics, air compressors, food preparation equipment, chewing gum, computer software, suspension systems for motor vehicles, ceramic housings for catalytic converters and tow trucks.  In most of my negotiations, I had business responsibility as well as legal responsibility.  My experience includes negotiations on six continents and in more than 40 countries.

7.      Following my graduation from law school in 1965, I accepted employment at the Minneapolis headquarters of Archer-Daniels-Midland Company ("ADM") as a patent attorney. Almost immediately thereafter, I became involved in the licensing of patents and know-how.  I was employed by ADM (and its successor in interest, Ashland Chemical Co.) until 1970, when I accepted the position of Director of Licensing at the Standard Oil Co. - Ohio ("Sohio").

8.      During 1970-1976, I was the individual within Sohio's Patent and License Department

who was primarily responsible for licensing Sohio's synthetic fiber intermediate technology and related technologies.  I personally negotiated, during this period, more than 20 major (multimillion dollar) licenses to utilize this technology.  In 1973, I negotiated on behalf of Sohio what was believed to have been the first license of technology (trade secrets/know how) to China by a Western company in return for a cash royalty (following the resumption of friendly diplomatic relations between the United States and China).  During this period, I also negotiated hundreds of licenses in other fields, including batteries and capacitors, photovoltaic cells, ceramics, molten metal processing, glass-lined reactors, activated carbon, computer software and many other technologies.

9.      For 17 years, from the Spring of 1976 until March 31, 1993, I headed the corporate Patent and License Department of Sohio and B.P. America ("BP") (following its acquisition of Sohio in 1987), serving as Chief Patent Counsel and Vice President of Licensing.  During this period, I supervised and, in many cases, personally handled hundreds of license negotiations.  Additionally, I was responsible for resolving (through negotiation, arbitration or litigation) numerous patent disputes with licensees, competitors and partners.  My responsibility in these negotiations, for the most part, included business as well as legal concerns.  Sohio and BP were conglomerates that invested in research and development in many areas, including monoclonal antibodies, copper mining and refining, photovoltaics, batteries and capacitors and many other technologies.  As Chief Patent Counsel and Vice President of Licensing, I led my department in the practice of preventative patent law, taking steps to ensure that the companies did not infringe valid and enforceable patents of others.  Invariably, I reviewed each patent application that had been allowed by the U.S. Patent and Trademark Office ("PTO") to ensure that, if the patent is issued and published, it would include valid and enforceable claims and that its disclosure would be justified by the protection it would convey.  My department also monitored patents of our main competitors and of organizations that were

conducting research in areas of interest.  Additionally, we conducted regular patent and intellectual property protection seminars for R&D personnel, as well as engineers and business personnel.  A significant objective of the seminars was to increase our third party patent monitoring capabilities.  An important part of the seminars, which were held at least two times per year, was to distribute and explain the company's patent manual, which included basic facts and principles of patent law and practice.  As a longtime member of the Association of Corporate Patent Counsel (A.C.P.C.), I regularly exchanged views on these subjects with corporate patent counsel of some of the largest corporations around the world in areas concerning protection and enforcement of patent rights.  Subjects dealt with regularly at A.C.P.C. meetings included patent department operation, the practice of preventative patent law, *i.e.,* how to avoid infringement problems, and effective (and enforceable) patent licensing.

    10.    In my capacity as Chief Patent Counsel and Vice President of Licensing at Sohio and BP America, I reported to Sohio's/BP's Board of Directors and was responsible for (among other things) maintenance and protection of the companies' intellectual property (including management and enforcement).  For example, I directed litigations both prior to verdict and after, including such areas as settlements and injunctions.

    11.    I was also responsible for ensuring that the companies' practices with respect to proprietary products and processes complied with the requirements of U.S. antitrust laws and regulations and similar laws and regulations in other parts of the world in which the companies operated.  In executing this responsibility, I frequently exchanged ideas and policies with my peers in the intellectual property and antitrust fields.  In the mid-1990s I was asked to present talks on the subject of "the impact of the antitrust laws on patent and know-how licensing" in Tokyo, Seoul and Berlin.

12.     The Patent and License Department at Sohio and BP was a profit center from 1970 until 1989.  My responsibility during this period extended to that of running a very profitable business that generated substantial royalty and catalyst income to Sohio and BP America.  Reporting only to Sohio's (and BP's) Board of Directors, one of whom was my direct supervisor, I established royalty rates and negotiated royalties and other terms in Sohio's (and BP's) licensing-out agreements.  Additionally, my staff and I were given responsibility from business unit heads to acquire licenses to patents and technology and, in so acquiring, to negotiate the terms, including royalty terms, of any such licenses that were negotiated.  In most cases, the responsible business director delegated the business/financial responsibility for negotiating such licenses to me.

13.     Beginning in 1968, I participated actively in a professional intellectual property association called The Licensing Executives Society.  This activity began with several speaking engagements.  Topics centered on license agreements, process licensing, determining royalties, licensing in developing countries, licensing technology in China, negotiation techniques and related topics.  In 1979, I was elected Secretary of LES USA/Canada, a position I held through 1983.  I then served as Vice President in 1984, President-Elect in 1985, President in 1986 and Past President in 1987.  Throughout this period, I was also a delegate to LES International (LESI), the federation of national and regional LES Societies.

14.     Following my progression through LES USA/Canada, I became more active in LES International.  I became a Committee Chairman in 1989, served as President Elect in 1992, President in 1993 and Past-President in 1994.  I continue to be active in both LESI and LES USA/Canada.  LESI now has more than 13,000 members from 30 national and regional Societies.  Members of LES Societies come from more than 70 countries.  Almost all substantial licensing throughout the world is conducted by LES members (representing at least one side of the transaction).  Without qualification,

LESI is the most important organization in the world in the field of patent licensing and technology transfer.

15.     In May 2000, in Amsterdam, the Netherlands, I was awarded LESI's highest award, the Gold Medal, for "leadership and service to the Society and to the licensing profession."  I was the eleventh individual (and fifth American) to receive this award in the nearly 40-year history of LESI.

16.     Following my departure from BP in April, 1993, I joined the Chicago intellectual property law firm of Willian Brinks Hofer Gilson & Lione where I served as Counsel to the firm.  My practice at the firm consisted mainly of acting as an expert in patent and license litigations and counseling clients and member of the firm with respect to licensing.

17.     I have published and presented speeches in the field of licensing more than fifty times throughout the world, in places such as Dublin, London, Zurich, Paris, Milan, Beijing, Xian, Shanghai, Guangzhou, Tokyo, Osaka, Sao Paulo, Rio de Janeiro, Buenos Aires, Caracas, Cancun, Mexico City, Stockholm, Goteborg, Antwerp, Seoul, Prague, Oslo, Cape Town and throughout the United States.  For example, I presented the keynote address at an international conference of the Licensing Executives Society International and AIPPI in Seoul, Korea, a meeting at which more than 700 worldwide members attended.  My talk was titled "Global Licensing Strategy from the Standpoint of an Experienced Licensing Executive."  A list of my publications for the last ten (10) years is contained in the *vitae* attached as Exhibit A.

18.     My professional activities are not confined to LES USA/Canada and LES International. I have also served as a member of the Executive Committee of the International Intellectual Property Association (the U.S. section of A.I.P.P.I.), a member of the Advisory Board of the Patent, Trademark and Copyright Institute at the Franklin Pierce Law Center, a Charter Member of the Board of the Intellectual Property Owners, Inc. ("IPO"), a Committee Chair of the American Bar Association

(ABA) Intellectual Property Law Section, and Chairman of the Intellectual Property Committee of the Chemical Manufacturers Association.

19.     I have also been a frequent speaker at the Practicing Law Institute, American Intellectual Property Law Association, LES, ABA-Intellectual Property Law Section, various other Intellectual Property Law Associations, China Business Council, Asia Society, various educational institutions, and other civic, educational and professional meetings.  My topics have included licensing, drafting and enforcing license agreements, interpretation of licensing clauses, valuation of technology, corporate IP management, and licensing negotiation.  I have taught the license negotiation course at the New York and San Francisco Tech Transfer seminars sponsored by LES USA/Canada on several occasions.  My speeches have included, *inter alia,* reciting experiences via case histories, presenting arguments for legislative changes, and teaching practitioners how to license and how to conduct license negotiations.

20.     My personal licensing experience at Sohio/BP included the licensing and enforcement of several significant patents and technologies.  I managed the companies' IP program, which included pioneer patents and technology owned by the companies that supported licensing programs that generated more than one billion dollars in income.  As noted above, after I left Sohio/BP, I advised several smaller companies with respect to the protection, enforcement and licensing of their patent portfolios.  Additionally, I have advised established companies and start-ups with respect to their IP rights and licensing (both "in" and "out") practices.  I continue to advise such companies with respect to their licensing programs.

21.     Additionally, following my involvement as an expert in an arbitration between Energy Conversion Devices' (ECD's) Ovonics subsidiary and Matsushita of Japan, I counseled ECD and its partner, Chevron Corporation, in their subsequent license negotiations with Matsushita and Toyota.

These negotiations related to Matsushita's and Toyota's use of Ovonics' nickel metal hydride batteries for hybrid vehicles. Resulting from the negotiations were several agreements under which Ovonics licensed the Japanese companies under its patents and technology relating to the battery for a significant lump sum and on-going running royalties. In return, the Japanese companies granted royalty-free cross licenses to Ovonics and Chevron (with the right to sublicense) to the Japanese companies' operational technology. This was a major negotiation in which I was pleased to have had a significant role.

22.     Additionally, while I was employed by Sohio and BP America, I was a member of several management committees of corporate divisions. As such, I was expected to understand spreadsheets and "hurdle rates," *i.e.*, the minimum rates of return that the company would support for a new project. In this regard, I attended a course offered by the company called the "Sohio Economic Evaluation Course." In this course, I was required to perform an economic evaluation of an actual project, calculating the discounted cash flow (DCF), "hurdle" rate, IRR, discounted payout, and other economic factors. The purpose was to prepare me to understand the influence of variables on the DCF and to read and understand spreadsheets.

23.     I have served as an expert witness in licensing matters and with respect to issues involving reasonable royalties for patent infringement on several occasions (see *curriculum vitae* attached as Exhibit A). Within the last four (plus) years, I have testified as an expert at trial or arbitration hearing on the following occasions: (1) <u>*Chevron Chemical Co.*</u> *v. Indemitsu Petrochemical Co., Ltd.;* (2) <u>*Univeristy of Washington*</u> *v. Optiva Corp.,* Binding Arbitration (Seattle, WA)*;* (3) *Phillips v. Exxon,* C.A. No. 9-638-JIF (D. Del); (4) *UniLever Brothers v.* <u>*Proctor & Gamble,*</u> Federal Court Trial Division, File No. T-2534-85 (Toronto, Canada); (5) *Medtronic v.* <u>*A.C.S. and Guidant,*</u> C.A. No. 97-2459 JMR-FLN (D. Minn.); (6) *Plant Genetic Systems N.V. v.* <u>*Dekalb Genetics Corp.,*</u>

(D. Conn.); (7) *Guidant et al. v. St. Jude Medical*, C.A. No. 1P96-1718-CHIG (S.D. Ind.); (8) *Chevron, et al. v. Crown, Cork & Seal*, C.A. No. 99-234-JJF (D. Del.); (9) *BBA Nonwovens, et al. v. Superior et al.,* C.A. No. 6:00 2764 13 (D.S.C.); (10) *MLMC Ltd. v. Air Touch, et al.*, C.A. 99781 SLC (D. Del.); (11) *Al-Site Corp., et al. v. VSI International,* C.A. 91-847, 92-201C and 941940 CW Highsmith (S.D. Fl.); (12) *Syndia Corp. v. The Gillette Co.¸* C.A. 01C2485 (E.D. Ill.); (13) *LinkCo. vs. Fujitsu,* CA 00 Civ. 7242 (SS) (S.D.N.Y.); (14) *Nilssen v. Motorola,* Binding Arbitration before Judge James Davis (Chicago, Illinois); (15) *MercExchange, L.L.C. v. eBay, Inc. et al.*, Case No. 2-01CV-736 (E.D. Va.); (16) *TriStrata Technologies v. ICN Pharmaceuticals Corp.,* Case No. 01-150 JJF (D. Del.); (17) *Aguao, et al. v. Universal Instruments,* C.A. No. H-02 1747 (S.D. Tex.); (18) *Norco v. Motorvac,* SA 02-876 AHS (ANX) (C.D.Cal.); (19) *TriStrata Technologies v. Mary Kay,* CA No. 01-127 JJF (D. Del); (20) *Nichols Institute v. Scantbodies,* Case No. 02CV 00046 B (JMA) (S.D. Cal.); (21) *Cryovac, Inc. v. Pechinery Plastics Pkg. Inc.,* Case No. 04-1278-KAJ (D. Del.); (22) *Litex v. Delphi,* Arbitration before Judge McKelvie, Washington, DC; (23) *Lexmark International Inc. v. Static Control Corp.*, C.A. 04-CV-84-GFUT (E.D. Ky.); (24) *Applied Medical v. U.S. Surgical*, C.A. JACO 03-1267 (MLGX) (C.D. Cal.); (25) *Rembrandt Vision v. CIBA Vision,* C.A. 2:5-CV-491 TJW (E.D. Tex.); and (26) *DirecTV v. Gemstar*, AAA Arbitration, Los Angeles.  (Note: My testimony was on behalf of the underlined parties).

24.     During the same period, I have also testified as an expert at depositions in the above cited cases and in the following additional cases:  (1) *Phillips Petroleum v. Tasco, et al.,* C.A. No. 98-336-SLR (D. Del.); (2) *JVM Innovative Design v. Spalding and Evenflo,* C.A. No. C-1-97-528 (W.D. Ohio); (3) *Dow Chemical Co. v. Sumitomo Chemical Co.,* C.A. No. CV 10330 BC (E.D. Mich.); (4) *ACLARA v. Caliper,* C.A. No. 99-1968 CRB (N.D. Cal.); (5) *U.S. Filter, et al. v. Ionics,* C.A. No. 98-10541-REK (D. Mass.); (6) *Terabeam v. Dominion, C00-1062C* (W.D. Wash); (7) *Dhuler, et al. v.*

*MCMC,* C.A. 00-CVS-12333 and 12334 (Wake County N.C. Superior Court); (8) *British Telecom v.*

*Prodigy,* C.A. 00-CIV-9451 (S.D.N.Y.); (9) *Borg-Warner v. N.V.G.,* C.A. 00-C-7470 (N.D. Ill.); (10)

*Farmer, et al.* v. *Medo Industries, Litigation,* Master File No. MDL-1274-WBH*;* (11) *In re Gemstar*

*Development Corporation Patent Litigation*, Master File No. MDL-1274-WBH; (12) *Synbiotics Corp.*

*v. Agen Biomedical,* C.A. 03-CV-17708 (AJB) (S.D. Cal.); (13) *Nilssen v. Universal Lighting*

*Technology,* Civil Case No. 3:04-CV-00080 (M.D. Tenn.); (14) *Panelite v. V.S.M., et al.,* Case No.

04-CV-2077 (AJB) (S.D. Cal.); (15) *L.P. Matthews v. Bath and Body Works, et al. and Kao, et al.,*

C.A. 04-1507-SLR (D. Del.); (16) *Gen-Probe v. Bayer Healthcare,* CV No. 04-CV-565 LAB (WMC)

(S.D. Cal.); (17) *Scott Clare & Innovative Truck Storage et al. v. Ford, GM et al.,* Case No. 2-02CV-

325-TJW (E.D. Tex., Marshall Div.); (18) *Kamatami, et al. v. BenQ Corp. et al.,* C.A No. 2:03-CV-

00437 (E.D. Tex.); (19) *Netalog v. Belkin,* C.A. No. 1:05-CV-000391 (M.D.N.C.); (20) *Static Control*

*Components, Inc. et al. v. Lexmark International,* C.A. 04-84-GFVT (E.D. Ky.); (21) *Furukawa*

*Electric N.A., Inc. v. Sterlite Optical Tech., Inc.,* C.A. 1:02-CV-2149 (CAP (N.D. Ga.); (22) *Autobytel*

*Inc., et al. v. Dealix Corp.*, Case No. 2:04CV-330-LED (E.D. Tex.); (23) *CA Innovations v. Igloo*

*Products, C.A.* 05-cv-0059 (W.D.N.Y.); (24) *Jaime Garcia v. S.C. Elec. And Gas Co.*, C.A. 3:06-cv-

02566-CMC; (25) *Univ. of Texas et al. v. NTT Corp. (Japan)*, C.A. D-1-GN-01-001844 (12th Judicial

Dist. Of Travis County, TX); (26) *U.S. Philips Corp. v. EMI Music, Inc. et al.*, No. 05598107 (Sup Ct.

of N.Y.); (27) *In Re: Katz interactive Processing Patent Litigation (RAKTL v. Teligence)*, Case No.

2:07-CV-04965-RGK (FFMx) (E.D.TX); (28) *Freedom Wireless v. Ericsson et al.*, C.A. 2:06-CV-

505-TJW (E.D. Tx.); (29) *Tessera, Inc. v. United Test and Assembly Center Ltd.*, Sup. Ct. CA,

Alameda County; (30) *Honeywell v. Samsung SDI*, Case No. 04-1337-JJF (D.Del.); (31) *Square D*

*Co. et al. v. E.I. Electronics, Inc. et al.*, C.A. 06CU5079 (D. No. IL, Eastern Div.); (32) *R.P.I. v.*

*Adventus*, C.A. 3:07CO00153 (W.D.N.C.); (33) *S.T. Microelectronics v. SanDisk*, Case No. 1-07-

cu-080123 (Sup. Ct. of CA, County of Santa Clara); (34) *Advanced Technology Incubator* v. *Sharp et al.*, C.A. No. 2:07-CU-468 (E.D. Tex.).  (Note: My testimony was on behalf of the underlined parties).

## II.     MATERIALS REVIEWED

25.     In performing the analysis that is the subject of the Declaration, I have reviewed the following materials:

1.      U.S. Patent No. 6,023,683 (PX-1);

2.      U.S. Patent No. 6,055,516 (PX-2);

3.      U.S. patent No. 6,505,172 (PX-3);

4.      the jury's verdict in *e*Plus, Inc. v. Lawson Software, Inc.;

5.      the trial testimony of Mr. Kenneth Farber;

6.      the trial testimony of Mr. Keith Lohkamp;

7.      the trial testimony of Mr. William Yuhasz;

8.      the trial testimony of Mr. Brooks Hilliard;

9.      the trial testimony of Mr. Douglas Momyer;

10.     PX-463: the Procurement and Sourcing Applications Report, 2005-2010 (AMR Research);

11.     PX-465: Market Outlook: Sourcing and Procurement in a Demand-Driven World – A Transformation Guide for Vendors, Service Providers and BPOs (AMR Research);

12.     PX-466: The Forrester Wave: eProcurement Solutions, Q2 2007;

13.     PX-140:  *e*Plus's Proposal to Indalex (ePLUS 0434494-515);

14.     Plaintiff *e*Plus, Inc.'s Second Supplemental Answers and Objections to Defendant Lawson Software, Inc.'s Fourth Set of Interrogatories, Answer to Interrogatory No. 18;

15.     Product brochures for *e*Plus's Content + and Procure + products (PX-448; Content+ Supplier Portal (ePlus 9390-91); Procure+ - Gain Total Control of

Your Procurement Process (ePlus 37014-15); ePlus eProcurement – Automating Spend With Procure+ (ePlus 529160-63));

16.     The jury's verdict in ePlus, Inc. v. Ariba, Inc.;

17.     Publicly available information from the websites www.eplus.com and www.lawson.com;

18.     ePlus Inc. Annual Report 2009 (ePlus 0528737-826);

19.     Lawson press release entitled, "Lawson Comments on ePlus Litigation," available at www.lawson.com;

20.     Annual Report of Lawson Software, Inc. for Fiscal year Ended May 31, 2010 (PX-440);

21.     Settlement and License Agreement between ePlus, Inc. and Ariba, Inc. (PX-43);

22.     Patent License and Settlement Agreement between ePlus, Inc. and SAP AG and SAP America, Inc. (PX-318);

23.     Settlement and License Agreement between ePlus, Inc. and Verian Technologies, Inc. (PX-320);

24.     Settlement and License Agreement between ePlus, Inc. and SciQuest, Inc. (PX-319);

25.     Settlement and License Agreement between ePlus, Inc. and Perfect Commerce, LLC (PX-317);

26.     PX-458: Lawson Workshop: Sourcing, Contracts & Procurement;

27.     Aberdeen Group, Research Brief, Enabling Suppliers, Enabling Savings (LE 215599-603);

28.     ePlus Acquisition of Structured Computer Services and Source Sys Inc. (ePlus 0135341-344);

29.     ePlus 2001 Annual Report (EP 132821-897);

30.     The Global Enterprise Application Sizing Market, 2008-2013 (July 2009 AMR Research) (LE 03581830-881);

31.     the Asset Purchase Agreement Between ProcureNet, Inc. and *e*Plus, Inc. (ePLUS 205193-403);

32.     Transcript of Deposition of Kenneth Farber (May 18, 2010);

33.     Conversations with Mr. Kenneth Farber; and

34.     any other materials cited in this Disclosure.

## III.   SUMMARY OF OPINIONS

26.     I understand that since 2001, Herndon, Virginia based *e*Plus has sold electronic sourcing and procurement software products known as Procure+ and Content+.  Trial Tr. at 2634:14-21; 2637:4-13 (Farber Direct).  (Citations to the Trial Transcript will be referred to hereinafter as "Tr.".)  It is my understanding that ePlus began this business by acquiring the technology assets (including the patents in suit) of a company called ProcureNet.

27.     I also understand that *e*Plus's Procure+ provides users with an electronic sourcing and procurement system where users can search for items in multiple electronic vendor catalogs, build requisitions, and generate purchase orders for transmission to suppliers.  Additionally, *e*Plus's Content+ enables users to create robust electronic catalogs by converting raw vendor catalog data into organized and searchable catalogs.  I have been informed that these products practice one or more claims of the patents-in-suit and are marked with the patent numbers pursuant to advice from *e*Plus's legal counsel.  *See, e.g.*, Tr. at 1302:11-1303:4; 1307:22-1308:4 (Farber Direct); PX-448; Content+ Supplier Portal (ePlus 9390-91).

28.     I further understand that *e*Plus and Lawson compete for customers in the market for electronic procurement software and services.  Lawson's most recent Annual Report notes that it has 3900 employees in various facilities worldwide.  Lawson reported revenues totaling over $415M for the fiscal year ending May 31, 2010 across all product lines.  While *e*Plus appears to have grown its electronic procurement business dramatically since 2001, it remains a fairly small player in the market compared to Lawson.

29.     It is my opinion that *e*Plus is suffering irreparable harm due to its inability to enjoin Lawson from its continued infringement and thereby exercise its right to exclude which is the essence

of its patent rights under U.S. law.

30.     In the litigation, Lawson had a full and fair opportunity to challenge the validity of the ePlus patent claims and was unsuccessful.

31.     The balance of hardships, in my opinion, strongly favors *e*Plus.  Lawson's costs incurred for development and marketing of the infringing products are, in my opinion, irrelevant.  In contrast, the failure to obtain a permanent injunction would deprive *e*Plus of a range of licensing and partnering opportunities.  Moreover, because a patent is a wasting asset, the window of opportunity for *e*Plus to exploit is patent rights is limited.  Thus, as between *e*Plus, the patent owner, and Lawson, the adjudicated infringer, it is my opinion that the balance weighs in favor of the grant of injunctive relief.

32.     It is my view that the public interest would be disserved by permitting an adjudicated infringer, such as Lawson, to continue its adjudicated infringement and to profit therefrom.

## IV.    EPLUS SHOULD BE ENTITLED TO PERMANENT INJUNCTIVE RELIEF UNDER THE TRADITIONAL FOUR-FACTOR TEST

### A.    Factual Background Relevant to Opinions

33.     From my review of the testimony at trial, my review of additional relevant materials and my discussions with *e*Plus management, I am aware of the following background facts that are relevant to my opinions.

### B.    The Claimed Inventions

34.     The claimed inventions relate to electronic sourcing systems and methods conducted by electronic sourcing systems.  An electronic sourcing system, according to the patents, is an electronic system for use by a prospective buyer to locate and find items to purchase from sources, suppliers or vendors.  The electronic sourcing and procurement systems and methods automate internal corporate purchasing processes, resulting in enormous savings in time and expense.  Corporate customer users

may search for items for sale from multiple selected electronic supplier catalogs, view inventory availability information for those items, find related items available from other suppliers, and requisition desired goods or services.  The system then generates electronic purchase orders to each different supplier for approved requisitions.  *See, e.g.*, '683 Patent, Col. 3:3-24.

35.     Prior to the inventions in the patent, procuring products for large corporations could involve several manual, paper-based operations coupled with awkward automated electronic processes.  *See, e.g.*, '683 Patent, Col. 1:11- Col. 2:18.  A company might be able to access a system to type information into an electronic requisition or submit an electronic order from hard-copy catalogs.  *See id.* at Col. 1:36-59.  Alternatively, a company might be able to view items from a single electronic catalog from a compact disc, for example.  *See id*. at Col. 2:3-12.  However, these systems, I understand, provided only limited improvements to the traditional paper-based corporate procurement processes.  Tr. at 227:3-252:2 (Momyer Direct) (inventor discussing prior systems used by Fisher Scientific and deficiencies in such systems); Tr. at 2071:6-2079:7 (Momyer Cross) (discussing distinctions of patented electronic sourcing systems over prior technology).

36.     The disclosure of the '683 Patent indicates that the inventors recognized that significant efficiencies could be realized by enabling users to make purchasing decisions based on price, item availability and product comparison.  Thus, they detailed in the patent specification systems and methods that:

- "search[] a database containing data (including product/vendor identification and other product information) relating to items available from at least two vendor product catalogs" ('683 Patent, Col. 2:49-52) (thereby enabling product comparison);

- "transfer[] the product information for desired catalog items obtained as a result of the search to a requisition/purchasing system for use in generating a requisition including entries for the desired catalog items" ('683 Patent, Col. 2:53-56) (thereby automating the flow of information from an electronic catalog into an electronic requisition/purchase order);

15

- "check[] the availability in one or more inventory locations" ("'683 Patent, Col. 3:19-22) (thereby avoiding delays in delivery of items); and

- "cross-reference[] from the [one catalog item] ... to similar corresponding catalog numbers of other vendors (suppliers or distributors) for the same Product" ('683 Patent, Col. 3:19-22) (thereby making comparison shopping easier and more efficient).

37.     Claim 26 of the '683 Patent is illustrative.  It recites the following:

> 26.     A method comprising the steps of:
>
> maintaining at least two product catalogs on a database containing data relating to items associated with the respective sources;
>
> selecting the product catalogs to search;
>
> searching for matching items among the selected product catalogs;
>
> building a requisition using data relating to selected matching items and their associated source(s);
>
> processing the requisition to generate one or more purchase orders for the selected matching items; and
>
> determining whether a selected matching item is available in inventory.

38.     I am aware that Defendant's President and Chief Executive Officer, Harry Debes, has intimated that *e*Plus operates as a *de facto* patent troll, leveraging its intellectual property without developing any competing products of its own.  Specifically, Mr. Debes, when remarking on the recent jury verdict in favor of *e*Plus, stated:

> We respect technological innovation and patents but will not be intimidated by companies that use questionable tactics expecting quick settlements while the Patent Office continues to reject the validity of the claims.

Lawson Press Release (Jan. 31, 2011), available at www.lawson.com.

39.     I disagree.  I understand that *e*Plus develops and markets two software applications, Procure+ and Content+, that embody the patented technology at issue in this litigation.  I further

understand that these software applications have been continuously offered as part of *e*Plus's product line for almost a decade.  Tr. at 2634:14-21; 2637:4-13 (Farber Direct).

40.     I understand that Fisher Scientific Company, the original assignee of the rights in the inventions of the patens-in-suit, manufactured and sold commercial implementations of the claimed inventions known as "Supply Link" and "Cornerstone."  Tr. at 225:24-227:20 (Momyer Direct). As *e*Plus's expert, Mr. Brooks Hilliard testified at trial, Fisher Scientific received several awards for its Cornerstone commercial implementation of the patented inventions.  Tr. at 2739:21-2740:15 (Hilliard Direct) (testifying that Fisher Scientific's Cornerstone product was the subject of several industry awards, including a 1996 award from the Internet and Electronic Commerce Conference for its innovation and excellence in electronic commerce).

41.     I understand that on May 4, 2001, *e*Plus purchased the commercial-technology business assets of ProcureNet, Inc. ("ProcureNet"), a company that at that time focused on e-commerce software.  *See* Asset Purchase Agreement (ePlus0205193) (May 4, 2001); Tr. at 1299:7-1303:4 (Farber Direct).  I understand that ProcureNet, which was formerly part of Fisher Scientific Company LLC ("Fisher Scientific"), had been spun off as an independent company in 1999.  *See* Farber Dep. at 27:6-16.  The assets acquired by *e*Plus were comprised of two business units of ProcureNet, Structured Computer Services ("SCS") and SourceSys, Inc. ("SSI"), which included ProcureNet's procurement and catalog systems.  Tr. at 1301:2-9 (Farber Direct); Farber Dep. at 13:5-16.  These procurement and catalog systems became part of *e*Plus Systems and Content Services.  Tr. at 1301:2-1302:10 (Farber Direct).  As part of the acquisition, *e*Plus obtained ProcureNet's enterprise procurement-software application, called OneSource, and the patents-in-suit, *i.e.*, U.S. Patent Nos. 6,023,683; 6,055,516; and 6,505,172.  Farber Dep. at 11:20-23; 31:6-22.  The SCS and SSI business units had a total of 39 permanent personnel, based in Avon, Connecticut, and Houston, Texas, who

were also part of the assets acquired by *e*Plus.  Valuation Methodologies and Valuations (ePLUS0135341) at ePLUS0135343; *e*Plus 2001 Annual Report at 18.

42.     *e*Plus saw the OneSource application, which was renamed "Procure+" following the acquisition, as an e-commerce procurement product that could be provided to customers an internal stand-alone program or as a hosted product provided through *e*Plus.  *See e*Plus 2001 Annual Report at 6; Farber Dep. at 31:20-22.  *e*Plus expected to obtain much of its electronic-commerce revenues either directly or indirectly through the Procure+ software application.  *See e*Plus 2001 Annual Report at 29. *e*Plus described this procurement software as being "one of the most valuable intangible assets acquired by *e*Plus" as part of the ProcureNet deal.  Valuation Methodologies and Valuations at ePLUS0135343-44.

43.     In addition to the OneSource software itself, the ProcureNet personnel obtained from the acquisition were a critical aspect of *e*Plus's electronic-commerce business strategy.  Prior to the ProcureNet acquisition, *e*Plus relied primarily on third-party vendors and development outsourcing for its software.  *See* 2001 Annual Report at 13.  The hiring of personnel from ProcureNet would allow future software development to be handled within the company.  *See* 2001 Annual Report at 13. The combined personnel from SCS and SSI were valued by *e*Plus at more than $850,000 at the time of the deal.  Valuation Methodologies and Valuations at ePLUS0135343.

44.     By contrast, the ProcureNet patent portfolio, which included the patents-in-suit, had minimal influence on either the strategic decision behind the acquisition or the value assigned to it. When *e*Plus began negotiations with ProcureNet regarding the acquisition, *e*Plus was not even aware that ProcureNet owned any patents.  Farber Dep. at 42:15-43:17; 47:2-16.  *e*Plus learned of ProcureNet's patents during the late stages of the negotiations between the companies and requested that they be added as part of the deal primarily to help protect *e*Plus's rights to use and market the

OneSource software.  Farber Dep. at 42:15-43:17; 46:12-22: 47:2-16.  Because the patents were hastily added before the deal was consummated, they were attributed a token value (viz. $12,000) to reflect for accounting purposes the cost of the transfer of ownership.  Farber Dep. at 42:15-43:17.  In fact, *e*Plus's subsequent annual report, which discusses the ProcureNet acquisition, makes no mention of the acquired patents, and even states that *e*Plus does not own any patents.  *See* 2001 Annual Report at 15.

45.     Both the software and personnel acquired from ProcureNet continue to be the core components of *e*Plus Systems.  Procure+ and Content+, another software application obtained from the ProcureNet acquisition, remain *e*Plus Systems and Content Services' flagship-software applications even today, almost a decade after the acquisition.  *See* Tr. at 1302:6-10 (Farber Direct); Farber Dep. at 26:6-12; 141:10-20.  Further, I understand that the vast majority of the original 39 employees taken from ProcureNet still work at *e*Plus, including Ken Farber, who now serves as the President of *e*Plus Systems and Content Services.  Tr. at 1299:11-13; 1301:10-16 (Farber Direct); Farber Dep. Tr. at 13:21-14:6.

46.     And while the ProcureNet patent portfolio did not figure largely into the ProcureNet acquisition, this was because *e*Plus did not fully appreciate the value of the patents.  It was not until outside counsel was consulted that *e*Plus began to appreciate the value of the patents.  That worth has been recognized over the last several years.  Since 2001, *e*Plus has obtained several fully-paid up licenses for the patents-in-suit totaling in excess of $57 million.  Tr. at 2620:4-12 (Farber Direct).  Also, *e*Plus's Procure+ and Content+ software, which embody the patented technology, have received repeated positive recognition in the marketplace, including several industry awards.  *See* Tr. at 2634:14-21; 2637:4-2638:9 (Farber Direct).

47.     *e*Plus's Procure+ provides users with an electronic sourcing and procurement system

where users can search for items in multiple vendor catalogs, compare those items, build requisitions for selected items, check the availability of selected items in the vendors' inventories, and generate multiple purchase orders from the requisitioned items for transmission to suppliers.  Tr. at 1302-11-1303 4 (Farber Direct).

48.    Procure[+] offers internet-based procurement capabilities.  Users of a Procure[+] system may:

- Access comprehensive online catalogs.
- Take advantage of robust catalog search to quickly find items, search by key word, category, or attribute.  Once search results are displayed, users can view images of products, detailed specifications, and price.
- Compare products based on such attributes as price and size.  Perform parametric searching.
- Add items to their online shopping cart, determine quantity, and quickly search for the next item.
- View transaction attributes, review and change their order, and submit their order.
- Check their order status, view approvals, check order fulfillment, and review order activity.
- Generate purchase orders as well as create approval and textual reports.

PX-0140 at ePLUS0434499-500.  Procure[+] functionality includes: electronic catalogs; approval workflow; order status; invoice matching; communication to and from sellers with EDI; and inventory. PX-0140 at ePLUS0434501.

49.    Content[+] is a flexible application that integrates with Procure[+] to connect catalogs.  *See* PX-0140 at ePLUS0434502.  Content[+] "empowers suppliers to convert raw product data into a manageable, searchable catalog."  PX-0140 at ePLUS0434501.  "Content[+] takes free-form, unstructured text descriptions and cleanses the content so it can be included in comprehensive catalogs.  With Content[+], catalogs are easily and quickly searchable by keyword, attributes, and classification structure."  PX-0140 at ePLUS0434501.

50.     Below are excerpts of *e*Plus product brochures describing the features of Procure+ and

Content+.  These brochures can be found at www.eplus.com.

# Procure+

**RELATED LINKS**

Procure+ Home

Benefits

Features

OneSource IT+

Procure+
Technology

Integration

Customers and Case
Studies

Collateral

Enterprise Cost
Mgmt Videos

Contact Us

Software Home

**Procure+** is a feature-rich eProcurement solution with sophisticated workflow, catalog management, and transaction management capabilities to manage your entire purchasing process. It enables you to achieve:

☑SAS70
Completed Type II Examination

Click here for details.

**Compliance**
Ensure compliance with corporate and financial guidelines via workflow management.

**Productivity**
Increase productivity with a completely integrated, paperless procurement process that streamlines purchasing, significantly shortens lead times, and reduces associated costs across your enterprise.

**Cost Savings**
Achieve a better return on your investment from a simple, scalable, and easily-implemented eProcurement system. Combine the benefits of central supplier management with distributed ordering authority.

An intuitive graphical user interface allows you to generate requisitions, issue purchase orders, track and receive orders, and leverage advanced searching techniques to ensure that you receive the right goods at the right price - on time and within budget.

*e*Plus helps customers leverage the power of web-based eProcurement to achieve a substantial, immediate, and sustainable ROI. Procure+ relies on internal expertise developed over 18 years of procurement software experience with hundreds of customers.

For more information, call 703-984-8207, send email to systemsinfo@eplus.com or find a local office near you.

*e*Plus' products are covered by one or more of the following: U.S. Patent Nos. 6,023,683; 6,055,516; 6,505,172; 6,892,185; 6,182,127; 6,510,459; 7,047,211; 7,185,069; 7,254,581 and corresponding foreign and patents pending.

21

**Content+ Advanced - a patented, comprehensive system for the management, syndication, and analysis of all product content**

For most organizations, content management is the foundation of all spend management and supply chain solutions.

From sell-side order entry systems and customer-facing catalogs, to buy-side eProcurement applications and spend analysis systems, rich, unified, and parametrically searchable content is the critical ingredient to reduce costs, improve supply chain visibility, and increase supplier performance.

Without normalized, enriched, and organized content, costs increase, internal users and customers become frustrated, and related applications can't be utilized to their full potential.

Content+ Advanced is our patented software that enables you to efficiently manage your product content information across your enterprise.



For more information, call 703-984-8207, send email to systemsinfo@eplus.com or find a local office near you.

51.     As noted above, *e*Plus has grown this business since 2001, but still remains a fairly small player in the market.

**C.     Competition in the Marketplace for the Patented Technology**

52.     According to Forrester (a third-party analyst that tracks the electronic procurement industry) electronic-procurement solutions, or e-procurement solutions, "play a key role in improving purchasing processes in enterprises through automating requisitions and purchase orders for goods and services, decentralizing buying, connecting to suppliers directly, and improving employee compliance with preferred supplier policies."  PX-466 at L0259044.

53.     According to another industry analyst, AMR Research, the supply management market, of which electronic procurement makes up roughly half, totaled about $2.8 billion in 2008 and is expected to reach $3.5 billion by 2013.  *See* The Global Enterprise Application Market Sizing Report, AMR Research (LE03581830) at LE03581851; PX-463 at LE00216154.  Thus, the electronic-procurement market itself now stands around $1.5 billion.  *Id.*  AMR Research estimates that licensing revenue alone for electronic-procurement solutions in 2008 was approximately $179 million.  *Id.* at LE03581856.

54.     From my review of the materials available to me, I have concluded that the market for electronic sourcing and procurement software and services is fiercely competitive.  There are several software vendors that provide solutions such as the Procure+ and Content+ solutions offered by ePlus Systems.  These include, for example, Ariba, SAP, Oracle, Lawson Software, Perfect Commerce, SciQuest and Verian Technologies.  *See* PX-463 at LE 00216135 (AMR Research noted that companies with competitive eProcurement applications include Ariba, *e*Plus, Epicor, Ketera, Lawson, Oracle, SAP, SciQuest, and others).  *See also* PX-465 at L0134638, and PX-466 at L0259044. Among the larger players are companies such as Oracle and SAP, who together comprise more than 40% of the market share and tend to focus on very large global companies.  *See* The Global Enterprise Application Market Sizing Report, AMR Research (LE03581830) at LE03581836, LE03581850. Other electronic procurement companies, including *e*Plus and Lawson, target mid-market companies

having market capitalizations roughly between $50 million to $2.5 billion.  Tr. at 1310:10-22 (Farber

Direct); Lawson 2010 10-K at 1.

55.     I understand that Lawson Software's S3 Procurement modules including Lawson

Requisitions, Lawson Inventory Control, Lawson Purchase Order, Lawson Requisitions Self-Service

and Lawson Procurement Punchout are its counterparts to *e*Plus's Procure+ and Content+

applications.  Lawson Requisitions Self-Service "[a]utomatically generates multiple purchase orders

for stock, non-stock, and special-order items, as well as services, from a single requisition."  Lawson

Supply Chain Management:  Lawson Web-Based Requisitioning at 1-2, *available at*

http://www.lawson.com/wcw.nsf/pub/scms_proc.  Requisitions Self-Service includes an"[a]dvanced

search function, employing item number, multiple-word, or partial-word search capabilities" and the

capability to "[b]rowse by United Nations Standard Products and Services Code® (UNSPSC®)."  *Id.*

at 2.  Procurement Punchout provides "[p]re-built integration with a large universe of individual

trading partners and digital marketplaces," allowing users to "set up external catalogs, hosted and

managed by vendors."  *Id.*  Lawson Purchase Order, which is "launched automatically via Lawson

Requisitions," provides the capability of "establishing pricing agreements and contracts with vendors,

maintaining item information, [and] creating and issuing purchase orders."  Lawson Purchase Order,

*available at* http://www.lawson.com/wcw.nsf/pub/scms_B16717.  The Lawson EDI application

provides "for two-way transfers of essential documents, such as purchase orders, invoices, and

catalogs."  Lawson EDI for Supply Chain Management, *available at*

http://www.lawson.com/wcw.nsf/pub/scms_86CC4D.

56.     Below are excerpts of Lawson product brochures describing the features of Requisitions

Self-Service and Lawson Procurement Punchout.  These brochures can be found at www.lawson.com.

## Lawson Delivers

Lawson Requisitions Self-Service and Procurement Punchout work with Lawson Procurement to help streamline purchasing processes, eliminate volumes of paperwork, accelerate order cycle times, increase standardization, improve your negotiating leverage, and ultimately lower your total supply spend. With your current purchase request system, are you able to:

- Delegate to internal customers the responsibility for electronically creating purchase requests, without the need for extensive user training?

- Allow internal customers to browse and shop vendor catalogs, choosing from an approved selection of items at negotiated prices?

- Electronically route requisitions to the right approvers for every request, without the need for manual administration?

- Consolidate multiple types of products and services onto a single requisition?

- Make it easy for your suppliers to do business with you, improving your negotiating leverage and the potential for discounts?

If not, consider the many exceptional advantages of Lawson Requisitions Self-Service and Procurement Punchout.

## Requisitions Self-Service: Empower Your Employees

Lawson lets you extend the advantages of Lawson Requisitions, a component of Lawson Procurement, beyond the purchasing department. Lawson Requisitions Self-Service offers easy-to-use templates and other timesaving features, adapted from the world of e-commerce, to quickly help make every internal customer a productive user of the system with minimal training. Key features and benefits of Lawson Requisitions Self-Service include:

- Automatically generates multiple purchase orders for stock, non-stock, and special-order items, as well as services, from a single requisition

- Configure to meet many of your business requirements — you determine what information is available and which fields, menus, and buttons are displayed, according to each user's role

- Defaults required user information, reducing the number of keystrokes needed and the amount of time generating requisitions

- Accessible to authorized users through a secure Internet connection and standard web browser

- Uses drop-down lists, checkboxes, shopping cart tabs, and other graphical elements to create the familiar look and feel of an e-commerce shopping experience

- Advanced search function, employing item number, multiple-word, or partial-word search capabilities — an easy, fast way for users to find the items they need

- Includes automated workflows, via Lawson ProcessFlow Standard, for routing and approval processes; you can create additional workflows with optional Lawson ProcessFlow Professional

- Visibility into approval processes allows you to identify bottlenecks and take prompt action, when necessary

- Browse by United Nations Standard Products and Services Code® (UNSPSC®), or you may define/import your own categorization schemas

- Self-service desktop receiving for items delivered directly to requesters

## Procurement Punchout: a Direct Connection to Vendors

- Purchasing departments typically must devote considerable time to uploading and updating item master data. Lawson Procurement Punchout, an extension of Lawson Requisitions Self-Service, can help reduce this obligation by allowing end users to browse and shop vendor web sites, choosing from approved products at negotiated contract prices. Features and benefits of Lawson Procurement Punchout include:

- Pre-built integration with a large universe of individual trading partners and digital marketplaces

- Contains technology, including universal XML connectivity, to extend your trading community to new suppliers

- Gives you the option to set up external catalogs, hosted and managed by vendors

- Conforms to transaction rules for user access, budget checks, and manager approvals

- Seamlessly transitions users from the Requisitions Self-Service menu to their selected vendor sites

- Incorporates key Lawson Requisitions Self-Service features, such as role-based catalog presentation, multi-item consolidation into a single purchase order, and easy-to-navigate drop-down menus

- Standard reports deliver a variety of useful information, such as purchase order activity by source, operator productivity, requisition volume, and departmental procurement expense

57.     I have concluded that in the marketplace, ePlus and Lawson Software are direct competitors.  I understand that in many instances in which *e*Plus has responded to a Request for Proposal ("RFP") from a potential customer, Lawson has also offered its products for sale to the same prospective customer.  In some instances, ePlus has been able to secure the sale in direct competition with the Defendant.  In other instances, the Defendant has prevailed.  For example, I understand that *e*Plus provided Procure$^+$ and Content$^+$ and related services to the Gannett Company for several years. Recently, Gannett informed *e*Plus that it was discontinuing its use of ePlus's e-procurement system and that it was switching e-procurement vendors.  I understand that Lawson was among the vendors

27

that Gannett considered.  *e*Plus is also aware of several RFPs relating to e-procurement products and services for which both *e*Plus and Lawson submitted responses including Novant Health, Indalex, Hanesbrands, Wolters Kluwer and XM Radio.  See ePlus's Answer to Interrogatory No. 18 and documents cited therein.  *See also* Tr. at 1310:10-1311:18 (Farber Direct).  According to the testimony of the President of *e*Plus Systems, Mr. Kenneth Farber, current or prospective customers for which ePlus and Lawson engaged in direct competition included Ames Corporation, Fortress Investments, Sterling Jewelers, Cleveland Clinic, Novant Health, Wolters Kluwer, and Deaconess Hospital, among others.  Tr. at 1314:18-1316:4 (Farber Direct).

58.     I am also informed and understand that ePlus's counsel has engaged in a comparison of the customer lists of both *e*Plus and Lawson and has discovered dozens of customers or prospective customers solicited by *e*Plus with respect to its Procure+ and Content+ solutions which are either Lawson customers or prospects for which Lawson submitted competitive proposals.[1]

59.     Indeed, *e*Plus may not be aware of every instance in which it has lost sales to Lawson or directly competed with Lawson for an award of a contract for an electronic procurement system.  Companies seeking to find e-procurement solution providers typically issue what is known as a request for proposal, or "RFP," which lays out the functionality requirements for the desired software-application suite.  *See, e.g.,* Tr. at 495:16-496:8 (Weaver Direct); Tr. at 1044:4-10 (Lohkamp Cross).  The companies can then select among competing vendors based on the vendors' responses to the RFPs, which provide details regarding the functionality of their proposed software solutions.  *See, e.g.,* Tr. at 497:11-498:10; (Weaver Direct); Tr. at 1043:25-1045:16 (Lohkamp Cross).  The RFP process is often done in secret, so vendors are usually unaware who they are competing against.  *See*

---

[1]  I have signed an undertaking to the Protective Order so that I may be able to review Lawson confidential information relevant to this issue.  I expect to supplement this Disclosure upon my review of such information.

Tr. at 1074:8-12 (Lohkamp Cross) ("*e*Plus Counsel:  This RFP process, that's often done in secret.

And by that I mean been the person, the potential customer, doesn't always inform the bidder who all

the other competition is; isn't that fair to say?  Mr. Lohkamp:  That's correct."); Tr. at 1315:1-8

(Farber Direct) ("*e*Plus Counsel:  Do you recall some testimony earlier this week that on occasion the

RFP process that we've heard testimony about can be in confidence and you don't always know as a

procurement software company who you're competing against?  Mr. Farber:  Yes, that's very true.

*e*Plus Counsel:  That's been your experience as well?  Mr. Farber:  It has.").  Lawson's own personnel

acknowledged that Lawson might not be aware if they were competing with *e*Plus on a particular

RFP.  Tr. at 1074:20-24 (Lohkamp Cross).

60.     Notwithstanding the inherent secrecy of the RFP process for e-procurement solutions,

there is little question that Lawson and *e*Plus have competed directly for many of the same potential

customers, as detailed above.

61.     This evidence of direct head-to-head competition as well as industry analysts'

recognition of the comparability of *e*Plus's and Lawson's eProcurement products and services serves

as substantial evidence, in my opinion, that both parties compete in the marketplace for the products

and services covered by the patents-in-suit.

### D.     ePlus's Efforts to Enforce its Patent Rights

62.     I understand that *e*Plus has spent millions of dollars enforcing its patents in two prior

lawsuits.  The first of these cases was brought in the Alexandria Division of this Court against Ariba,

a competitor of *e*Plus and Lawson and one of the largest electronic procurement software companies

in the United States.  The trial in that matter was conducted in January, 2005 before Judge Leonie

Brinkema.  The jury determined that Ariba willfully infringed all of the asserted claims of the same

three patents as those at issue here, and that all of the asserted claims were valid.  *See* Special Verdict

Form from *ePlus, Inc. v. Ariba, Inc.*  After the jury verdict was returned, but before proceeding to the

damages phase of the trial, the parties negotiated a settlement and license agreement pursuant to which Ariba paid $37 million and took a license to the patents-in-suit.  PX-43.

63.     The second case was against SAP AG and its U.S. subsidiary, SAP America, Inc., another of ePlus's (and Lawson's) largest competitors in the market for electronic sourcing and procurement systems.  The case was tried before Judge Spencer in the Richmond Division of this Court.  After a three-week trial, the jurors were unable to reach a verdict.  The parties then agreed to submit the case to Judge Spencer for a bench ruling.  While the matter was under consideration by Judge Spencer, the parties conducted settlement negotiations and entered into a settlement agreement pursuant to which SAP took a license to the patents-in-suit.  PX-318.

64.     As noted above, *e*Plus is a relatively small company as it pertains to the eProcurement market.  Thus, in order to effectively compete in this marketplace, *e*Plus must enforce its patent rights to exclude infringers.  Only in this way can *e*Plus level the playing field and achieve the market share it should be entitled to because it owns the pioneering patents in this area.  Indeed, *e*Plus has obtained in excess of $57 million in royalties associated with the three patents-in-suit.

### E.     *e*Plus's Licensees and License Terms

65.     Contrary to Lawson's contentions, *e*Plus has not freely licensed the patents-in-suit. First, each of *e*Plus's licenses has been as a result of settlement of actions to enforce the rights to the patents-in-suit.  Second, in each case, ePlus has exercised a degree of control over its licensees.  For example, following the jury verdict finding Ariba to have willfully infringed each of the asserted claims of the patents-in-suit, ePlus and Ariba entered into a Settlement and License Agreement pursuant to which ePlus granted Ariba a personal, non-exclusive, non-transferable, non-sublicensable, non-assignable license to the *e*Plus Patents in exchange for Ariba's payment of $37 M and a cross license to Ariba's patents.  *See* PX-43 at ¶¶5, 11-14.  The license grant extended to Ariba's customers, resellers, hosting or outsourcing partners, VARs, OEMs and Channel and Business partners, but only

30

for products and services as delivered by Ariba into channels of commerce.  PX-43 at ¶14.  Moreover, the license granted under the Settlement and License Agreement was personal to Ariba and not transferable or assignable, except in limited circumstances.  PX-43 at ¶¶14, 17.

66.     Following the jury trial in the *ePlus v. SAP* case, the parties entered into a Patent License and Settlement Agreement.  PX-318.  Pursuant to that Agreement, *e*Plus granted to SAP and its affiliates, SAP Vendors, SAP Customers and SAP Authorized Developers, in exchange for a license payment of $17.5 M, a non-exclusive, license, without the right to sublicense, under the *e*Plus Patents to practice, design, make, have made, operate, have operated, use, sell, license, offer to sell or license and import Licensed Products (as defined) and to practice any Licensed Process (as defined).  PX-318 at ¶2.1.  The license grant extended to third parties making products for or on behalf of SAP but, to the extent such products were provided to any person or entity other than SAP, an Affiliate of SAP, an SAP Vendor, an SAP Authorized Developer or supplier or provider to SAP or an Affiliate of SAP, those products were not considered to be Licensed Products and did not fall within the scope of the license rights set forth under the Agreement.  PX-318 at ¶2.1.

67.     I understand that when the present litigation was initially filed in May of 2009, *e*Plus brought this action against four defendants, including Verian Technologies, Inc., SciQuest, Inc., Perfect Commerce, LLC and Lawson.  With the exception of Lawson, each of the Defendants entered into a Settlement and License Agreement with *e*Plus at the outset of the litigation before significant discovery had commenced.

68.     For example, in exchange for Verian's payment of $500,000 and an agreement to pay ongoing royalties in the event its revenues exceeded certain thresholds, *e*Plus granted to Verian and its affiliates a personal, non-exclusive, non-transferable and non-assignable (except in certain circumstances), non-sublicensable (except in certain circumstances), license to make, have made,

import, export, sell and offer for sale, support and repair any products and services that were covered by one or more claims of the *e*Plus Patents.  PX-320 at ¶14.  The license was non-sublicensable except for sublicenses to manufacturers, distributors, sales agents, support and development contractors, customers and users acting under Verian's authority and only with respect to products and services which are sold or licensed by Verian.  *Id.*  Moreover, the patent license granted in the Agreement does not extend to entities or their Affiliates acquired by Verian or entities or their Affiliates with which Verian may merge after the Effective Date if, at any time during the six month period prior to such acquisition or merger, the counterpart entities or their affiliates are making, using or selling products or services which infringe one or more claims of any *e*Plus Patent, without the prior written consent of *e*Plus.  PX-320 at ¶15.  Moreover, Verian could not assign the Agreement without the prior written consent of ePlus except in certain limited circumstances.  PX-320 at ¶35.

69.     In the case of SciQuest, in exchange for SciQuest's payment of $2.4M, ePlus granted to SciQuest a personal, non-exclusive, non-transferable, non-sublicensable, non-assignable, license to make, import, sell and offer for sale any products or services that are covered by one or more claims of the ePlus Patents.  ePlus specified, however, that in no event does the license granted to SciQuest extend to Lawson.  PX-319 at ¶14.  Moreover, ePlus and SciQuest agreed that the patent license did not extend to any entities that conclude an Asset Acquisition or a Stock Acquisition with SciQuest that results in a Change in Control of SciQuest without the prior written consent of ePlus except in certain limited circumstances.  PX-319 at ¶15.

70.     In the case of Perfect Commerce, in exchange for Perfect Commerce's payment of $750,000, ePlus granted to Perfect Commerce a personal, non-exclusive, non-transferable, non-sublicensable, non-assignable (except in limited circumstances), license to make, import, sell and offer for sale any products or services that are covered by one or more claims of the ePlus Patents.

32

ePlus specified, however, that in no event does the license extend to Lawson.  PX-317 at ¶14.  ePlus further specified that the license granted under the Agreement was personal to Perfect Commerce and that Perfect Commerce could not assign the Agreement or any portion thereof, without the prior written consent of ePlus.  PX-317 at ¶15.

71.     It is my opinion that a denial of injunctive relief to a party that enters into license agreements to settle patent litigations because of such licenses would be contrary to the strong public interest in encouraging settlements of disputes.  In my 45 (plus) years of actual experience in patent enforcement and licensing, I have found that such settlements of patent disputes promote judicial economy and efficiency and are consistent with the principles and objectives of the U.S. patent system.  If such settlement agreements were to preclude a patent owner's ability to effectively enforce its patent rights against additional infringers, patent owners would have no incentive to settle litigations.

72.     Thus, the fact that ePlus has licensed other entities in an effort to settle its patent enforcement actions should not, in my opinion, preclude its ability to obtain an injunction to prevent Lawson's ongoing infringement.

### F.      The Supreme Court Decision and the Four-Factor Test

73.     The Supreme Court, in *eBay v. MercExchange, LLC*, 547 U.S. 388 (2006), held that "[a]ccording to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief.  A plaintiff must demonstrate:  (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest will not be disserved by a permanent injunction."  *Id.* at 391.

74.     The Supreme Court in *eBay* also held that a patent owner's willingness to license and its

33

lack of commercial activity in practicing the patents is not sufficient to establish that the patent holder would not suffer irreparable harm if an injunction did not issue.  Indeed, the Court indicated that such patent holders may be able to satisfy the traditional four-factor test.

75.    The concurring opinion authored by Chief Justice Roberts recognized that "courts have granted injunctive relief upon a finding of infringement in the vast majority of patent cases" because of "the difficulty in protecting a right to *exclude* through monetary remedies that allow an infringer to *use* an invention against the patentee's wishes -- a difficulty that often implicates the first two factors of the traditional four-factor test."

76.    Chief Justice Roberts in *eBay* agreed that the traditional four-factor test should apply in patent cases, but he emphasized the role history should play when courts apply the four-factor test.  Specifically, he noted "[f]rom at least the early 19th century, courts have granted injunctive relief upon a finding of infringement in the vast majority of patent cases.  This 'long tradition of equity practice' is not surprising, given the difficulty of protecting a right to exclude through momentary remedies that allow an infringer to use an invention against the patentee's wishes – a difficulty that often implicates the first two factors of the traditional four-factor test."  Chief Justice Roberts, therefore, counseled against "writing on an entirely clean slate."  And he advised "a page of history is worth a volume of logic" when courts apply the four-factor test to patent cases.

77.    Indeed, since the Supreme Court's decision in *eBay*, a number of district courts have addressed the issue of when a patentee is entitled to injunctive relief.  Although the *eBay* Court warned against using categorical or general rules in the analysis of when patentees are (or are not) entitled to injunctive relief, 547 U.S. at 393-94, certain patterns have emerged from the case law in this post-*eBay* landscape.  For example, a review of post-*eBay* district court decisions reveals that in cases where there is evidence that the patentee actually practiced its patents, or was a competitor in

34

the marketplace with regard to an embodiment of the claimed invention, courts have been willing to grant permanent injunctive relief approximately 88% of the time.  Fish & Richardson, "Permanent Injunctions in the wake of eBay v. MercExchange", available at http://www.fr.com/permanent injunctionebay/Generic.aspx (last updated Jun. 9, 2009); Morrison & Forester LLP, Intellectual Property Quarterly Newsletter, (Spring 2009); December 1, 2006: Ruffin Cordell (Washington D.C.), "Injunctions: Lessons Learned from the e-Bay Case" at the IP Law & Business "Innovations in IP Litigation".  In contrast, in situations where the patentee does not practice its patents (*e.g.*, where the patentee is a Non-Practicing Entity with an expansive licensing scheme), courts have been much more reluctant to enter injunctions, granting injunctions in only about 13% of such cases.  *See id.*  Thus, the willingness that courts show in granting permanent injunctive relief on behalf of practicing patentees is applied in equal force in denying permanent injunctive relief when the patentee merely licenses its patents to others

### G. *e*Plus Has Suffered Irreparable Harm, and Will Continue to Suffer Irreparable Harm, Unless Lawson's Unauthorized Use of ePlus's Patents Is Enjoined

78.     Based upon the background facts set forth above, it is my opinion that ePlus has suffered irreparable harm, and will continue to suffer irreparable harm, unless Lawson's ongoing infringement is enjoined.

79.     ePlus has not licensed the patented inventions in an indiscriminate manner.  Rather, it sought to exercise and maintain a degree of control over its licensees by, for example, providing that the licenses granted were personal, non-transferable, non-sublicensable and non-assignable.  Moreover, two of ePlus's licenses expressly prohibit the extension of such licenses to Lawson.  Further, it is my opinion that such licenses resulting from settlement of patent enforcement actions, should not preclude ePlus's ability to obtain injunctive relief here.

80.     The fact that ePlus is a small company that has a much smaller market share than

Lawson serves to reinforce my opinion that injunctive relief is needed.  Throughout the course of the history of commerce in the United States there have been numerous examples of inventors who formed companies to exploit their inventions but initially manufactured nothing, including George Westinghouse who formed Westinghouse Corporation to exploit his air brake inventions; Henry Ford who formed the Ford Motor Company to exploit his automobile assembly line invention; King Camp Gillette who formed the Gillette Company to exploit his razor invention; Elisha Graves Otis who formed the Otis Elevator Co. to exploit his elevator inventions; W.K. Kellogg who formed the Kellogg Co. to exploit his grain harvester invention; and numerous others.  These are individuals who, in most cases, worked alone, without government or corporate support, yet created not just new inventions, but whole new industries that employ millions of people today.

81.     As I have learned through my 45 years of experience in the patent licensing field, the great majority of *new* jobs created for the U.S. public are provided by small companies with fewer than 500 employees.  These companies most often are successful because of the right to exclude they obtain when they receive patent grants.  Often, these small businesses are able to fund their start-ups by leveraging their intellectual property, *i.e.*, patent rights; without the right to exclude, it is doubtful that such start-ups would be possible.

82.     Because intellectual property is but one component among many required in a commercialization effort, the owner of the intellectual property must arrange for its combination with the other necessary elements such as manufacturing facilities or system infrastructure, raw materials or system components, and a workforce, among other things.

83.     Often, in my experience, in order to commercialize his/her invention, a patent owner must enter into licenses, joint ventures or other contractual arrangements to secure funding, manufacturing facilities or raw materials.

84.     Licensing of intellectual property can also facilitate its integration with the other resources needed to commercialize the inventions.  This integration can lead to more efficient exploitation of the intellectual property, benefiting the public through the reduction of prices and the introduction of new, technologically-advanced products or services.  Such licensing arrangements increase the value of the intellectual property rights to the owner of the intellectual property as well as to the public.

85.     Additionally, licensing can increase the expected monetary returns from intellectual property, thereby increasing the incentives for the creation of new intellectual property and promoting still greater investment in research and development, both additional benefits to society.  Indeed, these are the very goals the Founding Fathers desired when they directed the Congress to enact laws to "promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."  U.S. Constitution, Article I, section 8, clause 8.

86.     Licensing of patents generates billions of dollars from both U.S. and foreign licensees. The value of licensing would be severely diminished if infringers who elect to infringe patents rather than honor them are permitted to continue.  In the words of the former Chief Judge of the U.S. Court of Appeals for the Federal Circuit, Howard Markey, such infringers would be in a "heads I win — tails you lose" position.

87.     As the Supreme Court in *eBay* held, ***"a plaintiff's past willingness to license its patent is not sufficient per se to establish lack of irreparable harm if a new infringer were licensed."*** *eBay,* 547 U.S. at 393 (emphasis added).  Moreover, other courts have found that adding a new competitor to the market may create an irreparable harm that the prior licenses did not.  *See, e.g.*, *Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1328-30 (Fed. Cir. 2008).

88.     Justice Kennedy's concern in his concurrence in *eBay* about patents of questionable validity is likewise not relevant here.  The jury found all of the asserted claims of the patents-in-suit not invalid based upon Lawson's various invalidity defenses raised at trial.  *See* Jury Verdict dated Jan. 27, 2011 at 4-7.  The trial court also denied Lawson's JMOL of invalidity.

89.     It is my opinion that ePlus has suffered, and will continue to suffer, irreparable harm because its right to exclude Lawson from using systems covered by the infringed claims of the patents-in-suit is being denied.

90.     ePlus is suffering irreparable harm that cannot be calculated due to its inability to exclude Lawson from using the patented systems and methods covered by the claims of the patents-in-suit.

91.     Moreover, it is my opinion and experience based on more than 45 years of IP management and licensing that the patent laws have always provided the patent owner with a right to license entities that it chooses and to refuse to license entities it chooses not to license.  This is the essence of the "right to exclude."  However, where that right is incapable of enforcement through exclusion of parties that are not authorized by the patent owner to use the patented inventions, the patent owner's right to exclude is irreparably harmed, and the intent of the patent laws is compromised.

92.     Indeed, the United States Government has been active in persuading other countries to amend their patent laws to provide "rights to exclude" and to prohibit compulsory licenses.

93.     For example, in 1976, I was an assistant ambassador to the Paris Convention Revision Conference administered by the World Intellectual Property Organization ("WIPO") and held in Nairobi, Kenya.  In this conference, I led the debate with the Soviet delegation on the merits of an incentive-based patent system in which inventors are given the "right to exclude" as compared to the

38

Soviet system of granting inventors' certificates (*i.e.,* monetary bonuses) to inventors.

94.     Following this debate and because of my remarks (according to a senior Chinese official who was present at the W.I.P.O. conference), China also adopted an incentive-based patent law since such a system was superior to the Soviet monetary-award system and had the greatest opportunity to promote domestic research and development.  I recall having said to the Soviet representative that, under the Soviet system, Thomas Edison would not have had the incentive to exploit his incandescent light bulb invention by creating the first of the electrical grids that are present in the U.S.

95.     In the 1988-89 time frame, I was a member of a U.S. organization (IIPA) seeking to convince the Japanese Government to accord inventors a "right to exclude" analogous to inventors' rights under the U.S. patent laws.  At the time, the Japanese patent laws gave patent owners only an exclusive right to license their inventions rather than a right to exclude.  This aspect of Japan's law provided a disincentive to Japanese researchers to conduct basic research.  Ultimately, Japan amended its patent laws to bring them into accord with U.S. laws and the TRIPs Chapter of the GATT (*see* below), finding the need to provide inventors with a right to exclude as a means to promote investment in new research and development activities.

96.     Canada also, at one time, had a law under which pharmaceutical patents were subject to compulsory licenses.  While this law was in force, there was essentially no new research and development work with respect to pharmaceuticals conducted in Canada.  The Canadian law was changed in 1992 because it was incompatible with Article 31 of the GATT Agreement on Trade-Related Aspects of Intellectual Property Rights (TRIPs) as well as Chapter 17 of NAFTA.

97.     Additionally, during the '70's, there was no patent protection for compositions of matter in Italy and Japan.  Not until the law was changed was any pharmaceutical research conducted in

these countries.  The Licensing Executives Society (*see* above) was one of a number of international organizations that worked to convince both countries that patent protection for compositions would serve their national interests.

98.    For all of these reasons, in my opinion, ePlus has suffered irreparable harm not quantifiable due to the lost business and licensing opportunities resulting from its inability to enjoin Lawson's ongoing infringement.

99.    Moreover, it is my opinion, that ePlus will continue to suffer irreparable harm if Lawson's infringement is not enjoined.  It will lose its right to exclude an infringer from the marketplace that ePlus wishes to exploit.  It will lose its right to choose the parties with whom it wishes to do business and to refuse to do business with others, such as Lawson.  It will lose its right to negotiate the terms upon which it is willing to grant licenses to entities.  Moreover, it may even cause the loss of value in its business, if it no longer has the ability to license and exploit its patented technology itself.

100.    A concern of ePlus, similar to concerns of other technology companies, is the "cost of capital."  Cost of capital simply refers to what it costs a company to raise the necessary funds to operate its business.  A standard source of capital in the Internet commerce market (or any technology market) is the sale of equity (common or preferred stock) to investors, either through public offerings if the company is large enough, or through private sales otherwise.  The price that an investor is willing to pay to the company for a share of stock (as a percentage of the company ownership) is tied to the value they assign to the enterprise and the risk they attach to the success of the company.  Higher risk, cheaper stock results in lower valued shares and more shares that must be sold.  The result is that the value of the investors' shares become more and more diluted.

101.    In ePlus's case, an obvious risk to an investor is that ePlus may not be able to properly

protect its intellectual property rights.  ePlus's patents would have minimal value if Lawson is permitted to continue to infringe.  Without the ability to exclude Lawson, ePlus's ability to differentiate its products from those of Lawson would be effectively impossible.  Without the ability to differentiate, ePlus's business is worth much less.  The result is that ePlus would be much less able to raise financing; in fact, its sources of funding could well be exhausted.

102.    Moreover, where, as here, the patent owner is precluded from a recovery of monetary damages, there clearly is no adequate remedy at law.

### H.    The Balance of Hardships Weighs in *e*Plus's Favor

103.    In addressing the balance of hardships, two issues should be considered: 1) hardships suffered by Lawson; and 2) hardships suffered by ePlus.  *See eBay*, 547 U.S. at 391 (the balance of hardships considered is only between the Plaintiff and the Defendant, and thus the effect on third parties, such as customers, is irrelevant under this factor of the four factor injunction test).  In my opinion, the sum total of these hardships appears to weigh heavily in ePlus's favor.

#### 1.    Lawson Hardships

104.    In an analysis of the balance of hardships, it does not appear that any hardship suffered by Lawson as a result of a permanent injunction would be beyond the costs associated with potential loss of sales revenues if Lawson continues to infringe the patent.  It is likely that Lawson would suffer losses of users and sales if it were to lose the ability to offer its infringing procurement software solutions.  Although the loss of users and sales is undoubtedly a hardship for Lawson, this hardship flows directly from its decision to infringe the patents at issue.  In effect, Lawson's "hardship" corresponds to the loss of sales that Lawson should not have been making in the first place.

105.    In addition to lost revenues and profits, another "harm" that Lawson would suffer in the event that a permanent injunction issued would be the costs associated with shutting down the infringing products and services.  That can hardly be considered a "hardship."  If that were the case, a

permanent injunction could never issue as a result of patent infringement.

106.    It is elementary and very logical in my experience that "one who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected." *See Windsurfing Internat'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986).

107.    If Lawson believes it can design around the patents at issue — which I am informed and understand is unlikely, if not impossible, given the necessary functionality claimed in the patents — there would be no harm to Lawson caused by the permanent injunction.  To the extent that this is not true, the additional costs of designing around the patent at issue are costs that Lawson should have incurred before offering its infringing products and services, if it was not interested in taking a license from ePlus.  Therefore, such costs are more properly considered normal business expenses rather than "harms" to be weighed against ePlus in the determination of whether a permanent injunction should issue.

108.    Indeed, the Federal Circuit has recognized that the consequences to the infringer of its infringement, such as the costs of redesigning the infringing products, and its initial development and marketing costs for the infringing products are irrelevant to weighing the balance of the hardships.  *i4i Ltd. Partnership v. Microsoft Corp.*, 598 F.3d 831, 863 (Fed. Cir. 2010).

109.    In any event, I am informed and understand that Lawson's deponents testified that they did not believe that Lawson would suffer significant hardship in the event an injunction is entered.

### 2.    ePlus Hardships

110.    Any hardships that might be suffered by ePlus due to the lack of a permanent injunction cannot be recovered by way of damages, given the Court's ruling as to that available remedy.

111.    The failure to obtain a permanent injunction, therefore, would deprive ePlus of a range

of licensing and partnering opportunities, not the least of which is the opportunity to negotiate licenses to the patents-in-suit from a position of significant strength.

112.    An additional hardship that would be suffered by ePlus in the absence of a permanent injunction is the loss of control of its intellectual property.  In the event that no permanent injunction issues, Lawson would have obtained an opportunity through infringement of the patent at issue — and would enjoy complete freedom to decide how long such usage would continue.  Such an affront to ePlus's property rights would undoubtedly be a hardship to it.

113.    Finally, the window of opportunity is open to ePlus for only a finite period.  A patent is a "wasting asset," and the value of this asset expires in 2017.

114.    As between ePlus (the patent owner) and Lawson (the adjudicated infringer), it is my opinion that the balance of hardships weighs in favor of the grant of the injunction.

I.      **The Public Interest Favors Entry of a Permanent Injunction**

115.    I have testified before Congress and served as a member of a number of U.S. delegations that have urged that the public interest in incentivizing ongoing investment in research and development favors strong enforcement of patent rights by way of injunctive relief.

116.    Moreover, in my opinion, the public interest is disserved by enabling an adjudicated infringer such as Lawson to continue its infringement without recourse.  An infringer should not be permitted to build a business based on its infringement and then argue that the public interest favors its continued infringement.

117.    Additionally, in my opinion, given the current competitive landscape in the electronic procurement marketplace, an injunction would serve the public interest by promoting competition and allowing ePlus and ePlus's authorized licensees, to have a more level playing field.  An injunction precluding Lawson's use of the infringing electronic sourcing and procurement systems would enable ePlus and ePlus's licensees the opportunity to compete more effectively against Lawson.

118.    In light of ePlus's licensing of its patent to others, the public would have access to the benefits of ePlus's patents, even if a permanent injunction issued.  This fact should tip the public interest factor in favor of injunction.

119.    Another public interest consideration is the benefits that a permanent injunction would provide to ePlus's existing licensees.  Those licensees are now at a commercial disadvantage to Lawson because Lawson continues to operate as an infringer of the patents-in-suit and has done so on a royalty-free basis.  Indeed, Lawson's continued infringement can now — going forward in light of the jury's verdict — only be considered willful infringement.  Issuance of a permanent injunction would stop this continuing harm caused by Lawson's infringement and would, therefore, be in the public interest.

120.    A factor that dovetails closely with a patent owner's licensing is the ability of a patent owner to maximize the value of its patent. Patents, like other property, are assets. And a fundamental precept of capitalism is that rational investors maximize the value of their assets. This is easier to accomplish when a patent owner can license its patents without fear of improper adverse inferences or other inappropriate or unwarranted consequences .

121.    Without the right to obtain an injunction, the right to exclude granted to the patentee would have only a fraction of the value it was intended to have, and would no longer be as great an incentive to engage in the toils of scientific and technological research. Even more generally, the public is harmed when the patent system is weakened. President Lincoln wisely recognized that "the patent system added the fuel of interest to the fire of genius."

122.    This of course recognizes that the incentive-based patent system drives innovation. Individuals and companies invest in assets with the highest return on investment. And a patent is often worth less without a right to exclude infringers. Individuals and companies, therefore, will be

less likely to invest in the research and development necessary for a patent if they are not allowed to exclude infringers.

123.    Less research and development means less innovation. And less innovation is bad for the public interest. Chief Justice Roberts' caution that a "page of history is worth a volume of logic" is particularly insightful in this context. Quite simply, the public suffers when injunctions are denied because innovation diminishes.

124.    Finally, this is not a case of a weak invention being used to hold up a large company or an entire industry.  This is a practicing patent owner participating in the business, attempting to ensure that a competitor does not capitalize on an invention to which it has been proven not to be entitled.

125.    Issuance of a permanent injunction will foster competition here.  It will allow the patents-in-suit to be used more broadly; such use will allow others to enjoy the benefits of the invention.  And competition benefits consumers.

126.    Further, I know of no countervailing harm to the public that would result from granting the requested injunctive relief.  There are suitable non-infringing alternative products available from ePlus or its licensees.  Additionally, companies could resort to paper-based procurement processes if necessary during any time needed to transition to a non-infringing software system.

127.    For at least these reasons, in my opinion, entry of a permanent injunction would serve the public interest.

128.    I reserve the right to respond to any opinion put forth by any expert proffered by Lawson and to supplement this Disclosure/Declaration accordingly.  In addition, I reserve the right to supplement this Disclosure/Declaration based on any additional information produced by the parties during this stage of the proceedings in this case.

## V.      CONCLUSION

129.    For all of the above reasons, it is my opinion that ePlus's circumstances more than satisfy the four-factor test for issuance of permanent injunctive relief.

I declare under the penalty of perjury under the laws of the United States of America that, to

the best of my knowledge, the foregoing is true and correct.

Dated:   $2/7/2011$

Larry W. Evans

# EXHIBIT A

# Larry W. Evans - C.V.

3811 Via Del Campo
San Clemente, CA  92673
949-218-4378 (Phone/Fax)
E-Mail: LWEvans @ MSN.Com

### *PERSONAL*

Born October 4, 1939 at Georgetown, Indiana
Married since 1964, three adult children.

### *EDUCATION*

- B.S. – (Ch.E) 1961 – Purdue University
- J.D. – (Law) 1965 – The George Washington University

### *BAR ADMISSIONS*

- USPTO – 1962
- Minnesota – 1965
- U.S. Court of Appeals for Federal Circuit
- U.S. District Court (Minnesota and Arizona)

### *PRACTICE*

- Domestic and International Intellectual Property Licensing
- Preparation and Negotiation of License Agreements
- International Business Transactions
- Dispute Resolution
- Service as an Expert Witness

### *PROFESSIONAL ACTIVITIES*

- Licensing Executives Society (USA and Canada):
  - Past President - 1986-87
  - President - 1985-86
  - President-Elect.-1984-85
  - Vice President - 1983-84
  - Secretary - 1980-83
  - Int'l Delegate - 1980-Present
  - Chairman – Endowment Fund Committee – 1987-1990
  - Chairman – China Licensing Committee – 1996-1998
  - Co-Chairman – Symposium Committee – 1988-1998
  - Co-Editor – Law and Business of Licensing – 1998
  - Chairman – Licensing Achievement Award Committee 1997-1998
  - Speaker – Tech Transfer Seminar – 1980-1986; 1990-1994; 1996-1998; 2002-2003
  - Chairman – Long Range Planning Committee – 1993-1995

# Larry W. Evans – C.V.
## Page 2

### PROFESSIONAL ACTIVITIES (CONT'D)

- Licensing Executives Society International:
  - President Elect. – 1992
  - President – 1993
  - Past President – 1994
  - Chairman – Long Range Planning Committee – 1994-1996
  - Prepared LESI Strategic Plan – 1995
  - Chairman – Endowment Committee – 1995-1997
  - Gold Medal Recipient – 1999, Chairman, Gold Medal Committee, 2000-2006
- American Bar Association (PTC Section) – Past Chairman – China Committee.
- American Intellectual Property Law Association.
- Association of Corporate Patent Counsel.
- Chemical Manufacturers Association (Past Chairman of I.P. & Licensing Committee).
- International Intellectual Property Association, the U.S. Chapter of AIPPI (Member of the Executive Committee, 1987-2002)
- National Training Center-Dalian, China (Member of the Advisory Board, Graduation Speaker, 2002)
- The Patent, Trademark & Copyright Research Foundation (Member of the Advisory Council, 1984-2003)

### PROFESSIONAL EMPLOYMENT HISTORY

- 1961-1965    ADAMS, FORWARD & MCLEAN – WASHINGTON, D.C
  Student Associate, Patent Agent

- 1965-1968    ARCHER, DANIELS, MIDLAND COMPANY – MINNEAPOLIS, MINNESOTA
  - Patent and Licensing Attorney.
  - Responsible for all areas of intellectual property practice, including extensive licensing.

- 1968-1970    ASHLAND CHEMICAL, HOUSTON, TEXAS
  Chemical Company acquired in 1968 by Ashland Oil Co.
  - 1968-1970 – Division Patent & License Counsel.

- 1970 to April 1993    B.P. AMERICA – (FORMERLY STANDARD OIL COMPANY) CLEVELAND, OHIO
  - 1970-1976 – Patent and License Counsel.
  - 1976-1993 – Director, Patent and License Department and Vice President, B.P. Chemical Co., Inc. (Formerly Sohio Chemical Company).
  - Devoted almost all practice from 1970 to 1976 to licensing of Sohio's world-famous acrylonitrile process patents technology and other technologies.
  - 1976-1993 – Managed all intellectual property lawyers at BP America and continued a personal active role in company's more significant licensing activity.
  - More than $1 billion in royalty income and catalyst profit realized through these licensing projects.
  - Sohio/BP America licensing has been a world-wide activity (e.g.- North & South America, Europe, Asia and Africa) establishing important personal and business contacts throughout the world.
  - Was the first American to successfully license technology to the P.R.C.  The 1973 license has been followed by eight additional licenses and innumerable personal contacts.

# Larry W. Evans – C.V.
## Page 3

### PROFESSIONAL EMPLOYMENT HISTORY (CONT'D)

- April 1993 to    WILLIAN, BRINKS, HOFER, GILSON AND LIONE
  Dec. 31, 1995

  - Practice included domestic and international technology licensing, preparation and negotiation of license agreements, dispute resolution and service as an expert witness.

- Jan. 1996 to    SOLO  PRACTICE – IP AND LICENSING CONSULTANT
  Present

  - Practice includes all aspects of IP management and licensing and service as an expert witness in intellectual property and anti-trust litigation.

### CAREER HIGHLIGHTS

See Attachments.

### PUBLICATIONS AND SPEECHES

See Attachments.

# Larry W. Evans – C.V.

### *CAREER HIGHLIGHTS*

During 1970-1976, Mr. Evans was responsible for licensing Sohio's world-famous acrylonitrile technology (recognized by many in the industry as the most successful chemical-licensing program in the world). He personally negotiated more than 15 licenses throughout the world during this period. In 1973, Sohio was the first American company to license technology to China following the resumption of friendly relations.

From 1976 to 1993, Mr. Evans headed the Patent and License Department of Sohio and of BP America, (following BP's acquisition of Sohio in 1987). During this period, Mr. Evans supervised and, in many cases, personally handled licenses of significant technology. Additionally, he was responsible for resolving (through negotiation, arbitration or litigation) high profile disputes with licensees, competitors and partners. Technology licensed (both in and out) included, *inter alia*, refining and petrochemical technology, ceramics, photovoltaics, fuel cells, batteries and capacitors, computer software, and biotechnology.

Sohio's/BP America's License Department was a profit center until 1989 and Mr. Evans' responsibility extended to that of running a business that generated royalty and catalyst income exceeding $1 billion to Sohio and BP America during the 1970-1993 period.

Beginning in 1968, Mr. Evans participated in the Licensing Executives Society (LES). This activity began with several speaking engagements. Topics centered around process licensing, royalties, license agreements, licensing in developing countries, China licensing, and related fields. In 1979, Mr. Evans was elected Secretary of LES USA/Canada, a position he held through 1983. He then served as Vice-President in 1984, President-Elect in 1985, President in 1986 and Past-President in 1987. Throughout this period he was a delegate to LES International. Mr. Evans remains active in this organization.

Following his progression through LES USA/Canada, Mr. Evans became more active in LES International, which is the international federation of national and regional LES Societies. He became a Committee Chairman in 1989, in 1992 served as President-Elect and in 1993 as President of LES International. LES International (LESI) has more than 12,000 members from 30 national and regional Societies and more than 60 countries. In October, 1999, Mr. Evans was voted by the LESI Board of Delegates to receive the highest honor of LES, the Gold Medal for outstanding service and leadership in the licensing profession. He received the award in ceremonies held in Amsterdam, The Netherlands in May 2000. Almost all substantial licensing is conducted by LESI members (on at least one side of the transaction). Without qualification, it can be said that LESI is the most important organization in the world in the field of licensing and technology transfer. Mr. Evans currently serves as an active past-president and member of LESI's awards committee.

Mr. Evans joined the Chicago intellectual property law firm, Willian, Brinks, Hofer, Gilson & Lione in April 1993 as Counsel to the firm. While at this firm, he specialized in domestic and international licensing, preparation and negotiation of licensing agreements, international business transactions, dispute resolution and service as an expert witness in licensing, patent infringement damages, contract interpretation and anti-trust matters.

Beginning in January 1996, Mr. Evans began his present practice as an Intellectual Property and Licensing Consultant continuing to specialize in the above areas.

# Larry W. Evans – C.V.

### *PUBLICATIONS AND SPEECHES*

"Current Trends in Domestic and International Licensing; When Should New Technology be Licensed?" Practicing Law Institute, New York, November 1977.

"Process Licensing; Turning Patents and Technology into Money", Licensing Law and Business Institute, February-March, 1979; The Law and Business of Patent and Know How Licensing, 1983.

"Evaluation, Selection of Technology", les Nouvelles, June 1981.

"Packaging and Valuation of Technology", LES USA/Canada NYC Seminar, 1983 (also given at AMA Seminars in San Francisco (1982), New York (1982) and New York (1981).

"When Should New Technology be Licensed?; Pricing the Technology, *The Law and Business of Patent and Know-How Licensing*", 6th Edition, 1983.

"To License or Not-The View of a U.S. Corporation", LES Tokyo, Japan, 1983.

"Pricing and Packaging the Technology", Practicing Law Institute Technology Licensing Program, December 1984, January, 1987 and February 1988.

"International Licensing of Chemical Processes; Practical Considerations – Industrialized, 3rd World and COMECON Countries", LES USA/Canada Meeting, Palm Springs, California, 1984.

"License Your Technology Abroad", Cleveland World Trade Association, Cleveland, 1984 and 1979.

"How Large Companies Treat Technology", Cleveland World Trade Association, 1985, 1988.

"Licensing Success at Standard Oil", ABA Annual Meeting, NYC, 1986.

"Language, Political & Cultural Hurdles in International Licensing", LES International Conference, Dublin, 1986.

"Establishing Reasonable Royalties", LES USA/Canada Seminar, Ottawa, 1986.

"Negotiation Do's and Don'ts", Intellectual Property Symposia, Marco Island, FL, 1986.

"Licensing Disincentives in Brazil", *les Nouvelles*, December 1986.

"Trade Secrets in Patent & Technology Licensing", Practicing Law Institute Protecting Trade Secrets Program, May 1986.

"International Licensing", International Law Institute, Washington, D.C., 1987.

"Licensing in China", LES Switzerland Seminar, Zurich, 1987.

"China Licensing", LES USA/Canada-China Seminar, Washington, 1987.

"Why, What & How to License", Intellectual Property Symposium, Marco Island, FL 1987.

# Larry W. Evans – C.V.

*PUBLICATIONS AND SPEECHES (CONT'D)*

"The Ten Commandments of a Successful Licensee", Intellectual Property Symposium, Marco Island, FL, 1987.

"Licensing in China", Association of Corporate Patent Counsel Meeting, Ft. Lauderdale, 1987.

"The Licensing of Trade Secrets and Know-How", LES USA/Canada Annual Meeting, Marco Island, FL, 1988.

"Observations of a China Licensing Veteran", Asia Society, New York, 1988.

"Licensing in China: One Company's Experience and Prognosis", LES International Conference, Sydney, 1988.  (Also given in New Hampshire, 1986)

"Process Licensing for Licensors and Licensees", LES China Seminar, Beijing, 1988.

"A Licensing Success Story… or Why Licensing is Often the Best Alternative", Albany Law School Annual Conference on Intellectual Property, Matthew Bender, 1988.

"Licensing with Japanese Companies-Resolving Disputes and Misunderstanding", LES Annual Meeting, Maui, Hawaii, 1989.

"Value of Patents", Les Argentina Seminar, Buenos Aires, 1989.

"Financing of Licensing and Joint Ventures in China", LES International Conference, Stockholm, 1989.

"How a Corporation Regards Patents", University of North Carolina, Chapel Hill, 1989.

"Licensing Success Story", Association for Corporate Growth, Cleveland, 1989.

"Trade Secrets in Patent & Technology Licensing: Negotiating and Drafting the License Agreement", Licensing Executives Society Annual Meeting (April-May, 1989).

"Key License Clauses for Technology License Agreements", Practicing Law Institute Technology Licensing Program, January 1989 (Repeated 3 Times).

"Licensing from Standpoint of a Large Multi-National Corporation", LES China First Annual Meeting, Shanghai, 1990.

"Licenses and Joint Ventures in the U.S.", Marketing in the USA, Program for Yugoslavian Businessman, Cleveland State University, 1990.

"Trade Secrets and their Protection from the Owner's/Corporation's Standpoint", LES Argentina Seminar, Buenos Aires, 1990.

"Case History:  Commercializing Acrylonitrile Technology", LES International Conference, Rio de Janeiro, 1990.

"Licensing is Good for Business", Seminar for Small Business, U.S. Small Business Administration, Cleveland, 1990.

# Larry W. Evans – C.V.

***PUBLICATIONS AND SPEECHES (CONT'D)***

"An Introduction to Intellectual Property and Licensing", International Executive Program, State University of New York at Buffalo, 1991.

"How to Get a Patent That Really Protects You", National Inventors Hall of Fame Inventors Showcase, Akron, 1991.

"Licensing:  Why, What, Who & How?" A Strategy for Profits Conference-Licensing From Research to Marketing, Middleburgh Heights, Ohio, 1991.

"A Corporate View of Proven vs. Unproven Technology", American Chemical Society Symposium, Atlanta, 1991.

"Technology Dispute Resolution in the U.S.: A Practical Perspective", Canada-U.S. Law Institute Conference, Cleveland, Ohio, 1991.

"China Business: Past, Present and Future", Forecast '91.  The U.S.-China Business Counsel Meeting, Washington, D.C., 1991.

"LES International:  What is it?  What is its role?", LES Portugal Seminar, Lisbon, 1993.

"The Impact of the Anti-Trust Laws on Patent and Know-How Licensing", Tokyo AIPPI Conference, 1992 (repeated at the LES International Conference, Berlin, 1993).

"Lessons Learned from 20 Years of Licensing to China", U.S.-China Business Counsel, Washington, D.C., June 1993.

"The Determination of Damages in a Patent Infringement Litigation in the United States", LES-Japan Seminar, Tokyo, 1993.

"Licensing in the New World Order-Practical Aspects of Licensing, Cross-Licensing and Strategic Alliances in Today's World", LES-Japan Seminar, Tokyo, 1993 and LES-Scandinavia Conference, Gothenburg, 1993.

"A Licensing Success Story", LES-China Seminar, Beijing, 1993.

"Licensing in the New World Order-Implications for U.S. Competitiveness", University of Pennsylvania, 1993.

"A Licensing Success Story", LES-Korea/AIPPI Korea Seminar, Seoul, Korea, 1993.

"Case History of Successful Licensing", *les Nouvelles*, Journal of the Licensing Executives Society, Vol. XXVIII, No. 2, June 1993.

"Licensing of Technology/Trade Secrets", Joint Seminar, LES-Germany, LES-Hungary, January 1994.

"BP's Futile Attempt to License Synthetic Fiber Intermediate Technology to Iran", Symposium of the American Foreign Service Association, Washington, D.C., March 1994.

# Larry W. Evans – C.V.

### PUBLICATIONS AND SPEECHES (CONT'D)

"Licensing in China:  A perspective of a Twenty Year Veteran", *Licensing Law and Business Report*, March-April 1994.

"International Licensing Case History", Licensing in Europe for 2002, 6th LES-European Conference, Delft, The Netherlands, April 1994.

"Licensing of Trade Secrets and Know-How", Trade Secrets Law Institute, Washington, D.C., April 13-16, 1994.

"EC Competition Law and Block Exceptions for Technology Licensing", Spring Meeting of AIPLA, Cleveland, Ohio, April 1994.

"Reflections of a China Licensing Veteran", 1994, LES International Conference, Beijing, China, May 1994.

"Licensing in the Pacific Rim", Franklin Pierce Law Center, Advanced Licensing Institute, Concord, New Hampshire, 1994, 1995, 1996, 1997 and 1998.

"A 20-Year Perspective on Petrochemical Licensing to China", LES USA & Canada Annual Meeting, Hawaii, October 1994.

"Risks and Rewards from International Licensing", AIPPI International Symposium, Seoul, Korea, November 2-4, 1994.

"Licensing:  Key Clauses, Risks and Rewards", Traverse City Conference, Business Law Section-Michigan Bar, May 12, 1995.

"Licensing in China, the Perspective of a 20-Year Veteran", The Southwestern Legal Foundation, Symposium on Private Investments Abroad, Dallas, TX, June 20-21, 1995.

"Licensing in the Pacific Rim", Franklin Pierce Law Center, Advanced Licensing Institute, Concord, New Hampshire, July 1995.  (Repeated 1996).

"Licensing in Asia", AIPPI International Symposium, Seoul, Korea, November 9, 1995.

"China Licensing:  The Effect of Culture on East-West License Negotiation", LES South Africa Annual Meeting, Capetown, South Africa, January 26, 1996.

"Negotiation Techniques", LES Technology Transfer Seminar, New York City and San Francisco, 1995, 1996, 1997 and 1998.

"Industry and Universities:  Friends or Foes?", LES-AUTM Summer Institute, July 1996.

"The Impact of the Anti-Trust Laws on Patent and Know-How Licensing", LES International Symposium, Seoul, Korea, October 1996.

# Larry W. Evans – C.V.

*PUBLICATIONS AND SPEECHES (CONT'D)*

"The Impact of NAFTA on Licensing into Mexico", LESI Conference, Canada, 1997 and AICLE Meeting, September 1997.

"Turning Patents and Technology into Money", *Licensing Law and Business Report*, Clark Boardman Callahan, 1979.

"Evaluation and Selection of Technology", *les Nouvelles*, June 1981.

"Pricing and Packaging of Technology", Practicing Law Institute, New York, 1984 (This talk was given two or three times).

"Licensing Disincentives in Brazil", *les Nouvelles*, December 1986.

"Observations of a China Licensing Veteran", Asian Society, New York, October 12, 1988 (May not have been published).

"What LESI is Today and What it Stands For", *les Nouvelles*, June 1993.

"Case History of Successful Licensing", les Nouvelles, June 1993.

"Reflections of a Licensor to China", les Nouvelles, December 1994.

"Licensing in China:  A Perspective of a China Licensing Veteran", Licensing Law and Business Report, March-April 1994.

"Risks and Rewards From International Licensing", *Licensing Law and Business* Report, March-April 1995.

"Key Licensing Clauses", Practicing Law Institute, 1987-1990.

"The Japanese Patent Law:  One of the Major Non-Cash Trade Barriers Between Japan and the U.S.", Testimony before the Senate Finance Committee, The Licensing Law Handbook, Clark Boardman Callahan, 1996.

*The LES Licensing Guide to Licensing Best Practices*, 2002 (John Wiley & Sons) – authored chapter titled "Challenges of Licensing to and from China and Hong Kong".

"Licensing to and from Japan" – LES Workshop Presentation (2001)

"Patent Valuation from a Business & Legal Perspective" – LES Workshop Presentation (2002)

"Challenges and Opportunities of Licensing to and from Emerging Economies" (2003) Oslo, Norway

"Global Licensing Strategy from the Standpoint of an Experienced Licensing Executive" (2006) Seoul, South Korea

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 7th day of February, 2011, I will electronically serve the foregoing

**RULE 26 EXPERT DISCLOSURE AND DECLARATION OF
LARRY W. EVANS IN SUPPORT OF PLAINTIFF'S
MOTION FOR ENTRY OF PERMANENT INJUNCTION**

on the following counsel:

Daniel McDonald, *pro hac vice*
William D. Schultz, *pro hac vice*
Rachel C. Hughey, *pro hac vice*
Andrew Lagatta, *pro hac vice*
MERCHANT & GOULD
3200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 332-5300
Facsimile: (612) 332-9081
lawsonservice@merchantgould.com

Robert A. Angle, VSB#37691
Dabney J. Carr, IV, VSB #28679
Megan C. Rahman
TROUTMAN SANDERS LLP
P.O. Box 1122
Richmond, Virginia 23218-1122
(804) 697-1238
(804) 698-5119 (Fax)
robert.angle@troutmansanders.com
dabney.carr@troutmansanders.com
megan.rahman@troutmansanders.com

*Counsel for Defendant Lawson Software, Inc.*

_____ /s/ _____

David M. Young (VSB #35997)
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4000
Facsimile:   (202) 346-4444
dyoung@goodwinprocter.com