# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| *e*PLUS INC.,                    ) | |
| ) | |
| **Plaintiff,**          ) | **Civil Action No. 3:09-CV-620 (REP)** |
| ) | |
| **v.**                  ) | |
| ) | |
| **LAWSON SOFTWARE, INC.,**   ) | |
| ) | |
| ) | |
| ) | |
| **Defendant.**          ) | |

**PLAINTIFF *e*PLUS INC.'S RULE 26 REBUTTAL DISCLOSURE
CONCERNING INJUNCTIVE RELIEF**

Pursuant to the Court's January 27, 2011 directive and Federal Rule of Civil Procedure 26, Plaintiff *e*Plus, Inc. ("*e*Plus") hereby discloses information it may rely upon concerning its request for injunctive relief, including information that may be offered in rebuttal to Defendant Lawson Software, Inc.'s ("Defendant's") opposition to *e*Plus's request for a permanent injunction. *e*Plus's Rebuttal Disclosure includes information that *e*Plus may rely upon (1) at the March 3, 2011 evidentiary hearing, (2) in the post-hearing briefing regarding its request for a permanent injunction against Defendant for Defendant's continuing infringement of U.S. Patent Nos. 6,023,683 ("the '683 Patent") and 6,505,172 ("the '172 Patent"), (3) in opposition to Defendant's request for a stay pending appeal of an injunction, and (4) in opposition to Defendant's request for a sunset provision delaying entry of an injunction.

*e*Plus's Rebuttal Disclosure is a supplementation to *e*Plus's written discovery responses and other discovery disclosures and contains references to materials previously disclosed. *e*Plus's previous discovery disclosures, including its Rule 26 Supplemental Disclosure

Concerning Injunctive Relief dated February 7, 2011, are incorporated by reference as if they were fully set forth herein.  All of the information in this Rule 26 disclosure is provided subject to, and without waiver of, *e*Plus's previously stated General Objections and Specific Objections to the discovery requests served on *e*Plus by Defendant in this matter.

## I.    EPLUS WILL BE IRREPARABLY HARMED IF AN INJUNCTION IS NOT ENTERED

### A.    The Software Products Covered By The Patents Are Critical Components of *e*Plus's Business

Since 2001, *e*Plus has sold electronic sourcing and procurement software products, known as Procure+ and Content+, that embody the patented technology at issue in this litigation. Procure+ and Content+ remain *e*Plus Systems and Content Services' flagship software applications even today, almost a decade after *e*Plus acquired the software and the patents underlying the technology embodied in the software from ProcureNet.  *See* Tr. at 1302:6-10 (Farber Direct); Farber Dep. (May 18, 2010) at 26:6-12; 141:10-20.  Indeed, the vast majority of the original 39 employees acquired along with other assets from ProcureNet still work at *e*Plus, including Ken Farber, who now serves as the President of *e*Plus Systems and Content Services. Tr. at 1299:11-13; 1301:10-16 (Farber Direct); Farber Dep. (May 18, 2010) at 13:21-14:6.

In its Rule 26 Supplemental Disclosure Concerning Injunctive Relief ("Defendant's Supplemental Disclosure"), Defendant acknowledges that *e*Plus develops and sells software that embodies the patented technology.  Defendant suggests, however, that this uncontested fact does not bear upon the issue of irreparable harm because, it contends, sales of Procure+ and Content+ "are a small fraction of *e*Plus's total revenues and virtually non-existent in the procurement field."  Defendant's Supplemental Disclosure at 2.  In support of this allegation, Defendant relies upon revenue information produced by *e*Plus, as well as industry analyst reports that indicate that

2

*e*Plus, like Defendant, is not one of the "dominant vendors in the procurement software market." *Id.* at 11.

As an initial matter, the patented Procure+ and Content+ products are the central and primary software products developed and sold by *e*Plus Systems and *e*Plus Content Services.  Tr. at 1302:6-10.  From the time Defendant first began infringing the *e*Plus patents through the present, *e*Plus has generated in excess of $50 million in revenue from Procure+ and Content+. DX-292.[1]  *e*Plus has also generated nearly $60 million in revenue from settlements concerning litigations involving the patented technology embodied in the Procure+ and Content+ products. Tr. at 2620:10-12 (Farber Direct).

The patented Procure+ and Content+ products are critically important aspects of *e*Plus's product offerings not only because they have generated tens of millions of dollars of revenues, but also because, as *e*Plus explained in its SEC disclosures, this proprietary software allows *e*Plus "to better support and retain our customers in our technology sales and finance business," the business from which *e*Plus currently derives the majority of its revenues.  *e*Plus 2010 10-K at 3.  Importantly, *e*Plus has "developed and acquired these products to distinguish [itself] from [its] competition by providing a comprehensive offering to customers."  *Id.*  Procure+ and Content+ are critical to *e*Plus's prospective business strategy as well because this in-house

---

[1]     Defendant argues that the sales information *e*Plus has provided for *e*Plus Systems and *e*Plus Content Services is not indicative of sales that *e*Plus has made for Procure+ and Content+ because sales information for *e*Plus Systems and *e*Plus Content Services includes sales for "unrelated products and services such as document management."  Defendant's Supplemental Disclosure at 2.  In fact, revenues from sales for virtually all of *e*Plus's products and services unrelated to *e*Plus's patented e-procurement software are tracked as revenues for *e*Plus operating companies other than *e*Plus Systems and *e*Plus Content Services.  For example, *e*Plus's sales of proprietary software for document management are tracked as revenues attributable to *e*Plus Document Systems, Inc.  *e*Plus 2010 10-K at 2.  Thus, the financial information *e*Plus has provided for *e*Plus Systems and *e*Plus Content Services is an appropriate measure of the revenues that *e*Plus has derived from its sales of Procure+ and Content+.

proprietary and patented software provides *e*Plus with an "added competitive advantage," since customers in this industry increasingly "prefer bundled offers to include IT products/services and leasing." *Id.* at 4. Procure+ and Content+ are a crucial component of the bundled solution of "IT sales and professional services, leasing and financing services" that *e*Plus provides to its customers. *Id.* at 5. Indeed, *e*Plus differentiates itself from its competitors through its ability to provide comprehensive technology solutions that include the patented proprietary software. *Id.* *e*Plus can only pursue its goal of becoming "a leading provider of bundled solution offerings in the IT supply chain," *id.* at 6, if adjudicated infringers of the *e*Plus patents, like Defendant, are not permitted to unfairly compete with *e*Plus in the marketplace by continuing to market and sell infringing e-procurement software.

### B. *e*Plus and Lawson Are Competitors

Defendant claims in its Supplemental Disclosure that *e*Plus and Defendant are not competitors. Defendant's Supplemental Disclosure at 8. That claim is demonstrably false and is contradicted by, among other things, (1) trial and deposition testimony from Defendant's witnesses; (2) trial and deposition testimony from *e*Plus's witnesses; (3) trial and deposition testimony from third parties; (4) Defendant's documents; (5) *e*Plus's documents; and (6) third-party documents.

*e*Plus and Defendant both develop, market, sell, maintain and service e-procurement software products that utilize the *e*Plus patented technology. As set forth above, and as is described more fully in *e*Plus's February 7, 2011 Supplemental Disclosure, *e*Plus's patented software products are Content+ and Procure+. Tr. at 1302:11-1303:4; 1307:22-1308:4 (Farber Direct); PX-448; Content+ Supplier Portal (ePlus0009390-91), PX-140. Defendant's products that compete with Content+ and Procure+ and have been determined to infringe the *e*Plus patents, both directly and indirectly, include:

4

(a)      Defendant's Core S3 Procurement System (Lawson System Foundation ("LSF")/Process Flow, in combination with Inventory Control, Requisitions, and Purchase Order Modules), and Requisition Self-Service or "RSS";

(b)      Defendant's Core S3 Procurement System (LSF/Process Flow, in combination with Inventory Control, Requisitions, and Purchase Order Modules), RSS, and Punchout;

(c)      Defendant's Core S3 Procurement System (LSF/Process Flow, in combination with Inventory Control, Requisitions, and Purchase Order Modules), RSS, Punchout, and Electronic Data Interchange or "EDI"; and

(d)      pursuant to the Parties' Stipulation With Respect To M3 Infringement, Defendant's M3 e-Procurement Software. [2]

*e*Plus and Defendant both market and sell software incorporating the *e*Plus patented technology to the same types of companies in the same types of industries.  For example, *e*Plus and Defendant both market and sell their e-procurement software to mid-market companies having market capitalizations roughly between $50 million to $2.5 billion.  Tr. at 1310:10-22 (Farber Direct); Lawson 2010 10-K at 1; *e*Plus 2010 10-K at 3.  Furthermore, as set forth in the following chart, *e*Plus and Defendant market and sell their competing e-procurement software to companies in the very same industries.

---

[2]      Defendant suggests in its Supplemental Disclosure that the only software products it sells that infringe the *e*Plus patents are RSS and Punchout.  *See, e.g.,* Defendant's Supplemental Disclosure at 14-17.  The jury's verdict, however, clearly states otherwise:  the configurations of Defendant's software that infringe the *e*Plus patents include not only RSS and Punchout, but also Defendant's Core S3 Procurement System (LSF and Process Flow, in combination with Inventory Control, Requisitions, and Purchase Order Modules), as well as RSS, Punchout ***and*** EDI.

| INDUSTRY | ePLUS[3] | LAWSON[4] |
|---|:---:|:---:|
| Agriculture & Mining | ✓ | ✓ |
| Education | ✓ | ✓ |
| Energy & Utilities | ✓ | ✓ |
| Financial Services | ✓ | ✓ |
| Food & Beverage | ✓ | ✓ |
| Government | ✓ | ✓ |
| Healthcare | ✓ | ✓ |
| Manufacturing | ✓ | ✓ |
| Retail | ✓ | ✓ |
| Other Services | ✓ | ✓ |
| Transportation | ✓ | ✓ |

ePlus and Defendant not only target the same size companies in the very same industries, they also **solicit, market and sell their competing e-procurement software to the exact same companies.** As noted in ePlus's February 7, 2011 Supplemental Disclosure, Mr. Farber testified

---

[3] *See* ePlus0949465.

[4] *See* L0345043; PX-439 (LE00129945).

that some of the current or prospective customers for which *e*Plus and Defendant engaged in direct competition include Ames Corporation, Fortress Investments, Sterling Jewelers, Cleveland Clinic, Novant Health, Wolters Kluwer, and Deaconess Hospital, among others.  Tr. at 1314:18-1316:4 (Farber Direct).  And *e*Plus is also aware of several RFPs relating to e-procurement products and services for which both *e*Plus and Lawson submitted responses, including Novant Health, Indalex, Hanesbrands, Wolters Kluwer and XM Radio.  *See e*Plus's Answer to Interrogatory No. 18 and documents cited therein; Tr. at 1310:10-1311:18; 1314:18-25, 1315:9-24 (Farber Direct); ePlus0003631-3677; ePlus0052694; ePlus0432883; ePlus0432884-910; ePlus0612276-93; ePlus0434089-96; ePlus0434516-17; ePlus0935319; ePlus0949120.  But neither Mr. Farber, nor any other *e*Plus employee, is aware of every instance in which *e*Plus has lost sales to Lawson or even directly competed with Lawson because the RFP process by which companies seek out e-procurement solution providers is often conducted in secret, so vendors are usually unaware who they are competing against.  Tr. at 1074:8-12 (Lohkamp Cross); Tr. at 1315:1-8 (Farber Direct).

Defendant suggests in its Supplemental Disclosure that *e*Plus does not truly compete with Defendant for sales of e-procurement software because *e*Plus does not compete as often with Defendant as it does with other companies in the e-procurement industry.  For example, Defendant has compiled a chart that shows that *e*Plus has recently competed with Defendant for sales to three potential customers.  Defendant's Supplemental Disclosure at 6-7.  Defendant argues that *e*Plus does not really compete with Defendant, because unlike Defendant, *e*Plus has recently faced Ariba and SAP for "6 and 8 prospects, respectively."  *Id.* at 6.  In a similar vein, Defendant argues that because industry analyst reports demonstrate that both *e*Plus and Defendant are smaller players in the e-procurement industry, *e*Plus and Defendant do not

compete with each other.  *See* Defendant's Supplemental Disclosure at 11-14; *see also* Feb. 11, 2011 Hearing Tr. at 10-11 (Mr. McDonald stating that industry analyst reports show that "*e*Plus is a small player in this market and Lawson is a small player in this market.")  These arguments are frankly nonsensical; if *e*Plus competes with Defendant for certain sales of its e-procurement software, *e*Plus and Defendant are competitors.  As the Court observed, Defendant's arguments only prove that both *e*Plus and Defendant "compete in the small player part of the same market." Hearing Tr. (Feb. 11, 2011) at 12.

Documents produced by Defendant for the first time on February 14, 2011 reveal – contrary to Defendant's claim – that *e*Plus and Defendant have targeted and competed directly for sales of software embodying the patented technology in literally hundreds of instances.  On February 14, 2011, Defendant for the first time produced a list of 830 customers to whom it has "sold RSS and/or Punchout."  Defendant's Response to Interrogatory No. 27 (citing L0418184). ePlus has actively solicited a large portion of Lawson's 830 customers.  Indeed, *e*Plus has targeted ***247 of Defendant's 830 RSS and Punchout customers for sales of its patented Content+ and Procure+ software products***.  ***ePlus is competing for sales of e-procurement software with nearly 30% of Defendant's RSS and Punchout customers.***

## Percentage of Customers of Infringing Lawson Systems Targeted by *e*Plus for Procure+ and Content+



Percentage of
These Customers
Targeted by *e*Plus:
**30% (247)**

Total Number of
Lawson Customers
for Infringing
Systems: **830**

Appendix A to this Rebuttal Disclosure is a detailed list of the 247 companies to whom Defendants have sold RSS and/or Punchout and to whom *e*Plus has marketed its Content+ and Procure+ products.

On February 14, 2011, Defendant also produced for the first time a report of customers it has targeted for its software products.  Defendant's Response to Interrogatory No. 27 (citing L0420744).  Although Defendant suggests in its interrogatory response that this report "has over 45,000 potential customers/deals listed," when duplicate customers and deals are removed, Defendant's solicitation report lists 7,989 unique potential customers for its software products. *ePlus has targeted 2,041 of the 7,989 customers targeted by Defendant for sales of its patented Content+ and Procure+ products, belying Defendant's suggestion that ePlus has marketed*

*Content+ and Procure+ to only 0.01% of the companies targeted by Defendant*.  See

Defendant's Response to Interrogatory No. 27.  **The truth is that ePlus has marketed or targeted**

**Content+ and Procure+ to over 25% of the companies targeted by Defendant.**

### Percentage of Companies Solicited by Lawson That Were Also Solicited by *e* Plus



Percentage of
These Companies
Targeted by ePlus:
**26% (2041)**

Total Number of
Companies
Targeted by
Lawson: **7,989**

Appendix B to this Rebuttal Disclosure is a detailed list of the 2,041 companies that both *e*Plus

and Defendant have solicited.

Not only has *e*Plus lost sales of Procure+ and Content+ to Defendant's infringing e-

procurement software, documents produced by Defendant last week indicate that Defendant is

actively targeting current *e*Plus Procure+ and Content+ customers.  According to Defendant's

February 14, 2011 report of companies it has solicited, *Defendant is actively targeting 16 of*

*ePlus's 64 Procure+ and Content+ customers for sales of its infringing software.*

### Percentage of *e*Plus Procure+ and Content+ Customers Solicited by Lawson



Percentage of
These Customers
Targeted by
Lawson:
**25% (16)**

Total Number of
*e*Plus Customers
for Procure+ and
Content+: **64**

Appendix C to this Rebuttal Disclosure includes a list of *e*Plus Procure+ and Content+ customers that Defendant is targeting.

Mr. Farber will testify about *e*Plus's extensive competition with Defendant for sales of software incorporating *e*Plus's patented technology. Mr. Farber will also testify about sales it has lost because of Defendant's infringing software. Mr. Farber will also describe the harm that *e*Plus will suffer if Defendant is permitted to continue to compete with *e*Plus in the marketplace by marketing and selling its infringing software.

### C.      *e*Plus Has Lost Sales Because Of Defendant's Infringing Software Products

Defendant wrongly asserts in its supplemental Rule 26 disclosure that "*e*Plus has not lost sales to Lawson." *See* Defendant's Supplemental Disclosure at 14. While *e*Plus is unaware of every instance that it has lost a sale to Defendant due to the secretive nature of the standard bidding process in the industry, *e*Plus is nonetheless aware of several instances where *e*Plus has lost sales of its Procure+ or Content+ products to customers or potential customers to Defendant's infringing software products.

For example, Gannett Supply Corporation ("Gannett Supply"), a subsidiary of Gannett Company, Inc. ("Gannett Co."), had been an *e*Plus customer since 2002, when it began licensing *e*Plus's Procure+ and Content+ products. *See* ePlus0430972 (Master Software License Agreement Between *e*Plus and Gannett dated June 17, 2002). Gannett Supply subsequently discontinued its license of *e*Plus's software, and now licenses an infringing system from Lawson, including the Inventory Control, Requisitions, and Purchase Order modules and the Requisitions Self-Service application. *See* L0135749; L0135750; L0418184.

Using a carefully-crafted customer declaration, Defendant attempts to obfuscate the facts surrounding *e*Plus's loss of business to Gannett Supply. Parsing the facts with lawyer-like precision, Stuart Steen, Jr., an employee of ***Gannett Co.*** ambiguously avers that "Gannett" has been using Lawson's core procurement software since 1999 and has never "used" Requisitions Self-Service. *See* Steen Decl. (Feb. 14, 2011) at ¶¶ 6, 8. Mr. Steen's declaration is willfully unclear as to whether he is referring to Gannett Co., or its subsidiary Gannett Supply, or both. More important, what Defendant intentionally omits, both in Mr. Steen's declaration and in its interrogatory responses, is that Gannett Supply ***began licensing Lawson Requisitions Self-Service in 2005***, three years after Gannett Supply began licensing Procure+ and Content+ from *e*Plus. *See* L0418184. After licensing the infringing Requisitions Self-Service product from

12

Defendant in 2005, Gannett Supply terminated its license of Procure+ and Content+, as Mr. Steen himself acknowledges.  *See* Steen Decl. (Feb. 14, 2011) at ¶ 10.

*e*Plus has lost business to Defendant in several other instances.  For example, in November 2007, the adjudicated infringer Lawson entered into a statement of work with Deaconess Health System ("Deaconess")—at that time one of *e*Plus's customers for its Procure+ product—to implement an infringing system, including the Inventory Control, Requisitions, and Purchase Order modules, and the Requisitions Self-Service and EDI applications.  *See* PX-276 (Lawson Statement of Work for Deaconess Health System) at L0294088.  While Procurement Punchout was not included in the statement of work, Defendant's just-produced list of Requisitions Self-Service and Procurement Punchout licensees reveals that in November 2007, Deaconess licensed it, too.  *See* L0418184.  Less than one year after Defendant began the implementation of the infringing system for Deaconess, *e*Plus received a letter from Deaconess terminating its license for use and support of the Procure+ product.  *See* ePlus0431548 (Letter from J. Kloosterman to *e*Plus dated Aug. 22, 2008).  *e*Plus was informed that Deaconess had replaced Procure+ with the Lawson system.  *See e*Plus0811211 (Email Chain from K. Farber to B. Collins dated Aug. 27, 2008).

Additionally, in 2007, *e*Plus met with executives from Blue Cross Blue Shield of North Carolina ("BCBS") on multiple occasions to discuss the potential license and implementation of *e*Plus's Procure+ product.  *See* ePlus0937228 (Email chain from W. Thomas to S. Vanrooy dated Nov. 12, 2007); ePlus0937079 (Email chain from W. Thomas to P. Norton dated Oct. 24, 2007).  As Lawson itself has acknowledged, BCBS was at that time a customer of Lawson using an infringing Lawson system, including the Inventory Control, Requisitions, and Purchase Order modules and the Requisitions Self-Service application.  *See* L0135749; L0135750; L0418184;

and Def.'s Answers to Pl.'s Fifth Set of Rogs. (Nos. 26-28), Response to Rog. No. 27 (Feb. 14, 2011). *e*Plus was ultimately unsuccessful in its bid to provide Procure+ to Blue Cross Blue Shield, who continued to license the infringing Lawson system. *See* L0135750; L0418184; and Def.'s Answers to Pl.'s Fifth Set of Rogs. (Nos. 26-28), Response to Rog. No. 27 (Feb. 14, 2011).

Furthermore, in 2010, *e*Plus offered its Procure+ product to Pharmaceutical Product Development, Inc. ("PPDI") as an alternative to Lawson Requisitions Self-Service. *e*Plus0949114 (Email chain from J. Pinkerton to P. Jarboe dated Sept. 13, 2010); *e*Plus0949115 (Email from G. White to J. Pinkerton dated Sept. 11, 2010); and *e*Plus0949118 (Email chain from H. Siegel to P. Norton dated Aug. 30, 2010). PPDI was at that time a Lawson customer for the Inventory Control, Requisitions, and Purchase Order modules. *See* L0135749. PPDI later informed *e*Plus that it had selected Lawson Requisitions Self-Service over *e*Plus Procure+, stating that it had "evaluated Procure+ cost and implementation vs. Lawson RSS cost and implementation [and] remain[ed] committed to Lawson." *See* ePlus0949120 (Email from T. McGraw to P. Norton dated Oct. 1, 2010).

### D.    *e*Plus's Has Not Freely Licensed Its Patents

Defendant suggests in its Supplemental Disclosure that *e*Plus has freely and broadly licensed its patents to companies in the industry. Defendant's Supplemental Disclosure at 9-11. In fact, as *e*Plus explained in its February 7, 2011 Supplemental Disclosure, each of *e*Plus's licenses has been as a result of settlements of actions to enforce its rights to the patents-in-suit. In each case, *e*Plus exercised a degree of control over its licensees. *See e*Plus Supplemental Disclosure at 7-10.

Lawson's arguments with respect to *e*Plus's patent licenses, if adopted, would punish *e*Plus for settling its prior enforcement actions, even though this Court urged *e*Plus and those

licensees to consider settlement, just as this Court on several occasions has urged the parties in this case to consider.  If adopted, Lawson's arguments would contradict the strong public policy favoring settlement.  The Federal Circuit has held, "***there is a strong public interest in settlement of patent litigation*** ….."  *Flex-Foot, Inc. v. CRP, Inc.*, 238 F.3d 1362, 1369-70 (Fed. Cir. 2001) (emphasis added).  The Federal Circuit explained that there is also a "compelling public interest and policy upholding and enforcing settlement agreements voluntarily entered into because enforcement of settlement agreements encourages parties to enter into them – thus fostering judicial economy."  *Id.* at 1370 (quoting *Hemstreet v. Spiegel, Inc.*, 851 F.2d at 348, 349-51 (Fed. Cir. 1988)).

The Federal Circuit has also held, following *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006), that irreparable harm is not negated simply because a patentee has previously licensed its patents.  *Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1328-30 (Fed. Cir. 2008); *Broadcom Corp. v. Qualcomm, Inc.*, 543 F.3d 683, 703 (Fed. Cir. 2008).  That Court has held that "[t]he fact of the grant of previous licenses, the identity of the past licensees, the experience in the market since the licenses were granted, and the identity of the new infringer" are relevant to whether an injunction is appropriate in order to prevent irreparable harm and ensure an adequate remedy to the patentee.  *Acumed,* 551 F.3d at 1328-30.  Thus, adding a new competitor such as Defendant to the market may create an irreparable harm that the prior licenses did not.  Moreover, Defendant's arguments flatly contradict the Supreme Court's admonition in *eBay*, in which "the Supreme Court cautioned that 'traditional equitable principles do not permit such broad classifications' as presuming that a patentee cannot establish irreparable harm based on a patentee's 'willingness to license its patents' . . . ."  *Broadcom,* 543 F.3d at 703 (quoting *eBay*).  Indeed, Chief Justice Roberts emphasized in a concurring opinion that:

> From at least the early 19th century, courts have granted injunctive relief upon a finding of infringement in the vast majority of patent cases. This "long traditional of equity practice" is not surprising, given the difficulty of protecting a right to exclude through monetary remedies that allow an infringer to use an invention against the patentee's wishes – a difficulty that often implicates the first two factors of the traditional four-factor test.

*eBay*, 547 U.S. at 394-95. Chief Justice Roberts, therefore, counseled against "writing on an entirely clean slate." *Id*. at 395. And he advised "a page of history is worth a volume of logic" when courts apply the four-factor test to future patent cases. *Id*.

That Defendant should be enjoined is consistent with the Supreme Court's rejection of categorical rules about when an injunction remedy may issue, as well as the long-standing precedent in *Continental Paper Bag Co. v. Eastern Par Bag Co.* allowing courts to issue injunctions to patent holders even in instances of "nonuse." 210 U.S. 405, 422-30 (1908). The Supreme Court addressed in *Continental Paper Bag* whether jurisdiction existed for courts to issue injunctions to a patent holder that did not practice its invention. *Id*. at 422. The Court found jurisdiction, reaching its decision based on a patent holder's exclusive right to practice its invention: "[w]e have seen that it has been the judgment of Congress from the beginning that the sciences and the useful arts could be best advanced by giving an exclusive right to an inventor." *Id*. at 429. Furthermore, "[i]t hardly needs to be pointed out that the right can only retain its attribute of exclusiveness by a prevention of its violation. Anything but prevention takes away the privilege which the law confers upon the patentee." *Id*. at 430.

Further, Defendant's argument, if adopted, would create a powerful disincentive for patentees such as *e*Plus to settle patent enforcement actions. Patentees such as *e*Plus would have little reason to settle a patent litigation if the consequence of a settlement is that the patentee is forfeiting the remedy of a permanent injunction in future enforcement actions. Not only would

such a result violate the clear public policy favoring settlements, it would result in severe congestion of the federal courts because patent cases would rarely be settled.

In addition, denial of injunctive relief on the basis that *e*Plus has licensed its patents would irreparably harm *e*Plus in other ways. Denial of injunctive relief forces *e*Plus to divert millions of dollars away from research, development, and business opportunities, and into litigation costs. Further, *e*Plus's patents would be diminished in value if potential infringers knew that they could freely infringe, all the while knowing that at most they will pay only a reasonable royalty for their infringement, without concern that they could be enjoined. Again, such devaluation of *e*Plus's patent rights would diminish *e*Plus's incentive to research and develop new, patentable technology.

> ### E. The Timing of the Lawsuit And *e*Plus's Decision Not To Seek A Preliminary Injunction Has No Bearing On the Issue of Irreparable Harm

That *e*Plus did not bring suit against Defendant earlier than May 2009 or move for a preliminary injunction is no basis to deny *e*Plus permanent injunctive relief. The Federal Circuit has made clear that a motion for a preliminary injunction and a motion for a permanent injunction are two very different things, and there is no legal requirement that *e*Plus have moved for a preliminary injunction. "The two instruments are distinct forms of equitable relief that have different prerequisites and serve entirely different purposes." *Lermer Germany GmbH v. Lermer Corp.,* 94 F.3d 1575, 1577 (Fed. Cir. 1996). A preliminary injunction is extraordinary relief that alters the status quo during the course of litigation, and it "is granted only after the requesting party has shown that it is likely to succeed on the merits." *Id.*

Preliminary injunctions are particularly difficult to obtain in patent cases, where a showing of "likelihood of success on the merits" may require the Court to consider, *inter alia,* claim construction issues, complex infringement issues, and the merits of invalidity contentions.

Courts are often reluctant to grant such motions and change the status quo in light of the complexity of such issues. Accordingly, that *e*Plus did not move for a preliminary injunction is not relevant to any factor this Court should consider.

Likewise, the alleged passage of time before *e*Plus filed suit against Defendant is irrelevant. As Defendant's disclosures elsewhere show, *e*Plus was engaged in substantial and prolonged litigation against Ariba, then SAP, with respect to enforcement of the patents-in-suit. There is no requirement that *e*Plus have filed suit against all infringers at the same time.

## II.  A LEGAL REMEDY IS INADEQUATE TO ADDRESS THE HARM TO *E*PLUS

Defendant suggests in its February 14, 2011 Supplemental Disclosure that *e*Plus "may be fully compensated" through a compulsory license. But on February 11, 2011, Defendant's counsel represented to the Court that there is no basis in the existing record for the Court to force *e*Plus to accept a compulsory license in lieu of an injunction. Hearing Tr. (Feb. 11, 2011) at 16-17. Indeed, the parties and the Court are all in agreement that there is simply nothing in the existing record from which the Court could provide *e*Plus with any legal remedy, let alone a legal remedy adequate to address the harm to *e*Plus for Defendant's eight years of adjudicated infringement. *Id.*

Accordingly, there really is no dispute that *e*Plus has suffered an irreparable injury and there are no remedies available at law, such as monetary damages, adequate to compensate for that injury. First, *e*Plus has suffered, and will continue to suffer, irreparable harm because its right to exclude Defendant from using systems covered by the infringed claims of the patents-in-suit is being denied. *e*Plus is suffering irreparable harm that cannot be calculated due to its inability to exclude Defendant from using the patented systems and methods covered by the claims of the patents-in-suit. In particular, *e*Plus has suffered irreparable harm not quantifiable

due to the lost business and licensing opportunities resulting from its inability to enjoin Defendant's ongoing infringement.

*e*Plus will continue to suffer irreparable harm if Lawson's infringement is not enjoined. It will lose its right to exclude an infringer from the marketplace that *e*Plus wishes to exploit. It will lose its right to choose the parties with whom it wishes to do business and to refuse to do business with others, such as Lawson. It will lose its right to negotiate the terms upon which it is willing to grant licenses to entities. Moreover, it may even cause the loss of value in its business, if it no longer has the ability to license and exploit its patented technology itself.

## III.     THE BALANCE OF HARDSHIPS WEIGHS IN EPLUS'S FAVOR

The balance of the hardships as between *e*Plus and Defendant weighs heavily in *e*Plus's favor. Defendant's "hardship" corresponds, at most, to the loss of sales that Defendant should not have been making in the first place. In fact, Defendant's employees and Defendant's expert witness have testified that there would be little to no harm to Defendant caused by a permanent injunction. For example, Mr. Christopherson testified that even if Defendant could no longer make and sell a Requisitions Self-Service module, it would still be able to compete in the Supply Chain Management market. Christopherson Dep. Tr. (Oct. 19, 2009) at 106:9-19. Mr. Christopherson also testified that even if Defendant could no longer make and sell a Punchout module, it would still be able to compete in the Supply Chain Management market. *Id.* at 107:11-20.

Like Mr. Christopherson, Defendant's employees Mr. Hager and Mr. Lohkamp also agreed that there would be little to no harm to Defendant caused by a permanent injunction. Mr. Hager testified that not all of Defendant's customers have Procurement Punchout, Defendant won the healthcare market before it offered Procurement Punchout, Procurement Punchout does not drive S3 sales, and Defendant has never won a sale merely because of its Punchout product.

Hager Dep. Tr. (Oct. 16, 2009) at 263:8-264:11.  And Mr. Lohkamp testified that he was not aware of a specific customer that would not have purchased an S3 system if Defendant did not offer Procurement Punchout and as far as he is aware not all customers that have it use it. Lohkamp Dep. Tr. (Oct. 21, 2009) at 433:2-8 and 433:10-11.

Additionally, Defendant's expert witness on damages, Mr. Green, opined in his expert report that Defendant's "prior system is not accused of infringement and would have been a readily available alternative in that it provided much of the functionality of the version 8.0.3 system accused of infringement."  Green Rpt. (June 3, 2010) at 32.  Mr. Green therefore concluded that "***Defendant could return to using its prior system for virtually no cost, as all the software code has already been written***."  *Id.* at 33 (emphasis added).

***Defendant addresses none of the testimony of its own employees and its expert in its Supplemental Disclosure.***  Instead of addressing the sworn, under-oath testimony of its own employees, Defendant has submitted thin, conclusory declarations from ***two of its 830 customers*** (***0.2% of its customers***).  Defendant suggests that these declarations reveal that its "customers do not have viable alternative sources for support other than Lawson" and "switching to a competitor product is not a viable option for Lawson customers."  Defendant's Supplemental Disclosure at 18.  The two customer declarations say nothing of the sort.  At most, these customer declarations suggest that an injunction could cause an increase in operational expenses for Defendant.  *See* Johnson Decl. at ¶ 10; Reasoner Decl. at ¶ 15.

The speculative harm that 0.2% of Defendant's customers may potentially suffer if an injunction is entered is not the kind of harm considered by Courts when balancing the harm between an adjudicated infringer and a prevailing patent plaintiff.  ***The law is clear that the "balance of harms" inquiry to be considered is "only between a plaintiff and a defendant, and***

20

*thus the effect on customers ... alleged by [defendant] is irrelevant under this prong of the injunction test."* *Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1330-31 (Fed. Cir. 2008) (citing *eBay,* 547 U.S. at 391) (emphasis added).

Likewise, Defendant's expenses in designing and marketing the accused product are irrelevant to the balance of harms. *Id.* (citing *Windsurfing Int'l, Inc. v. AMF, Inc.,* 782 F.2d 995, 1003 n.12 (Fed.Cir.1986) ("One who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected.")); *see also i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 863 (Fed. Cir. 2010) ("Similarly irrelevant are the consequences to [the infringer] of its infringement, such as the cost of redesigning the infringing products. As we explained in *Broadcom*, neither commercial success, nor sunk development costs, shield an infringer from injunctive relief. [The infringer] is not entitled to continue infringing simply because it successfully exploited its infringement.") (citations omitted), *cert. granted on other grounds,* 131 S. Ct. 647 (2010). An adjudicated infringer "should not be permitted to prevail on a theory 'that successful exploitation of infringing technology shields a party from injunctive relief.'" *Broadcom Corp. v. Qualcomm, Inc.*, 543 F.3d 683, 704 (Fed. Cir. 2008) (citing *Windsurfing Int'l,* 782 F.2d at 1003, n.12). In addition, that Defendant could have begun design-around efforts upon receipt of the complaint, which *e*Plus filed nearly two years prior to the jury verdict, is relevant evidence that the balance of hardships do not weigh against an injunction. *Broadcom*, 543 F.3d at 704.

Defendant also argues that the balance of harms favors Defendant because *e*Plus's patents are currently in reexamination. Defendant's Supplemental Disclosure at 19-22. The reexamination proceedings, however, are irrelevant to the balance of hardships and should be ignored. Patent reexaminations are interim proceedings that have no relevance to the validity or

enforceability of the claims.  Claims are not cancelled or confirmed in reexaminations until a final action has issued, all appeals have been exhausted, and a certificate has issued.  35 U.S.C. §§ 307(1); 316(a).  Moreover, the PTO is free to reconsider its initial determinations in a reexamination prior to issuing a reexamination certificate.  *In re Bass*, 314 F.3d 575, 577 (Fed. Cir. 2002); *Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.*, 2007 WL 1655625 at *4 (N.D. Cal. 2007).[5]

To support its assertion that reexamination proceedings shift the balance of harms in its favor, Defendant has submitted a declaration from Robert A. Kalinsky.  No weight should be given to this declaration, which is nothing more than the biased statement of an advocate made on behalf of his client.  Mr. Kalinsky, a partner at Merchant & Gould, has been the counsel of record working on behalf of the Defendant throughout the reexamination proceedings on the patents-in-suit.  *See* Kalinsky Decl. (Feb. 14, 2011) at ¶ 2.  Merchant & Gould has made no effort at even the appearance of maintaining the reexaminations separate and independent from this litigation, with several submissions by Merchant & Gould to the Patent and Trademark Office revealing that Mr. Kalinsky has worked alongside Mr. Daniel McDonald, lead counsel for Defendant in this litigation, throughout the reexamination proceedings.  *See, e.g.*, Comments in Response to Office Action, Reexamination Control No. 95/000,487 (Mar. 22, 2010); Request for Reexamination, Reexamination Control No. 90/009,636 (Nov. 12, 2009); Request for Reexamination, Reexamination Control No. 90/011,066 (June 25, 2010).  Notwithstanding this overlap, the positions taken by Lawson during the reexamination proceedings with regard to the patents-in-suit have been opportunistic and inconsistent with the positions Lawson took at trial.

---

[5]     To the extent that the Court considers the pending reexamination proceedings—and *e*Plus urges that such pending proceedings have no relevance to the issue of injunctive relief—*e*Plus submits herewith the Conditional Rule 26 Rebuttal Expert Disclosure and Declaration of Harry F. Manbeck, Jr. in Support of Plaintiff's Motion for Entry of Permanent Injunction.

*Compare* Detailed Request for *Ex Parte* Reexamination of U.S. Patent No. 6,055,516, Reexamination Control No. 90/009,636 (Nov. 12, 2009) at 11 (alleging that the U.S. Patent No. 5,712,989 ("'989 Patent") anticipates and alone renders obvious claims 1-6, 9-12, 15-19, 21-22, and 29 of the '516 Patent) *with* Trial Tr. at 2426:24-2427:5 (Shamos Direct) (conceding that the '989 Patent fails to anticipate any claim because it fails to disclose multiple catalogs) *and* Trial Tr. at 2557:4-2561:14 (Shamos Cross) (conceding that because the '989 Patent fails to disclose multiple catalogs numerous other claim elements cannot be satisfied).

Unlike Defendant, the hardships *e*Plus would suffer if an injunction was not entered are substantial and irreparable. First, the failure to obtain a permanent injunction would deprive *e*Plus of a range of licensing and partnering opportunities, including the opportunity to negotiate licenses to the patents-in-suit from a position of significant strength. Second, in the absence of a permanent injunction *e*Plus would suffer the loss of control of its intellectual property; instead, Defendant would have obtained an opportunity through infringement of the patent at issue to use the patented technology and would enjoy complete freedom to decide how long such usage would continue. Third, *e*Plus's ability to protect and enforce its intellectual property against Defendant has a major impact on its cost of capital. Obtaining an appropriate remedy against an adjudicated infringer augments the value of a patentee as a going concern and, as a result, significantly improves its position vis-á-vis the capital market. Fourth, as discussed above, Defendant's continued competition with *e*Plus for the same customers and prospects has a detrimental effect on *e*Plus's market share.

IV.     **THE PUBLIC INTEREST FAVORS ENTRY OF A PERMANENT INJUNCTION**

The public interest is disserved by enabling an adjudicated infringer like Defendant to continue its infringement without recourse.  An adjudicated infringer should not be permitted to build a business based on its infringement and then argue that the public interest favors its continued infringement.  Additionally, an injunction would serve the public interest by promoting competition and allowing *e*Plus and *e*Plus's authorized licensees, to have a more level playing field.  An injunction precluding Defendant's use of the infringing electronic sourcing and procurement systems would enable *e*Plus and *e*Plus's licensees the opportunity to compete more effectively against Defendant.[6]

V.      **RULE 26 EXPERT DISCLOSURE AND DECLARATIONS**

Pursuant to Rule 26, and in conjunction with this Disclosure, *e*Plus also incorporates by reference as if fully set forth herein the initial and rebuttal declarations of Larry W. Evans in support of *e*Plus's request for injunctive relief and the declarations of Jeff Pinkerton and Richard Hunsinger.

VI.     **DOCUMENTS**

In support of its request for an injunction, *e*Plus may rely upon documentary evidence that includes trial exhibits and other documents produced by the parties.  The documents *e*Plus may rely on at the March 3, 2011 evidentiary hearing and in the post-hearing briefing regarding its request for a permanent injunction include, but are not limited to, the documents described in

---

[6]     Defendant suggests that "there is a public interest in 'permitting full and free competition in the use of ideas which are in reality a part of the public domain.'"  Defendant's Supplemental Disclosure at 22 (citing *Lear v. Adkins*, 395 U.S. 653, 670 (1969)).  Defendant, of course, ignores the fact that a jury has unanimously found that each asserted claim of the *e*Plus patents is valid and ***not part of the public domain***.

its initial Rule 26 Disclosure, Defendant's Supplemental Disclosure, this Rebuttal Disclosure, as well as the following documents:

(1) Plaintiff's Trial Exhibits: 1-3, 45-48, 139-142, 145, 146, 150-152, 159, 171-174, 184, 186, 192-197, 220, 241-245, 247-250, 253, 254, 273, 274, 276, 278, 281-283, 287, 289, 290, 292, 298-300, 303-314, 316, 331-334, 336-341, 349, 416, 417, 425, 430-435, 439-441, 448, 458-460, 463, 465, 466, 468, 500-502, 504, 507-515.

(2) Defendant's Trial Exhibits: 24, 26, 27, 29, 45, 71, 82, 205-207, 214, 264-272, 274, 297-306, 312-320, 326, 329, 337, 338, 340, 341, 365, 366.

(3) Documents Produced by ePlus: ePLUS0430972, ePLUS0432959, ePLUS0432991, ePLUS0433522 - ePLUS0433557, ePLUS0433558 - ePLUS0433559, ePLUS0433976, ePLUS0434386 - ePLUS0434387, ePLUS0434404, ePLUS0439665, ePLUS0529747, ePLUS0531096, ePLUS0537889, ePLUS0539517, ePLUS0542336, ePLUS0571365 - ePLUS0571366, ePLUS0575549 - ePLUS0575555, ePLUS0579259 – ePLUS0579260, ePLUS0614804, ePLUS0615875, ePLUS0617641, ePLUS 807793-807812, ePLUS0809757, ePLUS0810036, ePLUS0816991, ePLUS 818488, ePLUS0831301, ePLUS0854117, ePLUS 862627-9, ePLUS0866813, ePLUS0874974, ePLUS0888415, ePLUS0903285, ePLUS0910740, ePLUS0923290, ePLUS0932758, ePLUS0935468, ePLUS0936230, ePLUS0937101, ePLUS0938436, ePLUS0938935-6, ePLUS0940189, ePLUS0940733-7, ePLUS0912394-422, ePLUS0942142, documents produced on February 4, 2011 and February 7, 2011 within the Bates range ePLUS0949078 – ePLUS0949433; and documents produced on February 22, 2011 within the Bates range ePlus0949434 – ePLUS0949947.

(4) Documents Produced by Defendant: L0281277 – L0281331, L0340572 – L0340600, LE01281910 – LE01281915 LE02679147 – LE02679199, LE03555354 – LE03555373, LE03581830 – LE03581881, LE01280376 – LE01280419, LE00588824 – LE00589037; LE00215934 – LE00215937, L0345043, L135749, L157226-L157227, L0418184, L0420744.

## VII. DEPOSITION AND TRIAL TESTIMONY

In support of its request for an injunction, ePlus intends to rely on deposition and/or trial testimony, including, but not limited to, deposition testimony from the following witnesses: Dale Christopherson; Dean Hager; Hannah Raleigh; William Yuhasz; Jeffery Frank; Henrik Billgren; Ken White; Keith Lohkamp; and Ken Farber; and the deposition and trial testimony disclosed in Defendant's Supplemental Disclosure.

**VIII.   LIVE WITNESSES**

In support of its request for an injunction, *e*Plus reserves the right to call witnesses at the evidentiary hearing currently scheduled for March 3, 2011 including Ken Farber; Larry Evans; Keith Lohkamp; Harry Debes and Jeffrey Frank, as well as the witnesses disclosed in Defendant's Supplemental Disclosure.

**IX.   OTHER INFORMATION**

In addition to the information set forth herein, in support of its request for an injunction *e*Plus may also rely upon information that has already been made known during the discovery process or in writing such as Defendant's responses to *e*Plus interrogatory nos. 24-28 (and documents cited therein) and *e*Plus's responses to Defendant interrogatory no. 18 (and documents cited therein).

Respectfully submitted,

February 22, 2011
_____/s/_____

Craig T. Merritt (VSB #20281)
**CHRISTIAN & BARTON, LLP**
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
Telephone: (804) 697-4100
Facsimile: (804) 697-4112
cmerritt@cblaw.com

Scott L. Robertson *(admitted pro hac vice)*
Jennifer A. Albert *(admitted pro hac vice)*
David M. Young (VSB #35997)
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4000
Facsimile:  (202) 346-4444
srobertson@goodwinprocter.com
jalbert@goodwinprocter.com
dyoung@goodwinprocter.com

Michael G. Strapp (admitted *pro hac vice*)
**GOODWIN PROCTER LLP**
Exchange Place
53 State Street
Boston, MA 02109-2881
Telephone:  (617) 570-1000

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 22nd day of February, 2011, I will serve the foregoing

**PLAINTIFF *e*PLUS INC.'S REBUTTAL RULE 26 SUPPLEMENTAL DISCLOSURE CONCERNING INJUNCTIVE RELIEF**

to the following counsel*:*

Daniel McDonald, *pro hac vice*
William D. Schultz, *pro hac vice*
Rachel C. Hughey, *pro hac vice*
Andrew Lagatta, *pro hac vice*
MERCHANT & GOULD
3200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 332-5300
Facsimile: (612) 332-9081
lawsonservice@merchantgould.com

Robert A. Angle, VSB#37691
Dabney J. Carr, IV, VSB #28679
TROUTMAN SANDERS LLP
P.O. Box 1122
Richmond, Virginia 23218-1122
(804) 697-1238
(804) 698-5119 (Fax)
robert.angle@troutmansanders.com
dabney.carr@troutmansanders.com

***Counsel for Defendant Lawson Software, Inc.***

_____/s/_____
Craig T. Merritt (VSB #20281)
Counsel for Plaintiff *e*Plus, Inc.
**CHRISTIAN & BARTON, LLP**
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
Telephone: (804) 697-4100
Facsimile: (804) 697-4112
cmerritt@cblaw.com