# EXHIBIT E

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | | |
|---|---|---|
| *e*PLUS INC., | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No. 3:09-CV-620 (REP)** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **LAWSON SOFTWARE, INC.,** | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFF *e*PLUS INC.'S RULE 26 SUPPLEMENTAL DISCLOSURE CONCERNING INJUNCTIVE RELIEF

Pursuant to the Court's January 27, 2011 directive and Federal Rule of Civil Procedure 26, Plaintiff *e*Plus, Inc. ("*e*Plus") hereby supplements its discovery disclosures with information concerning its request for injunctive relief.  The information set forth herein includes information that *e*Plus may rely upon at the March 3, 2011 evidentiary hearing and in the post-hearing briefing regarding its request for a permanent injunction against Defendant Lawson Software, Inc. ("Defendant") for Defendant's continuing infringement of U.S. Patent Nos. 6,023,683 ("the '683 Patent") and 6,505,172 ("the '172 Patent").

This disclosure of information is a supplementation to *e*Plus's written discovery responses and other discovery disclosures.  *e*Plus's previous discovery disclosures are incorporated by reference as if they were fully set forth herein.  All of the information in this Rule 26 disclosure is provided subject to, and without waiver of, *e*Plus's previously stated General Objections and Specific Objections to the discovery requests served on *e*Plus by Defendant in this matter.

## I.      THE SCOPE OF DEFENDANT'S INFRINGEMENT

On January 27, 2011, the jury in this matter returned a unanimous verdict that the '683 and '172 Patents were infringed, and that all *e*Plus patents-in-suit were valid.[1]  In particular, the jury determined that *e*Plus proved that the following configurations of Defendant's S3 Procurement System infringe the asserted claims identified below, both directly and indirectly:

(a)      Defendant's Core S3 Procurement System (Lawson System Foundation ("LSF")/Process Flow, in combination with Inventory Control, Requisition, and Purchase Order Modules) and Requisition Self-Service or "RSS," infringes claim 1 of the '172 Patent, both directly and indirectly;

(b)      Defendant's Core S3 Procurement System (Lawson System Foundation ("LSF")/Process Flow, in combination with Inventory Control, Requisition, and Purchase Order Modules), Requisition Self-Service or "RSS," and Punchout, infringes claims 3, 26, 28, and 29 of the '683 Patent, and claim 1 of the '172 Patent, both directly and indirectly;

(c)      Defendant's Core S3 Procurement System (Lawson System Foundation ("LSF")/Process Flow, in combination with Inventory Control, Requisition, and Purchase Order Modules), Requisition Self-Service or "RSS," Punchout, and Electronic Data Interchange or "EDI," infringes claims 3, 26, 28, and 29 of the '683 Patent, and claim 1 of the '172 Patent, both directly and indirectly; and

(d)      pursuant to the Parties' Stipulation With Respect To M3 Infringement, as set forth in the Revised Amended Final Pretrial Order (Dkt. No. 481) at Section II, because *e*Plus proved that the aforementioned configurations of Lawson's S3 Procurement System infringe claims 3,

---

[1] To the extent that the Court determines after considering *e*Plus's Rule 50(b) Motion for Judgment as a Matter of Law that Defendant has also infringed U.S. Patent No. 6,055,516 ("the '516 Patent"), *e*Plus also requests that Defendant be enjoined from its continued infringement of the '516 patent.

26, 28, and 29 of the '683 Patent, and claim 1 of the '172 Patent, both directly and indirectly, *e*Plus also proved that Lawson's M3 e-Procurement Software infringes claims 3, 26, 28, and 29 of the '683 Patent, and claim 1 of the '172 Patent, both directly and indirectly.

## II.    THE CLAIMED INVENTIONS

The claimed inventions relate to electronic sourcing systems and methods conducted by electronic sourcing systems.  An electronic sourcing system, according to the patents, is an electronic system for use by a prospective buyer to locate and find items to purchase from sources, suppliers or vendors.  The electronic sourcing and procurement systems and methods automate internal corporate purchasing processes, resulting in enormous savings in time and expense.  Corporate customer users may search for items for sale from multiple selected electronic supplier catalogs, view inventory availability information for those items, find related items available from other suppliers, and requisition desired goods or services.  The system then generates electronic purchase orders to each different supplier for approved requisitions.  *See, e.g.*, '683 Patent, Col. 3:3-24.

Prior to the inventions in the patent, procuring products for large corporations could involve several manual, paper-based operations coupled with awkward automated electronic processes.  *See, e.g.*, '683 Patent, Col. 1:11- Col. 2:18.  A company might be able to access a system to type information into an electronic requisition or submit an electronic order from hard-copy catalogs.  *See id.* at Col. 1:36-59.  Alternatively, a company might be able to view items from a single electronic catalog from a compact disc, for example.  *See id*. at Col. 2:3-12. However, these systems, I understand, provided only limited improvements to the traditional paper-based corporate procurement processes.  Tr. at 227:3-252:2 (Momyer Direct) (inventor discussing prior systems used by Fisher Scientific and deficiencies in such systems); Tr. at

3

2071:6-2079:7 (Momyer Cross) (discussing distinctions of patented electronic sourcing systems over prior technology).

The disclosure of the '683 Patent indicates that the inventors recognized that significant efficiencies could be realized by enabling users to make purchasing decisions based on price, item availability and product comparison.  Fisher Scientific Company, the original assignee of the rights in the inventions of the patens-in-suit, manufactured and sold commercial implementations of the claimed inventions known as "Supply Link" and "Cornerstone."  Tr. at 225:24-227:20 (Momyer Direct).  Fisher Scientific received several awards for its Cornerstone commercial implementation of the patented inventions.  Tr. at 2739:21-2740:15 (Hilliard Direct) (testifying that Fisher Scientific's Cornerstone product was the subject of several industry awards, including a 1996 award from the Internet and Electronic Commerce Conference for its innovation and excellence in electronic commerce).

## III.    *e*PLUS PRODUCTS COVERED BY THE PATENTS

On May 4, 2001, *e*Plus purchased the commercial-technology business assets of ProcureNet, Inc. ("ProcureNet"), a company that at that time focused on e-commerce software. *See* Asset Purchase Agreement (ePlus0205193) (May 4, 2001); Tr. at 1299:7-1303:4 (Farber Direct).  ProcureNet, which was formerly part of Fisher Scientific Company LLC ("Fisher Scientific"), had been spun off as an independent company in 1999.  *See* 5/18/10 Farber Dep. at 27:6-16.  The assets acquired by *e*Plus were comprised of two business units of ProcureNet, Structured Computer Services ("SCS") and SourceSys, Inc. ("SSI"), which included ProcureNet's procurement and catalog systems.  Tr. at 1301:2-9 (Farber Direct); 5/18/10 Farber Dep. at 13:5-16.  These procurement and catalog systems became part of *e*Plus Systems and Content Services.  Tr. at 1301:2-1302:10 (Farber Direct).  As part of the acquisition, *e*Plus obtained ProcureNet's enterprise procurement-software application, called OneSource, and the

patents-in-suit, *i.e.*, U.S. Patent Nos. 6,023,683; 6,055,516; and 6,505,172.  5/18/10 Farber Dep. at 11:20-23; 31:6-22.  The SCS and SSI business units had a total of 39 permanent personnel, based in Avon, Connecticut, and Houston, Texas, who were also part of the assets acquired by *e*Plus.  Valuation Methodologies and Valuations (ePLUS0135341) at ePLUS0135343; *e*Plus 2001 Annual Report at 18.

*e*Plus saw the OneSource application, which was renamed "Procure+" following the acquisition, as an e-commerce procurement product that could be provided to customers an internal stand-alone program or as a hosted product provided through *e*Plus.  *See e*Plus 2001 Annual Report at 6; 5/18/10 Farber Dep. at 31:20-22.  *e*Plus expected to obtain much of its electronic-commerce revenues either directly or indirectly through the Procure+ software application.  *See e*Plus 2001 Annual Report at 29.  *e*Plus described this procurement software as being "one of the most valuable intangible assets acquired by *e*Plus" as part of the ProcureNet deal.  Valuation Methodologies and Valuations at ePLUS0135343-44.

Since 2001, ePlus has sold electronic sourcing and procurement software products, known as Procure+ and Content+, that embody the patented technology at issue in this litigation.  Both the software and personnel acquired from ProcureNet continue to be the core components of *e*Plus Systems.  Procure+ and Content+, another software application obtained from the ProcureNet acquisition, remain *e*Plus Systems and Content Services' flagship-software applications even today, almost a decade after the acquisition.  *See* Tr. at 1302:6-10 (Farber Direct); Farber Dep. at 26:6-12; 141:10-20.  The vast majority of the original 39 employees acquired along with other assets from ProcureNet still work at *e*Plus, including Ken Farber, who now serves as the President of *e*Plus Systems and Content Services.  Tr. at 1299:11-13; 1301:10-16 (Farber Direct); Farber Dep. Tr. at 13:21-14:6.

ePlus's Procure+ provides users with an electronic sourcing and procurement system where users can search for items in multiple vendor catalogs, compare those items, build requisitions for selected items, check the availability of selected items in the vendors' inventories, and generate multiple purchase orders from the requisitioned items for transmission to suppliers.  Tr. at 1302:11-1303:4; 1307:22-1308:4 (Farber Direct); PX-448; Content+ Supplier Portal (ePlus 9390-91).

Procure[+] offers internet-based procurement capabilities.  Users of a Procure[+] system may:

- Access comprehensive online catalogs.
- Take advantage of robust catalog search to quickly find items, search by key word, category, or attribute.  Once search results are displayed, users can view images of products, detailed specifications, and price.
- Compare products based on such attributes as price and size.  Perform parametric searching.
- Add items to their online shopping cart, determine quantity, and quickly search for the next item.
- View transaction attributes, review and change their order, and submit their order.
- Check their order status, view approvals, check order fulfillment, and review order activity.
- Generate purchase orders as well as create approval and textual reports.

PX-0140 at ePLUS0434499-500.  Procure[+] functionality includes: electronic catalogs; approval workflow; order status; invoice matching; communication to and from sellers with EDI; and inventory.  PX-0140 at ePLUS0434501.

Content[+] is a flexible application that integrates with Procure[+] to connect catalogs.  *See* PX-0140 at ePLUS0434502.  Content[+] "empowers suppliers to convert raw product data into a manageable, searchable catalog."  PX-0140 at ePLUS0434501.  "Content[+] takes free-form, unstructured text descriptions and cleanses the content so it can be included in comprehensive

6

catalogs.  With Content$^+$, catalogs are easily and quickly searchable by keyword, attributes, and classification structure."  PX-0140 at ePLUS0434501.

*e*Plus has been systematically and continuously marking Content$^+$ and Procure$^+$ with patents-in-suit, pursuant to 35 U.S.C. §287(a), since no later than October 2003.  *See, e.g.* ePLUS0009339-40, ePLUS0009390-91, ePLUS0027401, ePLUS0028482, ePLUS0030545, ePLUS0037014-15, ePLUS0047323-24, ePLUS0113980, ePLUS0113995, ePLUS0229212-20, ePLUS0274902, ePLUS0274903, ePLUS0442856, ePLUS0442857, ePLUS0529214, ePLUS0529218.

## IV.   *e*PLUS'S EFFORTS TO ENFORCE ITS PATENT RIGHTS

ePlus has spent millions of dollars enforcing its patents in two prior lawsuits.  The first of these cases was brought in the Alexandria Division of this Court against Ariba, a competitor of ePlus and Lawson and one of the largest electronic procurement software companies in the United States.  The trial in that matter was conducted in January 2005 before Judge Leonie Brinkema.  The jury determined that Ariba willfully infringed all of the asserted claims of the same three patents as those at issue here, and that all of the asserted claims were valid.  *See* Special Verdict Form from *ePlus, Inc. v. Ariba, Inc.* (ePlus0449208-0449211).  After the jury verdict was returned, but before proceeding to the damages phase of the trial, the parties negotiated a settlement and license agreement pursuant to which Ariba paid $37 million and took a license to the patents-in-suit.  *See* PX-43.

The second case was against SAP AG and its U.S. subsidiary, SAP America, Inc., another of ePlus's (and Lawson's) largest competitors in the market for electronic sourcing and procurement systems.  The case was tried before Judge Spencer in the Richmond Division of this Court.  After a three-week trial, the jurors were unable to reach a verdict.  The parties then agreed to submit the case to Judge Spencer for a bench ruling.  While the matter was under

7

consideration by Judge Spencer, the parties conducted settlement negotiations and entered into a settlement agreement pursuant to which SAP took a license to the patents-in-suit.  *See* PX-318.

## V.  *e*PLUS'S LICENSEES AND THE TERMS OF THE LICENSES

Each of ePlus's licenses has been as a result of settlement of actions to enforce the rights to the patents-in-suit.  In each case, ePlus has exercised a degree of control over its licensees. For example, following the jury verdict finding Ariba to have willfully infringed each of the asserted claims of the patents-in-suit, ePlus and Ariba entered into a Settlement and License Agreement pursuant to which ePlus granted Ariba a personal, non-exclusive, non-transferable, non-sublicensable, non-assignable worldwide license to the ePlus Patents in exchange for Ariba's payment of $37 M and a cross license to Ariba's patents.  *See* PX-43 at ¶¶5, 11-14.  The license grant extended to Ariba's customers, resellers, hosting or outsourcing partners, VARs, OEMs and Channel and Business partners, but only for products and services as delivered by Ariba into channels of commerce.  PX-43 at ¶14.  Moreover, the license granted under the Settlement and License Agreement was personal to Ariba and not transferable or assignable, except in limited circumstances.  PX-43 at ¶¶14, 17.

Following the jury trial in the *ePlus v. SAP* case, the parties entered into a Patent License and Settlement Agreement.  PX-318.  Pursuant to that Agreement, ePlus granted to SAP and its affiliates, SAP Vendors, SAP Customers and SAP Authorized Developers, in exchange for a license payment of $17.5 M, a non-exclusive, worldwide license, without the right to sublicense, under the ePlus Patents to practice, design, make, have made, operate, have operated, use, sell, license, offer to sell or license and import Licensed Products (as defined) and to practice any Licensed Process (as defined).  PX-318 at ¶2.1.  The license grant extended to third parties making products for or on behalf of SAP but, to the extent such products were provided to any person or entity other than SAP, an Affiliate of SAP, an SAP Vendor, an SAP Authorized

Developer or supplier or provider to SAP or an Affiliate of SAP, those products were not considered to be Licensed Products and did not fall within the scope of the license rights set forth under the Agreement.  PX-318 at ¶2.1.

ePlus filed this action against four defendants:  Verian Technologies, Inc. ("Verian"), SciQuest, Inc. ("SciQuest"), Perfect Commerce, LLC ("Perfect Commerce") and Lawson.  With the exception of Lawson, each of the Defendants entered into a Settlement and License Agreement with ePlus at the outset of the litigation before significant discovery had commenced. For example, in exchange for Verian's payment of $500,000 and an agreement to pay ongoing royalties in the event its revenues exceeded certain thresholds, ePlus granted to Verian and its affiliates a personal, non-exclusive, non-transferable and non-assignable (except in certain circumstances), non-sublicensable (except in certain circumstances), worldwide license to make, have made, import, export, sell and offer for sale, support and repair any products and services that were covered by one or more claims of the ePlus Patents.  PX-320 at ¶14.  The license was non-sublicensable except for sublicenses to manufacturers, distributors, sales agents, support and development contractors, customers and users acting under Verian's authority and only with respect to products and services which are sold or licensed by Verian.  *Id.*  Moreover, the patent license granted in the Agreement does not extend to entities or their Affiliates acquired by Verian or entities or their Affiliates with which Verian may merge after the Effective Date if, at any time during the six month period prior to such acquisition or merger, the counterpart entities or their affiliates are making, using or selling products or services which infringe one or more claims of any ePlus Patent, without the prior written consent of ePlus.  PX-320 at ¶15. Moreover, Verian could not assign the Agreement without the prior written consent of ePlus except in certain limited circumstances.  PX-320 at ¶35.

In the case of SciQuest, in exchange for SciQuest's payment of $2.4M, ePlus granted to SciQuest a personal, non-exclusive, non-transferable, non-sublicensable, non-assignable, worldwide license to make, import, sell and offer for sale any products or services that are covered by one or more claims of the ePlus Patents.  ePlus specified, however, that in no event does the license granted to SciQuest extend to Lawson.  PX-319 at ¶14.  Moreover, ePlus and SciQuest agreed that the patent license did not extend to any entities that consummate an Asset Acquisition or a Stock Acquisition with SciQuest that results in a Change in Control of SciQuest without the prior written consent of ePlus except in certain limited circumstances.  PX-319 at ¶15.

Finally, in the case of Perfect Commerce, in exchange for Perfect Commerce's payment of $750,000, ePlus granted to Perfect Commerce a personal, non-exclusive, non-transferable, non-sublicensable, non-assignable (except in limited circumstances), worldwide license to make, import, sell and offer for sale any products or services that are covered by one or more claims of the ePlus Patents.  ePlus specified, however, that in no event does the license extend to Lawson. PX-317 at ¶14.  ePlus further specified that the license granted under the Agreement was personal to Perfect Commerce and that Perfect Commerce could not assign the Agreement or any portion thereof, without the prior written consent of ePlus.  PX-317 at ¶15.

## VI.     COMPETITION BETWEEN *e*PLUS AND DEFENDANT

*e*Plus competes with the infringing Lawson systems in the marketplace for electronic-procurement solutions.  One third-party analyst that tracks the electronic procurement industry has stated that electronic-procurement solutions, or e-procurement solutions, "play a key role in improving purchasing processes in enterprises through automating requisitions and purchase orders for goods and services, decentralizing buying, connecting to suppliers directly, and improving employee compliance with preferred supplier policies."  PX-466 at L0259044.

According to another industry analyst, AMR Research, the supply management market, of which electronic procurement makes up roughly half, totaled about $2.8 billion in 2008 and is expected to reach $3.5 billion by 2013. *See* The Global Enterprise Application Market Sizing Report, AMR Research (LE03581830) at LE03581851; PX-463 at LE00216154. Thus, the electronic-procurement market itself now stands around $1.5 billion. *Id.* Licensing revenue alone for electronic-procurement solutions in 2008 was approximately $179 million. *Id.* at LE03581856.

The market for electronic sourcing and procurement software and services is fiercely competitive. There are several software vendors that provide solutions such as the Procure+ and Content+ solutions offered by ePlus Systems. These include, for example, Ariba, SAP, Oracle, Lawson Software, Perfect Commerce, SciQuest and Verian Technologies. Among the larger players are companies such as Oracle and SAP, who together comprise more than 40% of the market share and tend to focus on very large global companies. *See* The Global Enterprise Application Market Sizing Report, AMR Research (LE03581830) at LE03581836, LE03581850. Other electronic procurement companies, including *e*Plus and Lawson, target mid-market companies having market capitalizations roughly between $50 million to $2.5 billion. Trial Tr. (Farber, Jan. 12, 2011) at 1310:10-22; Lawson 2010 10-K at 1.

Defendant's S3 Procurement modules, including the infringing configurations of Defendant's S3 Procurement System, are counterparts to *e*Plus's Procure+ and Content+ applications, and *e*Plus and Defendant are direct competitors in the market. *See* PX-463 at 7 (AMR Research noting that companies with competitive eProcurement applications include Ariba, ePlus, Epicor, Ketera, Lawson, Oracle, SAP, SciQuest, and others). Indeed, in many instances in which ePlus has responded to a Request for Proposal ("RFP") from a potential

customer, Defendant has also offered its products for sale to the same prospective customer.  In some instances, ePlus has been able to secure the sale in direct competition with Defendant.  In other instances, Defendant has prevailed.  Tr. at 1310:10-1311:18 (Farber Direct).  For example, *e*Plus provided Procure$^+$ and Content$^+$ and related services to the Gannett Company for several years.  Recently, Gannett informed *e*Plus that it was discontinuing its use of ePlus's e-procurement system and that it was switching e-procurement vendors.  Defendant's infringing software was among the software solutions that Gannett considered.

Mr. Farber, the President of ePlus Systems, testified that some of the current or prospective customers for which ePlus and Defendant engaged in direct competition include Ames Corporation, Fortress Investments, Sterling Jewelers, Cleveland Clinic, Novant Health, Wolters Kluwer, and Deaconess Hospital, among others.  Tr. at 1314:18-1316:4 (Farber Direct).  And *e*Plus is also aware of several RFPs relating to e-procurement products and services for which both *e*Plus and Lawson submitted responses including Novant Health, Indalex, Hanesbrands, Wolters Kluwer and XM Radio.  *See* ePlus's Answer to Interrogatory No. 18 and documents cited therein; Tr. at 1310:10-1311:18; 1314:18-25, 1315:9-24 (Farber Direct); ePlus0003631-3677; ePlus 0052694; ePlus 0432883; ePlus 0432884-910; ePlus 0612276-93; ePlus 0434089-96; and ePlus 0434516-17; ePlus0935319; ePlus0949120.  But neither Mr. Farber, nor any other *e*Plus employee, is aware of most instances in which *e*Plus has lost sales to Lawson or even directly competed with Lawson because the RFP process by which companies seek out e-procurement solution providers is often conducted in secret, so vendors are usually unaware who they are competing against.  Tr. at 1074:8-12 (Lohkamp Cross); Tr. at 1315:1-8. (Farber Direct).

Thus, the instances of direct competition with Defendant that *e*Plus itself is aware of including, for example, Ames Corporation, Blue Cross Blue Shield ("BCBS"), Deaconess Hospital, Gannett, Hanesbrands,  Indalex, Novant Health, Pharmaceutical Product Development ("PPDI"), Wolters Kluwer and XM Radio, are only a small fraction of the instances where Defendant and *e*Plus have competed directly for sales of software embodying the patented technology.  In fact, *e*Plus's counsel has determined through a comparison of customer lists of both *e*Plus and Defendant that more than 250 customers or prospective customers solicited by ePlus with respect to its Procure+ and Content+ products are also either Defendant's customers or prospects for which Defendant submitted competitive proposals.  This number is likely much higher, since Defendant has not yet supplemented the list of companies who it has solicited for its infringing products.  *e*Plus will supplement its disclosure of instances of competition between Defendant and *e*Plus once it receives a complete list of companies Defendant has solicited for its infringing products.  For now, a sampling of instances of competition between *e*Plus and Defendant, including references to corroborating documentation, is set forth in the following chart:

| **Customers** | ***e*Plus Documents** | **Lawson Documents** |
|---|---|---|
| Aaron Rents, Inc. | ePLUS0874974; ePLUS0938436; ePLUS0949134 - ePLUS0949135 | L0135749; L0135750 |
| Accenture – Anderson – Chicago | ePLUS0529747; ePLUS0888415 | L0135749; L0135750 |
| Amedisys, Inc. | ePLUS0432959; ePLUS0537889 | L0135749; L0135750 |
| American Eagle Outfitters | ePLUS0831301 | L0135749; L0135750 |
| Ames Corporation | Tr. at 1314:18-25 (Farber Direct) | |
| Assurant, Inc. | ePLUS0949130 – ePLUS0949131 | L0135749; L0135750 |
| Bearingpoint | ePLUS0539517; ePLUS0542336 | L0135749; L0135750 |
| Bed, Bath & Beyond | ePLUS0949148 – ePLUS0949149 | L0135749; L0135750 |

| | | |
|---|---|---|
| Beth Abraham Health Services | ePLUS0949144 – ePLUS0949145 | L0135749; L0135750 |
| BJs Wholesale | ePLUS0949128 – ePLUS0949129 | L0135749; L0135750 |
| Blue Cross/ Blue Shield of North Carolina | ePLUS0935319 – ePLUS0937229 | L0135749; L0135750 |
| Boston Medical Center | ePLUS0434404 | L0135749; L0135750 |
| Cintas Corporation | ePLUS0575549 – ePLUS0575555 | L0135749; L0135750 |
| Cleveland Clinic | ePLUS0433522 – ePLUS0433557; ePLUS0854117 | LE00496665 - LE00496666 |
| Coca-Cola Company | ePLUS0575549 – ePLUS0575555; ePLUS0949085 – ePLUS0949086; ePLUS0949134 – ePLUS0949135; ePLUS0949136 – ePLUS0949137 | L0135749; L0135750 |
| Cold Spring Harbor Laboratory | ePLUS0949150 – ePLUS0949151 | L0135749; L0135750 |
| Constellation Brands, Inc. | ePLUS0949099 – ePLUS0949100; ePLUS0949124 – ePLUS0949125 | |
| Cooper Tire and Rubber | ePLUS0949429 | L0135749; L0135750 |
| Costco Wholesale Corp. | ePLUS0949146 – ePLUS0949147 | L0135749; L0135750 |
| Deaconess Health System | ePLUS0809757; ePLUS0949132 – ePLUS0949133 | L0294084 – L0294316 |
| Digitas | ePLUS0949134 – ePLUS0949135; ePLUS0949136 – ePLUS0949137 | L0135749; L0135750 |
| Dollar General Corp. | ePLUS0615875 | |
| Dollar Tree Stores | ePLUS0936230 | L0135749; L0135750 |
| Federal Home Load Bank | ePLUS0949153 | L0135749; L0135750 |
| Forever 21 | ePLUS0949078 – ePLUS0949079; ePLUS0949080 | |
| Fortress Investments | Tr. at 1314:18-25 (Farber Direct) | |
| Gannet Company, Inc. | ePLUS0003631 - ePLUS0003677; ePLUS0430972; ePLUS0932758 | L0135749; L0135750 |
| Genentech, Inc. | ePLUS0866813 | L0135749; L0135750 |
| Hanesbrands, Inc. | ePLUS0434089 - ePLUS0434096; ePLUS0923290; ePLUS0949134 - ePLUS0949135; ePLUS0949136 - ePLUS0949137 | L0157131 - L0157225 |

14

| Indalex, Inc. | ePLUS0940189 | L0314909 - L0314961; L0135749; L0135750 |
|---|---|---|
| Inova Health Care System | ePLUS0617641 | L0135749; L0135750 |
| LHC Group, Inc. | ePLUS0949083 - ePLUS0949084 | |
| Medstar | ePLUS0903285 | L0135749; L0135750 |
| Novant Health | ePLUS0432883 - ePLUS0432883; ePLUS0432884 - ePLUS0432910; ePLUS0816991 | LE03394917 - LE03394964 |
| PPD Inc. | ePLUS0949113; ePLUS0949115; ePLUS0949120; ePLUS0949087 - ePLUS0949098; ePLUS0949100 - ePLUS0949101; ePLUS0949114; ePLUS0949118 - ePLUS0949119 | L0135749; L0135750 |
| Sara Lee Corp. | ePLUS0614804 | L0135749; L0135750 |
| Sears, Roebuck & Co. | ePLUS0571365 – ePLUS0571366 | L0135749; L0135750 |
| SKF | ePLUS0949152; ePLUS0949109 – ePLUS0949110 | L0135749; L0135750 |
| Standard Register Company | ePLUS0949116 - ePLUS0949117 | L0135749; L0135750 |
| Sterling Jewelers, Inc. | ePLUS0949121 - ePLUS0949123; ePLUS0949121 - ePLUS0949123; ePLUS0949085 - ePLUS0949086; ePLUS0949111 - ePLUS0949112 | L0135749; L0135750 |
| Wolters Kluwer | ePLUS0612276 - ePLUS0612293 | *e*Plus Response to Interrogatory No. 18; Tr. at 1314:18-25 (Farber Direct) |
| XM Satellite Radio | *e*Plus Response to Interrogatory No. 18 | L0157072 - L0157130 |

## VII.   EPLUS HAS SUFFERED IRREPARABLE HARM AND LEGAL REMEDIES ARE INADEQUATE TO COMPENSATE EPLUS

*e*Plus has suffered an irreparable injury because of Defendant's infringement of the '683 and '172 patents and there are no remedies available at law, such as monetary damages, adequate to compensate for that injury.  First, ePLUS has suffered, and will continue to suffer, irreparable

harm because its right to exclude Defendant from using systems covered by the infringed claims of the patents-in-suit is being denied.  ePlus is suffering irreparable harm that cannot be calculated due to its inability to exclude Defendant from using the patented systems and methods covered by the claims of the patents-in-suit.  In particular, ePlus has suffered irreparable harm not quantifiable due to the lost business and licensing opportunities resulting from its inability to enjoin Defendant's ongoing infringement.

ePlus will continue to suffer irreparable harm if Lawson's infringement is not enjoined. It will lose its right to exclude an infringer from the marketplace that ePlus wishes to exploit.  It will lose its right to choose the parties with whom it wishes to do business and to refuse to do business with others, such as Lawson.  It will lose its right to negotiate the terms upon which it is willing to grant licenses to entities.  Moreover, it may even cause the loss of value in its business, if it no longer has the ability to license and exploit its patented technology itself.

Additionally, where, as here, a patent owner is precluded from a recovery of monetary damages, there clearly is no adequate remedy at law.  In particular, on September 9, 2010, the Court granted Defendant's Motion to Preclude *e*Plus from seeking money damages in this case. Dkt. No. 472.  As a result of this order, *e*Plus was precluded from introducing evidence at trial on the issue of damages, and was unable to ask the jury to award money damages to compensate it for Defendant's infringement.  Accordingly, although *e*Plus, pursuant to 35 U.S.C. § 284, is entitled to "damages adequate to compensate for the infringement" by Defendant, *e*Plus has not received any remedy available at law as compensation for the irreparable injury it has suffered.

## VIII.  THE BALANCE OF HARDSHIPS WEIGHS IN EPLUS'S FAVOR

The balance of the hardships as between *e*Plus and Defendant weighs heavily in ePlus's favor.  Defendants "hardship" corresponds, at most, to the loss of sales that Lawson should not have been making in the first place.  In fact, Defendants' employees and Defendant's expert

witness have testified that there would be little to no harm to Defendant caused by a permanent injunction.  For example, Mr. Christopherson testified that even if Defendant could no longer make and sell a Requisitions Self-Service module, it would still be able to compete in the Supply Chain Management market.  10/19/09 Christopherson Dep. Tr. at 106:9-19.  Mr. Christopherson also testified that even if Defendant could no longer make and sell a Punchout module, it would still be able to compete in the Supply Chain Management market.  Mr. Christopherson explained that for some customers, the Punchout module is important, but not for all customers.  *Id.* at 107:11-20.

Like Mr. Christopherson, Defendant's employees Mr. Hager and Mr. Lohkamp also agreed that there would be little to no harm to Defendant caused by a permanent injunction.  Mr. Hager testified that not all of Defendant's customers have Procurement Punchout, Defendant won the healthcare market before it offered Procurement Punchout, Procurement Punchout does not drive S3 sales, and Defendant has never won a sale merely because of its Punchout product.  10/16/09 Hager Dep. Tr. at 263:8-264:11.  And Mr. Lohkamp testified that he was not aware of a specific customer that would not have purchased an S3 system if Defendant did not offer Procurement Punchout and as far as he is aware not all customers that have it use it.  10/21/09 Lohkamp Dep. Tr. at 433:2-8 and 433:10-11.

Additionally, Defendant's expert witness on damages, Mr. Green, opined in his expert report that Defendant's "prior system is not accused of infringement and would have been a readily available alternative in that it provided much of the functionality of the version 8.0.3 system accused of infringement."  6/3/10 Green Expert Report at 32.  Mr. Green therefore concluded that "***Defendant could return to using its prior system for virtually no cost, as all the software code has already been written***."  *Id.* at 33.

Unlike Defendant, the hardships *e*Plus would suffer if an injunction was not entered are substantial and irreparable.  First, the failure to obtain a permanent injunction would deprive ePlus of a range of licensing and partnering opportunities, including the opportunity to negotiate licenses to the patents-in-suit from a position of significant strength.  Second, in the absence of a permanent injunction ePlus would suffer the loss of control of its intellectual property; instead, Defendant would have obtained an opportunity through infringement of the patent at issue to use the patented technology and would enjoy complete freedom to decide how long such usage would continue.

## IX.   THE PUBLIC INTEREST FAVORS ENTRY OF A PERMANENT INJUNCTION

The public interest is disserved by enabling an adjudicated infringer like Defendant to continue its infringement without recourse.  An infringer should not be permitted to build a business based on its infringement and then argue that the public interest favors its continued infringement.  Additionally, an injunction would serve the public interest by promoting competition and allowing ePlus and ePlus's authorized licensees, to have a more level playing field.  An injunction precluding Lawson's use of the infringing electronic sourcing and procurement systems would enable ePlus and ePlus's licensees the opportunity to compete more effectively against Lawson.

## X.   RULE 26 EXPERT DISCLOSURE AND DECLARATION OF LARRY W. EVANS

Pursuant to Rule 26, and in conjunction with this Disclosure, *e*Plus also incorporates by reference as if fully set forth herein the declaration of Larry W. Evans in support of *e*Plus's request for injunctive relief.

## XI.   DOCUMENTS

In support of its request for an injunction, *e*Plus may rely upon documentary evidence that includes trial exhibits and other documents produced by the parties.  The documents *e*Plus

may rely on at the March 3, 2011 evidentiary hearing and in the post-hearing briefing regarding

its request for a permanent injunction include, but are not limited to, the documents described in

this Rule 26 Disclosure, as well as the following documents:

(1)  Plaintiff's Trial Exhibits:  1-3, 45-48, 139-142, 145, 146, 150-152, 159, 171-174, 184, 186, 192-197, 220, 241-245, 247-250, 253, 254, 273, 274, 276, 278, 281-283, 287, 289, 290, 292, 298-300, 303-314, 316, 331-334, 336-341, 349, 416, 417, 425, 430-435, 439-441, 448, 458-460, 463, 465, 466, 468, 500-502, 504, 507-515.

(2)  Defendant's Trial Exhibits:  24, 26, 27, 29, 45, 71, 82, 205-207, 214, 264-272, 274, 297-306, 312-320, 326, 329, 337, 338, 340, 341, 365, 366.

(3)  Documents Produced by *e*Plus:  ePLUS0430972, ePLUS0432959, ePLUS0432991, ePLUS0433522 - ePLUS0433557, ePLUS0433558 - ePLUS0433559, ePLUS0433976, ePLUS0434386 - ePLUS0434387, ePLUS0434404, ePLUS0439665, ePLUS0529747, ePLUS0531096, ePLUS0537889, ePLUS0539517, ePLUS0542336, ePLUS0571365 - ePLUS0571366, ePLUS0575549 - ePLUS0575555, ePLUS0614804, ePLUS0615875, ePLUS0617641, ePLUS0809757, ePLUS0810036, ePLUS0816991, ePLUS0831301, ePLUS0854117, ePLUS0866813, ePLUS0874974, ePLUS0888415, ePLUS0903285, ePLUS0910740, ePLUS0923290, ePLUS0932758, ePLUS0935468, ePLUS0936230, ePLUS0937101, ePLUS0938436, ePLUS0940189, and documents produced on February 4, 2011 and February 7, 2011 within the Bates range ePLUS0949078 – ePLUS0949433.

(4)  Documents Produced by Defendant: L0281277 – L0281331, L0340572 – L0340600, LE01281910 – LE01281915 LE02679147 – LE02679199, LE03555354 – LE03555373, LE03581830 – LE03581881, LE01280376 – LE01280419, LE00588824 – LE00589037; LE00215934 – LE00215937, L0345043, L135749, L157226-L157227.

Pursuant to the Court's January 27, 2011 Order, *e*Plus will supplement this list of

documents on February 21, 2011.

## XII.  DEPOSITION AND TRIAL TESTIMONY

In support of its request for an injunction, *e*Plus intends to rely on deposition and/or trial

testimony, including, but not limited to, deposition testimony from the following witnesses:

Dale Christopherson; Dean Hager; Hannah Raleigh; William Yuhasz; Jeffery Frank; Henrik

Billgren; Ken White; Keith Lohkamp; and Ken Farber.

## XIII.  LIVE WITNESSES

In support of its request for an injunction, *e*Plus expects to call witnesses at the evidentiary hearing currently scheduled for March 3, 2011 including Ken Farber; Larry Evans; Jeff Pinkerton; Keith Lohkamp; Harry Debes and Jeffrey Frank.

## XIV.   OTHER INFORMATION

Pursuant to Fed. R. Civ. P. 26(e), *e*Plus will supplement this disclosure after it receives the supplemental discovery Defendant has been ordered to disclose.  Furthermore, in addition to the information set forth herein, in support of its request for an injunction *e*Plus may also rely upon information that has already been made known during the discovery process or in writing such as Defendant's responses to *e*Plus interrogatory nos. 24-28 (and documents cited therein) and *e*Plus's responses to Defendant interrogatory no. 18 (and documents cited therein).

Respectfully submitted,

February 7, 2011

          /s/

Craig T. Merritt (VSB #20281)
**CHRISTIAN & BARTON, LLP**
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
Telephone: (804) 697-4100
Facsimile: (804) 697-4112
cmerritt@cblaw.com

Scott L. Robertson *(admitted pro hac vice)*
Jennifer A. Albert *(admitted pro hac vice)*
David M. Young (VSB #35997)
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4000
Facsimile:  (202) 346-4444
srobertson@goodwinprocter.com
jalbert@goodwinprocter.com
dyoung@goodwinprocter.com

Michael G. Strapp (admitted *pro hac vice*)
**GOODWIN PROCTER LLP**
Exchange Place
53 State Street
Boston, MA 02109-2881
Telephone:  (617) 570-1000

21

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of February, 2011, I will serve the foregoing

**PLAINTIFF *e*PLUS INC.'S RULE 26 SUPPLEMENTAL DISCLOSURE CONCERNING INJUNCTIVE RELIEF**

to the following counsel:

Daniel McDonald, *pro hac vice*
William D. Schultz, *pro hac vice*
Rachel C. Hughey, *pro hac vice*
Andrew Lagatta, *pro hac vice*
MERCHANT & GOULD
3200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 332-5300
Facsimile: (612) 332-9081
lawsonservice@merchantgould.com

Robert A. Angle, VSB#37691
Dabney J. Carr, IV, VSB #28679
TROUTMAN SANDERS LLP
P.O. Box 1122
Richmond, Virginia 23218-1122
(804) 697-1238
(804) 698-5119 (Fax)
robert.angle@troutmansanders.com
dabney.carr@troutmansanders.com

***Counsel for Defendant Lawson Software, Inc.***

_____/s/_____
Craig T. Merritt (VSB #20281)
Counsel for Plaintiff *e*Plus, Inc.
**CHRISTIAN & BARTON, LLP**
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
Telephone: (804) 697-4100
Facsimile: (804) 697-4112
cmerritt@cblaw.com