# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | |
|---|---|
| *e*PLUS INC., | ) |
| | ) |
| **Plaintiff,** | )  **Civil Action No. 3:09-CV-620 (REP)** |
| | ) |
| **v.** | ) |
| | ) |
| **LAWSON SOFTWARE, INC.,** | ) |
| | ) |
| | ) |
| | ) |
| **Defendant.** | ) |

## PLAINTIFF *e*PLUS INC.'S BRIEF IN SUPPORT OF MOTION FOR PERMANENT INJUNCTION

Craig T. Merritt (VSB #20281)
Henry I. Willett, III (VSB #44655)
**CHRISTIAN & BARTON, LLP**
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
Telephone: (804) 697-4100

Scott L. Robertson (admitted *pro hac vice*)
Jennifer A. Albert (admitted *pro hac vice*)
David M. Young (VSB #35997)
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4000

Michael G. Strapp (admitted *pro hac vice*)
**GOODWIN PROCTER LLP**
Exchange Place
53 State Street
Boston, MA 02109-2881
Telephone:  (617) 570-1000

*Counsel for Plaintiff, ePlus Inc.*

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ..................................................................................................1

II.     BACKGROUND ...................................................................................................3

III.    ARGUMENT .........................................................................................................7

        A.      *e*Plus Will Suffer Irreparable Harm In The Absence Of A Permanent
                Injunction ...................................................................................................8

        B.      *e*Plus Has No Adequate Remedy At Law ...............................................14

        C.      The Balance Of Harms Weighs Decidedly In Favor Of *e*Plus ............18

        D.      The Public Interest Will Not Be Disserved By An Injunction..............21

        E.      The Scope Of The Injunction Should Be Commensurate With The Jury's
                Infringement Verdict................................................................................28

IV.     CONCLUSION....................................................................................................29

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Abbott Labs. v. Sandoz, Inc.*,
  544 F.3d 1341 (Fed. Cir. 2008) ................................................................................ 22, 23

*Acumed LLC v. Stryker Corp.*,
  551 F.3d 1323 (Fed. Cir. 2008) ................................................................................ passim

*Amgen, Inc. v. F. Hoffmann-La Roche, Ltd.*,
  581 F. Supp. 2d 160 (D. Mass. 2008), *aff'd in part, rev'd in part, on other grounds*,
  580 F.3d 1340 (Fed. Cir. 2009) ................................................................................ 25

*Becton Dickinson & Co. v. Tyco Healthcare Group LP*,
  2008 WL 4745882 (D. Del. 2008) ............................................................................. 22, 24

*Bendix Commer. Vehicle Sys., LLC v. Haldex Brake Prods. Corp.*,
  2011 WL 14372 (N.D. Ohio, Jan. 3, 2011) ............................................................... passim

*Black & Decker Inc. v. Robert Bosch Tool Corp.*,
  2006 WL 3446144 (N.D. Ill. Nov. 29, 2006) ............................................................ 19

*Broadcom Corp. v. Qualcomm, Inc.*,
  543 F.3d 683 (Fed. Cir. 2008) .................................................................................. passim

*Commonwealth Scientific Indus. Research Org. v. Buffalo Tech. Inc.*,
  492 F. Supp.2d 600 (E.D. Tex. 2007).......................................................................... 13, 22

*Continental Paper Bag Co. v. Eastern Paper Bag Co.*,
   210 U.S. 405, 28 S.Ct. 748, 52 L.Ed. 1122 (1908)................................................... 8, 9

*Diomed, Inc. v. AngioDynamics, Inc.*,
  2007 WL 2045227 (D. Mass. July 2, 2007)............................................................... 25

*E. I. Du Pont de Nemours & Co. v. Phillips Petroleum Co.*,
  659 F. Supp. 92  (D. Del. 1987)................................................................................. 21

*eBay, Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006)................................................................................................... passim

*Emory Univ. v. Nova Biogenetics, Inc.*,
  2008 WL 2945476 (N.D. Ga. July 25, 2008) ............................................................ 10, 15, 24

*Ernie Ball, Inc. v. Earvana*,
  2011 WL 201816 (C.D. Cal. Jan. 21, 2011) .............................................................. 10

*Flex-Foot, Inc. v. CRP, Inc.*,
  238 F.3d 1362 (Fed. Cir. 2001) ................................................................................ 16, 23

*Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.*,
  2008 WL 928496 (N.D.Cal. Mar. 21, 2008)............................................................. 25

*i4i Ltd. P'ship v. Microsoft Corp.,*
   598 F.3d 831 (Fed. Cir. 2010), *cert. granted on other grounds,*
   131 S. Ct. 647 (2010)................................................................................ passim

*In re Mahurkar Patent Lit.,*
   831 F. Supp. 1354 (N.D. Ill. 1993), *aff'd,* 71 F.3d 1573 (Fed. Cir. 1995) ............................... 8

*Jacobsen v. Katzer,*
   535 F.3d 1373 (Fed.Cir.2008) .................................................................. 15

*Johns Hopkins Univ. v. Datascope Corp.,*
   513 F. Supp.2d 578 (D. Md. 2007), *rev'd on other grounds,*
   543 F.3d 1342 (Fed. Cir. 2008) ................................................................ 25

*Kewanee Oil Co. v. Bicron Corp.,*
   416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974)................................ 23

*Mallinckrodt, Inc. v. Masimo Corp.,*
   2005 WL 2139867 (Fed. Cir. Sept. 7, 2005) ........................................... 25

*Martek Biosciences Corp. v. Nutrinova Inc.,*
   520 F. Supp.2d 537 (D. Del. 2007), *aff'd in part, rev'd in part on other grounds,*
   579 F.3d 1363 (Fed. Cir. 2009) ......................................................... passim

*Novozymes A/S v. Genencor Int'l, Inc.,*
   474 F. Supp.2d 592 (D. Del. 2007) ................................................... 10, 11, 14

*Odetics, Inc. v. Storage Tech. Corp.,*
   14 F. Supp. 2d 785 (E.D. Va. 1998) ...................................................... 13, 14

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.,*
   2007 WL 869545 (D. N.J. Mar. 20, 2007)............................................... 25

*Paice LLC v. Toyota Motor Corp.,*
   504 F.3d 1293 (Fed. Cir. 2007)................................................................. 2

*Richardson v. Suzuki Motor Co.,*
   868 F.2d 1226 (Fed. Cir. 1989) .......................................................... 10, 11

*Sanofi-Synthelabo v. Apotex, Inc.,*
   470 F.3d 1368 (Fed. Cir. 2006)............................................................... 22

*Smith & Nephew, Inc. v. Synthes (U.S.A.),*
   466 F. Supp. 2d 978 (W.D. Tenn. 2006) ............................................... 25

*SynQor, Inc. v. Artesyn Techs., Inc.,*
   2011 WL 238645 (E.D. Tex. Jan. 24, 2011)....................................... 10, 14, 18, 24

*Trading Techs., Int'l, Inc. v. eSpeed, Inc.,*
   2008 WL 4531371 (N.D. Ill. May 22, 2008)........................................ 10, 17, 28

*Verizon Servs. Corp. v. Vonage Holdings Corp.,*
   503 F.3d 1295 (Fed. Cir. 2007) ...................................................... 2, 9, 11

iii

**Statutes**

35 U.S.C. § 154 ................................................................................................................. 1, 8

35 U.S.C. § 283 ........................................................................................................... 1, 7, 21

**Other Authorities**

Federal Trade Comm'n, *To Promote Innovation: The Proper Balance of Competition in Patent Law and Policy,* ch. 1 (2003) ................................................................................ 16

National Res. Council, National Academies, *A Patent System for the 21st Century* 26-27, 31 (Stephen A. Merrill et al. eds., 2004) ...................................................................... 16

**Rules**

Fed. R. Civ. P. 65 ................................................................................................................ 1

## I.    INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 65 and 35 U.S.C. § 283, Plaintiff *e*Plus Inc. ("*e*Plus"), by counsel, respectfully moves for a permanent injunction against Defendant Lawson Software, Inc.'s ("Defendant's") continuing direct and indirect infringement.[1]  A jury has now determined that several configurations of Defendant's S3 system infringe the identified claims, and that every one of the asserted claims is valid.  *e*Plus has a statutory right, pursuant to 35 U.S.C. § 154(a), to exclude Defendant from making, using, offering for sale or selling its infringing S3 systems.

Both before and after the Supreme Court's *eBay* decision, the federal courts have found that the protection of a patentee's statutory right to exclude, infringement having been found — in the Court's sound discretion — often requires the remedy of a permanent injunction under Section 283.  As Chief Justice Roberts stated in his concurring opinion:

> From at least the early 19th century, courts have granted injunctive relief upon a finding of infringement in the vast majority of patent cases.  This "long tradition of equity practice" is not surprising, given the difficulty of protecting a right to **exclude** through monetary remedies that allow an infringer to **use** an invention against the patentee's wishes – a difficulty that often implicates the first two factors of the traditional four-factor test.  This historical practice, as the Court holds, does not **entitle** a patentee to a permanent injunction or justify a **general rule** that such injunctions should issue.  …  At the same time, there is a difference between exercising equitable discretion pursuant to the established four-factor test and writing on an entirely clean slate.  …  When it comes to discerning and applying those standards, in this area as others, "a page of history is worth a volume of logic."

---

[1] The infringed claims are claims 3, 26, 28, and 29 of United States Patent No. 6,023,683 (or, "the '683 Patent"); and claim 1 of United States Patent No. 6,505,172 (or, "the '172 Patent").  To the extent that the Court determines after considering *e*Plus's Rule 50(b) Motion for Judgment as a Matter of Law that Defendant has also infringed U.S. Patent No. 6,055,516 ("the '516 Patent"), *e*Plus also requests that Defendant be enjoined from its continued infringement of the '516 patent.

*eBay, Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 395 (2006)  (Roberts, C.J., concurring)

(emphasis in original) (quoting *New York Times Co. v. Eisner,* 256 U.S. 345, 349 (1921)).

      Since the *eBay* decision, the Federal Circuit has continued to recognize that a permanent

injunction is often appropriate and necessary to remedy patent infringement.  *See i4i Ltd. P'ship*

*v. Microsoft Corp.,* 598 F.3d 831, 862-63 (Fed. Cir. 2010), *cert. granted on other grounds,* 131

S. Ct. 647 (2010) (affirming injunction as modified); *Acumed LLC v. Stryker Corp.*, 551 F.3d

1323, 1327-31 (Fed. Cir. 2008) (affirming grant of injunction against orthopedic nails used for

treatment of fractures); *Broadcom Corp. v. Qualcomm, Inc.*, 543 F.3d 683, 702-04 (Fed. Cir.

2008)  (affirming grant of injunction); *Verizon Servs. Corp. v. Vonage Holdings Corp.,* 503 F.3d

1295, 1310-11 (Fed. Cir. 2007) (affirming injunction).

      In *Acumed*, the Federal Circuit affirmed the injunction notwithstanding "public interest"

arguments far more compelling and substantiated than those presented by Defendant here.  In that case,

the infringer provided declarations from five surgeons, medical studies, and other evidence attesting to

medical safety complications that would result from an injunction against the infringing orthopedic nails.

*Acumed,* 551 F.3d at 1330-31.  The Federal Circuit concluded, however, that "[w]e agree with [the

patentee] that the district court did not abuse its discretion in concluding that 'there is not sufficient

objective evidence of any public-health issue in the form of screw back-out problems with the

[infringing product] to find that the public interest would be disserved by a permanent injunction.'"  *Id.*

at 1331 (quoting district court opinion).  Indeed, no post-*eBay* Federal Circuit case has approved the

denial of an injunction on public interest grounds that even remotely resemble Defendant's thin public

interest arguments offered in this case.

      Lawson's reliance on the Federal Circuit's decision in *Paice LLC v. Toyota Motor Corp.,* 504

F.3d 1293 (Fed. Cir. 2007), therefore, is entirely misplaced, as the facts are readily distinguishable.  In

that case, the district court denied an injunction and imposed an "ongoing royalty" based on facts such as: (i) *the patentee did not manufacture any goods, and therefore there was no threat to its name recognition or market share*; (ii) the patentee's inability to obtain licensees resulted from public misrepresentations it had made; and (iii) the jury's damages verdict indicated that the patented invention was of minimal value in relation to the overall value of the infringing products. *Id.* at 1302-03. On appeal, the Federal Circuit acknowledged that awarding an ongoing royalty may be appropriate in lieu of an injunction "[u]nder some circumstances," but the appellate court remanded the case because the district court had provided no reasoning to support its selection of the royalty rate. *Id.* at 1314-15.

Such facts are inapposite to those presented here. As discussed *infra, e*Plus has built a substantial commercial enterprise founded on the patented inventions, by which it competes head-to-head with Defendant in a fiercely competitive market. And no significant public interest concern has been presented or corroborated.

Accordingly, in order to prevent continued irreparable harm to Plaintiff, *e*Plus respectfully requests that the Court enter a permanent injunction against Defendant in its sound discretion.

## II.    BACKGROUND

On January 27, 2011, the jury returned a unanimous verdict that the '683 and '172 Patents were infringed, and that all three of the *e*Plus patents-in-suit were valid. In particular, the jury determined that the following configurations of Defendant's S3 Procurement System infringe the asserted claims identified below, both directly and indirectly:

(a)    Defendant's Core S3 Procurement System (Lawson System Foundation ("LSF")/Process Flow, in combination with Inventory Control, Requisition, and Purchase Order Modules) and Requisition Self-Service or "RSS," infringes claim 1 of the '172 Patent, both directly and indirectly;

3

(b)     Defendant's Core S3 Procurement System, RSS, and Punchout, infringes claims 3, 26, 28, and 29 of the '683 Patent, and claim 1 of the '172 Patent, both directly and indirectly;

(c)     Defendant's Core S3 Procurement System, RSS, Punchout, and Electronic Data Interchange or "EDI," infringes claims 3, 26, 28, and 29 of the '683 Patent, and claim 1 of the '172 Patent, both directly and indirectly; and

(d)     Pursuant to the parties' Stipulation With Respect To M3 Infringement, as set forth in the Revised Amended Final Pretrial Order (Dkt. No. 481) at Section II, because *e*Plus proved that the aforementioned configurations of Lawson's S3 Procurement System infringe claims 3, 26, 28, and 29 of the '683 Patent, and claim 1 of the '172 Patent, both directly and indirectly, *e*Plus also proved that Lawson's M3 e-Procurement Software infringes claims 3, 26, 28, and 29 of the '683 Patent, and claim 1 of the '172 Patent, both directly and indirectly.

*e*Plus and its predecessors-in-interest to the patents-in-suit have commercialized the claimed inventions and built an e-procurement business that competes directly with Lawson's infringing products and services.  On May 4, 2001, *e*Plus purchased the commercial-technology business assets of ProcureNet, Inc. ("ProcureNet"), a company that at that time focused on e-commerce software.  *See* Plaintiff's Proposed Findings of Fact and Conclusions of Law ("FF") ¶¶ 4-5.  As part of the acquisition, *e*Plus obtained ProcureNet's enterprise procurement-software application, including ProcureNet's procurement and catalog systems, and the rights to the patents-in-suit, *i.e.*, U.S. Patent Nos. 6,023,683, and any continuations later issuing from the '683 Patent (*e.g.*, the '516 and '172 Patents).  FF ¶ 4.  ProcureNet's procurement and catalog systems were renamed Procure+ and Content+ and became part of *e*Plus Systems and Content Services divisions.  FF ¶¶ 5-6.  *e*Plus described the procurement software it acquired as being "one of the most valuable intangible assets acquired by *e*Plus" as part of the ProcureNet deal.  FF ¶ 5.

The evidence at trial and at the evidentiary hearing of March 25, 2011 also revealed that:

•       ePlus has sold its e-procurement software products, known as Procure+ and Content+, since 2001.  FF ¶ 6.

- Procure+ and Content+ embody the patented technology at issue in this litigation. These e-procurement products allow users to search for items in multiple vendor catalogs, in both internal and external catalogs, select the items, compare those items, build requisitions for selected items, check the availability of selected items in the vendors' inventories, and generate multiple purchase orders from the requisitioned items for transmission to suppliers. FF ¶¶ 7-9.

- Procure+ and Content+ products are the central and primary software products developed and sold by ePlus Systems and ePlus Content Services. FF ¶¶ 6, 11.

- From the time Lawson first began infringing the ePlus patents through the present, ePlus has generated in excess of $50 million in revenue from sales and maintenance of Procure+ and Content+ alone. FF ¶ 11.

- The patented Procure+ and Content+ products also allow ePlus to support and retain its customers in its value-added reseller ("VAR") technology and finance business, the business from which ePlus currently derives the majority of its revenues. FF ¶¶ 12-13.

- The market for e-procurement software and services is fiercely competitive. There are several software vendors that provide solutions such as the Procure+ and Content+ solutions offered by *e*Plus Systems. These include, for example, Ariba, SAP, Oracle, Lawson Software, Perfect Commerce, SciQuest and Verian Technologies. Among the larger players are companies such as Oracle and SAP, who together comprise more than 40% of the market share and tend to focus on very large global companies. FF ¶ 22. Other electronic procurement companies, including ePlus and Lawson, target mid-market companies having market capitalizations roughly between $50 million to $2.5 billion. FF ¶¶ 22, 26.

- Lawson's S3 Procurement modules, including the infringing configurations of Defendant's S3 Procurement System, are counterparts to ePlus's Procure+ and Content+ applications, and ePlus and Lawson are direct competitors in the market for e-procurement solutions. *See* FF ¶¶ 25-34. Indeed, in several instances in which ePlus has responded to a Request for Proposal ("RFP") from a potential customer, Lawson has also offered its products for sale to the same prospective customer. FF ¶ 29. In some instances, *e*Plus has been able to secure the sale in direct competition with Lawson. In other instances, Lawson has prevailed. FF ¶ 28.

- Mr. Farber, the President of *e*Plus Systems, testified that some of the current or prospective customers for which *e*Plus and Lawson engaged in direct competition include Ames Corporation, Fortress Investments, Sterling Jewelers, Cleveland Clinic, Novant Health, Wolters Kluwer, and Deaconess Hospital, among others. FF ¶ 28. And *e*Plus is also aware of

several RFPs relating to e-procurement products and services for which both *e*Plus and Lawson submitted responses including Novant Health, Indalex, Hanesbrands, Wolters Kluwer and XM Radio.  FF ¶ 29.  There are likely numerous other instances of which *e*Plus is unaware, in which *e*Plus has lost sales to Lawson or even directly competed with Lawson, because the RFP process by which companies seek out e-procurement solution providers is often conducted in secret so vendors are usually unaware who they are competing against.  FF ¶ 30.

- *e*Plus has determined through a comparison of *e*Plus and Lawson customer lists that (1) *e*Plus has targeted 247 of Defendant's 830 RSS and Punchout customers for sales of its patented Content+ and Procure+ software products; (2) *e*Plus has targeted 2,041 of the 7,989 potential customers that Defendant has solicited for sales of its patented Content+ and Procure+ products; and (3) Defendant has actively targeted 16 of *e*Plus's 64 Procure+ and Content+ customers for sales of its infringing software.  FF ¶¶ 32-34.

*e*Plus continues to suffer an irreparable injury because of Defendant's infringement of the '683 and '172 patents, and there are no remedies available at law, such as monetary damages, adequate to compensate for that injury.  *e*Plus has suffered, and will continue to suffer, irreparable harm because its right to exclude its competitor Lawson from using systems covered by the infringed claims of the patents-in-suit is being denied.  *See* FF ¶¶ 41-46.  In particular, *e*Plus has suffered irreparable harm not quantifiable due to the lost business and licensing opportunities resulting from its inability to enjoin Lawson's ongoing infringement.  FF ¶ 45.

*e*Plus will continue to suffer irreparable harm if Lawson's infringement is not enjoined. It will lose its right to exclude a now willful infringer from the marketplace that *e*Plus wishes to exploit.  FF ¶ 54.  It will lose its right to choose the parties with whom it wishes to do business and to refuse to do business with others, such as Lawson.  *Id.*  And it will lose its right to negotiate the terms upon which it is willing to grant licenses to entities.  *Id.*  It will lose the opportunity to sell not only its patented Procure+ and Content+ products to companies using Defendant's infringing software, but also the opportunity to cross-sell and up-sell other *e*Plus products and services to those customers of Defendant's infringing software.  FF ¶¶ 12-13, 54.

Moreover, if Defendant is permitted to continue using *e*Plus's patented technology, the value of *e*Plus's entire business could decline, since *e*Plus will effectively be precluded from deciding how best to license and exploit its patented technology.

## III.   ARGUMENT

Under the facts of this case, a permanent injunction is clearly warranted and necessary. An analysis of the four factors set forth in *eBay, Inc.,* 547 U.S. at 391, permits no other conclusion.  Section 283 of the Patent Act authorizes district courts, upon a finding of infringement, to impose a permanent injunction "in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable."  35 U.S.C. § 283.  The *eBay* Court set forth the four factors that this Court must consider when granting a permanent injunction:

> (1) that the plaintiff has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest "would not be disserved" by a permanent injunction.

*eBay Inc.*, 547 U.S. at 391.

With respect to Lawson's continuing sales, installation, implementation, maintenance and support and servicing of the infringing configurations, the facts of this case present a textbook example for when a permanent injunction should issue.  Not only does Defendant infringe *e*Plus's patents but, moreover, the two parties compete for the very same customers with respect to Lawson's infringing products.  *See* FF ¶¶ 25-34.  As a result of Lawson's infringement, *e*Plus has lost market share and suffered harm to its reputation, while Lawson has seen increased sales and used its infringing products to cross-sell other products and services in competition with *e*Plus and ePlus's licensees.  *See* FF ¶¶ 35-40.

There are no hardships that tip in Lawson's favor, nor are there any public interest concerns to overcome the public's interest in protecting a patent owner's right to exclude an infringer — in this case, a competitor — from practicing its invention.  Lawson's contentions that an injunction would disserve the public interest have been greatly overstated and are uncorroborated.

### A.     *e*Plus Will Suffer Irreparable Harm In The Absence Of A Permanent Injunction

"The essential attribute of a patent grant is that it provides a right to exclude competitors from infringing the patent.  35 U.S.C. § 154(a)(1) (2000).  In view of that right, infringement may cause a patentee irreparable harm not remediable by a reasonable royalty."  *Acumed*, 551 F.3d at 1328.  Indeed, the Patent Act expressly provides that the right conveyed is "***the right to exclude others*** from making, using, offering for sale, or selling the invention throughout the United States or importing the invention into the United States…."  35 U.S.C. § 154(a)(1) (emphasis added); *Bendix Commer. Vehicle Sys., LLC v. Haldex Brake Prods. Corp.*, 2011 WL 14372, *5 (N.D. Ohio, Jan. 3, 2011) ("the whole point and benefit of a patent is the right to exclude others from manufacturing and/or selling the patented product.").[2]

The Supreme Court stated more than a century ago that "[t]he right which a patentee receives does not need much further explanation.  We have seen that it has been the judgment of Congress from the beginning that the sciences and the useful arts could be best advanced by giving an exclusive right to an inventor."  *Continental Paper Bag Co. v. Eastern Paper Bag Co.*, 210 U.S. 405, 429 (1908).  Thus,

---

[2] The injunction "thereby creates a property right and leads to negotiations between the parties. A private outcome of these negotiations — whether they end in a license at a particular royalty or in the exclusion of an infringer from the market — is much preferable to a judicial guesstimate about what a royalty should be."  *In re Mahurkar Patent Lit.,* 831 F. Supp. 1354, 1397 (N.D. Ill. 1993), *aff'd,* 71 F.3d 1573 (Fed. Cir. 1995).

> [f]rom the character of the right of the patentee we may judge of his remedies.  It hardly needs to be pointed out that the right can only retain its attribute of exclusiveness by a prevention of its violation.  Anything but prevention takes away the privilege which the law confers upon the patentee.

*Id.* at 430.

The Supreme Court's *eBay* decision did not overrule *Continental Paper Bag.*  To the contrary, the decision reaffirmed its present day relevance by holding that the district court's analysis in that case appeared to categorically and incorrectly deny the remedy of an injunction for patentees that do not commercialize their patents.  *eBay,* 547 U.S. at 393 ("[t]he [district] court's categorical rule is also in tension with *Continental Paper Bag Co. v. Eastern Paper Bag Co.,* 210 U.S. 405, 422-30, 28 S.Ct. 748, 52 L.Ed. 1122 (1908), which rejected the contention that a court of equity has no jurisdiction to grant injunctive relief to a patent holder who has unreasonably declined to use the patent.").

Both before and after the Supreme Court's *eBay* decision, the federal courts have found that the protection of a patentee's statutory right to exclude often requires the remedy of a permanent injunction under Section 283.  Accordingly, since the *eBay* decision, the federal courts have continued to recognize — as Chief Justice Roberts aptly restated — that "a page of history is worth a volume of logic," and that the presence of an infringing competitor forms the basis for a finding of irreparable harm.

More specifically, courts have found irreparable harm because infringement by a competitor causes the patentee to, *inter alia*:  (1) lose market share, (2) suffer losses on sales of its other products, and/or (3) experience reputational injury and the loss of business opportunities.[3]  *e*Plus has experienced each of these forms of irreparable harm as a result of Defendant's

---

[3]  *See, e.g.*, *Verizon Servs. Corp.,* 503 F.3d at 1310-11 (affirming district court's grant of permanent injunction because irreparable harm included loss of sales, price erosion, and "lost

infringement.  *See* FF ¶¶ 41-46.  As a "head-to-head" competitor of Lawson's, *e*Plus "has a right, granted by Congress, not to assist its rival with the use of proprietary technology."  *Novozymes A/S,* 474 F. Supp.2d at 613.

Indeed, since the *eBay* decision, patentees that are head-to-head competitors with the infringers have been granted injunctions after a finding of infringement in the vast majority of cases.  *See, e.g., Ernie Ball, Inc. v. Earvana*, 2011 WL 201816, *4 (C.D. Cal. Jan. 21, 2011) (granting injunction and stating "In this case, [plaintiff] is irreparably injured by the continuing patent infringement by [defendant].  ***The infringement devalues the patent and gives an advantage to competitors in the industry…by piggybacking on [the plaintiff]'s patented technology.***") (emphasis added); *Bendix Commer. Vehicle Sys.*, 2011 WL 14372, at *5 (granting injunction and stating "When a competing company acts in violation of a patent holder's right to the exclusive use of an

---

opportunities to sell other services to the lost customers"); *SynQor, Inc. v. Artesyn Techs., Inc.*, 2011 WL 238645, *3 (E.D. Tex. Jan. 24, 2011) ("The best case for obtaining a permanent injunction often occurs when the plaintiff and defendant are competing in the same market.  In that context, the harm in allowing the defendant to continue infringing is the greatest."); *Bendix Commer. Vehicle Sys.*, 2011 WL 14372, at *5 ("[c]ourts routinely and rightly find irreparable harm when the infringer and the patentee are direct competitors" and citing cases); *Emory Univ. v. Nova Biogenetics, Inc.*, 2008 WL 2945476, *4 (N.D. Ga. July 25, 2008) "[W]here a company pioneers an invention in the marketplace, irreparable harm flows from a competitor's attempts to usurp the pioneering company's market position and goodwill.") (quoting *800 Adept, Inc. v. Murex Secs., Ltd.,* 505 F. Supp.2d 1327, 1337 (M.D. Fla. 2007)); *Trading Techs., Int'l, Inc. v. eSpeed, Inc.,* 2008 WL 4531371, *3 (N.D. Ill. May 22, 2008) ("We agree with [the patentee] that the existence of the infringing products in the marketplace causes irreparable harm to [its] market share and goodwill in the industry."); *Martek Biosciences Corp. v. Nutrinova Inc.,* 520 F. Supp.2d 537, 558-59 (D. Del. 2007), *aff'd in part, rev'd in part on other grounds*, 579 F.3d 1363 (Fed. Cir. 2009) (irreparable harm found where infringing competitor is targeting patentee's customers and patentee is "likely to lose market share that it may not be able to recapture"); *Novozymes A/S* v. *Genencor Int'l, Inc.,* 474 F. Supp.2d 592, 612-13 (D. Del. 2007) ("The statutory right to exclude represents a benefit that, under these circumstances, cannot be equated by an award of cash.  These are head-to-head competitors, and [patentee] has a right, granted by Congress, not to assist its rival with the use of proprietary technology."); *see also Richardson v. Suzuki Motor Co.,* 868 F.2d 1226, 1246-47 (Fed. Cir. 1989) (holding that encroachment on right to exclude can cause immediate and irremediable harm to patentee).

invention or product, ***the patent holder suffers an immediate, and in many if not most cases, irreparable harm***.") (emphasis added).

In sum, *e*Plus has lost sales, lost market share, lost collateral sales, and suffered harm to its reputation. *See* FF ¶¶ 13, 35-41. Each of these harms has been considered "irreparable" for purposes of awarding a permanent injunction. *See, e.g., Verizon Servs. Corp.,* 503 F.3d at 1310 (affirming injunction where irreparable harm included loss of sales, price erosion, and "lost opportunities to sell other services to the lost customers"); *Richardson,* 868 F.2d at 1246-47 (encroachment on right to exclude can cause immediate and irremediable harm to patentee); *Martek Biosciences,* 520 F. Supp.2d at 558 (patentee "likely to lose market share that it may not be able to recapture"); *Novozymes A/S,* 474 F. Supp.2d at 612-13 (possibility of permanent loss of market share is irreparable harm).

While the four-factor test of *eBay* does not require that there be competition between the parties in order to justify an injunction, the fact that such competition exists certainly makes an injunction all the more appropriate. In this case, the fact of competition between *e*Plus and Lawson cannot reasonably be disputed. *e*Plus sells commercial products and services that compete with Lawson's infringing S3 system configurations and services. *See* FF ¶¶ 25-34. Both *e*Plus and Lawson sell products covered by the patents-in-suit,[4] albeit *e*Plus's products are lawful and Lawson's are infringing. *Id.* The two companies both target the same type of companies for sales, in particular, mid-market companies having market capitalizations roughly between $50 million to $2.5 billion. FF ¶¶ 22, 26. Furthermore, *e*Plus and Defendant market and sell their competing e-procurement software to companies in the very same industry sectors.

---

[4] Under *eBay, e*Plus is not required to prove that its commercial product practices the claimed inventions, or even that its commercial product is marketed in "direct" competition with that of Lawson. *Broadcom*, 543 F.3d at 702-03 (holding that patentee showed evidence of irreparable harm even though "it does not currently practice the claimed inventions" and it relied upon contention of "indirect" competition). Nonetheless, *e*Plus has shown such evidence of direct competition with a patented product in this case.

FF ¶ 27.  Indeed, *e*Plus has identified hundreds of instances where the parties competed for the same customer's business.  *See* FF ¶¶ 28-29, 32-34.  And as if this were not enough, *e*Plus has identified specific instances of lost sales in which customers chose Lawson's infringing products and services over the lawful products and services of *e*Plus.[5]  *See* FF ¶¶ 35-40.  Under these facts, any contention that the parties are not in competition with respect to the infringing products borders on the absurd.

Moreover, the impact of Defendant's infringement extends beyond competition with *e*Plus's covered products, but extends also to other products and services that *e*Plus markets to customers of its covered products.  FF ¶¶ 13, 41, 54; *see also Bendix*, 2011 WL 14372, at *6 (granting injunction and stating "***The loss or gain of a customer may have harms or benefits beyond just the sale of the patented product***.  Customers often choose to do all of their business with one supplier, therefore, the ability to attract customers with exclusive access to an innovative product is often relied on to increase the sales of other products and services as well.  The ***ancillary business*** that may come from converting customers of a competitor cannot be compensated by a mere royalty on the patented product.") (emphasis added).

Absent a permanent injunction, Defendant's infringement will force *e*Plus to continue to involuntarily "license" its proprietary technology to its competitor.  As this Court has aptly stated:

> defendants are incorrect that absent an injunction [the patentee] will not suffer irreparable harm simply because it will be paid royalties for all future infringement.  ***If no injunction issues, [the patentee] effectively will be forced to license the … patent to [the infringer], a result antithetical to a basic tenet of the patent system, namely that the decision whether to license is one that should***

---

[5] The Federal Circuit has held that a patentee is "not required to prove that its specific customers stopped using [its] products because they switched to the infringing … products."  *i4i Ltd. P'ship*, 598 F.3d at 862, *cert. granted on other grounds,* 131 S. Ct. 647 (2010).  Nonetheless, that proof again is present in this case.

> ***be left to the patentee.*** … [T]he existence of two licenses to practice the … patent does not mean that [the patentee] has given up all control over who may practice the rights granted exclusively to it by the patent.
>
> In sum, were an injunction not to issue [the patentee] would suffer significant irreparable harm, namely the loss of its statutory right to license or not to license its patent to whomever it wishes.

*Odetics, Inc.* v. *Storage Tech. Corp.,* 14 F. Supp. 2d 785, 795 (E.D. Va. 1998) (emphasis added); *see also Bendix*, 2011 WL 14372, at *6 ("it would defy the principles of equity to force [the patentee] into what amounts to an unwanted contractual relationship with a competitor who has repeatedly been found to willfully infringe … and has otherwise created a long-term continuous relationship exhibiting a lack of respect or acknowledgment of [the patentee's] legal rights").

In addition, Defendant's infringement has forced *e*Plus to divert millions of dollars away from research, development, and business opportunities, and into litigation costs.  FF ¶¶ 42, 44; *see also Bendix*, 2011 WL 14372, at *6 (court-imposed license agreement would be inadequate for patentee "because it would be required to expend and divert resources that could be used toward advancement of the products and its business to monitor, challenge, and sue [the defendant] for all future infringement"); *Commonwealth Scientific Indus. Research Org. v. Buffalo Tech. Inc.,* 492 F. Supp.2d 600, 604 (E.D. Tex. 2007) (granting injunction based in part on "the harm of lost opportunities" such as "divert[ing] millions of dollars away from research and into litigation costs," lost research capabilities, and lost opportunities to accelerate existing projects or begin new projects).  Further, *e*Plus's patents will be diminished in value if potential infringers know that they may freely infringe, all the while knowing that at most they will pay only a reasonable royalty for their infringement, without concern that they could be enjoined. *Bendix*, 2011 WL 14372, at *6.  Again, such devaluation of *e*Plus's patent rights would diminish *e*Plus's incentive to research and develop new, patentable technology.

### B.     *e*Plus Has No Adequate Remedy At Law

Under these circumstances — particularly where Defendant is one of *e*Plus's rivals in the

market — courts have repeatedly recognized that monetary damages are insufficient because the

loss in market share, business opportunities, and reputation is simply incalculable.  The *SynQor*

court recently held, when granting an injunction:

> Although future damages in lieu of an injunction may compensate SynQor for an
> ***approximate*** loss, ***such approximation does not make future damages adequate
> in the sense that they are a suitable proxy for injunctive relief***.  As discussed
> above, SynQor makes and sells products and has a presence in the relevant
> market.  Further, SynQor has name recognition, goodwill, and market share in the
> relevant market.  The loss associated with any of these effects is particularly
> difficult to quantify.  Difficulty in estimating monetary damages is evidence that
> remedies at law are inadequate.

*SynQor,* 2011 WL 238645, at *3 (emphasis in original) (citations omitted); *see also Martek*

*Biosciences Corp.,* 520 F. Supp.2d at 559 ("[the patentee] has a right to exclude its rival from

using its proprietary technology"); *Novozymes A/S,* 474 F. Supp.2d at 612-13 (noting that

"statutory right to exclude represents a benefit that, under these circumstances, cannot be equated

by an award of cash," where the circumstances involved infringement by competitor of the

patentee's licensee); *Odetics,* 14 F. Supp.2d at 795 ("[a]lthough such damages might be

'adequate' in the sense that they could replicate what might be a reasonable royalty for such

continued infringement, damages, however measured, are nonetheless inadequate because

limiting [the patentee] to damages does not allow it to exercise the monopoly power granted to it

by the statute; an injunction is the only remedy that can achieve that goal.").

*e*Plus cannot quantify the costs it will incur if it is forced to share its patented technology

with Lawson for the remainder of the patent's life.  Harm such as loss of market share, brand

recognition, and customer goodwill defies attempts at valuation.  *i4i,* 598 F.3d at 862.  The

"difficulty in estimating monetary damages reinforces the inadequacy of a remedy at law."

*Broadcom*, 543 F.3d at 703-04; s*ee also i4i*, 598 F.3d at 862 ("Difficulty in estimating monetary damages is evidence that remedies at law are inadequate.") (quoting *Broadcom*, 543 F.3d at 703-04); *Jacobsen v. Katzer,* 535 F.3d 1373, 1375 (Fed.Cir.2008) (stating that, in copyright licensing context, "because a calculation of damages is inherently speculative, these types of license restrictions might well be rendered meaningless absent the ability to enforce through injunctive relief"); *Emory*, 2008 WL 2945476 at *5 ("the negative effects of the Plaintiffs' potential loss in goodwill, market share, and prestige are real, and would be difficult to quantify solely through monetary damages."); *Martek Biosciences Corp.,* 520 F. Supp.2d at 558-59 ("The statutory right to exclude represents a tangential benefit associated with patent rights that cannot be quantified in monetary damages.").  Moreover, even more uncertainty to *e*Plus is present in this case because of the real and immediate possibility of Infor or another company acquiring Lawson.[6] FF ¶ 46.

Defendant contends that the fact that *e*Plus has entered into settlement agreements in prior enforcement actions in which it granted licenses is evidence that *e*Plus has an adequate remedy at law.  Such arguments, if adopted, would punish *e*Plus for settling its prior enforcement actions, even though in those cases this Court urged *e*Plus and the defendants to consider settlement, just as this Court has done in this case.

Adoption of Defendant's argument would create a prohibitive incentive for patentees such as *e*Plus ***not*** to settle patent enforcement actions.  In cases involving industries where there are likely multiple infringers, such a rule would virtually eliminate the possibility of dispute

---

[6] Furthermore, the prospective remedy of a "compulsory license" is incalculable even according to the financial data that Defendant tracks on the infringing systems.  Defendant's Director of Revenue Operations and Rule 30(b)(6) witness on costs, revenues, and profits for Defendant's e-procurement systems and services, Kenneth White, testified, for example, that services revenues are not tracked on a product-by-product basis.  FF ¶ 43.  Mr. White also testified that Defendant has no means to determine the profitability of its S3 procurement suite.  *Id*.  These facts render a future damages calculation all the more uncertain.

resolution.  Patentees such as *e*Plus would have little reason to settle a patent litigation if the consequence is that the patentee is forfeiting the remedy of a permanent injunction in future enforcement actions.

Not only would such a rule result in severe congestion of the federal courts, it also would violate the clear public policy favoring settlements.  *See Flex-Foot, Inc. v. CRP, Inc.*, 238 F.3d 1362, 1369-70 (Fed. Cir. 2001) ("[T]here is a strong public interest in settlement of patent litigation ….."). "'There is [also] a compelling public interest and policy upholding and enforcing settlement agreements voluntarily entered into' because enforcement of settlement agreements encourages parties to enter into them – thus fostering judicial economy." *Id.* at 1370 (quoting *Hemstreet v. Spiegel, Inc.*, 851 F.2d at 348, 349-51 (Fed. Cir. 1988)).

Defendant argues that there is a public interest in permitting "full and free competition in the use of ideas which are in reality a part of the public domain."  Def's Rule 26 Supp. Disc. 22 (quoting *Lear v. Adkins*, 395 U.S. 653, 670 (1969)).  As to Defendant's argument that public policy favors free competition (read, "patent infringement"), the Federal Circuit has answered, "While the federal patent laws favor full and free competition in the use of ideas in the public domain over the technical requirements of contract doctrine, settlement of litigation is more strongly favored by the law."  *Flex-Foot,* 238 F.3d at 1369.[7]

In addition, a patentee's licensing of the patents-in-suit does not negate the availability of injunctive relief.[8]  "While the fact that a patentee has previously chosen to license the patent may

---

[7] Moreover, ideas subject to patent rights are not "in the public domain."

[8] Indeed, licensing is a form of commercialization of the patented inventions, which has been recognized as critically important in promoting both innovation and competition.  *See, e.g.,* National Res. Council, National Academies, *A Patent System for the 21st Century* 26-27, 31 (Stephen A. Merrill et al. eds., 2004); Federal Trade Comm'n, *To Promote Innovation: The Proper Balance of Competition in Patent Law and Policy,* ch. 1, at 14, 22-25 (2003).

indicate that a reasonable royalty does compensate for an infringement, that is but one factor for the district court to consider.  The fact of the grant of previous licenses, the identity of the past licensees, the experience in the market since the licenses were granted, and the identity of the new infringer all may affect the district court's discretionary decision concerning whether a reasonable royalty from an infringer constitutes damages adequate to compensate for the infringement."  *Acumed*, 551 F.3d at 1328.  "Adding a new competitor to the market may create an irreparable harm that the prior licenses did not."  *Id.*

Accordingly, the fact that a patentee may have previously licensed the patents does not mean that it must do so again against its will.  *Id.* ("In this case, the fact that [the patentee] licensed the … patent under two particular sets of circumstances does not mean that the district court abused its discretion in not holding that [the patentee] must now grant a further license to [the defendant] and receive only a royalty as compensation.").[9]  As the Court in *Trading Techs.* stated:

> While [the patentee] has licensed to others, its licenses were negotiated in exchange for the parties' agreement to settle, rather than litigate, the validity or infringement of [the] patents.  Here, [the infringer] chose not to settle with [the patentee], but to litigate.  [The patentee] does not wish to license its product to [the infringer].  [The patentee] argues that if an injunction is not issued it will be forced into a compulsory licensing agreement with [the infringer], one that does not contain the myriad protections that a licensing agreement would normally possess.  We find [the patentee's] concerns valid, and that consideration of the above factors weighs in its favor.

*Trading Techs.,* 2008 WL 4531371, at *4 (citations omitted).

---

Accordingly, the *eBay* Court emphatically rejected any categorical rule that would deny patentees that license their patents the right to an injunction.  *eBay,* 547 U.S. at 393.

[9] That is particularly true here, where each of the licenses *e*Plus has granted has been tightly restrictive and has included terms limiting *e*Plus's licensees from transferring, assigning or sublicensing the patent licenses.  *See* FF ¶¶ 14-18.

### C.    The Balance Of Harms Weighs Decidedly In Favor Of *e*Plus

With respect to the third of the *eBay* factors, the "balance of harms" inquiry to be considered is "only between a plaintiff and a defendant, and thus the effect on customers and patients alleged by [defendant] is ***irrelevant*** under this prong of the injunction test." *Acumed*, 551 F.3d at 1330 (emphasis added) (citing *eBay,* 547 U.S. at 391); *see also eBay,* 547 U.S. at 391 ("[C]onsidering the balance of hardships ***between the plaintiff and defendant***, a remedy in equity is warranted.") (emphasis added); *SynQor,* 2011 WL 238645, at \*4 ("The effect of the injunction on third parties, however, is irrelevant under this prong of the injunction test.").

Likewise, Defendant's expenses in designing and marketing the accused product are irrelevant to the balance of harms.  *Acumed,* 551 F.3d at 1330 (citing *Windsurfing Int'l, Inc. v. AMF, Inc.,* 782 F.2d 995, 1003 n. 12 (Fed.Cir.1986) ("One who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected.")); *see also i4i*, 598 F.3d at 863 ("Similarly irrelevant are the consequences to [the infringer] of its infringement, such as the cost of redesigning the infringing products.") (citations omitted).  An adjudicated infringer "should not be permitted to prevail on a theory 'that successful exploitation of infringing technology shields a party from injunctive relief.'"  *Broadcom*, 543 F.3d at 704 (citing *Windsurfing Int'l,* 782 F.2d at 1003, n. 12).

In addition, that Defendant did not even attempt to engage in any design-around efforts upon receipt of the complaint, which *e*Plus filed nearly two years prior to the jury verdict, or even after the Court's *Markman* rulings rejecting Lawson's claim construction arguments, or after the denial of Lawson's summary judgment motion, but chose not to, is relevant evidence

that the balance of hardships do not weigh against an injunction.  *See Broadcom*, 543 F.3d at 704; *see also* FF ¶ 49.[10]

This case does not present any undue hardships to Defendant that would counsel against the issuance of a permanent injunction.  For example, this is not a situation where the issuance of a permanent injunction will drive the infringer out of business.  *Black & Decker Inc. v. Robert Bosch Tool Corp.,* 2006 WL 3446144, at *5 (N.D. Ill. Nov. 29, 2006) (granting injunction and stating "this is not a situation where [the infringer] will be driven out of business.").  Instead, requiring Defendant to comply with a permanent injunction should have little collateral effect on its business as a whole.  FF ¶¶ 52-53.

Defendant is a large company, and it does not claim to lack the resources to withstand the loss of its infringing products.  Indeed, as Defendant has argued with respect to the scope of the injunction, certain configurations of its accused S3 system were not found to infringe and therefore will not be enjoined, and Defendant has several other lines of products that *e*Plus has never accused of infringement.  FF ¶¶ 50-51.

The balance of the hardships as between *e*Plus and Defendant weighs heavily in *e*Plus's favor.  Defendant's purported "hardship" corresponds, at most, to the loss of sales that it should not have been making in the first place.  In fact, Lawson's employees and expert witness have testified that there would be little to no harm to Lawson caused by a permanent injunction.  For example, Lawson's Mr. Christopherson — its corporate representative at trial — testified that even if Lawson could no longer make and sell a RSS module, it would still be able to compete in the Supply Chain Management market.  FF ¶ 52.  Mr. Christopherson also testified that even if

---

[10] Of course, given the nature of ePlus's patent claims — described in functional terms — a so-called "design around" is virtually impossible.  The real "design around" is to simply ***stop*** infringing; a realization Defendant likely quickly appreciated.

Lawson could no longer make and sell a Punchout module, it would still be able to compete in the Supply Chain Management market.  *Id*.  Mr. Christopherson explained that for some customers, the Punchout module is important, but not for all customers.  *Id*.

Like Mr. Christopherson, Lawson's employees Mr. Hager and Mr. Lohkamp also agreed that there would be little to no harm to Lawson caused by a permanent injunction.  Mr. Hager testified that (i) not all of Lawson's customers have Punchout, (ii) Lawson won the healthcare market before it offered Punchout, (iii) Procurement Punchout does not drive S3 sales, and (iv) Lawson has never won a sale merely because of its Punchout product.  FF ¶ 53.  Mr. Lohkamp also testified that he was not aware of a specific customer that would not have purchased an S3 system if Lawson did not offer Punchout; he also testified that — as far as he is aware — not all customers that have Punchout make use of it.  FF ¶ 53.

Further, to the extent there is any harm to Lawson, it bears emphasis that Lawson could have, but failed to, mitigate the hardships it may face.  Lawson was certainly aware of the risks it faced by continuing to market, maintain and provide services associated with the accused products, and it has had more than ample time to prepare for an injunction to issue.  Despite the filing of this lawsuit, rejection of Lawson's claim construction arguments, and denial of its summary judgment motions, Lawson chose to continue selling and providing services with respect to the accused system instead of attempting to develop or institute non-infringing alternatives.  FF ¶ 49.  *e*Plus should not have to continue to share its market with Lawson while Lawson avoids the consequences of its own decision.

In contrast, the hardships *e*Plus would suffer if an injunction is not entered are substantial and irreparable.  As set forth above, *e*Plus will continue to face irreparable harm in light of Lawson's infringing competition.  The lack of a permanent injunction also would deprive *e*Plus

20

of a range of licensing and partnering opportunities, including the opportunity to negotiate licenses to the patents-in-suit from a position of significant strength.  In the absence of a permanent injunction, *e*Plus would suffer the loss of control of its intellectual property; instead, Lawson would have obtained an opportunity through infringement of the patents to use the patented technology and would enjoy complete freedom to decide how long such usage would continue.  *See E. I. Du Pont de Nemours & Co. v. Phillips Petroleum Co.,* 659 F. Supp. 92, 94 (D. Del. 1987).  As the court stated in the *E. I. Du Pont* case:

> [I]n reality, the only harm that [the infringer] will suffer if the injunction is not stayed is the loss of profits from the use and sale of infringing products.  The Court has already found that massive infringement has occurred in the past and now Phillips begs that it be permitted to continue to infringe.  To put an end to infringement is the reason for 35 U.S.C. § 283 which gives the Court power to issue injunctions.

*Id.*  Any "harm" Lawson will suffer from an injunction simply "mirror[s]" the success that it enjoyed through infringement.  *Id.* at 95.

In summary, the burden on *e*Plus if an injunction does not issue will be far greater than any harm Lawson contends it will suffer.  *e*Plus has experienced years of infringement by Lawson.  Without a permanent injunction, *e*Plus will continue to suffer encroachment on its sales of its covered products, other products sold in conjunction with them, its customers, its resources, and its reputation.  These harms significantly tip the balance of hardships in *e*Plus's favor.

## D.   The Public Interest Will Not Be Disserved By An Injunction

With respect to the fourth of the *eBay* factors, there are no compelling facts from which this Court could find that the public interest will be disserved by an injunction against Lawson's continued infringement.  To the contrary, courts have continued to recognize subsequent to the *eBay* decision that there is a substantial public interest in enforcing valid patents.

21

In *Sanofi-Synthelabo* v. *Apotex, Inc.,* 470 F.3d 1368 (Fed. Cir. 2006), the Federal Circuit upheld the district court's finding that the public's interest in protecting patents outweighed the serious harms that could occur in that case if an infringing generic drug were removed from the market by a preliminary injunction. *Id.* at 1383-84. In doing so, the Federal Circuit explained that it has "long acknowledged the importance of the patent system in encouraging innovation" and that "'encouragement of investment-based risk is the fundamental purpose of the patent grant, and is based directly on the right to exclude.'" *Id.* at 1383 (quoting *Patlex Corp.* v. *Mossinghoff,* 758 F.2d 594, 599 (Fed. Cir. 1985)). Other decisions have confirmed this view. *See, e.g., Bendix*, 2011 WL 14372, at *7 ("***In general, the public interest is served by the protection of the patent holders [sic] statutory rights***.") (emphasis added); *Becton Dickinson & Co. v. Tyco Healthcare Group LP*, 2008 WL 4745882, *4 (D. Del. 2008) ("[I]t is almost redundant to note the substantial interest in enforcing valid United States patents, while the court perceives no countervailing harm to the public in granting the requested injunctive relief.") (quoting *Fisher-Price*, *Inc. v. Safety 1st, Inc.,* 279 F. Supp.2d 526, 528 (D. Del. 2003)); *Commonwealth Scientific,* 492 F. Supp.2d at 607 ("***public policy favors the enforcement of patent rights*** … [t]he public maintains an interest in protecting the rights of patent holders as well as enforcing adequate remedies for patent infringement.") (emphasis added); *Martek Biosciences Corp.,* 520 F. Supp.2d at 559.

As the Federal Circuit stated in *Abbott Labs. v. Sandoz, Inc.*:

> The district court appreciated that the public interest includes consideration of whether, by shifting market benefits to the infringer while litigation is pending for patents that are likely to withstand the attack, the incentive for discovery and development of new products is adversely affected. ***The statutory period of exclusivity reflects the congressional balance of interests, and warrants weight in considering the public interest***. In *Sanofi-Synthelabo*, 470 F.3d at 1383, this court referred to the significant "public interest in encouraging investment in drug development and protecting the exclusionary rights conveyed in valid

> pharmaceutical patents."  As the Court explained in *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974):  "The patent laws promote this progress by offering a right of exclusion for a limited period as an incentive to inventors to risk the often enormous costs in terms of time, research, and development."  *Id.* at 480, 94 S.Ct. 1879.

*Abbott Labs. v. Sandoz, Inc.,* 544 F.3d 1341, 1362-63 (Fed. Cir. 2008) (emphasis added)

(applying *eBay* standards on preliminary injunction motion).

On the other hand, the public interest would be disserved by enabling an adjudicated infringer like Lawson to continue its infringement without recourse.  An infringer should not be permitted to build a business based on its infringement and then argue that the public interest favors its continued infringement.  Additionally, an injunction would serve the public interest by promoting competition and allowing *e*Plus and its authorized licensees to have a more level playing field.  An injunction precluding Lawson's use of the infringing configurations would enable *e*Plus and its licensees the opportunity to compete more effectively against Lawson.  It would also disserve public policy and have serious negative policy ramifications if the Court were to adopt Lawson's argument that *e*Plus's prior litigation settlement agreements preclude an injunction.  As set forth *supra,* "[**T**]*here is a strong public interest in settlement of patent litigation.*"  *Flex-Foot, Inc.*, 238 F.3d at 1369-70 (emphasis added).

In response to these public interest considerations that favor an injunction, Lawson argues that some its customers in the medical or health care field will be negatively impacted. The Court should reject this argument for several reasons.

First, an injunction in this case will not stop any hospital or other medical facility from purchasing or obtaining needed equipment or supplies, or from providing any form of medical treatment.  FF ¶¶ 56, 65.  Lawson's customers undoubtedly have numerous means by which they can obtain supplies and equipment without any need to use Lawson's infringing configurations.

FF ¶ 57.  There is no evidence in the record that Lawson's e-procurement software is the sole means by which hospitals and the like can obtain vital medical equipment and supplies.  Lawson has not even shown what if any medical supplies or devices the vast majority of these customers purchase through the Lawson software.  Moreover, Mr. Hager of Lawson conceded that *e*Plus and other providers (including *e*Plus's authorized licensees) could step in to replace Lawson.[11]  FF ¶ 58.

By comparison, in cases that actually involved critical medical devices or drugs with facts far more compelling for the infringer, courts have held that such public interest concerns did not merit denial of an injunction.[12]  *See, e.g., Acumed,* 551 F.3d at 1330-31 (affirming grant of injunction in case involving orthopedic nails for treatment of fractures notwithstanding declarations from five surgeons attesting to medical superiority of defendant's infringing device); *Becton Dickinson*, 2008 WL 4745882 at *4 (granting injunction in case involving patents for safety needles and rejecting appeals to protection from blood borne illnesses); *Johns Hopkins Univ. v. Datascope Corp.*, 513 F. Supp.2d 578, 586 (D. Md. 2007) (entering injunction

---

[11] *See Bendix*, 2011 WL 14372, at *7 (granting injunction and stating "There is evidence to show that [the patentee] would be able to satisfy any customer demand resulting from an injunction against [the infringer], and that [the patentee] would work with [the infringer] to ensure that [the infringer's] existing customers could obtain replacement parts for previously purchased [infringing] products, or could switch their existing products for a non-infringing product manufactured by [the patentee]."); *Emory*, 2008 WL 2945476 at *5 (entering injunction and noting that the public had alternatives in the marketplace, including the plaintiff's product); *Johns Hopkins Univ.*, 513 F. Supp. 2d at 586 (granting injunction and stating "There is evidence that the Plaintiffs have sufficient manufacturing capacity to meet the demand currently met by [the defendant].  Moreover, there is public interest in strong patent protection.  Accordingly, the public interest favors a permanent injunction in this case.").

[12] Likewise, with respect to Lawson's conclusory and unsupported allegations as to its customers involved in emergency and public safety services, *see SynQor,* 2011 WL 238645, at **4-5 (granting injunction and rejecting claims that the public interest weighed against injunction, notwithstanding the use of the infringing product in connection with multiple branches of the armed forces, law enforcement, government contractors, major financial institutions, and global telecommunication service providers).

on patents for methods for fragmenting clots within hemodialysis grafts), *rev'd on other grounds*, 543 F.3d 1342 (Fed. Cir. 2008).[13]

Second, Lawson has provided the Court with only minimal corroboration of its contention. While it asserts that more than two hundred of its relevant customers are in the medical or health care field, it has provided declarations from only two of them, and those declarations fail to substantiate Lawson's self-serving attorney argument. FF ¶ 64. If an injunction would have the kind of serious impact on these customers that Lawson argues, one would certainly expect that more than two customers would raise their concerns with the Court, and their testimony would be far less vague, conclusory, and artfully worded than the clearly lawyer-crafted declarations Lawson has filed in this case. Again, neither of these declarants states that the only way they can obtain medical equipment or supplies is by using Lawson's software to order it from the manufacturers or distributors. *Id.* Moreover, neither declarant substantiates that they use Lawson at all for ordering important medical devices such as "MRI machines" and the like. *See* Reasoner Dec. ¶ 9 ("We use RSS to purchase a majority of the supplies we purchase for our hospitals and assisted care facilities, including for example, surgical supplies, linens, software and office supplies, and some pharmaceuticals."); *id.* ¶ 5 ("[users] are trained to use RSS to order virtually all of the supplies and services we purchase for our health system, including for example, surgical supplies, lab supplies, linens, capital equipment, and

_____

[13] *See also Mallinckrodt, Inc. v. Masimo Corp.*, 2005 WL 2139867 (Fed. Cir. Sept. 7, 2005) (reversing district court for denying injunction with respect to blood oximeters); *Amgen, Inc. v. F. Hoffmann-La Roche, Ltd.*, 581 F. Supp. 2d 160 (D. Mass. 2008) (anemia drug), *aff'd in part, rev'd in part, on other grounds*, 580 F.3d 1340 (Fed. Cir. 2009); *Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.*, 2008 WL 928496 (N.D.Cal. Mar. 21, 2008) (dialysis machines), *rev'd on other grounds*, 582 F.3d 1288 (Fed. Cir. 2009); *Diomed, Inc. v. AngioDynamics, Inc.*, 2007 WL 2045227, * 1 (D. Mass. July 2, 2007) (laser vein ablation); *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 2007 WL 869545, *1 (D. N.J. Mar. 20, 2007) (anticonvulsive drug); *Smith & Nephew, Inc. v. Synthes (U.S.A.)*, 466 F. Supp. 2d 978, 985 (W.D. Tenn. 2006) (orthopedic bone nails).

technology (such as software and computers)").  These declarations establish, at most, that two customers in the health care field will be somewhat inconvenienced if Lawson is enjoined from providing ongoing support for the infringing RSS configuration.  FF ¶ 64.

Lawson's contention is further belied by the fact that it has not provided any notice to these customers, even after the jury verdict, to warn them that an injunction may be upcoming, or advising them to take steps to mitigate the drastic harms that Lawson now claims will occur.  FF ¶ 62.  If a real "public crisis" existed, certainly ethical and moral obligations to these customers, and likely  contractual and regulatory obligations, would dictate that Lawson alert these very customers that a potential injunction might enter.  The fact that Defendant took no such efforts speaks volumes, and severely undermines any such contention.

Instead, after the jury verdict, Lawson chose to issue a defiant and self-serving press release in which its President and CEO Harry Debes characterized a jury trial in this Court as a "questionable tactic[]," and reassured customers that they "can continue to rely on our core S3 procurement product and Lawson System Foundation."  *See* "Lawson Comments on ePlus Patent Litigation," (Jan. 31, 2011) (available at www.businesswire.com/news/home/20110131007332/en/Lawson-Comments-ePlus-Patent-Litigation).

Third, Lawson is required by contract to indemnify these customers for its infringement, which would mitigate the harms Lawson now claims will befall these customers.  *See, e.g.,* FF ¶ 62; *see also* PX241, ¶ 12.0; PX268, ¶ 11; PX256, ¶ 11; DX 506, ¶ 12.2.  Among Lawson's options under these agreements are to:  "(a) obtain the right for Client to Use the Product; (b) replace or modify the Product so that it becomes non-infringing; (c) terminate the License … and Lawson shall pay Client … an amount equal to the License Fee paid …."  PX241, ¶ 12.2.

Accordingly, the harm will not fall on the customers, but rather on Lawson itself.  And as set forth *supra,* that is simply the cost of Lawson's infringement and its freely-made and informed decision to indemnify its customers — which is not a relevant consideration.  To the extent the agreements may not ameliorate all the harm to the customers, again, the customers are sophisticated businesses that knowingly entered into the agreements with Lawson.  They should not now be heard to claim that *e*Plus should suffer the consequences of Lawson's continued infringement.

These indemnification options are particularly noteworthy in light of Mr. Hager's exaggerated testimony that it would cost approximately $1 million per customer to replace each such customer's Lawson software with a non-infringing alternative.  FF ¶ 60.  If his claim is to be believed, it suggests all the more that this Court should impose an injunction, level the playing field between the parties, and allow market forces to dictate the terms and amount of any license or alternative business solution to the customers' supposed "dilemma."

Finally, the "public interest" concerns that Lawson raises apply at best to only thirty percent (and likely substantially less) of its customers.[14]  As noted above, only two of these customers saw fit to provide a hearsay declaration.  None decided to appear in person.  As to the other seventy-plus percent of its customers, Lawson presents no evidence whatsoever of a public interest concern.  FF ¶ 61.  Accordingly, at a minimum, the injunction ought to be immediate as to those customers.  The Court could, if necessary, ameliorate the impact on bona fide hospital customers — if they are truly impacted — through a "sunset provision" that, for example, would

---

[14] According to Lawson, 227 of its 830 customers for RSS and Punchout are in the healthcare sector.  FF ¶ 55.

provide that the injunction does not take effect with respect to them for ninety days.[15]

The public interest will not be disserved by granting an injunction against Lawson's continued infringement.

**E.     The Scope Of The Injunction Should Be Commensurate With The Jury's Infringement Verdict**

It is axiomatic that the injunction should be of a breadth that is commensurate with the jury's infringement verdict. *See, e.g., Trading Techs.,* 2008 WL 4531371 at *5 (entering injunction against:  "the products the jury found to infringe; (2) any products not colorably different from the infringing products, and (3) any product capable of operating in an infringing manner, even if its default setting is not infringing.") (citing 5 CHISUM ON PATENTS § 16.02(3)(c)).  The jury found that three different configurations of Lawson's accused S3 system infringed five asserted claims, both directly and indirectly.  FF ¶ 1(a)-(c).  In addition, the parties stipulated that the question of infringement *vel non* of Lawson's M3 e-Procurement system would be decided by whether the S3 system was found to infringe.  FF ¶ 1(d).  Accordingly, the injunction must be of sufficient breadth that it reaches all of these infringing configurations, and puts an end to Defendant's direct and indirect infringement.

Lawson has argued in its injunction disclosures that any injunction could apply only to "RSS" and "Punchout," but this is inaccurate.  Neither of these software applications operates in isolation.  As is made clear by the verdict form, they both operate in conjunction with Lawson's core procurement system, which includes Lawson System Foundation and Process Flow, in

---

[15] *See, e.g., i4i*, 598 F.3d at 864 (providing based on evidence submitted that injunction would not take effect until five months from the date of the order).

combination with the Inventory Control, Requisition, and Purchase Order Modules.[16] Accordingly, an injunction order that simply recites "Punchout" and/or "RSS" will be inaccurate and undoubtedly a basis for further dispute as to the intended reach of the order.

Likewise, it is utterly baseless for Lawson to argue that the injunction should not apply to indirect infringement. There was substantial evidence at trial from Lawson's own witnesses and documents as to the significant installation, implementation, configuration, data migration and conversion, maintenance and support, training and consulting services that Lawson provides with respect to the infringing systems. FF ¶ 2. Indeed, Lawson's filing of its customers' declarations is a virtual admission of Lawson's indirect infringement, as two of Defendant's customers state that in order to properly use Defendant's infringing software, Defendant must continue to provide substantial infringing training, maintenance, and other services. FF ¶64; Johnson Dec., ¶¶ 6-10 ("We would not be able to run RSS without ongoing maintenance."); Reasoner Dec., ¶¶ 10-13 ("Lawson provides us with unlimited support, product updates, bug fixes, and product upgrades."). The jury verdict form recited both direct and indirect infringement (in the precise language requested by Lawson, *see* Dkt. Nos. 534, 584), and it is untenable for Lawson to now argue that jury's verdict did not reach indirect infringement or that the verdict form was in some manner ambiguous. There is simply no reason why the injunction should not apply to both direct and indirect infringement in this case.

## IV.    CONCLUSION

Accordingly, for the foregoing reasons, and based on the full evidentiary record at trial, the post-trial supplemental disclosures, and the injunction proceedings of March 25, 2011, *e*Plus

---

[16] In addition, Lawson overlooks the fact that one infringing system configuration includes its EDI application and, indeed, failed to provide discovery relating to the customers which have licensed the EDI application.

respectfully moves for a permanent injunction against Lawson's continued direct and indirect infringement of the patents-in-suit.

Respectfully submitted,

March 28, 2011

_____ /s/ _____
David M. Young (VSB #35997)
Scott L. Robertson (admitted pro hac vice)
Jennifer A. Albert (admitted pro hac vice)
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4000
Facsimile:   (202) 346-4444
dyoung@goodwinprocter.com
srobertson@goodwinprocter.com
jalbert@goodwinprocter.com

Craig T. Merritt (VSB #20281)
Henry I. Willett, III (VSB #44655)
**CHRISTIAN & BARTON, LLP**
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
Telephone: (804) 697-4100
Facsimile: (804) 697-4112
cmerritt@cblaw.com
hwillett@cblaw.com

Michael G. Strapp (admitted pro hac vice)
**GOODWIN PROCTER LLP**
Exchange Place
53 State Street
Boston, MA 02109-2881
Telephone:  (617) 570-1000
Facsimile:   (617) 523-1231
mstrapp@goodwinprocter.com

Attorneys for Plaintiff, ePlus Inc.

30

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 28th day of March, 2011, I will electronically file the foregoing

**PLAINTIFF *e*PLUS INC.'S BRIEF IN SUPPORT OF MOTION FOR PERMANENT INJUNCTION**

with the Clerk of Court using the CM/ECF system which will then send a notification of such filing (NEF) via email to the following*:*

Daniel McDonald, *pro hac vice*
William D. Schultz, *pro hac vice*
Rachel C. Hughey, *pro hac vice*
Andrew Lagatta, *pro hac vice*
MERCHANT & GOULD
3200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 332-5300
Facsimile: 612) 332-9081
lawsonservice@merchantgould.com
***Counsel for Defendant Lawson Software, Inc.***

Robert A. Angle, VSB#37691
Dabney J. Carr, IV, VSB #28679
TROUTMAN SANDERS LLP
P.O. Box 1122
Richmond, Virginia 23218-1122
(804) 697-1238
(804) 698-5119 (Fax)
robert.angle@troutmansanders.com
dabney.carr@troutmansanders.com

***Counsel for Defendant Lawson Software, Inc.***


　　　　　　　　　　 */s/*　　　　　　
David M. Young (VSB #35997)
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4000
Facsimile:   (202) 346-4444
dyoung@goodwinprocter.com