**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

ePLUS, INC.,                              )
                                          )
                                          )   Civil Action No. 3:09-cv-620
                        Plaintiff,        )
                                          )
              v.                          )
                                          )
LAWSON SOFTWARE, INC.                     )
                                          )
                                          )
                        Defendant.        )


**MEMORANDUM IN SUPPORT OF LAWSON'S**
**MOTION FOR A STAY OF ANY PERMANENT INJUNCTION**
**AND ADDRESSING THE RELATED BOND ISSUE**

## TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................... 1

II.  PROCEDURAL POSTURE ............................................................ 3

III. ANALYSIS .................................................................................... 4

    A.   Lawson has Shown Serious Issues that make Lawson
        Sufficiently Likely to Prevail on the Merits on Appeal to
        Warrant a Stay. .......................................................................... 5

        1.   The Rejections of ePlus's Patent Claims on
            Reexamination Show Lawson's Likely Success on
            Appeal and that a Stay is Warranted............................. 6

        2.   Lawson is Likely to Prevail on the Merits that Claim
            1 of the '172 and Claim 3 of the '683 Patents are
            Invalid Because they are Indefinite and Were
            Construed Too Broadly. ............................................... 9

        3.   Infringement Related to the Punchout Claims is
            Likely to be Overturned or Reversed because ePlus
            Failed to Show Lawson Directly Infringes or
            Induces Infringement of the Elements Provided at
            Vendor Websites that are Not Used or Controlled
            by Lawson. ................................................................. 11

        4.   Lawson is Likely to Show that Maintaining and
            Servicing Pre-Existing Customers is not
            Infringement as a Matter of Law. ............................... 14

    B.   Customers and the Public Will Suffer Irremediable
        Harm Unless the Injunction is Stayed Pending Appeal. ..................... 17

        1.   Customers will be Harmed If Lawson is Enjoined
            from Maintaining and Servicing Existing Products...................... 17

        2.   Customers "in Process" who have Selected Lawson
            as a Provider or Have Selected a Short List of
            Providers Including Lawson Will be Harmed if the
            Court does not Grant a Stay......................................... 20

        3.   Harm to Customers and the Public Would not be
            Compensated, Even if Lawson Prevails on Appeal. ................... 20

**C.**     **Lawson likely will Suffer Irreversible and Immeasurable Harm unless the Injunction is Stayed.** ............................................... 21

      1.     Lawson would Face Irreparable Harm if It were not Allowed to Service Its Products Already Implemented at Customer Sites. .................................................. 22

      2.     Lawson would Face Irreparable Harm if it were not Allowed to sell RSS and Punchout to Existing Lawson Customers. .................................................. 23

**D.**     **ePlus will not Suffer Irreparable Harm if any Injunction is Stayed Pending Appeal.** ...................................................... 24

**E.**     **Lawson is Solvent and there is no Indication Lawson will not be able to Pay any Royalty, Obviating the Need for a Bond.** ........................................................... 27

**IV.**     **CONCLUSION** ................................................. 28

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*Alexander v. Chesapeake, Potomac & Tidewater Books, Inc.*,
190 F.R.D. 190 (E.D. Va. 1999)..................................................................................27

*American Cynamid Co. v. United States Surgical Corp.*,
833 F. Supp. 92 (D. Conn. 1992)................................................................................18

*BMC Resources, Inc. v. Paymentech, L.P.*,
498 F.3d 1373 (Fed. Cir. 2007)..................................................................................11

*Bloomer v. Millinger*,
68 U.S. 340 (1863).....................................................................................................15

*Cordis Corp. v. Boston Scientific Corp.*,
561 F.3d 1319 (Fed. Cir. 2009)............................................................................10, 11

*Dillon v. City of Chicago*,
866 F.2d 902 (7th Cir. 1988)......................................................................................27

*Dow Chem. Co. v. Nova Chems. Corp.*, 05-737,
2010 U.S. Dist. LEXIS 77099 (D. Del. July 30, 2010)...............................................5

*E.I. duPont De Nemours & Co. v. Phillips Petroleum Co.*,
835 F.2d 277 (Fed. Cir. 1987)..................................................................................5, 6

*Encyclopaedia Britannica, Inc. v. Alpine Elecs., Inc.*
 355 Fed. Appx. 389 (Fed. Cir 2009).......................................................................9, 10

*Fonar Corporation v. General Electric Co.*,
107 F.3d 1543 (Fed. Cir. 1997).............................................................................15, 22

*Halbach v. Great-West Life & Annuity Ins. Co.*, No. 4:05-cv-02399,
2009 U.S. Dist. LEXIS 5882 .....................................................................................27

*Hybritech Inc. v. Abbott Labs.*,
849 F.2d 1446 (Fed. Cir. 1988) .................................................................................18

*i4i Ltd. v. Microsoft Corp.*,
343 Fed. Appx. 619 (Fed. Cir. 2009) .........................................................................18

*i4i Ltd. P'ship v. Microsoft Corp.*,
598 F.3d 831, 863 (Fed. Cir. 2010) ...........................................................................18

*Linear Tech. Corp. v. Impala Linear Corp.*,
379 F.3d 1311 (Fed. Cir. 2004) .................................................................................14

*Med. Instrumentation & Diagnostics Corp. v. Elekta AB*,
2002 U.S. Dist. LEXIS 26812 (S.D. Cal. 2002).......................................................14

*MercExchange, LLC,*
126 S. Ct. 1837 (2006) ..............................................................................................25

*MercExchange, LLC v. eBay, Inc.,*
500 F. Supp. 2d 556 (E.D. Va. 2007) .......................................................................25

*Muniauction, Inc. v. Thomson Corp.,*
532 F.3d 1318 (Fed. Cir. 2008) ................................................................................11

*Newton v. Consolidated Gas Co.,*
258 U.S. 165 (1922) ....................................................................................................5

*Odetics, Inc. v. Storage Technology Corporation,*
185 F.3d 1259 (Fed. Cir. 1999) ..........................................................14, 15, 17, 22

*On Demand Mach. Corp. v. Ingram Indus.,*
442 F.3d 1331 (Fed. Cir. 2006) ................................................................................21

*Paice LLC v. Toyota Motor Corp.,*
504 F.3d 1293 (Fed. Cir. 2007) ................................................................................21

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.,*
723 F. Supp. 2d 1284 (S.D. Cal. 2010) ....................................................................21

*Riles v. Shell Oil,*
298 F. 3d 1302 (Fed. Cir. 2002) ...............................................................................14

*Standard Havens Prods, Inc. v. Gencor Indus., Inc.,*
1993 U.S. App. LEXIS 11963 (Fed. Cir. May 21, 1993)............................................6

*Standard Havens Prods., Inc. v.  Gencor Indus., Inc.,*
897 F.2d 511 (Fed. Cir. 1990) ............................................................................4, 5, 6

*Techs., Inc. v. Microsoft Corp.,*
434 F. Supp. 2d 437 (E.D. Tex. 2006) ......................................................................18

*Verizon Servs. Corp. v. Vonage  Holdings Corp.,*
503 F.3d 1295 (Fed. Cir. 2007) ................................................................................17

*Verizon Servs. Corp. v. Vonage Holdings Corp.,*
228 Fed. Appx. 986 (Fed. Cir. 2007) ........................................................................18

*Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.,*
559 F.2d 841 (D.C. Cir. 1977) ....................................................................................5

## FEDERAL STATUTES

35 U.S.C. § 112 .........................................................................................................10

35 U.S.C. § 283...........................................................................................................21

35 U.S.C. § 284...........................................................................................................24

35 U.S.C. § 286................................................................................................................16

35 U.S.C. § 287................................................................................................................16

Fed. R. Civ. P. 62(b) ..........................................................................................................4

## I.      **INTRODUCTION**

Lawson opposes ePlus's request to enter an injunction in separate briefing.  The Court requested that the issues of a stay of the injunction and a bond be briefed simultaneously.  This memorandum explains why the Court should stay any injunction pending appeal.

A stay provides several benefits.  A stay is the only way to minimize irreparable harm regardless of the outcome of the case.  An injunction would irreparably harm Lawson customers, which are primarily (approximately 70%) hospitals and public sector organizations such as schools.  Customers would be harmed through less reliable and more costly health care and government procurement.  Lawson would likely lose customers and suffer a damaged reputation.  The law provides no remedy for a party who is wrongfully subjected to a permanent injunction, or for the customers or public affected by a wrongful injunction.  Thus, if Lawson prevails on appeal, there is no way to compensate Lawson, its customers, or the public for the harm they suffer as a result of the injunction.

On the other hand, if an injunction is stayed, and ePlus prevails on appeal, ePlus can be compensated for the harm it suffers in the form of damages for infringing sales made during the appeal.  ePlus does not service Lawson systems, and will capture no service business.  It is also highly unlikely that any of Lawson's current RSS or Punchout customers will switch to ePlus's Procure+ or Content+ product.  It is also highly unlikely that a prospective Lawson customer for RSS or Punchout will select ePlus's Procure+ or Content+ product if RSS or Punchout is unavailable.

Despite the fact that ePlus's Procure+ product and Lawson's RSS product have coexisted in the marketplace for 9 years, ePlus cannot point to even a single sale it lost because of RSS or Punchout.   ePlus has a miniscule part of the eProcurement market, and can identify only two new sales in each of the last two years even though over 98% of its market faces no competition from Lawson whatsoever.  Any harm to ePlus from staying the injunction will be minimal and compensable by money.  Thus, a stay minimizes irreparable harm, regardless of the outcome of these appeals.  A stay of an injunction will ameliorate the irremediable overkill that would otherwise result from enjoining Lawson's sales or service of RSS and Punchout software in the vast majority of situations where ePlus is not a contender for the business anyway.

Further, a stay is warranted because Lawson is likely to succeed in post-trial motions or on appeal on the merits.  Post-trial motions have not even been filed yet, let alone decided.  They will show that ePlus lacks evidentiary support for facts critical to the findings of infringement.  Moreover, the United States Patent and Trademark Office (PTO) has rejected all the claims in this case in reexam.  The only claim that RSS was found to infringe has been finally rejected by the PTO.  Such pending rejections, even when not final, are recognized as reasons to grant a stay.  Other issues raise serious questions about infringement and whether an injunction is warranted.  Such serious questions warrant a stay even though it is not certain that Lawson will prevail on them.

A stay is particularly appropriate to the extent any injunction bars Lawson from servicing existing RSS and Punchout customers.  Service is a critical support function, and Lawson is the only service provider available for RSS and Punchout customers.  A broad injunction would potentially require Lawson to breach existing service contracts and cause

customers to scramble to find alternative e-procurement systems, harming customers and irreparably harming Lawson's reputation. Lawson's health care and public sector customers will be impeded in purchasing supplies if a stay is not granted. Because most of Lawson's customers are health care facilities and government agencies, the public is also harmed because Lawson's software runs the procurement in those facilities, saving money and ensuring supplies important to these services are properly ordered and tracked. A stay will significantly ameliorate these risks and harms.

Moreover, an injunction against servicing existing customers is particularly vulnerable to reversal on its merits because, as ePlus admits, the Court may not enjoin the customer's continued use of RSS and Punchout systems. Servicing those customers should not be enjoined because servicing was not found to constitute an act of infringement and the law provides that servicing a pre-damages product is not an infringing act.

Finally, it takes anywhere from several months to more than a year for a customer to choose, negotiate for, test, and implement a new procurement software system. A stay will give Lawson's customers time to implement a new procurement software system, whether this system is the redesigned Lawson product or a competitors' product.

As shown in more detail below, consideration of the relevant factors shows that a stay of any injunction is warranted.

## II.   PROCEDURAL POSTURE

On January 27, 2011, the jury returned a verdict finding Lawson's core procurement system that included the Lawson System Foundation, Process Flow, Purchase Order, Inventory Control, and Requisitions modules, with or without EDI, did

not infringe any of the twelve claims ePlus asserted at trial.  The jury found that configurations adding Requisitions Self Service (RSS) infringed a single claim, claim 1 of the '172 patent.  The verdict also found that Procurement Punchout, when combined with RSS and the core system, infringed claims 3, 26, 28, and 29 of the '683 patent and claim 1 of the '172 patent.

The Court has not yet ruled whether an injunction is appropriate in this case or, if appropriate, the scope of any injunction.  Lawson opposes an injunction.  Many of the issues relevant both to a stay and to the grant of an injunction, such as the lack of irreparable harm to ePlus if no injunction is entered, will be fully addressed in the injunction briefing.  This brief will focus on the issues specific to a stay and a bond.

Once final judgment is entered, Lawson will file post-trial motions for judgment and/or a new trial.  In the event that Lawson does not prevail on its post-trial motions, it intends to appeal the final judgment to the United States Court of Appeals for the Federal Circuit.  Meanwhile, ePlus indicated it intends to appeal at least the exclusion of damages, and has already begun appealing the rejections of its patents during reexaminations at the PTO.

## III.   <u>ANALYSIS</u>

In deciding whether to grant a motion for a stay pending resolution of post-trial motions or appeal pursuant to Fed. R. Civ. P. 62(b) or 62(c), the court should consider: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether the issuance of a stay will substantially injure the other parties interested in the proceedings; and (4) where the public interest lies."  *Standard Havens Prods., Inc. v.*

*Gencor Indus., Inc.*, 897 F.2d 511, 512 (Fed. Cir. 1990) (*Standard Havens I*) (citing

*Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)); *E.I. duPont De Nemours & Co. v.*

*Phillips Petroleum Co.*, 835 F.2d 277 (Fed. Cir. 1987). No single factor is dispositive.

When harm to the movant is great enough, a court will not require as strong a showing

that the movant is likely to succeed on the merits, but only that there are substantial issues

for appeal. *Standard Havens I*, 897 F.2d at 513. Furthermore, these factors must be

considered in light of the general purpose of granting stays to injunctions, which is to

preserve the *status quo*. *Newton v. Consol. Gas Co.*, 258 U.S. 165, 177 (1922).

Granting a stay does not imply that the court believes it rendered an erroneous

decision, but merely that it has ruled on an admittedly difficult legal question and the

equities of the case suggest the status quo should be maintained. *Washington Metro. Area*

*Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844-45 (D.C. Cir. 1977). A stay is

warranted on the facts here. Indeed, the Court has yet to render any post-verdict

decisions.

### A.  <u>Lawson has Shown Serious Issues that make Lawson Sufficiently Likely to Prevail on the Merits on Appeal to Warrant a Stay.</u>

"[L]ikelihood of success in the appeal is not a rigid concept." *Standard Havens I*,

897 F.2d at 512. In fact, "substantial issues for appeal" is a proper basis to stay an

injunction. *Dow Chem. Co. v. Nova Chems. Corp.*, No. 05-737, 2010 U.S. Dist. LEXIS

77099, at *3, n.1 (D. Del. July 30, 2010). Here, the PTO's rejection of ePlus's patents

and other issues awaiting briefing and adjudication in post-judgment briefing show that

there are very substantial issues on the merits that would provide grounds to overturn any

injunction entered. Such a situation supports the stay of any injunction.

1.    The Rejections of ePlus's Patent Claims on Reexamination Show
Lawson's Likely Success on Appeal and that a Stay is Warranted.

After granting a stay pending appeal in *Standard Havens I*, the Federal Circuit

later instructed the district court to stay the permanent injunction "until the reexamination

decision becomes final." *Standard Havens Prods, Inc. v. Gencor Indus., Inc.*, No. 93-

1208, 1993 U.S. App. LEXIS 11963, at *2 (Fed. Cir. May 21, 1993) (*Standard Havens

II*).  Indeed, "the mere existence of conflicting views on validity as between a court and

the Patent and Trademark Office supports [the movant's] contention there exists an

important legal question regarding validity."  *Standard Havens I*, 897 F.2d at 514; *see

also E.I. duPont*, 835 F.2d at 277 (granting stay pending appeal in view of reexamination

decision finding claims invalid, harm to defendant and public, and lack of comparative

harm to plaintiff).

The question of validity is especially problematic where facts show that the patent

examiner either did not consider, overlooked, or did not fully appreciate the prior art.

*Standard Havens I*, 897 F.2d at 514.  That is certainly the case here, as the PTO has

stated that the prior art used to reject the claims (including the '989 patent, P.O. Writer, J-

Con, and other art) was not previously considered.  (DX242, ¶ 6 (finding '989 patent,

P.O. Writer, and J-Con (among others) "newly cited" and "not considered, nor discussed

during the prosecution of the application that became the '172 Patent"); DX238 at pp. 6,

9 (discussing J-Con and P.O. Writer systems as not being cumulative of art examined).)

Moreover, where—as here—an applicant argues that admission of certain evidence was

improper and prejudicial, that also "raise[s] serious questions of law which could

necessitate a new trial."  *Standard Havens I*, 897 F.2d at 514-15.

The rejection of every patent claim at issue in this case at the PTO shows that substantial questions exist as to the validity of ePlus's patents and supports Lawson's likelihood of success in reversing the finding of validity. The PTO has rejected all of the claims of the patents in suit at least once. Of particular note, claim 1 of the '172 patent (the **only** claim the jury found infringed by the RSS configuration) has been *finally* rejected by the Patent Office based on anticipation by *six* separate forms of prior art: the '989 patent, the '551 patent, the Sabre system, the J-CON system, the Gateway system, the P.O. Writer system. (1/13/11 Final Rejection–DX-243).) While ePlus has appealed this decision, there is a high probability that claim 1 of the '172 patent will eventually be found invalid in a final adjudication on at least one of these six grounds. Moreover, this claim is the only asserted claim that did not require "catalogs," making its breadth particularly vulnerable to invalidity.

Claims 26, 28, and 29 of the '683 patent, found infringed as to the Punchout system, have also been *finally* rejected by the Patent Office in view of numerous pieces of prior art not previously considered. (DX237, final rejection dated 1/8/2009.) That decision has already been argued on appeal before the Patent Office Board of Appeals, and a decision is pending. Claim 3 of the '683 has been rejected in a separate reexam, and is likely to face the same fate as its sister claims. (DX-243 non-final Office Action dated 2/10/2011 (pp. 3-12 rejecting claims 1-25 as anticipated by the '989 Patent).)

The reexaminations provide compelling objective proof that the patents are invalid. A final rejection is issued only after an initial rejection which is reviewed and approved by three senior PTO examiners, and a full and fair opportunity for ePlus to overcome the rejection. M.P.E.P. 2271.01, .03 (three judge panels for *ex parte* and *inter partes*

reexaminations); MPEP §§ 706.07, 2271 (discussion of when final rejection proper). There is a high affirmance rate of final rejections.[1]

Over Lawson's objection, the Court permitted ePlus to repeatedly argue to the jury that the '989 patent was fully considered by the PTO.  (Dkt. No. 268 (motion in limine to exclude inconsistent evidence of reexaminations); *see e.g.,* DX532, 135:13-136:4; 3090:16-19.)  This is contrary to the PTO, however, which has repeatedly said (in non-appealable, final findings) that the '989 patent raised substantial new questions of patentability and that the '989 patent did not appear to have been considered during original prosecution.  (*See, e.g.*, DX242, ¶ 6.)  The PTO found that the '989 patent was not used as the basis for any rejection, and otherwise indicated that the '989 patent presented a new issue because the record was not clear that the patent examiner considered the '989 patent during prosecution.  (*Id.*)  After so finding, the PTO rejected the claims in view of the '989 patent.

Lawson is likely to succeed in showing that it was error to permit ePlus to repeatedly tell the jury that the PTO considered the '989 patent, while excluding contrary evidence.  (DX532 at 156:21-159:21.)  ePlus told the jury the PTO had already decided the '989 patent was not invalidating prior art, when in fact the PTO said the '989 patent raised a new issue not previously considered.  Lawson is also likely to succeed in showing that the '989 patent, either alone or together with the TV/2 prior art, invalidates ePlus's claims.

---

[1]    PTO statistics showing that, in 2010, 136 of 177 reexaminations in the Technology Center resulted in at least partial affirmance.
<http://www.uspto.gov/ip/boards/bpai/stats/receipts/fy2010sep_e.pdf>.

Moreover, in the middle of trial the morning Lawson's expert was to testify, the Court precluded Lawson from using the J-CON prior art in combination with the PO Writer prior art to invalidate the claims. These references are strong--the PTO relied on them to reject the claims at issue on reexam, and the parties agree that they were not previously considered by the PTO. *See* DX-243 non-final Office Action dated 2/10/2011 at pp. 22-36, 51-64 (rejecting claims 1-25 of '683 Patent over both PO Writer and J-CON); DX-237, final rejection dated 1/8/2009 at pp. 33-46, 60-72 (finally rejecting claims 26-45 of '683 Patent over both PO Writer and J-CON); DX-241, Action Closing Prosecution dated 7/8/2010 at pp. 58-66 (finally rejecting claims 1-5 of '172 Patent over both PO Writer and J-CON). Lawson, however, was not given the opportunity to present this evidence to the jury. Lawson may prevail on these issues either in post-trial briefing, on appeal, or in the reexaminations, which may become final before this case is finally resolved. The prior art raises serious questions on the merits that weigh in favor of granting a stay pending appeal.

> 2.    Lawson is Likely to Prevail on the Merits that Claim 1 of the '172 and Claim 3 of the '683 Patents are Invalid Because they are Indefinite and Were Construed Too Broadly.

Lawson is likely to prevail in post-trial briefing or on appeal that claim 1 of the '172 patent and claim 3 of the '683 patents are invalid because the patent specifications lack sufficient corresponding structure (i.e., an algorithm) to support certain of the means elements. Section 112, ¶ 2 of the Patent Act requires that a patent have claims "particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." Failure to comply with this paragraph results in invalidity for indefiniteness. *Encyclopaedia Britannica, Inc. v. Alpine Elecs., Inc.* 355 Fed. Appx. 389,

392 (Fed. Cir 2009) (citing *Cordis Corp. v. Boston Scientific Corp.*, 561 F.3d 1319 (Fed. Cir. 2009)).

When a means-plus-function limitation is a computer programmed with software to carry out the claimed function, a corresponding algorithm is required to provide sufficient disclosure of structure under § 112 ¶ 6 to avoid indefiniteness under § 112 ¶ 2. *Id.* at 395 (citing *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1337-38 (Fed. Cir. 2008)). The Federal Circuit invalidated the claim in *Encyclopedia Brittanica* because the constructions of the means-plus-function elements were "pure functional claiming, which does not comply with the disclosure requirement of § 112 ¶ 6." *Id.* at 394-95. The court affirmed summary judgment of invalidity for indefiniteness under 35 U.S.C. § 112 ¶ 2.

Similarly in this case, claim 1 of the '172 and claim 3 of the '683 patents are invalid because the structures corresponding to the purchase order generation means elements disclose no algorithm that limits the scope of these elements. The constructions merely recite the function of purchase order generation, and indicate the modules operate on a computer and have access to the requisition. The constructions render the claims purely functional as a matter of law, indefinite under 35 U.S.C. § 112 ¶ 2, and invalid.

A stay is appropriate because the Lawson's RSS configuration was only found to infringe claim 1 of the '172 patent, which is likely to be found invalid as indefinite. If that single claim is found invalid, Lawson may freely sell its RSS product without modification. The substantial likelihood that the claim will be found invalid or its construction modified either in post-trial briefing or on remand shows that instituting an immediate injunction is inappropriate.

Moreover, serious questions exist about whether the means-plus function clauses of the asserted claims should have been construed more narrowly.  Also, as explained in connection with Lawson's motion for directed verdict, much of ePlus's infringement case was based on conclusory, unsupported testimony insufficient to support an infringement verdict.  For these and other reasons, the infringement case against RSS and Punchout is unlikely to be sustained on the merits, further supporting a stay of any injunction.

> 3. <u>Infringement Related to the Punchout Claims is Likely to be Overturned or Reversed because ePlus Failed to Show Lawson Directly Infringes or Induces Infringement of the Elements Provided at Vendor Websites that are Not Used or Controlled by Lawson.</u>

"A method claim is directly infringed only if each step of the claimed method is performed."  *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1328 (Fed. Cir. 2008) (citing *BMC Resources, Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1378-79 (Fed. Cir. 2007)).  When the actions of multiple parties combine to perform the claimed steps, "the claim is directly infringed only if one party exercises 'control or direction' over the entire process such that every step is attributable to the controlling party, i.e., the 'mastermind.'" *Id.* at 1329 (citing *NTP, Inc. v. Research in Motion*, 418 F.3d 1282, 1380-81 (Fed. Cir. 2005)).  In *Muniauction*, the Federal Circuit ruled that a party who controlled access to an allegedly infringing system and instructed another party on its use did not exercise sufficient "control" or "direction" to incur liability for direct infringement.  *Id.* at 1329-30.

The jury found Lawson infringed method claims 26, 28, and 29 of the '683 patent. There is no evidence, however, that a single entity performs all of the steps of those claims.  The only entities involved are (1) Lawson, (2) Lawson's customers, and (3) third-

party Punch Out vendors.  None of these entities performs all the steps of the method claims.

ePlus did not even argue that Lawson performs all of the steps.  Such an argument is absurd because there was no evidence Lawson ever performed all the steps of those claims, such as "generating . . . purchase orders."  Thus, there is no evidence that Lawson directly infringed.

ePlus did not allege that either customers or vendors performed all the steps of the method claims either.  ePlus's expert testified that customers perform the steps of building requisitions and generating purchase orders.  (Tr. Trans. at 607:1-14; 658:11-665:22.)  However, ePlus's expert admitted that the third-party vendor, not the customer, performed the other necessary steps of:

> determining whether a selected matching item is available in inventory" ('683 patent, claims 26 and 29); and

> searching for matching items among the selected product catalogs" ('683 patent, claims 26, 28, 29).

(Dkt. 575 at 16-17.)  ePlus's expert acknowledged that inventory information comes from the third-party vendor.  (Dkt. 575 at 16; Tr. 879:17-24.)  ePlus's expert also admitted that the search step occurs at the vendor's website and uses the vendor's search engine.  (DX532 at 878:7-15.)  No single entity thus directly infringes.

Joint infringement is not an issue.  ePlus waived its joint infringement contentions at trial.  Lawson moved for judgment as a matter of law on the issue of joint infringement, and ePlus dropped the contention.  As the court noted in response to a later reference to the theory by ePlus:

```
1              THE COURT:  You are through.  You don't have any

2     joint infringement claim under anything.  That's what you told

3     me, and that's it.  Sit down.  Have a seat.  That's it.
```

(DX532 at 1384.)

Lawson also cannot be liable for directly infringing '683 system claim 3 or '172 claim 1 related to Punchout because Lawson does not make, sell, or use a system with all of the claimed components.  ePlus admitted that once a customer punches out, the customer searches content provided by the Punchout vendor.  (DX532 at 1373.)  Lawson cannot infringe these two claims because its Punchout system does not have the claimed elements.

That leaves only the possibility that Lawson induced infringement of the system claims.  ePlus, however, failed to provide the necessary evidence that Lawson specifically induced use of all elements of claim 3 of the '683 patent or claim 1 of the '172 patent. ePlus failed to prove that Lawson induced use of particular claim elements such as "at least two vendor catalogs" required by claim 3 of the '683 patent, or a "database containing data related to items associated with at least two vendors maintained so that selected portions of the database may be searched separately," as required by claim 1 of the '172 patent.  Both claims also require means for searching the recited catalogs or database.  The evidence showed that Lawson's Punchout system sends and receives product information, and does not need such catalogs, databases, or search engines to function.  Punchout works at vendor sites, whether or not the vendors choose to provide such databases or searching capability.  (DX532 at 1134:17-1135:14.)

The substantial questions of law on the infringement issue at a minimum should show this Court that a stay of any injunction is appropriate.

> 4.   Lawson is Likely to Show that Maintaining and Servicing Pre-Existing Customers is not Infringement as a Matter of Law.

ePlus acknowledged that customers should not be enjoined.  Tr. at 3410.  Indeed, good faith purchasers who bought products later found to infringe should not be enjoined from using those products even after an injunction issues against an infringing seller.  *Med. Instrumentation & Diagnostics Corp. v. Elekta AB,* 2002 U.S. Dist. LEXIS 26812, **26-27 (S.D. Cal. 2002), *rev'd on other grounds* 344 F.3d 1205 (Fed. Cir. 2003) (emphasis added).  ePlus does, however, seek an injunction of Lawson's servicing of existing RSS and Punchout customers.

Such an injunction is improper on the merits.  An injunction should be narrowly tailored to the specific adjudged infringement.  *Riles v Shell Oil*, 298 F. 3d 1302, 1311(Fed. Cir. 2002).   ePlus has never made such a showing, however, with respect to Lawson's support and service of pre-existing RSS and Punchout customers.  Because pre-existing customers have the right to use their RSS and Punchout products, it is not an act of infringement to assist them in such use.  "There can be no inducement or contributory infringement without an underlying act of direct infringement."  *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1326 (Fed. Cir. 2004).

Very analogous cases have precluded the relief ePlus seeks here.  Courts do not allow a patentee to do an end-around denials of damages with respect to past product sales, and refuse to enjoin future use and repair of such products.  In *Odetics, Inc. v. Storage Technology Corporation*, 185 F.3d 1259 (Fed. Cir. 1999), the Federal Circuit

affirmed the district court decision ***precluding the patentee from collecting damages*** for

any devices sold before the filing of the complaint because of laches.  The court also

precluded the patentee from enjoining ***future uses and repair*** of these devices, because its

right to exclude pre-damages products is abrogated:

> Odetics, acknowledging that damages are unavailable, instead asks for an
> injunction against the use and repair of the pre-complaint devices. . . .
> Odetics argues that the continued use of the pre-complaint infringing
> devices is a current (and, indeed, future) violation of section 271(a)--and
> that therefore the use of laches to abrogate the right to exclude would
> work an impermissible prospective use of the laches defense.
>
> Odetics's position, however, construes the scope of laches too narrowly. . .
> .  [T]***he sale of an infringing product during the laches period is beyond***
> ***the reach of the patent: the patentee cannot later enjoin the use of a***
> ***product sold during that time***. As the Supreme Court has stated:
>
>> Patentees . . . are entitled to but one royalty for a patented machine,
>> and consequently when a patentee has himself constructed the
>> machine and sold it, or authorized another to construct and sell it,
>> or to construct and use and operate it . . . he has then to that extent
>> parted with his monopoly, and ceased to have any interest whatever
>> in the machine . . . .
>
> <u>Bloomer v. Millinger</u>, 68 U.S. 340, 350, 17 L. Ed. 581 (1863). We
> conclude, then, ***that laches will result in the patentee abrogating his right***
> ***to exclude any infringing products sold prior to the filing of the***
> ***complaint***.

*Id.* at 1273-74 (some citations omitted, emphasis added).

The subsequent support and maintenance of products that have already been sold

to customers is not, therefore, subject to injunctive relief as a matter of law.  "If a machine

was sold under circumstances that did not subject its seller to damages, then subsequent

repair cannot subject it to damages."  *Fonar Corporation v. General Electric Co.*, 107

F.3d 1543, 1555 (Fed. Cir. 1997) (holding "One is entitled to repair that which is sold free

of liability for infringement" with respect to products sold before marking began and thus not subject to damages).

Here, almost all Lawson customers have been using RSS for several years, and most even have systems which would predate any time frame in which ePlus could have sought damages.  (DX409.)[2]  Most products were sold before May of 2003 and thus predate the six-year limitation of damages under 35 U.S.C. § 286.  Many more are barred from pre-complaint damages (May 2009) because ePlus failed to meet its burden of proving continuous marking under 35 U.S.C. § 287 before it brought suit.  Lawson showed in its summary judgment motion that ePlus failed to require its largest licensee, SAP, to mark the patent number, and showed this is a failure to mark that precludes any damages prior to May 2009 when ePlus sued Lawson.  (Dkt. No. 241 at pp. 14-18.)  While the motion was denied, ePlus never did meet its burden of proof on the marking issue.

This Court properly ordered that ePlus was subject to a Rule 37 sanction barring damages.  (Dkt. No. 472.)  ePlus's damages expert proposed a royalty analysis that was fundamentally flawed and inadmissible in several respects.  ePlus's effort to sandbag Lawson regarding damages discovery by never providing an iota of support for its damages claim in discovery other than to cite this inadmissible report (on the last day of fact discovery no less) caught up with it.  Even after the expert was excluded, ePlus refused to indicate any royalty rate it would seek from the jury, and thus continued to refuse to either answer Lawson's discovery requests or provide the required "computation of each category of damages" under Rule 26(a)(1)(A).  As if that were not enough, ePlus

16

never met its burden of proof that it would be entitled to pre-lawsuit damages anyway, because even today it has yet to provide any proof it required its licensees (specifically SAP, perhaps its largest licensee) to mark.  ePlus has not even tailored its injunction demand to exclude customers who have had RSS systems since before May 2003.  ePlus's request for an injunction against servicing existing customers is grossly overbroad and unlikely to survive, regardless of the outcome of the other issues on the merits.

A stay of any injunction directed to existing Lawson customers is thus particularly well warranted under the merits prong of the stay test.  ePlus was barred from damages as a sanction under Rule 37.  (Dkt. No. 472.)  This "abrogates" ePlus's right to exclude such products.  Moreover, Lawson's customers are good faith purchasers entitled to continue using the products.  ePlus has no rights with respect to those previously-sold products, and cannot enjoin Lawson's service or maintenance of them. As suggested in *Odetics*, ePlus should not be given the leverage of an injunction to extract royalties that it was specifically precluded from recovering by this Court.  185 F.3d at 1273-74.  ePlus should not be able to enjoin Lawson from fixing, updating, repairing, maintaining and/or servicing these pre-existing products, and any injunction that extends so far should be stayed.

### B.   Customers and the Public Will Suffer Irremediable Harm Unless the Injunction is Stayed Pending Appeal.

#### 1.   Customers will be Harmed If Lawson is Enjoined from Maintaining and Servicing Existing Products.

Even where an injunction is entered, it can and should be stayed for existing customers and, in some cases, even new customers. *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295 (Fed. Cir. 2007) (discussing extension of district court's

---

[2]   Over 50 percent of RSS customers had RSS delivered prior to 2003.

17

stay of an injunction pending appeal to include new customers); Order to stay at *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 228 Fed. Appx. 986 (Fed. Cir. 2007).  Any injunction should be stayed if significant harm will befall customers.  *i4i Ltd. P'ship v. Microsoft Corp., 598 F.3d 831, 863 (Fed. Cir. 2010)* (in decision after stay granted, holding it was appropriate to narrowly tailor injunction scope to mitigate the effect on the relevant public, including the defendant's customers); Order to stay at *i4i Ltd. v. Microsoft Corp.*, 343 Fed. Appx. 619 (Fed. Cir. 2009).  Injunction cases not specifically involving a stay, but addressing harm to customers and the public also show a stay is appropriate.  *See z4 Techs., Inc. v. Microsoft Corp.*, 434 F. Supp. 2d 437, 444 (E.D. Tex. 2006) (holding that public interest would be disserved if injunction entered where there are certain sectors of the public that might suffer some negative effects).  Such harm also supports a stay.

In cases involving medical products or public health facilities, while there exists a public interest in protecting valid patent rights, a district court should also consider "whether there exists some critical public interest that would be injured" by granting injunctive relief.  *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1458 (Fed. Cir. 1988); *see also American Cynamid Co. v. United States Surgical Corp.*, 833 F. Supp. 92, 134 (D. Conn. 1992) (denying a preliminary injunction because, among other things, an injunction would leave doctors and hospitals without access to needed medical supplies).

Here, enjoining Lawson from continued maintenance of products that have already been sold to Lawson's customers will have a direct and significant adverse effect on the public. Lawson's products are used in hundreds of health care facilities around the country and worldwide.  (DX421 at L0418047 (showing 256 of 440 customers paying maintenance for RSS are in healthcare; 49 of 79 customers paying maintenance for

Punchout are in healthcare). Lawson's system tracks surgical supplies all the way into the operating room. (DX533 at 218:6-25.) About a third of all U.S. hospitals use Lawson's RSS product. (DX533 at 219:17-21.)

The selection of replacement procurement software from any of the dozens of competitors that offer similar software takes months, on average, to complete. (DX533 at 219:1-16.) While a small project may be quicker, most of Lawson's customers are larger and more complex, including companies with several hospitals and thousands of users. (DX533 at 212:17-214:16; *see, e.g.*, DX486 (single customer with 28 hospitals and 4000 RSS users); DX484 (customer is the largest health system serving northern Illinois and southern Wisconsin with over 3,000 employees.)) Installing, implementing, and deploying procurement software to thousands of users can take many months to several years. (DX486 at ¶7-8.) Thus, immediately switching to a competitor's product is not a viable option for Lawson customers. Absent a stay of any injunction, these facilities face significant retraining, delays, added costs, and likely errors in procurement without Lawson's support and maintenance. (DX533 at 262:21-263:20; DX486 at ¶¶ 13-15; DX484 at ¶¶ 9-10.)

Lawson's unique knowledge of the healthcare industry would be taken away if the Court issued an injunction without a stay. Lawson's software is in place at eight of the top ten hospitals in the United States. (DX533 at 213:8-10.) Its RSS product is in 277 customers representing 2,500 different hospitals. (*Id.* at 219:17-21.) That expertise allows Lawson to provide required support for the industry. Indeed, Lawson provides ongoing regulatory releases and fixes, patches, and updates to make sure that the software works with the latest databases and web browsers. (*Id.* at 209:4-7.) The regulatory

releases make sure that the software abides by the law of the land for the particular year. (*Id.* at 209:8-21.)  There is no evidence ePlus could provide that level of support.

ePlus's attempt to enjoin Lawson's services is an end-round to what the law prohibits—enjoining Lawson's existing customers.  ePlus's request is like saying customers can still drive their cars, they just cannot put gas in them.  The effect would be the same: customers would be forced to stop using the products.  A stay is warranted because such an injunction is highly unlikely to survive on the merits, and unduly harms customers and the public at a level disproportionate to any miniscule benefit an injunction will provide ePlus.

> 2. <u>Customers "in Process" who have Selected Lawson as a Provider or Have Selected a Short List of Providers Including Lawson Will be Harmed if the Court does not Grant a Stay.</u>

Customers who have not implemented but have selected Lawson as a provider or a finalist to provide RSS and Punchout also will be irreparably harmed if an injunction is not stayed that would preclude Lawson from completing the sales cycle with these customers. These customers would be required by an immediate injunction to re-start the RFP process.  Customers take months to select the providers that will offer the solutions necessary to accomplish the customers' goals.  (DX486 at ¶7.)  It would cause those customers significant harm if they were required to restart the RFP process, spend another more money to find a replacement, and lose out on months of time.

> 3. <u>Harm to Customers and the Public Would not be Compensated, Even if Lawson Prevails on Appeal.</u>

If an injunction is stayed but ePlus prevails on appeal, it will have a ready remedy: a royalty on Lawson's post-judgment sales.  An ongoing royalty for future sales may even be granted in lieu of an injunction.  *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1314 (Fed. Cir. 2007) (holding ongoing royalties satisfy the equitable relief provisions of 35 U.S.C. § 283); *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 723 F. Supp. 2d 1284, 1338 (S.D. Cal. 2010) ("Under some circumstances, awarding an ongoing royalty for patent infringement in lieu of an injunction may be appropriate.").  A royalty may be set pending appeal.  *On Demand Mach. Corp. v. Ingram Indus.*, 442 F.3d 1331, 1345 (Fed. Cir. 2006) (holding it within the court's discretion to enter royalty as opposed to injunction pending appeal).  ePlus is thus in a position to receive relief  in the form of a future royalty if it prevails on the merits.

In contrast, if an injunction is not stayed but Lawson prevails, then none of the above-described harm to Lawson, its customers, or the public will be remedied.  ePlus will not pay for the additional costs of procurement or the costs of reevaluating products, or for delays or errors in procurement resulting from an injunction.  Such costs would be difficult to measure in any event.  Thus, failing to stay an injunction creates a high risk of significant harm that will never be remedied.  This imbalanced situation strongly favors a stay.

**C.**   **Lawson likely will Suffer Irreversible and Immeasurable Harm unless the Injunction is Stayed.**

Lawson will suffer irreparable harm in the form of damage to its reputation and immeasurable lost sales and may be forced to breach hundreds of customer contracts if this Court enters an injunction without a stay.  If the finding of liability or validity is

21

reversed on appeal, Lawson will be left with no recourse to recover the lost sales and damage to reputation incurred during the pendency of the appeal.  Lawson will not be compensated for a wrongfully entered permanent injunction.  This factor also favors a stay.

            1.    <u>Lawson would Face Irreparable Harm if It were not Allowed to Service Its Products Already Implemented at Customer Sites.</u>

As discussed above, Lawson's existing customers are entitled as a matter of law to maintain their Lawson products.  "If a machine was sold under circumstances that did not subject its seller to damages, then subsequent repair cannot subject it to damages.  One is entitled to repair that which is sold free of liability from infringement." *Fonar Corp. v. General Electric Co.*, 107 F.3d 1543, 1555 (Fed. Cir. 1997); *Odetics, Inc. v. Storage Technology Corporation*, 185 F.3d 1259, 1273-74 (Fed. Cir. 1999),

Lawson's customers rely on Lawson to provide maintenance and services of the RSS and Punchout products.  (*See* DX484, DX486.)  Maintenance and services are needed when a product does not work right or the system will be unable to run.  (DX533 at 211:3-9.)  Lawson is the only source for such services for RSS and Punchout customers.  (DX533 at 211:10-17; DX486, ¶ 16.)  If Lawson is enjoined from providing such maintenance and services, customers who encounter bugs or other problems with their RSS and Punchout products would effectively be precluded from using the RSS and Punchout software.  Such customers will not be happy.  Lawson's reputation will suffer, even if the injunction is later dropped.

Failure to stay the injunction may result in many of Lawson's customer's being temporarily left without proper servicing for their RSS and Punchout products, many of

whom licensed RSS long before ePlus even alleged infringement.  (DX409 (Lawson RSS and Punchout Customer List showing many customers purchased RSS (SIP & SIPP) before 2002).)  As a result, Lawson will be faced with irreparable damage to its reputation for many longstanding customers if the Court does not stay any injunction.

Lawson may also be faced with potential breach of contract claims.  Lawson is under contract to provide these services.  (DX533 at 212:2-12.)  If the Court did not stay any injunction pending appeal, Lawson would have no opportunity to have the decision reviewed on appeal before disrupting its customers' business and potentially breaching its contracts with its customers.  In turn, Lawson's reputation for providing uninterrupted, quality maintenance service would be irreparably tarnished.  Customers forced to reconfigure their systems, or go to Lawson competitors for solutions, are unlikely to return to Lawson even if the injunction is later lifted.

Should Lawson lose customers or reputation, it will have no recourse for damage if it wins on appeal.  Such harm would be hard to calculate, but calculating monetary damages would be futile anyway because Lawson has no monetary remedy available for a wrongful permanent injunction.

2.   <u>Lawson would Face Irreparable Harm if it were not Allowed to sell RSS and Punchout to Existing Lawson Customers.</u>

Lawson also will be irreparably harmed if enjoined from making new sales of its RSS and Procurement Punchout products to existing customers.  Dean Hager testified that the vendor selection process for a typical customer looking to purchase procurement products takes on average nine months.  (DX533 at 219:1-10, *see also* DX486 at ¶ 7.)  During that period of time, the customer has invested significant resources, time, and

money into selecting potential vendors, reviewing requests for proposal, analyzing demonstrations, talking with the vendors, and determining the products that best fit its needs.  Lawson is selected by many customers who don't purchase RSS initially, but choose Lawson with the understanding they will later be able to buy RSS.

Lawson would be irreparably damaged if it were forced to suspend sales to such existing customers or prospects that are in process.  Lawson could not recover those lost opportunities or repair the damage to its reputation if the injunction is later lifted.  A stay of any injunction pending appeal would eliminate this further risk of non-compensated harm.

**D.**    **ePlus will not Suffer Irreparable Harm if any Injunction is Stayed Pending Appeal.**

ePlus waited years to bring this lawsuit, fully aware of Lawson's products. (DX533 at 147:18-149:6, 154:8-25.)  When ePlus filed the suit, it did not seek immediate injunctive relief.  Moreover, it sought only a royalty, which is the minimum damages available under 35 U.S.C. § 284.  ePlus never sought lost profits, price erosion damages, or any other damages that would require a showing of actual harm, even though such claims would give rise to greater monetary recovery.  If Lawson's infringement was causing ePlus irreparable harm, ePlus would not have waited years to bring this lawsuit. At a minimum, such a history shows that any irreparable harm to ePlus is minor.

Lawson's brief on the merits of an injunction will address the lack of irreparable harm arising from Lawson's sales of RSS and Punchout.  In short, ePlus cannot prove a single sale it lost to Lawson due to Lawson selling RSS or Punchout.  Additionally, ePlus's delay in seeking injunctive relief, its willingness to license the patents in suit to

major players in the eProcurement and ERP markets for lump-sum royalties, and its niche-based approach to marketing (as opposed to Lawson's ERP or suite-based approach) further show a lack of irreparable harm.

Should the Court issue an injunction, it presumably will find some level of irreparable harm to ePlus. ePlus's showing, however, is based on an extremely small number of customers. The minimal of any harm to ePlus, in contrast to the impact on hundreds of hospitals, as schools, other public agencies, and the public who will be burdened with increased costs strongly supports a stay. Moreover, ePlus, unlike Lawson, can be compensated if it ultimately prevails in obtaining monetary relief, either as an equitable alternative to an injunction or by prevailing on its damages appeal. All of these factors illustrate that ePlus is not likely to be unduly harmed by a stay.

ePlus has many competitors and has granted non-exclusive, lump sum licenses to five of its biggest competitors. (DX533 at 150:15-18; PX43, PX317-320.). This strongly mitigates, if not eliminates, irreparable harm. *eBay v. MercExchange, LLC*, 126 S. Ct. 1837, 1840-41 (2006); *see also MercExchange, LLC v. eBay, Inc.*, 500 F. Supp. 2d 556, 572 (E.D. Va. 2007) (finding that there was no irreparable harm and that "MercExchange's modus operandi appears to be to seek out companies that are already market participants that are infringing, or potentially infringing, on MercExchange's patents and negotiate to maximize the value of a license, entered into as a settlement to, or avoidance of, litigation").

There is no evidence that ePlus would have captured any of Lawson's sales of RSS or Punchout if Lawson had not been able to make these sales. Indeed, the testimony showed that ePlus has not lost any sales to Lawson. (DX533 at 118:5-119:8.) Lawson

offers total ERP solutions.  (DX533 at 179:22-190:21.)  The evidence showed that Lawson will turn down offers to purchase Lawson's RSS product standing alone, whereas standalone systems are a major part of ePlus's business.  (DX533 at 180:22-24.)  ePlus, on the other hand, does not offer a full ERP solution like Lawson, and is limited to selling a best of breed eProcurment solution.  (DX533 at 186:8-9.)

Moreover, there are dozens of other companies that sell non-infringing  or licensed eProcurement software, both as part of integrated ERP solutions and as niche or "best of breed" eProcurement solutions.  (DX533 at 49:2-4, 49:11-13, 56:20-57:7, 119:18-121:1, 143:25-144:6; Critical Capabilities for ERP-Based E-Procurement Solutions (DX-408); Critical Capabilities for Best-of-Breed E-Procurement Vendors (DX-416).)  Indeed, ePlus considers Punchout an industry standard product that virtually everyone sells.  (DX533 at 144:22-25.)  Thus, there is nothing to suggest that enjoining Lawson from selling and servicing RSS and Punchout will cause ePlus to make any new sales.  To the contrary, Lawson's customers are unlikely to select ePlus because ePlus does not have Lawson's experience in healthcare and there are "a lot of other solution providers out there to choose from."  (DX533 at 223:4-17.)  It is very important that vendors have prior experience specifically in the health care industry because it is a unique industry.  (*Id.* at 224:2-6.)  Lawson has that experience.  ePlus does not.

These facts show ePlus is not likely to sell to Lawson's customers because it cannot meet their needs.  A stay will not cause ePlus to lose any business.  If sales of Lawson's products are enjoined without a stay, Lawson and its potential customers will be harmed irreparably, yet ePlus will receive no benefit.  A stay therefore is warranted.

**E.    Lawson is Solvent and there is no Indication Lawson will not be able to Pay any Royalty, Obviating the Need for a Bond.**

In making a determination of whether a bond is required, the Court must be mindful of the purpose for requiring a bond on appeal, to "preserve the status quo while protecting the non-appealing party's rights pending appeal." *Alexander v. Chesapeake, Potomac & Tidewater Books, Inc.*, 190 F.R.D. 190, 193 (E.D. Va. 1999).  A bond thus may not be necessary "when the judgment debtor can currently easily meet the judgment and demonstrates that it will maintain the same level of solvency during appeal." *Id.*  A bond is unnecessary where a party is solvent and is able to pay royalties after appeals.  *See Dillon v. City of Chicago*, 866 F.2d 902, 904-05 (7th Cir. 1988) (defendant exempted from payment of bond based on availability of funds that could be used to pay judgment without substantial delay or other difficulty); *Halbach v. Great-West Life & Annuity Ins. Co.*, No. 4:05-cv-02399, 2009 U.S. Dist. LEXIS 5882, *6-8 (requirement to post bond waived where defendant was a large company with millions in assets).

Lawson's availability of funds that could be used to pay any royalty without substantial delay or other difficulty shows that no bond is needed.  Lawson has cash and cash equivalents of $375,917,000 as of May 31, 2010.  (DX214 at p. 85.)  Lawson can provide any further evidence required to demonstrate its solvency and ability to pay a judgment.

Here, the inflated damages demand of ePlus's expert—which included a claim for damages on license, maintenance, and service revenue for all accused products, even those found not to infringe—totaled about $25 million.  Thus, Lawson is able to fully pay a

reasonable royalty based on the products that were found to infringe from the time any injunction is entered to the resolution of the appeal.

Relying on Lawson's solvency has another advantage: a precise amount need not be calculated right now. While the Court may hold a hearing to set a going-forward royalty and determine the proper base for the royalty, those issues are both in dispute. Lawson's solvency obviates the need to determine such figures before appeals are resolved. The resolution of the appeal may well moot the issue of a going-forward royalty in its entirety, either because Lawson prevails, one or more reexaminations become final, or because damages are remanded. At a minimum, appeal is likely to resolve issues that would affect the royalty determination. Thus, relying on Lawson's solvency instead of a bond conserves judicial resources.

## IV.    CONCLUSION

Lawson is likely to prevail either in post-trial motions or on appeal on the merits of the infringement or validity issues. Every claim at issue has been rejected by the PTO, which is strong proof of the merits of Lawson's case. Moreover, case law shows that ePlus is entitled to no prospective relief for past Lawson sales not subject to damages. This means that, at a minimum, any injunction against servicing or maintaining existing customers is likely to be overturned on the merits.   Thus, a stay is warranted.

A stay will ensure that no one is harmed without a remedy.  ePlus is unlikely to suffer any significant harm that cannot be compensated by damages and a later-issued injunction. It can later receive damages based on Lawson's sales should it prevail on its appeal. If Lawson is successful on appeal, however, it has no recourse for damages and no way to regain lost customers.

The most relevant and largest amount of harm, however, is to Lawson customers whose ability to procure supplies will be harmed and costs increased by an injunction that is not stayed.  This harm is particularly acute for the hundreds of hospitals and government agencies who account for over half of Lawson's customers, and for their patients and constituents.  It is that harm, more than anything else, that justifies a stay.  Lawson thus requests a stay of any injunction pending appeal.

LAWSON SOFTWARE, INC.

By____/s/_____
        Of Counsel

Dabney J. Carr, IV (VSB No. 28679)
Robert A. Angle (VSB No. 37691)
Megan C. Rahman (VSB No. 42678)
dabney.carr@troutmansanders.com
robert.angle@troutmansanders.com
megan.rahman@troutmansanders.com
**TROUTMAN SANDERS LLP**
1001 Haxall Point, Richmond, VA 23219
Telephone:  (804) 697-1200
Facsimile:  (804) 697-1339

Daniel McDonald (admitted *pro hac vice*)
William D. Schultz (admitted *pro hac vice*)
Rachel C. Hughey (admitted *pro hac vice*)
Andrew J. Lagatta (admitted *pro hac vice*)
**MERCHANT & GOULD P.C.**
3200 IDS Center, 80 South Eighth Street,
Minneapolis, MN  55402
Telephone:  (612) 332-5300
Facsimile:  (612) 332-9081

Donald R. Dunner (admitted *pro hac vice*)
Erika H. Arner (admitted *pro hac vice*)
**FINNEGAN, HENDERSON, FARABOW,**
**GARRETT & DUNNER, L.L.P.**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 408-4000
Facsimile:  (202) 408-4400

*Counsel for Defendant Lawson Software, Inc.*

## CERTIFICATE OF SERVICE

I certify that on this 28th day of March, 2011, a true copy of the foregoing will be filed electronically with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Craig T. Merritt
Henry I. Willett, III
**CHRISTIAN & BARTON, LLP**
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
cmerritt@cblaw.com
hwillett@cblaw.com

James D. Clements
Goodwin Procter, LLP
Exchange Place
53 State Street
Boston, MA 02109-2881
jclements@goodwinprocter.com

Scott L. Robertson
Jennifer A. Albert
David M. Young (VSB No. 35997)
Goodwin Procter, LLP
901 New York Avenue, N.W.
Washington, DC 20001
srobertson@goodwinprocter.com
jalbert@goodwinprocter.com
dyoung@goodwinprocter.com

*Attorneys for Plaintiff*

     /s/
Dabney J. Carr, IV (VSB No. 28679)
Robert A. Angle (VSB No. 37691)
Megan C. Rahman (VSB No. 42678)
dabney.carr@troutmansanders.com
robert.angle@troutmansanders.com
megan.rahman@troutmansanders.com
**TROUTMAN SANDERS LLP**
1001 Haxall Point
Richmond, VA 23219
Telephone:  (804) 697-1200
Facsimile:  (804) 697-1339
*Counsel for Defendant Lawson Software, Inc.*