```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE EASTERN DISTRICT OF VIRGINIA

 3                     RICHMOND DIVISION


 4

 5     ---------------------------------------
                                           :
 6     ePLUS, INC.                         :    Civil Action No.
                                           :    3:09CV620
 7     vs.                                 :
                                           :
 8     LAWSON SOFTWARE, INC.               :    January 4, 2011
                                           :
 9     ---------------------------------------

10

11            COMPLETE TRANSCRIPT OF THE JURY TRIAL

12            BEFORE THE HONORABLE ROBERT E. PAYNE

13        UNITED STATES DISTRICT JUDGE, AND A JURY


14
       APPEARANCES:
15
       Scott L. Robertson, Esquire
16     Michael G. Strapp, Esquire
       Jennifer A. Albert, Esquire
17     David M. Young, Esquire
       Goodwin Procter, LLP
18     901 New York Avenue NW
       Suite 900
19     Washington, D.C.  20001

20     Craig T. Merritt, Esquire
       Christian & Barton, LLP
21     909 East Main Street
       Suite 1200
22     Richmond, Virginia  23219-3095
       Counsel for the plaintiff
23

24                  Peppy Peterson, RPR
                   Official Court Reporter
25              United States District Court
```

```
 1    APPEARANCES:  (cont'g)

 2    Dabney J. Carr, IV, Esquire
      Troutman Sanders, LLP
 3    Troutman Sanders Building
      1001 Haxall Point
 4    Richmond, Virginia  23219

 5    Daniel W. McDonald, Esquire
      Kirstin L. Stoll-DeBell, Esquire
 6    William D. Schultz, Esquire
      Merchant & Gould, PC
 7    80 South Eighth Street
      Suite 3200
 8    Minneapolis, Minnesota  55402

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

THE CLERK:  Civil action number 3:09CV00620, ePlus, Incorporated versus Lawson Software, Incorporated.  Mr. Scott L. Robertson, Mr. Craig T. Merritt, Ms. Jennifer A. Albert, Mr. Michael G. Strapp, and Mr. David Young represent the plaintiff.

Mr. Daniel W. McDonald, Dabney J. Carr, IV, Ms. Kirstin L. Stoll-DeBell, and Mr. William D. Schultz represent the defendant.  Are counsel ready to proceed?

MR. ROBERTSON:  Yes, Your Honor, plaintiff is.

MR. McDONALD:  Yes, Your Honor.  Thank you.

THE COURT:  All right.  Good morning, ladies and gentlemen.  On behalf of the Court and counsel and the parties, I'd like to thank you for your participation this morning in one of the most important civic duties that citizens of our country have.

We are a society which has chosen to rule itself in accord with the rule of law, and we have taken in our Constitution and our laws measures to make sure that we have an effective legal system by which people can resolve their disputes in court rather than in the streets, and if we did not have the service of jurors to make the sacrifices that jurors are called upon to do so, then our system of justice that is administered in accord with our Constitution and our statutes could not exist.

1          And so what you are called upon to do is a public

2     duty of the highest order which, of course, all of us know

3     entail sacrifices for you and for your families and for your

4     employers and imposes burdens upon you beyond that of the

5     ordinary responsibilities that you have which are already

6     significant, and all of us know that.

7          This case involves a dispute over patents.  There

8     are -- the plaintiff here is ePlus, Incorporated, or Inc., and

9     ePlus, whose lawyers are sitting over here, has some patents

10    that are issued by the United States Patent Office, a process

11    that is sanctioned and approved by the Constitution of the

12    country and the laws of the nation, and the patents all are

13    long-numbered.

14         They have six figures, and, in fact, I expect most of

15    us would like to earn incomes in accord with the size of the

16    numbers of these patents, but they are referred to by three

17    small digits, the last three digits of the patent.  I don't

18    know that any of you know anything about these patents, but I

19    want to let you know and understand what these patents are.

20         There's a patent number 6023683 which is called the

21    '683 patent.  There's patent number 6055516 or the '516 patent.

22    There's patent number 6505172 or the '172 patent.  Sometimes,

23    patents may be referred to, instead of using these short

24    numbers, '516 or '683 as the patents-in-suit.  That's just a

25    term that lawyers sometimes use to talk about the patents that

1   are the subject of the case, or they may be called the ePlus

2   patents.

3        Now, all three of these patents in this case relate

4   to what is called, and you'll come to learn, as electronic

5   sourcing and procurement software, systems, and methods,

6   software, systems, and methods, all three, and the parties are

7   going to, through the trial, offer testimony to explain what

8   all that is.

9        Now, I'm going to now show for you a -- and you can

10  look up at those big televisions there.  You all will be better

11  off looking that way, most of you will, and you'll be better

12  off looking that way -- a CD that sort of explains the patent

13  system and what it is that has given rise to the situation in

14  which we all find ourselves today.

15       Would it help if I turned the lights off back there?

16  I've never really looked at them.  It would?  All right, turn

17  those lights off, please.

18       How about that; is that better?  Now, who is playing

19  the CD for us?  All right, would you go ahead.

20                 (DVD played for jury.)

21            THE COURT:  Mr. Neal, will you please call the roll.

22            THE CLERK:  Yes, sir, Your Honor.  Ladies and

23  gentlemen of the jury panel, as I call your name, would you

24  please stand, answer present, and then be seated.  Sarah

25  Dolphin.  I'm sorry.  Sarah Abernathy.

```
 1              PROSPECTIVE JUROR:  Present.

 2              THE CLERK:  That's where you live.  Sarah Abernathy.

 3              PROSPECTIVE JUROR:  Present.

 4              THE CLERK:  John Abrams, John Abrams?

 5              (No response.)

 6              THE CLERK:  John Apostle, II.

 7              PROSPECTIVE JUROR:  Present.

 8              THE CLERK:  Charles Asbury.

 9              PROSPECTIVE JUROR:  Here.

10              THE CLERK:  Tiffany Bowles.

11              PROSPECTIVE JUROR:  Present.

12              THE CLERK:  Joan Boyd.

13              PROSPECTIVE JUROR:  Present.

14              THE CLERK:  Lisa Briscoe.

15              PROSPECTIVE JUROR:  Present.

16              THE CLERK:  Constance Campbell.

17              PROSPECTIVE JUROR:  Present.

18              THE CLERK:  Peggy Carrington.

19              PROSPECTIVE JUROR:  Present.

20              THE CLERK:  Brenton Carson.

21              PROSPECTIVE JUROR:  Present.

22              THE CLERK:  Rebecca Carter.

23              PROSPECTIVE JUROR:  Present.

24              THE CLERK:  Kristin Caufield.

25              PROSPECTIVE JUROR:  Present.
```

| | |
|---|---|
| 1 | THE CLERK:  Tamara Cebrian. |
| 2 | PROSPECTIVE JUROR:  Present. |
| 3 | THE CLERK:  Jason Chalmers. |
| 4 | PROSPECTIVE JUROR:  Present. |
| 5 | THE CLERK:  Luther Clary. |
| 6 | PROSPECTIVE JUROR:  Present. |
| 7 | THE CLERK:  Lindsey Comer. |
| 8 | PROSPECTIVE JUROR:  Present. |
| 9 | THE CLERK:  Richard Compher. |
| 10 | PROSPECTIVE JUROR:  Present. |
| 11 | THE CLERK:  Jerry Dawson. |
| 12 | PROSPECTIVE JUROR:  Present. |
| 13 | THE CLERK:  Gardner Divers. |
| 14 | PROSPECTIVE JUROR:  Present. |
| 15 | THE CLERK:  Ruth Downs. |
| 16 | PROSPECTIVE JUROR:  Present. |
| 17 | THE CLERK:  Eric Ellingson. |
| 18 | PROSPECTIVE JUROR:  Present. |
| 19 | THE CLERK:  Carrie Emerson. |
| 20 | PROSPECTIVE JUROR:  Present. |
| 21 | THE CLERK:  Sandra Gumm. |
| 22 | PROSPECTIVE JUROR:  Present. |
| 23 | THE CLERK:  Zelma Hatcher. |
| 24 | PROSPECTIVE JUROR:  Present. |
| 25 | THE CLERK:  Kathryn Horne. |

1              PROSPECTIVE JUROR:   Present.

2              THE CLERK:   Kathleen Hribar.

3              PROSPECTIVE JUROR:   Present.

4              THE CLERK:   Hugh Hutcherson.

5              PROSPECTIVE JUROR:   Present.

6              THE CLERK:   Danielle Jones.

7              PROSPECTIVE JUROR:   Present.

8              THE CLERK:   Ronda Jones.

9              PROSPECTIVE JUROR:   Present.

10             THE CLERK:   Stephanie Jones.

11             PROSPECTIVE JUROR:   Present.

12             THE CLERK:   Gregory Kiersarsky.

13             PROSPECTIVE JUROR:   Present.

14             THE CLERK:   Joan Kinzie.

15             PROSPECTIVE JUROR:   Present.

16             THE CLERK:   Kevin Lewis, Sr.

17             PROSPECTIVE JUROR:   Present.

18             THE CLERK:   Joyce Marsh.

19             PROSPECTIVE JUROR:   Present.

20             THE CLERK:   Jon Meyers.

21             PROSPECTIVE JUROR:   Present.

22             THE CLERK:   Linda Mitchell.

23             PROSPECTIVE JUROR:   Present.

24             THE CLERK:   Carole Mitchell.

25             PROSPECTIVE JUROR:   Present.

```
1              THE CLERK:  Melissa Moore.

2              PROSPECTIVE JUROR:  Present.

3              THE CLERK:  Debra Mosby.  Debra Mosby.

4              (No response.)

5              THE CLERK:  John Murgatroyd.

6              PROSPECTIVE JUROR:  Present.

7              THE CLERK:  Timothy Newton.

8              PROSPECTIVE JUROR:  Present.

9              THE CLERK:  Karen Ott.

10             PROSPECTIVE JUROR:  Present.

11             THE CLERK:  Kathy Pearce.

12             PROSPECTIVE JUROR:  Present.

13             THE CLERK:  Charonda Penn.  Charonda Penn.

14             (No response.)

15             THE CLERK:  Philip Pollack.

16             PROSPECTIVE JUROR:  Present.

17             THE CLERK:  Erika Powell.

18             PROSPECTIVE JUROR:  Present.

19             THE CLERK:  Betty Raymond.

20             PROSPECTIVE JUROR:  Present.

21             THE CLERK:  Monica Redwood.

22             PROSPECTIVE JUROR:  Present.

23             THE CLERK:  Desiree Roberts.

24             PROSPECTIVE JUROR:  Present.

25             THE CLERK:  Flora Robinson.
```

```
 1                    PROSPECTIVE JUROR:  Present.

 2                    THE CLERK:  Denise Robinson.

 3                    PROSPECTIVE JUROR:  Present.

 4                    THE CLERK:  Sinden Schoedel.

 5                    PROSPECTIVE JUROR:  Present.

 6                    THE CLERK:  Robin Silberman.

 7                    PROSPECTIVE JUROR:  Present.

 8                    THE CLERK:  Marchelle Sossong.

 9                    PROSPECTIVE JUROR:  Present.

10                    THE CLERK:  Josephine Strulson.

11                    PROSPECTIVE JUROR:  Present.

12                    THE CLERK:  Heather Traylor.

13                    PROSPECTIVE JUROR:  Present.

14                    THE CLERK:  Leanne Wight.

15                    PROSPECTIVE JUROR:  Present.

16                    THE CLERK:  Are there any jurors present in the

17   courtroom whose name I did not call?  Any jurors present in the

18   courtroom whose name I did not call?  Thank you.

19                    Now, ladies and gentlemen, if you would please stand

20   and raise your right hand, and after the oath is administered,

21   if you'll verbally respond I shall.

22                    (Jury panel sworn.)

23                    THE CLERK:  Thank you.  Please be seated.

24                    THE COURT:  Juror number 60, is your last name Wright

25   or Wight?
```

1            PROSPECTIVE JUROR:  It's Wight.

2            THE COURT:  W-i-g-h-t?

3            PROSPECTIVE JUROR:  Yes.

4            THE COURT:  Ladies and gentlemen, as you know now,

5    the case is about patent infringement, and someone is said to

6    be infringing on the claims of a patent.  Remember the video

7    said the part where the invention is disclosed, the part of the

8    deed of patent that contains the /TPEFS, the elements and the

9    boundaries, are called the claims, and it's the claims that are

10   alleged to be infringed.

11           And so it's said that I am infringing a claim if I,

12   without the permission of the patent owner, import, make, use,

13   offer to sell, or sell the patented invention or product made

14   by a patented process as defined by those claims, and if I do

15   that within the United States, and if I do that while the

16   patent is extant, that is before the patent expires -- you

17   remember the video said most patents go for 20 years.  So after

18   20 years, I could go in, and if you have a patent, after

19   20 years, most of the time I can come in and just use your

20   patent and product, and I don't have to pay you a royalty or do

21   anything.  I just get the right to use it.

22           All right, now, a patent, as you learned in the

23   video, is presumed to be valid.  That presumption of validity,

24   however, can be overcome if it is clearly and convincingly

25   shown that the patent is invalid.  The person who is suing for

1    infringement has to prove that infringement has occurred.  The

2    person who is accused of infringement -- here, that's the

3    defendant, Lawson -- can also say, I didn't infringe, and they

4    can deny infringement, and then it's up to the party, ePlus,

5    who has the patent to say, yes, you are, and to prove that.

6         But if Lawson can also say, well, that patent is

7    invalid, so even if I'm infringing it, it's no good, you can't

8    sue me, you can't get any really judgment against me.  It's up

9    to Lawson to prove clearly and convincingly that the patent is

10   invalid, because it is presumed that the patent is valid.

11        Now, I've told you before about the numbers of the

12   patents.  The parties are ePlus, Inc., and Lawson Software,

13   Inc., and ePlus contends that Lawson makes, uses, offers to

14   sell, or sells products and methods that infringe certain

15   claims of certain patents.

16        They allege that claim three, 26, 28, and 29 of '683

17   patent is alleged -- is infringed.  They allege that claims

18   one, two, six, nine, 21, 22, and 29 of the '516 patent are

19   infringed, and they allege, ePlus does, that claim one of the

20   '172 patent is infringed.

21        To determine infringement, what you have to do is to

22   compare the accused products and methods, that is Lawson's

23   products and the methods used by Lawson with the claim that

24   that method or product is alleged to infringe.  There's -- you

25   don't compare Lawson's products and ePlus's products.  You

1  compare the claims against what are called the accused products

2  or methods.

3         In your notebook, there's a list of the terms that

4  are used in the claims.  Now, the terms sometimes are not the

5  easiest things to understand, and it has been the job of the

6  Court to determine what those claim terms mean, and I've

7  decided that, and in the notebook of those nine of you who will

8  hear the case is a list of what those claim terms mean, and you

9  are obligated when you get into the jury box to follow what

10  those terms mean, not what you think they mean, but what the

11  Court says they mean.

12         From time to time, some of these witnesses are going

13  to use the same words that the claim terms use, and there are

14  going to be some documents maybe that have those terms in them.

15  It doesn't necessarily mean that the use given by those

16  witnesses or documents is the same that the Court has given the

17  meaning, so you should not assume that a witness or documents

18  use of a word or a phrase that is in the claim term necessarily

19  has the same meaning that the word or phrase within the claim

20  term that the Court has construed.

21         Now, you heard the video talk about boundaries, what

22  is the boundary of the claim.  That defines what the owner of

23  the patent has been awarded a patent on.  A patent is infringed

24  only if Lawson's products or methods includes each and every

25  element of a claim that is alleged to be infringed.  So if, for

1    example, a claim has five elements, let's say, for example, and

2    ePlus proves that four of those elements are exactly covered by

3    the patent but doesn't prove to your satisfaction that the

4    fifth element is covered, then there isn't any infringement,

5    and that's because ePlus has to prove all of the elements of

6    the claim are being infringed, and you have to do that, decide

7    that with respect to each claim for each of the patents.

8         Now, ePlus also contends that Lawson is indirectly

9    infringing these claims by contributing to or inducing third

10   parties to make and use products or methods incorporating the

11   patented inventions.  In this case, what that really means is

12   that Lawson is working with its customers, and when they do

13   certain things, they're infringing the patent together.

14        It is the customers that are alleged third parties;

15   isn't that right, Mr. McDonald, in this case?  There isn't

16   anybody else.

17        MR. McDONALD:  Yes, I believe that's the allegation.

18        THE COURT:  So you'll hear evidence about that, too,

19   and I'm going to give you instruction about indirect

20   infringement as well.

21        Now, Lawson, on the other hand, says and denies that

22   its infringing any claim of any of the ePlus patents either

23   directly, that is by itself, or indirectly, that is by what

24   it's doing with its customers, or by what it's telling its

25   customers to do.

1    Lawson also contends that these asserted claims,

2    every one of them, are invalid.  You remember the video

3    mentioned invalidity, and they base a claim of invalidity on

4    three basic doctrines which I'm going to explain to you later,

5    but you'll hear the lawyers mention them in their opening

6    statements.  There's invalidity on the theory of anticipation.

7    That means -- I'll give you instructions on that later.

8    It's invalid, they say, upon a theory of obviousness,

9    and it's invalid for -- some of the claims are invalid, excuse

10   me, because there's a lack of a written description that is

11   adequate under the patent law.

12   And as that -- I'll give you further instruction on

13   that.  But even though the PTO examiner has allowed some of the

14   claims here, it's up to you, the jury, to decide whether or not

15   the patent is invalid for the reasons alleged by Lawson.

16   Now, I don't know whether the lawyers -- I do know,

17   so never mind.  There's also -- I'm not going to get into that

18   because I realize yesterday I told them they can't do it.

19   Now, that's sort of a background of where you're

20   going, and it's a hard job that you are being asked to do.  Any

21   time you are serving on a jury it's a hard job, and you're

22   going to need to pay attention.  The lawyers have worked hard

23   to try to get this case down to a manageable level, and they've

24   been working on it for a good while, and they anticipate that

25   the trial of this case will take approximately three weeks.  It

1    maybe a little bit longer, it maybe a little bit less, so

2    they're going to do everything they can consistent with their

3    obligations to represent their clients and their client's

4    interest, which is what the law requires that they do, to

5    present the case efficiently and expeditiously, and I'm going

6    to do the same thing to see that they move things along.

7             Nonetheless, as you can tell from what I've told you,

8    and you'll be able to tell a little bit later for those of you

9    who are selected, it is a fairly complex set of questions that

10   have to be decided by the jury, and it will take some time to

11   hear the evidence and decide it.

12            Now, we're about to begin a process called voir dire

13   examination of the jury, and unlike what you've seen on

14   television, it isn't unduly long, and I hope it's not unduly

15   intrusive.  Indeed, I've tried to frame the questions in a way

16   that if you have to give an answer, you can stand, give me your

17   name, and answer the question.

18            I may have some follow-up questions, but there may be

19   questions -- I don't know that there will be.  There may be

20   questions which involve personal matters on your part that you

21   would rather not state openly, and that's fine.  In that case,

22   you come up here, and you will talk right here at the bench and

23   take your answer there.

24            This examination is important for several reasons.

25   First, there are reasons at law why people can't sit as jurors

1    in a case, and my questions are designed, in part, to find out

2    if there's any reason why any of you could not sit as a juror.

3    For example, if you are related to a witness or to a lawyer or

4    own stock in one of the companies, you can't sit as a juror.

5    The law says you can't, and so my questions are designed to see

6    if there are any of you who not only have those situations but

7    others.

8              In addition to that, in our system of justice, the

9    parties, through their lawyers, have the right to participate

10   in deciding who among your number actually sits in trial and

11   judgment in this case.

12             They do that by having or exercising what are called

13   peremptory challenges.  That is to say after we have a certain

14   number of you in the box, which -- and your names are drawn by

15   lot, they can say, I don't want this person, that person, or

16   this person to sit on the jury, and they can do that for a good

17   reason, a bad reason, or no reason at all, which one hopes they

18   don't do, so long as it is not an unconstitutional or unlawful

19   reason.

20             They don't have a lot of these challenges, so it's

21   very important that they have information so that they can use

22   them or not or decide not to use them on the basis of

23   deliberate and careful and meaningful thought, and to that end,

24   they have all been given copies of some extracted information,

25   some of the information you provided in response to your jury

1    questionnaire.  They weren't given all of it, but they were

2    given some of it.

3         I know it's been a long time since you lined up in

4    alphabetical order and stood up and said present when your name

5    is called, but there's a reason for that.  I've found over the

6    years that the lawyers can more quickly put together the

7    information that they already have about you with your name and

8    your face and the information they learn today from you if you

9    are seated in this order, and that's why I've asked you to do

10   that, because, as I said, they do need to make these challenges

11   intelligently because they don't have very many of them.

12        The first thing I'm going to ask them to do is to

13   stand, to introduce themselves and the lawyers and legal

14   assistants that there at the table with them in the case, who

15   will be here during the case, excuse me, and to introduce their

16   client representatives so that you'll have -- I'll have some

17   questions for you, and we'll start over here with the

18   plaintiff.  Mr. Merritt, are you starting?  Okay.

19        MR. MERRITT:  Yes, sir.  Good morning.  My name is

20   Craig Merritt.  I am with the Christian & Barton law firm here

21   in Richmond, Virginia.  Our lead counsel, Scott Robertson,

22   Jennifer Albert, are with the Goodwin Procter law firm in

23   Washington, D.C.  We also are going to have with us during the

24   trial Michael Strapp, also with Goodwin Procter, and David

25   Young from Goodwin Procter.

1          Robin Randolph is a legal assistant with my law firm

2     here in Richmond.  Ken Farber, who is sitting in the back row

3     here, is a representative who is here from ePlus during the

4     trial.

5          THE COURT:  Who is this gentleman that's probably

6     doing most important job in the courtroom?  Would you introduce

7     yourself, please.

8          MR. GREER:  I'm Mike Greer.  I'm with trial practice.

9          THE COURT:  All right.  Mr. -- who is going to do it

10    over here for you all?  All right, Mr. McDonald.

11         MR. McDONALD:  My name is Dan McDonald.  I'm an

12    attorney from Minnesota.  With me is Kirstin Stoll-DeBell.

13         THE COURT:  Stand up there so they can see you, Ms.

14    Stoll-Debell.

15         MR. McDONALD:  She's from Denver.  Representative of

16    Lawson Software, Dale Christopherson; Dabney Carr, counsel here

17    in Richmond, and Will Schultz, and our technology here, Bill

18    Mayleben, and representing Lawson also from time to time is

19    Bruce McPheeters.

20         THE COURT:  All right.

21         MR. McDONALD:  Maggie Martinez is our paralegal here

22    who you'll see moving around the courtroom.

23         THE COURT:  The name of your firm?

24         MR. McDONALD:  Merchant & Gould.

25         THE COURT:  And it's headquartered in Minneapolis.

1           MR. McDONALD:  Correct.

2           THE COURT:  And the name of Mr. Carr's firm is

3    Troutman Sanders.

4           MR. CARR:  That's right.

5           THE COURT:  All right.  First question I have, ladies

6    and gentlemen, is whether you, any of you know any of the

7    lawyers or legal assistants or technical people who have been

8    introduced today in the case.  In the back there.

9           PROSPECTIVE JUROR:  Josephine Strulson.

10          THE COURT:  Okay, just a minute.  All right, whom do

11   you know, Ms. Strulson?

12          PROSPECTIVE JUROR:  I know Mr. Dabney Carr.

13          THE COURT:  And how do you know Mr. Carr?

14          PROSPECTIVE JUROR:  I work at Troutman Sanders.

15          THE COURT:  You do?

16          PROSPECTIVE JUROR:  Yes, sir.

17          THE COURT:  Okay.  I don't believe I need to ask you

18   any more questions.

19          PROSPECTIVE JUROR:  Thank you.

20          THE COURT:  I wish I had known that.  We could have

21   excused you earlier.

22          THE CLERK:  What number is she, Your Honor?

23          THE COURT:  Number 58.

24          THE CLERK:  Thank you.

25          THE COURT:  Anybody else know any of the lawyers in

```
 1   the case?  All right.  Now, have I got the total -- there's
 2   just one defendant; right, Mr. Carr?
 3              MR. CARR:  That's right.
 4              THE COURT:  Has anybody been employed by, in the past
 5   or now, or do you have any family who has been employed by, in
 6   the past or now, or any close friends -- and when I say close
 7   friends in these questions I mean people whom you pay attention
 8   to and who influence your judgment -- who have been employed by
 9   ePlus, Inc., or by Lawson Software, Inc.?  Anybody?  No.
10              Is there anybody here who owns stock in or has ever
11   been an officer in or has ever owned stock in ePlus or Lawson,
12   or is there anybody in your family, to your knowledge, who owns
13   stock in either of those corporations?  The answer is no.
14              Now, ladies and gentlemen, I want to point out
15   something else.  A lot of these questions, like do you know the
16   lawyers, for the most part we know statistically the answer is
17   no, so for the most -- unless somebody stands up and said they
18   do, if everybody just sits and remains silent, it means you are
19   giving a no answer, and we'll record a no answer for you.
20              But there's some questions statistically we know,
21   such as have you been on a jury before, that many of the jurors
22   may very well have been on a jury, and in that instance, what I
23   do is start pointing with my pen down here with juror number
24   one, and I come right across the way, and when I come to you,
25   if the answer for you is yes, you stand up, you give me your
```

1    name, I have some follow-up.  When we finish with you, you can

2    sit down, and then I go right on across here, and I do that

3    each row, and that way we make sure we get everybody.

4            Sometimes we'll get back to the back row, and it will

5    be -- it will happen that somebody in the front row or before

6    then realizes, you know, I should have said in response to that

7    question or even to an earlier question, and if -- that happens

8    all the time because sometimes something somebody else says

9    prompts you to think of something that you ought to have

10   disclosed, and if that happens, you raise your hand.

11           We'll get to you.  People are watching.  My staff up

12   here is watching, and we'll get to you and get the answer and

13   get it straight.  The important thing is that we have the

14   answer.

15           The other thing is, if you don't understand the

16   question, you raise your hand and let me know, because it's

17   probably my fault that I have not put the question correctly,

18   and if you don't understand it, probably somebody else doesn't

19   understand it as well.  It is important, as I've told you, that

20   you understand these questions so you can give meaningful

21   answers to them, so you let us know.  We're not in so much of a

22   hurry that we don't want to do it right.

23           All right, has anybody or any of your family members

24   or close friends to your knowledge ever been employed by either

25   of the law firms, and the law firms in this case are, in

1    Richmond, Christian & Barton represents ePlus, and Troutman

2    Sanders represents Lawson, and Goodwin Procter is headquartered

3    -- or Mr. Robertson is in Washington, D.C., and Merchant &

4    Gould is in Minneapolis.  Has anybody ever been employed by any

5    of those law firms?  No, all right.  Thank you.

6            Now, I gave all of you when you came in a list of

7    witnesses.  Is there anybody -- you've looked at those

8    witnesses -- who believes that you know any of those witnesses?

9    Most of the witnesses are not from this area.  Is that a safe

10   statement, counsel?

11           MS. ALBERT:  (Indicating affirmatively.)

12           THE COURT:  Anybody believe you know any of the

13   witnesses, though?  All right.  Well, the answer to that is the

14   jurors have had these lists, and they've looked at them, and

15   the answer is, no, nobody knows any of the witnesses.

16           Have any of you served as a juror in a case, whether

17   it's civil or criminal?  There are two kinds of cases.

18   Basically a civil case is like this where a patent is involved

19   or contracts, personal injury or property damage.  Criminal is

20   where there's an allegation of criminal conduct, and this

21   counts -- this question includes whether you served as a juror

22   in a federal court like this one or a court of any state in

23   this country, or if you've been in the military, whether you've

24   been a member of the court martial board.

25           So starting over here with juror number one, Ms.

1    Abernathy, if you have -- when I point to you, if you've ever

2    been a juror, stand and give me your name, and we'll go from

3    there.  Starting there, anybody been a juror?  Coming straight

4    down the line all the way across.  Yes, ma'am, your name?

5            PROSPECTIVE JUROR:  Constance Campbell.

6            THE COURT:  Ms. Campbell -- I'll get back to this

7    other lady in a minute.  Ms. Campbell, when and where were you

8    a juror?

9            You can sit down over there.  Is that Ms. Boyd?

10           PROSPECTIVE JUROR:  Yes.

11           THE COURT:  Okay, have a seat.  I'll get back to you.

12           PROSPECTIVE JUROR:  In Richmond.  It was many years

13   ago.

14           THE COURT:  It was in the state court?

15           PROSPECTIVE JUROR:  Yeah.  I think it was Marshall

16   Street.

17           THE COURT:  The John Marshall Courts Building.  Was

18   it a civil case or a criminal case.

19           PROSPECTIVE JUROR:  Criminal.

20           THE COURT:  Was there anything about your service as

21   a juror in that case that would keep you from giving a fair

22   trial to the parties in this case?

23           PROSPECTIVE JUROR:  No.

24           THE COURT:  Thank you.  Back there to Ms. Boyd.  Ms.

25   Boyd, when and where were you a juror?

```
 1                    PROSPECTIVE JUROR:   In Brunswick County.

 2                    THE COURT:  Okay.

 3                    PROSPECTIVE JUROR:   Criminal.

 4                    THE COURT:  All right.  About how long ago was that?

 5                    PROSPECTIVE JUROR:  Maybe last year.

 6                    THE COURT:  All right.  Is there anything about your

 7   service as a juror, Ms. Boyd, that would give you any

 8   difficulty giving these people a fair trial in this case?

 9                    PROSPECTIVE JUROR:  No.

10                    THE COURT:  Thank you very much.  On down the front

11   row.  Yes, ma'am.

12                    PROSPECTIVE JUROR:  Peggy Carrington.

13                    THE COURT:  Ms. Carrington, when and where were you a

14   juror?

15                    PROSPECTIVE JUROR:  Nottoway County.

16                    THE COURT:  How long ago?

17                    PROSPECTIVE JUROR:  Many years ago, sir.

18                    THE COURT:  Is it a criminal or civil case?

19                    PROSPECTIVE JUROR:  Civil.

20                    THE COURT:  Is there anything about your service in

21   that case that would keep you from giving a fair trial to the

22   parties in this case?

23                    PROSPECTIVE JUROR:  No, sir.

24                    THE COURT:  Thank you.  On across the front row,

25   anybody been a juror?  All the way across, yes, sir.  Your
```

1    name?

2              PROSPECTIVE JUROR:  Luther Clary.

3              THE COURT:  Mr. Clary, when and where were you a

4    juror, sir?

5              PROSPECTIVE JUROR:  Brunswick County.

6              THE COURT:  All right, about how long ago was that?

7              PROSPECTIVE JUROR:  It's been many years ago.

8    20-plus years probably.

9              THE COURT:  Was it civil or criminal?

10             PROSPECTIVE JUROR:  Criminal.

11             THE COURT:  Was there anything about your service as

12   a juror in that case, Mr. Clary, that would keep you from

13   giving a fair trial to these parties?

14             PROSPECTIVE JUROR:  No, sir.

15             THE COURT:  Thank you very much.  On across the front

16   row.  All right, sir.

17             PROSPECTIVE JUROR:  Jerry Dawson.

18             THE COURT:  Mr. Dawson, when and where were you a

19   juror?

20             PROSPECTIVE JUROR:  Howard County, 30 years ago,

21   criminal.

22             THE COURT:  Criminal case.  Is there anything about

23   that jury service that will keep you from giving a fair trial?

24             PROSPECTIVE JUROR:  No, sir.

25             THE COURT:  Thank you very much.  Second row, over

1  here, anybody on this side?  Yes, ma'am, your name?

2          PROSPECTIVE JUROR:  Ruth Downs.

3          THE COURT:  Ms. Downs, when and where were you a

4  juror?

5          PROSPECTIVE JUROR:  Many years ago up in Maryland.

6          THE COURT:  All right.

7          PROSPECTIVE JUROR:  Civil and criminal.

8          THE COURT:  All right.  Is there anything about your

9  service in that case that would give you any problems giving a

10  fair trial to these people?

11          PROSPECTIVE JUROR:  No, sir.

12          THE COURT:  On across the second row.  Yes, ma'am,

13  your name?

14          PROSPECTIVE JUROR:  Kathryn Horne.

15          THE COURT:  Ms. Horne, when and where were you a

16  juror?

17          PROSPECTIVE JUROR:  Petersburg Circuit Court about

18  20 years ago.

19          THE COURT:  And was it criminal or --

20          PROSPECTIVE JUROR:  It was criminal.

21          THE COURT:  Is there anything about your service

22  there that would keep you from giving a fair trial to these

23  parties?

24          PROSPECTIVE JUROR:  No, sir.

25          THE COURT:  On down across the second row, anybody on

1    the second row?  Okay.  Third row, anybody on the third row

2    been a juror?  Yes, ma'am, your name?

3              PROSPECTIVE JUROR:  Carole Mitchell.

4              THE COURT:  Ms. Mitchell, when and where?

5              PROSPECTIVE JUROR:  October 2009, Henrico County,

6    criminal.

7              THE COURT:  All right.  Are you Carole Mitchell?

8              PROSPECTIVE JUROR:  Yes, Carole.

9              THE COURT:  And it was a criminal case, you say?

10             PROSPECTIVE JUROR:  Yes, sir.

11             THE COURT:  Is there anything about your service in

12   that case that would keep you from giving a fair trial to these

13   parties?

14             PROSPECTIVE JUROR:  No, sir.

15             THE COURT:  On across here.  Yes, sir, your name?

16             PROSPECTIVE JUROR:  John Murgatroyd.  I have a

17   question just for clarification.

18             THE COURT:  Yes, sir.

19             PROSPECTIVE JUROR:  You asked about the military

20   service and involvement with the court martial.  Is that only

21   as a jury member, sir?

22             THE COURT:  Yes.

23             PROSPECTIVE JUROR:  Okay.

24             THE COURT:  If you were the prosecuting attorney or

25   defense attorney or a witness or even the accused, it doesn't

```
1   make any difference.
2            PROSPECTIVE JUROR:  Thank you.
3            THE COURT:  All right, on across.  Yes, your name.
4            PROSPECTIVE JUROR:  Philip Pollack.
5            THE COURT:  Mr. Pollack, when and where were you a
6   juror?
7            PROSPECTIVE JUROR:  Many years ago, City of Richmond,
8   two criminal and one civil.
9            THE COURT:  Is there anything about your service in
10  those cases that would keep you from giving a fair trial to
11  these parties?
12           PROSPECTIVE JUROR:  No, sir.
13           THE COURT:  Thank you.  On across the way.  All
14  right.  In the back row, anybody in the back row been a juror?
15  Yes, ma'am.
16           PROSPECTIVE JUROR:  Marchelle Sossong.
17           THE COURT:  When and where, Ms. Sossong, were you a
18  juror?
19           PROSPECTIVE JUROR:  About five years ago, Henrico
20  County.
21           THE COURT:  Was it civil or criminal?
22           PROSPECTIVE JUROR:  Civil.
23           THE COURT:  Anything about your service there that
24  would keep you from giving a fair trial?
25           PROSPECTIVE JUROR:  No, sir.
```

```
 1                THE COURT:  Anybody -- thank you very much.  Anybody
 2     else?  Yes.  Okay, yes, sir, your name?
 3                PROSPECTIVE JUROR:  Kevin Lewis.
 4                THE COURT:  All right, Mr. Lewis, when and where were
 5     you a juror, sir?
 6                PROSPECTIVE JUROR:  Richmond.
 7                THE COURT:  About how long ago was it?
 8                PROSPECTIVE JUROR:  I'm assuming 12 years.
 9                THE COURT:  Was it civil or criminal?
10                PROSPECTIVE JUROR:  Civil.
11                THE COURT:  Anything about your service in that case
12     that would keep you from giving a fair trial to the parties in
13     this case?
14                PROSPECTIVE JUROR:  No.
15                THE COURT:  Thank you very much.  For those of you
16     who said you'd served as members of a civil jury, I know that
17     none of them were patent cases because they were all in the
18     state court, but did they, in any of the civil cases you were
19     involved in, involve intellectual property rights such as the
20     claim that somebody was entrenching on a trade secret or a
21     property, some kind of trade property of any kind?  No, all
22     right.  Thank you.
23                Now, I'd like to know at this time whether any of you
24     have heard any publicity or any information about this case in
25     the newspapers or even while you were around the courthouse
```

1    this morning.  If the answer is yes, let me know.  Otherwise,

2    I'll record a no answer for you.  I don't think there's

3    actually been publicity about it.  All right, thank you.  The

4    answer is no.

5             Have you or a family member or close friend ever been

6    employed by a company which either provides or sells computer

7    software or computer systems?  If the answer is yes, let me

8    know.  Starting over here as I point on the front row.  Yes.

9             PROSPECTIVE JUROR:  Sarah Abernathy.  My

10   brother-in-law was a -- worked for an internet service

11   provider.

12            THE COURT:  And what was the name of it; do you know?

13            PROSPECTIVE JUROR:  It's since folded.  I don't

14   remember the name of the company.

15            THE COURT:  Is there anything about that situation

16   that would keep you from giving a fair trial to these parties?

17            PROSPECTIVE JUROR:  No, sir.

18            THE COURT:  Thank you, Ms. Abernathy.  On across the

19   front row, anybody?  Yes, ma'am, your name?

20            PROSPECTIVE JUROR:  Rebecca Carter.  I work for Wells

21   Fargo trust department, and we have our own proprietary

22   software.

23            THE COURT:  All right.  Is there anything about that

24   that would keep you from giving a fair trial?

25            PROSPECTIVE JUROR:  No, sir.

```
 1              THE COURT:  Thank you.  Anybody on the second row?
 2   Let me get to you since you're up.  Your name?
 3              PROSPECTIVE JUROR:  Kristin Caufield.
 4              THE COURT:  All right, Ms. Caufield.
 5              PROSPECTIVE JUROR:  My dad works for a government
 6   contractor that sells computer software and securities systems.
 7              THE COURT:  And do you know what it is?
 8              PROSPECTIVE JUROR:  He currently works for the
 9   government.
10              THE COURT:  And has that been -- do you know how long
11   it's been?
12              PROSPECTIVE JUROR:  For the past four or five years.
13              THE COURT:  Before that, do you remember any?
14              PROSPECTIVE JUROR:  No.
15              THE COURT:  Anything about that situation that would
16   keep you from giving a fair trial to either of these parties?
17              PROSPECTIVE JUROR:  No.
18              THE COURT:  Back here, was it Ms. Boyd, I believe?
19              PROSPECTIVE JUROR:  I had two sisters who worked for
20   IBM.
21              THE COURT:  Did they work in the software area?
22              THE WITNESS:  One of them did.
23              THE COURT:  Is there anything about that situation
24   that would keep you from giving a fair trial to these parties,
25   Ms. Boyd?
```

1          PROSPECTIVE JUROR:  No.

2          THE COURT:  All right.  Anybody else on that row?  In

3   the third row, anybody?  Your name.

4          PROSPECTIVE JUROR:  Kathleen Hribar.

5          THE COURT:  Ms. Hribar, what is it?

6          PROSPECTIVE JUROR:  I worked for 12 years for Brimmer

7   Corporation as a home care executive.

8          THE COURT:  For what?

9          PROSPECTIVE JUROR:  Brimmer Corporation.  It's a

10  software vender of health care software.

11         THE COURT:  Is there anything with your experience

12  there that would keep you from giving a fair trial?

13         PROSPECTIVE JUROR:  No.

14         THE COURT:  Did you work with the software part of

15  it, or did you work in some other area?

16         PROSPECTIVE JUROR:  I worked with the software and

17  clinicians, physicians and nurses.

18         THE COURT:  Did it involve procurement of any kind?

19         PROSPECTIVE JUROR:  No.

20         THE COURT:  On across the third row, anybody?  Okay.

21  Yes, your name?

22         PROSPECTIVE JUROR:  Stephanie Jones.

23         THE COURT:  Ms. Jones, what connection do you have?

24         PROSPECTIVE JUROR:  My father is a computer network

25  analyst.  He doesn't actually sell systems, but he does work on

1    them.

2              THE COURT:  Okay.  Are any of them Lawson systems?

3              PROSPECTIVE JUROR:  No.

4              THE COURT:  EPlus systems?

5              PROSPECTIVE JUROR:  Not that I'm aware of, no.

6              THE COURT:  Thank you.  Anybody else?  Would that

7    keep you from giving a fair trial here?

8              PROSPECTIVE JUROR:  No, sir.

9              THE COURT:  Thank you.  Anybody else?  Yes, sir, your

10   name.

11             PROSPECTIVE JUROR:  Jon Meyers.

12             THE COURT:  Mr. Meyers, what about you?

13             PROSPECTIVE JUROR:  I work with a broker/dealer that

14   has proprietary software as well.

15             THE COURT:  Do you work with the software?

16             PROSPECTIVE JUROR:  No, sir.

17             THE COURT:  Do they sell it or produce it?

18             PROSPECTIVE JUROR:  It's part of our system.

19             THE COURT:  Is there anything about that that would

20   keep you from giving a fair trial?

21             PROSPECTIVE JUROR:  No, sir.

22             THE COURT:  Okay, on across.  Your name?

23             PROSPECTIVE JUROR:  John Murgatroyd.  I've worked for

24   Basic Commerce & Industries at Dahlgren, Virginia.  I support

25   the Department of Navy as a weapons systems engineer, and we

1    have -- we develop software, but we mostly act to inspect

2    software that DOD or a DOD contractor has developed.

3              THE COURT:  And does any of that involve procurement

4    or sourcing software?

5              PROSPECTIVE JUROR:  Not directly, no.  When I was

6    active duty in the military, I was involved, but not --

7              THE COURT:  You were involved in what?

8              PROSPECTIVE JUROR:  In aiding with procurement.

9              THE COURT:  What did you procure?

10             PROSPECTIVE JUROR:  Mostly weapons systems and

11   Tomahawk cruise missiles systems.

12             THE COURT:  From specialty weapons people?

13             PROSPECTIVE JUROR:  Yes, sir.

14             THE COURT:  Did you use Lawson or ePlus software in

15   any way?

16             PROSPECTIVE JUROR:  Not that I --

17             THE COURT:  Not that you know about, all right.

18   Thank you very much.  Yes, over here.  That's Ms. Moore, is it?

19             PROSPECTIVE JUROR:  Yes.  My brother worked dozens of

20   years ago in Silicon Valley designing software, and I don't

21   remember the name of his company.  And I also have a good

22   friend who currently works for a company that contracts with

23   the government designing software, but, again, I don't know the

24   name of the company.

25             THE COURT:  All right.  Is there anything about any

```
 1   of that that would keep you from giving a fair trial?

 2            PROSPECTIVE JUROR:  No.

 3            THE COURT:  How about you, Mr. Murgatroyd, anything

 4   about your background that would keep you from giving a fair

 5   trial?

 6            PROSPECTIVE JUROR:  No, sir.

 7            THE COURT:  Over here, yes, ma'am.

 8            PROSPECTIVE JUROR:  Kathy Pearce.  My daughter works

 9   for a company and demos software, and she helped install it at

10   one point in her career, SunGard Energy.

11            THE COURT:  All right.  Anything about that that

12   would keep you from giving a fair trial to these parties?

13            PROSPECTIVE JUROR:  No.

14            THE COURT:  Anybody else?  Yes, sir?

15            PROSPECTIVE JUROR:  Philip Pollack.

16            THE COURT:  Yes.

17            PROSPECTIVE JUROR:  Your Honor, repeat the exact

18   question again, please.

19            THE COURT:  Well, the question here, it's gotten a

20   little broader, but it's have you ever worked for a company

21   that provides or sells computer software systems.

22            PROSPECTIVE JUROR:  Yes, during college, years ago, I

23   was a summer programer for IBM.

24            THE COURT:  Okay.  Anything about that that would

25   keep you from giving a fair trial?
```

1                PROSPECTIVE JUROR:  No, sir.

2                THE COURT:  All right.  Thank you.  Anybody else?

3      Anybody in the last row?  Your name?

4                PROSPECTIVE JUROR:  Heather Traylor.

5                THE COURT:  Yes, ma'am, okay, got you.

6                PROSPECTIVE JUROR:  I work for Graybar Electric, and

7      we contract E-TURN software.  We also sell services for

8      e-procurement, and I'm the business development manager in

9      charge of that.

10               THE COURT:  Are you familiar with either the Lawson

11     or the ePlus systems?

12               PROSPECTIVE JUROR:  Not that I'm aware of.

13               THE COURT:  What is the name of the system you used?

14               PROSPECTIVE JUROR:  It's called E-TURNS.

15               THE COURT:  T-e-r-m?

16               PROSPECTIVE JUROR:  T-U-R-N-S.

17               THE COURT:  Okay, E-TURNS.  My guess is it's my

18     hearing, it's not you.

19               PROSPECTIVE JUROR:  No, it's me.

20               THE COURT:  Okay.  Thank you very much.  Anything

21     about that that would keep you from giving a fair trial to

22     these parties?

23               PROSPECTIVE JUROR:  No.

24               THE COURT:  Anybody else?

25               PROSPECTIVE JUROR:  Sinden Schoedel.  I work for

1   Northrop Grumman.  I don't personally install software, but my

2   company does a great deal of it.

3            THE COURT:  I'm sorry, your name is what?

4            PROSPECTIVE JUROR:  Sinden Schoedel.

5            THE COURT:  Anything about that employment that would

6   keep you from giving a fair trial to these parties?

7            PROSPECTIVE JUROR:  No.

8            THE COURT:  Okay.  Based upon your answers, I think

9   most of you have already answered this.  If you've answered it

10  previously, you don't need to, such as Ms. Traylor, I believe

11  you've already answered this, but is anybody employed by a

12  company which provides or sells electronic procurement or

13  electronic sourcing software systems?  And I know you've

14  already answered that, Ms. Traylor.

15           I'm going to start across the front row.  If the

16  answer is yes, let me know.  Second row, no.  Third row, no.

17  Fourth row, we've already gotten the answer back there.

18           Other than Ms. Traylor, is there anybody who has had

19  to use electronic source-ware -- electronic sourcing software

20  systems in connection with your work?  If the answer is yes,

21  let me know.  Okay, yes, ma'am, your name?

22           PROSPECTIVE JUROR:  Rebecca Carter.  I uses software

23  that we --

24           THE COURT:  You use -- and that's electronic sourcing

25  software, so you go out and you shop and try to find things, do

```
 1   you?

 2            PROSPECTIVE JUROR:  No, but we have license

 3   agreements.

 4            THE COURT:  But do you actually use it in your work?

 5            PROSPECTIVE JUROR:  Yes.

 6            THE COURT:  What do you do that you -- how do you use

 7   it, I think, is what I'm trying to get at.

 8            PROSPECTIVE JUROR:  Retirement plans, allocating

 9   contributions, and making distributions.

10            THE COURT:  But you don't buy things with it?

11            PROSPECTIVE JUROR:  No.

12            THE COURT:  Thank you very much.  Has anybody used

13   the Lawson Software S3 Supply Chain Management system or the M3

14   Supply Chain Management system, or the Fisher Scientific RIMS

15   system or the IBM Technical Viewer/2, also known as TV/2

16   system, the P.O. Writer system, the J-CON Writer system or

17   ePlus Procure(plus) or ePlus Contents(plus) systems?  Anybody

18   ever use that, any of those?  The answer is no.

19            PROSPECTIVE JUROR:  I have a question.

20            THE COURT:  Yes, ma'am, Ms. Downs.

21            PROSPECTIVE JUROR:  I am so not into computers.

22            THE COURT:  You're what?

23            PROSPECTIVE JUROR:  I'm not into computers.

24            THE COURT:  Me either.

25            PROSPECTIVE JUROR:  I do use a computer at my work,
```

```
 1    and it just dawned on me, one of the things that we sign on is

 2    Lawson, and I don't know --

 3               THE COURT:  Do you know what it is?

 4               PROSPECTIVE JUROR:  I have no clue.

 5               THE COURT:  Do you ever use it?

 6               PROSPECTIVE JUROR:  I type my password in, and it's a

 7    medical office I work in.

 8               THE COURT:  What do you do?

 9               PROSPECTIVE JUROR:  I'm an office assistant in a

10    doctor's office.

11               THE COURT:  All right.  So what do you do when you

12    are doing that?

13               PROSPECTIVE JUROR:  For the medical records on a

14    patient, and I don't know if it's the same Lawson.

15               THE COURT:  It may not be, but now we know as much as

16    you know which is all anybody can ask of you.

17               Yes, okay, stand up.  Your name?

18               PROSPECTIVE JUROR:  Jon Meyers.

19               THE COURT:  Yes, Mr. Meyers.

20               PROSPECTIVE JUROR:  When you were going through the

21    examples, you mentioned Fisher Scientific as one of the

22    examples.

23               THE COURT:  Yes, just a minute.  I'll read the name

24    exactly to you.  Fisher Scientific R-I-M-S, RIMS.

25               PROSPECTIVE JUROR:  All I can tell you is I have a
```

1   friend who sells for Fisher Scientific.  I don't have a clue

2   about the specifics of that.

3                  THE COURT:  Would that affect you in giving a fair

4   trial here?

5                  PROSPECTIVE JUROR:  Not at all, sir.

6                  THE COURT:  Have you heard him say anything good,

7   bad, or indifferent about that system?

8                  PROSPECTIVE JUROR:  Just what she gets paid.

9                  THE COURT:  That's good then, I guess.  All right,

10  has anybody here been educated in electronics or computer

11  programming?  If the answer is yes, give me your name.  All

12  right, back there in the back, your name, sir?

13                 PROSPECTIVE JUROR:  Eric Ellingson.

14                 THE COURT:  Mr. Ellingson, what kind of education

15  have you had in that area?

16                 PROSPECTIVE JUROR:  Well, I work for a pharmaceutical

17  company, and I work on systems, you know, some coding, you

18  know, to help in those systems.

19                 THE COURT:  How did you get trained in that?

20                 PROSPECTIVE JUROR:  Just through the vendor.

21                 THE COURT:  Okay.  Who is the vendor?

22                 PROSPECTIVE JUROR:  LabWare based out of Delaware.

23                 THE COURT:  Is there anything about that that would

24  keep you from giving a fair trial here?

25                 PROSPECTIVE JUROR:  No, sir.

1          THE COURT:  Anybody coming across?  Yes, ma'am?

2          PROSPECTIVE JUROR:  Kathleen Hribar.  When I worked

3   for Cerner Corporation, I was trained in the coding and

4   programming of those systems.

5          THE COURT:  Spell that name of that company.

6          PROSPECTIVE JUROR:  C-e-r-n-e-r.

7          THE COURT:  Did you actually do programming?

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  Of their system?

10          PROSPECTIVE JUROR:  Of their system.

11          THE COURT:  Is there anything about that that would

12   keep you from giving a fair trial to these parties?

13          PROSPECTIVE JUROR:  No, sir.

14          THE COURT:  Anybody else on that row.  Next row?  All

15   right, yes, sir, that's Mr. Murgatroyd; right?

16          PROSPECTIVE JUROR:  Yes, sir.  All DOD-related, but

17   27 years ion the Navy, I worked on communications systems,

18   weapons systems, those kinds of things.  At that time, I wasn't

19   involved in any software writing or coding, but obviously, if

20   there was a software glitch, we'd communicate with the shore

21   folks who would tell us what the adjustments to make so we can

22   go forward.

23          Since retiring from the Navy in 2002, I've been

24   working as a senior systems engineer out at Dahlgren

25   laboratories in the development of the future weapons systems.

1          THE COURT:  And you do programming?

2          PROSPECTIVE JUROR:  I assist in programming.

3          THE COURT:  Anything about that work that would keep

4     you from giving a fair trial to these parties?

5          PROSPECTIVE JUROR:  No, Your Honor.

6          THE COURT:  Yes, over there.  That's Ms. Moore, is

7     it?

8          PROSPECTIVE JUROR:  Yes.  One of my jobs is with a

9     nonprofit, and I have been trained by them to manage and to

10    help program their case management software.

11         THE COURT:  Is there anything about that situation

12    that would keep you from giving a fair trial to these parties?

13         PROSPECTIVE JUROR:  No.

14         THE COURT:  Thank you.  Yes, sir, right there in the

15    front row.  What is your name?

16         PROSPECTIVE JUROR:  Brenton Carson.

17         THE COURT:  Yes.

18         PROSPECTIVE JUROR:  Engineering student for a couple

19    years at Virginia Commonwealth University, and I took a few

20    basic programming classes, but I don't remember too much about

21    them, and I don't use them now.

22         THE COURT:  Anything about that situation in your

23    education that would keep you from giving a fair trial?

24         PROSPECTIVE JUROR:  No, sir.

25         THE COURT:  Anybody else on that row?  Third row?

1    Yes, your name?

2          PROSPECTIVE JUROR:  Carole Mitchell.  I work with the

3    University of Richmond, and I help with the programming and the

4    setup of all the coding for our SunGard Banner system and our

5    Recruitment PLUS system.

6          THE COURT:  Anything about that that would keep you

7    from giving a fair trial to these parties?

8          PROSPECTIVE JUROR:  No, sir.

9          THE COURT:  Thank you.  Anybody else on that row?

10    Last row, anybody on the last row.  Yes, Mr. Pollack?

11          PROSPECTIVE JUROR:  Yes, sir.  I'm a career

12    programmer analyst.  My undergraduate degree is in mathematics

13    and computer science, and, of course, I've had training in many

14    different systems, both --

15          THE COURT:  Have you had training in either ePlus or

16    Lawson?

17          PROSPECTIVE JUROR:  Neither of those.

18          THE COURT:  How about those that I asked you about

19    earlier?  I guess you haven't had any training in those either.

20          PROSPECTIVE JUROR:  Nothing in that list.

21          THE COURT:  Thank you very much.  Anything about that

22    situation, your training, your background that would keep you

23    from giving a fair trial to these parties?

24          PROSPECTIVE JUROR:  No, sir.

25          THE COURT:  On down the road, back row, anybody?

1    Okay, anybody I missed?

2            Has anybody ever invented a process which uses

3    computer software and computer hardware components?  That is,

4    have you invented it yourself?  If you have, let me know.  I'm

5    going down the front row, second row, third row, fourth row.

6    No inventors.

7            Whether you invented something or not, have you or

8    anybody in your family applied for a patent on anything?  It

9    doesn't make any difference whether it was computer software or

10   anything.  Have you applied for a patent?  First row, nobody.

11   Second row?  No.  Yes.  Ms. Hribar.

12           PROSPECTIVE JUROR:  My brother-in-law holds several

13   patents as a chemical engineer.  I couldn't tell you exactly

14   what they are for.

15           THE COURT:  Has he said anything, good, bad, or

16   indifferent, about the process of obtaining patents or

17   enforcing patents?

18           PROSPECTIVE JUROR:  Not at all.

19           THE COURT:  You don't have any experience that would

20   keep you from giving a fair trial to these parties?

21           PROSPECTIVE JUROR:  Correct.

22           THE COURT:  Thank you.  On down that row.  Yes,

23   ma'am.

24           PROSPECTIVE JUROR:  My father --

25           THE COURT:  Your name?

1                PROSPECTIVE JUROR:  Erika Powell.

2                THE COURT:  Just a minute, please, ma'am.

3                THE CLERK:  Number 49.

4                THE COURT:  Ms. Powell, what?

5                PROSPECTIVE JUROR:  My dad and his team have worked

6      on a couple of patents for Alcoa and Reynolds.

7                THE COURT:  All right.  Has he said anything about

8      the process?

9                PROSPECTIVE JUROR:  Just a little bit, but nothing

10     that would interfere.

11               THE COURT:  All right.  You could be fair?

12               PROSPECTIVE JUROR:  Yes.

13               THE COURT:  Even if he criticized the Patent Office?

14               PROSPECTIVE JUROR:  Yes, sir.

15               THE COURT:  Thank you.  Anybody else?  All right.

16     Has anybody been involved ever before in any way, as a

17     plaintiff, a defendant, or a witness in a patent infringement

18     case?  If the answer is yes, let me know.  We've gone through

19     all of the panel, and the answer is no.

20               How about have you ever been involved in a suit to

21     enforce intellectual property rights such as trademarks or

22     trade secrets or something of that nature that's not a patent,

23     whether you've been a plaintiff or defendant or witness?  If

24     the answer is yes, let me know.  All right.  All the way

25     through, the answer is no.

1          Have you ever been involved as a plaintiff, a

2   defendant, or a witness in any civil case whatsoever, whether

3   personal injury case or contract case or lease, anything like

4   that?  If the answer is yes, let me know.  Your name?

5          PROSPECTIVE JUROR:  John Apostle.  Personal injury

6   case, Your Honor.

7          THE COURT:  Anything about your experience that would

8   keep you from giving a fair trial to these parties?

9          PROSPECTIVE JUROR:  No, sir.

10          THE COURT:  Thank you very much.  Your name, sir?

11          PROSPECTIVE JUROR:  Charles Asbury.

12          THE COURT:  All right, sir.

13          PROSPECTIVE JUROR:  I've been a witness in many cases

14   being a Virginia state trooper.

15          THE COURT:  Were any of them civil cases?

16          PROSPECTIVE JUROR:  Yes, sir.

17          THE COURT:  Oh, yeah, sure.  As in personal injury

18   cases, for example.

19          PROSPECTIVE JUROR:  Yes.

20          THE COURT:  Is there anything about your experience

21   in that situation, or any of those situations, that would keep

22   you from giving a fair trial here, Mr. Asbury?

23          PROSPECTIVE JUROR:  No, sir.

24          THE COURT:  Thank you.  On down the road.  Yes,

25   ma'am.  That's Ms. Carrington.

1          PROSPECTIVE JUROR:  Personal injury case.

2          THE COURT:  Is there anything about that experience

3    that would keep you from giving a fair trial to these parties?

4          PROSPECTIVE JUROR:  No, sir.

5          THE COURT:  Thank you.  On down the front row.

6          PROSPECTIVE JUROR:  Jerry Dawson, civil case,

7    contract dispute.

8          THE COURT:  All right.  Is there anything about that

9    experience that would keep you from giving a fair trial?

10          PROSPECTIVE JUROR:  No, sir.

11          THE COURT:  All right, thank you.  Second row,

12    anybody in the second row?  Yes, ma'am.

13          PROSPECTIVE JUROR:  Kathryn Horne.  I was in a

14    personal injury case.

15          THE COURT:  Ms. Horne, anything about that experience

16    that would give you a problem with giving these folks a fair

17    trial?

18          PROSPECTIVE JUROR:  No, sir.

19          THE COURT:  Thank you.  On down the row, next row,

20    all the way across.

21          PROSPECTIVE JUROR:  Joyce Marsh, personal injury.

22          THE COURT:  All right, Ms. Marsh, anything about your

23    situation that would keep you from giving a fair trial to these

24    parties?

25          PROSPECTIVE JUROR:  No, sir.

1           THE COURT:  Thank you.  On down the back row.  All

2     right, back row, anybody involved in a lawsuit as a plaintiff,

3     defendant, or witness?

4           Have you, any member of your family, or close friend

5     ever been employed by the U.S. Patent and Trademark Office,

6     also known as the PTO?  If the answer is yes, let me hear from

7     you.  Second row?  Third row?  Fourth row?  Nobody.  All right.

8           Has anybody ever been employed by or been an officer

9     or owned any stock in Fisher Scientific procurement?  If the

10    answer is yes, stand and let me know.  The answer is no.

11          Now, ladies and gentlemen, as I told you, this case

12    is expected to go perhaps three weeks.  I need to know now

13    whether any of you have any special disability or problem that

14    would keep you from sitting as a fair and impartial juror in

15    this case for these people to decide these issues over that

16    period of time.

17          Now, I'm not going to go into all of the situations.

18    We have, for example, had people who have difficulty hearing,

19    and they just simply don't feel comfortable deciding cases on

20    the basis of things they've heard.  We've also had people who

21    have had difficulty seeing in a case where there's a lot to be

22    looked at in the way of evidence, not necessarily read but

23    looked at and examined.  They don't feel comfortable deciding

24    on the basis of what they see.

25          I'm not suggesting those things are disabilities, but

1   in their case they did, so that kind of thing is the kind of

2   thing I'm talking about.  In addition, we've had people who are

3   on pain medication and they simply cannot function.  They are

4   kind of fuzzy because of the pain medication.  We've had other

5   people who actually are in pain and don't take medication, and

6   because they are in pain, they simply cannot focus their

7   attention on what people are saying and don't feel comfortable

8   making decisions.

9          We had one lady on one occasion who said she could

10  serve the first several days of the tile, but she didn't think

11  she could do the rest of it because she was going to have

12  open-heart surgery and wouldn't be back.  There are different

13  reasons.  I'm not going to try to go through all of them.

14  Don't you think for one minute that everybody in here doesn't

15  know that service for a significant period of time presents a

16  burden for everybody.  We know that.

17         That's not the kind of burden I'm talking about.  I'm

18  talking about some special disability or problem that would

19  keep you from giving these people a fair trial and being a fair

20  and impartial juror.  So if you have anything like that, I'm

21  going to take it up here at the sidebar.  Mr. Langford -- I

22  mean at the bench, and Mr. Langford will guide you up here.

23         The rest of you are going to be subjected to cruel

24  and unusual punishment because we're going to turn on the white

25  noise system that somebody decided was effective in keeping the

1    rest of you from hearing what's going on up here, but I think

2    mostly what it does is irritate you, so I'm sorry, because it

3    does irritate me.  All right.  Lawyers come up here please.

4                Whoever is handling the challenges, come on up.  You

5    come here, you come here, and leave a place in the middle.

6    Come up please, ma'am.  And then and y'all need to talk into

7    this thing.  Here comes the noise.  Here, speak into this.

8                (Discussion at sidebar as follows:)

9                PROSPECTIVE JUROR:  Lisa Briscoe.

10               THE COURT:  Okay, Ms. Briscoe, what is your

11   situation.

12               PROSPECTIVE JUROR:  I have anxiety attacks and also

13   take Tramadol for my back which causes me to get sleepy

14   sometimes, drowsy.

15               THE COURT:  Let me ask you this:  Sometimes when I

16   take extra strength Tylenol, I want to fall up stand and move

17   around a little bit, I'm okay.  Can you do that, or does taking

18   the medicine make you real drowsy?

19               PROSPECTIVE JUROR:  Yes, this kind does.  I can't

20   stand as much or sit too long.  This is what I take like every

21   four hours or every six hours.

22               THE COURT:  You do?

23               PROSPECTIVE JUROR:  Yes, sir.

24               THE COURT:  Anybody have any questions of Ms.

25   Briscoe?

1           MR. MERRITT:  I just wanted to clarify what

2    medication she's taking.

3           THE COURT:  Tramadol, T-r-a-m-a-d-o-l, and it does

4    affect you.

5           PROSPECTIVE JUROR:  Yes, sir.

6           THE COURT:  Thank you.  You may go back to your seat.

7    All right.  Look at that line.  I told you.  Come on up.  Wait

8    just a minute.  All right, that is Ms. Downs; right?  What is

9    your situation?

10           PROSPECTIVE JUROR:  Well, I'm afraid I'm not going to

11    be very partial to anything in the court system.  My son is in

12    prison, and we just had a hearing for a reconsideration of his

13    sentencing up in Maryland, and I just -- and it was turned

14    down, and all this was in December.  It's just left me very

15    unfair towards the court system.

16           THE COURT:  Now, that was in Maryland; it wasn't in

17    the federal court?

18           PROSPECTIVE JUROR:  No, it was not.

19           THE COURT:  And it didn't involve patents.

20           PROSPECTIVE JUROR:  No, it did not.

21           THE COURT:  It involved criminal law.

22           PROSPECTIVE JUROR:  Yes.

23           THE COURT:  Do you think you could put all that aside

24    and decide this case, because what you're really deciding is

25    not the court.  You are deciding the rights between ePlus and

1    Lawson, not anything to do with the court.  Do you think you

2    could be fair?

3              PROSPECTIVE JUROR:  I would certainly try.

4              THE COURT:  Yes, I know, but could you, because you

5    have to say -- in order for them to be comfortable, they have

6    to be comfortable knowing either you could or couldn't, and

7    it's okay if you can't, but if you can, let us know.  If you

8    can't, you let us know, too.

9              PROSPECTIVE JUROR:  Yes, I will.

10             THE COURT:  You can?  All right, okay.  Thank you.

11   Okay.  Your name?

12             PROSPECTIVE JUROR:  Erika Powell.

13             THE COURT:  All right, Ms. Powell, what is your

14   situation?

15             PROSPECTIVE JUROR:  I don't know if it will be an

16   issue, but I have to go back to school on the 15th.

17             THE COURT:  Where do you go to school?

18             PROSPECTIVE JUROR:  UVa.

19             THE COURT:  You all don't go to class up there

20   anyway, do you?  Anybody have any questions for Ms. Powell?

21             MR. McDONALD:  No, sir.

22             MR. MERRITT:  No, sir.

23             PROSPECTIVE JUROR:  All right, thank you.

24             THE COURT:  All right.  This lady.  What is your

25   name?

1            PROSPECTIVE JUROR:  Monica Redwood.

2            THE COURT:  Okay, Ms. Redwood, what is your

3     situation.

4            PROSPECTIVE JUROR:  I have scheduled Rituxan

5     infusions coming up for rheumatoid arthritis.

6            THE COURT:  You have scheduled what?

7            PROSPECTIVE JUROR:  Rituxan infusions.

8            THE COURT:  What does that mean?

9            PROSPECTIVE JUROR:  It's for treatment for rheumatoid

10    arthritis.  It's IV drugs.  It takes about six hours.

11           THE COURT:  Do you know when it's scheduled?

12           PROSPECTIVE JUROR:  Tomorrow.

13           THE COURT:  Now, is that something you have to have a

14    regular schedule, or could it be rescheduled for next Monday,

15    January 10th?

16           PROSPECTIVE JUROR:  It's a two-step process.  I had

17    my first infusion two weeks ago.

18           THE COURT:  So you need to take this one on this

19    date.

20           PROSPECTIVE JUROR:  Right.

21           THE COURT:  Anybody have any questions?

22           MR. McDONALD:  No.

23           THE COURT:  Thank you, ma'am.  Okay.  Your name is

24    what?

25           PROSPECTIVE JUROR:  Brenton Carson.

1              THE COURT:  All right, Mr. Carson, what is your

2    situation.

3              PROSPECTIVE JUROR:  I'm just bringing this up.  My

4    place of work is only paying me for seven days.  So if it's

5    going to be three weeks, I'll be living on $3 a day for two

6    weeks, I guess, but I can make do if actually necessary.

7              THE COURT:  Would the fact that you're not getting

8    paid keep you from giving a fair trial at this point?  Where do

9    you work?

10             PROSPECTIVE JUROR:  I work at the Richmond SPCA.

11             THE COURT:  And Ms. Starr is going -- have you asked

12   her?  She's a lawyer.  I can't believe she wouldn't pay.

13             PROSPECTIVE JUROR:  I know, right.  I have the jury

14   duty written out, and in the handbook it says seven days.

15             THE COURT:  Have you asked them?

16             PROSPECTIVE JUROR:  I haven't, because I wasn't

17   really thinking that it would last that long.

18             THE COURT:  Well, we didn't tell you.

19             PROSPECTIVE JUROR:  Right, but, I mean, if she is

20   willing to pay, or -- I mean, you know, I could make do if

21   absolutely necessary.  It's not going to make me biased --

22             THE COURT:  Living on $3 a day is kind of hard.

23             PROSPECTIVE JUROR:  Right, it is tough.

24             THE COURT:  Anybody have any questions?

25             MR. MERRITT:  No, sir.

1          THE COURT:  Okay, Mr. Carson.

2          PROSPECTIVE JUROR:  I appreciate it.

3          THE COURT:  All right, next.  I know a lot of you

4   have problems, but just remember the jury system requires your

5   service, so we are not going to be but so understanding.  Yes,

6   Ms. Boyd, what is your situation?

7          PROSPECTIVE JUROR:  I have a mentally challenged

8   sister that lives with me, and I am her caregiver, and she has

9   doctors' appointments for the next three weeks that -- she

10  doesn't take good to strangers, and I have no control.

11         THE COURT:  Is there anybody else who can take her?

12         PROSPECTIVE JUROR:  I left her with a friend this

13  morning, and it's not a good -- she doesn't do well with

14  strangers or different people.  She never has.

15         THE COURT:  Okay.  Thank you.

16         PROSPECTIVE JUROR:  Thank you.

17         THE COURT:  All right.

18         PROSPECTIVE JUROR:  Peggy Carrington.

19         THE COURT:  Yes, Ms. Carrington.

20         PROSPECTIVE JUROR:  I work for a cardiologist.  It

21  would be a great hardship for me to be away from our practice

22  for three weeks.

23         THE COURT:  What do you do there?

24         PROSPECTIVE JUROR:  I'm a nurse.

25         THE COURT:  Well, if you were called, required to

```
 1   serve, would you be resentful and not be able to give a fair

 2   trial?

 3              PROSPECTIVE JUROR:  No, sir, I wouldn't be resentful.

 4              THE COURT:  And you'd be able to give a fair trial

 5   even if you're required to serve?

 6              PROSPECTIVE JUROR:  Yes, sir.

 7              THE COURT:  Okay, thank you.

 8              PROSPECTIVE JUROR:  Good morning.

 9              THE COURT:  Your name?

10              PROSPECTIVE JUROR:  Kevin Lewis, Sr.  The only

11   problem I have is that I tend to lose interest, not pay

12   attention.  I work out in the field.  I'm the type of person

13   that works out in the field.  I do maintenance work, and I'm

14   constantly moving.  For me to sit in one place, I would lose

15   interest.  My mind would just flare up into space, and I feel

16   that that would cause me not to be able to judge this case the

17   correct way, because I don't want to hurt anything.

18              THE COURT:  Anybody have any questions?

19              MR. MERRITT:  No, sir.

20              MR. McDONALD:  No.

21              THE COURT:  Thank you.  Yes, ma'am.  Your name?

22              PROSPECTIVE JUROR:  Denise Robinson.

23              THE COURT:  Okay, Ms. Robinson, let me get to you.

24              THE CLERK:  53, Your Honor.

25              MR. MERRITT:  54, I believe.
```

1            THE COURT:  All right, Ms. Robinson.

2            PROSPECTIVE JUROR:  I will be beginning classes at

3    Virginia Commonwealth January 18th.

4            THE COURT:  All right, anybody have any questions?

5            MR. MERRITT:  No, sir.

6            THE COURT:  All right, go ahead.  Thank you.

7            All right, come up and speak into this little black

8    thing here.  Your name?

9            PROSPECTIVE JUROR:  Carole Mitchell.  I am under

10   doctor's care.  I'm doing physical therapy twice a week for my

11   right knee and my left achilles.

12           THE COURT:  When does that end?

13           PROSPECTIVE JUROR:  When it gets well.  We're not

14   there.

15           THE COURT:  When did it start?

16           PROSPECTIVE JUROR:  In November.

17           THE COURT:  Do they have hours in the morning and

18   late in the evening?

19           PROSPECTIVE JUROR:  They have hours until 5:00.

20           THE COURT:  They don't have evening hours or early

21   morning?

22           PROSPECTIVE JUROR:  Not that I know of.  I've been

23   going during work or before work?

24           THE COURT:  Where is it?

25           PROSPECTIVE JUROR:  Henrico Doctors' Parham.

1          THE COURT:  They usually start about 7:30.

2          PROSPECTIVE JUROR:  They start at 7:30.

3          THE COURT:  Could you do that and go get your

4  physical therapy morning in the morning?

5          PROSPECTIVE JUROR:  I could, but if I'm going to be

6  here for three weeks, I'm going to have to go to work before I

7  come, and I'm going to have to go to work after.  I work in the

8  admissions office at the University of Richmond.  Our deadline

9  is January 15th.

10          THE COURT:  Well, if you had to serve, would you be

11  resentful and unable to be fair?

12          PROSPECTIVE JUROR:  I could be fair.  I could be fair

13  absolutely.

14          THE COURT:  All right, thank you very much.  What is

15  your name?

16          PROSPECTIVE JUROR:  Desiree Roberts.

17          THE COURT:  Okay, Ms. Roberts, what's your situation?

18  You are a teacher.

19          PROSPECTIVE JUROR:  Yes, I'm a teacher.  I teach

20  four-year-olds.  We're getting ready for a standardized test

21  for them.  I am also in the process of adopting a child that I

22  have a meeting for, and I have to take a test on the 18th for

23  my degree.  So I think that all of this right at the time, I

24  don't know that I would be impartial to coming to trial every

25  day for two weeks.

1              THE COURT:  What degree are you getting?

2              PROSPECTIVE JUROR:  It is in literacy and culture.

3    I'll be a reading specialist.

4              THE COURT:  You are taking a test what?

5              PROSPECTIVE JUROR:  A standardized test on the 18th,

6    January 18th.

7              THE COURT:  For you?

8              PROSPECTIVE JUROR:  For me, yes.

9              THE COURT:  What is the adoption?  I didn't

10   understand that.

11             PROSPECTIVE JUROR:  I am in the process of adopting a

12   child.

13             THE COURT:  What does that have to do with being

14   here?

15             PROSPECTIVE JUROR:  We are scheduling meetings with

16   the families.

17             THE COURT:  But you can schedule those around --

18             PROSPECTIVE JUROR:  I could.

19             THE COURT:  And these four-years-old --

20             PROSPECTIVE JUROR:  I'm a teacher.

21             THE COURT:  There's other teachers, aren't there?

22             PROSPECTIVE JUROR:  Yeah.

23             THE COURT:  They help out with you, don't you have a

24   teacher's aid and all that?

25             PROSPECTIVE JUROR:  I do, yes, I do.

1          THE COURT:  How about this test on the 18th, can you

2    reschedule that?

3          PROSPECTIVE JUROR:  I guess if I told them I had to

4    go to court, I could.

5          THE COURT:  Would doing all that or having to do any

6    of that, put off these meetings or reschedule a test, would

7    that keep you in any way from giving a fair trial to these

8    parties?

9          PROSPECTIVE JUROR:  I would do the best that I could.

10          THE COURT:  I know that, and I don't have any

11    question about it, but would you be sitting there saying I

12    don't like these people because I have to be --

13          PROSPECTIVE JUROR:  Oh, no, I wouldn't say that.

14          THE COURT:  Or I can't be fair because I'm going to

15    be mad about the whole thing?

16          PROSPECTIVE JUROR:  No, I wouldn't say that.

17          THE COURT:  What would you think then?

18          PROSPECTIVE JUROR:  Well, you know what I would be

19    thinking?  I'm really concerned about my four-year-olds because

20    we're getting -- they are getting ready to take a test

21    themselves on how much they have learned from September until

22    now.  I would be concerned --

23          THE COURT:  Does that affect your performance, grade

24    as performance as a teacher if they don't do well?

25          PROSPECTIVE JUROR:  Yes.  I would think it has

1  something to do with it, yes.

2          THE COURT:  Anybody have any questions?

3          MR. MERRITT:  No, sir.

4          PROSPECTIVE JUROR:  Okay.

5          THE COURT:  Your name is what ma'am?

6          PROSPECTIVE JUROR:  Flora Robinson.

7          THE COURT:  Okay, Ms. Robinson, what is your

8  situation?

9          PROSPECTIVE JUROR:  I'm willing to serve.  I have

10  some health issues.

11          THE COURT:  What problems did you want to tell me

12  about?

13          PROSPECTIVE JUROR:  First of all, I have triple

14  bypass.

15          THE COURT:  When did you have it?

16          PROSPECTIVE JUROR:  14 years ago.

17          THE COURT:  Are you doing okay with it?

18          PROSPECTIVE JUROR:  I'm doing okay.

19          THE COURT:  And then you had what other kind of

20  problems?

21          PROSPECTIVE JUROR:  Kidney problem, diabetes, high

22  blood pressure.  I take 11 medicines a day plus two as needed,

23  and I have a doctor's appointment on the 11th and the 18th.  As

24  I said, I'm willing, but it may be a concentration problem due

25  to the unusual case.

1          THE COURT:  And your current medical situation is
2  dealing with diabetes, is it?
3          PROSPECTIVE JUROR:  Diabetes.
4          THE COURT:  Is it type two or type one?
5          PROSPECTIVE JUROR:  Type two.
6          THE COURT:  And you take medicine?
7          PROSPECTIVE JUROR:  Yes.
8          THE COURT:  And these doctors' appointments, can they
9  be rescheduled?
10          PROSPECTIVE JUROR:  They can, yes.
11          THE COURT:  If you had to serve, would you be able to
12  give a fair trial knowing that all these -- that you're going
13  to have to reschedule your doctors' appointments?
14          PROSPECTIVE JUROR:  Yes.
15          THE COURT:  Is there anything else you need to let me
16  know?  You said you had bypass surgery.  Is your heart giving
17  you any problems?
18          PROSPECTIVE JUROR:  I see my heart doctor on the
19  18th.  I see my kidney doctor on the 11th.  So all of it is
20  affecting different organs.
21          THE COURT:  So do you have any problems with your
22  heart right now?
23          PROSPECTIVE JUROR:  Just -- no problem.  I take the
24  medicine and see him every, you know...
25          THE COURT:  As long as you take the medicine, you are

1   okay?

2           PROSPECTIVE JUROR:  Uh-huh.

3           THE COURT:  Anybody have any questions?

4           MR. MERRITT:  Ms. Robinson, do you have any medical

5   requirements or medication requirements that would cause you to

6   need to take a break after any certain period of time?

7           PROSPECTIVE JUROR:  No.  I just take medicine

8   different times during the day.

9           THE COURT:  All right.  Thank you.  Yes, sir, what is

10  your name?

11          PROSPECTIVE JUROR:  Gardner Divers.

12          THE COURT:  All right, Mr. Divers.

13          PROSPECTIVE JUROR:  I have no problems serving.  I

14  didn't know how long we'd be sitting at a time.

15          THE COURT:  Sitting down?

16          PROSPECTIVE JUROR:  Sitting down.  I have restless

17  leg syndrome, and I get very uncomfortable after sitting for

18  awhile.

19          THE COURT:  Any time you want to stand up, we'll put

20  you in a place where you can stand up if you want to.  The

21  chief justice of the United States had back problems.  He used

22  to stand up, hear cases standing up, so I figure we can do that

23  for you.

24          We'll take a break in the morning, and you can walk

25  around a little bit.  I can put a chair right over here or

1    right down at the end if you're not comfortable in one of the

2    jury chairs, and any time you need to stand up, you can stand

3    up.  I will put you in the back row so you wouldn't block

4    anybody else's view or on the end.  Would that be okay?

5              PROSPECTIVE JUROR:  Yes, sir.  You say there are

6    breaks for the restroom?

7              THE COURT:  A break in the morning, and break for

8    lunch, and then break in the afternoon.  The general rule is

9    that if anybody needs to have a comfort break, they raise their

10   hand and we go.

11             PROSPECTIVE JUROR:  May I ask one other question?

12   You asked a question earlier, and I didn't think about it.  You

13   had asked a question about being part of a court case.

14             THE COURT:  Yes, as a plaintiff or a defendant or a

15   witness.

16             PROSPECTIVE JUROR:  My company I work for, I would

17   take people to court for nonpayment of their loans.

18             THE COURT:  Did you have to testify?

19             PROSPECTIVE JUROR:  Yes, sir.

20             THE COURT:  Anything about that experience that would

21   keep you from giving a fair trial here?

22             PROSPECTIVE JUROR:  No, sir.

23             THE COURT:  Anybody have any questions of Mr. Divers?

24             MR. McDONALD:  No, sir.

25             MR. MERRITT:  No, sir.

1          PROSPECTIVE JUROR:  Thank you.

2          THE COURT:  Thank you.  Yes, ma'am, your name is

3     what?

4          PROSPECTIVE JUROR:  Constance Campbell.  I wasn't

5     going to say anything, but I was sitting there thinking, I do

6     have a bit of attention deficit disorder, and I do take

7     Ritalin® for that.

8          THE COURT:  When you take it, does that help you?

9          PROSPECTIVE JUROR:  Oh, yeah.

10         THE COURT:  Can you do all right with it?

11         PROSPECTIVE JUROR:  Oh, sure.

12         THE COURT:  Do you feel like you would be able to pay

13    attention?

14         PROSPECTIVE JUROR:  I think so.  I would really like

15    to do it, actually.

16         THE COURT:  You say, I think so.  I need to be

17    relatively sure, and I know you would try to do it, but have

18    you had to do protracted focusing on issues before and you take

19    your medicine and you do okay with it?

20         PROSPECTIVE JUROR:  Yes.

21         THE COURT:  So you feel like you could sit fairly and

22    impartially here, and even if you had to stay off and on for

23    three weeks, if you had adequate breaks, could go home at night

24    and sleep and rest, could you be fair?

25         PROSPECTIVE JUROR:  Yeah.  I mean, you usually get

1  out of here at 5:00?

2          THE COURT:  Between 5:00 and 6:00.  Where do you live

3  here?

4          PROSPECTIVE JUROR:  Henrico.  Near West End.

5          THE COURT:  Not too far.

6          PROSPECTIVE JUROR:  I think I'd be all right.  I just

7  thought I'd mentioned it.

8          THE COURT:  Well, thank you.  I told you, that's what

9  I want to know.  Anybody have any questions?

10          MR. MERRITT:  No, sir.

11          MR. McDONALD:  No, sir.

12          THE COURT:  Okay, thanks.  All right, let's go down

13  them one by one.  Ms. Boyd, she has the mentally challenged

14  sister who doesn't do well with other people.  I'm inclined to

15  believe that's cause.  Do you agree or not?

16          MR. MERRITT:  I agree.

17          MR. McDONALD:  I agree.

18          THE COURT:  So that's number six.  Ms. Campbell, I

19  think she's fine, the one who was just up her.

20          MR. McDONALD:  You skipped over Ms. Briscoe.  She was

21  the one --

22          THE COURT:  Oh, thank you very much.  She has the

23  anxiety problems and takes medicine that makes her drowsy.  I'm

24  inclined -- she was pretty adamant that she can't function, so

25  I had think we recuse her, number seven.  Do you all agree?

1          MR. McDONALD:  I agree, Your Honor.

2          MR. MERRITT:  Yes, sir.

3          THE COURT:  Ms. Campbell, the one who was just up

4    here, I think is okay.  Do you agree?

5          MR. MERRITT:  Yes, sir.

6          MR. McDONALD:  I agree.

7          THE COURT:  Mr. Carrington who is a cardiologist

8    nurse -- I'm not -- I don't think that's cause.  Cardiologists

9    have plenty of people they can call on.  It's a hardship, but

10   that's all it is, and I'm not inclined to find that's cause.

11   Anybody disagree with that?

12         MR. MERRITT:  No, sir.

13         MR. McDONALD:  I don't disagree with that.

14         THE COURT:  Mr. Carson, the guy who works for the

15   SPCA, $3 a day is hard to live on.  What do you think?

16         MR. MERRITT:  I'd be inclined to let him go.

17         THE COURT:  What do you think?

18         MR. McDONALD:  I'm on the fence on that one as well,

19   Your Honor.  I would be okay with letting him go.

20         THE COURT:  I think, as a general proposition, he

21   might not be able to focus is what I'm concerned about.  I

22   think he's not unwilling to do it, but I think his mind would

23   be on other things.

24         All right, then that brings us to Mr. Divers.  He's

25   okay, number 20.  Ms. Downs, she's the one who had the child

1    who was in Maryland and didn't like the system, and I tried to

2    rehabilitate her, and she finally said that she was okay, but I

3    fear maybe that was in response to the black robe.

4              MR. McDONALD:  And the relentless cross-examination.

5              THE COURT:  And relentless cross-examination.

6              MR. MERRITT:  It was a reluctant okay at best.

7              THE COURT:  I don't think -- I think she really is

8    bitter about it, and she could take it out on anybody depending

9    on what happens.  I don't think it's safe.  All right, so

10   that's number 21.

11             And Mr. Lewis, I will have to tell you that in all of

12   the days that I have been trying cases and on the bench, I have

13   never heard anybody use the float-off, but that guy was for

14   real.  He is going to float off.  I think he's entitled to

15   cause.  Don't you all?

16             MR. McDONALD:  I think that was one of the best

17   speeches he ever gave.

18             THE COURT:  Or at least the longest.

19             MR. MERRITT:  Very effective.

20             MR. McDONALD:  I would agree with that.

21             THE CLERK:  40, Your Honor.

22             THE COURT:  40, Ms. Mitchell, she is the one that has

23   to go for therapy twice a week, day care, and all that.  I mean

24   doctors' care, and she's at the admissions department at the

25   University of Richmond.  What do you all think about her?

1    She'd have to get up and get her physical therapy in the

2    morning before she got here, and she said she'd have to go to

3    work before.

4            MR. MERRITT:  I'd be concerned about her.  She's

5    working before, she's working after, and she's doing physical

6    therapy two days a week during.

7            THE COURT:  You all believe she's entitled to cause?

8    Both of you?

9            MR. MERRITT:  We do.

10           MR. McDONALD:  We'd agree with that.

11           THE COURT:  Okay, and then Powell, 49, she starts

12   school on the 15th, and you all agree that that's cause?

13           MR. MERRITT:  Yes.

14           MR. McDONALD:  I would agree with that.

15           THE COURT:  And the lady, number 51, who is getting a

16   doctors -- she has to have that infusion tomorrow, and I don't

17   want to stop the trial.

18           MR. MERRITT:  My father went through that.  I'm quite

19   familiar with it.

20           THE COURT:  Those are times that you can't put those

21   off.

22           MR. McDONALD:  I would agree with that.

23           THE COURT:  Ms. Roberts, she's the lady who is the

24   teacher and going through an adoption and is taking her own

25   test, and she said she thought the combination of things,

1  combination of things might make it hard for her to be fair.  I

2  think she tried to say she could be fair at the end, and she

3  could reschedule her degree test, but she's worried about

4  four-year-olds.  She raised that two or three times.  What do

5  you say?

6          MR. MERRITT:  I think the biggest concern I heard her

7  mention is whether she'd be attentive because she was --

8          THE COURT:  That's what she said.

9          MR. McDONALD:  Her concern about the four-year-olds

10  and lack of focus is my concern.

11          THE COURT:  I think you're right.  And Ms. Flora

12  Robinson, she was the lady who has got doctors' appointments on

13  the 11th and 18th, but she is the one who had the heart problem

14  sometime ago but has been okay, and she takes diabetes

15  medication.  What do you all say?  She would have to change her

16  appointments.  It's a routine cardiology appointment, but what

17  do you all say?

18          MR. McDONALD:  She mentioned diabetes issues as well

19  as I think some kidney treatment.

20          THE COURT:  Medication.  Anybody who has diabetes has

21  some kidney prospects, and she is apparently taking medication

22  for both, so what do you think?  I think she'd like to do it

23  but --

24          MR. McDONALD:  I think she's trying her best, but I

25  think it's going to be an impediment to her ability to serve.

1          THE COURT:  Do you?

2          MR. MERRITT:  I think that's correct.

3          THE COURT:  I agree.  And Ms. Robinson, 54, is going

4    to start school on the 18th as a student.  Do you agree she's

5    out?

6          MR. McDONALD:  Yes, sir.

7          THE COURT:  And that's it.

8          MR. MERRITT:  Judge, we had one more matter --

9          THE CLERK:  Constance Campbell.

10         THE COURT:  She's okay.  She said she'd be okay, and

11    they agreed on her.

12         THE CLERK:  Okay.

13         THE COURT:  Now, do you all have any challenges for

14    cause other than what I just mentioned?

15         MR. MERRITT:  Your Honor, I want to make a disclosure

16    and mention a couple of others.  By way of disclosure, juror

17    number three, John Apostle, is a lawyer at Genworth, although I

18    don't know if it affects his ability to be fair at all.

19         THE COURT:  Is that your client?

20         MR. MERRITT:  I have several partners who when we

21    circulated these names identified John Apostle as someone they

22    knew.  Ford Stephens, who is known to you, had lunch with him

23    just a couple weeks ago.

24         THE COURT:  Mr. Apostle, would you come up here

25    please, sir.

1          Mr. Apostle, apparently you are a lawyer with

2     Genworth.

3          PROSPECTIVE JUROR:  Correct.  I'm a chief compliance

4     officer, sir.

5          THE COURT:  And you know lawyers in Christian &

6     Barton?

7          THE WITNESS:  I don't think -- I may.  I can't tell

8     you.

9          MR. MERRITT:  Gaines Tavenner.

10         PROSPECTIVE JUROR:  I used to work with Gaines, yes.

11         MR. MERRITT:  Ford Stephens.

12         PROSPECTIVE JUROR:  I have been at a seminar with

13    Ford Stephens.

14         THE COURT:  Would the fact that you know those

15    people, would that keep you in any way from giving a fair trial

16    to these parties?

17         PROSPECTIVE JUROR:  No, sir, Your Honor.

18         THE COURT:  You worked with Tavenner where?

19         PROSPECTIVE JUROR:  Gaines Tavenner and I were both

20    corporate counsel at Signet Bank in 1993/'94.  I left Signet

21    late '94.

22         THE COURT:  Okay.  Any questions?

23         MR. MERRITT:  No, sir.

24         THE COURT:  Thank you.  Number 33, Mr. Kiersarsky.

25    Mr. Kiersarsky.  You told Mr. Langford you know some of the

1    lawyers or think you do?

2              PROSPECTIVE JUROR:  Well, I worked in the insurance

3    claims industry for 21 years.

4              THE COURT:  Are you an adjuster?

5              PROSPECTIVE JUROR:  Yes.  I'm a supervisor now.

6              THE COURT:  What company?

7              PROSPECTIVE JUROR:  Hanover Insurance, Ohio Casualty,

8    and National Grange.

9              THE COURT:  And do you know any of these lawyers?

10             PROSPECTIVE JUROR:  No, but we've retained -- my

11   company has used Troutman Sanders.

12             THE COURT:  Would that keep you from giving a fair

13   trial to this parties?

14             PROSPECTIVE JUROR:  No, I don't handle Virginia.  I

15   just wanted to let you know.

16             THE COURT:  I'm glad to know it.  Anybody have any

17   questions?

18             MR. MERRITT:  No, sir.

19             THE COURT:  Thank you, Mr. Kiersarsky.  Ms.

20   Carrington.

21             PROSPECTIVE JUROR:  I'm sorry, Your Honor.

22             THE COURT:  That's all right.  I told you, I'd rather

23   know later --

24             PROSPECTIVE JUROR:  I remembered that my son-in-law

25   was previously employed by Christian & Barton.

```
 1              THE COURT:  Who is your son-in-law?

 2              PROSPECTIVE JUROR:  Brian Boggs.  He no longer is

 3    there.  He's with Dominion Power now.

 4              THE COURT:  Is there anything about his being there

 5    or the fact that he left there that would keep you from giving

 6    a fair trial to the parties?

 7              PROSPECTIVE JUROR:  No, sir.  I just needed to let

 8    you know.

 9              THE COURT:  I know that, and I told you I'd rather

10    have later knowledge than not.  That's fine.  Anybody have any

11    questions?

12              MR. MERRITT:  No, sir.

13              THE COURT:  Thank you, Ms. Carrington.  We've got one

14    more.

15              PROSPECTIVE JUROR:  Jon Meyers.

16              THE COURT:  Yes, Mr. Meyers, what is your situation?

17              PROSPECTIVE JUROR:  I'm just asking.  Mine's a

18    business issue, but if this thing goes three or four weeks --

19              THE COURT:  It could go three, it could go four, but

20    I doubt it.

21              PROSPECTIVE JUROR:  I was going to wait to see if you

22    pulled me or not, but my issue is I'm a sole proprietor.  I

23    have a presentation on the 24th of January for a new account,

24    and --

25              THE COURT:  You'd probably have to move that.
```

1    PROSPECTIVE JUROR:  If I move it, I'd lose the deal.

2  I've got no choice.  I'm competing against two other companies,

3  and that's the day the board makes the decision.

4    THE COURT:  Would that keep you from giving a fair

5  trial here today if you were to do that?

6    PROSPECTIVE JUROR:  I'm sorry?

7    THE COURT:  Would that keep you from giving a fair

8  trial --

9    PROSPECTIVE JUROR:  Begrudging, you mean?  No.  It's

10  just I'd lose the deal.

11    THE COURT:  You are a sole proprietor in what area?

12    PROSPECTIVE JUROR:  I'm in financial services.  I'm

13  competing for a contract, and I've got no one else I can give

14  it to to do.

15    THE COURT:  It says you were a sales manager here.

16    PROSPECTIVE JUROR:  Same difference.  Of a financial

17  services group.  Independent contractor for them.

18    THE COURT:  Independent contractor?

19    PROSPECTIVE JUROR:  Yes, sir.

20    THE COURT:  All right.  Anybody have any questions?

21    MR. MERRITT:  I just want to confirm the date of that

22  presentation.

23    PROSPECTIVE JUROR:  Monday, the 24th.  I think that's

24  a Monday.

25    THE COURT:  That's right.  Thank you very much.  That

1   would be right near the end of the trial.

2           MR. MERRITT:  I would think.

3           MR. McDONALD:  I think we're trying to be done before

4   that.

5           THE COURT:  The other thing is, if he's chosen, we

6   will not go on the 24th given that he said he would lose the

7   whole deal, because I think losing a deal is reason to excuse

8   somebody.  So we wouldn't go on that date if we're not

9   finished.  Okay, is that all right with you?

10          MR. McDONALD:  Yes.

11          THE COURT:  Otherwise we're okay with it.

12          MR. MERRITT:  Yes.  We did have one other one we

13  wanted to raise as a possible strike for cause.  Number 48,

14  Pollack.

15          THE COURT:  Mr. Pollack, he is the programmer

16  analyst.

17          MR. MERRITT:  I believe he mentioned in years past he

18  had worked for IBM.  Now, we may have misheard that.

19          THE COURT:  He was an IBM programmer in college.

20          MR. MERRITT:  Given the TV/2 connection here and the

21  time during which he worked for IBM, I don't know if there's a

22  connection there or not.

23          THE COURT:  Mr. Pollack, could you come up here,

24  please.

25          He said when I read that list that he never worked

1    with them.  Come on up, Mr. Pollack.  Speak into this.

2              PROSPECTIVE JUROR:  Thank you.  How do you do?

3              THE COURT:  You were a programmer with IBM when?

4              PROSPECTIVE JUROR:  That was just two summers in

5    college, so the summer of '69, and summer of '70.

6              THE COURT:  Did it involve -- what is the name of the

7    system?

8              MR. MERRITT:  TV/2.

9              PROSPECTIVE JUROR:  I don't believe any of these

10   things existed back then.  I was a summer programmer doing

11   whatever they had summer programmers doing, and they certainly

12   didn't sell anything I did.

13             THE COURT:  Did you work with anything from TV/2?

14             PROSPECTIVE JUROR:  There was no such thing.

15             THE COURT:  Okay, no such thing.  Anybody have any

16   questions?

17             MR. McDONALD:  No.

18             THE COURT:  Thank you, Mr. Pollack.  Anybody else you

19   all want to challenge for cause?

20             MR. McDONALD:  If we go back to Mr. Apostle, with

21   respect to John Apostle, juror number three, who, with Genworth

22   Financial, had some connections with Christian & Barton, we

23   would ask he be excused for cause.

24             THE COURT:  If I recall correctly, he worked with a

25   guy named Gaines Tavenner who is now with you?

1              MR. MERRITT:  Who is now a partner.

2              THE COURT:  Put at the time he worked with Mr.

3     Tavenner, it was 1993 and '94, and they were both at the Signet

4     Bank which is -- your firm did not represent Signet Bank, did

5     it?

6              MR. MERRITT:  In the dim past, it may have.  It

7     hasn't recently.

8              THE COURT:  Well, it did.  It represented the

9     predecessor when Dick Catlett was over there, but that became

10    Signet Bank years after that.

11             MR. McDONALD:  I do think he mentioned one other

12    person.  He mentioned another name --

13             THE COURT:  Ford Stephens who met him -- who is a

14    litigator at Christian & Barton, a partner there, I believe.

15             MR. MERRITT:  He is a partner.

16             THE COURT:  And he met him at a seminar, and he said

17    it wouldn't make any different.  Have I got that right?  Are

18    you challenging --

19             MR. McDONALD:  There's more than one person he

20    mentioned that had a relationship with Christian & Barton.  I'm

21    just trying to make sure we recall all of them.

22             MR. MERRITT:  Gaines Tavenner and Ford Stephens.

23             THE COURT:  Any challenge for cause?

24             MR. McDONALD:  Yes.

25             THE COURT:  You're challenging for cause?

1          MR. McDONALD:  Yes, we're challenging for cause.

2          THE COURT:  What do you say?

3          MR. MERRITT:  Judge, I mean the connection is there.

4   That's why we disclosed it voluntarily.

5          THE COURT:  Do you agree to a challenge for cause?

6          MR. MERRITT:  We'll agree to it.

7          THE COURT:  You do?  Okay.  He just wants to get rid

8   of a lawyer, I think.  All right, is that it?  Let's go.

9          Okay, now, you're going to have nine people, and

10  remember -- you know how it's done?  You've been over it with

11  them?

12         THE CLERK:  Yes, sir, Your Honor.

13         THE COURT:  Mr. Langford, has the jury been given

14  sufficient time to have recesses?

15         COURT SECURITY OFFICER:  They all went to the

16  bathroom.

17         THE COURT:  Are you all okay?

18         MR. McDONALD:  A little break for the bathroom, we'd

19  appreciate it, Your Honor.

20         THE COURT:  Why don't we get them so we'll take --

21  can you get them a break and get them back in here, and we'll

22  take 15 minutes, I guess.

23         (Discussion off the record.)

24         THE COURT:  All right, go ahead and have a seat, and

25  I'll talk to them.

1              (End of sidebar discussion.)

2              THE COURT:  Ladies and gentlemen, the questioning has

3    now been completed, and we will complete the process of drawing

4    names by lot and then jury selection by the exercise of the

5    challenges, and that won't take long.

6              However, you all have all been in here a good while,

7    and in addition to that, the lawyers have and I have been in

8    here longer, and the Court staff, than you have, and so --

9    well, actually that's not right.  That's in most cases that

10   right, but we've all been in here.  We're going to take about a

11   15-minute break for a little recess, and then we'll get back to

12   the business of selecting the jury, and I expect that will be

13   finished by no later than 12:30.

14             So we'll take a 15-minute recess.  Those of you who

15   need to use the restrooms facilities, there are some on other

16   floors as well as some here, so if you would do that, I would

17   appreciate it.

18             Mr. Langford, you all can have all of the restroom

19   facilities down that way.  The lawyers, Mr. Neal is going to

20   show you where you go for now, just for the this time.  Thank

21   you.  We'll be in recess.

22

23             (Recess taken.)

24

25