1          THE COURT:  Counsel, you both agree that

2    numbers 58, who works for Troutman Sanders is excused

3    for cause?

4          MR. MERRITT:  We do, Your Honor.

5          MR. McDONALD:  Yes, Your Honor.

6          THE COURT:  All right.  Ladies and gentlemen,

7    now the clerk is going to draw by lot the names of

8    jurors, nine of you, who may sit as jurors in the

9    case.  And then the process of exercising the

10   challenges will occur.  When that happens, when that's

11   finished, the rest of you will be excused.

12         All right.  Mr. Neal, call the jurors,

13   please.

14         THE CLERK:  All right.  Ladies and gentlemen

15   of the jury, as I call your name, please come forward

16   and have a seat in the jury box:

17         Juror No. 37, Joyce Marsh.  Juror No. 12,

18   Kristen Caufield.  Juror No. 60, Leanne Wight.  Juror

19   No. 11, Rebecca Carter.  Juror No. 50, Betty Raymond.

20   Juror No. 33, Gregory Kiersarsky.  Juror No. 14, Jason

21   Chalmers.  Juror No. 57, Marchelle Sossong.  Juror No.

22   39, Linda Mitchell.

23         (Counsel exercising peremptory challenges.)

24         THE CLERK:  Would the following jurors please

25   return to their seat in the courtroom:

1              Juror No. 11, Rebecca Carter, and Juror

2    No. 39, Linda Mitchell.

3              The following jurors please come forward and

4    have a seat in the jury box:

5              Juror No. 18, Richard Compher, and Juror No.

6    48, Philip Pollack.

7              THE COURT:  Mr. Neal, what was the first one?

8              THE CLERK:  The first one, Your Honor, was

9    No. 18, Richard Compher.

10             THE COURT:  All right.

11             (Counsel exercising peremptory challenges.)

12             THE CLERK:  Would the following juror please

13   return to his seat in the courtroom:

14             Juror No. 48, Philip Pollack.

15             And would the following juror please come

16   forward and have a seat in the jury box:

17             Juror No. 23, Carrie Emerson.

18             (Counsel exercising peremptory challenges.)

19             THE CLERK:  May I swear the jury, Your Honor?

20             THE COURT:  Please.

21             THE CLERK:  Thank you.  Ladies and gentlemen,

22   I'm going to ask you once again if you will please

23   stand, raise your right hand, and after the oath is

24   administered, if you will again please respond by

25   stating "I shall."

1              You shall well and truly try the issues

2    joined between the plaintiff, ePlus, Incorporated, and

3    the defendant, Lawson Software, Incorporated, the

4    defendant herein, and a true verdict render according

5    to the evidence, so help you, God?

6              THE JURY:  I shall.

7              THE CLERK:  Thank you.  You may be seated.

8              THE COURT:  Ladies and gentlemen, those of

9    you not selected nonetheless played a very important

10   role in the administration of justice in the Eastern

11   District of Virginia because without the services of

12   more than the nine who will sit we couldn't have the

13   jury selection system that we have envisioned in our

14   Constitution and our laws.  And so we are grateful for

15   the time and commitment you have made this morning to

16   that end.  And you are excused with our gratitude.

17             Thank you very much.

18             (Jurors not serving are discharged at this

19   time.)

20             THE COURT:  Now, ladies and gentlemen, that

21   you've have been sworn, it's my responsibility to give

22   you some preliminary instructions about how we're

23   going to proceed.  It is going to be your duty to find

24   from the evidence what the facts are.  And you and you

25   alone indeed are the judges of the facts.

1          Then you will have to apply to the facts the

2     law as I instruct you at the end of the case, and you

3     are obligated to follow the law.  Please note that

4     nothing that the Court says or does during the period

5     of the trial is intended to indicate in any way what

6     your verdict ought to be for that is your

7     responsibility and yours alone.

8          Now, the evidence from which you're going to

9     find the facts will consist of the testimony of

10    witnesses, of things that are received into evidence,

11    and any facts or exhibits that the lawyers stipulate

12    to.

13         There are certain important things that

14    happen during a trial but they are not evidence.  For

15    example, the opening statements of the lawyers, when

16    they have an opportunity to give you a road map of the

17    case, to tell you what they think the evidence will

18    be.  That's important because it will help you keep in

19    mind what's going on in the case and it will help you

20    follow the evidence.  But what they say in those

21    opening statements is not the evidence.  The evidence

22    comes from the witness stand, from the documents and

23    from the other things that are admitted into evidence

24    and the stipulations.

25         At the end of the case the lawyers have an

 1  opportunity to make closing arguments.  That's the

 2  time when they have to tell you what they think has

 3  been proved by the evidence and to explain to you why

 4  they think you ought to return your verdict in favor

 5  of their respective clients.  And that's important

 6  because it will help you synthesize the evidence, pull

 7  it together, and understand each side's point of view.

 8  But what they say in those closing arguments is not

 9  the evidence.  The evidence comes from that witness

10  stand, from the documents that are admitted, and the

11  other things that are stipulated to.

12        The questions that the lawyers ask, that's

13  not evidence.  It's the answers that to the questions

14  that are evidence.  Now, objections that the lawyers

15  make are not evidence either.  They have been told not

16  to make what are called speaking objections and to

17  keep their objections short, so you shouldn't be

18  burdened with this, but sometimes it happens.

19        Whatever they say in those objections isn't

20  evidence, no matter what they say.  That's the way

21  that they get rulings in the event they think the

22  other side is acting not in accord with the rules of

23  evidence or the rules of procedure.  So don't get

24  upset with a lawyer or his or her client because they

25  make objections.  They're just doing what they have to

1  do under the law to represent their client.

2          If a question is asked and it's objected to

3  and the objection is overruled, I'll simply say

4  "overruled."  And then you'll hear the answer.  And

5  you pay attention to the answer just like you would

6  any other answer.

7          If the question is asked and I sustain the

8  objection, I'll say "sustained," and you won't hear an

9  answer to that question.  So forget about the question

10 and go on.

11         Any testimony that I tell you to disregard or

12 ignore or strike, you can't consider in your

13 deliberations.

14         Now, how, you say, does that happen?  Most of

15 the time it happens this way:  A lawyer is asking

16 questions of a witness on the stand, and the other

17 side has an objection, and before I can rule on the

18 objection and sometimes before the objection even gets

19 out of the lawyer's mouth, the witness has blurted out

20 the answer.  And then I say, "Well, that objection

21 should be sustained," and I will turn to you and say,

22 "Ladies and gentlemen, don't pay my attention to that.

23 Disregard it."  And we expect that in your

24 deliberations you will not take that testimony into

25 account in deciding your verdict.

1          Anything you have seen or heard outside the

2     courtroom is not evidence.  And that's important for

3     these reasons:

4          First, it's the evidence that's put on in

5     this courtroom that all of you hear the same way.  You

6     may not interpret it the same way, but at least you

7     have heard the same thing said.

8          Secondly, it's the evidence that's put on in

9     this courtroom that's tested by the rules or measured

10    by the rules of procedure and evidence.

11         And, thirdly, it's the testimony that's put

12    on in this courtroom that's tested by the

13    cross-examination of the side who is not putting on

14    the evidence, the other lawyers.

15         There are two kinds of evidence.  There is

16    direct evidence and circumstantial evidence.  Direct

17    evidence is direct proof of a fact such as testimony

18    of an eyewitness.  Circumstantial evidence is proof of

19    facts from which you can infer or conclude that other

20    facts exist.

21         For example, let's suppose that it's

22    necessary to prove in the case that there was a human

23    being on an island.  Nobody comes in and says I saw a

24    human being on the island, but somebody comes in and

25    says, "I saw what I think was a human footprint on the

1  island."

2        If you believe that what that witness saw was

3  a human footprint, you could infer, that's just making

4  a logical deduction, that there was a human being on

5  the island.  That's circumstantial evidence.  I'll

6  give you further instructions about that at the end of

7  the case.

8        Now, it's going to be up to you to decide

9  what witnesses to believe and what witnesses not to

10  believe.  You can believe all the witness' testimony,

11  none of the witness' testimony or part of a witness'

12  testimony.  It's up to you.

13        When you do that, just remember this:  Every

14  day you make judgments about the credibility of

15  witnesses.  You decide whether somebody is telling you

16  the truth or not, don't you?

17        How do you do that?  Well, first you look at

18  how they are talking, what they do and say while they

19  are telling something.  Then you assess does what the

20  person is saying make sense.  Do they seem to have had

21  an opportunity to have seen what they are talking

22  about or to know what they are talking about?  Are

23  they affected by what they are telling me?  And in the

24  case of a witness, is a witness affected somehow by

25  the outcome of the case?  Is a witness aligned with

1    one party or the other?  Does it make sense what this

2    witness is saying when considered in perspective of

3    all the other evidence in the case?

4         Those are things you take into account in

5    deciding whether to believe somebody's testimony,

6    accept it in whole or in part.  And you apply that to

7    the testimony of fact witnesses and expert witnesses.

8    There are some expert witnesses in this case.

9    Basically, you judge their testimony just like you do

10   anybody else's testimony.  You can accept it or reject

11   it in whole or in part just as you feel like you need

12   to.  I'll give you some further instructions on that

13   at the time that the case is over and you have to

14   decide the case.

15        But keep in mind that it's your

16   responsibility whether to accept as accurate what a

17   witness is telling you or not.

18        Now, you're going to be permitted to take

19   notes.  You'll each have a notebook.  It has some

20   things in it already.  It has places for you to take

21   notes in it, and it's all right for you to do that.

22        At the end of the trial, your notes will be

23   taken up, tore up and thrown away.  Those not are for

24   your individual uses.  You can't even in deliberation

25   show them to another juror.

1          And although I know you wouldn't do this, I'm

2     required to tell you, you can't say back in

3     deliberations, Well, I know I'm right about this

4     because I have better notes than you do.  There are

5     some people who better remember things without taking

6     notes, and that's all right.

7          You don't have to take notes, but you can.

8     But when you're taking notes, don't get so tied up in

9     taking notes that you forget to eyeball, as my

10    colleague Judge Williams says, keep an eye on the way

11    the witness is appearing when the witness is

12    testifying to you because that's in part how you make

13    your credibility determination.

14         Now, unlike what you may have seen on

15    television or heard, we don't have the capacity to

16    read back to you the testimony or to send the

17    transcript back to you in the jury room.  So you're

18    going to have to decide on what you remember what's

19    right.  And that's what you have to do.

20         Now, some of you, I don't know who actually

21    of the panel actually has been a juror before, but if

22    you have been a juror in a criminal case, this is

23    different than a criminal case.  This is a civil case.

24    The case involves the proof of infringement, and it's

25    the responsibility of ePlus to prove infringement.

1   And ePlus has to prove infringement by what's called a

2   preponderance of the evidence, which is more likely

3   than not that something is true.

4           There's also a defense of invalidity.  And

5   invalidity has to be proved by Lawson.  And

6   invalidity, I'll tell you more about later, but they

7   have the burden of proving that by clear and

8   convincing evidence.  And I'll tell you more about

9   that later.

10          You should just be listening to the testimony

11  and keeping it all in mind.  Now, remember, at the end

12  of the trial you're going to hear the closing

13  arguments and you're going to get instructions, and

14  then you'll have plenty of time to deliberate your

15  verdict.  And so what I'm going to ask you to do is

16  not to be deciding the case every time you go back in

17  there for a recess or have lunch or waiting for the

18  next day's session while you're having the coffee and

19  bagels we're going to give to you.  Just don't

20  deliberate the case until you get all the evidence in.

21  You'll have plenty of time to do it then.

22          Now, please don't discuss this case with

23  anyone, even your family.  And don't discuss it with

24  anybody here.  Now, you might be going to the

25  cafeteria at the same time some of these people in the

1    case are.  If you hear something or one of them tries

2    to talk to you, you need to let me know.  I don't

3    think that will happen, but sometimes it does happen

4    with people in the elevator and they are careless

5    about who else is in the elevator, and they'll say

6    something.  And if it concerns the case, you need to

7    let me know and say, Judge, I heard this in the

8    elevator.  Then I have some things I need to do and

9    I'll not go into all that now.

10           Don't do any research on your own.  And in

11   the days of computers at home and so much in the way

12   of information that's available, just remember if you

13   want to use your computer at home tonight, you can go

14   Google or do whatever you want to do, but don't be

15   looking up any of the terms or any of the people.

16   Don't be looking up any of the lawyers or the law

17   firms or anything else.  Don't do any research about

18   the case because you need to confine your efforts and

19   make your decision on what you hear in the courtroom

20   to what you hear in the courtroom.

21           And I think we're going to hear the opening

22   statements of the lawyers in just a minute.  And then

23   we'll hear testimony.  And after that happens, you'll

24   hear the closing arguments and the instructions.

25           There will come times when I have to talk to

1   the lawyers privately, and one of those times will be

2   now.  And I'm going to excuse you while that happens.

3   Or I'm going to come up here and turn on that dreaded

4   white noise and let you be irritated while I talk with

5   them.  They know to minimize the number of instances

6   when I have to do that so that we don't get into the

7   situation such as in the famous criminal trial that

8   occurred many years ago in California where they did

9   nothing but have side bar conferences, and the jury

10  felt like it was really out of the case.  So we're not

11  going to have that here.

12          All right.  Basically, what we're going do is

13  we're going to -- I'm going to hear something from the

14  lawyers, and you're going to come back and hear

15  opening statements.  And about one o'clock we'll take

16  a lunch break.  We'll go until sometime between five

17  and six in the afternoon.  We'll take a little break

18  in the afternoon.  We'll come back tomorrow.  I'm

19  going to look and see where you live.

20          Does anybody live a long distance away?  Does

21  anybody have a long drive in the morning?

22          A JUROR:  Fredericksburg.

23          THE COURT:  Well, that can be long or not

24  depending on who's driving whom on Interstate in 5

25  South.  We'll probably start around nine o'clock in

 1   sessions from now on.

 2        There will not be a hearing of any evidence

 3   on next Monday, January 10.  We'll be off for that.  I

 4   haven't decided whether we'll be off for January 17,

 5   which is a federal holiday.  I think it's a state

 6   holiday, too.  And so I haven't decided that.  That

 7   kind of depends on where we are in the case.

 8        And so now if you will go with Mr. Langford,

 9   I have some business to take up with the lawyers.  And

10   he will let you make phone calls and tell people

11   what's happened in your life.

12        Mr. Neal, you order them lunch.  You-all may

13   remain seated while the jury is being excused, please.

14        (Jury out.)

15        THE COURT:  All right.  Now, I got this email

16   from Mr. Strapp yesterday.  I don't understand what

17   it's about.  Can somebody tell me what the objection

18   to whatever Lawson is going to do in opening statement

19   is?

20        MR. ROBERTSON:  Yes, Your Honor.  Thank you.

21        This issue was raised with Your Honor on at

22   least two occasions before.  The first being at that

23   time Markman hearing.

24        THE COURT:  But what is the issue?  I don't

25   understand it.

1          MR. ROBERTSON:  The issue is that the

2  defendant has injected this "published by a vendor"

3  into the claim construction.

4          THE COURT:  What does it say in the claim?

5          MR. ROBERTSON:  Well, it's the construction

6  of the term "catalog."  If Your Honor would like me to

7  --

8          THE COURT:  No.  What does it say in the

9  claim?  What's the claim language?

10          MR. ROBERTSON:  Just catalog or product

11  catalog.

12          THE COURT:  No.  That isn't what it says.  I

13  don't have the claim construction documents here.

14  Does anybody have a set of what you're giving the

15  jurors?

16          MR. ROBERTSON:  Yes, Mr. Neal has all the

17  copies.

18          THE COURT:  Let me see what you're giving the

19  jury.

20          THE CLERK:  Yes, sir.

21          THE COURT:  And it has the patents in it,

22  right?

23          MR. ROBERTSON:  Yes, sir.  If you want to --

24          THE COURT:  What tab is the claim

25  construction?

1          MR. ROBERTSON:  Tab 6, Your Honor.

2          THE COURT:  Where is the catalog?

3          MR. ROBERTSON:  It's the first claim term.

4          THE COURT:  Okay.  I see.  All right.

5          MR. ROBERTSON:  So the issue here, Your Honor

6     is --

7          THE COURT:  Well, the claim construction has

8     "published by a vendor" in it.

9          MR. ROBERTSON:  I understand.  And what they

10    want to do now, Your Honor, is use that as a vessel to

11    imbue further construction into what published by a

12    vendor means.

13         Dr. Shamos, their expert, has suggested that

14    "published by a vendor" means you have to have the

15    entire catalog with all its information, not any

16    subsets, nothing.  That it would be just as if a paper

17    catalog was made into an electronic catalog.

18         What "catalog" was intended to mean, what

19    Your Honor construed it, is that it has to have

20    certain vendor information.

21         THE COURT:  You-all did not ask me to

22    construe "published," did you?

23         MR. ROBERTSON:  No, sir.

24         THE COURT:  "Published" doesn't have any

25    meaning other than its normal and ordinary meaning,

1    does it?

2            MR. ROBERTSON:  I think you even suggested at

3    the pretrial conference.  Your Honor.  That

4    "published" simply meant it could be writing or

5    verbally.  Writing could even be electronic.  And it

6    simply had to be information that was supplied by the

7    vendor.  That's all we're looking for.  We don't think

8    published means --

9            THE COURT:  What reason do you have to

10   believe that they're going to disobey what I've ruled?

11           MR. ROBERTSON:  Because --

12           THE COURT:  Have they told you they are going

13   to argue that or what?

14           MR. ROBERTSON:  Well, they have argued that

15   in one of their slides, Your Honor, that we find to be

16   contrary to the Court's construction.

17           THE COURT:  Which slide are you talking

18   about?

19           MR. ROBERTSON:  They are not numbered, Your

20   Honor.  It's the one that says, Evidence.  Lawson

21   systems.  It's very different.  That's the first one.

22           THE COURT:  Well, all it says --

23           MR. ROBERTSON:  The suggestion, if I might,

24   Your Honor, is going to be that a Lawson customer can

25   take data, information, such as defined in your

1   definition of a catalog, which includes preferably, a

2   part number, a price, a catalog number, vendor name,

3   vendor ID, etc.  And the customer of Lawson can select

4   from the vendor that it wants to include that

5   information.

6          Now, the source of that information, of

7   course, is the vendor.  The vendor comes up with the

8   part number, not the customer.  The vendor comes up

9   with the pricing, not the customer.  All of that is

10  the source of this information that Your Honor defined

11  what a catalog is, is an organized collection of

12  preferably including that information.

13         What they are now suggesting and what they

14  want to imbue the word "published" with instead of

15  what I think Your Honor just intended, that being

16  somehow this information is being supplied by a

17  vendor, and they are the source of that information.

18         They are suggesting now that --

19         THE COURT:  I don't understand what the

20  dispute is.  There's nothing on the face of the slide

21  that does what you think.

22         MR. ROBERTSON:  It says Lawson Software uses

23  a customer selected list, not multiple published

24  catalogs.

25         THE COURT:  Are you objecting to "multiple"

1   or --

2          MR. ROBERTSON:  I'm objecting to the

3   suggestion that when Lawson's customers selects the

4   information you defined to be an organized list of the

5   catalog, that somehow renders it no longer a catalog.

6   That's the argument that was been made and advanced by

7   Dr. Shamos in his expert report and his deposition.

8   And that, I think, is reading into your construction

9   something that was never intended to be read into your

10  construction.

11         THE COURT:  All right.  Well, let me hear

12  from them.

13         MR. ROBERTSON:  I'm sorry.  Just one last

14  point.  When we raised this at the pretrial, you

15  actually asked Ms. Stoll-DeBell whether or not you

16  intended a "gotcha," which is how the Court phrased

17  it, and her response was, Exactly.  We did intend a

18  gotcha as a non-infringement argument.

19         MS. STOLL-DeBELL:  Your Honor, I wanted to

20  hand up a couple copies of documents, if you don't

21  mind.

22         THE COURT:  Well, I'm going to tell you

23  something.  You can use exactly what I used in

24  catalog/product catalog.  That's what you can use.

25  The definition of "catalog" is an organized collection

1    of items and associated information, published by a

2    vendor, which includes suppliers, manufacturers, and

3    distributors, which preferably includes a part number,

4    price, catalog number, vendor name, vendor ID, a

5    textual description of the item, and nothing else.

6            MS. STOLL-DeBELL:  Your Honor, we have that

7    exact definition as one of the slides they objected

8    to.  It is a quote of your claim construction of the

9    term "catalog."  That is what we intend to use.  We

10   intend to put on a non-infringement case that our

11   product does not meet this definition.  That is our

12   non-infringement case.  We've said this all along.

13           Mr. McDonald said it at the Markman hearing

14   that we didn't have catalogs.  We have like a shopping

15   list for the grocery store, not a published catalog.

16   We said it in our non-infringement interrogatory

17   contentions.  We don't have published catalogs.

18           Dr. Shamus said it in his expert report.  We

19   don't have published catalogs.

20           THE COURT:  I didn't say "published

21   catalogs."  I decided a collection of items and

22   associated information published by a vendor.  That's

23   different than saying it's a published catalog.  And

24   you can't say "published catalog" with a view to

25   conveying the notion that you have the Sears catalog,

1    and that's what we're talking about or anything else.

2         MS. STOLL-DeBELL:  And I apologize.  I

3    misspoke, Your Honor.  If you look at our slides, we

4    say we do not have catalogs published by a vendor.

5    This is another slide that they used.  That's what

6    Dr. Shamos used in his report.  That exact language.

7    We don't have catalogs published by a vendor.

8         THE COURT:  You have Lawson does not infringe

9    the ePlus patents?

10        MS. STOLL-DeBELL:  Yes.  And I can give you

11   the paragraph of Dr. Shamos' report.  I can cite you

12   to of our interrogatory responses where we said we do

13   not have catalogs published by vendors.  We do not

14   have multiple catalogs.  We are arguing that we do not

15   meet your definition of "catalog."

16        THE COURT:  I didn't say it had to be

17   multiple catalogs.  I said it has to be an organized

18   collection of items and associated information.  That

19   doesn't say "catalogs."

20        MS. STOLL-DeBELL:  The claims do.  The claims

21   call for a collection of catalogs, two or more

22   catalogs, Your Honor.  So you're right.  Your

23   definition is for a single catalog.  If you look at

24   the claim language, it actually calls for more than

25   one.

1          THE COURT:  All right.  Thank you.

2          I don't understand, Mr. Robertson, where they

3     are going across the line.  I really don't.

4          MR. ROBERTSON:  I'd like to just point out

5     the very same slide that was just mentioned by Ms.

6     Stoll-DeBell Lawson does not infringe the ePlus

7     patent, says "Lawson does not have published

8     catalogs."

9          THE COURT:  Yeah.  And they're not going to

10    say that.  They're not saying that.

11         MR. ROBERTSON:  Then I would expect this

12    slide wouldn't be included.

13         THE COURT:  No.  I just told them.  I said

14    they are not saying that.  They are saying what I

15    said, and that's it.

16         MR. ROBERTSON:  Thank you, Your Honor.

17         THE COURT:  And the other thing that we're

18    doing to do is we're not going to have the closing

19    argument in the opening statements.  I don't want you

20    getting into arguments about why people are wrong in

21    making closing statements and what's wrong with the

22    expert testimony.  You can frame the issues in what

23    your expert is going to do.

24         The other thing is -- yes, Ms. Stoll-DeBell,

25    what else?

1          MS. STOLL-DeBELL:  I'm sorry.  We will not

2     say "published catalogs," but we do intend to argue

3     and we have disclosed all throughout this case, that

4     our product is not published.  It's not published at

5     all and is not published by a vendor.

6          THE COURT:  Well, you have to come up with

7     some definition of "published" that doesn't include

8     the written or the spoken word because that's what

9     I've said it belongs to.

10          I'm telling you, I want it understood --

11     whether I'm right or wrong, I don't know.  I think I'm

12     right in the way I interpreted it.  But I spent a lot

13     of time and effort, and so did you-all, in giving the

14     terms the meaning I thought they had.  And that's

15     going to be the terms that are going to be used.  And

16     no amount of workaround is going to happen.

17          And the consequence of a workaround is going

18     to be this:  If I find that you are just -- and I've

19     had this problem.  I've never had to say this before.

20     But if I find any more of what I've encountered, which

21     is trying to do indirectly what I've said you can't do

22     directly, and I'm not talking about you personally,

23     I'm talking about your side, then the consequence is

24     going to be is I'm inclined to grant a motion for

25     judgment as a matter of law for the other side on the

1    theory that that's an appropriate sanction for

2    repeated disobedience of the Court's directives

3    because I can't conduct a trial being constantly on

4    the concern that somebody is trying to come in the

5    back door.

6           Now, if I did it wrong, you-all have recourse

7    to that in the federal circuit, and that's fine, but I

8    want you to understand I don't deal with things that

9    way.

10          MS. STOLL-DeBELL:  I understand, Your Honor,

11   and I would like to remind you this came up at the

12   pretrial conference as well.  We have not taken issue

13   with the meaning of the term "published."  Dr. Weaver

14   has said that published means originated, and we

15   intend to cross-examine him on that.  I asked him

16   about it in his deposition.  And Dr. Shamos gave a

17   rebuttal report that "published" does not mean

18   originated.

19          THE COURT:  I don't care what the experts

20   say.  It's what the Court says that's the issue and

21   you-all didn't call upon me to determine the meaning

22   of "published."  Now, it's not unheard of that courts

23   have to make claim construction interpretations during

24   the trial.

25          I haven't gone back, I think I did this once

1   before, and looked at the ordinary meaning of the word

2   "published" in the dictionary, and that's what we're

3   going to use because nobody has taken the view that

4   "published" means anything other than what it means.

5            MS. STOLL-DeBELL:  It is our position it has

6   the ordinary meaning, too, Your Honor.  To the extent

7   that Dr. Weaver says it doesn't, we intend to

8   cross-examine him on that.

9            THE COURT:  You sure can.

10           MS. STOLL-DeBELL:  Okay.

11           THE COURT:  And that's fine.

12           Anything else on that point?

13           MS. STOLL-DeBELL:  I don't think so.

14           THE COURT:  You modify your slides

15   accordingly.

16           Now, let's keep in mind the order of things.

17   It's ePlus' responsibility to prove infringement, and

18   cross-examination on infringement is not a time to

19   develop invalidity.  I'm not going to hear that that

20   way.  I want it all clean, all the evidence cleanly,

21   crisply and organizedly presented on the issue of

22   infringement.

23           If you need to call witnesses back to talk to

24   them about invalidity, you can do that.  Any witness

25   who is here and whose testimony you need, you can have

1   back.  But I don't want, and I think I've told you

2   this before, but some of the things that have been

3   said recently suggest to me that maybe you-all

4   contemplate a commingling.  And I don't want a

5   commingling.

6          That way the Rul3 50 issues are very cleanly

7   and crisply dealt with, the record is as it needs to

8   be, and it will be easier for the jury to understand

9   what happens when I tell them that preponderance of

10  the evidence is how they have to decide infringement.

11  And clear and convincing evidence is how they have to

12  decide invalidity.  All right.

13         MR. ROBERTSON:  Your Honor, may I briefly

14  address that?  I want to make sure I don't run afoul

15  of Your Honor's ruling.

16         THE COURT:  Why are you dealing with

17  invalidity?  Don't you anticipate.  You can't

18  anticipate and start trying your response to

19  invalidity in the early days of the case because your

20  foot is then off base.  Does that make it clear?

21         MR. ROBERTSON:  It does, but let me just

22  raise the context of this, Your Honor.  The inventors

23  are going to come forward and tell how they developed

24  their invention.  That is the subject matter of these

25  patents.  Part of it is a development of a system that

1    they are also the inventors on, at least two of the

2    three inventors were inventors on, and they are going

3    to say how in part they took that system and made

4    changes and modifications to solve problems that are

5    the subject matter of the patents that have to be

6    addressed here.

7              THE COURT:  Well, that goes to the issue of

8    whether it's new and useful.

9              MR. ROBERTSON:  Well, it goes to the issue of

10   what the inventors actually invented and how they went

11   around solving a problem.  Solving a problem is really

12   what invention is all about.  I've never been involved

13   in a patent case where the inventors couldn't come

14   forward and say --

15             THE COURT:  Mr. Robertson, I made a clear

16   statement, and you stay within those bounds.  And

17   you're smart enough to figure out how to ask those

18   questions that way.  If what you're trying to do is

19   somehow use the inventors in anticipation of an

20   invalidity defense, you can't do that.  You can bring

21   them back and you can put on that testimony after he's

22   put on invalidity evidence.

23             Now, that's the way cases are tried, patent

24   or otherwise.  You have the burden, you have an issue,

25   and you have got to prive it, and you're staying

1   within that.  That rule has been the same in this

2   court for as long as I can remember.  And I don't

3   understand what you're saying to be anything that's

4   improper for you to put on in infringement.  But the

5   mere fact that you got up here and felt like it was

6   appropriate to do that suggests to me that you want

7   some kind of exemption.  And I'm not going to have it.

8   It's that simple.  I tried to make it clear to you

9   all.

10          MR. ROBERTSON:  I understand, sir.  It's just

11  going to be -- I'm --

12          THE COURT:  Bring them back.  If they are

13  going to trench on a topic that's infringement.

14          MR. ROBERTSON:  I will bring them back.

15          THE COURT:  I mean invalidity.

16          MR. ROBERTSON:  I just wanted to make the

17  simple point, Your Honor, that it's almost -- it's

18  going to be very difficult to tell the story of

19  invention if I can't tell where they got to from where

20  they were.  What were they doing --

21          THE COURT:  You can do that, but I'm telling

22  you it's how you ask the questions.  And you get paid

23  a God-awful amount of money to know how to ask the

24  questions.  Now do it right.

25          MR. ROBERTSON:  All right.

1          THE COURT:  That's not precluded by what I've

2     said, but the fact that you felt necessary to get up

3     and articulate that it was a problem on that topic

4     gives me problems.

5          MR. ROBERTSON:  I apologize, Your Honor.  I

6     am still a little confused.

7          THE COURT:  Well, get unconfessed.

8          MR. ROBERTSON:  I will try to make sure I

9     stay within the boundaries of the Court.

10          THE COURT:  Then we'll have to deal with any

11     objections that come up.  I don't know that they will

12     come up.

13          Are you all ready to give your opening

14     statements?

15          MR. ROBERTSON:  Your Honor, I'd prefer not to

16     have to break on my opening statement.

17          THE COURT:  I would, too.

18          MR. ROBERTSON:  During the lunch break.

19          THE CLERK:  The lunches won't be here before

20     one o'clock.

21          MR. ROBERTSON:  I've gone through mine, Your

22     Honor.  It's going to be about an hour.  I'm going to

23     try and keep it under that, but that's where I am.

24          THE COURT:  Well, maybe we can break at

25     2 o'clock.  It will take an hour for it to be here?

1          THE CLERK:  Yes.  It might be 1:30.  I'll

2    check on it.

3          THE COURT:  All right.  Maybe we need to send

4    somebody over there to get it.

5          THE CLERK:  I'll take care of the details

6    while he's opening.

7          THE COURT:  Are you ready?

8          MR. McDONALD:  We just need to fix the slide

9    that you mentioned, Your Honor.

10         THE COURT:  You will be able to do that

11   during the lunch break because you're not going to be

12   doing anything.

13         All right.  Let's get them back in.

14         THE CLERK:  Are you all going to be using the

15   evidence system during opening?

16         MR. McDONALD:  Yes.

17         THE COURT:  By the way, let Mr. Langford move

18   this lectern for you.  The thing is cantankerous.

19         (The jury is present.)

20         THE COURT:  Ladies and gentlemen, because of

21   the situation, I think what we'll do is your lunches

22   are coming in.  We'll go ahead and have the opening

23   statements and we'll break around 2 o'clock.  Is

24   everybody all right with that?  Can you live through

25   that?  Everybody okay?  If you're not, let me know.

112

1          Let's go.  You'll hear the opening statement
2     of Mr. Robertson for ePlus now.
3          MR. ROBERTSON:  Thank you, Your Honor.
4          May it please the Court, ladies and gentlemen
5     of the jury, my name Scott Robertson, and I represent
6     the plaintiff here, ePlus, who's the owner of the
7     patents.  And just let me reiterate what the Judge
8     said earlier this morning.  We all certainly do
9     appreciate your public service here.
10         If I might briefly, because it's been a long
11    morning and now it's early afternoon, introduce my
12    colleagues again who are with me.
13         At counsel table, it's Jennifer Albert, whose
14    with the firm of Goodwin Procter.  Craig Merritt, who
15    is with the law firm of Christian Barton.  Michael
16    Strapp with the law firm of Goodwin Procter.  And Mike
17    Greer, who's going to be our techno consultant helping
18    us present some of the evidence to you today.
19         And so with that, Mike, could I have that
20    first slide?
21         On the monitors in front of you, you'll see
22    some of the key witnesses who are going to be
23    testifying here during the trial.  Ken Farber is the
24    president of ePlus Systems and ePlus Content Services.
25    Mr. Farber is actually sitting in the courtroom over

1    here.  He will be our client representative throughout

2    this trial.  Mr. Farber will testify later concerning

3    the product lines that he sells, the software that

4    ePlus sells into the marketplace to provide business

5    solutions including the software that we're going to

6    be talking about that helps perform what's known as

7    electronic sourcing or electronic procurement that are

8    the subject matter of this case and the subject matter

9    of the patents.

10           Mr. Farber was at a company called ProcureNet

11   back in 2001.  And ePlus acquired the assets of that

12   company along with these patents.

13           Also in the courtroom is the chief financial

14   officer of ePlus, Elaine Marion.  And Ms. Marion will

15   tell you a little bit about ePlus and its business

16   headquartered here in Herndon, Virginia.

17           If I might, Your Honor, it might be helpful

18   if we could pass out the juror notebooks that Your

19   Honor had requested the parties make because I may be

20   referring to some of those.

21           THE COURT:  Here they are, Mr. Langford.

22           In the back of those notebooks, there's some

23   space for taking notes if you want to use those.  And

24   you also have notepads, I believe.  So you can do it

25   either place.  You can take them in the notepad or you

1    can take them in the back.

2         MR. ROBERTSON:  If I might just perhaps

3    briefly orient you to this notebook that the Judge

4    asked us to prepare, you'll note that there's an index

5    in the beginning.

6         THE CLERK:  Mr. Robertson, would you pull

7    that mike toward you a little bit.

8         MR. ROBERTSON:  Yes, thank you, Mr. Neal.

9    I'll move the notebook up here.

10        So there are seven tabs.  We don't need to go

11   through it all right now in detail, but I just wanted

12   to point out to you that under tab 1 was that sample

13   patent that was referred to this morning in that

14   videotape that we all saw about the patent system.

15   And I might use that during this opening to make some

16   points or examples with respect to how your task is

17   going to be to understand the issues that are raised

18   in this case with respect to both infringement and

19   invalidity.

20        Tab 2 is the first patent that my client was

21   awarded, which the Judge indicated we'd be referring

22   to it by the last three digits, the '683.

23        Under tab 3 you'll see the second patent that

24   my client was awarded, which we'll be referring to, as

25   the Judge indicated, as the '516 patent.

1           And under tab 4 is the final patent that's at

2     issue here, which we'll be referring to, as the Judge

3     indicated, as the '172 patent.

4           Under tab 5 there are a number of terms.

5     They are actually not terms of the patents but terms

6     that might assist you in understanding some of the

7     issues that are going to come up as we discuss them

8     during the course of this case.

9           Under tab 6, as Judge Payne indicated this

10    morning, this includes a glossary of claim terms that

11    were in dispute between the two parties.  That is, in

12    dispute between ePlus and the defendant Lawson.  And

13    the Judge has construed those claims.  He has

14    interpreted them for you.  You will see these terms as

15    we go through some of the claims that are at issue in

16    this case with both respect to the issue of

17    infringement and validity.  And as the Court noted

18    this morning, you're to follow these constructions,

19    these interpretations, and no others in your task to

20    determine whether infringement of my client's patents

21    is present or whether Lawson has established that the

22    claims are invalid.

23          Let me introduce some other key witnesses

24    that you're going to be hearing from in this trial.

25    You're going to be hearing from the inventors of the

1   patents-in-suit here.   There are three inventors that

2   are still living.   One is now deceased.   The first is

3   Douglas Momyer.   The second is James Johnson.   And the

4   third is Robert Kinross.

5           They are all here now and they're all going

6   to be testifying.   I think we'll at least get to

7   Mr. Momyer this afternoon, and we'll be following up

8   with the others later.

9           These three inventors were employed by a

10  company called Fisher-Scientific back in 1994.

11  Fisher-Scientific was the employer at the time when

12  these gentlemen who worked in the information

13  technology department came up with the inventions that

14  are the subject matter of these three patents.   I'll

15  tell you more about Fisher-Scientific, their story,

16  and their invention in a few minutes.

17          One of the witnesses you're going to hear

18  among several experts that are going to testify at

19  this trial is Dr. Weaver.   Dr. Weaver is a professor

20  of computer science at the University of Virginia.   He

21  has studied these patents extensively.   In fact, he

22  has testified on a few occasions before as an expert

23  on these patents in federal court here in Virginia.

24          He has also studied Lawson's infringing

25  software systems that are at issue here, and he has

1  looked at in his role in rendering opinions with

2  respect to infringement and certain validity issues,

3  he has looked at evidence that has been produced

4  during the course of these pretrial proceedings under

5  the Court's rules.

6          That will include documents that have been

7  produced by Lawson.  There will be manuals.  There

8  will be other guides.  There will be sworn testimony

9  of the witnesses that were taken in preparation of

10  this trial.  And Dr. Weaver will actually put on

11  several demonstrations of the Lawson software at issue

12  in this case, and he'll show you why in his opinion

13  that that software infringes the claims that are being

14  asserted in this case.

15          You're going to hear more about the Lawson

16  products in a minute.  For now I'm going to be

17  referring to it, as the Judge indicated, as either the

18  Lawson accused product and methods or the Lawson S3

19  system.  You'll probably be hearing that a lot in this

20  case.

21          So what is this software system we're talking

22  about?  What you're going to be hearing during the

23  course of the evidence is that it can be made up of

24  what are called several software programs or modules.

25  What these are really like are building blocks that

 1   are put together, software building blocks, in order

 2   to perform all the functionality that are the subject

 3   matter of the claims that are at issue here.

 4          So Dr. Weaver will provide detailed testimony

 5   applying those claims at issue in this case to the

 6   accused Lawson computer software.

 7          In addition, you'll be hearing from a

 8   Mr. Patrick Niemeyer.  Mr. Niemeyer is the founder of

 9   the company called Pat Niemeyer Consultants.  He's an

10   expert in source code and source code languages.  And

11   he wrote one of the leading treatises on that subject.

12          Again, during the course of the pretrial

13   proceedings under the Court's rules, ePlus obtained

14   copies of the accused S3 source code.  And

15   Mr. Niemeyer studied that source code, and he

16   interpreted it so he could offer opinions as to how to

17   understand it.  And he provided that information to

18   Dr. Weaver, who relied on his analysis to confirm his

19   opinions with respect to infringement.

20          You're also going to be hearing from

21   Mr. Brooks Hilliard, who's president of Business

22   Automation Associates.  He'll be addressing most of

23   Lawson's arguments concerning the validity of the

24   patents.  Mr. Hilliard has 30 years' experience in the

25   subject matter of electronic procurement or electronic

1   sourcing.  And he will be addressing what the Court

2   and what the video described earlier this morning as

3   prior art.

4          There will be several other Lawson employees

5   who we'll call as witnesses.  We'll call them as what

6   is known as adverse witnesses because they are not

7   under our control.  They are, in fact, employees of

8   Lawson.  But we've taken their depositions during the

9   course of this pretrial proceedings, that is, we've

10  taken their sworn testimony under oath, and we think

11  during the course of that sworn testimony they have

12  made several admissions that we think assist in our

13  burden to prove infringement.

14         And we'll also be calling some of Lawson's

15  customers.  Those customers have the S3 accused

16  software.  They use it.  We have taken their

17  depositions.  Again, they have been videotaped.  You

18  may be seeing some of those depositions by videotape.

19  We'll try to keep that to a minimum because that's not

20  the most scintillating testimony, I know.

21         So what are we talking about here with these

22  patents?  If we could just go to PX1, the'683 patent.

23  It's in your notebook under tab 2, but I think I can

24  bring it up on your screen and have you focused on it

25  a little bit.

1        You you'll see that the title is electronic

2   sourcing system and method.  So that's going to be

3   important.  It includes what are known as system

4   claims and method claims.  The patent was issued in

5   February of 2008.  What you'll see is it was filed

6   August 10 of 1994.

7        Now, why is that important?  Well, this

8   invention relates back to a conception for a computer

9   software system in 1994 for conducting what I will

10  call a complete shopping experience, which include the

11  ability to select catalogs from multiple vendors,

12  perhaps five, ten, dozens, hundreds.  It's unlimited

13  really in any sense as long as you can load these

14  multiple vendor catalogs into a database that can be

15  searched.

16       Once you have the vendor catalogs loaded, you

17  can search and browse these catalogs.  You can even

18  over a network such as the Internet browse catalogs

19  online, build requisitions using those search results,

20  and then generate multiple purchase orders to various

21  vendors.  And you can do this all from a desktop

22  computer, PC or a laptop.  It's all automated and

23  electronic.

24       Now, why is it important?  Well, it's

25  important because this happened back in 1994, and

1    these patents are still valid, and presumed valid, as

2    the Court indicated to you this morning, and they

3    didn't have an expiration date for another five,

4    actually even six years, which is quite remarkable

5    when you look back to technology that was created in

6    1994 and is still vibrant, alive, and being used

7    today.   In this case actually it's been enormously

8    successful because there are dozens of companies out

9    there now that employ this kind of technology.

10        So if I could just emphasize a few points

11   from that videotape that we saw this morning.   I don't

12   want to go over it again, but I think this is

13   appropriate.   I'd like to put it in the context of

14   these patents if I could.

15        Patents are different from other ways to try

16   and protect what are your ideas or your inventions or

17   it's often known as intellectual property.   You have

18   probably heard of trade secrets like the famous one is

19   the formula or the recipe for Coca-Cola.   You can

20   maintain that as a trade secret.   Why?   Because it's

21   difficult sometimes to reverse engineer.   There's

22   nothing improper about it.   And it might be the best

23   way to protect that kind of intellectual property.   Or

24   you can obtain a patent as the video indicated is a

25   limited right to exclude others from practicing your

122

1    inventions or from making products that are covered by

2    their patents.

3           And as the video indicated, and I believe the

4    Court emphasized, typically now those patents are

5    valid for 20 years from the filing of the application.

6    So why do people do that?  Why do people obtain

7    patents?  Why were they obtained in this situation?

8    Well, you probably heard the expression "We want to

9    build a better mousetrap."

10          So how does that happen?  What is required

11   under the patent system is that you disclose to the

12   world in this detailed description, as you're going to

13   see in these patents, exactly what your invention is

14   and how you make and use it.

15          And then typically, with the assistance of a

16   patent attorney, you draft what are called claims.

17   And these claims help define the invention.  And you

18   will see when you look at these three patents that

19   were at issue here, there are more than 79 claims that

20   the Patent Office has allowed.

21          Now, the Court has asked us and in order to

22   focus this case and the parties agreed that we would

23   focus on 12 representative claims in these patents.

24   So there will only be 12, thankfully, out of 79 that

25   we will need to address.  But those claims are what

1    will define the invention.  Those claims are what you

2    need to look at when you're making determinations both

3    as to the infringement by the Lawson software and by

4    validity based on the arguments they are going to

5    raise with respect to that.

6         Now, I want to talk a little bit in the

7    context of these patents about some of these different

8    terms you have heard about what are called product or

9    system claims or method claims or even improvements.

10   And I thought it was particularly appropriate that

11   this case is here in Richmond, Virginia, because I'm

12   sure that everybody knows Thomas Jefferson was the

13   third president of the United States and governor of

14   Virginia during the Revolutionary War, but few people

15   know that he was the first secretary of state under

16   George Washington.

17        And when Congress, the first Congress that

18   ever sat after the Constitution was ratified, one of

19   the first acts they passed because it was so important

20   was the Patent Act of 1790.  And under that act,

21   Jefferson, as secretary of state, was the head of a

22   three board panel that consisted of the entire patent

23   board at the time.  They were the Patent Office.

24        It included Jefferson, as secretary of state,

25   the secretary of war and the attorney general.  And

1    they would meet the fourth Saturday of every month and

2    they would review the applications, a responsibility

3    that Jefferson particularly enjoyed because he liked

4    to look at all the little models that had to be filed

5    along with the applications.

6           And the first patent ever granted by this

7    board, which took two of the three members to agree

8    upon, was for a patent directed to improvement on the

9    method of making potash by a new apparatus and

10   process.  And that was in 1790.

11          Now, why do I raise that?  Why is that

12   significant?  First, it raises some interesting

13   points.  First, individuals can obtain patents for

14   improvements.  That is, in a sense, that was the

15   bargain with the government that was made by the

16   inventors disclosing to the world what their invention

17   was.  Someone could then come along, look at that,

18   benefit from it, and say, I'm going to make an

19   improvement on it.

20          There is an expression that many patent

21   attorneys have, and it was quoted by one of the chief

22   judges of one of the courts that hear all the patent

23   appeals, and he said, "Only God creates from nothing."

24   If you think about it, that's quite true with respect

25   to something -- it's rare that something is wholly

1  new.  What happens is somebody came along, came up

2  with an invention.  Someone looked at it and could see

3  their whole disclosure and could say, Hey, I can build

4  a better mousetrap.

5        In fact, when I was thinking about this last

6  night, I noted that even some of the inventions that

7  are the most useful, that are the most eloquent, can

8  be very simple.  If I can just refer you back to that

9  juror notebook.  You will note there are a number of

10  yellow tabs on it, Pos-it tabs.  The Pos-it tab, the

11  Pos-it note, is an invention.  In fact, there are more

12  than 60 patents or variations on it.  What is it?

13  It's a very simple plastic adhered with a glue that's

14  not very effective, but it can be reapplied and

15  repositioned and used over and over again.

16        In fact, I kind of enjoy it's name.  In the

17  Patent Office that issued the first one called it a

18  repositionable pressure sensitive adhesive sheet

19  material.  That's the patented name for the Post-it.

20        As I say, it's simple, it's elegant, it's

21  useful, and it has many patents on it.  I can tell you

22  personally as a lawyer I can hardly get through a day

23  without having to use a Pos-it in its various

24  combinations.

25        Another example about improvement is it's in

1   our common knowledge or common vernacular that Edison

2   invented the lightbulb.  Everybody understands that.

3           Well, Edison didn't start working on

4   lightbulb technology until 75 years after lightbulbs

5   had been in existence.  In fact, Edison's patent that

6   became famous was actually called "an improvement on a

7   filament for an electric bulb."

8           Now, what had happened was Edison came along

9   and saw that a lot of the prior art that was out there

10  was inadequate.  Why was that?  The filaments would

11  burn out very quickly.  And so what Edison said was in

12  order to make an improved lightbulb, I need filaments

13  that don't last hours; they last days, even weeks,

14  hundreds of hours.

15          Edison didn't invent the glass bulb.  He

16  didn't invent electricity.  He didn't invent many of

17  the things that are part of a lightbulb, but his

18  improvement for the filament, that simple improvement

19  made the invention suddenly new and useful and novel

20  and patentable.

21          Second, I think, going back to that first

22  patent on potash, it talked about methods.  So patents

23  can be obtained for methods of doing things.

24          What's a method?  A method is really a

25  process or a step.  One famous method patent was a

127

1    patent from the 1940s called "Method for Vulcanizing

2    Rubber."   By vulcanizing rubber, you made it stronger,

3    last longer.   That is a patent of Good Year.   And that

4    was a patent that became very valuable.

5          The third point I wanted to make was patents

6    can be obtained for products or sometimes they are

7    called apparatuses.   Or in this instance, we're going

8    to be talking about an actual system.   This is a

9    software system.

10          So this burden that we have to show

11   infringement, how do we do this?   Well, as the video

12   indicated, and I believe the Judge emphasized, a

13   patent really is this right to exclude.   Think of it

14   like a deed to real estate, a deed to property because

15   a patent is a property right.   And just like any deed

16   to real estate, which defines the boundaries of your

17   right, infringement is like a trespass on that

18   property.

19          That trespass doesn't have to be intentional.

20   We don't have to show that they did it knowingly.   We

21   don't have to show that they did it willingly.   They

22   can even do it unknowingly.   Just think if you had a

23   tract of land and you went away for a few weeks and

24   you came back and somebody had built a house on your

25   property.   That's a trespass on your property.   They

1   had no right to go there.  You have a right to exclude

2   them.  And that's exactly what we're saying here.

3   Lawson is trespassing on our property right and we

4   want them to get off.

5          So how does Lawson infringe?  Well, with

6   respect to this software we've been talking about,

7   they do it two ways.  They do it by making, using,

8   selling and offering for sale this software I've been

9   talking about.  And they provide these systems and

10  services to their customers.  That is an infringement

11  under the patent laws.

12         They also do it another way that the Judge

13  referenced, which is by inducing or contributing

14  others to infringe our patents.  The others in this

15  instance are going to be Lawson's customers in the

16  simplest format.

17         When the customers use the system, they are

18  practicing the processes of some of these method

19  claims I'm going to be talking about in a short while.

20  And what Lawson does is, one, it gives them the

21  instrumentality to do that infringement by using the

22  system.  And then it encourages them and provides them

23  with aid and assistance by implementing it, by

24  servicing it, and by providing other assistance that I

25  will get to in a minute.

1        So if we could just go back to the patent for

2   a minute, Mike.  I'd just like to emphasize this

3   priority date of August of 1994.

4        Now, when you consider the evidence in this

5   case, you can't do it from the perspective of sitting

6   here in 2011.  You have to put yourself back in

7   context.  In fact, one of the things that I believe

8   will be emphasized at the end of this case is you

9   can't look at obviousness now through a prism of 2011

10  and through hindsight recreate what happened and what

11  occurred back in 1994.

12       And it's difficult to do that because

13  technology today moves so quickly.  The technical

14  world of 1994 was very different.  There were no

15  iPhones, no iPods, no iPads, no iTunes.  There were --

16  Google did not exist in 1994.  It was not founded

17  until 1998.  Ebay didn't exist either.  It was not

18  founded until 1995.  Amazon didn't exist.

19       We just came off the holiday season.  And if

20  anybody was like my wife, she spent a lot of time

21  online spending a lot of money purchasing things for

22  family and loved ones.  That seems so common place

23  today, but if you go back into the world of 1994, it

24  certainly was not, and that's what we believe we're

25  going to be able to demonstrate to you.

1      For example, the computers back then were

2  primitive.  They were bulky.  They were slow.  They

3  didn't have what we call graphical user interfaces,

4  the kind of things you see now when you go to an

5  Amazon site or when you go to a Google site and just

6  enter in keywords in order to do searches.

7      Throughout this trial, you're going to have

8  to try and place yourself in what was the state of

9  that technology back at that time.  So let me just

10  emphasize a few things with respect to some of the

11  claims.  If we could go to just representative Claim

12  3.  If you want to just the color demonstrative of

13  '683.

14      This is one of the system claims that are

15  going to be at issue in this case.  Now, as the Judge,

16  I believe, pointed out, in this instance it has six

17  elements.  They have color coded them so they are

18  easier to read.

19      In order for us to establish infringement,

20  we're going to need to show that as properly construed

21  by the Court, the Lawson system that is at issue here

22  has all six of these elements, and we believe that

23  we're going to be able to do that.

24      Again, this is directed to the actual Lawson

25  accused S3 system.  So it's going to have to have at

1    least two products catalogs.  Just at least two.  If
2    it has two, it satisfies it.  If it has more, it also
3    satisfies that element.
4         It's going to have to contain data relating
5    to items that are associated to sources.  Sources, as
6    the Court told you, include the vendors, manufactures,
7    or other suppliers that provide this.
8         You're going to be able to have to select the
9    product catalogs you want to search.  We're going to
10   show you through the evidence a variety of ways that
11   you can do that on the Lawson system.
12        Once you have selected the catalogs, you're
13   going to have to have a means for searching for those
14   matching items in those product catalogs.  You then
15   can build a requisition using the data that you got
16   back from doing that search of those product catalogs.
17   And then you're going to have to have the ability to
18   process requisitions, to generate one or more purchase
19   orders, which is another valuable aspect of the
20   invention because if I have multiple vendors, I want
21   to generate multiple purchase orders to go out to the
22   different vendors in order to bring back the goods
23   that I desire.
24        The last step in the system claim is called
25   means for converting data related to a selected item

1    and an associated source to data relating to an item
2    in and a different source.  That sounds a little bit
3    complicated, but it's also been construed by the
4    Court.  And what this really is back in 1994 was a
5    recognition by the inventors that doing a kind of
6    comparison shopping, is what we call it today, looking
7    at a vendor that's selling one product perhaps at one
8    price, and looking at another vendor that's selling
9    another product or is selling the same product or an
10   equivalent product at perhaps a lower price, the
11   customer can make an informed decision as to what they
12   want to purchase and can select the item from the
13   vendor that are perhaps has the lowest price or
14   perhaps has the item available in inventory, whereas
15   the other vendor did not.
16        So there are some claims here that have been
17   made with respect to these patents by Lawson as to why
18   they should be invalid.  And I'm going to come back to
19   that with a little bit more specificity here, but at a
20   high level I just want you to consider for a moment
21   that on three occasions the Patent Office has granted
22   these patents.  They have granted 79 claims on those
23   three occasions.  And according to Lawson, that was
24   all a mistake and that was a mistake made 79 times.
25        One of the mistakes that they are going to

133

1   assert, if I can go back to the '683 patent, is that

2   there was a prior art patent.  Let me go to column 1

3   of the '683 patent.  You will see when you go through

4   these patents that the way we're going to be looking

5   at them is there are a number of numbered columns at

6   the top.  There's column 1, there's column 2, and down

7   the middle there will be a number of line numbers, and

8   there will often be reference to column 1, lines 5

9   through 10, for example, if we want to illustrate

10  something, and that will help orient you to where in

11  the patent that I'm going to want you to focus on or

12  maybe one of the experts is going to want to direct

13  you to.

14          But one of the contentions that Lawson makes

15  concerning invalidity is if you go to and highlight

16  for me, Mike, column 1, lines 10 through 17, if you

17  can blow that up, is that this patent identified here

18  as United States Patent 5712989 filed in April of 1993

19  was never identified to the Patent Office.

20          Now, what you're going to hear in this patent

21  which is directed to a RIMS system, which I'm going to

22  discuss in a minute, it's called a requisition

23  information and management system, was actually a

24  patent developed by two of the inventors that were

25  involved here; Mr. Momyer, I introduced you before,

134

1  and Mr. Johnson.  And it was a method.  It was a

2  product and method for managing Fisher-Scientific

3  inventory such that they could try and fulfill their

4  inventory needs of their client by selling Fisher

5  products.

6          Now, the continuation is made here that the

7  Patent Office was unaware of that.  I would suggest to

8  you that it is in the very patent directly in the

9  background of the invention.  And it even says

10 underneath it that the disclosure is incorporated

11 herein by reference.

12         Now, you may also recall -- it was a lot of

13 information in that video, but you may also recall

14 that one of the things the narrator said was how you

15 disclose a patent was to put it in your application

16 and put it in your specification.

17         Here it is.  And I've gone through and I've

18 counted.  It's referenced no less, in its structure

19 and functionality, referenced no less than 52 times,

20 but at some point in time the suggestion is going to

21 be made by one of Lawson's experts is that they were

22 unaware of this patent and that this patent in

23 combination with some other alleged prior art would

24 invalidate or render the claims obvious.

25         One of those other pieces of prior art they

1    are going to reference was a document viewer program

2    that my inventors, the inventors you're going to hear

3    from, went out and identified and used as part of a

4    tool to build what became this electronic sourcing

5    procurement patent.

6           Again, if you can go to column 4 of the same

7    patent.  Specifically, starting at line 5 through 9.

8    Just highlight that.

9           Here, in fact, it indicates that preferably,

10   but not necessarily, this Technical Viewer 2 search

11   program available from IBM is used as a search program

12   in this invention.

13          So the inventors actually told the Patent

14   Office in no uncertain terms that you could use

15   aspects of this RIMS system that the inventors

16   developed with aspects of this TV2 system, which they

17   actually went out and contracted with IBM as a

18   work-for-hire in order to have it included pursuant to

19   their specifications in the overall invention that

20   they ultimately decided on.

21          The suggestion now is that somehow this RIMS

22   system and TV2 system in combination or alone

23   invalidates the patents and the Patent Office could

24   not have been aware of it.

25          Well, the Patent Office, as the video

136

1    indicated this morning, is required to review this

2    specification, required to review this application,

3    and determine in the face of it whether or not it is

4    patentable.

5           So we certainly think it was no mystery to

6    the Patent Office that these inventors considered

7    these to be tools that would help them make a

8    commercial embodiment of their inventions.

9           In fact, they worked towards that goal.  They

10   really made a prototype of this first invention.  They

11   didn't have to.  You don't really have to make a model

12   or a prototype.  All you have to do is disclose to the

13   Patent Office what your invention is and you're

14   entitled to get a patent if it is new, useful and

15   nonobvious.

16          If I could just go to claim 26 of the '683

17   patent.  This is a method claim that I wanted to

18   identify.  It is always a claim that is being asserted

19   in this case.  You may recall I indicated a method

20   claim is sort of a process or if you think about it,

21   the sort of steps of doing something.  A good

22   comparison might be it's kind of a recipe for

23   achieving an outcome or a result.

24          If I had a method of making or baking an

25   apple pie, I might have the steps of taking the flour

1  and mixing with the eggs and some water.  The next

2  step rolling the dough.  The next step putting in the

3  apple filler.  The next step putting it in the oven

4  and baking it for 45 minutes at 325 degrees.  You can

5  probably tell I haven't made too many apple pies, but

6  the point is it's the steps of performing a process.

7          So who is doing the steps in this instance?

8  The steps are being performed in this case by the

9  customer who's using the Lawson system because the

10  customer maintains on the system at least two product

11  catalogs.

12          The customer selects the product catalogs to

13  search.  The customer then searches for those matching

14  items.  The customer can build a requisition, and the

15  customer can process the requisition.

16          In this case, we have an additional aspect of

17  the invention was in some configurations, you can

18  actually determine whether an item you selected is

19  available in inventory.

20          Now, you can imagine that can be very useful

21  if I want to buy that product from one vendor and not

22  from another.

23          So an example of a product claim or the

24  system claim is like the manufactured product or

25  system we talked about, like the electric lightbulb as

1    we mentioned before.

2           Now, there are also what you will see in this

3    case what are called dependent claims.  I just want to

4    briefly go into those.  I think maybe the best way to

5    explain that is to use that model patent, which was

6    for the three-legged stool.  If you go to the very

7    last page, the claims appear -- and let's just focus

8    on Claim One for now.  If you can put that together

9    for me, Mike, I'd appreciate it.

10          So this is claiming a product or an apparatus

11   on this three-legged stool.  And you'll see patent

12   attorneys don't always appear to writ in the clearest

13   of terms, but this is important for a few points I'd

14   like to make.  First it says it's an apparatus

15   comprising.

16          Now, you're going to see that word

17   "comprising" in many of the claims that are going to

18   be at issue here.  Now, what does that mean in terms

19   of the issues you have to deal with?  Comprising means

20   it has to have all of the steps that were identified

21   in the claim, but it can have additional steps or it

22   can have additional elements.

23          For example, if we had an invention that has

24   six separate structures, A, B, C, D, E and F, and I

25   have all those, but I add G and H, that does not avoid

1  infringement because by use of the term "comprising"

2  what it's really saying is it has to have at least

3  these six elements, but it can have additional

4  elements, and you don't avoid infringement simply by

5  adding additional elements.

6          So that term "comprising" is going to be very

7  important when we look at some of the issues in this

8  case.

9          Secondly, you'll see when it's talking about

10 the legs of this stool that's at issue, the second

11 paragraph starts out, it says, Has to have at least

12 three elongated members.  Now, if you'll look back at

13 the figure that's in this model patent, in figure 1

14 there's actually a figure, a drawing, of the

15 three-legged stool.

16         You also see in figure 2 that there's a

17 drawing of a four-legged stool.  Now, there may be

18 advantages to a three-legged stool and there may be

19 advantages to a four-legged stool, but when you claim

20 something, if you can go back to that Claim One again,

21 as something that has at least three elongated

22 members, in this instance the legs we've been talking

23 about, a product with four legs still infringes this

24 claim.

25         Why is that?  Because a stool with four legs

140

1    still has at least three legs.  So, again, you can't

2    avoid infringement simply by adding additional

3    elements.

4           I mentioned this dependent claim I wanted to

5    talk about.  And there's an example in Claim Two of

6    this model patent.  What this says, and I won't read

7    the entire claim, but its says, "An apparatus

8    according to Claim One," and then it says, "further

9    comprising," and it goes on to talk about additional

10   requirements for this Claim Two.

11          Now, this is what's known as a dependent

12   claim.  And I just want to make sure we understand

13   that because there are going to be some dependent

14   claims that are coming up at issue in this case.  When

15   it says it's an apparatus according to Claim One, and

16   then it has additional elements, what's necessary is

17   that it has to have all of the elements of Claim One

18   and then you add this additional element.

19          So, in other words, if Claim One, let's just

20   say, had four elements, and Claim Two said there was

21   one additional element, then you would have to have

22   the four elements of Claim One as well as the

23   additional element of Claim Two.

24          I know it's a little confusing, but patent

25   attorneys like to do this and draft claims in this way

1    so they get the broadest possible protection for the

2    inventors.  But you don't want to always have to claim

3    something as broadly as possible because that

4    sometimes makes a claim too broad.  You'd like to

5    approach it from several different perspectives.

6            So who is ePlus, this Herndon, Virginia,

7    company?  And what is its business line?  Well, it has

8    two main operations.  It's an equipment leasing and

9    sales division, which is not at issue in this lawsuit,

10   and it has this business software solutions side of

11   its business, which includes the electronic sourcing

12   and procurement products that we talked about that

13   Mr. Farber who is the president of ePlus will talk

14   about.

15           EPlus has about 650 employees.  It has a

16   market cap.  It's known as its share price times the

17   number of shares.  It was about $190 million last

18   year.  Besides its main headquarters in Herndon,

19   Virginia, it has about 20 other offices throughout the

20   United States.

21           EPlus Systems is a successor of a company

22   that was part of all company which was

23   Fisher-Scientific where these inventors first

24   conceived their inventions and created them back in

25   1994.

1          And we're going to be talking about those

2    inventions and the applications that were filed at

3    that time on these early processes.

4          Now, the fact is there is going to be a lot

5    of discussion in the patent as to how they put

6    together the invention back in 1994, but that's not

7    important.  That supported the fact that the Patent

8    Office recognized they had something new and useful

9    and not obvious.  And then they claimed it.

10         Now, the fact is, as I said before, it's the

11   claims we're all going to have to focus on because

12   it's those claims that define what is, in fact, at

13   issue in this case and whether if indeed Lawson

14   infringes.

15         Now, have these patents been successful for

16   ePlus?  They have been enormously successful.  Since

17   they were acquired as part of this acquisition from a

18   company that Mr. Farber was at, at ProcureNet, in

19   2004, they have now received almost $60 million in

20   royalty revenues associated for licensing these

21   patents to five separate companies including SAP, one

22   of the largest manufacturers of software in the world,

23   and a company known as Ariba.

24         Now, to be sure, ePlus has had to enforce its

25   rights sometimes in court in order to have others

1  respect their intellectual property laws and their

2  property rights.  And that's why we're here today.

3  Because we filed this lawsuit now almost two years ago

4  and Lawson has refused to stop practicing our

5  inventions and has refused to pay us a license in

6  order to so.  And so those are some of the issues that

7  need to be addressed here by you over the course of

8  the next several days.

9        So who is Lawson Software?  They are based in

10  St. Paul, Minnesota.  They have 3900 employees

11  worldwide located in over 26 countries.  Last year

12  they had a gross profit of $450 million.  They are

13  about --

14        MR. McDONALD:  I object.  The financial

15  information was excluded from this case.

16        MR. ROBERTSON:  It's publicly-available

17  information.

18        THE COURT:  I don't care whether it's

19  publicly available or not.  There are no damage issues

20  in the case.  I think it's time for you to address the

21  question of infringement.

22        In fact, I'm about ready to do this:  You

23  finish up on infringement.  You talk about

24  infringement and when we get to the invalidity part of

25  the case, you can open on infringement, and you can

1   have an opening there.  Why don't we do it that way?

2   That will make it easy for you to deal with, won't it?

3          MR. ROBERTSON:  You mean in response, Your

4   Honor?

5          THE COURT:  Yes.  What about that?  There's

6   been a lot of what I would have given by way of

7   instructions at the end of the trial.  I haven't heard

8   anything about infringement yet.

9          What do you think?

10         MR. McDONALD:  They've been talking about

11  invalidity.  So I'd like a chance to respond to that.

12         THE COURT:  I know, but I'm wondering if you

13  don't want to wait and do it when it's all fresh in

14  everybody's mind.  I'm not going to force that down

15  your throat because he's been doing that, but it

16  occurs to me it might be in everybody's interest to do

17  it fresh.  I'll let you think about it.

18         MR. McDONALD:  We appreciate that.  If we can

19  talk about it over lunch.

20         THE COURT:  Go to infringement.  That's what

21  your responsibility is.

22         MR. ROBERTSON:  Sure.  Let me talk about some

23  of the building blocks that are going to be at issue

24  here in this case.  As I said, Lawson has a number of

25  software programs or what will be referred to as

1   modules, and they build upon each other.

2         So you're going to hear about the Lawson

3   system of foundation, which is basically an

4   environment which allows these components we're

5   talking about such as purchase orders and

6   requisitions, and the ability to go out to online

7   websites, it's the basic foundation upon which all of

8   these other programs or modules will operate.

9         You'll also hear about this process of

10  loading the software, which is used to create work

11  flows between the applications such as to get

12  requisitions approved, you would need this process

13  flow.

14        There's also going to be several other

15  modules that are actually called purchase orders,

16  requisitions, and inventory control.  Requisition

17  sounds exactly like you would think.  It's the

18  component that allows you to build the electronic

19  requisitions to request or order items.

20        The purchase order module or program is that

21  component that permits you to generate the purchase

22  orders that are at issue in this case.  The inventory

23  control module or program lets you load the vendor

24  catalog data into your system so you have that data

25  available to search and select.

1       You're also going to hear about something

2   called Requisition Self Service.  It's a Lawson module

3   program.  It is simply a sort of user friendly overlay

4   to permit large scale use of the invention.

5       For example, you want to have 500 people at

6   your company be able to do purchasing and procurement

7   on the system.  So all of these can be configured

8   together in a variety of different ways, which Dr.

9   Weaver will explain, in order to build and form the

10  infringing system that's at issue here.

11      So Lawson's own documents will confirm that

12  you can import vendor catalog containing the

13  information about the vendor items.  Its documents

14  will confirm that the vendor item information can be

15  categorized, that it can be searched by keyword.  It

16  can be given code identifications.

17      You'll see an actual demonstration.  There

18  will be four different demonstrations illustrating the

19  point about how you can conduct these searches, how

20  you can generate order lists, how you can create

21  requisitions, how you can then build requisitions and

22  then generate one or more purchase orders to various

23  vendors.

24      There will also be description of what's been

25  referred to as Lawson Punchout procurement.  What

1    Punchout is is that software allows you to go out over

2    the Internet and go to different vendors that might be

3    available.  For example, Lawson has a number of what

4    they call Punchout partners.

5          You just might imagine one Punchout partner

6    could be Office Max, for example, and one Punchout

7    partner might be Office Depot.  And a user of the

8    Lawson software might want to be able to buy

9    paperclips and might want to buy them in volume.  And

10   they might want to see if they are available at Office

11   Max or available at Office Depot, and that through

12   this software they can actually go and visit a

13   specially created website, a website created to

14   Lawson's specifications, and determine whatever items

15   they want that are available from that vendor.  If

16   they are there, they can put them on their order list

17   and retrieve them back to the Lawson software

18   environment and build their requisition there and

19   generate their purchase orders.

20         That even gives them the ability in most

21   instances, and you'll see examples of this, to

22   determine whether or not that the item that they are

23   looking for is available in inventory.

24         So you'll see during the infringement case

25   that Lawson's S3 system has the ability, the

1    capability, to have multiple vendor catalogs with

2    product data from multiple sources.  The catalog data

3    and contents can be loaded for searching.  You can

4    choose the users, you can, through cooperation with

5    Lawson choose their own Punchout partner catalogs that

6    they want to have ability to.

7         You will see that the Lawson system can

8    select the product catalogs to search by a variety of

9    different ways.  They can use particular keywords or

10   exact phrases.  They can perhaps use a particular

11   supplier part number or a manufacturer part number.

12   It could perhaps use and restrict the price ranges or

13   it can use product types and categories.  It can drill

14   down and get to where you want.

15        There are all these various methods for

16   performing this step or performing the functionality

17   of selecting how you're going to conduct the search.

18        You can search for the matching items by

19   retrieving those records in the database, and then you

20   build the requisition using that requisition module I

21   mentioned, and you can process those purchase orders.

22        The only other thing I wanted to briefly

23   mention was this notion of inducement or contributory

24   infringement the Judge mentioned.  I'm not going to

25   instruct you on what the law is right now.  I just

1    want to tell you what we think the facts are going to

2    be and the evidence is going to be.

3            So how does Lawson assist or aid or abet or

4    encourage or influence or urge the inducement or what

5    is known as the indirect infringement of these

6    patents?  As I mentioned, it's the very customers they

7    sell their products to.

8            Now, this inducement or this indirect

9    infringement under the patent laws is no less an

10   infringement.  You can't go out and encourage and urge

11   and assist someone else to infringe.  So when the

12   customers use the Lawson system in the way that it's

13   capable of performing, they have induced that

14   infringement.  And as they say, it's no less an

15   infringement, notwithstanding it's often referred to

16   as indirect infringement.

17           So what is the evidence that Lawson

18   encourages its customers to configure their software

19   and perform the patented functions here?

20           Well, the evidence will be that they actually

21   provide you with the catalog content.  That's one of

22   the services they offer and they will implement, and

23   there will be evidence that they have done that.

24           They also provide customer support in other

25   implementation.  They'll come and they'll spend months

1    at a time building a system right at your facility.

2    Then they'll maintain that system and provide you with

3    updates and software fixes when you need them.

4    They'll give you educational and training materials,

5    manuals, guides.  They'll provide help screens.

6    There's a Website you can go to for 24/7 assistance.

7    And what they do for this maintenance and this

8    implementation services is they charge you tens of

9    thousands, if not hundreds of thousands of dollars for

10   the very service they are providing in order to induce

11   this infringement.  And that will be the evidence

12   you'll hear on that.

13          So our evidence will be that you'll hear from

14   the three inventors.  You'll hear from Mr. Farber, the

15   president of ePlus Systems.  You'll hear from Elaine

16   Marion, the CFO of ePlus.  You'll also see and you'll

17   have in evidence the patents and other supporting

18   documents including what's alleged to be the prior

19   art.  And you'll have all these Lawson documents I

20   just mentioned, the marketing materials, the manuals,

21   even the representations that they make to their

22   potential customers as to how their software operates.

23   And that's very important because in this process when

24   Lawson goes out to try and sell this product, the

25   customers say, Well, what can it do?  And they'll ask

1   a number of questions about what its capability are.

2   And these are what are called requests for proposals.

3   That is, it's an RFP.  The potential customer is

4   asking Lawson, What can this software do for us?  And

5   what Lawson does is it responds to these RFPs.

6   Indeed, it has an entire library with canned responses

7   as to what it says the functionality can be.  And the

8   testimony will be that these responses were actually

9   invented by their legal department and their engineers

10  in an effort to make them as accurate as possible.

11          And Dr. Weaver has gone through and looked at

12  all these representations as to the features and

13  functionality that the product has, and using these

14  representations, using these admissions that they try

15  to make as accurate as possible, the testimony will

16  be, we'll be able to show that Lawson itself has that

17  capability.  And Dr. Weaver will show that, and he

18  will also show the demonstrations.

19          Mr. Niemeyer will explain how the Lawson

20  source code confirms that the systems that Dr. Weaver

21  has opined they infringe has that functionality.  As I

22  said, you'll hear testimony from Lawson management and

23  from its customers.

24          So with that, what is Lawson going to say in

25  response to the infringement case?  Well, one of the

1   things they are going to say is, We don't sell it

2   initially with the catalogs.

3           Well, that may or may not be true in every

4   instance, but what they do do and what the evidence

5   will be is they'll certainly come along and they'll

6   load it with the catalog data they want, and that's a

7   service they offer.  And, remember, offering for sale

8   is infringement.

9           They will transfer your old data from an old

10  system onto the new system so it's got all the catalog

11  content.  Or they'll put whatever catalog content you

12  ask them to put on it.  And, of course, they charge

13  for all those services.

14          So this argument that we don't sell it right

15  out of the box with the catalog content really is not

16  meaningful.  In fact, you'll see none of the claims

17  require that the system be sold out of the box with

18  respect to the catalog content.

19          They'll also talk a little bit about their

20  inability to do this comparison shopping aspect I

21  talked about or cross-referencing or they'll say their

22  customers -- well, the system can do it, but our

23  customers really don't use it much.

24          Well, again, that's not a defense to

25  infringement.  You can't sell a product and say, Well,

1   it has the capability of doing it, but our customers

2   just don't want to do that a lot.  It's like saying, I

3   could sell a car with infringing windshield wipers,

4   but I just never turn them on.  So that's not an

5   infringement.  Well, if the product is sold with the

6   capability of doing it, that is infringement.

7          So, Your Honor, with that I have concluded my

8   issues with respect to infringement.  As I understand,

9   I would like to address some of the issues on

10  invalidity after Mr. McDonald has an opportunity to

11  speak to the jury.

12         Is that what I understood Your Honor to be

13  suggesting?

14         THE COURT:  I want to know if he wants to

15  agree to that?

16         MR. McDONALD:  He already went into

17  invalidity.  He should finish his opening statement.

18         THE COURT:  Finish your statement.  I'm not

19  sure that's how we're going to try the case, but we're

20  going to finish it.

21         MR. ROBERTSON:  Let's talk a little bit about

22  invalidity because the case now is raised with respect

23  to what are going to be called six prior art

24  references.  Four of those six were considered by the

25  Patent Office.  Two of them I already referenced to

1    you being that RIMS system and the TV2 system.

2          They represent either alone or in isolation

3    or in combination, those references invalidate all 12

4    of the patent claims that are at issue.

5          We believe the evidence will show exactly the

6    opposite, that the Patent Office was fully aware of it

7    and that the RIMS system is radically different from

8    what the patented system is.  And that can be

9    explained by at least two of the inventors who were

10   responsible for and were the named inventors on the

11   RIMS system.

12         There are two other systems that are going to

13   be identified.  One is called the J-CONN, which was

14   essentially a parts ordering inventory system in our

15   view, and our expert will address how it doesn't have

16   all the elements of the claims.

17         Indeed, Lawson admits that it doesn't

18   anticipate any of the 12 claims that are at issue

19   here.  In other words, it doesn't have all of the

20   elements.

21         Another system that they'll be raising is

22   called P.O. Writer, which we really think was simply

23   nothing more than a sort of electronic form filler for

24   purchase orders.  And Lawson even admits that it

25   doesn't anticipate or have every element of nine out

1    of the 12 claims here.

2         So what they need to do is then try and put

3    together what's known as an obviousness case.  To say,

4    Well, a person of ordinary skill in the art back in

5    1994 would have somehow known to take the J-CONN

6    system and combine it with the P.O. system and take

7    the J-CONN system and combine it with some other

8    patent they are going to point you to, and then really

9    in hindsight make up the invention that was conceived

10   of and reduced to practice back in 1994.

11        We think the analysis done by their expert on

12   that is going to be significantly lacking.  And,

13   indeed, it's interesting to note that even their

14   expert concedes that he doesn't even agree with

15   Lawson's lawyers on how the invalidity should be put

16   together.  So I gather that reasonable minds in that

17   respect can differ.

18        So I think, Your Honor, with that I would say

19   thank you.  I think the bottom line is that the

20   evidence will show that Lawson infringes and that the

21   patents are invalid, and we would respectfully ask

22   that you return a verdict of infringement at the end

23   of the evidence.  I thank you for your attention.

24        THE COURT:  We'll take our lunch recess for

25   45 minutes.  It will probably be closer to an hour by

1   the time I talk to the lawyers.

2          All right.  You can take your pads with you

3   if you would.  Put your names on them.

4          (The jury is out.)

5          THE COURT:  Anything we need to go over?

6          MR. McDONALD:  Your Honor, in response to

7   your question I would like to do my opening about

8   validity and infringement.

9          THE COURT:  Well, if you want to.  I

10  understand the need to cover these things in opening

11  statement, but there was so little said about

12  infringement I got the idea that basically it was a

13  closing argument on invalidity.

14         So you can do it, but I'm wondering whether

15  it's not better to just try the case on the issues of

16  invalidity, let the jury return a verdict -- I mean of

17  infringement.  Let the jury return a verdict on

18  infringement or not.  And then we'll try the

19  invalidity case.  After hearing the statements and the

20  way you-all are proceeding.  Why isn't that the best

21  way to proceed now, Mr. Robertson?

22         I don't think you have it within you to

23  fragment the case the way it's supposed to be.  You

24  had nothing to say about invalidity in your opening

25  part of the case.  None.  It's not your business.

157

1   It's not what you're hear to prove.   And I don't want

2   to hear anything about it.

3            And you-all are getting things so commingled,

4   you're going to get the jury confused.   I now after

5   listening to the opening statements have come to the

6   conclusion that's really how we ought to try the case

7   and just let the jury have the instructions and

8   verdict on infringement and then try the invalidity if

9   they return an infringement finding.   If they don't,

10   the case is over.

11            I think you-all ought to think about that.

12   It seems to me as if I've told you before how the case

13   needs to be tried, that you don't anticipate or put on

14   all your evidence in anticipation or *in apprehendo* and

15   then come back and try to do it again.   We're not

16   going to do it that way.

17            I thought I told you that from the very

18   beginning of the case.   It looks to me like maybe

19   you're going to have to think about that at the lunch

20   hour.

21            MR. McDONALD:   Your Honor, during the opening

22   statements of Mr. Roberson, he made statements saying

23   that the RIMS prior art was considered by the Patent

24   Office.   That's directly contrary to a statement by

25   the Patent Office on the reexams of all three patents.

1        THE COURT:  Look, if it was in the patent, if

2   was in the patent, they're bound to have considered

3   it.

4        MR. McDONALD:  It was not in the information

5   disclosure statements.  It was not identified as to

6   references cited --

7        THE COURT:  How did it get in the

8   specification?

9        MR. McDONALD:  They wrote it in there.  What

10  he was talking about, he showed them the issued

11  patent, but as filed, it didn't show the patent number

12  on it.

13       THE COURT:  Well, somehow in the process it

14  got in there, and I don't care what they found there.

15  Somehow the Patent Office issued a document that had

16  actually in it the RIMS system.

17       You tell me they didn't consider it even

18  though they put it in there?

19       MR. McDONALD:  There's a new issue raised by

20  the reexams because of the RIMS prior art because they

21  found, the Patent Office found, in the re-exams that

22  it was not --

23       THE COURT:  We're not going to deal with the

24  reexams and maybe this is an example where the Patent

25  Office is all wet.  When the Patent Office puts in the

159

1    specification something that says you have a patent on

2    this, to let them then come back in here and say,

3    Well, we didn't consider it is almost farcical.

4            MR. McDONALD:  There's a procedure for

5    disclosing prior art.  Very easy process.  Put it on

6    your disclosure statement.  They didn't do it.  That's

7    why it didn't show up on the cover page of the patent

8    under the references cited.  TV/2 is in there too, but

9    they also disclose the prior art as references cited.

10           THE COURT:  That looks to me like an excuse

11   for doing a sloppy job at the Patent Office.  I'm not

12   dealing with the reexamination.  I'll have to deal

13   with the other issue later.

14           All right.  We'll be in recess.  Since I've

15   kept you this long, we'll take an hour from the time I

16   let the jury go.

17

18

19

20

21

22

23

24

25