1        THE COURT:  All right, have you all decided what you

2   think about just trying, making sure that we get everything in

3   on the infringement issue to go to a verdict on that issue and

4   then do invalidity?

5        MR. ROBERTSON:  I think that would be very

6   prejudicial to the plaintiff in this sense, Your Honor:  The

7   juror considers that evidence, I think they're going to be

8   savvy enough to know if they return a verdict of infringement,

9   then they will not have to proceed to the second phase and more

10   likely will go, and, therefore, it's prejudicial.  I don't

11   think it's going to be terribly efficient to take it up in that

12   manner.  I think it's --

13        THE COURT:  The efficiency, Mr. Robertson, is you all

14   keep your feet on the base.  Ordinarily there's no issue about

15   doing this because the lawyers keep their feet on the base.

16   That's the problem.

17        MR. ROBERTSON:  I understand, Your Honor.  We had

18   planned and we had discussed, and I thought we were at least on

19   agreement on the order of the witnesses.  We had exchanged

20   that.  I had intended, and I had in town here the inventors.

21        They are no longer employed by ePlus.  They are not

22   employed by ePlus.  They have their separate jobs.  I would

23   like them to put in context the technology we're talking about

24   the invention they came up with.

25        THE COURT:  They can do that.

1          MR. ROBERTSON:  Okay, sir.  Thank you.

2          THE COURT:  But I'm not going to let them go.  I'm

3    going to tell them once they appear, they are here, they are

4    going to stay or agree to come back whenever we need them back.

5    I told you all this.  I thought this very question about the

6    inventors and everybody came up in a phone call last week.  You

7    agree it ought to stay the way it is, Mr. McDonald, given the

8    way --

9          MR. McDONALD:  At this point, Your Honor, I'm not

10   prepared to say we shouldn't shift and bifurcate.  I don't know

11   if we have to decide right this moment.

12         THE COURT:  I'm not either, but I don't want to put

13   you all in that position, but I wish I had done it before, I'll

14   tell you that.  All right, get the jury.  You remember what you

15   are trying is an infringement case, and if you want to deal

16   with invalidity, you do it in rebuttal.

17         MR. McDONALD:  Your Honor, may I make a request that

18   the first witness be sequestered for my opening?

19         THE COURT:  Who?

20         MR. McDONALD:  Ms. Marion.

21         THE COURT:  All witnesses are sequestered.

22

23                    (Jury in.)

24

25         THE COURT:  All right, ladies and gentlemen, now

1    you're going to hear the opening statement of Lawson and Mr.

2    McDonald.

3              MR. McDONALD:   Thank you, Your Honor.  May it please

4    the Court, my name is Dan McDonald.  I represent Lawson in this

5    case.  Like Lawson, I'm from Minnesota, so I'm a long way from

6    home.  It's a little warmer here anyway, so we're not

7    complaining too much about that.

8              We're here because we have a dispute that the parties

9    couldn't resolve amongst themselves, and it's going to be your

10   job to hear both sides of the case.  You've heard ePlus's view

11   of what they think the evidence will show.  I'm going to tell

12   you the other side of the story.

13             It's kind of like when one of your kids comes and

14   tells you that someone hit them.  Well, it sounds like somebody

15   did something wrong, but you just don't make a decision until

16   you hear the other kid's version of what actually happened, and

17   that's basically what we'd appreciate you doing here.

18             We're going to show you two things here in the

19   opening.  One is why the evidence is going to show that

20   Lawson's system does not infringe these ePlus patents.  We do

21   things differently, and Lawson doesn't want to do things the

22   way these patents are talking about.

23             Number two, we're going to show you why these claims

24   are invalid, and I'm going to focus on obvious combination of

25   things, because the inventors themselves have essentially

1    admitted that these claims are a combination of these two

2    things.  And we have evidence going all the way back to 1992

3    that says those things should be combined with each other.

4              So when you have the two old things out there in the

5    prior art, and teachings to say put A and B together, you

6    shouldn't be able to get a patent on putting A and B together.

7              We have the case outline up there.  Is this up on the

8    screen for everybody?  So just to mention, essentially the two

9    main points here, non-infringement and invalidity, this is just

10   a little brief blueprint of what I'm going to talk about here.

11   I'm going to talk a little bit about the Lawson company and why

12   it has every right to sell its products for two main reasons.

13   One is they don't infringe, and two, the patents are invalid.

14             I'll explain the reasons for both of those and what

15   the evidence will show you, and then I'll wrap it up.  Lawson

16   was founded in 1975.  It's been a business software company for

17   all those years.  It does things like accounting systems for

18   keeping track of profits and losses and things like that, Human

19   Resources, customer relationships, and other areas as well.

20             We offer what they call a suite of products across

21   the board for all the different uses a company might have for

22   software.  There's one particular area that's involved in this

23   case, and that's the procurement area.  This is when people

24   need to buy products at a company.  They might need to buy pens

25   or pencils if you work at an office.  They might need to buy

1    nuts and bolts if they're at a manufacturer.  They might need

2    to buy apples and oranges if they are a food wholesaler which

3    happens to be the first customer that Lawson really started

4    developing modules for, a food wholesaler for grocery stores.

5              The evidence will show that Lawson builds its

6    products in this suite around something they call an item

7    master.  That's a phrase you're going to hear a fair amount, at

8    least from us in this case.  What does that mean?  Well, it's

9    really a computerized version of something that companies have

10   done for awhile.

11             You keep a list of items that they keep in inventory,

12   a master list, and they have a list because they have to keep

13   buying those things over and over again.  Just like at home,

14   you have to keep buying milk and cereal and things like that.

15             Well, companies try to get a little bit of a system

16   going, so they keep a list of the products they keep buying

17   over and over again.  So this master list is an inventory list

18   that Lawson's customers use to keep track of their inventory,

19   and all these purchasing and requisition products are built

20   around this master list or item master.

21             Lawson focuses on a few industries like health care

22   and fashion industries for their customers, because there are

23   some big companies in the industry.  You maybe heard of the

24   company Oracle or SAP.  Lawson isn't as big as them, so they

25   have to kind of focus on some niche areas and cater to specific

1    industries.

2         And they have a philosophy that might be useful for

3    the lawyers to keep in mind in this case.  It's their motto,

4    simpler is better, and I'm not sure we're going to really be

5    able to give justice to that in this case, but we're going to

6    do our best here to keep our story simpler because I think

7    simpler is better in this case here.

8         Lawson never sought ePlus's patents, never heard of

9    ePlus by the way.  Let's get that out of the way here.  They

10   just built what customers wanted.  So you did hear that ePlus

11   essentially agrees that Lawson's product to start with, it has

12   no data on it.  It's basically empty.  It's like a blank piece

13   of paper for this item master, because different customers need

14   different things.

15        You are not going to preload pencils if somebody is

16   actually buying apples.  So they start off by selling the

17   system with a blank list, and then the customer adds their own

18   things onto that list, the things they buy.  They'll type it in

19   or get it electronically different ways, but the point is, the

20   customer controls what goes on that list because every customer

21   is different.

22        And that's -- that difference, that particular

23   feature of the Lawson system is really a fundamental point in

24   this case.  It really goes to the heart of the non-infringement

25   issues because you heard mentioned the catalogs.

1          Catalogs are the sort of things that people who sell
2    products have.  They have catalogs that list their products.
3    They give nice detailed descriptions, because when you are
4    thumbing through the catalog, you pick some products out to buy
5    and need some more information.  So that's kind of the focus
6    from the seller's standpoint.
7          The Lawson system with the item master is focus from
8    the buyer's standpoint, and so you'll see they don't do the
9    same things you would do with a catalog when you are selling
10   something.  One really big difference, for example, is in a
11   catalog, you might have a description of a product that could
12   be a couple hundred words or more, because they want to tell
13   you a lot.
14         In the item master, there's only about 30 or 34
15   characters that can go on the Lawson item master for the
16   product description.  That's only about six, maybe seven words,
17   depending on how big the words are.  If they are lawyer words,
18   maybe one or two, but for normal people, it would be about six
19   or seven words.
20         So it's a very different description, because they
21   don't need a big description of the stuff they buy all the
22   time.  They know what they buy.  So it's just the green pens or
23   the blue pens or whatever, so it's a very different approach.
24   If you can understand the fundamental difference between the
25   seller and buyer, you really are a long ways to understanding

1   everything you need to know in this case about why Lawson

2   doesn't infringe.

3          Now, you might wonder why do we have these different

4   types of products?  Well, Lawson, by having this item master,

5   they really give the company control over what their employees

6   buy.  If it's not on the list, you know, it's going to be a

7   hassle to buy it.  It's easy to buy the stuff on the list, so

8   they make sure everybody buys just the pre-approved sort of

9   things.

10          There are exceptions, but the heart of the system is

11   this is the pre-approved list, so you keep getting the same

12   thing every time.  That can save money, because maybe you have

13   a special deal with some company on pricing for the products.

14   So you buy one on the list and make sure you get the special

15   pricing.

16          It saves time.  Employees don't have to worry about,

17   oh, I guess I'm going to look for some new blue pens this week

18   and shop around for blue pens.  No, we figured blue pens out a

19   long time ago.  Just buy the same blue pens again.  And it also

20   standardizes things which may be more important if you are a

21   manufacturer.  You want make sure you are using the same nuts

22   and bolts and parts because you know they go together.  If

23   somebody starts buying some different parts, that could mess

24   things up.

25          So there's a lot of advantages for the customer

1    having their own personal master list, that item master to keep

2    track of it.  These patents, on the other hand, they don't talk

3    about this having anything to do with the invention.  What they

4    are talking about is taking an old system -- you heard the

5    mention of RIMS.  That was that old Fisher system, requisition

6    inventory management system, R-I-M-S.

7         That's old, and if you do the RIMS system, everybody

8    would admit you wouldn't infringe the patents in this case,

9    because they predate the patents in this case.  So the I and

10   the M, inventory management, the RIMS system had the item

11   master sort of thing as well.

12        In the RIMS system, they call it a parts master, but

13   it was the same thing.  It's been around.  It's not like Lawson

14   is making claim to being the first one to have the idea of

15   having a list of products you buy all the time.  The RIMS

16   patent wasn't making that claim either, but starting with that

17   system -- and the RIMS had a parts master list of the stuff you

18   buy.

19        And then they file their patent, and I'll tell you a

20   little more detail about this in a bit as to how this came

21   about, that combine that RIMS system with a system that would

22   have multiple catalogs, as the Judge has defined the term

23   catalogs, to add on top of that RIMS system, and the system

24   that could search those catalogs, because now that you are

25   looking through lots of big catalogs, they needed something

1    special to do all the searching through those big catalogs.

2              So the ePlus system is the invention -- excuse me, of

3    the ePlus patents is focused on giving the user of the system

4    that freedom to go shopping, in effect, through multiple

5    catalogs.

6              You heard Mr. Robertson talk about comparison

7    shopping and their system and going through large volumes of

8    catalog data.  So it's all about that freedom and empowerment

9    of people, and that's fine for whoever wants that, but Lawson's

10   customers are a little stodgier.  They're careful with their

11   money, so they want to have a system that gives them more

12   control.  They don't want the employees out there shopping from

13   lots of catalogs.

14             So here's a picture here, and believe it or not, it's

15   a simplified version of the products, but we try to make things

16   as simple as we can as we get started here.  The Lawson system,

17   and I have these three modules that -- you might have heard

18   that phrase before.  Inventory, requisition, and purchase

19   order.  These are three of the many products that Lawson sells,

20   but this is the core of what's at issue in this case.

21             Those are things that help you track your inventory.

22   That's inventory module.  That's clear enough from the name.

23   The requisition module is putting together a list of products

24   you might want to buy.  These days on the internet we all talk

25   about a shopping cart.  It's that sort of thing.  It's kind of

1    an intermediate list before you make that final decision.

2            A lot of companies, you have to get a requisition

3    approved by a boss of some sort before the company will buy it.

4    So you have this intermediate sort of thing going on called a

5    requisition, and the purchase orders, the final, okay, we're

6    going to send out the purchase order or product, or somebody

7    approved it, or I'm finished doing my shopping with the

8    shopping cart, I'm ready to finalize my order, so what's what

9    these three basic modules are for.

10           But they are all, in the Lawson system, built around

11   using that customer item master that, as you can see here, I've

12   got kind of in an abstract form, but it's basically a list of

13   customer-selected item after customer-selected item.  It's

14   entered in the system in whatever order the customer enters it

15   in.

16           You can put a couple things from one company, a

17   couple from another, or you can carry over from some prior

18   company's software system.  Wherever they came from, they just

19   go in whatever order they are presented.  But the key there is

20   the customer does pick everything that goes on the list in the

21   Lawson system.

22           So what is the evidence on this?  Well, ePlus has

23   chosen to assert 12 claims in this case.  They are all based on

24   the same original patent application which you saw reference to

25   that got filed in 1994.  They are all similar.  They are just

1    rewording of essentially the same invention.  Whenever lawyers

2    get involved, they like to reword the same thing many different

3    ways.  That's essentially why they have their 78 or 79 claims

4    and why we have these 12 claims.

5            There's a little differences, but they are all

6    purportedly describing the same invention, because they are all

7    from the same patent application.

8            We're going to show that Lawson does not infringe any

9    of those 12 claims.  We do things very differently as you've

10   heard now.  You can say one way is better than the other.  It

11   really doesn't matter to Lawson.  We have our customers that

12   like our way.  We don't want to pitch our product like we're

13   going to give everybody this broad employee-empowering shopping

14   experience.  That's not our sales pitch.  Our sales pitch is if

15   you want to save money, if you want to keep control, use our

16   product.

17           It's kind of like the difference between having your

18   own address book versus a published phonebook.  A published

19   phonebook could be great sometimes if you have to track down a

20   number, Yellow Pages if you're looking for a pizza place and

21   looking for a good restaurant.  Maybe you're from out of town,

22   so you shop around.  You want all that extra information in the

23   Yellow Pages.

24           On the other hand, you have your own personal address

25   book.  That's the numbers you call all the time.  Maybe a

1    couple of them came out of a phonebook.  Maybe some of them you

2    got because somebody gave you a note or told you what their

3    phone number is.  You might have got it from different places,

4    but it's your own personal list.  It's not the phonebook.

5           And if -- that difference is very analogous here to

6    the difference between the item master in the Lawson system and

7    these catalogs, as the Judge has defined catalogs, which you

8    have to have multiple versions of in these claims of the ePlus

9    patents.

10          So the ePlus patents were purchased by ePlus back in

11   2001.  They didn't invent these patents.  They didn't come up

12   with these systems.  They bought them from a spinoff company of

13   Fisher Scientific that Fisher spun off a couple years before

14   that, I believe.

15          The Fisher people had these employees that were the

16   listed inventors on the patents that you will hear testimony

17   from.  You saw some of their pictures before.  And they'll show

18   you that in their patent application, they told the Patent

19   Office that these patents were about multiple catalog systems

20   that used multiple catalogs to search and build these

21   requisitions and things.

22          All three of the patents have the same figures in

23   them.  Figure one of one is figure one of the next one is

24   figure one of the third one and so on.  They are all very

25   similar, and you have copies of them, so you maybe have already

1   figured that out yourself by now, but they all have virtually

2   identical descriptions.  There's literally one or two words a

3   little bit different -- the descriptions, I think they are

4   almost identical.  A couple words difference.  That would be

5   it.  But all three of them are very, very similar.

6           And we'll show YOU that really even the ePlus

7   witnesses will admit that ePlus didn't invent the idea of doing

8   searching for parts or items.  ePlus didn't invent doing

9   requisitions even on a computer we're talking about now.  ePlus

10  didn't invent the idea of generating purchase orders on a

11  computer.

12          It was a combination of features that they had to get

13  their patent on that includes this idea of having multiple

14  catalogs.  That makes sense when you think about it, because

15  the Fisher company is actually known for something called a

16  Fisher catalog.  They are a company that supplies researchers,

17  health facilities with all sorts of products.

18          They are a supplier, and they, for decades, had a

19  Fisher catalog that has tens of thousands, even hundreds of

20  thousands of items in it.  So -- or a hundred thousand items in

21  it.  So Fisher was a catalog company.  That's where these

22  patents started from, so it doesn't -- it's not a big stretch

23  to realize what patents have to do with catalogs.

24          I've got a few quotes here from the patents

25  themselves.  One, the first quote there you see on the screen

1    is some language ending what's called the objects of the

2    invention for purposes of the invention that they are

3    describing in their patents.

4              It's got a few different, about three objects that it

5    lists, and one of them mentions, among other things, that it's

6    an object to provide a means for searching large volumes of

7    product information such as would be included in a vendor

8    product catalog.

9              Another part of the patent talks about, quote, a

10   feature of the present invention is the ability to search

11   multiple catalogs from different suppliers, and there's also a

12   section of the patent that talks about catalogs they are

13   talking about are catalogs that are published, and they could

14   be published.  In the patent it will describe three sources:

15   Published by a distributor, published by a manufacturer, or

16   published by a supplier.

17             So the patents are very clear about how important

18   catalogs are to what they are describing there.  So all those

19   basic modules, the requisition, the inventory, the purchasing,

20   those are all around.  The patents even say that the preferred

21   embodiments or kind of the quintessential version of the

22   invention is combining that old RIMS system that had those

23   requisition and inventory and purchasing capabilities and

24   combine it with this IBM system that was already in existence

25   at that time called a Technical Viewer 2, a TV/2 system from

1    IBM.

2          What was that thing?  That had the capability of

3    loading catalogs, parts catalogs, technical publications,

4    things like this.  This is right out of the literature from IBM

5    from 1991 and 1992.  It would load that stuff on a computer.

6    You could actually scan it in, so you could have figures from a

7    parts diagram, so it was, for the time especially, very -- had

8    a lot of information because it had drawings and words.

9          And so it could store all that stuff, and then you

10   could do searches in this Technical Viewer 2 system to find a

11   part you were looking for.  It was designed to integrate with

12   parts systems or inventory management systems.  That's what the

13   literature actually talked about, and that's what the inventors

14   of these patents talked about, that the preferred version of

15   the invention was connecting, in effect, a RIMS system to this

16   Technical Viewer 2 system.

17         One other thing I'll mention here is that they talked

18   about multiple catalogs.  You see that phrase here in the

19   second point on this slide.  And the reason why they talked

20   about multiple catalogs is that the patents themselves admit

21   that there were also preexisting systems that had at least one

22   catalog, had one catalog on a CD-ROM and that that could be

23   searched products.

24         So there was even the idea of having electronic

25   catalogs -- Fisher was acknowledging that at least a version

1    with one catalog on a CD was already out there.  So they were

2    zeroing their patent in on this idea of combining the RIMS

3    system with a system that could search multiple catalogs.

4              So we've been talking a lot about catalogs here.  I

5    know you have these definitions in your materials, but this

6    definition is going to be very important in this case, the

7    Judge's definition of catalogs.  I won't read every word for

8    you.  Obviously you can read it yourself.

9              I've highlighted some language of it, but I want to

10   emphasize here that we are talking about an organized

11   collection of items and associated information published by a

12   vendor, and vendor basically are the people who provide you

13   products.  They are sellers or supplier, manufacturer,

14   distributor as opposed to somebody buying a product certainly,

15   and it lists some preferred things, or maybe these would be

16   typical things you would see in a catalog like part number and

17   price and so on, and so that's how the Court has defined the

18   term.

19             It's a real key aspect of understanding why Lawson's

20   system not only is different but why the difference in Lawson's

21   system also means specifically, for purposes of this case, that

22   we don't infringe the patents.  You've got the claims

23   highlighted in your materials as well, but I'll just summarize

24   them here because I want to show you why that word catalogs is

25   so important here, that you can see that 11 of the 12 claims

1    literally use the word catalogs, plural.

2          Some of them talked about at least two product

3    catalogs.  Several of them talk about a collection of catalogs.

4    So we're talking about multiple catalogs when you get into the

5    claim language.  And you've heard now that for Lawson to be

6    found infringing, they have to be shown that they have every

7    single element of these claims.

8          So if law Lawson doesn't have catalogs, at least two

9    product catalogs, Lawson doesn't have a collection of catalogs,

10   they don't infringe the claims.  You don't need to know

11   anything else.  You can stop right there, because those claims

12   require that.

13         Now, for that 12th claim, I didn't hear ePlus really

14   trying to say it's any different from the other 11, and, in

15   fact, their own witnesses admit that this claim is also talking

16   about the idea of having multiple catalogs, that you have data

17   relating to items associated with at least two vendors, and the

18   patent talks about this in terms of having a selection of four

19   catalogs.

20         They give an example.  You can select certain of

21   those catalogs that you search, and the inventors will say,

22   well, that's to help save searching time and be more efficient

23   if you know which catalogs you want to search.  The systems has

24   lots of catalogs in it.  Well, you just select certain ones to

25   search.  So this last claim also relates to the idea of

1   multiple catalogs.

2          So the Lawson -- the patents talk about multiple

3   catalogs.  That's the image I've got here on this slide, are a

4   collection of catalogs.  The Lawson system is built around this

5   item master, this customers-created, customer-selected list.

6   It's kind of like when you run out of milk and you want to send

7   your kid to the store.  You can probably send your kid to the

8   store to buy some more two percent milk because that's the same

9   thing you keep buying over and over again, but you wouldn't

10  send your kid to the store if you were going to remodel the den

11  and say, well, why don't you go pick out some more paint and

12  some new window coverings, surprise me, I'm empowering you.

13         Maybe that's a nice thing to do, but at a company

14  that wants to control what its employees are doing may not be

15  such a good idea.  It looks like to me this may not be a good

16  idea to send your teenage son, or in some cases your husband if

17  he lacks much decorating skill, to the store to pick out any

18  old paint and any old window decorator materials.

19         So two very different approaches to buying products

20  and having lists that you would use to buy products.  That

21  difference will show up in a number of ways that you'll see in

22  the evidence here, because you'll hear how these item masters

23  are created.  And you heard a little bit from ePlus's attorney

24  about all these documents from Lawson about RFPs.  Well, they

25  load rim port catalog information.

1          Well, you have to listen real careful to that in a

2    couple ways.  One is -- the Judge already instructed you about

3    this -- that when people use the term catalog or different

4    terms from the claims, they don't necessarily use them exactly

5    the way the Judge defined them.  So you really have to hear the

6    facts.

7          And so, for example, when something is going on and

8    we see a document that says the word catalog, if it's being

9    cited to try to show us it infringes, well, you better go back

10   and look at that definition the Judge gave of catalog and say,

11   okay, well, do I have the evidence that says it's that type of

12   catalog, that organized collection of items published by a

13   vendor, number one, and number two, be careful about what

14   happens to that data once it gets into the Lawson system,

15   because you'll hear some evidence about data coming into the

16   Lawson system, but it gets changed very drastically.

17         Like I was saying, you might have data that comes in

18   from a catalog that might have a very long product description.

19   Well, the customer will take that and strip away a long

20   description of the product and just put in that six-word

21   description to fit the 30 or so characters you have on the

22   Lawson system, for example.

23         So they throw away a lot of information before it

24   gets into the item master, number one, and then number two,

25   they also add some new things that weren't in the information

1    they got from a vendor and wouldn't be in any published

2    catalog, things like where does the customer store that

3    product.

4           They might have multiple warehouses, so that item

5    master would have other information relating to keeping it in

6    inventory or which people are authorized to buy the product,

7    things like that.  So be careful when you hear them talking

8    about information coming into the Lawson system to recognize

9    that that's different from how does it actually wind up on the

10   item master.

11          I'd like to turn now to a different variation on the

12   Lawson products that ePlus is also accused of infringement, and

13   that's the Punchout.  You heard reference to that.  Punchout

14   really isn't talked about in the ePlus patents per se, but it's

15   a concept out there that a system like a Lawson system or

16   somebody else's system might have a way to connect out on the

17   internet someplace and go someplace else to get information and

18   bring it back.

19          And that doesn't infringe either.  It's a little

20   different variation here, and here's a key thing about that, is

21   that when the system can punch out to a vendor website, like it

22   might be Staples or something like that, when we think of

23   websites, we typically think of something that anybody can go

24   to like a google.com or something, but the websites that

25   Lawson's customers visit are not websites that anybody can go

1   to.

2          These are personalized websites just for those

3   customers.  They are secure, they are password protected, they

4   have a pass code with a key to get in, and that vendor has

5   something set up just for that customer.  That's typical,

6   because oftentimes an individual vendor will have a special

7   deal with the customer, a pricing deal, and that typically both

8   sides want to keep things like that confidential.

9          They don't want competitors or other folks knowing

10  what the pricing deals are, so that punch out will be very

11  personal and specific.  It's only going to be to one vendor, so

12  there's no way it's multiple catalogs or multiple anything.

13  It's a secure thing, so it's a personal list for that customer.

14  So this isn't something that is published by vendors as you see

15  in the Court's definition of catalog.

16          By the way, this Punchout feature is only used by a

17  small percentage of Lawson's customers, even a small percentage

18  that have the requisition and purchase order system.  About

19  five percent or so use this system because they do want to keep

20  control over what they're doing, and the Lawson system is just

21  good enough as is with the item master for the vast majority of

22  the Lawson customers, but there's a little percentage that do

23  do it this other way.

24          So the other key thing to remember here is that

25  Lawson doesn't have any control over what the vendors are doing

1    and, this is an important distinction here.  Certainly it's

2    true that Lawson helps its customers out.  We sell them a

3    system, and the evidence will show that we help customers load

4    up their system, get their software working properly, help them

5    load data if they want us to.  Sometimes they want us to,

6    sometimes they don't.

7              We will help the customers get their system going.

8    Absolutely.  We're not denying that.  That's one of the ways we

9    know our customers are using the item master the way I'm

10   describing it to you, but Lawson has no control over what those

11   vendors are doing.  Lawson figures out a language to talk to

12   those vendors in.  They will send you a request in this format.

13   If you want to send information back to the Lawson system, this

14   is the format you're going to send it back so I can understand

15   it, but what actually happens at that vendor website in

16   Punchout is totally up to the vendor.

17             So if ePlus wants to say, oh, the vendor is keeping a

18   catalog and the vendor has searching, that's not what Lawson is

19   doing, and so Lawson isn't control them.  They're not doing

20   things that Lawson is telling them.  Lawson isn't assisting

21   them in setting up their websites or in creating search

22   engines.  Lawson doesn't even know if they have this search

23   mechanism at those vendor websites.  So that's going on

24   independently, so that's not something that Lawson is

25   responsible for here.

 1           So we'll hear the fact evidence through the fact
 2   witnesses including a number of Lawson employees.  You'll also
 3   here from an expert in computer things who is also a lawyer,
 4   Mike Shamos.  He's even started a computer company, and he will
 5   show you, walk through the Lawson system and show you why it
 6   doesn't infringe the claim of the ePlus patents, and a big part
 7   of that will be the catalog aspect of things.
 8           The employees will show you that the item master and
 9   Lawson system isn't multiple catalogs as the Judge has defined
10   that.  Lawson doesn't make, sell, use, offer for sale, doesn't
11   encourage anybody else to use systems that have those multiple
12   catalogs as the Court has defined it.
13           The claims have some other requirements the Lawson
14   system doesn't have, and you'll see testimony about the details
15   there as we go along here.  You'll see references, for example,
16   to cross-reference tables and things like that.  We'll talk
17   about more of those things as we go through trial, but we'll
18   certainly address those elements as they come up along the way.
19           That's why the evidence will show Lawson doesn't
20   infringe.  ePlus's infringement case really comes down to this
21   expert of theirs, Dr. Weaver, who, I think, will come across
22   maybe as a pretty likable guy and a computer expert kind of
23   guy, but he's got his own theory on why Lawson's item master
24   is, in his opinion, multiple catalogs that meet the Court's
25   definition of catalogs.

1          We're going to show that he's wrong and that the

2    Lawson witnesses, and even a Lawson customer will testify that

3    the Lawson systems don't use any catalogs that are catalogs the

4    way the Court has defined that term.

5          This expert will use the term originate and say,

6    well, because the item master in the Lawson customer system --

7    well, that has some data in it that originated I think, he

8    says, because he didn't really go back and look.  But he said

9    it originated from some vendor catalogs; so, therefore, the

10   customer item master is multiple catalogs.

11         Well, we'll show you that doesn't really hold water,

12   because that's kind of like saying your own personal address

13   book or Rolodex is actually multiple published phonebooks

14   because some of the phone numbers in your personal book or

15   Rolodex originated from a phone books.

16         No, wait a minute.  The judge defined catalogs as a

17   collection of information -- I'm paraphrasing a little bit here

18   -- an organized collection of information published by a

19   vendor.  There's no way you can get to the item master in the

20   Lawson system being an organized collection of items published

21   by a vendor and certainly not multiple such catalogs just based

22   on the fact that some of the information in that thing

23   originated, perhaps, from some vendors.

24         I think one fact that you'll see as you go along that

25   will help you understand this and also help you understand the

1    importing vendor information is the customers will tell you

2    some numbers, and they'll tell you numbers in the ballpark of

3    they have 10,000 vendors that are loaded up on their Lawson

4    item masters.  That's a lot vendors.

5         They've got about 70,000 or 80,000 products for one

6    of those customers which is a lot of products.  These are big

7    companies, so you can see why they are on a computer system,

8    but on the other hand, if you do the math there, it's only

9    about seven or eight items per vendor.  So that gives you a

10   pretty good double-check on the system here that these

11   customers aren't loading these entire catalogs or all that

12   information from these sources, from other places, these 10,000

13   vendors, but it also gives you a pretty good sense of why in

14   the world they wouldn't want to.

15        If you've got 10,000 vendors, would you really want a

16   system?  Usually, for like most -- or certainly like Lawson's

17   customers, would you really want a system that loads up the

18   catalogs from 10,000 different vendors?  For Lawson's

19   customers, anyway, the answer is no.  This really helps them

20   simplify their system.  With that many vendors, you can see why

21   the message simpler is better could be appealing to Lawson's

22   customers.  Let's keep it simple.  We're not going to load

23   everything, we're just going to load the stuff we like.

24        So, to wrap up on the infringement issue, at least

25   for that reason -- we'll give you other reasons as we go

1   along -- Lawson doesn't infringe any of those 12 claims at

2   least because it doesn't have at least two catalogs required by

3   all the asserted claims in the '683 patent, doesn't have a

4   collection of catalogs required by all the claims asserted in

5   the '516 patent, and it doesn't have the database containing

6   data relating to items associated with two vendors which also

7   requires the option of selecting which is in the ellipses here,

8   but you as see the whole claim, you'll see it actually requires

9   the ability to select, describing the patents as actually

10  selecting catalogs to search as required by that last claim,

11  the '172 patent.

12          So I'd like turn now to invalidity.  So ePlus will

13  get up first in this case and go through their infringement

14  case.  There may be a little overlap.  I'm not sure how that's

15  going to play out here, but basically they put on their

16  infringement case.  We have a chance to cross-examine their

17  witnesses, and then we put on our case where we'll respond to

18  their infringement case to the extent we haven't already

19  through the witnesses we've asked questions to, and then we'll

20  put on our invalidity case to show why the ePlus patents are

21  invalid.

22          That story will be told in part just by the story of

23  how the patents themselves came about, and you'll really hear

24  most of the story right out of the mouths of the inventors,

25  that you have this Fisher company -- they are a big -- known

1    for their Fisher catalogs.  They are a vendor who had a large

2    published catalog, paper catalog that they used to sell their

3    products.

4            They developed this RIMS system to help computerize

5    customers to order parts out of a parts master, and they could

6    also link up to a Fisher list of products back at the Fisher

7    company.  So there was a synchronized link between a local

8    computer at the customer and also a computer over at Fisher.

9    That's this old RIMS system.

10           And these customers of Fisher that used that RIMS

11   system, they liked it for ordering Fisher products, but they

12   still had a bunch of paper catalogs on their shelf -- you'll

13   hear the testimony about this, that there was either a Fisher

14   paper catalog or paper catalogs of other distributors.

15           And so the customers talked to the Fisher people, the

16   people on the patent, and said, you know, is there a way to

17   take these paper catalogs and get them on the RIMS system, too.

18   So that's what Fisher heard, and so they set out to do

19   something like that.

20           And so that really brings to life the idea these

21   patents are about taking preexisting RIMS systems and then

22   putting on a computer these multiple catalogs.

23           Here I've got a little language that you'll see in

24   all three of the patents that talks about why -- their own

25   description, the inventors' own description of how the system

1  describing the patent is essentially a requisition and

2  purchasing system that is preferably but not necessarily the

3  Fisher RIMS system and a search program that's capable of

4  searching through large volumes of information quickly and

5  accurately, and again preferably but not necessarily.

6          That program could be the Technical Viewer 2 or TV/2

7  search program.  All three patents talk about them being a

8  combination of those things.  That's actually the preferred

9  version according to the inventors themselves.  And so we'll

10  show that at the time this was filed, 1994, that idea of

11  combination the RIMS system and the TV/2 system, both of those

12  things were in the prior art, and the idea of putting them

13  together was also obviously known in the prior art.

14          You'll hear from -- I think you heard already heard

15  actually from the ePlus attorney that although the RIMS system

16  is -- I think he used the phrase radically different from the

17  patent, and it's not radically different.  The RIMS systems had

18  a way of tracking inventory and had a way to build

19  requisitions.  It had a way to generate purchase orders, and,

20  in fact, that's one of the reasons why they used the

21  description of the RIMS patent and the patents in this suit

22  they piggybacked on.

23          So to say it was radically different when they

24  actually used the same description for these patents, I think,

25  goes little a little too far.  The only radical difference --

1    and I'll give them one thing.  The radical difference was the

2    RIMS didn't have the multiple catalogs on the system.  That's

3    where you needed that TV/2, so that's the thing that Lawson

4    doesn't do.

5            So here is a picture of that RIMS system with what

6    they call the parts master, and when you hear the evidence

7    about what that thing is, it's going to sound a lot like this

8    Lawson item master I've been describing for you.  It's

9    something the customer comes up with.  They pick the items to

10   go onto that list, and they just go on that list in whatever

11   order the customer puts them on.

12           They use it for inventory.  All the same things I was

13   telling you about the Lawson item master, that applies to the

14   old RIMS system.  The RIMS system also had something else that

15   the Lawson system did not have, and that was this host computer

16   backup Fisher or distributor that would keep track of all those

17   Fisher products so that you could interact with the two systems

18   and keep them synchronized.

19           The Lawson system didn't even have all the parts of

20   the RIMS system, but it had some parts that were similar.  So

21   Fisher is looking then -- they've got this system.  They want

22   to add the capability of searching multiple catalogs, so what

23   did they do?  Well, they talk to IBM.  They had worked with IBM

24   before on some other computerized system and talked to them

25   about whether they could help them build a system that would

1   add this multiple catalog functionality, and IBM said, yes, we

2   can help you, because we actually already got a system.

3        We saw that in the language before.  It's available

4   from IBM called this TV/2 system.  It was designed to work with

5   electronic catalogs, to search electronic catalogs.  You could

6   even search selected portions of catalogs, and the marketing

7   materials for the TV/2 system as well as IBM witnesses that

8   you'll hear testify in this case said that the TV/2 system can

9   be integrated with other systems like inventory management

10  systems.

11       Well, inventory management, that's the I and the M in

12  RIMS, requisition inventory management system.  TV/2 is a

13  perfect fit for integrating with a system like RIMS, and I've

14  got this little box with API in it.  You'll hear evidence about

15  that, again from the IBM people, that that's an application

16  program interface.  It's basically a little connector thing,

17  and you can -- in software.  It's a way for that TV/2 to

18  communicate with other computer systems like an inventory

19  management system.  Engineers have to reprogram it a little

20  bit, but it's basically designed to interact with other

21  systems.

22       So Fisher hired IBM to integrate the two systems

23  together.  They paid IBM some money to do that, and you'll hear

24  a little bit about that, and one aspect of that that you will

25  hear from an IBM witness is how a big part of the project was

1    actually taking Fisher catalogs and the catalog of one other

2    company, because they wanted to prove out the multiple catalog

3    concept, and they actually had to go to a scanner and scan

4    those catalogs pages in one page at a time which back then took

5    a long time.  These days our scanners are faster, but that was

6    a time-intensive effort, but they did that to prove the concept

7    of the TV/2 system could work with the RIMS system.  Then

8    Fisher saw that, and they went forward with the system.

9            I talked about the literature here.  I've got a

10   couple quotes up on this slide here to just give you a flavor

11   of what the TV/2 literature said about connecting to other

12   systems.  It says things like it's for integrating parts

13   catalogs with dealers' computer systems such as order entry,

14   inventory management -- there's that IM again from RIMS -- and

15   customer records systems and that it's built-in communications

16   capability makes it possible to connect to a wide range of

17   local and remote systems.  So it's really emphasizing it can be

18   connected with these other systems.

19           So they put the two together, and you heard about how

20   IBM did the scanning, and they had to do a little bit of

21   reprogramming to make sure the two systems could communicate

22   with each other, and you'll hear that that was just the

23   ordinary sort of thing you always do when you have to have two

24   computer systems talking to each other.  That wasn't anything

25   extraordinary in this case, and then Fisher filed a patent

1    application on that combination.

2          So the RIMS system has the requisitioning and

3    purchasing, essentially all the features other than the

4    multiple catalogs and searching of multiple catalogs.  TV/2

5    added the multiple catalogs and searching multiple catalogs,

6    and there was also -- because it was in the TV/2 old literature

7    to combine TV/2 with a system like RIMS.

8          So that's an obvious combination, and the Judge will

9    tell you more about what that means at the end, but we think

10   the evidence will show you that under the law as the Judge will

11   instruct you, that that's an obvious combination of the prior

12   art.

13         Just to be clear, when we say prior art, we will make

14   sure the evidence shows you that both the RIMS system and the

15   TV/2 system were prior art, and it was interesting because I

16   heard ePlus's attorney say, of course the examiner considered

17   RIMS as prior art.  Well, the ePlus expert is actually

18   disputing whether RIMS actually was prior art.  So how is it

19   that they can both admit that of course the examiner considered

20   it was prior art, but yet he says anyway that he's disputing

21   that.

22         But in any event, we'll show you testimony from the

23   inventors, from Fisher documents, including their annual

24   reports, and from a former Fisher lawyer who filed a trademark

25   application for Fisher on the RIMS trademark that all will show

1    you that the RIMS system was on sale way back in 1992, well

2    over one year before the August '94 filing date for the patents

3    in this case.  Clearly RIMS is prior art.

4            You'll also hear the testimony and see the documents

5    that the 1991 date on them, at least one of them from IBM, that

6    showed the TV/2 was also prior art and on sale in '92 at least,

7    over a year before August of '94.

8            So we have these two prior art things that are added

9    together, and you heard the counsel for ePlus talking about,

10   well, how could the Patent Office show what was going on.

11   We'll show you that what happened here, because the patents,

12   the body of the patents talk about the RIMS system and the TV/2

13   system.  That's clear, and that's one of the reasons why we say

14   the inventors admit it's a combination.

15           You'll see that the TV/2 literature shows up on the

16   cover pages of the patents as references cited.  I wonder,

17   Bill, can we go to the first page of the Exhibit 1 of the '683

18   patent, please, and blow up in the right column where it says

19   other publications.  You see this is -- on every one of the

20   three patents in the case is something similar where they list

21   what these references cited, these Technical Viewer 2

22   documents, and they got under covers of the patents because the

23   Fisher people, when they filed these patents and pursued them,

24   filed a special list to the Patent Office identifying all the

25   prior art to make sure that the examiner saw the prior art.

1           Then the examiner initials that list.  He actually

2      puts his initials next to each item, and then all that stuff

3      winds up on the patents.  So the TV/2, it's described in the

4      body of the patent, sure, but it was also properly disclosed as

5      prior art, and so it properly winds up on the cover of the

6      patent, so it's real clear.

7           There's a real clear system here to make sure that

8      stuff is considered as prior art by the Patent Office, but if

9      you go back to the big version of the patent -- you'll have

10     these patents in your materials, of course -- you won't see

11     anywhere on that list of references cited any brochures or

12     literature about the RIMS systems, and you won't see any

13     mention in that list -- if you can blow up the patent list,

14     actually over two columns there -- but the RIMS patent is

15     number 5712989.

16          The numbers are gradually going up here, 305199, so,

17     Bill, could you go to the next column and pick it up from

18     there?  So there's the other patents, and you can see they skip

19     right over that number I just mentioned, 5712989.  That's the

20     RIMS patent.  That RIMS patent and the RIMS literature did not

21     make it on the list.  It's not in the list the Fisher people

22     gave to the Patent Office.  It's not on any list that the

23     examiner initialed as prior art he considered, and it didn't

24     make it on the patents either as references cited and

25     considered by the Patent Office.

1          So what's pretty clear from all of that is the Patent

2     Office didn't consider it and realized the RIMS system was

3     actually prior art.  Nobody from Fisher ever told the Patent

4     Office that the RIMS system was on sale more than a year before

5     the filing date of the patent.  That didn't even come up, and

6     so when they talk about how could the examiner make 79 mistakes

7     with 79 claims, well, really there's only one thing that went

8     wrong here, and it wasn't the examiner's fault.

9          He was never given that list with any RIMS brochures

10    or RIMS information on it identifying it as prior art so he

11    could initial it.  So there's only one thing that went wrong

12    here, and that's the Fisher people didn't disclose the proper

13    information the right way to make sure it was considered by the

14    Patent Office.

15         So when you hear all the facts, you'll see that all

16    those facts together do show that these patents, all three of

17    them, are just obvious and, therefore, invalid.

18         Now, there's some other prior art which you'll hear

19    about like the J-CON system and P.O. Writer.  We'll hear some

20    testimony from people that know about that system.  I'm not

21    going to spend much more time.  You'll have plenty of time to

22    hear all the details about that, but there's other prior art

23    that also shows why all 12 of the claims in the patents here

24    that are asserted by ePlus are invalid.

25         We'll show you how every one of the elements of each

1    one of those claims is found either in the TV/2 system or the

2    RIMS system, and, of course, you've already seen some of the

3    literature that you'll see again during the case about how the

4    TV/2 literature said it obvious to combine it with another

5    system, and we'll show that the RIMS system was just the sort

6    of system that was designed to be combined with.

7            Now, ePlus might get into some testimony about what

8    they did and what's not in the RIMS system.  You need to listen

9    to that very carefully, because if they talk about differences

10   that don't show up in the claims, they don't matter.  They have

11   to show why the claims are valid.  We have to show the claims

12   are invalid, but if they're going to respond to that, they're

13   going to have to show you why their claims are something that's

14   not obvious and different from the combination of RIMS and

15   TV/2, not that they have some other bells and whistles here

16   that aren't mentioned in the claims.  So be careful and listen

17   for that.

18           They're not going to be able to show you anything in

19   the claims themselves that are different from what's in the

20   RIMS or the TV/2 disclosures.

21           Again, you'll hear from our expert, Dr. Shamos, who

22   also is going to be speaking about infringement to show you why

23   the claims are invalid as well.  So we have one expert that's

24   going to go through it from both sides.  ePlus has two experts.

25   They have one on infringement, Dr. Weaver, and then Mr.

1    Hilliard who is their responsive expert on invalidity, so they

2    have two different people talking, and I think when you hear

3    the evidence, you'll want to listen very carefully and make

4    sure they are being consistent with each other in how they

5    construe and apply the language of the claims as the Court has

6    construed it.

7            Our expert is just one person.  It's going to be

8    something where he's got to be consistent.  It's the same

9    person giving testimony on both, and we'll show you that our

10   opinions on validity and infringement are consistent.

11           So in sum, going back to that picture of the Lawson

12   system that I showed you awhile ago versus the story of how the

13   RIMS and TV/2 system got combined, you can see that the Lawson

14   system has similarities to the RIMS system but didn't even have

15   all the features of the RIMS system because we didn't have that

16   host system of Fisher products, but we did have a parts master,

17   type of thing we called it, the item master, so we're kind of

18   like the subset of the old RIMS system which, of course, isn't

19   covered by the ePlus patents.

20           On top of that, ePlus, to get the patents, had to add

21   in these multiple catalogs.  Lawson doesn't have anything like

22   that.  So you'll see that story of the invention here also

23   shows you why the Lawson system doesn't have catalogs, doesn't

24   have the multiple catalogs, or at least two catalogs, et

25   cetera, required by the claims.

1           So in sum, really the differences here are as clear

2     as the differences between a buyer and a seller, somebody

3     keeping track of what they buy and keeping inventory versus

4     somebody selling products.  If you agree that a Rolodex of your

5     own personal phone numbers is not multiple published

6     phonebooks, you pretty much understand why we think the

7     evidence will show that the Lawson system doesn't infringe

8     because it doesn't have multiple catalogs.

9           It's a very different system focused on control

10    rather than empowerment, saving costs.  We don't do it like the

11    ePlus patents.  We don't want to do it like the ePlus patents,

12    and so when all the evidence is in, you'll see the Lawson

13    system is completely different in every relevant way from the

14    patents and that Lawson is doing its own thing and doesn't

15    infringe at all.

16          The claims are invalid anyway, because they are an

17    obvious combination of the prior art including specifically the

18    prior art I went through with you in some detail, the RIMS and

19    TV/2 prior art.  Thank you.

20          THE COURT:  Do you have your witness, Mr. Robertson?

21          MR. ROBERTSON:  We're retrieving her right now.  We

22    had discussed with you preparing witness notebooks that have

23    exhibits, and we're doing that for every witness.  This witness

24    we will not be using any exhibit, fairly brief.

25          THE COURT:  From now on, put them in the witness

1   room.

2

3                    **ELAINE D. MARION,**

4   a witness, called by the plaintiff, having been first duly

5   sworn, testified as follows:

6                    DIRECT EXAMINATION

7   BY MR. ROBERTSON:

8   Q    Good afternoon.  Would you please tell the jurors your

9   full name.

10  A    Elaine D. Marion.

11  Q    And where do you live, Ms. Marion?

12  A    I live in Nokesville, Virginia.

13  Q    Who are you presently employed by?

14  A    ePlus.

15  Q    Are you married and have any children?

16  A    Yes, I am married, and I have two teenagers.

17  Q    What is your job title currently at ePlus?

18  A    I'm the chief financial officer.

19  Q    And how long have you been ePlus's chief financial

20  officer?

21  A    I was appointed September 2008, so about two years.

22  Q    And could you briefly describe for us what your duties are

23  as the chief financial officer for ePlus?

24  A    I essentially oversee all the financial functions of the

25  corporation and its subsidiaries.

Marion - Direct

1    Q    For how many have you worked at ePlus?

2    A    About 12 years.

3    Q    Just briefly, prior to becoming chief financial officer in

4    2008, what was your previous position?

5    A    I began at ePlus through one of the subsidiaries as a

6    controller, now known as ePlus Technology, and then I was

7    promoted to vice president of accounting in 2004.

8    Q    Just very briefly, could you just state your educational

9    background for us?

10   A    I hold a Bachelor of Science degree with a concentration

11   in accounting from George Mason University in Fairfax,

12   Virginia.

13   Q    And what I'd like to do now, Ms. Marion, if we could just

14   describe an overview of the business at ePlus?

15   A    Basically what we do is we try to assist our customers

16   with their supply chain from the beginning when they are trying

17   to select their products all the way to the end of life of

18   those products.  In addition, we resell various types of

19   computer equipment, and we can install that equipment as well

20   as finance that equipment.

21   Q    With respect to the aspect of ePlus's business about

22   supply chain you mentioned to end of life, can you explain to

23   me what you meant by that?

24   A    We have an eProcurement software which is called

25   Content(plus) and Procure(plus).  That software, basically we

1    can help customers requisition or purchase, search for products

2    as well as purchase the products within that software.

3    Q    I think you also mentioned that ePlus provides some

4    consulting services.  Can you just briefly describe for us what

5    type of business that is?

6    A    We help customers with business problems that they may

7    encounter such as communications problems or data center

8    problems.  We can help them, assist them with solutions related

9    to that with information technology equipment as well as

10   install that equipment.

11        We can also provide lease financing of that equipment or

12   other types of equipment as well, and we provide the software,

13   obviously, to be able to procure that type of equipment or

14   other types of equipment.

15   Q    I understood you to say that ePlus also develops and

16   licenses software; is that right?

17   A    That's correct.

18   Q    And you mentioned this eProcurement software that enables

19   customers to streamline their supply chains.  Can you describe

20   a little bit of that for us, please?

21   A    Basically it allows you to search for products to try to

22   save the company time and money in purchasing products.  It can

23   create a requisition and workflow that requisition through your

24   organization for approval and then create a purchase order.

25   Q    You work with the parent company, ePlus, Inc.; is that

1  right?

2  A    That's correct.

3  Q    Is there a company that is part of the parent or

4  subsidiary of ePlus that has responsibility for this

5  eProcurement software you've been describing?

6  A    ePlus Systems and ePlus Content are the primary two

7  subsidiaries.

8         THE COURT:  Mr. Robertson, why are we getting into

9  ePlus's products, because we don't compare ePlus's products

10  with the products of Lawson?  We compare the products of Lawson

11  with the claim, and I'm fearful we may be getting into a

12  confusing area, and I don't understand.  Would you help me?

13         MR. ROBERTSON:  One of the issues, Your Honor --

14         THE COURT:  Have I misunderstood the basic principles

15  we are operating under to begin with?

16         MR. ROBERTSON:  Not on that issue, sir, but one of

17  the issues that's going to be in this case is induced

18  infringement.

19         THE COURT:  Is what?

20         MR. ROBERTSON:  Induced infringement, knowledge of

21  ePlus, knowledge of them in competition in the marketplace, and

22  these are the products that we're going to hear testimony on

23  that compete with Lawson in the marketplace.  So it's just for

24  that limited purpose, Your Honor.  I'm going to move on

25  quickly.

1              THE COURT:  I just don't want the jury thinking they

2    have to compare ePlus's products with the Lawson products,

3    because that's a flaw in the whole analysis.

4              MR. ROBERTSON:  I'm not going to be asking this

5    witness to do that, nor will I be asking any witness, sir.

6    Q     Now, I'm sorry.  Maybe you answered this question, but who

7    has responsibility for these two products and these two

8    companies you mentioned, Content(plus) and Procure(plus)?

9    A     That would be two subsidiaries, ePlus Systems and ePlus

10   Content.

11   Q     Now, you are familiar with a gentleman named Mr. Farber

12   who is sitting here at the table?

13   A     I am.

14   Q     Who is Mr. Farber?

15   A     He is the president of both of those subsidiaries.

16   Q     Does he have responsibilities for those products?

17   A     Yes, he does.

18   Q     So then I can ask Mr. Farber specifically as to that issue

19   in competition, but let me just ask you, when you acquired this

20   capability for this software services, consulting, and provided

21   this eProcurement software, do you know approximately when that

22   happened?

23   A     I believe it was 2001 when we acquired ProcureNet.

24   Q     What was ProcureNet, if you recall?

25   A     We acquired some of the assets of ProcureNet including

Marion - Direct

1    three of the patents.  I don't know exactly the extent of the

2    business.

3    Q     Did it also include this eProcurement software solution

4    you were discussing?

5    A     Yes.

6    Q     Do you know whether or not Mr. Farber was part of

7    ProcureNet in 2001 when those assets were acquired?

8    A     Yes, he was.

9    Q     Do you know whether or not part of the assets that were

10   acquired from this ProcureNet company in 2001 included the

11   patents at issue in this case?

12   A     Yes, they were.

13   Q     Is ePlus still headquartered in Herndon, Virginia?

14   A     Yes, it is.

15   Q     How long have they been here?

16   A     Since its inception in 1990.

17   Q     Do you have any other offices in Virginia?

18   A     Yes, we do.  We have one in Glen Allen, Virginia.

19   Q     How about outside of Virginia?

20   A     We have offices in Massachusetts, New Jersey, Maryland,

21   North Carolina, Texas, and California.

22   Q     Is ePlus a public company?

23   A     Yes, it is.

24   Q     Where is it publicly traded?

25   A     It's traded on the NASDAQ under the ticker symbol PLUS.

1    As a matter of fact, we were invited to open the NASDAQ in

2    October.

3    Q    I think you've already described the corporate structure

4    of ePlus and the subsidiaries that are responsible for ePlus

5    Systems and Content.  Who are the customers that ePlus is --

6    directs its products to?

7    A    We primarily target middle market companies and larger in

8    the United States.

9              THE COURT:  What does that mean?  The jury may not

10   follow the same definition you do.

11   Q    Could you describe what you mean when you mention these

12   middle market tar -- targeted for the kind of software we're

13   discussing involving eProcurement?

14   A    Middle market and larger companies are midsized companies,

15   2.5 million and above in revenue and larger to enterprise large

16   sale customers.

17   Q    And why is it that ePlus looks to try and sell its

18   products, these electronic procurement products to those types

19   of companies?

20   A    Those types of companies generally have a need for our

21   type of services.  They are in the size range that we look to

22   do business with.

23   Q    Can I ask you as a CFO, has ePlus been a profitable

24   company?

25   A    Yes, we have, since we've been public in 1996 except for

1    one year.

2    Q    So you've been profitable for 13 of the last 14 years?

3    A    Yes.

4    Q    How have you been doing the last few years with this

5    economy?

6    A    We've been profitable.

7    Q    You are aware that ePlus has received royalty revenues

8    associated with licensing these patents; is that correct?

9    A    Yes.

10   Q    Have you been responsible in some way in being --

11   accounting for those revenues within the company?

12             MR. McDONALD:  Your Honor, I think this goes to

13   validity and not infringement.  I object.

14             THE COURT:  How does this go to infringement?

15             MR. ROBERTSON:  Your Honor, I'm just asking --

16             THE COURT:  I understand what you are asking.  My

17   question in response to his objection is how does it go to

18   infringement as opposed to validity, and the answer is it

19   doesn't.

20             MR. ROBERTSON:  It's my last question, Your Honor.

21             THE COURT:  Bring her back.

22             MR. ROBERTSON:  I will end with that then.

23             THE COURT:  Bring her back if you want to get into

24   that.

25             MR. ROBERTSON:  Thank you.  I have no further

1   questions, Ms. Marion.

2             THE COURT:  How far away is Nokesville?

3             THE WITNESS:  Near Manassas.

4             THE COURT:  About three years away by interstate.

5             THE WITNESS:  Could be on 95.

6

7                     CROSS-EXAMINATION

8   BY MR. McDONALD:

9   Q    Good afternoon, Ms. Marion.

10  A    Good afternoon.

11  Q    We haven't met before, have we?

12  A    I don't believe so.

13  Q    In fact, you know there are a number of depositions that

14  Lawson took of ePlus people in this case?

15  A    I understand there was.

16  Q    And you were never deposed, were you?

17  A    No.

18  Q    Do you know that we asked ePlus to designate spokespeople

19  for it on various topics related to the case?

20  A    I'm not aware of that.

21  Q    At least you know that nobody asked you to be the

22  corporate spokesperson at any of the depositions we took;

23  right?

24  A    I'm not aware --

25            THE COURT:  Are we going to get to something that has

1  to do with infringement or not?

2          MR. McDONALD:  I'm going to get to the issues covered

3  here.

4  Q    You mentioned that the ePlus has been profitable for

5  several years.  Now, Mr. Farber's division, that's the one that

6  actually has the technology relating to procurement; right?

7  A    That's correct.

8  Q    You are aware that Mr. Farber is the corporate

9  spokesperson said that that division has never been profitable?

10 A    That's correct, however --

11 Q    In fact, that division had trouble with sales a few weeks

12 before ePlus sued Lawson; right?  Sales were down?

13 A    I'm not aware of that.

14 Q    You know they sued in May of '09; right?

15 A    Pardon me?

16 Q    Do you know that ePlus sued Lawson in May of 2009?

17 A    I don't recall the exact date, but it sounds accurate.

18 Q    Do you recall that in the February/March of 2009 time

19 period, you were involved with making a disclosure to the SEC

20 regarding a write-down in the valuation of the division

21 involving Mr. Farber's business --

22          MR. ROBERTSON:  I'd object, Your Honor.  It's outside

23 the scope of my direct.

24          MR. McDONALD:  I'm talking about profitability here,

25 and also he mentioned competition which is also going to be

1    relevant to the lack of competition with Lawson.

2              MR. ROBERTSON:  I didn't ask her if she was aware

3    whether ePlus competed with Lawson.

4              THE COURT:  You asked her about profitability.  When

5    you open the door to something -- I don't know why she

6    testified, to tell you the truth, at least now, but when you

7    ask a question like that, you open the door.  He's entitled to

8    say something about it on his side if he wants to.  Overruled.

9    Go ahead.  Do it again.

10             MR. McDONALD:  Okay.

11   Q    Do you recall back in the February/March 2009 time frame

12   you put together a disclosure to the SEC which wrote down the

13   value of the procurement division of Mr. Farber's business

14   because of declining revenues?

15   A    Yes.

16   Q    And you had to disclose truthfully to the SEC the reasons

17   for those declining revenues in this procurement division;

18   correct?

19   A    I don't recall the exact reasons.

20   Q    Do you recall --

21             THE COURT:  That wasn't his question.  His question

22   was, did you have to tell the SEC the truth about what you

23   said?

24             THE WITNESS:  Of course.

25   Q    And if the reason for the decline in sales were happening

1    just weeks before suing Lawson was because Lawson was competing

2    with ePlus or infringing, you would have had to disclose that

3    to the SEC, wouldn't you?

4    A    Not specifically that Lawson was competing, no.

5    Q    Well, they were a factor --

6               THE COURT:  Wait a minute.  Let her finish her

7    answer.

8    A    I'm sorry.  I believe the disclosure was surrounding the

9    forecasts of the company rather than direct competition.

10   Q    Well, the reasons you disclosed were just a weakening U.S.

11   economy and global credit crisis; right?

12   A    That's correct.

13   Q    You didn't say anything about Lawson being the reason for

14   these lower sales; correct?

15   A    Nor did we talk about any other competitor in that

16   disclosure either.

17   Q    Because no competitor was actually causing the declining

18   sale; right?

19   A    It's not normal to disclose specific competitors in SEC

20   disclosures.

21   Q    Well, is it normal to give the SEC accurate information

22   about why sales are down?

23   A    Yes, it is, in a broad sense.

24   Q    And you didn't tell the SEC that the reason sales were

25   down was because of Lawson or any infringement by Lawson?

1   A    We did not.

2   Q    From time to time, have you ever gotten reports that

3   relate to review of ePlus's performance against peer review of

4   competitor public companies?

5   A    I don't recall.

6        MR. McDONALD:   Approach the witness, Your Honor?

7   Q    Ms. Marion, do you see you're a cc recipient on this

8   email?

9   A    Yes.

10  Q    And it's dated February of 2007; correct?

11  A    Yes.

12  Q    And you see amongst the attachments in the second line

13  there's something called a peer review of competitor public

14  companies, 2-20-07.xls?

15  A    I see that.

16  Q    That appears to be an attachment that's a spreadsheet

17  regarding a peer review of competitor public companies; right?

18  A    Yes.

19  Q    Does seeing this refresh your recollection that you, at

20  least on this occasion in '07, got a report that was a peer

21  review of competitor public companies?

22  A    It looks to be, yes.

23  Q    And isn't it true that in that peer review of competitor

24  public companies, Lawson is not listed as a competitor

25  anywhere?

1    A    I don't know, sir.  I don't recall the attachment.

2    Q    Do you recall any report like that that Lawson was ever

3    called a competitor?

4    A    I don't recall.

5         MR. McDONALD:  May I approach, Your Honor?

6    Q    Have you had a chance to review that, Ms. Marion?

7    A    Yes, I see.

8    Q    This is entitled a strategic competitors analysis; that's

9    correct?

10   A    That's correct.

11   Q    That has quarters in it from all four quarters of the year

12   2006; correct?

13   A    Looks correct, yes.

14   Q    Does seeing this refresh your recollection of seeing the

15   peer review competitor report of the type referred to in that

16   email I just showed you a moment ago?

17   A    Yes.

18   Q    And Lawson's name is nowhere to be found on this list of

19   competitors or peers, is it?

20   A    Nor would it be, because it's really describing the

21   competitors of the bar business which is our value-added

22   reseller business.

23   Q    So when you are talking about the ePlus sales, the vast

24   majority of ePlus's sales are in that value-added business,

25   aren't they?

1    A    That's correct.

2    Q    In fact, the procurement division of Mr. Farber, that's

3    less than two percent of the company, isn't it?

4    A    That sounds about accurate, yes.

5         MR. McDONALD:  I have no further questions.  Thank

6    you.

7

8                    REDIRECT EXAMINATION

9    BY MR. ROBERTSON:

10   Q    Just so I'm clear, Ms. Marion, this document that was

11   shown to you called strategic competitors analysis has nothing

12   at all to do with this electronic procurement software we've

13   been discussing?

14   A    No, it does not.

15   Q    Doesn't have anything to do with that part of the

16   business; is that right?

17   A    It does not, sir.  Who prepared it has nothing to do with

18   the procurement business.

19   Q    When I asked you about the almost $60 million in royalty

20   revenues that were enjoyed by licensing these patents, they

21   weren't --

22        MR. McDONALD:  Your Honor, we didn't get into that on

23   direct, because I objected and you sustained.

24        THE COURT:  Correct.

25        MR. ROBERTSON:  He's opened up the issue about

1   profits and whether or not ePlus was profitable, Your Honor.

2              THE COURT:  You opened up the issue on that, and a

3   subset of that was this royalty issue, and he objected to it

4   and I sustained as inappropriate to the infringement case.  Why

5   are you now going into that?

6              MR. ROBERTSON:  Because Mr. McDonald suggested that

7   ePlus systems involving these patents has not been profitable.

8   I want to ask the witness --

9              THE COURT:  He didn't suggest it.  The witness

10  testified to that.

11             MR. ROBERTSON:  Then I'd like to ask her a question

12  about it.

13             THE COURT:  Well, then, ask her that instead of

14  royalties.

15  Q    With respect to revenues associated with ePlus Systems,

16  does it or does it not include any royalties that were

17  associated with these patents?

18  A    It does not include royalties.

19  Q    Where were those royalties booked?

20  A    They were recorded on the parent company's books, ePlus,

21  Inc.

22  Q    If they had been recorded in ePlus Systems' books, would

23  it have been a profitable or non-profitable company?

24             MR. McDONALD:  Objection; hypothetical, speculation.

25             MR. ROBERTSON:  She's the CFO.  I think she knows how

1   to do the accounting.

2           THE COURT:  Why does that make it less speculative?

3           MR. ROBERTSON:  Because she, in fact, does the

4   accounting, Your Honor.  She would know the numbers.

5           THE COURT:  What?

6           MR. ROBERTSON:  I would suggest respectfully, Your

7   Honor, that as a CFO, she would be familiar with the numbers.

8           THE COURT:  If you ask the right questions, you may

9   get the right answers.  You haven't asked them yet.  Sustained.

10  Q    Were you responsible for making the decisions as to where

11  to place the royalty revenues with respect to ePlus, Inc.?

12  A    I was not responsible for that decision.

13  Q    Were you involved in the decision?

14  A    More or less.

15  Q    In the capacity that was more than less, why was that

16  decision made if you are aware?

17  A    I'm not aware specifically of that decision.

18          THE COURT:  Then you don't know.

19          MR. ROBERTSON:  Thank you.  I have no further

20  questions.

21          THE COURT:  All right, can she be excused

22  temporarily?

23          MR. ROBERTSON:  Yes, Your Honor.

24          THE COURT:  Ms. Marion, you are excused temporarily,

25  but you are not released from your obligation to be present

1    upon call, so any time that you are asked to be here, you need

2    to be here.  In the meantime, where can she be; at home, Mr.

3    Robertson?  Can she go home?

4                MR. ROBERTSON:  Yes, sir.

5                THE COURT:  How about you, Mr. McDonald?

6                MR. McDONALD:  That's fine with me.

7                THE COURT:  All right.  Be available, please.  Make

8    sure they know how to get hold of you and you can get back here

9    in short order.

10               THE WITNESS:  Thank you.

11               THE COURT:  Next witness is whom?

12               MR. ROBERTSON:  Mr. Douglas Momyer.

13               THE COURT:  Do you have somebody to go get him?

14               MR. ROBERTSON:  Your Honor, we have some exhibits

15   that are going to be associated with this witness, so with your

16   permission, we'd hand them out.  To the extent I make reference

17   to them, Mr. Greer can put them on the monitors for the jury.

18

19                         **DOUGLAS R. MOMYER,**

20   a witness, called by the plaintiff, having been first duly

21   sworn, testified as follows:

22                         DIRECT EXAMINATION

23   BY MR. ROBERTSON:

24   Q    Could you please state your name for the jury, please,

25   sir.

1    A    Douglas R. Momyer.

2    Q    And where do you currently live, Mr. Momyer?

3    A    Pittsburgh, Pennsylvania.

4              THE COURT:  Spell your name.

5              THE WITNESS:  M-o-m-y-e-r.

6    Q    And what do you currently do for a living?

7    A    I manage the software development for Ferguson Integrated

8    Services which is a division of Ferguson Enterprise which is

9    housed in Newport News, Virginia.

10             THE COURT:  What is the name of the company?

11             THE WITNESS:  Ferguson Integrated Services which is a

12   division of Ferguson Enterprise, and that's here in Virginia.

13   Q    And can you tell me, what are your duties at Ferguson

14   Service Supply?

15   A    I'm responsible for the development of software to support

16   the business operations of the company.

17   Q    And how long have you worked at Ferguson Supply?

18   A    Since 2003.

19   Q    Did you ever work for a company known as Fisher

20   Scientific?

21   A    Yes, I did.

22   Q    And is Fisher Scientific located in Pittsburgh,

23   Pennsylvania?

24   A    Its corporate headquarters is in Pittsburgh, Pennsylvania,

25   yeah.

1   Q    What period of time did you work at Fisher Scientific?

2   A    From 1989 through 2003.

3   Q    And what was your job title at Fisher?

4   A    Given the period of time I was at Fisher, I really held

5   quite a few job titles from software development, programming,

6   database administration.  I also managed the software

7   development.  Primarily for the greater period of time I was at

8   Fisher, I managed software development.

9   Q    And when you managed the software development, can you

10  tell me specifically what types of responsibilities you had in

11  that area?

12  A    Primarily to do the design and development, definition of

13  specifications for software that would help the Fisher business

14  operations.

15  Q    What was the nature of Fisher's business operations?  What

16  kind of company was it?

17  A    Fisher is a distributor, a distributor of laboratory

18  products and health care supplies.

19  Q    And is Fisher still in existence, in business today?

20  A    Yes, it is.  I think its name has changed.  I think it's

21  Thermo Fisher at this point, but it still exists.

22  Q    Does it primarily involve the same type of business?

23  A    Yes.

24  Q    Just briefly, where did you go to undergraduate school?

25  A    I went to undergraduate at University of Pittsburgh.  I

Momyer - Direct

1   have an undergraduate degree in psychology with a focus on

2   industrial psychology.

3   Q    How long have you been working in the area of computer,

4   computer programming, and design?

5   A    Since 1976.

6   Q    So over 30, 35 years?

7   A    Yes.

8   Q    Have you ever worked for my client, ePlus?

9   A    No, I have not.

10  Q    How many products that you mentioned, these kind of

11  medical laboratory products, how many products did Fisher sell?

12  A    Fisher actually had a lot of products.  It was kind of

13  known as the Sears of the medical supply business.  It had over

14  half a million products that it sold.

15  Q    Can you tell us who were typically some of Fisher

16  Scientific's customers?

17  A    Customers were in several different categories.  There was

18  the industrial group, and that was primarily pharmaceutical and

19  chemical companies.  There was education which were primarily

20  university research environments, and then there was hospitals

21  which, once again, were primarily the research end of the

22  hospitals.

23  Q    You have a notebook in front of you that has a number of

24  exhibits, and we'll be referring to some of them from time to

25  time.  Will you open it up to the first exhibit which is PX-1,

1    or Plaintiff's Exhibit Number 1, and tell me if you've seen

2    this document before.

3    A    Yes, I have.

4    Q    What is it?

5    A    It's a patent.

6    Q    And what is the title of the patent?

7    A    Electronic sourcing system and method.

8              THE COURT:  Ladies and gentlemen, you have this as

9    tab two in your book if you want a hard copy of it.

10             MR. ROBERTSON:  And it is identified at tab two as

11   Plaintiff's Exhibit Number 1.

12   Q    Are you listed there, Mr. Momyer, as one of the named

13   inventors?

14   A    I'm number four.

15   Q    Are you, in fact, one of the inventors --

16   A    Yes.

17   Q    -- of the subject matter -- you have to let me finish, Mr.

18   Momyer.  We'll get there.

19   A    Okay.

20   Q    Let me start over.  And were you one of the named -- were

21   you one of the inventors of this patent entitled electronic

22   sourcing system and method?

23   A    Yes.

24   Q    Just generally, at a high level, can you tell me what your

25   understanding was of the subject matter of this patent?

Momyer - Direct

1  A    Well, sure.  I'll kind of -- it was a system that was

2  developed to be able to review multiple electronic catalogs,

3  search those catalogs, identify a list of products from those

4  catalogs based on search criteria, compare using a comparison

5  on those products that were selected from the search, select a

6  product from that list, and remove that product to a

7  requisition form, and the requisition form, then from that you

8  would be able to contact the vendor of the product that you

9  selected electronically, obtaining price and availability of

10 the product, return the information back to the electronic

11 sourcing system, and then start processing that requisition

12 through the work flow which would involve sign-offs of a req

13 based upon dollar amount.

14 Q    When you say req, what do you mean?

15 A    Requisition form would be a requisitional product.  I mean

16 at a customer's location.  I am the end user.  I want to buy

17 something.  I pull it from the catalog, put it on an electronic

18 form, pass that form to my supervisor who then electronically

19 signs off on it.

20      After it's been priced and inventory availability of it

21 determined by contacting electronically the vendor, and then

22 processing that req once it's been approved as an order to the

23 supplier, and if that requisition had multiple lines on it,

24 different vendors, we'd create purchase orders, multiple

25 purchase orders to those different vendors.

Momyer - Direct

1   Q    Now, are you generally familiar, and have you been over

2   the course of the last few years, with the structure of this

3   patent and the content of the patent?

4   A    Yes.

5   Q    Very quickly, let me just confirm, if you would for me,

6   that Plaintiff's Exhibit Number 2, the '516 patent, and

7   Plaintiff's Exhibit Number 3, the '172 patent, that you are

8   also a named inventor on those patents; is that correct, sir?

9   A    That's correct.

10  Q    And is that a truthful statement, you were an inventor of

11  those patents?

12  A    Yes.

13  Q    Now, in your familiarity as an inventor and with the

14  structure of the patent, you are familiar with the section of

15  the patent that deals with the claims, the actual inventions

16  that are involved; correct?

17  A    That's correct.

18          THE COURT:  Before you get into that, you said when

19  you were given the subject matter patent that you could contact

20  the vendor and get pricing availability.  Do you mean while

21  you're in the system, there's capacity to leave what you are

22  doing, go somewhere else, and come back after you get the

23  pricing availability and continue with what you are doing?

24          THE WITNESS:  That's correct.

25          THE COURT:  All right, thank you.  Excuse me.

1            MR. ROBERTSON:   Thank you, Your Honor.

2    Q    Let me go back at one point.   You see on the front page

3    where it says, there's a heading 22, filed August 10, 1994?

4    A    Which one are we looking at?

5    Q    Relative to the '683.   Thank you for pointing that out to

6    me.

7    A    So go back to the '683?

8    Q    Yes, sir, Plaintiff's Exhibit Number 1.

9    A    Okay.   The front page there?

10   Q    Yes.   Do you have a recollection as you sit here today if

11   that was the time period in which you filed for the

12   application?

13   A    Yes.

14   Q    When did you start working on the inventions that are the

15   subject of this '683 patent, the electronic sourcing system

16   method?

17   A    In 1993 is when we would start the investigation, research

18   and design.

19   Q    Let me take you to claim one which is at column 24 of the

20   '683 patent.   Just highlight that if you would, please.

21   A    What column is it in?

22   Q    Column 24.   Starts at the bottom and goes over to the top

23   of the next column, 25.

24   A    Okay.

25   Q    Now, when you described your invention, you described a

1    number of elements that are not in this claim.  Would that be a

2    fair statement?

3    A    Yes.

4    Q    Are you familiar with the fact that the inventor who

5    represented these claims to the Patent Office are described --

6    in a variety of ways describing different aspects of your

7    invention?

8    A    Yes.

9    Q    So, for example, just looking at claim one, there was

10   notice of discussion in there about doing that sort of

11   cross-referencing or comparison you were talking about;

12   correct?

13            MR. McDONALD:  Your Honor, claim one is not asserted

14   in the case.  I think it would be more useful if we were using

15   an asserted claim.

16            MR. ROBERTSON:  It's not asserted, Your Honor, but

17   I'm trying to illustrate a point about the claims in general.

18   I can certainly move to a claim that is asserted, so let's look

19   at claim three.  That's fine.  That's highlighted in the

20   jurors' notebooks, so we focus on claim three then of the '683.

21            THE WITNESS:  All right.

22   Q    One of the things you mentioned to the Judge was that

23   there was ability to determine whether there was an item in

24   inventory, for example; do you recall that?

25   A    Yes.

Momyer - Direct

1    Q    That's not described in claim three, for example.

2    A    No, it's not.

3    Q    One of the claims that is asserted in this case is claim

4    26 which is a method for doing a certain process; do you see

5    that?

6              THE COURT:  Bottom of 26.

7    A    Yes, I see it.

8    Q    Does that claim contain the capability described as being

9    able to determine whether something is available in inventory?

10   I want you to focus on the last step.

11   A    Yes, it does.

12   Q    So do you understand, then, as an inventor on this patent

13   as well as the other patents, that there are different ways to

14   claim aspects of your invention and that each claim stands

15   independently and needs to be considered on its own merits?

16   A    Yes.

17   Q    Did you ever commercially develop a workable prototype of

18   the subject matter of the invention that's described in this

19   electronic sourcing system method?

20   A    Commercially available?

21   Q    Well, commercial embodiment, something that would -- you

22   know, a prototype that actually could function?

23   A    Yes.  A prototype was developed.

24   Q    Did there come a time when a product was developed for

25   Fisher Scientific involving the subject matter of this patents?

1    A    Yes.

2    Q    What was the first product called?

3    A    The first product would have been called electronic

4    sourcing.  First product would have been SupplyLink.

5    Q    Do you recall approximately when SupplyLink came into

6    existence?

7    A    1995.

8              THE COURT:  Are you saying SupplyLink.

9              THE WITNESS:  Yes.  S-u-p-p-l-y, l-i-n-k.

10   Q    Subsequent to that, was there another commercial

11   embodiment that was able to actually access and utilize the

12   internet?

13   A    (No response.)

14   Q    Let me ask you if you are familiar with a product known as

15   Cornerstone.

16   A    Yes.

17   Q    What is Cornerstone?

18   A    Cornerstone was -- which is a product really similar in

19   functionality to SupplyLink but was based -- was built using

20   web-based technology.

21   Q    Now, was this tool that you've described with the

22   capability that you have given us at a high level, was that a

23   tool that was used by Fisher Scientific in any way?

24   A    SupplyLink?

25   Q    Well, no, just the subject matter we're talking about, the

1    electronic sourcing systems and methods?

2    A    Yes.

3    Q    Prior to development, before computers came along, how did

4    Fisher sell its product?

5    A    Now, are we talking about before a computer at a

6    customer's site or talking about before the age, electronic

7    age?

8    Q    We're talking about before -- well, we had the computers

9    at the customers' sites, I think I know where you're going on

10   this, this RIMS system, but even before that.

11   A    Okay.

12   Q    How did Fisher sell its product?

13   A    This is assuming that there is a system at a Fisher

14   location that allows the taking of orders, electronically

15   taking of orders, and processing those orders through to

16   fulfillment which would be creating an invoice.

17        What typically would happen would be we would have to --

18   we would have several ways to get orders.  The first way would

19   be a customer would call in to a call center, and Fisher would

20   have call centers throughout the United States, and a customer

21   service rep would answer the phone and communicate with the

22   customers who would then identify who they were, identify the

23   products that they were interested in at which point the

24   customer service rep would then enter that order into the

25   Fisher system.

Momyer - Direct

1    Q    How would the customers know what product they wanted?

2    Was there a catalog of some sort?

3    A    Yes.  Well, couple ways.  First of all, if they've bought

4    product before and know what it is, they'd give a product

5    number.  If they didn't know the product number, they would

6    describe the product, maybe give the vendor, maybe give the

7    vendor part number in which case the customer service rep would

8    have to access either their knowledge of products that they

9    had -- that's one of the things that our customer service reps

10   would have, they had knowledge of the products, but they would

11   also have to, perhaps, take a look at the catalog, a Fisher

12   catalog, which is a fairly large product catalog which is

13   organized in various ways.  They'd look it up and try to

14   communicate with the customers over the phone saying is this

15   the product you want.

16   Q    Just so I'm clear, this customer service representative,

17   CSR for short, that is a fish Fisher Scientific employee who is

18   housed somewhere at a Fisher facility who is taking these calls

19   from customers typically over the phone; is that right?

20   A    That's correct.

21   Q    At some point, did Fisher start using computer technology

22   to help sell its products?

23   A    Yes, yes, they did.  One of the things that Fisher

24   recognized fairly early is that there was an advantage to

25   engaging our customers with our systems.  We call that

1    value-added systems.  What that really would do is it would

2    establish a good business relationship, partnership between

3    ourselves and our customers, and in many ways kind of lock that

4    customer in to doing business with Fisher.

5         We would do things like provide a customized invoice,

6    provide for remote order entry capabilities where the customer

7    themselves could enter the order, and these kind of things

8    would allow the customer to, in many ways, become more

9    efficient in their day-to-day operations as well as to reduce

10   their costs of operation.

11   Q    And do you understand one of the objectives then was to

12   promote the sale of Fisher product through these value-added

13   features you've mentioned?

14   A    Absolutely.

15   Q    Generally the goal of any business?

16   A    That's right.

17   Q    Now, you mentioned, I think, in one of your value-added

18   features that there was this inventory management aspect; do

19   you recall?

20   A    I didn't mention that.

21   Q    Okay, I'm sorry.  Did you have any value-added feature

22   that involved inventory management?

23   A    Yes, that was a value-added -- we did find a good tool to

24   allow us to get involved in a good relationship with our

25   customers, and what we do -- and we actually did this before we

1   had a system to manage it.

2       We would put inventory, Fisher owned inventory at our

3   customers' site to allow them to -- and get those products and

4   use those products that are in the inventory for their daily

5   use, and that would allow them to very quickly have access to

6   inventory and not have to wait a day or so until the ordered

7   item would be delivered from a Fisher distribution center.

8   Q   I'd like to sort of focus, if we could, on how we got to

9   the inventions that are the patents-in-suit, the ones in issue

10  here, Plaintiff's Exhibit 1, 2, and 3 and what led up to the

11  inventors, yourself, as well as the other inventors that are

12  identified in the patent solving some of the problems that

13  needed to be solved.  Are you capable of doing that with me?

14  A   Sure.

15  Q   You mentioned this inventory management system where you

16  kept actual Fisher inventory at customers' sites.  Is that

17  Fisher-owned inventory?

18  A   Yes.  We actually -- initially it was Fisher-owned

19  inventory, but the system we developed actually would allow us

20  to manage the customers' inventory as well.

21  Q   What was that inventory management system called?

22  A   RIMS, R-I-M-S.

23  Q   And what did RIMS stand for, sir?

24  A   Requisition inventory management system.

25  Q   Just at a high level, can you tell me what RIMS could do?

Momyer - Direct                                                           231

1   A    Sure.  The -- basically the RIMS system would keep track

2   of the inventory that was in the stockroom.  That inventory

3   could be both customer-owned or Fisher-owned and could keep

4   track of who pulled the product out, and would also -- keeping

5   track of the inventory, also determine if the inventory,

6   specific product had to be restocked.

7        So there was a component of the system that would allow us

8   to, based upon the order point and reorder quantity, would

9   actually reorder and transmit orders to Fisher to refill,

10  refill the stockroom for the products and how much was needed

11  in them.

12  Q    Did you help develop the RIMS system?

13  A    Yes, I did.

14  Q    When did you work on that RIMS system?

15  A    1989 would be probably when we started.  I think we had

16  our first installation around 1981.

17  Q    Did that RIMS system that you've generally described at a

18  high level go through various iterations or versions?

19  A    Oh, sure.  The first version that was put out there really

20  handled -- only handled recording of requisitions without

21  dealing with the inventory management.

22  Q    Let me just stop you there and say, approximately how many

23  iterations or variations did the system go through?

24  A    Dozens if not more than that.  The Fisher RIMS system was

25  in existence from 1991 all the way through until I left in

1    2003, and there were many iterations of that, and primarily

2    those iterations were based upon some unique requirements the

3    customer had or some business initiative that Fisher wanted to

4    undertake in the area of inventory control and inventory

5    management at a customer's site.

6    Q    Could you open to Plaintiff's Exhibit Number 10 that's in

7    your notebook, and I'd ask you if you could identify that

8    document for me.

9    A    That is a patent for a just-in-time requisition inventory

10   management system.

11   Q    Just-in-time requisition and inventory management system;

12   is that right?

13   A    That's correct.

14   Q    What does just in time mean in the context of that

15   invention?

16   A    If you think about what we were trying to do, tried to

17   explain a little bit when I talked about the invention itself,

18   the RIMS system, it is providing product to the customer when

19   they need it.

20        A very typical scenario would be a chemist who is doing

21   some research may need a reagent or a test tube, and it's very

22   critical they have it right away, so by putting inventory at

23   the customer's site, this would allow them to have inventory

24   just in time, just when they need it.  It is a value added to

25   our customers.

1   Q    So this just in time has often been referred to as JIT?

2   A    JIT, yes.

3   Q    This ability to replenish product quickly, was that

4   something desirable on Fisher's part in order to service their

5   customers?

6   A    Absolutely.  Once again, it was value both to Fisher as

7   well as their customer.  As a result, I think it created a good

8   relationship, a good business partnership.

9   Q    On Plaintiff's Exhibit Number 10, this patent involving

10  just-in-time requisition and inventory management system, is

11  that something that you -- subject matter associated with this

12  commercial system you were discussing known as RIMS?

13  A    Yes.

14  Q    And I understood you to say that there were multiple

15  variations and iterations of RIMS; is that right?

16  A    That's correct.

17  Q    Are all those variations described in this patent, this

18  '989 patent, Plaintiff's Exhibit Number 10?

19  A    No.

20  Q    Let me just go back.  I should have done this earlier.

21  Are you one of the named inventors on this patent as well?

22  A    Yes, I am, number two.

23  Q    And there's also a Mr. James Johnson named on this '989

24  patent, Plaintiff's Exhibit Number 10; do you see that?

25  A    Yes, I do.

234

1    Q    Do you know just from memory whether or not Mr. Johnson is

2    also a named inventor on Plaintiff's Exhibit Number 1, 2, and

3    3, the three patents issued in this case?

4    A    Yes, he is.

5    Q    I want to focus a little bit briefly on this RIMS system

6    and its functionality that you were talking to.  You mentioned

7    in the prior non-computerized world where someone would have to

8    pick up the phone and call in, there was a customer service

9    representative or a CSR.

10   A    That's correct.

11   Q    Was the CSR required in this RIMS system you are talking

12   about that Fisher utilized?

13   A    Yes, it was.  The RIMS system was entirely dependent upon

14   an on-site customer service rep to operate.

15   Q    What was the responsibility of that customer service

16   representative or CSR?

17   A    Twofold.  To manage the stockroom, or -- as well as take

18   the requisitions that the customers had for the, primarily for

19   the inventory that was in the stockroom.

20   Q    And what happened if one of the customers needed some

21   just-in-time inventory with this RIMS system?  How would that

22   work?

23   A    The customer would have to contact in some manner the

24   on-site customer service rep, and that contact would be

25   numerous ways.  They could make a phone call from the facility,

1    the customer facility.  They could come directly to the

2    customer service rep, or they could pass in the interoffice

3    mail a requisition form which would then come to the customer

4    service rep that way.

5    Q    When you say interoffice, we're not talking email or

6    something like that?

7    A    No, piece of paper.  Because in many cases what had to

8    happen was these requisitions would have to go through a level

9    of approval.  Any time you would take a requisition, in most

10   cases you're going to have to get some sign-off from some

11   supervisor along the way saying it's okay to buy this product.

12   Q    So in utilizing this RIMS system, there are number of

13   individuals who may need to be involved in the process

14   including the customer who wants to make the purchase, some

15   sort of intermediate approval, management, CSR, someone to fill

16   the item that's being desired; correct?

17   A    That's correct.  Now, that last step as far as picking the

18   product and delivering the product could be the same person.

19   Very often, it was with a customer service rep --

20   Q    Did Fisher charge its customers for this RIMS value-added

21   service you described?

22   A    It wasn't a for-sell product.  It was really a tool that

23   Fisher used to manage the on-site inventory.

24   Q    Did you ever try to sell this service to your customers?

25   A    No.  I will tell you it did provide some significant value

1    to our customers, and that would be in a couple ways.  One is

2    the cost of ownership would be eliminated for the customer, so

3    if it's Fisher-owned inventory sitting there, the customer is

4    not going to have to pay any kind -- any taxes for that

5    inventory sitting around in a crib.  They don't have to pay for

6    it until they used it.  That's one; cost of ownership goes

7    down.

8         Secondly -- and often what would happen would be there

9    would be the ability for the customer to reallocate a person

10   who was taking orders at their site, procurement person, or

11   even reallocating a crib attendant to another job.  These are

12   Fisher personnel, Fisher paid for them.

13   Q    It had some benefits obviously therefor.  Did it have some

14   problems, some issues associated with it?

15   A    Yeah.  There would have been some problems with it.

16   Typically, if we take a look at the requisition itself coming

17   in, there often, if we had to seek approval on a req, it came

18   in from someone and we didn't know if that person had approved

19   req, we --

20   Q    Req?

21   A    Requisition.

22   Q    Okay, thank you.

23   A    We would have to -- very often a req, requisition would

24   come in with a piece of paper saying, give me a test tube, and,

25   of course, there are many types of test tubes.  So what the

Momyer - Direct

1    customer service person would have to do is they'd have to

2    discern what particular test tube had been requested.  So

3    either they do that by contacting the requester back, or they

4    would pull the catalog down, take a look at it, try and do some

5    research and contact the requester back.

6    Q    Let me stop you there and ask you this question:  You

7    talked about this customer services representative.  Could the

8    customer actually, the end user, person who wanted the test

9    tube, could they use the RIMS system themselves?

10   A    No.  It was a system that was fairly specific to a

11   customer service or Fisher personnel would use, there was

12   nomenclature on the screen that was unique to Fisher.  There

13   was also some information that were on the screen that we

14   really wouldn't want our customers to see, like costs of the

15   product, so it was a system that we did not choose to expose to

16   our customers.

17   Q    So the end user, the customer, had no capability to use

18   this requisition inventory management system by his or herself?

19   A    No.

20   Q    If, though, a customer or this end user who wanted to

21   obtain product made a request, or however it was, by telephone

22   call or by sending interoffice envelope, what would happen next

23   in this process using the RIMS?

24   A    We got into a little bit of it.  The customer service rep

25   would have to identify what the specific product was and really

Momyer - Direct

1   get it down, identification down to a Fisher product number,

2   catalog number.

3        That is the only way that the RIMS system was set up to

4   operate, to identify products.  You needed a Fisher part number

5   to input to start the process going.

6             THE COURT:  So I'm ordering from you, I call and tell

7   you, Mr. Momyer, I'd like to have such-and-such.  You talk to

8   me and tell me -- you are the CSR.  You tell me, well, that's

9   product number, our product such-and-such and such-and-such,

10  and you put it down, and you are using RIMS, I don't have it;

11  is that right?

12            THE WITNESS:  That's correct.

13  Q    You talked about the product number.  Are we talking about

14  Fisher product or other supplier product?

15  A    We're only talking about Fisher products at that time.

16  The RIMS system only dealt with -- primarily dealt with Fisher

17  products and Fisher products that Fisher purchased.

18  Q    And so if I wanted a specific product, did I need to know

19  the Fisher part number in order to be able to look up and find

20  out whether that was either available in inventory at the

21  customer site or perhaps back at some Fisher warehouse?

22  A    Yes.  The starting point for the whole process as far as

23  entering a requisition into the RIMS system was identify who

24  you were, and typically this would have been account number,

25  and then who the customer was, and then identify the product,

Momyer - Direct

1    and by the product identification, I think what you could put

2    in was the Fisher product number.

3    Q    Is that what you could enter in as a lookup feature for

4    the RIMS system?

5    A    Yes.

6             THE COURT:  Excuse me, Mr. Robertson.  I think we

7    need to change court reporters here.

8

9             (Recess taken.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25