BY MR. ROBERTSON:

Q   I may have lost track.  If the customer called up the CSR and has specific requests and the CSR was unfamiliar with their precise part or part numbers associated with that request, what would that CSR have to do?

A   They'd have to do some research on the request.  Normally that research would involve accessing the hard copy catalog.

Q   So the CSR himself or herself would look through catalog and try and identify whatever product was the customer was receiving; is that right?

A   Yeah.  The catalog would be organized in such a way that there would be some access to the taxonomy of the catalog.  So, for example, if it was a beaker.  Start looking in glassware.  And there are indexes in the back saying beakers are on page 200 to 250.  And they'd start looking at that.  And they'd start getting some information from that.

Probably if it was very unspecific, then they'd get to a certain point and they'd have to contact the requester back again and try to get some additional information.

Q   You mentioned this catalog, this paper catalog, that they had thousands or tens of thousands.

1  A    Hundreds of thousands.

2  Q    Now, the RIM system on its database, did it
3  contain every part number for every product that
4  Fisher offered?

5  A    The only parts that were in the RIMS inventory
6  database were those parts that the RIMS system was
7  managing in inventory.  Those are the only parts.

8  Q    So if I was a customer and I didn't have in the
9  on-site inventory the Fisher-owned product, and I
10 wanted to obtain a part that wasn't already in that
11 database, could I use the RIMS system or not?

12 A    Yes, you could use the RIMS system.

13 Q    How would I do that?

14 A    The RIMS system had the ability to communicate to
15 the Fisher host for obtaining information on products.
16 When we talked about the first step in entering the
17 req, a time req, in RIMS was to enter the pin number
18 and the Fisher part number.

19      Once that was entered, hit the enter key, there
20 would be a series of business logic that would take
21 place in the system.  It would do a look-up first to
22 see if that product was a product that was local in
23 the inventory.  If it didn't find it there, then it
24 would proceed to connect up to the host.

25      Once again, it's leaving the local system,

1  systematically leaving it, and going up and talking to
2  some programs that are on a host, which would do
3  product validation, do some inventory sourcing, and
4  pricing, and return that information back.
5  Q   Let me see if I understand this because you made
6  reference to a few terms.  I just want to make sure
7  we're clear on what they mean.
8      So if at the customer location where the
9  Fisher-owned inventory is and the information, the
10 part number, is not on a database there, the RIMS
11 system had the ability to go back to -- and I think
12 you referred to it as a host or host computer?
13 A   Yes.
14 Q   Was that a mainframe system at Fisher?
15 A   Yes, it was a mainframe system.  When we were
16 talking earlier, it's the same system that our
17 customer service reps would have had.  These customer
18 service centers would have been taking the calls at
19 the call center and entering the orders into --
20 Q   On the host computer, was that Fisher product as
21 well?
22 A   Yes, it was Fisher product only.
23 Q   Well, where --
24 A   It would be Fisher products that Fisher would buy.
25 Q   And that Fisher would sell to its customers as a

1  distributor?

2  A    Yes.

3           THE COURT:  Did Fisher make anything?

4           THE WITNESS:  Yes, about a third of the

5  products that it sold it manufactured.

6           THE COURT:  And it bought two-thirds of the

7  other products it sold from other people and kept them

8  in inventory or had some arrangement to get it to

9  them?

10          THE WITNESS:  That's correct.

11 Q    What is this mainframe or host computer you

12 described, sir?

13 A    Well --

14 Q    The one specifically we're talking about used in

15 this RIMS system back in the late '80s and early

16 '90's?

17 A    It would have been an IBM computer running an NBS

18 operating system.  I don't know if that helps or not.

19 Q    Well, but was it able to communicate with a local

20 computer or something located --

21 A    Absolutely.  We talked about it.  There was a

22 dataline between the RIMS computer and this mainframe.

23 And that dataline allowed for the interaction,

24 electronic interaction, between two computers.

25      You basically -- the program would say, I need to

1  get information from the mainframe.  And there would
2  be a transaction that would be shipped across the
3  dataline up to the mainframe, which would, for
4  example, say, Validate this product.  We had passed a
5  block of data in this transaction across a dataline,
6  and in that would be the product number.  And then
7  we'd call -- we would initiate the product validation
8  routine, which we'd then say, Here's the product.  Go
9  look it up on the databases that are sitting on the
10 mainframe.
11 Q   If the customer is requesting a product that was
12 available, Fisher product inventory at its site, what
13 would happen in that instance?
14 A   The second step in the process is to source it,
15 and if it was a product that was not local, it was
16 product that was stored within one of the Fisher's
17 warehouses, there would be a request for availability
18 transaction.
19     It would be sent from the RIMS system, which is
20 running local at the customer site over this dataline
21 to the mainframe.  And it would initiate a program
22 which is availability program, which it would say,
23 Here's this product.  Go out and find where that
24 product may be in any one of the Fisher distribution
25 centers which would be across the United States.

1  Q    When you say "source it," do you mean source it
2  from Fisher?
3  A    It's always sourced from Fisher.  I'm sorry.  It's
4  provide availability of this product.  Where is it
5  stored within the Fisher distribution network.
6          THE COURT:  As you're using "source," it
7  means where it is?
8          THE WITNESS:  In this instance, yes.
9          THE COURT:  Where it is within the Fisher
10 system?
11         THE WITNESS:  That's correct.
12 BY MR. ROBERTSON:
13 Q    Since this was Fisher-owned inventory, wherever it
14 was kept, whether it was at Fisher warehouse or at a
15 customer-owned warehouse or stockroom, how did Fisher
16 go about getting paid for these items?
17 A    Well, actually, if it's Fisher-owned inventory,
18 which means we own it.  It's sitting at the customer
19 site.  The customer hasn't purchased it yet.  Whenever
20 the product is pulled off the shelf and was recorded
21 in the RIMS system, that would kick off another
22 transaction, which would be sent off to the Fisher
23 mainframe, which would say, Bill this customer for
24 this product.
25      So the issuing of a Fisher-owned item in a RIMS

1  system would initiate a billing transaction.  That's
2  one way that we initiate billing for the product.
3       A second way --
4  Q   Let me just ask you on that, was that a paper
5  billing process at that point?
6  A   In most cases it would have been a paper billing.
7  In some cases, the Fisher mainframe would have had the
8  ability to transmit EDI invoices, but for the most
9  part, it would have been paper invoices that was sent
10 out.
11 Q   Were all of Fisher's warehouses connected
12 electronically in some way in order to determine --
13 A   Yes, they're all connected into this central
14 mainframe system, which was in Pittsburgh.
15 Q   So how do you account for the products in the RIMS
16 system when it shipped an item from its warehouse to a
17 customer?
18 A   It really depends on the types of product you're
19 looking at.  There were two different types of
20 products that we manage within the RIMS database.  One
21 is the JIT Fisher owned.  We just talked about the
22 billing.  What would happen would be -- how do we keep
23 track of that inventory?  We mentioned a little bit
24 earlier what we called a replenishment program.  This
25 is when we determine when we have to restock the local

1  crib, local stockroom.
2      The customer's service rep periodically would run
3  this replenishment program, which would once again
4  determine if you needed product.  And for the
5  Fisher-owned product, since Fisher owns it, what we
6  would do is we would initiate a transfer which says,
7  Move inventory really from the closest Fisher
8  distribution center to this customer site.
9      A transfer is really just moving a product from
10 point A to point B without changing ownership of the
11 inventory.  Fisher still owns it, but we had to keep
12 track of that inventory because you couldn't have it
13 get lost somewhere along the way.
14     So we basically recorded the transit.  We call it
15 "in transit."  Whenever you left the Fisher
16 distribution center and you're going to move to the
17 local customer center warehouse crib, it would create
18 an in transit action on that transfer order.
19     When the product was received, physically
20 received, at the customer stockroom, a Fisher customer
21 service rep would receive into the RIMS system that
22 product, and that would, in essence, close out that
23 transfer order.  So what has happened is we were able
24 to track from the point in time the request was made
25 to the point in time it was received in keeping track

1  of the inventory, which is an important part because
2  that was one of the problems we had was keeping track
3  of that Fisher-owned inventory.
4  Q   If the customer had, for example, inventory in its
5  stockroom that was its own inventory, inventory that
6  it had purchased elsewhere and placed in its
7  stockroom, did RIMS have the ability to at least track
8  the availability of that customer-owned product?
9  A   Yes, it did.
10 Q   Did those have any special name in the RIMS
11 system?
12 A   Customer-owned inventory.
13 Q   Are you familiar with the term "non-catalog
14 items"?
15 A   Yes.
16 Q   What was that?
17 A   Non-cat items were items that Fisher would buy for
18 a customer but they weren't in this massive catalog.
19 A customer may want to have -- a prime example is a
20 broom.  Fisher wouldn't normally have brooms in their
21 catalog.  They may now, but they didn't when I was
22 there.  So you could put a broom in inventory, mark it
23 as a non-cat item that Fisher would procure, in which
24 case you could make the request on the req for this
25 non-cat item, and it would then send that activity up

1   to the host since the host was doing the sourcing of
2   the product.
3       And then from that point on Fisher's procurement
4   would purchase the product for the customer and ship
5   it to the customer site.
6   Q   I'd like to break that down if I could.  There's a
7   lot of information there.  Could the CSR then try and
8   order these non-catalog items using the RIMS system,
9   could he or she do that directly?
10  A   No.
11  Q   You mentioned you'd have to send this order to
12  procurement in order to obtain that.  How is that
13  process done?
14  A   What really happened was that there would be a
15  form that would pop in the RIMS system which would be
16  requesting the customer service rep to fill out some
17  information that would identify that product.
18  Remember, the product was not a Fisher catalog item.
19  So the Fisher part number doesn't work anymore.  So
20  they had to fill out things like here's the vendor.
21  Here's what I think the vendor part number is.  Here's
22  a description of that part.  And some other additional
23  information that would help identify that product to a
24  procurement person at Fisher.
25      So they'd fill that form out and submit it.  And

1  by submitting it, it would then move that transaction
2  from the local computer up to the mainframe.  And
3  basically all that would happen at the mainframe would
4  be it would print out at the procurement office a
5  piece of paper saying this customer is requesting you
6  to buy this for them.
7  Q   So this form, it's an electronic form, some
8  information would be entered.  Was there any way to
9  use that form to do some search capabilities for that
10 item?
11 A   No.  All it is is a fill-in-the-blanks form.
12 Q   There would be some effort to make the description
13 as to what the item might be, that would be
14 electronically transmitted to this procurement
15 individual?
16 A   Yes.
17 Q   And then he would make an effort to try and see
18 where they might be able to locate this product; is
19 that right?
20 A   Yes.  In that case, they actually would be doing
21 some sourcing.
22          THE COURT:  Did the next question come to be:
23 Did you need to arrive at a way to do things better?
24 Is that the next question, Mr. Robertson?
25          MR. ROBERTSON:  Yes, sir.

1          THE COURT:  And then the next question is:
2    And what did you do to do that?  Is that right?
3    Q    I would like to ask you a few questions about some
4    of the problems that were associated with the RIMS
5    system, just generally a high view, and then what were
6    some of the things you tried to do to solve those
7    problems.
8    A    Okay.  If you'd recall the problems that we were
9    seeing where first of all our customer was soliciting
10   information involving our customer service rep in
11   helping identify products, find a product, source of
12   product, and identify the product.  We were spending a
13   lot of time and effort in that research.
14        So there's a lot of inefficiencies that were in
15   play there, as well as the customer, in some cases,
16   even though the customer service person did their best
17   effort to try and discern what product it was,
18   sometimes they really missed.  It wasn't exactly what
19   the customer wanted.
20        So identifying the product and the entry of the
21   product by the customer service person seemed to be an
22   issue that we needed to resolve.  So we went about
23   that task.  The problem was, we felt, was try and
24   engage our customers to the process of giving them the
25   information in their hands, to allow them to identify

1  the product, source of product, and then
2  systematically submit that request.
3  Q   Do you know whether or not Fisher ever applied for
4  a trademark with respect to this RIMS system?
5  A   I believe it did.
6  Q   Let me show you what's been marked as Defendant's
7  Exhibit No. 61.  It's in your notebook there.  And ask
8  you if you have seen this document before?
9  A   Which document is that?
10 Q   It's Defendant's Exhibit No. 61.  It's towards the
11 back.
12 A   I see it.  I've got it.
13 Q   Have you ever seen this document before?
14 A   Yes, I have.
15 Q   Is this a technical document describing the
16 capabilities of the Fisher RIMS system?
17 A   I would consider this a marketing document that we
18 would use to introduce the high level features of the
19 product.
20 Q   Are the specifics of the features of the product
21 that you have been describing and testifying to today,
22 are they set forth in detail in this marketing
23 document?
24 A   Not in detail.
25 Q   Do you know whether this document was used by

1  technical people in utilizing the RIMS system you have
2  been discussing?
3  A    No.  No, it would not have been.
4  Q    Do you know whether or not, if you want to just
5  peruse the document, whether it's actually discussing
6  all the features of the RIMS system?  I can direct you
7  to the page that ends 598, for example.
8  A    Some of them features were in the RIMS system.
9  Many of them were put in various releases of the
10 product.  Some of the features were not actually
11 employed.
12 Q    When you say not actually employed, you mean never
13 employed by the RIMS system?
14 A    No.
15 Q    When you say no, you mean that statement I just
16 made was correct?
17 A    That's correct.  The statement you made is
18 correct.  We never did those.  I think we had some
19 aspirations to do them, but we never pulled them off.
20 Q    So could you just give me an example, if you
21 would?
22 A    Under requisition management features, four down,
23 "Allows flexible remote requisitioning by formatted
24 screen," we really never provide for remote
25 requisitioning in the system.

1  Q    Anything else?
2  A    The third point down in that requisition
3  management features, that's really kind of a bold
4  statement there.  We did not interface all types of
5  purchases.  We did have some interfaces.  As I can
6  recall we had two interfaces that we developed, but it
7  wasn't all types.  So it was somewhat restrictive.
8       Under "Inventory Control Features," if you take a
9  look at "Utilizes customized bar codes and labels to
10 expedite your receiving process," that feature was
11 talked about but never implemented.
12      And then finally under "System Customization
13 Features," we did utilize some file transfers, but we
14 never got to the point we used EDI.
15 Q    Was the RIMS system then, the RIMS system that
16 Fisher created, and I think I understood you to say
17 went through many iterations, was that ever made
18 publicly available, the technical information?
19 A    No.
20 Q    If I wanted to learn more about the RIMS system in
21 the early '90s, would I have been able to do so?
22 A    If you were an employee of Fisher.
23 Q    Was it maintained proprietary and confidential to
24 Fisher?
25 A    Yes.

1  Q    Could anybody obtain copies of the RIMS software
2  in the 1990s?
3  A    No.
4  Q    Did you need a password to get into the RIMS
5  software?
6  A    Yes, you had to log into the system.
7  Q    Were there product manuals associated with the
8  RIMS software?
9  A    There were operating manuals, but they were
10 exclusively for use of the Fisher personnel.
11 Q    Were they maintained proprietary to Fisher and
12 confidential?
13 A    Yes.
14 Q    Could Fisher's customers get copies of those
15 manuals?
16 A    They shouldn't have.
17 Q    Were they identified as being confidential to
18 Fisher?
19 A    Yes.
20          MR. ROBERTSON:  Your Honor, I'm about to get
21 into the electronic sourcing system and problems that
22 were solved.  If I could ask your indulgence, Your
23 Honor, I could seriously use a short biological break.
24          THE COURT:  I think all these people over
25 here have been here for a long time, and they could

1  use a break a little longer than that, couldn't you?
2  They have been at it a long time. And if you're going
3  to start a new area of inquiry, we'll go with that.
4             So, ladies and gentlemen, if you will give
5  your notebooks to Mr. Neal with your names on them so
6  he can return them to you tomorrow, then you can go
7  home and relax.
8             Please don't discuss the case with anyone.
9  If someone wants to know what it's about and you feel
10 like you understand what it's about, you still can't
11 talk to them. You just blame me and tell them that I
12 said you are not allowed to do that. And then you'll
13 be free to do whatever you want to do tonight. And
14 we'll see you at 9:00 o'clock in the morning.
15            Mr. Compher, are you able to get here all
16 right without getting up at 4 a.m.?
17            A JUROR: Yes.
18            THE COURT: We'll have some coffee and bagels
19 here for you tomorrow. Thank you very much for your
20 careful attention. You're excused.
21            (The jury has exited the courtroom.)
22            THE COURT: How much longer do you think you
23 have of this witness?
24            MR. ROBERTSON: About an hour and 15 minutes
25 to an hour and a half, Your Honor.

1            THE COURT:  More?
2            MR. ROBERTSON:  Yes, sir.  I'm about to get
3    into the inventions and the developments and the
4    problems.
5            THE COURT:  Let's use the evening to see if
6    you can't hone your examination a little bit.
7            MR. ROBERTSON:  All right, sir.
8            THE COURT:  Are you familiar with the
9    television program Raw Hide?
10           MR. ROBERTSON:  I recall it, sir.
11           THE COURT:  Do you know what the theme is?
12           MR. ROBERTSON:  No, sir.
13           THE COURT:  Rolling, rolling, rolling.  Get
14   those doggies moving.  Raw hide.  All right.
15           You can leave whatever you want to leave in
16   here if you'd like to.
17           All right.  We'll see you.  Be combat ready
18   at nine o'clock.  If you have something you need to
19   take up, you let us know before that.  Thank you.
20   We'll be in adjournment.
21
22           (The proceedings were adjourned at 5:12 p.m.)
23
24
25