258

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF VIRGINIA
2                  RICHMOND DIVISION

3   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                                     :
4   ePLUS, INC.,                     :
                                     :
5                      Plaintiff,    :
    v.                               :  Civil Action
6                                    :  No. 3:09CV620
    LAWSON SOFTWARE, INC.,           :
7                                    :  January 5, 2011
                       Defendant.    :
8   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _:

9

10

11          COMPLETE TRANSCRIPT OF **JURY TRIAL**
           BEFORE THE HONORABLE ROBERT E. PAYNE
12       UNITED STATES DISTRICT JUDGE, AND A JURY

13

14

15   APPEARANCES:

16   Scott L. Robertson, Esq.
     Jennifer A. Albert, Esq.
17   **Michael T. Strapp, Esq.**
     **David M. Young, Esq.**
18   GOODWIN PROCTOR
     901 New York Avenue, NW
19   Washington, D.C.   20001

20   Craig T. Merritt, Esq.
     CHRISTIAN & BARTON
21   909 E. Main Street, Suite 1200
     Richmond, VA   23219-3095
22
             Counsel for the plaintiff ePlus
23

24
             DIANE J. DAFFRON, RPR
25           OFFICIAL COURT REPORTER
           UNITED STATES DISTRICT COURT

259

APPEARANCES:   (Continuing)

Daniel W. McDonald, Esq.
**Kirstin L. Stoll-DeBell, Esq.**
**William D. Schultz, Esq.**
MERCHANT & GOULD
3200 IDS Center
80 South Eighth Street
Minneapolis, MN   55402-2215

Dabney J. Carr, IV, Esq.
TROUTMAN SANDERS
Troutman Sanders Building
1001 Haxall Point
P.O. Box 1122
Richmond, VA   23218-1122

          Counsel for the defendant Lawson Software.

1           (The proceedings in this matter commenced at

2    9:30 a.m.)

3           THE CLERK:  Civil Action No. 3:09CV00620,

4    ePlus, Incorporated v. Lawson Software, Incorporated.

5    Mr. Scott L. Robertson, Mr. Craig T. Merritt,

6    Ms. Jennifer Albert, Mr. Michael T. Strapp, and

7    Mr. David Young represent the plaintiff.

8           Mr. Daniel W. McDonald, Mr. Dabney J. Carr,

9    IV, Ms. Kirstin Stoll-DeBell, and Mr. William D.

10   Schultz represent the department.

11           Are counsel ready to proceed?

12           MR. ROBERTSON:  Yes, Your Honor.

13           MR. McDONALD:  Yes, Your Honor.

14           THE COURT:  All right.  Good morning, ladies

15   and gentlemen.

16           THE JURY:  Good morning.

17           THE COURT:  All right, Mr. Robertson, you may

18   resume your examination of the witness.

19           MR. ROBERTSON:  Thank you, Your Honor.

20           THE COURT:  And I remind you, sir, you're

21   under the same oath which you took yesterday.

22           THE WITNESS:  Yes, sir.

23   BY MR. ROBERTSON:  (Continuing)

24   Q    MR. Momyer, we spent a good deal of time yesterday

25   discussing this RIMS system which you were named

1  inventor along with Mr. Johnson.  Do you recall that?

2  A   Yes, I do.

3  Q   I'd like to move on now to this electronic

4  sourcing system and method, the inventions that are

5  subject of the patents that are at issue here if we

6  could.  All right?

7  A   Okay.

8  Q   Tab 1 in your witness notebook, I believe it's

9  Plaintiff's Exhibit No. 1, if you could go to column

10 1.

11         THE COURT:  That's also in your small book

12 there if you need to.

13 Q   And tab 2.  Thank you.

14     So we're on column 1 now of the '683 patent,

15 Exhibit No. 1.  Now, suggestion was made yesterday

16 that the Patent Office was unaware of the RIMS patent.

17 Did you disclose the RIMS patent to the Patent Office?

18 A   Yes, I believe so.

19         MR. McDONALD:  Objection, Your Honor.  This

20 is going to the validity issue.  Again, I thought we

21 were going to stick with infringement.

22         THE COURT:  Isn't it?

23         MR. ROBERTSON:  No, Your Honor.

24         THE COURT:  Why does it have to do with

25 infringement?

MOMYER - DIRECT                    262

1          MR. ROBERTSON:  Because there's going to be

2    discussion as to scope of the claims and how they are

3    to be applied to the accused product.  And one of the

4    embodiments that was raised was this RIMS embodiment,

5    and I want to go and discuss in the claims whether

6    they are limited to that RIMS embodiment or whether

7    they are broader than that RIMS embodiment.  It was

8    raised during the opening statement as to whether RIMS

9    was the essential component of the claims.  So how the

10   claims are to be applied to the accused system depends

11   on how they are to be understood in the specification

12   of the patent itself.

13          THE COURT:  It's in the patent, isn't it?

14          MR. ROBERTSON:  Well, the -- I mean --

15          THE COURT:  What kind of testimony is this?

16   It sounds to me like expert testimony.

17          MR. ROBERTSON:  I just want to ask the

18   witness --

19          THE COURT:  Look, what you want to ask the

20   witness is one thing.  He's objected to the question

21   as invalidity.  Is it or not?

22          MR. ROBERTSON:  It's not, Your Honor.

23          THE COURT:  You heard his argument, Mr.

24   McDonald.  What do you say?

25          MR. McDONALD:  I think he can talk to him

1  about RIMS and the difference between RIMS and the

2  claims.  That's fine.  But I don't see what the

3  disclosures to the Patent Office at this point in the

4  trial, why we need to go into that.

5          MR. ROBERTSON:  Let me ask it this way.

6  Q   Was RIMS one of the embodiments that we're

7  disclosed in the patent for requisition and purchasing

8  module?

9  A   Yes.

10 Q   Do you know whether or not in your review of the

11 specification --

12         THE COURT:  Wait a minute.  Are you saying

13 was RIMS disclosed as an embodiment of the patent, of

14 the invention?  Is that what your question was?

15         MR. ROBERTSON:  No.  I'm saying, Your

16 Honor --

17         THE COURT:  If that's the case, then this

18 case -- we don't have a case, do we?

19         MR. ROBERTSON:  No, Your Honor.

20         THE COURT:  Then ask the question a different

21 way.

22 BY MR. ROBERTSON:

23 Q   Was RIMS identified as one of a requisition

24 purchasing system that could be used as part of an

25 embodiment of the invention that you Mr. Kinross,

1    Mr. Johnson, and Mr. Melly invented?

2    A    Yes.

3    Q    Did you identify in the patent whether or not

4    there were some problems associated with the RIMS

5    requisition and purchasing system for use in the

6    patent?

7    A    Yes, we did identify several.

8    Q    Let me direct you, if I can, to the bottom of

9    column 1.  First, before I do that, at the top of

10   column 1, starting at about line 10 through line 16,

11   could we just -- is this the RIMS patent that we have

12   identified that you're one of the inventors, the '989?

13   A    That wording is pulled out of '683, yes.  '989 is

14   the RIMS patent.

15   Q    So it's saying here that there were a number of

16   known requisition and purchasing systems, is that

17   right, including this Fisher RIMS system?

18   A    Yes.

19   Q    Now, if you will look down at the bottom of column

20   1 starting at about line 60, going over to column 2

21   around line 2, what are you representing there to the

22   Patent Office with respect to these requisition and

23   purchasing systems which include the Fisher RIMS

24   system?

25   A    It identifies that there's some shortcomings to

1   the requisition purchasing systems, including RIMS,

2   for the ability to have a catalog be able to search

3   multiple catalogs and then move that information into

4   the requisition purchasing system.

5   Q    Are there any other problems that have been

6   identified with these requisition and purchasing

7   systems including RIMS in this section of the patent?

8   A    Yes.  As you look down column 2, maybe line 10,

9   computer systems for searching vendor catalogs are

10  limited, and only one such vendor catalog is

11  accessible to the user at any given time.  They were

12  also limited in they can only create a particular

13  vendor catalog database.

14  Q    You have to go a little slower, Mr. Momyer.

15  A    Sorry.  They were also limited in that they can

16  only create an order within the particular vendor

17  catalog database.  They cannot source items to be

18  requisitioned from a database containing multiple

19  catalogs or interact with the requisition purchasing

20  system or create a purchase order or orders including

21  the items located from the sourcing operation.

22  Q    Now, you discussed this RIMS system throughout out

23  the patent.  Let me ask you to go to column 4 at the

24  top.  Did you indicate to the Patent Office that this

25  RIMS system was necessary to your electronic sourcing

1   patent?

2   A    I think it's preferably but not necessarily in the

3   Fisher RIMS system is what it says in column 4.

4   Q    There's also a discussion here about a Technical

5   Viewer 2 Search Program called TV/2.  Do you see that

6   as well?

7   A    Yes.

8   Q    Are you familiar with that program?

9   A    Yes.

10  Q    It indicates in your patent that that was a

11  program that was available from IBM?

12  A    That's correct.

13  Q    Does it indicate that that program was necessary

14  to your invention?

15  A    The wording says preferably but not necessarily in

16  the Technical Viewer 2 Search Program.

17  Q    Let me direct you if I could to column 6 of the

18  patent beginning at about line 34 going down to about

19  line 39.

20  A    Column 6?

21  Q    Yes, sir.

22  A    Line 44?

23  Q    34.

24  A    34.  Okay.

25  Q    You state here the following description

MOMYER - DIRECT                    267

1    illustrates the use of the Fisher RIMS as a

2    requisition purchasing system and the TV/2 search

3    program as a search program; however, it will be

4    understood that the present invention is not limited

5    to such system or program.  Do you see that?

6    A    Yes, I do.

7    Q    Is that consistent with your understanding as to

8    what you disclosed in your patent?

9    A    Yes.

10   Q    Well, so you used the Fisher RIMS system to

11   describe certain features of functionality in your

12   patent.  Was it necessary to your patent to use the

13   Fisher RIMS system?

14   A    No, it was not.

15   Q    You also use the TV/2 search program to describe

16   certain capabilities and functionalities in your

17   patent.  Was it necessary for your patent, for your

18   electronic sourcing patent?

19   A    No, it was not.

20   Q    Can I just -- I put a juror notebook over on your

21   witness stand that the jury has, and in it starting at

22   tab 2 are the three patents that are at issue here.

23   And you'll see there are yellow tabs where the claims

24   appear.  And I'd like you to just briefly take a

25   moment to go through any of those claims and tell us

1   if any of those claims recite --

2   A    Excuse me?

3   Q    I'd like you to go through the yellow claims that

4   are tabbed in this notebook.  There are 12 of them.

5   You could quickly do it or if you know it from memory,

6   perhaps you could just tell us.  Do you know if within

7   any of those claims that the inventors, yourself,

8   specifically claimed TV/2 as a search program for

9   searching the catalogs or the RIMS requisition and

10  purchasing order system as constituting the means for

11  building requisitions and means for generating

12  purchase orders?

13  A    I'll look at the -- actually look at it.  I don't

14  trust my memory on that.

15           THE COURT:  You can take a look at it for a

16  minute.

17           While he's doing that are, ladies and

18  gentlemen, if you'll look at, just take PX1 as an

19  example, and turn to the first yellow tab.  That

20  begins a description of what are called claims.  Now,

21  if you'll look back one page, that's column 24, near

22  the bottom, the lines are numbered in the middle, and

23  you've got line 60 there.  Do you see that?  And right

24  above that it says, "We claim."  Do you see that?  The

25  "we claim" is where this case is all focused.  This is

 1    what is claimed to be the things that follow.  We

 2    claim are the things that are claimed to be the

 3    inventions.  The things that the Patent Office put the

 4    boundaries around by agreeing to these elements in

 5    these claims and by saying they are patentable.

 6            So I just want you to know that even though

 7    you start on column 25 with paragraph 3 where Claim

 8    Three is highlighted, it all starts before that have

 9    where it states "We claim."

10            So you read "We claim:  (1)  An electronic

11    sourcing system comprising," etc.  Well, that's not at

12    issue in this case.  So then you go to, "We claim" and

13    then read 3.  What do we claim?  "We claim an

14    electronic sourcing system comprising," and then all

15    of those elements follow.  And then when you get to

16    Claim 26 down at the bottom right-hand corner of that

17    page, it's, "We claim a method comprising the steps

18    of" and you do that every time you go to another

19    numbered claim, such as those that were issue 28.  And

20    that's all on this patent, isn't it, Mr. Robertson?

21            MR. ROBERTSON:  Yes, sir.

22            THE COURT:  Okay.  And then you follow the

23    same methodology in any patent.  Pardon me.  You can

24    go ahead now.

25            Have you read the patents?

MOMYER - DIRECT                    270

1      MR. ROBERTSON:  Actually, Your Honor, I

2  misspoke.  There's Claim 29 at issue here.  It's

3  highlighted, which is one of those dependent claims

4  that we discussed.

5      THE COURT:  I'm sorry.  It thought I said 29,

6  but you're right.  I did not say it.  Thank you.

7      MR. ROBERTSON:  Thank you.

8  BY MR. ROBERTSON:

9  Q   All right.  Have you confirmed to your own

10 satisfaction that in those claims you never

11 specifically claimed the RIMS requisition and

12 purchasing order system or the TV/2 search program?

13 A   There's nothing in those claims on RIMS or TV/2.

14 Q   And appropriate to the Court's instruction, would

15 you just take a look at column 19 of the '683 patent?

16 A   Okay.

17 Q   The last paragraph beginning, "Thus."  Let me read

18 that for you.  It says here, "Thus, it is seen that an

19 electronic sourcing system including means for linking

20 a requisition/purchasing system and a means for

21 searching large volumes of information has been

22 described.  Person's of skill in the art will

23 appreciate that the present invention can be practiced

24 by other than the described embodiments, which are

25 presented for the purposes of illustration but not of

1  limitation, and the present invention is limited only

2  by the claims which follow."  Do you see that?

3  A    Yes.

4  Q    Is that consistent with your understanding as to

5  what these examples and embodiments were that were

6  disclosed in the patent?

7  A    Yes.

8  Q    Now --

9           THE COURT:  Mr. Robertson, so the record is

10  clear, you said "persons of skill in the art."  The

11  text is "persons skilled in the art."

12           MR. ROBERTSON:  Thank you, Your Honor.

13  Q    All right.  Now, we were discussing yesterday the

14  RIMS system and some of its inadequacies and some of

15  the problems it presented.  I want to start focusing

16  now on how the electronic sourcing patent came about,

17  how the initial ideas of development were made.

18      We talked about this RIMS system, and we've talked

19  about this TV/2 system.  Now, Mr. Johnson and

20  Mr. Kinross are also here to testify.  So I'd like you

21  to discuss this, if we could, at somewhat of a high

22  level because the Court doesn't want to hear

23  cumulative or repetitive testimony.  I'm certain the

24  jurors don't as well.

25      So did Mr. Johnson have primary responsibility for

1    any modifications or revisions or additions to the

2    RIMS system for corporation into the electronic

3    sourcing system?

4    A    Yes.  Mr. Johnson was actually responsible for the

5    team getting the team to do modifications and

6    enhancements to the RIMS system.

7    Q    And on this TV/2 system, is it accurate to say

8    that Mr. Kinross had primary responsibility for any

9    modifications, revisions, reprogramming or new

10   creations that were necessary to utilize the TV/2

11   program with this electronic sourcing system?

12   A    That is accurate.

13   Q    So I'm going to want to leave the specifics to

14   them when they can come, and in a very focused

15   testimony we'll get to exactly what they needed to do

16   in order to adapt those systems for use in the

17   inventions, but let me talk just generally.

18        You indicated yesterday you started working on

19   this electronics sourcing system around 1993.  How

20   long did that continue?

21   A    Really it continued into 1995.

22   Q    How did the project that led to this electronic

23   sourcing come about?  How did the thinking begin,

24   evolve, that led to the creation of these inventions?

25   A    Well, I guess there were a couple of things that

1   stirred the specifications for this.  First of all, we

2   talked a little bit yesterday about how the current

3   RIMS system had some limitations as far as how to get

4   a requisition.  It was a very manual process.  And it

5   forced us to have an on-site person to record and

6   issue the requisitions.

7       The second piece would have been that

8   Fisher-Scientific was starting a new initiative that

9   was called the strategic procurement services which

10  was an integrated supply operation.  And that

11  operation is integrated supply.  I don't know if I

12  explained it yesterday, but it's where you have a

13  company come in and take over procurement operations

14  for another company.

15      So you'll do all the buying, and you'll do all

16  the -- they'll do the inventory, the specific

17  commodity, the storing of inventory, specific

18  commodity groups.

19      So with those two particular requirements in mind,

20  we began to design a system to support those two

21  issues.

22  Q   Now, this development of this electronic sourcing

23  system, was that going to permit your customers to

24  purchase goods from vendors other than Fisher?

25  A   Yes.

1    Q    And was that going to permit this electronic

2    sourcing system invention, was that going to permit

3    the actual customer, the end user, rather than some

4    intermediary CSR, customer service representative from

5    Fisher to do the sourcing?

6    A    Yeah, that was one of the intents was to -- we

7    talked about the customer would now be able to enter

8    requisitions rather than and select those requisitions

9    from a series of catalogs that are stored on the

10   system, and then process those through a work flow

11   that represented the customers' personal organization,

12   to allow them to approve those and process those

13   orders to suppliers.

14   Q    Would that ability permit Fisher to remove the CSR

15   from the equation?

16   A    Yes.

17   Q    Would that lead to some cost savings for Fisher?

18   A    Sure.  The cost savings would be significant

19   there.  In some of our RIMS sites, we actually had

20   three CSRs there taking requisitions, managing

21   software.  So this would reduce considerably.

22   Q    Wasn't one of the other issues that it would open

23   up to your customers products from Fisher's

24   competitors; is that correct?

25   A    Yes.  One of the things that was -- the

1    development of the project really started at one

2    level.  We began to develop a system that would allow

3    us to push the entry of the requisition, the

4    management of requisitions, out to the customer and

5    allow them to select what vendor they wanted to buy

6    from.  And when we opened that up and put catalogs out

7    there for any vendor that the customer required,

8    including Fisher's competitors, it did create some

9    problems.  It created some problems within the

10   executives of Fisher from a sales organization because

11   sales would be moving away from Fisher to the other

12   supplier.

13   Q    So when you began this invention, was Fisher

14   management somewhat skeptical as to the goal and the

15   objective in mind?

16   A    I think there were really two camps.  One camp

17   thought it was a great idea and one camp who was

18   representing the sales force thought it wasn't as

19   good.  Initially, we were trying to install system

20   such that it would focus on primarily Fisher products,

21   but as we went along with the development of the

22   invention, another part of the organization felt that

23   this actually was a product that we might want to look

24   to market and package and sell.

25   Q    Did you ultimately get authority for that project?

1    A    Yes.

2    Q    One of the things you indicated in this electronic

3    sourcing system was you could then select the vendor

4    from which you wanted to purchase the product; is that

5    right?

6    A    That's correct.

7    Q    Was that important to the customer, the end user?

8    A    Absolutely.

9    Q    Another, I think, element you discussed yesterday

10   in the overview of the electronic sourcing system was

11   that the users would be able to determine whether

12   products might be available in the vendor's inventory;

13   do you recall that?

14   A    Yes.

15   Q    Was that a value to the customers?

16   A    Yes, obviously, it would be if the customer is

17   selecting a product.  They would want to have some

18   idea how long it would take for them to get that

19   product.  If the product was unavailable from one

20   vendor, the system could give them possibility of

21   going to another vendor, sourcing that, finding their

22   inventory availability to make a decision to get the

23   product the next day.

24         So, of course, availability is a critical piece.

25   Q    You indicated that the patents could have these

1    multiple vendor catalogs.  I'd like you to go back to

2    Plaintiff's Exhibit No. 1, if you could, the patent,

3    specifically at column 4, starting at about line 42

4    going down to line 45, starting with, "The nature of

5    the business."

6         In your patent here you disclose that the nature

7    of the business that the customer using the electronic

8    sourcing system conducts will determine which product

9    catalogs are made part of the catalog database.  Do

10   you see that?

11   A    Yes.

12   Q    Did the customer in the electronic sourcing system

13   have the ability to make decisions as to what catalogs

14   they wanted to include and what catalogs they didn't

15   want to include?

16   A    Yes.

17   Q    Did the customer have the ability in your

18   electronic sourcing system to select just certain

19   items from certain catalogs to include in the

20   database.

21   A    Certain items, yeah, we could, depending on how we

22   offered the catalog.

23   Q    Let me then direct you down in that same column

24   starting at about line 47.  I believe it begins, "For

25   example," down pretty much to the end of that

1    paragraph.  I'm not going to read the whole thing

2    because it's rather lengthy, but can you tell me

3    whether or not there's a discussion here about how the

4    catalog database can have just certain products from

5    distributors and certain products not listed in the

6    other distributor catalogs and can also support

7    catalogs published from outside suppliers listing

8    different vendor products?  Is that a fair

9    characterization of what's being described there?

10   A    Yes.

11   Q    Does that confirm in your view that the products,

12   the customers actually had control as to what items

13   that they wanted to include from what particular

14   catalog in whatever database they wanted to create?

15   A    That's correct.

16   Q    Now, you mentioned yesterday that the Fisher

17   catalog had thousands or tens of thousands of products

18   as I recall, sir.  Do you recall that?

19   A    Hundreds of thousands.

20   Q    Did people on occasion only request parts of the

21   Fisher catalog to be loaded in to the catalog

22   database?

23   A    Yes.

24   Q    And they had that ability to do that; is that

25   right?

1    A    That's correct.

2    Q    I think one of the things you mentioned as one of

3    the advantages of the electronic sourcing system

4    involved this work flow process.   Do you recall that?

5    A    Yes.

6    Q    Can you tell us a little bit about what you meant

7    by that, sir?

8    A    Well, what we were trying to do is recapture what

9    was happening with the requisition of flow, the

10   requisition.   The work flow would -- once the

11   requisition had been entered by the customer, that

12   requisition would go through a couple different steps.

13   First step would be source and price of the product.

14   In most cases, it would go out to the specific vendor

15   that was indicated on the product that was selected.

16   Return that information back.   The requester would

17   then approve that.

18       And the way the work flow would work is that the

19   next step would be we had to see if there was an

20   approver, if there's a supervisor who had the sign off

21   on that particular requisition.   In which case -- and

22   that allowed really for multiple level of approvals.

23   And it's primarily based upon the dollar value of the

24   requisition, but in some cases there was an approval

25   that had to go by specific parts.   So we would route

1  the approval to a specific safety officer, for

2  example, if it was a radioactive item.  He had to sign

3  off on that.

4      So we basically take the routing of a manual req.

5  and put it into a system and get that is kind of

6  sign-offs into the system.

7  Q    So this was put into an electronic work flow

8  process?

9  A    That's correct.

10  Q   Once you had these approvals on these

11  requisitions, could these requisitions in the

12  electronic sourcing system have multiple items on

13  them?

14  A    Sure.  They could have -- I can't recall if it was

15  any limit, but they would have multiple items on them.

16  Q    Could these multiple items be from multiple

17  vendors?

18  A    It could be from multiple vendors, yes.

19  Q    Could the electronic sourcing system you have then

20  generate purchase orders from that requisition

21  containing multiple items that had been selected from

22  catalogs, whether they be entire catalogs or partial

23  catalogs, could they then select them for inclusion in

24  a purchase order?

25  A    Yes.

1   Q    And could that purchase order that was being

2   generated from that requisition from these multiple

3   items from multiple vendors then be routed to the

4   various multiple vendors?

5   A    Yes.

6   Q    So did the electronics sourcing system then have

7   the ability to generate multiple purchase orders from

8   a single requisition?

9   A    Yes, it could.

10  Q    Was that perceived as a benefit for the system?

11  A    Absolutely.

12  Q    Did the customers find that to be a valuable

13  attribute?

14  A    Sure.  If it didn't do that, they'd have to have

15  single line requisitions and group them by vendor and

16  then deal with it that way.

17  Q    That's a discussion in your electronic sourcing

18  system patent about cross-referencing.  Do you recall

19  that?

20  A    Yes.

21  Q    Can you tell the jury what you understand --

22  A    We're talking about the '683?

23  Q    I just want to talk about the concept generally

24  right now.  But let me represent that a suggestion has

25  been made that the specification, that is the written

1  disclosure, for all three patents is substantially

2  similar or almost identical.  I'm willing to stipulate

3  that that's way case.  If you want to just take a

4  minutes to confirm that for yourself, I'm happy to do

5  it.

6       Is that your understanding as well?

7  A    Yes.

8  Q    So just generally now disclosing this

9  cross-references capability, can you tell us what that

10 was with regard to your invention?

11 A    Well, if you would select a product, the system

12 would have the ability to provide for a matching item

13 and allow the end user requisitioner to make a

14 decision to resource product based upon the

15 cross-referencing that appeared.  It's a like item,

16 it's a similar product, you have the opportunity to go

17 out and resource this.

18          THE COURT:  So you could get Band-Aids, for

19 example, if you wanted to buy Band-Aids, and you go to

20 vendor A, which is Johnson & Johnson, and vendor C,

21 which is CVS, and D, which is Rite-Aid, you can

22 display the same kind of Band-Aid.  And then you can

23 compare the price and say, Well, I want the one from

24 Johnson & Johnson because even though Rite-Aid is

25 cheaper, there are more of them in a package, or for

1  whatever reason?

2          THE WITNESS:  That's correct.

3          THE COURT:  The cross-reference feature is

4  what allows you to make that comparison?

5          THE WITNESS:  That's correct.

6          THE COURT:  All right.

7  BY MR. ROBERTSON:

8  Q   Was that capability considered to be a valuable

9  attribute?

10 A   I think it was an important part of comparison

11 shopping, that you need that.

12 Q   You mentioned this team was working on this in the

13 '93-'94 time period.  Can you tell me how often did

14 you meet during that time?

15 A   Well, myself and Jim Johnson and Bob Kinross would

16 have met daily, if not hourly.  My office was next to

17 theirs and we were constantly discussing the

18 development.

19 Q   Do you know how much of the team members' time

20 during this period was devoted to this project?

21 A   Jim Johnson and Bob Kinross' were pretty much

22 100 percent of their time was devoted to that.  Mine,

23 I did have some other responsibility.  So I had a

24 little bit less.  Maybe 75 percent.

25 Q   So starting now with -- you have arrived at these

1    concepts that you want to include in this electronic

2    sourcing system invention.  Can you tell the jury some

3    of the steps that you went through to develop the

4    invention?  I'd just like you to start at a level, if

5    you could, of the design because I don't want to get

6    into the specifics of the modification, for example,

7    of TV/2 or RIMS, which will be for Mr. Johnson to talk

8    about.

9    A    Okay.  The development would have followed the

10   normal path as many software development projects.

11   There was a gathering of requirements and stating

12   those requirements.  And then following the

13   requirements, a development of a specification as to

14   how things should work at a high level and then more

15   detailed level designs as far as individual programs

16   and how they should work.

17   Q    What is this requirements?  Is it a document?

18   A    Yes.

19   Q    Can you just briefly describe it for us?  What's

20   the nature of this requirements document?

21   A    It defines the problem and it defines the approach

22   to solving the problem.

23   Q    Then you mentioned the design specifications.  Is

24   that where you get into the drill down --

25   A    Yes.  You take the results of the requirements

1    saying this is what you need to do, and then you would

2    apply a more technical level as far as how you would

3    go about doing it programmatically.

4    Q    Did the team encounter any difficulties along the

5    way in the development of these inventions?

6    A    Yes.

7    Q    Can you tell us what some of those were?

8    A    Well, on the Technical Viewer side, we encountered

9    quite a few problems as far as the performance, and it

10   had to deal with some redesign of how we were going

11   about some things.

12        There were some missing requirements that we had

13   to put in place.  I think we encountered some issues

14   as far as how we were going about interfacing between

15   the requisition management piece and the electronic --

16   the sourcing program.  There were issues on dealing

17   with that.

18        And I think just on how we would connect and

19   communicate out to the various suppliers was also kind

20   of a challenge as to the approach we would take to do

21   that, as well as how we would handle the unbundling of

22   the requisition creating multiple P.O.s and keeping

23   track of those multiple P.O.s and then tying that back

24   to the requisition.  There were a lot of issues that

25   we even encountered.

MOMYER - DIRECT                    286

1    Q    You mentioned this TV/2 program that you

2    identified in your patent as being available from IBM.

3    At some point did you have to hire an outside

4    subcontractor to work with you with respect to that

5    TV/2 program?

6    A    Yes.

7    Q    We're going to get into that in a minute, but was

8    that outside subcontractor IBM?

9    A    Yes, it was.

10   Q    Did you give IBM the requirements for your

11   electronic sourcing system?

12   A    Yes.

13   Q    Let me direct you, if I could, to figure 1B in the

14   patent.  This is the '683 patent I'll use, but it's

15   the same figure in all three patents.

16          THE COURT:  What figure?

17          MR. ROBERTSON:  1B, Your Honor.

18   BY MR. ROBERTSON:

19   Q    Do you recognize this figure from your patent,

20   sir?

21   A    Yes.

22   Q    What is this attempting to illustrate?

23   A    This is the high level diagram.  It would reflect

24   a representation of a client's server, a

25   representation of our system, our architectural

1    system.

2    Q   When you say "client's server," are you talking

3    about some kind of networked embodiment?

4    A   Yes.

5    Q   Can you explain what you mean by "client server"

6    then more specifically for the jury?

7    A   Sure.  A client server fairly simply is that parts

8    of the system will run on two different processors, at

9    least two different processors.  In this case, the

10   local computer as well as the server.  And the

11   interaction between the client and server is kind of

12   what makes up the system.

13   Q   So you mentioned the local computer, which is

14   identified here with a number 220.  Do you see that?

15   A   Yes.

16   Q   You have identified the server, which is

17   identified here as 200.  Do you see that?

18   A   Yes.

19   Q   And there's also a host computer, 210?

20   A   Yes.

21   Q   Can you tell us the difference between these local

22   computers, the host computers, and the server in

23   context of your invention?

24   A   Well, the host computer would be the computer that

25   would be at the suppliers/distributors site, and it's

1  where we would be getting information whenever we

2  would source the product.

3      We would go there to get the price of a product as

4  well as its availability and would also ultimately

5  turn around an submit an order whenever the

6  requisition had turned into an approved requisition to

7  become a P.O.

8  Q   And the host computer?

9  A   We would pass information to the host computer to

10 build the order.  Basically, the local computer in

11 this case would be passing a sales order to the host

12 computer, which would turn that into a purchase order.

13 Q   So you have described in general terms some of the

14 functionality that you needed for this electronic

15 sourcing system invention?

16 A   Yes.

17 Q   I sort of wanted to go to, using this figure,

18 whichever box controls certain functionality that you

19 described.  Can we do that?

20 A   Sure.

21 Q   Let me just specifically ask you which box

22 controls or which is supposed to --

23         THE COURT:  Mr. Robertson, you asked him to

24 define something that he didn't define.  Explain the

25 rest of what you were talking about.  You got off the

1    track.   Where is the local computer?

2           THE WITNESS:   The local computer would be the

3    computer in this case that is running the components

4    off to the left, the shell, the graphical user

5    interface, and the requisition purchasing program.

6           THE COURT:   Is that usually in the buyer's

7    facility?   Is it a buyer's computer?   Is it your

8    company's computer?

9           THE WITNESS:   No.

10          THE COURT:   You stated the host computer was

11   the suppliers.

12          THE WITNESS:   Yes.   This would be the

13   customer's, the customer using this.   It could be the

14   customer's purchasing department, but it could be a

15   researcher at the customer's facility as well.

16          THE COURT:   But it's not in your facility,

17   and it's not at the distributor's.   The server is

18   where?

19          THE WITNESS:   The server is the local, it's

20   the customer.

21          THE COURT:   So the server is the customer?

22          THE WITNESS:   Yes.

23   BY MR. ROBERTSON:

24   Q    Does the server have access to catalog databases?

25   A    Yes.   If we take a look, that's where the catalog

MOMYER - DIRECT              290

1   database is actually stored.

2   Q    There's a box here identified as a graphical user

3   interface, 254.  What is that, sir?

4   A    The user interface being, of course, what an

5   individual -- how they would interact with the

6   application.  And graphical being it has both text and

7   images on it.

8        So today we think of the normal application at a

9   Web environment.  When you bring up a program, what

10  you see and what you're interacting with would be a

11  graphical user interface.

12  Q    Can you give us an example of one currently

13  available that illustrates your point?

14  A    Google.  You go to Google and bring up the initial

15  search screen on Google, that would be user interface.

16           THE COURT:  The screen on Google that says

17  "famous football players of 1902," where you type that

18  in, and then you hit search.  You're saying the user

19  interface is the page that presents that?

20           THE WITNESS:  That's correct.  And the

21  initial screen.  When you bring up Google, that is the

22  user interface.  So when you enter the search

23  information, you're entering that search information

24  into a user interface.  The results you get back is

25  also a graphical user interface.  So it's really

1   what's displayed out to the user and what they

2   interact with.

3   Q    What is box 252, shell?

4   A    The shell program is -- it's an application that

5   allows the system to direct the search program and

6   kind of give it directions on what to do.  It's an

7   API, application program interface, into the search

8   program.  So it instructs the search program what

9   catalogs that you're searching.  It will control the

10  hit list that comes back as far as what you selected,

11  and actually ultimately will control what's been

12  selected and move off into a list of items that's

13  selected that get passed to the requisition.

14  Q    Who had responsibility for creating that

15  functionality on your team?

16  A    It was Bob Kinross' area.

17  Q    I'll let Mr. Kinross describe what we need to do

18  there.

19       Which box in this figure 1B controls the ability

20  to search the multiple catalogs?

21  A    Actually, the graphical user interface would talk

22  to the shell, and the shell program would instruct the

23  search program on what to do.

24  Q    And where is the search program identified?

25  A    That's right on the server side.

1    Q    What box?

2    A    200.

3    Q    The search program?

4    A    Yes.  250 is the search program.  I'm sorry.  I

5    thought you said what box was it on.

6    Q    Why do you need all four of these functionalities

7    in order to search multiple catalogs?

8    A    Well, the search program in and of itself doesn't

9    really do what we needed to do.  And that's one reason

10   why we needed to develop a shell to control the search

11   program to fulfill the requirements that we needed for

12   searching.

13   Q    Is there a box identified in this figure 1B that

14   illustrates how you have the ability to determine

15   whether an item that you were selecting was available

16   in the vendor's inventory?

17   A    It would be on the 260, work in process

18   requisition.

19   Q    Did the host computer have the ability to provide

20   information with respect to vendor availability?

21   A    Yeah, you would start with a work in progress

22   requisition, go to requisition purchasing program,

23   back up to the host program.  The flow would be work

24   in process, requisition, past the requisition

25   purchasing program and say, Here's a list of programs.

1    The sourcing of the item would occur in 240 and

2    communicate up to the host, 210.

3    Q    If we could just for a moment remove all the color

4    from figure 1B.  And I'd like you to tell us in the

5    development of your electronic sourcing system

6    inventions, which of these boxes had to be created or

7    modified from the existing RIMS system or the TV/2

8    program?

9    A    Okay.  The shell program actually had to be

10   developed.  We had to make some modifications to that.

11   We had no graphical user interface at all for any of

12   the RIMS system or started off as kind of a base code

13   for that.  There was no work in process, obviously,

14   since we weren't pulling anything from a catalog.

15       There were pretty substantial changes to the

16   requisition and purchasing program.  I'm talking about

17   the whole work flow, in that place, as well as

18   handling the multi line, multi P.O. requisition.

19       There would have been changes to the search

20   program.  We had to make a catalog database.  There

21   were changes that were made to that as well.  And

22   complete requisitions would have been different and

23   change would have had to have been made to that.

24       The other area I think we probably should -- the

25   communication between the local computer and the host

1    computer would have been changed as well to allow us

2    to talk to the host, and the format to which we talked

3    to the host would have changed.

4    Q    As far as your invention, you wouldn't need to

5    reinvent what a keyboard was for a computer, did you?

6    A    No.

7    Q    You didn't need to reinvent what a printer was for

8    your invention, correct?

9    A    That's correct.

10   Q    You could use those tools as part of your overall

11   invention, correct?

12   A    That's correct.

13   Q    You didn't need to reinvent the computer in order

14   to do your invention, correct?

15   A    That is correct.

16   Q    Let me direct you, if I could, to figure 1A, which

17   is another embodiment disclosed in the patent.  Are

18   you familiar with this figure?

19   A    Yes.

20   Q    You talked before about this networked environment

21   in figure 1B.  What is being illustrated in figure 1A?

22   A    This is where actually all of the system is

23   running on, well, two levels.  One is at the local

24   computer level.  And the other is at the host level.

25   Q    I'm sorry.  I didn't hear what you said.

MOMYER - DIRECT                    295

1  A    The local and host level.

2  Q    Okay.  Now --

3           THE COURT:  I don't know that anybody really

4  understood what was being said there.  Perhaps you two

5  because you know so much about this.

6           Start over again.

7           MR. ROBERTSON:  Sure.

8  Q    Can you explain how this is a different

9  environment -- let me just finish the question so it's

10  not garbled on the record.  How it's a different

11  environment from the environment that is depicted in

12  networked environment in figure 1B?

13  A    Sure.  If we could go back to 1B real quick and

14  take a look.  There are three pieces here within this

15  architecture.  There's a local computer, which in this

16  environment housed the programs, the requisition

17  purchasing program, the shell program, the overall

18  user interface.  And the server side, which composed

19  the search program, the databases, both the

20  requisition databases, a complete requisition of the

21  catalog base, as well as the host computer.  So there

22  are really three pieces to that.

23       And if we go to 1A, we've eliminated the server

24  piece of that.  So the databases, the application or

25  requisition application, and the shell, and the search

MOMYER - DIRECT                    296

1    program actually exist on one processor, one machine.

2    And that's in the local computer.  And it talks to the

3    host computer.

4        So we've taken out the server.  Basically, it's no

5    longer a client server.  It's now a two-tier

6    architecture.

7    Q   When you say you have taken out the server, is

8    this software operating on that local computer?

9    A   Yes.

10   Q   It still can be connected to a host computer and

11   host databases, correct?

12   A   That's correct.

13   Q   What are they again?  Can you refresh us on that?

14   A   The host computer would be, in our system, would

15   be the supplier or distributor's computer.  That's the

16   one we're asking for price availability and order

17   placement.

18   Q   In this embodiment, this configuration, can you

19   tell us what functionality needed to be modified or

20   revised or reprogrammed or invented from scratch?

21   A   Sure.  Let's first go to the top of the databases

22   themselves.  And this is really based upon using the

23   RIMS system as the starting point for the development.

24   Q   Let me just stop you there.  There is a number 40

25   there that says RIMS with two arrows pointing there.

1    Do you see that?

2    A    Yes.

3    Q    Now, when you discuss what needed to be modified,

4    I'd like to you do it in context of whether or not the

5    RIMS 40 that's described there needed to be modified

6    revised reprogrammed or changed in any way?

7    A    All right.  Let's start at the top.  42A42B42C the

8    databases.  Requisition database would have had to

9    have changed because we have to start carrying the

10   vendor, the vendor information.  In the RIMS system,

11   we only had a single vendor, and that was Fisher.

12       In the inventory databases, that really included

13   inventory as well as the product information.  The

14   part master would have changed there as well.

15       Customer specific databases would not have

16   changed.  Do I need to explain what that is?

17   Q    Yes.  Why don't you identify what kind of

18   information is in that database.

19   A    That information would allow us to kind of tailor

20   the input of a customer.  If they want to start

21   capturing information on the requisition, for example,

22   if they wanted to capture their reqs. by a department

23   number, accounting code, that would allow us to

24   customize their input to allow them to enter that

25   information.  We do validation against that.  So it's

1   the customer specific data.

2        So on the top level, the databases --

3   Q    Let me just top you there.  Was that a service

4   that you just provided that would assist the customers

5   in how they did their own process work flow?

6   A    Yes.

7   Q    Is that part of any of the claims you have seen in

8   your invention?

9   A    No.

10  Q    All right.  Thank you.

11  A    No.

12  Q    You can go forward.

13  A    On the bottom level, 44C, requisition maintenance

14  would also change since we were adding the multiple

15  lines to it.  The ability to add vendor information.

16  We have that whole work flow we talked about is being

17  put in place.  And the process of dealing with the

18  multiple P.O.s from multiple requisition lines to

19  generate multiple P.O.s, there would have been a

20  change there.

21       Inventory sourcing would have changed because it

22  would have -- now we're talking to multiple vendors

23  and sourcing out to them.  So that communication would

24  have changed, as well as the content.  The change

25  itself would change.

1    Req. order are all part of the requisition

2    process.  That would have changed as well.  Customer

3    variable data, that ties back to that customer

4    specific database.  That's the information that's

5    pulled out from there.  That is the changes for the

6    RIMS system.

7        And within the search area, obviously, we talked

8    about it previously.  The shell program would change.

9    There's a lot of information.  I think Mr. Kinross

10   will probably go into the details of what's changed

11   there.  And the catalog database would have changed as

12   well.  And I think we'll go into details there in the

13   Technical Viewer.  Actually, some things changed there

14   as well.

15   Q    And Mr. Kinross can address that?

16   A    Yeah.  Do you want me to get into that?

17   Q    Not at that level, no.  Thank you, sir.

18       Now, with respect to this TV/2 from IBM, how did

19   Fisher-Scientific and your group get introduced to

20   IBM?

21   A    Well, IBM was a strong partner of Fisher.  We had

22   done business with IBM for a long period of time,

23   purchasing their hardware and software.  Fisher was a

24   large enough installation to have an on-site account

25   rep who was on site several times a week.

1   Q    Did IBM provide some business software solutions

2   that were used by Fisher-Scientific?

3   A    Well, yes.  Actually, they provided some internal

4   software.  Obviously, we bought their hardware, but

5   their operating system.  Transaction processor was

6   called CICS.  We purchased off of them.  The database

7   management system, DB2, we purchased off of them.  I

8   think we were running some of their inventory

9   warehousing system.

10  Q    When you were trying to identify some sort of

11  search capability or search program or document viewer

12  for your electronic sourcing system, did somebody on

13  your team conduct any investigation to see what might

14  be available out there?

15  A    Bob Kinross was given the responsibility for

16  identifying possible search program candidates.

17  Q    Do you know whether he identified more than just

18  TV/2?

19  A    He did.  He had several programs that he had

20  identified.

21  Q    At some point in time the decision came to meet

22  with people at IBM concerning this TV/2; is that

23  right?

24  A    Let me explain one of the reasons that we would

25  have selected TV/2.  It was kind of a criteria.  A

1    couple of things that are important.

2        One, the operating environment that we were

3    running at that time was -- it was an OS/2 operating

4    environment.

5    Q    It was a what?

6    A    It was an OS/2 operating environment.

7    Q    OS stands for operating system?

8    A    Yes.

9    Q    Was that an IBM product?

10   A    It was an IBM product.  And TV/2 was built to work

11   within that operating environment.  The second thing,

12   and probably the most important, was that of all the

13   search programs that Bob had done investigation on,

14   the Technical Viewer product was the one that would

15   allow changes to the modifications.  You can customize

16   it.  Most of the other versions were kind of out of

17   the box.  It is what you get.  What you get is what

18   you see.  And you didn't have any ability to change

19   it.

20       We needed to customize it because we wanted to

21   provide interface into this new procurement system we

22   were developing.

23   Q    There came a time when you met with people at IBM

24   with respect to this TV/2 program?

25   A    Yes.

1    Q    Do you know approximately when that was?

2    A    1993.

3    Q    Did you have an understanding whether this TV/2

4    program was commercially available when you had that

5    initial meeting with the IBM people?

6    A    It's our understanding it was commercially

7    available, yes.

8    Q    Did you sign a confidentiality agreement with IBM?

9    A    Yes.

10   Q    Just if you could just say yes or no for now.

11   I'll follow-up with a question.

12   A    Yes.

13   Q    Why don't you take a look at Plaintiff's Exhibit

14   No. 13 in your book.  Tell me if you can identify what

15   that is.

16   A    That's a confidential agreement with IBM.

17   Q    That was an agreement, if you look at page 2, for

18   exchange of confidential information.  Do you see

19   that?

20   A    That's correct.

21   Q    And the customer name in the block at the lower

22   right-hand side, do you see that?

23   A    Yes.

24   Q    Can you recognize that signature?

25   A    It would be Frank Melly.

1  Q   Was Frank Melly one of the inventors of this

2  electronic sourcing system?

3  A   Yes.

4  Q   This is dated in August of 1993.  Do you see that?

5  A   Yes.

6  Q   Does that refresh your recollection that that's

7  about the time that you had a meeting?

8  A   Yes.

9  Q   All right.  Now, if you'll turn to the page that

10 ends with the Bates label 220, which is page 4 of the

11 document.  It says, Supplement to agreement for

12 exchange of confidential information.

13 A   Yeah, I see the one that's up on the screen.

14 Q   Okay.

15           THE COURT:  Do you want to find it in that

16 book?

17           THE WITNESS:  I think I have it.  I just

18 couldn't --

19           THE COURT:  It has 8220 in the lower right.

20           THE WITNESS:  Yes, I see it.

21 Q   Okay.  There's a heading there that says

22 discloser.  Do you see that?

23 A   Yes.

24 Q   And there's a line for IBM, and there's a line for

25 you.  And then it says (Fisher-Scientific), do you see

1   that?

2   A    Yes.

3   Q    Who does it indicate here was going to be the

4   discloser of the confidential information?

5   A    Fisher-Scientific?

6   Q    Does it indicate that IBM was going to be

7   disclosing confidential information to

8   Fisher-Scientific?

9   A    No.

10  Q    If you'll take a look at the next page.  There's a

11  description of confidential information there.

12  A    Yes.

13  Q    It states there Fisher-Scientific wishes to

14  classify as confidential to IBM and its business

15  partners/contractors all information relative to the

16  Fisher electronic catalog project.  This includes

17  discussions and presentations of the Fisher electronic

18  catalog without the written authorization of Frank

19  Melly or his authorized representative.  Do you see

20  that?

21  A    Yes.

22  Q    This Fisher electronic catalog project, is that

23  this electronic sourcing system invention we've been

24  talking about?

25  A    That's the catalog component of it.

1   Q   Was it your understanding that Fisher wanted to

2   maintain that component of it that it was working with

3   IBM confidential?

4   A   Absolutely.

5   Q   Why is it you felt it necessary to require that

6   IBM maintain that information confidential?

7   A   Well, I think we felt that what was being

8   developed was something that was unique and novel and

9   was something that we needed to protect from our

10  competition because we felt that if developed, it

11  would give Fisher competitive advantage in the

12  marketplace.

13  Q   At some point after you entered into the

14  confidentiality agreement you started to meet with

15  IBM.  Did you ever provide them with a requirements

16  document that you identified before?

17  A   Yes.

18  Q   Do you know who wrote the requirements document?

19  A   It would have been a combination of the inventors;

20  myself, Bob, and Jim Johnson and Frank Melly.

21  Q   Why did you prepared it?

22  A   Well, we had to give some kind of instruction to

23  the contractors that we were engaging from IBM as to

24  what they had to do and how they would go about doing

25  it.

1  Q    Have you looked for that requirements document?

2  A    Yes, I have.

3  Q    Have you been able to find it?

4  A    No.

5  Q    Were you able to take documents with you when you

6  left Fisher-Scientific?

7  A    No, I was not.

8  Q    But at some point in time you entered into an

9  agreement with IBM for this electronic catalog

10  project; is that correct?

11  A    Yes.

12  Q    Can you take a look at Plaintiff's Exhibit No. 25

13  that's in your book?  Do you recognize that document?

14  A    Yes.

15  Q    What is it?

16  A    That is a statement of work.

17  Q    What's a statement of work?

18  A    A statement of work is a narrative as to what is

19  involved in carrying out the instructions that would

20  have been interpreted from the requirements document.

21            THE COURT:  It's a statement of work that IBM

22  was supposed to do?

23            THE WITNESS:  That's correct.

24  Q    Did IBM work with Fisher personnel in

25  accomplishing the tasks that are set forth in the

1    statement of work?

2    A    Absolutely.

3    Q    It's dated March 16, 1994.  Do you see that?

4    A    Yes.

5    Q    Is that sort of consistent with your understanding

6    about the time period this project got underway?

7    A    Yes.

8    Q    Why don't you take a look at the second to the

9    last page.  And you see there's a -- let me just for

10   the record say it's page 21 of 22 in this document.

11           THE COURT:  Mine only has 19.  What's the

12   last page?

13           MR. ROBERTSON:  The last page of the

14   document --

15           THE COURT:  What's the Bates number?

16           MR. ROBERTSON:  It ends with 305, Your Honor.

17           THE COURT:  Well, I do have a 305.  And then

18   I have a 306.  But there's no page -- yes, there's

19   page 21 of 22, but that looks like it's an exhibit

20   page, not a page of the document.

21           Anyway, it's the page that ends 305.  Have

22   you got that, sir?

23           THE WITNESS:  Yes.

24   BY MR. ROBERTSON:

25   Q    Was this statement of work executed by

MOMYER - DIRECT                    308

1   Fisher-Scientific and IBM?

2   A    Yes.

3   Q    Does it indicate how much money Fisher-Scientific

4   was going to be charged?

5   A    Yes, it does.

6   Q    How much is that?

7   A    $620,000.

8   Q    If you will take a look at the page that ends with

9   the Bates No. 287.

10            THE COURT:   The third page of the whole

11   exhibit?

12            MR. ROBERTSON:   Yes, sir.

13   A    Okay.

14   Q    Under "project scope," do you see the No. 1

15   development of a pilot and comprehensive electronic

16   sourcing catalog using IBM Technical Viewer/2, TV/2;

17   do you see that?

18   A    Yes.

19   Q    There are certain exceptions that are noted there.

20   Do you see that?

21   A    Yes, I do.

22   Q    One is for subset searches.   Do you see that?

23   A    Yes.

24   Q    Where does it indicate whether TV/2 has that

25   ability or doesn't have that ability at the time of

1   this document?

2   A    It says it's not currently available.

3   Q    Were subset searches a necessary aspect of the

4   electronic sourcing system invention you had?

5   A    Yes.  Does everyone know what a subset search is?

6             THE COURT:  I don't think anybody does.

7   Q    Can you explain what a subset search is?

8             THE COURT:  I mean, the jury or me.  I'm sure

9   you-all know.  Tell us what it is.

10  A    It's the ability to refine a search.  So you do an

11  initial search.  You get a list back that you have

12  found.  It's quite long.  And you want to go in and

13  refine it.  So, for example, in a laboratory supply

14  example, you might say, Give me all the beakers, and

15  you get a thousand beakers back.  And now you want to

16  refine that list, and you say, Well, give me all the

17  150 milliter beakers.  And then that will go through

18  that subset that was returned and do a search against

19  that.

20  Q    Is that an important aspect of --

21  A    I think it's critical --

22  Q    Let me just finish the question.  Was that an

23  important aspect of your invention?

24  A    Yes.

25  Q    And it says here that one of the exceptions TV/2

1    can't do is Boolean logic services.  They are not

2    currently available in current releases of TV/2; do

3    you see that?

4    A    Yes.

5    Q    What's a Boolean logic search?

6    A    It's and/or logic.  So if you want to combine your

7    search criteria, you can say, an example we gave, Give

8    me search for beakers and 150 milliter, and that would

9    then take those two and combine them together, and

10   you'd get a more refined search.  The or would be,

11   Give me everything that says beaker and everything

12   that has 150 milliter.  So it includes everything.

13   Q    Would that be a helpful attribute for electronic

14   sourcing system?

15   A    I think it seems pretty obvious it would be.

16   Q    Let me ask you to go to the page that ends with

17   the Bates label, and I'm looking at the EPS label

18   there.

19              THE COURT:  What are you saying?

20              MR. ROBERTSON:  I'm trying to get on the

21   right page of the hymnal, Your Honor.

22              THE COURT:  Why don't you get there and then

23   tell us where you are.  Don't tell us how you get

24   there, which is a bad habit that I have.

25              MR. ROBERTSON:  Okay.

MOMYER - DIRECT                    311

1   BY MR. ROBERTSON:

2   Q   Why don't you go to the page that ends with the

3   Bates label 5092292, the lower right-hand side.   Do

4   you see that?

5           THE COURT:   Revised 3-8-94 at the top,

6   Mr. Robertson?

7           MR. ROBERTSON:   Yes, sir.

8   A   Got it.

9   Q   Now, I want to focus on deliverable materials.   Do

10  you see that?

11  A   Yes.

12  Q   It says under topic 1.5, The following items will

13  be delivered to Fisher on your statement of work.   Do

14  you see that?

15          THE COURT:   Wait a minute.   The page on the

16  screen isn't the same that you're talking about.

17  There you go.

18  A   Yeah, I see that.

19  Q   Okay.   Now, there's a 1.5.1 type 1 materials.   Do

20  you see that?

21  A   Yes.

22  Q   And none are being delivered to Fisher-Scientific;

23  do you see that?

24  A   Yes.

25  Q   Now, there's a heading 1.5.2, type 1A materials;

1   do you see that?

2   A    Yes.

3   Q    And underneath that is listed three bullet points.

4   Could you just read those for the jury, please?

5   A    "Electronic sourcing demonstration program.

6   Electronic sourcing pilot program.   Electronic

7   sourcing comprehensive program."

8   Q    And turn to the next page at the top.   First

9   paragraph states, Type 1A materials are those created

10  during the project as derivative works of databases

11  owned by Fisher including ownership of copyright.   IBM

12  will deliver one copy of these materials to Fisher and

13  Fisher shall own the materials including ownership of

14  copyright in the derivative work."   Do you see that?

15  A    Yes.

16  Q    Who had ownership then of the type 1A materials

17  under the statement of work?

18  A    Looks to be Fisher.

19  Q    Is that your understanding?

20  A    Yes.

21  Q    The third paragraph in this statement of work

22  begins, "For a period of two years," do you see that?

23  A    Yes, I do.

24  Q    Just read it for the record.   It says, "For a

25  period of two years following the earlier of (A)

1    completion of this statement of work, or (B)

2    September 30, 1996, IBM will not assign the following

3    employees:  Harry Alexander, Jim Gomola, Pam Jenkins

4    and Al Rolland to provide electronic catalog

5    application development services to the following

6    organizations," and I'll stop there.  Do you see that?

7    A    Yes.

8    Q    What did you understand this restriction to

9    entail?

10   A    That those employees of IBM couldn't work on any

11   electronic catalog project.

12   Q    And they identify Baxter Health Care, Curtin

13   Matheson or VWR Scientific.  Do you see that?

14   A    Yes.

15   Q    Who were they?

16   A    They would have been competitors of Fisher at that

17   time.

18   Q    It goes on to say nor were these individuals

19   communicate during that period the key features of the

20   overall design of type 1A materials to any of those

21   three firms or to persons performing electronic

22   catalog application development services for any of

23   those three firms; do you see that?

24   A    Yes.

25   Q    Why did Fisher-Scientific want that provision in

1  the agreement?

2  A   Once again, Fisher felt that they had a product or

3  were developing a product that would give competitive

4  advantages to themselves and certainly wouldn't want

5  to have the competition be aware and know how to

6  develop that, and we would be able to take advantage

7  of that competitive advantage.

8  Q   These individuals identified here, were they

9  individuals who were working on this project?

10 A   I can state that Harry Alexander, Pam Jenkins, and

11 Al Rolland were.  I don't recall Jim Gomola.

12 Q   Thank you.

13     We talked a little bit yesterday about a

14 commercial embodiment of your invention called

15 supplier link.  Do you recall that?

16 A   Yes.

17 Q   At some point in time did Fisher-Scientific create

18 a spinoff company to develop software associated with

19 your inventions?

20 A   Yes.

21 Q   What was the name of that company?

22 A   Initially, it was called Fisher Technology Group.

23 It also was renamed ProcureNet.

24 Q   Why would Fisher spin off this company called

25 Fisher Technology Group or I'll call it FTG?

1    A    I think if I recall the prior testimony I had that

2    it was determined by Fisher executives that we had a

3    problem in market and supply link, and they felt the

4    best way to do this was to create a separate

5    organization dedicated to the sales, marketing and

6    development of the software to sell.

7    Q    And this FTG or Fisher Technology Group, do you

8    know approximately when it started?

9    A    '95.  '94 or '95.  I'm not that sure.

10   Q    Did employees from Fisher-Scientific go over as

11   part of the personnel for FTG?

12   A    Yes.

13   Q    Were you part of that initial group?

14   A    Yes.

15   Q    What was your role in that?

16   A    I did manage software development projects.

17   Q    Involving the further development of this

18   electronic sourcing invention?

19   A    Yes, supply link.  I actually had some other

20   projects that I was working on unrelated to the

21   electronic sourcing.

22   Q    At some point in time did you read a product known

23   as Cornerstone?

24   A    Yes, I do recall a product known as Cornerstone.

25   Q    Were you involved in the development of

1   Cornerstone?

2   A    No.

3   Q    What was it, though, if you know?

4   A    Cornerstone was an application developed using Web

5   or Internet-type architecture that was similar

6   functionality to supply link.  It was kind of an

7   evolution of supply link into a Web-based environment.

8          MR. McDONALD:  I object.  I'm not sure how

9   this is getting us on the infringement issue at this

10  point.  I tried to wait a while.

11         THE COURT:  I'm not either.  And you told me

12  you had about an hour and 15 minutes with this

13  witness, and we haven't gotten through but about four

14  of the exhibits in the book that you have for this

15  witness, and we're moving rather slowly.

16         MR. ROBERTSON:  I'm going to be coming to a

17  close fairly quickly now, Your Honor.

18         THE COURT:  All right.

19  BY MR. ROBERTSON:

20  Q    So at some point I think you mentioned ProcureNet.

21  FTG became renamed ProcureNet?

22  A    Yes.

23  Q    Were you with ProcureNet?

24         MR. McDONALD:  I object to this line of

25  questioning, Your Honor.  It's not relevant to

317

1   infringement.

2          THE COURT:  Well, I don't know whether it is

3   or not.  He asked was he was with ProcureNet.  Were

4   you?

5          THE WITNESS:  No.

6   Q    Do you have any ownership interest in the patents

7   in this suit?

8   A    No, I do not.

9   Q    Do you know whether Fisher-Scientific still owns

10  the patents?

11  A    They do not.

12  Q    Have you been compensated for your time in

13  preparing for your appearance in court?

14  A    Yes, I have for the preparation.

15  Q    Are you being compensated for your time here

16  testifying?

17  A    No, I'm not.

18  Q    Have you had to take off time from work in order

19  to appear?

20  A    Yes, unfortunately, I have both missed work as

21  well as my family.

22  Q    The compensation you received for your time, is

23  that in any way dependent on the outcome of this case?

24  A    No.

25          MR. ROBERTSON:  Thank you.  Why don't you

1  please answer any questions Mr. McDonald may have.

2       Your Honor, I don't know how you'd like to do

3  this, but I've identified a number of exhibits.  We

4  could move them into evidence.

5       THE COURT:  The exhibits are into evidence if

6  they haven't been objected to, and I think none of

7  these are, in the pretrial order, right?

8       MR. ROBERTSON:  I don't believe so.

9       THE COURT:  They are in.  It's up to the

10  other side to tell me if there's still an objection

11  outstanding that wasn't ruled on at the pretrial

12  conference.

13       How long is your cross-examination going to

14  be?

15       MR. McDONALD:  Probably about an hour and a

16  half, Your Honor.

17       THE COURT:  We'll take the morning break at

18  this time.  We'll take a 20-minute recess.  Just take

19  your pads with you, please.

20       (The jury is out.)

21       THE COURT:  Mr. McDonald, an accepted method

22  of cross-examination is to ask the question that you

23  want to have answered and not to repeat everything

24  that the witness said and then say what your question

25  is.  The jury will have in mind what they want, and it

319

1    will cut cross-examination by roughly 50 percent if

2    you follow that approach.

3              MR. McDONALD:  I'll try to be as brief as I

4    can, Your Honor.

5              THE COURT:  Well, you have an entitlement to

6    cross-examination, but I don't know what your style

7    is, but many people say, Now you have said such and

8    such.  Yes.  And then you ask the question.  And the

9    first part of that we don't need to have.  Just ask

10   the question:  Did you bet your wife?  When did you

11   quit beating your wife?  Those kind of coaching

12   questions.

13             All right.  We'll be in a 20-minute recess.

14             (A brief recess is taken.)

15

16

17

18

19

20

21

22

23

24

25