1                    THE COURT:  All right, cross.

2                    MR. McDONALD:  Thank you, Your Honor.  May I approach

3     with a copy of claim three?

4                    THE COURT:  He's got one in his book.

5                    MR. McDONALD:  I have the colored-coded version like

6     one the one used in the opening by ePlus.

7                    THE COURT:  What exhibit is it?  Is this an exhibit?

8                    MR. McDONALD:  We can mark it, Your Honor.  It's not

9     marked.  It's a demonstrative, color-coded copy of the claim.

10    Do you want me to mark it as an exhibit number?

11                   THE COURT:  We'll wait and see what you do.

12                   MR. McDONALD:  Okay.

13                   THE CLERK:  It's a color-coded copy of PX-1 or 3?

14                   MR. McDONALD:  Claim three of PX-1, yes.

15

16                            CROSS-EXAMINATION

17    BY MR. McDONALD:

18    Q    Mr. Momyer, I'd like to start by talking about issues

19    relating to infringement of the patents involved in this

20    lawsuit, and I'd like to go back to the issue of whether any of

21    these activities that you described, these development

22    activities really relate to that issue.

23         You mentioned, for example, that you had worked on a

24    graphical user interface; do you recall that?

25    A    Yes.

Momyer - Cross

1   Q    That's got nothing to do with any of the claims asserted

2   in this case, does it?

3   A    I don't -- other than how the catalogs display.

4   Q    None of the claims talk about a catalog being displayed,

5   do they?

6              THE COURT:  Mr. Robertson, is the interface involved

7   in the case, in the claims that are at issue?

8              MR. ROBERTSON:  We would say, Your Honor.  In fact,

9   in the exhibit, it's how you have means for selecting prior

10  catalogs to search and means for searching for matching items.

11  That is the interface in which you are making these decisions.

12             THE COURT:  So you are contending it's an

13  infringement issue.

14             MR. ROBERTSON:  Yes, sir.

15             THE COURT:  All right.

16  Q    Mr. Momyer, you have claim three in front of you.  Is it

17  your understanding that any elements of that claim require a

18  graphical user interface?

19  A    Actually, I think probably means for selecting product,

20  means for searching for matching, means for building a req

21  would require a graphical user interface, and means for

22  processing the req, those all would be coming up to the screen.

23  Q    So the old way of doing it before graphic user interface

24  was a text format where it basically just has words and

25  characters on it; correct?

1    A    That's correct.

2    Q    And are you saying then if somebody does the things

3    described by claim three using that old text-based format, they

4    don't infringe?

5              MR. ROBERTSON:  Objection, Your Honor.

6              THE COURT:  So what's the objection?

7              MR. ROBERTSON:  Objection is he's calling for a legal

8    conclusion and the witness is not an attorney.  I don't think

9    he can make an assessment of infringement.

10             THE COURT:  I'm having trouble understanding you.

11             MR. ROBERTSON:  Yes, Your Honor.  The objection is

12   that it calls for a legal opinion from a lay witness, and I

13   think, therefore, it's improper.

14             THE COURT:  Doesn't it call for --

15             MR. McDONALD:  I can rephrase the question, Your

16   Honor.

17             THE COURT:  Objection to the form of the question is

18   sustained.

19   Q    Mr. Momyer, as one of the listed inventors on these

20   patents, do you consider your invention as claimed in your

21   patents to require a graphic user interface?

22   A    It requires what the graphic user interface does.

23   Q    Not the question, Mr. Momyer.  Does it a require a graphic

24   user face or would one come within the scope of your invention

25   as you understand it even if they performed all these functions

1    with just the text-based user interface?

2    A    I don't know.  I don't -- could probably do it with

3    text-based system.

4    Q    So then --

5            THE COURT:  I'm not sure I understand the answer.

6            MR. McDONALD:  I don't either.  I'm going to try to

7    clarify.

8    Q    It's not a requirement of the invention, as you understand

9    it, to use a graphic user interface; right?

10   A    Other than displaying the information in the catalog we

11   would have, you would need for the images -- you would need

12   some user interface to do that, the graphical interface to do

13   that.

14   Q    We are talking about the claims now; right?

15           MR. ROBERTSON:  Object, Your Honor.  The objection is

16   the Court's made a claim construction with respect to, for

17   example, means searching for catalogs, and the structure that's

18   in here is disclosed, and the witness is not aware of what the

19   Court's construction is with respect to that.  In fact, the

20   Court cites to sections of the specification concerning that

21   structure which is the graphical user interface.

22           THE COURT:  What are you talking about?

23           MR. ROBERTSON:  I'm saying, sir, you construed -- the

24   witness is being asked --

25           THE COURT:  Which claim term are you talking about?

1          MR. ROBERTSON:  Well, for example, if you have a

2    juror notebook, Your Honor.

3          THE COURT:  I do.

4          MR. ROBERTSON:  Glossary of terms, tab six.

5          THE COURT:  What is it?

6          MR. ROBERTSON:  Means for generating an order list,

7    for example, that Mr. Momyer pointed to.  The function is

8    described, and the Court made a ruling on the corresponding

9    structure which included graphical interface.

10          THE COURT:  Which one are you talking about now?

11          MR. ROBERTSON:  Page three.

12          THE COURT:  Which one of the three there are you

13    talking about?

14          MR. ROBERTSON:  The one in the middle just by way of

15    example.  I could talk about the one at the top as well.

16          MR. McDONALD:  Your Honor, may --

17          THE COURT:  Wait a minute.  Let me read it.  So what

18    is the objection now?  I've read what you said.

19          MR. ROBERTSON:  Well, the witness is being asked to

20    interpret this claim.  The Court has already done that with

21    respect to it.  It's asking again for a legal conclusion.  The

22    Court has identified what the structure is that includes what

23    the witness is being asked.  Graphical user interface is part

24    of the structure --

25          THE COURT:  Where does it say that?

1              MR. ROBERTSON:  For example, it's in the means for

2    entering product information.  I'm on page three.  This is the

3    top element.  The Court described the function is to enter

4    product information that at least partially describes at least

5    one desired item.

6              Then it says, corresponding structure which the Court

7    identified as part of its claim construction, and skipping

8    down, I'm identifying one or more software modules that provide

9    product information describing an item or combination thereof

10   and their equivalent, and describing things one and two, local

11   computer 20, graphical interface 254, and it goes on.

12             Interface 60 are also identified.  So the Court's

13   construed what the structure is for that means for entering

14   product information, for example.

15             MR. McDONALD:  Your Honor, the Court's construction

16   refers literally to a user interface.  I'm asking specifically

17   about a graphical user interface, and these constructions

18   aren't limited to that.

19             In fact, if I can continue with my questioning, I'll

20   show that the preferred embodiment described in the patents

21   doesn't even use a graphical user interface, it uses the old

22   text-based user interface.

23             THE COURT:  What difference does that make?

24             MR. McDONALD:  Well, he's gone through all this

25   testimony about what a wonderful development --

```
 1              THE COURT:  No, what difference does it make to the

 2   objection to the question that he's asked?  He's being called

 3   upon to give an expert opinion now and to construe a claim, and

 4   he's not going to be able to do that.

 5              MR. McDONALD:  He's been asked about his invention,

 6   what were the wonderful developments of his invention.  I'm

 7   entitled to --

 8              THE COURT:  That's fine, because he did say -- he

 9   asked about what they were.  He wasn't asked about whether they

10   infringe.  He didn't give an opinion whether they infringed.

11   He didn't give a claim interpretation, and he can't do that.

12              MR. McDONALD:  He was asked about that --

13              THE COURT:  The fact that he's asked about one

14   component doesn't necessarily open the door for you to convert

15   him to an expert giving an opinion on claim construction, I

16   don't think.

17   Q    Would you agree with me, Mr. Momyer, that you don't know

18   one way or the whether or not your claims require a graphical

19   user interface?

20   A    I'm confused.

21              MR. ROBERTSON:  Same objection, Your Honor.

22              THE COURT:  Sustained.

23   Q    Mr. Momyer, do you know whether any of the testimony that

24   you gave about the developments regarding your invention tie in

25   to the claim language as construed by the Court one way or the
```

1   other?

2           MR. ROBERTSON:  Same objection, Your Honor.

3           THE COURT:  Ladies and gentlemen, I want to talk to

4   these lawyers.  I'm going to excuse you.

5

6                       (Jury out.)

7

8           THE COURT:  If you, sir, would you step outside.

9

10                      (Witness out.)

11

12          THE COURT:  Now, Mr. Robertson, you asked the man

13  about what he did, and you went through the patent, and you had

14  him talk about figure 1A and figure 1B and all that, and

15  whether or not a graphic interface was required.

16          Now, once you did that, why can't he ask him whether,

17  in his view as the inventor, a graphic interface is required by

18  what he invented?  Why can't he ask him that?  It's -- he's --

19  I don't know.  He's not been identified as an expert, so he

20  can't be giving what we call expert opinion, but certainly he's

21  entitled to give lay opinion, that is the opinion of the

22  inventor, can't he?

23          MR. ROBERTSON:  Your Honor, I don't believe --

24          THE COURT:  When you open the door, why can't -- what

25  you want is you want it both ways, and you can't have it both

1    ways.

2              MR. ROBERTSON:  Sir, I didn't open the door.  I asked

3    him what he did.  I asked him what was necessary for them to

4    build the invention.  I didn't ask, for example, if it was

5    covered by a claim or where it is.

6              There are experts who are going to testify and

7    address what the claims require and how they are infringed and

8    satisfied by the accused Lawson product, but this gentleman

9    doesn't know what the Court's claim construction is.

10             THE COURT:  Why doesn't he?  Why don't you give it to

11   him and let him look at it?

12             MR. ROBERTSON:  I could have, but I didn't want to

13   elicit expert opinions from a lay witness and have that be

14   objected to.  I mean, he would have to study it, probably give

15   a report, all of those things.  I didn't have that time, and I

16   didn't want to ask him issues involving what his opinions are

17   on how something infringes.

18             Quite frankly, he doesn't know what the Lawson

19   software does.  He hasn't studied the patents with respect to

20   accused systems.  He invented the patents.

21             THE COURT:  He's not being asked about the Lawson.

22   He's being asked about his own invention.

23             MR. ROBERTSON:  He's being asked a hypothetical as to

24   whether something would infringe if it had a graphical user

25   interface.  Now, it's obviously addressed to some program, some

Momyer - Cross

1    software that has that kind of functionality.  I mean, the

2    Court has interpreted --

3         THE COURT:  And yet, what he wants to do is establish

4    that Lawson doesn't have graphic interface, and so this case is

5    over as of right now.  That's what he wants to do with the

6    question, I think.

7         MR. McDONALD:  That's not what I'm doing exactly.

8    Maybe on some of the other limitations I will, Your Honor, but

9    can I suggest something here?  The inventor did sign an oath

10   when he filed these applications saying he read them and he

11   understood them including their claims.  So if I lay that

12   foundation, would that get us over this issue so I can talk to

13   him about the claims at that point?

14        THE COURT:  Well, you are then putting him in your

15   case, not -- it's beyond the scope of the examination that Mr.

16   Robertson covered.

17        MR. McDONALD:  Well, I don't think --

18        THE COURT:  He asked him basically what they had to

19   do to get where they got.

20        MR. McDONALD:  Yes, but I think certainly the

21   impression from the testimony, he pulled out the claim three

22   during it and talked about the patents.  The impression is the

23   witness was talking about the claimed invention.  I don't know

24   why --

25        THE COURT:  That and a nickel will get you a Coke

Momyer - Cross

1    because you can't have any testimony about -- in a patent case

2    that somehow doesn't relate to the invention in a general

3    sense.  That's not the focus.  There needs to be a focus that's

4    much more tailored here.

5         I think that the objection is well taken as to the

6    cross-examination because he didn't get into that, but you can

7    call him back and put him on in your case and ask him anything

8    you want to ask him about this.  You can establish it, and I'll

9    give you all a chance to brief if they object.  They know it's

10   coming in.  They can file a brief, and I can look at it, but I

11   don't think -- his direct examination wasn't such that it

12   animates or opens the door to the issue that you're getting to.

13   All right.  Are we we're ready for the jury now?

14

15                         (Jury in.)

16

17        THE COURT:  Go get the witness, please.  Thank you,

18   ladies and gentlemen.  Sorry to inconvenience you.  The

19   objection is sustained.  Go ahead.

20        MR. McDONALD:  Thank you, Your Honor.

21   Q    Mr. Momyer, with respect to the application that led to

22   all three patents in this suit, you did sign an oath saying

23   that you had reviewed that application and understood it;

24   correct?

25   A    That's correct.

Momyer - Cross

1   Q    And you said specifically that you had read and understood

2   the claims; correct?

3   A    Yes, I did.

4   Q    So I'd like to talk about what you say you created and

5   what your understanding is as to what was the system that's

6   described in these patents.  Now, isn't it true that these

7   three patents, these all relate to electronic sourcing; right?

8   A    That's correct.

9   Q    And they are all essentially a requisition and purchasing

10  system that, for example, can be the RIMS system set up to

11  communicate with a catalog database and search engine such as

12  the IBM Technical Viewer 2 product?

13  A    I think we have to qualify that.  In the examples given

14  would be the RIMS system after significant modification and the

15  TV/2 system application after modification.

16  Q    Do you recall giving a deposition in this case in December

17  of 2009?

18  A    Yes, I do.

19  Q    And you were sworn to tell the truth at that deposition;

20  correct?

21  A    Yes.

22  Q    And you did, didn't you?

23  A    Yes.

24       MR. McDONALD:  One moment.  Can I hand up the

25  deposition, Your Honor?

1          THE COURT:  Page and line?

2   Q    Mr. Momyer, could you turn to page 65, beginning at line

3   22, please, of your December 9, 2009, deposition.

4   A    65, and which line?

5   Q    Line 22.  Do you see there where the question states, do

6   you have an understanding that the electronic sourcing patents

7   are essentially a requisition and purchasing system that, for

8   example, can be a RIMS system that is set up to communicate

9   with a catalog database and a search engine such as the IBM

10  Technical Viewer 2 product?  Do you see that question?

11  A    Yes.

12  Q    After the objection and it was read back, you answered

13  that question yes; right?

14  A    Yes, I did say -- I did say yes.

15  Q    Thank you.

16  A    One thing I wanted to question, Mr. McDonald --

17          MR. McDONALD:  Well, I don't think we have a question

18  pending right now.  May I continue Your Honor?

19          THE COURT:  If you want to explain your answer, you

20  lawyer will have a chance on redirect to do that.

21          THE WITNESS:  Okay.

22          THE COURT:  Unless you need to explain something.

23  You seemed like you were adding something.

24          THE WITNESS:  I was.

25          THE COURT:  I think maybe we'll let Mr. Robertson

1   deal with that on redirect.

2            THE WITNESS:  Okay.

3   Q    Now, with respect to the RIMS system, Mr. Momyer, that was

4   described in a patent application in April of '93; correct?

5   A    Yes.

6   Q    If you need some help on that, I believe it's Plaintiff's

7   Exhibit Number 10 in your notebook that ePlus gave you.  That's

8   the RIMS patent.  The filing day was April 2nd, '93, for the

9   RIMS patent?

10  A    Yes.

11  Q    So at least whatever features the RIMS patent had as of

12  that April '93 date, it's fair to say that those features are

13  pretty -- that description is a pretty comprehensive

14  description of RIMS as it existed in April of '93?

15  A    There were some things that weren't developed that were in

16  the patent.

17  Q    But they were described in the patent as something you

18  were going to develop?

19  A    They were described as being in the patent but not that we

20  were going to develop.  They were things that as of '93, as

21  of -- really have never been developed yet.

22  Q    You at least describe some functionality that you had

23  conceived of at that time; right?

24  A    Yes.

25  Q    That's more than a year before the August '94 filing date

1    on the patents involved in suit here; right?

2    A    Yes.

3    Q    Before April of '93, is it true that the RIMS system could

4    search for items using a catalog search?

5    A    The search would be significantly different than the

6    search in electronic sourcing.

7    Q    Well, you are not saying that with respect to the claims,

8    are you?  I'm just asking you, didn't the RIMS system have

9    searching by part or catalog number?

10   A    It did look up by part.

11   Q    Didn't it have searching by part or catalog number in it?

12   A    I guess you need to define what you mean by search.

13   Q    Didn't you, in your own patent, because you were one of

14   the inventors --

15   A    Search in that case would be a product lookup.

16   Q    Let me finish my question, please.  As one of the

17   inventors who also signed off on the RIMS system, isn't it true

18   that you describe that search by part number as a search, not

19   just a lookup; right?

20   A    It did say that, yes.

21   Q    Your application said that; right?

22   A    Yes.

23            THE COURT:  Is there some difference between a search

24   and a lookup?

25            THE WITNESS:  Yes.

1    Q    If we turn to the exhibit tab ten, the RIMS '989 patent,

2    if we go to figure three of that patent.

3    A    Which patent are you in?

4    Q    Exhibit 10 which is the RIMS patent.

5              THE COURT:  The RIMS patent which you have in front

6    of you, and he wants to go to figure three which is on the page

7    that has 1899 at the bottom of the right-hand corner.

8              THE WITNESS:  I see it.

9              MR. McDONALD:  If you can blow up the top four boxes

10   on that page, please.

11   Q    So didn't you say there in box 202 that one of the steps

12   here of the process after the customer service representative,

13   or CSR, enters the stock number, and that gets entered into the

14   requisition item table, that the local computer searches the

15   parts master table for a stock number?

16   A    It searches the part master table, yes.

17   Q    Part master table, I'm sorry.  So you did describe that as

18   being a search within the part master specifically in RIMS;

19   right?

20   A    Correct.

21   Q    That was a search for matching items; right?

22   A    It was a search for specific item.

23   Q    An item that matched the part number you put in; right?

24   A    Yes.  An exact match.

25   Q    Okay.  Now, was that parts master in the RIMS system,

1  would you consider that a catalog?

2  A    No.

3          THE COURT:  Was the parts master a catalog, is that

4  your question?

5          MR. McDONALD:  That's right.

6  Q    What was the parts master in the RIMS system?

7  A    It had -- if you recall, it was only the local inventory

8  records, and it really had everything that I recall except a

9  vendor.  It did not have a vendor in it since Fisher was a

10 single vendor.

11 Q    So with respect to the distinction between the RIMS patent

12 or product and what you were describing as your invention for

13 the patents in this case, they both had searching, but the RIMS

14 system didn't search catalogs specifically; is that fair?

15 A    Searched parts -- one searched parts lists and the other

16 searched a catalog.

17          THE COURT:  One searched a parts list?

18          THE WITNESS:  Part master table is what it is.

19 Q    Parts master table, another term for that that you just

20 used is a parts list; is that right?

21 A    Yes.

22 Q    Is that also sometimes called an item master?

23 A    Yes, it could be.

24 Q    As the sort of list a customer compiles themselves; right?

25 A    The customer compiles?

1    Q    Well, doesn't the customer typically select the products

2    to go on an item master or parts master?

3    A    When they are building up their item master.

4    Q    One item after another, the people deciding which items

5    get on that parts master or items master is the customer;

6    right?

7    A    Yes, using the system of whatever system you are using.

8            THE COURT:  If the customer is doing the selection,

9    it's the customer, but if I do it and I'm not the customer,

10   then I'm the one making it up; is that right or wrong, or does

11   it always have to go through the customer?

12           THE WITNESS:  No, it doesn't have to go through the

13   customer.

14   Q    The purposes of a parts master or item master is to track

15   the inventory of an individual customer; correct?

16   A    Yes.  That's one of purposes of it, is to hold inventory

17   information.  It also helps identify the product and give you

18   some information about the product.

19   Q    It would be -- the purpose of that information in a parts

20   master or an item master would be to give enough information to

21   help reorder products for that customer for their inventory; is

22   that fair?

23   A    Yes, or do -- the item master could have a list price in

24   it as well.

25   Q    Is it typical -- you are familiar with catalogs that are

1    published by vendors, manufacturers, suppliers, folks like

2    that; correct?

3    A    Yes, I am.

4    Q    Now, is it fair to say typically one of those published

5    catalogs is going to have a significantly longer description of

6    the products than an item master or parts master?

7                MR. ROBERTSON:  Your Honor, I object.  This is

8    outside the scope of my direct examination.

9                MR. McDONALD:  We talked a lot about the RIMS system.

10               THE COURT:  I know you are, but I don't think he --

11   among the things he questioned about, I don't think he was

12   questioned about how they made up catalogs, how vendors made up

13   catalogs.

14               MR. McDONALD:  I'm looking for the distinction in

15   terms of what his invention is starting from the RIMS patent --

16               THE COURT:  I'm not dealing with theory.  I'm dealing

17   with a question, and the objection to the question is

18   sustained.  You may be able to get at it another way, but that

19   particular question is objectionable.

20   Q    So is it true that the patents involved in this suit

21   involve ability to search multiple product catalogs?

22   A    Yes.

23   Q    That's a key part of the invention; right?

24   A    Yes, it is.

25   Q    And that's a distinction from what the RIMS system had; is

Momyer - Cross

1    that right?

2    A     That is a distinction, yes.

3    Q     So that RIMS parts master isn't the same thing as the

4    catalogs you had in mind as the invention for these patents in

5    this suit; right?

6    A     I don't think so.  For me, no they aren't the same.

7    Q     Again, the parts master, that's the same sort of thing as

8    an item master; correct?

9    A     Yes.

10   Q     Now, that RIMS system, it also had another database I

11   think you mentioned at the host which would be the distributor;

12   right?

13   A     Yes.

14   Q     And the way you guys used it, that would be at Fisher;

15   right?

16   A     Yes.

17   Q     Now, at that host database, did that database have a list

18   of products that Fisher sold?

19   A     Yes.

20   Q     Now, I think you mentioned about a third of Fisher's

21   products were made by Fisher, and two-thirds came from other

22   places; is that right?

23   A     Yes, but they still -- lists were still parts that Fisher

24   sold.

25   Q     Okay, fair enough, but Fisher was a distributor.  They

Momyer - Cross

```
 1   would acquire the product from another source, a manufacturer,
 2   for example; correct?
 3   A    Correct.
 4   Q    Then they would turn around and then, in effect, resell
 5   that product to the Fisher customers; is that how that worked?
 6   A    That's correct.
 7   Q    So that Fisher catalog had items that were actually made
 8   by Fisher as well; correct?
 9   A    That's correct.
10   Q    And then products made by somebody else that Fisher
11   resold; right?
12   A    Which is typical distributor operation.
13   Q    Now, did you consider that database at the host in the
14   RIMS system to be multiple catalogs published by vendors?
15   A    No.  It was a single parts table.
16   Q    Okay.  Did you consider it to be a single catalog
17   published by Fisher as a vendor?
18   A    Once again, I didn't, wouldn't consider it a catalog
19   because I have -- in my mind, a catalog involves some larger
20   textual description as well as some image or picture that
21   represents, gives further meaning to the product.
22   Q    It is the reason why you have that description of a
23   catalog in your mind, because that additional information helps
24   people select the products in the catalog to buy?
25   A    That's right.
```

1    Q    And that's different, isn't it, from an item master or

2    parts master where the customer already knows what they want to

3    buy; right?

4              MR. ROBERTSON:  I object.  This is entirely outside

5    the scope of my direct examination.

6              THE COURT:  Why?

7              MR. ROBERTSON:  Because I didn't go into anything as

8    to what he considers constitutes a catalog.  The Court

9    construed that term, and I didn't go into differences between

10   item masters and catalogs.

11             MR. McDONALD:  Still talking about his invention here

12   and what's different about it --

13             THE COURT:  That's not a very succinct response to

14   the objection that was made.

15             MR. McDONALD:  During the direct examination, Mr.

16   Momyer was asked about the development of the invention

17   including starting from the RIMS product and adding

18   functionality to that to come to the invention.  I'm going

19   through and exploring the differences, both the same additions

20   or changes.

21             THE COURT:  Well, what you did is ask him his opinion

22   about what a catalog was, and Mr. Robertson didn't object to

23   it.  That's what happened.  He gave the answer, and then you

24   asked a follow-up question.  The first question was

25   objectionable.  Had it been objected to, I would have sustained

1    it.  The second question is equally objectionable.  It is

2    sustained.

3    Q     Would you agree --

4              THE COURT:  I gave the definition of catalog, what it

5    means in this case, and that's the only one that's counts.

6    Whether it's right or wrong, it's the one that counts, so he

7    can't give definitions of catalog.  Nor can any other witness

8    give a definition of catalog, and I don't know why it wasn't

9    objected to begin with, but now that it has been, it is

10   sustained.

11             And I'm going to tell you to disregard his testimony

12   about what his opinion is on catalog as to either one of those

13   questions, because the definition you are bound by, ladies and

14   gentlemen, is the glossary of terms that is in your book which

15   is the claim construction given by the Court.  All right.

16   Q    Now, Mr. Momyer, did you understand that the invention as

17   claimed in the patents involved in this suit involved building

18   requisitions?

19   A     Yes.  That was one of the claims.

20   Q     One of the elements of claims?

21   A     Yes.

22   Q     I understand we're giving shorthand, that there are other

23   words other than requisition, but one the words used was the

24   word requisition; right?

25   A     (Indicating affirmatively.)

1   Q    Now, isn't it true that wasn't really a change from the

2   old RIMS system, the idea of generating requisitions in terms

3   of getting to the patents involved in this suit?

4           THE COURT:  Wait a minute.  That question was all

5   right until you add the prepositional phrase that you tacked on

6   at the end, so do it over again.

7           MR. McDONALD:  All right.

8           THE COURT:  Then it became a different issue.

9   Listen, are we going to pay attention to the questions over

10  there, folks, get with it?  Let's go.

11  Q    Mr. Momyer, would you agree that the RIMS system, the old

12  RIMS system that predates the patents here, that could build

13  requisitions?

14  A    For a single source.

15  Q    Well, we'll get to the source issue in a moment, okay, but

16  can just you answer --

17          THE COURT:  The answer is yes for a single source; is

18  that right?

19          THE WITNESS:  Yes.

20  Q    Isn't it true that the RIMS system had in it the data that

21  would relate to products that came from third-party vendors

22  other than Fisher?

23  A    You would always order products through Fisher.  So those

24  third-party products would have been purchased through Fisher.

25  Q    So those third-party products were -- there was a

1    third-party source for those products that Fisher acquired them

2    from; right?

3    A     Third party being parts that weren't in the Fisher parts

4    master.

5    Q     With that definition, are you agreeing with me then that

6    the RIMS system did allow Fisher to source products from

7    third-party sources?

8    A     No.

9    Q     So where did Fisher get those other products from?

10   A     The RIMS system lodges source from Fisher.  The Fisher

11   host system would determine where you would buy those products

12   from.

13              THE COURT:  You are using the word "you" in your

14   answer.  I understood from your testimony earlier that it was

15   the Fisher customer representative who had access to the

16   catalog.  Is that the "you" you are talking about, or are you

17   talking about some other "you"?

18              THE WITNESS:  I apologize.  I wasn't sure where I

19   used the word "you."

20              THE COURT:  You said you would source it.  I thought

21   -- the customer rep was the one doing the sourcing, wasn't he?

22              THE WITNESS:  Yes.

23              THE COURT:  I would call you.  You are the customer

24   rep.  You say -- I say, I want a beaker.

25              THE WITNESS:  Yes.

Momyer - Cross

1          THE COURT:  Then you do the sourcing.  I don't do the

2     sourcing as your customer; is that right?

3          THE WITNESS:  That's correct.  Someone at Fisher,

4     either a customer service rep or someone in the procurement

5     area of Fisher would do the sourcing of the product.

6          THE COURT:  I think that you all are using this

7     indefinite pronoun "you," and I think -- it's hard enough to

8     follow, for the jury and me to follow the testimony on this

9     technical matter without you all being -- even when you are

10    being precise, but when you are being imprecise about what you

11    mean, it confuses the issues, and I think it's better if you

12    all try to be very specific in your questioning and not do

13    indefinite pronouns like "you."

14         MR. McDONALD:  Let me try it a little differently,

15    Your Honor, see if I can eliminate that problem.

16    Q    Is it fair to say that in the preferred embodiment

17    described in the patents-in-suit, you described a requisition

18    module from the old Fisher RIMS system?

19    A    Yes.  So that was the preferred embodiment for

20    requisitions in the patents-in-suit; right?

21         THE COURT:  You mean that -- your question actually

22    was, was that one of the things disclosed in the preferred

23    embodiment, not was it the preferred embodiment, and you

24    converted it just now.  I don't think you intended to, but --

25         MR. McDONALD:  Can we turn to figure 1A of the '683

1    patent.  It's Plaintiff's Exhibit 1.  I believe that's page

2    three.

3                 THE COURT:  You want figure three.

4                 MR. McDONALD:  Figure 1A on page three of the

5    document.

6                 THE COURT:  Ladies and gentlemen, they are using the

7    term preferred embodiment.  That means that in the patent,

8    that's one way of doing, of actually using the invention, and

9    it is what the inventor says is a preferred way, the preferred

10   way, but it doesn't mean it's the only way, and that's, I

11   think -- is that a fair definition from a layman's standpoint,

12   folks?

13                MR. McDONALD:  Sure.

14                MR. ROBERTSON:  Yes, Your Honor.

15                THE COURT:  So they'll understand what you all are

16   talking about.

17   Q    So you have figure 1A before you, Mr. Momyer; is that

18   right?

19   A    Yes, I do.

20   Q    You see on the left side there, there's the number 40, and

21   then RIMS is in parentheses?

22   A    Yes.

23   Q    You understand in your own patents here that you were

24   using that to refer to the RIMS system as described in your

25   patent application that had been filed in April of '93; right?

 1            THE COURT:  What's that one that's filed in April of

 2   '93?

 3            MR. McDONALD:  The RIMS patent.

 4            THE COURT:  You are switching back and forth between

 5   the date and the RIMS patent, and I think the jury can

 6   understand it better if you keep some consistency in the terms

 7   that you are using.  Try it again with the redefinition.

 8   Q    When you use the term RIMS here in figure 1A, Mr. Momyer,

 9   in your patent --

10            THE COURT:  Which patent?  There are two different

11   patents that you are talking about in your question, and you

12   need to be precise about what you are talking about if you

13   would.

14            MR. ROBERTSON:  With respect to figure 1A of the '683

15   patent, Mr. Momyer, where you use the term RIMS, that patent

16   refers to that term RIMS in the context of the patent

17   application on the RIMS system filed in April of '93; correct?

18   A    It's my understanding -- we talked about this.  Actually

19   we identified there were changes that had to be made to RIMS in

20   the early part of the patent, and there were changes made to

21   RIMS to support electronic sourcing.

22            THE COURT:  So the question is, is the RIMS you are

23   talking about in number 40 on figure 1A the RIMS with changes

24   in it that you had made to support this, or is it -- are you

25   referring to the RIMS that is in the patent for RIMS that is

Momyer - Cross

1  Exhibit 10?  Is that right?  That's the question.

2          THE WITNESS:  It's not the same.

3          THE COURT:  It's not the one in ten, it's a modified

4  one.

5          THE WITNESS:  Modified.  We went through the

6  modifications earlier.

7  Q    Turn to column one of the '683 patent.  If we could blow

8  up around columns ten to 20.

9          THE COURT:  Columns or lines?

10          MR. McDONALD:  I'm sorry, lines ten through 20 of

11  column one of the '683 patent, and hopefully we'll get that on

12  the screen, Mr. Momyer, in a little bigger print for you as

13  well.

14          THE WITNESS:  Column two?

15          THE COURT:  Column one.

16          MR. McDONALD:  That's right.  Lines ten through 20.

17          THE WITNESS:  I see that.

18          MR. McDONALD:  Can we get that on the screen from

19  Exhibit 1?

20  Q    So this is in the background of the invention description

21  for the '683 patent here; correct?

22  A    Yes.

23  Q    Now, you say there at about line 12, one such system is

24  the Fisher Scientific requisition and inventory management

25  system, and then you put in parentheses and in quotes, Fisher

1    RIMS, quote, parentheses, describe U.S. patent number 5712989

2    filed April 2, 1993, and assigned to Fisher Scientific Company

3    of Pittsburgh, PA, the disclosure of which is incorporated

4    herein by reference.  Do you see that sentence?

5    A    Yes.

6    Q    So isn't it true here that when you put the words Fisher

7    RIMS in quotes like that, you are, in effect, indicating when I

8    use the terms Fisher RIMS in the rest of this document, this is

9    exactly what I'm talking about?

10   A    Is that what that means?

11   Q    You are the inventor.  You wrote the patent.

12   A    I'm not quite sure --

13            THE COURT:  I usually don't -- I try to stay out of

14   counsel's questioning because they know better how to deal with

15   a case than I do, but this is complicated for a jury to

16   understand, and your technical question is actually, where you

17   use the terms Fisher RIMS as a short form in column one, do you

18   mean only the thing that is referred to in the patent; right?

19   Do you mean that?

20            MR. McDONALD:  I'm not sure I would word it exactly

21   that way.

22            THE COURT:  That's the way you asked it.  Then the

23   figure 1A which you are talking about doesn't have Fisher RIMS

24   in it.  It has RIMS, and I think that you can confuse the jury

25   if you are not careful, and that is the thing lawyers do,

1    referring to short forms, and short form generally means that's

2    the abbreviation I use -- I mean when I'm referring to this

3    particular term, but if you don't use that particular

4    abbreviation, then you're not doing the same thing.  You're not

5    referring to it.  So let's kind of get with the program here.

6              MR. McDONALD:  Well, I can show you --

7              THE COURT:  Mr. Robertson, I don't want to be in the

8    position of doing what you should be doing.  Get on the program

9    and do it.  This is something that's important to the jury to

10   understand, and Mr. Momyer is not a lawyer either, so we're

11   dealing with legal issues or legal abbreviation formats, and

12   let's get going.

13             So the question he wants to know is, is that RIMS, as

14   you use it in 40, are you using that on figure 1A, the same

15   term you are using up in the front on column one, when you use,

16   quote, Fisher RIMS, close quote?  Is it the same or different?

17             THE WITNESS:  It's different.

18   Q    Could you turn to column four of the '683 patent at lines

19   one through three, please.

20             THE COURT:  Line what?

21             MR. McDONALD:  One through three.

22             THE COURT:  Begins electronic sourcing?

23             MR. McDONALD:  Yes.

24             THE COURT:  System also includes a

25   requisition/purchasing system 40, preferably but not

1    necessarily the Fisher RIMS system, and a search program that

2    is capable of searching through large volumes of information

3    quickly and accurately; is that what you are talking about?

4                MR. McDONALD:  That's what I'm talking about.

5    Q    That sentence, the first half of it describes the system

6    40 as preferably but not necessarily the Fisher RIMS system;

7    right, Mr. Momyer?

8                MR. ROBERTSON:  Objection, Your Honor.  That

9    mischaracterizes what's disclosed there.

10               THE COURT:  He's just reading.

11               MR. ROBERTSON:  It says, includes the

12   requisition/purchasing system 40, and then says, preferably but

13   not necessarily the Fisher RIMS system.

14               THE COURT:  That's what he just said.  I think that's

15   as far as he went.

16               MR. ROBERTSON:  I think he said -- I thought the

17   record will reflect he said 40 was the Fisher RIMS system.  If

18   I misunderstood, then I withdraw the objection and apologize.

19               THE COURT:  So the document says what it says, I

20   think, is the answer to that.  We don't need to have him agree

21   that the document says what it says.  Let's go.

22   Q    It does use that phrase Fisher RIMS that was in quotes

23   back in column one talking about the RIMS system describing the

24   patent application for RIMS; correct?

25   A    It does use the same words, yes.

1    Q    Are you aware, Mr. Momyer, of anyplace in the patent, the

2    '683 patent where you specifically say, actually the preferred

3    embodiment I'm talking about is a modified version of that RIMS

4    system that's in the patent application for the RIMS system?

5              THE COURT:  Can I see you up here please, gentlemen?

6    Put the white noise on.

7

8              (Discussion at sidebar as follows:)

9

10             THE COURT:  It says electronic sourcing also includes

11   a requisition/purchasing system 40.  Then it says, preferably

12   but not necessarily the Fisher RIMS system.  That's the same

13   thing he said, and you're not impeaching him by asking him what

14   you are asking him because you are trying to convert it into

15   the fact that he's equating the two, and, in fact, the very

16   language of the text you are talking about does not equate the

17   two.  It says it's preferable but not necessary, so I am -- you

18   keep -- and the problem is in a case that's technical, if you

19   ask questions or confuse the jury, it's a problem.

20             You need to be aware of that and don't make

21   objections about what is the wrong objection.  You had a valid

22   objection.  You just didn't make the right one.  Pay attention

23   to what's happening.  I know you've been in this case and tried

24   this case three times, but this is a new case.  That's this

25   one.  Listen to what's going on here.  I don't want the jury

1    confused.

2

3            (End of sidebar discussion.)

4

5    Q    Now, is it true -- I'd like to move to the issue of

6    generating purchase orders, Mr. Momyer; all right?

7    A    Okay.

8    Q    Now, in the old RIMS patent, that describes that the local

9    computer in the RIMS system can create purchase orders;

10   correct?

11   A    The local -- no.  The local computer cannot create

12   purchase orders.

13           THE COURT:  In the RIMS patent; is that what the

14   question was?

15           MR. McDONALD:  That's right.

16           THE COURT:  In the RIMS patent or system, the local

17   computer cannot generate purchase orders; is that what you are

18   saying?

19           THE WITNESS:  That's correct.

20   Q    Could you turn now in Exhibit 10, the RIMS '989 patent, to

21   column 17.

22   A    Okay, '989.

23           THE COURT:  What is it, sir?

24           THE WITNESS:  Which exhibit is that?

25           MR. McDONALD:  Exhibit 10.

1            THE COURT:  It's the original RIMS patent on ten, and

2    what page and line and so forth?

3            MR. McDONALD:  Column 17.  I believe that's page 23.

4    If you go to the sentence beginning -- paragraph beginning at

5    line 35 of column 17.  Blow up that paragraph, please.

6            THE COURT:  In either event, Mr. McDonald, is that

7    the paragraph?

8            MR. McDONALD:  Yes.

9            THE COURT:  How far do you want to go?

10           MR. McDONALD:  The full paragraph, to about line 42.

11   Q    It's also up on the screen, Mr. Momyer.  It might be a

12   little bigger print on the screen.

13   A    I see that.

14   Q    Okay.  Now, do you see in the second sentence of the

15   paragraph, as described in the diagram, figures 5A and 5B, for

16   items of product types 01, 03, and 04, local computer 40 uses

17   purchase order build program 112 to create a purchase order

18   between the customer and the distributor from the data in the

19   requisition header and item tables.  Do you see that?

20   A    2A?  Yes, I see that.  It's --

21           THE COURT:  Your only question was, do you see it.

22   You answered that yes, so if you have another question --

23           THE WITNESS:  Okay, sorry.

24   Q    So the local computer would create a purchase order

25   between the customer and the distributor from data; correct?

Momyer - Cross

1    A    No.  It would pass data up to a host program which are

2    figure 2B, number 120 purchase order.  That's what would build

3    the purchase order.

4    Q    So this sentence that I just read made it sound like it's

5    the local computer --

6                THE COURT:  Wait a minute now.  You're not

7    testifying.

8    A    I understand that.  I understand how that reads, but it's

9    a transaction -- purchase order build program initiates the

10   purchase order program.

11   Q    Okay.

12   A    Which is on the host and builds on the host.

13   Q    So we're talking about the RIMS system now; correct?

14   A    Correct.

15   Q    The RIMS system includes both the local computer and a

16   host computer; right?

17   A    The invention does say that, yes.

18   Q    So the RIMS system, as a whole, generates purchase orders;

19   correct?

20                MR. ROBERTSON:  Object to the form of the question,

21   Your Honor.

22                THE COURT:  What do you say?

23                MR. McDONALD:  I think it's a good form.

24                THE COURT:  You all really helped me with that one.

25                MR. ROBERTSON:  Well --

1          THE COURT:  What's objectionable to the form?

2          MR. ROBERTSON:  As a whole?  I don't understand what

3    that means, the RIMS invention as a whole.

4          THE COURT:  Is your objection then it's ambiguous?

5          MR. ROBERTSON:  Yes, sir.

6          THE COURT:  Sustained.

7    Q    Mr. Momyer, would you agree that the RIMS system, which

8    includes both the local computer and a host computer, generates

9    purchase orders?

10   A    Yes.

11   Q    And the sentence talks about product types 01, 03, and 04;

12   do you see that?

13   A    Yes.

14   Q    And do you know what those types are?

15   A    Yes, I do.

16   Q    What are they?

17   A    If product type 01 is a customer-owned inventory, that's

18   locally represented, stored locally.

19   Q    Okay.

20   A    On a customer's site.  03 is a product type which is a

21   product that's stored, would be stored within one of Fisher's

22   warehouses, and 04 would be a product that would be -- an off

23   catalog product that would be sourced from another vendor.

24   Q    Would be sourced from a third party; correct?

25   A    Yes.

1    Q    In fact, if you turn to column six of the '989 patent,

2    Exhibit 10, which is page 17 of Exhibit 10.

3    A    Column six?

4    Q    Yes.

5    A    What are the lines again?

6    Q    I haven't given lines yet.  We have column six, page 17 of

7    Exhibit 10.  I want to help you get there first.

8    A    I got it.

9    Q    Okay.  Then you see there there's a table that actually

10   begins at the bottom of column five and continues at the top of

11   column six; correct?

12   A    Correct.

13   Q    And the product types 01 and 02 are defined at the bottom

14   of column five; correct?

15   A    Yes.

16   Q    And then the other product types, 03, 04, 05, and 06,

17   they're all at the top of column six; right?

18   A    Yes.

19          MR. McDONALD:  Could you blow up the column six

20   portion of that table, please.

21   Q    So it has those types 03 and 04 that we were just talking

22   about; correct?

23   A    Yes.

24   Q    So 04, third-party item the distributor orders, that's

25   what you were just talking about in terms of sourcing; correct?

Momyer - Cross

1    A    Correct.

2    Q    Now, is it true that when the system generates purchase

3    orders, it even generates purchase orders when it's part of the

4    customer's own inventory sometimes?

5    A    Are we talking about product type 05?

6    Q    Not necessarily.  Isn't it true that there are certain

7    types of products that even if they are owned by the customer,

8    the RIMS system would generate purchase orders for them?

9    A    If I can give a little clarification.

10             THE COURT:  If you don't understand the question --

11             THE WITNESS:  I understand the question, but I wanted

12   to clarify the answer that I'll be giving.  If it's

13   customer-owned inventory, you can designate that inventory as,

14   to replenish in two ways.  One is to replenish and order the

15   product from Fisher, because in many cases the products that

16   the customers owned would be bought from Fisher, so that would

17   be one way to replenish.

18             The second way is it's customer-owned, and it's

19   really sourced by the customer and in the customer's system.

20   The product, local inventory product that is to be replenished

21   by ordering from Fisher would generate a purchase order to

22   Fisher.  Ultimately, through that process, where you go through

23   and you create -- the purchase order build goes and talks to

24   the host program which goes and builds the purchase order, but

25   that would be a Fisher order.  The second one, there is no

1   purchase order created within RIMS.

2   Q    Well, in the RIMS patent, doesn't it say that when it is a

3   customer internal transaction, a purchase order is created and

4   printed?

5   A    No.  As a matter of fact, I think it states somewhere in

6   that patent that it is not an order, that it's something that

7   is -- it's only there for record-keeping.  Let me see if I can

8   find that.

9   Q    Can you turn to figure 5A --

10          THE COURT:  Wait a minute.  He's looking for what he

11  wants to tell you.

12  A    Take a look at column 11 starting at line 14.  Items of

13  product type 05, the CSR may order the item for the customer.

14  These orders are not placed or filled using the system of the

15  present invention, although data regarding these transactions

16  may be entered on non-catalog information data 80 to record

17  these transactions.

18          Instead, either the proposed purchase order record is

19  uploaded into the customer's computer for processing or a

20  document is printed at local printer 43 for signature and

21  action by the customer's purchasing agent or the CSR confirms

22  that the order has been placed with the designated vendor by

23  some other means.

24  Q    Okay, so --

25          THE COURT:  So that described what you were talking

Momyer - Cross

1    about when you testified respecting what happens when there's

2    an order placed for a customer, an item in the customer's

3    inventory that was not bought from Fisher originally.

4              THE WITNESS:  That's correct.

5              THE COURT:  And there's no purchase order generated

6    in that situation.

7              THE WITNESS:  That's correct.

8              THE COURT:  But when -- there's a purchase order

9    generated when the item supplied as a purchase is an item

10   bought from Fisher, and there is a purchase order so that that

11   same product goes back into the inventory.

12             THE WITNESS:  That's correct.

13             THE COURT:  Is that right?

14             THE WITNESS:  That's correct.

15   Q    So customer orders from Fisher, RIMS generates a purchase

16   order; right?

17   A    A single purchase -- a purchase order to Fisher.

18   Q    And even if Fisher is getting it from a third-part source,

19   the customer is ordering it from Fisher, and a purchase order

20   is generated in that situation as well; right?

21   A    What happens is that order that's created, it's a purchase

22   order that is transmitted from RIMS for the customer, and it

23   is -- Fisher bills the customer for that third party, so it is

24   sourced outside of the PO.  PO is -- a single PO for Fisher,

25   and the customer pays Fisher for that product.  So that -- it's

Momyer - Cross

1    PO to Fisher.

2    Q    By PO, you mean purchase order?

3    A    Purchase order.

4    Q    You were just talking about type 05.  Is that the one

5    where it's the proposed purchase order that's generated?

6    A    That's what we just talked about.

7    Q    That's a proposed purchase order that's generated in that

8    case; right?

9    A    Yes, but all the other product types we're talking about

10   in RIMS, the PO that's sent up from RIMS builds an order for

11   that customer, and the customer pays for that.  Any items are

12   bought by Fisher, the customer pays Fisher for that, so,

13   therefore, POs to Fisher, single source.

14   Q    How about types 06?  That's the situation where it's a

15   customer-owned item, but in some cases, even then the RIMS

16   system would generate a purchase order for that customer;

17   right?

18   A    That's exactly the same -- we're talking about that

19   replenishment type.  It could be a customer-owned inventory,

20   and it could be either an 05 or an 06, an 06 being it's

21   customer-owned, but basically Fisher buys it for them.

22   Q    Isn't it true that for that type 06 product, the RIMS

23   system, as described in the RIMS patent, calls that a purchase

24   order, doesn't it?

25   A    Purchase order to Fisher.

1    Q    Well, I'm talking about the type 06 now, the internal
2    customer transaction.
3    A    No.
4    Q    That is --
5    A    It's kind -- let me try to explain this.  If it's a
6    customer-owned inventory, there are two ways to replenish that
7    inventory.  You can replenish it by buying product from Fisher,
8    or you can replenish them by this administrative thing, this
9    05.  Those are the only two ways.
10         So in the customer's stockroom are products that are
11   either purchased by Fisher for the customer or items that the
12   customer buys for themselves and just sticks in the stockroom.
13   Q    Could you turn to figure 5A of the RIMS patent,
14   Exhibit 10, which is page 11, please.
15              MR. McDONALD:  Could you blow up the box, the diamond
16   beginning at 332 and going down to the box 336.
17   Q    This is a flow chart; right, Mr. Momyer?
18   A    Yes.
19   Q    And it's depicting the RIMS system and how it accepts a
20   source requisition; correct?
21   A    Correct.
22   Q    So we got this diamond here that asks a question in the
23   system whether it's type 01, 03, or 04; correct?  That's the
24   diamond number 332?
25   A    Yes.

Momyer - Cross

1    Q    If the answer is yes, it goes to the right in this figure,

2    and if the answer is no, it goes to the left; right?

3    A    Yes.

4    Q    And so if it's a type 05 or 06, it goes to the left;

5    right?  Excuse me, I'll rephrase that.  If it's a type 05 or

6    06, it goes to left into that diamond 334; correct?

7    A    Correct.

8    Q    And what is the purpose of diamond 334 for those types, 05

9    and 06?

10   A    Excuse me.  05 and 06 are the replenishment types that

11   have identified for customer-owned inventory.

12   Q    This diamond is asking whether or not there should be an

13   internal purchase order generated for the customer; right?

14   A    That's internal PO.

15   Q    If the answer to that question is yes, then the RIMS

16   system, as described in Exhibit 10, creates and prints purchase

17   order internal to customer; correct?

18   A    That would be the 05.  This is not a well-constructed flow

19   chart.  If it's customer internal PO, it creates and prints

20   purchase order internal -- create -- the other part that I read

21   is what happens on that, and that basically would be an NO

22   five.  It does not -- you are looking to say create, you mean

23   building a purchase order.  It isn't building a purchase order.

24   I read in the patent what it does with the 05.

25   Q    06 also goes through this flow though, doesn't it, because

1    it's going to be a no to the question of whether it's a product

2    type 01, 03, or 04; correct?

3              THE COURT:  The question is, if the order is of 06,

4    does it go to the left of the diamond that is 332 and down to

5    the diamond that is 334 if it's an 06?

6              THE WITNESS:  I guess I'm not quite sure what that

7    diamond means, the customer internal PO.

8              THE COURT:  In other words, you'd have to read the

9    patent again to see what it means.

10             THE WITNESS:  Yes.

11             THE COURT:  All right.

12   Q    Let's move on, Mr. Momyer, to the idea of checking

13   inventory.  Did the RIMS system have the capability of checking

14   inventory?

15             THE COURT:  Are you talking about in the patent or

16   the one that they modified?

17   Q    The RIMS system as it existed at the time the RIMS patent

18   was filed in April of '93.

19   A    It had the ability to check inventory locally as well as

20   Fisher inventory in Fisher distribution centers.

21   Q    Did the RIMS system, as it existed in April of 1993, have

22   the ability, or have -- actually have in it cross-reference

23   tables that would show you equivalent products from vendor A

24   and vendor B?

25             MR. ROBERTSON:  Objection, Your Honor.  Again, it's

1   get into the Court's claim construction.  The Court has

2   construed these terms, so I object.  It calls for an expert

3   opinion.

4              MR. McDONALD:  Which term is he talking about?

5              THE COURT:  Cross-reference.

6              MR. McDONALD:  I can try to rephrase the question.

7              THE COURT:  All right.

8   Q    Mr. Momyer, did the RIMS system, as it existed in April of

9   '93, have tables in it that would have a reference between one

10  vendor and a second vendor for products that were found to be

11  equivalents?

12  A    Yes, only for the purpose of directing it back to a Fisher

13  part number.

14  Q    Well, the idea was to find an equivalent part; right?

15  A    No.  The idea was to bring it back to a Fisher part

16  number.

17  Q    Bring what back to a Fisher part number?

18  A    The lookup.  We're doing a cross-reference, and what we're

19  talking about is primarily if you have a competitor's number up

20  there, it would be the same product or equivalent.  It would

21  convert that number over to a Fisher number.

22       If you recall, it's the ultimate -- you have -- you can

23  only in RIMS use a Fisher parts number to submit the

24  requisition.  So you would only take -- that cross-reference

25  table is only there to bring it, the number, back,

1   cross-reference back to a Fisher part number.

2   Q    So in that situation, it could be a part number from a

3   third-party source that would then be converted to a Fisher

4   part number?

5   A    No.  I don't think we -- I don't think it could be third

6   party.  I'm not sure.

7   Q    How about we get back to the RIMS patent, Plaintiff's

8   Exhibit 10, and can we turn to page 31 of Exhibit 10.

9   Actually, let's go all the way to page 30, because there's a

10  heading we can start with.  Page 30 of the RIMS patent,

11  Exhibit 10.

12           MR. ROBERTSON:  Mr. McDonald, you mean column three?

13           MR. McDONALD:  Page 30 of the document.

14  A    Column 31, 32?

15  Q    That's exactly right.  At the bottom there, I just wanted

16  to get the heading of this section here that begins at the

17  bottom.  The heading is cross-referencing; do you see that?

18  A    Yes, I do.

19  Q    So then there's a discussion of cross-referencing that

20  goes on from, beginning at the bottom of column 31 of the RIMS

21  patent; right?

22  A    Yes.

23  Q    So if we continue, that discussion of cross-referencing

24  continues on to column 33 as well; right?

25  A    Yes.  Yes.  And 34.

1      Now, you see on column 33, there's a paragraph beginning

2   at line 15.

3           MR. McDONALD:  Will you blow that paragraph up,

4   please.  It's on page 31.

5           THE COURT:  The next table?

6           MR. McDONALD:  Right.

7           THE COURT:  Host computer ten; is that what you are

8   talking about?

9           MR. McDONALD:  Yes.

10  Q    Now, this is a section talking about that table that can

11  match up the parts that are equivalents; right Mr. Momyer?

12  A    Yes.

13  Q    In that paragraph, it talks about -- down to about line

14  30 --

15  A    Yes.

16  Q    -- there's a line representing a requisition for 1000250

17  which is, in parentheses, Corning's part number for the beaker.

18  A    Yes.

19  Q    And it says, a match will be found in the vendor

20  cross-reference file in host database 20, and that item

21  converted --

22  A    To the Fisher number.

23  Q    Yes, to the Fisher number.  So it starts as another

24  vendor's number, and it's converted to the Fisher number; is

25  that right?

1    A    Yes.

2    Q    Now, is it true -- I'd like to go to the issue now of just

3    how the invention came about where you started from the RIMS

4    system we've been talking about and got to the system described

5    in the patents in this suit.

6         Is it true that back in the 1992 time frame, you would,

7    from time to time, visit installations that had the RIMS

8    system?

9    A    That's correct.

10   Q    And at those installations, sometimes would you see that

11   the computer operator operating the RIMS system would also have

12   in their office or at their station a bookshelf of paper

13   catalogs from other vendors?

14   A    By operator, you are speaking of Fisher customer service?

15   Q    Yes.  The person sitting at the computer operating the

16   RIMS system; right?

17   A    They would typically have a collection of catalogs.

18             THE COURT:  The installations that you are visiting,

19   are they Fisher offices or some other place?

20             THE WITNESS:  These would be customer sites, customer

21   sites where the RIMS system would be installed.

22             THE COURT:  Do you have a customer representative on

23   site, Fisher employee that's running that system?

24             THE WITNESS:  That's correct.

25   Q    So in that situation, when you visited back in the '92

1    time frame, that user of the system, the representative, would

2    have paper catalogs from other vendors?

3    A    Correct.

4    Q    These would be pretty big catalogs; right?

5    A    Yes.

6    Q    Did it come up at that point that people wanted to get

7    those paper catalogs in an electronic form but also usable

8    through the RIMS system?

9    A    I can't say that it did come up.  It was something that --

10            THE COURT:  You are talking about in 1992?  That's

11   what you said.  You started us off with whether he visited

12   installations in 1992.

13            MR. McDONALD:  Right.

14            THE COURT:  In 1992, did people raise that with you?

15            THE WITNESS:  May have talked about it --

16            THE COURT:  If you remember, then say yes or no.  If

17   you don't remember --

18            THE WITNESS:  I don't remember.  At this time, I

19   don't remember having that conversation --

20            THE COURT:  All right.

21            THE WITNESS:  -- with customer service persons.

22   Q    Well, whether you actually talked to them or not, would

23   you agree at least that one of the motivations for developing

24   the system described in the patents-in-suit is that customers

25   were asking Fisher to also manage inventory of products from

1   other suppliers?

2           MR. ROBERTSON:  Objection, Your Honor.  The witness

3   just testified he didn't have any such conversations, can't

4   recall any such conversations.

5           MR. McDONALD:  My question wasn't limited to a

6   conversation.  I was just asking about the motivations, whether

7   he had the conversation himself or not.

8           MR. ROBERTSON:  He asked hypothetically if someone

9   had said that, would it motivate him to make paper catalogs.

10          THE COURT:  Actually he didn't ask that question at

11  all or anything near it, I don't think.  I'm not --

12          MR. ROBERTSON:  Then I misunderstood the question.

13          THE COURT:  It was a fairly -- there has been a lot

14  of discussion in between the question and now.  Ask it again,

15  please, Mr. McDonald.

16  Q   Mr. Momyer, putting apart whether you recall particular

17  conversations with customers now, is it fair to say that one of

18  the motivations for creating the systems that are the subject

19  of the patents-in-suit was that customers were asking Fisher,

20  as a company, not just to manage Fisher inventory but also

21  manage inventory of products from other suppliers?

22  A   I can't say that would be the reason that would generate

23  the electronic sourcing patents, but there were discussions

24  that our customers would ask us to take over inventory that

25  would be owned by the customer, and we would bring it in under

1    a product type of file.

2    Q    Was the main reason for developing the patents in this

3    case to address that customer desire that Fisher manage

4    inventory of products from other suppliers?

5    A    When you say inventory, it would -- one of the reasons

6    that we developed the system was to support this strategic

7    procurement services initiative which was to allow us to take

8    over the procurement activities for our customers which

9    included buying from companies other than Fisher.

10   Q    Can you turn back to the December 9th, 2009, deposition

11   that you gave in this case, please, and at page 25 beginning at

12   line 14, the transcript that I handed up or that was handed up

13   to you earlier.

14   A    I got it.

15   Q    And we're looking at page 25 beginning at line 14.

16   A    25, okay.

17   Q    And do you see there where the question to you was, at the

18   time you were developing the concept for the electronic

19   sourcing system that's described in the three patents, and you

20   interrupted and said, yes.  Question continues, involved in

21   this case, did you learn that customers were asking Fisher to

22   manage other types of product inventories other than the

23   products that Fisher supplied.  And you answered that yes;

24   right?

25              MR. ROBERTSON:  I'd object.

 1          THE COURT:  It's not impeaching.  It's entirely

 2 consistent with the answer he just gave you.

 3          MR. McDONALD:  It's the next question, actually.

 4          THE COURT:  I know.  I read line ten, that customers

 5 were asking Fisher; right?

 6          MR. McDONALD:  That was the main reason.

 7          THE COURT:  I understand, but your question wasn't

 8 circumscribed in the way this question was with the background

 9 of it, so it's not impeaching.  The witness does not need to

10 answer the question.  Objection sustained.

11 Q    Would you agree that the main reason that Fisher was

12 developing the concept for the three patents was that customers

13 were asking Fisher to do more than just manage Fisher inventory

14 but also manage inventory from products of other suppliers?

15          MR. ROBERTSON:  Again, Your Honor, that's not

16 impeachment.  It's consistent with what the witness --

17          THE COURT:  He's not trying to impeach him now.  He's

18 asking an entirely different question.  The question was

19 whether -- what you said, was that the main reason.  Is that

20 what you meant to say?

21          MR. ROBERTSON:  I'm sorry, sir.

22          THE COURT:  I said, Mr. McDonald, your question said

23 was it the main reason, and the answer here doesn't say that.

24 It says a main reason which connotes there are more than one

25 main reason.  Do it right or don't do it at all.

1          MR. McDONALD:  Can I rephrase, Your Honor?

2          THE COURT:  Yes.

3   Q    Mr. Momyer, would you at least agree that a main reason

4   for developing the system in the patents in this suit was that

5   customers were asking Fisher to do more than just manage Fisher

6   inventory but also manage inventory from products from other

7   suppliers?

8   A    Yes.

9          THE COURT:  Your answer --

10          THE WITNESS:  Products other than -- yes, that is one

11   reason it was developed, to be able for us to manage not

12   necessarily the inventory but manage the products and purchase

13   the products.

14   Q    Now, I'd like to turn now to working with IBM about the

15   TV/2 system.  Your understanding, when you went to IBM, is that

16   they already had a system that they called the Technical Viewer

17   2 system; correct?

18   A    That's correct.

19   Q    Now, that system, as it existed when you got to them --

20   was that in 1993 that you started talking to them?

21   A    To the best of my recollection, yes, it as around 1993.

22   Q    And at that time, of 1993, did the TV/2 system have the

23   ability of searching a list of selected topics?

24   A    Searching a list of -- it was my understanding that the

25   TV/2 that we had was -- at that time was only a text search

Momyer - Cross

1    capability.

2    Q    But could a text search a list of selected topics?

3    A    I guess I'm not sure what you mean by selected topics.

4    Q    Do you know what that means in the context of the TV/2

5    system?

6    A    No.

7    Q    Would you agree at the time that you filed the patents

8    involved in this suit there was known to be able to search a

9    single catalog on a CD-ROM?

10        THE COURT:  That what was known?

11        MR. McDONALD:  That it was known in the field of

12   purchasing and requisition systems to be able to search a

13   single CD-ROM with a catalog on it.

14        MR. ROBERTSON:  Your Honor, again, this is outside

15   the scope of my direct.

16        THE COURT:  I don't remember him asking anything

17   about that on his direct, Mr. McDonald.

18        MR. McDONALD:  Fair enough.  I'll withdraw it.

19   Q    Can we turn to the '683 patent now, Plaintiff's Exhibit 1,

20   and turn to figure 1A which is the third page, I believe.

21   A    Okay.

22   Q    Now, on that picture, figure 1A, this is in the '683

23   patent in this suit; right, Mr. Momyer?

24   A    Yes.

25   Q    You have shown here the catalog database number 36 kind of

1   in the middle of the page there.  Do you see that?

2   A    Yes.

3   Q    That was something that didn't exist in the RIMS system;

4   right?

5   A    Correct.

6   Q    Now, what database did exist in the RIMS system was a

7   parts master or item master; right?

8   A    As well as inventory tables.  You are talking about the

9   inventory database?

10  Q    Talking about the parts master.

11  A    There was a parts master.

12  Q    Which box was the parts master?

13  A    It would have been included in that grouping called

14  inventory databases.

15  Q    So that's 42B up above?

16  A    Yes.

17  Q    So parts master was over there, and so it's -- certainly

18  in your picture here, you were not depicting the parts master

19  should be part of the catalog database; right?

20  A    Yes.

21  Q    And the Fisher product list, that was in the host

22  database; correct?

23  A    Yes.

24  Q    And so would that be in this picture represented by what's

25  in host databases box number 11 in the upper right corner?

Momyer - Cross

1    A    Yes.

2    Q    So, again, there are even that list of Fisher products in

3    the host database, you were showing it in your patent as not

4    part of the catalog databases; right?

5    A    Yes.

6    Q    And the reason for is that is that catalog database had a

7    different purpose and function than those other databases?

8    A    Yes.  It was to -- yes.  It would have had a different

9    purpose and function.

10   Q    What would be the difference in purpose and function?

11   A    Well, one, it would allow you to place an order for a

12   specific part.  The catalog database in itself would not -- you

13   could pull the information from the catalog.  You can go and do

14   validation of that part against both the local part master and

15   then up against the host.

16        Another benefit or purpose would be inventory control,

17   inventory management.  The product information at that level,

18   that information wouldn't be in the catalog database but would

19   be in the part master.

20   Q    Earlier you testified about some subset searching

21   capability; do you recall that?

22   A    Yes.

23   Q    Is that something different from what the patents-in-suit

24   describe when they talk about selecting catalogs to search, or

25   is that the same thing?

1          MR. ROBERTSON:  Your Honor, we're getting into the

2    Court's claim construction here, so I object as calling for a

3    legal opinion.

4          MR. McDONALD:  Maybe I can tie it specifically to an

5    embodiment in the patent, Your Honor, and avoid that issue.

6          THE COURT:  All right.

7          MR. McDONALD:  Give me a moment, please.

8    Q    Mr. Momyer, can you turn in the '683 patent to column

9    nine.  If you look at the bottom part of column nine beginning

10   at about line 52.

11         THE COURT:  When multiple catalogs?

12         MR. McDONALD:  Yes.

13         THE COURT:  Where are you going, how far down?

14         MR. McDONALD:  Basically to the end of that column.

15   We might have to continue up to ten, but I think we can cover

16   it with what's at the bottom of column nine.

17   Q    So do you have that again, Mr. Momyer?  Bigger print on

18   the screen there if that helps you.

19   A    Thank you.  Yes, I do.  I have it.

20   Q    This part of your patent, the '683 patent, talks about an

21   option where when multiple catalogs are in the catalog

22   database, there's a function that allows for selecting catalogs

23   to be searched; right?

24   A    Yes.

25   Q    So the idea here is you don't have to select all the

1    catalogs?

2    A    That's correct.

3    Q    Is this something that's different from that search within

4    a search that you said you were working on with IBM?

5    A    I'm not certain.  I'd refer that to Mr. Kinross.

6    Q    You don't know one way or the other?

7    A    Yeah.  I think I can't give you a good answer on that.

8    Q    But at least you understand the idea here is that these

9    are pretty big catalogs, and it might streamline the search if

10   you can, in effect, eliminate some of the catalogs; right?

11   A    Yes.

12   Q    I'd like to turn finally now to that RIMS brochure,

13   Defendant's Exhibit 61.

14              THE CLERK:  Defendant's 61?

15              MR. McDONALD:  Yes.

16   Q    Mr. Momyer, I think you said you had seen this brochure

17   before.  Can you tell me the circumstances which you had seen

18   it?

19   A    I saw it on several occasions.  I know it was developed by

20   our internal IT organization, and it was developed to be handed

21   out at trade shows to -- as well as to give information to our

22   customers on the high level feature of RIMS and what it could

23   do for the customer.

24   Q    Was it, in fact, distributed?

25   A    I believe it was.  I'm not -- don't know for a fact at

1    that point, but I believe it was.

2    Q    I think you referred to IT?

3    A    Information technology.  That's the software development

4    group.

5    Q    Are those the people that were actually the ones that had

6    worked on developing the RIMS system?

7    A    It would have been a different group within the IT

8    organization.  It would have been like the documentation group,

9    the group that was develop documentation, doing training.

10   Q    Is it your understanding that this brochure was developed

11   in conjunction with people who knew what RIMS did?

12   A    Yes.

13   Q    And did you ever tell anybody that there was anything in

14   this brochure that you thought was inaccurate?

15   A    Yes.

16   Q    When did you do that?

17   A    I think -- what was put out was -- everything that was on

18   the brochure at the time we intended to do, and some things

19   didn't occur.  Many of the things were developed, but, yes, I

20   did tell them, and we went ahead and put the product out in

21   anticipation of getting to -- getting these things done.

22            THE COURT:  Are you saying there's some things in

23   this brochure that are wrong?

24            THE WITNESS:  Yeah.  I pointed a couple of those

25   things out.

1    Q    If you turn to page four of Defendant's Exhibit 61.

2    A    Yeah.

3    Q    You pointed some things out yesterday, I believe, that

4    were inaccurate, and I just want to clarify here that under

5    requisition management features, if we can blow up the left

6    column there with the side bullet points, please.

7              THE COURT:  On page 0598; is that what you are

8    talking about?

9              MR. McDONALD:  Yes, Your Honor.

10   Q    Of these five bullet points, yesterday, I believe it was

11   numbers three and four that you said weren't accurate in whole

12   or in part; is that fair?

13   A    Yeah, just to kind of redo that, the bullet point three,

14   as I said, we did develop some interfaces, but they weren't a

15   significant number of interfaces.  There were a couple of

16   interfaces we developed, and the second one, bullet point 4,

17   was -- to the best of my knowledge, we never developed a remote

18   requisitioning thing.  You could follow that up and ask Jim

19   Johnson later, but I don't recall us doing any of that.

20   Q    But the company distributed this with respect to

21   interfacing, though, because even though you didn't technically

22   have already built an interface with, quote, all types of

23   purchasing systems, did you think it was reasonable to convey

24   that you could?

25   A    I think if we had done it, we would have had to develop a

1    customized interface.

2    Q    It was something you knew you could do?

3    A    Yes.

4    Q    One of the things you didn't say was wrong was that first

5    bullet point that says consolidates all supplier activity

6    including third-party and administrative purchases; right?

7    A    That's correct.

8    Q    Now, if we go two more pages to page six --

9              MR. McDONALD:  Now, if you could blow up the image

10   below the big black box there where it says a system that's

11   easy to use and then the paragraph right to the right of that,

12   please.

13   Q    Now, in this part of this RIMS brochure, I'll give you a

14   chance to look at it.  Isn't it true that the brochure

15   indicated that customers of the RIMS system now could either

16   use a customer service representative or they could enter

17   requisitions or purchase orders remotely through the people in

18   their organization who would be using the product?

19   A    I see that.

20   Q    The computer system itself, it doesn't actually know who

21   is sitting at the keyboard; right?  That could be anybody.

22   A    Well, other than the fact -- it couldn't be anybody.  It

23   would have to be someone who would have had a password and a

24   log-in ID to log in.

25   Q    But that could be an employee of the customer as well as

1    the customer service representative; right?

2              MR. ROBERTSON:  Your Honor, calls for speculation.

3              THE COURT:  Overruled.

4    Q    Is that what this is communicating?

5    A    I don't know of any instance that a customer was

6    interacting with RIMS.  Doesn't mean it didn't happen.  I just

7    don't recall any instance of that happening.

8    Q    Now, is it true that the brochure -- if you turn to page

9    ending in 603, I think that's page seven?

10             THE COURT:  What about it?

11             MR. McDONALD:  I'm trying to get it up on the screen

12   here.

13   Q    This is a page that has a heading, simplified information

14   flow, clear audit trail.  Is that the page you have?

15   A    Yes.

16   Q    This is -- if we could blow up that left column below the

17   black box.  You didn't mention yesterday that there was any

18   inaccuracies in this section, did you?

19   A    No, I did not.

20   Q    And in this section, doesn't it indicate that the Fisher

21   RIMS handles purchases of various types including Fisher

22   products, third-party purchases delivered from a Fisher

23   warehouse, third-party purchases delivered direct, and then if

24   we can blow up the next column over, administrative purchases

25   which Fisher RIMS initiates for the supplier to ship and

1   invoice directly as well as automatically replenish JIT

2   deliveries; right?  That's what it says here?

3   A    That's what it says; however, I think you have to realize,

4   this is a marketing brochure.  They are taking some liberties,

5   not necessarily what Fisher can do, but what system

6   accomplishes it.  When they are saying Fisher RIMS, I am taking

7   it to mean Fisher will do this for you.

8   Q    All right, I understand your position on that.  Finally,

9   can we turn back to claim three of the '683 patent.  I think

10  you were asked about this claim doesn't actually specifically

11  mention RIMS or TV/2, and I want to talk about that for a

12  moment.

13       When you answered that question, I just want to make sure

14  we're clear.

15            THE COURT:  Ask the question you want to ask and

16  don't get back into what his former testimony was, because you

17  may not be saying it right.  You ask your question right, and

18  he can listen to it and answer it.

19  Q    Mr. Momyer, when you answered those questions --

20            THE COURT:  No.  You are asking him to remember what

21  the questions were and what the answers were, and there's no

22  way anybody can really do all that.  You ask him the question

23  you want to ask him on its substance without referring back to

24  the past.

25  Q    With respect to your understanding that you had as of

1    yesterday, Mr. Momyer --

2              THE COURT:  No.  That's the same thing.  You just

3    lost the privilege of asking the question.  I am not going to

4    tell you all two or three times.  When I tell what you the

5    problem is, you have to correct it, and I told you at the

6    beginning of examination that wasn't how we were going to have

7    examination, so that's it.

8              Do you have any other questions of this witness?  You

9    are beyond the point where you told me approximately you'd be

10   finished.

11             MR. McDONALD:  I'll wrapping it up right now, Your

12   Honor.

13   Q    So, Mr. Momyer, you're not familiar with the Court's claim

14   constructions and any details, in any detail; is that fair?

15   A    Yes.

16             MR. McDONALD:  I have no further questions.  Thank

17   you.

18             THE COURT:  All right.  How long is your redirect?

19   Short?  How short is your redirect?  Maybe I'll ask the

20   question a different way.

21             MR. ROBERTSON:  (No response.)

22             THE COURT:  And what is the answer to that question?

23             MR. ROBERTSON:  I'm sorry, sir?

24             THE COURT:  How short is your redirect?

25             MR. ROBERTSON:  15 minutes or less.

```
 1              THE COURT:  I want you all to be able to get your

 2    lunch, and they close the cafeteria downstairs.  The jury's

 3    lunch is here, so maybe this is a good place to let the jury

 4    have lunch, and then you all have lunch, and we'll come back

 5    here.  So we'll have 45 minutes for lunch.  Your lunch is back

 6    there.  If you take your pads with you.

 7

 8                      (Jury out.)

 9

10              THE COURT:  I'm giving the jury 45 minutes for lunch,

11    and the reason -- I'm buying them lunch and bringing it in for

12    them, and Mr. Neal says you all said you need an hour for lunch

13    because you have to go back to the hotel.

14              You each have a conference room here, don't you?  Why

15    don't you have your lunches delivered to the conference room

16    from now on?

17              THE CLERK:  They had actually asked about that, and I

18    didn't know whether you would approve it or not.

19              THE COURT:  Of course.  You have somebody assigned to

20    clean up so we don't have a mess back there.  That way you

21    won't be wasting your time.  What hotel are you talking about?

22              MR. MERRITT:  Two blocks away.

23              THE COURT:  I think it would be better for you to do

24    it that way, and then you would won't be running back and forth

25    to the hotel.  For today, we'll have an hour.  We need to tell
```

1    the Court security.

2             THE CLERK:  I'll go ahead and do an order and prepare

3    it for the CSOs, and it will be on file tomorrow.

4             THE COURT:  I let them out early on the theory they'd

5    go downstairs to eat, so my commission --

6             THE CLERK:  That request for an hour may have been

7    self-serving, Your Honor.  I don't know.

8

9                      (Luncheon recess.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25