1      THE COURT:  Mr. Momyer, I remind you, you are

2   under the same oath that you took earlier today.  All

3   right?

4      THE WITNESS:  Yes.

5

6   REDIRECT EXAMINATION

7   BY MR. ROBERTSON:

8   Q   Mr. Momyer, do you still have your December 9,

9   2009 deposition?

10  A   Yes, I do.

11  Q   If you could, I'd like you to go to page 65

12  because you were asked some questions by Mr. McDonald

13  there concerning the question that begins at page 65,

14  line 22, going over to page 66, line 9.  Are you with

15  me?

16  A   Yes.

17  Q   That deposition was taken over a year ago?

18  A   That's correct.

19  Q   At some point in time did you have an opportunity

20  after the deposition was taken to review your

21  testimony?

22  A   Yes, I did.

23  Q   Were you able to prepare what's called an errata

24  sheet to correct any issues or problems or mistakes

25  that were made with respect to that deposition?

MOMYER - REDIRECT                388

1   A   Yes, I did.

2   Q   Prior to preparing that errata sheet to make any

3   corrections, did you speak to anybody, any counsel for

4   ePlus, with respect to how you should make any

5   corrections?

6   A   No.

7   Q   Did you, in fact, make corrections?

8   A   Yes.

9        MR. ROBERTSON:  May I approach the witness,

10  Your Honor?

11       THE COURT:  The court security officer will

12  get it.

13  Q   I've handed you a document, which is entitled,

14  Douglas A. Momyer, December 9, 2009, acknowledgment of

15  deponent.  Do you see that?

16  A   Yes.

17  Q   The first line says, "I, Douglas A. Momyer, hereby

18  certify that I have read the foregoing transcript of

19  my testimony and that same is true and correct to the

20  best of my knowledge and belief except as follows: do

21  you see that?

22  A   Yes.

23  Q   Is that your signature at the bottom of this

24  document?

25  A   Yes, it is.

1   Q    And this was sworn to and subscribed on the 20th

2   of January, 2010, correct?

3   A    Correct.

4   Q    The question Mr. McDonald asked you at page 65,

5   let me repeat it, if I could.  It says, "Do you have

6   an understanding that the electronic sourcing patterns

7   are essentially a requisition and purchasing system

8   that, for example, can be a RIMS system that is set up

9   to communicate with a catalog database and a search

10  engine such as the IBM Technical Viewer 2 product?"

11  Then I interposed an objection.  And there was some

12  colloquy.  You asked to have question repeated.  You

13  gave the answer:  "Yes."  Do you see that?

14  A    Yes, I do.

15  Q    Did you address that question in your

16  acknowledgment of deponent?

17  A    Yes, I did.

18  Q    What did you say, sir?

19  A    No, the invention was much more than RIMS plus a

20  search engine.

21  Q    What did you give for why you gave that

22  correction?

23  A    I misunderstood the question.

24  Q    When is the first time you brought this to my

25  attention?

1   A    I don't think -- oh, today.  I think someone else

2   brought it.  I didn't bring it directly to your

3   attention.

4   Q    And do you know whether or not it was the

5   stenographer from Merchant & Gould that was present to

6   record your deposition?

7   A    No.

8             THE COURT:  You mean they had their own court

9   reporter?

10            MR. ROBERTSON:  Well, the one they had

11   retained, Your Honor.

12            THE COURT:  Well, that's an independent

13   person they retained.  It's not somebody who works for

14   them.

15            MR. ROBERTSON:  I understand.

16   BY MR. ROBERTSON:

17   Q    What's the difference between a search in the RIMS

18   system, which I understood you to say was a lookup,

19   and a search in the electronic sourcing system that is

20   the subject of the patents that are at issue here?

21   A    Well, there's a significant difference.  The

22   search in RIMS system is a word-for-word exact match

23   or it is a character-for-character match, and if any

24   of that is not present, it fails the match and it

25   isn't found.

MOMYER - REDIRECT                391

1      A search in the catalog is more of a text search

2   that searches for -- it's really based upon the

3   criteria that you give as the search criteria.

4          MR. McDONALD:  I object to this because I

5   think we're getting into this issue of search under

6   the claims and catalog under the claims.

7          THE COURT:  Well, search has been construed.

8          MR. ROBERTSON:  No, it's not, Your Honor.

9          THE COURT:  Just a minute.  Means for

10  searching is in the '683, Claim Three, and '172, Claim

11  One, is that what you're asking about?

12          MR. ROBERTSON:  No, sir.  Mr. McDonald asked

13  if the search in the RIMS patent was the same as the

14  search in the electronic sourcing patent.  The witness

15  said there's a difference, but he wasn't permitted to

16  say that the difference is.  I'm just asking him what

17  is the difference.

18          MR. McDONALD:  I don't believe I was given a

19  chance to ask that question.

20          MR. ROBERTSON:  Let me ask it another way,

21  Your Honor.

22          THE COURT:  Yes, I think you should.

23  BY MR. ROBERTSON:

24  Q    Did the RIMS system include a search program?

25  A    No, it did not.

1  Q   I'd like you to go and look at table 1 in

2  Plaintiff's Exhibit No. 10, which is this '989 patent

3  which you're the inventor, and there were a number of

4  product types there.  And you testified about product

5  types 5 and 6.

6      Let me direct you to column 11 of the '989 patent

7  starting at about line 25 down to about line 31 under

8  the heading "sourcing."  Actually, let me apologize.

9  Let's just go back and identify what product types 05

10 and 06 are in table 1 in column 6.

11 A   Do you want me to --

12 Q   Yeah, if you would just read it for the jury,

13 please?

14 A   Product type 05, third-party item which CSR or

15 customer orders.  Product type 06, customer-owned item

16 located in customer warehouse at or next customer

17 site.

18 Q   And you referred us to column 11 in the '989

19 patent beginning at about line 14 about product type

20 05?

21 A   Yes.

22 Q   Now, I'd like to direct you back down to this

23 column with the heading that says "sourcing."  Can you

24 read that to the jury, sir?

25 A   The whole --

1  Q   Yes.  The first paragraph.  I'm sorry.  From line

2  26 to looks to be about 31.

3  A   After all of the items for a requisition have been

4  entered, the next step is that of sourcing the

5  requisition.  Sourcing the requisition is the process

6  of determining what inventory will be used to fill the

7  requisition.  Pricing is also performed in this step

8  when it's called for.  Example, except for all product

9  types -- for all product types except for 05 and 06.

10  Q   Except for 05 and 06.  Is that consistent or

11  inconsistent with what you told Mr. McDonald?

12  A   I don't remember what I told Mr. McDonald.

13  Q   That's a fair question.  Is it consistent with

14  your understanding as to how product types 05 and 06,

15  the sourcing could happen except for those two -- let

16  me rephrase that.  That was a horrible question.  Is

17  this section that you read consistent with your

18  understanding as to how the RIMS system operated?

19  A   Yes.

20  Q   Let me direct you to column 18 of the '989 patent

21  in Plaintiff's Exhibit No. 10 starting at about line

22  51 and going down to line 54.  And if you could read

23  that, please, for the jury.

24  A   After the purchase order data block is described

25  in step 338 is transmitted to host computer over the

MOMYER - REDIRECT                394

1    data link described above local computer 40 waits for

2    a response from the host as shown in block 340.

3    Q    What if anything does that have to do with

4    generating P.O. orders, if anything?

5    A    Well, that's the process that RIMS was using to

6    transmit information to the host to the build the

7    P.O.s.  So all of the items that were on a requisition

8    would have been put in a data block along with the

9    affinity of the customer and passed up to the host

10   computer, which would then proceed to build a purchase

11   order.

12   Q    Was it your understanding that the RIMS system

13   operated by having the host generate the purchase

14   order?

15   A    Yes.

16   Q    Can you go to column 31?

17        THE COURT:  Why don't you stop a minute.

18   While we're here, pull the thing up.  You see these

19   after the purchase order data block described in step,

20   and then there's a number 338, and is transmitted to

21   host computer, and then there is the number 10, and it

22   continues, and there are numbers interspersed there.

23   What those numbers are references back to a particular

24   figure that are being talked about.  In this instance

25   there are references back to figure 8.  And it is a

MOMYER - REDIRECT                    395

```
 1   way to say the data block is described in step 338 if

 2   you go back and look at the figure 5A, and it says a

 3   host computer is -- has got those lines to it and has

 4   the number 10 if you go back and look at figure 5A.

 5   So all of those numbers when you are reading them, if

 6   you want to cross-reference back to the drawings, you

 7   can do that, but if you just want to read them, you

 8   just don't read -- you just don't pay any attention to

 9   the numbers unless you're going back to check them.

10              Is that a fair statement?

11              MR. ROBERTSON:  Yes.  And thank you for that,

12   Your Honor.

13              THE COURT:  Excuse me.  Go ahead.

14   BY MR. ROBERTSON:

15   Q   The figure 5A that's referenced here you were

16   asked about on cross-examination, correct?

17   A   5A?

18   Q   Yes.  If you want to go to it, it's at page 11 of

19   42 in the patent and it ends with Bates No. 904.  I

20   think it was characterized as a flow chart?

21   A   Yes, I have it.

22   Q   So that section that we were just reading from is

23   referencing that figure; is that right?

24   A   Yes.

25   Q   Now, on to column 31.  On this topic of
```

MOMYER - REDIRECT            396

1    cross-referencing, I think you informed us that that

2    section goes over to actually the bottom of column 34;

3    is that right?

4    A    Yes.

5    Q    Could the RIMS system use a cross-reference table

6    to take a requisition item say from a Fisher product

7    to identify a similar item from another vendor that

8    could then requisition from that vendor?

9    A    No.

10         MR. ROBERTSON:  Thank you.  I have no further

11   questions.  Actually, I'm sorry.  I misspoke.  One

12   last question.

13   Q    If I can take you to the '683 patent, figure 1A.

14   You were asked some questions about figure 1A and

15   figure 1B, do you recall that?

16   A    Yes.

17   Q    Are these two different embodiments that were

18   disclosed in your patent?

19   A    Yes.

20   Q    Is your invention confined to either to figure 1A?

21         MR. McDONALD:  Objection, Your Honor.  This

22   goes to his understanding of the scope of the claims.

23         MR. ROBERTSON:  He was asked about figure 1A.

24   I'm just asking if this is an embodiment.  I didn't

25   ask him anything about a claim.

MOMYER - REDIRECT                397

1         THE COURT:  Yes, you are.

2         MR. ROBERTSON:  I'm just asking if this is an

3    embodiment of his invention.

4         THE COURT:  These two.

5         MR. ROBERTSON:  Well --

6         THE COURT:  It's two different embodiments.

7    BY MR. ROBERTSON:

8    Q    Let me start with figure 1A.  Is figure 1A one

9    embodiment of your invention?

10   A    Yes.

11   Q    Is figure 1B another embodiment of your invention?

12   A    Yes.

13   Q    Are these merely preferred embodiments?

14   A    Yes.

15   Q    Do you have an understanding whether or not your

16   inventions are confined to either of those

17   embodiments.  Do you have an understanding?

18   A    Yes.

19        MR. McDONALD:  Objection, Your Honor.

20        THE COURT:  Overruled.

21   Q    What's your understanding?

22   A    My understanding is there are other embodiments.

23        MR. ROBERTSON:  Thank you.

24        THE COURT:  All right.  You're going to be

25   required, Mr. Momyer, to come back here and testify

1   potentially in another part of the case either at the

2   request of the Lawson people or the request of

3   Mr. Robertson.  So you're --

4           MR. McDONALD:  I need to call him.

5           THE COURT:  Didn't I say at the request of

6   the Lawson?

7           MR. McDONALD:  No, I thought you said

8   Mr. Robertson.

9           THE COURT:  I did.  Instead of using you, I

10  used your client.

11          MR. McDONALD:  Sorry.

12          THE COURT:  It may be that either side may

13  want you back, and you can be released from your

14  obligation to be here upon your agreement to come back

15  when they request you to come back.  Do we have your

16  agreement?

17          THE WITNESS:  Yes, you do.

18          THE COURT:  Reluctantly.

19          THE WITNESS:  Yes, very reluctantly.

20          THE COURT:  I don't think you're unusual in

21  giving a reluctant agreement.

22          THE WITNESS:  I do want to leave the

23  courtroom right now, so yes.

24          THE COURT:  Well, we wouldn't keep you in the

25  courtroom, but we would ask you to stay here.

1        THE WITNESS:  Okay.  It's a nice facility,

2   but I'd rather --

3        THE COURT:  You can go home to Pittsburgh in

4   colder weather than we have here and come back if

5   you're needed.

6        You must give the gentleman reasonable notice

7   to get him back.  And, of course, you must take

8   whatever steps are necessary to get him back here on

9   the schedule that is required by providing him

10  transportation.  All right.

11       THE WITNESS:  Thank you.

12        (The witness was excused from the witness

13  stand.)

14       THE COURT:  Next witness.

15       Under the circumstances, is anybody offering

16  the deposition as an exhibit?

17       MR. McDONALD:  No, Your Honor.

18       THE COURT:  All right.  Thank you.

19       All right.  Next witness.

20       MR. ROBERTSON:  The plaintiff would call

21  Robert Kinross, Your Honor.

22

23   ROBERT KINROSS, called by the Plaintiff, first

24  being duly sworn, testified as follows:

25

1      DIRECT EXAMINATION

2   BY MR. ROBERTSON:

3   Q    Sir, can you please introduce yourself to the

4   jury?

5   A    My name is Robert Kinross.  I'm from Ben Allen,

6   Pennsylvania, which is a suburb of Pittsburgh.

7   Q    Let me stop you there.  We'll get through this a

8   lot quicker if we just go step-by-step?

9   A    Okay.

10  Q    And the jury has heard of you, Mr. Kinross, as one

11  of the named inventors of these three patents

12  involving electronic sourcing.  Is that accurate to

13  say you were one of the inventors?

14  A    Yes.

15  Q    You were working at Fisher-Scientific for a period

16  of time; is that right?

17  A    That's correct.

18  Q    When was it that you worked at Fisher-Scientific?

19  A    I worked there for 24 years.  From 1979 until

20  2003.

21  Q    Briefly, what positions during those 24 years did

22  you hold with Fisher-Scientific?

23  A    I had a number of positions.  I was hired as a

24  programmer analyst specializing in CICS.  And I

25  advanced to systems analyst.  I also became a systems

1  programmer, which was a function of maintaining the

2  CICS software.  And I advanced to manager of

3  electronic catalog development.

4  Q   So you mentioned a few things there.  I just want

5  to see if we can clarify them.  You said you were a

6  program analyst in CICS.  Can you explain to the jury

7  what that is?  If you can, try in the simplest terms

8  so I can understand.

9  A   A programmer analyst is a person who takes

10  requirements and turns them into actual computer code.

11  And the CICS aspect of it is to know what the CICS

12  interfaces are and implement those in the program.

13          THE COURT:  What does CICS stand for?

14          THE WITNESS:  CICS is a Customer Information

15  Control System.  It was a control program supplied by

16  IBM to control the hardware and software of a

17  computer.

18  BY MR. ROBERTSON:

19  Q   Is that kind of a tool for performing those

20  activities?

21  A   It's more of an infrastructure that provides for

22  development.  So you could term it as a tool, but I

23  think it would be more than a tool.

24  Q   When you were at Fisher in those positions, can

25  you tell us some of the things that you did just very

1  briefly, sir?

2  A   Well, the first thing I did was convert some of

3  their systems to CICS.  One was a cash application

4  system that was used in accounting for paying bills.

5  Another was an order entry system that interacted with

6  customer service representatives to take orders over

7  the phone.

8  Q   What is your educational background?

9  A   I have a bachelor's degree from the University of

10 Pittsburgh, major economics, with a minor in computer

11 science.

12 Q   When did you receive those degrees, sir?

13 A   In 1974.

14 Q   Since 1974 until your retirement, have you been

15 spending your entire professional career in the

16 computer field?

17 A   Yes.

18 Q   You were involved, as I said, in this electronic

19 sourcing invention.  Were you also involved in a

20 project working with IBM during that period of time?

21 A   Yes.

22 Q   Mr. Momyer testified sort of the overview of what

23 was involved with respect to that, but did you have

24 personal contact with the IBM people?

25 A   Yes.

1   Q    Are you familiar with a program known as TV/2?

2   A    Yes.

3   Q    Did you have any role in identifying TV/2 as a

4   potential program that could be used in the protocol

5   type development of the inventions that resulted in

6   the patents that you have been awarded?

7   A    Yes.

8   Q    What did you do, sir?

9   A    I was charged with researching programs that were

10  essentially search engines for documents.  Fisher had

11  a large catalog and the industry was tending to put

12  catalogs on CD ROMS, and we wanted to have entry in

13  that field.  So I researched a number of search

14  programs.  Bard being one of them.  SteBo being one

15  other.  Millennium Software and Prism being others

16  that we looked at.

17  Q    Did you ultimately come to the decision along with

18  the other team members that the IBM TV/2 search

19  program might be most suited for adapting to your

20  inventions?

21  A    Yes, we did.

22  Q    Can you tell me just generally did the IBM TV/2

23  search program need to be modified, revised,

24  reprogrammed or have aspects of it created from

25  scratch in any way?

1   A    Yes.

2   Q    Were you involved in that, sir?

3   A    Yes, I was.

4   Q    We'll talk about some of those modifications or

5   changes that needed to happen in a minute, but at a

6   high level can you us tell us, if you can give me a

7   list, say, of some of the things that needed to happen

8   with this TV/2 program that you were personally

9   involved in?

10   A    Well, the first was the ability to have multiple

11   catalogs in the system.  We felt that was a very

12   unique requirement that we had that would enable the

13   end user to select and deselect catalogs to be

14   searched.

15   Q    Can we just run through the list first maybe of

16   everything you might recall that needed to be modified

17   with respect to TV/2, then we'll come back and go at

18   it in a little greater detail?

19   A    The catalogs, there was a footer bar that we

20   needed to provide for easy navigation through the

21   system.  Among the features of the footer bar were

22   creating an order list and being able to view the

23   order list, being able to accept the order.

24       We also needed specialized search functions that

25   would customize the search for electronic commerce,

1   basically.  That being search by part number, search

2   by keyword with Boolean logic including "and" and

3   "ors" so that you wouldn't get unnecessary results in

4   the hit list that would be created by the search.

5   Q   Let me just stop you there because you used a

6   couple of teams.  I want to make sure I understand

7   what you were referring to.  You said search by

8   keyword.  What did you mean by "keyword."

9           MR. McDONALD:  Your Honor, I'm going to

10  object.  I don't think this is really tied to the

11  infringement issue or the claims of the patent at this

12  point.

13          MR. ROBERTSON:  Your Honor, I'm just asking

14  the witness what modifications need to be made to

15  TV/2.  What did he do in order to create the

16  invention.  I'm not asking him at all about claim

17  constructions.  I haven't raised a single claim term

18  yet.

19          THE COURT:  He didn't say that.  He said it

20  didn't have anything to do with infringement.  It's

21  not relevant is his objection, I think.  Isn't that

22  your objection?

23          MR. McDONALD:  That's correct, Your Honor.

24          THE COURT:  Why is it relevant?

25          MR. ROBERTSON:  It's relevant, Your Honor, to

MOMYER - REDIRECT               406

1  the scope of the claims as to what the inventors

2  invented and when they invented it, just as Mr. Momyer

3  testified this morning.

4          THE COURT:  The fact that he testified to it

5  doesn't make it relevant.  It wasn't objected to in

6  that testimony and I didn't have an opportunity to

7  address that.  Now I do.  You're asking him to explain

8  terms within the term "specialized search function"

9  that he did.  Is this what you're talking about?

10         MR. ROBERTSON:  I'm asking him to explain how

11  TV/2 needed to be modified in order to be able to

12  provide the functionality of the invention, Your

13  Honor.

14         THE COURT:  How about this particular comment

15  about specialized search?

16         MR. ROBERTSON:  Well, I can rephrase that

17  question.

18         THE COURT:  I'm just asking you.  I'm trying

19  to figure out what it is first.  You're talking about

20  a specialized search function of some kind?

21         THE WITNESS:  Yes.

22         THE COURT:  Objection overruled.

23  BY MR. ROBERTSON:

24  Q    What did you mean by that, sir?

25  A    What did I mean by "specialized search function"?

MOMYER - REDIRECT                    407

1   Q    I don't know if you completed your answer.   I

2   was asking you about --

3            THE COURT:   You asked him.   It got

4   interrupted, but the objection was to what keyword

5   meant.   So that objection is overruled.

6            What does "keyword" mean?

7            THE WITNESS:   Keyword is any word that would

8   be found in the document.   So you're basically saying

9   "find ovens" and the search would go out and find

10  everywhere there was an occurrence of ovens in the

11  document.

12  Q    Is that an Aspect of your invention?

13  A    Yes.

14  Q    Was TV/2 able to do that when you first met with

15  IBM?

16  A    Technical Viewer was able to do a search, a

17  keyword search.   It's the other searches that were for

18  specific items like part number, vendor, bulletins,

19  page number that Technical Viewer wasn't able to do.

20  Q    One of the things you mentioned was that there

21  were ways you needed to develop multiple catalogs in

22  TV/2, do you recall that?

23  A    Yes.

24            THE COURT:   Are we now finished with the list

25  of things that he did to change TV/2 or modify it or

1    recreate parts of it in order to come to the invention

2    reflected in the patent?

3              MR. ROBERTSON:  No, Your Honor.  Thank you.

4              THE COURT:  Then go on back to that list.

5              MR. ROBERTSON:  Thank you, sir.

6    BY MR. ROBERTSON:

7    Q    Did you also have anything to do with creating a

8    catalog database?

9    A    Yes.

10   Q    Now, Fisher-Scientific -- well, let me complete

11   the list.  Your Honor is exactly right.

12        Did you also have anything to do with the ability

13   to search product catalogs?

14   A    Yes.

15   Q    Well, do you recall you mentioned this need to

16   create a footer bar; is that right?

17   A    Correct.

18   Q    Did you have anything to do with creating what's

19   known as a shell program that's disclosed in your

20   invention?

21   A    Yes.

22   Q    Did the TV/2 program need to be modified in order

23   to create order lists within a shell?

24   A    Yes.

25   Q    Did you have anything to do with modifying the

1  TV/2 to create interfaces to update catalogs in EDI

2  transactions?

3  A    Yes.

4  Q    Let's start with that are last one first.  What's

5  an EDI transaction?

6  A    EDI stands for electronic data interchange.

7  Q    What does that mean?

8  A    It's a way to interact with separate companies

9  without human intervention.  It's computer-to-computer

10 interactions that operate on a standard which is set

11 by the X12 Committee, which is a United States

12 standards setting body.

13 Q    Do they have to have a common language to talk to

14 each other?

15 A    Well, they called it common transaction sets,

16 which could be viewed as a language, but it's more of

17 a structure that enables computers to understand

18 messages between companies.

19 Q    So they can communicate data?

20 A    Yes.

21 Q    Were you involved in assisting to modify the TV/2

22 program with respect to that?

23 A    We wrote programs that would take the EDI

24 transaction, the price/sales catalog, and update

25 vendors' catalogs based on information provided in

1   those transaction sets.

2   Q   When you say "we," who are you referring to?

3   A   Me and my staff.

4   Q   I mentioned this need to customize TV/2 to create

5   order lists in the shell.  What's a shell?

6   A   The shell was a program that used Technical Viewer

7   API to change how Technical Viewer functioned.

8   Q   You used the term API.  What's an "API"?

9   A   API stands for Application Programming Interface.

10  It is a series of commands used to effect how a piece

11  of software will operate.

12  Q   So the Technical Viewer 2 had this API interface

13  you're referring to.  Could it communicate in the

14  context of your invention with this shell program you

15  had without modification?

16  A   The API was used in the shell program to effect

17  changes in Technical Viewer.

18  Q   So you had to develop the shell program in order

19  to communicate to TV/2?

20  A   Yes.

21  Q   And who had primary responsibility for that shell

22  program?

23  A   The primary responsibility for documenting the

24  requirements of the shell program were mine as far as

25  the functionality concerned.  The actual programming

MOMYER - REDIRECT                411

1   of the shell was an IBM responsibility.

2   Q   You also indicated that you needed to create this

3   footer bar to work within the shell.  Do you recall

4   that?

5   A   Yes.

6   Q   Tell us the purpose of the footer bar within the

7   shell program?

8   A   The footer bar --

9         MR. McDONALD:  It's irrelevant, Your Honor.

10  The footer bar isn't at issue in this case.

11        THE COURT:  Is it?

12        MR. ROBERTSON:  Yes, it is, Your Honor.  It

13  has functionality in the system that you're going to

14  hear from experts about that demonstrate infringement.

15        THE COURT:  Overruled.

16  BY MR. ROBERTSON:

17  Q   What's the purpose of the footer bar?

18  A   The footer bar was a series of icons at the bottom

19  of a screen that would assist the end user in

20  navigating through the system with ease.  It consisted

21  of a catalog selection button, an order list button, a

22  forward and backward button, a cancel button, and a

23  help button.

24  Q   It was a way to navigate through the program when

25  you were performing the functionality of your

1  invention?

2  A    Correct.

3  Q    Now, you mentioned also this catalog database.  Do

4  you recall that?

5  A    Yes.

6  Q    Fisher-Scientific had a very large paper catalog.

7  A    Yes, they did.  It was at least 2000 pages.

8  Q    With tens of thousands of items offered by various

9  vendors that Fisher distributed?

10  A    Correct.

11  Q    It also included Fisher products, correct?

12  A    It did, yes.

13  Q    Were you asked to provide that paper catalog to

14  IBM so they could adapt it into a catalog database?

15  A    Well, it was more than that.  We were asked to

16  provide the catalog in an electronic format to help

17  them in creating the catalog database.

18  Q    So just so I'm clear, did you have a

19  responsibility for giving an electronic catalog of

20  Fisher-Scientific, not a paper catalog that would then

21  need to be scanned and included into it?  Was that

22  part of your responsibility?

23  A    Yes.  It was an electronic version of the paper

24  catalog, and it was used by SteBo to actually create

25  pages of the paper catalog.

1    THE COURT:  You used SteBo to prepare the

2    pages or you said "used by SteBo."  How did you take

3    the paper catalog and convert it into an electronic

4    version that you ultimately gave to IBM?

5    THE WITNESS:  Okay.  We had a creative

6    services department within Fisher who was responsible

7    for creating the paper catalog.  And what they would

8    do is take paper in the way they wanted the catalog to

9    look and send it to SteBo.  SteBo would input that

10   into their system in an electronic format to create

11   pages that could be sent to the publisher.

12        In the process of that, SteBo now had this

13   catalog in electronic format, and we used that to give

14   to IBM to produce the catalog database.

15   Q   So IBM didn't have a paper catalog.  They had an

16   electronic catalog from one of your vendors, SteBo,

17   which you produced to them in order for them to

18   utilize it in this electronic sourcing project that

19   you were working on with them as a subcontractor; is

20   that right?

21   A   Correct.

22   Q   Did they ever receive a paper catalog?

23   A   Yes.

24   Q   Were they having difficulties with converting it?

25   A   I wouldn't categorize it as difficulty.  It was

1  generally agreed that an electronic format was

2  preferable because SteBo used a tagging language to

3  describe the catalog.  Technical Viewer used a tagging

4  language to describe its pages.  And I was able to get

5  the definition of the tags from SteBo and provide it

6  to IBM so that they could basically write a program to

7  take the tags that were in the SteBo catalog and

8  convert them to the IBM Technical Viewer format.

9  Q    What were these tags used for?

10 A    Tags in both systems were essentially used to

11 describe how the data should look.

12 Q    Did the tags need to be modified in order to

13 recognize and understand the electronic SteBo catalog

14 that you provided to IBM?

15 A    Well, it was more like a one for one substitution

16 of tags.  So a tag, for instance, that said "bold" in

17 SteBo might be "BL," and in Technical Viewer it might

18 be "BD."  So you had to substitute "BL" for "BD."

19 Q    So you had to reconcile those?

20 A    Yes.

21 Q    Let me ask you, you have had an opportunity to

22 look at the statement of work with IBM; is that right?

23 A    Correct.

24 Q    I want to go to an attachment to that statement of

25 work.  If you would turn, please, sir, in your

MOMYER - REDIRECT                    415

1   notebook, if you have it there, Plaintiff's Exhibit

2   No. 38.

3   A    Under DX?

4   Q    I'm sorry.  It should be under PX-38. do you have

5   that.

6             THE COURT:  There is no PX-38.  There's DX-1,

7   DX-107, DX-230, DX-111, and DX-30.  That's all there

8   is in this notebook.

9             Hand that big book up there, please.  What is

10  it in?  Is it in Momyer's notebook?

11            MR. ROBERTSON:  Yes, sir.

12            THE COURT:  We've got it.  Don't be doing

13  that.  Get back there.

14            Turn to PX-38 there, would you, please?

15            THE WITNESS:  Okay.

16            THE COURT:  PX what?

17            MR. ROBERTSON:  PX-38.

18            THE COURT:  All right.  Thank you.

19  BY MR. ROBERTSON:

20  Q    If I could refer you to the back of that document,

21  there is a Bates number that ends 4053.  It's entitled

22  "Fisher IBM Master Schedule Plan."  Do you recall

23  that?

24  A    Yes.

25  Q    Did this master schedule plan have any name that

1    you associated with it that you and the inventors and

2    the IBM people refer to it as?  Are you familiar with

3    the therm Gantt chart?

4    A   Yes, Gantt chart.

5    Q   Did you refer to this?

6    A   This would be a Gantt chart, yes.

7    Q   What's your understanding of what a Gantt chart

8    is?  I believe it's G-A-N-T-T.

9    A   It's a chart showing the tasks that are required

10   for some development and the length of time that those

11   tasks would take.  Also the dependencies of the task.

12   Typically, the ones that are first are required before

13   you can complete the others.

14   Q   And I just want to make sure we understand.  I'd

15   like you to orient us with this document, if we could.

16   So let me ask you some questions about its

17   organization.

18       First, there's several headings.  Do you see that

19   at the very top?

20   A   The legend?

21   Q   Yes.  It says IV and SOW?

22   A   Yes.

23   Q   SOW you understood to be statement of work?

24   A   Yes.

25   Q   Then there's a task name, correct?

1    A    Correct.

2    Q    And then there's a heading for the purpose of the

3    task; is that right?

4    A    Correct.

5    Q    And then there's a heading that says RESP.  What

6    did you understand that to mean?

7    A    Who was responsible for that task.

8    Q    In fact, at the top of the document does it say

9    RESP is responsible for document?

10   A    Yes, it does.

11   Q    Then there's a column that says DEL.  Do you see

12   that?

13   A    Yes.

14   Q    Is there a definition of what DEL means?

15   A    Yes, it says "deliverable."

16   Q    There's also a column that says "depends."  Do you

17   see that?

18   A    Depends, correct.

19   Q    Then there's a reading called "Fisher"?

20   A    Correct.

21   Q    What was the purpose of that heading, do you know?

22   A    Well, it looks like it was specifying the number

23   of hours that particular task would take.

24   Q    Next to that is a series of letters that starts S,

25   then O, then N, then D, etc.  Do you see that?

1    A    Yes.

2    Q    Would it be safe to say those correspond to the

3    months of the year?

4    A    Yes, it would.

5    Q    Just under that series of letters, which you have

6    identified correspond to months of the year, there

7    seem to be sort of bars going across indicating --

8    well, you tell me what do you think that indicates?

9    A    Well --

10   Q    What you understand it to indicate.

11   A    Right.  This isn't the ideal document to look at

12   because it was actually in color.  And the bars going

13   across corresponded to the bars at the bottom that say

14   critical task, non-critical task, baseline task.  So

15   the fact that these aren't in color means that they

16   get all blended in black and white, whereas if they

17   were in color, they would more clearly define what it

18   was.

19   Q    So your memory is that when you had this document

20   originally it was in color?

21   A    Yes.

22   Q    I can tell you this is the only copy we have as it

23   was produced to us, so we're going to have to just

24   labor through it.  But let me ask you, did

25   Fisher-Scientific ever deliver to IBM requirements for

1   your electronic sourcing system?

2   A    Yes.

3   Q    Did you have anything to do with preparing that

4   document?

5   A    Yes.

6   Q    The first task is definitize requirements for

7   electronic sourcing program, ESP.  Do you see that?

8   A    Yes.

9   Q    What was IBM doing with your requirements document

10  to definitize it, do you recall?

11  A    Well, they were having meetings with us to talk

12  about what requirements we had and how Technical

13  Viewer could address those requirements.

14  Q    Did you, in fact, engage in those meetings and

15  provide them with that information?

16  A    Yes.

17  Q    The next task, and trust me, I'm not going to go

18  through all of these tasks, but the next task is

19  Fisher technical familiarization and performing system

20  testing requirements.  Do you see that?

21  A    Yes.

22  Q    Who had responsibility for that?

23  A    I did.

24  Q    In the column, who does it indicate?

25  A    Fisher.

1    Q    It says "deliverable."  Do you see that?

2    A    Yes.

3    Q    What does it indicate as to whether it was

4    delivered?

5    A    Y.

6    Q    What does Y signify to you in this document?

7    A    It is a deliverable.

8              THE COURT:  Yes, in other words?

9              THE WITNESS:  Yes.  It means yes.

10             THE COURT:  Y is yes and N is no?

11             THE WITNESS:  Correct.

12             THE COURT:  Is this basically a document that

13   sets forth what you were asking IBM to do, what you

14   were going to do?

15             THE WITNESS:  Correct.

16             THE COURT:  In connection with the electronic

17   sourcing program you were working on, and it also sets

18   forth a timetable for trying to get that done?

19             THE WITNESS:  Correct.

20             THE COURT:  And that includes providing

21   deliverables.  What were deliverables?

22             THE WITNESS:  Deliverables were something

23   that either we would provide to IBM or they would

24   provide to us.  Now, when they were providing it back

25   to us we would have to ensure that was what we were

1   expecting based on the requirements.

2   Q   Well, let's just focus, if I could, for just one

3   minute on task 10.  "Provide Fisher existing systems

4   interface specification."  Do you see that?

5   A   Yes.

6   Q   Did Fisher have that responsibility?

7   A   Yes.

8   Q   We were talking specifically about this electronic

9   catalog that you had with SteBo.  Will you turn to the

10  next page at ID No. 24?

11  A   Yes.

12  Q   That's under a heading 23, verify, convert,

13  process, and author Fisher data.  Do you see that?

14  A   Yes.

15  Q   Who does it indicate had responsibility for task

16  24, provide Fisher electronic text and image data for

17  the demo ESP system?

18  A   Fisher.

19  Q   Did Fisher do that?

20  A   Yes.

21  Q   Is that what you were referring to when you

22  indicated that you gave them an electronic catalog?

23  A   Correct.

24  Q   Task No. 31 indicates that there was a requirement

25  to obtain and deliver ESP demonstration hardware to

1  IBM, FSC in Manassas, Virginia.  Do you see that?

2  A    Yes.

3  Q    Who had responsibility for that?

4  A    Fisher.

5  Q    Do you know if that occurred?

6  A    Yes, it did.

7  Q    Would it be fair to say that throughout this chart

8  we've been talking about, this Gantt chart as you

9  referred to, the responsibilities were fairly divided

10  between Fisher and IBM to achieve a prototype that was

11  the goal of this project?

12  A    Yes.

13          THE COURT:  Excuse me a minute,

14  Mr. Robertson.  Just sitting there, are you getting

15  any glare from up here?

16          THE WITNESS:  No, I'm not.

17          THE COURT:  If anybody gets it, let us know.

18          THE WITNESS:  Okay.

19          THE COURT:  And we'll drop the shades.

20  Sometimes in the afternoon, it particularly affects

21  all of you over here on this side.

22          Go right ahead.  Excuse me, Mr. Robertson.

23          MR. ROBERTSON:  That's all right, Your Honor.

24  BY MR. ROBERTSON:

25  Q    If you'd look at task No. 67 at that time page

1    that ends 056?

2    A    Yes.

3    Q    At that point it says, in 66, it says, Verify,

4    convert, process and author Fisher data.  Do you see

5    that?

6    A    Yes.

7    Q    Comprehensive purpose.  The purpose for that was

8    comprehensive.  Can you tell us what you understand

9    that to mean?

10   A    Well, yes.  There were two phases of the project.

11   One was the pilot project was basically a proof of

12   concept, which took about a quarter of the Fisher

13   catalog and delivered it so that we could test it and

14   see how our specifications were being met before more

15   work would continue with the comprehensive, which was

16   the entire Fisher catalog being used in Technical

17   Viewer.

18   Q    In topic ID 67, right after that verify, convert,

19   process, author Fisher data it says, Provide Fisher

20   electronic text and image data.  Do you see that?

21   A    Yes.

22   Q    For this comprehensive electronic system, who had

23   responsibility for that?

24   A    Fisher.

25   Q    Can you tell us approximately how long this

1    project took to accomplish all of these tasks that

2    were identified in Exhibit No. 38, this Gantt chart?

3    Your memory might be sufficient unless you want to

4    confirm with the document.

5    A    Well, with the Gantt chart, it goes from October

6    back to -- October to October.  So it took about a

7    year.

8    Q    Were you involved in the project that entire time?

9    A    Yes.

10   Q    And you have identified those things that you were

11   involved in, I believe, that were necessary

12   modifications to adapt this TV/2 for this pilot and

13   comprehensive program; is that right?

14   A    Yes.

15   Q    At some point in time when you met with the IBM

16   people, did they ever provide you with any marketing

17   literature with respect to the IBM Technical Viewer 2?

18   A    Yes.

19   Q    Do you have Defendant's Exhibit 107 in your book?

20           THE COURT:  It's in that small book there,

21   Mr. Kinross.

22           THE WITNESS:  All right.  I'm looking at it.

23   Q    Have you seen this document before?

24   A    Yes.

25   Q    Did you ever obtain a copy of this document?

MOMYER - REDIRECT                    425

1   A   Yes.

2   Q   Who gave it to you?

3   A   It came on the Technical Viewer CD that was

4   provided with the product.

5   Q   When you applied for a patent, did you provide

6   this document to your patent attorney so it could be

7   given to the Patent Office?

8   A   Yes.

9   Q   Let me just take you to Plaintiff's Exhibit No. 1,

10  which is the '683 patent, which is in all the jurors

11  books.

12          MR. McDONALD:  I'll object as outside the

13  scope of infringement at this point.

14          THE COURT:  I don't know what he's going to

15  do yet.  There's not a question yet.  So I can't rule.

16  Or if I ruled, it would be subject to a serious error

17  since I don't know what I'm ruling on.

18          Get combat ready.  Don't answer the question

19  because apparently there's going to be an objection.

20  So let's wait and see what it is.  Ask the question

21  and let's go.

22  BY MR. ROBERTSON:

23  Q   Can you go to the cover page of the '683 patent?

24  A   Yes.

25  Q   Do you see the heading "other publications"?

1    A    Yes.

2    Q    Is there an IBM Technical Viewer 2 general

3    information manual disclosed?

4    A    Yes.

5    Q    Is there always an IBM Technical Viewer 2 product

6    information brochure disclosed?

7    A    Yes.

8    Q    Does it indicate that's undated?

9    A    Yes, it's undated.

10   Q    Did you turn these documents over to your attorney

11   to produce to the Patent Office?

12         MR. McDONALD:  Your Honor, I'll object to

13   outside the scope of the infringement issue.

14         THE COURT:  So the objection is to the

15   question did you turn these documents over to be given

16   to the Patent Office.  That's the question, right?

17         MR. ROBERTSON:  Yes, sir.

18         THE COURT:  What does that have to do with

19   infringement?

20         MR. ROBERTSON:  Because, again, Your Honor, I

21   think it's going to go to the scope of the patents

22   that are going to be involved here, but I could see

23   that a very credible argument could be made that it

24   has to do with their invalidity position.

25         THE COURT:  It's actually a quite credible

1    argument.   The objection is sustained.

2              MR. ROBERTSON:   Your Honor, with that, I have

3    no further questions of this witness.

4              THE COURT:   All right.   Mr. McDonald.

5              MR. McDONALD:   Thank you, Your Honor.

6         CROSS-EXAMINATION

7    BY MR. McDONALD:

8    Q   Mr. Kinross, did you mention there in the last few

9    minutes something about a CD, I think you said, from

10   IBM?  Did I hear that right?

11   A   Correct.

12   Q   What was that?

13   A   It was the Technical Viewer CD that was provided

14   to be able to load the Technical Viewer onto a

15   computer.

16   Q   When did you get that?

17   A   I don't recall the exact date I got it.   I'm

18   sure that --

19              THE COURT:   Do you recall a year?

20              THE WITNESS:   Yes, 1994.

21   BY MR. McDONALD:

22   Q   I think you mentioned that Fisher was around that

23   time it began working with IBM working towards getting

24   its catalog on a CD ROM.   Did I hear that right?

25   A   No.   What I said was the industry was tending

1  toward putting catalogs on CD ROM, and that's why I

2  was investigating the search engines.

3         THE COURT:  You said also that your company

4  wanted to get an entry into the field, I think.  Is

5  that right?

6         THE WITNESS:  Yes, that's right.

7         THE COURT:  So now we have an orientation.

8  BY MR. McDONALD:

9  Q   So at the time Fisher was looking to get into

10 making its catalogs on CDs, other companies were

11 already doing that?

12 A   My recollection is our competitors weren't doing

13 that, and Fisher was challenged to do that because the

14 catalogs in our industry were so large.

15 Q   Were there non-competitors that were putting their

16 catalogs on CD at the time already?

17 A   I don't know.

18        MR. ROBERTSON:  Could we pull up Exhibit 1,

19 please, the '682 patent.

20        THE COURT:  What did you mean by saying that

21 others were putting --

22        THE WITNESS:  We knew that catalogs could be

23 put -- we knew that catalogs could be put on CDs.

24        THE COURT:  For instance, you don't compete

25 with Sears.

1          THE WITNESS:  Right.  I don't know of any

2    vendors who had catalogs on CDs at that time.  I

3    couldn't cite Sears as being an example.

4          THE COURT:  But there were people, you just

5    don't remember who they were?

6          THE WITNESS:  Yes, that's right.

7    Q    It was some sort of a vendor; is that fair?

8          THE COURT:  What his question is, was it the

9    vendors who were putting the catalogs on CD ROM or was

10   it your competitors, and you said it wasn't your

11   competitors.

12         THE WITNESS:  It wasn't our competitors.

13         THE COURT:  Was it vendors or not?

14         THE WITNESS:  No, I don't know.  I think

15   based on the Technical Viewer documentation it could

16   be like parts lists that were put on CDs.

17         THE COURT:  All right.  Go ahead.  Excuse me.

18   BY MR. McDONALD:

19   Q    Could we turn to column 2, please, and go to the

20   top of column 2 of the '683 patent, Plaintiff's

21   Exhibit 1, around lines 3 to 5.

22         THE COURT:  That's in your small book there,

23   if you want to look at it, or you can look at it on

24   the screen.  It's up to you.

25              Column what?

1        MR. McDONALD:  Column 2, lines 3 through 5 of

2   the '683 patent.

3   Q   This is some language -- and, Mr. Kinross, if you

4   need to look at the paper version, I think that's in

5   the big book.

6        THE COURT:  He's got one in your book.

7        THE WITNESS:  I have it here.

8   Q   Oh, you have it there, too.  This is in your

9   patent?

10  A   Yes.

11  Q   That is the patent-in-suit, right?  This Exhibit

12  1?

13        THE COURT:  Computer systems that are

14  capable, is that where you're starting?

15        MR. McDONALD:  Yes.

16  BY THE COURT:

17  Q   I'm just showing you this sentence here, Mr.

18  Kinross, that says computer systems that are capable

19  of searching databases containing a product catalog of

20  a particular vendor, for example, on CD ROM are also

21  known.  Do you see that sentence?

22  A   Yes.

23  Q   Do you have any reason to doubt the accuracy of

24  that statement that the CD that was known was one that

25  was a product catalog of a particular vendor at least

1  at the time you filed this patent?

2  A   I don't see any reason to doubt that.

3  Q   If we can expand down a few lines to the rest of

4  that will paragraph, please.  Your patent goes on to

5  say that, "Such systems can search for user requested

6  information about products and create orders which the

7  user can save, print or, in some cases, facsimile

8  directly to a vendor."  Do you see that sentence?

9  A   Yes.

10 Q   Do you have any reason to doubt that was already

11 out there before you --

12 A   No, I don't have any reason to doubt that.

13        MR. ROBERTSON:  Objection.  Outside the scope

14 of my direct.  I didn't ask him any questions

15 concerning this.

16        MR. McDONALD:  He did ask about this issue of

17 other CDs being out there.  He testified about that.

18 It's in the patents.

19        THE COURT:  He asked about the CD ROMs being

20 out there.  He testified about it.  You asked about

21 it, and he's just following up on what you opened.

22        MR. ROBERTSON:  I didn't ask any question

23 about CD ROMs being out there.  The witness said he

24 thought there was a movement to have CD ROMs, and the

25 passage that --

1    THE COURT:  You asked a question that opened

2    the door and you didn't move to strike the answer as

3    nonresponsive, so that's the way life is.  It's on the

4    record.  He can examine about it reasonably, but not

5    excessively.  All right?

6        MR. McDONALD:  Understood, Your Honor.  Thank

7    you.

8    BY MR. McDONALD:

9    Q   So, Mr. Kinross, that sentence I just read --

10       MR. McDONALD:  May I go ahead and rephrase

11   the question, Your Honor?

12       THE COURT:  Yes.

13       MR. McDONALD:  Thank you.

14   Q   That sentence that indicates that those systems

15   could search for user information about products and

16   create orders which the user can save, print or in

17   some cases facsimile directly to a vendor, was that an

18   accurate statement at the time you filed our your

19   patent application that there were such systems that

20   were already out there?

21   A   Yes.

22   Q   So those systems had one catalog on them, was that

23   right?

24   A   I don't know.  I think so, but I don't know.

25   Q   How about if I give you a chance to read the rest

1   of that paragraph for a moment, then I'll ask you

2   another question, that paragraph being the one at

3   column 2 of the '683 patent that begins at line 4 and

4   ends at line 17?

5   A    Okay.

6   Q    The next sentence after the one I read says, "The

7   known computer systems for searching vendor catalogs

8   are limited in that only one such vendor catalog is

9   accessible to a user at any given time."  Do you see

10  that?

11  A    Yes.

12  Q    Does that refresh your recollection at all that

13  the system that you were aware of at the time that

14  would have a catalog on a CD ROM had one catalog?

15          MR. ROBERTSON:  Object.  It mischaracterizes

16  the witness' testimony.

17          THE COURT:  Sustained.  Just ask him if he

18  agrees with it now that it refreshes his recollection

19  or not.

20  Q    Does this refresh your recollection, Mr. Kinross,

21  as to whether such known computer systems as described

22  in that sentence I just read did exist at the time you

23  filed your patent application?

24          THE COURT:  The question is:  Does reading

25  that sentence refresh your recollection?  If it

1   doesn't, then that's okay.  If it does, then say yes.

2              THE WITNESS:  Well --

3              THE COURT:  Your recollection just basically

4   means does it prompt your memory.

5   A   Yes.  I'm aware that the industry was looking at

6   ways to put catalogs on CD ROMs.  I don't know of any

7   actual catalogs that were put on CD ROMs that I could

8   quote you.  I know our competitors did not have them,

9   and I couldn't point to a vendor and say, Well, they

10  had their catalog on a CD ROM.  I could not do that.

11             THE COURT:  But your memory is that somebody

12  was doing it?

13             THE WITNESS:  My memory was the industry was

14  saying this could be done, yes.

15  Q   Is it fair to say that a feature of the system you

16  were trying to patent in these patents, including the

17  '683 patent, you were trying to patent a system that

18  had the capability of searching multiple catalogs from

19  different vendors?

20             MR. ROBERTSON:  Objection, Your Honor.  I

21  didn't ask anything about multiple catalogs.

22             MR. McDONALD:  I'm setting up the contrast

23  here to talk about the what the invention was, which

24  is what I thought we were here to talk about with Mr.

25  Kinross.

1        MR. ROBERTSON:  I asked what he did with

2   respect to providing IBM the Fisher catalog.

3        THE COURT:  His testimony was very limited

4   and basically dealt with what was given to IBM to

5   modify the TV/2 that IBM had, what he did, the topics

6   that had to be modified, revised or part recreated in

7   the TV/2 for use in the inventions of the patent.  And

8   it went to the ability to have multiple catalogs in

9   the system was the one topic.  And so your objection

10  is overruled.

11        Go ahead now and ask the question again.  I

12  bet you the witness doesn't know what it was.

13        MR. McDONALD:  I'm a little rusty myself

14  actually.

15        THE COURT:  Well, get some WD-40 and go to

16  work.

17  Q    Would you agree, Mr. Kinross, that a key aspect of

18  the invention you were trying to get patents on was

19  the ability to search multiple catalogs from different

20  suppliers as opposed to just searching one catalog on

21  a CD ROM?

22  A    Yes.

23  Q    Why is that?  Why was that important?

24  A    It was important because the line of business that

25  Fisher was in was creating a group called SPS, which

1   was a Strategic Procurement Services group, and the

2   idea there was to have that group handle more of the

3   purchasing activity for our customers than just

4   purchasing Fisher products.  So we wanted a way to

5   provide a tool for that group to be able to use that

6   as a resource to find products that those customers

7   may need that Fisher didn't provide.

8   Q   So the idea here wasn't just to sell a customer

9   software, it was to handle all their sourcing needs;

10  is that right?

11  A   It evolved to selling software.  So no, that's not

12  right.

13  Q   When you said why it was important, I thought you

14  were talking about this special procurement group at

15  Fisher, and I'm trying to understand how that relates

16  to this system.  Were they the ones that were actually

17  going to use the system?

18  A   There were three different groups the system was

19  designed to service.  The Strategic Procurement Group

20  was one.  The customer themselves was another.  And

21  our customer service reps was the third.

22  Q   Is it fair to say that in the invention described

23  in your patents involved in this case that the

24  preferred mode was to use an on-site customer service

25  representative just like the old RIMS system?

1    MR. ROBERTSON:  I object.  That's outside the

2  scope.

3    THE COURT:  I think this was.

4    MR. McDONALD:  Well, he brought customer

5  service representative --

6    THE COURT:  I know, but not every answer

7  generates an opening of the door.  I sustain the

8  objection.

9  BY MR. McDONALD:

10  Q   Let's go back to --

11    THE COURT:  Just kind of go around with what

12  he was doing there on direct.

13    MR. McDONALD:  Okay.

14  Q   Let's talk now about the TV/2 system, Mr. Kinross,

15  at the time you started talking to IBM.  Now, there

16  was such a system that was available from IBM the day

17  you started talking to them about searching, right?

18  A   There was what?

19  Q   A TV/2 system.

20  A   There was a TV/2 system, yes.

21  Q   And that system already had an application program

22  and interface on it, right?

23  A   My understanding is that it came with a sample

24  program that showed the use of the API, correct.

25  Q   Was it your understanding specifically that the

1   off-the-shelf version of TV/2 provided an application

2   program and interface and that would allow the passing

3   of data?

4   A    No.

5   Q    Mr. Kinross, do you recall on December 2 of 2009

6   in this case you gave a deposition?

7   A    Yes.

8   Q    And you swore to tell the truth at this

9   deposition, correct?

10  A    Yes.

11  Q    And you did tell the truth, right?

12  A    I tried to, yes.

13  Q    Could you turn, please, to page 108 of your

14  December 2, 2009 deposition?

15  A    All right.

16  Q    Do you see there beginning at line 13 there's a

17  series of a couple or three questions here that I'd

18  like to show you.  Line 13 of page 108, the question:

19  Did you understand that the TV/2 product off the shelf

20  would allow to you create a shopping list by selecting

21  items and then pass that list to another application

22  such as a parts ordering system?  After an objection

23  there was an answer.  "My understanding was the off

24  the shelf version provided application programming

25  interface, and that's what would allow the passing of

KINROSS - CROSS                       439

1    data."

2    A    Right.   That's true.

3              THE COURT:   That wasn't inconsistent with

4    what he said earlier.

5              THE WITNESS:   That's right.

6              THE COURT:   Your question was different.   So

7    it really doesn't impeach him.   He said that earlier,

8    basically.   I think he said it almost in those words.

9              THE WITNESS:   Right.   This lets you do it,

10   but it didn't do it.   You had to program it.

11             THE COURT:   Whether he did it or whether he

12   had the facility to do it.

13             THE WITNESS:   Correct.

14             THE COURT:   I think in both places he said

15   the same thing.

16             THE WITNESS:   Thank you.

17             MR. McDONALD:   I misunderstood.

18             THE COURT:   I just wanted Mr. McDonald to

19   know that I was paying attention.

20             MR. McDONALD:   I have no doubt.

21   BY MR. ROBERTSON:

22   Q    Did the Technical Viewer 2 system have the

23   capability of searching databases that were on a

24   computer other than in the form of a CD ROM?

25   A    Yes.

1    Q    That was before Fisher started working with IBM,

2    right?

3    A    Yes.

4    Q    Now, this research, I think you mentioned you did

5    some research as to different products and through

6    that process you picked the TV/2 product; is that

7    right?

8    A    That's correct.

9    Q    And you picked the TV/2 product because you

10   thought that would be a good fit for the purposes you

11   were looking to fulfill, correct?

12   A    There were a number of reasons we picked the

13   Technical Viewer product.  Do you want me to go into

14   those reasons?

15          THE COURT:  Was that one of them, that it was

16   a good fit?

17          THE WITNESS:  I wouldn't specify it as a good

18   fit.  I thought it was a development platform that

19   could be used to achieve what we were trying to

20   accomplish.

21   Q    But A good fit was one of the factors you used to

22   pick the TV/2 system; is that fair?

23   A    No.  I think a good fit would be more inclined to

24   selecting a package that had all the features and

25   functionality that your business required and you just

1   plug it in.  That to me is a good fit.

2        Providing an architecture that could lend itself

3   to development is actually why we chose Technical

4   Viewer.

5   Q    But architecture, what do you mean by that?

6   A    Having an API was very appealing so that we could

7   effect changes that we needed to make.

8   Q    Is that what you meant by architecture was just

9   that?

10  A    Yes, it was a piece of architecture.  The fact

11  that in their documentation they mention large volumes

12  of data was another feature that we liked.

13  Q    Was it relevant to your decision that the TV/2

14  product operated on this IBM OS/2 operating system?

15  A    It didn't hurt.

16  Q    Did it help?

17  A    It neither hurt nor helped.  We were a multi

18  platform environment at that time.  We were very

19  familiar with IBM's software.  We were very

20  comfortable with working with IBM because they were

21  providing hardware and software for Fisher for their

22  mainframe systems as well as their client server based

23  systems.  We felt that IBM was a stable company and

24  supported their products.  So the support issue was a

25  factor in choosing Technical View.

1  Q    At the time was the RIMS system built on OS/2 IBM

2  operating system?

3           MR. ROBERTSON:  Your Honor, I didn't ask

4  anything about the RIMS system.

5           THE COURT:  Mr. McDonald, it seems to me

6  that's beyond the scope of the direct examination.

7           MR. McDONALD:  I guess we can come back to

8  that, Your Honor.

9  BY MR. McDONALD:

10 Q    Now, with the IBM system as it existed when you

11 started working with them regarding TV/2, did it have

12 the capability of putting technical publications on a

13 single CD ROM?

14 A    Yes.

15 Q    Technical publications could include things like

16 bulletins and catalogs, right?

17 A    The only thing that they mentioned as far as what

18 they used Technical Viewer for was a parts catalog in

19 Europe for a car company.  And the Manassas people

20 indicated that they worked with the U.S. Navy on their

21 documents but didn't specify what documents the Navy

22 was using it for.

23 Q    Did you work with someone from IBM named Pam Eng?

24 A    Yes, Pam Jenkins at the time, but I think she's

25 been married and changed her name.

1    Q    She was working on this project from the IBM side;

2    is that right?

3    A    Correct.

4    Q    Chuck DeNaris, is that also a name that's familiar

5    to you?

6    A    Yes, he was the salesman from IBM.

7    Q    So you interacted with him on this project?

8    A    He attended the meetings and yes.

9    Q    The IBM system could do a word search, correct?

10   A    Correct, which we termed keyword search.

11   Q    But that was already in existence before you

12   started talking to IBM about the TV/2, right?

13   A    That was part of the Technical Viewer, yes.

14   Q    Then you choose the TV/2 system because of its

15   features and because you didn't want to reinvent the

16   wheel, right?

17   A    Correct.  The prospect of writing a search engine

18   when others we are available on the market really

19   didn't make sense to us to rewrite something that

20   already existed if it performed up to our

21   specifications.

22        MR. McDONALD:  I have no further questions.

23   Thank you.

24        THE COURT:  Any redirect?

25

1          REDIRECT EXAMINATION

2     BY MR. ROBERTSON:

3     Q    With respect to this multiple catalog capability

4     on TV/2, did TV/2 have the capacity to have multiple

5     catalog data right off the shelf?

6     A    No, I don't believe it did.

7     Q    Did you have to do anything or assist in any way

8     to modify TV/2 in order to be able to accommodate that

9     size of data volume that would be involved in such a

10    performance?

11    A    Yes.   There were two aspects of that.   One was to

12    create the functionality of the catalog icon which

13    would open one or more catalogs to be searched or

14    close catalogs if you didn't want that particular one

15    searched.

16         And also Fisher had a requirement that the system

17    would not be useful if you didn't provide a

18    three-second response time back to the end user when

19    it was searching catalogs.   And my understanding is

20    there was a problem with Technical Viewer once the

21    entire Fisher catalog was loaded onto the system in

22    obtaining a three-second response time.   So a

23    different indexing mechanism had to be developed to

24    facilitate that requirement.

25    Q    What was the indexing mechanism called?

1   A    It was called Super Index.

2   Q    Were you involved at all on that project?

3   A    Not -- well, only from the standpoint of it being

4   a requirement of Fisher for Technical Viewer to

5   achieve a three-second response time.  But as far as

6   designing the Super Index and coding it, no, that was

7   Technical Viewer that was responsible for that.

8   Q    So IBM was responsible for making that

9   modification?

10   A    Yes.

11   Q    Were they made to make the TV/2 program more

12   responsive in accordance with your requirement?

13   A    Yes.

14   Q    Was that necessary in order to accommodate the

15   volume of catalog data?

16   A    Yes.

17   Q    Did you indicate that you had problems with this

18   response time simply with just one catalog loaded on

19   TV/2?

20   A    I didn't.  IBM indicated there was a problem and

21   they wouldn't deliver the catalog until it was fixed.

22   So --

23   Q    So they went about fixing it to your

24   specifications?

25   A    Yes.

KINROSS - REDIRECT                    446

1          MR. ROBERTSON:  Thank you.  I have nothing

2    further.

3          THE COURT:  Can he be excused permanently or

4    do you need him back?

5          MR. McDONALD:  I need him back, Your Honor.

6          THE COURT:  All right.  Mr. Kinross, you may

7    be required to come back here.  And rather than have

8    you stay around, if you'll agree to come back when

9    they call you, and they'll give you as much notice as

10   they can, then you can leave.

11         THE WITNESS:  Okay.

12         THE COURT:  Under those conditions.  Is that

13   all right with you?

14         THE WITNESS:  Yes, that's fine.

15         THE COURT:  All right.  Well, have a safe

16   trip back to Pittsburgh.

17         THE WITNESS:  All right.  Thank you.

18         Should I leave these documents here?

19         THE COURT:  Yes, just leave them there.

20          (The witness was excused from the witness

21   stand.)

22         THE COURT:  Next witness.

23         MR. ROBERTSON:  Yes, Your Honor.  The

24   plaintiff would call Mr. James Johnson.

25         THE COURT:  Are you-all all right or do you

1   need a recess?  I didn't think to ask you all.  Are

2   you okay now?

3           THE JURY:  Yes.

4           THE COURT:  Okay.  If anybody needs anything,

5   make sure you let us know.

6           All right.  Let's go.  Who?

7           MR. ROBERTSON:  James Johnson, Your Honor.

8           (Transcript continues on page 448.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25