1                          **JIM JOHNSON,**

2      a witness, called by the plaintiff, having been first duly

3      sworn, testified as follows:

4

5                    MR. ROBERTSON:  I'm sorry, is the witness sworn?

6                    THE COURT:  Yes, he's been sworn.

7

8                          DIRECT EXAMINATION

9      BY MR. ROBERTSON:

10     Q     Sir, would you please introduce yourself to the jury.

11     A     My name is Jim Johnson.

12     Q     And where do you live, Mr. Johnson?

13     A     Pittsburgh, PA.

14     Q     And just briefly, give me your educational background.

15     A     Let's see.  I have an associate's degree in computer

16     science.  I also have a bachelor's degree in applied science

17     from Slippery Rock University.

18     Q     And have you ever taken any graduate classes?

19     A     I did start a graduate study but, unfortunately, never

20     finished.

21     Q     What do you currently do for a living, sir?

22     A     I'm the APV of information technology for a company called

23     Utility Service Partners.

24     Q     You said AVP.  What does that stand for?

25     A     Assistant vice president.

Johnson - Direct

1  Q    And IT, is that information technology?

2  A    Yes.

3  Q    And what is the business of Utilities Service Partners,

4  sir?

5  A    We provide service line warranties to customers that we

6  will come out and replace or fix your utility lines if they

7  break.

8  Q    And utility lines, what do you mean when you are using

9  that?  Are you talking electrical lines?

10 A    Actually, yes.  Electrical lines, gas lines, sewer lines.

11 Most homeowners don't realize in their area that they own the

12 line from the main, which is owned by the utility, to the

13 house.

14 Q    And before that company that handles these utility

15 services, you worked in the information technology department;

16 is that right?

17 A    I'm sorry.

18 Q    You worked in the information technology department for

19 that company?

20 A    Yes.

21 Q    At some point in your career, did you work with Fisher

22 Scientific?

23 A    Yes.

24 Q    When was that?

25 A    I believe I started in 1986 and up until 1998.  About 12,

1    13 years.

2    Q    And what area of the company did you work at in Fisher

3    Scientific?

4    A    In the information technology group.

5    Q    Just briefly, could you tell me some of the positions you

6    held while you were at Fisher during the period of time from

7    1986 to 1998?

8    A    Sure.  I started there as a programmer analyst.  I worked

9    my way up to project leader, ultimately became a supervisor and

10   manager of product development.

11   Q    And you are one of the named inventors on the three

12   patents in suit here, the patents that are at issue, the '683,

13   '516, and '172 is how we've been referring to; is that right?

14   A    Yes.

15   Q    And did you work on that project with both Mr. Momyer and

16   Mr. Kinross?

17   A    Yes.

18   Q    Mr. Momyer has testified yesterday and today to sort of

19   the big overview of the picture of the development of the

20   inventions in your electronic sourcing system.  What I'd like

21   to focus on today with you is what, if any, necessary

22   modifications, revisions, reprogramming, or new things needed

23   to be done in order to modify the RIMS system into what became

24   the subject matter of the these patents, the electronic

25   sourcing system.

1    So at a high view for now, could you just identify the

2    areas that you were involved in that project?

3    A    The areas I was involved in was to reengineer the programs

4    basically to be able to build a graphic user interface that the

5    end user could use.  We also modified the requisitioning

6    portion of the system to be able to handle multiple products

7    from various vendors.

8        In addition to that, we also allowed for that single

9    requisition to be broken up into multiple purchase orders by A

10   vendor.  We also built the interface actually over to the

11   electronic catalog as well.

12   Q    I'm sorry, I didn't hear your last answer.  You built the

13   interface to the electronic catalogs?

14   A    There was an interface we built to be able to pass

15   information from the requisitioning system over to the

16   electronic catalog system, yes.

17   Q    What about the issue of inventory availability, did you

18   have to do anything to modify the RIMS system in order to have

19   that functionality in the inventions of your electronic

20   sourcing system?

21   A    Yeah.  Basically we used, tapped into a technology for EDI

22   to be able to go out to a vendor and get some pricing and

23   availability as well.

24   Q    What about, did you have any involvement in any of the

25   business logic necessary for the functionality of the

1    electronic sourcing system and any modification that had to

2    occur with RIMS?

3    A     The business logic, yeah, we had to actually strip -- the

4    RIMS system had character-based application which we called a

5    green screen at the time.  That all had to be torn out of the

6    code, and we had to modularize the business code in order to be

7    able to interface with the new graphical user interface.

8    Q     We have now what I think are six separate topics.  If we

9    could go through them one by one and tell me in the simplest

10   terms as possible, what is it, in fact, you had responsibility

11   for doing with these revisions, modifications, reprogramming,

12   or creating from scratch some of these things.

13         So let's start with you indicated this construction of a

14   graphical user interface, and we've heard that term before.

15   Tell us what you understand that term to mean.

16   A     Graphical user interface is basically the interface that

17   the end user sees when interacting with the system.

18         At that time, most of the systems, especially the

19   mainframe systems, were character-based, so they started at the

20   left-hand corner and would go to the bottom right hand of the

21   corner, and it would display characters, numbers, dashes,

22   colons, things of that nature.  Very encryptic.

23         So in order for us to be able to allow for an end user,

24   like a researcher or lab technician, to use the system, we

25   wanted to generate or create a graphical representation of what

1    they would be doing, selecting products, placing orders,

2    selecting information to select the type of orders, that kind

3    of thing.  So we built this graphical user interface to be able

4    to make it easier, essentially, for the user to use.

5    Q    Would this graphical user interface make it easier for the

6    user of your invention in the electronic sourcing system to

7    utilize its features and functionality?

8    A    Yes.

9    Q    The RIMS technology, did it have a graphical user

10   interface?

11   A    No.

12   Q    Did it have this clunky character-based interface you were

13   talking about?

14   A    Yeah.  As I said, it was a character-based application.

15   It was originally designed for a Fisher Scientific CSR to

16   utilize, so it required a large number of hours to train this

17   person on how to use it.  There were abbreviations in there,

18   things like, for example, if we wanted them to enter a stock

19   number, the title of the field was STKNO.  If we wanted them to

20   enter a particular product type, it was just characters, PT.

21   So unless you understood what that meant, you wouldn't know

22   what to enter into that system.

23   Q    Are you familiar with the term green screen?

24   A    Yes.

25   Q    What is a green screen?

454

1    A    And old mainframe terminology where the characters on the

2    screen are basically green.

3    Q    Did the RIMS have a green screen technology?

4    A    Yes.

5    Q    I'm sorry?

6    A    Yes.

7    Q    And were you involved in programming and creating this

8    graphical user interface for the electronic sourcing system?

9    A    Yes.  I was involved in providing all the requirements to

10   the people that worked for me to develop it, yes.

11   Q    Did you supervise those people?

12   A    Yes.

13   Q    You also mentioned you had to design the interface for

14   communication between the requisitioning and purchasing program

15   and the catalog database.  Could you tell me what that entailed

16   and why that was necessary?

17   A    Well, it was necessary because the initial idea was to

18   supply a system that would allow us to do a complete supply

19   chain management end to end, be able to select products,

20   process the requisition, and ultimately generate a purchase

21   order.

22        In order to do that, we needed to connect the

23   requisitioning management system to this electronic catalog, so

24   we built some APIs, which are application program interfaces,

25   that had a two-way communication channel basically between the

1   requisition management system and the cataloging system so we

2   could pass data back and forth without losing any information.

3   Q     Did you have that interface in the RIMS system, or did

4   that have to be created?

5   A     No, that was not in the RIMS system.  That had to be

6   created.

7   Q     Why is that?

8   A     It wasn't there.

9   Q     Why --

10          THE COURT:  You asked for it.

11   Q     Let me see if I can rephrase the question.  Why did you

12   feel that it was necessary?

13   A     Well, it was necessary because in order for us to provide

14   a complete shopping experience without frustrating the user, we

15   wanted to seamlessly be able to process the information they

16   were selecting in the catalog into the requisition without them

17   having to look at a catalog, go over to the requisition system,

18   type it in, go back to the catalog, look for another product,

19   write it down, go over to the requisition system and type it

20   in.  We wanted a seamless interface so the user just had to

21   point and click and push a button, and all that data would flow

22   automatically.

23   Q     The way you described the difficulty you were trying to

24   overcome, did the RIMS system even have that kind of primitive

25   technology?

1    A    As far as communicating with a catalog?

2    Q    Yes.

3    A    No.

4    Q    You also mentioned something about splitting the

5    presentation layer, I believe, from the business logic.  Do you

6    recall that?

7    A    Yes.

8    Q    What was that?

9    A    RIMS was designed as a very traditional, what I'll call

10   CICS COBOL mainframe system.

11   Q    You have to stop there, and we're going to say again,

12   we're going --

13   A    Keep it high level.  I'm sorry.  I get technical

14   sometimes.

15            THE COURT:  It's okay, but it would be better you all

16   don't talk while each other are talking.  You can be technical

17   all you want to.

18   Q    You mentioned CICS COBOL.  I think I interrupted you, so

19   why don't you finish your answer.  What is CICS COBOL?

20   A    COBOL is a common business oriented language.  It's a

21   program language we used to develop the original RIMS system.

22       CICS is a transaction processor which allows COBOL

23   programs to run in that environment.  It's a very traditional

24   system, very geared towards businesses that want to process a

25   lot of data very quickly.

1    Q    And so did you need to be able to have that, to modify

2    that capability from RIMS to your electronic sourcing system

3    inventions in order to have that capability of transferring and

4    moving around a lot of data?

5    A    Well, I mean, what you asked me is what did we do to the

6    business logic to remove the presentation layer.  What we

7    needed to do was we needed to basically reengineer those

8    programs so they no longer worked with the green screens that I

9    mentioned earlier.

10        Those green screens were ripped out of those programs, and

11   we converted those programs into basically what we now call

12   business object that all it did was manage the business logic.

13   Then we built the interfaces to the graphical user interface

14   so, in short, the GUI could interface to the business logic.

15   Q    Was that an important aspect for making your invention

16   user-friendly and functional?

17   A    Yeah.  It was pretty much a requirement.

18   Q    And just so I'm clear, that wasn't available or present in

19   the RIMS system?

20   A    No.

21   Q    You also, I think, mentioned that you had to modify

22   requisition coding; is that correct?

23   A    Yes.  We -- at the time, the RIMS system could only

24   communicate to the Fisher mainframe, Fisher being Fisher

25   Scientific.  The programs were primarily sourcing those

1   products all to Fisher, so it was one requisition and

2   ultimately one requisition that was sent to the Fisher

3   mainframe as an order.  So basically we changed those programs

4   to be able to accept, in the requisitioning process, the

5   ability to add multiple products from different vendors to a

6   single requisition.

7   Q    In modifying this requisition coding, did it also address

8   any issues involving the purchase orders from these

9   requisitions?

10  A    Yes.  As an end result, once the requisition was created,

11  the user could say, yes, I want this order, go ahead and place

12  it.  The system would then take that requisition and by vendor

13  create multiple purchase orders with the products associated to

14  that vendor.

15  Q    You also mentioned this purchase order creation capability

16  that you needed to do.  Can you tell me how that changed from

17  the prior RIMS system, if at all, to -- for purposes of your

18  invention?

19  A    Well, as I said earlier, RIMS could only communicate to

20  the Fisher mainframe, so the order was actually created through

21  the Fisher mainframe system.  So in the electronic sourcing

22  system, what we needed to do was to be able to create purchase

23  orders that could be sent out to vendors through one of a

24  couple of different mechanisms to get the purchase order over

25  to the appropriate vendor.

Johnson - Direct

1   Q    When you say sent out, that could be sent out from a local

2   computer where an individual was using your electronic sourcing

3   invention to make a request for an item from multiple vendors?

4   A    It was a computer that was located at the customer

5   location, yes.

6   Q    The end user could utilize the electronic sourcing system

7   in order to accomplish the goals of your invention; is that

8   right?

9   A    Yes.  They would be working on a work station

10  theoretically in their laboratory or in their office

11  communicating to a server located on the network.

12  Q    And that server on the network would have information

13  available to transmit that contained information about products

14  that were available?

15  A    That's where the business logic resided, yes.

16  Q    You also mentioned this inventory availability issue that

17  had to be addressed with respect to modifying or revising,

18  reprogramming the RIMS system in order to achieve the goals of

19  your electronic sourcing system.  Do you recall that?

20  A    Yes.

21  Q    What did that entail?

22  A    End users, in other words, for them to make a good

23  decision as to whether or not to make a purchase, they want to

24  know pricing and availability, how much is it going to cost

25  them and am I going to get the product shipped, or is it going

1   to go on backorder.  In order to do that, we introduced a

2   technology of EDI to be able to generate -- back then what it

3   was called was a request for quote, to be able to send to a

4   vendor to say, can you give me the information about this

5   product, do you have it in stock, and how much is it going to

6   cost me.

7       So that request for quote would be responded to by the

8   vendor with a response to request for quote that would give us

9   that information.

10  Q    Now, RIMS had some inventory availability capability with

11  regard to Fisher products; is that right?

12  A    Yes, it did.

13  Q    Did RIMS have this inventory availability capability you

14  just described with regard to multiple vendors?

15  A    No.

16          MR. ROBERTSON:  That's all I have.  Please answer

17  whatever questions Mr. McDonald may have.

18          MR. McDONALD:  I take it, Your Honor, you want to

19  keep us rolling, rolling, rolling.

20          THE COURT:  I don't think you have many questions, do

21  you?  He hasn't been on but about 15 minutes or so.

22          MR. McDONALD:  That's true.

23          THE COURT:  I don't see how you are going to go

24  beyond that, but if we do, we'll see where we are in

25  15 minutes.

```
1                         CROSS-EXAMINATION

2    BY MR. McDONALD:

3    Q    Mr. Johnson, I'd like to talk about the graphical

4    interface user issue.  You were describing, I think, the steps

5    you took to get an actual physical embodiment of the product

6    put together in your answers; right?

7    A    That's what we did to build the system, yes.

8    Q    I'd like to talk to you about the system as it existed

9    when you actually filed the patents in this suit; okay?

10   A    Okay.

11   Q    The patents, if you have Exhibit 1 before you, that was

12   filed August 10th of 1994; correct?

13             MR. ROBERTSON:  Your Honor, I'm going to object.

14   This is outside the scope of my direct.

15             THE COURT:  I don't know if it is or isn't yet.

16   Let's wait until we get a question that deals with the

17   graphical user interface system first.  That's what he wants to

18   talk about.  There may be an objection, Mr. Johnson, so don't

19   answer the question.  We'll see if there's an objection and

20   ruling.

21             THE WITNESS:  Okay.

22             THE COURT:  So as of -- you are talking as of

23   August 10, 1994, what?

24   Q    So on that date, that's when you filed the patent

25   applications in this case; correct?
```

1    A    Are you looking at --

2    Q    The '683 patent, page one of that document has a filing

3    date of August 10th, 1994; correct?

4    A    Yes.

5         MR. McDONALD:  Put that up on the screen.  Can we

6    switch so that it will help to put it up on our screen.  Thank

7    you.

8    Q    So, Mr. Johnson, when you filed this application, did you

9    try to disclose the best way of using your invention that

10   existed at the time you filed?

11        MR. ROBERTSON:  Your Honor, I didn't ask anything

12   about the best way or the process with the patent.  I asked him

13   what he did with respect to the modifying the RIMS to achieve

14   the goals of the electronic sourcing system patent.

15        MR. McDONALD:  I can rephrase it a little, I think.

16        THE COURT:  Yes, I think you need to.

17   Q    Mr. Johnson, did you file an application based on the form

18   of the system as it existed at the time you filed the patent

19   application?

20   A    (No response.)

21        THE COURT:  You seem not to understand.  If you

22   don't, say I don't understand.

23        THE WITNESS:  I was waiting to see whether I should

24   or not based on --

25        THE COURT:  Okay, I understand.  You are doing just

1    what I asked you to do.  Thank you.

2                THE WITNESS:  I tried to comply.

3                THE COURT:  Sometimes we get a head of ourselves over

4    here, Mr. Johnson.  He didn't object, so it was okay.

5                MR. ROBERTSON:  There's been no answer yet, so I

6    didn't ask anything about the patent application, Your Honor.

7    That's my point.  I asked what they did.  They modified the

8    RIMS system.

9                THE COURT:  They had to get to it to get to what was

10   patented, I think.  The question was, basically what did --

11   what modification -- what modifications was done to RIMS to get

12   to the patents-in-suit, I think.

13               MR. McDONALD:  That's exactly what I'm talking about.

14               THE COURT:  So the patents-in-suit would include the

15   filing of the application to those patents, I would think, so I

16   think that the objection is overruled.  Why don't we get him to

17   answer the question -- ask the question again, and then you can

18   answer it, okay.

19   Q    Mr. Johnson, you filed the patent on August 10th, 1994, on

20   the system as it existed at that time; is that fair?

21   A    We filed the patent based on the ideas of what we wanted

22   to build is basically where we were at at that time.  We had

23   started building prototypes.  A prototype hadn't been completed

24   as of yet.

25   Q    Had you completed the graphic user interfaces yet?

1   A    At the time of the filing the patents, the final product

2   was not completed, no.

3   Q    In fact, isn't it true that the only user interfaces

4   that's actually shown in the patents-in-suit are all the old

5   text-based style interfaces, and you don't show any actual

6   graphic user interfaces?

7   A    We were in the midst of building the prototype.

8             THE COURT:  What he asked you was whether you

9   understand any of the figures; is that right, or the

10  embodiments, any of the embodiments shown in the patent to have

11  any pictures in them as opposed to just text.  Is that your

12  question?

13            MR. McDONALD:  Well, it has to do with the user

14  interface.

15            THE COURT:  In the user interface.  Is that your

16  understanding?

17            THE WITNESS:  You are correct.  We did not have the

18  graphical user interfaces ready to be put into the patent.

19            THE COURT:  Because you were still working on them

20  even though you conceived the idea; is that your point?

21            THE WITNESS:  Yes.

22  Q    Well, is it true that in the appendixes of the patent --

23  you can turn to column 19 of the '683 patent, Exhibit 1.  If we

24  can blow up appendices one and two there.  Those are two

25  examples of user interfaces being described in your patent;

1    right?

2    A     Yes.

3    Q     Those are not graphic user interfaces; right?

4    A     No, they are not.

5    Q     Those are these text-based ones, I think you described as

6    clunky; is that right?

7    A     That's correct.

8    Q     These are very similar to the RIMS style user interfaces;

9    right?

10   A     That's correct.

11   Q     If you had in development any graphic user interfaces,

12   maybe they weren't in an actual physical product yet, would you

13   have put them in the patent application to show that

14   alternative embodiment that uses graphical user interfaces?

15   A     If I understand your question correctly, yes.  If we had

16   the prototype screens completed, they would have gone into the

17   patent.

18   Q     I'll give you a chance to look at all the appendixes and

19   the figures of Exhibit 1 here, because if we go, for example,

20   to columns 21 and 22 of the next page, there's some more

21   appendixes there; correct?  Appendixes three, four, five, six,

22   and seven; right?

23   A     Yes.

24   Q     And then there's a few more on columns 23 and 24 on the

25   next page, continuation of appendix seven, then appendix eight,

1    nine, and ten; right?

2    A    Can I go back to 21 and 22?

3    Q    Sure.

4    A    Appendix six and seven are part of the electronic catalog,

5    and at that time the technology that we had to do print screens

6    was pretty archaic.  So these are not the RIMS screens.  Those

7    were actually part of the cataloging system, and they came out

8    sort of looking like character-based, but that was just the

9    technology we had at the time to be able to produce a printed

10   image.

11           THE COURT:  You mean the five and six or six and

12   seven had pictures on them to begin with?

13           THE WITNESS:  They were, if I recall correctly, the

14   six and seven at the bottom where it says on six, the help, the

15   cancel, the delete, the delete all, order, and description was

16   part of the electronic cataloging system, and those were

17   actually buttons.  But they didn't come up on that -- when we

18   tried to print it out, it didn't print real well.

19           THE COURT:  You tried to print it out in preparing

20   the patent application?

21           THE WITNESS:  Yes, sir.

22           THE COURT:  Or patent documents.

23   Q    But as shown here, would you agree this is just text and

24   there's no graphics?

25   A    As it appears here, yes.

1    Q    Would you agree that there are other figures in the patent

2    that show graphical features such as figures 1A and 1B, and

3    graphics can be presented other than in text and word in this

4    patent?

5    A    Are you referring to the flow charts?

6    Q    Figures 1A and 1B is what I was referring to.

7    A    Yes.  Those are flow charts.  Those could be created by

8    using a template with a pen and pencil.

9    Q    You could have done that and depict any graphic user

10   interfaces that were in existence at the time; right?

11   A    They would look archaic like this does as well.

12         THE COURT:  Are you saying that appendix six and

13   seven, as you really would look at them as opposed to your

14   capacity to print them out, would constitute graphic user

15   interfaces.

16   A    It looks a lot better than the printout.

17         THE COURT:  Well, is that answer yes or no.

18         THE WITNESS:  Yes.

19         THE COURT:  It's appendices six and seven, graphic

20   user interfaces, which you tried to put into the patent but

21   were limited in accurately depicting them because of the

22   limitations of your printing system that you used to prepare

23   the patent application; is that right?

24         THE WITNESS:  That's correct.

25   Q    Was there anyplace in the patent where you indicated that

1    those depictions in appendixes six and seven actually did not

2    fully and accurately depict the screens as you intended?

3                MR. ROBERTSON:  Objection, Your Honor, relevancy.

4                THE COURT:  Overruled.

5                THE WITNESS:  I'm sorry.

6                THE COURT:  Did you tell anybody in the patent

7    documents here that the depictions of six and seven weren't

8    what you wanted them to be?

9                THE WITNESS:  I believe we used the terminology of

10   there are examples, so it's just one way to do it.  I believe

11   we did.

12   Q    With respect to the concept of taking a requisition and

13   generating multiple purchase orders, I believe you indicated

14   that there was some changes to the RIMS system that you made;

15   is that right?

16   A    Yes.

17   Q    Were those changes to the database structures that enabled

18   that functionality?

19   A    There were database changes, yes.

20   Q    And with respect to those database structure changes, is

21   there anything in this '683 patent related to those changes

22   specific to generating multiple purchase orders?

23   A    Specifically database changes?  Is that what you are

24   asking?

25   Q    Database changes specific to generating multiple purchase

1   orders.

2   A    I'd have to go back and look.  I don't recall mentioning

3   database changes specifically.

4   Q    Are you familiar with the RIMS '989 patent?

5   A    Somewhat, yes.

6   Q    Do you recall that that has some flow charts that

7   specifically describe questions and routing to go through the

8   process of generating purchase orders?

9   A    I believe there were flow charts in there that described

10  the process.

11  Q    Are there any flow charts in the patents in this case,

12  '683 patents -- let's just focus on the '683 to keep this

13  simple.  Are there any flow charts in the '683 patent that

14  depict the process of generating purchase orders?

15  A    It's rudimentary, but, yeah, there's one.

16  Q    Okay.  Would you point me to that, please.

17  A    It's pretty basic.  That's figure three.

18           MR. McDONALD:  Put that up, please.

19           THE WITNESS:  Where it represents a requisition

20  management program generating a purchase order --

21           MR. McDONALD:  For the '683 patent.  Excuse me, I'm

22  sorry, Mr. Johnson.  I didn't mean to interrupt.  I want to

23  make sure the screen is coordinating to what you're saying

24  here.

25           THE COURT:  What is this again so we've got it, and

1    the jury will have your testimony in connection with figure

2    three?  What is it, sir?

3              THE WITNESS:  Which figure?

4              THE COURT:  Figure three.

5              THE WITNESS:  Figure three, yes.

6              THE COURT:  Repeat what it is so the jury will be

7    able to put together the image with your testimony.  What is

8    it?

9              THE WITNESS:  It's a flow chart of the process of

10   processing a requisition through the electronic sourcing module

11   which would be the cataloging system, doing the inventory

12   sourcing and requisition management process, generating a

13   purchase order or purchase orders, multiple, either through

14   fax, mail, print, or through the host processing.

15   Q    All right, so when I asked you about whether there's any

16   flow charts that depict generating multiple purchase orders,

17   this is the figure that you pointed to; correct?

18   A    Yes.

19   Q    Is there a particular part of this figure that actually

20   relates to generating multiple purchase orders or not?

21   A    Other than 114 where it says purchase orders being

22   multiple.

23   Q    So you have that one oval, 114, that says purchase orders.

24   That's the only figure in the '683 patent that specifically

25   talks about purchase orders; is that right?

Johnson - Cross

1   A      It's the only representation that we put in, I believe.

2   Q      Finally, I think you mentioned that the RIMS system did

3   not communicate with the catalog.  Did I understand that right?

4   A      That's correct.

5   Q      The RIMS system did have a parts master; right?

6   A      It had a part master, yes.

7   Q      You didn't consider that a catalog, though, for purposes

8   of your answer; is that right?

9   A      No.

10  Q      So when you say no, you are agreeing with me?

11  A      I did not consider that a catalog.

12  Q      Thanks for fixing the question.  Also the RIMS system had

13  a host database with Fisher products on it as well; right?

14  A      It had -- yes.

15  Q      And when you answered that question about RIMS not

16  communicating with a catalog, did you consider that Fisher

17  database of items to be a catalog or not?

18  A      No.

19          MR. McDONALD:  No further questions.  Thank you, Your

20  Honor.

21

22                      REDIRECT EXAMINATION

23  BY MR. ROBERTSON:

24  Q      Mr. Johnson, do you have the '683 patent in front of you?

25  It's Plaintiff's Exhibit Number 1.  You testified about this

Johnson - Redirect

1    graphical user interface or GUI; right?

2    A    Yes.

3    Q    Let me see if I can't direct you to some disclosure in the

4    patent other than these figures that discuss this aspect of

5    your invention.  Could you turn to column 17, if you would,

6    sir.  Starting at about line 13, shell program, 252, down to

7    line 15.

8    A    Starting at shell program 252, you said?

9    Q    Yes.

10   A    Okay.

11   Q    Disclosed here in your patent that shell program 252 and

12   graphical user interface, preferably Easel workbench program of

13   OS/2 the listing items.  Let me start over because it should be

14   the full sentence.  I apologize.

15        It says, local computer 220 is provided with programs

16   including requisition/purchasing system 240, shell program 252,

17   and a graphic user interface 254, preferably Easel workbench

18   program 254 for OS/2 for listing items.  Do you see that?

19   A    Yes, sir.

20   Q    Was the Easel Workbench program for OS/2 a commercially

21   available graphic user interface?

22   A    It was a commercially usable tool that we could use to

23   build the graphic user interface, yes.

24   Q    Is that the tool you were using?

25   A    That was the tool we built the prototype in, yes.

1    Q    When it says for the commercially available tool, Easel

2    Workbench program for OS/2, what does that OS/2 stand for?

3    A    Operating system two.  That was a competitor to

4    Microsoft's Windows.

5    Q    So that was being -- this Easel Workbench program for

6    creating a graphical user interface could run on this operating

7    system?

8    A    Yes.

9    Q    Were you doing that at the time?

10   A    Yes.

11   Q    Let me direct you, if I can, to that same column, down to

12   the paragraph that begins normally, starts at about line 23 and

13   goes down to about line 26, and this is describing one

14   particular environment in which this CSR can be using your

15   electronic sourcing system; is that right?

16   A    Yes.

17   Q    Nothing prevented a CSR or ultimately a customer end user

18   from using this electronic sourcing system if they had it

19   available to him or her; is that right?

20            MR. McDONALD:  Objection, Your Honor, outside the

21   scope of cross.

22            THE COURT:  I don't think so.  Overruled.

23   A    Yes.

24   Q    So the answer to my question is nothing prevented that?

25            THE COURT:  Why don't we let him answer the question.

1    He's doing a better job than you all.

2              MR. ROBERTSON:  I thought it was confusing on the

3    record.

4    Q    Could a CSR and end users use your electronic sourcing

5    invention?

6    A    Yes.  Anyone who had access to the system could use it.

7    Q    And in this instance, it's saying here that a CSR can

8    create order lists for customers by entering distributor

9    catalog numbers into graphic user interfaces 254 and connecting

10   to the distributor mainframe for price and availability.  Do

11   you see that?

12   A    Yes.

13   Q    Is that a feature of the invention that utilized graphical

14   user interface?

15   A    That was part of it.

16   Q    This distributor catalog, that's another vendor that the

17   customer, or in this case the CSR, can go out and obtain that

18   kind of information and have it returned to the GUI; correct?

19   A    That's correct.

20   Q    Go down a little further to about line 39, starts the

21   resultant lists, and go down to about line 44.  States here,

22   the resultant lists of products are then transferred to shell

23   program 252 to a work-in-progress requisition 260 and then

24   entered from graphical user interface 254 directly onto

25   distributor's mainframe computer as orders from the applicable

1   customer to distributor.  Do you see that?

2   A    Yes.

3   Q    Is that another disclosure of the use of the graphical

4   user interface, to display these work-in-progress requisitions

5   on the GUI?

6   A    Yes.

7   Q    If you'll go down in the same column, sir, to the line

8   that begins with line 60 and stop right about line 64, right

9   after figure 1A, are you with me?

10  A    Yes.

11  Q    It states here, file server 200 in that environment

12  contains TV/2 search program 250, Easel graphical user

13  interfaces 254, and multiple catalog databases 236 containing

14  catalogs similar to the Fairmont and NIST catalogs described

15  above for embodiment of figure 1A.  Do you see that?

16  A    Yes.

17  Q    Fairmont and NIST, were they companies that were going to

18  be included as having catalog data on your invention?

19  A    They were some of them, yes.

20  Q    Were they competitors of Fisher?

21  A    Fairmont, I don't believe, is a competitor, and I don't

22  believe NIST necessarily was a competitor either.  I don't

23  recall specifically.

24  Q    But you were using these as examples of electronic

25  catalogs that could be presented with the graphical user

1    interface using electronic sourcing --

2    A    Yes.  We were looking for multiple vendor catalogs.  We

3    were not necessarily concerned about which vendor they were.

4    Q    But my point is, when looking at these catalogs, could

5    they be displayed to the end user -- were they intended to be

6    displayed to the end user on a graphical user interface?

7    A    Yes.

8    Q    Is that what is disclosed here?

9    A    Yes.

10   Q    Let me just direct you to just one more.  I think there

11   are several more examples, but I won't belabor the point, but

12   at column 18 starting at about line 18, there's a sentence that

13   starts once responses.  Do you see that?

14   A    Yes.

15   Q    Says, once responses from either or both have been

16   obtained, the distributor purchasing employee can use the item

17   list in Easel interface 254 to create one or more of the

18   following purchase orders; do you see that?

19   A    Yes.

20   Q    Was that a manner in which a graphical user interface

21   could be used to disclose the purchase orders?

22   A    Yes.  Again, it goes back to anybody who had access to the

23   graphical user interface could use the system.

24   Q    Is graphical user interface 254 depicted in figure 1B in

25   the patent?

1   A    Yes.  254 is in this figure.

2   Q    There was a question about disclosure of database changes,

3   and I want to see if I could direct you to column 10 of the

4   '683 patent starting at about line 55 through line 64.  Starts

5   out, by contrast?

6   A    Yes.

7   Q    States there, by contrast, an item selected from the

8   Fairmont catalog would be transferred to Fisher RIMS system 40

9   with the vendor number of Fairmont and would be recognized

10  during inventory sourcing as either a type 07 product that

11  distributor orders from Fairmont or as a type 05 item that

12  customer orders from Fairmont as an administrative purchase.

13       Do you know what type 07 products were?

14  A    You know what?  I'm drawing a blank on seven.

15  Q    Let me see if I can have one moment.  Maybe I can find it

16  for you.  Is the Fairmont distributor a third-party distributor

17  of products?

18  A    I'm sorry, where are you?

19  Q    Back at that section talking about Fairmont distributor of

20  vendor product, it says, type 07 product that distributor

21  orders from Fairmont?

22  A    Where are you?

23  Q    I'm sorry, back at column ten, line 55, through down about

24  60.

25  A    Okay.

Johnson - Redirect                                      478

1    Q    What does it indicate a type 07 product is?

2    A    That's what I'm having a hard time recollecting.

3    Q    It says that distributor orders from Fairmont in

4    parentheses right after it.  Do you see that?

5    A    Yes.

6    Q    Fairmont is not Fisher, is it?

7    A    No.

8    Q    So is that another vendor that's making product available?

9    A    That's another vendor that we wanted to put into the

10   catalog, yes, and we did want to be able to process purchase

11   orders to them.

12   Q    So for those third-party vendors such as this Fairmont

13   type 07 product, were database or program changes necessary to

14   RIMS to accommodate that type of third-party product?

15   A    Were database changes required, yes.

16   Q    Were they made?

17   A    Yes.

18              MR. ROBERTSON:  Thank you.  That's all I have.

19              THE COURT:  Do you need him back?

20              MR. McDONALD:  Yes, Your Honor.

21              THE COURT:  Mr. Johnson, they're going to need you

22   back for another part of the case, so there's no need for you

23   to stay here in Richmond as much as we'd like to have you.  But

24   you'll have to come back, and you'll be excused temporarily if

25   you agree to come back.  They'll give you notice and get you

1    down here, pay your expenses to come.

2              THE WITNESS:  Can I ask a question?

3              THE COURT:  Yes.

4              THE WITNESS:  I'm going to be out of the country at

5    the end of the month.  I hope this doesn't interrupt that.

6              THE COURT:  I hope it doesn't, too.  They may be

7    flying you back from Europe.

8              THE WITNESS:  It's the Caribbean, it's not Europe.

9              THE COURT:  I will talk to them about how to handle

10   it in a way that will get you -- when is your departure?

11             THE WITNESS:  My wife and I are leaving the last week

12   of January.

13             THE COURT:  What day?

14             THE WITNESS:  I think it's the Monday.

15             THE COURT:  You give them the date, and we'll talk

16   about it.

17             THE WITNESS:  Thank you.

18             THE COURT:  We'll figure out a way to keep you from

19   missing a vacation.

20             THE WITNESS:  I'd appreciate it.

21             THE COURT:  I don't want to be named in any civil

22   action.  All right.  With that understanding that we'll work

23   around your schedule, you'll agree to be back, do you?

24             THE WITNESS:  Yes.

25             THE COURT:  Thank you.  You are excused.  All right,

1    ladies and gentlemen, we'll take the afternoon recess.  We'll

2    take 20 minutes.  Take your notebooks with you.  Please be

3    seated while the jury is being excused.

4

5                          (Jury out.)

6

7              THE COURT:  All right, you can be excused, sir.  Now,

8    what are you going to do next, Mr. Robertson?

9              MR. ROBERTSON:  We have about our infringement

10   expert, Your Honor, Dr. Weaver.

11             THE COURT:  So we're going to get started with him.

12             MR. ROBERTSON:  Yes, sir.  There's a number of

13   exhibits involved.  I don't want it to appear intimidating when

14   it's brought in.  Some of them are large manuals, but he's

15   going to be referring to select pages, but I think it does

16   constitute eight volumes.

17             THE COURT:  You don't need to give them to me, do

18   you?

19             MR. ROBERTSON:  I certainly hope not.

20             THE COURT:  I don't think I need them unless I have

21   to rule on something.  What I do want -- have I got all of his

22   reports?

23             MR. ROBERTSON:  Expert reports?

24             THE COURT:  Yes.

25             MR. ROBERTSON:  I believe we have a set here.

1          THE COURT:  Okay, because if I get an objection

2    because something is beyond the scope of the report, I need the

3    report to deal with it.

4          MR. ROBERTSON:  I understand, Your Honor.

5          THE COURT:  I don't know that we're going to have

6    that, but for each expert, I do need the reports.  All right,

7    we'll take a 20-minute --

8          MR. ROBERTSON:  Your Honor, may I raise one quick

9    housekeeping issue?  You may recall Dr. Weaver had medical

10   issues and needs to stretch his back every once in a while.

11         THE COURT:  He can stand up any time he wants to.

12         MR. ROBERTSON:  All right, thank you, sir.

13         THE COURT:  I mean if we need to take a break, we

14   will, but I hope we won't be here that long.  All right, Mr.

15   Merritt?

16         MR. MERRITT:  Yes, sir.

17         THE COURT:  Get an appointment for these two with

18   your doctor for else we're all going to be infected.

19         MR. MERRITT:  Judge, I need one, too.  They've

20   infected me now.  We'll get a group rate, too.

21         THE COURT:  If you can't get yours, I'll go get mine.

22   Don't anybody come up this way.

23         MR. MERRITT:  You don't mind if people have a cough

24   drop?

25         THE COURT:  I've been taking them all day.  I have

```
1   the same problem you have, but I don't have the cold.  I just
2   have the cough.  You help yourself, and if you have -- I find
3   that if you have cough medicine, just take the cough syrup and
4   take it under the table and pour it in a bottle and take a
5   slug.  Don't be taking any GI gin.  We'll be in recess.
6
7                (Recess taken.)
8
9                THE COURT:  All right, next witness.
10               MR. ROBERTSON:  Yes, Your Honor.  Plaintiff would
11  call Dr. Alfred C. Weaver with respect to the issues of
12  infringement, Your Honor.
13               THE COURT:  Ladies and gentlemen, Dr. Weaver has had
14  some back surgery and from time to time may just need to
15  stretch up and move around, so don't be surprised if that
16  happens.  That's perfectly all right.
17
18                        ALFRED C. WEAVER,
19  a witness, called by the plaintiff, having been first duly
20  sworn, testified as follows:
21                        DIRECT EXAMINATION
22  BY MR. ROBERTSON:
23  Q    Good afternoon, sir.  Could you please state your name for
24  the record?
25  A    Alfred C. Weaver.
```

1    Q    And can you tell us, please, your current occupation.

2    A    I'm a professor of computer science at the University of

3    Virginia.

4    Q    And what courses do you teach or have you taught at the

5    University of Virginia?

6    A    There's been a lot of those.  C++ programming, Pascal

7    programming, operating systems, trustworthy computing,

8    federated trust systems, electronic commerce, and internet

9    commerce.

10   Q    Have you taught courses in microcomputer architecture?

11   A    Yes.  That was one of the very first ones.

12   Q    How about database architecture?

13   A    Yes.

14   Q    You mentioned electronic commerce.  Can you tell us what

15   you mean when you use that term?

16   A    Electronic commerce is using computer networks, nowadays

17   typically the internet, in order to buy and sell products or

18   services.

19   Q    Did you start a program at the University of Virginia with

20   respect to electronic commerce?

21   A    Yes, I did.  That was 1995.

22   Q    Can you briefly describe for us your educational

23   background starting with college?

24   A    Sure.  So I have a Bachelor of Science degree from the

25   University of Tennessee in 1971 with a major in engineering

1   science.  That was as close as you could get to computer

2   science back then.

3        Then I went to the University of Illinois, and I have a

4   Master's degree in computer science from Illinois in 1973, and

5   then I stayed there for my Ph.D., so I have a Ph.D. in computer

6   science from the University of Illinois awarded in 1976.

7   Q    So how long have you worked in the computer science field?

8   A    I worked as a graduate student starting in 1971 and as a

9   professor in 1976.

10  Q    And at the University of Virginia, can you tell me some of

11  the positions you've held there, sir?

12  A    Yes.  I'm currently professor of computer science, and my

13  newest job is I'm director of the university's Applied Research

14  Institute.

15  Q    And did you ever serve as the chairman of the University

16  of Virginia department of computer science?

17  A    Yes, I did back.  That was back in 1984 and '85.

18  Q    Have you held any positions outside of the university that

19  are recognized in the field of computer science?

20  A    Sure.  I was a consultant to NASA, and I lived in Houston

21  for a year and worked on the international space station and

22  was one of the designers of the computer networks that run the

23  space station.

24  Q    Are you a member of the IEEE?

25  A    I am.  That's the --

Weaver - Direct

1   Q    I was going to say, what is that organization?

2   A    Okay.  That's the Institute of Electrical and Electronics

3   Engineers.  It's one of the two big organizations that

4   represents computer science professionals.  It's about 300,000

5   members.  I am a fellow grade in that organization, and that's

6   an honor that's given to maybe one percent of the membership.

7        I've been a member of IEEE for 35 years at least, and one

8   of the organizations within that is the computer society.  I've

9   been a member of the computer society for 30 years.  The

10  computer society publishes a magazine called *IEEE Computer*.

11  I've been on the editorial board for that magazine for nine

12  years.

13  Q    Other than your teaching responsibilities at the

14  University of Virginia, do you have any other responsibilities

15  as a professor there?

16  A    Sure.  We have to conduct research and provide

17  professional service, so in the research department, I have

18  supervised over 125 research projects.  I've brought in more

19  than $20 million in research funding to the university, and

20  I've supervised at least 65 Master's and Ph.D. students.

21  Q    Have you authored or co-authored any books on computer

22  science or systems or networks --

23  A    I have.

24  Q    Let me just finish.  -- databases or internet and

25  eCommerce?

1    A    Yes, I have.  So I've written two books and ten book

2    chapters and I think 150 peer-reviewed journal and conference

3    publications.

4    Q    Have you ever consulted for any companies in industry?

5    A    Sure.  Microsoft, General Electric, Lockheed Martin,

6    Honeywell, e-Systems, and some more.

7    Q    All right.  Thank you.  What other areas do you consider

8    to be areas that you have any specialized training or

9    expertise?

10   A    So it's computer science in general, and then more

11   specifically, computer networks, computer architecture,

12   computer network protocols, electronic commerce, computer

13   networks, and the internet.

14   Q    Dr. Weaver, are you the named inventor on any patents?

15   A    I am.

16   Q    Can you tell me just the general subject matter.

17   A    This is a computer controlled process control system, and

18   that patent arose from my Ph.D. dissertation.

19   Q    Have you ever been an expert in a patent case before?

20   A    Yes.

21   Q    Approximately how many occasions?

22   A    Six.

23   Q    Have you ever had, been required to testify in court

24   before?

25   A    I have.

Weaver - Direct

1    Q    How many occasions?

2    A    Four.

3    Q    Okay.  Have you ever testified in federal court in the

4    Eastern District of Virginia?

5    A    Yes.

6    Q    Just can you briefly tell us a little bit about those

7    cases?

8    A    Well, they were all patent infringement cases, and there

9    was one before Judge Brinkema in Alexandria, one before Judge

10   Spencer here in Richmond, and one before Judge Friedman down in

11   Norfolk.

12   Q    Can you tell me in those patents cases, did they involve

13   computer science issues?

14   A    Absolutely.

15   Q    Were you qualified as an expert in those cases?

16   A    Yes.

17   Q    You mentioned four.  Was there another one?

18   A    Yes.

19   Q    What would that be?

20   A    There was a case about data theft, and that was heard by

21   Judge Ellis in Alexandria.

22            MR. ROBERTSON:  Your Honor, I would proffer Dr.

23   Weaver as an expert in the fields of computer science and

24   systems networks, databases, and electronic commerce.  Should I

25   move forward, Your Honor?

Weaver - Direct

1        THE COURT:  Just a minute.  I'm not snoozing.  I'm

2    taking notes on something.  All right, do you have any

3    objections to his being qualified as an expert in those areas,

4    or do you wish to voir dire the witness?

5        MR. McDONALD:  I have no objection, Your Honor.

6        THE COURT:  Ladies and gentlemen, Dr. Weaver is

7    accepted as an expert in computer science, computer

8    architecture, computer systems, computer networks, databases,

9    computer databases, and in electronic commerce.  He may testify

10   in those areas as an expert.

11        There will be other experts who testify in the case,

12   and I'll tell you now that expert witnesses are people who can

13   give opinions if the opinions will help you in deciding a case,

14   an issue in a case, or in understanding the evidence.  Most

15   witnesses can't give opinions, but experts are people who are

16   qualified by reason of training or experience or education in

17   some technical or scientific area, and he's been so qualified,

18   so he and the other experts who will appear will be able to

19   give you opinions.

20        Expert witnesses' testimony should be assessed in

21   accord with the same rules that I told you about earlier when

22   you were deciding the credibility of witnesses, and I'll give

23   you some more instruction later, but the bottom line is you can

24   credit and accept an expert's opinion in whole, in part, or

25   reject in whole or in part, depending upon what your assessment

1    is of the credibility of the witness, and so with those

2    reminders, we'll proceed and have Dr. Weaver -- excuse me.   I

3    think they gave me something -- Dr. Weaver testify at this

4    time.

5    Q     Dr. Weaver --

6              THE COURT:   There's another thing you might as

7    well -- I'm sorry, Mr. Robertson, but there's another thing you

8    might as well understand at this time, too.   The experts in

9    this case, prepatory to coming to trial, have given expert

10   reports, and those reports aren't coming into evidence, but

11   there may be and sometimes are objections to people giving

12   testimony beyond the scope of what they said in their expert

13   reports, and I have to rule on that, and in doing that I either

14   will hold you up for a minute or I'll ask you to adjourn

15   depending on how long I think it's going to be in making that

16   ruling.

17             I don't know that we'll have that problem, but it's

18   not infrequent, and I thought you might as well understand the

19   process and understand why you might be asked to leave at this

20   stage if you are.  All right, Mr. Robertson, please proceed.

21             MR. ROBERTSON:   Thank you, Your Honor.

22   Q     Dr. Weaver, have you been retained as a consultant --

23             THE COURT:   Can you speak up?  Are you having trouble

24   hearing?

25             MR. ROBERTSON:   I'm losing my voice a little, Your

Weaver - Direct

1    Honor.  I'll try to deal with that.

2    Q    Dr. Weaver, have you been retained as a consultant by the

3    patent owner, ePlus in this case, to analyze the three patents

4    at issue?

5    A    Yes, I have.

6    Q    Have you had occasions in the past to analyze these

7    patents with respect to other enforcement actions of them?

8    A    Yes.

9    Q    On how many occasions?

10   A    Two others.

11   Q    And so how long have you been acquainted with the subject

12   matter of the patents that are in suit here?

13   A    About six years.

14   Q    In this particular case, what issues were you asked to

15   analyze and offer opinions on?

16   A    I was asked to, after reading and understanding the

17   patents-in-suit, to look at the Lawson system and to offer an

18   opinion about whether I thought that it infringed certain

19   claims of the three patents-in-suit, and I was also asked a few

20   questions about validity.

21   Q    For today's purposes, we'd like to focus just on your

22   opinions with respect to infringement.  We may have to have you

23   back to address issues of validity at another time.  Are you

24   able to do that for me today?

25   A    Yes.

Weaver - Direct

1   Q    All right, sir, were you provided a number of materials

2   that you relied on in order to present and render your opinions

3   in this case?

4   A    As a matter of fact, I was.  I have about 18 of these

5   boxes of documents sitting at home.  So, there were -- the

6   documents that were produced by Lawson in discovery, there was

7   the testimony of Lawson witnesses, the deposition testimony of

8   Lawson customers, Lawson produced a demonstration system that I

9   spent a good bit of time with.  You are going to see some

10  demonstrations later on.

11       There's training courses that I was able to find on the

12  internet that explain how the Lawson products work, and ePlus

13  also engaged another expert, Pat Niemeyer, who has taken a

14  long, hard look at the source code, and he and I have consulted

15  about what that source code means and does.

16  Q    I just want to make sure we all understand some of the

17  terms there.  One, you said you looked at documents produced in

18  discovery, so there were, you said, about 18 boxes.  There were

19  pretrial proceedings in which the parties exchanged documents;

20  is that right?

21  A    That's correct.

22  Q    Please tell us you are not going to be offering into

23  evidence 18 boxes of documents?

24  A    Good luck.  I'm not.

25  Q    There are a number of volumes behind me, though.  Are

Weaver - Direct

1    these some of the documents that you thought important in

2    rendering your opinions?

3    A    Yes, they are.

4    Q    You also mentioned there were depositions of both Lawson

5    personnel and Lawson customers.  Deposition was in these

6    pretrial proceedings testimony taken under oath by these

7    individuals in response to questions by the various attorneys;

8    is that right?

9    A    That's correct.

10   Q    And I thought I understood you to say that you reviewed a

11   demonstration system, the Lawson S3 software that was produced

12   in the case?

13   A    That's correct.

14   Q    Did you actually utilize that demo software?

15   A    Yes.

16   Q    Will you be having any presentations with respect to how

17   that software operates?

18   A    Yes.  We did some demonstrations, and we did what you call

19   screen captures of those, so you'll be able to see recordings

20   of the realtime operation of the S3 procurement system.

21   Q    You mentioned this expert, Mr. Niemeyer, who reviewed the

22   source code for the accused Lawson procurement systems.  Did

23   you have an opportunity to review Mr. Niemeyer's report?

24   A    I did.

25   Q    I understood you to say you spoke with him; is that right?

1    A     I was with him for four days.

2    Q     And then you did some of your own independent research; is

3    that what I understand?

4    A     That's correct.

5    Q     Did you review the deposition of Lawson's technical

6    witness, Mr. Christopherson?

7    A     Yes, I did.

8    Q     Did you review the deposition of Lawson's other than

9    corporate witnesses, Mr. Lohkamp and Ms. Raleigh?

10   A     I did.

11   Q     Did you review technical manuals produced by Lawson in

12   this case involving the accused software?

13   A     There were tons of them, yes, I did.

14   Q     Let me go back for a minute and ask a question I should

15   have asked.  What is source code?

16   A     Source code is the written program, so it's the

17   instructions that you want the computer to follow, and then

18   that source code is what we call compiled into the actual

19   binary that runs the computer itself.  So it's the instructions

20   that the computer follows.

21   Q     And why did you find it important to have the source code

22   analyzed in order to render the opinions on infringement in

23   this case?

24   A     Well, if you really want to know what a system is doing,

25   the source code is the answer.

1   Q    Will we be able to see what the system is doing through

2   these demonstrations you're going to provide to the jury?

3   A    Yes, I think it will be very clear.

4   Q    I was asking about technical manuals produced by Lawson.

5   Let me identify a few if we could.  Did you review the Lawson

6   purchase order guide for this accused product?

7   A    Yes, I did.

8   Q    Did you review the Lawson requisitions self-service user

9   guide for the accused product?

10  A    Yes, I did.

11  Q    Did you review Lawson's requisitions user guide for this

12  accused product?

13  A    Yes, I did.

14  Q    Did you review Lawson's inventory control user guide for

15  this product?

16  A    Yes, I did.

17  Q    Were you able to obtain and review the Lawson procurement

18  Punchout administrative guide?

19  A    Yes, I did.

20  Q    In trying to understand how the software operates, are

21  those technical guides the kinds of documentation that an

22  expert in your field would find relevant to understanding the

23  features and functionality of the software?

24  A    Yes, they are.

25  Q    And when you've done analyses involving these patents in

1    the past, have you reviewed those types of documents?

2    A    Yes, I have.

3    Q    Did you have an opportunity to review what are referred to

4    as Lawson's responses to prospective customers' requests for

5    proposals?

6    A    Yes, I did.

7    Q    From time to time, as a shorthand version I might be

8    referring to those as RFPs.

9    A    That's the standard abbreviation.

10   Q    You are familiar with RFPs, are you?

11   A    Yes.

12   Q    In a your capacity as a professor at University of

13   Virginia, have you ever had to deal with RFPs?

14   A    I think the very first month that I was at Virginia, I had

15   to work with RFPs.

16   Q    Did you have review any testimony -- let me step back.

17   What do you understand and can you explain to the jury what an

18   RFP is?

19   A    Okay.  So, of course, when you want to buy something

20   simple from Best Buy, you just go and get it, but if you are

21   trying to -- if you are a company, and you want to get

22   something complex like a computer system or complex computer

23   software, things that are going to probably be customized for

24   you, something you don't just buy off the shelf, then it's very

25   common for the company that wants to do the buying to write a

1    request for proposal that lists the specifications and the

2    requirements of the -- let's say the software, the

3    specifications and requirements of the software that you want

4    to buy, what's the functionality you need, what are the

5    capabilities that you require.

6         So you write that as an RFP, and you send that to vendors

7    that are in that field of business.  Then the vendors read

8    the RFP --

9              MR. McDONALD:  Objection, Your Honor.  This is

10   outside the scope of his report.

11             MR. ROBERTSON:  He's gone through extensive RFPs, and

12   they're referred to in his report.  All of the RFPs are the

13   representations that are made in response by Lawson to what

14   customers asked them, the features and functionality.

15             He's identified several RFPs, Your Honor, that are

16   fully disclosed in his report.  I have a number of citations if

17   you'd like when I start to get to them, but certainly he

18   discussed them at length in his report.

19             THE COURT:  Discussed the RFPs in his report?

20             MR. ROBERTSON:  Yes, the nature of the RFPs, what

21   their purpose is, and what Lawson's responses are to those

22   RFPs.

23             MR. McDONALD:  He's identified RFPs, but he doesn't

24   portray himself as an expert as to what they are or what the

25   purpose of them is.  There's no discussion of that in the

1    report.

2              THE COURT:  Is there discussion of the RFPs that

3    Lawson sent to their customers?  That's what you said, wasn't

4    it?

5              MR. ROBERTSON:  Yes, sir.

6              THE COURT:  So is there discussion of that in the

7    report or not?

8              MR. McDONALD:  Yes, there is discussion of the Lawson

9    RFPs.

10             THE COURT:  Objection overruled.

11   Q    So when someone receives this RFP, what typically happens

12   next in the process?

13   A    A potential vendor, a potential bidder on this project

14   would read the RFP, understand the questions that are in there,

15   and then write a response, and then -- so the potential vendor

16   would send that response to the RFP back to the potential

17   buyer.

18        The buyer would evaluate all of the responses that it

19   receives and presumably would pick one of those responses and

20   say, okay, that company will be the vendor of our product.

21   Q    In the course of your review of the various testimony of

22   Lawson personnel, did you see any testimony that suggested

23   these responses, these answers that Lawson provides to

24   potential customers in this RFP process are vetted or reviewed

25   by Lawson's internal legal department and its engineers?

1    A    Yes, I did.

2    Q    And in your review of this deposition testimony, do you

3    recall any testimony concerning whether that process was done

4    for the purpose of determining that the responses were as

5    accurate and truthful as possible?

6    A    Yes.

7    Q    And in relying on these Lawson responses to RFPs, did you

8    accept that the responses were truthful and accurate to the

9    best of your ability?

10   A    Yes.  And, of course, that makes good business sense.

11              THE COURT:  That's enough.

12   Q    Let me ask you this:  Did you review what is called

13   Lawson's statements of work?

14   A    Yes.

15   Q    And what -- are you familiar with what a statement of work

16   is?

17   A    Yes.  It's -- the statement of work is the contractual

18   underpinnings that says, okay, as the vendor, this is what I'm

19   going to do, this is my statement of work, these are the

20   functionalities and capabilities that I will provide.

21              THE COURT:  Excuse me a minute, Mr. Robertson.  You

22   have used and these lawyers have used and several witnesses

23   have used the term functionality.  Can you just tell the jury

24   very briefly what you understand that to be and what you are

25   saying when you say that, and the same thing with respect to

1    the word capability.  You used that, and so have a lot of other

2    people and the lawyers as if everybody knows what it is, and

3    I'm sure they do and you do, but the jury may not have that

4    background, and I know I don't, so I'll be glad to hear what

5    you have to say on both of those.  What do they mean?

6              THE WITNESS:  Sure, Your Honor.

7              THE COURT:  As you are using them.

8              THE WITNESS:  So with regard to functionality, it's a

9    question of whether or not a computer system can accomplish a

10   particular task.  As for capability, it's whether a computer

11   system is able to perform.  So functionality and capability are

12   quite similar.

13   Q    Is it the case, then, just to follow up on the Court's

14   question, that a computer system might have the capability to

15   perform a certain task, but the user of that software doesn't

16   utilize all the tasks?

17   A    Oh, absolutely.

18   Q    But is the system, if it has that capability, still able

19   to perform it even if the end user doesn't employ that

20   particular feature or functionality of the software?

21   A    Yes.

22   Q    So software that's capable of doing a particular task,

23   even if that task isn't accomplished, in your view, does it

24   still have the structure necessary to satisfy elements in a

25   patent claim that specify what that functionality is even if

1    the end user never turns it on?

2    A    Yes.

3    Q    Now, I've asked you a lot about these documents, and I

4    don't want to repeat them all, but the types of documents we've

5    been talking about, technical manuals and guides and these

6    RFPs, are these the type of documents that an expert in your

7    field who is going to be offering opinions on the capabilities

8    and functionality of computer software would reasonably rely on

9    in forming opinions about the infringement issues that are at

10   issue in this case?

11   A    Yes, they are.

12   Q    And have you, in the past, in these patents and other

13   patents, relied on these kind of documents in rendering your

14   opinions?

15   A    I have.

16   Q    Did you have the opportunity to review the expert reports

17   of Lawson's technical witnesses?

18   A    Yes, I did.

19   Q    Did any of those materials assist you in formulating

20   opinions that you will be rendering in this matter?

21   A    Yes, they did.

22   Q    Just generally, you understand the patents to be directed

23   to the subject matter of electronic sourcing and procurement?

24   A    I do.

25   Q    Have you had any personal experience in your job to engage

1   in procurement activities at the University of Virginia?

2   A     Yes.  Back in 1995, my research group had a research

3   project from a company called Epcom where we were asked to

4   build an electronic ordering system with an electronic catalog

5   and electronic database, perhaps, that were available for sale.

6   So as a research project, we worked hard to do this, but it was

7   not commercially successful.

8   Q     Have you ever had to engage in procurement activities the

9   old-fashioned way, using paper catalogs?

10  A     Yes.

11  Q     Can you tell us a little bit about what your experience

12  was in that area, sir?

13  A     Sure.  So when I arrived at the University of Virginia in

14  1977, I started our first microcomputer lab.  So, bingo, I was

15  the guy who had to order all the equipment.  So I started with

16  paper catalogs, like everybody else starts with back in that

17  time frame, and pick out computers or memory systems or

18  peripherals that I think I need for my lab, and, of course, a

19  mere university professor doesn't have any authority to spend

20  money, so I have to go over to our purchasing department and

21  explain to them what it is that I want to buy.

22        And so the purchasing person would create a requisition,

23  and it would say NorthStar computer system.  That was the

24  microcomputer of that age, and the purchasing specialist would

25  type up this document and send it to multiple potential vendors

1    and then wait for them to come back with bids, accept one, send

2    out a purchase order, and then see whether or not you got the

3    equipment that you wanted.  I know there was one time where I

4    ordered equipment and never was available, so I didn't get what

5    I wanted.

6    Q    Was this process time-consuming?

7    A    Very.

8    Q    Was it costly for you?

9    A    Oh, yes.  Costly in time and costly in personnel.

10   Q    Was it efficient?

11   A    No.

12   Q    Can you tell us -- you've had an opportunity to read

13   through all the three patents-in-suit in some detail; is that

14   right?

15   A    I have.

16   Q    You've studied the background of the invention?

17   A    I have.

18   Q    And the summary of the inventions?

19   A    Yes.

20   Q    And you've looked at the description of the drawings?

21   A    Yes.

22   Q    And you've read the detailed description of the invention

23   which is some 20 or so columns?

24   A    I have.

25   Q    And you've read the claims that are involved in this case;

Weaver - Direct                                          503

1    correct?

2    A    Correct.

3    Q    And understand that there are 12 representative claims

4    that are at issue in the three patents that are Plaintiff's

5    Exhibit Numbers 1, 2, and 3?

6    A    I do.

7    Q    So you reviewed the '683 patent, the '516 patent, and the

8    '172 patent; correct?

9    A    I have.

10   Q    So do you feel you have an understanding, having worked

11   with these patents and been involved in these for the last six

12   years, with respect to the subject matter and what's disclosed

13   and what is claimed?

14   A    I do.

15   Q    Did you also have an opportunity to review the Court's

16   construction of certain claim terms that were in dispute among

17   the parties?

18   A    Yes.

19   Q    And you received a copy of that?

20   A    Yes.

21   Q    Do you have -- you are holding a piece of paper in your

22   hand.  Is that the glossary of terms that has been -- is that

23   the glossary of terms?

24   A    Yes, it is.

25   Q    Just so you are informed, the jurors have that glossary of

1    terms in their binders, in their book which I believe is at

2    tab --

3              THE COURT:  Tab six.

4              MR. ROBERTSON:  Thank you, Your Honor.

5    Q    Let me ask, in rendering the opinions you're going to give

6    with respect to the infringement, did you apply the Court's

7    claim construction or some other claim construction?

8    A    I used the Court's claim construction.

9    Q    Did you attempt to faithfully use that claim construction

10   when you were looking at the functionality and capability of

11   Lawson's software?

12   A    Yes, I did.

13   Q    Did you come up with any of your own constructions

14   contrary to the Court?

15   A    No.

16   Q    So just back to the basic subject matter, at a high level

17   of these patents that were issued, what do you consider the

18   benefits to be realized by the inventions over this procurement

19   process that you have described?

20   A    Well, by computerizing the process, by making the catalogs

21   electronic, by being able to search them electronically, by

22   being able to create requisitions and purchase orders, you

23   reduce the economic friction in an electronic commerce system.

24   You make it more efficient, you make it more time-conserving,

25   and you save money.

1   Q     How about the ability to search multiple vendors at the

2   same time?

3   A     Oh, of course.  Searching multiple catalogs gives you the

4   ability to cross compare, to comparison shop.

5   Q     What about the requisitioning and ordering module that

6   permits you to go -- to do multiple requisitions from items

7   from multiple vendors and then issue multiple purchase orders?

8   Do you see any benefits to that?

9   A     If you go back to the example that I had where I had to

10  get requisitions issued to each vendor and then a purchase

11  order had to go individually to each vendor, that's a lot of

12  time and effort.  So the ability to put everything you want on

13  one purchase requisition electronically and then have the

14  computer system break that requisition up into however many

15  purchase orders are appropriate, typically one purchase order

16  per vendor with however many orders from the requisition,

17  that's a real benefit.

18  Q     The patents also discuss ability to gain approvals for

19  requisitions in order to have the process flow go smoothly and

20  quickly and more efficiently?

21  A     Yes, they do.

22  Q     Are there aspects of the inventions generally that relate

23  to determining whether there's an item available in the

24  vendor's inventory?

25  A     Oh, yes.  We're going to see that in the patent claims.

1    Q    That is an important aspect of the invention in your view?

2    A    Yes, it is.

3    Q    Dr. Weaver, in determining and preparing your expert

4    reports in this case, and in preparing the opinions that you're

5    going to be offering, did you consider what a person of

6    ordinary skill in the art would be in the subject matter of

7    these patents?

8    A    Yes, I did.

9    Q    Why did you do that?

10   A    Well, it's required that the patents be seen from the lens

11   of this hypothetical person of ordinary skill in the art.

12   That's a person who can read and understand the patents and

13   implement whatever is there.

14   Q    Now, this person of ordinary skill in the art from which

15   we have to view these patents at issue and the claims that

16   we're going to be talking about, is this a real person or a

17   hypothetical construct?

18   A    It's a hypothetical construct.

19   Q    And when you look at and try to determine who this person

20   of ordinary skill in the art would be, what time frame were you

21   looking at?

22   A    Well, that has to be -- in the case of these patents, that

23   would have to be 1993 to 1994, during the period of the

24   invention.

25   Q    And is that when the patents were conceived and then

Weaver - Direct

1    reduced to practice?

2    A    Correct.

3    Q    And you are familiar that the filing date of this patent,

4    these patents has what's called a priority date back to 1994?

5    A    Yes.

6    Q    Can you tell the jury what you understand that term to

7    mean, a priority date?

8    A    That means that the protection of the patents that we'll

9    talk about later, what the claims mean, goes back to that date,

10   the filing date.

11   Q    So in undertaking your study of these patents to determine

12   who this hypothetical person of ordinary skill in the art would

13   be for purposes of viewing the context, the historical context

14   where these patents were, did you come to any conclusions?

15   A    I did.

16   Q    And can you tell us what your opinion is as to who this

17   hypothetical person of ordinary skill in the art would be for

18   these ePlus patents?

19   A    So based on my experience, this person would be a college

20   graduate with a degree in computer science or something

21   related, like electrical engineering, and would have a year or

22   two of practical experience with writing software and

23   understanding the flow of information that is necessary for the

24   purchase of goods and services.

25   Q    And did you apply that person to the opinions you're going

Weaver - Direct                                         508

1   to be offering in this case both on the issue of infringement

2   and on the issue of validity?

3   A     Yes, I did.

4   Q     Did you have an opportunity to review who the hypothetical

5   person of ordinary skill in the art would be under Lawson's

6   expert's perspective?

7   A     Yes, and it's similar.

8            MR. ROBERTSON:  Mr. McDonald, do you want to agree on

9   that if we can at this point?

10           MR. McDONALD:  I thought we already did.

11           MR. ROBERTSON:  All right.

12           THE COURT:  I thought you stipulated that, haven't

13  you?

14           The person of ordinary skill in the art, ladies and

15  gentlemen, is something you'll hear from these experts, and

16  it's been explained what it is, and there'll be instructions

17  for you later, but that person is a person, the parties

18  agree -- excuse me -- who is a college graduate with a degree

19  in computer science or electrical engineering or like studies

20  with a year or so of experience writing software and

21  understanding -- and who understands the procurement process,

22  electronic procurement process; is that right, counsel?

23           MS. STOLL-DeBELL:  I think it's close enough, Your

24  Honor.

25           THE COURT:  Good enough for government work.

1           MS. STOLL-DeBELL:  I think so.

2  Q    Let me ask you this:  Are you familiar with that person of

3  that level of skill and knowledge during the time period we're

4  discussing?

5  A    Yes.  I was teaching people like that.

6  Q    In the 1993 time frame?

7  A    Right, 1993, 1994, yes.

8  Q    Did you work on any projects during that period for any

9  companies in which the subject, type of subject matter of this

10 might involve persons who had similar experience and education?

11 A    Right.  So I mentioned this research project.  There was

12 this company call Epcom that wanted to build an electronic

13 distributorship, and so they came to my research group, and the

14 person I hired to work on this was two years out of the

15 computer science bachelor's degree, and she and I worked on the

16 design of this system whereby there was an electronic catalog,

17 and a consumer using the internet could look at the catalog and

18 could order from it and kind of a rudimentary inventory

19 management.

20 Q    Why don't we go to Plaintiff's Exhibit Number 1.

21         THE COURT:  Are you going to get into infringement

22 opinions now?

23         MR. ROBERTSON:  I'm going to get into a little bit

24 more about high level overview, and then I'm going to start

25 looking at specific claims, Your Honor, within a few pages.

1          THE COURT:  I think it's a convenient place to break

2   for the jury.  They've been at it awhile today, and it's a good

3   place to do it, so, ladies and gentlemen, once again, if you'll

4   give your pads to Mr. Neal, we'll have them for you tomorrow.

5          We'll start at nine o'clock in the morning, and we'll

6   have the -- you'll remember my instructions not to discuss the

7   matter with anyone, and drive carefully.

8          Now you've been able, Mr. Chalmers -- is it okay to

9   get back?  Is that hour okay with you?

10          JUROR:  Yes, sir.

11          THE COURT:  You are the one who has the furthest

12   distance to go, although some of them, depending on where they

13   live in Henrico County, may have a worse compute than you do.

14   Thank you very much, ladies and gentlemen.

15

16                    (Jury out.)

17

18          THE COURT:  All right, now, you all -- one of the

19   things that occurs to me we didn't touch base on was this

20   questioning in respect of validity on the topic of graphic user

21   interface, and you objected to any discussion of it in

22   connection with anything, validity or infringement, and said --

23   and it came up in terms of a claim term construction, in

24   particular I think one of the means plus function terms.  I'm

25   not sure how it came up.  Anyway, it came up in earlier

1    questioning.

2              MR. MERRITT:  Is there anything we need to excuse the

3    witness for on this?

4              THE COURT:  No.  I'm going to say we need to do -- we

5    need to get briefing on it if you all -- I told you I wanted

6    you to brief it, and I need to have you all deal with it.

7    You're going -- Dr. Weaver can be excused.  He doesn't need to

8    sit here and go through all this.

9              You can step down, sir, and we'll see you in the

10   morning at nine o'clock.

11             THE WITNESS:  Thank you, Your Honor.

12             THE COURT:  Have you rethought whether you have any

13   objection to him raising it and I need to have briefs on it,

14   Mr. Robertson, in view of the way your questioning has gone and

15   his questioning has gone so far?

16             MR. ROBERTSON:  Your Honor, you must forgive me.

17   It's late in the day, and I am not sure I'm understanding the

18   issue being raised, so if you could restate it for me.  Maybe

19   Mr. McDonald and I can work out some sort of accommodation

20   before briefing.

21             THE COURT:  Basically there was questioning that I

22   held had to do with the invalidity question over an objection

23   that you raised, and it was one of your witnesses early on,

24   maybe Mr. Momyer, and it had to do with the meaning of graphic

25   user interface, and it was being -- his question related, you

1   said, to the topic of invalidity, and I concluded that it did

2   after hearing what he had to say about the topic and said that

3   we will -- you can deal with that in his -- when he has an

4   opportunity to present his case on invalidity, and I'll have

5   you brief it before we get to that point.

6          And I am now asking you whether you all have resolved

7   that question or whether I need to have briefing, and if so, I

8   want to set the briefing schedule.

9          MR. McDONALD:  What I would suggest and see if Mr.

10   Robertson agrees, we'll try to dig out that part of the

11   transcript where that's discussed, so we will figure out what

12   the issue is.  Give us a chance to talk.  I think we have a

13   couple days before the validity case starts.  Pretty good

14   chance we can work it out, at least narrow it down.

15          THE COURT:  It was fairly early on in Momyer's

16   testimony if I remember correctly, but I'm not sure of that,

17   that this issue came up, and then you maybe perhaps can agree

18   on the schedule.

19          Based on what you know about your case, where are

20   you, what are you estimating is going to be the concluding

21   moment?

22          MR. ROBERTSON:  I'm shooting for Tuesday, Your Honor,

23   probably midday, but we'll have to see --

24          THE COURT:  How come we lost all this time, because

25   you were shooting for Friday the other day.

```
 1              MR. ROBERTSON:  I don't think I made that

 2    representation, Your Honor.

 3              THE COURT:  You don't think you did?

 4              MR. ROBERTSON:  I'm pretty sure I made the

 5    representation that I did not think I could get done by Friday.

 6    That's still my best guesstimate on where we are.

 7              THE COURT:  All right.

 8              MR. ROBERTSON:  I'm going to try and move things

 9    along and get those doggies rolling, but Dr. Weaver has a lot

10    of ground to cover as you might imagine.

11              THE COURT:  Today is what day?  Did it change?  Today

12    is Wednesday, isn't it?  So he goes to tomorrow.

13              MR. ROBERTSON:  Well, we still have several Lawson

14    witnesses to call that involve infringement, we have the

15    customer depositions that involve infringement.

16              THE COURT:  You all have honed those down now, have

17    you?

18              MR. ROBERTSON:  We have, I think, made substantial

19    progress in cooperating in that respect.

20              THE COURT:  Okay.  All right.  Just so I know where

21    we stand.  I think he needs to know where you stand, too.  All

22    right, we'll -- again, you can leave whatever you want to leave

23    here, and at nine o'clock we'll start again tomorrow morning.

24    Thank you very much.

25
```

1                              (Court adjourned.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25