WEAVER - DIRECT                     677

1          THE COURT:  All right, Mr. Robertson.

2          MR. ROBERTSON:  Thank you, Your Honor.

3    BY MR. ROBERTSON:

4    Q   Dr. Weaver, if you would go to Volume 1 of the

5    exhibits, and specifically Plaintiff's Exhibit 105,

6    please.  This document is entitled "Lawson Procurement

7    Punchout Trading Partner List."  Do you see that?

8    A   I do.

9    Q   It says version 8X and 9.0, and it's dated

10   February 2009.  Are you with me on that?

11   A   Yes, sir.

12   Q   What is this document?

13   A   This is a list of the external vendors that Lawson

14   has set up partnerships with to make these people

15   Punchout partners.

16   Q   There's a paragraph that beings "As specified

17   below," do you see that?

18   A   On this?

19   Q   On this first page, 105.

20         THE COURT:  It's not on the first page.

21   BY MR. ROBERTSON:

22   Q   I'm sorry.  I apologize.  On page 3 of the

23   document.

24   A   Sure.

25   Q   I was on the page.  What does it indicate that?

1    A    As specified below, Lawson delivers generic Rick

2    Punchout transaction sets and Commercial Extended

3    Markup Language purchase order formats for the listed

4    trading partner.

5    Q    What does that mean with respect to this

6    procurement Punchout capability?

7    A    It means that what they call transaction sets, the

8    exchange of information, this has already been

9    implemented and it's available.  So when I, as a

10   customer, want to do business with a Punchout trading

11   partner that's already established by Lawson, it's

12   quick.

13   Q    What do the next few pages indicate?

14   A    These are lists of the names of the trading

15   partners.

16   Q    In that same book, can you go to Exhibit 104,

17   Plaintiff's Exhibit 104.  This document is entitled,

18   Punchout Partner Program?

19   A    Right.

20   Q    Have you reviewed this document?

21   A    Yes, I have.

22   Q    Were you aware that this document was discussed at

23   some depositions?

24   A    Yes.

25   Q    Did you review that testimony?

WEAVER - DIRECT                    679

1   A    Yes, I did.

2   Q    Going to page 2 of the document, what does the

3   program overview provide?

4   A    The program overview says, "Provide a formal

5   program for requesting, reviewing and adding new

6   Punchout or EDI trading partners."

7   Q    Turn to page 5 of that exhibit.  What's described

8   there?

9   A    This is talking about the initial setup fees that

10  would be required to become a Punchout trading

11  partner.  So in the first line, "Partners will be

12  expected to pay for initial setup."  And the next to

13  the last paragraph, "Lawson Development will perform

14  the work required to enable the trading partner and

15  that trading partner will be added to our list of

16  supported partners."

17  Q    What does Lawson tell its potential Punchout

18  trading partners its proposed benefits are on page 6

19  of this document?

20  A    "Listing on our site as a procurement Punchout

21  partner.  Listing in our documentation as a supported

22  Procurement Punchout Trading Partner.  Invitation to

23  attend CUE," which are customer meetings.  "Ability to

24  use Lawson Partner logo.  An alliance contact."  So

25  somebody at Lawson who will be responsible for trading

1   partner.  "Access to Punchout specifications."  And

2   "Listing in the Lawson's Partner directory."

3              THE COURT:  Does your screen stay on?

4              THE JURY:  Yes.

5              THE COURT:  How about you-all?  Are yours

6   going out on you?

7              THE LAWYERS:  No.

8              THE COURT:  I think it's just me.  What

9   happens is I tap it and it will come back on

10  sometimes.  Go ahead.  Excuse me.

11  BY MR. ROBERTSON:

12  Q   Dr. Weaver, I'd like you to take a look at

13  Plaintiff's Exhibit No. 212.  And that is in Volume V.

14  And it's entitled, "Vendor Implementation Technical

15  Specifications Punchout Connectivity."  Have you

16  reviewed this document?

17  A   Yes, I have.

18  Q   What is it?

19  A   Lawson is providing the specifications that are in

20  this document to their Punchout trading partners

21  explaining how they implement this connectivity that I

22  talked about between the partner and Lawson.  All

23  those exchanges of messages and formats and so on.

24  Q   Can you go to page 3 of the document with the

25  Bates label 372?

1    A    Yes.

2    Q    There's a heading there called "Integration

3    Process"?

4    A    Yes.

5    Q    And it says, "Vendor/B2B partner connectivity."

6    Do you see that?

7    A    I do.

8    Q    What's your understanding as to what is being

9    discussed here?

10   A    This is talking about the integration between the

11   Lawson Punchout capability and the technical items

12   that a Punchout vendor needs to have in order to do

13   this communication.

14   Q    Is there further detail as to the Punchout setup

15   request provided in this document at page 6?

16   A    Yes, there is.

17   Q    I certainly don't want to go into all the detail

18   of that code that's there, but can you tell us

19   generally what your understanding is that is being

20   depicted there?

21   A    Well, Mike, if you could do the bottom half of the

22   page.

23       In this exchange of information that's required

24   between Lawson and the Punchout partner, all the data

25   that's being exchanged has to be in a particular

1  format.

2      This is the format for just one of those functions

3  I talked about, the Punchout setup requests.  So these

4  things like the data type definition and the computer

5  elements and the attribute list, all of this is just

6  an explicit listing of what data is required, in what

7  order it's required, what kind of data it should be.

8  Should it be digits, should it be alphabetic

9  characters.  It's a complete specification of what's

10  needed to do the communication.

11  Q   Earlier you talked about the Punchout setup

12  request when you were discussing that diagram?

13  A   Eight-step diagram.

14  Q   Is that what's being described there?

15  A   Yes.  This is the Punchout setup request.

16  Q   If you turn to the next page, it says Punchout

17  setup response.  Do you see that?

18  A   So here is more code for Punchout setup response.

19  Q   Next page is the Punchout order message or PO

20  requisition.  Do you see that?

21  A   Right.

22  Q   Can you explain that as well?

23  A   It's the same type of thing.  It's the data type

24  definition for what occurs when and what type of data

25  has being transmitted.

1    Q    Page 11, there's a discussion of the purchase

2    order?

3    A    Yes, same type of thing for purchase order.

4    Q    So who is providing all this code?

5    A    All of this is being provided by Lawson.

6    Q    So, Dr. Weaver, you've indicated earlier, you did

7    a demonstration concerning the operation of the Lawson

8    system with this procurement Punchout functionality;

9    is that right?

10   A    That's right.

11   Q    Why don't you preview it and tell us what we're

12   about to see here.

13   A    All right.  So I'm going to go to one of those

14   drop down menus.  I find shop menu.  I'm going to

15   click on Punchout.  And then I'm going to go shopping

16   at two Punchout sites.

17   Q    For the record, the video is Plaintiff's Exhibit

18   No. 368, and the hard copy screen shots of that video

19   are Plaintiff's Exhibit 367.

20   A    Ready?

21   Q    Yes.

22   A    Okay.

23   Q    I'm going to try not interrupt you so much this

24   time.

25   A    So we're just looking at the screen of the laptop.

WEAVER - DIRECT                      684

1   Continue.  I'll click on Internet Explorer.  I'll go

2   to favorites.

3             THE COURT:  Before do you that --

4             THE WITNESS:  Stop.

5             THE COURT:  Just one minute.

6         Are you able to see your screens all right or

7   would it we better if we turned the lights out?

8             THE JURY:  I'm okay.

9             A JUROR:  I just need bifocals.

10             THE COURT:  We don't provide those.

11             A JUROR:  I know.

12             THE COURT:  Okay.  Excuse me, Dr. Weaver.

13   A   So I've chosen the favorites tab, and the drop

14   down menu, and I chose the Lawson portal.  Continue.

15       I do my user name and password.  I login.  So

16   there's a brief wait here, but I'll arrive at the

17   Lawson portal home.  Okay.  I'm finally there.

18       So I'll go over to that requisition self service,

19   and I'll come down to the shopping tab as I did

20   before.  Stop.

21       So now here I am at the entrance to the shopping

22   module.  I'm going to go up here to find and shop.

23   And I'm going to drop down that menu and choose

24   Punchout.  Continue.  Stop.

25       Before I get to making a choice of the Punchout

WEAVER - DIRECT                685

1    sites, I want to show you up here at the top the URL,

2    Universe Resource Locator, Web address that we're

3    talking to right now is this

4    lsfserver.corpnet.lawson. com.  So that's the server

5    that is providing all the Lawson software that I'm

6    seeing here, which is the requisition self service.

7    But I want you to notice that URL because it's going

8    to change, and that's an important part of the case.

9    Continue.  Stop.

10        So you notice that two icons were displayed.  Dell

11   and Staples.  So these are the two Punchout partners

12   that were available in the demonstration system that

13   we were given.

14           THE COURT:  Do you know, Dr. Weaver, if you

15   hadn't been limited to these two, the two that you

16   were given, when you hit the Punchout button on the

17   drop down menu, would all of the punched out partners

18   come up in here or do you know that?

19           THE WITNESS:  It would be all of the Punchout

20   partners that this customer had an agreement with.

21           THE COURT:  So this customer first has to go

22   in and say, I want to do business with Dell, Staples,

23   Office Depot, Home Depot, whatever?

24           THE WITNESS:  That's right, but there has to

25   be an agreement between the parties so that the

WEAVER - DIRECT                    686

1   catalog can be customized and the prices can be

2   customized for customer.

3           THE COURT:  Okay.

4   BY MR. ROBERTSON:

5   Q    There's an agreement between Lawson and its --

6   when Lawson provides this Punchout capability, the

7   customer can tell Lawson what Punchout websites it

8   wants to go to?

9   A    Exactly.

10          MR. McDONALD:  Objection, leading.

11          THE COURT:  Went out with the Coolidge

12  Administration on something like this.

13          MR. McDONALD:  I have to have an objection to

14  move.

15          THE COURT:  I know you need to move, but

16  that's --

17  Q    I just want to follow up on the Judge's questions

18  because there was some ambiguity between who the

19  agreements were between.  Does the Lawson customer

20  who's going to use this Punchout module, do they tell

21  Lawson what Punchout website they want to be able to

22  go to?

23  A    That's correct.

24  Q    So then Lawson puts that capability on this

25  Punchout module?

WEAVER - DIRECT                687

1    A    That's correct.

2    Q    So as many as they want Lawson could load on here;

3    is that right?

4    A    As many as the customer says.

5    Q    But the demo laptop that we got from Lawson only

6    had Staples and Dell; is that right?

7    A    That's right.

8              THE COURT:  When you say there are these

9    contracts between the customer, you in this instance,

10   and say you're going to do Staples, is that one of

11   those things that comes up and says "I agree to the

12   terms" and that's the end of it or is it actually

13   something else?

14             THE WITNESS:  The contract is between Lawson,

15   Lawson and the trading partner.  And then I as the

16   customer say -- and I have a whole list of trading

17   partners that we didn't bother to look at.  I say, I

18   want to do business with IBM, and Staples and Office

19   Max and whoever.

20             THE COURT:  But how do I get the terms?  You

21   earlier said, Well, the ones that will drop down here

22   will be the ones that I, the customer, have an

23   agreement with, and they are going to then customize a

24   catalog for me.  How does that happen?

25             THE WITNESS:  Lawson makes that happen and

1   when we get to the site, it will be for me the

2   customer.

3           THE COURT:  How does Lawson know to make it

4   happen?

5           THE WITNESS:  Because the customer has said

6   which Punchout sites they want to have access to.

7           THE COURT:  Okay.

8   BY MR. ROBERTSON:

9   Q   Why don't we continue with the demonstration.

10  A   All right.  So I, as the Lawson user, click on

11  Staples.  Continue.  Stop.

12      If you can remember back to that 8-step diagram

13  that I showed you, I made a big point out of the fact

14  that a URL, a Universal Resource Locator, was returned

15  from the Punchout trading partner, and I wanted you to

16  see what that looks like.  So instead of being

17  lsfserver.corpnet.lawson.com, there's an extended part

18  of the URL here, and I realize this is very tiny, but

19  it says HTTPS, which is the secure version of the

20  Hypertext Transfer Protocol.  And we're not going to

21  Staples, see, we're going to www.stapleslink.com.  So

22  this is the special arrangement between Staples and

23  Lawson.

24      And when we go to that special site, we go to a

25  folder called web applications/WCS-stores-servlet.  Do

WEAVER - DIRECT                689

1   you remember I used the word servlet.  And the less

2   rest of it is obscured.  It starts with S-T.  It

3   probably says Staples, but you can't see it.

4       Anyway, this is the point that this URL is

5   returned by Staples.  And this is where Lawson is

6   going to redirect me.  This is my store at Staples.

7   Continue.

8       Pop up window.  You can't get rid of those until

9   you click them away.  Stop.

10      So what we just saw was I'm going to look at pens

11  pencils, and correction.  All right.  Continue.

12      That's what I just showed.  Full screen.  Okay.

13  Now we go up to the text box.  Stop.  And my search

14  query is I'm going to look for some furniture, and I

15  want to find items that are available through Staples

16  from two manufacturers, Basyx or Bush.  So I type in

17  those names; Basyx or Bush.  And that's my search

18  query.  So having typed that in, now I click search.

19  Continue.

20      So in the normal return of information, I find

21  that the search for Basyx or Bush return the following

22  items.  So here is a list by the type of furniture.

23  Down here is the number of items from Basyx.  So

24  there's 150 furniture items from them and 150

25  furniture items from Bush.  So I'll just continue.

WEAVER - DIRECT                690

1    So now I'm just paging through these items that
2   were returned from that search.  Here's a second page.
3   Now, stop.
4    I'm going to click on cherry standard suites.  So
5   I'm changing from looking at everything, first two
6   pages of everything, to looking at these 45 cherry
7   standard suites, piece of furniture.  Continue.
8    Okay.  So now, of course, our offerings are
9   reduced.  There are 10 by Basyx and 35 by Bush.  So
10   there will be 45 items that are potentially visible
11   here.
12    So I'll continue.  So I'll click to the next page.
13   More items.  Next page.  More items.  Fourth page.
14   More items.  Stop.
15    So now out of these items that I have seen, I'm
16   going to pick the Basyx laminate bowfront desk, and by
17   clicking on this hyperlink, I'm going to drill down to
18   get more information from the catalog.
19    So continue.  Stop.  So here's the catalog
20   information that is returned by the Lawson system.  So
21   you'll see we have a description here of the furniture
22   and then here it is in much more detail.  So I get a
23   view of what's available.
24    So continue.  Stop.  And so here are some other
25   things that are available from the catalog.  There is

WEAVER - DIRECT                    691

1  the Staples item number.  There's the manufacturer

2  number.  The unit of measure and the price.

3      All right.  Continue.  Stop.  What I did there was

4  click.  In fact, Mike, can you back up a little bit?

5  I was too slow on the draw.

6      Okay.  Stop.  So I showed you that the catalog

7  items where I'm going next, that was the catalog

8  information.  And what, if I can draw, what I'm going

9  to do next is click on delivery date.  So I'm going to

10 check whether or not this item is available in

11 inventory.

12     Continue.  So click on delivery date.  Stop.  So

13 here is the information that we saw before plus --

14          THE COURT:  We've got a problem.

15          MR. McDONALD:  Thank you, Your Honor.  I'm

16 just trying to keep up with the paper version, but my

17 version of 367 ends here.  Sorry, Your Honor.

18          THE COURT:  You have a lot of paper.  You all

19 have done very well with all that paper.  Just a few

20 little slip-ups shows me that the legal assistants

21 have been doing what they should have done.

22          MR. McDONALD:  I agree.

23          THE COURT:  They are all human, but there

24 have been very few problems.  So don't you worry about

25 it.

WEAVER - DIRECT                    692

1          MR. McDONALD:  Thank you, Your Honor.

2          THE COURT:  Have you got it now?

3          MR. McDONALD:  Yes, sir.

4          THE COURT:  Okay.

5   A    Okay.  So now when we look at this expanded

6   information, we see the column of expected delivery.

7   And you notice it says backordered.  So this item is

8   not available in inventory.  I'm going to have to wait

9   for this.  So I'd rather not do that.  I wanted a

10  desk.  So I'm going to continue.  Go back.  Go back.

11  So this takes me back into that cherry standard

12  suites.

13      So I'll look for something else.  Go to the next

14  page.  So now I'll pick this Bush Milano bowfront

15  desk.  Here's its description.  Stop.

16      And as you saw.  So here's the catalog

17  description.  Here's the item number.  Here's the

18  manufacturer number.  Here's the unit each and here is

19  the price.  And we also have the opportunity to check

20  the delivery date on this.  So I'll do that.

21      Continue.  Click delivery date.  Stop.  And we

22  have a specific expected delivery date.  Nothing about

23  backordered.  So this item is available in inventory.

24  So I'll take this one.

25      So we continue.  I add this to my order.  Stop.

1   So this is my order as it stands here at Staples.

2   Notice that we're co-branded here with both Lawson and

3   the Punchout partner.

4       Okay.  So that's the item that I want.  So I'll

5   add that to the order.  Continue.  Stop.  Review my

6   order.  Stop.

7       So here's the same information that we saw before.

8   Looks good.  So I'm now going to submit this order to

9   Staples.

10      So continue.  Stop.  So back to that 8-step

11  diagram I talked about, the exchange of information.

12  One of those steps was having the Punchout trading

13  partner take the content of the shopping cart and

14  return that information to Lawson.  And so that is

15  what has happened with this last screen change.

16      Here's my Lawson shopping cart with that Bush

17  Milano desk in it.  So I'm going to shop some more.

18  So we continue.  I'll go to Dell.  So now were at the

19  Punchout Dell site.  And let me just stop.

20      Once again, I'll point out here that URL you see

21  from the Lawson server, the Dell site has provided a

22  different URL different the normal Dell site.  This

23  one is signin.Dell.com/Delllogin/portal/login.aspx.

24  ASPX is programming language.  So I've been redirected

25  to this Dell training partner site.

WEAVER - DIRECT                694

1    Continue.  Go full screen.  And now I do a keyword

2    search for printer.  I'll look at some printers.  Go

3    to the next page.

4        I'll pick this Kodak Easy Share Printer.  So I

5    drill down on this.  Stop.  And I've got the title.

6    I've got the description.  I've got the price, but the

7    catalog tells me that it's temporarily out of stock.

8    Please check back soon.  So this item is not available

9    in inventory.  Okay.  So I'll go get something else.

10       Continue.  So I go up here to photo printers.  And

11   look at the selection available from Dell for that.

12   Here's a Canon wireless printer.  Stop.

13       Got my description.  Got my price.  Usually ships

14   within 24 hours.  In addition, there's this other

15   information, the manufacturer part number.  The Dell

16   part number and the UNSPSC code.

17       So this usually ships within 24 hours.  So this

18   one is available in inventory.  So I'm going to take

19   this one.  So continue.

20       So I'll add this to the cart.  All right.  So

21   here's my Dell shopping cart.  So it has the order

22   information.  I'll create the order.  Then Dell has

23   some trade compliance requirements not relevant to us.

24   Continue.

25       All right.  Stop.  Now, I guess we better continue

WEAVER - DIRECT                    695

1    so we can see the descriptions.  So continue.  Right.

2    Now stop.

3         So here is that wireless printer.  Look at the

4    information.  It looks good.  So I'm going to submit

5    this order.  So continue.  Stop.

6         So now I have exited the Dell partner site and I'm

7    back into the screen from the Lawson Punchout.  And

8    notice that it says I'm retrieving items.  So, again,

9    as part of that 8-step process flow between Lawson and

10   the trading partners, now Dell is taking the content

11   of the Dell shopping cart and returning that as the

12   Punchout order document, which is now being accepted

13   and saved by the Lawson system, and then we're going

14   to see that it will go into the Lawson shopping cart

15   up here.  So continue.  Stop.

16        So there is my wireless printer up here along with

17   my Bush Milano desk.  All right.  So those are the

18   only two things I wanted.  So I now am going to

19   checkout from the Lawson shopping cart.  Okay.

20   Continue.

21        All right.  Stop.  So this has created an order

22   within Lawson with the number, the identifier 919.

23   Like the first demonstration, this one needs approval.

24   So we'll March through that.  So continue.

25        So back to the portal.  Login as the manager.

1   Find the requisition.  It's 919.  Get the requisition.

2   Take a look at it.  Okay.  Stop.

3       I'm sorry, Mike.  I went a little too long.  Would

4   you back up just a tad?  That's it.

5       So you see we have two line items here; the desk

6   and the printer.

7       When we scroll down here, you see we've got item

8   numbers and we've got manufacturer numbers.  So

9   continue.

10      All right.  So looks good to me.  I'm going to

11  approve it.  Okay.  We've got that.  So now I'm going

12  to run a PO 100 program.  So like we saw before, I'll

13  enter a job name and a job description.  I'll call it

14  requisition No. 919.  I'll fill in these other items

15  that I need to below.  Give it a delivery day of five.

16  Release the purchase order.  Don't need the filters.

17  Back to main.

18      Okay.  So this goods good.  Looks good.  I'm going

19  to add it.  Now I'm going to submit the job to run.

20  And I explained about foregrounds and backgrounds.  So

21  this is going to run and create the POs.  So here's

22  the submission.

23      So now the POs are being created and in just a

24  second I can look at them.  Give it time to process.

25  And then I'll go up and click on print manager.

WEAVER - DIRECT                    697

1     I'll pick up requisition 919.  Stop.  And so here

2     we have the header of the PO that tells who is doing

3     the buying.  It's our good old Metropolis Medical

4     Center.  And then we'll scroll down to see the items.

5     Continue.  Stop.

6          So here's our first PO.  So it's coming from

7     Staples.  It has a vendor item number.  It's our Bush

8     Milano desk.  It's a quantity of one.  It's an unit of

9     each.  And the PO is released.  So the purchase order

10    has been created and released for this desk that I've

11    ordered from Staples.

12         Scroll down.  Continue.  Stop.  So here's my

13    second PO.  So this one is the wireless office

14    printer.  It's coming from -- I'm not getting my

15    arrows.  Oh, well.  It's coming from Dell Computer.

16    It's got a vendor item number.  The purchase order has

17    been released, and then at the bottom of this entire

18    document the report is complete and two purchase

19    orders were created.

20         So from my Punchout I picked a desk.  I found out

21    it was not available in inventory.  I picked another

22    desk.  Put it in my shopping cart.  Went to Dell.

23    Picked a printer.  Found out it was not available.

24    Picked another printer.  Put it in my shopping cart

25    checked out.  Brought that back to Lawson.  Created a

WEAVER - DIRECT                    698

1    requisition.  Created, in this case, two purchase

2    orders.  That's it.

3    Q    Thank you, Doctor.  So with respect to this

4    demonstration, just like I asked you with respect to

5    the last demonstration, at a high level, I didn't want

6    to go through all the claim terminology right now, but

7    were we able to see in that demonstration that there

8    were at least two product catalogs?

9    A    Yes.

10   Q    Were you able to select the product catalogs?

11   A    Yes.

12   Q    Were you able to search for matching items in

13   those catalogs?

14   A    Yes.

15   Q    You did that?

16   A    I did that.

17   Q    Were you able to build a requisition?

18   A    I did it.

19   Q    Were you able to generate a purchase order?

20   A    I did.

21   Q    Did you see information about whether a product

22   was available in inventory?

23   A    Yes, for the desk and the printer.

24   Q    And there were images of the product?

25   A    Since they were Punchouts we had images for all of

1    them.

2    Q    Were there various descriptions and associated

3    information with the items?

4    A    We saw the vendor item number.  We saw the

5    manufacturer item number.  We saw a description.

6    Q    Did you see price?

7    A    We certainly saw a price.

8    Q    Was everything you saw there consistent with your

9    understanding of what a catalog is as defined by the

10   Court?

11   A    Yes, it is.

12   Q    Thank you.

13        I'd like to talk, just a little bit, about some

14   representatives that Lawson has made about how to

15   select among product catalogs if we could because

16   there's some dispute about whether there's one catalog

17   or more catalogs.

18        Could you go to -- let me first ask you what are

19   some of the item attributes that can be used for

20   selecting product catalogs to be searched?

21   A    Well, we could use vendor item number.  We could

22   use vendor name.  Manufacturer item number.

23   Manufacturer name.  Or partial description of the item

24   or the UNSPSC classification codes.

25   Q    Going back to Plaintiff's Exhibit 170 again.  This

WEAVER - DIRECT                    700

1    is a response to an RFP.  Specifically at page 37,

2    question 12.  Are you with me?

3    A    Not on page 37.

4    Q    Of 170.

5    A    170.  Right.  So let's do the Bates number.

6    Q    I'm sorry.  884.

7    A    Okay.

8    Q    In this question, the requester is asking does the

9    system have the ability for expand the item search by

10   a vendor catalog number, partial description,

11   manufacturer code, classification code, vendor name,

12   and manufacturer name.  What does Lawson indicate of

13   its ability to do that?

14   A    They put an X in column A, which says that that

15   capability is installed and is available.

16   Q    Thank you.  I'd like to go to Exhibit --

17              THE CLERK:  I'm sorry.  We couldn't hear you.

18              THE COURT:  Which exhibit?

19              MR. ROBERTSON:  Plaintiff's 215.

20   Q    Again, this is in response to an RFP.  Do you see

21   that, Doctor?

22   A    Yes.  This is the response to Jackson Health

23   System.

24   Q    And it's dated May 18, 2006?

25   A    Correct.

1  Q    If you could go to the page that has the Bates

2  label 6172.

3  A    Okay.

4  Q    Again, we're talking about functional capability

5  here about expanded search.   Do you see that?

6  A    Yes.

7  Q    Just confirm for me this is Lawson's response to

8  this request by the Public Health Trust, Jackson

9  Health system; is that right?

10 A    That is correct, but we need to get the right page

11 up here.

12 Q    If you'll look at the bottom, it has Bates No. 150

13 of 307.   Right at the bottom middle.

14 A    Your page numbers are different than mine, but I'm

15 on the right page.

16 Q    You're on the page that ends 6172?

17 A    6172, but that's not what's on the screen.

18 Q    Okay.

19 A    There we go.

20 Q    We were discussing here functional capability and

21 expanded items searched by.   Do you see that?

22 A    Yes.

23 Q    It says here "vendor catalog number."   What does

24 Lawson say about its availability?

25 A    Under the currently available column, it says yes.

1    Q    And partial description of item, e.g. wildcard

2    contains, etc.?

3    A    Yes.

4    Q    Manufacturer catalog number?

5    A    Yes.

6    Q    Classification code?

7    A    Yes.

8    Q    Vendor name?

9    A    Yes.

10   Q    Manufacturer name?

11   A    Yes.

12   Q    Are you aware of the contention that Lawson

13   maintains that an item master is a single catalog

14   rather than a collection of catalogs?

15   A    Yes.

16   Q    Do you agree or disagree with that?

17   A    I disagree.

18   Q    Why is that, sir.

19   A    I think if you have multiple vendor catalogs and

20   you import them into a single database, you have one

21   database, but you still have multiple item catalogs

22   because it has all of the information in it that was

23   originally in the vendor catalogs.

24   Q    And what about with respect to the Punchout

25   catalogs that were available?  Do you have an opinion

1    as to whether that's a multiple catalog availability

2    or a single catalog?

3    A    Well, as we just saw when we did our Punchout

4    Staples and Dell, those were two completely separate

5    catalogs on separate websites run by different people.

6    So those are unquestionably separate catalogs.

7    Q    Do you have an understanding about whether the

8    '683 patent, for example, requires catalogs to be

9    searched simultaneously?

10   A    It does not.

11   Q    Did the Court in any of its claim constructions

12   have that requirement?

13   A    No, that's not in the claim construction.

14   Q    Does the Lawson system have the capability of

15   enabling you to select search first a product catalog

16   and then subsequently select a search in another

17   product catalog?

18   A    Yes.

19   Q    Do you see that in any of your demonstrations?

20   A    Yes, we did.  The Bush or Basyx.

21   Q    In the demonstration in Punchout, did we see that

22   ability to select those product catalogs?

23   A    Yes, we did because we saw that in Dell and in

24   Staples.

25   Q    Why don't we talk a little bit about searching for

1   selected product catalogs using the Lawson keyword

2   index?

3           THE COURT:  Excuse me.  Before you do that,

4   are you saying in your view item master is not a

5   single catalog but is a multiple catalog because it

6   has imported into it all number of parts of other

7   catalogs?

8           THE WITNESS:  Well, let me just be clear.

9           THE COURT:  Yes.

10           THE WITNESS:  If the item master is built by

11   importing multiple vendor catalogs, then in my opinion

12   is that database contains multiple vendor catalogs.

13           THE COURT:  But what if it is built by

14   importing part of multiple catalogs, parts of

15   catalogs?

16           THE WITNESS:  In my opinion, it's still

17   multiple catalogs.

18           THE COURT:  I just want to know -- and it's

19   because in those instances you think it's a function

20   of importation?

21           THE WITNESS:  Yes, sir.

22           THE COURT:  All right.

23   BY MR. ROBERTSON:

24   Q   Does the Lawson system have the capability of

25   importing multiple vendor catalogs?

1   A    Yes.  We saw that in the documentation with the PO

2   536 program.

3   Q    Did you see representation that Lawson said they

4   could import multiple catalogs?

5   A    Yes, we did.

6   Q    So I did want to address this searching the

7   selected product catalogs using Lawson's keyword

8   search.  You're familiar with that?

9   A    Yes.

10  Q    Are you familiar with Lawson's contention that it

11  searches the entire item master and therefore the

12  Lawson systems don't, and its search engine, does not

13  search only selected portions of catalogs, but rather

14  the entire item master?

15  A    I'm aware of that, but I disagree with that.

16  Q    Why do you disagree with that?

17  A    Because the way that the system is built it uses a

18  search index.  If you think about building a complex

19  system, you would never build it such that you had to

20  search through every single item in order to match a

21  search query.  It would take forever if the database

22  was of any size.  So that's not the way relational

23  databases get built.

24       Instead there's a search index, and so like the

25  index of a book, you have keywords, and they point to

1    where in the database those items reside.

2        So if I do a keyword search for Dell, I look it up

3    in the index, and that tells me where the Dell items

4    are, and I only look at those.

5    Q   Do you have any demonstratives that you prepared

6    to help illustrate this point?

7    A   I do.

8    Q   Could we go to 09 at page 15.  Okay.  Here you

9    have a definition of an index from Webster's New World

10   Computer Dictionary.  What significance here should we

11   be focused on as you talk about this computer search

12   index that's being utilized?

13   A   This part here.  When searching or sorting the

14   database, the program uses the index rather than the

15   full database.  Such operations are faster than sorts

16   or searches performed on the actual database.

17   Q   As a computer scientist, is using an index in

18   order to search a relational database something that

19   is utilized in order to make those faster searches?

20   A   Absolutely.

21   Q   Do you know how the Lawson's system search index

22   is created?

23   A   Yes.

24   Q   What is that?

25   A   There's a process by which keywords are defined

1    that are going to become searchable.  So there's a

2    keyword search setup program that you run, and then

3    after you've defined what keywords are going to be

4    searchable and you've got your database loaded, and

5    the item master is now full of data, you run the

6    keyword search load program.  That builds the index.

7         And now until you have changed the database, you

8    have got an index into all the searchable keywords

9    that -- all of the keywords that were chosen to be

10   searchable.

11   Q    Are some of those keywords like item description,

12   item number, classification code that you've been

13   addressing already?

14   A    Yes, they are.

15   Q    Which database tables is the search index built?

16   A    I'm sorry.  Say that again.

17   Q    Sure.  From which database tables is the search

18   index built?

19   A    The item master.  Well, and the vendor item table,

20   too.

21   Q    Once the user has selected the field of the item

22   data that are to be searchable, what is the next step

23   in building this index?

24   A    So after you have chosen your keywords, you have

25   to load them all, and then you -- the computer system,

WEAVER - DIRECT                     708

1   the keyword search load program, builds this index

2   that is search engine then uses thereafter.

3   Q    Can you take a look at Plaintiff's Exhibit

4   No. 136.  It's in Volume III.  It's entitled,

5   "Requisition Self Service 8.1, 9.0."

6   A    Yes.

7   Q    What is this exhibit, if you know?

8   A    This is a training program for requisition self

9   service.  This particular one is a copy of what a

10  human trainer would be using in terms of slides and

11  notes.  So if you're familiar with Microsoft

12  PowerPoint, it has a notes feature.  So here is the

13  slide itself, and below it are the notes.  So if I

14  were a trainer training you as an RSS class, I would

15  be showing you this picture up here, and then this

16  would be my reminder text of what I wanted to tell you

17  about the slide that I'm showing you.  Instead of

18  having an audio recording, you've got words.

19  Q    Is this a presentation that Lawson gives to train

20  its customers?

21  A    Yes.

22  Q    Why don't we go to page 3 of the document, if we

23  could.  It's Bates label is 687.

24  A    Right.

25  Q    What would you like us to focus on here?

WEAVER - DIRECT                      709

1    A    The first two paragraphs.  You can search the

2    catalog, which will search for items in your item

3    master or vendor items.  It also allows you to search

4    for keywords for up to 29 fields based on your set up.

5    You can also search based on categories which can use

6    the UNSPSC code categories.  And I think we've heard

7    the rest of that before.

8    Q    We've gone over that.  Let me direct you then to

9    page 12 of the document.  Is this a Lawson keyword

10   search setup proposal?

11   A    Well, this is the training guide and --

12   Q    This is teaching the customers how to set up the

13   keywords?

14   A    Yes, it is.

15   Q    What's the next page?

16   A    Keyword search load.

17   Q    What is that?

18   A    So that was the second program that you have to

19   run.  The first one, the keyword search set up, this

20   is where you choose which of the 29 different fields

21   will become searchable.  So after you have got them

22   chosen, and you've got your item master database

23   loaded, then you run the keyword search load, and it

24   builds the index.

25   Q    Then if you will turn to page 29.  There's a slide

1   there that says "creating a requisition by searching

2   the catalog"?

3   A    Yes.

4   Q    What's being depicted there?

5   A    So this is something that we have seen.  When I

6   did the catagory search and picked items and built a

7   requisition.  So it says down here, When using the

8   search catalog task, you enter the value you want to

9   look for in the search field.  As soon as you type in

10  the third letter, the system begins searching for the

11  matching keywords and displays the result as a drop

12  down list.

13      Keywords exist because you enable certain fields

14  as searchable in this IC00.5 program and run IC800 to

15  build keywords from these fields.

16      So that's the setup and load.  IC800 is the

17  keyword load.

18  Q    So what if anything do the pages of this document

19  have with respect to your understanding of how the

20  Lawson system or whether the Lawson system uses a

21  search index to conduct its searches?

22  A    Well, it absolutely does such that it need not

23  search the entire database.  That's what keyword setup

24  is about and how a keyword load turns that into an

25  actual index.

WEAVER - DIRECT          711

1   Q    So once you have enabled the keyword terms and you

2   built the search index, how does the Lawson search

3   engine conduct a search of the item data in the

4   database?

5   A    So if I type in a word into a text box, say Dell,

6   and engage the search engine, it goes to the search

7   index.  It looks up Dell.  It finds records in the

8   database that match the keyword Dell.  And then it

9   extracts that data from the database and presents that

10  to me on the screen.

11  Q    Do you have a demonstrative you prepared to try

12  and illustrate how this search index operates?

13  A    I do.

14  Q    What's being illustrated here, sir?

15  A    Okay.  So up here at the top we have the text box,

16  which is the search query.  I don't know where that

17  popping is coming from.

18          THE COURT:  That's because you, like some

19  witnesses, but not all, articulate your P's in a

20  particular way at a particular length from the

21  microphone, and there isn't anything that we've been

22  able to do about it.  And it's not your fault.  It's a

23  function of the way things are.

24          THE WITNESS:  Thank you, Your Honor.

25          THE COURT:  It's annoying, but --

WEAVER - DIRECT          712

1          THE WITNESS:  I would have worried about that

2     all night.

3          THE COURT:  Well, don't.

4          MR. McDONALD:  As long as he doesn't use the

5     T sound for the rest of the testimony, it's fine.

6          THE COURT:  No, it's a P, generally.

7          Does this have an exhibit number?

8          MR. ROBERTSON:  No, Your Honor.  It's simply

9     demonstrative.

10          THE COURT:  All right.

11     A   So we have our keywords at the top, our query

12     text, and for this example I want to look for the

13     keywords Dell and monitor.  We'll assume that we have

14     enabled at least two fields, two keyword fields to be

15     searchable.  One of them would be a user-defined field

16     for the manufacturer.  We haven't actually talked

17     about user defined fields yet, but this is part of the

18     Lawson product.  So a user defined field or

19     manufacturer has been determined to be searchable.  It

20     has been declared to be searchable.  And a second

21     field, the item description, which is one of the

22     fields, one of the 29 fields supported by Lawson, that

23     one has also been declared to be searchable.

24          Now, after I do the search load and I build my

25     index, then what I have is for each of the entries in

1    the user-defined field for manufacturer, like Dell or

2    Hewlett-Packard or Gateway, for each of those I have

3    pointers into the database that tell me where I will

4    find a record, a product, in which the Dell keyword

5    was located in the user-defined field for

6    manufacturer.

7         Likewise, for the item description fields, if I've

8    got a database that contains keywords like keyboard

9    and mouse and monitor, every time a descriptive term

10   is found that is searchable for item description like

11   keyboard, in this database there are pointers from the

12   index into the database that say where that item is

13   found.

14        So the way this then works is when I put in Dell

15   and monitor, the search engine goes to the search

16   index, finds the keyword Dell, finds all of the places

17   that the keyword Dell would appear in the database.

18   In this case its locations are 10, 20, 25, 26, 27 and

19   28.

20        Then it would look for the next keyword in the

21   query box.  That's monitor.  It would look up all of

22   the places in the database where monitor appears as

23   keyword.  And that's 15, 16, 17, 19, 20, 21, 22, 23,

24   25 and 27.

25        Then having found where the records containing the

WEAVER - DIRECT                714

1  keyword Dell are located and where the records

2  containing the keyword monitor are located, then we do

3  the intersection of those.  That is, from those two

4  lists of numbers, we find where the numbers are

5  exactly the same.

6      So in my example here, 25 and 27 are the database

7  records that contain both the keywords Dell and

8  monitor.

9      So I go fetch records 25 and 27.  And that's what

10  I display to the user.  So I don't search the whole

11  database.  I just the index to search selected parts.

12          THE COURT:  Mr. Robertson, what is this

13  testimony related to?  We had that at the beginning.

14  Now we've had a lot of testimony, and I'm confused a

15  little bit, and the jury may be, about what exactly

16  this line relates to.  Does it have to do with whether

17  there's a search of a single catalog or not?  Is that

18  what we're still on?

19          MR. ROBERTSON:  No, Your Honor.  There are

20  some claims that say you have to search portions of

21  the database or search among the selected catalogs.

22  And so in order to search portions of the database,

23  you need a search index.  Lawson contends that the

24  index is -- that the search searches the entire

25  database all the time.  So, therefore, they can't

1    satisfy the selected portions.

2            So they employ a search index in order to be

3    able to go quickly to find the data record that they

4    need.

5            THE COURT:  I understand.  I have this

6    question now.  The database that is being searched in

7    either version, either Lawson's theory or ePlus'

8    theory, is made up of what?

9            THE WITNESS:  What is the database made up

10   of?

11           THE COURT:  Yeah, what's it searching?

12           THE WITNESS:  Well, it uses the index to

13   search the item master and the vendor item table.

14           THE COURT:  It's searching the item master

15   and --

16           THE WITNESS:  Let me be more precise.

17           THE COURT:  I know we're talking about

18   searching catalogs, and I think I'm confused about

19   what the issue is.  So go ahead and try it again.

20   A   So what's going on is that there are many keyword

21   fields like item number, item description, these

22   user-defined fields that can be marked as searchable.

23   This's part of the setup.

24       Then when information is loaded into the item

25   master and vendor item table, you use this keyword

WEAVER - DIRECT                716

1   search load program, and it builds this index, the one

2   that I'm showing on the screen.

3       Thereafter, whenever I do a search, I'm using the

4   index to search only selected parts of the database,

5   not the whole database.

6               THE COURT:  All right.  I understand that,

7   but the database is what?

8               THE WITNESS:  The database is the item master

9   table and the vendor item table.

10              THE COURT:  And the database contains

11  extracts or parts of different catalogs, right?

12              THE WITNESS:  Each item record and item

13  master represents some product from a vendor catalog.

14  BY THE COURT:

15  Q    Doctor, let me ask you this.

16              THE COURT:  I think I may be confusing things

17  more than I am doing any good.  So I'll leave it

18  alone.

19  BY MR. ROBERTSON:

20  Q    Have you ever seen this search index being

21  analogized to an index for a book, for example?

22  A    I have.

23  Q    If we had a book that was his history of the Civil

24  Wear, and it had an index with a number of topic

25  headings and number of pages.  If I wanted to go to

1    the Battle of Vicksburg, instead of going through

2    every single page of the book to find the chapter on

3    the Battle of Vicksburg, how could I use an index in

4    order to go directly to where that data record would

5    be located in that database, if you will?

6    A    That's a good analogy.  So if I've got this Civil

7    War history book and I want to learn about Battle of

8    Vicksburg, I don't start on page 1 and go to page 2

9    and 3 and 4 reading it all to see if it says anything

10   about Battle of Vicksburg.

11       I go to the back to the index.  I look up under

12   the alphabetical list.  I looked up V.  I find the

13   Battle of Vicksburg.  And it says pages 301 and 402.

14   So I go back to the book and I look up pages 301 and

15   402.  And those are the data record items that are

16   analogous to the Lawson system.

17   Q    So referring back now to your demonstrative,

18   what's happened is someone has assigned essentially a

19   number to a particular topic, and those can actually

20   be cross-referenced, is that right, to go immediately

21   to where the data record is locate in the database?

22   A    They're not cross-referenced, but they are

23   pointers into the database.

24   Q    And using those pointers, you can quickly go to

25   the record rather than going through every single

WEAVER - DIRECT                    718

1   record that's in the database?

2   A    Exactly.

3   Q    And just so I can -- this is relevant to Claim One

4   of the '172, for example.  Do you have that in front

5   of you?

6   A    This is the database claim.

7   Q    It's Plaintiff's Exhibit 3, for example.  Go to

8   Claim One.  We'll just focus on that first element.

9   Some of the other claims now, Doctor, you have seen

10  that they have referred to at least two other product

11  catalogs?

12  A    Yes, we've seen a lot of those.

13  Q    In this Claim One, there's not a catalog

14  requirement, is there?

15  A    No, nothing about catalogs here.  It's talking

16  about a database.

17  Q    If we could just highlight that first element.  So

18  here it says a database containing data relating to

19  items associated with at least two vendors maintained

20  so that selected portions of the database may be

21  searched separately.  Do you see that?

22  A    I do.

23  Q    Is this index a useful tool in being able to

24  search selected portions of the database separately?

25  A    Yes, it is.

1    Q    Let me ask to you look down at Plaintiff's Exhibit

2    No. 136, I believe.  I'm sorry.  I apologize.  127,

3    which is the first exhibit in Volume III.  Have you

4    seen this document before?

5    A    I have.

6    Q    It's entitled, "Application Design Document for S3

7    Item Search Center."

8    A    Correct.

9    Q    Let me direct you to the page that ends with Bates

10   label 060.

11   A    Okay.

12   Q    The heading there, it's 3.1 S3 item search.  Do

13   you see that?

14   A    Yes.

15   Q    This S3 product, is that the procurement system

16   that Lawson offers that's being accused here?

17   A    It is.

18   Q    What does it represent here with respect to the

19   search index that's available for Lawson?

20   A    The S3 item search center has the capability to

21   search for item information within the item master,

22   the item master table.  Item location, item loq table,

23   and vendor item, P.O. item inventory table.

24        The table below lists the database tables and

25   fields that are searchable.

WEAVER - DIRECT                720

1    Q    What does that indicate to you?

2    A    So what we have here are a list of fields that can

3    be marked as searchable.  And then this index is built

4    from these fields.

5    Q    Does it include vendor item?

6    A    The first one is vendor item.  The second one is

7    description.  And below that we have what I referred

8    to earlier as user-defined fields.  So there are five

9    user-defined fields, which simply means that the user

10   can use them anyway the user likes.  You could use the

11   field as a vendor code, for example.

12   Q    Going to the next page, is it also indexed for

13   commodity code?

14   A    Yes, there's commodity code, there's stock unit of

15   measure, and down at the bottom is vendor.

16   Q    Can you turn to the last page of Plaintiff's

17   Exhibit 127, and there's an asterisk there that

18   says -- well, why don't you tell me what you

19   understand that to mean?

20   A    After vendor was the asterisk.  And on this page

21   the asterisk is explained.  This is true for more

22   fields than just vendor.  These elements can only be

23   used in combination with a search value to filter the

24   results of a search.

25   Q    Can you translate that for us?  What does that

1    mean?

2    A    So in the advanced search page that is a part of

3    this system, you can put in keywords that you want to

4    search for, and you can put in keywords that you want

5    to ignore.

6    Q    Does this table tell us anything about whether you

7    can search in the Lawson S3 system by vendor?

8    A    It says you can.

9    Q    Now, you reviewed Lawson's expert report; is that

10   right?

11   A    I did.

12   Q    Do you know whether or not he acknowledged that

13   the vendor name field can be used in combination with

14   another search value to filter the search by vendor

15   name using this search functionality?

16   A    He did.

17   Q    Dr. Weaver, I'd like to talk to you a little bit

18   about the '516 patent claims, and we're going to have

19   a video at some point with respect to some of that

20   functionality that's claimed in that patent; is that

21   right?

22   A    Yes.

23   Q    Can we just go to Claim One of '516?  Now, this is

24   a fairly lengthy claim, Doctor, and I certainly don't

25   want to take the time to read it into the record here,

1  but at a high level, can you tell us generally what is

2  going on here directed to this type of claim and what

3  the elements are doing here with the sort of overall

4  essence of what this claim is?

5  A    Okay.  So there's a collection of catalogs.

6  There's a first set of predetermined criteria.

7  Q    That's tricky word.  At least it sounds tricky.

8  What is it?

9  A    The things that that could be are many of the

10  items that -- yeah.  Many of the things that we've

11  already mentioned like item number, manufacturer

12  number, vendor number, vendor name, description of the

13  product, UNSPSC classification code.

14  Q    These are all criteria that can be used for

15  searching that are determined ahead of time?

16  A    Yes.  And then there is a second set of those

17  criteria, and the content of that set could be the

18  same as the content of the first set.

19      Then there's a catalog selection protocol whereby

20  you use the first predetermined criteria to select

21  less than all of the catalogs.  And then you use the

22  second predetermined criteria to search within that

23  subset in order to find matching items.

24  Q    So let me see if I understand then.  What we're

25  doing here is search refinement.  That is, we can

1   start out with broad categories and narrow our search

2   in order to arrive at the object of what we want to

3   purchase, for example, in this configuration of

4   electronic sourcing system; is that right?

5   A    Right.  So an example would be if my first

6   predetermined criteria was Dell, I could select a

7   subset of the catalogs that contain an item from Dell,

8   and if my second criteria was Dimension 8100, which is

9   a particular Dell model, I could look within those

10  catalogs for those items that are Dell Dimension

11  8100s.

12  Q    Are there some of the catalog selection protocols

13  described there?  What is your understanding of what a

14  catalog selection protocol is?  First of all, the

15  Court has defined what a protocol is.  So let's just

16  that your definition.  Do you recall what that is?

17  A    For protocol?

18  Q    Yes.  It's on the first page.

19  A    A procedure.

20  Q    So let's call a catalog selection procedure, if

21  you will, since that is the Court's definition, and

22  can you tell us your understanding of that element?

23  What is it?

24  A    So there's a user interface that allows me to

25  input a criteria that's going to select less than all

1  of the catalogs.

2  Q    There was criteria we talked about.  It could be

3  the first set of criteria.   These attributes we've

4  been talking about such as vendor name and

5  manufacturer number, vendor number, textural

6  description?

7  A    Right.   All of those I mentioned as examples of a

8  first set of predetermined criteria.

9  Q    Then you can use that second set of criteria that

10  include those in the first set that then refine the

11  search?

12  A    Correct.

13  Q    This last element is search program.  Search

14  program relying on said second set of criteria to

15  select specific items from the catalogs for said

16  catalogs determined from the catalog selection

17  protocol.   What is going on there?

18  A    So you need a search program that uses that second

19  criteria in order to find specific items within the

20  catalogs that were sub selected by your choice of the

21  first criteria.

22  Q    Do you have a demonstration to illustrate whether

23  or not the Lawson system performs in a manner that is

24  implicated by Claim One of the '516 patent?

25  A    Yes.

1   Q    It's been represented to me it's very short.

2   Would you like me to proceed, Your Honor.   It's

3   Plaintiff's Exhibit 364 is the video and Plaintiff's

4   Exhibit 363 are the corresponding hard copy screen

5   shots.

6   A    Stop.

7   Q    Dr. Weaver --

8   A    Are you ready?

9   Q    Maybe we should make an effort not to stop as much

10  so we can have more of a narrative if the Court would

11  permit.

12          THE COURT:   Whatever he wants to do.   I think

13  he was waiting for you to do a question.

14  Q    Can we proceed with the demonstration?

15  A    We can.   All right.

16  Q    Can you preview it for the jury and tell us what

17  we're going to see here?

18  A    Yes, we're going to see searching for the first

19  criteria of Dell.   And then from those catalogs, we'll

20  see that there are multiple vendors for Dell.   And

21  then we'll refine the search with a Dimension 8100,

22  and we'll find that there are multiple vendors for a

23  more specific search inquiry, and that satisfies the

24  elements of Claim One of the '516.

25          THE COURT:   What are the exhibit numbers?

WEAVER - DIRECT                    726

1            MR. ROBERTSON:   364 is the video and 363 are

2   the hard copies.

3   A    Let's go.  Pick the browser.  Pick the favorite.

4   Pick the portal.

5   Q    Don't go so fast, Doctor, that we lose the import

6   of the point you're trying to make?

7   A    I have contradictory instructions.

8   Q    I apologize.

9   A    This part you have seen before.  So no problem.

10  We're waiting for the portal to load.  Okay.  We're

11  there.  Some requisition self service, shopping, and

12  from our drop down menu we'll now pick search catalog.

13  Stop.

14       So here is the query text box into which I am

15  going to put the first predetermined criteria.

16  Continue.

17            THE COURT:  Excuse me.  What do you

18  understand the catalog that's being searched in the

19  drop down when it says "search catalog"?

20            THE WITNESS:  Well, in this case --

21            THE COURT:  Where is it going to search?

22            THE WITNESS:  In this case it's searching the

23  database of item master and vendor table and, this

24  contains all the catalogs that are in the internal

25  database.

WEAVER - DIRECT                    727

1          THE COURT:  But it's not Punchout at all?

2          THE WITNESS:  No, sir.

3          THE COURT:  Because you have Punchout to get

4    the outside vendors?

5          THE WITNESS:  That's exactly right.

6          THE COURT:  So you search item master and

7    what do you call it?

8          THE WITNESS:  Vendor item table.

9          THE COURT:  Vendor item table.  It says

10   search catalog.  Okay.  Go ahead.

11   A    So stop.  Now, I'm about to enter the first

12   predetermined criteria.  I need to tell you, though,

13   that you see over here as part of this advanced search

14   feature there are -- you only see a partial list of

15   keyword fields that can be searched.

16        So if I wanted to really tightly control the

17   aspects of this search, I could go in and pick, say,

18   the item number.  I wish I had the -- I'll try this.

19   I can pick the item number.  I can pick the item

20   description.  I could pick, say, the first alphabetic

21   user field.  I could designate what fields I want to

22   be searched by whatever I put in this text box, but

23   what I have done is to click over here on search all

24   the fields.

25        So in my demonstration all of the fields that are

1  available are going to be searched using that search

2  index.  Okay.  Go.

3      So I type in Dell.  Stop.  So here are the records

4  in the database that include the keyword Dell.

5  Continue.

6      So there are several.  Let me pick the first one

7  and drill down on that.  Okay, stop.  So this is a

8  Dell Dimension 8100 Pentium 4 computer.  It's

9  available from Dell Computer.  Okay.  Continue.

10     I go back.  I look at another entry.  Stop.  All

11  right.  Here's a Dell Dimension 8100 Pentium 4, but

12  this one is available from Diablo.  The first one from

13  Dell, the second one from Diablo.  Continue.

14     Go back.  Now, I'm going to add the second

15  predetermined criteria.  So I'll put in Dimension

16  8100.  I'll search for that.  Stop.

17     Now, instead of all entries and catalogs that

18  contain the keyword Dell, I have those catalogs

19  containing the keyword Dell that contain the keyword

20  Dimension 8100.  Continue.

21     So here's that first one.  That was available from

22  Dell.  Here's the second one.  It's available from

23  Diablo.  And that's important because when we drill

24  down to the claim, what it says is that I have to be

25  able to find an item from one vendor and then the item

1   from a second vendor.  And that's what I've done here.

2          THE COURT:  So you can compare and find one

3   is $1,000 and one is $1,400?

4          THE WITNESS:  Yes.

5          THE COURT:  And decide which one you want to

6   buy.  Do you have the same product?

7          THE WITNESS:  In this case I do, yes.

8          MR. ROBERTSON:  Your Honor, we're about to

9   move onto another topic.  It's not going to be that

10  long, but it's another topic.

11         THE COURT:  Well, you're using time

12  measurements of which I am familiar; very short and

13  not that long.  What do you have in mind?  The jury

14  has been at it for a while.  I think this is a good

15  time to let them go home.  You get worn out after a

16  while focusing on all the details.  You're paying

17  attention carefully and we all appreciate that very

18  much, but why don't you go have a nice evening, and

19  leave your notebooks with Mr. Neal.

20         Drive carefully and don't discuss the case

21  with anybody if you don't mind.  Don't go online now

22  and try to find a cheap computer.

23         MR. ROBERTSON:  Thank you.

24         (The jury is out for the evening.)

25         THE COURT:  Tell them we'll start at nine in

1    the morning before they get out of here.

2         How much longer do you expect your

3    examination is going to be?  I've interrupted a lot.

4    So I know I've slowed you down.  So I'm sorry.

5         MR. ROBERTSON:  Don't apologize, Your Honor.

6    It's been helpful in many instances.  So thank you.

7         When I sat down at the break, I tried to cut

8    out about 40 pages of it, and I just wanted to make

9    sure I didn't cut out something that was critical.  I

10   need to go through indirect infringement and do that

11   at a fairly high level.  Then I need to march through

12   the claims, and that takes a little bit of time.

13        THE COURT:  I'm just asking you roughly how

14   much time instead of some unit I don't understand.

15   I'm not going to hold you to it.  I don't think that's

16   fair in a case like this, particularly when I

17   interrupt and take your time.

18        MR. ROBERTSON:  You have been patient, sir.

19   I'd like to look at my outline, but I'm going to give

20   you my best estimate right now, and that would be two

21   hours.

22        THE COURT:  We'll start in the morning.

23        Anything else we need to deal with?  What

24   about this issue about the briefing on graphic user

25   interface?  Did you all discuss that as you told me

1  you would?

2          MR. ROBERTSON:  We have, Your Honor.  My

3  suggestion to Mr. McDonald was that we think it's all

4  going to shake out in the wash and in calling back

5  some of these witnesses.  We don't think that it

6  raises any -- I don't think it raises any significant

7  issue on appeal, and I would certainly say I'm not

8  going to use it as a basis of an appeal.

9          What I think my understanding of it, Your

10 Honor, and I've been thinking of it a little bit.  Mr.

11 McDonald and I maybe don't have the same

12 understanding.

13         THE COURT:  Did you have go back to the

14 transcript and see where it was raised?  It was

15 Mr. McDonald's objection.

16         MR. ROBERTSON:  I think what happened is I

17 objected when Mr. McDonald was crossing Mr. Momyer

18 with respect to whether it would be an infringement

19 if --

20         THE COURT:  I'm sorry.  Mr. McDonald's

21 question.

22         MR. ROBERTSON:  Yes.

23         THE COURT:  Yes.

24         MR. ROBERTSON:  And I objected, Your Honor.

25         THE COURT:  Yes.

1           MR. ROBERTSON:  As to whether it would be an

2    infringement if a GUI was used or wasn't used.  I know

3    I'm paraphrasing and probably butchering his question.

4    I objected, I thought, on two bases.  One was because

5    he was asking a fact witness who didn't have the

6    benefit of your construction to give an opinion.  And

7    I also objected, I believe, on the basis of the fact

8    he was asking about a claim term that he then had to

9    comply that the Court had construed.

10           Later on I asked Mr. Johnson about what did

11   you do to modify the RIMS system to become the

12   electronic sourcing system, which is the subject of

13   the patents.  And he indicated, and, again, I'm just

14   summarizing, that he had to go from this green screen

15   character technology monitor to this graphical user

16   interface to make it more user friendly, shall we say.

17           My questions I was attempting to direct is

18   just what did you do, not -- I was asking a technical

19   question, essentially, as to what a GUI is.  So in my

20   view the two are not in conflict in any way, shape or

21   form, but I don't think it's going to have any impact

22   on the outcome of this.  And I certainly don't want to

23   spend a lot more money briefing.  And that was a

24   sentiment that Mr. McDonald and I shared, but I won't

25   speak for Mr. McDonald.

WEAVER - DIRECT                733

1          MR. McDONALD:  Your Honor, the concern I have

2   that relates to these issues has to do with the

3   inventors talking about some wonderful things they did

4   as far as the commercial embodiment of some product

5   they're trying to make.  Whereas, the question that

6   really would be relevant -- by the way, Dr. Weaver is

7   sitting here.  So maybe it's appropriate to dismiss

8   him at this point.

9          THE COURT:  Yes.

10          (The witness was excused from the witness

11   stand.)

12          THE COURT:  For the court reporter, GUI is

13   G-U-I.

14          THE COURT REPORTER:  Thank you, Your Honor.

15          MR. McDONALD:  The concern I have is at this

16   point, Your Honor, there may be some confusion where

17   the inventors were talking about a development towards

18   the commercial embodiment of a product and how that

19   differed from that RIMS prior system, whereas the real

20   issue should be what's in the patent, what's described

21   in the patent as the invention in the claims.

22          I haven't had a chance to finish looking at

23   the transcript there.  I thought I would be getting to

24   Mr. Weaver today, but that didn't quite happen.

25          I'm wondering through the questioning of

WEAVER - DIRECT                 734

1   Mr. Weaver I could get to those issues since he is

2   going to be qualified to talk about the claims here.

3           So I would suggest why don't we see how that

4   goes at least for another day, and if that doesn't fix

5   it, we'll have to go to plan B.

6           THE COURT:  All right.

7           MR. McDONALD:  Thank you.

8           MR. ROBERTSON:  Let me foreshadow a problem I

9   can see with that, Your Honor.  And some of the

10  means-plus-function claims you construed you identify

11  the GUI as structure that can perform the function. so

12  I certainly don't want Dr. Weaver cross-examined on

13  what his understanding is of your construction.

14          He took your construction and he applied it.

15  And so I think that line of questioning would be

16  improper.  I just want to bring that to your

17  attention.

18          THE COURT:  Wait just a minute.  I may have

19  it all wrong, but I thought that the debate you-all

20  had that prompted my question was the fact that

21  graphic user interface wasn't defined, and you were

22  going to ask me to define the term, and I was going to

23  say if you're going do that, I want to have you brief

24  it.  That's what I thought.  That's what my question

25  related to.

WEAVER - DIRECT                735

1          MR. ROBERTSON:  Oh, I'm sorry, Your Honor.

2    Then we completely misunderstood.  But graphical user

3    interface is not a claim term in any of the asserted

4    claims, so there's no reason for the Court to construe

5    it.

6          THE COURT:  All right.  Well, then if you

7    said I defined it in the means-plus-function --

8          MR. ROBERTSON:  No, sir.  In the

9    means-plus-function analysis, the Court had to do a

10   two-step analysis.

11         THE COURT:  What's the function?  What's the

12   structure?

13         MR. ROBERTSON:  Right.  You did that.  Then

14   you identified the structure because you need to

15   identify the structure from the patent as providing

16   that functionality.  That's what is required of a

17   means-plus-function claim.  When you did that in some

18   of the claims you construed, you identified the

19   representative structure as including the GUI for

20   performing certain of the steps like, for example,

21   means for selecting the product catalogs to search, a

22   means for displaying the search results.

23         Those are displayed on the screen.  And, you

24   know, that is what the GUI is.  It's the graphical

25   user interface that permits the user, for example, to

1  get the search results back and view them,

2  essentially.

3        THE COURT:  You're really saying -- you're

4  talking out of both sides of your mouth without

5  intending at all to be pejorative.  It's late in the

6  day, and I lost what I was going to say, but,

7  essentially, what I was going to say is you seem to be

8  taking a different position.

9        Where is the first place in the

10  means-plus-function module that uses the interface?

11        MR. ROBERTSON:  For example, at page 3 of the

12  glossary, Your Honor.

13        THE COURT:  Yes.  Yes, it's in the means for

14  entering product information that at least partially

15  describes at least one desired item.  And the function

16  is defined.  And then the structure is, "The

17  corresponding structures, materials, or acts, of this

18  element are disclosed as a user interface operating on

19  a computer through which a user may provide input; and

20  one or more software modules that provide product

21  information describing an item or a combination

22  thereof, and their equivalents."

23        I did not in that at all, as you just

24  suggested or as I thought you suggested, define what a

25  user interface was.

1          MR. ROBERTSON:  No, sir.

2          THE COURT:  And you said you didn't want Dr.

3   Weaver to be ask asked any questions about what was a

4   user interface, I think.  So to me that presents sort

5   of a different side of the coin, but it's the same

6   coin you're talking about, though.

7          What do you see is going on here and what do

8   you think really is at issue, Mr. McDonald?

9          MR. McDONALD:  Your Honor, I am concerned

10  about the issue of the jury being confused and the

11  ePlus having it both ways because the inventors if

12  they come in and say, We came up with a great

13  invention because it's got a wonderful graphic user

14  interface, then everybody thinks that that's part of

15  the invention, that we got into some validity type of

16  testimony, as much as we tried to avoid it.  And then

17  all of a sudden you say, okay, fine.  That's a great

18  invention.  We want to use it.  And they come back and

19  say, wait a minute, our claims don't require graphic

20  user interface.  That's got nothing to do with the

21  claim's scope.  That's the confusion, I think, that's

22  going to exist but that I was hoping I could clear up

23  with my question of the inventors during the case.

24         THE COURT:  What I intended to was to say you

25  had to question him in your case, but anyway I'm not

1    quite sure I know what the issue is now.  I'll let

2    you-all define it and give me a little paper on it in

3    the morning.  Tell me what it is and then I can go

4    from there and we'll decide what's going on.  I think

5    maybe your time and mine will be better spent if we do

6    that.

7              MR. ROBERTSON:  Could I just point out to

8    Your Honor in that very same definition that you read,

9    this corresponding structure, this is at page 3 of the

10   glossary.  In the "See, e.g.," that's where you're

11   claiming -- you're providing examples of the structure

12   that can perform that function.  And you'll see at the

13   bottom it says, Graphical interface 254.

14             Now, if you look at figure 1B of any one of

15   the patents, 254 is the graphical user interface.  So

16   Your Honor identified that as a structure that

17   actually helps perform the function that you had

18   defined.

19             THE COURT:  Yes, I agree with that.  Why

20   can't he ask him about it then?

21             MR. ROBERTSON:  Ask Dr. Weaver?

22             THE COURT:  Or anybody.  Why can't he ask

23   them whether that infringes, whether what they have

24   infringes, for example?  I don't understand why he

25   can't question about that.

1          MR. ROBERTSON:  I don't know who he's going

2    to question about it.

3          THE COURT:  I'm sure he's going to question

4    Dr. Weaver based on what he said.  Not because I'm

5    prescient or anything.

6          MR. ROBERTSON:  I guess I don't have an

7    objection to that.

8          THE COURT:  Well, good then.  We solved

9    something.

10          Raise the blinds so that in the morning it

11    will be open.

12          All right.  I think that's everything.  And

13    you don't expect to finish tomorrow, is that right,

14    Mr. Robertson?  You don't expect to finish tomorrow,

15    is that what your situation is?

16          MR. ROBERTSON:  I do not, sir.  I expect Mr.

17    McDonald might have a half an hour or 45 minutes of

18    cross-examination.

19          THE COURT:  If you ask your questions bullet

20    points, 30 minutes is plenty.  Once you get beyond

21    that, the expert bets you is generally what happens.

22          All right.  Okay.  So we're not going on

23    Monday.  You're going back on Tuesday.  Thank you very

24    much.  Hope you feel better, all of you.  Don't bring

25    anything else up here.

1

2          (The proceedings were adjourned at 5:15 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25