WEAVER - DIRECT                808

1        THE COURT:  The question was had you seen

2   instances where Lawson will implement multiple vendor

3   data for customers and that was objected to as being

4   beyond the scope of the report.  And then it was said

5   that -- and I should look at appendix 3 of his report

6   page 23, which I have in front of me.  So how does

7   that come into play here?

8        MR. McDONALD:  Your Honor, we're talking

9   about this element and that question is related to --

10       THE COURT:  Which element?

11       MR. McDONALD:  This element regarding a

12  database containing data relating to items, etc.  That

13  is in the left column here in appendix 3 at page 23.

14  So that's the element we're talking right now about.

15       As I understood the question was relating to

16  Dr. Weaver's purported support for his conclusion that

17  the Lawson systems satisfied this element because you

18  can see with the language there under the middle

19  column where he states the basis for his direct

20  infringement opinion, which is what we're talking

21  about right now, he doesn't say it that way.

22       THE COURT:  This goes on for, I don't know,

23  something like 10 pages.  Where in those 10 pages or

24  20 or whatever it is -- good grief.  It goes on to --

25  where does it stop?  It starts on 23 and I'm on 48 and

WEAVER - DIRECT                    809

1   it's still going.  Where does it stop?

2          MR. ROBERTSON:  Well, Your Honor, with

3   respect to -- I think you might be able to stop for

4   the purchases of this discussion at page 45 because

5   you may recall with respect to this M3 procurement

6   system there's a stipulation.

7          THE COURT:  M3?

8          MR. ROBERTSON:  Yes, sir.  It's on page 45.

9          THE COURT:  Uh-huh.

10          MR. ROBERTSON:  So just so for Your Honor's

11   purposes, there's some organization here that relates

12   to the systems that we've been describing.  If I could

13   just point to that first.

14          As you'll see here at page 23 in bold under

15   the column Lawson's direct infringement.  It says, Any

16   system including the S3 procurement system.  That's

17   that core system we've been talking about.

18          THE COURT:  Where are you reading now?

19          MR. ROBERTSON:  On page 23 right next to the

20   claim element there is in bold, Any system including

21   the S3 procurement system.

22          THE COURT:  Okay.

23          MR. ROBERTSON:  Then it goes on identifying

24   considerable evidence including customers who have

25   multiple databases or databases with multiple vendor

1  items for a number of pages.  And all the evidence

2  that the doctor relied on there until you get to page

3  38, which is talking about another configuration of

4  the infringing system we've been discussing, which is

5  that core system plus the EDI module.  Further

6  evidence goes on there.

7           THE COURT:  But the question is -- the

8  question is simple.  Have you seen instances where

9  Lawson will implement multiple vendor data for

10  customers?  Where does he say that?  I have to say

11  that --

12           MR. ROBERTSON:  It says --

13           MR. McDONALD:  Your Honor, the way I'm

14  looking at this, this is the first paragraph on page

15  23 summarizes his conclusions.  Then he includes a

16  bunch of sites for the next several pages.  I'm

17  focusing on that very first paragraph.

18           THE COURT:  No, that's not right because you

19  can read through what he says.  The fact of the matter

20  is the way I read page 24 and following, there are a

21  number of instances where precisely this question is

22  addressed.  It's just addressed in a different format.

23  It doesn't say does Lawson do it.  It just says it is

24  done by Lawson.  By the Lawson system.  So the

25  objection is overruled.

WEAVER - DIRECT                    811

1          You don't have an answer to the question.  If

2     you want the question answered, you have to get an

3     answer to it.  If you don't, move right along.

4     BY MR. ROBERTSON:

5     Q   Doctor, do you have an opinion as to whether or

6     not Lawson provides which of these configurations as

7     we've defined them satisfies the claim element of a

8     database containing data relating to items associated

9     with at least two vendors maintained so that selected

10    portions of the database may be searched separately?

11          THE COURT:  He can't answer that because it's

12    two questions, neither one of which is related to the

13    other one.  You changed the approach to the

14    questioning right in the middle of the sentence.  And

15    so start again and ask it again.  Either way.  It

16    doesn't make any difference, but you have to ask it

17    one way or the other.  Then it will make sense.

18          MR. ROBERTSON:  Let me try and rephrase, Your

19    Honor.  Thank you.

20    BY MR. ROBERTSON:

21    Q   Well, Doctor, do you have an opinion as to whether

22    any of the five accused configurations as we've

23    defined them satisfy the element of a database

24    containing data relating to items associated with at

25    least two vendors maintained so that selected portions

WEAVER - DIRECT                    812

1   of the database may be searched separately?

2   A    I believe that's true of all five.

3   Q    How can the database, selected portions of the

4   database, be searched separately?

5   A    That's what is accomplished by the keyword search

6   index.

7   Q    Does this claim element require catalogs?

8   A    It does not.

9              THE COURT:  We're talking, ladies and

10  gentlemen, about the first element of the only claim

11  that is accused in the '172 patent.  That's when he

12  said this element, does it require a catalog.  He's

13  saying no, it doesn't require a catalog.

14             Is that right?

15             THE WITNESS:  You're correct, Your Honor.

16  Q    Why doesn't it require catalogs?

17  A    Because it requires a database.

18  Q    What does that database have to contain?

19  A    It contains data relating to items associated with

20  at least two vendors.

21  Q    So that data doesn't have to be organized in the

22  way that the Judge has defined "catalog" in the

23  glossary of terms, first definition that's available

24  at tab 6 of the Judge's claim constructions; is that

25  right?

1    A    That's correct because "catalog" does not appear

2    in the first element of this Claim One of the '172

3    patent.

4    Q    Do you have an opinion as to whether or not the

5    Lawson -- which Lawson accused systems -- let me start

6    over.  Do you have an opinion as to whether or not

7    the five systems as we have defined them satisfy the

8    claim element of means for entering product

9    information that at least partially describes at least

10   one desired item?

11   A    Yes, all five.

12   Q    Where do we see examples of that?

13   A    In the product documentation and in my

14   demonstrations.

15   Q    How do you do that?

16   A    You enter a keyword into a text box using the user

17   interface that is provided by either the RQ, the

18   requisitions module, or the requisition self service

19   module.

20   Q    Do you have an opinion as to whether all five

21   systems, as we've defined them, satisfy the claim

22   element of means for searching for matching items that

23   match the entered product information in the selected

24   portions of the database?

25   A    Yes, all five do that.  They all provide a search

WEAVER - DIRECT                    814

1  engine and they all use the keyword search index.

2          MR. McDONALD:  Your Honor, configuration

3  No. 1 is not accused with this claim, so I think it's

4  confusing to have them going element through element

5  for all five of them.  I think the ones that include

6  the RSS should be --

7          THE COURT:  Mr. Robertson, what saith thou?

8          MR. McDONALD:  I'm actually confused by --

9          THE COURT:  Let me let you-all do this.  I

10  thought we'd be through with Dr. Weaver by now and

11  we'd take our morning break, but you have been here

12  for four hours working at it now.  I think it's a good

13  time to stretch your legs and get this sorted out, and

14  then we'll come back and conclude with Dr. Weaver's

15  direct and have cross-examination.

16          Take your pads with you.  We'll take a

17  20-minute recess.

18          It's different in different courts, isn't it?

19  In state court here you stand up or you used to.  It's

20  been so long since I've been in state court I don't

21  know.  But you can sit down and examine witnesses.

22          You-all get that straight, will you?  What he

23  said basically is that the first configuration, which

24  is the platforms, the yellow box, plus the S3 modules,

25  which has purchase order inventory and requisitions

1    aren't accused.  Isn't that what your objection was?

2         MR. McDONALD:  That's right.

3         THE COURT:  The question was confusing if he

4    is giving opinion that it does infringe.  In addition

5    to that, it is beyond where you are in the discovery

6    process.  And we have to sort that out and then get

7    your question straight, and go forward from there

8    while we're having a recess.

9         Thank you.  Recess for 20 minutes.

10        (Brief recess taken.)

11        THE COURT:  All right.  Have we gotten

12   ourselves ready to go now?

13        MR. ROBERTSON:  Yes, sir.

14        THE COURT:  All right.  Let's go.

15   BY MR. ROBERTSON:

16   Q   Dr. Weaver, we were looking at Claim One, the '172

17   patent.  The fifth element down I'd like you to focus

18   on as.  It's a means for building a requisition that

19   uses data obtained from a database relating to

20   selected matching items on said order list.  Do you

21   see that, the order list?

22   A   Yes.

23   Q   Which Lawson application did we see that had the

24   capability of providing an order list?

25   A   The shopping cart.  So the RSS module.

1   Q    So in order to have an infringing configuration

2   for Claim One of the '172 patent, you need to have the

3   RSS application; is that right?

4   A    Yes.

5   Q    And the way that we have defined these

6   configurations, configurations 2, 3 and 5 have RSS; is

7   that right?

8   A    That's my diagram as well.

9   Q    So with respect to Claim One of the '172 patent,

10  I'd like you to focus on systems 2, 3 and 5.  All

11  right?

12  A    Right.

13  Q    So let's go back again since we should start over

14  on the first element.  First, in configurations 2, 3

15  and 5, do you have an opinion as to whether or not

16  those are electronic sourcing systems as the Court has

17  defined them?

18  A    They are.

19  Q    To the extent that Lawson encourages, urges, aids

20  and abets, do they indirectly infringe that claim as

21  well?

22  A    They do.

23  Q    I'm just going to be focusing now, my questions,

24  on configurations 2, 3 and 5.  Okay?  Do those

25  configurations satisfy the claim element of a database

WEAVER - DIRECT                    817

1  containing data relating to items associated with at

2  least two vendors maintained so that selected portions

3  of the database may be searched separately?

4  A    Yes, they do.

5  Q    And in your opinion by the acts that we have

6  described does Lawson satisfy that element for

7  indirect infringement?

8  A    Yes.

9  Q    Do configurations 2, 3 and 5 have means for

10  entering product information that at least partially

11  describes at least one desired item?

12  A    Yes, 2, 3 and 5, they do.

13  Q    Do 2, 3 and 5 satisfy the element of means for

14  searching for matching items that matched the entered

15  product information in the selected portions of the

16  database?

17  A    They do.

18  Q    How did we see that?

19  A    Because of the user interface that we saw in the

20  requisition self service.

21  Q    And we saw that in your demonstrations?

22  A    Sure, we did.

23  Q    Do configurations 2, 3 and 5 have means for

24  generating an order list that includes at least one

25  matching item selected by said means for searching?

1   A    They do.

2   Q    Is it that RSS module that provides that order

3   list or shopping cart as you referred to it?

4   A    Yes, the RSS is where the shopping cart

5   functionality resides.

6   Q    Do configurations 2, 3 and 5 of the accused Lawson

7   systems have a means for building a requisition that

8   uses data obtained from said database related to

9   selected matching items on said order list?

10  A    They do.

11  Q    Do configurations 2, 3 and 5 have a means for

12  processing said requisition to generate purchase

13  orders for said selected matching items?

14  A    They do.  We saw that in the demo.

15  Q    The searching that's the subject of the means for

16  searching which permits you to search a database,

17  selected portions of a database, what evidence did we

18  see that that was present?

19  A    That was the search index that selected only --

20  that searched only selected portions of the database.

21  Q    Now, if Lawson provides such an electronic

22  sourcing system to its customers and assists them in

23  implementation, maintenance, servicing and all the

24  training materials, guides, manuals, online services,

25  etc., do you have an opinion as to whether or not all

WEAVER - DIRECT                 819

1    these remaining elements are indirectly infringed by

2    Lawson by providing those services?

3    A    My opinion is that they do.

4    Q    Why don't we go to the claims of the '516 patent.

5    And that's behind tab 3 in the jurors' notebook.  The

6    first claim we're going to talk about there is Claim

7    One.  And, again, the preamble says it's an electronic

8    sourcing system.  Do you see that?

9    A    Yes.

10   Q    And the Court has defined that.  It's the same for

11   Claim One, for example, of the '172 patent.  Is it

12   your opinion that all five configurations that are

13   accused here are electronic sourcing systems as the

14   Court has defined them?

15   A    Yes.

16   Q    This electronic sourcing system also comprises a

17   collection of catalogs of items stored in electronic

18   format.  Do all five configurations, as we have

19   defined them, satisfy that claim element?

20   A    Right, all five contain multiple internal

21   catalogs, and when you add Punchout, you can add

22   external catalogs as well.

23   Q    Do all five configurations of these accused Lawson

24   systems as we've defined them satisfy the claim

25   element of having a first set of predetermined

1   criteria associated with said collection of catalogs?

2   A    Yes, they do.

3   Q    What evidence do we see for that?

4   A    We saw in my demonstration that you could enter an

5   item number, or vendor item, manufacturer number.  You

6   have a text box in the user interface that allowed

7   that.

8   Q    Do all five configurations of the accused Lawson

9   systems as we've defined them have a second set of

10  predetermined criteria associated with items from each

11  of said catalogs?

12  A    Yes, they do.

13  Q    How do they do that?

14  A    Again, that's the text box.

15  Q    Do all five configurations have a catalog

16  selection protocol, said catalog selection protocol

17  relying on said first set of predetermined criteria to

18  select less than said entire collection of catalogs,

19  including a matching vendor identification code with a

20  subset of said collection of catalogs wherein said

21  subset of catalogs includes both a vendor catalog from

22  a predetermined vendor and a second catalog from a

23  predetermined third party that's one of a manufacturer

24  and a competing vendor, said predetermined third party

25  selling items corresponding to items in said vendor

1  catalog?

2  A    That's a mouthful, isn't it?  The answer is yes.

3  And we saw that yesterday when I did the demonstration

4  where I first searched for Dell and got back items

5  that included Dell as one of these keywords.  So that

6  was my first predetermined criteria.

7       And then I added a second predetermined criteria,

8  the Dimension 8100, and that narrowed the search down

9  to just two items, but they were from different

10  vendors, Dell and Diablo.  So one of them was a

11  competing vendor.  Dell is a manufacturer.  Dell is a

12  competing vendor.

13      So, yes, we've seen evidence that these systems

14  that we're talking about directly infringe the fourth

15  element of Claim One.

16  Q    The last element of Claim One of the '516 patent

17  is a search program.  Said search program relying on

18  said second set of criteria to select specific items

19  from said catalogs determined from said catalog

20  selection protocol.  Did I read that correctly?

21  A    I think so.  Again, we saw that yesterday in the

22  demonstration where Dimension 8100 was the second set

23  of predetermined criteria.

24  Q    Did you use that second set of predetermined

25  criteria to conduct the search?

1   A    Yes, I did.

2   Q    So do all five configurations of the accused

3   systems as we've defined them satisfy all of the

4   elements of Claim One of the '516 patent?

5   A    Yes, they do.

6   Q    If Lawson offers all five of those configurations,

7   manufacturers, sells or imports, do they directly

8   infringe this claim?

9   A    Yes, they would.

10  Q    And in the same manner, if they provide such a

11  system to their customers and then induce them to use

12  that system by the evidence that you've offered of

13  assisting, aiding, abetting, encouraging, etc.,

14  through all the various services and implementation

15  and educational services they provide, what is your

16  opinion with respect to whether or not Lawson

17  indirectly infringes Claim One?

18  A    I believe they do.

19  Q    So they would satisfy all of the elements if they

20  provided a system that had this capability and then

21  performed those acts that would constitute inducement?

22  A    Yes.

23  Q    Let's look at Claim Two of the '516 patent, which

24  is a dependent claim.  Do you understand that?

25  A    Sure.  It depends from Claim One.

1   Q    So we have to satisfy all the elements of Claim

2   One, which you just indicated for all five

3   configurations is infringing.

4        Claim Two talks about having catalogs stored in

5   separate databases.  Do you see that?

6   A    I do.

7   Q    How would the configurations as we've defined them

8   satisfy this separate database requirement?

9   A    These would be external databases that are

10  accessible through the Punchout module.

11  Q    Could they be a Punchout external plus Lawson

12  internal catalogs?

13  A    Of course.

14  Q    So if it requires Punchout, only configurations 3

15  and 5, as we've defined them, have Punchout; is that

16  right?

17  A    That's my diagram, yes.

18  Q    So your opinions with respect to Claim Two, I'd

19  like you to confine them to just configurations 3 and

20  5 that have the Punchout application.  Okay?

21  A    Right.

22  Q    Does Lawson configurations 3 and 5 satisfy the

23  claim cited in Claim Two of an electronic sourcing

24  system as recited in Claim One wherein catalogs

25  comprised of said collection of catalogs are stored in

1  separate databases?

2  A   Yes, we saw that in the Punchout to Dell and

3  Staples.

4  Q   Do they indirectly infringe in the same manner

5  that you have been describing?

6  A   Yes.

7  Q   Let's go to Claim Six if we can.  Again, Claim Six

8  is a dependent claim that depends on Claim One.  So

9  all the elements of Claim One need to be satisfied,

10  and you have already rendered an opinion that that is

11  present.

12      Claim Six recites an electronic sourcing system as

13  recited in Claim One where it said second set of a

14  predetermined criteria includes at least one of a

15  catalog number and an item textual information.  Do

16  you see that?

17  A   I do.

18  Q   Do configurations 3 and 5 including -- excuse me.

19  Let me step back.  What configurations satisfy Claim

20  Six that has at least one of the catalogs -- excuse

21  me -- wherein said set of predetermined criteria

22  includes at least one of the catalog number and item

23  textual information?

24  A   All five.

25  Q   Does Lawson indirectly infringe in your opinion in

WEAVER - DIRECT                           825

1  the same manner you have been describing?

2  A    Yes.

3  Q    Let's look at Claim Nine if we could.  Claim Nine

4  is an independent claim, is that right, Doctor?

5  A    It is.

6  Q    Again, it has the an electronic sourcing system

7  comprising.  Is that in your view the same electronic

8  sourcing system that the Court has defined?

9  A    It is.

10 Q    Which of the configurations has a collection of

11 catalog items stored in electronic format?

12 A    All five have this first element.

13 Q    Which of the configurations have a first

14 identification code associated with a first term in a

15 first catalog?

16 A    First item in a first catalog.  That's all five.

17 Q    Okay.  This last element has a second

18 identification code associated with a second item in a

19 second catalog.  Said first item and said second item

20 being generally equivalent and wherein a selection of

21 one identification code from one of said first and

22 second catalogs provides the other identification code

23 from the other of said catalogs.

24        MR. McDONALD:  Your Honor, I object.  I think

25 for this claim we're just talking about all the

1   systems except one.  So I did rather the questions

2   were phrased in that context.

3            MR. ROBERTSON:  I think when he answers the

4   question, we can find out which configurations satisfy

5   this element and therefore that will identify the

6   configurations that are infringed.

7            MR. McDONALD:  The prior ones he's already

8   used all the systems.  I was a little slow in reacting

9   there.

10           THE COURT:  Which ones do you say are charged

11  with infringement in the complaint of Claim Nine.

12           MR. McDONALD:  All except No. 1.  Systems 2

13  through 5 are accused of infringing Claim Nine, as I

14  understand it.

15           THE COURT:  Is that right or is it wrong?

16           MR. ROBERTSON:  I don't have it committed

17  right to my memory right this second.

18           Your Honor, let me rephrase it.

19           THE COURT:  But you have to go back and

20  rephrase all of them if he's right.

21           You-all know which ones allegedly are

22  infringed.  He says that all five infringe it, but

23  whether he accused them of that in the complaint, I

24  don't know.  I don't have it in front of me.

25           Do you have it over there, somebody?

1          MR. ROBERTSON:  Let me do it this way, if I

2    could.

3    BY MR. ROBERTSON:

4    Q    Doctor, this last element of Claim Nine, let's

5    focus on that.  A second identification code

6    associated with a second item in a second catalog said

7    first item and said second item being generally

8    equivalent and wherein a selection of one

9    identification code from one of said first and second

10   catalogs provides the other identification code from

11   the other of said catalogs, what configurations have

12   we seen that can satisfy this claim element of Claim

13   Nine?

14   A    That one needs the catagory searched, which I

15   demonstrated with the UNSPSC codes, and that's

16   implemented by the requisition self service module.

17   And as we have defined them, that's configurations 2,

18   3 and 5.

19   Q    Just configurations 2, 3 and 5 have the ability to

20   do that UNSPSC capability in order to satisfy this

21   claim element?

22   A    That's correct.

23   Q    Let's just focus on configurations 2, 3 and 5 for

24   purposes of this claim.

25          THE COURT:  The objection to the question,

1    though, I think, has been cured.  When he said all

2    five satisfy element one and satisfy element two, then

3    per force that includes 2, 3 and 5.  So he's answered

4    the questions, but the bottom line is that only the

5    configurations 2, 3 and 5 are charged to infringe

6    directly or indirectly Claim Nine; is that right?

7              THE WITNESS:  That's right, sir.

8              THE COURT:  Was that your opinion, sir?

9              THE WITNESS:  Yes, sir, it is.

10             THE COURT:  All right.  Now, what about

11   indirect?

12   BY MR. ROBERTSON:

13   Q   By Lawson making, using, selling, offering for

14   sale or importing electronic sourcing system that's

15   capable of performing all of these elements and by

16   encouraging, aiding, assisting and abetting their

17   customers to use that same system through all of the

18   various evidence you have offered as to providing

19   manuals and guides and online services and training

20   and implementation and servicing, do you have an

21   opinion as to whether all of the elements of Claim

22   Nine are satisfied and Lawson indirectly infringes

23   that claim?

24             THE COURT:  As to which systems?

25             MR. ROBERTSON:  Two, 3 and 5.

WEAVER - DIRECT                    829

1    A    Yes, I do.

2    Q    What is the opinion?

3    A    I believe that they indirectly infringe for

4    configurations 2, 3 and 5.

5    Q    Okay.  Let's focus on Claim 21 if we can for a

6    minute, of the '516.  Let me focus on the last element

7    first, if I could.

8         The last element says, Wherein said determination

9    system includes a cross-reference table matching an

10   identification code from a first located item with a

11   second identification code from a second located item.

12   Do you see that?

13   A    I do.

14   Q    So this element requires a cross-reference table.

15   Do you see that?

16   A    I do.

17   Q    What software application or module of Lawson is

18   required in order to do this cross-reference table

19   matching?

20   A    That's requisition self service.

21   Q    So, therefore, that would include configurations

22   2, 3 and 5; is that right?

23   A    That's right.

24   Q    So focusing only on configurations 2, 3 and 5 for

25   the purposes of Claim 21, is it your opinion that

1  those configurations comprise an electronic sourcing

2  system?

3  A   Yes, it is.

4  Q   Do those configurations have a requisition module

5  including data fields, user generated criteria entered

6  into at least one of said data fields to generate at

7  least partial criteria corresponding to a desired

8  item?

9  A   They do.  The requisition module has data fields

10 like the name of the requester.  And the user

11 generated criteria could be things like the vendor

12 number, vendor name, item number, manufacturer number.

13 Q   Do the configurations 2, 3 and 5 have a catalog

14 collection searching module, said searching module

15 including a collection of catalogs of items stored in

16 an electronic format, a catalog collection criteria

17 used to select less than the entire collection, said

18 searching module being used to generate additional

19 search module criteria for said data fields of said

20 requisition module?

21 A   They do.  And we saw that when I did a search for

22 Dell, and that returned items, and I drilled down on

23 the items.  And the item page produced the -- what's

24 the proper name for it?  Yeah, to generate additional

25 search module criteria.

WEAVER - DIRECT                    831

1    So in the item description, there were things like

2  that cost, and the unit of measure, and the vendor

3  name, and I could have used those items like vendor

4  name as the additional search criteria.

5  Q    Do configurations 2, 3 and five have a multiple

6  purchase order generation module, said purchase order

7  generation module creating multiple purchase orders

8  from a single requisition created with said user

9  generated criteria and said search module criteria?

10 A    Yes, they do, and we saw that in three of my

11 demos.

12 Q    Do configurations 2, 3 and 5 of the accused Lawson

13 systems satisfy the element wherein each of at least

14 two catalogs include a generally equivalent item from

15 a different source of said requisition module working

16 in combination with said catalog searching module to

17 determine multiple sources for said item?

18 A    They do, and we saw that in my first demo where I

19 looked for -- I used the UNSPSC codes to look for

20 notebook computers and found two different computers

21 from two different vendors.

22 Q    Do configurations 2, 3 and 5 satisfy the element

23 wherein said multiple sources is limited by said

24 catalog searching module providing a match according

25 to said user generated criteria, said search module

1   criteria in a determination system that located items

2   are generally equivalent?

3   A    They do.  And, again, we saw that in my first demo

4   using the UNSPSC codes to drill down to notebook

5   computers, and we found the IBM ThinkPad and the Dell

6   notebook.

7   Q    Do configurations 2, 3 and 5 satisfy the claim

8   element wherein said determination system includes a

9   cross-reference table matching identification codes

10  from a first located item with a second identification

11  code from a second located item?

12          THE COURT:  He's already answered that.  He

13  answered that.  That's what you started with.  You

14  started with six, and you did 1, 2, 3, 4 and 5

15  elements.

16          Is your answer yes or no?

17          THE WITNESS:  The answer is yes.

18  Q    Do you have an opinion as to whether or not Lawson

19  indirectly infringes Claim 21 by inducing infringement

20  by all of the activities that we've previously

21  described by offering a system that's capable of

22  performing these claim elements?

23  A    My opinion is that they do.

24  Q    Would that be for all the elements?

25  A    It would.

WEAVER - DIRECT                    833

1    Q    Can we go to Claim 22?  Claim 22, again, is one of

2    these dependent claims which depends on Claim 21,

3    which adds the additional limitation wherein said

4    determination system includes an identical

5    identification code for each of said located items.

6    Do you have an opinion as to whether or not the

7    configurations of the accused Lawson systems 2, 3 and

8    5 satisfy that claim element?

9    A    My opinion is that they do.  We saw that twice.

10   Once in the demonstration where we drilled down to

11   notebook computers and this morning where we drilled

12   down to halogen lamps.  The UNSPSC codes were

13   identical for the two notebook computers and identical

14   for the two halogen lamps.

15              THE COURT:  Which of the configurations are

16   we talking about; 2, 3 and 5?

17              THE WITNESS:  Two, 3 and 5.

18   BY MR. ROBERTSON:

19   Q    Why don't we go to Claim 29 of the '516.

20   Actually, I'm reminded I may have overlooked indirect

21   infringement on this one.  Does Lawson indirectly

22   infringe Claim 22 in the same manner that you have

23   been describing, for example, as they indirectly

24   infringe Claim 21?

25   A    Yes.

1   Q    Okay.  Thank you.

2        Claim 29 recites an electronic sourcing system.

3   I'd like you to focus only on configurations 2, 3 and

4   5 for purposes of this claim.

5        Are configurations 2, 3 and 5 an electronic

6   sourcing system in your opinion as the Court has

7   defined it?

8   A    They are.

9   Q    Do configurations 2, 3 and 5 have a collection of

10  catalogs of items stored in electronic format?

11  A    They do.

12  Q    Do configurations 2, 3 and 5 have a first set of

13  predetermined criteria associated with said collection

14  of catalogs?

15  A    They do.

16  Q    Do configurations 2, 3 and 5 have a second set of

17  predetermined criteria associated with items from each

18  of said catalogs?

19  A    They do.

20  Q    Do configurations 2, 3 and 5 have a catalog

21  selection protocol, said catalog selection protocol

22  relying on said first set of predetermined criteria to

23  select less than said entire collection of catalogs

24  and including matching a vendor identification code

25  with a subset of said collection of catalogs wherein

1  said subset of catalogs includes both a vendor catalog

2  from a predetermined vendor and a second catalog from

3  a predetermined third party?

4  A    Yes, they do.  We saw that in my demo for the

5  notebook computers.

6  Q    The Court has defined "subset" in its glossary.

7  What has the Court defined "subset" to be?

8  A    Less than all of a set.

9  Q    Did you apply that construction in rendering your

10 opinions?

11 A    I did.

12 Q    Next element of Claim 29 of the '516 recites a

13 search program, said search program relying on said

14 second set of criteria to select specific items from

15 said catalogs determined from said catalog selection

16 protocol.  Do you see that?

17 A    I do.

18 Q    Do you have an opinion as to whether or not

19 configurations 2, 3 and 5 satisfy that claim element?

20 A    They do.  We saw that in my demonstration

21 searching for Dell as the first predetermined criteria

22 and the Dimension 8100 as the second.

23 Q    The last element of Claim 29 recites the

24 cross-reference table linking a vendor item catalog

25 number from said vendor catalog with an item catalog

WEAVER - DIRECT                    836

1  number from said predetermined third party.

2      Do configurations 2, 3 and 5 satisfy that claim

3  element?

4  A   They do using the UNSPSC codes.

5  Q   Do you have an opinion as to whether or not Lawson

6  induces infringement of its customers by providing an

7  electronic sourcing system that's capable of doing all

8  of these elements of Claim 29?

9  A   My opinion is that they do.

10 Q   Earlier I asked you whether or not these five

11 configurations in the manner that they are configured

12 as we've defined them had any kind of substantial

13 non-infringing use if they had at least two product

14 catalogs available to them.  Do you recall that?

15 A   I recall the question.

16 Q   With respect to indirect infringement as to all

17 the claims you have just identified for any of the

18 configurations that are the subject of indirect

19 infringement, do you have an opinion as to whether or

20 not Lawson would contribute to infringement if those

21 systems as configured had no substantial

22 non-infringing use?

23 A   I didn't understand the question.

24 Q   Sure.  Let me go back.  Earlier you went through

25 this issue of whether or not there was a substantial

1  non-infringing use for the various configurations

2  we've talked about here.  Here we have five separate

3  configurations.  And I asked you whether or not if a

4  configuration had at least two product catalogs, would

5  it have any substantial non-infringing use.

6  A    And I said it would not have.

7  Q    So if it did not have a substantial non-infringing

8  use and had at least two catalogs for a system, do you

9  have an opinion as to whether or not based on that

10 Lawson would be contributing to infringement for the

11 same claims that you have identified here for each

12 configuration?

13 A    It would.

14        MR. ROBERTSON:  Thank you, Doctor.  I have

15 nothing further.

16

17    CROSS-EXAMINATION

18 BY MR. McDONALD:

19 Q    I was going to say good morning, but now I'll say

20 good afternoon.

21 A    Good afternoon, Mr. McDonald.

22 Q    Now, you would agree, wouldn't you, that for all

23 the claims that are at issue in this case, they all

24 claim a combination of parts?

25 A    They do.

WEAVER - CROSS                        838

1    Q    And in order to infringe Lawson's products, we

2    need to have every element of any one claim in order

3    to infringe that system claim, right?

4    A    That's correct.

5    Q    For the method claims, either Lawson or whatever

6    party you're saying is the one that's practicing the

7    method, every single step of that method claim would

8    have to be satisfied in order to infringe that claim,

9    right?

10   A    That's correct.

11   Q    Would you agree that at least 11 out of the 12

12   claims in this case require multiple catalogs or a

13   collection of catalogs?

14   A    Yes.

15   Q    So if Lawson's system doesn't use multiple

16   catalogs or a collection of catalogs you would agree

17   that 11 of the 12 claims in this case are

18   non-infringed, correct?

19   A    Correct.

20   Q    Could we put up the Court's definition of the term

21   "catalogs," please.

22        Actually, that's the definition of just the

23   singular "catalog" here.  Am I right, Dr. Weaver?

24   A    Right.

25   Q    Now, you applied that definition in your report

WEAVER - CROSS                    839

1  that you prepared for this case, is that right, in

2  analyzing the claims in Lawson's systems?

3  A    That's correct.

4  Q    Now, with respect to your analysis, specifically

5  of catalogs, you indicated that because catalog data

6  maintained in the Lawson S3 item master database

7  originated from vendors, for that reason the Lawson's

8  item master database was therefore published by

9  vendors; is that right?

10  A    Yes.

11  Q    You would agree that the word "originated" doesn't

12  mean the same thing as the word "published," right?

13  A    No, not necessarily.

14  Q    When you say "not necessarily," are you agreeing

15  with me or not?  I am not sure.

16  A    I'll say no.

17  Q    So you would agree that saying published would

18  include the concept of some kind of public

19  dissemination?

20  A    Yes.

21  Q    And in contrast, "originate" would be first

22  brought into being, right?

23  A    That's what I said.

24  Q    Well, you still agree that today, correct?

25  A    Yes, I do.

WEAVER - CROSS                    840

1   Q    So, for example, if I had a personal address book

2   and I was going to put a phone number of somebody in

3   there that came from a phone book, my address book, if

4   it had one entry from that published phone company

5   phone book, my address book would have an entry in it

6   that originated from that phone book in that case,

7   correct?

8   A    Correct.

9   Q    But in that case if it's my personal address book,

10  I didn't publicly disseminate it, I just keep it in my

11  own house, would you consider that to be a published

12  phone book?

13  A    Well, that data came from a published phone book,

14  so yes.

15  Q    So my personal address book that has one entry

16  from a published phone book, you'd consider my address

17  book to be a published phone book, right?

18  A    Its data came from am published phone book.

19  Q    What about the address book itself?  It's got a

20  collection of phone numbers including one phone number

21  that came from that published phone notebook.  Would

22  my address book, my collection of phone numbers, in

23  your opinion be a published phone book?

24  A    Yes.

25  Q    Who would have published my personal address book

WEAVER - CROSS                    841

1   according to you, Dr. Weaver?

2   A    You have used data from a public source.

3   Q    So, according to you, my personal address book

4   that has a few entries of my own personal family and

5   friends and one entry from the Richmond public phone

6   book, my personal address book in your opinion was

7   published by the phone company, right?

8              MR. ROBERTSON:  Objection.  It's been asked

9   and answered.

10             THE COURT:  Sustained.

11             MR. McDONALD:  I didn't ask published by the

12  phone company, Your Honor.

13             THE COURT:  Been there and done that.  Go

14  ahead.

15             MR. McDONALD:  Okay.

16  Q    Now, if we put this in the context of a catalog

17  now specifically.

18             MR. McDONALD:  Your Honor, I'd like to use

19  the ELMO at this point with Ms. Huey's help.  Is that

20  all right?

21             THE COURT:  We're going to use what now?

22             MR. McDONALD:  The machine in the corner

23  there.  We've got a catalog.  I forgot the numbers on

24  those.  Can you tell me the number.

25             We have a Sears catalog and Ward's catalog

1    here.

2              MS. HUEY:  Sears is DX 257.

3              THE CLERK:  DX 257, Your Honor.

4              MS. HUEY:  Montgomery Ward's is DX 258.

5    BY MR. McDONALD:

6    Q    So, Dr. Weaver, you're familiar with published

7    catalogs in the paper sense, right?

8    A    Yes, I am.

9    Q    You've talked to the inventors relating to the

10   patents in this suit more than once, I believe,

11   haven't you?

12   A    Briefly, yes.

13   Q    Do you understand that, according to them anyway,

14   the way this patented system came about is that they

15   had this old system called the RIMS system?

16   A    Yes.

17   Q    And then they wanted to add some additional

18   capabilities to that RIMS system, right?

19   A    Yes.

20   Q    And those additional capabilities were inspired by

21   the idea that at customer installation, people using

22   the RIMS system still had published vendor catalogs on

23   their shelves in paper form, right?

24             MR. ROBERTSON:  I'm going to object, Your

25   Honor.  This is outside the scope of my direct

1    examination.  I asked nothing about the RIMS system,

2    and Dr. Weaver is an infringement expert.  He hasn't

3    rendered any opinions with respect to any validity

4    issues.

5            THE COURT:  Sounds to me like it.

6            MR. McDONALD:  Well, the RIMS system is part

7    of the disclosure of the patent in case I'm talking

8    about what the invention is, Your Honor, which is very

9    relevant to his opinions and his understanding of what

10   the invention is.  And this RIMS system and what

11   happened to add to the RIMS system, that being the

12   invention story here, is very relevant to his

13   testimony.

14           THE COURT:  Your talking about whether the

15   invention infringes.  That's all he gave opinions

16   about.  Objection sustained.

17           If you want to call him in your case on that

18   issue, you can do that, but that's different.

19   BY MR. McDONALD:

20   Q   So a typical Sears catalog, Dr. Weaver, you would

21   agree that's got hundreds, probably even thousands, of

22   products described in it?

23   A   Yes.

24   Q   Is it organized somehow?

25   A   Yes, it's organized.

WEAVER - CROSS                    844

1    Q    How would you describe the organization of a

2    typical Sears catalog?

3    A    That it includes, as with the Court's definition

4    here, it includes Sears part numbers, a description of

5    the item, a cost, the vendor is known.  It's Sears.

6    Q    Would it typically be organized by type of product

7    as well as ladies' clothes in one section, men's in

8    another, and chainsaws in another?

9    A    It might be, sure.

10   Q    In your experience is that pretty typical of a

11   published catalog?

12   A    Yes.

13   Q    And --

14           THE COURT:  You mean is it typical that they

15   are organized by product type?

16           MR. McDONALD:  Yes.

17           THE COURT:  Or catagory.  Is that what your

18   answer is?

19           THE WITNESS:  Yes, Your Honor.

20   BY MR. McDONALD:

21   Q    So, Dr. Weaver, if someone takes a Sears catalog.

22           MR. McDONALD:  And, Ms. Huey, I wonder if you

23   could just put up a page of the catalog and identify

24   the number again for me as you're putting it up.

25           MS. HUEY:  DX 257.

WEAVER - CROSS                    845

1    Q    DX 257.  Just turn to a page with a product

2    description in there, please.

3        This is from 1984.  Can you see that, Dr. Weaver,

4    that it says 1984?

5    A    I can.

6    Q    Fall-winter catalog for Sears?

7    A    I see that.

8            MR. McDONALD:  Could you turn, Ms. Huey, to

9    an entry in the catalog there and zoom in.  Can you

10   zoom that to one of the dresses there, the

11   description, let's say, on the left side, please.

12           THE COURT:  You want the description or the

13   picture?

14           MR. McDONALD:  The description.

15   BY THE COURT:

16   Q    We'll use No. 1 there under the dress circle.

17       Do you see there, Dr. Weaver, there's a

18   description that looks like it starts off with 1

19   through 5 of some various ladies' clothes, and then we

20   have the number 1 next to the dollar figure as low as

21   $42?

22   A    I see the 1 through 5.

23   Q    Okay.  Do you see the number 42?

24   A    Yes.  Oh, okay.

25   Q    Right next to that there's the parenthetical 1?

WEAVER - CROSS                          846

1   A    Yes, I see that.

2   Q    That's got a description about a simply elegant

3   fortrel polyester wool jersey there, right?

4   A    Yes.

5   Q    So this would be a typical catalog type of entry,

6   correct?

7   A    It is for Sears.

8   Q    For Sears, right.  Different companies selling

9   different products would describe their products

10  different ways, right?

11  A    Right.

12  Q    But the whole point of the description is to have

13  enough of a description there so that somebody

14  browsing through catalog looking for things that they

15  might want to buy, they get enough information to make

16  a decision about whether they might want to buy that

17  product, correct?

18  A    They certainly do.  The description is intended to

19  inform about the product.

20  Q    Inform potential buyers about the product?

21  A    Inform potential buyers about the product.

22  Q    This is written from the standpoint of the seller

23  of the products, right, trying to get business?

24  A    Correct.

25  Q    Now, if I'm making a shopping list, let's say, and

WEAVER - CROSS                          847

1    I make a note about this dress on my own piece of

2    paper here.  So I just make a note of wool jersey,

3    let's say.  And I put down the word "Sears," and I

4    make a note of the catalog number of it.  I could do

5    that, right?

6    A    You could.

7    Q    And on this page, do you see it looks like there's

8    a catalog number for a cranberry, I assume color of

9    the dress, beginning with T31?

10   A    Yes, I see that.

11   Q    And then it goes on H49016F, correct?

12   A    Yes.

13   Q    So if I was going to perhaps place a call or go on

14   the Internet, I've might write down that catalog

15   number on my personal shopping list, right?

16   A    You might.

17   Q    Perhaps I have a coupon with Sears.  So I might

18   write next to that "use 20 percent off coupon" on my

19   own personal list, correct?

20   A    You could do anything you like with your own

21   personal list.

22   Q    That would be the sort of thing somebody might do

23   while putting together a shopping list, right?

24   A    They might.

25   Q    Would you consider my personal list at that point

WEAVER - CROSS                          848

1  a catalog published by Sears?

2  A    No.  You're looking at the catalog published by

3  Sears.

4  Q    I know.  But that piece of paper of mine, using

5  the Court's definition of "catalog," would you

6  understand that piece of paper that I wrote to be a

7  catalog?

8  A    No, it just contains data from the catalog.

9  Q    It just has information that originated from the

10 Sears catalog, right?

11 A    Yes.

12 Q    So I thought you said that when a list contains

13 information that originates from a vendor, that's a

14 catalog under the Court's definition published by

15 vendors?

16 A    I did say that.

17 Q    What's the difference?  Can you help me understand

18 the difference?

19 A    It depends on whether you're using information

20 originated from the vendor.

21 Q    I wrote down the catalog number in my example,

22 right?

23 A    Yes.

24 Q    That originated from Sears, right?

25 A    Yes, but you had other information there that

WEAVER - CROSS                849

1   didn't come from the vendor.

2   Q   Oh, some if my list in part originates from a

3   vendor includes additional information about that

4   product that I add, it's no longer a catalog under the

5   Court's definition?  Have I got that right?

6   A   No, that's not correct.

7   Q   Okay.  Maybe I'll have to ask you again.  Can you

8   explain to me why my piece of paper isn't a catalog

9   that originated from Sears under your definition as

10  you understand and applied it of the Court's

11  definition of catalog?

12  A   I think I finally understand your question.  So if

13  you have copied information out of the Sears catalog,

14  and what you've written down originated from Sears, so

15  it's the same information, then it is the same as the

16  Sears catalog.

17  Q   Well, that actually wasn't my question.

18  A   Sorry.

19          THE COURT:  Mr. McDonald, we're not talking

20  about a Sears catalog in this case.  We're talking

21  about the way that Lawson does certain things with its

22  item masters and the things that it uses in the

23  Punchout.

24          Now, let's get the examination over to those

25  topics and find out why it is he thinks those meet the

WEAVER - CROSS                    850

1   definitions.  We're not dealing with Sears, and I

2   don't think it's particularly helpful to wrestle with

3   this issue.  It's hard enough for the jury to

4   understand what they've got to decide without being

5   distracted by Sears.  Is Montgomery Ward even in

6   existence?

7            MR. McDONALD:  I got them on Ebay.

8            Take it off the screen, please.

9   BY MR. McDONALD:

10  Q    Let's talk now about Lawson's product, Dr. Weaver.

11  Lawson's product with the requisition and purchase

12  order and inventory control modules, that's all built

13  and uses what's called an item master, right?

14  A    It does.

15  Q    And the item master is a list of products

16  essentially, correct?

17  A    Sure.  It contains product information for many

18  products.

19  Q    That item master has items on it that are selected

20  by the Lawson customer who buys the Lawson system,

21  correct?

22  A    Yes.

23  Q    And that customer puts on that list the products

24  it chooses to keep track of for its own purposes,

25  correct?

1    A    Sure.   The customer chooses the catalogs and has

2    the products.

3    Q    That wasn't what I asked you.   You added a little

4    bit of extra stuff there at the end.

5    A    Ask your question again.

6    Q    Customers select the information that goes on the

7    item master for its own personal purposes, correct?

8    A    Yes.

9    Q    And that item master is actually originally

10   associated in the Lawson's system with the inventory

11   control module?

12   A    Correct.

13   Q    And so really the starting point for that item

14   master in the Lawson system is to control and keep

15   track of the customer's personal inventory of items,

16   correct?

17   A    Yes, it begins that way.

18   Q    When you say "it begins that way," does it end up

19   some other way?

20   A    I was thinking about what I was talking about

21   yesterday, which was Lawson provided utility programs

22   to bring in catalog information and add it to the

23   database.

24   Q    Now, in your discussion, did you talk at all about

25   what happens after the Lawson system brings in what

1   you call catalog information?

2   A    Yes, sir.

3   Q    What did you say happens to that data after that?

4   A    That is loaded into the item master and the vendor

5   type.

6   Q    Is it loaded as is, Dr. Weaver?

7   A    Well, depending on what format it originates.  It

8   might be loaded as is or it might be converted first.

9   Q    Have you seen any testimony at all or seen any

10  documents in this case that would indicate that, in

11  fact, that data that's imported from vendors undergoes

12  very significant changes before it becomes entered

13  into the item master in the Lawson system?

14  A    Sure.  I looked at -- I showed documentation that

15  showed how the data conversion was to occur and what

16  formats were required.

17  Q    Have you got any knowledge about actual customers

18  and what actual customers have done with data that

19  they have imported from vendors in the Lawson system?

20  A    Well, I reviewed deposition testimony that said

21  that they have done this.

22  Q    All right.  What is your understanding of what

23  customers do after they get that data imported?

24  A    Into the item master?

25  Q    Let me clarify my question.  What is your

1   understanding as to what customers do with the data

2   that is imported into their system from a vendor to

3   change it again before it gets into the item master?

4   A    They run conversion programs.

5   Q    What is the purpose of those conversion programs?

6   A    To change the format into that required by Lawson.

7   Q    Is it your understanding that the Lawson customers

8   ever take out information that comes in during that

9   importation process before putting that information

10  into their item master?

11  A    I don't know.

12  Q    Did you investigate that at all as part of your

13  analysis in this case?

14  A    Taking out data?

15  Q    Right.

16  A    No, I did not investigate that.

17  Q    About how many hours have you put into this case

18  now, Dr. Weaver?

19  A    Four hundred.

20  Q    About how much are you getting paid?

21  A    Four hundred dollars an hour.

22  Q    What does that add up to?

23       THE COURT:  Four times four is 16.  You can

24  add the zeros to that.

25  A    I'm starting to fade.  $160,000.

1   Q    $160,000 you've been paid in this case and you

2   have never investigated what a Lawson customers does

3   with the vendor data that they import to change it

4   around before it goes into the item master that you

5   say are catalogs for purposes of this case; do I have

6   that right?

7   A    What I looked at was what functionalities Lawson

8   provided to convert the data.  And that's what I

9   discussed.

10  Q    So what's the answer to my question?

11  A    Well, please ask it again.

12           THE COURT:  Maybe if you shorten it, you can

13  ask it without all the gloss on it.  Something like:

14  Did you investigate whether Lawson's customers deleted

15  data from what they were importing?  Something like

16  that.

17  Q    Dr. Weaver, did you investigate whether customers

18  deleted any data before putting it in the item master?

19  A    I did not.

20  Q    Did you investigate, Dr. Weaver, as part of your

21  400 hours involved in this case whether or not

22  customers add additional information associated with

23  the individual products that come from the vendor

24  before putting that information into the item master?

25  A    I did not.

1   Q    Why not?

2   A    There was no need.

3   Q    No need?  I withdraw that question.

4        Do you have any understanding as to whether or not

5   in the Lawson system customers could add additional

6   data from taking it from a vendor before putting it

7   into the item master?

8   A    I don't think that's relevant, so I didn't look at

9   that.

10  Q    Do you know whether or not a customer might put

11  their own customer number, for example, before putting

12  it in the item master?

13  A    I did not investigate that.

14  Q    Did you check out whether or not customers would

15  actually, in effect, delete any long descriptions of a

16  product that the vendors provided them before loading

17  the information into the item master?

18  A    I did not investigate that.

19  Q    Do you have any understanding at all as to how

20  many characters the customer has to work with when

21  inserting an item description for a product that goes

22  into the item master?

23            MR. ROBERTSON:  Objection, Your Honor.

24  Relevancy.

25            THE COURT:  Overruled.

1  A    I didn't investigate that because that was not

2  part of the Court's definition of catalog.  My concern

3  was would the item master contain catalog data.  My

4  conclusion is that it would under the Court's

5  definition.  The Court doesn't say anything about how

6  many characters are allowed in a description.

7  Q   But you understand there's a big difference here,

8  isn't there, Dr. Weaver, between how the data arrives

9  at the Lawson system from the vendor, when it comes

10  through in effect the portal or the doorway into the

11  Lawson system on the one hand, and what the data

12  actually looks like when it gets into the item master

13  on the other hand?  Wouldn't you agree that's a pretty

14  big difference potentially?

15  A    No, sir.

16  Q   What if all the data is set aside except a catalog

17  number before it goes into the item master and the

18  customer adds their own description an adds several

19  new fields to the item master for things they are

20  interested in such as how many do I have in inventory?

21  A    That's irrelevant under the Court's definition.

22  Q   As part of your analysis for this case you went

23  through the patents-in-suit and read them with an eye

24  towards what one of ordinary skill in the art would

25  understand; is that correct?

1   A    I did.

2   Q    In these patents, when they talk about all this

3   computerized stuff, they don't include all the source

4   code or all the computer programming stuff that many

5   computer programmers would have to actually write to

6   implement it, correct?

7   A    You mean is there source code in the patent?

8   Q    Right.

9   A    No, it is not.

10  Q    Is the reason for that that one of ordinary skill,

11  if you tell them how to do something in the patent,

12  ordinary skill in this field, they would be able to

13  write the code to do it?

14          MR. ROBERTSON:  Objection.  That was not

15  discussed on direct.

16          MR. McDONALD:  We talked about one of

17  ordinary skill in the direct, Your Honor.  I'm trying

18  to explore their knowledge.

19          MR. ROBERTSON:  I didn't ask anything about

20  how --

21          THE COURT:  What's that got to do with

22  infringement?  That's what I'm having trouble

23  following.  He didn't inquire about source codes with

24  this witness that I remember.

25          MR. McDONALD:  I want to make sure we have an

WEAVER - CROSS                    858

1   understanding of what that person of ordinary skill

2   really knows at this point because I don't think

3   that's very clear yet.

4           THE COURT:  Is he tendered as an expert in

5   source code?  I thought somebody else was.  I may be

6   wrong about that.  I thought there was another

7   witness.  Am I wrong?

8           MR. ROBERTSON:  No, Your Honor, you're not

9   wrong.  That would be Mr. Niemeyer.

10          THE COURT:  Objection sustained.

11  BY MR. McDONALD:

12  Q   Dr. Weaver, is the person of ordinary skill in the

13  art that you considered for purposes of your opinion

14  someone that does have skill in writing computer code?

15  A   Yes.

16  Q   Do you believe your qualifications allow you to

17  analyze this case from someone with that type of

18  knowledge?

19  A   Yes.

20          MR. McDONALD:  Could we put up the first page

21  of the patent, please, the description of the '683

22  patent.

23  Q   Would you like to go to column 1?

24          THE COURT:  What did you say, sir?

25          MR. McDONALD:  I'd like to go to column 1,

1   Plaintiff's Exhibit 1, the '683 patent.

2           If we could blow up the first paragraph under

3   "background of the invention."

4   BY MR. McDONALD:

5   Q    Dr. Weaver, when you did your analysis for this

6   case, you tried to look at it from the perspective of

7   one of ordinary skill in the art who actually read the

8   patents, right?

9   A    Correct.

10  Q    So you tried to put you're analysis in terms of

11  what one of ordinary skill would understand using the

12  Court's constructions in the context of the patents,

13  correct?

14  A    That's correct.

15  Q    And you understand that one of ordinary skill

16  would understand that this invention as stated here in

17  the background would relate to systems and method for

18  interfacing product information such as typically

19  found in vendor catalogs that are provided to

20  customers and requisition purchasing systems and

21  methods that may use the results of searches and

22  product information, right?

23  A    Right.

24  Q    That's the very first sentence in the body of the

25  patent here, correct?

1  A    Correct.

2  Q    Now, the body of the patent also refers to a prior

3  system called the Fisher RIMS system, correct?

4          MR. ROBERTSON:  Objection, Your Honor,

5  relevancy.  I didn't ask anything about the Fisher

6  RIMS system.  It has nothing to do with his opinions.

7          THE COURT:  I'm not sure where he's going.

8  So I'm going.  So I'm going to let that particular

9  question stand.  Then I'll have to wait and see where

10  about where it goes.  That one is not objectionable

11  because it's a preliminary question.

12  BY MR. McDONALD:

13  Q    Would you like me to repeat question?

14  A    Please.

15  Q    I'll probably ask a new one because I don't

16  remember it either exactly.  Isn't it true that the

17  patent talks about a preexisting requisition and

18  purchasing system called the Fisher RIMS system?

19  A    It does.

20  Q    A number of the drawings in the patents-in-suit

21  actually have modules that correspond to software

22  modules from that old RIMS system, right?

23  A    Yes, some of the figures contain a module that's

24  labeled RIMS.

25  Q    Isn't it true that some of the Court's claim

WEAVER - CROSS                    861

1   constructions on the means-plus-function clauses

2   actually use modules that are described in the patent

3   as coming from the old Fisher RIMS system?

4   A    Yes.

5   Q    So that Fisher RIMS system is pretty important to

6   the word construing the claims in this case, isn't it,

7   Dr. Weaver?

8   A    It's the background of the invention.

9   Q    It's not just the background.  It's actually some

10  of the modules that are used by the Court to construe

11  the scope of some of the claims, right?

12        THE COURT:  I'm not sure that's right, Mr.

13  McDonald.  As I recall, there is a module, a figure

14  that has a module that has RIMS in it, but the

15  inventor testified yesterday that that's not the

16  Fisher RIMS system, it's the RIMS as he modified it.

17  And whatever it was that the inventor used in those

18  terms is what was used, I believe.  Let's take a

19  figure you're talking about so I can understand.

20        MR. McDONALD:  Sure.  Why don't we turn to

21  figure 1A.

22        THE COURT:  It may be that my recollection is

23  wrong, but I want to make sure we're right.

24        Where does it have RIMS in it?  I don't see

25  it.

1      MR. McDONALD:  I'll show you where it makes

2  sense to start, Your Honor.  Can we go to column 4 of

3  the '683 patent at the very top, lines, approximately,

4  1 through 10.

5      THE COURT:  Which figure are we talking about

6  here?

7      MR. McDONALD:  It's figure 1A, but this

8  paragraph talks about 1A, but I think it's helpful to

9  set the context of what figure 1A is, Your Honor, to

10  start with column 4, if I may.

11      So at the top of column 4, do you see there,

12  Dr. Weaver, where it says "electronic sourcing system

13  5 also includes a requisition purchasing system 40"?

14  I'm going to stop there for a second.  Let me know if

15  you need to look at more of the patent or if you need

16  a copy or something, but do you understand that the

17  electronic sourcing system 5 represents the preferred

18  embodiments of that system for purposes of the

19  invention described in these patents?

20  A   Would you ask that again?

21  Q   Is it your understanding that that reference to

22  electronic sourcing system 5 here in this section that

23  I just read from column 4, that's referring to

24  preferred embodiments of the electronic sourcing

25  system of the present invention described in the

1  patents?

2           THE COURT:   Figure 1A doesn't have a 5 in it.

3  It has a 40, which is a requisition purchasing system,

4  which is listed as 40, and has (RIMS) and the inventor

5  testified that was the RIMS as modified.   That's what

6  I was talking about.

7           Are you asking him whether he has some view

8  different than the inventor?

9           MR. McDONALD:   I'm going to ask him what the

10  patent itself says, Your Honor, because it does

11  conflict with the inventor.   And I didn't get a chance

12  to ask the inventor that, but he's explained that, and

13  I want to establish that the RIMS system is very

14  fundamental to the interpretations of the claim.

15          THE COURT:   I didn't think he said that that

16  I know of.   I haven't heard that yet.   What does that

17  have to do with infringement?

18          MR. McDONALD:   It has to do with the

19  means-plus-function clauses.   It has to do with what

20  is and is not catalogs.   It's got --

21          THE COURT:   Means-plus-function clauses would

22  be determined in accordance with the interpretations I

23  gave, not with what he thinks the patent terms mean.

24  That's actually asking him to do claim construction.

25          MR. McDONALD:   No, we're just walking through

1   and getting an understanding of how he applied your

2   claim constructions.  If I just get a chance to ask a

3   few questions here --

4        THE COURT:  I'm telling you, y'all don't seem

5   to understand this, but for lay people its difficult

6   to follow what you're going through, and it's

7   confusing to them and to any lay person, not just

8   them, the jury, and I think it's important that we

9   stay on track about what we're here to have this jury

10  decide.

11       And I don't see how this does it.  In fact, I

12  think it has the potential to have him interpret the

13  claim, a claim that I've already interpreted, which

14  they are going to be told and have already been told

15  can't be done, and I think that therefore confuses

16  them because it puts in their databases upstairs in

17  their minds something they can't even consider.

18       So why don't you leave this alone, and I'll

19  deal with you after the jury is gone on this, and you

20  can come back to it if I allow it.  I'm just having

21  trouble with it.

22       MR. McDONALD:  That sounds like something I

23  should not look forward to, but all right.

24       THE COURT:  No.  I don't think it will be an

25  unpleasant experience like you don't like the result.

1        MR. McDONALD:  Well, I hope we're all going

2   to be happy at the end of it.

3   BY MR. McDONALD:

4   Q   How about if we go to figure 1A of the '683

5   patent.  Can we blow that up at least a little so we

6   can capture the whole thing.

7        Would you agree, Dr. Weaver, that one of ordinary

8   skill reviewing the patent and specifically figure 1A

9   would see something in figure 1A that represents the

10  catalog database?

11  A   Well, there is a portion, of course, labeled

12  catalog database numbered No. 36.

13  Q   And that's got multiple catalogs in it in the

14  preferred embodiment of the invention, correct?

15  A   Yes, it does.

16  Q   Does the patent describe those catalogs as

17  published by distributors and vendors and suppliers?

18  A   Yes.

19  Q   Are there other databases that are also shown in

20  figure 1A?

21  A   Yes.

22  Q   Those other databases are not depicted as

23  catalogs, correct?

24  A   No, they have separate labels, yes.

25  Q   It's your understanding that those other databases

1  that are shown here from the old RIMS system would not

2  be considered product catalogs, correct.

3  A    As you know, I'm excluded from hearing the

4  inventor's testimony, so I have not heard it, but I

5  heard the Judge say that this was a modified RIMS

6  system.

7  Q    Wouldn't you agree that according to the

8  description of the embodiments of the invention in the

9  patent specification there are no product catalogs

10 stored in the RIMS databases?

11          MR. ROBERTSON:  Your Honor, I object at this

12 point.  We're going into areas that have nothing to do

13 with the infringement opinions Dr. Weaver has offered.

14          MR. McDONALD:  This has to do with what is

15 and what isn't in the catalog as depicted in the

16 patent itself.

17          THE COURT:  It has some marginal relevance to

18 that, but it does it in the context of an issue or of

19 a topic that really isn't involved in the issue of his

20 testimony and, therefore, I think it's under 403

21 confusing and leads to delay and confusion.  So I

22 sustain the objection even though there is marginal

23 relevance to it.

24          Let's just get to what we're talking about

25 here in this case instead of trying to get at it

1  indirectly.  Let's just go directly to it.

2  BY MR. McDONALD:

3  Q   In the demonstration unit for the Lawson system

4  that you reviewed, I think you indicated yesterday

5  that the combination of the item master and the vendor

6  item table in there was the catalog; is that right?

7  A   I said that the data represented in the item

8  master and in the vendor item table was imported.  It

9  can be imported from a catalog.

10 Q   I'm asking a little different question.  So let me

11 try that again.  Do you recall yesterday saying, I

12 think when the Judge asked you some questions and

13 maybe after that as well, that the combination of item

14 master and the vendor item table in the Lawson system

15 is a catalog?

16 A   I have to be very careful about the wording.  The

17 combination of the item master and the vendor item

18 table, all of the information in there constitutes

19 what has been input and what has been input can be

20 multiple vendor catalogs.  So it's not that the item

21 master and the vendor item table are a catalog.  It

22 contains vendor information from many vendors and

23 represents many catalogs or at least it can.

24 Q   Do you or do you not remember saying yesterday

25 that the combination of the item master and the vendor

WEAVER - CROSS                    868

1  item table were a catalog?

2  A   I do not remember saying that.

3  Q   So you're saying in the Lawson system there's many

4  catalogs?  Did I hear that right?

5  A   If many catalogs are imported, there are many

6  catalogs in the Lawson database.

7  Q   And that database is the combination of this item

8  master and the vendor item table?

9  A   Yes, sir.

10 Q   So that demo unit that you had had data in those

11 two item master and vendor item table databases?

12 A   Yes.

13 Q   How many catalogs are in there?

14 A   I didn't count them, but we know from my

15 demonstrations that we saw items from Dell and this

16 morning from Granger and from -- what was the other

17 one?  Gosh, it's gone right out of my head.  Anyway, I

18 made a point of circling multiple vendors and so there

19 were multiple vendor catalogs present in the

20 demonstration system.

21     Gexpro is the one I was trying to think of.

22 Q   How many items were loaded up in the demo model

23 that you used?

24 A   I certainly didn't search through it and count, so

25 I don't know.

WEAVER - CROSS                           869

1    Q    Do you have an estimate?

2    A    I didn't search through it and count, so I don't

3    know.

4    Q    Did you talk to anybody about adding additional

5    items to the demo model?

6    A    Yes, I did.

7    Q    Did you talk about how many items to add?

8    A    No, I explained what functionality we needed to

9    demonstrate.

10   Q    So as you sit here right now you don't know how

11   many items are on the demo model that you reviewed for

12   purposes of your opinion?

13            MR. ROBERTSON:  He's answered that three

14   times, Your Honor.

15            THE COURT:  Yeah.  You-all are the ones that

16   provided it with whatever it had in it, so you-all are

17   better equipped to know what was on it than he is.  He

18   said he didn't count.  Let's go.

19   Q    Just to be clear, you did add additional items

20   after Lawson sent you the demo, right?

21   A    As you remember my testimony, I did three

22   demonstrations with the system as it was delivered,

23   and then added some data, and that was only for the

24   demonstration that we did with the halogen lamps.

25   Q    You only added data for purposes of the halogen

1  lamp demonstration?

2  A   In order to show the richer, fuller ability to

3  search categories.

4         THE COURT:  Did you add it or did the Lawson

5  people add it?

6         THE WITNESS:  My understanding from the

7  attorneys is that they engaged a Lawson -- I don't

8  know if it was an employee or a consultant, and this

9  Lawson person assisted them with adding data.

10        THE COURT:  And you didn't put it on?

11        THE WITNESS:  I didn't do it.

12  Q   The Lawson person assisted who?

13        THE COURT:  Some consultant hired by the

14  lawyers who put it on, I think is what he's saying,

15  and he didn't actually put it on.

16  BY MR. McDONALD:

17  Q   Is it your understanding that any search you could

18  do on the Lawson item master product description for

19  any keyword search in itself could generate another

20  catalog?

21  A   Yes, pretty much.

22  Q   So if you had searched for the word "blue," you

23  get back results from the Lawson item master that

24  would be the catalog of blue things?

25  A   Yes.

WEAVER - CROSS                                    871

1   Q    Or things with the word "blue" in their

2   description?

3   A    It would.

4   Q    If I searched for the number 5, it would generate

5   a list of all the things that had a number 5 in the

6   description?

7   A    It would.

8   Q    In your opinion, each one of them is a separate

9   catalog; is that right?

10  A    Yes.

11  Q    So is there really any limit to the number of

12  catalogs in the Lawson item master the way you looked

13  at it?

14  A    No.

15  Q    You are familiar with testimony from customers of

16  Lawson in this case; is that right?

17  A    I read some depositions, yes.

18  Q    Isn't it true that those customers have just a

19  handful, less than 10 items on average, that they get

20  from each vendor loaded into their item master?

21  A    No, sir.

22          THE COURT:   You mean people that were

23  deposed?

24          MR. McDONALD:   People that were deposed,

25  that's right.   They have not testified yet in this

1   case, but he's reviewed.

2   Q    You have reviewed deposition testimony of some

3   Lawson customers, correct?

4   A    Yes.

5   Q    And those customers will have just a few items

6   from each vendor on average in their systems, won't

7   they?

8   A    No, sir.

9   Q    Wasn't it true that for Robert Wood Johnson,

10  that's a Lawson customer, correct?

11  A    Yes, it is.

12  Q    And that's mentioned in your report that they have

13  approximately 36,000 items in the item master, right?

14  A    Yes.

15  Q    That was with approximately 3,000 distributors and

16  vendors, right?

17  A    Well, I don't remember those number, but --

18          THE COURT:  Is this designed to show that

19  there are a few?  36,000 is not a few.

20  BY MR. McDONALD:

21  Q    No, but it's only about 12 per vendor, right, Dr.

22  Weaver, if it's 36,000 items from 3,000 vendors?

23  A    Nobody said there was a uniform distribution of

24  the items over vendors.

25  Q    No, but on average, that would be the average,

1    right?

2    A    It's the average, but you can't draw the

3    conclusion that therefore there are few items per

4    vendor.  You can say on average there are 12 in that

5    instance, but there could be 30,000 from one vendor

6    and the rest distributed over the others.  I didn't

7    ask that question.  I didn't read --

8                THE COURT:  That's enough.  Thank you.

9                I think you can go on to another topic.

10   Q    Do you have an understanding, Dr. Weaver, as to

11   about how many words a Lawson customer can use to

12   describe the product in the item master?

13   A    No, because that's not a part of the Court's

14   definition of "catalog."

15   Q    Would you agree that the purpose of the Lawson

16   item master is different from the purpose of a typical

17   published catalog like a Sears catalog?

18   A    No.

19   Q    Would you agree that the typical published Sears

20   catalog is intended to sell products to people?

21   A    That is one of its purposes.

22   Q    Would you agree that the Lawson item master, its

23   purpose is not to sell products to people?

24   A    Its purpose is to find items, yes.

25   Q    You would agree that the Lawson item master's

WEAVER - CROSS                    874

1   purpose is not to sell products, correct?

2   A    I would.

3   Q    Now, you talked a little bit in your direct

4   testimony about selecting portions of a database to be

5   search, correct?

6   A    Yes, I did.

7              THE COURT:  Before you go there, do you have

8   any understanding about what happens if I'm a customer

9   of Lawson's, and I order a Punchout, and it comes from

10  Dell, whether Lawson gets any money from that or not?

11  Do they get paid or does the money all go to Dell?

12             THE WITNESS:  In my testimony yesterday and

13  in the documentation I showed, I said that when Lawson

14  sets up an agreement with a Punchout partner, Dell or

15  whoever, that the Punchout partner pays a fee.

16             THE COURT:  I'm talking about on an

17  individual purchase.  Does Lawson get a cut or a

18  percentage or fee or anything on the purchase basis?

19             THE WITNESS:  I don't know on a per purchase.

20             THE COURT:  Sorry for interrupting.  I

21  apologize.  Excuse me, Mr. McDonald.

22  BY MR. McDONALD:

23  Q    If you can give me a second, I will try to get to

24  the Punchout and pick up where you left off.

25             THE COURT:  I interrupted you.  I shouldn't

1  have.  But you had just gotten started, and I wanted

2  to follow-up with what he was saying.

3  BY MR. McDONALD:

4  Q    You do understand, don't you, Dr. Weaver, that

5  Lawson doesn't dictate what vendors make available to

6  customers when they are a Punchout partner?

7  A    I think that's right.

8  Q    All those websites you mentioned yesterday from

9  Staples, that Stapleslink.com, Lawson has no control

10 over that website, correct?

11 A    Oh, goodness, that's not true.  Lawson has immense

12 control over that website.

13 Q    Tell me about the control Lawson has over

14 Stapleslink.com.

15 A    When the Lawson customer clicks on that -- which

16 one did you say.  Staples?

17          THE COURT:  Stapleslink.com; is that right?

18          MR. McDONALD:  That's right.

19 A    When the customer clicks on that Staples icon,

20 then Lawson sets up a special connection with the

21 Staples link, and it exchanges authentication

22 information.  It issues that Punchout setup request.

23 It waits for the servlet on the Stapleslink.com

24 website to send back the Punchout setup response that

25 includes the URL to which Lawson is supposed to

1   redirect this particular customer.

2       So the customer goes to that site.  The customer

3   shops.  Presumably buys something.  Puts it in the

4   shopping cart.  Then the shopping cart contents at the

5   time of checkout are returned in a special format.

6   Lawson interprets that format.  Puts it in a cache

7   data file.  Closes out the session securely, and then

8   starts processing the checkout items to put them into

9   the Lawson shopping cart.  So Lawson has immense

10  control.

11  Q   Isn't everything you just described relating to

12  simply the communication back and forth with the

13  Stapleslink.com website as opposed to what is actually

14  posted or shown or displayed or done at the website

15  itself?

16  A   That's what I'm trying to say, yes, that Lawson

17  has complete control over the communication system.

18  Q   Let me ask you a different question.

19  A   Sure.

20  Q   The website itself, who controls the

21  Stapleslink.com website?  That's a different question

22  from how is the communication to that website, right?

23  A   I just explained the communications.

24  Q   I'm exploring the issue of the difference between

25  the communication with the website and who is actually

1   controlling the website itself.  Do you understand

2   that distinction?

3   A   Well, the control of the website, as I've just

4   explained, is a shared responsibility because the

5   servlet, which is part of Staples, is returning a URL

6   to Lawson saying where should we redirect the user's

7   browser.

8   Q   When I have --

9           THE COURT:  Excuse me, Mr. McDonald.  Are you

10  asking him who has control over putting on the Staples

11  link website whatever is on the website?

12          MR. McDONALD:  That's where I was going.

13          THE COURT:  Well, that's different than

14  whether there's control because control has a

15  component of it in the interrelated nature of things,

16  according to him, that I think is distracting from the

17  purpose.

18          What you want to know is:  Who is it that

19  puts products on the Staples link website, right?

20          MR. McDONALD:  Let's try that.

21          THE COURT:  Try that and see if you like it

22  and go from there and see if you can find another one

23  you like.

24  BY MR. McDONALD:

25  Q   With the Stapleslink.com website, who is in charge

1    of loading up a list of products on that website?

2    A    Staples is in charge of the content displayed on

3    the website.

4    Q    Does Lawson have any say in what content Staples

5    displays at that website?

6    A    I don't know.

7    Q    If I understood you right, when a customer uses

8    that Stapleslink.com Punchout, can they do a search

9    for products at the Stapleslink.com website?

10   A    Yes.

11   Q    Whose responsible for putting together the

12   computer stuff that you need to do a search at the

13   Stapleslink.com website?

14   A    The search on the stapleslink.com website uses the

15   Staples search engine.

16   Q    How do you know that?

17   A    Because that's the way these systems work.

18   Q    Have you ever done anything to check it out?

19   A    Well, I know how the protocols operate.  And once

20   you're redirected to that site, now you're working in

21   that environment at Staples.

22   Q    My question is did you do anything for your

23   $160,000 to check that out?

24   A    No.

25   Q    Did I understand right for this case you did talk

WEAVER - CROSS                          879

1   to a source code expert, right?

2   A    I did.

3   Q    Because you thought that was pretty important to

4   understand the source code and how that operated

5   behind the scenes in the Lawson system, right?

6   A    Yes.

7   Q    You didn't check that out for the Punchout

8   partners that do the actual searching and display the

9   actual data that you showed us in those demonstrations

10  yesterday, right?

11  A    I never made an issue of it, so no.  There's no

12  need to check it out.

13  Q    I think in your demo of the Punchout websites

14  yesterday you were also going through the issue of

15  availability of inventory; is that correct?

16  A    Correct.

17  Q    Is it true that in your examples the Staples and

18  the Dell, not Lawson, would have control over checking

19  out the inventory?

20  A    That's true, the information comes from the

21  Punchout partner.

22  Q    Lawson has no idea what Dell or Staples has in

23  inventory, right?

24  A    Probably not.

25  Q    And you understand that for purposes of the claims

1   in this case there's some structure that has to be

2   analyzed and compared to the Court's interpretation of

3   the claims to make sure the structure corresponds?

4   A   Of course.

5   Q   You didn't do that analysis with respect to the

6   searching or checking inventory functions at the

7   Punchout vendor websites, correct?

8   A   I think you've mischaracterized what I did.  I

9   understand how -- let's use Staples as your example.

10  I understand how a website works.  I understand how a

11  search engine works.  I understand how one checks

12  inventory.  What I was concentrating on, and this is

13  consistent -- in my opinion, it's consistent with the

14  Court's construction of the means-plus-function claims

15  was that Lawson had control over what information was

16  sent to the Staples site and what information was

17  returned.  And I think I demonstrated that clearly.

18  Q   So you just think because you have knowledge, you

19  can assume what's going on at those vendor websites

20  that you didn't have to check that out?

21  A   That's right.

22          THE COURT:  Is this a convenient place in

23  your examination to break for lunch, Mr. McDonald?

24          MR. McDONALD:  This would be a dandy spot,

25  Your Honor.

WEAVER - CROSS                    881

1          THE COURT:  I'm glad we're doing something

2    dandy.

3          Ladies and gentleman, today I thought you

4    would like to avoid being held captive in the

5    building, so I didn't have lunch ordered for you.

6          We'll take an hour for lunch.  There's a

7    cafeteria in the basement.  I checked the specials

8    today, and they have a salad bar.  They have shrimp

9    that's mostly, I think, fried bread.  They have sloppy

10   Joes, and they make all kinds of sandwiches, which I

11   often eat down there.  Around the corner, if you go

12   out to the left down 7th Street, to 7th and Franklin.

13   Is it 8th?  Right.  Go to the right then.  Go down to

14   8th and Franklin.  That's two blocks down.  There's a

15   Subway.

16         If you go out of the Court and go to the

17   right, there's the City Hall building, which is a tall

18   marble-looking building, glass and marble, between 9th

19   and 10th on Main Street, there's a place called

20   Padow's delicatessen.  I'm not warranting any of the

21   food, but I know there's a great place across the way

22   called Gibson's.  Sometimes it takes a little longer

23   to eat.  It depends on who is in there.

24         There are probably some over in the Marriott,

25   too, so we'll take an hour for lunch.  Leave your pads

WEAVER - CROSS                882

 1  with Mr. Neal so you won't have to tote them around,

 2  and we'll take an hour for lunch.  Thank you.

 3          (The jury is out.)

 4          THE COURT:  The gentleman in the back, you

 5  haven't been here, but in this court when the jury

 6  goes out, we all remain seated.  You obviously have

 7  been somewhere else.

 8          AN UNIDENTIFIED SPEAKER:  Unfortunately, I

 9  have.

10          THE COURT:  There's a different protocol, and

11  I just want to let you know so you don't have to get

12  aerobic every day the jury comes in or out.

13          Is there anything else you-all need to take

14  up over the break?  What about this issue you were

15  asking about?

16          MR. McDONALD:  We're coming up with a plan.

17  I talked to Mr. Robertson.  We were going to see if we

18  can agree amongst ourselves.  Sometimes that happens.

19  And if we have a dispute, we'll come back.

20          THE COURT:  That's fine.  I'm not talking

21  about that.  I'm talking about your questions about

22  the RIMS.  I told you I would give you a chance to

23  explain to me further why the objection shouldn't be

24  sustained.  If you want to deal with that now, we can

25  deal with it, or if you want to wait until tomorrow.

1           MR. McDONALD:  I supposed we should handle it

2     now.

3           THE COURT:  Dr. Weaver, you can step out.

4           THE WITNESS:  Thank you, Your Honor.

5           THE COURT:  And go on and go to lunch.

6           I notice that somebody, whoever is down

7     there, doesn't really enjoy potato chips or the

8     cookies that are being delivered to you.

9           What's the issue now?

10          MR. McDONALD:  I think the issue is this was

11    related to the context of what one of ordinary skill

12    would consider in getting an understanding of what the

13    invention is.

14          THE COURT:  Consider what?

15          MR. McDONALD:  Would consider the disclosure

16    in the patent of the components of the system that are

17    described as the preferred embodiments of the

18    invention.

19          THE COURT:  As to whether there was an

20    infringement?

21          MR. McDONALD:  Sure, because that would

22    relate to how to apply the Court's interpretations,

23    how to apply the words that are giving their plain

24    meaning that the Court didn't interpret as well.  The

25    context of the patent is very important to applying

WEAVER - CROSS                  884

1    the claims.

2              THE COURT:  All right.  The problem that I

3    foresaw last time it came up is that there's this

4    defined term "Fisher RIMS" that's used about the

5    patent, and there's a term called "RIMS" that's used

6    in the figures.  And it doesn't use Fisher RIMS.  So

7    that's not a fair way to say Fisher RIMS in the text

8    means the same thing as Fisher RIMS in the figures.

9              And then when the inventors said the RIMS in

10   the figures were modified in a modified system, that

11   provided a tremendous amount of confusion.

12             MR. McDONALD:  Can we put up column 4 of the

13   '682.  Because what I wanted to show you, Your Honor,

14   is when that figure 1A talks about the RIMS system and

15   it's got that number 40, the patent is very clear that

16   it is using the purchasing system 40 preferably, but

17   not necessarily the Fisher RIMS system.  It

18   specifically refers to it in line 3.

19             Then if you go down to about line 8, it again

20   refers to that number 40 as Fisher RIMS 40.  If you go

21   down a little further, the next paragraph goes into a

22   little more detail.

23             THE COURT:  The next paragraph says Fisher

24   RIMS 40 also includes several Fisher RIMS databases.

25             MR. McDONALD:  Exactly.

1          THE COURT:  What's the point here?  Tell me

2    where you're going.  What question are you going to

3    base on this?

4          MR. McDONALD:  The Fisher RIMS system had a

5    different database.  So it is not called a catalog in

6    that figure 1A.  It's called an inventory database.

7    And it's a parts master, which the inventor said is

8    the same thing as an item master.

9          There's where I'm going to, but there's this

10   apples and oranges going on that one of ordinary skill

11   in the art would read.  I think that the inventor's

12   testimony about the changes is totally irrelevant.

13         Talk about confusion, there's nothing in

14   these patents about changes to work flow and things

15   like that.  There is no record made that those things

16   were even done before the patent was filed.  The RIMS

17   patent, I'm talking about, or before this patent.

18         There is no tie into those development

19   efforts.  They're talking about commercial embodiments

20   and it's just not relevant.

21         THE COURT:  I don't you understand how Fisher

22   RIMS has anything to do with this case because we're

23   not dealing with Fisher RIMS.  It's talks about

24   preferably but not necessarily, and this isn't Fisher

25   RIMS.

1     They use the notions of Fisher RIMS, but it

2  isn't the same thing.  If it was, then what you're

3  really talking about is not infringement, but

4  invalidity.

5     MR. McDONALD:  If it says this box shows you

6  the old Fisher RIMS system with something called a

7  parts master database for inventory on the one hand

8  and now we're adding something new to it called the

9  catalog database on the other hand, my logic here is

10  simply that that old thing isn't a catalog database

11  because if it was, why would you be adding a catalog

12  database to it.

13     Fisher RIMS system, by the way, as described

14  is from the patent, the '898 patent, that this patent,

15  the patents-in-suit say was incorporated by reference,

16  was actually part of the specifications disclosure of

17  the patents involved in this suite.

18     THE COURT:  They disclose it, yes.

19     MR. McDONALD:  It's incorporated by reference

20  if we go back to column 1.

21     THE COURT:  As one of the embodiments.

22     MR. McDONALD:  No, not just as one of the

23  embodiments.  They actually incorporated it by

24  reference.

25     THE COURT:  I think I went through this

WEAVER - CROSS                    887

1   before, I believe.  I've been through this whole drill

2   once before.

3          MR. McDONALD:  But that's the bottom line is

4   I want to show this thing over here is called a

5   catalog database.  The thing over there is an

6   inventory database.  That's a parts manager.  That's

7   two different things.

8          THE COURT:  All right.  Anything else?

9          I think the ruling I made is correct.  I'm

10  going to continue with that.  If you want to bring him

11  back for invalidity, you can, because it certainly has

12  something to do with invalidity.

13         All right.

14             (Lunch recess.)

15

16

17

18

19

20

21

22

23

24

25