Weaver - Cross

1          THE COURT:  One other thing on the topic we were

2     discussing.  I see that in order to get into that topic, at

3     least the way we're getting into it which is to say essentially

4     would one of ordinary skill in the art have interpreted this

5     patent in view of what RIMS said to be entrenching, severely

6     entrenching on the claim construction question, and it -- I

7     think it's possible to sort of it out so that it doesn't, but

8     the way -- I think that to do that can present the possibility

9     of confusion and prejudice to the jury, and it opens us up to

10     some more testimony on the topic that I think will ultimately

11     end up being confusing to the jury in respect to the claim

12     construction situation.

13          So the only way I'm going to deal with this is for

14     you to tell me in writing what questions you want to ask them

15     and let me look at them one by one and see if they actually do

16     what I apprehend.  It seems to me that the responsible and

17     necessary thing to do to protect the jury from confusion and to

18     avoid unnecessary delay under 403 is to keep it out at this

19     stage, but I'll review it if you submit written questions so I

20     understand what they are.  All right, get the jury, please.

21

22                         (Jury in.)

23

24          THE COURT:  All right, sorry.  Please proceed, Mr.

25     McDonald.

1              MR. McDONALD:  Thank you, Your Honor.

2     Q    Good afternoon again, Dr. Weaver.

3     A    Afternoon, Mr. McDonald.

4     Q    I'd like to go to claim one of the '172 patent, if we can

5     put that up on the screen, please.

6              THE COURT:  That's at tab four of your notebook.

7     Q    Dr. Weaver, is this one of the 12 claims that doesn't

8     actually use the word catalog?

9     A    Yes, sir, it is.

10    Q    Can you summarize for me what your understanding is of the

11    invention that's described by this claim?

12    A    That product data has been compiled into a database, and

13    these items are from at least two vendors, and then when the

14    database is searched, not all of it is searched at once.

15    Q    Now, there is a reference there in the first element

16    beginning with the word database to the phrase selected

17    portions of the database may be searched separately; do you see

18    that?

19    A    Yes, sir.

20    Q    In your answer, I didn't hear you actually refer to that,

21    so can you explain how that fits into what this claim is about?

22    A    Certainly.  So in the search process, only portions,

23    selected portions of the database will be searched.  That's

24    what I meant by not all of the database is searched.

25    Q    And so then going down to the third element, if we could

1    highlight that, that refers to means for searching for matching

2    items that match the entered product information in the

3    selected portions of the database.  Do you see that language?

4    A    I do.

5    Q    So is the idea here that the system is capable of having

6    selected portions of the database searched separately, and then

7    you can also do a search in that selected portion or portions?

8    A    You can -- yes.  You can -- the means for searching will

9    look for matching items in the database by selecting -- by

10   searching only selected portions of the database.

11   Q    And do you have an understanding based on any

12   communications with the inventors that a reason they wanted to

13   add this feature was to avoid having to search big, bulky

14   catalogs if certain catalogs were ones that the user knew the

15   product they were looking for wasn't going to be in that one

16   anyway?

17   A    I did not talk to the inventors about that.

18   Q    Do you have any understanding as to what the inventors'

19   thought would be the benefits of a system as described in claim

20   one of the '172 patent?

21   A    Yes, I do.

22   Q    What is your understanding?

23   A    That's from reading the patent, and so my understanding is

24   that you would not want to search the entire database because,

25   as you suggest, it might be big and bulky and time-consuming.

1    So it would be efficient to search only portions of the

2    database.

3    Q    Is there a section of the -- description of the system in

4    the patents that describes a way to implement claim one of the

5    '172 patent?

6              THE COURT:  Wait a minute.  You are asking other two

7    patents provide information about this patent?

8              MR. McDONALD:  No.  I meant to focus it on the '172

9    patent.  I'm sorry.

10             THE COURT:  I think you said patents.  Let's stay

11   with the '172.

12   Q    I'm sorry.  Dr. Weaver, is there a section of the '172

13   patent that describes a way to implement this idea of selecting

14   portions of the database to search separately and then search

15   them?

16   A    There's a description of what that's about, but there's no

17   code indicating the algorithm to do it.

18             MR. McDONALD:  Could we turn in the '172 patent,

19   please, to column nine.  Beginning at line 55 at the bottom of

20   column nine and continuing to the end of the column, highlight

21   it, please.

22             THE COURT:  What line do you begin, sir?

23             MR. McDONALD:  55, column nine of the '172 patent.

24   Q    Do you see that section up on the screen now, Dr. Weaver?

25   A    Yes, sir.

Weaver - Cross

1    Q    That section here has a first sentence that says, when

2    multiple catalogs are present in the catalog database 36,

3    search program 50 contains a function associated with the

4    catalog symbol of the footer bar and screen window, not shown,

5    for selecting catalogs to be searched.  Do you see that

6    language?

7    A    Yes, I do.

8    Q    Are we in the right spot?  Is this the part of the

9    specification of the '172 patent that corresponds to a

10   description of what's going on in claim one of the '172 patent?

11   A    Yes.

12   Q    And so then the next sentence, for example, the following

13   choices might be available, and it's got a colon before a list;

14   correct?

15   A    Yes.

16   Q    Then it's got a list there of four things; correct?

17   A    Yes, it does.

18   Q    Those four things are --

19            THE COURT:  Wait just a minute.  Maybe I

20   misunderstood your question, but as I understand the claim one,

21   it involves a database.  It doesn't involve catalogs.  It says

22   when multiple catalogs are present in the database -- in

23   catalog database, search program contains a function associated

24   with catalogs symbol of the footer bar and screen window for

25   selecting catalogs, and I thought that you had established that

1    this doesn't involve selecting, this claim doesn't involve

2    selecting catalogs.

3               MR. McDONALD:  Well, I asked him what is the portion

4    of the specification that corresponds to this and if there's

5    anything else.  I'm just trying to get a description in the

6    patent that relates to this claim, Your Honor.

7               THE COURT:  How can a description in the patent that

8    describes a catalog relate to a claim that doesn't involve

9    catalogs?  That's what -- maybe you can pursue that to see if,

10   in fact, this is a correct focus.

11   Q    Well, Dr. Weaver, can you tell me why you understood that

12   this section here of column nine of the '172 patent that I've

13   been starting to quote from, this does correspond to the

14   description in the patent of a preferred embodiment of claim

15   one of the '172 patent?

16   A    It does, and, of course, you understand that that

17   specification of the three patents is the same.  So this is

18   directly applicable to the other two patents, and because there

19   is electronic storage, while there are no catalogs, I

20   interpreted your question more broadly as referring to the

21   contents of the database, but it's very clear this is talking

22   about catalogs.

23   Q    So is this an embodiment in any way of a product that

24   would be covered by claim one of the '172 patent?

25   A    I think it would be.

1   Q    And so we've got this list in this embodiment describing

2   there are four catalogs; correct?

3   A    In this example.

4   Q    Right.  This is the example at the bottom of column nine;

5   correct?

6   A    Correct.

7   Q    And the patent describes them giving the user a chance to

8   select which of those catalogs they want to search; correct?

9   A    Correct.

10  Q    What is your understanding as to why the user is given

11  that opportunity to select catalogs?

12  A    To avoid searching the entire database.

13  Q    And then once those catalogs are selected as described

14  here beginning at column nine, then the system does a search on

15  the selected catalogs; correct?

16  A    Yes.

17  Q    So the user does the selecting; correct?

18  A    Well, the user -- the user and the system together select.

19  Q    Now, you did a report regarding your infringement opinions

20  in this case; correct?

21  A    I did.

22  Q    And you understand that your testimony here needs to be

23  consistent with that report; correct?

24  A    Yes.

25  Q    And that report is a complete description of your opinions

1    in this case?

2    A    Yes.

3    Q    And that report does have discussion specifically of claim

4    one of the '172 patent; correct?

5    A    Yes.

6    Q    Now, if we go -- return now to claim one on the screen,

7    please.  If you go to the fourth element here, that one has

8    means for generating an order list that includes at least one

9    matching item selected by said means for searching; correct?

10   A    Correct.

11   Q    The Court did construe the term order list; correct?

12   A    Yes.

13   Q    The Court construed that as a list of desired catalog

14   items; correct?

15   A    Correct.

16   Q    In your opinion, you stated in your report, didn't you,

17   that the accused Lawson systems satisfied the claim element

18   that requires a list of desired catalog items.  I'll rephrase

19   that question.  Your report says that in your opinion, the

20   accused Lawson systems satisfy the element that includes this

21   term order list; correct?

22   A    I did say something like that.  If you'd like to point me

23   to a particular part of my report, I can verify that.

24   Q    All right.

25              MR. McDONALD:  May I approach, Your Honor?

Weaver - Cross

1              THE COURT:  Does he need both of those?

2              MR. McDONALD:  I gave two so you could have one.

3              THE COURT:  Okay.  I didn't know whether it was a

4    different product.  Thank you.

5    Q    Turn to page 85 of your report, Dr. Weaver.

6    A    85.

7    Q    Do you see at the bottom of page 85 there, Dr. Weaver,

8    there is a paragraph -- excuse me.  This is your expert report

9    you did on infringement for this case, the initial report;

10   right?

11   A    Yes, sir, it is.

12   Q    This is where you tried to put all your opinions in

13   together with the appendixes that are referenced in here;

14   right?

15   A    Right.

16   Q    In paragraph 195 here of page 85, do you see there where

17   you start off by saying, quote, further, I understand that the

18   Court has construed the claim term order list as used in claim

19   one of the '172 patent as, quote, a list of desired catalog

20   items, period, close quote; do you see that?

21   A    Yes.

22   Q    Then you went on to say, in my opinion, the accused Lawson

23   systems satisfied this element do; you see that?

24   A    Yes.

25   Q    Then you went on to provide the reasons for that opinion;

1    correct?

2    A    Sure.

3    Q    And then the next sentence said, desired items included in

4    results of searches of product catalogs, which then put in

5    parentheses as, quote, catalog items, quote, may be selected

6    and placed in a, quote, shopping cart, quote.  This shopping

7    cart constitutes an order list.  See appendix three at 66-67.

8    Do you see that?

9    A    I do.

10   Q    So isn't it true that your opinion about why the Lawson

11   systems satisfied claim one of the '172 patent, and

12   specifically the portion of that claim that refers to an order

13   list was based in part on your analysis concluding that desired

14   items included in results of searches of product catalogs which

15   you called catalog items may be selected and placed in a

16   shopping cart; correct?

17   A    Correct.

18   Q    I'd like to turn now to the diagrams you had where you

19   stacked all the different systems on top of each other.  Can we

20   turn to, I think it's slide number 13?

21              THE COURT:  Are you using theirs?  Do you need him to

22   do that, or do you have --

23              MR. McDONALD:  We cheated and got a copy of theirs to

24   put on our system.

25              THE COURT:  That's not cheating.  That's just being

Weaver - Cross

1   efficient.

2   Q    Dr. Weaver, you can use either the paper version or the

3   one up on the screen.  Let me know when you're ready, please.

4   A    Okay.

5        THE COURT:  What exhibit is this, Mr. McDonald, so we

6   know about it?

7        MR. ROBERTSON:  It's not an exhibit, Your Honor.

8   It's simply a demonstration by Dr. Weaver.

9   Q    Ready?

10  A    Yes.

11  Q    So this looks familiar, right, from your examination by

12  Mr. Robertson, I trust?

13  A    Yes.

14  Q    This first slide here that's up on the screen shows the

15  yellow rectangle which is platform technology foundation;

16  correct?

17  A    Correct.

18  Q    It's got two little dashed boxes in it called Lawson

19  system foundation and process flow; right?

20  A    Correct.

21  Q    Now, it's your opinion that what's shown here, that

22  doesn't infringe any claims; correct?

23  A    Not by itself.

24  Q    Now, with the technology, platform technology foundation,

25  are there any other aspects to that that you are talking about

Weaver - Cross

1    other than the Lawson system foundation and process flow?

2    A    No, because when I looked at the procurement suite, the

3    requisitions and the inventory control, requisitions module all

4    require these two fundamental --

5    Q    I guess I was asking that question because the fact that

6    those two boxes for Lawson system foundation and process flow,

7    they only take up a little part of this big yellow box, but

8    really, are they the whole yellow box, in effect?

9    A    No, there's more.

10   Q    There is more.  What else would be in there?

11   A    These are the only two relevant to our discussion.

12   Q    Okay, but do you know what else is in there or not?

13   A    I don't.

14   Q    But in any event, that one does not infringe even with

15   whatever foundational modules there are; is that fair?

16   A    Yes.

17   Q    So now we go to the next slide, 14.  This is, I think --

18   system number one is sometimes how this was referred to; right?

19   The Lawson accused system with the purchase order,

20   requisitions, and inventory control modules on top of the

21   foundation; right?

22   A    Correct.

23   Q    Can you show -- can you use the press-sensitive screen

24   here and show me, in this system here, where is it, if

25   anywhere, that you understand vendor data is loaded into the

1   Lawson system?  Where does it come into the Lawson system?

2   A    Through the inventory control module.

3   Q    And then the data, as I understand your testimony, it

4   winds up in the item master?

5   A    Correct.

6   Q    And you would agree that it's changed somehow from when it

7   comes in; right?

8   A    It can be changed.  There are programs that will convert

9   it if needed.

10  Q    Are there some times, in your opinion, it doesn't change

11  at all from how it comes into the Lawson system?

12  A    That's possible.

13  Q    Do you know whether that's actually a function that the

14  Lawson system has or not?

15  A    No, but it's common sense if you are moving data from one

16  Lawson system to another Lawson system, it would not need

17  reformatting, so I think it's plausible that it works without

18  reformatting.

19  Q    And the data as reformatted if necessary, where does it

20  wind up?

21  A    In the item master and vendor item table.  Excuse me.

22  Item master and vendor item table.

23  Q    Are those things a database?

24  A    Collectively, along with an item location table, yes.

25  Q    Where in this picture we have up on the screen right now,

1    Exhibit 14, where is that database that has the item master

2    locator?

3    A     Inventory control.

4    Q     Can you show that on the screen?  So it's inside that box

5    called inventory control?

6    A     It's part of this procurement module.

7    Q     Okay.  That is different.  So let me clarify what you mean

8    by that.  Can you show me again, put a circle or box where you

9    would say the item master is.  It looks to me like you circled

10   inventory control.  Is that what you were doing?

11   A     We were talking about what has access to the item master.

12   All of these have access, so -- I'm sorry, but I don't really

13   understand the question.

14          THE COURT:  Before you clarify, were you saying --

15   did I understand you correctly to say that item master and

16   vendor master, along with something else, is a database?  What

17   was the something else?

18          THE WITNESS:  The something else was an item location

19   table.

20          THE COURT:  Thank you.  Sorry.

21   Q     So my question, Dr. Weaver, I'm not asking about access,

22   so let's put that concept aside for the moment.  I'm just

23   talking about, there is a database.  That's some computer

24   semiconductors where the data is actually stored; is that

25   right?

1    A    No, sir.

2    Q    What's a database?

3    A    A database is a data structure.  Typically it's on

4    magnetic disk, but the media is not the question.  I understand

5    that.  So it's -- in this case, it's a relational database.

6    Q    Is it a set of information that's computer readable?

7    A    Yes.

8    Q    Where is that set of computer information that is

9    readable, that's a database, located in this picture up on the

10   screen right now, number 14?

11   A    It is accessed here through the inventory control module.

12   Q    That's where we're getting a little hung up, because I

13   didn't ask where it's accessed, so please listen to my

14   question.  Where is the item master database located, Dr.

15   Weaver?

16   A    In this module.

17   Q    And you circled the S3 procurement modules?

18   A    Yes.

19   Q    So is it not located then specifically in the inventory

20   control module?

21   A    Inventory control has access to it.

22   Q    So by saying it has access then, are you saying it's not

23   actually located in that module?

24   A    No.

25   Q    Okay.  So can you explain to me whether or not the item

Weaver - Cross                                                     903

1    master is located in the inventory control module?

2    A    I'm not making myself clear.  Multiple modules have access

3    to item master and inventory control.  I'm sorry, to item

4    master and vendor item table, and inventory control is the one

5    that does the most with it.

6    Q    Please listen to my question, because I'm not asking which

7    modules use it or which ones access it.  I'm simply asking,

8    where is it?  Where is the item master in what you represented

9    to be a complete infringing system in slide 14?

10   A    Inventory control.

11   Q    It's inside the inventory control module?

12   A    See, that's where we have this disconnect.

13   Q    Okay.  Well, when you make that circle around the word

14   inventory control in response to my question where is the item

15   master, please explain what you meant when you did that.

16   A    The modules have access to the database.

17   Q    Okay.  So you do understand which modules access the

18   database is a different question from where is the database;

19   right?

20   A    Right.

21   Q    So please listen to my question.  Where is the database?

22   A    The best -- the closest I can get to your answer is to say

23   that it is primarily accessed by the inventory control module.

24   It doesn't have a physical location.  That's, perhaps, our

25   disconnect.  The database is used by inventory control.

Weaver - Cross

1   Q     Is there information in the item master located at

2   anyplace in the system that you've depicted here as an

3   infringing system in slide 14?

4   A     Yes.

5   Q     Where is the data?

6   A     Well, the data is in the database.

7   Q     Where is the database?

8   A     That's what we're discussing.

9   Q     Now we are back to it doesn't have a physical location?

10  A     This is a depiction, so it's not like I can, you know,

11  draw a picture of a database here and say it's located at a

12  particular spot.  A database is part of the overall system, and

13  it's accessed by inventory control.

14  Q     As part of your work in this case, did you determine where

15  in a Lawson system that database is located?

16  A     No.

17  Q     Do you know whether or not the item master database is

18  located either in the blue module or the yellow module that

19  you've represented together as a complete and comprehensive

20  infringing system?

21  A     It is in there.

22  Q     How do you know that?

23  A     Because that's the way the system works.

24  Q     Have you seen any documents that would tell you the item

25  master database is located either in the S3 procurement modules

1    or the platform technology foundation as you've represented

2    here in exhibit or slide 14?

3    A    I don't remember a specific document.

4    Q    Let's go to slide 15, please.  Now, this is the second of

5    the systems that you have represented here as complete

6    infringing Lawson systems; correct?

7    A    Correct.

8    Q    And you would agree that any complete infringing system

9    has to have an item master; right?

10   A    Yes, and it's in there.

11   Q    Where is it on slide 15, Dr. Weaver?

12   A    There's the database.  It is associated with all of these

13   modules.

14   Q    So that database isn't actually shown in slide 15.

15   A    Well, not specifically, but it's there.

16   Q    It's not shown, but it's there; is that your answer?

17   A    Sure.  It is a part of a complete system.

18   Q    So between that green -- this system here on 15, just to

19   be clear, this is the one with the yellow platform technology

20   foundation at the bottom level; correct?

21   A    Yes.

22   Q    And the middle level is the S3 procurement modules; right?

23   A    Yes.

24   Q    And this one is different from the last slide because it's

25   also got requisition self-service in a green box on top; right?

Weaver - Cross

1    A    Yes.

2    Q    Can you tell me whether or not it's your understanding

3    that the item master that is required for infringement is

4    either in the green box, the blue box, or the yellow box as you

5    presented it here?

6    A    It's in the blue or the yellow or both boxes.

7    Q    How do you know that?

8    A    Because the requisitions in inventory control that make

9    use of that access that database.

10   Q    Have you seen any documents with respect to the

11   configurations shown here in slide 15 that would indicate to

12   you where that required item master would be in any of the

13   green, the blue, or the yellow boxes shown here on slide 15?

14   A    I don't have a document, but in order for the system to

15   work, that database has to be there.

16   Q    Does it have to be there in order for it to work?

17   A    Yes.

18   Q    This is your testimony as a professor of computer science;

19   right?

20   A    Yes.

21   Q    Can we go to slide 16 now?  Slide 16, this is just like

22   slide 15 which included requisition self-service, only now this

23   one has procurement Punchout on top; correct?

24   A    Correct.

25   Q    This is another system here in slide 16 that you have

1    represented is a complete system that satisfies all elements of

2    the claims in this case; correct?

3    A    Well, no, not elements of all claims, no.

4    Q    Fair enough.  I overstated that one.  Do you represent

5    that this system with the four boxes shown here on slide 16,

6    that is a system that infringes some of the claims in this

7    case?

8    A    Correct.

9    Q    Are you representing to us that this version here with

10   procurement Punchout, as depicted in slide 16, includes within

11   those four boxes an item master?

12   A    Yes.

13   Q    Where is it in slide 16?  Where is that item master?

14   A    Same place it's been in all the other slides.

15            THE COURT:  Is it ever going to move?

16            THE WITNESS:  No, sir, it's not.

17            THE COURT:  Let's don't go into this anymore.

18   Whether you like it or not or accept it doesn't make any

19   difference.  We don't need to go through every system and say

20   it changes.  It's sufficient to say, does it ever change.  He

21   said, no, it doesn't change, so there it is.  Whether it's

22   right or not is up to you to deal with.

23            MR. McDONALD:  I understand.  I just want to make it

24   clear for each system, as we add more boxes, I want to give him

25   another chance to answer that question just to be clear.

Weaver - Cross

1              THE COURT:  I solved your problem by asking the

2    question and asking if it ever moves, and he said, no, it never

3    moves, it's always in the blue or yellow somewhere.  Exactly

4    where, he doesn't know.

5    Q    And with respect to this embodiment shown in slide 16, Dr.

6    Weaver, with the procurement Punchout specifically in there, do

7    you recall seeing any documents or information relating to

8    where the item master is for that configuration?

9    A    It has got to be in these two boxes.

10   Q    Not my question.

11   A    I do not have a specific document.

12   Q    Did you get any information other than through a document

13   related to where the item master would be in the procurement

14   Punchout system?

15   A    No.

16   Q    And then finally, if we look at slide 17, this is the

17   system just --

18              THE COURT:  What do you want, Mr. Robertson?

19              MR. ROBERTSON:  I wanted to renew the Judge's

20   objection.  Your Honor, we're just going to keep repeating

21   this.

22              THE COURT:  He is not going to repeat it because I've

23   already told him he's not going to be.  He might have something

24   else to say.

25              MR. McDONALD:  I'll try to keep it short.

Weaver - Cross

1            THE COURT:  Keeping it short and not repeating are

2   two different things.  You understand the difference?

3            MR. McDONALD:  Yes, and I'm going to try very hard to

4   maintain it.

5            THE COURT:  Don't go where I've told you not to go.

6   We've already established that.  The jury understands it, and

7   you don't need -- it's a very dramatic effect but to no avail

8   because it's been established.

9   Q    So this the embodiment with the electronic data

10  interchange together with procurement Punchout and requisition

11  self-service; correct?

12  A    Yes, it is.

13  Q    Did you see any documents or information, Dr. Weaver,

14  relating to any embodiments with electronic data interchange

15  that would indicate where the item master was?

16  A    No.

17  Q    Would you agree that the Lawson employees that deal with

18  Lawson's procurement modules would have a better understanding

19  of the Lawson system than you?

20  A    Probably.

21           MR. McDONALD:  I have no further questions.  Thank

22  you.

23           THE COURT:  Redirect?

24

25

1                        REDIRECT EXAMINATION

2    BY MR. ROBERTSON:

3    Q    Dr. Weaver, what was the purpose of this demonstrative?

4    A    This is why I had so much trouble with the question.  It's

5    an abstraction.  It's not a concrete delineation of exactly

6    where things are.  Software isn't like that.  Doesn't don't

7    work that way.

8    Q    Were you trying to make some complex notions simple?

9    A    Simple.

10   Q    So we could kind of grasp what the actual accused products

11   were?

12   A    I was.  I thought it was unfair to ask the jury to read

13   all that.

14   Q    You have seen figures that can depict software

15   architecture and hardware to demonstrate specific locations of

16   where a database might reside; correct?

17   A    I have.

18   Q    Is that what you were trying to accomplish with this?

19   A    It was not.

20   Q    Let me ask you this question which wasn't asked:  Does it

21   matter where the item master database is located?

22   A    No.

23   Q    Why doesn't it matter?

24   A    Because all of these modules that need to use it have

25   access to it.

Weaver - Redirect

1   Q    What do you mean?  Can you explain when it says all these

2   modules that need to use it have access to it?  That's a

3   complex notion for me.

4   A    Sure.  Okay, so when you load data from a vendor catalog

5   into the item master, there's a program to do that.  When you

6   do a search for an item, you are searching the item master.  So

7   the search program in requisitions or in requisitions

8   self-service has access to it.

9        So from a computer science perspective, all that's

10  important is that the database exists and that software can use

11  it.  Where it is is just irrelevant.

12  Q    Did you see any documentation that said the Lawson system

13  could function without an item master?

14  A    Oh, oh, no.

15  Q    Now, you were asked, I think -- actually, can I borrow

16  Defendant's Exhibit 257 which, I believe, is the Sears catalog?

17            THE COURT:  Now, you objected to him going into it,

18  and I sustained it.

19            MR. ROBERTSON:  Your Honor, I think there were

20  several questions asked about --

21            THE COURT:  Be careful, and remember, we're not

22  litigating Sears.

23            MR. ROBERTSON:  I understand.

24            THE COURT:  There were some questions to which you

25  did not object, though.  We'll see.

```
 1              MR. ROBERTSON:  Defendant's 257, I believe.
 2    Q    Now, Doctor, we can all agree that this is a paper
 3    catalog; correct?
 4    A    Sure, it is.
 5    Q    Not an electronic catalog; is that right?
 6    A    It is not.
 7    Q    Now, let's just assume for purposes of our discussion that
 8    this catalog constitutes a database; okay?
 9    A    Yes.
10    Q    Is that fair, it's a collection of data?
11              MR. McDONALD:  Your Honor, this is beyond the scope
12    of what I was allowed to do on cross.
13              THE COURT:  I'm not sure it was.  Overruled.
14    Q    This is a collection of data; correct?
15    A    It is.
16    Q    You were -- a number of items were identified here that
17    were for sale that had item information?
18    A    Right.  We looked at one.
19    Q    Price, description?
20    A    Right.
21    Q    Manufacturer, vendor?
22    A    Right.  We had the part -- not the part number but the
23    item number.
24    Q    And if I clip up to this, it has an index, too, that I can
25    go, and I can look up, for example, where I want to find
```

Weaver - Redirect

1    watches.

2         MR. McDONALD:  Object, Your Honor.  Beyond the scope

3    of cross.

4         THE COURT:  You are getting there.

5    Q    So if I was going to maintain an electronic database,

6    would I maintain it like a paper catalog?

7    A    Well, you would certainly have your items such that they

8    would be indexed so that you could get to them quickly.

9    Q    But wasn't one of the advantages of the invention that you

10   no longer had to do a paper catalog and flip through it, but

11   you could actually access electronic data quickly and readily?

12   A    Absolutely.

13   Q    Thank you.  Is it easier to navigate an electronic

14   database using an index than flipping through a paper catalog?

15   A    Yes, sir.

16   Q    You were asked whether or not the Lawson system -- let me

17   ask this:  Does the Lawson system permit you to make informed

18   decisions about purchases?

19   A    Yes.

20   Q    Does it matter, for purposes of your infringement

21   analysis, who selects the catalog data to include in the item

22   master?

23   A    No.

24   Q    Do you know whether or not the claims even speak to that?

25   A    They do not.

1    Q    And does the Court's claim construction specify anywhere

2    as to whether it matters who selects the items to be included

3    in the item master?

4    A    Well, the Court's claim construction here says nothing

5    about the choice of who is choosing catalogs.

6    Q    So it doesn't matter if it's the customers or Lawson or

7    some third party?

8    A    According to the claim construction, it does not.

9    Q    Does it matter in the Court's claim construction how

10   detailed the textual description of the item is?

11   A    No, it does not.

12   Q    Does it matter -- let's assume for purposes of this

13   discussion that it's the customer who is taking the information

14   that is obtained from a vendor and reformatting it in some

15   manner when it loads that catalog data.  Does it matter, under

16   the Court's construction, whether that's reformatted in some

17   way?

18   A    Not under the Court's construction.

19   Q    Does it matter in some way if the customer takes out some

20   of the data about the catalog item as long as it meets the

21   Court's construction?

22   A    No, sir, as long -- the answer is no, it doesn't matter.

23   Q    It's conceivable that the customer could take out all the

24   data, but then it wouldn't be a real description about an item,

25   would it?

Weaver - Redirect

1    A    It would not.

2    Q    Now, you were asked about whether you had -- you were

3    asked about whether you looked at how Lawson customers used the

4    Lawson system.  Do you recall that?

5    A    Sure.

6    Q    Other than the handful of deposition testimony you were

7    given from the Lawson customers, did you have access to any

8    Lawson customers to see how they were utilizing the system?

9    A    No.  In fact, I asked for that, but I never got a reply.

10            MR. McDONALD:  Can we have clarified who he asked?

11            THE COURT:  What's that?

12            MR. McDONALD:  Could we clarify who he asked?  I

13    think that the answer was nonresponsive to the question.

14            THE WITNESS:  I asked the attorneys if there was more

15    information, and the answer was, no, this is what we had.

16    Q    And did you review --

17            THE COURT:  I think he wants to know which attorneys.

18    Q    Which attorneys did you ask?

19            THE COURT:  ePlus's or Lawson's?

20            THE WITNESS:  Ms. Albert.

21    Q    And when you asked ePlus's counsel if they could obtain

22    that information, did they actually provide you with

23    interrogatory answers in which ePlus had asked Lawson to

24    provide, on a customer-by-customer basis, all of the

25    information as to how they implemented the Lawson customer

Weaver - Redirect

```
1   systems?

2   A    No.

3   Q    Did you ever receive that customer-by-customer information

4   as to their implementation?

5   A    No.

6   Q    Were you aware that ePlus asked the Court to compel Lawson

7   to provide that information?

8   A    Yes.

9   Q    And were you aware that the Court granted that motion to

10  compel?

11  A    Yes.

12  Q    And are you aware that Lawson still failed to provide that

13  information on a customer --

14         MR. McDONALD:  Objection, Your Honor.  This is

15  outside of the record, and there is no record of failure to

16  comply with the Court's order.

17         THE COURT:  Well, it certainly is a relevant issue

18  based on your questioning, but I'm not sure this is the

19  appropriate place to deal with that.

20         MR. ROBERTSON:  I'll take it up at another time, Your

21  Honor.

22  Q    The Judge actually had a question about when you are doing

23  Punchout procurement as to whether or not Lawson received a

24  payment every time a Lawson customer uses their system to

25  access a Punchout partner and purchase an item.  Do you recall
```

Weaver - Redirect

1    that?

2    A    I remember the question.

3    Q    And does it matter, for the purposes of your analysis for

4    infringement, whether or not Lawson receives a payment when a

5    customer uses the Lawson Punchout system?

6    A    Certainly not.  That's not any part of the claims.

7    Q    Do you know whether Lawson receives fees, sometimes tens

8    of thousands, hundreds of thousands of dollars for licensing

9    this software?

10   A    Yes.

11   Q    Is that your understanding as how Lawson receives

12   compensation for these products?

13   A    Well, the licensing of the software as well as the

14   professional services.

15   Q    So Lawson receives fees also --

16        MR. McDONALD:  Your Honor, we object as outside the

17   scope of cross.

18        MR. ROBERTSON:  Fair enough, Your Honor.  This was a

19   question raised by the Court, so I'll move on.

20        MR. McDONALD:  Actually, I move to strike those

21   answers that were related to Lawson's revenues.

22        MR. ROBERTSON:  I think it was within fair scope of

23   followup of the Court's question.  I just wanted to --

24        THE COURT:  Objection to the last question is

25   sustained.  The request to strike the answers is not.

1    Previously given.

2    Q    Can the customer select the Punchout sites that it wants

3    Lawson to provide that customer with access to?

4    A    Not only can it, it does.

5    Q    And then does Lawson actually facilitate access to those

6    Punchout partner sites?

7    A    Absolutely.  We spent some time discussing that.

8    Q    Did you have access to any of the Lawson customer source

9    code?

10   A    No.

11         MR. McDONALD:  Object to that as to vague as to what

12   Lawson's customer source code is.

13         MR. ROBERTSON:  Well, you asked the Doctor if he had

14   access to the Lawson customer source code.  I'm just asking the

15   Doctor if it was provided in any way.

16         MR. McDONALD:  I never that.  We were asking about

17   the vendors.

18         THE COURT:  I don't remember that question, but --

19         MR. ROBERTSON:  I had a note of it, Your Honor, but

20   I'll move with on.  I'll withdraw the question.

21         THE COURT:  There was a question about the vendor

22   source code, but I don't think there was one about customers.

23   Q    Did you have access to the vendor source code?

24   A    No.

25   Q    Can you also use the EDI module to obtain information on

Weaver - Redirect

1    availability of inventory?

2    A    Absolutely.  We talked about that PO 850, the purchase

3    order -- I'm so sorry, Your Honor -- and the PO 855, purchase

4    order acknowledgment, that could contain information on whether

5    an item was available in inventory.

6    Q    Now, Dr. Weaver, claim one of the '172 patent, if you

7    could look at that for a moment.  Maybe we can bring that up on

8    the screen.

9         You were asked some questions about your report and

10   whether a database -- when we refer to the database here as a

11   catalog; do you recall that?

12   A    Yes.

13   Q    Were you attempting in your report to perform a claim

14   construction on this first element as to what a database

15   containing data relating to items associated with at least two

16   vendors means?

17   A    No.  That's not my job.

18   Q    So you weren't trying to rewrite this claim in any way,

19   were you?

20   A    No, sir.

21   Q    Confirm for me that the claim does include the term

22   database; correct?

23   A    It does say database.

24   Q    I'm sorry.  Let me rephrase the question.  It doesn't

25   include the claims term catalog which the Court has construed;

Weaver - Redirect

1    is that right?

2    A    It does not contain the term catalog.

3    Q    I just want to have some clarity here if I can, because I

4    want to make sure I understand it, on what constitutes the

5    catalogs in the Lawson accused systems, and for this I think we

6    can talk about all five configurations.  So can you tell us,

7    because I do recall the Judge had a question, so what is it?

8    A    It's the item master and the vendor item table.

9              THE COURT:  So that's a catalog?

10             THE WITNESS:  It contains data from catalogs.

11             THE COURT:  But is that a catalog within the meaning

12   of the claim construction as you see it?

13             THE WITNESS:  It is a catalog, and it is many

14   catalogs.  It's important that I make clear that it contains

15   items from many catalogs, in the plural.

16             THE COURT:  All right.  And then is there any other

17   catalog in the Lawson system?

18             THE WITNESS:  No, sir.  It has only one database.

19   Q    I guess my question is, do those two tables need to have

20   item data in them to constitute the catalogs?

21   A    Absolutely.

22   Q    So in addition to those two tables, we need actual data;

23   correct?

24   A    Oh, yeah.  The tables are the repository of the data.

25             THE COURT:  Before you leave that area, I'm confused,

Weaver - Redirect

1    and I'd like some clarification.  Keeping in mind the Court's

2    construction of the term catalogs/product catalog, are the

3    Punchout catalogs also catalogs within the meaning of the claim

4    construction in your opinion, or are they not?

5             THE WITNESS:  They are.

6             THE COURT:  So then there are two kinds of catalogs

7    that we deal with.  One is item master plus vendor item table,

8    and the other is the Punchout catalogs.

9             THE WITNESS:  Your Honor, you are correct, and the

10   point I was trying to make is that the Lawson item master and

11   vendor item table, which are collectively the database, you

12   could -- it contains item data from many external catalogs.

13   Q    We were referring to that internal catalog that you

14   indicated is the item master table and the vendor table with

15   data?

16   A    Right.

17   Q    As the internal catalog; is that right?

18   A    Yes.

19   Q    And this Punchout catalog, what's the shorthand we've been

20   using to refer to those catalogs?

21   A    Those are external catalogs.

22   Q    And in particular, there was one claim -- I believe it was

23   dependent claim two in the '516 patent -- which required

24   catalogs to be stored separate databases; do you recall that?

25   A    I have that in front of me.

1  Q    So in that claim, what did you find constituting a

2  separate database?

3  A    Those were the separate databases of the external Punchout

4  sites.

5  Q    There was some questions about keyword search.  If I

6  search for a keyword, and it generates a matching item -- will

7  it generate a matching item for any vendor who is offering

8  items that match that keyword?

9  A    Yes.

10  Q    So if I use a keyword laptop, and the Lawson accused

11  system has ten different catalogs, Dell, Hewlett Packard, IBM,

12  Sony, that are all selling laptops, what will happen when I hit

13  the enter button on that search?

14  A    The search engine will find all of the items containing

15  that keyword, display multiple items from multiple vendors.

16  Q    So have I searched the catalogs that have any of those

17  items that match my keyword?

18  A    The ones that match the keywords, yes.

19  Q    Could claim two also be satisfied by a system having

20  internal database plus an external Punchout database?

21  A    Sure.

22            THE COURT:  Is that it?

23            MR. ROBERTSON:  That's it, Your Honor.  Thank you.

24            THE COURT:  Ladies and gentlemen, we're going to take

25  about a 15-minute recess.

```
 1
 2                 (Recess taken.)
 3
 4                 THE COURT:  Where is Dr. Weaver?  You don't need to
 5      come up.  They're going to need you back in the defendant's
 6      case.  And, of course, you're probably going to be called in
 7      the plaintiff's rebuttal case, so you are released to go about
 8      your business upon your agreement to come back when we need
 9      you, and I assume you'll do that.  Thank you for being here.
10                 THE WITNESS:  Yes, sir, thank you, Your Honor.
11                 MR. McDONALD:  I was going to say, this question
12      actually might involve him helping us answer it.
13                 THE COURT:  Oh, okay.  Why don't you sit down there
14      for a minute.  We might need you.  Thank you.  That was a good
15      catch.
16                 Did you get the question from the juror?  The item
17      master plus the item table plus the item something equals a
18      database.  I think that was the item master plus the vendor
19      table plus the vendor item locator.
20                 THE WITNESS:  Item location table.
21                 THE COURT:  But I think it's probably -- if you all
22      don't stipulate to that, maybe you better have him testify to
23      it.
24                 MR. McDONALD:  It might be in the transcript where we
25      could read it back if we have a transcript --
```

```
 1              THE COURT:  I think we had a different court
 2    reporter.  We'll just -- come on back to the stand for a
 3    minute, and get the jury, please.  Thank you very much.
 4
 5                        (Jury in.)
 6
 7              THE COURT:  I'm going to mark this as Court
 8    Exhibit 1.
 9              MS. STOLL-DeBELL:  Your Honor, I was going to step
10    out and tell Mr. Lohkamp he can leave.
11              THE COURT:  Mr. Who?
12              MS. STOLL-DeBELL:  One of our witnesses.
13              MR. McDONALD:  She's just going to step out of the
14    courtroom for a moment.
15              THE COURT:  Oh, sure.
16              MR. McDONALD:  I could have said that much better.
17              THE COURT:  I just had a little trouble hearing.
18    You'll I understand that when you get older.
19              All right, ladies and gentlemen, who is going to ask
20    this question to get it straight?  Mr. Robertson, do you want
21    to go ahead?
22              MR. ROBERTSON:  Sure.  Dr. Weaver, there's been a
23    question concerning what the, I guess the catalogs of the
24    Lawson systems are, and --
25              THE COURT:  No.  The question is the database.  He
```

925

1    testified earlier about a database, and then I asked him a

2    question, and the question is, the item master plus the item

3    table plus the item question mark equals a database, and that

4    really wasn't what he said, but it was close.

5            Will you recite, sir, what you said was the database

6    in response to the question we were talking about earlier?

7            THE WITNESS:  Yes, Your Honor.  The database is the

8    item master, the vendor table, and the item location table.

9            THE COURT:  Item location table is the other question

10   mark.  All right.

11           MR. ROBERTSON:  Can I ask you what database is that,

12   Dr. Weaver?

13           THE COURT:  That's fine.  You can ask that question.

14   Then Mr. McDonald, since he's the one that started it all

15   anyway, can have a shot at it, too.

16           THE WITNESS:  That's the Lawson database.

17           MR. ROBERTSON:  Thank you.

18           THE COURT:  Mr. McDonald, do you want to ask him

19   anything?

20           MR. McDONALD:  Nothing else, Your Honor.

21           THE COURT:  All right, Dr. Weaver, you're excused

22   subject to the recall we talked about a little while ago.

23           THE WITNESS:  Thank you, Your Honor.  Thanks to the

24   jury.

25           THE COURT:  All right, your next witness, please,

1    sir, Mr. Robertson.

2            MR. ROBERTSON:  (No response.)

3            THE COURT:  Mr. Robertson is resting his case.

4            MR. ROBERTSON:  I'm sorry, Your Honor.  No, Your

5    Honor, we have a deposition, video deposition of Mr. Jeffrey

6    Frank, a vice president of marketing for Lawson.

7            THE COURT:  All right.  Ladies and gentlemen, a

8    deposition is something that occurs before the trial, and in

9    the course of the pretrial proceedings, the lawyers for each

10   side get together, and they ask a witness certain questions.

11   And the witness is testifying.  In this instance, this witness

12   is an officer of Lawson, and I'll give you further instructions

13   about how you consider the testimony of officers of a

14   corporation, but it's just as if Mr. Frank was sitting right

15   there and testifying.  You're just going to see it on

16   television, because they are entitled to do that.

17           MR. ROBERTSON:  There would be some exhibits with Mr.

18   Frank's testimony, and I have a copies of his transcript if the

19   Court and law clerk would like them.

20           THE COURT:  Does the jury need exhibits?

21           MR. ROBERTSON:  They will ultimately get the exhibits

22   in the jury room.

23           THE COURT:  I mean are they shown on the screen.

24           MR. ROBERTSON:  They will be depicted on the screen

25   as we're going through the video.

```
1            THE COURT:  Okay.  All right, is your screen all
2    right?  All right, you don't need it dark.  All right, thank
3    you.

4

5            (Videotaped deposition of Jeffrey P. Frank played.)
6            (Playback interrupted.)

7

8            MR. McDONALD:  We thought this was going to be the
9    stipulated version of the video.  It does not appear to be the
10   one we had worked out.
11           THE COURT:  You mean -- is it up to here?
12           MR. McDONALD:  I think up to just a couple minutes
13   ago it was, yes.  It looked familiar.  If we can take it off
14   the screen for a moment, please.
15           THE COURT:  Beginning with where?
16           MR. McDONALD:  I think actually number 22 at page
17   ten, somewhere around there.
18           THE COURT:  About the initial licensing component?
19   Is it fair to say that for products such as this, Lawson
20   generates revenues for all four of those categories, is that
21   what you're talking about?
22           MR. McDONALD:  Yes.  Actually, number 22 -- back it
23   up a little bit, but that's close enough.
24           THE COURT:  I don't have -- yes, 22 --
25           MR. McDONALD:  There's an entry number 22nd that
```

1   begins at 88:06.  That's where I would start.

2            THE COURT:  Where do you end?

3            MR. ROBERTSON:  Your Honor, could I just be heard

4   briefly?

5            THE COURT:  First I'd like to define what we're

6   talking about.

7            MR. McDONALD:  I think I would end it at least 11:08,

8   Your Honor, without reading further.  Actually, it may continue

9   from there as well.  It does not end at 11:08.

10           THE COURT:  Does it include all of 22, item 22?

11           MR. McDONALD:  Yes, all of item 22 --

12           THE COURT:  Over to 23?

13           MR. McDONALD:  Yes, it continues with item 23.

14           THE COURT:  Down to where?

15           MR. McDONALD:  All of 23, yes.  24, I can't tell.

16   That's a question and answer.  I can't tell the context of

17   that.  25 would seem to include a string that is one we would

18   dispute as well.

19           I have to say, I honestly don't have the actual

20   stipulated parts, but this stuff looks specifically like things

21   I thought had actually been excluded by the Court.

22           THE COURT:  Well, that goes all the way down through

23   25, that topic does.

24           MR. McDONALD:  I believe you are right.

25           THE COURT:  Just so I understand, your objection is

1    that you all -- you thought you had stipulated, and this was

2    not in what was a stipulated version; is that where you are?

3              MR. McDONALD:  That's right, Your Honor.  Honestly, I

4    don't have a copy of what was stipulated, but the subject

5    matter looks like the stuff that was not, so if they can tell

6    me I'm wrong, I'm happy to see that.  I'm trying to track it

7    down myself.

8              THE COURT:  All right, Mr. Robertson, please say

9    whatever you need to say.

10             MR. ROBERTSON:  Your Honor, this was sent to them.

11   I'm to trying locate the exact email, but this was stipulated

12   and provided to them with all the exhibits.  This was the exact

13   content of what was sent to them.  I can explain the

14   relevance --

15             THE COURT:  Do you have -- right now, that's not the

16   issue.  The issue is stipulation.  Do you have the

17   communication that sent the email to them so you can see what

18   they are talking about, and who did you deal with on it?  Who

19   dealt --

20             MR. ROBERTSON:  Mr. Strapp sent the email, Your

21   Honor.

22             THE COURT:  Who did you deal with, Mr. Strapp?

23             MR. STRAPP:  Mr. Schultz.

24             THE COURT:  Have you read this text here that he's

25   saying he's objecting to now, sir?

1          MR. SCHULTZ:  Your Honor, it was not me personally
2    who read the text.
3          THE COURT:  Who did?  Did somebody read the text?
4          MR. SCHULTZ:  Yes, Your Honor.  It was our staff who
5    went through the text.
6          THE COURT:  And you agreed with this or not?
7          MR. SCHULTZ:  Your Honor, in the conversations that
8    we had with ePlus's counsel, we discussed there were two
9    aspects that needed to be taken out.  One dealt with M3, the
10   other dealt with financial information that the Court has
11   stricken.
12         THE COURT:  All right.  And did you get that
13   information, Mr. Strapp?
14         MR. STRAPP:  Your Honor, I believe that the clips
15   that are being shown to the jury are the same clips that were
16   stipulated to by Lawson --
17         THE COURT:  Wait just a minute.  Did you get the
18   information that the financial information was to be taken out
19   because they weren't stipulating to that?  Did you get that;
20   yes or no?
21         MR. STRAPP:  No.  I believe that the information in
22   here is information that was provided by Lawson.  Your Honor,
23   we can resolve this by going back to the written correspondence
24   between the parties, but --
25         THE COURT:  Yes, I would think that's what I was

1    asking.  Do you have any of that here?

2            MR. STRAPP:  We have the information in the

3    conference room that's right outside the courtroom.

4            THE COURT:  Why don't we do this:  Can we skip down

5    to item 26, and then you go get that correspondence, and you

6    show -- Mr. Schultz, you get out there with him, and you all

7    resolve this as to whether it was agreed to or not, and then we

8    can deal with that, see if there's any misunderstanding about

9    it.

10           If there's a misunderstanding and it wasn't agreed to

11   and it's still being offered, then I need to rule on whether or

12   not it can come in.  You all have done a very good job in

13   getting a lot of this stuff ready for trial, and it's not

14   unusual that in the course of dealing with large litigations,

15   sometimes mistakes get made.  If they get made, we need to deal

16   them at the time, so let's see if we can get started.

17           MR. SCHULTZ:  With respect to the correspondence, we

18   don't have access to the correspondence that dates back to when

19   we had the meet-and-confer conferences regarding this, so I

20   don't know if I can resolve it at the courthouse.

21           THE COURT:  I think he said he had a copy of it.  Go

22   look and see, and, you know, if you can't, there are ways to

23   skin cats.  Let's go.  We're going to try this one and see what

24   happens.  If it doesn't work, we'll move on, and, fortunately,

25   this is something we have pretty good control over and can work

1    it out.

2              It goes all the way through item 25.  Do you have --

3    Mr. Schultz, do you have a copy of the transcript so that you

4    can know what you are looking at out there?

5              MR. STRAPP:  I have a copy of the transcript.

6              THE COURT:  Okay, that's good.  Share.  Okay, we'll

7    pick up -- can you do that, sir, get it over to 26?

8              MR. GREER:  Yes, sir.

9              THE COURT:  Yes, sir, go ahead and get it there, and

10   we'll go from there.

11

12             (Transcript continued on page 933.)

13

14

15

16

17

18

19

20

21

22

23

24

25