933

1          THE COURT:  Okay.  Are you about ready to get

2     back to where we were, sir?

3          MR. GREER:  Yes, sir.

4          THE COURT:  When you're ready, plunk your

5     magic button.

6          (The video deposition of Jeffrey P. Frank is

7     resumed.)

8          THE COURT:  Looks like they are still working

9     on the other matter.  So do you have another witness?

10         MR. ROBERTSON:  Yes, Your Honor.  I do have

11    the Excel Spreadsheet was sent to Lawson on

12    December 31 containing the excerpts of the Frank

13    deposition that were to be played.  The ones that

14    are --

15         THE COURT:  Well, give it to them.  They are

16    working on it.

17         MR. ROBERTSON:  If they are working on it,

18    fine, Your Honor.  We don't need to delay and retain

19    the jury.

20         THE COURT:  No, we're not going to hold the

21    jury up for this.  We're moving right along.

22         MS. ALBERT:  EPlus would call Hannah Raleigh.

23         THE COURT:  Where is Ms. Raleigh?

24         MS. ALBERT:  I understood she was here in

25    person.

934

1           THE COURT:  Who is she?

2           MS. ALBERT:  She's an employee from Lawson.

3           THE COURT:  Okay.

4           MS. ALBERT:  Your Honor, if I could just have

5    a brief moment.  We have some exhibit binders for

6    Ms. Raleigh and the Court.

7           THE COURT:  You're going to trust

8    Mr. Robertson to handle that?

9           MR. ROBERTSON:  We're all in trouble then.

10          THE COURT:  Here he comes.  Oh, no.

11          MS. ALBERT:  It's not quite as daunting as it

12   might appear.  There are just a couple of voluminous

13   documents.  I think there are two binders total.

14          THE COURT:  I wonder if your cap and trade

15   bill would include deductions for paper killing for

16   law firms.  Tree killing.

17          Is that for me?  Thank you for my present.

18   Thank you, sir.

19          All right.

20     HANNAH RALEIGH, called by the Plaintiff, first

21   being duly sworn, testified as follows:

22

23     DIRECT EXAMINATION

24   BY MS. ALBERT:

25   Q   Would you state your full name for the record,

1    please?

2    A    Hannah Edmundson Austin Raleigh.

3    Q    You are currently employed by Lawson with its

4    professional services organization; is that correct?

5    A    That's correct.

6              THE COURT:  Can you hear all right, ladies

7    and gentlemen?

8              THE JURY:  Yes.

9              THE COURT:  If you have any problems, let us

10   know.

11             MS. ALBERT:  I have a little bit of a hoarse

12   voice.

13             THE COURT:  No, I was talking about the

14   witness.

15   BY MS. ALBERT:

16   Q    Your current position at Lawson is one of practice

17   director; is that correct?

18   A    That's correct.

19   Q    And your responsibilities as practice director are

20   to oversee customer implementations of Lawson's

21   products at new customers and significant

22   implementations of current customers in the eastern

23   region of the United States; is that correct?

24   A    That's right.

25   Q    And your responsibilities as practice director

1   include overseeing customer implementations of

2   Lawson's procurement products; is that correct?

3   A    That's correct.

4   Q    Now, Lawson's Professional Services Organization

5   has roughly 1500 employees worldwide; is that correct?

6   A    That's roughly correct, sure.

7   Q    Isn't it true that 90 percent or more of Lawson's

8   customers engage Lawson Professional Services at some

9   time for some form of assistance over the course of

10  their relationship with Lawson?

11  A    Yes, over the course of their full use of the

12  products, yes.

13  Q    Now, among the different types of services

14  provided by Lawson's Professional Services

15  Organization to Lawson's customers, those services

16  would include training services; is that correct?

17  A    Absolutely.

18  Q    And Lawson's Professional Services Organization

19  also provides services that are referred to as project

20  management services to Lawson's customers; is that

21  correct?

22  A    Yes, we do.

23  Q    Lawson's Professional Services Organization also

24  services that are referred to as implementation

25  consulting services; is that correct?

1   A    That's correct.

2   Q    And Lawson's Professional Services Organization

3   also provides services that are referred to as upgrade

4   consulting services; is that correct?

5   A    That's correct.

6   Q    And those upgrade services would involve assisting

7   the clients with upgrading from one version of a

8   Lawson system to the next released version of that

9   system; is that correct?

10  A    That's correct.

11  Q    Lawson's Professional Services Organization also

12  provides technical development services to customers

13  such as interface development and customization

14  development services; is that correct?

15  A    We do at times, yes.

16  Q    Lawson's Professional Services Organization also

17  offers services to Lawson's customers that are

18  referred to as learning services; is that correct?

19  A    That's true.

20  Q    Among the learning services that Lawson's

21  Professional Services Organization provides to

22  Lawson's customers would be public instructor led

23  training in one of Lawson's offices or on site

24  instructor led training for a specific customer at

25  their site; is that correct?

1    A    Sure.

2         MS. ALBERT:  Mike, if you would, could we

3    have Plaintiff's Exhibit 202.

4    Q    And, Ms. Raleigh, that is in Volume I of your

5    binders.

6         THE COURT:  Before you go anywhere, what was

7    the exhibit number for that Frank deposition?  You're

8    going to have to put it in the record because the

9    court reporter wasn't taking it down.  Just look it up

10   and tell me later.

11        Go ahead, Ms. Albert.

12   Q    Do you have Plaintiff's Exhibit 202?

13   A    I do.

14   Q    Is Plaintiff's Exhibit 202 a catalog of online

15   courses that Lawson offers to its customers?

16   A    Yeah.  It's a catalog that was published at a

17   certain point in time, but yes.

18   Q    Can you turn, please, to page 5 of that exhibit,

19   and the Bates number on that page ends with 4027?

20   A    I'm there.

21   Q    Do you see at the top of the page there's a course

22   entitled inventory control 8.1/9.0 X?

23   A    I do.

24   Q    And Lawson offers this two-day course entitled

25   Inventory Control 8.1/9.0 X that provides its

1  customers with -- and I'm reading from the first line

2  there.  Instructions on the key setup components and

3  processing functionality of the inventory control

4  application; is that correct?

5  A    That's correct.

6  Q    And among the training included in that course

7  would be, in following along with the second sentence,

8  instructions on the key setup components and

9  processing functionality -- excuse me, instructions

10 concerning how to set up the item master associated

11 with the inventory control application; is that

12 correct?

13 A    Yes, that's right.

14 Q    Turn to page 6 of that exhibit, please.  Do you

15 see on that page there's a course entitled,

16 Requisition Self Service 8.1-9.0?

17 A    Yes.

18 Q    Lawson also offers a course entitled, Requisition

19 Self Service 8.1/9.0, which introduces major features

20 of requisition self service such as requisition

21 approvals, receiving, and the shopping experience

22 which includes searching the catalog for items, using

23 shopping lists, ordering specials or services, and

24 ordering by categories; is that correct?

25 A    Yes.

1    Q    In this course, Lawson enables its customers to

2    have an experience using an actual Lawson training

3    system that would have the requisition self service

4    application installed; is that correct?

5    A    Yes.

6    Q    I believe I'm done with that document.

7    A    Okay.

8    Q    Lawson's Professional Services Organization also

9    provides services to Lawson's customers that consist

10   of installing the Lawson software on the customers'

11   hardware; is that correct?

12   A    Yes.

13   Q    And you previously mentioned that Lawson provides

14   implementation services to its customers.  Do you

15   recall that?

16   A    Yes.

17   Q    Among the implementation services that Lawson

18   provides to its customers, those services would

19   include assistance with designing the configuration of

20   the Lawson software to meet the customer's business

21   requirements; is that correct?

22   A    Yes.

23   Q    Also included among the implementation services

24   that Lawson would provide to its customers would be

25   assisting the customer with developing test scripts

RALEIGH - DIRECT                    941

1    and assisting the customer with testing the software

2    on that equipment; is that correct?

3    A   Yes, we assist with customer with all the aspects

4    of implementing the software and those would be

5    included.

6    Q   Among the aspects included with implementation

7    would be all aspects up to and including bringing a

8    system live into actual production operation; is that

9    correct?

10   A   That's right.

11   Q   Lawson also provides -- when a customer's system

12   goes live, that means it's actually operational and in

13   an actual production environment to perform the

14   procurement process; is that correct?

15   A   We hope so, yes.

16   Q   Now, also included among the services that Lawson

17   would provide to its customers, Lawson can provide

18   hosting services or Lawson physically hosts the

19   customer's system in space that Lawson owns if the

20   customer so desires; is that correct?

21   A   We can.

22   Q   And Lawson also provides services to its customers

23   to support converting existing systems and conversion

24   of data from those existing systems into the proper

25   format for importation into a Lawson system; is that

1  correct?

2  A    Yes.  All of our customers are importing from a

3  previous system, so yes.

4          THE COURT:  Excuse me just a minute.  I don't

5  know that any of us over here know what hosting means.

6  The way it's been explained sort of leads me to the

7  impression that Lawson has everything on its computer

8  system, but if I'm the customer, I can be in Timbuktu

9  and just use my computer, and I go through you to get

10 what I want.  Is that basically right or wrong?

11         THE WITNESS:  The only clarification I would

12 make to that is that the system is actually still the

13 customer's system.  So it is their system.  It is

14 physically housed in a Lawson-owned or leased

15 facility.  Obviously, we take care of keeping the

16 lights on and the electricity and those of things, but

17 the system can be accessed, you're correct, from

18 Timbuktu or anywhere else in the world using Internet

19 protocols.

20 Q    And Lawson will assist its customer with

21 implementing those systems that it hosts in its own

22 facilities among other services; is that correct?

23 A    Yes.  It makes no difference where that hardware

24 lives.

25 Q    Lawson also provides workshops to educate its

1    customers on data migration requirements and data

2    mapping to put this data that's imported from a prior

3    system into a Lawson system; is that correct?

4    A    That's right.

5    Q    And Lawson Software includes within the software

6    import and export utilities that can be utilized for

7    this data conversion process; is that correct?

8    A    That's correct.

9    Q    As part of the data conversion effort, Lawson's

10   Professional Services Organization will actually

11   convert item master data from a client's preexisting

12   system to a format for use in the Lawson procurement

13   system; is that correct?

14   A    Yes.  When requested to help them with that, yes.

15   Q    Have you actually been involved in implementation

16   projects where the customer has so requested Lawson to

17   perform data conversion efforts?

18   A    Yes, I have been involved in some projects where

19   the customer needed assistance from the Lawson team to

20   do various elements of that conversion process.

21   Sometimes some steps and sometimes other systems, but

22   certainly I've been involved in projects where we

23   participate in that process.

24        MS. ALBERT:  Mike, if we could have

25   Plaintiff's Exhibit 216.  And, Ms. Raleigh, that's in

1    Volume II of your binders.

2    Q    Are you there?

3    A    I'm here.

4    Q    Ms. Raleigh, is this a copy of Lawson's statement

5    of work for system implementation it performed for the

6    Public Health Trust Jackson Health System?

7    A    Yes, it is.

8    Q    And you were Lawson's practice director that

9    oversees the implementation of Lawson's system for

10   this client; is that correct?

11   A    That's correct.

12   Q    And Lawson received the award of the contract for

13   this particular implementation project; is that

14   correct?

15   A    That's right.

16         MS. ALBERT:  Mike, if you could turn to page

17   15 of the exhibit and the Bates number on that page

18   ends with 5374.

19   Q    Do you see the heading on that page entitled "Data

20   migration and conversion scope"?

21   A    I do.

22   Q    Below that there's an item, 3.5.1 that refers to

23   master file and configuration table value builds, do

24   you see that?

25   A    I do.

1  Q    And the text below that indicates that the data to

2  be converted will be identified during the design

3  phase.   The Lawson functional consultants will provide

4  assistance with data mapping support, data loading

5  support, and executing uploads via Lawson add-ins tool

6  to build the required master files and

7  configuration/setup table values.   Do you see that?

8  A    I do.

9  Q    And the Lawson professional consultants did

10  actually provide this assistance to Jackson Health

11  System as indicated in the statement of work; is that

12  correct?

13  A    We did.

14  Q    And in the second paragraph below that, the second

15  sentence of that paragraph, indicates that the

16  customer will have access to Lawson's conversion

17  manuals and file layouts.   Do you see that?

18  A    I do.

19  Q    Did Lawson actually provide the customer Jackson

20  with the Lawson conversion manuals and file layout as

21  indicated in the statement of work?

22  A    We did.   I want to clarify that this entire

23  section does refer to all of the aspects of the

24  implementation, not purely the procurement

25  implementation.   So our involvement over the course of

1    the project may have, you know, been different

2    depending on which part of the system we were building

3    at the time.  So there could be differences, but yes.

4    Q    But this particular implementation project did

5    include the procurement modules; is that correct?

6    A    It did.

7    Q    Continuing on with that second sentence in the

8    second paragraph, it indicates that conversion work

9    session will be conducted to review the Lawson's

10   standard conversion programs and conversion process.

11   Do you see that?

12   A    I do.

13   Q    And Lawson did provide that conversion work

14   session to review the Lawson standard conversion

15   programs and conversion process for Jackson, correct?

16   A    Absolutely.

17   Q    Can you turn to page 16 of the exhibit and the

18   Bates number on that page ends with 375.

19   A    Yes, I'm there.

20   Q    That's table on this page entitled

21   "Responsibilities for master file and configuration

22   table value builds," do you see that?

23   A    I do.

24   Q    The table on this page relates to which party is

25   going to have responsibility for particular tasks

1  during the implementation project; is that correct?

2  A    That's right.

3  Q    The second task in the table indicates that Lawson

4  would be responsibility to provide cross functional

5  workshops to define the data migration process and

6  mapping required for Jackson.  Lawson did actually

7  provide such a cross functional workshop to define the

8  data migration process and mapping for Jackson Health

9  System, didn't it?

10 A    We did.

11 Q    And the next activity below that in the table

12 relates to migration strategy and process description.

13 Do you see that?

14 A    I do.

15 Q    And Lawson also provided Jackson Health System

16 with migration strategy and process description,

17 correct?

18 A    We did.

19 Q    And if you proceed down, I believe it's the sixth

20 task in the chart, it's identified as training and

21 data migration tools.  Do you see that?

22 A    Yeah, I do.

23 Q    And the Lawson personnel delivered standard

24 training and education courses relating to data

25 migration tools to Jackson personnel; isn't that true?

RALEIGH - DIRECT                948

1   A   We did.  I would probably refer to it more as

2   knowledge transfer than standard training or

3   education.  It was less formal than it maybe sounds

4   here, but we did help them understand those tools.

5   Q   And the last task on that page is identified as

6   test load sample data, do you see that?

7   A   I do.

8   Q   It indicates that the client would be responsible

9   for providing sample data and then Lawson is

10  responsible for executing the load of the test data.

11  Lawson, in fact, executed the load of the test data

12  for Jackson in connection with this project; is that

13  correct?

14  A   Yes, we did.

15  Q   Can you turn to the next page of the exhibit.

16  That Bates No. on that page ends with 376?

17  A   I'm there.

18  Q   The first task on this page is identified as

19  production data load.  Do you see that?

20  A   I do.

21  Q   And the table indicates that Lawson was

22  responsible for executing the load of the test data

23  for Jackson.  Lawson did in fact, load the production

24  data for Jackson in connection with this

25  implementation project, correct?

1   A    We did.  I believe we did.

2   Q    And continuing down the page.  Lawson also

3   conducted a full migration system test for Jackson in

4   connection with this project; is that correct?

5   A    We did.

6   Q    And Lawson was also responsible for the live data

7   migration for Jackson system, correct?

8   A    We were.

9   Q    If you look down below that table on the same page

10  there's another table, table 3.5.1.1.1, do you see

11  that?

12  A    I do.

13  Q    And the title on that table is master file in

14  configuration table value build and scope; do you see

15  that?

16  A    I do.

17  Q    And the table on this page identifies the master

18  files and configuration tables that were included

19  within the scope of the implementation project that

20  Lawson conducted for Jackson; is that correct?

21  A    Yes.

22  Q    So the data conversions that were included within

23  the scope of the project that Lawson performed for

24  Jackson included the vendor master, the item master

25  and the vendor catalog; is that correct?

RALEIGH - DIRECT                950

1   A    I would agree with the vendor master and the item

2   master, but if you note, there's a bolded Lawson

3   response next to the vendor catalog specification.

4   I'll also note that the system that was being convert

5   from was Eclipsys, right?  So the terminology used

6   here to describe the data is really more relevant to

7   the system from which the data was coming.

8        But if you note the Lawson response related to

9   catalog, vendor catalog, it's really more that that is

10  purely item master data.  So we really included the

11  item master data that they may be referring to based

12  on Eclipsys' terminology of the vendor catalog.

13  Q    If lawson provided a response to Jackson here that

14  said catalog information is a part of Lawson's item

15  master, it wouldn't be converted as part of conversion

16  item No. 22 above; is that correct?

17  A    Based on the definition of catalog information

18  that, I believe, was related to Eclipsys' definition

19  of vendor catalog information.

20  Q    But Lawson told Jackson that the vendor catalog

21  data in Jackson's prior system would be included as

22  part of the data that would be converted in connection

23  with this project, right?

24  A    Right.  Essentially, we told them that that is

25  item master data, so it would be included under item 2

1   there for item master.

2   Q    Lawson also provides maintenance and support

3   services to its customers; is that correct?

4   A    We do.

5             MS. ALBERT:   Mike, if you could, could you

6   put up Plaintiff's Exhibit 208.

7   Q    And, Ms. Raleigh, that's in Volume I of your

8   binders.

9   A    I'm there.

10  Q    Plaintiff's Exhibit 208, this is a handbook that

11  Lawson publishes to its customers to tell them about

12  the types of support services that Lawson offers; is

13  that correct?

14  A    That's correct.

15  Q    Could you go to page 17 of the exhibit, and the

16  Bates number on that page ends with 050?

17  A    I'm there.

18  Q    Now, with reference to the chart on that page, it

19  shows that Lawson has four different levels of support

20  services; is that correct?

21  A    That's correct.

22  Q    There's a bronze level of support service.

23  There's a base maintenance support level; is that

24  accurate?

25  A    That's accurate.

RALEIGH - DIRECT                    952

1  Q    There's a silver level of support services.

2  That's an enhanced level of support; is that correct?

3  A    That's right.

4  Q    And then there's a gold level of support services

5  that's entitled, Application Management; is that

6  accurate?

7  A    It incorporates Application Management in addition

8  to others, yes.

9  Q    Well, as we're proceeding up this chart, for each

10 successive level of support, Lawson would provide all

11 of the support at the level beneath that level plus

12 the additional support listed for the level that it

13 relates to; is that accurate?

14 A    That's accurate.

15 Q    Then there's a top level of support entitled,

16 Platinum that relates to hosted solutions; is that

17 correct?

18 A    That's right.

19 Q    So some services that would fall within the base

20 or bronze level of maintenance services that Lawson's

21 provides to its customers would include providing them

22 with upgrades to licensed products; is that accurate?

23 A    That's true.

24 Q    The enhanced level of support service that Lawson

25 provides to its customers at the silver level of

RALEIGH - DIRECT                953

1  support would include 24 by 7 emergency support; is

2  that correct?

3  A    Yes, that's correct.

4  Q    By 24 by 7 emergency support, that means 24 hour

5  by seven-day emergency support; is that correct?

6  A    That's right.

7  Q    In addition to the support services, Lawson can

8  also provide various different types of documentation

9  to its customers through its support website; is that

10 correct?

11 A    That's right.

12 Q    And at the bottom of the page there's some

13 additional options listed there.  So Lawson will also

14 provide, for example, an additional option of pager

15 support services for a client; is that correct?

16 A    That's right.

17 Q    So if a customer has as critical event happening

18 during nonbusiness hours, a Lawson support person

19 would be on call for the customer to respond to that

20 problem; is that correct?

21 A    That's right.

22 Q    And Lawson also offers something that's called a

23 Lawson knowledge base; is that accurate?

24 A    We do.

25 Q    That's included for customers that subscribe to

1    the base level of support; is that correct?

2    A    That's right.

3    Q    And this knowledge base includes documentation

4    such as user manuals and product release notes and

5    frequently asked questions and documentations of that

6    of support; is that correct?

7    A    That's right.

8    Q    And Lawson also offers services that are referred

9    to as WebEx online support center services where a

10   Lawson support person may access a customer system

11   over the Internet and take control of the customer's

12   system to diagnose a problem; is that correct?

13   A    Depending on the nature of the problem, yes, we

14   might use that tool.

15           MS. ALBERT:  No further questions.

16           THE COURT:  Any questions?

17           MR. SCHULTZ:  Yes, Your Honor.

18

19       CROSS-EXAMINATION

20   BY MR. SCHULTZ:

21   Q    Good afternoon, Ms. Raleigh.

22   A    Good afternoon.

23   Q    It's fair to say that Lawson helps its customers?

24   A    Absolutely.

25   Q    As part of helping your customers, do you learn

1    about what your customers do with the Lawson system?

2    A    Certainly.

3    Q    I'd like you to refer back to Exhibit 216, please.

4    A    Yes, sir.

5    Q    Are you there?

6    A    I am.

7    Q    This is the same exhibit that you were referenced

8    to during the examination by Ms. Albert?

9    A    Yes.  The statement of work, yes.

10   Q    Before Lawson gets to a statement of work, what is

11   the process for Lawson to obtain the work from a

12   particular customer?

13   A    The process often starts with and did for Jackson

14   start with requests for proposal that the customer

15   issued to multiple software vendors based on the

16   business processes or the functionality of what they

17   needed to run their business.  So that process enables

18   each of the vendors to respond to the customer's

19   questions about what functionality we have within our

20   software and hopefully get to a point where they

21   understand that we can meet their business needs.

22        So that process takes quite awhile and certainly,

23   you know, is fairly iterative.  At the, you know,

24   conclusion of the sales process, typically when a

25   customer has chosen to work with a particular vendor,

1    in this case Lawson, they then also begin to talk

2    about how they're going to get the software

3    implemented.

4        So there may be a separate competitive cycle or

5    maybe not for choosing a services partner, choosing

6    someone to help them, train them, and work with them

7    throughout the process of getting the software

8    implemented.

9    Q    In the RFP process, that's when the customer is

10   actually providing to Lawson and other potential

11   vendors what it wants; is that right?

12   A    Exactly.

13   Q    So as part of that have process, whose language is

14   being used in an RFP?

15   A    The customer is using their language essentially

16   because they are issuing it to different vendors.  So

17   there's no common language, if you will, between

18   different vendors and how they, you know, how they

19   describe their software, the business processes.

20   There are lots of terms that are unique to different

21   vendors.

22       So a customer generally would base that RFP and

23   their questions on their past experience, whether it's

24   the way in which they describe a business process

25   inside their organization -- as an example, some

1   companies call it material management.  Some companies

2   call it supply chain.  Some companies call it

3   strategic sourcing.  It all refers to that process of

4   getting materials into the organization.  But everyone

5   has different ways of naming their departments, etc.

6       It also may be based on the software that they are

7   currently using.  So very often we work with customers

8   who have been using the same software for 20 years.

9   So even though the terminology is really based from

10  another company's software product because it's been

11  in place for so long, it's just become way that they

12  speak.

13  Q   So in the process of working with Jackson in the

14  RPF process, did Jackson use its language from its

15  historic system?

16  A   Yes, from Eclipsys.

17  Q   What is Eclipsys?

18  A   Eclipsys is another provider of business

19  management software.  And Jackson, in particular, was

20  using their accounts payable and materials management

21  solutions.

22  Q   And Jackson came to Lawson and said, We've got

23  this opening.  Can you provide what we want?  Is that

24  the process?

25  A   That's right.

RALEIGH - CROSS                958

1          MS. ALBERT:  Leading, Your Honor.

2  Q   What happened then?

3          THE COURT:  Wait a minute.  What?

4          MS. ALBERT:  Leading.

5          THE COURT:  Does it really make a difference

6  at this stage?

7          MS. ALBERT:  I'll withdraw it.

8          THE COURT:  What I'd like you to do is ask

9  one question.  I'd like you to listen to the question

10 and give an answer that responds only to the answer

11 and not continue beyond where that's required.

12 Q   Ms. Raleigh, I'd like you to turn on Exhibit 215.

13 Please turn to 215 of that.  It ends with the Bates

14 No. 5374.

15 A   I'm sorry.  Which page?

16 Q   If you will look in the bottom right-hand corner

17 you will see numbers.  Look at the one that ends with

18 5374, please.

19         MR. ROBERTSON:  216, Your Honor.

20         THE COURT:  I thought you said Exhibit 215.

21         THE WITNESS:  Me, too.

22 A   5374.

23         THE COURT:  That's the one I think you were

24 talking about before.  Data migration and conversion.

25 Is that the page you're talking about?

1        MR. SCHULTZ:   That is the page I'm talking

2    about, Your Honor.

3    A    All right.   I'm there.   Thank you.

4    Q    So this page talks about data migration and

5    conversions.   What is a data migration?

6    A    Data migration is the process of getting data from

7    a customer's legacy system formatted into the

8    appropriate format to be loaded into, in this case,

9    Lawson.

10   Q    You say has to be formatted into the appropriate

11   format.   What do you mean by that?

12   A    Every software has a proprietary format in which

13   data must be in ordinary for it to be loaded.   For

14   instance, there may be a certain character length for

15   a particular field, the columns of data must be in a

16   particular order in order for the software to read in

17   that data.

18   Q    I'd like to refer you to what happened with

19   Jackson.   Was there a particular file format that

20   Lawson wanted Jackson to transfer its information into

21   Lawson system?

22   A    Yes.

23   Q    How did that happen?

24   A    Through the process of the implementation, Lawson,

25   as referred to before, provided Jackson with the

1    standard documentation of the file format in which the

2    data must reside.  Jackson then extracted their data,

3    pulled their data out of their existing system,

4    Eclipsys, and manipulated data or changed the data so

5    that it would be into the right format, and then

6    provided it to Lawson for loading into their system.

7    Q    I'd like to talk with you about the changing of

8    the data, but, first of all, you mentioned file

9    layout.  Is that what you were talking about earlier?

10   Better question:  What is a file layout?

11   A    File layout would be documentation of the specific

12   order of and description of data required to be loaded

13   into the system.  So what data, in what format, in

14   which order, that's all documented in a document

15   called a file layout.

16   Q    So was there a transfer of the data from the

17   legacy system, Eclipsys, into the Lawson system?

18   A    Yes, there was.

19   Q    Was there a conversion of the data from the legacy

20   system into what the Lawson item master has?

21   A    Yes, there was.

22   Q    Were there fields that were changed?

23   A    Yes, absolutely.

24   Q    Was data changed?

25   A    Yes.

1    Q    What fields were changed?

2    A    Some of the fields that were changed may have been

3    related to the descriptions associated with an item.

4    So in order to make it easy for a user to find a piece

5    of data, we need to think like the user, right?  So at

6    times the description field is what the user looks at.

7    So I'm looking for a syringe, for instance.  My

8    description field can help me understand, you know, if

9    I've found the right syringe.  Is it a half cc?  Is it

10   1 cc?  Is it various different features of that

11   particular product?  So over the course of time those

12   descriptions can become outdated or not as clear as we

13   might like them or easy to use.

14       So in many cases, what we did at Jackson was

15   revise those descriptions to ensure the best possible

16   experience for the user in finding their products.

17   Q    What if anything codes or specific language did

18   Jackson use in its item descriptions?

19   A    Jackson, like all hospitals, has a particular way

20   of coding.  So, for instance, some organizations might

21   use BX for box.  Other organizations might use BOX for

22   box.  There are different ways that each

23   organization's standards, if you will, that they have

24   set will so there's consistency in the data.  So those

25   kinds of things would have been changed and updated to

1   ensure they were as correct as possible.

2   Q   Was there a process to validate the data before it

3   gets into the Lawson system?

4   A   There's meant to be there, yes.  There is a

5   process for that.

6   Q   First, let's talk about what the process is and

7   then what your comment was on meant to be.  What is

8   the process of validating the data?

9   A   So there's multiple types of validation.

10  Obviously, there is the initial validation required to

11  make sure that the data will actually load.  If we

12  have the wrong field in the wrong place or the wrong

13  piece of data or we have 60 characters and we only

14  allow 30 characters for that particular field, that

15  kind of data validation has to happen so we know the

16  file will actually load into the system.

17      Beyond that, it is typically a customer's

18  responsibility to ensure that the data that actually

19  gets loaded is the data that they want in the system.

20  That's not something Lawson can really do for them.

21  We can't determine what data should be there.  It's

22  really up to the customer once we've loaded it in to

23  run reports and validate and check and check against

24  other files or wherever they want to check against to

25  make sure that the data that they have now put in the

RALEIGH - CROSS                963

1  system is the correct data that they need to run their

2  business.

3  Q   Who decides what data goes into the item master?

4  A   The customer.

5  Q   Does Lawson have any role in deciding what

6  information what information, what item information

7  goes, into the Lawson item master?

8  A   None whatsoever.

9          MS. ALBERT:  Your Honor, could we have

10  clarification on the question?  Are we talking

11  specifically about the Jackson implementation?

12          THE COURT:  As far as I know.

13  Q   Ms. Raleigh, let's ask a couple questions on this

14  issue.  For Jackson, specifically, who decided what

15  data, what information, what part information, went

16  into the Lawson item master?

17  A   Jackson decided.

18  Q   Did Lawson have any control in making any

19  determination on what information went into the item

20  master?

21  A   No, we didn't.

22  Q   How long have you worked at Lawson?

23  A   13 1/2 years.

24  Q   And in your 13 1/2 years at Lawson, have you ever

25  encountered a single situation where Lawson controlled

1   the data that was entered into the Lawson item master?

2   A   No.

3              MS. ALBERT:  Outside the scope.

4              THE COURT:  What?

5              MS. ALBERT:  Outside the scope of my direct.

6              THE COURT:  Wasn't it?

7              MR. SCHULTZ:  It was not outside of the scope

8   of her direct and there's two reasons.

9              THE COURT:  What did she ask that animated

10  the right to ask that question?

11             MR. SCHULTZ:  She asked specifically about

12  data conversion.  Specifically, Exhibit 216 at page 15

13  deals with data conversion.  If we're going to be

14  talking about data conversion, we need to actually

15  understand what's is being converted and the scope of

16  what is being converted.

17             THE COURT:  All she did was ask who did it.

18  That's all she did.  She didn't talk about the

19  background of selecting it and so forth.

20             MR. SCHULTZ:  That's what I'm getting at,

21  Your Honor.

22             THE COURT:  That's the point.  What do you

23  mean?  She didn't ask about that.  Ms. Albert didn't

24  ask about that.  And your obligation is to stay within

25  the scope of her direct examination.  She objects to

1   it.

2          You can call the lady back.  Just disregard

3   the answer for now.  You can call her back and put her

4   on in your case if you want to, but right now we're

5   talking about what she asked.  So the objection is

6   sustained.

7   BY MR. SCHULTZ:

8   Q   During your direct examination with Ms. Albert,

9   she talked about converting data?

10  A   Yes.

11  Q   What is your understanding with respect to

12  conversion of data into the item master in terms of

13  who does it?

14         MS. ALBERT:  Objection, ambiguous.  I asked

15  specifically about one implementation for Jackson.

16         THE COURT:  I think you asked who did the

17  conversion, and that's fair game for him to ask

18  further about that.

19         MS. ALBERT:  I think his question was

20  broader.

21         THE COURT:  It is.

22         MS. ALBERT:  Than just this Jackson.

23         THE COURT:  It is, but have you heard about

24  that camel that will sticks his nose under the tent?

25  Okay.

RALEIGH - CROSS                966

1  BY MR. SCHULTZ:

2  Q   Ms. Raleigh, do you remember the question?   Maybe

3  I'll just ask it again.

4  A   If you could.

5  Q   In a conversion of legacy information into the

6  item master information, who's in charge of doing the

7  data conversion?

8  A   Those responsibilities are typically shared

9  between Lawson and the customer.   There are a variety

10 of steps in the overall process, and some of those

11 steps, certainly the education on how to get the data

12 formatted into the right file format, and how to use

13 the tools that will load it, those are almost always

14 responsibilities that Lawson will take because the

15 customer wouldn't know how to do it if it weren't for

16 our assistance.

17         THE COURT:   Didn't you answer this question

18 in answering about the tables on 16, what was Lawson's

19 and what was the customer's responsibility?

20         THE WITNESS:   For the scope of this

21 implementation, I did.

22         THE COURT:   That's what he's talking about

23 now.

24 Q   Who selected the data?

25 A   The customer.

1  Q   I'd like to turn you now to table 3.5, which is on

2  page 17 of the document.  If you'd look down on the

3  table, it's Bates number ending in 5376.

4  A   I'm there.

5             THE COURT:  Is that master file and

6  configuration table value building and scope.

7             MR. SCHULTZ:  That is exactly it, Your Honor.

8  BY MR. SCHULTZ:

9  Q   Do you recall testifying to this table earlier?

10 A   I do.

11 Q   And you had some discussion regarding Eclipsys.

12 Who is Eclipsys?

13 A   Eclipsys is the vendor of the legacy software.  So

14 it's the software that Jackson was using that we

15 replaced.

16 Q   What was your involvement with this RFP and

17 statement of work process with Jackson?

18 A   Ultimately, I was the person who oversaw the

19 execution of the work, but I participated at various

20 points along the way throughout the RFP and the

21 creation of the SOW.

22 Q   In this table, there are some terms that are used

23 under file.  One of the them is vendor master, one is

24 item master, one is vendor catalog.  Whose terms are

25 those?

1    A    Those would be Jackson's terms.

2    Q    Have they any relation to the Lawson system?

3    A    No, not in this context here, no.

4    Q    You also, if you'll look under the vendor catalog,

5    which is item 3, you mentioned earlier that there's a

6    Lawson response in bold letters?

7    A    Correct.

8    Q    Could you explain why there's a Lawson response in

9    bold letters in paragraph 3?

10   A    So you have to understand that the Public Health

11   Trust of Miami is a government institution.  So they

12   have very strict laws about the way that they request

13   for proposals and the way that they write contracts

14   with their vendors.  So under the scope of that,

15   certain portions of the information provided here came

16   from Jackson.

17        So the first several columns of this table would

18   have only come from Jackson because only Jackson would

19   have known what systems they used, what data there

20   was, what they needed to get into our system.

21        Lawson's responsibility would be to respond to

22   those, right, in terms of how are we going to

23   accommodate those requests or those business needs, if

24   you will, that Jackson has articulated here.

25        So in this particular situation, it was Lawson --

1   instead of just deleting the entire line, obviously,

2   which isn't necessarily within our right to do, Lawson

3   called out a response to make it clear that while the

4   customer is asking for where is the vendor catalog

5   information going to go in Lawson, Lawson's response

6   is, Well, what you're asking for, that's just part of

7   our item master.  So it's covered in the prior line.

8   It's covered in line No. 2.  It's the item master.

9   Q    In other words, Lawson's system didn't have what

10  was paragraph No. 3 that Eclipsys had as a vendor

11  catalog?

12            MS. ALBERT:  Objection, leading.

13            THE COURT:  Sustained.

14            Look, you all are going to have to live with

15  all the terms that you used, and you can't be trying

16  to rewrite documents in the middle of the trial.  So

17  that one is over.  Move on.

18            Everybody lives with what they said,

19  historically, in life.  There's a way to ask her a

20  question about this, but you haven't gotten there yet.

21  BY MR. SCHULTZ:

22  Q    Ms. Raleigh, did Lawson write the term "vendor

23  catalog"?

24  A    No.

25  Q    Does Lawson have a vendor catalog?

1   A    No.

2   Q    What does Lawson have?

3   A    An item master.

4   Q    How does the information get into the item master?

5   A    It's extracted from the customer's legacy system,

6   it's changed into the appropriate format, and then

7   it's loaded using our proprietary tools into our

8   system, into the item master.

9   Q    If we look back at that table under lines 1 and 2,

10  there's what is referred to as Microsoft add-ins.

11  What is Microsoft add-ins?

12  A    Microsoft add-ins is a Lawson product that allows

13  you to use Microsoft Excel, which is a tool that most

14  of us are somewhat familiar with using, to load data

15  into the Lawson tables.  So it's an easier, more user

16  friendly product and way of getting an Excel

17  spreadsheet's worth of data into a particular table in

18  Lawson.

19  Q    In order to use Microsoft add-ins, does the data

20  need to be in a particular format beforehand?

21  A    Yes, it does.

22  Q    What format does it need to be in?

23  A    The data needs to be in a format that is

24  consistent with the database layout of Lawson.

25       So certain data needs to be in certain columns in

1   order for it to load properly.  If you just put it

2   wherever you want it, the system won't understand how

3   to read that data and put it in the right place in

4   Lawson.  Is that clear?

5   Q   I think I'm done with that exhibit.

6       I'd like to refer you to Exhibit 209, which is

7   another exhibit you looked at earlier.

8               THE COURT:  I don't believe she did.  She did

9   not look at 209.

10              MR. SCHULTZ:  That's correct.

11  Q   Actually, Ms. Raleigh, you talked about, on

12  examination before, about the services that you do

13  provide.

14  A   Yes.

15  Q   Are their services that you don't provide?

16  A   Certainly, there are.

17              MS. ALBERT:  Objection.  Outside the scope,

18  Your Honor.

19              THE COURT:  Do you want to bring her back for

20  your case?

21              MR. SCHULTZ:  Your Honor --

22              THE COURT:  I'm sorry, but that's the way the

23  rules are.  And I've told you before in a pretrial

24  conference that we are going to try this case in

25  accordance with the rules about who was testifying,

1    what they were saying, and whether or not the scope of

2    direct applied.  Otherwise, what happens is you end up

3    putting your case on in the middle of their case, and

4    I told you why I didn't want that done.

5           Sometimes it can be done, but I'm staying

6    with what I told you long ago.

7           Objection sustained.

8           MR. SCHULTZ:  I can confine the questions to

9    the questions that were asked on direct examination,

10   Your Honor.

11   BY MR. SCHULTZ:

12   Q   Ms. Albert asked you questions about the

13   conversion process with respect to Jackson.

14   A   Yes.

15   Q   Were there any modifications to the Lawson system

16   in the Jackson situation?

17   A   In the procurement system, no.

18   Q   If there had been modifications to the Jackson

19   system, would Lawson support that?

20   A   No.

21   Q   Why not?

22   A   The scope of our global support organization is

23   confined to only the software that we write and we

24   release.  So Lawson's global support organization is

25   just that.  They do not support modified programs.

973

1          MR. SCHULTZ:  Thank you.

2

3      REDIRECT EXAMINATION

4  BY MS. ALBERT:

5  Q    Just a couple more questions, Ms. Raleigh.

6  A    Sure.

7          MS. ALBERT:  Mike, if you could, could we

8  turn back to Plaintiff's Exhibit 216?  First page,

9  please.

10  Q    This document, Plaintiff's Exhibit 216, this is

11  Lawson's statement of work that it provided to Jackson

12  Health; is that correct?

13  A    That's correct.

14          THE COURT:  You mean Lawson authored the

15  document?  Is that what you're saying?

16          THE WITNESS:  That's correct.

17  Q    Thank you.

18      Now, could we turn to page 17 of the exhibit,

19  please.  And the Bates number on that page ends with

20  376.

21  A    I'm there.

22  Q    Now, referring back to that response that

23  Mr. Schultz directed you to where Lawson has a

24  response in bold, when Lawson wrote this response,

25  Lawson said that Jackson's vendor catalog data from

1    its prior Eclipsys system would be loaded into the

2    item master of the Jackson system, correct?

3    A    Yes.   This is item master data that would be

4    loaded into the item master.

5              THE COURT:   That wasn't the question that she

6    asked you.   She asked you whether or not what have in

7    their vendor catalogs would be loaded into the item

8    master.

9              That's the question, I think, isn't it?

10             MS. ALBERT:   That's correct, Your Honor.

11             THE COURT:   Yes or no to that one?   Because

12   you answered yes, and then you changed the question.

13   So I'm not sure that the record is clear.

14             MR. SCHULTZ:   Your Honor, may I make a point

15   here?

16             THE COURT:   No, you're not testifying.

17             MR. SCHULTZ:   I'm not testifying, but the

18   witness clearly could not answer with a yes or no, and

19   I ask that she be allowed to answer the question.

20             MS. ALBERT:   Your Honor, I object.

21             THE COURT:   One at a time.

22             Your concern is overruled.

23             Answer the question yes or no.   The question

24   is:   When the installation occurred, was -- go with

25   it.

RALEIGH - REDIRECT          975

1   BY MS. ALBERT:

2   Q   When Lawson wrote this response, this statement of

3   work, Lawson told Jackson that Jackson's vendor

4   catalog data would be loaded into the item master of

5   the Lawson system; is that correct?

6   A   I know you want a yes or no out of me.

7         THE COURT:   That's what you have to do is yes

8   or no.   You pick.

9         THE WITNESS:   I'll pick no then because I

10  don't agree with the way that it's being portrayed.

11  Q   Well, Lawson told Jackson that catalog information

12  is a part of Lawson's item master; is that correct?

13  A   Correct.

14        MS. ALBERT:   Thank you.   No further

15  questions.

16        THE COURT:   Is she the witness you wanted to

17  come back?   You talked about this in one of our

18  conferences on the telephone, and you wanted to know,

19  and I believe that the question was she was going to

20  be out at the country at some point in time.   Do you

21  want her back or do you want not want her back as part

22  of your case?   Because you're going to start on

23  Tuesday, right, with any luck?

24        MR. SCHULTZ:   Your Honor, we'd like to

25  reserve the right to bring her back.

RALEIGH - REDIRECT                976

1          THE COURT:  Well, I'm going to tell her to be

2   back if you tell her to be back.  That's the terms

3   under which she gets released.  Otherwise, she can

4   stay here like all the rest of the witnesses did.  Is

5   that what you want to do?

6          MR. SCHULTZ:  Yes, Your Honor.

7          THE COURT:  Obviously, or maybe not

8   obviously, you will be recalled to present testimony

9   in Lawson's case.  And you can leave and go about your

10  business provided that you respond to the return call

11  that they give you.  Do you agree to do that?

12         THE WITNESS:  I do.

13         THE COURT:  All right.  They have an

14  obligation to try to work consistently with your

15  schedule, but we haven't done real well with schedules

16  so far.

17         THE WITNESS:  I understand.

18         THE COURT:  But we're working on improving.

19         THE WITNESS:  That's all right.  I

20  understand.

21         THE COURT:  Actually, we haven't done badly.

22         Thank you for being with us.

23         THE WITNESS:  Thank you.

24          (The witness was excused from the witness

25  stand.)

1          THE COURT:  All right.  I think that it's

2     Friday afternoon and people need to go home for the

3     weekend.  We're not going to have any trial hearings

4     on Monday.  It will begin at 9:00 on Tuesday.

5          I'm told by the weather people that I listen

6     to on the radio coming in in the morning, there's

7     potentially a big snowstorm coming on Tuesday.  I

8     don't know.  You know how that goes.

9          There's a mechanism Mr. Neal will tell you

10    about.

11         THE CLERK:  Actually, the jury clerk has

12    given you a card to take home.

13         And when you call me around 6:15 Tuesday

14    morning, I'll call her.  Assuming we're both up at

15    6:15.

16         THE COURT:  I'm always up at 6:15.  My dog

17    gets me up.

18         All right.  If you'll leave your pads with

19    Mr. Neal.  He'll take care of them.  Have a nice

20    weekend and drive carefully.

21         (The jury is out.)

22         THE COURT:  You can be excused if you'd like

23    to go catch a plane.  Or are you stranded for the

24    night?

25         THE WITNESS:

1          MS. RALEIGH:  I hope not.

2          THE COURT:  I hope not.

3          All right.  Now, you anticipate finishing

4    Tuesday; is this correct?  How many more witnesses do

5    you have?

6          MR. ROBERTSON:  We have three videotape

7    depositions of customers, Your Honor.  We have Mr.

8    Christopherson, Mr. Lohkamp, and then we have our

9    expert Mr. Niemeyer on the source code.  I don't

10   anticipate the direct of Mr. Niemeyer will be very

11   long.

12         THE COURT:  What's very long?  What does that

13   mean?

14         MR. ROBERTSON:  An hour of direct.

15         THE COURT:  How many the customer

16   depositions?

17         MR. ROBERTSON:  Customer depositions are

18   2 1/2 hours total length.  And then we have probably

19   some short testimony from Mr. Farber.  Perhaps half an

20   hour tops.

21         THE COURT:  Look at the depositions because

22   there was an awful lot of repetition in there.  I

23   think basically it could have been stipulated that

24   Lawson in everything that it does tries to be accurate

25   in what it tells to its customers.  I think that could

979

1   have been stipulated, and we went through almost an

2   hour of testimony about that.

3           I understand the need to present it once, but

4   another way to deal with that is to turn to them and

5   say "Do you stipulate?  And they say yes.  And then go

6   on.  Have you all tried that method?

7           MR. ROBERTSON:  We have, Your Honor.

8           THE COURT:  Try it.

9           MR. ROBERTSON:  Not with complete success.

10          THE COURT:  Try it some more.  You're doing

11  pretty well.

12          Now, what about the objection to the

13  testimony of Mr. Frank that was on those pages 22

14  through 25 or entries 22 through 25 of the --

15          MR. STRAPP:  Your Honor, we had an

16  opportunity to review the final pretrial order that

17  lists the designations that were agreed to by the

18  parties.  In every single (unintelligible) on this, I

19  just doublechecked was in the final pretrial order.

20  It was also included in an email confirming that these

21  were the clips to be played sent on New Year's Eve to

22  Lawson's counsel to which they agreed that those clips

23  were --

24          THE COURT:  Well, I think that was fair to

25  send it to them on New Year's Eve and expect them to

1    agree to it that night.

2          MR. STRAPP:  I sent it right around midnight.

3          THE COURT:  Happy New Year.

4          Is that right?  Is it in the pretrial order

5    that way?

6          MR. SCHULTZ:  It is, Your Honor.  I think,

7    Mr. Strapp, was there one --

8          MR. STRAPP:  It's all in there.

9          MR. SCHULTZ:  When we were talking, there was

10   a small segment that was not in there, but apparently

11   that is corrected.  It was in there.

12         Your Honor, apparently that was accurate that

13   the pretrial order did have those stipulations in the

14   record.  However, based on a review of that

15   information along with the exhibits that went along

16   with that testimony, they did display financial

17   information, which Your Honor knows is part of the

18   damages issues and should have been excluded.  So we

19   would object to that testimony still.

20         THE COURT:  Just so I understand what you

21   say.  You're saying that that testimony related to an

22   exhibit, and that the exhibit was excluded in the

23   pretrial order?

24         MR. SCHULTZ:  Your Honor, may I check with

25   counsel on that?  I'm not sure.

1          THE COURT:  Yes.  Look at it and see.

2          MR. SCHULTZ:  Your Honor, I don't think there

3   that was an exhibit that was excluded.  The problem

4   with the issue is that the testimony that was read in

5   and on the screen was that the exhibit and the

6   information was brought up onto the screen.  It

7   shouldn't have been.  It's financial information.

8          THE COURT:  You are you saying that you erred

9   in agreeing that it could be admitted in the pretrial

10  order?

11         MR. SCHULTZ:  Yes, Your Honor.

12         THE COURT:  That's all right.  That happens.

13         MR. SCHULTZ:  It's just the financial part,

14  Your Honor, not the actual testimony itself, but the

15  financial aspect of it which was in the document.

16         THE COURT:  I think most of the testimony is

17  financial, isn't it?

18         MR. SCHULTZ:  I'm being corrected, Your

19  Honor.  It is the financial testimony and the

20  document.

21         THE COURT:  Yeah, the testimony relates to

22  the financial pages.  Okay.

23         So he says that in the whole pretrial order

24  situation, they fouled up, and they made a mistake.

25  And I bet you before the case is over, you'll be

1    standing and delivering on a statement like that

2    yourself.  At least my experience in large litigation

3    was that sometimes I fouled up.

4         In fact, you know what a good lawyer is?  A

5    good lawyer is one who knows how to get himself or

6    herself out of the trouble that he or she inevitably

7    puts before him or her because of things you do.  And

8    if there is some kind of venality or utter and

9    complete neglect to it, then the courts aren't very

10   forgiving, but I'm not sure we have any of that here.

11        So let's face this question:  Why is this

12   information relevant to anything that's left in the

13   case is I guess the pertinent issue.

14        MR. STRAPP:  Sure, Your Honor.  Just as a

15   preference, there was no ruling that all financial

16   information of Lawson's is out of the case.  In fact,

17   information about commercial success of Lawson's

18   products, that information is relevant to issues, for

19   example, like secondary consideration.

20        THE COURT:  Is that what this is all about?

21        MR. STRAPP:  Well, this information is

22   relevant to the implementation and installation

23   revenue.  The fact that Lawson not only licenses the

24   software that's at issue here, but it also generates

25   revenue from servicing and installing it, and that

1  goes to the indirect infringement issues here that

2  relates to what's happening on the customer's side

3  once the licensing is done.

4        THE COURT:  You say it goes to it, what do

5  you mean?  You're saying it's relevant to it.

6        MR. STRAPP:  Because the maintenance and the

7  service that many Lawson does after the software has

8  already been licensed by its customers is relevant to

9  elements that are necessary to prove both inducement

10 of infringement as well as contributory infringement.

11       THE COURT:  How so?

12       MR. STRAPP:  Because it goes to the point

13 that Lawson is aiding, abetting, assisting its

14 customers in performing the claimed elements of the

15 method claims, and it shows that the systems --

16       THE COURT:  How does it show that?  You're

17 telling me, you're basically saying here that Lawson

18 gets revenues, and how much of the revenue, I guess.

19 Doesn't it say how much over here?

20       MS. STOLL-DeBELL:  I think that was part of

21 our problem, Your Honor, is it does say how much.

22       THE COURT:  Wait a minute.  Is that your only

23 problem?

24       MS. STOLL-DeBELL:  I don't think it's

25 relevant.  The fact that we offer these services,

1    that's relevant, but how much we charge for them and

2    how much we get paid for them is not relevant.

3              THE COURT:  Wait just a minute.  Let me hear

4    him explain why that's relevant.

5              Why is what they get paid for it relevant?

6              MR. STRAPP:  Your Honor, I think that the

7    testimony here generally relates to the maintenance,

8    service and licensing revenue.  There's different

9    streams of revenue.  That indicates that Lawson is

10   both implementing, maintaining, servicing and

11   installing the software at its customer's site.

12             THE COURT:  Is that in dispute that Lawson

13   does that?

14             MS. STOLL-DeBELL:  Didn't we just hear

15   testimony on that?

16             THE COURT:  I think their own witness said

17   that.

18             MR. STRAPP:  We did hear testimony about

19   that, but we also have deposition testimony, and this

20   deposition testimony was not objected to.  The

21   exhibits are all in evidence.  They all went through

22   the vetting process of Lawson's counsel.

23             THE COURT:  Yes.  They said that and they

24   said they made a mistake.  And so the real question

25   I'm interested in is why does this come in given that

1    there are no damages issues?  And you need to tell me

2    that, and you can't just say it goes to it.  You have

3    to say it's relevant because it establishes this, and

4    that is an element or component of our proof.

5              MR. STRAPP:  Certainly, Your Honor.  It's

6    relevant --

7              THE COURT:  What's "it"?

8              MR. STRAPP:  The testimony that is being

9    objected to now of the deposition of Mr. Frank is

10   relevant because it shows that Lawson is servicing,

11   installing and maintaining software that is at its

12   customer's site.  That software is software that is

13   accused of infringing the claim elements.

14             THE COURT:  Stop.  They don't dispute that, I

15   don't think.  Do you?

16             MS. STOLL-DeBELL:  We don't dispute that we

17   do those services.  I just contend that how much we

18   get paid for it is not relevant.

19             THE COURT:  Do you dispute whether you get

20   paid for it is relevant as opposed to how much?

21             MS. STOLL-DeBELL:  I think it's minimally

22   relevant.

23             THE COURT:  Well --

24             MS. STOLL-DeBELL:  The fact we get paid for

25   it, I don't dispute that that is minimally relevant,

986

1    but I don't think the amount is relevant, and I think

2    it's prejudicial.

3             THE COURT:  Now the issue is how much.  Why

4    is how much they get paid for doing these services

5    that you just outlined, why is that relevant to any

6    issue that's in the case?

7             MR. STRAPP:  The amount didn't go so much to

8    an infringement issue.  That goes to a validity issue,

9    and the issue that it goes to invalidity is a

10   secondary consideration of nonobviousness.  One of the

11   secondary considerations recognized by the Supreme

12   Court all the way back to the 1950s was the Graham v.

13   John Deere case was whether or not the accused

14   infringer enjoys commercial success related to the

15   products that are being accused of infringement.

16            THE COURT:  So it's relevant to invalidity as

17   a secondary consideration.

18            MR. STRAPP:  Yes, correct.

19            THE COURT:  Okay.  Well, we can deal with

20   that then, can't be?

21            MS. STOLL-DeBELL:  We went through this exact

22   issue at the pretrial conference and they argued the

23   exact thing that Lawson's sales are relevant to

24   commercial success and non-obviousness.  And we went

25   through the interrogatories.  I went through them with

1    you and showed you how they did not disclose that.

2    And you agreed with me.

3            THE COURT:  Who did not disclose what?

4            MS. STOLL-DeBELL:  They didn't disclose the

5    argument that Lawson's sales showed commercial success

6    and were relevant to non-obviousness.  They didn't do

7    it for Lawson.  They talked about SAP and Ariba, as

8    you will recall.  Those financial numbers they were

9    going to use for their non-obviousness case.

10           THE COURT:  Are you talking about the

11   arguments that were made in respect of the rulings on

12   the experts is where this came up or something else?

13           MS. STOLL-DeBELL:  This was all of the

14   financial documents.  It was all of Lawson's sales

15   spreadsheets and our annual report.  There was a big

16   list of damages documents, as you'll recall, and

17   Mr. Strapp made the same exact argument then as he

18   made now.  And we went through it.  I pulled out the

19   interrogatory responses, and they never, never said

20   they were going to rely on Lawson's sales to show

21   commercial success of their invention.

22           MR. ROBERTSON:  I have a practical solution.

23   We can either redact the numbers from the document,

24   and we'll go back and look at the testimony again, and

25   if there was discussion of the revenues, we'll take

1   that out.   The case isn't going to turn on seven

2   minutes of testimony of Mr. Frank.

3           THE COURT:   I don't think so, but I did need

4   to get -- since you-all are insisting and they are

5   objecting, it's probably my job to be handle it.   What

6   I was going to suggest is that you go back and study

7   the transcript of the final pretrial conference and

8   the rulings that were made, and you see if you have

9   been foreclosed from it already by the argument that

10  you did not ever disclose that you were going to use

11  Lawson's revenues to show commercial success.

12          I don't have any question but that Lawson's

13  revenues are relevant to commercial success.   I think

14  that is fairly well settled.   But if there was a

15  discovery request that said for you to do that and you

16  didn't do it, then that may be sufficient to preclude

17  admission of the evidence.

18          On the other hand, it may be that another

19  person in this room made an error in making a ruling

20  on that score, and I wonder who that might be.

21          So let's go check it out because it doesn't

22  have anything to do with infringement anyway.   It's

23  admissible, if at all, on the invalidity argument, and

24  we'll deal with that when the time comes.

25          So you're going to be kicking off sometime in

989

1    the afternoon on Tuesday, it looks like.  If not, you

2    may be kicking off on Wednesday morning, it depends.

3            My wife criticizes me substantially for

4    checking out the NOAA weather and other weather items

5    like the Weather Channel, and she accuses me of being

6    an old man with nothing to do because I do that, but

7    there are times when it comes into play.  And I saw

8    that there is a very significant snowstorm supposed to

9    hit the Midwest, and I don't want you-all to go home

10   over the weekend and get trapped there.

11           So be advised that being trapped in the snow

12   is not a sufficient excuse not to start the trial.

13   Mr. Carr will be ready to go.

14           And I am not, I want you to know, being paid

15   by any merchant in town to keep you-all here.

16           All right.  Thank you very much.  Have a nice

17   weekend.  Get some rest.

18               (The proceedings were adjourned at 5:17 p.m.)

19

20

21

22

23

24

25