1048

 1       (The jury is present.)

 2            THE COURT:  All right.

 3   BY MR. ROBERTSON:

 4   Q   Mr. Lohkamp, I just want to get back to that

 5   question I was asking you about that hosting service

 6   that is Lawson will provide.  The hosting of that is

 7   at a Lawson facility; is that correct?

 8   A   My understanding is it's at a third party

 9   facility.

10   Q   A third party facility that is being leased by

11   Lawson for hosting those servers that have the

12   operational software?

13   A   We are leasing space at the third party hosting

14   site.

15   Q   It's Lawson's servers that are operating the

16   hosting service?

17   A   I don't know exactly how that's structured.

18   Q   You have a rather large binder next to you right

19   there on the left-hand corner of the table.  That's

20   Plaintiffs' Exhibit No. 118.  I just want to ask you a

21   few questions about that, if we could.

22       If you will flip through quickly, you will see

23   that that binder is just one Lawson response to a

24   request for a proposal for Cherry Creek Schools; do

25   you see that?

1    A    Yes, yes.

2    Q    This is a Lawson authored document?

3    A    It looks like it is, yes.

4    Q    And there's an executive summary at page 7 of the

5    document, Section 1.0, ends with Bates label 173.

6    Page 7 is identified in the lower left-hand corner.

7    A    Yes.

8    Q    One of the software solutions that Cherry Creek

9    School is seeking, you'll see in that first paragraph,

10   is to include the ability to conduct business online

11   with vendors and other partners.  The school wants to

12   have procurement activities and resources available

13   there.  Do you see that?

14   A    Yes, I see that.

15   Q    That would be part of the procurement solutions

16   we've been talking about; is that right?

17   A    That's what I would interpret, yes.

18   Q    If you'll turn to the page that is page 27495 and

19   ends with Bates label 193.  There's a heading

20   entitled, Custom catalogs.  Do you see that?

21   A    Yes, I see that.

22   Q    Under that heading it says, Individual department

23   and users can establish custom catalogs that reflect

24   their unique ordering patterns.  Do you see that?

25   A    Yes, I do.

1    Q    Next sentence that Lawson is representing to this

2    potential customer is that, Furthermore, you can

3    establish catalogs for certain days of the week by

4    item classification, vendor or other criteria.  Did I

5    read that correctly?

6    A    Yes, you did.

7    Q    That's a representation that Lawson was making to

8    this school district?

9    A    Yes.

10   Q    I want you to turn to page 179 of this document,

11   and there's a heading there called "functional

12   catagory purchasing."  Do you see that?

13   A    I'm just flipping to it, sir.

14   Q    Are you with me now?

15   A    I am.

16   Q    There's a legend there for certain things that are

17   provided by Lawson or are provided by third parties or

18   whether some people require some configuration, etc.

19   Do you see that?

20   A    Yes.

21   Q    Lawson represent there that when they use the term

22   "F," that the functionality is fully provided out of

23   the box.  Do you see that?

24   A    Yes.

25   Q    And you'll see below there there's a table that

1   has certain headings including a reference number and

2   functional requirements.  Do you see that?

3   A    Yes.

4   Q    And the third column has a response.

5   A    Yes.

6   Q    And under that response, for example, for the

7   reference No. PO 1.00, the response would be F, right?

8   So that means that the Lawson purchasing of the

9   procurement solution they are offering here, for

10  example, would have that capability fully provided out

11  of the box.  Is that how you would understand this

12  table?

13  A    Yes, that's what the response means.

14  Q    If you would turn to page that ends 192, which is

15  Bates label 9358.  There's a question from the school

16  district at PO 161 on that page.  Do you see that?

17  A    Yes.

18  Q    So the school district is asking Lawson for this

19  procurement solution whether it has the ability to

20  generate various catalogs, including vendor catalogs,

21  stockroom catalogs, textbook catalogs or food service

22  catalogs in print and online.  Do you see that?

23  A    Yes.

24  Q    And lawson indicated that that capability was

25  fully provided out of the box, correct?

LOHKAMP - DIRECT                    1052

1    A    Yes, we answered F.

2    Q    That's all I have of that document, sir.

3         I'd like you to go to Exhibit No. 215 now if I

4    could, plaintiff's exhibit.

5    A    I'm sorry?

6              THE COURT:  It's not in the notebook, is it?

7              MR. ROBERTSON:  No, Your Honor.  That was my

8    mistake, but he does have it now.

9    Q    Well, do you have Plaintiff's Exhibit No. 215 now,

10   sir?

11   A    Yes.

12   Q    Now, again, this is a Lawson authored document,

13   correct?

14   A    Yes, it looks like it.

15   Q    And it looks like it's a response to Jackson

16   Health Care System; correct?

17   A    Yes.

18   Q    And if you'd go to the executive summary again,

19   there's a mention of Lawson's ERP systems, which

20   include this procurement software we've been talking

21   about, correct?  That falls under the heading of

22   electronic -- what's called enterprise resource

23   planning solutions?

24   A    Yes.  ERP would include purchasing.

25   Q    If you go to the page that ends with the Bates

1    label No. 149, sir.  I'm sorry.  It's the page that's

2    at the left-hand corner ends with 149.  It ends with

3    the Bates label 171.  And again, in this table in the

4    left column is a heading called functional capability.

5    Do you see that?

6    A    Yes.

7    Q    Then there's another heading that, says currently

8    "available."  And then there's another heading that

9    says "currently not available."  And then there's a

10   heading that says "attachment."  Do you see that?

11   A    Yes, I do.

12   Q    And if you go down to the column with the heading

13   9 G commodity management functions?

14   A    Yes.

15   Q    The second question there says, Does the system

16   support generic and vendor catalogs with sub

17   categories of inventory and stockless items?  Do you

18   see that?

19   A    Yes, I do.

20   Q    What did Lawson indicate about whether its system

21   had that capability?

22   A    It indicated yes.

23   Q    Two lines down, sir, from that you'll see a

24   heading under "commodity management functions,"

25   support X12832, electronic price catalog data from

1    vendors to the JHS item catalogs with updates to

2    existing items only.  Do you see that?

3    A    Yes.

4    Q    JHS is this Jackson Health System, a potential

5    customer, right?

6    A    I believe that's what it stands for.

7    Q    What did Lawson represent to Jackson Health System

8    with respect to whether its procurement system had

9    that capability?

10   A    Yes.

11   Q    The next line down says, "Ability to update our

12   catalogs with external vendor provided files."  Do you

13   see that?

14   A    Yes.

15   Q    What did Lawson represent to the Jackson Health

16   Care system as to its procurement software capability?

17   A    We indicated yes.

18   Q    If you'll turn to the next page still under this

19   functional capability column, there's a subheading

20   there that says, "Expanded item searched by," do you

21   see that?

22   A    Yes.

23   Q    With respect to whether or not the Lawson

24   procurement solution offered to Jackson Health System

25   had the ability to do a search by vendor catalog

1  number, what did Lawson answer?

2  A    Yes.

3  Q    What did Lawson answer when it was asked whether

4  it could do a search by a hospital specific code?

5  A    Yes.

6  Q    What did Lawson answer when it was asked whether

7  it could do a partial description of an item, for

8  example, wild card, contains, etc.?

9  A    We answered yes.

10  Q    What did Lawson answer when it was asked by this

11  health system whether or not it could do searches by

12  manufacturer catalog number?

13  A    We answered yes.

14  Q    What did Lawson answer when it was asked whether

15  it could search by classification code?

16  A    We answered yes.

17  Q    What did Lawson answer when it was asked whether

18  it could search by a vendor name?

19  A    We answered yes.

20  Q    What did Lawson answer when it was asked whether

21  it could search by a manufacturer's name?

22  A    We answered yes.

23  Q    The next category said whether or not it could

24  answer questions with respect to item availability.

25  Do you see that where it says, "currently available"?

LOHKAMP - DIRECT                1056

1   A    What section?

2   Q    Actually, that's all I have with respect to that

3   document sir.

4   A    All right.

5   Q    Thank you.  Do you have Plaintiff's Exhibit 149 up

6   there?

7   A    Here it is.

8            THE COURT:  It's not in his book either.

9            MR. ROBERTSON:  He has it now, Your Honor, in

10  his book.

11  Q    This is another response to a request for

12  information, isn't it, by the Holland Hospital?

13  A    Yes.

14  Q    It's a Lawson authored document?

15  A    It appears so.

16  Q    And let me just go right to it.  There's some

17  questions about functional requirements for

18  procurement solutions being discussed by Lawson in

19  this document.  This is at the page that ends with the

20  Bates label 58.  I'm sorry.  It's page 58 of 91, and

21  it has the Bates label ending 796.

22  A    Okay.

23  Q    I apologize.  I've directed you to the wrong page.

24  It's 149 and it's at page 29.  So let's start over, if

25  we could.  I apologize, Mr. Lohkamp.

1    There's a heading there for material

2    requirements -- excuse me.  Materials requirements.

3    Then there's a subheading "inventory control," do you

4    see that?

5    A    Yes.

6    Q    Could you read out loud No. 10 for the jury?

7    A    "Ability to produce supply catalogs by item

8    number, manufacturer, vendor, class, inventory

9    location."

10   Q    And there's a response key at the top.  Do you see

11   that?

12   A    Yes.

13   Q    What does Lawson represent that A means?

14   A    Available/install.

15   Q    If you will go back to page 21 of 91, and there is

16   instructions for the application of functional

17   requirement questions there?

18   A    Yes.

19   Q    So you have already identified that have A means

20   available and currently installed.  Underneath that

21   there's a rating column.

22   A    Okay.

23   Q    It says, For each requirement listed, rate the

24   application's performance on a scale from 0 to 7, with

25   0 indicating no performance to 7 indicating leading

LOHKAMP - DIRECT                1058

1    edge capabilities.

2    A    Yes, I see that.

3    Q    So going back to page 29 then, Lawson represented

4    to Holland Hospital that it had a leading edge

5    capability that was available and installed to produce

6    supply catalogs by item number, manufacturer, vendor

7    class and inventory location; is that right?

8    A    Yeah, we rated that question a 7.

9              MR. ROBERTSON:  That's all I have with

10   respect to that document.

11   Q    The last exhibit with respect to these RFPs is

12   Plaintiff's Exhibit No. 226.  Will you confirm for me

13   that that is a response to a request for a proposal

14   from Blount Memorial Hospital?

15   A    Yes, it is.

16   Q    This a document authored by Lawson, correct?

17   A    It appears to be, yes.

18   Q    If you'll go to the page that ends with Bates

19   number -- excuse me.  The page that is labeled 58 and

20   ends with the Bates No. 416.

21             THE COURT:  What is the exhibit number?

22             MR. ROBERTSON:  226, Your Honor.

23   Q    Again, you'll see we have a column discussing

24   functional requirements?

25   A    Yes.

```
 1    Q    And there's a column for current release, do you
 2    see that?
 3    A    Yes.
 4    Q    Future release column?
 5    A    Yes.
 6    Q    Custom column?
 7    A    Yes.
 8    Q    And not available column?
 9    A    Yes.
10    Q    Can we assume that a Y means yes, that it's in the
11    current release?
12    A    It appears that that yes would be -- it would be
13    yes.
14    Q    The Y would be a yes?
15    A    Yes.
16    Q    Under the -- there's a Roman numeral 9, eCommerce
17    capabilities, do you see that?
18    A    Yes, I do.
19    Q    The fourth requirement under there is a list that
20    asks for manages price catalogs, purchase orders, PO
21    confirmations, and invoice transactions.  Do you see
22    that?
23    A    Yes, I do.
24    Q    What does Lawson represent to Blount Memorial
25    Hospital as to the capability of its procurement
```

1  system to do that?

2  A   We answered yes.

3  Q   If you will go to the page that ends with 22.

4  There's a heading there under "functional

5  requirements."  I want you to focus on the No. 2 there

6  that says, "The following definitions and format of

7  answers should be understood and followed when

8  completing this section."  You'll see for current

9  release, the answer should be Y or N.  Do you see

10  that?

11  A   Yes, I see that.

12  Q   So that must be a product must be in production

13  environment and included in the general product

14  release; is that right?

15  A   Yes.

16  Q   All right.  That's all I have with respect to that

17  document, sir?

18      You are familiar with the fact that after Lawson

19  is successful in winning a bid for or after a

20  potential customer receives a response for a proposal,

21  one of the next steps to prepare what is going to be

22  called a statement of work; is that right?

23  A   Yes, for proposal of services.

24  Q   So when you have won the contract, it's typical of

25  Lawson to prepare a statement of work; is that right?

LOHKAMP - DIRECT            1061

1    A    I believe it is if we're providing services.

2    Q    Okay.  And you have seen a statement of work as

3    part of your responsibilities at the company, correct?

4    A    I've seen a couple of them, yes.

5    Q    While we're getting those, let me move onto

6    another area.

7              THE COURT:  He's here.

8    Q    I'm not going to ask you about all those

9    documents.  Let me just ask you, if you would, to just

10   go to the first one and confirm for me that it's a

11   Lawson authored document statement of work?

12             THE COURT:  What is it?  What exhibit is it?

13             MR. ROBERTSON:  It's --

14   Q    Can you tell us the exhibit number, Mr. Lohkamp?

15   A    The first one is PX 501 E1.

16   Q    That's a statement of work for Lawson?

17   A    It's a change order form to modify the statement

18   of work.

19   Q    What's the next document?

20   A    The next one is PX 501, P1, and that's a statement

21   of work for Cancer Treatment Centers of America.

22   Q    Is that a Lawson authored document?

23   A    Yes, it is.

24   Q    What's the next one, sir?

25   A    The next one is PX S 501, I, and it's a change

1  order form that modifies a statement of work for

2  Community Medical Centers.

3  Q   What's a change order form modifying statement of

4  work?  Does that mean the statement of work has been

5  modified in some way?

6  A   Yeah.  My understanding of what a change order

7  form is someone is requesting a change to the services

8  we provide.

9  Q   What is the next document in that binder?

10  A   It's PX 501 L.  And it's a statement of work for

11  Deaconess Health System.

12  Q   Can you go to the next one?

13  A   The next one is PX 501 M, and it's the master

14  terms and conditions, Lawson Software and user

15  agreement.

16  Q   What's the next document?

17  A   That's the last one in this binder.  Should I go

18  to the next binder?

19  Q   All right.  Sorry, sir.  What's the first document

20  in there?

21  A   In this first binder?

22  Q   No, in the second binder.

23  A   I haven't got that.  Sorry.  It's PX 501 N.  And

24  the first page is a sales and use tax certification of

25  exemption.

LOHKAMP - DIRECT          1063

1    Q    What's the next page?

2    A    The next page is a services turnover document.

3    Q    Okay.  Next page?

4    A    It's a services order form for Holland Hospital.

5    Q    What's the exhibit number for that one, sir?

6    A    This one is PX 501 N.

7    Q    Services order form, is that the order form for

8    the services that Lawson is going to be providing to

9    Holland Hospital?

10   A    Yes, it is.

11   Q    What's the next document, sir?

12   A    The next document is PX 501 R, and it states,

13   "Server sizing estimate for Owensboro Medical Health

14   System."

15   Q    Can you turn to the page where it indicates it's

16   going to be a contract for services provided?

17   A    The next page is "What is a server sizing

18   estimate?"

19   Q    What about the next page?

20   A    "Parameters overview."  It's still part of the

21   sizing.

22   Q    Next page, sir?

23   A    "Proposed architecture."

24             THE COURT:  Interesting, but not useful.

25   What are we doing?  These exhibits are in.

LOHKAMP - DIRECT          1064

1    MR. ROBERTSON:  Well, Your Honor, I'd like to

2  offer what we had discussed before was is a Federal

3  Rule of Evidence 1006 summary of the documentation.

4  We've provided it to the defendant, and I believe with

5  one modification it was not objected to.  It's

6  Plaintiff's Exhibit 516.

7    THE COURT:  Any objections to Plaintiff's

8  Exhibit 516?

9    MS. STOLL-DeBELL:  No, Your Honor.

10    THE COURT:  What is it?

11    MR. ROBERTSON:  What is it?  I'm sorry, Your

12  Honor?

13    THE COURT:  Summary of what?

14    MR. ROBERTSON:  Of these contracts and what,

15  in fact, the software applications and modules that

16  were licensed, the involvement and the implementation

17  of those, and the various customers and information

18  detailing what the implementation was and what the

19  particular applications or modules were that were

20  licensed.

21    THE COURT:  And there's no objection to PX

22  516.  It's admitted.

23    (Plaintiff's Exhibit 516 is admitted into

24  evidence.)

25    THE COURT:  And all of the PX 501s are

1   admitted, aren't they?

2            All right.   Let's go.

3   BY MR. ROBERTSON:

4   Q    I'd like to talk to you, sir, a little bit about

5   some industry analyst reports and publications that

6   you review as part of your job as product strategist.

7   All right?

8        So in your role as a product strategist, you have

9   had occasion to review industry analyst reports; is

10  that right?

11  A    That is correct.

12  Q    Among the industry analyst reports you review on

13  occasion is Gartner, correct?

14  A    Correct.

15  Q    And you also review industry analyst reports from

16  Aberdeen; is that right?

17  A    Yes, I do.

18  Q    These are industry analyst reports that often

19  refer to products that were within your

20  responsibilities at the company including procurement,

21  right?

22  A    Yes.

23  Q    And you have also reviewed industry analyst

24  reports from Forester; is that right?

25  A    Yes, I have.

1   Q    Particularly, in the procurement area; is that

2   correct?

3   A    Yes, I have.

4   Q    And for procurement industry, you have also looked

5   at analyst reports from AMR; is that right?

6   A    Yes.

7   Q    And you have also looked at analyst reports from

8   an outfit known as VDC; is that right?

9   A    That's correct.

10  Q    And Lawson reviews and sometimes relies on the

11  information provided in those industry analyst reports

12  for making its own internal decision; isn't that

13  right?

14  A    Yes, we sometimes lavish those into our planning.

15  Q    Isn't it true that you provide information

16  concerning Lawson's products including procurement

17  products in the supply chain management industry to

18  those analyst reports?

19  A    Yes, I do.

20  Q    And part of your duties as a product strategist

21  for Lawson is to speak with these industry analysts

22  about the procurement solutions like S3 offered by

23  Lawson; isn't that right?

24  A    Yes, it is.

25  Q    And among the industry analysts that you speak

1    with in your role as a product strategist is Garter,

2    correct?

3    A    Yes.

4    Q    And Forester?

5    A    Yes.

6    Q    Aberdeen?

7    A    Yes, Aberdeen.

8    Q    VDC?

9    A    Yes.

10   Q    AMR?

11   A    Yes.

12   Q    And you use these industry analyst reports to

13   provide Lawson with intelligence with respect to

14   market trends; isn't that right?

15   A    Some of the reports I do use for that.

16   Q    What are the ones you find most reliable, sir?

17   A    Gartner is one of the more reliable ones.

18   Q    And you have a personal subscription to one of

19   more of these publications; isn't that right?

20   A    I have a personal subscription to AMR, but then it

21   converted into Gartner when they were purchased.

22   Q    But the ones you use most are Gartner and

23   Forester; isn't that right?

24   A    Gartner, Forester and AMR.

25   Q    Now, outside of these industry analyst reports,

1   you also keep abreast of trends and developments in

2   the supply chain management industry, right?

3   A   I try to.

4   Q   So if there are any mainstream periodicals or news

5   services that are discussing the procurement sphere,

6   for example, you try to pay attention to those as part

7   of your job responsibilities?

8   A   I certainly pay attention to certain publications.

9   Q   What would those be outside of the analyst reports

10  we've talked about?

11  A   I follow Health Care Purchasing News, Materials

12  Management and Health Care.  I also get emails from IT

13  Toolbox.  I also get emails from Supply Chain

14  Management Review.  So those are some of the key

15  publications I look at.

16  Q   How about just general news publications,

17  newspapers, that kind of thing?  If they have articles

18  of interest involving electronic procurement, do you

19  keep abreast press of them?

20  A   If I see the articles, I would read them.

21  Q   Let's talk a little bit now about your knowledge

22  of ePlus, if we can.

23  A   Okay.

24  Q   Isn't it true that you knew of ePlus prior to the

25  filing of this lawsuit?

1    A    Yes, I did.

2    Q    And you initially became aware of ePlus at a

3    health association conference in 2003; isn't that

4    right?

5    A    Yes.

6    Q    Is that one of those conferences you were talking

7    about before where various companies go and have

8    booths in order to display the software solutions that

9    they have?

10   A    That was an industry conference where they did

11   have booths set up for vendors.

12   Q    You saw that ePlus had a booth set up there; is

13   that right?

14   A    Yes, I did.

15   Q    And you visited that booth; isn't that right, sir?

16   A    I did stop by that booth.

17   Q    And you recall that ePlus was exhibiting product

18   offerings in procurement relating to catalogs; isn't

19   that right.

20   A    Yes, I recall they had software related to

21   catalogs.

22   Q    And it's also true that you're aware of ePlus

23   prior to the filing of this law suit by their listing

24   in the Forester e-Procurement Wave; isn't that right?

25   A    I didn't recall seeing that, and I went back and

LOHKAMP - DIRECT          1070

1   looked at that wave after the lawsuit had been filed.

2           THE COURT:  The question is were you aware of

3   it from Forester's listing?

4           THE WITNESS:  I did not recall seeing them in

5   the Forester listing.  I went back and checked after

6   this to see if they were on that list.

7           THE COURT:  Were they?

8           THE WITNESS:  They were.

9           THE COURT:  Did looking at that refresh your

10  knowledge about whether or not you knew about them

11  before the filing of the lawsuit?

12          THE WITNESS:  I had the prior knowledge from

13  2003 when I ran across them, but I hadn't run across

14  them prior to the law suit except for where they came

15  up at a Cleveland Clinic where Cleveland Clinic was

16  looking between ePlus and Sciquest.

17          THE COURT:  When was that?

18          THE WITNESS:  I believe that was in

19  approximately 2008.

20  Q   You're aware that the lawsuit was filed in May of

21  2009?

22  A   Yes.

23  Q   Isn't it true that prior to this lawsuit you had

24  also spoken to sales people at Lawson who had competed

25  with ePlus for business?

1    A    The situation with Cleveland Clinic where they

2    were bidding for a portion of the business there.

3    Q    How did you come to learn that ePlus was competing

4    for that customer?

5    A    The solution consultant contacted me and said that

6    Cleveland Clinic, who was already a Lawson customer at

7    the time, was trying to decide between Sciquest and

8    ePlus for a catalog solution.  They were expecting to

9    use Lawson's Punchouts to connect to whichever they

10   chose.  So he was asking me about our Punchout

11   capability.

12   Q    When you say "solution consultant," you're talking

13   about a Lawson salesperson, right?

14   A    The Lawson salesperson who does the demos.

15   Q    And that individual's name was Brett Weiss?

16   A    That's correct.

17           THE COURT:  You mentioned the name of some

18   other company; Science Quest or something.

19           THE WITNESS:  Sciquest.

20           THE COURT:  But his question was how did you

21   know about ePlus.

22           THE WITNESS:  I knew about it from the

23   Cleveland Clinic.  So, specifically, he was asking me

24   about the Cleveland Clinic opportunity.  So the

25   solution consultant from Lawson called me and

LOHKAMP - DIRECT          1072

1  explained that Cleveland Clinic was trying to

2  decide -- they were looking at Lawson's Punchout and

3  they were trying to decide between ePlus and Sciquest

4  in terms of catalog and content solution.

5  Q    And Lawson was going to partner with Sciquest if

6  they got the bid for the Cleveland Clinic; isn't that

7  right?

8  A    Yes.

9  Q    And you mentioned that Forester e-Procurement Wave

10  that you reviewed in reference to ePlus, that was

11  published in 2007; is that right?

12  A    I don't recall exactly when.

13  Q    What is that actually?

14  A    The Forester e-Procurement Wave is a report where

15  Forester goes out and interviews different software

16  companies, asks them about their capabilities, and

17  then scores and rates them and summarizes it.

18  Q    Are you aware of other competition between ePlus

19  and Lawson?

20  A    The only other one that I'm aware of is that of

21  Novant where ePlus was also vying for a portion of the

22  business.

23          MS. STOLL-DeBELL:  Objection, Your Honor.

24  There's no foundation that there was any competition

25  between Lawson and ePlus at the Cleveland Clinic.

LOHKAMP - DIRECT                    1073

1      THE COURT:  He just said there was.  This

2  witness has provided that foundation.

3      MS. STOLL-DeBELL:  I don't think so, Your

4  Honor.

5      THE COURT:  Well, I'll let the jury decide

6  that.  I heard what I heard.  Overruled.

7      You're talking about something else now.

8  You're talking about ePlus in competition with

9  somebody else.  Who was that?

10      MR. ROBERTSON:  Your Honor, I'm asking --

11  Q  You mentioned Novant.  You're aware that ePlus was

12  in competition with Lawson for Novant; is that right?

13  A  Well, I --

14  Q  Can you answer that question fairly yes or no,

15  sir?

16  A  I didn't think they were competing directly for

17  the business.

18  Q  So you thought they were competing indirectly?

19  A  I thought they were competing for a different

20  portion like the content side of it.

21  Q  Let me ask you this, sir.

22      THE COURT:  What is Novant?

23      MR. ROBERTSON:  It's a medical center.

24      THE COURT:  I'm asking the witness.

25      THE WITNESS:  It's a health care center.

1      THE COURT:  It's different from the Cleveland

2   Clinic?

3      THE WITNESS:  Yes, it is.

4      THE COURT:  You were aware that ePlus was

5   bidding for some component of Novant's business?

6      THE WITNESS:  I was aware of it after the

7   fact when it was pointed out that they had been there.

8   Q   This RFP process, that's often done in secret.

9   And by that I mean been the person, the potential

10  customer, doesn't always inform the bidder who all the

11  other competition is; isn't that fair to say?

12  A   That's correct.

13  Q   And that's typical, isn't it?

14  A   It's typical for a lot of situations.

15  Q   Sometimes your sales people get intelligence that

16  there may be somebody else in competition, but other

17  times they are completely in the dark as to who the

18  competition might be; fair to say?

19  A   That does happen, yes.

20  Q   So when that happens Lawson, might not even know

21  it's competing with ePlus on a particular request for

22  a proposal; is that right?

23  A   It's possible that we wouldn't know if ePlus was

24  bidding for a business.

25  Q   But even if you didn't know and it's a fact then,

1    that competition is occurring, right?  It doesn't turn

2    on whether you know or not know, right?

3    A    No, it doesn't.

4          MR. ROBERTSON:  Thank you.  I have no further

5    questions.

6

7          CROSS-EXAMINATION

8    BY MS. STOLL-DeBELL:

9    Q    Good morning, Mr. Lohkamp.

10   A    Good moaning.

11   Q    Let's start off first by talking about these

12   competition issues that you just talked about with

13   Mr. Robertson.

14        Can you explain to me who ePlus was competing with

15   for the Cleveland Clinic deal?

16   A    My understanding is they were competing against

17   Sciquest.

18   Q    Why is it your understanding that they were

19   competing against Sciquest?

20   A    Because when I spoke with the solution consultant,

21   Brett Weiss, he mentioned that Cleveland Clinic was

22   trying to decide between two solutions for catalog and

23   content, and they were trying to decide between

24   Sciquest and ePlus.  They were looking to use Lawson

25   Software and Lawson procurement regardless to connect

LOHKAMP - CROSS                1076

1    to whichever solution they were going to choose.

2    Q    So Lawson, had they selected ePlus, Lawson would

3    have been in a position that it was working with

4    ePlus?

5              MR. ROBERTSON:  Objection, leading.

6              THE COURT:  Overruled.

7    A    So if they had selected ePlus, we would have --

8    Cleveland Clinic would have been using Lawson, and we

9    would have been open to working with ePlus.

10   Q    And that was to use Lawson's Punchout product to

11   connect to some catalog product provided by ePlus?

12   A    That's what I would have expected was using

13   Punchouts to connect to ePlus.

14   Q    The same is true for Sciquest?  It would be

15   Lawson's Punchout product to connect to some catalogs

16   provided by Sciquest?

17   A    Yes, Punchout is used to connect to Sciquest.

18   Q    So the customer wasn't actually making a decision

19   between whether to purchase something from Lawson

20   versus ePlus?

21   A    That's my understanding.

22   Q    Is that the same situation for Novant as well?

23   A    That would be my understanding.

24   Q    And the Novant situation, did you learn about that

25   as part of this lawsuit?

LOHKAMP - CROSS                    1077

1   A    Yes, I did.

2   Q    So not as part of your daily job duties as a

3   product strategist?

4   A    Not as part of my daily duties.

5   Q    Other than the Cleveland Clinic situation that you

6   just described for us, are you aware of any other

7   situation where ePlus has been bidding for the same

8   customer against Lawson?

9   A    Not in the course of my day-to-day activities.

10  Only the situations mentioned as part of this lawsuit.

11  Q    Who are Lawson's main competitors for supply chain

12  management products?

13           MR. ROBERTSON:  Objection, Your Honor.

14  Outside the scope.

15           MS. STOLL-DeBELL:  I think he talked about

16  competition and competition with ePlus, so I think it

17  is within the scope.

18           MR. ROBERTSON:  I didn't ask anything about

19  any other outside competitors.

20           MS. STOLL-DeBELL:  I still think it's within

21  the scope of who is Lawson's competition.

22           MR. ROBERTSON:  It is, but that wasn't within

23  the scope of my questions and my examination.

24           MS. STOLL-DeBELL:  I think his questions

25  related to competition, and I'm following up on that.

LOHKAMP - CROSS                1078

1    THE COURT:  Well, they did relate to

2    competition, but the fact that they are related

3    doesn't make it relevant to the direct examination.

4    You can ask about that in your own case.  Sustained.

5         MS. STOLL-DeBELL:  Okay.  Thank you, Your

6    Honor.

7    BY MS. STOLL-DeBELL:

8    Q    How do you keep track of Lawson's competitors?

9    A    We review the websites.  We review analyst

10   reports.  And usually depending on the situation, I

11   may maintain a competitive folder about that

12   particular competitor.  And if I'm helping to launch a

13   new product, I might create a summary of the different

14   competitors to help with salespeople understand who

15   they are and how to position against them.

16   Q    So you keep some folders for Lawson's competitors?

17   A    Yes, I do.

18   Q    Do you have a folder for ePlus?

19   A    No.

20   Q    Does Lawson have a database that it uses to keep

21   track of its competitors?

22   A    Yes, it does.

23   Q    Do you have access to this database?

24   A    Yes, I do.

25   Q    Did you check it to see if it had any information

1    in it about ePlus?

2    A    Yes, I did.

3    Q    Did it?

4    A    Not that I could find.

5    Q    I'm going to move onto another topic.

6    Mr. Robertson asked you about your knowledge of ePlus

7    when you first learned about them.   When did you first

8    learn about ePlus' patents?

9    A    When this lawsuit was filed.

10   Q    So as part of your earlier knowledge, you did not

11   know that they owned patents?

12   A    That's correct.

13   Q    I'm going to ask you some questions about some of

14   the accused products in this case, the core modules

15   and also RSS.   Let's start by talking about RSS.   When

16   you select search catalog in RSS, what does it

17   actually search?

18   A    It's searching the Lawson item master.

19   Q    Who selects the items that are included within

20   Lawson's item master?

21           MR. ROBERTSON:   Objection, Your Honor

22   relevancy.

23           MS. STOLL-DeBELL:   Your Honor, it goes to

24   infringement.

25           MR. ROBERTSON:   It has nothing to do with the

1    Court's claim constructions, Your Honor.

2          MS. STOLL-DeBELL:  We disagree, Your Honor.

3    I think it's very relevant to whether it meets the

4    Court's definition of "catalog."  Who assembles it,

5    and as assembled, whether it meets the specific

6    requirements of the Court's definition.

7          MR. ROBERTSON:  There's nothing within the

8    Court's definition that talks at all about needs to

9    select the item data.  All it needs to be is an

10   organized collection of items and associated

11   information as set forth.  Further with the

12   requirement that it constitutes that organized

13   collection.

14         Your claim construction is completely silent

15   as to who selects it.  So it's irrelevant to these

16   proceedings.

17         MS. STOLL-DeBELL:  Your Honor, it's an

18   organized collection of items.

19         THE COURT:  What relevance does who selects

20   the items have to the case?  I think that's the

21   objection.

22         MR. ROBERTSON:  Yes, sir.

23         THE COURT:  I don't know what relevance it

24   has, and so I want you to tell me.  If you feel like

25   it has relevance, I'll overrule the objection.

LOHKAMP - CROSS          1081

1    MS. STOLL-DeBELL:  I do think it's relevant,

2    Your Honor.  Part of the Court's claim construction

3    requires that the organized collection of items be

4    published by a vendor.  We heard testimony from Dr.

5    Weaver talking about how he interprets that and

6    applies it to mean originated by a vendor.

7    THE COURT:  Your point goes to whether it's

8    published by a vendor or not?

9    MS. STOLL-DeBELL:  Yes, Your Honor.

10   MR. ROBERTSON:  Well, Your Honor has

11   indicated that doesn't mean who selects it.  It just

12   means that it has to be either in written form, which

13   can be electronic, or verbally provided.  Nothing

14   about who selects it.  Certainly, the source of the

15   information, such as pricing, item description, etc.,

16   is not under dispute.  That's not in dispute.  That is

17   always provided by the vendor.

18   So the selection process has nothing to do

19   with any kind of published by the vendor process.

20   MS. STOLL-DeBELL:  Your Honor, Dr. Weaver

21   talked on and on about where things originated,

22   whether they originated from a vendor or from a

23   customer who had a legacy system other than Lawson,

24   and we listened to all kinds of evidence about where

25   things originate, where they come from.

1    And this questioning goes to directly to

2  that.  Where did this information originate?  The

3  organized collection.  Who created that?

4        MR. ROBERTSON:  There's no "who created it"

5  in your construction, Your Honor.

6        THE COURT:  I don't understand where the

7  "who" is unless you're trying to establish that

8  "published by a vendor" means selecting something to

9  put in the item master.  Is that what you're trying to

10  show?

11        MS. STOLL-DeBELL:  I'm trying to show that

12  Lawson's item master is not published by a vendor.

13  The organized collection of items is something that is

14  created by Lawson's customer, not by a vendor.  So

15  it's selected, it's organized, all of that stuff is

16  done by the customer not a vendor.

17        And, therefore, and for other reasons as

18  well, it's not published by a vendor.  It's

19  something --

20        THE COURT:  You're offering this evidence to

21  support your view that placement of items in the item

22  master is not a catalog; is that right?  Because the

23  items in the catalog are not published by a vendor; is

24  that right?

25        MS. STOLL-DeBELL:  Yes, and the item master

LOHKAMP - CROSS                    1083

1   itself is not published by a vendor.

2          THE COURT:  And that's basically your defense

3   in this case, isn't it?

4          MS. STOLL-DeBELL:  It's one of them.

5          THE COURT:  Well, it's the principal one,

6   isn't it.

7          MS. STOLL-DeBELL:  The principal one in that

8   item master is not a catalog published by a vendor,

9   yes.

10          THE COURT:  The principal defense to the

11   issue of catalog, isn't it?

12          MS. STOLL-DeBELL:  Yes.

13          THE COURT:  Objection overruled, but the jury

14   can make its decision on the fact whether it's

15   admitted only to do -- not for the definition of

16   "catalog," but having to do with published by a

17   vendor.  And those are issues that you'll have to

18   argue based on the testimony and the record.

19          MS. STOLL-DeBELL:  Thank you.

20          THE COURT:  That's all it's admitted for,

21   ladies and gentlemen.

22          Who puts it in the catalog doesn't change the

23   definition of the catalog that the Court has construed

24   because the Court's construction doesn't mention who

25   puts the catalog together.  All right.

1    BY MS. STOLL-DeBELL:

2    Q    You probably need me to ask my question again?

3    A    Yes, please.

4    Q    I'll do the best I can.

5         Who selects the items that are included in item

6    master?

7              MR. ROBERTSON:  Can I have a running

8    objection to this line of questioning because I just

9    don't want to keep interrupting?

10             THE COURT:  It's the same one I just

11   overruled.  So you obviously have that.  She's just

12   repeating the question that she had.  Go ahead.

13             And running objections to questions are not

14   good things because nobody knows where the running

15   stops.  So if you have an objection to a question, you

16   have to raise it, but on this one, you've already

17   raised it.

18             So who in your understanding selects the

19   items to be put in the item master?

20             THE WITNESS:  The customer selects the items

21   to be put in the item master.

22   Q    Why doesn't Lawson select the items that go into

23   the item master?

24   A    Because we don't know what our customers purchase,

25   and we don't have visibility into the items they have

LOHKAMP - CROSS                    1085

1  on contract or want to purchase.

2  Q    What's the purpose of item master?

3  A    The purpose of the item master is to create a list

4  of goods and services that our customers are typically

5  going to want to purchase or maintain in inventory.

6  And so the goal is to be able to make that list

7  available to their employees.

8  Q    Is it possible for a customer to decide to include

9  every item a vendor sells in the item master?

10             MR. ROBERTSON:  Objection.  It calls for

11 speculation, Your Honor.

12             THE COURT:  Well, if he knows.

13             Do you know that?

14             THE WITNESS:  Yes, I do know that.

15             THE COURT:  All right.

16 A    It is possible, but our customers typically --

17             THE COURT:  All she asked is:  Is it

18 possible?

19 A    Yes, it's possible.

20 Q    Have you ever seen one of your customers or are

21 you aware of a situation where one of your customers

22 decided to include every single item a vendor sells in

23 their item master?

24 A    I'm not aware of that situation.

25 Q    Do you encourage customers to include all the

1    items that a vendor sells in item master?

2    A    No, we do not.

3    Q    Why?

4    A    Because our customers are usually buying our

5    system to put a limited set of items, the ones that

6    they have on contract, the ones that they want to

7    drive standardized purchasing against.

8    Q    When you say "standardized purchasing," can you

9    tell the jury -- describe what you mean by that.

10   A    What I mean by that is our customers are looking

11   to implement our systems to typically drive savings in

12   what they are buying.  So they want to make available

13   to their employees only a limited set of options of

14   things to purchase, and they want to make sure it's

15   got their negotiated price from their vendor.

16   Q    Is there any benefit to a customer including an

17   item in the item master that they don't want to

18   purchase?

19   A    No.

20   Q    Are there detriments to doing that?

21   A    The detriment is that they have to then maintain

22   that on an ongoing basis.

23   Q    Does that take time?

24   A    It does take time.

25   Q    Does it cost money to do that?

1    A    It costs money of the people who need to maintain

2    it.

3              THE COURT:  You have to maintain -- what you

4    do you mean by maintaining?  Suppose I have a catalog

5    page that I've put together with item master, and I

6    put in everything that I want to put in, but I also

7    put in that this person sells toilet tissue.  Are you

8    telling me it costs money to keep that item in the

9    system on my list?

10             THE WITNESS:  It costs money -- the time to

11   initially load it.

12             THE COURT:  To load what?  One item?

13             THE WITNESS:  To load that one line item.

14   Just the time it takes to load that.  And then if the

15   item changes, you need to update that, the time it

16   takes to update.

17             THE COURT:  If I don't use it, it doesn't

18   cost me.  If I don't want to update it, I don't have

19   to incur any time to correct it then; is that right?

20             THE WITNESS:  That's correct, if you don't

21   want to change it at all.

22             THE COURT:  So if I put something in there by

23   accident, it's not going to cost me extra to keep it

24   in there.

25             THE WITNESS:  No, sir.

LOHKAMP - CROSS              1088

1    THE COURT:  Unless I want to follow it, and

2    if it changes, then I have to put in a new number or

3    item number or something else; is that what you're

4    saying?

5    THE WITNESS:  Yes.  If you need to maintain

6    it, it takes the time to change it.  If you need to

7    update it, for example.  But if you don't ever want to

8    change it, there's no additional cost.

9    THE COURT:  But the maintenance that you're

10   talking about is the keeping track of the item number

11   if it changes?

12   THE WITNESS:  It could be keeping track of

13   the item number.  It could be a change to the price if

14   it changes.  It could be getting an update that's no

15   longer available for sale.  The model changes.

16   THE COURT:  All right.  Thank you.

17   BY MS. STOLL-DeBELL:

18   Q    Is this updating and maintaining process typically

19   done on a large group of items at one time?

20   A    It really depends upon the particular product and

21   situation.

22   Q    You were asked questions about PO 536?

23   A    Yes.

24   Q    What is that again?

25   A    It's a vendor agreement load program.

LOHKAMP - CROSS                1089

1      MS. STOLL-DeBELL:  Bill, can we go to PX 113,

2   please?

3      THE COURT:  I think that one is in that first

4   notebook you had there, Mr. Lohkamp.

5      THE WITNESS:  Here it is.

6   A    Okay.

7   Q    I think ePlus' counsel asked you about the first

8   step in the process of importing a vendor agreement.

9   A    Yes.

10  Q    Are there other steps that are required to import

11  a vendor agreement?

12  A    Yeah, I mean there are additional steps after the

13  first step.

14  Q    What I'd like to do is have you walk me through

15  what all the different things are that you have to do

16  when you're using PO 536 to import a vendor agreement.

17     MR. ROBERTSON:  Your Honor, I didn't ask

18  about importing a vendor agreement.  I asked about

19  importing vendor catalog data, which is what the

20  process is describing.

21     THE COURT:  Is that what your question is?

22  You did ask about that second sentence in the third

23  paragraph, the first step will be to obtain the vendor

24  catalog information.  And then he did ask some other

25  things in there, but it all had to do with loading

1  catalogs, not loading agreements.

2        MS. STOLL-DeBELL:  Well, Your Honor, if I

3  could ask the witness some questions, I think that

4  this particular function of Lawson is called different

5  things, and those different things all relate to the

6  same thing.  So if I could ask him a couple questions

7  about that, I think he can explain it so that we all

8  understand it a little better.

9  BY MS. STOLL-DeBELL:

10 Q    Is PO 536 sometimes used to refer to loading or

11 importing vendor agreements?

12 A    Yes, it is.

13 Q    Well, is it also sometimes referred to as

14 importing vendor catalogs?

15 A    Yes, it's sometimes referred to as that.

16 Q    Is this the same thing whether it says its

17 importing a vendor agreement or a vendor catalog?

18 A    It's the same program.

19 Q    Is it sometimes --

20       THE COURT:  But they are different things,

21 the vendor catalogs and the agreements are different

22 things, right or wrong?  To me it sounds like that's

23 right, but I may be --

24       THE WITNESS:  When I think of what's being

25 imported, I'm thinking of the list of products and

1  prices from the vendor.  And --

2         THE COURT:  I'm simply asking you is, is a

3  loading of vendor catalogs different than loading

4  vendor agreements?  Is that right?  Are they

5  different?

6         THE WITNESS:  I mean, it's the same process.

7         THE COURT:  I know, but that's not the

8  question.  The question is not whether they are the

9  same process that you do it by.  The question is:  Are

10 they the same things that you're using the same

11 process to do?

12        THE WITNESS:  I mean, I guess they are the

13 same thing.

14        THE COURT:  You think a price agreement, an

15 agreement with a vendor, and loading the vendor's

16 catalogs are the same thing?  I want to make sure we

17 know what you say.

18        THE WITNESS:  Yeah, I'm saying that the

19 loading of the vendor agreements is what I think of as

20 loading the vendor catalog.

21 Q   So PO 536 is used to load information from a

22 vendor; is a right?

23 A   Yes.

24 Q   And that information from a vendor is sometimes

25 referred to as a vendor agreement?

1    A    Yes.

2    Q    And its sometimes referred to as a vendor catalog?

3    A    Yes.

4    Q    And it's sometimes referred to as a vendor file,

5    isn't it?

6    A    Sometimes I've heard that used.

7    Q    But it's the same thing that is being loaded in,

8    whether it's called a vendor agreement, or a vendor

9    catalog, or a vendor file; is that right?

10             MR. ROBERTSON:  Could we be a little less

11   leading at this critical stage of this discussion?

12             THE COURT:  I think just let him testify.

13   Maybe you need to ask him what is it that makes an

14   agreement and a catalog the same thing.  Because he's

15   testified that the vendor agreement was a contract,

16   and a vendor agreement and the vendor's catalogs, it's

17   kind of hard to understand why they would be the same

18   thing.  So if you're trying to establish that, maybe

19   you ought to ask why he thinks they are the same.

20             And in answering, Mr. Lohkamp, we're not

21   talking about the process.  The process doesn't make

22   any difference to the question.  It is what is it that

23   goes in.

24             In other words, if you have got an oven and

25   you're putting bread in.  Is that the same thing as a

LOHKAMP - CROSS          1093

1   pizza, in your mind?  That's the question, if you

2   understand.  In other words, it's what's going in that

3   makes a difference.

4          All.  Now ask the question.

5   BY MS. STOLL-DeBELL:

6   Q   Can you explain to me why you think that the

7   vendor agreement and vendor catalog that can be loaded

8   into the system via PO 536 is the same thing?

9   A   The reason I think it's the same thing is because

10  it includes things like the vendor catalog number.  It

11  includes unit of measure.

12          THE COURT:  What's "it"?

13          THE WITNESS:  The file that's initially

14  received from the vendor then converted into the CSV

15  files, which is common separated value file.  That

16  gets loaded into the software.  It contains the

17  information about the product that's needed to

18  purchase the product, and should include the price for

19  that item.  And we store the price from that

20  particular vendor in our vendor agreements.  So that's

21  why I think of them as the same thing because I get

22  that information from the vendor.  I include the

23  products and the prices, and those get loaded into the

24  vendor agreement file.

25          THE COURT:  You load all those things before

LOHKAMP - CROSS                    1094

 1    you ever get the vendor's contract agreement to pay

 2    you your $2,000?  The agreement is the agreement

 3    between you and the vendor to pay you for your

 4    services and says what you're going to do, I think, is

 5    what you've testified to before.

 6              Now you're saying that you have data that you

 7    load once you have the contract.  And you think they

 8    are the same.  I'm having trouble understanding that.

 9    Can you help us out a little bit?

10              THE WITNESS:  Yes.  When our customers are

11    loading these products, they have a contract with the

12    vendor to get the price and the products.  So when

13    they are loading the initial set of items, they are

14    loading the contract, the contract price, and the item

15    information at the same time.

16              THE COURT:  Can they do that at the same time

17    that they are negotiating a contract with the supplier

18    or are they two different steps?

19              THE WITNESS:  They would do that after they

20    have negotiated the contract.

21              THE COURT:  All right.  Then the agreement

22    that you're talking about precedes the loading of the

23    information from the catalog; is that right?

24              THE WITNESS:  Negotiating and agreement would

25    precede that, yes.

1    BY MS. STOLL-DeBELL:

2    Q   So, Mr. Lohkamp, I think just to try and clear up

3    some of this confusion, within the Lawson databases,

4    is there a set of tables called "vendor agreement"?

5    A   Yes.

6    Q   What is that?

7    A   That's a set of tables that stores information

8    about the products you have on contract with the

9    particular vendor and the price you pay for that.

10   Q   So that vendor agreement table is different than a

11   contract that the customer has entered into with a

12   vendor about what items they are going to buy, and

13   what price they are going to pay, and whatever else

14   might be in a contract like that; is that right?

15   A   The table itself is different.  You load the

16   results of that negotiated contract into the vendor

17   agreement.

18          THE COURT:  Just go on to something else.  I

19   think we understand where he is.

20          MS. STOLL-DeBELL:  Okay.

21   BY MS. STOLL-DeBELL:

22   Q   So I wanted to ask you some questions about the

23   actual process of loading this I'll call it a vendor

24   file into Lawson's databases using PO 536.

25   A   Okay.

LOHKAMP - CROSS                1096

Q   I'll just ask you to walk us through that process.
What's the first thing that needs to happen?

          THE COURT:  Which process?  And loading "it,"
what do you mean by "it"?

          MS. STOLL-DeBELL:  I mean loading a vendor
file, a file of vendor information, into Lawson's
databases using this PO 536 method that we've talked
about.

          THE COURT:  How do you do that?

          MS. STOLL-DeBELL:  Yes.

A   The first step is to request a list of items and
prices from your vendor and get that file from the
vendor.  And then transform that file into the PO 536
format.  So it needs to be turned into the format that
can be loaded into the Lawson software.

     And then you go through program process of
deciding which items to load.  You have to assign a
Lawson item number to any new items you're adding.  So
that's the key item number.  And you may decide to add
additional things like inventory classes or purchasing
classes that are user defined categories to those
items to the import process.

Q   I think you said one of the steps is that the
customer has to select which items from the vendor
file they actually want to put in the system?

1    A    Yes.

2    Q    Then you said it's transformed into the format

3    required by Lawson Software?

4    A    Yes, it depends on --

5              THE COURT:  Let's don't repeat everything you

6    said.  The jury was listening.  And we can't be just

7    having you repeat it.

8              So just ask him another question.

9    Q    Do the customers change things before or as part

10   of that transformation process?

11             MR. ROBERTSON:  Objection, relevancy, Your

12   Honor.

13             MS. STOLL-DeBELL:  Your Honor, I think it's

14   relevant to say that what the customer receives from

15   the vendor as this vendor file gets changed

16   substantially before it's put into Lawson's system.

17   It's relevant to --

18             THE COURT:  That doesn't have anything to do

19   with the claim constructions, as I understand it.

20             MS. STOLL-DeBELL:  I think it does, Your

21   Honor, because Dr. Weaver testified --

22             THE COURT:  Let me tell you what I think

23   we'll do.  We'll let the jury go on to lunch and I'm

24   going to hear what you-all have to say about this so

25   we don't have to subject the jury to the back and

1  forth.

2            You will have an hour to eat, at least,

3  because they are going to eat some lunch too.  So

4  we'll let you know later.  You can just take your pads

5  with you.

6            (The jury is out.)

7            MR. ROBERTSON:  Your Honor, may I ask that

8  the witness be excused?

9            THE COURT:  Yes.  Mr. Lohkamp, if you will

10  just step outside, please, sir.  And don't discuss

11  your testimony with anyone during the break except the

12  lawyers in the case.  You're welcome to do that.

13            MR. ROBERTSON:  Your Honor, we have an

14  agreement that once he's taken the oath, he can't

15  discuss anything, even with his own lawyers.

16            THE COURT:  You do have that agreement?

17            MS. STOLL-DeBELL:  We do.  We won't.

18            (The witness is excluded from the courtroom.)

19            MS. STOLL-DeBELL:  So, Your Honor, I think

20  this goes to the heart of the issue of whether item

21  master meets the Court's definition of "catalog."

22  And --

23            THE COURT:  I know you think that.  I

24  understand that.  What I need to know is why you think

25  it.  What you're talking about is who selects the

1  items to go into the item master and what happens to

2  the list of items in the item master once they are

3  selected.  Right?

4           MS. STOLL-DeBELL:  Well, I think --

5           THE COURT:  That's where we are right now.

6           MS. STOLL-DeBELL:  For the taking, what a

7  vendor gives the customer, this vendor file, and what

8  has to be done to it to get it into item master needs

9  to be changed substantially.  Things are added.

10 Things are deleted.  Things are changed.  And by the

11 time it gets into item master, it's totally different

12 than what's in a vendor's catalog.

13          THE COURT:  What part of the claim

14 construction is it addressed to is the question.

15          MS. STOLL-DeBELL:  Well, it goes to an

16 organized collection of items and associated

17 information that's published by a vendor.

18          THE COURT:  No, we're not going to do it that

19 way.  You're reading the whole thing.

20          Are you telling me that that has to do with

21 an organized collection of items?  No, it can't be.

22          MS. STOLL-DeBELL:  That is published by a

23 vendor.

24          THE COURT:  So it goes to the topic of

25 whether or not the items in the item master are

1    published by a vendor?

2              MS. STOLL-DeBELL:  Yes, it does.

3              THE COURT:  That is the only relevance that

4    it has?

5              MS. STOLL-DeBELL:  Yes, but I think it's very

6    high relevance, Your Honor.

7              THE COURT:  I don't care whether it's good,

8    top level or what.  We get to that when we do a 403

9    analysis, but the starting point in determining

10   relevance is, is it relevant?

11             MS. STOLL-DeBELL:  Yes, it does, Your Honor.

12             THE COURT:  And that's your theory.

13             MS. STOLL-DeBELL:  Yes, and I understood Dr.

14   Weaver to argue once something is in a catalog

15   published by a vendor, it's always published by a

16   vendor.  And we're saying no, it's not.

17             THE COURT:  I don't think that's what he

18   said, but that's not really what the issue is.  The

19   issue is:  Is this relevant to the issue of

20   infringement?

21             All right, Mr. Robertson, why is it not

22   relevant for them to explain "published by a vendor"

23   this because it's relevant to "published by a vendor"?

24   I don't have any evidence at this stage what

25   "published by a vendor" means to one of ordinary skill

LOHKAMP - CROSS          1101

1   in the art.  And I haven't been called upon to

2   interpret that term, have I, Ms. Stoll-DeBell?

3          MS. STOLL-DeBELL:  I believe that Dr. Weaver

4   -- well, I think Dr. Weaver gave two definitions.  I

5   think he said that "published" means publicly

6   disseminated.  I'm sure he said that.  And I think he

7   also said it means originated.

8          THE COURT:  Public dissemination by anybody

9   is still public dissemination.  So then the question

10  is, is it publicly disseminated by a vendor?

11         MS. STOLL-DeBELL:  I agree with that, Your

12  Honor.

13         THE COURT:  It is publicly disseminated by a

14  vendor if the vendor provides it into the realm of the

15  public knowledge; isn't that right?

16         MR. ROBERTSON:  Yes, Your Honor.

17         MS. STOLL-DeBELL:  Yes, I think --

18         THE COURT:  So what difference does it make

19  if your customer takes items that are already made

20  known and publicly disseminated by a vendor and simply

21  puts them in a different order and puts some different

22  numbers on it as to the issue of infringement in this

23  case?

24         MS. STOLL-DeBELL:  Because we don't take what

25  is publicly disseminated and put it in item master

1   that's what I'm trying to get out of the witness.

2   It's changed.  The price is not the list price

3   anymore.  It's some special price that is

4   confidential, that is secret.

5          The item information is something that is

6   actually -- the item description is created by the

7   customer.  It's no longer the item description that is

8   in a vendor's published catalog.  Very little remains

9   the same when it finally ends up in item master.

10          THE COURT:  Does that change it from being

11   items and associated information published by a

12   vendor?

13          MS. STOLL-DeBELL:  Yes.

14          THE COURT:  The fact that you have altered it

15   changes it?  Because it still contains some kind of

16   part number.  It contains price, catalog number,

17   vendor name, vendor ID, a textual description, and I

18   don't believe your item master contains images,

19   though, does it, except through the Punchout process?

20          MS. STOLL-DeBELL:  I think it can, Your

21   Honor.  It can have --

22          THE COURT:  It's capable of having an image.

23          MS. STOLL-DeBELL:  Right, but, Your Honor --

24          THE COURT:  All right.  Let me hear --

25          MS. STOLL-DeBELL:  My point is this is all

LOHKAMP - CROSS                    1103

1    different, though.

2              THE COURT:  I understand, and I don't think

3    that's makes any difference.  That's the point I'm

4    trying to make to you.

5              I've never thought it made any difference.

6    I've never understood your argument to make any sense,

7    but the question is whether I'm entitled to make that

8    judgment or not and whether that comes in or not.

9              Now, let me hear from Mr. Robertson.

10             MR. ROBERTSON:  Yes, Your Honor.

11             The first thing, it's important to

12   understand --

13             THE COURT:  Why don't you come up hear so the

14   court reporter can hear.

15             MR. ROBERTSON:  Yes, Your Honor.

16             First, it's important to understand what the

17   origin of this "published by a vendor" language, where

18   did it come from.  Because this was language --

19             THE COURT:  Wait a minute.  Let me get -- my

20   copy of the patent is in the jury book, which is back

21   in my office, I think.

22             THE CLERK:  We have one coming up, Your

23   Honor.

24             THE COURT:  I have it.  Thank you very much.

25             All right.  Let's take in the -- what are we

LOHKAMP - CROSS                1104

1    going to work with?   The '683 patent?

2         MR. ROBERTSON:   Let me maybe make it easy for

3    you, Judge.   Let me make a representation and see if

4    Lawson agrees or disagrees.

5         There's not a single claim that's at issue in

6    this case that has the claim terms "published by a

7    vendor" in them.   Not one.   How did we get this

8    "published by a vendor"?   It was introduced by Lawson

9    in their argument with respect to what a catalog is.

10   They came up with it.   They suggested it to the Court.

11        At the time of the Markman ruling, I tried to

12   alert the Court to what I thought was behind this,

13   that it was going to be a vessel in which Lawson was

14   going to try to pour all of these notions like they're

15   doing now, that because the data gets reformatted or

16   because the data can be selected by the customer,

17   although I think the witnesses have testified that

18   they'll load the catalog data for you, that because

19   they may take something that has a textual description

20   of 80 characters and reduce it to 32 characters, that

21   somehow takes it outside the scope of your claim

22   construction.

23        My point is, it doesn't matter who selects

24   it.   It doesn't matter if it's reformatted in some

25   way.   It doesn't matter who the source is really as

1    long as it satisfies the Court's claim construction.

2         So the only thing they hang their hat on is

3    this "published by a vendor" because you're hearing

4    consistently from all the witnesses that it does have

5    all the attributes of an organized collection of items

6    and associated information, which includes part

7    numbers, and prices, and catalog numbers, and vendor

8    names, and vendor IDs, and textual descriptions, and

9    it can have images, both in the external Punchout

10   system and in the internal system.

11        So "published by a vendor" is their

12   non-infringement argument.  And, quite frankly, it's

13   been sort of a systematic rewriting of your claim

14   construction, which has formed the basis of their

15   entire infringement defense.

16        When they create these documents like

17   Plaintiff's Exhibit 113, before this lawsuit they call

18   it "vendor catalog data."  They tell us in all the

19   RFPs they can import vendor catalog data.

20        THE COURT:  I know that, but that's just

21   something they are going to have to live with, and

22   they're going to have to make an argument that, well,

23   they didn't really mean what they said at the time,

24   and they're going to choke on that argument because

25   they're going to have to make it so many times, that

1   the paper they are going to have to eat to change it

2   is going to throttle their argument, but that's not

3   point here.

4           MR. ROBERTSON:  My point is if we're looking

5   just at 113, for example --

6           THE COURT:  Where in the specification did

7   the term "published by a vendor" come into play?

8           MR. McDONALD:  It's in column 4, Your Honor,

9   beginning on line 46, it's a paragraph that goes to

10  line 60 of the '683 patent.

11          THE COURT:  Column 4 what, sir?

12          MR. McDONALD:  Beginning on line 46, Your

13  Honor, there's a whole paragraph there that refers to

14  the catalogs and the catalog database, and it uses the

15  term "published" numerous times for each type of

16  catalog in the catalog database.

17          THE COURT:  All right.

18          MR. ROBERTSON:  So, Your Honor, exactly.

19  First of all, it says, for example, it can contain

20  this.  But when it says "published by a vendor," it

21  doesn't say, well, if it's selected by the customer,

22  it's not published by a vendor.  If it's reformatted,

23  it's not published by a vendor.

24          THE COURT:  I agree with that.  And the

25  question is:  Are they entitled to make a showing and

1   put to the jury the simple question that it is not a

2   catalog because the clear catalog material that they

3   are putting into this item master is not selected by

4   the vendor no matter how supported with logic that

5   argument is?  That's the issue.

6       MR. ROBERTSON:  Well --

7       THE COURT:  Or is the issue whether somehow I

8   have imported into the claim the language of the

9   specification?

10      MR. ROBERTSON:  On numerous occasions, Your

11  Honor has given its common sense definition of what it

12  understands "published" to mean and "published" means

13  and what I understand Your Honor means is that in some

14  way it is publicly disseminated either in written

15  form, which can include an electronic form, or

16  verbally.  I agree with that.

17      And I agree with the fact that the evidence

18  shows that the vendor is the one who supplies that

19  information.  Indeed, even in this document we're

20  talking about now, Plaintiff's Exhibit No. 113 --

21      THE COURT:  Wait just a minute, though.  I

22  think it's true that if I were the finder of the fact,

23  what I would say is, I don't buy the assertion that

24  simply because a Lawson customer or if Lawson is doing

25  it, which the evidence is clear that Lawson often

1  does, the taking of the data that's published in a

2  catalog already and putting it into some other form is

3  not does not make it a catalog.

4        I mean, all they're doing is making a

5  different catalog or a series of different catalogs or

6  if they import the whole thing, the whole catalog.

7  And that would be the end of it.

8        The question is:  Are they entitled to make

9  this argument, that is the simple argument that

10  because the process that the witness has described in

11  building the item master has, in instances where

12  Lawson is not doing it, the customer is selecting the

13  item, but in the instances where Lawson is doing it,

14  clearly Lawson is selecting the item?

15        MR. ROBERTSON:  Well, I don't think it makes

16  a difference, Your Honor.

17        THE COURT:  Or Lawson is inputting the items

18  selected by the customer, I think, is a better way to

19  put it.

20        MR. ROBERTSON:  Again, I don't think who

21  inputs the data makes a difference under your

22  construction as long as it ends up being a catalog

23  that meets the attributes you defined.

24        THE COURT:  Am I granting summary judgment if

25  I sustain this objection, or a Rule 50 motion if I

LOHKAMP - CROSS          1109

1   sustained this objection?

2          MR. ROBERTSON:  I think the arguments they

3   are making with respect to selection or reformatting

4   or whatever can't avoid the definition of Your Honor.

5   What they want to do is redefine what "published by a

6   vendor" means, that the Court hasn't even defined, and

7   then say because we don't --

8          THE COURT:  What if I define it right now?

9   What if I tell the jury that "published by a vendor"

10  means to make generally known, to declare publicly or

11  make generally known, disclose or circulate, which is

12  the standard dictionary definition.  I don't know if

13  the computer dictionary or specialized dictionary has

14  any different definition than the Webster or the Third

15  New International have.

16         MR. ROBERTSON:  I don't think it's being used

17  in any kind of specialized sense in this patent.  I

18  will observe, Your Honor, that right above where Mr.

19  McDonald identified the section about published by a

20  vendor in the specification, it makes clear -- and let

21  me start at line 42, halfway across, it says, "The

22  nature of the business that the customer using the

23  electronic sourcing system 5 conducts will determine

24  which product catalogs are made part of the catalog

25  database."

1     So, in other words, even the specification is

2   saying the customer can make determinations as to what

3   catalogs or what parts of catalogs it wants to include

4   because if you go down, it even says that you may want

5   to make decisions to just have certain products

6   identified in the catalog database and not all the

7   products.

8     So I don't know that you're granting summary

9   judgment of non-infringement.  I know that it is one

10   basis of their positions on non-infringement.  I don't

11   know that it's the only basis.

12     THE COURT:  Well, is it the equivalent of

13   summary judgment if the only issue is whether it's a

14   catalog?

15     MR. ROBERTSON:  I think appropriately it is

16   keeping out irrelevant evidence they should not be

17   able to argue to the jury satisfies your claim

18   construction, and that is a systematic effort to

19   rewrite it in order to conjure up a non-infringement

20   argument.

21     THE COURT:  All right.

22     MR. McDONALD:  Your Honor, may I respond or

23   would you like to hear from Ms. Stoll-DeBell?

24     THE COURT:  Whichever you-all want to do is

25   all right with me.

LOHKAMP - CROSS          1111

1    Why shouldn't I just go on and tell the jury

2    that "published" means to make generally known, to

3    declare publicly or make generally known, disclose or

4    circulate, to impart or acknowledge.

5          MR. McDONALD:  I think we'd be fine with

6    that.  I don't think we're really arguing over what

7    "published" means.  That's the definition that's

8    consistent with our theory here.

9          I understand Your Honor may not be accepting

10   our version of it, but it's a fact issue.

11         THE COURT:  Why is it a fact issue?

12         MR. McDONALD:  Because the question is, is

13   the item master that Lawson has at least two product

14   catalogs, which is required by several of the claims,

15   or a collection of catalogs, as required by all but

16   one of the other claims.

17         So we're applying this definition to the

18   facts of case as to what is in the item master.

19         THE COURT:  You're lumping so much together,

20   you're not explaining to me who selects the items to

21   go in there, what part of your argument it really

22   relates to.

23         MR. McDONALD:  Well, the definition here is

24   an organized selection of items and associated

25   information published by a vendor, and it goes from

1    there.

2              So we're talking about trying to tell the

3    jury what is the organized collection that's involved

4    here.  Maybe it's not even organized because if this

5    gets put in in the order that the customer chooses,

6    but it's some collection of items and associated

7    information.

8              What is that thing?  And what is it and how

9    it came to be is something that occurred after they

10   even got data from the vendor.  We're saying that

11   collection couldn't possibly have been published by a

12   vendor.  He wasn't even there when the collection came

13   into being, and the vendor had no interaction with the

14   customer once the customer organized or collected that

15   information into its item master database.

16             THE COURT:  Are you saying now that it's

17   relevant to whether it's a collection of items as

18   opposed to what Ms. Stoll-DeBell told me, which is

19   whether it's published by the organized collection of

20   items and associated information as published by a

21   vendor?

22             MR. McDONALD:  Well, they go together because

23   she's bringing out the issue this was published.  And

24   the question is:  What is it that's being published?

25   And I'm just trying to bring that into the analysis

LOHKAMP - CROSS                    1113

1    here because I think it's important to understand what

2    is it that we're talking about that's being published.

3            And I think that's a fact issue here.  What

4    is it in the item master?  What is the collection?

5    Where does it come from is relevant to whether a

6    vendor could have published it if it did not even come

7    into being as a collection until the vendor didn't

8    have any role with it anymore.

9            There's all sorts of changes after the vendor

10   is out of the picture that come to being before this

11   item master collection of information, and it's kind

12   of fuzzy, I think, what their position is as to how

13   many catalogs is in that item master.  But that's

14   their position.  I guess they decided we have two

15   catalogs.

16           Well, if that's what we're talking about, how

17   much of that actually occurred after the vendor had

18   any involvement is very relevant to whether the vendor

19   could have possibly published whatever they say,

20   whether it's 1, 2 or 5,000 catalogs they say is in the

21   item master.

22           THE COURT:  You take the position at base on

23   this point that even though the vendor publishes the

24   information in its catalog, and even though your

25   customer goes to that catalog, and let's say they are

1   10 catalogs that your customer uses to prepare what he

2   wants to prepare in the item master, the collection of

3   items is no longer published by a vendor because your

4   process allows transformation of it in part.  Isn't

5   that what you're saying?

6          MR. McDONALD:  I'd say there's a lot more to

7   it than that.

8          THE COURT:  Well, I haven't heard it yet.  I

9   haven't heard your side of the case either.  What else

10  is there?

11         MR. McDONALD:  Well, for one thing this file

12  that comes in, whether its called a vendor catalog or

13  vendor agreement or anything else, that's not the same

14  thing that a vendor publishes as the Court just

15  suggested we define that.

16         This is a personalized private file for that

17  customer that has their own private pricing

18  information in it, their own products that are

19  pursuant to their agreement, and they double check it

20  and throw out more.  But there is no evidence at all

21  that that file is anything that's ever been published

22  by a vendor.

23         We haven't had an iota of proof on that in

24  this case that that incoming file is even published by

25  a vendor.

LOHKAMP - CROSS          1115

1      THE COURT:  What incoming file?

2      MR. McDONALD:  The file that's called the

3  vendor catalog file or the vendor agreement.

4      THE COURT:  That's a file that -- it's not an

5  incoming file.  It's in your system.  And the customer

6  is taking at your direction, or you're doing it, the

7  information from a catalog and putting it into a

8  somewhat different format, and then you're taking that

9  format and putting it into the item master.  But some

10  of the basic information that originally was with the

11  vendor still stays with the file.

12      If that's your theory, I think you've got

13  some problems, but --

14      MR. McDONALD:  I think it's a fact issue.

15      THE COURT:  I don't think the jury is going

16  to buy that, but the question is, is it a fact issue

17  or is it something I should decide?

18      MR. McDONALD:  Certainly it's a fact issue, I

19  think, Your Honor, and maybe there's some different

20  labels on it, but there is some file that comes into

21  the customer's system that supposedly comes from a

22  vendor.

23      Most of the time I think the testimony has or

24  will show that we're actually just loading a

25  customer's item master that they had in the prior

1  system they used before they came from Lawson.

2          THE COURT:  Sometimes you are, but sometimes

3  you're creating it.

4          MR. McDONALD:  Actually, the majority of the

5  time it's from a legacy system.

6          THE COURT:  It doesn't make any difference

7  whether it's a majority of the time.  If you do it at

8  all, that's the end of it, or if it's capable of it.

9          MR. McDONALD:  So you've got that group,

10  though, and I think that record is not made clear to

11  the jury yet, though, that those things are from

12  legacy systems.

13          But even for that subset that comes from a

14  vendor, there hasn't been any evidence that the data

15  in that file is published by a vendor.  That pricing

16  information is a perfect example.  That's a private

17  agreement file.

18          Moreover, it changes, and so what's in the

19  item master looks very, very different from that

20  incoming file that would come from a vendor in that

21  subset of cases.

22          That's a whole new collection of items and

23  associated information.  We're saying that's the

24  question, that that collection that's in the item

25  master, that's what their expert said is what's

1   comprising these multiple catalogs.

2          So let's look at the facts regarding what

3   that item master is.  And I think we should be

4   entitled to present those facts.

5          THE COURT:  All right.  It's your objection.

6   You can have the last word.

7          MR. ROBERTSON:  Thank you, Your Honor.  First

8   of all, published by a vendor doesn't have any

9   definition.  It's just there.  It should be construed

10  by its ordinary meaning.  And I think the Court's

11  construction or the Court's interpretation of what the

12  plain meaning is of published by a vendor is fine.

13         I will say there are circumstances where the

14  vendor provides confidential item information because

15  they don't want their price lists to be exposed.  So

16  they have an agreement with the customer that they'll

17  be getting some confidential pricing information.

18  That does happen.

19         But in large part, it is publicly available

20  or made known or made aware of.  So I think your

21  plain, ordinary meaning of those words would make this

22  line of questioning entirely irrelevant is my first

23  point.

24         I will say even the document -- when I hear

25  there's no evidence, and we've gone through repeatedly

LOHKAMP - CROSS                1118

1   where they've provided services to load the catalog

2   data, the documents say they load the catalog data.

3           This one we were last on, we're still on,

4   Plaintiff's Exhibit No. 113 says, "The purpose of this

5   document is to define a new process that will read a

6   vendor supplied file of items and add the items to the

7   item master and the item's price to the vendor

8   agreement file."

9           It then goes on and says, "The process for

10  reading the vendor catalog data into the Lawson system

11  will be performed in multiple steps."

12          So even in this document they're talking

13  about vendor supplied item information.  So there's

14  been a ton of evidence as to this.

15          Now, the point is it really, you know,

16  doesn't matter what happens to it afterwards as long

17  as it satisfies the Court's construction.  And if it

18  ends up having the attributes that you've identified

19  should preferably be included in this organized

20  collection of items such as part number, price,

21  catalog number, vendor name, vendor ID, textual

22  description, etc., it satisfies that claim term.

23          So these things about do we reform it, do we

24  convert the data somehow, can we let the customer

25  select it some of the times, will we provide the

LOHKAMP - CROSS                    1119

1  service?  Sure.  We'll do that a little it.  But

2  somehow it doesn't even manner if they provide the

3  service or not in my view.

4           If it ends up in a database, and it satisfies

5  the Court's construction, and it satisfies the plain

6  and ordinary everyday meaning of "published," then

7  this whole line of questioning is irrelevant, and we

8  should not be wasting the Court's time and the jury's

9  time with these kind of questions.  This is all

10  misdirection, Your Honor.

11          THE COURT:  Did this issue come up in <u>SAP</u> or

12  <u>Ariba</u>?

13          MR. ROBERTSON:  No, Your Honor, because

14  "published by a vendor" was not included in the

15  definition of a catalog.  I think it had the Court's

16  entire, and I'll have to check on this, but I think it

17  had the Court's entire construction absent the words

18  "published by a vendor," and that's why they've seized

19  on those four words to try and manufacturer a

20  non-infringement argument.

21          MR. McDONALD:  <u>SAP</u> actually involved

22  published catalogs.  There's documentation that that's

23  what they were doing.  So it's a whole different case

24  than this one.

25          I guess I hear their theory here is one piece

1    of information, if that survives the item master, then

2    it was published and that means it's published.

3              THE COURT:  No, it's a lot more than that.

4    It's virtually everything, according to them, with the

5    exception of price where it's made confidential

6    appears in the item master in one way or another.

7              You have added to it the Lawson number as

8    well.

9              MR. McDONALD:  There's actually a very small

10   percentage of that information in the item master that

11   comes from the vendors.  So I think we should be

12   entitled to develop that record here.

13             THE COURT:  What do you say comes from the

14   vendor?  Let's take the part number.  Does that come

15   from a vendor in the legacy system?  Yes or no?

16   Answer the question:  Yes or no?

17             MR. McDONALD:  There's oftentimes a catalog

18   part number that comes from the vendor.

19             THE COURT:  Then when it goes into the item

20   master, does the part number disappear?

21             MR. McDONALD:  I think that is typically past

22   through to the item list.

23             THE COURT:  Is the price in the legacy

24   system?

25             MR. McDONALD:  That'll be a different price

LOHKAMP - CROSS                1121

1    than the price that is in the published vendor's

2    catalog.

3            THE COURT:  If in fact there is a different

4    price.  If it's the same price, it will be the same

5    price.  Is that right or wrong?  He said it happens

6    sometimes that they are confidential.

7            MR. McDONALD:  I think it's more often than

8    not that they are confidential.  Certainly if there's

9    a group that is confidential, if there's a group

10   that's the published price, it could be both.

11           THE COURT:  All right.  The catalog number.

12   Does it have the vendor's catalog number in it?

13           MR. McDONALD:  I'm not sure it has a separate

14   part number and a catalog number.  I think it's one

15   number.

16           THE COURT:  Does it have the vendor's name in

17   it?

18           MR. McDONALD:  The item master does not have

19   the vendor name.

20           THE COURT:  But the item master has a

21   vendor -- works in conjunction with the what?

22           MR. McDONALD:  Vendor item table.

23           THE COURT:  Vendor item table.  And there's a

24   code that switches you from the item master or that

25   correlates between the item master and the vendor

LOHKAMP - CROSS                1122

1    table, right?

2            MR. McDONALD:  Right.

3            THE COURT:  So it's there.  Vendor ID.  Does

4    it have a vendor ID originally?  Sometimes yes,

5    sometimes no, I guess, is the answer?

6            MR. McDONALD:  It could.  It's some table

7    that will have the vendor ID on it.

8            THE COURT:  So the same situation.  It would

9    be either in there or it would be reachable in

10   correlation with the item tables.

11           MR. ROBERTSON:  We saw it in the demos, Your

12   Honor.

13           THE COURT:  I thought I saw it.

14           A textual description of the item.  Surely,

15   the catalog or the legacy system or the catalog that's

16   coming in has a textual description and do does the

17   item master.

18           MR. McDONALD:  This is a very key fact here,

19   though, Your Honor, because the customer has about a

20   32-character field, and they come up with their own

21   descriptions for the items, and they bear no

22   relationship to anything that a vendor publishes.

23   That's a very significant difference because catalogs

24   typically have much longer descriptions.  And because

25   it's for this item master, it's something that the

LOHKAMP - CROSS                    1123

1   customer buys repeatedly, they already know what it

2   is.  They just put in a much shorter description.

3           It's not just a matter of cutting off the

4   vendor's description at 32 characters.  They actually

5   come up with their own descriptions.  They can have

6   abbreviations that that customer formulates

7   themselves.

8           THE COURT:  They convert it to a number they

9   come up with.

10          MR. McDONALD:  They come up with their own

11  description, Your Honor, and it may bear no relation

12  to what the vendor describes in a published catalog.

13  The customer may not even see how the vendor describes

14  it in a published catalog.  So I wouldn't call it

15  simply a conversion.

16          MR. ROBERTSON:  It may not.  If it's a mop in

17  the vendor's catalog and they put it in, it doesn't

18  matter if they only have 32 characters, they call it a

19  mop.  They don't change the name to something else.

20          THE COURT:  How many of these things have

21  more than 32 characters?

22          MR. ROBERTSON:  I think the 32-character

23  issue, Your Honor, is again a red herring.  What does

24  it matter how long the textual description is in Your

25  Honor's claim construction?

LOHKAMP - CROSS                1124

1    THE COURT:  I don't think it makes any

2    difference.  I think the problem is with published by

3    a vendor.  I'm wondering if I didn't just err in

4    including published by a vendor, and I ought to tell

5    the jury that it's out of the case because I don't

6    know that I did it right now.

7        MR. McDONALD:  I think you did it perfectly

8    right.

9        THE COURT:  I know you do.

10       MR. McDONALD:  The other things is we would

11   have had a chance to argue summary judgment before.

12   There's a reason they didn't move on it.  When you

13   look at the context of catalogs as used in these

14   patents and how it's different from the prior art that

15   had parts masters, and we haven't had a chance to get

16   into all that evidence, but when you really read these

17   three patents in the context of the prior art that's

18   even described on the face of them, this definition

19   that you're going to for catalogs would include

20   clearly what's in the prior art.  And we think we are

21   entitled to say that's not what was meant here.  And

22   we think it would be an error of law for Your Honor to

23   change your ruling.

24       THE COURT:  I don't think so, but I tell you

25   how I'm going to solve this.  I'm going to hear the

1   rest of their case, then I'm going to let you bring

2   this witness back and talk, if I decide it's relevant,

3   about all this in your case.  For now we'll keep it

4   out.

5            MR. ROBERTSON:  Your Honor, after lunch may I

6   provide the Court with the construction of "catalog"

7   by Judge Brinkema and Judge Spencer?

8            THE COURT:  Sure.  But I remember having them

9   at one time.  I don't think I have them now, but I'll

10  be glad to have whatever was done.

11           MR. ROBERTSON:  Thank you.

12           THE COURT:  All right.

13           I have to tell you, Mr. McDonald, I think

14  that this issue on your part is how many angels can

15  stand on the head of a pin.  And I don't think anybody

16  is going to buy it.  And if that's what your whole

17  case is all about, I would suggest -- who is helping

18  you-all?  Judge Dohnal?

19           MR. ROBERTSON:  Yes, Your Honor.

20           THE COURT:  I would suggest that you all

21  productively could use some time with Judge Dohnal.  I

22  realize that you don't have any damages issues, but

23  if, in fact, infringement is found, you have a high

24  risk of having an injunction entered against you.  And

25  that could be just as bad for you-all as damages,

1    maybe even worse given the size of your company.

2           And I wonder if it's not appropriate for your

3    business people at a high level -- any high level

4    business people here in the courtroom?

5           MR. McDONALD:  We have general counsel has

6    been here, Your Honor, and we have certainly been

7    ready to talk many times.  But this issue on the claim

8    construction, it cuts both ways.

9           THE COURT:  General counsel, they are

10   important people, I understand that, but they are not

11   the business executives who need to understand what

12   the business situation is and what they face from a

13   business standpoint.

14          So usually I require the business people to

15   be together on both sides, the business people.

16          Has that ever happened in this case?

17          MR. McDONALD:  Oh, yes.

18          THE COURT:  I know we have had the general

19   counsels of each one of these people.

20          MR. McDONALD:  We've had executives from the

21   parties in mediations.

22          THE COURT:  All right.

23          MR. McDONALD:  By the way, Mr. McPheeters is

24   also senior vice president Lawson.

25          THE COURT:  Most of the general counsels are,

1    but they're not business people.

2         MR. McDONALD:  My point, though, on the

3    merits of the case, if you change your mind about the

4    definition of our catalogs, that's going to cut both

5    ways in terms of helping us tremendously on the

6    invalidity case in this case.  It's going to actually

7    make it a lot simpler if you're going to broaden that

8    definition.

9         THE COURT:  I'm not looking to help or hurt

10   either one of you.  What I'm trying to do is make sure

11   I'm right about what I said and make sure the jury

12   understands it, and they get the evidence in, one way

13   or the other.  It isn't my office to try to help one

14   of you or hurt the other one.

15        MR. McDONALD:  I'm just saying the liability

16   issues shift our risk.

17        THE COURT:  Away from infringement and help

18   you on the invalidity.

19        MR. McDONALD:  We're willing to take that

20   risk, Your Honor.

21        THE COURT:  I gather.

22        MR. ROBERTSON:  One final point, Your Honor.

23   I would like to have on the record a Rule 403

24   objection because I think this whole line of

25   questioning is just misleading and confusing to the

1   jury and is inappropriate.

2           So what I understand from the Court's ruling,

3   that when the witness resumes the witness stand, the

4   line of questions directed to this published by the

5   vendor language would be inappropriate.

6           THE COURT:  They are not going to pursue that

7   until their case.  They can bring that witness back.

8   And by that time I will have sorted through what it

9   is.

10          Ordinarily, I wouldn't approach it this way,

11  but I think if this is all in, then it may be hard for

12  the jury to dislodge it.  Whereas, if it comes in

13  later, they'll have it all in one place anyway.

14          I would like -- you-all have the testimony

15  already, don't you all, have the text?

16          MR. McDONALD:  The daily transcripts?

17          THE COURT:  Yes.

18          MR. McDONALD:  Yes, Your Honor, we're getting

19  daily transcripts.

20          THE COURT:  You might look and see the extent

21  to which Dr. Weaver talked about this issue on his

22  examination.

23          MR. ROBERTSON:  I recall very clearly I asked

24  him:  Does the Court's claim construction have

25  anything about who selects the data?  No.

LOHKAMP - CROSS                    1129

1          Does it matter no selects the data?

2          THE COURT:  I understand that he testified

3   quite clearly and accurately what was in there and

4   what wasn't, but that's not what I'm talking about.

5   I'm talking about did he testify how things got into

6   the item master on direct examination and how the item

7   master was established on his direct examination, and

8   how it worked with the vendor table on his direction

9   examination?

10         All right.  We'll take an hour for their

11  lunch, too.  So tell the jury.

12             (Luncheon recess taken.)