1       THE COURT:  Resolution, ladies and gentlemen, is the

2   questioning on that issue will be put off pending further

3   consideration of the matter by the Court, so we'll proceed to

4   another topic.

5   BY MS. STOLL-DeBELL:  (resuming)

6   Q    Okay, Mr. Lohkamp, I'm going to ask you some questions

7   about the punchout product now.

8   A    Okay.

9   Q    Do customers need to purchase RSS to be able to use

10  punchout?

11  A    Yes, they do.

12  Q    How many of Lawson's customers actually -- that have RSS

13  actually purchased punchout?

14  A    We have approximately a hundred punchout customers.

15  Q    And how many RSS customers do you have?

16  A    We have about 300 to 400.

17  Q    So what percentage is that?

18  A    Approximately 25 percent.

19  Q    What benefits does the punchout product offer that RSS

20  does not?

21  A    The punchout product allows our customers to bring more

22  categories ^ expanded under management by allowing them to

23  punch out to a vendor-managed website and search their list of

24  items and prices that the vendor set up for them encouraging

25  people to buy off that catalog and hopefully save money.

1    Q    How is that different than RSS?

2    A    It's different than RSS in that customers wouldn't have to

3    maintain their another -- wouldn't have to load those items in

4    their item master.

5    Q    Does Lawson control the content or functionality of a

6    punchout vendor's website?

7    A    No, we do not.

8    Q    If Lawson doesn't control the punchout vendor's website,

9    why does Lawson have contracts with the punchout vendor?

10   A    We have contracts with the punchout vendor so we can

11   accomplish that testing to insure that handshake of the

12   messaging so that when our customers use punchout, they are

13   able to log in, and then when they're done using the vendor's

14   website, able to get the data back from the shopping cart of

15   the things they want to order.

16   Q    Okay.  Can you explain what that handshake is for us,

17   please?

18   A    Well, it's we -- we kind of refer to it as a cXML message,

19   but it's an electronic formatted document that is sent to the

20   vendor's website with certain information.  First transaction

21   sends their login credentials and basically helps authenticate

22   the user, and then at the end, when the user is done using the

23   vendor website and decided to purchase something, then the

24   vendor website creates a message that we're waiting to receive

25   an electronic message that has the details of the cart, and

1    then we bring that into RSS.

2    Q    Okay.  So to make sure I understood this, a cXML message

3    is sent from Lawson's punchout software to the vendor's

4    website?

5    A    Yes.

6    Q    And that contains this handshake you've been talking

7    about?

8    A    Yes.  Contains the login credentials.

9    Q    And what are the login credentials?

10   A    It's a user name and password, an agreed-upon way for

11   the -- for our customers to access the vendor's website.

12   Q    Does Lawson select the user name or password that's sent

13   in this cXML message?

14   A    No, we do not.

15   Q    Who does that?

16   A    The customer in combination with the vendor.

17   Q    So is all that you're doing is requiring that that login

18   credential be sent in a certain format?

19            MR. ROBERTSON:  Objection, Your Honor, to the form of

20   the question; leading.

21            THE COURT:  Sustained.  Let him testify.

22   Q    What does Lawson require with regard to the login

23   credentials?

24   A    It may vary from vendor site to vendor site, but it

25   usually includes a URL which is the website address for the

Lohkamp - Cross                                                1133

1    where the vendor website is, and then it's usually an

2    identifier to identify the customer to the vendor, and then

3    usually a sort of what's called a shared secret which is

4    essentially the password, and then any other user identifier to

5    help identify who is logging in.

6    Q    And does Lawson control the URL that's part of that?

7    A    No, we do not.

8    Q    Do you care what that URL is?

9    A    No, we don't.

10   Q    So does Lawson control the identifier?

11   A    No.

12   Q    Do you care what it is?

13   A    No.

14   Q    Does Lawson control the shared secret?

15   A    No, we do not.

16   Q    Do you care what it is?

17   A    No.

18   Q    So that takes care of the handshake then?

19   A    The vendor website responds back with another XML message

20   saying that, yes, they've logged in, so it confirms that we've

21   logged in.

22   Q    What happens on the Lawson side of the system?

23   A    On the Lawson side of the system, we're -- our software is

24   waiting to hear back from the vendor website when the user is

25   done using that vendor website.

1   Q    Then I think you talked about receiving details of the

2   cart back from the vendor website?

3   A    Yes.

4   Q    Can you explain to us what that's all about?

5   A    When the customer has decided what they wanted to purchase

6   and they go through a checkout process, instead of the order

7   being placed on the website, the vendor website then creates an

8   XML message.  It's an electronic document that gives us all the

9   details of what was in the shopping cart, and we're waiting to

10  receive that information so we can pass that back into

11  requisition self-service.

12  Q    Where does it go once it's received by requisition

13  self-service?

14  A    Once it's received by requisition self-service, it gets

15  put into the shopping ^ cart in requisition self-service

16  requisition lines.

17  Q    Does Lawson control the content of that XML message that

18  the vendor's website sends back?

19  A    No.

20  Q    I think you said that Lawson's system waits around after

21  the customer has accessed and gained access to the vendor's

22  website?

23  A    Yes.  It's waiting for a message back.

24  Q    While it's waiting for a message back, does it have any

25  control over what the customer is actually doing at the vendor

1    website?

2    A     No, it does not.

3    Q     So does it control any searching functionality that

4    happens at the vendor website?

5    A     No, it does not.

6    Q     Does it control how the items are displayed at the vendor

7    website?

8    A     No, it does not.

9    Q     Does it control any kind of inventory checking that may

10   happen at the vendor website?

11   A     No, it does not.

12   Q     Does it dictate what kind of searching functionality

13   happens at the vendor's website?

14   A     No, it does not.

15          THE COURT:  I think that's sufficient to have asked

16   the question, which you did at the beginning, that Lawson, in

17   his view, doesn't control the function or content of the

18   punchout vendor's website or the communication in establishing

19   it, and you don't need to go through every component of it to

20   do it.

21          Once you have the whole, established the principle of

22   the whole, then you don't need to go in and add up each word in

23   the sentence.  So let's go on to something else.

24          MR. STOLL-DeBELL:  Okay, Your Honor.

25   Q     I want to talk to you about the contract that you have

1  between Lawson and the punchout vendors, and I'm going to ask

2  you to pull up PX-190 which is an exhibit you looked at earlier

3  today.

4           MS. STOLL-DeBELL:  And, Bill, if you can maybe

5  highlight first the top half of that.

6  A    Okay.

7  Q    What is this document, Mr. Lohkamp?

8  A    This is a procurement punchout partner agreement with

9  Global Healthcare Exchange.

10 Q    Is this similar to the form contract that Lawson enters

11 into with some of its punchout vendors?

12 A    Yes, it is.

13 Q    Is it identical to the form contract that Lawson enters

14 into with some of its punchout vendors?

15 A    It is nearly identical.  I think the difference is maybe

16 in the particular term or the partner fee.

17 Q    Is that something that sometimes changes?

18 A    It can change if it's negotiated with that specific

19 partner.

20 Q    What kind of changes have you seen with that fee?

21 A    In some cases, we've reduced it to a lower amount.  Some

22 cases, we've waived it.

23 Q    Let's go to the second page of this document, please, and

24 if you can blow up paragraph 3.3 for me.  Can you see that, Mr.

25 Lohkamp?

Lohkamp - Cross

1    A    Yes, I can.

2    Q    The first sentence says, each party shall contract for its

3    own products and services directly with customers.  Did I read

4    that correctly?

5    A    Yes, you did.

6    Q    What does that mean?

7    A    That means that each party, so Lawson and a punchout

8    partner, they contract directly with the customer.  So our

9    customer would buy our software from us, and then the punchout

10   partner would establish whatever business relationship they

11   might have with our customer to purchase goods or services.

12   Q    Okay.  So is that consistent with what you were saying

13   earlier, that Lawson does not control any of the functionality

14   or content of a punchout vendor's website.

15              MR. ROBERTSON:  Objection; leading.

16              THE COURT:  Sustained.

17   Q    Let's look at the, I think it's the second sentence in

18   this paragraph.  Starts out, unless otherwise agreed in

19   writing, each party shall bear no obligation to the customer

20   whatsoever with respect to products or services of the other

21   party.  Do you see that?

22   A    Yes, I see that.

23   Q    What does that mean?

24   A    That means that unless we spelled out something that we

25   were going to do together in an agreement, we don't have --

Lohkamp - Cross

1    there's nothing else we've agreed to.  There's no obligation.

2    Q     Are you aware of any other agreements that Lawson has

3    entered into with any other punchout vendors that would relate

4    to this paragraph?

5    A     All of our punchout agreements, to my knowledge, would

6    have this paragraph.

7    Q     Okay.  And so are there any other agreements with punchout

8    vendors other than this form agreement that we're looking at

9    here?

10   A     The only other one I'm aware of is we had a referral

11   agreement with SciQuest at one point.

12   Q     Let's look at paragraph four.

13         MS. STOLL-DeBELL:  You can blow that up, Bill,

14   please.

15   Q     The first sentence there says, partner agrees that it

16   will, at least ten days prior to any change in its website or

17   interface that would affect a Lawson product, provide Lawson

18   with notice of such changes, written notice of such changes.

19   What does that mean?

20   A     That means that if the vendor may change their website in

21   such a way that punchout no longer would work, then they need

22   to notify us so that we could see if we can make, you know,

23   make any changes to address that.

24   Q     What kind of change would they make that would make

25   punchout no longer work?

1    A    I can't think of an example of it.  It's just in there

2    just in case they make a change.

3    Q    Let's use Dell, for example.  If one of Lawson's customers

4    punches out to Dell's website and then buys products from

5    Dell's website, does Lawson make any money for any of the

6    products that the customer would purchase from Dell's punchout

7    site?

8              MR. ROBERTSON:  Objection; relevancy.

9              THE COURT:  Well, I think it probably is not

10   relevant, but she's following up on an irrelevant question

11   asked by somebody else in the courtroom, and I think that given

12   the circumstances, it's all right for her to establish how

13   irrelevant it was.

14             MS. STOLL-DeBELL:  Thank you, Your Honor.

15   Q    So do you understand the question?

16   A    Yes.

17   Q    Okay.

18   A    No, Lawson does not make any money off that purchase.

19   Q    How does Lawson make money off of punchout?

20   A    We make money off of punchout from the license fee for the

21   punchout software and the ongoing maintenance and then any

22   services that we provide to help implement the software.

23   Q    Why does Lawson call these punchout vendors punchout

24   trading partners?

25   A    We call them trading partners because that's an industry

Lohkamp - Cross                                                    1140

1   term that's used to describe a third party that you're doing

2   business with.  So when we use the word trading partners, our

3   customer is going to recognize that as a third party they might

4   be doing business with.

5   Q    When a Lawson customer punches out to a punchout vendor's

6   website, whose software is actually doing the searching at that

7   vendor website?

8   A    The vendor's website is doing the searching.

9   Q    Does Lawson's RSS software have a search engine?

10  A    Yes, it does.

11  Q    Does that search engine ever do any searching on a

12  punchout vendor's website?

13  A    No, it does not.

14  Q    For punchout to work, does a punchout vendor need to be a

15  supported punchout trading partner?

16  A    No, it does not.

17  Q    I think you testified that some of the punchout vendors

18  have contracted with Lawson and some do not; is that correct?

19  A    That is correct.

20  Q    How many of the punchout vendors have contracts with

21  Lawson?

22  A    It's about four or five.

23  Q    Can you give me some examples of punchout vendors that do

24  not have contracts with Lawson?

25  A    Yes.  Dell, Office Depot, McKesson, Hewlett-Packard, IBM,

1    Staples, Fisher, ^ steal case, ABC schools.  There's a number,

2    at least probably more ablations, school /PERBL /TEU.  Majority

3    don't have contracts with us.

4    Q    ePlus's counsel asked you about a number of industry

5    analyst reports.

6    A    Yes.

7    Q    Gartner was one of them, AMR, Forrester.  What were the

8    others?

9    A    Aberdeen and VDC.

10   Q    When did you get a subscription to Gartner?

11   A    I got a subscription to Gartner when my AMR subscription

12   converted over to Gartner.

13   Q    When was that?

14   A    That converted over last year.

15             THE COURT:  Was that because Gartner bought AMR?

16             THE WITNESS:  Gartner purchased AMR.

17             THE COURT:  How long did you have the AMR one?

18             THE WITNESS:  I had that ARM for about a year and a

19   half.

20             THE COURT:  And then it just changed over to Gartner

21   ^ to.

22             THE WITNESS:  It just changed over to Gartner.

23   Q    Okay.  So you got the subscription to AMR in around 2008?

24   A    I believe so, yes.

25   Q    Did you have a subscription to any of those analyst

1    reports prior to 2008?

2    A    I didn't have a subscription.  I would have been able to

3    request reports through our analyst relations.

4    Q    Can you explain to me --

5              THE COURT:  Excuse me.  In the question, it said

6    "you."  I guess the "you," she was talking about you yourself.

7    Is that what you've been answering to, what subscriptions you

8    had?

9              THE WITNESS:  Yes, I've been answering personally, I

10   had.

11             THE COURT:  The analyst that you were talking about

12   from whom you can get these, they have other subscriptions; is

13   that who you are talking about, somebody else in the company

14   that has other subscriptions?

15             THE WITNESS:  Yes.  Our company may have

16   subscriptions to particular analyst reports or access to those

17   websites.

18             THE COURT:  So those other ones that you don't have a

19   subscription to, do you get those through the company analyst?

20   Is that what you said?

21             THE WITNESS:  If I request it, I can get it through

22   our analyst relations and if our company has a subscription to

23   that particular service from the analyst.

24   Q    So if the company has a subscription to a particular

25   service, let's say, Gartner, for example, does that mean that

1    Lawson gets all of the reports published by Gartner

2    automatically?

3    A    No, it doesn't mean it gets all the reports.  Typically

4    when you are subscribing to a service, you are subscribing to

5    particular categories of their research.

6    Q    And if you subscribe to a category of research, do you

7    automatically get everything that's published within that

8    category of research?

9    A    You would get notice that maybe a new report had been

10   published, and then you'd have to go pull that down.

11   Q    So if you don't request to pull a particular report down,

12   then you wouldn't get that particular report?

13   A    That's correct.

14   Q    Do you have to pay extra money to pull down a particular

15   report?

16   A    If it's part of our subscription service, we can get that

17   report at no extra charge.  If it's a report that we request

18   that's not part of our overall service, we usually have to pay

19   for that.

20   Q    Are you aware -- well, does Lawson keep copies of reports

21   that it's requested from these different industry analysts?

22           MR. ROBERTSON:  I object, Your Honor.  There's no

23   foundation for this.  I mean, I don't know how this witness can

24   possibly know what all the other 3,900 employees of Lawson is

25   doing.

1          MS. STOLL-DeBELL:  Your Honor, I just want to know

2   if --

3          THE COURT:  You didn't ask him the foundational

4   question.  The objection is to foundation.  He may not have any

5   idea.  Maybe the question is relevant, but he does have to have

6   some basis for his knowledge.  Otherwise, it's sheer

7   speculation.  Objection sustained.

8   Q   Do you keep copies of the industry reports that you

9   request?

10  A   Yes, I do.

11  Q   Do you have copies of any industry reports that mention

12  ePlus?

13  A   Yes.  I have the Forrester eProcurement wave.

14  Q   Other than that, do you have any other ones?

15  A   No, I do not.

16  Q   Do you know if the company keeps copies of reports that

17  are requested by its employees?

18         MR. ROBERTSON:  Again, Your Honor, I object to the

19  question.  It's ambiguous, and there's no foundation ^ as.

20  Witness knows if the companies keeps report.

21         MS. STOLL-DeBELL:  I asked him if he knew the answer.

22         THE COURT:  I understand, but the objection is not to

23  that part of it.  The question is, the objection is to what the

24  company is.

25         MS. STOLL-DeBELL:  Oh, Lawson.  I'm sorry.

1    THE COURT:  Not the identity of it but what do you

2    mean by company?  Do you mean every person in the company, or

3    does the company maintain an official catalog -- I mean list of

4    all the -- or a copy of all the reports in sort of a library or

5    something like that.  I think that's the objection.

6                 MS. STOLL-DeBELL:  Okay.

7    Q    Do you know, does Lawson have a practice of keeping copies

8    of industry reports that are requested?

9                 THE COURT:  Do you know that?  That's the question.

10   Do you know whether they have a practice of keeping reports

11   that have been requested by people such as yourself?

12                THE WITNESS:  Yeah.  I don't know the exact practice

13   that we --

14                THE COURT:  Okay, you don't know.  The answer is he

15   doesn't know.

16   Q    Okay.  I want to go back and ask a few more questions

17   about the Cleveland Clinic situation that we discussed earlier

18   this morning.  At the time that ePlus was submitting a bid for

19   Cleveland Clinic business, did Cleveland Clinic already own

20   some Lawson products?

21                MR. ROBERTSON:  Again, Your Honor, object.  There's

22   been no foundation laid for this.  He spoke to one other

23   individual who told him the circumstances of the Cleveland

24   Clinic situation.  That's the only basis of his knowledge, so

25   this answer would be hearsay.

1    THE COURT:  Objection is to the form of the question.

2    There's no foundation for it.  Sustained.

3            MS. STOLL-DeBELL:  Your Honor, I was asking what

4    products Cleveland Clinic had of Lawson, whether they had

5    Lawson products.

6            THE COURT:  You haven't established that he knew

7    whether Cleveland Clinic had any products yet.  You have to

8    establish that foundation.  The answer to that has to be yes,

9    and then you can see what products.

10   Q    Mr. Lohkamp, did Cleveland Clinic -- do you know whether

11   Cleveland Clinic had any Lawson products?

12   A    Yes.

13   Q    You do know?

14   A    Yes.

15   Q    What products did they have?

16           THE COURT:  The next question is how do you know.

17   Q    How do you know?

18   A    I know because they were a customer of ours at the time

19   the bid came through.

20   Q    What products did they have?

21           MR. ROBERTSON:  I'm sorry, Your Honor, but ^ the

22   foundation for how he knows they were a customer.

23           THE COURT:  No, that's not the proper objection.

24   This is, I guess, evidence 101, but how did you find out what

25   products they had?  Did you learn that from somebody else?

```
 1                    THE WITNESS:  Yes --

 2                    THE COURT:  Or do you have personal knowledge because

 3     you sold them something, for example?  Did you sell them any

 4     products?

 5                    THE WITNESS:  I did not.

 6                    THE COURT:  Did you supervise in your line of

 7     business any work that caused you to learn what products

 8     Cleveland Clinic had at the time they are talking about?

 9                    THE WITNESS:  I learned from the account executive.

10                    THE COURT:  Some account executive told you what the

11     products were; is that right?

12                    THE WITNESS:  Yes.

13                    THE COURT:  Sustained.  That's why the Rules of

14     Evidence are as they are.

15                    MS. STOLL-DeBELL:  If I can have a minute to check my

16     notes, Your Honor.

17                    THE COURT:  All right.

18                    MS. STOLL-DeBELL:  I think that's it.  Thank you.

19     Thank you.

20                    THE COURT:  Any redirect?  Unfortunately, Mr.

21     Lohkamp, you may not be freed yet.

22                    MR. ROBERTSON:  Yes, Your Honor.  I'll be brief.

23                    THE COURT:  Promises, promises.

24

25
```

1                        REDIRECT EXAMINATION

2   BY MR. ROBERTSON:

3   Q    Could you go to that vendor agreement, please, Plaintiff's

4   Exhibit Number 113.

5                THE COURT:   Number what?

6                MR. ROBERTSON:   113.  I'm sorry, Your Honor, it was

7   190.

8   A    Okay.

9   Q    Are you with me yet, sir?

10  A    Yes, I am.

11  Q    You referred to various paragraphs in this agreement; is

12  that right?

13  A    I was asked about various paragraphs.

14  Q    I noticed one thing you weren't directed to is at the

15  bottom of page one under article two called intent of the

16  agreement; do you see that?

17  A    Yes.

18  Q    The intention of the parties to an agreement is a pretty

19  important thing; wouldn't you agree?

20  A    Yes.

21  Q    Okay.  Let's see what you said here about what the intent

22  of this punchout partner agreement was.  It's got two

23  intentions, doesn't it, identified there, small i and small ii?

24  A    Yes, it does.

25  Q    So it says, the intent of this agreement is to provide the

1    opportunity for the parties to -- now we're talking about the

2    parties there are Lawson and its punchout trading partner;

3    right?  That's your understanding?

4    A    Yes.

5    Q    For the parties to facilitate the use of their respective

6    products by entering into a relationship that will

7    facilitate -- now, this is the first intent of the parties;

8    right?  The development of the appropriate interfaces or

9    punchout between Lawson products and the partner's website; do

10   you see that?

11   A    Yes, I do.

12   Q    So the parties were going to jointly develop the

13   interfaces, the appropriate interfaces in order to do this

14   punchout between Lawson products and the partner website;

15   right?  That's number one intention; correct?

16   A    Yes.

17   Q    Okay.  Number two is the performance of joint marketing

18   activities; right?  You use the word "joint" there; correct?

19   A    Correct.

20   Q    Now, paragraph three about this licensing ^ in sport all

21   it says here, each party shall contract for its own products

22   and services directly with the customers; do you see that?

23   A    (No response.)

24   Q    Your reference to that?

25   A    Yes.

1   Q    But the intent of this agreement then is not the

2   relationship that Lawson might have with its customer or the

3   punchout trading partner might have with its customer, the

4   intent of this agreement is how you formulate your joint

5   marketing activities for your mutual benefit; isn't that right?

6   A    It is for the joint agreement with them.

7   Q    To your mutual benefit, sir; right?

8   A    Yes.

9   Q    Lawson does specify the format for how the item data needs

10  to come back from the punchout catalog to the RSS shopping

11  cart; isn't that right?

12  A    We specify the format, the standard.

13  Q    So the answer to my question is yes; right?

14  A    Yes.

15  Q    And if the customer using the Lawson software wants to get

16  to a punchout trading partner website, whether they be under

17  agreement or not under agreement, it needs the Lawson punchout

18  application; isn't that right?

19  A    To use punchout to that vendor website.

20  Q    They can't get there without the procurement punchout

21  application; right?

22  A    Yeah.  Using our software, yeah.

23  Q    That's how they do it?

24  A    Yes.

25  Q    You were asked questions about how many punchout products

1   you've sold.  I think you said around a hundred, and you've got

2   about 3- or 400 RSS, or requisition self-services applications

3   ^ ; right?  Now, if together the jury concludes that those

4   applications permit Lawson's customers to infringe the patents,

5   it's not an excuse for Lawson to say that we infringe just a

6   little bit, is it?

7           MS. STOLL-DeBELL:  Objection, Your Honor.  It calls

8   for a legal conclusion, and it's not relevant for this witness,

9   and it's prejudicial.

10          THE COURT:  Because it's not relevant, it's

11  prejudicial.

12          MS. STOLL-DeBELL:  Sure.

13          THE COURT:  Sustained.  It's a legal matter.

14  Q    You specified that a lot of your trading partners don't

15  use the vendor agreement that we've been referring to here as

16  Plaintiff's Exhibit Number 190; is that right?

17  A    That's correct.

18  Q    But the technology for punchout doesn't change for

19  Lawson's punchout trading partners whether they use the

20  agreement or don't use the agreement; isn't that right?

21  Technology is the same?

22  A    That's correct.

23  Q    You indicated that you were not aware of ePlus patents

24  prior to filing this lawsuit; is that right?

25  A    Yes.

1   Q    There's no question you've been aware of ePlus patents

2   since May of 2009 when the lawsuit was filed; right?

3   A    Right.

4   Q    Everyone at Lawson has been aware of the ePlus patent

5   since May of 2009; isn't that right?

6   A    I believe so.

7              MR. ROBERTSON:  Thank you.  No further questions.

8              THE COURT:  All right.  Mr. Lohkamp, it's obvious

9   you're going to be called back as a witness in the case, and

10  you can be temporarily excused and go about your business until

11  you are called back, and you agree to come back then?

12             THE WITNESS:  Yes.

13             THE COURT:  Or you can remain here and wait.  Which

14  would you rather do, go about your business upon agreement to

15  come back?

16             THE WITNESS:  Yes.  Come back.

17             THE COURT:  Is that satisfactory, counsel?

18             MS. STOLL-DeBELL:  Yes, Your Honor.

19             THE COURT:  Mr. Lohkamp, you can't discuss your

20  testimony with anybody because you may be called back as a

21  witness; all right?

22             THE WITNESS:  Okay.

23             THE COURT:  Thank you.

24             THE WITNESS:  Thank you.

25             MR. ROBERTSON:  Your Honor, the next witness we'll be

1    calling is a witness by videotape.  I believe Mr. Strapp can

2    identify what it is and tell you approximately how long the

3    videotape deposition is.  It's a customer of Lawson.

4             MR. STRAPP:  Your Honor, our next witness, we're

5    going to play the videotaped deposition of Kristy Oliver.

6    Kristy Oliver is an employee of Blount Memorial Hospital.

7    Blount Memorial Hospital is a customer of Lawson and a customer

8    for the accused Lawson S3 system.

9             The deposition videotape is a little bit under an

10   hour, and we can provide Your Honor with a booklet of the

11   exhibits that will be referenced during the deposition.  We've

12   marked the transcript, excerpted portions also as an exhibit,

13   and we will provide that to Your Honor.

14

15            (Videotaped deposition of Kristy Oliver played for

16   the jury.)

17

18            MR. STRAPP:  Your Honor, for the record, exhibits

19   referenced during the deposition transcript of Ms. Oliver were

20   Plaintiff's Exhibits 225, 226, 228, 229, 230, 231, 234, 237,

21   238, and 239, and the excerpted portions of the transcript that

22   were played on the video are marked as Plaintiff's Exhibit 518.

23            THE COURT:  All right.  They are admitted.  Next

24   witness?

25            MR. ROBERTSON:  Your Honor, plaintiff would call Mr.

1  Dale Christopherson.

2          THE COURT:  How long is this going to take?

3          MR. ROBERTSON:  Your Honor, I'm trying to cut it back

4  considerably.  I think I'd be less than 45 minutes.

5          THE COURT:  Mr. Niemeyer, how long is his examination

6  going to be?

7          MR. ROBERTSON:  Less than an hour.

8          THE COURT:  Let's go.  There was a lot of stuff that

9  that could have been excised from that.

10          MR. ROBERTSON:  I tried to limit it, Your Honor, but

11  both parties get to cross-designate, so...

12          THE COURT:  611 is in effect in full force.

13

14                    **DALE CHRISTOPHERSON,**

15  a witness, called by the plaintiff, having been first duly

16  sworn, testified as follows:

17

18          MR. ROBERTSON:  May I proceed, Your Honor?

19          THE COURT:  Please.

20

21                    DIRECT EXAMINATION

22  BY MR. ROBERTSON:

23  Q    Will you state your full name for the record, sir?

24  A    Dale Arnold Christopherson.

25  Q    And you are currently the director of development at

Christopherson - Direct                                    1155

1    Lawson Software; correct?

2    A    That's correct.

3    Q    Then in your role as the director of development, you have

4    responsibilities for these software modules that we've been

5    talking about, Lawson requisition self-service, Lawson

6    procurement punchout, Lawson purchase order, Lawson

7    requisitions, Lawson inventory control, and Lawson EDI;

8    correct?

9    A    Those are some of the many that I do have under my

10   control, yes.

11   Q    You are familiar also with the Lawson system foundation;

12   is that right?

13   A    Depends on how deep you want to go into it, but, yes, I am

14   familiar with it at some length.

15   Q    You were asked in your deposition whether Lawson system

16   foundation is a technology layer that sits below these current

17   applications we've been talking about.  Do you recall that?

18   A    I certainly do.

19   Q    You said it was?

20   A    Yes, it was and still is.

21   Q    And so isn't it true now that all customers of Lawson are

22   required to license the Lawson system foundation in order to

23   use the current version of the Lawson applications?

24   A    That's correct.

25   Q    And in this procurement version nine plus, any version

Christopherson - Direct                                        1156

1    nine plus you have to do that; isn't that right?

2    A    In nine plus?

3    Q    Any version nine and above?

4    A    Oh, any version nine and above, that's correct.

5    Q    There are several versions of this software we've been

6    talking about; correct?

7    A    Yes, there are.

8    Q    And there's a separate license fee associated with Lawson

9    system foundation; is that correct?

10   A    That's correct.

11   Q    Now, there's been a lot of discussion about these vendor

12   catalogs.  A customer can import a vendor catalog into the item

13   master of the Lawson system; isn't that right?

14   A    They can go basically through a three-step process, yes.

15   Q    And you are aware also of this UNSPSC we've been talking

16   about?

17   A    I certainly am.

18   Q    So isn't it true that you can use the UNSPSC to find items

19   from different vendors that were all cross-referenced using the

20   same product category?

21   A    Let me think about what you are really saying there.

22   Could you restate that?

23   Q    Sure.  Isn't it true that a user of the Lawson system that

24   has this UNSPSC capability can find items from different

25   vendors that were all cross-referenced to the same product

1    category?

2    A    That's correct, yes.

3    Q    The shopping cart in Lawson requisition self-service can

4    be dynamically built from results of conducting searches in the

5    item master; isn't that right?

6    A    That is correct.

7    Q    And it's also true that the shopping cart can also be

8    dynamically built using the results of searches in the vendor

9    punchout catalogs; right?

10   A    That is also correct.

11   Q    And when the user clicks a checkout in the items in your

12   shopping cart, they are moved into the requisition system, and

13   an actual requisition is created; isn't that right?

14   A    I would actually define that slightly different.

15   Q    All right.  Do you recall giving a deposition in this

16   case?

17   A    I certainly do.

18   Q    And you were under oath?

19   A    Uh-huh.

20   Q    I believe you have your deposition transcript.  It should

21   be in the first volume.

22   A    Yep.

23   Q    Could you go to page 77?  Excuse me.  I misspoke.  177.

24   A    177?

25   Q    Yes, sir.

Christopherson - Direct

```
1   A    Okay.  I'm not there yet.

2   Q    Okay, take your time.

3   A    Okay, 177.

4   Q    Starting at about line 18?

5   A    Starting with question, and then on the right-hand screen?

6   Q    Let me read the question for you.

7        Question:  And then on the right-hand screen in the card,

8   here you have four items that have been included in your

9   shopping cart.  What happens to that when you click checkout?

10       Your answer:  When you click checkout, then it would move

11  that information into the requisition system and actually

12  create a requisition.

13       Did you give that answer to that question at that time?

14  A    I certainly did.

15  Q    Okay.  Thank you.  Once a requisition is approved, the

16  requisition is released and then transferred to the purchase

17  order system; correct?

18  A    That's correct, after it's been approved.

19  Q    Talking just now about procurement punchout, when users

20  have filled their shopping carts, virtually speaking, and

21  checked out from the vendor website using the Lawson

22  procurement punchout, the chosen items and their prices are

23  returned to the Lawson server and a requisition is created

24  using the Lawson requisition self-service application; correct?

25  A    Can you state that again?  The second half of it basically
```

Christopherson - Direct                                    1159

1    is where I lost you.  ^ you check out at the customer, not the

2    customer but the vendor site and then it was at that point

3    where I got lost.

4    Q    Let me start over.  Let's hear the whole question.  When

5    users have filled their shopping carts, virtually speaking, and

6    checked out from the vendor website using Lawson procurement

7    punchout, the chosen items and their price are then returned to

8    the Lawson server, and a requisition is created using the

9    Lawson requisition self-service application; correct?

10   A    That's correct.

11   Q    Isn't it true that the current version of the Lawson

12   procurement punchout includes the capability to punch out to

13   multi-vendor catalogs?

14   A    That's correct.

15   Q    One of those examples of a site that you can go that is a

16   multi-catalog vendor -- excuse me, multi-vendor catalog, is

17   SciQuest; correct?

18   A    That's correct.

19   Q    Another example of a multi-vendor catalog site that's

20   available for the punchout procurement is an organization known

21   as GHX; correct?

22   A    That is correct.

23   Q    That stands for Global Healthcare Exchange?

24   A    That's correct.

25   Q    And Global Healthcare Exchange that provides this

1   multi-vendor catalog capability is a punchout trading partner

2   of Lawson; correct?

3   A    That's correct.  They are on the list, yes.

4   Q    It's an accurate statement to say that if Lawson could not

5   market a requisition module, it could not effectively compete

6   in the supply chain management product market?

7   A    I would say that that would be an accurate statement, yes.

8   Q    It's also accurate to say if Lawson could not offer a

9   purchase order module, Lawson could not effectively compete in

10  the supply chain management product market?

11  A    That would also be correct.

12  Q    You've heard a lot of talk about the implementation and

13  installation services that Lawson offers.  I just want to be

14  clear that Lawson will provide implementation services to

15  assist its customers with importing vendor catalog data into

16  the item master.

17  A    I didn't hear a question in that, sir.

18  Q    Let me restate it then.  Perhaps I misspoke.  Is it true

19  that Lawson provides implementation services to assist its

20  customers with importing vendor catalog data into the item

21  master?

22  A    If the customer so chooses and wants that service, yes, we

23  do.

24  Q    So for most situations where a customer licenses the

25  supply chain management suite or the procurement modules we've

1    been talking about in supply chain management, Lawson

2    professional services is going to provide the actual

3    installation and implementation services for that system;

4    correct?

5    A    That's correct, yes.

6    Q    All existing Lawson customers today are under maintenance

7    contracts with Lawson; correct?

8    A    That's correct.

9    Q    So all of the supply chain -- excuse me.  All of the

10   supply -- let me restate that.  All of the S3 procurement

11   products that are under contract today with Lawson customers,

12   they have maintenance contracts; is that right?

13   A    Could you restate that?

14   Q    Yeah.  I'm sorry.  It was a bad question.  With respect to

15   the Lawson S3 procurement product that's at issue here, any

16   customer that has that product is under an existing maintenance

17   contract?

18   A    That's correct.

19   Q    There's been a lot of talk about this RFP process, and I

20   don't want to go through it again in detail, certainly, but

21   there is a standard set of answers for those common questions

22   that customers have about the S3 procurement product; correct?

23   A    That is correct, yes.

24   Q    I think if you'll look in your book to Exhibit 117.

25   A    Okay.

1   Q    You've seen this document before?

2   A    I don't believe I've actually seen this document except as

3   this exhibit.

4   Q    But you are aware that this is the document that is the

5   proposal automation suite for providing answers with respect to

6   stock questions for the S3 product; right?

7   A    I couldn't confirm or deny that.

8   Q    It's a Lawson document; is that right, sir?  You have no

9   reason to doubt it's --

10  A    I have no reason to doubt it.  I mean literally, I've not

11  seen the document like this or in any form like this.  I've

12  seen a couple answers out of the database, and when I say a

13  couple, probably two or three over the last couple years.  So

14  for me to comment on this document, I don't know how many pages

15  it is, it's just not fair.

16  Q    Fair enough.  But Lawson does maintain such a document

17  that has stock answers to requests for proposals?

18  A    They do maintain a database, yes.

19          THE COURT:  Does the database you are talking about

20  have stock answers for the RFPs?

21          THE WITNESS:  Sure.  It will have -- there will be

22  things like about the company history, you know, things that

23  are very generic questions that almost all customers will ask

24  in the RFP process, and there's a set of answers that will come

25  up there along with other questions that maybe not all

1   customers ask, but they're routinely asked by a fair number.

2   So the sales team has asked, look, can we get what the answers

3   should be for these so that we can just cut and paste that in

4   so we don't get -- if we had 20 salespeople, you don't have 28

5   different answers for the same thing.

6   Q    This document is 297 pages long.  Can you just confirm

7   that, and it has 398 stock questions that often get asked and

8   stock answers that are often provided; is that fair enough?  Do

9   you just want to take a look at it for a minute?

10  A    I see it's 297, and keep in mind they are a pretty wide

11  product space.  This is just a few, a small number of products

12  that I actually have under my control.

13  Q    I understand.  But if you look --

14  A    398 -- I see the last page is 398, answers to 398

15  questions.

16  Q    And just going back to the first page, this has to do --

17  it says there's a database identified there, and then it says

18  Lawson S3 data.  Do you see that?

19  A    Uh-huh.

20  Q    So this Exhibit 117 is specifically dealing with just the

21  Lawson S3 product; right?

22  A    It appears to be, yes.

23  Q    And, I mean, if I just randomly open up a page -- for

24  example, I opened up to 106.

25  A    Sure.

1  Q    Question 149 of 398, and this has to deal with a fairly

2  complex question concerning EDI for supply chain management;

3  correct?

4  A    Uh-huh.

5  Q    Not simply what the company is about and that kind of

6  thing?

7  A    Absolutely.  It would be a variety of questions.

8  Q    Specific to the functions and features of the S3 product?

9  A    Correct.

10  Q    All right, there was some discussion about industry

11  analyst reports; do you recall that?

12  A    I certainly do.

13  Q    And Mr. Lohkamp, I understood him to indicate that he

14  personally subscribes to a number of those publications;

15  correct?  You heard that?

16  A    I certainly heard that, yes.

17  Q    But the company also subscribes to them as a company;

18  isn't that right?

19  A    That's my understanding.

20  Q    And, I mean, in your deposition, you were asked whether or

21  not the company subscribes to Aberdeen, Gartner, and Forrester;

22  right?

23  A    That's correct.

24  Q    And you indicated that some of those reports concerning

25  Lawson's newer products and possible competitor products are

1   disseminated fairly widespread throughout the company; isn't

2   that right?

3   A    If I said widespread, I certainly wasn't meaning -- take a

4   4,000-person company, it's not going out to even 3,000 of those

5   probably.

6   Q    It's available, though, over a Lawson intranet website,

7   isn't it?

8   A    I'm trying to recall the last time I've actually been able

9   to go out and look at any of the documents, and I don't recall

10  any -- I mean, I actually see very few in my current role.

11  Q    Well, it's actually, according to you in your deposition,

12  disseminated among the director level?

13  A    Correct.

14  Q    The manager level?

15  A    Yes.

16  Q    And in some instances, down to individual contributor

17  level; do you recall that?

18  A    Yes, I certainly do.  That's going to depend on the

19  product and what the content is.

20  Q    Isn't it a fact that before a new enhancement is released,

21  for example, with respect to this S3 supply chain management

22  module we've been talking about, Lawson does not engage in any

23  kind of intellectual property clearance investigation to insure

24  that enhanced features will not infringe the intellectual

25  property rights of third parties?

Christopherson - Direct                                              1166

1    A    That's correct.

2    Q    You don't do that, do you?

3    A    I do not, no.

4    Q    The company doesn't do that as a policy; correct?

5    A    That's correct.

6    Q    And since May of 2009 when this lawsuit was instituted,

7    Lawson has undertaken no efforts to modify or redesign its

8    existing S3 procurement products; is that right?

9    A    That's correct.

10        MR. ROBERTSON:  That's all the questions I have.

11   Thank you.

12        THE COURT:  Why don't we take the afternoon recess.

13   It's time to take 20 minutes, ladies and gentlemen.  You just

14   take your pads with you.

15

16                    (Jury out.)

17

18        THE COURT:  Counsel, I have word from the clerk's

19   office that ePlus intends to file 30,000 pages of exhibits

20   under seal.  What is that about?

21        MR. MERRITT:  Sounds terribly daunting.  Let me try

22   to address this, Your Honor.  Under Rule 103, we think that

23   we're required to make an offer of proof -- we'd like to do it

24   before we close -- with regard to damages testimony in exhibits

25   that were excluded by the Court's earlier rulings several

1    months ago.  It has nothing to do with the matters that are

2    currently being tried before this jury, but it's an offer of

3    proof as to lay testimony and to associate exhibits that would

4    have gone to the damages part of the case.

5         The 30,000 is driven significantly by the fact that

6    there are -- it includes some Lawson internal information that

7    are these huge electronic spreadsheets that if they were

8    actually printed out would be an enormous number of pages.

9         We have suggested that with the Court's permission we

10   might be able to simply file a written index and lodge a DVD

11   physically with the clerk's office that keeps us from having to

12   put boxes and boxes of these spreadsheets into the offer of

13   proof.

14        We'll take the Court's guidance on that, do whatever

15   the Court would like us to do.  We really are disinclined to

16   burden the Court with all that paper, but the clerk tells us

17   that absent special permission from the Court to put it on a

18   disk, that the default is the paper would have to be filed.

19        THE COURT:  Their problem is they don't want the disk

20   imported into the system.  I don't see why -- how long is the

21   index?

22        MR. STRAPP:  Approximately five pages.

23        THE COURT:  Why don't you file the index and then

24   file the -- is it a DVD or CD or what?

25        MR. MERRITT:  I believe it's a DVD, Your Honor.

1    THE COURT:  As your proffer proofs and log that as an

2  item, and then it will be filed, and I guess it needs to be

3  filed under seal since it has their financial information.

4    MR. MERRITT:  Yes, sir, it has financial information

5  from Lawson.  It would need to be under seal.

6    THE COURT:  Is this something that is different than

7  the Court has considered in making its ruling on the expert,

8  because you can't get anything in that wasn't before me on the

9  expert's opinion.

10    MR. MERRITT:  No, sir.

11    THE COURT:  These things were all part of the

12  expert's report, were they?

13    MR. MERRITT:  Well, there were two pieces of it, if

14  Your Honor recalls.  First of all, the expert was excluded on

15  the motion in limine.  His report and the attachments are

16  already a part of the record, and we can't improve upon that in

17  any way obviously.  We can't move the ball on that or go back

18  and fill.

19    There was a second motion that the Court granted that

20  was a Rule 37 discovery motion that precluded the use of lay

21  testimony or additional witnesses as an alternative means of

22  proving the damages.

23    THE COURT:  That was for failure to comply with the

24  discovery.

25    MR. MERRITT:  That was for failure to comply with the

1    discovery, and the only opportunity for an offer as to what

2    that proof would have been was on September 7th when that was

3    being argued.

4            In fact, Your Honor may recall that I argued that.  I

5    believe Mr. McDonald did as well, and you asked, well, what

6    sort of proof would you put in, and on the fly, based on some

7    notes, I was able to say, well, here are the people we think we

8    might call and what some of the evidence might be.

9            What we would like to do is take the opportunity to

10   simply make clear, in a particularized form, what those

11   witnesses and what that evidence would be since the one

12   opportunity previously that was available was on the fly in

13   that hearing.  So this is simply to say what the lay testimony

14   and exhibits would be and to try to put that into the record as

15   an offer of proof that's sufficiently particular so somebody

16   would understand what we were talking about on September 7th.

17           THE COURT:  Mr. McDonald, do you want a chance to

18   review the index and/or CD or DVD and then respond?

19           MR. McDONALD:  I haven't had a chance.  I don't know

20   our team has actually had a chance to see what's involved here.

21   I think they made their record back in September.  I don't know

22   why at this point they would be proffering evidence that's not

23   part of what they had even offered up in connection with the

24   joint pretrial order.  It sounds like it goes well beyond that,

25   but I guess I don't want to weigh in.  Maybe we can work

1   something out amongst ourselves.

2           THE COURT:  Why don't you all take a look at it.  Why

3   don't you tender it to them, and the procedure will be, when

4   and if it is approved for filing, that you file the index and

5   the DVD, and the DVD will be physically kept in the court, and

6   it will be among the sealed documents because it contains

7   Lawson's financial, confidential financial information, and

8   then you can make a motion for leave to file when you file it,

9   and then serve that on them with copies of these things, and

10  then they can file a response and you file a response promptly

11  so I can consider it.  All right.

12          And then there's also an argument, a motion

13  precluding -- *in limine* to preclude evidence or argument of

14  non-infringement due to defendant's failure to provide

15  discovery relating to customer-specific implementation and

16  accused product modules that landed on my desk during the lunch

17  hour.  It looks like it was filed on January 11th which is, I

18  think, today.  So have you committed that to memory, and are

19  you ready to respond to it, Mr. McDonald?

20          MR. McDONALD:  No, I'm not, Your Honor.  I think

21  we've had a lot of evidence on implementation in the case, and

22  there was no record -- Mr. Robertson made some comment in front

23  of the jury.  In fact, we were going to submit something to

24  correct that there's been no findings that we violated any

25  court orders regarding implementation discovery, so there's no

1   basis for this.

2        Lots of evidence has come in on implementation, and

3   maybe I'm bearing a headline.  We're not even disputing that we

4   help our customers implement.  That's not what this case is

5   about, so I'm not sure why they have their motion.

6        THE COURT:  I'm going to set a schedule right now.

7   Mr. Robertson, when are you planning to finish your case?  I

8   was under the impression you were going to finish with it

9   today, and I think you left me with that impression.  I don't

10  think I would have told them to have witnesses here if I hadn't

11  thought you'd be finished by the end of the day.  What is your

12  plan?

13        MR. ROBERTSON:  I'm sorry, sir, if I left you with

14  that impression.  I tried to do distinctly the opposite, and

15  the witnesses who were here, I think, were the witnesses we

16  called and I think they were going to call as part of their

17  case.  I significantly shortened my Christopherson direct as

18  you --

19        THE COURT:  Yes.

20        MR. ROBERTSON:  -- may have noticed.  So I think

21  worst-case scenario would be by the noon hour tomorrow.

22        THE COURT:  What do you have left?

23        MR. ROBERTSON:  We have two more videotapes.

24        THE COURT:  Don't you send me more videotapes like

25  that one.  That was just nonsense.  We sat there and watched

1  that woman go through -- I timed it in one place.  She went

2  through, and it took her forever to look at an exhibit.  What

3  is this; somebody needs airtime or what?  This is really silly.

4  It's one thing to have, to blame it on fairness designations,

5  but in part that depends upon what you designate.

6         And the other thing is, you all have reviewed, I

7  think in your -- I can tell what I thought were mostly what the

8  fairness designations were, that you can run around Robin

9  Hood's barn and leave a trail and that somehow a jury -- that

10  is fairness.

11         Fairness designations are those things which directly

12  deal with the statements that are, in fact, in the direct

13  testimony, and it looked to me like there was an effort to

14  create a smokescreen to do away with some fairly -- some

15  troublesome testimony, but that said, it was all very, very

16  general and vague, and it's been -- to the extent it's

17  relevant, it's been covered by all the other witnesses already

18  anyway.

19         MR. ROBERTSON:  Your Honor, I think the other two

20  combined videotapes are approximately one hour, and then --

21         THE COURT:  Well, they are now, but I'm sure with a

22  little editing, they'll get less than that.

23         MR. ROBERTSON:  We were going to play them after we

24  complete Mr. Christopherson's testimony, and that would be it,

25  and then we would start with Mr. Niemeyer in the morning.  I

1    think his direct is less than an hour, and then we have Mr.

2    Farber for, I think, about 20 minutes or so.  Then we would

3    rest our case.

4              THE COURT:  Well, you get it finished.  Let's focus

5    on the fact that a jury has got -- did you see how difficult it

6    was for them to follow what was going on in that deposition?

7    Did you see that?  Did any of you sit over there and look at

8    them?

9              They were trying to figure out what on earth is this

10   all about, because it was -- it was done in deposition pace.

11   It wasn't done in trial pace.  It was all hard to follow.  You

12   can't do that to juries.  It confuses them.

13             THE CLERK:  I have a question from the juror.

14             THE COURT:  They want to know when the case is going

15   to end.  The questions are these:  This is signed by juror

16   number -- the last juror, number 60.  They are the following

17   questions:  I'll have a copy made for you.

18             If Lawson has contractual and noncontractual punchout

19   partners, what is the point of the contract if Lawson is doing

20   the same work without the contract?  Somebody is paying

21   attention.

22             Next question, and this is identified for you as from

23   Mr. Lohkamp's testimony.  What is the difference between a

24   contractual and noncontractual punchout partner?

25             Now that you know that, maybe you all can decide how

1   you want to deal with it.

2          THE CLERK:  This would be marked Court Exhibit 2,

3   Your Honor?

4          THE COURT:  Yes.

5          MR. ROBERTSON:  Your Honor, I don't know if you want

6   me to address that, but maybe we can talk during the recess.

7          THE COURT:  I think what you're going to have to do

8   is figure out do you want to answer the question, do you have

9   any objection to the questions, who is the right person to

10  answer the question, and how are you going to put that on.

11  Those are the things, I think, that need to be considered.

12         MR. ROBERTSON:  Your Honor, during the lunch break I

13  was able to get Judge Spencer's Markman ruling and Judge

14  Brinkema's actual final jury instructions, and I have those for

15  you if you'd like.

16         THE COURT:  I'm so grateful.

17         Now, gentlemen --

18         MR. ROBERTSON:  I wanted to make one note, Your

19  Honor.  I misspoke when I said Judge Brinkema construed the

20  catalog term.  She did not find it necessary to construe the

21  catalog term.

22         THE COURT:  I probably should have done the same

23  thing.  You all be mindful that the claim construction opinion

24  contains the following language:  There's a recitation about

25  what you all were disagreeing about and what your positions

1    were, and then it concludes with the following:  The parties'

2    disagreement over whether a catalog must be published by a

3    vendor was resolved when they agreed at oral argument that the

4    term vendor includes suppliers, distributors, and

5    manufacturers.

6         And then it goes on to talk about what generally is

7    included in a catalog which is not the thing you all are

8    concerned with because it's part of construction.  So it seems

9    to me as if there's been an agreement about what would happen

10   there.  And nobody, to my knowledge, took any exception or

11   complained about the finding in the order -- I mean in the

12   memorandum opinion on claim construction.

13        MR. McDONALD:  That was my recollection as well, Your

14   Honor.  I wanted to double-check the record before I

15   represented to the Court.

16        THE COURT:  You need to check the record.  I haven't

17   checked the record of the hearing.  I'm going to also have

18   prepared and hand to you, and I'm not quite sure how I'm going

19   to handle it mechanically, but I think I would tell the jury

20   something like this, either the claim construction or an

21   instruction:  Published by a vendor is used in the definition

22   of the claim term catalog/product catalog.  Published simply

23   means to make generally known or to disclose.  By a vendor

24   simply means that at some point in time, a vendor such as a

25   supplier or manufacturer or distributor has made generally

1    known or disclosed an organized collection of items or

2    associated information, preferably but not necessarily

3    including a part number, price, catalog numbering, catalog

4    number, vendor name, vendor ID, a textual description of the

5    item, and images of or relating to the item.

6            I'll have that prepared so you all can reflect upon

7    it and study it, but you don't need to react to it.  But you do

8    need to check the transcript and see about what the claim

9    construction opinion says because I'm not quite sure why we're

10   having the discussion we're having now in view of that.

11           All right, we'll be in recess.  You all can have

12   20 minutes as well.

13

14           (Recess taken.)

15

16           THE COURT:  It occurs to me that one way to answer

17   both of these questions is for you to read -- just before

18   cross-examination occurs, for you to ask him if you want to ask

19   him.  Do you want to ask him, Mr. Robertson?

20           MR. ROBERTSON:  Well, this would be a question, I

21   would think, of Mr. Lohkamp who was the one who -- the context

22   this came up, and I'd like to ask in the context of Mr.

23   Lohkamp.

24           THE COURT:  Well, he's gone.

25           MR. McDONALD:  We just talked about it.  We'll be

1    recalling him, so maybe the thing would be to --

2              THE COURT:  To wait until he comes back.

3              MR. McDONALD:  Yeah.

4              THE COURT:  Okay, that's fine.

5              MR. ROBERTSON:  Your Honor, before jury comes in, I

6    want to make constructive suggestions here.  We've got two of

7    these videotapes.  One is fairly short, about 20 minutes.  The

8    other is fairly lengthy, over an hour.  Now, there's going to

9    be some redirect of Mr. Christopherson, but I understand from

10   counsel it's not going to be that extensive.  I would

11   suggest -- I mean we discussed some options --

12             THE COURT:  Do the 20 minutes, and you edit the other

13   one tonight.

14             MR. ROBERTSON:  That's what I was going to suggest,

15   or, Your Honor, we did do a deposition summary as required by

16   the Court's pretrial --

17             THE COURT:  I use those to make rulings.  I don't

18   require you to read those.  If you all want to read them, fine.

19   I've never found that's actually a good way to present

20   evidence.  It does help me in ruling on the objections to the

21   depositions in the final pretrial process, but I've never found

22   that it's a good way to present evidence.

23             MR. ROBERTSON:  We're going to go back, and we're

24   going to make serious cuts in that deposition, but I don't

25   want --

```
 1              THE COURT:  I'm going to let the jury go home as soon
 2    as they can anyway because weather-wise --
 3              MR. ROBERTSON:  After Mr. Christopherson, we'll play
 4    that 20-minute video and then we'll be done for the day.  We'll
 5    start in the morning with a much shortened video, and then
 6    we'll put Mr. Niemeyer and Mr. Farber on, and we'll be resting.
 7    Just one point of order, final point of order, Your Honor --
 8              THE COURT:  The faster you talk the further away you
 9    get.  You want to really challenge the court reporter.
10              MR. ROBERTSON:  Let me get up here and slow down.  I
11    do think procedurally we need to submit that offer of proof
12    before we rest our case based on the case law that we've looked
13    at.  I mean, I know the Court wants to look at it and review
14    it, and I'm fine with that.
15              THE COURT:  I said just file a motion for leave to
16    submit it and submit it, and then it will be submitted.
17              MR. ROBERTSON:  Okay.  Thank you, sir.
18              THE COURT:  I will defer ruling on it until later.
19    All you need is something to really record that you're doing
20    it.  I don't know whether you want to file a brief or not with
21    it, but you at least need a little motion to do it, and if you
22    want to file a motion later or you want to work on it, you can
23    talk about that and sort it out, but it will be filed, and then
24    it will be available for them to look at, because if he doesn't
25    oppose it, then, okay.
```

1    MR. ROBERTSON:  I mean, quite frankly, Your Honor, we

2    think under the rule and the case law we looked at in the

3    Fourth Circuit, it's pretty much an offer of proof is a matter

4    of right once something's been excluded, but I understand --

5    THE COURT:  I think you are right except that there

6    was an offer of proof made at the conference, and his

7    objection, I think is, that you can't make two offers of proof,

8    and I don't know -- I've not had that come up that way, and

9    I'll -- we'll deal with it in the ordinary course and get it

10   all sorted out.

11   The Court of Appeals generally wants to know what it

12   is that was kept out, and that's the only way they really know

13   what it was.  On the other hand, if you are changing the ball

14   game on them, then they have a right to be heard, and I have a

15   right to say, well, you can't do that because you've exceeded

16   the privilege granted you by the rules.

17   MR. ROBERTSON:  I understand, Your Honor.

18   THE COURT:  That's all we're going to do.  We'll just

19   do it in due course.

20   MR. ROBERTSON:  Thank you.

21   THE COURT:  Due course is going to be shortened,

22   however, and it won't be with any all-deliberate speed as some

23   phrases have been interpreted or issued by higher courts than

24   this one.  Okay, let's let them come in.

25

```
 1                        (Jury in.)

 2

 3           THE COURT:  All right, as to the questions that we

 4   have, it probably is preferable that Mr. Lohkamp answer those

 5   questions.  Mr. Lohkamp is coming back in another part of the

 6   case, and so when he comes back, these questions will be sorted

 7   out.  All right, let's go.  We have redirect -- I mean

 8   cross-examination.

 9           MS. STOLL-DeBELL:  Your Honor, we don't have any

10   questions for Mr. Christopherson at this time.  We do intend to

11   call him back in our case.

12           THE COURT:  That's the quickest cross-examination

13   that's ever happened.  No redirect in that situation.  You are

14   living under the right stars this afternoon, but I would like

15   to get you out of here at a reasonable hour because of the

16   weather.

17           I don't think we're due any more bad weather, but

18   with the forecast of three to five inches that went to two and

19   looks like we got none, who knows what's going to happen around

20   here, so I rather you get on home.  So we have about a

21   20-minute deposition, and then we'll hear some more evidence in

22   the morning.

23           All right, let's go with the 20-minute deposition.

24   Who is this?

25           MR. STRAPP:  Your Honor, this is Mr. Manuel Matias.
```

1    He's an employee of Robert Wood Johnson University, another

2    customer of Lawson, and this deposition, as Your Honor

3    mentioned, is approximately 20 minutes.

4

5              (Videotaped deposition of Manuel D. Matias played for

6    the jury.)

7

8              THE COURT:  All right, ladies and gentlemen, I think

9    this is a good time for us to break and for you to go home.

10   Drive carefully and remember my admonitions not to discuss the

11   matter with anyone.  If you'll give Mr. Neal your pads and

12   notes, he'll take care of it for you.

13             We do plan, because we're uncertain about the

14   weather, to have lunch for you tomorrow.  Somebody wanted to

15   know if we didn't have it, were you going to bring your lunch,

16   but that won't mean you'll be in complete confinement.  You'll

17   be able to get out some.  Thank you.

18             Can we start at nine tomorrow?  And also call -- if

19   there's any inclement weather, call that number, and there will

20   be a message on there for you about whether it's a delayed

21   starting time or not at all, depending upon what happens.

22   You've got that number?

23

24                        (Jury out.)

25

```
1              THE COURT:  Take that transcript, please, back to the

2      answer that he gave to the question, so if using just the

3      Lawson system and not GHX, is there any way to tell if a

4      particular item is in a vendor's inventory and listen to it.  I

5      don't think the transcript has it right.

6              What I want is beginning with line 19 and going

7      through line 25.  I don't think the transcript caught all of

8      what was there.

9              MR. GREER:  I can't jump right to that line, Your

10     Honor, but I can get it very close.

11             THE COURT:  That's fine.

12

13             (Portion of videotape replayed.)

14

15             THE COURT:  The jury heard what the witness said, but

16     the transcript is wrong.  It omits a phrase, so I would suggest

17     you figure out a way to straighten it out.  That's Exhibit 520?

18             MR. STRAPP:  Yes, Your Honor.

19             THE COURT:  Anything else we need to do today?

20             MR. ROBERTSON:  Just one point I'd like to make, Your

21     Honor.  We have your proposed definition for this "published by

22     a vendor," and would I just point out that there is a

23     typographical error in it.  At one point, it says where an

24     organized collection of times or associated --

25             THE COURT:  Actually I thought that was a good way to
```

1    rewrite the claim.

2           MR. ROBERTSON:  And I would just point out, Your

3    Honor, we would be resting tomorrow, and there will be several

4    Lawson witnesses.  This issue may come up in the context of the

5    witnesses, as it did today with Mr. Lohkamp, so, you know, we'd

6    like to achieve resolution.  We're going to go back and look at

7    the transcript of Markman and review --

8           THE COURT:  Assuming -- do you have any comment on

9    that text you just read other than the typographical?

10          MR. ROBERTSON:  Do I have a comment on it?

11          THE COURT:  Yes.  At this time.

12          MR. ROBERTSON:  I would say I think it would be

13   acceptable, but I'd like to talk to my colleagues and make sure

14   that's right, but right now I'm thinking I don't have a problem

15   with it, Your Honor.

16          The only other thing I'd like to point out is we are

17   having issues with some of the witnesses.  Counsel and I and

18   our team members have been working hard to try to resolve those

19   and accommodate those things.  Mr. Johnson, for example, had a

20   death in the family that's going to pose some problems.

21          THE COURT:  Who is Mr. Johnson?

22          MR. ROBERTSON:  He was one of the inventors, sir.

23          THE COURT:  Oh, yeah.

24          MR. ROBERTSON:  And then Dr. Weaver -- initially Mr.

25   McDonald had indicated he didn't want to call Dr. Weaver back.

```
 1    I know we all change our minds, and I've learned we all make
 2    mistakes and we're trying to work with Dr. Weaver.  His
 3    schedule is a little tight as well.
 4              MR. McDONALD:  Just to be clear, Scott, I don't think
 5    we're going to call Dr. Weaver back.  I guess somebody has left
 6    the door open a little bit.
 7              MR. ROBERTSON:  We're working together on that, Your
 8    Honor.  I wanted to bring to your attention we are having a few
 9    witness issues, but I don't think --
10              THE COURT:  I'm sure Dr. Weaver will make himself
11    available at a reasonable time.
12              MS. STOLL-DeBELL:  Your Honor, I was wondering if
13    we're going to have court next Monday on Martin Luther King
14    Day.  It will help us try and figure out who is coming when.
15              THE COURT:  At the rate we're going, I was inclined
16    to do that.  It seemed to be proceeding slowly, but I haven't
17    really thought that far ahead.  What do you all have to say
18    about it?  I don't know where we're going to be.  Let's assume
19    Mr. Robertson finishes tomorrow at about the lunch break.
20    Where will you be on -- what is it, the 17th?  What's going on
21    there?
22              MR. McDONALD:  Well, we hope to get through some fact
23    witnesses and get our expert, Dr. Shamos, on the stand on
24    Friday and hopefully get him off the stand on Friday.  He may
25    bleed over until Monday, and then we'll have just a couple more
```

1   fact witnesses after that.  I should use couple in the sense of

2   two, but it shouldn't be too many more.  I think we'd be close

3   to being done about Tuesday if we went to trial on Monday.

4          THE COURT:  If you use Monday.

5          MR. McDONALD:  Exactly.

6          THE COURT:  One thing I think I am going to do is --

7   I don't know whether the jurors have had any plans made.  Some

8   of them could have had -- nobody said anything about it in the

9   voir dire examination, but I think I'll solicit them.

10          Sometimes it's helpful to the jurors to have a break

11  from stuff like -- from the repetition of what's going on and

12  from the heavy duty here, and that's one way to achieve it.

13          I had given some thought about starting at 9:00 and

14  taking no breaks and stopping at 2:00 as another way to give

15  the jury some respite and some time to do things that they need

16  to do, but the fact of the matter is, I think it's almost

17  impossible to go that long without some kind of break.  We're

18  going to have to break for the court reporters anyway, to

19  switch, so I think we'll kind of stay with the schedule we've

20  been having.

21          If you'll remind me tomorrow, we'll kind of talk to

22  the jurors about it and see what they'd like to do, too.  Is

23  there anything else we need to deal with?  What did you say

24  about this information that I handed out about published, Mr.

25  McDonald?  Did I hear you and forget it?  If I did, I really

1  truly apologize, and maybe you'll get another judge to handle

2  the rest of the case.

3          MR. McDONALD:  I'm not sure I picked up all that --

4          THE COURT:  I'm asking if you said something and I

5  forgot what it was, because I actually don't remember you

6  saying anything.

7          MR. McDONALD:  You didn't miss a thing.  We haven't

8  formulated our position, Your Honor.  I have a couple concerns,

9  though, I can flag and maybe give --

10         THE COURT:  That would be helpful to talk about it.

11         MR. McDONALD:  Well, this language about "by a

12 vendor" means at some point in time.  I think the "by a vendor"

13 for one thing was pretty much agreed to at the Markman hearing,

14 what it did mean, and do inject the concept in time, of time

15 into a phrase like "by a vendor" could create some confusion, I

16 think, do more harm than good, actually.  We would probably

17 object to that, but I haven't finalized my position.

18         THE COURT:  But I think it's quite clear from the

19 specification that it's an antecedent event to the use of the

20 invention no matter how you cut it.

21         MR. McDONALD:  I just think --

22         THE COURT:  I understand what you are saying.  Think

23 about it and see what you --

24         MR. McDONALD:  The other concern I have is anything

25 we do with that, because our experts who have given opinions

1  relating to claim construction, I'm concerned that if we now

2  move the ball on what the claims mean, what is the implication

3  of that for the testimony that's already been given, the

4  testimony that's yet to come that the Court repeatedly says has

5  to be limited to what's in the expert reports, there were prior

6  decisions by the Court relating to prior art exclusions and

7  things like that.  I think there's many implications of making

8  any changes here, so I'm concerned about that.

9          THE COURT:  I think -- I'm not sure there are a

10 lot -- that is not a claim construction answer.  That's an

11 instruction, and the fact of the matter is that it is not at

12 all unusual for Courts to give revised claim constructions

13 during the trial.

14          In fact, for a good while, it was common to give the

15 claim construction only as part of the instructions.  Now, I've

16 never done that just because I didn't want to put myself

17 through that agony, but that's what happens sometimes, and in

18 that event, experts have to take their positions -- take out

19 their position and see what happens.  So we'll see.

20          MR. McDONALD:  In this case, the experts were allowed

21 to give their reports after the Court's Markman ruling, so I

22 think that really changes the dynamic.

23          THE COURT:  Okay.  Anything else?  Thank you.  We'll

24 see you all tomorrow at nine o'clock.

25                    (Court adjourned.)