```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE EASTERN DISTRICT OF VIRGINIA

 3                      RICHMOND DIVISION

 4

 5    --------------------------------------
                                           :
 6    ePLUS, INC.                          :    Civil Action No.
                                           :    3:09CV620
 7    vs.                                  :
                                           :
 8    LAWSON SOFTWARE, INC.                :    January 12, 2011
                                           :
 9    --------------------------------------

10

11            COMPLETE TRANSCRIPT OF THE JURY TRIAL

12            BEFORE THE HONORABLE ROBERT E. PAYNE

13          UNITED STATES DISTRICT JUDGE, AND A JURY

14

      APPEARANCES:
15
      Scott L. Robertson, Esquire
16    Michael G. Strapp, Esquire
      Jennifer A. Albert, Esquire
17    David M. Young, Esquire
      Goodwin Procter, LLP
18    901 New York Avenue NW
      Suite 900
19    Washington, D.C.  20001

20    Craig T. Merritt, Esquire
      Christian & Barton, LLP
21    909 East Main Street
      Suite 1200
22    Richmond, Virginia  23219-3095
      Counsel for the plaintiff
23

24                  Peppy Peterson, RPR
                  Official Court Reporter
25              United States District Court
```

```
 1    APPEARANCES:  (cont'g)

 2    Dabney J. Carr, IV, Esquire
      Troutman Sanders, LLP
 3    Troutman Sanders Building
      1001 Haxall Point
 4    Richmond, Virginia  23219

 5    Daniel W. McDonald, Esquire
      Kirstin L. Stoll-DeBell, Esquire
 6    William D. Schultz, Esquire
      Merchant & Gould, PC
 7    80 South Eighth Street
      Suite 3200
 8    Minneapolis, Minnesota  55402

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<u>P R O C E E D I N G S</u>

1
2
3       THE CLERK:  Civil action number 3:09CV00620, ePlus,
4  Incorporated, versus Lawson Software, Incorporated.  Mr. Scott
5  L. Robertson, Mr. Craig T. Merritt, Ms. Jennifer A. Albert, Mr.
6  Michael G. Strapp represent the plaintiff.
7       Mr. Daniel W. McDonald, Mr. Dabney J. Carr, IV, Ms.
8  Kirstin L. Stoll-DeBell, and Mr. William D. Schultz represent
9  the defendant.  Are counsel ready to proceed?
10      MR. ROBERTSON:  Plaintiff is, Your Honor.
11      MR. McDONALD:  Yes, Your Honor.
12      THE COURT:  All right.  You said you wanted to see me
13  before the jury comes in.
14      MR. McDONALD:  Yeah, there's basically three issues
15  we wanted to raise.
16      THE COURT:  The court reporters always can hear
17  better if you come to the lectern.
18      MR. McDONALD:  There's basically three issues that we
19  wanted to raise this morning.  One is our third witness in our
20  case that we start today is Ms. Raleigh.
21      THE COURT:  Third witness in what?
22      MR. McDONALD:  In our case when we start presenting
23  our case today.  We have Mr. Richard Lawson first, Mr.
24  Christopherson second, and then Hannah Raleigh was supposed to
25  come back and be third today.

1    She was supposed to be back last night from New York,

2    and New York is getting hammered real bad by this blizzard.

3    She's trying to get another flight, but her flight is not going

4    to get her here until after the trial day is over today.  So

5    we've been trying to work something out with ePlus about what

6    we would do next because we haven't disclosed any exhibits or

7    anything for the next witness.

8            THE COURT:  Just call the next witness, the expert or

9    whoever you've got here.  There's no magic to the order of

10   putting people on.

11           MR. McDONALD:  The next witness we would have

12   actually here is Mr. Lohkamp, calling him back.

13           THE COURT:  Good.

14           MR. McDONALD:  That's fine.  They haven't had a

15   chance to get ready for their cross-examination.

16           THE COURT:  They'll be ready.  They knew basically

17   what you were going to do anyway.  They're not going to do it

18   on your cross-examination; they were going to do redirect, so

19   we're going to reverse things.

20           MR. McDONALD:  We do have a deposition of Ms.

21   O'Loughlin on the RIMS prior art issue that we can move up in

22   the order.

23           THE COURT:  Is that carefully edited to eliminate the

24   trash?

25           MR. McDONALD:  That's being worked on as we speak,

1    and we'll try to go over --

2              THE COURT:  We're going to have to do some serious

3    editing of depositions, because what I've seen is no more.

4              MR. McDONALD:  We have two of them in our case.

5              THE COURT:  Good.

6              MR. McDONALD:  They are both pretty short.  So I just

7    wanted to give that heads-up that we're going to try to get

8    everything we can --

9              THE COURT:  From now on, get your witnesses here.

10   You have two choices basically:  Either have them here and

11   staying here so they're here, or they have to be prescient

12   enough to look at the news just like the rest of us do, and

13   anybody who watched the television news on the weather could

14   have seen what was happening, going to happen in New York, and

15   you get a train out or get a car or get out.

16             We had a law clerk who was smart enough to do it in

17   Chicago and beat the storm simply because they were watching

18   what's going on.  We're not running this on Lawson's business

19   schedule.  We're running this for the jurors, and, if

20   necessary, Lawson -- if it's important to the order of things,

21   then they have to charter a plane and get them here or do

22   whatever it is that's to be done.

23             Remember, we're not going to do this just on a

24   schedule that is the convenience of the witnesses.  That's just

25   not the way it's done in this district.

1      MR. McDONALD:  Understood.  I was disappointed --

2      THE COURT:  I know you know, I know -- Lawson's

3   executives need to understand that this trial is running on the

4   schedule that is convenient for the jurors and is best for the

5   jurors, because they are the ones -- as important as all of you

6   are, they are the critically important people because they are

7   the ones who have to decide your futures.

8      That's why I want them kept -- I don't send them

9   breakfast, coffee, and donuts because I love them and because

10  there's a lot of money.  I like them and respect what they are

11  doing, but we do these things here to keep the jurors'

12  attention and interest in the case and do the best we can.  The

13  parties have to do their part.

14     MR. McDONALD:  Understood, and I am sorry, Your

15  Honor.

16     THE COURT:  Well, you didn't have anything to do with

17  it.  You're not a travel agent, are you, or are you?

18     MR. McDONALD:  No, I did not book those tickets, no.

19  The second issue, and I talked to Mr. Robertson about this this

20  morning, is for Monday, Martin Luther King Day, we were talking

21  about it, and for one thing, the main issue from our

22  perspective, honestly, is that our teams are running on fumes

23  right now.  So to have the extra day would really help

24  people --

25     THE COURT:  Who is running on fumes?

1    MR. McDONALD:  Our teams, our teams of attorneys and

2    paralegals and things.  So to have that extra day there to

3    catch up on some things, honestly, I think will help us

4    streamline the case from there.

5    But aside from that, we basically are both concerned

6    that we do have an African-American on the jury and not take --

7    THE COURT:  Well, I told you, I'm going to poll the

8    jury.  I'm going to ask them what they think.  They'll be fine.

9    MR. McDONALD:  We at least jointly wanted to request

10   --

11   THE COURT:  So the record is clear, there are plenty

12   of Americans who respect Martin Luther King who are white as

13   there are who are African-American or black, so it isn't that I

14   don't respect Martin Luther king that I have a trial.  In fact,

15   part of it is the thinking that I respect these jurors, and one

16   of them is black, in order to think about what they've got to

17   do.  They make $40 a day or 42 or something now to be here, and

18   that's hard on them.  You all are making that a minute.

19   MR. McDONALD:  We did have a joint request, and I

20   just wanted to make it clear, a joint request that we not have

21   trial on Monday.  Obviously, we respect the Court's decision

22   either way on that.

23   THE COURT:  Is somebody sick?  I mean, is that what

24   you are saying or --

25   MR. McDONALD:  At this point, I think the coughing,

```
 1    as you indicated, has --

 2              THE COURT:  What?

 3              MR. McDONALD:  The coughing has subsided.

 4              THE COURT:  That doesn't mean that the illness is

 5    gone.  It means the symptoms are gone.

 6              MR. McDONALD:  I think there are certainly some that

 7    have fewer symptoms but still have some symptoms at this point.

 8              THE COURT:  I'm sympathetic with you.  The other

 9    alternative I thought about was going on Saturday instead of

10    Monday, and the reason -- again, I'm not doing this -- this

11    isn't -- what is it?

12              MR. McDONALD:  What is what?

13              THE COURT:  This isn't Junction, Texas.  That's not

14    why this is going -- do you know what I'm talking about?

15              MR. McDONALD:  No.

16              THE COURT:  The Junction boys were the people Bear

17    Bryant took from Texas A&M -- there were 60 of them -- out to

18    Junction, Texas to practice when he first went there.  When he

19    came back, there were 28 of them, and he deliberately tried to

20    run off the weak sisters by -- and the noncompetitive people,

21    and he almost killed a team and a couple of kids in the

22    process, and I am -- this isn't being done to put you all

23    through an endurance test.

24              I'm trying to do this, again, to take care of the

25    jury.  So I understand where you are, and I've actually been
```

1    there, and I know what it's like.  I actually have spent a lot

2    of time doing what you did, and it hurts sometimes.

3             MR. McDONALD:  Thank you.  So those are those two

4    issues.  The third issue I wanted to raise again -- brought

5    this up with ePlus this morning -- is when they call Mr.

6    Farber, Mr. Farber's testimony is going to relate to some of

7    these articles that were discussed at the pretrial conference

8    --

9             THE COURT:  Some what?

10            MR. McDONALD:  Articles about the settlements that

11   ePlus had with SAP and Ariba that they want to try to get into

12   evidence about their $37 million settlements with Ariba, et

13   cetera.

14            THE COURT:  Didn't I already rule on those?

15            MR. McDONALD:  Well, you ruled on some of them they

16   needed to lay foundation on them before they would come in, and

17   we think we're at that point now where we can probably show you

18   why there's no foundation for some of those.  We're wondering

19   if it was more efficient and appropriate to do that before the

20   jury came in.  I think there's a way maybe we can deal with

21   this more efficiently by going through the exhibits that

22   they're going to use and talk about whether there is a

23   foundation for them.

24            THE COURT:  I wish you told me you wanted to do this

25   yesterday, because I would have scheduled to be here at 8:30 or

1    eight o'clock, and then the jury wouldn't be sitting back there

2    waiting.  Is Farber after a break?  I don't know the amount of

3    time between now and when Farber comes on.  How long is that

4    going to be; do you know, Mr. Robertson?

5              MR. ROBERTSON:  Yes, Your Honor.  I think -- well, I

6    think it would be through -- we're going to call Mr. Niemeyer

7    first, our source code expert.  That's a little less than an

8    hour direct and then cross-examination, so it might be at a

9    break, Your Honor, and then we could discuss it during a break.

10             THE COURT:  I think the thing to do is try to deal

11   with it at the break, and then we will -- well, if they're

12   here.  Let's see if the jurors are here.  Are they all here,

13   Mr. Neal?

14             THE CLERK:  Let me go check.

15             THE COURT:  Both of you would prefer not to go on

16   Monday.  Is that what you are saying?

17             MR. ROBERTSON:  I'm sorry, sir.

18             THE COURT:  Both of you would prefer not to go on

19   Monday, and the reason is you're tired?

20             MR. ROBERTSON:  Your Honor, we're tired, no question

21   about it.

22             THE COURT:  I don't mean that.  That was too

23   flippant.  I don't mean that.  It's because you are getting

24   drained, and everybody -- there have been sicknesses on both

25   sides, and you've tried to work through all that, and I'm not

1    trying to demean anybody's reasoning.

2                THE CLERK:  We're waiting on one juror, Your Honor.

3                THE COURT:  Okay, let's do what we can do without --

4    while we're waiting.

5                MR. ROBERTSON:  If I can just address a couple issues

6    that Mr. McDonald raised and then a couple issues that we have.

7                THE COURT:  Excuse me, just a minute.  I've asked Mr.

8    Langford to have the jury talk to them about Monday and see

9    what they think.  I don't know what is going on in their lives,

10   and we'll just see from there.  Yes, Mr. Robertson.

11               MR. ROBERTSON:  Your Honor, I'm sure we're all tired

12   and both sides could soldier through it --

13               THE COURT:  I have every confidence that you could if

14   necessary.

15               MR. ROBERTSON:  But my preference is to have the day

16   off as well, because we think we'd be able to help make the

17   case more efficient and streamline some of the issues.

18               THE COURT:  Mr. McDonald thinks he's going to be

19   finished on Tuesday if we go on Monday.  That's the last thing

20   I heard last night.

21               MR. McDONALD:  No, we didn't say that.  I think we

22   talked --

23               THE COURT:  Has my hearing gone completely bad?  I

24   thought you said that you would be through on Tuesday if we

25   went on Monday.  Did I not hear that?  Did you not say that?

1    MR. McDONALD:  I don't believe I said that.

2    THE COURT:  You didn't mean to say that.  So whatever
3    I heard -- these cough drops don't have any hallucinogenic
4    properties.  Tell me this before I ask you to get on with him:
5    How long -- assuming -- how many days do you have to get your
6    case -- to finish your part of the case based on what you now
7    know, and I'm not going -- you know, you get the same leeway
8    he's got if there's a problem, but I'm just trying to make some
9    plans.

10   MR. McDONALD:  I think it's four to five days.

11   THE COURT:  So today is what, Wednesday?

12   MR. McDONALD:  Wednesday.

13   THE COURT:  So that's Thursday, Friday, Monday,
14   Tuesday.  That would be Tuesday, and five would be Wednesday.

15   MR. McDONALD:  If we go on Monday.

16   THE COURT:  I can subtract the one and figure out
17   what happens if we don't go on Monday.

18   MR. ROBERTSON:  With respect to the first issue that
19   Mr. McDonald raised about the witness order, I understand that
20   Your Honor wants to fill the day.  We just did not have advance
21   notice that Mr. Lohkamp was going to be called.

22   I will be able to cross-examine him, but I'd just ask
23   for a professional courtesy that someone can start getting
24   together the list of exhibits that we've been exchanging.  Are
25   there any demonstratives with Mr. Lohkamp?

1      MS. STOLL-DeBELL:  No, and I believe we should have

2  sent the list out to you already of Mr. Lohkamp's exhibits this

3  morning.

4      MR. ROBERTSON:  We haven't seen it, so we'll send

5  somebody back and start pulling those together so we'll be

6  prepared to move forward with Mr. Lohkamp.

7      MR. SCHULTZ:  I can get you a list.

8      MR. ROBERTSON:  With respect to the issues on these

9  exhibits for Mr. Farber that Your Honor has indicated you want

10  to take up during the break, Mr. Strapp can address those

11  issues.

12      A couple of issues I want to raise, we had the

13  deposition videotape of one of the customers that Your Honor

14  ordered us to go back and review, Lynn Cimino, and it was an

15  hour and 25 minutes long, Your Honor, and we reduced it to four

16  minutes and 50 seconds.

17      THE COURT:  To what?

18      MR. ROBERTSON:  Four minutes and 50 seconds.

19      THE COURT:  That beats Judge Williams' record.  I'm

20  going to have to call him and tell him.

21      MR. ROBERTSON:  Then we got the so-called fairness

22  designations from the defendant, and they added ten minutes and

23  50 seconds.

24      THE COURT:  So you are at 15 to 20 minutes.

25      MR. ROBERTSON:  We're going to withdraw it now, Your

1   Honor, because we don't even think they were fairness

2   cross-designations, had nothing do with our four minutes and 50

3   seconds, so we're going to take that out of the case.

4           So we're going to start with Mr. Niemeyer this

5   morning and Mr. Farber.  We're going to rest subject to that

6   offer of proof.  There's some stipulations in the final

7   pretrial order.

8           THE COURT:  You're going to make a motion to put it

9   in the record; right, or do you want --

10          MR. ROBERTSON:  I am.  I don't know if I have

11  physically have it here.

12          THE COURT:  As far as I'm concerned, you make a

13  verbal motion and preserve it.  I know of no procedure that

14  says you can't make the motion to make the proffer and then I

15  consider their objections to it out later, and then -- because

16  it's not going to the jury anyway.

17          I have, in fact, had the situation where a proffer,

18  people have made a proffer and the other side wanted to deal

19  with it evidentially, and I've done that off the record in

20  sworn testimony -- I mean while the jury is deliberating or at

21  other times.

22          So if that's where we are, we'll have to deal with

23  it, but as far as I'm concerned, and I want your agreement, Mr.

24  McDonald, they've made the motion to put this in before they

25  rest, and you're going to file that this morning.

1    MR. MERRITT:  Your Honor instructed us yesterday to

2    disclose the offer of proof to opposing counsel.  We have not

3    had the opportunity to do that.  We hope to deliver that to

4    them this morning.  We want to keep faith with what you asked

5    us to do.

6        The motion papers are being finalized, and we had

7    anticipated giving a courtesy copy to Mr. McDonald and his team

8    this morning and then sometime by mid day actually filing a

9    written motion with the proposed offer of proof attached.

10   THE COURT:  Okay.  Just so it's done procedurally to

11   preserve your right to do it, because the Fourth Circuit --

12   actually, I guess -- I don't really know what the Federal

13   Circuit does, but the Fourth Circuit rule and the rule I have

14   to follow is that proffers, if made, need to be put in the

15   record properly, and you are entitled to make the proffer

16   because it's the way you test the validity of the Court's

17   ruling.

18   MR. ROBERTSON:  I think where the Court was going

19   there when it inquired of Mr. McDonald, there's not going to be

20   argument here that if we haven't physically filed the offer of

21   proof before I rest my case that somehow it's untimely.  Can we

22   have that understanding, Mr. McDonald?

23   MR. McDONALD:  This is sight-unseen for us.  I think

24   -- the procedure is going to speak for itself I think is what

25   you are saying.  If they proffer it, that's not anything I have

1   control over.  We might object because it wasn't in the

2   pretrial order, et cetera, but in terms of being timely, I

3   don't think that's the issue --

4          THE COURT:  Being timely in the sense -- your

5   objection is that it's not timely in part, if I heard you

6   correctly, and that is that they did it once, and they can't do

7   it again.

8          That's a function of timeliness, but you're talking

9   about -- you are not objecting on the basis that it would --

10   let me just deal with it.  Instead of getting into all this,

11   just file the paper and I'll take care it.

12          MR. ROBERTSON:  Your Honor, we do have some

13   stipulations that were in the time pretrial order.  There were

14   23.  I think a lot of those stipulations have come out through

15   the evidence.  There's probably a handful -- I've identified

16   what they are -- I think there are four or five that at the

17   appropriate time before we close, however Your Honor wants --

18          THE COURT:  Read them into the record, and they mark

19   them as an exhibit, and that's it.

20          MR. ROBERTSON:  Okay, Your Honor.  There's one other

21   concern, two other concerns I have I'd just like to bring to

22   the Court's attention.  This published by a vendor issue, I

23   think it's likely to come up with respect to Mr.

24   Christopherson's testimony and Mr. Lohkamp's testimony today.

25   We were given a demonstrative last night by the defendants, if

1    I could hand it up to the Court.

2         THE COURT:  Wait a minute.  Is the jury here, Mr.

3    Langford?

4         MR. ROBERTSON:  I have a demonstrative.  So this is a

5    demonstrative that the defendant has represented that they're

6    going to be using today with Mr. Christopherson, and I think it

7    goes directly to this issue about published by a vendor that

8    the Court has been grappling with.

9         And you can see there that when they're talking about

10   these item information changes, it's all about the customer

11   selects the desired items, the customer can add additional

12   information, the customer can delete item info, customer

13   modifies the item info.

14        We don't think this has anything do with the Court's

15   construction as to what a catalog is, and that is this whole

16   issue of misdirection and trying to take the Court's published

17   by a vendor construction and read into it all these other

18   elements that were never contemplated by the Court, that are

19   not part of the Court's order, and that, quite frankly, is

20   something that was manufactured by the defendant as a

21   non-infringement defense.

22        So they created this, and now they tell the Court

23   that they've relied on the construction in some way.  They

24   didn't rely on the construction.  They relied on their own

25   reconstruction of the Court's construction.

1       Your Honor came up with a suggestion yesterday for

2  published by a vendor as an instruction, not a construction of

3  a construction, and I just wanted to state for the record that

4  ePlus agrees to it.  We think that would be fair.  We think

5  that would remedy any of the problems.

6       We think we should stop having irrelevant issues

7  related to these kind of arguments, non-infringement arguments

8  that are of, as I say, the defendant's own manufacture, and for

9  them to turn around now and say, we relied on the fact that we

10  imbued all this additional construction into the Court's

11  construction, and then say, it's unfair that the Court's going

12  to give this new instruction, I think is just -- it's a

13  creation of their own strategy, and they can't now complain

14  that they built their defense on a house of cards that was on a

15  faulty foundation.

16       So, Your Honor, we think it's inappropriate to sit

17  here and suggest that that catalog information in any way can't

18  be somehow modified by the customer.  It's not part of the

19  Court's construction.

20       THE COURT:  Hold on.  I want the text in front of me.

21  Do you want me to hear from Mr. McDonald at this time, or do

22  you have anything else on this topic?

23       MR. ROBERTSON:  The only other thing, I understand

24  that Mr. McDonald is going to make an oral motion for judgment

25  as a matter of law today.  I'll respond to it as best I can.  I

1  have no idea what he's going to say.  I'm informed they're not

2  filing an actual written motion today.  I'm going to respond to

3  that, Your Honor, as best I can, but, obviously, I'm going to

4  be hearing it for the first time when the Court hears it.  I

5  think I'll need -- I'm prepared to address most of the issues,

6  but I don't have all the evidence.

7           THE COURT:  Why don't we face the question of whether

8  you can or can't do it adequately later?

9           MR. ROBERTSON:  I would like and I would hope we

10  could work out a reasonable briefing schedule with respect to

11  it so all the issues can be addressed in an orderly fashion.

12           THE COURT:  We'll deal with it.

13           MR. ROBERTSON:  Thank you, Your Honor.

14           THE COURT:  Did anybody check the transcript about

15  whether -- what is in -- about your agreeing to this, the

16  language that's reflected in the --

17           MR. ROBERTSON:  Yes, Your Honor, I have the

18  transcript here at the appropriate place.

19           THE COURT:  What does it say?

20           MR. McDONALD:  There was an agreement.

21           THE COURT:  Excuse me one minute for the record, so

22  we'll get it straight.  The claim construction opinions says

23  the parties' disagreement over whether a catalog must be

24  published by a vendor was resolved when they agreed at oral

25  argument that the term vendor includes suppliers, distributors,

1    and manufacturers.

2         MR. McDONALD:  That's exactly what happened under the

3    transcript, Your Honor.

4         THE COURT:  Do you have the transcript to show me?

5         MR. McDONALD:  Mr. Schultz will pull that out, and

6    there's several pages of discussion on it, but it's pretty

7    clear that that is what happened, that the objection that Mr.

8    Robertson had was that the term vendor could be construed

9    unduly narrowly.

10        I came back and said, that's not my intent.  It's to

11   cover the seller so it would include suppliers and distributors

12   and those people described in column four of the patent as the

13   people that publish catalogs.  They said -- you asked them if

14   that was acceptable if we made it clear that vendors would

15   include that group of three different types of companies, and

16   they said yes.

17        THE COURT:  Yes, and then what he is saying now is

18   that you are doing precisely what you said you were not going

19   to do, and I'll have to read the transcript.  Somebody will, I

20   think, have a copy of it for me and mark the pages so I can

21   read it during a recess --

22        MR. McDONALD:  Yes, Your Honor.

23        THE COURT:  -- and deal with that, but I've thought

24   about it this and reviewed everything but the transcript last

25   night, and my inclination is there will be an instruction given

1   to the jury of the kind that I have given to you except that it
2   would say at some previous time for it to make sense with the
3   text -- with the issues in the case.  In other words, to give
4   it the right context instead of saying at some time.
5              MR. McDONALD:  Your Honor --
6              THE COURT:  That's my inclination.  I want you -- I'm
7   not ruling.  I'm trying to put you in picture of my thinking so
8   that your argument can address that, but if I don't need to do
9   it now, I'd rather just do it during a break later, because
10  it's going --
11             MR. McDONALD:  It could relate -- it will relate to
12  testimony that's going to be coming up probably sooner rather
13  than later.
14             THE COURT:  Who's the testimony coming in?
15             MR. McDONALD:  Mr. Christopherson.
16             THE COURT:  But he's not -- we're going to have a
17  break before --
18             MR. McDONALD:  Oh, yeah, we'll have a break.  You're
19  saying you want to have a break before we discuss this further?
20             THE COURT:  Yes.  I'm not going to cut you off.  The
21  jury is here now.
22             MR. McDONALD:  I want to make a couple of quick
23  points.  The issue where -- you know, was there going to be
24  some trick had to do with a narrow reading of the term vendor,
25  and I said we're not trying to play a trick there, we're

1   willing to use that in its broad sense that would include

2   suppliers, distributors, and manufacturers.  That was the

3   gotcha issue there, and that was totally resolved where we

4   conceded that.

5           My discussion at the Markman was very clear that the

6   word "publish" wasn't some sort of a gotcha word.  This was

7   important, because without that in the definition, if it's just

8   an organized collection of item information, including things

9   like a catalog number, that could include many things that the

10  patent itself described in terms other than a catalog like an

11  order list or a requisition or a purchase order.  All of those

12  things could be called organized collections of items that

13  could include things like catalog.

14          THE COURT:  So you understand, Mr. Robertson

15  understands about what my preliminary thinking is, is that I

16  suppose that with my edit, this instruction would be given to

17  the jury, and it would be at some previous, a vendor such as

18  such-and-such has made generally known or has disclosed, et

19  cetera.

20          Then the question becomes this as I see, and I'm

21  telling you this not to rule at this point but to tell you how

22  I'd like to at least have you all address the issues, because

23  it's how I framed it in my thinking and that is this:  The

24  question then becomes with this instruction, is testimony of

25  the ilk shown in this slide such as you are offering, is it

1   even relevant to the question.

2           In other words, are you free to still argue as a

3   matter of fact that published by a vendor, circumscribed by the

4   definition which is the general definition of the term, or of

5   the word published, is that a fact issue that you can put on

6   testimony about, or is it not a fact issue, and if it's not an

7   issue, then you can't put on testimony about it because it's

8   not relevant.  That's what I think the issue is here, I

9   believe.  Do you agree with that, Mr. McDonald?

10          MR. McDONALD:  I think it's a two-step process.  If

11  we get to the point where you decided over my objection,

12  because I do object to this proposed definition, if that's in,

13  that's the next question.

14          THE COURT:  Yes, yes.  I understand you have the

15  objection.  You said you objected to it yesterday, but I also

16  said you wanted to think about it.  You said this morning you

17  object to it, and I understand that.  My question related to

18  assuming -- I thought I made clear.  If I didn't, I'm sorry.

19          If I give this, if this is the instruction to the

20  jury -- let's assume that -- and then the real issue, is it a

21  factual issue to be decided, and you agree -- you say it is a

22  factual issue to be decided because it's -- you have the

23  freedom to say, well, that isn't what we do, and they say it's

24  not a factual issue, or their other side is, well -- the other

25  argument is, I guess, well, it doesn't make any difference,

1    they're just playing smoke and mirrors, because, in fact, they

2    take the -- the information comes from a catalog, and it gets

3    imported into the system.

4              MR. McDONALD:  The fact question is the item master

5    database is what is accused of being multiple catalogs under

6    the Court's definition.  I should be able to show as a factual

7    matter that the item master is not multiple catalogs published

8    by one or more vendors as a fact issue.

9              THE COURT:  Let the jury decide --

10             MR. McDONALD:  Even under this definition of the

11   Court, we should be allowed to argue that.

12             THE COURT:  And let the jury decide.

13             MR. McDONALD:  Exactly.

14             THE COURT:  Okay.

15             MR. McDONALD:  Could I mention one other thing, Your

16   Honor?  This came up in the context of testimony about things

17   like who decides what goes into the item master, and we were

18   precluded from asking questions on that pending the Court's

19   decision.

20             Then the video came in of, I think, Ms. Oliver,

21   Kristy Oliver, where ePlus's counsel at page 29 asked the

22   question, now, who makes the decisions about what nonstock

23   items to include in the item master.

24             THE COURT:  Excuse me.  What page is that?

25             MR. McDONALD:  Page 29, line 12.

1    MR. ROBERTSON:  I'm sorry, whose deposition?

2    MR. McDONALD:  Kristy Oliver.

3    THE COURT:  They didn't offer page 29, line 12.  My

4    copy that is on page ten of the summary -- I mean of the

5    transcript of the video, and it starts -- I'm sorry.  I'm

6    looking at the wrong entry.  29 I was looking at was the --

7    MR. McDONALD:  It's entry number 18.

8    THE COURT:  -- was the entry number.  Okay, let me

9    look.  Entry what?  18?

10   MR. McDONALD:  Yes, page 29, line 12.  So the

11   question there was, now, who makes the decisions about what

12   nonstock items to include in the item master.

13   The answer is, I do, in addition to our contract and

14   licensing purchasing manager based on the frequency of

15   ordering.  If we see an item is being ordered frequently, we

16   try to get that item added into our item master list.

17   So that door has been opened clearly.

18   THE COURT:  Did you do what I asked to you do and go

19   back and look and see what Dr. Weaver said about this?  I had

20   some recollection Dr. Weaver was also asked about it, too.

21   MR. ROBERTSON:  I asked Dr. Weaver, Your Honor --

22   THE COURT:  Just a minute.  He's got the floor.  He

23   didn't go back and do that.

24   MR. McDONALD:  I don't think I have that information

25   at my fingertips.

1           THE COURT:  Okay, thank you.  Do we need resolve this

2    now, or can we go on and call the jury?

3           MR. ROBERTSON:  I think we can resolve it.

4           THE COURT:  Wait a minute.

5           MR. McDONALD:  As long as it's resolved before Mr.

6    Christopherson.  I think that's the next time it's really going

7    to come to a head.

8           THE COURT:  Thank you.  Yes, Mr. Robertson.

9           MR. ROBERTSON:  On this last issue --

10          THE COURT:  The question isn't, can we resolve it.

11   The question is, do we need to resolve it now, or can we wait.

12          MR. ROBERTSON:  I think we need to resolve it before

13   Mr. Christopherson.  I would like to point out that it was

14   Lawson who counter-designated that Kristy Oliver excerpt that

15   Mr. McDonald just read.

16          THE COURT:  This was an Oliver designation.

17          MR. ROBERTSON:  Yes.

18          THE COURT:  I mean a Lawson designation.

19          MR. ROBERTSON:  Yes, sir.

20          THE COURT:  So I'm straight, item number 18 is

21   Lawson.

22          MR. ROBERTSON:  That's my understanding.

23          THE COURT:  All right, just a minute.  The people who

24   did these designations, I want you to go back -- who is that,

25   Mr. Schultz and Mr. --

1          MR. ROBERTSON:  Mr. Strapp.

2          THE COURT:  Mr. Strapp, I want you to go back, and I

3   want you to confirm that's what it is so I don't have any fight

4   over that issue.  Either it was cross-designated by Lawson or

5   it was not.  If you did it, then I want to know, okay?

6          MR. ROBERTSON:  That's my understanding.

7          THE COURT:  I understand that, but in the heat of

8   battle, we have a lot of understandings, and where we have a

9   chance, sometimes we like to disengage from the fray and

10  double-check things, so that's what we're going to do.

11         MR. ROBERTSON:  Just briefly on this issue about

12  published by a vendor, Your Honor, I have gone back and looked

13  at the Markman hearing, and I did alert the Court at the time

14  that mischief was ripe with this argument about published by a

15  vendor.

16         At the same time, we were having a dispute as to what

17  was a vendor, and the Court resolved it by saying, a vendor is

18  going to a manufacturer, a supplier, or distributor; you agree

19  to that, Mr. Robertson.  And I said, yes.  But the dispute

20  centered around whether or not there was published by a vendor,

21  and the Court actually said, if this was going to be some sort

22  of gotcha, then I can later find that what is a sneaky way to

23  get a summary judgment -- I may re-construe the claim in the

24  summary judgment process.

25         Well, it didn't go through the summary judgment

1    process, but it's resurfaced, and I raised it again at the

2    final pretrial conference when they wanted to introduce a

3    definition of published, and then I raised it again on the

4    first day of the trial, you may recall.

5         THE COURT:  What does the transcript say about that?

6         MR. ROBERTSON:  The transcript on the --

7         THE COURT:  Of the final pretrial conference.

8         MR. ROBERTSON:  It was -- the Court -- let me just --

9         THE COURT:  See what I'm saying is that this can all

10   be done later.  Go check it out, and give me that information.

11        MR. ROBERTSON:  I will pull this all together.

12        THE COURT:  I would like to have you copy the pages

13   of the transcript, designate them, copy them, and show me what

14   they are.  Give them a copy, and then I'll have a full base in

15   front of me.  We're all moving at a significant pace here, and

16   I'd like to do it right.

17        MR. ROBERTSON:  I understand, Your Honor.  I would

18   just say, as the Court has represented, it might modify that

19   published by a vendor to say previously.

20        THE COURT:  At some previous time.

21        MR. ROBERTSON:  At some previous point in time, ePlus

22   would not have any objection to that, and our position would

23   be, Your Honor, that is then a pure matter of law.  It's not

24   something that can be argued.  There's nothing in the Court's

25   definition of what published by a vendor would mean that could

1  suggest that if a customer in some way reformats the data,

2  takes something like Mr. Matias testified yesterday that is

3  described as a suture and abbreviates it as s-u-t, somehow then

4  takes it out of the Court's description of what a catalog is or

5  what is published by a vendor.  Those kind of fact issues

6  really have no relevance to this case under the Court's

7  constructions.

8          THE COURT:  You're going to make me copies of those

9  transcripts so I can have them.  Make sure you get everything

10  in one copy.  Somebody from your side and somebody from

11  Lawson's side agree on what the total part of the transcript is

12  that I need to consider in assessing this issue so I have it

13  all in one place, and then you can separately give me a

14  transcript from the claim construction hearing and a separate

15  one from the final pretrial conference; okay?

16          MS. STOLL-DeBELL:  We're going to do joint for both

17  of those areas.

18          THE COURT:  Separate in the sense that there'll be

19  one for each hearing but jointly agreed upon as to number of

20  pages and lines and so forth that I need to look at.  Then

21  you'll have both have the same playing field.  Okay, let's get

22  the jury.

23

24                  (Jury in.)

25

```
 1              THE COURT:  Good morning, ladies and gentlemen.  We
 2    didn't get the snow.  It all went to New York, and they were
 3    praying it comes back here.  Before we start this morning, I
 4    have had asked Mr. Langford to have you all talk about
 5    something back there.  We're trying to plan for the future, and
 6    we're always mindful, the lawyers and I are mindful of the
 7    imposition service on a jury is to you and your employers and
 8    your families and your whole life, and so one of the things
 9    that I was thinking about was whether we ought to have a
10    session on what otherwise would be a holiday which is next
11    Monday.  I think it's the 17th, Martin Luther King Day, and did
12    you all talk about whether you want -- you would like to have
13    the day off?
14              You may have already made plans for all I know to go
15    do something else.  Sometimes jurors also just like to be away
16    from it for an extra day, and I think the day off this Monday
17    probably helped your psyche.  On the other hand, it does extend
18    the time you are serving, so if you all have talked about it
19    and have reached a resolution, let me know what you're view is.
20              I'm not saying that's exactly what we'll do, but
21    we'll certainly take it into account.  If you haven't had
22    sufficient time to talk about it, we don't have to do it now.
23    You can talk about it and let me know at the end of the day.
24    Okay, you haven't had a chance, okay.
25              A JUROR:  We talked somewhat about it, but we haven't
```

1    made a decision.

2              THE COURT:  That's fine.  As I said, I'm not saying

3    that we're going to do exactly what you want.  Another option

4    that I had thought about was having the trial go on Saturday

5    and then doing Monday off as well.  Some jurors don't feel like

6    they want to do that, and I recognize -- I haven't been on a

7    jury, but I have had to serve as the finder of the fact in long

8    trials, and I do know that sometimes a couple of days away from

9    the fray really helps you in the process, and it's worth the

10   investment of an extra day or two that way.  So you all take

11   that into account and let us know.  Okay.  All right, Mr.

12   Robertson.

13             MR. ROBERTSON:  Your Honor, our next witness will be

14   Mr. Niemeyer, an expert.

15             THE COURT:  All right.

16             MR. ROBERTSON:  Ms. Albert will be handling the

17   direct examination.

18

19                       **PATRICK D. NIEMEYER,**

20   a witness, called by the plaintiff, having been first duly

21   sworn, testified as follows:

22                        DIRECT EXAMINATION

23   BY MS. ALBERT:

24   Q    Good morning, Mr. Niemeyer.

25   A    Good morning.

1   Q    Would you please state your full name for the record.

2   A    Patrick Dennis Niemeyer.

3   Q    Would you briefly describe your educational background

4   since high school?

5             THE COURT:  If you don't mind, before you do that,

6   would you spell your last name.  There are a number ways to

7   spell that name.

8             THE WITNESS:  Certainly.  N-i-e-m-e-y-e-r, and I

9   studied physics at St. Louis University in the time period 1991

10  to 1993 at which point I left to pursue a job opportunity with

11  Southwestern Bell Technology Resources which is research

12  division of Southwestern Bell.

13            This was at the, sort of the beginning of the

14  internet boom, and various opportunities opened from there, and

15  I never returned to my study of physics.

16  Q    Have you written any books relating to computer

17  programming or writing source code?

18  A    Yes.  I'm the author of a series of books on the Java

19  programming language entitled *Learning Java* and *Exploring Java*.

20  Q    And this is one of your books?

21  A    Yes, published by O'Reilly and Associates which is a

22  well-known technical book publisher.

23  Q    Do you know how widely distributed your books are?

24  A    Yes.  Currently *Learning Java* is published in nine

25  languages worldwide, and it's been consistently among the best

1     selling books for over ten years.

2            THE COURT:  What is Java?

3            THE WITNESS:  Java is a computer programming

4     language.  I could describe it more.

5            THE COURT:  No, I just think it's helpful -- I had to

6     learn what it was.  I didn't know how many people on the jury

7     knew what it was.  I had to learn what it was early on on this

8     job, but I didn't know before that.  All right, go ahead.

9     Q    So what is the Java programming language if you can

10    describe it at a high level?

11    A    So Java is a particular programming language in which the

12    instructions for a computer program are written by a person.

13    They are human readable form of the computer program that

14    someone writes in order to implement a program.  A program is

15    something like Microsoft Word or your web browser, something

16    that runs on the computer.

17           Java is a particular language in which those are written.

18    It has certain capabilities and features that differentiate it

19    from other computer programming languages.

20    Q    Why do programmers use different languages?  Why can't all

21    programmers use the same programming language?

22    A    Well, similar to the way humans speak different languages,

23    there are different ways to express the instructions for

24    computer programs.  Different languages have different

25    capabilities, different features, were developed at different

1   times.  Java is a modern, fairly modern recent programming

2   language which has a number of capabilities that are different

3   from older generations of programming languages.

4   Q    Now, do you know if your books are used as textbooks for

5   university programming classes?

6   A    Yes.  My understanding is they are used in coursework at a

7   number of universities including Washington University in St.

8   Louis.

9   Q    What, if any, awards have either of your books won?

10  A    My book *Learning Java* won the 2001 Readers' Choice Award

11  for best introductory Java book.

12  Q    Are you a member of any expert groups for the Java

13  programming language?

14  A    Yes.  I've served on three expert groups as part of what's

15  known as the Java Community Process which governs the evolution

16  of the Java programming language.

17  Q    Can you explain to us what the nature of these expert

18  groups are?

19  A    Yes.  So, as proposals are made for incorporating new

20  features into the Java programming language, the organization

21  convenes sort of in expert groups which consist of people with

22  a great deal of experience in the field or pertaining to the

23  particular area of the proposal.

24       The expert groups convene to study the problem, make

25  concrete recommendations for changes, and normally those are

1    adopted by a process and incorporated into the language that's

2    used by everyone.

3    Q    Have you ever developed a programming language of your

4    own?

5    A    Yes, I'm the author of a fairly popular Java-based

6    scripting language called BeanShell which is used all over the

7    world in products ranging from service applications to

8    developer tools.

9    Q    What is your current occupation?

10   A    I am the principal of my own consulting company as well as

11   the CTO of a company called an Ikayzo, I-k-a-y-z-o.

12   Q    And by CTO, do you mean chief technical officer?

13   A    Yes.

14   Q    And what does Ikayzo do?

15   A    Ikayzo is a software development company that specializes

16   in a wide range of applications ranging from financial industry

17   to desktop and even iPhone and iPad applications.

18   Q    In your current consulting business, would you briefly

19   describe some of the projects you are working on?

20   A    Yes.  So I spent a great deal of time over the years

21   working on large enterprise systems in areas such as finance

22   and similar systems.  More recently, I've worked on a variety

23   of networked applications including -- currently doing work for

24   a company called Referentia that contracts for DARPA -- that's

25   part of the Defense Department -- and it's an advanced network

1    monitoring tool.

2         I've also recently completed work on a high-performance ad

3    server for a company called Value Commerce.

4              THE COURT:  Ad as in advertising?

5              THE WITNESS:  Advertising server which serves webbed

6    banner advertising for the large -- Value Commerce is based in

7    Japan, and they are largest web advertiser in Asia.

8    Q   About how many years have you been reading and writing

9    source code?

10   A   I'd say professionally about 20 years, but more generally

11   since I've had my first computer when I was a kid.

12   Q   Do you consider yourself fluent in any programming

13   languages?

14   A   Yes.  Aside from Java, I'd say I have a great deal of

15   experience with languages such as C and C++, web-related

16   technology such as JavaScript, XML, and XSLT.

17        Additionally, I have a great deal of experience with some

18   less commonly used languages today such as COBOL and related

19   languages.

20   Q   Now, you said -- you mentioned XML.  What does that mean?

21   A   XML stands for extensible markup language, and it is a

22   textual data format that is commonly used for the exchange of

23   data especially relating to web-based services.  It's a very

24   popular data format.

25   Q   Now, you talked about Java earlier, but you also mentioned

1    JavaScript.  What is the difference between the two?

2    A    JavaScript is a language that was designed to run within a

3    web browser.  So a web browser is like Internet Explorer or

4    Firefox that you use to browse the web, and JavaScript is a

5    programming language that can be downloaded alongside content

6    like web pages and images and such into your web browser and

7    runs within the web browser to perform dynamic activity for web

8    pages, sometimes communicating with the server and performing

9    activities like that.

10   Q    You mentioned COBOL.  What is that?

11   A    COBOL stands for common business oriented language.  COBOL

12   is one of the earliest widely used programming languages in

13   business, and it is an older generation programming language

14   that is still found in some places today in large

15   organizations.

16   Q    And have you worked with the COBOL programming language

17   before you worked on this case?

18   A    Yes, I have.

19   Q    And what was the context?

20   A    Well, for example, at a company called Edward Jones, which

21   is a large financial institution, I worked there during a

22   period where they were migrating a large amount of COBOL --

23   large number of COBOL applications to the C and C++ languages.

24        During that time, I worked on both the development of

25   tools for the migration of data and code between the two

1    languages and as well as mentoring groups of programmers and

2    teaching them about the differences between the two languages.

3    Q    Are you being compensated for the time you've spent

4    working on this case?

5    A    Yes, I am.

6    Q    Is that compensation dependent at all on your testimony

7    here today?

8    A    No, it's not.

9    Q    Is your compensation dependent on the outcome of the case?

10   A    No, it's not.

11            MS. ALBERT:  At this time, Your Honor, ePlus would

12   like to offer Mr. Niemeyer as an expert in the field of source

13   code with particular emphasis on the interpretation and

14   understanding of source code and computer programs written in

15   the JavaScript, Java, COBOL, XML, and XSLT programming

16   languages.

17            THE COURT:  Any objection?

18            MS. STOLL-DeBELL:  No, Your Honor.

19            THE COURT:  All right, he's accepted as an expert in

20   those areas, ladies and gentlemen.  All right.

21   Q    Mr. Niemeyer, let's go back, and could you briefly tell

22   the jury what source code is?

23   A    As I started to describe it before, source code is the set

24   of human readable instructions that comprise a computer

25   program.  So when someone wants to write a program like

Niemeyer - Direct                                                1226

1    Microsoft Word or something on the desktop, they write that as

2    a set of instructions in particular programming language.

3    Q     And what's done with that human readable programming

4    language in order to make it useful for the computer?

5    A     Well, in most cases there's an intermediate step called

6    compilation where a tool called compiler take the human

7    readable instructions and transforms them into a machine

8    readable form that is the actual program you use on the

9    computer.

10          THE COURT:  So when you are doing a program for

11   somebody, do you start out using some base and then write it

12   out, and then it gets transferred by compiler into something

13   that the computer can read?

14          THE WITNESS:  You write in an editor that's much like

15   a word processor but has some additional capabilities, and then

16   you periodically test what you are writing, normally by

17   compiling it, which is a stage that you -- or step that you

18   perform, and then you run the code to test it, and you do that

19   iteratively during the process.

20   Q     Now, we mentioned this COBOL programming language earlier.

21   Is the COBOL programming language relevant to the accused

22   Lawson systems?

23   A     Yes.

24   Q     And could you describe how a COBOL program is structured

25   at a high level, please?

1    A    COBOL programs are centered around files, and two types of

2    files used in COBOL programs are known as program definition

3    files which contain the instructions written in the COBOL

4    programming language, and what are known as working storage

5    files which describe the data used by the corresponding program

6    definition files.

7         Furthermore, these COBOL files run within the context of

8    what is known as a transaction manager which is a -- I describe

9    as a runtime environment or a platform that determines which

10   instructions are executing at what time and move data into and

11   out of the associated working storage.

12   Q    Mr. Niemeyer, are you familiar with something called

13   Lawson 4GL?

14   A    Yes.  By virtue of my work on this case, I have come to

15   know Lawson 4GL as a proprietary extension of the COBOL

16   programming language created by Lawson for use in their

17   products.

18   Q    Is that 4GL an entirely new programming language?

19   A    No, it is not.  As I described, it is an extension of the

20   well-known COBOL programming language.

21   Q    Now, Mr. Niemeyer, were you retained by ePlus to study the

22   source code that Lawson produced in discovery for the system

23   accused of infringement here?

24   A    Yes, I was.

25   Q    Would you describe the nature of the opinions you've

1    rendered in this case at a high level?

2    A    I was asked to investigate the structure, function, and

3    operation of specific features within the Lawson system.

4    Q    Did you render any opinions on whether the Lawson system

5    you studied infringes the patents?

6    A    No, I was not asked to.  I did not.

7    Q    Do you understand whether or not ePlus has another expert

8    that performed that function?

9    A    Yes, my understanding is that Dr. Weaver is responsible

10   for rendering those opinions.

11   Q    Could you describe for the jury the circumstances under

12   which you reviewed the Lawson source code?

13   A    Yes.  The source code was made available at a secure

14   location in Washington, D.C.  I traveled to that location on at

15   least seven occasions and spent a total of at least 19 days

16   reviewing the source code.  I was also able to print excerpts

17   of the source code for later review.

18   Q    Did you review the entire amount of the source code that

19   was produced by Lawson?

20   A    No.  I reviewed the portions of it that I determined were

21   applicable to the functionality I was asked to investigate.

22   Q    What specific functions of Lawson system were you asked to

23   investigate?

24   A    I was asked to look at features of the S3 product

25   including category and keyword search, shopping cart

1   functionality, requisition creation, purchase order generation,

2   and what's known as punchout.

3   Q    How did you figure out --

4            THE COURT:  Go through those again, would you?

5   Category, search?

6            THE WITNESS:  Category and keyword search, category

7   search and keyword search, shopping cart functionality,

8   requisition generation, purchase order generation, and what

9   Lawson calls their punchout feature.

10           THE COURT:  Thank you.

11  Q    And how did you figure out what source code was relevant

12  to those functions?

13  A    I began by reviewing the available demonstration material

14  which illustrated the functionality, and from there I was able

15  to identify the user interface features that supported that and

16  the code which implements or supports those user interface

17  features.

18       From there I was able to trace the flow of the program

19  from the user interface elements through the, what I call the

20  back end, the Lawson 4GL COBOL programs, and ultimately to the

21  database structures involved.  This is the kind of thing you do

22  routinely in working with software, so I was able to trace the

23  flow through the code.

24  Q    Besides the source code itself, were there any other

25  documents that you found particularly helpful to your study and

1    understanding of Lawson source code?

2    A    Yes.   There were Lawson technical documents that I

3    reviewed.   One in particular that comes to mind is the Lawson

4    4GL application programmer interface reference document.

5             MS. ALBERT:   Could you please put on the screen

6    Plaintiff's Exhibit 470.

7    Q    Mr. Niemeyer, you could either look in your binder or its

8    on your monitor there.   Could you take a look at Plaintiff's

9    Exhibit 470, and is this the document that you referenced?

10   A    Yes, it is the one I was referring to.

11   Q    How did you use this document during your study of

12   Lawson's source code?

13   A    So this is a reference document of the type that a

14   programmer would use when developing this Lawson systems.   It

15   is sort of a dictionary or encyclopedia-like document that

16   defines specific features provided by the Lawson system to the

17   programs.

18        So as I would come across usages of these features within

19   the source code, I would reference this document to learn their

20   precise meaning and usage.

21   Q    Is this reference manual the type of document that a

22   source code expert like you would reasonably rely on in reading

23   and understanding the functionality of source code?

24   A    Yes, it is.

25   Q    Mr. Niemeyer, approximately how many hours would you say

1   that you spent studying Lawson's source code in this case?

2   A    I would estimate between 250 and 300 hours.

3   Q    Now, turning to your analysis of the systems, have you

4   prepared a demonstrative to help you explain how the Lawson

5   system is built from a source code perspective?

6   A    Yes, I have.

7        MS. ALBERT:  Mike, could we have slide 84 from slide

8   deck 93, please.

9   Q    Is this a demonstrative that you prepared, Mr. Niemeyer?

10  A    Yes, it is.

11  Q    Now, on your demonstrative, if we could orient ourselves,

12  we're showing two sides of the system, if you will.  On the

13  left-hand side, you've labeled that the client side, and the

14  right-hand side is labeled server side.  Can you explain at a

15  high level what a client and a server is?

16  A    Yes.  Software applications are often structured in a way

17  termed client -- in a client and server configuration where the

18  client component communicates with the server component over a

19  network.  An example of this that many people would be familiar

20  with would be web browser and a web server.

21       When you are using your web browser like Internet

22  Explorer, you are talking to web server.  Your web browser is a

23  client, and the web server is the server component that is

24  sending data to it.

25  Q    Is server just another name for a large computer?

Niemeyer - Direct                                          1232

1    A    In general, sure.  It's a remote computer.

2    Q    Using this demonstrative, would you explain the source

3    code architecture of Lawson's system and the components you've

4    illustrated in your demonstrative?

5    A    Yes.  The portion on the left labeled client is, contains

6    components that run in the user's web browser.  Some items

7    labeled there are JavaScript which I mentioned earlier is a

8    programming language that executes within the browser.  HTML

9    are the actual pages that display the information.

10        The right portion on the right labeled service side are

11   the components that run on the server.  There is a Java -- box

12   labeled Java web application.  That's essentially a web server

13   that feeds the data to the web browser.

14        Below that, the area labeled Lawson transaction manager

15   and Lawson 4GL COBOL comprise what I would call the business

16   logic of the application and contains the Lawson 4GL COBOL

17   code.  The transaction manager and supporting features are also

18   -- my understanding is they are termed by Lawson as Lawson

19   system foundation.  So it's sort of the back end portion of

20   that.

21        There's the database indicated there which contains the

22   data for the application, and the final box up on the right

23   labeled MCI is just an alternate mechanism for the Java

24   components to talk to the database.

25   Q    Now, you discussed in your demonstrative that there are

1   both Lawson web-based applications and Lawson 4GL applications

2   within the Lawson system.  Could you describe at a high level

3   the kinds of functionality that are implemented in the system

4   using the 4GL application?

5   A    Yes, the Lawson 4GL COBOL code implements the feature of

6   the S3 system including requisition, inventory control, and

7   purchase order.

8   Q    Could you describe at a high level the functionality

9   implemented in the system using the web-based applications?

10  A    The web-based components including the Java web, or Java

11  application server and the components that run the browser

12  together comprise a web-based interface to that Lawson 4GL

13  functionality.  They are sort of an overlay or an add-on that

14  provides that browser-based access to those components.

15  Q    What are some examples of the Lawson web-based

16  applications that you studied?

17  A    I believe Lawson calls the system the requisition

18  self-service component, and I believe they also called it --

19  refer to their punchout component as a web-based component.

20  Q    Now, you also mentioned this Lawson system foundation.

21  Could you briefly explain why the Lawson system foundation is

22  important to the functioning of the Lawson system?

23  A    Yes.  So the Lawson system foundation, inasmuch as it

24  contains the transaction manager, is responsible for running

25  the Lawson 4GL COBOL programs.  It is a runtime environment or

Niemeyer - Direct                                          1234

1    a container of sorts that holds that code, determines what's

2    running at what time, and moves the data into and out of it.

3    It's required to run those applications.

4    Q    Could you describe at a high level what the functionality

5    is with respect to the Lawson transaction manager?

6    A    Yes.  The Lawson transaction manager would be the key

7    component there that actually runs the COBOL programs for the

8    requisition, inventory control, and purchase order

9    applications.

10   Q    And how does the Lawson transaction manager execute the

11   4GL applications, or what does it do?

12   A    Well, so as I tried to describe, it determines which

13   programs are running at what time.  It moves data into and out

14   of the associated working storage structures, and it collects

15   the results.  It may also intermediate access to the database,

16   provide access to the database.

17   Q    And you talked about this DB thin API.  First of all, what

18   is an API?

19   A    The term API, the acronym API stands for application

20   programmer interface, and it is just a collection of functions

21   or utilities, features which can be used by the programmer.

22   Q    And what do you mean by the term DB thin?

23   A    In this case, it is a database API which just means it's a

24   collection of features that allow the Java code to talk to the

25   database.  The term thin to me implies that is it a streamlined

1  or otherwise not complex mechanism.  It's a delegating

2  mechanism that delegates to another layer.

3  Q    What do you mean by delegate?

4  A    So it's sort of a thin wrapper around some more

5  complicated functionality.  It passes off requests to another

6  layer for additional processing.

7  Q    Now, you've shown in your demonstrative that the system

8  has a database associated with it.  Have you prepared another

9  demonstrative to help you explain the database that's used by

10 the system?

11 A    Yes, I have.

12        MS. ALBERT:  Mike, if we could, could we have slide

13 number 85, please.

14 Q    Is this a demonstrative that you prepared to illustrate

15 the database?

16 A    Yes, it is.

17 Q    Could you describe at a high level the nature of the

18 database?

19 A    Yes.  So it is what's known as a relational database.

20 Lawson refers to this database as the item master database.

21 The database contains numerous tables.  Tables within a

22 database, you can roughly analogize to files in a filing

23 cabinet.  They may contain different types of information.

24        There are a number of actual tables from the Lawson item

25 master database illustrated here.  The one that I'll mention, a

1  key table is the ITEMMAST table on the left of this diagram

2  which contains information about items that can be

3  requisitioned within the system, and from -- another table that

4  I'll point out is the POITEMVEN which contains vendor

5  information pertaining to specific items within the ITEMMAST

6  table.

7  Q    You mentioned this term relational database.  What is a

8  relational database?

9  A    The term relational just means that a piece of data within

10 the database can refer to or point to another piece of data in

11 various ways.

12 Q    Would you explain the difference between when you say the

13 item master database and when you are referring to this item

14 master or ITEMMAST table?

15 A    Yes.  So the ITEMMAST table is a specific table within the

16 database.  More generally, Lawson documentation refers to the

17 database as a whole or collectively as the item master

18 database, presumably drawing its name from that key table.

19            THE COURT:  The ITEMMAST table has what in it?

20            THE WITNESS:  It consequence /TAEUPBS information

21 about items which can be requisitioned.

22 Q    What are some of the types of information about the items

23 that are contained in that table?

24 A    It contains an item number for the item, a textual

25 description of the item, and other information about the item.

Niemeyer - Direct                                          1237

1    Q    Now, you have a few other tables illustrated on your

2    demonstrative.  Could you provide us with a high level

3    description of the purpose of the table that's listed R-E-Q

4    header or REQHEADER?

5    A    Yes.  The abbreviation R-E-Q is short for requisition, so

6    this is the requisition header table, and it is involved in

7    both shopping cart and requisition functionality.

8    Q    And then you have another table that is referred to as P-O

9    inter F-A-C, POINTERFAC.  What is the purpose behind that

10   table?

11   A    The POINTERFAC table is involved in making requisitions

12   available to the purchase order system.  It's kind of an

13   intermediator.

14   Q    And I believe you talked about the POITEMVEN table.  You

15   have another table shown that's labeled KWDDETAIL.  Can you

16   explain at a high level the purpose of that table?

17   A    Yes.  Here the acronym, the abbreviation KWD stands for

18   keyword, so it would be keyword detail table, and it is an

19   index used in keyword searches.

20   Q    Now, we referenced this requisition self-service

21   application earlier.  Can you explain to the jury from a source

22   code perspective what the requisition self-service application

23   is?

24   A    Yes.  So, it is a -- as I described, it is a web-based

25   interface to the Lawson purchase order, requisition, and

Niemeyer - Direct

1    inventory control systems.

2    Q    And is that a more -- can you say whether or not that's a

3    more user-friendly interface?

4    A    Certainly, yes.  It's the main reason for adding a

5    web-based interface to an application, is to provide increased

6    or ease of use and flexibility.

7    Q    Could you explain from a source code perspective what

8    Lawson's procurement punchout application is?

9    A    Yes.  So procurement punchout is a feature of the -- which

10   runs in the context of the requisition self-service application

11   that allows a user to connect to a remote Lawson partner vendor

12   site, perform -- well, it communicates with the site.

13        The Lawson system communicates with the site over a secure

14   communications channel, performs a handshake using a protocol

15   known at cXML is which is a business standard for this type of

16   communication.  It allows the user to perform certain shopping

17   operations on the partner site, the vendor site, and ultimately

18   to have those shopping results returned to the Lawson system

19   for incorporation into their shopping cart.

20   Q    I'd like to turn now to the category search functionality

21   that you studied.  Does the source code of Lawson system

22   implement functionality that allows a user to search for items

23   by category?

24   A    Yes, it does.  There is an option from the find/shop menu,

25   the requisition self-service that brings up a category search

1   screen.

2   Q    What, if any, database tables does the source code use to

3   conduct this category search functionality?

4   A    There are two.  One is called IC item code, ICITEMCODE,

5   and the other is the previously mentioned ITEMMAST table.

6   Q    Do both of those tables belong to that same item master

7   database that you described earlier?

8   A    Yes, they do.

9   Q    What information is contained within that ICITEMCODE table

10  that would be relevant to searching by category?

11  A    The ICITEMCODE table contains the textual description of

12  the levels of the UNSPSC hierarchy and the corresponding codes

13  that are assigned to those levels.

14  Q    And what information does the item master table store that

15  is relevant to searching by category?

16  A    The item master table contains -- in addition to the item

17  descriptions, contains the corresponding UNSPSC codes

18  indicating where they belonged in that hierarchy.

19  Q    When the category selection is chosen by a user from that

20  find/shop menu, what is the first thing that happens in the

21  source code?

22  A    When a user chooses to bring up a category search screen,

23  a request is made from the user's web browser to the back end

24  of the Lawson system.  Specifically Lawson calls this kind of

25  request a data request, and it is -- it is handled by the --

1    passed from the Java code to the -- using the DB thin API that

2    I mentioned previously and results in a search of the

3    ICITEMCODE table for the top levels of the UNSPSC hierarchy.

4         Those top level initial part of the drill-down are

5    returned to the -- formatted as XML and returned to the

6    client's web browser where it's presented to the user to make

7    their initial choice.

8    Q    After the system retrieves these top level categories from

9    the database, would you explain what happens in the source code

10   as the user navigates the available hierarchy of categories?

11   A    Yes.  So the process is very similar to that of retrieving

12   those initial top level categories with the exception that as

13   the user chooses levels in the browser, the corresponding

14   UNSPSC codes are conveyed with the request to the back end

15   system, and the ICITEMCODE table is searched to find the

16   corresponding levels, the children or the child levels

17   underneath the selected level.  That information is returned

18   and then formatted for the user.  In this fashion they can

19   drill down, expanding from the parent to the child.

20   Q    When the user finds his desired category --

21        THE COURT:  Excuse me.  The parent is the larger and

22   the child just means the more specific; is that right?

23        THE WITNESS:  Yes.  If you imagine like a family

24   tree, there is a parent, and the children kind of branch out

25   and grandchildren branch out from there.  That's what I meant

1   in terms of that hierarchy.

2   Q    Once the user finds his desired category and chooses to

3   view the items that belong to that category, will you explain

4   what happens in the source code to cause the items that belong

5   to that category to be displayed?

6   A    Yes.  So when the user selects the items link, the UNSPSC

7   codes for that particular level of the hierarchy are packaged

8   up as part of a request.  In this case, it is what's known as a

9   transaction request.  It's passed from the user's browser to

10  the back end, the server component of the Lawson system.

11       This results in a Lawson 4GL COBOL program called RQIB

12  being executed which searches the ITEMMAST table for items

13  which have the corresponding UNSPSC codes.  The resulting item

14  information is then formatted as XML and returned to the

15  client's web browser where it is formatted as a search result

16  list.

17  Q    Now, Mr. Niemeyer, I'd like to turn to the keyword search

18  functionality in the Lawson system that you studied.  Does the

19  source code of Lawson system implement functionality that

20  allows a user to search by a keyword?

21  A    Yes.  The user may choose search catalog option from the

22  find/shop menu of the requisition self-service application

23  which brings up a keyword search screen with a field in which

24  the user can enter one or more search terms.  That screen has

25  some additional functionality, advanced search functionality

1   which allows the user to limit the search, the scope of the

2   search to Lawson certain origin fields and optionally provide

3   what it's called an exclusion term.

4   Q    What do you mean by an origin field?

5   A    It determines where in the information associated with an

6   item the term was located.  So there are multiple tables which

7   can relate to a given item within the ITEMMAST table, and

8   different textual and numeric information may be found in those

9   tables.  They named those different locations as origin fields,

10  and the user can limit the search if they wish.

11  Q    Can you give us an example of an origin field?

12  A    Well, so the primary description within the ITEMMAST

13  table, there's a field for the description, is the particular

14  origin field.  There is also a vendor description in the

15  POITEMVEN table.  That is another example of an origin field.

16  Q    Have you prepared a demonstrative to help explain how the

17  keyword search functionality is implemented in the source code?

18  A    Yes, I have.

19          MS. ALBERT:  Mike, could we have slide 24, please.

20  Q    Is this the demonstrative that you prepared?

21  A    Yes, it is.

22  Q    What, if any, database tables are involved in this keyword

23  search functionality?

24  A    Well, there are seven depicted here, but the four that I

25  would describe as first are the keyword tables at the bottom.

1    These are prefixed with the KWD abbreviation, and they are

2    keyword synonym, keyword master, keyword detail, and keyword

3    setup.  These tables comprise an index of the available search

4    terms, and then there are three tables above, ITEMMAST which I

5    previously mentioned, POITEMVEN, and a table called ITEMLOC,

6    I-T-E-M-L-O-C, are used after the search is performed to

7    retrieve the item information.

8    Q    And do all of these tables belong to that item master

9    database that you illustrated earlier?

10   A    Yes, they do.

11   Q    What data is contained or what is the keyword detail

12   table?

13   A    Keyword detail table is the key index of search terms, and

14   it relates a specific search term which has been found to the

15   origin field in which it was located and the item number of the

16   item in which it was found.

17   Q    And what types of data is contained in that table?

18   A    Well, as I said, there's an item number, a keyword, and an

19   origin field.

20   Q    Would you please explain briefly how the functionality to

21   build the keyword detail table is implemented in the source

22   code?

23   A    So my understanding is when the system is set up

24   initially, users determine which origin fields are to be

25   enabled for search, and the terms are gathered from the data

1  and placed into the keyword detail table.  For each item, there

2  is a corresponding keyword and an origin field.

3  Q    And what database tables are indexed by the keyword detail

4  table?

5  A    My understanding is that at minimum, the ITEMMAST,

6  POITEMVEN, and ITEMLOC tables.

7  Q    In the context of this source code, what is the purpose of

8  having an index like the keyword detail table?

9  A    It's common practice to create an index to -- an

10  optimization to increase the speed of the search and to

11  eliminate to need to search the whole collection of data when

12  you can condense it to an index that you can search more

13  rapidly.

14  Q    Can you explain how the item vendor table or the POITEMVEN

15  table is used in the implementation of a keyword search in the

16  source code?

17  A    After the search is performed against the keyword tables

18  and item information is being retrieved, corresponding vendor

19  information for the items is retrieved from the POITEMVEN

20  table.

21  Q    Do the records in the item vendor or POITEMVEN table link

22  in any way to the records in the item master or ITEMMAST table?

23  A    Yes, they do.  They contain a field which holds the item

24  number for a given item in the ITEMMAST table.

25  Q    Have you prepared a demonstrative to help you explain how

1   the information in these two tables can be related?

2   A    Yes, I have.

3         MS. ALBERT:  Mike, can we have slide 68, please.

4   Q    Is this the demonstrative that you prepared?

5   A    Yes, it is.

6   Q    Now, using your demonstrative, would you please explain

7   how records in the item vendor or POITEMVEN table can be

8   related to records in the item master table or ITEMMAST table?

9   A    Yes.  So within the ITEMMAST table, or the item master

10  table, there is a field called ITITEM which holds the item

11  number for that item.  That item number uniquely identifies the

12  item within the ITEMMAST table.

13        The PO item vendor table then can -- given record within

14  that table can refer to an item within the ITEMMAST table using

15  that unique number.  It's what's known as a key field in the

16  ITEMMAST table.  Within the POITEMVEN table, there's a field

17  called PIV item which holds that number, and, therefore, if you

18  want to, for a given item in the POITEMVEN table, you can point

19  back to a specific unique item within the ITEMMAST.

20        MS. ALBERT:  Mike, could we go back to slide 24,

21  please.

22  Q    Now, going back to your demonstrative on keyword search

23  query execution, can you explain how the keyword search

24  functionality is implemented in the Lawson system source code?

25  A    Yes.  So after the user enters a search term in the

Niemeyer - Direct

1    browser and hits the search button, the search term is conveyed

2    as part of a request to the server side components which causes

3    the Lawson 4GL COBOL program called RQIC to be executed.  The

4    RQIC program ultimately performs a search of the keyword detail

5    table for occurrences of that term that have been previously

6    indexed.

7        Any matching records from the keyword detail table are

8    then used to find the corresponding items in the ITEMMAST table

9    and data gets gathered from the PO and ITEMLOC tables.  All of

10   those results are formatted as XML and ultimately returned to

11   the item web browser and formatted as a search word.

12   Q    When the search code searches the keyword tables to locate

13   the keywords that the user typed in, does the source code

14   search the item master table at all?

15   A    No, it does not.  It only searches the keyword detail

16   table and the associated keyword tables.

17   Q    Now, I'd like to turn to the functionality for the adding

18   items to a shopping cart and building a requisition.  Does the

19   source code of the Lawson system implement functionality that

20   allows a user to select desired items for requisition from a

21   list of results returned from either this category or keyword

22   search that you discussed?

23   A    Yes, it implements a shopping cart functionality whereby

24   the user can indicate that an item from a search result should

25   be added to the shopping cart.  Items can be added and removed

1   until checkout operation is performed.  Similar to the way you

2   shop on Amazon or another web business.

3   Q    Now, what, if any, database tables are involved in this

4   shopping cart functionality?

5   A    There are three.  Two of them are prefixed with the term

6   REQ.  One is called REQHEADER and the other is called REQLINE.

7   The third is called PO interface which we mentioned before,

8   POITERFAC.

9   Q    And what information is stored in that REQLINE table

10  that's relevant to the shopping cart functionality?

11  A    The REQLINE table holds the individual line items

12  representing items that were selected to be added to the

13  shopping cart.

14  Q    Does this REQLINE table also contain a status field?

15  A    Yes, it does.  In addition to the item information, it

16  contains a status which can indicate that the item is either --

17  while in the shopping cart, it's in a state called unreleased.

18  Q    What does that mean?

19  A    It means that it is part of a shopping cart and not yet

20  part of a requisition.

21  Q    And is there another status that can be indicated in this

22  status field in addition to the unreleased status that you

23  mentioned?

24  A    Yes.  So I'd just say both the REQLINE and REQHEADER table

25  that I mentioned which are involved in this contain a status

1    field which indicates the disposition of the information,

2    whether it's part of the shopping cart or whether it's part of

3    requisition, that the two values can be what's called

4    unreleased or released.

5         It indicates it's either in a status of unreleased or

6    released where unreleased is the status used while the items

7    are in the shopping cart, and released is -- indicates that

8    they are now part of the requisition.

9    Q    What information is stored in that REQHEADER table that's

10   relevant to the shopping cart function?

11   A    The REQHEADER table represents the shopping cart as a

12   whole in this case, and it groups the REQLINE records together.

13   Q    Can you explain how this shopping cart functionality is

14   implemented in the source code?

15   A    Yes.  So as the user indicates that they would like to add

16   an item to the shopping cart, when the user indicates the item

17   should be added to the shopping cart, the item number for that

18   item is conveyed as part of a request to the server side at

19   which point a Lawson 4GL COBOL program is executed to add a

20   line to the REQLINE, add a record to the REQLINE table

21   corresponding to that item.

22   Q    Have you created some demonstrative to show what happens

23   in the source code when the user clicks on the checkout button

24   after he has added items to the shopping cart?

25   A    Yes, there should be two.

1              MS. ALBERT:  Mike, can we go first to slide 25,

2    please.

3    Q    Now, using these demonstratives, would you please explain

4    what happens in the source code when the user clicks on that

5    checkout button after he's added items to the shopping cart?

6    A    So when a user clicks on the checkout button, there's two

7    major -- two phases that happen, and this depicts the first.

8              If at this point a requisition header, REQHEADER record

9    has not previously been created, one will be created at this

10   time.  This happens when a request is made from the client's

11   web browser to the server side causing the Lawson COBOL program

12   RQIB, or create requisition header which is shown here, to be

13   executed.  That program adds a record to the REQHEADER table.

14   Q    What is a requisition header?

15   A    Again, in this case, it represents either the shopping

16   cart as a whole or the requisition as a whole.  It serves to

17   group the requisition lines and to contain a status for the

18   overall shopping cart or requisition.

19             MS. ALBERT:  Mike, can we go to slide 26, please.

20   Q    So now can you explain what happens in the source code in

21   the next step in this process?

22   A    In this step, there are two activities of importance.

23   This, again, is happening after the user has clicked the

24   checkout button.  Request is -- second request is made from the

25   client's browser to the server side.  In this case, the Lawson

1   4GL COBOL program called RQIF, or release requisition, is

2   invoked.

3        Its first job is to update the status that I mentioned

4   before in both the REQHEADER and REQLINE tables from an

5   unreleased to a released value.  The second step is to create

6   records in the PO interface table, POINTERFAC table, which make

7   those records, make that information then available to the

8   purchase order system.

9   Q    Are records created in this PO interface table at the time

10  when items are initially added to the shopping cart?

11  A    No.  They are only created after the checkout operation is

12  performed.

13  Q    Are the records in the REQHEADER and REQLINE tables

14  available to the purchase order system prior to that checkout

15  button being pressed?

16  A    No, they are made available by virtue of the records in

17  the PO interface table.

18  Q    Now I'd like to turn to the process for generating a

19  purchase order.  Does a source code of the Lawson system

20  implement functionality that generates one or more purchase

21  orders corresponding to the items listed in a requisition built

22  using the Lawson system?

23  A    Yes, it does.  The user can use a program called PO 100 to

24  generate one or more purchase orders from a requisition.

25  Q    Does the source code indicate anything about when multiple

1    purchase orders would be created from line items in a single

2    requisition?

3    A     Yes.  As part of the purchase order generation process,

4    the requisition items are essentially sorted in order to

5    produce a separate purchase order for each vendor corresponding

6    to items in the requisition.

7    Q     Have you prepared a demonstrative to explain how this

8    functionality is implemented in the source code?

9    A     Yes, I have.

10          MS. ALBERT:  Mike, could we have slide 27, please.

11   Q     Now, what, if any, database tables are involved in this

12   purchase order functionality?

13   A     There are three depicted here.  The first is the PO

14   interface table which I mentioned previously.  The two new

15   tables are -- one is called PURCHORDER, short for purchase

16   order, P-U-R-C-H-O-R-D-E-R, and the second is POLINE,

17   P-O-L-I-N-E, short for purchase order line.

18   Q     What information is stored in the PO interface table

19   that's relevant to the purchase order generation function?

20   A     Well, I mentioned before, this serves to make the

21   requisition information available to the purchase order system.

22   Q     And what information does the PURCHORDER or purchase order

23   table store that's relevant to the purchase order generation

24   function?

25   A     A record in the PURCHORDER table represents a specific

Niemeyer - Direct

1    purchase order for a given vendor.

2    Q    What information does the POLINE table store that's

3    relevant to this purchase order generation function?

4    A    The POLINE table contains the individual line items for a

5    specific purchase order.  They relate to a given record in the

6    PURCHORDER table, and they contain the information by an

7    individual requested item.

8    Q    Using your diagram, would you explain how that

9    functionality, generating one or more purchase orders, is

10   implemented in the source code?

11   A    Yes.  So after the user indicates that they would like to

12   generate purchase orders for a requisition, a request is made

13   to the server side, and the Lawson 4GL program PO 100 is

14   executed.  That program reads records from the PO interface

15   table, and as I described before, essentially sorts them in

16   order to create a separate PURCHORDER record for each vendor

17   having items within the requisition.

18        The corresponding line items are added to the POLINE table

19   for that PURCHORDER, and while this process is happening, a

20   textual report is being generated that the user can later print

21   as an actual purchase order.

22   Q    Now, Mr. Niemeyer, I'd like to turn to the procurement

23   punchout application which we discussed earlier.  Does the

24   source code of the Lawson system implement the procurement

25   punchout functionality?

Niemeyer - Direct

1  A   Yes, it does.

2  Q   Of the procurement punchout functionality, what is the

3  first step that's implemented by the source code?

4  A   When a user indicates that they would like to start the

5  punchout process, they are presented with a list of Lawson

6  partner vendors from which to choose.  That list is derived

7  from configuration within the system.

8     The user may select one of those at which point the Lawson

9  system establishes or performs a handshake with the remote

10 system.  It has established a secure connection, essentially

11 logs the user in remotely, and in return it receives a URL or

12 web address that can be used to establish the shopping session.

13 Q   And once the shopping session is established, can you

14 describe the next step that's implemented by the source code to

15 achieve this punchout functionality?

16 A   Yes.  So at this point, what's known as an IFRAME,

17 I-F-R-A-M-E, is opened within the browser.  Essentially like a

18 little browser window within the browser.  It allows the user

19 to perform their shopping activity on the partner website.  At

20 the completion of their shopping, the results of their

21 shopping, remote shopping cart are communicated back to the

22 Lawson system over the network by virtue of a Java servlet on

23 the Lawson system and ultimately incorporated into their

24 shopping cart within RSS.  At that point, those items can be

25 used just as they would if they had been shopped for using the

1    other mechanisms we described.

2    Q    How is this punchout process different, for instance, from

3    when I access a retail website for my home computer on my

4    browser at my computer?

5    A    It's different in that the Lawson system is intermediating

6    it or controlling it in several ways.  When you do -- when you

7    shop on your computer at home you are connecting directly to a

8    website like Amazon or something, and all the communication is

9    direct.

10        In the case of the Lawson system foundation, this is

11   happening within the context of the requisition self-service

12   application.  The Lawson system both establishes the connection

13   to their remote site, performs a login operation for the user,

14   and then finally when the shopping is done, those results are

15   communicated back to the Lawson system directly which it then

16   incorporates into the user shopping cart within RSS,

17   requisition self-service.

18        MS. ALBERT:  Thank you, Mr. Niemeyer.  I have no

19   further questions.  Please answer any questions that Ms.

20   Stoll-DeBell may have.

21

22                    CROSS-EXAMINATION

23   BY MS. STOLL-DeBELL:

24   Q    Good morning, Mr. Niemeyer.

25   A    Good morning.

Niemeyer - Cross                                                    1255

1    Q    Prior to your involvement in this case, you had never used

2    Lawson's procurement software; isn't that true?

3    A    That's true.

4    Q    And, in fact, before you began working on this case, you

5    had never used any kind of procurement software.

6    A    I've worked on enterprise systems including eCommerce

7    systems that resulted in procurement and similar types of

8    systems, but not a procurement system per se, no.

9    Q    And in -- do you recall being deposed in this case?

10   A    Yes.

11   Q    And you told the truth and the whole truth in your

12   deposition?

13   A    Of course.

14   Q    And do you recall saying that you had never worked with

15   procurement software in your deposition?

16   A    I don't recall --

17              THE COURT:  Ms. Stoll-DeBell, we need to get on the

18   point of use.  It didn't impeach what he said.  He just

19   qualified it somewhat.  So let's don't do things that don't

20   actually correspond item to item, so to speak.  That's not

21   impeaching.  That's just an explanation of his testimony.  All

22   right.

23   Q    And you reviewed only one version of Lawson source code

24   for this case?

25   A    I reviewed the source code that was provided.  I wasn't

1   asked to classify it by version.

2   Q    I couldn't hear you.  Sorry.

3   A    I reviewed the source code that I was provided.  I wasn't

4   instructed specifically about versions.

5   Q    You were provided with version nine of the source code?

6   A    My understanding is that it was version nine, yes.

7   Q    That it was version nine?

8   A    Yes.

9   Q    I'm having a little bit of a hard time hearing you.

10          THE COURT:  Pull that a little closer.

11  Q    Do you know what products are accused of infringement in

12  this case?

13  A    My understanding is that the Lawson systems involved in

14  inventory control, purchase order, and requisitions are

15  involved in infringement.

16  Q    And RSS?

17  A    Well, yes.

18          THE COURT:  He's not testifying about infringement.

19          MS. STOLL-DeBELL:  I'm just trying to get his

20  understanding as to what the products are at issue in this

21  case.

22          THE COURT:  Well, he testified about all of that in

23  his direct testimony in terms of the source code.  That's

24  where -- not in terms of infringement, and I don't want the

25  jury to believe they are hearing two different infringement

1    opinions, because I told you all, under the rules of the Court,

2    you can only have one expert on topics like that.  So let's

3    stay away from the issue of infringement, I would suggest if

4    you don't mind.

5    Q    You are aware that Lawson's S3 supply chain management

6    suite includes three modules called inventory control,

7    requisitions, and purchase orders?

8    A    Yes.

9    Q    And we've been calling these the core system, so if I use

10   that term for the system, you'll understand what I'm talking

11   about?

12   A    Sure.

13   Q    Do these core -- does this core system operate on a

14   platform, a software platform called LSF?

15   A    Portions of it I would describe as -- first I should say,

16   I only have an understanding of what Lawson system foundation

17   is by virtue of what I've been told.  It's not really something

18   I -- technical components I studied in my report, but my

19   understanding is that generally corresponds to the transaction

20   environment in which the COBOL runs.  So if you're asking me if

21   that functionality is supported by that, it is.

22   Q    Okay.  So you did not review the source code for LSF?

23   A    If FLS corresponds to the transaction monitor, I did

24   review source code for that.  Again, it's just a name, so it's

25   not a technical question.  So I'm not sure how to answer it

1    other than to tell you what I studied.

2    Q    But you didn't review all of the source code for the LSF;

3    will you agree with that?

4    A    That's probably true, yes.

5    Q    Is this an accurate depiction of the core modules

6    operating on the LSF platform?

7          MS. ALBERT:  Lack of foundation, Your Honor.

8    Q    Have you seen this slide before, Mr. Niemeyer?

9    A    I don't recall it, no.

10         THE COURT:  Sustained.

11   Q    Did you work with Dr. Weaver on this case?

12   A    I did on one occasion talk to him about the results of my

13   report and a few phone conversations following that.

14   Q    Did Dr. Weaver rely on your expert report regarding the

15   operation of Lawson source code?

16   A    It's my understanding that he did, but I don't know.

17   Q    Now, you did not review all of the source code for all

18   three of the core modules shown in the blue box here, did you?

19   A    I only reviewed the portions of it relating to the

20   functionality that I was asked to investigate.

21   Q    So the answer is yes, you did not review all of the source

22   code for all of the three core modules shown in the blue box

23   here; is that correct?

24   A    That's correct.

25   Q    And you did not review all of the source code for the

Niemeyer - Cross                                                   1259

1    inventory control module?

2    A    No, I did not.

3    Q    And you did not review all of the source code for the

4    requisitions module?

5    A    I only reviewed the portions that were relevant to what I

6    was asked to investigate.

7    Q    To answer my question, you did not review all --

8              THE COURT:  He answered it.  He said I only -- he may

9    not have given the answer that you thought he ought to give,

10   but he answered the question.  I think that's sufficient.

11   Q    And isn't it true that you did not review all of the

12   source code for the purchase order module?

13   A    Again, I only reviewed specific portions, so, no.

14   Q    And you did not review the portion of the source code

15   relating to searching in the RQ module?

16   A    I'm not sure what you are referring to exactly.  I

17   reviewed code pertaining to category and keyword searches which

18   are part of the inventory control module.

19   Q    Those are part of the RSS product?

20   A    And the inventory module.

21   Q    And I'm talking about the requisitions module.

22   A    I'm sorry.  What's the question?

23   Q    Are you aware that there is a searching functionality that

24   is part of the requisitions module?

25   A    Part of the requisitions module?

1          MS. ALBERT:  This is beyond the scope of my direct,

2    Your Honor.

3          MS. STOLL-DeBELL:  Your Honor, I'm just trying to

4    establish what functionality he looked at and what he didn't,

5    and there is searching in this case that is in addition to the

6    keyword searching and the category searching, and I'm just

7    trying to establish that he did not look at it.

8          THE COURT:  He said about four times now that what he

9    did -- he was given from Lawson a set of source codes, and he's

10   described what he did review, and if there exists other source

11   code that he didn't review, then by force he didn't -- of his

12   testimony about what he did review, he didn't review the other,

13   and he said about three times, I reviewed only what was

14   relevant to my job, to the task I was given.

15         MS. ALBERT:  Your Honor, could we ask that the slide

16   be removed from the screen?

17         THE COURT:  Yes, take that off, because he's never

18   seen it.

19   Q    Okay, I'm going to ask you a few questions about

20   requisition self-service which we've also been calling RSS.  I

21   think you may have called it RSS also?

22   A    Yes.

23   Q    So you know what I'm talking about?

24   A    Yes.

25   Q    RSS is a browser-based portal user interface for accessing

1   various functions of the core modules we just talked about; is

2   that true?

3   A    Yes, that sounds correct.

4   Q    So to put it in maybe a simpler terminology, RSS is an

5   overlay of the core modules; would you agree with that?

6   A    Yes.

7   Q    And you did not review all the source code for RSS either;

8   is that true?

9   A    I only reviewed the portions relevant to the functionality

10  I was asked to investigate, so, no, I did not review all of

11  them.

12  Q    Lawson's software uses a database to store item data; is

13  that correct?

14  A    Among other things, yes.

15  Q    And is this database a relational database?

16  A    Yes, I would call it a relational database.

17  Q    I think you talked about at least three data tables that

18  are included within this relational database.

19  A    Correct, yes.

20  Q    One of those was the item master tables?

21  A    One of those was the ITEMMAST table.

22         THE COURT:  Both of you, from time to time, lapse

23  into item master table when he has consistently said and every

24  time corrected you to say ITEMMAST table which is what he had

25  on his demonstration.  Just so the terms aren't confused, let's

1   stay with his terms.

2          MS. STOLL-DeBELL:  Can we go to Mr. Niemeyer's slide

3   number seven.

4          THE COURT:  Do we need to switch systems?

5          MS. STOLL-DeBELL:  I think we should have his slides

6   on our system.

7   Q    I think you talked about an item master database and an

8   ITEMMAST table?

9   A    Yes, I did.

10  Q    And I think you previously talked about having two

11  definitions of item master?

12  A    I don't recall saying that there were two definitions.  I

13  described the database collectively, loosely, as the item

14  master database.  That's how Lawson refers to it.

15         There's a specific table within the database called

16  ITEMMAST.  The abbreviation obviously implied the term item

17  master, hence the name of the table in the database.

18  Q    Does any of the Lawson documentation that you reviewed

19  call the database as a whole item master?

20  A    I'm sure that it did.  I can't recall a specific example.

21  I know that there was testimony in some of the depositions

22  where people -- where this is referred to as the item master

23  database.  I know I saw it on numerous occasions, and that's

24  where -- why we began calling it that.

25  Q    So is it your position that the Lawson documentation does

1   refer to this database as a whole as item master?

2   A    I believe I saw it in Lawson documents.  I don't recall

3   exactly which ones.  My report may have cited something.

4   Q    Okay.  So if it wasn't in your report --

5   A    If it wasn't in my report, then I'd have to research it.

6            THE COURT:  Wait a minute.  Y'all are talking over

7   each other.  So you started off asking a question, so it wasn't

8   in your report.  He then answered right in the middle of it,

9   and I don't think anybody heard anything.  So if you have a

10  question, ask the other question -- I mean ask the question,

11  and then give her a chance get finished with the question, and

12  then you can respond with your answer.

13  Q    So if there was documentation that referred to the

14  database as a whole as item master, you would have cited it in

15  your report?

16  A    I believe my report cites the depositions of Mr. Dooner

17  and Mr. Christopherson who, I believe, referred to it as the

18  item master database in those depositions.

19  Q    Let's talk about the ITEMMAST tables.  ITEMMAST -- the

20  ITEMMAST tables store data regarding inventory items; is that

21  correct?

22  A    There is only one ITEMMAST table, it's singular, and it

23  does store information about items which had been

24  requisitioned, yes.

25  Q    And there is a schema for item data in the ITEMMAST table.

1    A    Yes.

2    Q    And the schema is defined in the source code for Lawson's

3    inventory control module.

4              MS. ALBERT:  This is beyond the scope of my direct.

5              MS. STOLL-DeBELL:  Your Honor, I'm just trying to

6    understand.  I'm going to get into the fields and what fields

7    he looked at for the ITEMMAST table which relates to the

8    schema.  So I'm trying to set up some foundation for the next

9    couple of questions I'm going to ask him, and also in a way

10   that maybe lay some background so that the jury can attempt to

11   follow what we're talking about.

12             THE COURT:  It doesn't help me in ruling on the

13   objection to tell me what you're doing.  Her objection was that

14   it wasn't something she inquired about.  And so the question

15   is, for you, what does it relate to that she did inquire about,

16   and that's what you need to tell me.  Otherwise, I'm going to

17   sustain the objection.

18             MS. STOLL-DeBELL:  It relates to the fields in the

19   ITEMMAST table and what those are, and she did ask him

20   questions about that.

21             THE COURT:  And your question right now isn't related

22   to anything she asked, but it's going to get there because you

23   are laying a foundation.

24             MS. STOLL-DeBELL:  Yes.

25             THE COURT:  Get there quickly.  Overruled.

1   Q    So I think I'll reask the question, because I'm not sure I

2   got an answer to it.  There is a schema for the item data in

3   the ITEMMAST table.

4   A    Yes, yes, there is.

5   Q    And that's defined by the source code for Lawson's

6   inventory control module?

7   A    Loosely described, yes.  There are files which describe

8   the schema -- there are files which describe the schema which I

9   found within the source code.  Technically I wouldn't call them

10  source code.  They are schema files.

11  Q    And schema defines what fields are included in the

12  ITEMMAST table?

13  A    Yes, it describes them.

14  Q    And is a field -- I think of it as being an attribute for

15  an item.  Would you agree with that?

16  A    Sure.

17  Q    So, for example, item number would be a field of the

18  ITEMMAST items?

19  A    Yes.  It has a different name, but there is a field that

20  represents the item number.

21  Q    And item description would be another one?

22  A    Yes.

23  Q    Unit of measure another one?

24  A    Yes.

25  Q    You could have provided a list of all of the item master

1   fields in your expert report; that is something you are capable

2   of doing?

3   A    Yes.

4   Q    But you did not do so?

5   A    No, I did not.

6   Q    Do you agree with me that the item master schema does not

7   include a field for vendor name?

8   A    The ITEMMAST table contains, among other things, what are

9   known as user defined fields which can be supplied by the user

10  with whatever information they like which could include vendor

11  name or vendor number, things like that.  Additionally, I point

12  out that the POITEMVEN table relates to the item master table

13  by virtue of its item number.

14  Q    But that's not what I asked you.  I asked you does the

15  ITEMMAST table have a field for vendor name?

16  A    Other than the user defined field which could be used for

17  that purpose, it doesn't have a specific field.

18  Q    It can be used for any purpose, you can put anything in

19  there at all; correct?

20  A    Yes.

21  Q    So I'll ask you again.  Does the ITEMMAST table --

22            THE COURT:  I think he's answered.  He said twice now

23  that --

24            MS. STOLL-DeBELL:  I'd just like him to say no, Your

25  Honor.

Niemeyer - Cross

1      THE COURT:  I know you would, but that's not his

2  answer.  His answer isn't no.  His answer is it can be used for

3  that purpose if one wants to use it for that purpose which, per

4  force, precludes a no answer.  So let's go on.  I understand

5  how we'd like to get things, but we don't always get what we

6  like.

7  Q    Okay.  Assuming that the user defined fields are not --

8  someone doesn't choose to put vendor names in there -- let's

9  make that assumption -- there's not otherwise a vendor field.

10  So do you agree with me that a user cannot search the ITEMMAST

11  table by vendor name?

12  A    Users don't directly search tables.  I don't really know

13  how to address that.  Users use the application which runs code

14  which performs searches against many tables.

15  Q    So going through a process, it is possible to search the

16  ITEMMAST table?

17  A    Yes, I'll agree with that generally, sure.

18  Q    If a user field isn't set up as a vendor name, then you

19  can't search the ITEMMAST table by vendor name?

20  A    If the user has not defined a field as such, then there

21  would be no way to search by vendor name that I'm aware of.

22  Q    I want to talk a little bit about the keyword search

23  functionality in RSS.

24  A    Okay.

25  Q    You did review that; correct?

1    A    Yes, I did.

2    Q    And that functionality is based on an index of fields

3    defined by another Lawson program called IC 00.5; is that

4    correct?

5    A    Yes.  Although I did not study that program in particular,

6    that's my understanding, is that it's responsible for producing

7    that index.

8    Q    And you stated in your report, I think, that the search

9    index includes all fields of the item master that are enabled

10   for keyword searching; is that correct?

11   A    That sounds correct, in addition to other fields of other

12   tables.

13   Q    And isn't it correct that vendor name is not one of those

14   defined fields?

15   A    Within the ITEMMAST table, there's no vendor name if

16   that's what you are asking, but the POITEMVEN table, which

17   contains vendor information, is indexed as part of that

18   process.

19   Q    But it's not -- vendor name is enabled for searching

20   within RSS?

21   A    I don't recall there's a vendor name within the POITEMVEN

22   table, but the vendor information from that table is indexed as

23   part of that process.

24   Q    Let's change the focus to category searching.  I'm going

25   to ask you a couple questions about that.  That is something

1   else that you reviewed in Lawson's source code?

2   A    Category search, yes.

3   Q    And the category searching functionality is limited to the

4   RSS program?

5   A    I only reviewed the functionality that is contained in the

6   RSS program.  I don't know where else it might exist.

7   Q    We can agree that the displayed information for each

8   category comes from a table of UNSPSC codes and corresponding

9   category description; is that correct?

10  A    Yes.

11  Q    And can we agree that this UNSPSC table does not include

12  vendor names?

13  A    As far as I know, yes.

14  Q    And do you agree that this UNSPSC table does not include

15  item information?

16  A    Well, it contains the textual descriptions of the UNSPSC

17  hierarchy which are describing items.

18  Q    So it will say whatever, how many digits are in the code?

19  A    There are four fields.

20  Q    So four fields, and they'll say this particular field

21  relates to printer cartridges; right?

22  A    Yes.

23  Q    But it doesn't say what items within the Lawson's database

24  relate to that.

25  A    That's correct.

1  Q    So it's really just the UNSPSC code and an English

2  language description of what that code means?

3  A    That's correct.

4  Q    I'm going to ask you some questions about punchout now.

5  You testified that punchout provides an interface by which

6  Lawson's RSS program can be linked to a third-party punchout

7  website; is that correct?

8  A    That sounds correct.

9  Q    And isn't it true that procurement punchout allows users

10 to shop for items found in electronic catalogs on punchout

11 partner vendor websites?

12 A    You are asking me if that's true in general or I said that

13 precisely?

14 Q    Is that true?

15 A    That sounds correct, yes.

16 Q    Isn't it true that using Lawson's punchout software is

17 different than shopping on a vendor's public website?

18 A    Yes, I'd say so, yes.

19 Q    For one thing, punchout does not connect to a vendor's

20 public website; would you agree with that?

21 A    I don't know how the vendors have structured their systems

22 other than the fact -- other than what I studied which is the

23 punchout makes a connection to a vendor server.  I wouldn't

24 characterize it as public or private other than by virtue of

25 the functionality.

1   Q    Okay.  Well, doesn't Lawson's punchout software send

2   secure login and password information to the vendor's website?

3   A    Yes, it does.

4   Q    And then it can only connect to the vendor's website if

5   that information is good, is a good user name and the password

6   works, and the vendor's website can authenticate that user; is

7   that correct?

8   A    That's correct.

9   Q    And so if -- and it only sends back the URL for the

10  punchout site if that information is correct and the vendor is

11  able to log in Lawson's customer?

12  A    That's correct, yes.

13  Q    So you can't get to the punchout vendor's website without

14  a user name and password?

15  A    I don't know what other features they may support.  I only

16  know that's how the punchout system communicates with those

17  servers.

18  Q    And you know Lawson's customer cannot gain access to the

19  vendor's website unless they have the correct user name and

20  password?

21  A    First of all, I don't know what other access they may

22  have, but if the functionality that I reviewed, in the

23  functionality that I reviewed, this login phase happens behind

24  the scenes out of the user's control.

25  Q    In your expert report in this case, I think you

1   characterized the punchout product as being different than

2   shopping on a vendor's public website; do you agree with that?

3   A    I'd have to see what you are referring to.  I don't

4   remember exactly what.

5   Q    I think you should actually have a copy of your report up

6   there.

7   A    Yes, I do.

8           THE COURT:  Do you want to give us a page?

9           MS. STOLL-DeBELL:  I have a paragraph, 146.

10          THE COURT:  Okay, that's fine.  What did you say it

11  was, paragraph what?

12          MS. STOLL-DeBELL:  146.

13          THE COURT:  See if that refreshes your memory by

14  looking at paragraph 146.

15          MS. STOLL-DeBELL:  It's actually page 28.

16  A    Okay.

17  Q    Does that refresh your memory?

18  A    Yes.

19  Q    So in your report, you characterize Lawson's punchout

20  product as being different than shopping on a vendor's public

21  website for a couple of reasons, one of which was the user does

22  not log in to the remote website, but instead, a secure

23  system-to-system business-to-business handshake is performed to

24  identify the client automatically.

25          THE COURT:  Two things, Ms. Stoll-DeBell.  It doesn't

1    say that the -- what you said.  It starts off with the word,

2    the process of shopping via, and that's somewhat different.  I

3    don't know if it's a significant difference in this case, but

4    it is different because you question because he's asking about

5    a process.

6            If that helps you in some way to reformulate your

7    question, that's fine, but let's focus on exactly what he said

8    there because then we won't get tied up in, well, I didn't say

9    it that way, I said this, and we go through that.  We don't

10   need to go through all that.  Start again, if you don't mind.

11   Q    Isn't it true that the process of shopping via punchout

12   should be distinguished from simply shopping on a vendor's

13   public website in the following ways:  First, the user does not

14   log in to the remote website but instead a secure

15   system-to-system, business-to-business handshake is performed

16   to identify the client automatically?

17   A    Yes.  That's what I stated in my report.

18           THE COURT:  There are other ways, but you are just

19   inquiring about that way number one; right?

20           MS. STOLL-DeBELL:  Yes, that's correct, Your Honor.

21           THE COURT:  All right.

22   Q    Now, you testified that you reviewed the source code for

23   the Lawson's punchout software?

24   A    Yes, I did.

25   Q    And isn't it true that the punchout vendors have their own

1   software that runs the punchout vendor's website?

2   A    Presumably, yes.  I didn't review any of that, so I don't

3   know.

4   Q    Don't websites need software to run them?

5   A    That's why I said presumably, yes.  Of course.

6   Q    And as an expert in software and source code, you know

7   that; correct?

8   A    Yes, I'd agree with that.

9   Q    But you didn't analyze any of the source code for any of

10  the software from any punchout vendor website?

11  A    I only reviewed the source code relevant to the punchout

12  functionality that I was provided, and that was the Lawson

13  punchout functionality that established the connection and

14  retrieved the results of a shopping session.

15  Q    That's the source code that manages the handshake between

16  the Lawson customer system and the vendor's website?

17  A    In addition to the supporting functionality for -- within

18  the user interface, what you've described is the handshake

19  functionality and functionality involved in receiving the list

20  of items from the Lawson partner site and incorporating them

21  back into the system.

22            THE COURT:  In analyzing that part of the Lawson

23  software, did you also analyze any part of the system that

24  operates the partner's -- or that is the partner's software, I

25  think is her question; is that right?

```
 1              MS. STOLL-DeBELL:  Yes.
 2              THE COURT:  Did you go on the other side of the
 3   equation and look at their system as well?
 4              THE WITNESS:  No, Your Honor.  I wasn't provided with
 5   any of that source code, so other than by virtue of the
 6   protocol that's used, I'm not --
 7              THE COURT:  You didn't go into that side.
 8              THE WITNESS:  No.
 9              THE COURT:  Because you weren't given it.
10              THE WITNESS:  That's correct.
11   Q    So you didn't see -- let me ask it this way:  Lawson's
12   source code that you looked at does have search functionality?
13   A    Yes.
14   Q    Search engine?
15   A    Could you clarify the question?  I mean there is category
16   and keyword search functionality within RSS that I looked at.
17              THE COURT:  He doesn't understand the question.
18   Before you proceed, how much longer do you have with this
19   witness, Ms. Stoll-DeBell?
20              MS. STOLL-DeBELL:  Maybe ten minutes.
21              THE COURT:  And then you have redirect?
22              MS. ALBERT:  A few very brief questions.
23              THE COURT:  I think maybe it's probably a good idea
24   to go ahead and take the morning break, and we'll change court
25   reporters.  They've been in here for an hour and a half or so.
```

Niemeyer - Cross                                        1276

1    Just take your notebooks with you, and we'll have a 20-minute

2    morning break.

3

4                          (Jury out.)

5

6             THE COURT:  You people from Minneapolis, what is your

7    reaction to Richmond's reaction to the potential snow with this

8    kind of weather?  Do you all shut down anything up there?

9             MR. McDONALD:  No.

10            THE COURT:  Objection to form is sustained.  All

11   right, let's take a 20-minute recess.

12

13                          (Recess taken.)

14

15

16

17

18

19

20

21

22

23

24

25