1277

```
 1              (The jury is not present.)
 2              THE COURT:  What Farber exhibits are we
 3   talking about?
 4              MR. McDONALD:  Your Honor, we're talking
 5   about --
 6              MR. ROBERTSON:  May we just maybe excuse the
 7   witness for this argument?
 8              THE COURT:  What does he have to do with the
 9   Farber exhibits?
10              MR. ROBERTSON:  All right.
11              THE COURT:  Anything?
12              MS. ALBERT:  No.
13              THE COURT:  Okay.
14              MR. ROBERTSON:  Thank you.
15              MR. McDONALD:  We're talking about
16   Plaintiff's Exhibits 326, 327, 328, 329, 330 and also
17   325.  These are all mostly articles and then one
18   research report.
19              THE COURT:  325 through 330.
20              MR. McDONALD:  Right.  And these were
21   proffered --
22              THE COURT:  They are articles on what?
23              MR. McDONALD:  About ePlus' settlements with
24   Ariba and SAP.
25              THE COURT:  You mean like newspapers
```

NIEMEYER - CROSS                    1278

1    articles?

2          MR. McDONALD:  Yeah, that came out in like a

3    website IT management, eWeek, things like that.  A

4    number of these were ones where the Court had reserved

5    admission because we had objected to them at the

6    pretrial conference pending laying a foundation.

7          So I'd like to address those at this point

8    because we don't think they've got a foundation, and

9    there are also some other problems now that we're at

10   where we're at in the case that I'd like to show why

11   these shouldn't come in.

12         THE COURT:  This is something that really

13   takes a long time, and I really wish -- y'all knew

14   about this.  You should have told me about it.  I

15   would have come in early today and we would have

16   gotten it straight.

17         All right.  What is it?

18         MR. McDONALD:  Well, basically, you can take

19   two groups of them; 326 through 330.

20         THE COURT:  Does anybody have copies of them

21   so I can look at them?

22         MR. McDONALD:  Sure.

23         THE COURT:  They are admitted, Mr. Robertson.

24   They are offered for purposes of notice; is that

25   right?

NIEMEYER - CROSS                1279

1    MR. ROBERTSON:  Notice and intent to induce,

2  Your Honor, but Mr. Strap is going to be addressing

3  this issue since he's been dealing with it, but yes,

4  sir.

5    MR. McDONALD:  Are these actually admitted

6  yet?  Your Honor, these were not admitted yet.

7    MR. STRAPP:  Your Honor --

8    THE COURT:  They want them in.  Let me hear

9  why they want them in first.  Come up, Mr. Strap.

10  Just leave your stuff there, Mr. McDonald.  Don't take

11  any of his stuff away when you leave, Mr. Strapp.

12    Well, I have two copies of 326 and one copy

13  of 327.  Do we have the rest of them?

14    MR. McDONALD:  Yes.

15    MR. STRAPP:  Your Honor, you may recall we

16  argued about these particular exhibits --

17    THE COURT:  Let's just get into why they are

18  offered.

19    MR. STRAPP:  We're offering them to show

20  notice of the patent, which is relevant to indirect

21  infringement both to inducing infringement as well as

22  contributory infringement.  And at the pretrial

23  conference Your Honor said that these are admissible

24  subject to a proper foundation being laid, and

25  specifically you said at the pretrial conference to

NIEMEYER - CROSS          1280

1  the extent we can show that Lawson subscribes, quote,

2  subscribes to or read or otherwise kept abreast of

3  these types of publications, then they would be

4  admissible at the trial to show notice for indirect

5  infringement.

6          And we believe, Your Honor, that the

7  foundation has been laid.

8          THE COURT:  How did it get laid?

9          MR. STRAPP:  First --

10          THE COURT:  I don't think anybody asked about

11  supply chain, demand chain, executives.  This

12  newspaper article in 327, what is that?  *IT*

13  *Management*, *Info World* or the *New York Times*, and I

14  guess this is *Computer World*.  Nobody testified to

15  anybody of that.

16          MR. STRAPP:  Let me start specifically with

17  respect to PX 325.  That's the Gartner report.

18          THE COURT:  I don't have that.  Nobody gave

19  me that.

20          MR. McDONALD:  That's in a separate group,

21  Your Honor.  That's why I didn't hand that up yet.

22          THE COURT:  We're talking about the articles

23  now.  Nobody has ever laid a foundation yet that

24  anybody on ePlus' side ever saw these articles.

25          MR. STRAPP:  The way Your Honor ruled at the

1  final pretrial conference was that if we could

2  demonstrate that the Lawson witnesses generally

3  subscribe to these types of publications and keep

4  abreast of developments and trends in the industry,

5  then --

6         THE COURT:  That in a nickel will get you a

7  Coke.  I'm talking about these publications.  Nobody

8  showed that they regularly subscribed to these

9  publications, did they?

10        MR. STRAPP:  Specifically to the Gartner

11  publication --

12        THE COURT:  We're not talking about the

13  Gartner.  We're talking about the articles 326 through

14  330.

15        MR. STRAPP:  Mr. Lohkamp said he keeps

16  abreast of industry developments.  He reviews articles

17  in general news publications.  He reviews industry

18  publications on the supply chain management industry.

19  That was Mr. Lohkamp's testimony during trial

20  yesterday.

21        So we would submit that the foundation as to

22  these general news publications, supply chain

23  management industry publications and articles of which

24  these are a subset, the foundation has been laid

25  through --

NIEMEYER - CROSS          1282

1       THE COURT:  Do you have any evidence that

2   anybody at Lawson ever saw any one of these articles?

3       MR. STRAPP:  Your Honor, we don't have any

4   direct evidence.  We're putting this in to show

5   circumstantial evidence, which under the case law --

6       THE COURT:  I understand circumstantial

7   evidence very well.  But even then if you're offering

8   this for -- what have you is, A, this is hearsay.  I

9   think they objected to it as hearsay.  You've got to

10  get it in.  You were saying it comes in for a

11  nonhearsay purpose, i.e., notice and intent to

12  infringe, right?

13      MR. STRAPP:  Correct.

14      THE COURT:  Okay.  So if you don't show that

15  they ever got these, saw these, or read these, how can

16  that nonhearsay purpose be satisfied?

17      MR. STRAPP:  It's to show circumstantial

18  evidence of knowledge of the patent, which is relevant

19  to the inducing infringement.

20      THE COURT:  All right.  Thank you.  Objection

21  to 326 through 330 is sustained, A, because it's

22  hearsay, and it doesn't fall within an exception, and,

23  B, because there's no foundation that anybody at

24  Lawson ever saw any of them.

25      Now, let me see the Gartner thing.  Just tell

NIEMEYER - CROSS          1283

1  me what Gartner is.

2          MR. STRAPP:  That's DX 325, Your Honor.

3          THE COURT:  The man said he read Gartner and

4  kept up with it regularly.

5          MR. STRAPP:  Correct.  Actually, we had

6  testimony from three different Lawson witnesses who

7  all testified they subscribed to and reviewed Gartner

8  industry analyst reports.

9          Again, they not for the same purposes of

10 these other articles.  And Your Honor ruled at the

11 pretrial conference it would be admissible to show

12 notice --

13         THE COURT:  There's no indication that

14 anybody saw this particular one, is that their

15 objection?

16         MR. STRAPP:  That may be their objection, but

17 I think that objection in light of the testimony

18 that's come in, there's been proper foundation laid

19 through three separate Lawson witnesses.

20         THE COURT:  All right.  Let me hear from

21 them.

22         Why can't this come in for the purpose of

23 notice of the ePlus patents and intent to infringe?

24         MR. McDONALD:  A couple of reasons, Your

25 Honor.  One, the testimony was that Mr. Lohkamp, I

NIEMEYER - CROSS                1284

1    believe, specifically said he'd see Gartner reports

2    from time to time, but that doesn't mean that every

3    report from Gartner is something that he would

4    receive.  He would receive certain ones that they

5    would actually download.

6            You'll see from this article that it's got an

7    ePlus production number.  We produced millions of

8    documents in this case, including other Gartner

9    reports and scoured the Lawson electronic files for

10   all Gartner reports.  This is not one of the reports

11   that Lawson downloaded.

12           Mr. Lohkamp was not asked about this report

13   directly.  So --

14           THE COURT:  Well, I think the foundation has

15   been laid for this, but the problem, what I'm trying

16   to figure out is, and I think it passes the nonhearsay

17   purpose because it does put them on notice if there's

18   something in here that links ePlus and what was going

19   on in this text to something Lawson was doing.  Is

20   there?

21           MR. McDONALD:  There's nothing like that,

22   Your Honor.

23           THE COURT:  Do you know what they contend?

24   I've read it now, what they contend links it.  Do you?

25           MR. McDONALD:  Well --

1    THE COURT:  Do you know what they contend

2  provides the notice?  That is, what text is it that

3  provides the notice?  Let's assume he gets Gartner

4  because he said he did.  You get it.  You read it.  Is

5  there anything in here that puts you on notice?  You

6  can't just put out the fact of a settlement.  So do

7  you know what it is?

8    MR. McDONALD:  I believe it's basically

9  what's on the top of page 2, Your Honor.

10    THE COURT:  What is it that provides the

11  notice, Mr. Strapp?

12    MR. STRAPP:  Your Honor, that is one portion

13  of the document --

14    THE COURT:  Tell me the words.

15    MR. STRAPP:  The first sentence.  On

16  February 14, 2005, Ariba and ePlus settled a patent

17  infringement lawsuit involving electronic procurement

18  systems that search, check inventories, and perform

19  other functions.  Ariba agreed to pay ePlus $37

20  million during the first quarter of 2005 to settle the

21  case.

22    And then if you skip down to the next

23  paragraph, there's a little bit more information about

24  these patents.  Talks about how ePlus' Software and

25  Services Company bought two patents from

NIEMEYER - CROSS          1286

1  Fisher-Scientific.

2          Third one was developed.  And it explained a

3  little bit more information about the law suit, the

4  finding of willful infringement.  And then in the

5  second segment of the document there's an analysis

6  about how this finding might affect other companies in

7  the software --

8          THE COURT:  Tell me the text.  That's your

9  view of it.  Your view of it is irrelevant to what put

10  them on notice.  It's the text that puts them on

11  notice.

12          MR. STRAPP:  If I could direct Your Honor's

13  attention to the second full paragraph in the analysis

14  section beginning, This settlement is good news."

15          The second sentence in that paragraph says,

16  "The settlement may, however, harm many independent

17  software vendors, ISVs, which face high legal costs to

18  investigate patent and product delays if patent

19  troubles arise.

20          Finally, the last part of this document talks

21  about recommendations for those independent software

22  vendors.

23          THE COURT:  All right.  Now I know.

24          Why doesn't that put them on notice that they

25  better go look at the ePlus patents and see what's

1  going on?

2          MR. McDONALD:  Because it doesn't say that.

3  The closest thing that Mr. Strapp read is that the

4  settlement may, however, harm many independent

5  software vendors which face high legal costs to

6  investigate patent and product delays if patent

7  troubles arise.

8          So what this is saying is what might happen

9  is you might have some patent troubles.  It doesn't

10 give them notice that they have already got patent

11 troubles.  It says, Watch out.  There might be a car

12 accident later.

13         THE COURT:  All right.  Thank you.

14         MR. McDONALD:  The other aspects of this,

15 Your Honor, on the notice issue, I would just note

16 that this record actually is pretty clear at this

17 point.  The Lawson people have acknowledged they knew

18 about the patent, at least by May of 2009, when they

19 got sued under these patents.

20         THE COURT:  So what?

21         MR. McDONALD:  Well, they have now satisfied

22 the notice prong of whatever they're trying to prove

23 with respect to intent so why do we need to have this

24 sort of prejudicial information --

25         THE COURT:  So you stipulate all notice

1    issues have been proved in the case?

2          MR. McDONALD:  Not all notice issues, but my

3    understanding is they were trying to prove that we

4    knew about the patents with this article.  That's been

5    something we've already had testimony --

6          THE COURT:  What other notice issue is there

7    other than that you knew about the patents?

8          MR. McDONALD:  I don't think they're trying

9    to contend there's anything else.

10         THE COURT:  So you stipulate then that notice

11   has been proved?

12         MR. McDONALD:  Yes.

13         THE COURT:  Notice of the patents as of when?

14         MR. McDONALD:  May of 2009.

15         THE COURT:  Okay.  Thank you.

16         Anything else, Mr. Strapp?

17         MR. STRAPP:  Your Honor, they have asserted a

18   good faith defense.  They said even though they had

19   notice as of May 2009, they immediately developed good

20   faith defenses as part of their litigation analysis.

21         THE COURT:  They developed good faith

22   defenses?

23         MR. STRAPP:  That's what their argument is to

24   indirect infringement.

25         THE COURT:  Developing good faith defenses

1   doesn't do anything.  It's whether you have good faith

2   to continue in the use of the patent.  Isn't that what

3   the issue is?

4           MR. STRAPP:  That's correct, Your Honor.

5           THE COURT:  That's different than developing

6   good faith defenses.  That and a nickel will get you a

7   Coke.  That means you're developing litigation

8   strategy.

9           MR. STRAPP:  Your Honor, they claim that they

10  have good faith defenses, and, therefore, they don't

11  have the requisite intent even though they had

12  knowledge as of 2009.  To the extent that this can

13  show or indicate that they had knowledge prior to May

14  2009, then their argument on good faith defenses goes

15  out the window.

16          THE COURT:  All right.  Thank you very much.

17  Anything else?

18          MR. McDONALD:  No, Your Honor.

19          THE COURT:  The objection to PX 325 is

20  overruled, but it will have to be redacted to take out

21  the dollar amount.  The dollar amount is irrelevant to

22  the notice issue, I think.

23          MR. ROBERTSON:  It is, Your Honor.  It's

24  going to be relevant later in the case when Mr. Farber

25  testifies on invalidity about commercial success, and

1    Your Honor has already ruled that's admissible, but we

2    can redact it for purposes of this morning.

3                 THE COURT:  All right.

4                 MR. McDONALD:  I forgot the mention, Your

5    Honor, there were some other issues.  In fact, there

6    were some agreed sections to be redacted.  Do you have

7    a copy with the blue box --

8                 THE COURT:  No, I don't have anything.

9                 MR. McDONALD:  Can I hand up a copy of that?

10                THE COURT:  If you-all have agreed, I don't

11   need to deal with it.

12                MR. McDONALD:  There is a section we didn't

13   agree on.  And I hear Mr. Robertson saying that

14   they'll take the dollars out, but the dollars are

15   still in there at this point.

16                One way to do this might be to talk to the

17   witness --

18                MR. ROBERTSON:  Your Honor --

19                THE COURT:  Stop talking all at the same

20   time.  Ms. Daffron is good, but neither she, nor I,

21   can hear all three of you.  Please.

22                What is it that I need to rule on here on the

23   redaction that you all don't agree on?

24                MR. STRAPP:  Your Honor directed ePlus at the

25   final pretrial conference to redact the portions of

NIEMEYER - CROSS                    1291

1    the document that don't deal with notice.  So we've

2    agreed to do.  There was a dispute about which

3    portions go to notice and which portions do not go to

4    notice.

5         We believe most of the document does deal

6    with this notice issue, which is why we're introducing

7    the evidence.  We've agreed to redact the last few

8    bullet points here that talk about recommendations on

9    what to do for independent software vendors.  And we

10   will also agree to redact the $37 million figure.  I

11   think with that, that should resolve the redaction

12   issue.

13        THE COURT:  All right.  But you're not

14   offering it then in response to their good faith

15   defense?

16        MR. STRAPP:  We're offering it to show --

17        THE COURT:  Well, then the recommendations

18   don't have anything to do with the good faith defense.

19   Is that what you're saying?

20        MR. STRAPP:  They do, Your Honor.

21        THE COURT:  I'm afraid you're talking about

22   two different versions of the document is what I'm

23   trying to get at.  I hear you saying two different

24   things in your argument and I don't understand it.  E.

25        MR. STRAPP:  Your Honor, in light of your

1  ruling, I think that we have fair direction that this

2  comes in for notice, it's relevant to show that there

3  was no good faith defense, and that $37 million should

4  be redacted because that's not relevant to any of the

5  infringement issues.  That's a clear ruling.  We can

6  follow it.  We will redact it.  When we put it on in

7  front of Mr. Farber, we will have the $37 million

8  redacted.

9          THE COURT:  I don't think the rest of it is

10  necessarily related to notice, but it does relate to

11  good faith defense.

12          MR. STRAPP:  The third page of the document

13  doesn't have any relevance to issues in this case.

14          THE COURT:  I'm talking about recommendations

15  for ISVs.

16          MR. STRAPP:  Right.

17          MR. McDONALD:  Just to be clear, the first

18  page we have in the red box there, some materials that

19  this could spark more patent lawsuits.  This is the

20  sort of thing that goes beyond --

21          THE COURT:  No.  Listen, if there's anything

22  that should get a company's attention is whether or

23  not they're going to get a lawsuit.  Come one.

24          The $37 million comes out, and then what

25  ePlus originally sought and all that stuff comes out.

NIEMEYER - CROSS                    1293

1   It doesn't make any difference.

2          MR. McDONALD:  So that will be the first

3   paragraph on page 1, the first paragraph on page 2 --

4          THE COURT:  Not the paragraph.  The figure

5   $37,000.  Just say "a settlement."  And 37 million is

6   out.  And then a patent infringement settlement, blah,

7   blah, blah.

8          On the second page, ePlus originally sought

9   up to $98 million in damages in an injunction against

10  infringement.  That comes out.  The rest of it stays

11  in except for the last page.  That's around the blue

12  box, Recommended reading and related research.

13         All right.  Let's get the jury.

14         MR. ROBERTSON:  Your Honor, at the risk of

15  incurring the wrath of the Court, there are two things

16  --

17         THE COURT:  Would you quit saying that?  You

18  haven't been subjected to any wrath.  Just because

19  somebody expresses irritation doesn't mean wrath.

20         MR. ROBERTSON:  I just wanted to follow-up on

21  two requests, Your Honor.

22         THE COURT:  Does it have to do with

23  Mr. Farber?

24         MR. ROBERTSON:  No, sir.

25         THE COURT:  Well, then I don't want to deal

NIEMEYER - CROSS                1294

1   with it.

2            MR. ROBERTSON:  You asked for us in the

3   morning session to get this information for you.

4            THE COURT:  I'll get it, but I don't want to

5   intrude on the jury's time.  I'll get it at the lunch

6   break.  I'll give you all the time you want on your

7   time, not theirs.

8            MR. ROBERTSON:  Thank you, Your Honor.

9            THE COURT:  Did you hone that down to less

10  than 10 minutes?

11           MS. STOLL-DeBELL:  No, I whittled it way

12  down, Your Honor.

13           THE COURT:  Is it 9.2?

14           MS. STOLL-DeBELL:  More like one minute or

15  two minutes.  So breaks are good.

16           THE COURT:  I like the way you whittle

17  because the last time you whittled it to zero.

18           MS. STOLL-DeBELL:  I try.

19           (The jury is present.)

20           THE COURT:  All right.  Ms. Stoll-DeBell.

21

22  BY MS. STOLL-DeBELL:  (Continuing)

23  Q   Hello, Mr. Niemeyer.

24  A   Hello.

25  Q   I have just a few remaining questions for you.

NIEMEYER - CROSS                    1295

1  You testified that you've looked at I think it was six

2  different functions of Lawson's products; keyword

3  search, catagory search, shopping cart, requisition

4  generation, purchase order generation, and Punchout?

5  A    Yes.

6  Q    Did I get that list correct?

7  A    Those are the items I mentioned, yes.

8  Q    Was it ePlus' lawyers who asked you to look at

9  those functions?

10 A    They asked me to investigate that functionality of

11 the product, yes.

12 Q    Now, isn't it true that you're charging ePlus $250

13 per hour to work on this lawsuit for them?

14 A    Yes, that's correct.

15 Q    How much in total have you charged them for your

16 work on this case?

17 A    I would guess it was somewhere around $75,000.

18          MS. STOLL-DeBELL:   Thank you.   I have no

19 further questions.

20

21      REDIRECT EXAMINATION

22 BY MS. ALBERT:

23 Q    Mr. Niemeyer, was it necessary to review all of

24 the source code relevant to the Lawson system

25 foundation in order for you to formulate your opinions

1  about the functionality of these six different

2  features that you were asked to investigate?

3  A   No, it was not.  I was able to determine the

4  relevant source code and review what was necessary to

5  understand those functions.

6  Q   Was it necessary to review all of the source code

7  relevant to the inventory control module in order to

8  render your opinions about the functionality of the

9  features that you investigated?

10  A   No.  Again, I was able to determine which subset

11  was necessary for review.

12          MS. ALBERT:  Mike, could we have slide 86

13  back, please.

14          THE COURT:  Slide what?

15          MS. ALBERT:  86.

16          THE COURT:  Is that this one?

17          MS. ALBERT:  I'm sorry.

18          THE COURT:  You didn't get to this because he

19  hadn't seen it before except there was a different

20  version of it with the blue stacked on top, and I

21  sustained the objection.

22          MS. ALBERT:  Slide 85.  I'm sorry.  My

23  eyesight is going.  Sorry.

24  BY MS. ALBERT:

25  Q   Now, are all of the tables illustrated in your

1   demonstrative here included within the item master

2   database?

3   A   Yes, they are.

4   Q   Is there a field for vendor name in one of the

5   tables within this database?

6   A   I believe the POITEMVEN table includes a field for

7   vendor name.

8   Q   What tables of the item master database are

9   indexed for keyword searching?

10  A   My understanding is that the ITEMMAST table, the

11  POITEMVEN table, and the ITEMLOC table.

12  Q   You mentioned these user defined fields in the

13  ITEMMAST table.  Can you explain what these user

14  defined fields are?

15  A   Yes.  These are sort of like empty slots or empty

16  spaces left in the table, which can be filled in with

17  data determined by the user.  So there's some extra

18  storage space that the user can fill with data of

19  their choosing, and those fields can be indexed for

20  search within the Lawson system.

21  Q   So can a user put any type of data that they want

22  into one of these user defined fields?

23  A   Yes, they could.

24  Q   Would a vendor name be a type of data that a user

25  could put into one of these user defined fields?

NIEMEYER - REDIRECT          1298

1  A    Yes.

2  Q    Can these user defined fields be enabled for

3  keyword searching?

4  A    Yes, they can.

5          MS. ALBERT:  Thank you.  I have nothing

6  further.

7          THE COURT:  You need Mr. Niemeyer back in

8  your rebuttal?

9          MR. ROBERTSON:  I don't think so, Your Honor,

10  but I'd like to reserve on that.

11          THE COURT:  All right, Mr. Niemeyer, they may

12  need you back later in the case.  So you're excused

13  temporarily so long as you agree to come back when

14  they notify you that you need to come back.  Do you

15  agree to do that?

16          THE WITNESS:  Sure.

17          THE COURT:  Thank you very much.  You're

18  excused temporarily.  Thank you.

19          THE WITNESS:  Thank you, Your Honor.

20           (The witness was excused from the witness

21  stand.)

22          THE COURT:  Next witness.

23          MR. STRAPP:  EPlus calls as its next witness

24  Mr. Farber.

25          THE COURT:  All right.

1

2      KENNETH G. FARBER, called by the Plaintiff, first

3   being duly sworn, testified as follows:

4

5      DIRECT EXAMINATION

6   BY MR. STRAPP:

7   Q    Would you please state your name for the record?

8   A    Kenneth G. Farber.

9   Q    Please describe where you're presently employed.

10  A    I'm presently employed at ePlus, Incorporated.

11  Q    What's your position at ePlus?

12  A    I'm the president of ePlus Systems and Content

13  Services.

14  Q    How long have you been in that position?

15  A    About 10 years now.

16  Q    Was that your first position at ePlus?

17  A    Yes, it was.

18  Q    How did you come to work at ePlus?

19  A    I worked at a company called ProcureNet that sold

20  some of the assets of that company to ePlus.  So I

21  joined ePlus following that acquisition.

22  Q    What was the business of ProcureNet, the company

23  you worked at before ePlus?

24  A    The component business that I worked at,

25  ProcureNet, dealt with sourcing and catalog management

1  related applications that we've been hearing about

2  over the last week or so.

3  Q   Can you tell me just briefly about your

4  professional experience in the computer science

5  industry?

6  A   I've been in the field a little over 30 years.

7  About 32 years now.

8  Q   What types of jobs have you held in the field?

9  A   I've held everything from -- I started out as a

10 computer operator.  I went into systems programming.

11 So I programmed in a number of different application

12 languages.  Managed development staffs.  Did

13 statistical analysis on computer performance.  Ran

14 marketing organizations, sales organizations, and just

15 kind of moved up the ranks of the field.

16 Q   When did you join ProcureNet?

17 A   I joined ProcureNet roughly -- I think it was

18 around 2000.

19 Q   What was your position at ProcureNet?

20 A   Senior vice president.

21 Q   How long did you work there at ProcureNet?

22 A   I think it was just under a year before the

23 acquisition.

24 Q   So is it true then that ePlus acquired

25 ProcureNet's business in 2001?

FARBER - DIRECT          1301

1   A    Yes, that would be correct.

2   Q    What specific portions or assets of ProcureNet's

3   business were acquired by ePlus in 2001?

4   A    They acquired the procurement and catalog systems.

5   All the associated things that would go with that such

6   as the documentation.  They acquired the patents that

7   we've been talking about that are in dispute here.

8   And they also acquired the people that were associated

9   with those applications.

10  Q    How many employees from ProcureNet joined ePlus as

11  part of the acquisition?

12  A    Mid thirties, 35 or 38 or so.

13  Q    Do any of those employees from ProcureNet still

14  work at ePlus?

15  A    For the most part, they all work at ePlus with the

16  exception of a couple that have since retired.

17  Q    Have you been continuously employed by ePlus since

18  you joined after the acquisition of ProcureNet?

19  A    I have.

20  Q    To whom do you report at ePlus?

21  A    I report to the CEO, Phillip Norton.

22  Q    You mentioned that you are the president of ePlus

23  Systems and ePlus Content Services; is that correct?

24  A    Yes.

25  Q    Can you describe the businesses of those divisions

1   of ePlus?

2   A    Sure.   Those divisions are responsible for

3   developing, supporting and selling applications that

4   are involved in the procurement and catalog management

5   fields.

6   Q    What are the primary software products that are

7   developed and sold by ePlus Systems and ePlus Content

8   Services?

9   A    They are referred to as Procure Plus and Content

10  Plus.

11  Q    Can you just give us a brief high level overview

12  of Procure Plus and Content Plus?

13  A    Sure.   The products work in conjunction with one

14  another, and it provides the ability for our customers

15  and end users to be able to select items from multiple

16  vendors from a catalog, compare those items, decide

17  which ones they would like to purchase from vendors,

18  put those items on a requisition, and the system goes

19  through a work flow for corporate approval.   Inventory

20  is checked to make sure that the items are available

21  in inventory or if they are backordered, if you will.

22      Then the items are placed -- there's usually a lot

23  of different line items on a requisition that somebody

24  orders.   They're not just ordering like a blue pen.

25  They may order different items from different vendors,

FARBER - DIRECT                    1303

1    and then the system distributes those items once

2    approved from one single requisition that creates

3    multiple purchase orders to the suppliers and vendors

4    that they're ordering from.

5    Q    Can you turn, please, to Plaintiff's Exhibit 448

6    in your binder in front of you?

7    A    Okay.

8              MR. McDONALD:  I'm going to object to this

9    line of questioning to the extent it goes into any

10   detail about the ePlus products because that's not

11   really relevant to the infringement issue because it

12   compares the Lawson products to the patent.

13             MR. STRAPP:  Your Honor, I don't intend to go

14   into any detail about the products.

15             THE COURT:  Why are you offering it?

16             MR. STRAPP:  It will become apparent in

17   the --

18             THE COURT:  Can you make it apparent now in a

19   word?

20             MR. STRAPP:  Yes.  The bottom right-hand

21   corner of the document, list the patents, I want to

22   demonstrate that these products are marked with the

23   patents that are in suit in this case.

24             THE COURT:  All right.

25             MR. McDONALD:  That's not an issue in the

FARBER - DIRECT          1304

1   case anymore, Your Honor.

2          MR. STRAPP:  Marking goes to constructive

3   knowledge of the patents, which is relevant to the

4   issue we just discussed.

5          MR. McDONALD:  It is not relevant to notice

6   to Lawson.  It's just general public marking.  That is

7   not appropriate.

8          MR. STRAPP:  Your Honor, the witness will

9   testify that the various products are marked, and we

10  have testimony from Lawson witnesses that they have

11  seen those products at trade shows back as far as

12  2003.  That information is relevant to knowledge.

13         MR. McDONALD:  The Lawson people have already

14  testified.  They never testified to that.

15         THE COURT:  I think one of them testified

16  that he went to a trade show and looked at their

17  products.

18         MR. McDONALD:  He said he saw the booth, but

19  they never saw the products or any patent markings.

20         THE COURT:  He says there's no foundation

21  because you haven't established that they actually

22  looked at the products that have the marking.

23         MR. STRAPP:  Your Honor, first of all,

24  circumstantial evidence is relevant to indirect

25  infringement.

FARBER - DIRECT          1305

1          Secondly, we believe there is direct evidence

2    that we have established through Mr. Lohkamp's

3    testimony.

4          And third, under the case law --

5          THE COURT:  Evidence of what?

6          MR. STRAPP:  That Lawson employees knew of

7    ePlus, that they have seen ePlus --

8          THE COURT:  Somebody said they knew about

9    ePlus, but that's not the point.  The point is did

10   they see these patents or these products that had the

11   notice of the patent on them.

12         MR. McDONALD:  Mr. Lohkamp's testimony about

13   seeing ePlus at the trade show was in 2003 before he

14   even worked for Lawson.  So there's no evidence that a

15   Lawson employee saw that.

16         MR. STRAPP:  Your Honor, there's evidence

17   that Lawson has known of ePlus.  There's

18   circumstantial evidence at least that Lawson knows

19   that ePlus competes in this particular marketplace.

20   EPlus marks its website, its software, and under the

21   case law, marking is evidence of constructive

22   knowledge of the patents, which can be relevant to

23   indirect infringement.

24         THE COURT:  Yes, it is.  But do you

25   understand the concept of linkage, foundation?

FARBER - DIRECT                    1306

1        MR. STRAPP:  Yes, Your Honor.

2        THE COURT:  Well, do you have it?

3        MR. STRAPP:  We have testimony from Lawson

4   employees that they have known of ePlus.  We have

5   testimony from a Lawson employee that he attended a

6   trade show in which ePlus had set up a booth

7   demonstrating --

8        THE COURT:  But he says that's before he even

9   was an ePlus employee.  Is that right?

10        MR. McDONALD:  Lawson.

11        THE COURT:  I mean a Lawson employee.  Is

12   that right?

13        MR. STRAPP:  I don't know the answer to that

14   one way or the other, Judge.

15        THE COURT:  Isn't that something you need to

16   know to establish the foundation.

17        MR. STRAPP:  Well, Your Honor, I believe

18   under the case law, even if we don't have direct

19   evidence, circumstantial evidence is sufficient to at

20   least go to the jury so that they can consider whether

21   or not there is sufficient evidence for the indirect

22   infringement claim.

23        THE COURT:  All right.  Anything else?

24        MR. McDONALD:  No, Your Honor.

25        THE COURT:  Objection overruled.  The

FARBER - DIRECT                    1307

1   exhibits and testimony right now is admitted for the

2   limited purpose of whether or not Lawson may have

3   knowledge of ePlus and their patents.   EPlus as a

4   competitor and their patents.

5   BY MR. STRAPP:

6   Q    Mr. Farber, can you just tell me briefly what this

7   document is?

8   A    Sure.   This is a document, which I believe

9   describes at a high level a little bit about the

10  functionality and features of the Procure Plus

11  product.

12  Q    Can I direct your attention to the bottom

13  right-hand corner of the first page of this document?

14  A    Yes.

15  Q    Do you see there a list of U.S. patent numbers?

16  A    I do.

17  Q    Do you recognize any of those patents numbers as

18  patents that are at issue in this case?

19  A    Yes.

20  Q    Are those the first three patents listed there?

21  A    Yes, they are.

22  Q    Can you explain to me why it is that ePlus has

23  decided to mark this particular Procure Plus brochure

24  with the three patents numbers that are at issue in

25  this case?

FARBER - DIRECT             1308

1   A   Well, it's my understanding from working with our

2   counsel that when you have a patents marking, it is a

3   necessity, and it's a form of providing general notice

4   to the industry that you have patents.

5       So we mark things that are publicly disseminated.

6   Q   Let me ask you to turn to Plaintiff's Exhibit 417,

7   please.  What is this document, Mr. Farber?

8            MR. McDONALD:  For the record, I have the

9   exact same objections.  I think I know what you're

10  going to say, but I just want to make sure you know I

11  have the same objections to this one.

12           THE COURT:  Are these the same kind of

13  documents, it's just another kind of product?

14           MR. STRAPP:  Correct.  We've discussed --

15           THE COURT:  Is that what it is?

16           MR. McDONALD:  Yes, it is, Your Honor, and I

17  guess you did have a limiting instruction.  So I'd at

18  least request the same limiting instruction.

19           THE COURT:  Well, this Exhibit 417 and this

20  testimony is, again, limited to -- for you to consider

21  as evidence respecting whether Lawson is on notice of

22  ePlus as a competitor and its patents that are at

23  issue in this case.  That's the only purpose that this

24  is admitted to.

25  BY MR. STRAPP:

1   Q    Mr. Farber, this is Plaintiff's Exhibit 417?

2   A    It's a similar document and brochure that shows up

3   in written form and on the website that relates to our

4   product information management solutions.

5   Q    Which product specifically does this relate to?

6   A    Catalog and Content Plus.

7   Q    Can you take a look at the bottom right-hand

8   corner of this document, please?

9   A    Yes.

10  Q    Do you see there a list of U.S. patent numbers?

11  A    I do.

12  Q    Do you see the same three U.S. patent numbers

13  listed first there that we had discussed with respect

14  to Plaintiff's Exhibit 443?

15  A    Yes.

16  Q    I'm sorry, 448.

17       Are these the three patents that are at issue in

18  this lawsuit?

19  A    Yes, that's the '683, the '516, and the '172

20  patent.

21  Q    What types of additional documents or other

22  documents, if any, does ePlus mark with '683, '516 and

23  '172 patents?

24  A    We mark the products themselves so that when

25  people utilize the system, they see the patents as

FARBER - DIRECT                1310

1   soon as they login.  Anybody that goes to our website

2   sees markings at numerous locations on our website.

3   Our printed materials, our documentation, information

4   that we hand out at things like trade shows are also

5   marked.  So it's basically we try to mark everything

6   that's publicly disseminated.

7   Q   Since when has ePlus marked its products and its

8   literature?

9   A   I think that was since 2002, if I'm not mistaken.

10  Q   What types of customers does ePlus target for

11  these Procure Plus and Content Plus products?

12  A   In terms of who we try to attract and sell to, I

13  would say the mid market.

14  Q   What do you mean by "mid market"?

15  A   Well, similar type customers that Lawson, you

16  know, talked about earlier in the week.  You know,

17  they're not necessarily the largest.  They're not

18  necessarily the smallest.  They fall within a range.

19  It can be, you know, a company that may be in revenue,

20  does, you know, 50 million to 2 1/2 billion.  That's a

21  very wide range, but that's what's considered mid

22  market in industry terms.

23  Q   Do you know whether or not ePlus competes with

24  Lawson for sales of its e-Procurement software?

25  A   Yes.

FARBER - DIRECT                1311

1    Q    How do you know that ePlus competes with Lawson?

2    A    Well, I know through personal conversations that I

3    have with prospects and meetings that I attend, sales

4    meetings with my sales executives or account

5    representatives that are meeting with prospects to try

6    to sell them a solution.

7    Q    Any other ways that you know?

8    A    Yeah.  That's one way.  Other ways, through emails

9    at times that, you know, these prospects would send to

10   my sales organizations that I get copied on.  And

11   sometimes in situations where you're on a conference

12   call, you know, with a lot of vendors, you know, and

13   the prospect that's looking to buy a solution would

14   generally ask some general questions so that, you

15   know, they give the benefit to all the vendors to hear

16   the answer.

17       And sometimes there may be occasion to hear of a

18   competitor situation that way as well.

19   Q    Like the Lawson employees we've heard testimony

20   from, do you also pay attention to industry analyst

21   reports?

22   A    I do.

23   Q    Can you please turn to Plaintiff's Exhibit 463.

24   A    463?

25   Q    That's correct.

FARBER - DIRECT                    1312

1    A    Okay.

2    Q    Do you recognize this document, Mr. Farber?

3    A    Yes.

4    Q    What is this document?

5    A    This document was published in 2006 by AMR

6    Research and it's entitled, Procurement and Sourcing

7    Applications Report, Market Sizing Series."  It's a

8    projection of where vendors are in this field between

9    2005 and 2010.

10   Q    Can you tell me, who is AMR Research?

11   A    AMR Research is a reputable research firm that

12   since have been acquired by Gartner within the last

13   year, but they were an organization that followed the

14   market and reported on the market.

15   Q    Does ePlus subscribe to reports by AMR?

16   A    We have, yes.

17   Q    Does ePlus subscribe to reports by other industry

18   analysts as well?

19   A    Sure.

20   Q    Can you turn to page 7 of the document with the

21   Bates numbers 136.  Do you see a section there

22   entitled, Procurement?

23   A    Yes.

24   Q    Is this section describing e-Procurement software

25   like the Content Plus and Procure Plus products that

1    you just discussed?

2    A    Let me just read it real quick.

3              THE COURT:   What page are you on?

4              MR. STRAPP:   I'm on Bates number ending 136.

5    A    At a very, very high level.

6    Q    Do you see in the middle this paragraph here AMR

7    is discussing who some of the companies with these

8    types of applications, it has a list of companies with

9    procurement applications, and it states, Companies

10   with procurement applications include Ariba, ePlus,

11   Epicor, Ketera, Lawson, Oracle, Quadrem, Isiris

12   Innovations, SAP, SciQuest and Vinimaya.

13        Is that consistent with your understanding of some

14   of the companies that develop and sell e-Procurement

15   software applications?

16   A    At this particular time, sure.

17   Q    This again was in 2006?

18   A    I believe so, yes.

19   Q    Let me ask you to turn to the page with the Bates

20   number ending 142 it's.  Page 13 of the document.

21   A    Okay.

22   Q    There's a chart there on this page that is

23   entitled, "Procurement and sourcing vendors ranked by

24   2005 procurement and sourcing revenue (including

25   estimated '06 growth.)  Do you see that?

FARBER - DIRECT                    1314

1    A    I do.

2    Q    What kind of information do you understand this

3    table -- what is this meant to convey in this table,

4    this information?

5    A    I think this is the analyst estimate relative to

6    where they think how large and how small companies are

7    in this space, and they are ranking them according to

8    what the analyst thinks their revenue is.

9    Q    This is ranking companies that develop and sell

10   e-Procurement software applications?

11   A    That's correct.

12   Q    Do you see on this chart that both Lawson and

13   ePlus are mentioned and ranked on this chart?

14   A    Yes.

15             THE COURT:   What page is it?

16             MR. STRAPP:   That's at Bates number ending

17   142.

18   Q    Let me ask you, Mr. Farber, what current or

19   potential customers has ePlus directly competed

20   against Lawson for business?

21   A    Well, my personal knowledge is Ames Corporation, a

22   company such as Fortress Investments, Sterling

23   Jewelers, Cleveland Clinic, Novant, Wolters Kluwer,

24   just to name a few.  I'm sure there are others, but

25   those are the ones that immediately come to mind.

FARBER - DIRECT                    1315

1    Q    Do you recall some testimony earlier this week

2    that on occasion the RFP process that we've heard

3    testimony about can be in confidence and you don't

4    always know as a procurement software company who

5    you're competing against?

6    A    Yes, that's very true.

7    Q    That's been your experience as well?

8    A    It has.

9    Q    Have you learned about additional instances of

10   competition between ePlus and Lawson during the past

11   week that you have spent here in court as ePlus'

12   corporate representative?

13   A    Yes, coincidentally, that's true.

14   Q    What instance of competition was that?

15   A    I didn't know that we were competing or

16   potentially competing with Lawson at Deaconess

17   Hospital.

18   Q    How did you learn that Lawson is competing with

19   ePlus in Deaconess Hospital?

20   A    I saw a document that came up.  I don't know if it

21   was an RFP or statement of work or something that came

22   up, and it says Deaconess, and it was around the time

23   frame that we actually lost Deaconess.  So I suppose

24   it went to Lawson.

25   Q    Is the testimony you have heard generally about

FARBER - DIRECT                    1316

1  the RFP process from Lawson consistent with your

2  understanding of how the RFP process works for

3  e-Procurement software?

4  A    Yes, I believe so.

5  Q    When ePlus receives an RFP, does ePlus itself

6  draft a response and ensure that the response that it

7  gives to the RFP is accurate?

8  A    Yes, ePlus would draft the response, yes.

9  Q    In addition to industry analyst reports, what

10  other types of media or publications do you follow to

11  try to keep abreast of trends or developments in the

12  e-Procurement industry?

13  A    In addition, to analysts reports?

14  Q    Correct.

15  A    There's a lot of sources.  You know, we do --

16  besides the reports, you get to have briefings with

17  the analysts.  We actually sit down and they disclose

18  some information to you about competition.  There's

19  times where we follow -- not times.  We do follow a

20  number of different trade magazines.  There's web

21  based information such as blogs that are written now

22  in this discipline of procurement sourcing and catalog

23  management.

24      There's the competitors websites that we looked at

25  very often to see what the competitors are doing and

FARBER - DIRECT                1317

1    try to gain insight based on whatever public

2    information is available to help us position our

3    products and solutions.

4    Q    Do you know whether in these types of publications

5    you've been discussing there's ever been any mention

6    of ePlus or its patents?

7    A    Yes.

8    Q    What are you referring to specifically?

9    A    There have been authors that have written things

10   on blogs, on websites.   There have been newspaper

11   articles, trade magazines widely published --

12              MR. McDONALD:  Your Honor, we already went

13   through these issues as to foundations for some

14   exhibit that's been excluded.   Now he's talking about

15   the same thing.   That has been excluded.

16              THE COURT:  It sounds to me like it.

17              MR. STRAPP:  Your Honor, I wasn't planning to

18   go into any detail about these exhibits or show them,

19   obviously.   I was just asking about his personal

20   knowledge as the president of ePlus, what does he do

21   to keep abreast of industry developments.

22              THE COURT:  What's that got to do with

23   anything in the case?

24              MR. STRAPP:  It's relevant to understanding

25   how the marketplace works and how people in the

FARBER - DIRECT                1318

1    industry, including the president of ePlus keeps track

2    of what's going on in the industry.

3              THE COURT:   Objection sustained.

4    BY MR. STRAPP:

5    Q   All right.  Mr. Farber, you heard some testimony

6    that individuals at Lawson consider publications from

7    Gartner, I think that's an industry analyst, to be

8    some of the most reliable industry publications.  Is

9    that consistent with your understanding as well?

10   A   That's what they said, yes.

11             THE COURT:   The question is:  Is it

12   consistent with your understanding?

13             THE WITNESS:   That Gartner is a widely

14   recognized --

15   Q   And reliable publication?

16   A   For the most part.

17   Q   Is Gartner an industry analyst report that ePlus

18   subscribes to?

19   A   We have.

20   Q   Have you personally reviewed Gartner research

21   reports and industry analyst reports?

22   A   I have.

23   Q   I'd like you to turn, please, to Plaintiff's

24   Exhibit 325.

25   A   I don't know that I have a 325.  Here it is.  It's

1    out of order.  Okay.  I got it.

2    Q    It's also up on the screen for your reference if

3    you want to see a larger version there.

4    A    Okay.

5    Q    Does this appear, Mr. Farber, to be a Gartner

6    research report?

7    A    Yes.

8    Q    And is this the type of Gartner research report

9    that you have reviewed in the past?

10   A    Yes.

11   Q    What's the date of this particular Gartner

12   research report?

13   A    This is February 17, 2005.

14   Q    What is the title of this report?

15   A    Ariba/ePlus settlement could spark more patent

16   lawsuits.

17   Q    From reading that title, what do you understand

18   the subject matter of this particular report to be?

19   A    On the subject line, it's referring to a

20   settlement agreement that Ariba and ePlus had

21   pertaining to a certain number of our patents, and

22   Gartner, you know, is letting people know that it

23   could potentially result in some more litigation or

24   lawsuits.

25   Q    What patents were the subject of this patent

FARBER - DIRECT                    1320

1    infringement settlement referenced in the Gartner

2    report?

3    A    The same ones that are at issue here today.

4    Q    The three patents that are at issue in this case?

5    A    That's correct.

6    Q    All three of those were at issue in this Ariba

7    and ePlus litigation?

8    A    Yes, that's correct.

9    Q    What is the recommendation here at the second

10   sentence of the first page?

11   A    Starting with investigate, investigate the risk of

12   challenges to your products and whether others have

13   infringed on your patents.

14   Q    What do you understand that to mean?

15   A    They are giving advice, the research analysts --

16        MR. McDONALD:  Objection, Your Honor.  I

17   don't think the witness can interpret the report.

18        THE COURT:  Sustained.

19   Q    Let's turn to the next page of the document,

20   please.

21        THE COURT:  Ladies and gentlemen, this

22   document is admitted for a limited purpose.  Whether

23   or not Ariba and ePlus settled a lawsuit involving the

24   infringement of this case, I mean of the

25   patents-in-suit in this case, is not one of -- is

FARBER - DIRECT                1321

1   admitted only for the purpose of whether -- for you to

2   to consider as evidence of whether Lawson knew about

3   ePlus and the patents-in-suit in the case in view of

4   the fact that one of the witnesses from Lawson

5   testified about reviewing the Gartner reports as a

6   regular proposition.

7            You may not conclude from this information

8   that because Ariba thought it might have infringed

9   ePlus' patents and reached a settlement of that matter

10  that Lawson infringes those same patents, but you can

11  consider the evidence of whether Lawson knew about

12  ePlus as a competitor and ePlus' patents, and also in

13  deciding on some of the as, I'll tell you later, some

14  of the defenses that have been offered in the case by

15  Lawson.  And those are the limited purposes.

16           Are there any other requests for limiting

17  instruction other than what I just gave?

18           MR. McDONALD:  No, Your Honor.  Thank you.

19           THE COURT:  All right.

20  Q   Mr. Farber, I'd like to direct your attention to

21  the bottom of the second page of this Gartner report.

22  Do you see that there are some recommendations listed

23  there in bullet points?

24  A   Yes.

25  Q   I want you to take a look in particular at the

FARBER - DIRECT                1322

1   recommendations for ISVs.  Is ISV a term that's used

2   in the supply chain management industry?

3   A    It's used in the computer industry.

4   Q    What does it refer to?

5   A    It means independent software vendors.  Those

6   vendors that develop and install software.

7   Q    Is ePlus an ISV?

8   A    Yes.

9   Q    Is Lawson an ISV?

10  A    Yes.

11  Q    What recommendations is Gartner providing to

12  companies like ePlus and Lawson in this particular

13  Gartner research report?

14  A    What Gartner is recommending is to make sure that

15  your innovations are patented, which is the marking

16  that we talked about earlier, and then do an extensive

17  review of the functionality of your software against

18  patents that are known to be in dispute.

19          MR. McDONALD:  Your Honor, we don't need this

20  witness to read this document to us.  I object.

21          THE COURT:  I think that's enough.

22          MR. STRAPP:  I have no further ear questions.

23  Thank you for your time, Mr. Farber.

24          THE COURT:  Cross-examination.

25

1323

1     CROSS-EXAMINATION

2  BY MR. McDONALD:

3  Q    Good afternoon, Mr. Farber.

4       EPlus never gave Lawson any notice of these

5  patents directly before they sued them, did they?

6  A    No.

7  Q    And so the first time there's a direct

8  communication between ePlus and Lawson is when ePlus

9  filed a complaint and served that complaint on Lawson?

10 A    Yes, that's my understanding.   That's the way we

11 were instructed to do that.

12 Q    That was in May of 2009; is that correct?

13 A    I believe that's correct, yes.

14 Q    You talked at the beginning of your testimony

15 about some documents that you said put the patent

16 number out there in the public so that the public

17 would see you had these patents numbers.   Do you

18 remember that?

19 A    I said that we put the information out because it

20 was our understanding that that's how you have to

21 disseminate the patent, and we put it on documents

22 that are publicly available.

23 Q    And those documents that you picked as examples of

24 those publicly available documents, those are a couple

25 of exhibits that were put up on the computer monitors

FARBER - CROSS                1324

1  during your testimony, right?

2  A   I didn't select them but I think my attorneys did,

3  yes.

4  Q   You weren't surprised that they were asking you

5  about those documents, are you?

6  A   I'm not surprised at anything.

7  Q   So let's put up Exhibit 448 for a moment.

8  Plaintiff's Exhibit 448.

9  A   Okay.

10  Q   Do you recall this was one of the documents that

11  Mr. Strapp asked you about?

12  A   Yes.

13  Q   This is one of these examples of these publicly

14  disseminated documents that have the patent number?

15  A   Yes.

16  Q   Can we blow up -- on the first page of Plaintiff's

17  Exhibit 448, the lower left corner, all the way down

18  to the very bottom of the page, as far as you can go.

19  A   Yes.

20  Q   Isn't it true, Mr. Farber, that the document that

21  you said was publicly disseminated was, in fact,

22  designated by ePlus, your company, as confidential and

23  proprietary to ePlus, Inc.?

24  A   On this it was, but I don't know if this was a

25  brochure, Mr. McDonald, or if it was on our website

1   screen that gets published.

2   Q    Are you saying you have on a website information

3   that would be publicly available that you're going to

4   say that that is confidential and proprietary to

5   ePlus?

6   A    It could be.

7   Q    Do you actually know what you're talking about or

8   not?

9           THE COURT:  Wait a minute.  That's not a

10  proper question.

11          But let me tell you-all something.  This

12  designation is confidential.  All of this.  This is

13  something that happened during the lawsuit under a

14  protective order.  And what happens is when the

15  parties exchange documents, the lawyers can say they

16  are confidential or certain kind of categories or not.

17  That's how it was put on there.

18          MR. McDONALD:  That's only the very bottom

19  one, Your Honor.  That's the only one that's in all

20  capitals that was marked --

21          THE COURT:  I'm sorry.  Anyway.  That's what

22  this big thing that says, Confidential, PX 004, page 1

23  of 8 means.

24          Now, he's talking about this section of the

25  first page.  Can you highlight that?  Proprietary and

1   confidential, ePlus, Inc.  That means that when ePlus

2   put this out to the public, they also put out the fact

3   that it was proprietary and confidential ePlus

4   information.  Whatever that means.  All right.

5   BY MR. McDONALD:

6   Q    Do you see that highlighting here on the screen,

7   Mr. Farber, that proprietary and confidential, ePlus,

8   Inc.?

9   A    I do.

10  Q    That was a marking that the company put on this

11  document, right?

12  A    I would imagine so.

13  Q    Then there's another one below that that the Judge

14  was talking about that was done by the lawyers for

15  ePlus in producing this to Lawson?

16  A    That's what I heard.

17         MR. McDONALD:  So if we look above the

18  highlighting, if we could highlight that paragraph

19  above that, Bill.

20  Q    The sentence that begins, All information.  So

21  that's in addition to the proprietary and confidential

22  legend from the company.  Above that there's actually

23  a paragraph that says, All information contained

24  within this document is confidential and proprietary

25  to ePlus, Inc.  Do you see that?

FARBER - CROSS                    1327

1    A    I do.

2    Q    This document wasn't publicly distributed, was

3    it?

4    A    I disagree with you.  I believe it was.

5    Q    What's your basis for believing this document that

6    was designated by ePlus was confidential and

7    proprietary was publicly distributed?

8    A    Because I'm familiar with the document, and I know

9    of certain instances of where it was used, and I know

10   that it was freely distributed in certain trade shows

11   and to certain customers, and the information as

12   depicted here is also on our website.

13   Q    Well, you mentioned distributing information to

14   customers.  Is it true that from time to time you've

15   distributed information to customers, but you want to

16   limit the distribution of it so it doesn't go beyond

17   the customers?

18   A    And we usually have a nondisclosure in place for

19   that, yes.

20   Q    So this is something that you might have disclosed

21   to a customer with the intent that it not be further

22   distributed to other companies such as Lawson,

23   correct?

24   A    No, I don't believe I said that.

25   Q    But I'm asking you, isn't it true when you put a

FARBER - CROSS           1328

1   legend like this that it's confidential and

2   proprietary on a document like this describing your

3   product in some detail, really the purpose of it is to

4   go to prospective customers and not to go to your

5   competitors, right?

6   A    Customers and prospects.

7   Q    That's who you want to see this information.  You

8   don't want Lawson to see this, do you?

9   A    No more than Lawson would want us to see any of

10  their information, but that's not necessarily why this

11  was marked this way.

12  Q    Isn't it true that every page of this document has

13  that proprietary and confidential, ePlus, Inc. marking

14  in addition to the confidential marking that lawyers

15  put on it?

16  A    It does.

17  Q    Let's go to the other example document that you

18  mention.  That was Plaintiff's Exhibit 417, correct?

19  A    417, sure.  Okay.

20  Q    This is the other example that was put up on the

21  screen during your testimony in answering Mr. Strapp's

22  questions about another example of a publicly

23  distributed document that supposedly was distributed

24  with the patent English, right?

25  A    That's correct.

1    Q    Now, if we go down again to the lower left corner

2    of this document, we see the exact same confidential

3    and proprietary legend here again, don't we?

4    A    We do.

5    Q    It's the ones from the lawyer and also the ones

6    from the company, right?

7    A    It appears to be, yes.

8    Q    If you thumb through every page of this exhibit

9    417, you'll see that the company again put on its own

10   proprietary and confidential ePlus, Inc. destination

11   on every one of those pages that you say was publicly

12   disseminated, right?

13   A    Yes, I do.

14   Q    Just to be clear, I didn't pick these examples,

15   right, Mr. Farber?  It was your lawyers who picked

16   these examples of the marked documents?

17   A    That's correct.

18   Q    Isn't it true that you actually go out of your way

19   to make sure that your customers don't talk -- excuse

20   me.

21        THE COURT:  Wait just a minute.  I'm confused

22   about something at least with these two exhibits.  Are

23   these exhibits, were they made available to people

24   like Lawson or were they made available only to your

25   potential customers?

FARBER - CROSS                    1330

1      THE WITNESS:  I don't know.  I guess they are

2  provided to Lawson in discovery, Your Honor.

3      THE COURT:  No, no.  I don't mean that.  I

4  mean in the business world, the world you function in

5  with all this proprietary on here, etc., etc., in your

6  previous testimony, were these documents ever

7  distributed to your competitors or were they limited

8  in distribution to people with whom you were hoping to

9  do business, your customers?

10      THE WITNESS:  They were distributed to

11  prospects, those that we were hoping to sell our

12  solutions to as well as being on our publicly

13  available website.

14      THE COURT:  So it's on your website, but if

15  you distributed the documents, you distributed them

16  not to competitors, you gave them to your prospects;

17  is that right?

18      THE WITNESS:  That's correct, yes.

19      THE COURT:  And anybody can go to your

20  website; is that right?

21      THE WITNESS:  Absolutely, correct.

22  BY MR. McDONALD:

23  Q   There's no designations on these exhibits that

24  we've been looking at, Mr. Farber, 417 or 448, that

25  indicate they were actually something that was on your

1   website, is it?

2   A   No, I'm saying that from my personal knowledge.

3   Q   These indicate they were dated September 2007.  Do

4   you see that?

5   A   Yes, I do.

6   Q   Are you saying this was on ePlus' website in

7   September of 2007?

8   A   Yes, I am.

9   Q   Do you know that because in September of 2007 you

10  have a memory as you sit here today that these

11  particular documents were on ePlus' website?

12  A   I could tell you that the component of our website

13  that has these documents has not been altered.  So

14  this information as you see it is going to be on our

15  website today.

16          THE COURT:  It has not been altered since

17  when, sir?

18          THE WITNESS:  Since the publication, 2007.

19  Q   Now, has ePlus actually issued any press releases

20  regarding the issuance of any of the three patents in

21  this suit?

22  A   I'm sorry.  Can you repeat that?

23  Q   Are you aware of ePlus issuing any press release

24  about the issuance of any of the three patents

25  involved in this case?

FARBER - CROSS                    1332

1    A    The issuance of the patents?

2    Q    Yes.

3               THE COURT:  Do you know what that means?

4               THE WITNESS:  It means when the Patent

5    Office --

6               THE COURT:  Yeah, when the Patent Office

7    issued the patents, at that time did ePlus issue any

8    press releases?

9               THE WITNESS:  I'm not aware of the issuance.

10   Most of the issuance or some of them, I think, might

11   have been before my time at ePlus.  So I don't know.

12   Q    The third one was still pending when ePlus

13   acquired these assets, right?

14   A    I believe it may have.  I don't recall.

15   Q    Well, you were actually involved with a press

16   release about that third patent, weren't you?

17   A    May have been.  I don't recall.

18   Q    Isn't it true that the third patent is the '172

19   patent, correct?

20   A    Yes, that's correct.

21   Q    That's the one claim that doesn't have the word

22   "catalog" actually literally in the claim asserted

23   here?

24   A    I think that's the one that says "database"?

25   Q    Yes.

FARBER - CROSS                    1333

1  A   Yes.

2  Q   Okay.  Isn't it true that you were actually quoted

3  in a press release about that patent issuing that

4  called that patent a patent on electronic cross

5  catalog searching?

6  A   I may have.  I'd have to see the press release.  I

7  don't recall what was said.

8           MR. McDONALD:  May I approach, Your Honor?

9           MR. STRAPP:  Objection, Your Honor.  This is

10  beyond the scope of my direct.  In never got into

11  press releases.  I never talked about the subject

12  matter of the '172 patent.

13           THE COURT:  Can I see it?

14           MR. McDONALD:  We just got through talking

15  about how they publicly disseminated information about

16  their patents.  That's what I'm asking about here.

17           THE COURT:  I think he didn't ask about the

18  '172 patent, but he did ask about public information,

19  public dissemination of the '172 patent by virtue of

20  what is on Exhibit 417 and 448.  So the objection is

21  overruled.

22  BY MR. McDONALD:

23  Q   Mr. Farber, you have been handed now --

24           THE COURT:  Did you give it to him?

25           MR. LANGFORD:  Yes.

FARBER - CROSS          1334

1   Q    You've been handed now an Exhibit entitled, "ePlus

2   awarded patent on electronic cross catalog searching,"

3   do you see that?

4   A    Yes.

5            THE CLERK:  Does it have a number?

6            MR. McDONALD:  No, it should be numbered.

7   Can we get a sticker so we can mark this?

8            THE COURT:  Are you offering it as an

9   exhibit?

10           MR. McDONALD:  I think I will be offering it

11  as an exhibit, Your Honor, once he has a chance to

12  look at it.

13           MR. STRAPP:  No objections, Your Honor.

14           MR. McDONALD:  We'll designate it as DX 400.

15           THE COURT:  All right.

16  BY MR. McDONALD:

17  Q    So, Mr. Farber, do you recognize what's been

18  marked now as Exhibit 400 as a press release that

19  ePlus issued when it got that '172 patent, that third

20  patent?

21  A    Yeah, I mean vaguely I recall it, yes.

22           MR. McDONALD:  I think I heard "no objection"

23  before I even offered it, but I would offer up

24  Plaintiff's Exhibit 400, Your Honor.

25           THE COURT:  It's admitted without objection.

FARBER - CROSS                    1335

1    MR. McDONALD:  Thank you.

2         (Plaintiff's Exhibit 400 is admitted into

3    evidence.)

4    BY MR. McDONALD:

5    Q   So this relates to the patent No. 6,505,172 as you

6    can see in that second paragraph, right?

7    A   That's correct.

8    Q   That's the patent with the one claim that's

9    asserted in this class that doesn't use the word

10   "catalogs," right?

11   A   That's correct.

12   Q   In that paragraph, in the press release, and you

13   personally are quoted in this press release down in

14   the fourth paragraph, correct?

15   A   That's correct.

16   Q   In the second paragraph, it says that that patent

17   "covers ePlus' technology for searching multiple

18   catalogs from different suppliers simultaneously,

19   checking inventory availability, and transferring

20   information on selected items to generate purchase

21   orders in an e-Procurement purchasing ERP or

22   accounting system," correct.

23        MR. STRAPP:  Objection, Your Honor.  We don't

24   object to this document for purposes of notice and for

25   purposes that the patent is publicly available, but we

FARBER - CROSS                1336

1    do object to the extent that this question calls for a

2    claim interpretation.  It calls for a legal

3    conclusion.  It goes beyond the scope of direct as to

4    the interpretation of the patents claims.

5          MR. McDONALD:  I'll take it a step at a time,

6    Your Honor, but I think this has to do with the

7    message they were sending out.  He's been testifying

8    about what the message was about their patent.

9          THE COURT:  I know it has to do with the

10   message because it's a press release, but that doesn't

11   respond to the objection.

12         MR. McDONALD:  Well, it responds to how they

13   are representing their patent out there to the public,

14   and if they are trying to say that Lawson should have

15   been an aware of publicity and realized they had a

16   problem here, I think I'm entitled to show that they

17   were telling the world these patents had to do with

18   cross catalog searching.

19         MR. STRAPP:  Your Honor, the quote that Mr.

20   McDonald is reading from is a quote from Mr. Farber

21   describing the product, not the patents.  Furthermore,

22   it's irrelevant what Mr. Farber's interpretation of

23   the patent claims are.  That's already been decided,

24   Your Honor, and there's no need for him to testify

25   about that.

FARBER - CROSS                    1337

1    THE COURT:  I think it's confusing and leads

2  to the development of collateral issues which will be

3  further confusing.  So the objection is sustained to

4  the question.

5    MR. McDONALD:  You can take that off the

6  screen, I guess, at this point, then we'll move on to

7  other topics here.

8  BY MR. McDONALD:

9  Q   You were here when Ms. Marion testified as the

10  first witness of ePlus, right?

11  A   Yes.

12  Q   Would you agree that just before ePlus sued

13  Lawson, this division that you're responsible for that

14  has the e-Procurement software, had a big $4 million

15  write-down of its goodwill valuation because its sales

16  were going down?

17    MR. STRAPP:  Objection, Your Honor.  This is

18  beyond the scope of my direct.  It doesn't have

19  anything to do with the issues of infringement.  This

20  witness will be called back for in validity related

21  issues, but this is beyond the scope of this

22  particular part of the case.

23    THE COURT:  I've already ruled on that topic.

24  It was something that needs to be dealt with in

25  invalidity, and he didn't open it up by what he did.

FARBER - CROSS                    1338

1   You shouldn't have asked that question.  Sustained.

2   BY MR. McDONALD:

3   Q    In the SCC disclosures in early 2009, there was no

4   identification of Lawson as a competitor or an

5   infringer or any cause of any harm to ePlus, correct?

6   A    I think that's what Elaine Marion testified to.

7   Q    I'm asking for your testimony, Mr. Farber.

8   A    Then repeat the question because you confused me.

9   Q    All right.  Isn't it true that in early 2009, just

10  before you sued Lawson, the disclosures to the SCC

11  regarding the write-down and the value of your

12  division said nothing about Lawson as a competitor?

13          MR. STRAPP:  Objection.  I move to strike the

14  question.

15          THE COURT:  Sustained.  If you do it again,

16  there will be other consequences.  You can get into

17  that in the other area.

18  BY MR. McDONALD:

19  Q    Mr. Farber, I'd like to turn then to what you were

20  saying about competition with Lawson and you mentioned

21  some specific customers.

22      Isn't it true that for some of the customers you

23  listed, they already had Lawson systems in place and

24  you were competing for some additional business with

25  those customers?

1    A    On one or two of them I understand that they had a

2    Lawson procurement system in place that we were both

3    responding to the requirements of interfacing with

4    that system as well as potentially replacing that

5    system over time.

6    Q    Isn't it true that Cleveland Clinic was the

7    company that you're you talking about or at least one

8    of them?

9    A    That wasn't one that immediately came to mind, but

10   yes.

11   Q    Who did you have in mind when you said there was

12   at least one?

13   A    I think it was Novant.  I know that Novant and

14   Cleveland Clinic were both customers of the

15   procurement solution.

16   Q    So your understanding is that both Novant and

17   Cleveland Clinic had the purchase order, requisition,

18   and inventory control modules from Lawson?

19   A    I can't say that.

20   Q    When you say "procurement," what is your

21   understanding as to what the Lawson procurement

22   product would have been?

23   A    I didn't look at it that way.  I looked at the

24   functionality that they were requesting and talking to

25   us about, and if they were utilizing that

1    functionality and said they were utilizing that

2    functionality of the Lawson system, I didn't equate

3    them to a specific product name.  I equated them to

4    the functionality that both products were generally

5    equivalent, and you were already in there, and I was

6    potentially trying to displace you or displace Lawson.

7    Q    Isn't it true that actually for Cleveland Clinic,

8    the issue that Cleveland Clinic had sent out a request

9    for bids on wasn't to replace the Lawson system, it

10    was to add some catalog functionality to the Lawson

11    system?

12    A    It was a two-step approach with Cleveland Clinic

13    and I received personal emails from Cleveland Clinic

14    that said initially that they wanted to evaluate both

15    our catalog capabilities to help them populate a

16    Lawson system with vendor catalogs, and then also to

17    learn more about our general procurement solution.

18    And that led my sales organization to talking to them

19    down the road about a potential replacement.  So it

20    was going to be a two-step sales approach.

21    Q    But what Cleveland Clinic had, they already had

22    Lawson Punchout, didn't they?

23    A    I don't know.

24         MR. McDONALD:  Can we put up Defendant's

25    Exhibit 45, which already is admitted.

FARBER - CROSS                    1341

1   A    I'm sorry.  Which one?

2   Q    Defendant's Exhibit 45.

3            THE COURT:  It's not in your book.

4            MR. McDONALD:  I can give you a paper copy

5   while we're putting it up.

6            Can we blow up the text down to the signature

7   block, I guess.

8   BY MR. McDONALD:

9   Q    Mr. Farber, while they are doing that, do you

10  recognize Exhibit 45 as an email regarding a Lawson

11  meeting?

12  A    Yes, that's what it looks like for sure.  Yes.

13  Q    This was an email I showed to you back in December

14  of 2009 at your deposition, right?

15  A    I don't recall it, but if you say so, I'll agree

16  with you.

17  Q    You see there's a little sticker there that looks

18  like it has the Exhibit Lawson 36 on it down there?

19  Above the yellow sticker, there's a white sticker?

20  A    Yes.

21  Q    And it's got Lawson 36 and then 12-17- and I'm

22  going to interpret that next number 09?

23  A    I see that, yes.

24  Q    I understand that's awhile ago, but do you

25  remember having to do a deposition in this case back

1   in December of '09?

2   A    Yes, I do.

3   Q    This document is an ePlus email, correct?  These

4   are ePlus employees?

5   A    Yes, they are.

6   Q    And this had to do with Cleveland Clinic, correct?

7   A    It appears to be.

8   Q    That's what the initials CCF -- does that stand

9   for, is it Cleveland Clinic Foundation?

10  A    I believe so.

11  Q    And this is in February of; 08, correct?

12  A    Yes.

13  Q    Now, this Lawson meeting, do you have an

14  understanding as to what exactly that means as the

15  topic of this email?

16  A    No, I don't.

17  Q    But you did review it over a year ago, and you

18  have had every chance to review that, correct?

19  A    Yeah, I guess.  Sure.

20  Q    And you recall that back in December when you were

21  deposed, you were deposed as a witness designated on

22  behalf of ePlus to talk about issues including

23  competition?

24  A    Sure.

25  Q    So if we take these notes from the Lawson meeting

1    here, I'll start with No. 1, they are no bidding this

2    RFP as they do not have the catalog services

3    necessary.  Do you see that line?

4    A    I do.

5    Q    Do you understand that Lawson wasn't bidding for

6    that Cleveland Clinic catalog business in terms of

7    Lawson representing that it had the additional catalog

8    services Cleveland Clinic was seeking to add to the

9    Lawson system, right?

10   A    I can't universally say that.  You're implying

11   that it's Lawson.  It says "notes from Lawson

12   meeting," and you're implying that "they" means Lawson

13   specifically no bidding.  I don't know what -- you'd

14   have to refresh my he memory and we'd have to go back

15   and look at all the requirements that were in that bid

16   so I can know precisely what it is that they are

17   looking for.

18   Q    Do you see any information in this email that

19   would indicate that the "they" that's being referred

20   to in point No. 1 under the title "notes from Lawson

21   meeting" is somebody other than Lawson?

22   A    They could have had an internal meeting between

23   Drew Buford, Paul Jarboe and Jay Raulerson to discuss

24   Lawson.  That doesn't mean that Lawson was physically

25   at the meeting.

1   Q    But somebody may have gotten information that

2   indicated that Lawson wasn't bidding for the catalog

3   services, right?

4   A    I wouldn't know that.

5   Q    But you did testify as the corporate

6   representative on competition issues including this

7   document?

8   A    I'm not on the document.  I'm not copied on the

9   document, and I'm telling you to the best of my

10  knowledge I don't know.

11  Q    Now, do you see on point No. 2 there, it indicates

12  that all of CCF currently uses Lawson's requisition

13  self service.  Do you see that?

14  A    I do.

15  Q    It goes on from there, but I just want to focus

16  the requisition self service.  That's something we've

17  heard testimony about in this case, that RSS module?

18         MR. STRAPP:  Objection.  There's been no

19  foundation laid for this specific type interpretation

20  testimony that Mr. McDonald is seeking about this

21  document.  Lack of foundation.

22         THE COURT:  Sustained.  It says Lawson

23  meeting.  We haven't even established that it was a

24  meeting with Lawson.  Basically, he doesn't know

25  anything about the document is what it sounds like.

FARBER - CROSS                 1345

1   So if you can establish a foundation that he knows

2   what's in it and what's talked about, that's one

3   thing, but otherwise, let's move on to something else.

4   BY MR. McDONALD:

5   Q   Had Cleveland Clinic indicated that they were

6   going to stay with Lawson's requisition self service

7   but use the ePlus catalog, would ePlus have found a

8   way to accommodate Cleveland Clinic and integrate

9   their catalog functionality with Lawson's requisition

10  self service?

11          MR. McDONALD:  Objection.  Calls for

12  speculation.

13          THE COURT:  It starts with if, right?

14          MR. McDONALD:  It starts with "had."

15          THE COURT:  Huh.

16          MR. McDONALD:  Had Cleveland Clinic indicated

17  that.

18          THE COURT:  "Had" meaning the same thing as

19  "if."  Sustained.

20  BY MR. McDONALD:

21  Q   Now, is it true that --

22          MR. STRAPP:  Your Honor, could I ask that

23  document be taken off the screen?  Thank you.

24  BY MR. McDONALD:

25  Q   Did ePlus have some discussions with Lawson

FARBER - CROSS                    1346

1   specific to Cleveland Clinic to determine whether or

2   not they could integrate their products with Lawson's

3   product and represent that to Cleveland Clinic?

4   A    We may have.

5             THE COURT:  Do you know that?

6             THE WITNESS:  I don't know that.

7             THE COURT:  Then say "I don't know."  Don't

8   be guessing.  It helps the jury to know what you know,

9   not what might have happened.  Or if you're saying it

10  may have, and I have a vague recollection of it, then

11  say something like that, but don't guess, Mr. Farber.

12            THE WITNESS:  Okay.  I don't know at this

13  time.

14  BY MR. McDONALD:

15  Q    But you're aware of situations where ePlus has

16  integrated its product with Lawson products, right?

17  A    With their accounting and human resource products,

18  yes.

19  Q    I think you mentioned before, though, that

20  Cleveland Novant was something that you're aware of

21  that -- I'll withdraw that question.

22       So you have made that effort, though, to integrate

23  ePlus' products with Lawson's software before?

24  A    We have integrated our solutions at several of our

25  clients, and we've interfaced our procurement

1    solutions and catalog solutions with Lawson's human

2    resource and accounting software.

3    Q    In the course of these efforts to integrate with

4    Lawson, have you ever had any communications with

5    Lawson before you sued them that related at all to the

6    patents in this case?

7              MR. STRAPP:  Objection, asked and answered.

8              THE COURT:  Sustained.  Well, actually, no

9    because he said he didn't notice of the patents.  It

10   sort of overlaps.

11             But have you ever discussed the subject of

12   the patents with Lawson before the suit was initiated

13   is the question.

14             THE WITNESS:  No.

15             MR. McDONALD:  I'm just checking my notes

16   here, Your Honor.  I think I'm close to done if I

17   could have a moment.

18   BY MR. McDONALD:

19   Q    Mr. Farber, you don't have any personal knowledge

20   that anybody from Lawson ever actually saw an ePlus

21   product of any kind, right?

22   A    I'm sorry.  Can you repeat that?  I didn't hear

23   you.

24   Q    Sure.  You don't have any personal knowledge that

25   any employee of Lawson has ever seen an actual ePlus

1    product, right?

2    A    I don't have any personal knowledge, no.

3    Q    Are you aware of any corporate knowledge at ePlus

4    that would indicate that Lawson personnel had ever

5    actually seen an ePlus product?

6    A    Not that I'm personally aware of.

7    Q    On this integration issue, is it true that ePlus

8    does represent that its products that have catalog

9    content can be integrated with other companies'

10   procurement products?

11   A    Repeat that question.

12   Q    Okay.  Is it true that ePlus does represent to

13   potential customers that its products relating to

14   content, catalog content, can be integrated with

15   software systems from other companies?

16   A    Not necessarily.  We don't provide catalog

17   content.  We have tools that will work with content

18   and enable it to be populated into other systems.

19   That's what we represent.  We don't provide a catalog

20   that has content prepopulated.

21   Q    Finally, I do have one more thing.  You talked

22   about that research report, plaintiff's Exhibit 463

23   from AMR.  Do you recall that?

24   A    Yes.

25              MR. McDONALD:  Can we pop up Plaintiff's 463,

1   please.  I just wanted to go to the page -- I think

2   it's page 15 of the document, Bill.

3   BY MR. McDONALD:

4   Q   And for you, Mr. Farber, it's got the number 6144

5   in the lower right corner.

6            THE COURT:  The pie chart?

7            MR. McDONALD:  It's a pie chart, that's

8   right.  Figure 2.

9   Q   Do you see that pie chart, Mr. Farber?

10  A   I do.

11  Q   This is a document you said you reviewed and

12  understood, correct?

13  A   That's correct.

14  Q   So figure 2, it said that's for top 10 procurement

15  and sourcing vendors by 2005 total revenue share,

16  right?

17  A   Yes.

18  Q   Do you see there that Lawson has got a 3 percent

19  slice in the lower right side about five o'clock?

20  A   I see that.

21  Q   Is ePlus anywhere on the pie?

22  A   No.  I'm sure it would be considered in the

23  "other" catagory.

24  Q   Can we turn to the next page of figure 2A?  That's

25  another pie chart, correct?

FARBER - CROSS                        1350

1    A    Yes.

2    Q    This is for procurement and sourcing hosting

3    revenue share, 2005, correct?

4    A    That's correct.

5    Q    What is your understanding as to what that's

6    talking about with the word "hosting"?   "

7    A    That's trying to depict or estimate the vendors

8    that are in the procurement and sourcing that offer

9    procurement and sourcing systems, where they rank

10   relative to those companies providing hosting

11   facilities to their customers, which I think we heard

12   what hosting was a few days ago.

13   Q    Would hosting, would that include hosting catalog

14   content?

15   A    Would it mean hosting catalog content?

16   Q    Would it include it?

17   A    It could.  It could be a data center that anything

18   that the customer is running or licensed to use would

19   be in that hosting facility.  It wouldn't be owned by

20   any of these companies.  It would be maintained.

21   Q    You're just managing and maintaining the content?

22   A    No, that's not what this is saying.  This is

23   maintaining the system, the application, the server it

24   runs on, the network that it belongs to, how an end

25   user would access it remotely.  It has nothing to do

FARBER - CROSS                    1351

1   with the underpinnings of the operation of the

2   software and the administration of it.

3   Q    So does it have anything to do with managing the

4   content itself that the customer may be using?

5   A    No, I don't believe that's the case here.

6   Q    Do you know if that's generally true for when

7   computer companies do hosting services?

8   A    I don't know if that's true or not.

9   Q    On this particular pie chart, ePlus is there with

10  about 4 percent at about five o'clock on the chart,

11  right?

12  A    That's correct.

13  Q    Lawson is nowhere to be seen on this chart, right?

14  A    I would image they'd fall in the "other

15  procurement" catagory.

16  Q    We saw them on figure 2 where ePlus wasn't and we

17  don't see them on figure 2A where ePlus is, right?

18  A    Well, they are two different charts describing two

19  different scenarios.

20         MR. McDONALD:  I have no further questions.

21         THE WITNESS:  Thank you.

22         MR. STRAPP:  We're going to put that back up.

23         THE COURT:  ELMO back to the duty form.

24

25

1352

1      REDIRECT EXAMINATION

2    BY MR. STRAPP:

3    Q    I'm going to ask Lawson to put back up on the

4    screen the press release that was shown to you,

5    Mr. Farber.

6         Mr. Farber, what's the purpose of ePlus' press

7    releases generally?  Why does ePlus issue press

8    releases?

9    A    A press release is issued to, you know, let the

10   industry know what's going on at ePlus and what we

11   think are notable events.

12   Q    Do you see at the top of this document there's a

13   date, July 21, 2003?  Do you see that?

14   A    Yes.

15   Q    Right above it, it says "market wire."  What's

16   your understanding of market wire?  What does that

17   imply about where this was disseminated to?

18   A    Market wire is a public relations organization

19   that picks up will press releases and then

20   redistributes them on their own vehicles of

21   communication.

22   Q    So who would have been the target audience of a

23   press release about ePlus' patent and the subject

24   matter of the patent?

25   A    Well, it would have had a very broad distribution.

FARBER - REDIRECT                1353

1    Certainly, you know, to ISVs and certain customers

2    that look at the releases.  The financial world as

3    well.

4    Q    This press release specifically mentions one of

5    the patent numbers that's at issue in this case,

6    doesn't it?  The '172?

7    A    Yes.

8    Q    You were asked a few questions by Mr. McDonald

9    regarding marking.  Do you recall that?

10   A    Yes.

11   Q    Does ePlus mark any of its products or patent

12   literature that is disseminated publicly without

13   restriction?

14   A    Yes.

15   Q    Which particular --

16            MR. McDONALD:  Objection.  This is already

17   covered.

18            THE COURT:  Overruled.

19   Q    Which particular products or product literature

20   are marked with a patent that aren't restricted in any

21   way?

22   A    Sales brochures, sales presentations that are

23   provided at either a prospect's or industry conference

24   that we speak at.

25   Q    Trade shoes?

1   A    Trade shoes.  Information that's, you know, widely

2   available and nonrestricted on our websites.

3   Q    For example, at an industry trade show, can anyone

4   walk up, take a product brochure and walk away?

5   A    Absolutely.

6   Q    Can anyone go to the ePlus website and see the

7   patent numbers marked there?

8   A    Yes.

9           MR. STRAPP:  No further questions.

10          THE COURT:  All right.  You may step down,

11  sir.

12          (The witness was excused from the witness

13  stand.)

14          MR. ROBERTSON:  Your Honor, we have a few

15  housekeeping matters to take care of, a few

16  stipulations to read into the record.  If you'd like,

17  I can do that now.

18          THE COURT:  The lunches are here.  I think

19  I'll let you-all clean up and get things straightened

20  out.  We'll take one hour for lunch.  You can take

21  your notebooks with you.

22          (The jury is out.)

23          THE COURT:  Do you have something,

24  Mr. Robertson, you wanted to give me that I had asked

25  for or something and I told you to do it after the

1    examination at the break?

2           MR. ROBERTSON:  Yes, sir.  Two thinks, Your

3    Honor.  The first issue had to do with this deposition

4    destination of that was Kristy Oliver.

5           THE COURT:  And the issue there was whether

6    Lawson had designated that part of it on item No. 18,

7    page 29, as a fairness designation or whether you had

8    designated it.

9           MR. ROBERTSON:  Yes, sir, and we have the

10   answer to that question.

11          THE COURT:  And the answer is?

12          MR. ROBERTSON:  It was Lawson.  And let me

13   direct you to where you can find it.

14          THE COURT:  Do you all agree?

15          MR. SCHULTZ:  Yes.

16          THE COURT:  All right.

17          MR. McDONALD:  It was ePlus' counsel that

18   asked it during the actual taking of the deposition,

19   but we at Lawson actually designated it for the

20   reading.

21          THE COURT:  All right.  The fact that ePlus

22   asked it but didn't offer it doesn't change the

23   fundamental issue, and that is who opened the door at

24   the trial.  So this doesn't open the door.

25          MR. McDONALD:  We put it in without their

1356

1   objection, Your Honor, and their cross designation.

2          THE COURT:  All right.  It's in without

3   objection.  How do you deal with that now?  You have

4   let it in without objection.

5          MR. ROBERTSON:  No, Your Honor.  I don't know

6   if we objected or not.  Our objection might have been

7   overruled.

8          THE COURT:  Well, then you better check that

9   out, too, because if it's overruled, that's a

10  different issue.  If you didn't open the door, they

11  did.

12         MR. ROBERTSON:  I will look into that, Your

13  Honor.

14         THE COURT:  Yes.

15         MR. ROBERTSON:  With respect to this issue

16  about the published by a vendor, we have collected a

17  number of documentation that involved both the Markman

18  hearing the subsequent motion in limine we had with

19  respect to proffering new constructions of any claim

20  terms outside of the Court's construction, the

21  discussions we had at the final pretrial conference.

22         THE COURT:  Have you tabbed them?

23         MR. ROBERTSON:  It's tabbed and highlighted,

24  Your Honor.

25         THE COURT:  So I can read it fairly quickly.

1    MR. ROBERTSON:  I've provided it to Mr.
2   McDonald.
3    MR. McDONALD:  I thought you asked us to try
4   to get together and agree on a joint appendix of these
5   materials.
6    THE COURT:  I thought that's what this it
7   was.
8    MR. ROBERTSON:  He has it.
9    THE COURT:  He may want to add to them.
10  That's the point.
11   MR. McDONALD:  We should be able to work it
12  out over lunch.
13   THE COURT:  I'm sure you can.  But if you
14  work it out early, then I can look at it.
15   MR. ROBERTSON:  Your Honor, I think when we
16  return from lunch, I'll just confirm with my
17  colleagues, there's just some issues we need to take
18  up with respect to some exhibits that were to the
19  Frank videotape deposition that was played, and then
20  there are about four or five stipulations I'd like to
21  read into the record.
22   THE COURT:  I didn't know about the Frank
23  deposition.  What are you talking about?
24   MR. STRAPP:  Your Honor, we just wanted to
25  identify for the record the exhibits that were

1358

1    referenced during the playing of the Frank deposition.

2              THE COURT:  All right.  You mean they were

3    used and admitted in the depositions.  You just want

4    to put the trial exhibit numbers on there?

5              MR. STRAPP:  Correct, Your Honor.

6              THE COURT:  Okay.  You-all can work that out.

7    And then you're going to rest.  Is that it?

8              MR. ROBERTSON:  Yes, I believe so, Your

9    Honor.

10             THE COURT:  What do you mean?

11             MR. ROBERTSON:  I don't have any other live

12   witnesses.

13             THE COURT:  I was waiting for rest of the

14   answer.  Okay.  We'll take an hour for lunch.

15             (Luncheon recess taken.)

16

17

18

19

20

21

22

23

24

25