1    THE COURT:  The jury reports that they'd like to work

2    both Saturday and Monday.  You're really not sure, are you, Mr.

3    Strapp?

4    The jury doesn't want to work -- they said they don't

5    want to work either day, so I think we'll not work on Monday.

6    MR. ROBERTSON:  Is it a unanimous decision, Your

7    Honor?

8    MR. McDONALD:  Can we poll the jury?

9    THE COURT:  I didn't poll them -- I didn't ask them

10   either.

11   COURT SECURITY OFFICER:  It was the majority.

12   THE COURT:  Okay.  You want to make your Rule 50

13   motion.

14   MR. McDONALD:  I've been replaced for this one.  Ms.

15   Hughey will be arguing.

16   THE COURT:  All right.

17   MS. HUGHEY:  Thank you, Your Honor.  Lawson

18   respectfully moves this Court for judgment as a matter of law

19   under Rule 50 of the Federal Rules of Civil Procedure.  ePlus

20   has been fully heard on the issue of infringement, and a

21   reasonable jury does not have a legally sufficient evidentiary

22   basis for find for ePlus on this issue.

23   The testimony and documents introduced at trial

24   demonstrate that Lawson did not directly or indirectly infringe

25   asserted claims three, 26, 28, or 29 of the '683 patent, claims

1  one, two, six, nine, 21, 22, or 29 of the '516 patent, or claim

2  one of the '172 patent.  For this reason, Lawson requests the

3  Court resolve the issue of infringement against ePlus in this

4  case.

5          With respect to direct infringement, ePlus has not

6  proven that Lawson directly infringes the asserted claims.

7  During trial, Dr. Weaver provided his infringement opinion on

8  five Lawson accused systems:  Inventory control, purchase order

9  and requisitions, also referred to as S3 procurement, RSS

10  combined with S3 procurement, punchout combined with S3 and RSS

11  procurement, EDI combined with S3 procurement and all modules

12  combined.

13          ePlus has not proven that it is more likely than not

14  that Lawson has made, used, offered to sell, or sold the

15  inventions defined in the asserted claims.  A reasonable jury

16  does not have a legally sufficient evidentiary basis to find

17  otherwise.

18          With respect to the asserted systems claim three of

19  the '683 patents, claims one, two, six, nine, 21, 22, or 29 of

20  the '516 patent and claim one of 172 patent, ePlus has not

21  proven that Lawson's accused products have any of the required

22  elements.  ePlus's expert, Dr. Weaver's testimony was

23  conclusory, unsupported, and insufficient to meet ePlus's

24  burden to prove that Lawson's accused systems have these

25  required elements.

1    ePlus also has not proven that Lawson practices all

2    of the steps required by method claims 26, 28, and 29 of the

3    '683 patent.  At trial, ePlus did not even accuse Lawson of

4    performing all of the steps of these method claims.  Indeed,

5    when questioned, Dr. Weaver never opined that Lawson performed

6    the step of maintaining at least two product catalogs on the

7    database containing data related to items associated with the

8    respective sources, selecting the product catalogs to search,

9    or searching for matching items among the selected product

10   catalogs.

11   Thus, the jury does not have a legally sufficient

12   basis to find for ePlus on the issue of direct infringement of

13   the method claims, and this Court should grant judgment as a

14   matter of law that Lawson does not directly infringe any of the

15   method claims.

16   With respect to indirect infringement, ePlus has also

17   not proven that Lawson indirectly infringes the asserted

18   claims.  A reasonable jury does not have a legally sufficient

19   evidentiary basis to find otherwise.  First, liability for

20   indirect infringement, either contributory or induced

21   infringement, requires proof of direct infringement.

22   ePlus has failed to prove that any third party,

23   either customers, vendor, or other, directly infringed any of

24   the claims in suit.  Thus, a reasonable jury does not have a

25   legally sufficient evidentiary basis to find indirect

1    infringement.

2        Second, ePlus has not proven that the legal

3    requirements of indirect infringement have been met.  Among

4    other things, both contributory and induced infringement

5    require intent, an element ePlus has failed to prove.

6    Contributory infringement requires proof that the accused

7    infringer offers a component of a patented machine knowing the

8    same to be especially made or especially adapted for use in

9    infringement of such patent and not a stable article or

10   commodity of commerce suitable for substantial non-infringing

11   use.

12       The Federal Circuit has instructed that for this

13   requirement to be met, plaintiff must show the defendant knew

14   that the combination for which its components were especially

15   made was both patented and infringing.

16       For induced infringement, a patentee must demonstrate

17   that the accused infringer's actual or constructive notice of

18   the patent and its intent to induce infringement of the patent

19   requires culpable conduct, namely that the alleged infringer's

20   actions induced infringing acts and that he knew or should have

21   known his actions would induce actual infringement.

22       Legal requirements for contributory and induced

23   infringement have not been met in this case.  There is no

24   evidence that Lawson knew of the patents before the lawsuit was

25   filed in May of 2009, let alone had the intent required for the

1    contributory or induced infringement.  Further, there is no

2    evidence that Lawson should have known of ePlus's patents.

3         Dr. Weaver's opinion on the issue of induced

4    infringement is totally irrelevant.  Not only is it conclusory,

5    he did not consider the knowledge issue at all.  The same is

6    true with respect to contributory infringement.  With respect

7    to the accused punchout system, the jury does not have a

8    legally sufficient evidentiary basis to find for ePlus on the

9    issue of infringement.

10        Lawson did not practice all of the claimed method

11   steps with respect to the punchout product, and Lawson's system

12   does not meet all of the required system limitations with

13   respect to the punchout product.  This Court should grant

14   judgment as a matter of law that the punchout system does not

15   infringe any of the asserted claims.

16        First, with respect to method claim 26, 28, and 29 of

17   the '683 patent, there has been no showing that any one party

18   performs every single one of the claimed method steps for the

19   punchout products.

20        There is no dispute that ePlus relies on the actions

21   of customers and third-party vendors in its argument that the

22   claim limitations are met with respect to this product.  For

23   example, ePlus argues the step of maintaining at least two

24   product catalogs on a database containing data related to items

25   associated with the respective sources is met by external

1    vendor catalog, not Lawson.

2          Likewise, Dr. Weaver never asserted Lawson practiced

3    the step of determining whether a selected matching item is

4    available in inventory; instead, merely opining in a conclusory

5    fashion that punchout allows the step to happen while admitting

6    that Lawson did not have any idea what was available in the

7    inventory of the third-party vendors, and with respect to

8    searching for matching items, ePlus argues a user searches on a

9    vendor's website using a vendor search engine, which, again, is

10   a step that Lawson does not practice.

11         The systems claims are likewise deficient.  Claim

12   three of the '683 patent and claims one, two, six, nine, 21,

13   22, and 29 of the '516 patent all require multiple catalogs.

14   Dr. Weaver opined that these claims were infringed by the

15   punchout product because punchout allows users to have access

16   to external vender catalogs, not Lawson catalogs.

17         Claim one of '172 patent is also a system claim which

18   requires a database containing data relating to items

19   associated with at least two vendors maintained so that

20   selected portions of the database may be searched separately.

21   Dr. Weaver opined that this limitation was met by the separate

22   databases of the external punchout site, but there is no

23   dispute that Lawson has not maintained separate databases of

24   the external punchout sites.  Those external vendor catalogs

25   are maintained by the vendor.

1    ePlus cannot rely on the doctrine of joint

2  infringement to resolve the issue of direct infringement as it

3  has failed to show that Lawson has the required control over

4  the third parties or that Lawson performs the remaining steps.

5    In a situation in which more than one party is

6  required to perform the steps of a claimed method, there is no

7  infringement unless one party exercises control or direction

8  over the entire process such that every step is attributable to

9  the controlling party.

10    The same requirement for direction and control

11  applies to the system claims as well.  Lawson does not exercise

12  control or direction over any third party, suppliers, vendors,

13  distributors, manufacturers, or others who sell items to

14  Lawson's customers.  Likewise, Lawson exercises no control over

15  its customers.  Lawson does not have an agency relationship

16  with any party that performs any of the remaining steps from

17  the system or method claims.

18    While Lawson may reach an agreement with certain

19  vendors to allow them to provide services to its clients --

20    THE COURT:  What's the difference, Ms. Hughey,

21  between joint infringement and induced infringement in this

22  case on this record?  I know conceptually what the difference

23  is, but is there really any difference in this case between

24  those two?

25    MS. HUGHEY:  With respect to joint infringement,

1    that's related to direct infringement.  Under direct

2    infringement, one party has to actively engage in every single

3    step or method claim.  If, however, a party has an agency

4    relationship with another, in certain limited circumstances,

5    the Court has allowed that to be a direct infringement.

6              For indirect infringement to occur, there must be at

7    least one direct infringer.  That is to say that someone must

8    be practicing the steps.

9              THE COURT:  Are you saying joint infringement doesn't

10   apply to indirect infringement?

11             MS. HUGHEY:  In theory you could have two parties

12   engaging in joint infringement and a third party guilty of --

13             THE COURT:  But on this record, is there any theory

14   of joint infringement that exists as to indirect infringement?

15   Any basis any jury could find that?

16             MS. HUGHEY:  I don't believe so, Your Honor, no.

17             THE COURT:  Why?

18             MS. HUGHEY:  On this record, there's no -- on this

19   record, ePlus could not prove joint infringement because it

20   hasn't demonstrated that there is an agency relationship

21   between Lawson and any third party.

22             THE COURT:  I thought you said, though, that that

23   made it direct infringement.

24             MS. HUGHEY:  That's right.  Joint infringement is

25   direct infringement.

1   THE COURT:  I understand, but I also asked you,

2   because some of the instructions you all tendered suggested

3   that joint infringement an application in the indirect

4   infringement context.  Are you contending that or not?

5   MS. HUGHEY:  I don't believe that we're contending

6   that the joint infringement is the same thing as indirect

7   infringement or that it has applicability to indirect

8   infringement.  It's possible that --

9   THE COURT:  So the joint infringement doesn't -- do

10  you understand it doesn't even apply to indirect infringement?

11  MS. HUGHEY:  I think it could apply to indirect --

12  THE COURT:  On the facts of this case.

13  MS. HUGHEY:  Correct, Your Honor.  Correct.  As I was

14  saying, Lawson does not control that vendor or contractually

15  obligate them to do anything.  Likewise, Lawson does not have

16  control over what its customers do, as they act for their own

17  benefit and under their own control.  Because there is no

18  single direct infringer, there can be no indirect infringement

19  either.

20  THE COURT:  All right.

21  MS. HUGHEY:  I have two more points, Your Honor.

22  Unless you have a question?  With respect to the unaccused

23  systems, Lawson has provided no basis for a reasonable jury to

24  find for ePlus with respect to certain unaccused systems.

25  THE COURT:  If it's not accused, what do I care?  I

1   don't need to rule on an unaccused system.

2          MS. HUGHEY:  They were potentially accused in the

3   pretrial order, but then during trial, it became clear they

4   were no longer accused.  I am not sure ePlus would actually

5   oppose this part of the motion.

6          THE COURT:  What are you talking about, unaccused?

7   Looking for the approvals on the purchasing agent?

8          MS. HUGHEY:  I'm sorry, Your Honor.  Certain systems

9   -- I think you remember that Dr. Weaver accused five systems of

10  infringing, and then he went through claim by claim, but he did

11  not accuse every system of accusing every claim.

12         THE COURT:  You don't need judgment on any system

13  that they don't have any evidence on.  Is there anything else?

14         MS. HUGHEY:  One final thing.  I don't believe that

15  ePlus is asserting the doctrine of equivalents infringement,

16  but I'd like to make a record here that we move for judgment as

17  a matter of law to the extent that they would suggest

18  otherwise.

19         MR. ROBERTSON:  We will stipulate we haven't made the

20  doctrine of equivalents argument with respect to the

21  infringement.

22         MS. HUGHEY:  That's all I have, Your Honor.  We'd be

23  willing to brief any of these issues further.

24         THE COURT:  Thank you.

25         MR. ROBERTSON:  Thank you, Your Honor.  I'm sure you

1    can appreciate that just like Your Honor, I've heard those

2    arguments for the first time right now, so let me see if I can

3    try and track them for you and answer any questions you might

4    specifically have.

5         We think we brought forth ample evidence of both

6    direct infringement and induced infringement --

7         THE COURT:  Do you take the view that joint

8    infringement applies in the indirect infringement claim?

9         MR. ROBERTSON:  I think there can be a joint

10   infringement scenario in which Lawson aids, assists, abets,

11   encourages their customers to indirectly -- to induce

12   infringement, and that would be a situation, Your Honor, for

13   example, if Your Honor concludes --

14        THE COURT:  What is the difference between that and

15   contributory infringement then?  I think it's very confusing to

16   the jury to have this joint infringement issue in the case in

17   the indirect infringement issue, and I don't even understand

18   how it would apply on the facts of the case anyway.

19        But forget about the facts of the case.  Is there any

20   case that holds joint infringement applies in indirect

21   infringement charges?

22        MR. ROBERTSON:  I haven't seen one specifically, Your

23   Honor.

24        THE COURT:  I haven't either.  Never heard of it.

25        MR. ROBERTSON:  But, you know, if you want to ask me

1    theoretically can that be the case, absolutely.  Do you want me

2    give you a scenario in the facts of this case in which it could

3    be occurring, I'm happy to do so.

4            THE COURT:  What is your theory?  Are you pressing

5    joint infringement in the indirect infringement context?  If

6    you aren't, I don't need to hear anything further about it, and

7    since it's such a rare animal, even if it's not in the extant

8    one or ever was, just fish or cut bait.

9            MR. ROBERTSON:  Your Honor, this joint infringement

10   position is a defense that Lawson is taking because they are

11   arguing that they don't have control or direction over their

12   punchout partners.  Now, I think we marshalled the substantial

13   evidence that showed that is not the case, but how could an

14   indirect or induced infringement scenario --

15           THE COURT:  They don't direct claims like that.  Do

16   you claim there is a joint infringement under the indirect

17   infringement case you are presenting?  I think that you don't.

18   I think they, in fact, then -- they may say, well, even if its

19   joint infringement, you are saying we don't have control, but

20   in the first instance it's you who presses the point, so do you

21   or do you not have a joint infringement claim under your theory

22   of indirect infringement, or are you going to give it a mercy

23   killing?

24           MR. ROBERTSON:  Your Honor, I don't want to give it a

25   mercy killing because it shouldn't be killed, and let me

1   explain why that's the case.  Let me give you a scenario with

2   where there can be an induced infringement in a joint

3   infringement -- direct infringement case.  You have --

4            THE COURT:  Huh-uh.  I didn't ask about direct.

5            MR. ROBERTSON:  Yes, we are pressing an indirect

6   infringement that could involve joint infringement, direct

7   infringement.

8            THE COURT:  What is that?

9            MR. ROBERTSON:  What is it?

10            THE COURT:  Yes.

11            MR. ROBERTSON:  It is inducing someone, perhaps more

12   than one party, to actually commit the direct infringement.

13            THE COURT:  Why isn't that induced infringement?

14            MR. ROBERTSON:  It is --

15            THE COURT:  -- under indirect infringement, and why

16   isn't it then joint infringement under direct infringement?

17            MR. ROBERTSON:  I agree with Ms. Hughey that joint

18   infringement is a direct infringement theory.

19            THE COURT:  That's all I'm asking you.

20            MR. ROBERTSON:  Okay.  Then I'm sorry.  I

21   misapprehended Your Honor's question, but Ms. Hughey and I

22   agree joint infringement is direct infringement.

23            THE COURT:  The instructions that both of you

24   tendered did not distinguish, and some of the arguments that

25   were being made suggested to me that you were pressing a theory

1    of which I was unaware, and now that we've gotten that

2    straight, what's the joint infringement theory under the direct

3    infringement claims?  In this case on this record.

4            MR. ROBERTSON:  Well, joint infringement sometimes is

5    called divided infringement when a defendant wants to say that

6    they are not directly controlling the actions of another, and

7    the way I understood Ms. Hughey's argument to be is they say,

8    we really don't know what these punchout trading partners are

9    doing that we have.  Once you go to their website, it's all up

10   to them.  So the evidence turns on whether or not there's

11   direction and control with respect to what's been proffered so

12   far before the Court.

13           THE COURT:  Direction and control of whom?

14           MR. ROBERTSON:  The third party punchout partners,

15   Your Honor, their trading partners that they either have

16   informal agreements with or formal agreements with in which

17   they -- I think one of the intentions of the formal agreements

18   is we're going to do this jointly.  We're going to make a joint

19   effort, combine our products.

20           I asked Mr. Lohkamp, do you do that for the mutual

21   benefit of both companies.  He said absolutely.  We heard

22   evidence that the Lawson system controls the punchout process,

23   that they provide the protocols.  Mr. Lohkamp even called it

24   the handshake that lets you get there.  Dr. Weaver testified

25   you can't -- you don't even leave the Lawson system, and when

1    you go to the website, there was that special URL that showed

2    you had never left the Lawson system, that you are not at a

3    commercial website.  You are at a website that has been

4    especially prepared for Lawson's customers using the

5    procurement punchout.

6            The customer has to say to Lawson, we want you to set

7    this up.  We'll tell you who our punchout partners are.  Lawson

8    then goes out, they either contract with them, or they make an

9    arrangement if the protocols work, and we actually demonstrated

10   the punchout process.

11           So the argument becomes, boils down to this:  Well,

12   when you finally punched out, but you never left the Lawson

13   system, you then can search content provided by the supplier,

14   for example.  But, of course, that's exactly why the whole

15   arrangement was set up, for their joint effort and mutual

16   benefit.

17           So we think, quite frankly, Your Honor -- there's a

18   recent decision called *Akamai* that came down from the Federal

19   Circuit perhaps two weeks ago, and it was a situation of joint

20   infringement, and we think if there were ever a situation that

21   joint infringement applied through a factual scenario, it is

22   this case.  This case is the poster child for joint

23   infringement because of the relationship that Lawson has with

24   its punchout trading partners.

25           You will remember, even when we were looking at the

1    demonstration that Dr. Weaver did a punchout, to go out and get

2    the data and retrieve it, it still was branded with Lawson.

3    You were framed within a Lawson website, and as Dr. Weaver

4    said, you never left.

5            So you can't even do the punchout process without the

6    Lawson software.  That's the first step.  And then once you do

7    do it, you are there, and you are retrieving the data, and you

8    are putting it in your requisition, and you are building your

9    purchase order just as the claims described.

10            So that, Your Honor, I think is the only scenario in

11   which I would think the joint infringement could arise at all

12   if you even needed to go there, and I think in our papers we

13   would argue first that this is not a situation of joint

14   infringement, but even if it were, that it's been satisfied by

15   the evidence that's been presented here.

16            And so how do you induce that direct infringement

17   which I think we're in agreement is joint infringement?  Lawson

18   induces it by first providing the functionality in its punchout

19   software to do that.  Second, it induces it by providing their

20   customers with the guides, the implementation, the

21   installation, the services.  They provide all of that kind of

22   evidence is evidence that they are abetting and assisting.

23            So we think that the facts of this case, particularly

24   Dr. Weaver who went through, you will recall, that eight-step

25   protocol you need to do in order to set up this communication

1  links, and no one has ever denied or challenged the fact that

2  it's Lawson that sets up this communication protocol and

3  permits this process to happen, and Mr. Lohkamp even conceded,

4  you can't do it without the punchout procurement software.

5        So when you do that, you are inducing the direct

6  infringement by the customers performing those steps of the

7  method claims when they go through and they select catalogs

8  which Dr. Weaver showed in his demonstration.  They search

9  those catalogs, they match items, they build a requisition, and

10 they build and generate the purchase order.

11       THE COURT:  Thank you.

12       MR. ROBERTSON:  He showed how to do it both from an

13 internal catalog database and -- which Lawson can set up in the

14 customer's software, and an external catalog database which is

15 the punchout.

16       THE COURT:  Thank you.  Is there -- is this record

17 now complete on the issue of willful infringement?

18       MR. ROBERTSON:  Of what, sir?

19       THE COURT:  Is the record complete on willful

20 infringement?

21       MR. ROBERTSON:  I do not believe so.  I thought we

22 were going to reserve some of those things.

23       THE COURT:  What are you going to do and when are you

24 going to do it?

25       MR. ROBERTSON:  Well, I thought we had bifurcated

1   willful infringement.  I contemplated that Your Honor might

2   want to have a short hearing, perhaps a half a day, as to

3   evidence on that.

4           THE COURT:  Could we use Monday or Saturday?

5           MR. McDONALD:  Let me go back and --

6           THE COURT:  Do you really have a case of willful

7   infringement here?

8           MR. ROBERTSON:  I think one of the things, Your

9   Honor -- certainly didn't contemplate that I was going to have

10  to put on evidence in this portion of the case because I agreed

11  to bifurcate that, but let me address that specifically.

12  Number one, Lawson --

13          THE COURT:  The point is, if you haven't -- when are

14  you going to put on the evidence of willful infringement, and

15  basically what is it going to be if it's not already in?  The

16  question is, what did you do?  Did you decide to put in what

17  you had and let me decide it?  We never did decide whether we

18  were going to have a hearing.  I was going to have to decide

19  the issue, but we never did decide how we were going to do it

20  unless my memory fails.

21          MR. ROBERTSON:  Your Honor --

22          THE COURT:  Do you have additional evidence on

23  willfulness that isn't in the record at this time?  That's all

24  I want to know.

25          MR. ROBERTSON:  Let me think.  I think there's

1    evidence that Lawson had an opinion of counsel that it obtained

2    early on and refused to turn over that opinion and stood on the

3    privilege.  While there is not an adverse inference the jury

4    can draw --

5            THE COURT:  The jury doesn't draw that.  I'm drawing

6    it.

7            MR. ROBERTSON:  Well, I think if the Court wasn't

8    aware, there was an opinion early on that was given --

9            THE COURT:  Didn't you all agree I did willfulness?

10   Isn't that what you agreed?

11           MR. ROBERTSON:  Yes, sir.

12           THE COURT:  All right.  I wanted to make sure --

13           MR. ROBERTSON:  In addition to the evidence that

14   there's been nothing done by Lawson since they've been put on

15   notice of this lawsuit in May 2009, no redesign, no good

16   faith effort --

17           THE COURT:  Mr. Robertson, I'm not asking you to

18   argue.  I'm asking do you have any other evidence that you

19   haven't put on.  You tell me about willfulness.  You tell me

20   that there's an opinion of counsel that they declined to

21   produce and stood on the privilege.  Can the finder of fact

22   draw from that an inference of willfulness?

23           MR. ROBERTSON:  I think the finder of fact can

24   consider that in the totality of the circumstances which is the

25   test for willfulness.

1   THE COURT:  Do you have any case that says that?

2   MR. ROBERTSON:  Your Honor, I'll have to go and

3   check.  One of my colleagues reminded me of a case that I have

4   not actually read and I don't want to represent to the Court.

5   THE COURT:  It's a good thing not to argue a case you

6   haven't read.

7   MR. ROBERTSON:  I didn't want to do that.

8   THE COURT:  Unless you want me to decide on the bases

9   of the cases I have read.

10   MR. ROBERTSON:  No, Your Honor.  In fairness, I came

11   here today to try and prepare to argue this.  I was not

12   thinking in terms of the representation of the Court what the

13   willfulness case should be.

14   I think you've heard some evidence that under the

15   totality of the circumstances, you could consider as being

16   evidence that would warrant a conclusion of willful

17   infringement.  I think there would be some additional evidence.

18   Right now what comes to mind--

19   THE COURT:  We'll deal with that later.  Thank you.

20   MR. ROBERTSON:  Do you need to hear any --

21   THE COURT:  No, thank you.  The motion did not relate

22   to willfulness, so I'm not going to deal with it.  I was just

23   asking you a question while you were standing up there.

24   MR. ROBERTSON:  Thank you.

25   MS. HUGHEY:  Your Honor, if I may, with respect to

1    the issue of joint infringement, ePlus's counsel suggested that

2    it was a defense, and that's not the case.  ePlus always has

3    the burden of proof on the issue of infringement, and it can

4    pursue that burden of proof either through the direct

5    infringement --

6            THE COURT:  Ms. Hughey, what he said was, he's not

7    contending it's joint infringement, you are, saying that if it

8    was any kind of infringement it's joint infringement and you

9    win -- and he wins -- because you haven't any evidence of the

10   elements of it, I believe; is that right, Mr. Robertson, or did

11   I miss it?

12           MR. ROBERTSON:  My argument, Your Honor, was whether

13   it's direct infringement just by Lawson committing all the

14   steps or having the system, or whether it's joint infringement,

15   we win either way.

16           THE COURT:  I understand that, but what you said was

17   we don't think it's joint infringement, but even if it is, we

18   win.  The predicate of that sentence is, we don't think it's

19   joint infringement, and that's what I am trying to ascertain.

20           You said it was they who injected that question, the

21   defendants injected that issue in, and you don't think it's

22   joint infringement, but even if it is, you win.  Is that your

23   position or not?

24           MR. ROBERTSON:  That's our position, Your Honor.

25           THE COURT:  Okay, thank you very much.  Now you know

1  the framework.

2           MS. HUGHEY:  Okay.  Well, with respect to that then,

3  if ePlus is not asserting joint infringement as a method to

4  prove infringement, then I think it's going to be easy --

5           THE COURT:  Then you are not asserting that this is

6  any joint infringement issue for me to decide; is that right?

7           MS. HUGHEY:  I'm moving for judgment as a matter of

8  law --

9           THE COURT:  No, you are not asserting that there's a

10  joint infringement issue for me to decide; right?

11           MR. ROBERTSON:  Who are you pointing to, Your Honor;

12  me?

13           THE COURT:  Ms. Hughey.

14           MS. HUGHEY:  ePlus has the burden of proof on

15  infringement.

16           THE COURT:  I understand that, but you need to answer

17  the question that I asked.  You are the one who got up here and

18  argued it.  He says he doesn't content that it's joint

19  infringement, but even if there is, he wins.

20           Now, I understand your argument to be that if there's

21  any infringement that's been available to go to a jury, it is

22  joint infringement and you win because the elements haven't

23  been made out for joint infringement.  That was your argument

24  as I understand it, wasn't it?  Wasn't it your argument?

25           MS. HUGHEY:  Yes, both there is no direct

1   infringement by Lawson alone, and there is also no direct

2   infringement by Lawson combined with another party through a

3   doctrine called joint infringement.  That's what I'm saying,

4   Your Honor.

5        THE COURT:  But you also are saying if they have

6   proved any infringement, directly, direct infringement, it's

7   joint, and you don't -- and you don't infringe jointly because

8   they haven't made out the elements of a joint infringement

9   claim in a direct infringement context; right?

10        MS. HUGHEY:  I don't think I said that they proved

11   infringement in any context, Your Honor.

12        THE COURT:  I didn't say that they had.  Listen

13   tight, as John Wayne used to say, soldier.  If -- you are

14   saying, we don't think that there's any infringement at all.

15        MS. HUGHEY:  Yes.

16        THE COURT:  But if they've proved any kind of

17   infringement, then the best it could be is joint infringement,

18   and even if that's what they're going for, they lose because

19   they haven't put out the evidence, they haven't made out the

20   elements of that.  Isn't that what you are saying?

21        MS. HUGHEY:  That's fair, Your Honor, yes.  With

22   respect to the issue of joint infringement, counsel references

23   this *Akamai* case, and I can give you the cite.  It's a very

24   recent case.  It doesn't have the F Reporter yet.  2010, U.S.

25   App. LEXIS 25825.  That's a recent Federal Circuit case.

1    With respect to that case, what the Federal Circuit

2  found was that there was no joint infringement because the

3  accused infringer did not perform all of the steps of the

4  accused claims, and there was no evidence that the accused

5  infringer's customers performed the remaining steps as agents

6  of the accused infringer.

7    In that case, the patents related to a system and

8  method for allowing a content provider to outsource the storage

9  and delivery of discrete portions of its website content.

10   THE COURT:  Let me ask you something.  Since he's

11 saying, he's not arguing there's any joint infringement, why

12 are you bringing to me an issue of joint infringement in the

13 first place?  Why don't you just say, he has agreed there's no

14 issue of joint infringement, and so we don't have to discuss

15 that any further?  In other words, I have cornered the fox in

16 his den.  And he has folded.

17   MS. HUGHEY:  Your Honor, I would like to say that I

18 have cornered the fox in his den, and he has folded.

19   THE COURT:  Thank you.

20   MR. ROBERTSON:  Your Honor, can I respond to that?

21   THE COURT:  Don't get out of the den, and it's her

22 motion, so she gets the last word.  Don't try to get out of the

23 den.

24   MR. ROBERTSON:  We're only talking about this

25 punchout scenario here.

1      THE COURT:  No, no.  That's like -- you just folded

2  over here.

3      MR. ROBERTSON:  Your Honor --

4      THE COURT:  Not only did you fold, you induced her to

5  quit.

6      MR. ROBERTSON:  But the joint infringement context

7  didn't come out in the initial opening argument outside of the

8  context of what the third party punchout partners did.

9      Now, did they do anything?  Yeah, they provided the

10  catalog content, and they'll let you search a site and it all

11  comes back to Lawson.  So there are two steps that they have to

12  perform.

13      Now, they can even be inducing those steps by the

14  facts that I already have adduced to the Court.  They can be

15  inducing those parties to do it, or they can be doing under

16  their direction or control.  So as I say, Your Honor, I think

17  we win on alternative theories of --

18      THE COURT:  But you didn't have that theory, and you

19  told me you didn't have the joint infringement theory under the

20  direct infringement --

21      MR. ROBERTSON:  I don't think we need to -- first of

22  all, I want to make clear we're talking -- I was talking only

23  about punchout, because there are method claims that are

24  performed by the customers when Lawson provides them with

25  features and functionality, the five software --

1    THE COURT:  You are through.  You don't have any

2    joint infringement claim under anything.  That's what you told

3    me, and that's it.  Sit down.  Have a seat.  That's it.  I

4    mean, there's a limit to what I have, what I can deal with here

5    and what is allowed, and you just transcended it by saying

6    that.  I don't have to rule on that now.  It's already been

7    dealt with by way of a concession as to the Rule 50 motion,

8    there is -- and there is no doctrine of equivalents claim

9    notwithstanding what some of the instructions that were

10   tendered say.

11        So to the extent the doctrine of equivalents is

12   asserted on any claim, the motion for judgment as a matter of

13   law is granted, but I believe they said they don't have the

14   claim, so the rest of the issue is whether there is, as to any

15   of the patents, claims of the patents-in-suit, a reasonable

16   basis for a reasonable jury to find patent infringement, and

17   there is under theories of both direct and indirect

18   infringement, and the motion for relief under Rule 50 is

19   denied.  All right?  Are we ready for the jury?

20        No?  Yeah.  You have to rest in front of a jury.

21   Read the stipulations, and let's go.

22        MR. ROBERTSON:  We have these exhibits in binders.

23   We're bringing the stipulations, and then I'll be ready.

24        THE COURT:  First witness then is whom, Mr. McDonald?

25        MR. McDONALD:  Mr. Lawson will be our first witness,

1   Your Honor.  I just want to clarify, I think -- we know you

2   wanted to get the transcripts on the Markman rulings and

3   things, and I'm not sure when you actually want to hear that.

4   I don't know they are ready yet.

5            THE COURT:  You did get together and what?  I'm

6   having trouble hearing you.

7            MR. McDONALD:  I'm sorry.  The parties did get

8   together over the lunch hour and combined the pages that they

9   thought were appropriate to provide to the Court.  I don't

10  think the Court's actually got a copy of the combined version

11  of that.  I think they are working on it, so obviously we don't

12  have it at this point.

13           I just wanted to give a heads-up, because I wasn't

14  sure when Your Honor wanted to address that issue.  Obviously,

15  you have to read the materials --

16           THE COURT:  When do I have to address it?

17           MR. McDONALD:  It's actually going to come off to

18  some extent with respect to Mr. Christopherson's testimony, so

19  it won't be too long.

20           THE COURT:  Is he the second witness?

21           MR. McDONALD:  Yes.

22           THE COURT:  Do you have a joint version that I can

23  have?

24           MR. McDONALD:  Let me check, Your Honor, if I may.  I

25  see some bodies moving at this point, Your Honor.  I think

1   they're working on it.  I don't know that it's ready yet, but

2   I'll let you know.

3            THE COURT:  Go back there and talk to them and find

4   out.

5            MR. McDONALD:  I'm told it could be ready in ten

6   minutes, Your Honor.  I think that might be a little

7   aggressive.

8            THE COURT:  I haven't got what I need to rule, so I

9   don't think it's a good idea to rule.  Can we have the

10  witness --

11           MR. STRAPP:  Your Honor, a few housekeeping matters.

12  For the record, during the Frank deposition video, the exhibits

13  that were referenced by Mr. Frank were Plaintiff's Exhibits

14  150, 153, 154, 155, 156, 157, 173, and 129, and the excerpted

15  portions of the deposition transcript itself are Plaintiff's

16  Exhibit 517 --

17           THE COURT:  My copy of it doesn't have an exhibit

18  number on it.

19           MR. STRAPP:  That's correct, Your Honor.

20           THE COURT:  517.

21           MR. STRAPP:  That's correct.  And Your Honor --

22           THE COURT:  You need to make sure you get one.

23           MR. STRAPP:  There were a couple of typographical

24  errors on the transcripts of the depositions of Ms. Oliver and

25  Mr. Matias.  By agreement of the parties, those have been

1  corrected, and we have corrected versions of those deposition
2  transcripts to hand up to Your Honor.
3           THE COURT:  Let me have them.  You have to hand the
4  clerk the originals.
5           MR. STRAPP:  This is -- Ms. Oliver's corrected
6  transcript is Plaintiff's Exhibit 518 replacing the original
7  Plaintiff's Exhibit 518.  I'm sorry.  Plaintiff's Exhibit 520
8  this is the corrected version of Mr. Matias's deposition
9  transcript.
10          THE COURT:  Let's do this:  Let's call 518-A -- get
11  that back and mark it.  Mr. Neal, mark 518 518-A and 520, the
12  one he just handed you 520-A, and that will be the corrected
13  versions.  All right, folks, that way we will get them
14  straight.
15          MR. STRAPP:  Your Honor, with respect to one of the
16  Frank exhibits that was referenced, you will recall that there
17  was an issue that came while it was being played.  Although
18  that exhibit had never been objected to during court, Lawson
19  suggested that they now did have an objection to part of the
20  document, and they're asking it be redacted.
21          I've agreed that the parties can meet and confer with
22  that as soon as we have a minute after the day is over in
23  court, but we haven't resolved that issue yet.
24          THE COURT:  I appreciate your confidence in my
25  memory, but I don't remember, so I'll let you all deal with

1  that, let you solve it by the end of the day.  All right, are

2  we now ready -- and you have the stipulations to read; right?

3          MR. ROBERTSON:  I have a handful of stipulations,

4  Your Honor, to read, and I'll rest.

5          THE COURT:  All your exhibits you are going to use

6  you've gotten done; right?

7          MR. ROBERTSON:  Exhibits that Lawson is going to use?

8          THE COURT:  You.  Remember I told you any exhibits

9  that you don't use is not going to be part of the record, and

10  now we have a complete list of exhibits that are part of the

11  record, and Mr. Neal has got that list, and he'll give you a

12  copy of it and you can deal with that.  That way the record

13  will not be as unwieldy as --

14          MR. ROBERTSON:  I just might suggest, Your Honor, to

15  the extent that we use some exhibits during the rebuttal case

16  or in response to Lawson's non-infringement case, we might

17  be moving some of those --

18          THE COURT:  That is a different animal.

19          MR. ROBERTSON:  Okay.

20          THE COURT:  Just don't get animated to move all your

21  paper in just because of that.

22          THE CLERK:  Will they have a chance to review this

23  list to make sure --

24          THE COURT:  Yes, we don't want a *Lentz* situation.

25          THE CLERK:  Because on the video depositions, they

1  were nilly-willy sometimes.  I'll give you a copy of those so

2  you can look at it.

3          MR. ROBERTSON:  Your Honor, could I ask --

4          THE COURT:  What you need to do is give -- as I

5  understand it, you've given me the list of exhibits by

6  Plaintiff's Exhibit number that were used in 517, 518, which is

7  now 518-A, and 520.  I don't have any -- or 520-A.  I don't

8  have any PX numbers used in there.

9          MR. STRAPP:  There were no exhibits referenced.

10          THE COURT:  There were none, okay.  Does that take

11  care of all the depositions now?

12          MR. STRAPP:  Yes, Your Honor.

13          THE COURT:  On the front page of my copy, Mr. Neal,

14  are the exhibits of 517 and 518-A.  You can use those and then

15  return them to me.  All right.

16          MR. ROBERTSON:  Your Honor, could I just ask, before

17  I read the stipulated facts if Your Honor could explain to the

18  jury what stipulated facts are.

19          THE COURT:  I do always.

20          MR. ROBERTSON:  Thank you.

21

22                    (Jury in.)

23

24          THE COURT:  All right, I'm sorry to do this, but with

25  these questions, I think I need to have copies made, give them

1    to the lawyers, because it may affect what's going to happen

2    next.  ePlus is on the verge of resting its case which means

3    that that will be the end of the plaintiff's case.  I think in

4    fairness, before that's done, since you have presented these

5    questions to me, I'm going to present them to the counsel.

6         So what that means is that we need to ask you to get

7    some more aerobic exercise and go back into that room.  Sorry.

8    That way I may need to talk to with them, and they may need to

9    do something else.  For your information, I have been told that

10   you all have reached a unanimous verdict that you do not want

11   to work on Monday, and that's fine.  You will be pleased to

12   know that the lawyers are delighted.

13        I, on the other hand, am going to be working on

14   Monday anyway.  Go right ahead.  If you'll go back.  I am sorry

15   to do this to you, but I think will be a more orderly procedure

16   and fair to everybody.

17

18                      (Jury out.)

19

20        THE COURT:  Somebody has some interesting questions.

21   And if you all had been ready just as soon as lunch was over,

22   we probably wouldn't have got them.  We gave them time, so Ms.

23   Haggard is making copies.  One of the questions is how many

24   discovery orders were involved in the -- whatever question it

25   was.

1    Another one is why didn't Lawson get a patent on its

2    S3 system and is Lawson's system prior art, and I've forgotten

3    the first one, but I think given it came to me at this stage of

4    the trial, it was only fair to give both of you the information

5    so you at least know what the jury is dealing with, because we

6    told them as to Court Exhibit 1 that that would come up later

7    in your case, I believe it was, Mr. McDonald, wasn't it?

8        MR. McDONALD:  The Lohkamp questions you mean?

9        THE COURT:  Do you have Court Exhibit 1, Mr. Neal?

10       MR. McDONALD:  Those were the questions that related

11   to Mr. Lohkamp's testimony.

12       THE COURT:  Yes.

13       MR. McDONALD:  We were going to bring him back, and

14   when he was re-called, we'll address those.

15       THE COURT:  Right.  There's a Court Exhibit 2

16   already, isn't there?

17       THE CLERK:  Yes, sir, Your Honor.

18       THE COURT:  So this will be Court Exhibit 3.  The

19   first question, is there a duty/requirement for an entity to

20   perform due diligence and search for patents on

21   products/services, et cetera, before the entity markets and

22   sales their products/services, et cetera is the first question.

23       Second, why didn't Lawson file for a patent on its S3

24   system?  Can it be considered prior art if the patent has not

25   expired?

1   Three, can one contact the U.S. Patent Office for

2   existing patents (search)?

3   Who decides if a patent is valid?  Is the U.S. Patent

4   Office notified and their opinion sought if the validity of a

5   patent is questioned?

6   How many orders to compel were ignored (re discovery,

7   document production?

8   All right, earn your money, ladies and gentlemen.

9   Let's take them one at a time starting with number four.

10   MR. ROBERTSON:  Starting with number four.

11   THE COURT:  That's the last one.  How many orders to

12   compel were ignored.  I think the answer to that is, that is

13   not something that is -- about which you need to concern

14   yourself.

15   MR. McDONALD:  Your Honor, the problem is, Mr.

16   Robertson asked the question and implied we had ignored a court

17   order to compel regarding implementation which is not the case,

18   and I think we need to correct that record at some point along

19   the way here.  So I think this question shows --

20   THE COURT:  How are you going to correct the record?

21   MR. McDONALD:  Well, I think the jury should be

22   instructed that there were no orders that were violated by

23   Lawson regarding implementation or anything else.  I think the

24   question was specifically about discovery regarding

25   implementation, and there's absolutely no noncompliance with

1    any court order on that in this case, but Mr. Robertson asked a

2    question that implied that, and I think we need to correct that

3    record and say there was no such order ignored.

4              THE COURT:  When you say we need, do you mean I need

5    to say that?

6              MR. McDONALD:  I think that would be the appropriate

7    remedy to this question.

8              THE COURT:  I have to rule on that.

9              MR. ROBERTSON:  I asked Dr. Weaver if he was -- since

10   he reviewed all the interrogatory answers, whether or not there

11   was evidence that was supplied by Lawson on a

12   customer-by-customer basis as to all the modules that were

13   implemented and whatnot.  I believe his testimony was there was

14   one, and I asked him, did you have the information with respect

15   to that in that interrogatory answer.

16             That is the very interrogatory answer that Your Honor

17   ordered a motion to compel on and said if they refused to

18   answer it, that evidence will not be used for basis for

19   non-infringement.  Now I'm paraphrasing what Your Honor said.

20   The language was a little more colorful than that, but I

21   thought it was entirely appropriate to ask Dr. Weaver if he had

22   been provided with all the information he felt necessary,

23   including the interrogatory answers that dealt with this

24   implementation issue and which Your Honor had granted a motion

25   to compel, and --

1    THE COURT:  Do you have that in the question?

2    MR. ROBERTSON:  I asked him the perforatory questions

3    if he, in fact, reviewed the interrogatories and if he found

4    that Lawson had provided them with the information on a

5    customer-by-customer basis, and he said -- he didn't have that

6    information, it wasn't provided.  That was --

7    THE COURT:  That's not the same thing as the motion

8    to compel.  You didn't even recite the motion to compel in your

9    question as you just recited it.  My recollection is a little

10   different than all that.  My recollection is that it was Dr.

11   Weaver who said he had understood there had been a motion to

12   compel and it hadn't been provided, but it may be that it came

13   up in sort of a redirect.  So who has -- does anybody have a

14   transcript?

15   MR. McDONALD:  Yes, Your Honor, I have it right here.

16   Let me get the page number here.  I can't -- is it page 434 of

17   the PDF file?  Page 916.  Here's the question.  Were you aware

18   that ePlus asked the Court to compel Lawson to provide that

19   information.

20   Yes.

21   And were you aware that the Court granted that motion

22   to compel?

23   Yes.

24   And are you aware that Lawson still failed to provide

25   that information on a customer -- and then I objected.  I said,

1    this is outside of the record, and there's no record of a

2    failure to comply with the Court's order.  And the Court said,

3    well, it certainly is a relevant issue based on your

4    questioning, but I'm not sure this is the appropriate place to

5    deal with it.  Mr. Robertson, I'll take that up at another

6    time.

7              This gave the jury a misleading impression, Your

8    Honor, that we had failed to comply with a Court order.  There

9    is no record of that regarding the implementation or anything

10   else, and so that has to be corrected.

11             I think the fact the jury asked this question shows

12   that that's the impression that was left here, and we do ask

13   the Court to give the instruction that there was no order to

14   compel that Lawson ignored.

15             THE COURT:  Isn't this the subject of the brief that

16   was filed, Mr. Robertson?

17             MR. ROBERTSON:  Yes, sir.  That's why I followed up

18   with that brief.

19             MR. McDONALD:  Which brief is that?

20             THE COURT:  It says, plaintiff ePlus, Inc.'s brief in

21   support of motion to preclude evidence or argument of

22   non-infringement due to defendant's failure to provide

23   discovery relating to customer-specific implementations of

24   accused product modules, and I said I thought you all were

25   going to research that and give me a paper on it, and it, in

1   essence, establishes that interrogatory -- ePlus interrogatory

2   24 called for that information, that there was communication of

3   it, and on March 25th of 2010, there was a letter sent to the

4   Court asking that I address it during a March 26th conference

5   call, and they asked me to rule that you were deficient because

6   you didn't include any information about the implementation of

7   the accused Lawson software modules on a customer-by-customer

8   basis, and the Court ordered Lawson to provide the

9   implementation -- information sought by ePlus citing the

10  transcript.

11          The Court is -- the remark is attributed to the

12  Court, answer the interrogatory, and then the Court stated, and

13  if somebody doesn't give you the information in discovery that

14  you asked for that's pertinent to their defense, they want to

15  raise it.  You say, I want to move -- you say, I want to move

16  to strike the defense because they said we weren't entitled to

17  this and they didn't give it to us, and then, wham, the door

18  shut on it.

19          It's further -- later, in a written order, I said,

20  you should supplement your responses to interrogatories 23 and

21  24 by April 2, 2010 and that you didn't provide the

22  customer-by-customer information thereafter.  Now, that's what

23  the brief says, in essence.

24          MR. McDONALD:  Mr. Schultz has been dealing --

25          THE COURT:  So there's a court order that tells you

1    to do it, a verbal order and written order that gives you a

2    date by which to do it, and you didn't do it.  So there was a

3    motion to compel and you didn't do it, according to the brief.

4              Now, that's the way I read it.  Is that basically the

5    position, Mr. Robertson, that is set forth in this brief?

6              MR. ROBERTSON:  Yes, sir, and we did follow up with a

7    letter after that, and we said, we're not filing any other

8    motions because we understand Your Honor's order to be

9    self-executing.

10             MR. SCHULTZ:  Your Honor, one modification to the

11   facts, and that is that there was an interrogatory number 24.

12   Lawson provided a response to interrogatory number 24.  There

13   was a series of meet-and-confers between counsel regarding the

14   substance of interrogatory number 24.

15             That ultimately led to the conversation with Your

16   Honor and the Court order regarding supplementation of

17   interrogatory number 24.  There was an agreement between

18   counsel to extend the time to respond to interrogatory number

19   24.  Thereby Lawson did, on April 8th, 2010, fully respond to

20   interrogatory number 24.

21             Here is a key fact that was not put in ePlus's brief.

22   The parties then had, on April 16th, a meet-and-confer

23   regarding the scope of Lawson's response to interrogatory

24   number 24.  Thereafter, ePlus followed up with a correspondence

25   detailing the meet-and-confer conference.  Interrogatory 24 was

1   not on that correspondence that followed up with that.

2           The only thing that we can take from that is that

3   there was no further dispute regarding interrogatory number 24.

4   Then, at the close of discovery, Lawson further supplemented

5   interrogatory number 24.

6           Also, if Your Honor recalls, the scheduling order in

7   this case requires that all discovery motions be completed by

8   the close of discovery.  If ePlus had an issue with respect to

9   the response that Lawson had with respect to interrogatory

10  number 24, that should have been raised at that time, not at

11  trial as an ambush.

12          THE COURT:  No, Mr. Schultz.  If, in fact, they

13  wanted to keep it out, they could keep it out if you violated

14  the Court order.  So the question is, did you violate the Court

15  order.  That's the issue.  The only way I have to answer

16  that -- first, those questions went un-objected to.  There were

17  two of them.  I've forgotten exactly what they were.

18          It was the third question that had that information

19  in it that was objected to, and I said I would deal with it

20  later, but there were two questions that were not objected to,

21  and I can't deal with -- what I would like to have done is to

22  have had you all deal with it and bring it up in some other

23  time after the question had been asked, but I can't deal with

24  it without seeing the answers which you say comply with the

25  Court order.

1   And so if you have those -- the only thing I can do

2   is read them.  Do you have them?

3   MR. SCHULTZ:  Your Honor --

4   THE COURT:  The answer is -- I'm sorry.  I had an

5   indefinite pronoun.  Do you have the answers that you say you

6   provided, I think you said on April 8th, but I'm not sure.

7   MR. SCHULTZ:  April 8th is correct, Your Honor, and

8   then there was a further supplementation of those answers at

9   the end of discovery.  I have them on my computer, Your Honor.

10  I don't know -- I don't have a hard copy of those.  I could get

11  a printout of that for Your Honor during a break, but I don't

12  have them right now.

13  MR. ROBERTSON:  Your Honor, there is --

14  THE COURT:  Do you have the answers available?

15  MR. ROBERTSON:  I have a supplement of May 18 that is

16  Exhibit 11 to the brief.  I don't know if we have --

17  THE COURT:  Do you have the whole thing?  Did you

18  cite the April 8th as exhibits to the brief?

19  MR. ROBERTSON:  I believe we cited the last

20  supplement.  I thought it included -- when they supplement,

21  they would just add additional information.  I thought it

22  included --

23  THE COURT:  Wait just a minute.  We're going to get

24  our copy of that.  You must remember, we don't keep everything

25  out here on the bench.  Otherwise, I wouldn't be able to enjoy

1  the view.

2          MR. ROBERTSON:  I would just like to direct --

3          THE COURT:  Wait, just wait.  So your position is,

4  Mr. Schultz, is that if I read the April 8th and May 14th

5  supplements, that you will have obeyed the Court order, and it

6  was erroneous to have allowed those questions to stand.

7          MR. SCHULTZ:  That is correct, Your Honor.

8          THE COURT:  And that the objection was -- albeit

9  late, was sufficient to hold the matter open.

10         MR. SCHULTZ:  Your Honor, that is correct, and as

11  further support for the fact that the interrogatory responses

12  were adequately responded to, if Your Honor looks at

13  Exhibit 516, Plaintiff's Exhibit 516, it's actually the exhibit

14  that the plaintiff used to show the implementation on a

15  customer-by-customer basis showing that we complied with the

16  Court's order.

17         THE COURT:  I don't have -- I'm sure I have it up

18  here.  I don't know which thing it was.  Exhibit what, Mr.

19  Robertson?

20         MR. ROBERTSON:  Sorry, Your Honor?

21         THE COURT:  Exhibit 5 to the motion is what you want

22  me to look at, and that was -- let's see.  The supplement says

23  Lawson incorporates its previous objections and responses

24  subject to and without waiving its objection.  Lawson also

25  incorporates into this response as fully provided herein its

1   response to ePlus's interrogatory number ten.

2        Lawson further identifies the following documents by

3   Bates number as having responsive information.  I'm not sure

4   that complies with the Court order because the Court order told

5   you to answer the interrogatory.  It didn't tell you -- it

6   didn't leave you with any objections, and it didn't say file

7   some kind of document.  It said answer it.  So what I have as

8   number five is the May -- excuse me, I have to go back here.

9   May 18th response.

10       MR. SCHULTZ:  Your Honor, that was a mere

11   supplementation.  The April 8th response actually has a chart

12   on a customer-by-customer basis.

13       THE COURT:  Just a minute.  I'm asking Mr. Robertson

14   if the April 8th response is part of what you filed.

15       MR. ROBERTSON:  Your Honor, I'm looking for it as an

16   exhibit, Your Honor.  It wasn't included.  It was an oversight

17   on my part.

18       THE COURT:  It wasn't included as an exhibit to your

19   motion; is that what you are saying?

20       MR. ROBERTSON:  I'm trying to find it, Your Honor.  I

21   directed the motion to be prepared, Your Honor.  I did not

22   actually personally prepare it.

23       THE COURT:  The buck stops with you.  Don't you blame

24   somebody else.  That's the same thing as blaming your

25   secretary.  There are too many people in this country that

1  don't believe the buck stops with them when they have the

2  responsibility.  You guys have got it.  It's one thing to say

3  it's not there.

4            MR. ROBERTSON:  It's there, Your Honor.

5            THE COURT:  Where is it?

6            MR. ROBERTSON:  Exhibit Number 7.

7            THE COURT:  It's perfectly all right to say it's not

8  there.  We'll work it out.  My copy doesn't have an Exhibit

9  Number 7.  Oh, oh, oh, I'm sorry.  Thank you.  This jury is

10  going to think they're listening to the O.J. Simpson trial.

11  You know, you ought to have to take this apart, Mr. Robertson.

12  I don't need to go to the gym this afternoon.  Let's see, the

13  response to number eight is -- let me look at it.

14            Well, there was a supplement to it.  Now, all right.

15  I've read all of these now.  I've read the April 8th response,

16  which is Exhibit 7 to the motion of ePlus, and Exhibit 11,

17  which is the May 18th supplement.  The May 18th supplement

18  isn't worth much.  The May -- or the April 8th supplement looks

19  to be a fairly full load of information of some sort, but what

20  was deficient about it, Mr. Robertson?

21            MR. ROBERTSON:  Two things, Your Honor.  One, I

22  counted them.  There's only 36.

23            THE COURT:  What's that?

24            MR. ROBERTSON:  There was only 36 customers

25  identified, Your Honor.

1    THE COURT:  Right.

2    MR. ROBERTSON:  Mr. Lohkamp, I believe, testified

3    there were more than 300 sales of RSS alone.  RSS, you'll

4    recall, has to sit on the core technology.  So we can at least

5    infer from that that there were at least 300 sales of the core

6    technology.  It's our understanding, based on our discovery,

7    that there were hundreds more than that when you were talking

8    about the core technology.

9        The second problem with this, Your Honor, is it

10   really is only directed to data migration; that is, who did the

11   data migration.  That's the last column, responsible for

12   implementation, and if you'll see, the chart is indicative of

13   the frequency, and I'm quoting, with the customers responsible

14   for the migration of data onto the customers' systems.  Several

15   of the implementations listed on the chart are upgrades from

16   previous systems and would not constitute new installation.

17       Of course, we didn't limit it only to data migration.

18   We asked for all the modules that were involved with each

19   customer, for all the customers, and we didn't distinguish

20   between upgrades, which we think still constitutes an

21   infringing system when you provide them for them and not

22   installation.

23       We subsequently -- I think we heard that there were

24   many more customers than just the 36 identified here, and this

25   does not provide us with a full answer to the interrogatory if

1    you go back and look at the specifics of the interrogatory

2    which pretty much covers the waterfront, Your Honor.  I won't

3    try to read that.

4                THE COURT:  It doesn't cover the waterfront, but what

5    it does cover is identify on a customer-by-customer basis for

6    each Lawson customer from May 2003 until the present, one, the

7    modules of Lawson's S3 supply chain management suite and/or M3

8    supply chain management suite and/or other Lawson electronic

9    sourcing and procurement systems and/or services which Lawson

10   has made, used, sold, offered for sale, imported, licensed,

11   implemented, maintained, and/or serviced for or to each such

12   customer, and/or which module such customer used, purchased,

13   licensed, implemented or had implemented, maintained or had

14   maintained, or serviced or had serviced, and then state for

15   certain things the dates and then the revenue.  Now, read the

16   question again, Mr. McDonald.

17               MR. McDONALD:  The jury's question again?

18               THE COURT:  No, the question Mr. Robertson asked.

19               MR. McDONALD:  Are you aware that Lawson still failed

20   to provide that information --

21               THE COURT:  No, the one before that, please.

22               MR. McDONALD:  Are you aware the Court granted that

23   motion to compel?

24               THE COURT:  Go ahead before that.

25               MR. McDONALD:  Before that?

```
 1            THE COURT:  It defines what is the topic of that
 2    exchange.
 3            MR. McDONALD:  Did you ever receive that
 4    customer-by-customer information as to their implementation?
 5            THE COURT:  Go back one more before that one.
 6            MR. McDONALD:  Okay.  So you want to know what
 7    information is being requested here?
 8            THE COURT:  Yes.  What is he asking about there?
 9            MR. McDONALD:  This is the prior page, line 915, I
10    believe, at line six, I believe, gives context.
11            Other than the handful of deposition testimony you
12    were given from the Lawson customers, did you have access to
13    any Lawson customers to see how they were utilizing the system?
14    He was asking actually about access to Lawson customers.
15            No.  In fact, I asked for that, but I never got a
16    reply.
17            And I said, can we have clarified who he asked.  The
18    witness, I asked the attorneys if there was more information,
19    and the answer was no, this is what we have.
20            You said, I think he wants to know which attorneys
21    were asked, ePlus's are Lawson's.
22            The witness:  Ms. Albert.
23            And then question, and when you asked ePlus's counsel
24    if they could obtain that information, did they actually
25    provide you with interrogatory answers in which ePlus had asked
```

1   Lawson to provide, on a customer-by-customer basis, all of the

2   information as to how they implemented the Lawson customer

3   systems?

4           Answer:  No.

5           Did you ever receive that customer-by-customer

6   information as to their implementation?

7           No.

8           Were you aware that ePlus asked the Court to compel

9   Lawson to provide that information?

10          Yes.

11          Do you want me to keep going, Your Honor?

12          THE COURT:  No.  So basically this whole query got

13  started by how did they use the system.  The question does, in

14  fact, call for the modules on a customer-by-customer basis of

15  whichever system is involved and how it was used.

16          MR. McDONALD:  He says he didn't get any

17  customer-by-customer information.  Obviously there was

18  information produced.  Mr. Schultz, I believe, has more detail

19  about the scope of our response which I don't think is within

20  the four corners --

21          THE COURT:  And it says, and/or which modules such

22  customer, used, purchased, licensed, et cetera.  So basically

23  it is correct that the interrogatory calls for the information

24  that is the topic of the question.  It is correct that the

25  Court ordered Lawson to answer the interrogatory as asked and

1   to do so by April 2nd.  We know that it was extended to

2   April 8th.  We know that April the 8th there was an answer, and

3   the answer confined itself basically to migration of data, and

4   on that it gave a table of 36 or so people, and then there were

5   some -- there was a supplementary part about another part of

6   migration and responsibilities for that, and they added about

7   four or five more.  So that's what I know.  May 18th supplement

8   doesn't really help much.

9             MR. SCHULTZ:  Your Honor, there is one other piece of

10  information with respect to --

11            THE COURT:  Let's get all the pieces together,

12  because I thought I had all the pieces now.

13            MR. SCHULTZ:  There's one other.  There's a chart,

14  appendix B, that Lawson provided.

15            THE COURT:  To what?

16            MR. SCHULTZ:  To the interrogatory response.

17            THE COURT:  Well, I don't have that.

18            MR. SCHULTZ:  It's a large Excel spreadsheet that I

19  was a part of creating that essentially goes through on a

20  customer-by-customer basis and lists the customer number, for

21  example, 359, and lists right under it the modules that are

22  associated with that particular customer.  For example, 359 is

23  LSF.

24            THE COURT:  Where is that exhibit?

25            MR. SCHULTZ:  It was what we produced to ePlus.

1        THE COURT:  Where is it now?

2        MR. SCHULTZ:  We have it on a computer.  I don't have

3    a physical copy of it.

4        THE COURT:  How big is it?

5        MR. SCHULTZ:  It is 42 pages long.

6        THE COURT:  Does it cover all 300-plus customers?

7        MR. SCHULTZ:  Yes, it does.

8        THE COURT:  You only had 300 customers the whole

9    time, from 2003 to the present?

10       MR. SCHULTZ:  It covers more than 300 customers.  I

11   believe there were 1,600 customers that were on this particular

12   list.

13       THE COURT:  And it shows which modules they did?

14       MR. SCHULTZ:  That's correct.  It lists the customer,

15   and then immediately below that it lists the modules.  For

16   example, 674 customer number is ICPORQ, and then SIP.

17       THE COURT:  What does that mean?

18       MR. SCHULTZ:  Those are the module records.

19       THE COURT:  What does it mean?

20       MR. SCHULTZ:  IC is inventory control, PO is purchase

21   order, RQ is requisitions, and, Your Honor, I don't know what

22   SIP means off the top of my head.  RSS.

23       THE COURT:  I know what RSS means.

24       MR. SCHULTZ:  RSS I do.  SIP means RSS.

25       THE COURT:  SAP means RSS.

1   MR. CARR:  S-I.

2   THE COURT:  Sounds like Dr. Seuss wrote this.  So I

3   think I can't deal with this any further until ePlus looks at

4   this -- and I look at this appendix B.  That's where I am right

5   now.  You say that provides the information that's actually

6   called for, and either it does or doesn't; isn't that right?

7   That's all the pieces -- I don't have an inexhaustible period

8   of time in which to rule on these things, and I have a jury

9   that needs to have its business attended to which is hearing

10  cases, so that's it.  Have I got all of the information except

11  that appendix B?

12  MR. SCHULTZ:  Actually, no, Your Honor.  I just

13  looked back at the interrogatory, and I apologize profusely.

14  There is also an appendix A.  I don't have that here.

15  THE COURT:  What does it provide?

16  MR. SCHULTZ:  It is a chart listing on a

17  customer-by-customer basis the modules licensed by the

18  customer, the release of the modules delivered to each customer

19  in or after May of 2003, the delivery date, the module release,

20  and the last date of the customer --

21  THE COURT:  Did you get that stuff, Mr. Robertson?

22  If you did, how can you make the argument you are making now?

23  MR. ROBERTSON:  Your Honor, licensing revenues,

24  that's what that was directed to.  It had nothing to do with

25  what was implemented on a customer-by-customer basis.

1    THE COURT:  Why would they pay licensing revenues on

2    something they hadn't implemented?  I mean, come on.  I mean,

3    that may be the only form of information they had it in, but if

4    they provided it in that form, that's seems to me to be

5    sufficient.  Nobody pays for implementations they don't use, or

6    if they do, they really are -- it's -- I won't get into that

7    economic theory.

8    MR. ROBERTSON:  Your Honor, there are instances where

9    they do license and sometimes don't implement it, but I'll go

10   back and look at appendix B.

11   THE COURT:  And A.  And I'm telling you something.

12   I've about had it with this kind of stuff, because look what

13   it's taken for me to wrestle with this, and somebody could have

14   gone back and said, the answer to this lies in appendix A and

15   B, and if it's there, it's there.

16   MR. STRAPP:  Your Honor, maybe I can clear this up.

17   Appendix A through D was provided to ePlus on December 23rd,

18   2009, months before this motion to compel.  We already had the

19   appendix.  We said that was insufficient, wasn't responsive to

20   interrogatory 24.  Your Honor granted the motion to compel

21   notwithstanding that appendix A had already been in our hands

22   for months.

23   So to the extent that they are referring back to

24   something that we already had when we made the motion and the

25   motion is granted, I think that's irrelevant here.

1          MR. SCHULTZ:  Your Honor, the supplementation,

2    however, is on top of what we had already provided which is

3    included in appendix A, B, C, and D.  There was actually four

4    exhibits that were provided with the interrogatory after

5    looking back at it.  There's clearly all of the information

6    with respect to the customer-by-customer basis that was

7    requested, and it's all the information that Lawson had.

8          In addition, we cited the Bates number range for each

9    of the documents associated with each customer and the

10   statement of work and the RFP response.  It clearly was

11   sufficient to respond to the interrogatory, specifically

12   interrogatory number 24.

13         THE COURT:  Okay.  Sit down, please.  We're going to

14   tell the jury to disregard those questions and answers that

15   dealt with that, that there was a failure of communication

16   respecting what was communicated.

17         That gets us through question four, and I think that

18   resolves this motion, but I'm not sure it does, so I'll not

19   rule on that at this time.  I'm just ruling on the jury's

20   questions right now.

21         Question three, can one contact the U.S. Patent

22   Office for existing patents search?  The answer to that is yes,

23   isn't it?

24         MR. McDONALD:  Your Honor --

25         THE COURT:  I don't know who is going to put it on in

1    testimony.

2         MR. McDONALD:  This ties into question number one,

3    Your Honor, where I think it's implicit with that question

4    number three that they are assuming there's some sort of

5    duty --

6         THE COURT:  You are assuming that it does.  I'm not

7    going to assume what relates to what.

8         Who decides if a patent is valid.  The answer is,

9    they do, the jury does; right?

10        MR. McDONALD:  Right.

11        THE COURT:  Is the U.S. Patent Office notified and

12   their opinion sought if the validity of a patent is questioned?

13        MR. ROBERTSON:  Your Honor, could I just be heard on

14   who decides if a patent is valid?  I mean first, the Patent

15   Office determines whether or not it's patentable and adds the

16   presumption of validity from there, and then -- but as the tape

17   they saw indicates, if it's found it's in dispute, they're

18   going to be -- they decide, they make that determination.

19        MR. McDONALD:  The question is who.  The answer is

20   the jury.  I don't think it's more complicated than that.

21        MR. ROBERTSON:  I think the PTO first decides that

22   it's a valid patent, and now it's in dispute here.

23        MR. McDONALD:  There was no patent until the Patent

24   Office issued it, but now that it's issued --

25        THE COURT:  The answer is the PTO decides to issue

1   the patent, and it's presumed valid, and if there's a dispute

2   about it, the jury decides whether or not there's validity.

3            MR. ROBERTSON:  Your Honor --

4            THE COURT:  Is the U.S. Patent Office notified and

5   their opinion sought if the validity of a patent is questioned.

6            MR. McDONALD:  This gets into -- we'd love to answer

7   that question, Your Honor.  You know the re- exam is going on.

8            THE COURT:  That's a different -- that's not the

9   validity they are taking about.  They don't have any basis for

10  understanding that.

11           MR. McDONALD:  I'm not trying to say I should answer

12  the question that way, but I did want to say there is a process

13  for that that the jury is not hearing about.  It's prejudicial

14  to us, I think, with the question like that hanging out there,

15  and to have them again mention the presumption of the validity,

16  I think, is unfair when we can't tell the jury the other side

17  of the story there which is that we could go and did go back to

18  the Patent Office for examination.

19           MR. ROBERTSON:  There's no other side of the story

20  because the case law is it is presumed valid even when pending

21  re-examination, but the answer, Your Honor, specifically to

22  this question is when a suit is filed, the PTO is, in fact,

23  notified of -- that the patent's in suit.

24           MR. McDONALD:  Not --

25           THE COURT:  Is notified that the patent is in suit or

1    that the validity is in question?

2         MR. ROBERTSON:  No, just that the suit has been filed

3    that implicates the patent.  A suit's been filed that

4    identifies that patent.

5         MR. McDONALD:  There's the lawsuit that's filed that

6    they were notified.  A patent infringement lawsuit in ePlus's

7    complaint, which is all the Patent Office is notified about,

8    the validity of their own patents is not questioned.  So that

9    is not true that the Patent Office was notified that the

10   validity was questioned.  The Patent Office was notified that

11   ePlus brought a lawsuit alleging the patent was valid.

12        THE COURT:  I understand.  Did Lawson file for a

13   patent on its S3 system?

14        MR. McDONALD:  No.

15        THE COURT:  Why didn't it?  I just think we tell them

16   that that's not a matter of concern in this case.

17        MR. McDONALD:  I can just ask Mr. Lawson that

18   question.

19        THE COURT:  All right, that's fine.  You can do that.

20   I'm not sure it's important.

21        MR. ROBERTSON:  Your Honor, I'm going -- I think that

22   is irrelevant, and I just don't want the suggestion to be made

23   when that question is asked, the followup question, well, why

24   didn't you, and Mr. Lawson blurt out, well, because I didn't

25   think it was patentable or something like that.  That would

1    improper and irrelevant to the inquiry.  You know, it also

2    starts to implicates closely again --

3            THE COURT:  What is the answer?  What is the answer,

4    Mr. McDonald -- McDaniel?  McDonald.  I'm going to name you

5    everything in the book.  Sorry.

6            MR. McDONALD:  I should wear a card.  The answer was

7    that they just looked at it as computerizing something that

8    people had done for years manually, and they didn't think it

9    was the sort of thing you get a patent on.

10           THE COURT:  I'm going to tell them that's not a

11   concern of theirs.  Number one, is there a duty requirement for

12   an entity to perform due diligence and search for patents on

13   products, services, et cetera, before the entity markets and

14   sells their products/services, et cetera.

15           MR. McDONALD:  The em banc decision by the Federal

16   Circuit in the CK case gives that an unequivocal no, there is

17   no such requirement.

18           MR. ROBERTSON:  I think the Court doesn't need --

19   this is not a concern of the jury.  The jury is not going to be

20   hearing anything on willful infringement.  This is asking a

21   purely legal question which I think is inappropriate to

22   instruct the jury on, because that is not an issue in this

23   case.

24           MR. McDONALD:  I think Mr. Robertson asked Mr.

25   Christopherson, you knew about these patents, but you didn't do

1   anything about it.  They've opened the door to this, Your

2   Honor.  I think the jury is entitled to hear -- in other words,

3   to hear there was no duty because Mr. Robertson left the

4   impression that there was.

5           MR. ROBERTSON:  That was with respect to intent to

6   induce which is that he had knowledge and he hasn't done

7   anything since May of 2009 which is what I was directing my

8   question there.  It's relevant directly to intent to induce.

9           THE COURT:  They are talking about before they modify

10  the products -- I mean sell the products or system.  I think

11  the answer is, number one, it's not a matter for your concern.

12  Number two, it's not a matter for your concern.  Number four,

13  I've told you, and number three, how do you all want to handle

14  that?  I think we agree, yes, the answer is yes, and the PO

15  decides to issue a patent, it's presume valid, and if there's a

16  dispute over the validity, the jury decides it, and the answer

17  is that isn't an issue in this case for the third question, it

18  seems to me.

19          MR. McDONALD:  Is the first one can one contact the

20  U.S. Patent Office, Your Honor?  I don't think that's their

21  concern.  If you're not going to let them hear the answers to

22  these other questions, I don't think they should have that one

23  either.

24          MR. ROBERTSON:  In the context of this case, I think

25  the evidence was they searched through the existing patents.

1    In fact, Mr. McDonald asked one of the inventors and showed him

2    to the cover page of the patent and showed all these patents

3    here that the examiner had actually looked at --

4              THE COURT:  Wait a minute.  He didn't ask -- this

5    question basically cuts both ways.  It's can the inventors

6    search, and can Lawson search.  I mean that's -- it has two

7    implications here.

8              MR. ROBERTSON:  But patents are publicly available,

9    Your Honor, so the answer is yes.

10             THE COURT:  Well, I understand that, but there's

11   another little problem called you don't -- I don't testify, you

12   don't testify, Mr. McDonald doesn't testify.  So if there is a

13   stipulation, I can tell them.  If there's no stipulation, you

14   still have your case open, and you can put on somebody to

15   testify about it, but I don't know if that's proper at this

16   stage of the game.  I can tell them that it's public

17   information because the tape, videotape from the Judicial

18   Center says that it is.

19             MR. ROBERTSON:  Well, the videotape also said that

20   the examiner's search --

21             THE COURT:  Wait just a minute.  It says who decides

22   the patent, who issues the patent, okay?  All right.  So what

23   I'm going to tell them is as you saw in the videotape, the

24   Patent Office, once a patent is issued, the whole file on it is

25   available for examination by anybody in the public, and it is

1  the Patent Office that issues a patent.  And if there's a

2  dispute about the validity of the patent, it is the jury that

3  ultimately decides that dispute.

4         MR. ROBERTSON:  Could I ask you, before Your Honor

5  was indicating you were going to say presumed valid but if

6  there's a dispute --

7         THE COURT:  I don't know that I need to do that now.

8  I'm going to tell them that in the instructions anyway, so I

9  don't want to overemphasize it.

10        How long have we been in here?  I think we're going

11  to change.  I think we all need a little break, don't we,

12  before we get going?  If you all come up with anything else

13  that makes me look like I'm saying something untrue to the

14  jury, the marshal has a lockup.  So tell them we'll be about

15  20 minutes.

16

17        (Recess taken.)

18

19

20

21

22

23

24

25