1419

1     (The jury is present.)

2          THE COURT:  Ladies and gentlemen, I'm sorry

3     we consumed the time that way, but it was necessary to

4     get some of these things sorted out.

5          Taking these in various orders, how many

6     orders to compel were ignored regarding discovery

7     document production?  I think the appropriate thing to

8     do here is for you-all just to get that out of the

9     case and just disregard the question and the answer.

10    There was some information requested.  There was some

11    information provided.  There was some information that

12    was not provided, but in the bottom line, it appears

13    there was some misunderstandings about what was

14    thought to have been provided.  And so whatever

15    happened procedurally before now is just something

16    that needs not be something to be considered as part

17    of the case at all.  So just forget about that.

18         The first question is:  Is there a duty or a

19    requirement for a defendant to perform a due diligence

20    search for patents on products, services, etc., before

21    the entity markets and sells their respective product

22    or services?

23         That is something that I will take up with

24    the lawyers later, and if an instruction on it is

25    appropriate, I'll give it to you in the final

1    instructions.

2          The next question is:  Why didn't Lawson file

3    for a patent on its S3 system?  Can it be considered

4    prior art if the patent has not expired?

5          We're not here dealing with Lawson's patents,

6    and so that is really not a matter you-all need to

7    concern yourselves with.

8          The first question and part of No. 3 is:  Can

9    one contact the Patent Office for existing patents

10   (search)?

11         Do you remember from the video that said that

12   once a patent, when it's filed, it remains

13   confidential until -- all of the application remains

14   confidential, but once the patent is actually issued

15   by the Patent Office, the whole file is open and

16   available to anybody in the public to look at, period.

17         The next question is:  Who decides if a

18   patent is valid?

19         I think they tried to deal with this in the

20   video that you saw.  In the first instance, the Patent

21   and Trademark Office issues a patent.  And if there is

22   a dispute about the validity of a patent in a lawsuit,

23   it's the jury that decides the issue of whether a

24   patent is valid.

25         Now, this part of our case has been involved

1421

1    with the claims of ePlus that Lawson infringed the

2    patent.

3            The issues about invalidity come up in the

4    next part of the case.  And it's going to be ePlus'

5    burden to prove by a preponderance of the evidence

6    that there was infringement.  It is Lawson's burden to

7    prove by clear and convincing evidence that the patent

8    is invalid.  And you'll hear evidence that's related

9    to that a little bit later on.

10           EPlus is getting ready to read you some

11   stipulations.  And with that, they'll rest and then

12   ePlus will come forward.

13           The next question is:  Is the U.S. Patent

14   Office notified and their opinions sought if the

15   validity of a patent is questioned?

16           That part of patent law to the extent there

17   is any on that doesn't really concern us at this part

18   of the case.  So it's not anything that you need to be

19   concerned with in this case, and I think that's the

20   way we'll leave it.

21           So with those questions answered, we'll now

22   let Mr. Robertson proceed.

23           MR. ROBERTSON:  Thank you, Your Honor.  Does

24   Your Honor want to provide an instruction to the

25   jury with respect to --

1422

```
 1            THE COURT:  Do you want face the jury?
 2            MR. ROBERTSON:  I'm sorry, yes.  -- what a
 3   stipulated fact is?
 4            THE CLERK:  Mr. Langford, can you move the
 5   lectern?
 6            THE COURT:  He can just do it from there.
 7            Mr. Robertson is going to read to you what
 8   are called stipulations of fact.  When the lawyers and
 9   the parties on each side stipulate that something is
10   true, you can accept it as fact, as proved.  It's not
11   anything that there will be any evidence on.  And so
12   they are stipulating now that certain facts are true
13   and have been approved or do not need to be proved.
14            All right.  Mr. Robertson, would you like
15   to -- and a copy of these stipulations will be made
16   available for you in the jury room.  You'll have
17   those, too.
18            MR. ROBERTSON:  Thank you, Your Honor.  May I
19   proceed?
20            THE COURT:  Please.
21            MR. ROBERTSON:  EPlus is the lawful assignee
22   of all rights, title, and interest in and to the '683,
23   '516, and '172 patents, collectively the
24   patents-in-suit.  The patents-in-suit were assigned to
25   ePlus on May 15, 2001.
```

1423

1    United States patent No. 5,712,989, the '989

2    patent, was incorporated by reference into the

3    disclosure of the patents-in-suit and shares two of

4    four inventors with the patents-in-suit.

5    Lawson makes, uses, licenses, sells or offers

6    for sale in the United States software applications

7    and services including a software product line known

8    as S3.

9    Included in the Lawson S3 product line is a

10   suite of applications and modules referred to as the

11   S3 supply chain management.  These software

12   applications and modules include inventory control,

13   requisitions, purchase order, Lawson EDI, requisitions

14   self service, and Punchout procurement.

15   The current version of the Lawson S3 software

16   suite is release 9.0.1.  Lawson makes technical

17   documentations available to its licensees of its S3

18   product through its "mylawson.com" website, including

19   installation guides, implementation guides,

20   configuration guides, release notes, and other

21   documentation.

22   That's it, Your Honor.

23   THE COURT:  All right.  And with that?

24   MR. ROBERTSON:  Sorry.  Thank you.  And with

25   that, the plaintiff rests, Your Honor.

1424

```
 1            THE COURT:  All right.  Thank you.

 2            Mr. McDonald, a couple of times during the

 3    day, I guess I've gone off course.  I've referred to

 4    Mr. McDonald and renamed him as Mr. McDaniel, but it's

 5    really Mr. McDonald.

 6            MR. McDONALD:  As long as my first name isn't

 7    Ronald, I guess that works.

 8            I call Richard Lawson to the stand.

 9            THE COURT:  All right.  Mr. Lawson.

10

11    RICHARD LAWSON, called by the Defendant, first

12    being duly sworn, testified as follows:

13

14    DIRECT EXAMINATION

15    BY MR. McDONALD:

16    Q    Good afternoon, Mr. Lawson.

17    A    Good afternoon.

18    Q    Can you state your full name, please?

19    A    My legal name is Herbert Richard Lawson, Jr.  My

20    dad went by Herbert, so I go by Richard Lawson.

21            THE COURT:  Mr. Lawson, will you come back

22    over this way and get that mic a little closer to you.

23    Just move the chair back this way a little bit.

24            There you go.  Then pull the mic -- there you

25    go.  I think it will pick you up.
```

LAWSON - DIRECT                    1425

1       THE WITNESS:  I have a problem with my voice

2   trailing off.

3       THE COURT:  There we go.  And talk a little

4   bit away from the mic.  All right.

5   BY MR. McDONALD:

6   Q   Mr. Lawson, is it more than just coincidence that

7   your name is Lawson and this case also involves a

8   company called Lawson Software?

9   A   No, I started the company.

10  Q   Did you just start it by yourself?

11  A   Yes, I did.

12  Q   At some point did any other Lawsons join you?

13  A   Yes.  After one year of being in the company by

14  myself, my brother joined the company.

15  Q   When was that?

16  A   Bill Lawson.  It would have been in 1976.  I was

17  '75.

18  Q   I'd like to talk to you today about three basic

19  things.  One is the background of Lawson Software.

20  Two is Lawson's competitors.  And three is some issues

21  relating to the process of developing the Lawson

22  systems that are accused of infringement in this case.

23  All right.

24      So if we had turn first to the background of the

25  company, where did you form Lawson Software?  Where

1   was that?

2   A   Minneapolis, Minnesota.

3   Q   What type of company was it when you formed it?

4   A   It was a -- we called it a contract programming

5   company, which today I think they use the word

6   "professional services" a lot.  In other words, I sold

7   my time as a temporary employee to companies.

8   Q   Did you have some prior experiences that enabled

9   you to start a business in this area?

10  A   Yes, I worked seven years for a company called

11  Analysts International Corporation out of Minnesota.

12  They are actually still -- they are a partner of ours

13  now.  So I worked seven years with them.

14  Q   What did you do for Analysts International?

15  A   I did contract programming.  In other words, I

16  worked for them, but they would actually contract me

17  out to other companies.  Companies such as Control

18  Data, which is where I started as my first contract.

19  Q   So when you say "contract," can you be a little

20  bit more specific about what your job duties actually

21  were as a contractor?

22  A   To walk into that company and do what they wanted

23  me to do in terms of programming.  So at Control Data

24  I was a systems programmer working on the operating

25  system.

1    Q    What years were you working at Control Data?

2    A    The years at Control Data were split up a lot.

3    The first three years was at Control Data.

4    Q    Which years were they?

5    A    I'm sorry.  1968 through -- I'm sorry.  Yes, '68

6    through '69 was Control Data in Minneapolis.  And the

7    next two to three years was in Sunnyvale, California,

8    because Control Data opened up an office out there and

9    wanted us to go out there with them.

10   Q    What types of functions did the software do that

11   you were involved with at Control Data?

12   A    Actually, I ran the operating system on the

13   Control Data 6500, a dual processing machine.

14   Q    What sort of stuff would that computer do?

15   A    Read tape drives, read disks.  It was the

16   operating system itself.  It would be like the Windows

17   operating system but for a super computer.

18   Q    Were there particular applications that that

19   computer was used for?

20   A    Well, it was a super computer that was used by

21   scientists and by the government for all sorts of

22   applications, but I worked on the operating system,

23   the foundation that allowed those applications to run.

24   Q    Before you got to Analysts International, did you

25   get some educational background that would be relevant

1   to computers?

2   A    Yes.

3   Q    What education did you get?

4   A    Well, in 1962 through '66 I attended Oklahoma

5   Christian College, which is now Oklahoma Christian

6   University in Oklahoma City.  And I got a math degree

7   because back then they didn't really have computer

8   science degrees.

9        I went to Perdue University for '67 through '68

10  and got a Master's Degree in Computer Science.

11  Q    How was it that you wound up at Perdue?

12  A    My brother-in-law.  My brother-in-law was early

13  into the computer business.  He was working -- he was

14  head of the department at the University of Minnesota,

15  and I had worked at Univac, one of the early computer

16  companies for many years, and he advised me to go to

17  graduate school, and helped me through the process,

18  and we looked at three universities; Perdue, Stamford,

19  and University of Waterloo because they actually had a

20  computer science department so that you could get a

21  computer degree through the actual computer science

22  department.  And I chose Perdue.

23  Q    So when you started Lawson, your company, what did

24  you call it first?

25  A    Lawson Associates.

LAWSON - DIRECT                    1429

1   Q    Did you actually have any associates at that

2   point?

3   A    No, but just in case I did, I figured I'd put

4   Associates on there.

5   Q    Can you tell me what sort of customers you worked

6   for initially?

7   A    The first customer I worked for was actually an

8   insurance company.  They were going to have a

9   three-year project that I thought I would have, and,

10  of course, that lasted three months until they

11  canceled the project.  And I had to start finding

12  another one.  So I worked for FMC Corporation, which

13  is out of Minneapolis, Minnesota.  And in that

14  capacity, I was actually coding an inventory system

15  that they had designed.

16  Q    Now, are you familiar with the term "turnkey

17  system"?

18  A    Yes.

19  Q    What is a turnkey system?

20  A    First of all, I was doing contract work, which is

21  to me it would be like a temporary employee.  Instead

22  of hiring an employee, they had contractors.

23       When my brother came aboard, which would be in

24  '76, he really liked to work with small businesses.

25  His background is -- my background is technical and

LAWSON - DIRECT                1430

1    engineering.  His background was in business.

2       So he liked to go into small businesses, find out

3    what their needs were, and program specific systems

4    for them.  And then after he programmed them, he would

5    turn them over, hence the term "turnkey," and walk

6    away.  So it was not a package system.  It was a very

7    specific system built specifically for that customer.

8       So we did a lot of that in the early years, too,

9    because when my brother came aboard, he would go to

10   those small companies, and we would actually code and

11   write turnkey systems.

12   Q   So you say you'd walk away, that sounds like

13   you're leaving your customers high and dry.  Can you

14   explain what you mean by that?

15   A   Well, if they had problems with the software after

16   we left or if they wanted new features or

17   functionalities, they could call us back in.  And,

18   again, we would charge them for that.  But we didn't

19   run the software, and we didn't have upgrades to it.

20   We didn't sell it as a package and have a package

21   solution for them.  We didn't have a phone line that

22   they could call and say, I have a problem.  Tell us

23   what it was, and I would patch it for them.

24           THE WITNESS:  I'm sorry.  Too loud.

25           THE COURT:  No, that's not the problem.

LAWSON - DIRECT                    1431

1        THE WITNESS:  Okay.

2        THE COURT:  We have finally determined what

3    the problem is that makes the system go pop when you

4    use Ps and Ts.  It's not everybody, but many people we

5    have this problem with.  That little section on the

6    front there is too small, and they have ordered and

7    are going to install by the end of this week bigger

8    mics such as they use when people are singing songs.

9    So we'll be able to have a performance here free of

10   popping.

11        In the meantime, you just go ahead and talk

12   and don't worry about it.  The jury and the rest of us

13   will deal with that, but it's nothing you're doing

14   wrong.  It's just the way some people talk.  It

15   happens and that's just the way it is.

16        THE WITNESS:  Rest assured I will not sing

17   anyway.

18        THE COURT:  We won't call upon you to do

19   that.

20   BY MR. McDONALD:

21   Q   This was back in the '70s that you're talking

22   about so far, Mr. Lawson?

23   A   Yes.

24   Q   So along the way, if we could kind of pick up the

25   pace here a little bit.  At least get to the late '70s

1  or into the '80s.  Did you start adding people or not?

2  A    Yes, we did.  As we took on more contracts, we had

3  to make a decision.  First of all, two more people

4  were added as partners after that time frame.  A very

5  good friend of mine that worked with me at Control

6  Data, he was a Control Data employee, but we knew each

7  other.  John Cirillo became a third partner.

8      Then my brother met a guy named Jerry Snyder out

9  selling small business solutions.  He came aboard.  So

10  there was four of us.

11  Q    Why did you have those people?

12  A    Because they complemented -- first of all, when

13  you're out there on your own doing contracting,

14  sometimes you might have to turn work down because

15  it's only you.  And you hate to turn work down because

16  you like the business.  But also because my brother

17  and John -- I'm sorry.  John and I were technical.  We

18  did contract programming, hourly rate programming, on

19  contracts with companies like Control Data, big

20  companies.  It kept a nice cash flow coming into the

21  company.

22      Bill and Jerry would go out and bid on and sell

23  these turnkey projects.  And, of course, if they sold

24  more than one or two we needed programmers to do

25  those.  So we had to make a decision either to turn

LAWSON - DIRECT                    1433

1   business down or to actually hire employees to satisfy

2   the business that we were getting.  And we decided to

3   add employees for that.

4   Q   At some point in the process did you reevaluate

5   whether you wanted to keep doing these customized

6   turnkey systems?

7   A   Yes.

8   Q   When was that?

9   A   What happened was every time we went into -- it

10  would be about '77.  We went into these companies, and

11  the first thing we found out is first of all the

12  company normally wanted what we would call the

13  operational software.  They wanted software for order

14  entry.

15  Q   Just keep it generic at this point.

16  A   Well, what we found out is they would then say --

17  We were always bidding the same modules.  Financials.

18  And we'd have to charge them a from scratch price to

19  code that module.  Some of those modules were the same

20  from company to company.  So we decided to build what

21  we call today what is known as shell packages.  They

22  were complete packages, but they didn't have a lot of

23  bells and whistles on them.

24      So we could go into a company and bid those at a

25  much lesser price.  We'd bid them as a small price for

LAWSON - DIRECT                    1434

1    the software and then whatever it took to modify them

2    for their specific needs.

3    Q    So what did you call those products then?

4    A    They became our off-the-shelf beginning projects.

5    I'm sorry.  Beginning modules that would keep the

6    price down.

7    Q    Approximately when was that then?

8    A    '77, '78.

9    Q    So getting into the '80s now, did the company

10   start to grow at any point?

11   A    Yes, I like to joke with sales people that we made

12   a mistake and hired a salesman.  And the salesmen not

13   only helped us get local business, but they helped us

14   get these packages, which were on Burrell machines.

15   Back in those days, you actually sold packages

16   typically by hardware.  It's a different world today,

17   but you niched out the hardware.

18        We niched with Burrell's hardware.  And the

19   Burrells did not have very many software packages that

20   they could buy from, that Burrell's customers could

21   buy from.

22        So he actually went to California, the salesman,

23   and started selling packages in California.  And that

24   put us in a different world because we had to have

25   phone support.  We had to have our own hardware.  We

1  had to have a real office, and we had to have support

2  personnel.

3  Q   So that basic business model, using the modules

4  that you would describe it as --

5  A   Yes.

6  Q   -- how long did that will continue with that

7  particular business model?

8  A   The model I just described?

9  Q   Yes.

10  A   To this day it's continued.  That's who we became.

11  And at some point you asked when did we change to that

12  model.  About 1983, 2 or 3, our fourth partner, Jerry

13  Snyder, decided he wanted to go a different way than

14  us, and he took all the contract.  We agreed.  He took

15  all the contract programmers that we had in

16  Minneapolis, about 70 or 80 people, and started his

17  own contracting business, professional services

18  business.

19      And what we were left with after that was the

20  package software plus the modification of that

21  software.  So we got out of the generalized

22  contracting business at that point.

23  Q   What is your current position with Lawson

24  Software?

25  A   I'm cochairman of the board.

LAWSON - DIRECT                    1436

1   Q    How long have you had that position?

2   A    Cochairman for five years, but I've been the

3   chairman ever since the company was founded.

4   Q    About five years ago did your position -- did you

5   have a different position than before you became

6   cochairman?

7   A    In the company itself I had various positions.  I

8   had chief technology officer and at various points in

9   times I was CEO.

10  Q    At various points in times, you mean basically

11  between the '80s and about 2007?

12  A    Between '75 and that point, yes.

13  Q    At some point did Lawson Software go public?

14  A    Went public in 2001, yes.

15  Q    Let's now talk about the processes that you use to

16  develop the systems that are accused in this case.

17  I'd like you to answer these questions in terms of the

18  purchase order module, the requisition module, and the

19  inventory control module.  All right?

20          MR. ROBERTSON:  Can I just have some

21  clarification, Your Honor, of what we're talking about

22  when we're saying the product accused in this case?

23  As Your Honor understands, there's an order that you

24  have given defining the scope of this gentleman's

25  testimony.  So I want to make sure we're talking about

LAWSON - DIRECT                1437

1   a product that's accused, which is 2003 S3

2   procurement.

3   BY MR. McDONALD:

4   Q   Let's clarify that, Mr. Lawson.  We'll talk about

5   the systems, those three types of modules that I just

6   talked about from the year 2003.  All right?  And

7   forward.

8       So with respect to those products did you have

9   some role in developing those products?

10  A   Yes.  Well, the products themselves, the answer is

11  in one sense no except that the technology beneath

12  those applications I had roles in.  Well, since 2003,

13  the answer is, since I left, the answer, that would be

14  basically no.  Before that, yes.

15          THE COURT:  That's enough.

16          MR. ROBERTSON:  I object to anything before

17  2003.

18          THE COURT:  We've had a ruling on this,

19  haven't we?  And all you're going to do is talk about

20  the way things are, the general process of development

21  of something.  Not the birth plan of it all.

22          MR. McDONALD:  Understood.

23          THE COURT:  And I want you to stay there, and

24  you do that by asking very focused questions, to which

25  Mr. Robertson will not object as leading, will he?

1          MR. ROBERTSON:  If they are focused and not

2     leading, Your Honor.

3          THE COURT:  No.  If they are leading because

4     that's the way he's focusing the interrogation, then

5     the leading question objection is gone.  So go you try

6     it and get us there.

7     BY MR. McDONALD:

8     Q    Now, Mr. Lawson, is there a kind of a generic

9     process that the company goes through in terms of

10    deciding whether to add features to these products

11    like the three modules I've talked about since 2003?

12    A    Yes.

13    Q    Can you tell me step by step what that process is?

14    A    The process or the information we gather to figure

15    out what we want to do comes from lots of sources.

16    One is our own clients who'll give us feedback on

17    what features or functionality they would like to see

18    in our software.

19         And in fact, we have user groups that actually

20    accumulate those features and actually whittle them up

21    into the company and say, These are the most important

22    features that --

23          MR. ROBERTSON:  Your Honor, can we just have

24    some clarity whether Mr. Lawson was involved in this

25    process from 2003 forward?  So I'd object.  There's no

                        LAWSON - DIRECT              1439

1   foundation.

2   BY MR. McDONALD:

3   Q   Mr. Lawson, have you been involved in that type of

4   a process since 2003?

5   A   No, but I'm very aware of them, but I haven't been

6   specifically in the room dealing with it.

7            MR. ROBERTSON:  Then I would move to strike,

8   Your Honor.

9            THE COURT:  I thought he was there when it

10  was going on.

11           MR. ROBERTSON:  2003 he just testified he

12  wasn't involved in the process.

13           THE COURT:  He said he wasn't doing it.  He

14  said he was in the room while it was going on.

15           Did I misunderstand, Mr. Lawson?

16           THE WITNESS:  As my role, when we go to user

17  exchanges and so forth, I get into some rooms where

18  people talk about these issues.  So I'm involved not

19  on a day by day basis, but I'm very aware of the

20  process.

21           THE COURT:  Okay.  Overruled.

22  BY MR. McDONALD:

23  Q   So when you say "user groups," can you tell me

24  what a user group is?

25  A   Well, on a national level, it's all of our clients

1  are invited once a year to what's called a user group.

2  And on a local basis, user groups are formed, which

3  are run by local clients of ours, and sometimes

4  Lawson's people will attend and sometimes we don't,

5  depending on if they ask us to.

6      And it's those user groups, and there's a national

7  user group, that will ask for features and

8  functionalities they want to see in our software, and

9  they then will actually decide what they want to

10  present to Lawson to say, We would like to see these

11  features.  That's one area that we get feedback.

12  There's other areas, but that's one area.

13  Q   What other ways did you get that type of feedback?

14  A   Well, our own installers, if you will, or our own

15  consultants that go out to see a client and help

16  install our current software.  They'll notice the

17  business practice of these companies and what we might

18  be able to do in our software to address things we

19  haven't addressed or to change things we have

20  addressed to work differently.

21      So our own consultants will come back to us and

22  say, This is a list of things we see that would be

23  nice to add in the next release.

24      Software is constantly being released.  There's

25  release numbers and that feeds a product marking group

1    that makes a decision on what to put into the next

2    release.

3    Q    So once you get this feedback, is there another

4    step in the process that relates to adding

5    functionality to the specific products we're talking

6    about?

7    A    After we get all the feedback, it's up to the

8    product marketing group to mix all that together and

9    look at it, and say these are the important features

10   that seem to affect most of our clients, and

11   therefore, we'll put those into the software for the

12   next release.

13   Q    Is there any sort of a review as to the technical

14   feasibility of those proposed new features?

15   A    Certainly.  The end product development will get

16   involved and talk about how long it might take to do

17   such a feature and work that into whatever schedule

18   the next release should be.  And some things might be

19   delayed because they will take longer to get into the

20   software.

21   Q    Are you familiar with the term "reverse

22   engineering"?

23   A    Yes.

24   Q    What's your understanding as to what that means?

25   A    Reverse engineering would be, for example, taking

1   a car apart and undoing it and seeing all the pieces

2   and components of it and finding out what's in it.

3       In software, it would be to grab somebody's

4   product, let's say, or whatever, and look at it or

5   take it apart to try to see what was inside.

6   Q    Have you personally been involved in any sort of

7   reverse engineering at Lawson Software?

8   A    No.

9   Q    What is your philosophy about reverse engineering?

10           MR. ROBERTSON:  Objection, Your Honor.

11   Relevance.

12           THE COURT:  Is there an issue about reverse

13   engineering in this case?  I didn't hear any.  I

14   didn't hear any testimony about it so far.  I'm not

15   sure why it's relevant.  Besides that, he just

16   testified that he doesn't do it.  He hasn't testified

17   that the company does or doesn't.

18           So why are we getting into that?

19           MR. McDONALD:  That's within the scope of

20   what we're permitted to ask about.  So that's why.

21           MR. ROBERTSON:  It still doesn't make it

22   relevant to the issues in the case.  Mr. Lawson can

23   speak for himself.  Personally, I don't think he can

24   speak for all 3900 employees of Lawson.

25           THE COURT:  Well, I'm not sure why -- I mean,

LAWSON - DIRECT                    1443

1    we haven't had any charge that there's been reverse

2    engineering in the case that I know of.  So I think

3    he's right.

4    BY MR. McDONALD:

5    Q    Mr. Lawson, have you ever seen any software

6    products from any companies called ePlus, Fisher or

7    ProcureNet?

8    A    No.

9    Q    I'd like to turn now to the topic of competitors

10   of Lawson.  Do you have familiarity with who Lawson's

11   competitors are?

12   A    The main competitors, yes.

13   Q    How do you have that familiarity?

14   A    Well, over the years and from the board today we

15   get competitive analysis and see who our competitors

16   are, but we also know who we're competing with on

17   typically a constant basis.

18   Q    Based on that understanding -- how many years have

19   you had that understanding?

20   A    Thirty years.

21   Q    Based on that understanding, do you consider ePlus

22   to be a competitor?

23   A    No.

24              MR. McDONALD:  I have no further questions.

25

1444

CROSS-EXAMINATION

BY MR. ROBERTSON:

Q   Mr. Lawson, you reside in Dallas, Texas; is that
right?

A   Yes, I do.

Q   And the headquarters for Lawson is in St. Paul,
Minneapolis?

A   Yes.

Q   So you don't fly there on a daily basis, do you,
sir?

A   No, I do not.

Q   So it's fair to say you haven't been involved in
the day-to-day operations of the company for quite
sometime; is that right?

A   Since we went public -- I have been retired for
five years.

Q   Retired for five years?

A   Yes.

Q   So since 2005?

A   Yes.

Q   Since this lawsuit has been filed, have you had an
opportunity to go out and investigate some of the
product offerings of ePlus?

A   I'm sorry?

Q   Since this lawsuit was filed, sir, approximately

LAWSON - CROSS                    1445

1    in May of 2009, have you had an opportunity to go and

2    look at some of the product offerings of ePlus?

3    A    No.

4    Q    So you didn't even go and investigate that to see

5    what kind of products ePlus was offering in the

6    marketplace?

7    A    No.

8    Q    And in your deposition you acknowledge that you

9    haven't been keeping up with the latest products of

10   Lawson; isn't that right?

11   A    In the last five years, that's correct.

12           MR. ROBERTSON:  Thank you.  I have no further

13   questions.  Have a safe trip back.

14

15        REDIRECT EXAMINATION

16   BY MR. McDONALD:

17   Q    Mr. Lawson, since you retired, what role have you

18   had with Lawson?

19   A    Cochairman.

20   Q    What duties do you have as a cochairman?

21   A    Obviously, like any other chairman or like anybody

22   on the board, I have responsibility to look at the

23   strategic direction of Lawson and also the performance

24   of Lawson on a quarterly basis.

25   Q    Do you go to board meetings?

1   A   Yes, I do.

2   Q   Do you go to other meetings?

3   A   Typically, board meetings and strategy meetings

4   that the board is involved with.

5   Q   These are strategy meetings between the board

6   meetings?

7   A   From the -- to the board meeting from management

8   that we invite management to give us strategy.

9           THE COURT:  What is that?

10          THE WITNESS:  I'm sorry.  Once a year we have

11  a strategy meeting that management presents to the

12  board our strategies.  So it's a specific meeting to

13  get the strategies from the company.

14  Q   That's separate from the quarterly board meetings?

15  A   Yes.

16          MR. McDONALD:  I have no furthest questions.

17  Thank you.

18          THE COURT:  Can he be excused permanently?

19          MR. ROBERTSON:  From my perspective, yes,

20  sir.

21          MR. McDONALD:  Yes, sir.

22          THE COURT:  Mr. Lawson, thank you for being

23  with us.  You can stay in the court or you can go back

24  to Texas if you can get an airplane that will get you

25  there.

LAWSON - REDIRECT                1447

1    THE WITNESS:  I have to go to a board meeting

2    in Florida.

3           (The witness was excused from the witness

4    stand.)

5           MR. McDONALD:  Your Honor, our next witness

6    is Mr. Christopherson.  Some of these other issues

7    relate to his testimony.

8           THE COURT:  Ladies and gentlemen, I have to

9    deal with another set of problems with the lawyers to

10   try to make life better for you-all in the future.

11          So I think what we'll do is excuse you-all

12   today and let you go home, and we'll start again at

13   nine o'clock in the morning.  And drive carefully.

14   Thank you very much.

15          (The jury is out for the evening.)

16          THE COURT:  All right.  Do you have the

17   transcript that I'm supposed to read that you all are

18   supposed to agree on?

19          MR. McDONALD:  I think the answer is yes,

20   Your Honor.

21          MR. ROBERTSON:  Yes.

22          THE COURT:  We won't provide lunch tomorrow.

23   The weather is going to be nice.  They can get out and

24   they won't feel like they're locked up.

25          I need to know first, just so -- I want the

1   record to be clear.  What are we dealing with?  Let's

2   get that straight so we get the issue defined.  And

3   then we'll go from there.

4           MR. McDONALD:  The issue, Your Honor, is what

5   if anything do we do with the Court's definition of

6   "catalog" and your proposed new definition of

7   "catalog".

8           THE COURT:  I'm just going to give an

9   instruction to them, I think.

10          Can you give these back to them.  All right

11  now.  You have given me something to read here.

12          MR. McDONALD:  I think the main question that

13  gave rise to providing the Court with a copy of the

14  Markman transcript was is the definition that the

15  Court had already given for a catalog, was that

16  actually an agreed definition?

17          And I think the answer is going to be pretty

18  clearly yes when you actually go through this

19  transcript, Your Honor, and I think the most clear

20  section of that is near the end of the transcript when

21  you get around to page 133.

22          And the context of that is there was a

23  discussion about "by a vendor," and whether that term

24  was unduly narrow.  And I had previously in the

25  transcript that you'll see in various places here,

1   both sides actually had referred to column 4 of the

2   patent, the '683 patent, which we've referred to at

3   least once or twice during the course of the case here

4   with the witnesses.

5           It talks about what's in that catalog

6   database.  And a list, I'll give the shorthand version

7   of the paragraph, at column 4 of the '683 patent from

8   lines 46 to 60.  In essence, it says, A feature of the

9   present invention is the ability to search multiple

10  catalogs from different suppliers.  Then it uses the

11  phrase "published" a few times.  It talks about

12  published by a vendor distributor.  It talks about

13  published by some of the vendor manufacturers.  And it

14  talks about further contain catalogs published by

15  outside suppliers whether other manufacturers or other

16  distributors listing such vendors products different

17  from those in the distributor's catalog.  That's

18  column 4.

19          And that was discussed at the hearing because

20  when we had another definition, "published by a

21  vendor" was what we had originally proposed,

22  Mr. Robertson had raised some concerns that the word

23  "vendor" was too restrictive.  So we pulled out, both

24  of us, pulled out that column 4 to say, Well, there's

25  some other terms here.  We want to make sure that the

1  term "vendor" isn't too restrictive and that we cover

2  the distributors, the vendor manufacturers, the

3  outside suppliers.  Basically, everybody talked about

4  in that column 4 section I just referred to.

5          So that was the context of this.  And so if

6  we go to page 133, for example, Mr. Robertson at line

7  5 says, I think it should include all, Your Honor.  I

8  think it should include vendors, distributors,

9  manufacturers, which are all listed there in that

10  column 4.

11          Then the Court at line 8 said so, you're

12  happy with this definition as long as it reads like

13  the text in column 4; is that right?

14          Answer from Mr. Robertson:  I think that's

15  right, Your Honor.  I'm trying to think if there's

16  another example that's beyond a distributor, a vendor,

17  a supplier, or a manufacturer that could be relevant.

18          THE COURT:  What page are you on?

19          MR. McDONALD:  133 of the Markman.

20          THE COURT:  This is the Markman hearing?

21          MR. McDONALD:  That's correct.  I already

22  started reading from line 5, Your Honor.  I was just

23  at the point I think about line 12, after

24  Mr. Robertson, "I think that's right, Your Honor."

25  Where you asked if he'd be happy which the definition

1  as long as it reads like the text in column 4.

2         He said, "I'm trying to think if there's

3  another example that's beyond a distributor, a vendor,

4  a supplier, or a manufacturer that could be relevant,

5  but I think if it's inclusive, it shouldn't be a

6  problem."

7         Then the Court read further down in that

8  column 4 a quote, "Catalog database can further

9  contain catalogs published by outside suppliers

10 whether other manufacturers or distributors listing

11 such vendors products different from those in the

12 distributors' catalogs."

13        The Court went on to say, Even that text

14 connotes that the vendor, the word "suppliers" is

15 intended to be a vender, doesn't it?

16        Answer from Mr. Robertson, "I think a

17 supplier typically is a vendor.  A distributor is a

18 supplier of other vendor's goods."

19        Then the Court then went on to say on page

20 134 now at line 3, "But, look.  Catalog database can

21 further contain catalogs published by outside

22 suppliers.  I'll leave out the whether clause for

23 purposes of clarity for a moment, listing such

24 vendor's products, etc."  That such vendor's products

25 means supplier in that context, does it not?

1452

1      Answer from Mr. Robertson, "In that context,

2  yes, it does."

3      Then the Court goes on at page 134, line 11,

4  In adding back in the whether clause, it would be

5  whether other manufacturers or distributors, they too

6  could be considered vendors because they have

7  previously been defined as vendor manufacturers and

8  vendor distributors.

9      Finally, the punchline here at line 16 for

10  Mr. Robertson, "I think you have solved the problem,

11  Your Honor.  Vendor is construed broadly to include

12  all those types of suppliers of goods, all the

13  sources."

14      "The Court:  Then that takes care of the

15  problem for both of you."  And then the Court turned

16  to me and said, "You agree with that, too, don't you?"

17  And I answered on page 135, line 1, "That was our

18  intent all along.  That's why we chose the word

19  "vendor" to grab all those.

20      And then the Court said, "But you just

21  shortened it too much."

22      Then at line 8, Well, I mean in the

23  presentation of it here.  But in your actual

24  presentation, you seem to go along with that notion,

25  do you not?

1453

1       I answered, "That's correct."

2       Then the Court said, "Okay.  That's fine.

3  That's good to get a feeling of accomplishment at the

4  end of the day."

5       This is where we agreed on the definition,

6  Your Honor, that a catalog as it is in the jury

7  notebook is that organized collection of items and

8  associated information published by a vendor, and then

9  in parentheses we have the phrase "Which includes

10 suppliers, manufacturers, and distributors,

11 parentheses, which preferably includes a part number,

12 a price, catalog number, vendor name, vendor ID, a

13 textual description of the item, and images of or

14 relating to the item."

15      So that establishes that the parties did

16 agree on this definition.  And I think --

17      THE COURT:  If you look at page 136, it says,

18 Mr. Robertson:  If Your Honor says "vendor" is broad

19 enough to include "manufacturer," then I think we have

20 reached at least an agreement there.

21      MR. McDONALD:  Right.  You're right.  I had

22 that marked here, but I forgot to keep going after I

23 saw the other language.  That's at page 136, line 24,

24 to page 137, line 1.

25      So there was this agreement on the meaning of

1    or the proper definition of "catalog," Your Honor.

2    There's no dispute that as defined then the

3    definition, the construction by the Court, does use

4    terms in their plain and ordinary meaning.

5         And I think I heard even yesterday

6    Mr. Robertson reemphasizing that that was their belief

7    as well, that the terms of the Court's instruction,

8    including the word "published," those are all words

9    that are appropriate with their plain and ordinary

10   meaning.

11        Of course, you could just keep defining and

12   defining and defining.  You could have another

13   interpretation of another interpretation of a

14   construction, but at some point you create more

15   confusion rather than resolve issues.

16        This definition was agreed.  It's got plain

17   and ordinary words in it that a jury can understand.

18   So we think it is appropriate as is and should not be

19   altered in large part primarily because it's accurate,

20   it's correct, it is proper in the context, and other

21   parts of the Markman transcript you can see where I

22   was talking about there are many things described in

23   these patents that can be considered organized lists

24   of item information that are not catalogs, like

25   requisitions, and order lists, and purchase orders and

1    things like that, even something called a non-catalog,

2    which is a cross-reference table.

3            Those things aren't catalogs.  What's the

4    difference?  Well, those aren't published by a vendor.

5    These are.

6            So the number one reason to stick with this

7    definition is that the parties agreed to it.

8            No. 2 is that it's very correct.  It's very

9    consistent with the patents themselves.  Furthermore,

10   the experts and all the testimony in this case has

11   been developed around these constructions in the case

12   that are accurate and complete.  And so I think we

13   need a pretty compelling reason to do anything to

14   monkey with them right now, and there just isn't one.

15           THE COURT:  All right.

16           MR. McDONALD:  Thank you.

17           MR. ROBERTSON:  Thank you, Your Honor.

18           Your Honor, what was agreed to there and what

19   the Court was focusing on was what is a vendor.  And

20   the Court identified in that particular dispute by

21   looking at the patent that a vendor could be a

22   distributor, a manufacturer or a supplier.  And so

23   included that in the definition.

24           The mischief that I was alerting the Court to

25   at the time was this notion of "published," which I

1 think has quite really been realized now, Your Honor.

2 They morphed a dispute over what a vendor was into now

3 what publication means.

4           And as Your Honor has seen throughout the

5 first half of the case, the argument now goes that

6 "published" has some particularized meaning that the

7 Court never gave it, such that, and when we raised

8 this this morning, Your Honor, with respect to one of

9 the demonstratives, the argument has been made that if

10 a vendor provides information to a customer, and then

11 the customer modifies it in some way, or the customer

12 adds additional information to it, or the customer

13 deletes some of the information but keeps the majority

14 of the information or if it's reformatted or modified

15 in any way, shape or form, that then no longer becomes

16 a published by a vendor.

17           So it's the "published" where they really

18 have imported and actually interpreted your claim

19 construction not to have its ordinary meaning, but to

20 basically create a noninfringement argument that they

21 have now pressed.

22           THE COURT:  Basically, as I see it, the

23 argument by Lawson is that "published" means edited by

24 the customer.  The item master, it seems to me, is

25 multiple catalogs in computerized format, and those

1    catalogs have an organized collection of items and

2    associated information that includes preferably part

3    numbers, prices, catalog numbers, vendor name, vendor

4    ID, a textual description of the items and images of

5    or relating to the item.  That is published by a

6    vendor but often edited by Lawson's customer.  I mean,

7    that's what this whole dispute seems to me to be

8    about, isn't it?

9              MR. ROBERTSON:  My position -- yes, Your

10   Honor.  My position is "edited by a customer" is

11   irrelevant to the claim.

12             THE COURT:  Your position is "edited" is not

13   equivalent to "published," is that what you're saying?

14             MR. ROBERTSON:  No.

15             THE COURT:  No, that isn't your position?

16             MR. ROBERTSON:  No, that's not my position,

17   Your Honor.

18             Whether it's edited or not edited is

19   irrelevant as to whether or not it satisfies your

20   claim construction.

21             THE COURT:  That's not the point.  You're

22   making the point that nobody called out published for

23   definition.  The fight was over and the argument was

24   really over the meaning of the word "vendor," and that

25   now that's all been changed.  It's been changed

1  because of this.  In item master, the customer can put

2  different things in it themselves.

3           What does it do?  It takes information that's

4  in a catalog, in catalogs that vendors have that have

5  been imported into the system in a particular format

6  that can be accommodated by the way computers operate.

7  And then edits some of that information to conform to

8  Lawson's system.  And the theory is that that changes

9  what was a catalog into a non-catalog.  Isn't that

10 what their theory is?

11          MR. ROBERTSON:  I think it changes from being

12 published by a vendor, they would suggest, to not

13 being published by a vendor with focus on the word

14 "published."

15          THE COURT:  So that means it doesn't satisfy

16 the claim construction?

17          MR. ROBERTSON:  Right.  That's why I think

18 there are two solutions in my view.  As modified, the

19 Court's instruction with respect to "published by a

20 vendor," I think, solves that mischief or removal of

21 "published by" and just say "from a vendor" or

22 "available from a vendor," which includes suppliers,

23 manufacturers and distributors is fine.

24          THE COURT:  To a certain extent, I think

25 you-all are the authors of your own misfortune.  You

 1    both inveighed the Court to do certain things.  Lawson

 2    inveighed the Court to use "published by a vendor."

 3    There's support in the specification for that, but it

 4    was clear from the very beginning of the discussion at

 5    the Markman hearing that what we're really focusing on

 6    is the vendor, and it is proper to import some of the

 7    requirement from the specification into the claim

 8    construction, but the rule is the claims are given by

 9    the Court, and then all other terms that are not

10    construed by the Court are given their ordinary and

11    usual meaning to one of ordinary skill in the art;

12    isn't that right?

13              MR. ROBERTSON:  I think that is correct, Your

14    Honor.

15              THE COURT:  I think this is the instruction

16    I'm going to give the jury.  Published by a vendor as

17    used in the definition of the claim term "catalog,

18    product, or catalog," these words are to be given

19    their ordinary meaning to one of ordinary skill in the

20    art.  Published simply means to make generally known

21    or to disclose.  Published by a vendor simply means

22    that at some point in time before a user uses the

23    invention, a vendor, such as a supplier, a

24    manufacturer or distributor has made generally known

25    or has disclosed an organized collection of items or

 1   associated information preferably, but not

 2   necessarily, including a part number, price, catalog

 3   number, vendor name, vendor ID, a textual description

 4   of the item, and images of or relating to the item.

 5   Why doesn't that solve this problem?

 6           MR. ROBERTSON:  I think it fully solves that

 7   problem, Your Honor, and we have no objection to that

 8   instruction.

 9           THE COURT:  But I interrupted your argument.

10   If you've got more points you want to make, go ahead

11   and make them.

12           MR. ROBERTSON:  The point I would like to

13   make, Your Honor, is really it's Lawson who made the

14   unilateral and independent and unsupported decision as

15   part of their non-infringement strategy to construe

16   the Court's instruction of "published."

17           It was a reconstruction of a construction,

18   and no party, either plaintiff or defendant, has the

19   right to rewrite the Court's construction to

20   manufacturer, non-infringement or infringement

21   positions, and that's what I think really happened.

22   They took "published," and they imbued all of these

23   connotations into it that they now are attempting to

24   use beyond its ordinary meaning as the Court obviously

25   intended it to happen, not some meaning that the data

1  could not be in any way either reformatted or

2  redefined or --

3          THE COURT:  Well, let me ask you this,

4  though.  I think you're beginning to digress some.

5          If this definition is used, isn't it still

6  possible for Lawson to introduce evidence that the

7  customers do things, and that, in fact, to one of

8  ordinary skill in the art, what is done in using the

9  Lawson system doesn't fit the claim definition?

10          MR. ROBERTSON:  I don't think so, Your Honor.

11          THE COURT:  With this instruction.

12          MR. ROBERTSON:  If "published" simply means

13  to make generally known or disclose, then how is it

14  relevant at all that the data is reformed or not all

15  of the data is included?  If enough data is included

16  to satisfy that it is the Court's claim

17  construction -- excuse me.  That it's an organized

18  collection of items and associated information that is

19  made generally known or disclosed by a vendor.  Now

20  I'm reading your construction into there.  And that it

21  preferably but not necessarily includes all of those

22  requirements, or I guess they're not requirements, but

23  includes things such as part number, price, catalog,

24  number, etc., then it satisfies the definition of

25  "catalog."

1462

1       So to have all this inquiry into:  Did the
2  customer modify it?  Did it take the description and
3  reduce it to 32 characters?

4       THE COURT:  What does it do?  You're using
5  too much information at the front end before you get
6  to the operative verb in your presentation.  Tell me.

7       MR. ROBERTSON:  It introduces completely
8  irrelevant information that has no bearing whatsoever
9  on whether or not the Lawson catalog database is, in
10 fact, or satisfies --

11      THE COURT:  What if it's relevant to some
12 extent?

13      MR. ROBERTSON:  Under the Court's
14 construction, I don't see how it could possibly be
15 relevant if it simply means to make generally known or
16 disclosed.  How could reformatting the data in some
17 way or who even selects the data to include?  The
18 Court's definition has nothing to do with who selects
19 the data to put in the database.  That's one of the
20 arguments that's being made here, and it's the
21 customer that selects at the data.  The answer is:
22 Who cares who selects the data.

23      THE COURT:  Let me ask you something.  Why
24 did you object to DX 371, where Lawson proposed to
25 define "published" as made generally known, publicly

1463

1   announced or declared, which is one of the exhibits in

2   the case that Lawson offered and you objected to?

3           MR. ROBERTSON:  Well, first, I thought it was

4   hearsay, Your Honor.  And, secondly, I thought the

5   jury doesn't need to get a definition in there.  They

6   should have their ordinary meaning of it.

7           If the Court's comfortable with that as the

8   ordinary meaning --

9           THE COURT:  Are you comfortable with it as

10  the ordinary meaning to one of ordinary skill in the

11  art?

12          MR. ROBERTSON:  I am comfortable.

13          THE COURT:  They are, too.  They wanted DX

14  371.  That had the same basic definition in it.

15          MR. ROBERTSON:  Then, Your Honor, I will

16  withdraw my objection if you want to introduce that,

17  but I think you have solved that problem by having

18  this instruction.  But the problem I have when I look

19  at the demonstrative is that it wants to say all these

20  things --

21          THE COURT:  Wait a minute.  Is that item

22  information changes that you handed up this morning to

23  me, is that the demonstrative you're talking about?

24          MR. ROBERTSON:  Yes, sir.  Now I'm looking

25  for my copy.  Yes.  So if you see at the top, "Vendor

1    changes information to new electronic format and gives

2    information to customer." Who cares if the vendor

3    changes it in some way if it still is disclosed or

4    made generally known? And then there's this next one,

5    the customer.

6            Who selects it? The customer selects the

7    desired items. What does that matter to the Court's

8    claim constructions? Completely irreverent. The

9    customer can add additional item information. So

10   what?

11           The customer can delete item information.

12   What does that matter? The customer can modify the

13   item information. Totally irrelevant as long as it

14   satisfies the Court's claim construction at the end of

15   the day.

16           The fact that the customer loads the new info

17   into the Lawson database, we've heard testimony it

18   doesn't happen all the time. In fact, we heard

19   testimony that 90 percent or more of the systems are

20   implemented by Lawson or they teach the customer how

21   to load the catalog data. But, again, what does it

22   matter who loads the catalog data? At the end of the

23   day we're talking about a catalog database. And so

24   we're looking at what's in the database. And if this

25   data is in the database, it satisfies the Court's

1  definition.  It doesn't really matter how it got there

2  or if it was changed in any way, shape or form.

3           THE COURT:  All right.  How do you address

4  Mr. McDonald's argument that instructing the jury as I

5  have suggested is not right because it skews what the

6  experts have done after the Court's claim construction

7  opinion was issued?

8           MR. ROBERTSON:  Quite, frankly, Your Honor,

9  they did this at their own peril.  They are the ones

10  who created a new definition for "published" in order

11  to conjure up a non-infringement argument.  The Court

12  didn't say that's what I meant by "published."

13           What they did is they looked at the

14  definition.  They recognized they were going to have a

15  problem with it.  So they came up with their own

16  construction of published.  And they did so at their

17  own risk because it's not what the Court intended.

18  It's not what was set forth, and it's not supported by

19  the specification.

20           THE COURT:  Is there any prohibition in the

21  law of the Federal Circuit against a court instructing

22  a jury on what the standard usual definition of a term

23  in a patent claim is?

24           MR. ROBERTSON:  No, not that I know of, Your

25  Honor, particularly now when it's to dispute because

1   this whole position of Lawson has been revealed.   I

2   think it's entirely appropriate.   I know of no case

3   law that doesn't permit the Court to address an issue

4   like this that's come up so we don't have all of this

5   confusing and misreading information offered to the

6   jury that has no relevance and yet is going to appear

7   to have some significance when they go to do their

8   deliberations.

9           THE COURT:  All right.  Thank you.

10          Do you have any other dictionary definition

11  of "published" other than the one you offered in DX

12  371?

13          MR. McDONALD:  I have four dictionaries in

14  the courtroom, Your Honor.

15          THE COURT:  You have what?

16          MR. McDONALD:  Four dictionaries in the

17  courtroom.

18          THE COURT:  Can you give me one of them?  You

19  have four copies of the same one?

20          MR. McDONALD:  I very four different ones

21  tabbed with the word "published" in them.  Would you

22  like me to hand them all up to you?

23          THE COURT:  You cited Oxford English

24  Dictionary in Defendant's 371.

25          MR. McDONALD:  Right.  And I have a pocket

1   version of the Oxford American, a paperback version

2   here.  It doesn't really matter to me which of these

3   definitions are used for "published" because every one

4   of them focuses on the idea of public dissemination of

5   something, which is actually what the experts said,

6   including even Dr. Weaver in his examination in this

7   case.  He talked about that that word uses the idea of

8   public distribution or public sale.

9           And I've got two more here if you'd like to

10  see those.  I can read the American Heritage

11  Dictionary, for example.

12          THE COURT:  Merriam Webster, I think, is the

13  one that I used to prepare the one I was proposing.

14          MR. McDONALD:  Do you have that up with you

15  right now?

16          THE COURT:  Yes, I'm not sure it's the same

17  edition.  It says the new edition.  Have you got more?

18          MR. McDONALD:  Well, I thought you were going

19  to read that one.  Do you have the Webster?  May I

20  read that out loud so we've got it in the record?

21          THE COURT:  I thought you were going to talk

22  about it and so I was --

23          MR. McDONALD:  I think we may be both waiting

24  for each other, but I have the Random House Webster's

25  dictionary, 4th edition, here that was just handed

1    back to me with "published" first meaning, to issue

2    (printed or otherwise reproduced textual or graphic

3    material) for sale, and (2) to make publicly or

4    generally known.  Those are the first two.  And then

5    there's a third one, to issue newspapers, books, etc

6    and then fourth is to have one's work published.

7            And that's very typical of these other

8    definitions.

9            THE COURT:  American Heritage, 4th edition,

10   says, No. 1, To prepare an issue (printed material).

11   For public distribution or sale.  (2)  To bring to the

12   public attention, announce.

13           The Merriam Webster New Edition says, "To

14   make generally known, announce publicly."  Second one,

15   "To produce or release literature, information,

16   musical scores or sometimes recordings or art for sale

17   to the public."

18           The Pocket Oxford American Dictionary, did

19   y'all bring these with you or did you stimulate

20   business --

21           MR. McDONALD:  This was stimulated in

22   Richmond, Virginia, local economy, Your Honor.

23           THE COURT:  The first one is "Prepare and

24   issue a book, newspaper, piece of music for public

25   sale, print something."  (2)  "Print something in a

1  book, newspaper or journal as to make it generally

2  known."  (3)  "Formally announce to read an edict or a

3  marriage ban."

4       MR. McDONALD:  That last one, I don't think

5  we're using that last one about marriage.

6       THE COURT:  I don't think that works, but

7  basically I think the way I've defined "published"

8  catches these, doesn't it?

9       MR. McDONALD:  The problem I have, Your

10 Honor, that I don't think it does is when you've got

11 to make generally known, I think that should be

12 publicly to be consistent with these as well as Dr.

13 Weaver and the experts.  So I would change the word

14 "generally" to "publicly."  And then we've got that

15 phrase "or to disclose," which doesn't have any sort

16 of a public or sale related aspect to it.

17      So I would say that should be eliminated

18 entirely from it.  I think it's very accurate to say

19 "published" simply means to make publicly known.

20      THE COURT:  I'll take those dictionaries, and

21 I'll give you back yours, but I'll just take all of

22 them and look at them and frame something.  I think

23 "disclosed" needs to be in there, but I'm not sure.

24      MR. ROBERTSON:  Your Honor, may I address

25 this "publicly" now a new term has been injected?  I

1  think generally known was in several of the

2  dictionaries that you indicated.  I think that's more

3  appropriate.

4         Remember, "published" still has to be read in

5  context of the patent, and we're talking about

6  electronic data here.  So when you take electronic

7  data, and you put it in a vendor catalog database,

8  you're not making something publicly known, you're

9  just taking that data that has been made generally

10  known or disclosed by the vendor, and then you're

11  loading it into the database.

12         Now, who does that loading or how it's

13  modified in any way is not relevant to "generally

14  known" or "disclose."

15         Publicly now would suddenly become another

16  non-infringement gotcha that we've been talking about.

17         THE COURT:  Well, go ahead, Mr. McDonald.

18         MR. McDONALD:  Okay.

19         THE COURT:  Anything else?

20         MR. McDONALD:  Your Honor, just to be clear

21  as well, speaking of gotchas, as Mr. Robertson said,

22  basically, he's the one that's trying to turn this

23  into a gotcha.  I'm fine going to the jury on a fair

24  and ordinary meaning.  He's the one who is trying to

25  say, "I can't even present evidence anymore on these

1  issues of how the accused database, the item master,

2  came into being."

3       These are clearly facts that are relevant

4  here.  What if the vendor was the one who had selected

5  the desired items and added the information and

6  deleted the items and modified?  Obviously, that would

7  be relevant.  So the fact that somebody else does it

8  is also relevant to the converse.

9       And so he's the one that's trying to do the

10  gotcha here and preclude us from even being able to

11  present our case to the jury here by saying none of

12  this evidence that Lawson wants to present is even

13  relevant here.  That's where the gotcha is coming in.

14  So Mr. Robertson is the one who keeps saying we

15  shouldn't use these claim constructions --

16       THE COURT:  Why should this come in into

17  evidence?  You want to argue that it's not a catalog

18  because the customer of Lawson in the instance where

19  it's using a legacy system, for example, has pulled

20  from a bunch of catalogs things that it put together,

21  and you flipped it into the system when you into the

22  Lawson system.  And somehow that information doesn't

23  constitute information that's published by a vendor

24  merely because it's gone through a relocation.

25       And that's not what the claim construction

1    says.  And that's not a fair reading of the patent.

2    So maybe he's right that none of this comes in, that

3    to the extent it is relevant, it's only marginally

4    relevant, and it's too confusing to the jury to have

5    to sort through all of this who put the material into

6    the system, the structure that you all have

7    constructed, that is the Lawson system.

8              MR. McDONALD:  But we're talking about the

9    item master as being the thing that's being accused as

10   being multiple catalogs, Your Honor, and I think as a

11   fact matter, we should be able to show that doesn't

12   satisfy this definition.  The definition starts off by

13   talking about an organized collection.  That's the

14   noun here.  And then it goes on to say that's why it

15   has to be published by a vendor.  And that's very

16   consistent with the patent.  Any other way is

17   inconsistent.

18             THE COURT:  I'm going to tell you now that

19   you're not free to argue simply that -- you just

20   argued that the only thing that's covered by the claim

21   construction is a Sears catalog that is put into the

22   system.  And if that's what your theory is, you lose.

23   And I'm going to find that you lose as a matter of law

24   because that isn't what it's all about.

25             And I think if that's what you're trying to

1   do, then I think the answer is that Rule 403 keeps

2   that whole line of evidence out.  If that's what

3   you're thinking, forget it, because it ain't going to

4   happen.  If you argue that in front of the jury, I'm

5   going to tell the jury that that isn't permissible and

6   I'll sustain a motion to strike it because it never

7   was intended to do that.

8        We may not have done the best job of claim

9   construction here.  I don't know.  But in any event,

10  whatever is going to happen is that we're not going to

11  convert this into something that it wasn't and is not

12  reasonably intended.

13       MR. McDONALD:  You have that Markman

14  transcript, and if you take a look at that, you'll see

15  that I was definitely talking about the issue that we

16  have to have a definition that's consistent with the

17  patent and consistent with the ordinary meaning of

18  catalog that will exclude something like a shopping

19  list or a list of products somebody buys instead of

20  something somebody sells.  That was all on the table

21  at the Markman.

22       And if we go too far the other way with the

23  definition, Your Honor, I think we start grabbing

24  things within the catalog definition that would not be

25  considered within the ordinary meaning.  It would be

1474

1  inconsistent --

2        THE COURT:  Everything that your customers

3  look for is something that a vendor sells because what

4  happens is when they use your system, your customer

5  goes to buy it from the vendor who is selling it to

6  them, and a requisition is made, a purchase order is

7  made, and it goes to the vendor, and that's a typical

8  sale, isn't it?  It's a sale purchase.  That's what it

9  is.

10        MR. McDONALD:  The point is what's a catalog

11  and what's not.  That's what I'm talking about, and

12  the shopping list is not a catalog.  If I come up with

13  a list of requisition items that I want to buy, that's

14  not a catalog.  That's not how these patents use that.

15  They call them requisitions.  They call them purchase

16  orders.  They call them something different from a

17  catalog.  And that's my concern that if we go too far

18  on reconstruing the construction, that it's going to

19  lead the jury to --

20        THE COURT:  You reconstruing the

21  construction, I think.  So anyway I think what I'm

22  going to do is instruct the jury.  And the question

23  then is:  On what the ordinary meaning is, do you know

24  of any case that says the Court can't instruct them on

25  what the ordinary meaning is?

1    MR. McDONALD:  I'm not sure.  We'll have to

2    look for that, Your Honor.  I'm not an aware of any

3    case at this point.

4    THE COURT:  I don't know why it wouldn't be

5    appropriate if there's a dispute about it.  And you're

6    offering Defendant's 371.  I assume you did it in good

7    faith believing that it was appropriate to do that.

8    So I think I'm going to give it.  I'm going to look at

9    these definitions, if you don't mind loaning me your

10   books for the evening.

11        Now, the real issue is:  Can you ask these

12   questions?  Why is it that this approach as shown in

13   item information changes, which I think Mr. Robertson

14   just read into the record in its entirety in the first

15   three blocks, I don't know that you read the last

16   three -- the last block.  It says, "Customer loads new

17   info into Lawson database."  And then it goes to item

18   location, item master, and vendor item.  I think

19   that's now the whole thing is in the record.

20        But what difference does it make about

21   whether the vendor changes the information to the new

22   electronic format?

23        MR. McDONALD:  Because we're showing the

24   distance between when this thing actually was anything

25   that even resembles a catalog at the vendor end and

1476

1    how really when we get it isn't really necessarily

2    corresponding to a catalog.  It's a set of electronic

3    data.

4              THE COURT:  Where did it come from?

5              MR. McDONALD:  It either comes from a legacy

6    system or a vendor.

7              THE COURT:  Where does what the vendor

8    changed come from?

9              MR. McDONALD:  That would typically be

10   information consistent with the agreement that they

11   have reached specific with that Lawson customer about

12   the particular items.  It's the particular items they

13   have agreed to, which may be just a handful of items

14   that have their own personal private price that they

15   have negotiated, a discount price that is not

16   available elsewhere, that neither vendor nor customer

17   wants others to see.  They keep it secure.  It is not

18   the same thing even at that initial step.

19             THE COURT:  Where did it come from?

20             MR. McDONALD:  It came from the agreement

21   between the vendor and the customer.

22             THE COURT:  No.  That's where -- it's got to

23   come from somewhere before they agree on it.  Where

24   did it come from before then?

25             MR. McDONALD:  Why does it have to come from

1  someplace before they agree on it?

2          THE COURT:   Where does it come from before

3  they agree on it?

4          MR. McDONALD:   I'm sorry?

5          THE COURT:   Where does this information that

6  they put in the list come from before they agree on

7  it?

8          MR. McDONALD:   Well, the price is an agreed

9  price, so I don't know if that existed before, and

10 certainly there's product information that could

11 preexist and come from the vendor.   So it's a

12 combination --

13         THE COURT:   It comes from the vendor where?

14 It comes from a catalog in the vendor, right?

15         MR. McDONALD:   That's not what the evidence

16 is, Your Honor.

17         THE COURT:   They take it and they say, Well,

18 I want all of this information from the catalog or I

19 only want 8,000 entries.   And I'm putting the 8,000

20 entries into my legacy system, for example.   That's

21 one of the examples that somebody gave.   Or 15

22 entries.

23         MR. McDONALD:   Well, it's a very selective

24 process, Your Honor, and it's a fact issue, I think,

25 is our point here.   That's a record we should be

1478

1  entitled to make as to how that item master comes

2  about.  That's the accused device.  We think that the

3  facts related to how that item master comes about are

4  really relevant here, and we should be entitled to

5  present those facts to the jury and let them decide

6  and apply that ordinary meaning as the Court has given

7  it to them as to what catalogs are.

8          THE COURT:  All right.  Anything else?

9          MR. ROBERTSON:  Yes, Your Honor, I just want

10  to make one point.  And that is, if you look at your

11  definition, for example, it says one of the things

12  that preferably needs to be included is price, for

13  example.

14          Now, Mr. McDonald just made an argument,

15  Well, this could be a negotiated price between the

16  vendor and the customer.  Again, where does it say

17  that it has to be negotiated or it has to be the list

18  price?  This is illustrative of the point.  The claim

19  is silent on that.  You just to have a price, for

20  example.

21          So whether it was negotiated or whether it

22  was the list price is the perfect example that you

23  shouldn't be reading those kind of things into the

24  claim construction.  Thank you.

25          THE COURT:  All right.  Well, I think this:

1    I've reflected.  I've read the claim construction

2    opinion, and I've reviewed the transcript parts that

3    you have cited, and a couple others that you didn't

4    cite but that you pointed me to.  And I've read the

5    patent claims again and the glossary of terms, and I

6    believe that it is appropriate for the Court to

7    instruct the jury on the ordinary and usual meaning of

8    "published by a vendor" to one of ordinary skill in

9    the art.

10          Nobody says it's any different than the

11   standard dictionary definitions.  That is, that nobody

12   says a person of ordinary skill in the art would use

13   anything other than the standard dictionary

14   definitions.  In fact, DX 371, which Lawson offered,

15   is a standard dictionary definition, and it is one of

16   the definitions I used to prepare the draft that I've

17   given to you all and has been read into the record.

18          That said, I believe that Lawson is entitled

19   to attempt to show that the way its system is used

20   doesn't fit any of the definitions, and that the

21   functional effect of the claim, excuse me, it doesn't

22   fit the claim, excuse me, and the functional effect of

23   precluding all that evidence is to deprive them of

24   that right.

25          And so I'm going to allow them to introduce

1   this testimony, but I'm also going to assess at the

2   end of the case and the end of all the evidence

3   whether a Rule 50 motion is appropriate after I hear

4   it all because I believe that what I'm hearing is a

5   fairly ephemeral argument, and it may be that the

6   witnesses can suggest otherwise, but it may very well

7   be that at the end of the day, I'll have to do

8   something else about this.

9           But for now, that's how we'll proceed.

10          MR. ROBERTSON:  Your Honor, could I just ask

11  for some guidance then?

12          THE COURT:  Can you ask for what?

13          MR. ROBERTSON:  For some guidance from the

14  Court.  Because this is going to come up often

15  throughout the testimony with Mr. Christopherson,

16  perhaps Mr. Lohkamp, and even Dr. Shamos.  And to

17  protect the record, I'm going to have to object each

18  time as irrelevant.

19          And I understand Your Honor's ruling.  I

20  don't want to disrupt the proceedings, but given Your

21  Honor's ruling, does Your Honor still think I need to

22  protect the record or can we rely on the fact that

23  Your Honor has indicated you're going to permit this

24  type of testimony?

25          THE COURT:  I'm going to permit some of this

1481

1    testimony, and you're going to have to deal with it on

2    a question by question basis.  My belief is that if

3    the question is nothing more than how do you could

4    this and how do you do that, who selects it, if the

5    only part of the question is those things that are set

6    forth in this item information changes slide, you've

7    already made your objections to that.

8            What you ought to do is object to it on the

9    record, and I'll overrule it, and you can ask for a

10   continuing objection to the extent that the questions

11   are confined just to this.  But you have to keep your

12   ears and eyes open because it's not right for them,

13   for the Court of Appeals or anybody else for you to be

14   able to have a general floating objection which you

15   assert only after you are on appeal.

16           If it's the same kind of question, your

17   objection will stand.

18           MR. ROBERTSON:  My concern, Your Honor, is

19   that I am going to be repeatedly objecting and the

20   Court is going to be repeatedly overruling suggesting

21   to the jury that the questions are entirely proper in

22   the context, and therefore they are satisfying the

23   claim language at the end of the case.  It puts

24   significant prejudice to ePlus to be put in that

25   position.

1    THE COURT:  To be put in the position of

2  trying cases in the usual and standard way?  Come one,

3  Mr. Robertson.  Besides that, I don't think you

4  listened.  I said you have to listen to the questions.

5  And if the questions are of the ilk that are set forth

6  in this slide, then you can make your objection the

7  first time and say, Can I have a standing objection to

8  these.  And I'll say yes.

9        But if the question is different, you have to

10  get up and object to it because it may not be

11  something that is covered within the ruling that I've

12  made.

13    MR. ROBERTSON:  I think I understand the

14  Court now.

15    THE COURT:  That's what I hoped I said.

16        All right.  Now, the other thing that I have

17  is does the ruling that was made earlier in answering

18  question 4 also dispose of this motion -- well, excuse

19  me.  I've put it somewhere.

20        EPlus, Inc.'s motion to preclude evidence or

21  argument of non-infringement due to defendant's

22  failure to provide discovery relating to customer

23  specific implementations of accused product modules.

24  I kept the evidence out because what they -- they

25  don't have any business deciding this case as a

1  discovery sanctioning.  That's essentially what that

2  question was aimed at.

3       I'm not sure it disposes of this issue, the

4  ruling disposes of this issue.

5       MR. ROBERTSON:  Your Honor, I haven't had --

6  this arose after the lunch break.  I haven't had an

7  opportunity to go back and look at exhibits A and B,

8  but I've spoken to some of my colleagues.  And

9  Exhibits A and B were aimed at revenues associated

10 with certain modules.  It didn't answer the questions

11 that were asked in that.

12      I need to go back and look at it and I'll

13 report to the Court promptly in the morning.

14      THE COURT:  All right.  That's fine.  Now I

15 know where I stand.

16      MR. SCHULTZ:  In addition to Appendix A, B,

17 we were also talking about C and D.  There are four

18 exhibits and appendices that were attached --

19      THE COURT:  Mr. Schultz, you just keep adding

20 stuff.

21      MR. SCHULTZ:  No.

22      MR. McDONALD:  We'll do a written response,

23 Your Honor, and try to summarize --

24      THE COURT:  What?

25      MR. McDONALD:  We would do a written

1484

1  response.  I'm not sure if I hear Mr. Robertson when

2  he says he's going to review the papers overnight, are

3  you considering withdrawing the motion?

4        MR. ROBERTSON:  I have to review the papers.

5  Then I would consider it if in fact --

6        THE COURT:  That's all he's asking was is one

7  of the purposes of you review considering whether to

8  withdraw the motion?  That's all he was asking.

9        MR. ROBERTSON:  Yes.

10        THE COURT:  Easy big fellow.

11        MR. ROBERTSON:  Yes.

12        MR. McDONALD:  If that's the case, Your

13  Honor, we'll hold off on filing a responsive briefing

14  until we find out if it's really necessary.

15  Obviously, especially when we use the word "appendix,"

16  I think it's something you have to lift that's pretty

17  heavy.

18        So we'll hold off on that until we know we

19  really have to respond to it.

20        THE COURT:  When are you going to be putting

21  this evidence in?

22        MR. McDONALD:  I don't think it's coming in.

23  They have already taken their testimony on

24  implementation.  And it's really not an issue we're

25  disputing.

1485

1    THE COURT:  In other words, it's not going to

2    be implicated in the testimony of your witnesses?

3    MR. McDONALD:  Not in the foreseeable future.

4    I can't think of who that would even apply to going

5    forward.

6    THE COURT:  So you're going to wait and see

7    who it is you make stay here this weekend and work.

8    MR. McDONALD:  Well, I know the answer to

9    that question.

10   THE COURT:  All right.  Anything else that we

11   need?  Are we going to be ready to go?  Who have we

12   got tomorrow?

13   MR. McDONALD:  Dale Christopherson is first.

14   We'll make sure he keeps the handcuffs on him and he

15   doesn't leave the county.  We have Hannah Raleigh

16   here.  I think we are all set.  The glitches we had

17   have been taken care of.

18   We have another issue or two about some

19   witnesses.  I'll just talk to opposing counsel about

20   that before I brink it up to the Court.

21   THE COURT:  Now, you will be projecting to be

22   finished on the 25th of January, which is -- wait a

23   minute.

24   THE CLERK:  Tuesday, the 25th.

25   THE COURT:  Sorry.  You will have all day.

1486

1    You have tomorrow, which is what?  Friday?

2         MR. McDONALD:  Thursday.

3         THE COURT:  Thursday and Friday.  So you have

4    those two days.  Then you have the 18th and the 19th,

5    which are four days.  Then you have the 20th, which is

6    the fifth day.  Do you expect to be finished on the

7    afternoon of the 20th.

8         MR. McDONALD:  Yes.

9         THE COURT:  You know basically what -- have

10   you given them a list of who you're calling in your

11   case?

12        MR. McDONALD:  Yes.

13        THE COURT:  And you know who they are

14   calling.  You have a pretty good idea.  How long a

15   rebuttal case do you see?  And I'm not going to hold

16   either one of you, I mean, absolutely.  I think we

17   have events such as occurred today that affect what

18   we're doing, and we'll have to deal with what's fair

19   and right, but I'm trying to get some scheduling

20   information.

21        How long do you think your rebuttal case is?

22        MR. ROBERTSON:  About four to five hours.

23        THE COURT:  So you expect to be finished, if

24   he finishes up on Thursday, the 20th, you'll be

25   finished on the evening of the 24th at the latest?

1487

1    MR. ROBERTSON:  Yes, sir.

2    THE COURT:  I have revised the instructions,

3    and I'm going to work on them again this weekend.  I

4    haven't had a chance.  And I've taken what you've done

5    and looked at them and tried to simplify them some.

6    And you-all, for example, put some things about the

7    doctrine of equivalents in that I don't think have

8    applicability.  At least I didn't hear anybody testify

9    about it.  So we need to get that straight.

10    So we'll do the instructions Friday and maybe

11    Saturday the 21st, and go to the jury on Monday the

12    24th is what I hope we're shooting for.

13    If we have an earlier schedule than that,

14    we'll just have to flex and deal with what we've got.

15    We may need it.  But I'm going to get the instructions

16    to you the first part of the week, so that you'll have

17    them and can go through them.

18    They don't vary a great deal from what

19    you-all have done.  Is there anything that Judge

20    Spencer did in the SAP trial, is there any change in

21    the law, Mr. Robertson, that you see that affects the

22    instructions he used?

23    MR. ROBERTSON:  Yes, sir, there is.  There is

24    the Supreme Court decision in KSR, and so I think we

25    have put in the model instruction from -- I'm sorry.

1488

1    And there's also a case called SEB from the Federal

2    Circuit which has to do with the standard of intent

3    for the inducement infringement, which I understand

4    also includes a reckless disregard for the patent.

5            THE COURT:  I want you to give Ms. Haggard

6    the citations for those two cases, plus --

7            MR. ROBERTSON:  Let me be candid with the

8    Court.

9            THE COURT:  What is it?

10           MR. McDONALD:  Akamai.

11           THE COURT:  Alkamai?

12           MR. ROBERTSON:  Alkamai is how it's

13   pronounced.

14           THE COURT:  I can't pronounce it.  All right.

15   I want you to give her the cites, so I make sure I've

16   read those while I'm working on the instructions.

17           MR. ROBERTSON:  The Supreme Court has granted

18   a writ of certiorari with respect to this SAB case I

19   just referenced.  But the Federal Circuit just came

20   down with a case I think in the last week that said

21   that the pendency of a writ of certiorari has no

22   impact whatsoever on what the state of the law is.

23           THE COURT:  Why did the Federal Circuit feel

24   compelled to decide that?  I think that's been the law

25   forever.

1489

1    MR. ROBERTSON:  I think it was because one of

2  the litigants made the argument.

3    THE COURT:  I understood that to be the case

4  for as long as I've been practicing law.

5    MR. ROBERTSON:  All right.  Thank you, Your

6  Honor.

7    THE COURT:  All right.  Thank you all very

8  much.  Give the citations to her tonight so she can

9  print those out for me.  Give her the books and we'll

10  be ready to go.

11    Thank you very much.

12

13    (The proceedings were adjourned at 5:34 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25