```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE EASTERN DISTRICT OF VIRGINIA

 3                    RICHMOND DIVISION


 4

 5   --------------------------------------
                                         :
 6   ePLUS, INC.                         :   Civil Action No.
                                         :   3:09CV620
 7   vs.                                 :
                                         :
 8   LAWSON SOFTWARE, INC.               :   January 13, 2011
                                         :
 9   --------------------------------------

10

11            COMPLETE TRANSCRIPT OF THE JURY TRIAL

12           BEFORE THE HONORABLE ROBERT E. PAYNE

13         UNITED STATES DISTRICT JUDGE, AND A JURY


14
     APPEARANCES:
15
     Scott L. Robertson, Esquire
16   Michael G. Strapp, Esquire
     Jennifer A. Albert, Esquire
17   David M. Young, Esquire
     Goodwin Procter, LLP
18   901 New York Avenue NW
     Suite 900
19   Washington, D.C.  20001

20   Craig T. Merritt, Esquire
     Christian & Barton, LLP
21   909 East Main Street
     Suite 1200
22   Richmond, Virginia  23219-3095
     Counsel for the plaintiff
23

24                  Peppy Peterson, RPR
                  Official Court Reporter
25             United States District Court
```

```
 1   APPEARANCES:  (cont'g)

 2   Dabney J. Carr, IV, Esquire
     Troutman Sanders, LLP
 3   Troutman Sanders Building
     1001 Haxall Point
 4   Richmond, Virginia  23219

 5   Daniel W. McDonald, Esquire
     Kirstin L. Stoll-DeBell, Esquire
 6   William D. Schultz, Esquire
     Merchant & Gould, PC
 7   80 South Eighth Street
     Suite 3200
 8   Minneapolis, Minnesota  55402

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          P R O C E E D I N G S

2

3          THE CLERK:  Civil action number 3:09CV620, ePlus,

4   Incorporated, versus Lawson Software, Incorporated.  Mr. Scott

5   L. Robertson, Mr. Craig T. Merritt, Ms. Jennifer A. Albert, and

6   Mr. Michael G. Strapp represent the plaintiff.

7          Mr. Daniel W. McDonald, Mr. Dabney J. Carr, IV, Ms.

8   Kirstin L. Stoll-DeBell, and Mr. William D. Schultz represent

9   the defendant.  Are counsel ready to proceed?

10          MR. ROBERTSON:  Plaintiff is, Your Honor.  Thank you.

11          MR. McDONALD:  Yes, Your Honor.  Thank you.

12          THE COURT:  Do you need to see me about something

13   before the jury comes in?

14          MR. ROBERTSON:  Yes, Your Honor.  You had asked us to

15   take a look at those appendices with respect to our motion on

16   this implementation on a customer-by-customer basis.

17          THE COURT:  Yeah.

18          MR. ROBERTSON:  We have done that, and the reason I

19   raised it, Your Honor, is one of the witnesses that's going to

20   be called this morning is Ms. Hannah Raleigh.  You may recall

21   she testified once already.  She is involved with Lawson

22   Professional Services that has to do -- that has responsibility

23   for implementation of the Lawson software products, and we're

24   concerned that she's going to be getting into areas in and

25   presenting testimony that Lawson is going to contend are

1  defenses to infringement later that are directly implicated by

2  that interrogatory number 24.

3         What I have provided Your Honor with is the

4  appendices that were referenced in the answers to the

5  interrogatories, the transcript from the March 26th hearing,

6  telephonic hearing on the motion to compel, and the relevant

7  citations to the transcript where this issue came up, and I do

8  want to continue to press the motion, Your Honor.

9         We do think that the answers, even with the

10 appendices, were nowhere near what was called for and what Your

11 Honor directed Lawson to do in response to that.

12        If I might just, Your Honor, you may recall that

13 these appendices that are being referenced were provided to

14 ePlus three months before the motion to compel was presented,

15 and the appendices do not respond to the interrogatory as

16 represented by counsel for Lawson.

17        Indeed, if you look at some of the appendices, for

18 example --

19        THE COURT:  Is A appendix A?

20        MR. ROBERTSON:  Yes, sir.  Under the tab December 23,

21 2009, response to interrogatory number -- yeah, A is one.

22        THE COURT:  March 26th is the first tab, the

23 transcript, and then there's an A behind that.  Is that

24 appendix A or not?

25        MR. ROBERTSON:  I believe appendix A, Your Honor, is

1  under the tab that is the December 23, 2009, response to

2  interrogatory 24.  That's appendix A.  It's a SKU list.

3           THE COURT:  All right.

4           MR. ROBERTSON:  And appendix B, you'll see, is

5  license revenues.  I'm assuming that the codes here, for

6  example, IC, PO, RQ stand for, for example, inventory control,

7  requisitions --

8           THE COURT:  Right, but that doesn't list the

9  customer.

10          MR. ROBERTSON:  Not to my mind, Your Honor.  Then

11  there's a tab C which, again, has to do with maintenance

12  revenues, and then there's a tab --

13          THE COURT:  Wait a minute.  Let me look at

14  maintenance revenues.  What does it say?  How do you read the

15  thing?

16          MR. ROBERTSON:  Again, it has these codes.  Some I

17  think I can identify.  Like LSF we know is Lawson system

18  foundation, RQ, requisitions, but the point --

19          THE COURT:  What does it mean?  This appendix doesn't

20  tell me anything.  You all know about them.  You have to

21  understand something, gentlemen, ladies.  When you are dealing

22  with something that you are intimately familiar with and that

23  other people are not, you have an obligation to stop for a

24  moment and tell them what it is they are looking at.

25          Now, what does this table -- this appendix C, it's

1  very small, it's hard to read.  I don't have my magnifying

2  glass up here, so what does it say?  It says row, labels.  What

3  does that mean?

4          MR. ROBERTSON:  Your Honor, it was a mystery to us as

5  well.

6          THE COURT:  It was a mystery when you got it, but you

7  spent much time and much money figuring it out, so what does it

8  mean?

9          MR. ROBERTSON:  To me it means --

10         THE COURT:  What did they tell you it meant?

11         MR. ROBERTSON:  They didn't tell us what it meant,

12  Your Honor.

13         THE COURT:  Did you ask them?

14         MR. ROBERTSON:  We asked them to respond to the

15  interrogatory.

16         THE COURT:  Did you ever pick up the phone and say --

17  the common thing to do -- what is this table?

18         MR. ROBERTSON:  Yes, we did.

19         THE COURT:  And what did they tell you?

20         MR. ROBERTSON:  They told us it was revenues

21  associated with licensing, maintenance, and servicing for

22  various customers.  The point of the motion to compel, Your

23  Honor, was they had a defense, and it's still a defense, that

24  they say, and I think you are going to hear from the witness,

25  that sometimes, not always but sometimes we help with the data

1    migration or we load the catalogs, but oftentimes the customers

2    do it themselves.

3           And we said, well, if you sell them all the system

4    and it's capable of doing that, then it infringes.  And they

5    said, no, our customers are going to do this.  And that was

6    exactly the issue that came up.  This is page 17 of the

7    transcript, Your Honor, where I inform the Court that Lawson is

8    contending that we have to prove infringement on a

9    customer-by-customer basis and that the software they have

10   licensed or maintain is actually, quote, implemented.

11          Go down starting at line 19.  If that's going to be

12   the basis of their defense, we think that they should provide

13   us with information as to which software modules on a

14   customer-by-customer basis is actually implemented.  For

15   example, the defense is -- and you're going hear it because

16   we've seen slides from Dr. Shamos and we've heard testimony

17   from Ms. Raleigh that sometimes we don't load the catalog data,

18   our customers do it.

19          Now, when I raised that with the Court, I mean, the

20   Court said, well -- and this is a quote from the Court:

21   Frankly, I don't understand how that's a defense to

22   infringement.  You say you sold Payne something, but Payne

23   didn't use all of it.  If you sold it to me, that's

24   infringement it seems to me.  So I really understand the issue,

25   but you all know enough and you can use the dictionary to get

1   your definitions.

2          Answer:  And the fact is, all we got after that was

3   36 customers out of hundreds of customers in which they said,

4   here, here's a few customers that we've done data migration

5   for --

6          THE COURT:  What are you doing?

7          MR. McDONALD:  I was going to offer something, Your

8   Honor, because I think we may not have a dispute on this issue,

9   and we can maybe cut it short.

10          THE COURT:  Let's see if we can speed it up.

11          MR. McDONALD:  Since damages are out of the case, I

12   don't think we're going to dispute now -- we don't have to

13   worry about how many customers or whether there was some that

14   we didn't help load the data.  I don't think this is an issue.

15          THE COURT:  You're not going to offer evidence on

16   that topic.

17          MR. McDONALD:  No, it's not a defense that we're

18   asserting.

19          THE COURT:  Then it's moot.

20          MR. ROBERTSON:  All right, thank you, Your Honor.

21   That's a good resolution.

22          THE COURT:  Do you know how that could have been

23   solved, Mr. Robertson?  Let me tell you the way that we did it

24   in the days gone by.  The issue was on the table -- Mr.

25   McDonald, this is for both of you.

1    You get up, you pick up the phone, you say, Scott, or

2    Mr. Robertson if you don't call each other by the first name,

3    that motion is no problem anymore because we're not offering a

4    defense on that.

5    Then they don't spend the time putting this together,

6    and I don't spend 20 minutes sitting here listening to whatever

7    it was -- it wasn't 20 -- and that's the way it's done.

8    Now, whatever happened to the notion of just doing

9    things that way?  And both of you are equally at fault for

10   letting that ball drop.  That's the way you practice law.

11   That's one of the reasons or one of the ways law can be a

12   profession that allows you to focus on what you really need to

13   focus on and not fight all the time.  All right, would you take

14   this.  Are we ready for the jury?

15   MR. McDONALD:  Yes, we are.

16   THE COURT:  All right.  I don't like addressing

17   topics like that because to some extent it makes one sound like

18   Rodney King, but the fact of the matter is, this is still a

19   profession, and you better start acting like it as long as you

20   are here.  That's the way it's done here.  That's the way it's

21   going to be done here.

22

23   (Jury in.)

24

25   THE COURT:  All right, Ms. Stoll-DeBell, who is your

1    next witness?

2           MS. STOLL-DeBELL:  Mr. Christopherson.

3

4                    **DALE CHRISTOPHERSON,**

5    a witness, called by the defendant, having been first duly

6    sworn, testified as follows:

7                       DIRECT EXAMINATION

8    BY MS. STOLL-DeBELL:

9    Q    Good morning, Mr. Christopherson.

10   A    Good morning.

11   Q    Welcome back.

12   A    Thank you.

13   Q    I'm going to ask you a few questions about your education

14   and work experience before we get into some of the more

15   substantive questions.

16   A    Okay.

17   Q    Where did you go to high school?

18   A    I went to high school Cambridge Public School, and that's

19   in Minnesota.

20   Q    When did you graduate?

21   A    Back in 1977.

22   Q    What did you do after you graduated from high school?

23   A    I joined the military.

24   Q    What branch of the military?

25   A    U.S. Army.

Christopherson - Direct                                          1500

1    Q     What kind of work did you do in the U.S. Army?

2    A     Worked as an intelligence analyst.

3    Q     Can you tell us a little bit about that.

4    A     A little bit about that.

5    Q     A little bit.  Not a lot.

6             THE COURT:  If he did, he'd have to -- let's get on

7    with it.

8    A     Basically worked for 12 years in the military as an

9    intelligence analyst.  A good bit of that was actually

10   instructing the profession of intelligence analysts to both

11   noncommissioned and commissioned officers, but I also had the

12   opportunity to actually perform that job.

13             One of the places I performed my job was at headquarters

14   U.S. European Command, and there I worked at the command

15   center.  Command center, probably the best way, most people in

16   the court were around during the first Iraq war.  We'd see

17   General Schwarzkopf every night on the news, and that was in

18   the command center.  That's where I worked, except it wasn't a

19   tactical situation.  It was peacetime.  So not the same energy

20   necessarily.

21   Q     How long were you in the Army?

22   A     12 years.

23   Q     Do you have a college agree?

24   A     Yes.  Actually I have two, an associate's and a bachelor's

25   degree.

1    Q    What kind of associates degree do you have?

2    A    I got that in general studies, and I did that while I was

3    in the military.

4    Q    What kind of bachelor's degree do you have?

5    A    Management information systems.

6    Q    What is management information systems?

7    A    It's -- partly you look at project management or program

8    management directly related to the computer science field, and

9    then also, about 50 percent of the programmers, we'll be

10   looking at computer programming also.  So I did a fair bit of

11   computer programming.

12   Q    So sort of a combination of computer programming and

13   management?

14   A    Absolutely.

15   Q    Other than your bachelor's degree in management

16   information systems, will you describe for us other types of

17   experience you have relating to computer software?

18   A    Sure.  Actually, I started programming back when I was in

19   10th grade which brings us back to 1974, but I'll jump quickly

20   forward.

21        When I was working in the intelligence field, many times I

22   was called to work as basically a business analyst to design

23   artificial intelligence systems and get those deployed out in

24   the field along with training systems.

25   Q    Have you ever written software?

Christopherson - Direct                                                        1502

1    A    Absolutely, I have.  I wrote some software while I was in

2    the military, not a lot, but I really, really enjoyed it, and

3    that's where I saw my career eventually going, and I had the

4    opportunity to get out of the military and join a defense

5    contractor really where I was able to still continue my

6    intelligence analyst work but also move into computer

7    programming.

8         So I felt it was an excellent opportunity for me to start

9    a new career path and, again, still retain the old career path

10   that I had, and then I started writing programs for Department

11   of Defense back in 19789.

12   Q    Have you ever been an instructor for computer software

13   projects?

14   A    Yes, I was.  I took quite a few courses in both COBOL,

15   Basic, introduction to computers, C, C++, and that would have

16   all been at what's now called Strayer University but back then

17   when I was doing that was Strayer College.  It was up near D.C.

18   Q    Maybe slow down a little bit and that will be helpful.

19   Me, too.  I'll try to slow drown.  So overall, how many years

20   have you been working in the software development management

21   and director areas?

22   A    Can you say that question again?

23   Q    Sure.  How many years have you been working in the

24   software development, management, and director areas?

25   A    Clearly over 30 years.

Christopherson - Direct

1   Q    And how many years have you been working with procurement

2   software?

3   A    Started working with procurement software back in 2001.

4   Q    When did you start working for Lawson?

5   A    1997.

6   Q    What is your current position with Lawson?

7   A    Director of development for S3 applications.

8   Q    What are all the supply chain products for which you have

9   development responsibilities?

10  A    I may forget one or two, but clearly inventory control,

11  purchase order, requisitions, EDI, fax integrator, procurement

12  punchout, requisition self-service, or what we called RSS,

13  warehouse, order entry, vendor self-service, and then customer

14  self-service.

15  Q    Do you have development responsibility for products other

16  than the supply chain products that we just mentioned?

17  A    Yes, I do.

18  Q    Briefly describe what those are.

19  A    Sure.  Within the financial suite, I've got general

20  ledger, accounts payable, accounts receivable, invoice

21  matching, or what we call matching typically.  Quite a few

22  others in that area, grant management being one.

23       In the HR area, I've got HR, benefits, payroll, taxes,

24  teacher contract administration, employee manager self-service,

25  and in smart reconciliation which is used to take a look at

Christopherson - Direct                                          1504

1    invoices from both inventory control and matching, what did we

2    order through purchase order, the requisitions, and then what

3    did we actually receive.  So going back also in the area of

4    supply chain management receiving applications also.

5    Q    How many people directly report to you?

6    A    Directly report to me, just under 40.  I think it's about

7    38 right now.

8    Q    What are their functional responsibilities?

9    A    I've got business analysts, software developers, and also

10   then quality control or tester, testing people.

11   Q    How many people indirectly report to you?

12   A    About another 60 people that I have that are all based in

13   our operations that I set up in Manilla.

14   Q    Do you have exposure to Lawson's customers?

15   A    On a daily basis.

16   Q    Can you describe at a high level how that happens?

17   A    Sure.  It can happen in a variety of ways.  One, quite

18   often I'm invited to go out to our user events as Mr. Lawson

19   talked about yesterday.  We have regional ones or local ones.

20   There's one based in Minneapolis, so that one I get invited to

21   all the time that seems like, and that's once a quarter

22   practically.

23        Then there's a global one or the national one.  That

24   happens once, usually in the spring.  Sometimes I'm invited to

25   that one.  Sometimes I may be busy on something else, so I may

1   choose not to go to that one.

2   Q    Other than the user conferences, what other kind of

3   customer interactions do you have?

4   A    So then we get to actually supporting the applications.

5   We talked a little bit about maintenance.  Maintenance, you get

6   these customers who maybe run into an issue with their

7   software.  Maybe they run into an actual defect or what some

8   people may call bug.  That goes to our support organization.

9   They talk to the customer, find out what the issue is, comes

10  into my organization, we fix the issue.

11      Sometimes we actually don't understand what the issue is.

12  Even though the support person has gotten all kinds of good

13  notes, I have to actually get on the phone, pick up the phone

14  and talk to the person on the other end that reported this

15  issue and find out what goes on.

16      I'm not too terribly involved unless there's an escalation

17  of those problems.  I got engineers that handle that, but what

18  I what get into a lot is really called trusted advisor roles

19  where I've got customers who are trying something different to

20  use their software, they're not quite sure how maybe they

21  should best implement it within their system, and they have had

22  they system for awhile.  It's already past services.  Services

23  is no longer engaged.

24      They'll talk to someone such as me that they've built a

25  really trusted relationship and say, Dale, what do you think,

1    should I try this, should I not try this, I'm having some

2    issues here, can you help us out, and we'll take a look at

3    that.   Those are always phone calls or site visits, sometimes

4    they come up and see us.

5    Q    I'm going to ask you a couple of questions about Lawson

6    generally.

7    A    Sure.

8    Q    What kinds of products does Lawson sell?

9    A    Software and then services to help service that software

10   and then clearly the maintenance.

11   Q    Does Lawson sell computer systems?

12   A    No, it does not.

13   Q    Does Lawson sell any kind of computer hardware?

14   A    No, it does not.

15   Q    I'm going to ask you a few questions about Lawson system

16   foundation.

17   A    Sure.

18   Q    At a high level, what is LSF?

19   A    Lawson system foundation, it is a basis for the 4GL,

20   Lawson 4GL applications such as purchase order, requisitions or

21   RQ, and inventory control.   They need that in order to operate,

22   but not only do they need it to operate it, they need it in

23   order to actually be compiled.

24        The programming language by itself my developers actually

25   work in is an extension of COBOL but doesn't always necessarily

1  look like COBOL.  The program files, when you look at it, is

2  completely dispersed through a variety of things, and LSF pulls

3  it all together into an actual COBOL program.  We don't

4  actually see that.  That's a machine that does that.

5  Q    Other than -- are Lawson software modules other than the

6  accused products in this case also hosted on top of LSF?

7  A    That is correct.

8  Q    Can you give me a few examples of modules that are hosted

9  on LSF other than the accused products in this case?

10 A    When I talked about the financial suite and the HR suite

11 --

12        THE COURT:  Why are we getting into this?  It's hard

13 enough to follow this technical material without getting into

14 something that isn't an issue.  Let's just stay with what's at

15 issue and get right to the point, okay?  That doesn't make any

16 difference what else is hosted.

17        MS. STOLL-DeBELL:  Well, I think it goes to the fact

18 that LSF -- what are the accused products and that LSF works

19 with things other that.

20        MR. ROBERTSON:  I'll stipulate that LSF works with

21 the other products as long as you stipulate it works with the

22 accused products.

23        MS. STOLL-DeBELL:  I think we do.

24        THE COURT:  Do you or not?

25        MS. STOLL-DeBELL:  We do.

Christopherson - Direct                                    1508

1          THE COURT:  Okay, done.  Now we don't need to talk

2     about anything else.  Stay with the accused products.

3     Q    I'm going to ask you, or I'm going to turn now to the item

4     master database --

5     A    Sure.

6     Q    -- and ask you some questions about that.

7     A    Uh-huh.

8     Q    When Lawson sells its software to its customers, is there

9     any item data in the item master database?

10    A    No, there's not.

11    Q    Why does Lawson sell it that way, with no item data in it?

12    A    Essentially we don't know what the customers are going to

13    want to have in the database.  It's configurable in a variety

14    of ways.

15         THE COURT:  Essentially, you don't know; that's the

16    answer.  Keep the question and the answer -- and the best way

17    to keep an examination moving is for you to take control of the

18    questions and not be -- we don't need a general dissertation of

19    things.  We need to have the questions asked and answered.

20    Q    Would item master work if it included only items from a

21    single vendor?

22    A    Yes.

23    Q    Would item master work if it included only items that were

24    already owned by the customer?

25    A    Yes.

Christopherson - Direct                                    1509

1   Q    Can item master be stored in a local database at the

2   customer's location?

3   A    Yes, it may.

4   Q    Can item master include item records for items owned by

5   the customer?

6   A    Yes.

7   Q    Can item master records include a customer's part number?

8   A    Yes, it can.

9   Q    Can item master records include the manufacturer or

10  supplier's catalog or part number?

11  A    Yes.

12  Q    Do item master records include a default unit of measure?

13  A    Yes, it does.

14  Q    Do item master records include an item description?

15  A    Yes, it does.

16  Q    Do item master records include the quantity of items

17  available in the customer-owned inventory?

18  A    For stock items, yes.

19  Q    Do item master records include price?

20  A    Yes.

21           MS. STOLL-DeBELL:  If we can go to PX-361.

22           MR. ROBERTSON:  Your Honor, I'm going to object.

23  This is a demonstrative that Dr. Weaver did that was never

24  introduced.  This witness -- so it's not in evidence.

25           THE COURT:  Could I see it?

1          MR. ROBERTSON:  Excuse me, sir?

2          THE COURT:  Could I see it?  It's always helpful to

3     know what you all are talking about.

4          THE CLERK:  PX-361; is that correct?

5          THE COURT:  It was never was introduced.  Mr. Neal,

6     you don't have it.

7          MR. ROBERTSON:  Your Honor, while we're waiting -- if

8     you want to wait for the exhibit, I'll wait.

9          MS. STOLL-DeBELL:  Your Honor, I'm focusing on the

10    page --

11         THE COURT:  Just a minute.  Excuse me.  I just need

12    to get there.  What is this, Ms. Stoll-DeBell?

13         MS. STOLL-DeBELL:  This is one of the screen shots

14    from one of the demonstrative demos that Dr. Weaver ran.

15         THE COURT:  But he didn't run it in the testimony, or

16    he did here?

17         MS. STOLL-DeBELL:  He did not run it at trial, but it

18    was part of his expert report, and I'm not actually going to go

19    through the demo.  I'm more going to ask one question about one

20    screen shot.

21         THE COURT:  Which page?

22         MS. STOLL-DeBELL:  It ends in 2233.

23         THE COURT:  You all have a real knack of printing

24    things in such small dimensions nobody can see them.  Will you

25    go look in my desk, maybe it's on the desk, there's a little

1   magnifying glass about that big.

2           What is the purpose of this?

3           MS. STOLL-DeBELL:  Your Honor, it's relevant to

4   explain what item master is in the database which goes to --

5           THE COURT:  You are offering it to show what item

6   master is.

7           MS. STOLL-DeBELL:  What it looks like, yes.

8           THE COURT:  So, now, Mr. Robertson, what is your

9   objection to it?

10          MR. ROBERTSON:  This was never introduced into

11  evidence by Dr. Weaver.  I think it's inappropriate for a lay

12  witness to sit and comment now on an expert's exhibits or

13  expert's report.

14          We didn't get any expert report from Mr.

15  Christopherson saying that he was going to be analyzing Dr.

16  Weaver's expert report or Dr. Weaver's exhibits relating to his

17  expert report, so I just think it's inappropriate expert

18  testimony from a lay witness commenting on an exhibit that was

19  never in evidence or that Dr. Weaver didn't present.

20          MS. STOLL-DeBELL:  Your Honor, this is just a screen

21  shot from Lawson's software, the laptop demo that we produced

22  in discovery.  Mr. Christopherson works with these products

23  every day as he testified about, and I'm asking ask him to

24  explain what the screen shot shows.

25          MR. ROBERTSON:  As Your Honor knows, we asked Lawson

1    to produce to us any demonstrations they were going to rely

2    on --

3              THE COURT:  This isn't a demonstration.

4              MR. ROBERTSON:  This is our screen shot of what was a

5    demonstration, Your Honor.  You will recall the demonstrations

6    were produced both on a laptop captured by a software so we can

7    present it like a video, and then we also captured hard copies

8    of the screen shots for each web page or page that was

9    presented.

10             THE COURT:  Do you agree or disagree that this is a

11   screen shot of a Lawson item master?

12             MR. ROBERTSON:  I would agree that page 233 is a

13   screen shot from the Lawson system.

14             THE COURT:  All right.

15             MS. STOLL-DeBELL:  I was going to point out, the

16   Lawson laptop is actually an exhibit that has been admitted

17   into evidence as well, but it seemed to be easier just to put

18   the screen shot --

19             THE COURT:  Excuse me.  The exhibit as been admitted?

20             MS. STOLL-DeBELL:  The laptop is an exhibit in this

21   case.

22             THE COURT:  This is just a page of that exhibit?

23             MS. STOLL-DeBELL:  Yeah.  We could put it up, and put

24   on the screen shot from the actual laptop.  It's already been

25   printed here.  I'm only going to ask questions about this one

1    page from this exhibit.

2              MR. ROBERTSON:  The laptop is not in evidence, Your

3    Honor.

4              MR. CARR:  Yes, it is.

5              THE COURT:  Wait just a minute.  It either is or it

6    isn't.

7              MR. ROBERTSON:  I didn't introduce it during my case.

8              MR. McDONALD:  I believe that is a stipulated

9    exhibit, though, isn't it?

10             MS. STOLL-DeBELL:  It was, Your Honor.  We have

11   both -- we made two laptops that are identical.  We kept one,

12   and we gave one to ePlus, and both of those are actual

13   stipulated exhibits in this case.

14             MR. ROBERTSON:  Your Honor, remember, we had a motion

15   that Lawson never provided us with any demonstrations, and so

16   the laptop can come in.  Your Honor's already ruled on the fact

17   that as to these demonstrations, that can't be performed.

18             THE COURT:  My question is, is this from that laptop?

19             MS. STOLL-DeBELL:  Yes, it is.

20             MR. ROBERTSON:  It's from a demonstration that Dr.

21   Weaver did using that laptop.

22             THE COURT:  So it's not from the laptop?

23             MR. ROBERTSON:  Well, he uses the software on the

24   laptop in order to be able --

25             THE COURT:  I know, but it's not what appears now on

1    the laptop.

2          MR. ROBERTSON:  Nothing appears on the laptop, Your

3    Honor, unless you turn it on and run a program.

4          THE COURT:  Even I know that.

5          MR. ROBERTSON:  I'm just saying, it's not --

6          THE COURT:  Why would you make an argument like that?

7          MR. ROBERTSON:  I'm sorry.  It's not on the laptop,

8    Your Honor.

9          THE COURT:  If it's on the laptop and the laptop is

10   an exhibit, then why can't she put it in?

11         MR. ROBERTSON:  It's not on the laptop.

12         THE COURT:  Is that because of this argument that the

13   laptop hasn't been turned on?

14         MR. ROBERTSON:  No.  You'd have to run through the

15   exact same demonstration that Dr. Weaver did to generate these

16   screen shots.

17         THE COURT:  It would be using the laptop to make a

18   demonstration to get there.

19         MR. ROBERTSON:  Yes, sir.  You have to go through all

20   the steps --

21         THE COURT:  Objection sustained.  I've already ruled

22   on that.

23         MR. ROBERTSON:  Your Honor, this is also a stipulated

24   exhibit, 361.  It's also a stipulated exhibit.

25         THE COURT:  Why are you objecting if it's a

1    stipulated exhibit?

2              MS. STOLL-DeBELL:  I'm not --

3              THE COURT:  I'm talking to Mr. Robertson.

4              MR. ROBERTSON:  Your Honor, this was Dr. Weaver's

5    exhibit.  I don't know how this witness, a lay witness --

6              THE COURT:  But the pretrial order says the exhibits

7    are in unless they are objected to, and if you stipulated that

8    it's in, it's in, and she can use it.  There may be an

9    objection as to the question, but she can certainly use the

10   exhibit --

11             MR. ROBERTSON:  Well, actually, they were in, Your

12   Honor, less they were objected to, and I'm objecting to using

13   this document with this witness.

14             MS. STOLL-DeBELL:  Your Honor, it's plaintiff's

15   exhibit.  We went through the pretrial order, and we both

16   agreed to have it entered into evidence, and now I'm using it.

17             THE COURT:  I think that you didn't read the pretrial

18   order.  The exhibits are in at the pretrial conference unless

19   they are objected to.  They weren't objected to.  They were

20   stipulated, I'm told.  I don't know whether that's true, but

21   your objection after the fact doesn't deal -- doesn't then

22   resurrect your right to object at the time it's offered at the

23   pretrial conference.  That's why I do the pretrial conference.

24             MR. ROBERTSON:  Your Honor, there were a number of

25   exhibits yesterday with Mr. Farber that were stipulated to that

1   were objected to when Mr. Farber testified.

2           MS. STOLL-DeBELL:  That's not true, Your Honor.  They

3   were not stipulated to, and you didn't enter them into

4   evidence.  If you recall, you said they needed to lay a

5   foundation for those exhibits.

6           MR. ROBERTSON:  It was --

7           THE COURT:  You know the first rule of holes?  Quit

8   digging.  All right, objection overruled.

9           MS. STOLL-DeBELL:  Thank you, Your Honor.  Bill, if

10  you could put up PX-361 and go to the page that ends in Bates

11  number 2233 for us, please.  If you can blow up that screen

12  shot.

13          THE COURT:  That's not the page I was looking at.

14  Did I look at the wrong page?

15          MS. STOLL-DeBELL:  2233.

16          THE COURT:  I looked at 2223.  I don't think for

17  purposes of the ruling it made any difference.

18  Q   Can you see that, Mr. Christopherson?

19          THE COURT:  Well, okay.

20          MS. STOLL-DeBELL:  You also have a copy in your book

21  as well.

22          THE COURT:  My concern is the extent to which it

23  animates or affects the ruling I made on the demonstration.  Is

24  this the same demonstration -- what is the name of that fellow

25  who was going to introduce it?

1     MR. ROBERTSON:  Mr. Hvass.

2     MS. STOLL-DeBELL:  This is Dr. Weaver's

3     demonstration.

4          THE COURT:  Yes, but is this what he was going to do?

5          MS. STOLL-DeBELL:  Mr. Hvass?

6          THE COURT:  Yes.  You can't do indirectly what you --

7          MS. STOLL-DeBELL:  No, Your Honor.  This is Dr.

8     Weaver's, so there's no point to redo exactly what Dr. Weaver

9     did, so, no.

10         THE COURT:  But Dr. Weaver had to testify to this.

11    The real objection to this, I guess, is there's no foundation

12    for it, but it's been admitted without objection, so you can

13    use it.

14         MS. STOLL-DeBELL:  Thank you.

15    Q    Mr. Christopherson, have you seen this screen shot before?

16    A    Yes, I have.

17    Q    What is it?

18    A    In this particular case, it's 25 records of items that are

19    in the item master for a specific location, what they call

20    requesting location.

21    Q    I'm going to walk through some of the different things

22    that we can see on this screen shot and ask you to explain to

23    us what they are.

24    A    Sure.

25    Q    I see a column there that is labeled item.

1           MS. STOLL-DeBELL:  I don't know, Bill, if you can

2    highlight that item column.

3    Q     Can you tell us what that is, Mr. Christopherson?

4    A     We've been referring to that's kind of the Lawson item

5    number or the customer part number.

6    Q     Is that something that -- well, who creates that item

7    number?

8    A     The customer does.

9    Q     Does it ever come from the vendor?

10   A     No, it does not.

11   Q     Let's go on to the next column.  It has a heading

12   description?

13   A     Uh-huh.

14   Q     What is that?

15   A     That's what we've been referring to as the item

16   description.

17   Q     And then what is the column, the next column over?  I

18   think it says tracked.  Can you explain what that is?

19   A     Yes.  That has to do with if -- well, in the item master,

20   we have two types of items.  We have those that we don't keep

21   in stock, what we call nonstock items.  Those are items that

22   when we need them, we always have to go purchase them.

23         Then we have our stock items and whether or not we're

24   tracking the stock of those items, thus tracked, and that has

25   to do with tracking that order and -- not the order, but rather

Christopherson - Direct

1519

1   the inventory and making sure that we're always going to have

2   enough on hand.

3        This particular case, you've got medical instruments.  You

4   want to make sure that -- you got someone going into surgery,

5   you've got the equipment, the supplies that you need for that

6   surgery before that surgery actually starts or the medical

7   procedure.

8   Q    Where does the tracking information come from?

9   A    Tracking information, that's housed within inventory

10   control or IC.

11   Q    The screen shot we're looking at here, where did the item

12   description information come from?

13   A    The item description can come from the customer.

14   Generally they'll put it in terms that they understand.  In

15   particular, a lot of the hospitals will have terms that are

16   very similar between hospitals, between locations.

17        Take nurses today are very short-supplied within the US,

18   and as a result, it's quite often that nurses are having to go

19   from hospital to hospital even in different companies.  They'll

20   work different shifts different places.  They need to know

21   basically standardized ways of the way things are being

22   identified.

23   Q    Is this a typical list of items that you see in an item

24   master database?

25   A    For medical unit, yes.  This would be some of the items

Christopherson - Direct                                    1520

1   that you may see.

2   Q    What kinds of items do you see here?

3   A    Clearly, I've got some, looks like -- it's a little bit

4   fuzzy in mine also, Your Honor, so --

5           MS. STOLL-DeBELL:  Bill, could we blow up some of

6   those maybe, blow up that description column or somehow make

7   those bigger and easier to see?

8   Q    Is that better?

9   A    Sure.  It looks like there's some sort of a surgical tape

10  dispenser, different amounts on each one of those, ten or

11  20 yards, some strips.  Those are probably Band-Aids, or we

12  might refer to them as Band-Aids, but obviously they don't in

13  this case.  Some needles, varying lengths.

14  Q    Looks like maybe shoe covers?

15  A    Yes, some shoe covers down there, some surgical masks,

16  there's some gloves, there's a gown, there's a scalpel, another

17  type of tape.  There's some syringes.  So a wide selection of

18  things, some related, some not related.  The shunt, probably

19  not related to the shoe covers, for instance.

20  Q    Is item master organized by related items?

21  A    You know, if you look at this, you've got items numbers

22  going 1,007, -8, -9, -10, -11, -12, and it's -- I haven't

23  looked at them all, but they appear to be almost in

24  alphabetical order.  I see now where 1,026 is not there, but as

25  I said --

1          THE COURT:  What was the question?

2          MS. STOLL-DeBELL:  The question was, is item master

3     organized by related items.

4          THE COURT:  Yes or no?

5          THE WITNESS:  No, it's not.

6     Q    Are items in item master organized by vendor?

7     A    No, they are not.

8     Q    Why not?

9     A    Vendor doesn't come into the item master or the ITEMMAST

10    table at all.

11    Q    Is this customer's item master database ever published by

12    a vendor?

13    A    Can you say that again?

14    Q    Is a customer's item master database ever published by a

15    vendor?

16         MR. ROBERTSON:  Objection, Your Honor, calls for

17    legal conclusion.

18         MS. STOLL-DeBELL:  It does not, Your Honor.  I'm

19    asking him to use the ordinary meanings of those terms.  They

20    are not claim terms.  I'm just asking for his understanding

21    based upon his experience working at Lawson and working with

22    these products.

23         MR. ROBERTSON:  Your Honor knows that there's a

24    dispute with respect to this, and there's a --

25         THE COURT:  Maybe we need to tell the jury what the

1    ordinary claim term is -- I mean what the ordinary meaning is,

2    and he needs to explain what he understands the ordinary

3    meaning is.  Or maybe I need to do it.  Are you finished, Mrs.

4    Stoll-DeBell?

5              MS. STOLL-DeBELL:  We can ask Mr. Christopher --

6              THE COURT:  He doesn't define what the ordinary

7    meaning is, does he?  He defines what his meaning is.  So I

8    define -- should I go ahead and tell the jury what the ordinary

9    meaning is now if that's what the question is?

10             MS. STOLL-DeBELL:  Your Honor, I think it's

11   appropriate to let him answer with his understanding.  He works

12   with these products every day.  He works with customers.  He

13   already laid his foundation for that, and I'm just asking --

14             THE COURT:  If he gives the definition of what his

15   understanding is but it's not what the usual meaning is, it's

16   not the same.  Then it confuses the jury, doesn't it?

17             MS. STOLL-DeBELL:  I think it's up to the jury to

18   decide what the ordinary meaning is, and we've already heard

19   testimony from the witnesses what their understanding of that

20   ordinary meaning is, and now we're going to ask Mr.

21   Christopherson what his understanding is.  And I believe it's

22   up to the jury to ultimately decide what that is.

23             THE COURT:  Who testified to that?

24             MS. STOLL-DeBELL:  Dr. Weaver.

25             THE COURT:  No.  He didn't testify what published by

1   a vendor meant.

2          MS. STOLL-DeBELL:  I believe he did, Your Honor.

3          THE COURT:  He was asked a different question.  I'm

4   going to tell the jury what the definition is.  That's enough.

5   Published by a vendor is used in the definition of the claim

6   term catalog, product catalog.  Published simply means to make

7   generally known.  Published by a vendor simply means that at

8   some point in time, a vendor, such as a supplier, a

9   manufacturer, a distributor has made generally known or has

10  disclosed an organized collection of items or associated

11  information, preferably but not necessarily including a part

12  number, price, catalog number, vendor name, vendor ID, textual

13  description of the item and images relating to the item.

14  That's what the general meaning of the term is.  I'll have that

15  in writing for you.

16  Q    Okay, Mr. Christopherson, using that definition of

17  published by a vendor, I'm going to ask my question again and

18  ask that you answer it using that definition.

19          THE COURT:  You are going to ask him for his opinion;

20  is that what you are doing?

21          MS. STOLL-DeBELL:  I don't think it's an opinion, but

22  if it is, it's a lay opinion based upon his experience and what

23  he's seen and what he does in his job.

24          MR. ROBERTSON:  Your Honor, I think it's still

25  calling for a legal conclusion from a lay witness, so I would

1    object on that.  This gentlemen's supplied no report, no

2    Rule 26 disclosure.  I think it's inappropriate.

3              THE COURT:  Well, it is his opinion, I think; isn't

4    it?

5              MS. STOLL-DeBELL:  I think it's a fact.

6              THE COURT:  It can't be a fact.  It's his opinion as

7    to what the facts are; right?

8              MS. STOLL-DeBELL:  It's using the definition he --

9              THE COURT:  Do you want it in as an opinion, because

10   I'll let it in.

11             MS. STOLL-DeBELL:  Yes, then.

12             THE COURT:  It's not going to come in just as a fact.

13   It's his opinion.

14             MS. STOLL-DeBELL:  Then, yes.

15             THE COURT:  There are two kinds of people who can

16   give opinions.  One are experts.  He's not qualified as an

17   expert, so he's not giving an opinion as an expert.

18             Lay people, such as you and me, can give opinions

19   about matters as well.  They can do that if it will help you

20   decide a fact that is in issue or if it will help you

21   understand the evidence and if it is based reasonably on their

22   perception.

23             It is up to you to decide whether, in listening to

24   the testimony, his opinion on this matter is based reasonably

25   on his perception, and if you -- and you can give it such

1   weight as you choose or none if you choose which is an

2   instruction I'll tell you about later.  Do you want to ask him

3   what his opinion is?

4           MS. STOLL-DeBELL:  Yes.

5   Q    Using the definition the Court just gave for published by

6   a vendor, is the customer's item master database ever published

7   by a vendor?

8   A    If you looked at the entire --

9           THE COURT:  I think the answer is yes or no to start

10  with, and then if she wants you to explain it, she can, but the

11  jury will understand your opinion better if you preface it by

12  giving them the guidepost from which to make the assessment if

13  there's any further explanation she asks you for.  Yes or no?

14          THE WITNESS:  No.

15          THE COURT:  Do you want to ask him to explain that?

16          MS. STOLL-DeBELL:  Yes.

17  Q    Please explain your no answer.

18  A    Sure.  Looking at the screen that we were just talking

19  about, item number, a vendor could not have published that

20  because they never had access to it.  That's from the customer.

21  Tracked, that's another one where the vendors would love to

22  have the customers have everything in stock.  That comes at a

23  cost to the customer, and they don't want to do that.  They may

24  have items that are low turnover, they only use maybe once or

25  twice a year.

1    There's many other fields that are in the item master.

2    We've talked about some of them.  You know, catalog number, the

3    vendor's part number or its number, the manufacturer number,

4    clearly those came from the -- the manufacturer came from the

5    manufacturer, and the vendor number came from the vendor, and

6    those were in their catalogs at some point in time.  The

7    description generally --

8              THE COURT:  Those did come from a vendor?

9              THE WITNESS:  What did come from --

10             THE COURT:  Those that you just testified to --

11             THE WITNESS:  Did come from the vender, but --

12             THE COURT:  So they were published by a vendor?

13             THE WITNESS:  Those particular items, right.

14             THE COURT:  Thank you.

15             THE WITNESS:  Where I was differentiating, she was

16   saying the item master, that, in itself, all the fields were

17   not, and that's why I was really struggling with the yes or no,

18   Your Honor.

19             THE COURT:  I know, but the jury have a right to

20   understand what people's opinions are before they start talking

21   about them.

22             THE WITNESS:  I appreciate that.

23             THE COURT:  Then they understand what they're being

24   told.

25   Q    Do a lot of fields come from the customer in item master?

Christopherson - Direct                                    1527

1   A    Most of the fields.

2            MR. ROBERTSON:  Object to the form of the question;

3   vague, ambiguous as to a lot of fields.

4   Q    Do most of the fields in item master come from the

5   customer?

6            MR. ROBERTSON:  Same objection, Your Honor.  I mean,

7   if we want to be specific, there's hundred of fields.

8   Q    Mr. Christopherson, are there hundreds of fields in item

9   master?

10  A    No, there's not.

11  Q    How many fields are in item master?

12  A    I don't recall, but there's under 100.

13           THE COURT:  So there are a lot, I mean between 0 and

14  100?

15           THE WITNESS:  Yes, Your Honor.

16           THE COURT:  Is it closer to a hundred than it is to

17  zero, or close to zero than it is to a hundred?

18           THE WITNESS:  It's probably pretty close to 50

19  roughly.

20           THE COURT:  So there are 50.  You can handle that on

21  cross-examination, Mr. Robertson.  Overruled.

22           MR. ROBERTSON:  Thank you, Your Honor.

23  Q    Would you say a majority of those 50 come from the

24  customer?

25  A    I would say from the customer it is clearly a majority.

1   Q    Do Lawson's customers maintain the item master database in

2   private?

3   A    Yes.

4           MR. ROBERTSON:  Objection, relevancy, Your Honor.

5           MS. STOLL-DeBELL:  Your Honor, it goes to --

6           THE COURT:  What does that have to do with anything?

7           MS. STOLL-DeBELL:  I think it goes to whether it's

8   published by a vendor, whether it meets your definition --

9           THE COURT:  No, I don't think so.  Objection

10  sustained.  Disregard the answer, please.

11          MS. STOLL-DeBELL:  Can we go to, Bill, PX-363, and

12  I'm going to want to see page that ends in 942297.

13          MR. ROBERTSON:  I'm sorry, Ms. Stoll-DeBell, what

14  page?

15          THE COURT:  What exhibit are we on?

16          THE CLERK:  363.

17          MS. STOLL-DeBELL:  Actually I need to get you a

18  better page.

19  Q    Let's go to the page ending in 942297.

20          THE COURT:  297, the last three digits?

21          MS. STOLL-DeBELL:  Yes.

22  Q    What is this, Mr. Christopherson?

23  A    That is the login screen to get into the Lawson system

24  requiring a user name and a password.

25  Q    So when a customer or when anyone wants to use Lawson

1   software, do they need to have a user name and password?

2             MR. ROBERTSON:  Objection, Your Honor, relevancy.

3             MS. STOLL-DeBELL:  It goes to his opinion, support

4   for his opinion as to whether item master is -- meets the

5   definition of catalog as defined --

6             THE COURT:  I don't understand why, the fact that

7   somebody needs a password to get in and use it.

8             MS. STOLL-DeBELL:  I think it goes to whether item

9   master is made generally known or not.

10            THE COURT:  The issue is not whether item master is

11  made generally known.  It's whether the things that are listed

12  in item master are made generally known, isn't it?

13            MS. STOLL-DeBELL:  Well, I think --

14            THE COURT:  The issue is what's in the item master,

15  not whether item master is made generally known as I understand

16  the way you all have tried the case, so objection sustained.

17  Q   For a user to gain access to see what information is in

18  item master, do they need to use login credentials as shown on

19  this screen?

20            MR. ROBERTSON:  Same objection, Your Honor.

21            THE COURT:  It may be admissible for a different

22  purpose.  Besides that, Dr. Weaver has already testified about

23  putting in the user name that says Lawson, and then he said, we

24  put in our password.  So it may be appropriate, but it's not

25  appropriate for -- the previous question wasn't.  All right,

1  overruled.

2  Q    Do you need me to ask that again?

3  A    Yes, please.

4  Q    In order for a user or anyone to gain access and see what

5  information is in the item master database, do they need to

6  enter a user name and password?

7  A    Yes, at a minimum.

8  Q    Okay, I'm going to change topics slightly,

9  Mr. Christopherson, and I want to talk about how item

10 information is loaded into the customer's Lawson databases.

11 Are there different ways that item information can be loaded

12 into the item master database?

13 A    Yes, there are.

14 Q    What are those different ways at a high level?

15 A    You start with the most basic which would be just key in

16 the items.  Someone such as a buyer for an organization working

17 in the purchasing department could just sit in inventory

18 screens and just type in all the required fields.  That would

19 be the easiest way, particularly if you are just entering in

20 one or two items.

21 Q    So is it safe to call that a manual entry of item

22 information?

23 A    Sure.

24 Q    Are there tools that Lawson offers that can be used to

25 import information into the database?

1    A    Absolutely.  There's a PO 536.

2    Q    Are there third-party tools that can used --

3              THE COURT:  PO or field?

4              THE WITNESS:  PO 536.

5              THE COURT:  And that is a what?

6              THE WITNESS:  We've referred to it as, I think, about

7    three different ways so far in court, but it's a way to load

8    vendor agreements was one it's been called, a catalog load, I

9    think or something very similar to that.

10             THE COURT:  All right.

11             THE WITNESS:  Kind of a couple different names.

12   Q    Are there third-party party tools that can be used to load

13   item information into the item master database?

14   A    Sure.  You could use the SQL tools -- structure query

15   language is what SQL stands for -- provided by the database

16   providers, so Oracle or IBM for DB-2, for instance.

17   Q    Did you create a demonstrative exhibit that will help

18   explain the process that's used to load item information into

19   the item master database?

20   A    Yes, I did.

21             MS. STOLL-DeBELL:  Bill, can we put that up, please.

22             MR. ROBERTSON:  I'm just going object for the record

23   on this.  This is the demonstrative we talked about yesterday.

24   I understand the Court's ruling.

25             THE COURT:  Yes, I've already dealt with this out of

1    court, and the objection has been overruled, and I'm going to

2    allow questioning, but, Mr. Robertson is not going to stand up

3    and object to every question about this particular

4    demonstrative exhibit because it would then interrupt the flow

5    of your hearing and understanding, but his objection is

6    preserved under the terms previously articulated yesterday, Mr.

7    Robertson.

8              MR. ROBERTSON:   Thank you, sir.

9    Q    Okay, Mr. Christopherson, can you see that?

10   A    Yes, I can.

11   Q    Does this describe essentially a three-step process for

12   loading item information into the customer's Lawson database?

13   A    Yes, it does.

14   Q    What is the first step?  Does it have a nickname that you

15   use to identify this first step?

16   A    Sure.  In fact, all three steps, collectively we just call

17   that the ETL process, and that's very standard within the

18   computer industry.

19   Q    E stand for?

20   A    E stands for extraction.

21   Q    What does T stand for?

22   A    Transformation or transform.

23   Q    And what about L?

24   A    Load.

25   Q    Let's talk about the extraction step.  Where is that shown

Christopherson - Direct                                    1533

1    on this demonstrative?

2    A    Very first step.

3    Q    And you can actually maybe even touch it and put a little

4    arrow maybe.

5              THE CLERK:  What is the number of this exhibit?

6              THE COURT:  It's not.  It's a demonstrative.

7              THE CLERK:  Thank you.

8    Q    Tell us how the extraction step works.

9    A    The extraction step, basically that's the vendor.  The

10   customer will ask for the items that they want or maybe the

11   entire catalog.  That catalog is generally today going to be

12   housed in a database at the vendor's site.  Could also be a CD

13   or DVD.

14        They need to get that data from the vendor's system

15   extracted into some form, email message or a flat file -- when

16   I say flat file, I mean CSV file -- and send that over to the

17   customer.

18   Q    And then the next step is the transformation step?

19   A    Transformation, correct.

20   Q    Is that shown in the middle box of this slide?

21   A    That's correct.  That's this one.

22   Q    Looks like there are sort of four sub steps that are a

23   part of that?

24   A    Correct.

25   Q    Okay.  What is the first sub step that is part of the

1  transformation process?

2  A    So you get the file from the vendor, and now you're going

3  to go through and select what do you really want in your item

4  master.  Just because you negotiated prices on a hundred items,

5  you may not want actually the hundred loaded.  You may only

6  want 80.  Maybe it's 99.  Maybe it's all 100.  Or the vendor

7  sent you the entire catalog, and you may not want to load that

8  entire catalog.  You go through and select what you want out of

9  that, identify those that you really want to keep and continue

10  on.

11  Q    Do you encourage your customers to select all of the items

12  that a vendor may send as part of the extraction step?

13          MR. ROBERTSON:  Objection, lacks foundation.

14          MS. STOLL-DeBELL:  It doesn't, Your Honor.  I think

15  he already testified at length actually about all of his

16  customer interactions as part of his job.

17          THE COURT:  Well, are you asking him has he ever, or

18  are you asking has any of Lawson's sales force ever?

19          MS. STOLL-DeBELL:  I'm asking him.  Does he encourage

20  customers.

21          THE COURT:  And what relevance is that?

22          MS. STOLL-DeBELL:  I think he works with Lawson's

23  customers.

24          THE COURT:  I know that.

25          MS. STOLL-DeBELL:  Okay, and so it goes to whether

Christopherson - Direct                                    1535

1    the item master database is -- meets the definition of catalog

2    as set forth by the Court.

3              THE COURT:  So it's offered -- is what his practice

4    is offered to whether or not Lawson's product meets the

5    definition?

6              MS. STOLL-DeBELL:  Yes, and how Lawson talks with its

7    customers and how it instructs its customers to use --

8              THE COURT:  He said he hadn't got a foundation.  You

9    asked him to testify about his own personal practice, and it's

10   not -- it's of marginal relevance, but it's confusing and

11   leaves open the door to a lot of other responses that will

12   just, that would delay the trial, confuse the jury, and make a

13   difficult situation for the jury already more difficult.  So

14   I'm going to sustain the objection for lack of foundation.

15   Q    Mr. Christopherson, are you familiar in your job with

16   Lawson's practices and its instructions to its customers on how

17   to load item information into the item master database?

18             MR. ROBERTSON:  Objection, Your Honor.

19             THE COURT:  The question is -- what is your objection

20   to that question?

21             MR. ROBERTSON:  Relevancy.

22             THE COURT:  It's what he does.  Overruled.  She's

23   trying to lay the foundation to which you objected, I think.

24             MS. STOLL-DeBELL:  Yes, Your Honor.

25   A    Yes, I am.

1    Q    So you are familiar with Lawson's policies?

2    A    Correct.

3    Q    Is it Lawson's policy to encourage customers to load all

4    of the item information they receive from a vendor into the

5    item master database?

6              MR. ROBERTSON:  Objection, relevancy, Your Honor.

7              THE COURT:  Overruled.

8    A    No, it's not.

9    Q    What does Lawson encourage its customers to do?

10   A    When a customer comes up with that sort of an idea, myself

11   personally and actually other members of my team, because it's

12   not always me interacting with the customers, but obviously

13   I've got --

14             THE COURT:  That disqualifies the answer because he's

15   now -- he was asked, and the answer is nonresponsive.  He was

16   asked about whether there's a policy and is there a policy.  If

17   he does it, that doesn't make it a policy, and the fact that

18   maybe one or two other people may do it doesn't make it a

19   policy.

20             A policy is something that's adopted by the company,

21   and either they have the policy or they don't have the policy,

22   or -- and then if you've got another issue, you can get into

23   that, but policies -- he's disqualified himself from answering

24   that question with the policy because he said it's based on his

25   practice.

1    Q    Mr. Christopherson, are you aware of the policy that

2    Lawson has regarding selecting item information to load into

3    the item master database?

4    A    Yes.

5    Q    Can you answer the question about what is that policy?

6              THE COURT:  Just what is the policy.

7    A    The policy is that we will first ask the customer why do

8    you want to do that.  We want to establish what the

9    requirements are.  Inevitably what we find out --

10             THE COURT:  No.  You're going to have to take hold of

11   the examination, because we have -- this kind of testimony,

12   self-starting, rambling testimony creates all kinds of

13   problems, and we're in a question that has been objected to,

14   Mrs. Stoll-DeBell, and he was asked about the policy.

15             He said what the policy was, and then he goes on and

16   gives a lot of other information, and that isn't responsive to

17   the question, and it doesn't give Mr. -- and the reason for all

18   this is that Mr. Robertson, your opponent, has the right to

19   object to a question, and if the witness is self-animating

20   everything, he doesn't have that opportunity and we have to

21   move to strike the testimony, and then we have to ask the jury

22   to do the difficult thing and disregard that which has been

23   said.  So let's get hold of it.

24             Now, Mr. Christopherson, listen to the question.  You

25   answer the question.  Just answer the question.  Don't

1    elaborate on it, and then Ms. Stoll-DeBell, if she wants more

2    information, will ask you another question on that or another

3    topic; okay?

4              THE WITNESS:  Yes, sir.

5    Q    Is Lawson's policy to instruct its customers to only load

6    the item information for those items that it's going to

7    actually use or purchase?

8    A    Yes.

9    Q    The second sub step on this demonstrative says, adding

10   additional item information.  What additional item information

11   can be added in this step?

12   A    The item number that the customer would be using, that's

13   one.  Whether or not there's going to be tracking, if there's

14   stock or nonstock items, what its inventory levels might be,

15   additional user fields that exist, UNSPSC codes, other category

16   codes.

17   Q    What about, are there classification fields within the

18   item master database?

19   A    Correct.

20   Q    What classification fields are there?

21   A    The classification fields, I'm not sure now which

22   classification fields you are talking about.

23   Q    Are there inventory classifications fields?

24   A    Yes.

25   Q    Are there purchasing classifications fields?

1   A    Correct.

2   Q    Are those Lawson-specific fields?

3   A    Yes.

4   Q    That do not come from a vendor?

5   A    Correct, they do not.

6   Q    Are there any other Lawson-specific fields that you can

7   think of right now that would be added as part of this step?

8   A    There's also some user numerical fields.

9   Q    The next sub step says, deletes item information?

10  A    Correct.

11  Q    What item information is deleted here?

12  A    It may be the entire line item meaning I don't want that

13  item at all.  It may be, for instance, they may have sent

14  photos.  The customer may not want photos loaded into the

15  system.  That requires space and band width.  They may delete

16  that.

17  Q    The last sub step that's listed on this slide is modifies

18  item information.  What item information is modified?

19  A    Frequently it's the item description.

20  Q    And is it modified as you described earlier to get a

21  standardized description name?

22        MR. ROBERTSON:  Objection to the characterization of

23  the witness's testimony.

24        THE COURT:  I don't think he said that.

25  Q    Why is it modified?

1   A     It's modified for usually two purposes.  One, if the

2   description is greater than 30 characters, the field only holds

3   30 characters, and you want to have something that reasonably

4   describes the item that your users would know is the item that

5   you are trying to purchase or requisition on.

6         But also what we'll have, as I said earlier, is many of

7   the institutions or the customers will actually come up with

8   standard terminology for the items to help -- they can do

9   searches quicker, and it helps their employees as they move

10  around in the organization.

11  Q     What about price, is that a modified information?

12  A     The price is typically going to come from --

13           THE COURT:  Yes or no?

14           THE WITNESS:  It's not modified, no.

15  Q     Can it be modified?

16           MR. ROBERTSON:  Objection, Your Honor.  The witness

17  has answered the question, no, it's not modified.  I think it's

18  an improper question.

19           MS. STOLL-DeBELL:  I asked can it be.

20           MR. ROBERTSON:  What is the relevance then, Your

21  Honor?

22           THE COURT:  If it's not ever, whether it can be or

23  not seems to me to be irrelevant.  Sustained.

24  Q     Mr. Christopherson, is it ever modified?

25           MR. ROBERTSON:  Objection, Your Honor.

1           THE COURT:  Wait a minute.  I've got to deal with a

2   contempt problem here.  I'm in contempt.  I forgot to put that

3   thing --

4           MS. STOLL-DeBELL:  I thought you were going to say

5   I'm in contempt, Your Honor.  I was a little worried there for

6   a minute.

7           THE COURT:  All right.  Sorry.  Nobody can be

8   listening and paying attention to what you're doing while I was

9   in contempt which is why I keep these things out of the

10  courtroom.  I'm terribly sorry.

11          Ask your question again.  Don't answer, please, sir,

12  because there's obviously going to be an objection.  Now with

13  my contempt purged, let's go ahead.

14          MS. STOLL-DeBELL:  Let me back up and ask this a

15  different way.

16          THE WITNESS:  Sure.

17  Q    The price information that is put into the item master

18  database, is that a public list price that the vendor sells the

19  item for?

20          MR. ROBERTSON:  Objection, relevancy.

21          MS. STOLL-DeBELL:  Your Honor, this goes to, again,

22  whether the information in item master is published by a

23  vendor, whether this price field specifically is generally

24  available or not.

25          THE COURT:  How does he know that?  That's something

Christopherson - Direct                                    1542

1  that this record testified -- the testimony on this record is

2  that whatever prices are set are between the vendor and the

3  Lawson customer, and it may be sometimes they are and sometimes

4  they aren't, depending upon what goes on is the testimony.  So

5  how can he know that?  I don't understand how he can even

6  answer the question because he's got how many, 300, 400

7  customers?

8         MS. STOLL-DeBELL:  More than that.  May I lay a

9  foundation?

10        THE COURT:  More than that, okay, I'm sorry.  I

11 didn't mean to diminish the size of the company's business, but

12 how many?  Thousands of customers?

13 Q    How many customers does Lawson have for these products?

14 A    For these specific products, I couldn't give you a firm

15 answer on that.

16        THE COURT:  It's so many he doesn't even know, and

17 you are asking him to say what happens in situations -- how do

18 you turn these things off?  Consign it to the office, please.

19 Third contempt yields a prison sentence.  I am sorry.

20 Sustained.

21 Q    After this information is transformed, it looks like the

22 next step says, customer loads new info into the Lawson

23 database?

24        MR. ROBERTSON:  Objection.  It's leading, Your Honor.

25        THE COURT:  She just describing what's on the slide.

1    She didn't get a question out yet.  Okay, now ask the question

2    again.

3    Q    Is the last step on this slide to load new information

4    into the Lawson database?

5    A    Yes.

6    Q    And is the information that is loaded into the Lawson

7    database the information that was just transformed as we talked

8    about earlier?

9    A    Yes.

10   Q    And it looks like there are three different tables on this

11   demonstrative?

12   A    Correct.

13   Q    Why are there three separate tables there?

14   A    Those are the three tables that data is commonly loaded

15   into.  Depending on what else they are adding, it may go into

16   some additional tables.

17   Q    So is it fair to say that even after the information is

18   transformed, that it is then divided up and sent to different

19   tables within the Lawson database?

20   A    Correct.

21   Q    After this information is extracted, transformed, and

22   loaded, is it different than the information that was received

23   from the vendor?

24              MR. ROBERTSON:  Objection, Your Honor, relevancy.

25              MS. STOLL-DeBELL:  Your Honor, it goes to whether

1  it's generally known and whether item master --

2          THE COURT:  Whether what's generally known?

3          MS. STOLL-DeBELL:  The information in item master as

4  it has been loaded in.

5          THE COURT:  Whether the contents of item master are

6  generally known doesn't have anything to do with this case.

7  It's whether the information that goes into item master is

8  generally known that we're litigating, I think.  Objection

9  sustained.  It's confusing in addition to the extent it has

10 marginal relevance.

11 Q   We're going to switch topics.

12 A   Okay.

13 Q   Mr. Christopherson, have you watched the recorded

14 demonstrations that Dr. Weaver did showing the functionality of

15 Lawson's accused software?

16 A   Yes.

17 Q   Let's pull up PX-363.

18         MR. ROBERTSON:  I'm going object to this line of

19 questioning if we're going to be commenting -- we're going to

20 have a witness comment on the demonstrations that an expert has

21 performed.  It's inappropriate lay witness testimony.

22         THE COURT:  It seems to me like maybe it offends the

23 lay witness provision, depending upon what it is, because the

24 lay witness provision explicitly says that you can't garb lay

25 witness opinion in -- I mean expert opinion in lay witness garb

1     and get it in that way.

2            Otherwise, if he's testifying on the same subjects as

3     Dr. Weaver was testifying about, then he'd be giving expert

4     testimony, and he does not qualify.  He hasn't qualified as an

5     expert or given a report.  Why isn't it improper lay testimony?

6            MS. STOLL-DeBELL:  Because I'm simply going to ask

7     him questions about what the software does.  I am not going to

8     ask him to apply the function of the software to the claims in

9     this case.  I am merely going to go in and ask questions about

10    the demonstrations that Dr. Weaver did and how Lawson software

11    works.

12           THE COURT:  Using that exhibit.

13           MS. STOLL-DeBELL:  Yes.

14           THE COURT:  All right.

15           MR. ROBERTSON:  I still press the objection, Your

16    Honor, because I think it's improper for this witness to be

17    testifying as to what Dr. Weaver presented as an expert witness

18    in his demonstrative.

19           THE COURT:  Why don't we take it question by question

20    and see.  Now, before we get too far removed on the previous

21    question, your question -- from the previous question.  Your

22    question was, what was his opinion as to whether or not the

23    information, when it got finished with ETL, was different from

24    when it started ETL; is that right?

25           MS. STOLL-DeBELL:  Yes.

1       THE COURT:  You can ask him that question.  That was

2   an improper ruling on my part.  The question is, in your

3   opinion -- you ask the question.  You'll do better than I will.

4       MS. STOLL-DeBELL:  Maybe.

5   Q   After this information is extracted, transformed, and

6   loaded, is it different than the information that was received

7   from the vendor?

8   A   Yes.

9       MS. STOLL-DeBELL:  We can take that off now.

10  Q   If you touch the bottom left of your screen, I think you

11  can get rid of those arrows.

12      Let's pull up PX-363, and I'd like you to go to the page

13  ending in Bates number 2332.

14      THE COURT:  Of Exhibit 263?

15      MS. STOLL-DeBELL:  It's 363.

16      THE COURT:  363, and the page again?

17      MS. STOLL-DeBELL:  Ends in 2332.

18  Q   Mr. Christopherson, do you recall watching this video

19  demonstrative that Dr. Weaver put on at trial in this lawsuit?

20  A   Yes.

21  Q   Do you recall watching the one that we're looking at a

22  screen shot from right here?

23  A   Yes, I do.

24  Q   Does this screen shot show that Dr. Weaver ran a search in

25  the RSS product using Dell as a keyword?

1  A    Yes.

2         MS. STOLL-DeBELL:  And I don't know, Bill.  Maybe you

3  could blow up sort of the left-hand side of the screen.

4  Q    How many items were returned as search results for this

5  search?

6  A    It looks like there's just four, but in actuality, with

7  what you've got on the screen shot, you can't tell, and the

8  reason I say that is we've got a scroll bar on this side, and

9  my mistake for not knowing how to use a touch screen here

10 really well.  That scroll bar you notice is not going from top

11 to bottom.  There are additional items below this, so that, to

12 me, tells me that there's greater than four.

13 Q    But you can see four search results on the screen right

14 now?

15 A    Correct.

16 Q    Was this a search by vendor name?

17 A    No.

18 Q    Why not?

19 A    Well, two things.  First of all, one is that having

20 knowledge of the code, I know that with inside of RSS, you

21 cannot search by vendor name.  The actual name -- that actual

22 field in the database.  Further, we're searching off keywords,

23 and you can see the keywords on the upper right-hand side of

24 that screen, and you see item, manufacturing item, sales class,

25 and there's a variety of those.

1          THE COURT:  Where are the keywords?

2          THE WITNESS:  Keywords, Your Honor --

3          MS. STOLL-DeBELL:  We're going to have them

highlighted, Your Honor.

5    Q    Are those the keywords you were talking about?

6    A    Correct.  That's some.  Notice again there's a scroll bar

there, so you would have to go through and look at all of those

that are on the scroll bar.  So it appears there's maybe a

third of those being displayed.

10   Q    Are any of those keywords vendor name?

11   A    None of them are.

12   Q    So, you know if you scroll down, you are not going to see

vendor name as one of those keywords?

14   A    Yes, absolutely.

15   Q    Do you know whether this search found all of the items

that are being offered for sale by Dell in this item master

database?

18   A    Since you cannot search --

19         MR. ROBERTSON:  This witness didn't even do this

demonstration, so I don't know how he can possibly answer that

question.

22         THE COURT:  You are getting way off what you said you

were going to do and into what he was apprehensive you were

going to do, Ms. Stoll-DeBell.  I think we --

25         MS. STOLL-DeBELL:  May I try and lay a foundation for

1  this, Your Honor?

2          THE COURT:  I really wish you'd just ask him the

3  questions you want to ask him instead of using this other

4  thing, other demonstrative, because it confuses everybody, but

5  keep trying.

6  Q    Did you run a search on the demo laptop that has the same

7  database that Dr. Weaver used?  Did you run the same search?

8          MR. ROBERTSON:  I'm going to object, Your Honor.

9  That wasn't disclosed to us.

10         THE COURT:  That's the problem I've been

11 apprehending, is that the real basis of his testimony is an

12 undisclosed demonstration, and he's not going to be allowed to

13 do it.  I've ruled on that, and that will not happen.  So let's

14 move on, and don't ask questions that are based on that.

15 Q    Okay.  If you were putting a keyword into the search

16 query, let's say you use a vendor name --

17         THE COURT:  Let's just close this exhibit, because

18 we're not going to be talking about this again because it -- to

19 make sure we're not talking about the demonstration.  All

20 right.  Go ahead and ask the questions without reference to the

21 exhibit.  Then you're not talking about search -- I mean a

22 demonstration that he did.

23         He did a demonstration, and you didn't disclose it,

24 and if it comes out in cross-examination, we'll strike his

25 testimony, but there are general areas of information I'm sure

1    he knows that aren't based on the demonstration.

2    Q    Okay, if you were running a search in RSS and you choose a

3    keyword that happens to be a vendor's name, let's say Staples,

4    and you run that search, will you get all of the items that are

5    being sold by Staples in that database as search results?

6    A    No.

7    Q    Why not?

8    A    Staples is the vendor name.  That was key, what you said,

9    and there's a specific field that has to hold the vendor name.

10   That's called vendor name.  All these modules are linked

11   together.  The data flows from --

12           THE COURT:  I think you've answered the question.

13           THE WITNESS:  Okay, thank you, Your Honor.

14   Q    Now, is it possible to set up a user -- first of all, what

15   are user-defined fields?

16   A    Exactly what they are, user-defined fields.  The user is

17   allowed to define the use of what they want for those.

18   Q    If a user was to decide that they want to use a

19   user-defined field as vendor name, would that function the same

20   way as if Lawson had set up a vendor name field?

21           MR. ROBERTSON:  I object to that question, Your

22   Honor.  It's hypothetical and ambiguous.

23           THE COURT:  It is a hypothetical, but it doesn't make

24   it objectionable, and I don't think it was ambiguous.

25           MS. STOLL-DeBELL:  You can go ahead and answer that.

1   A     No, it would not work the same.

2   Q     And why would it not work the same?

3   A     The purchase order module is expecting, when it's going to

4   order something from a vendor, to have the vendor name not in a

5   user-defined field but rather has to be inside of the vendor

6   name field.

7   Q     So if you set up a user-defined field and you say that's

8   going to be vendor name, and I'm going to say this particular

9   item is from Staples, so I'm going to put that in my

10  user-defined field and then you run a search for an item and

11  put it into the shopping cart, will the system know that the

12  vendor is Staples and issue a purchase order to Staples?

13  A     No.

14  Q     Why not?  Can you explain that to us so we understand why

15  that's not true?

16  A     First of all, again --

17          THE COURT:  I thought he already answered it.  I

18  thought you said that the purchase order module doesn't --

19  won't take it, and therefore -- I mean doesn't recognize it

20  because it doesn't come from the vendor field that is vendor

21  name.

22          THE WITNESS:  You are correct, Your Honor.  That's

23  what I was going to say.

24          THE COURT:  He's already answered.

25          MS. STOLL-DeBELL:  I just thought it was a little

1   confusing.  I just wanted to make sure everyone understood his

2   answer.

3            THE COURT:  I thought it was fairly clear, but it

4   bothers me if you thought it was confusing.

5            MS. STOLL-DeBELL:  Now it's crystal clear.

6            THE COURT:  All right.  Let's go.

7   Q    I'm going to change topics.

8   A    Okay.

9            THE COURT:  Is this a good time for a recess?

10           MS. STOLL-DeBELL:  Sure.

11           THE COURT:  We were in here earlier before you all

12  came in at 9:30.  We were in here beginning earlier, so we're

13  going to take a morning recess of 20 minutes now.  You just

14  take your pads with you.  Thank you.

15

16                      (Jury out.)

17

18           THE COURT:  All right, we'll take a 20-minute recess.

19

20                      (Recess taken.)

21

22

23

24

25