1553

```
 1              (The jury is present.)
 2              THE COURT:  All right.
 3    BY MS. STOLL-DeBELL:  (Continuing)
 4    Q    Are you ready?
 5    A    Yes.
 6    Q    Okay.  Good.  Mr. Christopherson, is it fair to
 7    say that you know the way that Lawson's accused
 8    software works?
 9    A    Yes.
10    Q    In all of the demonstrations that you saw Dr.
11    Weaver present at trial in this case, did you ever see
12    him show multiple catalogs?
13    A    No.
14              MR. ROBERTSON:  I'm sorry.  I was a little
15    slow.  I object to this witness commenting on another
16    witness' testimony.  That's inappropriate examination.
17              THE COURT:  Why is it inappropriate?
18              MR. ROBERTSON:  Because he's characterizing
19    and commenting on what Dr. Weaver.  First, he's not an
20    expert that's been designated in this case.  Dr.
21    Weaver has provided expert opinions, and I think it's
22    inappropriate to have a lay witness come in and talk
23    about an expert's opinions.
24              I think it's inappropriate to have a lay
25    witness comment on another lay witness' testimony.
```

CHRISTOPHERSON - DIRECT          1554

1   That's not a proper relevant line of questioning.

2            MS. STOLL-DeBELL:  I'm asking him to comment

3   on how the software works.

4            THE COURT:  Your asking him to comment on

5   what another witness did.  So what's the difference

6   between asking him -- can I ask another witness does

7   he believe the other witness was telling the truth?  I

8   can't ask that, can I?

9            MS. STOLL-DeBELL:  No.

10           THE COURT:  If you're testifying, I can't ask

11  you do you believe that witness A was telling the

12  truth, can I?

13           MS. STOLL-DeBELL:  No, but I think this is

14  different because we're talking about Lawson's accused

15  software in this case.  And Mr. Christopherson does

16  know how that software works.  He's worked with it for

17  nine years.  So I'm asking him about that.

18           THE COURT:  No, you're asking him about what

19  somebody else did.

20           MS. STOLL-DeBELL:  Your Honor, I'm asking him

21  about what he saw Dr. Weaver do with the software he

22  works with.

23           THE COURT:  I know.  Your asking him to

24  comment on Dr. Weaver's testimony, right?

25           MS. STOLL-DeBELL:  What he saw the software

CHRISTOPHERSON - DIRECT          1555

1    do.  What he saw Dr. Weaver do with the software in

2    this case.

3              THE COURT:  Objection sustained.  Please

4    disregard the answer.  One witness can't comment upon

5    what another witness has testified to in that fashion.

6    BY MS. STOLL-DeBELL:

7    Q   I'm going to ask you some questions about UNSPSC

8    codes.  Okay?

9    A   Okay.

10   Q   Are UNSPSC codes used to categorize similar

11   products for use with different kinds of analysis?

12             MR. ROBERTSON:  Objection.  Lack of

13   foundation.

14             MS. STOLL-DeBELL:  I can lay a foundation.

15             THE COURT:  All right.

16   BY MS. STOLL-DeBELL:

17   Q   Do you know what UNSPSC codes are?

18   A   Yes.

19   Q   Do you work with them as part of your work for

20   Lawson software?

21   A   Yes.

22   Q   Does Lawson Software have the capability of using

23   UNSPSC codes?

24   A   Yes.

25   Q   Are UNSPSC codes used in Lawson Software to

CHRISTOPHERSON - DIRECT          1556

1    categorize similar products to be used for different

2    kinds of analysis?

3    A    Yes.

4    Q    Do they help companies analyze spending patterns?

5    A    Yes.

6    Q    Do UNSPSC codes identify generally equivalent

7    items?

8              MR. ROBERTSON:  Objection, Your Honor.  I

9    think that calls for an opinion, and it also intrudes

10   on an opinion with respect to infringement issues.  So

11   it calls for a legal conclusion.

12             THE COURT:  It calls for expert opinion, did

13   you say, or legal conclusion or what?

14             MR. ROBERTSON:  It calls for an expert

15   opinion.

16             THE COURT:  Your voice dropped off right

17   there at the end and I didn't hear it.

18             MR. ROBERTSON:  I apologize, Your Honor.

19   Yes, it's seeking a legal opinion from this witness

20   and it calls for a legal conclusion in this case.

21             THE COURT:  A legal opinion?  Why is it a

22   legal opinion?

23             MR. ROBERTSON:  Excuse me.  I misspoke.  It

24   calls for an expert opinion, Your Honor, and it seeks

25   a legal conclusion.

CHRISTOPHERSON - DIRECT          1557

1         THE COURT:  All right.  And the question was?

2         MS. STOLL-DeBELL:  The question was, Do

3    UNSPSC codes identify generally equivalent items.  I

4    don't think it calls for an expert opinion.  I'm just

5    asking him a fact about whether these codes categorize

6    generally equivalent items.  It's not an expert

7    opinion.

8         THE COURT:  It's a lay opinion.  So you're

9    asking him whether in his opinion that's what they do?

10        MS. STOLL-DeBELL:  Yes.

11        THE COURT:  Why is his opinion relevant?

12        MS. STOLL-DeBELL:  Because he works with the

13   software.  The software uses these codes.  And so he

14   can talk about what the codes do.

15        THE COURT:  You can ask him his opinion as a

16   lay person what it does.  It's up to the jury to

17   decide what weight to give to the opinion.

18        MS. STOLL-DeBELL:  Okay.

19   BY MS. STOLL-DeBELL:

20   Q   Do you understand or do you want me to ask it

21   again?

22   A   Will you ask the question again?  I think it's a

23   yes or no.

24   Q   Okay.  It might be.  In your lay opinion, do

25   UNSPSC codes identify generally equivalent items?

CHRISTOPHERSON - DIRECT          1558

1  A    No.

2  Q    Why not?

3  A    They are structured in a way that it's much like a

4  grocery store, if you would.  It kind of identifies

5  the aisle that you first are headed down.  You're

6  heading down perhaps the produce aisle.  And that's at

7  the top level, maybe even the first two digits or the

8  first four digits, and as your get further down, let's

9  take produce, for example.  Maybe you're over in the

10  vegetable area and eventually you end up with the

11  tomatoes.

12      When you get down to the fourth level, the

13  tomatoes, maybe they are the same.  Maybe they are not

14  equivalent, the same.  But there's other examples of

15  codes.

16          THE COURT:  You mean it identifies Roma

17  tomatoes and Hanover tomatoes and Fairfield tomatoes,

18  and they are not generally equivalent; is that what

19  you're saying?

20          THE WITNESS:  They may not be, Your Honor.

21          THE COURT:  Okay.

22  BY MS. STOLL-DeBELL:

23  Q    Mr. Christopherson, do you have an example of a

24  UNSPSC code that we can show the jury to put this in

25  some context?

CHRISTOPHERSON - DIRECT            1559

1  A    Yes, I do.

2         MS. STOLL-DeBELL:  Bill, can you pull up

3  Plaintiff's Exhibit 32.  And can you go to page ending

4  in 0105.

5         THE COURT:  Now you are getting him to give

6  expert testimony on UNSPSC codes.  You're asking him a

7  lot of other questions about it other than what was

8  the basis for his opinion.

9         This is what I think.  I don't think it does

10  generally equivalent because he thinks tomatoes aren't

11  the same.  That's his business.  That's his opinion.

12  But now you're moving into another area, and I think

13  this is what Mr. Robertson's objection may have been

14  to.  And if that's what it is --

15         MS. STOLL-DeBELL:  We don't know if there's a

16  UNSPSC for tomatoes.  I have no idea if there is, if

17  that's what the level is.

18         THE COURT:  He knows that.

19         MS. STOLL-DeBELL:  So I'm asking him, this is

20  just a list of codes, actual codes, and what they are.

21  I'm just going to pull it up and ask him to answer the

22  question in the context of a real code with a real

23  description as opposed to tomatoes.

24         THE COURT:  I think we've gone as far as we

25  need to go.  He's given the basis for his opinion, his

CHRISTOPHERSON - DIRECT          1560

1  lay opinion, otherwise he's getting into expert

2  opinion.  So let's just go ahead and do something

3  else.  He wasn't identified as an expert.  He hasn't

4  done a report on those codes.  So let's go.

5  BY MS. STOLL-DeBELL:

6  Q    Okay.  I'm going to ask you some questions about

7  Punchout.

8  A    Okay.

9  Q    And I'm going to ask that you put up PX 101.

10  Actually, can you go to page ending in 1265.  What is

11  this?  What does this show?

12  A    This shows RSS running and they have selected the

13  Punchout options.

14        THE COURT:  I think the more basic question

15  is:  What's the whole exhibit?  Is this something that

16  Lawson produced?

17        MS. STOLL-DeBELL:  Yes.

18        THE COURT:  Mr. Christopherson, is this a

19  document Lawson generated?

20        THE WITNESS:  It's actually a joint one

21  between Mr. Lohkamp and then also one of our

22  customers.  A power point.

23        THE COURT:  A presentation?

24        THE WITNESS:  Yes.

25        THE COURT:  In that presentation on that page

1    what's going on?

2            THE WITNESS:  On that particular one, they

3    are showing a Punchout running or they are starting

4    the Punchout application inside of the RSS.

5    BY MS. STOLL-DeBELL:

6    Q   So in this screen shot here, we're looking at

7    Lawson Software actually running this page; is that

8    correct?

9    A   Can we highlight the top because it's a bit fuzzy?

10   I would actually like to see the URL.

11        Based on that, that's actually the -- the key is

12   you get the Trinity Health Organization.  So that

13   would be actually the customer's website that the

14   screen shot is taken from.

15   Q   Okay.  Is the screen shot of Lawson's RSS

16   software?

17   A   Yes.

18   Q   Is it showing the Punchout icons that you can

19   select as part of Lawson's Punchout product?

20   A   At that particular customer site, yes.

21            THE COURT:  At what did you say?

22            THE WITNESS:  At that customer site, yes.

23            THE COURT:  Okay.

24   BY MS. STOLL-DeBELL:

25   Q   And then there's that red box that says select the

CHRISTOPHERSON - DIRECT          1562

1   supplier that you would like to order product from.

2   Do you see that?

3   A    I do.

4   Q    And do you do that by clicking on one of those

5   Punchout icons?

6   A    Yes, you do.

7   Q    If you can turn to the next page, which ends in

8   Bates No. 1266.  Is this the result of clicking on one

9   of those Punchout icons?

10  A    All I can say is it appears to be.

11  Q    Does this look like what you would see when you

12  click one of those Punchout icons?

13              MR. ROBERTSON:  Objection, Your Honor.  She's

14  asked and answered that.

15              THE COURT:  I think he said the best he can

16  say is it appears to be.

17              MS. STOLL-DeBELL:  Okay.

18  Q    Is this showing catagory searching at the Punchout

19  vendor site?

20  A    This is showing the list of categories that they

21  have on the right-hand side.  Not the right-hand.  The

22  left-hand side.

23  Q    Is this vendor software responsible for providing

24  that list of categories?

25  A    Yes.

1        MR. ROBERTSON:  Objection, Your Honor, lack

2   of foundation.

3        MS. STOLL-DeBELL:  I can lay a foundation,

4   Your Honor.

5        THE COURT:  All right.  Sustained.  Disregard

6   the answer.

7   BY MS. STOLL-DeBELL:

8   Q   Mr. Christopherson, are you familiar with the

9   operation of Lawson's Punchout product?

10  A   Yes.

11  Q   Have you demonstrated Lawson's Punchout products

12  to customers?

13  A   Yes.

14  Q   And so you know how it works; is that correct?

15  A   Yes, correct.

16  Q   So looking at a screen shot, can you tell us what

17  is going on with the Punchout product?

18  A   Yes.

19  Q   So looking at that screen shot in front of you,

20  can you tell us whose software is responsible for

21  providing this list of categories?

22        MR. ROBERTSON:  Again, Your Honor, I object.

23  That doesn't lay a foundation for him to testify as to

24  whose software is now operating.  He's looking at a

25  static page, a web page.

1   THE COURT:  I'm having trouble understanding

2   that objection given that he said this came from the

3   software of the customer.  I've forgotten the name of

4   the customer.  Why would he not be able to tell that?

5   MR. ROBERTSON:  That answer, I understood to

6   be, Your Honor, that if a customer using the Lawson

7   RSS, the customer has received it in the RSS and the

8   other core technology modules, and they are conducting

9   this Punchout search, it's not the customer's

10  software.  It's Lawson's software, which is the RSS.

11  Now he's asking about what software is running to

12  provide the information that is displayed on this page

13  that ends with the Bates label 266.  I don't think any

14  foundation has been laid as to how he would know what

15  software is operating that.

16  THE COURT:  Has he decided?  I don't

17  understand that he's got a foundation for this yet.

18  MS. STOLL-DeBELL:  Okay.

19  Q   Mr. Christopherson, Lawson's Punchout product,

20  does it require a vendor website to punch out to?

21  A   Yes.

22  Q   To work?

23  A   Yes, it does.

24  Q   Let's talk about how in the general sense how

25  Punchout works.

CHRISTOPHERSON - DIRECT          1565

1   A    Okay.

2   Q    At a high level, what does a Punchout product do?

3   A    Essentially, it establishes a communication link

4   between the customer's system, which is running Lawson

5   Software's products, and the vendor, and that link

6   happens to be a secure link.

7   Q    When you say "the vendor," do you mean the

8   vendor's external website?

9   A    Correct.

10  Q    Whose software runs the vendor's external website?

11  A    Whose software?  Can you repeat the question?

12  Q    Yes.  Whose software runs the vendor's external

13  website?

14  A    The vendor is running it.  We have no context of

15  what is there.

16  Q    Does Lawson have any control over the vendor's

17  external website?

18  A    No.

19  Q    Well, so when you look at a Punchout

20  demonstration, can you tell if you see the vendor's

21  website who is running the software for that vendor

22  website?

23  A    I can tell --

24           THE COURT:  Yes or no.

25           THE WITNESS:  Yes.

1    THE COURT:  Can you tell?

2    THE WITNESS:  I can tell.

3    THE COURT:  Now the next question is how do

4    you tell because that's the foundational question.

5  Q   How do you tell?

6  A   How do you tell?  When we open up a window, which

7  is what's occurred here, when you have selected, in

8  this case I believe it's Staples link, a brand new web

9  page is opened up.  And there's a frame put on that.

10  That frame is much like a picture frame.  In this

11  case, really closer to a digital picture frame.

12      So the outside of the frame looks like the frames

13  in any of the pictures here.  You can put a label on

14  that frame.  The label is Lawson.  We happen to put

15  our logo, our brand, always with Punchout since we've

16  come out with that product always in the upper

17  left-hand corner.

18      Everything below that is the picture.  So we have

19  created the frame, but we don't care what happens

20  inside of that picture.  At that point everything

21  below that is being run by and controlled by the

22  vendor.

23  Q   Okay.  So in this slide you can see there's a list

24  of categories?

25  A   Yes.

CHRISTOPHERSON - DIRECT                1567

1    Q    Are you saying that that is controlled by the

2    vendor?

3    A    Correct.

4    Q    And not Lawson?

5    A    Correct.

6    Q    We can go to the next page.  And within the

7    picture frame, do you see results of a search?

8    A    What I see is they have drilled down into the

9    catagory further.

10   Q    Is it the vendors software that's providing that

11   drill down of catagory?

12   A    Yes.

13   Q    And not Lawson?

14   A    Correct.

15   Q    Okay.  If we can go to the page ending in 1269.

16   It's a couple pages ahead.  What is this showing?

17   A    In this case, they have selected some paper.  And

18   you can start seeing the item description, more

19   information about that particular product.

20   Q    Is it the vendor software that's providing that

21   item description and additional detail regarding that

22   product?

23   A    Yes.

24   Q    And not Lawson?

25   A    Correct.

1    THE COURT:  In view of what you said earlier,

2  whose software is providing the whole page?

3    THE WITNESS:  The whole page, Your Honor, is

4  actually being constructed by two parties.  You've got

5  the very -- actually, three parties.  You've got in

6  this case Internet Explorer is done by Microsoft.

7  That's creating the blue bar and the borders around

8  it.  Right below that is Lawson.  So you have the

9  Lawson logo.  All we're putting up is an image of that

10  and it enters blank space.

11    THE COURT:  Whose software is being used to

12  enable me to view this?

13    THE WITNESS:  To enable you to view it?  It

14  would be Microsoft.  It's Internet Explorer in this

15  particular example.  That's the browser that's being

16  used.

17    THE COURT:  That's not what I'm asking.

18    THE WITNESS:  Sir, I didn't understand then.

19    THE COURT:  Do I have to have one of the

20  Lawson systems in order to see what's on this screen?

21    THE WITNESS:  To use Punchout, yes.

22    THE COURT:  All right.  Now I understand.

23  Thank you.

24    THE WITNESS:  It would help maybe, Your

25  Honor -- Punchout is what opens up --

CHRISTOPHERSON - DIRECT          1569

1    MR. ROBERTSON:  Your Honor, I just object.
2  The question has been answered.
3          THE WITNESS:  Okay.
4          THE COURT:  You may have objected to my
5  question.
6          MS. STOLL-DeBELL:  I think he did actually.
7  BY MS. STOLL-DeBELL:
8  Q   Okay.  Are there some of these Punchout vendor
9  websites that customers can go to without using
10 Punchout?
11 A   Can you say that again?
12 Q   Yes.  So, for example, Staples link, is that one
13 of the Punchout vendors that can be used with Lawson's
14 Punchout product?
15 A   Yes, it is.
16 Q   Okay.  Can a customer use Stapleslink.com without
17 having the Punchout product?
18 A   I do not know.
19          MR. ROBERTSON:  No objection.
20 Q   I think we're done with that line of questioning
21 so I'm going to transition again for you.
22 A   Sure.
23 Q   While you take a drink.
24 A   That's okay.  Go ahead.
25 Q   When did you first learn about ePlus' patents?

CHRISTOPHERSON - DIRECT          1570

1   A   May 10, 2009.

2   Q   Is that when you first learned about the law suit

3   that ePlus had filed against Lawson?

4   A   Yes.

5   Q   What did you do when you learned that ePlus had

6   filed suit against Lawson for patent infringement?

7   A   What I first did was I got the three patents and

8   reviewed those, read those.

9   Q   What did you think when you finished reading those

10  patents?

11          MR. ROBERTSON:  Objection, Your Honor.  This

12  is calling for a legal conclusion and it's --

13          THE COURT:  I'm sorry?

14          MR. ROBERTSON:  It's calling for a legal

15  conclusion, Your Honor, and it's not relevant.

16          THE COURT:  What did he think?  Is that the

17  question?

18          MS. STOLL-DeBELL:  Yes, what did he think.

19          MR. ROBERTSON:  It's a little vague and

20  ambiguous, too.

21          THE COURT:  Well, I think maybe that's the

22  right objection.  Sustained.

23          We have to have a more precise question to

24  understand whether it's objectionable or not.

25          MS. STOLL-DeBELL:  Okay.

CHRISTOPHERSON - DIRECT          1571

1   BY MS. STOLL-DeBELL:

2   Q   After reading the patents, did you think Lawson

3   had a problem with these patents?

4           MR. ROBERTSON:  Objection.  That's an

5   important question and that's leading.

6           THE COURT:  Well, it is.  Sustained.

7   BY MS. STOLL-DeBELL:

8   Q   What was your first reaction after reading the

9   patents?

10          MR. ROBERTSON:  Objection, vague and

11  ambiguous.

12          MS. STOLL-DeBELL:  Your Honor, I'm trying --

13          THE COURT:  I guess my basic inquiry here is

14  why is it that what he thinks is relevant?  To what

15  issue does it go that this jury has to decide?  That's

16  the question.  So just name the issue that it goes to.

17          MS. STOLL-DeBELL:  It goes to the intent

18  element of indirect infringement.  And Mr. Robertson

19  actually asked Mr. Christopherson about this same

20  topic when he put him on the stand in his case.  And

21  so it goes to that.

22          MR. ROBERTSON:  I didn't ask him anything

23  about what he thought or his reaction or anything.  I

24  just asked him if he was aware that a lawsuit was

25  filed and if he had notice since that date.

1          THE COURT:  What he thought is the irrelevant

2    to this case except with respect to the intent element

3    of indirect infringement; is that right?

4          MS. STOLL-DeBELL:  Yes.

5          THE COURT:  This information can be

6    considered by you, ladies and gentlemen, only in

7    deciding whether or not a certain element of in

8    direction infringement has been met, and that is

9    whether there was an intent to have an infringement.

10   And so you can consider it for that purpose and that

11   purpose alone.  And I'll give you some more

12   instructions later about what indirect infringement

13   is.

14          But for your purposes, you can just keynote

15   this testimony of what his reaction was goes to the

16   intent to indirectly infringe or to have indirect

17   infringement.  Excuse me.  Go ahead.

18   Q    Can you go ahead and answer the question?

19   A    Can you restate the question.  It's been awhile.

20   Q    Sure.  After you read the patents, what was your

21   first reaction?

22   A    My first reaction was that it didn't appear as

23   though we were actually doing that, the three patents.

24   Q    Why did you think it didn't appear that you were

25   doing what was in the three patents?

CHRISTOPHERSON - DIRECT          1573

1    MR. ROBERTSON:  Your Honor, now I'm going to

2    object.  This calls for a legal conclusion and an

3    expert opinion.

4    MS. STOLL-DeBELL:  Your Honor, it doesn't.

5    I'm asking him what he thought.  I'm not asking him

6    for his opinion.  I'm not asking him about the claims.

7    THE COURT:  When you asked him what he

8    thought, why isn't that asking him for an opinion?

9    MS. STOLL-DeBELL:  Well, I suppose it is a

10   lay opinion on some level, but Mr. Robertson asked him

11   what Lawson as a company did after this lawsuit was

12   filed.  And Mr. Christopherson was involved in that,

13   and I'm just trying to inquire further into the issue

14   of Lawson's intent.

15   THE COURT:  What he said was he didn't think

16   that Lawson practiced the patent.  That's what his

17   reaction was.

18   MS. STOLL-DeBELL:  Yes.

19   THE COURT:  And you want to know why he

20   thought that?

21   MS. STOLL-DeBELL:  Yes.

22   THE COURT:  You can consider that for the

23   same limited purpose, ladies and gentlemen.

24   BY MS. STOLL-DeBELL:

25   Q   Why did you think that Lawson was doing something

CHRISTOPHERSON - DIRECT          1574

1    different than what was in the patents?

2    A    Keep in mind, this is the first initial look at

3    the patents.  Some of the key things I was noticing

4    were catalogs and what I was going back to was the

5    state of where catalogs were back in the mid '90s or

6    around the time the patents were filed.  And in

7    looking at screens, for instance, and they were

8    mentioning page numbers from catalogs.  Very much like

9    a printed catalog except they turned it into an

10   electronic form.  That was the first thing.

11   Q    Why did you think that was different from what

12   Lawson was doing?

13         MR. ROBERTSON:  Objection, Your Honor.

14   There's a claim construction in this case with respect

15   to catalog, and now we're asking the lay witness to

16   opine on what his understanding of a catalog is.  It

17   doesn't have any relevancy to this case.

18         THE COURT:  You're getting into expert

19   testimony, and he wasn't qualified as an expert, and

20   what you're doing is you're offering it without a

21   report or anything.  And he's involved in in-house

22   development of the systems and knows about them, and

23   he can be qualified as a person who's an expert, but

24   he wasn't.

25         MS. STOLL-DeBELL:  Your Honor, first of all,

1   he's just testifying in his capacity as an employee

2   for Lawson.  So I don't think there was a requirement

3   for him to do an expert report.

4           THE COURT:  If he's giving expert testimony,

5   if he' testifying as an expert for Lawson, he has to

6   give a report.  I don't care whether he's an employee

7   or not.

8           MS. STOLL-DeBELL:  He wasn't professionally

9   retained to give expert testimony.

10          THE COURT:  You can't have an employee

11  professionally retained or otherwise give expert

12  testimony without a report.

13          MS. STOLL-DeBELL:  Okay.  I don't think it

14  matters because I don't think I'm asking him for

15  expert testimony.  I want to -- I think it goes to the

16  intent --

17          THE COURT:  You're just asking him whether he

18  thought Lawson did something different.

19          MS. STOLL-DeBELL:  Yes, were they different.

20          THE COURT:  Okay.  Why don't you ask him

21  that?

22  BY MS. STOLL-DeBELL:

23  Q   Did you think Lawson was doing something different

24  than the patents?

25  A   Yes.

1  Q    Did you have a meeting with your team members

2  regarding the lawsuit?

3  A    Yes.

4  Q    Did they agree with you?

5          MR. ROBERTSON:  Objection, Your Honor.

6          MS. STOLL-DeBELL:  Let me ask a better

7  question.

8          THE COURT:  Yes.  She's going to ask a

9  different question.

10 BY MS. STOLL-DeBELL:

11 Q    Did they agree with you that what Lawson was doing

12 was different than the patents?

13         MR. ROBERTSON:  Objection, Your Honor.  It

14 still calls for a legal conclusion, and it's

15 inappropriate expert testimony, and it's hearsay.

16         THE COURT:  It's sustained as hearsay.  It's

17 offered for the truth of the matter.  So it doesn't

18 have any nonhearsay use.

19 BY MS. STOLL-DeBELL:

20 Q    Was it your recommendation that Lawson not make

21 any changes --

22         THE COURT:  What did you do after this?  Ask

23 him.  Let him testify.

24 Q    What did you do after you read the patents?

25 A    I'll provided recommendation that in my belief, my

1    reading, we weren't doing that patent, first, and that

2    they didn't need to do any changes with the software

3    that was currently available.

4           MS. STOLL-DeBELL:  I have no further

5    questions right now, Your Honor.

6           THE COURT:  All right.  Cross-examination.

7

8       CROSS-EXAMINATION

9    BY MR. ROBERTSON:

10   Q    Let's start with that last topic first if we

11   could, Mr. Christopherson.

12   A    Sure.

13   Q    You did something else, didn't you, sir, besides

14   making the recommendation that no changes would be

15   made to the software?

16   A    I'm not sure what you're referring to, sir.

17   Q    Lawson went out and sought a legal opinion with

18   respect to these patents, didn't they, sir?

19          MS. STOLL-DeBELL:  Objection, Your Honor.  I

20   don't think it's appropriate to get into whether we

21   got an opinion or not.  It's not relevant.

22          MR. ROBERTSON:  It goes to the whole intent

23   issue, Your Honor, under the *Broadcomm v. Qualcomm*

24   case.

25          MS. STOLL-DeBELL:  Your Honor, it goes to

1   jury instructions that you're going to give, and I

2   think there's a disputed issue of law here on that

3   point.  And I think the law is clear that we don't

4   have to get into it.  It's just not relevant.  We

5   shouldn't be getting into this.  We have no duty to go

6   get an opinion.  And so he shouldn't be getting into

7   this.  It's prejudicial.

8          MR. ROBERTSON:  The door was opened, Your

9   Honor, when they asked him what he did and steps he

10  took.  And under the *Broadcom v. Qualcomm* case, if he

11  sought a legal opinion and then failed to disclose it,

12  that can go to the intent issue, and that's what I

13  want to ask him.

14         MS. STOLL-DeBELL:  I was going to say I asked

15  him what he thought and what he did.  I did not ask

16  him about any communications he had with any of

17  Lawson's attorneys outside or inside.  I was merely

18  asking him what he personally thought and what he did.

19  So it's outside the scope as well.

20         THE COURT:  Well, I don't think it is.  I

21  think it's fair cross-examination.

22         Just answer the question yes or no because

23  I'm going to have to take it question by question.  I

24  think what he did, whether he got a legal opinion, can

25  be considered depending on what the answer is.  If his

CHRISTOPHER - CROSS                    1579

1    answer was no, he didn't, then I'll tell the jury one

2    thing.  If the answer is yes, then I have to tell the

3    jury something else.

4           So the objection is overruled.  You may

5    answer the question whether you sought a legal opinion

6    respecting whether your products infringed.

7           MR. ROBERTSON:  Well, actually, I don't know

8    what the legal opinion says and whether it was

9    infringement, Your Honor, or was some other basis.

10          THE COURT:  All right.  You can ask your own

11   question.  Did you seek a legal opinion of any kind,

12   whatever?

13          MR. ROBERTSON:  Yes.

14   BY MR. ROBERTSON:

15   Q   I don't want to know the content of that because

16   that was privileged; however, the fact is you didn't

17   turn it over in discovery to ePlus; isn't that right?

18          MS. STOLL-DeBELL:  Objection, Your Honor.

19   That's really not relevant and it's outside the scope

20   of my direct examination and --

21          THE COURT:  I'm waiting to hear what you have

22   to say.  I thought you were conferring with Mr.

23   McDonald about what you were going to say.  And so I

24   just held everything in abeyance until you finished

25   your remarks.

CHRISTOPHER - CROSS          1580

1      MS. STOLL-DeBELL:  So I think the objection

2   is outside the scope of my direct, not relevant,

3   prejudicial.

4           THE COURT:  Why is it relevant?

5           MR. ROBERTSON:  It's relevant --

6           THE COURT:  What case?

7           MR. ROBERTSON:  *Broadcom v. Qualcomm*, Your

8   Honor.  In that case, the accused infringers --

9           THE COURT:  I'll tell you what we'll do.

10  I'll deal with this at a recess.  You can have the

11  right to come back into this area.

12          MR. ROBERTSON:  All right.  Thank you, Your

13  Honor.

14          THE COURT:  You don't have that case with

15  you, do you?

16          MR. ROBERTSON:  We actually have a brief on

17  it, Your Honor, that we can probably produce to you

18  during the lunch break.

19          MS. STOLL-DeBELL:  We've got some case law to

20  support our position, too, Your Honor, and we'll get

21  that for you, too.

22          THE COURT:  All right.

23  BY MR. ROBERTSON:

24  Q   Mr. Christopherson, just refresh me again, you are

25  director of development for the S3 application?

CHRISTOPHER - CROSS                    1581

1   A    Yes.

2   Q    How long have you had that position?

3   A    I've had this current position since December 1,

4   2008.

5   Q    But you have been with the company since 1997 as I

6   understand it?

7   A    Yes, that's correct.

8   Q    You're aware since you have been the company's

9   designated person on a number of infringement issues

10  and testified, I think, for two days in this case in

11  depositions that ePlus is accusing Lawson of

12  infringing with this S3 procurement product going back

13  to 2003; is that right?

14  A    That's my understanding, yes.

15  Q    You were here yesterday when I read the

16  stipulations the stipulated facts to the jury that we

17  understand the current version of this S3 procurement

18  product is Version 9, right?

19  A    That's correct.

20  Q    But you're also familiar there was a Version 8?

21  A    Are you referring to 803?

22  Q    Yes, 8.0.3.  Thank you.

23  A    Yes.

24  Q    So it's true that in this procurement version

25  8.0.3, I understood you to say there were three ways,

CHRISTOPHER - CROSS                1582

1    is that right, in which the item master can get item

2    data; is that right?

3    A    I gave three examples of that, yes.

4    Q    One was manual input?

5    A    Yes.

6    Q    And one was this PO 536 tool we talked about?

7    A    Correct.

8    Q    That's what you called a vendor agreement catalog

9    load; is that right?

10   A    Correct.

11   Q    So with this version 8, 0.3 which is at issue in

12   this case, there was a tool that Ms. Stoll-DeBell

13   asked you about that can actually load catalog data

14   into the item master; isn't that right?

15   A    Going through a three-step process.

16   Q    There's a tool, sir?  Can you answer that?  Yes or

17   no?

18   A    Yes.

19   Q    Called PO 536, which is the vendor agreement

20   catalog load which loads vendor item data into the

21   item master, right?  Yes or no?  If you don't agree

22   with me --

23   A    No, it does not.

24          MR. ROBERTSON:  I'd like to mark this

25   document as an exhibit unless there's an objection.

1   May I mark it as an exhibit?

2          MS. STOLL-DeBELL:  I don't know yet.

3   BY MR. ROBERTSON:

4   Q   You agree with me, however, Mr. Christopherson,

5   that this is a Lawson-authored document, correct, sir?

6   A   It appears to be.

7   Q   It's got a Bates label on the bottom that begins

8   LE, do you see that?

9   A   That's correct.

10  Q   You don't have any question that this is an ePlus

11  document, do you, sir?  It's talking about Procurement

12  8 Series workshop, right?

13  A   I'm pretty confident this is not an ePlus

14  document, correct.

15  Q   Take a look at the second page of this document.

16  A   Sure.

17  Q   It says, Vendor agreement -- actually, I'm sorry.

18  Let's look at the title first.

19         MR. McDONALD:  Your Honor, this hasn't been

20  admitted yet.  So it should not be up on the screen.

21         MR. ROBERTSON:  That's fine.  Again,

22  yesterday --

23         THE COURT:  I'm sorry, but I thought you said

24  you didn't mind it being an exhibit.  Maybe I

25  misunderstood what you said.

1     MS. STOLL-DeBELL:  I said I needed to look at

2  it, Your Honor.

3     THE COURT:  All right.  I'm sorry.  I just

4  didn't hear you.  Now that you looked at it, he said

5  he'd like to use it as an exhibit if you have no

6  objection.  Have you had a chance to look at it and

7  what's your answer?

8     MS. STOLL-DeBELL:  I think I just want to

9  know whether there's a foundation with this witness to

10  talk about this document.

11     THE COURT:  All right.

12     MS. STOLL-DeBELL:  If he can do that, I don't

13  object.

14  BY MR. ROBERTSON:

15  Q   You talked about on direct examination this vendor

16  agreement catalog tool, correct?

17  A   Correct.

18  Q   You're familiar with it, sir, as the director of

19  product development, correct?

20  A   Correct.

21     MR. ROBERTSON:  So I'd like to move its

22  admission, Your Honor.  It would be Plaintiff's

23  Exhibit No. 521.

24     MS. STOLL-DeBELL:  Your Honor, I don't know

25  that he's established that this witness has ever seen

1  this document before.

2          THE COURT:  Excuse me.  I thought he just

3  said you're familiar with this in your role as product

4  development director, and the witness said yes.

5          MS. STOLL-DeBELL:  I understood the testimony

6  to be he's familiar with this procedure in the Lawson

7  Software, not that he's --

8          THE COURT:  Well, ask him the question that

9  he's familiar with it.

10 BY MR. ROBERTSON:

11 Q   You're familiar with the procedure for doing this

12 vendor agreement import for price agreements, right?

13 A   Correct.

14         MR. ROBERTSON:  I move the admission of PX

15 521, Your Honor.

16         THE COURT:  Have you looked at this document?

17 Is it a Lawson document?

18         THE WITNESS:  Two questions to answer, Your

19 Honor.  I've not seen this document before.  I don't

20 know if it's a Lawson agreement was my earlier

21 testimony.  It appears to be is what I had said.

22         THE COURT:  All right.

23         MR. ROBERTSON:  I'd like to move its

24 admission, Your Honor.  There's no question as to its

25 authenticity.  It was produced by Lawson.  And we have

1   a stipulation, Your Honor, that if the document's

2   produced, it's authentic.

3          THE COURT:  Why don't you just ask him some

4   questions, and we'll see if it helps him understand

5   it.

6          MS. STOLL-DeBELL:  I don't think he's ever

7   seen this document before.  So I object on the basis

8   of foundation.

9          THE COURT:  Well, he can look at the document

10  and see if what's in there helps him understand

11  Mr. Robertson's questions.

12  BY MR. ROBERTSON:

13  Q   So on this vendor agreement import process, it was

14  new for Version 8.0.3, right?

15  A   That's incorrect.

16  Q   Why don't you look at the page in that document.

17  There's a heading that says, Vendor agreement import

18  new for 8.0.3.  Do you see that?

19  A   That's correct.

20  Q   The next bullet point says, A process to load

21  vendor item information into the Lawson system so that

22  items will be available for purchase and cost

23  defaulting in the requisition and purchase order

24  systems.  Do you see that?

25  A   That is correct.

CHRISTOPHER - CROSS                1587

1    THE COURT:  Well, he sees it.  Do you mean

2    that's correct?

3    The right way to do this is to ask him is

4    this process a process to load vendor item

5    information, etc., and ask him substantively is it

6    correct.  And if he says no, ask him to look at this

7    and see if it helps inform his answer.

8    MR. ROBERTSON:  Let me do it this way, Your

9    Honor, if I could, but thank you for the guidance.

10   BY MR. ROBERTSON:

11   Q   You're familiar with what are called release notes

12   when new versions of Lawson Software comes out,

13   correct?

14   A   That's correct.

15   Q   In fact, one of the stipulations yesterday was

16   that Lawson distributes to its customers and others

17   when a new version of the Lawson Software comes out,

18   they tell you, Here's what the new features are going

19   to be; isn't that right?

20   A   That's correct.

21   Q   That's the purpose of the release notes, right?

22   A   That's correct.

23   Q   So isn't it true with this version 8.0.3, you

24   introduced a new vendor catalog load feature, the new

25   functionality has been added to electronically load a

1  vendor file which can contains a vendor item, an unit

2  of measure, and a unit price information into the

3  purchase order application, didn't you, sir?

4  A    Can you say that again, sir?

5  Q    Yes.  With the version 8.0.3 that we're talking

6  about that's at issue in this case, Lawson distributed

7  release notes that a new feature called a vendor

8  catalog load was going to add functionality that has

9  been added to electronically load a vendor file which

10  contains vendor item, unit of measure, and unit price

11  information into the purchase order application,

12  correct?

13  A    I don't recall what the 8.0.3 release notes would

14  have said.

15  Q    Why don't we see if we can refresh your

16  recollection.

17  A    Sure.

18  Q    Now, this is a Lawson document, correct, sir?

19  A    It does appear to be that, yes.

20  Q    And it's concerning 8.0.3, correct?

21  A    Yes.

22  Q    And it's called "purchase order release notes,"

23  correct?

24  A    That's correct.

25  Q    And it's talking about Procurement Suite updates,

CHRISTOPHER - CROSS          1589

1  correct?

2  A    Uh-huh, yes.

3  Q    I want you to turn to the next page, sir.

4  Actually, let me go back to the first page.  I

5  apologize.  Under new features and benefits, the first

6  sentence there states, "The following table outlines

7  the major features and functionality that are new in

8  the 8.0.3 version of purchase order."  Do you see

9  that?

10 A    That's correct.

11 Q    And purchase order is one of the modules that's at

12 issue in this case, correct?

13 A    That is correct.

14 Q    Why don't you take a look at the next page where

15 it says one of the new features is the vendor catalog

16 load?

17 A    Yes.

18 Q    Are you with me on that?

19 A    I am.

20 Q    It states there under a description new

21 functionality has been added to electronically load a

22 vendor file which contains vendor item, unit of

23 measure, and unit price information into the purchase

24 order application.  Do you see that?

25 A    I do.

1  Q    Does that refresh your recollection that this new

2  functionality was added with respect to 8.0.3 when

3  this release note came out?

4  A    This reflects -- it does help refresh my memory

5  about these particular release notes, yes.

6          THE COURT:  That wasn't the question.  The

7  question was:  Does it refresh your recollection that

8  the new functionality has been added to electronically

9  load a vendor file which contains vendor item, unit of

10 measure, and unit of price information into the

11 purchase order application?  Does it refresh your

12 recollection on that point?

13         THE WITNESS:  Yes, it does.

14         THE COURT:  All right.  And did it?

15         THE WITNESS:  Did it do what?

16         THE COURT:  Did it do what it said in that

17 first sentence that you've been talking about?

18         THE WITNESS:  Yes, it did, Your Honor.

19         THE COURT:  All right.  Let's go.

20 BY MR. ROBERTSON:

21 Q    The next bullet point says, Item 3 identifies how

22 a Lawson item number should be created when adding the

23 catalog item to the item master.  Do you see that?

24 A    Yes.

25 Q    Those are the terms you used, the catalog item,

1    isn't that right, when you made this new release note

2    for Version 8.0.3?

3    A    That's a term that was used by the technical

4    writer.

5    Q    You're not trying to run away from "catalog," are

6    you, sir?

7    A    No.  You did ask me "did you use that term," and I

8    did not use that term.

9    Q    I'm sorry.  It was an indefinite pronoun.  Did

10   Lawson use "catalog item" when it did these release

11   notes?

12   A    Yes, it did.

13   Q    On this import process?

14   A    Yes.

15   Q    It's the vendor that are provides the item catalog

16   in a CSV format; is that right?

17   A    That's correct.

18   Q    The vendor discloses or makes known that item

19   information in that CSV format, correct?

20   A    Discloses to whom?

21   Q    The customer.

22   A    To the customer, yes.

23   Q    And Lawson in this vendor import agreement process

24   calls that vendor information "item catalog

25   information," right?

1  A    That's correct.

2  Q    And you would agree with me that that item catalog

3  information disclosed by the vendor or the supplier

4  through a vendor agreement import process ends up in

5  the item master, correct?

6  A    Say that again.

7  Q    Yes.  The vendor or the supplier who provides this

8  item catalog information to the customer can be

9  imported through this process we're talking about

10  here, this vendor agreement import, into the item

11  master?

12          MS. STOLL-DeBELL:  Objection to form of the

13  question.  It's unclear.

14          MR. ROBERTSON:  I'll rephrase, Your Honor.

15          THE COURT:  All right.

16          MS. STOLL-DeBELL:  I think he talked about a

17  supplier being loaded in.

18          MR. ROBERTSON:  I'll rephrase the question.

19  BY MR. ROBERTSON:

20  Q    The vendor that has provided the catalog item

21  information in a CSV format ends up through this

22  process in the item master; isn't that right?

23          MS. STOLL-DeBELL:  Objection.  The vendor --

24  the question is unclear.

25          THE COURT:  Are you asking whether the vendor

CHRISTOPHER - CROSS          1593

1   ends up in the item master?

2          MR. ROBERTSON:   No.

3          THE COURT:   That's what her objection is and

4   I think it's well taken.

5          MR. ROBERTSON:   Let me rephrase then.

6          THE COURT:   It's the item that ends up there,

7   I think.

8   BY MR. ROBERTSON:

9   Q    The vendor provides the item catalog information

10  that ends up in the item master; isn't that right?

11  A    That is some of the information that ends up

12  there.

13  Q    Why don't you take a look at this vendor import

14  price agreement again.   Let me see if I can refresh

15  your recollection on the process.   If you would look

16  at the page that ends 428.

17  A    Sorry about that.   I was in the wrong document.

18  Q    That's all right.   Take your time.   Do you see

19  that page is entitled, Vendor agreement import?

20  A    That's correct.

21  Q    And in the first box, it says, Vendor provides

22  item catalog in CSV format.   Do you see that?

23  A    That's correct.

24          MS. STOLL-DeBELL:   Your Honor, he hasn't

25  asked him if this refreshes his recollection, and the

CHRISTOPHER - CROSS                1594

1    witness has already testified that he hasn't seen this

2    document before.

3              MR. ROBERTSON:  I was just about to ask that

4    question since I just directed him to it.

5              THE COURT:  All he said is that's what it

6    says.

7              MS. STOLL-DeBELL:  He should ask him that

8    before he reads from the document and then ask the

9    witness to testify.

10             MR. ROBERTSON:  I had to use the document to

11   refresh the witness' recollection.

12             THE COURT:  Yes, you can.  Objection to that

13   part of the process is overruled.

14   BY MR. ROBERTSON:

15   Q    So it says here --

16             THE COURT:  Just ask him.

17   Q    Does this refresh your recollection that the

18   vendor provides item catalog in CSV format?

19   A    Yes.

20   Q    When you were talking about your ETL process, one

21   of the things you talked about was an extraction.  Do

22   you recall that?

23   A    Correct.

24   Q    You said you could have a CD or a DVD and you even

25   said a flat file, and that's when you identified the

1  term CSV, correct?

2  A    Yes.

3  Q    Can you tell the jury again what a CSV file is?

4  A    CSV is basically a comma separated values.

5         THE COURT:  C-o-m-m-a?

6         THE WITNESS:  Yes.

7  Q    And those values that are being separated is data

8  with respect to the catalog item; isn't that right?

9  A    It starts out that way, yes.

10 Q    And that was disclosed or made known to the

11 customer by the vendor, right?

12 A    Correct.

13 Q    And in this page that we're looking at here now,

14 428, you'll see that there is a series of arrows

15 pointing to other boxes, and at the very end there's a

16 database, I believe.

17       Would you agree with me that that's what's being

18 characterized there?

19 A    Some sort of a data repository, yes.

20 Q    In there, it says, Create item master vendor item

21 records, do you see that?

22 A    Correct.

23 Q    So this through this chart, Lawson is showing a

24 customer how this vendor item catalog information that

25 it disclosed or made generally known ends up in this

1  database that is creating the item master and

2  containing vendor item records, correct?

3  A    At a very high level, yes.

4  Q    And in this imported file, which is this comma

5  separated value format, there are certain required

6  fields, correct?

7  A    That's correct.

8  Q    One of the required fields is a vendor item

9  number; isn't that right, sir?

10 A    Correct.

11 Q    And one of the required fields is a vendor item

12 description, correct?

13 A    Correct.

14 Q    And one of the required fields is a unit of

15 measure; isn't that right?

16 A    Correct.

17 Q    And one of the required fields is a unit price;

18 isn't that right?

19 A    Correct.

20 Q    If you turn to the page that ends 431, there are a

21 number of fields there.  Are you comfortable now with

22 this exhibit that it is describing the vendor import

23 price agreements at a high level?

24 A    It appears to be, yes.

25          MR. ROBERTSON:  Your Honor, then I would move

CHRISTOPHER - CROSS          1597

1    admission of this document.

2              THE COURT:  Any objection?

3              MS. STOLL-DeBELL:  No.

4              THE COURT:  All right.  It's admitted as

5    what?

6              MR. ROBERTSON:  I think it's Plaintiff's

7    Exhibit No. 521.

8              THE CLERK:  521?

9              MR. ROBERTSON:  Yes, sir.

10             (Plaintiff's Exhibit No. 521 is admitted into

11   evidence.)

12   BY MR. ROBERTSON:

13   Q   If you will turn to the page -- actually, why

14   don't we, now that it's admitted, let's go back and

15   take a look at that page I was talking about, which

16   ends with the Bates label 428.

17   A   Okay.

18   Q   So we've agreed that this item catalog information

19   is disclosed or made known by a vendor.  That's the

20   first box.  And I understood you to agree with me that

21   this sort of barrel-shaped thing at the bottom, that's

22   a database, correct?

23   A   Correct.

24   Q   So you go through phase 1 where the Lawson

25   Software reads the CSV file from the vendor to create

1    a vendor agreement, correct?

2    A    That's correct.

3    Q    And we go through this phase 2, mark or unmark a

4    subset of vendor items for inclusion in the vendor

5    agreement, right?

6    A    That's correct.

7    Q    If it's a new item, it goes over and it's

8    indicated as yes to phase 3, import marked vendor

9    items for inclusion on vendor agreement, correct?

10   A    That's correct.

11   Q    And then it ends up in the item master there where

12   it says, Create item master vendor item records,

13   right?

14   A    That's correct.

15   Q    Let's go to the page we talked about that has

16   required fields which ends at 430.

17   A    Ends at 430?

18   Q    The Bates label that ends with 430, sir.  Now,

19   it's talking about what actually was imported in that

20   file, right?  I asked you about whether these were

21   required fields.

22   A    It could.  I've not seen this before, so give me a

23   chance to look at it.  You've obviously had that

24   chance.

25   Q    That's fair.

CHRISTOPHER - CROSS          1599

1    A    Yes.   Okay.

2    Q    Just confirm for us that you agreed with me when I

3    asked you whether all four of these things were

4    required fields, correct?

5    A    Correct.

6    Q    If you turn to the next page, there's additional

7    fields, isn't there?

8    A    That's correct.

9    Q    One of the fields in this importing vendor

10   catalogs into the item master is, in No. 2, a vendor

11   item description.   Do you see that?

12   A    Correct.

13   Q    And it's described as the vendor's item

14   description, right?

15   A    That is correct.

16   Q    That is who disclosed or made generally known that

17   description, right?

18   A    That's correct.

19   Q    The next one is a vendor item number.   Do you see

20   that, number 3?

21   A    Uh-huh.

22   Q    It's the vendor identification code for the item;

23   isn't that right?

24   A    That's correct.

25   Q    The vendor made generally known or disclosed that

1    information when it provided this catalog data,

2    correct?

3    A    That's correct.

4    Q    The next one is UOM, do you see that, sir?

5    A    Correct.  Yes, I do.

6    Q    That's the unit of measure, right?

7    A    That is, yes.

8    Q    That's one of the required things the vendor had

9    to do, right?

10   A    Yes.

11   Q    The next one is the item cost.  Do you see that?

12   A    Yes, I do.

13   Q    That's also one of those required things that the

14   vendor had to make known or generally available to the

15   customer in order for this to be loaded into the item

16   master, correct?

17   A    Correct.

18   Q    The next one is a Lawson item number, okay?  Do

19   you see that?

20   A    Yes.

21   Q    So now Lawson can create its own item number for

22   that, right?

23   A    Correct.

24   Q    But you can also have a field for a universal

25   product code, correct?

1  A    Correct.

2  Q    You can also have a field for stock-keeping units;

3  isn't that right?

4  A    Correct.

5  Q    Go down to No. 12.  Do you see there they have

6  manufacturer item number?

7  A    Yes, I do.

8  Q    That's also information the vendor can provide

9  that can then be imported into the item master,

10  correct?

11  A    That's correct.

12  Q    And talked a little about these UNSPSC codes?

13  A    Correct.

14  Q    No. 16 talks about the -- actually, let me

15  rephrase.  You're familiar with that UNSPSC code,

16  right?

17  A    Right.

18  Q    It's a hierarchy to drill down to try and identify

19  products, correct?

20  A    Correct.

21  Q    And yesterday I asked you if that could be used in

22  order for cross-referencing products, and I think you

23  agreed with me.  Do you mean that?

24  A    That was not yesterday.  Two days ago, but yes.

25  Q    Okay.  Sorry.  They're starting to blur together.

CHRISTOPHER - CROSS          1602

1    I appreciate that.

2        It also has a field for the UNSPSC family.  Do you

3    see that?

4    A    Correct.

5    Q    Now, if you turn to the next page.  There's a

6    black box around those four required fields there.  Do

7    you see that?

8    A    Correct.

9    Q    So what's being emphasized here is this black box.

10   These are the required fields, but all these other

11   fields are available, right?

12   A    Fair.  We don't understand the content, but that

13   appears to be it, yes.

14   Q    But these are the fields that are available in

15   this import process; isn't that right?

16   A    These are the fields that are available?

17   Q    That can be filled with catalog item data?

18   A    These are for the fields, yes.

19   Q    Why don't you turn to the next page.

20           THE COURT:  Wait a minute.  Is everything

21   listed on that page an available field?

22           THE WITNESS:  Correct.

23           THE COURT:  Including the four that are

24   bracketed.

25           THE WITNESS:  Yes.

1    BY MR. ROBERTSON:

2    Q    I think you said earlier when we were talking

3    about -- I think I made an objection as to what fields

4    we were talking about.

5    A    Sure.

6    Q    And the Court asked the question:  Are they

7    between 0 and 100?

8    A    Right.

9    Q    These are the fields we're talking about, right?

10   A    Absolutely.

11   Q    Well, the next page that's now ending with 433

12   also has a field that can be completed for UNSPSC

13   class, right?

14   A    Correct.

15   Q    And then the next field that can be completed is

16   for UNSPSC commodity, right?

17   A    That's correct.

18   Q    If you drop down a little bit, there's a number of

19   user defined alpha fields.  Do you see that?  That's

20   on 24 through 28 are user defined alpha fields,

21   correct?

22   A    Uh-huh.

23   Q    If you look over, it says, This is a client

24   defined alphanumeric field.  Do you see that?

25   A    Yes, I do.

CHRISTOPHER - CROSS                1604

1    Q    So alphanumeric means you can use the alphabet to

2    describe something or identify it or you can use

3    numbers, right?

4    A    Correct.

5    Q    You can use both?

6    A    Correct.

7    Q    There are at least five available user defined

8    fields for that purpose isn't that right?

9    A    For alphanumeric, yes.

10   Q    One of the things I can put in that field, isn't

11   it, sir, is the vendor name?

12   A    You could put the vendor name there, yes.

13   Q    If I put the vendor name in there, I come search

14   in the Lawson system by vendor name; is that right?

15   A    You're searching for the alpha field.

16   Q    If I'm searching in that alpha field, and it has

17   the vendor name, I could search by vendor name,

18   correct?

19   A    You would get back those entries, yes.

20   Q    Those vendors?

21   A    Yes.

22   Q    That I put in that user defined field?

23   A    Correct.

24   Q    Could you just go to the page that ends with 437.

25   That actually is identifying this vendor price

1   agreement import system as PO 536, which you indicated

2   was the catalog load, right?

3   A    Correct.

4   Q    Why don't you go to the second to last page of

5   what is now Plaintiff's Exhibit 521.

6   A    Bates number on that?  477?

7   Q    477, yes, it is.

8   A    Okay.

9   Q    Do you see there's referenced at the bottom --

10  actually, I'm sorry.  Let me just start over and lay a

11  better foundation.  This is a screen shot; is that

12  right?

13  A    Yes.

14  Q    And it's at a web address, an URL, of

15  HTTP://support.lawson.com, correct?

16  A    That's correct.

17  Q    That's a Lawson website?

18  A    Yes.

19  Q    And we're looking here at a page on the Lawson

20  website for customer support?

21  A    That's correct.

22  Q    And one of the things it says here under chapter

23  6, Importing vendor price agreements, are you with me?

24  A    Importing -- okay.  Got it.  Yes.  Chapter 6, yes,

25  Importing vendor price agreements.

CHRISTOPHER - CROSS          1606

1    Q    And it states underneath there, "With more

2    business being conducted electronically, you," and you

3    understand you to be the customer, right?

4    A    Correct.

5    Q    "You may have a need to load vendor information in

6    your Lawson application.  The vendor agreement import

7    process lets you automatically load vendor pricing

8    information and create item master and purchase order

9    vendor item records," do you see that?

10   A    Right.

11   Q    That's an accurate statement, correct?

12   A    That's correct.

13   Q    The heading below that says, Purchase order 8.0.3

14   release notes.  Do you recall we talked about those

15   release notes earlier?

16   A    Yes.

17        MR. ROBERTSON:  Your Honor, I'd like to move

18   those release notes as Plaintiff's Exhibit 522.

19        THE COURT:  Any objection?

20        MS. STOLL-DeBELL:  No, Your Honor.

21        THE COURT:  It's admitted.

22        (Plaintiff's Exhibit No. 522 is admitted into

23   evidence.)

24   BY MR. ROBERTSON:

25   Q    It's states under that heading, Purchase order

1   release notes, 8.03, purchase order release notes 1,

2   8.0.3, purchase order release notes.  Let me focus on

3   what I want to get here.

4       This document contains release notes for the

5   purchase order application for 8.0.3, 28.0.3, purchase

6   order, purchase notes, purpose order release notes,

7   vendor catalog load, correct?

8   A    Correct.

9   Q    Now, there's another way for the item master to

10  get vendor catalog data into the -- excuse me.

11  There's another procedure that Lawson employs to get

12  catalog data into the item master, isn't there?

13  A    Correct.

14  Q    One of those processes is an EDI transaction;

15  isn't that right?

16  A    You're talking about which transaction type?

17  Q    EDI 832?

18  A    Correct.

19  Q    So you know if a Lawson customer, for example, has

20  that EDI Lawson module available to it as part of its

21  procurement process, it can use that EDI 832

22  transaction, right?

23  A    832 transaction gets it to the front door, yes.

24  Q    And getting in through the front door in order to

25  get into that item master, you can get a price catalog

1  file; isn't that right?

2  A   You do get a file, yes.

3  Q   It's a catalog file, isn't it, sir?

4  A   Correct, yes.

5  Q   All right.  And that price catalog file can

6  contain data such as the vendors item description,

7  correct?

8  A   Correct.

9  Q   Vendor identifier?

10  A   Correct.

11  Q   The price?

12  A   Correct.

13  Q   The unit of measure?

14  A   Correct.

15  Q   And the vendor's catalog number, correct?

16  A   Correct.

17  Q   And the vendor can send the user the vendor price

18  agreement import program, this vendor catalog we've

19  been talking about, in a CSV file that contains a

20  catalog of all the items the vendor can sell the user;

21  isn't that right?

22  A   It could.

23  Q   Do you have any doubt about that?

24  A   I have no doubt that they can do it, yes.

25  Q   In fact, customers who have the EDI module that

1   you sell use that EDI 832 to import catalog data,

2   don't they?  You are familiar with that?

3   A   Yes, I am.  Which catalog data are you referring

4   to?  The whole catalog?

5   Q   Well, it can be the whole catalog, can't it?

6   A   It could be the whole catalog.

7   Q   And it could be part of the catalog, right?

8   A   Correct.

9   Q   So it could be the entirety of the catalog or some

10  subset of the catalog, right?

11  A   Right.

12  Q   The customer having this EDI 832 module has the

13  capability of importing an entire vendor catalog into

14  the item master, right?

15  A   It has that capability as you're defining it, yes.

16          MS. STOLL-DeBELL:  I'm going to object.  It's

17  outside the scope of direct.

18          THE COURT:  Overruled.

19          MS. STOLL-DeBELL:  Your Honor, I didn't even

20  get into EDI at all.

21          MR. ROBERTSON:  She asked him about the

22  manners and the way the data was imported.

23          THE COURT:  He testified as to three manners

24  of getting data in, and now he's testifying to a

25  fourth that you didn't ask him about, but the opening

1    of the three opens the door to the fourth, and the

2    fourth includes the EDI.  So I think the questioning

3    line is well taken.

4    BY MR. ROBERTSON:

5    Q   All right, sir.  In this EDI 832 process, you can

6    also get catalog items that give, among other

7    information, the cost of the item and the date on

8    which that cost becomes effective, right?

9    A   Correct.

10   Q   An then the vendor price agreement import program

11   can take that information and put it into the user's

12   purchasing database, correct?

13   A   Correct.

14   Q   This 832 catalog sales catalog import, that

15   transaction can be set up to provide for customary and

16   established business and industry practice relative to

17   furnishing or requesting the price of goods or

18   services in the form of a catalog; isn't that right,

19   sir?

20   A   That is one of the purposes of 832, yes.

21   Q   And that would also include the item

22   identification?

23   A   Yes.

24   Q   And the product item description?

25   A   Yes.

CHRISTOPHER - CROSS                    1611

1      MR. ROBERTSON:  Your Honor, I'd like to show

2   the witness another document, if I could.

3   Q   This is a Lawson document; is that right, sir.

4   A   Yes.

5   Q   And you recognize this, sir?

6   A   I do not.

7      MS. STOLL-DeBELL:  Your Honor, I'm going to

8   object.  These are all Lawson documents.  They were

9   produced during discovery.  They should have been on

10   the exhibit list and --

11      THE COURT:  He can cross-examine from things

12   that aren't on the exhibit list, but he can't get them

13   into evidence unless you agree.

14      MS. STOLL-DeBELL:  Your Honor, I think he can

15   use them for impeachment, but this isn't impeachment

16   testimony.  He's asking about documents that should

17   have been on the exhibit list, and they're not.

18      THE COURT:  That doesn't have anything to do

19   with whether it's impeachment or not.  The correct way

20   to do it is ask him a question first.  Don't be

21   getting the document in.  Ask him the question.  Then

22   ask him an impeaching question if you've got one.

23   BY MR. ROBERTSON:

24   Q   Would you agree --

25      MS. STOLL-DeBELL:  These are new exhibits.

CHRISTOPHER - CROSS                    1612

1    THE COURT:  They are not new exhibits because

2    they haven't been admitted, and he erred in handing

3    out the document before he asked the question.

4    MR. ROBERTSON:  I apologize, Your Honor.

5    THE COURT:  So turn the document over.

6    Forget about the document, Mr. Christopherson.  And

7    he's going to ask you a question, and then we may go

8    somewhere, but who knows.

9    As my colleague Judge Williams says, let's

10   abide that event.  All right.

11   BY MR. ROBERTSON:

12   Q   This EDI 832 price and sales catalog process for

13   importing catalog data, that would provide us with

14   item identification information and product and item

15   description, right?

16   A   Correct.

17   Q   And I may have asked this already, but it also can

18   provide you with a unit of measure?

19   THE COURT:  You asked him all those before.

20   MR. ROBERTSON:  I don't think I asked him

21   with respect to EDI, but I asked him with respect to

22   the other import process.

23   Q   You could have unit of measure through this EDI

24   transaction process?

25   A   Right.

CHRISTOPHER - CROSS                1613

1    Q    And you could have the price, too?

2    A    Correct.

3    Q    All right.  That's fine.  That's all I have with

4    respect to that.

5              THE COURT:  See, the document never came in.

6    BY MR. ROBERTSON:

7    Q    Now, are you familiar with the PO 25 vendor

8    catalog load changes?

9    A    No.

10   Q    Well, do you agree that the vendor catalog load

11   process automatically loads item and vendor item

12   information into the Lawson system?

13   A    Say that again.

14   Q    That the vendor catalog load process automatically

15   loads item and vendor item information into the Lawson

16   system?  Do you agree or disagree with that statement?

17             MS. STOLL-DeBELL:  Your Honor, I object.  I'm

18   not sure what he's talking about.  He just said he

19   wasn't familiar with it.  So I don't know if he's

20   moved on.

21             THE COURT:  He said he wasn't familiar with

22   something else, and then he changed the question and

23   asked something else.

24             MS. STOLL-DeBELL:  Okay.

25   BY MR. ROBERTSON:

1    Q    Do you need the question read back to you, sir?

2    A    Yes.

3    Q    All right.  The vendor catalog load process

4    automatically loads item and vendor information into

5    the Lawson system.  You would agree with that

6    statement, correct?

7    A    I have no basis to agree or disagree with it.

8    Q    Does that refresh your recollection that that's

9    one of the vendor catalog load processes purposes?

10   A    I may have been confusing it with PO 25.  So if

11   you could go back and re-read your question again.

12   Q    Is there a vendor catalog load process that

13   automatically loads item and vendor item information

14   into the Lawson system?

15   A    Process, yes.

16   Q    And it will create a vendor agreement, an item in

17   the item master, item file, and a vendor item,

18   correct?

19   A    Correct.

20   Q    In this vendor agreement import process?

21   A    Uh-huh.

22   Q    This CSV file, I believe you have identified, that

23   has the vendor's catalog information, it can contain

24   all the items from a vendor's catalog or only specific

25   items that are included in a negotiated contract; is

1    that right?

2    A    That's correct.

3    Q    Now, Lawson also gives training to its customers,

4    you understand that, right, on how to use its software

5    systems?

6    A    I know they do provide training, yes.

7    Q    And they provide customers with training on how to

8    do this vendor agreement import process to

9    automatically load vendor pricing information and

10   create an item master and purchase order vendor item

11   records, correct?

12   A    I do not know if they provide that specific

13   training.

14   Q    Let me show you another document and see if I can

15   refresh your recollection.

16           THE COURT:  Point him to the page and tell

17   him where to read and see if it refresh his

18   recollection after he looks at the document.

19   Q    This is entitled, Web-based training library?

20   A    It is.

21   Q    There is a web-based available training library

22   for Lawson's customers for this software?

23   A    I could not tell you.  I do not know.

24   Q    Let's turn to the page that ends with the Bates

25   label 108.

CHRISTOPHER - CROSS                    1616

1   A    108?

2           MS. STOLL-DeBELL:  Your Honor, I object to

3   this whole line of testimony.

4           THE COURT:  Don't object to anything yet.

5   Oh, you object to as outside the scope?

6           MS. STOLL-DeBELL:  Yes.

7           THE COURT:  Since we don't have a question,

8   can I wait until I get a question before I rule on

9   that?

10          MS. STOLL-DeBELL:  Sure.

11          THE COURT:  Okay.

12  BY MR. ROBERTSON:

13  Q    Let me direct you to the page that ends 108.

14  We're talking about the vendor agreement import,

15  Version 8.0.3, do you see that?

16  A    Yes, I do.

17  Q    It says, "Course details," do you see that?

18  A    I do see that.

19          THE COURT:  Just have him read it to himself.

20  Q    Will you read it to yourself, sir.

21          THE COURT:  And don't say anything.  Just ask

22  him if reading it helps refresh his recollection.

23  Because if it doesn't, then that's it.

24          MR. ROBERTSON:  Understood.

25          THE COURT:  The question, as soon as he asks

CHRISTOPHER - CROSS                1617

1   it, don't answer anything because she's going to

2   object.

3           THE WITNESS:  Okay, Your Honor.

4   A   Okay.

5   Q   Does this refresh your recollection that Lawson

6   provides a web-based training course to its customers

7   concerning the vendor agreement import process?

8           THE COURT:  Don't answer.

9           MS. STOLL-DeBELL:  I object.  This is outside

10  the scope.  I didn't ask anything about training.

11          THE COURT:  I don't remember anything about

12  training at all, Mr. Robertson.  Did she ask anything

13  that you can tell me about?

14          MR. ROBERTSON:  She asked how did the

15  customers load the item catalog database and pointed

16  to this PO 536 tool for vendor agreements and catalog

17  load.  I want to understand how the customers know how

18  to do that.

19          THE COURT:  All right.  I understand.

20  Overruled.  The door is open.

21          Does it refresh recollection about whether

22  they provide a web-based training course that does

23  what, Mr. Robertson?

24  Q   That does what you've just read here in this

25  document that ends with the Bates label 108, sir?

CHRISTOPHER - CROSS                    1618

1   A    It's not freshing of memory on it.

2   Q    You have no reason to doubt that Lawson offers --

3              THE COURT:   That's enough.   If it doesn't

4   refresh his memory, that's the end of that line of

5   questioning.

6              MR. ROBERTSON:   Can you put up your

7   demonstrative again, please?

8              THE COURT:   Which demonstrative?

9              MR. ROBERTSON:   I'm sorry.   The only one that

10  was used with the witness.

11             THE COURT:   Item information changes.   Can

12  somebody do that?

13             MS. STOLL-DeBELL:   Yes.

14  BY MR. ROBERTSON:

15  Q    Okay.   At the top of this item information

16  changes, the first box you put there is vendor gives

17  the information to the customer, is that right, after

18  they change it into an electronic format like a CSV

19  file you've been talking about?

20  A    That's correct.

21  Q    So that vendor item information on your chart is

22  published at some point in time because it was made

23  generally known to the customer; isn't that right?

24  A    It was --

25             MS. STOLL-DeBELL:   Objection.   Generally

1  known to one person?  I mean, I don't think he's using

2  the ordinary meaning of "generally known."  Objection

3  to the form of the question.

4  BY MR. ROBERTSON:

5  Q   Is it generally known to your customers?

6         THE COURT:  Overruled.

7  A   What's the question again?

8  Q   Yes.  This vendor information that's put in

9  electronic format like we've been talking about, this

10 catalog CSV that the vendor can provide, in your chart

11 is given to a customer, correct.

12 A   That's correct.

13 Q   So it's made generally known by publishing it to

14 that customer at some point in time; isn't that right?

15         MS. STOLL-DeBELL:  Objection.  It calls for a

16 legal conclusion.  Now we're using "publishing."  He's

17 asking questions --

18         THE COURT:  Do you think you can improve on

19 that objection?

20         MS. STOLL-DeBELL:  I can, yes.

21         THE COURT:  Okay.  Go ahead.

22         MS. STOLL-DeBELL:  I am objecting to question

23 because he's using the word "publishing."  He's

24 objecting to the same kind of questioning that I asked

25 and he objected to me.

CHRISTOPHER - CROSS                    1620

1    THE COURT:  So that's sort of under the rule

2    of what's sauce for the goose is sauce for the gander,

3    right?

4            MS. STOLL-DeBELL:  Yes, Your Honor.

5            MR. ROBERTSON:  I understood, Your Honor,

6    that the question was he was able to answer in his

7    understanding.

8            THE COURT:  Well, he was.  And he's probing

9    the understanding.  He was given the right to answer

10   as to his understanding.  But you didn't ask the

11   question as to his understanding.  You asked the

12   question in an objectionable form, and her objection

13   is sustained.

14   Q    Let me ask it based on your understanding.

15   A    Correct.

16   Q    This is a chart that you created, right?

17   A    That is correct.

18   Q    And in this chart, you're saying that the vendor

19   gives this electronic format, which we've identified,

20   for example, as this CSV catalog file, gives that

21   information to the customer, okay.  Is that right?

22   A    That's correct.

23   Q    So in your lay person understanding, by giving

24   that information, is it disclosing it to the customer?

25   A    It's disclosing that to the customer.

CHRISTOPHER - CROSS                1621

1    Q    And it's making it generally known to the

2    customer, right?

3    A    It's making it known to that customer, yes.

4    Q    You can load lots of catalog item data in this

5    item master, can't you, sir?

6    A    Define "lots."

7    Q    For example, Mr. Matias testified, he's from

8    Robert Wood Johnson that he had 36,000 items in his

9    item master, right?

10   A    That's correct.

11   Q    From 3,000 vendors.  You were in the courtroom

12   when that testimony was played?

13   A    I don't recall the exact numbers.

14   Q    It was thousands?

15   A    Yes.

16   Q    And the Lawson procurement system has that ability

17   to load thousands of items from thousands of vendors,

18   right?

19   A    Thousands of items from thousands of vendors?

20   Q    Yes.

21   A    So you're going to be saying tens of millions?

22   Q    Well, it can have at least we know from the record

23   36,000 items can be loaded into it from 3,000 or so

24   vendors, right?

25   A    Cumulative, yes.

CHRISTOPHER - CROSS                1622

1    Q    Do you know what upper limit there is on the

2    number of items?

3    A    It would depend on the field length of the item

4    number that Lawson has, and I don't recall what that

5    was, but that's in one of the previous slides, I

6    believe, that we looked at.  It may have been.

7    Q    Could it be more than 100,000 items?

8    A    Could be.

9    Q    Could it be more than 10,000 separate vendors?

10   A    Yes.

11   Q    And Lawson's procurement system, even it's core

12   procurement system out of the box, has that

13   capability, right?

14   A    Correct.

15   Q    You were asked whether or not Lawson sells

16   computers, right?

17   A    Correct.

18   Q    But you do sell services, right, sir?

19   A    Correct, services for the software that we sell.

20   Q    And services for the software that's at issue in

21   this case, right?

22   A    Correct.

23   Q    And one of the services you sell is you implement

24   the software modules and applications that are accused

25   in this case on the servers, the computers of your

CHRISTOPHER - CROSS                    1623

1    customers, right?  You've done that, sir, right?

2    A    I have not, no.

3    Q    But the company does it?

4    A    Yes.

5    Q    And the company makes a lot of money from doing

6    that, don't they?

7    A    I actually do not get into any of the financials

8    on that.

9    Q    But you know that the company does that as one of

10   its regular practices; isn't that right?

11   A    Correct.

12   Q    And the software that we're talking about is

13   intended to be used on computers, right?

14   A    All software is intended to be used on computers.

15   Q    Right.  I mean, they're not doorstops or bookends.

16   They are intended to run on computers, right?

17   A    One hopes so.

18   Q    And Lawson knows that when it's implementing it on

19   the customers' computers, right?

20   A    That's correct.

21   Q    And these implementations, we know, for loading

22   this software that's at issue in this case can take

23   months, can't it?

24   A    It can, yes.

25   Q    It can take up to a year sometimes, can't it?

CHRISTOPHER - CROSS                     1624

1   A    Which particular software?

2   Q    The software that's accused in this case, this

3   procurement software.

4   A    Generally, it's not going to take a year to do

5   that.

6   Q    Did you see the deposition testimony of Blount

7   that said it took seven months to load the software?

8   A    Correct.

9   Q    That's not a typical, is it?

10  A    Seven months, not atypical, but also you have to

11  look at the full product set that they were probably

12  putting in.  It may go beyond just the accused

13  products.

14  Q    You talked a lot about the item master table.  You

15  are familiar with the vendor item table, correct?

16  A    The vendor item table?

17  Q    Yes.

18  A    Yes.

19  Q    In that table there's a vendor identification,

20  right?

21  A    Correct.

22  Q    And I understood you to say that there can be

23  communication among these modules, right?

24  A    There is, yes.

25  Q    You're familiar with the table that's the

CHRISTOPHER - CROSS                    1625

1    POITEMVEN?

2    A    POITEMVEN?

3    Q    Yes.  That's the vendor item table?

4    A    That's what it is, yes.  That's the computer name

5    for it.

6    Q    That's where that vendor item identification can

7    be, right?

8    A    Correct.

9    Q    That's also where you can have price information?

10   A    Yes.

11   Q    And the item number there serves to link the item

12   record to the ITEMMAST table; is that right?

13   A    That's now the communication occurs, yes.

14   Q    And the ITEMMAST table is the item master table;

15   isn't that right, sir?

16   A    Correct.

17   Q    And so between those two tables you can link the

18   item information that we've been talking about that's

19   in the item master table to the vendor information

20   that's provided in the vendor item table, right, sir?

21   A    Correct.

22   Q    You heard Mr. Niemeyer, the source code expert,

23   testify exactly to that, didn't you?

24   A    That's the way relational databases work.

25   Q    Exactly.  Do you have the exhibit notebook that

1   you were handed by Ms. Stoll-DeBell?

2   A    Sure.

3   Q    If you'd look at Plaintiff's Exhibit 361.

4   A    Okay.

5   Q    Specifically, if we go to -- just to fresh the

6   jury's recollection.  This was screen shots from the

7   demonstration of the Lawson requisition system; is

8   that right?

9   A    That's correct.

10  Q    And this is not RSS, this is just the requisition

11  module we're talking about, right?

12  A    I have not looked through all the slides, so --

13  Q    Let's go to the page that ends with the Bates

14  label 255.

15  A    Okay.  255?

16  Q    Yes, sir.

17  A    Okay.

18  Q    Now, this is a screen shot of the Lawson

19  requisition module as it appears to the user when they

20  are using it.  Do you see it says RQ 10.1 at the top?

21  A    I do see that, yes.

22  Q    This isn't requisition self service, this is just

23  the requisition module?

24  A    This is one program within that module, yes.

25  Q    What we see here is a item description, isn't that

1  right?  Right in the middle, sir?

2  A   All I see right now is fuzzy.  But it appears to

3  be something there, yes.  Item description, yes.

4  Q   Would it help --

5  A   Oh, okay.

6          THE COURT:  Can you read it?  If you can't,

7  you don't have to testify about it.

8          THE WITNESS:  I can read it now that he's

9  highlighted it, yes.

10  Q   It says, Item description, Dell Dimension 8100,

11  correct?

12  A   Correct.

13  Q   And that item description was disclosed or made

14  generally known by the vendor in this instance,

15  correct?

16  A   I would say probably not.

17  Q   Well, it came from that vendor, didn't it?

18  A   I would say that the first few words, yes.

19  Q   Okay.  And the unit cost is there, too.  Do you

20  see that?  Up on the upper right?

21  A   Right.

22  Q   That cost, that pricing information, you said

23  comes from the vendor, correct?

24  A   That's correct.

25  Q   And at the bottom under the item description

1    there's a vendor item and there's a number there,

2    right?

3    A    That's correct.

4    Q    That vendor item comes from the vendor as well,

5    correct?

6    A    That's correct, yes.

7    Q    That's all I have with that notebook, sir.

8    A    Okay.

9    Q    You were asked questions concerning Plaintiff's

10   Exhibit No. 101.  This was involving a procurement

11   Punchout.  Do you see that?

12   A    Yes.

13   Q    I think you identified that this was a Lawson

14   document, right?

15   A    I identified it as a joint document between Lawson

16   and Trinity Information Services.

17   Q    This was some presentation that was being made to

18   Trinity?

19   A    I would say -- I cannot say I have no idea who the

20   audience was.

21   Q    But you recognized the document when you were

22   asked about it on direct examination by Ms.

23   Stoll-DeBell, correct?

24   A    That's correct.

25   Q    And Mr. Lohkamp, he was the product strategist who

CHRISTOPHER - CROSS                1629

1    testified here a few days ago?

2    A    That is correct.

3    Q    Will you go to the page that ends with the Bates

4    label 239?  There's a page concerning Lawson

5    requisition self service.  That's this RSS application

6    we've been talking about?

7    A    Correct.

8    Q    I'm going to ask you some questions that are

9    represented in this document, Plaintiff's Exhibit 101.

10   Is it true that it's a web-based user interfaced with

11   a familiar shopping looking field?

12   A    Yes.

13   Q    And you can have shopping lists for frequently

14   ordered items?

15   A    That's correct.

16   Q    And you have the ability to request off catalog

17   items and services?

18   A    Correct.

19   Q    And you can integrate it with Lawson procurement

20   and Procurement Punchout, right?

21   A    Correct.

22   Q    And one of the benefits that Lawson is identifying

23   here as to this procurement application is that it

24   eliminates manual paper-based requisitioning by

25   providing web-based end user template-based

1  requisitioning and workflow approval leading to faster

2  order cycle times, increased standardization and

3  reduced costs, correct?

4  A    That is correct.

5  Q    That's one of the benefits of having this kind of

6  procurement software over the old fashioned

7  paper-based procurement process, right?

8  A    That's correct.

9  Q    Like every invention, you want it to be doing to

10 do something fast, better cheaper?

11         MS. STOLL-DeBELL:  Objection, Your Honor.

12         THE COURT:  Sort of.

13         MR. ROBERTSON:  I'll withdraw the question,

14 Your Honor.

15         THE COURT:  Yes, I think so.

16 Q    Turn to the next page, sir.

17 A    Sure.

18 Q    You see the representation there under Lawson

19 Procurement Punchout?  You can seamlessly browse from

20 Lawson's requisition self service to vendor websites.

21 Do you see that?

22 A    Yes.

23 Q    That's an accurate statement, right?

24 A    Yes.

25 Q    Seamlessly, right?

CHRISTOPHER - CROSS                1631

1    A    You have to define what seamlessly means.

2    Q    This is your document.  Do you have an

3    understanding of what "seamlessly" means?

4    A    It's not my document, sir.

5    Q    Well, it's a Lawson document.  Lawson was

6    representing that the process is seamless, right?

7    A    Well, we know --

8    Q    Lawson was representing that --

9            THE COURT:  You know, it would have just been

10   sufficient to have left the question where it was

11   because he already answered it was seamless and then

12   you get into it.

13           MR. ROBERTSON:  I'll move on, Your Honor.

14   BY MR. ROBERTSON:

15   Q    When the Lawson system punches out to the Punchout

16   creating the partner's catalog, you remain connected

17   to the Lawson system; is that right?

18   A    Say that again.

19   Q    Yes.  When the Lawson system punches out to the

20   Punchout creating the partner's catalog, you remain

21   connected to the Lawson system, correct?

22   A    Correct.

23   Q    Let's take a look at the page that ends with Bates

24   label 261, if we could.

25           So here's the representation of this RSS Punchout

1    process flow.  Do you see that?

2    A    I see it, yes.

3    Q    So this is saying how we're going to navigate

4    through this process to build our shopping cart and

5    then pull it back as a requisition and make purchase

6    orders; isn't that right?

7    A    Give me a chance to review it.

8    Q    Sure.

9    A    Okay.  At a very high level, yes.

10   Q    So at this high level, Lawson is representing that

11   the first step is that Lawson requesters use this RSS

12   screen to punch out to external vendors, correct?

13   A    That is correct.

14   Q    So then the Lawson requester is presented to the

15   externals vendor's website to search and add items to

16   the vendor's shopping cast.  The shopping cart is

17   being checked out and submitted, right?

18   A    That's correct.

19   Q    Then the shopping cart contents are returned back

20   to Lawson RSS, right?

21   A    Right.

22   Q    Then the requester checks out their RSS shopping

23   cart and requisition is sent for approval, right?

24   A    Correct.

25   Q    Once the requisition is approved, the purchase

CHRISTOPHER - CROSS                1633

1    order, the PO there, is created by PO 100.  That's

2    accurate, right?

3    A    That's correct.

4    Q    Then the purchase order can be sent to the vendor

5    using the Lawson EDI module, right?

6    A    It can be, yes.

7    Q    When the Lawson system was doing that, you

8    remained connected to the Lawson system at all times;

9    isn't that right, sir?  Didn't you testify to that in

10   your deposition?

11   A    It's connected, yes.

12   Q    You were asked about page 265, sir.  If you could

13   turn to that.  Now, there's some questions about where

14   the software was running on this in this Punchout

15   demonstration.  Let me just ask you, this was a joint

16   presentation by Lawson and Trinity Information

17   Systems, right?

18   A    Correct.

19   Q    So it's operating, as you can tell, I think you

20   pointed to it, sir, the URL address is Trinity Health

21   Organization, right?

22   A    That is correct.

23   Q    But after where it says TrinityHealth.org/, it

24   says "Lawson/portal," right?

25   A    It does say that, yes.

CHRISTOPHER - CROSS                    1634

1    Q    So it's using the Lawson portal to be able to

2    access this data that appears here on this web page?

3    A    On this screen, yes, absolutely.

4    Q    And there are four vendors here, correct?  There's

5    HP.  There's Standard Register.  There's Corporate

6    Express, and there's Grainger; is that right?

7    A    That's correct.

8    Q    So the Trinity customer using RSS and Punchout

9    from their computer has access this page to select the

10   product catalog it wants to search, right?

11   A    That's correct.

12   Q    When a customer such as Trinity -- excuse me.  Let

13   me just make it generic.  When a customer asks Lawson

14   to provide them with access to a Punchout trading

15   partner, Lawson provides that service for them, right?

16   A    Can you state that again?

17   Q    Sure.  If a customer comes to Lawson and says that

18   I've got RSS, and I've got Punchout, and I want the

19   following 10 vendor catalogs to be available to me,

20   lawson will make that happen?  They'll facilitate it,

21   right?  It's one of the services you provide?

22   A    We don't actually facilitate.  The customer has to

23   have contract with those providers.

24   Q    If the Court has a contract with that provider,

25   and they came to you, and they say, Will you put these

1  10 vendor catalogs on the system, Lawson provides that

2  service, right?

3  A   Lawson will type in the appropriate characters

4  that need to be in filled in the configuration file.

5  Q   Right.  Then it has to do those communication

6  protocols that Mr. Lohkamp talked about in order to

7  have a handshake with that vendor catalog; isn't that

8  right?

9  A   That's correct.

10 Q   At least here we see we have four catalogs that we

11 can click on, is that right, to access the catalog

12 content, right?

13 A   That's correct.

14 Q   And one of those catalogs there is from Grainger.

15 Do you see that?

16 A   That's correct.

17 Q   Grainger is a Lawson Punchout trading partner,

18 correct?

19 A   Yes.

20 Q   And Grainger actually is a catalog that has

21 multiple catalogs within it.  You are familiar with

22 that, right, sir?

23 A   I'm not very familiar with Grainger itself.  I

24 know it is a Punchout provider.

25 Q   You don't know if it has multiple vendor catalogs

1   within it?

2   A    I do not.

3   Q    What you've indicated here, for example, is that

4   we're selecting the vendor catalog that we want to go

5   to; isn't that right?

6   A    Correct.

7             MR. ROBERTSON:  Your Honor, if I may just

8   take one minute to check my notes.

9             With the exception of that one follow-up

10  question I wanted to have, Your Honor, with respect to

11  the issue you're aware of, I'll -- subject to that,

12  Your Honor, I'm finished with the witness.  Thank you.

13            THE COURT:  All right.

14            THE COURT:  Do you have any redirect?

15            MS. STOLL-DeBELL:  Yes.

16            THE COURT:  How long is your estimate?

17            MS. STOLL-DeBELL:  My estimate is maybe 20

18  minutes.  We have that issue we need to resolve, too.

19  So --

20            THE COURT:  I think probably this is a good

21  time for you-all to take a lunch break.  And we're not

22  trying to hold you captive while you're here, so we're

23  not going to get you lunch.  You can go ahead and find

24  someplace to eat, get out and enjoy the fresh air and

25  stretch your legs a little bit.

CHRISTOPHER - CROSS          1637

1    Give your notepads to Mr. Neal.  He'll hold

2    them for you during the lunch recess.

3        (The jury is out.)

4        THE COURT:  Have you got some case law for

5    me, both of you?

6        MR. ROBERTSON:  I've got this *Broadcom v.*

7    *Qualcomm* case, Your Honor.

8        THE COURT:  Do you have cases for me, Ms.

9    Stoll-DeBell?  Did you have case law for me?

10       MS. STOLL-DeBELL:  Your Honor, there are

11   cases cited in here that I think are relevant.

12       THE COURT:  Cited in where?

13       MS. STOLL-DeBELL:  Cited in the *Broadcom* case

14   that I think Mr. Robertson just handed you.

15       THE COURT:  Where in the *Broadcom* case is

16   this dealt with?

17       MS. STOLL-DeBELL:  So, Your Honor, there's a

18   case out of the Federal Circuit called *Knorr-Bremse*

19   and it talks about how there should not be a negative

20   inference drawn from a party's decision not to waive

21   the attorney-client privilege and not to disclose it

22   to opposing counsel.

23       THE COURT:  What part of *Broadcom* are you

24   talking about?

25       MR. ROBERTSON:  I'm trying to find it right

1    now, Your Honor.

2          MS. STOLL-DeBELL:  At page 10, Your Honor, in

3    the left-hand column in the sort of first full

4    paragraph is the citation to the *Knorr-Bremse* case,

5    and I can give this to you if you'd like.

6          THE COURT:  Wait a minute.  Page 10?

7          MS. STOLL-DeBELL:  Yes, it says --

8          THE COURT:  Page 10 of what he handed me?

9          MS. STOLL-DeBELL:  Well --

10         THE COURT:  Because I don't see it here.

11         MS. STOLL-DeBELL:  We'll find it in his copy.

12         MR. ROBERTSON:  Your Honor, what I'm

13   referring to starts at page 13 under headnote 16 where

14   it starts talking about inducement.  We're not

15   offering it.  And, Your Honor, the Knorr-Bremse case

16   just talks about the jury can't draw an adverse

17   inference that the failure turn over an opinion of

18   counsel meant they were willful.  Willfulness is not

19   even before the Court.

20         What was going on in this case was that the

21   failure to turn over the opinion was relevant to the

22   issue of intent.  And it starts out at headnote 16,

23   "While inducement requires more than just intent to

24   cause the acts that produce direct infringement, it

25   also requires that the alleged infringer knowingly

CHRISTOPHER - CROSS                1639

1   induced infringement and possessed specific intent to

2   encourage another's infringement.  This intent may be

3   established through circumstantial evidence.

4   Moreover, the requisite intent to induce infringement

5   may be inferred from all circumstances.

6          *Qualcomm* stresses that it did obtain opinions

7   of counsel regarding the invalidity of the patents.

8          THE COURT:  Where is this?

9          MR. ROBERTSON:  I'm sorry.  It's at page 13.

10          MS. STOLL-DeBELL:  I think his copy is

11   missing a page, and that's why we're having so many

12   problems finding it.  We have a full copy of the case

13   here.

14          MR. ROBERTSON:  I'm at page 13 now and you

15   have page 13.

16          THE COURT:  I have a page 12 on my copy.

17          MS. STOLL-DeBELL:  Do you?  Mr. Robertson,

18   did you not give us page 12?

19          THE COURT:  He deliberately withheld page 12

20   because that's where the key holding is.

21          MR. ROBERTSON:  Let me share it, Your Honor,

22   if we could in the spirit of cooperation.

23          Here on page 12, it says, Qualcomm argues,

24   however, that the District Court erred in allowing

25   inducement verdicts to stand in light of its

1    instruction to consider failure of opinion of counsel

2    as a factor in determining whether *Qualcomm* had the

3    requisite level of intent to induce infringement of

4    Broadcom's patents.

5         Qualcomm's argument essentially rests on the

6    proposition that Seagate altered the standard for

7    establishing the intent element of inducement.

8    Qualcomm contends that in Seagate we abandoned the

9    affirmative duty of care to avoid infringement and

10   reemphasized that there was no affirmative obligation

11   to obtain an opinion of counsel.  And because specific

12   intent is a stricter standard than the objective

13   recklessness standard adopted in Seagate, evidence not

14   probative of willful infringement cannot be probative

15   of specific intent to induce infringement.

16        That is, Qualcomm argues that opinion of

17   counsel evidence is no longer relevant in determining

18   the intent of the alleged infringer in the inducement

19   context.  We disagree.

20        They went on to allow that evidence to go in

21   that there was an opinion of counsel that was withheld

22   for that specific intent, Your Honor.

23        THE COURT:  Where does that appear?

24        MS. STOLL-DeBELL:  Your Honor, I think that

25   quote he was just talking about, it was referring to a

1   failure to obtain an opinion of counsel.  We obtained

2   them.  We elected not to waive the privilege.  And I

3   think our concern here -- well, we have a couple of

4   concerns.  One is there is --

5           THE COURT:  Wait before you do that.  Where

6   do they actually, in the part you were reading in

7   headnote 16 and following, where do they actually deal

8   with what happened in this case, Mr. Robertson?

9           MR. ROBERTSON:  Your Honor, I'm sorry.  Can

10  Mr. Strapp address this issue because I didn't have

11  the case in front of me?  It was pulled while I was

12  making the argument.

13          MR. STRAPP:  Your Honor, the case is slightly

14  different than the facts here.  There was an opinion

15  that was obtained regarding validity in that case.

16  There was no opinion obtained regarding infringement.

17          The opinion regarding validity was not turned

18  over.  And the question was whether the circumstances

19  surrounding this opinion of validity that was not

20  turned over and the failure to obtain an opinion on

21  infringement all together could be considered as part

22  of the totality of the circumstances for the indirect

23  infringement.

24          So it's slightly different here where there

25  is an opinion that's been obtained.  We don't know

1   whether it's on infringement or validity or both, but

2   it hasn't been turned over.  And the case stands

3   generally for the proposition that opinions of

4   counsel, whether it's for infringement or whether it's

5   for validity or both, and whether or not those

6   opinions have been turned over can be considered as

7   part of the intent prong of the indirect infringement.

8          THE COURT:  Where does it say that?

9          MR. STRAPP:  Well, Your Honor, Qualcomm's

10  position was that it couldn't.  The fact they hadn't

11  obtained an infringement opinion and that they had

12  obtained a validity opinion, but not turned it over,

13  couldn't be considered, and, therefore, the jury

14  instruction that had been submitted was incorrect.

15         THE COURT:  But that was on the issue of

16  willfulness.

17         MR. STRAPP:  Well, Your Honor, specifically.

18         THE COURT:  That's precisely what the

19  instruction says on page 12.

20         MR. STRAPP:  Your Honor, actually the

21  instruction went both to -- there was an instruction

22  on willfulness, and an instruction -- the specific

23  instruction that's at issue in this case was an

24  instruction on indirect infringement.

25         THE COURT:  Where is it?

1    MR. STRAPP:  Your Honor, it's at the bottom

2  of page 13 on the left column.

3    THE COURT:  Because opinion of counsel

4  evidence along with other factors may reflect whether

5  the accused infringer knew or should have known that

6  its actions would cause another to directly infringe,

7  we hold that such evidence remains relevant to the

8  second prong of the intent analysis.

9    MR. STRAPP:  Yes, Your Honor.

10    THE COURT:  Well, what evidence were they

11  talking about?  What the opinion was or the failure

12  provide it?

13    MR. STRAPP:  Your Honor, it was --

14    THE COURT:  Or failure to get it?  Excuse me.

15    MR. STRAPP:  It was the failure to obtain an

16  non-infringement opinion in that case.

17    THE COURT:  Okay.

18    MS. STOLL-DeBELL:  Your Honor --

19    THE COURT:  Just a minute.

20    MS. STOLL-DeBELL:  Okay.

21    THE COURT:  Okay.

22    MS. STOLL-DeBELL:  Okay, Your Honor.  If

23  we're looking at the totality of the circumstances and

24  this issue of whether we chose to waive privilege or

25  not comes into evidence, I think it is highly relevant

CHRISTOPHER - CROSS                1644

1  to look at the evidence of the reexams as well.

2           THE COURT:  Wait a minute.  Just quit

3  bringing that reexam up.

4           MS. STOLL-DeBELL:  Your Honor --

5           THE COURT:  I don't want to hear about it

6  anymore right now.  I'm dealing with your objection to

7  the allowing the opinion in or the failure to disclose

8  the opinion in.  That's what I want to hear right now.

9  I'll deal with the other at some other time if it's

10 pertinent, but I certainly don't want to hear it as

11 part of this.

12          MS. STOLL-DeBELL:  Okay.  Going to this

13 issue, we did not fail to get opinions.  We got them.

14 We made a choice, as is our right, to not waive the

15 privilege on them and not disclose them to ePlus'

16 counsel.

17          I think this case is dealing with failure get

18 an opinion.  Mr. Strapp said that as well.  So that's

19 the first issue.

20          The second is I think it's very prejudicial

21 because we have no duty to go get an opinion.  The

22 case law says that.  The case is cited in here.  So by

23 talking about whether we got an opinion or not implies

24 to the jury that we had a duty and an obligation to

25 get one, which we did not.

1    THE COURT:  No, it doesn't imply that you had

2  an obligation.  Particularly, if the jury is told you

3  have none.  The question is:  What's the probative

4  value of an opinion that you failed to disclose?  Is

5  that probative of whether you knew or should have

6  known that your actions would cause another to

7  infringe?

8    MS. STOLL-DeBELL:  I think it's of minimal

9  probative value, Your Honor, if at all.

10    THE COURT:  Wait a minute, Mr. Strapp.

11    MS. STOLL-DeBELL:  We got opinions of

12  counsel.  We elected not to waive privilege on them,

13  Your Honor, and that's of very minimal probative value

14  as to whether we knew or should have known that there

15  was indirect infringement in this case.  I further

16  think that --

17    THE COURT:  You get an opinion and you choose

18  not to disclose that opinion, you can't use the

19  opinion of counsel to help yourself out, but can you

20  use the failure to use the opinion, and they use the

21  failure to use the opinion as evidence that you should

22  have known you were going to cause somebody else to

23  infringe is the issue.  Isn't that the issue?

24    MS. STOLL-DeBELL:  Yeah, I think so.  I think

25  the issue framed proves why it's so prejudicial

1  because it implies that the opinion was bad or the

2  opinion was negative and that's why we elected not to

3  disclose it.

4          So it gets into the substance of that, and it

5  also invades the attorney-client privilege, Your

6  Honor.  Asking these questions infers there was a

7  reason that we don't disclose it and that reason must

8  be bad, otherwise we would have.

9          MR. STRAPP:  Your Honor, that's specifically

10  what the case said.  It could be considered as part of

11  the totality of the circumstances as circumstantial

12  evidence, this opinion of counsel, decision whether or

13  not to disclose it.  We don't know what it said.

14          THE COURT:  Where does it say that?

15          MR. STRAPP:  The contention of *Broadcom* was

16  that -- it's this is on page 11, the second paragraph.

17  The first full paragraph.  The contention of *Broadcom*,

18  one of the parties here, as testified in the federal

19  circuit, is that opinions of counsel remain relevant

20  to the intent inquiry of our inducement precedent.

21  And Seagate addressed neither the admissibility of

22  evidence inserting an alleged infringer's failure to

23  obtain non-infringement opinions nor the standard for

24  establishing intent to induce infringement.

25          So the issue here is that we're dealing with

CHRISTOPHER - CROSS                1647

1   the totality of the circumstances test.

2          THE COURT:  Has there been any court holding

3   by the Federal Circuit or any District Court that says

4   that when they obtain an opinion and fail to disclose

5   an opinion on infringement, that the failure to

6   disclose is admissible as proof of the intent part of

7   the induced infringement equation?

8          MR. STRAPP:  My understanding is that there's

9   no valid federal circuit case specifically on that

10  point.  This is the closest analogous case.

11         THE COURT:  So I'll be the first person so to

12  hold; is that right?

13         MS. STOLL-DeBELL:  Your Honor, he was reading

14  what *Broadcom's* contentions were, not what the Court

15  held.

16         THE COURT:  I understand.  And he said that.

17         MR. STRAPP:  Your Honor, I do believe there

18  are one or two district court cases that actually

19  address this issue.

20         THE COURT:  What are they?

21         MR. STRAPP:  I'm trying to get that for you.

22         MR. ROBERTSON:  Your Honor, we do have a

23  bench brief on this.

24         THE COURT:  Where is it?

25         MR. ROBERTSON:  We're trying to pull it up on

CHRISTOPHER - CROSS                  1648

1  the computer.  Can we bring it back after the lunch

2  break?

3            MS. STOLL-DeBELL:  We haven't had an

4  opportunity to see it either, Your Honor.

5            THE COURT:  Why do you need an opportunity to

6  see it or even respond to it, Ms. Stoll-DeBell?  Come

7  on.

8            All right.  We'll take the lunch recess at

9  this time.  And you get me the information and get it

10  to them during the lunch recess.

11            MR. ROBERTSON:  We'll do that, Your Honor.

12            THE COURT:  All right.

13            (Lunch recess taken.)

14

15

16

17

18

19

20

21

22

23

24

25