1          THE COURT:  All right, Ms. Stoll-DeBell, your

2    redirect.

3          MS. STOLL-DeBELL:  Can you put up PX-521, and let's

4    go to page ending in 0428.

5

6                    REDIRECT EXAMINATION

7    BY MS. STOLL-DeBELL:

8    Q    ePlus counsel asked you some questions about the PO 536

9    process for loading vender item information into the item

10   master; is that correct?

11   A    That's correct, yes.

12   Q    And that process, is that shown here in this diagram from

13   PX-521?  Is that what process is shown?

14   A    Which process are you referring to?

15   Q    The PO 536 process.

16   A    That's correct.

17   Q    And I believe you testified that that PO 536 process was

18   new in version 8.0.3 of Lawson software; is that correct?

19   A    Yes.

20   Q    What was new about the PO 536 process?

21   A    Essentially it took existing programs that we had and made

22   them more streamlined for the customers.

23   Q    Was there anything that was old about the PO 536 process?

24   A    Some of the programs that it actually utilizes existed.

25   Some of them were modified.  I don't have the complete list of

1    what all changed with it.

2    Q    Did the PO 536 process include some old functionality?

3         MR. ROBERTSON:  Your Honor, I'm going to object to

4    this.  In a sense, there's been several rulings by the Court on

5    this.  We're not going there.  So I would think my objection

6    would be that it pertains to a ruling the Court has already

7    made with respect to this.

8         THE COURT:  I think I understand what he's talking

9    about.  We've been at this a long time, so we speak somewhat

10   elliptically.  On these matters, you don't need to be worried

11   about.  It's just whether it comes into evidence, but you can't

12   trench on that ruling, and it sounds like you're getting there.

13   And that's what his apprehension is.  I understand it.  How

14   much further do you plan to go?

15        MS. STOLL-DeBELL:  One or more two questions, Your

16   Honor.

17        THE COURT:  What is the substance of them?

18        MS. STOLL-DeBELL:  I think I answered your question.

19        THE COURT:  You did.

20        MS. STOLL-DeBELL:  Okay.

21        THE COURT:  I didn't ask the right question.  I don't

22   know that this necessarily does entrench on the ruling, Mr.

23   Robertson, but you can hear each question as it goes, and we

24   will see.

25        MR. ROBERTSON:  Thank you, Your Honor.

1          THE COURT:  All right, go ahead, Ms. Stoll-DeBell.

2    Q    Was it possible to load vendor information into item

3    master in the versions of Lawson's software before version

4    8.0.3?

5          MR. ROBERTSON:  Objection, Your Honor.

6          THE COURT:  Sustained.

7          MS. STOLL-DeBELL:  Your Honor, before you sustain it,

8    he opened the door and asked about this being new.  He brought

9    up the concept of 8.0.3 being new and opened the door for me to

10   inquire into what was new and what was old.

11         THE COURT:  I don't think it did, but to the extent

12   that it did, it opens -- it's been answered as far as we're

13   going to go.  Otherwise, then we get into another issue which

14   I've already ruled on and which both for relevance and 403

15   reasons I have kept out, among others, so let's go ahead.

16   Q    Can you download information for all of the items from a

17   vendor's catalog into the item master database?

18   A    No.

19   Q    Why not?

20   A    First of all, it's -- to get them in, you're going to use

21   the PO 536 process or program really.  It's not a process, it's

22   a program.  You have to have the correct formatted CSV file.

23   That is -- that particular file format is one that Lawson

24   created.  So the probability that a vendor is actually using

25   the same format, pretty low.

Christopherson - Redirect                                          1652

1   Q    So do you need to use --

2            THE COURT:  Wait just a minute.  I don't think that

3   answered the question.  The question is not the probability of

4   doing it.  The question, her question was could it be done;

5   isn't that what you asked, Ms. Stoll-DeBell?

6            MS. STOLL-DeBELL:  I asked if you could download

7   information for all of the items that are in a vendor's catalog

8   into item master.

9            THE COURT:  Could you is the question.

10           THE WITNESS:  And I thought I was cut off, Your

11  Honor, on being able to answer further.  So, first you take the

12  CSV file format --

13           THE COURT:  Could you or could you not is the

14  question.

15           THE WITNESS:  It is --

16  Q    I'm talking about information relating to all of the items

17  in a vendor's catalog.

18           THE COURT:  Now you changed the question.

19           MS. STOLL-DeBELL:  I think that was my question all

20  along, Your Honor.

21           THE COURT:  No, because you said information.  That

22  means some or all or one minute component, and so you've

23  changed the subject of the sentence there.

24           MS. STOLL-DeBELL:  My original question was, can you

25  download information for all of the items in a vendor's catalog

1    into item master.

2              THE COURT:  But you didn't circumscribe the

3    information.  You are not circumscribing the information, so --

4              MS. STOLL-DeBELL:  Well, the question I intended to

5    ask --

6              THE COURT:  The kind of information.

7              MS. STOLL-DeBELL:  Item information.

8              THE COURT:  No.  Information about items is not the

9    same thing as item information.

10             MS. STOLL-DeBELL:  Okay.

11             THE COURT:  So ask the question, the one you started

12   with.  Let's try that.  Listen to the question, because it's

13   very broad.

14             THE WITNESS:  Is it okay to ask clarification if I'm

15   not quite sure?

16             THE COURT:  Sure.

17             THE WITNESS:  Okay, Your Honor.

18             THE COURT:  It sure is.

19   Q    Can you download information for all of the items that are

20   included in a vendor's catalog and download that into item

21   master?

22             MR. ROBERTSON:  Let me object as vague and ambiguous.

23             THE COURT:  Overruled.  It means any information.

24   Can you download any information for all of the items.  It

25   doesn't mean can you download all of the information for all of

Christopherson - Redirect                              1654

1  the items.

2          THE WITNESS:  If it's any of the information, yes,

3  Your Honor.

4          THE COURT:  Okay, that's the answer.

5  Q    Can you download a whole vendor catalog into the item

6  master database without changing it?

7          MR. ROBERTSON:  Objection, Your Honor, to the whole

8  vendor catalog.  I mean, I think that's vague and ambiguous.

9          THE COURT:  Think it's what?

10         MR. ROBERTSON:  Vague and ambiguous, Your Honor.

11         THE COURT:  You asked it, and she asked it, and he's

12  testified what you can do, so it's not vague and ambiguous.

13  A    No, you can't.

14  Q    And just -- okay.  You understood the question, remembered

15  it?

16         THE COURT:  You can't download the whole catalog

17  without changing it somehow.

18         THE WITNESS:  And importing it.

19  Q    So do you need to use the extraction, transformation, and

20  load process you described earlier to download a whole vendor

21  catalog into the item master database?

22         MR. ROBERTSON:  Objection, relevancy, Your Honor.

23         THE COURT:  Overruled.

24         MR. ROBERTSON:  May I have that standing objection,

25  Your Honor, to this line of questions?

1    THE COURT:  Yes.

2    A    Can you say the question again.

3    Q    Yes.  Do you need to use the extraction, transformation,

4    and load process you described earlier to download a whole

5    vendor catalog into the item master database?

6    A    Yes.

7    Q    Looking at Plaintiff's Exhibit 521 which I believe is the

8    document you have in front of you?

9    A    Okay.

10   Q    When was the document created?

11   A    I have no idea.

12   Q    When did Lawson start selling version 8.0.3 of its

13   software?

14   A    I don't recall the exact date, but it was somewhere in the

15   early 2000s.

16           MS. STOLL-DeBELL:  I think that's all the questions I

17   have, Your Honor.

18           THE COURT:  All right.  You may step down.  You are

19   the representative of the company, and you're going to stay

20   here?

21           THE WITNESS:  That's correct, Your Honor.

22           THE COURT:  In case you have need to go away, you

23   have to remember I may need to have you back here to answer one

24   question.

25           THE WITNESS:  That's correct, Your Honor, I'm aware

1    of that.  I'm pretty much here except for the weekend I head

2    back, but I'll make sure I give plenty of time.

3            MS. STOLL-DeBELL:  I'd like to leave the door to open

4    further questions on the issues --

5            THE COURT:  That's what I said.  We'll have to

6    deal -- we have another issue to deal with.  We're going move

7    on in the interest of letting things happen in the case, but

8    we'll deal with it a little bit later in the day.

9            You wanted time to do some things, give me some

10   information, and you are entitled to do that, and I will take

11   it up in due course.  You can come back and ask questions about

12   it.

13           MS. STOLL-DeBELL:  Thank you.

14           THE COURT:  Okay, thank you, Mr. Christopherson.  You

15   can step down.

16           MS. STOLL-DeBELL:  Your Honor, we're going to call as

17   our next witness Hannah Raleigh.

18           THE COURT:  Mr. Robertson, one of you come up here

19   and get this stuff, would you please, sir, and put it in your

20   recycle bin or whatever you're going to do with it.

21           MR. ROBERTSON:  Yes, sir.

22

23

24

25

1    **HANNAH RALEIGH,**

2    a witness, called by the defendant, having been first duly

3    sworn, testified as follows:

4                              DIRECT EXAMINATION

5    BY MR. SCHULTZ:

6    Q    Welcome back, Ms. Raleigh.

7    A    Thank you.

8    Q    Thank you for coming back.  I'd like to start to talk with

9    you about some more detail about what we started talking about

10   last Friday.

11            THE COURT:  It might be helpful to the jury to sort

12   of refresh their memory on what her job is.

13            MR. SCHULTZ:  We are going to do that, Your Honor.

14   Q    What is your job position at Lawson?

15   A    I'm the practice director for health care east.

16   Q    What does it mean when you say practice director?

17   A    It means I'm responsible for the customers in our health

18   care industry in the eastern part of the United States who are

19   implementing our software for the first time or potentially

20   doing upgrades or major projects, you know, at an existing

21   customer.

22   Q    What is your role as the practice director?

23   A    I oversee the project managers and consultants who work

24   with our customers through the training and implementation,

25   testing, and go live with the software.

1    Q    What is a project manager?

2    A    Project manager is typically the team leader, if you will,

3    who is responsible for, you know, bringing the resources that

4    are needed to do the work of the project, overseeing the

5    activities, serving as an escalation point for issues that

6    might come up throughout the project.

7    Q    How many people work for you in your role of project

8    director?

9    A    I have 12 direct reports, but through the course of the

10   various projects that we have, many more people may be working

11   on projects that I oversee.

12   Q    What types of projects do you and your staff work on?

13   A    Predominantly they are implementation projects, so new

14   implementations of our products, a customer who has just

15   purchased our suites of applications, but they may also be

16   upgrades for existing customers.

17   Q    When you say implementation, could you define that for us?

18   A    An implementation would be comprised of all of the

19   activities required to get the system from, you know, installed

20   on the customer's server, get the customer trained on how to

21   use it, how to set it up, make decisions about how to design

22   and configure the software, what buttons to push and switches

23   to flip and that sort of thing so it will meet the customer's

24   business needs.

25        It would also include the testing of the functionality to

1    insure that it works according to, you know, the documentation,

2    and the customer's business needs.  It would also include

3    getting the data, converting the data into the system so that

4    we have the customer's real data there for use.  Testing and

5    then, you know, readiness, readiness activities, training, and

6    go live.

7    Q    As your role as practice director for Lawson, have you

8    come to an understanding of how the Lawson system operates?

9    A    I have.

10   Q    Have you come to an understanding on how the customers use

11   the Lawson system?

12   A    Yes, definitely.

13   Q    You mentioned loading the information into the Lawson

14   system, and when I'm talking about the system, I'm talking

15   about the procurement system.

16   A    Okay.

17   Q    Let's talk about the vendor agreement load.  Are you

18   familiar with the vendor agreement load?

19   A    Yes.

20   Q    What is it?

21   A    The vendor agreement load would be a conversion program or

22   a routine that you would run through to load in, say,

23   contracts, if you will, agreed upon pricing for a specific

24   group of items that the organization purchases from a specific

25   vendor.

Raleigh - Direct

1    Q    You mentioned the term contracts.  What do you mean by

2    that?

3    A    Well, ordinarily, in order to -- in order to insure that a

4    customer is getting the best price for the items that they

5    order on a regular basis, they will negotiate with that vendor

6    to create a pricing agreement, if you will.  So they'll commit

7    to the vendor that we're going to order these particular items.

8    Usually they have a sense of how many of them they're going to

9    order in a particular year, and they'll agree upon some

10   negotiated pricing for those items that they can use throughout

11   the term of the contract, and that is all documented between

12   the organization and the vendor.

13           THE COURT:  So you are saying the vendor agreement

14   load simply just is a load of the contract between -- all

15   that's loaded is the contract between the customer and

16   suppliers?

17           THE WITNESS:  It's loading the data, so the items and

18   the pricing that was agreed upon.

19           THE COURT:  Well, that's different than loading the

20   contracts.  Contracts are agreements between people that say,

21   this is what I'm going to do and this is what you're going to

22   do.

23           You are saying there's more to it than just the

24   contract, there's something else, there's data that comes in in

25   the vendor load agreement; is that right?

1    THE WITNESS:  What's loaded into the system is the

2    actual -- it's what we've agreed to, if you will.  So we've

3    agreed these are the items we're going to purchase from you as

4    a vendor at this particular negotiated price.

5         THE COURT:  Who is "we"?

6         THE WITNESS:  "We" the organization, so not "we"

7    Lawson, but a customer.  So a particular hospital would work

8    with a particular vendor, say, Cardinal, for instance, and they

9    would negotiate around what items they're going to buy from

10   Cardinal on an annual basis, for instance, and at what price.

11   And then what needs to go in the Lawson system is just the

12   items and that negotiated --

13        THE COURT:  So it's a list of all the items, sort of

14   a master list of things they might purchase off and on during

15   the year plus the contract terms for the purchase; is that what

16   it is?

17        THE WITNESS:  The pricing terms, yes.

18   Q    So in terms of the contract, I'd like to follow up on a

19   few of the points that you made there.  In terms of the

20   negotiation back and forth, is there a written agreement

21   between the customer and the vendor?

22   A    Typically.  It's not something Lawson generally would have

23   a copy of, but typically there would be a written agreement.

24   Q    And for the actual data that's loaded into the Lawson

25   system, is there like an addendum to that contract that would

Raleigh - Direct

```
1   be in an electronic format?

2   A    You could call it an addendum.  I think there is -- there

3   is certainly a file of data, or there's -- whether it's written

4   or it's provided in an Excel spreadsheet, for instance, that

5   documents these are the items that we've contracted to sell you

6   at a particular price.

7             THE COURT:  I'm still confused now.

8             THE WITNESS:  I'm sorry.

9             THE COURT:  Is the actual contract loaded into the --

10  as part of the vendor load agreement, or is it the addendum

11  that he's talking about that's loaded?

12            THE WITNESS:  What's loaded in through the PO 536 is

13  the items and their price.

14            THE COURT:  Not the contract.

15            THE WITNESS:  Right.  I mean, that is a contract, I

16  suppose, in some ways --

17            THE COURT:  That's the way you are using the term,

18  but that isn't the legal definition of the contract.

19            THE WITNESS:  Okay, fair enough, sure.

20  Q    Is there a definition that you use in the industry of the

21  term contract in terms of the vendor agreement load as we're

22  talking about right now?

23  A    Again, I don't know that it's a succinct definition, but

24  what we're referring to --

25            THE COURT:  That's enough.  Just listen to the
```

1    question and just answer the question that he asks.  You don't

2    need to go beyond that.  If he's wants to know, he'll ask.

3    Q    I want to know if there's a distinction between the legal

4    agreement, as we sometimes refer to as a contract, and the

5    vendor agreement that may be in an electronic format or some

6    other format that actually is loaded onto the Lawson system.

7    Is there a distinction between the two of those?

8    A    I suppose there is.

9    Q    What is that distinction --

10            THE COURT:  If you know, that's okay.  But if you're

11   saying I suppose, meaning I guess there is, you don't have to

12   guess.

13   Q    Do you know if there's a distinction?

14   A    Yes.

15   Q    What is that distinction?

16   A    The distinction would be the difference between a

17   negotiated agreement between two parties and the data about

18   which they have negotiated.

19            THE COURT:  Which one of those is loaded?

20            THE WITNESS:  The data about which you have

21   negotiated is what is loaded.

22            THE COURT:  All right, thank you.

23   Q    Let's talk about the data that's loaded.  In what format

24   is that provided to go onto the Lawson system?  Or the

25   customer's Lawson system.  I should be more accurate.

1    A    It could be provided in a variety of formats.  It's

2    possible it could be provided literally on paper or in a

3    Microsoft Word document, and that data would then need to be

4    placed into the appropriate format so that the system can read

5    it.

6         That's where the PO 536 comes in.  That's the file format

7    in which the data would eventually have to be to loaded into

8    the system.  It could come to the customer via an Excel

9    spreadsheet of items and pricing.  It really -- it doesn't

10   really matter.

11   Q    Let's take it from the perspective if it comes to the

12   customer in the form of paper.  How is that actually converted

13   and placed onto an electronic system such as the customer's

14   Lawson system?

15   A    It would presumably be done manually for the most part if

16   it comes on paper.  It would be a matter of one of the

17   customer's employees keying the data into the appropriate

18   columns in an Excel spreadsheet so that that data could be

19   loaded into the system.

20   Q    What happens if it comes in a Word document?

21   A    It's very similar.  It may be possible to copy and paste

22   or use some other technical tools that would be able to grab

23   that data and change it so that it's into the right format.

24   Q    You also mentioned an Excel document.  What would happen

25   to that data?

1    A     An Excel document, again, would hopefully have the right

2    data that we need, but there may be some data that would need

3    to be deleted out of the document, columns might need to be

4    changed, we may need to look at, you know, the character length

5    or the amount of data that's been provided in a particular

6    column to, again, insure that it's in the right format

7    according to the specifications for PO 536.

8    Q     I want to talk more about PO 536 now.

9          THE COURT:  Mr. Schultz, Mr. Christopherson talked at

10   length about 536.  Rule 611 says we don't keep repeating

11   things.  If you've got something different to say about the

12   whole topic, then that's one thing, but you're not going

13   through the process of having four or five different witnesses

14   say the same thing.  It doesn't work that way.  So if you have

15   something different he didn't address, let her address it.

16   Otherwise, we don't want to repeat things.

17         MR. SCHULTZ:  Yes, sir.

18   Q     Ms. Raleigh, you are involved with the customers; right?

19   A     Yes.

20   Q     Okay.  So I'm talking from the perspective of the

21   customers that you actually interacted with.  Have you seen the

22   interaction of the PO 536?

23   A     Yes.

24   Q     What is the PO 536, real briefly?

25   A     The PO 536 is a program from Lawson that allows for the

Raleigh - Direct

1   import of data into our database.

2   Q     Now, when you are working with the customers, how do you

3   get from paper, Word, and Excel into the PO 536?

4   A     You will take the data that's required, whatever the

5   particular data fields that are needed to adhere to the PO 536

6   file format, and you will select that, whether it's manually

7   typed into an Excel spreadsheet or cut and pasted, copied, all

8   of those different tools we use to make life go faster, into

9   the appropriate format.  And then a program is used to load

10  that data.

11  Q     Is a PO 536 program a proprietary Lawson program?

12  A     Yes, it is.

13  Q     Is it available to the public?

14           MS. ALBERT:  Relevancy, Your Honor.

15           THE COURT:  Available to the public?  Do you mean if

16  it's bought?

17           MR. SCHULTZ:  No, Your Honor.  She just testified

18  that PO 536 is a proprietary layout, a program.  I'm asking

19  whether --

20           THE COURT:  Why would you have something that's not

21  available to the public if it's paid for?  I don't think --

22  it's something you sell -- I thought you said it was a product

23  that they told.

24           MR. SCHULTZ:  Your Honor --

25           THE COURT:  I don't understand --

1    MR. SCHULTZ:  What I'm talking about is the public in

2    general, the general public.  I'll ask a different question.

3                 THE COURT:  Yes, I would think so.

4    Q    Do you have confidentiality agreements that you sign with

5    your customers?

6    A    Um, yes, in a manner of speaking, I suppose.  We certainly

7    have terms around their use of our product.

8    Q    And is a customer allowed to just give away the software

9    that you sell to them?

10   A    No.

11                MS. ALBERT:  Your Honor, what's the relevancy of

12   this?

13                THE COURT:  I really don't know.

14                MS. ALBERT:  Move to strike the question and answer,

15   please.

16                MR. SCHULTZ:  Your Honor, this gets to the heart of

17   whether it's generally available to the public.  That's what

18   this is talking about.  We're talking about a conversion

19   process that's completely private, that the data comes in in a

20   private manner --

21                THE COURT:  Do you want to testify?

22                MR. SCHULTZ:  Your Honor, I'm responding to her

23   objection to strike.

24                THE COURT:  All you have to do is to say it relates

25   to a topic.  You don't need to have speaking objections or

1   speaking responses, Mr. Schultz.

2          MS. ALBERT:  Your Honor, I think you said earlier

3   that it's not relevant whether the item data that goes into the

4   item master is generally -- well, you said that whether the

5   information that is in the item master is generally known is

6   irrelevant.  It's whether the item data that goes into the item

7   master is generally known.  That's the --

8          THE COURT:  I'm not sure that deals with his

9   question.  I don't understand how it goes -- you're just saying

10  that they are not free to give it away to the public.

11         MR. SCHULTZ:  I'm trying to elicit questions that

12  there is private information from the very start when there's a

13  private negotiation and contract --

14         THE COURT:  You are talking again, and it isn't right

15  anyway.  It isn't private when it starts, but I'm not going to

16  get into that.  If that's the basis for it, I don't think

17  that's an appropriate basis to try to show.  I don't think

18  that's what you're trying to show.

19  Q    Ms. Raleigh, you testified there's a contract negotiation

20  between your customer and the vendors.  Is that public or

21  private?

22  A    Private.

23  Q    Why do you say it's private?

24  A    For competitive reasons, both the vendor and the customer

25  have an interest in that information, that negotiation between

1   them and the pricing they agree upon remaining private.

2   Q     Are there programs that actually will load the data onto

3   the Lawson item master?

4   A     Yes.

5   Q     What are those programs?

6   A     The IC 511, if I'm recalling correctly.  It's a load

7   program.

8   Q     Let me ask you a different way.  Are you familiar with the

9   Lawson standard application program interfaces?

10  A     Yes.

11  Q     What is that?

12  A     The Lawson standard application programming interfaces,

13  again, allow for the import of data into our database so long

14  as the data is in a particular format.

15  Q     Why does it need to be in a particular format?

16  A     The database wouldn't understand where to put the data if

17  you didn't give it to it, if you didn't give it the data in the

18  format that it expects.

19  Q     Whose format does it have to be in?

20  A     Lawson's format.

21  Q     Are all customers required to follow that format?

22  A     Yes.

23  Q     Let's talk about data validation.  What is data

24  validation?

25  A     Data validation can refer to a number of things.

1   Typically we talk about validating data to insure that the data

2   that we need to run our business is the data that we have

3   loaded, or vice versa, the data we loaded is the data we need

4   to run our business.  It could relate to the accuracy of the

5   data.  For instance, you know, insuring that if we attempted --

6   if we wanted to load in an item called a syringe, that we have

7   the appropriate description associated with that, that the

8   description isn't related to a glove, right.  That wouldn't

9   make any sense.  So we might validate to insure that the data

10  is accurate.  We also might validate that the data is, you

11  know, fits into the right format, again, so that it actually

12  can load and we don't have errors in our load process.

13  Q    If the data is not validated correctly, will the item

14  master operate --

15         MS. ALBERT:  Your Honor, can I just have a standing

16  objection to this entire line of questioning?

17         THE COURT:  Yes, for the same reasons I've ruled.

18  Q    Ms. Raleigh --

19         THE COURT:  Don't go too far.

20  Q    Ms. Raleigh, if there is a data validation problem, will

21  the Lawson item master in the procurement system operate?

22  A    Not necessarily.

23  Q    What do you mean?

24  A    If the data that's in the system conforms to the format

25  that the program expects, for instance it's a syringe but it

1    has the description of glove, right, but from the standpoint of

2    how many characters and what type of data it expects, it could

3    actually load in an item that is a syringe but described as a

4    glove.  That would be wrong; right?  But the system would

5    actually function.  You wouldn't actually get a glove when you

6    tried to order a glove, you'd get a syringe.  In other cases,

7    however, if the data is inaccurate, it would not function

8    because it just would violate the rules of the software.

9    Q    Have you encountered situations where the data validation

10   was incorrect with respect to the Lawson item master?

11   A    I have.

12   Q    What are those instances?

13   A    It probably happens to, you know, a greater or lesser

14   extent in almost every project where the customer is typically

15   responsible for validating their data.  Two recent examples

16   that I had in my practice would be Jackson and Robert Wood

17   Johnson.

18   Q    Let's start with Jackson.  What happened there?

19   A    At Jackson, again, it was the responsibility of the

20   customer to validate the data before it was loaded into the

21   item master for go live.  That data validation process probably

22   wasn't as stringent as it should have been, or maybe it didn't

23   happen at all, but, unfortunately, what happened in that case

24   is that the data that was loaded into the system, sort of back

25   to my glove and syringe example, was kind of like that where

1   the end users were ordering supplies but not necessary --

2   because the data was inaccurate, they weren't necessarily being

3   delivered the right supplies from the vendor.

4   Q    So what you are saying is the information from a vendor

5   wasn't actually in the item master?

6   A    It was incorrect.

7   Q    You also mentioned was it Robert Wood Johnson?

8   A    Uh-huh.

9   Q    What happened there?

10           THE COURT:  Mr. Schultz, may I see you -- who is

11   handling this witness, Ms. Albert?

12           MS. ALBERT:  Yes.

13

14           (Discussion at sidebar as follows:)

15

16           THE COURT:  Mr. Schultz, let's get on with what makes

17   a difference in the case.  She said, in words of one syllable,

18   that if the data isn't in the right place in the right way in

19   the system, the system doesn't work.  You don't need to cite 15

20   examples of why that's true.  She's already said that.  That

21   point's been established, and you keep -- you don't want to

22   keep repeating, and you're doing a lot of it in your

23   examination.  So I think it would be a good idea if you make

24   your point and move on.

25           MR. SCHULTZ:  Yes, sir.

1          THE COURT:  Beginning now.

2

3          (End of sidebar discussion.)

4

5    Q    Ms. Raleigh, there is a topic that you had addressed last

6    Friday, and it dealt with the services that Lawson does provide

7    to its customers.  I'd just like to touch on the topic we

8    couldn't get into or didn't get into, and that's the services

9    Lawson does not provide.

10   A    Sure.

11   Q    Are there times that a customer modifies the system, the

12   Lawson procurement system that Lawson sells to a customer?

13   A    There are.

14         MS. ALBERT:  Your Honor, I'd like a running objection

15   to this line of questions.  I think we dealt with this at the

16   beginning of the day, and Mr. McDonald has stipulated that he

17   wouldn't go into this area due to the discovery disputes

18   between the parties.

19         MR. McDONALD:  What I stipulated, Your Honor, was we

20   weren't asserting these things as a defense, but that doesn't

21   mean these facts aren't relevant.  I actually think they help

22   us.  I was saying we weren't going to use them as a defense.

23         THE COURT:  If they are not usable as a defense, why

24   are they relevant?

25         MR. McDONALD:  Because they help us prove

1   non-infringement.

2            MR. SCHULTZ:  Your Honor, this is not going on that

3   topic.

4            THE COURT:  There's no way that this helps you prove

5   non-infringement if you talk about what you don't do.  I don't

6   understand this.  Why is what Lawson doesn't do relevant to

7   infringement or to any defense that you have?

8            MR. SCHULTZ:  Because if a customer modifies its

9   system, that is not the Lawson accused system, and Lawson does

10  not do its services and Lawson does not provide help to those

11  systems.

12           THE COURT:  But the issue is -- that's the

13  customer-by-customer issue; right?

14           MS. ALBERT:  Exactly, Your Honor.

15           THE COURT:  That's just trying to do indirectly what

16  you said you weren't going to do directly.  That's it, I think.

17           MR. McDONALD:  Excuse me, Your Honor.  We're just

18  going to see if we can streamline this.

19           THE COURT:  Objection sustained.

20  Q   Ms. Raleigh, are there security credentials that are

21  required to operate the Lawson system?

22           MS. ALBERT:  Objection, Your Honor, relevancy.

23  A   Yes.

24           THE COURT:  Overruled.

25  Q   Are there security credentials required to operate the

1    Lawson system?

2    A    Yes, they are.

3    Q    What are those requirements?

4    A    Security is defined either by user or by user class based

5    on the actual functions that each user should be entitled to or

6    allowed to or needs to perform within the system.

7    Q    And how does that actually operate to access the Lawson

8    system?

9    A    A user name and password.

10              MR. SCHULTZ:  Thank you.

11

12                    CROSS-EXAMINATION

13   BY MS. ALBERT:

14   Q    Good afternoon, Ms. Raleigh.

15   A    Hi.

16   Q    Now, you talked about this PO 536 vendor agreement load

17   process; is that correct?

18   A    Yes.

19   Q    The file for the vendor agreement load, that file comes

20   from the vendor; is that right?

21   A    Yes.

22   Q    And I believe you talked about the different formats that

23   the vendor could provide the item data to the customer.

24   Regardless of the format in which the data comes to the

25   customer for this vendor agreement load process, that data does

Raleigh - Cross

1    come from the vendor; isn't that right?

2    A    Yes.

3    Q    And I think you were talking about whether or not these PO

4    file formats were proprietary to Lawson.  Does Lawson provide

5    the PO 536 file formats to its customers?

6    A    Yes, we do.

7    Q    So it makes those files formats known to its customers;

8    correct?

9    A    We do.

10             MS. ALBERT:  I have no further questions.

11             THE COURT:  Any redirect?

12             MR. SCHULTZ:  No, Your Honor.

13             THE COURT:  All right.  Next witness.  Can she be

14   excused?  Excuse me a minute, Ms. Raleigh.  Can she be excused

15   permanently?

16             MR. ROBERTSON:  Yes, Your Honor.

17             THE COURT:  How about you?

18             MR. SCHULTZ:  Yes.

19             THE COURT:  Thank you, Ms. Raleigh.  You are relieved

20   from your obligation to be here.  I hope you don't get stranded

21   anywhere else.

22             THE WITNESS:  Thank you.

23             THE COURT:  Next witness is whom?

24             MR. SCHULTZ:  Next witness is William Yuhasz.

25             THE COURT:  Is somebody going to go get him?

1    THE CLERK:  I think she did.

2    THE COURT:  That's spelled Y-u-h-a-s-z; is that

3    right?

4    MR. SCHULTZ:  Y-u-h-a-s-z, that's correct.

5

6                    **WILLIAM YUHASZ,**

7    a witness, called by the defendant, having been first duly

8    sworn, testified as follows:

9                    DIRECT EXAMINATION

10   BY MR. SCHULTZ:

11   Q    Good afternoon.

12   A    Good afternoon.

13   Q    Would you please introduce yourself to the jury, please.

14   A    I'm William Yuhasz.

15   Q    How do you spell that last name?

16   A    Y-u-h-a-s-z.

17   Q    Mr. Yuhasz, where do you live?

18   A    Mooresville, North Carolina.

19   Q    Let's talk about a little bit of your education.  What did

20   you do after high school?

21   A    Attended West Virginia Institute of Technology, a degree

22   for computer management, programming.

23   Q    What happened after college?

24   A    I obtained a job with Magnavox in Ft. Wayne, Indiana.

25   Q    What was your position there?

1   A    Programmer.

2   Q    What type of software did you program in at Ft. Wayne?

3   A    At Magnavox, I programed financial systems, order

4   processing system.

5   Q    What did you do after Magnavox?

6   A    After Magnavox, I worked for an insurance entity in

7   Winston-Salem, North Carolina.

8   Q    What was the company's name?

9   A    Integon Insurance.

10  Q    What did you do at Integon?

11  A    I maintained primarily financial systems, the mortgage,

12  insurance systems, general ledger systems, treasury systems.

13  Q    Was this involving computers?

14  A    Yes.

15  Q    Were you involved with software selection?

16  A    Yes.

17  Q    And what did that involve?

18  A    Developing requirements for your business needs and then

19  asking solution providers to -- as to whether they meet those

20  requirements or not and then scoring them on their responses.

21  Q    Where do you work now?

22  A    I work for Novant Health, Incorporated.

23           THE COURT:  For what?

24           THE WITNESS:  Novant Health, Incorporated.

25           THE COURT:  All right.

Yuhasz - Direct

1  Q    What is Novant Health, Incorporated?

2  A    Novant Health is an integrated delivery network, and by

3  that it's a health care delivery organization that delivers all

4  forms of health care meaning acute care, which is your normal

5  hospital, inpatient hospital care.  You have ambulatory care

6  which is physician practices.  You have home health care.  You

7  have long-term care.  So we deliver all forms of that type of

8  health care.

9  Q    What is your position at Novant?

10 A    I am director of supply chain technology.

11 Q    What are your duties as the director of supply chain

12 technology?

13 A    I manage a team that's responsible for the functional

14 support of the technology used to run supply chain business

15 such as for procurement purposes, for inventory purposes, for

16 warehouse management.

17 Q    How many years have you been involved with computers or a

18 computer analyst?

19 A    I'm probably going to say 20 years.

20 Q    Are you familiar -- let's switch topics now.

21 A    Okay.

22 Q    Let's talk about why we're here.  Are you familiar with

23 the Lawson S3 procurement system?

24 A    Yes.

25 Q    How are you familiar with the Lawson procurement system?

Yuhasz - Direct                                        1680

1   A    It is the solution provider for our supply chain

2   technology for procurement, inventory, warehousing.

3   Q    How long have you worked with the Lawson procurement

4   software at Novant?

5   A    Since 1999.

6   Q    Were you at Novant when Lawson first came to Novant?

7   A    Yes.

8   Q    Can you take us through the process of how that happened?

9   A    Yes.  It was a similar request for proposal for a solution

10  provider to meet our needs while Novant was doing a merger with

11  another hospital facility, and we wanted to try to get our

12  standard systems for processing for those type systems.

13  Q    So you were combining two hospitals or two providers into

14  one?

15  A    Yes.

16  Q    Let's talk about when Novant set up the Lawson standard

17  application.  How was the software delivered to Novant?

18  A    It was provided on a disk.

19  Q    And who set up that system?

20  A    Novant personnel.

21  Q    Did Novant use a third-party provider?

22  A    Yes, we used a company called Balrae.

23  Q    Who is Balrae?

24  A    They were a consulting firm that had experience with the

25  Lawson procurement systems.

Yuhasz - Direct

1    Q    Had Balrae implemented Lawson systems in the past?

2    A    Yes.

3    Q    When the Lawson standard application was installed on

4    Novant's -- installed at Novant, was there any product data

5    included with that?

6    A    No.

7    Q    Was there a time that you loaded product data into the

8    Lawson standard application?

9    A    Yes.

10   Q    Who loaded that data?

11   A    Novant personnel and with Balray's assistance.

12   Q    What was the process to load the data onto the Lawson

13   standard application?

14   A    Primarily it was conversion programs written by Novant

15   personnel where you take the source system, which was our

16   legacy systems we were converting from, and you converted it

17   into the Lawson format to do an upload was the primary method,

18   and then otherwise it was manual entry using forms provided in

19   the Lawson software solution.

20   Q    So you are taking the data that existed on legacy system

21   and then placing it on the Lawson system?

22   A    Yes.

23   Q    What hardware was required, is required to operate the

24   Lawson procurement system?

25           THE COURT:  You mean for him?

1    MR. SCHULTZ:  For Novant.

2    MR. STRAPP:  Objection, relevancy.

3    THE COURT:  I guess I'm having a little trouble

4    understanding why what they use as opposed to what's available

5    and what the system is is pertinent.  Will you help me with

6    that?

7    MR. SCHULTZ:  Yes, Your Honor.

8    THE COURT:  What is it relevant to?

9    MR. SCHULTZ:  Non-infringement.

10   THE COURT:  How?

11   MR. SCHULTZ:  Because one of the elements that must

12   be shown --

13   THE COURT:  What element?

14   MR. SCHULTZ:  Lack of the operating -- the hardware,

15   the computer.

16   MR. STRAPP:  Your Honor, you can search the elements

17   of the claim, and there's no computer mentioned in any of them.

18   THE COURT:  That is my problem, is I didn't think it

19   was.  Is there one of the claims that I misinterpreted here or

20   it relates to?

21   MR. SCHULTZ:  Your Honor, if I could grab the jury

22   book.  I'm thinking of the means plus function.

23   THE COURT:  Which claim?  Which patent?  Let's start

24   with that.

25   MR. SCHULTZ:  One moment, Your Honor.  In addition to

1    that, I just want to mention that it's also relevant to the

2    electronic sourcing system.

3             THE COURT:  Let's take the one we've got instead of

4    shifting away from the one I'm dealing with.  Then you can do

5    the next one on your next sentence.  Which patent, which claim?

6             MR. SCHULTZ:  If we look at '683, claim three.

7    Related to the --

8             THE COURT:  Which element?

9             MR. STRAPP:  Your Honor, maybe I can shortcut this.

10   We can stipulate that the Lawson S3 system is installed on

11   Novant's computers.

12            MR. SCHULTZ:  That's all it is, Your Honor.  That

13   would be fine.

14            THE COURT:  Isn't it fairly basic that unless it's

15   installed on somebody's computer, it doesn't work?  You can't

16   take the software and set it down in the office and have it

17   work.

18            The jury is paying attention, and they've tried to

19   follow very carefully what's going on.  Let's get on with the

20   issues at hand.  I'm not sure that relates to infringement, but

21   let's go ahead.

22   Q   Let's talk about the process of obtaining information

23   that's placed into the Lawson system, and I'm not talking about

24   the initial load data from other legacy systems.  Are you

25   familiar with that process?

1    A    Yes.

2              THE COURT:   Which process?

3    Q    Are you familiar with the process of uploading new data

4    into the Lawson procurement system?

5    A    Yes.

6    Q    From where is the data that is obtained that would be

7    placed into the Lawson item master?

8    A    The data is obtained from the -- after a contract process

9    has occurred by our sourcing managers who has negotiated

10   contracts with the manufacturers of products.

11   Q    I want to be clear what you're meaning by contracts.  What

12   do you mean by contract?

13   A    A contract would be a legal document stating what items

14   Novant is eligible to purchase for what price for a certain

15   period from that manufacturer.

16   Q    Where is the data from the negotiation that actually makes

17   it into the Lawson item master?

18             THE COURT:   What?

19   Q    Is there data associated with the contract that will

20   actually be loaded into the Lawson item master?

21   A    Yes, usually along with the contract wording, terms and

22   conditions, there's exhibits or addendums that the manufacturer

23   is required to provide Excel spreadsheet or some type of data,

24   electronic data of the actual item information involved in that

25   contract.

1    Q    Is that contract process with the data that's associated

2    with that on an Excel spreadsheet or PDF or other format

3    generally available?

4    A    Generally available from the manufacturer to Novant?

5    Q    Generally available to the public.

6             MR. STRAPP:  Objection, Your Honor.  The question is

7    taking a construction and sort of twisting it.  It's not the

8    actual Court's construction.  It's calling for legal conclusion

9    and opinion testimony.

10            THE COURT:  Well, it's a different question, I think.

11   Overruled.  He doesn't understand your question, so I think you

12   have to start all over again.

13   Q    Let's talk about the data that's actually in this addendum

14   to the contract that you are talking about.  Is that a public

15   or private transaction between the manufacturer and Novant?

16   A    That's a --

17            MR. STRAPP:  Objection.

18            THE COURT:  You have a standing objection.

19   Q    Is it a public or private transaction between the vendor

20   and Novant?

21   A    It's a private transaction.

22   Q    So it's not generally available?

23   A    It's not generally available.

24            THE COURT:  What's the "it"?

25   Q    So the data associated with the addendum is not generally

1    available; correct?

2    A    Correct.

3    Q    Why not?

4    A    Because it's -- it's a formally negotiated legal document

5    between the manufacturer and Novant Health that we engaged in

6    that relationship and based on the terms and conditions of that

7    particular contract.

8    Q    Are you familiar with the process of uploading that data

9    onto the Lawson item master?

10   A    Yes.

11   Q    What is that process?

12   A    First, the item data is reviewed by the sourcing manager,

13   who was the primary person who negotiated the contract, and

14   they filter out which items they want available for our

15   internal customers to see, to be able to purchase, and so

16   they'll make those notations of which items to be uploaded, and

17   then the data management team will begin the upload.  They have

18   to do some transformations of the data as it comes from the

19   manufacturer to change the description, put any more

20   information that is more Novant-specific for our customers.

21   Q    You said that there's information that's more

22   Novant-specific.  Are there any predefined rules Novant has for

23   placing items in the item master?

24   A    Yes.  We have a standard format for the description which

25   is a noun first separated by a comma and then as unique

1   information that is possible to describe that product.

2   Q     Why do you use that unique information?

3   A     So the customers -- and a lot of them are clinicians --

4   can find the correct product they need, for example a syringe

5   or a stent or a suture.  They need to know the specific

6   information about that type product.

7   Q     Does Novant add information to the item data that is

8   provided from the vendor?

9   A     Yes.  We would add additional accounting information to

10  it.  We would maybe add additional unit of measures which is

11  the packaging that the product can be obtained by our

12  customers.

13  Q     Does Novant use --

14        THE COURT:  Wait a minute.  By your customers, what

15  are you talking about?

16        THE WITNESS:  Our customers, meaning our internal

17  customers.

18        THE COURT:  Your own people.

19        THE WITNESS:  Our own people in Novant.

20        THE COURT:  Who use the system.

21        THE WITNESS:  Who use the system, right.  I'm

22  speaking from a supply chain personnel, our customers are the

23  people who order.

24        THE COURT:  I just wanted to make clear who you were

25  talking about.

1           THE WITNESS:  Sorry.

2    Q    Mr. Yuhasz, does Novant use a third party to implement the

3    business rules with respect to the data?

4    A    Yes.  We use Demand Data Systems, a company in Florida.

5    Q    What is Demand Data Systems?

6    A    They are a data enrichment and benchmarking service

7    provider.

8    Q    And what do they do?

9    A    Enrich and cleanse data so they can build a more robust

10   item description.  They can benchmark your negotiated price to

11   other health care organizations.  They can correct information

12   that you may have wrong as far as UNSPSC or the actual

13   manufacturer, name of the product.  So they can do enrichments

14   of that nature.

15   Q    You mentioned UNSPSC.  Is that UNSPSC codes?

16   A    Yes.

17   Q    We've heard that before.  I just wanted to clarify.  Thank

18   you, Mr. Yuhasz.  What is the form of the document that Demand

19   Data provides to Novant to load up to the item master system?

20   A    The document we send to Demand Data?

21   Q    We'll start there.  Do you send a document to Demand Data?

22   A    We send the addendum that the manufacturer provided.

23   Q    Okay, and then Demand Data will make its modifications?

24   A    Correct.

25   Q    Then what happens?

1   A     Then they return their enhanced data to Novant personnel,

2   and then we do the data management setup in Lawson to have --

3   we add a Lawson item number to the data and add it into our

4   database.

5   Q     Let's talk about the order of the information that's --

6   the item data that's entered into the Lawson database.  Is

7   there a particular order that the data is entered into the

8   Lawson database?

9   A     Can you clarify somewhat?

10  Q     Sure.  Is the order that the items are entered into the

11  database in chronological order?

12  A     As far as the Lawson item numbering, it is sort of the

13  next number to be assigned.  As the data management person gets

14  an item to add, it's just whatever next sequence number to add

15  in that area.

16  Q     Do you recall what the first item is in the Novant item

17  master?

18              MR. STRAPP:  Objection, relevancy.

19              MR. SCHULTZ:  Goes to non-infringement dealing with

20  organization.

21              THE COURT:  What difference does it make what the

22  first one is or the second one?

23              MR. SCHULTZ:  Because it's not organized.

24              THE COURT:  He's already testified to that.

25              MR. SCHULTZ:  I'm further probing into the reasons

1    why it's not organized.

2          THE COURT:  You're doing exactly what I suggested

3    that you don't do.

4    Q    We'll continue on.  Who controls the items that are placed

5    in the item master?

6    A    Novant personnel.

7    Q    Is Novant's item master and the data in the item master

8    publicly disseminated?

9          MR. STRAPP:  Objection, Your Honor, calls for legal

10   conclusion.  Can we have a standing objection?

11         THE COURT:  Yes, you do.

12   Q    Mr. Yuhasz?

13   A    No.

14   Q    Is this data in Novant's item master generally known?

15   A    No.

16   Q    Is the item master data maintained as private?

17   A    Yes.

18   Q    What credentials would a person need in order to access

19   the Novant item master?

20   A    They would first have to be assigned a Novant network

21   access ID and password, and then they would have to be given

22   specific security access to the Lawson forms that perform that

23   process, perform that function.

24   Q    Let's switch topics again.  Let's talk about the growth of

25   your company.  Was there a time that Novant chose to look at

1  other software options?

2  A    Yes.

3  Q    Why did that happen?

4  A    Again, we have had substantial growth.

5          THE COURT:  Mr. Schultz, why does the growth of that

6  company have anything to do with infringement or invalidity?

7          MR. SCHULTZ:  Not dealing with invalidity, Your

8  Honor.

9          THE COURT:  Why does have to do with either one of

10  them?  It's not invalidity.  What about --

11          MR. SCHULTZ:  It deals with infringement.  It's

12  foundational, Your Honor.  I'll get into --

13          THE COURT:  Why don't you ask a question you think

14  makes a difference, because that doesn't.

15          MR. SCHULTZ:  It's foundational, Your Honor.

16          THE COURT:  You don't get questions in under the

17  guise of foundation if they don't really -- if they open up a

18  lot of different areas.  Even if it's marginally relevant, it's

19  prejudicial because it causes delay and confusion.  Go to the

20  question you want to ask him.

21          MR. SCHULTZ:  Bill, could we bring up, and, Mr.

22  Yuhasz, could you look at Exhibit 207.

23          THE COURT:  Plaintiff's or defendant?

24          MR. SCHULTZ:  Defendant's Exhibit 207.

25  Q    If you could focus in on -- well, actually, Mr. Yuhasz,

1   what is this document?

2   A    This was an initial document to describe a business need

3   for better supply chain functionality.

4   Q    Why was Novant looking for better supply chain

5   functionality?

6   A    We were -- with our growth and a lot of -- our customers

7   surveys were getting us information, giving us feedback that it

8   was difficult to use the current system, finding the correct

9   product was difficult.

10       Our number of return products was growing because

11  customers were saying they couldn't find the right product,

12  they were ordering the wrong product or ordering it in the

13  wrong amount, and so we felt we needed to explore other options

14  for our ordering process.

15  Q    What did you do as a result of the customer data that you

16  received?

17  A    We did another request for proposal to search for a better

18  option that we felt had product catalogs, had a more robust

19  search capability, you know, that would be more user-friendly,

20  and things of that nature.

21  Q    Were these feature that the Lawson system, as it was

22  installed at Novant, did not provide?

23  A    Yes.

24  Q    What happened as a result of the request for proposal

25  process?

1    A     We had chosen another solution provider to run our

2    procurement processes.

3    Q     How many companies responded to the request for proposal?

4    A     I don't know the actual number that responded to the RFP.

5    Q     Was ePlus one of the companies that responded to the

6    request for proposal?

7    A     Yes.

8    Q     What was the result for ePlus?

9    A     They were eliminated in the first round based on vendor

10   scoring that their responses to the essential questions,

11   meaning they had to provide that it was an essential need,

12   business need, and they did not respond adequately enough to

13   those that were deemed essential.

14   Q     Did Lawson bid for the work on the RFP.

15   A     Yes.

16   Q     You mentioned that Lawson did not, as a system currently

17   installed, did not have the functionality that you were looking

18   for.  How did Lawson bid for that work if that was the case?

19   A     They actually partnered with another solution provider to

20   provide the complete solution to meet the RFP requirements.

21   Q     Who was that provider?

22   A     SciQuest.

23   Q     Who is SciQuest?

24   A     It's another solution provider of procurement processes,

25   supply chain processing.

Yuhasz - Direct                                                    1694

1    Q    Does SciQuest have catalogs?

2    A    Yes.

3    Q    I'd like you to refer to Plaintiff's Exhibit 337, please,

4    which has the Bates number on the bottom right-hand corner LE

5    03394967.  Do you recognize this document, Mr. Yuhasz?

6    A    Yes.  This is a document provided in an RFP response.

7    Q    Let's turn to page three of the document.

8         MR. SCHULTZ:  Bill, if you could turn to page three

9    and blow up the lower portion of the document.

10   Q    Does the diagram detail who is responsible for the

11   different areas of the procurement?

12   A    Yes.

13   Q    And how do I tell, how do we tell who is responsible for

14   the different portions of the procurement process?

15   A    The legend in the bottom right corner would describe

16   either an independent solution provider by either Lawson or

17   SciQuest or combined, and that correlates to how they

18   color-coded the particular modules that were to provide the

19   functionality.

20   Q    So in the bottom right-hand corner, there's a green box,

21   and then there's Lawson product behind that.  What does that

22   indicate?

23   A    That indicates that a functionality that's all in green is

24   solely provided by the Lawson product.

25   Q    And then in the legend at the bottom right-hand corner of

1    the document, it shows a white box followed by SciQuest

2    product.  What does that mean?

3    A    That similarly means the white colored functional modules

4    are solely provided by SciQuest.

5    Q    And then there's a box that is part white and part green.

6    What does that mean?

7    A    That means that both Lawson and SciQuest are going -- some

8    modules of theirs are going to be provided for that solution to

9    work.

10   Q    Let's start at the top left of that document then.  You

11   see the item master.  Who is in control of the item master?

12   A    That would be Lawson since it's green.

13   Q    Then there's the next section, the supplier punchout

14   sites.  Who is in charge of that?

15   A    That is -- the arrow is pointing to content, and then

16   content is sitting over spin director, and spin director is a

17   SciQuest product.

18   Q    So it's SciQuest's responsibility with respect to supplier

19   punchout sites?

20   A    Correct.

21   Q    Then the next product over is the supplier-hosted

22   catalogs.  Who was responsible with respect to the

23   supplier-hosted catalogs?

24   A    SciQuest.

25   Q    So that was a SciQuest product?

1   A     Yes.

2   Q     That was not a Lawson product?

3   A     Correct.

4   Q     Did Lawson's system, as it was installed at that time,

5   have the capability to provide Novant supplier-hosted catalogs?

6   A     No.

7   Q     At the time of the RFP process, has the Lawson system, as

8   it's installed at Novant, changed?

9   A     No.

10  Q     So you still have the same product as was available with

11  this RFP process?

12          THE COURT:  Whoa.  He hasn't established that they

13  actually got the bid.

14          MR. SCHULTZ:  No.  Let me ask a better question.

15          THE COURT:  That answer doesn't make any sense.  The

16  question doesn't make any sense unless they got the bid.

17  Q     As currently installed, the Lawson system -- you are still

18  operating the Lawson system; correct?

19  A     Yes.

20  Q     So it's currently installed.  Does the Lawson system

21  that's installed at Novant have the capability to provide a

22  Novant supplier-hosted catalogs?

23          MR. STRAPP:  Objection, Your Honor.  There's been no

24  foundation laid that the witness actually has personal

25  familiarity with what capabilities and what Lawson system is

Yuhasz - Direct                                                    1697

 1   installed or isn't installed at the site.

 2              THE COURT:  Lack of foundation.  He knows what the

 3   Lawson system contains.

 4              MR. SCHULTZ:  Your Honor, he has testified that he is

 5   the person in charge of the software.  I'll follow up with it.

 6   Q    What is your familiarity with the Lawson system as it's

 7   installed at Novant?

 8   A    I have overseen all of the implementations, upgrades

 9   and --

10              THE COURT:  When did you get the system?

11              THE WITNESS:  Originally, we first installed it in

12   1999.

13              THE COURT:  So this is a 1999 model?  Why are we

14   dealing with this?  Mr. Schultz, daggone it.  The accused

15   products in this case are 2003, and I just can't believe that

16   this is what we've been going through this.  The first thing

17   you should have asked about was that.  Come up here.

18

19              (Discussion at sidebar as follows:)

20

21              THE COURT:  Now, I don't know what you've been doing

22   over there.  If you knew this was 1999 -- why are we dealing

23   with something that is a 1999 system when what's accused is

24   2003 on?

25              MR. McDONALD:  They have the updated versions, Your

1   Honor.

2          THE COURT:  It hasn't changed.  He said it hasn't

3   changed from 1999, and it's just what he established.

4          MR. SCHULTZ:  I was just going to ask about the

5   upgrades.

6          THE COURT:  Then you are just going to confuse the

7   jury.  So then you did put in a new system.

8          MR. SCHULTZ:  It's an RFP process that they are

9   working on now.  They still currently have the Lawson system.

10  They're switching away from it, but that isn't happening yet.

11         MR. McDONALD:  They've had upgrades along the way,

12  though, including the ones that are specifically at issue in

13  this case.

14         THE COURT:  No, he actually said something different.

15  What he said was --

16         MR. McDONALD:  I think we need to get that clarified

17  then.

18         THE COURT:  Well, if they have upgrades, that's one

19  thing.  Either that or you're asleep at the switch over there

20  because what happened in 1999 --

21         THE CLERK:  Your Honor --

22         THE COURT:  Get the jury out.

23

24                      (Jury out.)

25

1        THE COURT:  Do you have in place, apart from this

2   upgrade, this Novant bidding that's going on, do you have in

3   place the same system you bought in 1999 from Lawson?

4        THE WITNESS:  With multiple upgrades and patches.

5        THE COURT:  And when did you get upgrades?

6        THE WITNESS:  Multiple times.  The last one was

7   probably last year.

8        THE COURT:  After 2003.

9        THE WITNESS:  Correct.

10       THE COURT:  You need to clarify that, because that

11  isn't clear at all.

12       MR. SCHULTZ:  Yes, Your Honor.

13       THE COURT:  And I'd like to know why -- you can be

14  excused while we deal with this, if you would, sir.

15

16                    (Witness excused.)

17

18       THE COURT:  It hasn't been objected to, so I'm not

19  going to raise it myself, but I don't really know why we're

20  dealing with specific customers here and how -- they have

21  thousands of customers, and the issue is not what this company

22  did.  They're not charged, this company, with -- this company

23  hasn't been sued, so why does a specific company make a

24  difference?

25       MR. SCHULTZ:  Because it is relevant to show what the

1   system actually has as capabilities to disprove what ePlus has

2   been arguing on their case in chief.  That's why.

3          MR. STRAPP:  Your Honor, we were going to allow some

4   testimony to come in to see whether a foundation can be laid,

5   but I think we've seen here that a foundation can't be laid for

6   this witness to describe in any sense the accused functionality

7   of the system, and it's not going to be probative to that issue

8   which is the issue we're all here to decide, infringement.

9          THE COURT:  Well, you didn't make any objection, so

10  you're stuck with it.  I mean, you know, it sounds to me like

11  he's giving expert opinion over here about what it contains,

12  but, anyway, you didn't object to it, so it can come in.  How

13  much more of this do you have, Mr. McDonald, specific

14  customers?

15         MR. McDONALD:  This is the only customer we're

16  calling, Your Honor.  The other ones -- actually all the

17  customers were deposed by ePlus, and the other ones --

18         THE COURT:  3,000 of them were deposed?

19         MR. McDONALD:  Pardon?

20         THE COURT:  You have 3,000 depositions?

21         MR. McDONALD:  No, I didn't say a thousand.  I'm

22  sorry.  There were the Cimino, Matias, and Oliver.  Those were

23  the only other three customers that were deposed in this case.

24  Mr. Yuhasz was the one who could come live, so this is it.

25         THE COURT:  We'll be in recess for 20 minutes.

1    (Recess taken.)

2    (Jury in.)

3

4    THE COURT:  All right, Mr. Schultz, go right ahead.

5    You are on 337, or are you finished with that?

6    MR. SCHULTZ:  We are finished with that, Your Honor.

7    Q    Mr. Yuhasz, we were talking about some of the

8    functionality related to the Lawson procurement system.  What

9    is the current version of the Lawson procurement system?

10    THE COURT:  No, no.

11    MR. SCHULTZ:  Let me clarify.

12    Q    What is the current version of the Lawson procurement

13    system that Novant has installed?

14    A    9.01.

15    Q    Is that the version that you were talking about when we

16    were talking about the Lawson functionality?

17    A    Yes.

18    Q    Does Novant receive the upgrades from Lawson on a basis?

19    A    Yes.

20    Q    How often?

21    A    Just as they generally make them available as needed,

22    either they have so many enhancements to put in their product

23    or so many software fixes, they'll release an upgrade or a

24    service pack.

25    THE COURT:  As it comes out, you get it.

1        THE WITNESS:  Yes, sir.

2   Q    When was the latest upgrade that Lawson provided to

3   Novant?

4   A    The upgrade was to the 9.01 release.

5   Q    And when was that?

6   A    I think it was 2009.

7   Q    And Novant installed that upgrade?

8   A    Yes.

9   Q    We mentioned the UNSPSC codes before, the UNSPSC codes as

10  you phrased them.  Does Novant use the UNSPSC codes in its

11  Lawson system?

12  A    We have them loaded in the data set up in the item master.

13  Q    In the item master using the Lawson system, does the

14  UNSPSC code, does that enable a user to locate an equivalent

15  item?

16       MR. STRAPP:  Objection, foundation.

17       THE COURT:  He can testify about what he thinks his

18  does, but he can't testify about what all the rest of them do.

19       MR. STRAPP:  Your Honor, I also object that it calls

20  for a legal conclusion as well.

21       THE COURT:  How?

22       MR. STRAPP:  It's asking for an expert opinion

23  regarding a claim in the claim construction terms, term of

24  equivalents.

25       MR. SCHULTZ:  There is no equivalents -- Your Honor,

1    that's not a claim term.

2              THE COURT:  You can ask him his understanding.

3              MR. SCHULTZ:  Yes.

4    Q    Mr. Yuhasz, your understanding with respect to the UNSPSC

5    codes, does the Lawson system installed by Novant have the

6    ability to locate an equivalent item?

7    A    No.

8    Q    Why not?

9    A    In more of a clinical setting, it is difficult to

10   determine equivalent items.  We would rely on a clinical

11   specialist to tell us that, two different syringes from

12   different manufacturers or even gauze or even hand sanitizer is

13   an equivalent product.

14             THE COURT:  Wait a minute.  Clinical, you mean

15   doctors?

16             THE WITNESS:  Physicians, nurses, yes, sir.

17             THE COURT:  Medical people.

18             THE WITNESS:  Medical people.

19             THE COURT:  So you don't think it operates that way

20   because you want the doctors and the nurses to be making that

21   decision, not to have a computer make it.

22             THE WITNESS:  Yes.

23             THE COURT:  Okay, thank you.

24   Q    Do you have an example of a situation where the UNSPSC

25   codes would not work for finding matching equivalent items?

1    THE COURT:  Mr. Schultz, on this situation, let's
2    move on.  That's just sort of topical specific in their
3    hospital because of their situation, and for good reason they
4    don't want anybody but doctors and nurses telling them what's
5    comparable or equivalent.  That's what he's talking about, so
6    that's not what we're dealing with this in this case.  Let's go
7    on.
8    MR. SCHULTZ:  Actually, Your Honor, that's all I've
9    got.
10   THE COURT:  Okay.
11   MR. SCHULTZ:  Thank you, Mr. Yuhasz.
12
13                    CROSS-EXAMINATION
14   BY MR. STRAPP:
15   Q    Good afternoon, Mr. Yuhasz.
16   A    Afternoon.
17   Q    Could you please put Plaintiff's Exhibit 337 back on the
18   screen for a minute, and page three of the exhibit.  Now, we
19   were -- you were discussing just recently this proposal from
20   Lawson and SciQuest.  I want to be perfectly clear here.  This
21   is just a proposal from Lawson and SciQuest; correct?  This
22   isn't the system as actually implemented at Novant; isn't that
23   correct?
24   A    That's correct.
25   Q    And even in this depiction here, graphical proposal

1   representation, the item master, the item data, that's Lawson's

2   in this depiction; correct?

3   A     That's correct.

4   Q     Let's talk about the products that are actually installed

5   at Novant.  Novant uses the Lawson inventory control module;

6   correct?

7   A     Yes.

8   Q     And Novant also uses the Lawson purchase order module;

9   correct?

10  A     Yes.

11  Q     And Novant uses RSS or requisition self-service; is that

12  correct?

13  A     Yes.

14  Q     And Novant has also licensed procurement punchout; is that

15  correct?

16  A     Yes.

17  Q     Novant's been using Lawson requisition self-service for

18  about five years; is that correct?

19  A     Yes.

20  Q     And prior to that, Lawson was using the requisitions

21  module; is that correct?

22  A     Yes.

23  Q     Isn't it true that Lawson provided personnel to assist

24  Novant with the initial implementation of requisition

25  self-service?

1   A    Yes.

2   Q    And that initial implementation took about four months;

3   isn't that correct?

4   A    I think that was -- I couldn't put an exact date on just

5   the requisition self-service because it is part of a larger

6   project.

7   Q    That larger project took approximately four months; is

8   that correct?

9   A    No, the larger project took more than that.

10  Q    How long did it take?

11  A    I'm not sure I can recollect at this moment.

12        THE COURT:  Don't guess.  It's okay.

13  Q    Isn't it true that during that initial implementation,

14  Lawson provided Novant with application consulting services?

15  A    Yes.

16  Q    And with technical consulting services?

17  A    Yes.

18  Q    And isn't it true that during that initial implementation

19  of requisition self-service, Lawson also provided Novant with

20  client site training?

21  A    For requisition self-service?

22  Q    Correct.

23  A    Yes.

24  Q    And Lawson personnel actually traveled to Novant to

25  provide some classroom training on requisition self-service;

1    isn't that correct?

2    A    Yes.

3    Q    Novant has a maintenance agreement with Lawson for the

4    requisition self-service software; isn't that correct?

5    A    Yes.

6    Q    And isn't it true that that maintenance agreement also

7    allows Novant to receive ongoing upgrades to its software?

8    A    Yes.

9    Q    Lawson also provides Novant with an online library of

10   educational materials regarding its procurement package?

11   A    Yes.

12   Q    Including specific product guides, for example?

13   A    Yes.

14   Q    Is it true that Novant currently has about 70,000 to

15   80,000 active items in its item master database?

16   A    Yes.

17   Q    And those are all available for ordering through

18   requisition self-service?

19   A    Yes.

20   Q    And isn't it correct that those 70,000 to 80,000 items are

21   associated with approximately 10,000 different vendors; is that

22   correct?

23   A    Yes.  In rough numbers.

24   Q    And each of those items, those items have textual

25   descriptions, correct, in the item master?

1    A    Yes.

2    Q    And those items also have part numbers sometimes; isn't

3    that correct?

4    A    Yes.

5    Q    And items will have vendor or manufacturer numbers;

6    correct?

7    A    Yes.

8    Q    And items sometimes have images associated with them;

9    correct?

10   A    Yes.

11   Q    Items have price information; is that right?

12   A    Yes.

13   Q    And items sometimes will have inventory availability;

14   correct?

15   A    Yes.

16   Q    Now, isn't it true that the manufacturer or the vendor

17   provides the contract price for the items in the item master?

18   A    Yes.

19   Q    And isn't it also true that the description of the items

20   in the item master are provided by the manufacturer or vendor?

21   A    Not without transformation by Novant personnel.

22   Q    You get the descriptions of the goods from the

23   manufacturers; right?

24   A    Yes.

25   Q    You understand UNSPSC to be a classification system for

1   particular items; correct?  We've discussed that?

2   A    Yes.

3   Q    Isn't it true that Lawson requisition self-service, the

4   application that's used at Novant, has the capability of using

5   those UNSPSC codes?

6   A    Capability exists, not used.

7          THE COURT:  You say it exists but you don't use it?

8          THE WITNESS:  Yes, sir.

9   Q    Isn't it true that by searching for items using a UNSPSC

10  code in Lawson requisition self-service, that if a user at

11  Novant was to use that capability, it could find items from

12  multiple vendors with a particular UNSPSC code?

13         MR. SCHULTZ:  Objection, foundation.  He said he

14  doesn't use it.

15         MR. STRAPP:  Your Honor, we've been talking about the

16  capability of the Lawson system.  The door was opened on

17  direct.

18         THE COURT:  It's on cross-examination.  I think he

19  can answer that.

20  A    Could you repeat the question.

21  Q    Sure.

22         THE COURT:  If you did use it is the question.  You

23  may ask that.

24  Q    If a user at Novant was using Lawson requisition

25  self-service searching for an item by using a UNSPSC code, that

Yuhasz - Cross

1    user could find items from multiple vendors with the same

2    UNSPSC code; isn't that correct?

3    A    Yes.

4    Q    You talked a little bit about a competition, an RFP

5    process at Lawson; do you recall that testimony?

6    A    Yes.

7    Q    And the RFP that was sent was for procure to pay solution;

8    correct?

9    A    Yes.

10   Q    By a procure to pay solution, Novant means an end-to-end

11   solution that starts all the way from requisitioning and goes

12   through payment; correct?

13   A    Yes.

14   Q    The Novant Health -- the RPF, that was issued around 2008;

15   is that correct?

16   A    Yes.

17   Q    And that RFP we saw was sent to Lawson; isn't that

18   correct, Lawson and SciQuest?

19   A    Yes.

20   Q    It was also sent to ePlus?

21   A    Yes.

22   Q    Isn't it true that Novant sought the same functionality

23   from ePlus that it sought from all the other vendors as part of

24   this process including Lawson and SciQuest?

25   A    Yes.

1          MR. STRAPP:  I have no further questions, Your Honor.

2          THE COURT:  Any redirect?

3

4                    REDIRECT EXAMINATION

5   BY MR. SCHULTZ:

6   Q    Mr. Yuhasz, Mr. Strapp just asked you about the RFP

7   process.  Did either ePlus or Lawson win that RFP process?

8   A    No.

9   Q    Who did?

10  A    Ariba.

11  Q    And why?

12         MR. STRAPP:  Objection, Your Honor, relevancy.

13         THE COURT:  What difference does it make who won it?

14         MR. SCHULTZ:  It goes to the functionality that was

15  selected by Novant for fulfilling what they wanted out of their

16  RFP process.

17         MR. STRAPP:  Your Honor, the functionality -- what

18  Novant wanted is irrelevant.  What matters here is the

19  functionality that Lawson has in its accused system.

20         THE COURT:  It's marginally relevant, but it

21  introduces delay and confusion and opens up a lot of other

22  areas that we don't need to get into that really aren't

23  relevant, so sustained.

24         MR. SCHULTZ:  Mr. Yuhasz, thank you for your time.

25         THE COURT:  Can Mr. Yuhasz be permanently excused?

1        MR. STRAPP:  Yes, Your Honor.

2        MR. SCHULTZ:  Yes, Your Honor.

3        THE COURT:  Mr. Yuhasz, thank you for being here and

4   giving us your testimony, and you are released from your

5   obligation to be here.  Thank you, sir.

6        THE WITNESS:  Thank you.

7        THE COURT:  Next witness?

8        MS. STOLL-DeBELL:  Your Honor, we're calling Mr.

9   Keith Lohkamp back to the stand.

10

11                        **KEITH LOHKAMP,**

12   a witness, called by the defendant, having been first duly

13   sworn, testified as follows:

14                     DIRECT EXAMINATION

15   BY MS. STOLL-DeBELL:

16   Q    Mr. Lohkamp, do you have a college degree?

17   A    Yes, I do.

18   Q    When did you get your college degree?

19   A    In 1991.

20   Q    Where did you get it from?

21   A    Stanford University.

22   Q    And what kind of college degree did you get?

23   A    Bachelor's in international relations.

24   Q    Do you have an advanced degree?

25   A    Yes, I do.

1   Q    Will you describe that for me, please.

2   A    Yes, I have an MBA from the Haas School of Business at UC

3   Berkeley.

4   Q    When did you get that?

5   A    I got that in 1996.

6   Q    When did you start working for Lawson?

7   A    May 2005.

8   Q    I think the other day you testified that you first learned

9   about ePlus when you saw them at a trade show in 2003?

10  A    Yes, that's correct.

11  Q    Is that correct?  But at that time, you were not working

12  for Lawson; isn't that correct?

13  A    That's correct.

14  Q    And then I believe that you testified you didn't hear

15  again of ePlus until 2008 in connection with a Cleveland Clinic

16  bid; is that correct?

17            MR. ROBERTSON:  Your Honor, I'm going to object.

18  This is cumulative.  We went through this all on the first day,

19  both on direct and cross-examination.

20            THE COURT:  Well, what do you say in response to

21  that, Ms. Stoll-DeBell?

22            MS. STOLL-DeBELL:  I'm trying to establish when he

23  was an employee for Lawson and compare that to when he heard

24  information about ePlus, and I will say this is the last

25  question on it as well, Your Honor.

```
 1              THE COURT:  So that falls under the last question
 2   rule of evidence?
 3              MS. STOLL-DeBELL:  Yes, Your Honor.
 4              THE COURT:  Okay, sustained -- I mean overruled.
 5              MS. STOLL-DeBELL:  Thank you.
 6   Q    So I'll ask you, do you remember the question?
 7   A    Could you repeat it, please.
 8   Q    Sure.  I think you testified the other day that you didn't
 9   hear about ePlus again until 2008 in connection with the
10   Cleveland Clinic situation you testified about?
11   A    That's correct.
12              THE COURT:  Do you see why the form of that question
13   elicited the objection it did?
14              MS. STOLL-DeBELL:  Yes, Your Honor.
15              THE COURT:  You testified.  Did you next hear from
16   them -- when did you next hear from them.  2008.  Okay.
17   Q    What percentage of Lawson's S3 supply chain customers
18   purchase punchout?
19              MR. ROBERTSON:  Your Honor, we went into this, too.
20   The gentleman testified, I believe, it was a hundred customers.
21              MS. STOLL-DeBELL:  Your Honor, we were talking
22   about --
23              THE COURT:  I think she's just laying some foundation
24   for what she wants to get into, so I'll allow the question.
25   There was some discussion, but they were -- their
```

1   cross-examination was restricted, so they can go into it a

2   little bit now and put on their case.

3   Q    I think we were talking about RSS, and I'm now asking you

4   a different question today, and that is, what percentage of

5   Lawson's S3 supply chain customers purchase punchout?

6   A    Approximately ten or 11 percent.

7   Q    We had a couple of questions that were asked regarding

8   your testimony the other day relating to the punchout partner

9   contracts, so I'm going to ask you about those now.

10  A    Okay.

11  Q    Does the punchout product work the same regardless of

12  whether Lawson has a contract with the punchout vendor or not?

13  A    Yes, it does.

14  Q    What is the difference between a contractual punchout

15  vendor and a noncontractual punchout vendor?

16  A    The difference is that a contractual one, we have a

17  relationship with and an ongoing contact so we can better

18  support our customers.

19  Q    So what happens if the connection between Lawson's

20  punchout product and a noncontractual punchout vendor's website

21  breaks?

22  A    Well, if they are not on the supported punchout list, then

23  we wouldn't be able to support our customers.  If they are on

24  the supported list, we can provide phone support and try to

25  resolve the issues, and if someone has a contract, we usually

1    have a contact there so that we can call and help work together

2    to resolve the issue for the customer.

3              THE COURT:  Are you using contract and support in the

4    same term to mean the same thing there?  In other words, you

5    support those people, those punchout partners that you have

6    contracts with.  You don't support if you don't have the

7    contract; is that what you mean?

8              THE WITNESS:  What I mean is we have a list of

9    supported punchout trading partners.

10             THE COURT:  Are they the ones with the contract?

11             THE WITNESS:  Some have contracts and some don't.  We

12   have a list of supported trading partners, and the ones that

13   are on that list we'll try to support our customers on because

14   we know that it should work with our software.

15             THE COURT:  The question was, what's the difference

16   between those punchout partners who have contracts and those

17   who do not insofar as you are concerned?

18             THE WITNESS:  Well, the ones that have a contract, we

19   have a defined contact as well as an agreement on how to

20   support the customers and the expectations.

21             For the ones that we don't have a contract with,

22   we'll try our best to support those customers, but we sometimes

23   don't have a contact at that vendor, and it's harder for us to

24   support.

25   Q    So when you say defined contact, you mean a person you

1   know works there and you can call and work with them to see if

2   you can fix the connection?  Is that correct?

3          MR. ROBERTSON:  Could the witness testify?

4   Objection, leading.

5          THE COURT:  Well, it is, but I think she was just

6   clarifying, and I think it's all right in this instance.

7          MS. STOLL-DeBELL:  I think it was hard to hear if he

8   was contract or contact.

9          THE COURT:  Yes.

10  Q    What do you mean by defined contact?

11  A    That means that we have a person at the vendor that we can

12  reach out to in case we have a need to work with them to help

13  support our mutual customer.

14  Q    And does the support of your mutual customer relate to the

15  connection between that customer's punchout product and the

16  punchout vendor's website?

17  A    Yes, it does.

18  Q    If you have punchout vendors that you support, some of

19  which you have a contract with and some of which you do not,

20  what is the purpose of having a contract between Lawson and the

21  punchout vendor?

22  A    Well, when I proposed putting together the punchout

23  partner program, at the time, we had a list of supported

24  trading partners.  We didn't really have -- it was very much ad

25  hoc.  We didn't have a really good process or any relationship

1  really with those vendors, official relationship, so the

2  purposes of having the contract was to make it a formalized

3  process for bringing new supported punchout partners on as well

4  as to set up the ground rules of how we were going to work

5  together and set the expectations with that vendor with the

6  goal of being able to support our customers who were interested

7  in punching out using procurement punchout to that vendor

8  website.  So the contract helps us kind of establish the

9  expectations and how we were going to work together to support

10 our mutual customers.

11 Q    Is it possible to use Lawson's punchout product to punch

12 out to a vendor website if the vendor is not a supported vendor

13 by Lawson?

14 A    Yes.

15 Q    Is it possible for Lawson's customers to connect to

16 punchout vendors' websites without using Lawson's punchout

17 product?

18        MR. ROBERTSON:  Objection, Your Honor, vague and

19 ambiguous.  Is this just using the internet to go to a website

20 or using a Lawson product?

21        MS. STOLL-DeBELL:  I can ask a better question, Your

22 Honor.  I'll withdraw that.

23        THE COURT:  All right.

24 Q    Is it possible to use an internet browser to connect to a

25 punchout vendor's website?

1          MR. ROBERTSON:  Objection, Your Honor, relevancy.

2          MS. STOLL-DeBELL:  Your Honor, I think it goes --

3          THE COURT:  Why does that have anything to do with

4    this case?

5          MS. STOLL-DeBELL:  I think it goes to the

6    relationship and connection between Lawson and the punchout

7    vendor and how the punchout vendor's website works.

8          THE COURT:  They are different websites.  The

9    testimony he gave earlier, or somebody gave, was if you go on

10   the internet, you get one website.  If you go through the

11   punchout you get another, I think.  Isn't that right?  Ask him.

12   I think -- if you go through the internet to get to what was --

13   a website of somebody who is your punchout partner, you get the

14   internet site or not, the regular site?

15         THE WITNESS:  For certain vendors, for example, like

16   StaplesLink.com, you can go directly to StaplesLink.com versus

17   going through punchout through a browser.

18         THE COURT:  But if you go through the punchout, it's

19   a different website; isn't it?

20         THE WITNESS:  You would be logged in to -- it would

21   be the same website.  You'd be logged into StaplesLink.com.

22         THE COURT:  So it's true for some of them but not for

23   all of them.

24         THE WITNESS:  I am not familiar with all of them.

25   Q    So with StaplesLink.com, you can use an internet browser

1    to connect to a customer specific private StaplesLink.com

2    website; is that correct?

3                MR. ROBERTSON:  Objection, relevancy, Your Honor.

4    We're talking about using a Lawson product, not using the

5    simple internet browser.  This has nothing relevant to the

6    accused systems.

7                THE COURT:  I'm inclined to agree with him, Ms.

8    Stoll-DeBell.  I was trying to see what the difference was, but

9    I think the objection is sustained.

10                MS. STOLL-DeBELL:  I think that's all the questions I

11    have for right now.

12                THE COURT:  Any cross-examination?

13

14                        CROSS-EXAMINATION

15    BY MR. ROBERTSON:

16    Q    Good afternoon, Mr. Lohkamp.

17    A    Good afternoon.

18    Q    I understand you have these punchout trading partners that

19    you have contracts with and punchout trading partners that you

20    don't have contracts with; right?

21    A    Correct.

22    Q    But other than not having, for example, a defined contact,

23    I think that's what you said; that was one of the benefits of

24    having a contract?

25    A    That was one of the benefits, yes.

Lohkamp - Cross

1   Q    So we're all clear on this, it doesn't matter for a

2   contract punchout trading partner of Lawson's or noncontract

3   trading partner of Lawson's, the technology never changes;

4   right?

5   A    That's correct.

6   Q    And isn't it true that the vast majority of Lawson's

7   punchout trading partners are noncontractual; right?

8   A    Yes.

9   Q    And but yet you work with these noncontractual punchout

10  partners to the mutual benefit of both companies just like you

11  do with your contractual partners; right?

12  A    No.

13  Q    So, I see.  Because there's a contract, you have a mutual

14  benefit, and because you don't have a contract, there's no

15  mutual benefit?

16  A    I thought I understood you to say they work with them the

17  same way.

18  Q    I'm wondering -- it doesn't matter whether you have a

19  contract or don't have a contract.  It's still mutually

20  beneficial to both Lawson and its punchout trading partners to

21  have that relationship; right?

22  A    Yes.

23           MR. ROBERTSON:  That's all I have, Your Honor.  Thank

24  you.

25           THE COURT:  Any redirect?

 1              MS. STOLL-DeBELL:  No, Your Honor.

 2              THE COURT:  Can he be excused permanently?

 3              MR. ROBERTSON:  From our perspective, yes, Your

 4    Honor.

 5              MS. STOLL-DeBELL:  I thought I answered.  Yes.

 6              THE COURT:  You may have, and I didn't hear.  You are

 7    permanently accused.  You don't need to worry about coming

 8    back.

 9              THE WITNESS:  Okay, thank you.

10              MR. ROBERTSON:  Your Honor, I understand the next

11    witness is going to be Lawson's expert, Dr. Shamos, and we were

12    provided with some slides last night, and I think they're

13    intended to be used with Dr. Shamos, and we have some issues

14    with respect to them, Your Honor, that we'd like to take up in

15    court before they are published.

16              THE COURT:  You got those slides when?

17              MR. McDONALD:  We gave them to them on the agreed

18    time yesterday, Your Honor, and we've been trying to work this

19    out, and I think I've been able to -- I think we can get

20    through today without having to use any slides that they're

21    concerned about.

22              THE COURT:  All right, we'll deal with that after

23    court today.

24              MR. McDONALD:  I think we tried to go through and get

25    rid of the ones that were an issue for him.

1    THE COURT:  All right.

2    MR. McDONALD:  We call as an expert Dr. Michael

3 Shamos.

4

5                      **MICHAEL I. SHAMOS,**

6 a witness, called by the defendant, having been first duly

7 sworn, testified as follows:

8                      DIRECT EXAMINATION

9 BY MR. McDONALD:

10 Q    Good afternoon.  Could you state your full name, Dr.

11 Shamos.

12 A    Yes.  It's Michael Ian, I-a-n, Shamos, S-h-a-m-o-s.

13 Q    Where do you live, Dr. Shamos?

14 A    I live in Pittsburgh, Pennsylvania.

15 Q    Where do you work?

16 A    My main job is at Carnegie Mellon University.  I'm on the

17 faculty of the school of computer science.

18 Q    Do you have any positions or specific positions at

19 Carnegie Mellon?

20 A    I have the title of distinguished career professor.  I've

21 been there for 35 years, and I direct the master's degree

22 program in electronic business.

23 Q    And you were asked to provide some expert services in this

24 case; is that right?

25 A    Yes.

Shamos - Direct                                    1724

1   Q    Can you generally summarize what you were asked to do in

2   this case?

3   A    Yes.  I was asked to look at expert reports.  There was an

4   expert report written on infringement in this case, and I was

5   asked to rebut that, and I was also asked to prepare an expert

6   report on the invalidity of the patents in this case, and I did

7   that.

8   Q    You understand you are here right now this afternoon to

9   focus on the infringement issues?

10  A    That's right.

11  Q    Rebut, can you explain what you mean by that?

12  A    Yes.  Well, it's the plaintiff in the case that puts

13  forward its arguments as to why the defendant infringes.

14         THE COURT:  I think maybe that's something I tell the

15  jury, Dr. Shamos doesn't tell the jury.  I know he's a lawyer,

16  but you are responding to the report, position of Dr. Weaver;

17  is that what you mean?

18         THE WITNESS:  That's right.

19         THE COURT:  Let's do it that way.

20  Q    And you did do that work, didn't you, Dr. Shamos?

21  A    Yes.

22  Q    You told us a little bit about your position at Carnegie

23  Mellon, but can you tell me what other educational background

24  you have that is relevant to the work you did for this case.

25  A    Yes.  I think the relevant education starts actually when

1   I was in high school.  When I was 15, I attended a program at

2   Carnegie -- at Columbia University in New York City for high

3   school students to teach them computer programming.

4   Q    What year are we talking here?

5   A    1962.

6   Q    What other experiences do you have that are relevant here?

7   A    Yes.  After I began programming in 1962, I was kind of

8   bitten by that bug, and every job I've ever had since then has

9   involved computers in one way or another.  So when I went on to

10  undergraduate school, even though there was no such thing as

11  computer science then, I spent my time in the university

12  computing center.

13  Q    Which university was this now?

14  A    That was Princeton University.  And immediately upon

15  graduation, I got a job as a programmer for IBM Corporation.

16  Q    Can we stop?  When you say graduate, when did you graduate

17  and where?

18  A    I graduated from Princeton in 1968.

19  Q    What was your degree?

20  A    Physics.

21  Q    At the time, did they have a computer science major?

22  A    No.  There actually wasn't a field called computer science

23  at the time.  It was possible to take courses, but there was no

24  major.

25  Q    So after you graduated, I believe you were about to tell

1    us where you went next.  Pick up from there, please.

2    A    Yes.  The dream job for somebody who is interested in

3    computers at that time was to work for IBM.  I took their

4    aptitude test, and I got hired in East Fishkill, New York,

5    which then, as now, has IBM's largest facility in the world.

6    It manufactures semiconductors, the circuitry used inside IBM

7    computers.  I was a programmer there.

8    Q    How long were you at IBM as a programmer?

9    A    I was with IBM full time for two years, but my total

10   employment actually lasted seven years.  I was on leave for

11   five years because of circumstances.  One of those

12   circumstances was the Vietnam War, and I had a very low draft

13   number so I was going to go, and I enlisted in the United

14   States Public Health Service and served as a programmer at the

15   National Institutes of Health from 1970 to 1972.

16       By that time, there was a field called computer science,

17   and Yale University had just started a computer science

18   department.  So I went from -- after leaving the public health

19   service in '72, I went to Yale to study for Ph.D. in computer

20   science from 1972 to 1975, and upon finishing my work at Yale,

21   that's when I was hired by Carnegie Mellon University to teach

22   programming.

23   Q    So in 1975, did you actually get a Ph.D. from Yale in

24   computer science?

25   A    No.  I left Yale having completed everything except the

1    thesis.  I went to join the faculty at Carnegie Mellon, and I

2    finished my thesis during the next three years.  So I actually

3    formally got awarded degree in 1978.

4    Q    So is that from Yale or from Carnegie Mellon that you got

5    the Ph.D.?

6    A    I got the Ph.D. from Yale while I was a professor at

7    Carnegie Mellon.

8    Q    And since -- and you've been at Carnegie ever since?

9    A    I've been continuously associated with Carnegie.  I was

10   full time for six years, and then I took adjunct status which

11   means I was affiliated with the university and I would teach

12   every once in a while, but I didn't have a full-time position

13   there.

14        I was adjunct status for 17 years doing other things.  I

15   got promoted kind of in absentia, and then I returned to

16   Carnegie Mellon full time in 1998.

17   Q    So in those years between '81 and '98, did you have some

18   other experiences that would be relevant to the work you did in

19   this case?

20   A    Yes.

21   Q    What else did you do in that period?

22   A    One thing was, I became a patent attorney.  Another was

23   that I started two computer software companies in Pittsburgh,

24   Pennsylvania, and formed a company in 1979, another one in

25   1984, and sold them in 1987.

1   Q    Stop a second here.  So when you say you were a patent

2   attorney, do you mean you got registered at the Patent Office

3   or went to law school or what?

4   A    Immediately after finishing the Ph.D. at Yale in 1987, I

5   enrolled in law school in Pittsburgh at Duquesne University,

6   and while I was teaching during the day, I was attending law

7   school at night.  So from 1978 to 1981, I was in law school.  I

8   got admitted to the bar in 1981, and because my undergraduate

9   degree was in physics, I was qualified to take the patent bar

10  exam, and I did that.

11  Q    What is the patent bar exam?

12  A    It's an examination that's required of persons who want to

13  practice before the United States Patent and Trademark Office

14  in preparing patent applications.

15  Q    Did you pass that test?

16  A    Yes.

17  Q    When was that?

18  A    1981.

19  Q    I think you mentioned two companies.  Can you tell us,

20  those are both computer companies; is that right?

21  A    Yes.

22  Q    Generally, what was the business?  What was the business

23  of those two companies?

24  A    The first company I started was a software company based

25  on a product that had been developed by a student at Carnegie

1    Mellon University.  It was a document production system that

2    you could best think of as a precursor to Microsoft Word.  It

3    was a program that enabled people to produce beautiful typeset

4    documents in a day before they could even see them on the

5    screen.

6          Right now we're used to the computers that have very high

7    resolution screens.  You can see beautiful fonts and colors,

8    but in those days, everything was a fixed width.  There were 80

9    columns on a screen and 24 rows, and there were no colors.  So

10   you couldn't even see on the screen the documents that you

11   wanted to produce, and this software almost magically was able

12   to produce documents that you couldn't even see on the screen,

13   but they could be printed out on a printer.

14   Q    That was one of the two companies?

15   A    That was the first company.

16   Q    What did the other company do?

17   A    The other company was a software services company.  Other

18   companies who had software would come to us and say, well, we

19   have this system running on an IBM computer, but we'd really

20   like it to run on a Digital Equipment computer, could you

21   transport it, could you translate it or port it from one system

22   to another.  So for several years we rendered the service of

23   actually translating software from one computer system to

24   another.

25   Q    I think you indicated you sold both of those businesses;

1    right?

2    A    Yes.

3    Q    Did you get out of those two businesses once you sold

4    them?

5    A    When I sold the document production software company --

6              THE COURT:  The answer to that is probably yes or no,

7    and we don't need to have a lot of explanation.  So let's kind

8    of confine this.  Whether he kept the company or not doesn't

9    make any difference.  Let's go.  Get on with it.  Do you accept

10   him as an expert, Mr. Robertson?

11             MR. ROBERTSON:  I haven't seen he's going to be

12   represented to be an expert.  I have this concern about --

13             THE COURT:  Never mind.  I'm let him finish his

14   examination.

15   Q    So if we pick up from about that 1987 time period, Mr.

16   Shamos, when you sold those two companies, did you acquire any

17   experiences after that that would be relevant specifically to

18   the work you did regarding the patents in this case?

19   A    I spent --

20   Q    That is a yes or no question.

21   A    Yes.

22   Q    What did you do after '87, specifically '87 to the early

23   '90s time frame?  What experiences did you have in that period

24   that would be relevant to the work you did in this case?

25   A    I was an intellectual property attorney full time for

1    eight years, dividing my time among patent, copyright, and

2    trademark cases, but every one of them involved computers or

3    computer software in some way, and I continued to remain active

4    as far as my affiliation with Carnegie Mellon University in

5    anticipation of returning there.

6    Q    If we zero in on issues specific to electronic commerce or

7    electronic procurement, can you tell me what background in your

8    education or experience you have particularly in that area, if

9    any?

10   A    Yes.  Very shortly after I returned to Carnegie Mellon in

11   1998, the university wanted to set up an educational program in

12   electronic commerce, and at the time, it was to be a joint

13   venture between the business school and the school of computer

14   science.

15        When I returned, I held appointments in both the business

16   school and the school of computer science, so I was made one of

17   the founding team that was to put together that degree program.

18   Because it was a joint venture, it had a director from computer

19   science and a director from business.  I was the director from

20   the school of computer science, and so my role there was to

21   design and staff and teach in the technical component of the

22   master of science and electronic commerce which was a degree

23   that we were offering.

24        I did that.  I taught three courses in that program

25   starting in 1999, and subsequently, in 2004, the school of

1   computer science took over the entire program, and I'm its

2   director now.

3   Q    How long have you been the director of the eCommerce

4   program at Carnegie Mellon?

5   A    Since late 1998.

6   Q    I think you said you taught the technical component of

7   that?

8   A    Yes.  When the program started, it was 50 percent business

9   and 50 percent computer science.  I was responsible for

10  designing and staffing the computer science side of it.

11  Q    Have you got other experiences other than your involvement

12  as the director of this eCommerce department that would

13  specifically relate to electronic commerce or electronic

14  procurement?

15  A    Yes.  I've been an expert witness in a large number of

16  cases, all involving computer software, and lately most

17  involving electronic commerce, particularly internet commerce.

18  Q    You used the phrase internet commerce.  Can you explain

19  what you meant by that?

20  A    Yes.  It's commerce in which one or more steps are

21  performed by communication over the internet.

22  Q    Have you got any other experiences or educational degrees

23  and the like that would be specifically related to electronic

24  commerce or eProcurement?

25  A    No.  I stopped the degree-getting business a long time

1    ago.

2    Q    And in connection with your work in this case, you did

3    read the three patents involved; right?

4    A    Oh, yes, extensively.

5    Q    Could you tell me generally how you would characterize the

6    technology involved in those three patents?

7    A    The patents involve what's referred to as electronic

8    procurement.  There are some -- let's say I'm an employee of a

9    company, and I need various components as part of my work.  And

10   I go, and I look up in a database where these components might

11   be able to be ordered from, and I tell which ones I like, and

12   the system is then supposed to go and prepare requisitions and

13   purchase orders for submission to the relevant suppliers of the

14   equipment that I would like.

15   Q    Is that a technology area that the experiences you've been

16   describing so far this afternoon pertains to?

17   A    They relate to -- I performed expert witness services in a

18   number of electronic procurement cases.

19              MR. McDONALD:  We do offer Dr. Weaver as an expert in

20   the tech --

21              THE WITNESS:  Not Weaver, I think.

22              MR. McDONALD:  Ha, ha, ha, thank you.  I offer Dr.

23   Shamos as an expert in the patent and technology involved in

24   this case including electronic commerce and procurement

25   software and the patent analysis relating to infringement and

1   validity of those patents.

2          MR. ROBERTSON:  Your Honor, I just want to make clear

3   there was a motion *in limine* with respect to this gentleman

4   testifying as a computer scientist and not in any capacity as a

5   patent attorney or to offer any legal opinions.

6          What I heard in that proffer, what I thought I heard

7   was legal analysis or legal opinions in patented technology,

8   and I want to make sure we're confining ourselves to the area

9   of science which was the Court's ruling.

10         THE COURT:  In electronic procurement science; is

11  that your point?

12         MR. ROBERTSON:  Yes, sir.  Is that what you are

13  offering?

14         MR. McDONALD:  I think my understanding is we're not

15  going to ask him legal opinions.  That's not what I meant when

16  I made that proffer.

17         MR. ROBERTSON:  I just didn't want there to be any

18  confusion, because part of the questions concerned credentials

19  as a patent attorney and intellectual property attorney, and I

20  didn't want the jury to misunderstand he was going to be

21  offering any kind of opinions in that sphere.

22         THE COURT:  He can't.  I've ruled that he can't.  And

23  he's not accepted as an expert in those areas.  He's accepted

24  as an expert in the electronic procurement field from a

25  scientific standpoint.

1         MR. McDONALD:  Understood.

2    Q   Dr. Shamos, I'd like to turn now to the infringement

3    issues in this case.  You understand that for purposes of this

4    case, ePlus has asserted 12 specific claims of the '683, '516,

5    and '172 patents against Lawson?

6    A    Yes.

7    Q   And you understand that through Dr. Weaver, ePlus has

8    asserted that Lawson infringes those 12 claims?

9    A    I don't know that to be the case.  I read Dr. Weaver's

10   report.  I assume he testified based on that.

11        THE COURT:  I don't think that's what he was asking.

12   He was asking you if, through that report, you understood he

13   was asserting that there was infringement.

14        THE WITNESS:  Oh, I wasn't here for his testimony, so

15   I don't know what he said, but it was my understanding he was

16   going to do that.

17   Q   You read his report; right?

18   A    Yes.

19   Q   His report said that basically; is that right?

20   A    Yes.

21   Q   And you did your own report for this case; correct?

22   A    Yes.

23   Q   And can you tell us generally what work you did to put

24   together your report regarding infringement?

25   A    Yes.  Well, I had to review all the patents.  I reviewed

1   the file histories of the patents.  I reviewed Dr. Weaver's

2   report and report of other experts and all of the attachments

3   and exhibits associated with those reports.

4   Q    You use the word file histories.  Can you explain what

5   file histories are?

6            MR. ROBERTSON:  Your Honor, there's a description in

7   the glossary that you gave to the jury, and, again, I think

8   this is getting into an area where he's testifying as to the

9   patent law issue.  I object.

10            MR. McDONALD:  He used the phrase, Your Honor.  I

11   just thought it was time to clarify at that moment, but I'm

12   fine with whatever you want to do here.

13            THE COURT:  I think you've had file history in the

14   glossary terms, and it was explained in the opening videos.  Is

15   that what you reviewed, Dr. Shamos?

16            THE WITNESS:  Yes, Your Honor.

17            THE COURT:  What is commonly called the file history,

18   prosecution history or file wrapper, as it's been variously

19   referred to.  Is that what you also reviewed when you said

20   that?

21            THE WITNESS:  That's correct.

22            THE COURT:  All right.

23   Q    What else did you do, Dr. Shamos, to form your opinions in

24   this case regarding infringement?

25   A    There were numerous documents referred to, documents

1    describing Lawson software.  I looked at those.  I compared the

2    documentation to the assertions made by Dr. Weaver, and then I

3    wrote a rebuttal report of my own.

4    Q    Did you review any deposition testimony?

5    A    Yes.

6    Q    About how many boxes of materials do you have regarding

7    this case?  By boxes, I mean boxes like a banker's box.

8    A    I don't know because I don't have paper documents.

9    Everything was supplied to me in electronic form, but it does

10   represent several gigabytes worth of material, and I presume if

11   it were actually printed out, it would be many thousands of

12   pages.

13   Q    And as part of your analysis, did you say that you read

14   Dr. Weaver's report on infringement?

15   A    Oh, meticulously.  I had to rebut everything in there that

16   I could find to rebut.

17   Q    Did you then, after reviewing those materials, reach your

18   own conclusions as to whether or not Lawson infringed those 12

19   asserted claims that are at issue here in this case?

20   A    Yes, I did form that opinion.

21   Q    What opinion did you reach, your opinions about that?

22   A    My opinion is that the accused systems don't infringe any

23   of the asserted claims.

24   Q    Can you tell me in a nutshell why that is?

25   A    Yes.  I think for infringement purposes, everything really

1   revolves around the concept of the catalog and whether the

2   Lawson system uses a catalog or multiple catalogs, collection

3   of catalogs, and whether those -- there are such things as

4   separately searchable portions of those catalogs.

5   Q    And so how does the catalogs issue relate to your

6   conclusions?

7   A    The, I think, 11 out of the 12 claims, asserted claims

8   require catalogs, and I used the construction that was

9   propounded by the Court for the word catalog and didn't find

10  catalogs in the Lawson system.

11  Q    When you say Lawson system, we've had a number of initials

12  and things thrown around in the case, so let's make sure we're

13  on the same page.  Can you tell me what system or systems you

14  looked at from Lawson to do your analysis?

15  A    I looked at everything that Dr. Weaver accused of

16  infringement, S3, RSS, punchout.  There was an earlier system

17  in the case that I also looked at that I understand is no

18  longer in the case.

19  Q    Now, with respect to S3 procurement, are you familiar with

20  the names of some modules that comprise that S3 procurement

21  suite?

22  A    I don't know their literal names.  I know functionally

23  what they do.

24  Q    What functionally do the S3 procurement suite modules do?

25  A    Well, there's a search function that enables somebody to

Shamos - Direct

1   look within the database to determine if particular items are

2   there.  There's a mechanism for producing requisitions, and

3   requisition purchase orders can be produced.

4   Q    Are you familiar with the module called inventory control

5   or IC?

6   A    Yes.

7   Q    Is that one of the modules you looked at as well?

8   A    It's one of the modules I considered.  When I say looked

9   at.  I didn't actually look at source code of these modules

10  except as appeared in other experts' reports.

11  Q    Now, are you familiar with the phrase RSS?

12  A    Yes.

13  Q    What is your understand as to what that is?

14  A    Requisition self-service is a mechanism that allows

15  someone to create a requisition.

16  Q    Is that part of a Lawson product?

17  A    Yes.

18          THE COURT:  Excuse me just a minute, Dr. Shamos.

19  Will you pull that mic down a little bit?  I'm just -- no, so

20  it's closer to you.  You are sort of dropping off at the bottom

21  of the question, and I'm -- are you having trouble hearing?

22  See if you can pick it up at the bottom.  The front is okay.

23

24          (Brief interruption.)

25