1864

1   (The jury is out.)

2   THE COURT:  All right.  I've read the papers

3   filed in and the cases referred to in the plaintiff

4   ePlus' bench brief pertaining to relevance of the

5   absence of assertion of opinion of counsel for

6   inducement of infringement and the response thereto,

7   and I think I've heard from you-all on it extensively

8   already.

9   Does anybody have anything else to say on it?

10   Well, it's your motion.  Do you have anything

11   to say that hasn't been said?

12   MR. STRAPP:  I just want to say briefly that

13   --

14   THE COURT:  Then come to the lectern so at

15   the court reporter can hear you.

16   MR. STRAPP:  Briefly, Your Honor, the

17   evidence that came into the record was from

18   Mr. Christopherson regarding his lay opinion about

19   what Lawson's reaction was.  It was a lay opinion of

20   one person out of thousands at Lawson.  And it was his

21   understanding about whether or not the patented

22   technology was embodied in Lawson's S3 products.

23   I think that there's more evidence that's

24   relevant to intent that just Mr. Christopherson's lay

25   opinion.

1    THE COURT:  Of course, there is.

2    MR. STRAPP:  It would be prejudicial if we

3  weren't permitted to say that and to introduce to the

4  jury that not only did Mr. Christopherson look at

5  this, but Lawson considered it serious enough to send

6  to an attorney for opinion of counsel, but then

7  decided not to-

8    THE COURT:  Well, what's the inference to be

9  drawn?  It's that the opinion said there was

10  infringement.  Otherwise, it was no probative value,

11  does it, towards the intent element of the induced

12  infringement.

13    MR. STRAPP:  That's certainly one inference

14  that can be drawn.

15    THE COURT:  But that's one that can't be

16  drawn under the law, isn't it?

17    MR. STRAPP:  It is an inference that can be

18  drawn.

19    THE COURT:  That you got an opinion and you

20  didn't disclose it because it was bad?  It may have

21  been you read it and found it was an incompetent

22  opinion.  It may have been you read it and found that

23  it was wishy-washy, and it was very indefinite, and it

24  doesn't help one way or the other.

25    It may have been that you read it and you

1   thought it was wrong.

2          MR. STRAPP:  Of those are possibilities, I

3   agree, Your Honor.

4          THE COURT:  Without the evidence of what it

5   is that happened, the jury is being asked to speculate

6   as to one of those things.

7          MR. STRAPP:  The issue is without that

8   evidence, what the jury hears is that

9   Mr. Christopherson, one of thousands of employees at

10  Lawson, is speaking here in court and talking about

11  the intent as to Lawson generally.  That there was a

12  lack thereof.  Because he looked at the patents and

13  decided that it wasn't infringed.

14         It wouldn't be fair for the jury just to

15  consider that evidence in isolation without the

16  totality of the circumstances here that should be

17  considered as part of the intent prong of inducing

18  infringement.

19         THE COURT:  You have no case that says what

20  you want me to do.

21         MR. STRAPP:  Well, Your Honor, *Broadcom* is

22  about the absence of an opinion of counsel.  This is

23  about the absence of an opinion of counsel, too.

24         THE COURT:  No, this is about the presence of

25  an opinion of counsel and the failure to disclose it.

1    There's a fairly significant difference.

2             Okay.  Thank you.  Anything else?

3             MR. STRAPP:  Your Honor, could I just make

4    one more point?  I'm sorry.  If there's going to be

5    some sort of limiting instruction here with respect to

6    the evidence that came in from Mr. Christopherson's

7    opinion as well as the opinion of counsel, we would

8    suggest that the instruction be limiting with respect

9    to both what Mr. Christopherson said as to his lay

10   opinion as well as to the opinion of counsel.  So that

11   there's an equity here that the jury doesn't hear some

12   evidence but not other evidence.  So I'd like to make

13   that.

14            THE COURT:  You knew or Mr. Robertson knew at

15   the time that the question was asked what the answer

16   was.  And you stepped out there into thin air knowing

17   there wasn't any case support for what you did.  You

18   take the consequence of it when you do that, I think.

19            MR. STRAPP:  Your Honor, we thought that

20   Mr. Christopher's opinion could come in if it was

21   fairly counterbalanced by all the evidence.

22            THE COURT:  Even though there was no case

23   that said that.

24            MR. STRAPP:  *Broadcom* says opinion of counsel

25   was relevant to the intent prong.

1868

1  THE COURT:  Even though there's a specific

2  case law that says that you can't draw --

3  MR. STRAPP:  Your Honor, all the cases

4  that --

5  THE COURT:  -- a negative inference that you

6  seek.

7  MR. STRAPP:  Your Honor, *Knorr-Bremse* is the

8  case on the adverse inference.  That's strictly

9  limited to willfulness.  That was the Federal

10  Circuit's only question addressing the other district

11  court case cited by Lawson in its papers, which is

12  also a willfulness case, and, in fact, distinguishes

13  itself from *Broadcom* because it's willfulness.

14  THE COURT:  That's the same argument as

15  you've made before.  I'm going on with life.  Let's

16  go.

17  Anything else?

18  MS. STOLL-DeBELL:  The only thing I wanted to

19  point out is I think you've got two proposed

20  corrective instructions here, Your Honor.  We think

21  ours is better.  It's shorter.  It's simpler and it

22  just gets to the issues that need to be addressed and

23  doesn't get into Mr. Christopher's opinion, which is a

24  completely separate issue.  He's not an attorney.  He

25  didn't waive privilege to give it.  He just said what

1   he thought.  They opened the door when they asked him

2   what Lawson did after they learned of the patents.

3          So the questions I asked about that were

4   simply responding to the questions that ePlus asked

5   him.

6          THE COURT:  All right.  Thank you.

7          MS. STOLL-DeBELL:  Thank you.

8          THE COURT:  In my judgment, there's a fairly

9   substantial disconnect in the basic law applying to

10  opinions of counsel and how they can be used and how

11  they can't be used, but the law, as it exists, is, I

12  think, fairly clear on some points.

13         And the question is whether if an accused

14  infringer obtains an opinion of counsel and doesn't

15  waive the attorney-client privilege, the plaintiff or

16  patentee can use that fact as part of the totality of

17  circumstances that may be considered in adjudicating

18  by the finder of fact of the intent component of

19  induced infringement.

20         There is no case on the point that either

21  parted has cited.  The case of *Broadcom* deals with the

22  failure to obtain an opinion of counsel.  The

23  Knorr-Bremse decision provides that no adverse

24  inference shall arise from invocation of the

25  attorney-client and/or work product privilege.

1      I think to do what I am inveighed to do here

2  would, in essence, offend that principle because the

3  only helpful inference on the issue of intent to

4  induce infringement is to ask the jury to assume that

5  the unproduced opinion was unfavorable to the

6  patentee.

7      I perceive that the underlying principles of

8  the Federal Circuit's rules on failure to obtain an

9  opinion and the no adverse inference provision are an

10  intention, and it is appropriate to deal with evidence

11  in perspective of the rule that an instruction cannot

12  be given that implies a negative inference from the

13  assertion of the attorney-client privilege regarding

14  opinion of counsel.  Otherwise, firms would be

15  discouraged from obtaining an opinion of counsel

16  knowing that it would have to be disclosed.

17      Now, that said, I also believe that there is

18  some considerable illogic between the rules on failure

19  to obtain an opinion, which can be used, and obtaining

20  an opinion and not disclosing it and the adverse

21  inference instruction law that comes from *Knorr*.

22      The resolution of that question really is

23  appropriate for the Federal Circuit because its

24  guiding teaching here is that you can't put somebody

25  at prejudice because they obtain an opinion and don't

1  disclose it.

2       I think that that's something the court is

3  going to have to visit, perhaps in this case, but in

4  this case I believe that the correct decision is to

5  preclude that evidence because it does invite the jury

6  to speculate even if it's considered in perspective or

7  with an instruction of the sort in *Broadcom* where the

8  judge balanced the failure to get an opinion with the

9  no adverse inference rule in the instruction.

10       So the motion to use the failure to disclose

11  the opinion of counsel is -- the motion to use that

12  evidence is denied.  And I'll give an instruction.

13       Right now I'm just going to tell them at an

14  appropriate point just to disregard the instruction.

15  And we'll argue the larger versions of the corrective

16  instruction at a later point in time in the charge

17  conference when we give the instructions as whole.

18       Is there anything else that we have left

19  here?

20       MR. McDONALD:  I don't believe so, Your

21  Honor.

22       THE COURT:  Okay.  All right.  How long did

23  we go?  Because I'd like to give you-all a little

24  respite.

25       MR. McDONALD:  Can we have until half past

1872

1    the hour?

2            THE COURT:   Sure.   Just so we all know when

3    to come back.   That gives us 20 minutes.

4            (Recess taken.)

5            THE COURT:   All right.   Cross-examination.

6

7        CROSS-EXAMINATION

8    BY MR. ROBERTSON:

9    Q   Dr. Shamos, you talked a little bit about what you

10   did to prepare your report in this case and what you

11   reviewed; is that right?

12   A   Yes.

13   Q   And I'd like to talk a little bit about what you

14   didn't do, if that's all right.   First, sir, isn't it

15   true that you didn't talk to any Lawson programmers

16   for this accused product prior to rendering your

17   report?

18   A   I think that's true.

19   Q   Isn't it true you didn't talk to any of the people

20   who write the software code prior to rendering your

21   report?

22   A   I don't specifically recall having done so.

23   Q   Isn't it true you didn't talk to any salespeople

24   at Lawson?

25   A   I didn't talk to salespeople.

SHAMOS - CROSS                1873

1    Q    Isn't it true you didn't talk to the head of

2    product development for these accused products?

3    A    Since I don't know who that is, I guess I didn't

4    talk to hem.

5    Q    That is this gentleman sitting over here,

6    Mr. Christopherson.

7    A    No.

8    Q    You didn't talk to him?

9    A    No.

10   Q    The first time you ever met him was when you came

11   to the courthouse?

12   A    I never really even met him.  I saw him.

13   Q    You didn't talk to the product strategist for

14   Lawson, did you, sir?

15   A    No.

16   Q    Do you know who he is?

17   A    No.

18   Q    He is Mr. Lohkamp.  He's testified here.

19        You didn't talk to anybody in Lawson Professional

20   Services who implements these products, did you, sir?

21   A    No.

22   Q    You didn't know who the representative was from

23   Lawson Professional Services who testified here?

24   A    No.

25   Q    You didn't talk to any of the people who install

1  the software; isn't that right?

2  A    That's right.

3  Q    The only people you talked to in preparation for

4  rendering your report were the attorneys over here;

5  isn't that right?

6  A    I talked to them.  I didn't talk to them all that

7  much, but I did talk to them.

8  Q    And the attorneys, they are zealous advocates for

9  the accused infringer here, right?

10  A    I think that is their job.

11  Q    As capable as they are, you would agree with me

12  that the attorneys representing their client are the

13  only people you spoke with in preparation for your

14  report are a little less than objective.  Would that

15  be fair to say as zealous advocates for their client,

16  the accused infringer?

17  A    I think that's fair to say.  I think the documents

18  in the case are objective, but maybe the people I

19  talked to weren't.

20  Q    So you also said you looked at a lot of Lawson

21  documents; isn't that right?

22  A    Yes.

23  Q    You said something like several gigabytes?

24  A    No.  I said I looked at several gigabytes of

25  documents.  They weren't all Lawson documents.

1   Q    A great majority of them were Lawson documents,

2   weren't they?

3   A    I'm not ready to characterize it as to whether it

4   was a majority or not.

5   Q    You're the hired expert for Lawson, right?

6   A    Yes.

7   Q    So you could have had access to any Lawson

8   documents that you wanted; isn't that right?

9   A    Yes.

10  Q    All you had to do was ask, right?

11  A    Yes.

12  Q    And you would have been given whatever you needed,

13  right?

14  A    I expect.

15  Q    And you didn't indicate that you looked at and you

16  cite in your report some guides and manuals and things

17  like that with respect to these accused products?

18  A    Yes.

19  Q    Did you ask for any additional documents?

20  A    No, I had -- it was very difficult to deal with

21  the quantity of documents that I already had.

22  Q    And the documents you were given were all selected

23  by the lawyers, right?

24  A    Yes.

25  Q    They provided you what they wanted you to see;

1   isn't that right?

2   A    Only to a certain extent.  The documents were

3   provided by lawyers; however, there were expert

4   reports that I reviewed, and there were documents that

5   were cited in those expert reports, and the selection

6   of those documents was not made by the Lawson lawyers.

7   Q    And you had any opportunity to actually get a

8   laptop demonstration of this software and conduct your

9   own demonstration using the software, correct?

10  A    Yes.

11  Q    And you didn't do that, recite that, anywhere in

12  your support report, did you, sir?

13  A    No.

14  Q    So you didn't do that in preparation for your

15  expert report, right?

16  A    I did a little of it.  I didn't do enough that I

17  thought it was of relevance to put it in the report.

18  Q    So you didn't present any demonstrations here

19  today to show or illustrate your opinions with respect

20  to infringement, did you?

21  A    They weren't necessary.

22  Q    And so you didn't think it would be helpful to

23  show the jury by using the actual accused software how

24  it didn't satisfy the claim elements of the asserted

25  claims in suit?

1  A    It's very difficult to show --

2  Q    If you would answer that yes or no fairly, I'd

3  appreciate it.

4  A    No, I didn't.

5  Q    You know that Dr. Weaver made some demonstrations,

6  correct?

7  A    Yes.

8  Q    Now, did I understand that you applied the Court's

9  claim construction, is that right, with respect to

10  "catalog"?

11  A    Yes.

12  Q    And one of your arguments for non-infringement or

13  one of your opinions for non-infringement is that the

14  accused systems don't have catalogs, correct?

15  A    Yes.

16  Q    But you've seen a lot of Lawson documents that

17  talk about importing catalog data into the item

18  master, haven't you?

19          MR. McDONALD:  Objection, Your Honor,

20  irrelevance regarding the Lawson documents for

21  business purposes.  They were not written with an eye

22  towards the Court's construction.

23          MR. ROBERTSON:  I was going to follow-up,

24  Your Honor, with respect to that.

25          THE COURT:  Overruled.

1   Q    You have seen a lot of Lawson documents that use

2   the term "catalog," correct?

3   A    Yes.

4   Q    Now, how do you know that Lawson's using that term

5   "catalog" inconsistent with the Court's claim

6   construction?

7   A    Because Lawson had no idea what the Court's claim

8   construction would be when it wrote those documents.

9   Q    How do you know it's inconsistent with the Court's

10  claim construction?

11  A    Well, because I know what the structure of the

12  Lawson database is.

13  Q    When Lawson was using the term "catalog" in its

14  documents, you have no idea if they were using it

15  inconsistent with the Court's claim construction;

16  isn't that right?

17  A    I didn't really consider the fact that they used

18  the word "catalogs."  I don't think it has any

19  relevance.

20  Q    What if they were using it consistent with the

21  Court's construction?

22  A    Then they would have been wrong.

23  Q    Well, did you ask anybody at Lawson whether they

24  were using the term "catalog" consistently with the

25  Court's claim construction?

1  A    No.

2  Q    Because you didn't talk to anybody at Lawson,

3  right?

4  A    If I had, I don't think I would have brought up

5  the Court's claim construction with them.

6  Q    Well, if you saw a lot of documents that were

7  using the term "catalog," wouldn't you be at least

8  curious as to whether or not that satisfied the

9  Court's claim construction when they used had term?

10 A    No, because terms are frequently used in a way

11 that's different from the way they are construed in a

12 particular patent.

13 Q    Sure.  And sometimes they are used as they are

14 construed in a particular patent, aren't they?

15 A    It can occur.

16 Q    But you didn't make that inquiry, right?

17        THE COURT:  He's already answered that

18 already.

19        MR. ROBERTSON:  I'll move on.

20 Q    Can we take a look at the Court's claim

21 construction for "catalog"?  I understood you to say

22 yesterday that an organized collection of items and

23 associated information was -- I think you said the

24 item master there is certainly an organized collection

25 of items and associated information in the item

1   master.  So that prong of the construction would be

2   satisfied?

3   A    Yes.

4   Q    Then you also testified that the item master can

5   have information in it such as part number, price,

6   catalog number, vendor name, vendor ID, a textual

7   description of the item, and images that were relating

8   to the item.  You know that the item master didn't

9   have that kind of data, right?

10  A    I didn't mention images, but I mentioned some of

11  the others.

12  Q    You do know that the Lawson software is capable of

13  including images of the item, right?

14  A    I actually didn't know one way or the other.

15  Q    You didn't investigate that?

16  A    No.

17  Q    So if that is evidence in the record that they

18  can, that wouldn't affect your opinion one way or the

19  other?

20  A    No.

21           MR. McDONALD:  Objection.  Lack of

22  foundation.

23           THE COURT:  Overruled.

24  Q    So you'd agree with me also that you faithfully

25  applied the Court's construction for vendor to include

1  suppliers, manufacturers and distributors, right?

2  A    Yes.

3  Q    And suppliers, manufacturers, and distributors can

4  all provide data about items, correct, for sale?

5  A    Yes.

6  Q    And I understood you to say during the direct

7  examination that you know that data for items can come

8  from vendors, for example, in flat files or DVDs,

9  right?  They are the source of that data, right?

10 A    You mean with respect to the Lawson system or just

11 in general?

12 Q    Yeah.  You understand that vendors can provide

13 electronic data to Lawson's customers for inclusion in

14 the item master, correct?

15 A    Yes.

16 Q    So what we're down to then is this published by a

17 vendor, right?

18 A    Yes.

19 Q    That's the only thing that you're saying is

20 absent?

21 A    Yes.

22 Q    Can we go to your slide 9, if we could.  This is

23 where you summarized your reasoning with respect to

24 Lawson does not have a catalog, correct?

25 A    Yes.

1   Q   One other thing.  With all the access to all these

2   documents, the only thing we saw from you on these

3   slides that you prepared were your conclusions; isn't

4   that right?

5              THE COURT:  What do you mean?  The only thing

6   who saw?

7              MR. ROBERTSON:  The only thing everybody saw.

8              THE COURT:  How does he know what you saw?

9   BY MR. ROBERTSON:

10  Q   The only presentation that was made today during

11  the direct examination had to do with these

12  demonstratives that you created, right?

13  A   Yes, that and my testimony.

14  Q   Let me make one more specific question.  During

15  your direct examination, Mr. McDonald didn't offer a

16  single document in evidence to support any of your

17  opinions; isn't that right?

18              MR. McDONALD:  Objection, Your Honor.  We

19  have evidence that's stipulated in the case.  I'm not

20  sure what his point is.

21              THE COURT:  I don't think that's really a

22  proper question.  I don't know how Dr. Shamos would

23  know what came in in the pretrial conference.

24              MR. ROBERTSON:  Let me rephrase it then, Your

25  Honor.

SHAMOS - CROSS                    1883

1    THE COURT:  Yes.

2  Q   To support your opinions, did you offer any

3  exhibits to the jury?

4    MR. McDONALD:  Your Honor, I don't believe

5  he's in a position to offer exhibits before trial.

6    THE COURT:  I think that's right.

7  BY MR. ROBERTSON:

8  Q   Well, did you rely on any documents during your

9  direct examination?

10  A   Yes, I relied on the patents.  I relied on the

11  Court's construction.

12  Q   So those were the two things?

13  A   That I recall.

14  Q   No Lawson documents, though, right?

15  A   I didn't cite to any Lawson documents on my

16  slides.

17  Q   All right.  Thank you.

18    So the first point you're making here is that

19  Lawson keeps track of data about selected items in a

20  single database called an item master, right?

21  A   Yes.

22  Q   What is the significant there?  That it's a single

23  database?

24  A   Yes, because there are claims that require

25  multiple databases.

1    Q    But if there are claims that can have just one

2    database and it has catalog data in it, isn't that a

3    collection of catalogs?

4    A    No.

5    Q    Why not?

6    A    Because it's not -- first of all, just because you

7    have some catalog data in a database doesn't make the

8    database a catalog at all, but just because you had

9    data from two different vendors in the database

10   certainly doesn't make it a collection of catalogs.

11   Q    Let's go back to the definition, if we can, of

12   catalog again.  Where does it say in the Court's claim

13   construction that you can't have a single database for

14   catalog?

15   A    It doesn't say that.  I explained that the reason

16   that that bullet point is there --

17   Q    My question is specific.  Where does it say in the

18   Courts claim construction that you can't have a single

19   database?

20   A    It doesn't say that.  I never said it did say

21   that.

22   Q    Then don't read that into the claim, please, sir.

23   A    I didn't read it into the claim.

24        THE COURT:  Whoa, whoa, whoa.  We're not

25   going to do that now.

SHAMOS - CROSS                1885

1      MR. ROBERTSON:  All right.

2           THE COURT:  Just remember, the witness is

3  here.  And I know zealous advocacy animates us all to

4  get enthusiastic about our causes, but remember the

5  concept of civility and politeness governs all court

6  proceedings.  And I'm not suggesting you weren't civil

7  and polite, but don't let it get out of hand.

8           MR. ROBERTSON:  Yes, sir.

9  BY MR. McDONALD:

10 Q   The next bullet point that you have here is when

11 Lawson software is installed, the item master is

12 empty.  Do you see that?

13 A   Well, in a second.

14          THE COURT:  Wait a minute.

15 Q   I apologize.  Do we have the slides.  Why don't we

16 do that?

17          THE COURT:  What system are we working with?

18 Your system?  So Mr. Neal can activate the ePlus side

19 of things.

20 Q   The second bullet point says, When the Lawson

21 software is installed, the item master is empty,

22 correct?

23 A   Yes.

24 Q   But you understand from your review of the

25 document that Lawson also provides services,

1   implementation in which they will either migrate the

2   data from a legacy system to the new Lawson system or

3   they'll assist the customers in loading the item data,

4   correct?

5   A   Yes, I've testified to that.

6   Q   When the Court was construing "catalog," it was

7   referring to this collection of items and associated

8   information that is existing in electronic format in

9   the database, right?  You understood that in the

10  context of the patent?

11  A   I thought you just told me to take "database" out

12  of the claim.

13  Q   Well, I told you to take the single database out

14  of the claim, but you understand that that's where

15  this information, this electronic information, data,

16  resides, correct, in the Lawson system?  The item

17  master, the database, right?

18  A   Yes.

19  Q   The next bullet point you say is an item master

20  data is selected by inclusion by a customer.  Do you

21  see that?

22  A   Yes.

23  Q   And not a vendor.  Tell me where in the Court's

24  claim construction that the Judge has said that the

25  actual selection of the item data has to be made by

SHAMOS - CROSS          1887

1   anyone.

2   A    The catalog has to be published by a vendor.  If

3   the information is merely selected by a customer, it's

4   not published by a vendor.

5   Q    So you have your own construction of what

6   "published by a vendor" means?

7   A    No.

8              MR. McDONALD:  Objection, Your Honor.

9              THE COURT:  Overruled.

10  Q    Are you aware of the Court's construction?

11  A    Yes.

12  Q    The Court says "published by a vendor" simply

13  means that at some point in time a vendor, such as a

14  supplier, a manufacturer, or a distributor has made

15  generally known or has disclosed an organized

16  collection of items and associated information

17  preferably but not necessarily including all these

18  descriptions for the product.

19             MR. McDONALD:  Your Honor, I don't think he

20  read the very first sentence of the Court's

21  construction.

22             THE COURT:  I also don't think I said

23  anything about disclosed.  I don't know where you got

24  that.

25             MR. ROBERTSON:  I'm looking at what was

1   handed out, Your Honor, I think.

2        THE COURT:  Well, that was what you-all got.

3   That isn't what I read.  What I read was published by

4   a vendor as used in the definition of the claim term

5   "catalog/product catalog."

6        "Published" simply means to make generally

7   known.  At one time I was thinking about "or to

8   disclose," but I didn't say that.  "Published by a

9   vendor" simply means that at some point in time a

10  vendor such as a supplier, a manufacturer or a

11  distributor has made generally known or has disclosed

12  an organized collection of items or associated

13  information preferably but not necessarily including a

14  part number, price, catalog number, vendor name,

15  vendor ID, a textual description of the item, and

16  images of or relating to the item.  And it should be

17  items and associated information, I think.  But that's

18  what I think I read.

19        MR. ROBERTSON:  I thought I was asking him

20  whether it just needs to be made generally known or

21  disclosed.  I think Your Honor said --

22        THE COURT:  I didn't say "disclosed."  I took

23  it out when I read it.  You've got a typographically

24  erroneous description.

25        MR. ROBERTSON:  All right, Your Honor.  I

1   apologize.

2          THE COURT:  It's not your fault.  It came

3   from our office.  So it's my fault, isn't it?

4          MR. ROBERTSON:  No, sir, I would not blame

5   the Court.

6          THE COURT:  Look, I'm looking for little

7   things to get blamed for because I get blamed for big

8   things, too, and I did rater have a little thing.

9          MR. ROBERTSON:  Just so I'm clear, Your Hour,

10  it's just "has made generally known an organized

11  collection of items and associated information"?

12         MR. McDONALD:  No, you should read the

13  sentence, Mr. Robertson.

14         THE COURT:  Here.  I'm going to read it

15  again.  Published by a vendor as used in the

16  definition of the claim term "catalog/product

17  catalog."  Published simply means to make generally

18  known.  Published by a vendor simply means that, keep

19  going all the way down in your construction and then

20  instead of time, it's "items."  Edited by hand.  And

21  instead of "or" it's "and."

22         MR. ROBERTSON:  Thank you.

23         THE COURT:  That's what we're going to use.

24         MR. ROBERTSON:  I understand.

25         THE COURT:  You just got a typographically

1  flawed product.  That's my fault.

2  BY MR. ROBERTSON:

3  Q   All right.  So, now you understand, now I

4  understand, that "published" simply means to make

5  generally known, right?

6  A   Yes.

7  Q   And so that doesn't matter in that definition who

8  selects the item data.  It just has to be made

9  generally known, correct?

10  A   No.  I'm not denying that vendors publish

11  catalogs.  What we're talking about is whether item

12  master is one of those.  And it isn't.

13  Q   Right now I'm talking about the Court's claim

14  construction and your understanding of it so we can

15  then apply it to the item master.  I understand that

16  customers can select information to include in the

17  item master, right?  I'll agree with you on that.

18      My point is what does it matter with respect to

19  the Court's claim construction.  So I'm trying to --

20          MR. McDONALD:  Your Honor, we're waiting for

21  a question here.

22          MR. ROBERTSON:  Here's the question?

23          THE COURT:  I thought maybe he was getting

24  ready to testify and you'd get to cross-examine him.

25  BY MR. ROBERTSON:

1  Q    "Published" simply means to make generally known.

2  So that has nothing to do with who selects the data

3  for inclusion in the item master, correct?

4  A    Yes.

5  Q    "Published by a vendor" simply means that at some

6  point in time a vendor such as a supplier, a

7  manufacturer or a distributor has made generally known

8  or has disclosed an organized collection of items and

9  associated information preferably but not necessarily

10  including a part number, price, catalog number, vendor

11  name, vendor ID, a textual description of the item,

12  and images of or relating to the item."  Do you see

13  that?

14  A    Yes.

15  Q    That has nothing do with who selects the item to

16  be included in the item master, correct?

17           MR. McDONALD:  I'm a little confused because

18  he asked if he could see that and actually what he

19  read is different from what's on the screen.

20           THE COURT:  Excuse me.  What's up on the

21  screen is the actual claim construction.  It's not the

22  definition of the ordinary term "published by a

23  vendor."

24           MR. McDONALD:  His question he was

25  reading was different.

SHAMOS - CROSS                1892

1    THE COURT:  Yes.

2    MR. McDONALD:  It's different.

3    THE COURT:  Yes, I was explaining that to

4    Mr. Robertson.

5    He doesn't have in front of him what you're

6    reading from.  So don't use that in your question.

7    Are you stymied for lack of a pen?

8    MR. ROBERTSON:  No, Your Honor.

9    THE COURT:  With which to edit?

10    MR. ROBERTSON:  I have just changed --

11    THE COURT:  Why continue you edit it.  Write

12    down "edited" if you want to give it to him.  Show it

13    to Mr. McDonald and go on.  Do you want to take mine

14    and look at it?  Mr. Robertson, Mr. McDonald is giving

15    it to you.

16    Q   So I'll give you a minute to look at that, Dr.

17    Shamos, but I want to focus on the definition of

18    "published by a vendor."

19    A   Yes.

20    Q   So why don't I just cut to the chase.  Where in

21    the definition of "published by a vendor" that the

22    Court has given does it matter who selects the data

23    for inclusion in the item master?

24    A   Well, it matters because the item master was not

25    published by a vendor.  It may contain data out of a

1  catalog that was published by a vendor.

2  Q   Well, the item master doesn't have to be published

3  by the vendor, does it?  It's the collection of

4  information -- excuse me.  It's the organized

5  collection of items and associated information that's

6  published by a vendor, correct?

7  A   But that's what a catalog is.  The vendor

8  publishes the catalog.

9  Q   The vendor makes that organized collection of

10  items and associated information available to the

11  customer, right?

12  A   Yes, the vendor publishes the catalog.  I don't

13  think there's any doubt about that.

14  Q   Okay.  So that's all that's required of the claim

15  that the vendor publish the catalog?

16          THE COURT:  Is that a question?

17  Q   Isn't that correct?

18          MR. McDONALD:  Object to the form.

19          THE COURT:  Overruled.

20  A   No.  If there's to be a catalog in the Lawson

21  system, the catalog had to have been published by the

22  vendor.

23  Q   Fine.  So point to the language then in the

24  Court's construction of "catalog" that you rely on to

25  say that this organized collection of items and

1   associated information has to be selected by the

2   customer, not somebody else.

3   A   It's not that it has to be selected by the

4   customer.  It is selected by the customer, therefore,

5   it's not an organized collection published by a

6   vendor.  I'm explaining why it doesn't meet the

7   Court's construction, not why it does.

8   Q   So what language are you relying on?

9   A   Published by a vendor.

10  Q   That's the only language you're relying on about

11  this organized collection of items and associated

12  information is that it's got to be published by a

13  vendor?

14  A   You just took me through that.  We went through

15  everything else in the Court's construction and found

16  it was satisfied except "published by a vendor."

17          THE COURT:  I think he's made his position

18  clear.  Whether you agree with it or not is a

19  different issue, but I think his position is clear.

20          MR. ROBERTSON:  I understand, Your Honor.

21  I'll move on.

22          THE COURT:  Let's move on.

23  Q   Does it matter then if the customer loads just

24  some of the item information?

25  A   Of course.  My personal address book was not

1   published by the phone company even though it has

2   phone numbers of some people in it.

3   Q    Where in the Court's construction of "catalog"

4   does it say that you have to have all of the item

5   information included?

6   A    Well, I don't think that it says all.  I know it

7   doesn't say all, and I don't think you have to have

8   all.

9   Q    Where does it say you have to have most?

10  A    There's a matter of degree.

11  Q    Where does it say that in here?  It just says "a

12  collection of items and associated information."

13  A    Published by a vendor.  The question is:  What's

14  published by a vendor?

15  Q    And you interpret that as meaning you have to have

16  how much?

17  A    I don't know.  There's some point at which it's no

18  longer published by a vendor in the same sense that my

19  address book is not published by the phone company.

20  Q    If I have 50 percent of it, is that enough?

21  A    I don't know.

22  Q    75 percent?

23  A    I don't know.

24  Q    You know that the system, the Lawson system, is

25  capable of incorporating all of the item data from an

1  electronically produced catalog from a vendor, right?

2  A   It may or may not be.  That may be true for some

3  catalogs.

4  Q   Did you make any investigation into that?

5  A   Well, I know what the structure of item master is.

6  And item master has fields, some of which are in

7  vendor catalogs and some of which are not in some

8  vendor catalogs.  And if there's a field in a vendor

9  catalog for which there's no place in item master, it

10 cannot be imported into item master.

11 Q   Does it have to import all the fields?

12 A   No.

13 Q   The Court's claim construction made clear that

14 some of the data about the item is just preferably but

15 not necessarily; isn't that right?

16 A   Correct.

17 Q   So it doesn't even have to include all the things

18 that the Court identifies in its construction, right?

19 A   I never assumed it did have to include those.

20 Q   But you have seen in the item master this kind of

21 data, haven't you?  Part number, price, catalog

22 number, vendor name, vendor ID, textual description of

23 the item?

24 A   Yes.

25 Q   Now, you know that a system or device that is

SHAMOS - CROSS                1897

1   capable of satisfying the claim elements can infringe

2   even if it's capable of operating in non-infringing

3   modes, correct?

4            MR. McDONALD:  I'm going to object to this.

5   He's asking the witness to make legal conclusions that

6   I wasn't allowed to ask about either.

7            THE COURT:  Do you have a response to that or

8   are you going to reframe the question?

9            MR. ROBERTSON:  Let me reframe the question.

10           THE COURT:  All right.

11  BY MR. ROBERTSON:

12  Q   You understand when you were doing your opinions

13  that this system was capable of doing something even

14  if it was capable of not performing a certain element,

15  that needed to be considered when rendering your

16  infringement opinions, right?

17           MR. McDONALD:  I object to the form of that.

18  I really don't know what he's saying.

19           THE COURT:  He just said that needed to be

20  considered in forming his infringement opinion.

21           MR. McDONALD:  I don't know if he's stating a

22  principle of law there or what, but I think the

23  question is very confusing.

24           MR. ROBERTSON:  I'm asking a question whether

25  he understands that there can be -- he gave an

SHAMOS - CROSS            1898

1    infringement opinion.

2            THE COURT:  The objection is overruled.  Ask

3    the question so the witness can understand it again.

4    BY MR. ROBERTSON:

5    Q   You would agree, wouldn't you, sir, that a device

6    or system may be found to infringe a claim if it is

7    reasonably capable of satisfying the claim elements

8    even if it is also capable of operating in

9    non-infringing modes?

10           MR. McDONALD:  I object, Your Honor.

11           THE COURT:  It's a different question.  What

12   you asked him that I overruled the objection to was

13   whether in forming his infringement opinion, he

14   considered whether infringement could occur if a

15   system was capable of performing under the elements of

16   the claim even if it didn't, I think.  Did you

17   consider that I think is the sole question.

18           MR. McDONALD:  But I object to that because I

19   think it's causing confusion on this capable of issue.

20   There's a difference between capable of providing a

21   function and having a catalog or not having a catalog.

22   Those are two different things and the question is

23   ambiguous as to what he's talking about.

24           THE COURT:  That's because your so deeply

25   into the case you read that into the question because

1    it wasn't in the question, I think.  Overruled.

2          Now, do you want to ask that question again?

3          MR. ROBERTSON:  Yes, Your Honor.

4          THE COURT:  And just stay with that one

5    instead of getting him to testify about the law.  I'll

6    instruct the jury on what the law is on that issue.

7    BY MR. ROBERTSON:

8    Q   You'd agree with me that take device or system may

9    be found to infringe a claim if it is reasonably

10   capable of satisfying the claim elements even if it is

11   also capable of operating in non-infringing modes,

12   correct?

13         THE COURT:  That's the one that I said is

14   asking him to give instruction on the law.  So you

15   can't ask that.

16         The one you can ask is whether he took into

17   account in framing his opinion X, and I'm sure you can

18   fill in the blanks on X.

19   BY MR. ROBERTSON:

20   Q   Did you take into account that a device or system

21   may be found to infringe a claim if it is reasonably

22   capable of satisfying the claim elements even if it is

23   also capable of operating in non-infringing modes?

24         MR. McDONALD:  Objection.

25         THE COURT:  The question is did you take into

1   account whether, not that, because that assumes the

2   construction is correct.  Whether.  Did you take into

3   account whether.

4   BY MR. ROBERTSON:

5   Q    Did you take into account whether a device or

6   system may be found to infringe an apparatus claim if

7   it is reasonably capable of satisfying the claim

8   limitations even if it is also capable of operating in

9   non-infringing modes?

10  A    Yes.

11  Q    And you understood that to apply to your analysis

12  in this case, correct?

13  A    Yes.

14  Q    One of the reasons you said that the claims

15  couldn't be infringed was that you couldn't search to

16  select a catalog, is that right, or you couldn't

17  select a catalog to search?

18  A    Yes.

19  Q    You're aware, are you not, sir, that the Lawson

20  system has user created fields that they can employ,

21  correct?

22  A    Yes.

23  Q    And the user, for example, can insert in those

24  fields a vendor name, can't they?

25  A    Yes, we saw in the description of item field that

1    Dell was inserted.

2    Q    That's where you're doing the keyword search.  I'm

3    talking about the user fields that are in the system.

4    You can actually enter into a user field a vendor

5    name, can't you, sir?

6    A    I think you can.  I'm not sure whether you can

7    search on that field, but you can enter it.

8    Q    So you don't know one way or the other whether you

9    can search once you have entered a vendor name in that

10   field?

11   A    In a use defined field, I don't know.

12   Q    Would it change your opinion if there was evidence

13   in the record that if you did enter the vendor name

14   into one of those user fields, you could search by

15   vendor?

16   A    No, because what you're postulating is the user

17   taking the system and making his own additions and

18   changes to it.

19   Q    The user of the Lawson system, according to you,

20   populates all the data in the item master; isn't that

21   right?

22   A    Yes, I think that's an important point.

23   Q    And if the user inserts a vendor name in one of

24   those user defined fields that it can use, then it

25   could search by vendor, couldn't it?

1    A    If the proposition is that --

2    Q    Can you answer that question fairly yes or no?

3              THE COURT:  Just a minutes.  Listen to the

4    question he asked and answer that question.

5              THE WITNESS:  Okay.

6    A    Could you repeat it?

7    Q    Sure.  If the user who's populating the fields

8    with information, price, unit of measure, textual

9    description also uses one of these user created fields

10   and enters a vendor name, you could search by that

11   vendor name; isn't that right?

12   A    Yes.  You could search by that vendor name, but --

13   Q    That's fine.  You have answered the question.

14        Now, let me ask you this:  If I had two

15   catalogs -- just assume I have two catalogs in the

16   item database, the item master, a Home Depot catalog

17   and a Dell computer catalog, right?  And just assume

18   for purposes of my question that Home Depot is not

19   selling computers, all right?

20   A    Yes.

21   Q    If I type in a keyword "laptop," I'm not going to

22   get any catalog data from Home Depot, am I?

23   A    Not if they don't have any laptops.

24   Q    I'm going to get laptops from the Dell computer,

25   correct?

1  A   Yes.

2  Q   So in that scenario by using the term "laptop,"

3  which only appears in the Dell catalog, I only

4  selected the Dell catalog to search; isn't that right?

5  A   No, that's false.  It looked over the whole

6  database.  It just happened because of the

7  circumstances you have set up that there were no

8  responsive hits from the Home Depot catalog.

9  Q   So I got all the Dell items that corresponded to

10 that keyword laptop and none of the items in the home

11 Depot catalog, right?

12 A   Well, that's the output of the search, yes.  But

13 if Home Depot had had a laptop, then you would have

14 retrieved the laptop from the Home Depot catalog.

15 Q   Well, if I added a Hewlett-Packard catalog to my

16 catalog database with Home Depot, Dell, and now

17 Hewlett-Packard, and I searched for laptops, I would

18 get hits for Hewlett-Packard and Dell, right?

19 A   Yes.

20 Q   So the selection of the catalog was made by using

21 that keyword because I didn't get any Home Depo hits,

22 but I did get Dell and Hewlett-Packard, correct?

23 A   That's nonsense.  It makes no sense at all.  It's

24 a happenstance that one particular vendor doesn't sell

25 a thing.  So by asking for pens, for example, the fact

1    that you don't get a vendor who doesn't sell pens

2    doesn't mean you have selected particular catalogs to

3    search.

4        There's structure in the software.  The software

5    does certain things.  In Lawson, it searches the

6    entire item master database.  It's fortuitous that a

7    particular vendor doesn't sell a particular thing.

8    That's not a means for selection.

9    Q    Why not?  It didn't come back from the Home Depot

10   catalog.

11   A    Because there was nothing responsive in there.  If

12   you search for an item that doesn't exist, you

13   certainly wouldn't be saying that you selected no

14   catalogs.

15   Q    No, but if I search for an item that does exist in

16   two catalogs that sell computers and I get results

17   from there, I've selected those two as a subset of the

18   three that are there?

19   A    You have not.

20   Q    All right.  You understand that the item master

21   can hold a hundred thousand items or more, correct?

22   A    Yes.

23   Q    And tens of thousands of vendors, correct?

24   A    Yes.

25   Q    And you would agree, wouldn't you, Dr. Shamos,

1   that the data about items available from different

2   vendors can be loaded into the Lawson software,

3   correct, that item master?

4   A    Yes.

5   Q    And you would agree, sir, that the Lawson item

6   master can contain data associated with multiple

7   vendors, correct?

8   A    Data associated with items from multiple vendors,

9   yes.

10  Q    And you understand that in the Lawson's accused

11  systems, there's a link between the Lawson items in

12  the item master table and vendor items in the vendor

13  item tables, correct?

14  A    Yes.

15  Q    And the vendor item links and the item master

16  record, which can be a non-stock item or a vendor item

17  to a specific vendor, correct?

18  A    Yes.

19  Q    And you'd agree that data that is imported into

20  the item master may have originated from a number of

21  different sources including a vendor catalog for the

22  customer itself, correct?

23  A    Yes.

24  Q    And you understand that there are many instances

25  where Lawson personnel load catalog data into the

1  Lawson item master for use of Lawson's customers,

2  correct?

3  A   I'm aware that it's done.  I'm not ready to

4  characterize it as many, but I know that it's done.

5  Q   And you would also agree, sir, that there's an EDI

6  protocol called EDI 832 that enables Lawson's

7  customers to upload to the item master vendor item

8  tables as a file from the vendor, correct?

9  A   Sometimes we would call that download, but yes.

10 Q   Whether it's upload or download, you would agree

11 it can happen, right?

12 A   I did say yes.

13 Q   And it's not disputed that the Lawson software

14 with the EDI module has the capability of ingesting

15 catalog data from suppliers via an electronic data

16 interchange; is that right?

17 A   I don't know whether it's disputed.  I don't

18 dispute it.

19 Q   You're familiar with the Lawson PO 536 program

20 included in the Lawson software that can be used to

21 import vendor catalogs?

22 A   It can be used to import information from vendor

23 catalogs, yes.

24        MR. ROBERTSON:  Do you have Exhibit 521.

25        THE COURT:  I've got a copy.

1    Q    Why don't you take a minute to look at that, Dr.

2    Shamos.  Do you see this document?  It's called

3    importing vendor price agreements?

4    A    Yes.

5    Q    And you're aware that vendor price agreements,

6    they also use the term of vendor catalogs?

7    A    I think that's done.

8    Q    If you would turn to the page that ends with the

9    Bates label 428.

10   A    I'm sorry, which one?

11   Q    428 at that time lower right-hand corner.

12   A    Yes.

13   Q    This is the PO 536 import process?

14   A    Yes.

15   Q    At the top box it says, The vendor provides item

16   catalog in CSV format.  Do you see that?

17   A    Yes.

18   Q    Do know what CSV format is, correct?

19   A    Yes.

20   Q    It's comma separated values?

21   A    Yes.

22   Q    That's how you present the data with respect to

23   this catalog item data?

24   A    It's how you distinguish one field of information

25   from another is you look for a comma as separating

1    them.

2    Q    Like price, comma, unit of measure, comma, textual

3    description, comma?

4    A    Yes.

5    Q    And you see at the bottom there's something that

6    looks like a barrel?

7    A    Yes.

8    Q    You understand that to be the item master; is that

9    right?

10   A    Yes, the barrel is usually a symbol in these

11   charts for a file or a database.

12   Q    So this is going through the process in which when

13   a vendor makes known to a customer its catalog data,

14   this process is how it ends up in the item master,

15   correct?

16   A    It is one way, yes.

17   Q    If you'll turn to the page that ends with the

18   Bates label 431.  Do you see that?

19   A    Yes.

20   Q    Here's some of the fields that can be populated

21   with that vendor catalog data.  Do you agree with me?

22   A    Some of the fields can.

23   Q    Well, it can be the vendor item description can be

24   included, correct?

25   A    Yes.

1    Q    Vendor item number?

2    A    Yes.

3    Q    Unit of measure?

4    A    Probably.

5    Q    The item cost?

6    A    Maybe.

7    Q    You haven't seen pricing information in the --

8    A    There's pricing information.

9            THE COURT:  Lawson and price are two

10   different things, I think, is the distinction.

11           MR. ROBERTSON:  I understand.

12   Q    You can also have these UNSPSC hierarchal codes do

13   you understand that, on the bottom of the page

14   starting at 16 and 17?

15   A    Yes.  Those are the two highest levels of the 8

16   digit code that I talked about earlier.

17   Q    And you also, if you could go to No. 12, you have

18   the manufacturer item number?

19   A    Yes.

20   Q    If you will turn to the page that ends 433, you

21   have the next two UNSPSC codes, correct?

22   A    Yes.

23   Q    No. 24 is a user defined alpha field one, do you

24   see that?

25   A    Yes.

1    Q    If you will go over to the far column, it says,

2    This is a client defined alphanumeric field?

3    A    Yes.

4    Q    And alphanumeric, you understand, to be either

5    letters or numbers, correct?

6    A    Or both.

7    Q    Or both, right?

8    A    Yes.

9    Q    So that's a user defined field that the user could

10   but the vendor name, isn't it?

11   A    He could if he wanted to.

12          MR. ROBERTSON:  Could I have Exhibit 522,

13   please.

14          THE COURT:  I have a copy of that, too.

15   Q    You know what purchase order release notes are,

16   don't you, sir?  Do you know generally what release

17   notes are with respect to Lawson software?

18   A    Well, I know what release notes are generally,

19   with respect to software, and I don't think Lawson

20   uses that term in any different sense.

21   Q    Well, release notes talk about new futures that

22   have come available with the software?

23   A    Yes.

24   Q    You understand that this 8.0.3 is one of the

25   systems that's being accused of infringement in this

1    case?

2    A    Yes.

3    Q    If you'll turn to the second page of Plaintiff's

4    Exhibit 522, at the top you see there there's a new

5    feature called the vendor catalog load?

6    A    Yes.

7    Q    And the description that Lawson provided was "New

8    functionality has been added to electronically load a

9    vendor file which contains vendor item, unit of

10   measure, and unit price information into the purchase

11   order application."  Do you see that?

12   A    Yes.

13   Q    That's the representation that Lawson made was

14   part of the new functionality of this accused 8.0.3

15   procurement system, correct?

16   A    Well, it's a statement that they have made in

17   their documentation.

18   Q    The price information and the unit of measure,

19   that's some of the elements that are in the Court's

20   claim construction for "catalog," correct?

21   A    Yes.

22   Q    You talked a little bit about this UNSPSC

23   classification codes.  Do you recall that?

24   A    Yes.

25   Q    And you referred to a white paper; is that right,

1    sir?

2    A    Yes.

3    Q    Can I have Plaintiff's Exhibit No. 11, please.

4          THE CLERK:  Are we talking about Plaintiff's

5    Exhibit 11?  Is that what you said?

6          MR. ROBERTSON:  Yes.

7          THE CLERK:  Thank you.

8    Q    Is this the white paper you were referring to when

9    you gave your testimony on direct?

10   A    Well, I think it is.

11   Q    This is a white paper concerning the UNSPSC,

12   correct?

13   A    Oh, it is.  I'm just looking to see whether it's

14   the same one, and I'm not actually sure that it is.

15   Q    Why don't you take a look at the page that ends

16   with the Bates label 044.

17   A    Yes.

18   Q    That's the --

19   A    I have no reason to dispute that this is the one.

20   I could check against my report.  I could check the

21   Bates number, but I'm not disputing it.

22   Q    I understand.  But that's the example you used in

23   your demonstratives; isn't that right, sir?

24   A    Yes.

25   Q    And we can both agree that Granada Research is an

1    independent company.  It's not the plaintiff or the

2    department, right?

3    A    It's not the plaintiff or the department.  I don't

4    know under whose auspices they created this report,

5    but it's neither of the parties in the case.

6    Q    In any event, you relied on it when you gave your

7    testimony about the capability of the UNSPSC, right?

8    A    Yes.

9    Q    Let's go to the page that ends with 036.  And

10   under the finding and purchasing, it says, A product

11   and service coding convention brings many benefits to

12   the purchasing function of the company, did I read

13   that correctly?

14   A    Yes.

15   Q    One of the pros is that table in the first box

16   says "enables buyers and employee requisitioners to

17   find all suppliers of a given catagory," correct?

18   A    It can.  If that functionality is built into the

19   system that's using the UNSPSC code, it can, yes.

20   Q    It does it by using the codes, right?

21   A    Well, if it has the capabilities to do that.

22   Q    And the Lawson accused software had the capability

23   of using these UNSPSC codes.  We just saw the fields.

24   A    Yes.

25   Q    I want you to look at the page of this white paper

SHAMOS - CROSS                1914

1    you relied on that ends with 042.  Do you see that at

2    the bottom?  It says UNSPSC is a hierarchal

3    classification having five fields.

4    A    Levels, it says.

5    Q    Excuse me.  Five levels, I apologize.  The levels

6    allow users to search products more precisely because

7    searches will be confined to logical categories and

8    eliminate irrelevant hits.  It allows managers to

9    perform expenditures analysis on categories that are

10   relevant to the company's situation.  Do you see that?

11   A    Yes.

12   Q    Now, you went through the segment level, the

13   family level, the class level, and the commodity

14   level, do you see that?

15   A    Yes.

16   Q    Under commodity, doesn't this white paper

17   represent that when you get to that level, you have a

18   group of substitutable products or services, correct?

19   A    Well, I think they say that, but it's clearly not

20   correct.

21   Q    Well, do you know that they have classifications

22   down to like, say, for specific white-out right down

23   to that level?

24   A    Well, I don't think you can.  There are only two

25   digits down at that level.

1    Q    This is Plaintiff's Exhibit 32.

2         Why don't we move on while we're looking for that.

3    At least this white paper that you relied on

4    identifies those commodity levels, codes, as

5    substitutable products, correct?

6    A    Oh, it says that.

7    Q    Using your examples, if I went down and I got some

8    pen refills, couldn't I then look after I've used

9    those codes to find the search just by looking at it,

10   find something that I considered to be generally

11   equivalent that I want to purchase?

12   A    You may or may not be able to do that.

13   Q    So in some instances I could do it, right?

14   A    Oh, yes.

15   Q    You'd agree with me, sir, that this Lawson

16   software is not something that you can buy at the

17   local Best Buy for software and load it onto your

18   computer, right?

19   A    I don't think so.  I'm expecting that it's

20   probably above their price point.

21   Q    And it sometimes takes months to implement this

22   software; isn't that right?

23   A    That sounds right.

24   Q    And it can cost tens of thousands, even hundreds

25   of thousands of dollars, right?

SHAMOS - CROSS                    1916

1  A    That sounds right.

2         MR. McDONALD:  Objection.  We don't need to

3  get into the revenues for things, I think, at this

4  point to make whatever point he's trying to make.

5         THE COURT:  I'm not sure why that's relevant.

6         MR. ROBERTSON:  I'll move on, Your Honor.

7  BY MR. ROBERTSON:

8  Q   So you understand as part of your review of the

9  documents in this case in forming your opinions that

10 Lawson employees can be at a customer's facilities for

11 months to design, install, implement, configuration

12 and test the system for the customer, correct?

13 A   I don't think I was aware of the specific amount

14 of time that they would spend, but I was aware that

15 they do go to customer sites to assist with

16 implementation.

17 Q   In reviewing the documents in this case, you saw

18 manuals and guides that are provided to the customers

19 to an assist them in how to operate the software?

20 A   Yes.

21        MR. McDONALD:  Your Honor, I think this is

22 outside the scope of his testimony and his report.  It

23 really isn't an issue in dispute here.

24        MR. ROBERTSON:  We talked about induced

25 infringement, Your Honor.  I just wanted to ask some

1  questions in that respect.

2          MR. McDONALD:  I don't think the witness is

3  even disputing any of that.  It's not for this

4  witness.  We're wasting time.

5          MR. ROBERTSON:  I need to ask the question to

6  see if he wasn't disputing it, but I'll move forward.

7          THE COURT:  I thought Dr. Shamos' opinion was

8  that there's no induced infringement because there's

9  no direct infringement.  And there's no contributory

10 infringement because there's no direct infringement.

11 So it all hinges on, insofar as he's concerned,

12 whether there's direct not.

13         Is that right, Mr. McDonald?

14         MR. McDONALD:  Yes, Your Honor.

15         THE COURT:  Under that circumstances, I'm not

16 sure how much further you need to go, but you are on

17 cross-examination.  I'll give you some leeway, but --

18 BY MR. ROBERTSON:

19 Q   Dr. Shamos, you'd agree, wouldn't you, that the

20 requisitions module of the Lawson procurement software

21 allows you to quickly create purchase orders from

22 requisitions in a one-step process?

23 A   Yes.

24 Q   And you don't dispute that the Lawson requisition

25 self service application lets you create requests for

1  a demand on stock and a demand on vendors?

2  A    I don't dispute that.

3  Q    And you'd agree, wouldn't you, that the Lawson

4  purchase order module takes the approved requisition

5  and creates a purchase order or purchase orders that

6  were required to fill the requisition if the item is

7  not in stock?

8             MR. McDONALD:  I object.  This is outside the

9  scope of the direct, Your Honor.  We're just wasting

10 time.

11            THE COURT:  I don't remember him asking much

12 about that as the basis for his opinion.  Did he?

13            MR. ROBERTSON:  I'm sorry, Your Honor?

14            THE COURT:  I don't recall -- in other words,

15 my recollection is the same as Mr. McDonald's.  And if

16 I'm wrong, tell me, and I'll not sustain the

17 objection.

18            MR. ROBERTSON:  I don't recall either.

19            THE COURT:  So moving right along.

20 BY MR. ROBERTSON:

21 Q    Let's talk a little bit about indexing if we

22 could.  I understood you to say that the analogy you

23 used was if somebody liked to put all of their items

24 or their goods in their pantry and arrange them

25 alphabetically, that even if I open the pantry and I

SHAMOS - CROSS                    1919

1  wanted to find the item I was looking for, and I went

2  right to it because it was apples, is it your opinion

3  that I've searched the entire pantry right through

4  zucchini when apples was the first thing in the

5  pantry?

6  A   Yes, you have searched the entire pantry because,

7  for example, if you didn't find it, you would know

8  that it's not anywhere in the pantry.  You didn't

9  separately examine every item in the pantry, but you

10  searched the entire pantry.

11  Q   Well, didn't I find the first item right there,

12  apples?  I didn't have to go down to zucchini to get

13  the apples that were right there.

14  A   As I said, you don't examine every item in the

15  pantry.

16  Q   I didn't search the entire pantry --

17         THE COURT:  Give him a chance to finish.

18  A   But you did search the entire pantry because

19  you're able at the end of your search to say yes, this

20  item is in the pantry or no, this item is not in the

21  pantry.

22  Q   Isn't an index in a database management program a

23  file containing information about the physical

24  location of records in a database file?

25  A   Yes.

1    Q    When searching or sorting the database, the

2    program uses the index rather than the full database;

3    isn't that a correct statement?

4    A    Well, it makes use of the index.

5    Q    So it uses the index rather than the full

6    database?

7    A    Well, no.  It uses the full database.  It doesn't

8    look at every record in the entire database.

9              MR. ROBERTSON:  Can we put up slide 15.  It's

10   093R07, page 5.

11   BY MR. ROBERTSON:

12   Q    Do you recognize the Microsoft Computer

13   Dictionary, correct?

14   A    Well, this is Webster's New World Computer

15   Dictionary, but I do recognize Microsoft Computer

16   Dictionary.

17   Q    Webster's New World Dictionary also is a computer

18   dictionary, correct?

19   A    Yes.

20   Q    And you'd agree that you didn't author that,

21   correct?

22   A    I certainly agree with that.

23   Q    And Dr. Weaver didn't author that, did he?

24   A    I don't know.

25   Q    Well, it says when searching or sorting the

1  database here, the program uses the index rather than

2  the full database; is that right?

3  A   Yes.  Well, I think that's a colloquialism as to

4  what "use" means.

5  Q   It's supposed to be a definition in a dictionary,

6  isn't it?

7  A   Well, it supposed to be.

8  Q   So you disagree with it?

9  A   I think I disagree with the interpretation of it.

10 This is designed to give somebody who looks at this

11 dictionary an understanding of what an index is.  I

12 don't think it's a precise definition, for example, at

13 the level of the Courts construction.

14     The index is used so that you don't have to look

15 at every individual record in the entire database, but

16 the index indexes the entire database.  So you can by

17 looking in the index determine, for example, if an

18 item is not in the entire database.  You can tell that

19 by looking in the index.  And if it is in the

20 database, then the index will tell you where to go to

21 find it.

22 Q   So you don't go through the whole database, you

23 just go to where the pointer is that the index is

24 telling you to go to?

25 A   Depends.

1    Q    In that file record?

2    A    That's right.

3    Q    Thank you.  Why don't we take a look at slide 100,

4    if we could.  This is talking about an indexed

5    sequential access method.  Do you see that?

6    A    Yes.

7         MR. McDONALD:  I object this.  It's outside

8    the scope and cumulative and wasting time.

9         MR. ROBERTSON:  There's a lot of discussion

10   on what an index search is and whether it searches

11   selected portions of the database.

12        MR. McDONALD:  Not under the sequential

13   access method.

14        THE COURT:  I'm going to overrule the

15   question until I hear a question other than do you

16   recognize.  I think the question was is it an index

17   sequential access method that's being described, so I

18   don't know what the question is yet really.

19   BY MR. ROBERTSON:

20   Q    Is that what is being described here and defined?

21   A    Yes.

22   Q    And this index search we're talking about in the

23   Lawson software is this kind of sequential access

24   method, correct?

25   A    I don't think it is, no.

1   Q    Why not?

2   A    Because index sequential a very old database

3   organization method that refers to files that are

4   organized already in some kind of order, and I don't

5   believe that to be true of the item master database.

6   Q    You didn't look at the source code to make that

7   determination, did you?

8   A    No, I looked at the structure of the database.

9   It's a relational database.   ISAM is not a relational

10  organizations method.

11  Q    But when I use an index in a relational database,

12  it provides me with pointers to the actual data record

13  that I want to retrieve; isn't that right?

14  A    That's right.   It has nothing to do with ISAM, but

15  that's correct.

16         MR. McDONALD:   I think we're off of this.

17  Can we take this off the screen so we don't confuse

18  the jury.

19  BY MR. ROBERTSON:

20  Q    You'd agree with me that the Lawson accused system

21  includes the ability to search the item master file

22  using a number of different queries, right?

23  A    Yes.

24  Q    For example, you can do searches for items by

25  generic name, or by class types, or by a first user

1   defined field?

2   A   I don't recall those specifically.  I don't have a

3   reason to dispute it.

4   Q   Isn't it possible to avoid searching an entire

5   database by creating indexes that allow particular

6   records containing specific data to be located

7   quickly?

8   A   I've said that what an index does --

9   Q   Please, if you can answer my question.

10          THE COURT:  Why don't you just ask it again.

11  Q   Do you want me to repeat it?

12  A   Yes, repeat it.

13  Q   Isn't it true that you can avoid searching an

14  entire database each time by creating indexes that

15  allow particular records containing specific data to

16  be located quickly?

17  A   No.

18          MR. McDONALD:  Object to that.  He's already

19  answered.  I'll withdraw the objection.

20          THE COURT:  All right.

21          THE WITNESS:  If you didn't object the first

22  time, I didn't think you were going to object the

23  second time.

24  Q   Do you have your report in front of you?

25  A   No.

1          THE COURT:  Do you have a copy of his report

2   for him?

3          MR. ROBERTSON:  Yes, sir.

4          THE COURT:  What paragraph?

5          MR. ROBERTSON:  Paragraph 134, on page 40.

6          THE COURT:  Page 40, paragraph 134, Dr.

7   Shamos, is what he's going to ask you about.

8   BY MR. ROBERTSON:

9   Q   You indicate here that as a hypothetical

10  proposition, it's possible in a sense to avoid

11  searching an entire database each time by creating

12  indexes that allow particular records containing

13  specific data to be located quickly.  Did you say that

14  in that your report?

15  A   Yes, it says "in a sense."

16  Q   Thank you.  You also said in this regard, a

17  database index is similar to the index of a book which

18  makes it unnecessary to scan the entire book to locate

19  the occurrence of a word each time a search is

20  performed, correct?

21  A   Yes.

22  Q   With respect to the Punchout functionality and

23  Punchout procurement, you understand that when the

24  customer is using that functionality with the

25  requisition self service module, they're operating

1    within the Lawson system during the entire process,

2    correct?

3    A    No.

4    Q    So if there were testimony in the record with

5    respect to that, that that is the case, would that

6    change your opinion?

7              MR. McDONALD:  Objection.  He wasn't able to

8    hear the testimony.

9              THE COURT:  That's a proper question.  It's

10   the functional equivalent of a hypothetical.  That's

11   all right.

12   A    I'm an open-minded guy.  If whoever said that

13   would explain what he meant by it, it's possible he

14   might change my mind, but merely hearing such

15   testimony exists doesn't change my mind.

16   Q    You're aware that it's Lawson who creates the

17   communication protocols with its Punchout trading

18   partners, correct?

19   A    Okay.  As a general proposition, in order

20   to connect to --

21   Q    As a general proposition, do you agree with that?

22   Yes or no?

23   A    Repeat it then.

24   Q    It's Lawson that creates the communication

25   protocols used in the Punchout procurement process?

1   A    The phrase I'm having trouble with is

2   "communication protocols."

3            THE COURT:  You do not know what they are?

4            THE WITNESS:  I know what they are.

5            THE COURT:  Do you not know what he means?

6            THE WITNESS:  I think I know what he means,

7   but I think it's different from what he said.

8   BY MR. ROBERTSON:

9   Q    What do you understand communication protocols to

10  mean?

11  A    Well, you can't create communication protocols

12  over the Internet.  You have to use standardized

13  communication protocols.

14       If what you mean is Lawson's facility have the

15  ability to connect to the vendors so that you can

16  search the vendor's website, the answer is yes.

17  Q    And law also creates those protocols to return the

18  data from a vendor for inclusion into a requisition

19  and then a purchase order; isn't that right?

20  A    I'll have a lot easier time if we don't use the

21  word "protocols."  Just say mechanism and I'll agree

22  with you.

23  Q    Well, Lawson creates that mechanism?

24  A    Yes.

25  Q    Are you familiar with the term handshake used in

1    that context?

2    A    Yes.

3    Q    Lawson creates that handshake, right?

4    A    Lawson implements part of that handshake, yes.

5    Q    If there were testimony in this case that Lawson,

6    in fact, creates that handshake, would that affect

7    your opinions in any way?

8    A    No, because I understand how handshakes work and

9    it's a two-way street.  The vendor has to do certain

10   things, too, as part of the handshake.

11   Q    Isn't it true in this Punchout process, selecting

12   checkout on the shopping cart releases the requisition

13   to the next stage of process?  And checkout saves

14   items to the cart to the requisition lines, and it

15   goes into the requisition to the next processing

16   stage?

17   A    Yes.

18   Q    So the shopping cart then is not the same as the

19   final requisition, correct?

20   A    I haven't opined on that.  I haven't looked at it.

21            THE COURT:  You say you haven't looked at it?

22            THE WITNESS:  I haven't looked at that.  I

23   haven't considered it.

24   Q    You were asked some questions about some of these

25   means-plus-function claim constructions.  Do you

1    recall that?

2    A    Yes.

3    Q    Can we go to the page 5 of the glossary, the means

4    for selecting product catalogs to search?

5         You were asked about this particular claim element

6    in Claim Three of the '683 patent?

7    A    Yes.

8    Q    One of the structures the Court indicated there is

9    a user interface that allows the user to select a

10   catalog, do you see that?

11   A    Yes.

12   Q    If in one of those user defined fields, I had the

13   vendor name, the Lawson software presents a user

14   interface that would allow me to select that vendor in

15   that field, correct?

16   A    If you -- yes, in a sense.

17   Q    Thank you.  Also in this claim construction, the

18   Court indicated that the structure, corresponding

19   structure, is what's described, and at the end he

20   indicates "and their equivalents," do you see that?

21   A    Yes.

22   Q    You weren't asked by Mr. McDonald about the

23   equivalents, were you?

24   A    No.

25   Q    If you'll go to page 3, the means for generating

SHAMOS - CROSS                    1930

1    an order list.  '172 patent, Claim One.

2        Now, for this means claim, the Court identified

3    the corresponding structure as being a user interface

4    operating on a computer through which a user may

5    select from results of a search program or a search

6    program that generates an order list of matching

7    items; is that right?

8    A    That was almost right.  I think you read one word

9    wrong.

10   Q    Let me start over then.  The Court identified the

11   corresponding structures that are disclosed as a user

12   interface operating on a computer through which a user

13   may select from results a search program or a search

14   program that generates an order list of matching

15   items?

16   A    You omitted a word that time.  I don't think it

17   really matters.

18   Q    Tell me which word I omitted.

19   A    "From."  Select from results from a search

20   program.  The second "from" was omitted.

21              THE COURT:  It probably was a typographical

22   error, isn't it?  I don't know.

23   Q    Well, in any event, the reason you say this can't

24   be satisfied is because you say catalogs aren't

25   present in the accused system, right?

1    A    Well, no, the function isn't performed.  The

2    function has to -- first of all, there has to be a

3    means for searching, which we didn't have, and there

4    has to be a matching item selected by said means for

5    searching.

6         If you don't perform the function, it doesn't

7    matter what structure you have.

8    Q    Well, the Court construed means for searching for

9    matching items among the select product catalogs,

10   right?

11   A    Yes.

12   Q    While we're on that one still, Mr. McDonald didn't

13   ask you about any equivalents, did he?

14   A    In the interest of brevity, I don't think he asked

15   me about equivalents or any of the means-plus-function

16   elements.

17   Q    Let's go to means for searching for matching

18   items.  Now, it's your position that you can't search

19   for matching items among the selected product catalogs

20   because, first, you say there are no catalogs in the

21   item master, right?

22   A    That's one reason.

23   Q    Let's assume there are catalogs there.

24   A    Yes.

25   Q    Let's assume that the vendor identified the vendor

1  name in one of those user defined fields.  I could

2  then select that catalog, I think you've indicated, by

3  using the vendor name, and then I could search in it,

4  couldn't I?

5  A    I did not indicate that, and you can't.

6  Q    Doesn't the Court indicate that the corresponding

7  structure here is a search program and modules

8  operating on a computer system with access to data in

9  a database or other file system, correct?

10  A    Yes, but you were talking about selected product

11  catalogs.

12  Q    I said assume that we have a vendor name and a

13  vendor field and we have selected that vendor name and

14  got results.

15  A    That's not selecting a vendor catalog.  That's

16  selecting a particular field in a database.

17  Q    Don't I get results from that is the catalog that

18  has that vendor name?

19  A    Well --

20  Q    Can you answer that fairly yes or no?  If I just

21  search using that vendor field that I've populated

22  with the vendor names, and I just want Dell, and I put

23  Dell computer in that vendor name, I'll get Dell

24  results, won't I?

25  A    Yes, you search the entire catalog to get Dell

1   results.

2   Q    And what came back was the Dell catalog that I

3   selected using that vendor field, right?

4   A    What came back were the items that the customer

5   decided to include from Dell's information.

6   Q    But if they included it, that's what I got back,

7   right?

8   A    You get back whatever was put in.

9   Q    You are aware that Lawson represents that it can

10  include all of a vendor's catalog data within the item

11  master, correct?

12  A    Well --

13  Q    Have you seen any documents like that?

14  A    I think that it's possible for Lawson to include

15  data about every item in a vendor's catalog.  I don't

16  know if it's possible for it to include everything in

17  a vendor's catalog.

18  Q    Can I include all the things that the Court has

19  identified in its definition of a catalog?

20          THE COURT:  I think we have already been

21  through that.  And he went through them one by one and

22  said yes.  So let's go ahead with something else.

23  BY MR. ROBERTSON:

24  Q    You understand -- I already asked that question.

25  So thank you.

1934

1     MR. ROBERTSON:  Your Honor, that's all the

2  questions I have.  Thank you.

3     THE COURT:  How long do you project your

4  redirect to be?

5     MR. McDONALD:  Twenty minutes.

6     THE COURT:  Or how short?

7     MR. McDONALD:  I think about 20 minutes, Your

8  Honor.

9     THE COURT:  I think probably it's a good time

10 to go ahead and have lunch.  Your lunch is here.

11 We'll take an hour for lunch.  And if you will just

12 take your pad if you would, please.

13     (The jury is out.)

14     THE COURT:  One productive effort in which

15 you might engage over the lunch hour is to designate

16 or have somebody call one person from one place to go

17 to the CVS on Broad Street and get some cough drops

18 for all of you, and I'm including all of you back

19 there because at one time everybody but this gentleman

20 back here was coughing.  He was coughfree.  And the

21 rules about having cough drops in the courtroom are

22 suspended because of the time of the year.  And if

23 you'd like to use them, fine.

24     I see no reason that you need to have

25 everybody go down there, but if I were you, I'd flip a

1935

1  coin, and let one side or the other send somebody down

2  there and get several packages of them and use them.

3  And that will be easier on the court reporters if they

4  don't have to deal with the coughing.

5          And I understand.  I've been through more

6  packs than I ever have used in my whole life, I think,

7  just to keep from coughing because I have a little bit

8  of that hack, too.

9          All right.  Thank you all very much.  We'll

10  take a recess for lunch.

11          (Lunch recess taken.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25