1998

1              (The jury is out.)

2              THE COURT:  Okay.  How much more of this do

3    we have?  Thirty minutes of this witness, but what's

4    this 20-minute video and an hour-plus video?  Why do

5    we have over an hour of a video?  You remember what I

6    told you about these videos.

7              MR. SCHULTZ:  Yes, Your Honor.  The 20-minute

8    video is a video related to the Fisher RIMS system

9    related to the priority of it.  And that's the

10   20-minute video.  Then there's a video that is Laurene

11   McEneny, and that is related to an entire system, the

12   PO Writer System.  That video was originally two hours

13   and 20 minutes.  The parties worked together and cut

14   that down to an hour and a half, approximately.

15             THE COURT:  You might be able to cut it down

16   more over the weekend.

17             MR. SCHULTZ:  Yes, Your Honor.

18             THE COURT:  About 30 minutes.  That's about

19   all a jury can take of that.  If it was NCIS or

20   Housewives of Atlanta or whatever it is, they can

21   handle something like that, but you can't take more

22   than an hour and a half of this stuff.  It's a hard

23   dose.

24             You have a witness over here.  She knows what

25   she's talking about, and she relates, and they can

1999

1    handle that.

2            All right.  Get them, please.

3            What are you doing with this witness?  What's

4    the purpose of this testimony?

5            MR. McDONALD:  It's to show that the TV/2

6    system is prior art.

7            THE COURT:  It's anticipation.

8            MR. McDONALD:  It's part of the obviousness

9    determination.

10           THE COURT:  Obviousness, excuse me.  But we

11   never did tell them that we were moving.  I was trying

12   to figure out what you were doing and I thought I knew

13   what this was.

14           MR. McDONALD:  You did say something about

15   that.  I thought that was the segue.

16           THE COURT:  Yeah, but I didn't say now is the

17   time, Charlie.  Okay.

18               (The jury is present.)

19           THE COURT:  All right.  Ladies and gentlemen,

20   I told you that they were about ready to move into

21   invalidity, and they have been with this lady.  They

22   do have two of the inventors that are coming back.  Is

23   that right?

24           MR. McDONALD:  I think we'll keep it to two.

25   Maybe three, but probably two.

2000

1          THE COURT:   Whatever.   They have inventors,

2     and it may have to do with infringement and

3     invalidity, but now they have moved into invalidity.

4     And what they are trying to do is -- that makes it

5     sound like they flunked.   I don't mean do that.   I'm

6     not making any comment.

7          The general topic is the issue of

8     obviousness, which I think was talked about in the

9     video, and I'll tell you more about it.   But that's

10    what they're doing.   And we'll try to tell you as they

11    move from one to another kind of topic they are

12    addressing.   Nobody will be arguing it, but at least

13    it will help you focus on what the point is.

14         So we're now moving into obviousness with

15    this witness, Ms. Eng.   Okay.

16         This is your cross-examination.

17         MR. ROBERTSON:   Thank you, Your Honor.

18

19    CROSS-EXAMINATION

20    BY MR. ROBERTSON:

21    Q    Nice to see you again, Ms. Eng.

22    A    You, too.

23    Q    I understand that you were a consultant for Lawson

24    in this case?

25    A    Yes.

ENG - CROSS                    2001

1   Q    You indicated that you had spent five to ten

2   hours.  That was preparing for today's testimony?

3   A    Reading the material and stuff, yes.

4   Q    But you spent more time in the case than that,

5   right?  You were deposed back in May, I believe, of

6   last year?

7   A    When I saw you?

8   Q    Yes.

9   A    Yes.

10  Q    You were also a paid consultant in a trial with

11  SAP, right?

12  A    Yes.

13  Q    That was about what, four years ago now?  2006 or

14  so?

15  A    Was it?  Okay.

16  Q    It's difficult to remember back to just --

17           THE COURT:  She tried to block it out.

18           THE WITNESS:  Yes.

19  Q    It's difficult to remember just back four years,

20  nevermind what we've been talking about here 18 years

21  ago, right?

22  A    Well, that I did every day.  The trial was just --

23  Q    You'd agree with me, though, that TV/2 was not

24  commercially available back in 1995, right?

25  A    I think it was available from like '91, and then I

ENG - CROSS                    2002

1    think it was discontinued in '94 or something.  '95

2    maybe.

3    Q    You recall testifying under oath in the SAP trial?

4    A    No.  I mean I remember testifying, yes.

5              MR. McDONALD:  Your Honor, I don't think this

6    is impeachment.  She's not denying that it wasn't on

7    sale in '95.

8              MR. ROBERTSON:  Let me --

9              THE COURT:  Well, there was a different

10   question, so I think it's a relevant approach.  It

11   depends on what the testimony was, doesn't it?  The

12   answer was different than the question.  Fairly

13   significantly.  So let's see.

14             MR. ROBERTSON:  May I hand the witness a

15   notebook?

16   BY MR. ROBERTSON:

17   Q    In the 1994-95 period, when you were working with

18   Fisher right before, I think, you left in January of

19   '95 --

20   A    Yeah, I did.

21   Q    -- fisher was the first customer really to use

22   TV/2 in a production environment; isn't that right?

23   A    As far as I know in the U.S.

24   Q    Did any other customers to your knowledge ever use

25   TV/2 in a production environment?

ENG - CROSS                          2003

1    A    I'm not sure about Volvo.

2    Q    Volvo was this demonstration that was happening

3    over in the U.K.?

4    A    In the U.K.

5    Q    You weren't involved in that, were you?

6    A    I was not, no.

7    Q    We're going to have to not talk over each other.

8    So just wait until I finish my question, then I'd

9    appreciate your answer.

10        So it was written by people in the development lab

11   in the U.K., right?

12   A    Yes.

13            THE COURT:   What was written?

14            MR. ROBERTSON:   This TV/2 program.

15   A    Yes.

16   Q    Okay.  And so it wasn't commercially available as

17   far as you know, right, at that period?

18   A    What do you mean by commercially available?

19   Q    This program, this development lab program, they

20   were working on in the U.K.

21   A    I mean, you couldn't go to a Best Buy and buy it,

22   but you could get it through an IBM group.

23   Q    Let me ask you if you'd look -- there's a tab in

24   your book that has your SAP testimony.

25   A    Okay.

1   Q    I'd like to direct you to page 1296.

2   A    Where do I see the page numbers?

3   Q    They should be in the upper right-hand corner.

4        THE COURT:  There's a little fold on the

5   squares on the pages.  An in the upper right-hand

6   corner of each one of those little quarters is the

7   page number, Ms. Eng.  And at the bottom is page

8   numbers, and this one is on page 16.

9        THE WITNESS:  Right.

10       THE COURT:  Go ahead.

11  Q    Do you see at page 1295 the question was asked:

12  Was TV/2 a final release IBM product?  You answered:

13  No, I don't think so.  I think Fisher was the first

14  customer really to use it in a production environment.

15  I had asked you that.

16  A    Okay.

17  Q    That's the time period we're in now.

18  A    Uh-huh.

19  Q    Was TV/2 an off-the-shelf product?

20  A    Like I said, they couldn't go to Best Buy and buy

21  it.  It had to be packaged with service.

22  Q    So the question was asked:  So was it commercially

23  available as far as you know?  Do you see that?

24  A    Right.

25  Q    Let me finish my -- and the answer there was:  No,

1    not as far as I know.  Correct?  Yes or no?  That's

2    what it says?

3    A    That's what it says there, yes.

4    Q    Okay.  Thank you.

5         As far as you know, no one after Fisher ever used

6    it in a commercial production environment, correct?

7    A    I left so I do not know.

8    Q    As you sit here even today, you don't know whether

9    anybody ever used it after Fisher in a commercial

10   production environment, right?

11   A    I do not know.

12   Q    Before working with Fisher, though, you were not

13   aware of any other instance in which IBM integrated

14   Technical Viewer 2 with a product to read large

15   amounts of data; isn't that right?

16   A    Before Fisher?

17   Q    Yes.

18   A    Correct.

19   Q    Did I understand you to say that TV/2 didn't have

20   a database, right?

21   A    It didn't have a relational database.

22   Q    It was a search program, wasn't it?

23   A    TV/2 was -- that was one of the capabilities.

24   Q    You worked on this project with Fisher, do I

25   understand, from sometime in the middle of 1993 until

ENG - CROSS                          2006

1  when you left in 1995?

2  A   Well, I left in -- I probably didn't work any in

3  '95, but, yes, through '94.

4  Q   So approximately about a year and a half?

5  A   Or a year and -- not quite a year and a half

6  probably.

7  Q   A little less than a year and a half?

8  A   Yeah.

9  Q   And the TV/2 that was integrated with Fisher, it

10  went through serious significant modifications over

11  that year and a half, wouldn't that be fair to say?

12  A   I know they did add some features to make it

13  work -- have better performance.

14  Q   But you did a lot of things during that period of

15  time on the project, correct?

16  A   What do you mean by a lot of things?

17  Q   You had to do a lot of modifications to bring this

18  project to a conclusion eventually?

19  A   Well, we changed a lot of the process to try to do

20  it more efficiently, yes.

21  Q   So, for example, you worked on a conversion tool.

22  Do you remember that testimony in SAP?

23  A   Yes.

24  Q   That was an important aspect of coming up with a

25  commercial or production prototype, correct?

ENG - CROSS                    2007

1   A    I think that the conversion tool was just for the

2   Fisher data, to take it from their electronic version

3   to the TV/2.

4   Q    But you had to develop that; is that right?

5   A    Yes.

6   Q    You actually worked a lot on creating some new

7   tags, didn't you, that needed to be programmed in

8   order to be able to read some of the data?  That was

9   part of your job?

10  A    Can you refresh my -- did I say something about

11  new tags?

12  Q    Didn't you work on tags during this project?

13  A    We put the tags in, yeah.  The way the generalized

14  markup language works, you would put in there -- a tag

15  was like a part number or paragraph or a table.

16  Q    Did you actually have to create a new type of

17  markup language, GML, as part of this project?

18  A    No, I think that was already --

19  Q    This conversion tool you talked about for this

20  project, IBM never made that tool publicly available

21  to anybody else; isn't that right?

22  A    I'm sorry.  Can you repeat that?

23  Q    Sure.  This conversion tool you just mentioned,

24  IBM never made that publicly available to anybody else

25  other than Fisher; is that right?

ENG - CROSS                    2008

1   A    Not to my knowledge.

2   Q    Fisher contracted IBM to assist them in this

3   project, right?

4   A    To come up with a solution, yes.

5   Q    Well, it contracted you to work with them?

6   A    Right.

7   Q    When they came with to you and presented you with

8   this project, correct?

9   A    Correct.

10  Q    And are you aware that Fisher paid IBM $620,000

11  for this?

12  A    I saw that in here.

13  Q    Did you know that at the time?

14  A    I don't remember.  Probably.  I think I've seen

15  those documents before.

16  Q    This Technical Viewer had proprietary tagging; is

17  that right?

18  A    It had a proprietary database.  Probably some of

19  the tags were not like the standard.  We used the

20  standard way to do it, but they probably had our own

21  tags, yes.

22  Q    Did you modify those tags to be able to

23  formulate -- to be able to work in this project?

24       MR. McDONALD:  Objection to the form of the

25  question, Your Honor.

1          MR. ROBERTSON:  Let me rephrase.

2     BY MR. ROBERTSON:

3     Q    Did the tags have to be modified for this project?

4     A    I don't remember.

5     Q    Why don't you take a look then, if you could, Ms.

6     Eng, at again your SAP testimony at page 1270.

7          THE COURT:  The way this is usually done is

8     to ask the question that you want to ask, and then

9     say, You testified to such and such, and you were

10    asked such and such, and said such and such; is that

11    right?  Does that refresh your memory?  And if it

12    doesn't refresh her memory and if she answers, you

13    know.  If it doesn't refresh her memory, then the

14    document can't be introduced into evidence.

15         Do you want to try using it the standard way?

16         MR. ROBERTSON:  I'll try that, Your Honor.

17    BY MR. ROBERTSON:

18    Q    I think you indicated that you used GML or

19    generalized markup language for tags for the

20    information in this project, correct?

21    A    We did.

22    Q    There were also other specific TV/2 tags that were

23    used to cull out and identify specific information

24    that needed to be created as part of this project,

25    correct?

1    A    Right, and those were there, though.  They were

2    the ones that let you select the parts data or the

3    table.

4    Q    Do you remember working on a project that involved

5    a shell?

6    A    Yes.

7    Q    And the shell had to be created as part of the

8    presentation to make use of what's known as an

9    application program interface?

10   A    The shell was just like the menu like in the Volvo

11   pictures we saw.  And then the API was the interface

12   between the programs.

13   Q    Put you had to create a shell for this project

14   with Fisher-Scientific, correct?

15   A    We did because they wanted to have specific things

16   there.

17   Q    Those TV/2 tags weren't publicly available in

18   1994; is that right?

19   A    That's right.

20   Q    In fact, isn't it the case that those TV/2 tags

21   have never become available even to this day, right?

22   A    Not that I know of.  I mean, you would need TV/2

23   to use them.

24   Q    Did IBM ever make the TV/2 API publicly known or

25   made available?

1   A    I don't know that.

2           THE COURT:  What did you say?

3           THE WITNESS:  I don't know.

4   Q    Did you give it to Fisher and nobody else?

5   A    I'm sorry.  I didn't hear you.

6   Q    Did you give it to Fisher and nobody else?

7           MR. McDONALD:  Objection.

8           THE COURT:  Overruled.

9   Q    I asked you did it ever become publicly known.

10  Let me ask you now, did you give it to Fisher and

11  nobody else?

12  A    There was a specific API for Fisher, yes.

13  Q    Did you ever give the TV/2 API to anybody else

14  besides Fisher?

15  A    Not that I know of, no.

16  Q    And the API is necessary for this project, right?

17  A    If you want to integrate it with another system.

18  Q    Did you also work on a compiler as part of the

19  project?

20  A    We used a compiler as part of the project.

21  Q    That had to be created as part of this project as

22  well; isn't that right?  Did you testify about that at

23  the SAP trial?

24  A    The compiler was already there.

25  Q    But you had to make special what are called .inf

1  files?

2  A   Well, we had .inf files, but I think what we had

3  to do is we added some features, and I think it talks

4  about it in that one document, too.  We added some

5  features to make it faster.

6  Q   As part of the Fisher --

7  A   As part of the Fisher.

8  Q   As part of the Fisher-Scientific project?

9  A   Yes.

10  Q   And you needed those .inf files for multiple

11  catalogs; isn't that right?

12  A   Yes.

13  Q   I'm sorry.  I didn't hear you.

14  A   Yes.

15  Q   Thank you.

16      Even after you had these .inf files containing

17  data that was given to you, you still had problems

18  searching them, didn't you?

19  A   Well, it depended on the size of the file.

20  Q   The bigger the file, the slower the search?

21  A   Yes.

22  Q   There were certain requirements as part of this

23  project in order to be able to get search results back

24  quickly, correct?

25          MR. McDONALD:  Objection, Your Honor.

1   There's no relevance as to how fast the system is

2   working.

3            MR. ROBERTSON:  I'm just asking how T/V2 was

4   modified for this project.

5            THE COURT:  Overruled.  She said it was

6   modified for the project.  The question is:  How was

7   it modified?  He's going through the parts of it to

8   see how they were modified.

9            MR. McDONALD:  Well, i it's modified in a way

10  that only relates to speed, there's no speed that's at

11  issue in this case.  So it's irrelevant for that

12  reason.

13           MR. ROBERTSON:  I think it's very relevant.

14  It was a year and a half long project, Your Honor.  A

15  lot of things had to happen.

16           THE COURT:  It depends the speed.  It depends

17  on a lot of things.  Overruled.

18  BY MR. ROBERTSON:

19  Q   You also had to complete a super index for the

20  project, correct?

21  A   That was related to making it faster.

22  Q   Did you work on the super index?

23  A   I mean, I talked to the people.  I don't think I

24  wrote that, no.

25  Q   But you know that had to be created in order to

1   make the search faster?

2   A    To make the search faster, yes.

3   Q    And that was because there was so much data in a

4   catalog like the Fisher-Scientific catalog, right?

5   A    Correct.

6   Q    You mentioned that you did a lot of scanning

7   initially in the first few weeks of the project.  Did

8   I understand that right?

9   A    Yeah.

10  Q    But at some point in time Fisher-Scientific gave

11  you the catalog in an electronic format, is that

12  right, as part of the project?

13  A    Yes.

14  Q    And you could not have built this system to use a

15  Fisher catalog unless you had something like the super

16  index to make the search faster, right?

17  A    Can you repeat that again?

18  Q    Sure.  Could you have built this system for use

19  with the catalog like Fisher without using something

20  like this super index?

21  A    Could we have built it?  We could have built it,

22  the system, but it wouldn't be very usable.

23  Q    And that would be because these searches would be

24  so slow, it would be quicker to just look in the paper

25  catalog, wouldn't it?

1   A    Probably.

2   Q    Those APIs we talked about with the TV/2, they

3   were not publicly available in 1994, correct?

4   A    They were specific for Fisher.  They were just for

5   Fisher.

6   Q    Well, you were asked to look at Plaintiff's

7   Exhibit No. 38, which I think is in either book, and

8   you directed us to this --

9        THE COURT:  In the book you have got, it's

10  back near the back.

11       THE WITNESS:  Thank you.

12  Q    I think you directed us to this Fisher/IBM master

13  schedule plan, do you see that?

14  A    Yes.

15  Q    Can you go to that page that ends with 53 there?

16       THE COURT:  What page?

17       MR. ROBERTSON:  Sorry.  It ends 053.  It's

18  page 18 of 23, I think.

19  BY MR. ROBERTSON:

20  Q    These are all the tasks that needed to be done for

21  the original pilot.  And then what was the second

22  phase of the project?

23  A    The first was demo, the second was the pilot, and

24  the third was the comprehensive.

25  Q    The comprehensive was supposed to be a working

1   prototype?

2   A    No, it was everything done.

3   Q    So this project, did you start right at this

4   project from the beginning?

5   A    Me?

6   Q    Yes.

7   A    Well, I was still on maternity leave when they

8   first started, but when I came back I started.

9   Q    When approximately was that?

10  A    Probably --

11  Q    Nine months backward?

12  A    No.  I had him in April, and I was supposed to be

13  off for six months, but I did not stay off for six

14  months.  So it was a little bit before that.

15  Q    Sometime in the summer then?

16  A    End of the summer or in September.

17  Q    I'd like you to just look at some of the things

18  here generally.  First, let me ask you, have you heard

19  the expression Gantt chart?

20  A    Yes.

21  Q    Would you consider this to be a Gantt chart?

22  A    Yes.

23  Q    On this chart, there's a number of tasks that

24  start out with a column that has an ID number, and it

25  goes right through down to -- I'm going through pages

1   1 through 81; is that right?

2   A    Yes.

3   Q    So there are at least 81 separate tasks that had

4   to be accomplished from the beginning of the project

5   through to install, deliver, maintain, and enhance as

6   requested by Fisher in task 81, correct?

7   A    Correct.

8   Q    You were aware that Fisher and IBM entered into

9   what was called a nondisclosure agreement,

10  confidentiality agreement?

11  A    Right.

12  Q    And you were aware that it was Fisher providing

13  IBM with confidential information?  If you know.

14  A    I don't know.

15  Q    You don't recall?

16  A    I know that Fisher didn't want anybody to tell

17  anybody else that we were building the system.

18  Q    As part of that contract that IBM entered into

19  with Fisher, they agreed that, for example, you

20  couldn't work on any kind of project like this for any

21  of their competitors, correct?

22  A    I do remember reading that.

23  Q    And it actually applied to some of the other

24  people who worked on the project, right?

25  A    Yes.

ENG - CROSS                          2018

1   Q    Do you recall if it applied to Mr. Rolland?

2   A    Yes.

3   Q    And I think it's a Mr. Gomola.  Is that the right

4   pronunciation?

5              THE COURT:  You mean Gounaris?

6              MR. ROBERTSON:  No, sir.

7   Q    Since I raised the issue, why don't we take a look

8   at it.  If you'd go to Plaintiff's Exhibit No. 112.

9   And this is what was called the pilot and

10  comprehensive electronic sourcing system; do you see

11  that?

12             MR. McDONALD:  I think we have the wrong

13  number.

14  A    I can't find that.

15  Q    I'm sorry.  That's probably from an old case.

16  It's PX 25.  I apologize.

17  A    Okay.

18  Q    So just to confirm, will you go to the second to

19  the last page of Plaintiff's Exhibit No. 25.  Now, do

20  you recognize Mr. Gounaris' signature there?

21  A    No, not really.

22  Q    Does it look like it says "Charles Gounaris"?

23  A    Yes.

24  Q    You'll see there is someone who signed on behalf

25  of Fisher-Scientific there?

ENG - CROSS                    2019

1   A    Yes.

2   Q    Do you know who that is?

3   A    I think Frank Melly.

4   Q    Frank Melly?  You're aware that this is a patent

5   infringement suit, right?

6   A    Yes.

7            MR. McDONALD:  Your Honor, I'll object to his

8   using this exhibit with the witness.  He hasn't laid a

9   foundation and it's also outside the scope.

10  BY MR. ROBERTSON:

11  Q    Have you seen this document before?

12  A    I think you might have shown it to me before.  I

13  don't know.

14  Q    You were aware about this --

15           THE COURT:  Objection overruled.

16  Q    You were aware about this restriction on you

17  working for a period of two years after the close of

18  this project because Fisher wanted to maintain this

19  proprietary?

20  A    I did know that Fisher did not want anybody else

21  to know they were doing this.

22  Q    Can you go to the page that ends 293 in this

23  document.  You'll see there's a little number, ePlus,

24  and then there are some numbers at the bottom.

25           THE COURT:  What number?

1              MR. ROBERTSON:  It's 293, Your Honor.

2    Q    Specifically, the third paragraph where it starts

3    for a period of two years.  Now, your maiden name was

4    Pam Jenkins; is that right?

5    A    Yes.

6    Q    So it states here for a period of two years

7    following the earlier of (a) completion of this

8    statement of work, or (b) September 30, 1996, IBM will

9    not assign the following employees:  Harry Alexandra,

10   Jim Gomola, Pam Jenkins, and Al Rolland, to provide

11   electronic catalog application development services to

12   the following organizations.  Do you see that?

13   A    I do.

14   Q    Those organizations that are identified there are

15   competitors of Fisher, did you know that?

16   A    I do now know that.

17   Q    Does it refresh your recollection now that

18   Mr. Gomola worked on the project?

19   A    It says his name, but no, I don't.  He didn't work

20   in Manassas.

21   Q    What about Harry Alexander?

22   A    That sounds familiar, but he didn't work in

23   Manassas either.

24   Q    Back to that Plaintiff's Exhibit No. 38, and if I

25   could direct you back to that Gantt chart that had all

1   the tasks 1 through 81.  Do you see there that there

2   is divided responsibility for a lot of these tasks

3   between Fisher and IBM; is that right?

4   A    Right.

5   Q    I don't want to go through all of them, but, for

6   example, Fisher gave you some requirements for this

7   project, didn't they?

8   A    Yes.

9   Q    And the first item was that IBM needed to take

10  those requirements and definitize them for the

11  electronic sourcing program, ESP.  Do you see that?

12  A    Uh-huh.

13  Q    And then Fisher, you see, had responsibilities for

14  the next task to get technical familiarization in

15  performing system test requirements?

16  A    Okay.

17  Q    And I'll just go through some of the bold, bigger

18  tasks.  You understood that there were some big tasks

19  and there were some sub tasks; is that how I should

20  understand this document?

21  A    That's correct.

22  Q    So, for example, IBM had to verify data format

23  requirements and define the conversion, right?  So you

24  see it's No. 6?

25  A    Yes.

1    Q    Is that accurate?

2    A    Yes.

3    Q    Down at No. 10, Fisher had to provide existing

4    systems interface specifications, right?

5    A    Yes, of course.

6    Q    And No. 12, Fisher had to approve the existing

7    systems interface specifications, correct?

8    A    Because it was their system they had, yes.

9    Q    I understand.  No. 14 is Fisher had to definitize

10   desired plan and hardware scenarios for ESP, which you

11   identified as electronic sourcing program?

12   A    Yes.

13   Q    And system initial roll out, correct?

14   A    Yes.

15   Q    And then Fisher approved and recommended the ESP

16   system typical configurations, correct?

17   A    Correct.

18   Q    Another big project had do with definitizing the

19   distribution and maintenance procedures, right?

20   A    I can't see that yet.

21   Q    That's No. 18 at the top.

22   A    Okay.

23   Q    And IBM had responsibility for that, right?

24   A    Yes.

25   Q    And we're about tow months into the project now;

ENG - CROSS                    2023

1   is that right?

2           THE COURT:   Two months into the schedule.   I

3   think she said previously this was just a schedule.

4   Q   Okay.   For the 18 tasks, does it appear that the

5   project or the schedule here for these tasks started

6   sometime in November and ended sometime the following

7   year in July?

8   A   For the whole system?

9   Q   For all these tasks.

10  A   What does the last page say?   I thought it was

11  supposed to go out until the end of -- oh, maybe July

12  is when it said it was supposed to finish, yeah.

13  Q   So it was supposed to finish in July and it took

14  longer than that?

15  A   I think so, yes.

16  Q   Because when you left in January of '95, it still

17  wasn't completed?

18  A   I think so.

19  Q   Do you know how much longer it took after that?

20  A   No.

21  Q   Do you know whose property the project was, the

22  final comprehensive ESP system, whose property that

23  was at the end of this?

24  A   It was all Fisher's data, so I assume it was

25  Fisher's.

ENG - CROSS                    2024

1   Q    Just back to these projects again, some of the

2   bigger projects here.  No. 23, in order to build this

3   ESP system, you had to verify, convert, process, and

4   author Fisher data; do you see that?

5   A    Yes.

6   Q    And No. 24 is provide Fisher electronic text and

7   image data for the demo ESP system?

8   A    Correct.

9   Q    That's a Fisher responsibility?

10  A    Right.

11  Q    That's the electronic catalog they gave you?

12  A    Well, they didn't give us electronic catalog.

13  They gave us images and parts data.

14  Q    You don't remember receiving an electronic catalog

15  and a CD-ROM from a company called SteBo?

16  A    If I read No. 26, it says convert the image data

17  and then convert the text data.  So I think we didn't

18  get it all in one package.  I think we got it in two

19  separate things.

20         THE COURT:  Just a minute.  He was asking you

21  a little bit different question.  Do you remember

22  getting something from a company called what?

23         MR. ROBERTSON:  SteBo.

24         THE COURT:  What was it that you're asking

25  her if she remembered getting from SteBo?

1        MR. ROBERTSON:  An electronic Fisher catalog.

2        THE COURT:  So you remember such a thing?

3        THE WITNESS:  I don't exactly remember if we

4   got anything from SteBo.

5   BY MR. ROBERTSON:

6   Q   But you do recall getting an electronic version of

7   the Fisher catalog?

8   A   Yes.  We did not have to scan anymore, yes.

9   Q   Did I understand you to say in response to my

10  first question that you think you got it in two

11  separate submissions?

12  A   I thought we had the image data separately and we

13  had to go back and match it.

14  Q   That was one of the things you needed to do for

15  this project?

16  A   Well, we had to tag everything.

17  Q   And you were involved in that, right?

18  A   Yeah, at different times.

19  Q   Is that the next task, 25, convert and tag Fisher

20  electronic text data?

21  A   I guess so.

22  Q   Well, I don't want you to guess.  Do you know or

23  don't you know?

24  A   Do I know if I exactly worked on 25, I don't know,

25  but I did during the project do tagging for them.

1    Q    Then you had to deliver a demonstration of the ESP

2    system to Fisher representatives; is that right?

3    A    Yes, that's correct.

4    Q    Then the next thing you had to do was build this

5    pilot electronic sourcing system, correct?

6    A    Correct.

7    Q    No. 39 was a Fisher task about the interface ESP

8    with existing Fisher systems, correct?  Do you see

9    that, No. 39?

10   A    Yes.

11   Q    And that had to be done as part of the project?

12   A    To interface with their inventory management, yes.

13   Q    And you had to also verify, convert and process

14   and author Fisher data as part of the project,

15   correct?

16   A    Correct.  That's the same thing we had for the

17   sample, just more data.

18   Q    More data?

19   A    Yeah.

20   Q    Let me just go through this very quickly then.  So

21   No. 52, you had to build, test and demonstrate the

22   pilot ESP system, correct?

23   A    Yes.

24   Q    You had to provide copies and field test pilot for

25   the ESP system that's No. 58?

ENG - CROSS                    2027

1   A    Yes.

2   Q    Then you had to start building a comprehensive

3   electronic sourcing program system?

4   A    Right.

5   Q    As part of that, Fisher provided you with more

6   electronic text and image data for this comprehensive

7   system?

8   A    Right.  The way it worked was the demo was a small

9   number of pages, and the pilot was more pages, and the

10  comprehensive was full.

11  Q    Was it the entire catalog at that point?

12  A    I think so.

13  Q    Then No. 74 was the build test and demonstrate the

14  comprehensive system, right?

15  A    Right.

16        THE COURT:  While he's looking for something,

17  this part of Exhibit 38 you're looking for starts with

18  11/11 and ends with 7 something.  The 11/11 is what

19  year?

20        THE WITNESS:  That would be '93.

21        THE COURT:  Look at the front of the

22  document.  The first page.  It's dated February of

23  '94.

24        THE WITNESS:  Right, but there are several

25  versions of the same thing in there.  Every time we

ENG - CROSS                    2028

1    came up with a new version, we put a new date.  That

2    wasn't the initial date.  That was the date of this

3    version because you'll see another one that says March

4    something.

5            THE COURT:  March.

6            THE WITNESS:  So as you see, the 11/11 tasks

7    are completed in this one because this is like a

8    snapshot of February.

9            THE COURT:  So it started in 11/11/93, and it

10   was supposed to end in July of '95?

11           THE WITNESS:  '94.

12           THE COURT:  But it wasn't finish when you

13   left in January of '95, whatever the schedule may have

14   been?

15           THE WITNESS:  Right.

16           THE COURT:  Okay.  Pardon me for the

17   interruption.

18           THE WITNESS:  No problem.

19   BY MR. ROBERTSON:

20   Q    Okay.  You were asked some questions about some of

21   these brochures --

22   A    Uh-huh.

23   Q    -- that IBM had on this TV/2?

24   A    Correct.

25   Q    Let me direct you to Defendant's Exhibit No. 107.

1   This is what I think you referred to as the brochure.

2   A    Right.

3   Q    Just confirm for me that this doesn't have a date

4   on it.

5   A    It doesn't have a date on it.

6   Q    You weren't involved in the preparation of this

7   document, correct?

8   A    I was not.

9   Q    Why don't you take a look at the document that's

10  Defendant's Exhibit No. 230.  You were asked questions

11  about that; is that right?

12  A    Yes.

13  Q    You'd agree that this general information manual

14  does not provide enough information for anybody as to

15  how to integrate a TV/2 search engine with an

16  electronic catalog, correct?

17  A    It does not.  It's just general information.

18  Q    And none of those TV/2 special tags are described

19  in the marketing brochure; is that right?

20  A    Correct.

21  Q    Neither of these two documents disclose markup

22  language that would be used in any kind of project

23  like the electronic sourcing project that IBM did with

24  Fisher, correct?

25  A    No, there's no tags in here.

ENG - CROSS                    2030

1    Q    And there's no description of these .inf files in

2    any of these documents that were necessary for the

3    project?

4    A    Not in these two documents.

5    Q    There's no description in either of those two

6    about this super index that needed to be developed in

7    order to do quick searches in either of those two

8    documents?

9    A    Not in these documents.

10            THE COURT:  These documents, are you talking

11   about Defendant's 107 and 230?

12            THE WITNESS:  I don't know what number.  It

13   was the one with the picture on the front that he just

14   asked me to look at before this.  It wasn't in that

15   one either.

16            THE COURT:  Okay.

17   Q    There's no technical description in this general

18   information manual as to those things as well.  That

19   was Defendant's Exhibit No. 230, right?

20   A    There's no technical information, no.

21   Q    This wasn't intended to show somebody how to

22   construct a system like the electronic sourcing system

23   project, correct?

24   A    No, that was something else.  This was just the

25   general information for if you're looking at it.

1  Q    That something else was documentation that was

2  part of the electronic sourcing project, correct?

3  A    Well, no, it came with TV/2.

4  Q    I thought I understood you to say that TV/2 wasn't

5  in commercial production until the electronic sourcing

6  project with Fisher; isn't that right?

7  A    If commercial means you can buy it off the shelf,

8  no, but it was available to use in a service.

9  Q    We haven't seen any of those documents, have we,

10 that you're referring to?

11 A    They are not here, no.

12 Q    You're aware that IBM has never claimed to be an

13 inventor of these patents that are in suit, right?

14 A    I'm not aware --

15        MR. McDONALD:  Objection, Your Honor.  Beyond

16 the scope.  Irrelevant.

17        MR. ROBERTSON:  I don't think it's beyond the

18 scope, Your Honor.  I think --

19        THE COURT:  Well, I'm not sure what relevance

20 it has.  Sustained.

21        MR. ROBERTSON:  Thank you.  That's all I

22 have, Ms. Eng.

23

24

25

2032

1    REDIRECT EXAMINATION

2  BY MR. McDONALD:

3  Q   Ms. Eng, do you have the transcript that's first

4  tab in that binder that Mr. Robertson gave you from

5  your testimony in 2006?

6  A   Yes.

7  Q   Can you turn back to that page 1296 that

8  Mr. Robertson directed you to?

9         THE COURT:  Are you going to do it right?

10  You have to do it right, too.  All of you do.

11         MR. McDONALD:  I hope so.

12         THE COURT:  Just pointing her to a deposition

13  and reading it in doesn't get the job done.  It can't

14  come in that way.  That isn't how you do it.

15  Q   Ms. Eng, in the year 1992, was the TV/2 system

16  being offered for sale by IBM?

17         MR. ROBERTSON:  Objection, Your Honor.  This

18  was asked on direct examination.  It's just going over

19  prior testimony.

20         THE COURT:  Well, I think there was some

21  confusion engendered as a result of your last question

22  and he's trying to straighten it out.

23         THE WITNESS:  I can answer?

24         THE COURT:  Yes.  Sorry.

25  A   It was available for people to use as a service

1    and to use as a solution, but you couldn't go into a

2    store and buy it.

3    Q    Could you buy it if you bought it together with

4    the services?

5    A    Yes.

6    Q    That was in the year 1992, correct?

7    A    Yes.

8    Q    So when you were asked about it being commercially

9    available, I think you indicated it was not

10   commercially available?

11   A    Right, and I think I said you can't go buy it off

12   the shelf.

13   Q    So when you said it wasn't commercially available,

14   you were talking about getting it off the shelf at

15   Best Buy, right?

16   A    Correct.

17   Q    So in the year 1992, you were out there marketing

18   and selling the TV/2 system?

19         MR. ROBERTSON:  Objection.  That's been asked

20   and answered and it's leading now.

21         MR. McDONALD:  I'm trying to clarify.

22         THE COURT:  It is leading and it has been

23   answered and asked.  She's been through all that.  You

24   don't use redirection to go back and cover everything

25   that you covered in direct.  You use it to address the

1    things that were raised in cross that you need to deal

2    with.  That way we aren't here forever.

3    BY MR. McDONALD:

4    Q   Ms. Eng, I think you indicated that the TV/2 in

5    1992 did not have a relational database; is that

6    correct?

7              MR. ROBERTSON:  Objection.  First, that's

8    leading, and that was asked and answered in direct.

9              THE COURT:  Sustained.  And on cross the same

10   way.

11   BY MR. McDONALD:

12   Q   What type of database did the system have in 1992,

13   if any?

14   A   It had the .inf file.  It had, I would say, a

15   proprietary database because it was more like a flat

16   file database, a flat file with indexes.

17             THE COURT:  What do you mean by proprietary

18   database?

19             THE WITNESS:  Like it wasn't -- it was

20   specific for IBM.  They made up the file format.

21             THE COURT:  I see.

22   BY MR. McDONALD:

23   Q   What's the difference between that type of

24   database and a relational database?

25   A   Well, a relational database is what most people

1  use now and there's a lot more search features.  The

2  way it's stored.

3  Q   So in the 1992 version of the database, the TV/2,

4  that could be searched?

5  A   It could be searched.

6  Q   Did it have an index?

7          THE COURT:  What's "it"?

8  Q   Did the database used in the TV/2 system in 1992

9  have an index?

10          THE COURT:  Let me tell you, what you're

11  doing is you're flipping from one question has

12  relational and then "it" comes up in the next

13  question, and then relational, and then "it."  So the

14  build is suggesting that TV/2 has a relational

15  database, and she said at least three times now that

16  it did not have a relational database.

17          MR. McDONALD:  Maybe I misspoke.

18          THE COURT:  Strike all of that.  We're not

19  going to pay any attention to that now.  And I don't

20  think we're going to go any further if we can't get it

21  straight this time.  This is it.

22          Now, if you want to ask the question, that's

23  fine.  But get it done, and don't be using the

24  alternate form of the indefinite pronoun trying to

25  shift from one system to the other.  It's hard enough

ENG - REDIRECT                    2036

1   for the jury to follow without the specificity that

2   I'm telling you you have to have.

3   BY MR. McDONALD:

4   Q   Did the TV/2 database sold with the product in '92

5   have indexing in it?

6   A   Yes.

7   Q   What time frame were those modifications

8   Mr. Robertson was talking to you about occur?

9           THE COURT:  Which ones?

10          MR. McDONALD:  All of them.

11          THE COURT:  He went through about 15 of them,

12  20.  They didn't all occur on the same day, I gather,

13  from the sequence of events that she was describing.

14  BY MR. McDONALD:

15  Q   Ms. Eng, did all of those modifications that

16  Mr. Robertson talked about occur after 1992?

17          MR. ROBERTSON:  Objection, Your Honor,

18  leading.  This is an important issue right here.

19          THE COURT:  Sustained.

20  BY MR. McDONALD:

21  Q   Ms. Eng, were those modifications that you

22  discussed related specifically to the work with

23  Fisher?

24          THE COURT:  There were a lot of

25  modifications, and I think you're talking about the

1   modifications in the chart that is at the back end of

2   exhibit -- whatever it is.  So you need to be more

3   specific so that we understand what you're talking

4   about.

5   BY MR. McDONALD:

6   Q   Let's talk about those modifications in that Gantt

7   chart that you testified earlier.  Is it your

8   understanding that the questions Mr. Robertson asked

9   you about modifications related to activities that

10  were depicted in that chart or not?  You may answer.

11  A   The modifications that he was talking about were

12  in there somewhere.  They weren't like a line item

13  form.

14  Q   But they are part of the activities involved with

15  what's depicted in the chart; is that fair?

16  A   Yes.

17  Q   That was all activity that happened after 1992 or

18  before?

19  A   After '92.

20  Q   So in my questioning of you when I asked you about

21  the 1992 version of the product, none of those

22  questions about modifications pertained to what the

23  product looked like in 1992; is that correct or not?

24          MR. ROBERTSON:  Objection.  This is vague as

25  to the product.  I don't know what we're talking

ENG - REDIRECT                    2038

1   about.   Are we talking about T/2 as modified?

2           THE COURT:   Sustained.

3   BY MR. McDONALD:

4   Q   Did any of the modifications on the Gantt chart

5   relate to anything done to the product as it existed,

6   the product being the TV/2 product, as it existed in

7   1992?

8   A   No.

9   Q   Do you recall being asked by Mr. Robertson about

10  the application program interface API for Fisher?

11  A   Yes.

12  Q   Did the TV/2 system in 1992 have developed any

13  application program interfaces for any applications

14  other than Fisher?

15          MR. ROBERTSON:   This was asked on direct,

16  Your Honor.

17          THE COURT:   I think you have already answered

18  all that.   He asked about it in connection with 1993

19  and 494.   Sustained.

20  BY MR. McDONALD:

21  Q   Did the Navy project that you referred to, did

22  that have an application program interface or not?

23          MR. ROBERTSON:   I didn't ask anything about

24  the Navy project on cross-examination.   Outside the

25  scope.

ENG - REDIRECT                    2039

1          THE COURT:  Sustained.

2          MR. McDONALD:  All right.  I have no further

3    questions.  Thank you.

4          THE COURT:  Can she be permanently excused,

5    Mr. McDonald?

6          MR. McDONALD:  Yes.

7          THE COURT:  Mr. Robertson.

8          MR. ROBERTSON:  Yes.

9          THE COURT:  Thank you for being with us, Ms.

10   Eng, and giving us your testimony, you're released

11   from your obligation to be here.

12              (The witness was excused from the witness

13   stand.)

14         MR. McDONALD:  We have a 20- or 25-minute

15   video, Your Honor, if you want to do it.

16         THE COURT:  Who is it?

17         MR. McDONALD:  It's Ms. O'Loughlin regarding

18   the RIMS system as prior art in 1992.

19         THE COURT:  Well, let's go ahead and play it.

20         MR. ROBERTSON:  I object to the

21   characterization of what it's going to depict, Your

22   Honor.  I mean, that's very important.

23         THE COURT:  It addresses the subject of

24   invalidity in general.  Is that fair?

25         MR. ROBERTSON:  Yes.

ENG - REDIRECT                    2040

1          THE COURT:  Their theory of invalidity.

2          MR. ROBERTSON:  Yes.

3          THE COURT:  Who is this, Mr. McDonald?

4          MR. McDONALD:  Johanna O'Loughlin.

5          THE COURT:  Do you want to spell all that?

6          MR. McDONALD:  J-o-h-a-n-n-a

7    O-apostrophe-L-o-u-g-h-l-i-n.

8          (A videotaped deposition of Johanna

9    O'Loughlin is now being played.)

10         THE COURT:  Stop it.  Call out the

11   plaintiff's exhibit number when you refer to the

12   deposition exhibit, so we'll all understand what it

13   is.  What's the plaintiff's exhibit number this.

14         MR. ROBERTSON:  It's a defense exhibit.

15         THE COURT:  Whatever.

16         THE CLERK:  Defendant's 40.

17         MS. HUGHEY:  Are you asking what is the video

18   going to be marked as an exhibit?

19         MR. CARR:  What exhibit is it in this case?

20         MS. HUGHEY:  DX 62.

21         THE COURT:  DX 62.  It's a Fisher RIMS

22   trademark application.  What is it?  I can't read it.

23         THE CLERK:  They called it a service mark

24   principle register.

25         THE COURT:  All right.

ENG - REDIRECT                    2041

1           MS. HUGHEY:  Same exhibit, DX 62.

2           This is DX 212.

3           This is DX 213.

4           This is DX 211.

5           THE COURT:  All right, ladies and gentlemen.

6    We'll see you all on Tuesday morning.  We'll start at

7    nine o'clock.  Have a nice weekend.  Drive carefully

8    and just leave your pads with Mr. Neal.

9           Now, they've worked out an arrangement.  I

10   don't know how Mr. Neal and others did it, but if you

11   want to eat in the cafeteria for lunch downstairs in

12   the basement, you can do that and it won't cost you

13   anything.

14          What do you give them?

15          THE CLERK:  We're going to tell them Tuesday

16   morning.  Monica will tell them.  It's very simple.

17          THE COURT:  Or you can bring your own lunch

18   or you can go out on your own.  It's your choice.

19          Have any of you been to the cafeteria.  They

20   have warm foods and sandwiches and a salad bar.  There

21   you go.

22          Thank you very much.  Have a nice weekend.

23          A JUROR:  Thank you for the donuts.

24          (The jury is exiting the courtroom for the

25   evening.)

1          THE COURT:  All right.  Somebody tell me why

2    it was important to establish that the former general

3    counsel of the company didn't know what she was

4    talking about or anything else.  Why was that put in?

5          MR. ROBERTSON:  Your Honor, I offered to

6    stipulate to all of those documents to avoid playing

7    the deposition.  I said we could but in the

8    application, the annual reports, and all that.

9          MR. McDONALD:  It's news to me, Your Honor.

10   I don't remember Mr. Robertson ever doing that.  I

11   would have loved to have streamlined that and get the

12   facts in about the trademark application that she

13   signed verifying that the RIMS system was on sale in

14   1992.  That was the only purpose of that.  We tried to

15   find another way to do it and we couldn't.

16         MR. ROBERTSON:  I would have stipulated to

17   that.  That's what I told him.

18         THE COURT:  We wasted the jury's time.  What

19   is this thing we're going to do for an hour in the

20   next deposition?  What is it?

21         MR. McDONALD:  This is a witness on the PO

22   Writer prior art.

23         THE COURT:  Who is it?

24         MR. McDONALD:  Laurene McEneny.  And she's

25   going to establish the features of that product and

ENG - REDIRECT                    2043

1   that it, too, was on sale more than one year before

2   the filing date on the patent involved in the law

3   suit.

4          THE COURT:  Do you stipulate that the PO

5   Writer was on sale for --

6          MR. ROBERTSON:  It's the details of it, Your

7   Honor, that's important.  The PO Writer, Your Honor

8   has already dealt with at least two of those exhibits,

9   DX 121 and DX 122.

10         MR. McDONALD:  We're not talking about those

11  here.

12         MR. ROBERTSON:  What I'm talking about is the

13  details of what PO Writer are are important.  But we

14  don't have -- we'll take a look at it and try to

15  whittle it down as much as possible as the Court has

16  suggested.

17         There's one document left with respect to PO

18  Writer, and I don't think even Lawson is contending

19  that it anticipates a claim.  Excuse me.  There are

20  three claims, I apologize, out of the 12 that says

21  anticipate.

22         So there is some devil in the details, Your

23  Honor, with respect to that.  I think we both agree on

24  that since both parties took Ms. McEneny's deposition.

25         THE COURT:  Is this the end of your

ENG - REDIRECT                    2044

1  depositions?

2          MR. McDONALD:  That will be.  The McEneny one

3  will be the last one.

4          THE COURT:  It's an hour and a half.  Then

5  what's next?

6          MR. McDONALD:  What's next is we have the

7  inventors are starting, I think, on Tuesday.  Mr.

8  Shamos coming back.  Mr. Staats won't be until

9  Wednesday, I think.  We're going to try to get two of

10  the inventors and Mr. Shamos on Tuesday.  So then

11  Wednesday is Mr. Staats who is J-CONN prior art.  The

12  third inventor, if necessary, will be Thursday, if

13  necessary.  We could get the third inventor, if

14  necessary, on Wednesday.  It may not be necessary.

15          So we could be close to wrapping up, I think,

16  on Wednesday.

17          THE COURT:  All right.  Well, just remember

18  that the jury has to pay attention to this, and it's

19  better if it moves.  And I'm sure they couldn't

20  understand why a lawyer standing up there and

21  answering questions about something she doesn't

22  remember, doesn't really know anything about, and is

23  not able to talk about, and yet she is not

24  technologically able.

25          All right.  Lawson, will you-all come up here

1   and get these binders that you sent up here at the

2   very beginning, not now, because you-all are both

3   adopting a new mode, and I need the space to put in

4   the exhibits that you are using.

5          I'd like to say that I'd like to commend, and

6   it's obvious to me there's been some hard work put in

7   by the legal assistants in this case.  There have been

8   very few problems, and when there have been problems,

9   they have been solved immediately.  And you can't do

10  that unless you know what you're doing.

11         And the IT people, I think you-all have done

12  a fine job, too.  Of course, the lawyers.  I don't

13  mean to take anything away from you, but I remember

14  well who does most of the work.

15         MR. McDONALD:  Your Honor, just one more

16  thing with respect to that last video that Ms. Huey

17  would like to offer.

18         MS. HUGHEY:  I'd like to offer it as

19  Defendant's Exhibit 401.

20         THE COURT:  What is it?

21         MS. HUGHEY:  This is the transcript of what

22  was read in.  My understanding is that

23  Ms. O'Loughlin's deposition transcript was read in, I

24  believe, and it will be marked as an exhibit for the

25  record.

ENG - REDIRECT                    2046

1            THE COURT:  Any objections?  It's admitted.

2            THE CLERK:  What number is that?

3            THE COURT:  401.  Defendant's 401.

4            (Defendant's Exhibit 401 is admitted into

5     evidence.)

6            THE COURT:  All right.  Anything else anybody

7     has so we can get ready to go on Tuesday morning?

8            MR. McDONALD:  Nothing else, Your Honor, for

9     the defense.

10           THE COURT:  All right.

11           MR. ROBERTSON:  Sorry, Your Honor.  I didn't

12    hear you.

13           THE COURT:  I just want to know if there's

14    anything else so that we can solve it and get going

15    and actively out of the box at nine o'clock Tuesday

16    morning.

17           MR. ROBERTSON:  Nothing by the plaintiff.

18           THE COURT:  Okay.  That sounds good.  All

19    right.

20

21           (The proceedings were adjourned at 5:20 p.m.)

22

23

24

25