```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE EASTERN DISTRICT OF VIRGINIA

 3                      RICHMOND DIVISION

 4

 5    --------------------------------------
                                           :
 6    ePLUS, INC.                          :    Civil Action No.
                                           :    3:09CV620
 7    vs.                                  :
                                           :
 8    LAWSON SOFTWARE, INC.                :    January 18, 2011
                                           :
 9    --------------------------------------

10

11           COMPLETE TRANSCRIPT OF THE JURY TRIAL

12          BEFORE THE HONORABLE ROBERT E. PAYNE

13         UNITED STATES DISTRICT JUDGE, AND A JURY

14
      APPEARANCES:
15
      Scott L. Robertson, Esquire
16    Michael G. Strapp, Esquire
      Jennifer A. Albert, Esquire
17    David M. Young, Esquire
      Goodwin Procter, LLP
18    901 New York Avenue NW
      Suite 900
19    Washington, D.C.  20001

20    Craig T. Merritt, Esquire
      Christian & Barton, LLP
21    909 East Main Street
      Suite 1200
22    Richmond, Virginia  23219-3095
      Counsel for the plaintiff
23

24                  Peppy Peterson, RPR
                   Official Court Reporter
25                United States District Court
```

```
1    APPEARANCES:  (cont'g)

2    Dabney J. Carr, IV, Esquire
     Troutman Sanders, LLP
3    Troutman Sanders Building
     1001 Haxall Point
4    Richmond, Virginia  23219

5    Daniel W. McDonald, Esquire
     Kirstin L. Stoll-DeBell, Esquire
6    William D. Schultz, Esquire
     Merchant & Gould, PC
7    80 South Eighth Street
     Suite 3200
8    Minneapolis, Minnesota  55402

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

THE CLERK:  Civil action number 3:09CV00620, ePlus, Incorporated, versus Lawson Software, Incorporated.  Mr. Scott L. Robertson, Mr. Craig T. Merritt, Ms. Jennifer A. Albert, and Mr. Michael G. Strapp represent the plaintiff.

Mr. Daniel W. McDonald, Mr. Dabney J. Carr, IV, Ms. Kirstin L. Stoll-DeBell, Mr. William D. Schultz represent the defendants.  Are counsel ready to proceed?

MR. ROBERTSON:  Yes, Your Honor.

MR. McDONALD:  We are, Your Honor.

THE COURT:  All right.  What is this all about?

MR. ROBERTSON:  Your Honor, good morning.

THE COURT:  Morning.

MR. ROBERTSON:  Last night at 6:00 p.m., plaintiff received a package of something like almost 170 demonstrative graphics that the defendant intends to introduce, apparently, with the testimony of Dr. Shamos.

As a practical matter, Your Honor, I think last week the defendant represented that they would wrap their case up in two days.  Going through 170 slides is just going to be impossible to try to get through just as an initial matter before we even get to the issue that we have with respect to 170 slides being presented to the jury.

THE COURT:  Why are these exchanges being made now?

1    I thought demonstrative exhibits were supposed to have been

2    exchanged before the trial.  Isn't that what the pretrial order

3    says?

4              MR. ROBERTSON:  I'm not certain the pretrial order

5    says that or not.  We did have an agreement among the parties

6    that we would present demonstratives at 6:00 p.m. the night

7    before a witness was to go on, but the sheer volume --

8              THE COURT:  Did I say grace over that?

9              MR. ROBERTSON:  I'm sorry, sir?

10             THE COURT:  Did somebody present that to me?

11             MR. ROBERTSON:  I don't know that it was presented to

12   you, Your Honor.

13             THE COURT:  You see what happens?  I would never have

14   allowed that if I knew that was what was going on.  Never in a

15   million years would I have allowed it.  I've never allowed it,

16   and the reason I don't allow it is because of this kind of

17   problem.

18             MR. ROBERTSON:  There had been a rule of reason

19   applied to it, Your Honor, where the demonstratives were fairly

20   limited in scope.  For example, Dr. Weaver, I think we had

21   about 30 of which 24 were simply the claims or the -- you'll

22   recall the infringement charts where we were checking off the

23   boxes.

24             The problem we have now is we believe that these

25   slides substantively violate several of the Court's orders with

 1   respect to limitations on the testimony of Dr. Shamos.  Let me

 2   just give what I think is one --

 3            THE COURT:  I've got a copy of an email from Mr.

 4   Strapp to Ms. Stoll-DeBell, and it's got eight bullet points.

 5   Does that cover it?

 6            MR. ROBERTSON:  I think that's a good summary.  I

 7   could get down in the weeds and give you some specific

 8   examples.  I mean, just one, there are 50 slides, Your Honor,

 9   on a combination of J-CON and PO Writer to render the claims

10   obvious.  There's one paragraph in Dr. Shamos's report,

11   paragraph 236, in a conclusory fashion that addresses that

12   combination.

13            THE COURT:  That's all he can testify to.

14            MR. ROBERTSON:  But, yet, he has 50 slides.  There's

15   going to be a number of examples.  Your Honor, I'm happy, as we

16   go along, because we did stay up until the wee hours of the

17   morning trying to go through and map out all of our objections

18   consistent with the Court's prior rulings on the second

19   supplemental statement, the limitations he has.

20            He's now tried to go back and incorporate -- you will

21   recall they wanted to swap out Dr. Shamos with Dr. Staats, and

22   we had a motion on that.  There were several examples where Dr.

23   Staats' opinions from the report that you struck have now

24   migrated into Dr. Shamos's opinions and find themselves in

25   slides in this presentation.  So I want to do what's realistic

1    and practical for the Court, but as these slides come up --

2            THE COURT:  I'm not going to do that.  There's no way

3    on earth I'm going to do that.  I'm not putting this jury

4    through that.  Let me -- have you submitted -- before I get

5    into another contempt situation.

6            Have you submitted these emails -- have you talked

7    about the emails since the one that arrived at 8:24 a.m. today

8    in the --

9            MR. ROBERTSON:  We have not -- I'm sorry.

10           THE COURT:  -- with the other side?

11           MR. ROBERTSON:  We have not really had an

12   opportunity, Your Honor.  We were up until, literally, this

13   morning trying to go through these slides and identify whether

14   they were in the record, out of the report, whatever.  About

15   ten minutes ago, Mr. McDonald handed me an annotated version of

16   these 167 slides where he represents he believes that there was

17   support for a lot of these contentions.

18           I haven't had a chance to even look at it.  It's been

19   ten minutes ago.  One of my colleagues is looking at it right

20   now.  Already we found what we think are substantial issues

21   with their representations.  For example, there might be an

22   exhibit cited in Dr. Shamos's report but not specific pages or

23   slides or things like that which is what the Court required,

24   and we're also finding out that some of the specifics that were

25   in Dr. Staats' reports, as I say, now find their way into Dr.

1    Shamos's report.  We just weren't put on notice as to that.

2              THE COURT:  Were those things not in Shamos's report?

3              MR. ROBERTSON:  That's right, sir.  This came up with

4    respect to Dr. Weaver at one point.  We had -- Dr. Weaver was

5    going to testify about a handful of documents, perhaps six, and

6    Ms. Stoll-DeBell brought to my attention that although he had

7    relied on them and cited them in his report, he didn't have

8    specific paragraphs that were addressing those.

9              I immediately withdrew those six exhibits and told

10   her I was not going to be offering them because they weren't in

11   the report.  Under the ruling, I think Your Honor identified

12   last week what's sauce for the goose, sauce for the gander.  We

13   think that applies here.

14             I don't know how possibly we're going to get through

15   170 slides with Dr. Shamos.  This is going to take several days

16   to do this, and then we're going to have to cross-examine him

17   on each one of these slides, because I think a lot of them are

18   not in his report, not supported, don't stand for the opinions.

19             As I say, 50 slides on J-Con, plus PO Writer, and he

20   has one paragraph in his report.  I mean, that's just beyond

21   the pale.  Thank you, Your Honor.

22             THE COURT:  I'm going -- do you have a -- this is --

23   what is the term you all are fond of using?  You are presenting

24   these things to me at a high level.  I don't have any specifics

25   in front of me, but I told you that Dr. Shamos is not going to

 1    testify about anything that's not in his report.

 2              I don't know why you would even prepare these slides.

 3    Why did you come with 167 slides, Mr. McDonald?  You know

 4    that's not going to fly.

 5              MR. McDONALD:  Well, we've got a tremendous burden --

 6              THE COURT:  Yes.  I'll tell you what burden you have.

 7    Here's the burden you have.  I'm going to give you some time to

 8    straighten this out or your invalidity defense will be

 9    stricken.  That's the burden you have.  I am not putting the

10    jury -- I can't believe you did that to the other side.

11              You came in here and pleaded for a day off because

12    you are running on fumes, and yet you give them something at

13    six o'clock that you know is going to take hours to review.

14    Now, what on earth is going on?

15              MR. McDONALD:  Well, I think we're going to try to

16    streamline it, Your Honor.  I think the RIMS plus TV/2 is the

17    main issue.  That's what we're going to spend the most time

18    with Mr. Shamos on.  That's not what's been the issue.  I think

19    there are too many slides on the PO Writer, and that's at the

20    end of his testimony here on the invalidity.

21              THE COURT:  Does he have one paragraph in the report?

22              MR. McDONALD:  No, that's not the issue there, Your

23    Honor.  What they're trying to say is -- this was the issue

24    that was argued before Your Honor back on December 30th when we

25    had a hearing, very similar issue anywhere, where they were

1    trying to say, well -- I think it was on a different

2    combination of prior art that was the subject of their motion

3    at that point, but they were saying, well, you've got a

4    combination of two references.

5           We went through in detail, element by element, to go

6    through reference number one, detail element by element for

7    reference number two, and they were saying, yes, but when you

8    actually combine them, you didn't repeat the exact same element

9    by element detail again.  You just used the anticipation

10   element by element analysis.

11          So we showed you that that was totally appropriate,

12   and they understood exactly that's what we were doing when they

13   deposed Mr. Shamos, that we were combining them.  That's the

14   issue.  The details are in there.  We just didn't repeat every

15   word of it.  You talk about overburdening things and having too

16   much paperwork, well, we have done the exact -- simply repeated

17   the analysis for the combination of two --

18               THE COURT:  I think I may have erred in the ruling.

19               MR. McDONALD:  Pardon?

20               THE COURT:  I think I may have erred in making that

21   ruling.  I was very troubled at the time, but I felt as if I

22   did the right thing, but I may have erred.  Let's say it's more

23   than 100 of Lawson's slide make a claim by claim, element by

24   element analysis of how the RIMS and TV/2 combination and the

25   PO Writer and J-Con combination rendered the asserted claims

1    obvious.  That analysis was never disclosed in Dr. Shamos's

2    report.

3             MR. McDONALD:  That's totally untrue, Your Honor, and

4    I've got a copy of the slides here along with the report and

5    the attached appendixes with the detailed analysis element by

6    element, and every one of the slides now we've annotated, as

7    Mr. Robertson indicated, and, again, for us in the wee hours to

8    go through and get this done by this morning.

9             Each slide now shows you the paragraphs where Dr.

10   Shamos talked about that or the cells where he did the specific

11   element by element comparison, and if I may, I'd like to hand

12   that up to the Court so you have a copy of the slides as well

13   as the supporting documents here that they referred to.

14            And I think what makes sense -- because RIMS plus

15   TV/2, Your Honor, that's been a very straightforward story all

16   along, and ePlus has never filed any motions with respect to

17   either our interrogatory answers or Dr. Shamos's report that

18   says --

19            THE COURT:  I'm dealing with what's in this email

20   that's in front of me.  It says several things.  I'm going to

21   attach it and consider it as part of -- what I'd like to know

22   is what do you want me to do, Mr. Robertson?  What relief are

23   you seeking; to strike all of these things that you mention in

24   this email or what?

25            Realize that I need to be confronted with a decision,

1    know what is it, hear the argument on it, and then decide.

2          MR. ROBERTSON:  I understand, Your Honor.  I find

3    myself in a real dilemma and a real conundrum, because we've

4    gone through these things.  We think a number of them are not

5    fair.

6          As Your Honor pointed out when you had the discussion

7    before about what Dr. Shamos can testify or not, all -- the

8    Court observed, correctly I think, it contains nothing but

9    anticipation themes.  He doesn't talk about the combinations

10   being obvious.

11         This kind of RIMS and TV/2 was disclosed.  We've gone

12   through.  There's a number of things now that Dr. Shamos is

13   relying upon within the RIMS patent, for example, that they

14   didn't disclose in his expert report.  I had my team go through

15   these 167 slides last night, and on the opposite page of each

16   one, I feel we have what would be an objection or a position

17   that we would take that is not disclosed.  I don't know how to

18   do it, Your Honor, given the fact --

19         THE COURT:  What do you want me to do?

20         MR. ROBERTSON:  I'd like to strike these slides and

21   just have Dr. Shamos testify based on his report.  That's what

22   I think would be appropriate given the circumstances we find

23   ourselves in now.  50 slides on J-Con and PO Writer when he

24   only has paragraph 236 addressing it, that's a problem.

25         The other backsliding we had, Your Honor, I wanted to

1   bring to the Court's attention is in his chart, the Court, in

2   the second *motion in limine* to -- excuse me, in the order to

3   enforce *motion in limine* number two about that Dr. Shamos could

4   only reply in his expert opinion on those things that were set

5   forth in the second supplemental statement, he has now back

6   slid into the interrogatory answers that the Court found to be

7   inadequate -- that's why you ordered the second supplemental

8   statement -- and then once he had circumscribed that further in

9   his expert report, you limited him to his expert report, he's

10  now slid back to relying on things that weren't in his expert

11  report --

12          THE COURT:  That were not in his expert report?

13          MR. ROBERTSON:  That were not in his expert report

14  but he says were in his second supplemental statement.  That's

15  not what the Court said.  The Court said, if it was in the

16  second supplemental statement, you can do it, but once he did

17  an expert report, he even disclaimed some of the things in the

18  second supplemental statement and said that he disagreed with

19  those opinions and he was going to rely on his opinions.

20          Now what we've had is this backsliding both to the

21  second supplemental and to the interrogatories.  So, I mean, it

22  has been very difficult to try to get our arms wrapped around

23  this in the short period of time that we've had.

24          THE COURT:  I have five slides that contain

25  invalidity opinions that the Court already specifically struck.

1    Is there anywhere I can verify any of these things?

2              MR. ROBERTSON:  Your Honor, I have prepared, for

3    example, this is --

4              THE COURT:  Have you given that to Mr. McDonald

5    before?

6              MR. McDONALD:  We never got this specific --

7              THE COURT:  All right, here's what I'm going to do.

8    We're going -- you're going on -- well, listen.  Don't worry

9    about the fact you haven't gotten it.  You didn't give it to

10   him until six o'clock last night.  What did you expect?  I

11   think they've done pretty well considering when you gave it to

12   them.

13             Dr. Shamos is not going to testify until I get this

14   sorted out.  Get the rest of your case on and put some people

15   back in there to work talking this out and let me see where it

16   goes.  I have a motion to strike all of these proffered slides

17   and confine his report explicitly -- his testimony to what he

18   said in the report, and I can do that, and I'm inclined to do

19   it, but I want to see if I can get it sorted out.

20             Let me tell you how I sense this.  It's been a

21   running situation throughout this litigation, and you all have

22   to understand something.  When a Court makes a ruling, you have

23   to live by it whether you like it or not.  The Federal Circuit

24   is there, and if I did wrong, I'm sure they'll feel free to

25   tell me.  And that's the way it works.  And it is all right, in

1  my view, to read what a Court said and see if there's anything

2  else in the record that will allow you, within the rules, to do

3  other things that may have dealt with the topic that was a

4  Court ruling, but it is not all right to do what I've seen done

5  here, and that is attempt to evade the rulings, and I don't

6  like it, I don't like spending time on it, and I'm at the point

7  now in the middle of the trial where the remedy is going to be

8  that Dr. Shamos simply will not testify about any of the

9  matters that are in contest if you all -- but I want to give

10  you all a chance to work them out and to see if maybe you all

11  can spend some protective time doing that.

12         So you dispatch whoever you need to dispatch -- Mr.

13  Robertson, you do the same thing -- to go talk about it.  You

14  all, I take it, have both crystalized your positions

15  sufficiently from the things that you've said here this morning

16  that you can work them out.  In the meantime, put on the rest

17  of your case, and we'll see where Dr. Shamos comes out.  He may

18  or may not be testifying.  He may be testifying about some

19  things but not others.

20         I'm not going to hold the jury up.  We don't do

21  things like that.  I didn't know you had this protocol.  I

22  would never have approved this protocol.  The very purpose of

23  having all these things out at the final pretrial conference

24  stage is so that if there are objections to them, they can be

25  worked out, sorted out, and straightened out.

1        If I -- does anybody contend that you all informed me

2   you were going to be doing this?  Is this something --

3        MR. McDONALD:  I don't think, sir.  We had worked it

4   out before trial and we've been obviously working with that in

5   terms of the ePlus experts.  We've been getting their slides --

6        THE COURT:  It worked fine --

7        MR. McDONALD:  It worked as well as we could make it

8   work.  We didn't have a lot of time to look at their slides

9   either and work through the issues, but we've been playing by

10  those rules.

11       THE COURT:  What is the most they ever gave you?

12       MR. McDONALD:  I think it was about 50 or so.

13       THE COURT:  You three-times-ed that, and in an area

14  where I have found it necessary, because of the violations of

15  Court orders on the part of Lawson, to circumscribe and make

16  rulings circumscribing what Dr. Shamos could testify about and

17  striking part of his report or the areas on which he can

18  testify about, and so when it is presented to me in this kind

19  of form, I need to pay attention to it and have it resolved.

20       In the past when ePlus has made these claims and I

21  have had the time to go through them and review them, for the

22  most part I have found that Dr. Shamos's efforts have been

23  properly criticized by ePlus, and they have been not in

24  conformance with the rulings of the Court.  And I don't have

25  time to do that at this time, but given that history, I feel

```
1    obligated to take some action.  I don't think that makes sense.
2    I don't think they are crying wolf or posturing.  I think this
3    is a real problem here, Mr. McDonald.
4         MR. McDONALD:  We've tried to be very sensitive to
5    the Court rulings, and that's why we put together and how we
6    put together this annotated set for Your Honor, but I
7    understand if you need more time.  Our next --
8         THE COURT:  No, you all need more time, and the last
9    guy you're going to put on is Dr. Shamos.  We're going to
10   finish the rest of your case.
11        MR. McDONALD:  The next witness we were going to call
12   is Mr. Momyer, one of the inventors listed on the patent.  Is
13   he available?
14        MR. ROBERTSON:  I anticipated Your Honor might rule
15   in this manner, and I told Mr. Momyer that he needed to have
16   himself prepared to be over here, so he is ready to go, but we
17   would have to email him back the hotel and get him over here
18   forthwith, and I can do that.
19        THE COURT:  Have you got other witnesses besides
20   Momyer?
21        MR. McDONALD:  Mr. Momyer.  Lined up the next witness
22   is going --
23        THE COURT:  Who is the next one?
24        MR. McDONALD:  -- Mr. Staats.  He's here.
25        THE COURT:  Is Staats here.
```

1              MR. ROBERTSON:  The next witness --

2              THE COURT:  Wait a minute.  Quit talking at the same

3      time.

4              MR. McDONALD:  Kinross is the next witness after

5      Momyer.

6              THE COURT:  Is Kinross here?

7              MR. ROBERTSON:  Yes, he is.

8              THE COURT:  Put Kinross on and email --

9              MR. ROBERTSON:  I apologize.  He's here at the hotel.

10     Mr. Momyer is ready, dressed in a suit, to come over here and

11     start.

12             THE COURT:  Get him dressed -- okay, here's the next

13     thing.  Have all of the rest of your witnesses that are in this

14     case from now on with their clothes on, dressed, out there.

15     I'm not going to be held up by this.

16             I have been through 20-some years on the bench and a

17     good bit before that doing what you are doing, and I have never

18     seen this kind of thing happen, and I'm distressed that we are

19     imposing on the time of these citizens to do things that should

20     have been done a long time ago.  All right.  Now, how many

21     witnesses have you got today?  Let's see, you have Momyer and

22     Kinross and who?

23             MR. McDONALD:  Mr. Staats.

24             THE COURT:  All right, Staats.

25             MS. STOLL-DeBELL:  I think it was Momyer, Kinross,

1    Gounaris.

2            MR. McDONALD:  That's right, Gounaris, Mr. Kinross,

3    Mr. Gounaris.

4            MS. STOLL-DeBELL:  Then I think it's the McEneny

5    deposition, and then I think Staats.

6            MR. ROBERTSON:  Actually you also had Mr. Johnson who

7    is one of the inventors.

8            MR. McDONALD:  He is not available today.

9            MR. ROBERTSON:  When did he arrive?  He's arriving

10   today.

11           THE COURT:  You've got witnesses, you get them going.

12   Do you have anybody here in court?

13           MR. ROBERTSON:  We've emailed Mr. Momyer and told him

14   to come over here straightaway.

15           THE COURT:  I want you to dispatch somebody who knows

16   what they're doing about this case on each side to work through

17   these objections.  I don't want 167 slides.  I don't want him

18   testifying about things that Staats testified to that he didn't

19   testify to.

20           If that happens -- and I'm going to tell you the

21   first time -- here's the way I'm going to resolve this:  I

22   don't have the leeway to do what I would take the time that you

23   all might want me to take, because you have a jury sitting in

24   the box, and we've kept them here for two weeks already, and we

25   don't do things this way.  This is a monument to how you can

1    foul up a jury trial.  But if that man gets his foot off the

2    base after this conference, if after that conference he gets

3    his foot off the base and I sustain an objection because he's

4    testifying to something that is not in the report, that is the

5    last word that will come out of his mouth, and I mean that,

6    because you can't expect a jury to sit through the process of

7    objection and resolution question by question and not be

8    utterly and totally confused.

9             So I'm not going to do it that way.  That's not right

10   to the jury in a case like this, nor can you send them out like

11   the Lance Ito in-and-out process that went on in the O.J.

12   Simpson trial.  It belittles them, it confuses them, and it

13   wastes their time.  I'm not going to do that.  And you all have

14   had plenty of time to get ready for this case.  When were these

15   demonstratives prepared?  Did Shamos prepare them?

16             MR. McDONALD:  Yes.

17             THE COURT:  When did he prepare them?

18             MR. McDONALD:  Over the weekend we were going over

19   them with him --

20             THE COURT:  No.  When did he prepare them?

21             MR. McDONALD:  I'm not sure when the invalidity ones

22   were prepared.  We had focused on the infringement ones because

23   that is what he was testifying about on Friday, and then we

24   shifted gears --

25             THE COURT:  You find out when he prepared them.  That

1    will be important to know.  I want to know when he did them and

2    when he gave them to you the first time.

3           MR. McDONALD:  The PO Writer ones I know were

4    actually very recent, since Sunday --

5           THE COURT:  I want the dates.

6           MR. ROBERTSON:  I'm sorry, since Sunday?

7           THE COURT:  Now, I guess we have to take a recess

8    until the witnesses get here.  We'll take a recess.  In the

9    meantime, get somebody started and get it solved.  Then I'll

10   know the ones that I have to rule on, what's left.

11

12           (Recess taken.)

13

14           THE COURT:  All right.  I have a trial brief

15   regarding the identity of element 40 and figure 1A of the

16   patents-in-suit.  Mr. Robertson, what do you have to say about

17   that?  I've read their trial brief.  I know what they say.  I

18   don't have one from you.  It wasn't filed, so I'll just hear

19   what you have to say orally.

20           MR. ROBERTSON:  I appreciate that, Your Honor.  I

21   will tell you I received this morning, I think at 8:30.  I

22   briefly scanned it.  The testimony is been consistent that the

23   RIMS was modified, that there needed to be several changes in

24   order for the kind of requisitioning and purchasing

25   capabilities that were in RIMS that were not in the electronic

1    sourcing system.

2          What they used, and as the Court has seen and the

3    Court itself has observed on several occasions, is they said,

4    you can use some of these requisition and purchasing order

5    systems, and you can use Fisher RIMS preferably but not

6    necessarily.

7          The patent then goes through in detail a number of

8    things that need to be modified from the RIMS systems that the

9    inventors have testified.  You need to be able to have multiple

10   catalogs.  We only had the Fisher catalogs with respect to the

11   RIMS system.  You needed to able to generate multiple purchase

12   orders to all those vendors.  You need to have all the

13   communication protocols.  You need to be able to select the

14   multiple catalogs that were not in the RIMS system.

15         So, of course, you know, the argument that's being

16   made that RIMS fully anticipates, that's one of the

17   arguments --

18         THE COURT:  But what they're arguing is they ought to

19   be allowed leeway to explain -- to talk to Dr. Momyer, for

20   example, and cross-examine him and show that he's wrong.  Why

21   shouldn't they be allowed to do that?

22         MR. ROBERTSON:  Well -- they can ask Mr. Momyer about

23   what his understanding is about figure four.  They asked him

24   that in direct examination.

25         THE COURT:  I thought they did.  I thought that's

1    where it came from.

2         MR. ROBERTSON:  In fact -- so I think what they want

3    to do now is they were unhappy with their cross-examination.

4    Two weeks have gone by, and they want to revisit the issue.

5    Quite frankly, I think that would be cumulative testimony, and

6    I think it was fully within the scope of his direct, and it was

7    fully within Mr. McDonald's ability to cross-examine him on it.

8         I mean, we're not calling these inventors back, I

9    didn't understand, to just go over things they testified to two

10   weeks ago.

11        THE COURT:  I only recall once, and I can't even

12   remember who it was with, dealing with this situation involving

13   the short form abbreviation of Fisher RIMS and RIMS in

14   connection with figure 40.  Was there more than one time that

15   happened?

16        MR. McDONALD:  That's the transcript, I think, that

17   we presented in our brief was there was an interchange at that

18   point where you said you can come back and talk about that

19   later.  ePlus knows you're going to do it.  If they want to

20   brief it to stop you, they can.  So that's what kind of brought

21   it to a halt, obviously, as an issue --

22        THE COURT:  You're going to bring it on now in your

23   case.  What I had thought we were doing was that you were going

24   to be doing what you were going to be doing in your case so the

25   context would be that you were leading the examination.

1              MR. McDONALD:  Right.

2              THE COURT:  I mean were handling the examination in

3    the first instance, so I didn't envision you couldn't ever talk

4    about it.  It was the context in which you talked about it.  So

5    I think it's fine depending upon the question you ask.  I think

6    you can.  You are entitled to show a witness is wrong if you

7    can.  All right, are we ready -- is it Mr. Momyer, Dr. Momyer?

8              MR. McDONALD:  Mr. Momyer, I believe.

9              THE COURT:  What is the legal assistant's name?

10             MR. McDONALD:  Maggie?  Ms. Martinez.

11             THE COURT:  Ms. Martinez, I have a whole bunch of

12   these notebooks up here that I would like to get out of here so

13   I can store what's being thrown at me.  Can I get you to come

14   get them?

15             MS. MARTINEZ:  Absolutely.

16             THE COURT:  Get some help.  Bring some help up here.

17             MR. CARR:  Your Honor, these two big ones right here

18   are for the next witness.

19             THE COURT:  I know.  That's what I'm making room for.

20   Ms. Martinez, thank you very much, and I continue to thank you,

21   both paralegals for their work here.  I know full well it is a

22   difficult assignment.

23             MS. MARTINEZ:  You're welcome, Your Honor.

24             THE COURT:  Are we ready with Dr. Momyer?

25             MR. McDONALD:  Mr. Momyer.  I saw him and then --

1           THE COURT:  Yes, we're ready for the jury.  Is this a

2    two-volume work I get to study this morning, or is it two

3    copies of the same thing?

4           MR. McDONALD:  That is the exhibits and the

5    transcripts, Your Honor.  Actually this should work for all

6    three of the inventors, this set of materials.  We weren't

7    going to make extra copies for each one.

8           THE COURT:  Okay.

9

10                      (Jury in.)

11

12           THE COURT:  Good morning, ladies and gentlemen.

13

14                  **DOUGLAS R. MOMYER,**

15    a witness, called by the defendant, having been first duly

16    sworn, testified as follows:

17                     DIRECT EXAMINATION

18    BY MR. McDONALD:

19    Q    Good morning, Mr. Momyer.

20    A    Good morning.

21    Q    I'd like to start first by just talking to you about what

22    you actually invented here.

23           THE CLERK:  Can we get him to state his name for the

24    record.

25           MR. McDONALD:  Oh, I'm sorry.

1   Q    Could you restate your name for the record, Mr. Momyer.

2   A    Douglas Momyer.

3   Q    And you've already testified earlier in this trial;

4   correct?

5   A    Yes, I have.

6   Q    Mr. Momyer, I'd like to start with talking to you about

7   what it is that was real -- what you thought was the invention

8   that's described in the patents involved in this case, all

9   right?

10  A    Do you want a description?

11  Q    I'm just getting on the same page here; okay?

12  A    Okay.

13  Q    Would you agree that before you came up with the invention

14  in these patents, there were known requisition and purchasing

15  systems?

16  A    Yes.

17  Q    They could build requisitions as a result of searching for

18  part numbers; right?

19  A    Yes.

20  Q    They could take those requisitions and generate purchase

21  orders out of those requisitions; right?

22  A    A single purchase order.

23  Q    We'll talk about that issue in a little bit.  But at least

24  you would agree a purchase order could be generated from a

25  requisitions in the old systems; right?

1    A    Correct.

2    Q    Would you agree that it was also old to be able to search

3    a database of -- containing a product catalog of a particular

4    vendor, for example, on a CD-ROM?

5    A    Be able to search a particular vendor's catalog on a

6    CD-ROM, yes.

7    Q    That was old; right?

8    A    Yes.

9    Q    You could search those old CD-ROMs for the purpose of

10   picking out a product that you might want to buy; right?

11   A    I don't know -- I'm not sure that there were any products

12   that I was aware of that actually turned around and pulled that

13   product out and actually created an order directly.

14   Q    I didn't talk about creating an order?

15   A    You said buy.  To me, that's kind of inclusion of the

16   transaction, is you pick an item --

17            THE COURT:  He interpreted the word buy in your

18   question to mean purchase which connotes a purchase order; is

19   that what you are saying?

20            THE WITNESS:  That's correct.

21   Q    Would you agree that the systems that could look at a

22   single catalog could search for user-requested information

23   about products and create orders which the user could save,

24   print, or fax to a vendor?

25   A    Save, print, or fax, yes.

1    Q    So that single catalog on a CD-ROM system could be used to

2    create orders to buy products; right?

3    A    Not directly from that system.  At least my understanding.

4    Q    Do you have the binders there?  I think there's a couple

5    of big binders.  Go to volume one.

6    A    Okay.

7    Q    Go to PX-1.  That's the '683 patent?

8    A    Yes.

9         THE COURT:  That's in your book, ladies and

10   gentlemen, at tab two.

11   A    I see DX-5.

12   Q    We're just looking at PX-1.

13   A    Oh, PX, I'm sorry.

14   Q    That should be in your volume there.

15   A    I got it.

16        THE COURT:  It's PX, in your book, 0001; do you see

17   that, sir?

18        THE WITNESS:  I've got it.  Thank you.

19   Q    You understand that's one of the patents involved in this

20   lawsuit; right?

21   A    Yes.

22   Q    Could you turn to column two of the patent, please, past

23   the figures.

24   A    Excuse me for squinting here.  Okay.  I have it.

25        MR. McDONALD:  Bill, can you blow up the upper left,

1    about the first ten lines or so of column two.  I said upper

2    left, didn't I?  I meant upper right.  I'm sorry.

3    Q    Now, this patent, you actually reviewed this application

4    that led to the three patents-in-suit; right, Mr. Momyer?

5    A    Yes, I did.

6    Q    And you did sign an oath and declaration saying you had

7    reviewed it and it was accurate as far as you knew; correct?

8    A    At the time the patent was filed, yes.

9    Q    And that declaration includes statements that you've

10   reviewed the claims as well; right?

11   A    That's correct.

12   Q    And that you believe that what was described in the patent

13   as claimed was the thing that you considered to be your

14   invention; right?

15   A    Yes.

16   Q    And you also put in that declaration that you were aware

17   of your duty to disclose prior art; right?

18   A    Yes, although I haven't seen a copy of that declaration in

19   a while, but, yes, I did sign a declaration.

20   Q    Well, does that ring a bell, though, that the declaration

21   specifically acknowledged your duty to disclose information

22   that would be relevant or material to the Patent Office?

23   A    Yes.

24   Q    So if we go up to this line beginning at -- the paragraph,

25   excuse me, of column two, line three, of the '683 patent?

1    A    Yes.

2    Q    Do you see there about -- actually the second sentence of

3    that paragraph -- well, we'll start with the first sentence

4    just to make sure we have the context here.  It says, computer

5    systems that are capable of searching databases containing a

6    product catalog of a particular vendor, for example on CD-ROM,

7    are also known.  Do you see that sentence?

8    A    Yes, I do.

9    Q    By saying it was also known, were you acknowledging in

10   effect I'm not trying to get a patent on a system that is

11   capable of searching databases containing a product catalog of

12   a particular vendor?

13   A    Yes.

14   Q    All right.  Then you go on the next sentence to say, such

15   systems can search for user-requested information about

16   products and create orders which the user can save, print, or,

17   in some cases, facsimile directly to a vendor; do you see that?

18   A    Yes, I do.

19   Q    So you did believe it was true at the time you filed the

20   application and still today believe it's true that there were

21   such systems that worked with a product catalog of a particular

22   vendor; right?

23   A    Yes.

24            THE COURT:  He answered that earlier.  He said that

25   it could be used to a create orders to be faxed, saved, or

1    printed.  We didn't need to go through all that.  He already

2    agreed to that.

3    Q    You view that as different from your invention because it

4    was just one vendor catalog; is that right?

5    A    Well, it's a little more than that.  It's multiple

6    catalogs, be able to search across those multiple catalogs,

7    select an item, move it into an order list, place on a

8    requisition, be able to create multiple purchase orders, not an

9    order to a single vendor, although I don't think in that system

10   we -- how I read that system doesn't really say an order.  It's

11   creating an order with a -- directly with a supplier there.  I

12   see where it creates --

13             THE COURT:  You mean the old system.

14             THE WITNESS:  The old system creates an order, save,

15   print, or in some cases, facsimile directly to a vendor in

16   which case they'll take that and enter it into their system.

17             THE COURT:  "They" meaning the vendor.

18             THE WITNESS:  Yes.  That is a different than what

19   I -- our patent was claiming.

20   Q    Well, in any event, you are talking about a single vendor

21   product catalog, and that's at least one of the reasons you

22   were distinguishing that particular system as you described in

23   column two; right?

24   A    Yes.

25   Q    Now, with a catalog a CD-ROM, for example, of a vendor,

1   that could be have products from multiple sources in it; right?

2   A    Multiple sources, you mean multiple vendors?

3   Q    Multiple sources for the vendor to get those products.

4            THE COURT:  Are you talking about the one that's

5   referred to in the preceding sentence?

6            MR. McDONALD:  Yes.  This one here in the first

7   paragraph of column two, for a product catalog of a particular

8   vendor.

9            THE COURT:  So could a product catalog of a

10  particular vendor in that system have products from other

11  vendors?

12           MR. McDONALD:  Other sources, other manufacturers and

13  places where that vendor could get products.

14  A    Not if it was a vendor.  If it was a distributor, you

15  might be able to do that.

16  Q    Well, I thought you were talking about a faxed purchase

17  order directly to a vendor, and you made it sound like that

18  wasn't, for some reason, a real purchase order.  Can you

19  explain to me what --

20           THE COURT:  He didn't say that, Mr. McDonald.  You

21  need to pay -- I think the problem is you're not listening.

22  What he said is, what's described in this sentence can print --

23  can create a purchase order.  It is then saved or it is

24  printed, and then it could be, in some instances, facsimiled

25  directly to a vendor, but that wasn't the same thing as using

1    the computer to send it directly to the vendor.  I think that's

2    what he said; is that right?

3                THE WITNESS:  Yes.  Thank you.

4                THE COURT:  I think he said it now at least twice, so

5    let's pay attention.

6    Q    Well, that system with what you call the single product

7    catalog of a particular vendor, for example, that could be a

8    store like an Office Depot; right?

9    A    Yes.

10   Q    But they could have products that came from computer

11   companies like Dell and HP or Post-it Notes from 3M; right?

12   A    Yes, they could.

13   Q    Now, in those cases, would you consider that actually

14   multiple catalogs because there could be multiple

15   manufacturers?

16   A    No, I wouldn't consider it multiple catalogs.

17   Q    Now, there might be products in that catalog that might be

18   described according to color or other characteristics; right?

19   A    Yes.

20   Q    Would the fact that you could search that single CD-ROM

21   for products of a certain color, would that mean that CD-ROM

22   actually contains multiple catalogs depending on what word you

23   search with?

24   A    It would be -- to me, the catalog would indicate the

25   company you were buying the product from.  So if -- to me, it

1    would not -- if I were buying a Post-it Note from Office Depot,

2    it's a 3M Post-it, so it would be a single catalog.

3    Q    So even though you could do keyword searches and look up

4    all sorts of different words within that catalog, it's still,

5    as you understood it for the purposes of your patent, a single

6    catalog; right?

7    A    Yes.

8    Q    I'd like to turn now to the issue of selecting catalogs to

9    search.  You would agree, wouldn't you, that part of your

10   patent talks about being able to select particular catalogs to

11   search?

12   A    Yes.

13   Q    And, in fact, if we go up to page or column nine of the

14   '683 patent that we just were looking at, in the lower left

15   corner...

16   A    Yes, I see that.

17   Q    If we could blow up about the bottom quarter of column

18   nine, please.

19             THE COURT:  When multiple?

20             MR. McDONALD:  Yes.

21             THE COURT:  Begins when multiple.

22   Q    Do you see what's up on the screen now, Mr. Momyer,

23   beginning at line 52 of column nine of the '683 patent?

24   A    Yes.

25   Q    That's the part of your patent where you actually describe

1  this process or function of being able to select particular

2  catalogs to search; correct?

3  A    Correct.

4  Q    Now, in your description here, you gave a list, a menu, in

5  effect, of catalogs that are available for the user; correct?

6  A    Yes.

7  Q    And then you give that user the option to select which

8  catalogs they're going to search; right?

9  A    Yes.

10  Q    And you do that because you want to give the user the

11  option of limiting the search to exclude catalogs that the user

12  knows they don't want to look in; right?

13  A    That's correct.

14  Q    And another reason for that is that it doesn't bog down

15  the system searching through catalogs that are unnecessary to

16  search for if you know the products are only in one or two

17  particular catalogs; right?

18  A    That's correct.

19  Q    Now we'll move on.  If we go back now to the RIMS system,

20  remember, I think we talked a little bit about the RIMS system

21  back in your earlier testimony?

22  A    Yes.

23  Q    Now, the RIMS system, that was a precursor to the systems

24  in the patent, claim in the patents-in-suit; right?

25           MR. ROBERTSON:  Objection to the form of the

1    question.  I think precursor is vague and ambiguous.

2              THE COURT:  Well, I don't know -- I think you can be

3    a little bit more precise, Mr. McDonald.

4    Q    There was -- the RIMS system had an embodiment that

5    existed as of April of 1993; correct?

6    A    Is that when that patent --

7    Q    If that would help you, we can go to that -- I think you

8    have either Plaintiff's Exhibit 10 or Defendant's Exhibit 7.

9              THE COURT:  Is that the patent on RIMS?

10             MR. McDONALD:  That is the RIMS patent, the '989

11   patent, yes.

12             THE COURT:  Exhibit what now?

13             MR. McDONALD:  Either Plaintiff's Exhibit 10 or

14   Defendant's Exhibit 7.

15             THE COURT:  They are not in either one of the

16   notebooks he has.

17             THE WITNESS:  They might be.  The tab isn't there.

18             THE COURT:  I don't see it -- PX-10 is the last one

19   in the second notebook, Mr. Momyer.

20             THE WITNESS:  Okay.

21             THE COURT:  Is that what you want, PX-10?

22             MR. McDONALD:  That's right.

23             THE COURT:  The last one in that notebook.

24             MR. McDONALD:  Close to the end, that's right.

25             THE WITNESS:  Okay, I have it.

1   Q    If we can blow up the top half of the first page of PX-10,

2   please.  Do you see that now, Mr. Momyer?

3   A    Yes, I do.

4   Q    Now, that shows a filing date there on the left side of

5   April 2nd, 1993; correct?

6   A    Correct.

7   Q    So this is capturing the RIMS system as it existed as of

8   April of '93?

9            MR. ROBERTSON:  Objection, Your Honor.  There is no

10   foundation to that.  As the Court knows, this is a confidential

11   application that's filed with the Patent Office as of April of

12   1993.  The witness has already testified that many of the

13   features in this were never in a commercial embodiment.

14            MR. McDONALD:  He's just testifying at this point,

15   Your Honor.  I'm just trying to ask him a question that this

16   patent describes the version of RIMS as it existed in April of

17   '93.

18            MR. ROBERTSON:  What it describes is what was filed

19   with the Patent Office in April of 1993, and it didn't become

20   public until January of 1998 by definition.

21            MR. McDONALD:  I didn't ask him whether it was public

22   or not.  I asked him if it existed.

23            THE COURT:  How would he know?  How would he know

24   what it did in April of 1993, and the answer is that he was an

25   inventor; right?

1          MR. McDONALD:  Sure.

2          THE COURT:  So did this describe what you understood

3    was the RIMS system in April of 1993, I think is the question.

4    The patent is dated 1998.

5          MR. McDONALD:  That's the issuance date, right.

6          THE COURT:  We all -- the record is clear that things

7    happen between the time the application is filed and the date

8    of issuance.  That's in the video.

9          So the question is -- what he's really asking you, I

10   guess, I don't know, is did things change in the RIMS system

11   from 1993 when the application was filed until the date the

12   patent was issued in June of 1998.

13         THE WITNESS:  Yes.

14         MR. McDONALD:  That wasn't my -- that's not my

15   question, Your Honor.

16         THE COURT:  Well, what is your question?

17         MR. McDONALD:  I was asking about the system as it

18   existed in April of 1993, because that's the system that would

19   be prior art here.

20         THE COURT:  So then go find the application and ask

21   him about that, because he's made clear that changes occurred

22   between April of 1993 and 1998 when it was issued.  So it's

23   fair to ask him what it was like in 1993, but use a document

24   that was 1993.

25   Q    Mr. Momyer, you didn't make any --

 1            THE COURT:  I'm going to sustain the objection to the

 2     question.

 3            MR. McDONALD:  Let me lay some more foundation.

 4     Q    Mr. Momyer, you didn't go, as the inventor on this RIMS

 5     patent, and actually add material to the patent after April of

 6     '93 when it was filed about later developments, did you?

 7     A    I didn't.  I don't know if the attorneys did, but I didn't

 8     do anything.

 9     Q    Isn't it your understanding that when you file the

10     application, that's what you are working from as you proceed

11     forward from there to acquire your patent; you can't just keep

12     adding new things along the way to the patent?

13            MR. ROBERTSON:  Objection, lacks foundation.

14            MR. McDONALD:  I'm asking for his understanding.

15            THE COURT:  Overruled.

16     A    There were -- I think we stated this earlier in my

17     testimony, that what was outlined in this patent, there were

18     things that, as of that date, that 1993, weren't in the

19     existing RIMS system.

20     Q    They were described in the patent but not in the existing

21     RIMS system?

22     A    It was the system that was operational in 1993.

23     Q    Please let me finish my question.  I want to make sure we

24     get it clear.  What you are saying is you did describe some

25     things for a RIMS system in April of 1993 in the patent

1   application that weren't actually implemented yet in the RIMS

2   system that was on the market; is that right?

3   A     That's correct.

4   Q     But there was a RIMS system out in the market as of April

5   of '93, wasn't there?

6   A     Yes, there a was.

7   Q     Isn't it true that RIMS development work that you were

8   involved in was actually pretty much wrapped up by 1991?

9   A     No, that's not true.

10  Q     Can you turn to your September 2004 deposition,

11  Mr. Momyer?

12          THE COURT:  Which volume is that in?

13          MR. McDONALD:  Volume one, I believe.

14          THE COURT:  Remember how to do it.

15          THE WITNESS:  What exhibit?

16          MR. McDONALD:  September 2004 deposition transcript.

17  You should have some tabs in your volume number one.  I think

18  you might be in volume two right now.  So we have to go back to

19  volume one.

20          THE WITNESS:  Okay.

21          THE COURT:  September what date?

22          THE WITNESS:  What is the tab on that?

23          THE COURT:  They are all tabbed by name, your name,

24  and then --

25          MR. McDONALD:  September 16, 2004, I believe.

 1              THE WITNESS:  Oh, I see it.  Deposition of December

 2   what?

 3              THE COURT:  September 16th.

 4              MR. McDONALD:  2004.

 5              THE COURT:  What page?

 6              MR. McDONALD:  Page 46.

 7              THE WITNESS:  I see 10/17/05.

 8              MR. McDONALD:  Your Honor, can I see if I can help

 9   him out?

10              THE WITNESS:  I see it.

11              THE COURT:  Page what?

12              MR. McDONALD:  46.

13   Q    Do you have a page 46 before you now, Mr. Momyer?

14   A    Yes.

15   Q    Do you see beginning at line ten, were you asked -- this

16   was a deposition where you have -- do you have page 46 now?

17   A    Page 46, sorry.

18   Q    This was a deposition where you swore to tell the truth;

19   correct?

20   A    I swore to tell the truth, yes.

21   Q    And you did tell the truth in that deposition; correct?

22   A    Yes.

23   Q    Do you see there --

24   A    To the best of my recall.

25   Q    Do you see there beginning at line ten you were asked the

1    question, and how long did you work on the RIMS development

2    effort, and you said several years?  Then the question, through

3    1993?  And then your answer, early, we pretty much wrapped up

4    the RIMS system early '90s.  You were asked, can you be more

5    specific than early '90s, and you answered '91; correct?

6    A    Correct.

7    Q    Thank you.

8    A    Can I respond to that?

9    Q    Well, I'll ask you some more questions about that, all

10   right?

11   A    The --

12   Q    Mr. Momyer, you've answered the question.  I'll ask you

13   more questions about it, all right?

14          THE COURT:  Mr. Momyer, Mr. Robertson will have a

15   chance to ask you questions about that segment, and you can

16   explain it then.

17          THE WITNESS:  Thank you.

18   Q    Would you agree that Fisher customers started using a RIMS

19   system as described in the '989 patent by late 1992?

20   A    I know we talked about.  Those dates are kind of fuzzy to

21   me, and I think I might have -- in the '92/'93 time frame is

22   when we would have had customers using it.

23   Q    Well, the difference between '92 and '93 could be kind of

24   important here, so I'll ask you, Mr. Momyer, would you agree

25   that 1992, late '92 was actually when the RIMS system, as

1    described in the patent, was actually being first sold to

2    customers?

3    A    First of all, it wasn't being sold.  We didn't sell the

4    RIMS system.

5    Q    You talked about used at customers' facilities; right?

6    A    Used at customer facilities.  It wasn't sold.  It wasn't

7    something we sold.

8    Q    Well, you got a trademark on the RIMS trademark; you

9    understand that, don't you?

10   A    Yes.

11   Q    And that's something that you have to get only if you are

12   using it in commerce; right?

13          MR. ROBERTSON:  Objection, lacks foundation.

14          THE COURT:  Do you know about getting a trademark?

15          THE WITNESS:  I know what a trademark is.

16   Q    Isn't it true --

17          THE COURT:  He's twice now said they were using it,

18   that people were using it, it wasn't being sold.

19   Q    Mr. Momyer, wasn't the RIMS system, though, part of the

20   sales pitch to Fisher's customers at the time that if you buy

21   products from Fisher, we'll provide to you the RIMS system as

22   part of our services?

23   A    It was definitely a tool that was used to help Fisher

24   perform its duties better at a customer's location and,

25   therefore, convince the customer that they should continue to

1    do business with them.

2    Q    Would you agree that the RIMS system was on sale more than

3    one year before the patents involved in this suit were filed?

4              MR. ROBERTSON:  Objection.  He just testified several

5    times it wasn't on sale.

6              THE COURT:  How many more times does he have to say

7    it wasn't on sale, it was used.  Now, whether you like that or

8    not is a different issue, but it was used.  I think he was

9    saying it was used by people who were -- what do you call them?

10             THE WITNESS:  Customer service representatives.

11             THE COURT:  And they were employed by whom?

12             THE WITNESS:  Fisher.

13             THE COURT:  And sometimes they were stationed at

14   customers' locations, and sometimes they were stationed at

15   Fisher's location; is that right?

16             THE WITNESS:  That's correct.

17             THE COURT:  He said it was used.

18   Q    The RIMS system was marketed to customers through a

19   brochure; correct?

20             MR. ROBERTSON:  Your Honor, I'm going to object

21   because the RIMS system is vague and ambiguous.  The witness

22   has testified repeatedly that there were several iterations or

23   versions of the RIMS system.  It's important that we know which

24   one we're talking about at which point in time.

25             MR. McDONALD:  I'm just trying to lay some

1    foundation.

2           THE COURT:  Let's put a time in it.  In 1991, in

3    1992, whatever.

4    Q    In the 1992 time frame, Mr. Momyer, isn't it true that

5    that RIMS brochure was being used and distributed to potential

6    customers to advertise the RIMS system?

7    A    Which brochure are you talking about?

8    Q    Well, we can put that one up.  I think it's Defendant's

9    Exhibit 61.  Actually put up 62, because that's the trademark

10   application that has it in.  Actually, let's go to Exhibit 61

11   after all.

12          So there's the first page of it, Mr. Momyer.  I think that

13   might be in the book as well, but do you recognize that

14   brochure?

15   A    Yeah, I do recognize that.

16   Q    And that was distributed in 1992; right?

17   A    I don't know.  I really don't know when it was

18   distributed.

19   Q    You know that Fisher used that as their example of using

20   the trademark since 1992 when they filed the trademark

21   application --

22          MR. ROBERTSON:  Objection.  There's been no

23   foundation on that.

24          THE COURT:  I'm sorry.  I didn't hear the last of the

25   question because you objected.  Would you ask the question

1    again, please.  Don't answer, Mr. Momyer, because there may be

2    an objection, but I didn't hear.

3    Q    Mr. Momyer, you know that this brochure was used by Fisher

4    as proof of use of the Fisher trademark dating back to 1992;

5    right?

6                MR. ROBERTSON:  Objection, lacks foundation.

7                THE COURT:  Just ask him if he knows.  Do you know

8    that one way or the other?  Was Fisher using this as proof that

9    it used the system?

10               THE WITNESS:  I don't recall.  It may have been

11   brought up earlier.  I just don't recall.  I don't know what

12   that means, was being used as proof --

13               THE COURT:  Proof of use?  You don't know what proof

14   of use means?

15               THE WITNESS:  No.

16               THE COURT:  That's a term, Mr. McDonald, that has to

17   do with the trademark that, in fact, he says you didn't know

18   what that was all about.  So let's go on to something he does

19   know something about.

20   Q    Mr. Momyer, you and the other inventors did disclose some

21   brochures regarding some Fisher products as prior art in

22   connection with the patents-in-suit; right?

23   A    Yes.

24   Q    And if we turn, for example, to the '683 patent, go back

25   to that, Exhibit 1, and if we -- actually, go to the second

1    page of the '683 patent.

2    A    What page?

3    Q    The second page, page two.

4           THE COURT:  It has other publications on the top of

5    it.  Do you have that?

6           THE WITNESS:  I see it.  Thank you.

7    Q    Mr. Momyer, do you see I've got a little green mark on the

8    screen next to a product called Fisher StockPro inventory

9    management system?

10   A    Yes.

11   Q    Was that a Fisher product?

12   A    Yes.

13   Q    Did you disclose the brochure about -- or some information

14   about that product to the Patent Office in connection with the

15   patents involved in this suit?

16   A    Does that mean that it should have been disclosed if we

17   state it there?  I'm assuming we did.  The patent filing was --

18   I didn't do the patent filing.

19   Q    Do you remember gathering --

20          THE COURT:  His question is, he didn't do the patent

21   filing.  When he lists other publication, does that mean

22   disclosed.  That's what he was asking you, is that what you

23   meant by disclosed; is that right?

24          THE WITNESS:  Yes.

25          THE COURT:  Is that what you meant in your question

1    by disclosed?

2           MR. McDONALD:  Let me clarify it.

3    Q   Mr. Momyer, did you through a process of gathering

4    information --

5    A   Yes, I did.

6    Q   Let me finish the question because that's a pretty rough

7    question right there.  -- information in connection with your

8    patent application in this case?

9    A   Yes.

10   Q   And did that include some prior Fisher product materials?

11   A   Yes.

12   Q   So StockPro was one of them; right?

13   A   StockPro was one.

14   Q   And go to the second column.  There's one called

15   PurchasePro; do you see that?

16   A   Yes.

17   Q   Did you gather up literature about PurchasePro for

18   disclosure to the Patent Office?

19   A   One of the inventors may have.  I don't recall myself

20   pulling that together.

21          THE COURT:  Excuse me a minute.  When he asks him a

22   question about a particular part, it would be better if you

23   would zero in on the part of the text, if you can blow it up,

24   because it's hard to read those things.

25          THE WITNESS:  That's what I'm looking at right now.

1   Q    And there's some other Fisher products, for example the

2   next one listed, Fisher Lightning product; is that right?

3   A    It's not up on the screen, but -- right now.

4   Q    We'll try to get it up on the screen for you here.

5   A    Yes, I see that.

6   Q    These were some prior Fisher products that would help with

7   the electronic order entry and purchasing and things like that;

8   correct?

9   A    That's correct.

10  Q    But you disclosed no literature at all to the Patent

11  Office, no publication at all that related to the RIMS system,

12  did you?

13            MR. ROBERTSON:  Objection, Your Honor.  No allegation

14  in this case whatsoever that the inventors withheld anything

15  material from the Patent Office.  There's nothing within the

16  Court's final pretrial order that was agreed upon that would

17  have any relevancy to whether or not they disclosed the RIMS

18  publication.  As Your Honor observed, they incorporated by

19  reference the RIMS patent.

20            MR. McDONALD:  This is testifying by Mr. Robertson at

21  this point.

22            THE COURT:  It's also something I think I've ruled on

23  and I think the witness testified about it earlier, if I

24  remember.  There's a statement about the RIMS patent in column

25  one right up at the top, and he said, yes, we told them that.

1    That's what -- whether you like that answer or not, that's the

2    one he gave before.  Has it changed?

3            MR. McDONALD:  Your Honor, I'm just clarifying that

4    there were no publications regarding the RIMS system that were

5    disclosed to the patent.  I don't think that's even disputed

6    yet at all, but --

7            THE COURT:  That's not an issue in the case.

8            MR. McDONALD:  Yes, it is.

9            THE COURT:  What is it?

10           MR. McDONALD:  That the RIMS brochure, the fact that

11   the RIMS system was on sale.  That is a discrete piece of prior

12   art --

13           THE COURT:  That doesn't mean it was disclosed.  You

14   don't content that it wasn't disclosed.  You contend that it

15   was on sale.  They are two different proof items.

16           MR. McDONALD:  Well, we're going to prove both, it

17   was on sale --

18           THE COURT:  Is that an issue in the case?  I don't

19   remember --

20           MR. McDONALD:  The fact that the RIMS system was on

21   sale as prior art --

22           THE COURT:  No, no, no.  I know that is an issue.

23   The failure to disclosure is not an issue.

24           MR. McDONALD:  They have disputed, and we dispute

25   that the patent --

1           THE COURT:  That's not what I -- I just want you to

2    listen.  I think you need listen.  Is that, is the failure to

3    disclose an issue; yes or no?  Is it an issue that's in the

4    case?  Did you raise it as a defense?

5           MR. McDONALD:  It's not -- that answer -- it's hard

6    to answer that question because it is disputed whether or not

7    the Patent Office did consider it.

8           THE COURT:  That's not the issue, what they

9    considered.  It's what was disclosed.  Listen.  Are you

10   contending that there was a failure to disclose on the Patent

11   Office?  I don't remember it.

12          MR. McDONALD:  It's not a separate defense, Your

13   Honor, but it's part of our explanation of why the Patent

14   Office did what they did here, that it wasn't disclosed, and,

15   therefore, the Patent Office --

16          THE COURT:  Then the question is simply this:  Was

17   one of those brochures listed in the other publication; right?

18          MR. McDONALD:  Yes.

19          THE COURT:  Then ask that.  Quit using the words that

20   animate a defense that you haven't actually pleaded.

21   Q   Mr. Momyer, would you agree that at least here in the '683

22   patent -- if we can back up to that whole list of publications

23   and blow that up as best we can -- that there's no RIMS, no

24   reference to any RIMS publications or literature in that list?

25          MR. ROBERTSON:  I understand the Court's ruling.  I

1    want to preserve the record, so I object on relevancy.

2    A    There is no mention of RIMS in that listing of other

3    publications.

4    Q    Just to be comprehensive, can we go back to page one,

5    please.  Do you see there's a list of other publications in the

6    right column there?  That's actually the start of that list;

7    right, Mr. Momyer?  Then it says continued on next page?

8    A    Yes.

9    Q    And the RIMS, there's no RIMS literature listed on the

10   first page of the patent either?

11            MR. ROBERTSON:  Same objection, Your Honor.

12   A    There's no list of RIMS on either of those listings under

13   other publications.

14   Q    Now, in the patent, you do mention the technical viewer,

15   TV/2 system in the description of the patent; correct?

16   A    I think we always mentioned the RIMS systems in the --

17   Q    Just answer my question, please, Mr. Momyer.

18   A    Yes.

19   Q    The TV/2 system is mentioned in the specification of the

20   patent, but it was -- the literature about that product was

21   also listed here under other publications; correct?

22   A    Yeah.  It was listed there, yes.

23   Q    We see here there's two documents; right?  The IBM

24   technical viewer general information manual, 1991; right?

25   A    Yes.

1   Q    The second one, IBM Technical Viewer/2 product information

2   and brochure, IBM Corporation undated; right?

3   A    Yes.

4   Q    And so even though the TV/2 system is mentioned in the

5   body of the patent, you also disclosed and listed these other

6   publications involving TV/2; correct?

7   A    Yes.

8   Q    But you didn't do that for the RIMS system; did you?

9            MR. ROBERTSON:  Objection, asked and answered three

10  times.

11           THE COURT:  Yes.  I agree.  Sustained.  You don't

12  have to answer.

13  Q    Now, at the time -- if we can go back to the cover page

14  here, when this application for the patents-in-suit was filed

15  in August of 1994 --

16           THE COURT:  Excuse me, Mr. McDonald.  This is not the

17  application.  You said when this application.  This isn't the

18  application.  It's the final issued patent.

19           If you want to ask him about the application, then

20  get the application in front of him or -- you all have to

21  remember something.  You all deal with these terms all the

22  time.  The jury doesn't, and it's easy for the jury to be

23  confused, and I'd like you to make sure your question is

24  precise.  If you want to ask him about the application, do

25  that.  If you want to ask him about the patent, that's fine,

1    too.  Just be precise.

2          MR. McDONALD:  That's fair enough.

3    Q    Mr. Johnson, I think just to keep our dates straight here,

4    I think you talked about the RIMS application --

5          MR. ROBERTSON:  I think you misspoke.  You called him

6    Mr. Johnson.

7          MR. McDONALD:  At least I didn't call him Dr. Weaver.

8    Q    Mr. Momyer, you recall that the RIMS application for the

9    patent was filed in April of '93 'right?

10   A    Yes.

11   Q    I think we talked earlier, it was actually issued in '98;

12   correct?

13   A    Yes.

14   Q    So the patent application that gave rise to the '683

15   patent as shown here, that was filed in August of '94; correct?

16   A    That's correct.

17   Q    So at that point, the RIMS patent hadn't issued yet;

18   right?

19   A    Yes.

20   Q    So when you filed it, you weren't trying to tell the

21   Patent Office in August of '94 that the RIMS patent had

22   actually issued and would be considered prior art as an issued

23   patent, were you?

24         MR. ROBERTSON:  Objection, that lacks foundation and

25   calls for legal expertise that I'm not sure this witness has,

1    the significance of those dates and whether it was prior art.

2          THE COURT:  I agree.  I sustain the objection.

3    Q    Let's go to the file history then.  I think that's PX-4,

4    Mr. Momyer.

5          MR. McDONALD:  This is already in evidence, Your

6    Honor, as the file history for the '683 patent.

7    Q    Can we turn to the page that would be page number ePlus

8    0703564.

9    A    Are you going to bring that up on the screen?

10   Q    I think that should be about page 26 or so of the

11   document.

12         THE COURT:  Last three digits are what?

13         MR. McDONALD:  564.

14         THE COURT:  That's PX-4?

15         MR. McDONALD:  Correct.

16         THE COURT:  In the book you handed up?

17         MR. McDONALD:  Yes.

18         THE COURT:  My PX -- I see.  There's two different

19   numbering systems down there.  It's the lower numbering system

20   he's talking about.  One of them is EP, and the other is ePlus,

21   and the last three digits of 04 start with 539, and he's

22   looking for 564; is that right?

23         MR. McDONALD:  Yes.  Do you have that page 564 now?

24         THE COURT:  564, Mr. Momyer, is on the reverse side

25   of 03, of 563.

1           THE WITNESS:  I think it's up on the screen.

2           THE COURT:  Good for you if you can read it.

3           MR. McDONALD:  If we can blow up that circular symbol

4    in the upper left corner, Bill.

5    Q    Do you see that's got a date stamp on it from the Patent

6    and Trademark Office of August 10th, '94, Mr. Momyer?

7    A    Yes.

8    Q    Back off again here.  So, do you recognize this as at

9    least the page of your patent application, the background of

10   the invention section as filed with the Patent Office in August

11   of '94?

12   A    I've never seen this document before.

13   Q    Isn't this the one you actually reviewed when you signed

14   your declaration?

15   A    I don't recall.

16   Q    What did you review --

17   A    I may.  It's been a long time, very long time.  I can't

18   recall the document.

19   Q    Well, you can thumb through it if you'd like, review it,

20   but I will direct your attention to your declaration.  That's

21   basically the next document right after the end of this one

22   called declaration and power of attorney beginning on page

23   ending in 3646.  That's about page 108 maybe.  You can blow up

24   the text part of that.  Do you see up at the top it says

25   declaration and power of attorney, Mr. Momyer?  Do you see

1    that?

2              MR. ROBERTSON:  What exhibit is this, Mr. McDonald?

3              MR. McDONALD:  PX-4.

4              THE COURT:  PX-4, page 3646.

5    A    I see.

6    Q    Then if you scroll down a little bit, below that part, you

7    see there's a box checked that says, specification of which is

8    attached here to?

9    A    Yes.

10   Q    And if we go three pages further up, we see your name is

11   on this declaration; right?

12   A    Yes, I see it.

13   Q    And on this document, you didn't sign it, but if we go up

14   a few more pages, another 12 pages to the page 3661, the last

15   four digits up at the top, you see that you did eventually sign

16   that declaration; correct?

17             THE COURT:  Isn't it agreed that this is the

18   application for the patent?

19             MR. McDONALD:  I thought it was, but he was saying he

20   wasn't sure about that, so I wanted --

21             THE COURT:  He said he hadn't read it in a long time.

22   It's been since whenever it was filed, and he said he just

23   didn't remember it.  What are you doing?

24             MR. McDONALD:  Well, trying to refresh his

25   recollection.

1   Q    Is this is the document you looked at and signed off on,

2   Mr. Momyer, with respect to your oath; correct?

3   A    Yes.

4   Q    So if we can go back to that page that ends with 3564,

5   page 26 of the document, if we can blow up that second

6   paragraph there.  Just the second paragraph, please.  That's

7   enough of it right there.

8        So in the typewritten version of this document filed in

9   August of '94, do you see there's a reference there to the

10  Fisher RIMS system?

11  A    Yes.

12  Q    And here it's described as being in a co-pending patent

13  application; correct?

14  A    Yes.

15  Q    So that clarifies that when the patents-in-suit were

16  originally filed in August of '94, you weren't portraying the

17  Fisher RIMS patent application as an actual issued patent;

18  right?

19  A    Is that what that means?

20  Q    Do you understand the difference between a pending

21  application and an issued patent?

22  A    Yes.

23  Q    So you're representing it's a pending application but not

24  an issued patent; right?

25            MR. ROBERTSON:  I'll stipulate.  It's already

1    answered --

2              THE COURT:  Stipulated.

3              MR. ROBERTSON:  -- the '989 did not issue until 1998.

4              MR. McDONALD:  So he's stipulated to that?

5              THE COURT:  He did.  That would have saved us

6    15 minutes if we had done that before like I asked you to do,

7    all that, both of you.

8    Q    Now, would you agree that the RIMS patent application

9    describes the concept of cross-referencing or converting

10   between two products from different sources in some detail?

11   A    What was the question again?

12   Q    Would you agree with me that the RIMS patent talks about

13   cross-referencing or converting between products from two

14   different sources in some detail?

15             MR. ROBERTSON:  I'll object.  I think the question is

16   vague and ambiguous, and the Court has already made

17   constructions with respect to some of these terms.  I'm not

18   sure how Mr. McDonald is using it in his question.

19             THE COURT:  Your first question was whether the

20   application did something, and now you moved to the patent.  Is

21   your question whether the RIMS patent, which is what, PX-10?

22             MR. McDONALD:  PX-10, that's right.

23             THE COURT:  Contains a term called cross-referencing?

24             MR. McDONALD:  The question was actually whether it

25   has, in fact, a fairly detailed discussion of cross-referencing

1   in that patent as it was filed, the RIMS patent.

2               THE COURT:  I don't remember that being asked either.

3   So is that what you want to ask him?

4               MR. McDONALD:  Yes.

5               THE COURT:  Do you remember whether the patent for

6   RIMS, which is PX-10, has a description of cross-referencing

7   that is somewhat detailed?

8               THE WITNESS:  Yes.

9               MR. ROBERTSON:  Can I object to Your Honor's question

10  because cross-referencing is a claim term.  I just want to make

11  sure we're using -- are we using it in --

12              THE COURT:  He's using it as used in the RIMS patent,

13  not as I have construed it in these patents.

14  Q    Mr. Momyer, if you can turn to Exhibit 10 and go to the

15  bottom of column 31 of the '989 patent.  Do you have that

16  before you now?  Do you see at the bottom of column 31 it talks

17  about cross-referencing and begins a whole section, really,

18  titled cross-referencing; correct?

19  A    Which column is that in?

20  Q    Bottom of column 31.

21  A    Okay.

22  Q    That discussion of cross-referencing continues for all of

23  columns 32 -- all of column 32; correct?

24  A    Yes.

25  Q    And also continues in column 33 and column 34 if you go to

1    the next page; correct?

2    A    Yes.

3    Q    And in that discussion, it does talk specifically about

4    cross-referencing a similar product from two different vendors;

5    correct?

6              THE COURT:  Do you want him to read all three of

7    those columns and then ask him the question?  It's there or

8    it's not.

9              MR. McDONALD:  You would agree --

10             THE COURT:  Point him to the page and the line.  You

11   are asking somebody to look back at something that's dated a

12   long time ago, and you guys are familiar with it, but he

13   doesn't study this stuff all the time.

14   Q    Can we zero in on the bottom of column 33 beginning at

15   about line 52, Mr. Momyer.  Column 33, about line 52.  Let's go

16   ahead and highlight it or expand it, Bill, all the way to the

17   end of that column.  Do you see here this is a section talking

18   about a product having a vendor number such as 1,000 --

19   A    It's lost.

20             THE COURT:  It's not there.

21   Q    Do you see that around line 54 of column 33, Mr. Momyer,

22   where there's a reference -- this is in the RIMS patent now;

23   right, correct?  Just so you have your bearings, Mr. Momyer,

24   we're in the RIMS patent; right?

25   A    Yes.

1   Q    So, if you see, there's a reference to vendor number such

2   as 1000 space 250, or a competitor's number such as B2650250;

3   right?

4   A    Yes, I see that.

5   Q    Then it goes on to say, the hose computer will search

6   various files in the host database as during sourcing described

7   above and recognize each as a number corresponding to

8   distributor catalog number 02 540K.  Do you see that?

9   A    Yes.

10  Q    And then you see there's a little code there at about line

11  61 that has two numbers that start off with the letters VN?

12  One has the number VN00002047; correct?

13  A    Yes.

14  Q    And the other one is VN with a long string of zeros

15  followed by the number one; right?

16  A    Correct.

17  Q    Those are two different vendor numbers that represent

18  Corning and the distributor in this example; correct?

19  A    One thing you have to be aware of, this is all within

20  Fisher product files.  All it's really doing is

21  cross-referencing the fact of a Fisher number.  That is the

22  intent of that cross-reference.

23  Q    Whatever the intent is, I understand its cross-reference

24  Fisher.  That Fisher would be the distributor there, right,

25  with the capital D there?

1    A    Yes.

2    Q    But there's another vendor number for Corning; right?

3    A    It's a vendor number internal to the Fisher environment.

4    Q    But it represents a different vendor; right?

5         THE COURT:  Which "it"?

6         MR. McDONALD:  The vendor number representing

7    Corning.

8    A    Yes.  It does represent -- VN00002047 would be another

9    vendor, but it's a vendor internal to Fisher, Fisher vendor

10   number.

11   Q    So the RIMS system, as it existed in April of '93, had

12   this conversion system there?

13   A    This was the host-based.

14   Q    I'm just asking for the timing on it right now,

15   Mr. Momyer.  Would you agree that the RIMS system, as of April

16   of '93, had this conversion system in it?

17        MR. ROBERTSON:  Conversion system as described by the

18   RIMS patent?  I think it's vague and ambiguous.

19        MR. McDONALD:  As we've been going through it here.

20   A    Yes.

21   Q    I'd like to turn now to the inventory, issue of checking

22   inventory.  Would you agree with me that the RIMS system, at

23   least as of April of '93, was capable of checking inventory?

24        MR. ROBERTSON:  Objection, vague and ambiguous as to

25   whose inventory.  That is an important issue here.

1           MR. McDONALD:  No, it's not.  It's not in the claims.

2           THE COURT:  What?

3           MR. McDONALD:  The issue of whose inventory you are

4    checking is not in any of the claims in this case.  It is not

5    an important issue.

6           MR. ROBERTSON:  In the patent, you are checking

7    multiple catalog inventory of suppliers.  That's what's going

8    on here.  The testimony has been in the RIMS systems, you are

9    checking Fisher inventory.

10          MR. McDONALD:  We have no testimony from Mr. Weaver

11   or anybody else that said that checking inventory had to be

12   specific to any particular type of source.

13          THE COURT:  We'll deal with that --

14          MR. McDONALD:  -- limited to checking inventory.

15          THE COURT:  We'll deal with that later.  Overruled.

16   Q    Would you agree, Mr. Momyer, that the RIMS system, at

17   least as of April of '93, was a system that did check

18   inventory?

19   A    It checked local inventory it was managing and Fisher

20   inventory at its distribution centers.

21   Q    And that local inventory could include stockroom inventory

22   for the customer; correct?

23   A    It could include both customer and Fisher-owned inventory,

24   yes.

25   Q    And the RIMS system included a parts master, like an item

1    master; right?

2    A    Yes.

3    Q    That was the RIMS as it existed in April of 1993?

4    A    It would have had that.

5    Q    That's a system where the customer could select the

6    products that might come from various sources such as Fisher

7    and specifically select the products that they were going to

8    keep in inventory and keep track of on that parts master;

9    correct?

10   A    They could really only order Fisher parts.  Is that what

11   you are asking?  For.  They did have the ability for

12   customer-owned inventory, but I think we established that the

13   customer-owned inventory, depending upon how it's replenished,

14   it could issue a req to be input into the customer's system to

15   place the order.

16   Q    I'm not sure that was actually my question, Mr. Momyer.

17   Let me try again.  Would you agree that the parts master in the

18   RIMS system, as it existed in April of '93, included products

19   that the customer would select to put on that list because

20   that's what they wanted to keep track of in inventory?

21   A    Customer would select?  Meaning what they wanted to put in

22   inventory?

23   Q    They would select the parts that went onto the parts

24   master; right?

25   A    Yes, they would select the part.  As far as the -- you

1    mean -- they would go in, and we would ask them what products

2    do you want stored in your stockroom, and they would say these

3    parts we want to store in the stockroom, and then we would

4    enter those into the RIMS systems.  Almost exclusively they

5    were Fisher parts.

6    Q    That parts master would keep track of what was called

7    product type in the RIMS system; correct?

8    A    Yes, that's correct.

9    Q    And that product type could include products that were

10   third-party items which the CSR, customer service

11   representative, or the customer could order; right?

12   A    No.

13   Q    Can you turn to column six of the '989 patent, please.

14            THE COURT:  What section is the '989 patent.

15            MR. McDONALD:  PX-10.

16   Q    That's the RIMS patent, Mr. Momyer, so I think you might

17   already have that in front of you there.

18            THE COURT:  Put it up.

19   A    I've got it.

20   Q    Column six, blow up that table at the top of column six.

21   Do you see, Mr. Momyer, this is a continuation of a table

22   listing the product types for the RIMS systems?

23   A    Yes.

24   Q    And you see there's a type 05?

25   A    Yes.

1    Q    That's called, or its description is third-party item

2    which CSR or customer orders; right?  Do you see that?

3    A    What that means is --

4    Q    First, do you see it?

5    A    I see it, yes.

6    Q    You agree there was a product type for that?

7    A    Yes.

8    Q    That's in addition to --

9         THE COURT:  What does it means?  I want to hear what

10   he's saying.  What does it mean?

11        THE WITNESS:  The product type 05 would be a product

12   that would be -- we consider customer-owned inventory, and it

13   would be a product that -- we were just keeping it in our

14   system for recordkeeping purposes, keeping track of the count

15   of inventory, how much was there, when it was issued, how much

16   was issued out.

17        But when it came time for the buyer to replenish

18   that, all the RIMS system would do would send a note saying

19   this amount of items needs to be reordered, and then we would

20   basically hand that over to the customer.  The customer would

21   enter that into their purchasing system to buy.

22        CSR, in some cases, the CSR would call up on behalf

23   of the customer and place that order.  It wouldn't be placed in

24   RIMS, though.  I think we pointed out earlier that that

25   particular product was very clearly only there for

1    recordkeeping purposes.  I think there were several references

2    in my prior testimony.

3    Q    Okay.  So that is product type 05, and then product type

4    06 is a customer-owned item located in a customer warehouse at

5    or near the customer's site; correct?

6    A    Yes.

7    Q    So that is also something that's different from a product

8    that was owned by the distributor such as Fisher; correct?

9    A    No.  Yes, it is, but it's -- 06, most of our product type

10   06s were for customer-owned inventory.  Most of those were

11   products that Fisher had and the customer bought from Fisher.

12   When the inventory replenishing came to replenish that order,

13   the replenishment order went straight to Fisher.

14   Q    But there are situations separate from that where a

15   customer would actually replenish by generating an internal

16   purchase order; correct?

17   A    Those 06s, they are really two different replenishment

18   types for those 06s, multiple replenishment types.  The primary

19   ones would be it's a Fisher product or it's an 05, in which

20   case it would do same thing.  It would create a requisition

21   that would go through, create a paper, req, go buy this amount

22   and turn over to the customer, the customer would buy it.

23   Q    Isn't it true that for that product type 06, the RIMS

24   patent itself describes the document it created as a customer

25   internal purchase order?

1    A     Yes.  But also, there's numerous places throughout that it

2    says product type requires that the RIMS system isn't

3    responsible for placing the purchase order.  Numerous places in

4    the patent.

5    Q     But you do agree -- I think you said the word yes before

6    you gave that explanation.  Wouldn't you agree that the patent,

7    the RIMS patent application that's incorporated by reference in

8    the patents-in-suit calls that document an internal customer

9    purchase order for that product type 06?

10             THE COURT:  Wait a minute.  You asked him about the

11   patent application, and the patent application, is that

12   incorporated in the patent?

13             MR. McDONALD:  Yes.  That's what that page shows on

14   that.

15   Q     And you said yes in answer to my question?

16   A     There is wording in the patent, I recall, that does call

17   it internal customer.

18   Q     And the RIMS system, as it existed in April of '93 when

19   that application for RIMS was filed, that can generate a

20   purchase order for the Fisher system and also that internal

21   customer purchase order for a type 06 product; right?

22   A     I understand what it said, but as I said, there's numerous

23   places in that patent that says that the RIMS system does not

24   place the purchase order.

25   Q     Let's talk about the places it does say that.  Let's turn

1  to figure 5A of the '989 patent, Mr. Momyer.  Can we blow up

2  the boxes going from about the diamond 332 down to including

3  336, both left and right side.  This is a flow chart,

4  Mr. Momyer, from the RIMS patent; correct?

5  A    Yes.

6  Q    This is a flow chart that the patent says describes

7  programs employed by an embodiment of the system of the

8  invention to accept a source requisition; right?

9  A    Yes.

10 Q    So in this RIMS system, we see that diamond there where

11 the question is, is it a product type 01, 03, or 04; right?

12          MR. ROBERTSON:  Your Honor, I'm just going to object.

13 It's cumulative.  We went through this figure at length within

14 Mr. Momyer's direct testimony.  Cross-examination by Mr.

15 McDonald --

16          THE COURT:  Really have been through it a lot, Mr.

17 McDonald.  Even I remember it.

18          MR. McDONALD:  Well, I'll just try to wrap it up

19 maybe, Your Honor.

20          THE COURT:  Let's just move on.  Go on and ask

21 something else.  The record is clear on that.

22 Q    Now, is it true that the reason why there would be an

23 internal customer order generated is that for some companies,

24 there's actually an obligation for a requisitioner who is in

25 department A to pay stockroom management who is in another part

1    of the company?

2                MR. ROBERTSON:  Objection, lacks foundation.

3                THE COURT:  What?

4                MR. ROBERTSON:  I think it lacks foundation.

5                THE COURT:  He can ask him if he knows it.

6    Overruled.

7    A     That was one of the things that it did keep track of, was

8    the ability to -- for an internal transfer of funds within that

9    customer from requisition department to the owning department.

10               THE COURT:  Within the same customer?

11               THE WITNESS:  Within the same customer.

12   Q     Would you agree that -- we'll go away from that topic now

13   and move on to some other things.  Would you agree that the

14   parts master in the RIMS system is not organized like a catalog

15   from the vendor?

16   A     Yes.  I don't think it is.

17   Q     How, if at all, is a parts master organized?

18   A     This particular parts master in RIMS?

19   Q     Yes.

20   A     The key to it is the Fisher part number, and then it has

21   data specific to that.  Primarily it's stock-keeping

22   information relating to the product.

23   Q     Is a parts master, is that basically organized in terms of

24   just the order the products get ordered into the parts master

25   list, that's how it's organized?

1    A    No.  It's -- they all, the products get entered.  The way

2    the system works is there's a key, which is the product number,

3    and that key -- if you enter the product number, it allows you

4    to specifically pull up all the detailed information about the

5    product.  So it's a keyed table.

6    Q    Now, the RIMS system include both a local computer and a

7    host computer; right?

8    A    Yes.

9         MR. ROBERTSON:  Object as to the RIMS system because

10   I think there's been testimony there's been dozens of

11   iterations, so I think it's vague and ambiguous what we're

12   taking about.

13        MR. McDONALD:  I can rephrase that.

14   Q    The RIMS system, as it existed in April of '93, had a

15   local computer and a host computer; right?

16   A    It had components that ran locally and a host, yes.

17   Q    At the host, was there a database there with a list of the

18   Fisher products as part of the RIMS system that existed in

19   April of '93?

20   A    I don't know if I'd consider that part of the RIMS system,

21   but there was a product file that was on the Fisher host which

22   had all the products that Fisher would buy.

23   Q    Okay.  Are you saying you don't agree that the Fisher

24   system included both the host system --

25   A    I have trouble in my mind separating where the RIMS system

 1  ends and the Fisher system, other Fisher systems pick up.  I

 2  will agree that there's a product file that's on the host that

 3  contains product information.

 4  Q    All right.  Well, let's get at least on the same page in

 5  terms of whether the RIMS system holds the host computer as

 6  well.  Could you turn to the bottom of column two of

 7  Plaintiff's Exhibit 10 still, the RIMS patent that was filed in

 8  April of '93.

 9       Do you see there under the first sentence under the

10  heading detailed description of the invention, it says, quote,

11  the requisition and inventory management system of the present

12  invention, which is shown in figure one, employs at least two

13  computers, a host computer 10 located at a distributor site and

14  a local computer 40 used by a customer service representative,

15  CSR --

16  A    I think --

17  Q    -- at or near the customer site and the site of JIT

18  inventory?

19  A    I think I already said that.

20  Q    So you would agree that the system in the RIMS application

21  described as the RIMS systems does include both a local and the

22  host computer?

23  A    Yes.

24  Q    Okay.  So at that host computer, then that Fisher

25  database, would you consider that to be a Fisher catalog?

1          MR. ROBERTSON:  Your Honor, I'm going to object, Your

2    Honor, because obviously the term catalog is ripe with meaning

3    as the Court has construed it.  And before Mr. Momyer

4    testified, the objection was sustained that he couldn't give an

5    opinion with respect to whether it was a catalog or not a

6    catalog given the Court's construction which Mr. Momyer is

7    unaware.

8          MR. McDONALD:  I'm asking for his understanding, Your

9    Honor.  We have a lot of testimony in this case about the word

10   catalog apart from the claims, but I'd like to start with his

11   understanding.

12         MR. ROBERTSON:  His understanding is not relevant

13   unless it's going to be applied to the Court's claim

14   construction, and he is not aware of that.

15         MR. McDONALD:  That's where the follow-up questions

16   will come into play.

17         THE COURT:  Well, you don't get any follow-up

18   questions to an irrelevant question.  Why is his understanding

19   of catalog in this case relevant given that the Court has

20   construed the term?

21         MR. McDONALD:  Trying to get an understanding of what

22   -- he got his invention.  He's describing in their patents as

23   including these catalogs.  What did they have in mind as the

24   inventors as to what is and what is not a catalog would

25   certainly be important to one of ordinary skill, even in the

1   application.

2              MR. ROBERTSON:  The case law is clear that even an

3   inventor can't construe the claims once the Court's construed

4   the claims.  He can't testify in variance to what the Court's

5   construction is.

6              THE COURT:  I think that's quite clear.  Sustained.

7   Q    Would you agree, Mr. Momyer, that for purposes of the

8   patents in the present case, you envisioned a catalog database

9   that would be searched by a system like a TV/2 system; correct?

10  A    Yes.

11             MR. ROBERTSON:  Same objection, Your Honor.  First of

12  all, it's still infected with the word catalog, and secondly,

13  the patents in this case, and we've been talking the '989, the

14  '683, this other patent.  I'm not really sure what patent we're

15  talking about at this point.  Vague and ambiguous, and it still

16  begs the question as to what a catalog is which the Court has

17  construed.

18             THE COURT:  Objection to the form of the question is

19  sustained.

20  Q    Now, would you agree that -- you were involved when Fisher

21  started working with IBM to actually create the system that led

22  to the three patents that are involved with this lawsuit?

23  A    I'm sorry?

24  Q    I'm changing gears here a little bit.

25  A    Okay.

1   Q     Threw you off a bit, but I'd just like to talk about

2   Fisher working with IBM now to develop a system that led to the

3   patents that are asserted in this case, okay, so can we shift

4   gears on that topic?

5   A     Yes.

6   Q     You were involved with working with IBM; right?

7   A     Yes, although not -- I wasn't the primary person working

8   with IBM, but, yes, I was involved.

9   Q     And did IBM's system have a search capability that could

10  do keyword searches before you started working with them?

11  A     Technical Viewer/2 could do keyword searches against a

12  document, yes.

13  Q     And that TV/2 system, you saw some literature about that

14  product from IBM; correct?

15  A     I've seen that literature really after the fact.  I have

16  seen that literature, but when I saw the literature, that's why

17  I recall it was when we first started talking about these

18  cases, in this case.  Not this particular cases but prior

19  cases, but I have seen that document, yes, talking about TV/2.

20  Q     Okay, but you do understand that the TV/2 system before

21  Fisher ever showed up at IBM was capable of searching a number

22  of technical publications that could be held on a single CD?

23  A     That wasn't my understanding.  My understanding, you could

24  search a single document.

25  Q     Could we turn to Defendant's Exhibit 107.  Let's start

1   with the first page first.  Do you recognize this Exhibit 107,

2   Mr. Momyer, as a copy of the brochure for the Technical

3   Viewer/2 system from IBM?

4   A    I've seen that.  I don't recall when I saw it.

5   Q    Well, if you go to the last page of that document, please.

6   And there's some bullet points on the right side of the page.

7   Let's do the right side.  Actually, the last bullet point on

8   that right side.

9           MR. ROBERTSON:  I'm going to object.  This lacks

10  foundation.  The witness says he doesn't remember if it was

11  contemporaneous with his work with IBM, that he's seen it as

12  part of the enforcement actions that have been brought with

13  respect to this patent.  There's been no foundation laid he's

14  familiar with this document or its contents other than that.

15          MR. McDONALD:  I'd like to establish whether he

16  recalls this specific bullet point as something that was

17  communicated to him.

18          THE COURT:  Well, have you established when this

19  document was --

20          MR. McDONALD:  I think Ms. Eng did earlier.

21          MR. ROBERTSON:  This document is undated, Your Honor.

22          THE COURT:  I think she said it was undated, and she

23  didn't know when it was prepared.

24          MR. McDONALD:  She knows she had used it in 1992.

25          MR. ROBERTSON:  That testimony was completely

Momyer - Direct                                          2123

1    uncorroborated other than her naked testimony which, as Your

2    Honor knows, is important in this case.

3              THE COURT:  I'll see -- what do you want -- what are

4    you doing?

5              MR. McDONALD:  I'm just confirming, seeing if I can

6    refresh his recollection --

7              THE COURT:  Ask him, does looking at this refresh

8    your recollection about something.  So don't answer any

9    question yet.  Refer him to what you want to look at.

10   Q    Do you see that last bullet point there up on the screen,

11   Mr. Momyer, in this TV/2 brochure that says, large capacity

12   means all technical publications can often be held on a single

13   CD-ROM?

14   A    I see that, yes.

15   Q    Does seeing that refresh your recollection when Fisher

16   started working with IBM that the TV/2 system had the

17   capability of searching multiple technical publications on a

18   single CD-ROM?

19   A    No.

20   Q    You don't remember one way or the other?

21   A    Honestly, when I saw this publication, the earliest I can

22   recall seeing it was when in prior cases it was presented.  It

23   doesn't mean -- I don't recall.

24             THE COURT:  So it doesn't refresh his recollection.

25   Let's move on.  How much longer do you have with this witness?

1          MR. McDONALD:  Not too much, Your Honor.  I'm

2    thumbing through.  I think I am just about done.

3    Q    If we go back to column nine of the '683 patent, that's

4    PX-1.  If you go down to the lower part of that column,

5    Mr. Momyer.  I just want to clarify here, we talked about this

6    earlier, but I forgot to clarify one thing.  The process that's

7    being described here is that the customer or the user of the

8    system can select which catalogs to search, and then after

9    those catalogs are selected, then they enter whatever words

10   they want to search within those selected catalogs?

11         MR. ROBERTSON:  I object, Your Honor.  The Court

12   construed selecting product catalogs to search as part of its

13   claim construction which is in the glossary the jurors have.

14   This witness can't, by using a preferred embodiment, explain

15   something contrary to what the Court construed.  The inventors

16   cannot re-construe the claims as they are issued.  The Court's

17   done that.

18         MR. McDONALD:  I'm not asking him to construe

19   anything, Your Honor.  I'm asking him how the system works, but

20   I think my question is totally consistent with the Court's

21   claim construction about searching selected portions or

22   selected catalogs.

23         MR. ROBERTSON:  Whether it's consistent or not is not

24   relevant then, Your Honor.  I mean, the witness can't

25   contradict the Court's claim construction.  If it's consistent,

1    then that should control, but going and looking at a preferred

2    embodiment and then trying to reformulate what the Court's

3    claim construction is, we should look at the Court's claim

4    construction.  And maybe he wants to ask the witness if the

5    Court's claim construction is consistent with his understanding

6    of how the system operated.

7              THE COURT:  Objection sustained.

8    Q    Mr. Momyer, turning back now to when you worked with IBM,

9    is it true that when IBM was putting together the system with

10   Fisher, that would include the TV/2 system with the RIMS

11   system, that IBM was actually taking actual catalog pages from

12   the Fisher catalog and trying to reproduce those pretty much

13   exactly in the demonstration system they were putting together?

14             MR. ROBERTSON:  Objection, lack of foundation.

15             THE COURT:  If you know.

16   A    I'm probably not the best one to ask that question.

17   Q    Well, you were working with IBM at the time they were

18   developing that demo system; right?

19             MR. ROBERTSON:  He's answered that question, Your

20   Honor.

21             THE COURT:  You were.  He was, so what else?

22   Q    Well, do you remember seeing a demo from IBM?

23   A    Yes.

24   Q    Is it your understanding that that demo had a demo of

25   pages from the Fisher catalog scanned in by IBM into their

1   system just like they appear in the paper version of the Fisher

2   catalog?  You saw it; right?

3   A    I'm trying to recall that.  I'm not the best one to ask

4   that --

5         THE COURT:  Do you remember?  If you don't remember,

6   you don't remember.

7         THE WITNESS:  I remember seeing the demo.  I don't

8   remember if that demo was scanned pages or not.

9   Q    Do you remember seeing on the screen pages that looked

10  like a Fisher catalog or not?

11        THE COURT:  You mean such as a reproduction of a page

12  itself?

13        MR. McDONALD:  Right, with the same words and the

14  same images just like in the paper catalog.

15  A    Honestly, I can't recall the demo.  I know there was a

16  demo.  I can't visualize it.

17  Q    Wasn't that the purpose of the demo, to show that?

18        THE COURT:  Mr. McDonald, he's now said several times

19  he knows there was a demo, he just can't remember what it was.

20  Move on.

21  Q    Do you recall that the TV/2 system did have a graphical

22  user interface with it?

23  A    Yes, it did.

24  Q    That was before Fisher ever came to IBM to add that;

25  correct?

1           MR. ROBERTSON:  Objection.  How would he know that?

2           THE COURT:  Your objection is to lack of foundation?

3           MR. ROBERTSON:  Yes, sir.

4           THE COURT:  Sustained.

5    Q    When you first started talking to IBM about using the TV/2

6    system, the first time you saw that, did the TV/2 system have a

7    graphical user interface?

8    A    Yes.

9           MR. McDONALD:  I have no further questions.  Thank

10   you.

11          THE COURT:  Ladies and gentlemen, we'll take the

12   morning recess for 20 minutes.  Go ahead and take your pads

13   with you.

14

15          (Jury out.)

16

17          THE COURT:  We'll be in recess.

18

19          (Recess taken.)

20

21

22

23

24

25