2128

1              (The jury is present.)

2              THE COURT:  Cross-examination.

3

4      CROSS-EXAMINATION

5  BY MR. ROBERTSON:

6  Q    Good morning, Mr. Momyer.

7  A    Good morning.

8              MR. ROBERTSON:  I'd like you to put the '683

9  patent up, Exhibit No. 1, specifically column 1

10  starting at line 10 going down to about line 17.

11  Q    You recognize this as the '683 patent, you're

12  patent?

13  A    Yes.

14  Q    I'm sorry?

15  A    Yes.

16  Q    Did you disclose in your patent and the Patent

17  Office that there were a number of known --

18              THE COURT:  Can you speak up, please.

19              MR. ROBERTSON:  Sure, Your Honor.  I'm sorry.

20  Q    Did you disclose to the Patent Office in your

21  patent that there are a number of known

22  requisition/purchasing systems that manage and process

23  requisitions and purchase orders, one such system is

24  the Fisher-Scientific Requisition and Inventory

25  Management System, Fisher RIMS, described in United

MOMYER - CROSS                    2129

1   States No. 5,712,989 filed April 2, 1993, and assigned

2   to the Fisher-Scientific Company of Pittsburgh,

3   Pennsylvania, the disclosure of which is incorporated

4   herein by reference; do you see that?

5   A   Yes, I do.

6   Q   Did you make that representation to the Patent

7   Office?

8   A   Yes.

9   Q   Why did you do that, sir?

10  A   Well, RIMS was an inventory control purchasing

11  requisition system, and we actually would use the

12  basis for RIMS to build the component for the

13  electronic sourcing application.

14  Q   So did you want them to be aware that such a

15  system existed out there?

16  A   Yes.

17  Q   Can you go down to about line 35?  Just the first

18  two lines.  There's a statement in your patent that

19  says, Other requisition/purchasing systems can be

20  grouped broadly into four classes; do you see that?

21  A   Yes.

22  Q   Just generally, if you would just refer to your

23  patent, did you go on to describe for the Patent

24  Office what those four classes of requisition

25  purchasing systems were?

1   A    Yes.   We did describe some other types of

2   requisition purchasing systems.

3   Q    If you would go down to line 60, down to about

4   line 64.   You then represented to the Patent Office

5   that none of these known requisition/purchasing

6   systems, including Fisher RIMS, however, provides a

7   capability for a user readily to search for and locate

8   information about the products that may be

9   requisitioned and ordered in connection with the

10  requisition/purchasing system; do you see that?

11  A    Yes.

12  Q    When you made that statement to the Patent Office,

13  did you consider it to be truthful?

14  A    Yes.

15  Q    Do you consider it to be truthful to this day?

16  A    Yes.

17  Q    You were also asked about the ability for a user

18  to request information about products and create

19  orders that can be saved, printed or, in some cases,

20  facsimiled directly to a vendor; do you recall that?

21  A    Yes, I did.

22  Q    When you print or facsimile directly to a vendor,

23  are you working within the electronic sourcing system

24  patent that you've described and claimed in your

25  patents?

1  A    No.

2  Q    Why don't we look at right underneath where that

3  was cited to you in the patent, starts at line 9, the

4  known computer systems, going down to about the end of

5  that first full paragraph.  It says, Sourcing

6  operation.  I'm sorry.  Column 2, starting about line

7  8.

8            MR. ROBERTSON:  I want to start where it

9  says, The known computer systems.  If we could just

10  include a little bit above it.  Why don't you do the

11  whole paragraph.  Thank you, Mike.

12  BY MR. ROBERTSON:

13  Q    So you see here where the reference was made to

14  systems that can search for user requested information

15  and then save, print or, in some cases, facsimile

16  those orders directly to a vendor?

17  A    Yes, I see that.

18  Q    That was what Mr. McDonald was asking you about,

19  right?

20  A    That's correct.

21  Q    After that it says, The known computer systems for

22  searching vendor catalogs are limited and that only

23  one such vendor catalog is accessible to a user at any

24  given time.  They are also limited in that they can

25  only create an order within the particular vendor

1    catalog database.   They cannot source items to be

2    requisitioned from a database containing multiple

3    catalogs or interact with a requisition/purchasing

4    system such as Fisher RIMS to create a purchase order

5    or orders including the items located from that

6    sourcing operation.   Did I read that correctly?

7    A    Yes.

8    Q    Was that a truthful statement when you made it to

9    the Patent Office when you filed this application in

10   August of 1994?

11   A    Yes.

12   Q    Do you still consider it to be truthful to this

13   day?

14   A    Yes.

15   Q    You go on to identify a number of advantages that

16   you consider for your electronic sourcing system.

17   I'll just ask you to just briefly scan down the next

18   few paragraphs there.   It should be in PX 1.

19        Maybe I can just blow it up on the screen and we

20   can do it.

21   A    I've got it.

22            THE COURT:   It's about midway through

23   Volume I.

24   A    What column is it in?

25   Q    Column 2, starting at about line 18, I think the

1   first paragraph says, Thus --

2   A    Yes, I see it.

3   Q    Let me just paraphrase rather than read it.

4        Do you agree or disagree that it's desirable for

5   your electronic sourcing system to provide means for

6   transferring information between requisition and

7   purchasing systems that may use results of a search of

8   product information, search large volumes of product

9   information such that it would be included in vendor

10  product catalogs or catalogs?

11  A    Yes.

12  Q    Was that one of the advantages that you considered

13  for your invention?

14  A    Yes, it was.

15  Q    Did you also agree that for your electronic

16  sourcing system, it would be desirable to have a

17  capability of searching a database containing at least

18  two product catalogs for product information?  Is that

19  one of the advantages you thought was presented by

20  your invention?

21  A    Yes.

22  Q    Was that an advantages over the RIMS system?

23  A    Yes.

24  Q    Why is that?

25  A    RIMS didn't really even have a catalog in it.

1    Q    You were asked about whether or not you would

2    consider RIMS to have a catalog.  And I forget your

3    answer.  What was it?

4              MR. McDONALD:  Objection, Your Honor.

5    Q    Let me rephrase the question.  Are you familiar

6    with the term "parts list"?

7    A    Yes.

8    Q    What's a parts list?

9    A    It's pretty self-explanatory.  It's a list of

10   parts.

11   Q    What kind of information with respect to the

12   products was contained in the RIMS database?

13   A    Primarily product number, description, unit of

14   measure, and some stock-keeping information.

15   Q    What do you understand a parts list to contain?

16   A    Pretty much that.

17   Q    All right.  Let me ask you about another advantage

18   of your system.  The next paragraph says, and I'm

19   paraphrasing.  Let me ask you, would it be desirable

20   for an electronic sourcing system to be capable of

21   searching a database of catalog items containing

22   vendor product catalogs, selecting particular items

23   located, and transferring that item information, for

24   example, a catalog number, a vendor identifier such as

25   a vendor name or vendor number to a requisition

1    purchasing system for inclusion in a requisition

2    generated by the system?  Would you consider that to

3    be an advantage of your invention?

4    A    Yes, I would.

5    Q    Did the RIMS system have that capability?

6    A    No, it did not.

7    Q    You also represented to the Patent Office that it

8    would by further desirable to provide an electronic

9    sourcing system that's capable of creating an order

10   list including items located as the result of a

11   catalog database search, and then transferring that

12   order list of desired items to a requisitioning and

13   purchasing system for inclusion of the catalog items

14   as entries in a requisition generated by the system.

15   Do you see that?

16   A    Yes.

17   Q    Did you consider that to be an advantage at the

18   time when you applied for your patent?

19   A    Yes.

20   Q    Do you consider that to be the same or different

21   from the capability of the RIMS system?

22   A    Well, RIMS, obviously, didn't have a catalog.  So

23   it really couldn't pull results of a search back into

24   an order list.  So, yes, it's something that RIMS did

25   not have.

1    Q    Did you consider one of the advantages of your

2    invention to be that it could generate multiple

3    purchase orders for multiple vendors from a single

4    requisition?

5    A    Yes, I do.

6    Q    Did the RIMS system have that capability?

7    A    No.

8    Q    Was there any means for selecting product catalogs

9    to search disclosed in the RIMS '989 patent?

10   A    No.

11   Q    You were ask some questions about how many

12   versions the RIMS system went through when it was

13   being used by the customer service representatives.

14   Do you know as you sit here today how many versions

15   there were?

16   A    No, I can't say.  There are quite a few.

17   Q    Can you give us give your best estimate?

18   A    Thirty, 40 versions.

19   Q    You were directed to your deposition with respect

20   to when the RIMS development wrapped up.  Do you

21   recall that?

22   A    Yes.

23   Q    And at the time you indicated, I thought I

24   understood, you wanted to follow-up on your answer

25   with respect to that when you were directed to your

1   testimony.

2   A    Yes.

3   Q    Can you tell us what was it that you had in mind?

4   A    All right.  Okay.  What I was addressing, that was

5   in an earlier deposition, was that the first release

6   of RIMS was wrapped up around 1991.  There were many

7   subsequent releases of RIMS that occurred after that

8   up until I left Fisher in 2003.  We continually

9   modified and upgraded the RIMS system.

10  Q    Do you have a memory specifically in that

11  deposition as to whether or not you were asked a

12  question as to the ongoing development of the Fisher

13  RIMS system?

14  A    I really don't recall.

15  Q    Why don't you then go to page 99 of that

16  deposition transcript.  That was the --

17          MR. McDONALD:  Objection, Your Honor.  He

18  just said he doesn't recall.

19          MR. ROBERTSON:  I'm going to fresh his

20  recollection.

21          THE COURT:  Overruled.

22  Q    Can you go to the September 16, 2004 deposition

23  you have in your book?

24  A    All right.

25  Q    Specifically, if you'd go to the bottom of page 99

1    starting at about line 20.  If you could read over to

2    the top of page 100.

3    A    Page --

4    Q    99 starting at line 20 at the bottom.

5    A    Okay.

6    Q    And going over.

7    A    Sorry, Mr. Robertson.  I'm having trouble with the

8    page.  93, 94 to 97, 98 to what?

9              MR. ROBERTSON:  99, starting at line 20.  It

10   says, Question:  Welcome back.

11   A    99, line 20, yes, I see that.

12   Q    Why don't you read that over to page 100 down

13   through line 9.  Just read it to yourself, sir.

14   A    How far did you want me to read?

15   Q    Down to line 9.

16   A    Okay.

17   Q    Now, you were asked a question concerning when the

18   RIMS product was complete.  Do you see that shortly

19   after the luncheon break?

20   A    Yes.

21   Q    Does that fresh your recollection now as to what

22   you told the attorney under oath in your testimony as

23   to when the RIMS system was completed?

24   A    Yes.

25   Q    What does it refresh your recollection to be and

MOMYER - CROSS                    2139

1   what did you indicate there?

2   A    Pretty much what I just said.  We continue

3   developing RIMS up until I left Fisher.

4          MR. McDONALD:  Your Honor, I don't know what

5   he's referring to at this point, but I think the

6   question and answer should just be red.

7          MR. ROBERTSON:  I'm happy to do that, Your

8   Honor.

9          THE COURT:  He asked if it refreshed his

10  recollection, and he said yes.  What was the

11  recollection that was refreshed?  He's entitled to

12  answer how it was refreshed.  And if you'd like to

13  read the question and answer, both of you, go ahead.

14  BY MR. ROBERTSON:

15  Q    Well, I thought you had answered the question, but

16  I understood you to say it refreshed your

17  recollection.  So what recollection was refreshed by

18  referring to this testimony that you gave under oath?

19  A    My recollection was that the RIMS system was an

20  evolutionary system that continued to be developed

21  over a period of time up to and through 2000, 2003.

22  Q    Is it your testimony there under oath consistent

23  with your recollection now?

24  A    Yes.

25  Q    Can we just go to the RIMS patent?  The RIMS

1  system is mentioned multiple times in your patent; is

2  that right?

3  A   Yes, it is.

4  Q   I've got just a graphic here of your '683 patent.

5  If we could just go along.  Do you know how many times

6  RIMS is mentioned in this patent?

7  A   No, I don't.

8  Q   I've indicated here in red in each instance that

9  the RIMS system or the RIMS features or capabilities

10  are described or as modified.  If we could just scan

11  through this.  This is column 1 and 2, there's 3 and

12  4, 5 and 6, 7 and 8, 10, columns 11 and 12, 13, 14,

13  15, 16, 18.  All right.  Would it surprise you, sir,

14  if you disclosed RIMS functionality and feature in

15  your patent more than 55 times in your patent

16  application?

17  A   No.

18  Q   You weren't trying to mislead the Patent Office by

19  withholding descriptions of what the RIMS capability

20  was, were you?

21  A   No, I wasn't.

22  Q   Can you tell us whether or not you think you fully

23  disclosed the features and capability and the

24  revisions and modifications that were necessary in

25  order to come up with your electronic sourcing

1    invention?

2    A    Yes, to the best of my understanding we did.

3    Q    I want to talk to you a little bit about

4    cross-referencing in the RIMS system.  Do you recall

5    being directed to sections in the RIMS patent?

6    A    Yes, I do.

7    Q    In your electronic -- well, let me ask you this

8    basic question.  Is the cross-referencing, as

9    identified in the RIMS patent, the same

10   cross-referencing as utilized in your invention of the

11   electronic sourcing system?

12   A    No, it's not.

13   Q    Can you tell us how it's different?

14   A    The cross reference in the RIMS system was

15   intended to be a means to do a look-up from a

16   competitor or vendor's catalog number, part number,

17   over to Fisher, and always convert it to that.  The

18   cross referencing in the electronic sourcing was much

19   broader in that it didn't specifically cross reference

20   you to any specific Fisher part number.  It wasn't

21   tied back to a specific Fisher part number.

22   Q    Let me ask you this about the RIMS system.  If you

23   were able to identify a part number, for example, of

24   your competitor, was the RIMS system then able to

25   source it from that vendor?

1   A    In the RIMS system?

2   Q    Yes.

3   A    It would identify the part number.  Which part

4   number?

5   Q    The part number of the competitor.

6   A    No, it would always -- in the RIMS system, you

7   would always translate back to the Fisher part number.

8   Q    So in other words, you were trying to cross

9   reference to a part number so you could then find a

10  corresponding Fisher product to sell to the customer;

11  is that right?

12  A    That's correct.

13  Q    In your electronic sourcing system, does the

14  customer, the user, have the ability using the cross

15  reference table to purchase the actual item from one

16  vendor, another vendor, or multiple vendors?

17          MR. McDONALD:  Objection, Your Honor.  The

18  cross-reference table was a term that the Court has

19  used in its claim constructions, and I think it's

20  unclear here because there's nothing in that

21  definition that is specific to which part it's being

22  converted to.

23          MR. ROBERTSON:  I'll rephrase the question.

24  Q    Did the electronic sourcing system have the

25  capability to identify the same or similar products

1  from multiple vendors, your invention?

2  A    Yes.

3  Q    Could you then source it from those multiple

4  vendors?

5  A    Yes.

6  Q    Could you then purchase it from those multiple

7  vendors?

8  A    Yes.

9  Q    Did the RIMS system have that capability at any

10 time, way, shape or form?

11 A    No.

12 Q    Did you consider that to be one of the advantages

13 of your electronic sourcing invention?

14 A    Yes.

15 Q    Can we go to I think it's Plaintiff's Exhibit

16 No. 10, which is the '989 patent.  It's at the very

17 back of Volume II, Mr. Momyer.

18 A    Okay.

19          MR. ROBERTSON:  If you could blow up the --

20 we're going to the page that ends with 910.

21 Q    The lower right-hand corner, the lowest number

22 there.

23 A    Right.  Okay.

24 Q    There's a table there that you were asked some

25 questions about --

1          MR. ROBERTSON:  If you could put them

2    together, please.

3    Q    -- about 05 and 06 product types.  Do you see

4    that?

5    A    Yes.

6    Q    This customer owned item located in customer

7    warehouse at or near customer site.

8    A    Yes.

9    Q    Tracking that item in the inventory of the

10   customer, is that a service that Fisher was providing

11   for its customers?

12   A    Yes, it was.

13   Q    Using the RIMS system, could I use that product

14   type to, within the system, order product from a third

15   party vendor?

16   A    No.

17   Q    Is there any type 7 product identified in that

18   table?

19   A    No, there's not.

20   Q    Was there a product type 7 in your electronic

21   sourcing patent?

22          MR. McDONALD:  Objection, Your Honor.  It's

23   outside the scope of direct and also the claims have

24   nothing to do with the product type 07.

25          MR. ROBERTSON:  Your Honor, the question was

1    asked about product type 05, 06.  I want to now point

2    out that product type 07 in this electronic sourcing

3    patent is third party vendor items that are part of

4    the system differentiating the RIMS patent, which he

5    was asked questions about in the electronic sourcing

6    patent.

7              MR. McDONALD:  It's not in the claim, Your

8    Honor.  That's why we object to it.

9              MR. ROBERTSON:  Multiple catalogs are in the

10   claims, Your Honor, and there were multiple vendor

11   catalogs, vendors, supplier, manufacturer.  And that's

12   what type 07 products are.

13             MR. McDONALD:  That's not what type 07

14   products are.

15             THE COURT:  I tell you what, why don't you

16   ask him, and on redirect you can deal with it.

17             What are type 07 products, Mr. --

18             MR. ROBERTSON:  Let me just so if I can find

19   it so we can reference.

20   BY MR. ROBERTSON:

21   Q   If we can go to appendix 1 of the '683 patent?

22             THE COURT:  Figure 1?

23             MR. ROBERTSON:  Appendix 1, Your Honor.  Let

24   me direct you to that.

25   Q   It's on the page that has column 19.  Do you see

1    in there this is a requisition header?

2    A    Yes.

3    Q    In the lower left-hand side there's a reference to

4    vendor.  Do you see that?

5    A    Yes.

6    Q    The Fisher RIMS System didn't have that vendor as

7    part of a requisition system; is that right?

8    A    That's correct.

9    Q    Can we go back to that Fisher RIMS patent at table

10   1, column 37?  It was PX 10.  Table 1 there in the

11   RIMS patent, PX 10, is an order header information.

12   Are you with me?

13   A    Yes.

14   Q    Is a vendor identified anywhere in that order

15   header information for that requisition?

16   A    In table 1?

17   Q    Yes.

18   A    No.

19   Q    You'd agree with me by the time that you were

20   applying for this -- let me ask you this.  But when

21   you were applying for the patent application that led

22   to the patents that are at issue here in August of

23   1994, there was a RIMS system in operation, correct?

24   A    Yes.

25   Q    Notwithstanding that, did Fisher devote

1  significant resources to develop the electronic

2  sourcing system?

3  A    Yes.

4  Q    Did they devote personnel to it?

5  A    Yes.

6  Q    Including yourself, Mr. Kinross, Mr. Johnson and

7  Mr. Melly?

8  A    Yes.

9  Q    Did they devote considerable financial resources

10  to developing the electronic sourcing system?

11  A    Yes.

12  Q    Did they subcontract with IBM and pay them a

13  considerable amount of money to work with you for more

14  than a year and a half to develop the electronic

15  sourcing system?

16          MR. McDONALD:  Objection, Your Honor.  It's

17  related to commercial embodiment, not the scope of the

18  claims and the filing.  So it's irrelevant.

19          MR. ROBERTSON:  It's part of the invention

20  story.  It's part of the development of this

21  invention.

22          THE COURT:  Sustained.

23  Q    Let me ask you this.  If the RIMS patent could do

24  everything that the electronic sourcing patent could

25  do, why would the company go and expend that effort to

MOMYER - CROSS                2148

1  come up with this new patent and apply for patent and

2  pay all that money if that was the case to get a

3  patent from the Patent Office?

4         MR. McDONALD:  Objection.  Lack of

5  foundation.

6         THE COURT:  Overruled.

7  A   I don't know why it would invest that if RIMS

8  could do all of that.

9         MR. ROBERTSON:  Thank you.  I have no further

10 questions.

11        THE COURT:  Redirect?

12        MR. McDONALD:  Yes, please.

13

14    REDIRECT EXAMINATION

15 BY MR. McDONALD:

16 Q   If we could go back to the '683 patent, please,

17 Exhibit 1.  Go back to column 2.

18        THE COURT:  He needs to get the book first.

19 A   Which column?

20 Q   Column 2.

21 A   Okay.

22 Q   Now, in column 2 --

23        MR. McDONALD:  Could we put that up on the

24 screen?  We have to have switch the systems, I guess.

25 If we could blow up column 2.

MOMYER - REDIRECT                  2149

1    BY MR. McDONALD:

2    Q    You were asked some questions in this area by

3    Mr. Robertson.  I just want to clarify.  You were

4    saying that all these statements in this column were

5    truthful in your belief, correct?

6    A    Yes.

7    Q    If we go to line 18 there, beginning with the

8    known.  Excuse me, line 8.  I'm sorry.  Line 8,

9    beginning with the sentence, "The known computer

10   systems for searching vendor catalogs are limited in

11   that only one such vendor catalog is accessible to a

12   user at any given time."  Do you see that sentence?

13   A    Yes.

14   Q    Wasn't it true that the TV/2 system was a known

15   computer system for searching vendor catalogs that

16   wasn't limited to just searching one vendor catalog at

17   a given time?

18          MR. ROBERTSON:  Objection, lacks foundation.

19          THE COURT:  Overruled.

20   A    I thought I mentioned I didn't believe that the

21   TV/2, one, could search multiple documents and, two,

22   when it was presented to us had the ability to search

23   a catalog.

24   Q    You didn't think TV/2 could search a catalog?

25   A    No.

1          MR. ROBERTSON:  Objection.

2          MR. McDONALD:  I'll rephrase that.

3    Q    It was your understanding when you started working

4    with IBM that the TV/2 system could not search a

5    catalog?

6    A    Search a document.

7    Q    That's a different question, Mr. Momyer.  My

8    question is when you started working with IBM, didn't

9    you know that the TV/2 system was fully capable of

10   searching catalogs?

11   A    No, not to the requirements that we needed it to.

12   Q    You knew it could search catalogs, though, right?

13   A    It could search a document.  If you want to

14   consider a catalog a document, then --

15   Q    Wasn't that exactly the sort of document that the

16   TV/2 system was designed to work with was a catalog?

17   A    That's not what was presented to us.

18   Q    Do you remember -- did IBM ever communicate to you

19   in your experience that the TV/2 system was actually

20   designed to work with documents specifically including

21   parts catalogs?

22   A    We actually went there with the intent of -- that

23   that was a requirement for us to be able --

24   Q    I have a different question for you.  My question

25   is:  Did IBM, anybody from IBM, ever communicate to

MOMYER - REDIRECT                    2151

1   you that the TV/2 system was capable of searching

2   parts catalogs?

3   A   I'm sure it came up during the discussions when I

4   was at the meeting as far as being able to search a

5   document, a list of products, and find some keywords,

6   find some products.

7   Q   In fact, isn't it true that the TV/2 system was

8   specifically designed to work with a CD ROM that could

9   have multiple catalogs on it?

10  A   I don't recall that.

11  Q   All right.  So when you said this statement here

12  was truthful, you're saying basically as far as you

13  know without really knowing the details about the TV/2

14  system, is that what meant by that?

15           MR. ROBERTSON:  I object to the form of that

16  question.

17           THE COURT:  Sustained.

18  BY MR. McDONALD:

19  Q   Let's go to the next sentence.  They are also

20  limited in that they can only create an order within

21  the particular vendor catalog database.  Do you see

22  that sentence?

23  A   Yes.

24  Q   Did you understand, was there any limitation on

25  the TV/2's system ability to communicate with the RIMS

1    system regarding multiple catalogs from multiple

2    vendors?

3    A    Well, my understanding, I didn't think the TV/2

4    system as it was presented to us could handle multiple

5    catalogs and could not search multiple catalogs.  That

6    was my understanding.  That's the reason we did the

7    development that we did.

8    Q    In the next sentence then, do you see where it

9    says, They cannot source items to be requisitioned

10   from a database containing multiple catalogs, which is

11   what we have already been talking about, or interact

12   with a requisition purchasing system, such as Fisher

13   RIMS, to create a purchase order or orders including

14   the items located from that sourcing operation?  Do

15   you see that part of the sentence beginning with the

16   word "interact," Mr. Momyer?

17   A    Yes, I do.

18   Q    Wasn't it true that when Fisher started working

19   with IBM, the TV/2 system was already capable of

20   interacting with a requisition purchasing system such

21   as the Fisher RIMS System to create a purchase order

22   or orders including the items located from that

23   sourcing operation?

24   A    Once again, I'm probably not the best person to

25   ask this because I don't recall that being brought up.

MOMYER - REDIRECT          2153

1   I really don't.

2   Q   You do recall that the TV/2 system was designed to

3   integrate with order entry inventory management

4   systems, don't you?

5   A   No, I don't.  I know it had an interface

6   capability, but no, I don't recall that.

7   Q   Let's go back to Defendant's Exhibit 107.  And go

8   to the last page of Defendant's Exhibit 107.  This is

9   the Technical Viewer/2 brochure.

10       And the third bullet point on the left, if we

11   could blow that one specifically up.

12           MR. ROBERTSON:  Your Honor, I object.

13   There's no foundation this witness even recalled this

14   at the time, and he testified that he didn't recall it

15   except that he was shown it later on at some point

16   during the enforcement actions in this case.

17           MR. McDONALD:  The third bullet point, it's

18   specific to this language in column 2.

19           MR. ROBERTSON:  It's outside the scope of my

20   direct.  I didn't ask the witness any questions about

21   this document.

22           MR. McDONALD:  He asked him about whether

23   there were systems that could interact with the

24   requisition purchasing system that he knew of.

25           MR. ROBERTSON:  I asked if that statement was

1  truthful, not anything about this document.

2            THE COURT:   Objection is sustained.

3  BY MR. McDONALD:

4  Q    Let's go back to column 2 of the '683 patent and

5  pick up where we left off there.   I think that would

6  be at column 2, line 18.   The next sentence.

7        You were asked about this sentence that says, Thus

8  it would be desirable to provide an electronic

9  sourcing system that provides a means for transferring

10  information between a requisition purchasing system

11  that may use the results of a search of product

12  information and a means for searching large volumes of

13  product information such as would be included in a

14  vendor product catalog or catalogs, right, Mr. Momyer?

15  A    Yes.

16  Q    Isn't it true that the TV/2 system was already a

17  system that provided a means for transferring

18  information between a requisition purchasing system

19  that may use the results of a search of product

20  information and a means for searching large volumes of

21  products' information such as would be included in a

22  vendor product catalog or catalogs?

23  A    It did have a means for transferring information.

24  That's the reason that we selected it is that we could

25  take advantage of that and customize it to meet our

1    requirements.

2    Q    And TV/2 also had the means for searching through

3    large volumes of product information, right?

4    A    To an extent.   There were some changes we had to

5    make to allow us to have multiple catalogs.

6    Q    That was one of the features that the TV/2 system

7    touted by IBM to Fisher, specifically the feature of

8    searching large volumes of product information?

9             MR. ROBERTSON:  Objection.   Lacks foundation.

10    It calls for hearsay as well.

11             THE COURT:  Overruled.

12    A    They did say they could search large volumes of

13    information, yes.

14    Q    Let's go to the next sentence.   I think we have

15    already covered this one, Mr. Momyer, in a little

16    different form, but let's just take a look at it here.

17    Do you see this sentence, also one Mr. Robertson asked

18    you about, "It would also be desirable to provide an

19    electronic sourcing system that is capable of

20    searching a database containing at least two vendor

21    product catalogs for product information."  Do you see

22    that?

23    A    Yes, I do.

24    Q    Isn't it true that the TV/2 system already had the

25    capability of searching a database containing at least

MOMYER - REDIRECT                    2156

1  two vendor product catalogs for product information

2  before Fisher even started working with IBM?

3  A   Not that I understood.  That's some of the reason

4  we did the development we did, to allow us to provide

5  for multiple catalogs.

6  Q   Do you know one way or the other whether the TV/2

7  system had that capability?

8           MR. ROBERTSON:  Objection.

9           THE COURT:  He use answered it.  He said it

10 did not to his knowledge.

11          MR. McDONALD:  I just want to clarify.

12          THE COURT:  I want you to move on.  He

13 answered.  Let's go on.

14 Q   Let's go to the next sentence.  I think this is

15 basically repetitive of what we have already talked

16 about.  So we won't go through this one in detail.

17 Let's go to the next sentence after this.

18      You were also asked about this one regarding an

19 order list, right, Mr. Momyer?

20 A   Yes.

21 Q   Isn't it true that the TV/2 system as it existed

22 when Fisher started working with IBM had the

23 capability of generating a shopping list that could be

24 transferred to an order system?

25 A   I think we've gone through this.  I don't recall

1    that being a capability of the system.

2    Q    Well, could you refer to -- could we refer to the

3    brochure, PX 107?  I'll just ask you if this refreshes

4    your recollection, Mr. Momyer.  The third page of

5    Exhibit 107, that third paragraph.

6    A    DX?

7    Q    107.  Does reviewing that paragraph refresh your

8    recollection as to whether or not the IBM TV/2 system

9    had the capability of creating a shopping list?

10   A    This is the same document I said I did not see.

11   And the last time I recall seeing it -- the first I

12   recall seeing it was 2004 when we had the first case.

13   Q    I'm just asking if it refreshes your recollection.

14   If it doesn't, it doesn't.

15   A    No.

16   Q    Now, you were asked whether the patents mention

17   the RIMS system.  The patents involved in this suit,

18   the three alleged to be infringed here.  Do your three

19   patents-in-suit also mention the TV/2 system several

20   times?

21   A    I believe it does.

22   Q    But in addition to that, the TV/2 system was

23   specifically disclosed to the Patent Office as

24   publications and listed on the cover page of the

25   patent in addition to being listed in the patent

MOMYER - REDIRECT                  2158

1   itself, right?

2          MR. ROBERTSON:  Objection.  This was asked on

3   direct examination.

4          THE COURT:  Already been there and he didn't

5   go into it.  Exceeds the scope of cross.  Sustained.

6   BY MR. McDONALD:

7   Q   I think you were asked about the RIMS patent.

8   Could we turn to the RIMS patent, please, Plaintiff's

9   Exhibit 10?  If we could turn to column 37.

10  A   Column 37.  All right.

11  Q   There's that first table, No. 1, order header

12  information.  Do you see that?

13  A   Yes.

14  Q   I want to make sure I have the right chart here,

15  Mr. Momyer.  I want to just verify.  But you were

16  asked whether a particular table did or did not

17  include a reference to a vendor.  Do you recall that?

18  A   Yes.

19  Q   And that was in the RIMS patent, right?

20  A   Yes.

21  Q   Is this the right table that I've got here?

22  A   This is the one that we talked about, yes.

23          MR. McDONALD:  Could we back out to the full

24  page, column 37 and 38, and look at the table

25  immediately to the right of table 1, please.  And blow

MOMYER - REDIRECT                2159

1   that up.

2   Q   This is table 5 from the RIMS patent, right,

3   Mr. Momyer?

4   A   Yes, it is.

5   Q   Do you see about the 12th line down there, there's

6   a reference to vendor NVR colon and vendor name colon

7   next to that?

8           MR. ROBERTSON:  I object.  He's

9   mischaracterizing the table.  It's entitled

10  "Non-catalog information.  Can we --

11          MR. McDONALD:  I didn't misidentify anything.

12          THE COURT:  Well, he didn't ask about this,

13  about non-catalog information.  So what's that got to

14  with it?  What does it have to do with anything that

15  we're dealing with if we're asking about non-catalog

16  information?

17          MR. McDONALD:  This is part of the RIMS

18  system, Your Honor, that's in the cross reference

19  tables that we have been talking about.  That's what

20  this non-catalog information is for.  These

21  cross-reference tables.

22          MR. ROBERTSON:  I just asked about the

23  requisition header, Your Honor, table 1.  No questions

24  about this.  It has no relevance.

25          MR. McDONALD:  I think it was implied that

1    the RIMS system didn't track vendor names or numbers,

2    and I just wanted to clarify that.

3              THE COURT:   Overruled.

4    Q    Do you see that reference, Mr. Momyer, to vendor

5    NVR and vendor name in table 5 of the RIMS patent?

6    A    I do see that.

7    Q    And the NVR, that would refer to a vendor number,

8    correct?

9    A    What that was used for was --

10   Q    Is it for a number?

11   A    Yes.

12             THE COURT:   He was just answering what it was

13   used for.

14   A    What it's used for is the ability for dealing with

15   the product type 04s, which was, if you'll recall how

16   we talked about how that worked was, it was basically

17   some information that was sent up to the Fisher host

18   to basically print off a piece of paper for a customer

19   service person to enter an order into the Fisher

20   system to buy for the customer a product.

21   Q    So that order would be placed at the host end of

22   the system, right?

23   A    It would actually -- it would be placed manually.

24   Someone would actually key that information in.  That

25   particular piece of information would get passed up in

MOMYER - REDIRECT                    2161

1    the data block that RIMS would send up.  As it was

2    going through and building the order, it would create

3    for all that information, basically put that

4    information on a paper document, and would print it

5    off as a procurement area within Fisher, who would

6    then look at the piece of paper, and then proceed to

7    enter an order with the supplier that was requested.

8    Q    Did you consider that inventive to take that piece

9    of paper and simply load it onto a computer

10   electronically?

11   A    No.

12   Q    So this table 5 is called non-catalog information,

13   right?

14   A    Yes.

15   Q    And that relates to the information that's tracked

16   in those cross reference tables, right?

17   A    It can do a look-up on them, yes.

18   Q    If we go to table No. 17 on column 43 of the '989

19   patent --

20          MR. ROBERTSON:  I'm going the object now,

21   Your Honor.  This is far outside the scope.

22          MR. McDONALD:  This is just closing the loop

23   on the vendor numbers on the cross-reference table.

24          MR. ROBERTSON:  I didn't ask anything about

25   those tables with respect to that, Your Honor.

1          THE COURT:  Can I see the table?

2          MR. McDONALD:  The table is 17 in column 43.

3    Can you blow that up, please.

4          THE COURT:  Overruled.

5    BY MR. McDONALD:

6    Q   Do you have table 17 before you, Mr. Momyer?

7    A   Yes, I do.

8    Q   So this is the cross reference number list,

9    correct?

10   A   Yes.

11   Q   This does have columns for vendor number and

12   vendor, correct?

13   A   It has columns for vendor, the vendor ID, and the

14   vendor part number, yes.

15   Q   And so that's all in the RIMS system and the

16   tracking of the vendor number, right?

17   A   Once, again, the cross reference, it's back to a

18   specific Fisher part number, that's correct.

19         MR. McDONALD:  I have no further questions.

20         THE COURT:  Can he be excused permanently or

21   do you need him further?

22         MR. ROBERTSON:  He can be excused, Your

23   Honor.

24         THE COURT:  Mr. McDonald?

25         MR. McDONALD:  I'm done also, Your Honor.

MOMYER - REDIRECT                    2163

1            THE COURT:  Thank you very much for being

2    with us, Mr. Momyer.  You're welcome to remain and

3    watch or you can go.

4            THE WITNESS:  Thank you very much.

5              (The witness was excused from the witness

6    stand.)

7            THE COURT:  Who's next?

8            MR. McDONALD:  We'll call Mr. Kinross next,

9    Your Honor.

10           THE COURT:  Where is Mr. Kinross?

11           MR. ROBERTSON:  He's making his way from the

12   witness room right now.

13           THE COURT:  All right.

14

15      ROBERT KINROSS, called by the Defendant, first

16   being duly sworn, testified as follows:

17

18      DIRECT EXAMINATION

19   BY MR. McDONALD:

20   Q   Would you state your full name, please?

21   A   Robert Kinross.

22   Q   And you've already testified once here, right,

23   Mr. Kinross?

24   A   Yes.

25   Q   I'd like to start by talking to you about two

1    documents that relate to the Technical Viewer/2

2    system.  The first one is Defendant's Exhibit 105.

3    Can we put that up on the screen.

4        It's IBM Technical Viewer/2 General Information

5    Manual.  This is a document that you obtained before

6    Fisher developed the system that resulted in the

7    filing for the patents involved in this, suit correct?

8            MR. ROBERTSON:  I apologize, but the book you

9    have handed me --

10           THE COURT:  It would be in No. 1.

11           MR. ROBERTSON:  It's not in this document.

12           THE COURT:  Defendant's Exhibit 105.  It's in

13   the first volume.

14           MR. ROBERTSON:  I have one now, Your Honor.

15   Thank you.

16   BY MR. McDONALD:

17   Q   So, Mr. Kinross, let me start over again with

18   Exhibit 105.  This is an IBM Technical Viewer/2

19   General Information Manual, correct?

20   A   Correct.

21   Q   Is that a document that you obtained before Fisher

22   developed the system that it filed these patents on

23   that are involved in this case?

24   A   Yes.

25   Q   And IBM gave you a copy of that document at the

1   beginning, right?

2   A    I can't tell you exactly when I received this.   I

3   do know that I had it in my possession during the

4   development of the system.

5   Q    So it's fair to say you got it before the system

6   was actually developed, right?

7   A    No, I don't recall that being the case.

8   Q    Do you have a binder of depositions up there or

9   actually I think it's Volume I.   There's a big book

10   there with all the deposition transcripts.

11          THE COURT:   The only ones that are in my

12   notebook are Momyer.   Is it in Volume II?   It's not in

13   these documents.

14          MR. McDONALD:   I'm sorry, Your Honor.   You're

15   right about that.   I have a volume of transcripts

16   here.   At this moment I don't have the multiple copies

17   of it.   Can I just show him the one copy I have right

18   now or do you want me to move on?

19          THE COURT:   Mr. Langford, I think he wants to

20   hand up his copy.

21   BY MR. McDONALD:

22   Q    Let me get to the right page.

23       Mr. Kinross, you have been handed a copy of your

24   December 2, 2009 deposition transcript opened up to

25   page 119.   You do remember giving the deposition under

1    oath in this case in December of '09, right?

2    A    Yes.

3    Q    Can you direct your attention there to between

4    lines 12 and 17 where you were shown an exhibit called

5    the IBM Technical Viewer General Information Manual?

6    A    Yes.

7    Q    Do you see there after the reference to the

8    copyright 1991 date, you're asked if you'd continue to

9    page 120 at line 3.  "Was this a document that you

10   obtained before you developed the system that you

11   filed the patents on?"  And your answer was, "Yes,"

12   right?

13   A    That's correct.

14   Q    Let's turn now to the --

15           THE COURT:  Mr. McDonald, he said he got it

16   during the development of the system and before it was

17   developed.  So why is that impeaching?

18           MR. McDONALD:  I thought he said he got it

19   during the development and not before.

20           THE COURT:  He did.  But during presupposes

21   that there is a continuum of it.  That kind of stuff

22   doesn't help out a whole lot.

23   BY MR. McDONALD:

24   Q    Let's turn to Exhibit 107, the Technical Viewer/2

25   brochure.  Is it your understanding that this brochure

KINROSS - DIRECT                    2167

1    predated the invention that you filed your patents on

2    for this case?  Do you have Exhibit 107 before you?

3                THE COURT:  It's in one of those big books

4    there.  It's the one labeled -- what volume, is it?

5    It's Volume No. 1, and it's about the third or fourth

6    thing in.  Do you see it?  It has a tab on it that

7    says DX 107.

8                MR. LANGFORD:  He's got it.

9    A    This is the one that does not have a date,

10   correct?

11   Q    Correct.  But you agree, don't you, that that

12   brochure, that description of the IBM Technical

13   Viewer/2 product predated your invention that you

14   filed patents for?

15   A    I can't say yes or no to that.  I don't know when

16   this document was created.

17   Q    You still have, I believe, your December 2009

18   deposition before you, correct?

19   A    Yes.

20   Q    Can you turn to page 106?  Actually, I guess it

21   would start at the bottom of 105 at line 25.  Turn to

22   page 105 first?

23   A    All right.

24   Q    Do you see there there's a reference to the

25   exhibit that's an IBM publication about Technical

1 Viewer/2, and then the question at the bottom of page

2 105 beginning at line 25, "Is it your understanding

3 that Exhibit 8 of the description of this IBM

4 Technical Viewer/2 product that predated your

5 invention that you filed patents for?"  You answered

6 "Yes."  Right?

7 A   Well --

8          MR. ROBERTSON:  Your Honor, may I just

9 object?  Because there's another question in which the

10 witness clarifies his answer right then and there, I

11 think.

12          THE COURT:  Read it.

13 A   These documents --

14          THE COURT:  Read it, Mr. McDonald.

15          MR. McDONALD:  I don't have it right in front

16 of me, but the witness can read it.

17          THE COURT:  Can you read what follows, the

18 next thing it says, please, sir?

19          THE WITNESS:  Yeah.  "Had you seen this

20 brochure before you actually developed your

21 invention?"

22          "Answer:  I can't recall the exact time I saw

23 this brochure."

24          "Did you see it sometime before you filed

25 your patent?"

1          "I would say yes."

2          Do you want me to go on?

3    Q    I think that's enough.

4    A    That's what I recall.

5    Q    Now, is it true, Mr. Kinross, that at least

6    initially in IBM's work with Fisher on this project

7    leading to the patents in this suit, that IBM worked

8    from a paper catalog of Fisher?

9    A    My understanding of that is they had access to the

10   Fisher paper catalog as did hundreds of thousands of

11   other people in the United States.  We distributed

12   that freely to customers.  When we first met with IBM,

13   they had taken the first four pages of that catalog,

14   paper catalog, and re-created that in technical viewer

15   to show us how a search would operate on catalog

16   content.

17   Q    So this was just kind of a pilot demo just with

18   four pages?

19   A    Yes.

20   Q    But the four pages, was there an effort to

21   reproduce the pages just like they were in a those

22   four pages of the Fisher paper catalog; is that right?

23   A    Not exactly, no.  The pages in the Fisher paper

24   catalog had X number of products on them, each of

25   which became what technical viewer termed a topic.

1       So, for example, if a laboratory suit was depicted

2   and had a description about a Tyvek laboratory suit,

3   and a product number and a price in the catalog.  That

4   would become one entity in Technical Viewer.

5   Q   So that one entity in Technical Viewer would

6   reproduce the information from that one product

7   description in the paper catalog?

8   A   Yes, but it wouldn't be the page.  This was a

9   subset of the page.

10  Q   This was for demo purposes, they were just doing

11  certain ones of the products on the page; is that

12  right?

13  A   Could you state that again?

14  Q   This was for demonstration purposes, this first

15  one with just the four pages.  So they were just

16  picking some specific items that they were re-creating

17  to show you their product could work the way you

18  wanted to, right?

19  A   They I think picked those pages to show how

20  Technical Viewer could display information on a screen

21  rather than a printed page.

22  Q   Was the ultimate goal at the end of the project,

23  though, that the Technical Viewer/2 system could

24  re-create the entirety of the pages of the Fisher

25  catalog in the system?

KINROSS - DIRECT                    2171

1   A    No.  Well, you need to define entirety of the

2   page.

3   Q    I guess the entirety of the product descriptions

4   and drawings or pictures.

5   A    Yes.

6   Q    Okay.  And at some point in the process -- well

7   let's, back up a moment.  Fisher had worked with a

8   company called SteBo.  Did I pronounce that right?

9   A    That's correct, yes.

10  Q    SteBo created an electronic version of the Fisher

11  paper catalog; is that right?

12  A    It was an electronic format that the paper catalog

13  was used to provide the publisher information to

14  print.  So it was it an electronic catalog?  Probably

15  not, but it was an electronic form of the catalog that

16  the publisher's system could understand so that it

17  could format pages.

18  Q    Was SteBo the publisher or did somebody else

19  actually publish the paper version?

20  A    Someone else.  Donnelly was the Publisher.

21  Q    SteBo would provide Donnelly then with an

22  electronically formatted file; is that right?

23  A    Yes.

24  Q    An Donnelly would receive that file and generate

25  the paper catalogs from that electronic file?

1   A    Yes.

2   Q    So what SteBo did represented completely what the

3   paper catalog looked like, right?

4   A    Well, for the most part, yes.  There were sections

5   of the catalog that SteBo did not do, and we had a

6   creative services division of Fisher that was

7   responsible for producing the paper catalog, and they

8   would use other software to create certain other

9   pages.  And then they would just give them to the

10  Donnelly publisher for publication.  So they didn't

11  have a complete catalog, but they had the majority of

12  it.

13  Q    They had many tens of thousands of pages of a

14  catalog; is that correct?

15  A    No, the catalog was 2000 pages total.

16  Q    So SteBo had the vast majority of those 2000

17  pages?

18  A    Probably 90 percent or more, yes.

19  Q    At some point when Fisher was working with IBM,

20  did Fisher send that SteBo electronic file to IBM to

21  work with?

22  A    Yes.

23  Q    Did IBM take that electronic file that

24  corresponded to the paper catalog and load that into

25  the TV/2 system?

KINROSS - DIRECT                    2173

1    A    Yes.   It didn't go as smoothly as you're

2    portraying it, though.   There was other work to be

3    done.

4    Q    Okay.   There were some step perhaps in changing

5    the markup language or kind of translating the

6    electronic files, right?

7    A    Right.   The images were a different matter.   Also

8    the SteBo electronic text did not include the images.

9    Q    So how did IBM get the images?

10   A    I provided the images to IBM.

11   Q    In what form did you provide them?

12   A    They were called bit maps.   BMP files.   Each file

13   had a picture of the item, and then from the picture

14   we also created a smaller version called a thumbnail,

15   so that it would provide a more rapid response to the

16   end user by just displaying a thumbnail.

17        You see this all the time now with like Google

18   images.   You just see a little thumbnail encapsulation

19   of the image.   And if you click on it, you get the

20   entire image brought up.

21   Q    Did IBM create the thumbnails?

22   A    No, I did.

23   Q    In that process of IBM taking that information

24   then and loading it into the TV/2, that took some

25   time?

KINROSS - DIRECT                    2174

1   A    Yes.

2   Q    That's because they had to translate the files

3   into a format that the TV/2 system understood them in,

4   correct?

5   A    Which files are we talking about?  The images,

6   they didn't have to do anything to the images.

7   Q    So that answers that.  How about for the text

8   file?

9   A    For the text files, the conversion process wasn't

10  100 percent compatible depending on the accuracy of

11  your conversion program.  So things either fell out of

12  the text because of programming lapses or the tables

13  were of particular importance in converting because

14  both the SteBo text and the IBM markup language

15  described how the data should look, not what it

16  actually is.

17      So in writing a program to work with data like

18  that, it would be much better if you knew what the

19  data was rather than how it looked.  So they were

20  going on the basis of trying to interpret how the data

21  looked to come up with the conversion process, which

22  in the instance of tables because you have different

23  column headings and split headings, it became a fairly

24  complex programming task to sort those issues out and

25  create identical markup from SteBo to Technical

1    Viewer.

2    Q    Did IBM do that through that process that you just

3    described?

4    A    Did they do it?  They tried to do it.  I don't

5    think they were completely successful.

6    Q    It was their job as part of the project, though,

7    to do that conversion?

8    A    Yes.  And what their programs couldn't do, they do

9    manually.

10   Q    So one way or the other they got it into their

11   system?

12   A    Yes.

13   Q    Ands that's part of what Fisher paid them for,

14   correct?

15   A    Right.

16   Q    And that IBM system as it existed when Fisher

17   first started working with IBM, it did have the

18   ability to do keyword searches, right?

19   A    Correct.

20   Q    It had the ability to search a document, a

21   complete document, or a list of selected topics,

22   right?

23   A    I don't think the list of selected topics was part

24   of it.

25   Q    Could you turn to Defendant's Exhibit 105, please,

KINROSS - DIRECT                    2176

1    to the seventh page of the document, please?

2    A    All right.   These aren't numbered the same way.

3    Q    The lower corner --

4    A    Mine is numbered 230.

5    Q    Do you have an IBM Technical Viewer/2 Manual?

6    A    Yeah, it's numbered DX 230 in my book.

7    Q    Just turn to the seventh page of that document

8    where it has the heading features of IBM Technical

9    Viewer/2 just down seven pages.

10             THE COURT:   The even numbered pages are

11   missing out of my copy.   What are you on?   Seven?   I

12   have seven, but I don't have the even numbered pages.

13             MR. McDONALD:   This is Exhibit DX 105.   You

14   say you're missing some pages, Your Honor?

15             THE COURT:   Mine goes from 3 to 5 to 7 to 9.

16             MR. McDONALD:   Okay.   This is actually the

17   document that's filed with the Patent Office.   It had

18   missing pages from the document.   I think there's

19   another version of it.

20   BY MR. McDONALD:

21   Q    Exhibit 230 is the complete version.   Do you have

22   that, Mr. Kinross?

23   A    Yes.

24   Q    So let's turn to the page --

25             THE COURT:   What volume is 230 in?

1    MR. McDONALD:  It should be in the same

2    volume as 107.

3    Q   Mr. Kinross, have you seen that version that we

4    were first looking at there that was actually missing

5    some of the pages of this technical bulletin?

6              THE COURT:  Do you have a document called 230

7    over there?

8              THE WITNESS:  Yes, I do.

9              MR. McDONALD:  You don't have 230?

10             THE WITNESS:  I very 230.

11             THE COURT:  Well, it's more important you

12   have it than I have it.

13             THE WITNESS:  It has blank pages in it.  Page

14   18 is completely blank.

15             THE COURT:  He doesn't have a complete copy.

16             MR. McDONALD:  I think he said he just has

17   some blank pages because it has both sides copied and

18   includes some of those missing pages from the other

19   one.

20   BY MR. McDONALD:

21   Q   If you could turn to the 12th page of that

22   document, Mr. Kinross.

23   A   Page 12 is just the IBM Technical Viewer general

24   information cover.

25   Q   What's the number in the lower right corner on

1   page 1 of the document?

2   A    The lower right, G0000012.

3   Q    Can you turn to G23, please?  Now, if we blow up

4   the search capability here, about the third one down.

5   A    Yes.

6   Q    This is the 1991 IBM document, right, Mr. Kinross?

7   Do you see that in the lower left part of that same

8   page?

9   A    Yes.

10  Q    So we have now blown up this search function here

11  where it talks about "A search facility that can

12  locate every occurrence of a word or phrase in either

13  the current topic, a list of selected topics, the

14  complete document, or another document."  Do you see

15  that sentence?

16  A    Yes.

17  Q    Now, isn't it true that the IBM Technical Viewer/2

18  product had that search facility as described there

19  before Fisher started working with IBM?

20  A    I can't say I saw a list of selected topics in the

21  Technical Viewer search program that I looked at

22  initially.

23  Q    Were you looking for that ability to search

24  selected topics initially?

25  A    Yes.

KINROSS - DIRECT                2179

1    Q    What did you actually see?

2    A    Well, when you brought Technical Viewer up, it

3    would have the content that could be searched.  If you

4    did a search, it would search that content.

5    Q    Did it give you a menu of things you could search

6    through such as part catalogs or other types of

7    documents?

8    A    No.

9    Q    Did you ever see a demo of the Volvo parts system?

10   A    No, I didn't.  There are other things in this

11   manual that in my opinion did not exist in the product

12   as well.

13   Q    If we go farther down in the same page, do you see

14   near the bottom of the page it talks about Windows?

15   A    Yes, sir.

16   Q    That's a graphic user interface, correct, as used

17   there?

18   A    Right.

19   Q    Did the IBM Technical Viewer/2 as you first saw it

20   have that Windows graphical user interface?

21   A    Well, Windows to me is the windows we all know

22   from Microsoft which IBM also had as its OS/2 version.

23   So a Window would -- my definition of this is just a

24   portion of the screen that can be manipulated,

25   resized, just like Windows is today.

KINROSS - DIRECT                    2180

1   Q    You'd consider that a graphical user interface,

2   right?

3   A    Yes.

4   Q    Isn't true that the TV/2 system could search

5   either data on a CD ROM or data saved on the hard

6   drive of the TV/2 computer system?

7   A    Yes.

8   Q    That was before Fisher started working with IBM

9   that the TV/2 had that capability, right?

10  A    It was just a matter of where the data was placed.

11  Q    So you're agreeing with me that it had that

12  capability?

13  A    Yes, I'm agreeing with you.

14  Q    It's IBM that actually programmed the search

15  engine capability for TV/2, not anybody from Fisher,

16  right?

17  A    Yes, IBM programmed the search in Technical

18  Viewer, right.

19          THE COURT:  How much longer do you with the

20  witness, Mr. McDonald?

21          MR. McDONALD:  I'd say maybe about a half

22  hour, Your Honor.

23          THE COURT:  I think this is a good place to

24  break for lunch.

25          They're going out today.

KINROSS - DIRECT          2181

1          THE CLERK:  They are going to go downstairs.

2          THE COURT:  Just leave your notebooks with

3   Mr. Neal.  He'll watch them for you.

4          (The jury is exiting the courtroom.)

5          THE COURT:  When is Mr. Gounaris due up?

6          MR. McDONALD:  After Mr. Kinross.

7          THE COURT:  Be ready to argue this motion

8   then when we come back from lunch.

9          All right.  We'll be in recess for one hour.

10          (Luncheon recess taken.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25