1          THE COURT:  Sorry, ladies and gentlemen.  I think we

2    had meaningful progress, but we entrenched on your time, and I

3    apologize for that.  All right, the next witness.

4          MR. ROBERTSON:  Your Honor, I do have a motion to

5    make.  Do you want to do it at sidebar just very briefly and

6    put it on the record and then address it at a later time?

7          THE COURT:  All right.

8

9          (Sidebar discussion as follows:)

10

11          MR. ROBERTSON:  ePlus would be making a motion

12   pursuant to Rule 50 for judgment as a matter of law on

13   infringement now that the defendant has concluded its

14   non-infringement case, and we think that it should be granted.

15   A reasonable jury would have not -- would not have a legally

16   sufficient evidentiary basis to find for the party Lawson on

17   this issue.

18          Obviously there's a detailed argument I'd like to

19   make and a brief we're going to submit, but I understand from

20   your law clerk you want wanted us to do it at another time.

21          THE COURT:  Yes, I'll hear you later on all of that.

22          MS. HUGHEY:  Lawson opposes the motion.

23          THE COURT:  I figured.

24          MR. ROBERTSON:  Thank you, Your Honor.

25

```
 1              (End of side discussion.)

 2

 3              THE COURT:  All right, next witness.

 4              MR. SCHULTZ:  Lawson calls Preston Staats.

 5

 6                      PRESTON STAATS,

 7    a witness, called by the defendant, having been first duly

 8    sworn, testified as follows:

 9                        DIRECT EXAMINATION

10    BY MR. SCHULTZ:

11    Q    Good afternoon.

12    A    Good afternoon.

13    Q    What is your name?

14    A    Pardon me?

15    Q    What is your name?

16    A    My name is Preston Staats.

17    Q    How do you spell your last name?

18    A    S-t-a-a-t-s.

19    Q    Where do you live?

20    A    Austin, Texas.

21    Q    Let's talk about your education a little bit.  What did

22    you do after high school?

23    A    I attended Rice University and majored in electrical

24    engineering.

25    Q    When did you graduate?
```

1    A    I graduated from Rice in 1965.

2    Q    After you graduated from Rice, what did you do?

3    A    I was in the United States Nuclear Submarine Service for

4    six and a half years.

5    Q    What did you do while you were in the Navy?

6    A    First I went through a year and a half of training at

7    nuclear power training submarine school.  Then I served on

8    nuclear powered submarines based out of Charleston, South

9    Carolina, and Rota, Spain, and then I was a training officer

10   training people like myself at the land-based nuclear

11   prototypes and navy head in Idaho Falls, Idaho.

12   Q    What did you do after the Navy?

13   A    I returned to Rice University, and I obtained my doctorate

14   in electrical engineering, and after that I went to work as a

15   consulting engineer.

16   Q    Where were you a consulting engineer?

17   A    I was a consulting engineer based out of the Washington,

18   D.C. area working primarily for utilities with nuclear power

19   plants.

20   Q    What company did you work for?

21   A    The company's name was MPR Associates.

22   Q    What did you do after working for MPR Associates?

23   A    While at MPR Associates, my brother, Glen, came and talked

24   to me about starting a computer software company, and it

25   sounded like an opportunity.  So I left MPR, and my brother and

1    I started a company called Cooperative Computing, Inc., based

2    out of Austin, Texas.

3    Q    What was the business of Cooperative Computing, Inc.?

4    A    We wrote software and obtained hardware, bundled the two

5    products, the hardware and the software together and sold it

6    primarily to people who were in the business of selling

7    automotive parts.

8    Q    Let's get a little bit of a time reference when this is

9    occurring.  When did you start Cooperative Computing, Inc.?

10   A    We started in 1977.

11   Q    What were your products in 1977?

12   A    In 1977, we had a product called ADIS.  It stood for

13   automotive distributor information system, and it was a system

14   for operating wholesale, the business of a wholesale

15   distributor of auto parts, inventory control, purchasing,

16   accounts receivable, just everything that was necessary to run

17   the business of wholesaling and selling automotive parts.

18   Q    Did you have any other software packages at Cooperative

19   Computing?

20   A    We had some other software packages initially that we were

21   going to provide to other industries like hardware industry,

22   electrical distribution, but pretty early on we found that our

23   true expertise was in automotive parts, and we focused in auto

24   parts exclusively after the first, maybe year, year and a half,

25   something like that.

1    Q    In the auto parts industry, did you come up with any other

2    programs or systems?

3    A    Yes, we did.  Automotive parts in the United States are

4    basically manufactured by somebody, sold to a wholesale

5    distributor who then sells them to an automotive parts store,

6    an auto parts store like most of us would be familiar with

7    around your hometown, and then they're sold either to people

8    who want to work on their car or people who repair cars.

9         We started out with a system for the wholesale

10   distributors of auto parts.  In 1982, we came out with a

11   property called J-CON.  It stood for the Jobber Connection.

12   Jobber was the industry term that they used for automotive

13   parts stores, and so it was essentially an electronic sourcing

14   system for automotive parts.  It was the next step in the

15   distribution chain for auto parts.

16   Q    That was 1982, you said?

17   A    1982.

18   Q    Did the company update the J-CON or the Jobber Connection

19   system over time?

20   A    Yes, we did.  Our philosophy on software development for

21   our customers was that we always had just one software for

22   J-CON at a time, and as we added features, we just added

23   features to the existing system, and then we would provide that

24   to our customers.  So at any given time, all of the customers

25   were running the same set of J-CON software.

1   Q     Let's focus on 1982.  What was the functionality of the

2   system in 1982?

3   A     In 1982, it basically was an inventory control system.  It

4   let you build requisitions to supply parts to people who needed

5   them to repair cars.  It let you do all of the other ancillary

6   functions necessary like purchasing to replace parts, make

7   decisions about what parts to continue to provide, or to decide

8   to provide for your customers, because as we all know, every

9   year the auto makers bring out new cars.  Sometimes they have

10  the same parts as the year before.  Sometimes they don't.  And

11  so there was a constant in flow of new parts into the system

12  and just all the other things that are necessary to run a

13  business, sales history, accounts receivable, accounts payable,

14  et cetera.

15  Q     Did there come a time when you had another upgrade to the

16  J-CON system?

17  A     Well, we upgraded the J-CON system frequently because,

18  like any industry, business practices are constantly changing,

19  but the next really significant change in our software was we

20  introduced a product that we called Part-Finder.  This was in

21  1988.

22        In the automotive parts business, if you've ever been into

23  an auto parts store, especially in those days, you would see

24  feet upon feet of catalogs of auto parts, and the purpose of

25  these was so that when a person needed to repair a car, they

1    could figure out which part actually applied to that particular

2    car.  For example, a water pump that fits a 1988 Buick LaSabre

3    wouldn't necessarily work on a Chevrolet Camaro.  So it's very

4    important to decide -- determine, rather, which part that was

5    actually the right part or parts for that car.

6         Looking through those feet and feet of catalogs --

7              MR. ROBERTSON:  Your Honor, I'm going to object.  The

8    question was very specific, and now we've got quite a narrative

9    here.  The Court has had a ruling on the scope of this, and I

10   would appreciate it if we can just have question and answer.

11             THE COURT:  Mr. Schultz, that's enough.  Remember

12   what I've said about asking the question.

13             How about if you would sir, Mr. Staats, just listen

14   to the question and answer just the question.  If he wants any

15   follow-up, he can do it.  It's particularly important, Mr.

16   Schultz, given earlier rulings; okay?

17             MR. SCHULTZ:  Yes, Your Honor.

18   Q    Dr. Staats, you were just talking about the parts catalogs

19   that were in the auto parts store.  Did the J-CON system and

20   did you do anything to integrate that product information into

21   the J-CON system?

22   A    Yes.  We took those paper catalogs, and we put -- and we

23   computerized those paper catalogs and integrated them with the

24   J-CON system so that the J-CON system now had electronic auto

25   parts catalogs as part of its product offering.

1  Q     What type of media did you place that electronic catalog

2  on?

3  A     Well, we -- we computerized the catalogs in Austin, Texas,

4  and then we initially put the data on magnetic tape that we

5  would ship a unique tape to each customer representing the

6  paper catalogs that he wanted to put on his computer.  Then he

7  would load the tape onto his hard drive of his computer.

8       The second part of that would be over time when compact

9  disks became readily available, we started distributing the

10  product on compact disks, CDs.

11  Q     When did you start using compact disks or CDs?

12            MR. ROBERTSON:  Objection, Your Honor.  Given the

13  prior ruling, when is not really relevant to what we need to

14  pursue here, I think, given the scope of this gentleman's

15  testimony.

16            MR. SCHULTZ:  Your Honor, it is relevant.  We're

17  talking about six paragraphs here that we're dealing with, and

18  the when of when the system was actually in operation is

19  completely relevant.

20            MR. ROBERTSON:  If he can give us a precise date,

21  then we can move on.  I'll withdraw the objection.

22            THE COURT:  Just do the examination with a little

23  leading.

24  Q     Mr. Staats, did you have the CDs -- were they in use by

25  1993?

1   A    Absolutely.  Well before that.

2   Q    Did the J-CON system have a database that included the

3   vendor's inventory information?

4   A    Yes.  The J-CON system had a number of databases.  It had

5   the parts database.  It had customer database, a variety of --

6            THE COURT:  The only question on the table, Mr.

7   Staats, is did it have a database that included one thing.  So

8   the answer to that is yes, it did.

9            THE WITNESS:  Yes, it did.

10  Q    Did the database have vendors' inventory information?

11  A    Yes.

12  Q    Did it have the availability of the inventory of a vendor?

13  A    Yes.

14           MR. ROBERTSON:  Can we have a time reference, Your

15  Honor?

16           THE WITNESS:  It had that information -- I'm sorry.

17  Q    Dr. Staats, with respect to the vendor information in the

18  database associated with that, when did the J-CON system first

19  have a database that had vendor inventory information

20  associated with it?

21  A    1982.

22  Q    Did the J-CON system have the vendor inventory information

23  from 1982 forward?

24  A    Yes.

25  Q    Did that database have the availability of inventory from

1    a particular vendor?

2    A    Yes.

3    Q    From what point on?

4    A    1982.

5    Q    Did that database have the ability to search multiple

6    vendors?

7    A    Yes, it did.

8    Q    From what point?

9    A    1982.

10   Q    How did the system inquire as to the inventory?

11        MR. ROBERTSON:   What system?

12   Q    How did the J-CON system inquire as to inventory?

13        MR. ROBERTSON:   What reference point in time?

14   Q    From 1982?

15   A    A person would type a command on the keyboard at a

16   computer terminal inquiring the information, and it would just

17   display it on the computer terminal.

18   Q    Did the J-CON system at some point in time, and I'd like

19   to ask you when this was, have the comparison shopping feature?

20   A    Yes, it did.

21   Q    As of what date?

22   A    1992.

23   Q    What was the comparison shopping feature as of 1992?

24   A    I'm sorry.  I was incorrect.  I was thinking of a later

25   product.  1988 is when we introduced Part-Finder, and that had

2386

1    comparison shopping feature in it.

2    Q    How did the 1988 Part-Finder do comparison shopping?

3    A    You would enter on the computer terminal the type of part

4    that you were looking for; for example, an ignition part or a

5    brake part or belts and hoses or rubber products.  You would

6    then be asked if it was appropriate -- well, then you would

7    tell it what car you were looking for and what year.

8         If it was appropriate for the type of part, it would ask

9    you for the model -- the engine that that car had, and then it

10   would display on the screen all of the parts in the electronic

11   catalog from all of the manufacturers that were in that catalog

12   that fit that application.  Then you could choose among those

13   that were displayed on the screen for which ones you actually

14   wanted to deal with further.

15   Q    So a user could actually choose between one vendor or

16   another?

17   A    Yes, absolutely.

18   Q    And that was in 1988?

19   A    Yes.

20   Q    You mentioned that there was a 1992 product.  What was

21   that?

22   A    I was thinking you were referring to the cross-reference

23   product that we brought out in '92 which we called Interchange.

24   Q    So the J-CON system, as of 1992, had a cross-reference

25   capability?

Staats - Direct

1    A    Yes, it did.

2    Q    What is Interchange?

3    A    Interchange was a product to address the problem of a

4    customer having a part that he needed to replace on a car, but

5    the auto parts store didn't have that exact, specific part.

6    Usually it would be the original part that came on the car when

7    it was manufactured.

8         It was necessary for the auto parts store to

9    cross-reference, or in our terminology, interchange the part

10   that fit the car that they didn't have to an equivalent,

11   functionally equivalent part that would do the same job on the

12   car that they did have, and the computer would show you all of

13   the parts that were available that were the exact functional

14   match with the part you started with.

15   Q    How did the computer know to cross-reference a particular

16   item?

17   A    Most frequently because you told the computer what part

18   you wanted to cross-reference.

19   Q    Could you search by a manufacturer and get a generic item

20   back on the cross-referenced item.

21        MR. ROBERTSON:  Your Honor, I think we're getting

22   beyond the scope of what was permitted for this testimony based

23   on the paragraphs that are at issue here.

24        MR. SCHULTZ:  Paragraph 247, Your Honor.

25        MR. ROBERTSON:  I don't see that statement there

1   based on the question you just asked.

2               MR. SCHULTZ:  States for example, a database --

3               MR. ROBERTSON:  Please don't read the question.

4               THE COURT:  Wait just a minute.  I gave my copy to

5   the court reporter, and the law clerk is going to go get it so

6   I can read it.  I don't see how that question relates to 247.

7               MR. SCHULTZ:  I'll rephrase it.

8               THE COURT:  Yeah, I don't think it does.

9   Q    Dr. Staats, did the J-CON system, as of 1988, have a

10  database which identifies cross-referenced items?

11  A    Yes, it did.

12  Q    What was that?

13  A    We referred to that as replaced parts and alternate parts.

14  Q    What did you mean by replaced parts?

15  A    What a replaced part referred to is over time, a

16  manufacturer might decide to provide a different part for a

17  specific application than the one they had been providing, say,

18  the year before.  The computer system would be told that, and

19  when the first part was attempted to be put on a requisition,

20  the computer would exchange the original part for the new part.

21       It had a similar feature where an auto parts store might

22  choose to carry more than one part that fit the same

23  application.  We called that alternate part, and when you told

24  the computer system to put a part number one on a requisition,

25  it would give you the option of selling the alternate part

1    instead, typically because it was, perhaps, a generic part, a

2    cheaper part, variety of reasons, but it would provide that

3    functionality.

4    Q    Did the J-CON system have the capability of conducting

5    searches of product catalogs for multiple vendors?

6    A    Yes, it did.

7    Q    When was that first available on the J-CON system?

8    A    Basically 1982.

9    Q    And how did that function in 1982 to conduct searches of

10   product catalogs from multiple vendors?

11   A    You would enter a part number that you wished to have

12   information about, and then it would search the database, and

13   it would look through all of the vendors' catalogs that you had

14   in your database.

15   Q    Were there any enhancements to the search capability over

16   the years?

17   A    Yes, there were.

18   Q    What year?

19   A    1988 was the next big enhancement.

20   Q    What happened in 1988 with respect to searching product

21   catalogs of multiple vendors?

22   A    That's when we came out with the Part-Finder product where

23   you could tell the computer system, I want to see all of the

24   parts for a particular car that fit a particular application,

25   and then it would search all of the vendor catalogs on the

1   computer and come up with the correct parts.

2   Q    Were there any further enhancements to the search

3   capability of the J-CON system?

4   A    Yes, in 1992, and we came out with our cross-reference or

5   Interchange product.  Would enter the part that you wanted to

6   cross-reference, and it would, again, search the database

7   across all of the relevant vendors or manufacturers and come up

8   with the proper parts that had the equivalent functionality.

9   Q    You mentioned a requisition before.  Did the J-CON system

10  have the capability of enabling the automation of necessary

11  approvals?

12          MR. ROBERTSON:  I didn't hear him mention the

13  requisition, Your Honor, so I'd object on that basis.

14          THE COURT:  I didn't hear him either.

15  Q    Dr. Staats, did the J-CON system have the capability of

16  the necessary approvals related to a requisition?

17  A    Yes, it did.

18  Q    When was that first available?

19  A    1982.

20          MR. ROBERTSON:  Objection, Your Honor.  No relevancy

21  to necessary approvals for requisitions in this case.

22          MR. SCHULTZ:  Your Honor, it refers to paragraph 245.

23          MR. ROBERTSON:  It doesn't matter if it refers to

24  paragraph 245.  It's completely irrelevant to the issues in

25  this case.

2391

1            MR. SCHULTZ:  It relates to the requisition process

2      and placing an order with the vendor.

3            THE COURT:  Let me tell you something.  You are

4      asking about a paragraph that I didn't approve that you could

5      ask about.  You were given approval for 242, 244, 246, and 247.

6      You didn't say you were going to do 245, so --

7            MR. SCHULTZ:  Your Honor, I did talk to Mr. Robertson

8      about this issue.

9            THE COURT:  You didn't talk to me.

10           MR. SCHULTZ:  Yes, Your Honor.

11           THE COURT:  So I don't know about what you are

12     talking about.

13           MR. ROBERTSON:  Well, he did represent it to me, Your

14     Honor.  I didn't agree to it.

15           MR. SCHULTZ:  He didn't disagree with it either.

16     Your Honor, paragraph 245 --

17           THE COURT:  Wait a minute.  We don't have agreement

18     by assent here.  I told you what you could do, and that was

19     242, 244, 246, and 247.  That's what you had asked for.  We had

20     a long hearing about it.  I'm not going to go back and revisit

21     it.  If you bring it up, you bring it up with me, not with him,

22     unless he agrees to it.  If he didn't agree to it -- did you

23     agree, Mr. Robertson?

24           MR. ROBERTSON:  I did not agree, sir.

25           THE COURT:  Move on.

1    Q    Did the J-CON system at sometime have a requisition

2    building module?

3    A    Yes, it did.

4    Q    At what date?

5    A    1982.

6    Q    What did the requisition building module do?

7    A    The requisition building module permitted you to put on

8    the requisition the various auto parts that were necessary or

9    desired to satisfy what a customer wanted to repair a car.

10   Q    Did that requisition module have the inclusion of catalog

11   items as entries in a requisition generated by the system?

12   A    Yes, it did.

13   Q    As of 1982?

14   A    It had catalog as of 1982, via paper catalogs.  Electronic

15   catalogs, via as of 1988.

16   Q    So in 1988, there was some revisions to the system?

17   A    Yes, there were.

18   Q    Regarding the requisition process?

19   A    Yes.

20   Q    What were those revisions?

21   A    The revision tied together electronically the

22   computerization of the paper catalogs in the requisition

23   process so when you used the electronic catalogs to select

24   parts that you wanted, it would automatically enter them onto

25   the computer requisition.

Staats - Direct                                                    2393

1   Q    After 1988, were there any additional revisions in the

2   J-CON system related to requisition building modules?

3   A    Yes.  In 1992, when we introduced the cross-reference or

4   Interchange module product, it worked the same way.  Once you

5   found the interchange information and had an option of

6   selecting which of the interchanged or referenced parts you

7   wanted, you would select that part, and it would automatically

8   put it on the requisition.

9   Q    Did your company do marketing of the J-CON system from

10  1982 on?

11           MR. ROBERTSON:  Objection, beyond the scope of the

12  Court's ruling.

13           MR. SCHULTZ:  Your Honor, it goes to the availability

14  of the system, and it specifically deals with the fact that one

15  of ordinary skill in the art would have known and would have

16  the capability of the system in the public.

17           THE COURT:  What?  What does that have to do with

18  what he's being allowed to testify about?

19           MR. SCHULTZ:  Because we're talking about the need of

20  this type of system in the public.

21           MR. ROBERTSON:  I'll stipulate everything he said so

22  far is prior to 1993.  Does that satisfy it?

23           MR. SCHULTZ:  No, it does not, Your Honor.  What

24  we're talking about here is the fact of whether or not there

25  was a need for the features we've just talked about in the

1  public.

2          THE COURT:  What does his marketing have to do with

3  that?

4          MR. SCHULTZ:  It goes to what features were needed in

5  the public.

6          MR. ROBERTSON:  That's not what this witness can

7  testify about.  That's apparently what another witness is going

8  to be testifying about.

9          MR. SCHULTZ:  It's the facts that underlie the

10  testimony of the other witness, Your Honor.  This witness has

11  the facts.

12          MR. ROBERTSON:  And the other witness has an opinion

13  based on the facts that this gentleman is providing.

14          THE COURT:  Where does the marketing --

15          MR. SCHULTZ:  Because it goes to whether there was a

16  need for the product at any time, and Dr. Staats can testify to

17  that.

18          THE COURT:  It goes to creating a need, not to

19  whether there was one.  You are talking about the existence?

20          MR. SCHULTZ:  Yes, Your Honor.

21          THE COURT:  Marginally relevant.  Let's get on and

22  stay with what I told you you could do.  I kind of am ready to

23  say if we don't stay where I told you you could stay, then

24  we're not going further.  Ask the question about the marketing.

25  Before 1993, did you market your J-CON products?

2395

1          THE WITNESS:  Yes, sir, we did.

2     Q    In what manner?

3     A    In two manners.  One is we had salesmen that directly

4     called upon auto parts stores and discussed our product with

5     them, and we also marketed it through the automotive wholesale

6     distributors, so in trying or encouraging them to provide this

7     system into their customer base, the auto parts stores.

8     Q    How many auto parts stores bought the J-CON system from

9     before 1994?

10         MR. ROBERTSON:  Objection, Your Honor.  I think we're

11    well beyond the scope of what was the prescribed testimony.

12         MR. SCHULTZ:  Your Honor, this is to satisfy the

13    foundational question for the next question dealing with did it

14    satisfy the need of the customers.

15         MR. ROBERTSON:  That is not within what this witness

16    was permitted to testify under the Court's rulings.  He

17    testified about certain functionality set forth in those

18    paragraphs, and that was it.  Now we're getting far afield.

19         MR. SCHULTZ:  It's in the first sentence of each of

20    those paragraphs dealing with there was a need to provide.

21         MR. ROBERTSON:  I don't understand what that has to

22    do with how many customers there were.

23         THE COURT:  That's the trouble I'm having.  I

24    understand the topic, but I don't understand how the number of

25    customers does that.

1              MR. SCHULTZ:  I'll ask a different question.

2     Q    Dr. Staats, for the customers you provided the J-CON

3     system to, did it satisfy their need of having electronic

4     catalogs?

5              MR. ROBERTSON:  Objection.  How can this witness

6     possibly --

7              THE COURT:  Sustained.

8              MR. SCHULTZ:  Dr. Staats, thank you for your time and

9     testifying here today.  I appreciate that.

10             THE WITNESS:  Thank you.

11             MR. SCHULTZ:  Nothing further.

12             THE COURT:  Dr. Staats, this gentleman has some

13    questions.

14             MR. ROBERTSON:  I'll try to be brief.

15             THE WITNESS:  I'm sorry.

16

17                       CROSS-EXAMINATION

18    BY MR. ROBERTSON:

19    Q    Good afternoon, Dr. Staats.

20    A    Good afternoon.

21    Q    We've met before; correct?

22    A    Yes, we have.

23    Q    You were, in fact, a paid witness for SAP in that case;

24    correct?

25    A    Correct.

Staats - Cross                                                    2397

1    Q    And you are also being paid by Lawson in your role as a

2    witness in this case; correct?

3    A    Correct.

4    Q    And I noticed you testified about a number of features

5    today that were in your J-CON system during some period between

6    1982 and 1993; correct?

7    A    Correct.

8    Q    But you didn't offer in any exhibits whatsoever to

9    corroborate the functionality that you ascribed from 1982 to

10   1983 for the jury to consider; isn't that right?

11   A    I don't know.  I mean, there's a J-CON manual that exists.

12   I don't know whether --

13   Q    Counsel didn't offer that today, did he?

14   A    Is that what this is?

15   Q    It may be.  I don't know.

16   A    Yes, it is.  He offered it to me right there.

17   Q    But he didn't put it into evidence as far as you could

18   tell; right?  Let me put it this way:  He didn't ask you a

19   single question about that document.

20            MR. SCHULTZ:  Your Honor, objection.

21            THE COURT:  Wait a minute.  One at a time so the

22   court reporter can hear and I can hear, and I don't know why

23   you need to ask the witness this.  It's obvious what happened

24   and what didn't happen.  Let's move on to something else.

25            MR. ROBERTSON:  I will do that.

1   Q    You didn't offer any sales invoices with respect to any

2   Part-Finder or inventory system or the Interchange software

3   products; right?

4   A    No, I did not offer any invoices, no.

5   Q    That's fine.  You used to license these different software

6   products, didn't you?

7   A    Absolutely.

8   Q    You licensed them separately; right?

9   A    Um --

10  Q    You could license them as separate products; is that

11  right?

12  A    Once you had bought a J-CON system, you had the choice of

13  licensing or not licensing these programs.  You had to have a

14  J-CON system in order to do that.

15  Q    But you could license some of the separate software

16  products you talked about like Interchange?

17  A    Specifically those two, yes, sir.

18  Q    And Part-Finder?

19  A    Yes.

20  Q    So you didn't have to license all these software products

21  together; isn't that right?

22  A    It was not necessary to run the J-CON system, no.

23  Q    And you didn't offer any licenses today to show that any

24  of these modules were ever sold as a package; correct?  Yes or

25  no, sir?  Can you answer that question fairly?

1    A    No.

2    Q    And you didn't do any demonstration of the system for the

3    jury today; right?

4    A    No, I did not.

5    Q    You didn't present any source code for any of these

6    systems, did you, sir?

7    A    No, I did not.

8              MR. ROBERTSON:  Thank you.  That's all I have.

9              THE COURT:  Just a minute.  He may have some more

10   questions.

11

12                      REDIRECT EXAMINATION

13   BY MR. SCHULTZ:

14   Q    Counsel asked you a question about corroboration.  You

15   mentioned the J-CON --

16             MR. ROBERTSON:  I didn't ask any question about

17   corroboration.  I asked a specific question of the witness as

18   to what he disclosed or didn't disclose and what he had or what

19   he didn't present.

20             THE COURT:  Actually I think you did ask a question

21   that contained the word corroboration, and you, Mr. Schultz,

22   objected to it, and I told him to move.  I believe that's

23   exactly what happened.  So there isn't any answer, and the

24   question wasn't pursued, so there's nothing on the record for

25   you to examine about.  Moving right along.  If you object -- I

1    mean, if you want to lay a trap, lay it.  You have to lay it,

2    and then you have to spring it, but if you lay it and then you

3    don't spring it, and you tell the bear to get away from the

4    trap, then the bear gets away and you don't spring the trap.

5    Let's go.  Move.

6    Q   Dr. Staats, did you rely on any information in presenting

7    your testimony today?

8              MR. ROBERTSON:  Objection, Your Honor.  I mean, it's

9    outside the scope of my direct.  I believe this witness

10   testified from his memory.

11             MR. SCHULTZ:  Mr. Robertson asked several questions

12   about what he relied on, did he do a demonstration, did he rely

13   on source code.  That's what I want to get to.

14             MR. ROBERTSON:  I didn't ask what he relied on.  I

15   asked what he presented.

16             THE COURT:  You didn't need to ask that because the

17   jury -- I think the jury, I counted nine of them, and every one

18   of them are paying attention, and they know what came in and

19   what didn't.

20             That's a good matter for argument, but we don't need

21   to get into it, and he didn't ask about what he relied on.  He

22   asked about what he provided, and that's different.  Sustained.

23   Outside the scope.

24   Q   Dr. Staats, did you provide testimony related to any

25   manual that you had?

1              MR. ROBERTSON:  Objection, Your Honor.  That's

2    outside the scope, too.

3              THE COURT:  He didn't do that.

4              MR. SCHULTZ:  Mr. Robertson insinuated that this

5    witness didn't rely on anything.  I'm trying to lay the

6    foundation that he did, in fact, rely on something.

7              THE COURT:  Mr. Schultz, insinuations are not

8    evidence in testimony, and that's not what happened.  So you

9    can make your argument whatever you want.

10             MR. SCHULTZ:  Your Honor --

11             THE WITNESS:  That's enough.

12             MR. SCHULTZ:  Your Honor, I respect your ruling.  I'd

13   like to make an offer of proof at this time.

14             THE COURT:  No.  You can make an offer of proof

15   later.

16             MR. SCHULTZ:  Okay.  Thank you, Your Honor.

17             THE COURT:  You can do it at the first recess.  Do

18   you have anything else?

19             MR. SCHULTZ:  No, Your Honor.

20             THE COURT:  Can he be excused?

21             MR. SCHULTZ:  He may, Your Honor.

22             THE COURT:  Can he be excused, Mr. Robertson?

23             MR. ROBERTSON:  Yes, Your Honor.

24             THE COURT:  All right, Mr. Staats, you can leave.

25   Thank you.

```
 1              MR. McDONALD:  We'd call Dr. Shamos back to the
 2    stand.
 3              THE COURT:  Wait a minute.  Mr. Staats, let me deal
 4    with this now.  Wait right here.  Come up here -- you're not
 5    going to be make a long offer of proof, are you, Mr. Schultz?
 6    Wait right there.  Come up and let me hear it.
 7
 8              (Discussion at sidebar as follows:)
 9
10              THE COURT:  What is your offer of proof?
11              MR. SCHULTZ:  The only thing with respect to the
12    offer of proof, Your Honor, is that Exhibit DX-96 is already a
13    trial exhibit.
14              THE COURT:  Yeah.
15              MR. SCHULTZ:  That's all that I wanted to say with
16    respect to the offer of proof.  Any insinuation from Mr.
17    Robertson that that's not a trial exhibit is inaccurate.
18    That's all I wanted to say.
19              THE COURT:  It's in evidence, isn't it?
20              MR. ROBERTSON:  Your Honor, correct me if I'm wrong,
21    sir, but I understand your ruling to be --
22              THE COURT:  I said if you didn't use it, it wasn't
23    going in the record.
24              MR. ROBERTSON:  That's what I understood.
25              THE COURT:  Any exhibit not used is not going in the
```

1    record.

2              MR. SCHULTZ:  I just want to clarify for the

3    record that --

4              THE COURT:  Did you understand that or did you not?

5              MR. SCHULTZ:  Your Honor, I'm not sure that that was

6    the understanding that we had, Your Honor.

7              THE COURT:  You can only speak to you.  Did you?

8              MR. SCHULTZ:  For me, I did not know that.

9              THE COURT:  Okay.  Then do you want to cure that

10   situation by offering that exhibit?

11             MR. SCHULTZ:  Yes, with respect to this witness.

12   Your Honor, with respect to this witness, had we been able to

13   get into the other areas, we would have offered DX-96.  So just

14   for the record --

15             THE COURT:  Into what other areas?

16             MR. SCHULTZ:  We were limited on the questioning of

17   Dr. Staats to the specific areas of the paragraphs discussed

18   prior to the recess.

19             THE COURT:  You all decided you were going to limit

20   it to that and not have him on the other topics.

21             MR. SCHULTZ:  That was based on the Court's --

22             THE COURT:  You withdrew all that evidence, so,

23   anyway, you say it would be pertinent to the matter, the other

24   matters that he can't testify about; is that what you're

25   saying?

```
 1              MR. SCHULTZ:  That's correct.
 2              THE COURT:  Well, I'll consider that later.  He
 3    doesn't need to stay here for that.
 4              MR. SCHULTZ:  All right.  Thank you.
 5              MR. ROBERTSON:  Thank you, Your Honor.
 6
 7              (End of sidebar discussion.)
 8
 9              THE COURT:  Thank you, sir.  You can leave.  I
10    apologize for pulling you back.  I figured I'd save you some
11    time.  All right, Dr. Shamos?
12              MR. McDONALD:  Yes.  We'll recall Dr. Shamos.
13              THE COURT:  Now, ladies and gentlemen, you heard from
14    Dr. Shamos earlier on the topic of infringement, and I've tried
15    to keep the evidence sort of compartmentalized, and pursuant my
16    instructions, they are presenting the evidence in a
17    compartmentalized way so you can fairly readily keep up with
18    it.
19              He's now going to testify on the topics of the
20    defenses of Lawson on invalidity of the patent, and that's why
21    he's coming back here, and the reason he's coming back this
22    way, it's being done this way is because I asked the lawyers to
23    do it this way.  I think it would be easier for you follow.
24              MR. McDONALD:  Thank you, Your Honor, and we've got
25    several volumes of exhibits that Dr. Shamos had referred to.
```

1    I'm going -- there's eight huge volumes.  I think we can do

2    this without having those eight volumes up by the witness or by

3    you.

4             ePlus has a copy.  I've got a bunch of copies of

5    those if we need them, but I'm going to see if we can make it

6    through without referring to those big volumes if that's all

7    right.

8             THE COURT:  A great environmentalist would appreciate

9    your --

10            MR. McDONALD:  We killed the trees.  They're all

11   laying over there.

12            THE COURT:  You already killed the trees?  Oh well.

13            MR. McDONALD:  Thank you.

14

15                   **MICHAEL I. SHAMOS,**

16   a witness, called by the defendant, having been previously

17   duly sworn, testified as follows:

18                   DIRECT EXAMINATION

19   BY MR. McDONALD:

20   Q    Dr. Shamos, I'd like to pick up where we left off.  Can

21   you state your full name for the record, please.

22   A    Yes.  Michael Ian, I-a-n, Shamos, S-h-a-m-o-s.

23   Q    So before, you talked about the non-infringement opinions

24   you gave in this case; right?

25   A    Yes.

1    Q    What are you here to talk about today?

2    A    Invalidity.

3    Q    Can you summarize what you looked at to evaluate the

4    invalidity issue?

5    A    Yes.

6    Q    When you do that, let's stick to the prior art related

7    invalidity issues; all right?

8    A    Yes.  Well, there were a number of references, prior art

9    references that were identified that I looked at, and I

10   compared those references with the asserted claims.

11   Q    When you say prior art references, what do you mean?

12   A    Well, the patent statute contains a list of things that,

13   if they occurred or were published before an invention was

14   made, then they're referred to as prior art, and they would

15   invalidate the invention.

16          MR. ROBERTSON:  Objection, Your Honor.  He's been

17   asked a legal opinion as to prior art.  There is a term in the

18   jurors' glossary that has to do with that, and I think we rely

19   on that and not go into Dr. Shamos's legal opinions.

20          THE COURT:  I agree.

21   Q    Let's try to get our bearings there.  So if you could keep

22   your answers short, Dr. Shamos, and we'll elicit more

23   information as we go along if we need more about it, all right?

24   Thank you.

25          So with respect to the prior art references that you

1   considered, can you tell me, was there a primary reference or

2   set of references that you looked at with respect to your

3   invalidity opinions in this case?

4   A    Yes.  The combination of the prior art RIMS system and an

5   IBM system called TV/2.

6              MR. McDONALD:  Could we put up slide number four,

7   please?

8   Q    Dr. Shamos, in connection with your testimony today, did

9   you prepare some slides again like you did before?

10  A    Yes.

11  Q    Is this one of the slides -- we may have gone through some

12  revisions here, but does this look like one of the slides that

13  you prepared?

14  A    It is.

15  Q    Now, you just told us what the main reason is that the

16  claims are invalid.  Can you walk us through one bullet point

17  at a time and tell me what you are trying to summarize here in

18  this slide?

19  A    Yes.  There's literature that was published by IBM that

20  describes TV/2.  It was published in 1991.  That literature

21  contains a prescription to combine TV/2 with a parts ordering

22  and inventory management system.  It says -- it basically says

23  that in the document.

24  Q    Can you remember which particular TV/2 literature that

25  was?

1    A    Well, I think there's a document that's variously been

2    called the brochure and the general information manual.  I

3    think it was in the brochure.

4    Q    What are you referring to in your second bullet point

5    here?

6    A    The second bullet point refers to the RIMS system that was

7    the subject of the '989 patent.  That was a parts ordering and

8    inventory management system.

9    Q    Now, was the -- is RIMS, is that one of the things you

10   called a prior art reference?

11   A    Yes.

12   Q    What is your third point there?

13   A    Well, the patents don't do any more than follow the

14   instructions in the TV/2 literature which is to combine a parts

15   ordering and inventory management system with TV/2.

16   Q    In the bullet point here, you have the word or the letters

17   RIMS, R-I-M-S, rather than parts ordering system; right?

18   A    Yes.

19   Q    Does the literature specifically say to combine the TV/2

20   system with the RIMS system, that brochure?

21   A    Well, the TV/2 -- no.  The brochure didn't mention RIMS by

22   name.  It said parts ordering and inventory management system.

23   Q    So why is it that you concluded from that that that taught

24   combining the TV/2 system specifically with the RIMS system?

25   A    Because of the second bullet point which is that RIMS is a

1    parts ordering and inventory management system.

2    Q    Can you explain to us what you meant by that last bullet

3    point on this?

4    A    Yes.  So once there is an expressed teaching or

5    prescription in the literature to do something, even if it's

6    never been done before, it's still obvious to do it because one

7    is taught to do it, and that's what the TV/2 literature said to

8    do, is take this wonderful product that we have at IBM, and you

9    can use it with a parts ordering and inventory management

10   system.

11   Q    As part of your analysis in this case with respect to the

12   invalidity issues, did you review the file histories of the

13   patents?

14   A    Yes, I did.

15   Q    Did that, those file histories include any information

16   regarding disclosures made to the Patent Office about prior

17   art?

18   A    Yes.

19   Q    In your review of the file histories, did you see anything

20   that showed that the RIMS system was disclosed to the Patent

21   Office as prior art to the patents involved in this case?

22         MR. ROBERTSON:  Objection, Your Honor.  That calls

23   for a legal conclusion.

24         MR. McDONALD:  It's either in the file or it's not.

25   It's not a legal conclusion whether it was disclosed.

1          THE COURT:  That is a different question.  Was the

2    existence of the patent disclosed -- for RIMS disclosed to the

3    Patent Office in the file history.

4          MR. McDONALD:  That wasn't my question.  My question

5    --

6          THE COURT:  That is the question.

7          MR. McDONALD:  -- disclosed as prior art to the

8    Patent Office.  That's what my question is.

9          MR. ROBERTSON:  Well, then, I think he'd be

10   testifying as a patent attorney, not as a -- I think he was

11   qualified as an expert in electronic commerce.

12         THE COURT:  I don't think -- I think he can testify

13   whether there was anything that was -- whether the file history

14   disclosed the existence of the RIMS or the TV/2 system.  What

15   was prior art, he can't give that opinion if you are asking

16   that question.  I think it's not proper.

17         If you want to ask him whether under the places where

18   it says prior art the RIMS patent was disclosed, you can ask

19   that, too, but that's a different question than the one you

20   just asked.

21   Q    Dr. Shamos, with respect to the portions of the file

22   histories of the patents in this case that specifically

23   identify prior art references, okay, can we talk about that for

24   a moment?

25   A    Yes.

1   Q    Was there any literature regarding the RIMS system that
2   was disclosed and identified as prior art?
3   A    No.
4   Q    Was there any literature disclosing the TV/2 system as
5   prior art?
6   A    Yes.
7   Q    And if we go to the Plaintiff's Exhibit 1, please, the
8   '683 patent, and to the first page under other publications,
9   the top third of the page there, do you see that blown up on
10  the screen right now, Dr. Shamos?
11  A    Yes.
12  Q    Now, did you actually see in the file histories
13  specifically of this patent, the '683 patent, a list that
14  specifically identified the two IBM Technical Viewer/2
15  documents listed here as prior art?
16  A    Yes.
17  Q    This list, at least this part of it shown up on the
18  screen, doesn't have any reference to the RIMS system; right?
19  A    No.
20  Q    Did you review the list of publications disclosed on all
21  three of the patents-in-suit as part of your analysis?
22  A    Yes.
23  Q    Did you see any references at all in those three lists for
24  the three patents-in-suit to any literature regarding the RIMS
25  system?

1    A    No.

2    Q    Did you, as part of your analysis in this case, look in

3    general at the landscape regarding electronic sourcing systems

4    in existence in the early 1990s?

5    A    Yes.

6    Q    Did you prepare a slide regarding that as well?

7    A    Yes.

8         MR. McDONALD:  Can we turn to slide six, please.

9    Q    Dr. Shamos, is this slide six here up on the screen right

10   now, is that the slide you prepared regarding electronic

11   sourcing systems as of the early 1990s?

12   A    Yes.

13   Q    When you said early 1990s, can you tell me exactly what

14   time frame you were zeroing in on?

15   A    Yes, the period of 1993 and before.

16   Q    Why did you zero in on that particular time frame?

17   A    Because the critical date with respect to these patents

18   occurred --

19        MR. ROBERTSON:  Objection, Your Honor.  Again, he's

20   testifying to legal objections that are not within the scope of

21   what he's been qualified as an expert for.

22        MR. McDONALD:  Well, I think this is helpful to the

23   jury to understand what the critical date is, Your Honor.  I

24   don't think there's any dispute.

25        THE COURT:  We'll instruct the injury on that, won't

1    I?

2              MR. McDONALD:  Yeah, I think you will.  I want to

3    make sure the jury knows that this witness is using the same

4    date you're going to instruct them.

5              MR. ROBERTSON:  He doesn't have to opine -- do you

6    want to make a representation as to what you consider the

7    critical date to be?

8    Q    For purposes of your analysis, Dr. Shamos, what did you

9    consider to be the critical date?

10   A    August of 1993.

11   Q    How did you come up with that date?

12   A    One year before the filing of the patent.

13   Q    So why don't you tell us what you were trying to explain

14   here in this first bullet point on the slide that's up on the

15   screen right now?

16   A    Yes.  Well, one of the earliest commercial uses of

17   computers was to do parts ordering and electronic sourcing.

18   Over the decades, the systems became more sophisticated, and by

19   the early 1990s, there are at least these three prior art

20   references that were prior art systems that were in existence;

21   RIMS, which we've talked about, a system called PO Writer, and

22   another system called J-CON, all of which performed electronic

23   sourcing.

24   Q    When you use the phrase electronic sourcing system here,

25   did you do that familiar with the Court's construction of that

1    term for this case?

2    A    Yes.

3    Q    Did you use that Court's construction?

4    A    I did.

5    Q    So what are you talking about here with respect to the

6    second bullet point on this slide?

7    A    Well, because the prior art included electronic sourcing

8    systems, the applicants for these patents did not invent

9    electronic sourcing systems.

10   Q    What was the significant of that to your analysis?

11   A    I don't know that it had significance other than it

12   appears as though plaintiffs are claiming that they did invent

13   electronic sourcing system.

14            MR. ROBERTSON:  Objection, Your Honor.  Move to

15   strike.

16            THE COURT:  Why is that?

17            MR. ROBERTSON:  He's telling us what he thinks the

18   inventors are appearing to disclose?  How can he possibly know

19   that?

20            MR. McDONALD:  I don't think that's what he said.  I

21   think he was explaining why he thought that was important.  I

22   don't think he said it that way.

23            THE COURT:  He came pretty close.  The jury can pay

24   attention and can understand what to do with that or not.

25   Overruled.

1   Q    Dr. Shamos, as part of your analysis here, did you review

2   any disclosures regarding the RIMS system in any detail?

3   A    Yes.

4   Q    What did you review about the RIMS system?

5   A    Well, primarily, I reviewed -- there was some product

6   brochures, and I reviewed the '989 patent.

7           THE COURT:  The what patent?

8           THE WITNESS:  '989.  Johnson '989.

9   Q    When was the Johnson '989 patent filed approximately?

10  A    Well, it was in 1993/1994 range.

11          MR. McDONALD:  Can we put up the '989 patent.  I

12  believe it's Plaintiff's Exhibit 10.  If we can blow up the top

13  third of that page.

14  Q    Does this -- this is a copy of that '989 patent you said

15  you looked at in some detail; right, Dr. Shamos?

16  A    Yes.

17  Q    Is there some information on this page here that would

18  indicate when that application was filed?

19  A    Yes.  It's here.

20  Q    When was --

21  A    Opposite number 22.  April 2nd, 1993.

22  Q    As part of your review of the '989 patent, was there any

23  indication that after that date of April of 1993, any additions

24  or changes to the specification of that application were made

25  before the patent issued in January of '98?

1          MR. ROBERTSON:  Objection, no foundation.

2          THE COURT:  I thought he said he reviewed the file

3    history, Mr. Robertson.  He's asking him if he saw in the file

4    history any change in the specification.  Isn't that your

5    question, Mr. McDonald?

6          MR. McDONALD:  I'm asking as part of his review of

7    the RIMS patent and related documentation --

8          THE COURT:  Why don't you ask him specifically in the

9    file history for this patent.

10         MR. ROBERTSON:  I thought he was referring to the

11   file history before in the '683, Your Honor, but if we've

12   changed file histories --

13         THE COURT:  I maybe didn't understand.  Can you ask

14   the question again and let's see.

15   Q    Dr. Shamos, as part of your review of this '989 patent and

16   any related documentation, did you see anything that would

17   indicate whether or not the specification and description of

18   the RIMS product or technology in that patent was changed or

19   modified at all after the filing date, April 2, 1993, that's

20   indicated on the cover page?

21         MR. ROBERTSON:  Your Honor, I don't believe this is

22   in his report.

23         THE COURT:  Where is it in the report, which

24   paragraph?

25         MR. McDONALD:  I don't think I have a sentence

1    specific to that.  I'll withdraw.  Maybe there is, Your Honor.

2    I just realized.  Give me a moment, please.

3            THE COURT:  Coach Stoll-DeBell sent in a play from

4    the sideline.  Will you tell me what it was, because I can't

5    see that far.

6            MS. STOLL-DeBELL:  222.

7            THE COURT:  I thought that's what it was.  Just a

8    minute.  Why did you have to pick a long paragraph, Ms.

9    Stoll-DeBell?

10            MR. McDONALD:  I think that one qualifies as close

11    but no cigar, Your Honor.

12            THE COURT:  I think I have to say the same thing.

13    Q    Did you prepare a slide, Dr. Shamos, regarding what you

14    considered the '989 patent to disclose?

15    A    Yes.

16    Q    Please turn to slide number seven, please.  Can you take

17    up one -- is this the slide you prepared regarding -- at least

18    one of the slides you prepared regarding the RIMS system, Dr.

19    Shamos?

20    A    Yes.

21    Q    Could you walk us through one bullet point at a time here

22    what you were trying to convey here through this slide?

23    A    Yes.  The first bullet point is that the Fisher RIMS

24    system was described in the Johnson '989 patent.

25    Q    Okay.  Why don't you go to the next point.

1   A    Yes.  So a reading of the '989 patent reveals that it

2   discloses at least the following five things:  One is searching

3   a database for items from multiple sources, the building of

4   requisitions from searching that database, generating purchase

5   orders from those requisitions, and checking inventory to

6   determine whether it was necessary to actually order the items

7   or not, and then I think I have the comment over here on the

8   right that those four functions were old standard functions in

9   the prior art.  Electronic sourcing systems did those things.

10  Q    When you say that, you mean systems other than RIMS?

11  A    Yes, the prior art other than RIMS, yes.  And the fifth

12  point is a cross-reference table for locating equivalent items.

13  So if I want to order a microphone but the particular

14  microphone that I want to order isn't in stock or isn't in a

15  particular manufacturer's catalog, I want to find a substitute

16  that I can order, and RIMS had a cross-reference table that

17  would relate a part number of one product to a part number of

18  an equivalent product.

19  Q    In your analysis of the RIMS system, did you determine

20  whether or not the RIMS system employed a local computer as

21  well as a host computer?

22  A    Yes.

23  Q    What did you determine about that?

24  A    It did.  There's a figure in the RIMS patent that

25  discloses a local computer and a remote host computer.

1    Q    Are those two computers, the local computer and host

2    computer, are they linked in some fashion in the RIMS system?

3    A    They communicate with each other.

4    Q    Why do they communicate with each other?

5    A    Because if there is information that is looked for on the

6    local system and it's not present on the local system, then it

7    can be looked for on the host system.

8         Furthermore, the activities that the user performed such

9    as selecting items, that information has to be communicated

10   somewhere so that the order can actually be placed.

11   Q    Are you familiar with the term just-in-time inventory?

12   A    Yes.

13   Q    Does the RIMS patent disclosure relate at all to a system

14   involving just-in-time inventory?

15   A    Yes.  I think it's even mentioned in the abstract of the

16   '989 patent.

17   Q    Can you tell us generally how the RIMS system relates to

18   just-in-time inventory?

19   A    Yes.  I'm just assuming that the jury is familiar with

20   what just-in-time inventory is.

21             THE COURT:  I think it was explained a long time ago

22   in the trial, and it's okay, if you don't mind, go ahead and

23   explain what you mean by that term, Dr. Shamos.

24             THE WITNESS:  Yes.  So a problem in inventory

25   management in the manufacturing operation is that the

1    manufacturer needs to stock enough parts so that when he's

2    making a car or whatever it is he's manufacturing out of those

3    parts, he doesn't run out of them.

4              And sometimes that means that a tremendous amount of

5    money is tied up holding inventory just waiting until the parts

6    are needed, and one of the great efficiencies of supply chain

7    that came about because of computers was the ability to be much

8    more efficient and not buying the inventory or not having it

9    even delivered in your warehouse or holding area until just at

10   the time you're really going to need it to manufacture

11   something.

12             And that's what just-in-time inventory management is,

13   is making sure that you have enough of all the particular parts

14   you need but you don't have too many.

15   Q   And did the RIMS system facilitate the use of just-in-time

16   inventory?

17   A   Yes.

18   Q   Did you also prepare a slide specific to the TV/2 system?

19   A   Yes.

20             MR. McDONALD:  Can we turn to slide 19, please.

21   Q   Dr. Shamos, do you see up on the screen there a slide

22   entitled TV/2?

23   A   Yes.

24   Q   Did you prepare this slide?

25   A   Yes.

1   Q    Can you tells us, first of all, something that looks like

2   a cut and paste section of the document up on the top of the

3   page under the heading TV/2, what is that?

4   A    Yes, I sort of apologize for that.  Instead of retyping

5   material from the various prior art references, I thought it

6   was more effective to actually show a direct image of what was

7   in the document, and, unfortunately, that particular document

8   was a little bit fuzzy.  This is from one of those two

9   references that were mentioned on the cover page of the '989

10  patent.

11  Q    Cover page of the '989 patent or different --

12  A    Sorry, '683 patent.

13  Q    The patents involved in this lawsuit?

14  A    Yes, that's right.

15  Q    Can we briefly put up at least the cover page of DX-105

16  that's referred to here in the slide so we have our bearings

17  here.  Do you see up on the screen, Dr. Shamos, the first page

18  of DX-105?

19  A    Yes.

20  Q    Is this the document you got that material from on that

21  slide we were just talking about?

22  A    Yes.

23  Q    What is this document?

24  A    It's a general information manual that was distributed by

25  IBM that described TV/2.

1          MR. McDONALD:  Can we go back to that slide number

2    19, please.

3    Q    When you have a reference on any of these slides where it

4    refers to an exhibit number and a page number, is that meaning

5    you got it from that particular exhibit and page?

6    A    Yes.

7    Q    Why did you cut and paste that excerpt here on the top of

8    this particular slide, Dr. Shamos?

9    A    Well, because this is a part of the teaching of TV/2, that

10   TV/2 ought to be combined with parts ordering systems.

11   Q    What is it about that excerpt that indicates that the TV/2

12   system should be combined with parts ordering systems?

13   A    Well, let's look at the second sentence of the citation.

14   In particular, information providers such as manufacturers can

15   use the program, meaning TV/2, to make parts catalogs and

16   service manuals available to users, for example their sales and

17   service agents, in an electronic format.

18   Q    Were there some other excerpts of the TV/2 materials that

19   related to the idea of that combining that TV/2 system with

20   another system?

21   A    Yes.

22   Q    Do you have some other slides that go into that?

23   A    Yes.

24   Q    We'll continue on this slide then for the moment.  Why

25   don't you go through one bullet point at a time, please, and

1    pause between the bullet points to tell us what else you were

2    trying to convey here that -- I assume this was something -- or

3    let me ask the question.  Are you trying to convey some

4    information here that you think is helpful to understanding

5    your opinion in this case?

6    A    Yes.  That's why it's there.

7    Q    Can you tell us in a nutshell what -- well, let's take it

8    one bullet point at a time.  Why don't you walk us through

9    these bullet points?

10   A    Well, TV/2 was an IBM product.

11   Q    Okay.  Do you have an understanding as to whether or not

12   it was available prior to August of 1992?

13   A    I know it was available in 1991.

14   Q    Why don't you go to the next bullet point.

15           MR. ROBERTSON:  I'm going to object, Your Honor, and

16   move to strike as lacking foundation.

17           MR. McDONALD:  I think he's gone through and already

18   talked about what he looked at, but I can zero in on that if

19   you think that matters.

20           MR. ROBERTSON:  He said he looked at literature dated

21   1991.  I don't know how, looking at that literature, it informs

22   him when it was on sale.  If he has a basis for knowing, then

23   he can testify to it.  If he doesn't --

24           THE COURT:  I think you're right.  It needs a

25   foundation.

1   Q    How is it that you know the TV/2 was available in 1991,

2   Dr. Shamos?

3   A    I used to work with IBM.  I'm familiar with IBM policies.

4        MR. ROBERTSON:  That's not in his expert report, Your

5   Honor.

6        MR. McDONALD:  I didn't need to ask this question.

7   He's the one that asked for the foundation.

8        THE COURT:  It's part of his testimony.  It's

9   supposed to be in his report if that's the basis of how he knew

10  it was on sale.  It's supposed to be in his report.  Strike

11  that testimony, ladies and gentlemen.

12  Q    With respect to what you referred to to prepare your

13  report and what's in your report, Dr. Shamos, can you zero in

14  on those materials and tell us whether or not there's anything

15  in those materials that gave you a reason to understand that

16  the TV/2 materials were available in 1991?

17  A    Yes.  The materials are dated 1991, and they make

18  reference to TV/2 in the present tense.  Technical Viewer/2 is

19  an electronic documentation program.

20       MR. ROBERTSON:  Objection, Your Honor.  You can't

21  draw that inference simply because it makes reference to it in

22  the present tense in the marketplace in 1991.

23       MR. McDONALD:  I think Mr. Robertson is practicing

24  his closing argument at this time.  I don't think that's an

25  objection.

1          THE COURT:  Wait a minute.

2          MR. ROBERTSON:  There's no foundation, Your Honor,

3    just from reading a date on a document that was on sale or in

4    public use.

5          THE COURT:  Well, I think it is inferable from the

6    testimony for the jury to make, and you can argue whether it's

7    significant or not.  Overruled.

8          MR. McDONALD:  I think we already got an answer to

9    the question.

10         THE COURT:  He did.

11   Q    Why don't you go on to the next bullet point, Dr. Shamos,

12   and explain to us what you're trying to convey with that one.

13   A    Yes.  The TV/2 system, well, fundamentally, its purpose

14   was to combine some fairly new technologies at the time,

15   including data on CD-ROMs, and to create a generalized

16   searching program that allowed you to search by keyword or

17   topic through catalogs that were embodied in CD-ROMs, and the

18   catalogs could also be stored on hard disk.

19   Q    What's hard disk?

20   A    Hard disk is -- the easiest way to understand is the

21   permanent disk that's installed in your computer like your PC

22   or laptop that retains information even when the machine is

23   turned off.  But it normally is not separately removable from

24   the machine the way a CD would be.

25   Q    Why don't you move to your third bullet point and explain

Shamos - Direct                                                  2426

1    what you wanted to convey with that one.

2    A    Yes.  TV/2 taught expressly combining a multi catalog

3    search system, namely TV/2, with parts ordering and inventory

4    management system.

5    Q    And what is your last -- can you explain your last point

6    on this particular slide, please?

7    A    Yes.  The conclusion there is that the applicants in this

8    case didn't invent multi catalog searching.

9    Q    Did you put together a slide regarding the combination of

10   RIMS and TV/2?

11   A    Yes.

12   Q    Can we turn to slide 22, please.  Is this at least one of

13   the slides you prepared regarding combining the RIMS and TV/2

14   systems, Dr. Shamos?

15   A    Well, it's one of them.

16   Q    Okay.  Why don't you go ahead and walk us through this

17   particular slide point by point, and, again, pause between each

18   bullet here so we have time to follow up with any questions.

19   A    Okay.  Well, RIMS was an inventory management and parts

20   ordering system as described in the '989 patent.

21   Q    Go on to the next one.

22   A    TV/2 was a multiple catalog searching system as described

23   in the IBM TV/2 literature.

24   Q    Okay.  What is your third point?

25   A    RIMS had -- well, RIMS had all the elements of the

1    asserted claims except maybe those involving two or more

2    catalogs or equivalent phrases that are used in the patent such

3    as collection of catalogs, but since TV/2 had that, the

4    combination of RIMS plus TV/2 had all the elements of the

5    asserted claims, and, therefore, would render them obvious.

6    Q    Is that under how you applied the Court's construction of

7    catalogs in this case?

8    A    Yes.

9    Q    Did you use the same approach when you looked at the

10   application of the Court's construction of catalogs for

11   purposes of evaluating infringement as you did for purposes of

12   invalidity?

13   A    Yes.  I think that everybody in the case tried to apply

14   the Court's construction.  I think the parties have different

15   ideas about how the Court's construction applies to these

16   systems.

17              MR. ROBERTSON:  Objection, Your Honor.  I don't know

18   how this witness knows what my idea or ePlus's idea is about

19   the Court's construction.

20              THE COURT:  I think that's -- that question has been

21   answered.  Let's go ahead.

22   Q    What are you trying to convey about the last bullet point

23   on this slide, Dr. Shamos?

24   A    Fundamentally that because of the principle that the claim

25   terms must be construed the same way for infringement and for

1    invalidity, if it turns out that Lawson item master meets the

2    Court's definition of catalog, then RIMS alone had all the

3    elements of the asserted claims.

4    Q    Why is it that RIMS alone would have all the elements of

5    the asserted claims with that assumption?

6    A    Because RIMS alone has a database that is, for all

7    practical purposes, identical to that of Lawson's system.  It

8    had a database that had information about items from multiple

9    sources.

10   Q    What was that database called in the RIMS system?

11   A    I think it was called parts master.

12   Q    Let's go to your slide number 25.  Did you look at the

13   issue of whether the RIMS system was a single source or

14   multiple source system, Dr. Shamos?

15   A    Yes.

16   Q    What did you conclude about that?

17   A    Well, that it's not a single source system.

18   Q    What was the basis for that conclusion?

19   A    There's a citation here from column two of the patent

20   that's explaining figures 4A through 4D, that they are flow

21   charts describing program employed by an embodiment of the

22   system of the present invention to source requisition JIT

23   inventory owned by either the distributor or the customer,

24   other inventory owned by the distributor, and inventory owned

25   by other vendors.  Those different inventories are the

1    different sources.

2    Q    That term JIT, J-I-T, that's just-in-time inventory;

3    right?

4    A    Yes.

5    Q    We talked about that earlier today; right?

6    A    Yes.

7    Q    Can we turn to slide 27, please.  Did you have some other

8    analysis you did, Dr. Shamos, regarding whether or not the RIMS

9    system was a single source system or a multiple source system?

10   A    Yes.

11   Q    Is this slide 27 another slide you prepared on that topic?

12   A    Yes.

13   Q    Can you walk us through what you are trying to show us

14   here in slide 27, please?

15   A    Yes.  These are three paragraphs of column three of the

16   '989 patent, and I've highlighted in blue the part where

17   there's discussion of where the items are coming from.  So in

18   the first paragraph, there's reference to records for each

19   product regularly sold by the distributor.

20   Q    Is that what you have in the blue box there in the first

21   paragraph?

22   A    Yes.  Well, I read a little bit more than what was in the

23   blue box, but, yes.  Then in the second paragraph, there's

24   information in the database about similar catalog numbers of

25   other suppliers or distributors.  It would be necessary to have

1    that or the cross-reference table wouldn't make any sense.

2         Then in the third citation, it says, post database 20 also

3    includes data regarding items from third party suppliers.  And

4    so we have the distributor, we have other suppliers'

5    distributors, and we have items from third-party suppliers, all

6    of which could be searched for in the RIMS database.

7    Q    Let's go ahead and go forward to slide 29, please.  As

8    part of your analysis of the RIMS system, did you look at the

9    issue of whether or not the RIMS system generates purchase

10   orders from requisitions?

11   A    Yes, I did.

12   Q    What did you conclude after reviewing the RIMS literature

13   about that issue?

14   A    I think it's clear from both the text and the figures of

15   the RIMS patent that it does those things.  There's reference

16   to accepting the requisition, and then there's another

17   reference shown in blue, create a purchase order, and then

18   furthermore, down in figure 2A at the bottom, there's a

19   requisition maintenance block, 108, over on the left, and that

20   is interacting with the build purchase order block, 112.  So

21   that shows building of a purchase order from a requisition.

22   Q    This excerpt that you have here above the figure, there's

23   reference there to figures 5A and 5B.  Do you see that?

24   A    Yes.

25   Q    What are figures 5A and 5B from that RIMS '989 patent?

1    A    Those are logical flow charts showing the flow of the

2    operation of RIMS whereas this is more -- this figure 2A is

3    more of a structural drawing showing the pieces of the RIMS

4    system.

5    Q    Do those flow charts, figures 5A and 5B, do those relate

6    to the process of creating purchase orders or something else?

7    A    They certainly relate to that.  They relate to the

8    purchase order build program.

9    Q    Did you look at the issue of whether or not the RIMS

10   system had cross-reference tables as the Court defined that

11   term in that case?

12   A    Yes.

13   Q    What did you conclude about that regarding the RIMS system

14   as it existed back in April of '93?

15   A    Well, it does have cross-reference tables, and it

16   expressly refers to cross-reference tables and the purpose of

17   cross-reference tables.

18   Q    Can you turn to slide 31, please.  Dr. Shamos, is this a

19   slide you prepared regarding this cross-reference table issue

20   specific to the RIMS system?

21   A    Yes.

22   Q    Why don't you walk us through what you are trying to

23   convey here.

24   A    Well, I think it's useful for me to read the quote from

25   column 32.

1    Q    Of what document?

2    A    Of the '989.

3    Q    That's the RIMS patent?

4    A    The RIMS patent, yes.  The host cross-reference table

5    include, for each item regularly stocked or supplied by the

6    distributor, ID items of product type 01 or 03, a list of the

7    corresponding part numbers of distributor's vendor or other

8    distributors which are identified by a competitor number for

9    items which have been determined to be equivalent.

10        So that relates to what I was talking about before.  If

11   there's a part that you want and it's not in stock, the system

12   will inform you of an equivalent part that you might order in

13   its place.  And figure 2A down at the bottom shows the

14   interaction between the requisition management block 58 --

15   Q    58 or 68?

16   A    It's difficult to read, and the cross-reference --

17             THE COURT:  Which is it, Doctor?  58?

18             THE WITNESS:  I can't tell exactly from this slide.

19             MR. McDONALD:  Can we blow that up, Bill.

20             THE WITNESS:  There it looks like 68.  The

21   interaction between that and the cross-reference number list,

22   72.

23   Q    What is the cross-reference number list?

24   A    That's the cross-reference table.  So I'm building

25   requisitions, I'm trying to requisition something that's not in

2433

1    stock, this will give me a cross-reference to an equivalent

2    product.

3    Q    Did you look at whether or not the RIMS system checked

4    inventory?

5    A    Yes.

6    Q    What did you conclude about that?

7    A    It does.  I mean, that's one of its whole purposes, is to

8    maintain JIT inventory.

9    Q    What does the I in RIMS stand for?

10   A    Excuse me?

11   Q    What does the letter I in RIMS stand for?

12   A    Inventory.

13            MR. McDONALD:  Can we go to slide 32, please.  Can

14   you blow that up, Bill?  Thank you.

15   Q    Did you also prepare this slide, Dr. Shamos?

16   A    Yes.

17   Q    Does this relate to your conclusion that the RIMS system

18   did check inventory?

19   A    Yes.

20   Q    What is the excerpt on this slide that you have?

21   A    This is from the RIMS patent.  It says, requisition item

22   table is updated with the following information from the entry

23   in the plant location table in local database 50 associated

24   with the relevant stock number.  The quantity of the item

25   available in the customer-owned inventory 54 in the JIT

1    facility 51, for product type 06, or in the distributor-owned

2    inventory 52 in the JIT facility 51 for product type 01.

3         So if it's updated with the quantity of the item

4    available, it means that's checking inventory, how much do we

5    have on hand.

6              MR. ROBERTSON:  Can I see the slide number on this,

7    Mr. McDonald?

8              MR. McDONALD:  32.

9    Q    Let's turn now, Dr. Shamos, to the TV/2 system, dig into

10   that in a little more detail now, all right?

11   A    Yes.

12   Q    Did you also put together some slides about some of the

13   specific functionality of the TV/2 system?

14   A    Yes.

15   Q    Let's go to slide number 34, please.  Is this a slide you

16   prepared regarding the TV/2 system, Dr. Shamos?

17   A    Yes.

18   Q    Can you explain to us what you were trying to convey with

19   this slide?

20   A    That TV/2 was an electronic sourcing system.

21   Q    When you put that in quotes, why do you put that in

22   quotes?

23   A    Because that's a claim term from the patents, and it was

24   also a construed term.

25   Q    Construed by the Judge?

1    A    Yes.

2              THE COURT:  So it's clear, which patents did you mean

3    in that situation?  Did you mean this patent?

4              THE WITNESS:  The patents-in-suit, yes.

5              THE COURT:  I don't know whether TV/2 is patented or

6    not.

7              THE WITNESS:  I don't know whether it was patented

8    either.

9              THE COURT:  So you were talking about the

10   patents-in-suit.  You covered that.

11             MR. McDONALD:  Thank you.

12   Q    So this definition in yellow here, this is the Court's

13   definition for purposes of this case and the patents in this

14   lawsuit; right?

15   A    Yes.

16   Q    And then right below that yellow box, what do you have

17   there?

18   A    That is the actual construction, the Court's construction

19   of electronic sourcing system.

20   Q    That's in the yellow box.  I'm actually asking what's

21   below the yellow box.

22   A    Oh, I'm sorry.  Citations from the IBM general information

23   manual.

24   Q    That's --

25   A    -- about TV/2.

Shamos - Direct                                              2436

1   Q    That is the manual we blew up the first page of a little

2   earlier in your testimony today?

3   A    Yes.

4   Q    So why did you pick this particular except to put on this

5   slide?

6   A    Because the first citation there mentions the use of the

7   program to make parts catalogs and service manuals available to

8   users.  But -- so that takes care of the fact that there are

9   sources of suppliers or vendors, but that paragraph doesn't say

10  searching or finding.

11       So to show that it meets the finding requirement of the

12  construction, I have this other quote about a search which is

13  in the list of features of the TV/2 system.  One of them was

14  called search.  Search facility that can locate every

15  occurrence of a word or phrase in either the current topic, a

16  list of selected topics, the complete document, or another

17  document.  So if you understand the TV/2 had catalogs and had a

18  search facility, that would allow a prospective buyer to locate

19  and find items to purchase.

20  Q    Can we turn now to the issue of combining the RIMS and

21  TV/2 system and the additional information you looked at

22  regarding that issue.  Did you prepare -- well let's go right

23  to slide 37.  Did you prepare this particular slide, Dr.

24  Shamos?

25  A    Yes.

1    Q    And this slide with the heading here is TV/2 teaches

2    combining TV/2 with order entry and inventory management

3    systems; correct?

4    A    Yes.

5    Q    How does that topic relate to the obviousness evaluation

6    for purposes of your opinions in this case?

7    A    As a general matter, one can't simply pick and choose

8    arbitrary prior art references from the past.  It has to be

9    some reason or motivation to take one particular prior art

10   reference, a second reference, and put them together for

11   obviousness purposes.

12        One of the ways in which that motivation can be shown is

13   by a statement in the prior art that says to do that.  If

14   there's a statement in the prior art that says to do that, then

15   it's obvious to do it.  I'm showing here in -- this is from the

16   brochure, the TV/2 brochure -- I'm showing such statements.

17              THE COURT:  So the record is clear, DX-107 is what

18   he's referring to as the parts or brochure he described.

19              MR. McDONALD:  Is that right, Dr. Shamos, the DX-107,

20   is that the TV/2 brochure that you referred to?

21   A    Yes.

22              THE COURT:  The reason I said it is because he cited

23   it here in the slide, but the slide is not in evidence.  So I

24   want the record just to be clear.

25              MR. McDONALD:  Thank you, Your Honor.

1           THE COURT:  Everybody understands what his basis is.

2    Q    Can we go to Exhibit 107, please, and to that page

3    G0000032.  Can you blow up the paragraphs starting off, you can

4    also.

5    A    It's the bottom of the first column.

6    Q    So this is that -- you actually cut and pasted this in

7    this particular document or paragraph from this document into

8    your slide; is that right?

9    A    Yes.

10   Q    What is it about this paragraph that you think is

11   important to this issue of whether or not it would be obvious

12   to combine the TV/2 system with an order entry and inventory

13   management system?

14   A    This is expressly teaching a combination.  It says you can

15   also create a shopping list just by selecting items and passing

16   that list to another application.  So TV/2 --

17   Q    Let's stop.  Can you explain that one sentence?  Please

18   explain that first sentence.

19   A    Yes.  So when it says you can also create a shopping list,

20   it means using TV/2 you can create a shopping list, but because

21   TV/2 is not a parts ordering system, you can't order the parts

22   directly from TV/2, so you have to pass that list to another

23   application by which is meant another piece of computer

24   software, another piece of application software.

25           Then the next sentence is giving an example of what kind

1    of application you might be passing that list to.  It says, for

2    example, you might select parts to be ordered from the exploded

3    drawing in a parts catalog.  The parts list could then be sent

4    directly to your parts ordering system all without moving from

5    your PS/2.  PS/2 was a popular personal computer at the time.

6    Q    So that second or that last sentence there, is that

7    indicating that the parts ordering system and the TV/2 system

8    would both be on the PS/2 computer system?

9    A    They could be.

10            MR. ROBERTSON:  Objection, leading.

11            THE COURT:  Overruled.  I don't know that the answer

12   was heard, so you may want to start again.

13            MR. McDONALD:  Okay.

14   Q    Can you explain what it means in that last sentence, as

15   you understood it, Dr. Shamos, where it says, the parts list

16   could then be sent directly to your parts ordering system, all

17   without moving from your PS/2.  What does that mean?

18   A    Yes.  Here's what that means:  It's conceivable that you

19   could have a parts ordering system on your PS/2 in which case

20   since TV/2 ran on the PS/2, you could take the parts list or

21   the shopping list directly out of TV/2 and send it directly

22   into that parts ordering system not only without you physically

23   moving away from your PS/2, but without even having to access

24   another computer to do it.

25            It also contemplates the capability or the possibility

1   that your parts ordering system might not be on your PS/2 in

2   which case you'd have to find some way of sending the shopping

3   list over to your parts ordering system.

4   Q    What was it about the TV/2 system, if anything, that would

5   facilitate its ability to pass something like a shopping list

6   or a parts list to another application?

7   A    Well, the PS/2 was an IBM computer.  TV/2 was an IBM

8   product.  They designed it to be able to run on the PS/2, and

9   so they made the integration of TV/2 particularly easy with

10  respect to other software that was running on the PS/2.

11  Q    How did they make it particularly easy?

12  A    The -- well, for one thing, if I create a shopping list

13  and save it to a file that's actually on the hard disk of the

14  computer, then it's easy for another application that's running

15  on the same computer to simply read that file.  So it's easy to

16  perform the integration if it's all on the same machine.

17  Q    So it's your understanding that the TV/2 system had

18  something called an application program interface?

19  A    Yes.

20  Q    What is that?

21  A    An application program interface is basically a set of

22  rules that are devised by the creator of that application that

23  tells developers who are developing other software how to

24  integrate, contact, transmit information to and from the

25  application that they've created.

2441

1        So TV/2 wouldn't be particularly useful if it could only

2   be used with one particular parts ordering system.  So when it

3   refers to your parts ordering system, what they are essentially

4   saying is it doesn't matter what parts ordering system you've

5   got, if you use our API, application program interface, you

6   will be able to talk to TV/2 and acquire information from TV/2.

7           MR. McDONALD:  Can we go to the next page of the

8   brochure here, DX-107, please, and can you highlight the right

9   column, some of the possibilities.

10  Q    In that slide number 37 you were looking at before we went

11  to the brochure, Dr. Shamos, I think you had highlighted, I

12  believe -- actually it's the left side.  The third bullet

13  point, is that the one you had in that slide?

14  A    Yes.

15  Q    Why don't we blow that one up here.

16  A    Before you do -- okay, highlighting is good.  I didn't

17  want to blow it up because up at the top, the last piece of the

18  first paragraph says potential uses, and that means uses of

19  TV/2.  Potential uses include, and one of the uses is

20  integrating parts catalogs with dealers' computer systems such

21  as order entry, inventory management, and customer records.

22  Q    What was the significance of that bullet point to your

23  analysis?

24  A    Well, that's an expressed teaching to integrate TV/2 with

25  ordering entry inventory management systems.

Shamos - Direct                                                2442

1    Q    Let's go back to slide 37 now, please.  So have we --

2    actually back to the original document, DX-107, to find both of

3    the quotes that you put in the blue box here on this slide?

4    A    We're done with this slide.

5    Q    Let's go on to slide number 38.  What is the point of this

6    slide, Dr. Shamos?

7    A    Well, it's to show that RIMS falls within the category of

8    system that TV/2 taught ought to be integrated with TV/2.

9    Q    Why don't you walk us through this one bullet point at a

10   time, and please pause between bullets.

11   A    Yes.  Column one of the RIMS '989 patent states, quote,

12   this invention generally relates to systems for requisition and

13   inventory management.  Requisition is essentially a synonym for

14   order entry.

15   Q    So this is supporting the title on this slide?

16   A    Yes.

17   Q    What are you conveying by the second bullet point?

18   A    RIMS is a requisition system which will generally, quote,

19   process purchase orders for items and track inventory.

20   Purchase order system is an order entry system.

21   Q    These numbers that you have following your quotes in the

22   first two bullet points, what are you referring to with those

23   numbers?

24   A    Those are the express citations to the column and lines

25   numbers within the RIMS '989 patent.

1    Q     So is it your understanding that those statements describe

2    the RIMS patent or the RIMS system as it existed at the time

3    that RIMS '989 patent was filed in April of '93 or not?

4    A     Well, I don't know, but I believe there was testimony to

5    that effect.

6    Q     What is the third bullet point?

7    A     That's just the conclusion that because the RIMS patent

8    itself describes RIMS, and it describes it as the type of

9    system that TV/2 taught ought to be integrated with TV/2.

10   Q     What is the point of your final bullet point here?

11   A     This relates to that PS/2 comment that we looked at

12   earlier.  PS/2 was a computer, and the operating system that

13   ran on PS/2 was called OS/2.

14         RIMS was implemented in OS/2, and TV/2 was implemented in

15   OS/2, so that would make it even easier to integrate because

16   they are running under the same operating system, so they could

17   be residents on the same computer at the same time.

18   Q     As part of your analysis, did you determine -- let's back

19   up.  Looking at this issue of the RIMS -- I'll rephrase the

20   question.  When you are looking at the issue of whether it was

21   obvious to combine the RIMS system and the TV/2 system as they

22   existed prior to August of '39, did you look at that from the

23   standpoint of a person of ordinary skill in the art or from

24   some other perspective?

25   A     I looked at it from that viewpoint, but when there's an

1    express teaching in the prior art, the level of skill really

2    doesn't mean much.

3    Q    Why do you say that?

4    A    Well, because it's right there in the literature.  You

5    don't have to use your imagination to figure out that these

6    things ought to be combined.  You are expressly told to combine

7    them.

8    Q    Did you look at whether or not there would be any

9    motivations for one of ordinary skill in the art to actually go

10   ahead and combine the RIMS system specifically with the TV/2

11   system?

12   A    Yes, but the principle motivation comes from the teaching

13   in the TV/2 brochure.  It tells you to do it.  And if you just

14   follow its instructions, you are, therefore, motivated to do

15   it.

16   Q    Why would you do it?  Why would you combine these two

17   systems?

18          MR. ROBERTSON:  Objection; calls for speculation.

19          THE COURT:  Overruled.

20   A    IBM is promoting TV/2 as a generalized searching system

21   that can used as a front end interface to a large number of

22   different kinds of applications.  If I have, for example, an

23   order entry system that makes use of catalogs, and in the past

24   I hadn't been able to use CD-ROM catalogs, and I find out about

25   TV/2 and I read that bullet point in the brochure that says

Shamos - Direct                                                    2445

1    that's a solution to my problem, I can now use TV/2 to search

2    distributors' catalogs on CD-ROM.

3    Q    Did you also put some slides together, Dr. Shamos,

4    specifically matching up this combination of the RIMS system

5    and the TV/2 system as they existed before August of '93 on a

6    claim-by-claim, element-by-element basis?

7    A    Yes.  It's essential to do that.

8    Q    Let's go to that.  Let's start with slide number 40.  Now,

9    Dr. Shamos, if you already testified to something that's going

10   to come up as we go along, why don't you refer to that briefly,

11   but if there's something as we walk through these

12   element-by-element slides that's kind of new to that slide, can

13   you please make a note of that as we go through here?

14   A    Yes.

15   Q    Why don't you take it from the top here.

16   A    Yes.  The exercise here is that in order to show that a

17   claim is obvious in view of the prior art, I have to show that

18   the particular combination of TV/2 plus RIMS has each and every

19   element of each claim, and so we're starting with the preamble

20   which is, is there, in RIMS plus TV/2, an electronic sourcing

21   system, and we already talked about how RIMS also -- RIMS was

22   an electronic sourcing system.

23        As it turns out, due to the construction of electronic

24   sourcing system, TV/2 is also an electronic sourcing system,

25   because it was used by a prospective buyer to locate and find

1   items to purchase from sources, suppliers, or vendors as stated

2   in the TV/2 brochure.

3   Q    Do a number of the asserted claims in this case start off

4   with this term an electronic sourcing system?

5   A    Yes.

6   Q    So does your analysis for this claim one of the '516, does

7   it apply to all of the other claims that have that same

8   introductory phrase?

9   A    Yes.  That will save us some time.

10  Q    So you did conclude then that this phrase is satisfied by

11  the combination of the RIMS and TV/2 systems; is that right?

12  A    Yes.  Since they are both electronic sourcing systems, the

13  combination teaches an electronic sourcing system.

14  Q    Let's go to the next slide, please, 41.  Can you tell us

15  what you have here, Dr. Shamos?

16  A    Yes.  So the first element of '516, claim one, is a

17  collection of catalogs of items stored in an electronic format.

18  I think there's no question that the catalogs of the TV/2

19  system were stored in an electronic format.  They are on a

20  computer, and they are on CD-ROM.

21       The TV/2 documents that are admitted in this case describe

22  the catalogs being either on separate CD-ROM or multiple

23  catalogs being able to be stored on the same hard disk.  So

24  TV/2 had that.

25  Q    That's element eight?

1    A    Yes.

2    Q    Looking at element B now?

3    A    Yes.  B is a first set of predetermined criteria

4    associated with said collection of catalogs, and that first set

5    of predetermined criteria are the criteria used to select

6    catalogs to be searched, and TV/2 had such predetermined

7    criteria as discussed in this citation from the DX-105.

8    Q    That's the citation that relates to the search function of

9    the TV/2?

10   A    Yes.

11   Q    Let's go to slide 42 then, please.

12   A    Yes.  Element C, a second set of predetermined criteria

13   associated with items of each of said catalogs.  The second

14   criteria are the ones that are used to actually search within a

15   catalog, and TV/2 allowed criteria such as part number, product

16   type, or other data, and I'll just read from the quotation,

17   citation there.

18        It says, instead, simply call for the information by

19   specifying keywords such as product part numbers or names,

20   instructing the computer by selecting an icon on the screen, or

21   using the keyboard.  So it even specifically talks about

22   product part number to be searchable in TV/2.

23   Q    So did you conclude that this element C of claim one of

24   the '516 patent was satisfied by this combination of the RIMS

25   and TV/2 system?

1    A      Yes.

2    Q      Let's go to the next slide, please, 43.  What were you

3    trying to convey here?

4    A      The fourth element is a catalog selection protocol.  Said

5    catalog selection protocol, relying on said first set of

6    predetermined criteria to select less than said entire

7    collection of catalogs.

8           That's consistent with what I said before.  The first set

9    of criteria are used to select the catalogs that you are going

10   to search.  And I have a quotation from DX-105 here in which

11   TV/2 discloses that information providers such as manufacturer

12   can use the program to make parts catalogs and service manuals

13   available to users, for example, their sales and service

14   agents, in an electronic online format.

15          It also discloses a search facility -- that's what TV/2 is

16   about -- and a choice of materials to be searched.  So you can

17   select which of the catalogs you would like to search.  And so

18   catalog selection protocol involving vendor identification

19   codes would have been obvious if you wanted to give a vendor an

20   identification code to use as a mechanism for selecting the

21   particular catalog.

22          There's even an easier way which is you have a stack of

23   CD-ROMs and pick the CD-ROM you want to search and stick it

24   into the TV/2 reader.  And that's a catalog selection protocol

25   also.

Shamos - Direct                                            2449

1   Q     Did you conclude that this element D was satisfied by that

2   combination of RIMS and TV/2?

3   A     Yes.

4   Q     Let's go to slide 45, please.  What were you trying to

5   convey here -- this is actually about the same element as the

6   prior set --

7   A     It's a long element, so I split it into two slides.  So

8   there's the catalog selection protocol, but then part of that

9   has to be the inclusion of matching a vendor identification

10  code with a subset of said collection of catalogs, and I don't

11  know if it's useful to read the entire --

12  Q     Why don't you summarize.

13  A     -- limitation.

14  Q     What did you find in the combination of the RIMS and TV/2

15  system to satisfy the rest of element D as you quoted it here

16  at length?

17  A     Basically what this says, what the limitation refers to as

18  cross-referencing, that if I have an item in a particular

19  catalog, and I want to know what the corresponding item is in

20  another catalog, that has to be provided by element D.

21        And that's in RIMS, the RIMS '989 patent which is

22  described in this quotation here.  The CSR, customer service

23  representative, may also enter an item by using a catalog or

24  reference number from a third-party supplier other than the

25  distributor where the same item has both distributor and

1    third-party catalog numbers which are necessarily different.

2    So that's what the cross-referencing is, is understanding that

3    even though the catalogs numbers are different, it's really the

4    same or an equivalent item.

5    Q    There's a reference here to CSR.  Is that a term that's

6    used in the patents involved in the suit as well?

7    A    Yes.

8    Q    Could we turn to the '683 patent, please, Exhibit 1, to

9    column three, please.  And the paragraph right under the term

10   detailed description of the invention there near the bottom at

11   about line 48.  Do you have that paragraph?

12        Now, we're not talking about the RIMS patent anymore, Dr.

13   Shamos, right?  We're talking about one of the patents-in-suit

14   here, '683 patent; correct?

15   A    This citation is from the patents-in-suit.

16   Q    What does this paragraph here indicate as to whether the

17   patents-in-suit would or would not be used with the customer

18   service representative of the RIMS system?

19   A    Well, it says that the electronic sourcing system of the

20   patents is preferably used by an on-site customer service

21   representative dedicated to a customer to assist that customer

22   in requisitioning items needed.  Preferably, not necessarily.

23   Q    It uses that abbreviation CSR for customer service

24   representative; right?

25   A    Yes.

1    Q     So if we can go back to slide 45, so in the RIMS patent,

2    it also uses that same abbreviation, CSR for customer service

3    representative; right?

4    A     Right, yes.

5    Q     That is actually what you have quoted here on slide 45, is

6    from the RIMS patent; right?

7    A     Yes.

8    Q     I want to go to slide 46.  What were you trying to show

9    here with respect to element E of claim one of the '516 patent,

10   Dr. Shamos?

11   A     That it's disclosed by TV/2.

12   Q     What is the element?  Can you summarize what it is,

13   please?

14   A     Yes.  So the search program has to rely on this second set

15   of criteria to select items from the catalogs, and that second

16   set of criteria, those are the search criteria you are giving

17   to try to locate a product, and this quotation from DX-107

18   says, you can search through parts catalogs, service manuals,

19   stock lists, schematics, user warranty information, and

20   training aids, and the previous description of the search

21   capability, which we had on a previous slide, it explains that

22   you can do topic searching or keyword searching.

23         Keyword searching falls into the category of this second

24   set of criteria.  The criteria would be does this keyword occur

25   in the item record relating to a particular item.

1    Q    So this element E here, that has a period after it?  Do

2    you see that?

3    A    Yes.

4    Q    Does that mean we're all the way through claim one now of

5    the '516 patent?

6    A    Yes.

7    Q    Was it your opinion that claim one of the '516 patent is

8    obviousness in view of the RIMS plus TV/2 system?

9    A    Yes, because the combination discloses of the all elements

10   of '516 claim one.

11   Q    Did you reach that same conclusion -- if I can avoid

12   asking that same question after every claim, it will maybe save

13   some time here.  Did you reach that same conclusion with

14   respect to the 11 other asserted claims in this case?

15   A    Yes.

16   Q    Let's go to slide 48, please.  This won't take as long to

17   get through this claim, Dr. Shamos.  This is claim two of the

18   '516 patent; right?

19   A    Yes.

20   Q    This one is dependent on claim one; right?

21   A    Yes.

22   Q    Can you summarize the basis for your opinion that claim

23   two is obvious?

24   A    Yes.  This one is easy.  The only difference between this

25   and claim one is the wherein clause.  It says, wherein catalogs

1   comprising said selection of catalogs are stored in separate

2   databases.

3        Well, that's easy because in TV/2, the different catalogs

4   were coming on different CD-ROMs from different manufacturers,

5   so each CD-ROM was its own database, so the catalogs were

6   stored in separate databases.

7   Q    Let's go to slide 49, please.  This claim six of the '516

8   patent, that also depends from claim one; correct?

9   A    Yes.

10  Q    What additional analysis did you have to do to determine

11  whether the claim six was obvious?

12  A    I had to determine whether the wherein clause was

13  disclosed in the combination of RIMS plus TV/2.

14  Q    Did you decide it was?

15  A    Yes, because RIMS allowed search by catalog number as one

16  of the predetermined criteria, the searching criteria.

17  Q    Can we go to the RIMS '989 patent, DX-7, please.  Go to

18  column eight, lines 17 to 22.  Does this excerpt here, Dr.

19  Shamos, relate to whether or not the claim six of the '516

20  patent is satisfied?

21  A    Yes.

22  Q    Can you explain why?

23  A    Yes.  So beginning with the first full sentence, the CSR

24  can now enter the items and quantities for the requisition.  So

25  that's applying that second set of predetermined criteria that

1    are going to specify the search.  It then goes on, the item is

2    identified by entering the distributor catalog number of the

3    desired item in the field below the stock NBR label on the

4    appropriate line number in requisition management data screen

5    68.  So basically this says that you can search by catalog

6    number.

7    Q    So if we go back to slide 49 again, please.  That excerpt

8    that we just saw from column eight of the RIMS '989 patent,

9    does that support your conclusion in blue here on slide 49?

10   A    Yes.  It says you have to have at least one of the catalog

11   number and item textual information.  So I just have to show

12   that there's a catalog number, and that's what that excerpt

13   from the RIMS patent showed.  You could also search item

14   textual information.

15   Q    Let's go to slide 50, speaking of that.  This is the same

16   claim we just talked about, claim six of the '516; right?

17   A    Yes.

18   Q    Now it looks like you are relying on something from the

19   TV/2 disclosures as opposed to the RIMS disclosures?

20   A    Yes.

21   Q    What was it about the TV/2 disclosures that showed this

22   claim was satisfied?

23   A    Yes, I previously read an excerpt from the TV/2 material

24   that said you could search by keyword or name.  Keywords and

25   names are textual information.

1    Q    When you say textual information, I've just underlined

2    that part of the element?

3    A    Yes.

4    Q    Did you conclude -- you've already talked about your

5    conclusion.  Let's go on to the next slide, 51.  The next slide

6    shows claim nine of the '516 patent; is that right?

7    A    Yes.

8    Q    Can you walk us through your analysis as shown here on the

9    slide 51?

10   A    Yes.  The preamble and element A are the same as the

11   preamble and element A for '516 claim one, so we've already

12   taken care of that.

13   Q    So you've already covered the preamble in element A, so

14   why don't you pick up at element B, please.

15   A    Yes.  The system has to have a first identification code

16   associated with a first item in a first catalog.  Well, a

17   catalog number is a first identification code.  That's a way of

18   identifying an item, so that's even described in the '989

19   patent as an item code which is what the previous citation

20   talked about what the CSR is entering.  CSR is entering a

21   catalog number in the stock NBR field, stock number field.

22   Q    So is an item code the same thing as a stock number?

23   A    It can be, but an item code is certainly first

24   identification code.  It's a code for identifying an item.

25   Q    You also have reference on this slide to TV/2.  Do you see

1   that at the bottom?

2   A    Yes.

3   Q    What were you trying to convey there?

4   A    The TV/2 citations I read previously referred to the

5   ability to search by part number in TV/2.

6   Q    So you found this element B satisfied by either RIMS or

7   TV/2; is that right?

8   A    Both.

9   Q    Let's go to slide 52.  This is the third element, or

10  element C as you labeled it, of claim nine of the '516 patent;

11  is that right?

12  A    Yes.

13  Q    Rather than read that element, can you tell us generally

14  what that element C is about?

15  A    Yes.  This is cross-referencing.  It's saying that if I

16  found this testimony in this catalog, I'd like to know what a

17  generally equivalent item would be in another catalog, and I

18  already had up on a previous slide the citation from the RIMS

19  patent that described how that was done.

20  Q    Is there a section of the RIMS patent that's dedicated to

21  the cross-referencing function?

22  A    I recall that there is, yes.

23  Q    Can we go to the '989 patent, DX-7, to column 31 and 32, I

24  think.  Do you see at the lower part of column 31 from the RIMS

25  patent, Dr. Shamos, there is a section that starts with the

1    term cross-referencing?

2    A    Yes.

3    Q    And then if we go over to column 32 and that section, go

4    to the lines between one and 13.  Does this excerpt here at all

5    relate to the issue of whether or not the RIMS system or the

6    patent describes the cross-referencing as claimed in element C

7    of claim nine of the '516 patent?

8    A    Yes.  The entire material that was blown up refers to

9    that.

10   Q    Can you tell us in a nutshell what's being described here

11   at column 32, lines one to 13?

12   A    Yes.  Well, let's just start at the top.  Other

13   distributors and the customer will frequently use different

14   identifying part numbers for items which are essentially

15   equivalent, e.g., a 250 millimeter Pyrex Griffin beaker

16   manufactured by Corning who designates it as part number 1000

17   250 could have a distributor's catalog number 02540K and

18   competitor's part number B2650250, et cetera, et cetera.

19        I mean, I think we're familiar with this.  If you look up

20   the same item at Staples and look up the same item at Office

21   Depot, they're going to be the same item, but they're going to

22   have different catalog numbers in those two different catalogs,

23   and a cross-reference table provides a convenient means for you

24   to move from one catalog to another so you know you're getting

25   equivalent items.

1    Q    And is that last section up on the screen right now, does

2    that refer to the cross-reference tables both at the host and

3    local databases in the RIMS system?

4    A    Yes.  It says to address this situation, this situation

5    being the fact that different manufacturers or vendors use

6    different catalog numbers for the same thing.  To address that,

7    we're going to have the host cross-reference table and a local

8    cross-reference table that addresses that situation.

9    Q    Can we go back to slide 52, please.  So that element C,

10   that's the last element of claim nine of the '516 patent;

11   right, Dr. Shamos?

12   A    Yes.

13   Q    So we're done with that claim, are we?

14   A    Yes.  I'll just point out that this identification code

15   that's referred to in element C is this catalog number, this

16   item code, and so it says we have an item code from a first

17   catalog and equivalent item code in the second catalog.

18   Q    Thank you.  Let's go to slide 53 now, please.  This is the

19   next claim of the '516 patent that's asserted in this case,

20   claim 21; correct?

21   A    Yes.

22   Q    Can you walk us through your analysis of claim 21 of the

23   '516 patent, please?

24   A    Yes.  The preamble is the same as all the preambles we've

25   looked at so far so that's disclosed.  Element A is a

Shamos - Direct                                                    2459

1    requisition module including data fields, user-generated

2    criteria entered into at least one of said data fields to

3    generate at least partial criteria corresponding to a desired

4    item.

5         I think I said when I was testifying in infringement that

6    I didn't understand what generated at least partial criteria

7    means with respect to this patent.  Nonetheless, if Lawson has

8    one, if Lawson generates them, then so does RIMS, but I just

9    don't know what that means.

10   Q    Does the requisition module in the RIMS system include

11   data fields?

12   A    Yes.

13   Q    Can you enter user-generated criteria into the data fields

14   in the RIMS system?

15   A    Yes.

16   Q    Is it that last part about to generate at least partial

17   criteria corresponding to a desired item, is that the part

18   you're not so sure about?

19   A    I'd like to answer.  If I could just understand what that

20   means in the context of these patents.  I understand what

21   generating criteria are.  It's just that there's no disclosure

22   anywhere in the patents.

23            MR. ROBERTSON:  I object, Your Honor.  This is an

24   issue that is not before the jury.  This is an issue in the

25   final pretrial order that we conceded to be an issue for the

1    Court.

2              MR. McDONALD:  I think I got the answer to my

3    question.  I think he was just going beyond it, so I --

4              THE COURT:  Sustained.  Disregard the last part,

5    please, ladies and gentlemen.

6    Q    So let's continue with element B of claim 21.  Can we go

7    to slide 54, please.

8    A    Yes.

9    Q    Tell us what you are trying to convey here, Dr. Shamos.

10   A    This is kind of a transformation of an element that was in

11   a previous '516 claim phrased differently, but basically it

12   said that there's a searching module that allows you to search

13   a collection of catalogs, and that's what TV/2 was, was a

14   searching program for searching multiple catalogs.

15   Q    And we've already seen some references in the TV/2

16   literature to that searching functionality; right?

17   A    Yes.

18   Q    Do you rely on that same functionality to find element B

19   of claim 21 met?

20   A    Yes.

21   Q    Let's go to slide 56, please.  Can you walk us through

22   your analysis of element C of claim 21, please.

23   A    Yes.  This one talks about a catalog selection criteria.

24   The previous claim we looked at had a catalog selection

25   protocol, and a protocol would apply criteria.  So I'm saying

Shamos - Direct                                                        2461

1    this is substantially the same as '516, claim one, element D,

2    which is disclosed by TV/2.

3    Q    What is this quote that you have here below that?

4    A    That was what was in '516, claim one, element D, catalog

5    selection protocol, relying on said first set of predetermined

6    criteria to select less than said entire collection of

7    catalogs, and the phrase, to select less than said entire

8    collection is in element C here in claim 21.

9    Q    The same analysis would also show that element C is

10   satisfied?

11   A    It's essentially the same thing.

12   Q    Let's move on to element D in slide 57, please.  What are

13   you communicating here?

14   A    Said searching module being used to generate additional

15   search module criteria for said data fields of said requisition

16   module.

17   Q    Where did you find this element between the RIMS and TV/2?

18   A    In RIMS.

19   Q    Can we refer to the '989 patent, please, DX-7 at column

20   18, beginning at about line 63.  Does this excerpt that starts

21   at the bottom of column 18 of the RIMS patent, Dr. Shamos,

22   relate to this searching module element of claim 21 of the '516

23   patent?

24   A    Yes.  It's one of them.

25   Q    What is being talked about here at the bottom of column 18

Shamos - Direct

1    of the '989 patent?

2    A    Well, basically this is generating additional search

3    criteria, because when you look at the item stock number, then

4    the product type information associated with that stock number,

5    it says, is used to determine what database in host databases

6    20 to search.  So those are additional search criteria,

7    selecting less than the whole set of catalogs and I'm searching

8    those.

9    Q    Let's go to slide 58 then and go to element E of claim 21

10   of the '516 patent.  Why don't you tell us what you are

11   communicating here.

12   A    Yes.  In element E, there has to be a multiple purchase

13   order generation module, and that purchase order generation

14   module has to create multiple purchase orders from a single

15   requisition created with said user-generated criteria and said

16   search module criteria.

17        Simply put, you do a search, and then you create a

18   requisition from the hits that you get in your search, and now

19   it's time for the purchase order generation module to come into

20   play and generate purchase orders.  And in this figure 5A from

21   DX-7, what I'm showing is that it has the ability, that is RIMS

22   had the ability to generate multiple purchase orders from the

23   same requisition, and it's useful to take it from the top of

24   that flow chart to show exactly how that happened.

25   Q    Can we blow up that flow chart a little bit?

Shamos - Direct

1   A    At the top, box 330, it says, CSR accepts requisition, so
2   we're talking about one requisition here.
3        It's not necessary to look at 331 since it doesn't relate
4   to what I'm going to talk about, so let's go down to box 332.
5   Box 332 is a test criteria.  That is, it's going to look for a
6   condition, and depending on whether the condition is satisfied
7   or not, we are going to branch out either to the right or to
8   the left.
9        So for each item in the requisition, each item is going to
10  have a product type.  If the product type equals one, three, or
11  four, then the answer to that would be yes, and you go over to
12  the right.  And if you follow the logic down the right, it says
13  create and send purchase orders data block including relevant
14  requisition data from requisition header and item tables.  So
15  it's going to go create a purchase order there.
16       If the product type was something other than one, three,
17  or four, then you take the branch to the left, and if the
18  branch -- then there's another test that asks whether it's an
19  internal purchase order, and if it's an internal purchase
20  order, it says yes, create and print purchase order internal to
21  customer.
22       So in some cases, you're going to create a purchase order
23  internal to customer, and in some cases, from the same
24  requisition, you're going to create a purchase order that is
25  not internal to customer, so they're going to be different

1    purchase orders.  That's multiple purchase orders from the same

2    requisition.

3    Q    Let's go to slide number 60, please, and the next element

4    of claim 21 of the '516 patent.  This is the element -- next

5    two elements, F and G; correct?

6    A    Yes.

7    Q    What, in essence, is element F of claim 21?

8    A    Element F is basically the equivalent searching that we

9    talked about before.  I have at least two catalogs, I found an

10   item in one catalog, and I'd like to know if there's a

11   generally equivalent item in another catalog.  We talked about

12   that already.  So that's present in RIMS.

13   Q    How about element G?

14   A    This says, wherein said multiple sources is limited by

15   said catalog searching module providing a match, according to

16   the search criteria, and a determination system that located

17   items are generally equivalent, and so what this says is --

18   this citation from DX-7 talks about the host cross-reference

19   table including information on items shown in the blue box

20   which have been determined to be equivalent.  So RIMS satisfies

21   this limitation on '516, claim 21.

22   Q    Let's go to slide 61, please.  What are you showing here

23   on slide 61 regarding claim 21?

24   A    This is a further limitation that says that determination

25   system, whatever it is, has to include a cross-reference table

1    matching an identification code from first item with an

2    identification code from the second item, and the phrase

3    cross-reference table has been construed, and it's a table that

4    links vendors' items determined to be equivalent between two --

5    I think there's a typo in the original, but it should be two or

6    more different vendors, and that's exactly what the host

7    cross-reference table does in RIMS.

8    Q    So I think we got to the end of claim 21 here; correct?

9    A    Yes.

10   Q    You've got your conclusions stated at the bottom of slide

11   61; right?

12   A    Yes.

13   Q    Let's go to slide 62.  You have to love these dependent

14   claims; right?

15   A    They make things simpler.

16   Q    Can you walk us through your analysis of claim 22?

17   A    Yes.  It's basically everything in claim 21 with the

18   additional requirement, wherein said determination system

19   includes an identical identification code for each of said

20   located items.

21   Q    Did you find that in the RIMS system?

22   A    Yes, in a way.  I mean, to the extent that this could even

23   be understood, it's certainly in the RIMS system.

24   Q    Can we go to the RIMS patent DX-7, column 34.  Column 34,

25   lines one through nine, if you can blow those up, please.  You

1    were just looking at claim 22 of the '516 patent that says,

2    wherein said determination system includes an identical

3    identification code for each of said located items; correct?

4                MR. ROBERTSON:  Objection, Your Honor.  It's not in

5    his expert report.

6                MR. McDONALD:  This would be at -- in the Exhibit 3

7    appendix, Your Honor.  Do you have a copy of that, Dr. Shamos's

8    charts?

9                THE COURT:  Color-coded one?

10               MR. McDONALD:  Yes, the one with all the cells to it.

11               THE COURT:  I do have it.  Where it is?

12               MR. McDONALD:  That's at I --

13               THE COURT:  What page?

14               MR. McDONALD:  Page 11.

15               THE COURT:  Column --

16               MR. McDONALD:  I, the RIMS --

17               THE COURT:  These columns aren't numbered on this

18    thing.

19               MR. McDONALD:  I believe it would be a little easier

20    to follow.

21               THE COURT:  Would it be on Exhibit 3?

22               MS. STOLL-DeBELL:  Yes, it is Exhibit 3.

23               THE COURT:  But I mean the one you gave me, the

24    version you gave me this morning or an earlier version?

25               MS. STOLL-DeBELL:  No, that was something different.

1               THE COURT:  Okay, column what?

2               MR. McDONALD:  Actually it would be page 17, column

3       I, cell 110.

4               MR. ROBERTSON:  I'm sorry.  I just need to get on the

5       same page.

6               THE COURT:  Cell what number?

7               MR. McDONALD:  Cell number 110.

8               THE COURT:  What paragraph?

9               MR. McDONALD:  Row I should be number -- basically

10      the first box on the far right.

11              THE COURT:  What corner of that box?  I'm there.

12              MR. McDONALD:  There's a reference to -- at the end

13      of that, the section including 31:60 to 34:67 to show that that

14      section satisfies this element, and the quote we have here is

15      within that range.  It's at 34:1-9.

16              THE COURT:  I'll tell you, I can't make heads or

17      tails of it.

18              MR. McDONALD:  Do you see the section that says, see

19      generally 31:60 to 34:67?

20              THE COURT:  Uh-huh.

21              MR. McDONALD:  What I'm saying is within that range

22      is what we've got here with 34 --

23              THE COURT:  Put that slide up so I can see what he's

24      talking about.

25      Q    Here, Dr. Shamos, do we have two entries regarding these

1    cross-reference tables?

2    A    Yes.

3    Q    And do they both have an identification code, beaker 250?

4    A    Yes.  It says beaker 250 as a stock number which is an

5    identification code.

6    Q    So it's identical for each of the two located items;

7    right?

8    A    Yes.

9              THE COURT:  Objection overruled.  Who did this come

10   from?  Dr. Shamos?

11             THE WITNESS:  Yes, Your Honor.

12   Q    So go back to slide 62 now.

13   A    Yes.

14   Q    That's what we were just talking about, is this element;

15   correct?

16             THE COURT:  He already testified to this element and

17   therefore it's obvious; right, according to your opinions?

18             THE WITNESS:  Yes, sir.

19   Q    Let's go to slide 63.  Now, claim 29, correct, Dr. Shamos?

20   A    Yes.  It's getting easier.

21   Q    So what are you conveying here on slide 63?

22   A    The preamble and elements A, B, and C are exactly the same

23   as those of '516, claim one, and we already went through that,

24   and those are disclosed by RIMS plus TV/2.

25   Q    Let's go to slide 64 here regarding claim 29.

Shamos - Direct                                                    2469

1    A    Yes.

2    Q    Can you summarize what you are communicating on this

3    slide, please?

4    A    Yes.  This is just another way of expressing the catalog

5    collection protocol element which we already looked at in the

6    '516, claim one, and so it's -- it's also disclosed by RIMS

7    plus TV/2.

8    Q    Let's go to slide 65.  This goes to the 5th and sixth

9    elements of claim 29?

10   A    Yes.

11   Q    Can you summarize your analysis here?

12   A    Well, the element E is the same as '516, claim one,

13   element E, so we've already done that.  F is just another way

14   of expressing the cross-reference table, and that's found as

15   the host cross-reference table in RIMS.  That's the end of

16   claim 29.

17   Q    So can we turn now to the '683 now.

18           THE COURT:  Can we turn now to a break?  All right,

19   take your pads with you, please.  We'll take a 20-minute

20   recess.

21

22                      (Jury out.)

23

24           THE COURT:  How much longer do you have, Mr.

25   McDonald?

Shamos - Direct                                                2470

```
 1              MR. McDONALD:  Give me a moment, Your Honor.  Can
 2    I -- I would like to consider the possibility of slicing out a
 3    lot of the analysis when we get through with RIMS plus TV/2.
 4    Can you give me the break to determine whether I can get myself
 5    and my team on the same page?  If that's the case, I think we
 6    can keep it to about another half hour or so.
 7              THE COURT:  Sure.  And one other question, do you
 8    have any other witnesses after this witness?
 9              MR. McDONALD:  No.
10              THE COURT:  Thank you.  All right, thank you.  We'll
11    be in recess.
12
13              (Recess taken.)
14              (Jury in.)
15
16              THE COURT:  All right.
17    Q    Can we turn to slide 66, please.  We're moving on now, Dr.
18    Shamos, to the '683 patent claims; correct?
19    A    Yes.
20    Q    So let's take it from the top here.  The first claim in
21    the '683 patent that's involved in the case is claim three;
22    right?
23    A    Yes.
24    Q    So why don't you tell us about the first element of claim
25    three.
```

2471

1    A    I said earlier that with many of the claims, it required

2    at least two catalogs or a collection of catalogs or words of

3    similar import, and so collection of catalogs covers at least

4    two product catalogs.  So we already showed that that was

5    satisfied in '516, claim one.

6    Q    For the same reasons also, element A of claim three of the

7    '683 patent is satisfied?

8    A    Yes.

9    Q    Let's go to the next slide.  This is the second element of

10   claim three; correct, Dr. Shamos?

11   A    Yes.

12   Q    It's a means for selecting the product catalogs to search;

13   correct?

14   A    Yes.

15   Q    Is this a phrase that the Court construed especially for

16   the case?

17   A    Yes.

18   Q    Why don't you walk through your analysis of this slide

19   number 68, please.

20   A    Oh, yes.  Means for selecting the product catalogs to

21   search.  There's a quote here from DX-105 about what search is

22   in TV/2.  So it's a search facility that can locate every

23   occurrence of a word or phrase, and this is an interesting

24   list.  Either the current topic, a list of selected topics, the

25   complete document, or another document.

1       So as part of the search, you can select which document it

2  is that you would like to search, and, therefore, it had a

3  means for selecting catalogs to search.

4  Q    What is your understanding in that phrase as to what a

5  list of selected topics would be?

6  A    It was possible --

7            MR. ROBERTSON:  Objection, lacks foundation.

8            THE COURT:  What?

9            MR. McDONALD:  He's talking about his understanding

10  of this information.

11           MR. ROBERTSON:  The document says what the document

12  says.  How does he form an understanding as to what it means,

13  the author's intent.

14           MR. McDONALD:  I didn't ask him the author's intent.

15  I asked him for his understanding.

16           THE COURT:  I didn't hear him say that he asked what

17  the author's intent was.

18           MR. ROBERTSON:  I said I don't understand how he can

19  understand what was meant by these words here.

20           THE COURT:  You don't understand how he can

21  understand something?  You do that by applying your thought

22  process.  I think I understand how you understand, but I don't

23  understand sometimes what you understand, but I do understand

24  how you do it.  Do you want to drop that one and send it

25  back to the kennel?

1          MR. ROBERTSON:  I'll send that one back.

2          THE COURT:  Send that one back to the kennel.  Put it

3    back in the corral.

4    Q    What is your understanding, Dr. Shamos, as to what a list

5    of selected topics is for purposes of that TV/2 disclosure?

6    A    My fair reading as one of skill in the art of that phrase

7    that's on the screen is that in TV/2, a list can be presented

8    of topics, and you can select from that list the topics that

9    you would like to search.

10   Q    So in between the combination of the RIMS and TV/2 system,

11   it's the TV/2 part of the combination that satisfies this

12   element B in your opinion; is that right?

13   A    At least the TV/2 part.

14   Q    Let's go to the next slide, please.  What do you have on

15   the screen here, Dr. Shamos?

16   A    This is element C, means for searching for matching items

17   among the selected product catalogs, and below is the Court's

18   construction of this means including both the function and the

19   structure.

20        Clearly TV/2 performed the function because it searched

21   for search results among the selected catalogs.  With respect

22   to the structure, it's particularly easy because the Court

23   included TV/2 as part of the structure that satisfies this

24   means element.  You can see on the bottom line an example of

25   the disclosed structure in the '683 patent was TV/2.  So the

Shamos - Direct                                              2474

1    function is present and the structure is present, so the means

2    is present.

3    Q    And for the prior element, that means for selecting the

4    product catalogs to search, just to be clear, did you find both

5    the function and the corresponding structure satisfied for that

6    element as well or not?

7    A    Yes.

8    Q    Let's go on to the next slide, please.  What's the next or

9    fourth element of claim three of the '683 patent?

10   A    Means for building a requisition using data relating to

11   selected matching items and their associated sources.

12            MR. ROBERTSON:  Your Honor, I'm going to object.  I'd

13   appreciate if we can approach for a minute on this issue.

14            THE COURT:  All right.

15

16            (Discussion at sidebar as follows:)

17

18            MR. ROBERTSON:  Thank you.  Your Honor, I'm objecting

19   because what they are attempting to do is use the Court's claim

20   construction for means-plus-function element which the Court

21   was required to look at the function as specified in the claim

22   and then identify the corresponding structure in the patent,

23   which, in this case, is the preferred embodiment of TV/2.

24            So I think the suggestion is being made somehow that

25   the Court's construction itself is suggesting a combination of

1    TV/2 and the RIMS patent, and I just think that's improper to

2    cloak this argument in the robe of the Court, really, is what's

3    going on here, by trying to use your construction that had to

4    be made for purposes of construing the means-plus-function

5    claims to now leave the impression that identifying TV/2 as the

6    corresponding preferred embodiment somehow suggests it's

7    obvious.

8              MR. McDONALD:  I think it's just doing the same thing

9    we do for every other claim element, Your Honor, and that is to

10   take the element the Court's construed and use the Court's

11   construction and match it to the combination of prior art we're

12   saying --

13             THE COURT:  I think maybe you're outthinking an owl,

14   Mr. Robertson, seeing more than is there.  If you want me to, I

15   will give an instruction that you cannot infer a combination

16   from any aspect of the Court's construction.

17             MR. ROBERTSON:  Particularly when it's the

18   specification --

19             THE COURT:  I said I'll do that.  Do you want me to

20   do it now or later?

21             MR. ROBERTSON:  I think --

22             MR. McDONALD:  I think it should be part of the

23   overall instructions myself.

24             MR. ROBERTSON:  I think I'd appreciate it now because

25   the suggestion is being made.  This is the specification of the

1    patent itself.  That can't invalidate the patent, its own

2    specification.

3            MR. McDONALD:  That is an entirely different

4    question, but whenever you want to give the instruction is fine

5    with me.  Our preference is together with the other

6    instructions so the jury has context.

7            THE COURT:  You tender one for me.

8            MR. ROBERTSON:  All right.  Thank you.

9

10           (End of sidebar discussion.)

11

12   Q    I believe we left off with slide number 71 and the fourth

13   element of claim three; right, Dr. Shamos?

14   A    Yes.

15   Q    Can we pick up where we left off then, please?

16   A    Yes.

17   Q    You have the Court's description of the function and

18   structure for that claim element here on slide 71; correct?

19   A    Yes.

20   Q    So did you find that the combination of the RIMS and TV/2

21   prior art systems perform that same function that you've got

22   described here or not?

23   A    Yes.  That's all in RIMS.

24   Q    That function being building a requisition using data

25   relating to selected matching items and their associated

Shamos - Direct                                                2477

1    sources?

2    A    Yes.  The location of the matching items comes from TV/2.

3    TV/2 then sends the data about them to RIMS, and RIMS builds

4    the requisition from that.

5    Q    What is the structure in the RIMS system that performs

6    that function that you relied on here?

7    A    The structure is something that's actually called the

8    requisition module in RIMS.

9    Q    That RIMS system, that's a module operating on a computer

10   system that has access to data in the database; is that right?

11   A    Yes.

12   Q    Let's go to the next element here on slide 73.  This is

13   the fifth element of claim three; correct?

14   A    Yes.

15   Q    Again, in the yellow box, do you have the Court's

16   construction of the function and corresponding structure for

17   that means for processing the requisition to generate one or

18   more purchase orders for the selected matching items?

19   A    Yes.

20   Q    Did you find in either or both of RIMS and TV/2 prior art

21   systems that that function, as the Court defined it, was

22   satisfied?

23   A    Yes, I showed that earlier when I showed the purchase

24   order building flow chart that starts with the requisition and

25   makes purchase orders.

1    Q    You showed us a figure.  Did that figure include a

2    purchase order generation module or not?

3    A    I'm not sure that it was called that, but it is that

4    because it generates purchase orders and it's a module.

5    Q    So that was the analysis that you did with respect to

6    element E of claim 21 of actually the '561 patent; correct?

7    A    Yes.

8    Q    That is a typo here?

9    A    That is a typo.  It should be '516.

10   Q    Go to slide 75, please.  This is the next and last element

11   of claim three; correct, Dr. Shamos?

12   A    Yes.

13   Q    Did you compare the Court's construction of this element

14   to the RIMS and TV/2 combination?

15   A    Yes.  TV/2 doesn't do this, so it's only necessary to look

16   at the RIMS patent.

17   Q    So what, in essence, does this element F relate to that's

18   in the RIMS patent?

19   A    We have to look at the Court's construction of converting

20   which is substituting data relating to a selected matching item

21   and associated source to data relating to an item in a

22   different source, and that's described in DX-7 at column 33,

23   lines nine to 14.

24        It actually refers to the local computer 40 will normally

25   convert customer stock numbers to distributor catalog numbers

1    using the local cross-reference table, and it's clear that

2    convert there means substitute, because the purchase order

3    isn't going to make any sense.  If you send a purchase order to

4    someone that doesn't have his own stock numbers, he won't be

5    able to fill the order.  So, clearly, convert in this context

6    means substitute.

7              MR. McDONALD:  Do you have, Bill, the Court's claim

8    constructions that are in the jury notebook?  Can we go to the

9    second page of that and blow up the bottom element there.

10   Q    Dr. Shamos, is this that last element of claim three of

11   the '683 patent that we were just talking about?

12   A    Yes.

13   Q    So did you apply the Court's construction of that function

14   as well as look at the corresponding structure here to

15   determine that the RIMS system satisfied that element?

16   A    Yes.

17   Q    What specifically was the structure in the RIMS system

18   that you found had the corresponding structure to what's set

19   forth in the Court's construction?

20   A    Start at the end of line four of corresponding structure

21   where it says, one or more, and then highlight the next several

22   lines.  So it's one or more cross-reference tables or file

23   identifying cross-referenced items, identical items, or

24   generally equivalent items, and we looked at the

25   cross-reference tables in RIMS earlier that have that

1   information.  So the structure is present in RIMS.

2   Q    So we've gone through with that all of the elements of

3   claim three?

4   A    Yes.

5            MR. ROBERTSON:  Your Honor, I'm actually -- I'm

6   sorry, I'm a little slow here, but that was not in his report,

7   so I ask that the question and the answer be stricken.

8            THE COURT:  Where is it?  What paragraph?

9            MR. McDONALD:  I believe is column I, 110.  Let me

10  see if I have that right.

11           THE COURT:  I don't know --

12           MR. McDONALD:  If you go to page 16 of --

13           THE WITNESS:  Page 17.

14           MR. McDONALD:  Page 16 actually has the element on it

15  at the bottom of the page.  I want him to start there at the

16  very bottom of page 16 of the RIMS related chart, Your Honor,

17  and row 109.  It's got this specific element that we're talking

18  about.  It's the means for converting data --

19           THE COURT:  Row what?  I?

20           MR. McDONALD:  The element itself is column A, row

21  109, and if you go all the way across to column I, that is the

22  RIMS disclosure that corresponds to that.

23           THE WITNESS:  It's the lower right-hand box on page

24  16.

25           MR. McDONALD:  Then continues to the top corner of

1    page 17, and that's where it discusses the cross-reference

2    table.

3            THE COURT:  Mr. Robertson, do you agree?

4            MR. ROBERTSON:  No, Your Honor.  It's not using the

5    construction that's on the screen right here in that column I.

6            THE COURT:  Where?

7            MR. ROBERTSON:  I understood they agreed to take this

8    slide out this morning, Your Honor, because it had the wrong

9    construction in it.

10           MR. McDONALD:  I think it had been modified by

11   agreement of the parties, but the reference to cross-reference

12   tables is in I --

13           THE COURT:  Wait a minute.  Are you saying -- what is

14   on the screen now is from the jury notebooks.  Are you saying

15   the slide is wrong?  Is that what you are saying?

16           MR. ROBERTSON:  No.  I'm saying he did not apply

17   what's on the screen, Your Honor, in his opinion.

18           THE COURT:  Where did he do that, Mr. -- I don't see

19   that, Mr. McDonald.

20           MR. McDONALD:  We actually gave you the condensed

21   version, Your Honor.  We thought it would be a little easier to

22   handle.  If you had the full version, row E actually sets forth

23   the Court's function and structure and goes across the table to

24   show that's what's been filed.

25           THE COURT:  He's got the means for converting and the

1    function, but there's no -- let's see.  Are you referring to

2    the text under the opinion re Johnson?

3              MR. McDONALD:  I think the column E was its own

4    column for the Court's construction.

5              THE COURT:  I know, but your question is, you're not

6    using that construction.

7              MR. McDONALD:  If you go all the way across on the

8    same line to column I, that's where you'll see the RIMS patent

9    corresponding to that.

10             THE COURT:  Where is column I?  It's not marked.  All

11   of those -- I got a bunch of things that have been excluded,

12   plus pink just said this means is not disclosed in the

13   reference.  So it can't be the opinion that he's giving.  Do

14   you see what I'm saying it says in pink?  If you read pink in

15   the block 109, it does not correspond with his answer.

16             MR. McDONALD:  No, but the green here is actually on

17   the RIMS patents.  This is the one that corresponds right here.

18             THE COURT:  That's what was on the -- is in the

19   patent.  I mean in the exhibit, excuse me, Exhibit 3.

20             MR. McDONALD:  Yes.  This corresponds to exhibit --

21             THE COURT:  Have you read this thing, Mr. Robertson?

22   It may, in some subtle way knowledgeable to you not be using

23   it, but it looks to me like it is on the surface, and I figure

24   the best way for you to deal with that is cross-examination.

25             MR. ROBERTSON:  All right, Your Honor, I'll do that.

1    There's a lot of data to try to absorb.

2              THE COURT:  I can pledge to you that I know less

3    about this case than any of you sitting there.

4              MR. McDONALD:  Could the record reflect there was

5    silence in the courtroom after that?

6              THE COURT:  Silence is a sin.

7    Q    Can we go back to slide 77, please.  So, Dr. Shamos, you

8    did apply the Court's construction as to the function and

9    structure with respect to element F of claim three of the '683

10   patent; correct?

11   A    Yes.  In my report, I have a column, usually column A,

12   that lists the literal claim language, and then I have a column

13   E which says as construed in which I plug in the Court's

14   constructions for all of the claim language to get the claim as

15   written as I have to apply it.

16        And I did apply the Court's construction and found that

17   RIMS cross-reference table satisfied the structure and function

18   recited in claim '683, claim three.

19   Q    Can we go to slide 78, please.  Now moving we're from one

20   of those means-plus-function claims to a method claim, claim

21   26; correct?

22   A    Yes.

23   Q    Can you walk us through your analysis of claim 26 of the

24   '683 patent as set forth here in slide 78?

25   A    Yes.  Element A begins, maintaining at least two product

1  catalogs on a database.  We've talked about this many times

2  now.  It was made reference to two product catalogs, a

3  collection of product catalogs, and words that essentially mean

4  the same thing.  So clearly RIMS and TV/2 maintained at least

5  two product catalogs.  At least the combination did.

6       For element B, selecting the product catalogs to search,

7  we've been over that a number of times.  In the earlier claims,

8  it was even more restrictive.  It was selecting less than all

9  of the catalogs.  Here it just says selecting product catalogs

10 to search, and that was performed by the means for selecting

11 product catalogs to search in '683, claim 3B.

12      C, searching for matching items among the selected product

13 catalogs, that's the whole purpose of these search systems, is

14 to allow the buyer to find the items he wants to search.  So

15 that's performed by the means for searching in claims '683,

16 claim three, and both RIMS and TV/2 have that search function.

17 So all of A, B, and C are disclosed by the combination.

18 Q    If we can go to the next slide, please, 79.  You have the

19 next two elements of the method claim 26; correct?

20 A    Yes.  We've actually seen this before.  Building a

21 requisition using data relating to the selected matching items,

22 that was performed by the means for building the requisition of

23 '683, claim 3D, in RIMS.  And then processing a requisition to

24 generate one or more purchase orders, that relates, again, to

25 the flow chart that I went through that showed the different

1    purchase orders being made, but it's also performed by the

2    means for processing the requisition of '683, claim 3E.

3    Q    That flow chart, are you talking about the figure five

4    flow chart from the RIMS patent?

5    A    Yes, that starts at the top with CSR accepts the

6    requisition, and then there's some branching logic depending on

7    the product types that makes either this purchase order or that

8    purchase order or both.

9    Q    Let's go on into slide 80 and the last element of claim

10   26.

11   A    Yes.

12   Q    Did you determine whether or not the combination of the

13   RIMS and TV/2 systems satisfied this last element, determining

14   whether a selected matching item is available in inventory?

15   A    Yes.  We talked about this before.  It is, after all, an

16   inventory management system, and so RIMS allows the

17   determination of the quantity of the item available in the

18   customer-owned inventory, or actually, if you go on, in several

19   other inventories.

20   Q    And do you have an excerpt here in slide 80 to support

21   your conclusions?

22   A    That's what I was quoting from.

23   Q    Is that an excerpt from the RIMS patent?

24   A    Yes.

25   Q    Can we go to the RIMS patent, please, DX-10 at column two,

1    lines 46 to 51.  Column two, lines 46 to 51.  Does this excerpt

2    also relate, Dr. Shamos, to whether or not the RIMS patent

3    discloses the step of determining whether a selected matching

4    item is available in inventory?

5    A    Yes.

6    Q    Refers to these figures 4A through 4D of the RIMS patent;

7    correct?

8    A    Yes.

9    Q    What do those pictures depict in the RIMS patent?

10   A    Well, my recollection is that there is a box in there that

11   depicts looking up how much -- whether the item is available in

12   inventory.

13   Q    All right.  So let's -- have we completed the analysis

14   then of claim 26 of the '683 patent?

15   A    Yes.

16   Q    And the combination of the RIMS and TV/2 systems, did you

17   find each one of the steps of that claim satisfied?

18   A    Yes.

19   Q    Turn now to claim 28 and the next slide, 82.  Can you tell

20   us what your analysis here is of claim 28 of the '683 patent?

21   A    Yes.  Claim 28 is the same as claim 26 as far as steps A

22   through E.  The only difference is step F is replaced by the

23   one that's on the screen here, the converting data related to a

24   selected matching item, and we've already discussed that.  It

25   does that conversion through the use of cross-reference tables.

Shamos - Direct                                                    2487

1    Q    Did you conclude that claim 28 was obvious in view of the

2    combination of the RIMS and TV/2 systems?

3    A    Yes.

4    Q    So can we, just to make sure we have our bearings here,

5    can you put claim 28 of the '683 patent up from Plaintiff's

6    Exhibit 1?  Blow up claim 28, please.  So this is the claim you

7    were just talking about; right, Dr. Shamos?

8    A    Yes.

9    Q    So you are saying all the elements of this claim 28 except

10   the very last one that we covered when we went through 26; is

11   that right?

12   A    All the steps.

13   Q    Then the last one is the one that you just analyzed?

14   A    Yes.

15   Q    Thank you.  Can we go back now to slide 83, please.  This

16   is dependent claim 29 of the '683 patent; correct, Dr. Shamos?

17   A    Yes.

18   Q    Can you explain your analysis of that claim?

19   A    Well, it's the method of claim 28 further comprising the

20   step of determining whether a selected matching item is

21   available in inventory.  So claim 28 had steps A through F.

22   This would add a step G, but that happens to be exactly the

23   same as step F of claim 26 which we already showed was

24   performed by RIMS, or a combination of RIMS plus TV/2.

25   Q    That's that inventory availability step?

1    A    Yes.

2    Q    So you found claim 29 was also obvious in view of the

3    combination of the RIMS patent and TV/2?

4    A    Yes, because all the steps are performed by that

5    combination.

6    Q    So does that take us through all the asserted claims in

7    the '683 patent now?

8    A    Yes.   The end is in sight.

9    Q    Turn now to slide 84, please.   Is this the last of the

10   asserted 12 claims?

11   A    Yes.

12   Q    So the '172 patent, claim one; correct?

13   A    Yes.

14   Q    Can you walk us through your slides here beginning with

15   slide 84 and the first element of that claim?

16   A    Yes.   This is the only claim that doesn't actually use the

17   word catalogs.   So here it's, instead, element A is a database

18   containing data relating to items associated with at least two

19   vendors maintaining so that selected portions of the database

20   may be searched separately.

21        TV/2 had that because there's a disclosure in TV/2 that

22   separate catalogs can be maintained on the same hard disk as

23   the -- that's the hard disk of the machine.   So that's a

24   database that has separate catalogs that can be searched

25   separately because the sophisticated TV/2 search system allowed

1    that.  So TV/2 had that.

2              MR. McDONALD:  Can we go to the TV/2 document DX-105,

3    please, and to the page G06 being the last two digits, and then

4    highlight or expand the upper half of that page, please.

5    Q    Dr. Shamos, is there something in this text of that IBM

6    manual that relates to this issue of selecting portions of the

7    database to search separately?

8    A    Well, for one thing, the catalog information, it talks

9    about storage on CD-ROM, and so if I have catalogs from

10   different vendors, then I can search one particular vendor's

11   catalog separately from all the others by simply putting in

12   that CD-ROM.  I'm not actually seeing anything else on this

13   particular page that relates to it.

14   Q    I think that's basically what I was asking about, so I

15   think that covers it.  So we can move on to the next slide,

16   number 85.  This is the second element of claim one of the '172

17   patent; correct?

18   A    Yes.

19   Q    This is an element that the Court construed with both the

20   function and the structure; correct?

21   A    Yes.

22   Q    Can you walk us through your analysis of this element of

23   claim one?

24   A    Let's understand it first.  Means for entering product

25   information that at least partially describes at least one

1    desired item.  So there's a search interface where the guy who

2    wants to find a beaker, for example, might type in the word

3    beaker, and he's going to get back a list of all beakers.  But

4    that's only a partial description, because he may want a beaker

5    of a very specific size, like 250 milliliters.  So he gave a

6    partial description, and he gets the -- that describes at least

7    one desired item.

8         So that function was clearly performed by the TV/2 search

9    system, because there's a discussion that you can put in

10   topics, you can even put in something called wild cards,

11   asterisks, et cetera, to partially search for something.

12        As far as the structure, we don't have to go very far to

13   determine that the structure is present, because on the bottom

14   line, one of the examples of the required structure is TV/2.

15   And so it's automatically -- the structure is automatically

16   present in the combination of TV/2 and RIMS.

17   Q    If we can go to slide 87 and the third element of claim

18   one of the '172 patent?

19   A    Yes.

20   Q    This is another means-plus-function clause; correct?

21   A    Yes.

22   Q    Did you apply the Court's construction of this

23   means-plus-function clause?

24   A    Yes, in every case.

25   Q    Can you walk us through that analysis specific to this

1    third element of claim one?

2    A    Yes.  So in the first element, which was the means for

3    entering product information that partially describe an item,

4    the reason you do that is because you want the system to then

5    go and search for things that satisfy the data that you've

6    entered.

7         So this is the means for searching for matching items that

8    match the entered product information in the selected portions

9    of the database.  And so we essentially saw this in this '683

10   patent, element C of claim three, that RIMS had it, but also

11   TV/2 allowed searching through multiple catalogs, and there's a

12   quote here from DX-107.  You can search through parts catalogs,

13   service manuals, stock lists, et cetera, and, of course, the

14   whole purpose of the search is find matching items.  You're not

15   looking for non-matching items.  So that's performed by TV/2.

16   Q    Can we go to the Court's construction of this claim,

17   please.  Page four of the Court's claim construction is the

18   last element on that page, please.  So this is the actual Court

19   construction of that element; is that right, Dr. Shamos?

20   A    Yes.

21   Q    Can you tell us what structure in the combination of RIMS

22   and TV/2 matches to the corresponding structure in the Court's

23   construction?

24   A    Yes.  This is another easy one.  On the last line, one of

25   the examples of structure corresponding to the recited function

1    is TV/2, and TV/2 was present in TV/2, so it's there.

2    Q    So we can go back to the slides.  Let's go to 88, the

3    fourth element of the claim one of the '172 patent.  Can you

4    walk us through your analysis of that fourth element, Dr.

5    Shamos?

6    A    Yes.  Means for generating an order list that include at

7    least one matching item selected by said means for searching.

8    All that's going on here is that you are getting first a hit

9    list, which is the items that are responsive to your search

10   criteria, but you may not want to order all of those.  So you

11   go down the hit list, and you select from the hit list the ones

12   that you actually want to order.  Then those are going to end

13   up on one or more requisitions.

14       So this is just a means for generating that order list.

15   The function is generating a list of desired catalog items that

16   includes at least one search result selected by said means for

17   searching.  Well, that's the whole purpose of searchable order

18   entry system, is to do that, and RIMS did that.

19       So did TV/2, actually, because it's a search program.  And

20   then remember the idea was in TV/2, to do a search, you find

21   the items you want, and then that data gets transmitted over to

22   RIMS for subsequent processing.  So the function is performed.

23       It's easy to show that the structure is present because on

24   the next to last line of the Court's construction, TV/2 is

25   listed as one of the possible structures that's disclosed in

1    the patent as performing this function.  And so since TV/2

2    includes TV/2, it's automatically there.

3    Q    Let's go to slide 90, please, and the last two elements of

4    claim one of the '172 patent.

5    A    Yes.

6    Q    Why don't you walk us through first that fifth element

7    that you labeled --

8    A    I think it was agreed that the means in this claim are the

9    same as the corresponding means in the '683 patent, claim

10   three.  So we've already been through '683-3.

11   Q    This relates to means for building a requisition, at least

12   that's a short form of the means; correct?

13   A    Yes.  And the same thing is true for means of processing

14   said requisition.  It's the same means as in the '683 patent,

15   claim three.

16   Q    So you've already shown us why those two elements of '683,

17   claim three, were satisfied using the Court's construction of

18   the means clauses; correct?

19   A    Yes.

20   Q    And so that same analysis shows that the Court's

21   construction of these two elements of claim one of the '172

22   patent are met; is that correct or not?

23   A    That's correct.

24   Q    So now we've walked through all 12 of the asserted claims

25   with the RIMS plus TV/2 foundation, haven't we?

Shamos - Direct                                          2494

1    A    Yes.

2    Q    Let's turn to another topic now.  If we could go to the

3    issue of other things that you consider when you're doing an

4    obviousness type analysis like you did here?

5    A    Yes.

6    Q    Are there some other factors you look at other than just

7    RIMS and TV/2 and the teachings to combine them when evaluating

8    obviousness, Dr. Shamos?

9    A    Yes, there are factors referred to as secondary

10   considerations.

11   Q    Did you look at those secondary considerations in this

12   case?

13   A    I did.

14   Q    How did your evaluation of those secondary considerations

15   affect your analysis that the RIMS and TV/2 combination is an

16   obvious combination and invalidates the claims in this case?

17   A    It bolstered it.

18   Q    Why is that?

19   A    Well, the concept of secondary considerations is just

20   because you find all the elements of a claim somewhere in the

21   combination of prior art does not automatically mean that the

22   combination was obvious.  For example, suppose for years many

23   people had been trying to make the invention but they failed,

24   and then later on somebody else --

25              MR. ROBERTSON:  I'm going to object, Your Honor.

1    This is now getting into an area where the witness is inviting

2    legal opinions and analysis.  If he wants to say what secondary

3    considerations he considered, that's fine, but he shouldn't be

4    lecturing the Court or jury on what he considers the law to be.

5            THE COURT:  I don't think he was lecturing me, and I

6    don't think he was lecturing the jury, but I think we're

7    getting into the province of the Court and the instructional

8    process, and so let's confine it, Mr. McDonald, to what

9    factors, secondary consideration that he took into account to

10   bolster his opinion of obviousness.

11   Q    Let's zero in on some specific facts here, Dr. Shamos,

12   that relate to your analysis.  Can you identify some specific

13   facts that you looked at regarding the secondary

14   considerations?

15   A    Yes.

16   Q    Give us some examples --

17           THE COURT:  Well, he can also identify the general

18   topics so we can put some framework to it, but not a full

19   description of what all is.  That's for the Court to do.

20   Q    What topics did you consider?

21   A    Yes.  I considered, for example, allegation of failure of

22   others.  I considered commercial success.  I considered

23   recognition of the products by others in the field such as by

24   the handing out of awards for the product, things like that.

25   Q    Did you look at the issue of whether or not there was any

Shamos - Direct                                                    2496

1    sort of a long-felt but unmet need that the patents-in-suit

2    would have addressed?

3    A    Yes.  Long-felt and unmet need is very close to failure of

4    others.

5    Q    Did you find that there was some long-felt but unmet need

6    in the marketplace that the systems in the patents-in-suit

7    addressed?

8    A    No.  The need was met, so there's no unmet need.

9    Q    Are you familiar with the product called PO Writer?

10   A    Yes.

11   Q    How did your analysis of the PO Writer product relate to

12   your assessment of the secondary considerations on obviousness?

13   A    PO Writer is an example of a prior art system that met the

14   need, so thus proving that there was no unmet need.

15   Q    Can we go to slide number ten, please.  Is this a slide

16   you prepared, Dr. Shamos, regarding the PO Writer system?

17   A    Yes.

18   Q    Can you walk us through what you are showing us here on

19   slide number ten?

20   A    Yes.  This is from DX-117, and I apologize again for the

21   poor quality of the original, but I thought it was more

22   effective to take it right out of the original.

23   Q    When you say the original, what are you talking about?

24   A    Well, the original document that was admitted as DX-117.

25   Q    What is DX-117?

1   A    It's a literature describing -- it's a manual describing

2   the PO Writer system.

3   Q    Why don't you go ahead and walk us through what you have

4   here on slide ten.

5   A    Yes.  Well, in PO Writer, you could specify a catalog for

6   searching and give a partial specification of an item.  And so

7   it says at the top, for example, say you want to display all

8   items in the --

9            MR. ROBERTSON:  I object, because in the section of

10  this gentleman's report, there's no specific citation to these

11  documents that he's now referring to.

12           MR. McDONALD:  He refers to the secondary

13  considerations specifically --

14           THE COURT:  Give me the page, and I'll look at it and

15  we'll go from there.

16           MR. McDONALD:  We've got the section here on the

17  unmet needs.

18           THE COURT:  What paragraph, page and paragraph are

19  you talking about?

20           MR. McDONALD:  In Dr. Shamos's report beginning at

21  page 70.

22           THE COURT:  7-0?

23           MR. McDONALD:  Yes.

24           THE COURT:  Just a minute.  And what paragraph?

25           MR. McDONALD:  Beginning at the top of the page

1    there, 241.  He's going through the analysis there of the

2    benefits of the system and whether other prior art systems

3    existed --

4              THE COURT:  It says, though, that he didn't cite this

5    document.  Isn't that the objection, Mr. Robertson?  And the

6    rule, federal rule says that you shall identify every document

7    or reference that forms the basis of your opinion as part of

8    your report, and the objection is it's not -- this document

9    isn't identified, and there is no document identified in

10   paragraph 241 that I know of.

11             MR. McDONALD:  Okay.  So what it does say on the

12   third line of paragraph 241, the however -- actually begins at

13   the second line.

14             THE COURT:  Second sentence.  Okay, let me read that.

15   Well, that doesn't cite the specific reference; therefore, it

16   doesn't comply with the requirement of Rule 26 that the

17   specific reasons for the inclusions be articulated, so it's not

18   compliant with the disclosure requirement of 26(e), and the

19   objection is sustained to the use of that document unless it's

20   somewhere else disclosed in the record, and if it is -- that

21   paragraph doesn't do it, is all I was trying to say rather

22   inarticulately.

23             MR. McDONALD:  The PO Writer system and the manual

24   cited, specifically at paragraphs 180 through 180 --

25             THE COURT:  Just a minute.  What paragraph?

1             MR. McDONALD:  Let's zero in on 181 at page 54.

2             THE COURT:  Paragraph 181.

3             MR. McDONALD:  That's right.

4             THE COURT:  What sentence does it cite this exhibit?

5             MR. McDONALD:  The fourth line, it refers to the PO

6    Writer manual.

7             THE COURT:  The parenthetical?

8             MR. McDONALD:  Yes.

9             THE COURT:  Is that where this is?  Is that what this

10   is from?

11            THE WITNESS:  I think it's actually paragraph 182.

12            MR. McDONALD:  Actually what's on this page, if you

13   continue to the top of page 55, Your Honor, the next paragraph,

14   there's a specific cite to the PO Writer manual guided tour at

15   46 to 47.  This excerpt, I understand, is right from those two

16   pages.

17            THE COURT:  Is that correct, sir?  You prepared it.

18   Is that where this reference came from?

19            THE WITNESS:  It came from that manual.  I can't

20   remember if it was exactly that page, but we can pull up that

21   page.

22            MR. McDONALD:  Maybe that's the best thing to do.

23   How about I pull up that particular page.

24            THE COURT:  Mr. Robertson, does that refresh your

25   recollection that this has been adequately disclosed?

1              MR. ROBERTSON:  Your Honor, that exhibit has been

2    disclosed.  I don't know if that particular page has.  I'm as

3    befuddled as the witness and Mr. McDonald with respect to that.

4              THE COURT:  So you want us to go look for that page

5    and see whether it does.  Get us that exhibit and that page,

6    please.

7              MR. McDONALD:  Put up Defendant's Exhibit 117, and

8    put up the guided tour at pages 46 and 47, please.  I guess 46.

9              THE COURT:  Just so the record is clear, it's not the

10   guided tour at page 22 and 130, 31 in paragraph 81.  It is the

11   reference in paragraph 182 to the guided tour at 46 and 47; is

12   that where this is from?

13             MR. McDONALD:  Can you blow up page 46 from

14   Exhibit 117?  In the lower left there is a number 46.  Does

15   that also correspond -- go back to the main page, please.  Is

16   that also in the lower right corner L0126576?  That's what's

17   cited on the slide, Your Honor.  This is that page 46 that is

18   exactly the page --

19             THE COURT:  So do you stand down?

20             MR. ROBERTSON:  I'll accept the representation.  It

21   is in a different completely section of the report that doesn't

22   have to do with secondary considerations, but I understand the

23   Court's ruling.

24   Q    Let's go back to slide ten, Dr. Shamos.

25   A    Yes.

1   Q    Can you tell us what you are showing us here?

2   A    Yes.  Basically this says that if I want to restrict my

3   search to just the Bayless catalog, then I can search for a

4   particular item that has this partial description in just that

5   catalog.  So this was done by PO Writer.

6   Q    With respect to this issue of whether there's a long-felt

7   unmet need in the marketplace for something, how does this

8   relate to that particular secondary consideration?

9   A    Well, the only thing that allegedly was missing, as least

10  at recited by the patents, is the ability to search multiple

11  catalogs, and this did that.

12        MR. ROBERTSON:  I object to that, Your Honor.

13  There's no basis or foundation for that in the patent.  That is

14  not -- the claims define what the invention is.  There is no

15  characterization that's the only thing that was the missing.

16  That mischaracterizes the document, and that characterization

17  is certainly not in his report.

18        THE COURT:  If what he says is true, we've been

19  trying this case for an awful long time on a lot of issues

20  other than that.  I think maybe Mr. Robertson 's objection is

21  well-taken.

22        MR. McDONALD:  If we go to paragraph 244 of Dr.

23  Shamos's report, you'll see he's referring to a discussion of a

24  purported need that actually ePlus had raised in their

25  interrogatory as a reason --

1          THE COURT:  I understand that, but that's not what he

2     said here.  That's not what the objection is related to.  He's

3     not objecting to the fact that if it's his opinion, that it was

4     shown -- I mean that there was an extant need that had been

5     fulfilled already.

6          He's objecting to his characterization of the claims

7     in the patent, and I sustain the objection.  The answer is

8     stricken.  Don't pay any attention to that, please.

9     Reformulate the question.

10    Q    Let's focus on the need issue, Dr. Shamos, as opposed to

11    trying to define the invention in your answer.  Is it your

12    understanding that there was an issue in the case as to whether

13    or not the systems, the patents at issue in this case would

14    satisfy a need that related to conducting searches of product

15    catalogs of multiple vendors and transfer information about

16    items selected from the results of a vendor catalog database

17    search to a requisition building module?

18    A    I can't remember whether you phrased it in a positive or a

19    negative, but there were no needs that were alleged to be unmet

20    by ePlus that really were unmet.  They were all met by the

21    prior art including this one.  And I laid that out in my

22    report, in successive paragraphs of my report beginning at --

23         THE COURT:  The jury can't have your report.  That's

24    not evidence.

25         THE WITNESS:  We can go down them one by one.

1    Q    Let's go through your slides here.  Let's go to slide 11.

2    Did you do some analysis as to whether or not the PO Writer

3    product would satisfy marketplace needs related to systems that

4    create a requisition?

5    A    Yes.

6    Q    What did you conclude about that?

7    A    That's shown here, and that's, again, from the PO Writer

8    guided tour.

9    Q    What is shown here?

10   A    What's shown here is the creation of a requisition

11   containing multiple items from multiple catalogs, and you can

12   create -- in this case, it's Bayless catalog, but if you had

13   done a search over the entire database and found items from

14   more than one catalog, you could have created a requisition

15   with items from multiple catalogs.

16   Q    Can we go to slide 12, please.  Did you also look at

17   whether or not the PO Writer system met any market needs

18   regarding creating multiple purchase orders from the

19   requisition?

20   A    Yes.  This is creating multiple purchase orders from a

21   single requisition, and that's what the last sentence of the

22   citation says, a requisition can also be split creating any

23   number of purchase orders.

24   Q    Are you again quoting from that same PO Writer guided tour

25   document?

Shamos - Direct                                              2504

1    A    Yes, DX-117.

2    Q    Did you look at whether or not the J-CON system also was

3    in existence before the patents-in-suit were filed that met any

4    of the needs in the marketplace at that time?

5    A    Yes.

6    Q    What was your conclusion about the J-CON system?

7    A    That the J-CON system met numerous of the allegedly unmet

8    needs.  In fact, apparently, all of them.

9    Q    Did you look at any particular J-CON documents as part of

10   your analysis of the J-CON system?

11   A    Yes.  There was a huge J-CON manual, I think called volume

12   one.  It was over a thousand pages long.

13   Q    Can we put up the first page of Defendant's Exhibit 96,

14   please.

15   A    That's it.

16   Q    That's page one of that thing; is that right, Dr. Shamos?

17   A    Yes.

18   Q    What did you determine from reviewing the J-CON manual

19   about the features of that system that would be relevant to

20   whether or not that system met the market needs that were in

21   existence back in the early '90s?

22        MR. ROBERTSON:  Your Honor, I'm going to object.  It

23   calls for a narrative.  That's a pretty wide-open question

24   there.

25        THE COURT:  Do you want him to lead?

1            MR. ROBERTSON:  Well, I'd like him to ask --

2            THE WITNESS:  I'm not going to give a narrative.

3    I'll answer in one sentence.

4            THE COURT:  I think you already did.  You said it met

5    all the --

6            THE WITNESS:  Correct.

7            THE COURT:  I think the question was what were the

8    unfelt needs, though.  Is that right?

9            MR. McDONALD:  Yes.

10           THE COURT:  It met all the unfelt needs, but what

11   were the unfelt needs that you think it melt -- met.  Oh,

12   goodness, too late in the day -- and the J-CON that is.

13           THE WITNESS:  Yes.

14           THE COURT:  Identify very briefly the needs.

15   Q    Did you do a slide about that, about the J-CON system?

16   A    Yes.

17   Q    Let's go to slide 14.  Is this a summary of what you

18   viewed as relevant to features of the J-CON system that would

19   be relevant to the marketplace needs back in the early '90s?

20   A    Okay.  Wait.  The answer is yes, and those are some of the

21   features of J-CON.  But with respect to the unmet needs that

22   were alleged by ePlus, those were in their interrogatory

23   responses, and I can just go down and list the needs that they

24   believed were unmet, and I can show that they were met by

25   J-CON.

1    Q    Can you walk us through this and tell us what features you

2    saw when you looked at Defendant's Exhibit 96 about the J-CON

3    system?

4    A    J-CON maintained multiple catalogs, allowed you to do

5    product searches among the multiple catalogs.  It enabled you

6    to create requisitions from the hit results that you got from

7    the catalogs.  You could then generate multiple purchase orders

8    from a single requisition.  You could do inventory checking and

9    also cross-referencing.  You could convert a catalog number

10   from one vendor to that of another vendor.

11   Q    Thank you.  Can we go back to the PO Writer issue.  Well,

12   actually, let's do this:  Let's go back to slide number 90.  I

13   want to make sure we have something clear here.

14        You mentioned that the, something about the structure in

15   these claims, claim elements corresponded to the structure in

16   the corresponding elements of claim three of the '683 patent.

17   I want to be clear, though.  Was the function the same in these

18   two elements as it was in the '683 patent or not?

19   A    I thought that there was an agreement that the means were

20   to be treated identically.  There may have been slight

21   differences in the wording of the function.  I don't recall.

22   Q    Well, did you look at the Court's construction of the

23   function of those two means elements of claim one of the '172

24   patent?

25   A    Oh, yes.  But for the purposes of testifying here today,

1   there's no substantial difference.

2   Q    If we can turn to slide number 147.  Dr. Shamos, can you

3   tell us what you wanted to convey here with your slide number

4   147?

5   A    Yes.  There's a dispute in this case as to whether the

6   Lawson system has catalogs at all, or if it does have catalogs,

7   whether it has more than one catalog, and the plaintiff has

8   asserted for purposes of infringement --

9         MR. ROBERTSON:  Objection, Your Honor,

10  characterization of what the plaintiff has asserted here.

11        MR. McDONALD:  Why don't you stick -- I'll try to

12  keep a shorter leash here, Your Honor.

13  Q    Dr. Shamos, can you walk through your analysis here in

14  slide 147, one bullet point at a time and try to stay on those

15  particular bullet points, please?

16  A    Sure.  Well, you already know from my previous two hours

17  of testimony that all of certain claims are obvious in light of

18  RIMS plus TV/2.

19  Q    Okay.  Take us to the next element?

20  A    The only claim elements missing from RIMS, or even

21  allegedly missing from RIMS, are at least two catalogs, a

22  collection of catalogs, et cetera.

23        MR. ROBERTSON:  Objection, Your Honor.  I don't know

24  who he's characterizing as alleging is missing from RIMS,

25  because if he's alleging it's ePlus, that's not an accurate

1    statement.  So I object to the characterization of what the

2    plaintiff's position is with our allegation with respect to

3    RIMS.

4                THE COURT:  I think there are more allegations than

5    that.  I think it's all right for you to ask him what he

6    understands the missing claims elements to be, to say without

7    characterizing what they've actually done in their assertions,

8    because he's entitled to his understanding of it, and then Mr.

9    Robertson can cross-examine him about any of that but without

10   binding Mr. Robertson to the allegations as understood by Dr.

11   Shamos.  So maybe try it again.  Disregard that testimony,

12   please, ladies and gentlemen.  Start again.

13   Q    In your analysis, Dr. Shamos, as you apply the Court's

14   construction of the term these two catalogs or collection of

15   catalogs and your RIMS plus TV/2 analysis, did you find the

16   catalogs to be in the RIMS system or the TV/2 system?

17   A    Catalogs are certainly in the TV/2 system because those

18   were published by a vendor, and they were distributed from the

19   vendor to the user of the TV/2 system.  So those met the

20   Court's construction of catalog.

21   Q    If we go to the third bullet point product here, what are

22   you trying to convey about the third bullet point in slide 147?

23   A    Lawson's item master has at least two catalogs and/or a

24   collection of catalogs, and so does RIMS parts master.

25   Q    Why do you say that?

1    A     Because they are effectively the same thing.  You load

2    data about items from multiple vendors into a database, and you

3    search that database.  And so if Lawson has more than one

4    catalog, then so does parts master in RIMS.

5              THE COURT:  Are you saying -- I understood you to say

6    that item master in RIMS were the same thing.  Is that what you

7    intended to say?

8              THE WITNESS:  No, I didn't say they were the same

9    thing.  Item master is a data structure -- it's a database

10   schema that's used in the Lawson system.  Parts master is a

11   similar database structure that's in the RIMS system, but at a

12   higher level they do the same thing.  You load data from

13   multiple sources into one database in both item master and in

14   RIMS parts master.  So if the one has more than one catalog,

15   the other has more than one catalog.

16   Q     What is your understanding as to how the parts master is

17   actually created in the RIMS system?

18   A     There are a number of sources of inventory.  Some of them

19   are in the local JIT inventory.  Some of them are in the

20   distributor's inventory, and information about those

21   inventories is loaded into parts master.

22   Q     Is that information loaded in an item at a time

23   essentially or some other way?

24   A     It could be done an item at a time, but typically it's

25   done by importation of electronic files.

1    Q    So what are you trying to say with the last element of

2    this slide?

3    A    Well, if these elements are in RIMS alone --

4    Q    Which elements are you talking about now?

5    A    At least two catalogs and collection of catalogs, then

6    RIMS anticipates the asserted claims because RIMS has

7    everything else.

8    Q    So you wouldn't even need to combine it with TV/2 in order

9    to validate the claims; is that what that means?

10   A    (No response.)

11   Q    Is it...

12        MR. McDONALD:  I have no further questions.  Thank

13   you, Dr. Shamos.

14        MR. ROBERTSON:  Your Honor, given the lateness of the

15   day, if I made a representation that if we recessed and I could

16   focus my cross-examination and shorten it considerably and

17   thereby spare everybody more time with me fumbling around,

18   would the Court be willing to entertain such a representation?

19        THE COURT:  Yes, but it's an insufficient one because

20   it hasn't been quantified at all.  And as all Paul Bryant said

21   years ago, that and a nickel will get you a Coke.

22        But I do think that the jury has been here long

23   enough today, and there's no sense in getting started with a

24   couple lines of questions and then letting them go home -- I

25   mean having them go, so we'll let them go home now, have a

1    fresh start in the morning at nine o'clock.  If you'll leave

2    your pads with Mr. Neal.

3            Now, let me ask you something.  Did you like those

4    donuts?

5            A JUROR:  Yes, very much.

6            THE COURT:  Would you like some more?

7            A JUROR:  Sure.

8            A JUROR:  I said that today.

9

10                        (Jury out.)

11

12           THE COURT:  We'll make a copy of this after this.

13   This involves the testimony of someone else, so I believe we

14   need to excuse Dr. Shamos.  Thank you very much.  He needs to

15   go get dressed for the Jets game.

16           THE WITNESS:  Yes, sir.

17           THE COURT:  Nine o'clock tomorrow morning, Dr.

18   Shamos.

19           THE WITNESS:  Yes, sir.

20           THE COURT:  Thank you very much.  I'm going to leave

21   this question with you.  Were PO Writer and J-CON patented.  If

22   so, when?  Next question -- I mean statement.  Question -- I

23   don't know what this is, but it's below this.  Didn't Dr.

24   Staats say that within a year of starting his company

25   Cooperative Computing, Inc., the company decided to stick to

1   their area of expertise which was the automotive industry?  So

2   was the J-CON system only used for automobile purposes and

3   couldn't be used for, say, medical company purposes?

4            That's the way I read this.  I think you'll be able

5   to read the same thing.  I'm going to mark that as Court

6   Exhibit whatever it is.  All right.  Just get it before you

7   leave.

8            Also, somebody from each side can stay here and get

9   the instructions.  What I did was take what you all tendered,

10  those that were agreed upon and the ones you differed, and the

11  objections, and have arrived at a set of instructions which I

12  think are appropriate.  Some of the ones that were given were

13  rejected, and some were incorporated into the others.

14           You are going to have to worry about where all that

15  fits.  I didn't spend a lot of time trying to cite what I did,

16  but I'm sure you're able to do that.  I'm sure there are issues

17  in there that perhaps we aren't going to need anything on

18  because of the way the case has been tried, but I started off

19  with the concepts that each of you -- that you all, as a whole,

20  have put together and have instructions on those topics, I

21  think, with the exception of some of the things I've tossed

22  out.

23           So you can take a look at those and see.  They'll be

24  ready in just a minute.  Ms. Hooper is going to number them,

25  and then we will hereafter refer to them by those numbers, and

1   they'll never change, even if we throw 50 of them out.  The

2   remaining packages will stay the same.  The record will always

3   refer to the number we used.

4          I want you to assign someone from each side to make

5   sure that you prepare a list of the exhibits that were used at

6   trial and compare it with Mr. Neal's and we can make sure what

7   is the record is now.  Those things that weren't objected to

8   were admissible, but if you didn't use them, there's no sense

9   putting them in the record, and, of course, those things that

10  were considered by experts can be considered, but they are not

11  exhibits in the case anyway.  I mean considered by an expert.

12         There's been a request for -- Ms. Haggard tells me

13  that ePlus requested an instruction on incorporation by

14  reference.

15         MR. ROBERTSON:  Yes, Your Honor.  We filed that this

16  morning.  We do have a courtesy copy for the Court, and we have

17  given a courtesy copy to counsel.

18         THE COURT:  That is not reflected in what I did, and

19  in addition to that, the limiting instruction on

20  Christopherson -- on the counsel, advice of counsel isn't in

21  there either, because I thought I was going to give it to them

22  today, but you all got me so off the topic that I had in mind

23  with all the way we spent the morning, I just neglected to do

24  that.  So I'm blaming you all, and that's just something you

25  have to take.

1          MR. ROBERTSON:  Your Honor, we do have that one

2     additional perhaps limiting instruction that Mr. McDonald and I

3     approached the bench on.

4          THE COURT:  You're going to have to tender me one.

5          MR. ROBERTSON:  I will do that tomorrow morning.

6          THE COURT:  I understand that.  All right.  Now, you

7     said something -- you objected, Mr. Robertson, you objected to

8     some question Mr. McDonald was asking on the ground that it was

9     an issue preserved for the Court.  He then stood down on the

10    question, but I have to tell you, I didn't understand what it

11    was, the issue that was reserved for the Court you were talking

12    about.  I didn't need to rule on it because he reframed the

13    question.  What were you talking about?  The only thing I know

14    is willfulness.

15         MR. ROBERTSON:  No, sir.  There was some issues of

16    pure law that Lawson, I think, are contending are still

17    pursuing.  You may recall there's the section 101 so-called

18    patentability issue that came up in the context of the *Bilski*

19    summary judgment.

20         THE COURT:  I already decided that.

21         MR. ROBERTSON:  You denied their summary judgment,

22    but I didn't think you ruled as a matter of law in respect to

23    that because I did not cross-move.  I think the Court

24    admonished me for not cross-moving.

25         I don't know if it's an issue, but there's another

1    issue under section 112, paragraph one, on indefiniteness, and

2    indefiniteness basically says that the claim terms are so

3    insolubly ambiguous that they can't be construed or understood

4    and, therefore, applied, and I believe my concern was Dr.

5    Shamos was getting into an area about I don't really understand

6    what this means, I couldn't make heads nor tails --

7            THE COURT:  What claims are alleged to be indefinite?

8            MR. ROBERTSON:  Some are alleged --

9            THE COURT:  I don't remember any paper on that yet.

10           MR. ROBERTSON:  It's in the final pretrial order,

11   Your Honor, under triable issues for the jury and triable

12   issues for the Court, and indefiniteness, under that section

13   112, paragraph one, and patentability -- I'm misspoke.  It's

14   paragraph two, my colleague reminds me, and section 101,

15   patentable issue, is under the final pretrial order is an issue

16   triable for the Court.

17           THE COURT:  What is the patentability issue?

18           MR. ROBERTSON:  It's whether or not it's patentable

19   subject matter under the statute.  You may recall the recent

20   Supreme Court *Bilski* decision, which did not provide much

21   guidance, suggests that abstract ideas, mathematical

22   concepts --

23           THE COURT:  It's the *Bilski* issue.

24           MR. ROBERTSON:  It is, Your Honor.

25           THE COURT:  I thought you were suggesting there was

1    another patentability issue other than the *Bilski* issue.

2              MR. ROBERTSON:  Indefiniteness, Your Honor.

3              THE COURT:  Indefiniteness is under section 112.

4              MR. ROBERTSON:  Yes, sir.

5              THE COURT:  Patentability is section 101.

6              MR. ROBERTSON:  Yes, sir.  They are raising both.

7    The parties have agreed that they are pure issues of law for

8    the Court.

9              THE COURT:  I understand that, but you earlier

10   discussed *Bilski*.  Then you discussed patentability, and you

11   came back full circle and said ultimately in your discussion

12   that the patentability question they were raising was *Bilski*,

13   and I just wanted to make sure there aren't two 101 issues,

14   because there's only one that's *Bilski*.

15             MR. ROBERTSON:  Maybe we are confusing things.

16   *Bilski* is a section 101 decision.  It's the most recent

17   pronouncement on it from the Supreme Court, so that is a 101

18   section.  There are not two 101 questions, Your Honor.

19             THE COURT:  That's what I just wanted to make sure.

20   Is there anything else you are looking to me to decide other

21   than that and willfulness?

22             MR. ROBERTSON:  Of course, there's the issue of

23   injunctive relief which we hope to be discussing at some point.

24             THE COURT:  I'm not going to do that until after the

25   jury determines where they go.  I think that would be kind of

1   bad form, wouldn't it?

2           MR. McDONALD:  Cart before the horse, perhaps.

3           MR. ROBERTSON:  Not according to me, Your Honor.

4           THE COURT:  Depends on whether it was granted or not.

5           MR. McDONALD:  I think agreeable minds can disagree

6   on that.

7           THE COURT:  How about willfulness?  How do you

8   propose to handle the decision on the willfulness?  Do you want

9   me to just wait until the jury returns its verdict and then

10  return a finding of fact on willfulness at the same time?  Do

11  you have additional evidence?

12          MR. McDONALD:  We do have additional evidence we'd

13  like to present, Your Honor, including the evidence on the

14  re-exam.  At least we need to get that in front of the Court as

15  opposed to the jury to show the good-faith basis for believing

16  these claims are invalid, and, in fact, I think I understand

17  today the Patent Office issued a final office action rejecting

18  all the claims of the '172 patent in view of the prior art.

19          And so that's a record that we would like to develop,

20  perhaps among other evidence that would be specific to the

21  willfulness issue.

22          THE COURT:  How are we going to handle that?  I have

23  this little problem called a docket and other cases, and I need

24  to plan for how to deal with those things.  How is it you

25  propose to deal with that?  I don't want to just keep coming

1    back here.  The jury goes out after I instruct them.  I can

2    hear evidence, any other evidence that you have while they are

3    out, and then if they -- and the witnesses are here.  Y'all are

4    in a combat-ready mode, and I'll hear the evidence, and then if

5    need be, if you all feel like briefing is necessary, I can

6    consider briefing on another schedule or I can have oral

7    argument.

8         We need to sort of sort these things out so that

9    those of you who think you are getting out of here quicker at

10   the end of the case may not be.  I don't want to be alone in

11   this endeavor.  So how is it you -- you have the burden of

12   proving willfulness, Mr. Robertson.  How is it you see this

13   happening?

14        MR. ROBERTSON:  I think I agree on procedure with Mr.

15   McDonald, not substance, but I would contemplate there would

16   probably be less than a one-day hearing, perhaps, Mr. McDonald,

17   in which we could do that.  I would suggest in the exercise of

18   efficiency and to conserve judicial resources, we might want to

19   wait until we hear the jury verdict so we don't move forward on

20   something that may or may not be necessary.

21        Hopefully it is, but I think if I can get with Mr.

22   McDonald, I think we can work out what we think is an

23   appropriate procedure.  I don't see this as lasting --

24        THE COURT:  Here's my concern.  The further you get

25   away from here, the longer you all have to think about it, the

1    more you concoct things and the longer that one day stretches,

2    whereas if you're here while you've got your teams here, your

3    evidence here, you're combat-ready here.  I want to go and get

4    it sorted out, because I do have some fairly significant, some

5    trials of fairly significant length coming up between now and

6    June, and Ms. Haggard is leaving in August and I don't want to

7    be doing this alone.  So I want this done quickly.

8            I will expect you all to be prepared to put on your

9    willfulness case at the end of the evidence while the jury is

10   deliberating.  We'll kind of wait and see exactly what that

11   means, because I don't yet know how long your case is going to

12   take.  What rebuttal case do you think you have?  Wait a

13   minute, how long do you think you have?  He said one day.  Do

14   you think one day of willfulness will do it?

15           MR. McDONALD:  I think somewhere in the ballpark of a

16   day, day and a half, yes.

17           MR. ROBERTSON:  It would depend on this issue of

18   re-examination, Your Honor.  We still think it's inappropriate

19   even for consideration of willfulness, but if there were, we

20   would want to put on perhaps some expert testimony with respect

21   to the re-examination process and where we are.

22           You may recall we had Mr. Harry Manbec who had

23   addressed this issue in his report, and, Your Honor, when you

24   excluded Mr. Manbec, and I understand the reasons you did that,

25   you did indicate that at the time, if you were to hear evidence

1  of this re-examination, you'd have to have it in context and
2  have it have some meaning.
3          I still think on balance it has no relevance
4  whatsoever to the willfulness issue, and we briefed that
5  earlier, and Your Honor, in its ruling, indicated it wasn't
6  relevant even to willfulness.  So that is a variable that
7  could --
8          THE COURT:  Which opinion was that?
9          MR. ROBERTSON:  One of your motions *in limine*.
10         THE COURT:  Is it verbal --
11         MR. ROBERTSON:  No, it was a written order.
12         THE COURT:  Then you need to tell me by docket number
13 what it is at some point.  So anyway, you want to put on --
14 what are you going to put on on willfulness, Mr. Robertson?
15 What witnesses are you going to put on?
16         MR. McDONALD:  I would call Mr. Farber on
17 re-examination, perhaps Mr. Manbec, and I would probably
18 cross-examine a Lawson witness or two, but that would likely be
19 it.  But, Your Honor, I would like to be able to consult with
20 my colleagues this evening and come back.
21         THE COURT:  I understand, but, you know, it's good to
22 get some idea so I can be thinking, too.  How about you?  What
23 do you see the number of witnesses being for you, Mr. McDonald?
24         MR. McDONALD:  I think it would be some witness to
25 get into re-examination.  I think that would be Dr. Shamos.

1    That was covered in his report, and Mr. Lipscomb was our

2    rebuttal to Mr. Manbec.

3           I'm not sure that the Court's exclusion, though, was

4    dependent on this issue.  I think it was independent of any

5    issues here.  I think they are both out, as I understand it.

6           THE COURT:  What is his name?

7           MR. McDONALD:  Ernest Lipscomb, L-i-p-s-c-o-m-b.  I

8    believe I got that right.

9           THE COURT:  I have to tell you, I don't remember

10   exactly how I handled the re-examination issue, and since the

11   time that I handled it, you all have agreed willfulness will be

12   tried by the Court, and that may, in fact, affect what evidence

13   can come in.

14          Depending upon -- my recollection is I considered the

15   willful -- the re-examination to be of marginal relevance to

16   the issues here except willfulness and that 403 kept it all out

17   because it would be very hard for the jury to segregate all

18   that out, and after that, you all agreed to have the case tried

19   to the Court, the willfulness case tried to the Court.  So I

20   don't know exactly where we stand, but that's sort of where my

21   general recollection is.

22          MR. ROBERTSON:  Your Honor, the willfulness issues

23   was fully briefed in the context of re-examinations, and I've

24   been handed, I believe it's Document 375 was Your Honor's order

25   on July 26th of 2010.  While you are talking about this perhaps

1   hearing that we might have, there are these issues of

2   patentability and indefiniteness that I just brought to your

3   attention.

4        I think as pure issues of laws, there is no real

5   facts in dispute.  Whether it's patentable or not, you have to

6   focus on the claim and the specifics.  Those are not in

7   dispute.  With respect to the indefiniteness, you have to focus

8   on the claim and the specifics.  Those are not in dispute.

9        THE COURT:  You take the view that patentability and

10  indefiniteness are legal -- you take the view that

11  patentability and indefiniteness are legal questions, that no

12  fact issues need to be considered as respects those; is that

13  right?

14       MR. ROBERTSON:  I think the parties are in agreement

15  on that.

16       THE COURT:  Are you in agreement?

17       MR. McDONALD:  I believe there aren't any disputed

18  facts, Your Honor.  I think there are factual underpinnings to

19  those determinations, but I don't think the actual facts are in

20  dispute.

21       THE COURT:  There are no papers filed at this time,

22  are there?

23       MR. McDONALD:  No.

24       THE COURT:  Has the Federal Circuit decided a case

25  since *Bilski*?

1          MR. ROBERTSON:  Your Honor --

2          THE COURT:  I know there were some cases that were

3     sort of put on hold up there, I thought, waiting for *Bilski*,

4     but I don't know whether they've been decided or whether they

5     just sent them back in view of *Bilski* or what happened.

6          MR. ROBERTSON:  I don't know the answer to that

7     question, Your Honor.  I don't know if -- I follow them fairly

8     closely, and I haven't seen anything come out.  I maybe defer

9     to Mr. McDonald.

10          THE COURT:  You all are going to have to brief those

11     issues.

12          MR. ROBERTSON:  We can do that, Your Honor.

13          THE COURT:  You might sit down and decide on a

14     briefing schedule, 10:00 a.m., 5:00 p.m., 9:00 a.m., those

15     kinds of scheduled.

16          MR. ROBERTSON:  Your Honor, one other issue I do want

17     to raise.  Mr. -- I had Dr. Weaver here to call in rebuttal on

18     some of these issues that don't have to deal with prior art,

19     these anticipation and obviousness.  He did have to -- he was

20     going to address written description which is another section

21     112 issue.

22          That is a fact question as we all have identified in

23     the pretrial order.  I just want to make -- Mr. McDonald

24     represented to me that he was not going to be asking Dr. Shamos

25     any questions with respect to written description.  I think it

1    would be fair to say, I take him at his word, I don't think I

2    heard any, and so I guess my question is are we in agreement --

3           THE COURT:  The question is, is written description

4    any longer in the case.

5           MR. ROBERTSON:  Yes, sir.

6           THE COURT:  It isn't, I don't think, is it?

7           MR. McDONALD:  We did not present any testimony from

8    Dr. Shamos on that.  We haven't produced any evidence on that

9    issue at the trial.  I believe it was briefed on summary

10   judgment, Your Honor.  I believe there were some issues that

11   were issues of law, and to the extent that preserved any issue

12   for appeal --

13          THE COURT:  Preserve your issues for appeal.  That's

14   your business.  I think whatever you've done on the summary

15   judgment question on that, you've done, but -- and so you've

16   got instructions on, for example, written descriptions.  So

17   just don't pay attention to them.  So we're not having any

18   written description issue.  I have that as my next question,

19   so --

20          MR. McDONALD:  So I think that means for Dr. Weaver,

21   there's no reason for him to be called to rebut Dr. Shamos

22   because Dr. Shamos didn't address any of the issues Dr. Weaver

23   rebutted.

24          MR. ROBERTSON:  I just want to be sure I'm not being

25   a little dense here, Your Honor.  Do I understand that based on

1    this discussion, there will be a JMOL granted as of the written

2    descriptions.  There's no evidence presented, and it's part of

3    the contours of the final pretrial order that was to be

4    presented to the jury.  Without any evidence, I don't see how

5    they can proceed.  That's why we think we'd be taking it out of

6    the jury instructions.

7             THE COURT:  Well, then, you move for JMOL on it.

8             MR. ROBERTSON:  We'll do that.  I thought we might

9    get an agreement.

10            THE COURT:  Do you agree --

11            MR. McDONALD:  I'd like to consult with our team,

12   Your Honor, but I think our expectation is that based on our

13   summary judgment, that's how we'll present the issue.  It's not

14   an issue for the trial here.

15            THE COURT:  Work it out and give me whatever briefs

16   you need and do it fairly quickly.  Shouldn't take you long.

17   Okay.

18            MR. ROBERTSON:  Your Honor, I just have one last

19   issue I'd like to ask the Court, because, obviously, the jury

20   is not getting any instructions on remedy, and I do have a

21   concern about the prejudice that might be involved if the jury,

22   who has been sitting here very long and patiently and paying

23   very close attention, might have the concern and expectation

24   that they might have to come back with respect to the remedy

25   phase of the case --

1            THE COURT:  The way we handle that is the way we

2    handle it in criminal cases, and we tell them in this case --

3    what happens after they decide on this issue, whether they

4    decide that there is infringement of one or all of the claims,

5    or that there's invalidity is not a matter that they'll be

6    involved in, that that's something the Court handles.

7            That's the way I always do it in the criminal

8    context, and I don't have any problem doing that in this case.

9    Is that all right with you all?

10           MR. ROBERTSON:  Yes.  If I understand, you are

11   instructing them that they don't need to be concerned about any

12   remedy in the case, that the Court will be handling those

13   issues after they reach their verdict, whatever it maybe.

14           THE COURT:  Yes.

15           MR. McDONALD:  I'd like to see what you do for a

16   criminal case, and I think it would make sense to do something

17   equivalent here.

18           THE COURT:  Sometimes, for example, here, in

19   Virginia, if anybody has been on a criminal jury, they, the

20   juries, do the sentencing in Virginia.  So they often come with

21   questions about it, and I'm sure -- I don't know whether any of

22   these jurors ever served, that we have served on the jury, but

23   if they were on a civil jury, they may wonder about it, and I

24   think it's just simple enough to tell them this is their job

25   and they won't have to do anything else.

1          MR. ROBERTSON:  Thank you, Your Honor.

2          THE COURT:  All right.  Now, you've got -- how long a

3    cross-examination now, before you get this respite to hone

4    things down, Mr. Robertson?

5          Do you want to sit down, Mr. McDonald?

6          MR. McDONALD:  I'd love to.

7          THE COURT:  You've been standing for several hours.

8          MR. McDONALD:  Can you tell I'm wobbling a little

9    there?

10          THE COURT:  No, you seem strong of foot.

11          MR. ROBERTSON:  I'm going to say an hour and

12    15 minutes out of an abundance of caution, but I'm going to

13    shoot for an hour.

14          THE COURT:  That is the order of magnitude.  Then

15    what's left?

16          MR. ROBERTSON:  Call Mr. Farber, and I believe his

17    testimony would be an hour to an hour and 25 minutes both on

18    direct and cross.  Call Mr. Hilliard, our invalidity rebuttal

19    witness, our expert.  I'm anticipating about two hours of

20    direct --

21          THE COURT:  Is that the same two-hour kind of

22    measurement that Mr. McDonald used to tell me that Dr. Shamos

23    was going to be three hours?

24          MR. ROBERTSON:  I don't have his chronograph on my

25    wrist --

1          THE COURT:  He actually ended up coming pretty close,

2    but for awhile I was beginning to think we were all going to

3    become grayer than we are.

4          MR. ROBERTSON:  Well, the reason I think I can

5    streamline it some more is because J-CON is no longer prior

6    art, and we're going to be asking for instruction on that

7    because I think there is some confusion just from the jury's

8    question.  J-CON is no longer being offered for any purposes of

9    invalidity --

10         THE COURT:  If you want instructions, I want you all

11   to get me the instructions and get them to the other side in

12   plenty of time for me to think about.

13         MR. ROBERTSON:  It might just be a matter of removing

14   the items listed or identified as the prior art in there.  I

15   think PO Writer is no longer prior art for purposes of

16   invalidity or for any reason, so it's a matter -- that will

17   help me streamline my presentation of Mr. Hilliard.

18         THE COURT:  Okay.  All right.  Is there anything else

19   that any of you -- I know you don't want to, but I've got life

20   that I've got to sort out for the next several weeks.  So

21   you'll finish tomorrow?

22         MR. ROBERTSON:  I'm fairly -- yes.

23         THE COURT:  He may have some redirect, of course, of

24   Dr. Shamos.  So that's Thursday.  And then you're going --

25   we're going to have to deal with the instructions.  I don't see

1   that would be a particularly long process, but I need to tell

2   the jury what to do about the case and with their lives, and I

3   don't want them sitting around while we're talking about

4   instructions if we're going to have a lot to say about

5   instructions.

6          So I'd like you to take a look at the instructions

7   tonight and tell me if you have any major questions about them.

8   Because one of the alternatives is to let the jury have Friday

9   off and we do the -- and then we have argument on Monday.  How

10  long do you have for closing argument, Mr. Robertson, your

11  opening and your rebuttal would you say?  You've done this,

12  this is the third time, so I'm sure you have refined it so you

13  can probably get it all said in two or three sentences.

14         MR. ROBERTSON:  Not if the past is prologued, Your

15  Honor.

16         THE COURT:  How long do you anticipate?

17         MR. ROBERTSON:  Certainly less than an hour and a

18  half.  I think more like an hour and 15 minutes, and that's

19  what I'm going to be shooting on.  I haven't -- we're working

20  on it.  I haven't actually rehearsed it yet, but I will

21  certainly be doing that.

22         I suppose if we have the weekend, I'll have more time

23  to try to get it focused and razor-sharp.  Just off topic, we

24  do have certain motions for judgment as a matter of law.

25         THE COURT:  That's the next question.  I'm going to

1    ask Mr. McDonald, how long do you see your closing argument?

2    You do have to respond to the infringement, and you have to

3    deal with the question of invalidity.

4           MR. McDONALD:  I'm thinking around an hour and a

5    half.

6           THE COURT:  Okay.  That's not too bad.  Now, the next

7    question, how are we going to do -- we have a motion for

8    judgment as a matter of law on infringement by the plaintiff.

9    We have no motions at this time by the defendant.

10          Do you foresee making a motion for judgment as a

11   matter of law on any issue, Mr. McDonald?  If so, what do you

12   anticipate and how long do you think it will take me to hear

13   you?

14          MR. McDONALD:  We did bring a motion on the

15   infringement issue at the close of the plaintiff's case, Your

16   Honor.  I think we'd bring a renewed motion on both

17   infringement and invalidity before the case goes to the jury.

18          MR. ROBERTSON:  We, of course, have the JMOL of

19   infringement, and then we'd have a JMOL of no invalidity at the

20   conclusion of their case.

21          My suggestion might be, since Your Honor is setting,

22   perhaps, Friday aside for the discussion of the jury issues,

23   that maybe we can have all those arguments -- that we can

24   reserve, just as we did today, on our motion at the conclusion

25   of their infringement rebuttal and have them all at the same

1    time.

2              THE COURT:  I'm inclined to think that might be the

3    best thing to do from the standpoint of actually getting this

4    case wrapped up.  So I'll tell this to the jury tomorrow

5    morning, and we'll go from there.  All right.

6              Oh, who's got the verdict forms?  I would like to

7    look at them.  You all had them.

8              MR. McDONALD:  We received a copy, I think, sometime

9    during the course of the day today.  We'd like a chance to look

10   at it --

11             THE COURT:  I would, too.  That's all I'm saying.

12   All right.  Thank you all.  We'll be in adjournment.

13             THE CLERK:  Judge, for your information, you only

14   have 25 criminals hearings next week, and I think 11 pretrials.

15   So you're in pretty good shape.

16

17             (Discussion off the record.)

18             (Court adjourned.)

19

20

21

22

23

24

25