2532

1          IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA
2                  RICHMOND DIVISION

3   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                                      :
4   ePLUS, INC.,                      :
                                      :
5                      Plaintiff,     :
     v.                               :   Civil Action
6                                     :   No. 3:09CV620
    LAWSON SOFTWARE, INC.,            :
7                                     :   January 20, 2011
                        Defendant.    :
8   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _:

9

10          COMPLETE TRANSCRIPT OF **JURY TRIAL**
            BEFORE THE HONORABLE ROBERT E. PAYNE
11         UNITED STATES DISTRICT JUDGE, AND A JURY

12

13

14   APPEARANCES:

15   Scott L. Robertson, Esq.
     Jennifer A. Albert, Esq.
16   **Michael T. Strapp, Esq.**
     GOODWIN PROCTOR
17   901 New York Avenue, NW
     Washington, D.C.   20001
18

19   Craig T. Merritt, Esq.
     CHRISTIAN & BARTON
20   909 E. Main Street, Suite 1200
     Richmond, VA   23219-3095
21
             Counsel for the plaintiff ePlus
22

23

24            DIANE J. DAFFRON, RPR
             OFFICIAL COURT REPORTER
25          UNITED STATES DISTRICT COURT

2533

APPEARANCES:   (Continuing)

Daniel W. McDonald, Esq.
**Kirstin L. Stoll-DeBell, Esq.**
**William D. Schultz, Esq.**
**Rachel C. Hughey, Esq.**
MERCHANT & GOULD
3200 IDS Center
80 South Eighth Street
Minneapolis, MN   55402-2215


Dabney J. Carr, IV, Esq.
TROUTMAN SANDERS
Troutman Sanders Building
1001 Haxall Point
P.O. Box 1122
Richmond, VA   23218-1122

          Counsel for the defendant Lawson Software.

2534

1          (The proceedings in this matter commenced at

2     9:15 a.m.)

3               (The jury is not present.)

4          THE CLERK:  Civil Action No. 3:09CV00620,

5     ePlus, Incorporated v. Lawson Software, Incorporated.

6               Mr. Scott L. Robertson, Mr. Craig T. Merritt,

7     Ms. Jennifer A. Albert, and Mr. Michael G. Strapp

8     represent the plaintiff.  Mr. Daniel W. McDaniel,

9     Mr. Dabney J. Carr, IV, Ms. Kirstin L. Stoll-DeBell,

10    Mr. William D. Schultz, and Ms. Rachel C. Hughey

11    represent the defendant.

12               Are counsel ready to proceed?

13          MR. ROBERTSON:  Yes, Your Honor.

14          MR. McDONALD:  Yes, Your Honor.

15          THE COURT:  What do you need to see me about?

16          MR. McDONALD:  I think we worked out all the

17    issues on the Hilliard slides.  I think the only thing

18    that was outstanding was these jury questions.

19          MR. ROBERTSON:  There is also --

20          THE COURT:  I don't need the jury questions,

21    to deal with them now.

22          MR. ROBERTSON:  All right.

23          THE COURT:  Oh, the questions raised by the

24    jury.  Oh, yes.  What do you want to do about the

25    questions?  Where is that thing that was submitted

1    yesterday?   Court Exhibit 4.

2              Are P.O. Writer and J-CON patented, if so,

3    when?  Didn't Dr. Staats say that it was within a

4    year?

5              Basically, what he said is for them to

6    remember.  So was the J-CON system only used for

7    automotive purposes and couldn't be used, all that big

8    long text is something he testified to or didn't, and

9    they'll have to remember that testimony.  And you-all

10   will address it in argument; is that right?

11             MR. McDONALD:  I think that's fair, Your

12   Honor.

13             MR. ROBERTSON:  Your Honor, I think the real

14   response, what I would suggest, Your Honor, is that

15   just you need not concern yourself with it.  Whether

16   the J-CON system addressed auto parts or medical

17   systems, the J-CON system is not prior art in this

18   case, and that's why they don't need to consider it.

19   Dr. Shamos didn't over any opinions with respect to it

20   and I think this is just ripe for confusion if we say

21   it had some significance.

22             The same thing with were P.O. Writer and

23   J-CON patented.  That's evidence of some confusion on

24   the part of the jury.  First of all, they need not

25   concern themselves with whether J-CON or P.O. Writer

2536

1    were patented at all because that was no bearing on

2    any issue in this case.  Moreover, J-CON and P.O.

3    Writer are not prior art because there's been no

4    opinions on them.

5            THE COURT:  I'm just going to tell them I'll

6    deal with this later.

7            MR. ROBERTSON:  All right.  There's one other

8    issue I wanted to bring to the Court's attention.  In

9    the final pretrial order, there's a factual issue with

10   whether some of the claims had an adequate written

11   description as phrased.  There's been no evidence

12   offered with respect to it.

13           THE COURT:  They are still in their case.

14           MR. ROBERTSON:  I'm sorry?

15           THE COURT:  They are still in their case.

16           MR. ROBERTSON:  They already called Dr.

17   Shamos and they're not presenting any additional

18   evidence on that.  That's been represented to me by

19   Mr. McDonald.

20           THE COURT:  Okay.  He's the last witness, so

21   there's no more evidence on it.

22           MR. ROBERTSON:  There's no evidence on it

23   whatsoever.  So my question is do I need to call Dr.

24   Weaver?  It's not that I need to rebut anything, but

25   Dr. Weaver is prepared to offer opinions that there is

1    an adequate written description.  I don't want to

2    waste the jury's time with respect to this, but quite

3    frankly, I think --

4            THE COURT:  What do you want me to do?

5    Advise you on how to try your case?

6            MR. ROBERTSON:  No.

7            THE COURT:  I can't do that.

8            MR. ROBERTSON:  I think ePlus is entitled to

9    a JMOL --

10           THE COURT:  Then make it at some point after

11   the case is over.

12           MR. ROBERTSON:  I'll do that.  I want to be

13   able to release Dr. Weaver, but I won't do that until

14   I hear what the Court's ruling is, I gather.

15           THE COURT:  I don't think it's a good idea to

16   rule in apprehendo.  I'll wait until the right time

17   and then rule.

18           Are we ready for the jury?

19           MR. McDONALD:  Yes.

20           MR. ROBERTSON:  Yes.

21           THE COURT:  All right.  We're ready.

22           (The jury is present.)

23           THE COURT:  You can outsmart yourself.  So I

24   wouldn't have the problem with the donuts that I had

25   the last time waiting, I called ahead and ordered

2538

1    them.  But they gave them to somebody else.  I'm not

2    getting anymore donuts.  So I had to wait anyway.

3              THE JURY:  We appreciate it.

4              THE COURT:  Dr. Shamos, you can come on back

5    to the witness stand.  Thank you, sir.

6              DR. SHAMOS:  Good morning.

7              THE COURT:  Good morning.

8              I'll deal with the question that was asked

9    later.  Okay?  At the end of the day yesterday.

10             Dr. Shamos, I just remind you you're under

11   the same oath which you took yesterday.

12             THE WITNESS:  Yes, Your Honor.

13             MR. ROBERTSON:  May I proceed, Your Honor?

14             THE COURT:  Sure.

15

16       CROSS-EXAMINATION

17   BY MR. ROBERTSON:

18   Q    Good morning, Dr. Shamos.

19   A    Good morning.

20   Q    Dr. Shamos, these questions were asked of Dr.

21   Weaver, so I'd like to just ask them of you as well.

22   You are a retained expert on behalf of Lawson; is that

23   right?

24   A    Yes.

25   Q    And you are charging Lawson $550 an hour for

1  testifying as an expert; is that right?

2  A    The firm that I work for charges $550 an hour,

3  yes.

4  Q    That's Expert Engagements, that's the firm you

5  work for that locates expert services for law firms?

6  A    Yes.

7  Q    But, in fact, you're the president of Expert

8  Engagements, aren't you?

9  A    Yes.

10 Q    And so when you pay the firm, you're the owner of

11 the firm, right?

12 A    Well, I'm the owner of the firm, but the firm has

13 expenses, and the firm does not pay me $550 an hour.

14 Q    And your wife, she is the vice president of the

15 firm?

16 A    Yes.

17 Q    Are you the only two principals of the company?

18 A    Yes.

19 Q    And did you testify in your deposition that when

20 you take the stand and are under oath, literally

21 anytime you're under oath, your company then charges

22 $750 for your testimony; is that right?

23 A    Yes.

24 Q    So you have a premium when you're under oath?

25 A    Yes.

SHAMOS - CROSS                    2540

1    Q    Did you testify at your deposition about eight

2    months ago that at that point you had already charged

3    Lawson over $175,000 for your services?

4    A    I don't think that was the right number.

5    Q    What was the number?

6    A    Well, I don't think it could have been that high,

7    although possibly at that time if it included

8    expenses, travel expenses, and things like that.

9    Q    Do you have your --

10           THE COURT:  Mr. Langford, I think there's

11   something.

12   Q    Your deposition is in that notebook?

13           THE COURT:  Do you have the deposition there,

14   Doctor?

15           THE WITNESS:  I have a large notebook.  The

16   first thing in the notebook, yes.

17           THE COURT:  It does have it in there?

18           THE WITNESS:  Yes.

19   Q    Would you just turn to the deposition at page 244,

20   please?

21   A    Yes.

22   Q    I'm sorry.  Specifically, at line 17 to 20, you

23   were asked the following question:  What's the dollar

24   amount that you billed Merchant & Gould for your

25   services in this case?

1    You gave the following answer:  Well, I haven't

2    billed for June yet, but it's very close to $176,000.

3    Do you see that?

4    A    Yes.

5    Q    Was that accurate that?

6    A    Yes.

7    Q    You've charged considerably more since that time,

8    haven't you, sir?

9    A    Well, I've certainly charged more.  This is the

10   gross amount that includes expenses also.

11   Q    Let's talk about what's in this case and what's

12   not in this case for a little bit, sir.  You testified

13   yesterday about the J-CON system?

14   A    Yes.

15   Q    That is this auto parts point of sale system that

16   Mr. Staats testified about?

17   A    I wasn't here for Mr. Staats' testimony, but he's

18   associated with J-CON.

19   Q    Have you read Mr. Staats' testimony from the prior

20   case?

21   A    I think I read some of it, yes.

22   Q    Now, you had one slide on J-CON; do you recall

23   that?

24   A    Yes.

25   Q    And you indicated it was an electronic sourcing

1  system; is that right?

2  A    Yes.

3            THE COURT:  Can we take a look at the '683

4  patent, for example.

5  Q    Now, this is a claim that's at issue in this case,

6  and it says it's an electronic sourcing system

7  comprising, do you see that?

8  A    I don't see anything yet.

9            THE COURT:  Is yours not up, sir?

10            THE WITNESS:  It's not on my screen.

11            THE COURT:  He doesn't have anything.  Does

12  he have to touch his like I do?

13            THE WITNESS:  It's up now.

14  Q    Do you see it now?  This is Claim Three of the

15  '683 patent, which is one of the asserted claims,

16  correct?

17  A    Yes.

18  Q    It says an electronic sourcing system comprising,

19  do you see that?

20  A    Yes.

21  Q    Then it has six elements, right?

22  A    Yes.

23  Q    And "comprising" means that it has to include all

24  those elements or it can others, right?  You

25  understand that?

1    A    Yes.

2    Q    So the electronic sourcing system here is a very

3    specific electronic sourcing system that has to have

4    at least all six of these elements, right, sir?

5    A    Yes.

6    Q    So when you said that the J-CON system was an

7    electronic sourcing system, you weren't talking in

8    terms that J-CON had all these elements, correct?

9    A    I didn't testify to that, no.

10   Q    You didn't give any specific testimony on an

11   element by element, claim by claim basis with respect

12   to J-CON, correct?

13   A    That's right.

14   Q    In fact, you offered zero opinions that the J-CON

15   system from any version from 1988 to 1992 rendered any

16   of the 12 asserted claims here obvious in any way,

17   shape or form; isn't that right?

18   A    Not in this courtroom, no.

19   Q    Well, that's what's important.  We're in the this

20   courtroom, right?  So is the answer to my question you

21   offered zero opinions that J-CON invalidated or

22   rendered obvious any of the 12 claims?

23   A    It's the same question, and I'm giving you the

24   same answer.  I didn't do it in this courtroom.

25   Q    Can you answer the question fairly yes or no?  Did

SHAMOS - CROSS                    2544

1  you offer it in this courtroom?

2          MR. McDONALD:  Objection, Your Honor, asked

3  and answered.

4          THE COURT:  Sustained.

5  Q   Did you --

6          THE COURT:  It doesn't make any difference

7  what he's testified to elsewhere, ladies and

8  gentlemen.  It's only what is testified to here that

9  is important.

10         MR. ROBERTSON:  Thank you, Your Honor.

11 BY MR. ROBERTSON:

12 Q   You offered zero opinions that J-CON anticipated

13 any of the 12 claims at issue in this case here,

14 correct?

15 A   In this room.

16 Q   You offered zero opinions that J-CON in

17 combination with any other prior art reference

18 invalidates the claims in this courtroom, right?

19 A   Right.

20 Q   You are the only Lawson expert testifying on

21 invalidity opinions, right?

22 A   I believe so.

23 Q   You don't know of any other Lawson expert on

24 invalidity, do you?

25 A   No.

1   Q    So as far as the jury is concerned with regard to

2   the testimony on J-CON, they can forget about that for

3   any purposes of an element by element, claim by claim

4   analysis for anticipation and obviousness, right?

5   A    I don't know if it's my place to say what the jury

6   can forget about.

7   Q    But you didn't give them any opinions that it

8   invalidates any claims, right?

9   A    Not in this courtroom.

10           THE COURT:  Well, you didn't give the jury

11  any, Dr. Shamos, so it had to be in this courtroom.

12  So the answer to that is no.

13           THE WITNESS:  Correct.

14  Q    And let me ask you this:  You put up --

15           MR. ROBERTSON:  Can you put up just the cover

16  page of Defendant's Exhibit No. 96, please.

17  Q    Now, you showed this J-CON manual, Volume I, cover

18  page, correct?

19  A    Yes.

20  Q    That's the only thing you offered to the jury when

21  you brought up J-CON, this cover page that has the

22  title of the manual, and that's it, right?

23  A    No, I had a slide with the bullet points about

24  J-CON.

25  Q    I'm talking about this exhibit, Defendant's

1  Exhibit 96.  This is what, I think, was represented by

2  Mr. McDonald that had thousands of pages.  I'll accept

3  that representation.  This is the only page of

4  Defendant's Exhibit 96 that you showed to the jury;

5  isn't that right?

6  A    Yes.

7  Q    You didn't discuss a single substantive page in

8  this manual that contains thousands of pages, right?

9  A    I think I testified that it had over a thousand

10  pages, not thousands.  No, that's the only page that

11  was shown.

12  Q    With respect to P.O. Writer that was discussed,

13  similarly you offered zero opinions that P.O. Writer

14  rendered obvious any claim at issue here, correct?

15  A    In this courtroom.

16  Q    And you offered zero opinions that P.O. Writer

17  anticipates any element or any claim of the patents

18  that are asserted here, correct?

19  A    In this courtroom.

20  Q    So you know of no other invalidity expert who's

21  going to offer opinions on P.O. Writer, do you?

22  A    No.

23  Q    Let's talk a little bit about RIMS now, if we can.

24  You reviewed the inventor's deposition testimony in

25  preparation for your expert report, correct?

1   A    Yes.

2   Q    And you're aware that the RIMS system starting

3   perhaps in the late '80s all the way up until the year

4   2000 went through many iterations, correct, many

5   different versions?

6   A    Yes.

7   Q    Which version are you relying on when you are

8   rendering your opinions?

9   A    That described in the '989 patent.

10  Q    So it's only confined to the '989 patent, right?

11  You're not relying on and you didn't offer any

12  testimony with respect to any versions that were in

13  commercial use between the late '90s and 1994, for

14  example, right?

15  A    I don't have personal knowledge, but there was

16  testimony that the '989 patent fairly described the

17  actual RIMS system as it was distributed.

18  Q    There was also testimony from the inventors in

19  their deposition that many of the functionalities in

20  the '989 patent were never implemented.  Do you recall

21  reviewing that?

22  A    Yes.

23  Q    So what you're relying on when you offer your

24  opinions, though, is just the '989 patent; isn't that

25  right?

SHAMOS - CROSS                    2548

1   A   No.

2   Q   Did you point to any other versions or produce any

3   other documentation of the technical nature of the

4   RIMS system as being used between 1989 and 2000?

5   A   No, I didn't personally, because, as I said, I

6   don't have personal knowledge of the RIMS system as

7   distributed.

8   Q   It would be fair to say that the inventors had

9   personal knowledge of the RIMS system because they

10  worked with it, right?

11  A   I don't know what knowledge they had.  I know what

12  they said.

13  Q   Well, you know that Mr. Momyer and Mr. Johnson are

14  actually inventors of the '989 patent, correct?

15  A   Yes.

16  Q   So it would be fair to say that Mr. Momyer and

17  Mr. Johnson are in a better position than you to

18  understand what's in that patent, correct?

19  A   I wouldn't say that.  I think they might be in a

20  better position to know what systems were actually

21  distributed, but I can read the patent as well as they

22  can.

23  Q   So you know better than the inventors with respect

24  to the '989 patent?

25  A   Anybody can read the patent.  The patent says what

1    it says.

2    Q    So with respect to the evidence you presented,

3    though, did you present anything outside of the '989

4    patent to support your opinions?

5    A    Not in this courtroom.

6    Q    Let's talk about the TV/2 search program for a

7    minute, if we can.  Do you recall talking about that

8    system?

9    A    Yes.

10   Q    In preparing your report, nowhere in your report

11   do you ever indicate that you saw a TV/2 search

12   program in operation, correct?

13   A    Correct.

14   Q    Nowhere in your report did you say that you ever

15   reviewed any TV/2 source code, correct?

16   A    Correct.

17   Q    Nowhere in your report did you indicate that you

18   ever saw any user guides with respect to TV/2?

19   A    Well, it depends on what a user guide is, but I

20   revealed in my report exactly what TV/2 documents I

21   looked at.  Whether you want to characterize the

22   general information manual as a user guide or not is

23   up to you.

24   Q    You never saw any demonstrations of the TV/2,

25   correct?

1    A    Correct.

2    Q    You never saw the Fisher prototype that was

3    created as part of the electronic sourcing project

4    that Fisher did with IBM?

5    A    Correct.

6    Q    You didn't see any technical documents with

7    respect to the electronic sourcing project that IBM

8    did with Fisher-Scientific, correct?

9    A    Correct.

10   Q    You never --

11            THE COURT:  Wait a minute.

12            THE WITNESS:  I don't think that's actually

13   correct.  I think there were some proposal documents

14   or some technical descriptions, proposals, between IBM

15   and Fisher that I looked at, I think.

16   Q    It was a contract, a statement of work?

17   A    Yes.

18   Q    That was where they had to do almost a year and a

19   half of work to come up with a working prototype for

20   this system; isn't that right?  That's what you're

21   talking about?

22   A    Yes.

23   Q    You know a gentleman by the name of Mr. Charles

24   Gounaris or are you aware of him?

25   A    I'm aware of him.  I don't know him.

SHAMOS - CROSS                    2551

1   Q    You reviewed his deposition in preparation for

2   your testimony, correct?

3   A    Yes.

4   Q    And you're also aware of a young woman named

5   Pamela Eng?

6   A    I've heard the name.  I don't know her.

7   Q    You reviewed her deposition in preparation for

8   your report, correct?

9   A    Yes.

10  Q    Are you aware that Mr. Gounaris and Ms. Eng are

11  also paid witnesses for Lawson?

12  A    I think I may have seen the name Gounaris on a

13  schedule of witnesses that were going to testify.  I

14  don't recall Eng.

15  Q    Well, did you make any effort to speak to

16  Mr. Gounaris or Ms. Eng about their knowledge of the

17  TV/2?

18  A    No.

19  Q    So it's fair to say you don't rely on some actual

20  operating TV/2 system in your report because you never

21  saw it, right?  You just have two documents that

22  you're relying on; isn't that right?

23  A    Yes.

24           THE COURT:  Which question do you want him to

25  answer?

1           MR. ROBERTSON:  Excuse me, sir?

2           THE COURT:  Which one of those questions do

3    you want him to answer?  There were about four in

4    there.

5           MR. ROBERTSON:  I'll rephrase, Your Honor.

6    Thank you.

7    Q    You rely on two documents to support your opinions

8    in this case on the TV/2 system, correct?

9    A    Yes, there's plenty in those two documents.

10   Q    One is an advertising brochure, right?

11   A    I think advertising brochure is your

12   characterization.  It's a brochure that describes the

13   capabilities of the product.

14   Q    Well, it's not a technical document; isn't that

15   right?

16   A    That's right.

17   Q    And then there's a general information manual,

18   correct?

19   A    Yes.

20   Q    And in your preparation for your report, did you

21   review Ms. Eng's testimony where she indicated that

22   that was not a technical document at well?

23   A    I read that testimony.

24           MR. ROBERTSON:  Could we see the '683 patent,

25   the cover page, please.  If you could blow up on the

1    side, Mike, where it says "other publications."

2    BY MR. ROBERTSON:

3    Q    You're aware, Dr. Shamos, that the inventors

4    disclosed to the Patent Office the two documents that

5    you rely on for your invalidity opinions; this IBM

6    Technical Viewer general information manual and this

7    IBM Technical Viewer/2 product information brochure,

8    correct?

9    A    Yes.

10   Q    And you understand that the product brochure is,

11   in fact, undated, correct?

12   A    Yes.

13   Q    You had no personal knowledge, do you, that either

14   of these documents were ever in the public domain

15   prior to August of 1993, do you?

16   A    I have no direct personal knowledge of that.

17   Q    So you understand that when these documents are

18   disclosed to the Patent Office, the Patent Office can

19   review them and consider them as part of the

20   examination, correct?

21   A    Yes.

22   Q    Now, let me ask you about this RIMS patent and the

23   disclosure in the patent at issue in this case.  Is it

24   your position that the '989 patent was not disclosed

25   to the Patent Office?

SHAMOS - CROSS                2554

1    A    It was not disclosed as prior art.

2    Q    And you don't think when you disclose something in

3    the background of the invention it can be considered

4    by the Patent Office?

5    A    Not for prior art purposes.

6    Q    What's the basis of that opinion?

7              THE WITNESS:  Your Honor, I can't answer that

8    question without violating a ruling of the Court.

9              THE COURT:  It's a legal opinion.

10   Q    Let me ask you this:  Have you seen places where

11   the '989 patent was disclosed in the specification of

12   the patent?

13   A    Not as prior art.

14   Q    Have you seen places in the patent, sir, can you

15   answer my question, where the '989 patent was

16   disclosed?

17   A    It is disclosed not as prior art.

18   Q    Was it disclosed as incorporated by reference?

19   A    Yes.

20             MR. ROBERTSON:  Why don't we pull up column 1

21   of the '683 patent if we could.

22   Q    If you'd go, please, to column 1, starting at line

23   10, going down to line 17.  The inventors here are

24   telling the Patent Office that there are a number of

25   known requisition purchasing systems that manage and

1    process requisitions and purchase orders.  One such

2    system is the Fisher-Scientific requisition and

3    inventory management system, Fisher RIMS, described

4    United States Patent No. 5,712,989, filed April 2,

5    1993, and assigned to Fisher-Scientific Company of

6    Pittsburgh, Pennsylvania.  The disclosure of which is

7    incorporated herein by references.  Do you see that?

8    A    Yes.

9    Q    Do you understand that when someone incorporates a

10   patent by reference in the specification, it's as if

11   it was fully set forth therein, isn't it?

12   A    Yes.

13   Q    And you don't have any misapprehension that when

14   the inventors told the examiner and the Patent Office

15   about this patent that they couldn't fully understand

16   and comprehend that the inventors were saying

17   everything that's in this patent is now considered to

18   be part of the '683; isn't that right?  That's what

19   incorporated by reference means?

20   A    Yes.

21   Q    And you're aware, are you not, sir, that the RIMS

22   patent and the RIMS system is mentioned in this patent

23   more than 50 times, right?

24   A    Yes.

25   Q    So, again, the examiner couldn't have been under

1    any misapprehension as to what was being disclosed as

2    part of what RIMS functionality was necessary to be

3    modified in order to come up with the inventions of

4    the electronic sourcing patent, correct?

5    A    Well, the examiner didn't consider it as prior

6    art.  The examiner considered it for what it said

7    about the RIMS system.

8    Q    Well, the examiner has access to be able to go and

9    look at any patent, doesn't he, that's available in

10   the Patent Office?

11   A    Yes.

12   Q    And if the inventors repeatedly throughout all 28

13   columns of the patent described what they thought the

14   RIMS system disclosed, he wasn't under any illusions

15   as to what they were representing, was he?

16   A    He was under an illusion.

17   Q    Oh, I see.  So you know what the examiner was

18   thinking when he was reviewing the RIMS patent?

19   A    Yes, I do because I read the file history.  I read

20   what he said.

21   Q    You didn't offer any opinions in direct testimony

22   with respect to the file history and what the examiner

23   said, did you, sir?

24   A    No, but you're asking me about it now.

25   Q    So the answer to my question is no, you didn't

1  offer any opinions with respect to the file history,

2  correct?

3  A   That's right.

4        MR. ROBERTSON:   Could we go back and look at

5  Claim Three again.

6  Q   Now, you understand that for purposes of both

7  infringement and invalidity you need to consider the

8  claim as a whole; is that right?

9  A   Yes.

10 Q   And just using this claim as an example, this has

11 six elements, I think, we've already confirmed, right?

12 A   Yes.

13 Q   And the preamble of the electronic sourcing system

14 is also an element of the claim the Court has

15 construed, right?

16 A   Yes.

17 Q   So when we go through this on an element by

18 element basis, you're familiar with the term what's

19 called an antecedent basis?

20 A   Yes.

21 Q   So let's look at the first element.  The first

22 element says that the electronic sourcing system has

23 to have at least two product catalogs.  I just want to

24 zero in on that.  Right?

25 A   Yes.

1    Q    The next element says that this electronic

2    sourcing system has to have a means for selecting the

3    product catalogs, right?

4    A    Yes.

5    Q    So the product catalogs that are being referred to

6    in this second element are the product catalogs that

7    were identified in the first element, right?

8    A    Yes.

9    Q    Next element says you have to have a means for

10   searching for matching items among the selected

11   product catalogs.  Do you see that?

12   A    Yes.

13   Q    The selected product catalogs that were being

14   referred here are the product catalogs that were

15   selected with the means in the second element, right?

16   A    Yes.

17   Q    The fourth element says you have to have a means

18   for building a requisition using data relating to

19   selected matching items and their associated sources.

20   Do you see that?

21   A    Yes.

22   Q    The selected matching items here are the selected

23   matching items that had been searched for in the

24   selected product catalogs, right?

25   A    Maybe.

1    Q    Excuse me?

2    A    Maybe.

3    Q    All right.  And the means for processing the

4    requisition to generate one or more purchase orders

5    for the selected matching items refers to the selected

6    matching items in the element above, right?

7    A    Yes.

8    Q    And then, finally, the means for converting data

9    relating to selected matching item and then associated

10   source to data relating to an item in a different

11   source, those selected matching items are the ones

12   that were placed on the purchase order in the element

13   above, correct?

14   A    Maybe.

15   Q    And the sources that are being referred here refer

16   back to the element three, which are the selected

17   matching items and their associated sources, right?

18   A    Maybe.

19   Q    So we're talking about multiple sources there,

20   right?

21   A    Yes.

22   Q    So if I don't have product catalogs in the prior

23   art system, I can't satisfy any of these elements, can

24   I?

25   A    When you say the prior art system --

SHAMOS - CROSS                    2560

1    Q    Any prior art system.  If I don't have a prior art

2    system that has at least two product catalogs, then

3    since all these elements in some part can or may

4    depend on the one above, I can't satisfy any of those

5    elements, isn't that right, since they all depend on

6    the one above them?  Can you answer that question

7    fairly yes or no?

8    A    Let me think about it.  Yes.

9    Q    All right.  So if a prior art system doesn't have

10   catalogs, it doesn't satisfy any of these elements,

11   right?

12   A    That's right.

13   Q    So when you said the RIMS system, you considered

14   for your purposes that it had all the elements of the

15   claim except two or more catalogs; is that right?

16   A    Yes.

17   Q    But that's wrong now in consideration of the fact

18   that if it doesn't have two product catalogs, it can't

19   satisfy all the rest of these elements; isn't that

20   right?  Isn't that what you just said?

21   A    It's right if you add the two product catalogs.

22   Q    But if you don't have the two product catalogs

23   which you assumed for purposes of your RIMS opinion,

24   you don't satisfy any of the elements of the claim?

25   A    That's right.

1  Q    And that would be true on any claim that has this

2  antecedent basis where there is an element that

3  includes a catalog and then there are other claims

4  that would require the antecedent basis of a catalog;

5  isn't that right?

6         MR. McDONALD:   I object to the form, Your

7  Honor.   I think that's confusing.

8         MR. ROBERTSON:   I'll rephrase.   I think it

9  was, too.

10 Q    If there's a requirement of a catalog and then

11 there's a subsequent element that relies on the fact

12 that a catalog is in the claim, it couldn't satisfy

13 that element, right?

14 A    Right.

15 Q    Isn't it true that the TV/2 reference does not

16 disclose or suggest at least two catalogs a generally

17 equivalent item from a different source said

18 requisition module working in combination with said

19 catalog searching module to determine multiple sources

20 for said item?

21 A    I wasn't expecting the question to be that long.

22 Can you repeat that?

23 Q    The TV/2 reference does not disclose or suggest at

24 least two catalogs including a generally equivalent

25 item from a different source said requisition module

SHAMOS - CROSS                    2562

1    working in combination with said catalog searching

2    module to determine multiple sources for an item,

3    correct?

4    A    Well, it certainly doesn't have all of that, no.

5    Q    And the TV/2 reference doesn't disclose or suggest

6    that the determination system including a cross

7    reference table matching an identification code from a

8    first located item with a second identification code

9    from a second located item, right?

10   A    Right.

11   Q    And you would agree, wouldn't you, that there had

12   to be an interface created between the TV/2 search

13   programs and the RIMS system for an electronic

14   sourcing system; is that right?

15   A    Well, what I agree with is to integrate the two,

16   one would have to create an interface, yes.

17   Q    And you would agree also that additional search

18   capabilities were added to the TV/2 search program for

19   the Fisher electronic sourcing system; isn't that

20   right?

21   A    That's my understanding.

22   Q    Is it your understanding that TV/2 search program

23   could not do Boolean search functionalities when IBM

24   presented it to Fisher-Scientific?

25        MR. McDONALD:  Objection, Your Honor.

SHAMOS - CROSS                2563

1   Boolean search isn't one of the claims.  It's

2   irrelevant.

3            MR. ROBERTSON:  I think search capability is

4   and Boolean search capability is in the accused

5   products and in the commercial embodiment.  So I think

6   it does have relevance.

7            MR. McDONALD:  This is what I'm talking

8   about, Your Honor.  He's trying to match up things

9   that have nothing to do with the claim by talking

10  about Boolean searching.  The issue is searching.

11           THE COURT:  Why isn't that right?

12           MR. ROBERTSON:  I think Boolean searching is

13  a form of searching, Your Honor.

14           THE COURT:  So what?

15           MR. ROBERTSON:  I'll move on, Your Honor.

16           THE COURT:  I sustain the objection.

17  BY MR. ROBERTSON:

18  Q   Now, you're aware that when IBM met with

19  Fisher-Scientific, they presented this TV/2 product as

20  a potential product to use in the electronic sourcing

21  project, correct?

22  A   Yes.

23  Q   And thereafter they entered into a contract and

24  began working together, correct?

25  A   Yes.

SHAMOS - CROSS                    2564

1    Q    And you're aware that Fisher committed significant

2    resources to the project, correct?

3    A    Yes, I think anybody would regard the expenditure

4    as significant.

5    Q    So they committed not only the expenditures, but

6    they also committed human resources? That is, there

7    were the four inventors, two of which were full-time

8    on the project for a year and a half.  You're aware of

9    that, right?

10   A    I don't recall who was full time and who wasn't,

11   but they did commit human resources.

12   Q    And they also had IBM commit significant

13   resources; isn't that right?

14   A    Yes.

15   Q    And the project lasted a considerable time and you

16   have seen that statement of work where there were over

17   81 tasks that needed to be completed, correct?

18           MR. McDONALD:  Objection, Your Honor.  I

19   don't see what relevance this has with anything.  How

20   long it took to put the product together has nothing

21   to do with it.

22           THE COURT:  Overruled.

23   Q    Correct?

24   A    I need you to repeat the question.

25   Q    Sure.  There was a statement of work I think that

1    you referenced before that had a number of tasks that

2    needed to be accomplished in order to complete the

3    electronic sourcing project that led to a prototype

4    for what is claimed in the inventions in this case,

5    correct?

6    A    Yes, I saw that.

7    Q    And you also saw that Fisher-Scientific committed

8    more than $600,000 in cash to the project, correct?

9    A    Yes.

10   Q    And I don't know if I asked this already, but

11   you're aware that it took some substantial time,

12   perhaps as much as a year and a half?

13   A    Yes.

14   Q    Well, why isn't it when Fisher walked in IBM

15   didn't say, You know, you don't need to do that.

16   Here's a brochure.  It's right here.  There's the

17   invention?

18   A    Because IBM likes to charge money for services.

19   Q    So you think they just did this whole thing as a

20   charade for a year and a half working with

21   Fisher-Scientific just to be able to charge money for

22   their services?

23   A    It wasn't a charade.  What Fisher needed was a

24   commercial product that would serve its needs.  The

25   commercial product is different from what's claimed in

SHAMOS - CROSS                    2566

1  the patent.  It has much more.

2  Q   How do you know?  You have never even seen the

3  commercial product.

4  A   But I've read the description of work.

5  Q   But you didn't know what the actual commercial

6  product was, right?

7  A   As I said, I read the description of work, and

8  what IBM and Fisher did together was a lot more than

9  is claimed in the patents.

10 Q   Let me ask you to take a look at what is

11 Exhibit 4.  Plaintiff's Exhibit 4.  Do you have that?

12 A   Yes.  Well, it looks like a file history.

13 Q   It's the file history for the '683 patent.  Can

14 you confirm that?

15 A   Not at this resolution.

16 Q   Well, it's in your notebook, I believe.

17      THE COURT:  In that big notebook there in

18 front of you, is that what you're talking about?

19      MR. ROBERTSON:  Yes, sir.

20      THE COURT:  Maybe it's easier to do that

21 because I see his problem.

22      It's Plaintiff's Exhibit 4?

23      MR. ROBERTSON:  Yes, sir.

24      THE COURT:  Do you have it, sir?

25      THE WITNESS:  Well, I have what's marked as

1   PX 4, but it doesn't begin with the same cover page

2   that's on the screen.

3   BY MR. ROBERTSON:

4   Q   Why don't we just focus on what's in front of you

5   if you can for now, and maybe I can direct you to a

6   page that we're going to be focusing on.  You did say

7   you considered this for purposes of your report,

8   right?

9   A   Yes.

10              THE COURT:  Which file history, the '683?

11              MR. ROBERTSON:  Yes, sir.

12   Q   If you'd go to -- do you see the lower right-hand

13   corner there's a number of what are called Bates

14   numbers.  You're familiar with that term, right?

15   A   Yes.

16   Q   Actually, go to the page that starts with 721.  Do

17   you see that?  Actually, if you start before that,

18   there's a page 720.  It says office action summary?

19   A   Yes.

20   Q   If you'd turn to the next page -- actually, yes,

21   can you explain to the jury what an office action is,

22   sir, if you know?

23   A   I know.

24   Q   What is it?

25   A   During the prosecution of a patent, there's

1    correspondence that takes place between the Patent

2    Office and the applicant.  The applicants will file an

3    application and the office reviews it.  And if they

4    reject any claims or if they allow any claims, they do

5    so by providing a document back to the applicant.

6    It's called an office action in which the nature of

7    the action is stated and an explanation is given by

8    the examiner for why he did what he did.

9    Q    Here under heading No. 4 it says the disclosure is

10   objected to because of the following informalities; do

11   you see that?

12   A    Yes.

13   Q    The disclosure, that's what's contained in the

14   application when the applicants first filed the patent

15   describing what they believe their invention is,

16   right?

17   A    Yes.

18   Q    That becomes the specification of the patent if

19   the patent issues?

20   A    Correct.

21   Q    And it indicates here that the applicant must

22   update some things.  Do you see that?

23   A    Yes.

24   Q    One of the things it says, the application data on

25   page 12 with the current status of each of the

SHAMOS - CROSS                    2569

1    referenced applications, e.g. now abandoned or now

2    patent number, question mark, or which is abandoned,

3    and now a serial number, symbol, question mark, etc.,

4    correct?

5    A    Yes.

6    Q    Why don't we go to page 575 of the document.  Do

7    you see here at the bottom of the page, in fact,

8    there's a reference to an application number?  Do you

9    see it?  It's a little difficult to read, but it's in

10   the lower left-hand corner.

11   A    Yes.

12   Q    That application number has been crossed out and

13   there the examiner has now written United States

14   Patent No. 5,712,989.  Do you see that?

15   A    Yes.

16   Q    So the examiner has appreciated that what was now

17   being fully described was the actual '989 RIMS patent

18   that it issued, correct?

19   A    Well, what happened was that during the

20   prosecution of the '683 patent, the '989 patent

21   issued, and the examiner required the applicants to

22   amend the specification to replace the word

23   "application" with the patent number that was

24   subsequently granted.

25   Q    So there we have actually appreciation by the

1    examiner that he understands that this is now the '989

2    patent, right?

3    A    No, he knew it was a patent.

4    Q    That's why he put it in there, right?

5    A    Yes.

6    Q    Now, I think you agreed with me earlier that when

7    you are going to apply for a patent or when you're

8    looking at a patent for purposes of infringement or

9    invalidity you need to look at it and read it as a

10   whole, correct?

11   A    I'm sorry.  Could you say it again?

12   Q    Yeah.  You need to view the claim as a whole, not

13   its little pieces, right?

14   A    I didn't think it was phrased that way in your

15   original question, but, yes, you evaluate the claim as

16   a whole for invalidity purposes.

17   Q    So you can't say, for example, if there's an

18   element that says in determining whether there's a

19   selected matching item available in inventory, you

20   just can't go and focus on a prior art reference and

21   say, Well, there is a discussion of inventory.  So

22   that element is satisfied.  You have to read it in the

23   context of the entire claim; isn't that right?

24   A    Yes.

25               THE COURT:  Is your question you have to read

1    the prior art in context of the entire claim of the

2    patent-in-suit?  Is that your question?

3              MR. ROBERTSON:  I think that's right, Your

4    Honor.

5              THE COURT:  You didn't make the antecedent

6    noun clear.

7              MR. ROBERTSON:  I'm sorry.  Let me see if I

8    can.

9    Q   You have to consider whether the prior art

10   satisfies that claim element when you look at the

11   claim and consider it in its entirety; isn't that

12   right?

13   A   For obviousness purposes, you must consider the

14   claim as a whole.

15   Q   For anticipation purposes don't you need to

16   consider the claim as a whole, as well?

17   A   I don't think so.

18             MR. ROBERTSON:  Can we look at slide 27, if

19   we could.

20   Q   This is what you relied on when you said RIMS

21   search for items in multiple sources; do you see that?

22   A   Yes.

23   Q   And you had certain little excerpts from the '989

24   patent.  Do you see that?

25   A   Yes.

1        MR. ROBERTSON:  Can we go to column 3 of the

2   '989 patent and see the entirety?

3   BY MR. ROBERTSON:

4   Q   While we're doing that, one of the things you said

5   could be searched for was each product could regularly

6   sold by the distributor, right?

7   A   That's what the patent says.

8   Q   I'm just saying this is what you cited to,

9   correct?

10  A   Yes.

11  Q   And the distributor, you understand, that's being

12  discussed in this section was Fisher, wasn't it?

13  A   Well, it could be Fisher.  If the product is used

14  by others, it's not going to be Fisher.

15  Q   In the context of this patent, the distributor is

16  Fisher; isn't that right?

17  A   I don't think that's correct.

18  Q   We'll just say it's a distributor, all right?

19  A   Yes.

20  Q   And then down below where it's discussing this

21  cross reference, a distributor catalog to its vendor's

22  part number, a similar catalog number to other

23  supplier or distributors.  Do you see that?

24  A   Yes.

25  Q   That's what you're saying being searched here; is

1    that right?

2    A    Well, that's what the cross references are to.

3    Q    That's not what the heading of your document is.

4    It's RIMS searched items from multiple source,

5    correct?

6    A    Yes, if it's retrieving catalog number of other

7    suppliers and distributors, it's finding those items

8    from other sources and those sources being other

9    suppliers or distributors.

10   Q    The last one says, Host database includes data

11   regarding items from third party suppliers; do you see

12   that?

13   A    Yes.

14         MR. ROBERTSON:  Now, can we see column 3 of

15   the '989 patent?  It's PX 10.  If you could blow up

16   the first half.

17   Q    There's no search capability being described here

18   at all in this column 3, is there?

19   A    Well, I just verified that the word "search" does

20   not appear on the screen, but that's the purpose of

21   databases is to be searched.

22   Q    Sir, you were asked about figure 5(a) in this

23   patent.  You represented that that was where we could

24   find that there were multiple purchase orders

25   generated from a requisition; is that right?

1    A    Yes.

2    Q    But, specifically, sir, Mr. McDonald asked you

3    that there was this product type 01, 03, 04, and if it

4    was yes, you went in one direction, and if it was no,

5    you went in another direction, correct?

6    A    Yes.

7    Q    And those were the two purchase orders you say

8    that were created, correct?

9    A    Well, it could be lots more than two.

10   Q    All right.  But those are the two different

11   directions you went in to start to generate the

12   multiple purchase orders you said were present in the

13   RIMS system, correct?

14   A    Yes.

15   Q    But the one on the left side says, Customer

16   internal purchase order; do you see that?

17   A    Yes.

18   Q    That's not part of the RIMS system, is it, sir?

19   That's the customer's internal purchase order, right?

20   A    I don't know what you mean "not part of the RIMS

21   system."  This is the '989 patent.

22   Q    When you go into the customer internal P.O.,

23   you're not in the RIMS system anymore, are you, sir?

24   A    I don't know what that means.  To the extent that

25   the '989 patent is describing the RIMS system, it's

1  part of the disclosure of the patent.

2  Q    But the next thing says you create and print a

3  purchase order internal to the customer; isn't that

4  right?

5  A    Yes.

6  Q    That's the customer's purchase order, right?

7  A    Yes.

8  Q    Do you see these; 01, 03 and 04?

9  A    Yes.

10 Q    01 is at table 1, these product types are in a

11 table at column 5 and column 6 of the patent.  01 is

12 the distributor-owned product, correct?  That's

13 distributor-owned item in a Just In Time warehouse

14 located at or near the customer site, right?

15 A    Right.

16 Q    And 03 is a distributor catalog item like a Fisher

17 catalog item stored in the distributor's warehouse,

18 correct?

19 A    Yes.

20 Q    So that's a Fisher product, for example, a catalog

21 product that they are storing in their own warehouse.

22 And 04 is a third-party item that the distributor

23 orders, correct?

24 A    Yes.

25 Q    So none of those are products that are from a

1  vendor that is not a Fisher vendor, correct?

2  A    Well, of course, they are.

3  Q    Well, it's the distributors who has the product,

4  isn't it?

5  A    No, the distributor is just the intermediary.  The

6  distributor for product type 4, the distributor orders

7  the part or item from whatever is manufacturing it or

8  whoever is vending it.

9  Q    But it's the distributor who actually is selling

10  it, isn't it?

11  A    Well, the distributor buys it from somebody else,

12  and then the distributor sells it to the customer.

13  Q    But that doesn't go through the RIMS system, isn't

14  that right, for 04 type products?

15  A    I don't know what you mean that it doesn't go

16  through the RIMS system.  It goes through the system

17  that's described in the patent.

18  Q    But then the customer service representative has

19  to go out and actually outside of the RIMS system

20  order that product, right?

21  A    Well, that's one way of doing it.

22  Q    Well, isn't that the way it's taught in the

23  patent?

24  A    It's in the preferred embodiment.

25  Q    Human intervention is actually doing it, correct?

1    It's not happening as part of an electronic process?

2    A    There's a flow chart in figure 5.   That flow chart

3    can be implemented electronically.   It can be

4    implemented by computer.

5    Q    But when you go to order that product, you

6    understand, and what's disclosed in the patent you

7    called preferred embodiment, the CSR then goes and

8    actually contacts and obtains that product from the

9    vendor; isn't that right?

10   A    Well, that's one way of doing it, but when the

11   distributor receives an order for a part that he does

12   not have or does not stock, he goes and orders it.   He

13   can order it by having somebody pick up the phone or

14   he can order it through electronic data exchange or

15   whatever other interfaces he may have to its

16   suppliers.

17   Q    And that's not part of the electronic sourcing

18   system that's claimed in the '683 patent, is it?

19   That's all part of an electronic sourcing system, not

20   somebody stopping all of a sudden saying I'm going to

21   pick up the telephone and call a vendor and purchase

22   an item; isn't that right?

23   A    Well, I would agree that for the

24   means-plus-function claims, the means isn't a human

25   being.

1              MR. ROBERTSON:  Can you go to slide 32,

2    please.

3    Q    This is an excerpt from the '989 patent you relied

4    on for RIMS checking inventory; isn't that right?

5    A    Yes.

6    Q    The inventory being checked there is

7    customer-owned inventory, correct, at the JIT

8    facility?

9    A    That's one of the inventories being checked, yes.

10   Q    And the second one is product type 01, which is

11   the distributor-owned inventory, correct?

12   A    Yes.

13   Q    No inventory is being checked there for any other

14   sources of the product; isn't that right?

15             MR. McDONALD:  Objection, Your Honor,

16   irrelevant.  The claim doesn't talk about inventory.

17             MR. ROBERTSON:  No, they talk about --

18   Q    That's why you have to read the claims as a whole

19   because they talk about inventory from selected

20   matching items and their associated sources, don't

21   they, sir?

22   A    Yes.

23             MR. McDONALD:  Objection.

24             THE COURT:  Objection overruled.

25   Q    So it has to be from an associated source, which

1    is a vendor, a manufacturer or a supplier in the

2    context of these claims; isn't that right?

3    A    I don't think that's right.

4    Q    Well, a catalog in which the item came from is

5    provided by a vendor, a supplier or a manufacturer,

6    right?

7    A    I think that's right, yes.

8    Q    So when we went down the claims before and all

9    those antecedent bases, when we got down to checking

10   for availability of a selected matching item, it was

11   from the associated sources that had those multiple

12   product catalogs, right?

13   A    Yes.

14   Q    So the sources from which the products are coming

15   are from at least two vendors, correct?

16   A    Yes.

17   Q    So what you're checking here is the customer

18   inventory and the Fisher inventory, correct?  Those

19   aren't two separate sources?

20   A    But they are.

21   Q    Not as defined by the Court when they have to be

22   from a vendor, a supplier or manufacturer.  The

23   customer-owned product is not a vendor, a manufacturer

24   or a supplier, correct?

25             MR. McDONALD:  Object to his characterization

1    of the claim terms.  I don't even know which one he's

2    talking about right now.  I think it's getting very

3    confusing.

4              MR. ROBERTSON:  I'm using Claim Three, the

5    one we've been going through this morning.

6              THE COURT:  The objection was to the form of

7    the question?

8              MR. McDONALD:  Yes.

9              THE COURT:  Sustained.

10             MR. ROBERTSON:  I'll rephrase.

11   Q    All you have identified here in this slide which

12   you say discloses that RIMS checked inventory is the

13   customer-owned inventory at a facility and the

14   distributor-owned inventory, which is the Fisher

15   product, correct?

16   A    Yes, and those are two different sources.

17   Q    The customer-owned inventory is what the customer

18   already owns.  It's not vending.  It's not a vendor,

19   supplier or manufacturer, is it?

20   A    That's not true.  That's what an internal purchase

21   order is.

22   Q    It's already customer-owned inventory sitting in a

23   warehouse, isn't it?

24   A    But it's not owned by the department that wants

25   it.  The department that wants it has to pay for it.

1    Q    Well, the company owns it, don't they?   So you're

2    saying that a vendor is an internal department of the

3    company?

4    A    It certainly can be.   The department has to expend

5    its funds in order to get that material.

6    Q    So the internal department, say, of a company is

7    in your view a manufacturer, a vendor or a supplier

8    under the Court's definition?

9    A    It certainly can be, yes.

10            THE COURT:   So are you saying that if it's in

11   the inventory of the customer, and -- well, let me ask

12   you this:   To be in the inventory of the customer, the

13   customer has to pay for it, right?

14            THE WITNESS:   Well, for it to get there in

15   the first place, the customer --

16            THE COURT:   Somebody has to pay for it.

17            THE WITNESS:   The customer has to pay for it.

18            THE COURT:   That's the company paying for it,

19   right?

20   A    Yes.

21            THE COURT:   Does the department within the

22   company according to your testimony have to pay again?

23            THE WITNESS:   It has to pay another entity

24   within the company.   It can't go to the inventory and

25   just take what it wants.   It has to pay for it with

1  internal funds.

2         MR. ROBERTSON:  Can we go to slide 38, if we

3  could.

4  BY MR. ROBERTSON:

5  Q    Here you're saying RIMS was an order entry and

6  inventory management system, correct?

7  A    Yes.

8  Q    And you rely on that for -- at column 1, lines 5

9  through 7, correct?

10 A    Well, that's an example.

11 Q    Well, then you go on to say RIMS is a requisition

12 system which will generally, and then quote "process

13 purchase orders for items and track inventory."  Do

14 you see that?

15 A    I didn't say that.  That's from the patent.

16 Q    Why don't we go to the patent if we can switch

17 back.  Column 1.

18     It's actually referring to -- if you go down below

19 that -- two other systems, isn't it?  To process

20 purchase order items and track local inventory.

21 A    I'm sorry.  What's the question?

22 Q    There it's being referred to two other systems in

23 patent, 4888208 and 4972318, correct?

24        THE COURT:  The question is whether the cited

25 reference supports what he says because the cited

1  reference when viewed in the whole refers to systems

2  not to the patent.  Is that what you're saying?

3          MR. ROBERTSON:  Yes, sir.

4          THE COURT:  Is that true or not?

5          THE WITNESS:  I'm sorry.  What's the -- could

6  you just rephrase the question?

7  Q   I'll just move on.  Why don't we take a look at

8  column 4, starting at about line 23.  Here it's

9  describing an embodiment, correct?  That is Fisher and

10 customer inventory, not multiple vendors, correct?

11 A   Well, that's your characterization.  The

12 department wants to order something.  The vendor can

13 be another department within the company or it can be

14 in the distributor-owned inventory.  Those are two

15 different sources, two different vendors.

16 Q   The customer that's selling the product to itself,

17 what's the basis for your opinion with respect to

18 that?

19 A   I have worked for a number of companies and that's

20 the way it works.  You don't get to take what you

21 want.  You have to pay for it.

22 Q   So that makes the department within the company a

23 vendor in your view?

24 A   Yes.

25 Q   Now, you're aware in the '683 disclosure in the

SHAMOS - CROSS                    2584

1   application and in the specification, the inventors

2   discussed a number of problems with the RIMS system as

3   disclosed in the '989 patent, correct?

4   A    They said that, yes.

5   Q    And they informed the Patent Office repeatedly

6   that this RIMS system as modified in the TV/2 system

7   were merely preferred embodiments, correct?

8   A    I think that's right.

9   Q    And you would agree with me that the claims are

10  not confined to the preferred embodiments, right?

11  A    Yes.

12  Q    And it's true that while the invention can be

13  described in detail with reference to specific

14  embodiments, it can be apparent to one skilled in the

15  art that various changes and modifications can be made

16  without departing from the spirit and the scope of the

17  invention, correct?

18  A    Yes, as a general proposition that's true.

19  Q    And these three patents, the first one was filed

20  in August of 1994?

21  A    Yes.

22  Q    And the last one issued, the '172 patent, issued

23  in January of 2003, correct?

24  A    I think so.

25  Q    So all told, these patents were pending for over a

1  period of nine years, correct?

2  A    Yes.

3  Q    And the Patent Office issued three separate

4  patents, correct?

5  A    Yes.

6  Q    With 79 total claims?

7  A    I don't recall the total number of claims.

8  Q    And the examiner, do you know whether it was the

9  same individual each time?

10  A    I don't recall that.

11  Q    Do you have any reason to dispute it?  The patent

12  says what the patent says, right?  If it is, then it

13  is?

14  A    Exactly.

15  Q    And in each instance, the examiner had before him

16  the 2 TV/2 references that you relied on, correct?

17  A    Yes.

18  Q    And in each instance, he allowed the claims,

19  right?

20  A    Obviously.

21  Q    If, in fact, Fisher-Scientific already had an

22  electronic sourcing system in its RIMS patent, why

23  would they expend all those resources, commit all that

24  personnel, hire IBM, and spend all that money to come

25  up with an invention which was something they already

1   had?

2   A    One, how could I know that?

3   Q    Well, does it make sense?

4   A    Sure it does.

5   Q    To spend all that money and all those resources to

6   get an invention you already have?

7   A    Well, the invention is described --

8          THE COURT:  Mr. Robertson, if he can't know

9   why they did something, how can he answer the question

10  whether it made sense because in order to answer the

11  question why it made sense, you have to know why

12  you're doing it, don't you?

13         MR. ROBERTSON:  All right, Your Honor.  I'll

14  move on then.

15  BY MR. ROBERTSON:

16  Q    You're not offering any opinions or have not

17  offered any opinions with respect to whether or not

18  any of the claims of these patents lack an adequate

19  written description under the patent statute, correct?

20  A    Well, I'd be happy to if you ask me.

21  Q    But you haven't?

22  A    No, not as of now.

23  Q    When you were talking about the prior art, you

24  were indicating that you needed to apply the Court's

25  construction faithfully both for infringement and

1  validity, correct?

2  A    Yes.

3  Q    You but when you gave your opinions with respect

4  to infringement, you indicated that your understanding

5  of published by a vendor, which is in the Court's

6  construction of catalog, required in some way that the

7  customer had to select the items to put in the

8  database, correct?

9           MR. McDONALD:  Objection, Your Honor.  I'm

10  not sure what he's characterizing at this point.

11  A    I'd like that read back.

12  Q    For purposes of infringement, you had opinions

13  with respect to how the Court's term "published by a

14  vendor" needed to be satisfied?

15  A    I don't think I testified about that.

16  Q    Well, didn't you testify that the data had to be

17  modified in some way for inclusion in the item master,

18  for example?

19           MR. McDONALD:  I think he's confused at this

20  point, Your Honor.  Maybe this isn't a technical

21  obvious, but I think he's talking about the opposition

22  of what he testified about.

23           MR. ROBERTSON:  Let me see if I can clarify

24  this.

25  BY MR. ROBERTSON:

1   Q   You said that the item master didn't satisfy the

2   catalog because the data was modified, could be

3   modified or had to be modified in some way, right?

4   A   I gave many reasons.

5   Q   Is that one?

6   A   That was one.

7   Q   And the customer could delete information, so

8   that's why it didn't satisfy the Court's definition?

9   A   I don't think I said it that way.

10  Q   I think you said that -- well, let me ask you

11  this.  Didn't you indicate that it doesn't satisfy the

12  Court's construction if only a partial items were

13  entered into the item master?

14          MR. McDONALD:  Your Honor, I think we're back

15  on the infringement part of the case, and I think it's

16  getting awfully confusing.  I object.  It's outside

17  the scope of my direct examination.

18          THE COURT:  I thought that's what we were

19  doing.  Why are you doing this?  Are you trying to

20  establish that he said one thing in infringement and

21  another in invalidity and that's why you're asking

22  about infringement?

23          MR. ROBERTSON:  Yes, sir.

24          THE COURT:  Well, then the objection is

25  overruled.  You can do that, if you can do it.

SHAMOS - CROSS                    2589

1   BY MR. ROBERTSON:

2   Q    Didn't you indicate for purposes of infringement

3   that if the item master didn't contain the entire

4   catalog, it didn't satisfy the Court's construction as

5   published by a vendor?

6   A    No.

7   Q    Did you say even if a customer loads all item data

8   from a published vendor, if it only comes from one

9   place, that it doesn't mean it's a catalog within the

10  Court's construction?

11  A    I don't think I said that.

12  Q    Let me start back -- I don't think I asked you

13  this question.  You had some slides and you were asked

14  about some bullet points.  One of the bullet points

15  was about the catalog at issue.  Let me ask you this:

16  Isn't it true you said that you had to look at where

17  the data in the item master comes from because the

18  item master starts out empty when the system is

19  installed.  Do you recall that?

20  A    Yes.

21  Q    The TV/2 starts out empty, doesn't it?

22  A    Well, the TV/2 system as delivered by IBM starts

23  out empty.

24  Q    Didn't you give an opinion with respect to

25  infringement that in order to satisfy the Court's

1    construction published by a vendor - excuse me - of

2    published by a vendor, that's right, it has to be

3    carefully handpicked by a customer who decides what to

4    import?

5    A    No.  That's confusing and wrong.  I don't know

6    what that means.

7    Q    You said it wouldn't satisfy the claim if it were

8    carefully handpicked by a customer and the customer

9    decided what to import into the item master, correct?

10   A    Yeah.  We had a discussion about how much of a

11   catalog would you have to import for it to remain a

12   catalog, and at what point wouldn't it be a catalog

13   anymore.

14   Q    But your opinion was that if a customer decides

15   what to import into an item master, that doesn't

16   constitute a catalog, correct?

17   A    It may not.

18   Q    You didn't offer any opinions with respect to

19   invalidity as to whether a decision was made to import

20   some data into this TV/2 and RIMS combination you had,

21   whether that would constitute a catalog, didn't you?

22   A    But many times during my testimony I said under

23   the plaintiff's theory of infringement --

24   Q    I'm not talking about the plaintiff's theory of

25   infringement.  I'm talking about what you say was

1  required under the Court's construction for published

2  by a vendor, not our theory.  We don't have a theory.

3  We're following the claim construction.  I want to

4  know what you said satisfied the claims.  You said if

5  the customer only imported some of the data, it didn't

6  constitute a catalog, correct?

7  A    Yes.

8  Q    You didn't offer any opinions with respect to that

9  on this TV/2 and RIMS invalidity argument, did you?

10 A    But in TV/2 --

11         THE COURT:  Yes or no?  Did you offer those

12 opinions?

13         THE WITNESS:  Yes.

14         MR. ROBERTSON:  I guess the record will speak

15 for itself on that.

16 BY MR. ROBERTSON:

17 Q    Did you indicate in your opinions on validity that

18 the TV/2 brochure disclosed searching for catalogs,

19 correct?

20 A    Searching in catalogs, yes.

21 Q    Didn't you indicate that the search was how the

22 TV/2 can select the catalog to search?

23 A    I'm sorry?

24 Q    Didn't you indicate that the TV/2 brochure taught

25 that you can select a catalog to search by searching

SHAMOS - CROSS                    2592

1   for a catalog?

2   A    No.   There's a disclosure in the TV/2 literature

3   that you can store multiple catalogs on hard disk and

4   there's a discussion of the search interface whereby

5   you can specify which portion of the database you'd

6   like to search.

7   Q    Selecting a catalog, can that be a search?

8   A    Well, you may have to search for --

9   Q    Can selecting a catalog be a search, sir?

10  A    I can't answer yes or no.

11  Q    Isn't it true that the RIMS parts master didn't

12  have the entire Fisher catalog imported into it?

13  A    I'm sorry.   I was coughing.   Could you repeat?

14  Q    Yes.   Isn't it true that the RIMS parts master

15  didn't have an entire Fisher catalog imported into it?

16  A    I don't know that.

17             MR. ROBERTSON:   If I could just have a

18  minute, Your Honor.

19             All right.   Thank you.   That's all I have.

20

21      REDIRECT EXAMINATION

22  BY MR. McDONALD:

23  Q    Good morning Dr. Shamos.

24  A    Good morning.

25  Q    I'd like to turn first to the issue of the

SHAMOS - CROSS                    2593

1    sourcing of products relating to customer's inventory.

2              MR. McDONALD:  Can we go to the '989 patent

3    the RIMS patent, please, DX 7.  Can we go to column

4    11.  Could you blow up the section of the left column

5    that starts with the heading "sourcing," and then blow

6    it up from there on down.

7    BY MR. McDONALD:

8    Q    We've got up on the screen now, Dr. Shamos, from

9    the '989 RIMS patent column 11 beginning at line 25

10   and going to line 47.  Do you see that?

11   A    Yes.

12   Q    Now, does this section of the RIMS patent relate

13   at all as to whether or not -- relate at all to the

14   sourcing issue?

15   A    Yes.

16   Q    Can you explain to us what is being described here

17   if we walk through this?  For example, in the first

18   paragraph there, it talks about what sourcing is,

19   right?

20   A    Yes.

21   Q    What does it indicate that sourcing is?

22   A    Sourcing -- I'm reading from the second line of

23   text.  Sourcing the requisition is the process of

24   determining what inventory will be used to fill the

25   requisition.

SHAMOS - CROSS                    2594

1   Q    So it could be purchased or it could come from an

2   inventory.   That's all sourcing, right?

3   A    Yes.

4   Q    So if we go down to the third paragraph here --

5             MR. ROBERTSON:   Just so it's clear, it also

6   says for all product types except 05 and 06.   I think

7   for clarity, you ought to identify what 05 and 06

8   products are.

9   Q    Let's verify the next sentence, Dr. Shamos.   Can

10  you read the next sentence after the highlighted one?

11  A    Yes.   Pricing is also performed in this step when

12  1it's called for, e.g., for all product types except

13  for 05 and 06.

14  Q    Well, pricing is something different from

15  sourcing, isn't it?

16  A    Yes.

17  Q    It's got nothing to do with this, right?

18  A    That's right.

19  Q    If we could go to the third paragraph, please,

20  where it says sourcing is performed on both local

21  computer 40 and host computer 10.   Do you see that

22  paragraph?

23  A    Yes.

24  Q    Well, let's take a look at this next sentence in

25  some detail.

1        MR. McDONALD:  Can we blow up the next

2   sentence, please.

3   Q    Sourcing in the preferred embodiment of the

4   system, we're talking but the RIMS system here, right?

5   A    Yes.

6   Q    Of the present invention can involve up to four

7   different product types:  01, local distributor-owned

8   JIT the items; 03, distributor catalog items; 04,

9   third party items which are ordered by the

10  distributor; type 06, customer-owned JIT items; do you

11  see that?

12  A    Yes.

13  Q    So these are the different product types that are

14  all sourced in the RIMS system, correct?

15  A    Yes.

16  Q    Now, the internal customer purchase order that you

17  were referring to, is that sometimes called an

18  administrative purchase?

19  A    Yes.

20        MR. McDONALD:  Can we turn to the '683

21  patent, please, the patent-in-suit.  Can we go to

22  column 18.  Can you blow up the section beginning at

23  line 17 or 18 of column 18, and then the list of 3

24  bullet points.

25  BY MR. McDONALD:

1  Q   So this is from the '683 patent, but this is in

2  all the patents-in-suit; is that right, Dr. Shamos?

3  A   Yes.

4  Q   Can you tell us what being described here in the

5  '683 patent at column 18?

6  A   Well, what's being described is the generation of

7  one or more purchase orders.

8  Q   That first item there, what is that?  It says, "An

9  order from the customer to the supplier, an

10  administrative purchase."

11  A   Well, that seems to contradict what we were

12  talking about before about what an administrative

13  purchase is because that doesn't look internal.

14         THE COURT:  Well, it can't be internal

15  according to the construction.

16  Q   Well, if we look at --

17         THE COURT:  Can it?

18         MR. McDONALD:  Yes, it can.  Well, let me

19  walk through this.

20         THE COURT:  Are you trying to make a point

21  here that when a company owns something in inventory,

22  and it's paid for it, and one department has it but

23  another department wants it, and there's a bookkeeping

24  entry to reallocate funds within the company, that you

25  have a vending going on; is that the point?

SHAMOS - CROSS          2597

1          MR. McDONALD:  That's sourcing, Your Honor.

2          THE COURT:  Well, I'll let the jury decide

3     whether it is or not, I guess, but --

4     BY MR. McDONALD:

5     Q    You just testified that the whole RIMS

6     specification is incorporated by reference into the

7     patents in this suit, correct?

8     A    Yes.

9     Q    And in the RIMS patent, doesn't it specifically

10    say that those customer internal transactions are

11    called purchase orders?

12         MR. ROBERTSON:  Objection, leading.

13         THE COURT:  Let him testify.  That's enough.

14    Q    All right.  So does --

15         THE COURT:  Sustained.

16    Q    Does the RIMS specification describe the internal

17    customer transaction?

18    A    Yes, we went through this in discussing figure 5,

19    which has the decision block when processing a

20    requisition looking at the different type codes and

21    deciding whether to issue an internal purchase order

22    or not an internal purchase order.

23    Q    That was from that figure 5A of the RIMS patent,

24    correct?

25    A    Yes.

1          MR. McDONALD:  Can we put figure 5A back up,

2     please, from the '989 patent.

3     BY MR. McDONALD:

4     Q   So for purposes of the RIMS disclosure that's

5     incorporated into the patents-in-suit, is there

6     anything from figure 5A that indicates what that

7     internal customer transaction is actually called?

8     A    Well, it says -- it refers to in block 334,

9     customer internal P.O.

10    Q    What does P.O. stand for?

11    A    Purchase order.

12         MR. McDONALD:  Well, can we go to column 17

13    of the '989 patent.  Could you blow up a section from

14    lines 35 to 43, please.

15    BY MR. McDONALD:

16    Q    I think you were asked some questions about

17    whether the system generates the purchase orders in

18    those figures 5A and 5B or not.  I'd like to direct

19    your attention to this paragraph, Dr. Shamos.  Can you

20    tell us what this paragraph of the RIMS patent is

21    explaining about that purchase order building process?

22    A    Yes, it's describing what happens, for example,

23    for items of product types 1, 3 and 4.  It creates a

24    purchase order between the customer and the

25    distributor.

SHAMOS - CROSS                    2599

1   Q    Does it refer to figures 5A and 5B to support that

2   statement or not?

3   A    Yes.

4   Q    What does it indicate in terms of what system uses

5   the purchase order build program?  Was it that local

6   computer?

7          THE COURT:  Let him testify.

8   A    Well, it says for items of product types 01, 03

9   and 04, local computer 40 uses purchase order build

10  program 112 to create a purchase order.

11  Q    If we go to figure 2A of the '989 patent --

12         MR. ROBERTSON:  Objection, outside the scope.

13  I didn't ask anything about figure 2A.

14         MR. McDONALD:  It's referred to in this

15  paragraph that refers to 5A.

16         THE COURT:  Well, that doesn't make it

17  something that was a topic of his examination.

18  Sustained.

19  BY MR. McDONALD:

20  Q    Let's turn now to the patent, the file history,

21  Exhibit 4, that Mr. Robertson was asking you about.

22  He was asking you about whether or not -- well, let's

23  talk about the issue of whether or not there was a

24  disclosure to the Patent Office that any aspect of the

25  RIMS system was actually prior art.  Did you look at

1    the file history, Exhibit 4, to determine whether or

2    not the RIMS system was actually disclosed as prior

3    art?

4    A    Yes.

5    Q    What did you conclude about that?

6    A    It wasn't.

7    Q    What's the basis for that conclusion?

8         MR. ROBERTSON:  Objection.  This calls for

9    legal conclusions.

10        MR. McDONALD:  He's asked the exact same

11   questions.  I want to get a chance for him to explain

12   his reasoning.

13        MR. ROBERTSON:  I didn't ask --

14        THE COURT:  He didn't ask him the reasoning.

15   He volunteered that.  Mr. Robertson opposed it.

16        MR. McDONALD:  Well, the exact issue was is

17   the RIMS system disclosed as prior art.

18        THE COURT:  I ruled.  It's over.  I'm not

19   going to have you testifying about the law.

20   BY MR. McDONALD:

21   Q    Dr. Shamos, is there any documentation in the file

22   history of Plaintiff's Exhibit 4, the '683 file

23   history, that goes specifically to the issue of

24   disclosing prior art to the Patent Office?

25        MR. ROBERTSON:  Objection, Your Honor.  It's

SHAMOS - CROSS                    2601

1    the same question asked in a way --

2             MR. McDONALD:  This is a fact.  I'm not

3    asking him for an opinion.  This is a fact.

4             THE COURT:  It's the same.  It's another way

5    of doing the same thing, I think.  There may be a

6    question you can ask.  I'm not going to get into

7    asking it, but that isn't the one.

8    BY MR. McDONALD:

9    Q   Dr. Shamos, is there -- I think you were asked

10   about whether the TV/2 documentation was considered by

11   the Patent Office, correct?

12   A   Yes.

13   Q   Now, is there something in the file history of the

14   '683 patent that would indicate how it was that the

15   TV/2 publications were disclosed to the Patent Office?

16            MR. ROBERTSON:  I'm going to object, Your

17   Honor, because now we're just going over the direct

18   examination again.  This was already asked in direct

19   and I didn't raise this issue again in my

20   cross-examination.  I just asked him where the '989

21   was referenced in the file history and the

22   specification.

23            MR. McDONALD:  You did ask him about the

24   TV/2.

25            THE COURT:  Yeah, but not that.  You're

1  really retreading.  You're repeating basically what

2  you said on direct examination, and that isn't what

3  redirect is about.  So let's go on to something that

4  he actually asked about.

5          MR. McDONALD:  Okay.

6  BY MR. McDONALD:

7  Q   Can we go to the office action in the file

8  history?  Turn to page, I think it would be about 182.

9          MR. McDONALD:  Could you blow that up, Bill.

10  The number ending with 3720.

11          THE COURT:  Do you want to blow the number up

12  or the picture up?

13          MR. McDONALD:  I just want to help Dr.

14  Shamos --

15          THE WITNESS:  I have it.

16  BY MR. McDONALD:

17  Q   So this is the same office action you were asked

18  about earlier, correct?

19  A   Yes.

20          MR. McDONALD:  Can we go to the two pages

21  later, please.  Its part of this office action.

22          THE COURT:  Can you blow that up?  Can you

23  read that, Dr. Shamos?

24          THE WITNESS:  Well, I'm reading from the

25  original document.

1          THE COURT:  All right.  Well, the jury is

2     being asked to look at it here, and I can't read it,

3     and I don't see how they can read it.  So if you can

4     blow it up, let's get to where you want to go.  Where

5     are you going?

6          MR. McDONALD:  Paragraph No. 7 here from the

7     office action.

8          MR. ROBERTSON:  I'm going to object, Your

9     Honor.  I didn't ask anything about this page or

10    paragraph 7.

11         MR. McDONALD:  Well, he was asking about this

12    in the context of the disclosure of the RIMS prior

13    art. I'd like to go to that exact same issue.  They

14    are part of the same document and talk about that

15    issue of disclosure of RIMS as prior art.

16         MR. ROBERTSON:  The only reason I sited this

17    office action was to show --

18         THE COURT:  Come up here, please.

19         (The following sidebar conference is begun.)

20         THE COURT:  Is it your view of the law that

21    if something is disclosed in the text of the patent

22    that it can't be considered as prior art unless it is

23    listed somewhere else in the patent as prior art?  Is

24    that what you say the law is?

25         MR. McDONALD:  I think the law is just

1   because it's incorporated by reference does not

2   mean --

3              THE COURT:  What case do you have that says

4   that?

5              MR. McDONALD:  Well, I don't have a case.  I

6   have all the Patent Office actions on the reexams.

7              THE COURT:  I don't care about that.  I care

8   about the law.  What you're suggestion is something

9   that I don't understand to be the law.

10             And do you have a case on it?

11             MR. ROBERTSON:  I have what's called the

12  MPEP, which is the Manual for Prosecution and

13  Examination Procedures, and I believe there's a

14  procedure in there that if it's disclosed in the

15  background of the invention, it's presumed that the

16  examiner has considered it.  He can read, Your Honor.

17  It's there 59 times.

18             THE COURT:  And there is no section in the

19  patent that says prior art?

20             MR. McDONALD:  Well, the references cited is

21  the section that refers to the prior art.

22             THE COURT:  No.  That's how you refer to it,

23  but it doesn't call it prior art.  It doesn't say --

24  is there any rule that says you have to put all of

25  your prior art in the references section?

SHAMOS - CROSS                    2605

1       MR. McDONALD:  That is, again, the MPEP

2   process is that you disclose prior art --

3       THE COURT:  I didn't ask you that.  I said,

4   Is there rule that says that?  Not what they do, but

5   what is the rule?

6       MR. McDONALD:  I believe there is a rule that

7   the Patent Office puts all the prior art in the list

8   of references cited.  I don't have the rule cite at my

9   fingertips.

10      THE COURT:  Well, you're making a lot of

11  paper over nothing unless there's a rule that does it.

12  Somebody has got to know the answer to that.

13      MR. ROBERTSON:  I'll look into it, Your

14  Honor.  We'll tell you on the video that you played

15  said the examiner can look at the prior art references

16  and the references discussed in the background of the

17  invention.

18      THE COURT:  It's in the video.  I know.

19  That's why I'm asking the question, for Pete's sake.

20  It's confusing to the jury to be doing what you're

21  doing.  That's why I'm concerned about this.  So the

22  way you're asking these questions suggests that it's

23  required when in fact they have already been told that

24  it isn't.

25      And if that reference is wrong, then I need

1    to know it and straighten it out, but I don't think it

2    is wrong.

3             MR. ROBERTSON:  We did give you the case law

4    for a supplemental instruction on what incorporated by

5    reference means.

6             THE COURT:  That's different.

7             MR. ROBERTSON:  When it's incorporated by

8    reference, it's all -- the entire patent is fully

9    disclosed therein.  It's as if it's part and parcel of

10   the whole patent.

11            THE COURT:  That's correct unless there is a

12   rule that says to be considered prior art, it has to

13   be in the -- is it cited references?

14            MR. ROBERTSON:  Yes, sir.

15            MR. McDONALD:  References cited.

16            THE COURT:  References cited.  And I don't

17   think it is.

18            MR. ROBERTSON:  I don't think so either.

19            THE COURT:  I don't think it is, which is why

20   I don't think it's the rule.

21            MR. McDONALD:  I did want to show in this

22   section --

23            THE COURT:  You can do it, but change your

24   question so you don't do this.  Don't cause that

25   problem.  You can ask a question without -- and I

1    don't want him saying another thing about has it been

2    disclosed as prior art.

3            MR. ROBERTSON:  We're going into a different

4    section.  It has nothing to do with --

5            THE COURT:  What does it have to do with?

6            MR. McDONALD:  Well, the RIMS patent

7    application clearly disclosed --

8            THE WITNESS:  Put that back up.  Okay.  I've

9    got what I want.  I can't make any sense out of this

10   because I don't have the whole text.

11           MR. McDONALD:  I'll just move on.

12           THE COURT:  Okay.

13   BY MR. McDONALD:

14   Q    Dr. Shamos, you were shown a part of the file

15   history that showed that the original application, the

16   RIMS application, was described as an application

17   about a patent number, correct?

18   A    Yes.

19   Q    When the patents in this suit were filed, was that

20   disclosure of the RIMS patent application that was not

21   in the issued patent, was that something that you

22   considered to be prior art at that point in time?

23           MR. ROBERTSON:  I'm going to object, Your

24   Honor.

25           THE COURT:  The question is whether he

1    considered it.  And the answer is yes or no.

2            In forming your opinion, did you consider

3    the prior art or not?

4    BY MR. McDONALD:

5    Q   At that point in time on the filing date of the

6    patents.

7    A   I'm not sure that I understand the question.

8            THE COURT:  Okay.  Then let him rephrase it.

9    BY MR. McDONALD:

10   Q   When is it that the RIMS patent became prior art?

11           MR. ROBERTSON:  That's actually calling for a

12   legal conclusion.

13           THE COURT:  Yes, it is.

14   Q   Did you have an understanding, Dr. Shamos, from

15   your standpoint as to when that RIMS patent would have

16   become prior art?

17           THE COURT:  Start all over again.  Did you

18   consider when you were making your analysis that, as

19   of the date of the patent at issue, did you consider

20   the RIMS patent as prior art?  Is that what you asked

21   him?

22           MR. McDONALD:  I think the question is when

23   did it become prior art?

24           THE COURT:  What?

25           MR. McDONALD:  My question is what is his

1   understanding as to when the RIMS patent became prior

2   art.

3            THE COURT:  No.  The question is whether he

4   considered it as prior art.  That's where you started

5   out.  Did you consider as prior art the RIMS patent,

6   '989, right?

7   BY MR. McDONALD:

8   Q    Okay, we can start there.

9   A    For purposes of forming my opinions on validity, I

10  considered the '989 patent to be prior art.

11  Q    And that patent issued in January of '98, right?

12  A    Yes.

13  Q    How long after the patents were filed did that

14  issue approximately?

15           MR. ROBERTSON:  Your Honor, I didn't go into

16  any inquiry about this.

17           THE COURT:  Actually, you did.

18           MR. ROBERTSON:  As to the date --

19           THE COURT:  It's obvious between the date of

20  the application and the date of the issuance.  It's

21  right on the face of the patent.  And I think you did

22  ask him about it.

23           Are you asking him what's the difference

24  between the dates?

25           It was filed when?  Do you remember.  It's on

 1   the face of the patent.

 2              THE WITNESS:  It was filed in 1993.  I'm

 3   sorry.  1994.

 4   BY MR. McDONALD:

 5   Q   So let's talk a little bit about the J-CON and

 6   P.O. Writer prior art that Mr. Robertson asked you

 7   about.

 8              MR. ROBERTSON:  I object, Your Honor,

 9   referencing this prior art.

10              THE COURT:  He didn't testify about it.  In

11   fact, he said he didn't.  So you can't ask him about

12   that.

13              MR. McDONALD:  He was asked about it in his

14   cross-examination.

15              THE COURT:  But the fact that he was -- I

16   don't think that I would have asked that question, but

17   that didn't open the door to a whole new set of

18   testimony on that topic.  All he did is say he asked

19   him whether he gave the opinion or not.  And he said,

20   No, I didn't.  And that's the end of it because you

21   don't need to go into it unless you think that he did

22   give an opinion, and that that answer was wrong by

23   Dr. Shamos, and you need to correct it.  And he didn't

24   give the opinion.  So you don't need to correct

25   anything.  So let's move on.

SHAMOS - CROSS                2611

1    BY MR. McDONALD:

2    Q   What was the relevance of your testimony about the

3    J-CON and P.O. Writer products, Dr. Shamos, that you

4    gave in this court?

5              THE COURT:   Let's see.   What's the relevance?

6              MR. McDONALD:   That sounds a little funny.

7              THE COURT:   Generally, don't you ask judges

8    to rule on that?

9              MR. McDONALD:   I think you're right.

10   BY MR. McDONALD:

11   Q   Dr. Shamos, can you explain to us what the

12   importance was of the J-CON and P.O. Writer systems to

13   your invalidity opinions that you provided in court

14   yesterday?

15             MR. ROBERTSON:   That's outside the scope.   I

16   just asked him if he had opinions on invalidity with

17   respect to those two references, and he said no.   And

18   now --

19             THE COURT:   Does that show you why you

20   shouldn't have asked that question and just argued it?

21             MR. ROBERTSON:   He is redirecting it.   He's

22   going over what he went over on direct.   So now we're

23   just going back to direct on redirect.

24             THE COURT:   Sustained.   Let's go.

25   BY MR. McDONALD:

1   Q    You were asked about materials you reviewed with

2   respect to the RIMS system.  Do you recall that?

3   A    Yes.

4   Q    In your expert report in this case, you indicated

5   that you looked at something called the RIMS trademark

6   file history as part of the documents, correct?

7              MR. ROBERTSON:  I didn't ask him anything

8   about that, Your Honor.  I asked about the '989

9   patent.

10             MR. McDONALD:  He asked about the

11  documentation regarding the RIMS system that he

12  reviewed.

13             MR. ROBERTSON:  I asked him if he had

14  awareness of any of the commercial embodiments and I

15  asked him -- and he said no, he relied on the '989

16  patent --

17             THE COURT:  It's beyond the scope.

18  Sustained.

19  BY MR. McDONALD:

20  Q    Do you recall Mr. Robertson's question, Dr.

21  Shamos, where they put up one of the claims on the

22  screen and talked about how catalogs interacted with

23  the various elements of the claims?

24  A    Yes.

25  Q    That issue of whether or not the system, the

1    combination of the RIMS and TV/2 systems, taught or

2    suggested the use of multiple catalogs, is that pretty

3    important to your analysis or not?

4         MR. ROBERTSON:  I object to the form of that

5    question, Your Honor.  Vague and ambiguous.  Pretty

6    important to your analysis?

7         THE COURT:  I think so.  Sustained.

8    BY MR. McDONALD:

9    Q    Does the issue of whether or not that combination

10   of the RIMS and TV/2 system teaches or suggests

11   multiple catalogs, is that something that's important

12   to a number of the elements of the claims in this case

13   or not?

14   A    It is.

15        MR. McDONALD:  I have no further questions.

16   Thank you.

17        THE COURT:  May he be excused permanently?

18        MR. McDONALD:  I believe so.

19        THE COURT:  Thank you for being with us, Dr.

20   Shamos.  You're excused.

21        THE WITNESS:  You're welcome.

22        (The witness was excused from the witness

23   stand.)

24        THE COURT:  Next witness.

25        MR. ROBERTSON:  Your Honor, I believe we need

2614

1   to make a motion.

2           MR. McDONALD:  I get to rest first.

3           THE COURT:  You can't make anything yet.

4           MR. McDONALD:  The defense rests, Your Honor.

5           THE COURT:  Thank you.

6           Ladies and gentlemen, we'll take the morning

7   recess now.  It may be a little bit longer than 20

8   minutes because I have a matter to take up with the

9   lawyers.  We'll let you know.

10          (The jury is exiting the courtroom.)

11          THE COURT:  All right.  You're motion is

12  going to take how long, Mr. McDonald?

13          MR. McDONALD:  Our motion?

14          THE COURT:  Yes, your motion.

15          MR. ROBERTSON:  I understood we were making

16  JMOL -- no invalidity, but I understood Your Honor to

17  indicate that we were going to take that up on Friday.

18          THE COURT:  I'm trying to figure out just

19  timing, that's all.  How long do you see this motion

20  process taking, given that we're going to hear the

21  arguments on Friday?  Just a short one?

22          MR. McDONALD:  We have infringement and

23  validity as well.

24          MR. ROBERTSON:  Can we confer at the break,

25  Your Honor.  I think we could probably -- I estimate

2615

1    less than an hour total.

2            THE COURT:  I'm talking about now.  In order

3    to put it on the record, do you just have five

4    minutes.

5            MR. ROBERTSON:  Two minutes.

6            THE COURT:  We'll do all that after the break

7    then.

8            We'll get 20 minutes and we'll come back and

9    deal with it.

10            (Luncheon recess taken.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25