1          THE COURT:  All right.  Mr. Robertson.

2          MR. ROBERTSON:  Thank you, Your Honor.  I'm just

3     reserving for the record, as I understand we are arguing

4     tomorrow, Your Honor, ePlus moves for judgment as a matter of

5     law under Federal Rule of Civil Procedure 50, that all of the

6     asserted claims, '683, '516, and '172 patents are valid.

7          As Rule 50 provides, a judgment as a matter of law

8     may be granted when a reasonable jury would not have a legally

9     sufficient evidentiary basis to find for the nonmoving party on

10    that issue.  Thank you.

11         THE COURT:  You are just moving against validity.

12         MR. ROBERTSON:  On that issue.  As we had previously

13    put into the record, that judgment of law should be granted on

14    infringement, and we had also preserved that for the time

15    period that Your Honor specified you wanted to have oral

16    argument which I understand to be tomorrow, and I did confer --

17         THE COURT:  You're not moving now after he's finished

18    on that?

19         MR. ROBERTSON:  I would like to renew that, yes, Your

20    Honor.

21         THE COURT:  I just want procedurally to know what I'm

22    doing.  That's all.

23         MR. ROBERTSON:  I understand.

24         THE COURT:  All right.

25         MS. HUGHEY:  Thank you, Your Honor.  For the record,

1    Lawson opposes ePlus's judgment as a matter of law on

2    invalidity.  This Court should deny ePlus's motion for judgment

3    as a matter of law because a reasonable jury has more than a

4    legally sufficient evidentiary basis to find for Lawson on the

5    issue of invalidity of the asserted claims.

6            At trial, documents demonstrated, witnesses testified

7    regarding the features and functionality of the prior art.  Dr.

8    Shamos went through every single claim --

9            THE COURT:  I'm going to hear the arguments tomorrow.

10           MS. HUGHEY:  Okay.  For these reasons, Lawson opposes

11   ePlus's judgment as a matter of law, and to the extent that

12   ePlus has renewed a judgment as a matter of law on the issue of

13   infringement, we also oppose that, and, once again, renew our

14   own motion.

15           THE COURT:  Your motion on infringement?

16           MS. HUGHEY:  Yes.

17           THE COURT:  All right.  Are we ready then --

18           MR. ROBERTSON:  One other issue, I don't know if the

19   Court wants to now inform the jury we're moving to a new phase

20   of the trial for rebuttal.

21           THE COURT:  Yes.  And you are rebutting on both

22   infringement and invalidity.  Are you going to -- are you going

23   to offer any evidence -- I mean, you have the right of rebuttal

24   on infringement and invalidity.  Are you rebutting both or one?

25           MR. ROBERTSON:  Just one, Your Honor, the invalidity.

```
1              THE COURT:  Are we ready for the jury?

2

3                    (Jury in.)

4

5              THE COURT:  Has anybody filed briefs on these JMOLs?

6    Somebody mentioned it, and I just haven't checked.  Mr. Neal,

7    do you have a pad?

8              Now, ladies and gentlemen, you've been hearing

9    testimony in the case of -- Lawson's side on the issue of

10   infringement and also on the affirmative defenses of

11   invalidity, and now it's time for ePlus to respond to the

12   invalidity points that were made by Lawson in its case, and

13   that's what this next part of the trial will be.

14             Just so you understand, that is also the last part of

15   the trial except for the closing arguments and your

16   deliberative process.

17             Just for your information, for those of you who have

18   been on juries before, I know that you know that sometimes the

19   jury decides the question of what's to be done if they return a

20   verdict of one kind or another, either infringement or not,

21   whatever, what happens then.

22             In this case, what happens after you return your

23   verdict does not involve you.  It is a matter that the Court

24   will be taking care of, so your last responsibility will be to

25   hear this evidence today and then to hear the closing arguments
```

1    and the instructions and deliberate and decide on the basic

2    issues of patent infringement and patent validity.  Once you

3    return the verdict on those, then the rest of what happens, if

4    anything, is for the Court to decide.  Is that satisfactory;

5    counsel?

6                    MR. ROBERTSON:  Yes.  Thank you, Your Honor.

7                    THE COURT:  All right, Mr. Strapp, are you taking

8    over now?

9                    MR. STRAPP:  Yes.  Your Honor, ePlus calls as its

10   next witness Mr. Ken Farber.

11

12                        **KENNETH FARBER,**

13   a witness, called by the plaintiff, having been first duly

14   sworn, testified as follows:

15                        DIRECT EXAMINATION

16   BY MR. STRAPP:

17   Q    Could you please state your name again for the record.

18   A    Kenneth Farber.

19   Q    And just to refresh everyone's memories, can you please

20   describe your present employment.

21   A    Sure.  I'm the president of ePlus Systems and content

22   services.

23   Q    How long have you been in that position?

24   A    Ten years.

25   Q    Mr. Farber, last time you were on the stand, you offered

1    some testimony about the ePlus/Ariba license agreement; do you

2    recall that?

3    A    Yes.

4    Q    Has ePlus ever licensed the three patents that are at

5    issue in this case to any other companies?

6    A    Yes.

7    Q    What other companies has ePlus licensed the patents to?

8    A    We've licensed the patents to companies such as SAP,

9    SciQuest, Verian, Perfect Commerce.

10   Q    And approximately how much revenue has ePlus received for

11   licensing the three patents that are in suit in this case?

12   A    Close to 58 million.

13   Q    Do you see in front of you, Mr. Farber, is that a complete

14   list of the licensees for ePlus's patents-in-suit?

15   A    Yes, it is.

16   Q    Has ePlus ever licensed the patents-in-suit to anyone else

17   besides these five companies?

18   A    There was a patent license granted to a company called

19   ProcureNet which is the company -- or piece of the company that

20   ePlus had acquired.

21   Q    And that was back in what time frame?

22   A    It was around the acquisition, about ten years or so ago.

23   Q    Would you consider each of the five companies listed here,

24   Ariba, SAP, Perfect Commerce, Verian, and SciQuest to be

25   competitors of ePlus?

Farber - Direct

1   A    Yes.  They are direct competitors.

2   Q    And competitors in the e-procurement software industry?

3   A    That's correct.

4   Q    What about ProcureNet, are they a competitor of ePlus?

5   A    No, ProcureNet is not a competitor.

6   Q    Listed here you have the five license agreements for the

7   companies ePlus considers as competitors to the e-procurement

8   software industry?

9   A    That's correct.

10  Q    Are you personally familiar with license agreements, the

11  five license agreements that you've described?

12  A    I am.

13  Q    How do you have any familiarity with these agreements?

14  A    I was directly responsible and involved in the negotiation

15  and the finalization of these agreements.

16  Q    For each five of the agreements?

17  A    Correct.

18  Q    Mr. Farber, you have a notebook in front of you.  Could

19  you please turn to Plaintiff's Exhibit 43.

20  A    Okay.

21  Q    Do you recognize the document in front of you?

22  A    Yes.

23  Q    What is this document here?

24  A    This is the license and settlement agreement between Ariba

25  and ePlus.

1            MR. STRAPP:  Can you blow up the first paragraph

2   there, please.

3   Q    When was this particular agreement entered into between

4   ePlus and Ariba?

5   A    February 12th, 2005.

6   Q    Mr. Farber, can you turn, please, to section F of the

7   agreement.  That's on page four of the license, bottom of the

8   page, paragraph 11.  It's got the Bates number on the bottom

9   right 600.

10  A    600?

11  Q    It's up on your screen as well.

12           THE COURT:  May I see counsel for just a minute.

13

14           (Discussion at sidebar as follows:)

15

16           THE COURT:  I'm a little bit confused about using

17  these exhibits.  Mr. McDonald, do you want the exhibits in?

18           MR. McDONALD:  We had opposed their admission at one

19  point, Your Honor, but you said they could come in.  We would

20  stipulate to what he's already testified about the cumulative

21  numbers.  I think he could probably get through it without

22  having to go through these things.

23           THE COURT:  Why do we need to have the documents in

24  if they'll agree to the amounts?

25           MR. STRAPP:  I wanted to show that each one of the

Farber - Direct                                                2623

1   licenses were for the same three patents that are in suit in

2   this case and that each of these companies are the competitors.

3   I mean, maybe I can do that without showing the documents.

4           MR. McDONALD:  I've seen them all.  They all are the

5   three patents-in-suit.

6           THE COURT:  I'm sure if he knows that, he'll testify

7   to it.  Then we don't have to get into any discussion of that.

8           MR. McDONALD:  That would certainly be what we'd

9   appreciate, Your Honor.

10          MR. STRAPP:  All right, so we'll do it without

11  showing them the documents.

12          THE COURT:  Then we don't have to get into -- the

13  reason I ask this is because if you want to show that they were

14  the product of settlements, I need to give the jury some

15  instructions about it.

16          In other words, if you want to discount their

17  effectiveness by examining on -- that they came out of

18  litigation, there are different lawyers that approach that

19  issue differently about whether they want to get into that or

20  not.  Certainly you can get into it, and you can have the

21  exhibits in in that event, but if you're not going to approach

22  it that way --

23          MR. McDONALD:  Well, I think he's already identified

24  them as settlement and license agreements.  That's what they're

25  all called, and if he just has him establish that they are in

1    settlements of litigation, I don't know that --

2              THE COURT:  That's sufficient for you?

3              MR. McDONALD:  Yeah.

4              THE COURT:  Then let's do it that way, and don't use

5    the documents.

6

7              (End of sidebar discussion.)

8

9    Q    Mr. Farber, we were talking about the ePlus/Ariba license

10   agreement.  Can you tell me specifically what was exchanged or

11   what was licensed as part of that agreement between ePlus and

12   Ariba?  Let's start first with Ariba.  What did Ariba license,

13   if anything, to ePlus as part of that agreement?

14   A    What Ariba licensed to ePlus is the ability for ePlus to

15   utilize its patents.

16   Q    So Ariba licensed its own patents to ePlus as part of this

17   license agreement?

18   A    That's correct.

19             THE COURT:  When you say its patents, you mean the

20   right to use Ariba's patents?

21             THE WITNESS:  That's correct.

22             THE COURT:  All right, go ahead.

23   Q    What did ePlus license to Ariba?

24   A    Conversely, we had provided the rights for Ariba to

25   utilize our patents.

```
 1              THE COURT:  The patents-in-suit?

 2              THE WITNESS:  Correct, the patents-in-suit.

 3    Q    That is the '683, the '172, and '516 patents?

 4    A    Correct, the same ones we're talking about.

 5    Q    Did Ariba agree to pay any amount of money for this

 6    license agreement?

 7    A    Yes.

 8    Q    How much was that?

 9    A    I believe it was -- let me go to that, refresh my memory

10    exactly, but it was 37 million.

11    Q    $37 million?

12    A    Correct.

13    Q    So in sum then, Ariba granted a license to ePlus for its

14    patents, paid ePlus $37 million, and in exchange, ePlus

15    licensed the three patents that are in suit in this case; is

16    that correct?

17    A    That's correct.

18    Q    Now, you had mentioned there were four other license

19    agreements that ePlus has entered into with its competitors.

20    What was the next one in time after Ariba?  What was the next

21    license that ePlus granted?

22    A    The next one would be SAP.

23    Q    And do you recall approximately what time frame that was?

24    A    Let me try to find an agreement.

25    Q    In your binder, it's at Plaintiff's Exhibit 318.
```

1   A     Okay.  It was -- looks like it was finalized

2   December 11th, 2006.

3   Q     Who is SAP?

4   A     SAP is a large company that some of the products that they

5   offer competed with our solutions.

6   Q     And I didn't get a chance to ask you, but who is Ariba?

7   A     Same.  Ariba was a large company that competed with ePlus

8   in the market.

9   Q     Can you describe for me what was licensed as part of the

10  ePlus/SAP license agreement?

11  A     We had provided, in a similar fashion as we had done for

12  Ariba, we provided them the ability to utilize the three

13  patents that are in suit here.  We granted them a license to

14  utilize those patents.

15  Q     And what did SAP give to ePlus in exchange for a right to

16  use the three patents that are in suit in this case?

17  A     I have to just refresh my memory if they had

18  cross-granted --

19  Q     Let me direct your attention to section four of the

20  agreement.

21  A     Okay.

22  Q     4.1?

23  A     Yeah, what this is is that in exchange for the grant by

24  ePlus to the three patents-in-suit, SAP paid ePlus 17 and a

25  half million dollars.

1    Q    $17.5 million?

2    A    That's correct.

3    Q    We've talked about the Ariba and SAP license agreements.

4    I think you mentioned that there were three additional

5    agreements.  Can you just refresh my memory what those three

6    agreements are?

7    A    Sure.  There was Verian, it was Perfect Commerce, and

8    SciQuest.

9    Q    Let's start with Perfect Commerce.  If you could turn to

10   Plaintiff's Exhibit 317 in your binder.

11   A    Okay.

12   Q    When did ePlus enter into a license agreement with Perfect

13   Commerce?

14   A    That would be August 28, 2009.

15   Q    Who is Perfect Commerce?

16   A    Perfect Commerce is a company that competes with ePlus.

17   Q    And, again, can you describe for us what the subject

18   matter was that was licensed as part of this ePlus/Perfect

19   Commerce license agreement?

20   A    Specifically associated with the three patents that are in

21   suit here.

22   Q    ePlus licensed the three patents-in-suit to Perfect

23   Commerce?

24   A    That's correct.

25   Q    So that Perfect Commerce could use, sell, make, or offer

1    products that incorporated the technology in those three

2    patents?

3    A    Yes, that's correct.

4    Q    And how much money, if any, did Perfect Commerce pay for

5    the right to have a license to the ePlus patents?

6    A    Let me just make sure.

7    Q    Let me direct your attention to Exhibit A to the Perfect

8    Commerce --

9    A    I have it.

10   Q    -- agreement.

11   A    In exchange for the patents, they paid $750,000.

12   Q    Well, as the negotiator for ePlus, why was ePlus willing

13   to accept $750,000 from Perfect Commerce if ePlus -- if SAP and

14   Ariba had agreed to pay millions of dollars more?

15          MR. McDONALD:  I object to this, Your Honor.  We

16   tried getting into the details, but there was claims of

17   privilege, so we weren't able to inquire into all the whys and

18   wherefores of these settlements.  I don't think it's

19   appropriate to go into them now, and also cumulative.

20          THE COURT:  It isn't cumulative, I don't think, but

21   if in fact you claimed a privilege and foreclosed their inquiry

22   in depositions, then you can't inquire into it because that's

23   not been allowed.

24          MR. STRAPP:  Your Honor, I was not present when

25   privilege was claimed --

1            THE COURT:  You read the deposition, I take it, in

2    preparation.

3            MR. STRAPP:  I did read that deposition, and I

4    believe that we didn't make a claim of privilege with

5    respect to --

6            THE COURT:  You did?

7            MR. STRAPP:  We did not with respect to this

8    particular agreement.

9            THE COURT:  Mr. McDonald.

10           MR. McDONALD:  I'm looking for it.

11           THE COURT:  If they did, if you did, your objection

12   is well-taken.  If they did not, your objection is not

13   well-taken.

14           MR. McDONALD:  What we're able to find at this point,

15   Your Honor, is at pages 416 to 417 of Mr. Farber's testimony

16   regarding the SAP agreement, he was asked, how did you come up

17   with a settlement number in the case, and his answer was, I

18   used my counsel to determine what they thought was fair, et

19   cetera, and then we got into some privilege issues there.

20           THE COURT:  This relates to the Perfect Commerce

21   agreement.  They did the same thing.  No?

22           MR. McDONALD:  Nothing specific to Perfect Commerce,

23   Your Honor.

24           THE COURT:  All right.  Objection overruled.

25   Q    Mr. Farber, let me ask you that question again.  Why was

1    it that ePlus agreed to license the patents to Perfect Commerce

2    for $750,000 if Ariba had paid 37 million and SAP had paid 17

3    and a half million for the patents?

4    A    Well, I mean, quite simply --

5              MR. McDONALD:  I object, Your Honor, because I think

6    he worked SAP into that question, and that is the one we were

7    able to find --

8              MR. STRAPP:  Your Honor, I'm asking about Perfect

9    Commerce and why ePlus, the --

10             THE COURT:  Why don't you reframe your question.

11             MR. STRAPP:  Sure.

12   Q    Mr. Farber, why was it that ePlus accepted $750,000 for a

13   license, to grant a license to Perfect Commerce if Ariba was

14   willing to pay $37 million for a license?

15   A    Well, they were a much, much smaller company for starters.

16   Secondly, we had the opportunity during the negotiation to

17   actually physically go to their location and audit their

18   financials, and, you know, we had some significant concerns of

19   them being a going concern, that they would actually stay in

20   business over time, and we came to an amicable agreement, you

21   know, and considered this to be a fair settlement agreement

22   based upon what their situation was at the time as a business.

23   Q    And Perfect Commerce, again, that was a company that

24   competed in the e-procurement software industry?

25   A    That's correct.

Farber - Direct                                                        2631

1    Q     I think you mentioned that ePlus also granted a license to

2    SciQuest; is that right?

3    A     That is correct.

4    Q     Can you turn to Plaintiff's Exhibit 319 in your notebook,

5    please.

6    A     Okay.

7    Q     When did ePlus enter into a license agreement with

8    SciQuest?

9    A     That's August 19th of 2009.

10   Q     And what was the subject matter that was granted by ePlus

11   to SciQuest as part of this license agreement?

12   A     This, again, is the licensing of the three

13   patents-in-suit.

14   Q     The three patents in this suit?

15   A     Yes, the '683, the '516, and '172 patent.

16   Q     And what, if anything, did SciQuest give to ePlus in

17   exchange for a license to the three patents, same patents that

18   are in suit in this case?

19   A     Let me check here.  In exchange for the licenses that were

20   granted by ePlus, SciQuest paid us $2.4 million.

21   Q     And the last, I think the last license you mentioned was

22   with a company called Verian; is that right?

23   A     Yes, that's correct.

24   Q     Who is Verian?

25   A     Verian was also and also is a competitor of ePlus in the

1    market.

2    Q    And let's just take a look quickly at that license

3    agreement.  That's at Plaintiff's Exhibit 320?

4    A    Yes.

5    Q    When did ePlus enter into a license agreement with Verian?

6    A    July 7th, 2009.

7    Q    What did ePlus grant to Verian as part of this license

8    agreement?

9    A    The same as the other licenses.  We granted the three

10   patents that have been in suit here.

11   Q    And can you tell me what, if anything, Verian agreed to

12   pay ePlus for a right to use the patented technology?

13   A    Sure.  They had an initial payment of $500,000.

14   Q    Was there any other arrangement between the two companies

15   for their licenses?

16   A    Yeah.  We had settled on -- they were also a small

17   company, similarly to Perfect, but we saw them more as an

18   ongoing concern, and we agreed to associate a royalty so that

19   when they exceeded $15 million within a calendar year, that we

20   would receive two and a half percent of those revenues.

21   Q    What was the reason that you felt like that was a fair and

22   reasonable license arrangement with Verian, this royalty

23   provision?

24   A    Why did we think it was fair?

25   Q    Yeah.

Farber - Direct                                                      2633

1    A    Well, I think it was fair to both parties.  I mean, we

2    weren't necessarily looking to, you know, press a thumb on them

3    and put them out of business.  You know, we did see them as

4    staying in business.

5         They didn't have the funds to pay what we thought, you

6    know, the patents were worth at that time, but, you know, we

7    gave them an opportunity.  As they grew, then, you know, there

8    was a percentage associated as a royalty to the patents.

9    Q    Mr. Farber, has there been any recognition in the supply

10   chain industry for the products that ePlus sells that

11   incorporated the patented technology?

12   A    Yes.  Yes.

13   Q    What kind of recognition?

14   A    There's been industry awards, industry reports.

15   Q    And have you or your customers been recognized for any

16   specific benefits or specific recognition for the Procure+ or

17   Content+ products?

18   A    Yeah.  Well, one of our clients recently was just awarded

19   what's called Pros to Know which is a supply chain.  We

20   actually nominated one of our clients --

21              THE COURT:  What's it called, sir?

22              THE WITNESS:  Supply chain.

23              THE COURT:  No.

24              THE WITNESS:  Oh, pros, as in professionals, to know.

25              THE COURT:  Right, t-o, and then k-n-o-w.

1              THE WITNESS:  That's correct.

2              THE COURT:  And that is an award?

3              THE WITNESS:  It's a recognition award, and it's this

4    publication, an organization that evaluates submissions and

5    looks at how individuals or companies are using solutions.

6              THE COURT:  Excuse me.

7              MR. McDONALD:  Thank you, Your Honor.  I think the

8    sequence that we had talked about was that they first need to

9    lay a foundation and show a connection to the patented

10   inventions before they go into any detail about any of these

11   awards that might be for a corporation as a whole, things like

12   that, so I object to the question unless there's some

13   connection specifically to the claimed invention.

14   Q    Mr. Farber, do you recall when you were here earlier in

15   this case you talked about Procure+ and Content+?

16   A    I do.

17   Q    Are those products that are developed and sold by ePlus?

18   A    Yes.

19   Q    Are those products that ePlus believes incorporates the

20   patented technology?

21   A    Yes.

22             MR. McDONALD:  Objection, Your Honor, lack of

23   foundation.  This witness isn't qualified to testify as to the

24   scope of the claims or whether the products are covered by

25   that.  In fact, we tried to inquire into that in deposition and

1    weren't able to.

2              THE COURT:  You shut it down in deposition?

3              MR. STRAPP:  I never shut them down in depositions on

4    that particular issue that I can recall.

5              MR. McDONALD:  He indicated he wasn't able to do the

6    analysis, that the lawyers had to do it, and he couldn't.

7    That's what I mean by that.

8              MR. STRAPP:  Let me maybe --

9              THE COURT:  He's not asserting -- what he's doing

10   is -- what he contends, he understands the claims -- I mean the

11   patents to be practiced in his own products; is that right?

12             MR. STRAPP:  That's correct.

13             THE COURT:  He's qualified to testify to that.

14             MR. McDONALD:  I think we need to lay a foundation,

15   because he did say in the deposition he had to turn that over

16   to the lawyers, Your Honor, he couldn't do it himself.

17             MR. STRAPP:  He's talking about --

18             THE COURT:  Did he or not?  Did he do that?

19             MR. ROBERTSON:  Your Honor, I was at the deposition,

20   and I don't recall that at all.

21             THE COURT:  Go over there and look at the deposition

22   transcript.  If you did that, maybe it's quitting time,

23   Lucille.

24             MR. STRAPP:  I'll move on to a different area.

25             MR. ROBERTSON:  Wait a minute.

1          MR. McDONALD:  Page 396, Your Honor, he said, I don't

2     try to interpret everything back to our patented claims because

3     I'm not a lawyer, and I don't, you know, know all the legal

4     aspects of it.

5          MR. ROBERTSON:  Could we have the question --

6          MR. STRAPP:  Your Honor, let me read the question

7     there.  That question was, what information did you learn about

8     the functionality of Lawson's product line from going to their

9     website.

10         It has absolutely nothing to do with the ePlus

11    products.  So I think -- if there's no deposition testimony

12    that Mr. McDonald is referring to, we should be permitted to go

13    forward.

14         MR. McDONALD:  He was saying there, I'm not a lawyer

15    and I don't understand the legal aspects of interpretation.

16    He's saying he's not qualified to do this construction

17    approach.  We didn't ask the question over and over again once

18    he made the record of that.

19         THE COURT:  That was a different question.

20    Overruled.  It's not even related to this one except very

21    marginally.  This witness can testify that as far as he's

22    concerned, the patents -- the products that he sells, that he's

23    talking about, ePlus something, do or do not use the patents.

24         MR. McDONALD:  I also object.  He hasn't laid any

25    foundation that he's used the Court's claim constructions or

1    anything for purposes of that.  His personal understanding

2    would not establish the nexus necessary.

3              THE COURT:  He's the guy that runs the company.

4    Q    Mr. Farber, could you please state again, which of the two

5    products you are referring to that, in your understanding,

6    practice the patented technology of the patents-in-suit?

7    A    It's Procure+ and Content+.

8    Q    And those were the products that we saw during your

9    testimony earlier that are marked with the patent numbers on

10   the front of the brochures?

11             THE COURT:  Did he sell that.

12   Q    Okay.  Does ePlus sell Procure+ and Content+?

13   A    Yes, we do.

14   Q    And has ePlus received any industry recognition or awards

15   for Procure+ and Content+?

16   A    Yes, we have.

17   Q    Can you describe what some of those industry recognitions

18   and industry awards are.

19   A    So the one that I was just previously describing from

20   supply chain was a Pros to Know, submission that we put in for

21   one of our clients which was Unicco.  They are a janitorial

22   facility management company, and we put them in for their use

23   of our solutions and how they use our solutions within their

24   environment and the benefits that they've derived from that.

25   Q    And have you been recognized for your -- have Procure+ and

1    Content+ been recognized by any publications in the supply

2    chain industry?

3    A    Yes.

4    Q    Can you give me some examples?

5    A    They were recognized by, I believe, iSource magazine and

6    also I think we received some prior awards by supply chain,

7    and, you know, we had awards that even go back to the

8    ProcureNet days.  The United States government gave us an award

9    that's called the Hammer Award --

10              MR. McDONALD:  Your Honor, he's talking about

11   ProcureNet now.  There's no foundation.

12              THE COURT:  That is a different issue.

13              MR. STRAPP:  Thank you, Your Honor.  I have no

14   further questions.

15              THE COURT:  I told you, ladies and gentlemen, you're

16   not going to be concerned with money at the end of the case.

17   This is being offered because it has -- this evidence that he's

18   just testified to is being offered because it's pertinent to

19   one of the issues that are called secondary considerations that

20   I'll tell you about later, but as a general proposition, in

21   response to a claim that a patent is obvious in view of the

22   prior art, the patentee can introduce evidence showing, among

23   others things, that there has been commercial success of the

24   patent, and that's something that you can take into account in

25   deciding invalidity, and that's why this evidence is coming in

1    on this topic.

2

3                        CROSS-EXAMINATION

4    BY MR. McDONALD:

5    Q    Good morning Mr. Farber.  Good afternoon.

6    A    It's close.

7    Q    You mentioned ProcureNet.  They were the company that was

8    the spinoff from Fisher that took these patents as part of that

9    spinoff; is that right?

10              MR. STRAPP:  Objection.  Lack of foundation, beyond

11   the scope of the direct.

12              THE COURT:  I think he testified to it earlier.

13              MR. STRAPP:  He didn't mention Fisher, I don't think,

14   at all.

15              THE COURT:  Not with you, but in the earlier part of

16   his testimony.

17   A    Well, what I testified to was that ePlus acquired the

18   assets of ProcureNet.

19   Q    Those assets included the three patents in this case;

20   correct?

21   A    That's correct.

22   Q    And you've testified today about the money that was made

23   in connection with these patents; right?

24   A    From the licensing perspective, yes.

25   Q    And ProcureNet, did they, as I understood it, use the

1    patented technology?

2    A    Yes.

3    Q    ProcureNet didn't make, did not make money on these

4    patents, did they?

5    A    I don't know.  I wasn't involved in the financials of the

6    company at that time.  I do know that they did license a number

7    of different companies and used it internally.

8    Q    You were an executive of ProcureNet, weren't you?

9    A    For just under a year, yes.

10   Q    You were senior vice president of business development?

11   A    That's correct.

12   Q    Isn't it true that in the years leading up to the sale of

13   the patents from ProcureNet to ePlus, that ProcureNet lost tens

14   of millions of dollars?

15   A    I don't believe it was tens of millions.  I don't know for

16   sure.

17             MR. McDONALD:  May I approach, Your Honor, with

18   Plaintiff's Exhibit 16?  It was a Plaintiff's Exhibit.  They

19   withdrew it, but it's Plaintiff's Exhibit 16.

20             THE COURT:  If they withdrew it --

21             MR. STRAPP:  Your Honor, I object to this.

22             MR. McDONALD:  I'm using it for impeachment.

23             MR. STRAPP:  He hasn't established he's impeaching

24   any particular testimony.

25             MR. McDONALD:  Or refresh his recollection.

```
 1              THE COURT:  He said he didn't know.  I guess I have
 2    this question:  You objected to anything about ProcureNet, Mr.
 3    McDonald.  Now you are asking about it.  Why, when I sustained
 4    your objection, are we going into the topic of what went on at
 5    ProcureNet?
 6              MR. McDONALD:  Well, I asked -- had an objection on a
 7    specific question on the foundational issue.  We've laid the
 8    foundation.  I just wanted to make sure we went through the
 9    right process.  I wasn't saying he couldn't talk about it at
10    all, just like I have for the other one, to lay the foundation
11    first, but...
12              THE COURT:  That objection really wasn't foundation.
13    It was that you couldn't get into ProcureNet at all.
14              MR. McDONALD:  That was my intent with raising the
15    objection, Your Honor, was a foundational objection.
16              THE COURT:  It may have been your intent.  It wasn't
17    articulated as that, but he's -- I don't understand you letting
18    it go on so long.
19              MR. STRAPP:  Your Honor, I object to any line of
20    questioning --
21              THE COURT:  Why?  After I said something about it,
22    you decide to object?
23              MR. STRAPP:  No.  Specifically with respect to this
24    exhibit and also to the line of questioning generally, but on
25    the exhibit specifically, Your Honor, he's putting it in for
```

1    impeachment purposes, he said, but he's not impeaching the

2    witness on any particular testimony.

3              MR. McDONALD:  I was going to use it, actually, to

4    refresh his recollection.  I corrected that because he said --

5              THE COURT:  Why is what ProcureNet made relevant to

6    this case?

7              MR. McDONALD:  Well, as I understand, the relevance

8    of the licensing revenues that had to do with the financial

9    success of the patents.  I'm trying to establish that there was

10   another side to the financial aspects of these patents where

11   they lost a lot of money.

12             THE COURT:  How do we know that the loss came from

13   the patents as opposed to something else?

14             MR. McDONALD:  That's what ProcureNet was selling,

15   was the products --

16             THE COURT:  That's not in the record.

17             MR. McDONALD:  I thought Mr. Farber had said that,

18   but we can clarify that.  That's what the assets of ProcureNet

19   were and what they were selling were these products from

20   Fisher --

21             THE COURT:  What he said was that they acquired the

22   patents from ProcureNet.  He didn't say that was the only asset

23   they had.

24             MR. STRAPP:  Your Honor, in fact, he testified

25   earlier that --

Farber - Cross                                                    2643

1              THE COURT:  Get down to the basic point.  What does

2    what ProcureNet did with it have anything to do with this case?

3    How does it show commercial success?  That's the issue.  How is

4    it relevant to show commercial success or lack thereof?

5              MR. McDONALD:  It's relevant because they lost tens

6    of millions of dollars selling the products that are

7    purportedly covered by the patents.

8              MR. STRAPP:  Your Honor, that's just Mr. McDonald

9    testifying.  There's been no evidence at all --

10             THE COURT:  The jury knows and has been told that

11   doesn't make any difference.  I think he can ask -- look at the

12   document and see if any -- point him -- don't -- just point him

13   to it without talking about it.

14   Q    Could you go to the page, Mr. Farber -- actually it's two

15   pages -- in the lower left corner, the number ePlus 0228410 to

16   8411.

17             MR. STRAPP:  Mr. McDonald, is there a date on this

18   document?

19   A    You mean on the lower right you are saying?

20   Q    Yes, that's where the numbers are.  This was the form S-1

21   filing.  I don't know that that I see the date on the front.  I

22   think it's either 2000 or 2001.

23             THE WITNESS:  Okay.

24   Q    Does seeing that --

25             THE COURT:  Were you there then?

1            THE WITNESS:  I'm sorry?

2            THE COURT:  Were you with that company then?

3            THE WITNESS:  Not for all the years represented but

4    just for the one year.

5    Q    At the time of this, in the years 2001, at the time of the

6    effort by ProcureNet to go public when they filed this S-1

7    form, you were working with them at that time; right?

8            MR. STRAPP:  Your Honor, the purpose that Mr.

9    McDonald is asking the question is talking about historical

10   financials of the company for time period when Mr. Farber

11   wasn't even there.

12           THE COURT:  Wait until you get a question that deals

13   with that, and then get vertical with your objection.  You

14   can't object to everything that you think he might come out

15   with.  You have to give some time to Mr. Farber so he can --

16   you have to hear the question, then object, frame a reason, and

17   object to it at that time.  Then I have something to rule on.

18           Otherwise, I'm striking a whole area of inquiry on

19   the speculative approach that maybe he might not be, Mr.

20   McDonald may not be taking.  Let's go.  You looked at those

21   pages.  Does looking at those pages refresh your recollection

22   about what, Mr. McDonald?

23           MR. McDONALD:  About the finances and the losses of

24   ProcureNet at the time it sought to become a public company.

25           THE WITNESS:  I have vague recollection.  I can't

1   contest to how the numbers were created and the statements --

2            THE COURT:  That isn't the question.  The question

3   is, does it refresh your own personal recollection of what the

4   situation was.

5            THE WITNESS:  No, not particularly.

6            THE COURT:  All right, it doesn't.

7   Q    At the time ProcureNet was seeking to go public,

8   Mr. Farber, you were an executive of the company; is that

9   correct?

10  A    I was senior vice president of business development, yes.

11  Q    You were involved in the process of creating the

12  application to the Securities and Exchange Commission to go

13  public; right?

14  A    I wasn't really involved in it, no.

15  Q    You were identified in the papers filed with the secretary

16  as one of the executives of the company; correct?

17  A    I was named as one of the executives, yes.

18           THE COURT:  Move on to something else.  He doesn't

19  know anything about that.

20  Q    You were involved in the process -- when ProcureNet sold

21  assets to ePlus, you then began working for ePlus at that

22  point; right?

23  A    That's correct.  Yes.

24  Q    After ePlus acquired the patents, you were involved in a

25  valuation of those patents; correct?

1   A    Can you repeat that?  I'm sorry.

2   Q    After ePlus acquired the patents and you were with ePlus,

3   you were involved in a valuation the three patents involved in

4   this suit; correct?

5   A    I don't believe I was, no.

6   Q    You were designated in this case as a witness to testify

7   about the valuations of the patents involving the ePlus

8   company; is that fair?

9   A    One of the elements that I was deposed for, sure.

10  Q    So the company picked you as the witness to testify about

11  valuations of the patents that ePlus was aware of; correct?

12  A    Yes, of what occurred, sure.

13  Q    As part of that testimony, you gave testimony about a

14  valuation of the patents that ePlus did after it acquired them

15  from ProcureNet; right?

16  A    I vaguely recall that, sure.

17  Q    And in that, at that time when ePlus acquired those three

18  patents, it did a fair market value of those patents, didn't

19  it?

20  A    That's what the agreement says, sure.

21  Q    When you say that's what the agreement says, what are you

22  talking about?

23  A    Well, if you'd like to go further in my deposition, I

24  think I explained, you know, what I thought had occurred at

25  that time.

1    Q    Well, I'm just asking, you did a valuation.  That's not an

2    agreement.  You're talking about -- you did a valuation after

3    you acquired the patents --

4                 THE COURT:  He didn't do the valuation.  He was

5    designated in the course of discovery to testify about

6    valuation by ePlus, apparently.  Part of what a witness who is

7    so designated has an obligation to do is, whether he has

8    personal knowledge about it or not, is go back and look at

9    company records and see what he can put together on a requested

10   subject.

11                One of the requested subjects was, what valuation was

12   put on the patents when they were acquired by ePlus from

13   ProcureNet, and that's what you are asking about, and that's

14   what he's talking about, not what he personally knew at that

15   time or knows now.  It's something he did to check some things

16   out.  Get to the bottom line.

17   Q    Isn't it true, Mr. Farber, that at that time, it was

18   estimated by ePlus management that the fair market value of all

19   of the patents involved in this suit was $12,000?

20   A    Yes, that's how they recorded it in the agreement.

21                MR. McDONALD:  I have no further -- let me turn to

22   another issue.

23   Q    SciQuest is one the licensees; correct?

24   A    Yes.

25   Q    And SciQuest, is that the company that was actually

1    working together with Lawson, as you understood it, with

2    respect to Cleveland Clinic Foundation?

3    A    Well, I think we heard here it was Cleveland Clinic, yes.

4    Q    You are aware, though, that from time to time, Lawson had

5    a situation where if they couldn't provide certain services to

6    their customers, that their products weren't capable, they

7    would team up with SciQuest to do so?

8    A    For health care.  There were specific instances they

9    worked with SciQuest to try to win a business.

10   Q    That was a situation where Lawson's system was already in

11   place at that customer with the requisitioning and purchasing

12   systems; correct?

13              MR. STRAPP:  Objection.

14              THE COURT:  You shifted and got an indefinite pronoun

15   that was single-person specific to an answer that, in fact, was

16   generic.  So ask the question again.  What you mean is, what

17   was going on in Cleveland Clinic at the time.

18   Q    Well, is Cleveland Clinic the one that you are aware of

19   specifically, or --

20              MR. STRAPP:  Objection, Your Honor.  This is beyond

21   the scope of my direct exam.

22              THE COURT:  Well, you did raise SciQuest, and I think

23   he's trying to -- I assume you're trying to get into why

24   SciQuest got the purchase price that it got of $2.4 million.

25   Is that what you are asking?

1         MR. McDONALD:  Yeah, to show their products are

2    actually different from the Lawson products.

3         THE COURT:  That's a different issue.  That's not

4    part of what -- his objection on that is sustained if -- I

5    thought you were trying to get to why they cut them a deal.

6    That's a purpose of legitimate inquiry, but whether they had

7    the same or similar products is not subject to something he

8    testified to, so move on.

9    Q    Your understanding is SciQuest specifically markets making

10   a variety of catalogs available to customers; is that right?

11   A    No.  My understanding of SciQuest is they provide

12   procurement, and they provide search mechanisms, and they also

13   have a business that revolves around supplying a health care

14   catalog to anybody in addition to the procurement content

15   solutions.

16   Q    So you understand, SciQuest specifically does have a

17   product including making available to customers multiple

18   catalogs?

19   A    I don't know -- I've never looked at their catalog --

20        THE COURT:  Before or after the license, or when are

21   we talking about?

22        MR. McDONALD:  Either time, either before or after.

23   Just what's their product.

24   A    I don't know what's physically in their catalog, because

25   my dealing with them and in their -- the patents that are in

1   suit have nothing to do with the catalog that they provided to

2   customers.

3   Q    Let me turn to a different issue here.  You are in charge

4   of the specific division at ePlus that sells software for

5   procurement; is that right?

6   A    Yes.

7   Q    And that division is less than two percent of the overall

8   revenues of the company; correct?

9   A    Absolutely correct.

10  Q    And you've been in charge of that division ever since the

11  acquisition of the patents?

12  A    That, amongst others, sure.

13  Q    And it's true that your division has never been

14  profitable; is that right?

15  A    Well, it depends it how you look at it and how things are

16  journaled.

17  Q    Isn't it true -- do you have your deposition --

18            THE COURT:  How things are what?

19            THE WITNESS:  Journaled.

20            THE COURT:  Accounting-wise.

21            THE WITNESS:  Accounting-wise, yes.

22  Q    The way ePlus has decided to take account for the profits

23  and losses of your division, isn't it true your division has

24  never been profitable?

25  A    Excluding licensing fees, we have not had a profit on the

1   individual products.

2   Q    In fact, you are losing money; is that right?

3   A    As a company, no.  As a division, we have a slight loss

4   annually, yes.

5   Q    In fact, just a few weeks before ePlus sued Lawson, your

6   division had a $4 million write-down in its valuation because

7   of its declining sales; right?

8   A    No.  I think Elaine Marion tried to describe this as

9   goodwill, and it was an allocation that was put in and I don't

10  know the calculations of how goodwill gets calculated.

11  Q    You do know that the goodwill valuation was reduced from

12  over $4 million to zero for your company in early 2009; right?

13  A    I don't.  She would have been the best to testify.

14  Q    So we can rely on what she said about that issue?

15  A    If that's what she said, that's her testimony.

16  Q    Is it true that all the licenses you've talked about in

17  this case were in situations where ePlus had sued someone and

18  the litigation was ongoing?

19           MR. STRAPP:  Objection, Your Honor.  Could we

20  approach for a moment?

21           THE COURT:  I thought we did.

22           MR. STRAPP:  I thought during the sidebar Mr.

23  McDonald said he wasn't going to get into this.

24           MR. McDONALD:  All I said --

25           THE COURT:  No, he said he was going to get into it,

1    and this was the way he was going to get into it, I understood.

2          THE WITNESS:  Okay.  Repeat the question, I'm sorry.

3    Q    Mr. Farber, isn't it true that all the licenses you've

4    talked about were involving companies ePlus had sued; is that

5    right?

6    A    Yes, that's correct.

7    Q    And all of those agreements were settlements of those

8    lawsuits; correct?

9    A    Correct.

10   Q    So the parties hadn't finalized -- there was no final

11   decisions in those cases; correct?

12   A    I don't understand what you mean.

13         MR. McDONALD:  I'll withdraw the question.

14         THE COURT:  Let's don't get into that.  I'm going to

15   tell the jury about -- I think that's getting further than you

16   need to get.

17   Q    EPlus has dozens and dozens of competitors in the software

18   procurement area; right?

19   A    We have competitors, sure.

20         THE COURT:  The question he's getting at is how many.

21   Why don't you try again, and you ask him if he knows how many

22   competitors he has in that area.

23   Q    Isn't it true that you have dozens and dozens of

24   competitors, Mr. Farber, in the software procurement area?

25   A    I don't know if it's dozens and dozens, but I think it's

Farber - Cross                                                    2653

1    fair to say there's a large number of them.  Probably more than

2    ten.

3              MR. McDONALD:  I have no further questions.

4              THE COURT:  All right, ladies and gentlemen, you've

5    heard some evidence about the licenses that were done --

6    achieved after litigation began about patent infringement

7    between the companies and ePlus.

8              That was admitted solely for the purpose of allowing

9    you to understand the context of where the licenses came from,

10   and they'll argue about that later, but the fact that those

11   companies settled their litigation is not something that you

12   can consider in deciding whether there's infringement or

13   invalidity here at all.  That's just -- it can be considered

14   for the limited purpose of assessing this concept of commercial

15   success.  All right?

16

17                        REDIRECT EXAMINATION

18   BY MR. STRAPP:

19   Q    Mr. Farber, you were testifying about the valuation of the

20   patents; do you recall that?

21   A    Yes.

22   Q    And you mentioned there was a $12,000 valuation of the

23   patents.  Was that back at the time that ePlus acquired

24   ProcureNet assets and the patents in ProcureNet?

25   A    Yeah, that's correct.

1    Q    And did that $12,000 valuation turn out to be accurate?

2    A    No.

3    Q    How so?

4    A    Well, there were a number of things -- let me try to

5    explain it this way:  Well, first of all, if it was valued at

6    $12,000, we obviously were able to license almost $60 million

7    worth of the patents.  So somebody, you know, really estimated

8    incorrectly.  So I think ePlus made a very good assessment of

9    its own value in the acquisition, but --

10   Q    Let me ask you this:  Do you have any knowledge about how

11   that valuation was actually done?

12   A    I do.

13   Q    How do you know how this valuation was done?

14   A    When I spoke to the principals that were involved in the

15   valuation on both sides --

16            MR. McDONALD:  Your Honor, this is outside the scope.

17   He didn't get into these things.

18            THE COURT:  In fact, he was kept from going into it

19   because he said he wasn't involved in it, and in addition to

20   that, his answer is hearsay.

21            MR. STRAPP:  Your Honor, he was asked about whether

22   or not --

23            THE COURT:  Hearsay.  Who was asked what.  Doesn't

24   count in dealing with hearsay.

25            MR. STRAPP:  We're not offering it for the truth of

1    the matter of whether or not it was a $12,000 valuation was

2    accurate.

3            THE COURT:  What's the non-hearsay purpose?

4            MR. STRAPP:  The process involved in coming up with

5    the valuation.

6            MR. McDONALD:  He knows the process because somebody

7    told him, so it's still hearsay.

8            THE COURT:  But if he's offering it for a non-hearsay

9    purpose, then the non-hearsay purpose has to be relevant and

10   has to be judged by Rule 403 as well.  Why is it relevant?

11           MR. STRAPP:  It's relevant because it shows why the

12   number $12,000 was come up with.

13           THE COURT:  That's for the truth of the matter.

14   Thank you.  That's what I thought it was relevant for.  All

15   right.  Let's move right on.  Objection sustained.

16   Q    Mr. Farber, you mentioned that the valuation turned out to

17   be inaccurate in the sense that you received almost $60 million

18   in license revenue.  Was it inaccurate in any other way besides

19   that?

20   A    I'm not sure I understand.

21   Q    Has the patents brought any other value beyond the

22   $60 million to ePlus?

23           MR. McDONALD:  Objection, beyond the scope, Your

24   Honor.

25           THE COURT:  Overruled.

1   A    Yeah.   It has brought other value.  We've been able to

2   market it.  A number of clients have licensed our products, you

3   know, that revolve around -- you know, the patents,

4   specifically Procure+ and Content+, so, you know, we have

5   customers worldwide utilizing this solution, and we have other

6   divisions of the company such as our bar group, which is our

7   valuated reseller that incorporates the methodologies of the

8   patents into the solution, and they utilize Procure+ to

9   increase the growth of their business throughout the other

10  operating companies as well.

11            MR. STRAPP:  Thank you.  I have no further questions.

12            THE COURT:  All right.  You may step down.  Next

13  witness.

14            MS. ALBERT:  Your Honor, ePlus calls Mr. Brooks

15  Hilliard.

16            THE COURT:  Brooks Hilliard.

17

18                    **BROOKS L. HILLIARD,**

19  a witness, called by the plaintiff, having been first duly

20  sworn, testified as follows:

21                    DIRECT EXAMINATION

22  BY MS. ALBERT:

23  Q    Good afternoon, Mr. Hilliard.

24  A    Good afternoon.

25  Q    Could you please state your full name for the record.

1   A    Yes.  Brooks Louis, L-o-u-i-s, Hilliard.

2   Q    And what is your current business address?

3   A    1811 North Tatum Boulevard, Suite 3031, Phoenix, Arizona.

4   Q    By whom are you presently employed?

5   A    I have my own company, Business Automation Associates.

6   Q    What is the nature of the business of Business Automation

7   Associates?

8   A    I do two things primarily.  I consult to businesses and

9   help them in the selection of computer systems for business

10  applications, and I do expert witness work in computer-related

11  litigation.

12  Q    How much of your time is spent serving as an expert versus

13  your other activities?

14  A    Over the course of the 30 years since I founded my firm,

15  it's been about half and half, about half of the consulting to

16  businesses on the selection of computer systems and about half

17  on the expert witness services, and some professional speaking

18  as well.  Over the past few years, there's been a good demand

19  for the expert witness services, so it's tended to be mostly

20  that.

21  Q    Can you briefly describe your educational background

22  starting with college.

23  A    Yes.  I have a bachelor's degree in engineering from MIT

24  which I received in 1968, and I have a master's in business

25  administration, MBA degree from the Harvard Business School

Hilliard - Direct                                                    2658

1    which I received in 1973.

2    Q    Can you briefly describe any professional certifications

3    that you've received.

4    A    I have two.  I'm a certified management consultant.  The

5    CMC certification is offered by the Institute of Management

6    Consultants which is the only worldwide professional

7    association for those in the management consulting profession.

8    It has chapters in countries all over the world, including the

9    United States, and I'm a past board member, national board

10   member for the United States chapter, and I currently serve as

11   the ethics committee chairman for the USA chapter of the

12   Institute of Management Consultants.

13        I also have a CCP certification, certified computer

14   professional.  That's granted by the Institute for the

15   Certification of Computing Professionals, the ICCP, which is

16   also a worldwide organization.  It was made up and sponsored by

17   over 20 different professional societies for the computer

18   professionals.

19        They didn't each want to have their own certification, so

20   they banded together to form the ICCP organization to grant the

21   certification worldwide.  I'm one of only 15, or I believe

22   fewer than 15 people in the world that has both of those

23   certifications.

24   Q    How long have you worked in the computer field?

25   A    I started actually in college working summers and part

1    time as a software developer, and that was in the mid '60s.

2    I've worked more or less continuously aside from the time I

3    spent in the military service in the computer field, from then

4    until now.  So I have over 40 years of computer industry

5    experience.

6    Q    Now, you mentioned that you had some experience with

7    developing computer software.  What types computer software

8    have you developed?

9    A    I started out with highly technical software, what's

10   called assembly language software which is the most -- at the

11   most technical level, and I worked on two projects for NASA,

12   the Mariner Mars project and the Surveyor project which went to

13   the moon, and I developed telemetry collection software for

14   those projects.

15       I also did an Air Force project, and I did a project for

16   Honeywell.  I was actually employed during that period of time

17   by a company called Infomatics which was at the time one of the

18   three largest computer consulting firms in the world, and all

19   of the projects I mentioned to you were done while employed

20   with Infomatics, contracted to NASA, to the U.S. Air Force, and

21   to Honeywell.

22       With Honeywell, I developed some what's call system

23   software for doing sorts and collating of data on a new

24   computer that Honeywell was going to introduce at that time.

25   Q    Can you describe some of the areas in which you've been

Hilliard - Direct

1   retained as a consultant?

2   A    Certainly.  Most of the work I've done as a consultant is

3   work where I've been retained by a business that is looking

4   either to upgrade from an existing computer system to a newer

5   computer system to handle their business applications, or in

6   some cases where they were acquiring a system for the first

7   time, and I'm not talking necessarily about a PC and some

8   shrinkwrapped software, but these are the multi user systems

9   running from tens of thousands up to millions of dollars for

10  the hardware, the software, and the implementation services.

11       I've also been retained on projects where there were

12  information technology issues or questions that the company

13  needed to have answered or resolved, sometimes with regard to

14  putting together requirements for IT personnel, sometimes

15  interviewing, helping them interview IT personnel, that sort of

16  thing.  But mostly on systems, acquisitions either for upgrades

17  or for systems.

18  Q    Have any of these consulting engagements involved systems

19  having procurement functionality?

20  A    Almost all of them.  Starting -- I actually started my

21  business, Business Automation, the consulting firm, in 1980

22  with the idea that the consulting services would be my primary

23  business.

24       I've done over 200 of the projects, and in the early 1980s

25  was before systems were called enterprise resource planning, or

1   NRP, but most of my clients were looking for systems that are

2   what today we would call these large ERP type systems where

3   they encompass the entire breadth of functionality that a

4   business would need.  In almost every case, procurement, the

5   purchasing was a part of the application, and in many of the

6   cases the key part.

7   Q    What are a few of the companies that you consulted for?

8   A    I have consulted for companies all over the country,

9   Stewart Stamping in New York; Insilco Technologies in North

10  Carolina; Aircraft Gear Corporation, a supplier to Boeing in

11  the Phoenix area; Phoenix Transit, the bus company in the

12  Phoenix area; Schatz Industries in the Phoenix area; Atlas

13  Roofing in Alabama, manufactures roofing materials;

14  manufacturing companies in Idaho; Dowdy Aircraft in St. Louis;

15  a wide variety of companies, many of them in distribution and

16  manufacturing, although I've also worked for publishers such as

17  Taylor Publishing in Texas, New Times Publishing in Phoenix,

18  Arizona, worked for professional organizations, CPA firms,

19  medical practices, and so forth.  So a wide variety of

20  industries.

21  Q    Have you ever been qualified as an expert witness in the

22  field of computer systems and software in prior cases?

23  A    Yes.

24  Q    On how many occasions roughly?

25  A    I've been engaged in over a hundred engagements of this

1    type, information technology related cases.  Most of them

2    settle, of course, before they go to trial, and if they don't

3    go to trial, I don't get qualified, but I've been qualified in

4    both federal and state courts, and I believe four states around

5    the country and in five different federal courts from Arizona

6    and New Mexico to Virginia.

7              MR. McDONALD:  Your Honor, I think he's answered the

8    question on this point, and maybe we can go on to the next

9    question.

10   Q    Have you ever testified in a case involving a system

11   having procurement functionality?

12   A    Several, including one in New Mexico, and, of course, I

13   was involved as an expert in the *ePlus v. SAP* case here in

14   Virginia back a few years ago.

15   Q    Was that a patent case?

16   A    Yes, it was.

17   Q    Did that involve the same patents as the patents-in-suit

18   here?

19   A    Yes, it does.

20   Q    Have you written any books or had any articles published?

21   A    Both.  I wrote a book called *Buying a Computer For Your*

22   *Growing Business, an Insider's Guide*, which was published by

23   Dow Jones Irwin in 1984, and I've had various articles

24   published over the years on IT-related topics.

25        The most recent one was on computer forensics in a legal

1    magazine called *For the Defense*.

2    Q    Have you been retained for professional speaking

3    engagements?

4    A    Yes, I have.  I've been retained by a number of trade

5    associations and professional associations in the United

6    States, and recently I was retained to go to France to speak to

7    a group of IT-related expert witnesses in Paris.

8    Q    Based on your education and your 40 years of experience in

9    the area of computer technology, what do you consider to be

10   your fields of expertise?

11   A    My fields of expertise are the acquisition,

12   implementation, function, and issues related to usage of

13   business computer systems or computer systems used for business

14   applications including applications such as purchasing,

15   inventory management, sales, accounting, and so forth.

16           MS. ALBERT:  Your Honor, at this time I would offer

17   Mr. Hilliard as an expert in the area of the use of computer

18   systems for business functions including procurement and

19   related activities.

20           THE COURT:  Any objection?

21           MR. McDONALD:  No objection.

22           THE COURT:  He is so qualified as an expert in those

23   areas.

24   Q    Mr. Hilliard, were you retained by counsel for ePlus to

25   provide expert opinions concerning the issues of validity of

1   the ePlus patents?

2   A    Yes.

3   Q    In the course of your engagement, have you reviewed and

4   responded to opinions that were rendered by Lawson's expert,

5   Dr. Shamos?

6   A    Yes.

7   Q    In general, what did you do to prepare your response to

8   Dr. Shamos's opinions?

9   A    Well, of course I read his opinions, and I reviewed all

10  the documents that he had referenced in his opinions.  I

11  also -- there are a large volume of documents that have been

12  produced in this case, and I've read through, I think, all of

13  those that relate to the validity of the patents.

14       I've also reviewed the testimony, the deposition testimony

15  of the inventors and those with knowledge of some of the

16  alleged prior art systems.  I've also reviewed testimony from

17  the SAP trial of those same individuals.

18  Q    Did you review the patents that are at issue here in the

19  file histories relating to their prosecution before the Patent

20  Office?

21  A    I did.  Both the patents at issue, and there are some

22  patents referenced that I reviewed in some detail.

23  Q    Did you review Dr. Shamos's expert report?

24  A    Yes, I did.

25  Q    Were you provided with an understanding of the applicable

1    legal principles that govern your analyses?

2    A    Yes, I was.

3    Q    Did you have an opportunity to personally review and use

4    any of the alleged prior art systems?

5    A    Well, I have had that experience with the PO Writer system

6    during the SAP trial.  SAP was able to produce a copy of that

7    software, and I was able to experiment with it, exercise it,

8    and determine how it functioned.  I did so prior to that trial,

9    and I also did so in court during that trial.

10   Q    Did you review file listings relating to the computer code

11   for that system?

12   A    I did.

13   Q    And do you recall any relevant information about the dates

14   that were included in those file listings?

15   A    Yes.  The dates included both dates preceding and dates

16   following August of 1994.

17              MR. McDONALD:  I'll object, Your Honor, as irrelevant

18   and confusing.  We haven't proffered any, and he's talking

19   about dates of things that weren't in evidence in this case.

20              MS. ALBERT:  I'll move on.

21              THE COURT:  I think he's just relating what he did

22   and his familiarity with the systems at issue.

23   Q    Did you have the opportunity to review the validity report

24   submitted by ePlus's other technical expert, Dr. Alfred Weaver?

25   A    Yes, I did.

1    Q    Did you also have an opportunity to review the Court's

2    order concerning the construction of the key terms used in the

3    patent claims?

4    A    Yes.

5    Q    Did you take the Court's claim constructions into account

6    in rendering your opinions?

7    A    Yes.  They were a foundation.

8    Q    Now, turning to some of Lawson's contentions that are at

9    issue here, are you aware that Lawson has alleged that several

10   systems were in public use prior to the relevant August 1994

11   filing date of the ePlus patents?

12   A    I'm aware of that, yes.

13   Q    And what types of evidence do you consider to be relevant

14   to your analysis of this issue of public use?

15   A    My -- when I look at this, I have to look at what evidence

16   is there in documentary form primarily to determine whether the

17   dates of the document can corroborate that the allegedly in-use

18   system was in use and performing the functions that it's

19   claimed to perform, i.e., the functions in the claims before

20   August of 1994.

21        So I look for hard written documentation that has a dating

22   on it that shows that it existed prior to 1994.  I also

23   consider other evidence, but other evidence needs to be

24   corroborated, in my view, with documentary evidence.

25             MR. McDONALD:  Object, Your Honor, to the witness's

1    explanation of corroborating.  His own personal standard isn't

2    appropriate or relevant here.

3              THE COURT:  What do you say?

4              MS. ALBERT:  It's relevant to his analysis of what he

5    considered for purposes of trying to determine and render

6    opinions on whether systems were allegedly in public use.

7              THE COURT:  I'll tell you about corroboration in

8    connection with the public use, and so I'll give you the

9    instruction, ladies and gentlemen.  He was just explaining why

10   it is that he confined his -- that he focused principally on

11   documentary evidence.

12   Q    Now, Mr. Hilliard, are you -- in rendering your opinions

13   concerning the validity of ePlus's patents, are you aware that

14   Lawson has alleged that each of the asserted claims at issue

15   here are invalid as being anticipated by the RIMS system as

16   described in the '989 patent?

17   A    I'm aware that's their contention, yes.

18   Q    Do you agree with those allegations?

19   A    No, I don't.

20   Q    Why do you disagree with that?

21             MR. McDONALD:  Your Honor, I don't think we went into

22   the anticipation of RIMS in terms of Dr. Shamos's opinion.  I

23   thought we already went into it --

24             THE COURT:  I lost what you were saying.

25             MR. McDONALD:  Dr. Shamos's testimony was focused on

1    the combination of the RIMS and TV/2 systems, I believe, and

2    moreover, I think we've already established that we're not

3    responding to other experts' testimony on the witness stand.

4    We're just giving this expert's opinions.

5            MS. ALBERT:  I didn't ask if he was responding to Dr.

6    Shamos's opinions.  I asked if he was responding to Lawson's

7    contentions.

8            THE COURT:  I hope that you were asking was he aware

9    that there was a contention -- that their anticipation argument

10   involved the RIMS '989 patent.

11           MR. McDONALD:  That's correct.  That's what I asked.

12           THE COURT:  Then objection overruled.

13   Q    Why do you disagree with Lawson's contentions?

14   A    I disagree with it because I've looked at the function of

15   the RIMS system as described in the '989 RIMS patent, and it

16   does not perform all of the elements of any of the claims of

17   the 12 claims at issue.  I've looked at the function and

18   compared it on a claim-by-claim, element-by-element basis, and

19   it doesn't perform.

20   Q    Do you understand that Lawson also contends that all 12 of

21   the asserted patent claims are obvious based on the combination

22   of the RIMS system as disclosed in the '989 patent and the TV/2

23   search program as it existed prior to the inventors' invention

24   of the electronic sourcing system?

25   A    I understand that that's their contention, yes.

Hilliard - Direct                                              2669

1    Q    Do you agree or disagree with that contention?

2    A    I disagree.

3    Q    Why do you disagree?

4    A    Once again, I have looked in the same way that I did with

5    the RIMS alone at the combination of the two and all the

6    implications of the combination of the two, the RIMS system as

7    described in the '989 patent and the TV/2 system based on the

8    sketchy description that's available of it, and even when you

9    combine them and try and take the implications of that

10   combination, it still does not satisfy all of the elements of

11   any of the 12 claims.

12   Q    Now, Mr. Hilliard, there's been a stipulation here that

13   the person of ordinary skill in the art, for purposes of the

14   analyses for validity, is a person with a Bachelor of Science

15   degree in computer science or equivalent and a year or two of

16   practical programming experience having an understanding of the

17   basic principles of supply chain management and procurement in

18   the mid 1993 to 1994 time frame.  Did you utilize this

19   definition of the person of ordinary skill for your analyses?

20   A    Yes.  That's the same understanding that I used.

21   Q    Now, these alleged prior art systems that we're talking

22   about, do you have an understanding, from your perspective as

23   one who is an expert in computer systems for use in business

24   applications such as procurement, whether or not these systems

25   evolved over time?

1   A    Yes, they did evolve over time.

2   Q    So are features present in 2011 necessarily present in

3   2008 or 2007?

4   A    No, and that generalization would apply probably for any

5   similar time period in the past.  In my experience, all

6   application --

7            MR. McDONALD:  Objection, Your Honor.  He's passed

8   the question, and it was a very general question.

9            MS. ALBERT:  We can move on.

10  Q    Are you aware, from your review of deposition testimony

11  and documents produced in discovery, as to whether or not any

12  of the alleged prior art systems here evolved over time?

13  A    Yes.

14  Q    What is your understanding with respect to the RIMS

15  system, for example?

16  A    The evidence is that it did evolve over time.

17  Q    So for purposes of the jury's determination of these

18  validity issues, is it important or not important for them to

19  understand what particular features and functionality a system

20  had at a critical point in time?

21  A    I believe it's important to understand what features and

22  functions the system had and was able to perform at -- in

23  August of 1994, and that features and functions need to be

24  dated or corroborated to be functioning at that point in time.

25  Q    Suppose a prior art system was modular in nature -- well,

1   perhaps I should ask you, what is your understanding of a

2   computer software system that is modular?

3   A    Having worked in the computer industry for computer

4   vendors before going out on my own as a consultant, companies I

5   worked for produced modular systems, and by that we meant they

6   were systems that were sold in pieces.  Customers didn't have

7   to buy every single module.  There typically might be a

8   required module and optional modules.

9   Q    So suppose a prior art system was modular.  Is that

10  relevant to the issues that the jury needs to consider?

11  A    I believe.

12            MR. McDONALD:  Objection, Your Honor.  I don't think

13  he's in a position to tell the jury what's relevant here.  Plus

14  modular is not even part of the claims.  I think it's

15  irrelevant.

16            THE COURT:  I think the focus here is what's the

17  reason for his -- what is his opinion and what is the reason

18  for it, not what's relevant for the jury.  I'm not going to let

19  in irrelevant evidence, but he shouldn't be commenting upon it.

20  Let's frame the question another way, please.

21            MS. ALBERT:  Thank you, Your Honor.

22            THE COURT:  Sustained.

23            MS. ALBERT:  I will move on.

24  Q    With respect to the PO Writer system, did you seek

25  contemporaneous documents that supported each of the assertions

Hilliard - Direct

1    that Lawson has made with respect to the features and

2    functionalities that that system allegedly had?

3    A    No, I did not.  No such documents were produced by the

4    inventor or the developer of the system, and no such documents

5    were produced by Lawson.

6              THE COURT:  Are you talking about in August of 1984?

7    1994?

8              THE WITNESS:  I'm sorry, Your Honor.  What was it?

9              THE COURT:  Are you talking about the functionality

10   and features as they existed in August of 1994?

11             THE WITNESS:  Yes.  Yes, Your Honor, that's what -- I

12   saw no evidence of what the functions and features were at that

13   time, or for that matter, any time.

14             THE COURT:  You didn't see any contemporary

15   documentation that supported what the features or functionality

16   were of the PO Writer in August of 1984 -- '94?

17             THE WITNESS:  I saw some contemporaneous

18   documentation of some features and functions, but I did not see

19   complete contemporaneous documentation of all of the features

20   and functions that it's my understanding are part of the

21   contention that that system anticipates the patents-in-suit.

22   Q    Did you review the PO Writer guided tour manual?

23   A    I did.

24   Q    Now, were these PO Writer documents that you referenced

25   publicly available?

1    A    No, they were not.

2    Q    Did you see any pre-1994 documentation relating to a

3    license by any company to a PO Writer system having all of the

4    alleged features and modules that Lawson relies upon for its

5    contentions?

6    A    I didn't see any of that, no, and it's my understanding

7    that Mrs. McEneny was asked if she had that, and she said she

8    didn't in her deposition.

9    Q    Did you see any pre-1994 documentation relating to a

10   license by any company to a RIMS system having all of the

11   alleged features that Lawson contends existed at that time?

12   A    No.

13   Q    Did Lawson produce any documentation to corroborate that

14   the TV/2 search program, having all of the alleged features

15   that it relies upon, was ever licensed to anyone prior to IBM's

16   contract with Fisher Scientific relating to the patented

17   electronic sourcing system?

18   A    I saw no such document, no such corroboration.

19   Q    Now, turning to the patents-in-suit, Mr. Hilliard, do you

20   have an opinion as to what the problem was that the inventors

21   were trying to solve in those patents based upon your review of

22   the patent specification and the patent claims?

23   A    Yes, I do.

24   Q    Can you describe your understanding.

25   A    Yes.  The patents-in-suit solve a problem that's been, to

1    my knowledge, a problem for a good period of time.

2              MR. McDONALD:  Objection, Your Honor, beyond the

3    scope of the question.

4              MS. ALBERT:  I asked what his understanding was -- I

5    can reframe my question.

6    Q    What is your understanding of the nature of the problem

7    that the inventors were trying to solve in the ePlus patents

8    based upon your review of the patent specification and the

9    patent claims?

10   A    They were -- it's my understanding that they were trying

11   to design a system, create an invention that would become a

12   system that would empower purchasers to review catalogs and

13   select items and select vendors to acquire or purchase those

14   items from a variety of vendors.

15   Q    Now, with respect to any of these prior art systems that

16   you've reviewed, do you have an opinion as to whether or not

17   they satisfied all of these needs?

18             MR. McDONALD:  Objection, Your Honor.  We're not

19   talking about invalidity.  This is not connected to the claims,

20   and I think it's confusing.

21             MS. ALBERT:  Well, it is connected to his analysis of

22   the scope and content of the prior art and secondary

23   considerations of nonobviousness, and it was covered in his

24   expert report.

25             THE COURT:  It is generally, but it's fairly -- it is

1   so general, maybe, I don't know that it's helpful.  Why don't

2   you try to get more specific.

3   Q    In your opinion, did the PO Writer system satisfy the

4   needs that were recognized by the inventors in their patents?

5            MR. McDONALD:  Same objection, Your Honor.  I think

6   we need to tie it to the claims.

7            MS. ALBERT:  I'll rephrase.

8   Q    Mr. Hilliard, do you have an opinion as to whether or not

9   the PO Writer system satisfied the needs or the requirements of

10  the ePlus patent claims?

11  A    Yes, I do have an opinion of that.

12  Q    What is your opinion?

13  A    Even if it did operate as described in the documents, even

14  under those circumstances, and there's no corroboration that it

15  did, but even if that were the case, it wouldn't satisfy the

16  claims.

17  Q    What were some of your reasons why it doesn't satisfy the

18  claims?

19  A    Primarily the PO Writer is a system that allows users to

20  review catalogs, but the items in the catalogs are not

21  associated with vendors, and that's one of the key elements of

22  almost every single claim in that the patents-in-suit, the

23  claims of the patents-in-suit all call for the buyer to be able

24  to look for items and to select items to create requisitions

25  where the items in the requisitions are associated with the

1   vendors from whom that buyer wants to purchase, and then to

2   turn those requisitions into one or more purchase orders where

3   the items on the purchase order -- and you only send one

4   purchase order to each vendor.  You wouldn't send a purchase

5   order to a vendor that doesn't sell the item or from whom you

6   don't want to buy the items.  So where the purchase orders pick

7   up the association of vendors from the requisition and

8   translate that into the purchase order.

9       The PO Writer system is simply a form-filling system.

10  It's designed for the purchasing agent, someone in the

11  purchasing department of the company to make the determination

12  of who the vendor or supplier will be, not the buyer, not the

13  one who specifies.  So at every step along the way in that

14  system, even if the buyer indicates a preferred vendor, or even

15  if the item comes out of a catalog selected by the buyer and

16  that catalog is associated with a vendor, by the time that item

17  gets into the requisition, the vendor association is lost.

18      The purchasing agent has to reenter the vendor, and then

19  once again, once the requisition is completed, it's the

20  purchasing agent, not the requisition, that determines what

21  supplier the purchase order goes to.  So it doesn't satisfy

22  almost all of the claims because it looses that connection

23  between the selection of the buyer who wanted to pick out

24  vendors that he knows and is comfortable with and the ultimate

25  purchase.

1    Q    Now, I want to turn to the RIMS system, if you could.  Did

2    you review the Johnson '989 patent relating to the RIMS system

3    that's relied upon by Lawson for its invalidity positions?

4    A    Yes, I did.

5    Q    And you indicated that you had reviewed the testimony of

6    the Fisher Scientific inventors relating to the RIMS system?

7    A    I have.

8    Q    Did you review Ms. Eng's trial testimony from the prior

9    trial between ePlus and SAP concerning the work that IBM did

10   for Fisher Scientific?

11   A    Yes.

12   Q    Did you review Ms. Eng's deposition testimony in this

13   case?

14   A    Yes, I did -- deposition testimony, yes.

15   Q    Did you review Mr. Gounaris's 's trial testimony from the

16   prior trial between ePlus and SAP concerning IBM's work for

17   Fisher Scientific?

18   A    I was actually in attendance for both Ms. Eng's and Mr.

19   Gounaris's testimony, so I was there, and I've also reviewed

20   their testimony since.

21   Q    Now, does the description of the system in the '989 patent

22   serve to substantiate the details of any particular commercial

23   version of the Fisher RIMS system that was allegedly publicly

24   used prior to August of 1994?

25   A    According to the testimony of the inventors in their

1    depositions and in the prior trial, no, it does not.  There are

2    features and functions that are described in the '989 patent

3    that were never implemented into the RIMS system, and there are

4    RIMS system features and functions that were added that were

5    not described in the '989 patent, and that this evolved over

6    time.  There were several versions of RIMS that evolved over a

7    period of time starting prior to 1994 and continuing beyond

8    1994.

9    Q    Did Lawson provide any evidence of any Fisher Scientific

10   customer who had a RIMS system installed having all the

11   features described in the '989 patent?

12   A    No.

13   Q    Let's turn now to the functionality of the RIMS system as

14   described in that '989 patent, and can you just describe at a

15   high level the functionality of that system?

16   A    Yes.  The RIMS system, as described in the '989 patent, is

17   a seller's system.  It's not a buyer's system like the

18   patents-in-suit, so it's operated by a customer service

19   representative who is an employee of Fisher.

20       When it's installed at a Fisher customer, according to the

21   inventors, a Fisher customer service representative operates

22   the Fisher RIMS system and takes requests from buyers who work

23   for the customer and enter it into the system, but -- and then

24   the system determines where the items that that customer wants

25   are.  They could be in a local, what's called just-in-time

Hilliard - Direct                                          2679

1    inventory, they could be at a distributor, the Fisher

2    distributor's inventory, the corporate inventory.  They could

3    be something that Fisher is going to purchase from an outside

4    vendor and then deliver and resell to the buyer.

5         So it creates a requisition, and it completes that

6    transaction, all done by the Fisher CSR, and it delivers the

7    item and manages the inventory.  RIMS stand for requisition and

8    inventory management system, and that's what it is.  It's a

9    requisition and inventory management system that works from the

10   seller's standpoint.  It's a seller's system.

11   Q    Now, so you indicated that the distributor's customer

12   service representative was the user of the RIMS system.  How is

13   that relevant to your analysis as to whether the RIMS system is

14   an electronic sourcing system as required by the system claims

15   at issue here?

16   A    Well, we have a construction that I have referred to and

17   understood as to what an electronic sourcing system is, and

18   it's a buyer's system.

19            MS. ALBERT:  Can we put the juror's glossary of claim

20   terms up on the screen.

21   Q    And if you look about the middle of the page, has the

22   Court construed the term electronic sourcing system?

23   A    Yes, it has.

24   Q    What is the Court's construction of that claim term?

25   A    It's an electronic system for use by a prospective buyer

1    to locate and find items to purchase, to purchase from sources,

2    suppliers, or vendors, and in this case, I believe sources,

3    suppliers, and vendors are synonymous.

4    Q    And how is it relevant to the issue of whether the RIMS

5    system satisfies the claim requirement of an electronic

6    sourcing system, of whether or not the user of the system is

7    the distributor's customer service representative?

8    A    The RIMS system is a seller's system.  It's not for use by

9    the prospective buyer.  It's for use by the Fisher customer

10   service representative or CSR.

11   Q    Could the RIMS system be used to purchase goods from

12   multiple different sources, suppliers, or distributors?

13   A    No.  Only from Fisher.

14   Q    Now, did the RIMS system have a database?

15   A    Yes.

16   Q    Did it have a database with records of items?

17   A    Yes.

18   Q    Do you have an opinion as to whether or not that database

19   constitutes a database with multiple vendor catalogs?

20   A    I do have an opinion, yes.

21   Q    What is your opinion?

22   A    It does not.

23   Q    Why not?

24   A    It is not -- the items have no vendor or source

25   association with them as a catalog item would, because all of

1    the items in it are Fisher items that are going to be sold.

2    There's no need for association of a vendor or a source because

3    all items requisitioned through the RIMS system are sold to the

4    customer from Fisher.

5    Q    Can we verify that there is no source related information

6    in the item database by reference to the '989 patent?

7    A    Yes.

8    Q    Could we see DX-7 at table Roman numeral vi, and that's at

9    column 39.  Could you blow up there on the left-hand corner

10   table vi.  What is illustrated in this table vi?

11   A    This illustrates what's called the part master which is

12   the listing of all of the items in the Fisher RIMS database,

13   and the vendor or supplier is nowhere listed there.  If you

14   look at -- I've looked at every single item in the part master,

15   and the vendor supplier isn't there.  It's irrelevant because

16   the vendor is always Fisher.

17   Q    Now, do you see about in the middle of the table there's a

18   reference to an MFG part NBR which I interpret to mean

19   manufacturer part number?  Do you see that?

20   A    Yes, I do.

21   Q    Would that constitute vendor or source-related data?

22   A    No.  That's reference information.  With the Fisher RIMS

23   system, the customer never buys from the manufacturer.  The

24   customer always buys from Fisher.  This is an indication for

25   Fisher, perhaps, where they source the item that they will

Hilliard - Direct                                                    2682

1    ultimately sell to the buyer, but it is not where the customer

2    buys the item.

3    Q    Was there any way to select product catalogs to search

4    within the RIMS system?

5    A    Well, the RIMS system doesn't have catalogs, but even if

6    you were to construe its parts master to be a catalog, and I

7    wouldn't construe it that way because it doesn't have -- the

8    items aren't related to vendors, but even if you were to

9    construe it that way, it would only have one, so you can't

10   select which one you want from multiple, because it would only

11   have one.

12   Q    Did the RIMS system include a search program?

13   A    No.

14   Q    Is the presence or absence of a search program relevant to

15   any claims at issue here?

16   A    Several of the claims.

17            MS. ALBERT:  Mike, could we see the jurors' claim

18   term glossary at page four.

19   Q    In the middle of that glossary, there's a claim element,

20   means for searching for matching items among the selected

21   product catalogs; do you see that?

22   A    I do.

23   Q    And what structures has the Court defined would satisfy

24   that claim limitation?

25   A    Well, it says the materials X of this element are

1    disclosed as search programs and modules operating on a

2    computer system with access to the given database and their

3    equivalents, and then it cites the columns and rows within the

4    patent where those corresponding structures, materials, or acts

5    are referenced.

6    Q    So if the RIMS system as described in the '989 patent does

7    not have a search program, would that system satisfy this claim

8    requirement?

9    A    It would -- for that reason alone, it wouldn't satisfy the

10   claim element.  It also wouldn't because it can't search among

11   selected catalogs because you can't select a catalog.

12   Q    And this particular claim element, what claim is it

13   relevant to?

14   A    '683, claim three.

15            MS. ALBERT:  And, Mike, if we can continue to look

16   down further on the claim glossary, down below that, there's

17   another element, means for searching for matching items that

18   match the entered product information in the selected portions

19   of the database, and that element comes from the '172 patent,

20   claim one.

21   Q    Do you see that, Mr. Hilliard?

22   A    I do.

23   Q    What structures has the Court defined as being required in

24   order to satisfy this claim requirement?

25   A    Once again, there's reference to the columns and rows

Hilliard - Direct                                                    2684

1   within the '172 patent that identify the specific corresponding

2   structures, materials, or acts.

3   Q    And what is the text of the Court's definition there?

4   A    The corresponding structures, materials, or acts of this

5   element is disclosed as search programs and modules operating

6   on a computer system with access to data in a database or other

7   file system and their equivalents.  And as I say, it refers to

8   the specific places within the '172.

9   Q    So if the RIMS patent as described in the '989 patent does

10  not have any description of a search program, would that system

11  in the '989 patent satisfy this claim requirement?

12  A    No.

13  Q    Could the RIMS system at the customer's facility build a

14  requisition from data relating to selected matching items found

15  in conducting searches of vendor catalogs and their associated

16  sources?

17  A    No, it can't do that for a number of reasons.  There are

18  no catalogs, you can't select a catalog, you can't search --

19  without a search, there are no matching items and so forth.

20            THE COURT:  Ms. Albert, how much longer do you have

21  with this witness?

22            MS. ALBERT:  I probably have another area.

23            THE COURT:  Well, I think probably we ought to take

24  lunch.  Their lunches are here, so take your notebooks with

25  you, please.

Hilliard - Direct

2685

1
2                              (Jury out.)
3
4          THE COURT:  How many witnesses do you have after this
5    witness, Mr. Robertson?
6              MR. ROBERTSON:  This is our last witness, Your Honor.
7              THE COURT:  Thank you.  We'll have the lunch recess
8    for an hour.
9
10             (Luncheon recess.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25