2686

1            (The jury is present.)

2    BY MS. ALBERT:   (Continuing)

3    Q   Mr. Hilliard, before the lunch break, we were

4    talking about the functionality of the RIMS system for

5    building a requisition, and I had asked -- I guess

6    I'll just ask you again.   Could the RIMS system at the

7    customer's facility build a requisition from data

8    relating to selected matching items found in searching

9    vendor catalogs and their associated sources?

10   A   No, it couldn't.

11   Q   Why not?

12   A   Because there's no catalog.   There's no selection

13   of catalogs.   Even if you were to interpret the parts

14   file to be a catalog, there would only be one.

15   There's no search of the catalog.   Just a part number

16   look-up.   So there would be no search results to build

17   the requisition from.

18   Q   The RIMS system did build a requisition, though;

19   isn't that right?

20   A   Yes, it did.

21            MS. ALBERT:   Now, can we take a look at this

22   requisition that's built in the RIMS system.   Can we

23   look at DX 7 at table Roman numeral 3, column 37.   And

24   could you blow up, yes.

25   Q   What's illustrated in this table III?

1    A    This is a requisition screen from the RIMS system.

2    Q    I'm sorry.  Go ahead.

3    A    It shows the account number, which is a

4    department, and line items.

5    Q    Now, do the line items that are listed in that

6    requisition include information relating to the

7    sources from which the item are to be procured?

8    A    No, there's no source information.  There's only

9    one source in the Fisher RIMS system.

10   Q    Why didn't the requisition built by the RIMS

11   system need to include vendor information?

12   A    There's only one vendor.

13   Q    Does the electronic sourcing system of the ePlus

14   patents require that the requisition line items have

15   associated source or vendor information?

16   A    Yes.

17   Q    Why is that necessary?

18   A    Well, because in the patents-in-suit they call for

19   the ability of the buyer to go through catalogs and to

20   select the sources from which he or she wants to buy.

21   And so the requisition needs to reflect the sources

22   that are selected or vendors - source and vendor I'm

23   using interchangeably - that the buyer has selected.

24   Q    Then does the system take that requisition and

25   need to be able to generate purchase orders using the

HILLIARD - DIRECT                2688

1  data in that requisition?

2  A    Yes.   The '683 patent, Claim Three, and many of

3  the other claims all talk about generating multiple

4  purchase orders from the requisition, and the reason

5  for multiple purchase orders is that the individual

6  line items in the requisition are each associated with

7  vendors, and you have to have a separate purchase

8  order for reach vendor.

9  Q    So is it necessary to the functionality of being

10  able to process that requisition to generate purchase

11  orders, is it necessary to have requisitions with

12  associated vendor information?

13  A    Yes, otherwise you wouldn't know what vendors to

14  issue the purchase orders to.   Or the system wouldn't

15  know, pardon me.

16  Q    Did the RIMS system generate a purchase order from

17  a requisition?

18  A    The RIMS system generated a purchase order block

19  at the RIMS system, which is the on-site system

20  operated by the Fisher customer service rep or CSR,

21  and that purchase order block then went to the Fisher

22  warehouse where a purchase order could conceivably be

23  generated, but it would be generated with manual

24  intervention.

25  Q    Can we look at some figures in the '989 patent

1    that concern this purchase order functionality?  And

2    if we could look at DX 7 at figure 5A.

3        Can you explain, Mr. Hilliard, what happens in the

4    system after the CSR accepts the requisition and when

5    you reach the decision block labeled 332 there?

6    A    Yes.  Can we blow up this section?  Yes, a

7    decision block shows that -- the diamond refers to a

8    decision.  So there's a question as to whether the

9    item on the requisition is of type 1, 3 or 4.

10            MR. McDONALD:  Your Honor, I object.  This is

11   outside the scope of Mr. Hilliard's report.

12            MS. ALBERT:  Your Honor --

13            THE COURT:  I don't have Mr. Hilliard's

14   report here.  Does somebody have it for me so I can

15   see where it is?

16            MS. ALBERT:  Your Honor, Mr. Hilliard was

17   questioned at length about this figure in the course

18   of his deposition, and we have a stipulation with Mr.

19   McDonald that the experts can testify concerning

20   opinions that were elicited from them in the course of

21   the deposition.

22            MR. McDONALD:  We have talked about that.

23   That's not the case.  That was for the initial --

24            THE COURT:  I didn't hear you.  Talk about it

25   and what?  We have talked about it and what?

1          MR. McDONALD:  That the deposition -- if it's

2    not in the report.  That's the question.  Moreover,

3    Mr. Hilliard is a rebuttal expert.  As a rebuttal, he

4    wasn't allowed to have another rebuttal report in the

5    form of his deposition.  That was something that was

6    discussed by the parties -- the party that had the

7    burden of proof with the first expert report, but you

8    have already ruled that we have to have them in the

9    reports anyway.

10         MS. ALBERT:  Now we're backtracking on a

11   stipulation that Mr. McDonald provided to us earlier

12   in the case.

13         THE COURT:  I remember this coming up.

14         MS. ALBERT:  I believe it came up in the

15   course of another hearing with Your Honor where Mr.

16   McDonald did stipulate.

17         THE COURT:  Go to my desk, please, and bring

18   me the transcript that is -- it may be in your office.

19   It's the transcript of the August 10 hearing that I'm

20   using for the opinion.

21         MS. ALBERT:  I think we might have a copy.

22         MR. McDONALD:  This actually came up in the

23   hearing yesterday morning, the issue of whether the

24   experts' deposition could be used to supplement their

25   reports, and I think you ruled that we couldn't rely

1  on the deposition testimony.

2          THE COURT:  There was nobody talking about a

3  stipulation that you had agreed to do that yesterday

4  morning.  I'm not quite sure exactly how it came up,

5  but I gathered that as to Dr. Hilliard there's a

6  stipulation, and I didn't understand there was as to

7  Dr. Shamos.

8          MS. ALBERT:  This came up in the course of

9  the August 10 hearing before Your Honor, and if I can

10  refer you to page 3, starting at line 24, Mr. Merritt

11  said, "as a consequence the" --

12          THE COURT:  Let me read it.

13          MS. ALBERT:  Okay.

14          THE COURT:  Look at 4, page 4, line 13 to the

15  bottom.

16          MR. McDONALD:  That shows that actually

17  Mr. --

18          THE COURT:  And in addition to that, it's

19  that last line, 24, and carrying over to the top of

20  page 5, number 4, that was involved yesterday morning.

21  It wasn't in the report to begin with, the original

22  report.  That was what this was.  And the same rule

23  would apply here.

24          If there's a deficiency in the original

25  report such as there was with respect to what we were

 1   talking about yesterday with Dr. Shamos, then the same

 2   rule applies here.  But if the stipulation is that all

 3   he's doing is -- if he's testifying to some point that

 4   was in his original report but that was augmented

 5   because he was rebutting whatever Dr. Shamos did, then

 6   that would be the situation that would be covered by

 7   the stipulation.

 8            MR. McDONALD:  Here's the situation.  That

 9   only goes to the expert that did the first round of

10   reports because Dr. Shamos went first.  Mr. Hilliard

11   then rebutted him.  Then the issue was:  Does

12   Mr. Shamos do another report or can we just rely on

13   his deposition.  There was no issue that the second

14   expert after already rebutting the first expert would

15   also rebut him at his deposition.  So Mr. Hilliard as

16   the second expert, there was no stipulation regarding

17   the second expert.

18            THE COURT:  You said that a lot better than I

19   did.

20            MS. ALBERT:  Your Honor, Mr. Hilliard treated

21   the issue of purchase order generation at length in

22   his report.

23            THE COURT:  Just give me the report and let

24   me see it.  The challenge is it isn't in his report.

25            MR. ROBERTSON:  I believe it's in the binder

HILLIARD - DIRECT                 2693

1  you have, Your Honor.

2            THE COURT:  Page?

3            MS. ALBERT:  Page 30 at paragraph 72.

4            THE COURT:  What is the supplemental?

5            MS. ALBERT:  Is the objection that Mr.

6  McDonald is raising is that this specific figure was

7  not referenced in his report?

8            MR. McDONALD:  That's right.

9            MS. ALBERT:  I think he discusses the

10 functionality of this figure at length in his report.

11           THE COURT:  Let me see the paragraph and page

12 you're talking about.

13           MS. ALBERT:  I'm referring to paragraph 72 as

14 one paragraph.

15           THE COURT:  Hold on.  I can't read but one at

16 a time.  You-all are all smarter than I am.  I can

17 only do it one at a time.

18           MS. ALBERT:  Then I would also refer Your

19 Honor to paragraphs 81 through 83.

20           MR. McDONALD:  Your Honor, could we have the

21 figure removed from the screen while you're reading?

22           THE COURT:  Sure.

23           MS. ALBERT:  Specifically, with reference to

24 paragraph 82, the quotations from the patent that are

25 referenced in that paragraph are specifically directed

HILLIARD - DIRECT                    2694

1   to figure 5A.

2            THE COURT:  Figure 5A is the one he's

3   testifying about?

4            MS. ALBERT:  That's correct, Your Honor.

5            THE COURT:  Well --

6            MR. McDONALD:  That's actual in figure 5B,

7   Your Honor.

8            THE COURT:  Ms. Albert, is it 5A or 5B?

9            MS. ALBERT:  I think 5B is a continuation of

10  figure 5A.  These specific quotations might be.

11           THE COURT:  All right.  Anything else?

12           MS. ALBERT:  That's all I connote at this

13  current time.

14           THE COURT:  This is the hour of decision.

15           All right.  Anything else, Mr. McDonald?

16           MR. McDONALD:  No, Your Honor.

17           THE COURT:  It looks to me like in paragraphs

18  81 through 83 and in 72, he is covering in fair detail

19  the very topic he's addressing now.  And while he may

20  not have cited a specific figure in his report, he's

21  doing everything but citing the figure in his report.

22  So I overrule the objection to the testimony.

23           MS. ALBERT:  Thank you, Your Honor.

24  BY MS. ALBERT:

25  Q   So I think the pending question was could you

1  explain what happens in the RIMS system after the CSR

2  accepts a requisition and at the point where you reach

3  the decision block 332?

4  A    Yes.   The diamond-shaped block indicates that

5  there's a logic decision that's made by the Fisher

6  RIMS system to determine whether the item that's being

7  requisitioned is a type 1 item, which is a

8  distributor-owned item that's located at the Just In

9  Time location at the customer's site, a type 3 item,

10 which is a distributor-owned item that's located at

11 the warehouse, or a type 4 item, which is an item that

12 the distributor buys and resells to the customer.

13     If so, the system creates a purchase order data

14 block, as I mentioned in response to your prior

15 question, over here on the right.  And if not, the

16 system generates what's called a customer internal

17 P.O., although that internal P.O. is really not a

18 purchase order.  It's a material transfer request.

19 Q    What's the difference between a material transfer

20 request and a purchase order?

21 A    In a purchase order something is going to be

22 purchased as is the case with the type 1, 3 or 4.  The

23 other types that are active are the 5 and 6.  Five

24 being an item that's not handled by the system and 6

25 being a -- so I'm going to ignore 5 for a moment.  Six

1  being a customer-owed item that's located at the Just

2  In Time warehouse at the customer's location.

3      Now, in the case of that type 6, since it's a

4  customer-owned item, there is no purchase.  The

5  customer doesn't need to purchase that item because

6  the customer already owns that item.  So this is

7  really a material transfer, not a purchase.  Although,

8  there's a reason, I believe, why it's called that in

9  this patent.

10 Q   Does this diagram show the RIMS system generating

11 multiple purchase orders from a single requisition?

12 A   No, it does not.  It shows on the right-hand side

13 a purchase order block, which is sent to the host

14 system, and the left-hand side the initiation of

15 basically a material transfer that transfers the

16 customer's own inventory from one department to

17 another.  No purchase or sale occurs.

18 Q   Now, I want to turn to the converting

19 functionality that's required by some of the claims.

20 Is there any description in the '989 patent of using

21 the RIMS system to convert a selected matching item

22 associated with one vendor to another item from a

23 different vendor by means of cross referencing

24 functionality?

25 A   No, there isn't.

HILLIARD - DIRECT                 2697

1  Q   What about the cross reference tables at the

2  Fisher mainframe computer.  Would those satisfy the

3  claim requirements?

4  A   No, they don't.  The cross reference tables are

5  basically a table that's in there for the purpose of

6  allowing Fisher to supply a Fisher item in place of an

7  item that has a competitor's product number.  There's

8  no alternative vendor.  The only vendor to the

9  customer is Fisher.  So you can't -- the system

10  doesn't provide for the conversion of an item from one

11  vendor to another vendor because -- to include the

12  item of another vendor because it's all one vendor.

13          MS. ALBERT:  Mike, could we take a look at

14  Claim Three of the '683 patent?

15  Q   You see at the bottom there there's this claim

16  element means for converting data relating to a

17  selected matching item and an associated source to

18  data relating to an item in a different source?  Do

19  you see that?

20  A   Yes.

21  Q   Has the Court construed the meaning of the term

22  "selected matching item"?

23  A   Yes, it has.

24  Q   Do you know what that construction is?

25  A   A selected matching item is an item that is the

1  result of -- that's found as a result of a search,

2  something that the patent refers to as a hit.

3         MR. McDONALD:  Your Honor, I object.  The

4  Court has defined the term "matching item," and you

5  did want use the word "hit."

6  Q   Why don't we look at the Court's construction.

7         MS. ALBERT:  I want to go back, Mike, to the

8  first page, and I want to blow up the second to the

9  last item there; selected matching items.

10 Q   What's the Court's construction for selected

11 matching items?

12 A   These are requisition items.

13 Q   So could we go back to Claim Three for a moment,

14 please?  So with respect to this means for converting

15 data requirement, does that relate to requisition

16 items and an associated source?

17 A   No, there's no associated source.  There's only

18 one source.  There's only one vendor.  And there's no

19 different source because, once again, there's only one

20 vendor.

21 Q   So would the RIMS system satisfy that claim

22 requirement?

23 A   No.

24 Q   We saw earlier the requisitions that are actually

25 built by the RIMS system.  Did those requisitions

1   contain associated source related information?

2   A    No, they did not.

3   Q    Did the RIMS system employ a catalog selection

4   protocol where the system can select a subset of a

5   collection of catalogs where the subset has a catalog

6   of a first vendor and a catalog of either a second

7   competing vendor or a manufacturer?

8   A    No, it did not.

9   Q    Why not?

10  A    There's no catalog.  And even if you were to

11  interpret the product list as being a catalog, there

12  would only be one.  So you can't select from one.

13  There's only one vendor.

14  Q    Now, with reference to this catalog selection

15  protocol, could we take a look at Claim One of the

16  '516 patent?  Is this catalog selection protocol

17  requirement relevant to Claim One of the '516 patent?

18  A    Yes.  The fourth element in the '516 patent is a

19  catalog selection protocol.

20  Q    And you said that in your opinion, the RIMS system

21  does not employ such a protocol?

22  A    There's nothing in the RIMS system anywhere in the

23  '989 patent that even approaches anything like that.

24  Q    Could we take a look at Claim 29 of the '516

25  patent?

HILLIARD - DIRECT          2700

1       Is the catalog selection protocol requirement

2  relevant to Claim 29?

3  A   Yes, it is.  Once again, it's the fourth element.

4  The fourth, yeah, element.

5  Q   Now, with respect to inventory capability, could

6  the RIMS system determine the availability of a

7  selected matching item in inventory?

8  A    As I understand it, inventory refers to a third

9  party vendor's inventory.  And there's nothing in the

10  RIMS system --

11          MR. McDONALD:  Objection, Your Honor.  The

12  term "inventory" is not construed by the Court as

13  limited to third party inventory.

14          MS. ALBERT:  Can I take a look at Claim 26 of

15  the '683 patent?

16          THE COURT:  Is "inventory" a construed term?

17          MS. ALBERT:  No, it wasn't.  So I think he

18  could give his opinion from the perspective of a

19  person of ordinary skill in the art, how a person of

20  ordinary skill in the art from review of the ePlus

21  patent specification would understand the meaning of

22  that term as it's used in the claim with reference to

23  the claim as a whole.

24          MR. McDONALD:  Well, if they wanted a special

25  meaning, Your Honor, that's what they should have

1    asked you to give it.  The word "inventory" has a

2    meaning.  If he wants to say what "inventory" means as

3    he would understand it or one of ordinary skill,

4    that's one thing.  But to say it's a specific party's

5    inventory, well, that's adding additional words to it,

6    and that's a whole different thing.  He shouldn't be

7    allowed do that.

8               MS. ALBERT:  Maybe I can just walk him

9    through the claim.

10              THE COURT:  Maybe that would be a better

11   approach.

12   BY MS. ALBERT:

13   Q    Now, do you see this inventory functionality

14   referenced in the last element of Claim 26?

15   A    Yes.

16   Q    Do we also see a reference to a selected matching

17   item?

18   A    Yes.

19   Q    Earlier we referred to the Court's claim term

20   glossary and its construction of "selected matching

21   item."  What was that construction?

22   A    A selected matching item is an item in a

23   requisition.

24   Q    Does that selected matching item refer back then

25   to the fourth element in the claim that relates to

1    building a requisition using data relating to selected

2    matching items and their associated sources?

3    A    Yes, at this time does.

4    Q    And what are the sources that are associated with

5    those selected matching items in the requisition?

6    A    Those sources are the catalogs of vendors from

7    whom the customer -- multiple vendors from whom the

8    customer is potentially going to buy.

9    Q    Did the RIMS system have catalogs associated with

10   vendors?

11   A    No.

12   Q    Did the RIMS system build a requisition using data

13   relating to selected matching items and their

14   associated sources?

15   A    No.

16   Q    So do you have an understanding then that the

17   selected matching item relates back to the vendor

18   product catalogs if you follow back through the claim?

19   A    I think that's quite clear.

20   Q    The '989 patent does use the term "sourcing," is

21   that right?

22   A    Yes, it does.  And it defines it right in the

23   description.

24   Q    How is the reference to sourcing used in

25   connection with the '989 patent?

HILLIARD - DIRECT                    2703

1    A    It's used in an entirely different way than

2    sourcing is used in the patents-in-suit.   The

3    patents-in-suit are customer purchase purchasing

4    systems.   The '989 is a buyer, a selling system.

5    Sourcing is defined right in the '989 patent.

6              MR. McDONALD:   Your Honor, I object.   He's

7    referred to the RIMS patent as opposed to the

8    patent-in-suit.   I think it's already been shown the

9    RIMS patent is part of the patents-in-suit, and he's

10   using a definition from the RIMS patent as part of the

11   patents-in-suit as if it's not part of the

12   patents-in-suit.   I object to his interpretation.

13             THE COURT:   I think that's one of your

14   arguments, but I'm not sure that's been definitively

15   determined.   So I think he's entitled to say what he

16   has to say on the topic.   Objection is overruled.

17             MS. ALBERT:   Thank you, Your Honor.

18             THE COURT:   But you better start over again

19   with the question.   You still have your objection to

20   it, Mr. McDonald.

21   BY MS. ALBERT:

22   Q    How is the term "sourcing" used in connection with

23   the RIMS system described in the '989 patent?

24   A    There's a section on sourcing in the '989 patent

25   beginning on in column 11.   And the first paragraph

1    shows a definition of sourcing.  Sourcing the

2    requisition is the process of determining what

3    inventory will be used to fill requisition.

4        And in the case of the '989 patent, this

5    definition of "sourcing" is different than the

6    definition of "sourcing" in the patents-in-suit, and

7    the reason it's different is because the '989 patent

8    is a seller's system and the patents-in-suit is a

9    buyer's system.  So you can't look at the word in the

10   two patents and say they mean the same thing or the

11   combination of patents-in-suit versus the '989 because

12   sourcing is clearly defined differently in the '989

13   than sourcing is used in the connotation of an

14   electronic sourcing system.

15   Q    Now, Mr. Hilliard, do you have a slide that

16   summarizes what you consider to be the major

17   differences between the RIMS system and the electronic

18   sourcing system of the asserted claims?

19   A    Yes.

20        MS. ALBERT:  Could we have slide 51 from

21   slide deck 93.

22   Q    What have you summarized here?

23   A    This is basically a summary of the characteristics

24   of the Fisher or of the RIMS system, the requisition

25   and inventory management system.  And in summarizing

1   it, would you like me to go through the bullet points?

2   Q    Yes.  So does this slide set forth what you

3   consider to be the differences between the RIMS system

4   and the '989 patent and the requirements of the claims

5   of the patents-in-suit?

6   A    Yes.

7   Q    Could you briefly summarize what you consider to

8   be those distinctions?

9   A    Yes.  The patents-in-suit describe an electronic

10  sourcing system.  Sourcing being defined as

11  purchasing.  Whereas, the RIMS system is an inventory

12  management system.  There are no product catalogs in

13  the RIMS system.  And even if you were to interpret,

14  as I've said before, the product list as a catalog, it

15  would be a single catalog rather than multiple.

16       You can't select product catalogs to search

17  because at most, and I don't agree with that

18  interpretation, but at months, if you took that

19  interpretation, there would be one.

20       There's no search capability in RIMS.  RIMS has

21  strictly a product lookup by product number.  And then

22  there's no cross-reference table that links like items

23  from multiple vendors because in RIMS there's only one

24  vendor.  And there's no means of processing a

25  requisition to generate one or more purchase orders

1    for the selected matching items because there are no

2    selected matching items for all the preceding reasons.

3    Q    Now, let's turn to the TV/2 search program.

4    A    Okay.

5    Q    Does Lawson contend that the TV/2 search program

6    fully anticipates any of the patent claims?

7    A    I don't believe so, no.

8    Q    Did the inventors disclose brochures relating to

9    the TV/2 search program to the Patent Office for

10   consideration during the prosecution of the

11   application which led to the patents-in-suit?

12   A    Yes.

13   Q    Can we confirm that by looking at one of the

14   patents?  Let's take a look at PX 1 on the cover page

15   under "other publications."  Do you see some

16   documentation relating to the TV/2 search program

17   there?

18   A    Yes, there's the item referred to as a general

19   information manual, which does have a date, and then

20   there's an item referred to as a product information

21   brochure.

22       When I used to work for computer companies, that's

23   what we called a product slick or a product brief, and

24   that one is undated.

25   Q    Let's take a look, if we could, at the general

1    information manual that was disclosed to the Patent

2    Office.  I think that's DX 105.

3        Did you review this IBM general information

4    manual?

5    A   Yes, I did.

6    Q   Does it provide a sufficient description of the

7    TV/2 search program such as a person of ordinary skill

8    in the art would be able to make and use that search

9    program?

10   A   No, it's only about six or seven pages long.

11   Eight, I believe, including a blank page.  And it

12   doesn't have any detail in it at all.  Although it's

13   referred to as a manual, it's really more of a

14   brochure.  There's no descriptive information that

15   would allow someone who was looking at it to

16   understand how the TV/2 system was built or works.

17   Nothing that would enable one of ordinary skill in the

18   art to create a similar product or even to use this

19   product if they had it.  There's no technical detail

20   whatsoever.

21   Q   Did you review any deposition testimony of the IBM

22   witnesses concerning the level of technical detail

23   contained in this general information manual?

24   A   I did.

25   Q   Who testified about that?

1  A    I believe both Mr. Gounaris and Ms. Eng testified

2  that it really was more of a marketing --

3          MR. McDONALD:  Objection, Your Honor.  I

4  don't think he should be characterizing people's

5  testimonial.

6          MS. ALBERT:  This was in the deposition

7  testimony that he reviewed to form the basis of his

8  opinions.

9          THE COURT:  Well, then I think you need to

10  make that clear.  He can consider these things as the

11  basis of his opinion, but Mr. Gounaris and Ms. Eng

12  testified at trial, and what Mr. McDonald is pointing

13  out is that it sounds like he's saying what they

14  testified to at trial.  And whatever they said at

15  trial, they said, and the jury will remember, but if

16  there's literature that he considered in forming his

17  opinion that's of the type that an expert ordinarily

18  considers, which all of you have used the depositions

19  to do in this case, then he can say that he relied on

20  that in reaching his judgment.  Do you see the

21  difference?

22          MS. ALBERT:  Yes.  I believe my original

23  question was directed specifically to the deposition

24  testimony and not to any trial testimony.

25          THE COURT:  It may have been.

HILLIARD - DIRECT          2709

1   BY MS. ALBERT:

2   Q    Did you --

3              THE COURT:  So the objection is overruled,

4   but just in order that you'll straighten out that

5   which Mr. McDonald and I messed up, will you do it

6   over again?  Maybe I'll just take the blame.  It

7   wasn't him.

8   BY MS. ALBERT:

9   Q    Did you review any deposition testimony from any

10  IBM witnesses in formulating your opinions with

11  respect to the teachings of the IBM documentation?

12  A    I did.

13  Q    Is that deposition testimony the type that an

14  expert would reasonably rely upon in formulating

15  opinions as far as teachings of alleged prior art

16  documentation?

17  A    Well, it's something that I would consider and be

18  part of what I would rely on.  I also, since I develop

19  documentation of this type, I would also rely on my

20  own knowledge of this type of documentation, but

21  certainly I considered that, and I considered it to be

22  important, and I found that it concurred -- that their

23  characterization of it concurred with my own judgment,

24  that this was not a technical document or nothing that

25  would give enough detail that would be enabling to one

HILLIARD - DIRECT                    2710

1   of ordinary skill in the art.

2   Q   Let's take a look at the other IBM document that

3   the inventors disclosed to the Patent Office.  Could

4   we take a look at DX 107.

5       Did you review this IBM TV/2 brochure in

6   formulating your opinions?

7   A   Yes.  I did.

8   Q   Does this TV/2 brochure provide sufficient

9   description of the TV/2 search program such that a

10  person of ordinary skill in the art would be able to

11  make and use that search program?

12  A   No.  This is, as I stated in my deposition and in

13  my report, this is basically a marketing piece that

14  has bullet points that are largely puff or appear to

15  be largely puff and really provide no technical detail

16  and certainly don't provide any information that would

17  allow one of ordinary skill to make or use a technical

18  viewer or a search product like TV/2 purports to be.

19  Q   What type of documentation would a person of

20  ordinary skill in the art need to make a system that

21  would implement the TV/2 search program?

22  A   A technical design manual, a user's manual,

23  perhaps product coding, listings of the code, and

24  technical manuals, basically, is what it would take

25  for one of ordinary skill in the art and neither of

1  these items fit that characterization.

2  Q    Have you reviewed any evidence that would

3  substantiate whether or not IBM had ever had a

4  commercial version of the TV/2 search program prior to

5  IBM's work with the inventors on the electronic

6  sourcing system project?

7  A    There was no evidence at all to that effect.

8  Q    Now, can you describe at a high level the nature

9  of this Technical Viewer/2 search program?

10 A    Yes.  It's a piece of software that allows the

11 user or buyer to search through electronic information

12 to find information that's included in that electronic

13 document and to view the items that were found as a

14 result of the search.

15 Q    Was TV/2 an electronic sourcing system?

16 A    No.

17 Q    Why not?

18 A    It doesn't have any of the characteristics of an

19 electronic sourcing system.  There's no -- well, can

20 we put up the construction?

21 Q    Well, sure.

22        MS. ALBERT:  Can we look at the glossary of

23 claim terms.  Blow up that middle one, electronic

24 sourcing system.

25 Q    So what characteristics are missing from the TV/2

1  program that are required in order to constitute an

2  electronic sourcing system?

3  A    An ability to complete the process described in

4  that description.  You can find items, but there is no

5  purchasing capability from sources, suppliers or

6  vendors.  There's nothing relating to sources,

7  suppliers or vendors at all in the TV/2 system.

8  Q    Did the TV/2 program prior to 1994 include any

9  product catalogs in its database?

10  A    No, it didn't come with a database.

11  Q    Did TV/2 prior to August of 1994 have multiple

12  product catalogs?

13  A    No.

14  Q    Was there any capability using TV/2 to search for

15  items and build a requisition using those search

16  results?

17  A    No, there's no requisition logic in TV/2 at all.

18  It's simply a search and display engine.

19  Q    Could we take a look at DX 107, and the Bates

20  number on the page I would like to refer you to is

21  G33.

22         MS. ALBERT:  Could we blow up the left-hand

23  column there?

24  Q    Under some of the possibilities, we see some

25  potential uses include -- and about three bullet

HILLIARD - DIRECT          2713

1    points down there's a reference to integrating parts

2    catalogs with dealers' computer systems such as order

3    entry, inventory management and customer records.

4    Does that describe how to use search results to build

5    a parts list which could be sent to a parts ordering

6    system?

7    A    No, it just says this is a possibility and a

8    potential use.  It doesn't say that the TV/2 system

9    has this capability, and, in fact, it didn't have that

10   capability.

11   Q    Do you have a slide illustrating the deficiencies

12   of the TV/2 program as related to the requirements of

13   the ePlus patent claims?

14   A    Yes.

15             MS. ALBERT:  Could we take a look at slide 75

16   in slide deck 93?

17   Q    Could you summarize your analysis of the

18   deficiencies of the TV/2 program as applied to the

19   claims?

20   A    Yes.  It's not a corresponding system as we have

21   just discussed.  It's simply a search program.  It

22   does not have multiple product catalogs.  It doesn't

23   even have one product catalog.  It has no requisition

24   capability and no ability to generate purchase orders.

25   Q    Now, was TV/2 modified in order to be integrated

1  into the electronic sourcing system of

2  Fisher-Scientific?

3  A   Yes.  Fisher engaged IBM to undertake a project to

4  modify TV/2 to work with software Fisher was

5  developing that ultimately became something called

6  Supplylink or Cornerstone.  And that involved

7  significant modifications to TV/2, which both

8  Mr. Gounaris and Ms. Eng described in their deposition

9  testimony and in their trial testimony in the *SAP*

10 trial.

11 Q   Now, I would like to turn to your opinions with

12 respect to each of the asserted claims and Lawson's

13 contentions regarding the RIMS system as disclosed in

14 the '989 patent and the combination of the RIMS system

15 in the '989 patent and the TV/2 search engine.

16     Have you prepared some slides -- well, have you

17 prepared a slide that summarizes some of your opinions

18 with respect to the combination of the RIMS and TV/2

19 systems?

20 A   Yes.

21 Q   Will you take a look at slide 107 in slide deck

22 93?  So can you summarize your opinions with regard to

23 the deficiencies in the combination of the RIMS and

24 TV/2 programs as related to the requirements of the

25 patent claims?

HILLIARD - DIRECT          2715

A    Yes, I've tried to take requirements -- in most

cases, these requirements relate to multiple claims,

but neither system was an electronic sourcing system.

Neither system had multiple product catalogs.   In

fact, it would be my opinion that neither system had

even a single product catalog.

Neither system had a means for selecting product

catalogs to search.   Neither system had a means for

generating an order list that includes at least one

matching item selected by said means for searching

since there was no means for searching product

catalogs.

Neither system built requisitions using data

related to selected matching items and their

associated sources.

Neither system generated purchase orders from the

requisitions that used selected matching items and

their associated sources.

Neither system had the ability to determine

whether a selected matching item was available in the

inventory of the catalog vendor from whom the buyer

wanted to purchase.

Neither system had the capability to convert data

relating to a selected matching item from one source

to a comparable or equivalent selected matching item

HILLIARD - DIRECT                2716

1   and a different source since the TV/2 system had no

2   sources at all, and the only source in the RIMS system

3   was Fisher itself.

4   Q   Now, you mentioned these modifications that were

5   made during the electronic sourcing system project.

6   What modifications do you understand had to be made to

7   the prior RIMS system as it existed prior to the work

8   on this electronic sourcing system project to render

9   it useful and to have the functionality required by

10  the electronic sourcing system of the patent?

11  A   Well, I've relied on the deposition testimony of

12  the inventors who were involved in the project.   And

13  the description that they gave of what had to be done

14  I wouldn't even call modifications.

15      They, essentially, tore the RIMS system limb from

16  limb and reused some code, but, essentially, it was a

17  whole new development.   They had to develop -- since

18  the RIMS system was a seller oriented system --

19          MR. McDONALD:   I object.   I think we're very

20  vague here as to the timing of whether any of these

21  changes even relate to the claims in the case.   I

22  think it's irrelevant.

23          MS. ALBERT:   I think my question specifically

24  said the RIMS system as it existed prior to the

25  inventors' work on the electronic sourcing system of

HILLIARD - DIRECT                  2717

1   the patented inventions, and I tied it to the

2   modifications that had to be made in order to meet the

3   requirements of the patent claims.

4        MR. McDONALD:  He's talking about changing

5   code, and I don't know what time his answer related

6   to.  I couldn't tell whether he said the code was

7   changing.  So I think maybe it's the answer I'm

8   objecting to more than the question.

9        THE COURT:  The question is specific as to

10  time.  It started with the process and it existed

11  before the combining process occurred in the project

12  of IBM.  Is that what your timing was?

13       MS. ALBERT:  That's what my timing was.

14       THE COURT:  Is that what you're answer is?

15       THE WITNESS:  I believe --

16       THE COURT:  It was when the project started

17  and they made a lot of modifications to it.  Is that

18  what you're saying?  In fact, you said it wasn't even

19  modifications.  They took what was there at that time

20  and tore it limb from limb or something like that.

21       THE WITNESS:  Well, it's what I would

22  characterize tearing it limb from limb, Your Honor.

23       THE COURT:  What?

24       THE WITNESS:  I would characterize it as

25  tearing it limb from limb.  It's virtually a new

HILLIARD - DIRECT                    2718

1  product development rather than a modification in my

2  view, Your Honor, and I can explain why.

3          THE COURT:  But "it's" in that sentence means

4  what came out of the project?

5          THE WITNESS:  That's correct.

6  BY MS. ALBERT:

7  Q   So what modifications had to be made to the RIMS

8  system as it is existed prior to that project in order

9  to come up with the electronic sourcing system of the

10 patented inventions?

11 A   There are a raft of them.  First of all, the RIMS

12 system, because it was a seller's system, was oriented

13 toward use by the Fisher CSR.  They had to put on a

14 user interface that was oriented to a customer's use

15 because the system that they were trying to build was

16 an electronic sourcing system for use by a buyer.  So

17 it's a whole new user interface.

18     Secondly, they had to do an interface to the

19 search engine.  They choose TV/2.  And that was a very

20 significant interface.

21     They had to change the database.  They had to make

22 a wholesale change in the database because previously

23 the database was a database of items.

24          MR. McDONALD:  Your Honor, I don't know what

25 he's talking about here because a type of database

HILLIARD - DIRECT                    2719

1   isn't specified in any of the claims.  For the witness

2   to be talking about changes in the database type is

3   not related to the patented invention, which is what

4   the question was about.

5            MS. ALBERT:  Well, I think if you would have

6   allowed Mr. Hilliard to continue, he would have tied

7   it to the claim limitations, the changes in the

8   database.

9   BY MS. ALBERT:

10  Q   Were they specific changes made in the databases

11  of the RIMS system as it existed prior to the

12  inventors' work on the electronic sourcing system

13  project that are specifically tied to some of the

14  claim limitations at issue here?

15  A   Yes.

16  Q   What changes were those?

17  A   The RIMS system was oriented for keeping inventory

18  of Fisher inventory and customer-owned inventory.  The

19  database that was required for the electronic sourcing

20  system was a catalog database of multiple catalogs

21  with the items in the multiple catalogs associated

22  with multiple vendors.  So that, according to the

23  inventors, was a major change to the database.  A

24  wholesale change to the database.  And it was done

25  specifically to satisfy the need to access multiple

1   catalogs associated with items associated with

2   vendors.

3   Q    Do you know if there are any changes made to the

4   requisitions databases of the RIMS system as it

5   existed prior to the electronic sourcing system

6   project in order to accommodate the need to have

7   requisitions having line items with associated source

8   information?

9   A    Yes, absolutely.  The inventors say, and it's

10  clear from just the difference in functionality, that

11  they had to interface to the TV/2 system to get the

12  items that the TV/2 system found as a result of the

13  search, the matching items, and then to put them into

14  a requisition where previously the requisition was for

15  only one source, now the requisition had to be for

16  multiple sources because the search algorithm

17  searching the catalogs was going to turn up items from

18  multiple sources.

19       So they had to do that interface and then change

20  the requisition to have multiple sources.  They then

21  had to change the system or add the capability of

22  generating multiple purchase orders from the

23  requisition, and they had -- which wasn't in there

24  before.  They had to add the conversion capability to

25  be able to convert the items from one vendor to

1  comparable items from another vendor.  And they had to

2  add the inventory checking to check the vendor's

3  inventory for the inventory of the items that were the

4  result of the selected catalog searches being catalogs

5  of third-party vendors.

6      So with all of those modifications and additions,

7  according to the inventors, they were able to reuse

8  some of the existing RIMS code, but a change of that

9  magnitude, any computer professional will tell you

10 that that's a rewrite.

11 Q   Now, were any changes necessary to the TV/2

12 program as it existed prior to IBM's work on the

13 Fisher-Scientific project in order to render it

14 capable of performing the functions required for the

15 electronic sourcing system of the claimed inventions?

16 A   Yes, according to the deposition testimony of

17 Mr. Gounaris and Ms. Eng, IBM took over a year and

18 devoted at least ten people to a project to do

19 modifications that included interfacing two ways to

20 the sourcing system.  To receive information from the

21 sourcing system and to after doing the search to be

22 able to feed back the information to the sourcing

23 system, they had to change the search algorithms so it

24 could search sections of the database.

25     Let me give you an example.  If, for insurance,

1    the vendor was Radio Shack and you were looking for an

2    FM radio.  The way the TV/2 system worked, it would

3    turn up all references to Radio Shack because the term

4    "radio" appears as part of the vendor name.  So they

5    had to be able to do the tagging so that they could

6    search just the product descriptions and find radio

7    there rather than finding all instances of radio in

8    the electronic catalog.

9        And then they had to create the order list that

10   would then be fed back to the sourcing system, the

11   electronic sourcing team.

12   Q    Do you have some slides that illustrate your

13   opinions with respect to each specific claim as they

14   relate to Lawson's contentions concerning the RIMS and

15   TV/2 systems?

16   A    Yes, I do.

17            MS. ALBERT:  Could we have slide 1 in slide

18   deck 256, please?

19   Q    Now, do you have an opinion, Mr. Hilliard, as to

20   whether or not the RIMS system as described in the

21   '989 patent anticipates Claim Three of the '683

22   patent?

23   A    Yes, it does not.

24   Q    Why not?

25   A    It fails the basic description of Claim Three of

1   being an electronic sourcing system as we've

2   discussed.  It's for use by a seller, not by a buyer,

3   for example.  And then every single element of that

4   claim it fails.  It doesn't have two product catalogs.

5   It has no means of searching the product catalogs it

6   doesn't have.  It has no means of -- pardon me.  It

7   has no means of selecting from the product catalogs it

8   doesn't have.

9       It has no means of searching from the product

10  catalogs it couldn't select.  It has no means of

11  building a requisition coming from the selected

12  catalogs -- from the search of the selected catalogs

13  because it can't select catalogs and search them.

14      It has no means for processing the requisition to

15  generate one or more purchase orders for the selected

16  matching items.  It couldn't generate multiple

17  purchase orders.  And it had no means of converting an

18  item from one vendor to items from another vendor

19  because it only referred to the one vendor, that being

20  Fisher.

21  Q   Do you have an opinion as to whether or not the

22  combination of the RIMS system as described in the

23  '989 patent in combination with the TV/2 program

24  renders Claim Three obvious?

25  A   Yes, I do.

1    Q    What is your opinion?

2    A    It doesn't.

3    Q    Why not?

4    A    Basically, TV/2 doesn't bring anything to the

5    table as described in the brochures and RIMS as

6    described in the '989.  As we saw, in order to produce

7    an electronic sourcing system, you had to take the

8    RIMS as described in the '989 patent and tear it limb

9    from limb, virtually rewrite it.  And then TV/2

10   doesn't -- so if you took RIMS as it was and just

11   added TV/2 to it, it really doesn't bring anything to

12   the party.  Neither one is an electronic sourcing

13   system.

14       Neither one has two product catalogs.  Neither one

15   has a means of selecting from the two product

16   catalogs.  Neither one has a means of searching for

17   selected matching items among the selected product

18   catalogs, and so on.

19       I'm repeating myself, but basically the addition

20   of TV/2 to the RIMS system as described in the '989

21   patent brings nothing new to the table.  The addition

22   is no better than the RIMS system alone.

23   Q    Let's turn to your opinions with respect to claim

24   26 of the '683 patent.  Can we have slide 2?

25       Do you have an opinion as to whether or not the

HILLIARD - DIRECT                    2725

1   RIMS system as described in the '989 patent

2   anticipates that claim?

3   A    It doesn't.

4   Q    Why not?

5   A    Let's look at the RIMS system as described in the

6   '989 patent first.  It didn't have two product

7   catalogs, so there was no means of maintaining two

8   product catalogs.  Because there weren't multiple

9   product catalogs, you couldn't select product catalogs

10  to search.  There's no search for matching items.

11  There's no building of a requisition from the items

12  found as a result of searching the selected catalogs

13  because there's no searching, and there's no selected

14  catalogs.

15      And there's no processing of the requisition to

16  generate one or more purchase orders for the selected

17  matching items because the RIMS system as described in

18  the '989 patent couldn't do multiple purchase orders

19  to multiple vendors.  And there's no way -- there's no

20  capability in the RIMS system, that's something that

21  had to be added to the RIMS system as described in the

22  '989 patent, to give it the ability to search the

23  inventory of the items found as a result of the search

24  of the matching items in the catalog because, of the

25  selected catalog, because there aren't selected

1    catalogs to search.

2        So it fails on all of the elements of the Claim 26

3    method claim.

4    Q   Do you have an opinion as to whether or not the

5    combination of the RIMS and TV/2 systems would have

6    rendered Claim 26 obvious?

7    A   Yes.  It doesn't.

8    Q   Why not?

9    A   Once again, TV/2 doesn't bring anything to the

10   table when what we're talking about is bringing it to

11   the RIMS system as described in the '989 patent.  The

12   search capability, it can't search matching items from

13   selected catalogs because there are no catalogs and no

14   selected catalogs.  There certainly aren't multiple

15   catalogs to select from.

16       So just having the search and viewing capability

17   that's inherent or claimed to be inherent in TV/2

18   doesn't add anything to the capability of a

19   combination to meet any of the elements in this claim.

20   Q   Let's turn to Claim 28 of the '683 patent.  Now,

21   this claim, the first five elements are the same as

22   the first five elements of Claim 26; is that right?

23   A   That's correct.

24   Q   So let's focus on converting data relating to a

25   selected matching item and an associated source to

1   data relating to an item in a different source.  Let

2   me step back.

3       Is your opinion with respect to the first five

4   elements of Claim 28, would that be the same as your

5   opinion with respect to the first five elements of

6   Claim 26 with respect to whether or not the RIMS

7   system as described in the '989 patent would

8   anticipate those claim requirements?

9   A   Yes.

10  Q   What's your opinion?

11  A   My opinion is the same.  Those first five

12  elements, the RIMS system as described in the '989,

13  doesn't meet any of those first five elements.

14  Q   So turning to the last element of that claim, does

15  the RIMS system as described in the '989 patent

16  satisfy that claim element?

17  A   The keywords are different source.  There is no

18  different source in the RIMS system.  There's only one

19  source that the customer can buy from, and that's

20  Fisher.  So it fails to meet that element as well.

21  Q   What about the combination of RIMS and TV/2?  Does

22  that combination render Claim 28 obvious?

23  A   No.  TV/2 doesn't add anything to any of the

24  elements.

25  Q   Let's turn to Claim 29 of the '683 patent.  Are

1  the first six elements of Claim 29 the same as the

2  elements of Claim 28?

3  A   Yes.  And the last element is the same as the last

4  element in Claim 26.  29 is basically a combination of

5  26 and 28.  So it doesn't meet 26, it doesn't meet 28,

6  and it doesn't meet 29.

7  Q   What about the combination of the RIMS and TV/2

8  systems?  Would that combination have rendered Claim

9  29 obvious?

10 A   No.

11 Q   Let's turn to the claims of the '516 patent.  Do

12 you have an opinion as to whether or not the RIMS

13 system as described in the '989 patent anticipates

14 Claim One of the '516 patent?

15 A   It does not.

16 Q   Why not?

17 A   Well, first of all, the RIMS system is not an

18 electronic sourcing system, as I've said before.  It's

19 a seller's system, not a buyer's system, among other

20 things.  There's no collection of catalogs in the RIMS

21 system.  There's no predetermined criteria associated

22 with the selection of catalogs since there's no

23 selection of catalogs.

24     There's no second criteria in the RIMS system for

25 items.  The RIMS system allows just a parts lookup

1  by -- not even -- a part lookup by part number.  It's

2  not a search based on a criteria.  There's no catalog

3  selection protocol by this description or any other

4  because there aren't catalogs to select from.  And

5  there's no search program relying on the selection

6  criteria because it doesn't have the ability to have

7  those selection criteria for searching, and there's no

8  search algorithm.

9  Q   What about the combination of the RIMS and TV/2

10 systems, would that combination render Claim One

11 obvious?

12 A   No.  TV/2 fails all the same elements.  It has

13 no -- it's not a sourcing system.  There's no

14 collection of catalogs.  There are no criteria built

15 into it.  There's no catalog selection protocol.  It

16 does have a search program, but the search program as

17 the TV/2 system is described in these two brochures

18 doesn't do this search relying on a second set of

19 criteria to select specific items from a catalog

20 selection using a catalog selection protocol it

21 doesn't have.

22 Q   Let's turn to Claim Two of the '516 patent.  And

23 all the elements are the same in Claim Two as Claim

24 One with the exception of the last element; is that

25 correct?

HILLIARD - DIRECT                    2730

1   A    That's correct.

2   Q    And so would your opinion with regard to those

3   first six elements of Claim Two be the same for Claim

4   Two as for Claim One with respect to whether or not

5   the RIMS system as described in the '989 patent

6   anticipates those claim requirements?

7   A    Yes.  My opinion with regard to those elements is

8   the same.

9   Q    What about with respect to this last element,

10  catalogs comprising said collection of catalogs are

11  stored in separate databases, does the RIMS system as

12  describe in the '989 patent satisfy that claim

13  requirement?

14  A    No, the RIMS system doesn't have multiple

15  catalogs.  So regardless of how many databases it has,

16  it doesn't store separate catalogs in separate

17  databases.

18  Q    What about the combination of RIMS and TV/2, would

19  that combination render the claim obvious?

20  A    It wouldn't in the case of the first six elements

21  for the same reason as for Claim One, and there are no

22  catalogs or separate databases in the TV/2 system

23  either.

24  Q    Now, let's refer to Claim Six of the '516 patent.

25  The first six elements of Claim Six are the same as

1   the elements of Claim One; is that correct?

2   A    Yes.

3   Q    So would your opinion with regard to those

4   elements be the same for Claim Six as it was for Claim

5   One with respect to the issue of whether or not the

6   RIMS system as described in the '989 patent satisfies

7   those claim requirements?

8   A    Yes.

9   Q    And what is your opinion?

10   A    It doesn't.

11   Q    Then with regard to the last element of Claim Six,

12   said second set of predetermined criteria include at

13   least one of a catalog number and item textual

14   information.  Does the RIMS system as described in the

15   '989 patent satisfy that requirement?

16   A    There's no catalog number and there's no -- it has

17   textual information, but it can't use that textual

18   information as criteria.  So no, it doesn't.  It

19   doesn't satisfy that element either.

20   Q    Would the combination of the RIMS and TV/2 systems

21   rendered Claim Six obvious?

22   A    No, once again, TV/2 brings nothing to the party

23   here.  It doesn't add anything to the failure of the

24   RIMS system to meet the elements.

25   Q    Let's turn to Claim 9 of the '516 patent.  In your

1   opinion, does the RIMS system as described in the '989

2   patent satisfy all of the requirements of Claim 9?

3   A    No.

4   Q    Why not?

5   A    It's not an electronic sourcing system because,

6   among other things, it's used by the seller, not the

7   buyer.  There's no collection of catalog items where

8   catalog items have to be associated with vendors

9   stored in electronic format.  So there's not an

10  identifiable -- an identification code associated with

11  an item in the first catalog since there's no first

12  catalog.  And there's no identification code for an

13  item in the second catalog for the same reason.

14       There's only one vendor, so there's no ability to

15  select an identification code of the first and second

16  catalogs because there aren't first and second

17  catalogs where one provides the other or one leads to

18  the other.  It doesn't do that.

19  Q    Does the combination of the RIMS and TV/2 system

20  render Claim 9 obvious?

21  A    No, TV/2 doesn't add anything here either.  The

22  search and display capability of TV/2 as described in

23  the two publications doesn't relate to any of these

24  elements.

25  Q    Can you turn to Claim 21 of the '516 patent?

1      In your opinion, does the RIMS system as described

2   in the '989 patent satisfy all the requirements of

3   Claim 21?

4   A    No.

5   Q    Why not?

6   A    Well, as we've discussed or as I've pointed out,

7   it's not an electronic sourcing system.  It does have

8   a requisition module, which includes data fields.  And

9   user generated -- if the user generated criteria is a

10  part number, and only if the user generated criteria

11  is a part number, then it could satisfy the second

12  item here, which is actually the first limitation, the

13  first element, because electronic sourcing system is

14  sort of the caption for the whole thing.

15     So I've given that the benefit of the doubt since

16  the criteria conceivably could be a part number.  But

17  there's no catalog collection searching module.

18  There's no catalog selection criteria to select less

19  than the entire collection of catalogs because there's

20  no collection of catalogs.  There's no multiple

21  purchase order generation.  There's no equivalent

22  items from one catalog to another catalog.

23     There's no general equivalency from one catalog to

24  another because there aren't multiple catalogs.  And

25  there's no determination of a cross-reference table

HILLIARD - DIRECT                    2734

1    that would provide an equivalency of an item in one

2    catalog to a second identification code in a second

3    located item in the other.  It fails that one as well.

4    Q   For purposes of your anticipation analysis, would

5    you have to find that the RIMS system satisfied each

6    and every one of the claim requirements in order to

7    find that claim anticipated by that prior art system?

8    A   That's my understanding.  If any one element of a

9    claim is missing, then there's no -- then the system

10   that's claimed to anticipate it doesn't.  In order to

11   anticipate a claim, a prior art system must anticipate

12   every element of the claim.

13      So the fact that in this case the RIMS system

14   arguably if you called the product number a user

15   generated criteria satisfies one element of the claim,

16   even with that the RIMS system doesn't satisfy all the

17   elements of the claim, and, therefore, the RIMS system

18   doesn't anticipate the claim.

19   Q   For purposes of your opinions with respect to

20   obviousness, would you have had to find that the

21   combination of the RIMS and TV/2 system satisfied each

22   and every requirement of the claim in order to render

23   an opinion that that claim was obvious based upon that

24   combination?

25   A   Yes.  The RIMS system as described in the '989

HILLIARD - DIRECT                2735

1  patent and the TV/2 system as described in the two

2  brochures, assuming those brochures are accurate,

3  which is also something we don't know.

4  Q    What is your opinion with respect to whether or

5  not the combination of the RIMS system as described in

6  the '989 patent and the TV/2 system as described in

7  the two brochures renders Claim 21 obvious?

8  A    Instead of anticipating every element of that

9  claim, it at most anticipates one element.  And since

10 that's all that it arguably anticipates, even in the

11 combination, the combination doesn't anticipate the

12 claim.

13 Q    Let's look at Claim 22, if we could.  And that

14 claim has all of the same elements as Claim 21 but

15 adds an additional element at the end, said

16 determination system includes an identical

17 identification code for each of said located items.

18 Does the RIMS system as described in the '989 patent

19 satisfy that claim requirement?

20 A    Well, since there's no determination system from

21 the prior element, as I've discussed, then there's no

22 -- the determination system can't include something.

23 So, no, it doesn't satisfy that final element either.

24 Q    So what is your opinion with respect to whether or

25 not the RIMS system anticipates Claim 22?

1  A    It doesn't.

2  Q    Would the addition of TV/2 to the RIMS system cure

3  the deficiencies of the RIMS systems with respect to

4  Claim 22?

5  A    No.  TV/2 as described in the two brochures, even

6  if it performs as described there, adds nothing.

7  Q    So what is your opinion as to whether or not the

8  combination of RIMS and TV/2 renders Claim 22 obvious?

9  A    It does not.

10  Q    Let's turn, if we could, to Claim 29.  Do you have

11  an opinion as to whether or not the RIMS system as

12  described in the '989 patent fully satisfies all of

13  the requirements of Claim 29?

14  A    It doesn't.  I have an opinion and it doesn't.

15  Q    Why not?

16  A    It doesn't satisfy any of the elements of Claim

17  29.  RIMS is not an electronic sourcing system.

18  There's no collection of catalogs.  There's no

19  predetermined criteria associated with the collection

20  of catalogs.  There's no second set of predetermined

21  criteria associated with the items in the catalogs

22  because there aren't catalogs.  There's no catalog

23  selection protocol in this description or any other.

24  And then there's no search program relying on the

25  criteria because there aren't the criteria in the

1    cross-reference table.  Since there's only one vendor,

2    there's no cross reference that provides the ability

3    to link a vendor catalog item with another catalog

4    item from a different vendor or different

5    predetermined third party.

6    Q    Would the addition of TV/2 to the RIMS system cure

7    the deficiencies of the RIMS system with respect to

8    Claim 29?

9    A    No.

10   Q    And so do you have an opinion as to whether or not

11   the combination of the RIMS and TV/2 systems renders

12   Claim 29 obvious?

13   A    It doesn't.

14   Q    Let's look now at the final claim, Claim One of

15   the '172 patent.  With reference to the '172 patent,

16   in your opinion, does the RIMS system satisfy all of

17   the requirements of Claim One of the '172 patent?

18   A    No, it doesn't satisfy any of them.

19   Q    Why not?

20   A    It's not an electronic sourcing system.  Now, this

21   is the claim that doesn't refer to catalogs.  It just

22   refers to a database.  But the database in the RIMS

23   system is not a database containing items associated

24   with at least two vendors because the RIMS system only

25   has one vendor and that's Fisher.  It doesn't have a

1  search capability of any sort because it only has the

2  parts number lookup.

3       It doesn't have a means of entering product

4  information that at least partially describes one

5  desired item.  All that can be entered is a product

6  number, and a product number doesn't describe an item.

7       It doesn't have a means for searching for matching

8  items that match the entered product information.

9  There's no means for searching whatsoever.

10       It doesn't have a means for generating an order

11  list that includes at least one matching item.

12  Selected by said means of searching, there's no said

13  means of searching.

14       There's no means of building a requisition that

15  uses the data obtained from the database related to

16  the selection of selected matching items on the order

17  list for all the reasons above.  And there's no means

18  for processing the requisition to generate purchase

19  orders for the matching items.

20       So it fails all the criteria.  There are no

21  matching items.  So even if it were to generate

22  purchase orders, which it doesn't, it wouldn't do it

23  in this case.

24  Q   Does the combination of RIMS and TV/2 render Claim

25  One of the '172 patent obvious?

1    A    In order to render Claim One of the '172 patent

2    obvious, it would have to satisfy all of the elements

3    of the '172, Claim One.  And because there are no

4    catalogs in this case, conceivably in this case TV/2

5    does bring something to the party.  It does bring the

6    ability to support portions of the database

7    separately.

8        It does bring a means for entering product

9    information that partially describes an item.  You can

10   put a description in, and it can search on the

11   description.

12       And it does provides a means for searching for

13   matching items that match the product information.  So

14   it does in fact, the combination, satisfy three of the

15   elements, but it doesn't bring anything to the

16   combination with regard to satisfying the other

17   elements.

18       So in order for the combination to anticipate the

19   claim, we'd have to have a checkmark on every single

20   one of these, not just three of them, which we don't.

21   Q    Mr. Hilliard, did you also consider other evidence

22   that would show that the patented inventions were

23   innovative?

24   A    Yes.

25   Q    What other evidence did you consider in forming

HILLIARD - DIRECT                    2740

1  your opinions?

2  A   Well, I considered the fact that it was considered

3  to be an innovative invention by the industry.   There

4  was an industry research and evaluation group known as

5  the Aberdeen Group that ranked it very high.   And then

6  the Internet and Electronic Commerce Conference, which

7  is an industry organization that provides awards, gave

8  it an award shortly after it was developed as a

9  Supplylink or Cornerstone product, that it was above

10 the capabilities of comparable -- of other systems

11 that attempt to do the same thing.   And also it's been

12 licensed by other vendors.

13    So all of those put together are really sort of

14 additional indications that it's an innovative

15 invention.

16         MS. ALBERT:   Thank you, Mr. Hilliard.   I have

17 no furthest questions.

18         THE COURT:   I think Mr. McDonald may have

19 more than five mints or so.   So I think it will be a

20 good time to take the afternoon recess.

21         Just take your books with you if you would,

22 please.

23         (The jury is exiting the courtroom.)

24         THE COURT:   How long do you think you're

25 going to take?

1          MR. McDONALD:  About an hour, Your Honor.

2          THE COURT:  And your redirect will be very

3   brief?

4          MS. ALBERT:  Yes, Your Honor.

5          THE COURT:  All right.  We'll take a

6   20-minutes recess.

7          Excuse me.  I have been gifted with a

8   temporary restraining order application, and in order

9   that I can tell those people when I can hear them, I

10  need to understand a little bit about how long you

11  think we'll take tomorrow with the arguments.

12         I'm going to give you first priority.  I

13  think I may give them first priority if they are not

14  going to be very long, but I thought I'd find out from

15  you-all first since you have been here longest.

16         What is your estimate of the arguments on the

17  motions for JMOL?

18         MR. McDONALD:  Can you give us a moment to

19  talk amongst ourselves, so to speak, and I could talk

20  with Mr. Robertson, so we can figure that out?

21         MR. ROBERTSON:  I didn't hear the last

22  question you asked?

23         THE COURT:  The length of the arguments on

24  the JMOL.  Does anybody really think I can grant a

25  JMOL in this case?

1          MR. ROBERTSON:  Hope springs eternal, Your

2    Honor.

3          THE COURT:  I know it springs eternal, but

4    sometimes reality has got to grab a hold of the back

5    of your neck and shake it.

6          MR. ROBERTSON:  Let me just suggest, Your

7    Honor, I think there are some issues that have now

8    fallen by the wayside.

9          THE COURT:  Yes, I think there are.  There's

10   no question about it.

11         MR. ROBERTSON:  I think it can be granted in

12   part and denied in part.  And we think we can make

13   some headway.  My suggestion would be, we each have

14   two, it would be 45 minutes each.  So that's an hour

15   and a half total.

16         MR. McDONALD:  I don't think it should be

17   more than that.  It may be a little less that that,

18   that part of it.

19         Jury instructions, I guess, an hour and a

20   half.

21         THE COURT:  Have you all looked at the jury

22   instructions?

23         MR. ROBERTSON:  Yes, we have, Your Honor.

24         THE COURT:  Are we far off the mark?

25         MR. McDONALD:  I think we maybe can count on

1  one hand the number of issues we might have to

2  resolve.  Five.

3           THE COURT:  Depending on the number of

4  fingers.

5           MR. McDONALD:  Five.  I'll be specific.

6           MR. ROBERTSON:  I think we're down to five or

7  so.

8           THE COURT:  All right.  I'll decide how to

9  approach then.  You-all probably wouldn't object to a

10 little sleeping in time tomorrow, would you?

11          MR. ROBERTSON:  Not at all, Your Honor.

12          THE COURT:  All right.  Thank you.

13          (Recess taken.)

14

15

16

17

18

19

20

21

22

23

24

25