```
 1              THE COURT:  All right, folks, Ms. Marsh, the juror
 2   who sits about four in there was sick last night.  She came in
 3   and tried to give it a go.  She's sick now.  She wants to go
 4   home, and we have two choices; stop and see what happens or
 5   excuse her.  My vote is to excuse her.  Do you know the one I'm
 6   talking about?  The lady in the front row, has sort of short
 7   hair, and -- I think.
 8              MR. McDONALD:  Dark hair.
 9              THE COURT:  Yeah, short and dark.
10              MR. MERRITT:  This lady at the far end?
11              THE CLERK:  Like three or four in.
12              THE COURT:  She's number -- you don't have all day.
13   This woman is sick.  She's number 37.
14              MR. ROBERTSON:  Your Honor, the plaintiff agrees with
15   the Court.
16              THE COURT:  Okay.  That will bring the jury to eight.
17   We've got nine.  That's why I got nine.  There are no
18   alternates in the civil system.
19              MR. McDONALD:  We would agree, Your Honor.  She can
20   be excused.
21              THE COURT:  Would you tell her to go with our
22   gratitude, and I will call her and thank her personally.  She
23   doesn't need to come in here.  She needs to go on home.  Bring
24   the rest in and pray that it hasn't spread.
25              I don't know that we ever got the spelling of your
```

1    last name.  It's H-i-l-l-i-a-r-d?

2              THE WITNESS:  That's correct.  I hope my testimony

3    didn't worsen her illness, Your Honor.

4              THE COURT:  Well, all I can say, sir, is if it

5    worsened it, it was really because of the apprehension because

6    she knew you were coming because she got sick last night.  So I

7    don't think you had anything to do with it.

8

9                          (Jury in.)

10

11             THE COURT:  All right.  Mr. McDonald, when you're

12   ready.

13             MR. McDONALD:  Thank you, Your Honor.

14

15                       CROSS-EXAMINATION

16   BY MR. McDONALD:

17   Q    Good afternoon, Mr. Hilliard.

18   A    Good afternoon.

19   Q    How much have you been paid to do your work in this case?

20   A    I'm billing this case at $450 an hour.

21   Q    How much money has that added up to for this case?

22             THE COURT:  So far you meant?

23   A    I honestly don't know, Mr. McDonald.  I haven't added it

24   up.

25   Q    Can you give me an estimate?

Hilliard - Cross

1    A    I believe I gave your associate an estimate during the

2    deposition, and I think I said I put in maybe a hundred hours

3    by that point in time, and I may have done another hundred by

4    now, but I really have not looked at it.  I can't give you a

5    good estimate.  I'm sorry.

6    Q    Do you send itemized bills for your time?

7    A    I do.

8    Q    So is your best estimate then for this case about

9    200 hours now?

10   A    That's the best I can do off the top of my head.

11   Q    That would be about $90,000; is that right?

12   A    About.

13   Q    How much did you get paid for your work on the SAP case?

14   A    That was probably a bit more because I attended the trial,

15   much of the trial, so I spent more time, and there were more

16   issues.  So that was probably a bit more.

17   Q    How much more?

18   A    There was five years ago, sir.  I can't really tell you.

19   Q    Was it over $100,000; is that fair?

20   A    I believe so, yes.

21   Q    And you have done some other work for ePlus relating to

22   these patents; right?

23   A    Yes, I have.

24   Q    How much more did you charge for that work?

25   A    Oh, probably another 30 or 50 hours.

Hilliard - Cross

1    Q    So that would be about another $25,000 or so?

2    A    Yes.  Over the course of five years.

3    Q    I'd like to go back to your background for a moment.  You

4    mentioned in the 1980s you had done some work in connection

5    with computer procurement system; is that right?

6    A    Yes.

7    Q    Can you tell us what type of work you did on procurement

8    systems in the 1980s?

9    A    Certainly.  During the 1980s, I formed my company,

10   Business Automation Associates in 1980, so during that period

11   of time, I had approximately a hundred, give or take, clients

12   where I helped them select either new or upgraded computer

13   systems for their business applications.

14       A large portion of those clients were either distribution

15   companies or manufacturers, but there were others as well, and

16   in nearly every case, the procurement activities, the

17   purchasing and procurement was a significant portion of the

18   requirements that they were looking for the systems to fulfill.

19       So I probably, over the course of that period of time,

20   looked at a hundred or more different computer systems and

21   evaluated the procurement functionality as well as other

22   functionality that was of interest to my clients.

23   Q    Did those systems have the capability of searching

24   databases for items?

25   A    They have the ability of searching databases for items.

Hilliard - Cross

1    Not in the way that's described in the patents-in-suit.

2    Q    You are adding a little more to my question.

3    A    I'm sorry.  I was intending to qualify that with a further

4    explanation.

5    Q    I'm just asking, did your work in the '80s on procurement

6    systems, that could search for items?

7    A    Many of the systems had the ability to search -- to enter

8    criteria and search for items that met those criteria, yeah.

9    Q    That was for the purpose of purchasing the products,

10   finding a product to purchase; correct?

11   A    No.  In most cases, that was for the development of a

12   sales order for selling their own products.  Most of them did

13   not have that capability in the procurement area for searching

14   for products to buy.  It was searching among their own database

15   of products that they sold.

16   Q    So did you, in the '80s, work on any systems that were

17   computerized systems to help one of your clients buy things?

18   A    Almost all of the systems had purchasing capability, but

19   they didn't have the ability to search for the items to buy.

20   Q    Did you work on any systems in the '80s that could search

21   for items to buy?

22   A    There may have been a few, but I don't recall off the top

23   of my head.

24   Q    Now, for purposes of your analysis for this case, you used

25   the perspective of one of ordinary skill as you described it

1    earlier; correct?

2    A    Yes.

3    Q    That would be someone with a computer science type of

4    degree and one or two years of experience; correct?

5    A    Yes.

6    Q    And so when you reviewed the documents in the case, did

7    you review them from that standpoint?

8    A    Yes.

9    Q    Can we turn to the TV/2 brochure, Defendant's Exhibit 107.

10   This is one of the documents you reviewed --

11              THE COURT:  Excuse me.  My machine is going crazy.

12   Does everybody else have a good machine?

13              THE CLERK:  Hit the screen one time and see --

14              THE COURT:  I'm going to hit it real hard in a

15   minute.

16              THE CLERK:  We had problems during the recess, but we

17   straightened them out.

18

19              (Discussion off the record.)

20

21              THE COURT:  As long the jury -- you are okay?  I'll

22   do without, and you go ahead, and --

23              THE CLERK:  Do you want me to get IT up here now?

24   Q    Do you see there the first page of that Technical Viewer/2

25   brochure?

1   A    Yes.

2   Q    If I understood your testimony today, you were saying that

3   the TV/2 system didn't have catalogs; is that right?

4   A    There were no catalogs delivered as part of the TV/2

5   system or promoted as being delivered as part of it.  That's my

6   understanding, yes.

7   Q    If we go to the second page of this brochure, see if we

8   can blow up that picture near the bottom of the page.  It's got

9   a picture of the TV/2 system on a computer here; is that your

10  understanding?

11  A    Yes.

12  Q    And there's a CD to the left of the computer in the

13  picture; is that right?

14  A    Yes.

15  Q    That's the CD that would have catalogs and technical

16  manuals and things like that; is that your understanding?

17  A    That's my understanding, that it's an exemplary CD that

18  could contain information that the TV/2 system could view and

19  search.

20  Q    So you would agree that one of ordinary skill in the art

21  would understand from reviewing these materials that the point

22  of the system, even though it might be sold without the

23  catalogs loaded on them, is you'd get a CD or catalog data on a

24  computer and load it into the system; right?

25  A    Well, this also shows that there is a computer there, and

1    the brochure clearly states that it doesn't come with a

2    computer, that there's a prerequisite that the buyer has to

3    have, so it's a piece of software.  It's not a CD or a

4    computer, it's a piece of software, and that certainly

5    indicates and it indicates in the brochure that it's used to

6    read data that can be input into it through a CD, yes.

7    Q    So you would agree that this brochure does teach or

8    suggest to that person with the computer science degree and a

9    couple of years of experience that you take that TV/2 software,

10   load it on a computer, and put a catalog on a CD into the

11   system?  That would at least be one way to use it; right?

12   A    It says that's one of the possibilities, yes.

13   Q    So your testimony about TV/2 not having catalogs, you are

14   just saying when you buy the system from IBM, it's not going to

15   come with your own personal catalogs that you would select to

16   load on; right?

17   A    That's what I'm saying, yes.

18   Q    Okay.  But you do understand that the materials regarding

19   the TV/2 system would teach or suggest to one of ordinary skill

20   in the art that they could use that system with one or two or

21   more CDs of catalogs depending on what their needs are; right?

22   A    This is an undated brochure, number one.  We don't know

23   when it was published.  Number two, it certainly indicates that

24   it has that capability, but we know that it didn't have the

25   capability of doing the catalogs that were necessary for the

1    electronic sourcing system because that was the subject of a

2    contract between IBM and Fisher to develop that.

3    Q    Well, please listen to my questions and just answer my

4    questions.  Your lawyer will have a chance to ask you some more

5    questions and clarify things if necessary, but I just want to

6    see if we at least agree on one thing which is that one of

7    ordinary skill, seeing these TV/2 materials, would understand

8    that the TV/2 system could be used with multiple electronic

9    catalogs?

10   A    It says in the brochure, whenever this brochure came out

11   in whatever version it refers to, that that's one of the

12   possibilities that it could be adapted to do, yes, and that's

13   my understanding.

14   Q    Did you use that understanding in your analysis?

15   A    Yes.

16   Q    You do agree that the TV/2 system is prior art to the

17   patents-in-suit?

18   A    What TV/2 system?

19           MS. ALBERT:  Calls for a legal conclusion.  I don't

20   know that he's competent to say what is prior art or not.

21           THE COURT:  You can ask him what he considered as

22   prior art.  Whether it is or isn't is a matter the jury will be

23   instructed on as a matter of law.

24           MR. McDONALD:  Can we go to Mr. Hilliard's slide

25   number four, please.

1    Q    This is one of the slides you prepared for your testimony;

2    right, Mr. Hilliard?

3    A    Yes.

4    Q    The heading on your slide is prior art system, TV/2;

5    right?

6    A    Yes.

7    Q    You considered the TV/2 system to be a prior art system;

8    right?

9    A    Well, I probably should have titled that claimed or

10   alleged prior art systems.  It was my understanding that it was

11   Lawson's contention that TV/2 was prior art, so I was dealing

12   with that.  I didn't put the full title.

13   Q    You haven't been shy about disagreeing with Lawson's

14   contentions where you thought that was appropriate, have you?

15   A    No, sir.

16   Q    So this slide, you created this slide, and you chose to

17   label it prior art systems TV/2 yourself; right?

18   A    I told you what I meant by that, but, yes.

19   Q    Let me just understand, though.  Are you disagreeing that

20   the system -- if we can be specific, the system as described in

21   the TV/2 brochure, Defendant's Exhibit 107, that describes as

22   prior art TV/2 system?

23            MS. ALBERT:  Asked and answered and calls for a legal

24   conclusion.

25            MR. McDONALD:  Clarify what he's taking about.

1        THE COURT:  Can you just ask him the question of

2   whether he considered this as prior art.  Whether it is or is

3   not is a matter that the jury will be instructed on.  They then

4   will determine it.  The issue is whether he considered it to be

5   prior art as of whatever time you are talking about.

6   Q    Mr. Hilliard, did you consider the TV/2 system as

7   described in the brochure, Defendant's Exhibit 107, to be prior

8   art?

9   A    Exhibit 107 has no date, so I can't -- I don't know

10  whether Exhibit 107 would be considered prior art or not from

11  that standpoint, and I don't know whether what's described in

12  the brochure -- in the general terms, it's described as what

13  TV/2 actually did or what the brochure was intending to portray

14  it could do.

15       Brochures, as one of -- from the point of view of one of

16  ordinary skill in the art, one knows that brochures often

17  describe not only existing capabilities but future capabilities

18  of products, so the combination of this being a marketing

19  product brief, is what I would call it, and not knowing its

20  date, I can't say.  I had to look at it and analyze whether if

21  it were prior art, whether it would anticipate the claims, but

22  I can't say what it is or isn't.

23  Q    For purposes of your analysis, you did not personally make

24  a conclusion one way or the other as to whether the system

25  described in the brochure, Defendant's Exhibit 107, was prior

1    art?  Yes or no?

2    A    Whether the system described in the brochure -- the

3    description is so vague and uncertain that I couldn't make that

4    determination.

5              THE COURT:  I think he said he assumed for the

6    purposes of his analysis that it was prior art because he had

7    to address that question, but he made no judgment whether, in

8    fact, it was.  Is that what you are saying?

9              THE WITNESS:  Yes, sir.  Yes, Your Honor.

10   Q    If we can turn to slide number two of Mr. Hilliard's

11   slides.  This is another slide you prepared; right, Mr.

12   Hilliard?

13   A    Yes.

14   Q    This one is entitled prior art systems RIMS; correct?

15   A    Yes.

16   Q    For purposes of your analysis, did you assume the RIMS

17   system, as depicted in the '989 RIMS patent, is prior art?

18   A    I assumed that the RIMS system as described in the '989

19   patent was of -- I don't know that I'm able to make the legal

20   judgment, but I assumed that it was available since it was

21   disclosed and referenced in the patents, that it was prior and

22   that it was as described in the '989.

23   Q    You understand also that one form that something can be

24   prior art is if it's on sale more than one year before the

25   filing date on the patent?

1   A    I understand that, yes.

2   Q    Did you do -- did you provide any testimony about whether

3   or not either the RIMS system or the TV/2 system was on sale

4   more than one year before the filing date on the

5   patents-in-suit?

6   A    I found -- I looked for evidence of it having been on sale

7   one year before, or even one day before, and I found no

8   evidence that either system had ever been sold and delivered

9   prior to the date of the patent.

10  Q    So you don't have personal knowledge, though, as to

11  whether or not those RIMS systems or TV/2 systems were on sale

12  back in the early '90s; correct?

13  A    Well, let me address them one at a time.  With regard to

14  the RIMS system, my understanding is that it was not on sale,

15  that it was a tool --

16  Q    Please understand my question.  I'm asking your own

17  personal knowledge.  Were you there, in other words.  You

18  weren't there at the time back in that '92/'93 period where,

19  from a first person standpoint, you could tell us one way or

20  the other whether the RIMS system was on sale; right?

21          MS. ALBERT:  Your Honor, vague and ambiguous as to

22  which RIMS system is being referenced here.  I think the record

23  evidence is that the system changed over time, and I don't know

24  that this question is tethered to any particular system or the

25  system described in the patent.

Hilliard - Cross                                                         2757

1          MR. McDONALD:  I tried to zero in on a time frame,

2    Your Honor, and I think the answer should eliminate the need to

3    go through any details about that.

4          THE COURT:  I'm not sure I quite understand what you

5    are saying in response, but I believe the objection is

6    well-taken to the form of the question.  So can you reformulate

7    it?

8    Q    Mr. Hilliard --

9          THE COURT:  By putting some time into it, I think was

10   the principal objection.

11   Q    So go to the time frame prior to August of '93, Mr.

12   Hilliard.

13   A    Yes, sir.

14   Q    Did you have any role in selling any version of the

15   Fishers RIMS systems?

16   A    No.

17   Q    Do you have any personal knowledge from a first person

18   standpoint of any sales activities involving any sort of RIMS

19   systems prior to August of '93?

20   A    No, I don't have any firsthand knowledge.

21   Q    Do you have any firsthand or personal knowledge about any

22   sales activities regarding the TV/2 system prior to August of

23   '93?

24   A    Well, are you asking was I involved in that or was I

25   involved in any transaction, where it was sold?

1    Q    Personal involvement in something.

2    A    No.

3    Q    Now, can we turn to Defendant's Exhibit 62, please.  Now,

4    as part of your work in this case, Mr. Hilliard, did you review

5    a trademark application by Fisher Scientific Company for the

6    Fisher RIMS trademark?

7    A    I may have.  I don't recall it specifically.

8    Q    Can we turn to the fifth page of this document, please.

9    Can you blow up the text in the main body of that?

10   A    I have seen this document.

11   Q    Now that you've seen more, it refreshes your memory?

12   A    Yes.

13   Q    So this is the file relating to Fisher Scientific's

14   application to get a federal trademark registration for the

15   Fisher RIMS trademark; correct?

16   A    I believe so, yes.

17   Q    You can see on the screen right now there's a date stamp

18   indicating this document here on the screen was filed

19   April 30th, 1993; correct?

20   A    Yes.

21   Q    And then there's a description of the services there.  Do

22   you see in the indented paragraph where it starts with the

23   words, computer-based services for processing requisitions,

24   entering purchase orders, maintaining inventory records,

25   transferring related reports and data to other computers, and

Hilliard - Cross                                                    2759

1   generating documents for picking, packing, shipping, and

2   receiving requisitioned and ordered products?  Do you see that

3   language?

4   A    Yes.

5   Q    Do you think that is a fair summary of what the RIMS

6   system did, as you understand it, back in the time frame before

7   April of '93?

8   A    That's a characterization of what it was purported to do,

9   although I don't know that -- the inventors' deposition

10  testimony would contradict -- in terms of what it actually did,

11  would contradict some of that.

12  Q    Can we scroll down on the page here, please.  Do you see

13  that bottom paragraph here where it indicates the service mark?

14  That's the Fisher RIMS mark; right, Mr. Hilliard?

15  A    Yes.

16  Q    Says was first used with respect to the services at least

17  as early as August 1992, and was first used with respect to the

18  services in interstate commerce at least as early as

19  August 1992, and is now in use in such commerce.  Do you see

20  that language?

21  A    Yes.

22  Q    You don't have any reason to dispute those statements, do

23  you?

24  A    No.

25              MR. ALBERT:  Objection.  Go ahead.

1  Q    You have an understanding that use in commerce, that would

2  be use trying to sell products using the trademark; correct?

3         MS. ALBERT:  Objection, Your Honor, relevance.

4  There's no way to tie DX-62 to any system described in the '989

5  patent.  We don't even know which specific version of the RIMS

6  system is referenced in this exhibit or if it's at all related

7  to the system described in the RIMS patent that's at issue.

8         MR. McDONALD:  I think I'm entitled to an answer to

9  the question, Your Honor, but I will be more specific about

10 what's in this file and which RIMS system it was.  I can't get

11 all the answers in one question.

12        THE COURT:  Overruled.

13 Q    So you don't have any reason to dispute that the Fisher

14 RIMS system was in commerce in August of 1992; right,

15 Mr. Hilliard?

16 A    I don't have any reason to dispute that there was a system

17 that went by that name that was as described in this statement.

18 Q    If we go to the next sentence here after the highlighting,

19 it says there, quote, the mark is used in literature and

20 presentation materials for the services and three specimens

21 showing the mark as actually used are presented herewith; do

22 you see that?

23 A    Yes.

24 Q    Do you recall seeing an actual specimen or example of that

25 mark in use in that trademark file history that you reviewed?

1    A    I believe so, yes.

2    Q    That was a brochure for the Fisher RIMS system; correct?

3    A    Yes, I recall seeing the brochure for the Fisher RIMS

4    system.

5    Q    Can we turn to, I think it's page 32 of this exhibit.  Is

6    that the cover page for that brochure, Mr. Hilliard?

7    A    Yes.

8    Q    Did you review this brochure as part of your work in this

9    case?

10   A    Yes.

11   Q    If we go to the second page of this, this is for the

12   Fisher RIMS system as you understand it; correct?

13            MS. ALBERT:  Your Honor, I object to the form.  The

14   question is untethered to any particular version of the RIMS

15   system or any particular time frame.

16            THE COURT:  I think considering the issue, it needs a

17   time limit.  Sustained.

18   Q    Your understanding is this was a brochure submitted to the

19   Patent and Trademark Office in connection with the trademark

20   application by April of 1993; correct?

21   A    That's my understanding, that this brochure was submitted,

22   yes.  That's my understanding.

23   Q    And you understand it was a document authored by Fisher

24   Scientific?

25   A    Yes, that's my understanding as well.

1  Q    All right.  So with respect to this brochure in existence

2  by April of 1993, go to the second page of this document.  Do

3  you see there some description of features of the Fisher RIMS

4  system?

5  A    Yes, I looked at the features that are listed there.

6  Q    If we look at the very first bullet point on the left

7  side, it says, consolidates all prior activity including

8  third-party and administrative purchases; do you see that?

9  A    Yes, I see that it says that, yes.

10  Q    What was your understanding of what that means when you

11  reviewed this?

12  A    I looked at this as a marketing brochure that described

13  intended potential functions for something called Fisher RIMS

14  which may or may not have performed some of the functions

15  described in the '989 patent.

16       So looking at it from the standpoint of one of ordinary

17  skill in the art, I would understand this to be a sales claim

18  that some system that may conform to some description -- to

19  some unspecified description will have or is intended to have

20  this capability at some point in time.  And it says

21  consolidates all supplier activity.  That could include just

22  reporting on that activity rather than having anything to do

23  with acquiring products in that activity.

24  Q    What is your understanding as to what the term third party

25  means in this bullet point?

1   A    Third party would be parties other than Fisher.

2   Q    Would those mean third parties that provide products?

3   A    Conceivably.

4   Q    That's what it means?  That's your understanding as to

5   what it means; right, Mr. Farber?

6   A    I understand that's what it's claiming that the -- some

7   RIMS system might be able to do, yes.

8   Q    And that's basically third-party sources; right?

9   A    Yes.

10  Q    If we go to the right side of this page of the brochure,

11  can you highlight the inventory control features?  Do you see

12  the third bullet point there, Mr. Hilliard?  Where it says,

13  cross-references your stock numbers and all supplier numbers,

14  do you see that?

15  A    Yes.

16  Q    Now, this is a brochure.  The intended audience for this

17  brochure would be a Fisher customer; correct?

18  A    That's my understanding, yes.

19  Q    So this would be the customer who buys products; right?

20  A    Yes.

21  Q    Is it your understanding that the Fisher RIMS system was

22  intended to benefit buyers of products?

23  A    No.

24  Q    Why would they have a brochure touting Fisher RIMS system

25  to people who buy products unless the Fisher RIMS was intended

1   to benefit people who buy products?

2   A    It was intended primarily to benefit Fisher because it was

3   a Fisher system.  If you look in the '989 patent, for example,

4   and this doesn't necessarily -- what's described here doesn't

5   necessarily conform to the '989 patent according to the

6   inventors, but if you look at the '989 patent, there is a

7   section on cross-referencing, and it basically says that the

8   purpose of cross-referencing is to supply customers with Fisher

9   products even though they might give the customer service rep a

10  competing product, a competing vendor's product.

11  Q    Let's stick with this brochure, Mr. Hilliard, all right?

12  Would you agree that one of ordinary skill reading this

13  brochure in this particular bullet point would understand that

14  this means that this Fisher RIMS system could cross-reference

15  the customer's stock numbers with all of that customer's

16  supplier numbers?

17  A    I would understand that it means that the system was

18  claimed at some point to have that capability at some point in

19  time, yes.

20  Q    So would you agree, at least in part, that the RIMS

21  system, as described in this April 1993 brochure, at least in

22  part is a buyer's system?

23          MS. ALBERT:  Object to the form of the question to

24  the characterization of the brochure as being April 1993 since

25  the brochure is undated.

1          MR. McDONALD:  I think I've already shown it, Your

2    Honor, from the document dated April '93, and in the official

3    trademark file history it refers specifically to a specimen of

4    use, and this is the specimen of use.

5          THE COURT:  It doesn't -- it's not a dated specimen

6    of use.

7          MR. McDONALD:  But it was submitted to the Trademark

8    Office with the date stamp April 30, 1993, so we know it's no

9    later than that.

10          THE COURT:  Well, that's a different question.

11    Sustained.

12    Q    Would you agree with me, Mr. Hilliard, that the system

13    described in this brochure that's part of the RIMS trademark

14    application describes a system that, at least in part, is for

15    the benefit of buyers?

16    A    That's a different question -- you asked me before whether

17    I would agree it's a buyer's system, and I would not agree it's

18    a buyer's system.  It's a seller's system.  It did provide some

19    benefits to buyers of Fisher products, but it is not a buyer's

20    system which was the question that you asked me previously.

21    Q    Take them one question at a time.  And if we blow back up

22    to this page here, the entirety of this page two of the

23    brochure, aren't all of the features listed on this page

24    intended to communicate the benefit of the RIMS system to

25    somebody who buys products?

1   A    Yes.  They are intended to communicate potential benefits

2   to the buyer to allow Fisher to put this system into their

3   premise along with the Fisher customer sales rep to operate it.

4   Q    Isn't it true that the features of the Fisher RIMS system

5   were developed to provide Fisher Scientific's customers with

6   flexibility and customization for requisitions, purchasing, and

7   inventory control?

8   A    I wouldn't agree with that characterization, no.

9   Q    Can we turn to the next page of the brochure, please.  Can

10  you blow up that paragraph below the keyboard.

11      Do you see the sentence there in the brochure,

12  Mr. Hilliard where it says, the exclusive features of Fisher

13  RIMS were developed to provide Fisher Scientific's valued

14  customers with maximum flexibility and system customization for

15  requisitions, purchasing, and inventory control.  Do you see

16  that?

17  A    I see where it says that.  That's certainly a sales claim.

18  To me, that's like saying, I'm from the IRS, I'm here to help

19  you.

20  Q    This is a document from Fisher; right?

21  A    Yes.

22  Q    This is from the 1993 time frame; right?

23  A    Yes, and they certainly would like their customers to

24  believe that, I'm quite sure.

25  Q    Are you disputing what's in that statement?

Hilliard - Cross

1    A    Pardon?

2    Q    Are you disputing what's highlighted up on the screen

3    right now?

4    A    I'm not disputing that the RIMS system, some RIMS system

5    could provide some benefits to buyers, but that wasn't its

6    purpose.  I'm just -- and I'm -- the testimony of the inventors

7    certainly indicated to me that this was not the principal

8    reason why the features were developed.  The features were

9    developed so that Fisher could sell more of its products to its

10   customers rather than having its customers buy from

11   competitors.

12   Q    But would you agree that at least one purpose of the

13   system, as it existed in April of '93 as described in this

14   brochure, was to benefit customers?

15              MS. ALBERT:  Asked and answered, Your Honor.

16              THE COURT:  Sustained.

17   Q    Let's go -- isn't it true that Fisher told its customers

18   that the people in the customers's organization could enter

19   requisitions and purchase orders using -- using the Fisher RIMS

20   system, that the customer could, in fact, enter requisitions

21   and purchase orders?

22              MS. ALBERT:  Object to the form.  I don't know how he

23   could know what Fisher told its customers.

24              MR. McDONALD:  He's reviewed the documents in the

25   case.

Hilliard - Cross                                          2768

1                THE COURT:  You mean that document or what?

2                MR. McDONALD:  I was asking the question generally to

3    start with here.

4                THE COURT:  Objection sustained.

5                MR. McDONALD:  Can we go another five pages into the

6    brochure here.  Can we blow up the paragraph at the bottom of

7    the page.

8    Q    Do you see there, Mr. Hilliard, in the paragraph that

9    begins with the word, a Fisher customer service representative?

10   A    I see that.

11   Q    So it talks about a Fisher customer service

12   representative; right?

13   A    Yes.

14   Q    Then the next sentence after that, it says, your

15   requisition or purchase order can be entered remotely by the

16   people in your organization who will be using the product, or

17   your Fisher CSR can enter it directly into the Fisher RIMS PC.

18   Either way, you'll get complete reports on every transaction;

19   do you see that?

20   A    I see where it says that, but you've left out the

21   remainder of the first sentence.

22   Q    We can highlight that if you'd like, but as I understand

23   this, would you agree what's being described in this April '93

24   brochure is both the customer service representative and the

25   customer's own people can use the RIMS system?

1    A    I agree that it says that in the brochure, but according

2    to the inventors, it never worked that way, and certainly the

3    system described in the '989 patent doesn't work that way.

4    Q    Go to the next page of the brochure, please.  If you

5    highlight the column on the bottom left.

6         Now, in this section, it's referring to the color-coded

7    paths in the schematic diagram above; do you see that?

8    A    Yes, I see that, yes.

9    Q    And it says following that, you can get a sense of how

10   smoothly and efficiently Fisher RIMS handles purchases of

11   various types; do you see that?

12   A    Yes.

13   Q    It lists three types under that; correct?

14   A    Yes.

15   Q    One is Fisher products, one is third-party purchases

16   delivered from a Fisher warehouse, and the third is third-party

17   purchases delivered direct; do you see that?

18   A    Yes.

19   Q    Do you have any reason to dispute the accuracy of this

20   representation in this brochure that was provided to the

21   trademark office?

22   A    I don't know what system this refers to in that there's no

23   tying this brochure to the '989 patent specifically, at least

24   according to the inventors, but if you were to look at the '989

25   patent, the '989 patent describes all three of the these

Hilliard - Cross                                                    2770

1    options, and all three of these options in the '989 patent

2    result in a sale from Fisher to the customer, no direct sales

3    from a third-party vendor to the customer regardless of whether

4    its's delivered direct on a drop shipment or delivered from a

5    warehouse.

6         In all three of those instances as described in the '989

7    patent, the sale is from Fisher to the customer.  There is no

8    option in the '989 patent for a sale direct from a third party

9    to a customer.  So I don't dispute that they promoted this.  I

10   don't dispute that the description in the '989 patent covers

11   this, but this does not imply any vendor to the customer other

12   than Fisher.  And that's described right in the description of

13   the '989.

14   Q    Do you have an understanding that Fisher gets about

15   two-thirds of its products actually from other sources?

16   A    I don't know what percentage, but they don't

17   manufacture -- my understanding is they don't manufacture

18   necessarily all of the products that they warehouse and sell.

19   Q    So they act for some products as a middleman for other

20   sources; right?

21   A    By a middleman, you mean buy and resell?

22   Q    Yes.

23   A    Yes, they buy and resell.

24   Q    And sometimes they'll actually have the products delivered

25   directly from who they are buying from directly to the

1   customer; right?

2   A    Yes, but the ones they buy from bill them for the product,

3   and then they bill the customer.  So the sale goes from Fisher

4   to the customer.  There is no direct sale from the third party

5   to the customer.  There's only one vendor to the customer, and

6   that's Fisher.

7   Q    Can you put up the Court's definition of electronic

8   sourcing system, please.

9        You have that definition up on the screen now,

10  Mr. Hilliard?

11  A    Yes.

12  Q    Would you agree that the Fisher RIMS system described in

13  the brochure from April of '93 that we were just going through

14  is an electronic system for use by a prospective buyer to

15  locate and find items to purchase from sources, suppliers, or

16  vendors?

17  A    No.

18  Q    You don't agree that the brochure, if it's an accurate

19  description, if we can accept it as accurate, that it meets

20  that description, Mr. Hilliard?

21            MS. ALBERT:  Object to the form.  I think

22  Mr. Hilliard already testified that he does not accept it as

23  accurate.

24            THE COURT:  He's already answered the question.  He

25  said, no, he doesn't.

1          MR. McDONALD:  But I'd like him to at least tell me

2    whether or not he would agree that if the brochure is accurate,

3    that it meets the Court's definition of electronic sourcing

4    system.  I think I'm entitled to know that.

5          MS. ALBERT:  Same objection.

6          THE COURT:  He already answered that.  He said, no,

7    it doesn't.  Assuming it's accurate, he said, no, it doesn't.

8          THE WITNESS:  Even assuming it's accurate, no, it

9    doesn't.

10         THE COURT:  I think he said that.

11   Q    With the respect to the RIMS system as described now in

12   the '989 patent, Mr. Hilliard, I'd like to but the brochure

13   aside now and talk about the patent.

14   A    Okay.

15   Q    In your analysis, you took into account the Court's

16   definition of catalogs; correct?

17   A    Yes.

18   Q    And is it your opinion that there are no databases in the

19   RIMS system that meet the Court's definition of catalog?

20   A    That's correct, because the databases in the RIMS system

21   do not have any relation to multiple vendors.  The items aren't

22   related to a vendor.  There's nothing in the item file that

23   indicates vendor, and there's only one vendor, not multiple.

24   Q    So is it your opinion that if a given part master or item

25   master does not have an indication of who the vendor is within

Hilliard - Cross

1    that master, it's not a catalog?

2    A    That's my understanding of the Court's construction, yes.

3    Q    And your understanding is that the parts master is a list

4    of items that are kept in the customer's inventory; is that

5    right?

6    A    It's a -- the part master is a list of items that are kept

7    in the inventory that Fisher manages.  The inventory that

8    Fisher manages, according to the '989 patent are of five

9    different types; types one, three, four, five, and six.  Some

10   of those, I think -- four of those five types -- there's a type

11   two mentioned also, but it's not used.  So four of the five

12   types are owned by Fisher, and -- pardon me.  Three of the five

13   types are owned by Fisher.  One of the five types is owned by

14   customer, and then the fifth are items that are not -- that the

15   RIMS system is not used to acquired.  I can go type by type

16   number with you if you'd like.

17   Q    That's all right.  Let me ask you ask it this way:  Would

18   you agree that the databases in the RIMS '989 patent system

19   relate to items that are already owned by either the customer

20   or the distributor?

21   A    Yes.  Pardon me.  There are items listed in the database

22   that may not be in stock in either customer or the

23   distributor's inventory, so it might -- at any given point in

24   time might not be owned by one or the other.

25   Q    For those, would those be items the customer would want to

1    keep track of even though on a given day they might not have

2    them in inventory?  Is that the sort of thing you are talking

3    about?

4    A    They are items Fisher wants to keep track of in order to

5    manage their customer account.

6    Q    Would you agree that the RIMS system, as described in the

7    '989 patent, has cross-reference tables?

8    A    Yes.

9    Q    Those cross-reference tables include information from

10   multiple vendors, don't they?

11   A    Their cross-reference tables include product numbers from

12   multiple vendors.

13   Q    That would be information from multiple vendors; right?

14   A    They are product numbers related to multiple vendor

15   products.  I guess you could say it that way.

16   Q    Do you consider those cross-reference tables in the Fisher

17   '989 patent to be catalogs since they have information from

18   vendors?

19   A    No.  Because they don't indicate a vendor from which the

20   customer is going to purchase product, and, in fact, if you

21   look at the bottom of column 34, you'll see what those

22   cross-reference tables are used for.  They're used so that the

23   Fisher customer sales rep can supply a Fisher product instead

24   of a competing vendor product.

25   Q    Do you think the purpose of the table relates to whether

Hilliard - Cross                                                    2775

1    it's a catalog or not?

2    A    The catalog has to refer to the vendor for whom the -- who

3    is going to sell the product to the customer.

4    Q    I just want to get clarified, though.  When you looked at

5    applying the Court's definition of catalog in this case, did

6    you look at the purpose of the database you were looking at as

7    an important consideration in deciding whether or not a given

8    database is a catalog?

9    A    You know, I apologize for trying to answer your question

10   by giving you another reason why -- you asked me whether I

11   agreed with one reason, and I tried to explain another reason.

12   I apologize for doing that.  I'm sorry.

13        What I'm saying is that the Court's construction requires

14   that the catalog information needs to be related to sources or

15   vendors from which the customer is going to buy product.  In

16   this case, that other vendor information doesn't relate to

17   sources or vendors from whom the customer is going to buy

18   product.  It relates to just a cross-reference to the other

19   vendor's product number.

20             THE COURT:  In that answer, when you said, in this

21   case, did you mean in the '989 patent or the RIMS system, or

22   what did you mean?

23             THE WITNESS:  In the RIMS system.

24             THE COURT:  Okay.

25             THE WITNESS:  I'm sorry, Your Honor.

1   Q    The RIMS system also, as described in the '989 patent,

2   also includes a host database; correct?

3   A    Yes.

4   Q    That host database, what sort of item information is kept

5   in the host database in the Fisher RIMS system as described in

6   the '989 patent?

7   A    Information about the items that the host distributor --

8   the distributor, which is Fisher, which owns the host computer

9   sells to its customers.

10  Q    Is that a catalog as the Court construed it?

11  A    No, because it -- there is only one vendor.  It doesn't

12  provide information.  At least as I understand it, it doesn't

13  provide information about vendors from which the customer is

14  going to buy product.  The customer only buys product from

15  Fisher.

16  Q    Would you agree that that host database at least includes

17  information that originates from Fisher as a vendor or

18  distributor?

19  A    Yes, it includes database that originates from Fisher,

20  yes.

21  Q    And includes information about products such as an item

22  number and description and things like that; right?

23  A    Yes.

24  Q    And it's an organized collection of data, isn't it?

25  A    Yes.

1    Q    But it's not a catalog; right?

2    A    No.

3    Q    Did ePlus ask you to do any analysis of the infringement

4    issues in this case?

5    A    No.

6    Q    Did you describe the systems in the patents in the suit as

7    systems that would be operated by the buyer as opposed to a

8    seller like Fisher?

9    A    I'm sorry.  I didn't follow your question.

10   Q    I'm sorry.  Maybe -- I just remember you saying something

11   about a buyer system versus a seller system when you were

12   comparing the RIMS and the patents-in-suit, so maybe we'll

13   start by, can you explain to me whether or not the systems

14   described in the patents-in-suit, did you consider those buyer

15   systems or seller systems?

16   A    I would consider those buyer systems because they are

17   operated -- because they empower the buyer to select the

18   vendors from whom he or she is going to buy product.

19   Q    Okay.  And then the Fisher system as described in the '989

20   RIMS patent, did you consider that a seller system?

21   A    I considered that a seller system because as described in

22   the '989 patent, the operator of that system is a Fisher

23   employee, the Fisher CSR.

24   Q    Customer service representative; right?

25   A    Yes.

1   Q    So if the system has the customer service representative,

2   then you would consider that to be a buyer-focused system?

3   A    If a system is operated by a CSR -- well, that wouldn't

4   necessarily be the only criteria, but certainly when you look

5   at the system as described in the '989 patent, which is

6   operated by a seller, the Fisher CSR, not by the buyer who --

7   when you look at the fact that it's operated by the seller

8   along with all the other description, it's clear that it's a --

9   the system as described in the '989 is a seller's system, not a

10  buyer's system.

11  Q    Isn't it true that under your analysis, the system

12  described in the patents-in-suit would also be seller systems

13  in the preferred embodiment described in these patents?

14  A    The --

15       MS. ALBERT:  I'm sorry, I missed the question.  Can

16  you repeat it, please?

17  Q    Let me just go right to it.  Can you turn to the patent

18  number '683, Exhibit 1, and column three.  If you go down to

19  line 48 to 56, please, of column three.  Now, we've moved away

20  from the RIMS patent now, and now we're involved in one of the

21  patents involved in the lawsuit; correct?

22  A    Yes.

23  Q    It's your understanding all the patents in the lawsuit

24  have essentially the same detailed description of the

25  invention; right?

Hilliard - Cross                                                      2779

1   A    Very similar.  It varies a bit from patent to patent.

2   Q    And you see here the very first paragraph under the

3   heading detailed description of the invention?

4   A    Yes.

5   Q    First line says, figures 1A and 1B show preferred

6   embodiments of the electronic sourcing system five of the

7   present invention.  Do you see that?

8   A    Yes.

9   Q    The next sentence, as shown in figure 1A, a local

10  computer, which is preferably located at or near a customer

11  SITE and the site of just-in-time, or JIT, inventory is

12  preferably used by an on-site customer service representative

13  dedicated to a customer to assist that customer in

14  requisitioning items needed.  Do you see that language?

15  A    I do.

16  Q    So isn't it true that, at least in the preferred format of

17  the use of the system described in the patents-in-suit, they

18  would be used with the customer service representative just

19  like the RIMS system?

20        MS. ALBERT:  Object to the form of the question.  It

21  suggests that that's the only preferred embodiment described in

22  the patent.

23        THE COURT:  I think you asked specifically about the

24  preferred embodiment.

25        MS. ALBERT:  He said that was the preferred

1    embodiment.  There are multiple preferred embodiments.

2            THE COURT:  You mean it should be a preferred

3    embodiment.

4            MS. ALBERT:  Correct, Your Honor.

5            THE COURT:  Sustained.

6    Q    Would you agree, Mr. Hilliard, that as shown on the

7    language up on the screen here, a preferred embodiment of the

8    system described in the patents-in-suit is to have that system

9    used by an on-site customer service representative just like

10   the RIMS system described in the '989 patent?

11   A    Well, this is an introductory paragraph to quite a long

12   detailed description of the invention, and it does say that,

13   but as you go through the rest of the detailed description, it

14   gives options even in that preferred embodiment where the buyer

15   is empowered to do the catalog selection and the search and the

16   requisition building and so forth.

17          So, yes, it says that, but that doesn't characterize the

18   whole of the preferred embodiment if you go through and read

19   the entire detailed description.

20   Q    Are you aware of any language in the patent which actually

21   says it's preferable to have the customer operate the system

22   themselves?

23   A    I think I can find that, yes.  Well, that says that's part

24   of a preferred environment, that is an option within the

25   preferred environment, yes.

1   Q    I'm asking whether there's any indication that that's

2   actually a preferred way to do things.

3   A    I believe I can find that in the patent, yes.

4   Q    Okay.  Would you go ahead and show me what you are talking

5   about.

6             THE WITNESS:  May take me a moment.

7   Q    How long do you think it will take you, because I'll

8   withdraw --

9             THE COURT:  The answer would be about an hour and a

10  half then.  You talk about rising on the bait.

11            MR. McDONALD:  Threw myself a curve ball there.  I'll

12  withdraw the question.

13            THE WITNESS:  I don't think it would take -- a few

14  moments.

15            THE COURT:  If he wants to withdraw it, he can

16  withdraw it.  It's his question.  He can pull it any time he

17  wants to.  Do you want him to look or pull?

18            MR. McDONALD:  I think we're going to go on.

19            THE COURT:  Abandon your ship.

20  Q    You would agree that the TV/2 system did have a way to

21  allow a user to select certain topics to search?

22  A    Based on the lack of specificity of both of the brochures

23  that were produced, combined with the recollection of the two

24  IBM employees that were involved and the amount of effort on

25  IBM's part that was required to allow it to do that, no, I

1  wouldn't necessarily agree that it had that capability.

2       I would agree that it could be as was shown with over a

3  year of effort by ten IBM employees, it could be made to have

4  that capability, but I don't agree that as delivered it had

5  that capability, and certainly the brochures, the DX-105 and

6  107 aren't specific enough to corroborate that it had that

7  capability.

8  Q   Can we turn to the Technical Viewer/2 general information

9  manual, DX-105, to page seven, please.  Can you blow up the

10 section entitled search.

11      Do you have up on the screen now, Mr. Hilliard, a

12 description of the features of IBM Technical Viewer/2 with

13 respect to search; correct?

14 A   Yes.

15 Q   This indicates that TV/2 had a search facility that can

16 locate every occurrence of a word or phrase in either the

17 current topic, a list of selected topics, the complete

18 document, or another document; correct?

19 A   That's what the brochure claims, yes.

20 Q   Now, is it -- for purposes of your analysis, did you

21 assume that was true in the IBM system as it existed back in

22 1992 or not?

23 A   I didn't find this to be convincing.  I found this to be a

24 marketing -- I looked at it from the point of view of one of

25 ordinary skill in the art, and I would look at it as a

1    marketing claim, and when I combined that with the actual

2    knowledge of what happened when IBM was contracted to deliver

3    TV/2 with that capability, I didn't consider that to be

4    accurate, no.

5    Q    Would you agree that the people that were working at IBM

6    in the early '90s on the TV/2 product would know more about

7    what it could do than you do?

8    A    Most likely.

9    Q    Would you agree that the TV/2 product, as of the 1992,

10   early 1993 time frame had the ability to create a shopping list

11   of products and pass that list to another application?

12   A    I would agree that it was claimed to have that, although

13   my reading of the depositions of the IBM employees who were

14   involved in this during that time frame said that developing

15   that shopping list capability was one of the tasks that they

16   undertook as part of their contract with Fisher.

17        So it would seem to me that it didn't have that capability

18   despite the fact that it was claimed.

19   Q    Do you understand that the TV/2 product had in the '92,

20   early '93 time frame something called an application program

21   interface?

22   A    Yes.

23   Q    What is your understanding as to what the purpose of that

24   is?

25   A    Application programming interface, often called an API, is

Hilliard - Cross

2784

1    a component of a system that allows it to interface to related

2    applications so that it can pass data back and forth.

3    Q    Is it your understanding that part of that project that

4    Fisher asked IBM to do was to help customize the interface

5    specific to the Fisher system?

6    A    Yes.

7    Q    Now, in your testimony, you basically, I think you said

8    more than once the TV/2 system didn't bring anything to the

9    table; did I get that right?

10   A    With respect to the elements of the claims I said that,

11   yes.  I didn't say that just in general, but if you looked at

12   it in the context of the claims and the elements of the claims,

13   it didn't bring anything to the table that would enable the

14   combination to meet the claims, and, therefore, rendering a

15   combination an obvious way of meeting the claims.

16   Q    When Fisher paid IBM about $600,000 to do this work, do

17   you have an understanding as to whether IBM brought anything to

18   the table in exchange for getting that money?

19   A    Well, after the 600 -- after the $600,000, yes, but the

20   TV/2 system as it was deliverable prior to the contract with

21   Fisher, no.

22   Q    What is your you understanding as to what IBM actually

23   delivered with that?

24   A    They delivered a revised version of TV/2 that had, after

25   ten individuals worked for over a year for, I think you said

1    $600,000, a version of TV/2 that had interfaces to the

2    electronic sourcing system, had the ability to search

3    individual portions based on tags, it had a data loading

4    capability, and it had an order list capability, that all of

5    those things were developed onto the TV/2 system, not as it's

6    described in the 105 and 107, but after that $600,000, one-year

7    plus project was complete.

8    Q    Would you agree that one of ordinary skill reading the

9    Technical Viewer/2 brochure would think it would be obvious to

10   combine a system like the RIMS system described in the '989

11   patent with a searching system like the TV/2 system?

12   A    No.

13   Q    Well --

14   A    Well, for what purpose?

15   Q    For the purposes described in the TV/2 brochure.

16   A    No, because the RIMS system -- to combine the -- the RIMS

17   system was a requisition and inventory management system.  The

18   TV/2 is a search and viewer system.  The -- there's nothing in

19   the brochure that suggests combining it with a requisition and

20   inventory management system.

21        I mean, I'd have to look at the purpose, but it doesn't

22   seem obvious to me from the point of view of one of ordinary

23   skill in the art that it would be an obvious thing to combine

24   for the purposes described in that brochure in either of the

25   two brochures.

Hilliard - Cross

1  Q    Can we turn to the TV/2 brochure, Defendant's Exhibit 107,

2  please.  Go to the fourth page of that document.  Blow up the

3  column on the left, and specifically let's blow up the third

4  bullet point.  And maybe I should -- I don't know if you can

5  read the fine print there.  Let's blow up the whole left column

6  so we can see the context.  This is a part of the TV/2 brochure

7  that's talking about potential uses; correct?

8  A    Yes.

9  Q    And the third one is, integrating parts catalogs with

10 dealers' computer systems such as order entry, inventory

11 management, and customer records; right?

12 A    Yes.

13 Q    Wouldn't you agree, Mr. Hilliard, that someone with a

14 computer science degree and one or two years of experience in

15 working with computer procurement systems reading this bullet

16 point in the TV/2 brochure would understand that it would be a

17 good idea to combine the TV/2 system with an inventory

18 management system like the RIMS system to get the features

19 discussed in this brochure?

20 A    What features are you referring to?

21 Q    Any of the features that the brochure highlights as

22 benefits of the TV/2 system?

23 A    I don't see a feature.

24 Q    Well, we've already gone through that brochure, haven't

25 we, a little bit, Mr. Hilliard?  You know the brochure talks

1   about some potential benefits of the TV/2 system, don't you?

2   A    It talks about -- features are different than benefits.  I

3   didn't see any features described.

4   Q    I'll rephrase the question.

5   A    It talks about potential benefits as -- I don't recall it

6   talking about features.

7   Q    Let's talk about benefits then.  Would you agree that one

8   of ordinary skill in the art, seeing this paragraph about

9   integrating parts catalogs, would agree that if they had a RIMS

10  system, an inventory management system like RIMS, and they

11  wanted to get the benefits described in this brochure, that it

12  would be an obvious thing to combine a TV/2 system with the

13  RIMS system?

14  A    If one had a RIMS system, would it -- well, the only

15  company that had a RIMS system was Fisher, and it wasn't

16  obvious -- Fisher didn't sell the RIMS system to competitors or

17  to customers.  They installed the RIMS system in their

18  customers' site.

19  Q    I wasn't asking about selling, Mr. Hilliard.  I had a very

20  specific question?

21  A    You're saying if someone had a RIMS system.  So the only

22  one who had a RIMS system was Fisher.

23  Q    All right.

24  A    Okay.

25  Q    But let's make sure we're clear.  I'm talking about one of

1    ordinary skill in the art who knew about the RIMS system and

2    was looking at this brochure.  Wouldn't they read this and say

3    it's an obvious thing to combine that RIMS system with the TV/2

4    system?

5    A    They might look at that and say that it's a possibility to

6    do that.  I'm not sure that you'd look at it and say it was

7    obvious to do that.  You'd have to -- obvious for what purpose?

8    It's not clear to me for what purpose it would be -- I mean, if

9    you give me a purpose, I can say, well, would it be obvious for

10   that purpose.

11   Q    Mr. Hilliard, based on all your investigation for purposes

12   of this case, do you have an understanding as to what the

13   benefits of the TV/2 system were as they were described in the

14   TV/2 literature?

15   A    I understand that the claimed benefits are the ability to

16   search and view databases or data on CDs or so forth.

17   Q    Things likes catalog that are large volumes of data;

18   right?

19   A    Such as that, right.

20   Q    And could include images and things likes that?

21   A    Yes.

22   Q    Using that as the benefits of the TV/2 system, isn't it

23   true that one of ordinary skill back in 1993, April of '93, if

24   they knew about the RIMS system in the '989 patent, they saw

25   this TV/2 brochure, it would be obvious to them, to get the

Hilliard - Cross

1    benefits of the TV/2 system, incorporated with that RIMS system

2    by combining the two things together?

3    A    I'd love to be able to answer your question, but I'm not

4    sure what benefits you are talking about.  The benefits have to

5    be in relation to something, and so -- it's difficult for me to

6    respond to your question -- if you could lay out what benefits

7    we're talking about, I could perhaps answer the question, but

8    in terms of just to combine two systems because they're

9    potentially combinable, unless you know what purpose you would

10   want to do it for, for some purposes it might be obvious and

11   for others it wouldn't.

12             THE COURT:  I think we've been through this already

13   once.

14             MR. McDONALD:  I was ready to move on.

15             THE COURT:  Are you ready?  About how close are you?

16             MR. McDONALD:  I'm very, very close.  In fact, I

17   think I may stop right here.

18             MS. ALBERT:  I just have a couple redirect questions,

19   Your Honor.

20             THE COURT:  Do you know the most fundamental flaw in

21   redirect?

22             MS. ALBERT:  What's that?

23             THE COURT:  Opening doors.  The most common error

24   made.

25             MS. ALBERT:  I understand, Your Honor.

```
 1            THE COURT:  Or at least the most common error I made.

 2

 3                     REDIRECT EXAMINATION

 4  BY MS. ALBERT:

 5  Q    Mr. Hilliard, you were directed to this DX-62 that

 6  includes the Fisher RIMS brochure at page 32 of DX-62.

 7  A    Yes.

 8  Q    Does that brochure provide any details for how the RIMS

 9  system is supposed to perform the features that are touted in

10  that brochure?

11  A    No.  No, no detail at all.

12  Q    Does the brochure change -- does the description of the

13  system included in the brochure change any of your opinions as

14  to the functionality that the RIMS system had in the 1993 to

15  1994 time frame?

16  A    No, no, it doesn't, because the inventors said that it was

17  not an accurate description of the RIMS system.

18  Q    Does the description of the RIMS system included in the

19  brochure change any of your conclusions about whether the RIMS

20  system satisfied any of the elements of the asserted claims?

21  A    No.

22  Q    Now, you were referenced to the description in the patent

23  of one of the preferred embodiments, and I want to refer to

24  PX-1.

25       You were referenced to the embodiment where the customer
```

1    service representative is a user of the system, and you

2    indicated that there was another embodiment described where the

3    customer end user is the user of the system.  Could I direct

4    your attention to column 16 of PX-1.

5    A    Okay.

6    Q    And if you look --

7    A    15 did you say?

8    Q    Column 16.

9    A    16, okay.

10   Q    And if you refer to the paragraph starting at line 40, do

11   you see the first sentence of that paragraph says, in some

12   embodiments, a customer end user or a customer purchasing

13   employee operating REQI program 44A of the Fisher RIMS system

14   40 may also operate TV/2 search program?  Do you see that?

15   A    Yes.

16   Q    Is that the beginning of the description that you

17   referenced that refers to the customer end user being able to

18   use the electronic sourcing systems of the claims?

19   A    That's one of them, yes.

20   Q    Now, directing your attention to DX-107, the TV/2

21   marketing brochure, and going back to that page four that Mr.

22   McDonald referenced, from a review of the bullet that Mr.

23   McDonald referred you to about integrating parts catalogs with

24   dealers's computer systems such as order entry, inventory

25   management, and customer records, would it be obvious based on

1    that description in this brochure to combine the RIMS system as

2    described in the '989 patent with the TV/2 program as it

3    existed prior to 1994 to implement a system having the elements

4    of any of the patent claims at issue here?

5    A    No.  For that purpose, it wouldn't be obvious.

6            MS. ALBERT:  Thank you.  No further questions.

7            THE COURT:  Can he be excused permanently?

8            MR. ROBERTSON:  Yes, Your Honor.

9            MR. McDONALD:  Yes, Your Honor.

10           THE COURT:  All right.  Thank you, Mr. Hilliard, for

11   being with us and giving us your evidence.

12           MR. ROBERTSON:  Plaintiff rests, Your Honor.

13           THE COURT:  Plaintiff rests.  Ladies and gentlemen,

14   the evidence in this case is now closed.  What does that mean

15   to us now?  I have to do some things with the lawyers tomorrow.

16   It probably will take three to four hours to finish that

17   process.

18           It seems to me that it would maybe be a better --

19   because I have found that in this case my estimates have not

20   always been as good as I thought they would be.  I think it

21   might be a better use of your time for you to take off

22   tomorrow, come back Monday.  They'll be ready to argue the

23   case.  They'll start off Monday morning, argue the case.  I'll

24   give you the instructions, and then you can retire to

25   deliberate.

1          I think that in the overall scheme of things, your

2     time will be better served by allowing us to do what we need to

3     do tomorrow.  So if you will just be here at nine o'clock on

4     Monday morning, we'll take -- we'll finish up the case.  All

5     the evidence is now in.  Have a nice weekend.  Remember not to

6     discuss the matter with anybody.  I don't want you -- and don't

7     go out and try to build any procurement systems or anything

8     like that.  Just leave your books.  Mr. Neal will take care of

9     them.  Thank you.  Drive carefully.

10

11                         (Jury out.)

12

13          THE COURT:  All right, our task for tomorrow is to

14     hear the arguments on JMOL and to -- JMOLs, and to make sure we

15     have the jury instructions and the verdict forms correct.  I

16     estimate that if we get started about 9 o'clock, that we can be

17     finished, and I have told the people for the preliminary

18     injunction, temporary restraining order to be here, and I'll

19     start with them at two o'clock.  So I figure by noon we ought

20     to be out of here.  I certainly hope so.

21          MS. HUGHEY:  Your Honor, before we close out the day,

22     I, just for the record, would like to move for judgment as a

23     matter of law on the issue of invalidity now that the plaintiff

24     has been fully heard, just to preserve the issue.  I understand

25     we're going to argue tomorrow.  Would that be all right?

```
 1              THE COURT:  All right, you've made your motion.  We
 2   need -- also, I have to clean up what to do about Court
 3   Exhibit 4 which was that last question that we got, and I need
 4   to give a proper instruction on this opinion of counsel
 5   question as well.  I told you what I'm going to do, but I need
 6   to -- I haven't put it into the jury question -- I mean the
 7   jury instructions, and then -- I will.  Somebody sent back an
 8   instruction.  Who did that?
 9              MR. ROBERTSON:  That was the plaintiff, Your Honor.
10   Here's what --
11              THE COURT:  Do you have an instruction gremlin back
12   at the hotel, or is that you?
13              MR. ROBERTSON:  No, Your Honor, but I might make a
14   suggestion.  If those slides that I found objectionable that,
15   in my view, suggested that Court somehow through the
16   construction for the means plus function claims was suggesting
17   a combination between TV/2 and RIMS was appropriate, if those
18   slides aren't used in the closing arguments, then I think
19   putting any undue emphasis, even with a curative instruction,
20   would do more harm than that good.  So if I can agreement from
21   Mr. McDonald that those slides wouldn't be used in closing,
22   then I think the problem would be solved.
23              MR. McDONALD:  I have to know exactly what he is
24   talking about.
25              MR. ROBERTSON:  They were the slides that
```

1    incorporated the Court's construction that were used by Dr.

2    Shamos on his obviousness opinions, and I think the suggestion

3    was being made, because the Judge was looking in some instances

4    at TV/2 as performing a search function among other structures,

5    that the implication was left that that would therefore warrant

6    the jurors concluding that TV/2 and RIMS would be combined by

7    cloaking it in the guise of the Court's construction.

8             We thought that was just inappropriate, so I wanted a

9    curative instruction.  Your Honor actually suggested that I

10   prepare one for you.  So that was actually the genesis of that.

11            THE COURT:  I said if you wanted one.  I wasn't out

12   fishing trolling for a free hit.

13            MR. ROBERTSON:  I made a proposal that would permit

14   that Your Honor would not have to address that if I can get Mr.

15   McDonald's agreement.

16            THE COURT:  Why don't you look at it and look --

17            MR. McDONALD:  I'll look at it overnight and talk to

18   Mr. Robertson first thing in the morning and see if we can work

19   that out earlier.

20            THE COURT:  Okay.  Nine o'clock.  Now, let me ask you

21   something, are you all using demonstratives in your closing

22   arguments?

23            MR. ROBERTSON:  Yes, Your Honor, plaintiff is.

24            MR. McDONALD:  I'm sorry, what was the question?

25            THE COURT:  Are you going to use demonstratives in

1   your closing arguments.

2           MR. McDONALD:  I would expect that.

3           THE COURT:  I don't want any problems on Monday

4   morning, so I want you all to show those demonstratives to each

5   other.  Are they ready now?

6           MR. ROBERTSON:  I would suggest we schedule a meeting

7   sometime together Sunday and iron it all out.

8           MR. McDONALD:  I think we can try to come up with a

9   time to exchange, maybe Sunday morning, 9:00 a.m.

10          THE COURT:  All right.  That's fine.  Okay.  That's

11  it then, is it?  All right.  We'll be in adjournment.

12

13          (Court adjourned.)

14

15

16

17

18

19

20

21

22

23

24

25