1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF VIRGINIA

3                    RICHMOND DIVISION

4

5    --------------------------------------
                                          :
6    ePLUS, INC.                          :    Civil Action No.
                                          :    3:09CV620
7    vs.                                  :
                                          :
8    LAWSON SOFTWARE, INC.                :    January 21, 2011
                                          :
9    --------------------------------------

10

11            COMPLETE TRANSCRIPT OF THE JURY TRIAL

12           BEFORE THE HONORABLE ROBERT E. PAYNE

13          UNITED STATES DISTRICT JUDGE, AND A JURY

14

   APPEARANCES:
15
   Scott L. Robertson, Esquire
16   Michael G. Strapp, Esquire
   Jennifer A. Albert, Esquire
17   David M. Young, Esquire
   Goodwin Procter, LLP
18   901 New York Avenue NW
   Suite 900
19   Washington, D.C.  20001

20   Craig T. Merritt, Esquire
   Christian & Barton, LLP
21   909 East Main Street
   Suite 1200
22   Richmond, Virginia  23219-3095
   Counsel for the plaintiff
23

24                  Peppy Peterson, RPR
                   Official Court Reporter
25               United States District Court

```
1    APPEARANCES:  (cont'g)

2    Dabney J. Carr, IV, Esquire
     Troutman Sanders, LLP
3    Troutman Sanders Building
     1001 Haxall Point
4    Richmond, Virginia  23219

5    Daniel W. McDonald, Esquire
     Kirstin L. Stoll-DeBell, Esquire
6    William D. Schultz, Esquire
     Merchant & Gould, PC
7    80 South Eighth Street
     Suite 3200
8    Minneapolis, Minnesota  55402

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2

3          THE CLERK:  Civil action number 3:09CV00620, ePlus,

4    Incorporated, versus Lawson Software, Incorporated.  Mr. Scott

5    L. Robertson, Mr. Craig T. Merritt, Ms. Jennifer A. Albert, and

6    Mr. Michael G. Strapp represent the plaintiffs.

7              Mr. Daniel W. McDonald, Mr. Dabney J. Carr, IV, Ms.

8    Kirstin L. Stoll-DeBell, Mr. William D. Schultz, and Ms. Rachel

9    Hughey represent the defendant.  Are counsel ready to proceed?

10         MR. ROBERTSON:  Yes, Your Honor.

11         MR. McDONALD:  Yes, Your Honor.

12         THE COURT:  All right.  We'll take plaintiff's JMOL

13   motion first.

14         MR. ROBERTSON:  Good morning, Your Honor.

15         THE COURT:  Good morning.

16         MR. ROBERTSON:  I'm going to be arguing plaintiff's

17   judgment as a matter of law with respect to infringement, and

18   Ms. Albert will be addressing plaintiff's judgment as a matter

19   of law with respect to the invalidity issues.

20             Your Honor, Rule 50 provides that judgment as a

21   matter of law may be granted when a reasonable jury would not

22   have a legally sufficient evidentiary basis to find for the

23   party Lawson on that issue.  ePlus moves for JMOL that Lawson

24   infringes all the asserted claims of the patents-in-suit, both

25   directly and indirectly, both through inducement of

1    infringement and contributory infringement.

2            I'm not going to go through all the asserted claims,

3    Your Honor.  I know Your Honor is familiar with them, and that

4    would just take up too much time, and I know we're pressed for

5    time here this morning with the Court's schedule this

6    afternoon, but let me hit a high point, first start off by

7    saying, we contend that the defendants non-infringement case in

8    this proceeding has been really based on misdirection, that

9    they have ignored the Court's claim construction with respect

10   to catalog.  They rewrote the provision for published by a

11   vendor to suit their manufactured non-infringement positions.

12           It required the Court, I think midcourse through this

13   case, to issue the instruction with respect to published by a

14   vendor to bring some clarity to what the Court intended when it

15   gave its instruction with respect to what a catalog is.

16           It did not mean, as the defendant contended, that the

17   item data associated with the catalog could not be selected --

18   or had to be selected by the customer or modified or deleted or

19   reformatted or be an entire catalog.  That was never intended

20   by the Court, and its revised published-by-a-vendor

21   construction made that clear, and I think the arguments made on

22   that, the non-infringement arguments that were based on that

23   have no sound footing in the record on this case.

24           We believe that the best evidence in this case has

25   come from, indeed, Lawson's own witnesses and documents.  Mr.

1    Christopherson's admissions, Mr. Lohkamp's admissions, Ms.

2    Raleigh's admissions all point to the fact that the claim

3    elements of all the claims have been satisfied by five separate

4    configurations that are accused in this case.

5           Lawson's own documents support the infringement in

6    this case.  They are uncontradicted.  Responses to RFPs that

7    were shown repeatedly to the jury demonstrate that the elements

8    asserted in these patents were satisfied.

9           They were vetted by in-house legal counsel and the

10   engineers at Lawson to be as accurate as possible, was the

11   testimony.  Those documents showed that Lawson, indeed, does

12   provide catalog content.  They implement the systems, they

13   maintain, the service --

14          THE COURT:  Is your theory that the item master

15   contains any complete catalogs from a published by a vendor as

16   I've defined it?

17          MR. ROBERTSON:  I think it's capable of --

18          THE COURT:  Does it -- we'll take things one at a

19   time.  Just answer the question.  In what you know of it, does

20   it contain any complete catalogs that are published by a

21   vendor?

22          MR. ROBERTSON:  The item master with the vender table

23   and the vendor lookup together was the evidence that constitute

24   a catalog.  That is the evidence I think uncontradicted by any

25   party.  It was the evidence provided by Dr. Weaver, it was the

1    evidence shown by Mr. Niemeyer in the source code.  Those three

2    things together constitute a catalog, because those databases

3    are connected --

4              THE COURT:  Item master plus what?

5              MR. ROBERTSON:  The vendor item table and vendor --

6    I'm sorry.  I'm refreshed that that --

7              THE COURT:  It's just those two, isn't it?

8              MR. ROBERTSON:  Yes, sir.

9              THE COURT:  And that constitutes a catalog.

10             MR. ROBERTSON:  Yes, sir.

11             THE COURT:  That has catalog information taken from

12   data published by vendors about their products.

13             MR. ROBERTSON:  Exactly.

14             THE COURT:  And it's put in there, into the -- the

15   item master comes empty.

16             MR. ROBERTSON:  It can.

17             THE COURT:  Well, it comes empty unless somebody put

18   something in it.  When it starts from the factory and it's a

19   newborn baby, the item master is empty.

20             MR. ROBERTSON:  That's fair, Your Honor.

21             THE COURT:  And then information is loaded into it.

22   Information is loaded into it by either the customer or by

23   Lawson acting under a contract for the customer.

24             MR. ROBERTSON:  That's right.  It can happen in a

25   variety of ways, as I think the testimony showed.

1    THE COURT:  And it is always -- it's not Lawson, but

2    it is always the customer who selects what goes into the item

3    master, because it is the customer who, in the first instance,

4    has constituted what it wants in the legacy system that is

5    transported or imported into the item master, or is the

6    customer who tells Lawson what it wants in the item master; is

7    that right or wrong?

8    MR. ROBERTSON:  I'm not certain that the evidence is

9    unequivocal on that, Your Honor.

10   THE COURT:  Who else does it?

11   MR. ROBERTSON:  Lawson, for example, could say,

12   you're going to want this.  The customer will say, well, I need

13   some -- this kind of data, and Lawson can volunteer and say,

14   well, we can provide you this data.

15   THE COURT:  Then that's the customer saying, okay,

16   yeah, I do want that, too, I want the parts for a Ford, and the

17   Lawson representative says, well, you know, you sell Cadillacs,

18   you've got a market for Cadillacs in your customer base, don't

19   you want the Cadillac, yeah, I do.  So it's the customer who

20   makes the decision what goes in there, and Lawson doesn't just

21   come in and say, here, this is what goes in; right?

22   MR. ROBERTSON:  I think Lawson can make the

23   suggestion to the customer --

24   THE COURT:  But that's not the same thing as making

25   the decision.  Let me ask you something.  Are you married?

1                    MR. ROBERTSON:  Yes, sir.

2                    THE COURT:  You make a suggestion to your wife, she

3        decides to take your suggestion.  Who's made the decision, you

4        or her?  And you better answer that right, or you're going to

5        be in trouble.  She's made the decision.

6                    MR. ROBERTSON:  Yes, sir.

7                    THE COURT:  Same difference.

8                    MR. ROBERTSON:  I don't think it's germane, actually,

9        to --

10                   THE COURT:  Well, it might be germane in respect of

11       their position.

12                   MR. ROBERTSON:  I think that is their position.  I

13       don't think it's germane to the Court's claim construction as

14       to who actually selects it.  What we're talking about here is a

15       database that has item information.

16                   Who made the decision to put that item information in

17       there, in a system is not relevant to the Court's claim

18       construction.  Anybody can make that decision.  It doesn't

19       matter.  In this case, if it happens --

20                   THE COURT:  If you win on the catalog, it's all over

21       anyway; right, on the catalog issue?  There's nothing else to

22       be done?

23                   MR. ROBERTSON:  Well, there's been some arguments

24       made that the Lawson system can't select the catalogs to

25       search.  I think that wasn't supported by the evidence.  I

1    think there --

2              THE COURT:  I know, but you have to first have a

3    catalog to search as every witness in the case has said, so if

4    the case turns -- if you win summary judgment on the issue of

5    what the evidence is as to what a catalog is, the case is over

6    for 11 of the 12 claims; right?

7              MR. ROBERTSON:  I think that's true.

8              THE COURT:  '172, claim one, is the claim that

9    doesn't have the catalog mentioned in it.

10             MR. ROBERTSON:  Yes, sir.

11             THE COURT:  All right, excuse me.  Go ahead.

12             MR. ROBERTSON:  It has multiple databases.  I don't

13   know if the Court wants me to review the additional evidence on

14   the catalog itself, but there were a variety of ways that the

15   Lawson system can import catalog data that's made available to

16   the customer, so the customer itself can go and use that EDI

17   protocol 832, do the catalog import process.

18             We saw the vendor catalog load PO 536 program that

19   Lawson provides and will actually load the catalog data for the

20   customer.  We saw the punchout scenario in which the customer

21   tells Lawson what kind of catalog access it wants to their

22   punchout partners, and Lawson sets up and provides the whole

23   protocol communication procedure for that.

24             Lawson designed it, created it, implemented it.  The

25   testimony was from Mr. Christopherson, for example, that the

1    customer using that configuration never leaves the Lawson

2    system.

3          And so we think, Your Honor, with respect to the

4    catalog issue, that's been completely satisfied.  There was

5    testimony that Lawson hosts these systems for their customer so

6    they can access them remotely and use the catalog content

7    that's been provided by Lawson on those hosted systems.  And so

8    that's a situation, I think, Your Honor, where Lawson would be

9    providing, indeed, and selecting catalog content for that

10   hosted solution, and that would be a direct infringement.

11         With respect to the issue of searching by vendor, we

12   saw RFPs in which the question was made, can I search by

13   vendor, and Lawson unequivocally answered, yes, that comes

14   right out of the box with the system.  Can you search by

15   keyword?  I think that was unequivocal as well in the evidence.

16         Dr. Weaver put on demonstrations to show the variety

17   of configurations that were infringing through RSS.  In fact,

18   Ms. Stoll-DeBell introduced through Mr. Christopherson the

19   screen shots of the use of technology to show that claims were

20   satisfied.  I think it was very telling that Lawson offered no

21   demonstrations whatsoever of the system to try and show that it

22   was in a non-infringement mode.

23         I think we saw evidence concerning the use of the

24   classification codes, the UNSPSC, in which the system comes

25   capable of loading that right in there, and, in fact, we showed

1    a demonstration doing searches and drilling down to find

2    equivalent items, generally equivalent items.  Even Mr. Shamos

3    relied on that white paper to show the classification schema,

4    but then he tried to run away from it when it showed that when

5    you get down to the commodity level, you are dealing with

6    substitutable items.

7            THE COURT:  That was where he was making the point

8    that you can't get equivalent items by looking at the code, the

9    last digits of the code because not all black pens are the

10   same?

11           MR. ROBERTSON:  Yes, but, of course, the paper that

12   he relied on said it was substitutable, and when I asked him

13   the question, can't you just look at it and see -- the hits,

14   whether or not this black pen is similar to that black pen when

15   you get the hit results.

16           There's no question that there's the requisition and

17   purchase order capability.  I don't think that's even been

18   challenged by anybody.  There was some argument that the search

19   index wouldn't -- compelled you to search the entire database

20   for items.  I think Dr. Shamos tried to analogize to a pantry

21   that he had alphabetized, and then when he wanted to look for

22   apples, he had to go all the way to zucchini.  Dr. Weaver

23   explained how a search index works.  There's independent

24   evidence --

25           THE COURT:  Well, when you open the pantry, and if

1    you had your spices organized alphabetically, as some people

2    might have, if you know you want coriander, you go to the C

3    part of it, the coriander, and you get that.  You haven't

4    searched the whole drawer of spices to go down even to cumin,

5    for example, or to some other spice the name of which escapes

6    me.  What is it they put in chicken salad and tuna that

7    begins -- tarragon.  So you haven't gone all the way down.

8              MR. ROBERTSON:  That's the point of the whole index.

9    Like the analogy to the book I made, the *History of the Civil*

10   *War*, if I want to see about the Battle of Vicksburg, I don't

11   need to read through every single page.  I can go to that

12   index, and it points me to where in that database, if you will,

13   that book, I can find a discussion about the Battle of

14   Vicksburg.

15             THE COURT:  It's just a form of short, quick, easy

16   search, not a lengthy search.

17             MR. ROBERTSON:  It's an index search for speeding up

18   the whole process and for searching just selected portions of

19   the database.

20             THE COURT:  When I look at the index, I look for V.

21   I look for Vicksburg.

22             MR. ROBERTSON:  Exactly.

23             THE COURT:  That's a search, according to you; right?

24             MR. ROBERTSON:  That's a search of a selected portion

25   of the database, because I've used that tool to get me to where

1    in the database I need to go.  In fact, we had a graphic of the

2    -- I believe it was the Webster's computer dictionary.  We

3    said, that's exactly why you have a search index, so you don't

4    need to search the entire database in order to find the file

5    record that you want.

6            Mr. Niemeyer, the source code expert, the only source

7    code expert to testify in this case, notwithstanding that the

8    defendant said they were going to have a rebuttal source code

9    expert that they never called, Mr. Niemeyer explained how that

10   can be used in order to identify the file records.  So I think

11   that was essentially uncontradicted in this case.

12           Again, selecting the catalogs to search, Dr. Weaver

13   showed how I could, if I had multiple catalogs and I wanted to

14   search for catalogs that had laptop computers, for example, I

15   could enter that keyword and only get the catalogs that had

16   laptops to search.  I could also have those user-generated

17   criteria that Mr. Christopherson, I believe, and Mr. Lohkamp,

18   and I believe even Dr. Shamos conceded that you could put the

19   vendor name in those user-identified criteria and search by

20   vendor name.

21           So there are a variety of ways to do that, and,

22   again, I would come back to the RFPs which unequivocally

23   represented in every instance when a customer said, can I

24   search by a vendor name, yes was the answer.  There was never a

25   no answer demonstrated in this case.

1          Inventory availability shown through a variety of

2   ways.  Those EDI protocols can bring back information.  Dr.

3   Weaver showed it in his demonstrations.  He also showed it

4   through the punchout process.  We saw all those --

5          THE COURT:  But it would be an error on my part to

6   grant a judgment of infringement on all claims, would it not,

7   because when you finished the day with Dr. Weaver, he

8   identified certain claims that were infringed in certain

9   patents and other by certain systems.  And that would be a

10   wholesale grant that maybe would be beyond the scope of the

11   evidence, wouldn't it, if I did what you want me to do?

12          MR. ROBERTSON:  No --

13          THE COURT:  Don't I have to do it by which system

14   deals with which, infringes which claim?

15          MR. ROBERTSON:  Yes, absolutely, Your Honor.

16          THE COURT:  How am I to do that?

17          MR. ROBERTSON:  Because, Your Honor --

18          THE COURT:  Do you have a little table that shows me

19   which ones I should grant, make the grant of if I grant it?

20          MR. ROBERTSON:  I do.

21          THE COURT:  If I ask you to produce a monkey, will

22   you do that, too, next time?

23          MR. ROBERTSON:  I'll try.  Yes, Your Honor, in fact,

24   I'm sorry.  I think I only have one copy of this.

25          THE COURT:  Keep the one you've got.

 1          MR. ROBERTSON:  It is proposed in our verdict form,

 2    Your Honor.  We have asked the jury to find --

 3          THE COURT:  Yes, but that's a rare document you have

 4    there.  It is the only document in the case of which there is

 5    only one copy.

 6          MR. ROBERTSON:  That's true.  But our verdict form

 7    does lay out, on a configuration-by-configuration basis and a

 8    claim-by-claim basis which claims we do, in fact, feel are

 9    satisfied.

10          THE COURT:  What is your understanding as to Lawson's

11    position on the issue of catalog?  What is it that -- why is it

12    that item master doesn't constitute plus vendor item table --

13    excuse me, doesn't constitute a catalog?  What is their

14    position as to why it doesn't, in your view, and what do you

15    say in response to that position?

16          MR. ROBERTSON:  Well, Your Honor, quite frankly, I've

17    always been a little bit confused by it, and I think that was

18    kind of the effort that was being created here.  What I can

19    suggest to Your Honor is there was a graphic that was used, I

20    believe with Mr. Christopherson, and I've got extra copies of

21    that, Your Honor.  I don't know if you have it, but essentially

22    what this summarizes or suggests -- if you'd like, I can hand

23    up --

24          THE COURT:  I had it here earlier yesterday, and I

25    hope it isn't among the things that I directed to the recycle

1    bin, because I had notes on it.

2           MR. ROBERTSON:  It's on the screen now, too, Your

3    Honor.

4           THE COURT:  Here is my copy.  Item information

5    changes, yes, okay.  I regard that as a best-seller in this

6    case, because I think it helps me understand, but I'm not sure

7    I understand, so tell me.

8           MR. ROBERTSON:  Let me -- so this is what I

9    understood the argument to be, or at least the way it was

10   crystalized when Mr. Christopherson testified, and then I

11   cross-examined him, and then there was Dr. Shamos who testified

12   with respect to this, too.  So I think -- the point of this, I

13   think, Your Honor, was to suggest that if a customer selects

14   the desired items or if the customer adds additional item

15   information or if the customer deletes --

16          THE COURT:  Let's start with the beginning.  The

17   vendor changes the information to new electronic format.  In

18   order for it to go into an electronic system, the vendor has to

19   put it into some electronic system, doesn't it?

20          MR. ROBERTSON:  Well, the vendor can do it in a

21   variety of ways.  It doesn't to do it that way.  It can do it

22   through the EDI load-up.

23          THE COURT:  I understand, but at a very basic

24   level -- you all keep talking about the high level.  I like to

25   get down to the basic level.  At a very basic level, it is true

1    that at some point, before anybody deals with it, the vendor,

2    the information that a vendor has about his products have been

3    somehow put into electronic form, either originally or have

4    copied it into electronic form to make it available for use; is

5    that right?

6              MR. ROBERTSON:  I think that's a fair statement.  In

7    a variety of different ways it can do that.

8              THE COURT:  Yes, lots of ways.  So what?

9              MR. ROBERTSON:  Yeah, so what.

10             THE COURT:  What does that have to do with whether or

11   not it's a catalog?  I'm trying to understand what your

12   position is.

13             MR. ROBERTSON:  I don't think it matters.  In fact, I

14   think what I would do, Your Honor, is I would take vendor, and

15   I would cross out changes information to a new electronic

16   format and, and I would basically say, vendor gives information

17   to customer in whatever way it wants to do, and that's

18   consistent with published by a vendor in the Court's

19   definition.  It makes it available, generally known, or

20   discloses it.  Indeed, even in the legacy systems, and those

21   are the systems where customer has an old procurement system --

22             THE COURT:  I've got my catalogs.

23             MR. ROBERTSON:  Right.

24             THE COURT:  Basically a legacy system is I've got my

25   stuff set up the way I want it, and now I'm going to buy a new

1    system, so I change it over to the other system.

2              MR. ROBERTSON:  Yeah, just transfer it over.  And

3    even if you need to reformat it because it's going to have to

4    be reformatted to be configured in Lawson's catalog.

5              THE COURT:  In that instance, I could have, if I'm a

6    customer -- you can tell me if this is right or wrong --

7    according to the evidence, I could have a database that has in

8    it the catalogs of three vendors, for example, either all or

9    part; right?

10             MR. ROBERTSON:  Yes, sir.

11             THE COURT:  And in that event, all that happens is

12   whatever I've got in my legacy system goes into the Lawson

13   system by virtue of the Lawson software and the application

14   interface; is that right?

15             MR. ROBERTSON:  Well, they come over and they

16   transfer it for you.

17             THE COURT:  Somehow it has to get from here to here.

18             MR. ROBERTSON:  Yes, and they provide that service.

19   I think --

20             THE COURT:  In that event, if you did that with the

21   item master -- if I had three catalogs in my database as a

22   customer, in my legacy system, and it's transferred, it's

23   transferred into Lawson's item master plus vendor table.  Then

24   those three catalogs are in the item master and vendor table

25   database; is that not right?

1           MR. ROBERTSON:  That's exactly right, Your Honor.

2           THE COURT:  And then whether or not -- your position

3      is whether or not any customer actually does that, the fact

4      that that can be done, the capability exists to do that, that's

5      sufficient to constitute infringement.  That's at the most

6      basic level; is that right?

7           MR. ROBERTSON:  I think that's correct at the most

8      basic level.

9           THE COURT:  Does the law support you on the

10     capability issue that you are arguing?

11          MR. ROBERTSON:  I think it certainly does.  I think,

12     as the Court knows, because the Court has adopted the jury

13     instructions from both the Ariba case and the SAP case, capable

14     of infringing is sufficient.

15          Remember, this item master, this system can't do

16     anything without catalog data.  I mean, I can't -- no one buys

17     it just to keep it and keep it there empty.  And the testimony

18     is just, you know, unequivocal from Ms. Raleigh and others that

19     Lawson does transfer that legacy data from the system and

20     builds a system, and when they make that system, whey they

21     build it and when they put that catalog content in, or in any

22     way made available to the customer through various software

23     programs they provided to import that catalog data, that is a

24     system that is now in an infringing mode.

25          So if you were to say, oh, if I just bought the

1    system and never loaded catalog data in it, would that be

2    infringing, I suppose not, but who would do that?  Why would

3    you have this whole procurement software if it wasn't going to

4    be able to perform the functionality that it was intended to

5    do?  That defies common sense.

6            THE COURT:  We don't have any of that in this case

7    anyway.  We have evidence of use by customers of the Lawson

8    system in a way that makes Lawson a very formidable force in

9    the market.  It's a big company, and it didn't get that way by

10   selling systems that didn't get used.

11           MR. ROBERTSON:  I think that's exactly right.

12           THE COURT:  I don't think that's an issue, and they

13   never have contended that.  They are big hitters in the

14   program.  They have a good product, they say, and they're

15   selling it, and people are using it.  It hasn't been an issue,

16   I don't think.

17           MR. ROBERTSON:  Obviously, I can continue to discuss

18   the criteria for selecting the catalogs and searching for items

19   when we saw that in the demonstrations.  We saw the

20   demonstrations of the punchout --

21           THE COURT:  Can you do, do you believe, according to

22   the evidence, search the item master/vendor table combo and

23   find, if I have a need for -- let's take the medical area.  I

24   have a need for syringes, and there's a different UNSPSC code

25   for one-inch syringes, two-inch syringes, and half-inch -- or

```
 1    actually it's cc, I guess.  One-half cc, one cc, and one and a
 2    half cc.  There are three different ones.  But I know that if I
 3    need to -- I can't use a half cc syringe to inject a one cc
 4    dose, but I can use a one cc syringe to inject a half cc doze.
 5    All I have to do is load it differently.
 6              So for me, in the hospital, if we're down in the area
 7    where we're out of one cc's, I say to myself, okay, I want to
 8    know if we've got any one cc's.  Can the Lawson system find
 9    whether in my inventory, either the hosted site or otherwise, I
10    have or have access to any one half cc's or one cc syringes,
11    during the process of a search?
12              MR. ROBERTSON:  I think it certainly can happen,
13    because you can actually put in keywords, both that are
14    alphanumeric, both letters and numbers, in order to get to
15    where you want to get and drill down on the search.
16              Now, the argument has been made, because Your Honor
17    prefaced this by starting out with the UNSPSC.  The argument
18    has been made that when you go from that -- I'm not going to
19    get this right, but I think it was family, segment --
20              THE COURT:  You can down the tree.
21              MR. ROBERTSON:  Class and commodity, when you go down
22    that hierarchy, you get to a position where at some point there
23    can be some comparison to see what kind of equivalency there
24    is, and the argument has been made both in this case and in
25    prior cases that, well, you know, in fact, the document we saw
```

1    said even has another classification.  You can have it down

2    to even ten digits or five levels of classification beyond just

3    the commodity level, so that's available as well.

4            But that the argument is, and this is a technical

5    term in the computer world, it doesn't have sufficient

6    granularity.  That is, I can't get down to the exact syringes

7    that I might compare.

8            THE COURT:  I've got two black pens here.

9            MR. ROBERTSON:  Yes, sir.

10           THE COURT:  This one is a $100 pen that my law clerks

11   gave me years and years and years ago.  This is one the

12   government gave me, and I will pledge to you we don't have any

13   hundred dollar pens.  Can Lawson bring me to a place that has

14   these two on here, and can I say, well, I want the $100 one

15   instead of the other -- both these things do the same thing, I

16   can tell you.  I've used them both.

17           MR. ROBERTSON:  If you had a database that had the

18   keyword searching capability that would permit you -- I don't

19   know what kind of pen the partners gave to you --

20           THE COURT:  My partners didn't do it.  My partners

21   were so tight they would never do anything, even give me my

22   money when I left.

23           No, they treated me fine.  They did a whole lot

24   better than the law clerks, but this is a Waterman pen, and

25   this is a Bic -- yeah, a Bic.

1          MR. ROBERTSON:  The answer to your question, sir,

2     using the UNSPSC again, you probably can't get down to that

3     level of granularity, that level of precision, but you don't

4     need to if the system is capable of at least coming up with

5     some items that are generally equivalent.

6          THE COURT:  When I get down to the last one, the very

7     last one of those searches, will it let me choose between all

8     these pens?

9          MR. ROBERTSON:  It would bring you up a list of --

10          THE COURT:  I don't want black pens --

11          MR. ROBERTSON:  It will get you to all black pens,

12     Your Honor, yes.

13          THE COURT:  That's all I want to know.

14          MR. ROBERTSON:  Yes, sir.

15          THE COURT:  All black pens in the system.

16          MR. ROBERTSON:  Then you can look and see --

17          THE COURT:  I can look at them, and I can say, well,

18     those are generally equivalent because they do the writing, but

19     I'll tell you what, I've lost this one, and I really want in my

20     pocket the same kind of pen that my law clerks gave me 20 years

21     ago.  Whoops, I'm going to buy the $100 one even though the Bic

22     does the same thing.  Can Lawson give me the Bic and the

23     hundred dollar one?

24          MR. ROBERTSON:  You will get -- if UNSPSC has been

25     entered in there, you will get the results that show you what

1    matches that commodity, and then you can search those

2    results --

3              THE COURT:  That is in the inventory.

4              MR. ROBERTSON:  That is in your catalog.

5              THE COURT:  In the item master.

6              MR. ROBERTSON:  Yes, and you can search it and say,

7    this is the one I want.  You can just read it and say, I will

8    take that one.

9              THE COURT:  At some level, don't you have to, at some

10   point, have a human being look at the various things and say,

11   that, to me -- they all do the same thing, they are different

12   prices, and I'm on an economy kick so I want the one that's the

13   cheapest?

14             MR. ROBERTSON:  At some point, a human being has to

15   interact with all these features and functionality.  Human

16   beings have to enter the keywords.  Human beings have to know

17   what they want --

18             THE COURT:  I guess my point was, in your view, does

19   the patent require that it be the computer which identifies

20   from all these pens, some of which are red, those which are

21   black, or can the buyer, the user say, okay, well, these two

22   are black, and I'm not going to worry about the red one?

23             MR. ROBERTSON:  That's all you need to do.  The

24   computer needs to assist you in getting to a result where you

25   can then make a decision, and it does that.

1          THE COURT:  Okay.

2          MR. ROBERTSON:  And it does that by way of keyword

3    search.  If Your Honor knew the particular type of pen that you

4    wanted, and, you know, you typed in Parker black pen, you would

5    probably get a variety of results of Parker black pen that you

6    could then look at it and determine whether or not there was

7    genuine -- a general equivalency for those pens or you wanted

8    one that was $5.95 or one that was $12.95 but still provided

9    the same writing capability.

10         THE COURT:  Back to item information changes.  The

11   customer then, after the vendor gives the information to the

12   customer, the customer selects the desired items that go into

13   the item master vendor table.  You agree with that, don't you,

14   that that can be done?  You also say Lawson can do it, and it

15   doesn't really make any difference.

16         MR. ROBERTSON:  Let me cut to the chase, Your Honor.

17   I agree that all of this can be done, and my point is, so what?

18   Who cares?  It doesn't matter under the Court's published by a

19   vendor.  The customer can select it, the customer can delete

20   some, the customer can add additional information.  The

21   customer can take -- one of the arguments that's made is, well,

22   I take a textual description of the item, and I take it from 80

23   characters, for example, down to -- I forget the precise

24   number, 30 or 32 it was represented.  It's still a textual

25   description of the item.  It has to contain enough information

1    for me to be able to know what it is.

2           I think Mr. Yuhasz from Novant testified that, you

3    know, they use abbreviations for syringe, but they still know

4    it's a syringe.  That doesn't destroy the fact that it's

5    textual information about an item in there.  So this argument

6    that goes from 80 characters down to 30 characters, for

7    example, what does that matter?

8           THE COURT:  Mr. Yuhasz, basically he was saying he

9    looks at the list that the vendor has, and they convert that

10   list, and let's call this pen comma black, and they convert it

11   to P comma B, for example, so it will be under the number of

12   character limits, but they know in their lexicon that what came

13   from the vendor is a pen comma black.  They just simply convert

14   it to a P comma B.  That's what he said, wasn't it?

15          MR. ROBERTSON:  Yes.

16          THE COURT:  What difference does that make?

17          MR. ROBERTSON:  None, but that's why it's an argument

18   that I think -- it's been promoted here as a non-infringement

19   argument.  Is that still a textual description of the item

20   under the Court's construction?  Absolutely.  There's no

21   character limitation in the Court's construction, nor was there

22   any character limitation described anywhere in the patents --

23          THE COURT:  No, the difference is, does it make a

24   difference if the vendor information is changed by the user

25   into another form, and that's what's recorded in the catalog.

1          MR. ROBERTSON:  I don't know why it would, because

2     it's the vendor that provided that information in the first

3     place, and it's the customer that then took that information

4     and conformed it so it would fit into the Lawson system.  The

5     argument was made that in many instances, the customer

6     negotiates prices with its vendors, and that negotiated price,

7     which may not be the list price, then gets loaded into the

8     Lawson catalog database.

9          What difference does that make, Your Honor, whether

10     it was a negotiated price or a list price?  It's still a price,

11     so that, again, was, I think, just an argument of misdirection,

12     of an attempt to mislead and confuse the jury as to what really

13     is the construction.  The construction that the Court made, I

14     think, is fairly plain and fairly clear, and it is satisfied no

15     matter what happens after the customer gets this information.

16          On the next level, what does it matter if the

17     customer loads the new info into the Lawson database?  We know,

18     in many instances, that Lawson has actually provided the

19     functionality for them to do that in a number of ways, but I

20     guess it's been conceded Lawson will certainly do that for you

21     and charge you a hefty price with respect to that.

22          I have not gone through on a claim-by-claim basis,

23     but I will provide the Court with the configurations in the

24     claim.  The Court's very familiar with the claim.

25          I think I did talk about inventory availability.  I

1    don't know if the Court has any other questions.  I think, just

2    to summarize, that the most compelling evidence in this case

3    that ePlus should be entitled to a JMOL of infringement has

4    come from the defendant's own mouths and their own documents

5    and the demonstration and the source code that we think

6    established beyond peradventure that Lawson indeed infringes

7    these claims in the configurations as set forth by Dr. Weaver

8    in his testimony.  Thank you.

9           MS. HUGHEY:  Good morning, Your Honor.

10          THE COURT:  Morning.

11          MS. HUGHEY:  I'd like to start by clearing up

12   something that may not have been clear from Mr. Robertson's

13   discussion today.  The fact is, if there's no catalog as

14   defined by the Court, then Lawson does not infringe, and we

15   don't have to go any further.  However --

16          THE COURT:  I think he said that.

17          MS. HUGHEY:  Yes.  However, even if there are

18   multiple catalogs, Lawson still does not infringe.  It doesn't

19   do the searching, the selecting, the equivalent items, the

20   things Mr. Robertson went into.  So I just want to make that

21   clear on the record, that catalogs are not the only

22   non-infringement argument in this case.

23          However, because it was discussed in great detail

24   with Mr. Robertson, I'd like to start with that.  I think both

25   parties agree that a full vendor catalog, like the Sears

1    catalog, meets the Court's definition of a catalog, and I think

2    both parties agree that at some point, single items don't meet

3    the definition of a catalog, like a phone list.  So the

4    question is, where is that line drawn.

5         What ePlus wants to do is drawn a line and say, if an

6    item, at some point, was in a catalog at any point, then it's a

7    catalog.  Even if --

8         THE COURT:  If I'm a user, and I have in front of me

9    a catalog, and I say, well, look, all I really am interested in

10   are the sweaters.  I don't care about boots and fly rods or

11   jack hammers and other things, and I take all of the section of

12   that catalog out of the vendor's catalog and put it into my

13   catalog, my item master, I have put a catalog or part of a

14   catalog in there, haven't I?

15        MS. HUGHEY:  That's an interesting argument, Your

16   Honor, but that's not the argument that ePlus is making --

17        THE COURT:  Answer my question, because whether it's

18   interesting or not to ePlus, it is interesting to me.  Haven't

19   I put a catalog into that database?

20        MS. HUGHEY:  So you're saying that you've ripped a

21   page out of that catalog --

22        THE COURT:  No, whatever.  I've taken the whole

23   section.

24        MS. HUGHEY:  That's not a vendor catalog.

25        THE COURT:  Not yet.  That's part of a vendor

1    catalog.

2         MS. HUGHEY:  That is a piece of data from a vendor

3    catalog.

4         THE COURT:  A piece of data.  Now, suppose that I

5    take the whole catalog and put it into my database; is that a

6    catalog?  Is that a vendor catalog?  Yeah.

7         MS. HUGHEY:  I think the evidence in this case would

8    be yes.  If you took the entire Sears catalog, it would be

9    considered still a catalog.

10        THE COURT:  Now, if I take Sears -- somebody used

11   Montgomery Ward.  I didn't even know it was still in business.

12   How did you know it was still in business?

13        MS. HUGHEY:  Saw it on eBay®.

14        THE COURT:  But I take three catalogs, I take

15   L.L.Bean, Magellan, and somebody else, and I put them in my

16   database, in my legacy system so it's got catalogs.  It's

17   got -- what I've got in my legacy system is vendor catalogs;

18   right?

19        MS. HUGHEY:  No, Your Honor.

20        THE COURT:  No?

21        MS. HUGHEY:  No.

22        THE COURT:  Why not?

23        MS. HUGHEY:  The actual facts in this case are --

24        THE COURT:  Why don't I have a catalog there under

25   what I just asked you?

1            MS. HUGHEY:  I feel like there may be two questions

2     pending.  The general question, is a Sears catalog a catalog,

3     yes.  The question of the Lawson's customers' legacy system is

4     a catalog is no.

5            THE COURT:  Even if they have all of those three

6     catalogs in there, and you bring it into the -- and Lawson

7     imports it into the customer's system for them, they don't have

8     catalogs in the item master and vendor table?

9            MS. HUGHEY:  In your hypothetical, that may be the

10    case, but those aren't the facts that we're dealing with.

11           THE COURT:  That doesn't make any difference.  How

12    your customers use it don't make any difference.  If the

13    principle is correct that if your system is capable of doing

14    that, then you are infringing.  Do you agree as to the

15    capability argument that Mr. Robertson made?

16           MS. HUGHEY:  I disagree for two reasons.  With

17    respect to the specific issue of the capability, the fact of

18    the matter is that whether a party is capable of infringing is

19    not the question.  It's whether it actually --

20           THE COURT:  No, it's not whether a party is capable

21    of infringing, it's whether the system, once it's sold, is

22    capable of an infringing use; right?

23           MS. HUGHEY:  That's right.  Same question, same

24    answer.  Capability is not the same as infringement.

25           THE COURT:  What case is that?

1          MS. HUGHEY:  I'm going to send you the *Ball Aerosol*

2    case.  The cite is 555 F.3d 984, and it's a 2009 Federal

3    Circuit case.  I'll read from it first.

4          THE COURT:  Has anybody highlighted it here?

5          MS. HUGHEY:  I haven't highlighted it, Your Honor.

6          THE COURT:  Where do I go?

7          MS. HUGHEY:  I'll direct you to page eight of the

8    actual -- in the right-hand corner, it says page eight, and the

9    heading starts on the left side, infringement.

10          What happened at the District Court was the District

11   Court found infringement right under the heading infringement.

12   We next turn to the second sentence.  The District Court found

13   infringement because the accused travel candle, quote, is

14   reasonably capable of being configured in such a way that the

15   holder is supported by the cover when the cover is placed open

16   and down on a surface.

17          The Court then went on, the next full paragraph at

18   the top of the second column, BASC's reliance on the cases that

19   found infringement by accused products that were reasonably

20   capable of operating in an infringing manner is misplaced since

21   that lines of cases is relevant only to claim language that

22   specified that the claim is drawn to capability.

23          What this is saying, Your Honor, is that if the

24   claims -- -in this case require actual catalogs, not the

25   capability of having catalogs, and because that element is not

1    met, there is no infringement.

2         To answer your question, I do agree with ePlus's

3    position that capability allows for infringement.  The second

4    question with respect to the specific issue of catalogs is that

5    here, there is no catalog.  Like I said, both parties agree

6    that at some point data that's been drawn from a catalog, a

7    vendor catalog and changed is not a catalog.

8         THE COURT:  But you don't even agree if I put my

9    whole catalog in, that I've got a catalog in the item master

10   vendor table.

11        MS. HUGHEY:  I would agree that that would be an

12   infringement if that happened, but it does not, nor is it

13   capable of happening.  That's my point.

14        THE COURT:  Why isn't it capable of happening?  In

15   fact, every witness that testified said it is, including Mr.

16   Christopherson.  What he said was, in words of one syllable,

17   sure, that can done, but that isn't the way it's usually used.

18   That's what he said.

19        MS. HUGHEY:  The evidence that was coming in was that

20   the item master -- all the evidence that came in about the item

21   master is that it is uniquely organized and created by a

22   customer, it does not look like a published catalog, it's a

23   private collection of personal items, has special price

24   information.  These are not -- this is a not a catalog, a

25   vendor catalog like the Sears catalog.  This is a grocery list.

1           THE COURT:  That isn't the question.  Your witness

2      testified that the -- that I could put one or more entire

3      catalogs into the item master if I wanted to depending on the

4      capacity of the item master I bought, and your position is that

5      even if I do that, the item master parts list, vendor item list

6      isn't a catalog, and I don't understand that at all.

7           MS. HUGHEY:  Your Honor, the evidence that came into

8      this case is that the item master is like a grocery list, and

9      so, yes, people were saying in theory -- in context, they were

10     talking about what kind of information could be drawn in, but

11     in reality, all the evidence came in that that item master is a

12     grocery list.  It is not a catalog.

13          THE COURT:  What about something -- you make it sound

14     like a grocery list that my wife goes to the store or sends me

15     to the store with a list of 20 items.  There are hundreds of

16     thousands of items in most of these item masters, and they

17     came -- all that information came from vendors, and it was --

18     and the information -- your user transformed some of it, edited

19     some of it and moved some of it, gave some information that's

20     not in the catalog such as price because they worked out a

21     special price deal, but what's in the catalog that is created

22     by the item master is the price, or what's in the item master,

23     whatever you want to call it, is the price, for example.

24          Now, I don't understand how you can have something

25     that's a hundred thousand items, or in many instances more than

1   that, and 10,000 vendors and you don't have a catalog of what's

2   in there just because it came from multiple sources.  That's

3   what you are saying.  You're saying you can't -- you don't have

4   a catalog because it came from 10,000 different vendors or a

5   thousand.

6           MS. HUGHEY:  No, that's not why it's not a catalog.

7   It's not a catalog because it doesn't meet the Court's

8   definition of catalog.  The Court's definition of catalog

9   requires an organized collection of items and associated

10  information published by a vendor.

11          At no point was any of the information pulled from a

12  catalog and then transformed, as we've gone through in great

13  detail, and then put into the item master, also known as a

14  grocery list.

15          THE COURT:  In fact, that's exactly what Mr.

16  Christopherson said did happen under the ETL process that he

17  testified to in connection with this exhibit, and the T in that

18  is transformation.  That is exactly what he did.

19          MS. HUGHEY:  The transformation is the whole point of

20  change.  There is a -- everyone agrees that the Sears catalog

21  or the Montgomery Ward catalog is a catalog.  It comes from

22  that point, it is -- it is changed and then put in the item

23  master like a grocery list.  That is the T.  That is what we're

24  talking about.  It's not the same.

25          THE COURT:  I don't understand why it isn't.

1          MS. HUGHEY:  It's not the same because it doesn't

2     meet the Court's definition of catalog.  The Court's definition

3     of catalog is an organized collection of items and associated

4     information published by a vendor.

5          THE COURT:  What is wrong with that?  You can't just

6     cite the whole thing.  You now need to tell me what part of the

7     definition it doesn't fit.

8          MS. HUGHEY:  Yes.  Specifically the published by a

9     vendor.  It requires the items --

10          THE COURT:  Why isn't it published by a vendor?

11          MS. HUGHEY:  The items in the item master have never

12     been published by a vendor.

13          THE COURT:  Of course they have.  Where did they come

14     from in the first place?

15          MS. HUGHEY:  There was a published vendor catalog.

16          THE COURT:  And that was published by the vendor.

17          MS. HUGHEY:  That was.

18          THE COURT:  Then I go to the catalog, I look at it,

19     and then I have Remmington shotgun model 12 in there.  Well, my

20     system won't take a Remmington shotgun model 12, so what I do

21     is I take that vendor information, and I transform it to RSG

22     and 12 so it will fit the number of characters.

23          All I've done is transformed the exact data, loaded

24     that into my system, and I have my own little catalog there.

25     If I want a AK-47 and a Berretta and a long gun, and I take

1    that and put it in there, too, and I change all those

2    definitions, what I've done is take from that catalog those

3    four kinds of guns.  Then I go to the next part of the catalog,

4    and I take the four kinds of ammunition for those four kinds of

5    guns, and then I go to the next part of the catalog and I take

6    the cleaning equipment for that kind of guns, and that's all I

7    want.

8            And I take that information, which is vendor

9    published information, I put it into my system, and when I do,

10   I transform it to a smaller segment of data so that it will fit

11   the computer that I'm using.  Why on earth isn't that still

12   data published by a vendor, it's just been transformed into

13   some different format?

14           MS. HUGHEY:  That's a database, right?  That list is

15   a database much like you could say your typed up grocery list

16   is a database.  It's not an organized collection of items

17   associated --

18           THE COURT:  Why isn't it an organized collection?

19   It's very organized.  It's my guns.  I've got it all under

20   guns.  I've got guns, ammunition.  That's about as organized as

21   you can get.

22           MS. HUGHEY:  ePlus's argument is that that grocery

23   list, that database is multiple catalogs, and the way they get

24   there is by saying, well, there's a metal catalog, you could

25   search metal; and there's a blue catalog because if any of

1    those guns or bullets are blue, that's a catalog, but the fact

2    is that just demonstrates exactly why this is not a catalog.

3    It's just a list of items, and it's not published by a vendor.

4              Yes, at some point maybe that gun was in a published

5    vendor catalog, but then it was put on my grocery list, and I

6    put my own special information; do I have a coupon, do I want

7    to get a specific color.

8              THE COURT:  Does that make the information that came

9    from a vendor, the published information, any less the vendor

10   published information just because you add some individual

11   information to it?

12             MS. HUGHEY:  And take away and transform it.  That's

13   the whole point.  It's not the same.  I think even ePlus will

14   agree at some point a list is no longer a catalog.  So the

15   question is, where is that line drawn.

16             THE COURT:  Where is it drawn?

17             MS. HUGHEY:  I believe it's drawn --

18             THE COURT:  Where is it drawn?

19             MS. HUGHEY:  The evidence in this case demonstrates

20   that the line between a catalog as defined by the Court is a

21   vendor catalog with the data in it versus my private personal

22   list with my private personal pricing information --

23             THE COURT:  There's nothing in the Court's definition

24   that even remotely does that.

25             MS. HUGHEY:  But that's my point.

2835

1        THE COURT:  Your argument is, in essence, that if you

2   take a just little bit from a catalog, that you don't -- and

3   make your own smaller kind of catalog out of it, that you are

4   not using data published by a vendor to create your catalog,

5   and you are.

6        MS. HUGHEY:  The words in the Court's construction,

7   published by a vendor, have to have some meaning.  If they

8   don't, then it could just be an organized collection of items,

9   and that's what it is when it's on the item master.  It's --

10       THE COURT:  I may have erred by injecting published

11  by a vendor into the construction, but I think I've

12  straightened it out by the definition that I've given.

13       MS. HUGHEY:  Even the Court's additional definition

14  recognizes that it has to be -- at some point, that information

15  was publicly available.

16       THE COURT:  It was.  It was publicly available in the

17  vendor's catalog.  That catalog is made available to the world

18  of people who want it, and you took it, and you took some of it

19  and you fixed.

20       Look, this is the world of computers, and it really

21  is wonderful that we're able to do these things.  What you've

22  got is a system that uses the vendor published information to

23  put together your item master, and the fact that you transform

24  it, I don't think, changes one bit the fact that it is

25  information published by a vendor.  That's what it was, and

 1    that's what it is, and I don't think you can change that.  Do

 2    you have any other argument?

 3              MS. HUGHEY:  Yes, I have many arguments.  I'd like to

 4    make one more --

 5              THE COURT:  You don't have too much time.

 6              MS. HUGHEY:  Yes, I understand.  One more point on

 7    this is that ePlus's own expert, Dr. Hilliard, went on record

 8    as saying that RIMS did not have a catalog of items, and the

 9    reasons that he provided are identical to the reasons that

10    we're talking about in this case.  So I just want to make that

11    very clear.

12              But, Your Honor, as I said at the beginning of this

13    argument, it's not just the question of whether Lawson has a

14    catalog that's relevant to the issue of infringement in this

15    case.  There are many other reasons why there is no

16    infringement.

17              Even if the item master is a single catalog, even if

18    the item master could be considered multiple catalogs, the

19    evidence in this case demonstrates that the other elements of

20    the claim are not met.  As Mr. Robertson discussed, the claims

21    in this case, all but, I think, one of them, and I can get you

22    the list, requires selecting and searching these multiple

23    catalogs, and Lawson's --

24              THE COURT:  '172-1 doesn't have any catalog component

25    to it.

1          MS. HUGHEY:  '172-1 does not have a catalog component

2     to it in the claim language.  However, I was referring

3     specifically to the selecting and searching requirement, and

4     that is met in claim one of the '172 patent.

5          Also, claim one of the 172 patent requires an order

6     list, and on the stand Dr. Weaver's infringement position on

7     claim one of the '172 patent was that the order list was met

8     because of the multiple catalogs requirements.

9          So while I will agree with you the words multiple

10    catalog -- catalogs do not occur in claim one of the '172

11    patent, ePlus's infringement argument relies on the requirement

12    of the multiple catalogs.

13          THE COURT:  Okay.

14          MS. HUGHEY:  Your Honor, so as I said before, the

15    selecting and searching requirements aren't met.  The

16    cross-reference table, the equivalent items, Dr. Shamos went

17    through, in great detail, why, even if there are multiple

18    catalogs, even if you consider the item master, which is just a

19    list of items, to be somehow catalog blue, catalog gun, catalog

20    however they decide they want to sort it -- because at this

21    point, we're all agreeing that it's not a catalog sort of by

22    any specific way by Lawson, right?  Even if that could be met,

23    these other requirements aren't met.

24          He went through in great detail, and with respect to

25    the UNSPSC codes, and I know that you discussed with Mr.

1    Robertson, again, to clear up any confusion that might have

2    been raised, the UNSPSC codes do not go down to this fifth

3    level in the item master.  There's no field to do that.

4            So just to be clear, Your Honor, when you were

5    talking about black pens, blue pens, that's not what the UNSPSC

6    codes are.  They get you to the row in the grocery store that

7    says -- or a Target that says, whatever, bath products, and

8    then from that point you have to go in and find what it is you

9    want by yourself.  It's not being done by the system.

10           So these UNSPSC codes do not meet this requirement of

11   equivalent items, cross-reference table.  ePlus has tried to

12   have them meet many different claim limitations.

13           In addition, Mr. Robertson relies on the parties'

14   statement of catalog.  There's no dispute in this case that

15   when the parties were using that term, quote, catalog, they

16   were not aware of the Court's definition, and they explained

17   what they meant.  Ms. Raleigh explained that she was using the

18   terminology of the customer.  So I think that it's clear on the

19   record that just because that word --

20           THE COURT:  I think that's all smoke and mirrors.

21   Your people knew what catalog meant, and it doesn't mean

22   anything different than what the Court's construction meant,

23   and the meaning those people were playing -- that's just a post

24   hoc rationalization concocted to defend a case.  They knew what

25   catalogs were, and they spent a lot of money to deal with

1    catalogs.  The whole business was converting catalogs, so I

2    can't buy that at all, but that's a question of credibility for

3    the jury, isn't it?

4                MS. HUGHEY:  That's right, Your Honor.

5                THE COURT:  So if I were the finder of the fact, I

6    would say, don't spend any time talking to me about that.

7                MS. HUGHEY:  Yes, Your Honor.  I'd briefly like to

8    move to the issues that Lawson -- just to be clear, not only

9    does Lawson oppose ePlus's motion for judgment as a matter of

10   law for the reasons that have been set forth, both in this oral

11   argument and during the course of the case, Lawson itself moves

12   for judgment as a matter of law on the issue of infringement.

13               ePlus has been fully heard, and no -- a reasonable

14   jury does not have a legally sufficient basis to find for ePlus

15   on the issue of infringement.

16               I'd like to just obviously point out the fact the

17   patentee bears the burden of proving infringement, and the

18   patentee must show that every single element is met.  The loss

19   of a single element is insufficient for a finding of

20   infringement.

21               THE COURT:  What does it mean for a claim to be drawn

22   to capability?  What does that mean?

23               MS. HUGHEY:  If the claim language demonstrates a

24   capability is what the claim is covering.  That's not what's

25   happening in this case.

1          Your Honor, I understand with respect to the

2     capability issue, I think that's something the parties are also

3     going to dispute with respect to the Court's jury instructions.

4          With respect to the punchout product specifically,

5     there is no single entity that performs all of the claimed

6     steps either of the method claims or of the systems claims with

7     respect to the punchout product.  And for that reason, there's

8     no direct infringement of the punchout product.  This Court can

9     grant judgment as a matter of law on that issue.

10          THE COURT:  Thank you.  All right.

11          MS. HUGHEY:  With respect to the method claims, I'm

12     not even sure that ePlus argues that Lawson practices the steps

13     of the method claims.  That evidence certainly didn't come into

14     the record during the trial.

15          When Dr. Weaver was opining on the issue of

16     infringement, he repeatedly asked -- was asked and answered

17     whether the customers performed the steps.  There was no

18     allegation that Lawson was performing the steps.  And really

19     there can be no argument that Lawson does not perform the steps

20     of selecting the products catalogs to search, searching for

21     matching items among the selected catalogs, or maintaining at

22     least two product catalogs on a database containing data --

23          THE COURT:  What if Lawson's hosting the system?

24          MS. HUGHEY:  What about Lawson's hosting system?

25          THE COURT:  What if Lawson's hosting the system?

1    Isn't Lawson doing it then?

2          MS. HUGHEY:  If Lawson is hosting the system, that

3    doesn't mean that Lawson is practicing the method step of

4    selecting product catalogs to search.  That's not what Lawson

5    is doing.  Method steps -- for direct infringement of a method

6    claim, it means that a party must perform every single step of

7    the method.

8          In this case, there's not even an allegation that

9    Lawson performs the steps of selecting the product catalogs to

10   search.  There's not even an allegation that Lawson performs

11   the step of searching for matching items among the selected

12   product catalogs.

13         That allegation was made of Lawson's customers.

14   There's no evidence on the record that Lawson does those

15   things, nor was an allegation made that that would be an

16   infringement.

17         THE COURT:  All right.  Thank you.

18         MS. HUGHEY:  Yes, Your Honor, just one final point

19   that was raised in our brief, but I'd like to raise it here at

20   oral argument.  ePlus's expert, Dr. Weaver, was extremely

21   conclusory with respect to the infringement allegations made at

22   trial.

23         THE COURT:  You say his testimony was conclusory?

24         MS. HUGHEY:  Yes, Your Honor.

25         THE COURT:  Can you put that one back in the barn?

1    Anybody who testified as long as he did, it's hard to say it

2    was conclusory.  I think the Federal Circuit would laugh me out

3    of the courthouse if I did that.

4           MS. HUGHEY:  No, Your Honor, actually what the

5    Federal Circuit has said -- specifically the means plus

6    function limitations, the Federal Circuit itself has said, to

7    establish infringement of a means plus function claim, quote,

8    it is insufficient for the patent-holder to present testimony

9    based only on a functional, not structural analysis.

10          Based on this requirement, the Court has repeatedly

11   either granted summary judgment, granted judgment as a matter

12   of law, or reversed District Courts that allowed the

13   infringement verdict to stand when the expert merely made

14   conclusory statements that the function was performed or that

15   the structure element was met without any statement of where

16   the structure was in the accused products, and I'll give you

17   two examples.

18          For the means for selecting a products catalog to

19   search, claim three of the '683 patent, Dr. Weaver opined as

20   follows, quote:  This is Mr. Robertson.  In each of these

21   scenarios, all five systems, do they provide the means for

22   selecting a product catalog to search?  Answer:  Yes.

23          That is the extent of Dr. Weaver's testimony on that

24   element.  Now, there is not just a mere, well, it's not really

25   in dispute, so let's just get it out there.  Whether these

1    claim elements were met is a disputed issue in this case.  Dr.

2    Shamos specifically said with respect to the means for

3    selecting product catalogs to search, there is not even

4    remotely any structure in the Lawson accused systems that

5    correspond to this element.

6             So what I'm telling you is that specifically with

7    respect to the means plus function claims, when the only

8    statement of infringement was, yes, that's met, that is

9    insufficient as a matter of law for this to be sent to the

10   jury.  ePlus does not have a basis to find for infringement on

11   these claims.

12            THE COURT:  All right.

13            MS. HUGHEY:  The same issue permeates the system

14   claims, but I wanted to point out the method claims because the

15   Federal Circuit has been so clear that you cannot just make a

16   conclusory statement, you must point out the structure.

17            THE COURT:  All right.  Thank you.  She just served

18   you up an air ball.  Take a swing at it and tell me why she is

19   not right on Dr. Weaver's testimony on means plus function.

20            MR. ROBERTSON:  Well, Dr. Weaver said he faithfully

21   applied the Court's construction, and the Court's construction

22   identified what the structures were that performed the

23   function.  Dr. Weaver introduced --

24            THE COURT:  Yes, but did he say what the structures

25   were on the Lawson side?  The point she's making, you have to

1    say what the structures were in the --

2         MR. ROBERTSON:  He did when he went through all the

3    modules and he talked about the guides that talked about the

4    purchase order module, the requisition module, the search

5    program, the order list, the user interface.  All those were

6    the structures that the Court defined as performing the various

7    functions.  So he went through that first in great detail as to

8    what all those modules were and --

9         THE COURT:  That's all I need.  I think that's

10   correct.  He didn't in response to that particular question,

11   but the hour or so that preceded that conclusion question dealt

12   with that, I believe, so I don't need to hear any more.

13        What about this capability thing?  These cases she's

14   talking about seems to say -- the copy from Lexus is fouled up.

15   It doesn't have in it -- it's got -- I don't know how it did

16   it, but it begins at one part, what is set out below in another

17   column, and it's almost as if -- one time I had a defendant on

18   the stand when I was a prosecutor, and I showed him a copy of

19   his confession, and his excuse for why the confession wasn't

20   right was that the computer -- that the copier had changed the

21   text of his confession, and I didn't find that very persuasive.

22        Now, for the first time, I find that a computer may

23   be capable of doing that, so I'm going to get a new copy of the

24   case and see if I can get it right, read the right part of it.

25   And I'm not saying anybody did anything funny.  I'm saying that

1   we think that the computer may have done something here.

2            MR. ROBERTSON:  Let me address that while I can.

3            THE COURT:  You know the case law?

4            MR. ROBERTSON:  I do.  I think one of the most

5   instructive cases --

6            THE COURT:  Capability has to be recited as an

7   element of the claim for the capability doctrine to apply

8   according to the case she cited.

9            MR. ROBERTSON:  I don't believe that's the case, Your

10  Honor.  Indeed, in fact in this case, I note that it's a simple

11  device.  It's a candle, a travel candle, a mechanical device,

12  and there was no evidence -- in fact, this section of the case

13  wasn't right.  There was no proof that this travel candle was

14  ever placed in the infringing configuration, and it's clear

15  that the travel candle does not necessarily have to be placed

16  in the infringing configuration.

17           Now, let me just say, we had ample evidence in here

18  that not only is it capable of doing it, but it, in fact, does

19  it.  For example, you will recall Mr. Matias.  He testified by

20  deposition.  He was a Lawson customer.  He had 36,000 catalog

21  items in his database, and he had 3,000 vendor catalogs.  You

22  recall that.

23           I asked Mr. Christopherson.  He said you could load

24  entire catalogs.  Ms. Albert asked Ms. Raleigh with respect to

25  specific customers, Jackson Health, for example.  The statement

1    of work says they loaded thousands of catalogs into their

2    system.  So this isn't a theoretical construct here.  We are

3    talking about actual evidence in this case that shows that it

4    performs in this way.

5                Now, I'd just briefly like to address the grocery

6    list argument, and that is, nobody pays hundreds of thousands

7    of dollars, even millions of dollars once these systems are

8    fully installed and maintained and serviced during the course

9    of their life, to put two catalogs and 15 items on them.

10   They're intended to have robust data in order to be able to

11   perform the kind of purchasing functionality that a large

12   corporation wants to do for its employees, and that was the

13   evidence in this case, and that's just a practical, common

14   sense approach to this stuff.

15               The documents that we saw that they provided

16   indicated they can do and they, in fact, do load the entire

17   vendor catalog.  The PO user guide said expressly that.

18   Indeed, there's no question, these capable-of-infringing cases,

19   Your Honor, often arise in the context of software, because

20   software is a situation where I can turn on some features and

21   turn off other features, or I can decide not to use any

22   features that might be there.  Your e-mail and your Microsoft

23   Outlook has a lot of features that I can use my calendar, I can

24   use my task list, I can use --

25               THE COURT:  If the fact that it has it and is there

1    to be used, it's infringed in that situation even if I don't

2    use it that way.

3              MR. ROBERTSON:  That's exactly right, because it's

4    capable of doing that.

5              THE COURT:  Is that a claim that recites capability?

6              MR. ROBERTSON:  It doesn't have to recite capability.

7    I think -- I haven't had a chance to review this case.  We have

8    provided --

9              THE COURT:  He cited *Fantasy Sports Propositions v.*

10   *Sportsline* in this case, this opinion, and it says, BASC's

11   reliance on cases that found infringement by accused products

12   that were reasonably capable of operating in an infringing

13   manner is misplaced since that line of cases is relevant only

14   to claim language that specifies that the claim is drawn

15   capability parenthetically.

16             Here, the language of the claims specifies that

17   infringement occurs only if the accused product is configured

18   with the cover being used as a base underneath the candle

19   holder with feet.  That the travel candle was reasonably

20   capable of being put into the claimed configuration is

21   insufficient for a finding of infringement.

22             MR. ROBERTSON:  I would respectfully suggest, Your

23   Honor, that all these claims are directed to something that's

24   reasonably capable of performing it, because it says it's an

25   electronic sourcing system comprising, and then it --

```
 1              THE COURT:  Comprising means including but not
 2  limited to.
 3              MR. ROBERTSON:  Your Honor, exactly right, and then
 4  it lays out that you just have to have means for doing this and
 5  means for doing that and means for doing that.  That's all
 6  about does it have the capability --
 7              THE COURT:  Means for doing it means it is capable of
 8  doing it.  Isn't that what that means?
 9              MR. ROBERTSON:  I think that's exactly right, and
10  even the ones --
11              THE COURT:  Is there a case that says means for is a
12  capability kind of claim?
13              MR. ROBERTSON:  I don't know as I stand right here,
14  Your Honor.  I would direct, Your Honor, to the Hilgraeve case
15  which is listed in our proposed jury instructions, but I have
16  the cite here.  265 F.3d 1336 at 1343, Federal Circuit 2001.
17  It's a case that both Judge Brinkema and Judge Spencer relied
18  on when they issued their capable of infringing instruction.
19              THE COURT:  265 F.3d what?
20              MR. ROBERTSON:  1336, 1343.  I actually have some
21  familiarity with the Fantasy Sports case because I represented
22  the plaintiff in that case at one point in time, and that was a
23  case that was tried before Judge Friedman, and the fact is,
24  there was no evidence that the system was used in the manner
25  that was suggested by the plaintiff.
```

1                THE COURT:  Is that what the case holds?  That's what

2      this case holds -- that's what this case about the travel

3      candle holds, that, in fact, there was no evidence that the

4      travel candle was used in the infringing way.

5                MR. ROBERTSON:  There's amble evidence in this case

6      that it's used in the infringing way, both from Mr.

7      Christopherson and --

8                THE COURT:  Here's the bottom line.  I'm the finder

9      of the fact.  I would clearly find that there is infringement

10     of everything that Dr. Weaver said, that each system infringed

11     each claim for the reasons he stated.  There isn't any question

12     that I would do that.

13               But I'm not the finder of the fact.  So under these

14     facts, under the evidence in this case, don't I have to let the

15     jury decide that case and then come back at the end of the day

16     and see whether that's right?  So what I'm inclined to do is

17     reserve judgment on this motion, because I will tell you -- I

18     personally am having real trouble deciding why there's any

19     defense to infringement at all.

20               MR. ROBERTSON:  I understand.

21               THE COURT:  But I believe that I do have to let the

22     case go to the jury subject to my ability to control that, and

23     I'm going to take this motion under advisement, deny the motion

24     of no infringement by Lawson, keep your motion under

25     advisement.

1              MR. ROBERTSON:  I understand, Your Honor.  Thank you.

2              THE COURT:  All right, now, invalidity.  I believe

3    that -- Ms. Hughey, are you doing that one, too?

4              MS. HUGHEY:  I am, Your Honor, and I promise to be

5    much slower this time.

6              THE COURT:  Because if you don't, you're going to get

7    knee-capped but not buy me.

8              Let's see.  Is this a good place for the court

9    reporters to switch and for us to take a little recess?

10

11             (Recess taken.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25