2851

1          THE COURT:  All right.

2          MS. HUGHEY:  Hello, Your Honor.  May it

3   please the Court.  Lawson moves for judgment as a

4   matter of law on the issue of invalidity because a

5   reasonable jury does not have a reasonable evidentiary

6   basis to find for ePlus on the issue.

7          At trial documents demonstrated and witnesses

8   testified --

9          THE COURT:  Now, there are three grounds of

10  invalidity.  One is anticipation.

11         MS. HUGHEY:  Correct.

12         THE COURT:  One is obviousness.

13         MS. HUGHEY:  Correct.

14         THE COURT:  And the other is written

15  description.

16         MS. HUGHEY:  No, Your Honor, Lawson is not

17  asserting written description.

18         THE COURT:  That was there at one time.

19         MS. HUGHEY:  Correct.

20         THE COURT:  That's no longer there.  So I

21  don't need to deal with that one.

22         MS. HUGHEY:  Correct.

23         THE COURT:  So you have anticipation and

24  obviousness.

25         MS. HUGHEY:  Correct, Your Honor.  At trial

1    the documents demonstrated and the witnesses testified

2    regarding the features and functionality of the prior

3    art RIMS system disclosed in the '989 patent.

4            THE COURT:  Let's take the anticipation.

5    What is it that anticipates?

6            MS. HUGHEY:  The RIMS system alone

7    anticipates every single claim of the patents-in-suit.

8            THE COURT:  All right.

9            MS. HUGHEY:  In combination, the RIMS system

10   and the TV/2 product render every single one of the

11   claims of the patents-in-suit obvious.

12           Dr. Shamos went through every single claim

13   and explained both the anticipation and obviousness

14   analysis.  The evidence at trial further demonstrated

15   that both systems are prior art.

16           The combination of RIMS plus TV/2 renders

17   every single asserted claim of the patents-in-suit

18   obvious.  The preferred embodiment disclosed in the

19   patents is the combination of RIMS plus TV/2 and the

20   Court's construction is consistent with that.

21           The TV/2 literature specifically says to

22   combine TV/2 with the parts ordering system and

23   inventory management system.  The RIMS system

24   disclosed in the '989 patent was a part ordering and

25   inventory management system.

2853

1           The patents-in-suit do no more than combine

2    the RIMS system with TV/2.  This is an obvious

3    combination that renders the claims invalid.

4           In addition, there are no secondary

5    considerations of non-obviousness.

6           THE COURT:  There aren't any?

7           MS. HUGHEY:  There are not any.

8           THE COURT:  I thought we had evidence on it.

9           MS. HUGHEY:  I think that ePlus attempted to

10   provide some evidence about commercial success of its

11   commercial products, but there's no evidence that the

12   commercial products are claimed by the

13   patents-in-suit.

14          THE COURT:  Well, Mr. Farber testified that

15   they were yesterday afternoon, didn't he?

16          MS. HUGHEY:  Mr. Farber is not a technical

17   expert.  He said it was his opinion they were covered

18   by the patents-in-suit, but no evidence has come in

19   regarding the features and functionality of ePlus'

20   commercial products.

21          THE COURT:  In your evidence, didn't you

22   introduce evidence that or didn't -- I don't know who.

23   Let me back away from that.

24          MS. HUGHEY:  Yes, Your Honor.

25          THE COURT:  There's some brochures about

2854

1    these e -- is it eContent and --

2            MR. ROBERTSON:  Content+ and Procure+.

3            THE COURT:  They put the patent down there on

4    the bottom of the thing.

5            MS. HUGHEY:  The fact that ePlus marks its

6    product with a patent does not mean that the product

7    is actually covered by the patents-in-suit.

8            THE COURT:  I know that, but isn't that

9    evidence that it is?

10           MS. HUGHEY:  No, Your Honor, because even if

11   ePlus' products --

12           THE COURT:  Just so I understand, you have to

13   have a technical expert come in and say the

14   products -- what are they again?  Content+ --

15           MS. HUGHEY:  Content+ and Procure+.

16           THE COURT:  Procure+ practiced the patent.

17   Don't you have to have an expert come in and say that?

18           MS. HUGHEY:  I'm not sure that you need to

19   have an expert, Your Honor, but you have to have some

20   disclosure of the functionality because commercial

21   success requires --

22           THE COURT:  How do you prove disclosure of

23   the functionality?  What do you mean by that?

24           MS. HUGHEY:  They would have to have some

25   disclosure about what their product actually is.

1    There's nothing in the record.  The fact is for

2    commercial success to be relevant, it has to be

3    relevant to the patented features.  And because

4    there's no evidence in the record, we have no idea.

5    Even if Procure+ and Content+ were covered by the

6    patents-in-suit, and let me be clear, there's no

7    evidence on that point, even if that were the case,

8    there's no evidence that any commercial success was

9    related to the patented features.

10          Moreover, there's actually no evidence of

11   commercial success in this case at all.  So even if

12   ePlus' products are covered by the patents.

13          THE COURT:  What do you mean by that?

14          MS. HUGHEY:  The only evidence that came in

15   was --

16          THE COURT:  When you make statements like

17   that, you kind of leave me floating around.  So it's

18   okay for you to say that, and then say, Let me explain

19   why I say that.  Because those are fairly conclusory

20   statements on which to base some kind of motion.

21          MS. HUGHEY:  Absolutely, Your Honor.

22          THE COURT:  Or judgment as a matter of law.

23          MS. HUGHEY:  Absolutely.  The evidence that

24   came in at trial with respect to Content+ and

25   Procure+, let's call them the ePlus products, was that

2856

 1   those divisions were not commercially successful.

 2   Those products never made money.

 3         I believe that on the stand Dr. Farber may

 4   have said, We won some awards.  We had some praise.

 5   But no documents came in suggesting that that was

 6   related to any of the features or functionality

 7   related to the commercial products, let alone that

 8   that was tied back to the claimed features and

 9   functionality of the patents-in-suit.

10         And more importantly, Your Honor, evidence of

11   commercial success, the secondary considerations,

12   would only be relevant if there were for some reason

13   no motivation to combine the prior art references.  In

14   this case what we have is an explicit motivation to

15   combine the TV/2 system and the RIMS system.  For that

16   reason, these secondary considerations of

17   non-obviousness don't apply.

18         THE COURT:  Well, you were at one point

19   making the argument in your papers, I think it was at

20   summary judgment, that you can't count the income that

21   came to ePlus from the settlements as evidence of

22   commercial success.  Are you still taking that

23   position?

24         MS. HUGHEY:  That's absolutely correct.

25         THE COURT:  Aren't those things paid up

1    royalties.

2            MS. HUGHEY:  No, Your Honor.

3            THE COURT:  Isn't that what Ariba is?  It's a

4    $37 million paid up royalty.  And SAP is what?  It's a

5    $17.5 million paid up royalty.  And the others are

6    paid up royalties except one of them has a runner of

7    2.5 after the first $15 million of sale in a calendar

8    year?

9            MS. HUGHEY:  The facts you just recited are

10   correct, Your Honor, about the license agreements, but

11   the fact is commercial success, the question is

12   whether or not the patented products were commercially

13   successful.  Those license agreements have nothing to

14   do with ePlus' commercial products.  That's the point.

15           THE COURT:  You mean you can't consider other

16   products that are licensed under the patents that are

17   sold pursuant to a license in considering commercial

18   success?

19           Suppose, for example, that I'm a company that

20   doesn't make anything.  I just own patent rights.  Are

21   you saying that in considering commercial success in

22   a challenge to an obviousness issue of one of those

23   patents that a finder of the fact could not consider

24   the revenues generated by the license agreements in

25   determining whether there was commercial success?

2858

1   Because in that instance the patentee would have no

2   commercial product at all.  And you're saying you have

3   to only consider the commercial product.  Is that

4   really what you want me to do?

5        If I did that, do you think the Federal

6   Circuit would say, Hmm, not a good decision, fellow?

7        MS. HUGHEY:  I'm confident in this case if

8   you conclude that there was no evidence of commercial

9   success, that the Federal Circuit would agree with

10  you.

11       THE COURT:  Boy, are you a thrill seeker.  Do

12  you know the extent that the Federal Circuit agrees

13  with District Courts is about 40 percent?  You know,

14  you don't want to the take that one to Las Vegas.

15       Okay.  But seriously, why does commercial

16  success have to be linked only to the products that

17  ePlus sells?

18       MS. HUGHEY:  Well, I think that that's what

19  ePlus is saying what's commercially successful is its

20  commercial products.

21       Now, with respect to the license agreement is

22  separate from ePlus's commercial.  So my point is I

23  think we're going to agree that ePlus' commercial

24  product was not commercially successful.

25       The second question is, well, can we look at

1     those license agreements and say, well, they were

2     licensing it.  So much like a company that had no

3     product, they were able to generate license revenue.

4     That's a different question.  And with respect to that

5     question, certainly in a scenario you gave, you don't

6     make a product but you go out and you license it, that

7     might be evidence of -- that might be a secondary

8     consideration.

9            In this case, the only evidence we have is

10    that they sue those companies and that those companies

11    pay to not be sued anymore.  To consider that --

12            THE COURT:  Well, they took licenses.

13            MS. HUGHEY:  They did take licenses to avoid

14    the litigation.  To consider that evidence of

15    commercial success would be like saying because that

16    company doesn't want to pay however millions of

17    dollars for attorneys' fees, therefore you should pay

18    a million dollars because you're saying that someone

19    else's decision not to be involved in litigation is

20    therefore somehow going to apply to a company that

21    isn't willing to make that payment.

22            Those license agreements aren't tied to the

23    commercial products.  We can both agree to that.

24            THE COURT:  Not to that commercial product.

25    They are tied to the commercial products of the

1  licensee.

2          MS. HUGHEY:  Yes.  So --

3          THE COURT:  Which practiced the patents.

4          MS. HUGHEY:  Yes, Your Honor.

5          The third question is, Well, could you look

6  at those licensees and see if they are commercially

7  successful because they're using your patented

8  products?  But there's no evidence in this case of any

9  commercial success of SAP, Ariba, or those licensees.

10  So that evidence doesn't exist.

11          I would agree with you that in theory that

12  might be relevant that you have licensed someone and

13  your licensee has gone off and been commercially

14  successful because all the features and functionality

15  of your patented technology.  That evidence isn't in

16  that case.  That's not the same as in this case.

17          So that's what I'm saying that there is no

18  evidence of secondary considerations of

19  non-obviousness in this case.

20          THE COURT:  All right.

21          MS. ALBERT:  Good morning, Your Honor.

22          THE COURT:  Good morning.

23          MS. ALBERT:  Not only does ePlus oppose

24  Lawson's motion, but ePlus' crossclaims for judgment

25  as a matter of law under Rule 50 that all the asserted

1   claims are valid.

2          Rule 50(a) provides that judgment as a matter

3   of law may be granted where a reasonable jury would

4   not have a legally sufficient evidentiary basis to

5   find for the non-moving party on that issue.

6          Lawson has failed to show that any of the

7   asserted claims of the patents-in-suit are invalid

8   under any theory, including anticipation under Section

9   102, obviousness under Section 103, or written

10  description under Section 112.

11         THE COURT:  Well, that's out of the case, she

12  said, so you don't need to address that.

13         MS. ALBERT:  So I would assume that the Court

14  would then grant judgment as they plead that theory in

15  the final pretrial order.

16         THE COURT:  Well, it's an affirmative

17  defense, isn't it?  I mean, isn't it a pleaded

18  affirmative defense?

19         MS. ALBERT:  Yes, Your Honor.

20         THE COURT:  Okay.

21         MS. ALBERT:  Furthermore, although Lawson

22  pled lack of enablement under Section 112, paragraph

23  1, they didn't raise that issue in the final pretrial

24  order.  So we would ask for judgment as to that issue

25  as well.

1          As a preliminary matter, there were several

2     prior art theories that Lawson had asserted in the

3     final pretrial order as to which Lawson did not offer

4     any evidence at all.  Specifically, anticipation based

5     on the King patent.  That theory, there was no

6     evidence presented at trial as to that theory.  So

7     ePlus would ask for judgment as a matter of law with

8     respect to that contention.

9          Lawson had also pled several theories of

10    obviousness based upon combinations, and there was no

11    evidence presented as to obviousness based upon the

12    combination of the P.O. Writer system and the J-CON

13    system, the RIMS system plus the Dworkin patent, and

14    the J-CON system plus the Dworkin patent.  So ePlus

15    would ask for judgment as a matter of law as to those

16    contentions.

17         In addition, ePlus also moves the Court to

18    find under Rule 52, or alternatively under Rule 50,

19    that Lawson has failed to show that any of the claims

20    constitute unpatentable subject matter under Section

21    101 or that any claim element is indefinite under

22    Section 112, paragraph 2.

23         Rule 52(a)(1) provides that in an action

24    tried on the facts without a jury or with an advisory

25    jury, the Court must find the facts specially and

1   state its conclusions of law separately.  The findings

2   and conclusions may be stated on the record after the

3   close of the evidence or may appear in an opinion or

4   memorandum of decision filed by the Court.  Judgment

5   must be entered under Rule 50(a).

6         Rule 52(c) provides that if a party has been

7   fully heard on an issue during a nonjury trial and the

8   Court finds against the party on that issue, the Court

9   may enter judgment against the party on a claim or

10  defense that under the controlling law can be

11  maintained or defeated only with a favorable finding

12  on that issue.  The Court, however, may decline to

13  render any judgment until the close of the evidence.

14        The key difference between Rules 52 and 50 is

15  that under Rule 52 the Court need not draw any

16  inferences in favor of the non-moving party, but can

17  make findings in accordance with its own view of the

18  evidence.

19        As the parties agreed in the final pretrial

20  order, Section 101 and Section 112, paragraph 2,

21  indefiniteness issues, are not for the jury to decide.

22  So, therefore, they are issues of law for the Court

23  and are ripe for decision.

24        THE COURT:  Are they issues of law or are

25  they issues on which the Court must make findings of

1   fact and conclusions of law?

2           MS. ALBERT:  Well, Section 101 is definitely

3   an issue of law.  The indefiniteness issues,

4   indefiniteness is an issue of law, but I believe that

5   there can be preliminary fact finding made based upon

6   the understanding of a person of ordinary skill in the

7   art.

8           THE COURT:  Yes, but what is it that's put to

9   the Court in this instance?  101 is patentability,

10  right?

11          MS. ALBERT:  Correct.

12          THE COURT:  112(2) is indefiniteness, right?

13          MS. ALBERT:  Correct.

14          THE COURT:  Are you saying both of those are

15  legal questions?

16          MS. ALBERT:  Yes.

17          THE COURT:  All right.  Go ahead.

18          MS. ALBERT:  As far as the issue of

19  anticipation, I'll address that first.  I believe that

20  in the final pretrial order, Lawson had also pled that

21  the P.O. Writer manual was a prior art printed

22  publication under Section 102A and 102B.  That was

23  paragraph 36 in the final pretrial order.  And the

24  defendant had contended in the final pretrial order

25  that the P.O. Writer system and manual anticipated

1    Claims 3, 26, 28 and 29 of the '683 patent, and Claims

2    1 and 6 of the '516 patent.

3         However, at the telephonic hearing on ePlus'

4    motion to enforce prior Court orders held on

5    December 30, the defendant voluntarily withdrew its

6    allegations that the P.O. Writer system anticipated

7    Claims 3, 28 and 29 of the '683 patent.

8         So the only claims that are still at issue, I

9    guess, would be Claim 26 of the '683 patent and Claims

10   1 and 6 of the '516 patent.

11        And with respect to those contentions, Lawson

12   failed to offer any expert opinion on those issues.

13   And the subject matter of the patents-in-suit

14   electronic sourcing systems and methods involves an

15   understanding of database and software that is

16   sufficiently complex to fall beyond the grasp of an

17   ordinary lay person.

18        Accordingly, in order to meet its burden of

19   clear and convincing evidence on invalidity, Lawson

20   was required to establish the existence of certain

21   features in this alleged prior art using expert

22   testimony.  And I would cite you again to the case of

23   *Proveris Scientific Corporation v. Innovasystems*, that

24   I believe we discussed the other day.  That cite is

25   536 F.3d 1256.  And that's a Federal Circuit decision

2866

1   in 2008.

2            THE COURT:   What's the first name of that

3   case?

4            MS. ALBERT:   Proveris, P-r-o-v-e-r-i-s.

5            THE COURT:   All right.

6            MS. ALBERT:   Now, turning to the issue of the

7   RIMS system.   As we heard Ms. Huey, the defendant

8   contend that some unidentified RIMS system was known

9   or used by others or on sale more than one year before

10  the filing date or in public use more than one year

11  before the filing date within the meaning of Section

12  102(a) and 102(b).

13           The defendant also contends that the '989

14  patent is prior art under 35 U.S. Code Section 102(e).

15  And the defendant contends that, I guess, all of the

16  claims are fully anticipated based on those theories.

17           No reasonable jury could find that any of the

18  asserted claims are anticipated by the '989 patent.

19  Furthermore, Lawson has introduced no evidence that

20  there was any knowledge or use by others of the RIMS

21  system as described in the '989 patent or any sales or

22  public use of the RIMS system as described in the '989

23  patent more than one year before the filing date of

24  the patents-in-suit.

25           Lawson failed to establish that a system

1   having all of the functionality disclosed in the '989

2   patent was actually in public use prior to the

3   August 10, 1994 filing date of the patents-in-suit.

4   Moreover, the testimony of the inventors here was to

5   the effect that the '989 patent, there was never a

6   system sold by Fisher-Scientific or offered for sale

7   that performed all of the functions described in the

8   '989 patent.

9          Apart from the '989 patent, Lawson offered no

10  evidence showing any functionality of any actual

11  commercial RIMS system that existed before August 10

12  of 1994.  Additionally, as to the '989 patent, it's

13  ePlus' contention that the '989 patent is not prior

14  art to the patents-in-suit.  Lawson concedes that the

15  only statutory basis for asserting that the '989

16  patent is prior art is under Section 102(e) of Title

17  35.  And that's in the final pretrial order at

18  paragraph 21.

19          THE COURT:  What about that now?

20          MS. ALBERT:  That's Lawson's only basis for

21  contending that the '989 patent --

22          THE COURT:  I don't have the statute in front

23  of me.  I don't have it readily at hand.  What's the

24  text of it?  What's the theory?

25          MS. ALBERT:  The theory is that Section

2868

1    102(e) provides that -- there must be -- it applies

2    to -- I can read it to you.   102(e) provides that a

3    person shall be entitled to a patent unless the

4    invention was described in an application for a patent

5    that was by another filed in the United States before

6    the invention by the applicant for a patent.

7             So as to the facts here, there is no inventor

8    of the '989 patent who is not also an inventor on the

9    three patents-in-suit.   In other words, the two named

10   inventors on the '989 patent, James Johnson and

11   Douglas Momyer, were also named inventors on all the

12   patents-in-suit.   Therefore, as a matter of law under

13   the statute, there is no basis for anticipation based

14   on a theory under Section 102(e).

15            Furthermore, the RIMS system lacks several

16   elements of the asserted claims and therefore cannot

17   anticipate any of the an asserted claims.   Among other

18   things, the RIMS system was not an electronic sourcing

19   system as defined by the Court's claim construction.

20   It was used by a customer service representative of a

21   distributor, not by a prospective purchaser as

22   required by the Court's claim construction.

23            And this evidence is found in the '989 patent

24   itself, which is DX 7, and it was also conceded by

25   defendant's expert, Dr. Shamos, at trial.

2869

1          Furthermore, the system described in the '989

2     patent lacks multiple sources for items, which is

3     required by all of the asserted claims.

4          The RIMS system did not include multiple

5     vendor catalogs as Dr. Shamos himself conceded.  The

6     database in the RIMS system contained only inventory

7     records and items and it lacked any associated source

8     related information.  And that was shown in table 6 of

9     the '989 patent.

10          Additionally, the RIMS system lacked any

11     catalog selection capability since it did not have

12     catalogs.  It also did not include the search program

13     as required to meet the Court's constructions under

14     Claim Three of the '683 patent.

15          THE COURT:  Didn't they offer evidence to say

16     otherwise on all those points?

17          MS. ALBERT:  Well, the evidence of record --

18     will, what's required by the Court's construction of

19     Claim Three of the '683 patent and Claim One of the

20     '172 patent is that you need to have a search program.

21     The part number lookup feature described in the RIMS

22     patent is not a search program.  It is a part number

23     lookup on a specific field in the database.  That is

24     not a search program.

25          THE COURT:  Didn't Dr. Shamos say it was?

2870

1          MS. ALBERT:   I believe he said it was a part

2    number lookup.   There's a distinction there.   It's

3    undisputed that it's a part number lookup.   That's the

4    way it's described in the patent.

5          And under your construction, you have

6    described the specific structures that are required to

7    satisfy that means-plus-function element, and those

8    specific structures require that there be a search

9    program.

10         The RIMS system also lacked the capability to

11   generate purchase orders from requisitions.   Purchase

12   orders were generated by a separate system on a Fisher

13   mainframe computer, and there was no linkage between

14   those purchase orders and the requisitions created by

15   the RIMS system since you required manual intervention

16   on the part of an employee at the Fisher host location

17   in order to supply vendor information, for example,

18   for the purchase orders because there would not be any

19   vendor information in the requisitions built by the

20   RIMS system.

21         Additionally, the RIMS system lacked the

22   capability to provide inventory concerning the

23   availability of items in external vendors' inventory.

24   The users of the RIMS system could only check the

25   internal inventory at the JIT facility or the

2871

1    inventory in the Fisher warehouses.  The RIMS system

2    lacked the capability to convert data about a selected

3    matching requisition item that was associated with one

4    source to data about a similar item from a similar

5    source.  Because there was no associated source

6    related information contained in the requisitions

7    built by the RIMS system, they simply cannot perform

8    that function.

9         With respect to the issue of obviousness

10   under Section 103, a claimed invention is invalid as

11   obvious only if it would have been obvious to a person

12   of ordinary skill in the art of the claimed invention

13   at the time that the invention was made considering

14   (1) the scope and content of the prior art relied upon

15   (2) the differences between each claim and the prior

16   art (3) the level of ordinary skill in the art at the

17   time the invention was made, an additional secondary

18   consideration that indicates that the invention was

19   not obvious.

20        When attempting to combine alleged prior art

21   references, there must be something in the prior art

22   as a whole to suggest the desirability and therefore

23   the obviousness of making the combination.

24        This requirement known as the teaching

25   suggestion or motivation to combine tests remains one

2872

1  test for analyzing obviousness following the Supreme

2  Court's decision in *KSR v. Teleflex*.

3        Further, it's often necessary for a court to

4  look at interrelated teachings of multiple patents,

5  the effects of demands known to the design community

6  or present in the marketplace and the background

7  knowledge possessed by a person of ordinary skill in

8  the art all in order to determine whether there was an

9  apparent reason to combine a known element in the

10  fashion claimed in the patent claims at issue.

11        To facilitate review, the analysis must be

12  made explicit.  An obviousness challenge cannot be

13  sustained by mere conclusory statements.  There must

14  be some articulated reasoning with some rational

15  underpinning to support the legal conclusion of

16  obviousness.  And we would suggest that with respect

17  to J-CON and P.O. Writer combination, J-CON plus

18  Dworkin and RIMS plus Dworkin, there was no

19  articulated reasoning in the record to combine those

20  systems.

21        As to the defendant's assertions that the

22  RIMS plus TV/2 system rendered obvious all the

23  asserted claims of the patents-in-suit, no reasonable

24  jury could find that any of the asserted claims are

25  rendered obvious by the combination of the RIMS system

1    as disclosed in the '989 patent or in public use or on

2    sale before August 10, 1994, and TV/2 as described in

3    a printed publication or in use before August 10 of

4    1994.

5              The combination of the RIMS system --

6              THE COURT:  It's your theory that none of

7    those things were public?

8              MS. ALBERT:  Well, actually, there has been

9    no evidence adduced that there was any RIMS system

10   containing all of the functionality as described in

11   the '989 patent that was ever in public use or on

12   sale.  And in addition, the IBM witnesses candidly

13   acknowledged that there was no TV/2 system in use

14   prior to the August 10, 1994 filing date.

15             The first commercial version of TV/2 was the

16   version that was used in connection with

17   Fisher-Scientific's electronic sourcing system.

18             THE COURT:  What about Ms. Eng?  She said

19   that it was on sale, TV/2, in 1991.  How do I deal --

20   she may be wrong, but isn't that a fact issue for the

21   jury to decide?

22             MS. ALBERT:  She said that IBM would have

23   made a system for you, but there was no commercial

24   product available.  And there's no corroboration in

25   the record to support that other than --

2874

1          THE COURT:  Wait a minute.  You've got two

2     different points.  One is it didn't happen, that it

3     was on sale.  One is that on sale doesn't mean I'll

4     make it for you if you ask me.  It has to be offered

5     for sale.

6          The other is even if it was on sale, the only

7     evidence of it is her oral testimony of the on sale,

8     and that that is insufficient as a matter of law, and

9     there's nothing by way of any documentation or other

10    testimony to document it.

11         MS. ALBERT:  That's correct.

12         THE COURT:  But didn't Gounaris testify that

13    it was on sale earlier than a year before 1994?

14         MS. ALBERT:  I think he testified that it was

15    not on sale prior to --

16         THE COURT:  He refuted Ms. Eng?

17         MS. ALBERT:  I believe when Mr. Robertson

18    cross-examined him, he'll conceded that it was not --

19         THE COURT:  Do you have his testimony?

20         MS. ALBERT:  I don't happen to have it here,

21    but we can certainly supply it in our brief.

22         THE COURT:  It's in your brief?

23         MS. ALBERT:  It will be in our briefing, yes.

24         THE COURT:  You didn't file a brief this

25    morning or last night, did you?

1      MS. ALBERT:  No, we have not filed our brief

2  yet.

3      THE COURT:  I told Ms. Haggard not to sleep,

4  that she's to be here all night to get briefs.  And

5  she didn't show me one.  So I thought she disregarded

6  my request knowing that you all work all night.

7      Okay.

8      MS. ALBERT:  I guess the Lawson team was

9  burning the midnight oil because they got theirs on

10  file at some wee hour of the morning.

11      In addition, the combination of the RIMS

12  system and TV/2 was disclosed by the inventors during

13  prosecution of the patents-in-suit and was considered

14  by the Patent and Trademark Office prior to the

15  issuance of the patents-in-suit.  Both the RIMS system

16  and TV/2 were referenced multiple times in the

17  specification of each of the patents-in-suit, and the

18  Patent and Trademark Office reviewed that disclosure

19  and found each of the claims allowable over those

20  systems.

21      THE COURT:  What point is made by that?  What

22  point are you making with that fact?

23      MS. ALBERT:  That Lawson cannot meet its

24  burden of clear and convincing evidence by asserting

25  the same prior art systems that were already

2876

1   considered by the Patent and Trademark Office.

2           THE COURT:  Well, they say that they weren't

3   disclosed as prior art.  Lawson says that the '989

4   patent wasn't disclosed as prior art because it's not

5   in the cited reference section on the first page of

6   the patent, the '683 patent.

7           You're saying it was disclosed and

8   incorporated by reference because it's mentioned in

9   the background section of the specification, I

10  believe, early on.

11          MS. ALBERT:  That's correct, Your Honor.

12          THE COURT:  What's the law on whether that's

13  disclosed as prior art or not?

14          MS. ALBERT:  I think we tendered a jury

15  instruction on this issue to Your Honor, but the law

16  that I have to cite to you would be the Manual of

17  Patent Examining Procedure of the Patent and Trademark

18  Office at Section 904.02.  And in that section, it

19  indicates that the examiner must fully consider all

20  the prior art references cited in the application.

21          So in the application itself and included

22  those cited by the applicant in a properly submitted

23  disclosure statement.

24          THE COURT:  What is a properly submitted

25  information disclosure statement?

2877

1          MS. ALBERT:  Pardon me?

2          THE COURT:  What is a properly submitted

3  information disclosure statement?

4          MS. ALBERT:  The Patent Office has a form.  I

5  forget the form number off the top of my head.  But

6  there's a form that you can use to submit prior art.

7          THE COURT:  Was the '989 in one of those?

8          MS. ALBERT:  No, the '989 was not disclosed

9  pursuant to an information disclosure statement, but

10 it was disclosed in the application itself.  And the

11 Manual of Patent Examining Procedure provides that the

12 examiner does fully consider all of the prior art

13 references cited in the application itself, and any

14 prior art references that are cited additionally by an

15 applicant pursuant to an information disclosure

16 statement.

17         THE COURT:  Right, but the issue here that

18 Lawson is contending is that cited in the application

19 part, not cited in the form part of it the disclosure

20 form, cited in the application means cited in the --

21 recited in the cited references which are (A) patents

22 and (B) other publications.  And that since it wasn't

23 cited, that is, the '989 wasn't cited, it wasn't

24 considered.  Isn't that their argument?

25         MS. ALBERT:  That is their argument.

2878

1          THE COURT:  What's the law?  Does the law

2     require that cited in the application means cited in

3     the cited reference other publications section or can

4     it be cited anywhere in the application itself?

5     That's the question.

6          MS. ALBERT:  Yes.  I have some cases on point

7     that do indicate that prior art described in the

8     specification is expected to be considered by the

9     examiner.  Anywhere in the specification, including in

10    the background of the invention, including in the

11    detailed description of the preferred embodiment,

12    anywhere.

13         THE COURT:  Anywhere between the abstract --

14    between the title of the patent and the listing of the

15    we claim language, it's fair game for consideration if

16    it is properly disclosed?

17         MS. ALBERT:  Correct.  The entire

18    specification is considered to be everything from the

19    cover page, which includes the title, the name of the

20    inventors, the reference cited, the drawing figures,

21    the background of the invention, the abstract, the

22    summary of the invention, the detailed description and

23    the claims.

24         THE COURT:  No, not the claims.

25         MS. ALBERT:  Pardon me?

1        THE COURT:  Not the claims.

2        MS. ALBERT:  The claims wouldn't cite a prior

3  art reference, that's true.  And the evidence of

4  record is that --

5        THE COURT:  What several cases do you have

6  that say that?

7        MS. ALBERT:  I can cite to you *Polaroid*

8  *Corporation v. Eastman Kodak Company*, 641 F.Supp 828.

9  And that's a District of Massachusetts case, 1985.  It

10  was affirmed by the Federal Circuit at 789 F.2d 1556.

11  Federal Circuit, 1986.

12        Also I can cite --

13        THE COURT:  1986?

14        MS. ALBERT:  Correct.

15        THE COURT:  Why was the Federal Circuit

16  deciding patent cases in 1986?  1987 wasn't it

17  created?

18        MS. ALBERT:  I think it was created in 1982.

19  And in that case --

20        THE COURT:  I know it was created earlier

21  than that, but up until '87, didn't the appeals from

22  District Courts go to the regional circuits or have I

23  got date wrong?

24        MS. ALBERT:  I think you may have the date

25  wrong.

2880

```
 1              THE COURT:  You mean I've erred again?

 2              MR. McDONALD:  Right when the Federal Circuit

 3    started doing patent appeals.  I think that was '82.

 4              THE COURT:  '82.  Could they hear all patents

 5    appeals beginning in '82?

 6              MS. ALBERT:  I believe so.

 7              THE COURT:  All right.  I just had the date

 8    wrong.

 9              MS. ALBERT:  I can hand up a copy of the

10    Polaroid decision, too, Your Honor.

11              THE COURT:  What happened in 1987?  Is that

12    when the statute changed on venue or was it -- no,

13    that was later.  Well, anyway, it doesn't make any

14    difference.

15              MS. ALBERT:  I can also cite Gould v. General

16    Photonics.

17              THE COURT:  Who?

18              MS. ALBERT:  Gould, G-o-u-l-d --

19              THE COURT:  Do you have a cite?

20              MS. ALBERT:  534 F.Supp 399.  It's a Northern

21    District of California case dated 1982.  And that case

22    stands for the proposition that to the extent that the

23    patent contains disclosure -- this was an optically

24    pumped laser prior art at issue.  This subject matter

25    was discussed as prior art in the specification of the
```

2881

1  patents-in-suit.  And therefore was considered by the

2  examiner as prior art in issuing the patents-in-suit.

3  And I can hand up a copy of that case as well.

4          THE COURT:  Thank you.

5          MS. ALBERT:  I can also cite the case of

6  *Indiana Mills and Manufacturing, Incorporated v.*

7  *Burrell Industries, Incorporated*, 458 F.Supp 2d 890.

8  It's a Southern District of Indiana case in 2006.  And

9  it says that despite the fact that the examiner failed

10 to list them in the appropriate sections of the

11 prosecution history, the Court presumes that the

12 examiner considered the Tacota 483 and Yang 550

13 references because those references were clearly cited

14 in the specification.  And I can hand up a copy of

15 that.

16         THE COURT:  All right.  Thank you.  What

17 else?

18         MS. ALBERT:  All right.  I don't know if you

19 want the MPEP section as well.

20         THE COURT:  Did you all -- I haven't had a

21 chance to read these.  Did you all highlight them so I

22 can find them?

23         When you're given a job, why don't you do it

24 right?  Have you forgotten what it's like to do the

25 hard work in the case?

2882

1          MR. ROBERTSON:  I apologize, Your Honor.  I

2    did highlight the MPEP cite.

3          THE COURT:  Boy, did you get a good start.

4    Then you went to bed.

5          MR. ROBERTSON:  I can do it during the next

6    recess, Your Honor.

7          MS. ALBERT:  Furthermore, the RIMS '989

8    patent is not available to be used in a prior art

9    combination for purposes of obvious as against Claim

10   One of the '172 patent under 35 U.S. Code Section

11   103(c)(1) as a matter of law.

12         The '989 patent was filed April 2, 1993 and

13   issued January 27, 1998 and named inventors Johnson

14   and Momyer, and was assigned to Fisher-Scientific.

15   Section 103(c) reads that subject matter developed by

16   another person which qualifies as prior art only

17   under -- and the relevant subsection here is

18   subsection (e) of Section 102 of this title, shall not

19   preclude patentability under this section where the

20   subject matter and the claimed invention were at the

21   time the invention was made owned by the same person

22   or subject to an obligation of assignment to the same

23   person.

24         So here we have the '989 patent, which can

25   only be prior art under Section 102(e).  That patent

2883

1   was assigned to Fisher-Scientific.  And the '172

2   patent was filed on March 22, 2000, and was assigned

3   to Fisher-Scientific.

4          The '172 patent has an effective filing date

5   of August 10, 1994.  And, therefore, this section

6   103(c) provides that as a matter of law, the '989

7   patent, which was commonly assigned at the relevant

8   time, cannot preclude patentability of any claim of

9   the '172 patent.

10          THE COURT:  '172 or '683?

11          MS. ALBERT:  This particular section only

12   applies to Claim One of the '172 patent.  Because the

13   statute was amended in 1999.  So that's the only one

14   of the three patents that was filed after that

15   statute.

16          THE COURT:  That's under 103(c)?

17          MS. ALBERT:  103(c)(1).

18          So we would submit that Your Honor should

19   grant judgment as a matter of law with respect to

20   Lawson's obviousness assertion as against Claim One of

21   the '172 patent based on the statute itself.

22          THE COURT:  Okay.

23          MS. ALBERT:  Further, the combination of the

24   RIMS system and the TV/2 search program lacks several

25   elements of the asserted claims and therefore cannot

2884

1    render obvious any of the asserted claims.

2              THE COURT:  Well, let me ask you something.

3    Is the combo claim barred under 103(c)(2) for the same

4    reason because one half of the combo is barred under

5    103(c)?

6              MS. ALBERT:  The combination claim as against

7    Claim One of the '172 patent is barred by Section

8    103(c(1) of the statute.

9              THE COURT:  So now you're talking about in

10   addition to that.

11             MS. ALBERT:  It says --

12             THE COURT:  In addition to that theory, there

13   are other reasons to bar the combo?

14             MS. ALBERT:  Right.  Correct.  I'm saying

15   that substantively the combination of the RIMS system

16   and the TV/2 search program lacks several elements of

17   the asserted claims and, therefore, does not render

18   obvious any of the asserted claims.

19             Among other things --

20             THE COURT:  Are they alleging that the '989

21   renders it obvious standing alone because it shows

22   RIMS plus TV/2?

23             MS. ALBERT:  My understanding of Lawson's

24   contention is that they are contending that the RIMS

25   system as described in the '989 patent in combination

2885

1    with the two TV/2 brochures renders the claims

2    obvious.

3              THE COURT:  But your 103(c) argument really

4    only relates to the combination of obviousness.

5              MS. ALBERT:  That's correct.

6              THE COURT:  It doesn't relate just to the

7    RIMS -- to the '989.  It relates to the combination

8    because the combination is the '989 RIMS plus TV/2?

9              MS. ALBERT:  That's correct.

10             THE COURT:  I just wanted to make sure I

11   understood you right.

12             MS. ALBERT:  That is correct.  But under

13   102(e) --

14             THE COURT:  Again, we're talking about the

15   '172, Claim One issue?

16             MS. ALBERT:  Correct.  But then with respect

17   to Lawson's contention that the '989 patent in and of

18   itself renders the claims invalid based upon a theory

19   of anticipation, it is ePlus' position that under the

20   statutory section, Section 102(e), that because the

21   '989 patent is not an invention by another, it cannot

22   be applied as prior art to invalidate any of the

23   claims of the three patents-in-suit.

24             THE COURT:  You just merged anticipation and

25   invalidity in that statement.

2886

1        MS. ALBERT:  Yes, but one of your questions

2    related to whether the '989 patent in and of itself

3    could be used to invalidate any of the claims.  So I

4    was just addressing that it's ePlus' contention that

5    the '989 patents in and of itself cannot be used as an

6    invalidating reference because under the statutory

7    section that's appropriate, Section 102(e), it is not

8    an invention by another, and, therefore, it does not

9    constitute prior art.

10        Even if the Court was to find that somehow

11   Lawson --

12        THE COURT:  103(c)(1) applies because it

13   wasn't developed by another person and has the common

14   assignability feature as to '172?

15        MS. ALBERT:  That is correct.

16        THE COURT:  So it's for both of those

17   reasons?

18        MS. ALBERT:  That's correct.

19        And even if Lawson could clear both of those

20   statutory hurdles, it's ePlus' position that the

21   combination of the RIMS system and the TV/2 search

22   program lacks several elements of the asserted claims

23   and therefore cannot render obvious any of the

24   asserted claims.

25        Neither the RIMS system nor TV/2 was an

2887

1    electronic sourcing system.  The RIMS system was used

2    by a customer service representative of a distributor,

3    not by a prospective buyer as the undisputed evidence

4    shows.  And that is specifically described in the '989

5    patent itself, and I believe defendant's expert Dr.

6    Shamos conceded that point.

7           The TV/2 program was simply a document viewer

8    program, not a procurement system, and that's

9    described in the TV/2 brochures, DX 105 and DX 107.

10          And neither the RIMS system nor TV/2 included

11   multiple product catalogs associated with multiple

12   vendors, and Dr. Shamos, Lawson's own expert, conceded

13   this point.  The RIMS system was a single source

14   system.  And TV/2 was simply a search program.

15          Neither the RIMS system, nor TV/2, included

16   any capability to convert data about a requisition

17   item associated with one source to data about a

18   similar item from a different source.  And then TV/2

19   didn't generate any requisitions at all.

20          The '989 patent discloses that there were no

21   sources associated with the line items in the

22   requisitions built by the RIMS system.  So the RIMS

23   system has no capability to convert a requisition line

24   item associated with a first source to a requisition

25   line item associated with a second source because the

2888

1    requisition line items were not associated with any

2    source.

3           Neither the RIMS system, nor TV/2, included

4    the capability to generate purchase orders from

5    requisitions.  TV/2 did not generate any purchase

6    orders at all.  And the RIMS system as described in

7    the '989 patent did not generate purchase orders from

8    data in the requisitions.  Rather those purchase

9    orders that were generated, if at all, were generated

10   at the distributor's mainframe host computer and

11   required manual intervention by a purchasing

12   department employee since the requisitions that were

13   generated by the RIMS system did not include any

14   source related data.

15          Neither the RIMS system nor TV/2 included the

16   capability to determine the availability of a selected

17   matching requisition item in external vendor

18   inventory.

19          And with respect to Ms. Hughey's argument

20   that the patents-in-suit do no more than combine the

21   prior RIMS system and the prior TV/2 system, it's

22   undisputed that there were numerous modifications that

23   were made to integrate the RIMS system and TV/2 in

24   order to build the patented electronic sourcing

25   system.  We have the inventors' testimony.  Dr. Shamos

1    conceded this point as well.

2         Among the modifications made to the RIMS

3    system were a modification of the user interface in

4    the RIMS system so that the system could be used by a

5    prospective customer.  The RIMS system was also

6    modified to accommodate multiple catalog databases

7    having items associated with vendors.  The prior

8    system did not include that feature.

9         The RIMS system was also modified to enable

10   the transfer of matching items that were found in

11   search results to a requisition and purchasing system.

12   The prior RIMS system did not have catalog databases.

13   It did not have a search program.  It did not have any

14   interface to transfer results of searches to a

15   requisition program.  There was also the addition of

16   the capability to the RIMS system to generate multiple

17   purchase orders from requisitions.  The prior RIMS

18   system, again, did not have the capability to generate

19   purchase orders from the requisitions but required

20   manual intervention.

21        There was a modification made to the prior

22   RIMS system to enable splitting a single requisition

23   into multiple purchase orders directed to multiple

24   vendors.  The prior RIMS system lacked that

25   capability.

2890

1          There was a modification made to the prior

2   RIMS system to enable communication to external vendor

3   databases to determine the availability of requisition

4   items in the vendors' inventory.

5          Additionally, there were modifications made

6   to TV/2.  TV/2 did not have the capability to search

7   catalog databases prior to the IBM personnel's work on

8   the project for Fisher-Scientific.

9          Additionally, as we heard from Ms. Eng and

10  the inventors, TV/2 was modified to add the capability

11  to be able to select catalogs to search.  Ms. Eng also

12  testified that TV/2 was modified during the

13  Fisher-Scientific project to build the order list that

14  was required in order to place matching items found in

15  conducting searches of catalogs.

16         Additionally, TV/2 was modified to build the

17  interface to accommodate the transfer of data between

18  the search program and the requisitioning system.

19  And, I mean, there were many more tasks.  I can't

20  remember them all, so I'm not going to go through them

21  all.

22         As to the questions concerning secondary

23  considerations that were raised by Ms. Huey, licensing

24  itself is a secondary consideration separate and apart

25  from the secondary consideration of commercial

1    success.  And Your Honor has recognized this in the

2    Court's jury instruction No. 42.

3            So ePlus' licenses are evidence of secondary

4    considerations of non-obviousness without regard to

5    whether or not there's evidence of commercial success.

6    Additionally, Mr. Farber did testify that the industry

7    had recognized the ePlus products that practiced the

8    claim invention with several awards.  And awards are

9    evidence of secondary consideration.

10           I think that addresses the points that were

11   raised by Ms. Huey.  Does Your Honor have any

12   additional questions?

13           THE COURT:  She said you can't consider any

14   licenses because you haven't shown that the licensees

15   themselves have had success.

16           MS. ALBERT:  The success of the licensees is

17   irrelevant to the question of licensing.

18           THE COURT:  It would be pertinent evidence if

19   it were shown.  If I have a license and the only thing

20   I make is made pursuant to the patent that is licensed

21   and I am successful, and you introduce that evidence,

22   that would be probative of the commercial success.

23           MS. ALBERT:  Yes, it would.

24           THE COURT:  But the failure to introduce that

25   evidence -- I mean, but that's not the only way you

2892

1  can consider licensing because the fact of licensing

2  is an indicia of commercial success -- I mean is a

3  secondary consideration independent of commercial

4  success.

5      MS. ALBERT:  That's correct, Your Honor.

6      THE COURT:  Okay.  Thank you.

7      MS. ALBERT:  Thank you, Your Honor.

8      MS. HUGHEY:  Your Honor, I look forward to

9  briefly addressing the issues that Ms. Albert raised,

10  but two specific issues that she discussed, one is

11  this incorporated by references issue, and, two, is

12  this 102(e) prior art issue.  Those are disputed

13  issues also with respect to the jury instructions.

14  And I know that we've gotten into them now.  So I

15  request the Court's permission to have Mr. Schultz,

16  who's much more familiar the incorporation by

17  reference issue address Ms. Albert's argument on that

18  point and have Ms. Stoll-DeBell address the 102(e)

19  issue, and I'll briefly discuss everything else if

20  that will be acceptable.

21      THE COURT:  All right.  I don't view this as

22  an incorporation by reference issue.

23      MR. SCHULTZ:  Your Honor, there was a

24  discussion about adequacy of the disclosure of the

25  '989 patent and whether it was considered by the

2893

1    Patent Office during Ms. Albert's discussion with the

2    Court.

3            Your Honor, what I have placed before you is

4    a section of the MPEP that actually is of the current

5    standard that it has to be or, excuse me, from the

6    1998, 7th Edition.  The case law that Ms. Albert

7    provided you was pre-1992.  And if I could refer you

8    to the second page of the MPEP document that I

9    provided to Your Honor on the right-hand column almost

10   midway under the first set of highlighting talking

11   about the effective date of March 16, 1992 of

12   requiring the disclosure of the cited prior art

13   references had to be in a particular format and the

14   information --

15            THE COURT:  Where is that you're saying?

16            MR. SCHULTZ:  It's on page 2 of document that

17   I handed you to you.

18            THE COURT:  That's the disclosure statement.

19   That's the second method she was talking about.

20            MR. SCHULTZ:  No, Your Honor.  The basic

21   point is if you turn to the last page of the document

22   of the 609 Manual of patent Examining Procedure,

23   left-hand side, to comply with the requirement --

24            THE COURT:  Wait a minute.  The last page?

25            MR. SCHULTZ:  Yes.

2894

1          THE COURT:  It says second.

2          MR. SCHULTZ:  The last page, if you look at

3    the bottom, it's 600-104.

4          THE COURT:  Yes.  And that's under the

5    section that says "legible copies."

6          MR. SCHULTZ:  No, the left column.

7          THE COURT:  Okay.  This is all patent

8    publications or other information.

9          MR. SCHULTZ:  That's correct.  In other

10   words, where I have it highlighted for Your Honor to

11   comply with this requirement the list may not be

12   incorporated into the specification but must be

13   submitted in a separate paper.

14          This is required by, if you continue reading,

15   Form PTO 1449, the information disclosure citation of

16   PTO, SB 08A and 08B information disclosure statement.

17   That's the requirement for a patent examiner to say

18   that the actual reference was considered by the patent

19   examiner post 1992.

20          The cases pre-1992 have no relevance because

21   the patent law that we're talking about is the period

22   of time post 1992.  This is the law that has to be

23   applied in Section 609 of the MPEP.

24          Your Honor, I do have some additional

25   conversation with respect to this issue; however, it's

1    pertinent to the jury instructions.

2              THE COURT:  What's the case that you cited?

3              MR. SCHULTZ:  Your Honor, the case that I

4    included with you, it's a case that distinguishes

5    Section 608.  And in the jury instruction that is what

6    ePlus cites to as Section 608, but that's the patent

7    examiner search as opposed to disclosure requirements

8    of the patentee.  It goes through and describes that

9    608 is not applicable to 609.  The MPEP section that I

10   provided to you is applicable.  And that is a post

11   1992 case, Your Honor.

12             THE COURT:  I don't understand the

13   difference.  What's the difference that you're talking

14   about?  I'm not following it.

15             MR. SCHULTZ:  Section 608 is what the

16   examiner searches.  In order to be found that the

17   examiner considered a piece of prior art, there's a

18   procedure that has to be followed by the patentee.

19   Section 609 describes that procedure.  609

20   specifically says that if a disclosure of a prior art

21   reference is included only in the specification, that

22   is insufficient for a court afterwards to consider

23   that as the examiner considering that as prior art.

24             That is exactly the issue with respect to the

25   '989 patent in this case.  This is post 1992 law that

1   if the patentee wanted the Patent Office to consider

2   the '989 patent as prior art, they had to disclose it

3   in an information disclosure statement on a separate

4   paper from the specification.  They did not.

5            MR. ROBERTSON:  What's the cite for that,

6   sir?

7            THE COURT:  Did you give them copies of what

8   you gave me?

9            MR. SCHULTZ:  Your Honor, I did think that I

10  did give them, however, I may have inadvertently not

11  given them the case.

12           MR. ROBERTSON:  Is it (unintelligible)

13  Pharmaceuticals?

14           MR. SCHULTZ:  That's correct.

15           I actually put that in a brief that I

16  provided to you that on other grounds.

17           THE COURT:  I don't want to hear anything

18  about it.

19           MS. STOLL-DeBELL:  Good morning, Your Honor.

20           THE COURT:  Good morning.

21           MS. STOLL-DeBELL:  The issue I was going to

22  address is ePlus' allegation that the RIMS prior art

23  cannot be considered in an obvious combination because

24  of what 103(c)(1) says, and I want to read that to

25  you.  I think what they're saying is you can't

2897

1    combining RIMS with TV/2 for the '172 patent because

2    they were commonly assigned at the time of the

3    invention.

4         THE COURT:  Developed by.  It doesn't meet

5    the developed by another person or owned by or

6    commonly assigned provision.

7         MS. STOLL-DeBELL:  So I think there are two

8    issues.  One is whether the '989 qualifies as prior

9    art under Section 102(e) because it needs to be

10   invented by another.  So I can address that as well.

11        And then the second issue is whether the RIMS

12   prior art can be used in combination to show

13   obviousness under 103.  And they say it can't for the

14   '172 patent because 103(c)(1) says you can't use

15   102(e) prior art if the 102(e) prior art was owned by

16   the same person that owned the patents that you're

17   looking at.  And I think neither of those apply.

18        THE COURT:  Why weren't they owned by the

19   person?

20        MS. STOLL-DeBELL:  They are.  I'm not

21   disputing that.

22        THE COURT:  Why aren't they developed -- why

23   were they developed by another person?

24        MS. STOLL-DeBELL:  Because under Section --

25        THE COURT:  I thought there were four

2898

1   inventors on one and two on the other.  And two of

2   them are in common.

3            MS. STOLL-DeBELL:  That's right.  So when you

4   look at --

5            THE COURT:  In the alternative, they are both

6   commonly assigned, aren't they?

7            MS. STOLL-DeBELL:  Your Honor, the law is an

8   inventive entity has to be identical under Section

9   102(e).  So even if there are two in common, there are

10  two that are not.  So that's a different entity.

11           THE COURT:  Statute 103, is it in the

12  alternative or instead of and commonly assigned?

13           MS. STOLL-DeBELL:  I'm not sure.  Are we

14  talking about Section 103?

15           THE COURT:  Listen.  I don't have the

16  statutes in front of me.

17           MS. STOLL-DeBELL:  I do.

18           THE COURT:  Let me have them.

19           MS. STOLL-DeBELL:  Okay.

20           THE COURT:  Subsection (c)(1) says, Subject

21  matter developed by another person qualifies as prior

22  art only under one or more of subsections (e), (f) and

23  (g) of Section 102, shall not preclude patentability

24  under this section where the subject matter and the

25  claimed invention were at the time the claimed

1    invention was claimed owned by the same person or

2    subject to an obligation of assignment to the same

3    person.

4         So your first argument was that they can't

5    meet the owned by the same person requirement because

6    there are four inventors of the '683 and two inventors

7    of the '989, right?

8         MS. STOLL-DeBELL:  Well, my argument is that

9    they were commonly assigned, but they are different

10   persons under 103 and 102(e).

11        THE COURT:  Wait a minute.  Let's just stop.

12   Are you contending that they cannot meet -- the '683

13   and the '989 do not meet the owned by the same person

14   requirement of Section (c)(1) because there were two

15   inventors for the '989 and four inventors for the '683

16   or I guess it's the '172, 1, is what it is.  The '172,

17   1, and they have to be a virtual identity, and the

18   fact there are two additional inventors to the '172,

19   1, keeps these patents from qualifying under at the

20   owned by same person rule.  Are you contending that,

21   first?

22        MS. STOLL-DeBELL:  No, I'm contending they

23   don't meet the developed by another person part of

24   that.  I do --

25        THE COURT:  It doesn't say anything about

2900

1    developed by another person.  It says owned.

2              MS. STOLL-DeBELL:  You're reading 103(c)(1)?

3              THE COURT:  It says owned by the same person.

4              MS. STOLL-DeBELL:  It says subject matter

5    developed by another person.  They were developed by

6    another person.  They were owned.  And I think my

7    argument with 103(c)(1), I admit they were owned by

8    the same person, and that's not my argument.  My

9    argument is the word "only."  If the prior art

10   qualifies only under one or more subsections (e), (f)

11   and (g).  And so this subsection (c)(1) doesn't apply

12   because RIMS doesn't qualify as prior art only under

13   102(e).

14             THE COURT:  What does it apply under?

15             MS. STOLL-DeBELL:  It also qualifies as prior

16   art under subsections 102(a) known and used before the

17   invention date.  And Section 102(b) on sale or

18   publicly used more than one year before the filing

19   date.  Therefore, it's not prior art only under

20   Section 102(e).  And Section 103(c)(1) does not apply

21   in this case.

22             THE COURT:  That's the whole thing?

23             MS. STOLL-DeBELL:  Yes, Your Honor, and I'm

24   sorry.  I mean, I think it gets a little complicated

25   getting into these patent statutes, but that's my

1    argument.  This doesn't apply because it's not prior

2    art only under 102(e).

3              THE COURT:  If I find that it's not prior art

4    under 102(a) and (b), then there's no issue here at

5    all anyway.

6              MS. STOLL-DeBELL:  Well, I think --

7              THE COURT:  Do you contend that it's prior

8    art under (e), (f) and (g), in other words?

9              MS. STOLL-DeBELL:  The '989 patent is prior

10   art under Section 102(e).

11             THE COURT:  (e)?

12             MS. STOLL-DeBELL:  (e).

13             THE COURT:  So if I find that it's not prior

14   art as a matter of law under 102(a) or (b) because the

15   predicates for those are not proven, that a jury

16   couldn't find by clear and convincing evidence that

17   the predicate hasn't been proven, then I have to look

18   at it under (c)(1) anyway because you contend that the

19   '989 is prior art under (e)?

20             MS. STOLL-DeBELL:  Yes, that's correct except

21   that I have another argument why this shouldn't apply

22   in this case.

23             THE COURT:  We're not going to hear that

24   right now.  We're going to finish this one and get

25   intellectually straight on it.  Then we can hear the

2902

1   others.

2          Now, I've framed the issue.  So the next

3   issue is 102(a).  Why have you clearly and

4   convincingly shown that the '989 is prior art under --

5   why could a reasonable injury find under the clear and

6   convincing evidence standard that the '989 qualifies

7   under 102(a)?

8          MS. STOLL-DeBELL:  Well, I think, Your Honor

9   for, 102(a) and 102(b), I think the analysis is the

10  same for both of those.

11         THE COURT:  What is it?

12         MS. STOLL-DeBELL:  For one thing, we looked

13  at the trademark application that was filed for RIMS,

14  and it said -- and they had a declaration under oath

15  that RIMS was being used in commerce, and you have to

16  do that to get a trademark application.  That they are

17  using the RIMS trademark on the RIMS system in

18  interstate commerce.  They are out there selling it.

19         THE COURT:  What date was that?

20         MS. STOLL-DeBELL:  I think it was -- I think

21  the application was filed in -- it alleges use of

22  August of '92.  When you file a trademark application,

23  Your Honor, you have to tell the Trademark Office when

24  you're using it.  Because you don't get trademark

25  rights unless you're actually out there using it.

2903

1   That's the whole point of the trademark.  That you're

2   using it in the public and your building brand

3   recognition.

4          THE COURT:  Using it in the public or using

5   it?

6          MS. STOLL-DeBELL:  Both.

7          THE COURT:  It's being commercially used, for

8   example.  RIMS is being commercially used without any

9   question by Lawson by that time.  Some version of

10  RIMS, right?  I mean, by Fisher.

11         MS. STOLL-DeBELL:  Absolutely.

12         THE COURT:  But we don't know which version.

13  We just know that some version was being used.

14         MS. STOLL-DeBELL:  We know that they

15  submitted that RIMS brochure with the Trademark

16  Office, and it was date stamped by the Trademark

17  Office August of '93.

18         We know that the lawyer for Fisher signed a

19  declaration with the Trademark Office saying I swear

20  that we are out there commercially using this brand,

21  RIMS, for this product as shown in this brochure at

22  least as early as '92.

23         So that's public.  They were out there using

24  it.  Otherwise, they couldn't get a trademark

25  application.  So we have that evidence.  We have the

2904

1   inventors talking about their use.  We have them going

2   and --

3             THE COURT:  There isn't any question Fisher

4   was using it commercially.  That's how they made their

5   money.

6             MS. STOLL-DeBELL:  That's right.

7             THE COURT:  But that's not publicly.  That's

8   private.

9             MS. STOLL-DeBELL:  I don't think so.  When

10  you file a trademark application, you say, I'm out

11  there using it in interstate commerce.

12            THE COURT:  The use is private.  They are

13  using it commercially, but they're not selling it to

14  other people to use, are they?

15            MS. STOLL-DeBELL:  Your Honor, that's what

16  use in commerce is, to get a trademark application.

17            THE COURT:  Ms. Stoll-DeBell, I'm talking

18  about what Fisher said they did with it.  As I

19  understand it, the Fisher system was used by the

20  Fisher people and a customer service representative

21  either on-site of the customer or on-site at Fisher.

22  Isn't that the evidence?

23            MS. STOLL-DeBELL:  Well, no, I don't think

24  so.

25            THE COURT:  Where was it used other than

2905

1    that?

2            MS. STOLL-DeBELL:  Well, I think they are out

3    their using it with customers.  They are using it in

4    their business.

5            THE COURT:  I'm using it.  You and I have an

6    arrangement.  I come to your place and I use it.

7            MR. ROBERTSON:  Your Honor, I don't like to

8    lead you into error.  But let me just suggest

9    something.  We would not argue that a RIMS system,

10   some RIMS system, was in public use, but the real

11   question is what RIMS system was in public use at the

12   time.  So the public use issue, I just want to put

13   this aside because I don't want Your Honor to waste

14   time on that.  We'll be addressing that.

15           MS. STOLL-DeBELL:  I think that issue,

16   there's plenty of facts to send to the jury on that.

17   You had testimony from the three different inventors.

18   You had the time line there.  You had the RIMS

19   brochure they filed with the Trademark Office, Your

20   Honor.

21           If you're secretly using something, you don't

22   go file a federal trademark application for it.

23           THE COURT:  What they are using, he said --

24           MS. STOLL-DeBELL:  I think the --

25           THE COURT:  Is there any proof about what

2906

1   they were using when in this case?

2           MS. STOLL-DeBELL:  Yes, I think there is.  I

3   think we saw that the time line.

4           THE COURT:  You-all just used the term

5   "RIMS."  And you-all just kept talking about RIMS, but

6   nowhere did you ever that I can recall specify what

7   the RIMS system was that was in use at any particular

8   time, and the evidence is that the RIMS system was

9   modified over time, from the time it was patented on,

10  and it never -- and there isn't any dispute that it

11  was up until 1994, and then when they began that

12  project with IBM, they even did more modifications.

13          The evidence -- let's just take the evidence

14  up until 1994 because I don't think the evidence after

15  1994 addresses itself to the point you're making, does

16  it?

17          MS. STOLL-DeBELL:  No.

18          THE COURT:  What was the date of this

19  application?

20          MS. STOLL-DeBELL:  August of '94.  I agree

21  with that.  What happened after August of '94 is not

22  relevant.

23          THE COURT:  Is there any evidence that you

24  know of that the RIMS system was not being modified

25  constantly from the time up until 1994?  I thought all

2907

1    the evidence showed that it was.

2            MS. STOLL-DeBELL:  Your Honor, maybe it was

3    modified, but we have to look at what do these claims

4    call for.  The claims call for catalogs.  They call

5    for searching catalogs.  Selecting catalogs to search

6    a requisition and purchase order.  Okay.  In the

7    simplest claim.  So whether the interface was modified

8    and there was graphical user interface, all of these

9    things they talked about, how fast it searched, none

10   of that matters to what is claimed.

11           And if you go look at that RIMS brochure

12   which has a date of at least as early as 1993, it has

13   all of those things.  It says it had catalogs.  It

14   said it applied to multiple different vendor.  It said

15   you could search.  It said it built requisitions.  It

16   said it built multiple purchase orders.

17           So all this other stuff that we heard

18   evidence on is not relevant.  All we have to show is

19   were the claimed elements present in RIMS before

20   August of 1994.  And there is absolutely evidence of

21   that.  There's evidence in the RIMS brochure alone.

22   There's evidence in the time line that Mr. McDonald

23   put up with -- I think it was Mr. Momyer.  Sorry.  Mr.

24   Kinross.  I think I was out of the court that day,

25   Your Honor, working on Dr. Shamos' slides.  But

1    there's plenty of evidence for these fundamental

2    features and these claims.

3            These claims are very broad and they are at a

4    very high level.  They don't say searching at a

5    specific speed.  They don't talk about something about

6    some footer bar.  None of that is in the claims.  And

7    it doesn't matter.

8            THE COURT:  Okay.

9            MS. STOLL-DeBELL:  Now, the other thing I

10   wanted to address quickly is I think Ms. Albert

11   said -- well, we're going back to the 103(c) issue and

12   whether you can use it in combination.  That should be

13   precluded in this case under Rule 37.  That was not a

14   theory disclosed in ePlus' contention interrogatories.

15           We served them with interrogatories asking

16   they specify their contentions to rebut our invalidity

17   contentions, and they gave it to us.  They

18   supplemented it.  It's 20 pages long.  Never did they

19   say that you can't use RIMS in combination with TV/2

20   because of Section 103(c)(1), and it's too late to do

21   it now, Your Honor.

22           In the original injury instructions that we

23   submitted in this case, and I believe there were a

24   couple of sets, we went back and forth for weeks,

25   meet-and-confer, we had phone calls, we exchanged

1    drafts, red line objections.  It wasn't in there, Your

2    Honor.  They didn't rely on Section 103(c)(1).  They

3    didn't say you can't use RIMS in combination with TV/2

4    for the '172 patent.  And they should not be able to

5    do so now.  They should have put it in their

6    interrogatories responses.  They should have -- I

7    mean, even had they put it in the jury instructions,

8    it was too late.  They needed to do it in response to

9    interrogatories during discovery.

10            THE COURT:  All right.  Thank you.

11            MS. STOLL-DeBELL:  We've been precluded from

12   a number of things for not having it in our

13   interrogatories, and they need to live by the same

14   rules that we have lived by.

15            THE COURT:  I agree with that.

16            MS. STOLL-DeBELL:  The last issue I wanted to

17   address -- sorry, Rachel -- is I think Ms. Albert said

18   that she doesn't think that the RIMS patent qualifies

19   as prior art under Section 102(e) because two

20   inventors are in common.  That's not law, Your Honor.

21   If there's any difference in the inventors at all,

22   even if two are in common, if one is different, it's a

23   different inventive entity under Section 102(e), and I

24   have a cite for that.

25            THE COURT:  What is that cite?

2910

1           MS. STOLL-DeBELL:  I lost it now.  It's

2    Manual of Patent Examining Procedure, Section 2136.04.

3           THE COURT:  What?

4           MS. STOLL-DeBELL:  2136.04.  And I'll get a

5    copy of that over.  I assume we're going to take a

6    break now.  I'll get a copy for everybody for that.

7    But it's very clear in patent law, 102(e) has to be

8    identical.  Every inventor has to be identical.

9           THE COURT:  Identical.

10          MS. STOLL-DeBELL:  Identical.  Any

11   difference, different inventive entity under Section

12   102(e).  Black letter patent law, Your Honor.  Thank

13   you.

14          THE COURT:  Okay.  I want to hear the other

15   side of this.  Excuse me.

16          MS. HUGHEY:  I was going to ask if that's

17   what you wanted.

18          THE COURT:  Thank you.  I didn't mean to be

19   rude.

20          MS. ALBERT:  Can I make just a few points I'd

21   like to address?

22          THE COURT:  Yes.  Come on.  That's what I was

23   trying to accomplish before we all die of hunger.

24          MS. ALBERT:  All right.  First of all.

25          THE COURT:  Let's take the 102(e) identical

2911

1    argument.

2            MS. ALBERT:  With respect to 102(e), I would

3    concede, Your Honor, that there is some split in the

4    cases that have analyzed that section.

5            THE COURT:  What about the Federal Circuit?

6    Is there a split there, too?

7            MS. STOLL-DeBELL:  Your Honor, I actually

8    have a copy.

9            THE COURT:  Give it to her and give it to me.

10   Or is that another one of these rare documents that

11   has only one copy?

12           MS. ALBERT:  I do have a Federal Circuit case

13   to cite, *Riverwood International Corporation v. Jones*

14   *and Company*, 324 F.3d 1346.

15           THE COURT:  324 F.3d. --

16           MS. ALBERT:  1346.

17           THE COURT:  What does that hold?

18           MS. ALBERT:  Well, in that case, the Federal

19   Circuit vacated the holding of invalidity by the

20   District Court based on the fact that the invalidating

21   prior art was not an invention by another under

22   Section 102(e), and in that case there were

23   differences between the inventive entities with

24   respect to the prior art and the patent-in-suit.  And

25   the Court held that what is significant is whether the

2912

1    portions of the reference relied on as prior art and

2    the subject matter of the claims in question represent

3    the work of a common inventive entity.

4         THE COURT:  So you measure commonality by

5    measuring the inventors of the '989 patent, RIMS, with

6    the '172 patent part that deals with RIMS?

7         MS. ALBERT:  Right.  Correct.  And I can --

8         THE COURT:  Is that what you're saying?

9         MS. ALBERT:  Yes.  I have a copy of that

10   decision.

11        THE COURT:  I had a case one time where the

12   issue was whether there was a shred day.  I'm about

13   ready to need a shred day up here.

14        Does that take care of that issue?

15        MS. ALBERT:  Well, with respect to the

16   question that Ms. Stoll-DeBell just raised about not

17   putting them on notice of this Section 103

18   contention --

19        THE COURT:  We're going back do that now.

20        MS. ALBERT:  We do have in the final pretrial

21   order, paragraph 67, we ePlus set forth its triable

22   issue that the '989 patent at the time the '172

23   application was filed was owned by the same person as

24   the owner of the rights to the '172 patent

25   application, Fisher-Scientific.  Accordingly, the '989

2913

1  patent cannot be used as part of a combination to

2  invalidate Claim One 1 of the '172 patent under

3  Section 103.

4        THE COURT:  Well, let's go back to the

5  beginning.  Did you ever supplement your interrogatory

6  answers other than by what we put in the triable

7  issues section?

8        MS. ALBERT:  I'm not sure about the

9  interrogatories, but, Your Honor, as a matter of law

10  under the statute --

11        THE COURT:  Under what statute?

12        MS. ALBERT:  Section 103(c) of the '989

13  patent cannot be used as part of a combination to

14  invalidate the claims of the '172 patent.  Of course,

15  we didn't tender a jury instruction on it because it

16  is a pure question of law.  So, therefore, it's not a

17  question appropriate for the jury.

18        Now, with respect to this argument about the

19  common inventive entity, Section 103(c) is written in

20  the alternative.  So the question is we're not

21  necessarily relying on the common inventive entity

22  prong of that statute.  We're saying simply because

23  the invention of the '989 patent and the invention of

24  the '172 patent were commonly assigned at the relevant

25  time, that is sufficient to find that the '989 patent

1    cannot be asserted as part of a prior art combination

2    under Section 103.

3            THE COURT:  Well, now, she says that you

4    can't even rely on Section (c)(1) because (a) even if

5    you win under the developed by another person rule

6    under *Riverwood*, that the subject matter does not

7    qualify as prior art only under 102(e), (f) and (g).

8    That it qualifies under 102(a) and (b) as well.

9            MS. ALBERT:  The '989 patent was not public

10   until 1998, therefore the only section of 102 that

11   applies to the '989 patent is Section 102(e).  That's

12   the only section that's relevant under the statute.

13   And Lawson itself in its triable issues contends that

14   the '989 patent -- this is at paragraph 30.  The '989

15   patent is prior art to the patents-in-suit at least

16   under 35 U.S. Code Section 102(e).

17           And there is no evidence.  There's an absence

18   of evidence that there was any system in public use

19   having all of the features that were described in the

20   '989 patent.  There is no evidence.  They brought

21   forth no system out there in the public domain prior

22   to 1994 that had all of the features stated in the

23   '989 patent.

24           THE COURT:  Okay.

25           MS. ALBERT:  As far as the evidence put on by

1   their expert, the only prior art relied upon by Dr.

2   Shamos was the '989 patent.  Dr. Shamos did not put

3   forth any obviousness allegations with respect to any

4   other prior art other than the '989 patent.  He didn't

5   contend that the RIMS brochure could be applied and

6   you could find each and every element of the claim

7   simply by virtue of the RIMS brochure.  There is no

8   evidence of that.

9          So you know the '989 patent in and of itself

10  only qualifies as prior art under Section 102(e) if at

11  all.  And, therefore, under Section 103(c)(1) because

12  it was commonly assigned at the relevant time with the

13  assignee of the '172 patent, it cannot be applied in a

14  Section 103 combination to invalidate the '172 patent.

15         Going back to the issues raised by

16  Mr. Schultz, he raised --

17         THE COURT:  Wait a minute.  I just need to

18  get something organized here.  Okay.  I need to have

19  this information.  I got it.

20         MS. ALBERT:  Going back to the issue raised

21  by Mr. Schultz --

22         THE COURT:  All of this that we've been

23  discussing so far in your presentation relates only to

24  the '172 Claim, One.

25         MS. ALBERT:  The 103(c), that relates only to

1  the Claim One of the '172 patent.

2         THE COURT:  Okay.

3         MS. ALBERT:  With respect to the issue raised

4  by Mr. Schultz concerning disclosure of the '989

5  patent in this specification.

6         THE COURT:  Those regulations seem to say

7  what he says, don't they?

8         MS. ALBERT:  Well, the information disclosure

9  statement and the format of an information disclosure

10  statement is irrelevant.  It's a red herring.  Our

11  point is that under the case law and under the Manual

12  of Patent Examining Procedure, it's fully acceptable

13  to disclose a prior art reference by virtue of citing

14  it in the patent specification itself.

15         I would agree with Mr. Schultz that --

16         THE COURT:  This doesn't fit the bill -- if

17  you were offering it under an information disclosure

18  statement, it wouldn't fly, right?

19         MS. ALBERT:  I would agree with Mr. Schultz

20  that if we were contending that the information

21  disclosure statement requirement was satisfied by

22  virtue of citing the patent in the specification, that

23  would not meet the required format for an information

24  disclosure statement.

25         THE COURT:  So your point here is that the

1    section on which he relied relates only to the

2    information disclosure section, and that the prior law

3    governs because you're not proceeding in that fashion,

4    right?

5            MS. ALBERT:  That's correct.  We're saying

6    that it's fully acceptable to disclose a prior art

7    reference by virtue of citing it in the patent

8    specification itself, and the examiner is required to

9    consider it if it's cited anywhere in the patent

10   specification.

11           THE COURT:  All right.

12           MS. ALBERT:  Thank you.

13           THE COURT:  Mr. Schultz, I believe this is

14   your motion on this point.  You have the last right --

15   I hope that's not what we have is the last rites.  You

16   have the right of last reply.  Although let's make

17   this the last rite on this issue.

18           How about that?

19           MR. SCHULTZ:  Sure.

20           THE COURT:  She says, and it looks to me like

21   she's correct, in looking at the regulation you gave

22   me, the whole topic is information disclosure

23   statement, and throughout it in places even where you

24   didn't highlight it there's a lot of discussion that

25   what we're talking about is information disclosure

1    statement.  She's not relying on the information

2    disclosure statement.  She agrees that if they were

3    relying on that, you would win.  But you don't, and

4    the prior law allows what's considered anywhere in the

5    patent.

6              Why isn't that right?

7              MR. SCHULTZ:  Two things, Your Honor.  In

8    1992, the patent law changed the way that the prior

9    art references were designed to be considered.  In

10   other words, for a prior art reference to actually be

11   considered by the patent examiner, it had to --

12             THE COURT:  Where does your authority say

13   that?

14             MR. SCHULTZ:  It's in 609.

15             THE COURT:  No, it isn't.

16             MR. SCHULTZ:  It's also in the CFR.  CFR

17   Sections 1.97 and 1.98.

18             THE COURT:  Is it in what you gave me?

19             MR. SCHULTZ:  It references those sections,

20   Your Honor.

21             THE COURT:  But you didn't give that to me.

22   I can't be charged with dealing with these arguments

23   that you have by sections you don't give me because I

24   have to read them.  Now, what you gave me deals only

25   with the disclosure statement.  And now you're saying

1    there's some other provision of law.  Where is the law

2    that you're talking about, Mr. Schultz?  I don't have

3    it and I need to read it.

4            MR. SCHULTZ:  You don't have that, Your

5    Honor.  I did not submit that to you.

6            THE COURT:  Then I'm not going to consider

7    it.  I have to bring an end to this somewhere.

8            MR. SCHULTZ:  Your Honor, the other issue

9    with respect to this whole thing --

10           THE COURT:  Besides that, it's silly.  It's

11   utterly silly to suggest -- I mean, what is this?  A

12   rule for convenience for the patent examiners?  Is

13   that what this is?  These people can't read for some

14   reason.  They are told in spades if you can't figure

15   out that a prior art is involved with a '989, you

16   ought not have that job, for Lord's sake.  It's not

17   mentioned but 50 times in there.

18           That rule, it doesn't make any sense.  So I

19   can't believe that you're uncited provision of the law

20   changes the preexisting law that I have seen on it.

21           MR. SCHULTZ:  Well, two things, Your Honor.

22           THE COURT:  Do you have that law that you're

23   relying on that says this changes the world?  Let me

24   have it.

25           MS. STOLL-DeBELL:  I don't have it here.

1          THE COURT:  Why wouldn't you think that was

2    the most important thing in the argument?

3          MR. SCHULTZ:  Because 609 cites to that law

4    and it describes what it is.

5          THE COURT:  You know what?  That an a nickel

6    will get you a Coke.  I've got to see the real law.

7          MR. SCHULTZ:  Section 609 further describes

8    the public policy behind having the applicant actually

9    provide a separate list as opposed to including it in

10   the specification.  600-604 in 609 of the Manual of

11   Patent Examining Procedure goes through the public

12   policy behind that.

13         THE COURT:  What is the public policy?  To

14   make it easier for the patent examiner so he doesn't

15   have to think?

16         MR. SCHULTZ:  That is part of the public

17   policy, Your Honor.

18         THE COURT:  The public policy, seems to me --

19   where does it say that in what you cited?  Where does

20   it say that?

21         MR. SCHULTZ:  It's on page 600-104, left

22   column, and it's highlighted.

23         THE COURT:  Yeah, but it's talking about the

24   disclosure statement.  You have got to come to the

25   party, Mr. Schultz.  That text that you're citing

1   relates to the disclosure statement.  And I understand

2   that, but that doesn't say that the prior law is

3   abrogated.

4         MR. SCHULTZ:  There is no other section that

5   provides that the patent examiner just by including it

6   in the patent specification will review the law.

7         Furthermore, ePlus does not actually dispute

8   that the '989 is prior art.  Why wouldn't the patent

9   examiner also think that same theory?  The patent

10  examiner did not include the '989 patent.

11        THE COURT:  The patent examiner actually

12  looked at all this.  He actually annotated -- there's

13  evidence in the record that he even changed the

14  application to the actual issued patent.  Clearly, the

15  guy or lady looked at, whoever it was.

16        I've heard enough.  If you have the 608 part

17  that says what you say, I'll look at that.  Otherwise,

18  I read this and it talks about the disclosure

19  statement.  And I'm going on with life.

20        MR. SCHULTZ:  Okay.  Your Honor, I'd just

21  also say that we filed a brief --

22        THE COURT:  Go get me this law that you're

23  talking about.  You know, you-all file briefs at

24  midnight.  I don't work 24 hours a day.  If I got paid

25  what you all did, I might do it, although I didn't.  I

1   only worked 18.  Come one.  Let's go.

2            Go get me if law and I'll look at it.

3            MR. ROBERTSON:  I simply observed, Your

4   Honor, the MPEP sections that you have that they have

5   provided you and we provided you come from the same

6   edition.  The 1998 version.  So that section says that

7   they read the application, and if it has the prior

8   art, they must consider it.  That's from the same MPEP

9   that Mr. Schultz is relying on.

10           THE COURT:  And it seems to me that the basic

11  rule is you read these things together so that they

12  make sense, and one provision doesn't gut the other

13  provision, and that's a standard rule of

14  interpretation that is generally to be followed.  And

15  the other thing is the rule of reason.

16           I just don't believe that just to make the

17  job easier for a patent examiner, they clearly

18  disclosed information that is clearly considered by a

19  patent examiner can't be taken into account in

20  assessing things.  That would make the Patent Office

21  exercise almost absurd.  And we can't construe

22  regulations as absurd.  We just can't do that.

23           MR. McDONALD:  Your Honor, I'd also note for

24  the record, I know the reexams aren't before the jury,

25  but the Patent Office on reexam for each of the three

2923

1    patents specifically said that this '989 patent
2    presented a substantial new question of patentability
3    because it wasn't a fact not considered.
4        I do think it's very unfair to do anything
5    that would portray to the jury that the Patent Office
6    must have considered it.  I know the reexam isn't
7    coming in, but when it's actually directly contrary to
8    the Patent Office's findings, and we agreed back at
9    the motions in limine, I just think that would be very
10   unfair.
11       THE COURT:  You know, you can deal with the
12   reexamination procedure in whatever way you want to in
13   the instructions, but that's not before me now.
14       MS. HUGHEY:  Your Honor, I don't want to beat
15   a dead horse, but can I have one moment to wrap up
16   before we close this?
17       MS. STOLL-DeBELL:  I have one short thing.
18       The 102(e) issue that Ms. Albert raised with
19   that *Riverwood* case, I wanted to explain -- and I
20   actually -- I want to explain what's going on with
21   that, Your Honor.
22       Each claim may have different inventors.  And
23   so you have the inventors on a patent, and it would be
24   all the inventors that may apply to all the claims.
25   But you do look at inventorship on a claim by claim

2924

1    basis.  So it's possible you may look at one of the

2    asserted claims in this case, and maybe only two of

3    the inventors invented that particular claimed

4    invention.

5              And so I think that's what that case is

6    talking about is, you know, you have to look at it

7    claim by claim.  But for 102(e) claim by claim it has

8    to be identical.  Even if two are in common, you have

9    two more, that's not the same inventive entity for

10   Section 102(e).

11             And in this case, we have no idea which of

12   the four inventors invented which portions of which

13   asserted claims.  There's no evidence in this case of

14   that.  And so the exception --

15             THE COURT:  Momyer and Kinross both said that

16   Momyer focused on the RIMS part of it.  He said that

17   was his job.  In fact, Mr. Kinross in dealing with the

18   line item, or what do you call it, the time line, said

19   he didn't really have anything to do with the RIMS

20   part of it, that we really have to ask Mr. Momyer what

21   all that meant.

22             Momyer was one of the inventors on the '989,

23   wasn't he?

24             MS. STOLL-DeBELL:  Right.  So you would have

25   to say --

2925

1          THE COURT:  Was it Kinross and Momyer?

2          MS. STOLL-DeBELL:  No, I think it was Momyer

3   and Johnson that were on the '989.  Then you had Mr.

4   Kinross added to the patents-in-suit, and someone else

5   whose name escapes me.

6          THE COURT:  Melly.

7          MS. STOLL-DeBELL:  So for 102(e) to not apply

8   this case, they would have to show that it was only

9   Momyer and Johnson that invented all of the asserted

10  claims in this case, and I think to the extent there

11  is any testimony on this at all, Mr. Kinross was

12  involved.

13         And the addition of Mr. Kinross makes it a

14  different inventive entity for 102(e), and so

15  therefore we can use that in this case.

16         THE COURT:  All right.  Okay.

17         MS. STOLL-DeBELL:  Thank you.

18         THE COURT:  I understand your argument.

19         MS. STOLL-DeBELL:  Thank you.

20         MS. HUGHEY:  Very briefly, Your Honor, just

21  to address some of the issues that Ms. Albert raised

22  with respect to the judgment as a matter of law issue.

23         She's seeking judgment as a matter of law of

24  no written description, enablement, claims that aren't

25  in the case anymore.  And the Court has -- I think you

1    recognized when I wanted to move for judgment as a

2    matter of law on unasserted claims that might not

3    cover certain products, you said, If it's not in

4    dispute, if they aren't contending it, there's no

5    judgment as a matter of law.

6              That's the same exact thing here.  There are

7    lots of defenses that Lawson could have raised but did

8    not.

9              THE COURT:  The difference, I think here,

10   is -- I'm trying to recall that point.  The difference

11   is that here you actually went into the trial pursuant

12   to the final pretrial order on these issues, and they

13   were issues as to which you had the burden of proof,

14   and you had to offer evidence on, and if you didn't,

15   you lose as a matter of law because you didn't offer

16   any proof on them, not because they were abandoned

17   before the case went to the jury.

18             I have to tell you, I don't remember what

19   you're talking about.  Can you help me a little bit

20   more?

21             MS. HUGHEY:  Yes, Your Honor.  So ePlus has

22   accused the (unintelligible).

23             THE COURT:  What?

24             MS. HUGHEY:  The products.  The EDI.  The

25   five accused systems of infringing.  And the pretrial

1   order, it was all systems accused of infringing, all

2   claims.

3            When Dr. Weaver was on the stand, he was very

4   specific; 2, 3 and 5.  And so at the end, I said,

5   Well, for those, 1 and 4, that aren't accused of

6   infringing anymore even though they were through the

7   beginning of trial, and they must have been abandoned,

8   I'd like judgment as a matter of law.

9            MR. ROBERTSON:  Mr. Momyer define the

10  systems.  In fact, those are the only five systems

11  that are at issue here.

12           THE COURT:  But that's not the argument that

13  she's making.  Let her finish.

14           MR. ROBERTSON:  I'm sorry.

15           MS. HUGHEY:  The point is, Your Honor said

16  that, well, if they didn't assert infringement on all

17  those systems, there's no need to grant judgment as a

18  matter of law, which makes sense to me because they

19  didn't prove that they weren't --

20           THE COURT:  But you're saying they came into

21  the case just like you did.

22           MS. HUGHEY:  Correct.

23           THE COURT:  They were asserting a theory of

24  infringement.  I should have granted judgments as a

25  matter of law on those infringements.

1          MS. HUGHEY:  I actually agreed with Your

2    Honor at that time that it didn't make sense.

3          THE COURT:  I know that if you were wrong and

4    I was wrong, we ought to straighten it out.

5          MS. HUGHEY:  Yes, that's right.  I suppose

6    the point is, Your Honor, I don't believe that ePlus

7    is entitled to judgment as a matter of law on written

8    description or enablement because those aren't defense

9    that we even raised at trial; however, if it's Your

10   Honor's position that a defense that was at some point

11   in the case and not dropped before trial can then have

12   a judgment as a matter of law granted against it, then

13   the same should apply to Lawson and we're entitled to

14   judgment as a matter of law on all those other claims.

15         THE COURT:  I think you're right about that.

16         MS. HUGHEY:  Okay.  To make that record

17   clear.

18         The second point, Ms. Albert raised the 112,

19   paragraph 6, and paragraph 2 on 101, issues of law.

20   The enablement issue of law and statutory subject

21   matter issue of law.

22         I agree with Ms. Albert.  That's an issue for

23   the Court to decide.  Lawson moved for summary

24   judgment on those pure issues of law.

25         THE COURT:  And I denied it.

1          MS. HUGHEY:  That summary judgment was

2    denied.  It's my understanding that that issue is now

3    preserved for appeal and that Your Honor doesn't have

4    to rerule on it, but just to make the record clear,

5    Lawson again moves for judgment as a matter of law on

6    the 112, paragraph 6, and 101 claims.

7          THE COURT:  How can you do that?

8          MS. HUGHEY:  Your Honor --

9          THE COURT:  You didn't try them.

10         MS. HUGHEY:  We did not try them.

11         THE COURT:  You relied for better or for

12   worse on the summary judgment decision.

13         MS. HUGHEY:  Correct.

14         THE COURT:  And your appeal point is that the

15   Court erred in failing to grant summary judgment.

16         MS. HUGHEY:  Correct, Your Honor.

17         THE COURT:  That's where the matter stays.

18   There's no judgment to be obtained on that at this

19   juncture, I don't think.

20         Now that was with respect to what issue?

21         MS. HUGHEY:  112, paragraph 2 and 6,

22   enablement issue, and the 101 statutory subject matter

23   issue.

24         THE COURT:  You mean the patentability issue?

25         MS. HUGHEY:  Correct, Your Honor.

2930

1            THE COURT:  112, six and what?

2            MS. HUGHEY:  Paragraph 2 and paragraph 6.

3            THE COURT:  And 2 is indefiniteness, right?

4            MS. HUGHEY:  That is indefiniteness, Your

5    Honor.

6            THE COURT:  And 6 is enablement, right?

7            MS. HUGHEY:  I'm sorry, Your Honor.  The 112,

8    paragraph 2, is --

9            THE COURT:  You-all quit using patent terms.

10   I don't have the statutes up here, and I don't have

11   them committed to memory like you-all do.  And I have

12   so much else going on up here, that I need to know

13   what you're talking about.  I use the short form

14   references to trigger my memory.

15           MS. HUGHEY:  I'm sorry, Your Honor.  I'm just

16   trying to make sure I'm very clear.  112, paragraph 2

17   and paragraph 6.

18           THE COURT:  Let's take 112, paragraph 2.

19   What are you talking about?  What is that one?

20           MS. HUGHEY:  Indefiniteness.  I'm sorry, Your

21   Honor.  I was having a moment.  112, paragraph 2 is

22   indefiniteness.

23           THE COURT:  And six is what?

24           MS. HUGHEY:  Also indefiniteness.  They go

25   together.

2931

1          THE COURT:  All right.  And those have

2    already been decided in the motion for summary

3    judgment, right?

4          MS. HUGHEY:  Correct.

5          THE COURT:  So I don't need to address those.

6          MS. HUGHEY:  That's any understanding.

7          THE COURT:  And then the 101 is the issue of

8    patentability, which is the subject matter or, i.e.,

9    the Bilski issue, and I erred as a matter of law in

10   failing to grant the summary judgment on that, right?

11         MS. HUGHEY:  Correct.

12         THE COURT:  And that's where it lies because

13   it never came into trial one way or the other?

14         MS. HUGHEY:  Correct.

15         THE COURT:  I don't need to deal with that

16   either.

17         MS. HUGHEY:  Okay.  And I think the issues

18   have been fully raised, but just for the record I

19   disagree with Ms. Albert.  Dr. Shamos explained every

20   element.

21         THE COURT:  You disagree with Ms. Albert on

22   general principles on everything she said.

23         MS. HUGHEY:  Correct, Your Honor.

24         If you have any questions, I'm happy to

25   answer them.

2932

1            THE COURT:  Thank you.  I don't.

2            All right.  I've got an injunction, and it's

3    a sealed hearing, so you can't come in, at 2 o'clock.

4    It shouldn't take half an hour.  And I'll see you-all

5    at about 2:30 for instructions.

6            MR. ROBERTSON:  Your Honor, could I just --

7            THE COURT:  The court reporter may kill you

8    or me, I'm not sure.  I'm going to send her to you

9    first.

10           MR. ROBERTSON:  Just one thing to tell the

11   Court.  EPlus withdraws its claim for willful

12   infringement.

13           THE COURT:  Then it's taken care of.  Thank

14   you.  We'll be in recess.

15            (Luncheon recess taken.)

16

17

18

19

20

21

22

23

24

25