1          THE COURT:  All right.  We're now going to deal with

2     the instructions.  I need to rule on the JMOLs about

3     invalidity, but right now I'm not going to do that.

4          All right, let's see, the instructions.  The protocol

5     is that you should just speak up clearly, because you have

6     paper in front of you dealing with things, so the court

7     reporter can hear you.  Any objections to numbers one through

8     11?

9          MR. ROBERTSON:  Your Honor, Lawson had a suggestion

10    for jury instruction number eight.

11         THE COURT:  What's that?

12         MR. ROBERTSON:  Lawson had a suggested for jury

13    instruction number eight, Your Honor, and I think we have some

14    agreed language to put in there --

15         THE COURT:  All right.

16         MR. ROBERTSON:  -- that I can represent to you.  It's

17    the second paragraph that starts, statements -- I'm sorry,

18    third paragraph that starts, statements, arguments, questions.

19         THE COURT:  Yes.

20         MR. ROBERTSON:  After the word not evidence in this

21    case, the parties would agree to insert moreover, questions of

22    the Court are not evidence in the case.  That was Lawson's

23    proposal, Your Honor, and we agreed to it.

24         THE COURT:  I think it's better in number seven just

25    to say, of course, the Court's questions are not evidence.

1          MR. McDONALD:  That's fine with us, Your Honor.  Then
2     we won't need it in eight.

3          MR. ROBERTSON:  That's agreeable, Your Honor.

4          THE COURT:  I'll have to say I follow the rule in
5     life that if you don't learn something new every day, the day
6     has been somewhat of a disappoint.  Now my day is definitely
7     not going to be a disappointment because I've learned something
8     new.  I'm sure much else.

9          All right, so now we're on 12.  Or, wait a minute.

10         MR. ROBERTSON:  I think the next one there's an issue
11    with is 18.

12         MS. STOLL-DeBELL:  Yes, that's correct.  We actually
13    filed a proposed redline for this instruction, number 18, Your
14    Honor.  I have a copy if you would like.

15         THE COURT:  Yes.  I'd love to have a copy.

16         MS. STOLL-DeBELL:  I thought Mr. Carr said he had a
17    copy, Your Honor.  Now I'm just baling on you.

18         THE COURT:  You have to watch Mr. Carr.  I think I
19    have a copy of the redline.  Hold on.  Let me get number 18 in
20    front of me.

21         MS. STOLL-DeBELL:  We didn't put page numbers on
22    here, so sorry for that.

23         THE COURT:  You listed it as your proposed redline to
24    number 18.

25         MS. STOLL-DeBELL:  Yes.  So the issue here, Your

1    Honor --

2            THE COURT:  Wait a minute.  I need to read and see

3    what you're doing.  Are you all in agreement with this?

4            MS. STOLL-DeBELL:  They do not agree.  We think the

5    Federal Circuit has made clear that for method claims, direct

6    infringement requires that the defendant perform each and every

7    step of the method, and the way it was written, that wasn't

8    clear.

9            THE COURT:  Are you saying that would -- that would

10   suggest that you think that in a method claim, there can't be

11   contributory or induced infringement; are you saying that?

12           MS. STOLL-DeBELL:  No, I'm talking about direct

13   infringement.  For direct infringement, the defendant needs to

14   perform each and every step of the method.  If the defendant

15   doesn't perform each and every step, then you can look to see

16   if some other third party performs each and every step, and

17   then if that's true, like Lawson's customer, then there may be

18   a situation where you have indirect infringement.

19           So, Your Honor, I thought -- I may have misspoke.

20   For Lawson to be liable for direct infringement of the method

21   claims, Lawson had to perform each and every step of the

22   method.  That doesn't -- that's a separate analysis from

23   indirect infringement.  This jury instruction, I think, is

24   relating to a direct infringement, and we need --

25           THE COURT:  No, it relates to all infringement.

1          MR. ROBERTSON:  Your Honor, I think the thrust of

2    this instruction has to do with explaining what method claims

3    are and explaining what system claims are, and that's it.  Then

4    later on, there's discussion about direct infringement and

5    indirect infringement.

6          THE COURT:  I think I did that back there.

7          MS. STOLL-DeBELL:  Even for indirect infringement in

8    this case, you still have to have one party --

9          THE COURT:  That's all taken care of back in the

10   back.

11         MR. ROBERTSON:  I agree, Your Honor.

12         THE COURT:  Let's wait -- let's preserve this.  I

13   don't want to do it twice.

14         MS. STOLL-DeBELL:  Well, I think the other confusion

15   is a system doesn't infringe a method claim, and right now it

16   says, an accused system uses each of the steps of the defined

17   claim.  It's confusing.  It's not the system that does the

18   method claim.

19         THE COURT:  What is it in this case that does the

20   method claim?

21         MS. STOLL-DeBELL:  It would be a person, a company,

22   Lawson, or Lawson's customers.

23         MR. ROBERTSON:  It would be a person using the --

24         THE COURT:  Using the system.

25         MR. ROBERTSON:  Or -- I guess Lawson hosting --

1          MR. McDONALD:  I think it's just simply, Your Honor,

2     the issue of who infringes a method claim.  It's an entity.

3     It's Lawson or a customer, I suppose, if it's induced

4     infringement, but a system doesn't infringe.  The lawsuit isn't

5     against a system, it's against a party.

6          THE COURT:  I think that's right.  I'm sorry.  I

7     thought the way it was written didn't --

8          MR. ROBERTSON:  Your Honor is right.  The system has

9     to be used by someone performing the steps.

10          MR. McDONALD:  How about if we say this, Your Honor:

11     In that language where we have the change, beginning after the

12     comma in that first line, it must be proved that a single

13     party, using the system, using the accused system --

14          THE COURT:  That's just what I did.  I said a single

15     party using an accused system performs each of the steps as

16     defined in that claim.  Is that all right, folks?

17          MS. STOLL-DeBELL:  Yes.

18          MR. ROBERTSON:  Your Honor, what's coming up here,

19     and I just want to preview this for the Court because I think

20     it's going to be repeated here.  I think this has to do with

21     this punchout notion that is going to be argued, because later

22     on, in both the direct infringement and other, there's a

23     substitution made that we have to prove that Lawson -- where is

24     the example?

25          They keep inserting that the system and method

1    performed by Lawson directly and indirectly infringed claims,

2    and that is put in there more and more and more, and we think

3    this is getting this whole situation wrapped up about punchout

4    where Your Honor was asking me questions about is joint

5    infringement direct infringement, can direct infringement be

6    performed by Lawson in this case through the punchout system,

7    and I answered Your Honor that it can be, because based on the

8    facts of what we have, that they are the ones who do the

9    protocols and the communications and they set it up and they

10   have the trading partners, and now it's being argued

11   essentially that if anybody else is involved whatsoever, that

12   can't be a direct infringement.

13          So they want to put in repeatedly, and you'll see

14   this nine or ten times, has to be performed by Lawson, to

15   create an argument that they want to make in closing that they

16   don't perform either some of the steps or -- of the method

17   claims.

18          We think that's simply improper to have that in

19   there, because it's the accused system that either is operating

20   or it's the accused system that's being used, not that

21   Lawson --

22          THE COURT:  I think the way to solve this problem is

23   it must be proved that use of an accused system performs each

24   of the steps as defined in that claim.

25          MR. ROBERTSON:  We would agree to that, Your Honor.

1          THE COURT:  And then we'll deal with the other

2     problem back in the back.  This is just a general instruction.

3          MR. McDONALD:  Just so we're clear, our concern about

4     that being left alone there is that it does imply if two

5     different discrete --

6          THE COURT:  Mr. McDonald, I'm thinking about the

7     jury, and I'm not going to instruct on every issue in every

8     instruction because that will confuse the jury.  That's

9     fundamentally one of the things that's wrong with the

10    instructions that you all filed.

11         It is sufficient, if I tell the jury one place back

12    at the place where we are talking about that, the issue, that

13    we do that, and I'll be glad to put it in someplace back in the

14    back which I thought I had done, but I'm just trying to give

15    them some general instructions here, and that's all that this

16    is.  It doesn't -- in ruling that way, I'm not foreclosing you

17    from raising it to put in an appropriate place, but this isn't

18    the place.

19         All right, the second page, Lawson -- wait just a

20    minute.  I need to do work on my master here.

21         MR. McDONALD:  Your Honor, can you confirm what

22    change you did make to instruction number 18 then so we're on

23    the same page?

24         THE COURT:  It must be proved that use of an accused

25    system -- I guess it should say involves each of the steps as

1    defined in that claim, instead of performs, but it could be

2    performs.  Performs is what I said.

3                MR. ROBERTSON:  That's fine, Your Honor.

4                THE COURT:  Does involve suit you all?

5                MR. McDONALD:  Performs is fairly --

6                THE COURT:  All right, performs.  Performs each of

7    the steps as defined in that claim.  All right, and then on the

8    next page --

9                MR. McDONALD:  We had proposed something there, but

10   we'll withdraw that proposed change, Your Honor.  I think

11   that's part of what we just agreed to with counsel for ePlus.

12               MR. ROBERTSON:  There's a typo, Your Honor.

13               THE COURT:  Where?

14               MR. ROBERTSON:  It should be comprising instead of

15   compromising.

16               THE COURT:  Well, you see what I had on my mind.

17   Where, what line is it?

18               MR. ROBERTSON:  I think it's actually --

19               THE COURT:  Comprising, yeah.

20               MR. McDONALD:  Last paragraph, the fourth line down

21   in the last paragraph.

22               THE COURT:  O-M needs to come out; right?

23               MR. McDONALD:  That's correct.

24               THE COURT:  That's the only place that comprising is

25   spelled wrong, isn't it?

1          MR. ROBERTSON:  We believe so, yes, Your Honor.

2          THE COURT:  All right.

3          MR. ROBERTSON:  Next one, 19, Lawson has made a

4     proposal, and we're agreeable to it.

5          THE COURT:  19.

6          MR. ROBERTSON:  One of ordinary skill in the art is

7     someone, and then strike a person.

8          THE COURT:  So the words a person in the field -- no,

9     a person would come out, and it should be, one of ordinary

10    skill in the art is someone in the field, et cetera, et cetera.

11         MR. ROBERTSON:  Yes, sir.

12         MR. McDONALD:  That's correct.

13         THE COURT:  Are you all in agreement with that?  I

14    think that's an improvement.  All right, anything else?

15         MR. ROBERTSON:  On number 20, Lawson has a suggestion

16    which we do not agree with.

17         THE COURT:  Wait a minute.  Let's see.  A vendor has

18    made generally known or has disclosed it took out.

19         MR. McDONALD:  It's certainly with trepidation we

20    come back to this instruction, Your Honor.

21         THE COURT:  When I instructed the jury before, I did

22    not -- somehow, I don't know how it happened, you all picked up

23    a copy of something that had been maybe from a court reporter

24    that I had read into the record at one time and asked -- and we

25    were discussing and it had, or has disclosed, and you all

1    questioned about it, but the definition I gave did not have as

2    disclosed in it, and that's what the jury has been told.  So I

3    think the correct instruction is as edited in Lawson's 20.

4          MR. ROBERTSON:  Well, Your Honor, I guess our concern

5    is, I mean, we received that from --

6          THE COURT:  You got that.  I don't know how you got

7    it, but you didn't get it from me.

8          MR. ROBERTSON:  Well, not directly, sir.

9          THE COURT:  Well, you did get it.  What you did is --

10   it is my words, but it was my words before I finished the

11   instruction.  It was articulated at the beginning.  We then had

12   discussion, and as a consequence of the discussion, I took out

13   as disclosed basically because all of the definitions that

14   anybody provided me just has made known, and I don't, frankly,

15   think there's any difference with it out.

16         MR. ROBERTSON:  Your Honor, could I just -- I won't

17   quibble with that.  Let me just make this for the record then,

18   if I could, sir, and that is, we did cross-examine witnesses on

19   it, and I did ask questions that utilized this language and did

20   get what I thought were favorable answers with respect to it.

21         Now if it's coming out, I don't think the jury is

22   going to have a specific memory of that, but I don't want to

23   hear -- I'd appreciate not hearing an argument made that

24   somehow the questions that were asked would not apply to this.

25         THE COURT:  They don't, because has made known and

1   has disclosed is the same thing.  It's redundant.

2          MR. MERRITT:  Your Honor, for the clarity of the

3   record, this may be where some of the confusion comes from.  At

4   page 1523 of the trial transcript, the Court was reading from

5   that piece of paper, and in that iteration, the transcript says

6   that the Court did use the term disclosed in talking to the

7   jury.  So that may be where some of our confusion is coming

8   from.

9          THE COURT:  I did use it to the jury?

10          MR. MERRITT:  Yes, sir, you did.  It was during the

11   Christopherson direct, and it's at page 1523.

12          THE COURT:  Read what's before that.

13          MR. MERRITT:  This is during an exchange with Ms.

14   Stoll-DeBell, and then the Court says, beginning at line three,

15   he was asked a different question.  I'm going to tell the jury

16   what the definition is --

17          THE COURT:  That's where I did it.

18          MR. MERRITT:  That's enough.

19          THE COURT:  What I did was take it out in the typed

20   form and left it in in the question if that's what the

21   transcript shows.  Then that's what -- that's the one the jury

22   was told about, and that ought to stay in then.

23          MR. MERRITT:  Beginning at line seven, just to

24   confirm --

25          THE COURT:  The reason I asked you to read what went

1    before is I know what triggered the issuance of the instruction

2    at that particular time.  It was made necessary by the

3    questioning, and so I decided that was the time to do it, and

4    if that's what the transcript shows, that -- it's obvious that

5    while I had edited out, or has disclosed, I did not edit it out

6    in telling the jury, and that's what the instruction should say

7    here.  Shouldn't be different.

8            Frankly, I don't think there's a whit of difference

9    between has disclosed and made generally known, and the only

10   reason I took it out is because all of the other definitions,

11   one way or the other, sort of equate disclosing and made known,

12   and I saw no difference, and so I was just trying to make it

13   simple.  But if that's what happened, then that's what

14   happened.  That's the way it needs to stay, I think.

15           So your objection, if that's what you have still --

16   who is that, Mr. McDonald talking or -- who is going to talk?

17   Do you object now with that background or not given what I

18   actually did?

19           MR. McDONALD:  What I recall is actually in the first

20   sentence, you also -- or the second sentence, you used to have

21   the language, or as disclosed, and you did remove it from that.

22   In this instruction, even as in the transcript here just read,

23   it just says, published simply means to make generally known

24   just as in instruction 20 in the second sentence.

25           I do have the remaining concern, though, that we have

1    this second reference to generally known that now has that

2    language on it.  So we're --

3              THE COURT:  I see what happened --

4              MR. McDONALD:  -- talking about the same thing in two

5    different ways.

6              THE COURT:  It is the same thing, and I did take it

7    out up there at the top, but I didn't take it out down in the

8    bottom in my edit.  That's what happened.

9              MR. McDONALD:  Exactly.  My concern is --

10             THE COURT:  What do you want me to do?

11             MR. McDONALD:  Take it out the second time --

12             THE COURT:  Not going to do it.  Objection overruled

13   and preserved.  I think I need to be consistent with what I've

14   already told the jury, particularly if I articulated it and you

15   all answered questions on it.  Either I'm right or wrong that

16   -- I don't think as disclosed makes any difference.  Then I

17   think you all are entitled to rely on what I the jury in open

18   court.  If I did it wrong, then I'm sure you'll be able to get

19   the Federal Circuit to do something with it.

20             All right, 21.  No objection to 21?

21             MR. ROBERTSON:  No, sir.

22             THE COURT:  22.

23             MR. ROBERTSON:  No objection.

24             THE COURT:  Now, 23, Lawson has a suggestion

25   somewhere.

1          MS. STOLL-DeBELL:  23.

2          THE COURT:  Yes, 23 is what I was trying to say.

3          MR. ROBERTSON:  Let's tell you what we agree on, and

4    then we can address what we didn't agree on, Your Honor, and

5    that is, you see by a preponderance of the evidence is

6    stricken.  Lawson has agreed to put that back in.

7          THE COURT:  Okay.  So it stays as it is in my

8    version.

9          MR. ROBERTSON:  Yes, sir.  On the next page, you see

10   the sentence that's stricken, you have heard evidence about

11   both ePlus's commercial products and methods and Lawson's

12   accused systems and methods.  Then the next line, however,

13   stricken.  We agree that that can come out.

14         THE COURT:  So you have heard evidence comes out?

15         MR. ROBERTSON:  Right through to however.

16         THE COURT:  Yes.

17         MR. ROBERTSON:  Including the word however.

18         THE COURT:  You have heard evidence about both

19   ePlus's commercial products and methods and Lawson's accused

20   systems and method, however.

21         MR. ROBERTSON:  We think the next sentence covers

22   that.

23         THE COURT:  I think it does.

24         MR. ROBERTSON:  Not as modified by, so now we have --

25   this is now where we have issues --

1          THE COURT:  Wait a minute.  There's another proposed

2     change in Lawson's on the first page of 23.

3          MR. ROBERTSON:  This is where the performed-by-Lawson

4     issue comes up.

5          MR. McDONALD:  Let us suggest something here.  I

6     think what we'd be willing to do, Your Honor, is we've got a

7     number of clauses here in the first, second, and fourth

8     paragraphs where we added the words performed by Lawson in our

9     proposal.

10          We're willing to withdraw those and just get the

11     issued narrowed down to what we had in the last paragraph of

12     the instruction.  We have that new sentence added that says,

13     direct infringement of a method claim results if a single party

14     performs all of the steps of a method claim.

15          THE COURT:  Wait just a minute.  So, performed by

16     Lawson comes out everywhere in your proposal.  So my

17     instructions are all right on the second page as well with the

18     exception of the second paragraph where we deleted the language

19     about which we just spoke.  And now you want to add, down in

20     the last paragraph --

21          MR. ROBERTSON:  Before we get there, Your Honor,

22     there is a performed by ePlus there as well.  Have we agreed to

23     take that out?

24          MS. STOLL-DeBELL:  Yes.

25          THE COURT:  Okay.  That's in the penultimate

 1   paragraph of the instruction.  All right, now, in the bottom

 2   paragraph, let's see what you are doing here.

 3             MR. McDONALD:  Actually, we have two changes, Your

 4   Honor, there.  I read in the one sentence, and then we've also

 5   had a change in line two there after the direct infringement

 6   adding the word of a system claim, and we would continue to

 7   seek both of those changes even as we withdrew the others.

 8             MS. STOLL-DeBELL:  This goes to the issue we were

 9   talking about before.  For a method claim, you have to have one

10   party perform all of the steps for direct infringement.

11             THE COURT:  That's correct, isn't it, Mr. Robertson?

12   And then you read on to it -- that's consistent with the -- it

13   doesn't preclude any induced infringement.

14             MS. STOLL-DeBELL:  It doesn't say Lawson, it says a

15   single party.

16             MR. ROBERTSON:  Do you mind, Your Honor, if I just

17   confer for a minute with my colleagues?  What I would suggest

18   is, of a system claim doesn't need to be added because it says

19   direct infringement results if the accused product, and in this

20   instance, that happens to be a system.

21             THE COURT:  I think what I've been doing is --

22   another way I have done that is an accused system is covered by

23   one or more or all of the claims of the patent.  That is the

24   same thing.

25             MR. ROBERTSON:  That is agreeable.

1              MR. McDONALD:  We would agree with that, Your Honor.

2              THE COURT:  Instead of accused product, take system

3    out.  And then I had in there as well, or method, and it is

4    this --

5              MR. ROBERTSON:  I think the or method should stay in

6    there as well, Your Honor, results of the accused system or

7    method is covered by one or more or all of the claims of the

8    patent.

9              THE COURT:  Because it's talking about what's

10   covered, and they want to add the sentence, direct infringement

11   of a method claim results if a single party performs all of the

12   steps of a method claim and then we pick up with induced

13   infringement and contributes, and then we explain contributes.

14             I think that gets it clear and takes care of Lawson's

15   apprehension as well as allows you all -- it doesn't trap

16   anybody.  So I would add -- I think I would leave or method in

17   the first -- second sentence, and I would add Lawson's third

18   sentence; is that all right with folks?

19             MR. ROBERTSON:  That's agreeable, Your Honor.

20             MR. McDONALD:  That's agreeable.

21             THE COURT:  Okay.  I don't think it ought to be

22   single part, because that suggests it should be one of you two,

23   and it's the single entity.  Isn't that right?

24             MS. STOLL-DeBELL:  The claims say actor.  I put party

25   because it seems more clear to me, but I think actor entity --

1          THE COURT:  I think entity is more consistent with

2     what we've got here.

3          MR. ROBERTSON:  Just -- Your Honor, in most

4     instances, it's the customer using the product, and so, can we

5     say entity or actor?  The jury might be confused.  Is a

6     customer performing the steps of the method an entity?

7          THE COURT:  Yeah.

8          MR. ROBERTSON:  I understand that, I know the Court

9     understands that.  I'm a little worried the jurors might be

10    confused --

11         THE COURT:  Oh, actor is all right, I guess.

12         MS. STOLL-DeBELL:  Actor is fine.

13         THE COURT:  It should be of that claim, shouldn't it,

14    instead of repeating method again?

15         MS. STOLL-DeBELL:  That's fine.

16         THE COURT:  All right.  Then I'll put that in as

17    the -- right before we start with indirect infringement.  That

18    ought to take care of what you all need to have done.

19         MS. STOLL-DeBELL:  The next issue, Your Honor, is

20    jury instruction number 25.  We got into this issue a little

21    bit this morning.  It's about this capability case law.  I

22    wanted to explain that a little bit more to you.

23         THE COURT:  Let me read the instruction here.  All

24    right, I've refreshed my recollection and seen your changes.

25    Wait just a minute before you proceed.  What did you hand me on

1  that issue?

2          MS. STOLL-DeBELL:  Ms. Hughey handed you a case out

3  of the Federal Circuit, 2009, *Ball Aerosol v. Limited Brands,*

4  *Inc.*

5          THE COURT:  Yes, there it is.  And somebody cited 265

6  F.3d 1336.

7          MR. ROBERTSON:  That is actually a site in your

8  authority, Your Honor.

9          THE COURT:  I understand.  I'm just saying, I wrote

10  down this morning when we were talking about it the Hilgraeve,

11  265, yeah.  Now I've gotten the correct version of this.

12          I don't know how it happened, but the printout you

13  all gave me had eight pages, and this was on the eighth page,

14  and, in fact, it's on the 11th page, and I'm not quite sure how

15  that happened.

16          MS. STOLL-DeBELL:  Our printer is possessed.

17          THE COURT:  That's okay.  I know they have a mind of

18  their own.

19          MS. STOLL-DeBELL:  The issue here is that some claim

20  elements can be drawn to a capability, and some are not.  For

21  the claim elements that are drawn to a capability, then you can

22  look at the reasonably capable test, but the claim elements for

23  catalog in this case are not drawn to a capability.  They have

24  to be there.

25          It's not that the system has to be capable of having

1    catalogs.  It has to actually have catalogs because that's what

2    it says, two or more catalogs.  To give you an example of what

3    the claim element might look like if it was drawn to a

4    capability, it might say a database for receiving multiple

5    catalogs or a database for storing multiple catalogs.

6                    THE COURT:  Or a means for --

7                    MS. STOLL-DeBELL:  Or, you know, the means for

8    searching element.  That is an element that's drawn to a

9    capability.

10                   THE COURT:  How are we going to tell the jury this

11   the question?  How would you have me tell the jury this?  Do

12   you think they have any earthly idea what drawn to a capability

13   means?  That's the Federal Circuit's view, and you understand

14   it -- I mean short form, that's your short form, but --

15                   MS. STOLL-DeBELL:  This language we proposed here is

16   directly out of the Federal Circuit opinion.

17                   THE COURT:  Let me tell you how I feel about

18   opinions.  They don't confront the realities that juries have

19   to deal with, and I see the language you've got, includes claim

20   elements reciting capability.  See, I don't know that they'll

21   understand what that means, and I understand -- it's what I was

22   talking about.  The appellate cases are not always the best

23   sources of instructions that have to go to the real people who

24   decide these things, so I'm trying to figure out the best way.

25   You agree with her analysis, don't you?

1          MR. ROBERTSON:  No, I don't, sir.  In fact, I think

2     that case is an outlier.  That case had to deal with something

3     that was a simple mechanical device, that travel candle, and

4     what it basically said is, there was no proof that ever

5     performed in that manner.  So that's why it had to have the

6     capability.

7          The case law that you cited actually in your -- as

8     authority for this instruction is completely consistent and

9     almost verbatim as to how it's articulated in the instruction

10    itself, and I'd point to the *Hilgraeve* case.  I forget the

11    case -- I don't have the case in front of me any longer, Your

12    Honor, that you are looking at, but it even relied on *Fantasy*

13    *Sports* which recites the same thing.

14         THE COURT:  I'm looking at *Fantasy Sports* right now

15    to try to --

16         MR. ROBERTSON:  And that is in your authority.  This

17    is the same exact instruction that Judge Spencer gave.

18         THE COURT:  Where in *Fantasy Sports* does this occur?

19         MS. STOLL-DeBELL:  I think in *Fantasy Sports*, Your

20    Honor, the claim element was a computer for playing football.

21    Mr. Robertson might be talking about the *Finjan* case.  It talks

22    about they are all claim elements drawn to a capability, so a

23    logical engine for preventing execution, a communications

24    engine for obtaining a downloadable, a linking engine for

25    forming a sandbox package.

1          If you have a function recited in the claim element,

2     you have something for doing something else, that's drawn to a

3     capability, and you frequently see those elements in software

4     claims here.  And there are plenty of them in this case, but

5     the catalog claim elements are not drawn to a capability.

6          My proposal, to keep it clear for the jury, would be

7     to list out the elements that do not or -- you know, you can't

8     use the reasonably capable test for, and it's a huge issue

9     here, Your Honor.  It's a big difference between whether our

10    software is capable of handling catalogs --

11         THE COURT:  Knowing this was a big issue, how come I

12    didn't see any motions on it earlier so I could have studied it

13    a little bit more?

14         MS. STOLL-DeBELL:  Well, I think we did actually

15    brief this issue in the jury instructions we submitted to you

16    back in September.  I think actually we've had this discussion

17    before, maybe at the motions hearing.

18         THE COURT:  *Acco Brands*.  In *Acco Brands* it says, in

19    order to prove direct infringement, a patentee must either

20    point to a specific -- to specific instances of direct

21    infringement or show that the accused device necessarily

22    infringes the patent-in-suit.  Here, the parties do not dispute

23    that the accused devices can be operated in either of two

24    modes, the infringing Dornfeld method or the non-infringing

25    press-to-lock method.  Because the accused device can be used

 1    at any given time in a non-infringing manner, the accused

 2    device does not necessarily infringe the '989 patent.

 3            If you read *Acco* in perspective of *Fantasy Sports* and

 4    *Ball Aerosol*, it seems to me that the Court is telling us to

 5    look at what the facts of the case are and do the facts of the

 6    case provide an instance where this accused system can be used

 7    in a non-infringing manner.  Is there any evidence that it can

 8    be used in a non-infringing manner?

 9            MS. STOLL-DeBELL:  Yes, Your Honor.  I think --

10            THE COURT:  What evidence is that?

11            MS. STOLL-DeBELL:  I think we heard testimony that

12    you could load item master with items from a single vendor.

13    There was testimony that item master could have only items

14    already owned by the customer, so you wouldn't be doing a

15    purchase order --

16            THE COURT:  Why would that constitute a

17    non-infringing use if the customer, for example, has catalogs

18    on his system?

19            MS. STOLL-DeBELL:  Because if it's already owned by

20    the customer, they won't be issuing purchase orders.

21            THE COURT:  Now your argument is they do order

22    purchase orders inside the hospital.  Your man used as an

23    example that he ordered it from -- I think you called it -- Mr.

24    McDonald made a big deal about administrative purchase, and I

25    don't think that distinction makes a difference.

1          I'm fearful that the instruction you are proposing is

2    confusing to the jury and is not a correct statement of the

3    law, and the obligation of counsel is to propose an instruction

4    that is a correct statement of the law, and if you don't, then

5    I don't take it.  So, Mr. Robertson --

6          MR. ROBERTSON:  I'm just looking at the claims, Your

7    Honor, and for example claim three, which is the means for, I

8    think we've already agreed that's a capability one.  I'm

9    looking at claim 26.  The first thing is maintaining at least

10   two products, so is the system capable --

11         MS. STOLL-DeBELL:  That is a method claim.  This

12   isn't an issue for method claims, Your Honor, because a method

13   claim, the step has to actually be performed.

14         MR. ROBERTSON:  It says, or method.  That's a

15   correct --

16         THE COURT:  In every infringement analysis, the

17   language of the claims, as well as the nature of the accused

18   system or method, dictates whether infringement has occurred.

19   To infringe a claim that recites capability and not actual

20   operation, an accused system or method need only be capable of

21   operating in the described mode.

22         Now, where there's evidence that it can be operated

23   in both an infringing and non-infringing mode, *Acco* teaches us

24   that we have to do a somewhat different instruction.

25         MR. ROBERTSON:  We agree with your instruction, just

1    to bottom line it.

2           THE COURT:  It's not my instruction.  It's yours,

3    isn't it, or Judge Spencer's or somebody?

4           MR. ROBERTSON:  We proposed it, yes, but you adopted

5    it.

6           MS. STOLL-DeBELL:  He agrees with his own

7    instruction.

8           (Indecipherable cross-talking.)

9           THE COURT:  Remember, even though you all are casual,

10   we have a court reporter who has a job to do.

11          MR. ROBERTSON:  I apologize.  We think the language

12   suggested by Lawson would add confusion.

13          MR. McDONALD:  Your Honor, to use the example of

14   claim three of the '683 patent, very first element is a

15   fundamentally different form from the means plus function

16   elements that followed.  It does say, at least two product

17   catalogs containing data relating to items associated with the

18   respective sources.

19          And we -- they could have claimed that as a database

20   or a system of some sort that was capable of containing data.

21   It's not.  And that is a fundamental difference between that

22   element and all of the elements that follow, and I think it is

23   appropriate to separate that out and instruct the jury that

24   simply having -- every computer in the courtroom is capable of

25   holding data from catalogs.  Every computer probably in the

1    country could do this, and that opens the door much farther

2    than the Federal Circuit or the case law contemplates for an

3    element that's specific to catalogs.

4              THE COURT:  When you make arguments that are that

5    broad in a field where the case law is considerably more

6    refined than that, it doesn't help advance the ball.  That's

7    more of a -- that's what we need to do, is not be making broad

8    generalizations to help our case.  We need to focus exclusively

9    on the law and the text of the instruction.  That's all we do

10   here in any part of the record that's relevant to the inquiry.

11             MR. McDONALD:  I apologize --

12             THE COURT:  You're just making an argument that

13   overstates by gross measure what the point is, and it doesn't

14   help the resolve the issue, and I don't need that.

15             Mr. Robertson, instead of just telling me this is

16   right, why don't you tell me why it is that the cases, that the

17   *Ball Aerosol*, *Fantasy Football*, and *Acco* don't require some

18   adjustment to this instruction and then what adjustment it

19   really requires, see if you can avoid the temptation that

20   befell your compatriot across the aisle, and remember, I'm

21   not -- if I find you trying to get up and play gotcha in

22   drafting instructions, I'm not going to pay attention to you

23   all anymore.

24             We're here in a joint effort to try to make sure we

25   say the law correctly to the jury, and this isn't the -- your

1    arguments will come from the facts in the case.  You're not

2    going to get anything out of the law all alone.  That's for

3    both of you.

4              MR. ROBERTSON:  I'm trying -- I'm looking, trying to

5    look for the articulation in *Fantasy Sports*, Your Honor.

6              THE COURT:  The cited part is -- let's see.  It's

7    cited at page 117, 18 which is under the heading -- somewhere

8    it starts under the heading ESPN under the heading of

9    infringement.

10             I'm not sure that that particular -- I'm trying to

11   find where that quote is in here.  It just says -- they say,

12   clarifying infringement is not proven per se by a finding that

13   an accused product is merely capable of infringing because,

14   quote, in every infringement analysis, the language of the

15   claims as well as the nature of the accused product dictates

16   whether infringement has occurred.

17             MR. ROBERTSON:  I think it's referring to the *Intel*

18   case, Your Honor.

19             THE COURT:  I think it's referring over here to the

20   next page.  Let's see.  Okay, here it is.  The defendant in

21   *Intel* argued that even though its products could be modified to

22   infringe the claim, the fact that those products are capable of

23   infringing alone could not support infringement -- a finding of

24   infringement.  Although we concluded that the defendant's

25   products did infringe, we explained our basis for doing so as

1  follows:  Because the language of claim one refers to

2  programable under -- and that's italicized, selection, means

3  the accused device to be infringing need only be capable of

4  operating in the page mode.  *Intel*, therefore, does not stand

5  for the proposition, as argued by Fantasy, that infringement

6  may be based upon a finding that an accused product is merely

7  capable of being modified in a manner that infringes the claims

8  of the patent.

9        MR. ROBERTSON:  I don't think the *Intel* case then is

10  on point, Your Honor, because *Fantasy Sports* was arguing that

11  their system could be modified to be infringing.

12        What we're saying is that their system is capable of

13  it because that's how it's intended to operate and it has that

14  functionality.  We're not suggesting that because -- it has to

15  be modified to operate in that manner.

16        THE COURT:  You're saying without modification, it

17  can be?

18        MR. ROBERTSON:  Yes, sir.  And, in fact, that's what

19  I think the case that was handed up to Your Honor this

20  morning -- I don't have it -- said because there was no showing

21  that it ever, it had ever been operated in that manner, ever

22  been configured in that manner, the capable-of language was

23  inappropriate.

24        I think we embraced that case when we said not only

25  -- we have proof in this case that it has been operated in an

1    infringing manner both by third-party evidence and by internal

2    documents and evidence of both Mr. Lohkamp and Ms. Raleigh.

3          MR. McDONALD:  If that's the case, Your Honor, why

4    don't they simply argue the evidence shows that the Lawson

5    systems have catalogs?  Why do we have to talk about this

6    hypothetical situation of they have the capability of having

7    catalogs.  If that's what their evidence is, it seems like we

8    should keep it simple.

9          MR. ROBERTSON:  They do it for both reasons, Your

10   Honor, and the fact is, the arguments -- I thought we had a

11   stipulation that there wasn't going to be an argument that the

12   implementation and how it operates is at issue here because the

13   damages are out of the case.

14         So the fact the system can operate that way I think

15   is relevant and consistent with the case law.  There's been

16   evidence of that in the case.

17         MR. McDONALD:  I think we're maybe making this more

18   complicated than it needs to be.  I agree, we haven't disputed

19   that we help our customers implement.  So I don't see why we

20   have to talk about either one of those.  I think we should talk

21   about the facts of whether it's actually in this case and argue

22   they think that we helped our customer actually load catalogs,

23   we say we just helped our customers load item masters that

24   aren't catalogs, and this capability issue really isn't the

25   issue in this case.

1          MR. ROBERTSON:  It is an issue in this case, Your

2    Honor, because there has been argument that, you know,

3    sometimes we don't do it in a system or sometimes we don't

4    provide this.  The fact that it's intended to be used in this

5    manner, and if it's capable of doing it, it's capable of

6    infringement.  That is consistent with all the cases including

7    the case that was handed to Your Honor this morning.

8          THE COURT:  In *Finjan against Secure Computing*

9    *Corporation*, Federal Circuit L, in November of 2010, as we have

10   cautioned in every infringement analysis, the language of the

11   claims as well as the nature of the accused product dictates

12   whether an infringement has occurred.

13          Accordingly, we have held that in order to infringe a

14   claim that recites capability and not actual operation, an

15   accused device need only be capable of operating in the

16   described mode, *Intel v. U.S. Trade Corporation*.  Thus,

17   depending on the claims, an accused device may be found to

18   infringe if it is reasonably capable of satisfying the claim

19   limitations even though it may be capable of non-infringing

20   modes of operation, citing *Hilgraeve*, *Ball*, *Intel*, and *Fantasy*

21   *Sports*.

22          So I think this instruction is exactly what the

23   Federal Circuit has held, and that's really where this came

24   from, and I think that in our little citation of authority, we

25   may not have -- yeah, we put *Finjan* in.  It's right there.

1    It's the second authority cited.  So the objection is

2    overruled.  The instruction number 25 will be given as set

3    forth.  All right --

4             MR. McDONALD:  Your Honor, there was one separate

5    issue in number 25 as I'm looking at it here.  About the fifth

6    line down, it says, an accused system or method.  I'm not sure

7    that this is really applicable to a method claim.  I'm doing

8    this a little on the fly here.

9             THE COURT:  If you're doing it on the fly, what do

10   you think I'm doing?  That's not a very good way to be doing

11   something.

12            MR. McDONALD:  No, but I believe that is accurate

13   here as I'm looking at what's involved here, that it should be

14   focused on the system claim.  Maybe we can agree on that.

15            MR. ROBERTSON:  No, I'm sorry, we can't, because we

16   think the *HilGraeve* case -- this came up before, Your Honor.

17            MR. McDONALD:  If they'll agree it is a method case,

18   I'll withdraw that.

19            THE COURT:  I've got it up here.

20            MR. ROBERTSON:  I don't want to speak without

21   reading, Your Honor.  I believe -- here, it's claim 18.

22            THE COURT:  *Hilgraeve*, they cite page 1343.  It's

23   where they cite it.  It's probably a better idea to go back to

24   the front and confirm.

25            MR. ROBERTSON:  Your Honor, I'm reading from

1    *Hilgraeve.*

2            THE COURT:  What page?

3            MR. ROBERTSON:  I observed there were method claims

4    in here, and Mr. McDonald pointed out there were system claims

5    in here as well, and then starting at headnote ten, 11, 12 --

6            THE COURT:  The '776 patent recites in its first line

7    a system claim, and in claim one and in 18 is a method claim.

8            MR. ROBERTSON:  And it cites -- I'm sorry.

9            THE COURT:  It looks to me like that maybe this is a

10   lot like our case the more I think about it.  So it does.  It

11   involves method claims.

12           MR. ROBERTSON:  It is a software case, and so I think

13   the *High Tech* case on that side of the page says, finding that

14   an accused device does not infringe if it does not infringe in

15   normal configuration, even if it may be altered into an

16   infringing configuration under unusual circumstances, and then

17   it goes on to say, so to the sale the device may induce

18   infringement of a method claim even if the accused device is

19   capable of non-infringing modes in the operation in unusual

20   circumstances.

21           THE COURT:  I don't think this case presents that

22   question about unusual circumstances.  So I think the

23   instruction taken from *Finjan* is the correct instruction.  Is

24   that the -- is that it, okay?

25           MR. McDONALD:  Yes.

1              THE COURT:  Moving to 26, there is an objection

2     there.  I thought you all worked out a lot of stuff.

3     Substantial progress you made -- who was it that represented

4     there was substantial progress going on?  You don't have to

5     answer that question.  You plead guilty?

6              MR. MERRITT:  I do.  I was sent down the hall to

7     check.  I was assured, and they looked like they were working.

8              THE COURT:  All right, 26.

9

10             (Discussion off the record.)

11

12             THE COURT:  Okay, 26.

13             MR. ROBERTSON:  Let me raise one issue, and then I'll

14    let Lawson raise the other issues.  The things that are struck

15    here about -- I'm sorry, I'm down about --

16             THE COURT:  Let's go to about the eighth line down,

17    acts that constitute.

18             MS. STOLL-DeBELL:  So, Your Honor, with that, I think

19    the Federal Circuit held in *DSU Medical Corporation* that intent

20    for indirect infringement requires an intent to cause the

21    actual infringement, not the acts that constitute infringement.

22             THE COURT:  What is the difference?

23             MS. STOLL-DeBELL:  You'd have to actually know about

24    a patent and intend to cause the infringement as opposed to

25    intend to just cause something that you don't know is an

1    infringement.

2              So I just took out the acts that constitute, because

3    that is the holding of the *DSU Medical Corp.*  It was actually

4    an en banc decision from the Federal Circuit to resolve a

5    conflict in their law, and they held exactly that, that the

6    intent is to cause --

7              THE COURT:  That's what the next clause says.  It

8    says -- you are not reading the whole thing.  You are just

9    editing out something.  Cause the acts that constitute direct

10   infringement, comma, that Lawson knew of the patent and Lawson

11   knew or should have known that its actions would lead to actual

12   infringement.  I mean, that seems to me to do --

13             MS. STOLL-DeBELL:  I'll withdraw that redline.

14             THE COURT:  Okay.

15             MS. STOLL-DeBELL:  I'll put my horse back in the

16   barn, Your Honor.

17             THE COURT:  That's a good thing to do.  A good

18   horsewoman knows when to stable a mount.

19             All right, now, do you want to add the underscored

20   part here in your suggestion, Ms. Stoll-DeBell?

21             MS. STOLL-DeBELL:  Yes, sir.

22             MR. ROBERTSON:  I mean this appears argumentative to

23   me, Your Honor, and I don't know.  Is there a case that says

24   this that you want to rely on?

25             MS. STOLL-DeBELL:  I think to start off, they are

1    relying on this *SEB* case, Your Honor, which is an outlier case

2    talking about deliberate indifference.  The facts of that case

3    are very different than what we are talking about here.

4         In that case, the defendant actually copied the

5    patentee's product.  They sent it to their manufacturer, and

6    they copied every feature of it.  Then they went and had a

7    patent infringement -- or an opinion done, and they didn't tell

8    the patent attorney that they had copied the patentee's

9    product.

10        And in that case, the Federal Circuit found that they

11   had acted with reckless disregard for the patent rights by

12   copying the product and then having a search done and not

13   telling their patent attorney that they copped it.  In that

14   case, the Federal Circuit found that they basically did know

15   about the patent in that case because of those bad acts.

16        We don't have those facts here, Your Honor, and I

17   think this reckless disregard standard is confusing.  As Mr.

18   Robertson noted, the Supreme Court has granted cert on that

19   case, and I just don't think it's good law, and I don't think

20   it makes sense to put it in this case.

21        MR. ROBERTSON:  Your Honor, it is the Federal

22   Circuit's most recent pronouncement on this case.  They didn't

23   announce the standard based on the facts.  They announced the

24   standard can be reckless disregard, and I did raise this with

25   Your Honor before.  A case that's on certiori is still the law

1   of the land until and -- if and until the Supreme Court

2   overturns it.

3          MS. STOLL-DeBELL:  It is one case, Your Honor,

4   talking about --

5          THE COURT:  Excuse me.  Reckless disregard has always

6   been -- as far as I know, the concept of willful blindness,

7   deliberate indifference, all of those meld together and are

8   components that typically, in the law of intent, have been

9   considered -- have been appropriately considered as factors in

10  the analysis.

11         MS. STOLL-DeBELL:  Your Honor, that may be true, but

12  it doesn't fit the facts of this case.  We don't have any

13  copying here.  In fact, as you know, Lawson has been selling

14  these products since the 1980s.  There's just no facts that are

15  even anywhere close to the facts that they looked at in the *SEB*

16  case that would support instructing the jury on reckless

17  disregard here.

18         THE COURT:  This case says, this Court has made

19  clear, however, that inducement requires a showing of specific

20  intent to encourage another's infringement.  As other Courts

21  have observed, specific intent in the civil context is not so

22  narrow as to allow an accused wrongdoer to actively disregard a

23  known risk that an element of the offense exists.

24         And isn't that -- this Court notes that the Supreme

25  Court has indicated, in a different civil context, that

1    deliberate indifference is not necessarily a should-have-known

2    standard.  That's a 1983 case, *Farmer against Brennan*.

3             MR. ROBERTSON:  Your Honor, we believe there is

4    evidence that a reasonable jury could find deliberate

5    indifference on.  You'll recall the Gartner reports and the

6    instructions once the Ariba decision came out that they would

7    need to look and determine whether or not their products were

8    infringing.

9             MS. STOLL-DeBELL:  Your Honor --

10            THE COURT:  Wait just a minute.  Okay, I agree --

11            MR. ROBERTSON:  There is no question that notice

12   about this these --

13            THE COURT:  Wait a minute.  There's evidence -- this

14   is a correct statement of the law:  Knowledge of the patent may

15   be established that Lawson had actual knowledge of the patent

16   or that Lawson deliberately disregarded a known risk that ePlus

17   had a protected patent.

18            Now, what you want to take out is the part proof

19   of -- let's see.  Proof of knowledge through a showing of

20   deliberate indifference maybe defeated, however, where an

21   accused infringer establishes that he actually believed that a

22   patent covering the accused product or method did not exist.

23   There is no evidence on that point in this case at all.  Why

24   does that sentence need to be in there at all?

25            MS. STOLL-DeBELL:  I wanted to take it out, Your

1    Honor, because I don't think -- we didn't know --

2              THE COURT:  You wanted to put something else in.

3              MS. STOLL-DeBELL:  I did.

4              THE COURT:  But that sentence actually helps you, but

5    it also puts a burden on you, and the problem that I have is

6    that basically I don't think there's any evidence that would

7    make this an appropriate -- this sentence an appropriate

8    instruction for the jury on the record in this case.

9              So I'd be inclined to take that sentence out and then

10   pick up with, intent to cause the acts that constitute direct

11   infringement may demonstrate by active steps taken to encourage

12   direct infringement such as advertising an infringing use or

13   instructing how to engage in it.

14             So I think we take that out, and I will -- do not put

15   in, this is not to say that mere belief that Lawson should have

16   known that ePlus had protected patents establishes that Lawson

17   did, in fact, know of the patents.  I don't think that's a

18   correct statement of the law, either, and I also think that

19   language is confusing, but I do think it is appropriate to take

20   out proof-of-knowledge sentence.  Do you agree, Mr. Robertson?

21             MR. ROBERTSON:  Yes, I'll agree with that.

22             THE COURT:  Oh, and there's one other question that I

23   need to ask you.  On what issue did the Supreme Court grant

24   certiori in this case?  Which case is it?  *SEB*?

25             MR. ROBERTSON:  It's on the standard, Your Honor.

1           THE COURT:  What?

2           MR. ROBERTSON:  It's on the deliberate indifference

3      standard.

4           THE COURT:  Well, that's somewhat different from

5      this, though.  There is a relationship between deliberately

6      disregarding and deliberate indifference in the context of the

7      civil rights case.  Indifference constitutes -- suggests

8      something different than disregard.  So they are not exactly

9      the same, and I think the way the instruction is framed is

10     probably -- it certainly is consistent with the current state

11     of the Federal Circuit law, and I'm obligated to apply the

12     Federal Circuit law, not what I think the Court would do, the

13     Supreme Court is going to do.

14          Now that brings us to number -- let me ask you

15     something, Ms. Stoll-DeBell, while I'm thinking about it.  Did

16     you file these so they are in the record?

17          MS. STOLL-DeBELL:  Yes, sir.

18          THE COURT:  I don't need to separately deal with

19     them?

20          MS. STOLL-DeBELL:  Yes.  So the next one, Your Honor

21     we reached an agreement on it.

22          THE COURT:  You're going to give me shock.  What is

23     it?

24          MS. STOLL-DeBELL:  27.

25          THE COURT:  You all agreed to the added language?

1           MS. STOLL-DeBELL:  Yes.

2           THE COURT:  All right.

3           MS. STOLL-DeBELL:  I'm speaking for you.

4           MR. ROBERTSON:  I'll adopt the representation, Your

5     Honor.

6           THE COURT:  All right.  To avoid having to write all

7     that out, I'm going to tear yours out and say, add attached.

8     If you'll give me a minute to do that.

9           All right.  The next objection is 32; is that right?

10          MR. ROBERTSON:  Your Honor, we have our first

11    objection to 29.

12          THE COURT:  Did you give me one of these things?

13          MR. ROBERTSON:  Yes, sir.

14          THE COURT:  Wait a minute.  I think Ms. Haggard gave

15    it to me.  I just didn't lay it out.

16          MR. ROBERTSON:  Entitled plaintiff ePlus's proposed

17    revisions to Court's jury instructions with respect to alleged

18    prior art and invalidity.

19          THE COURT:  I've got it here somewhere.  I saw it.

20          MR. ROBERTSON:  I have another copy, Your Honor.

21          THE COURT:  Give me another copy.  All right, where

22    are we now, on 28?

23          MR. ROBERTSON:  29, sir.

24          THE COURT:  There's no objection to 28?

25          MR. ROBERTSON:  No.

```
 1              THE COURT:  You all just figured there was a great
 2    need to copy every other page of something here and kill some
 3    more trees?
 4              MR. ROBERTSON:  I don't know how that happened, Your
 5    Honor, but I see that there.
 6              THE COURT:  Because they have a mind of their own,
 7    copying machines.  All right, 29.
 8              MR. ROBERTSON:  Let me start by emphasizing the
 9    positive.  We have an agreement that the last line, last three
10    lines where it starts, and three, Lawson contends has to do
11    with the written description requirement, and there's agreement
12    that that's no longer in the case.
13              THE COURT:  So there's no three.
14              MR. ROBERTSON:  Yes, sir.  Now, what we've done here,
15    I understand, is we have taken out the '172 patent in hopeful
16    anticipation of the Court's ruling with respect to our 103(c)
17    argument, but to the extent that the Court does not find for us
18    on that 103(c)(1) argument, then the '172 patent would stay in.
19              THE COURT:  Okay.  Then let's go back to that.  The
20    objection to it, Ms. Stoll-DeBell, is predicated on the
21    language, developed by another person?
22              MS. STOLL-DeBELL:  No.
23              THE COURT:  And the word only.
24              MS. STOLL-DeBELL:  Yes.
25              THE COURT:  Is it both or just only?  Because all you
```

1   handed me up was only.

2           MS. STOLL-DeBELL:  I think it's only.

3           THE COURT:  All right.

4           MS. STOLL-DeBELL:  Also that they didn't disclose

5   this argument in their interrogatories.

6           THE COURT:  Whoa, whoa, whoa.  Let me do one thing at

7   a time.  I'm just trying to frame the issue.  It's only, but

8   you did a lot of talking about developed by another person, and

9   I guess -- I'm not quite sure why you did that, because -- and

10  you handed me up -- Maggie Martinez worked to 12:19 p.m. to

11  give you this.  If there's any difference between the invented

12  entity, the reference is by another.

13          MS. STOLL-DeBELL:  I think there's two issues here,

14  Your Honor.  The first is whether we can use RIMS and TV/2 in a

15  103 obviousness combination, and that is the 103(c)(1) issue,

16  and that goes to whether RIMS is prior art -- RIMS patent is

17  prior art only under section 102(e).  That's what this

18  instruction is about.

19          THE COURT:  And your first point is that it is under

20  102(a) and (b).  Now tell me what 102(a) is.

21          MS. STOLL-DeBELL:  102(a) is known or used by another

22  before the date of invention.

23          THE COURT:  And that is August of --

24          MS. STOLL-DeBELL:  Of 1994.  That's one part of

25  102(a) that relates to the RIMS system.

1              THE COURT:  So what evidence is there that it was

2    known or used -- that the system that's in the patent -- that's

3    what you are talking about, right, the RIMS patent, because

4    that's all he used, Dr. Shamos, was the RIMS patent; right?

5              MS. STOLL-DeBELL:  Well, we're talking about the RIMS

6    system as described in the RIMS patent.

7              THE COURT:  Yes.  That's what I mean.  The '989

8    patent.  In other words, what he kept saying was, the '989 plus

9    the TV/2, the RIMS '989 plus the TV/2.  In every instance, he

10   was linking the RIMS '989, and the RIMS he's talking about, so

11   we're not careless with the language, was that which is

12   disclosed in the '989 patent; right?

13             MS. STOLL-DeBELL:  Yes.

14             THE COURT:  So the question then is, what evidence is

15   there -- excuse me, just a minute.

16             All right, now, what evidence is there that the RIMS

17   '989 patent was what?

18             MS. STOLL-DeBELL:  Okay, so I think the inventors

19   testified that the --

20             THE COURT:  Let's start with the statute.  What am I

21   looking for?

22             MS. STOLL-DeBELL:  Okay, so we say it's prior art

23   under section 102(a) and (b).

24             THE COURT:  Right.  What does 102(a) say?

25             MS. STOLL-DeBELL:  102(a) is known or used by another

1    before the invention date of the patents-in-suit.  So known or

2    used by another before August of 1994.

3              THE COURT:  All right.  So what evidence is there

4    from which a jury could find by clear and convincing

5    evidence -- and that's the test.

6              Remember, under *Liberty Lobby*, the issue is viewed

7    through the prism of the burden of proof.  So what evidence is

8    there that a jury could find by clear and convincing evidence

9    that the '989, as disclosed in that patent, was known or used

10   by another before August 1994?

11             MS. STOLL-DeBELL:  Okay, so I think the inventors

12   testified that the '989 patent described the RIMS system as it

13   existed at the time they filed their patent application.  We

14   also had testimony that that RIMS system was installed at

15   customers' locations.

16             THE COURT:  Wait a minute.  At the time the patent

17   was filed.

18             MS. STOLL-DeBELL:  Before the patent was filed.  It

19   was installed at customers' locations.

20             THE COURT:  You said the inventors said that the --

21   the system described in the patent was as it existed at the

22   time the patent was filed; right?

23             MS. STOLL-DeBELL:  Yes.

24             THE COURT:  That's what you said they said.

25             MS. STOLL-DeBELL:  Yes.

```
 1              THE COURT:  And then the other point -- and the
 2    testimony is what?
 3              MS. STOLL-DeBELL:  Around that same time, it was
 4    installed at customers' locations.
 5              THE COURT:  When it was filed was August of 19 -- it
 6    was '94, wasn't it?  I keep confusing the '93 and '94 dates.
 7              MS. STOLL-DeBELL:  I'm sorry.  RIMS was filed in '93,
 8    April.
 9              THE COURT:  April of '93.
10              MS. STOLL-DeBELL:  Yes.
11              THE COURT:  So that's the date we are looking at.
12              MS. STOLL-DeBELL:  Yes.  At that same time, Your
13    Honor, Fisher had filed a trademark application.
14              THE COURT:  Wait a minute.  The next thing is Fisher
15    trademark.
16              MS. STOLL-DeBELL:  Yes, for the trademark RIMS,
17    Fisher RIMS, and that was for use in connection with these,
18    the --
19              THE COURT:  Commercial use.
20              MS. STOLL-DeBELL:  Computer systems with requisition
21    and inventory management, and it had that long description of
22    what RIMS was in the trademark application.  They allege that
23    that had been used in commerce and used in interstate commerce
24    at least as early as 1992.  They sent in the RIMS brochure --
25    this is coming from the O'Loughlin testimony we put into
```

1    evidence.

2         THE COURT:  No.  It's coming from that lawyer, isn't

3    it?

4         MS. STOLL-DeBELL:  Yes, O'Loughlin.

5         THE COURT:  Is the lawyer -- was the lawyer who was

6    the general counsel, his name is O'Loughlin?

7         MS. STOLL-DeBELL:  Yes.

8         THE COURT:  Okay.

9         MS. STOLL-DeBELL:  So anyway, they sent in the

10   brochure, the RIMS brochure which they were using to promote,

11   publicly promote their RIMS system.  That was sent in and

12   stamped by the Patent and Trademark Office in '93, I think

13   April of '93.

14        THE COURT:  What else?

15        MS. STOLL-DeBELL:  The inventors were talking to

16   customers, their customers about the RIMS system.  We have the

17   Fisher annual reports that came in through Ms. O'Loughlin in

18   1993 and '94 and I think 1992 as well talking about the RIMS

19   system.

20        THE COURT:  You have the inventors' testimony that

21   the '989 reflected the RIMS as it existed at the time the

22   patent was filed which was 4/'93, the Fisher trademark

23   application and the attached brochure, and the inventors were

24   talking to customers, talking to customers, and then the annual

25   reports of Fisher.

```
 1              MS. STOLL-DeBELL:  I think that also the system was
 2    installed at customers around that time as well.  Oh, we have
 3    Mr. Kinross's timeline which talks about what features were
 4    implemented -- well, a timeline of when they were implemented.
 5              THE COURT:  Okay.  Anything else?
 6              MS. STOLL-DeBELL:  I think again with that, Your
 7    Honor, we have to look at the claimed invention, what do the
 8    claims call for in all of this stuff about what changed over
 9    time.  Most of it, if not all of it, was not part of the
10    claims.
11              THE COURT:  I've got the specific evidence that you
12    rely on now.
13              MS. STOLL-DeBELL:  That's all we can think of right
14    now, Your Honor.
15              THE COURT:  It's the hour of decision, okay.  Why
16    isn't that sufficient to send it to the jury?
17              MR. ROBERTSON:  Well, because --
18              MS. ALBERT:  I can address it.
19              THE COURT:  Stifle it, Edith.
20              MS. ALBERT:  The inventors testified that there were
21    some 40 different versions of the RIMS system over time, and
22    there's no evidence whatsoever in the record to link any of
23    this evidence that Ms. Stoll-DeBell just recited, the RIMS
24    brochure, you know, use of some unspecified version of the RIMS
25    system at customer locations.
```

1          I think the RIMS patent itself even says in the

2     background of the invention that there were prior versions of

3     the RIMS system out there.  The problem that Lawson has is that

4     the evidence, the only evidence in the record is that the

5     inventors testified that there was no actual system ever

6     implemented that had all of the features and functionality as

7     described in the '989 patent.

8          So in order to consider the '989 patent prior art,

9     under the statute, the patent application that issued as the

10    '989 patent was held in confidence in the Patent and Trademark

11    Office until 1998 when it issued.  Therefore, it can only be

12    prior art -- the '989 patent in and of itself can only be prior

13    art under the statute under section 102(e), and that's why that

14    section 103(c)(1) comes into play, because the only basis for

15    contending that the '989 patent in and of itself is prior art

16    is under 102(e), and, therefore, under 103(c)(1), you can't use

17    that prior art in a combination where you are trying to

18    invalidate a patent that was commonly assigned as the assignee

19    of the purported prior art.

20          THE COURT:  But the lynchpin to that argument is what

21    does "was developed by another person" mean and developed --

22    yes, because the very beginning of (c)(1) says, subject matter

23    developed by another person.  Subject matter developed by

24    another person, that's the subject of the sentence, and it

25    can't be -- if it qualifies, that is if the subject matter

1    developed by another person qualifies as prior art only under

2    (e), then you don't preclude patentability in either event, and

3    that is if it's owned by the same person or subject to an

4    obligation of assignment.

5         There's no dispute over the obligation of assignment.

6    The issue that Lawson raises is that even if it is under 12(e),

7    and I reject their theory under 12(a) and 12(b) so it's under

8    12(e), you still lose because of the fact that the inventors

9    have to be --

10        MS. ALBERT:  Then I don't understand, because the

11   statute says subject matter developed by another person.  So as

12   I understand Lawson's contention, they do contend that the '989

13   patent was developed by a different entity than the person who

14   developed the '172 patent.

15        THE COURT:  Yes, they do.

16        MS. ALBERT:  So 103(c) would apply then if, as Lawson

17   contends, the subject the matter of the '989 patent was

18   developed by a different person than the subject matter of the

19   '172.

20        THE COURT:  What do you say to that?  What do you say

21   to that, Ms. Stoll-DeBell?  She says that you have mislaid your

22   argument on the croquet court, and you can't get through the

23   wicket, and the reason you can't is because you've now told me

24   that it is developed by another person because two of the

25   inventors are the same but two are not.

1          MS. STOLL-DeBELL:  I think that's right.  I think I

2     am not saying that this does not apply because it was not

3     developed by another.  I think it was developed by another.  I

4     think it doesn't apply because of the word only.

5          THE COURT:  Okay.  Why did you spend all that time

6     talking about and giving me this thing from Ms. Martinez?

7          MS. STOLL-DeBELL:  Because it's a different issue,

8     Your Honor.  That relates to whether the '989 patent can

9     qualify as prior art under 102(e) for purposes of anticipation.

10          That's a different issue than this jury instruction,

11     and it's also something that's in dispute.  The 102(e) also

12     says by another.  And so it's related.  It is different, and

13     for that reason --

14          THE COURT:  Now, so the only issue here is, is there

15     evidence whether it qualifies as prior art under 12 -- 102(a)

16     or 102(b).

17          MS. STOLL-DeBELL:  Yes.

18          THE COURT:  What is 102(b)?  What is that argument?

19          MS. STOLL-DeBELL:  102(b) is on sale or in public use

20     more than one year before the file date.

21          MR. McDONALD:  Your Honor, can I just add one other

22     piece of evidence?

23          THE COURT:  And the filing date was April of '93.

24          MS. STOLL-DeBELL:  It's the filing date of the

25     patents-in-suit, so the 102(b) date in this case is August of

1   '93.  So on sale or in public use before August of '93.

2          THE COURT:  But you're now -- you're talking about

3   the '989 patent.

4          MR. McDONALD:  Well, no.  To invalidate the

5   patents-in-suit, we have to look at the filing date for the

6   patents-in-suit.  The filing date for the patents-in-suit is

7   August of '94, the effective filing date for all three of them.

8   So for 102(b) purposes, we use that date, turn the clock back

9   12 months, and then the critical date is August of '93.  So if

10  there's on sale or public use before August of '93, that would

11  be what fits under 102(b).

12         Really, for 102(a) and (b), the evidence that Ms.

13  Stoll-DeBell already referred to would establish that activity

14  under 102(b) as well.  I'll also mention that all three of the

15  patents have a statement in them that's further evidence that

16  the RIMS system was known and in the market.  That's, for

17  example, at the '683 patent, column one, of the patent

18  beginning at line ten.  It says, there are a number of known

19  requisition purchasing systems that manage and process

20  requisitions and purchase orders.  One such system is the

21  Fisher Scientific requisition and inventory management system,

22  Fisher RIMS, described in US patent number 5712989 --

23         THE COURT:  But the issue is whether the Fisher RIMS

24  was in existence more than one year before what date?

25         I was trying to go down that line, and you said, no,

1    that's not what it is.  You have to look at the patent-in-suit

2    and was that system on sale.  That's not what you are reading.

3    You are talking about Fisher RIMS.  Just stop a minute.

4              Let me have that to sign.

5

6              (Brief recess.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25