```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE EASTERN DISTRICT OF VIRGINIA

 3                     RICHMOND DIVISION

 4

 5   ---------------------------------------
                                          :
 6    ePLUS, INC.                         :    Civil Action No.
                                          :    3:09CV620
 7    vs.                                 :
                                          :
 8    LAWSON SOFTWARE, INC.               :    January 24, 2011
                                          :
 9   ---------------------------------------

10

11           COMPLETE TRANSCRIPT OF THE JURY TRIAL

12          BEFORE THE HONORABLE ROBERT E. PAYNE

13        UNITED STATES DISTRICT JUDGE, AND A JURY

14

15   APPEARANCES:

     Scott L. Robertson, Esquire
16   Michael G. Strapp, Esquire
     David M. Young, Esquire
17   Goodwin Procter, LLP
     901 New York Avenue NW
18   Suite 900
     Washington, D.C.  20001
19
     Craig T. Merritt, Esquire
20   Christian & Barton, LLP
     909 East Main Street
21   Suite 1200
     Richmond, Virginia  23219-3095
22   Counsel for the plaintiff

23

24                 Peppy Peterson, RPR
                 Official Court Reporter
25             United States District Court
```

```
 1    APPEARANCES:  (cont'g)

 2    Dabney J. Carr, IV, Esquire
      Troutman Sanders, LLP
 3    Troutman Sanders Building
      1001 Haxall Point
 4    Richmond, Virginia  23219

 5    Daniel W. McDonald, Esquire
      Kirstin L. Stoll-DeBell, Esquire
 6    William D. Schultz, Esquire
      Merchant & Gould, PC
 7    80 South Eighth Street
      Suite 3200
 8    Minneapolis, Minnesota  55402

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

1

2

3          THE CLERK:  Civil action number 3:09CV00620, ePlus,

4  Incorporated versus Lawson Software, Incorporated.  Mr. Scott

5  L. Robertson, Mr. Craig T. Merritt, Ms. Jennifer A. Albert, and

6  Mr. Michael G. Strapp represent the plaintiff.

7          Mr. Daniel W. McDonald, Mr. Dabney J. Carr, IV, Ms.

8  Kirstin L. Stoll-DeBell, Mr. William D. Schultz represent the

9  defendant.  Are counsel ready to proceed?

10          MR. ROBERTSON:  Yes, Your Honor.

11          MR. McDONALD:  Yes, Your Honor.

12          THE COURT:  All right.  I was very sorry to hear

13  about Ms. Albert's father passing away.  You all both wrote

14  letters about it.  I don't see the point in bringing that to

15  the attention the jury.  Do either one of you?

16          In the old days, when people didn't do what they were

17  supposed to do, they got keelhauled.  I'm about ready to

18  institute that procedure here.  It's time for the jury to get

19  going, and I've had to read all this stuff now.  I told you

20  what to do about this verdict form, and it was pretty easy, and

21  it's unnecessary to go through all this stuff.

22          Now, apparently we're going to have to revise it

23  anyway because -- and some of the instructions.  What

24  instructions have to be revised because Lawson is not

25  contending that the RIMS brochure is prior art?  Which one is

1   arguing?

2              MR. YOUNG:  Your Honor, David Young for ePlus.  It's

3   instruction 3-A that was submitted to the Court over the

4   weekend.  It lists as I think reference number three, RIMS

5   brochure, and that would have to come out now because it

6   appears that Lawson does not have that as an anticipated

7   reference on its own verdict form.

8              THE COURT:  Is that right?

9              MR. McDONALD:  Yes, that's right, Your Honor.

10             THE COURT:  So I suppose I need to tell the jury

11  simply to disregard any testimony about the RIMS brochure as

12  prior art.

13             MR. McDONALD:  No, it not anticipatory prior art

14  meaning it's not all by itself anticipating a claim.  We're

15  still using it for obviousness and support for the on sale, the

16  RIMS as prior art and 102(a) and (b), but the brochure, all by

17  itself, we're not contending is an anticipating reference, but

18  it would be used to support number one in the instruction which

19  is the Fisher RIMS system as prior art.

20             THE COURT:  What do you mean, to be used to support?

21  If you're going to use it --

22             MR. McDONALD:  It's evidence of the Fisher RIMS

23  system as it was being sold and --

24             THE COURT:  Well, if it's evidence of it, it comes

25  out of 39, too, because you're not contending that it is

1    obvious.

2         MR. McDONALD:  So we're saying it is a printed

3    publication and still in it's own right is prior art, but it

4    doesn't all by itself anticipate the claims.  It can be used

5    for the obviousness defense.  So it is a piece of prior art.

6    It just doesn't anticipate the claims all by itself.

7         THE COURT:  Anything?  Is that the only modification?

8         MR. YOUNG:  Your Honor, it is listed on the Lawson

9    verdict form, so --

10        THE COURT:  I'm talking about the instructions right

11   now.  That's the only change in the instructions.

12        MR. YOUNG:  Yes, yes.

13        THE COURT:  I've prepared an instruction on

14   incorporation by reference that says incorporation by reference

15   is a phrase that allows a patent applicant to make another

16   document become part of the patent application in such a manner

17   that the incorporated document can be considered to be part of

18   the patent application just as if the incorporated document had

19   been fully set out in the patent application.

20        I believe that that is a slight modification from the

21   ePlus system -- I mean from the ePlus proposal because it got

22   into whether the examiner considered it and all of that, and

23   that's not necessary, but I think this instruction is accurate.

24   Does anyone disagree with that?

25        MR. McDONALD:  We have no objection to that, Your

1   Honor.

2         MR. YOUNG:  We have no objection to it, Your Honor.

3         THE COURT:  All right.  I'll make that then -- where

4   should that go?  Let's make it 30-B.

5         MR. YOUNG:  I think that would be fine, Your Honor.

6         MR. McDONALD:  I'm not sure it goes into the prior

7   art invalidity section, Your Honor.  I think it's more about

8   what the patent is, so I would suggest it go earlier.

9         MR. YOUNG:  Your Honor, I think it's directly

10  relevant to the prior art issues in the case given the context

11  in which --

12        THE COURT:  Given your argument, it seems to me as if

13  it goes right where I put it.  I've reviewed the verdict forms,

14  and I think the preferable verdict forms are as ePlus has put

15  them, but how does it have to be changed?

16        MR. YOUNG:  I'm sorry, Your Honor.  I didn't hear the

17  last point.

18        THE COURT:  You said the verdict form had to be

19  changed.  How does it have to be changed?

20        MR. YOUNG:  I don't think the verdict form from our

21  proposal does need to be changed.  It was the jury instruction

22  30-A that needed to be changed to eliminate the RIMS brochure.

23        Neither party's proposal for the verdict form last

24  night included the RIMS brochure as an anticipated reference,

25  so I don't think that aspect needs to be changed.

1            THE COURT:  All right, so your form has already made

2    that edit.

3            MR. YOUNG:  Correct, and I believe Lawson's as well.

4            THE COURT:  All right.  Take all the certificate of

5    service and all of that stuff off of it, and we'll have a clean

6    form for the jury.

7            MR. YOUNG:  I actually do have some copies of that.

8            THE COURT:  Can I have it?  I believe that the Lawson

9    form is -- ePlus form is somewhat cumbersome.  The Lawson form

10   is confusing, and I think cumbersome is better than confusion.

11           These motions that have been filed, judgment as a

12   matter of law, that's what you argued the other day, right?

13   The motion on 103 is what you argued the other day.

14           MS. STOLL-DeBELL:  Yes, sir.

15           THE COURT:  I don't need to deal with that to get

16   ready for the jury.  Are we ready for the jury?

17           MR. ROBERTSON:  Yes, Your Honor.

18           MR. McDONALD:  Yes, Your Honor.

19           THE COURT:  All right.

20           MR. ROBERTSON:  Just to be clear, Your Honor, I'll go

21   first and address the infringement issues, and then Mr.

22   McDonald goes and addresses both, his non-infringement

23   arguments and invalidity, and I have rebuttal.  Is that your

24   understanding?

25           THE COURT:  Yes.  That's what we said.

1        MR. McDONALD:  May I ask how much time we should each

2   expect and how much he's reserving for rebuttal?

3        MR. ROBERTSON:  I expect that my opening argument

4   will be approximately an hour long, and my rebuttal would be

5   about half an hour to 40 minutes.  I'm going to try do this as

6   quickly and efficiently as I can.

7

8                        (Jury in.)

9

10        THE COURT:  Good morning ladies and gentlemen.  Now

11   we've reached the point in the trial where all the evidence is

12   in, and the lawyers now have a chance to make their closing

13   arguments, and in those closing arguments, what they will be

14   doing is reciting to you what they think the evidence shows and

15   explaining to you what they think the evidence proves.

16        And they will try to explain to you why they think

17   you should return a verdict in favor of their respective

18   clients, and that's important because it will help you

19   understand each side of the case and the positions they are

20   taking and what you have to decide.  But remember, what they

21   say in these closing arguments is not the evidence.  The

22   evidence came from the things that have been admitted into

23   evidence which you will have back with you.

24        You'll have a computer back there that is set so that

25   you can run one piece of the evidence which was the

1    demonstrations that you saw.  You'll have your recollection of

2    the testimony, and that's what the evidence is, and the things

3    that were stipulated.  You'll of a copy of stipulations also.

4          So if you'll just give to these lawyers -- Mr.

5    Robertson will go first, and then Mr. McDonald, and then Mr.

6    Robertson will close.  Then you will hear instructions from me

7    after that.

8          The issues in this case are somewhat lengthy, and so

9    it is anticipated that the arguments will take up most of the

10   morning.  So give your attention, and we'll take a break in

11   between because you need to stretch and let your mind refocus.

12   If anybody needs a recess during the arguments, just let us

13   know, raise your hand and stop.  All right?  Thank you very

14   much.  Mr. Robertson.

15        MR. ROBERTSON:  Thank you, Your Honor.  May it please

16   the Court, good morning ladies and gentlemen of the jury.

17   First, I know I speak for all the attorneys and parties here

18   when I thank you for your public service.  You've devoted

19   almost a month serving on this jury, and I understand this

20   trial has interrupted your lives, lives of your families, your

21   friends, and your jobs.  We thank you for your patience,

22   thoughtful consideration, and your time.

23        Today you're going to be asked to decide two issues.

24   First you'll have to decide whether the five accused Lawson S3

25   configurations infringe any of the 12 asserted claims in this

1   case.  The second thing you'll be asked to determine is whether

2   the asserted claim of the ePlus patents are valid.

3          The Judge will instruct you on the law at the end of

4   the arguments, but it will be up to you to determine what the

5   facts are.  Ultimately you will need to decide the issues of

6   infringement and invalidity based on the instructions provided

7   to you by the Judge and the facts as you find them.  You're

8   going to have one tool that's going to be invaluable that will

9   allow you to focus on what matters most, and that's going to be

10  your own common sense.

11         Let me talk to you about some basic themes that I

12  think are in this case.  As you know, this is about an

13  invention called electronic sourcing system.  You've heard

14  testimony from the three inventors of that invention, Doug

15  Momyer, Bob Kinross, and Jim Johnson.

16         The United States Patent and Trademark Office granted

17  those inventors three patents for their electronic sourcing

18  systems and methods.  By this time I think you are quite

19  familiar with them; the '683, the '516, and the '172 patents.

20         As you will recall, patents are like a deed to

21  property.  You can imagine that the language of the claims that

22  you're going to be looking at are like the boundary lines of

23  that property.  Just like someone who steps over those lines on

24  your property, they're trespassing.  Somebody who uses a

25  claimed invention that the Patent Office has granted is

1    infringing those patents.  ePlus brought this lawsuit to stop

2    Lawson from trespassing on its property and infringing these

3    patents.

4           As the Court will tell you, it does not matter

5    whether Lawson knew that they were trespassing.  Trespass is

6    trespass.  It doesn't need to be intentional, it doesn't need

7    to be knowingly.  It just has to happen, and at this point, we

8    want them off our property.

9           First I want to talk to you about Lawson's

10   infringement in this case.  There are a few critical issues to

11   keep in mind when you are reaching your decision.  Later on,

12   after I present my infringement arguments, Mr. McDonald will

13   have an opportunity to talk about invalidity.  I'm going to

14   save my response to that to the end, because it's not our

15   burden of proof to prove that the patents are valid.

16          As you will hear from the Court, they presumed to be

17   valid by the Patent and Trademark Office, and they come here

18   with that presumption of validity, and it is Lawson that bears

19   a heavy burden of clear and convincing evidence to demonstrate

20   to you that these patents are invalid, and we believe that

21   evidence, when you hear it, fails.

22          First, I would suggest to you that the best evidence

23   of infringement in this case comes from Lawson's own witnesses

24   and Lawson's own documents.  The testimony of Lawson's own

25   employees who testified here and the words of their documents

1    reveal clearly that the accused configurations of this S3

2    procurement product infringes ePlus's patents.

3         Second, Lawson's arguments about why they don't

4    infringe, quite frankly, we think have been misleading, it's

5    been misdirection, and it's been smoke and mirrors, and they

6    have to tried to confuse this jury as to why they don't

7    infringe.

8         What I'm going to ask you to do is focus clearly on

9    what the Court has instructed you as the definitions, the

10   construction of the claims terms at issue about what a catalog

11   is, about how you select catalogs, about the issues about

12   searching, about the issues of finding things that are

13   available in inventory, about the things like how you find

14   generally equivalent items by using the cross-reference tables.

15        When Lawson's attorneys hold up a Sears catalog or

16   mention shopping lists or address books, that's just the smoke

17   and mirrors they want you to believe about.  Look at the

18   Court's claim construction in your glossary about a catalog,

19   and you will find out that it has nothing to do with the

20   arguments.

21        When you deliberate and you look at Lawson's

22   arguments and you look at the Court's claim construction, these

23   kind of misdirection, misleading arguments will make no sense.

24        Third, this was a significant invention.  As you have

25   heard, it took more than a year and a half, millions of

1    dollars, and several highly trained engineers, both at Fisher

2    Scientific and at IBM, to help come together and create and

3    develop this electronic sourcing system patent.

4            It represented a significant advance over the Fisher

5    RIMS system and the IBM TV/2 system.  It was far more than just

6    putting these two things together like you might put together a

7    child's snapping Lego blocks.

8            Fourth, the Patent Office thoroughly examined the

9    inventors' patent application for this invention and decided

10   after a review process that spanned more than nine years that

11   the invention should be patented.  If you look at the first

12   page of any of the three patents in your notebook, you will see

13   the same examiner, Edward Cosimano, a name that hasn't come up

14   in this trial but was an examiner who looked at these patents

15   and had everything in front of him that Lawson's expert now

16   claims invalidates these patents.  The RIMS '989 patent and the

17   two TV/2 brochures were fully before him when he considered

18   these patents over the course of nine years, and he granted

19   three patents and 79 claims.  He examined all of them, and he

20   found that they were new, useful, and nonobvious, and that is

21   what matters here.

22           Remember, as I told you in the opening statement, you

23   can get improvements on patents.  You can get improvements on

24   inventions.  That's what the patent system was built on, to

25   make a better mousetrap, and that's why the patent system

1    exists, and that's how we make advances in technology.  As I

2    said in my opening statement, only God creates from nothing.

3    Everybody else stands upon the shoulders of the people who came

4    before them, and they make new and better inventions.

5              Let's put this into perspective a little bit and go

6    back to 1994.  We all need to remember, because it's very easy

7    to forget as we sit here today in 2011, but back in the early

8    1990s, Amazon was the world's largest river, not the world's

9    largest retailer, online retailer.  Back in the 1990s, most of

10   us had not even heard of the internet.  I certainly hadn't.

11             It was back in the early 1990s, almost 20 years ago,

12   that Mr. Momyer, Mr. Kinross, Mr. Johnson, and Mr. Melly, who

13   has since passed away, invented this electronic sourcing system

14   invention.  You heard testimony from Mr. Momyer and Mr. Kinross

15   and Mr. Johnson about the state of the procurement industry in

16   the early '90s.

17             At that time, people in the procurement industry

18   still used huge, unwieldy paper catalogs like the Fisher

19   Scientific catalog that had thousands of pages and thousands of

20   items.  The inventors here simplified that process to allow

21   people to search electronically for items in catalogs, create

22   requisitions, generate multiple purchase orders, check

23   availability of inventory, check to see and do comparison

24   shopping, and they could all do it from a desktop PC right in

25   your office.

1          Just like that Edison light bulb in which dozens of

2    light bulb patents came before Edison, what he invented was a

3    new improvement, an improved filament on an incandescent bulb

4    that suddenly made the light bulb something new, useful, and

5    nonobvious and is a great success.  That's what these inventors

6    did here themselves.

7          Indeed, this electronic sourcing system invention,

8    when the inventors came up with it at Fisher Scientific, was

9    somewhat against the conventional wisdom.  You might recall

10   that the invention empowers the end user to actually go out and

11   find products from Fisher's competitors.  You might recall that

12   the inventors testified that when they first came up with this,

13   they met resistance from upper management.  They were saying,

14   why are we doing this, this doesn't make sense, we're going to

15   go out and allow our customers to buy product from other

16   companies.

17         And so that kind of initial skepticism is something

18   that often happens in the inventive process when people wonder,

19   is this really a smart thing to do, and then suddenly someone

20   realizes that, yes, it is.  Indeed, it was such a smart thing

21   for Fisher Scientific to do that they created a new company

22   called Fisher Technology Group, and they spun that company off,

23   and they put these inventors in that company to develop this

24   product, to develop this software, and then market it.

25         You recall that company then later became renamed

1    ProcureNet, and my client, ePlus, acquired ProcureNet back in

2    2001 with all of its assets, all of its products, and it's

3    patents.

4            If we could have the first slide.  It's not on my

5    screen.  Is it on anybody else's screen?

6            THE COURT:  His screen doesn't work.

7            MR. ROBERTSON:  It's always something.  Everybody has

8    it?  All right.  So ePlus acquired these patents, and they've

9    been proven to be very valuable.  We've had five of ePlus's

10   competitors that have now taken license to the patents-in-suit,

11   and ePlus has earned almost $60 million in royalties.

12           ePlus and its customers have received awards for

13   these products as you heard from Mr. Farber for the patented

14   technology.  It was a long-felt need in this industry, and

15   there was, as I say, even initial skepticism from Fisher

16   Scientific's own management.

17           Notwithstanding that five of our competitors have

18   taken licenses, Lawson, however, now wants you to let them

19   skate free.  Lawson now argues the invention was obvious.

20   That's an argument that can only be made 20 years after the

21   fact with 20/20 hindsight.

22           Lawson suggests that sitting here now, it should have

23   been obvious to create an invention that several engineers

24   spent millions of dollars and more than a year, two years to

25   create and that the Patent Office got it wrong, not once, not

1   twice but three times on all 79 claims.

2         The facts and the evidence and the testimony and the

3   documents all show that the invention is not obvious, and it

4   was no easy task.  You heard testimony from the inventors and

5   even the IBM employees that Lawson hired as their own paid

6   witnesses about the time, money, and effort involved to create

7   this electronic sourcing system.

8         More than ten IBM employees worked on this project.

9   It took months to develop.  You heard that Fisher paid more

10  than $600,000 to IBM only for part of the development effort.

11  You may recall the Gantt chart that was part of an exhibit the

12  statement of work with IBM.

13        That project required substantial revisions,

14  modifications, and entirely new creations for this electronic

15  sourcing system patent.  In fact, there were more -- if you go

16  back and look at this plaintiff's exhibit, there were more than

17  81 tasks that needed to be done over a year and a half that Ms.

18  Pamela Eng testified about.  You'll have that chart in the jury

19  room, and I would urge you to look at that and consider what

20  was involved in the development of this project.

21        Keep in mind, too, that after the examining the

22  patent application submitted by the inventors in 1994, the

23  Patent Office decided that there were several inventions.

24  Indeed, the reason that three patents were granted is because

25  the Patent Office could look at that disclosure, that detailed

1    28-column specification and determine that not only were there

2    inventions that were worthy of the '683 patent, there were

3    additional inventions disclosing they were worthy of the '561

4    patent, and there were additional inventions worthy of the '172

5    patent, and it was all based off that same disclosure, that

6    same initial application, that same specification that you will

7    have before you when you review those patents.

8              It is certainly ePlus's burden to prove infringement

9    in this case, and as the Court will instruct you, if you decide

10   that it's simply more likely than not that Lawson infringes any

11   of the 12 asserted claims of the ePlus patents, then ePlus has

12   met its burden.  The legal phrase for this is preponderance of

13   the evidence, and the Judge will instruct you on that.

14             You can simply think of that in terms of the classic

15   image of the scales of justice.  If the scales tip ever so

16   slightly in ePlus's favor, then ePlus should prevail in your

17   deliberations.  Lawson's claim that the patents are invalid,

18   however, as the Judge will instruct you, must be proven on a

19   much stricter standard.

20             Remember, an issued patent is presumed valid because

21   the Patent Office is presumed to have done its job, and the

22   Patent Office has examined all of these patents.  So Lawson

23   must prove to you, by clear and convincing evidence, that the

24   patents are not new, not useful, or not obvious.

25             We believe that Lawson's evidence in that respect

1    fails and fails completely.  On the Court's verdict form which

2    you will receive, you'll be required to check off boxes as to

3    whether or not ePlus has proven a claim has been infringed or

4    whether or not Lawson has proven that a claim is invalid,

5    either as anticipated, and that is that a reference, a prior

6    art reference they allege to exist fully contains each and

7    every element of every claim.  If it does not, it cannot

8    anticipate.

9         You'll be asked in that verdict form whether or not

10   Lawson has proved by clear and convincing evidence that the

11   patents are obvious by some sort of combination of the

12   references.  If they do not disclose or teach each and every

13   element of every asserted claim, they have not met their burden

14   of clear and convincing evidence.

15        Let's now turn to the infringement of ePlus's

16   patents.  As I've mentioned, it's important to apply the

17   Court's construction that's given in your glossary that you've

18   had for the past three weeks.  That is what is going to control

19   here.  Those claims have been highlighted.  The claims that are

20   at issue have been highlighted in your notebook, but let's just

21   use a couple just to refresh you, and let me go through some of

22   the basic elements involved here.

23        This is claim three of the '683 patent.  It's one of

24   those system claims that describe the elements of what the

25   electronic sourcing system invention is.  By now, I would hope

1    they are familiar to you, but we have, just to summarize,

2    multiple catalogs, ability to select the catalogs, to search

3    for matching items in those catalogs, to build requisitions

4    from those matching items, to process those requisitions, to

5    generate multiple purchase orders, and then to convert the data

6    in this claim relating to an item from one vendor source to

7    data relating to another vendor source.

8            You remember that's about how you do the comparison

9    shopping, the finding an item from one vendor to compare it to

10   another vendor to see if you want to pay this price or that

11   price or whatever features it might have that would be useful

12   to you.

13           The Court will instruct you that a system claim like

14   this claim three is infringed if the S3 system contains each of

15   the elements of that particular claim, and we think the

16   evidence was overwhelming in that regard.

17           Let's take a look at claim 26 of the '683 just as an

18   exemplary.  This was one of the method claims.  Remember, the

19   method claims are sort of like the recipe, performing the steps

20   that go through this claim.  A method claim is infringed in

21   this case by the customers of the products that Lawson sells.

22   So when Lawson sells a customer this S3 system, and the

23   customer uses that system, it performs every step of this

24   method claim, and so the customer in that instance is what's

25   called the direct infringer, and Lawson is the indirect

1    infringer because it is inducing the customer to directly

2    infringe by using the infringing system.

3           I'll come back to you and explain a little bit more

4    about this, what's called inducing and contributory

5    infringement in a little bit, but fundamentally, those claims

6    are infringed by Lawson just as if the customer was infringing,

7    because Lawson provides the infringing system.  And you'll find

8    in the Judge's instructions exactly what this inducement to

9    infringe or contributory infringement is.

10          As I mentioned, it's important to keep in mind the

11   words of the claims as the Court has construed them, because

12   they define what the boundaries are of the invention, both for

13   infringement and for invalidity.

14          So let's talk a little bit about the Lawson

15   infringing S3 system.  As you've heard from the Lawson

16   employees, the S3 system is a software system built by modules,

17   and there are at least five configurations now accused of

18   infringement.  Lawson has sold these systems to hundreds and

19   hundreds of customers.

20          It's a robust program that allows customers to

21   maintain information about hundreds of thousands of catalog

22   items from tens of thousands of different vendors.  You may

23   recall that Mr. Matias -- he testified by videotaped

24   deposition.  He was from the Robert Wood Johnson Medical

25   Center.  He uses a Lawson infringing system.  He had more than

1   36,000 catalog items in that system from 3,000 separate catalog

2   vendors.

3           I asked Mr. Christopherson about the capability of

4   the system.  Mr. Christopherson, corporate representative from

5   Lawson, admitted that the system could handle more than

6   hundreds of thousands of items from tens of thousands of

7   different catalog vendors.

8           Dr. Weaver, professor of computer science from the

9   University of Virginia, actually demonstrated the S3 system to

10  show you the different configurations that infringed the ePlus

11  patents.  He walked you through several of those systems and

12  used a demonstrative to show you how the various software

13  modules could be combined to perform an infringing system.

14          Initially, as you may recall, you need to have this

15  platform technology, the Lawson system foundation and process

16  flow upon which you build the procurement system that

17  infringes.  Without this, the modules can't communicate.  It is

18  basic, and we believe it was uncontested through the documents

19  and through the testimony of Lawson's own witnesses that this

20  platform technology was necessary.

21          In configuration number one, which is accused of

22  infringement, the three procurement modules, purchase order,

23  requisitions, and inventory control, based on that foundation,

24  can perform all the necessary functionality for several of the

25  claims that are accused of infringement, and in your verdict

form, when you see it, the actual claims that are being accused
of infringement will be spelled out with respect to each
configuration I'm going to talk about now so there will be no
confusion for you when you go back to determine what claims
apply to what infringing configuration.

So this was the first configuration which was the
foundational -- Lawson's system foundation and process flow
with the purchase order, requisitions, and inventory control.
Second configuration, upon that foundation, you can add the
requisition self-service application they called it.  You
recall one of the things that the requisition self-service
application can do is to add that classification code, the
UNSPSC we talked about, in order to do the kind of drill-down
to get to items that are generally equivalent.  This RSS is
necessary for that process.  It's also necessary for the next
configuration which is accused that includes the procurement
punchout.

Procurement punchout, you will recall, lets you go to
vendor websites that have been specially designed to
communicate with the Lawson system, and I'm going to talk about
the details of procurement punchout functionality in a little
bit.

The fourth configuration includes this electronic
data interchange or EDI.  You heard a lot of testimony about
how EDI is a communication protocol in order to obtain

1    information, download catalogs into the Lawson system, obtain

2    information about availability of products in inventory.  This,

3    again, is another infringing configuration that Dr. Weaver

4    testified about, and finally, we have the last configuration

5    that infringes in this case which includes all of these modules

6    acting together.  As you know, all these things can communicate

7    together in order to be able to provide the functionality that

8    these patents are directed to and cover.

9            So let me give you an overview, if I can, of what

10   evidence we believe proves that these configurations infringe.

11   First, Lawson's own employees.  Mr. Lohkamp, Mr.

12   Christopherson, and Ms. Raleigh all testified.  Mr. Lohkamp,

13   you will recall, was the product strategist.  Mr.

14   Christopherson is the director of product development, and Ms.

15   Raleigh was a practice director who does implementation and

16   maintenance and servicing for these systems.

17           Further, Lawson's own documents demonstrate clearly

18   that the S3 system infringes each of the asserted claims.

19   Lawson has been trying throughout this case to run away from

20   these documents that were created long before this lawsuit was

21   ever filed.  But, remember, Lawson's own vice president of

22   marketing confirmed that Lawson's engineers and its in-house

23   lawyers and its marketing personnel reviewed those documents to

24   make sure that the information is absolutely accurate and

25   reliable.  He testified, of course, they don't want to mislead

1    their customers, and so now they have to live with the

2    documents they created before this lawsuit was ever filed.

3            In addition to the evidence from the mouths of

4    Lawson's employees, in the words of their own documents, you

5    heard about how the S3 system infringes the patents from the

6    expert witnesses, Dr. Weaver and Mr. Niemeyer.  You even heard

7    in many instances, although he fought me over and over, Dr.

8    Shamos made concessions about how these systems satisfied the

9    infringing claims.

10           Let me just show you what ePlus's experts

11   demonstrated.  What did they do?  Dr. Weaver showed you a demo

12   of Lawson's S3 system.  You'll actually have that back in the

13   jury room when you deliberate, and you can look at that.  Dr.

14   Weaver show you Lawson's system guides and manuals and walked

15   you through them to show you each of the functionalities of the

16   patents.

17           Dr. Weaver showed you those responses to the customer

18   RFPs, those questions the customers asked, and they say, can

19   your system do this.  Remember, Mr. Frank, who is their head of

20   marketing, said, we try to be as accurate and truthful as

21   possible, and those responses are vetted by our legal

22   department and our engineers to make sure they are accurate,

23   and in those RFPs, you will see lots of admissions as to the

24   functionality of what they perform, and I'm going to come back

25   in detail to those in a minute, that admit that they satisfy

1    all of the elements of the asserted claims.

2            We saw technical specifications in their

3    documentation.  We saw Lawson presentations where they go and

4    meet with their customers, and they tell them in PowerPoints

5    and these webinar presentations or white papers that are

6    available on their website, all of which the Lawson witnesses

7    testified were supposed to be truthful and accurate, and

8    admitted all of the elements of the claims at issue, and we had

9    Mr. Niemeyer, an expert in source code, look at the source code

10   and tell you exactly what it said.

11           That was some dense material, I will grant you, but

12   we put on a source code expert to tell you what the source code

13   revealed, and Lawson had a source code expert and decided not

14   to call him because apparently he had nothing to say to

15   contradict Mr. Niemeyer.

16           So, now, what did Dr. Shamos show you?  Dr. Shamos

17   didn't do any demonstrations of the S3 systems.  Dr. Shamos

18   didn't discuss any of the system guides or manuals.  Dr. Shamos

19   didn't address any of the responses to the customer RFPs.  Dr.

20   Shamos never once talked to you about any technical

21   specifications.  Dr. Shamos didn't discuss any Lawson

22   presentations, and Dr. Shamos didn't look at the Lawson source

23   code.

24           I think that's very telling.  Indeed, when Dr. Shamos

25   testified on non-infringement, he didn't have a single document

1    to show you.  Now, why is that?  Dr. Shamos had unfettered

2    access to anything that he could want from Lawson.  He could

3    have gotten anything that they had.  He could have put on his

4    own presentation and showed you this is why it doesn't

5    infringe, let me tell you why it doesn't infringe, you can see

6    it right here.  Did he do it?  No.  Think about that if you

7    would during your deliberations.

8            So what do they have to have hide, and why are they

9    hiding it?  Why didn't they get out in front of you and show

10   you how their systems can't infringe?  Another interesting

11   issue with Dr. Shamos who testified about non-infringement, you

12   may recall when I asked him, who did you talk to at Lawson.  I

13   mean, you're their expert, they're paying you hundreds of

14   dollars an hour, why couldn't you sit down and just talk to

15   somebody at Lawson and ask them questions about it.

16           So why would he bury his head in the sand when there

17   was no reason to?  In fact, you may recall I asked him had he

18   even talked to the director of the S3 product development.  He

19   told me he didn't even know who that person was.  And at that

20   moment on the witness stand, it was literally the first time

21   that Dr. Shamos learned that Mr. Christopherson, the man in

22   charge of this whole project, the man sitting here as Lawson's

23   corporate representative for this entire trial, was right

24   there, and I had to introduce the two of them.  Now, does that

25   make sense?  Why wouldn't you talk to the man who is in charge

1    of the product development for the very product that's being

2    accused of infringement here?

3            Let's talk a little bit more specifically about some

4    of the issues that are in this case like the arguments about

5    catalogs that Lawson has been making.  We think the evidence

6    establishes that Lawson concedes that its S3 system satisfies

7    or meets almost all of the elements of the asserted claims.

8            So Lawson spent most of its time arguing with the

9    Court's definition of catalogs.  Why would they do that?

10   Indeed, you may recall that halfway through the case, the Court

11   had to issue an additional instruction with respect to what

12   published by a vendor means, because there had been a lot of

13   argument over that claim term.

14           I asked Dr. Shamos if he agreed -- can we go back to

15   the previous slide for a second?  Thanks -- that this

16   definition by the Court, an organized collection of items and

17   associated information was satisfied, and he said it clearly

18   was.  And then I asked him if he agreed that a catalog could

19   include, and the Lawson catalog does include, preferably all of

20   these details about an item, about a catalog item that be

21   present, a part number, a price, catalog number, a vendor name,

22   a vendor ID, a textual description of the item, and possibly

23   images relating to the item, and he conceded that was all

24   present in the Lawson system.

25           So the only thing he said that wasn't present, and I

1    asked him, so what we're down to then is this published by a

2    vendor, right?  That's the only thing you are saying is absent.

3    Yes, he says.

4            So what's the argument on published by a vendor?  You

5    heard a lot of argument here about how -- while Lawson gets the

6    information from a vendor and provides it to the customer or

7    takes what's called a legacy system where a customer has an old

8    system that has catalog information on it, and they'll transfer

9    it to the Lawson system, and all that information originates

10   with is disclosed by, is made generally known by the inventor.

11   What they then argue is, we transform it somehow, we modify it,

12   we may delete some information, we might not include the entire

13   catalog, we might just do portions of the catalog.  None of

14   that, as you'll see when you go back and you look at the

15   Court's definition of catalog -- and if we can go back to that

16   for just a second -- has any relevance to this case.

17           That's the smoke and mirrors.  That's the

18   misdirection, that's where Lawson is trying to mislead you.

19   All of that, they say, is in the term published by a vendor.

20   Do you have the Court's construction of published by a vendor?

21           Published, according to the Court, an instruction you

22   must follow, is simply to make generally known.  Published by a

23   vendor means at some point in time, a vendor such as a

24   supplier, a manufacturer, or a distributor has made generally

25   known or has disclosed an organized collection of items and

1    associated information, all of which -- I won't continue to

2    read -- but that Dr. Shamos concedes is present in the Lawson

3    system.

4            So it all comes down to published by a vendor.  All

5    that is is to make generally known or disclose.  So what does

6    it matter if the data gets transformed in some way?  What does

7    it matter, under the Court's construction, whether it was

8    reformatted?  What does it matter if the customer selects the

9    catalog items it wants to put in its catalog database?

10           None of that is relevant to the Court's construction,

11   and all of that has been argued by Lawson in order to try and

12   pull the wool over your eyes that that's required by published

13   by a vendor.  But when you go back and you read this

14   construction that the Court has made in its necessary file,

15   you'll see that none of that is relevant.

16           I asked Mr. Christopherson to look about how vendor

17   catalog data is imported, and you may recall that there was an

18   exhibit which will be back in the jury room, Plaintiff's

19   Exhibit Number 521, which was called, I think, the vendor

20   catalog import process.  So I asked him how, through this

21   document, Lawson was showing how a vendor item catalog

22   information that is disclosed or made generally known ends up

23   in the database.  That was the item master.  He said it was

24   correct at a very high level.

25           Well, that's all you need to know at that very high

1    level.  It's indeed correct.  It ends up in that item master

2    and the vendor item table, and that's how they can obtain and

3    use and utilize that information for performing all the

4    functionality of the claims that are at issue.

5           Similarly, Lawson's employee Hannah Raleigh explained

6    that the Lawson item master can contain catalog information.

7    This was one of the documents they were trying to run away

8    with, but when they were asked how they would get the catalog

9    information -- question was, so this is going through the

10   process when a vendor makes it known to a customer its catalog

11   data, this process is how it ends up in the item master.  She

12   said, in one way, yes, and if you look at that, it says,

13   catalog information is part of Lawson's item master.

14          They said that in a document filed long before this

15   lawsuit, and now they tell you something differently.  Even Dr.

16   Shamos, even Lawson's own expert, Dr. Shamos, reluctantly

17   agreed that Lawson's own documents show how the S3 system

18   allows Lawson's customers to import catalog information into

19   the item master.  I asked him about that same document.  So

20   this is going through the process in which, when a vendor makes

21   known to a customer its catalog data, this process is how it

22   ends up in the item master; correct?  In one way, yes.

23          Dr. Shamos also agreed that the vendor catalog data

24   includes vendor item description, vendor item number, a

25   manufacturer item number, and UNSPSC codes all of which, when

1    you look at the Court's construction of catalog, satisfied that

2    information.

3            And not only do the Lawson documents prove that

4    Lawson infringes the ePlus patents, but even the documents

5    Lawson created during trial to help prove it doesn't infringe

6    show you exactly how the S3 system is published by a vendor.

7    Mr. Christopherson had a slide, a demonstrative exhibit that he

8    created about the process for the catalog, and when I asked him

9    about that slide, created by them to try to prove to you that

10   their system wasn't infringing, he had to disclose that it is

11   the vendor -- he had to concede that it is the vendor that

12   actually provides the catalog data, and it just makes sense.

13   How would the customer know what the vendor item is?  How would

14   the customer know what the vendor price is?  How would the

15   customer know what the vendor item description is unless the

16   vendor provided all that information?

17           It was even arguments about, well, sometimes the

18   customers, our customers negotiate the prices with the vendors

19   and get special prices, not their typical list prices.  The

20   response you should be thinking about that when you read the

21   Court's construction is, so what.  It's still a price.  That's

22   all the Court required, just a price to be there.  Whether it's

23   negotiated, whether it's a list or whether it's otherwise, it

24   doesn't really matter.

25           I asked him with respect to that slide that he had

1  created to try to convince you that the item master was somehow

2  different, so in your layperson understanding, by giving that

3  information, that item information, is it disclosing it to the

4  customer?

5          Answer:  It's disclosing that to the customer.

6          And it's making it generally known to the customer;

7  right?

8          It's making it known to that customer, yes.

9          That's all the Court's definition of published by a

10  vendor requires.

11          So Lawson's employees, Lawson's experts and Lawson's

12  documents reveal that the accused configurations of this S3

13  procurement system has catalogs.

14          So how did they try to convince you they didn't?

15  Well, Lawson showed you a Sears catalog and talked about

16  grocery lists.  Lawson is attempting to distract you from that

17  definition.  Lawson says, for example, well, you know, if I

18  take a phonebook, and I just take a few of the numbers and put

19  it my address book, does that make my address book a phonebook?

20          Well, I think you've heard testimony that these

21  systems cost hundreds of thousands, if not millions of dollars,

22  and take months to implement.  Who's going to buy a system like

23  that and put a handful of items in there?  Who is going to buy

24  a system and make it -- instead of having a robust list of all

25  the data you could buy from the grocery, just put in five

1   things from the grocery list?  They don't do that, and that's

2   not the evidence here.

3           As I say, Mr. Matias testified that his system had

4   36,000 catalog items and 3,000 catalog vendors.

5   Mr. Christopherson said it could have hundreds of thousands of

6   items and tens of thousands of catalog vendors.  Nobody buys

7   these systems to implement them and put them there if they're

8   only going to be using them for a handful of items.  That just

9   simply makes no sense.

10          So another argument was made that the item master

11  itself has to be published by the vendor.  There's no evidence

12  whatsoever for that, and the Court's construction says nothing

13  about that.  The issue is not whether the item master is made

14  generally known.  What counts is whether the information of the

15  catalog items ends up in the item master.  That's what matters

16  and was made generally known or disclosed by a vendor, and the

17  evidence of that, again, I would suggest to you is

18  overwhelming.

19          So, first, Lawson's first argument is the item master

20  is not published by a catalog.  Again, I'm not going to go

21  through this slide in detail because it's fairly wordy, but if

22  you'll go back, you'll see that that argument is completely

23  inconsistent with the Court's construction.

24          Second, Lawson's argument is the customers select

25  items for the item master.  Again, when you go back and look at

1    the Court's construction, who selects the items to put in the

2    item master doesn't matter.  At the end of the day, what you

3    need is a database of catalog items, and they have that.  It

4    doesn't matter if the customer selected it, Lawson selected it,

5    or some other third party selected it.  It has nothing to do

6    with the Court's construction.

7          Even Dr. Shamos agreed.  I asked him, published

8    simply means to make generally known.  So that has nothing to

9    do with who selects the date for inclusion in the item master;

10   correct?  Yes.

11         Next, throughout the trial, you've heard that

12   Lawson's customers only import parts of the vendors' catalog.

13   Now, there was evidence and was testimony that the capability

14   of the system could include and import entire catalogs if they

15   wanted to, but nowhere in the Court's construction does it say

16   that importing only a part of the catalog renders it a

17   non-catalog.  Indeed, I asked Lawson's expert, where in the

18   Court's construction of catalog does it say that you have to

19   have all of the item information included?

20         Answer:  Well, I don't think it says that at all.  I

21   know it doesn't say all, and I don't think you have to have

22   all.

23         And he's right, but that's one of the arguments that

24   Lawson had advanced in this case to say that it wasn't

25   published by a vendor.

1          Mr. Christopherson testified about importing an

2    entire vendor catalog.  I asked him using this EDI capability,

3    this electronic data interchange module, does it have the

4    capability of importing an entire vendor catalog into the item

5    master?

6          Answer:  It has that capability as you're defining

7    it, yes.

8          Lawson's own documents show that the S3 system can

9    import entire vendor catalogs.  This was the vendor import

10   feature -- this is Plaintiff's Exhibit Number 398 -- and I

11   pulled this out.  The purpose of this import process was that

12   the data could be a vendor catalog that contains information

13   about all the items that a vendor carries.

14         And when you are deliberating and reviewing the

15   Judge's instructions, I'd like you to keep in mind about this

16   issue about capability, whether the system has the capability

17   of doing all the things we've said, because a system such as

18   Lawson's has that capability, and when you are listening to the

19   Court's instructions, you may hear that Lawson argues it

20   doesn't infringe because sometimes, sometimes a user of the S3

21   system might not perform all the steps of the method claims or

22   that in certain configurations, the system might not include

23   all of the elements of the claims, but the Court will instruct

24   you that the fact that a product or process may operate in a

25   manner that does not infringe is not a defense of infringement

1    against Lawson if the S3 system is reasonably capable of

2    operating in a manner that satisfies the claim limitations and

3    it has that capability.

4           It can search by vendor name, it can search by vendor

5    product number, it can search by keyword, it can search using

6    the UNSPSC classification code system to find items that are

7    equivalent.

8           Then I talked about catalogs.  I'd like to talk about

9    the evidence remaining for some of the other claim elements.

10   First, let's look at the sample system claim three again, if we

11   can.  One of the elements, as you see there, the second

12   element, is selecting the product catalogs to search.  This

13   element can be satisfied in a variety of ways.

14          First, we demonstrated that the S3 system, and Dr.

15   Weaver showed you that you can search for keywords in order to

16   locate specific items from specific catalogs.  If I have

17   catalogs involving computers, like Dell or like Hewlett Packard

18   or IBM, and then I have catalogs involving things from Home

19   Depot, if I search for the word laptop as a keyword, I'm only

20   going to get those catalogs that are selling laptops like Dell

21   and Hewlett Packard.

22          You can also search under a vendor name.  You'll

23   remember I asked Mr. Christopherson and Dr. Shamos about

24   whether or not, in fact, you could use one of those multiple

25   user-generated criteria -- there were fields that you could

```
 1    fill out with what were called alphanumeric -- that's both
 2    letters and numbers -- and you could put in, for example, a
 3    vendor name, and then you could search using that vendor name
 4    to get that specific catalog.
 5            So one of the questions I asked Mr. Christopherson,
 6    if I'm searching in that alpha field and it has a vendor name,
 7    I could search by vendor name; correct?
 8            You would get back those entries, yes.
 9            Those vendors?
10            Yes.
11            I asked Dr. Shamos, if one of those user-defined
12    fields, I had a vendor name, the Lawson software presents a
13    user interface that would allow me to select that field;
14    correct?
15            If you -- yes, in a sense.
16            I don't know why he had to qualify in a sense, but
17    certainly the answer was yes.
18            Now, Lawson may also try to argue that RFP responses
19    don't really mean what they say.  As I say, they were vetted.
20    Can we go back to the one where -- this was the testimony of
21    Mr. Frank, and I asked him during his deposition, it's not
22    Lawson's intent to mislead anybody about the features and
23    functionality of the software products; right?
24            That's correct.
25            So if we were looking at a response to an RFP with
```

1    respect to the features and functionality of an ERP solution,

2    that's an enterprise resource planning solution, like the ones

3    we're talking about here, procurement, such as S3, we should be

4    able to rely on the accuracy of that information; correct?

5              That's correct.

6              Do we have the slide with Mr. Lohkamp?

7              This was the testimony of Mr. Lohkamp when I asked

8    him about a response to an RFP that Lawson represents is

9    accurate.

10             I asked, what did Lawson answer when it was asked

11   whether it could search by a vendor name?

12             We answered yes.

13             Can we go to the slide for Deaconess?  Here is a

14   response that Lawson made to a request for proposal for the

15   Deaconess Health System.

16             Question:  Can requisition searches be performed in

17   the following ways?

18             Yes.

19             By description with the option of using wild cards

20   which are wild card keywords that you can do.

21             Yes.

22             By catalog number?

23             Yes.

24             By manufacturer number?

25             Yes.

1          Others?

2          Yes.

3          Vendor item number, vendor description, item

4   user-defined fields, generic name, and search by the UNSPSC.

5   That's what Lawson represented when it was telling the

6   Deaconess Health System how its system performed.

7          Go to the next slide, please.  Here was a response to

8   a request for proposal from the CML Health Care about the

9   functionality of these accused systems.  Does the system have

10  the ability for expanded item search by vendor catalog number,

11  partial description, manufacturer code, classification code,

12  vendor name, manufacturer name?

13         Answer:  AX, which meant available as installed.

14  Right out of the box it has that capability.

15         I've already covered this, but I think the S3 system,

16  the testimony was, can also select product catalogs to search

17  by using those user-defined fields, the search for vendors as

18  both Mr. Christopherson and Dr. Shamos testified.  So now we've

19  seen that the Lawson system clearly has catalogs and clearly

20  can select product catalogs to search.

21         The next item was searching for matching items after

22  you select the product catalogs to search.  You may recall that

23  Dr. Weaver explained in his demonstrations how this element was

24  meant.  Dr. Weaver showed that the accused S3 system uses an

25  index that allows selected portions of the database for

1    selected catalogs to be searched separately.

2            An index, you may recall, is just like an index to a

3    book.  If I have a history book that has the history of the

4    Civil War and I want to go and look up something like the

5    Battle of Vicksburg, instead of going through every single page

6    of that book -- and, if you will, the book is the database --

7    instead of having to go page by page to find where the Battle

8    of Vicksburg is, I can go to that index, look up under V, find

9    Vicksburg, and it will point me exactly to the pages that

10   describe and discuss the Battle of Vicksburg.

11           That's a fast way, a speedy way to find what I want

12   instead of having to go through the database, if you will, page

13   by page by page, and that's what the index does.  So although

14   Lawson agreed that the S3 has an index, Dr. Shamos says that,

15   nonetheless, you had to search the entire database.

16           I pointed him to a dictionary definition, if I could,

17   an independent dictionary definition.  This is from *Webster's*

18   *New World Computer Dictionary*, and what it essentially says

19   there is when you have this index, which was the term that was

20   being defined, you don't have to search and sort the database.

21   The program uses the index rather than the full database.  In

22   other words, the program uses the index to locate the data

23   record that you want right away.

24           What did Dr. Shamos argue to you?  Dr. Shamos made an

25   analogy to a pantry.  Do you recall that?  And he said if you

1    alphabetized all of the things in your pantry, in other words

2    so it was organized and indexed, and if you wanted to find

3    something like an apple, you still had to go through the entire

4    database all the way down to zucchini notwithstanding you had

5    created an index so you could find quickly the data record you

6    want, if you will.  I would submit that that made no sense when

7    Dr. Shamos made that argument, made no sense then and it makes

8    no sense now.

9          The bottom line is Dr. Weaver showed you there an

10   actual demonstration how searching system meets the claim

11   element, and Dr. Shamos offered no demonstrations and discussed

12   no documents.

13         Lawson doesn't dispute that the S3 system is capable

14   of building requisitions and generating multiple purchase

15   orders, so we don't need to spend much time on those elements.

16   I think Mr. Lohkamp, indeed, conceded as much.

17         Isn't it, in fact, how Lawson markets this

18   requisition self-service application, by saying, in effect, you

19   can now distribute that capability to many of your employees to

20   have the ability to search for matching items, build

21   requisitions, and generate multiple purchase orders; correct?

22         We market it as a way for them to search those items

23   and create requisitions.

24         Let's turn, if we can now, to this element about

25   converting data, this sort of comparison shopping feature that

1    are in the patents.  Lawson's employees and Lawson's customers

2    and Dr. Weaver have all testified that the S3 system, with this

3    requisition self-service module, includes that category search

4    functionality under the UNSPSC for cross-referencing.  There's

5    been a great deal of evidence about this element.

6            You will recall seeing in some of the fields, you

7    could put in those family, segment, commodity levels that would

8    let you drill down to get to specific items that were generally

9    equivalent.

10           If we can look at PX-11, page 12.  Blow that up for

11   me.  These were the various categories, the hierarchical levels

12   that you could put into the Lawson system that were all

13   conceded that were present and could be used.  Dr. Shamos

14   actually even relied on this white paper, and the white paper

15   shows you that the products at this level, the commodity level,

16   which are included in the Lawson system, is capable of doing

17   that, are a group of substitutable products or services.

18           This is the same white paper that Dr. Shamos relied

19   on in his testimony, although later on, when I asked him about

20   that question, he tried to run away from that part of it and

21   said, oh, well, I don't think that's accurate.  I said, in any

22   event, you relied on the UNSPSC white paper when you gave your

23   testimony about the capability of the UNSPSC, right?  Yes.

24           Under commodity, doesn't this white paper represent

25   that when you get to that level, you have a group of

1    substitutable products or services; correct?

2         Well, I think they say that, but it's clearly not

3    correct.

4         He relies on it in one instance, but when it

5    contradicts what he wants to say in another instance, suddenly

6    the paper's not correct.

7         You may also recall that Mr. Yuhasz, a gentleman from

8    Novant Hospital who is a customer of Lawson, testified.  He

9    agreed when a user of the system employs that UNSPSC, you can

10   find items from multiple vendors with the same code.  I won't

11   go through all that testimony, but I think you'll see he

12   conceded yes.

13        I asked Mr. Christopherson, the corporate

14   representative, isn't it true that a user of the Lawson system

15   that has this UNSPSC capability can find items from different

16   vendors that were all cross-referenced to the same product

17   category.  That's correct, yes.

18        So clearly that UNSPSC code is included in the Lawson

19   system for a reason.  It's not just there for no reason.  They

20   include it to use it as a tool in order to do this kind of

21   cross-referencing.

22        Let's talk a little bit about the inventory

23   capability of the Lawson system if we can.  You will recall

24   that Dr. Weaver did a demonstration in which he used punchout,

25   and one of the times when he was looking for a laptop bag, he

1    got back information that it was temporarily out of stock,

2    please check back soon.  Clearly, using the Lawson system,

3    using that punchout capability, there was the capability of

4    determining whether a selected matching item was available in

5    inventory.

6         That functionality is also available with the systems

7    that use the EDI or electronic data interchange capability.

8    Dr. Weaver showed you, if we're using the electronic data

9    interchange module, the purchase order goes to a vendor, and

10   the vendor can reply and the purchase order responds as to

11   whether that item is available in inventory, for example,

12   whether or not the item was backordered.  During his

13   demonstration, he showed you a situation in which that

14   happened, and you'll be able to look at that when you're in

15   your deliberations.

16        Let's talk a little bit about this punchout

17   capability.  As you know, there's a punchout application that

18   Lawson includes that is accused of infringement in one of the

19   five configurations.  Dr. Weaver's demonstration of the

20   punchout capability showed how a punchout user can determine

21   whether an item is available in inventory, and it showed how

22   Lawson creates, communicates, and controls the punchout trading

23   partner websites that an S3 user punches out to.

24        You don't punch out to Dell.com, for example, when

25   you are doing that.  You punch out to a specially created Dell

Case 3:09-cv-00620-REP   Document 688   Filed 03/29/11   Page 46 of 53 PageID# 19919

3123

1   punchout website that Lawson has worked with Dell in order to
2   set up the communication protocols in order to do that.

3           For example, we can look at the next slide.  Here
4   you'll see, and the testimony was that Lawson, when you use
5   this punchout capability, you are always within the Lawson
6   system and that this is not, notwithstanding we are looking at
7   products that are available from the Dell catalog, this is a
8   special Dell website for this, and Dr. Weaver pointed out that
9   you can tell that from what's called the URL address.

10          You are at the Lawson server.corpnet.lawson.com when
11  you are there looking at these Dell products.  Lawson
12  established that, Lawson created that, Lawson designed it, and
13  Lawson set up all of the necessary architectures and
14  communication protocols in order to do that.

15          You even heard from Mr. Lohkamp, the product
16  strategist, about how Lawson enters into agreements with its
17  punchout trading partners to develop that connection.  He also
18  explained how the punchout partners pay Lawson to configure and
19  test and set up the connection.  He said those contracts were
20  mutually beneficial.

21          Now, he also said he had a number of relationships
22  with punchout trading partners that were not contractual, but
23  when I asked him, were they mutually beneficial as well to both
24  Lawson and to the trading partners, he said, yes.

25          If I can just talk to you a little bit about the

1    punchout architecture to show you Lawson keeps a bear hug

2    around this entire process, if we can go to the punchout

3    architecture slide.

4           This was one of the Lawson documents.  It's the

5    procurement punchout guide, I believe, Plaintiff's Exhibit

6    Number 211.  Dr. Weaver testified as to the eight steps that

7    are necessary in order to do the punchout process.  These eight

8    steps are set up by Lawson in order to provide this

9    functionality through a user of the punchout system.

10          I'm not going to go through all eight, but that

11   exhibit is back in evidence, and it demonstrates clearly that

12   Lawson is the one that has created, designed, and instituted

13   this entire process to provide that architecture to the user of

14   the system in order to perform the search, the selection, and

15   retrieval of the information necessary to then fill out a

16   requisition and build the purchase orders.

17          Indeed, I thought it was very interesting.  The term

18   that Mr. Lohkamp used is that they have to create the handshake

19   with their punchout trading partners in order to do that.  Each

20   of these steps is controlled by Lawson, and Lawson controls the

21   authorization process, and Lawson establishes the connection,

22   and Lawson retrieves the information in order to complete the

23   entire purchase process.

24          It was Mr. Lohkamp who also confirmed that Lawson

25   provides the assistance to its customers including manuals,

1    training services, and implementation services all to help them

2    configure the procurement punchout with its partners.  Indeed,

3    the user of the Lawson system tells Lawson what punchout

4    trading partners they want available to their system, and then

5    Lawson will indeed to do that, and then they charge for that

6    service.

7         May I have the next slide, 43.  Indeed, I asked

8    Mr. Christopherson, when the Lawson system punches out to the

9    punchout creating the partner's catalog, you remain connected

10   to the Lawson system; correct?  Correct.

11        I'd like to talk to you a little bit now about what's

12   call indirect infringement, some of these issues about inducing

13   and contributory infringement.  Indirect infringement, like

14   direct infringement, is still infringement, and ePlus, we

15   believe, has shown through the testimony, again, of Lawson's

16   own witnesses and its own documents that Lawson infringes the

17   claims of the patent both directly and indirectly.

18        The Court will instruct you that Lawson may directly

19   infringe the patents even if they believe in good faith what

20   they are doing is not infringement of any of the patents.  The

21   Court will also explain to you the law concerning indirect

22   infringement.  In a nutshell, ePlus asserts that Lawson has

23   both induced and contributed to the infringement of ePlus's

24   patents.

25        So what does that mean?  Well, to show induced

1    infringement, ePlus must prove simply by a preponderance of the

2    evidence that Lawson's customers have directly infringed the

3    ePlus patents and that Lawson has actively or knowingly aided

4    and abetted that direct infringement, that Lawson encouraged

5    their customers to infringe.

6           Well, of course they did.  They sold them the

7    infringing system in the first instance, and they implemented,

8    they maintained it, they serviced it, they instructed him how

9    to do it.  They provide all of the customer support systems

10   including the online services, the training manuals, and

11   guides.  They did the webinar instructional sites.  You saw all

12   of that evidence.  All of that is aiding, abetting, assisting,

13   and encouraging the customers to do the actual direct

14   infringement of those method claims by performing every single

15   step.  Indeed, I didn't think there was much dispute when

16   either Mr. Lohkamp or Ms. Raleigh testified that they were, in

17   fact, doing that.

18          The Court will also instruct you that Lawson can be

19   liable for contributory infringement of a claim if ePlus

20   proves, simply by a preponderance of the evidence, that Lawson

21   sells or offers for sale a component of the S3 system that has

22   no substantial non-infringing use.  Let me say that again.  No

23   substantial non-infringing use.

24          Well, of course it doesn't.  These systems are

25   designed to do one thing and one thing only, to do that

1    procurement process that has been described that infringes

2    ePlus's patents.  It has no other real non-infringing

3    functionality when you think about it.  That's what it's

4    intended for, and that's how it was used.

5         So ePlus has proved -- can I have the next slide --

6    through the testimony that not only does Lawson directly but

7    also indirectly infringes the patents.

8         Ms. Raleigh was asked, among the aspects included

9    with implementation would be all aspects up to and including

10   bringing a system live into actual production operation; is

11   that correct?  That's right.  So not only do they sell it to

12   you, they set it up for you.

13        One of Lawson's customers, Ms. Oliver, who testified

14   by deposition from Blount Memorial Hospital said that a Lawson

15   employee actually came to Blount Memorial for seven months to

16   install, implement, and actually load catalog data into the

17   item master of their S3 system.  Ms. Raleigh testified that

18   Lawson was involved in all aspects of bringing that system into

19   actual production.

20        Second, Lawson indirectly infringes the ePlus patents

21   because Lawson is aware of the ePlus patents.  Mr. Lohkamp

22   admitted that everyone at Lawson has been aware of the ePlus

23   patents since May of 2009; isn't that right?

24        I believe so.

25        So in conclusion, to sum up this evidence, I want to

1    return to the five different configurations that Dr. Weaver

2    carefully walked you through to explain how the features

3    available infringe.  You've heard from Lawson's employees, and

4    you've seen their documents, and you'll have additional

5    documents back in the jury room that you can consider on issues

6    of infringement.

7            That evidence has shown that configuration one with

8    the inventory control requisition and purchase orders includes

9    the patent element that we've discussed.  As I say, the verdict

10   form will provide this for you, so you don't have to commit

11   this all to memory, but configuration number one infringes

12   claims one and six of the '516 patent as you'll have there

13   including the S3 procurement modules for purchase order,

14   requisitions, and inventory control.

15           It has catalogs, you can select catalogs, you can

16   search for matching items, you can build requisitions, and you

17   can generate multiple purchase orders.  That's an infringing

18   system.  As we discussed, there are multiple ways to get that

19   catalog information to put into the item master including the

20   EDI, catalog download, the vendor can provide you with Excel

21   spreadsheets that have the catalog data.  The vendor can

22   provide you with CD-ROMs that have the catalog data.  You can

23   do that vendor catalog upload process that was discussed with

24   Mr. Christopherson, and you can do the punchout process in

25   order to obtain catalog data information from the Lawson

1   punchout trading partners.

2          The evidence you have seen shows additional modules

3   that add functionality for the other four configurations.  For

4   example, just to refresh, the requisition self module --

5   requisition self-service module allows users to find identical

6   or generally equivalent items because it has that UNSPSC

7   capability.

8          You've also heard evidence about how the Lawson EDI

9   and punchout modules allows users to determine whether an item,

10  if selected, is available in inventory.  Configuration three

11  adds punchout which you've seen evidence as to how users can go

12  to multiple vendor catalogs and determine availability in

13  inventory as to what is there, and Dr. Weaver's demonstrations

14  performed that for you.

15         Going to configuration four, EDI, like punchout,

16  allows a user to get messages to tell you whether the catalog

17  vendor has an item available in inventory.  So that is

18  implicated by the patents including claims three, 26, of the

19  '683 patent and claims one and six of the '516 patent, and,

20  again, you'll see that on your verdict form.

21         Finally, configuration five is a configuration that

22  has all the software modules, and so all of the claims asserted

23  in this case are infringed by configuration five, because all

24  of the elements of the claims are met.

25         So let me sum up by remarking that even though ePlus

1    needs to show that it's just slightly more likely than not that

2    Lawson infringes, in fact the evidence of infringement you

3    heard is substantial, it is compelling, and the best evidence

4    on this comes from Lawson's own witnesses and straight from the

5    lips of Lawson's own employees.

6              Lawson's main defense, therefore, has been to twist

7    or ignore the Court's definition of catalogs or published by a

8    vendor.  When you disregard those misleading arguments and that

9    misdirection and that smoke and mirrors, there is really no

10   dispute that the S3 system, in all five configurations,

11   infringes all 12 of the asserted claims in this case.  Thank

12   you for your attention.

13             THE COURT:  Would you all like to take a little break

14   to stretch?  We're going to hear another hour-plus of argument

15   now from Mr. McDonald; is that about right?

16             MR. McDONALD:  Yes.

17             THE COURT:  Would you like to take a little break?

18   We'll take a 15-minute recess.

19

20             (Jury out.)

21

22             THE COURT:  We'll be in recess.

23

24             (Brief recess.)

25