3131

1                 THE COURT:  Mr. McDonald will now speak for

2      Lawson.

3                 MR. McDONALD:  Thank you, Your Honor.

4                 May it please the Court.  Lawson also thanks

5      you for your time.  I know three weeks is long by any

6      measure.  With some of the drier testimony here, I

7      think you can measure it in dog years, the last three

8      weeks.  So we really do appreciate your time.

9                 So I'll really am going to get right to it

10     here.  Even though this case involves some technology

11     that may or may not have been familiar to you the,

12     good news is your decision in this case really comes

13     down to applying the Court's instructions to use your

14     common sense in deciding this case.

15                Who do you believe and who don't you believe?

16     Who made sense and who contradicted the documents and

17     other testimony?  Who, like the oaths they took, told

18     you the truth, the whole truth, and nothing but the

19     truth?  Who is trying to help you understand the truth

20     and who was it that was trying to hide the truth?

21                Those are the things that you know how to

22     decide even if you're not that person of ordinary

23     skill in the art with a computer science degree in

24     this case.  And when you look at those issues, you'll

25     see why Lawson should prevail in this case.

1          Second, you heard some discussion of smoke

2     and mirrors.  Well, I think you'll see from my

3     presentation the smoke and mirrors came from the ePlus

4     side.  But putting the smoke and mirrors aside for a

5     second, I'd like to talk about cake.  Because,

6     actually, the essence of ePlus' case is they want to

7     have their cake and eat it, too.

8          They've got Dr. Yes, Dr. Weaver, the catalog

9     guy.  Everything is a catalog.  No, that's not enough.

10     Everything is multiple catalogs.  Everything is

11     thousands of catalogs to Dr. Yes on the infringement

12     side.

13          But then we have Mr. Hilliard.  He's Mr. No.

14     Nothing is a catalog.  It's not even one catalog.

15     Even if it has all that same data in it like a parts

16     master that their own witness has admitted is an item

17     master.  So on the one hand they try to make those

18     claim real broad to cover everything at Lawson.  Then

19     when we get to validity, they try to shrink them down

20     tiny.  They are trying to have their cake and eat it,

21     too.

22          You'll see from the Court's instructions that

23     he doesn't give you two different claim constructions

24     for the terms depending on whether you're looking at

25     infringement or validity.  The words mean the same

1    thing for both purposes.  And that's what's going on

2    in this case.  That ePlus is trying to have it both

3    ways.

4            So there are three main questions you really

5    need to answer here.

6            (1)  Did ePlus or really Fisher invent

7    anything worthy of a patent that shows up in any other

8    claims in this case?

9            (2)  If not, why should you find those claims

10   invalid even though the Patent Office allowed them;

11   and

12           (3)  Did Lawson infringe any of those claims

13   or is Lawson really doing something completely

14   different and really what's in the prior art?

15           And once you answer those three questions,

16   you'll know everything you need to know to get through

17   that very long verdict form you're going to have to

18   answer questions for in this case.

19           So I'd like to turn to that first issue.  Did

20   Fisher invent anything worthy of a patent as described

21   in the claims here?  The answer to that is no.  It's

22   clearly and convincingly been shown to you in the

23   evidence of this case.

24           So that question starts with the issue of

25   what was in the prior art.  What was already out there

1 in the marketplace and literature involving

2 procurement?

3        So we go to slide 2.  As I showed you in the

4 opening statement, we were saying there were two main

5 things in the prior art here that make these claims,

6 all of these claims invalid.  One is there RIMS system

7 and the other is the TV/2 system.  Both were on sale

8 more than one year before the filing date on the ePlus

9 patents.  The patents-in-suit were filed August of

10 '94.  Turn the clock back 12 months, August '93.

11 That's the magic data.  If RIMS was on sale by then,

12 it's prior art.  If TV/2 was on sale by then, it's

13 prior art.

14        And that's what we showed you clearly and

15 convincingly in this case, that both of those systems

16 were, in fact, on sale before August of '93.  It even

17 goes back to August of '92.

18        So if we go to the slide 3, please.

19 Essentially, this is the old RIMS system as shown in

20 the '989 patent, also as testified to by the inventors

21 in this case who also were very familiar with the RIMS

22 system.  They talked about it having that inventory

23 checking.  That parts master list was the way it kept

24 track of inventory.  That RIMS system, that had

25 requisitioning.  That's the R in RIMS.  Requisition

1    and inventory management system.

2         It generated purchase orders.  Remember

3    seeing that flow chart over and over again.  If you

4    look at the patent, there's all sorts of blocks and

5    things referring to purchase orders.  Actually, a lot

6    more detailed in the RIMS patent, that old one, than

7    even in the patent in this case.

8         So the RIMS system had all those functions.

9    It had that customer selected parts master.  But it

10   also had something else.  It had a host, which was

11   typically Fisher, a distributor, a database of the

12   Fisher products as well.  And it had a way to

13   communicate between those two things.  That was the

14   RIMS system.  And that was what was not only in that

15   patent that you saw over and over again or heard about

16   again and again, the '989 patent, but was also being

17   sold more than one year before the patents involved in

18   this suit were filed.

19        Now, the Judge will give you some

20   instructions that there are several ways things can be

21   prior art, and one of them is in instruction No. 35

22   I'm not going to read the whole thing because each one

23   of them is pretty long, but that one relates to

24   something about prior public sale, and it's also

25   referred to in the instructions as on sale.

1          And I think the key thing here is that part

2     of that instruction says, "It is not required that a

3     sale was actually made.  The essential question is

4     whether or not there was an attempt to obtain

5     commercial benefit from the invention."

6          So that's what had to have been happening

7     before August of '93, whether we're talking RIMS or

8     TV/2.  Were they trying to get a commercial benefit?

9     I think you saw that in several ways in this case.

10         If we can turn to slide 4, please.  This is

11    the trademark application that Fisher filed back in

12    April of -- April 30 of '93.  So that's over three

13    months prior to that important date here.  And that's

14    issued in '94, but all these papers were filed in

15    April of '93 on the Fisher RIMS trademark.

16         So if we can go to the next slide, please.

17    So this is the actual application itself.  And you can

18    see up at the top there is the heading where they file

19    it with the trademark office.  There's the date stamp

20    April 30, 1993, Patent and Trademark Office for the

21    mark Fisher RIMS.  That's the system we're talking

22    about here.  And then it goes on from there.  There's

23    a description that talks about the computer services

24    involved here with requisitioning and so on.

25         Then down here it establishes the date that

1    they represented to the Trademark Office was the date

2    they were using the Fisher RIMS trademark in commerce.

3    They were getting that commercial benefit from the

4    system.  That date was August of '92.  That's a whole

5    year sooner than it has to be.  We only have to show

6    they were commercially benefiting from it by August of

7    '93.

8            Then this paragraph also goes on the talk

9    about the mark was used in literature and presentation

10   of materials for the services.  And three specimens

11   showing the mark as actually used are presented

12   herewith.

13           What are specimens?  That's an example of

14   using the trademark.  That's whether the brochure

15   comes in that you saw a few time.

16           So if we can go to the next slide, please.

17   Part of the same document.  Here's the first page of

18   the Fisher RIMS brochure.  So this is the document

19   that describes this system to their customers.  You

20   can see there at the bottom it refers to Fisher

21   Scientific, and there is a lot of discussion or at

22   least some implication, I'll call it, in this case

23   that this document was undated.  And it was really

24   pretty silly to have a fight over that when you think

25   about it because this whole file was submitted and had

1    date stamps on it April 30 of '93.  We know that's

2    more than three or four months before the critical

3    date anyway.  Obviously, it was at least in existence

4    by then.

5         But if we can go to the last page of this

6    brochure, you actually see down in the lower right

7    corner it does have a date on it.  3/93.  March of

8    '93.  It makes perfect sense because this was filed on

9    April 30.  Even in this document here, you can see in

10   the upper left corner of that last page of the

11   brochure there's that same date stamp you saw on the

12   other filings at the Trademark Office.  April 30,

13   1993.

14        So who is presenting you the smoke and

15   mirrors on when the RIMS brochure was out?  EPlus was.

16   Not Lawson.  Clearly, it was in use in commerce,

17   commercial use, more than a year before the filing

18   date.

19        If we can go to the next slide, please.  We

20   had some other evidence.  This came in through a

21   deposition that was a video deposition, and you

22   probably didn't get much of a chance to see those

23   documents, but they'll be with you when you go back in

24   the jury room.  This was from Ms. O'Loughlin's

25   deposition, the lawyer for Fisher, who had talked

1    about the trademark application, who signed it

2    actually.  But she also talked about some other Fisher

3    documents, including their annual report.  It's called

4    a 10(k).  This particular one, you can see the date is

5    highlighted there, is for the year ending December 31,

6    1992.

7              So we know that whole year that's going to be

8    more than one year before the filing date on these

9    patents.  So does this say something about the Fisher

10   RIMS system being something that Fisher is

11   commercially benefiting from way back in '92?  Well,

12   yes, it does, and this is Fisher's own words here.

13             If we can go to the next slide, please, and

14   highlight that paragraph there.  This is Fisher now

15   disclosing to their shareholders in the official 10(k)

16   filed with the Securities and Exchange Commission

17   describing what's going on with their company.  They

18   have to be truthful in here.

19             Here's the paragraph talking about their

20   Fisher RIMS system.  I have one sentence highlighted

21   here, but actually there's a couple of them that are

22   pretty interesting.  The one I've got highlighted

23   there in the middle says -- well, let me take it from

24   the top here.

25             On the first sentence, "Information on all

3140

1    100,000 products offered in the Fisher catalog can be

2    obtained through Fisher RIMS, the company's newest and

3    most powerful electronic order system which provides

4    paperless purchasing, receiving, billing, and product

5    distribution."

6             That all lays it out.  As of 1992 that's what

7    RIMS was doing.  The Fisher RIMS system.  And it had

8    100,000 products from the Fisher catalog in it.  And

9    you heard some testimony from ePlus trying to say, oh,

10   well, which RIMS?  When was it out?  Boy, there were

11   so many versions you don't know.

12            Then you hear testimony from their witnesses

13   saying, Oh, the Fisher RIMS system didn't have any

14   catalogs.  Well, this shows you what Fisher itself was

15   saying about that system.  It did have at least the

16   one huge catalog in it.

17            And if we go on to this sentence that's

18   highlighted here, "The company believes that the lower

19   procurement cost and increased control offered by

20   Fisher RIMS has been instrumental in securing several

21   long-term supplier agreements with large customers."

22            Now, you apply that against the Judge's

23   instruction were they obtaining a commercial benefit

24   from the RIMS system before August of '93?  Obviously,

25   they were.  Obviously, they were.  EPlus was the one

1   blowing smoke on this one, too.

2          They can talk about the smoke and mirrors in

3   general.  Our witnesses got up there.  They answered

4   the questions.  Do we import vendor catalog

5   information?  Yes, we do, but we change it.  Our

6   customers pick it.

7          We didn't deny anything in there.  There was

8   no smoke and mirrors from our side.  The smoke and

9   mirrors was from ePlus and their attorneys on these

10  issues.  And I'm getting into the specifics on this

11  one by one here.  This is another example.

12         Go to the next slide, please.  The time line.

13  All that discussion when they brought in those

14  inventors at the beginning of the case.  And do you

15  remember, by the way, that was when they were supposed

16  to be proving infringement?  And they brought in the

17  first witness, Elaine Marion.  Did Elaine Marion have

18  any idea what was in the patents in this case?  No.

19  Did Elaine Marion have any idea what Lawson Software

20  did?  No.  She didn't know anything that was relevant

21  to infringement.

22         So who was blowing smoke there?  They put her

23  up there to present a nice face for the company, but

24  she really didn't know anything except her own

25  personal records that she had about competitors said

1    absolutely nothing about Lawson.  And that this

2    division lost money.  They are successful maybe with

3    settlements, but when they tried to sell these

4    inventions, they lose money.  So right out of the gate

5    you saw who was blowing the smoke here.

6            Then they brought in the three inventors.

7    Did they say anything about the Lawson system?  No.

8    Did they talk at all about what the claims actually

9    cover?  No.  You went through all those witnesses

10   supposedly for the infringement case.  They didn't

11   tell you anything that you needed to know about

12   infringement.

13           So we got into that RIMS system, though, and

14   you heard it through out the trial, Oh, well, we

15   changed it.  And we don't know what it was when.  And

16   then the time line came up.  This is Exhibit 402.

17   This was Mr. Kinross' outline here.  Let me go to the

18   next slide here where we have some parts highlighted

19   on there.

20           Remember his testimony was that he was

21   sitting -- he brought his computer over to

22   Mr. Momyer's house.  They sat down at maybe the

23   kitchen table or living room.  I can't remember where.

24   Mr. Momyer is looking over his shoulder.  They put

25   this thing together several years ago.

1            What was the purpose?  To try to nail down

2    when RIMS had various features at various times for

3    the lawyers, for the ePlus lawyers.  We'll help them

4    out here.  We'll show them with clarity what RIMS had

5    when.  They are smart people over there at ePlus

6    between the inventors and their lawyers.  They could

7    have been real clear about what RIMS did when if they

8    wanted you to know that.

9            Instead, over and over again in this case

10   they tried to cloud that issue up.  Oh, RIMS, gee, it

11   was so many different things.  I don't know what it

12   was.  But then you got to see this time line finally

13   near the end of the case when Mr. Kinross was on the

14   stand, and we walked through this with you, and you

15   can see way back in '89 they were talking about these

16   features that are related specifically to the claims

17   in this case.

18           Multiple inventory sourcing.  So the various

19   sources of inventory there.  That was a key thing.

20   Multiple vendors cutting purchase orders to multiple

21   vendors from one requisition.  You have seen that in

22   some of the claims.  They were trying to fight that in

23   the RIMS system, but there it is in the inventor's own

24   words well before August of '93.

25           Product cross reference, the matching of

3144

1   equivalent things from one to another.  That was there

2   way back then.  They had it well before '93, and they

3   knew it.  They just didn't want you to know it.

4         Then if you go on from there, you see in 1991

5   to 1993 a few more entries where they are now sourcing

6   off catalog items even if they didn't have a part

7   number.  And they are assigning vendors.  So now they

8   are clearly going to third-party sources, this is back

9   in '91, in creating purchase orders even for these

10   other vendors than Fisher by then.

11         Then after that there are other ongoing

12   things as they say are not related to the patent in

13   '92.  Then you see the '93 where we get to the

14   technology involved here, which is developing a TV/2

15   interface.  They say two things about it.  Multiple

16   catalogs searched.  Integrated with requisitioning.

17   That's really what this case is all about is adding

18   those things from TV/2 to RIMS.  They had already told

19   that story, but they didn't want you to hear it.

20         And the testimony really backs everything up

21   here that's on the time line.  I can walk through that

22   with you here.  I'll show you several examples from

23   Mr. Momyer especially here.

24         Can we go to slide No. 13, please.  This is

25   Mr. Momyer's testimony.  The RIMS system as of April

1    of '93, did it check inventory?  Remember some of the

2    claims talked about that.  Yes, checked local

3    inventory it was managing and Fisher inventory at its

4    distribution centers.  Two kinds of inventory it was

5    checking.  The claims don't even specify what kind of

6    inventory.  Clearly not that one.

7          RIMS included a parts master like an item

8    master.  That comes up over and over again.  That's

9    the concept of having the cake and eating it, too.

10   The parts master doesn't have catalogs, but our item

11   master, golly, does.

12         Well, the RIMS system had that very important

13   feature, the parts master, back then in April of '93

14   as well.

15         If we can go to the next slide.  Again,

16   April of '93.  Kind of a nice date here because the

17   trademark application and the RIMS patent application

18   were both filed in April of '93.  Your common sense

19   tells you that's the sort of thing somebody could do

20   when the RIMS system was pretty much all settled.  You

21   know what it looks like.  It's complete.  It's done.

22   Well, now we take care of the legal stuff.  We'll file

23   a trademark on it.  We'll file a patent on it.

24         It's April of '93.  This thing is done.  So

25   that's what's going on.  That's why this April '93

1   date matches up so well.

2           It also had that cross reference between two

3   different vendors.  Here is Mr. Momyer talking about

4   that.

5           And then if we can go to the next one then,

6   please.  Also Mr. Momyer continuing here, talking

7   about that purchase order issue.  Again, you saw that

8   in the time line.  On a lot of these things, you

9   already saw in the time line.  But he also admitted

10  that in that thing called the internal customer

11  purchase order, that's not some type of purchase

12  order.  He was saying that is important.  This

13  internal customer order is generated for a purpose.

14  There's an actual transfer of funds within a customer

15  from the requisition department to the owning

16  department when you have those customer internal

17  orders.  And that's why the RIMS system itself even

18  calls those purchase orders.

19          That patent, that RIMS patent, the Court will

20  instruct you is really a part of the patents in this

21  case.  It's incorporated by reference.  So if that

22  thing calls those internal orders purchase orders,

23  that is purchase orders for purposes of these patents.

24  And they can't run away from that.  So there's more

25  smoke and mirrors to try to get away.

3147

1          Can we go to the next one, please.  This is
2     just a reminder here.  If we can blow up kind of the
3     middle part of the page.  This is the old RIMS patent
4     now, filed in April of '93.  You saw this a few times.
5     Just emphasizing here the description in the patent,
6     5A, that's what this is, the flow chart, showing that
7     for each product on a requisition, the system figures
8     out what type of product it is, product type, and it
9     either goes to the one side to generate a customer
10    internal purchase order like Mr. Momyer described or
11    it goes the other way where it still prints a purchase
12    order and creates a purchase order.
13         So it's generating multiple purchase orders
14    off of a single requisition.  There's a lot of detail
15    about that in the RIMS description.  You really don't
16    see any detail at all about that in the
17    patents-in-suit outside of the RIMS description
18    because the RIMS system already had that.
19         Can we go to the next one, please?  So this
20    was Dr. Shamos summary here.  And I have shown you at
21    least some of the evidence.  There was much more, as
22    well as the time line, but this was his summary of all
23    the things that were important to the claims in the
24    case from when that RIMS patent was filed back in
25    April of '93.  Searches the database for items for

1  multiple sources.  Building requisitions.  Generating

2  purchase orders from those requisitions.  Checking

3  inventory.  Cross reference table.  All of those

4  things were out there in April of '93.  The evidence

5  fully supported Dr. Shamos' analysis.

6          And he looked at lots of documents.  You

7  heard him talk about nine pages of things he looked

8  at.  All lined up about, I think he said 40 or 50

9  things per page.  Documents, deposition testimony,

10  including Mr. Christopherson's two days of deposition

11  testimony under oath getting all the data here that he

12  knew he could rely on for purposes of his opinion in

13  this case.

14          He wasn't like Mr. Hilliard coming in and

15  saying, Oh, ignore all the documents.  I talked to

16  somebody else, and they told me all the documents are

17  wrong.  That doesn't tell you anything.  That's not

18  helpful to you.

19          Dr. Shamos was relying on the sworn testimony

20  from depositions and from the actual documents in this

21  case to have his opinions, and there's no reason we

22  need to apologize for that.

23          So with that support, we go to the next

24  slide.  That shows you then this was the old RIMS

25  system commercially on sale by April of '93.  All

3149

1   those parts, we've gone through all of that stuff.

2         So that takes us to the next step here

3   because we get to the TV/2.  So this sets the stage

4   now in '93 for the patents-in-suit.  So Fisher hears

5   the need from customers.  They want him to put

6   catalogs of companies other than Fisher on their

7   system.  Mr. Robertson talked about that a little bit,

8   and he called it kind of counterintuitive.

9         Well, if your customer asks you to do

10  something, I think it's kind of intuitive to try to do

11  it for them is one thought that comes to mind.  But

12  moreover, when you think about that, that is really

13  very consistent with the idea of what a published

14  catalog has to be in this case or catalogs, as defined

15  by the Court, have to be.  Because Fisher is running

16  this computer system.  They are trying to sell stuff

17  to a customer.  Now that customer wants Fisher to also

18  keep track of competitor products.

19        All those competitors don't want Fisher

20  seeing private lists of information and special

21  pricing information now, do they?  No.  They are going

22  to have Fisher use the published catalogs.  That's

23  what you're going to share with your competitors.  You

24  can see what's out there in the public, what other

25  people can see anyway.  You can see that, I guess, but

1    I'm not going to show you unpublished, private

2    material.  So it really sets the stage, what he said,

3    about what's going on here.

4           So that brings us up to this TV/2 system.

5    They're looking around for what the customers want.  A

6    system that can integrate with the RIMS system and

7    also load up those big paper catalogs from companies

8    other than Fisher.  So they turn to IBM.  And this

9    TV/2 system fits the bill.  And we've proved that the

10   TV/2 system was also out there on sale commercially

11   benefiting IBM prior to August of '93.

12          That's, again, the critical date here, one

13   year before the patents in this suit were all

14   effectively filed.  So before August of '93.  And it

15   had all the key features of being used to search

16   multiple catalogs, selecting parts of catalogs to

17   search, and interfacing with the requisition and

18   purchasing system.

19          So if we could go to the next slide.  I think

20   it's 19.  Got you saw this, of course, the IBM on

21   general information manual.  And this one, if we go to

22   the next page of it, in the lower left corner here on

23   really all the pages, or almost all the pages here

24   anyway, you have that copyright date from IBM of 1991.

25   So certainly supporting the idea that this is out

3151

1    before August of '93.

2           And if we go to the next slide then, please.

3    This has some highlighting.   Part of that same

4    exhibit.   That's Defendant's Exhibit 105, by the way.

5    As we go through the pages here, this one also has

6    that 1991 date on it.   It's got the heading

7    "Introducing IBM Technical Viewer/2."   And you can see

8    in the first paragraph, it goes right to the same sort

9    of things that the patents in this suit were talking

10   about.   The idea that you have this capability of

11   producing and displaying large amounts of information,

12   information from people like manufacturers who have

13   parts catalogs and service manuals, things like that.

14   Exactly what the issue is.

15          We all know people that have these

16   cellphones, and I think it's Apple that has the phrase

17   "There's an app for that."   You have your iPhone.   All

18   these different things, if you need to do them, you

19   can load up a little app on your iPhone.

20          Well, guess what?   There's an app for that.

21   When Fisher was looking for loading catalogs into

22   their RIMS system, there was an app for that; TV/2.

23   And this description makes that real clear here that

24   you could go through that system for reading

25   information, selecting data.   You could include text,

3152

1    diagrams, photographs, all the sort of things you'd

2    see in a full blown catalog like that Fisher catalog.

3           Go to the next slide, please.  This was also

4    part of the same document.  Also on a page dated 1991.

5    Talking about you can select topics from an index.

6    The user can select things.  And then you can do

7    searches by word or phrase in either a whole document

8    or part of a document.  You can select things to

9    search.  All those same things that are important to

10   the claims in this case.  All of that out there with

11   TV/2 in 1991.

12          Go to the next slide, please.  Now we'll move

13   over to the brochure.  Defendant's Exhibit 107.  The

14   TV/2 brochure.  And it was a little strange to see

15   some cars on the front because you're thinking TV/2 is

16   a computer, it's not a sedan.  They're not selling

17   cars.  But there was a reason.  Ms. Eng explained to

18   you why there's cars on here.  It's because Volvo was

19   actually using the TV/2 system for their car parts and

20   for their service places and all that all over the

21   place to keep track of their parts and help their

22   individual dealers and service centers and such have

23   access to their parts catalogs.

24          So it's a pretty lousy picture here, but I'm

25   pretty sure those are Volvos in that picture.  In this

1    first line under that picture on page 1 even talks

2    about this being used for automotive and other

3    industries.  So sure, it was used for parts for cars.

4    Cars have lots of parts.  It's a perfect application

5    for TV/2 or any system like that, but it's not limited

6    to auto parts.  It can be used for other industries as

7    well.

8         If we go to the next page of this, you can

9    see on this page some more description of it in the

10   highlighted part.  What's the whole point here?  The

11   benefit you get is it saves time.  This is all having

12   to do with searching large volumes of information,

13   right?  You save time.  You save space.  You don't

14   have to have all those big paper catalogs around and

15   the frustration of trying to find things because it's

16   easy to search through the large information, and it's

17   being used with especially developed software in a

18   compact disk or CD-ROM technology.  All that is set

19   out here.

20        Remember Mr. Hilliard was trying to say, Oh,

21   TV/2 doesn't want have catalogs.  One of ordinary

22   skill in the art wouldn't figure that out.  Well, here

23   it is.

24        If we can back up to the full page here.

25   Across the top you see a couple of screen shots next

1   to, I assume, another Volvo, screen shots showing you

2   the different manuals you can select to go search in.

3   And then see the materials once you select that up

4   there.

5           Then if we go to the next page, and Ms. Eng

6   walked you through this.  Why don't we go ahead and

7   highlight those images up at the top here.  Continuing

8   in this brochure, here's a couple of pages showing you

9   the drawings, the parts drawings, just like they would

10  be in a paper catalog.  All the details there.  And

11  you can even see some -- looks like parts on a drop

12  down menu that you can scan out there.  She talked a

13  little bit about that as well.

14          This is obviously not a great photocopy, but

15  Ms. Eng explained all this, and it makes perfect sense

16  when you see all the information and hear all the

17  testimony on what TV/2 did.

18          Go back out again from this one to the lower

19  left.  TV/2 could create a shopping list, like an

20  orders list that you have seen in the claims in this

21  case.  And the parts list could then be sent directly

22  to your parts ordering system all without moving from

23  your PS2.

24          So here it's talking about transferring the

25  results of the search of the parts catalogs into a

1    parts ordering system, something, for example, like

2    RIMS.  All that is set right out in the four corners

3    of the document here.

4         And if we continue now to the next slide.

5    This is the last page of the document.  Talking about

6    large volumes of data.  Again, the idea of having

7    multiple catalogs there being reinforced with the

8    highlighted bullet there.  And the second one, again,

9    emphasizing what is this TV/2 thing supposed to do.

10   It's not just going to just sit by itself and help you

11   look at parts real fast on a computer, and then just

12   make you go to pieces of paper from there to fill your

13   orders.  That's like driving a sports car up to the

14   red light.  What's the point of that?

15        No, if you're going to take advantage of the

16   speed of this thing, you're going to integrate it into

17   a computer system that takes it from the selection of

18   the parts process, and also computerizes it from there

19   to go ahead and build a requisition and place orders

20   or do whatever else you want to do with that part that

21   you have selected.  You want to computerize it all.

22        So from day one, TV/2 was designed with that

23   idea that this isn't going to be a stand alone system.

24   It could be if you wanted it to, but it's really going

25   to help you out if you integrated it with inventory

1    management systems, or order entry systems, and things

2    like that that are also computerized.

3         It was designed for that.  And anybody with a

4    computer science degree and a year or two of

5    experience would have understood that reading these

6    materials about the TV/2 system.

7         And then also on this page, if you can back

8    out, in the lower right.  Again, just reinforcing the

9    idea that many technical publications, many catalogs

10   can be on a single CD-ROM.  Multiple catalogs.

11   Totally envisioned here.  Totally explained,

12   disclosed, taught by this TV/2 brochure.

13        Finally, down below, getting to the

14   commercial benefit.  Now, this brochure wasn't dated.

15   We'll get to the testimony on that in a moment, but

16   it's clearly a brochure intended to be marketing the

17   product.  It reads like that.  It's intuitive just

18   looking at this thing.  They're trying to sell it.

19   But you also see specifically down here on the last

20   page in the lower right information about ordering.

21   They're trying to sell this thing, and it's got these

22   numbers that go with that.

23        So all those things show you exactly what the

24   TV/2 system did.  And that was also backed up with the

25   testimony here.  Especially regarding the year and the

3157

1   timing of this thing.

2          So if we could go to the next slide, please.

3   This is Ms. Eng's testimony, who probably got less

4   money than anybody else who testified in this case

5   practically, but she came back after all these years

6   and was willing to come down here and testify in this

7   case.

8          She said, Did you personally see this

9   brochure back in '92?  Yes.

10         How did you use it?  I handed it out to lots

11  of people.

12         That's what you do with a brochure.  You want

13  to sell the thing.  You hand it out to everybody you

14  think may want to buy it.

15         That's '92.  Well over a year before August

16  of '94.  Clearly IBM is already trying to commercially

17  benefit from the TV/2 system by then.

18         Go to the next one.  The inventors from

19  Fisher acknowledge that really the TV/2 was already

20  out there before they even started working with or the

21  day they started working with Fisher, IBM and Fisher

22  started working together.

23         This is Mr. Kinross' testimony here.  TV/2

24  was available from the day you started talking to them

25  about searching, right?  The TV/2 system, yes.

3158

1          They already had an application program

2    interface program on it, right?  That's that API thing

3    with the shell or the communication link between TV/2

4    and another system.

5          My understanding is it came with a sample

6    program that even showed the use of the API.  It

7    demonstrated that.

8          Go to the next slide check.  Even in the

9    patents-in-suit, they have this language in them where

10   the Fisher people pretty much admit that the TV/2

11   system was available from IBM.  It was already out

12   there.  They weren't saying it was some top secret

13   system.  It's available from IBM.  That's in column 4

14   of the '683, but it's in all three of them.

15         Go to the next slide, please.  Here's

16   Mr. Gounaris' testimony, the other person from IBM

17   that testified in this case.  He made it clear that,

18   again, there weren't variations on the TV/2.  The TV/2

19   was the TV/2.  There weren't any variations on it

20   prior to '92.  So there was just one system out there

21   about it.  That's what this testimony shows you.

22         If we go to the next page after this one.

23   This is back to Mr. Momyer again, one of the inventors

24   that ePlus brought to the case.  An IBM system has a

25   search capability that could do keyword searches

1   before you started working with them.  That's Momyer

2   working with IBM.  Technical Viewer/2 could do keyword

3   searches against a document.  That was already there.

4   Not something developed in that $600,000 and all that

5   time.

6           By the way, ePlus has made a big deal about

7   that, and I guess I think the short answer to that is

8   if you came up to somebody today, even if it was Ford

9   Motor Company and you said, "I'd like to start

10  production on a new Model T."  Well, Model T's were

11  around a hundred years ago.  How long do you think it

12  would take to get that Model T up and running, and how

13  much money would it cost?  How long it takes to get

14  something to a commercial state and how much money it

15  costs to do it doesn't tell you whether it's new or

16  old or anything.  It's really smoke and mirrors in

17  this case to even talk about that.

18          That work was going on into 1995.  That was

19  after the patent was even filed.  There's nothing

20  about those activities in the patent.  It was filed in

21  August of '94 with the description at that time.  This

22  is all irrelevant stuff about trying to make the

23  system work well with the RIMS or be faster.  The

24  claims don't require searching to be any particular

25  speed or the graphic user interface to be anything in

3160

1    particular.  They don't even call out a requirement

2    for a graphic user interface.  This is all stuff

3    that's got nothing to do with it.

4          So we can go to the next one, please.  Even

5    with that graphic user interface, TV/2 already has it

6    from day one of starting to work between IBM and

7    Fisher.  This is Mr. Momyer again, one of the

8    inventors, acknowledging that.

9          Go to the next slide.  Mr. Momyer has even

10   admitted that since the TV/2 program was commercially

11   available when he had the initial meeting with the IBM

12   people back in '93.

13         Go to the next one, please.  This is

14   Mr. Gounaris also talking about what was going on in

15   1993, and pinpointing it, it was actually the first

16   half of '93 when IBM and Fisher first started working

17   together.  Remember, he was up in Pittsburgh as was

18   Fisher in Pittsburgh.  So they actually started

19   meeting together.  And that was in the first half of

20   '93, more than one year before the filing date on the

21   patents in this suit.  TV/2 was already commercially

22   available.  It was on sale under the Judge's

23   instructions.  It was prior art in this case.

24         And he confirmed that the documentation was

25   provided.  The documents, Exhibits 105 and 107, that

1   we've talked about.  That's 105 is the general

2   information manual.  And highlights, features and

3   functions of Technical Viewer/2, you saw that.

4         Then go to the next slide.  This is

5   Mr. Gounaris continuing talking about the Technical

6   Viewer brochure.  "You were physically present in '93

7   when that brochure was passed from IBM to Fisher

8   Scientific?"

9         "Yes."

10        So all this establishing that the TV/2 system

11  was out there commercially available on sale more than

12  a year before the patent.

13        So we go to the next slide here.  This was

14  the summary.  I think I showed you something very

15  similar to this, if not identical, in my opening

16  saying this is the old IBM TV/2 system.

17        It was for electronic catalogs.  It had

18  search capabilities.  It had that capability of

19  searching selected portions.  That's where the manual

20  talks about topics.  And you saw over and over again

21  that the materials themselves say this is great for

22  integrating with a parts order and inventory

23  management system with that searching catalogs here

24  and that little API or interface device.

25        So it's all there clearly and convincingly,

3162

1   RIMS and TV/2 both out there.  Both going together.

2   Now, we showed you a little bit of additional prior

3   art as well to give you the context for the

4   marketplace and show that the needs in the market for

5   these types of products for purchasing and requisition

6   systems were already being met by some pretty old

7   systems.  That was those P.O. Writer and J-CON

8   systems.  And heard some testimony about both of those

9   things.

10          If we could go to the next slide, please.

11  This was one of Mr. Shamos' slides talking about that

12  P.O. Writer system.  That was Ms. McEneny who

13  testified what you saw in the video.  She talked about

14  the P.O. Writer system.  And Mr. Shamos gave some

15  examples of the features of this thing.  It was a

16  requisition and purchasing system that even allowed a

17  user to specify a catalog for searching.  And then

18  once you've picked a catalog like Bayless that's shown

19  in this page, then you could pick a particular part or

20  look for a part within that specific Bayless catalog.

21          So selecting catalogs to search, selecting

22  parts of the database to search, and then searching

23  them in a two-step process.

24          And if we go to the next slide.  Another one

25  of Mr. Shamos' slides here just to give an example of

1    how this P.O. Writer documentation described that a

2    user could create a requisition.  Pick the part.  Now,

3    I put it on that requisition list.

4            THE COURT:  Why are we talking about P.O.

5    Writer?  Instruction 29 and 30A don't have that in

6    there at all.

7            MR. McDONALD:  This was to show the needs of

8    the marketplace were being met and goes to the

9    obviousness issue.

10           THE COURT:  It does not go as prior art, and

11   you're arguing it as prior art, and it's inconsistent

12   with what you said you want as prior art.  You can't

13   have that argument.  That's not right.

14           We've gone beyond that in this case.  Excuse

15   me.  Disregard that about the P.O. Writer.

16           MR. McDONALD:  All right.  Can we go back to

17   slide 43.  So these were the key parts of the IBM

18   literature that really show it's obvious to combine

19   this with RIMS.  So we've got all these features from

20   the RIMS system.  We've got all these features from

21   the TV/2 system.  Together they have all the elements

22   of the claims here.  So now the question is, is it

23   obvious to combine them?  The Judge will give you an

24   instruction on that, but that's the question for one

25   of ordinary skill in the art at the time August of '94

1    when ePlus says they made this invention that they

2    filed for a patent on at that time.

3            So, clearly, you have this teaching in the

4    prior art before August of '94.  Anybody of ordinary

5    skill would understand you ought to connect the dots

6    here and combine the RIMS system and the TV/2 systems

7    together.

8            Go to the next slide, please.  So this is

9    what they look like when you put them together, in a

10   sense, at least that's a diagram.  Again, I think I

11   showed you this in my opening.  You have all those

12   RIMS components there.  Then you have that API in

13   green that connects that whole RIMS system to the IBM

14   TV/2 system that searches catalogs.

15           So you put all those things together, that's

16   one of ordinary skill in the art, was it obvious to do

17   that prior to August of '94 using all this prior art

18   that are existed even by August of '93?

19           You also heard the testimony from Ms. Eng

20   that this was exactly the goal of the whole project

21   here was to have that RIMS system work together with

22   electronic versions of these big paper catalogs.  And

23   she described the meticulous process of having to take

24   those paper catalog pages, get them loaded up into the

25   electronic form so all the information would we there,

1    all the words would be there available on the

2    computer.

3         They talked about getting the images in the

4    system.  Even Mr. Kinross talked about getting

5    electronic versions of all the catalog pictures to IBM

6    so they could all load it up just like the catalogs

7    looked like.  That was the whole point.  Even the

8    patent itself talks that this is reality essence of

9    it.  If we can go to slide 45.  This is that part of

10   the patent, every one of them has this -- I believe

11   it's at the top of column 4 in the '683 patent.  The

12   electronic sourcing system 5.  That's what the patent

13   says over and over again.  That's what it's describing

14   as the invention.  After the previous paragraph just

15   talked about some basic things like a computer, a

16   keyboard and a printer.

17        It also includes a requisition and purchasing

18   system 40.  Preferably but not necessarily the Fisher

19   RIMS system, and a search program 50 that's capable of

20   searching through large volumes of information quickly

21   and accurately.  Preferably, but not necessarily, the

22   Technical Viewer/2 search program, TV/2, available

23   from IBM is used as that search program.

24        That's what you're putting together here.

25   Yes, it says "preferably," but, clearly, the idea here

1   was that the claims involved in this case and the
2   invention was going to cover something that was a
3   combination of the IBM system and the RIMS system.
4   And so if that's in the prior art, you need to find
5   that those claims are invalid.  It doesn't matter that
6   the claims might be so broad that they can cover other
7   things, too.  The fact that the claims are even
8   broader than that doesn't help them escape invalidity.
9   The question is are they too broad?  The fact that
10  they cover IBM plus TV/2.  That's enough to invalid
11  them even if they are even broader than that.

12          So I think there was a lot of talk brought,
13  well, these are just the preferred versions of it.
14  Well, again, that's just smoke and mirrors here.  It
15  has nothing to do with defeating the fact that the
16  RIMS and TV/2 systems are a combination to make these
17  claims obvious.

18          And Dr. Shamos went through with you claim by
19  claim, element by element, to show you all the parts,
20  every single detail of each of those claims were in
21  either or in some cases even both of the RIMS and TV/2
22  systems.  He showed you that in a great deal of
23  detail.

24          Now, Mr. Hilliard was the other side of that
25  for ePlus.  He was Mr. No.  He was the one that said

1    nothing is a catalog anyway.  It was kind of

2    interesting because you have got this up here that the

3    preferred embodiment is actually RIMS plus TV/2.

4    That's what the patent says.  Yet when Mr. Hilliard

5    looked at RIMS and TV/2, he had a chart where he put a

6    no, no, no, or an X that either or both of RIMS and

7    TV/2 had none of the elements of many of the claims in

8    this case.  Use your common sense here.  Does that

9    really make any sense at all that what the inventors

10   said was the preferred embodiment, RIMS plus TV/2

11   doesn't have the elements of the claims?  It just

12   doesn't make any sense.  And we showed what was going

13   on there when we asked him some questions about that.

14        If we can go to slide 45A.  He had a little

15   trick here because, as you know, catalogs is a big

16   issue in this case.  Multiple catalogs is a big issue.

17   And Mr. Hilliard was trying to get around the

18   catalogs.  Oh, TV/2 doesn't have a multiple catalogs.

19   Well, wait a minute.  So your testimony about TV/2 not

20   having catalogs, you're just saying that when you buy

21   the system from IBM, it's not going to come with your

22   own personal catalogs that you would select to load on

23   it, right?  That's what I'm saying, yes.

24        All he was saying was when you buy the TV/2,

25   it's empty.  It doesn't have the data loaded on it

1   yet.  But anybody reading the brochure or seeing the

2   description of the product, obviously you load the

3   data on.  The picture in the brochure even shows a

4   little picture of a CD-ROM.  It talks about a CD-ROM

5   all over the place.  It was just silly for

6   Mr. Hilliard to say, Oh, the TV/2 system, that doesn't

7   teach multiple catalogs because I didn't put the CD in

8   the computer yet.  That's how he got around that.  So

9   that's more smoke and mirrors here about how he was

10  able to show them that the elements aren't met because

11  it was like dominoes for his analysis.

12        If there aren't multiple catalogs, then you

13  can't search for items in multiple catalogs.  So that

14  one is now there.  You can't build a requisition on

15  multiple catalogs.  You can't build a purchase order

16  from a requisition from that, that those came from

17  multiple catalogs.  So all the dominoes fell down.

18  Just because he wanted to ignore the fact that the

19  TV/2 system was clearly for use with multiple catalogs

20  even though when you bought it, you had to put on your

21  own catalogs that you wanted.

22        The rest of his opinion was really based on

23  him ignoring all of the documents about the TV/2 and

24  the RIMS system and basically saying everything is

25  wrong.  Well, those documents were corroborated.  I've

1    gone through that in great detail now with the

2    witnesses' testimony for both systems that those

3    documents were accurate.  For all the features that

4    are relevant to this case certainly.

5           Mr. Hilliard even said that the RIMS system

6    wasn't really for buyers.  Wasn't that interesting.

7    Because the whole point of that RIMS brochure is to

8    tout the system to buyers.  You're filing a trademark

9    with the Trademark Office.  I'm not just going to use

10   something internally at my company if it's just for my

11   benefit as a seller.  I'm not going to be out there

12   using a trademark on it.  I'm not going to be using it

13   in commerce.  It's just my personal system.  I don't

14   need that.  But they went and filed a trademark on it,

15   and said it was in use in commerce.  And the whole

16   brochure cover to cover is clearly targeted for people

17   who buy products, who were going to be Fisher

18   customers, and say, Oh, this RIMS system is great for

19   you.  And you can use it.  And Mr. Hilliard just

20   ignored the whole thing.

21           If we can go to 45C.  So what did Mr.

22   Hilliard say about the catalogs issue?  This comes

23   back again to the idea of having your cake and eating

24   it, too, because Mr. Hilliard was on the invalid side,

25   and he wants to say knowing is catalogs.

1          So he says no databases in the RIMS system

2    meet the Court's definition of catalogs.  He says a

3    bunch of stuff like these experts do to spin it, but

4    the bottom line is he says RIMS doesn't have catalogs.

5    Parts master is not an catalog.  Item master, that's

6    not a catalog.

7          Even in the RIMS system, that big host system

8    of Fisher catalog products that they have on that post

9    database, well, that's a database in the RIMS system.

10   He says that that's not even a catalog.  So for him

11   nothing is a catalog.  Well, that just doesn't make

12   any sense.

13         I guess what he was trying to say about that

14   Fisher catalog is somehow, Well, that one doesn't

15   relate to a vendor.  That's what he tried to say about

16   that.  Again, does that make any sense at all?  The

17   Fisher database at the Fisher host computer selling

18   Fisher's products isn't a database relating to Fisher

19   as a supplier of products?  It was nonsense.

20         Then I confirmed for him at one point, did

21   ePlus ask you to do any analysis of the infringement

22   issues in this case?  Well, the answer was no.  Well,

23   what a surprise that is since he's Mr. No.

24         MR. ROBERTSON:  I'm going to object, Your

25   Honor.  There was a Court order that indicated who

1  could testify about what issues, and --

2          THE COURT:  Sustained.  Just disregard that

3  argument, please.

4          MR. McDONALD:  There was no Court order on

5  that, Your Honor.

6          THE COURT:  There was a Court order saying

7  who could testify about what.

8          MR. McDONALD:  Yeah, but clearly they didn't

9  ask him to do an infringement analysis.  They had

10  every right to do that and they chose not to.  And

11  they chose not to.  I think I can establish that fact.

12          MR. ROBERTSON:  Because he was a validity

13  expert on that issue under the Court's order.

14          THE COURT:  I've dealt with it.  Just don't

15  pay any attention to that part of the argument, ladies

16  and gentlemen.  Strike it.

17          MR. McDONALD:  So what we've shown here is

18  that Fisher did not invent anything worthy of a

19  patent.  They didn't invent requisition and purchasing

20  systems.  They didn't invent searching multiple

21  catalogs.  They didn't invent putting those things

22  together.  They didn't invent the Internet, using a

23  system like that with the Internet.  They did not

24  invent EDI, electronic data interchange.  They did not

25  invent Windows.  They did not invent databases.  They

1    did not invent indexing databases.

2         So the second question then is if the Patent

3    Office gave them these patents, why should you reach a

4    different result?  On this issue, you saw in that

5    video at the beginning of the case what happens when

6    the Patent Office reviews patent applications.  There

7    are people sitting in their offices at the Patent

8    Office, and they have these stacks of files there.

9    And they have a way to search at the Patent Office for

10   patents and prior art, but they rely largely on what

11   the applicants disclose to them.

12        You heard the inventors actually have an oath

13   they file where they have to disclose the prior art

14   they know about.  That's because the examiner, he or

15   she, is not in the marketplace.  They are at the

16   Patent Office.  They are not out there in the

17   marketplace, and they don't necessarily have access to

18   all the information.  And in fact, that's the case

19   here.  There's critical information that you have now

20   that the Patent Office didn't have.  You have a copy

21   of the RIMS brochure.  You have the evidence that the

22   RIMS system was on sale more than one year before the

23   filing date on these patents.

24        The Patent Office didn't have that.  It might

25   have mentioned the RIMS system many times in the

3173

1   patent, but there's no information presented to the

2   Patent Office that the RIMS system was on sale more

3   than a year before these patents were filed.

4          That's particularly telling here if you look

5   at 45D.  This is the part of this and all three

6   patents have something similar to the patents-in-suit.

7   This lists the publications involved here that were

8   disclosed and what the Patent Office did consider.

9   This is the start of the list on this page and we go

10  to the next page.

11         This is the rest of the publications

12  disclosed.  And there's a few publications on here

13  about various Fisher systems like Purchase Pro,

14  Lighting, Reliance, Stock Pro, but there are not any

15  publications regarding the RIMS system provided with

16  any of the patents.  So that's the information that

17  you have that the Patent Office did not have.

18         Now, people can choose to use the patent

19  system.  You heard about it in the video.  It's a

20  tradeoff.  If I want a patent, I have to make this

21  disclosure of the details of my invention, and then

22  it's published, and everybody can see that.  Well, not

23  every company out there wants to make that trade and

24  make that disclosure so that their competitors, for

25  example, can know what they're doing.  And that's a

1    choice.  And that doesn't stop ePlus from going to the

2    Patent Office, but it is true and the Judge will

3    instruct you that even if a product isn't the subject

4    of a patent like TV/2, if it's on sale more than a

5    year before the filing date of the ePlus patent, it's

6    still prior art.  EPlus can't go get a patent on that

7    same thing.  So that's how it works.  So that's why

8    the Patent Office doesn't always have all the details

9    about what everybody is doing out there.

10           So that's why because you have this critical

11   information here in the courtroom that the Patent

12   Office didn't get why you should reach a different

13   conclusion from the Patent Office.  So that's why you

14   should decide that the claims are invalid.

15           Let's go down to question No. 3 about

16   infringement.  We made it pretty clear from the first

17   moment in this case that this issue came down to the

18   catalogs issue.

19           And if we could go to 45F.  Mr. Weaver at

20   least acknowledged that 11 of the 12 claims in this

21   case required not just one catalog, but multiple

22   catalogs in the Lawson system.  So if Lawson doesn't

23   have multiple catalogs, Lawson at least does not

24   infringe those 11 claims.  We're all on the same page

25   on that.  That's why we didn't waste your time on all

1    these other deals in the case, why it really came down

2    to the catalogs.

3            And if we go to the slide 46, this was the

4    Court's definition of catalogs.  It has the term

5    published by a vendor in it, and the Court also has an

6    instruction for you on that.

7            And we showed you here, this is Exhibit 257,

8    it's a demonstrative, but it's nothing of the sort you

9    haven't seen before.  It's one of these big catalogs.

10   We don't get them in the mail so much anymore, but we

11   used to.  And something like this pretty clearly meets

12   that Court definition.  You can apply this pretty

13   well.  It's an organized collection.  You have got the

14   ladies clothes at the beginning.  Then it goes to kids

15   and boots and shoes and so on, product by product

16   organized.  It's about items.  Things Sears is selling

17   with associated information.  Published by Sears.

18   They are a seller, a distributor, whatever you want to

19   call it.  Includes things like a part number, price,

20   catalog number, vendor name.  Sears is on the front.

21   It may not be on every page, but certainly on the

22   front.

23           I don't know if it has a vendor ID, but this

24   list isn't something that's required that you have to

25   have all of these.  That's why it has the word

1  preferably, right?  Then a textual description of

2  items and preferably, not necessarily, images of the

3  items.

4      So that meets the definition of a catalog

5  pretty well.  That holds up with your common sense.

6  And it's pretty consistent if we go to slide 48, I

7  think it is.  Even what the patent says about

8  catalogs.  This is a feature of the invention to have

9  multiple catalogs from different suppliers.  And it

10 gives these examples.  And I'll summarize it here, but

11 basically it talks about published by a vendor,

12 distributor, having the distributor's catalog numbers

13 for their listed products.  And also vendor

14 manufacturer part numbers.  Down at the bottom, line

15 52 there, it further contained catalogs published by

16 some of the vendor manufacturers.  Again having part

17 numbers and the like.

18     Then if you go down to about line 56.  It can

19 also contain catalogs published by outside suppliers,

20 other manufacturers, distributors listing their vendor

21 products different from those in the distributor

22 catalog.  So these are all these different published

23 things out there.

24     So if we go back to 46.  So that was the

25 Court's definition of "catalog."  Very consistent with

1    what the patent says.  What about that last claim?

2    I'll just talk about that a little bit.  That 12th

3    claim.  That's Claim 1 of the '172 patent.

4          Now, that claim has a claim element that

5    refers to something called an order list.  So I want

6    to show you the Court's definition of that in slide

7    49.  So even that claim requires a means for

8    generating an order list, which is a list of desired

9    catalog items.  So here's where that concept of

10   catalog comes into play here.

11         And if we look at slide 49A, Dr. Weaver, his

12   analysis was entirely reliant on his opinion that the

13   Lawson system had catalogs in it.  And that even

14   included this claim.

15         And if we could go to the next slide here.

16   This was Dr. Weaver's testimony specific to that Claim

17   1 of the '172 patent.  It's kind of a long question

18   here, but what's being shown here is his opinion about

19   Lawson infringing that claim, and specifically the

20   part of that claim that refers to an order list, that

21   was based in part on his analysis concluding that the

22   desired items - do you remember an order list is a

23   list of desired catalog items - included in results of

24   searches of product catalogs, and that's what he

25   called catalog items.  That's how he looked at it for

1   purposes of his analysis.  The items you get back from

2   product catalogs.  So he relied on his analysis

3   involving catalogs actually for all 12 of the claims.

4          So we showed you the testimony of Mr. Shamos,

5   though, that the Lawson system doesn't have catalogs

6   and therefore it doesn't infringe any of the 12

7   claims.  It's completely different from all that.  And

8   to illustrate what the Lawson system really is here,

9   I'm going to show you something.  This is from

10  Plaintiff's Exhibit 361, page 49 of that exhibit, page

11  2243.  The last four digits are 2243.  Do you remember

12  Mr. Weaver showed you some demonstrations.

13         This particular one he didn't talk about.  He

14  didn't present this one to you.  In fact, we talked

15  about it, and this has something called an active

16  items at requesting location list.  This is about the

17  closest thing in any of ePlus' materials of showing

18  you what an item master in the Lawson system actually

19  looks like.

20         It's this list of products.  At the far left

21  is an item number.  That's the number that the

22  customer assigns.  The first one is 1007, 1008, 1009.

23  The customer puts those in there in the order that the

24  customer enters those item numbers.  They have some

25  descriptions of the products there.  You see tape.

1    Then it goes to steri strips.  I guess that's some

2    sort of a bandage, and so on.

3         These are these very short descriptions that

4    are only 30 characters or less.  So you can see how

5    abbreviated they are.  And you heard the testimony

6    that those are the things the customer comes up with.

7    And they're not trying to sell anything here.  They're

8    not trying to give you a big description to entice you

9    to buy anything.  They're just reminding themselves

10   which one that is because this is the thing they buy

11   over and over.

12        Over on the far right it talk about that

13   being tracked.  That's their inventory.  This is their

14   own personal inventory.  Yes, we track it.  Yes, we

15   monitor our inventory on this thing.  This is the

16   closest thing that ePlus had to show you what the item

17   master actually looks like.  And they have never

18   linked this or anything else to a published vendor

19   catalog.  It doesn't look like it, and it's from the

20   customer.  This is an organized collection of

21   information, yes, but it's the customer who organized

22   it.  The vendor never even sees this.

23        So how could the vendor publish this?  An

24   organized collection.  And that's what has to be

25   catalogs here.  It just doesn't look like a catalog as

1   the Court has defined it.

2          So Dr. Weaver never showed either a single

3   vendor catalog that actually came from a vendor and

4   said, Oh, look.  Here's one of those vendor catalogs

5   that comes from somebody selling products to a Lawson

6   customer and compare that now to the item master.  Oh,

7   look, they look similar, don't they?  Dr. Weaver never

8   did that.

9          The reason he didn't do that is because he

10  wouldn't have been able to show that that comparison

11  would hold any water.

12         So they talk about what Dr. Weaver did do,

13  but it's what Dr. Weaver did not do that's the most

14  important thing here.

15         And they didn't do that even though they

16  picked four of our customers to give them information

17  about who our customers are.  They picked four of them

18  to depose and subpoena.  And you heard from -- I think

19  you heard from three of them in the case as it wound

20  up.  Mr. Yuhasz was live, Mr. Matias and Ms. Cimino.

21  Those are our customers that they picked.  They didn't

22  show you anything in those depositions or documents

23  that would show catalogs.

24         If we could go to slide No. 51.  Actually,

25  let's go to 52.  So Lawson doesn't infringe these

1  patents because it doesn't have multiple catalogs.  It

2  doesn't have published catalogs.  It doesn't have

3  catalogs published by inventors.  We've got very basic

4  information.

5        The whole purpose of an item master is

6  different from the purpose of catalogs.  Catalogs are

7  from vendors to sell things.  The item master is to

8  track personal customer's private inventory.  Short

9  descriptions selected by the customers.  It's an

10 inventory list like a shopping list just trying to

11 keep track of what they've got in stock.  Also control

12 what their employees can buy.  That's a big thing here

13 in comparison and contrast to catalogs.

14       You heard Mr. Robertson talk about comparison

15 shopping.  That's the intent of these patents.  Let's

16 the employees go out there and maybe do some shopping

17 and things.  And that might be good in some

18 situations.  If some customers want to do that, that's

19 fine.  But for some companies, they would say, I don't

20 want my employees doing that.  I just want them to go

21 buy the pens.  I don't want them out there shopping

22 around looking for new pens that are different or more

23 expensive or whatever and wasting time on that.

24       The Lawson system is all about control.  The

25 patented system a all about empowerment of the

1   customers.   Two very different purposes here.

2           So let's go to the evidence now on the issue

3   of the catalogs.   The testimony showed that Lawson

4   doesn't have catalogs.

5           Can we go to slide 53, I think it is.   This

6   is Mr. Christopherson's testimony here.   Using the

7   definition the Court just gave for published by a

8   vendor, is the customer's item master database ever

9   published by a vendor?   The Judge said just answer it

10  yes or no.   Mr. Christopherson then answered no.   So

11  Lawson people showing that the item master is not a

12  catalog as the Court defined it.   Customer testimony

13  is well.

14          If we go to 55.   This is Mr. Yuhasz.   He was

15  the customer that showed up in court here.   He was

16  nice enough to do that from Novant.   Is this data in

17  Novant item master generally known?   No.

18          Is the item master data maintained as

19  private?   Yes.

20          And the supporting differences here from the

21  published catalog.   If we go to the next slide, 56.

22  Mr. Yuhasz actually explained that they already had

23  the Lawson system that's accused of infringement in

24  this case with the requisition and purchase order and

25  inventory control modules, but they were looking for

1    the ability to have what he called a better option

2    that we felt had product catalogs.  They wanted to be

3    able to search for more things.

4         They wanted something different from what

5    Lawson had.  Were these features as the Lawson system

6    as it was installed at Novant did not provide?  Yes.

7         Here's his testimony that he, having one of

8    the accused systems, didn't think it had product

9    catalogs.  He was actually putting it out for bid.  He

10   was willing to write another check for somebody else

11   to go in and add that capability.  Well, there's some

12   real world market information for you that really

13   shows why the Lawson system doesn't have catalogs.

14        If we could go to the next slide.  This is

15   the inventor testimony.  They didn't talk about the

16   Lawson system, but they did talk about the parts

17   master that they acknowledge was like an item master.

18        This again relates to the have your cake and

19   eat it too, issue.  So that parts master that has the

20   same sort of things like we have on the blow up here,

21   item part number, a short description, tracking and

22   inventory, that isn't the same thing as the catalogs

23   you had in mind as the invention for these

24   patents-in-suit, right?  I don't think so.  For me,

25   no, they aren't the same.

3184

1          Again, the parts master, that's the same sort

2     of thing as an item master, correct?   Yes.

3          Mr. Momyer.   If we go to the next slide.

4     Again, reinforcing that that RIMS system as of

5     April '93 had that parts master.   That would not meet

6     the Court's definition of a catalog, Mr. Momyer's

7     testimony.

8          THE COURT:   It says Mr. Kinross.

9          MR. McDONALD:   I'm sorry.   Is that Kinross?

10    You're right.   It's Mr. Kinross.   Thank you.

11         Then go to the next slide.   So we're back to

12    Mr. Momyer again here.   This is confirming that that

13    parts master in the RIMS system, that's parts that a

14    customer would select, just like in the Lawson item

15    master.   That's what they would track for their

16    stockroom or inventory.   Just like the Lawson item

17    master.

18         Go to the next slide.   This is the third

19    inventor who testified, Mr. Johnson, now.   Again

20    acknowledging the RIMS system had a parts master, but

21    he didn't think that it had a catalog, though.

22         Then if we go to the next slide.   This is

23    Mr. Hilliard, their invalidity expert.   Of course he's

24    Mr. No.   This was an easy quote to find because

25    nothing was a catalog for him.   But he acknowledged

1    here with the Court's definition of catalogs that

2    there were no databases in the RIMS system that met

3    the Court's definition of catalogs.

4           So you have all of these Lawson witnesses,

5    all the inventors, even one of ePlus' experts

6    acknowledging that a parts master, which was just like

7    an item master, doesn't meet the definition even for

8    one catalog, let alone multiple catalogs.

9           So who was the only witness in this case who

10   said Lawson's item master was multiple catalogs?  It

11   was Dr. Weaver.  Dr. Weaver's approach, just about any

12   list of item information is not only a catalog, it's

13   actually multiple catalogs.  That's incredible.  It

14   defies common sense.  And we went through that with

15   him in a couple of ways.

16          If we go to the slide 63.  Remember, I asked

17   him, because he was saying that as long as the

18   information originated in some part from a vendor,

19   that meant the vendor actually published the organized

20   collection.  I gave them that example if I had a

21   personal address book, and I was going to put a phone

22   number in it that came from a phone book, my address

23   book if it has one entry from a published phone

24   company's phone book, my address book has an entry in

25   it that originated from the phone book, right,

1   Mr. Weaver?  Correct.

2           But in that case, even if it's my personal

3   address book, I didn't publicly disseminate it.  I

4   kept it in my own house.  Would you consider that to

5   be a published phone book?  Answer:  Well, that data

6   came from a published phone book, so, yes.

7           So Dr. Weaver said the address book is the

8   same thing as a published phone book.  It doesn't make

9   any sense.  But it doesn't end there.

10          Can we go to the next slide, please.  I went

11  on to talk to Dr. Weaver about how within the item

12  master -- he had to come up with a way to say this one

13  database was actually multiple catalogs.  So he had to

14  be a little creative there.  What he came up with is

15  this line of reasoning.  So if you search for the word

16  "blue," you get back results from the Lawson item

17  master that would be the catalog of blue things

18  because when you search "blue," you're searching for

19  the item master description, right?  Answer:  Yes.

20          If I search for the number five, it would

21  generate a list of all the things that had a number

22  five in the description?  It would.

23          In your opinion each one of these is a

24  separate catalog; is that right?  Yes.

25          So is there really any limit to the number of

3187

1    catalogs in the Lawson item master the way you look at

2    it?  No.

3            The Lawson item master has a limitless number

4    of catalogs according to Dr. Weaver.  Mr. Hilliard,

5    though, would say a parts master, which is just like

6    an item master, has no catalogs at all.  Having their

7    cake and eating it, too.  That's what we have going

8    on.

9            And that's even established on this last

10   thing with Mr. Momyer's testimony.  If we could go to

11   slide No. 65.  We talked to Mr. Momyer about this part

12   of their patents-in-suit.

13           Go back to 65, please.  Blow up the part

14   that's yellow.  This is in the background section of

15   the patents.  They acknowledge, Well, there are

16   computer systems out there capable of searching

17   databases containing a product catalog of a particular

18   vendor.  For example, on CD-ROM.

19           But down here you see around line 10, Well,

20   those are limited, though, in that only one such

21   vendor catalog.  That's one such vendor catalog is

22   accessible to a user at any given time.

23           So I asked Mr. Momyer about that since he's

24   one of the inventors of this thing.  If we could go to

25   No. 66, please.  I asked him about that section.

1    Would the fact you could search that single CD-ROM for

2    products of a certain color, would that mean the

3    CD-ROM actually contains multiple catalogs depending

4    on what word you searched with?  His answer was:  To

5    me, the catalog would indicate the company you were

6    buying the product from, he went on to explain.

7    Bottom line.  So it would be a single catalog.

8         So even though you could do keyword searches

9    and look up all sorts of different words within that

10   catalog, it's still as you understood it for purposes

11   of your patent a single catalog, right?  Yes.

12        So here is Mr. Momyer applying a little

13   common sense by saying a catalog is a catalog.  It's

14   not a limitless number of catalogs.  But he's one of

15   the inventors here talking about a part of the patent,

16   so that's really important here.

17        I talked to Dr. Weaver a little more about

18   the item master.  I think ePlus and their expert knew

19   that this catalog issue was pretty important from day

20   one in this case or certainly before trial.  And that

21   the item master and whether it's catalogs is

22   important.  So it's pretty striking, I think, wasn't

23   it, when we had slide 15 from his presentation which

24   is my slide No. 67?  Do you remember he had these

25   blocks that he stacked up.  I talked to him, and he

1  said, Those system shown in those systems were a

2  complete and comprehensive infringing system.  It had

3  everything that had to be infringing, including

4  multiple catalogs, right?  Eleven of the 12 claims

5  specifically say multiple catalogs or collection of

6  the catalogs, at least two catalogs.  Some variation

7  on it.

8          So the item master is the catalogs.  Dr.

9  Weaver, where is the item master?  Do you remember

10  that pause?  Do you remember he was starring at that

11  screen for a long time?  This was his own slide he

12  did.  But he starred at it for a long time there

13  because he knew it wasn't there.  And that's really

14  the story of their whole infringement case.  It's just

15  not there.

16          I want to show you one more thing about

17  Dr. Weaver's analysis.  This has to do with the

18  selecting catalogs or portions of the database to

19  search issue.  That's not in all the claims here, but

20  I think it's important to illustrate.

21          67A, if we could go to that.  This is the

22  part of the patent that actually talks without

23  selecting catalogs to search.  You get a choice of

24  some catalogs.  In the example here they have four.

25  It doesn't have to be these four, obviously, but this

1    is how the patent talks about it.  The user gets to

2    select the catalogs to search, and then you can search

3    within the catalogs.  You search for particular items.

4            Dr. Weaver didn't show anything about the

5    Lawson system that does anything like that.  And, in

6    fact, if we look at Mr. Momyer's testimony about this

7    feature at 67B, he explains why you do it this way.

8    Well, there was explanation evidence in the case

9    anyway that explained you might want to let a user

10   pick particular catalogs to search because that will

11   make the search more efficient.  You don't have to

12   look through catalogs that you know are from companies

13   you don't want to buy from or don't have the stuff you

14   want.  That was the point.  And there's really nothing

15   like that in the Lawson system.

16           And instead Dr. Weaver had to go to a whole

17   different thing really to try to fit this square peg

18   in a round hole on selecting catalogs.

19           If we go to slide 68, this is from

20   Dr. Weaver's presentation in Exhibit 363.  This is

21   where he went -- if you can blow up the upper left

22   quadrant or so.

23           Remember, Dr. Weaver after he had done a

24   search just for Dell, he came back with six products

25   in the demo.  Then he tried to show you, Well, now

1    what I'm going to do is a search within just those six

2    things just to get the Dimension 8100.  He was

3    suggesting to you he was just searching the six to get

4    two of the size, but what you see here is really what

5    was going on as he was searching the entire database

6    again.

7              Because up in the upper left corner there,

8    you see Dell, Dimension 8100.  And it says below that,

9    Search all fields.  And it's got that comma in it.

10   You might say why does it have that comma in there?

11   Well, if you look down here at the descriptions of the

12   products, those two particular products have Dell

13   comma space Dimension 8100 in the item description.

14   He was searching the whole database, but he wanted to

15   make sure he just got those two items, so he stuck a

16   comma in there.  That's what was going on there.

17             This is kind of like one of those Google

18   searches that you just put it in quotes.  It was an

19   exact search.  It wasn't narrowing the search to any

20   catalogs that the user selected.  This has nothing to

21   do with what the patent is talking about, the

22   patents-in-suit are talking about.

23             I'd like to turn now to the Punchout issue.

24   If we could go to slide 68.  About 11 percent of

25   Lawson's customers that have the basic requisition

1    purchasing and inventory control systems have this

2    Punchout option.  So it's really used by a small

3    minority of the customers here, and it really kind of

4    confirms that the item master itself doesn't

5    necessarily meet all your needs if you're looking for

6    lots of products out there.

7                But what we showed here, just as we talked

8    about at the beginning, that to get Punchout, that's a

9    private interaction, that's not on the Internet.

10   EPlus tried to suggest that Lawson has control over

11   what goes on at the vendor because Lawson interacts

12   with the vendors to come up with the right handshake

13   to make sure they can talk to each other.  But Lawson

14   doesn't have any control over the vendor catalog or

15   the searching.

16                Dr. Weaver didn't show you anything about

17   what goes on at the vendor website or where the search

18   modules or anything else like that are.  That's not a

19   part of their case.  And so I think that the fact that

20   that's a secured site means it's not published.

21   Remember the testimony was this was, again, the

22   customer's personal website, their personal pricing.

23   It's got nothing to do with, well, it would be out

24   there published and generally disseminated by a

25   vendor.

1          Also, there's the communication link.  It's

2     kind of like, I don't know if this happens much

3     anymore, but a boss had a secretary and wanted her to

4     place a call for him.  She'd dial up the phone, get

5     the contact connection established, and once the call

6     is ready, she says, Okay, boss, so-and-so is on the

7     line for you.  And he takes over.

8          Well, in that case the secretary might have

9     set up the connection link, but the secretary doesn't

10    have any control over what happens from there.

11    Certainly doesn't have control over what's going on at

12    the other end of the line.  So Lawson doesn't control

13    this.  They haven't shown any infringement to Lawson

14    here.

15         There was a little discussion of the intent

16    issue in this case.  And on the one hand for direct

17    infringement, Lawson, intent is not an issue, but if

18    they're going to try to show some inducement of

19    infringement by others, the Judge will instruct you

20    that they do have to prove that Lawson actually

21    intended to cause infringement.  I think you've seen

22    that there's no evidence that Lawson was trying to

23    cause anybody to infringe.

24         Finally, I'd like to turn to the issue of

25    competition.  And let's put up slide 69 because I

1    think this is a nice summary really of the whole case

2    here.  Because on the right side you see the RIMS

3    system combined with TV/2.  That's really what the

4    claims are about, no. 1.

5          You also see it's just all the pieces from

6    RIMS plus TV/2.  So it's an obvious combination,

7    No. 2.  And you can also see by comparing it to the

8    left side, it's just completely different from what

9    the Lawson system is.  Lawson doesn't even have the

10   whole RIMS system, let alone the RIMS system combined

11   with the TV/2 systems because Lawson just uses that

12   item master.

13         There was some discussion about competition

14   in this case.  I guess it's somewhat relevant to the

15   issue of are we really selling the same product or are

16   we selling something different?  And that's the issue

17   that we talked about briefly before.  Ms. Marion came

18   in and supposedly talked to me about infringement, but

19   she had to admit that her documents don't even

20   identify Lawson as a competitor.

21         EPlus didn't show you any documents in this

22   case, their own corporate records, that would indicate

23   Lawson is a competitor.  When their sales were down

24   and they had to revalue the division, they didn't

25   blame Lawson for losing sales.  Lawson had nothing to

1  do with it as portrayed in their SCC filings.

2          Richard Lawson himself testified in this

3  case.  He's been with Lawson since day one, 1975.

4  Helped them build that original item master and all

5  that.  He testified that he had never heard of ePlus

6  until this lawsuit came along.

7          All the Lawson witnesses said that.  The only

8  one that didn't was Mr. Lohkamp, who ran into ePlus

9  once at a trade show before he even worked for Lawson.

10  So this really confirms the common sense notion here

11  that the companies sell different products.  They

12  didn't really see each other in the marketplace.

13  They're different.

14          So in conclusion here, I think I've answered

15  the three questions that I think you need to answer

16  here.  One is that the Fisher people didn't invent

17  anything that wasn't obvious in view of the RIMS and

18  TV/2 prior art.  It's something that was done before.

19          Two, that you have got information the Patent

20  Office did not have, and that's why you should make a

21  different decision about this and find these payments

22  invalid.

23          Three, Lawson system is completely different.

24  Its purpose is different.  The item master is just

25  tracking a customer's personal inventory.  It's got a

1    whole different purpose.  It's got a whole different

2    organization.  It's not published by a vendor.  It

3    does not meet the Court's definition of catalogs.  So,

4    therefore, there's no infringement either.

5         So I'd like to talk a little bit about the

6    verdict form.  There are a lot of questions on there,

7    but the answers, I think, at least we can make this

8    simplified a little bit.  You've got the first section

9    on infringement.  If you believe the Lawson witnesses,

10   basically, you would have to find there's no

11   infringement.

12        So for all the part 1 questions about

13   infringement, you should check the box no.  That's

14   Roman numeral 1.

15        Roman numeral 2 on validity, there's two

16   sections of that.  One is part A.  If you find that

17   Lawson has proven by clear and convincing evidence

18   that any of the following claims are anticipated by

19   the Fisher RIMS systems.

20        If we could put slide 69 up again.  On this

21   question, the only reason the Fisher RIMS system would

22   actually anticipate the claims is if you found that

23   the Fisher RIMS system actually had multiple catalogs.

24        I think we have shown that neither the parts

25   master, nor the item master had multiple catalogs.  If

1    you agree with me and you say no on infringement, I

2    think you should also say no on part 2A on validity.

3    You'd only say yes in part 2A if you agree with

4    Mr. Weaver that those parts masters have multiple

5    catalogs.

6         And then finally with part 2B, if you find

7    that Lawson has proven by clear and convincing

8    evidence that any of the following claims are

9    anticipated by U.S. Patent No. 5,712,989, same thing.

10   If you agree with Dr. Weaver on multiple catalogs, say

11   yes.  If you don't agree with Mr. Weaver, say no.

12        Then in Section C, this has to do with the

13   claims being obvious in light of the combination, my

14   main argument, of, one, the RIMS system, the RIMS

15   brochure, and/or that RIMS patent.  And two, the TV/2

16   system and/or the TV/2 literature.

17        I think that you should say yes on all of

18   those whether you agree with Dr. Weaver on catalogs or

19   not because TV/2 provides published catalogs even as

20   Dr. Weaver defined them.  So it's still obvious even

21   under his approach.  So they should all be marked yes

22   in Section C.

23        And then you have to fill in the blank in

24   Section C:  Which prior art are you relying on?  There

25   you should just put in "RIMS system plus TV/2 system."

3198

1   That should be your answer to all those questions in

2   part C after you answer those questions yes.

3          So in view of all the evidence, I think we

4   have clearly and convincingly shown the invalidity of

5   the patent, shown you why Lawson doesn't infringe, and

6   I believe you should render a verdict in favor of

7   Lawson.   Thank you.

8          MR. ROBERTSON:   Your Honor, could I ask for a

9   brief restroom break?

10          THE COURT:   I'm going to ask the jury.   We're

11   going to have to take a recess in any event for this,

12   and then Mr. Robertson has what, 30 to 45 minutes?

13          MR. ROBERTSON:   Yes, sir.

14          THE COURT:   More argument.   Your lunches are

15   here.   Would you like to have lunch and then come back

16   after that for his final argument?

17          THE JURY:   Yes.

18          THE COURT:   Okay.   Your lunches are here.

19   Please take your pads with you.

20          (Jury is exiting the courtroom.)

21          THE COURT:   All right.   We'll take one hour

22   for lunch.

23          (Luncheon recess taken.)

24

25