1    THE COURT:  All right.  I'm going to tell you all

2 something that lawyers ought to know.

3    MR. ROBERTSON:  I apologize for interrupting, but

4 this witness is involved in the relationship at IBM.

5    THE COURT:  Excuse me, sir.  We have a motion that we

6 need to deal with, but he didn't...

7

8    (Witness out.)

9

10    THE COURT:  The jury wants to know when this case is

11 going to be over with.  We've got one juror who is working two

12 jobs.  Do you see why I want you to focus on getting this stuff

13 in and streamlined and cut this nonsense out?  They don't make

14 the money you make, and if you're not careful, you lose people

15 after awhile.  All of you.  Okay.

16    Gounaris, is that how you pronounce it?

17    MR. SCHULTZ:  Yes.

18    THE COURT:  I got your motion, I got the response.

19 Do you want to say anything?

20    MR. ROBERTSON:  Yes, Your Honor.  I'm sure you've

21 seen the brief.  I'm sure you've seen the overlap with respect

22 to the exhibits.  There is only one additional exhibit that's

23 been identified.

24    The argument is made that they have to prove

25 invalidity by clear and convincing evidence, but that doesn't

1    mean the Federal Rules of Evidence are trumped and a defendant

2    is permitted to pile on with cumulative testimony under either

3    611 or 403.

4              Quite frankly, I found it remarkable that they called

5    in a woman who actually worked on the project, who identified

6    Mr. Gounaris as someone who was just in sales, not involved in

7    the project at the Manassas facility.

8              Now they want to call the salesman to go over the

9    same exhibits, and in their brief, the remarkable statement I

10   saw was, Ms. Eng was asked questions to which she was not the

11   person with the best knowledge.  Well, then, why did they call

12   her in the first place to discuss these documents?

13             Now, I won't disagree with that statement, but that

14   doesn't mean you get to call another witness and try and clean

15   up the record and fix something that's already been fully

16   articulated with respect to all these things.

17             She was involved in those modifications that were

18   necessary to TV/2, and that's really what's relevant here, not

19   what some salesperson has to offer.  So I would think, Your

20   Honor --

21             THE COURT:  He's been deposed, hasn't he?

22             MR. ROBERTSON:  He has.

23             THE COURT:  I'm sorry.  Periodically my throat is

24   just sore.  It sounds like I'm growling at you.

25             MR. ROBERTSON:  He has been deposed in this case,

1    Your Honor, and he testified in the SAP case.  He's been a

2    consultant for both SAP and Lawson.

3             THE COURT:  Was he in sales, or was he in the

4    development of this project?  Certainly somebody asked him that

5    in all that testimony.

6             MR. ROBERTSON:  I think we did.  He'd like to take

7    credit for a lot of things involved here.

8             THE COURT:  What is his technical background?  What

9    is his education?

10            MR. SCHULTZ:  He has a computer background.

11            THE COURT:  But what's his job?  Is he sales?

12            MR. SCHULTZ:  He analyzes systems, so he goes in and

13   puts systems together.  That's what he'll testify to, and

14   that's what he did in this case.

15            MR. ROBERTSON:  There's not any document that shows

16   that Mr. Gounaris had any involvement in this project other

17   than signing the statement of work.  And the statement of work,

18   Your Honor, is just what IBM did.  I think that's all fully

19   come out.  Why do we need to have cumulative testimony on what

20   IBM did in this project?  The Gantt chart is what the Gantt

21   chart is.  The project ran its course.

22            I will say one thing:  Fisher was very careful about

23   seeing that there was a noncompete clause in that statement of

24   work, and you saw Ms. Jenkins testify to it.  When I asked her

25   if Mr. Gounaris was there, he's not even listed in the

1   non-complete clause.  They didn't care enough about Mr.

2   Gounaris to restrict his activities after this confidential

3   project was over.  I think that speaks volumes, Your Honor.

4   Thank you.

5           THE COURT:  All right.

6           MR. SCHULTZ:  Mr. Gounaris was the project leader at

7   IBM.  In other words --

8           THE COURT:  That's what they called him?  That was

9   his title?

10          MR. SCHULTZ:  That was his title.  In other words,

11  when Fisher came to IBM, it was Mr. Gounaris who was sitting

12  down with the inventors and with Frank Melly who is deceased.

13  So Mr. Gounaris has a special knowledge of what actually

14  happened when Fisher first came to IBM, what they wanted.

15          Mr. Gounaris also has the specific knowledge of what

16  IBM did to find an alternative to meet the search catalog

17  criteria that Fisher Scientific wanted when it came to IBM.

18  Mr. Gounaris will testify that he led the team in finding the

19  TV/2 alternative, and the TV/2 alternative is the search

20  catalog functionality.

21          THE COURT:  If he's such a key part of this, why

22  didn't they have him in the noncompete agreement?  It suggests

23  to me he didn't do anything of any technical importance

24  because -- but I don't know that that's the only inference.

25  And she said he was sales and he was in a different office, he

1    wasn't even working in the office where this was going on.

2    What does he say about that?

3            MR. SCHULTZ:  So Mr. Gounaris was in the Pittsburgh

4    office which is the same location as Fisher Scientific.  Fisher

5    Scientific Pittsburgh went to IBM located in Pittsburgh.  Mr.

6    Gounaris was the individual who they spoke with, who Fisher --

7            THE COURT:  At the beginning.

8            MR. SCHULTZ:  At the beginning.

9            THE COURT:  But then the project migrated, and they

10   worked on it down here, and he didn't have anything do with

11   that.

12           MR. SCHULTZ:  That is incorrect.  Mr. Gounaris

13   oversaw the entire project from start to finish.  You may

14   recall that Ms. Eng testified that she was not involved when

15   Fisher first came to IBM.  She also testified that she took

16   maternity leave.  She also testified that she had left before

17   the project was complete.

18           Mr. Gounaris was there the entire time.  Mr. Gounaris

19   was the person who signed the statements of work as Ms. Eng

20   testified to.  He was there --

21           THE COURT:  Why didn't you just call him then?

22           MR. SCHULTZ:  Because Ms. Eng had specific knowledge

23   about the TV/2 product in 1992.  There was testimony from the

24   inventors earlier today about what was actually provided to

25   Fisher Scientific in terms of a TV/2 system.  Mr. Gounaris has

 1    that knowledge, the specifics about what the functionality was

 2    at the time in 1993 that IBM --

 3              THE COURT:  Does he know what the functionality was,

 4    or does he know what the company said the functionality was?

 5              MR. SCHULTZ:  He knows what it was.  There was a

 6    validation process that they went through.  He can testify as

 7    to the fact they had their Havant lab --

 8              THE COURT:  What does that mean?

 9              MR. SCHULTZ:  It's a lab over in England, as well as

10    the Manassas individuals testify as to validate the system to

11    make sure that it had the functionality that the brochure said.

12              THE COURT:  I'm going to take this on a

13    question-by-question basis, but if she's testified to it,

14    that's going to be the end of it.  My suggestion to you is that

15    you ask only the questions that are noncumulative, Mr. Schultz,

16    because if you get into one cumulative question, that's you're

17    first step, and I'll sustain the objection.  You get into two,

18    that's the second step.  On the third one, the witness is gone.

19              MR. SCHULTZ:  Your Honor, I would like to -- also

20    Mr. --

21              THE COURT:  I'm going to sustain the objections if

22    it's cumulative.  So I want you to understand that's the

23    consequence you're going to pay for not calling him first if he

24    has the most knowledge.  You must understand that the person

25    who puts on the most witnesses doesn't win clear and convincing

1    evidence.  That's not a very good argument.

2            MR. SCHULTZ:  Your Honor, I do anticipate that his

3    testimony would be about half an hour to 40 minutes, just so

4    you have a reference point of Mr. Gounaris.

5            THE COURT:  That's before you cut out all the stuff

6    that you told me you can cut out because she's already

7    testified to it.

8            MR. SCHULTZ:  Actually, Your Honor, I have gone

9    through and cut out everything.  Once we received this motion,

10   I went through and made sure that the testimony was based on

11   his role and did not deal with Ms. Eng.

12           THE COURT:  Whether the testimony is based on his

13   role is not the test.  It's whether it's cumulative.  It's

14   whether he's testifying to the same thing; okay?

15           MR. SCHULTZ:  I would like to make for the record,

16   Mr. Robertson made the insinuation this morning that Ms. Eng

17   did not have any corroboration for her evidence.  The fact that

18   Mr. Gounaris had that knowledge and had the knowledge of the

19   functionality of the system is corroboration for Mrs. Eng --

20           THE COURT:  The weakest kind of corroboration,

21   though, isn't it?

22           MR. SCHULTZ:  Well, there's number one -- we don't

23   think -- we think that the documents that Ms. Eng referred to

24   is corroboration sufficient.  However, if ePlus is going to

25   make the argument that there isn't corroboration, witness

 1    testimony is sufficient to do that corroboration, especially

 2    when there's documents that further support that issue.

 3              THE COURT:  All right.  Anything else, Mr. Robertson?

 4              MR. ROBERTSON:  I think I understand the Court's

 5    ruling, and we'll proceed --

 6              THE COURT:  I'm going to consider it question by

 7    question.  We're beyond the point we're doing this now.  You

 8    all took most of the morning dealing with a lot of things that

 9    just didn't need to be dealt with, and the points that were

10    trying to be made ultimately got obscured.  You just have to

11    understand something.  What means something to you in the

12    subtleties of the patent law doesn't necessarily mean something

13    to nine citizens who don't function in that arena.  All right,

14    we're ready for the jury?  Can we get the witness back?

15

16                        (Jury in.)

17

18              THE COURT:  All right.  Just a minute.  Thank you

19    very much.

20    BY MR. McDONALD:   (resuming)

21    Q    Good afternoon, Mr. Kinross.  I want to talk to you

22    briefly about the differences in the function between a parts

23    master in the old RIMS system and the catalogs in the patents

24    that are involved in this case.

25    A    Okay.

1   Q    Is it fair to say that the parts list would just have

2   short descriptions of the products that the customer would buy

3   again and again in contrast to a catalog which would have a

4   full description of products and specifications to help people

5   make buying decisions?

6               MR. ROBERTSON:  Objection, Your Honor.  Again,

7   talking about a catalog here as defined by the Court, and I

8   think it's inappropriate for this question consistent with the

9   Court's prior ruling.

10              MR. McDONALD:  My question is totally consistent with

11  the Court's ruling.

12              THE COURT:  But you haven't even shown that he

13  understands what the definition of a catalog is.

14              MR. McDONALD:  Well, I think the evidence --

15              THE COURT:  You have to use that catalog.  You have

16  to use that definition of a catalog.  So you can ask the

17  question, but you have to use that definition of the catalog in

18  your question, and there's been no showing he knows what it is.

19  Otherwise, the jury has got testimony addressed on one plane

20  and not on the plane that makes a difference.  So let's put --

21  the objection to the form of the question is sustained.

22              MR. McDONALD:  Can we put up the definition of

23  catalog from the Court up on the screen, please.

24              MR. ROBERTSON:  Let me say, Your Honor, I object

25  to -- now we're going to be asking the witness to formulate an

1    opinion, expert opinion with respect to whether or not some

2    catalog is present or not present, and I think it's

3    inappropriate for lay witness testimony and hasn't been

4    permitted before in this Court.

5              MR. McDONALD:  I'm just trying to respond to what the

6    Court asked.  I think the idea is to use the ordinary meaning

7    of the Court's construction through this witness's

8    understanding.

9              THE COURT:  Objection overruled.  He's not an expert,

10   but he is one of the inventors, so his testimony -- but you

11   can't ask him objectively what is the difference.  You can say,

12   what did you understand the difference to be.

13             MR. McDONALD:  Okay.

14   Q   Mr. Kinross, you have up on the screen now the Court's

15   construction of the term catalog as used in the claims of the

16   three patents in this case, and I'll give you a minute to

17   review that for a moment here.

18        Now, under that Court construction, do you believe that

19   the -- as you understand the Court's construction, I just want

20   to use your understanding, would you agree or disagrees that

21   the parts master in the old RIMS system, that is the list of

22   the inventory items for a customer, that would be a catalog?

23             MR. ROBERTSON:  We object, Your Honor --

24             THE COURT:  Are you saying does the parts master in

25   the old RIMS system -- in the patent, the RIMS patent, match

1    that?  Is that what you are saying?

2              MR. McDONALD:  Well, the -- in the old RIMS system,

3    that's both in the RIMS patent --

4              THE COURT:  But he's already said, or somebody said,

5    it underwent something like 30 or 40 modifications, so it's

6    somewhat indefinite.  Your reference has got to be to the

7    patent, doesn't it, because you are asserting that as the prior

8    art?

9              MR. McDONALD:  I can put it in those terms.

10   Q    So we're taking about the RIMS parts master, Mr. Kinross,

11   as it existed back in April of '93 when the RIMS patent was

12   filed, okay, or times prior to that.  Parts master at that

13   point of time, okay?  Is your understanding that that RIMS

14   April '93 parts master would meet the Court's definition of a

15   catalog or not?

16   A    No.  It wouldn't meet this definition of a catalog.

17   Q    Is that, in part, because that parts master isn't

18   published by a vendor?

19   A    No.

20             MR. ROBERTSON:  Objection, Your Honor.  I mean,

21   again, now, this is a term that the Court has defined, and the

22   witness has no idea what that means.  This is simply unfair.

23   So I object.  There's been no foundation, and it calls for an

24   expert conclusion.

25             THE COURT:  Aren't you getting into expert opinion?

1          MR. McDONALD:  I think, like you said, he's an

2    inventor who signed off on this thing that he understood the

3    claims, and I've asked for his understanding.

4          MR. ROBERTSON:  Published by a vendor is nowhere in

5    any claim, Your Honor, and Your Honor did this mid course

6    during the trial, as you know, and you know why --

7          MR. McDONALD:  Wait a minute.  This wasn't done mid

8    course the during trial.  This definition has been here since

9    May of 2009.

10         MR. ROBERTSON:  Not the definition that the Court's

11   provided.

12         THE COURT:  I understand.

13         MR. ROBERTSON:  Thank you, sir.

14         THE COURT:  He said -- what is your question again?

15   Ask it again.  Overruled.  You can ask your question.

16   Q    Mr. Kinross, with respect to the parts master in the RIMS

17   system as it existed in April of '93, can you explain why you

18   don't consider that to be a catalog as defined here in your

19   understanding?

20   A    Right.  The RIMS system did not include images, it had a

21   very short description of the item, not a -- 25 characters, 25

22   or 30 characters description which I wouldn't really categorize

23   as a textual description because it was full of abbreviations

24   to get some information in there to identify the part.

25         It did not include vendor name.  I don't believe it

1   included vendor ID.  So, based on the last four items, that

2   would disqualify it from being the same as what was in the

3   electronic sourcing system.

4   Q    Okay.  I'd like to turn now to the process in the context

5   of combining the RIMS system with the TV/2 system with IBM;

6   okay?  Now, is it fair to say that both the RIMS system and the

7   TV/2 systems were designed to operate on that IBM OS/2

8   operating system?

9   A    Yes.

10  Q    And both the RIMS system and the TV/2 system used

11  characters called ASCII, A-S-C-I-I, characters; correct?

12  A    Correct.

13  Q    Can you explain in lay terms what ASCII characters are?

14  A    They're a numerical representation of what a letter should

15  be based on, I believe seven bits of information.  So you have

16  seven individual bits of information that you can fill up to

17  represent the character A.  You have a different set of bits to

18  fill up to represent the character B.

19       The alternative to ASCII is EBCDIC which was IBM's version

20  of character representation, and that was based on an eight-bit

21  architecture instead of seven.  So that was my definition of

22  what ASCII characters were, bit representation that the

23  computer would understand to define a character set.  Both

24  numbers, letters, and special symbols.

25  Q    Did Fisher work on developing the RIMS side of the

1   interface with TV/2?

2   A    Fisher worked on developing the requisition side of

3   electronic sourcing.  Whether that could be characterized as

4   RIMS or not, I think, is an open question.

5   Q    Fisher worked on the requisition side of the system to

6   communicate with the TV/2 search side; is that fair?

7   A    That's correct.

8   Q    And would you --

9           THE COURT:  Excuse me.  When you said side of the

10  system, are you saying the side of the system that involved the

11  electronic procurement system?  Which system do you mean?

12          THE WITNESS:  Well, electronic sourcing involving

13  searching the catalog and then taking the results of those

14  searches and actually placing a requisition which ultimately

15  became an order.  So the side of the system that did the

16  requisitioning and ordering was the question that he just

17  asked, worked on by Fisher.

18          THE COURT:  Do you mean the side of the system that

19  ultimately became the invention of the '863 patent?

20          THE WITNESS:  No.

21          THE COURT:  Or some other system?

22          THE WITNESS:  Well, I think both sides are part of

23  the patent.  I think both sides are part of the patent.

24          THE COURT:  All right.

25  Q    Would you agree that the programming done to create the

1   Fisher side of that interface would be understood by anyone

2   skilled in the art of CICS programming?

3          MR. ROBERTSON:  I object to the form of the question.

4   Is he asking would a programmer understand CICS?  The question

5   is ambiguous, Your Honor, and vague.

6          THE COURT:  Sustained.  Are you asking for his

7   opinion?

8   Q   Well, Mr. Kinross, there was nothing extraordinary or

9   unusual about the programming done to develop the Fisher side

10  of the interface, was there?

11         MR. ROBERTSON:  I object to that question.  Nothing

12  extraordinary or unusual about developing?  That question is

13  vague and ambiguous.

14         MR. McDONALD:  It goes to the obviousness issue, Your

15  Honor.

16         THE COURT:  Why don't we just let him explain what

17  was done.  Sustained.

18  Q   On the Fisher side of the fence here, Mr. Kinross, did you

19  have some computer programmers at Fisher that you had hired to

20  create this interface?

21  A   The development was more than just an interface.  The

22  interface, to me, was the communications link between Technical

23  Viewer and requisition management.  And we used a technique

24  called dynamic data exchange, which is frequently abbreviated

25  to DDE, to accomplish that.  That's the interface.

1   Q    That's what I'm talking about.

2   A    Well, you refer to the whole thing as an interface.  The

3   other side of it is an application that does requisitioning and

4   purchasing.

5   Q    Well, I'm talking about the interface right now.

6           THE COURT:  Just the -- is it DDE?

7           THE WITNESS:  Yeah, DDE, dynamic data exchange.

8   Q    That DDE, that was a known technique for interfacing two

9   applications on the same operating system at the time you came

10  up with this; right?

11  A    That's right.

12  Q    And, in fact, DDE was even the preferred method at the

13  time you were working with IBM of interfacing on a computer

14  using OS/2; right?

15  A    It's hard to say if it was the preferred method.  It had

16  some advantages that other methods did not.  We viewed it as

17  the best way to link the two systems because of the speed and

18  the amount of resources that it would consume.

19  Q    And anybody with knowledge of the possible interfaces

20  would have probably reached the same conclusion you did; right?

21          MR. ROBERTSON:  Objection, calls for speculation.

22  A    I don't know.

23          THE COURT:  Overruled.

24  Q    There was nothing extraordinary about the ability of the

25  TV/2 system to communicate with the RIMS system, was there?

1              MR. ROBERTSON:  Objection.

2              THE COURT:  Sustained.

3    Q    IBM did tell Fisher that they had an application program

4    interface with the TV/2 system that would allow interfacing

5    with the RIMS product; right?

6    A    They indicated that the Technical Viewer had application

7    programming interface.  Whether they said it would interface to

8    the requisitioning system was a requirement that we had.  I

9    don't know if IBM suggested that or not.

10   Q    But they did tell you that their API, their interface,

11   would allow Technical Viewer to communicate with RIMS; right?

12   A    I think that the fact that it had an API would indicate

13   that it could do other things to extend the product.

14   Q    Those other things would include interfacing with a

15   product like RIMS; right?

16   A    Correct.  Or requisitioning.

17   Q    Several years ago you put a timeline together about the

18   development of the RIMS product; right?

19   A    Yes.

20   Q    And in that timeline, you indicated that in 1989, the RIMS

21   product worked with multiple vendors, cutting purchase orders

22   to multiple vendors from one requisition; right?

23   A    I would have to review that document.

24             MR. McDONALD:  May I approach, Your Honor?

25   A    This --

1   Q    You've been handed a document here, Mr. Kinross.  It's got

2   a designation on there, among others, of RK 000001; do you see

3   that?

4   A    Yes.

5   Q    RK, that's your initials; right?

6   A    Correct.

7              THE COURT:  That's Defendant's Exhibit 589?

8              MR. McDONALD:  That's actually from another matter,

9   Your Honor.  That is just a photocopy.

10             MR. ROBERTSON:  Your Honor, I object.

11             THE COURT:  I'd like to take that out, because I

12  don't want somebody later trying to do that.

13             MR. McDONALD:  I know it's confusing.  I'm not even

14  sure we're going to mark it as an exhibit since we're using it

15  for impeachment at this point.

16             MR. ROBERTSON:  Your Honor, there's been no question

17  that's been raised in which to impeach him on this document.

18  All he asked him was did he prepare a timeline.  He said yes.

19             THE COURT:  I agree there's nothing yet, so why don't

20  you ask the question --

21             MR. McDONALD:  I think I asked him specifically about

22  didn't he indicate on his timeline that in 1989 with respect to

23  the RIMS development, that's when the feature of multiple

24  vendors cutting purchase orders to multiple vendors from one

25  requisition was indicated, and I think he indicated that he

1   didn't agree with that.

2              THE COURT:  No, he didn't.  He said, I need to see

3   the document.

4              MR. McDONALD:  Oh, right.  So now he's been presented

5   with the document.

6   Q    Does seeing that document now refresh your recollection,

7   Mr. Kinross, that in your timeline that you put together

8   regarding RIMS development, you indicated that in 1989 the RIMS

9   system had multiple vendors cutting purchase orders to multiple

10  vendors from one requisition?

11  A    Well, I worked on this with Doug Momyer.

12  Q    I'm asking, does this refresh your recollection that you

13  did put that --

14  A    You asked me if I put that on here, and I don't believe I

15  did.  You said, didn't I include on this document multiple

16  vendors, and I don't think I put this on here.  I wasn't the

17  RIMS expert.

18       We were merely trying to put together a timeline so that

19  the dates that some of the development occurred in regard to

20  the patent were fresh, refreshed in our minds since we didn't

21  have any documentation to refer to.  So that's the genesis of

22  this whole timeline.

23  Q    Okay.

24  A    They were more important than the functionality, in my

25  opinion.

1  Q    But does seeing that language on here at least refresh

2  your recollection that that timeline you were just referring to

3  did indicate that in 1989 the RIMS system had a feature,

4  multiple vendors cutting purchase orders to multiple vendors

5  from one requisition?

6  A    Well, there's --

7  Q    Does it refresh your recollection or not?

8  A    There's information here that has come out that --

9  Q    Well --

10  A    In the instance of multiple vendors and third parties,

11  RIMS, I believe, could send a requisition that would create

12  these third-party purchases from Fisher to other vendors, but

13  it was actually just one purchase order that did that, not

14  multiple purchase orders.

15  Q    What you are saying, though, is inconsistent with the

16  entry on your timeline; correct?

17         MR. ROBERTSON:  Objection, Your Honor, to the

18  characterization.

19         THE COURT:  Well --

20         MR. ROBERTSON:  The witness has explained exactly

21  he's characterized in the document.

22         MR. McDONALD:  He's saying what he thought later, and

23  I'm just clarifying that that is inconsistent --

24         THE COURT:  I'm not sure it is.  You made a

25  statement.  Why don't you ask him the question, is what you are

1    saying now inconsistent with that.  You made the assertion that

2    it is.  It may not be.  It depends on how you read things.

3    Q    Well, Mr. Kinross, is what you are saying consistent or

4    inconsistent with what's on the timeline here which indicates

5    in 1989 RIMS had multiple vendors cutting purchase orders to

6    multiple vendors from one requisition?

7            MR. ROBERTSON:  Object to the form of the question as

8    vague and ambiguous.

9            THE COURT:  Overruled.

10   A    I think that it cut one purchase order.  It's not saying

11   it's cutting multiple purchase orders here.  And that purchase

12   order was to Fisher.

13   Q    So you are saying that the phrase, quote, cutting purchase

14   orders to multiple vendors from one requisition is actually

15   referring to just one purchase order?

16   A    Yes.

17   Q    And in this timeline, doesn't it also indicate by 1991,

18   the RIMS system had third-party procurement?

19   A    Yes, it indicates third-party procurement.

20           THE COURT:  He didn't ask you whether it indicated.

21   He said whether the RIMS system did in 1991.  You changed from

22   shifting from what the document said to whether or not it, in

23   fact, did.

24   Q    Well, Mr. Kinross, your timeline does indicate that in

25   1991, the RIMS system had the feature third-party procurement;

1    right?

2    A    That's a heading above 1991, yes.

3    Q    So it is linked to 1991 here; right?

4    A    Yes.

5    Q    And the features with that were, one, source off catalog

6    items, no existing part number, and two, assign vendor and

7    create purchase order; right?

8    A    That's what it says, yes.

9    Q    And the RIMS system did have those features in 1991;

10   right?

11   A    Well, this goes back to those third-party items that I was

12   talking about in the 1998 bullet point.

13   Q    I'm sorry, what year?

14   A    1989.

15   Q    Okay.

16   A    Bullet point.  There was an aspect of Fisher systems that

17   allowed non-catalog items to be ordered, and they would be

18   researched by some purchasing agent and ordered on behalf of a

19   customer.

20   Q    What year --

21   A    In that process, they would have to assign a vendor number

22   and create a purchase order to that vendor to order the item.

23   Q    That was true in 1991 with the RIMS system?

24   A    That's what it says, 1991.

25                THE COURT:  That's what it says, but the question was

1    not what it said.  The question was, is that true of the RIMS

2    system in 1991.

3              THE WITNESS:  I don't know.

4              THE COURT:  Okay.

5              THE WITNESS:  In terms of the RIMS features, I was

6    not the key person to include these bullet points.  It was Doug

7    Momyer who was working in conjunction with me to create this.

8    So he was basically coming up with these bullet points to

9    develop a timeline.

10   Q    This was a document that you had produced from your files;

11   is that right, with this RK number on it?

12   A    No.

13   Q    What does that RK number indicate as you understand it?

14   A    It would indicate it came from me, and I did send it via

15   email to the attorneys just to document some of the time frames

16   of development.

17   Q    Do you know whether or not Mr. Momyer ever produced a copy

18   of this document?

19   A    I don't know.  He was in the room when I sent it to the

20   attorneys.

21             THE COURT:  I don't think that you --

22             THE WITNESS:  So I don't know --

23             THE COURT:  It's not really a good idea to be asking

24   who produced something.  That's a vernacular term that the

25   lawyers have.

1          In your recollection, no matter where the file copy

2     came from, who wrote this up; you or Mr. Momyer or somebody

3     else?

4          THE WITNESS:  Well --

5          THE COURT:  I think that's what he wants to know.

6          THE WITNESS:  We met at Doug's house on a Saturday

7     morning, and we discussed development issues that we thought

8     related to the patent.  We came up with a timeline because we

9     thought that would be helpful because they were going to be

10    asking us dates of when things happened in the system.  So we

11    produced this in a morning based on our recollection of when we

12    did things.

13         Now, I'm certain all this RIMS development came from

14    Mr. Momyer and not me, so I'm not the one that, you know, that

15    should be answering what does this mean or what does this mean.

16         THE COURT:  Let me ask you this question:  This is a

17    typed piece of paper, obviously.  Who typed it?

18         THE WITNESS:  I typed it.

19         THE COURT:  You typed it, and then you gave

20    Mr. Momyer a copy of it?

21         THE WITNESS:  I don't even know if I did that.  He

22    read it.  It was on the computer.  It was a laptop in his

23    house.  We decided, well, this is what we wanted to send over

24    to the attorneys after the meeting that we had with them, and

25    they were asking us dates and times of when certain development

1   happened.

2            THE COURT:  Okay.

3            THE WITNESS:  To the best of our recollection, this

4   is what we came up, and that is the genesis of this document.

5            THE COURT:  All right, thank you.

6            MR. McDONALD:  At this point, I'd like to mark this

7   as 402 and offer it into evidence.

8            MR. ROBERTSON:  No objection, Your Honor.

9            THE COURT:  What?

10            MR. ROBERTSON:  No objection.

11            THE COURT:  All right, Defendants's Exhibit 402.

12   Make sure you get this done, folks.  Make sure you get that in

13   the system as it exists today.

14            MR. McDONALD:  Well, we pretty much already talked

15   about the multiple vendors, part three under the 1989 bullet

16   point features; is that right, Mr. Kinross?

17   A    Yes.

18   Q    So let's hit a couple of other ones we haven't talked

19   about.  Up on the screen, this is a copy of that timeline you

20   were just referring to; right?

21   A    Yes.

22   Q    So the first feature indicated in the '89 version of RIMS

23   was multiple inventory sourcing, either customer location or

24   Fisher location, search for inventory.  Do you see that?

25   A    Yes.

1   Q    Is it your understanding that's an accurate description of

2   the RIMS system as it indicated in '89 that it had that

3   feature?

4   A    Yes.

5   Q    The second point, realtime pricing and availability, do

6   you see that?

7   A    Yes.

8   Q    Is it your understanding that the RIMS system, in '89,

9   also had that feature?

10  A    Well, yes, but all of this is just Fisher's system, just

11  Fisher.

12  Q    Okay.  And then we already talked about number three;

13  right?

14  A    Yes.

15  Q    So let's go to number four, product cross-reference.  Do

16  you see that one?

17  A    Yes.

18  Q    Did the RIMS system, as it existed in '89, have that

19  product cross-reference feature?

20  A    It had a way to reference competitors' numbers to Fisher

21  numbers, yes.

22  Q    So that would be a similar or equivalent product?  It

23  would have a Fisher number and a competitor number; is that

24  what you are talking about?

25  A    Yes.

1    Q    Then there's another bullet point about all based on

2    knowing the part number and entering it into the system for

3    verification, i.e., no search capability; do you see that?

4    A    Yes.

5    Q    Now, it is true that in the RIMS system in '89, it could

6    search via part number; right?

7    A    If you want to characterize that as a search.  We think

8    that's a part lookup.  It's a full key lookup, so if you have

9    to identify the part number, you needed to know the entire part

10   number key.

11   Q    But is it true that in the RIMS patent itself, it does

12   refer to looking up a part number as a search?

13   A    I don't know.  It probably does if you have that

14   information, but the definition of searching changed over time.

15   You search a database by giving it a key.  That's where that --

16   that's where that terminology came from.

17   Q    So, I'm not sure now.  Are you agreeing or disagreeing

18   that the RIMS system patent application that's incorporated

19   into the patents involved in this lawsuit actually refers to a

20   part number search or part number lookup as a search?

21   A    I think the RIMS patent does refer to a part number lookup

22   as a search.

23            THE COURT:  He didn't ask you about the patent.  He

24   asked you about the patent application.  Do you know what was

25   in the patent application?

Kinross - Direct

1    A    No.

2              THE COURT:  Be careful what you are asking.  People

3    can get confused, you know.

4    Q    The RIMS patent refers to a part lookup as a search;

5    right.

6    A    If you say so.  I'm not an expert on the RIMS patent.  I

7    never read it in its entirety, so I think --

8              THE COURT:  You don't know; is that your answer?

9              THE WITNESS:  I think in my deposition we did read

10   portions of it, Mr. McDonald.

11             THE COURT:  Is that where you saw it?

12             THE WITNESS:  Yes.

13             THE COURT:  Let's go.

14   Q    Scroll down on this page.  In 1993 now, is this the entry

15   that really relates to the patents involved in this lawsuit?

16   A    Yes.

17   Q    Develop TV/2 interface; right?

18   A    Correct.

19   Q    It says, features, two things:  One, multiple catalogs

20   searched; two, integration with requisition, right?

21   A    Yes.

22   Q    That's really what the invention in this case is about;

23   right?

24             MR. ROBERTSON:  Objection.  Invention in the case is

25   what the claims are that are asserted here, not some general

1   idea of what the invention is.

2            THE COURT:  Sustained.

3   Q    Mr. Kinross, would you agree that with the development of

4   the TV/2 interface, the features added to the RIMS system were,

5   one, ability to search multiple catalogs, and two, integrating

6   that searching with the requisition system?

7   A    I think it was more than that.

8   Q    Would you agree that it includes those two things?

9   A    Yes, I would agree.

10  Q    Would you agree those are the only two things you listed

11  here on the timeline as features of that TV/2 interface

12  development in 1993?

13  A    Yes.

14  Q    And then in 1994, there's a reference on this timeline to

15  the graphical end user interface for requisitioning; right?

16  A    Yes.

17  Q    The TV/2 system we already talked about, that had its own

18  graphic user interface; right?

19  A    Yes.

20  Q    The RIMS did not have it yet, is that right, as of 1994?

21  A    1994 is when we developed it.  We recognized the

22  requirement for it early on, and 1994 was the year that we

23  developed it.

24  Q    Now, there aren't any graphical user interfaces actually

25  shown in the patents-in-suit, are there?

```
 1            MR. ROBERTSON:  Objection, Your Honor.  This has been
 2   gone over in direct examination already.
 3            MR. McDONALD:  I'm trying to tie it into this
 4   timeline, Your Honor.  Now that we have some clarity on the
 5   timing of everything, I think it's helpful to put it in the
 6   context.
 7            MR. ROBERTSON:  Same timeline.
 8            THE COURT:  It seems to me like we're plowing old
 9   ground, Mr. McDonald, and remember what I told you before we
10   started today?  Let's go ahead.
11   Q    I'd like to now turn, Mr. Kinross, to how much demand
12   there was for the system.  We can take this off the screen
13   now -- for the system that corresponds to the patents that have
14   been asserted in this case.
15        Now, the SupplyLink was the brand name used for the system
16   described in the three patents in this case; right?
17   A    Yes.
18   Q    Is it true that only a small portion of RIMS customers
19   ever adopted the SupplyLink system to use with RIMS?
20   A    Well, I think the system would have replaced RIMS, not
21   been used with RIMS.
22   Q    Well, did some portion of RIMS customers adopt the
23   SupplyLink system to use with RIMS?
24   A    Well, no.  If you are getting SupplyLink, you don't need
25   RIMS anymore.
```

1    Q    Turning to the patents-in-suit in, the patents-in-suit are

2    referred to as the RIMS system, RIMS in a number of places;

3    right?

4    A    Yes.

5    Q    Are there any places in any of the three patents-in-suit

6    where the RIMS system is specifically identified as prior art?

7    A    I couldn't tell you.  If I'd have to do a search to see

8    prior art.

9    Q    You would agree that no documents related to the RIMS

10   system are identified on the cover pages of any of the three

11   patents-in-suit as a reference cited, wouldn't you?

12            MR. ROBERTSON:  Objection, Your Honor.  I mean, I

13   don't even know the relevancy of that question, but I don't

14   know how he could possibly have that in his memory.

15            MR. McDONALD:  We can refer to the patents if you

16   need to, Mr. Kinross, if you don't know the answer.

17            MR. ROBERTSON:  We have a stipulation, Your Honor,

18   that the '989 is incorporated by reference in the patents.

19            MR. McDONALD:  That's not what we're taking about.

20   That stipulation has nothing do with my question.

21            THE COURT:  You asked what was disclosed.

22            MR. McDONALD:  Disclosed as a reference cited on the

23   cover of these patents as part of the information disclosure

24   process.

25            THE COURT:  Whether it was disclosed on the cover or

1    disclosed in the text doesn't make any difference.

2            MR. McDONALD:  Well, it makes a difference if that

3    one is prior art and the other one isn't.

4            THE COURT:  Depends.

5            MR. McDONALD:  Well, the information in the

6    disclosure statement is where --

7            THE COURT:  I'm not going to get into that.  Reframe

8    your question.

9    Q    Would you agree with me that there are --

10           THE COURT:  You've got a showing -- do you want me to

11   show you how to do it?  You ask him, do you know what the prior

12   art references are on the patent, and if he says, yes, then you

13   say, okay, did they include that.  If he says no, then you show

14   him the patent.

15           That's how you do it.  He's told you three times he

16   does not remember everything in these patents or the other

17   ones, so just ask him the right way, and we will get going.

18   I'm going to put an end to it if we don't get going.

19           MR. McDONALD:  I'm about wrapped up anyway, Your

20   Honor, but I'll --

21           THE COURT:  All right.  Do it the right way.

22   Q    Mr. Kinross, could we go ahead and just put Plaintiff's

23   Exhibit 1, the '683 patent, up on the screen so you'll know

24   what we're talking about.

25           Go to the first page there, the part references cited --

1    there's a section, do you see in the lower left of what's blown

2    up on the screen, Mr. Kinross, the words references cited?

3    A    Yes, I see that.

4    Q    And over on the right side -- let's leave that up the way

5    you had it, Bill -- there's a list of patents.  That list of

6    patents doesn't include the RIMS patent.  That's number

7    5712989; correct?

8                THE COURT:  You mean under references cited?

9                MR. McDONALD:  Yeah, under the U.S. patents

10   documents, references cited.

11   Q    It does not include 5719 -- excuse me, 5712989; correct?

12               MR. ROBERTSON:  For the record, Your Honor, let me

13   pose a relevancy objection.

14               THE COURT:  I think it's fairly obvious from reading

15   the patents whether it's in there or not, but let's go.  Let's

16   get to it.

17   A    I don't see it under references cited, no.

18   Q    Then there's a few entries under the title other

19   publications on this page; right, Mr. Kinross?  Right side

20   there?

21   A    Yes.

22   Q    And there's no reference to any RIMS publications there;

23   correct?

24   A    That's correct.

25   Q    If we go to the next page of the document, please, the

1    patent, the other publications listed there, give you a chance

2    to look at that.  There are some Fisher Scientific product

3    publications listed on this page of the patent under the

4    heading other publications; right?  Systems such as the

5    Lightning system or StockPro?

6    A    Fisher StockPro, systems by Fisher inventory management

7    system.

8    Q    Do you see any Fisher references in the other publications

9    page here to a publication regarding the Fisher RIMS system?

10            MR. ROBERTSON:  Your Honor, I object.  This is fairly

11   cumulative.  We went through this exercise with Mr. Momyer.  I

12   don't know why we need to do it again.

13            THE COURT:  I am assuming that you have some question

14   that followed up there.  If that was the only purpose, was to

15   establish what was there, then that's the end of it.  Do you

16   have some following question?

17            MR. McDONALD:  I don't have any other questions.

18            THE COURT:  Thank you.  Can he be excused

19   permanently?

20            MR. ROBERTSON:  May I cross-examine him, Your Honor,

21   or redirect briefly?

22            THE COURT:  Can you what?

23            MR. ROBERTSON:  Can I cross-examine the witness?

24            THE COURT:  I thought you had an opportunity to

25   cross-examine.

1          MR. ROBERTSON:  Not on the questions Mr. McDonald

2    just asked.

3          THE COURT:  In other words, you want to cross on

4    redirect?

5          MR. ROBERTSON:  I want to cross on the questions Mr.

6    McDonald just asked.  I haven't had an opportunity to cross the

7    witness.

8          THE COURT:  All right.  I guess that's fair.  I've

9    been here too long.  I think it was just so much that I heard

10   before, that I thought you had actually cross-examined him and

11   redirected him and I lost touch with it.  You get to go the

12   whole nine yards of cross-examination.

13         MR. ROBERTSON:  Perhaps Your Honor is suggesting

14   cross-examination is not necessary, but let me ask a few

15   questions.

16         THE COURT:  I didn't intend to suggest anything else.

17   I had just gotten confused.

18

19                    CROSS-EXAMINATION

20   BY MR. ROBERTSON:

21   Q   Let me direct you to this timeline you have which is in

22   front of you, Defendant's Exhibit 402.

23         THE COURT:  Do you want it put up for the jury?

24         MR. ROBERTSON:  Sure, if you'd like.  I don't have

25   it, Your Honor.

1           THE COURT:  Or do you need it?

2           MR. ROBERTSON:  I don't think I do.  I think I can

3      move through it fairly quickly.

4      Q    You are looking at, Mr. Momyer, under this -- first, let

5      me ask you this.

6           THE COURT:  That's Mr. Kinross over there.  You got

7      confused, and I want the record to reflect I'm not the only one

8      that's confused.

9           MR. ROBERTSON:  Thank you.

10     Q    Mr. Kinross, you were not one of the named inventors on

11     this '989 RIMS patent?

12     A    That's correct.

13     Q    Is that why you were deferring to Mr. Momyer and Mr.

14     Johnson with respect to the details of the RIMS system?

15          MR. McDONALD:  Objection.  I'm not sure where Mr.

16     Johnson's name came up here, Your Honor.  Outside the scope.

17          THE COURT:  Overruled.

18     Q    Are Mr. Johnson and Mr. Momyer the named inventors on the

19     RIMS patent?

20     A    Yes.

21     Q    Would it be fair to say they are more knowledge about the

22     RIMS functionality than yourself since you are not a named

23     defendant?

24     A    Yes.

25     Q    Now, when you sat down and you tried to put this timeline

1    together, did I understand you to say you didn't have any

2    documents to review in preparing this?

3    A     That's correct.

4    Q     You were doing it completely from your own memory; is that

5    right?

6    A     That's right.

7    Q     Now, in this, though, this first section of 1989 RIMS

8    development, you use or represent anywhere in there as the

9    features that the RIMS development include catalogs?

10   A     No.

11   Q     Do you indicate anywhere in there RIMS development

12   included multiple catalogs?

13   A     No.

14   Q     Do you indicate anywhere in there that you have the

15   ability to view catalog data in electronic format?

16   A     No.

17   Q     I understood you to say in response to one of the

18   questions that this RIMS development was, quote, just Fisher

19   system.  What did you mean by that when you used that term?

20   A     They only could order something that was provided by

21   Fisher.

22   Q     Now, you mentioned non-catalog items; do you recall that?

23   A     Yes.

24   Q     Why don't you tell the jury what non-catalog items are as

25   opposed to Fisher catalog items in that context, please, sir?

1   A     Non-catalog items were items that Fisher would purchase

2   for a customer that were not in our catalog.  They were

3   basically items that we typically didn't sell, but as a favor

4   to the customer, because they were such a large customer, our

5   purchasing requirement would do purchasing over and above just

6   selling what Fisher would sell in their catalog.

7   Q     So if the customer said, we want some other item, would it

8   go through the Fisher system, or would it be outside of the

9   Fisher system where some CSR would have to place a separate

10  paper order, for example?

11  A     It would first go through the system, Fisher system so

12  that we could bill the customer for it, and then we would have

13  to contact the other vendor, purchase it from them, get it in,

14  and ship it to the customer.

15  Q     In other words, you have to do it the old-fashioned way;

16  is that right?

17  A     Right.

18  Q     Not part of an electronic sourcing system that can

19  actually contact multiple vendors, provide catalog data, build

20  requisitions, and then generate multiple purchase orders; is

21  that fair to say?

22  A     That's fair.

23  Q     You were asked some questions about those two brochures, I

24  think one was the Defendant's Exhibit 107 which was that

25  brochure, the Technical Viewer/2 brochure; do you recall that?

1   A    Yeah, general information as well as the marketing

2   literature.

3   Q    And you did receive those documents at some point, didn't

4   you?

5   A    Yes, I did.

6   Q    And you turned them over to your patent attorney?

7   A    Yes.

8   Q    Let me show you the cover page of the '683 patent, if I

9   could, for example.  And you recall that the product brochure

10  is not a dated document; is that right?

11  A    Correct.

12  Q    Let me highlight for you here under other publications, do

13  you see the IBM Technical Viewer/2 general manual information

14  1991 and IBM Technical Viewer/2 product information brochure,

15  IBM Corporation, undated; do you see that?

16  A    Yes.

17              MR. McDONALD:  Objection, Your Honor.  I think we've

18  been through these before as well.

19              THE COURT:  Overruled.

20  A    Yes.

21  Q    You are the individual who turned these documents over to

22  your patent attorney; correct?

23  A    Correct.

24  Q    And after they were turned over and submitted to the

25  Patent Office with respect to all three patents, did the Patent

 1   Office grant your patents?

 2   A     Yes.

 3             MR. ROBERTSON:  Thank you.  Nothing further.

 4             THE COURT:  Anything?

 5             MR. McDONALD:  I will resist the temptation, Your

 6   Honor.  I have no further questions.

 7             THE COURT:  All right.  Can he be excused

 8   permanently?  Does anyone need him?

 9             MR. McDONALD:  Yes.

10             MR. ROBERTSON:  He can be excused.

11             THE COURT:  All right, Mr. Kinross, thank you for

12   being with us and giving us your evidence.  You are excused to

13   go about your business.  Next witness.

14             MR. SCHULTZ:  Lawson calls Charles Gounaris.

15             THE COURT:  Do you have somebody going to get him?

16             MR. SCHULTZ:  The timing was all wrong, Your Honor.

17   He just went to the restroom real quick.

18

19                       **CHARLES GOUNARIS,**

20   a witness, called by the defendant, having been first duly

21   sworn, testified as follows:

22                       DIRECT EXAMINATION

23   BY MR. SCHULTZ:

24   Q     Good afternoon.

25   A     Good afternoon.

1    Q    Would you please introduce yourself to the jury and spell

2    your last name, please.

3    A    Sure.  Charles Gounaris, G-o-u-n-a-r-i-s.

4    Q    Mr. Gounaris, where do you live?

5    A    Pittsburgh, Pennsylvania.

6    Q    Let's talk about your education real quickly.  What did

7    you do after high school?

8    A    Attended Pennsylvania State University.

9    Q    What was your major?

10   A    I majored in management, minored in computer science.

11   Q    When did you graduate?

12   A    1978.

13   Q    What was your degree?

14   A    Bachelor of science.

15   Q    After graduation from college, what did you do?

16   A    Began my career with Electronic Data Systems.

17   Q    What was your position at Electronic Data Systems?

18   A    I had increasing roles of leadership there but started out

19   in a systems engineering role.

20   Q    What is a systems engineering role?

21   A    Primarily was involved with the design, development, and

22   implementation of complex software systems for the federal

23   government at that time.

24   Q    What did you do after Electronic Data Systems?

25   A    I was -- I went to work for General Public Utilities,

1    Pennsylvania Electric Company in particular.

2    Q     What was your position at General Public Utilities?

3    A     I was assistant director of systems.

4    Q     What did you do when you were in systems?

5    A     I was responsible for the application of information

6    technology and operational excellence capacity for the white

7    collar workforce, engineers and accountants, et cetera.

8    Q     Were you working with computer systems?

9    A     Yes, using systems to be able to improve the way work got

10   done in the utility environment.

11   Q     What did you do after General Public Utilities?

12   A     I began work with IBM.

13   Q     What positions did you hold at IBM?

14   A     A variety of positions, but I was recruited basically to

15   work in the development of the consulting and systems business

16   for IBM, and titles changed regularly as we got started there

17   but basically involved in an engagement manager, eventually

18   became a principal and worked in the distribution industry,

19   wholesale and in the industrial sector.

20   Q     Did you work with the integration of computer systems?

21   A     Yes.  We designed, developed, and implemented solutions

22   for clients.

23   Q     When did you begin working at IBM?

24   A     I think it was January 2nd, 1990.

25   Q     How long were you at IBM?

1    A    Just over ten years.

2    Q    Mr. Gounaris, what is your current occupation?

3    A    I have -- I manage my own business, and I am a managing

4    partner of a second business called CGroupAdvisors, all one

5    word.

6    Q    Mr. Gounaris, in your current occupation, do you work with

7    computer systems?

8    A    Yes.

9    Q    In all, how many years have you worked with the

10   integration of computer systems?

11   A    Most of my career I've had major involvement with computer

12   systems.  I'd say well over 30 years.

13   Q    Did you have the opportunity -- let's go back to IBM.

14   A    All right.

15   Q    Did you have the opportunity to work with Fisher

16   Scientific while you worked at IBM?

17   A    I did.

18   Q    What project did you work on with Fisher Scientific?

19   A    One of the first ones was the electronic sourcing program.

20   Q    As your -- what was your role with the electronic sourcing

21   project?

22   A    As I began, I was the engagement manager, and that

23   involved into the role of principal.

24   Q    What is the engagement manager?

25   A    I was responsible for understanding the needs at Fisher,

1   organizing an approach to be able to respond to those needs

2   contractually, and then overseeing the delivery of the work and

3   the implementation of the work.

4   Q    When did Fisher Scientific first come to IBM?

5   A    I would say within the first half of 1993.

6   Q    Was that in Pittsburgh?

7   A    Yes.

8   Q    Is your understanding that Fisher Scientific was also in

9   Pittsburgh?

10  A    They were.  Downtown Pittsburgh at that time.

11  Q    You said you changed roles throughout the process with

12  Fisher Scientific.  What was your second role?

13  A    I moved from being an engagement manager into being a

14  principal.

15            THE COURT:  What does that mean?

16            THE WITNESS:  Principal is a title that IBM used

17  primarily to basically say you had a different level of

18  accountability and responsibilities for the development of the

19  work and the delivery of the work in making sure it was done

20  according to the contract.

21  Q    Is another words, was that a services leader?

22  A    It was a leadership role, yes.

23  Q    Did you have any meetings as a services leader with IBM

24  with Fisher employees?

25  A    Yes.

Gounaris - Direct                                      2226

1   Q    When did you first meet with Fisher employees?

2   A    My estimate would be in the early -- in the early part of

3   1993, initial meetings with Frank Melly who was the chief

4   information officer at that time.

5   Q    Did you have an opportunity to meet with other Fisher

6   Scientific employees?

7   A    Yes.  Initially it was with Frank.  There was -- Bob Gryzb

8   was the IBM account manager at the time who was involved in

9   those meetings, and there was a gentleman by the name of Mo

10  Campsey who was involved in the some of the earlier meetings,

11  and then as this project unfolded, Bob Kinross, Doug Momyer,

12  Jim Johnson were involved as the project progressed, and there

13  were others as well.  There were people from the business side

14  of things, but those were the keep people.

15  Q    What was the purpose of the early meetings in early 1993?

16  A    The very early meetings were really to understand the

17  concept of what Frank and Fisher was trying to do with the

18  concept of moving from a hard copy paper catalog system to an

19  electronic catalog and gaining some advantage through the use

20  of information technology that way with their customer set.

21  Q    Were you familiar with the Fisher RIMS system?

22  A    I am familiar with it.

23  Q    How are you familiar with that system?

24  A    Well, as the project unfolded, it became clear that the

25  electronic catalog front end was going to be -- had to

1    integrate with RIMS which was the requisition inventory

2    management system, their mainframe based solution they already

3    had before we started the work.

4    Q    Did IBM come up with an alternative to do the catalog

5    system you just mentioned?

6    A    Yes.  Yes.  I'm not exactly sure how to answer that, but I

7    would say that we developed an approach that involved starting

8    out with finding the requirements, namely the way that the

9    information had to flow, the business processes, the data, and

10   the technical architecture that would be needed for this

11   solution working with the Fisher team, and then we built a

12   small demonstration system to show the concept to several

13   business executives and Frank early on, and then that led to

14   following work.

15   Q    Before we get into the demonstration system, was there a

16   software solution that IBM had that met the needs?

17   A    We looked at several as we were working through the

18   requirements part of the project, and, yes, we found a piece of

19   software from IBM called Technical Viewer/2 that we thought was

20   a pretty good fit for what we were trying to do.

21            THE COURT:  Excuse me.  I'm still unclear on what you

22   were doing.  Were you doing the technical, actual work on this,

23   or were you serving as the manager?

24            THE WITNESS:  I was the manager that oversaw the

25   work.

1           THE COURT:  So you didn't do any of the work, you

2    just oversaw the work.

3           THE WITNESS:  I participated in a number of the

4    requirements definition sessions, but my role as a principal

5    was one of making sure that IBM's project team did its job and

6    delivered according to the contract, and then also I had a key

7    role involved in working with Frank.  So as we looked at the

8    whole project, if there were any issues that were happening on

9    the Fisher side, he and I collaborated around that so we

10   addressed it, and the whole goal was to make sure everything

11   stayed on track, on schedule, and that we delivered

12   appropriately.

13   Q    You mentioned Frank.  Was that Frank Melly?

14   A    Yes.

15   Q    And when were you in your managerial role, did you have

16   the opportunity to understand the technical requirements of the

17   electronic sourcing project?

18   A    I understood the requirements because I sat in on most of

19   the sessions where the requirements were defined.

20   Q    You were talking about the TV/2 system.  Do you know the

21   functionality of the TV/2 system -- well, let me go back.  When

22   did IBM first introduce the TV/2 system to Fisher Scientific?

23   A    Well, as we were working through the requirements, namely

24   what this system needed to do and how it needed to fit in at

25   Fisher, we --

1          THE COURT:  Mr. Gounaris, I think things would go

2     better if you kind of listen to the question and then answer

3     the question, because the question was when did you first

4     introduce it, and then if he wants to know any more, he'll ask

5     more and we'll move right on through it and get to the things

6     that he wants to get into.  When did you introduce the TV/2

7     system to Fisher?

8          THE WITNESS:  I would say it was in the first half of

9     1993 when we first had exposed Frank to the concept of

10    Technical Viewer/2.

11    Q    And the first half of 1993, did you provide any

12    documentation regarding the TV/2 system to Fisher Scientific?

13    A    Yes.

14    Q    Do you recall what documentation you provided to Fisher

15    Scientific in 1993, in the early half?

16    A    There was a document known as the general information

17    manual that we provided to Frank early on that had highlights

18    of features and functions of Technical Viewer/2, and I think it

19    was also shared with the team.

20    Q    Did you provide any other documentation to Fisher

21    Scientific?

22    A    Well, I'm sure that there were, but nothing else is coming

23    to mind right now.

24    Q    I'd like you to open -- you have an exhibit binder there

25    in front you.  Open up to Exhibit 107, please.

1   A    Okay.

2   Q    Do you recognize the document that is identified as 107?

3   A    Yes.

4   Q    What is it?

5   A    It is a version -- it's the general information manual on

6   Technical Viewer/2.

7   Q    Do you know whether you provided the brochure to Fisher

8   Scientific in the early part of 1993?

9   A    Actually, I'm sorry --

10              MR. ROBERTSON:  Objection --

11              THE COURT:  Just a minute, please, sir.

12              MR. ROBERTSON:  He just identified it as general

13   information.

14              THE WITNESS:  I just was going to correct myself --

15              THE COURT:  Just a minute, sir.

16              MR. ROBERTSON:  That's not what Exhibit 107 is.

17              THE COURT:  It is not.  Sustained.  This is not the

18   general information; right?

19              THE WITNESS:  Correct, it's not.  I just realized --

20   when I looked at the cover, it was a marketing brochure on

21   Technical Viewer/2.

22   Q    For the marketing brochure that's identified in

23   Exhibit 107, did you provide the marketing brochure to Fisher

24   Scientific in 1993?

25   A    IBM did, yes.

1    Q    That wasn't --

2          THE COURT:  The question was did you?

3          THE WITNESS:  Did I personally?

4          THE COURT:  Yes.

5          THE WITNESS:  I can't say that I did.

6    Q    Do you know personally whether Fisher Scientific received

7    Exhibit 107?

8          MR. ROBERTSON:  Objection, no foundation.  How would

9    he possibly know that?

10         THE COURT:  There would be one way.

11         MR. SCHULTZ:  I'm asking him whether he knows.

12         THE COURT:  That would be one way, he would be told,

13   or another way is that he saw somebody else do it.  The

14   question --

15         MR. ROBERTSON:  Objection, hearsay, if he was told.

16         THE COURT:  We'll see.  Take it a little bit at a

17   time.

18   Q    Mr. Gounaris, do you know whether Fisher Scientific

19   received the IBM brochure that's identified in --

20   A    Yes, I do.

21         MR. ROBERTSON:  I object as ambiguous, because there

22   are two different ways --

23         THE COURT:  He's not going anywhere yet.  The answer

24   is yes.  Next question.

25   Q    How do you know that?

1   A    I know that it was passed to Frank as a part of just

2   general information on the product.

3   Q    So you were physically present in 1993 when the Technical

4   Viewer brochure was passed from IBM to Fisher Scientific?

5   A    Yes.

6   Q    You also mentioned a general information manual.  I'd like

7   you to turn to Exhibit 230.  Would you do that, please.  Are

8   you familiar with the document that is identified as DX-230?

9   A    Yes.

10  Q    What is it?

11  A    This is the general information manual on Technical

12  Viewer/2.

13  Q    Do you know whether IBM provided the general information

14  manual that is identified as DX-230 to Fisher Scientific in

15  1993?

16  A    Yes.

17  Q    And did IBM provide the DX --

18          THE COURT:  No.  How do you know.

19  Q    How do you know, Mr. Gounaris?

20  A    I believe I actually -- I know I was there.  I might have

21  been the guy who handed it to Frank, but I was there when it

22  was handed to Frank and the team eventually as to background

23  material on TV/2.

24  Q    So you physically saw someone from IBM, whether it was you

25  or someone else, hand the general information manual to Fisher

1    Scientific in 1993?

2              MR. ROBERTSON:  Asked and answered.

3              THE COURT:  Go ahead.  Overruled.

4    A    Yes.

5    Q    Mr. Gounaris, there are some Bates numbers that are on the

6    bottom that starts with the number G.  I'd like to you to turn

7    to what has been identified as ending in 23 and 24, and that's

8    pages 12 and 13 of the document.

9    A    G23 and 24?

10   Q    We'll start with what ends with G23.  Do you see that?

11   A    Yes.

12   Q    Are you familiar with the features of the IBM Technical

13   Viewer as they are depicted on page G23 of Exhibit DX-230?

14   A    Yes.

15   Q    Did IBM do any testing of the TV/2 system prior to

16   disclosing that to Fisher Scientific?

17             MR. ROBERTSON:  Objection, vague as to time and

18   ambiguous.

19             THE COURT:  Overruled.

20   Q    Did IBM do any validation of the TV/2 system in 1993 prior

21   to delivering this general information manual to Fisher

22   Scientific?

23             MR. ROBERTSON:  I'm going to object, Your Honor.

24   That lacks foundation.  There's been no testimony this

25   gentleman was involved in any testing and validation.

1          THE COURT:  It doesn't show that.  The record doesn't

2   show that.  So that would be a sustainable objection, wouldn't

3   it?

4   Q    Mr. Gounaris, were you involved with any testing of the

5   TV/2 system?

6   A    I wasn't involved with testing.  I was involved with the

7   team who reviewed these claims around the features and

8   functionality, and our team went back and checked it out and --

9          THE COURT:  Well, now, that's enough, please.

10  Remember what I told you.  Answer just the question.  Were you

11  involved in testing.  The answer was no.

12  Q    Were you in charge of instructing the IBM team to test the

13  TV/2 system?

14  A    Our project manager did.  I kind of saw that it happened.

15  Q    And you oversaw that project?

16         MR. ROBERTSON:  Objection.  Again, there's been no

17  foundation laid.  I kind of saw is what I thought the answer

18  was.

19         THE COURT:  Look.  It's sort of important that we

20  kind of listen to just the question and answer the question.

21  Do that, if you will.

22  Q    Mr. Gounaris, when I ask a question, can you just wait for

23  me to ask the full question before you start to respond?  It

24  also gives Mr. Robertson a chance to object if he wants to.

25  A    All right.

1    Q    I want to talk to you about the validation process that

2    IBM went through with respect to the TV/2.  Did you have a role

3    in doing that?

4              THE COURT:  In doing the validation.  Did you have a

5    role in doing that?  That means doing the validation; yes or

6    no?

7              THE WITNESS:  No, I don't think I had a role.

8    Q    Did you oversee the validation process?

9    A    Yes.

10   Q    As part of your oversight of the validation process, did

11   you come to an understanding of what the validation process

12   was?

13             MR. ROBERTSON:  Objection, Your Honor lacks

14   foundation.

15             THE COURT:  I think he's establishing a foundation.

16   Overruled.

17             THE WITNESS:  So answer it?

18             THE COURT:  Yes.

19             THE WITNESS:  Could you repeat it, please?

20   Q    Yes.  As your role in overseeing the validation process,

21   did you have an understanding of what happened in the

22   validation process?

23   A    Yes.

24   Q    What was that that you -- what did you oversee?

25   A    What I had to do was just make sure that our understanding

1    that this particular product would meet the requirements that

2    were needed to develop this solution were correct and that

3    was --

4              THE COURT:  Excuse me, but the question wasn't that.

5    The question was, what did you do?  Did you go to the lab and

6    watch what they did?  You have to listen to what he's asking

7    you and then just answer what he asks you, if you would, sir.

8    What did you do to oversee -- you said you oversaw the

9    validation process.  What did you do to do that?

10             THE WITNESS:  My view was that I spoke with our

11   project manager who managed the day-to-day activities, and he

12   validated the fact --

13             THE COURT:  All right, that's enough.  So you spoke

14   with the project manager.  Now you can ask another question.

15   Q    Mr. Gounaris, was it a business routine at IBM that you

16   would speak with business managers regarding validation of

17   software packages?

18             MR. ROBERTSON:  Objection, relevancy.

19             MR. SCHULTZ:  I'm laying a foundation, Your Honor --

20             THE COURT:  What foundation is that; to get in

21   hearsay?

22             MR. McDONALD:  Yes.

23             THE COURT:  Does it come in as a verbal business

24   record?

25             MR. SCHULTZ:  Yes, Your Honor.

```
 1              THE COURT:  I didn't know there was such a thing.
 2              MR. SCHULTZ:  Your Honor, I'm laying a foundation as
 3    to what --
 4              THE COURT:  For me to apply a new rule of evidence?
 5              MR. SCHULTZ:  No, Your Honor.
 6              THE COURT:  Whatever he knew, he found out from the
 7    project manager.  That's hearsay, so let's go.
 8    Q    Why there any documents that you received regarding the
 9    validation of the TV/2 system?
10    A    Yes.
11    Q    What documents did you receive?
12    A    It was internal communications from the project manager
13    that went out to the Fisher team and to our team that basically
14    said we've done this and this and this on a regular basis.
15              THE COURT:  All right, now, Mr. Gounaris, he said
16    what did you receive.  He didn't tell you to say what was in
17    there.  Mr. Schultz, you need to get hold of this or it's over;
18    all right?
19              Obviously, Mr. Gounaris, you have to listen because
20    they have apparently objections to some part of it, and they
21    have a right to voice those objections.  And if you go on and
22    talk and add chat to the topic that he asks you about, then
23    they are deprived of that right, and I'm trying to let them
24    both have whatever rights they've got on the evidence front.
25              THE WITNESS:  Sorry.
```

1          THE COURT:  Now, right now we've got -- he's got some

2   documents.

3   Q    Mr. Gounaris --

4          THE COURT:  What documents did you get.

5          MR. SCHULTZ:  What documents did you get --

6          THE COURT:  And he described those but not with any

7   specificity.

8   A    Regular status reports on the project from the IBM project

9   manager to the Fisher project manager.

10          THE COURT:  Copy of the status reports.

11          THE WITNESS:  Yes.

12   Q    Were those documents regularly maintained in the course of

13   IBM's business?

14   A    Yes.

15          MR. ROBERTSON:  Objection, Your Honor.  What

16   documents?  Do we have an exhibit?

17          MR. SCHULTZ:  We do not have an exhibit as to that,

18   no.

19          THE COURT:  You are laying the foundation for a

20   verbal recitation.  What you are doing is trying to get hearsay

21   within hearsay in; is that right?

22          MR. SCHULTZ:  Yes, Your Honor.

23          THE COURT:  Okay.  How are you going to get that in?

24          MR. SCHULTZ:  Your Honor, based on the fact that he

25   has these documents, that he has an understanding of what

1    actually occurred with the TV/2 system.

2              MR. ROBERTSON:  They would be offered for the truth

3    of the matter asserted, and they don't even exist.  How do I

4    cross-examine on a document that doesn't exist even if it were

5    hearsay within hearsay and there was some exception which

6    there's not?

7              THE COURT:  Is that something you want me to look at?

8              MR. SCHULTZ:  Your Honor, with respect to the hearsay

9    issue here, Mr. Gounaris is laying the foundation, or has laid

10   the foundation with respect to the business records that he

11   relied on, and based on that --

12             THE COURT:  You realize what you do with the business

13   records exception, don't you?  You have the business records,

14   and then you tender them, because it is the substance of the

15   business records which speak, not his recitation of what was in

16   the business records.

17             MR. SCHULTZ:  Yes, Your Honor.

18             THE COURT:  And you can't get the business records,

19   the substance of what was in those records through verbal

20   testimony unless you qualify to get them in under the rules of

21   evidence.  So tell me how you do that, and then I will overrule

22   the objection.  Otherwise, I'm going to sustain the objection.

23             MR. SCHULTZ:  Your Honor, I'm going to move on and

24   get it a different way.

25             THE COURT:  All right.  Objection sustained.

1    Q     Mr. Gounaris, we're talking 1993 now.  Did you have an

2    opportunity to see the TV/2 system actually operate?

3    A     Yes.

4    Q     When in 1993 did you see the TV/2 system in operation?

5    A     About the middle -- toward the latter part of the

6    requirements definition phase.  We kind of put together a

7    little prototype for Frank and some of the business executives,

8    and it was demonstrated.  Elements of it were demonstrated

9    then.

10              THE COURT:  But the question was when.

11              THE WITNESS:  You mentioned the date.  It was in

12   1993, toward the summer, I guess I would say.  Somewhere in

13   that time frame.

14              THE COURT:  Summer 1993.

15              THE WITNESS:  Yes.

16   Q     So in the summer of 1993, what did you actually see in the

17   TV/2 system operation?

18   A     We saw --

19   Q     Mr. Gounaris, what did you see?

20   A     What did I see?  I saw a demonstration that was put

21   together for the business -- Frank and for the business teams.

22   Q     Did that demonstration show the functionality of the TV/2

23   system as of the summer of 1993 --

24              THE COURT:  Why don't you let him testify?

25              MR. ROBERTSON:  I want to object, Your Honor, because

1    it also goes to one of your prior rulings in this case.  If we

2    might approach.

3              THE COURT:  All right.  Given the number of prior

4    rulings, I have to confess, I don't have a mind that can

5    searched by an index feature or otherwise.

6

7              (Discussion at sidebar as follows:)

8

9              MR. ROBERTSON:  I'm not certain, Your Honor, but out

10   of an abundance of caution, we had this issue concerning the

11   videotape that the Court has excluded.

12             MR. SCHULTZ:  We're not going there.

13             MR. ROBERTSON:  Well, then, if it has to do with the

14   demonstration that is this Volvo demonstration --

15             MR. SCHULTZ:  We're not --

16             THE COURT:  Wait a minute.  One at a time.  She's

17   good, but she's not that good.

18             MR. ROBERTSON:  It has to do with this demonstration

19   that supposedly existed involving the Volvo demonstration that

20   was produced by the United Kingdom, there been no foundation

21   laid that this witness has any knowledge about that or

22   participated in it.  So if there's some other kind of

23   demonstration, I'll withdraw the objection and wait to see what

24   it is.

25             THE COURT:  Is it the Volvo demonstration?

1          MR. SCHULTZ:  It's not.

2          THE COURT:  What is it?

3          MR. SCHULTZ:  It's the demonstration system that IBM

4    put together to show the business executives at Fisher

5    Scientific the operation of the system.

6          THE COURT:  Is this what Ms. Eng testified to?

7          MR. SCHULTZ:  No, she testified about the pilot

8    program.  This was before that.

9          MR. ROBERTSON:  The pilot program was the first part

10   of it and then an actual demonstration --

11         THE COURT:  There was a pilot and then a demo.

12         MR. ROBERTSON:  Then the comprehensive.  Your Honor

13   is exactly right.

14         THE COURT:  That's what she said.  So which is this?

15         MR. SCHULTZ:  This is a demonstration that actually

16   was sent to the business executives, and Mr. Gounaris was the

17   person who was actually there with the business executives.

18   After the demonstration with Frank Melly, the CIO of Fisher

19   Scientific, at that point, when they get -- Fisher Scientific

20   gives the go-ahead to do the pilot program --

21         THE COURT:  So this preceded the pilot program.

22         MR. SCHULTZ:  That's exactly correct.

23         MR. ROBERTSON:  I think Ms. Eng went through that

24   entire Gantt chart, all 81 tasks.  I only highlighted 15 of

25   them, but she certainly addressed the pilot program, the

1    demonstration, and comprehensive.

2              THE COURT:  Right, but he's not going through those.

3    He's going through what preceded those, as I understand it.

4              MR. SCHULTZ:  That's exactly correct, Your Honor.

5              THE COURT:  Objection is overruled.

6

7              (End of sidebar discussion.)

8

9              THE COURT:  All right.  Go ahead.

10   Q    Mr. Gounaris, you were talking about a demonstration

11   system.  What was the demonstration system that you saw?

12   A    It was a type of mockup --

13             MR. ROBERTSON:  Can we have a time frame, Your Honor?

14             THE COURT:  Summer 1993; right?

15             THE WITNESS:  Yes.  It was a mockup.  It was the way

16   to be able to show the business executives what this might look

17   like as it was being developed.  It was just to take something

18   that conceptual and give it a physical look and feel.

19             THE COURT:  What is a mockup?

20             THE WITNESS:  Mockup is kind of a -- it was some

21   samples of different screens and how they would interact with

22   one another so you get a sense of how a user might sit down in

23   front of the electronic catalog and use it, but it wasn't a

24   fully developed system.  It was just very limited function.

25             THE COURT:  Mr. Schultz, remember what you are

1   talking about.  You ask him whether he saw the TV/2 operate.

2   He said, yeah.  When?  Summer of '93.  What was it?  This demo,

3   and he just said in response to that what?  It wasn't fully

4   developed.  So he didn't see the TV/2 operate.  So now I

5   want -- you know, that's why I ask you all to be careful about

6   what you are doing.  Okay.

7   Q    When you say it wasn't fully developed, were you talking

8   about the TV/2 plus RIMS system?

9            MR. ROBERTSON:  Objection, leading.

10  A    No, I was --

11           THE COURT:  What were you talking about, is the

12  proper question, that wasn't fully developed.

13  A    I was talking about the entire system wasn't fully

14  developed.  It was just a small subset of the electronic

15  catalog system just to give it a mockup.

16  Q    I want you to focus just on TV/2.  Was the TV/2 system in

17  operation when you saw the demonstration in the summer of 1993?

18           MR. ROBERTSON:  Let me object as vague and ambiguous

19  as the TV/2 system.  This is part of a project here, and went

20  through several --

21           THE COURT:  I'm going to sustain it.  You need more

22  specificity of his testimony.  Otherwise, I wouldn't do that.

23  We've got something that we don't know what it is, and we need

24  to get it defined properly.  So either do it or move on.

25  Q    Mr. Gounaris, if we could bring up Exhibit 230 again,

1    please, and go to page 12 of that document.

2    A     Page 12 of this same document?

3              THE COURT:  Why don't we try it this way:  I can

4    strike it if I need to and tell him to disregard it.

5              What did you see in operation?  He's described a

6    mockup and a mockup with some screens.  That's what he said so

7    far.  What did you see in the summer of '92 that was this

8    demonstration other than those two screens?  Anything else?

9              THE WITNESS:  We demonstrated for Frank and for a few

10   executives from Fisher what the system would look like, so

11   there were pictures, there were simulations of what was in the

12   catalogs, so it gave you the look and feel of the catalog.

13             THE COURT:  So you saw simulations of something that

14   was in a catalog, saw pictures, and you saw mockups on the

15   screen.

16             THE WITNESS:  Text, pictures.  It looked similar to

17   what the physical catalog looked like only on an electronic

18   form, so you would get a sense of what an electronic version of

19   a paper catalog would look like and how somebody might go

20   through an order process.  It was very simple and limited in

21   terms of its capability but gave them a feel for here's what

22   this system would be like.

23             THE COURT:  Now, Mr. Schultz, that doesn't sound to

24   me like what he saw was the TV/2 in operation.  What he saw was

25   a mockup of the TV/2 in operation using some fairly basic

1    tools.  Isn't that where we are, and if that's right, then Mr.

2    Robertson's objection I should have sustained.

3              MR. SCHULTZ:  Mr. Gounaris --

4              THE COURT:  That's where we are.

5              MR. ROBERTSON:  I would move to strike the question

6    and answer, Your Honor.

7              THE COURT:  I think that's right.  We've tried and

8    tried and tried, and it isn't there, so I sustain his

9    objection.  Just disregard the testimony about this preliminary

10   demonstration, ladies and gentlemen.  It's not pertinent to the

11   case.

12   Q    Mr. Gounaris, if you'd take a look at Exhibit 230.  I'd

13   like you to refer to the Bates number at the bottom, G0000023.

14   A    Okay.

15   Q    Did the TV/2 system, as of 1993, have the functionality

16   described on this page?

17             MR. ROBERTSON:  I object, Your Honor.  Ms. Eng

18   testified at length about this page, so this is cumulative.

19             MR. McDONALD:  I'm talking about 1993, and Mr.

20   Gounaris is in a specific role with respect to --

21             THE COURT:  What difference does that make if Ms.

22   Eng's testified to it?

23             MR. SCHULTZ:  Because Mr. Gounaris is the person

24   actually providing the information --

25             THE COURT:  The better answer is, Ms. Eng wasn't

1  there at the time.  Is that what you say?

2          MR. SCHULTZ:  Yes.

3          THE COURT:  Why don't you say that, because that

4  makes a difference.

5          MR. SCHULTZ:  Yes, Your Honor.

6          THE COURT:  The fact that two people saw it and are

7  going to testify to it isn't the answer to the question.  You

8  need to establish that she wasn't there at the time.

9  Q    Mr. Gounaris, when you provided this brochure to Fisher

10 Scientific in 1993, was Ms. Eng present?

11 A    No.

12         THE COURT:  Was she working with the company, not

13 whether she was present.  We all know she worked in Manassas.

14 Q    Mr. Gounaris, was she working with the company in 1993?

15 A    Yes.

16 Q    When you provided this information to Fisher Scientific,

17 did you go through the functionalities and features that are

18 listed in this document being DX-230?

19         MR. ROBERTSON:  Objection, relevance, Your Honor.

20         THE COURT:  Overruled.

21 A    We talked about this --

22         THE COURT:  Did you go through it?  Did you go

23 through it yourself before to get ready for the meeting, did

24 you go through it at the meeting, did you review it or read it

25 to them?

1    Q    Mr. Gounaris, you said you had a series of meetings with

2    Fisher Scientific.  During those meetings, did you explain the

3    functionality of the TV/2 system to Fisher Scientific in 1993?

4              MR. ROBERTSON:  Objection, again, TV/2 system, I

5    don't know what we're talking about in 1993.  I just understood

6    we were talking about a mockup that existed in 1993, and the

7    Court has struck the testimony with respect, so vague and

8    ambiguous as to what we're talking about.

9    Q    Mr. Gounaris, was there more than one system of TV/2 in

10   1993?

11   A    I'm not sure -- I'm not sure what you're asking me.

12   Q    Were there different modifications of the TV/2 system

13   prior to 1993?

14   A    No.

15   Q    So we're talking about one system that preexisted 1993;

16   correct?

17   A    We're talking about Technical Viewer as it existed in

18   1993, yes.

19   Q    And that system, that Technical Viewer/2 system that

20   existed in 1993, did you convey the functionality of that

21   system to Fisher Scientific?

22   A    Yes.

23   Q    Did you convey the functionality listed on --

24             THE COURT:  What functionality did you convey.  How

25   did you do it.  Come on.

1    Q    What functionality did you convey?

2    A    The items -- clearly it was the items that are listed here

3    relative to the requirements that Fisher had, because many of

4    them addressed these issues, so we just talked through it, yes.

5    Q    You used your hand motion to go down Defendant's

6    Exhibit 230.  What were you referring to?

7    A    Well, this has a listing of Technical Viewer features at

8    the time, so table of contents was standard, index, search,

9    bookmark, view pages, image handling, print, windows, you know,

10   et cetera.  These were part -- these were the features and

11   functions highlighted in the manual and was available in

12   Technical Viewer/2.

13   Q    Does that list continue on the next page ending with 2350?

14   A    Yes.  There's a series of additional items on that page,

15   links, parts catalogs, et cetera.

16   Q    Mr. Gounaris, have you had to take time away from your job

17   to be here today?

18   A    Yes.

19   Q    What was your compensation rate at IBM?

20   A    350 an hour.

21        MR. ROBERTSON:  Objection.  I'm sorry.  I didn't hear

22   the question.

23        THE COURT:  What was the compensation rate at IBM.

24        MR. ROBERTSON:  What's the relevance of that?

25        THE COURT:  Why is that relevant?

Gounaris - Direct                                                    2250

```
 1              MR. SCHULTZ:  I'll withdraw the question.

 2              THE COURT:  Disregard that answer, ladies and

 3    gentlemen.

 4    Q    Mr. Gounaris, were you compensated for your time preparing

 5    for today?

 6    A    Yes.

 7    Q    At what rate?

 8    A    350 an hour.

 9              MR. SCHULTZ:  Thank you, Mr. Gounaris.

10

11              (Recess taken.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```