1                          (Jury in.)

2

3              THE COURT:  All right, Mr. Robertson.

4              MR. ROBERTSON:  Thank you, Your Honor.  Good

5      afternoon.  This afternoon I'd like to address some of the

6      arguments that were made by Lawson's counsel with respect to

7      some of his non-infringement opinions, and then we'll get to

8      the invalidity positions.

9              It's just important to remember at all times on these

10     arguments on invalidity that it's Lawson that bears the burden

11     of proof to you by clear and convincing evidence that these

12     patents are invalid.

13             First, I'd like to go back to what Mr. McDonald ended

14     with with respect to his argument that no one from Lawson ever

15     testified that there were catalogs in this item master or that

16     they were published by a vendor and said the only person who

17     made that representation to you in this courtroom was Dr.

18     Weaver.

19             Now, I think what you need do so, if that's the case,

20     you need to put aside all the Lawson documents that talk about

21     how you load vendor catalogs, you need to put aside those

22     documents that showed you how they can load entire catalogs,

23     and those were their words in their own documents, that that's

24     what their system had the capability of doing.

25             But right before we broke for lunch, there was some

1    testimony shown of Mr. Christopherson.  You will remember

2    Mr. Christopherson was the large fellow who is the corporate

3    representative who was here for most of trial, although he's

4    not here today.  They put up the question and answer, and the

5    question -- this was Ms. Stoll-DeBell asking Mr.

6    Christopherson -- using the definition the Court just gave for

7    published by a vendor, is the customer's item master database

8    ever published by a vendor?

9              Answer:  If you looked at the entire --

10             And then the Court interposed and said, I think the

11   answer is yes or no to start with, and then if she wants you to

12   explain it, she can, but the jury will understand your opinion

13   better if you preface it by giving them the guidepost from

14   which to make the assessment if there's any further explanation

15   she asks you for.  Yes or no?

16             And the witness answered no, and that's what Mr.

17   McDonald read to you, and that's where he stopped.  But the

18   questioning went on, and he didn't show you what he said after

19   that.

20             The Court:  Do you want to ask him to explain that?

21             Yes.

22             Question:  Please explain your answer.

23             Answer:  Sure.  Looking at the screen that we were

24   just talking about, item number, a vendor could not have

25   published that because they never had access to it.  That's

1    from the customer.  Tracked, that's another one where the

2    vendors would love to have the customers have everything in

3    stock.  That comes at a cost to the customer, and they don't

4    want to do that.  They may have items that are low turnover,

5    they only use maybe once or twice a year.  There's other fields

6    that are in the item master.  We talked about some of them, you

7    know, catalog number, the vendor's part number or its number,

8    the manufacturer number.  Clearly those came from the -- the

9    manufacturer, came from the manufacturer, and the vendor number

10   came from the vendor, and those were in their catalogs at some

11   point in time.  The description generally --

12           And then the Court asked the question, those did come

13   from a vendor?

14           Witness:  What did come from --

15           The Court:  Those that you just testified to --

16           Witness:  Did come from the vendor, but --

17           The Court:  So they were published by a vendor.

18           Mr. Christopherson:  Those particular items, right.

19           So Mr. Christopherson did testify that the items

20   identified by the Court in its definition of a catalog indeed

21   did come from the vendor for the published catalogs.

22           If I could just talk now a little bit about, some of

23   these arguments about, other arguments about published by a

24   vendor.  One of the arguments has been made that when using the

25   Lawson system, you can only have a textual description of up to

1    30 characters.  I think you heard that several times through

2    several of the witnesses.  I would urge you to look at the

3    Court's construction when it talks about the textual

4    description of the item.  It doesn't say it has to have any

5    limitation on the number of characters that can be used to

6    describe the item.

7            It doesn't say, for example, that the customer, when

8    it gets information from a vendor -- I think we heard from Mr.

9    Yuhasz who dealt with medical equipment that when he gets a

10   description that says syringe and they abbreviate it to s-y-r,

11   that doesn't make it any less a description.  They certainly

12   understand what they're entering there when they put that

13   description that they obtained from a vendor in the used

14   abbreviations.  Using abbreviations or using only 32 characters

15   to describe the item doesn't take it outside of the Court's

16   definition.

17           In addition, the argument that the item master is not

18   a published catalog has no relevance to this case.  The item

19   master is not what's published.  It's the information that

20   comes from the vendor that is published and then downloaded

21   into the item master is what's important, and that's how the

22   Court's construction clearly reads.

23           In fact, when there was questioning about whether the

24   item master itself was being published, repeatedly the Court

25   sustained objections with regard to those questions.

1           Let me talk a little bit now, if I can, about the

2    validity of these patents at issue.  One of the things that was

3    argued was that the RIMS system, for example, was in the public

4    or on sale or the TV/2 system was in the public or on sale.  I

5    would respectfully submit to you that there was no evidence as

6    to what the system they are describing was that was in the

7    public domain.

8           The only thing we have with respect to the RIMS

9    system was that which is disclosed in the '989 patent and which

10   you will have before you and which you can look at it when you

11   deliberate.  The only thing we had with respect to the TV/2

12   product were those two brochures; one, simply an advertising

13   brochure, and another, this general information manual.

14          We didn't see any RIMS system demonstrated.  We

15   didn't see any TV/2 system demonstrated.  We didn't see any

16   technical documentation with respect to either of those two

17   so-called systems.

18          Now, it was the defendant's burden of proof to show

19   you what those functions and features of those systems were.

20   So really, all that can be relied on here, and, indeed, I will

21   show you shortly the only thing that Dr. Shamos relied upon in

22   his opinions was the '989 patent, the TV/2 brochure, and the

23   TV/2 general information system.

24          Indeed, when I asked Dr. Shamos about the RIMS

25   system, I asked him whether or not it had two catalogs

1    disclosed.  It said, okay, take us to the next element.  We

2    were discussing the claim.

3              Answer:  The only claim elements missing from RIMS re

4    at least two catalogs, a collection of catalogs, et cetera.

5              That was actually in response to Mr. McDonald's

6    question.  So Dr. Shamos acknowledges even that RIMS does not

7    have catalogs, an element that's in 11 out of 12 claims that

8    are at issue.  You may recall that two of the inventors of this

9    RIMS '989 patent are Mr. Johnson and Mr. Momyer, and they are

10   also inventors on the electronic sourcing patents.

11             So you would clearly think that Mr. Momyer and Mr.

12   Johnson are in a better position than Dr. Shamos, for example,

13   to tell you the differences between their requisition and

14   inventory management patent and the electronic sourcing patents

15   at issue.

16             Certainly, as inventors on both of those patents,

17   they are best suited to explain the differences.  So what were

18   some of the differences?  Remember now, at least four people

19   came in and told you about the differences between the RIMS

20   patent and the patents that are at issue here.  They were the

21   three inventors who were all fully involved, and it was Mr.

22   Hilliard.

23             You will recall that the Fisher RIMS product, its

24   patent described there was a requisition inventory management

25   system.  Fisher wanted to be able to take over the management

1  of its customers' stockrooms and make sure that Fisher supplied

2  their customers with Fisher product.  So Fisher would fill its

3  own inventory at a customer's location so it could fill those

4  customers' needs quickly.  You will recall that was called

5  just-in-time or JIT inventory.  That was the purpose of this

6  RIMS system.

7       Using it, Fisher had what was known as a customer

8  service representative.  You will recall that testimony.

9  That's a human being right there physically at the customer's

10  location who could then look up an item, but the only way he

11  could do that was using the item number.  He didn't have

12  keyword search capability in the RIMS system.  There was no

13  question about that.

14       Using that, that CSR could generate a requisition,

15  but it was a requisition for Fisher product available in the

16  local inventory.  If it wasn't available in the local

17  inventory, the RIMS system could communicate over a network

18  back to a mainframe computer at Fisher to transmit a request to

19  transfer the desired testimony based on its item number from

20  one of Fisher's warehouses to the customer location.

21       Fisher was the only distributor from which the

22  customer could obtain those products using RIMS.  That was the

23  whole purpose of the RIMS system, and that's why Fisher

24  Scientific liked it.  We want to move and push our product out

25  to our customers.

1          In contrast, the electronic sourcing system that was

2     a subsequent invention was intended to empower the customer

3     himself or herself.  It was to permit that customer to use the

4     product to conduct the end-to-end procurement process.  Sitting

5     at their desktop or laptop, they could, in fact, enter

6     keywords, search catalogs, select catalogs, select the matching

7     items, build the requisitions themselves, generate the purchase

8     orders, check the inventory, and do the comparison shopping

9     features.  That was the empowerment that was part of the

10    patents, and that's exactly what the infringing Lawson system

11    does as well.

12         Let's talk a little bit about the differences we can

13    readily discern from the RIMS patents and the electronic

14    sourcing patents.  One way to get quickly comfortable with

15    understanding differences is a simple exercise you can do in

16    the jury room.

17         If we could, let's take a look at the side-by-side

18    abstracts of the invention.  Actually, could we switch this

19    first to one of the '683 patents.  If you'll look at the cover,

20    this is the cover page of the '683 patent.  On the cover page

21    of every one of the patents that are in suit here, there is

22    what's called an abstract.

23         You'll find there on the '989 patent, which, I

24    believe, is both Defense Exhibit Number 10 and Plaintiff's

25    Exhibit Number 7, you'll find it in there.  There's also an

1    abstract on the '989 RIMS patent, but this abstract, this one

2    from the '683 patent, you will find that this abstract is

3    identical for all three of the patents-in-suit here.  It's the

4    same abstract in the '516, it's the same abstract in the '172,

5    and it's the same abstract in the '683.

6          And so one way to understand the differences, to

7    quickly understand the differences between the RIMS and the

8    electronic sourcing patents is to look at this.  So what are

9    the abstracts used for at the Patent Office?

10         Their regulations say that it enables the Patent

11   Office and the public generally to determine quickly from a

12   quick review the nature and gist of the technical disclosure of

13   the patent.  It is a tool that the examiners use to look at the

14   subject matter and to immediately understand what that

15   invention is directed to.

16         So let's see how we can compare and contrast these

17   two.  I'm not going to go through all these because they are in

18   the jury room, but there are some significant differences.

19   First, just looking at the '989 patent, the first sentence

20   there says, in accordance with the present invention, a

21   requisition and inventory management system is provided.

22   That's what it's being directed to.

23         Going down a little bit further, it says, the

24   computers there can build and transmit to the other computer

25   communication blocks of data relating to a particular

1    requisition of an item in just-in-time inventory.  You will

2    recall that's what Mr. Johnson and Mr. Momyer said were the

3    Fisher products that they wanted to supply to the customer.

4            The other computer that's part of this system can

5    then use the received data to process the requisition or to

6    update the just-in-time inventory records.  Again, we're

7    talking about Fisher product there.

8            You'll note down here that these requisition records

9    are created from a realtime interaction between these two

10   computers from information -- I'm skipping down now -- entered

11   by a customer service representative.  That's the CSR operating

12   at the local computer.  That's at the customer's site.

13           So the system of the present invention, it goes on to

14   say, utilizes means for automatically determining items in the

15   just-in-time inventory that are likely to require

16   replenishment.  Again, that's what's talking about a Fisher

17   product.

18           So this system then proposes a purchase and transfer

19   order for an optimum quantity of that item, the Fisher item,

20   which the CSR may accept or modify.  So what is significant

21   about that?  Nowhere in that entire abstract is there ever even

22   any reference to a catalog, never mind multiple catalogs.

23   Nowhere is there any reference to a system that can be used by

24   a customer.  Instead, it refers to the CSRs operating that

25   local computer just as the inventors testified.  And the items

1    that are requisitioned from the just-in-time inventory are the

2    Fisher products.  They are not products that are able to be

3    purchased for multiple vendors.

4              And it's important to remember, even when we're

5    looking at the '989 patent, that the inventors testified that

6    many of the features and functionality that are actually

7    disclosed and described in the '989 patent were never actually

8    even commercially utilized.  For example, Mr. Momyer, one of

9    the inventors of both the RIMS and the electronic sourcing

10   patent, was asked the question, what you are saying is you did

11   describe some things for a RIMS system in April of 1993 -- that

12   was the year of the patent application for RIMS -- in the

13   patent application that weren't actually implemented yet in the

14   RIMS system that was on the market; is that right?  That's

15   correct.

16             So then we really don't know what the features and

17   functionality of this RIMS system were that the defendants are

18   relying on and they need to show you by clear and convincing

19   evidence were present.  But I'm going to show you in a minute

20   that even if we rely on the RIMS patent itself, it doesn't

21   provide all the functions and features of the patents-in-suit,

22   and it's their burden to demonstrate to you by clear and

23   convincing evidence, on an element-by-element basis for all 12

24   claims that it's present in the prior art that they're going to

25   rely on.

1          Take a look just a minute at the abstract of the

2     patents that are in suit, '683, '516, and the '172 which

3     describe to the Patent Office what the real subject matter of

4     the invention is.

5          Here, the abstract says it's an electronic sourcing

6     system which includes a computer that maintains a catalog

7     database of data including product information such as product

8     identification and descriptive information relating to catalog

9     items available from vendor product catalogs.  Right in the

10    first sentence there, they're telling you what this is.

11         This is an electronic sourcing system.  It has

12    catalogs in it.  It has product identification and descriptive

13    information.  Compare and contrast that to what the abstract is

14    saying about the RIMS patent.  It has a means for building,

15    generating the requisition including at least one requisition

16    item.  It has a means for searching the database, for catalog

17    items matching that information and selecting at least one

18    catalog located as a result of that search.

19         It goes on to say it has text describing those

20    catalog items, images of the items may be viewed.  Data

21    identifying those catalog items can be communicated to a

22    requisition building means which generates requisition

23    including entries for items corresponding to the selected

24    catalog items, and significantly, the system checks the

25    availability in one or more inventory locations for desired

1    catalog items.

2           So there it's checking multiple vendor catalog

3    availability unlike the RIMS just-in-time inventory check.

4    Completely different, and as you might appreciate, completely

5    significant in the context of what we're talking about with

6    this invention.

7           On the one hand, I'm just -- on my own have the

8    capability to replace my Fisher product.  On the other hand,

9    the user now is empowered to select multiple catalogs, multiple

10   items, multiple requisitions, purchase orders, and check

11   multiple catalog inventories.  So we see we have catalog items

12   here, vendor product catalogs, and inventory from desired

13   catalogs.

14          So even on the face of the patents themselves, it's

15   readily apparent that these are two entirely separate

16   inventions, and there's certainly no question that the Patent

17   Office knew when they granted the patents that were issued here

18   that the '989 was fully disclosed in it because it was

19   incorporated in there, in the patents fully by reference.

20          If we could just go to the slide that is at page 65

21   towards the back.  You'll see in each of the patents-in-suit,

22   in the background of the invention, this was read to you

23   several times, but in the patents that are at issue here, that

24   Lawson has accused of infringing, it tells the Patent Office

25   right in the body of the patent about the RIMS patent.  It says

1    one such system is the Fisher Scientific requisition and

2    inventory management system, Fisher RIMS, described in this

3    '989 patent, assigned to Fisher Scientific, and it's

4    incorporated herein by reference.

5           And if you'll note, if we can go to the slide that is

6    page 66, here I've tried to illustrate for you in the

7    patents-in-suit -- these are the patents that Lawson is accused

8    of infringing -- how many times the RIMS patent is referenced

9    as being disclosed to the Patent Office.  There are 59 separate

10   times that the RIMS patent is described and explained as to how

11   it was used and modified to make the inventions that are at

12   issue here.

13          So is it even possible the patent examiner could not

14   understand the details of the RIMS system when it's fully

15   incorporated in by reference and it's referred to more than 59

16   times?  And, indeed, the Court is going to give you instruction

17   on what incorporated by reference means in the jury

18   instructions.

19          Just paraphrasing, it basically means the entirety of

20   the '989 patent is considered to be set forth with all of its

21   figures and descriptions and everything about it as if it were

22   set forth just in these same patents-in-suit.

23          So clearly RIMS is not an electronic sourcing system

24   as the Court has described.  It is not a system that can be

25   used by a prospective buyer to locate and find goods to

1    purchase from different sources, suppliers, or distributors,

2    and that's what the Court has defined an electronic sourcing

3    system to mean.  The RIMS system was not even used by a buyer,

4    rather as -- the evidence demonstrates it was used by that CSR

5    of the distributor, Fisher Scientific.

6         RIMS couldn't be used to locate goods to purchase

7    from multiple different suppliers or vendors.  The only

8    distributor from which those goods were procured were through

9    Fisher Scientific.  There were no multiple catalogs.  As I

10   think I indicated, even Dr. Shamos agrees that the RIMS system

11   didn't have multiple catalogs.

12        The item records in RIMS were for a local database,

13   and they didn't have vendor source-related information since

14   all the products were obtained from Fisher Scientific.  You

15   couldn't select product catalogs in RIMS since they didn't have

16   them.  You couldn't search for matching items among selected

17   product catalogs because there were no product catalogs to

18   select.

19        The only thing you could do in the RIMS system was

20   retrieve an item record from the RIMS part master database by

21   performing an item number lookup.  All the inventors testified

22   to that, and Mr. Hilliard testified to that.  And the problem

23   was if you didn't know the item number, you couldn't retrieve

24   the item from the -- the record from the database because that

25   was the only way to look it up.  There was no search

1    capability, no keyword search.

2         Given the fact that you didn't have matching items,

3    you couldn't build requisitions with those matching items from

4    the catalogs, you couldn't generate purchase orders from those

5    requisitions for those catalogs, and you couldn't check

6    inventory of the multiple vendors.

7         The cross-reference tables that are discussed in the

8    '989 patent were simply to cross-reference a competitor's part

9    number with a Fisher part number so if the customer asked for

10   the competitor part number, Fisher could say, you know what, we

11   have the same product.  Corning, for example, I think was one

12   of the examples in the case, might be offering a 50-milliliter

13   beaker that had a specific part number that Fisher was able to

14   learn about, and it created a cross-reference table to say,

15   that corresponds to our 50-milliliter beaker, so if the

16   customer wants this, we can try and sell them our Fisher

17   product.

18        It had nothing to do with the cross-referencing or

19   comparison shopping that is at issue in these patents.  Again,

20   RIMS could not determine the availability of a selected

21   matching item from a catalog in inventory.  It could only track

22   the inventory of the Fisher products.

23        So, let's talk about now this combination that's

24   being alleged that RIMS and TV/2 could be put together in some

25   fashion to come up with the patents-in-suit.  Again, let me

1   just suggest to you that the Patent Office was fully aware of

2   the RIMS -- excuse me, the TV/2 product.  If you could just

3   show, I think it's page 67.  Here's TV/2 disclosed in the

4   patents-in-suit.  I've highlighted it in green.  32 times the

5   inventors told the Patent Office about features and

6   functionality of TV/2 in the same patent and what aspects

7   needed to be modified, what aspects could be included and how

8   we could invent the new useful and nonobvious invention that is

9   the subject of these patents.

10          If you put them together, there's something like 91

11   separate references.  Certainly the Patent Office understood

12   that these two references, and they were fully aware of them --

13   if we can cite the face of the patents in which the two

14   brochures are disclosed.  You see there that Fisher Scientific

15   actually gave the Patent Office the Technical Viewer/2 general

16   information manual, and this IBM Technical Viewer/2 product

17   information brochure.

18          Now the argument has been made that these were in the

19   public domain.  That may have been the case, that may not have

20   been the case as of August of 1993.  There's been no

21   corroboration that they were, in fact, out in the public.

22   There's been some testimony based on memories that are some 17

23   or 18 years ago.  You might remember Mr. Gounaris says he

24   recalls being at a meeting some 17 years ago where he actually

25   handed someone a brochure or saw someone hand a brochure to a

1    Fisher Scientific person.

2           I would just ask you to consider the credibility of

3    that statement; first that he remembers actually being at a

4    meeting then 17 years ago and then he has a specific memory

5    that he either handed it or he saw somebody hand it.  You would

6    think if he has a specific memory, he would know whether it was

7    him or somebody else, but is it credible to suggest that

8    someone remembers being at a meeting 17 years ago and handed

9    out a specific document, or was that self-serving testimony

10   from a paid witness by Lawson who wants to have that suggestion

11   become part of the record?

12          So let's take a look and see if we can identify

13   really what it is Lawson alleges is the prior art.  If we can

14   go to slide 61, please.

15          First we have this '989 patent, as I say, invented by

16   Mr. Johnson and Mr. Momyer and disclosed to the Patent Office,

17   and then we have this TV/2 general information brochure, and we

18   have this TV/2 advertising brochure, all of which the Patent

19   Office has.  There's no question about that.

20          Then there's this Fisher RIMS system which we're

21   really not clear what that is; the RIMS brochure, well, that is

22   going to be in evidence, but you'll see that that's simply an

23   advertising brochure, and there's no argument that's made that

24   the advertising brochure anticipates any of the claims at issue

25   in this case.  Then there's this unspecified TV/2 system which

1    we really don't know what the details of that are.  All we have

2    to look at are those two brochures.

3              Now, you will recall testimony that the RIMS system

4    went through many variations and iterations.  For example, Mr.

5    Momyer was asked, let me just stop you there and say,

6    approximately how many iterations or variations did the system

7    go through?

8              Dozens, if not more than that.  The Fisher RIMS

9    system was in existence from 1991 all the way through until I

10   left in 2003, and there were many iterations of that.

11             Unlike Lawson, Dr. Shamos testified that he didn't

12   rely upon any unspecified RIMS system or unspecified TV/2

13   system.  I asked Dr. Shamos, and you are aware that the RIMS

14   system, starting, perhaps, in the late '80s all the way up

15   through until the year 2000 went through many iterations;

16   correct, many different versions?

17             Answer:  Yes.

18             Which version are you relying on when you are

19   rendering your opinions?

20             That described in the '989 patent.

21             So with respect to the evidence you presented,

22   though, did you present anything outside of the '989 patent to

23   support your opinions?

24             Answer:  Not in this courtroom.

25             I then asked him, did you point to any other version

1  or produce any documentation of the technical nature of the

2  RIMS system as being used between 1989 and 2000?

3          No, I didn't personally because, as I said, I don't

4  have personal knowledge of the RIMS system as distributed.

5          Well, let me suggest, if Lawson's paid expert didn't

6  have any knowledge of the RIMS system as distributed, how could

7  they possibly rely on some unspecified RIMS system, and how

8  could they possibly ask you to determine what it was if they

9  have no evidence to show, and that, again, was their burden to

10  come forward.  They could have made inquiries, they could have

11  subpoenaed Fisher Scientific, they could have tried to gather

12  additional evidence, but they didn't offer it here before you,

13  and Dr. Shamos doesn't even understand what the features and

14  functionality of this unspecified RIMS system was.

15          I also asked Dr. Shamos about the TV/2 system.

16          Question:  So it's fair to say you don't rely on some

17  actual operating TV/2 system in your report because you never

18  saw it; right?  You just have two documents that you are

19  relying on, isn't that right?

20          Yes.

21          Asked about those TV/2 brochures, you have no

22  personal knowledge, do you, that either of these documents were

23  ever in the public domain prior to August of 1992, do you?

24          I have no direct personal knowledge of that.

25          So, were they publicly disclosed?  I don't know.

1    Perhaps, but is that clear and convincing evidence for you to

2    say that these things were in the public domain when nobody has

3    come forward and proved concretely that's the case?  There's

4    been no corroboration.

5         Ms. Eng testified she thought so, and I actually

6    found her to be a fairly credible witness notwithstanding that

7    she was a Lawson consultant paid by Lawson to testify here.

8    But she was doing all this from memory, and it's memory of

9    events that are 18 years ago without any corroboration, and

10   you'll see that the judge will instruct you as to what is

11   necessary in order to corroborate whether or not something is

12   actually out in the public.

13        So what are we left with if we can put to the side

14   these unspecified systems of which we have no details?  We're

15   left with the '989 patent and the two brochures, all of which,

16   again, there's no question the Patent Office had before them.

17        So when you consider that Lawson is claiming that

18   they have to prove by clear and convincing evidence, you have

19   to evaluate, among the other factors, each difference between

20   every element of each one of the 12 claimed patents and this

21   alleged combination of prior art.

22        Let's discuss the TV/2 brochures first.  Neither

23   brochure provides technical details of how to build a TV/2

24   search program such that a person of ordinary skill in the art

25   would make and use that program.  Mr. McDonald said, and I

1    wrote it down when he was making the argument, he said anyone

2    of ordinary skill would understand how to combine these things.

3    I would respectfully suggest to you that Ms. Eng, who was at

4    IBM and who had a computer science background and had years of

5    programming experience, she's probably the kind of person of

6    ordinary skill in the art that we're talking about here, and

7    notwithstanding that she was a paid Lawson witness, you would

8    think if anybody could have combined them like Mr. McDonald has

9    suggested, wouldn't it be her?

10           Question was asked, you'd agree that this general

11   information manual does not provide enough information for

12   anybody as to how to integrate a TV/2 search engine with

13   electronic catalogs; correct?

14           It does not.  It's just general information.

15   Remember the that general information manual is the more

16   detailed of the two brochures.  The other one is a just an

17   advertising puff piece.  If the information manual can't help

18   us, how possibly can that advertising brochure?

19           And there was also no evidence to substantiate that

20   IBM ever had a commercial version of the TV/2 search program

21   prior to IBM's work on the electronic sourcing system.  Ms. Eng

22   acknowledged that as well.  Lawson wants to rely on a single

23   bullet point from that marketing brochure as providing some

24   sort of suggestion to combining the two.

25           However, that single bullet point talks about

1    possibilities and doesn't give you any details, technical or

2    otherwise, on how you might combine these systems.  It doesn't

3    even tell you how to use the search results to build a parts

4    list which could be sent to a parts ordering system.  Mr.

5    Hilliard indeed says even if you combine the two systems on an

6    element-by-element basis, the combination would not satisfy all

7    the requirements of any claim.

8           It's because you are combining a system that can

9    simply check the existing inventory of Fisher product, not

10   multiple vendor products, with a search program that can simply

11   read documents.  That doesn't give you the elements of the

12   electronic sourcing system that requires multiple catalogs.

13          Neither system, it was conceded, was not an

14   electronic sourcing system.  Neither system can generate

15   requisitions having line items associated with multiple

16   sources, and neither system can generate purchase orders,

17   multiple purchase orders from a requisition.

18          As we heard from the inventors and the IBM employees,

19   significant modifications needed to be made to both the RIMS

20   and TV/2 system to render them useful for the electronic

21   sourcing system patents.

22          By now, I've know you've seen repeatedly that

23   statement of work between IBM where Fisher contracted them and

24   paid them more than $600,000 to work with them in a year and a

25   half to make all those modifications.  I asked Ms. Eng about

1   all the modifications that needed to be made to the TV/2

2   product in order for it to be adapted to the electronic

3   sourcing product, and she testified at length.  You may recall

4   the inventors were asked what they needed to do.  One of the

5   things that was important was that an interface for the RIMS

6   system had to be created.

7            Mr. Johnson said, did you have that interface in RIMS

8   system, or did it have to be created?

9            No, that was not in the RIMS system.  That had to be

10  created.

11           In addition, he was asked other questions concerning

12  the project in order to result in the inventions at issue here.

13  In modifying this requisition coding, did it also address any

14  issues involving the purchase orders from these requisitions?

15           Answer:  Yes.  The system would then create that,

16  would then take that requisition and, by vendor, create

17  multiple purchase orders with the products associated to that

18  vendor.

19           In addition, there needed to be modifications for

20  connections to outside vendor databases, because that was never

21  in the RIMS system, in order to determine the availability of

22  selected items, inventors' inventory.  You needed to add a new

23  cross-reference table that would enable you to convert a

24  selected matching requisition of one vendor to a comparable

25  item to a different vendor, none of which was present in the

1  RIMS system.

2         So the question, you also, I think, mentioned that

3  you had to modify requisition coding; is that correct?

4         Answer:  The RIMS system could only communication to

5  the Fisher mainframe, Fisher being Fisher Scientific.  We

6  changed those programs to add multiple products from different

7  vendors to a single requisition.

8         So Ms. Eng, Mr. Kinross, Mr. Momyer described those

9  numerous modifications that were made to the TV/2 viewer

10 document, viewer search program including there was tagging

11 catalog data so the search program could be made to look in the

12 proper places to find the relevant information about catalog

13 items.

14        And building order list capability, building an index

15 to facilitate searches of large items of data, all of these,

16 you will see when you retire to the jury room, are outlined in

17 that Gantt chart that took more than a year and a half to

18 complete those tasks.

19        Mr. Momyer testified, did you understand, was there

20 any limitation on the TV/2 system ability to communicate with

21 the RIMS system regarding multiple catalogs from multiple

22 vendors?

23        Answer:  Well, my understanding, I didn't think the

24 TV/2 system, as it was presented to us, could handle multiple

25 catalogs and could not search multiple catalogs.  That was my

1   understanding.  That's the reason we did the development that

2   we did.

3          Now, Dr. Shamos wants to suggest these modifications

4   were trivial tasks easily accomplished with no information

5   other than that which would be found in those two brochures,

6   but the actual facts from the inventors' testimony, Ms. Eng's

7   testimony, and the IBM documentation all speak otherwise.

8          So let's talk a little bit about some of the

9   witnesses that came here, if we can, that Lawson presented.

10  First, there was Ms. O'Loughlin.  You may recall that she was

11  the in-house counsel at Fisher Scientific, and they played her

12  videotape.  She was the one who was responsible for filing a

13  trademark application, that Fisher advertising brochure on the

14  RIMS product.  It was suggested that there was a lot of arguing

15  over the date of that brochure.

16         When that brochure came up, I stipulated that it was

17  attached to that April 1993 trademark application and that it

18  at least had to be in the public domain as of that date.  I

19  didn't quibble with that, but the fact is, if you look at that

20  brochure, it doesn't tell you what RIMS system was there.  In

21  fact, the inventors said many of the things that were in that

22  advertising piece actually never were part of the RIMS system.

23         And now, there's not a single anticipation argument

24  made with respect to that, but what did Ms. O'Loughlin, a

25  lawyer, not an engineer, candidly admit about the features and

1    functionality of the RIMS system?  Question was asked, how many

2    iterations did the Fisher RIMS system go through?

3              I don't know.

4              Do you know how the features and functionality

5    changed during the period of time from 1992 to 1995, for

6    example?

7              I do not.

8              You were asked about this entry italicized computer

9    order entry system.  Do you see that?

10             I do.  That was in the, one of the brochures.

11             Can you tell me where in this paragraph it discusses

12   the capabilities of searching multiple vendor catalogs?

13             I don't see it there.

14             She was also asked about the annual reports that Mr.

15   McDonald referenced.  I asked her, does it discuss in there any

16   other catalog other than the Fisher catalog, and you'll see

17   when you look at those annual reports, that the only catalog

18   that's ever discussed is the Fisher catalog consistent with, in

19   fact, the testimony of the inventors and the disclosure in the

20   '989 patent itself.

21             Lawson also called Richard Lawson in, the founder of

22   the company, very nice man.  He talked about the early years of

23   Lawson.  He lives in Dallas.  His company operates out of St.

24   Paul, Minnesota.  He testified he hasn't been involved in the

25   products that are issue here for over the last five or six

1   years.  He didn't really -- I didn't really understand that he

2   had much relevance to contribute, but Lawson is entitled to

3   call whoever they wanted to call, but he candidly admitted that

4   since 2003, when the products at issue were at issue here, he

5   has not been involved in any of the development of the products

6   at issue in this case.

7          Question:  So it's fair to say you haven't been

8   involved in the day-to-day operations of the company for quite

9   some time; is that right?

10          Since it went public.  I have been retired for five

11   years.

12          So with respect to those products, did you have some

13   role in developing those products?

14          Well, since 2003, the answer is, since I left, the

15   answer, that would be basically no.

16          Pamela Eng was asked a question about what she

17   disclosed with respect to TV/2, in particular the application

18   programming interface.  Slide 56, please, Mike.  Did you ever

19   give the TV/2 API to anybody else besides Fisher?

20          Not that I know of, no.

21          And the API is necessary for this project; right?

22          If you want to integrate it with another system.

23          Lawson also called Mr. Charles Gounaris.  You will

24   remember Mr. Gounaris was the gentleman who testified that he's

25   made tens of thousands of dollars as a professional witness in

1    these ePlus cases testifying on behalf of infringers.

2    Surprisingly, Mr. Gounaris didn't really contribute much of

3    anything.  Ms. Eng, when asked about Mr. Gounaris, said, he was

4    a fellow in sales, wasn't he?  He didn't work in Manassas where

5    the project was going on.

6         I don't think he contributed much of anything or

7    certainly didn't contradict anything that Ms. Eng had to say.

8         So let me say in closing, I do want to come back, and

9    you've been importuned a number of times on this issue about

10   using common sense, which, of course, we all need to do.  This

11   case has certainly been challenging and complex on the

12   technology.  I confess candidly I don't fully understand all

13   the aspects of these inventions.  I was not a computer

14   scientist in college, but I can tell you one thing that's not

15   another or two things aren't the same, and I have every

16   confidence that you can do so yourselves.

17        So I just would like to put out some questions, if I

18   could, that you should think about or ask you respectfully to

19   think about during your deliberations.  Why, for example, would

20   Fisher Scientific go out and commit the kind of resources it

21   did, its people, its money, its time, to build a new system,

22   this electronic sourcing system, if it already had that

23   invention in RIMS?  Why would they commit four of their

24   employees, Mr. Melly, Mr. Momyer, Mr. Johnson, Mr. Kinross, the

25   latter two full time, to a two-year project in research and

1    development if they already had the invention right in their

2    backyard?

3              Why would they go out and contract with IBM and pay

4    them $600,000 and spend that year and a half in order to build

5    an electronic sourcing system incorporating a completely

6    revamped TV/2 program, itself which had to go through

7    substantial revisions and modifications, in order to come up

8    with an invention they already had?

9              Why would Fisher hire several patent attorneys and

10   pay them to prepare patent applications with the Patent Office

11   for an invention they had already patented?  Why would Fisher

12   Scientific pursue those patents for nine years paying the

13   Patent Office application fee after application fee after

14   application fee and continue to pay the patent attorneys for

15   that nine-year period to obtain an invention they already had?

16             Why would the inventors spend two years of their

17   lives trying to develop an invention they already invented?

18   Who would do that?  You saw those inventors.  They were proud

19   of their invention.  They truly believe they had invented

20   something new and novel, nonobvious, and not the RIMS system.

21             You might remember, I asked Dr. Shamos why someone

22   would go all through this and pay IBM that money, and his

23   cynical response was, it was just because IBM wanted to make

24   the money.  Do you think that's really why Fisher did this or

25   IBM?

1          Would the inventors have had the pride they had in

2    their invention if they had only reinvented the same wheel?  I

3    don't think so.  So don't take their inventions away from them,

4    and don't take ePlus's patents away from them on the basis of

5    this infringer's arguments.

6          Lawson is simply looking to escape the consequences

7    of its own actions, and to do that they ask for your help.

8    That is why they ask you to invalidate a patent that's presumed

9    valid, and the thin evidence they've presented here falls far

10   short of their significant burden.

11         I'm not going to walk you through that verdict form

12   that Mr. McDonald mentioned.  I think it is going to be

13   relatively clear on its face, but we would respectfully ask

14   that when its comes to the five configurations at issue in the

15   specific claims that are involved, that ePlus has demonstrated

16   by a preponderance of the evidence that Lawson's system

17   infringes those claims, and we'd ask you to check yes.

18         With respect to the invalidity allegations, you're

19   going to be asked a number of questions with respect to whether

20   claims are anticipated or rendered obvious.  I would

21   respectfully ask, and I believe that the evidence shows, that

22   Lawson hasn't met its burden by clear and convincing evidence

23   that any of these patent claims are invalid as either being

24   anticipated or obvious, so I respectfully ask that each of

25   these boxes should be checked no.

1          You are also going to be asked if you do find that a

2     claim is invalidated to specify the prior art that would be

3     relied on.  If you do not find it invalid, you need not include

4     any prior art reference alleged by Lawson to invalidate those

5     claims.

6          So I thank you for your time, and we thank you for

7     your public service.

8          THE COURT:  May I see counsel for a moment.

9

10          (Discussion at sidebar as follows:)

11

12          THE COURT:  You say, and then you have to fill in the

13     blank in section C, which is obviousness, which prior art are

14     you relying on.  There you should put in, just put in RIMS plus

15     TV/2 system.

16          Now, as I see it, that changes significantly your

17     whole theory of what it is that is prior art that constitutes

18     obviousness, because you are telling them what they need to do

19     is put in RIMS system plus TV/2 system.  Did I --

20          MR. McDONALD:  I think I might have said it that way.

21     I meant to say at least instead.  At least put in those two,

22     but I did not read that into those two things.  I misspoke.

23          THE COURT:  They can't do that under the evidence.

24     In the first place, your expert didn't even rely on those.  He

25     relied on other things, so I'm not even sure it's proper for

1   any of it to go to the jury anyway, but I think they'll figure

2   it out, but if you don't include the '989 patent in the

3   obviousness, you're dead.  So you say you made an error.

4           MR. McDONALD:  That's right.

5           THE COURT:  All right.  I think what they have to do

6   is to say if they have one, they have to specify it's the '989

7   plus TV/2 brochure, '989 plus TV/2 whatever.  I mean whatever

8   the combo is, they have to say exactly what they find and only

9   what they find.

10          MR. ROBERTSON:  Your Honor, I think the verdict form

11  is going to be clear on its face.

12          THE COURT:  It is.  I think it is, but his statement

13  was at odds with the verdict form.  I just want to make sure

14  I'm not giving the jury contradictory messages, and I didn't

15  feel free to tell them you were wrong without consulting you.

16          MR. McDONALD:  Is that something you are going to

17  correct, or do you want me to?

18          THE COURT:  I'm going to have to correct it.

19          MR. ROBERTSON:  I would not want undue emphasize

20  placed on the verdict forms, and the instructions spell out

21  what alleged prior art they can consider.

22          THE COURT:  If I do it wrong, object, and you can

23  object if you want to if I don't do it right, I foul it up, but

24  the jury is entitled to know what they really have to do.

25          MR. ROBERTSON:  I'd be loath to object to the Court's

1    instruction at this critical juncture.

2              THE COURT:  You can object to it, and if you want to,

3    you can come up here and do it quietly.  There's nothing wrong

4    with objecting to what Courts do.  That's what the lawyers get

5    paid for.  You just have to be right so you can prevail.

6              MR. ROBERTSON:  That's right.

7

8              (End of sidebar discussion.)

9

10             THE COURT:  My instructions are going to take about

11   45 minutes or an hour.  What I think we'll do is probably go to

12   a logical breaking point and give you a little break in

13   between.  Does anybody need a break now before we start?  Okay.

14             These instructions are something that you're going to

15   have back in the jury room with you, and you can read them.

16   Nonetheless, I think it's helpful for us to have time together

17   for me to present them to you, and that's why -- and over the

18   years, it's been shown that that is helpful, and that's why I

19   will be doing some reading to you.

20             In most cases, I know all the instructions pretty

21   well by heart, having done this for a long time, but as you

22   have learned, the patent law issues are very technical, and so

23   I need to be accurate, and I'll be probably reading a little

24   bit more than I usually do.

25             If you find that my reading tends to put you to

1    sleep, you let me know and we'll stand up and take a stretch

2    break, because I do know that, in fact, that is a phenomenon

3    that can happen, and I charge you, if you are drifting off, let

4    me know.  That's the time for us to take a break, and we'll go

5    from there.

6              I promise you I won't be the least bit offended,

7    because I know you have the toughest, most important job of

8    anybody in this courtroom.  These lawyers have worked very

9    hard, and they've done a great job trying to make the case for

10   their respective clients and put together a case that you could

11   understand out of some very difficult issues, and now you have

12   to -- now you have to do your duty.

13             And now that you've heard the evidence and the

14   arguments, it's my duty to give you the instructions on the law

15   that you are to follow in the case, and it's your duty as the

16   jurors to follow the law as it's stated here and then apply the

17   law to the facts in the case.

18             The lawyers properly have referred to some of the law

19   in their arguments, and it's okay for them to do that, but if

20   there's any difference between what you heard them say and what

21   you hear the Court say, obviously you're to be guided by what

22   the Court's instructions say, not that I suggest that they

23   misstated anything, and if they did, I don't believe that

24   either one would have done it deliberately, but sometimes when

25   you are talking and you are doing what they were doing, you say

1   things that aren't exactly right and without meaning to.  So if

2   there's any contradiction, you follow what the Court says.

3          You are not to single out any one instruction as

4   stating the law, because they are all intended to work together

5   to help you do your job.  Nor are you to be concerned with the

6   wisdom of the rules of law, because it would be a violation of

7   your sworn duty and your oath to apply any view of the law

8   other than the law as you are given here, just as it would be a

9   violation of your duty to decide the case on anything other

10  than the facts that are produced here.

11         Because you are the judges of the facts and you keep

12  in mind that justice through trial by jury always depends on

13  the willingness of each juror individually to seek the truth

14  from the facts and the facts from the same evidence that's been

15  presented to you all and to give -- and to apply the same law.

16         You are to perform this duty without bias or

17  prejudice to either party, because the law doesn't permit

18  juries to be governed by sympathy or prejudice or public

19  opinion.  Indeed, the parties and the public expect that you'll

20  carefully and impartially consider all the evidence in the

21  case, follow the law as stated by the Court, and reach a just

22  verdict regardless of the consequences.

23         The case is between two corporations, and you should

24  realize that the case is to be decided by you as persons of

25  equal standing in the community, of equal worth and holding the

1    same or similar stations in life.  And the corporations are

2    entitled to the same fair trial at your hands as would a

3    private individual be.  They stand equal before the law and are

4    to be dealt with as equals in a court of justice.

5         Now, there's nothing particularly different in the

6    way that a jury should consider the evidence in a trial from

7    that in which any reasonable and careful person would treat any

8    very important question that has to be decided by facts and

9    listening to facts and evidence and opinion, and, therefore,

10   you are expected to use your good common sense.

11        The lawyers both said it, and I will reiterate it.

12   In considering and evaluating the evidence for the purposes for

13   which it's been admitted and to give the evidence -- you're

14   permitted to give the evidence a reasonable and a fair

15   construction in light of your common knowledge of the natural

16   inclinations and tendencies of human beings.

17        I told you earlier and I remind you now, it's the

18   sworn obligation of the lawyer to object if the lawyer feels

19   like the other side is offering evidence that's not in keeping

20   with rulings of the Court, rulings of evidentiary principles,

21   or rules of procedure, and that's how they get a ruling in our

22   system.  So don't be upset with a lawyer or his or her client

23   because an objection was made by him or her, and don't be

24   influenced because one side lost the objection and the other

25   side prevailed, because I'm just applying the Rules of Evidence

1   and the rules of procedure to objections that have been made

2   and not taking sides in the case, and it's the duty of the

3   Court to admonish an attorney who, out of zeal for his or her

4   cause, does something that the Court feels is not in keeping

5   with the Rules of Evidence or rules of procedure.

6          You, of course, are to draw absolutely no inference

7   against the side, that is the client, to whom an admonition of

8   the Court for a lawyer may have been addressed during the trial

9   of the case.

10         I've asked some questions in the case.  Don't assume

11  that I hold an opinion on the matters to which my questions

12  related.  The Court can simply ask questions to clarify a

13  matter, not to help one side or hurt the other.

14         Remember that the evidence consists of the sworn

15  testimony of the witnesses regardless of who called them, the

16  documents that have been admitted into evidence regardless of

17  who offered them into evidence, and all of the facts that have

18  been stipulated, and there's a written stipulation in the case,

19  and you'll have that, and those facts which have been

20  stipulated means the lawyers and the clients on both sides have

21  agreed, and you are obligated, unless something -- I tell you

22  otherwise to accept the stipulation as evidence and regard the

23  stipulated facts as proved.

24         Remember what I told you at the beginning, that the

25  opening statements, the closing arguments, the questions, and

1    objections of counsel, the questions of the Court, are not

2    evidence in the case.  Any evidence as to which an objection

3    was sustained and which I told you to disregard is not evidence

4    in the case, and we expect that you'll disregard that in making

5    your deliberations.

6           Remember that anything you've seen or heard outside

7    the courtroom isn't evidence, and you are to disregard it.  So

8    you are to consider, therefore, only the evidence in the case,

9    but when you are doing that, you're not limited to just the

10   bald statements of the witness or what appears in the

11   documents, because you are permitted to draw from the facts

12   which you find have been proved any reasonable inferences as

13   you feel are justified in the light of experience, and an

14   inference is just a logical deduction or conclusion that reason

15   and common sense lead you to draw from the evidence that's been

16   received.

17          Remember there are two types of evidence in the case

18   that I told you about earlier.  There's direct evidence and

19   circumstantial evidence.  I explained that earlier, and I tell

20   you now the law doesn't make any distinction between direct

21   evidence and circumstantial evidence.  You are to consider it

22   all.  Nor does circumstantial evidence have to be of any better

23   quality than direct evidence.  You consider every bit of it.

24          One doesn't require more certainty than the others,

25   because you can consider both direct and circumstantial

1    evidence.  Now, corporations here are involved as parties in

2    the case, and, of course, corporations can act only through

3    natural people such as you and me as the agents or employees,

4    and in general any agent or employee of a corporation may bind

5    the corporation by his acts and declarations made while acting

6    within the scope of the authority delegated to the employee or

7    the agent and within the scope of those duties.

8           Now, the lawyers have made references to facts in

9    their arguments, and I have, on occasion, made references to

10   some of the testimony and facts in ruling on things here, on

11   objections that is.  If any reference to a fact that is made by

12   the Court or by the lawyers doesn't coincide with your own

13   recollection, remember, it is your recollection that controls,

14   not what they say and not what I say, because you are the

15   judges of the facts.

16          I told you earlier, too, that you are going to be

17   judging the credibility of witnesses.  That just means who do

18   you believe and how much of what they have to say do you

19   believe.  You bring to that skill the talent that you exercise

20   in everyday life.  There isn't a day that goes by that somebody

21   doesn't tell you something that you have to decide whether you

22   are going to believe or not.

23          Well, you probably do everything I'm going to mention

24   now, but if you don't, keep in mind that this is what you need

25   to do when you are assessing the credibility of the witness:

1          Scrutinize the testimony that's given.  Consider the

2     circumstances under which each witness has testified.  Consider

3     every matter in evidence which tends to show whether a witness

4     is worthy of belief or not.  Consider each witness's

5     intelligence, motive, and state of mind and demeanor, the way

6     they act, and manner while on the stand.  Somebody tells you

7     something, you look at them, you listen to them, and you judge

8     by the way they act in part whether what they are saying is

9     right or not.

10          You can do that here, too.  Consider what the

11     witness's ability was to have observed the matters as to which

12     he or she has testified and whether the witness impresses you

13     as having an accurate recollection of the matters.  Consider

14     also any relation each witness may bear to either side of the

15     case.  Consider the manner in which the witness might be

16     affected by the verdict and the extent to which, if at all,

17     each witness is either supported or contradicted by other

18     evidence in the case, because you are to consider all the

19     evidence.

20          Remember that inconsistencies or discrepancies in the

21     testimony of a witness or between the testimony of different

22     witnesses may or may not cause you, the jury, to discredit such

23     testimony, but remember this:  When two or more people witness

24     an incident or transaction, they just simply may see it or hear

25     it differently, and innocent mis-recollection, like failure of

1    recollection, isn't an uncommon experience.  And so in weighing

2    the effect of some discrepancy, always consider, does that

3    discrepancy pertain to a matter of importance or to some

4    unimportant detail?  And does that discrepancy result from

5    innocent error or from deliberate falsehood?

6            After making your own judgment, you're going to give

7    the testimony of each witness such credibility, if any, as you

8    may think it deserves.  That is up to you to do.

9            Something came up during the trial that I need to

10   sort out for you.  Several days ago, Mr. Christopherson

11   testified, and there was some testimony about whether Lawson

12   obtained an opinion of counsel of non-infringement or

13   invalidity on the patents.  I instruct you now that I have

14   excluded that testimony.  That issue is simply not pertinent to

15   the case.  It has nothing to do with the case, and I'm

16   instructing you to disregard whatever was said about the

17   intention or nonintention of counsel by Lawson.

18           Now, several times during the trial, the lawyers have

19   pulled out depositions and have asked a witness a question and

20   said, on such and such a date, didn't you say this after the

21   witness has said something here in court.

22           A deposition is a sworn statement made out of court

23   but under oath, but the testimony of a witness can be

24   discredited or impeached by showing that a witness made

25   statements earlier which are different or are inconsistent with

1   what the witness testified to in court.

2          So if I come to court and I testify that a traffic

3   light was red, and that's my testimony, but at some earlier

4   time I've been deposed or I've written down something, and I

5   said the light was green, you can consider what I said before

6   in evaluating what I said here in deciding which is it that you

7   should accept.  There'll be lots of reasons why maybe people

8   give inconsistent statements, and you'll just have to sort that

9   out.

10          Now, this earlier inconsistent or contradictory

11   statement of a witness who is not a party -- that would be Ms.

12   Eng -- who are the nonparties who testified?  Actually Ms. Eng

13   is a consultant, isn't she?

14          Mr. Yuhasz, let's say that that was Mr. Yuhasz who

15   said the green light, red light, all right?  Well, in his case,

16   the only reason you can consider that outside testimony is to

17   decide whether to believe what he said in here, that is you

18   say, well, he said something inconsistent, so I'm not sure I

19   want to believe him, or it was inconsistent, but it's not a big

20   deal, so I'm going to go ahead and accept what he said in court

21   even though he did say something inconsistent.  In other words,

22   you can use it to evaluate his credibility.

23          It's your responsibility to do that.  Now, where a

24   party in the case, by -- and that's a corporation by its

25   witnesses, admits some fact or facts, then if that's knowingly

1    done, that can be considered as well -- that is in the previous

2    statement, as evidence of the truth of the fact as well as for

3    judging the credibility.

4           So if Mr. Christopherson said green when, in fact, he

5    testified to red here in court, you can consider the fact he

6    said it was green for two purposes:  One, whether it was green

7    or not; two, whether it was right when he said it was here --

8    when he said what he said here which is red, that is to

9    consider his credibility.

10          Now, there have been certain demonstratives.   In

11   fact, there have been a lot of demonstrative exhibits shown to

12   you in the course of the trial.  Those are sometimes referred

13   to as demonstrative exhibits, and they are used for convenience

14   and to help explain the facts of the case to you, but they are

15   not themselves evidence or proof of any facts, and, therefore,

16   when you go back to the jury room, you're not going to have the

17   demonstratives.  You're going to have the actual exhibits from

18   which the demonstratives were made.

19          We're going to deal with expert opinions.  Expert

20   opinions -- usually the rules of evidence don't let people give

21   opinions in cases, but in the case of someone who is an expert,

22   that rule changes and the expert can give opinion, and Dr.

23   Weaver and Dr. Shamos -- is it -- Dr. Shamos, yes, both of

24   them.  Mr. Hilliard, all were experts, and they gave opinions.

25   And they are entitled to do that.

1          An expert is someone who, by education or experience,

2    may have become knowledgeable in some technical or scientific

3    or specialized area, and if that knowledge can help you in

4    understanding some of the evidence or in determining a fact,

5    then that witness can state his opinion, but remember, what

6    they said are their opinions.  That was their view of things.

7    They didn't always say, well, it's my opinion that, but as a

8    basic proposition, everything that they testified to was

9    opinion.

10          And you can consider opinions received into evidence,

11    and you can give the opinions such weight as you think it

12    deserves, but you should consider the testimony of an expert

13    witness just like you should consider other evidence in the

14    case, and if you should decide that the opinion of the expert

15    witness is not based on enough education or enough experience,

16    or if you should conclude that the reasons that the expert gave

17    in support of the opinion isn't good or sufficient to support

18    it, or if you should conclude that the opinions of one expert

19    is outweighed by all the other evidence or by the opinion or by

20    other evidence or by the opinion of another expert, then you

21    can disregard the expert's opinion in whole or in part, because

22    that's -- you are the judges of the facts, and you can consider

23    that opinion.

24          Now, also lay people can give opinions, and I believe

25    it was Mr. Christopherson who this applied to.  I may be wrong,

1  but I believe I'm right.  He can give an opinion on something

2  if it's based on his or her personal knowledge and is

3  rationally based on his or her perception of something.

4          So if you find that an opinion given by a nonexpert

5  witness is based on personal knowledge and is rationally based

6  on his perception or her perception of the events, you can

7  consider, you can give it such weight as you want to give it.

8  That's up to you.

9          Now, we've had a discussion here up to date of sort

10  of the general framework and rules that you apply sort of in

11  doing the job you're going to have to go do.  We're now going

12  to turn to the issues that you have to decide, and I'm going to

13  give you instructions on those.

14          You have to decide whether ePlus has proved by a

15  preponderance of the evidence that Lawson has infringed

16  directly or indirectly claims three, 26, 28, or 29 of the '683

17  patent, whether Lawson has proved -- Lawson has proved by clear

18  and convincing evidence that those same claims are invalid

19  either for anticipation or obviousness, whether ePlus has

20  proved by a preponderance of the evidence that Lawson has

21  directly or indirectly infringed claims one, two, six, nine,

22  21, 22, or 29 of the '516 patent, whether Lawson has proved by

23  clear and convincing evidence that claims one, two, six, nine,

24  21, 22, or 29 of that patent are invalid, and whether ePlus has

25  proved by a preponderance of the evidence that Lawson has

1      directly or indirectly infringed claim one of the '172 patent

2      and whether Lawson, in turn, has proved by clear and convincing

3      evidence that that claim is invalid.

4             Now, there are different kinds -- you've got those

5      claims in your book, and people have referred to them

6      throughout the trial.  There are different kinds of claims at

7      issue in the case.  There are system claims and method claims.

8      All claims, whether they are system or method, contain elements

9      or requirements sometimes that people have referred to them as,

10     or the elements or limitations on the claims.

11            The system claims in this case are claim three of the

12     '683 patent, claims one, two, six, nine, 21, 22, and 29 of the

13     '516 patent, and claim one of the '172 patent.  And to infringe

14     a system claim, an accused system has to contain each of the

15     elements in that particular claim, and you know what the

16     elements are.

17            They are small little paragraphs that follow the

18     introductory language, the prefaces that say an electronic

19     system comprising, or a system, et cetera, or a method, et

20     cetera, and then it contains specific things that have to be

21     done to be within the reach, protective reach of the claim, and

22     if an accused system contains each of those elements, then it

23     infringes.  If it doesn't, then it doesn't.

24            In fact, if it doesn't -- if, say, the claim has six

25     elements, if you find that it contains five of the elements but

doesn't contain the sixth, then it doesn't infringe, so it has
to have them all.

There also are method claims, and those, in this
case, are claims 26, 28, and 29 of the '683 patent, and that
method claim recites a series of steps that have to be
performed, and to infringe a method claim, it must be proved
that use of an accused system performs each of the steps as
defined in the claim, and, again, they have to prove all of it.
If they only prove one out of five, then that's not enough.  If
they prove five out of six, that's not enough.

Now, you've also heard some evidence from the experts
about independent and dependent claims.  An independent claim
simply recites its own elements or steps and does not refer to
any other claim.  A dependent claim includes all the elements
or steps of another claim, that is the claim from which it
depends, plus one or more other elements or steps.

So it will say a system comprising or a method
comprising or method for doing this as recited in claim one
which also, or that also does, and that's a dependent claim
because it recites the claim that it comes from.

A dependent claim, of course, is infringed only if
all elements or the steps of the independent claim, as well as
the other element listed in the dependent claim, are shown to
exist in an accused system or method.  So in other words, to
prove infringement of the dependent claim, you have to prove,

1    A, that all of the elements of the claim from which it depends

2    are infringed and the one which is new as well.  Now, the

3    dependent claims at issue in this case are claim 29 of the '683

4    patent, and claims two, six, and 22 of the '516 patent.

5         These instructions are numbered.  If you need to know

6    that, all of this is recited for you in instruction number 17

7    so you can identify, but you can also tell by the language they

8    use as well.

9         And all of the other claims here are independent

10   claims.  The claims here, all of them actually, whether they

11   are system claims or method claims, use the term comprising.

12   Comprising simply means including but not limited to or

13   contain.  Thus, claims that contain the word comprising cover

14   any accused system or method that includes the elements of the

15   claims even if that accused method or system includes

16   additional functionality or steps.

17        What is important is whether the accused system or

18   method of a claim using the term comprising includes all the

19   elements of the claim.  If it does, then infringement is proved

20   even if the accused system or method includes even more

21   functionality or features.

22        Now, to decide the issues of infringement and

23   invalidity, you're going to need to understand the claims of

24   the patents because as both lawyers, I think, have pointed out

25   and was in the video before, the claims define the boundaries

1   of the rights that ePlus has in its patents, that anybody has

2   in their patents.

3          Now, those instructions -- I mean those patents are

4   in your notebook, and each of the claims that are at issue are

5   highlighted in yellow, and I've defined the claim terms, and

6   you have to use those terms, and they are in your notebook as

7   well, and you use those same definitions in deciding both

8   infringement and invalidity.  And the definitions are those as

9   would be given and are understood by one of ordinary skill in

10  the art, and you've heard people talking about.

11         One of the few things that I think the parties agreed

12  upon in this case is who was the person of ordinary skill in

13  the art, and that is someone in the field of computer science

14  with an undergraduate Bachelor of Science degree and some

15  practical programming experience, perhaps about a year or two,

16  and having an understanding of the basic principles of supply

17  chain management and procurement during the 1993 to mid 1994

18  time frame.

19         If the Court has not given you a definition, then the

20  words of a claim are to be given their usual and ordinary

21  meanings.  The parts of the patent that precede the claim are

22  called the abstract, and I believe somebody pointed that out to

23  you -- that has some evidentiary value, of course, because it

24  tells you things -- and the written description or

25  specification, but neither the written description nor the

1    abstract nor the drawings, which are called figures, can be

2    infringed.  The infringement is of the claims, not the things

3    that precede the claims, and that's what you are looking at.

4           The term published by a vendor was used, and I'll

5    remind you of that definition.  I think they read it, and you

6    probably have it perfectly in mind now, but published by a

7    vendor is used in the definition of the claim term

8    catalog/product catalog.

9           Published simply means to make generally known.

10   Published by a vendor simply means that at some point in time,

11   a vendor, such as a supplier, a manufacturer, or a distributor,

12   has made generally known or has disclosed an organized

13   collection of items and associated information, preferably but

14   not necessarily including the part number, price, catalog

15   number, vendor name, vendor ID, a textual description of the

16   items, and images of or relating to the item.

17          Now, two of the claims here contain what is referred

18   to as means for performing a stated function in the elements,

19   and you've got those interpreted in your book as well.  Claim

20   three of the '683 patent and claim one of the '172 patent have

21   elements that also include the means plus function

22   requirements.

23          That term, means for, has a special meaning in patent

24   law.  One example is that claim three of the '683 patent uses

25   the phrase means for selecting the product catalogs to search.

1    When it uses that term, means to do something, it's called a

2    means plus a function.

3             Here, the means is recited, and then the function is

4    to do something.  What is the function, to search, in the

5    example that I just gave you?  A means plus function element

6    covers a structure or a set of structures that perform the

7    particular function that is outlined, and that is either

8    identical or equivalent to at least one of the structures

9    described in the patent for performing that function.

10            The issue of whether two structures are identical or

11   equivalent is for you to decide.  I've identified the

12   structures described in the patents, and they are in your

13   juror's notebooks as are the functions.

14            All right, now, let's discuss for a moment how a

15   claim defines what it covers.  You probably have this in mind

16   pretty well, but I think I better just make it clear.  A claim

17   I said has a preface.  That's that beginning thing.  You'll

18   notice that in these claims, at some point before that

19   highlighting occurs and after all that verbiage occurs and I'm

20   going to use the '683 patent as an example, you have many, many

21   pages in there of description in the specification and the

22   abstract, and then on column 24, right under appendix X, it

23   says we claim, and it is from that point that the claim, i.e.,

24   the boundaries of the invention become defined.

25            The first one of these claims that you have to worry

1   about is claim three, and it's highlighted for you, and it's an

2   electronic sourcing system comprising, and then it has the

3   elements set forth below it.  That's what you are looking at.

4        Each element is then stated in a single sentence, and

5   if an accused system or method satisfies each of these

6   requirements, then it's covered by the claim.  In other words,

7   what does covered by the claim mean?  It means it infringes the

8   claim.  So if an accused system, and you've got the list of

9   them, you'll have them right in here in your verdict form, and

10  you'll remember that Dr. Weaver, when Mr. Robertson was talking

11  to him and asked him questions, defined which of the five

12  systems he thought infringed which, each of the claims, and

13  you'll have that identified in your verdict form for you to

14  look at.

15       So that means that -- let's just say configuration

16  one, and I don't know if this is right or not, but if they say

17  configuration one infringes only claim one of the -- claim

18  three of the '683 patent, then that's all you have to decide,

19  but if they say it infringes every one of them, the claims,

20  then you have to decide that, too, and that's all outlined for

21  you on your verdict form as well.

22       So let's talk just briefly about infringement

23  generally.  Patent law gives the owner of a valid patent the

24  right to exclude others from importing, making, using, offering

25  to sell, or selling the patented invention or product made by a

1    patented method within the United States during the term of the

2    patent.  Any person or business entity that has engaged in any

3    of those acts, that is importing, making, using, offering to

4    sell, or selling, et cetera, that I just read, without the

5    patent owner's permission infringes the patent.

6         The parties here agree that ePlus has not given any

7    such permission to Lawson.  Here, ePlus alleges that Lawson's

8    accused system and methods directly and indirectly infringe the

9    yellow highlighted claims in your juror notebook for each the

10   '683, '516, and '172.

11        The verdict form asks you to determine whether ePlus

12   has shown by a preponderance of the evidence whether any of

13   Lawson's accused system or methods infringe, either directly or

14   indirectly, the asserted claims of those three patents.  ePlus

15   has to prove by a preponderance of the evidence the issue of

16   infringement.  What does that mean?

17        Preponderance of the evidence simply means to prove

18   that something is more likely so than it is not so, or in other

19   words, a preponderance of the evidence in the case means such

20   evidence, as when considered and compared with the opposing

21   evidence, has a more convincing force for you and produces in

22   your minds belief that what is sought to be proved is more

23   likely true than it is not true.

24        I don't mean in singling out numbers here for you to

25   tell you where that is, but the parties emphasized these

1    burdens so much in our arguments, the lawyers did, if you need

2    to refresh your memory on what preponderance means for ePlus

3    and what clear convincing means for invalidity for Lawson, you

4    can look at 23.  That's for infringement.  Invalidity is dealt

5    with in another thing.  I'll tell you what that is later.

6              Now, infringement, of course, has to be based, as you

7    know and you've learned, on a claim-by-claim basis so that

8    there may be infringement of one claim and not another.  That's

9    something you're going to have to decide.

10             Now, when you are deciding infringement, you must

11   only compare Lawson's accused systems and methods to the claims

12   of the ePlus patents.  In deciding the issue of infringement,

13   you may not compare Lawson's accused systems and methods to

14   ePlus's commercial products and methods.  You don't compare

15   product to product.  You do the system that's accused, whether

16   it's a system or a method, against the claims of the patent.

17   So whether or not Lawson's products that they sell and ePlus's

18   products are the same or different is not a matter that you get

19   into.

20             A patent can be infringed directly or indirectly.

21   Direct infringement occurs if the accused system or method is

22   covered by one or more or all of the claims in the patent.

23   Direct infringement of a method claim results if a single actor

24   performs all of the steps of that claim.

25             What's indirect infringement?  Indirect infringement

1    results if the defendant, here, Lawson, induces another to

2    infringe a patent or contributes to the infringement of a

3    patent by another person.  I'm going to explain those two types

4    of infringement now.

5         Lawson would be liable for directly infringing

6    ePlus's patents if you find that ePlus has proven by a

7    preponderance of the evidence that Lawson itself has made,

8    used, offered to sell, sold, or imported into the United States

9    the invention defined in any claim of the patents.  Then that

10   claim has been infringed if they proved that by a preponderance

11   of the evidence.

12        Now, remember that someone can directly infringe a

13   patent without knowing that what they are doing is an

14   infringement of the patent.  You don't have to know you are

15   infringing the patent to infringe it.  You either do or you

16   don't.  So you can directly infringe a patent even though you

17   believe in good faith that what you are doing is not an

18   infringement of the patent.

19        The issue is does it or doesn't it, not what state of

20   mind the direct infringer had.  In every infringement analysis,

21   the language of the claims as well as the nature of the accused

22   system or method dictates whether infringement has occurred.

23   To infringe a claim that recites capability and not actual

24   operation, an accused system or method need only be capable of

25   operating in the described mode.  Thus, depending on the

1    claims, an accused system or method may be found to infringe if

2    it is reasonably capable of satisfying the claim elements or

3    limitations even though the system or method may also be

4    capable of non-infringing modes of operation.  The fact that a

5    product or process may operate in a manner that does not

6    infringe is not a defense to a claim of infringement against

7    Lawson if its system is also reasonably capable of operating in

8    a manner that satisfies the claim elements.

9           Now, Lawson -- I mean ePlus also alleges that Lawson

10   has actively induced other people to infringe the

11   patents-in-suit.  In particular, who are they alleged to have

12   induced?  The Lawson customers in this case.  That's what it's

13   about.

14          To show induced infringement, ePlus has to prove by a

15   preponderance of the evidence that someone, here, Lawson's

16   customers, have directly infringed the ePlus patents, and that

17   Lawson -- so they have to show that the customers directly

18   infringe.  And remember, it doesn't make any difference whether

19   the customers knew or didn't know that they were infringing,

20   because if you infringe, you infringe whether you know it or

21   not.  But they also, ePlus has to prove by a preponderance of

22   the evidence that Lawson has actively and knowingly aided and

23   abetted that direct infringement.

24          So here, in order to find that Lawson has induced

25   somebody else to infringe, you do have to consider Lawson's

1    state of mind, i.e., that they actively and knowingly aided and

2    abetted the indirect infringement by their customers.  ePlus,

3    thus, must show that Lawson actually intended to cause the acts

4    that constitute infringement and that Lawson knew of the patent

5    and that Lawson knew or should have known that its actions

6    would lead to actual infringement.

7            Knowledge of the patent may be established by a

8    finding that Lawson had actual knowledge of the patent or that

9    Lawson deliberately disregarded a known risk that ePlus had a

10   protective patent.  Intent to cause the acts that constitute

11   direct infringement may be demonstrated by evidence of active

12   steps taken to encourage direct infringement such as

13   advertising an infringing use or instructing someone on how to

14   engage in the infringing use.

15           It is not necessary to show that Lawson has directly

16   infringed as long as you find that someone, here the Lawson

17   customers, directly infringed and that Lawson did the things

18   that I said constituted inducement.  If there's no direct

19   infringement by anyone, there can be no induced infringement,

20   and, of course, induced infringement must also be assessed on a

21   claim-by-claim basis.

22           Now, just to review that, what you're going to have

23   to do here is look and see if Lawson's systems, all or any of

24   them, actually infringed the patent when they were used by the

25   customers of Lawson.  Then you have to decide whether Lawson

1    actively and knowingly helped -- that's called aiding and

2    abetting -- the direct infringement, and there was evidence

3    that you have to decide about who was involved in talking to

4    the customers, what they told the customers.  You consider all

5    of that as well, but remember that in order to prove by -- I

6    mean to prove induced infringement, ePlus has to show that

7    Lawson actually intended to cause the acts -- and I'm reviewing

8    this little part of the instructions -- that constitute

9    infringement, that Lawson knew of the patent and that Lawson

10   knew or should have known that its actions would lead to actual

11   infringement.  Pay attention to the rest of that instruction as

12   well, but I wanted to recapitulate for you that.

13          Now, there's another kind of indirect infringement

14   that's involved, and that's called contributory infringement.

15   ePlus also argues that Lawson is liable for this contributory

16   infringement by contributing to the direct infringement of

17   ePlus by third parties, again, the Lawson customers.

18          As with direct infringement, you have to determine

19   contributory infringement on a claim-by-claim basis.  Lawson is

20   liable for contributory infringement of a claim if ePlus proves

21   by a preponderance of the evidence, one, that Lawson sells,

22   offers to sells, or imports within the United States a

23   component of a Lawson system or apparatus for use in a process

24   during the time the patent is in force.

25          I don't think there's any issue here, is there, about

1    the time frame?  If there were infringing sales, is there an

2    issue about the patent being enforced?  I don't remember any

3    evidence about it, and I'm trying to take it out of the case.

4    Mr. Robertson, Mr. McDonald, was there any evidence adduced to

5    that point?

6              MR. McDONALD:  I don't think that's an issue, Your

7    Honor.

8              THE COURT:  No, I don't think it's an issue here,

9    either.  Do you?

10             MR. ROBERTSON:  No, sir.

11             THE COURT:  While I told you about that during the

12   time the patent is enforced, there's no issue as to that.  You

13   still have to be comfortable with that.  Two, that the

14   component or apparatus has no substantial non-infringing use;

15   three, that the component or apparatus constitutes a material

16   part of the invention of the ePlus patent; and four, that

17   Lawson is aware of the ePlus patent and knows that the system

18   for which the component or apparatus has no other substantial

19   use may be covered by a claim of the ePlus patent, and that the

20   use of this apparatus or component directly infringes the claim

21   by -- and that direct infringement here would, of course, be

22   the person who they are alleged to be contributing to infringe

23   the patent, and that would be the Lawson customers.  That is

24   the use by Lawson customers directly infringes the claim.

25             It is not necessary to show that Lawson has directly

1    infringed as long as you find that someone, here, the

2    customers, has directly infringed, but if there's no direct

3    infringement by anybody, then there can be no contributory

4    infringement, and, of course, this has to be assessed on a

5    claim-by-claim basis as well.

6           And now we'll turn to these means-plus-function

7    claims in claim three of the '683 and claim one of the '172

8    patent, and those definitions are set out for you on the second

9    through fourth pages of your juror notebook glossary of claim

10   terms.

11          A product or a process meets a means-plus-function

12   requirement of a claim.  Again, look at the claim language and

13   look at it element by element.  So it meets -- a process or

14   product meets a means-plus-function element of a claim if, one,

15   it has a structure that is the product or process -- here, has

16   a structure or a set of structures that perform the identical

17   function that is recited in the claim, and, two, the structure

18   or set of structures is either identical or equivalent to one

19   or more of the described sets of structures that I've given for

20   you and performing the functions that are recited.

21          If the product does not perform the specific function

22   recited in the claim, then the means-plus-function requirement

23   is not met, and the product does not literally infringe the

24   claim.

25          Alternatively, even if the product has a structure or

1    set of structures that perform the functions recited in the

2    claim, but the structure or set of structures that performs the

3    function is either not identical or not equivalent to one or

4    more of the structures or sets of structures that I have

5    defined for you, then the product does not literally infringe

6    the asserted claim.

7           A structure or a set of structures may be found to be

8    equivalent to one of the sets of structures I have found, and

9    that's -- if you'll look at your notebook and look at your

10   terms, you will see that there is -- for each one of these

11   means-plus-function things, it says, means for building

12   requisition that uses data from said database relating to

13   selected matching items on set order list.  Boy, that's a

14   mouthful, isn't it?

15          There's a function described, and then there's a

16   corresponding structure.  Now, we're talking about -- now, what

17   does it take for some structure to be equivalent to what I have

18   defined?  Well, it's equivalent if a person, having ordinary

19   skill in the art or in the field, would have considered the

20   differences between what I have described and what actually

21   happens to be insubstantial at the time the patent issued if

22   that person would have found the structures performed the

23   function in substantially the same way to accomplish

24   substantially the same result.

25          In deciding whether the differences would be

1    insubstantial, you may consider whether a person having

2    ordinary skill -- ordinary level of skill in the field of

3    technology of the patents would have known of the

4    interchangeability of the two structures or sets of structures.

5            Interchangeability itself is not enough in order for

6    the structures to be considered interchangeable.  The

7    interchangeability of the structures must have been known to

8    persons of ordinary skill in the art at the time the patent

9    issued.  That's August of 1994.

10           The fact that a structure or set of structures is

11   known now and is equivalent is not enough.  The structure or

12   set of structures must also have been available at the time the

13   patent issued.

14           All right, we're through now talking about

15   infringement.  We're going to move to the invalidity defense,

16   but you've been sitting here for awhile.  Would you like to

17   take a little rest before we go there?  We'll take about a 15-,

18   20-minute break and then come back and do invalidity.

19

20                      (Jury out.)

21

22           THE COURT:  Will you tell me who testified to

23   interchangeability and equivalency for purposes of contributory

24   infringement?  As I was going through that -- I'm not sure we

25   had evidence.  If you did, it went right by me.  Who did it?

1           MR. ROBERTSON:  It's for the means-plus-function

2    claims, Your Honor.

3           THE COURT:  Yes, I know that.

4           MR. ROBERTSON:  Dr. Weaver was talking about the

5    various programs that perform that functionality during his

6    testimony.  I mean, I think that's -- quite frankly, the

7    structures disclosed in your construction show that there are

8    various types of programs that can actually perform that

9    functionality.

10          THE COURT:  But what he didn't say was he didn't

11   address interchangeability or equivalency on that pint.

12          MR. ROBERTSON:  It's not a doctrine of equivalents

13   concept, Your Honor.

14          THE COURT:  I understand that, but it still uses the

15   word and the term.  I think it is one of the dumbest concepts

16   of patent law, to tell you the truth, and I think that you have

17   to have an expert actually come in and say what it is so a jury

18   can understand it, and I'm not sure we have it in this case.

19          It is a very difficult concept for any juror to grasp

20   without the aid of expert testimony, and I don't think we ever

21   did it.  Why didn't -- you must have thought he did it, because

22   you didn't get up and say anything or object to the

23   instruction, so you must think I'm one of the dumbest --

24          MR. McDONALD:  It was part of our JMOL when we were

25   saying go claim by claim and element by element doing the

1    necessary analysis --

2        THE COURT:  Well, no.  You said he didn't go claim by

3    claim and he didn't do it the right way.  You didn't get into

4    the fact that he didn't offer the opinion on structural

5    interchangeability.

6        MR. McDONALD:  What we said was he gave only

7    conclusory opinions and failed to do the analysis necessary,

8    and that is exactly the sort of analysis --

9        THE COURT:  I know you made those statements, but you

10   didn't put it out in terms of contributory infringement.

11       MR. McDONALD:  Or this is actually the means plus

12   function clauses, but it was certainly meant to encompass

13   those.

14       Just to be clear, our motion for JMOL did include

15   those means-plus-function elements, and specifically that Dr.

16   Weaver's conclusory --

17       THE COURT:  I don't mean contributory infringement.

18   I mean means plus function.

19       MR. ROBERTSON:  I think Dr. Weaver testified when we

20   went through all those manuals exactly what the programs were

21   that were performing that functionality.

22       Remember, these are computer programs, so we went

23   through the purchase order manual, we went through the

24   inventory control manual.  He was testifying based on that.

25   Quite frankly, I think he was saying that the claims were

1    literally satisfied based on the Court's construction.

2            THE COURT:  I know that's what -- I agree he did

3    that.  The question is, having done that and having no evidence

4    on the issue of any interchangeability, why is that a good

5    instruction?

6            MR. ROBERTSON:  As I'm standing here right now, I

7    don't specifically recall whether or not he said there can be

8    programs outside this that are disclosed, that are not

9    disclosed in this purchase order manual, but I don't think he

10   did it with respect to every single one, but I don't have

11   memory respect to every single.  He certainly did do it with

12   respect to the Court's construction.

13           THE COURT:  I know that.  I know he did that.  He

14   said specifically this does this function, this is the

15   structure that does this function.

16           All right.  Well, it's done now.  We'll take a

17   recess.

18

19           (Recess taken.)

20

21

22

23

24

25