1

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA
2                    RICHMOND DIVISION

3    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                                      :
4    ePLUS, INC.,                     :
                                      :
5                        Plaintiff,   :
     v.                               :  Civil Action
6                                     :  No. 3:09CV620
     LAWSON SOFTWARE, INC.,           :
7                                     :  March 25, 2011
                         Defendant.   :
8    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _:

9

10                        DAILY COPY

11

12        COMPLETE TRANSCRIPT OF **EVIDENTIARY HEARING**
             BEFORE THE HONORABLE ROBERT E. PAYNE
13               UNITED STATES DISTRICT JUDGE

14

15   APPEARANCES:

16   Scott L. Robertson, Esq.
     Jennifer A. Albert, Esq.
17   **Michael T. Strapp, Esq.**
     GOODWIN PROCTOR
18   901 New York Avenue, NW
     Washington, D.C.   20001
19
     Craig T. Merritt, Esq.
20   CHRISTIAN & BARTON
     909 E. Main Street, Suite 1200
21   Richmond, VA   23219-3095

22           Counsel for the plaintiff ePlus

23

24                 DIANE J. DAFFRON, RPR
                 OFFICIAL COURT REPORTER
                UNITED STATES DISTRICT COURT
25

2

APPEARANCES:   (Continuing)

Daniel W. McDonald, Esq.
**Kirstin L. Stoll-DeBell, Esq.**
**William D. Schultz, Esq.**
MERCHANT & GOULD
3200 IDS Center
80 South Eighth Street
Minneapolis, MN   55402-2215

Dabney J. Carr, IV, Esq.
TROUTMAN SANDERS
Troutman Sanders Building
1001 Haxall Point
P.O. Box 1122
Richmond, VA   23218-1122

          Counsel for the defendant Lawson.

3

1          (The proceedings in this matter commenced at

2     9:30 a.m.)

3

4          THE CLERK:  Civil Action No. 3:09CV620,

5     ePlus, Incorporated v. Lawson Software, Incorporated.

6          Mr. Scott L. Robertson, Mr. Craig T. Merritt,

7     Ms. Jennifer A. Albert, Mr. Michael G. Strapp

8     represent the plaintiff.  Mr. Daniel W. McDonald,

9     Mr. Dabney J. Carr IV, Ms. Kirstin L. Stoll-DeBell,

10    Mr. William D. Schultz, and Ms. Rachel C. Huey

11    represent the defendant.

12          Are counsel ready to proceed?

13          MR. ROBERTSON:  The plaintiff is, Your Honor.

14          MR. McDONALD:  Lawson is as well, Your Honor.

15          THE COURT:  All right.  This is the

16    evidentiary hearing on the issue of an injunction.

17          Is there another firm coming into this case

18    for you-all?

19          MR. McDONALD:  The Finnegan firm is involved,

20    Your Honor, but they are not going to be participating

21    in this hearing.  They are going to be involved with

22    the appeal primarily, but they wanted to have access

23    to the documents.

24          THE COURT:  Oh, okay.

25          Mr. Robertson.

4

1          MR. ROBERTSON:  Good morning, Your Honor.

2          If I might, I just have a few brief opening

3    remarks to just sort of put some of the issues in

4    context and then preview for the Court or highlight

5    some of the topics that are going to be addressed

6    today by Mr. Farber's testimony, if that's

7    permissible.

8          THE COURT:  All right.

9          MR. ROBERTSON:  First, we are here to discuss

10   the supplemental evidence, testimony and documentation

11   that have been provided to the Court and exchanged by

12   the parties since the trial ended that we believe will

13   support the Court's discretion to grant an injunction

14   in this case to prevent the ongoing infringement of

15   ePlus' patents.

16         We certainly don't want to be here today, and

17   I know the Court doesn't want to retry the case, or

18   reargue a number of the issues involving hotly

19   contested issues that are before the Court.

20         That said, there will be some additional

21   details concerning evidence that did come out that we

22   think would be important for the Court to consider.

23         I'd just like to highlight Section 154 of the

24   Patent Act.  Your Honor, the only right conferred upon

25   a patent owner under the Patent Statute is the right

1    to exclude.  And that is the right that we are here to

2    enforce today as the Court knows.

3         The Patent Act was what's called a carefully

4    crafted bargain by Congress which provided a limited

5    right to exclude for a period of years in exchange for

6    disclosure to the world of the invention.

7         As you know, the eBay case has indicated and

8    confirmed that the Court has substantial discretion in

9    granting an injunction.  And if we could just put up

10   the factors for the eBay test.

11        This four-factor test, which has been called

12   the eBay factors, are, of course, as the Court

13   recognizes, the traditional factors for a court

14   entering injunctive relief.

15        Irreparable injury and adequate remedy at law

16   have often been called the two sides of the same coin.

17   Balancing of the harms, of course, needs to be

18   considered as well as the public interest.  But even

19   in the eBay case, an issue that arose was whether or

20   not a case called *Continental Paper Bag*, a 100-year

21   old decision, which had held that a patent owner, even

22   a non-practicing patent owner, had the right to

23   exclude an infringer from the marketplace.

24        And the Court considered that case and

25   whether or not it actually had to reverse that

1   decision.  And it found that it did not.  And I think

2   there's some interesting wording in that case that I'd

3   like to bring to the Court's attention.

4        It said from that right to exclude, the only

5   right granted to the patent owner, we may judge the

6   patent owner's remedies.  Nothing less than an

7   injunction can retain that right of exclusivity

8   granted by the patent.

9        As Justice Roberts noted in his concurrence

10  in the eBay case, citing Justice Holmes, a page of

11  history is worth a volume of logic.  Infringement

12  having been found, the traditional remedy is to enter

13  the injunction.

14        Those are my opening arguments.

15        THE COURT:  It's been interpreted to mean

16  there's a presumption of entitlement to injunctive

17  relief as opposed to an absolute entitlement to

18  injunctive relief; is that your point?

19        MR. ROBERTSON:  I think the issue is still

20  open as to whether or not the presumption still

21  applies.  I think certainly in instances where there

22  has been established proven competition,

23  overwhelmingly courts have entered the injunctions in

24  favor of the patent owner, infringement having been

25  found.

1             But even competition itself, Your Honor, is

2       not critical to the injunctive relief we're seeking

3       here.  We think the parties have focused significantly

4       in their posttrial submissions on this issue of

5       competition, and there will be a lot of discussion

6       about that today.

7             But even the Federal Circuit post eBay has

8       said, for example, you're not required to prove actual

9       lost sales in order to obtain an injunction.  You're

10      not even required to show that you have a commercial

11      product that's marketed in direct competition.

12            Those cases I can cite to the Court are *Eye*

13      *For Eye, Limited*.  The citation is 598 F.3d 831.  It's

14      a 2010 case.  And Broadcom v. Qualcomm, which is 543

15      F.3d 683.  Obviously, we'll be citing those in our

16      posttrial brief, Your Honor.  But, nevertheless, we

17      believe at the end of this hearing the evidence will

18      be overwhelming that there's direct competition in the

19      same marketplace, in the same market sectors,

20      involving Lawson and ePlus for these procurement

21      software solutions.

22            So, first, I think it is important to

23      emphasis to the Court that ePlus does practice its own

24      patents.  It's not what is known has an NPE, as it's

25      come up, or a non-practicing entity, or the more

1    disparaging term, a patent troll.

2          Mr. Farber is going to address the importance

3    of the products that ePlus sells in this marketplace.

4    The Court may recall they are called Procure+ and

5    Content+, and how they embody the patents-in-suit.

6          He's going to describe the ongoing role of

7    those software solutions for the company, how ePlus

8    has generated tens of millions of dollars in revenues

9    from licensing not only those products, but by

10   leveraging the sale of other related products for

11   those Content+ and ePlus.

12         He's going to explain how those products help

13   support and retain customers for its other business

14   and distinguish itself from its competitors in the

15   marketplace.

16         We are also going to have Mr. Farber address

17   issues about how ePlus markets those products and

18   solicits its customers, about the process and the

19   context and the significant overlap that it has with

20   the same way that Lawson solicits and targets its new

21   potential customers using a variety of means to obtain

22   leads and contact potential customers.  He's going to

23   describe ePlus' sales and marketing efforts in that

24   manner.

25         And Your Honor may also recall that in this

1   process of solicitation of new companies, there is the

2   submission of what were called RFPs or requests for

3   proposals and the secretive nature of that bidding

4   process, which often makes it difficult to really

5   understand who you're competing with when you go

6   through that process.  But since the trial terminated,

7   the parties have changed lists of their customers,

8   lists of the customers they solicited, and in the

9   submissions we provided to Your Honor, we have three

10  appendices, A, B. and C, in which we show the

11  substantial overlap there is with the solicitation of

12  the same customers, the customers that we've actually

13  solicited of Lawson's, and the customers that ePlus

14  has that Lawson has actually solicited as well.

15        Mr. Farber will also describe how both Lawson

16  and ePlus not only both target mid market sized

17  companies, so we're in that same market sector, but

18  also how we focus on many of the same industries,

19  including the education, energy, food and beverage,

20  government, health care, manufacture, retail and

21  transportation.

22        He'll then describe his own personal

23  knowledge of instances where ePlus and Lawson have

24  targeted the same customers and where Lawson has

25  targeted ePlus' customers.

1        He'll also address what we believe is the

2   ongoing irreparable harm to ePlus.  Obviously, I've

3   emphasized the fundamental right is the right to

4   exclude, and that is a right that we would like to

5   retain since it's the only right granted to us by the

6   Patent Act.

7        He will describe how Lawson continues to

8   compete in the marketplace with its infringing systems

9   currently, the lost opportunities that ePlus has,

10  first, to try and market and sell to Lawson's

11  customers that are using the infringing systems, the

12  lost opportunities that we've suffered as a result of

13  the capital that's been diverted from this case that

14  could have been used for other efforts, sales efforts,

15  research and development, and opportunities to grow

16  our business.

17       He'll also discuss the result of Lawson's

18  infringement including the opportunity to sell its

19  products, as I said, to Lawson's customers.

20       Finally, if necessary, Mr. Farber is prepared

21  to discuss the licensing of ePlus' patents to other

22  infringers that we needed to bring enforcement actions

23  against, and how those licenses were carefully

24  circumscribed and restricted to make certain that they

25  were not sub-licensable, nonassignable,

 1   nontransferable.

 2           And, indeed, at least two of the licenses

 3   that were a result of the litigation involved here,

 4   ePlus and Mr. Farber negotiated what are called

 5   carve-out provisions that specifically made certain

 6   that those licenses granted to two of the other

 7   defendants in this case that resolved their dispute

 8   with ePlus could not be transferred to Lawson in

 9   particular.

10           Finally, briefly, Mr. Farber may discuss

11   ePlus' capability to replace Lawson's procurement

12   solution in the marketplace.

13           So with that, Your Honor, those are my

14   concluding opening remarks.  Unless the Court has any

15   questions, I would call Mr. Farber.

16           MR. McDONALD:  Your Honor, Mr. Robertson and

17   I talked about whether you might give both of our

18   openings at the beginning.  We didn't talk about it

19   again this morning.  If you want me to wait, that's

20   fine, but if you want, I can help tee it up and give

21   you five minutes of our version of it right now.

22           MR. ROBERTSON:  I'm happy either way.

23           THE COURT:  What do you want to do?  Do you

24   want to wait or do you want to talk now?

25           MR. McDONALD:  I'd like to give you about

1    five minutes right now, if it's all right.

2         THE COURT:  All right.

3         MR. McDONALD:  Thank you.  We certainly agree

4    on those four factors.  In fact, if you want to leave

5    those up on the screen, that's fine with me.  The four

6    factors after the eBay case.  And I do think on the

7    issue of the presumption, when that case was remanded,

8    I was just looking at the remanded version of the

9    case, and in that decision the district court here in

10   Virginia said the presumption of irreparable harm does

11   not apply in patent cases, and you don't have that

12   presumption anymore.  It's just like any other case.

13   The burden is on the party seeking the injunction to

14   show these factors are met.

15        And a number of things won't be hit in the

16   hearing today.  We don't have to because they can be

17   on the papers or in terms of what was done previously

18   at trial.

19        I'll just note very briefly on the

20   availability of a remedy alternative to injunction,

21   there is the availability of a going forward royalty.

22   In post eBay, you see a number of cases doing that.

23   The Federal Circuit has weighed in on the Toyota Pace

24   case to say it's not a jury issue.  This is an issue

25   for the Judge to decide going forward.

13

1          And so what happened at trial, the ePlus

2    folks didn't mention this, obviously.  They haven't

3    talked about a royalty as being an alternative.  And I

4    think they want it both ways because damages was

5    excluded as a sanction at the trial of this case.

6    They are going to appeal that issue and try to get

7    damages back in the case.

8          I think that's the elephant in the room from

9    their standpoint.  Why isn't a royalty going toward

10   directed to the RSS and Punchout products an adequate

11   remedy?  And they didn't touch that in their first few

12   minutes here, and it's really the primary issue

13   because clearly it will been.  It has been for every

14   other infringer that sells a lot more products than

15   Lawson, like SAP and Ariba.  A lot more of the types

16   of products here.  It was an adequate remedy to pay

17   them there, and it's an adequate remedy here going

18   forward.

19          THE COURT:  How would I decide that?

20          MR. McDONALD:  Well, you'd had a separate

21   hearing.  There's some other case law out there that

22   says once we deny the injunction, one judge mentioned

23   I asked the plaintiff do they want to have a royalty.

24   And they said, Well, Judge, we want to wait and see

25   what you do with the injunction.  And the Court said,

1  Well, I've denied your request for an injunction.  So

2  now you know it's that or nothing.  So we'll have

3  briefing on that.

4         THE COURT:  Why would anybody ever do that?

5  Why wouldn't I just decide it all at one time?

6         MR. McDONALD:  It's the plaintiff's burden to

7  come in and do that.  They didn't want to put the

8  evidence in because they didn't want to make that look

9  like an alternative for you, but it is an alternative.

10 Maybe that would have been more efficient, I agree

11 with that, but it's kind of hard for us to respond to

12 something when they didn't put in evidence of what the

13 royalties should be.

14        We can certainly through either a bond or

15 just through the fact that Lawson is solvent represent

16 that one way or the other we can even calculate that

17 after an appeal is over, if need be, and keep track of

18 our sales in the meantime, and we can do it at some

19 later date.  We don't have to do it right now.

20        THE COURT:  I don't know why I'm even having

21 the hearing today if at some point later they are

22 going to come back and tell me they want a royalty if

23 I don't grant an injunction.

24        MR. McDONALD:  Well, I think they want you to

25 give them the injunction and think that you don't have

1    that option, but the fact is you do, and you don't

2    have to find it now.  The question is whether there's

3    a remedy that's available to them.

4            And if there is one, and there is, then you

5    don't order the junction.  But I don't think you look

6    at it as, well, I have to grant an injunction just

7    because they haven't asked for that alternative remedy

8    that is available.  That would be a wrong thing to do.

9    So that's the situation.  There's a gateway issue

10   here.

11           On the issue of irreparable harm, ePlus has

12   fashioned this as competition.  And, really, this

13   competition that they have we're going to show today

14   through the testimony isn't anything more than *de*

15   *minimis* competition because Lawson and ePlus really

16   sell different products in different ways.

17           Lawson is one of these providers, what they

18   call ERP, enterprise resource planning, vendors that

19   sells a whole suite of products; human resources,

20   accounting or general ledger, and other things as well

21   as procurement.  That's like SAP and Oracle and

22   McKesson.  These are these people that provide that

23   one stop shopping for businesses so all of their

24   corporate activities can be taken care of.

25           EPlus is not an ERP provider.  They are a

niche provider of a procurement product.  In the
industry, they call that best of breed.  Some
companies do it for procurement.  Others do it perhaps
for human resources.  And it's a whole different world
than of competition.

In one place that comes into place, for
example, is all those companies out there that already
have SAP and Oracle and other ERP systems, that's
98 percent of the ERP customers out there because
Lawson only has actually a little less than 2 percent
of all those companies that have that suite of
products out there.

For those folks that are looking for
eProcurement, what we're talking about today, Lawson
doesn't even bid for that business because Lawson is
not one of these niche players or best of breed with
their procurement product.  Even if they were invited
to compete for that, they wouldn't go for that because
that's not what they try to do.  That's not their
strength.  They devote their resources to the full
line of products.

EPlus, that's right in their sweet spot.
That's the sort of customer where they say, Yes, our
product is the best of breed that will integrate with
your SAP or Oracle system.

1          So when you drill down and really look at the

2    competition here, what's going to become clear is that

3    ePlus has not lost a single sale due to Lawson's RSS

4    or Punchout products.  And that's a very, very

5    important issue on whether or not they would be

6    irreparably harmed in a way that cannot be compensated

7    by money.

8          Is there a little bit of competition?  There

9    might be literally one or two customers.  I don't even

10   know if those are really competition.  When you really

11   get down to it, it's a small number because it's the

12   people that are within that 2 percent that have the

13   Lawson ERP suite and now they're looking to add this

14   type of procurement functionality.  So you're in a

15   subset of that 2 percent that even would be in that

16   ballpark.  So it's very, very rare.

17         The other key things here, that 2 percent

18   number is also significant in another way.  Less than

19   2 percent of ePlus' business is this procurement

20   business, this Procure+ and Content+.  They call them

21   their flagship products within this niche, but it's an

22   awfully small armada within that company.  It's only

23   about $6 million out of over $800 million in sales.

24   Lately, it's been less than 1 percent of their sales.

25   So it's very small.

18

1          So when you're looking at harm and the

2     injunction, there's really no harm to ePlus.  With all

3     the other competitors out there, the different

4     products, whether or not Lawson is enjoined isn't

5     going to alleviate any harm to ePlus.

6          THE COURT:  Is it your view that I can impose

7     royalties going forward?

8          MR. McDONALD:  Yes.

9          THE COURT:  And I can hear evidence on that

10    now?

11         MR. McDONALD:  Yes.

12         THE COURT:  I don't need a jury?

13         MR. McDONALD:  That's correct.

14         THE COURT:  That's the *Toyota* case?

15         MR. McDONALD:  Right.

16         THE COURT:  Is that case on appeal?

17         MR. McDONALD:  That was the Federal Circuit.

18         THE COURT:  I know, but did it go up?

19         MR. McDONALD:  I believe it did.

20         THE COURT:  Has it been denied writ?

21         MR. McDONALD:  Did it go to the Supreme

22    Court, you mean?

23         THE COURT:  Yes.

24         MR. McDONALD:  I'm pretty confidant the

25    Supreme Court hasn't accepted anything.  I don't know

1   whether it was petitioned for cert or not.

2            THE COURT:  The issue is whether it's

3   pending.  I don't know of anything being granted.

4            MR. McDONALD:  I think the time has passed

5   for that, Your Honor, just looking at the district

6   court decision back in 2006, but I'm not sure.

7            THE COURT:  Oh, yeah.

8            MR. McDONALD:  So on the harm issue, I'm not

9   clear what exactly ePlus is asking for in terms of a

10  scope of injunction.  I didn't hear Mr. Robertson talk

11  about that in his opening remarks, but we have seen

12  some indication in their papers they're seeking an

13  injunction not just in going forward RSS and Punchout

14  sales by Lawson, which is one thing for customers that

15  aren't in the pipeline, etc., but they actually have

16  indicated that while they want to let our existing

17  customers continue to use RSS and Punchout -- Your

18  Honor asked that question to Mr. Robertson at one of

19  our hearings, I think, between trial and now, and he

20  said, oh, no, we're not seeking to stop the customers

21  from using it, but they are seeking to have Lawson

22  stop servicing those customers.  And that would be

23  very harmful.

24            Lawson's life would go on at some level for

25  Lawson, but we're really talking about there is a harm

1    for the customers because they cannot use unsupported

2    software, especially industries like health care and

3    the public sector.  We're talking about buying the

4    supplies for people's operations.  And if they have an

5    unsupported system, they have a problem with it, it is

6    actually -- for example, Google makes a change to

7    their system.  Well, if the product interfaces with

8    Google, there might be a little glitch or something.

9    The customer needs to pick up the phone and call

10   Lawson and fix that.

11        It's like saying you can keep driving the

12   car, but you just can't put anymore gas in it because

13   the support is so critical to using these things.

14   We're talking about people having operations.  We're

15   talking about Virginia Commonwealth university, which

16   is a Lawson customer of RSS.

17        If you enjoin Lawson from supporting them,

18   they don't have any other options.  No other company

19   out there supports Lawson's systems.  You have to have

20   a knowledge and understanding and access to the code

21   of the Lawson systems to be able to fix those types of

22   glitches and figure out how it interacts with the

23   other Lawson systems in that suite of products to

24   solve those problems.

25        So you're talking about a very significant

1   harm.   They can't simply just stop using our product

2   and switch to another one tomorrow.   That takes

3   months, even years, to qualify the products to make

4   sure they work so they don't cause products with

5   supplying operations and things like that.   It

6   literally takes years for a customer to switch to a

7   different product.   So that would be a devastating

8   thing.

9         And ePlus has nothing to gain from that.

10   They don't provide service to the Lawson customers.

11   We're talking about an injunction here that would

12   really just hurt customers without helping ePlus.   The

13   right thing to do would be to just -- we would keep

14   track of our sales.   Everybody can take their appeals.

15         The only way to make sure that nobody is

16   irreparably harms here is to deny an injunction,

17   because those customers, there's no way to compensate

18   them if they are lost from support and ePlus loses on

19   appeal.   What recourse do they have at that point?   So

20   that's the right thing to do here when you look at the

21   balance of the harms.

22         So that in a nutshell -- Mr. Hager is our

23   person.   He's the VP from the S3 part of Lawson, which

24   has these RSS and Punchout products, very

25   knowledgeable about many aspects of the company

1  because he's held different jobs within S3. And he'll

2  help you understand the competitive landscape out

3  there, what we really sell, how it's sold, and also

4  this impact on customers if an injunction is entered.

5          Thank you.

6          Oh, we have a cite for the Federal Circuit

7  decision in *Pace v. Toyota*. It's 504 F.3d 1293.

8  That's from 2007. And somebody just checked that cert

9  was denied.

10         Thank you.

11         MR. ROBERTSON: If I might briefly respond.

12         THE COURT: I don't want you to do anything

13  except tell me one thing.

14         MR. ROBERTSON: Yes, sir.

15         THE COURT: If you are denied an injunction,

16  am I going to be facing a request for going forward

17  royalty?

18         MR. ROBERTSON: Sir --

19         THE COURT: Assume you're going to be denied

20  an injunction today after I hear the evidence and tell

21  you I don't think there's any reason for an

22  injunction, are you going to be asking for going

23  forward royalty?

24         MR. ROBERTSON: I think the Court has the

25  authority to do it.

1          THE COURT:  I didn't ask you that.

2          MR. ROBERTSON:  I'm not going to ask for that

3    relief, Your Honor.  We want --

4          THE COURT:  Ever?

5          MR. ROBERTSON:  Excuse me?

6          THE COURT:  Are you ever going to come to me

7    and ask for that relief?

8          MR. ROBERTSON:  This is what we want.

9          THE COURT:  E-v-e-r, Mr. Robertson?

10          MR. ROBERTSON:  I am not going to ask you for

11   that relief, Your Honor, because I want an injunction,

12   and once the injunction enters, if my client so

13   decides that it wants to determine to license Lawson,

14   that's when the playing field has been leveled.

15          In fact, Judge Ellis wrote a very thoughtful

16   decision on this very point saying that it is

17   difficult for courts who are ill-equipped to determine

18   what the appropriate licensing terms should be between

19   these two parties.  The Court is not an expert in the

20   software industry, with all due respect.  And as Judge

21   Ellis pointed out, once the injunction enters, it is

22   indeed the marketplace that sets the terms for the

23   license that could issue going forward.

24          In other words, Lawson would have to sit down

25   with ePlus and determine, based on marketplace

1   factors, how valuable the technology is that is

2   infringing.

3           THE COURT:   The answer is no, you're not

4   going to come to me for royalty going forward if the

5   injunction is denied?

6           MR. ROBERTSON:   I suppose if the injunction

7   is denied and the Federal Circuit then upholds the

8   denial of the injunction, it would probably be

9   remanded for some relief because, as the Court knows,

10  the statute says a licensee, excuse me, I mean a

11  patent owner shall receive no less than a reasonable

12  royalty.

13          So I think they would remand indicating that

14  since there was no injunction granted, that there had

15  to be some relief afforded by the district court.

16          I wanted to point out something about the

17  *Toyota v. Pace* case if I could.   It's a very unique

18  case.   In fact, that's a case where the Court did

19  impose a compulsory license, but it turned on the fact

20  that the patent owner was an NPE, didn't have its own

21  product, wasn't out there competing in the

22  marketplace, didn't have a product covered by the

23  patents.   And that is why and that was the only reason

24  why.

25          THE COURT:   Tell the record what an NPE is.

1          MR. ROBERTSON:  That's the non-practicing

2     entity, sometimes referred to, as mentioned before,

3     the patent troll.

4          THE COURT:  What if I decided that the public

5     interest here requires a compulsatory license because

6     when one of my colleagues goes to the Medical College

7     of Virginia for open heart surgery, I can't be putting

8     him or any other member of the public, colleague or

9     not, Mr. Merritt, Mr. Carr, or anybody in his firm,

10    anybody in the Richmond area, at risk of losing a

11    stitch or two, or not having the right syringe, or not

12    having the right product.  So instead of an

13    injunction, I say you're entitled to a remedy, and

14    under the circumstances an injunction is not the right

15    one, but a compulsory license is.

16         At that juncture I'd have to find out what

17    the license is or rate is, wouldn't I?

18         MR. ROBERTSON:  You would probably need to

19    make findings of fact with respect to what a

20    reasonable royalty would be.

21         THE COURT:  How would I do that on the record

22    that would be before me at the conclusion of these

23    proceedings?

24         MR. ROBERTSON:  I think it would be very

25    difficult, Your Honor.

1        THE COURT:  It would be somewhat difficult

2   unless one accepts Ouija work, dart boards, and those

3   kinds of things as the bases for deciding evidence.

4        MR. ROBERTSON:  One of the things that the

5   Court suggested earlier was that we should be looking

6   at comparable licenses.  Of course, we did that when

7   we went out in preparing our damages model for the

8   Court, and we didn't find comparable licenses.

9        The Federal Circuit has been very particular

10  in what it has determined to be comparable licenses in

11  the same technology.  I don't want to relive that, the

12  argument with respect to ResQNet, but one of the

13  reasons they say to look to the settlement agreements

14  was they were the most pertinent because they

15  addressed the very patents that were at issue in the

16  case.

17        I looked at some of the other comparable

18  licensing.  In fact, it involved some of my clients,

19  licenses I knew that the clients had never received a

20  penny in royalties under, notwithstanding what the

21  terms were.  I looked at the technology that was

22  identified.

23        So we had a handful, maybe five, that we

24  thought were comparable or could be considered

25  comparable and determined that they all were not

1  because they did not involve the same technology or

2  they were not really arms' length negotiated

3  comparable licenses.

4          So I think it's going to be very difficult

5  for the Court to try and come up with a royalty rate

6  given the sort of absence of examples out there for

7  the Court to draw upon.

8          Lawson has offered in its own self-serving

9  way.  It wants to dictate what the terms of the

10  licensing are.

11          THE COURT:  They said what?

12          MR. ROBERTSON:  They said first it should

13  only be on the revenues they generate from licensing

14  fees.  Why is that?  Because it's a very small portion

15  of revenues they generate from --

16          THE COURT:  Mr. McDonald can't argue that

17  anymore after what he just argued about the critical

18  nature of the service aspect of their business.  He

19  just said that's the integral link, the thing that

20  keeps things going, the thing that creates such a

21  significant interest in the public that an injunction

22  couldn't possibly lie.

23          And if that's the effect of it there,

24  certainly it has another effect in the dollar arena,

25  doesn't it?

1        MR. ROBERTSON:  Certainly, Your Honor, I

2   think Mr. McDonald has overstated the harm.

3        THE COURT:  He's bound by it now having

4   stated it.

5        MR. ROBERTSON:  First let me say, as a matter

6   of law, Your Honor, let me cite this case to you.

7   It's *Acumed v. Stryker Corporation*.  It's 551 F.3d

8   1323.  It's a 2008 case.  It says, in considering the

9   balance of the hardships in an injunction

10  determination, you only consider the hardships between

11  the patent owner and the infringer.  The effect on a

12  customer's -- and in this case, it was a medical case

13  -- patients is irrelevant under this prong.

14       There have been a number of cases actually

15  involving medical devices where injunctions have

16  entered.

17       THE COURT:  Is that before or after eBay?

18       MR. ROBERTSON:  It's a 2008 case.

19       THE COURT:  I have to read that case because

20  it sounds to me like -- I think I've looked at it, but

21  I think it's rather remarkable to say that you don't

22  pay any attention to the public interest.  Here you're

23  not talking about the customers, you're talking about

24  the patients in the hospital who aren't the customers

25  at all.

1          And it seems to me that you have to pay

2    attention to the public interest under eBay, I don't

3    care what anybody else says.  And, in fact, what eBay

4    actually said to the patent bar and to the Federal

5    Circuit is the law has been the same for hundreds of

6    years in respect of giving injunctions, and you must

7    pay attention to it in the patent field.  There is no

8    such think as the eBay factors.  Those factors were

9    decided at common law so far back that your degree

10   even picks them up, and so does mine, because that's

11   what we were taught.  And one of the components of

12   that degree is the public interest.

13          So if you're suggesting that you don't

14   consider the public interest, and that's the meaning

15   of *Stryker*, I can't accept that in view of what eBay,

16   the fundamental message that eBay says, which is

17   patent lawyers, Federal Circuit, you're in the same

18   system of justice that all the rest of us in this

19   country are in.  We ordered our lives by certain

20   precepts, and you're bound by it.  Now get with it and

21   apply those rules.

22          That's what the Supreme Court told everybody

23   in the patent bar and they told the Federal Circuit

24   the same thing.  And they told every district judge

25   the same thing.  Go back and look at what the law is

1    about granting junctions and do what we've been saying

2    you're supposed to do for a couple hundred years.

3         MR. ROBERTSON:  Your Honor, we didn't argue

4    anything differently as the respondent in that case

5    that went out there and said the traditional four

6    factors need to be applied.

7         Justice Roberts said they should be applied,

8    too, but for hundreds of years when they have been

9    applied, historically injunctions have been granted.

10        So certainly we need to consider the public

11   interest here.  Let me again say I think it's been

12   overstated somewhat because Lawson already has

13   provided indemnifications to every single one of their

14   customers with respect to this software if it is found

15   to infringe.

16        And they need to do three things.  They need

17   to either modify it at their expense so it doesn't

18   infringe.  They need to reimburse the customers for

19   the cost of the license.  Or they need to go and seek

20   a license from ePlus.  That's the indemnification,

21   that is the bargain they made with their

22   customers when --

23        THE COURT:  That'll all be dealt with in the

24   briefing, I suppose.  We're getting ahead of

25   ourselves.

1        MR. ROBERTSON:  It will be.

2        Having said that, I do have copies of the

3   *Acumed v. Stryker* case I just cited, Your Honor, that

4   I can hand up.

5        THE COURT:  Thank you.

6        MR. ROBERTSON:  I call Mr. Farber to the

7   stand.

8

9      KENNETH FARBER, called by the Plaintiff, first

10  being duly sworn, testified as follows:

11

12     DIRECT EXAMINATION

13  BY MR. ROBERTSON:

14  Q   Mr. Farber, just please state your name for the

15  record.

16  A   Kenneth Farber.

17  Q   You are the president of ePlus Systems, Inc.,

18  correct?

19  A   Yes.

20  Q   The two products we've been talking about that

21  ePlus offers for sale that concern the patents-in-suit

22  are Procure+ and ePlus Content+; is that right?

23  A   Yes.

24  Q   Are those the primary software products developed

25  and sold by ePlus Systems and ePlus Content Services?

1  A   Yes.

2  Q   I want to ask you some additional detail about

3  those products.  I know you went into it briefly at

4  trial, but if we could, let's talk about it in terms

5  of just the functionality of that software, if we

6  could.

7      Do you understand that the products that we're

8  talking about here practice the claims of the

9  patents-in-suit?

10 A   Yes.

11       MR. McDONALD:  Objection, Your Honor.  Lack

12 of foundation as to this witness' knowledge of the

13 scope of the claims.

14       THE COURT:  Overruled.

15 Q   Can you tell us if you have familiarity with that,

16 sir?

17 A   Yes.

18 Q   Okay.  What is it?

19 A   Well, my familiarity of what the systems do, my

20 understanding and knowledge of the systems is because

21 I oversee the development of those systems, and I

22 understand through the various court cases that I've

23 been through and the reviews and evaluations of each

24 claim and the many, many times that --

25 Q   So at a high level, can you describe the

1  functionality of those products that you offer on the

2  marketplace?

3  A    Sure.  The products that we offer for Procure+ and

4  Content+ functionally they provide the ability to

5  allow customers or end users to electronically procure

6  goods or products and services.  It allows them to

7  select and search multiple catalogs.  It allows them

8  to create requisitions, to create purchase orders, to

9  check inventory, to gain approval for those purchases,

10 and be able to combine purchase orders on multiple

11 purchases from a single requisition at a high level.

12 Q    Can you do what's known as comparison shopping or

13 cross-referencing to determine whether one product is

14 similar or generally equivalent to another?

15 A    Yes, you can.

16 Q    I'm going to ask you to take a look.  I think you

17 have your book in front of you.  It's Exhibit 448 in

18 there.  What is this, sir?

19 A    It's a product description of Procure+ 6.8.

20 Q    Let's go to page 2 of the document that ends with

21 the Bates label 3127.  What's being depicted by the

22 illustration at the top right-hand corner?

23 A    It's a very high level description of the

24 functions that are performed by the Procure+ solution.

25 Q    So you have catalogs and requisitions and ordering

1   and approvals we've all talked about?

2   A    Right.

3   Q    As well as inventory management?

4   A    Correct.

5   Q    So does the Procure+ allow users to select items

6   from catalogs for the requisition and services?

7   A    Yes, it does.

8   Q    On the right-hand side of the page, there's a

9   section called "creating a requisition."  Do you see

10  that?

11  A    Yes.

12  Q    What is this describing here?

13  A    There are a number of different ways that

14  requisitions can be created in the system, and this is

15  a description, a very high level of the different ways

16  that a requisition can be created through either

17  searching or hot lists or what we call quick reqs or

18  service templates, etc.

19  Q    On this page is also a discussion about punching

20  out to external catalogs.  Do you see that?

21  A    Let's see.

22  Q    The next page.  I'm sorry.

23  A    On page 2?  Which page are you referring to?

24  Q    Does the Procure+ solution and Content+ permit you

25  to what's known as Punchout to external catalogs?

1   A    Yes.

2   Q    Just briefly refresh the Court on what this

3   Punchout capability is.

4   A    Sure.   From within the control of the Procure+

5   application Punchout allows you to go to a third

6   party's catalog, purchase goods or services from that

7   catalog, and then bring that information back into the

8   control of the procurement application.

9   Q    You were present during the trial of this case as

10  the corporate representative for ePlus, correct?

11       THE COURT:  Where is that referred to in this

12  exhibit?  What page, Mr. Farber?

13       MR. ROBERTSON:  It's on page 3, I believe,

14  Your Honor.  It's now on the screen there.  It has a

15  Bates label of 3128, I believe.

16       THE COURT:  Okay.  All right.

17  BY MR. ROBERTSON:

18  Q    I'm sorry.  You were present as the corporate

19  representative for ePlus, right?

20  A    Yes, I was.

21  Q    During the testimony from Lawson's witnesses, did

22  they discuss the same Punchout capability?

23  A    Yes, they did.

24  Q    This Punchout term, is that an industry term?

25  A    Yes, it is an industry term.

1   Q    Do a number of the competitors in this

2   eProcurement space have that capability?

3   A    Yes.

4   Q    You have licensed Ariba and SAP, for example.  Do

5   they have that capability?

6   A    Yes, they do.

7   Q    Is that capability pretty standardized now for

8   somebody to be competitive in this marketplace?

9   A    Yes, it is.

10  Q    You mentioned about searching the multiple

11  catalogs and selecting items, building requisitions,

12  and generating multiple purchase orders from a single

13  requisition, checking inventory, and

14  cross-referencing.  Again, you were present during the

15  trial when all those functionalities were discussed by

16  Lawson's witnesses as their S3 procurement suite

17  having those capabilities; is that right?

18  A    Yes, that's correct.

19  Q    Why don't we take a brief look at Plaintiff's

20  Exhibit 307, if we could.

21  A    I'm sorry.  Which one?

22  Q    307.

23          THE COURT:  Which book is it in?

24          MR. ROBERTSON:  Should be in the book that

25  indicates Mr. Farber's witness binder.

FARBER - DIRECT                      37

```
 1              THE COURT:  I or II?

 2              MR. ROBERTSON:  Volume II, Your Honor.

 3   Sorry.

 4              Excuse me, Your Honor.  It's Volume I.  I

 5   only have one volume.

 6   BY MR. ROBERTSON:

 7   Q    Do you recognize this document, sir?

 8   A    Yes, I do.

 9   Q    What is it?

10   A    This is an ePlus procurement brochure.

11   Q    Does it provide an overview of the advantages

12   customers can realize from the ePlus procure product?

13   A    Yes.

14   Q    I want you to take a look at page 3 that ends with

15   the Bates label 9162.

16   A    Okay.

17   Q    What's being shown here?

18   A    This is a description at a very high level again

19   of the benefits that's provided by the Procure+

20   solution.

21   Q    It's identifies the electronic catalogs?

22   A    Yes, the catalogs, the auto PO generation.

23   Q    Requisitions?

24   A    Yes.

25   Q    Inventory management?
```

FARBER - DIRECT                    38

1  A    Yes.

2            THE COURT:   What's the difference between

3  ePlus, eProcurement and Procure+?   You earlier

4  discussed Procure+ and Content+ unless I misunderstand

5  you.   Is eProcurement Content+?

6            THE WITNESS:   Yes.   This is just a high level

7  brochure that encompasses the product level

8  functionality of Procure+ and Content+, Your Honor.

9            MR. ROBERTSON:   EProcurement, Your Honor, if

10 I might, is just sort of an industry term that

11 summarizes the general capability of these types of

12 products.   The brand for ePlus is Procure+ and

13 Content+.

14 Q    Can you tell the Court what the difference is

15 between Procure+ and Content+ and what the different

16 functionalities they each provide?

17 A    Well, the Procure+ solution is the component that

18 provides the actual purchasing mechanisms, the

19 requisitions, the inventory management, the work flow,

20 etc., the auto PO generation.

21       The Content+ solution is the element of the

22 solution that provides the electronic catalogs.

23 Q    Provides the actual catalog content?

24 A    That's correct.

25 Q    I want you to take a look at Plaintiff's Exhibit

1    287 that's in your book.

2    A    Okay.

3    Q    Do you recognize this document?

4    A    Yes.

5    Q    What is it?

6    A    This is a white paper describing Content+.

7    Q    Why don't you turn to page 9 of the document which

8    ends with the Bates label 7396.

9    A    96?  All right.  That's page 8, right?

10   Q    I'm sorry.  There's a heading at the top of this

11   page say that says content management from ePlus

12   introducing Content+?

13   A    Yes.

14   Q    What is this describing?

15   A    Well, again, it's describing the high level

16   functionality of the solution and the components that

17   we call enabler, the manager, and the syndicator

18   functions of the system.

19   Q    Does the enabler function allow users to import

20   catalog content?

21   A    Yes, it does.

22   Q    Into their databases?

23   A    Yes.

24   Q    Does it permit you to validate and transform that

25   data if necessary?

FARBER - DIRECT                    40

1    A    Yes, it does.

2    Q    Does it allows users to categorize catalog content

3    by schemas and classifications and various attributes?

4    A    It does.

5    Q    And you were present during the trial when

6    Lawson's witnesses testified as to the functionality

7    of their S3 product with respect to that same sort of

8    transformation, validation, and classification by

9    schemas including the UNSPC; is that correct?

10   A    That's correct.

11   Q    So does Content+ then enable users to take catalog

12   items and associate them with a classification schema

13   such as the UNSPC in order to do the cross-referencing

14   to determine whether the products are similar or

15   generally equivalent?

16   A    Yes, it does.

17   Q    Does the enabler, manager and syndicator

18   functionality of Content+ also allow users to upload

19   supplier catalogs or transfer catalog data from legacy

20   systems?

21   A    Yes.

22   Q    Were you present during the trial when Lawson's

23   employees testified that they had that same

24   capability?

25   A    Yes, I was.

1   Q    So together the Procure+ and Content+ provide the

2   capability to store vendor catalog data in a database?

3   A    Correct.

4   Q    Can this vendor catalog data be comprised in

5   multiple product catalogs?

6   A    Yes.

7   Q    How many?

8   A    It's limitless.

9   Q    Can Procure+ provide the capability to search

10  those catalogs?

11  A    Yes, it does.

12  Q    Can you search portions of the database separately

13  using the Procure+ in an electronic sourcing system?

14  A    Yes, you can.

15  Q    Does the Procure+ and Content+ functionality

16  enable those users to select the search results and

17  add them to a shopping cart?

18  A    Yes.

19  Q    Were you present during the trial when Lawson

20  employees testified as to that same functionality?

21  A    Yes.

22  Q    Let's just briefly go into some of the history

23  between about the ProcureNet acquisition.  That was

24  the acquisition back in 2001 when ePlus purchased the

25  company that had the patents as well as the

1  operational software; is that right?

2  A    That's correct.

3  Q    At the time were you aware of the purpose behind

4  ePlus' acquisition of ProcureNet?

5  A    Of ePlus' purposes?  I wasn't employed by ePlus.

6  I was employed by ProcureNet, so I don't know all the

7  motivations that they might have had.

8  Q    Have you come to learn what those motivations

9  were?

10 A    Some of them.

11 Q    What were they?

12 A    I know that ePlus was very interested in having

13 their own intellectual property.  They had licensed

14 something else from somebody or had some solution that

15 provided some functionality.

16       MR. McDONALD:  I object.  I think he's

17 testifying as to what other people told him at this

18 point.  I don't think there's foundation laid.  I

19 think there's lack of foundation and probably hearsay.

20       MR. ROBERTSON:  Let me see if I can rephrase

21 it.

22 Q    Subsequently, in the course of your

23 responsibilities as the president of ePlus Systems,

24 have you come to learn the value of the products to

25 ePlus and the purpose they are being employed by?

FARBER - DIRECT                    43

1   A    Yes.

2           MR. ROBERTSON:  I understand Your Honor has a

3   call.

4           THE COURT:  I have a short conference call.

5   I'll be right back.  If you will just stay there

6   unless you need to take a recess.  If you do, you can

7   take a short recess.

8               (Brief recess taken.)

9               (Transcript resumes on page 44.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25