Farber - Direct                                                    44

| 1  | THE COURT:  I apologize for the interruption.  All |
| 2  | right, Mr. Robertson. |
| 3  | MR. ROBERTSON:  Thank you, Your Honor. |
| 4  | Q    For Procure+ and Content+, can they be provided to |
| 5  | customers as an internal standalone program? |
| 6  | A    You mean operated within their own data center? |
| 7  | Q    Yes. |
| 8  | A    Yes, sir. |
| 9  | THE COURT:  Is that sort of at a high level, same |
| 10 | thing as can you buy these and use them just by themselves? |
| 11 | MR. ROBERTSON:  They can install them on their own -- |
| 12 | THE COURT:  Is that what you were asking? |
| 13 | MR. ROBERTSON:  Yes, sir, on their own servers. |
| 14 | THE COURT:  If I want just these two, can I buy these |
| 15 | two and operate them with some operating system that I have. |
| 16 | THE WITNESS:  Correct, Your Honor. |
| 17 | Q    And can they also be hosted by ePlus for customers? |
| 18 | A    Yes, they can. |
| 19 | Q    And were you present in the courtroom when Lawson's |
| 20 | employees testified that they provide those same two types of |
| 21 | software services? |
| 22 | A    Yes. |
| 23 | THE COURT:  Do you provide hosting services for your |
| 24 | software? |
| 25 | THE WITNESS:  Yes, we do, Your Honor. |

Farber - Direct

1    Q    Is Procure+ and Content+ important to ePlus's overall

2    business strategy?

3    A    Certainly.

4    Q    Why is that, sir?

5    A    There's a number of reasons.  It's important to our

6    business strategy as a company, number one.  One of the

7    strategies that we have at the company is cross-selling and

8    up-selling the complete line of products that we offer as a

9    company, so, you know, we have multiple divisions, multiple

10   product lines.  So, you know, if you look at just our

11   procurement and content products, they alone have driven

12   probably $16 million worth of hardware sales for the company.

13   Q    I'm sorry?

14   A    Approximately 16 million in hardware sales.

15           THE COURT:  Are you saying six zero?

16           THE WITNESS:  One six, Your Honor, last year.

17           THE COURT:  In one year?

18           THE WITNESS:  Within one year, yeah.

19           THE COURT:  I'm familiar with the term cross-selling.

20   That's where the litigation department goes to the corporate

21   place and says, I want you to meet the corporate lawyers we

22   have and can we do your corporate business?

23           THE WITNESS:  Okay, yes.

24           THE COURT:  What is up-selling?

25           THE WITNESS:  Okay, so up-selling is when you have a

Farber - Direct

1    product already established within the customer's site, and now

2    you want to potentially up-sell them to more products and more

3    similar services, or up-sell them to something else that the

4    company also offers.

5          So it's very important, once you have -- at any

6    level, in any product that the company offers, once you have

7    placed yourself within the company's environment, there's a

8    certain level of I like to say stickiness that you get within

9    that customer's environment, and we've been very successful

10   with our procurement and content solutions in increasing our

11   stickiness.  Our customer's don't leave us that often.

12         So we have a low attrition rate from our procurement

13   customers which enables us to grow that business.  So, you

14   know, by example, last year when I said we did 16 million, we

15   had management by objectives this year to grow that to 50

16   million.  I don't know whether we'll attain it, but that's the

17   goal.

18   Q    ePlus is also what's known as a value-added reseller of

19   equipment; is that right?

20   A    That's correct.

21   Q    And it's known in the industry as a VAR?

22   A    Correct.

23   Q    And the equipment they sell is computer hardware?

24   A    It's generally -- the majority of it is IT hardware and

25   software.

Farber - Direct

1    Q     And does the ability to sell Content+ and Procure+ to

2    these customers permit ePlus to cross-sell or up-sell its VAR

3    business?

4    A     Yes.

5    Q     And is that that 50 million goal you said you were going

6    to try to achieve with respect to that?

7    A     The goal is twofold.  It's increasing that number within

8    our existing procurement client base and then also extending it

9    to the technology client base.

10   Q     Is Procure+ and Content+ the only software solutions that

11   ePlus offers?

12   A     No.

13   Q     What are some of the others?

14   A     Document management, spend analysis, and asset management

15   are other software components.

16   Q     Are you able to cross-sell that software by having the

17   ability to sell Procure+ and Content+?

18   A     We have tried and continue to do so, yes.

19           THE COURT:  Document management, spend analysis, and

20   what?

21           THE WITNESS:  Asset management.

22   Q     How many customers does ePlus presently have for Procure+

23   and Content+?

24   A     Approximately 65, I think.

25   Q     And since 2002, how many revenues have you generated for

1    sales of the products, just those products?

2    A    Since 2002?

3    Q    Yes.

4    A    I don't know.  50, 69 million, somewhere in that

5    neighborhood.

6    Q    In licensing revenues, refresh the Court in how many

7    royalty revenues you've received for the patents-in-suit?

8    A    We have, I believe, have done five licensing agreements

9    and have received close to 60 million in license revenue.

10   Q    You heard Mr. McDonald mention an ERP in his opening

11   remarks to the Court.  Can you just explain to the Court what

12   an ERP is?

13   A    Well, enterprise resource planning is a suite of

14   applications that could be offered as a combined solution or as

15   individual point products.  They generally contain -- in

16   addition to procurement, they contain inventory management

17   applications, human resource applications, travel management

18   applications, financial applications as an example, and they

19   could be bundled together as one solution or purchased as

20   individuals.

21   Q    Does ePlus Systems, with its Procure+ and Content+,

22   compete with companies that offer those range of ERP software

23   products?

24   A    Sure.

25   Q    Can you give me some examples?

Farber - Direct

1    A    SAP that we have a license agreement with is one example.

2    Q    Let me ask you, do you continue to compete with SAP in the

3    marketplace?

4    A    Yes.

5    Q    Even though they are an ERP provider?

6    A    Yes.

7    Q    Are you successful sometimes?

8    A    Absolutely.

9    Q    Can you give me some other examples of ERP providers that

10   you compete with?

11   A    I heard -- I think Mr. McDonald mentioned McKesson I think

12   qualifies as an ERP.  We've run across them periodically.

13   Other ERPs may be Oracle, N4, you know, companies like that.

14   Q    Have you been successful competing against those ERP

15   companies?

16   A    Sure.  You win some and you lose some.

17   Q    Does ePlus have the ability to integrate its procurement

18   product into other systems such as an Oracle or even a Lawson?

19   A    There probably isn't a customer that we have that we have

20   not integrated into an ERP system.  It's a requirement with

21   procurement today.

22   Q    Do you know if there are any specific examples, or do you

23   know if ePlus has ever integrated its procurement solution into

24   a Lawson platform?

25   A    Yeah we've integrated into Lawson ERP systems, sure, into

Farber - Direct                                                          50

1    the financial application, and I think in accounting.

2    Q    Let's talk a little bit about how you market and solicit

3    these products, if we could.  Are you involved in the process

4    of marketing Procure+ and Content+ products in the solicitation

5    of customers?

6    A    Yes.

7    Q    Can you describe for the Court as to how ePlus seeks out

8    new customers for those products?

9    A    Well, there's a number of ways that we seek potential new

10   customers or prospects.  One is the easy way, when they come to

11   us, when they maybe have read an analyst report or have done a

12   Google search and find us on the web, as I'm sure they find the

13   competition, and they go out to our website or call us and say,

14   we're doing a solicitation, we're requesting information, we're

15   thinking about launching an initiative, would you like to

16   participate, and then we generally would go under some form of

17   a nondisclosure.  Those are rare, but it does happen.

18        There's other occasions where we purchase lists from third

19   parties, very targeted lists that says, okay, we're looking for

20   companies that fit a certain criteria generally, mid market.

21   That would be like 25 million to two and a half billion or

22   something in revenue.

23   Q    So mid market company is a company that has revenues in

24   that range?

25   A    Yeah, and we may pick vertical markets.  We may pick, you

1    know, say, okay, we want them running these ERP systems and fit

2    this type of a profile, and then we would do mailers to those

3    customers.  We hand the customer list over to -- or the

4    prospect list, I should say, over to a telemarketing group.

5    They would actually physically start doing what they do which

6    is doing telemarketing.

7    Q    Phone calls?

8    A    The annoying phone calls, yes.

9    Q    And emails?

10   A    And emails.  We also do direct mail.  We also do what's

11   called webinars where we invite those customers to listen to

12   their peers.  So for example, I've done, you know, of late,

13   Coca-Cola or Family Dollar has done webinars with us, and I'll

14   maybe get a list of other food and beverage or retail companies

15   and say, okay, listen to how Coca-Cola or Family Dollar or any

16   one of our other number of clients have implemented our

17   procurement system and how much it saved them and the benefits.

18   So that kind of attracts the peer audience of that vertical to

19   listen to how ePlus has helped.

20        We also do trade shows, you know, where we go and we

21   speak.  Generally when we speak, we do keynotes, we also do it

22   with our clients.  It's better received.  And then we do

23   demonstrations.  We hold conferences, and we invite prospects

24   to some of those conferences.

25   Q    You've actually had a graphic prepared that I believe

1    summarizes some of these things you've just been talking about

2    here.  And you do engage in this RFP process just as we heard

3    Lawson's employees testify; is that correct?

4    A     Yes, absolutely.

5    Q     Are you directly involved in this solicitation of

6    potential customers?

7    A     I oversee and make decisions based upon how we do that,

8    sure.

9    Q     How does ePlus keep track of the leads that it has for its

10   potential customers?

11   A     We have what's called a CRM tool which is a lead

12   generation tool, so everything that our sales folks are working

13   on, or if there's an incoming lead or we purchased a list from

14   somebody, we put that into what's called our Microsoft CRM

15   tool, and it's a tracking system.  It keeps track of relevant

16   information about that customer and what's transpired.

17   Q     Were you asked, as part of this supplemental production in

18   this case concerning these sales and services, to obtain lists

19   of customers that have been solicited?

20   A     Yes.

21   Q     Did you provide that?

22   A     We did.

23   Q     And were you asked to provide the actual list of your

24   actual customers?

25   A     Yes.

Farber - Direct

1    Q    And you provided that?

2    A    We did.

3    Q    Just tell me generally what happens when a potential new

4    customer decides it's ready to implement a system, an ePlus

5    system or perhaps any system?

6    A    When contracts are done you mean?

7    Q    Yes.

8    A    Okay.  When a customer has made that decision and the

9    contracts are complete, we generally have a kickoff meeting,

10   which is an orientation of our implementation team with the

11   customer's team, and review everything that is going to be done

12   within the implementation, and then generally my team lives

13   with the customer for the duration of the implementation until

14   it's complete.

15   Q    And do you execute a license agreement with the company?

16   A    Yes, we do.

17   Q    Is the business model involving licensing the software,

18   servicing and maintaining that business model, is that

19   generally similar or the same as the business model that you've

20   heard Lawson's employees testify during the trial?

21   A    Yes, it's common practice.

22   Q    Is it common in the industry?

23   A    Yes.

24   Q    Is it how Ariba operated its business?

25   A    Absolutely.

Farber - Direct

1    Q    SAP?

2    A    Yes.

3    Q    Some of these other customers you're talking about?

4    A    Yes.

5    Q    Is service and maintenance revenues a significant portion

6    of the revenues associated with the software?

7    A    Yes.

8    Q    Is it -- in the case of ePlus, is it greater than the

9    actual licensing?

10   A    Over time, probably, sure.

11   Q    Were you present during the testimony of the ePlus --

12   excuse me, the Lawson employees when they indicated that's the

13   same business model?

14   A    Yes.

15   Q    Let's talk a little bit now if we can about competition

16   with Lawson.  What are the benefits for companies that have

17   products like Procure+ and Content+?

18   A    The benefit is a potential of cost reduction in their

19   purchasing because it directs their end users of the company

20   organization to purchase from negotiated contracts with certain

21   suppliers that the company or organization has desired to do

22   business with, and that eliminates maverick spend, having

23   visibility to those suppliers by -- holistically throughout the

24   organization eliminates the need for somebody to go outside of

25   a system and go down the street and purchase something that may

1    exponentially be three times more expensive.  So they get a

2    savings from that.

3         They get a savings from being able to compare suppliers

4    that have like facilities.  They have the ability, on the

5    accounting end, to reduce a lot of the paperwork, because it

6    electronically deals with requisitions and invoices and

7    purchase orders, and the ability to take the requisition that

8    has to be split out to multiple suppliers and create multiple

9    purchase orders eliminates a lot of back office manual

10   processing that would normally take place.  So there's a

11   financial benefit to that as well.

12   Q    So the general benefits are the efficiencies and the money

13   that's saved with respect to this kind of software solution;

14   right?

15   A    That's correct.

16   Q    You heard Mr. McDonald talk about what he suggested would

17   be the harm to the customers if, in fact, they were enjoined

18   from continuing the infringement.  Nothing prevents those

19   customers from going back and doing procurement the

20   old-fashioned way, by simply doing paper requisitioning;

21   correct?

22   A    Absolutely correct.  The reality is that today, even with

23   all of the marketing, all the analyst reports, everything that

24   everybody said about the benefits of procurement, there's still

25   studies as of this day that still say that a small percentage,

1    you know, 40 percent of overall spend is actually going through

2    procurement systems, and companies are striving to put more and

3    more spend through those systems, but they haven't achieved it.

4    There are companies you can point to that have put 90 percent,

5    but they are, you know, smaller in the masses.

6    Q    And you were present during the trial when, in fact, there

7    were configurations of Lawson's software that could perform

8    procurement that were not found to infringe; correct?

9    A    That's correct.

10   Q    And you understand then that ePlus can't get an injunction

11   against those systems that were not found to infringe?

12   A    That's correct.

13   Q    Nothing would prevent Lawson's customers from continuing

14   to use the non-infringing configurations for procurement; is

15   that right?

16   A    That's correct.

17   Q    Let me ask you who you consider to be your competitors in

18   the marketplace for this procurement solution that ePlus

19   offers.

20   A    Well, I mean, again, it changes every -- fairly often, but

21   at this point in time, aside from Lawson, of course, and what

22   we've established as it relates to SAP that we still compete

23   against, we still compete against Ariba, we compete against --

24   you know, we're seeing Verian, we see a little bit of Perfect

25   Commerce, we see SciQuest, we see some other players at times

1    like companies like Coupa come and go or Basware, a few others.

2    It really depends, as I think I've either testified or during

3    my depositions described a lot of the companies that aren't

4    necessarily public companies kind of come and go as they get

5    funding from venture firms.  So if they have more money in

6    their coffers, they seem to do more marketing and we see them

7    more during different times of the years than others.

8    Q    You indicated that the primary target companies for

9    ePlus's products are mid market companies; is that right?

10   A    Yes.

11   Q    Do you know Lawson's focus is on mid market companies as

12   well?

13   A    It is.

14   Q    Take a look at -- I'm sorry, Exhibit Number 5 --

15   Plaintiff's Exhibit 523 which is an ePlus 10K from 2010.

16   A    523?

17   Q    Yes, sir.

18        MR. ROBERTSON:  It's in volume two if Your Honor is

19   looking for it.

20   Q    If you want to turn to page three, if you have it, and I'd

21   like to focus on the last paragraph here.  What is ePlus

22   disclosing to its investors here with respect to its strategy?

23   A    You are talking about the strong balance sheet?

24   Q    Actually I'm talking about --

25   A    Page two?

Farber - Direct

1    Q    Yes, page three of the 10K.  I'm sorry.

2              THE COURT:  Page three it says to our shareholders.

3    Is that the page you are talking about?

4              THE WITNESS:  I think he's actually going further

5    where he's saying industry background.

6              MR. ROBERTSON:  Yes.

7              THE COURT:  Where is that?

8    Q    I'd like to focus on key elements of your business, the

9    last bullet point.  What are you representing there with

10   respect to your software?

11   A    Well, it's basically saying that, you know, that, you

12   know, our customers are looking to reduce the number of vendors

13   and improve their efficiencies, improve supplier management and

14   reduce costs.

15   Q    You identify in this annual report who your primary target

16   customers are.

17   A    I believe we state that it's mid market.

18   Q    What is the representation you made there?

19   A    In the last paragraph?

20   Q    It's the paragraph right above industry background.

21   A    Our primary target market is a middle market and larger

22   companies in the U.S. with revenues between 25 and two and a

23   half billion.

24   Q    Why don't you take a look at Plaintiff's Exhibit

25   Number 685 if we could, which, I believe, is in volume two as

Farber - Direct

1    well, Your Honor.

2    A    685?

3    Q    Yes.

4    A    Okay.

5    Q    Have you seen this document before?

6    A    Yes, I believe I have.

7    Q    There are a number of industries indicated there that

8    Lawson targets for its software products; do you see that?

9    A    Yes.

10   Q    Does ePlus target those same industries for its

11   procurement solutions?

12   A    Yes, those and others.

13   Q    Are you in the food and beverage industry?

14   A    Yes.

15   Q    Health care?

16   A    Yes.

17   Q    Manufacturing?

18   A    Yes.

19   Q    Retail?

20   A    Yes.

21   Q    Transportation?

22   A    Yes.

23   Q    Can you give me just some of the examples for perhaps some

24   of those business sectors that you target?

25   A    Sure.  Retail we have companies like Family Dollar,

1    Hanesbrands.  Manufacturing, you know, we have companies like

2    Koch Industries.  Affordable Health Care obviously falling in

3    the health care.  Coca-Cola for food and beverage.  You know,

4    Strategic Distribution and KBS for distribution companies just

5    as examples.

6    Q    You testified at trial that ePlus and Lawson have competed

7    directly with each other in the electronic procurement

8    marketplace; do you recall that?

9    A    Yes, they do.

10   Q    Can you recall for the Court some of the specific

11   instances which you are aware of where there was direct

12   competition between ePlus and Lawson?

13   A    Sure.  I believe I spoke about companies like Sterling

14   Drugs -- not Sterling Drugs.  Sterling Jewelers, Hanesbrand,

15   PPDI, Blue Cross/Blue Shield North Carolina, Wolters Kluwer.

16   There were a number of others.

17   Q    Do you recall Fortress Investments?

18   A    Yes.

19   Q    How about Ames Corporation?

20   A    I'm sorry?

21   Q    Ames Corporation.

22   A    Might have.  I have to go back.

23   Q    Tell me a little bit about the competition with Sterling

24   Jewelers.  Was that fairly recent?

25   A    Yes.

Farber - Direct

1    Q    When did that occur?

2    A    It was within the past year, and actually up until about a

3    month or so ago, two months ago.

4    Q    Do you know if you obtained the business?

5    A    No, we did not.

6    Q    Do you know if Lawson obtained the business?

7    A    I think both Lawson and ePlus lost that business.

8    Q    Do you know who actually won the business?

9    A    I think it went to a company called Ketera.

10   Q    Ketera, are they an ERP provider?

11   A    No.

12   Q    So Lawson was competing with you and another non-ERP

13   provider for that procurement business with Sterling Jewelers?

14   A    Yes, yes.

15          THE COURT:  Is ePlus an ERP provider?

16          THE WITNESS:  No.

17   Q    Now, there have been some comparisons that were made, Mr.

18   Farber, in the overlap of customers between Lawson and ePlus.

19   Are you aware of that?

20   A    I'm sorry.  Repeat that.

21   Q    Sure.  There have been comparisons, some studies done,

22   some analysis of the overlap of potential customers being

23   solicited by both Lawson and by ePlus and actual customers of

24   Lawson that ePlus has solicited and actual customers of ePlus

25   that Lawson has solicited.  Are you aware of that?

Farber - Direct

1    A    Yes, I am.

2    Q    You participated in that process; correct?

3    A    I did, I did.

4    Q    And we provided to the Court summaries of that in

5    appendices to the materials we provided in appendix A, B, and

6    C, and I'll be addressing those in closing argument to the

7    Court if permitted, but let me ask you right now, do you know

8    how those summaries of these comparisons were prepared?

9    A    Well, we were asked, as you said, to provide a list of,

10   you know, all the solicitations that we had done to prospects

11   as well as to our existing clients.  We provided it to you or

12   counsel, and I understand that Lawson provided a similar list

13   to our counsel, and an analysis was done by our counsel to

14   compare the overlap.

15   Q    You were aware that Lawson provided customers that

16   actually licensed requisition self-service and Punchout; is

17   that right?

18   A    Yes.

19   Q    You didn't review that and study that list; correct?

20   A    No, no, I didn't.

21   Q    Do you understand that comparison was made to create

22   summaries based on --

23            THE COURT:  Why didn't you review it?

24            THE WITNESS:  Why didn't I review it?  I understand

25   there were tens of thousands of names on the list, and we

1    provided a similar amount, and it seemed to be more expeditious

2    of a process to have a central repository, who was the lawyers,

3    who seemed to have the tools to do a quicker comparison and --

4    I would have had to eyeball every one and try to do

5    comparisons.

6                    MR. ROBERTSON:  Let me also represent, Your Honor,

7    that Mr. Farber may not be aware.  Although it was not marked

8    confidential, we were somewhat concerned about providing

9    customers lists to ePlus, a competitor of Lawson.  So we

10   conducted that exercise ourselves, but you do have as part of

11   your materials the underlying data for those, that analysis.

12   Q    Can you tell us some specific instances that you are aware

13   of that ePlus lost sales to Lawson for this procurement

14   solution?

15   A    Yeah.  I think one that happened within the past year I

16   think was PPDI which was a pharmaceutical and manufacturing

17   distributor where we were competing against Lawson specifically

18   on procurement, and they had notified us that they were going

19   to be utilizing the Lawson system.

20   Q    Were you present at trial when a license agreement for

21   Deaconess Hospital was introduced?

22   A    Yes, I was.

23   Q    Had ePlus provided a procurement solution to Deaconess

24   Hospital?

25   A    Deaconess was actually one of our customers, so, you know,

Farber - Direct

1    it was a little surprising to me at first sitting in court and

2    seeing Deaconess as one of their procurement customers.  So

3    post-trial I went back, and I actually had known, I think, back

4    in 2008 that they did decide to go with Lawson, so, you know,

5    that was another one that we lost to Lawson.  They happened to

6    have been a client of ours at first.

7    Q    Would you take a look at Exhibit PX-530, if you will.

8    A    I'm sorry.

9    Q    530, Plaintiff's Exhibit 530.

10   A    All right.

11   Q    Do you recognize the document?

12   A    Yes.

13   Q    What is it?

14   A    This is a document that we received in August of 2008 from

15   the chief information officer at Deaconess stating that they

16   are terminating their agreement with ePlus.

17   Q    Why don't you turn to the next exhibit which is 544.

18   A    Okay.

19   Q    Do you recognize this document?

20   A    Yes, I do.

21   Q    What is it?

22   A    This is an exchange between, you know, the sales

23   organization and myself and my support manager, Patty Frenette,

24   and, you know, we had found out at first that, you know, the --

25   Jolene, who also worked for me, Jolene Wallerson, that was --

Farber - Direct

1    indicated that they're going to use Lawson to process their

2    orders, and they're going to use something that they were

3    developing inhouse for asset management instead of our asset

4    management system, but they were going to be using Lawson for

5    procurement.

6            THE COURT:  Who is "they"?

7            THE WITNESS:  "They" being Deaconess Hospital.

8    Q    Are you familiar with the company called LHC Group?

9    A    Yes.

10   Q    Has ePlus lost sales of Procure+ and Content+ to Lawson

11   for the LHC Group?

12   A    LHC, we had an opportunity that we discussed with them for

13   procurement, and I believe they also indicated that they were

14   going to be utilizing the Lawson procurement system.

15   Q    Take a look at Plaintiff's Exhibit 564 and tell me if you

16   can identify that document.

17   A    Sure.  You said 564?

18           THE COURT:  There isn't any in my book.  Yes, there

19   is.  It's hidden.  The tab is hidden.  Right before five --

20           THE WITNESS:  I see it, yes, okay.  Thanks.

21   Q    Do you recognize this document?

22   A    Yes.

23   Q    And --

24           MR. McDONALD:  I'm sorry, what is the number of the

25   exhibit again?

Farber - Direct

1           MR. ROBERTSON:  Plaintiff's Exhibit 564.

2           THE COURT:  The tab -- it's the one right before 570,

3    and you can't see the tab very easily, but it's up at the top

4    of the page.

5           MR. McDONALD:  Thank you.

6    Q    Does this concern LHC?

7    A    Yes.

8    Q    What was the substance of this solicitation?  Was it

9    successful?

10   A    No.  One of my sales reps had reached out to one of her

11   contacts over at LHC, and they informed her that they were

12   going to be -- had selected Lawson as procurement.

13   Q    And you had mentioned PPDI; is that right?

14   A    That's right.

15   Q    What kind of organization is PPDI?

16   A    I believe it was a pharmaceutical research and

17   distribution company.

18   Q    Can you take a look -- I'm sorry.  To refresh, did you

19   indicate you had lost business to Lawson with respect to PPDI?

20   A    Yes.

21   Q    Take a look at Plaintiff's Exhibit 574 in your book,

22   please.

23   A    Okay.

24   Q    Are you familiar with this document?

25   A    Let me take a look.  Yes.

Farber - Direct

1  Q    What is the general substance of the issues here with

2  PPDI?

3  A    This is an email chain with my senior vice president of

4  sales with the gentleman named Patrick Norton who had a

5  relationship with the folks at PPDI, and they were asking

6  questions about our solution, so could we integrate with the

7  Lawson system, will our system replace Lawson requisition

8  self-service, what does our system do that requisition

9  self-service can't do, is our solution global, et cetera.  So

10  they were asking information about the system compared to

11  requisition self-service, and there were some high-level

12  answers provided.

13  Q    What did you represent with respect to whether or not you

14  could interface with Lawson?

15  A    Sure, we've done it and continue to do it.

16  Q    Can you replace Lawson RSS?

17  A    Certainly.

18  Q    And does your solution do things that RSS can't do?

19  A    Yes.

20  Q    What do you represent here?

21  A    Well, that we have an indexing capability that, you know,

22  enables us to do some of the functions of working with external

23  catalogs that we believe Lawson doesn't do, and we can drag

24  that through our portal.

25  Q    Why don't you take a look at Plaintiff's Exhibit

Farber - Direct

1    Number 575 if you could, sir.

2    A    Okay.

3    Q    Have you seen this document before?

4    A    Yes.

5    Q    What is it?

6    A    This is, again, an exchange between the sales

7    organization, and this one is dealing with our, again, from the

8    purchasing person at PPDI, Tom McGraw, saying that they've

9    evaluated Procure+ costs and implementation versus Lawson

10   requisition self-service costs and implementation, and they're

11   going to stay and remain committed to Lawson.  They believe the

12   ongoing cost was a factor that -- one of the reasons they were

13   going to use Lawson.

14   Q    Let's talk a little bit about the harm to ePlus if an

15   injunction were not granted in this case.

16   A    Well, you know, again, you know, we lose the opportunity

17   to sell our product.  We lose our revenue stream.  We lose the

18   stickiness that I talked about, the ability to sell the

19   additional products and the additional services that we have.

20        We lose a very long revenue stream because our attrition

21   rate within our procurement client base is extremely low, and

22   that gives us a tremendous opportunity to sell all the other

23   things that ePlus has to offer.  Just like ERP companies that

24   if they got in there with a procurement solution, they could

25   sell eventually, if they weren't already in place, they could

Farber - Direct

1    sell any one of their other modules.  They could sell their
2    financial modules, their HR modules, their inventory modules,
3    their accounting modules.
4    Q    Does actually being an ERP company in some way assist an
5    infringer like Lawson in being able to beat you out in sales?
6    A    I believe it does.  You know, very often what we see with
7    ERP providers is that they do a number of different things.
8    They leverage other modules that they have in place.  They may
9    have sold them accounting and finance and inventory but
10   somebody is not running their procurement system, so we may
11   compete in an RFI or RFP against an ERP company, and, you know,
12   they may just end going, you know what, you have all these
13   other things.  There's times where they give it away and just
14   charge them services, and there's times they say, hey, you want
15   go to a niche provider because it's going to more difficult for
16   you to integrate with our system and you want everything in one
17   place.  It gives them a competitive market advantage to do that
18   sometimes.
19   Q    Given the fact that you've actually had proven instances
20   where you've integrated with Lawson's system, could you replace
21   the procurement system for Lawson's customers that use the RSS
22   and Punchout applications?
23   A    Sure.
24   Q    Have you made a determination yet whether or not you'd
25   rather it be more advantageous to ePlus to exclude Lawson from

Farber - Direct                                                        70

1    that market for those configurations found to infringe rather

2    than license them?

3    A    Well, that's kind of an open-ended question.

4    Q    Have you come to that conclusion yet?

5    A    No, we haven't come to a conclusion.  I think our remedy

6    has been to -- at this juncture is to exclude them.

7    Q    And if you were able to obtain an injunction, what

8    benefit, if anything, would that give to ePlus's business?

9    A    Well, I mean, if we were to receive the remedy of

10   injunction, that gives us the ability then to be able to

11   potentially offer our solutions to the 800-some-odd clients of

12   Lawson that are using, you know, what I view as our infringing

13   solution.

14   Q    Has ePlus been required to divert capital and the time of

15   its executives to focus on enforcement of its patents against

16   Lawson?

17   A    Yes, a significant amount.

18   Q    And the several million dollars in fees and costs and

19   expenses?

20   A    That is an underestimation, but, yes.

21   Q    And what, if anything, could ePlus have done with that

22   kind of resources if it did not have to enforce its patents

23   against this infringer?

24   A    Well, this has been probably one of the most interesting

25   of the licensing type of disputes that we've had because it's

Farber - Direct

1    gone on for so long, so much conflict in it.  So, you know, the

2    expenses are significant here, both in time and physical

3    dollars expended, and certainly the management time as well as

4    the dollar time could have been invested back into more

5    development, more oversight into the business unit, more hiring

6    of personnel, marketing, sales, more focus, you know, on the

7    market and selling to the market and reinvesting that money,

8    you know, back into the organization.

9            THE COURT:  Are you saying that there are 800 Lawson

10   customers who are using Lawson's S3 systems in an infringing

11   way which, if Lawson were enjoined from servicing those

12   customers, ePlus could service, could substitute its products

13   for those infringing products?

14           THE WITNESS:  Yeah.  It's either going to be ePlus or

15   somebody else that has a license to our, you know, to our

16   patents, but, yes.

17           THE COURT:  The question is, could ePlus do it?

18           THE WITNESS:  Yes, I believe that ePlus can do it.

19           THE COURT:  And if you didn't have the injunction, do

20   you believe you would have any chance to go in and get that

21   business from those 800 customers?

22           THE WITNESS:  Well, based on my historical experience

23   of trying to do that, I'd say, no.  I stand no chance -- very

24   little to no chance, Your Honor.

25   Q    The capital you've had to expend in enforcing the patents

1    against this infringer that diverted away from research and

2    develop and other business opportunities, have you had ability

3    to attempt to try to calculate what the value would have been

4    to the company?

5    A    Yeah.  We've made -- we did some analysis.  I had our

6    accounting organization do an analysis of that.

7    Q    Can you calculate with any kind of level of certainty?

8         MR. McDONALD:  Your Honor, we had disclosures.  I

9    don't think we have a disclosure of some sort of a capital

10   analysis that Mr. Farber is referring to, so I would object to

11   a line of questioning directed to that.

12        MR. ROBERTSON:  What he's about to say, Your Honor,

13   is that they can't calculate the losses because it's just

14   incalculable.

15        THE COURT:  So you weren't disclosed -- and so your

16   objection is overruled given his proffer of what the question

17   is going to be.

18        MR. McDONALD:  Well, if there is no analysis that

19   concludes that -- we didn't get a document that says what Mr.

20   Robertson just said.

21   Q    Can you tell me or not whether or not the investment of

22   capital, in your position as president of ePlus Systems and as

23   an executive of ePlus, has had an impact on its share price?

24   A    Yes.

25   Q    Has it had an impact on the market capital of the company?

1    A    It certainly has.

2         THE COURT:  What has the impact been?

3    Q    Have you been able to calculate that with any level of

4    precision, sir?

5    A    It's difficult with a level of precision.  There's

6    estimates that have been made.

7    Q    What are the estimates?

8    A    The estimates --

9         MR. McDONALD:  Your Honor, we didn't get any

10   disclosures about any estimates being made about this, and so I

11   object to this evidence.

12        MR. ROBERTSON:  I'll withdraw the question, Your

13   Honor.

14   Q    Has ePlus lost --

15        THE COURT:  You're going to withdraw my question?

16        MR. ROBERTSON:  I'm sorry, sir?

17        THE COURT:  You're withdrawing my question?

18        MR. ROBERTSON:  I didn't appreciate that it was your

19   question.  Perhaps I adopted it, Your Honor, in my head.

20        THE COURT:  Since he objected to it, you thought it

21   would be withdrawn, so it's okay.  Let's go on.  I think he's

22   able to say he's tried to calculate certain things, and there's

23   no way -- they've concluded that there's no reliable way to

24   accurately calculate it, because there's probably no document

25   that you can provide that says it's incalculable.

Farber - Direct                                          74

```
 1              MR. McDONALD:  If there was an effort made, I'm
 2   saying they should have disclosed that to us.
 3              THE COURT:  You mean they should have disclosed the
 4   effort?
 5              MR. McDONALD:  Yeah.  If they're going to rely on
 6   that as evidence, yes.
 7              THE COURT:  Was that called for in some disclosure
 8   agreement or interrogatory or something?  Is that what you are
 9   saying?
10              MR. McDONALD:  Yes.  That was those series of
11   discloses we had back in February disclosing evidence each
12   party is going to rely on to support their position on an
13   injunction.
14              THE COURT:  I see.
15   Q    Without having that capital available to you, do you even
16   know the business opportunities that you could have utilized or
17   obtained if that were otherwise available?
18   A    You'd have to repeat that question.
19   Q    Sure.  That was a very bad question.
20              THE COURT:  Probably don't even need to ask it.
21              MR. ROBERTSON:  Thank you, Your Honor.  Let me move
22   on.
23   Q    Has ePlus lost any other business opportunities as a
24   result of Lawson's infringement?
25   A    Yeah, we covered a few of them so far, but, yeah.
```

Farber - Direct

1    Q    The opportunity to continue to cross-sell to other IT and

2    various services?

3    A    Yeah, absolutely.  I mean, opportunity as far as the

4    company is concerned, like I described earlier, is our ability

5    to utilize our stickiness with a client, up-sell and cross-sell

6    and provide more product and more services.

7    Q    Let me ask you generally, now, you've had to enforce the

8    patents before against Ariba, SAP, and several our defendants

9    in this case; is that right?

10   A    That's correct.

11   Q    And have you read the negotiations with respect to those

12   companies in arriving at licensing agreements?

13   A    Yes.

14   Q    Has ePlus taken efforts to make certain that those rights

15   that are granted under the license agreements are restricted or

16   confined in any way?

17   A    Yes.

18   Q    What are some of the efforts, just in the general basis,

19   that ePlus has required in the licensing of those companies?

20   A    As you said, from a general perspective, one of the

21   restrictions that we put on the license generally has to do

22   with an assignment, transfer of the rights.

23   Q    Are they assignable?

24   A    No.

25   Q    Are they nontransferable?

Farber - Direct

1    A    They are nontransferable.

2    Q    Non-sub-licensable?

3    A    They cannot be sublicensed.

4    Q    There are certain conditions, if, for example, there's a

5    transfer of ownership or something like that of the entire

6    company, that the license can transfer in certain instances?

7    A    Certain instances with certain provisions, yes.

8    Q    And I had mentioned to the Court about what's known as a

9    carve-out provision.  Are you familiar with that?

10   A    I am.

11   Q    Did you require such provision with respect to some of the

12   licenses?

13   A    Yes, we did.

14   Q    Specifically, if you recall, do you know which licenses

15   involved the carve-out provision?

16   A    I think the carve-out provision was in SciQuest and, I

17   believe, Perfect Commerce.

18   Q    Those were two of the defendants in this case that settled

19   early on; is that right?

20   A    Yes, that's correct.

21   Q    Specifically the carve-out, why did you want that

22   carve-out?

23   A    Well, I knew, as an example, in the case of SciQuest, they

24   were already a business partner of Lawson, so the carve-out

25   that was put into that is they could not transfer, provide

1    license or grant of the license to us, so Lawson was excluded.

2    Q    And you're aware that all of these license agreements have

3    been proffered to the Court and, I think, were in evidence

4    earlier, so I don't think we need to go through them term but

5    term if we can avoid that.

6    A    Okay.

7    Q    Let me ask you this:  When you were in the SAP case, did

8    the Court direct you to meet with the magistrate judge in an

9    effort to settle the case?

10   A    Yes.

11   Q    And did you follow that instruction?

12   A    Certainly.

13   Q    From time to time in this case, have we been given some

14   gentle guidance by this Court to see if we could resolve our

15   dispute with Lawson?

16   A    Yes.

17   Q    Have we attempted -- have you, as a company, attempted to

18   do that?

19   A    Certainly.

20           MR. McDONALD:  Your Honor, I'm not sure that the

21   settlement negotiations between the parties is appropriate here

22   under Rule 408, et cetera, so I object to this.

23           THE COURT:  Why is that appropriate?

24           MR. ROBERTSON:  Well, the suggestion has been made,

25   Your Honor, that my client licenses freely, and, therefore,

1    should not be entitled to an injunction.  The point I'm trying

2    to make here, and the point I think I've made to the Court in

3    instances before, is courts need to resolve disputes that come

4    before them, and if we were in position, for example, to have

5    to tell Judge Spencer that we couldn't go down and meet with

6    Judge Dohnal in order to resolve our dispute with SAP because

7    three years from now another infringer was going to argue that

8    we license freely, we'd never be able to have resolution.

9         It would be -- I think as the case laws already

10   suggested, it would be against public policy, but the argument

11   has been made, and I think will continue to be made, that we

12   are licensing freely and therefore not entitled to injunction

13   whereas we should be able to choose the parties that we want to

14   license and choose who we don't want to do business with.

15        That's what the right to exclude gives us.  But once

16   we have a right to exclude, then we can sit down and determine

17   whether or not, in fact, we do want to license Lawson on a

18   level playing field, but that's the only the point I want to

19   make and that ePlus is very careful about what it does when it

20   licenses its parties and that it's careful to make sure that

21   they are confined and therefore can't get out and into the

22   marketplace generally and inoculate other infringers.

23   Q    So my question is, have you made those efforts, Mr.

24   Farber?

25   A    Yes.

Farber - Direct

```
1    Q    Let me ask you to take a look at page -- excuse me,

2    Plaintiff's Exhibit 247.  Volume one, Your Honor.  Have you

3    seen this document before?

4    A    Hold on.  Are you talking about the Lawson SciQuest?

5    Q    Yes.  Do you recall that this document came up during the

6    trial?

7    A    Yeah.  That's what I was going back to.

8    Q    This was a proposal by Lawson and SciQuest for a

9    procurement solution to Novant Health; is that right?

10   A    Right, with SciQuest.

11   Q    Did ePlus also submit a response for the same proposal?

12   A    Yes.

13   Q    Can you take a look at page two which ends with the Bates

14   label 9460.

15   A    Okay.

16   Q    Does this document suggest anything regarding the

17   interoperability of different proprietary procurement systems?

18   A    Well, its's showing the interoperability and integration

19   between the Lawson system and the basic tenants of procurement

20   and SciQuest of the posting of the catalogs.

21   Q    And does this suggest anything about the common

22   place-ability to swap in and swap out software in the

23   eProcurement industry?

24   A    Certainly it's showing they're able to utilize other

25   third-party tools that integrate with theirs, sure.
```

1   Q    Was that the proposal you were making to Novant Health as

2   well?

3   A    Sure.

4   Q    How quickly is ePlus able to implement an operational

5   electronic procurement system?

6   A    You know, it varies.  You know, the important thing is

7   understanding the requirements of a customer.  We've done it as

8   quickly as 30 days.  You know, generally speaking it could be

9   90 days to six months.  On some rare occasions it could be

10  longer.

11  Q    What is the cost to implement an ePlus system typically?

12  A    Cost from the customer's perspective?

13  Q    Yes.

14  A    I'm sorry.

15  Q    Yes.

16  A    Again, it varies, but the average cost, I think, is

17  probably around 150,000.

18  Q    Would ePlus be willing to consider discounting, providing

19  discounts to Lawson customers if they were required to

20  implement an alternative ePlus system?

21  A    I'm sure that, you know, we'd have to consider something

22  for the customer to make it financially attractive to them.

23            MR. ROBERTSON:  Thank you.  That's all I have.

24            THE COURT:  Cross-examination.

25

```
 1                    CROSS-EXAMINATION
 2   BY MR. McDONALD:
 3   Q    Good morning, Mr. Farber.
 4   A    Good morning.
 5   Q    You're just finishing up there talking about how long it
 6   takes to, I believe, implement a customer in to your product.
 7   Is there a sales cycle involved with when you first come to
 8   them versus when they decide to pick you plus also after they
 9   pick you, some cycle where you have to negotiate a contract?
10   A    Yeah.  There's certainly a sales cycle, you know, which
11   consists of from the time, you know, a customer puts a request
12   out to multiple vendors until the time they make a decision.
13   That's one process in the sales cycle.
14        Then, you know, there's a process of once they select a
15   vendor, you know, going through, you know, contract
16   negotiations, the Ts and Cs, and then the implementation
17   component, yes.
18   Q    How long does the sales cycle typically take?
19   A    Well, the sales cycle could be -- which component of the
20   sales cycle are you referring to?
21   Q    I didn't realize there were more than one.
22   A    You just asked me what are the components, and I look at
23   the sales cycle as just from the time a customer is interested
24   in going out to vendors for requests for information to the
25   time they make a decision.  That's what I call the sales cycle.
```

Farber - Cross                                              82

1    Q    That's what I'm calling it, too.  How long does that

2    typically take?

3    A    It could be -- there's some instances where it's taken

4    30 days and some instances where it could take a year for them

5    to make a decision.

6    Q    And then the contract negotiations, once they've made that

7    decision, how long do those typically take?

8    A    They're typically not long.  A contract negotiation,

9    usually could wrap that up within a month of the decision.

10   Q    After that, how long does it take after the contract is

11   signed to get the customer fully implemented?

12   A    Again, it could be 30 days, 90 days, or a year for a

13   customer that's never had a procurement system in place.  For

14   those that have had a procurement system in place, it

15   drastically reduces the cycle time.

16   Q    So if we had all these together, the cycle could go from a

17   few months to more than two years; is that a fair range?

18   A    No.  Well, if you're taking everything together?

19   Q    Yes, all three, going from sales contract and

20   implementation.

21   A    If you are looking at the extreme, maybe, you know, for

22   the one or two cases that we've had implementation go a year,

23   that would be an extreme.

24           THE COURT:  Is that because the customer took a long

25   time to decide or because it took a long time to implement?

1              THE WITNESS:  Generally it takes longer for the

2    customer to decide than it actually does for the

3    implementation.

4              THE COURT:  Have you ever been in a case where a

5    supplier went bankrupt or shut down and -- of eProcurement

6    systems, and the customer needed help right away and gone in

7    and said, look, we need you to integrate your system?

8              THE WITNESS:  Yes.

9              THE COURT:  And if you have, how long did that take?

10             THE WITNESS:  That's what I was referring to.  We

11   have been involved in those -- Hearst Corporation was a good

12   example of that.  They selected a vendor that did exactly what

13   you said, they went out of business.  And the easier thing is

14   when somebody already has a procurement system, because the

15   hardest thing in an implementation is really not installing and

16   getting the software running on a computer.  It's having the

17   customer make decisions, and by the decisions, I mean what

18   suppliers do you want to do business with that you want in the

19   system.

20             THE COURT:  If you have already have an eProcurement

21   system in place --

22             THE WITNESS:  It's already there.

23             THE COURT:  So we're talking about a situation where

24   an eProcurement system is in place.  Was Hearst Corporation one

25   of those?

Farber - Cross

1              THE WITNESS:  Yes.

2              THE COURT:  How long did it take you to get your

3    system operational?

4              THE WITNESS:  We were up within 45 to 60 days they

5    were running and testing that system.

6              THE COURT:  How long before it was operational?

7              THE WITNESS:  Within a couple weeks after that.

8    Q    Have you been in a situation like that involving a

9    health-care provider where you came in and tried to do

10   something as fast as you could?

11   A    Where they already had a procurement system in place?  I'd

12   have to research that to see if we did.  I don't know off the

13   top of my head.

14   Q    Are you aware of a health-care provider where you've done

15   that whether they had an e-Procurement system or not?

16   A    I'd have to research that.  I don't know.

17   Q    Are you aware of whether health care providers have any

18   additional regulations or rules that would relate to

19   essentially the hoops they'd have to jump through in order to

20   implement a new software system?

21   A    We've implemented health-care providers, and it depends on

22   what they have under spend.  So, for example, there may be a

23   health care provider, as many of them that we have interacted

24   with, that don't have that many hoops to go through because

25   they don't put their critical care facility operations under

1   the procurement system.  They use it to maintain the facility,

2   janitorial equipment, restocking of noncritical care items such

3   as beakers and things of that nature.

4        And then you have the others that do have, as you said

5   earlier, the critical components for operating rooms and things

6   of that nature, and generally they don't have as much that I've

7   seen, per se, in the general procurement system as they do in

8   their inventory fulfillment systems where there's a lot of

9   health care regulations in terms of maintaining and tracking

10  drugs as an example.  And the procurement system isn't always

11  the best place to house that information.  A lot of them are

12  housed in inventory management systems.  That's not to say that

13  procurement isn't used at times to do that.

14  Q    Is that a more extensive process, to implement a system

15  that involves critical care suppliers than noncritical care

16  supplies?

17  A    No, I don't believe so, because you just have to have the

18  control procedures in place and be able to test those controls

19  against those control procedures.

20  Q    Have you implemented Procure+ with critical care supplies

21  at a health care facility?

22  A    We have implemented procurement applications with critical

23  care drugs just as we have for nuclear energy and other things

24  where there are similar regulations and restrictions.

25  Q    With which health care facility have you implemented

Farber - Cross

1  critical care --

2  A    We've done things with Quest in the past, Quest

3  Diagnostics.

4  Q    What is Quest Diagnostics?

5  A    It's a diagnostic company and distributor of medical

6  equipment and drugs.

7  Q    It's not a hospital, it's not a health care --

8  A    No, not a hospital.  Deaconess is a hospital.

9         THE COURT:  Do you know of any hospitals that depend

10  on electronic systems to provide what they need in operating

11  rooms for surgeries instead of having it available and on hand

12  before they ever start the surgery?

13         THE WITNESS:  No.  It's generally -- I'm not aware,

14  Your Honor.  It's generally -- the ones that I personally have

15  seen, there was recently a bid that we had, as an example, with

16  -- I think it was St. Peter's Medical Center, and, you know,

17  they have different facilities to manage those critical care

18  drugs and units, and they had everything else which was

19  noncritical in the procurement system and managed their

20  facilities and lesser maintained and regulated items.

21  Q    I'd like to go back, Mr. Farber, to the issue of your

22  interest in the license agreement in this case, and Mr.

23  Robertson made some statements at the beginning, and I just

24  want to see if you are on the same page as he is on this.  Is

25  it true that at this point, ePlus is not interested in giving

Farber - Cross

1    Lawson a royalty license?

2    A    Well, right now, it's my understanding that our recourse,

3    you know, in terms of where we are -- I know we don't have

4    damages at our disposal, so our resource, as I understand it,

5    is to ask for an injunction.

6    Q    From your perspective, you don't think you have a choice

7    right now; is that the issue?

8    A    Let me say this:  There's always a choice in life, right,

9    in terms of what you want to do.  I would say right now, as I

10   stand here today, I'm saying I don't have a choice because

11   Lawson has made it very clear to us what their intentions are

12   relative to these patents-in-suit.  So, no, I don't have a

13   choice other than to request an injunction.

14   Q    Would you be interested in entering a license, and are you

15   willing to do that right now if you could figure out the proper

16   price for it?

17             THE COURT:  Going-forward license or --

18             MR. McDONALD:  Thank you, Your Honor, for clarifying.

19   Q    Mr. Farber, with respect to the going-forward license, as

20   you sit here today, is ePlus interested in entering a

21   going-forward license with Lawson if the price is one that you

22   think is fair?

23   A    No.  I think right now we're leaning towards excluding

24   Lawson.

25   Q    Okay, that's your preference, but is it at least a choice

Farber - Cross

1    you would be willing to accept right now, that you have a

2    going-forward license with Lawson at a fair price?

3    A    Right now I'd say no.  The alternative would be to

4    discuss, after an injunction is provided to ePlus, the request,

5    and, quite honestly, it goes beyond me.  Even though I'm the

6    corporate spokesperson, my responsibility is to speak with the

7    board, shareholders, principals to make that final decision.

8    Right now the decision of the board is to request the

9    injunction.

10          THE COURT:  Well, suppose you could get a license

11    going forward with ten percent, would you be willing to do

12    that?

13          THE WITNESS:  Right now my recommendation to the

14    board, Your Honor, would honestly be no, and the reason being

15    is because of the contentious battle that we've had with Lawson

16    which has exponentially been much greater than anybody else.

17          We would be tremendously concerned, and we feel we'd

18    be tremendously harmed with the burden of determining what that

19    ten percent is and also insuring that they remained honest of

20    what that ten percent is and not having to keep going back and

21    audit and fight with them year after year after year.

22          There is only one provision in one agreement that we

23    ever did with one vendor that had a royalty if they hit a

24    certain dollar amount, and that's because there was nothing

25    else there for that company or they'd be out of business, okay.

Farber - Cross

1   All of our agreements have been a fully paid-up license, we're

2   done, we don't have to deal with one another again, we don't

3   have to -- there's some terms that deal with no more lawsuits

4   for a period of time and so on and so forth, and that

5   eliminates the ability to have to deal with one another again.

6           That's what we would prefer versus the burden that,

7   again, would be placed on us and the hardship of making sure

8   that we believe what Lawson is saying and auditing them and

9   tracking it.

10  Q    So at this point, would you be willing to enter a deal

11  that would involve a lump sum payment by Lawson for

12  going-forward activities so you did not have to monitor their

13  activities?

14  A    Now you are getting into a situation of what we discussed

15  at the settlement agreements --

16          THE COURT:  Wait a minute.  Settlement proposal, I

17  want to make sure that you are not waiving your objection to --

18          MR. McDONALD:  I'm not asking about history here.

19  I'm just asking as he sits here today, we've been talking about

20  what they'd be willing to do, and I want to --

21          THE COURT:  If the price was right, would he enter

22  into a lump sum royalty that would take care of everything.

23          MR. McDONALD:  Everything going forward.

24          THE COURT:  Are you saying the lawsuit would be

25  dismissed, too?

1              MR. McDONALD:  Not necessarily.  We're just talking

2     about dealing with the going-forward situation with Lawson.

3     Q    Let's not talk about anything else other than how do we

4     deal with Lawson's activities going forward.  Would you be

5     willing to enter a deal that would be involve Lawson paying a

6     lump sum to ePlus to take care of future activities?

7     A    As I sit here today, no.

8     Q    Why not?

9     A    Because I'm sitting here today because we've had every

10    opportunity to do that, and right now there's been a decision

11    made by the company that we want to exclude Lawson.

12    Q    Is your understanding consistent with what Mr. Robertson

13    said, that after an injunction is entered, if there is one that

14    is entered, at that the point you can go back and talk to

15    Lawson again about some sort of a licensing arrangement?

16             MR. ROBERTSON:  I object.  We're really calling for

17    speculation here at this point.

18             MR. McDONALD:  Well, I think Mr. Robertson talked

19    about after an injunction was entered.  You asked him the

20    question.  They would view that as I think you called it a

21    level playing field to negotiate.

22    Q    Is that how you look at it, Mr. Farber, that if the Court

23    enters an injunction, at that point you'd feel like it was a

24    level playing field and you'd be willing to talk to Lawson

25    about a license at that point?

1          MR. ROBERTSON:  Your Honor, that was attorney

2    argument.  This is still asking this witness to speculate on

3    something that he said the board hasn't even decided yet.  The

4    board has made a decision as to what they want to do.

5          THE COURT:  Sustained.  Are you saying that Lawson --

6    you just don't believe Lawson would pay you enough to make it

7    worthwhile because of the previous negotiations you've had to

8    make it worthwhile to take a lump sum settlement that you would

9    recommend to your board; is that what you are saying?

10          THE WITNESS:  To some degree.

11          THE COURT:  Suppose that they offered you

12    $100 million going forward?  What difference does it make as to

13    what your past losses were?  Why wouldn't you take that and

14    dismiss the lawsuit and be done with it, is the question, I

15    think.  I can understand why you might not, but I'd like to

16    hear why you understand.

17          THE WITNESS:  Look, there's always possibilities, and

18    it would be my responsibility to the company, to the board, to

19    the shareholders to take anything that I thought was reasonable

20    and present it to the board, okay.  And I would do that.  And

21    based on historical discussions, based on public comments that

22    Lawson made following the jury trial and the lawsuit and the

23    tensions that they made known publicly, I have no faith in

24    believing that that will ever happen, that they will ever come

25    and say, here's a reasonable dollar amount, do we want a

Farber - Cross                                    92

1    royalty, no.  Would we have considered a dollar amount up to

2    this point prior?  Sure, we would have.  Right now, that's why

3    I'm saying I feel as though --

4              THE COURT:  The history between you forecloses that

5    as an option.

6              THE WITNESS:  As of today, yes.  That's why we're

7    asking for the injunction.

8    Q    Your Procure+ and Content+ products, that's what you were

9    talking about today; right?  That's the products at issue from

10   ePlus's standpoint?

11   A    That's what we were talking about at trial as well.

12   Q    I think you called those, or at least ePlus has called

13   those your flagship products in the eProcurement area?

14   A    Uh-huh.

15   Q    Could you say yes or no so she can --

16   A    Oh, I'm sorry, yes.

17   Q    It is a flashback to the deposition; right?

18   A    It certainly is.  I thought I was done.

19   Q    The most recent fiscal year is what for ePlus?

20   A    2011 would be our fiscal.

21   Q    Does that end March 31st?

22   A    Correct.

23   Q    So we're not quite done with that one just yet?

24   A    That's right.

25   Q    So if we take the last fiscal year that has ended, that

Farber - Cross                                           93

1   would be March of 2010; right?

2   A    Correct.

3   Q    In that year, your division sales of Procure+ and Content+

4   products and services, that was around $6 million or so; is

5   that right?

6   A    Yes.  Of what we contributed to that division, that's

7   correct.

8   Q    That's less than one percent of the company's total

9   revenues; right?

10  A    That's what we established, yes.

11  Q    The other 99 percent, that's the value-added resale of the

12  hardware and IT equipment?

13  A    No, it's other things as well.

14  Q    But mainly that?

15  A    The majority falls into the reselling.

16  Q    With respect to Content+, I think you indicated you

17  considered that to be a product covered by the patents involved

18  in this suit; is that right?

19  A    When it's used in conjunction with Procure+.

20  Q    How about by itself?  Is it a product that you consider

21  within the claims of the patents in this case if Content+ is

22  used by itself?

23  A    Well --

24       MR. ROBERTSON:  Objection, Your Honor.  This is calls

25  for a legal conclusion.

1            THE COURT:  What is the difference between the legal

2    conclusion you asked him to give and this one?  If you have a

3    distinction, I believe I could maybe understand better to rule,

4    but having overruled Mr. McDonald's objection, it seems as if

5    I'm hard-pressed to sustain yours.

6            MR. ROBERTSON:  I understand, Your Honor.

7            THE COURT:  That would be called approbating and

8    reprobating on the same topic which all Virginia lawyers are

9    taught from the time they studied the bar on never to do.

10   A    Would you mind repeating the question.

11           THE COURT:  At least in the same case.  Why don't you

12   ask the question again.

13   Q    Is it your understanding that the Content+ product alone,

14   without Procure+, would come within the claims of the patents

15   in this suit?

16   A    I don't believe it would.

17   Q    It doesn't build requisitions or generate purchase orders;

18   right?

19   A    That's correct.

20   Q    Is it the ePlus Systems division and content division?

21   Are those the two divisions that involve Procure+ and Content+?

22   A    Yes.

23   Q    You are responsible for both of those?

24   A    Yes, sir.

25   Q    You handled sales or you're responsible for sales,

Farber - Cross                                                    95

1    development, client support, daily operations, and strategic

2    planning for both of those divisions; is that right?

3    A    Among other things, yes.

4    Q    You did provide us with a sales summary for that division;

5    is that right?

6                THE COURT:  You asked him about two divisions.

7                MR. McDONALD:  You are right.

8    Q    You gave a sales summary for both of those divisions;

9    right, Mr. Farber?

10   A    Yes, I believe we did.

11               MR. McDONALD:  Can we put up Defendant's Exhibit 531,

12   please.

13               THE COURT:  Do you have one of those things that old

14   eyes can read?

15               THE WITNESS:  Do I need to do anything to see it

16   here?

17               THE COURT:  Have you got a paper version?

18               MR. McDONALD:  I don't think the paper versions are

19   any better.

20               THE COURT:  I didn't realize I had this terrible

21   burden over here on my left side.

22               MS. STOLL-DeBELL:  Your Honor, can I go help the

23   witness get a book?

24               THE COURT:  You sure can.  I'm not sure this is a

25   whole lot better.

Farber - Cross

1           MR. McDONALD:  It is not.  I'm going to try to blow

2    up some particular numbers, Your Honor, on the screen so we can

3    zero in for a second.

4           THE COURT:  I can read some of this, so tell me where

5    I go.  Do you need a magnifying glass to read, Mr. Farber?

6           THE WITNESS:  You know, I have glasses.

7           THE COURT:  So do I.

8           THE WITNESS:  I don't know that they help.  I think

9    I'm okay.  Thank you.

10   Q    Try to blow it up on the screen, too.

11   A    Screen is actually worse.

12          THE COURT:  It's fuzzy.

13   Q    So is this a summary -- at least we've got up on the

14   screen, Mr. Farber, I believe this is the first page of

15   Exhibit 531 where it says in the upper left corner income

16   statement, ePlus Systems; is that right?

17   A    Yes.

18   Q    So this is the Procure+ product?

19   A    Correct, I believe so, yes.

20   Q    Is there any products other than Procure+ in there?

21   A    No, I don't believe so.

22   Q    Let's go to the lines for fiscal year 2010.  I'm going to

23   circle something here.

24   A    Okay.

25   Q    Is that the sales for the fiscal year ending March 31st,

Farber - Cross

1    2010?

2            THE COURT:  What is it, total revenues?

3    Q    Total revenues for that fiscal year ending March 31st,

4    2010; correct?

5    A    The one that says 4.6?

6    Q    4,677,968, that was the total Procure+ related sales for

7    that fiscal year; correct?

8    A    Appears so, yes.

9    Q    Let's talk about what goes into that revenue figure, all

10   right?

11   A    Uh-huh.

12   Q    How much of that would be for hosting services for

13   preexisting customers?

14   A    You know, I'd have to look at the detail pro forma.  I

15   don't know I can tell from here.

16   Q    You understand we asked for a detailed breakdown of that,

17   and it was represented to us that ePlus did not have a

18   breakdown of the various subsets of revenue --

19   A    I'm looking to see if I can see it here.

20   Q    While you are looking at that, maybe I should get a

21   question posed here right now because I'm not sure what you're

22   look for at this point.

23        Is it your understanding that there is a breakdown at

24   ePlus of sales within this Procure+ division that would include

25   which part of that is hosting revenues and which part is

1    service revenues and which part is new sales and new licenses,

2    et cetera?

3    A    No, I don't think we break it down that way.  I think we

4    break it down as the -- as I've seen it, as the suite, the

5    whole suite costs, and then I think there's professional

6    service fees that are associated with it.

7         So, you know, as an example, what this is saying is of the

8    4.6 -- let's see here.  Looks like it's maintained as one

9    number.

10   Q    Okay.  So you don't know what part of that four point --

11   $4,677,000 goes into payments for hosting for preexisting

12   customers that existed before fiscal 2010?

13   A    No, not off the top of my head, I don't.

14   Q    How many new customers for Procure+ did you get in fiscal

15   2010?

16   A    Probably, I'm going -- handful of customers.

17   Q    How many?

18   A    Probably less than five.  Five or so.

19   Q    Who were they?

20   A    Kaplan, I think maybe Koch Industries.

21             THE COURT:  Are you saying K-o-c-h?

22             THE WITNESS:  K-o-c-h which is also referred to, I

23   think, in some documents as KBS.  I'm just trying to think off

24   the top of my head.  There's -- then there's a whole slew of

25   new renewals that are done --

1   Q    I'm not talking about the renewals.

2   A    Okay, all right.

3   Q    I just want to know the new customers in fiscal year 2010

4   ending March 31st of that year.

5            THE COURT:  For Procure+?

6            MR. McDONALD:  For Procure+.

7   A    Those are the ones that are coming to my mind.  I know

8   there's others.

9   Q    You think there might be three more?

10  A    Possibly, yeah.

11  Q    For the years since March 31st, 2010, up until now, which

12  is almost another 12 months; right?

13  A    Uh-huh.

14  Q    How many new customers of Procure+ in the last 12 months?

15  A    About the same.

16  Q    About five?

17  A    I think so.

18  Q    Who were they?

19  A    You have customers like CONSOL Energy.  We have -- I think

20  Quest was one of them.  I have to go back and check.

21  Q    Well, other than -- is this ePlus's Systems division, is

22  that the biggest division that you are in charge of?

23  A    I have other responsibilities in the company, but in terms

24  of the software, yes.

25  Q    In terms of anything, isn't this the division that is your

1   biggest division?

2   A     In terms of software, yes.

3   Q     Do you have some responsibility for divisions other than

4   software?

5   A     I have responsibilities for other divisions, working with

6   other division as the company --

7   Q     You are not in charge of any other divisions?

8   A     That's correct.

9   Q     In terms of what you're in charge of, this division for

10  Procure+ is the biggest one; right?

11  A     Yes.

12  Q     Did you have more than the two customers you have

13  identified in the last 12 months that are new customers in that

14  division that's the biggest one you are in charge of?

15  A     Yes.

16  Q     What were their names?

17  A     I'm telling you I have to go back and look.

18  Q     As the guy in charge of that division, of the five new

19  customers, you are telling me you can only identify two of

20  them?

21  A     Let me explain something to you, Mr. McDonald.  You are

22  asking me about the last year.  The last year I have put the

23  division in the hands of my management team, and I have spent

24  mostly every day working on this case, and I've had two

25  personal family deaths that I've dealt with, so my hours of

1   operation with the companies have been like this, okay?  So I

2   have to go back and check.

3   Q    But it's about five?

4   A    That is what I believe.  I could be grossly

5   overestimating, I could be grossly underestimating.

6   Q    In any event, the total number of customers for Procure+

7   that exist for all the years ePlus has existed, I think you

8   said about 65 right now?

9   A    Yes.

10  Q    And ePlus has existed for about ten years now, nine years;

11  is that right?

12  A    Since they acquired ProcureNet, yes.

13  Q    Were there some existing customers that were there back in

14  2002 when ePlus acquired ProcureNet that they are included in

15  the 65?

16  A    I don't know if there are or not.  I don't recall back.

17  There were very, very few, I think, if there were any at all.

18  Q    There may be some that have been around that long?

19  A    There are some using our product today that aren't paying

20  maintenance that are still using the product from maybe way

21  back then, but we're not supporting them to run all the

22  releases.

23  Q    So of 65 customers, maybe a few were carryovers, but some

24  part of that 65 are customers that have been acquired over the

25  last nine years; is that right?

1    A    The majority, yes.

2    Q    So ePlus's total customer base that it's acquired over all

3    the ten years of its existence since acquiring ProcureNet is

4    less than ten percent of that Lawson RSS customer base; is that

5    right?

6    A    Of what's contributed in this division, yes.

7    Q    We are talking about Procure+; right?

8    A    Right, but --

9              THE COURT:  He says less than ten percent of Lawson's

10   customer base.

11             MR. McDONALD:  Yeah, Lawson.  We had the statistic,

12   the pie chart from Mr. Robertson that showed there was 800, I

13   think, or so RSS customers of Lawson --

14             THE COURT:  Less than ten percent of the 800 --

15             MR. McDONALD:  Yes.

16             THE COURT:  I'm sorry.  I didn't understand you.

17   Q    Now, with respect to Content+, how many new customers have

18   you had in the last 12 months?

19   A    It's generally the same because we generally bulk the two

20   together.

21   Q    Do you recall at trial there was an AMR Research report

22   from 2006 that ePlus relied on to show the market?

23   A    We may have.  I have to refresh my memory to it.

24   Q    If we could put Exhibit 231, is the -- 531.

25   A    531.  That's what we're on.

1    Q    Yeah.

2    A    Okay.

3    Q    What were the sales for Procure+ in 2006?

4    A    Procure+?

5    Q    Yes.  It's the first page; right?

6    A    Uh-huh.  That's showing seven million.

7    Q    And then how much were the sales for Content+ if we go to

8    the next page of that document for fiscal year 2006?

9    A    1.3.

10   Q    So if you add those two together, is that about

11   8.4 million?

12   A    Roughly, sure.

13   Q    That fiscal year is nine months of 2005; correct?  And

14   then three months of 2006?

15   A    Yes.

16   Q    So that year, ePlus's revenues in procurement were under

17   nine million; right?

18   A    Correct.

19   Q    Do you know whether or not in the report that ePlus used

20   at trial it depicted ePlus's 2005 procurement and sourcing

21   revenue at 23 million?

22   A    I don't recall.

23   Q    Do you recall whether or not ePlus gave any information to

24   AMR to help AMR put together research and market reports --

25   A    To the best of my knowledge and recollection, we don't

1    provide any analyst any specific revenue numbers in the area of

2    procurement or content management because we don't disclose it

3    as a separate item on a balance sheet of our company at ePlus,

4    so we can't provide public information that's not public.

5    Q    You think it's legally prohibited for you to give data

6    like this to a research company?

7    A    I didn't say it was legally prohibited.  I said we do not,

8    as a practice, as a company, provide any information that's

9    already not public.

10   Q    It's a policy of the company; is that what you are saying?

11   A    Yes.

12   Q    Now, is it -- we can take this -- you can leave the

13   document up for a moment.  Is it the goal of your ePlus System

14   division and content divisions to make money selling those

15   products?

16   A    Repeat that question.  I'm sorry.  Is it a goal --

17             THE COURT:  Why would we need to ask that question?

18             MR. McDONALD:  Well, because they've never made any

19   money, so if the answer is yes, I'm trying to figure out why

20   they're still around.

21             THE COURT:  Why who is still around?

22             MR. McDONALD:  Those two divisions.  Let me give a

23   little back up here.

24             THE COURT:  What does that have to do with anything?

25             MR. McDONALD:  Well, it shows that they're really a

Farber - Cross

1    company that only exists so they can keep enforcing these

2    patents.  It's the only way to make any money.  That's what I'd

3    like to show.  It is relevant certainly to the injunction

4    issue.

5                THE COURT:  All right.

6    Q    Isn't it true -- I think you summarized the total revenues

7    over the years since 2002, Mr. Farber, the total revenues over

8    that period were about, I think you said -- well, through

9    fiscal 2010, aren't they about 46 million?

10               THE COURT:  For these two divisions?

11               MR. McDONALD:  For these two divisions.

12   A    For the two combined.

13   Q    Yes?

14               THE COURT:  Since 2000-what?

15               MR. McDONALD:  From 2002 to 2010.  The full fiscal

16   here shown on the charts.

17   A    Is it summarized on here?

18   Q    No.  You have to take the numbers and add them up, but I

19   added them up and they added up to 46 million.

20   A    If that's what they say, there's no reason I would

21   dispute your calculation.

22               THE COURT:  That's for Procure+ and Content+?

23               MR. McDONALD:  Exactly.  Both of the two divisions

24   here in 531.

25               THE COURT:  Is that gross sales --

1          MR. McDONALD:  Exactly.

2          THE COURT:  -- or net revenue or what?

3          MR. McDONALD:  Gross revenue.

4    Q     Right, Mr. Farber?

5    A     Yeah, gross sales.

6    Q     Is it true that in that same period the total expenses for

7    those two divisions have totaled about $76 million?

8    A     I haven't added it up, but it could be.

9    Q     You do know, though, don't you, that every year from 2002

10   to 2010, the systems division with Procure+ and the content

11   division with Content+ lost money; is that right?

12   A     Yes.  As it shows up on our P&O, it has.

13   Q     And cumulatively, for those years 2002 to fiscal 2010,

14   those losses total about $30 million; right?

15   A     Sounds right.

16   Q     In fact, the last couple of years' sales have been down in

17   those divisions; right?

18   A     Sales have been down for the company, you know, in a

19   number of areas, sure.

20   Q     Is it the purpose of these divisions to make money selling

21   products and services or not?

22   A     Yes.

23   Q     Have you ever fulfilled that service -- excuse me.  Have

24   you ever fulfilled that purpose for these divisions?

25   A     I think, again, it's what I tried to describe, you know,

1    during the original depositions, is, you know, you could look

2    at these as an individual -- at the product level, the answer

3    to your question is no, we have not fulfilled that.

4              THE COURT:  You mean in terms of sales.

5              THE WITNESS:  In terms of sales of the product.  Have

6    they influenced and increased revenue in other parts of the

7    business and helped our bottom line in other parts of the

8    company?  Then I would say yes.

9    Q    But there's no accounting that the financial people of

10   ePlus have provided that would show that value that you are

11   saying exists on the other parts of the company; is that right,

12   that you produced in this case?

13   A    I don't know that anybody has asked us as part of this

14   case to put that analysis together.

15   Q    How about just in the ordinary course of business?

16   There's no analysis like that, is there?

17   A    I gave you an example.  I gave you an example that these

18   divisions -- that this particular division contributed

19   $16 million of hardware sales last year as one example.

20   Q    There's documentation that you produced to us in this case

21   that would reflect that $16 million figure, is there?

22   A    I don't think it was asked for.  I don't know whether it

23   was produced or if it wasn't produced.  If it was asked for, it

24   may have been produced.

25   Q    Do you think it's relevant to what we're talking about

Farber - Cross

1  today or not?

2  A    Well, there were questions that were asked by my counsel

3  that dealt with the fact that, you know, there were other areas

4  that, you know, the company benefits by having these products.

5  Q    Mr. Farber, have you received any bonuses over the years

6  for or as a result of the settlements --

7            MR. ROBERTSON:  Objection, relevancy.

8            THE COURT:  Has who received bonuses; the company?

9            MR. McDONALD:  Has Mr. Farber received bonuses.

10           MR. ROBERTSON:  Relevancy.

11           THE COURT:  What does what he's paid have to do with

12  the injunction?

13           MR. McDONALD:  It has to do with whether these

14  divisions are in the business of suing people or making money

15  on selling products and services.  We're going to show he gets

16  bonuses for when they successfully settle cases, but they've

17  never made any money actually selling products or services.

18           MR. ROBERTSON:  I don't understand the relevancy.

19           THE COURT:  Are you trying to show they are a patent

20  troll.

21           MR. McDONALD:  I'm trying to show about the closest

22  things there is.  I don't want to use pejorative terms here,

23  Your Honor, but they're in business to sue people.

24           THE COURT:  What was he called?

25           MR. McDONALD:  Non-practicing entities.  You know,

1    I'm not looking for absolutes, and, you know, this is an

2    injunction.  There are no fast and firm rules here, but I think

3    it's important just to understand who ePlus and who these

4    particular divisions really are.

5              THE COURT:  Overruled.

6    Q    So, Mr. Farber, have you received bonuses over the years

7    for getting settlements of your patent litigation?

8    A    I have.

9              THE COURT:  Settlement bonuses were tied to settling

10   the litigation?

11             THE WITNESS:  No.  They were bonuses that awarded by

12   the board after, you know, everything was all done, and, you

13   know, they elected what they felt they wanted to give me a

14   bonus on.

15   Q    It was true that those bonuses were awarded as a result of

16   the settlement proceedings; right?

17   A    Depends who you might ask.

18   Q    How about if we ask --

19             THE COURT:  I think the question is what were you

20   told was the reason for the bonuses.

21             THE WITNESS:  Well, on the Ariba one --

22             THE COURT:  If you were ever told.

23             THE WITNESS:  On Ariba, I, obviously, you know, was

24   thanked by the board and was awarded a bonus for the several

25   years that I put into that project for the company, and, yes,

Farber - Cross                                              110

1    they provided a bonus, you know, for that purpose.

2    Q    Once the money came in; right?

3    A    Yes.

4              THE COURT:  Once what?

5    Q    Once the money actually came in.  They gave you the bonus

6    at that point when the proceeds from the settlement came in.

7    A    I think like within 90 days after receiving it.

8    Q    Now, we talked about the revenues now for these divisions.

9    If we can talk about the expenses here a little bit.  Can we

10   blow up the first page here and the lines kind of in the middle

11   part of the page that relate to cost.  Don't go all the way

12   down to earnings.  Go a little short.  There you go.  Right

13   there.  Does that help to stretch them out, make it any more

14   readable?

15   A    For me it's easier --

16             THE COURT:  I've got enough here with my little

17   trusty magnifying glass, and if you'll tell me where you're

18   going, I can get there better this way than on the machine.

19             MR. McDONALD:  Thank you.

20   Q    Does this part that we have blown up on the screen, here,

21   Mr. Farber -- obviously use the paper version if that helps

22   you figure out what we've got up there -- but that lists the

23   costs of the systems division that sells the Procure+ products

24   and services; right?

25   A    That's correct, yes.

1   Q    There's nothing listed here, at least itemized for sales

2   expenses, is there?

3   A    Well, I think sales would be under, might be under salary

4   and benefits if that's what you're referring to.

5   Q    Well, you tell me.  You're in charge of this division.

6   Are there sales expenses of the system division or not?

7   A    Of course there are.  Sales expenses would be in multiple

8   categories.  One is salary, and the other is marketing,

9   development cost.  There's a lot of different components.

10  Q    Where are the costs reflected here in this sheet?

11  A    It's all under total expenses.  You have salaries, general

12  administration.

13  Q    So, for example, the salaries for salespeople, would that

14  be under salaries and benefits?

15  A    I believe so.

16  Q    Do you have any salespeople dedicated full time to selling

17  Procure+ and Content+?

18  A    Absolutely.

19  Q    How many people?

20  A    Now we have about -- I think there's five or six people

21  that are direct salespeople.

22  Q    Could you put up -- excuse me for a minute.  Could you put

23  up the ePlus demonstrative number one.  So this is the

24  demonstrative used in your testimony, Mr. Farber, right,

25  regarding electronic procurement sales; correct?

1    A    Correct.

2    Q    I'm looking at this map here with a lot of blue stick

3    figures.  It looks like there are about 12 of them on this map

4    of the U.S.; right?

5    A    Okay.

6    Q    If I understand you right, you'd actually have less than

7    half of that in terms of actual dedicated salespeople?

8    A    I think what this is referring to, I don't think this is

9    making a distinguishing fact of how many direct salespeople we

10   have.  We have about 90 people out in the field that also have

11   the capability within their sales kit to sell anything that the

12   company has to offer.  So this represents different channels of

13   sales, not explicitly to match up with names on top of each

14   person and where they sit.

15   Q    If we go to the next demonstrative, please.  So this is

16   the electronic procurement sales, so ePlus sales structure

17   here, when it says ePlus up there, it's talking about ePlus as

18   a whole; is that what's being depicted here?

19   A    Where does it say ePlus here?

20   Q    In the upper left --

21   A    ePlus sales structure?

22   Q    Yeah.

23   A    I think what this demonstrative is showing is that there's

24   a combination of a decentralized national sales organization --

25   Q    I have a different question for you.  My question is, is

1    this depicting the sales structure of ePlus as a whole company

2    including the value-added reselling and the other 99 percent,

3    or is it just the part that involves Procure+ and Content+?

4    A    I think it's a pictorial describing both, different

5    channels to ePlus and the customer.

6    Q    So if I understand you right, though, there are about five

7    salespeople in your division that are dedicated just to selling

8    Content+ and Procure+ products and services; is that right or

9    not?

10   A    Yes.  It works two ways.  There's five direct, and I said

11   there's 90 out there.  There's five people who support the 90

12   people that are out in the field that work as part of our

13   technology leasing organization, so a lead, an opportunity can

14   come in from either source.

15   Q    So those five or so salespeople, they bring in about five

16   or so customers a year?

17   A    It's a combination of the salespeople working with the 90

18   people out in the field or for themselves.

19   Q    How much do you pay those salespeople a year?

20   A    It varies.  I think the average salary is probably 125

21   plus commissions of what they bring in.

22   Q    So -- and those five people are partly but not wholly

23   responsible for those five or so new customers a year; right?

24   A    They've played some role in that.

25   Q    Go back to the expense part of 531, please.  I think you

1    mentioned trade shows, Mr. Farber, as one of the ways you sell

2    Procure+ and Content+; is that right?

3    A    I said one of the ways that we generate leads is to be at

4    trade shows.

5    Q    All right.  Who is the "we" that we're talking about?  Is

6    it your division or ePlus as a whole?

7    A    It could be both.

8    Q    Let's talk about just your division for a moment then.

9    What trade shows are attended by people just within your

10   division specifically to sell Content+ and Procure+?

11   A    Well, we just got done with the outsourcing and payables

12   conference that was held at the Peabody Hotel this past month.

13   Did a presentation with one of our clients, UGL UNICCO.  EISM

14   we've attended in the past.  We've attended Gartner conferences

15   in the past.  We've attended Forrester trade shows.

16   Q    You say in the past.  I want to make sure we're in the

17   same page here.  How about if we just zero in on the last

18   12 months.

19   A    Okay.

20   Q    So, specifically for Procure+ and Content+, did you make a

21   decision, as the head of the division or somebody in the

22   management of that division, to attend some trade shows?

23   A    Yes.

24   Q    Which ones?

25   A    The outsourcing conference, the Forrester conference, I

Farber - Cross

1    believe we attended the National Association of Purchasing and

2    Payable Professionals, NAPP, and I think we attended a

3    Forrester Managed Services conference.

4    Q    Meta service?

5    A    Managed Services.

6    Q    You mentioned Forrester twice there.  I just want to make

7    sure --

8    A    I did, okay, once.

9    Q    I wasn't sure how busy they were.

10   A    Those are the ones that I recall.

11   Q    With respect to research and development, I don't see any

12   line items on the expenses here that relate to research and

13   development.  Is there research and development in your

14   division?

15   A    Yes.

16   Q    Where does that fall in the expense?

17   A    I think -- let me just see here.  It's probably going to

18   be under the salaries and benefits.

19   Q    How many dedicated R&D people do you have associated with

20   Procure+ and Content+ specifically?

21   A    Now we probably have about, I'm going to say 20 or 30.

22   Q    What do those people do?

23   A    What do they do?

24   Q    Yeah.

25   A    They develop the application.  They develop new releases

1    of the application.  We just released a major new revision of a

2    million lines of code that they changed over the last year and

3    a half.  So there's a completely new paradigm that we are

4    announcing probably next week and have rolled out at our

5    conference that was had March 9th that was reviewed and beta

6    tested with our clients.

7        So development and new releases is one, and that was a

8    major undertaking.  Then they have ongoing support activities

9    where if there's problems that are found within the code that's

10   reported by our customers, we fix that.  So they maintain the

11   health of the application, if you will.

12   Q    So if I understand right, next week you're going to

13   announce, in fact, a rewrite of your code; is that right?

14   A    I'm saying what we did is we came out with -- called it an

15   enhancement to the code with new features and new elements that

16   work within the code.  It's a substantial undertaking.

17   Q    You were able to do that over the last year; is that

18   right?

19   A    Year and a half.

20   Q    I don't see anything on the Exhibit 531 for either

21   Procure+ or Content+ that includes any expenses for the costs

22   of this lawsuit.  Is it true that your divisions don't have the

23   litigation costs charged against your divisions?

24   A    There is some years that it does and some years that it

25   hasn't.

1  Q    Which years between 2002 and 2010 does it reflect any cost

2  of the Lawson litigation?

3  A    Let me see here.  I think when you go into professional

4  and other fees in 2006 and -7 wherein --

5  Q    Let me clarify my question.  I'm talking about the Lawson

6  litigation.

7  A    No, that's not attributed to that.

8  Q    That's for ePlus as a whole; is that correct?  That's

9  where that cost is charged to?

10 A    Yeah, sure.

11 Q    So that didn't have any impact on your ability to conduct

12 research and development within your division to develop your

13 enhancements and additional functionality for Procure+ and

14 Content+ that you are releasing right now; right?

15 A    No.  I mean, I think that what we're releasing right now I

16 wanted to actually do earlier, and I wanted to dedicate more

17 people to it, but we did hold back the reins a little bit

18 because of the incurred expenses.

19 Q    Do you have any documentation indicating that you deferred

20 or delayed any work on this what you call the major undertaking

21 that you've undertaken in the last year and a half because of

22 litigation expenses?

23 A    No, I don't think there was one needed to be written up at

24 ePlus to make that decision.

25 Q    I'd like to turn now to the issue of these sales that,

1    according to you anyway, you lost to Lawson.  In your

2    testimony, I didn't hear you saying anything specific, so I

3    want to ask a specific question to you.

4    A     Sure.

5    Q     Are you aware of any customers that ePlus lost to Lawson

6    as a result of Lawson's selling that customer RSS or Punchout?

7    A     You know, leading up to this lawsuit, I don't know the

8    variations of what and how Lawson sells its customers.  I know

9    that lists were provided, you know, through whatever discovery.

10   What I do know is that we compete against the same RFPs with

11   the same functionality --

12   Q     You are going to start answering some other questions now.

13   I'm asking a very specific one.  Are you aware of any specific

14   customers ePlus has lost because Lawson sold that customer RSS

15   or Punchout?

16   A     I wouldn't know that information.

17   Q     So all those companies that you listed here today, PPEI,

18   Sterling, Deaconess, LHC, et cetera, you're not saying any of

19   those were lost to Lawson because Lawson sold them RSS or

20   Punchout; right?

21   A     I am saying that Lawson competed with ePlus within those

22   accounts.  I'm not saying what -- you know, RSS, Punchout, or

23   whatever, all of them had Punchout requirements that we

24   generally go into, the ones that I highlighted, but I don't

25   know what ultimately sold them.  I barely have an idea

Farber - Cross

1    sometimes who our competitors are.

2    Q    So, for example, for PPD, did you know that they did not

3    purchase RSS or Punchout?

4    A    I wouldn't know.

5    Q    With Novant, do you know what they did?

6    A    I don't know how they ended up.

7    Q    Do you know that they bought Ariba?

8    A    They may have.

9    Q    Ariba is a licensee of yours; right?

10   A    Yes, patent licensee, sure.

11   Q    And you've got a restriction, if I understood you right,

12   that Ariba can't license other companies -- right -- under your

13   patents?

14   A    Yes.

15   Q    But Ariba can use your patents and sell to anybody they

16   want to using your patents; right?

17   A    They can sell, sure.

18   Q    Isn't Ariba one of your biggest competitors in

19   procurement?

20   A    Actually not anymore, they're not.  They used to be.

21   Q    Well, for how many years were they one of your biggest

22   competitors?

23   A    Three or four years they were, you know, really, really

24   big.

25   Q    What years were those?

Farber - Cross                                                          120

1    A    Around the years we went through the lawsuit, a few years

2    before.

3    Q    You are still competing with them today, aren't you?

4    A    Sure, we still compete with them, absolutely.

5    Q    Who are your biggest competitors today?

6    A    I still see, you know, companies as I mentioned earlier.

7    Our biggest competitors may be -- I still see Lawson, I still

8    see SAP on occasion.  I see companies like -- I see SciQuest.

9    I see Coupa, company called Basware that seems to be investing

10   a lot in the U.S.  They are a European company.  So the

11   complexion as I've described in the past to you, it changes.

12   It's a very dynamic vertical market that we're in.

13   Q    I think you mentioned McKesson as well.  Are they an ERP

14   provider?

15   A    McKesson is in ERP, but you asked me who we see as a top

16   provider.  I don't consider them a top provider.

17   Q    Are they in the mix somewhere?

18   A    Somewhere in the mix.  There's a lot in the mix.

19   Q    There's almost 100 competitors in this business, isn't

20   there?

21   A    I think that's what I had testified to.

22   Q    I think you mentioned Infor as well.  Do you look at them

23   as a significant competitor?

24   A    I don't know that I say, you know -- I think they used to

25   be Agilisys and we lost business to them, so, yeah, you know,

1    they are a competitor.

2    Q    Do they have a functionality for eProcurement?

3    A    They do.

4    Q    They are not a licensee, are they?

5    A    No.

6    Q    Are they using your patents or not?

7    A    I don't know.  You see, just because somebody competes

8    doesn't mean they're infringing.  I think that's -- you know,

9    we have to go through a whole analysis, and I have to ask our

10   lawyers to participate in that analysis to make that

11   determination.

12   Q    At this point, are you aware of any companies in the

13   marketplace that are using your technology that aren't licensed

14   and aren't Lawson in your opinion?

15            MR. ROBERTSON:  I object, Your Honor, because this is

16   now starting to impede on attorney-client privilege

17   information.

18            MR. McDONALD:  They've alleged in their papers, Your

19   Honor, that by not enjoining Lawson that's going to impede

20   their ability to license anybody else.  I don't think there is

21   anybody else that they're planning on licensing.  They haven't

22   identified any anybody.

23            If they want to say they're not going to do that, I

24   guess I don't need the answer to the question, but then they

25   shouldn't rely on this as a reason to get an injunction.

1            THE COURT:  What papers are you talking about?

2            MR. McDONALD:  The disclosures in February regarding

3    the evidence and the points everybody was going to make in

4    connection with the injunction.

5            MR. ROBERTSON:  There was some analysis done, Your

6    Honor.  It would have been conducted by the attorneys, as Mr.

7    Farber just indicated, and that analysis would be, in fact,

8    privileged, and, therefore, he's asking him a question that

9    gets to the question of whether or not his attorneys went out

10   and did analysis and whether there are other infringers out

11   there in the marketplace.  That's why it impedes on the

12   attorney-client privilege, and I think there's limited, if any,

13   relevance to this issue.

14           MR. McDONALD:  There's a simple solution, and ePlus

15   can just agree that they're not going to contend that an

16   injunction is necessary to assist them in licensing others in

17   the industry.  If they would agree to that, then we don't have

18   a go here.

19           As long as they're going to keep talking about that,

20   I should at least be able to drill down a little bit and prove

21   that there really isn't anybody else out there they're planning

22   on giving a license to so this is a nonissue.

23           MR. ROBERTSON:  Your Honor, the ability to have an

24   injunction in place will obviously assist us in being able to

25   reach out --

1          THE COURT:  It seems to me if this is basically a

2    legal issue.

3          MR. McDONALD:  It's either theoretical or factual.

4          THE COURT:  I don't think you need to get into what

5    legal advice he's been given about who might get the

6    infringing.  They may be readying a lawsuit for somebody else

7    right now.  That's not an appropriate ground of inquiry to have

8    them waive that.

9          MR. McDONALD:  I just don't think they can have it

10   both ways then.

11         THE COURT:  You can ask him if there are people whom

12   he believes are infringing, how many of them are there, those

13   kinds of things, but that's not disclosing the advice.

14   Q    Mr. Farber, from your perspective, are you aware of any of

15   these dozens, or up to a hundred companies in the industry that

16   are using the technology that's covered by the '683 or the '172

17   patents involved in this case?

18   A    There could be.

19         THE COURT:  Are you aware now?

20         THE WITNESS:  No, I'm not aware if they are

21   specifically infringing or not.

22   Q    Let's talk a little bit about how the marketplace works

23   with respect to ERP and --

24         THE COURT:  You can also ask him if he's got reason

25   to believe that there are others who are infringing without

1    identifying them or whether they infringe or not, just what his

2    belief is as of this time.

3              MR. McDONALD:  I think I got what I needed.

4              THE COURT:  Are you through with that?

5              MR. McDONALD:  Yeah, thank you.

6    Q    Let's take an example here and tell me if this is a valid

7    example, Mr. Farber, and stop me if I'm going too far here.

8    There are some customers out there -- I think you mentioned SAP

9    is an ERP provider; right?

10   A    Yes.

11   Q    So there are customers out there that have an SAP system,

12   but they don't have electronic procurement; is that fair?

13   A    Sure.

14   Q    Is that one of your possible customers for ePlus?

15   A    That's one of our channels of opportunity, yes.

16   Q    How significant is the channel of going to people that

17   already have ERP systems and are looking to add an eProcurement

18   functionality?

19   A    I think it's -- I think there's an opportunity.  We've

20   been able to do it in the past.

21   Q    You think that's one of the more important or less

22   important opportunity areas for your Procure+ and Content+

23   products?

24   A    It varies.  I think it's one of.  It's not more or less.

25   There's a lot of instances just using SAP that they are more on

1  the high end Fortune 500 than they are in the middle market or

2  Fortune 1000.  So it would be harder up there at the very high

3  end.  The middle market may be a little easier to penetrate.

4  Don't know for sure.

5  Q    Are you aware that Lawson has less than two percent of the

6  revenues in the ERP areas specific to supply chain management

7  and procurement?

8  A    No.  It wouldn't mean anything to know that.

9  Q    Would that surprise you at all to know that Lawson has

10 less than two percent of that market?

11 A    No.  Worldwide, domestically?

12 Q    U.S.

13 A    All right.

14 Q    That sounds about right as far as you know?

15 A    I wouldn't know.

16 Q    Is that not important to know to you, who has the shares

17 of the market of ERP systems in the U.S.?

18 A    It is important.  I've seen reports that talk about, you

19 know, the leading ERP vendors.  I think that's generally good

20 enough for me.  I don't get into the splitting of the hairs,

21 who has 30 percent, five percent, ten percent.

22 Q    Let's talk about -- I'm going to use the number

23 99 percent, and I understand -- that aren't Lawson ERP systems,

24 but just that chunk that aren't Lawson, do you have an

25 understanding or not for those customers that have an ERP

1    system that's not Lawson's and want eProcurement, does Lawson

2    sell to those people or not?

3    A    That already have an ERP?

4    Q    Have a non-Lawson ERP.

5    A    I would suspect that -- I wouldn't know, but I would

6    suspect --

7            THE COURT:  Don't guess.

8    A    No.

9    Q    You don't know one way or the other?

10   A    I have an inkling, but I'm not going to guess.

11   Q    Do you understand whether or not Lawson's procurement

12   products are really designed only to work within Lawson's ERP

13   system and not other people's ERP system?

14   A    I wouldn't know.

15   Q    Let's talk about another part of the market now.  Tell me

16   if this exists or not.  Are there customers there that don't

17   have an ERP system at all, but they're looking to add an

18   eProcurement capability all by itself?

19   A    Sure.

20   Q    Is that part of your market?

21   A    One of the avenues, sure.

22   Q    Is it a big part of your market?

23   A    I don't weigh one versus the other.  I view them both as

24   opportunity.

25   Q    When you say "both," which both are you talking about?

1   A    Ones that -- customers that have ERP versus customers that

2   don't.

3   Q    With respect to customers that don't have ERP that are

4   just looking for electronic procurement, do you know whether or

5   not Lawson competes for those customers?

6   A    I don't know if they do or they don't.

7   Q    Now, when you go into a customer that as an SAP --

8              THE COURT:  Mr. McDonald, how much longer do you

9   have?

10             MR. McDONALD:  I'd say about 20 minutes to half hour.

11             THE COURT:  I think we need to change court

12  reporters.  Do I have a call at one o'clock?

13

14             (Discussion off the record.)

15

16             THE COURT:  Lets go ahead and switch court reporters.

17

18             (Recess taken.)

19

20

21

22

23

24

25