128

1          (The proceedings resumed at 2:00 p.m.)

2

3          THE COURT:  All right, Mr. McDonald.

4          MR. McDONALD:  Thank you, Your Honor.

5          Bill, could we put up our demonstrative

6  No. 2, please, up on the screen.

7

8  BY MR. McDONALD:  (Continuing)

9  Q    You don't have a hard copy of this, Mr. Farber,

10  so, hopefully, you can just the screen, but if you

11  want a paper copy, please let me know.

12  A    Sure.

13  Q    I was talking before about that 98 percent number.

14  I just wanted to put something up here.  This was some

15  data derived from a market report about supply chain

16  management market shares in 2009.

17      You see the three big legends here, Oracle, Ariba,

18  and SAP with the biggest percentage of the market

19  there?

20  A    I do.

21  Q    Is that consistent with your understanding in the

22  marketplace of who are the biggest supply chain

23  management companies by market share in the U.S.?

24  A    From a supply chain perspective, yes, not

25  necessarily procurement, but certainly supply chain.

FARBER - CROSS                    129

1    Q    If we asked the question specific to procurement,

2    how would your answer change?

3    A    I'm not sure if Oracle would fall in there versus

4    others.   I don't know.

5    Q    Would you think Oracle still is one of the bigger

6    ones, maybe not just the biggest?

7    A    Yes, I would say so, sure.

8    Q    Ariba and SAP, those are both licensees under the

9    patents in this case, right?

10   A    They are.

11   Q    You see over there on the right side at about 2:30

12   or 3 o'clock, the companies with the fourth through

13   the tenth largest market shares, they accumulatively

14   have about 14 percent of the market with 13.88

15   percent?   Do you see that?

16          MR. ROBERTSON:  Your Honor, I'd like to pose

17   an objection, if I could.  This chart apparently is

18   based on DX 424.  If I might just direct Your Honor to

19   DX 424, if you have it.

20          THE COURT:  Is it in what you gave me?

21          MR. ROBERTSON:  Their binder set 2 of 5.

22          THE COURT:  Oh.  424?

23          MR. ROBERTSON:  Yes, Your Honor.  Defendant's

24   Exhibit 424.

25          THE COURT:  All right.  I've got it.

FARBER - CROSS                    130

1              MR. ROBERTSON:  You'll see, first of all,

2    that this is directed to what is software worldwide

3    market share up at the top, the supply chain

4    management, and, secondly, it is one page, Your Honor,

5    of a multipage Gartner report, apparently.  So we have

6    no ability to really determine how this data was

7    assembled, what the criteria were for including it,

8    and how the supply chain management market share and

9    products were determined based on this.

10             So I can't cross-examine a chart that makes

11   representations when I don't even have the full

12   information with respect to what is being provided

13   here.  And if they had this one page, and certainly we

14   believe they could provide the entire page because

15   people subscribe to these reports.

16             In fact, the evidence at trial was that, in

17   fact, they do subscribe.

18             MR. McDONALD:  Your Honor, we had given this

19   to them yesterday.  This is news to me that they had

20   any issues about this.  This chart on Exhibit 424

21   directly comes from the Gartner report that we

22   provided them exhibits, Defendant's 419, which we have

23   as a CD because it comes in an electronic form, an

24   Excel spreadsheet.  So it's pretty easy to connect the

25   dots and we have would have been happy to do that

1   ahead of time.

2          What you can see here on the document -- can

3   we put DX 424 up on the screen?  What you can do with

4   the Excel spreadsheet is specifically specify a

5   country there, the United States, and this is actually

6   procurement specific.

7          So this is where this data comes from.  So

8   it's really right on the money here in terms of what

9   we're talking about.  That's why we put that source on

10  the pie chart.

11         I'm not sure what the problem is going to be

12  in terms of cross-examining.  The data is what it is.

13  They have got the CD with the whole Excel spreadsheet.

14  If they had questions about it, they could have asked

15  us those questions yesterday when we produced this to

16  them.

17         MR. ROBERTSON:  Nobody ever made a

18  representation to us that some disk -- that this

19  document 424 came from 419.  It was a little difficult

20  to connect the dots considering we have five binders

21  here.

22         But, again, Your Honor, we had no idea

23  exactly how they're defining supply chain management.

24  Supply chain management doesn't necessarily mean

25  electronic procurement as we're talking about here.

FARBER - CROSS                    132

1   It can be a lot more expansive.  And what

2   functionality we're discussing here, whether or not it

3   actual involves the patents-in-suit.

4              THE COURT:  It says market supply chain

5   management, subsegment procurement.  Country, United

6   States.  So I don't know what your objection is here?

7   That they didn't give it to you?  They did give it to

8   you in its whole form.  They just didn't tell you that

9   they gave it to you; is that right?

10             MR. ROBERTSON:  Well, it was given to us on a

11  CD-ROM.  I didn't understand that CD-ROM to be this

12  whole report.  So, yes, I did not fully appreciate

13  that, Your Honor.  But, you know what, Your Honor?

14  Let's do this.

15             THE COURT:  It shows that Lawson grew

16  25 percent.

17             MR. ROBERTSON:  Excuse me, sir?

18             THE COURT:  It shows that Lawson grew

19  25 percent.  In '08, 24 percent and even in '09,

20  25 percent.  Shows Lawson was moving right along.

21             MR. ROBERTSON:  Your Honor, I'll address this

22  on redirect examination with the witness.

23             THE COURT:  All right.

24  BY MR. McDONALD:

25  Q   So I think we were talking, Mr. Farber, about if

1  we were specific to procurement, would you view

2  Oracle, Ariba and SAP as the three largest ones in the

3  industry or not?

4  A   If you just are talking about eProcurement, they'd

5  probably be, yeah, probably the largest I would think.

6  Q   And I think you indicated that that share of less

7  than 2 percent for Lawson, that's not inconsistent

8  with your experience in the marketplace; is that

9  right?

10  A   No, I didn't say that.  I didn't know, so I

11  couldn't respond to that.

12  Q   Now, did you review this Gartner report from 2010

13  that went into supply chain management, this Exhibit

14  419 report yourself?

15  A   I don't recall.

16  Q   Have you seen it before outside of the lawsuit, I

17  mean?

18  A   No, I saw it in connection with the lawsuit.  That

19  was my recollection.

20          THE COURT:  That was what?  Your voice

21  dropped off.

22          THE WITNESS:  I have seen this chart now, but

23  I haven't seen the full report.

24          THE COURT:  Before now?

25          THE WITNESS:  Well, I still haven't seen the

1   full report.  I see the chart.  I'm not familiar with

2   the full report.

3   Q   Let's talk a little bit about the ERP providers

4   that provide the suite of products.  We talked about

5   that a little earlier today.  I think I heard the term

6   you used when Mr. Robertson was asking you questions

7   about stickiness of customers in terms of when

8   somebody has them, they stay with the vendor who

9   originally sold them the software.  Do you remember

10  using a term like that?

11  A   I used the term "stickiness" is the ability that,

12  you know, our clients have for us a low attrition

13  rate.  So it gives us the ability to try to cross and

14  upsell them other solutions that we have.

15  Q   For an ERP provider like SAP, if they provided

16  products other than eProcurement, is a customer likely

17  to be inclined to buy the eProcurement product from

18  SAP?

19  A   I don't know about the client side.  I know from a

20  marketing side.  It gives SAP the capability to say,

21  hey, you have something of ours already.  So why not

22  buy something else?

23  Q   Are there functional advantages to the customer in

24  terms of getting training from a single provider,

25  getting maintenance from a single provider if they

1    have service issues, they don't have to call two

2    different companies to figure out the problems,

3    advantages like that in sticking with the same ERP

4    provider for an eProcurement product?

5    A    I personally don't believe that to be the case.

6    Maybe 20 years ago that was often the case, but I

7    think my personal experience vendors have gotten

8    better at working together and also integrating.

9    There's more standards in the industry than there were

10   many years ago.  So really, in my opinion anyway, it

11   hasn't really been an issue.

12   Q    Do you run into it from the customer's

13   perspective, they have an inclination they want to

14   stick with the ERP provider in the first instance

15   unless you give them a reason to switch?

16   A    You see it in the ERP providers.  You see it in

17   SRN providers.  You see it in every industry, I think,

18   to some degree.  Maybe some more or less.  I don't

19   know.

20   Q    But if you're talking to a potential customer that

21   already has an SAP suite of products, they're looking

22   to add eProcurement, what is your sales pitch to that

23   customer as to why they should use your product

24   instead of SAP's?

25   A    Sometimes it has do with functionality.  Sometimes

FARBER - CROSS                    136

1   it has to do with cost.   Sometimes it has do with

2   speed of implementation.   There's a lot of variables

3   but those variable get defined when you know the

4   client's requirements.

5   Q    What do you say about functionality in that

6   situation?

7   A    There are some things depending upon what releases

8   we're going up against.   Some things our competitors

9   don't provide that we may provide.

10  Q    Can you be specific?

11  A    Well, for example, we provide some advance

12  reporting and historical analysis that's inherent in

13  the product that maybe SAP doesn't provide.   That may

14  be an important feature for the customer.   Whereas,

15  others may have competitive advantages over us and

16  they'll highlight those.

17       So I don't compete with this list of vendors.   A

18  lot of them aren't procurement.   Some of them are

19  contingent labor.   Some are contract management

20  providers.   These aren't all eProcurement providers on

21  this list.

22  Q    Sciquest is, right?

23  A    Sciquest, yes.

24  Q    Perfect Commerce is, right?

25  A    Yes.

FARBER - CROSS                    137

1    Q    Ariba is, right?

2    A    Yes.

3    Q    SAP and Oracle also eProcurement, right?

4    A    Sure.

5    Q    Are there any specific companies listed in this

6    chart here?  Are you looking at the one on the screen

7    or the pie chart?

8    A    I looked at both.

9    Q    Okay.  Well, let's stick with the pie chart

10   because this has fewer names.  So go back to the

11   demonstrative number 2.  Do you see over there is a

12   total of 10 companies listed by name here?

13   A    Yes.

14   Q    I've already gone through a few of those.  Are

15   there any of the ones listed here, of the 10, are

16   there any that don't provide eProcurement?

17   A    Intourist I don't believe provides.  Fieldglass

18   Zycus, IQ Navigator, I haven't seen them having

19   eProcurement software.

20   Q    Do you know one way or the other whether they do?

21   A    In some instances, I do, yes.

22   Q    In which instances are you sure they don't provide

23   eProcurement?

24   A    I'm pretty sure that Intourist does not.  I'm

25   pretty sure that Fieldglass does not.  Zycus does not

FARBER - CROSS                138

1   and I'm almost sure about IQ Navigator, but I can't be

2   positive, though.  That's it on this list.

3       So they are part of the supply chain management

4   analysis that apparently Gartner did, which is a

5   larger sector because it encompasses -- supply chain

6   management encompasses a lot of different disciplines.

7   Q   If we can go back to Exhibit 424.  Do you

8   understand this indicated a subsegment of procurement?

9   A   Sure, but if you have the report, it will explain

10  where they placed Zycus, where they placed IQ

11  Navigator, where they placed Upside Software.

12      I have a business relationship with the CEO of

13  Upside Software, and I know as a fact that they don't

14  have procurement.  I know as a fact that they do

15  contract management.

16      So in terms of supply chain management, even

17  though they have a subsection of procurement, contract

18  management is a component of the procurement segment

19  for sure, but it doesn't mean they perform electronic

20  procurement.  They're doing contracting software for

21  the procurement industry.

22          THE COURT:  Do you know the extent to which

23  the Ariba and SAP market share is made up of products

24  that are sold that were at issue in the litigation and

25  subject to the licenses that were granted by ePlus?

FARBER - CROSS                139

```
 1              THE WITNESS:  Well --
 2              THE COURT:  In other words, could you break
 3    out what ePlus, what Oracle, and Ariba's situation
 4    would be and tell me how much of that market share
 5    comes from using infringing products that are
 6    protected by the license?
 7              THE WITNESS:  Let me make sure I understand
 8    your question.  Are you asking -- let's say, Ariba is
 9    one example.  Of all the things that Ariba offers,
10    what percentage of that?
11              THE COURT:  In the procurement area.
12              THE WITNESS:  What part of their -- I would
13    speculate to that.
14              THE COURT:  You don't know.
15              THE WITNESS:  I don't know the precise
16    numbers, yes.
17              THE COURT:  Don't guess.
18    BY MR. McDONALD:
19    Q   Do you have Defendant's Exhibit 416 in front of
20    you, Mr. Farber?  It's in binder 2 of 5.
21    A   I have 5 of 5.
22              THE COURT:  What is it?
23              MR. McDONALD:  Binder 205.
24              THE CLERK:  Defendant's 416, Your Honor.
25              MR. McDONALD:  Defendant's 416 in that
```

1    binder.  It's near the end.

2           THE WITNESS:  I do.

3    Q    This is a Gartner report.  Do you see that, Mr.

4    Farber?

5    A    Yes.

6    Q    You have seen some Gartner reports before, right?

7    A    In my time, yes.

8    Q    With respect to this one, you see the title here,

9    "Best of Breed eProcurement Vendors"?

10   A    Okay.

11   Q    Is that what ePlus would be considered to be?

12   A    I don't know.  It depends on the analyst and how

13   they feel that year.

14   Q    Do you consider ePlus to be a best of breed

15   eProcurement vendor?

16   A    I'd like to think so.

17   Q    Do you see at page 15 of this document or 18337?

18   Would you turn to that, please?  There's a little

19   section about ePlus on it.

20   A    Sure.  18337?

21   Q    Yes.

22   A    Okay.

23   Q    Did ePlus participate at all in giving Gartner

24   some information that would have gone into this

25   report?

1  A    I don't recall.

2  Q    Has ePlus provided Gartner information from time

3  to time?

4  A    Some years, yes, and some years we haven't.

5  Q    Do you see there's a description there in ePlus.

6  If you go to the third paragraph down where it says

7  "industry focus."  It indicates ePlus has eProcurement

8  customers across all industries, but has notable

9  success in the retail, manufacturing and financial

10  services industries, do you see that?

11  A    I see it.

12  Q    Would you agree that retail, manufacturing and

13  financial services are places where you're more

14  successful than other industries generally when it

15  comes to eProcurement?

16  A    Absolutely not.

17  Q    Which industries, if any, would you say you're

18  more successful in than others?

19  A    Well, I would say in spite of ourselves we're in a

20  lot of different verticals, and I don't know that one

21  is more than the other, but in financial management,

22  maybe we only have just one or two customers.  We have

23  a few customers in retail.  We have a number in

24  manufacturing.  We have a number in health care.  We

25  have a number in transportation.  I don't think that

1    one overshadows the other.

2        Now, so I don't know -- let me just see who wrote

3    the report.  That will give me an idea.  Debbie

4    Wilson.

5        There are years, like I said, that we do provide

6    information to Gartner and there's years that we

7    don't.  We don't necessarily have a relationship that

8    we brief them on an annual basis.  This year was the

9    first year in a few years we actually briefed them.

10   Q   Do you know where Gartner would have got that

11   information about your industry focus if it wasn't

12   from you?

13   A   No, it's one of the problems that I have with

14   Gartner as many other vendors do.  Gartner is Gartner,

15   and they'll say and do what they want to do and what

16   they think.

17   Q   You think they are not reliable reports?

18   A   You know, it depends on the analyst and it depends

19   on -- you know, every vendor has issues to some degree

20   with analysts.  We've talked about this in my

21   deposition.

22       Gartner, to me, is a paid for hire, pay-to-play

23   vendor.  It's very expensive to deal with Gartner.  So

24   my last company before ePlus, we spent $12 million a

25   year as a client of Gartner's and still had issues

FARBER - CROSS                    143

1    with them.  So I'm not a believer.

2        I'm not discrediting what they say.  I'm just

3    saying that they would come out with reports without

4    having full briefs by the vendors, and I have

5    historically taken issue.

6        I don't know specifically on this report if they

7    were briefed in '09 or not.  I know we show up in a

8    2010 report as well.

9    Q    Can you turn to page 9 of the report 18331.  It's

10   a little chart.  Table 2.

11   A    I'm sorry.  Page 9, you said?

12   Q    Page 9 of the report also numbered 418331.

13   A    Okay.  I'm with you.

14   Q    Do you see across the top row there's a list of

15   company names including ePlus?

16   A    Yes, I do.

17   Q    Includes Sciquest, Perfect Commerce and Variant

18   Technologies among several others, right?

19   A    I see that.

20   Q    Are these companies that you're familiar with as

21   best of breed eProcurement vendors?

22   A    Not all of them.

23   Q    Which ones are you familiar with other than the

24   ones I mentioned?

25   A    I'm familiar with Ariba, and I have some

FARBER - CROSS                    144

1    familiarity with Bestware, Coopa, Caturra, Perfect,

2    Sediment, limited exposure to purchasing that,

3    Sciquest and Variant.

4    Q    Are these all competitors of yours among

5    eProcurement products?

6    A    Yeah.  Different times they could be, sure.

7    Q    If you could turn to the two pages earlier, page

8    7.  Do you see there's an inclusion criteria list on

9    the bottom half of the page?

10   A    Page 7, you said?

11   Q    Right?

12   A    I just went too far.  Okay.

13   Q    Do you see there's an inclusion criteria for this

14   best of breed report that Gartner provides here for

15   what vendors have to have to be included?

16   A    I see.

17   Q    Now, one of them they list here is the third

18   bullet point, support for either open catalog

19   interface, OCI or CXML for Punchout to supplier

20   websites for catalog content.  Do you see that?

21   A    I do.

22   Q    I think in your earlier testimony with Mr.

23   Robertson you indicated that Punchout has become an

24   industry standard.  Did I get that right?

25   A    Correct.

1   Q   Does that mean it's pretty much all the

2   competition out there that's a viable competition in

3   eProcurement have this Punchout capability?

4   A   I can't say that every single one does.  I think

5   they'd be foolish not to.

6   Q   In your experience when you're competing with

7   other companies, have you run into pretty much all

8   your competitors having Punchout these days?

9   A   I don't see their responses.  Like I'm saying,

10  they'd be foolish not to, but I'm assuming they would.

11  Q   What's your basis for saying it's an industry

12  standard?

13  A   Well, there's industry standard organizations that

14  are created around technologies.  There's an industry

15  standard body called CXML.org.  And being an industry

16  standard, it provides detailed information about CXML

17  and there's a lot of different things that you could

18  do with CXML beyond just punching it out.

19      It could be used for exchanging of invoices and

20  you could use other technologies to do that as well.

21  Q   Do you view Punchout as one of the technologies

22  covered by the patents involved in this case?

23  A   Do I personally view it?

24  Q   Yes.

25  A   Yes.

FARBER - CROSS                    146

1    Q    I'd like to turn now to how long ePlus knew about

2    Lawson before they brought the suit.  The suit was

3    brought in May of 2009 against Lawson; is that right?

4    A    Yeah, that sounds right.

5    Q    Do you recall when ePlus sought damages, its

6    expert indicated that Lawson had been using the

7    infringing technology since 2002?

8    A    That's what I understand, yes.

9    Q    Between 2002 and May of 2009, did ePlus ever

10   contact Lawson about the patents?

11   A    I don't think there would have been a reason to

12   prior to that.

13   Q    Why not?

14   A    Well, just because somebody competes with ePlus

15   doesn't mean that they're infringing.  So I'm not

16   going to accuse somebody of infringing until a

17   thorough analysis is performed to make that

18   determination or at least have a very high degree of

19   certainty in order to then determine what the next

20   step is going to be.

21   Q    Well, prior to May of 2009, did you view Lawson as

22   a competitor who was a significant competitor of

23   yours?

24   A    Yes, we certainly competed with them, sure.

25   Q    Did you undertake any effort before you sued them

1   to determine whether they might be using your patented

2   technology?

3   A    The effort that we took was just prior to filing

4   suit.  We had asked our counsel to help us and look

5   deeper to make that determination with us because

6   prior to that, like I said, we were involved in other

7   things with limited resources and didn't have that

8   time to do it.

9   Q    Did ePlus look at Lawson as a significant

10  competitor in 2007?

11  A    You know, I don't know year by year what was

12  considered significant or not significant.  I think

13  we've talked about many times how each year the

14  climate changes.

15  Q    I understand that, but you were in charge of the

16  division in 2007, right?

17  A    I was.

18          THE COURT:  I think the question is:  Why

19  didn't you go look at whether Lawson infringed before

20  2009?  Why didn't you look when you knew they were

21  competing from 2002 on is the question.

22          THE WITNESS:  Well, A, the first time we

23  decided to enforce our patents was with Ariba, Your

24  Honor.  And I think, if I'm not mistaken, that was

25  like 2005.

1          So, you know, that expended a lot of time.

2     And we knew there were other competitors.  We didn't

3     know if all those competitors infringed.  A lot of

4     those people that we thought were competitors in 2005

5     aren't in business today.

6          So we didn't have the resources, manpower,

7     people, unlimited legal budget to go after everybody

8     at once, and that wasn't our intention.

9          After that we wanted to focus on our business

10    and then a decision was made by the executive

11    management and the board to protect our patent with

12    SAP, and we through, again, a multiyear process with

13    SAP.

14         And then, you know, we were recognizing that

15    a number of different things were going on with

16    Lawson.  We were getting beat up a bit.  And to us

17    that was the next logical evaluation to do.

18         In concert, we made the risky decision to

19    also include in that suit three other defendants.  And

20    we knew that that could potentially take up a

21    significant amount of our time as well.

22         So, you know, we're not the largest of

23    companies with unlimited budgets and resources.  And

24    speculation doesn't always prove correct.  So, you

25    know, we made our decision, you know, a number of

1   months before the lawsuit to be able to do that.

2         There are a lot of companies that we compete

3   with, you know, that I find out, you know, don't do

4   certain things.  That surprised me.  And, you know, if

5   we don't take our time and look at these things, there

6   would be a lot of frivolous suits, I would suspect.

7   Q   In 2007, did you look at Lawson's competition as

8   irreparably harming ePlus?

9   A   You know, I think when you put the summation of,

10  you know, the number of years that we're competing,

11  the number of clients that we're talking about, the

12  number of losses, and the number of losses that could

13  continue, I'd say, yeah, there's a good possibility.

14  Q   Did you do anything in 2007 to investigate whether

15  or not Lawson was infringing any of your patents?

16         MR. ROBERTSON:  Objection.  It's been asked

17  and answered now.  He covered this ground.

18         THE COURT:  Overruled.

19  A   In 2007, I think we were involved with other

20  litigation.

21  Q   Please answer my question so we have these

22  questions asked and answered.

23  A   Okay.

24  Q   Did you investigate in 2007 whether or not Lawson

25  was infringing any of your patents?

FARBER - CROSS                    150

1   A    No.

2   Q    At that point you didn't have any other lawsuits,

3   right?

4   A    I have to go through the timetable.  We may have

5   just been coming off one.

6   Q    You settled with SAP in early '06, didn't you?

7   A    I'd have to go back and look at the agreement

8   date, but it's possible.

9   Q    Everybody that you ever sued for infringing these

10  patents wound up getting a license from you in

11  exchange for money, right?

12  A    Everyone that we sued?  Yeah.  There was

13  uniqueness to each of those licenses, but we did

14  settle with them.

15  Q    Were any of Ariba, SAP, Perfect Commerce,

16  Sciquest, or Variant Technologies -- they were all

17  competitors of yours, right?

18  A    Yes.

19  Q    Is it your position that competition with ePlus

20  means that ePlus is being irreparably harmed if it's

21  an infringer that's competing with you?

22  A    I don't know all the legal ramifications of what

23  you're asking, so I'm not quite sure how to answer

24  that.

25  Q    You understand the issue of harm, right?

FARBER - CROSS                    151

1    A    Sure.

2    Q    Did those companies, Ariba, SAP, Perfect Commerce

3    Sciquest, or Variant Technologies, did they take any

4    customers from you?

5    A    Over the duration of competition, yeah.

6    Q    At any time?

7    A    Sure.

8    Q    Have they taken more customers from you than

9    Lawson?

10   A    I don't know.

11        THE COURT:  Mr. McDonald, I'm getting a

12   little lost in all of this.  Is it your theory here to

13   show that a small company that owns patents has to sue

14   all of the people it thinks might infringe all at the

15   same time no matter what its resources are?

16        MR. McDONALD:  No, but there is law for one

17   thing beginning in early 2006, they did not have any

18   lawsuits pending at that time.  So there's really no

19   reason they couldn't have at least communicated with

20   Lawson and talked to them about the patent

21   infringement.  You don't have to sue everybody you

22   think is infringing.  You can talk to them, pick up

23   the phone, and send them a letter.  There are

24   alternatives to that, number one.

25        THE COURT:  They might think differently

1  based on what they've seen here according to what he

2  says.

3          MR. McDONALD:  The fact is there's an option.

4          Second, the Federal Circuit law does excuse

5  delay for other law suits unless the patent owner

6  actually contacts the other infringers and says, I

7  have this lawsuit pending against another infringer.

8  That's why I'm not coming after you right now.

9          This is kind of a lay in the weeds type of

10 situation, and there are some things that the patent

11 owner has to do.  They don't have to sue everybody,

12 but they have to have at some level some

13 communications.

14         THE COURT:  Sounds to me like you want them

15 to do more than what's reasonable to ask them to do.

16 There's a limit to what people can pay lawyers.  The

17 business world doesn't exist to fund patent lawsuits.

18 The business world exists to try to make money.

19         MR. McDONALD:  If you feel as a company that

20 you're being irreparably harmed by a competitor who is

21 an infringer to the extent you think hospitals should

22 be enjoined, there's probably something you should be

23 doing about that.

24         THE COURT:  You can argue that, but to the

25 extent you have infringed, it's time to stop it.  And

1    you can't go back and redo all the world and what

2    happened in the business world in order to keep that

3    from happening.

4            So I don't understand what you're doing by

5    asking them a lot of these questions.  Sounds to me

6    like because they're small and because you don't have

7    the 1.46 of the market, you think an injunction is not

8    appropriate, and I don't understand why that's so.

9            MR. McDONALD:  For one thing, ePlus' sales

10   are over $700 million.

11   Q    Is that right, Mr. Farber?

12   A    The reselling of other equipment and everything

13   else.

14   Q    The whole company.

15   A    Sure.

16   Q    About the same size as Lawson, isn't it, in terms

17   of annual revenues?

18   A    You're not comparing apples because Lawson is

19   selling software that has one type of margin.  EPlus

20   is selling other people's hardware that we don't

21   manufacture.

22        So when you talk about we're selling 6 or 700

23   million, that's about $70 million in actual margin in

24   revenue that hits our bottom line, not 700 million,

25   because we're selling somebody else's.  We only get a

1    small percentage of that.

2        So the top line looks very big.  The bottom line

3    number is very small in comparison.  10 percent of it.

4    Q    Between Ariba and SAP settlements by 2006 you had

5    over $54 million in settlement money, cash in the

6    bank, right?

7    A    Yes.

8    Q    Was that money that you could have used to

9    investigate whether Lawson's products were infringing?

10   A    Well, let me say this.

11   Q    Why don't you please answer my question.  Couldn't

12   you have used that money?

13            THE COURT:  He's trying to answer the

14   question.  Let him answer.

15   A    The answer to that is no.  And the reason -- can I

16   talk about the reason?

17            THE COURT:  Yes.

18   A    The reason is that after the SAP litigation, there

19   were about a thousand companies in the United States

20   that received letters to investigate them on how stock

21   options were submitted to officers and employees of

22   the company.  And there was a two-year process that we

23   had to undergo also under legal review to ensure that

24   we did everything by the book that was required from

25   an accounting principal.

1    And the whole company was involved at that time

2    with as many resources as possible to make sure that

3    we had, in fact, done everything by the books and

4    reported it as such.

5         So were we going to undertake another

6    investigation of a third party lawsuit at that time?

7    Absolutely not.  We do not have unlimited resources.

8    Q   Well, you kept going with your day to day business

9    throughout that time period, right?

10   A   We continued to go with our day to day business,

11   yes.

12   Q   What did you do with the $55 million?

13        MR. ROBERTSON:  Your Honor, I'm going to

14   object.  We're getting far afield here.  I was hoping

15   we were going to finish this in one day.

16        THE COURT:  We are going to.  Sustained.

17   BY MR. McDONALD:

18   Q   You understand that during the discovery phase of

19   this case when Lawson asked ePlus what it was claiming

20   in damages, ePlus did not assert any lost profits or

21   price erosion due to competition from Lawson, right?

22   A   I'm not -- I don't recall what was said at that

23   time.

24   Q   Do I understand right that you're asking the judge

25   to stop Lawson from servicing existing RSS and

1    Punchout customers including hospitals?

2    A    I think that what we're asking is to enjoin Lawson

3    from selling, servicing, and maintaining the customers

4    for the products that the jury found Lawson to

5    infringe upon.

6    Q    That does include precluding Lawson from servicing

7    existing RSS and Punchout customers; is that right?

8    A    That would be correct.

9    Q    Are you seeking an injunction against Lawson

10   servicing any customers that don't have RSS or

11   Punchout?

12   A    Well, I think it was more than RSS and Punchout

13   right?   It was RSS Punchout, I think there was EDI,

14   the foundational software.

15   Q    Let me understand what you're asking.   If a

16   customer had Lawson's system foundation, but they

17   don't have RSS or Punchout, are you trying to get an

18   injunction against Lawson servicing those existing

19   customers?

20          MR. ROBERTSON:   Objection, Your Honor.   This

21   is calling for legal conclusions that are beyond the

22   scope and competency of this witness.   What --

23          THE COURT:   If he knows, he can answer the

24   question.

25          If that component was found to be infringing,

FARBER - CROSS          157

1   then the question is:  Are you seeking an injunction

2   against use and service of that component?  Is that

3   right?  Was that found to be infringing?

4           MR. McDONALD:  No.

5           THE COURT:  Then why would you ask that

6   question?

7           MR. McDONALD:  Because they never told us

8   what they're asking for.

9           THE COURT:  You can't get an injunction

10  against non-infringing products anyway.

11          MR. McDONALD:  I can't tell what they're

12  asking for yet.

13          THE COURT:  Well, I think you'll have to

14  figure that out somewhere else because one of the

15  things you can't do is get an injunction against a

16  non-infringing product as far as I know.

17          MR. ROBERTSON:  We're not asking for that,

18  Your Honor.  There are three configurations.

19          THE COURT:  Okay.  I don't need to explore

20  whether they are asking for an injunction against all

21  the things that weren't found infringing or alleged to

22  be infringed.

23          I don't know where you-all are on the

24  landscape of injunction law, but you're pretty far

25  afield now.  So let's get a foot back on the base and

FARBER - CROSS                    158

1  let's get going.

2  BY MR. McDONALD:

3  Q    How many employees does your division have that

4  service ePlus' existing software to customers in

5  eProcurement?

6  A    Total is probably, I'd say, close to 100.

7  Q    That's within your system's division?

8  A    Systems, content, sure.

9  Q    Do they do anything other than service customers,

10 those hundred people?

11 A    Develop, sell, support.

12          THE COURT:  Is this the 90 plus the five or

13 so that you were talking about earlier?

14          THE WITNESS:  I'm sorry, Your Honor?

15          THE COURT:  Is this the 90 people and the

16 five you were talking about earlier?

17          THE WITNESS:  I don't recall -- oh, yes.

18          THE COURT:  Sales people.

19          THE WITNESS:  Well, no, no.  It's different.

20 We're talking about that are paid out of the systems

21 department versus the 90 that are in other divisions.

22          THE COURT:  And their job is to service

23 existing clients; is that right?

24          THE WITNESS:  To sell, service, develop new

25 releases, create new product for that vertical market.

FARBER - CROSS                    159

1   BY MR. McDONALD:

2   Q   Do you have any employees in your division that

3   are dedicated to solving customer problems when they

4   have a problem using Procure+?

5   A   It's the same group.

6   Q   Are any of them dedicated to that job full-time?

7   A   We have a small support group, what we call our

8   level 1 group.

9   Q   How many employees are full time in that group, if

10  that's an answer to my question?

11  A   I'd have to go back, but I think it's less than a

12  dozen.

13  Q   That's the customers you need to service your

14  existing 65 or so Procure+ customers?

15          THE COURT:   That's the not customers.   That's

16  something else.   Are you talking about the people they

17  need to service the existing customers?

18          MR. McDONALD:   No, I'm talking about existing

19  customers that have a problem.

20          THE COURT:   I think you were asking about the

21  customers.   You just got your words mixed up.

22          MR. McDONALD:   Maybe I misspoke.

23  BY MR. McDONALD:

24  Q   How many customers do you currently have of

25  Procure+?

FARBER - CROSS                    160

1    A    65.

2    Q    When they have a problem, how many full-time

3    people do you have on staff that have the job of

4    helping those customers solve a problem with the

5    system?

6    A    Well, everybody is full time and everybody is

7    responsible to take ownership to solve a problem.

8              THE COURT:   Do you have anybody whose

9    dedicated job is to do nothing but solve problems of

10   the 65 customers, I think is the question.

11             THE WITNESS:   There's probably 12 people,

12   Your Honor, that will answer the phone, and then

13   determine if they can answer the question, they will

14   right then and there, or they'll escalate it to one or

15   the other 80 or 90 some odd people that best can

16   resolve that customer's problem.

17   Q    So the other 80 or 90 people, are they in R&D or

18   sales or what?

19   A    Some are in general support, some are in R&D, some

20   could be in sales, absolutely.

21   Q    How many total employees do you have in the

22   content and systems divisions?

23   A    If you combine them together, it's probably a

24   little over 100.

25   Q    And 90 of them have some responsibility of

1   supporting existing customers?

2   A   We all have responsibility.  There's no

3   delineation.  Everybody has a responsibility to

4   support customers.

5   Q   Maybe I should be more specific.  If they have a

6   problem, some sort of technical glitch, how many of

7   those employees have responsibility solving those

8   technology problems?

9   A   Every one minus the five.  Depending on what the

10  problem is, we have an online tracking system, and the

11  person or group that's best capable of solving that

12  problem, it goes to them, because internally we view

13  if a customer has an issue based on the severity

14  levels that we assign, 1 through 4, the customer comes

15  before development and other things that we're doing.

16  So we kind of rally to solve those problems first.

17  Q   In terms of would you agree that if a customer

18  that's a hospital, if they don't have support for

19  software, they basically can't use it?

20  A   I think that holds true for everybody.

21  Q   Hospitals and other customers as well, they just

22  can't use it unless they have the proper support,

23  right?

24  A   No.  There's a number of our clients that actually

25  operate our software that don't receive support from

FARBER - CROSS                      162

1  us and have been doing it for years.

2  Q    Let's go back to hospitals only.   Hospitals would

3  need a procurement product to be supported in order to

4  use it for their supplies properly, correct?

5  A    I couldn't answer that.

6  Q    You don't know?

7  A    It depends on the individual hospital.

8           THE COURT:   They may have their own support

9  people in house and know exactly what they're doing?

10          THE WITNESS:   Absolutely.

11 Q    Is it your understanding that would comply with

12 the requirements that hospitals have if they just have

13 internal support?

14          MR. ROBERTSON:   Objection.   It lacks

15 foundation, Your Honor.

16          THE WITNESS:   Are you talking about HEPA

17 requirements?

18          THE COURT:   No, HEPA doesn't deal with that.

19          THE WITNESS:   That's what I'm trying to

20 figure out what type of requirements.

21 Q    Are there any other requirements that hospitals

22 typically have regarding having support for software?

23          THE COURT:   What kind of software?

24          MR. McDONALD:   Procurement software.

25 A    I don't know.

FARBER - CROSS                    163

1          THE COURT:  They clearly have support for

2    software that's used in the middle of surgery, and

3    they have requirements that are not governed always by

4    state law.  They are governed by the practical fact

5    that if they don't have support, they can get sued if

6    the software doesn't work.  But there's not much of

7    that.  None of this involves that.  None of this

8    product involves that kind of issue.

9          So I think he's a little confused, as am I,

10   about what you're talking about.  The mere fact that a

11   hospital has some requirements to live up to is

12   neither here nor there without knowing exactly what

13   the requirements are, and I think that the question

14   has to be refined more.

15         Let's go on to something else.

16   BY MR. McDONALD:

17   Q   You're not personally familiar with what hospitals

18   would require by way of support, is that fair?

19   A   For procurement, no, I'm not.

20   Q   You talked earlier about how long it would take a

21   customer once they pick Procure+, how long it would

22   take them to implement.  Is it fair to say that taking

23   about a year to do that, even that would be fairly

24   quick for ePlus?

25   A   For somebody who has a procurement solution

FARBER - CROSS                    164

1   already in place?

2           THE COURT:   The only thing that makes any

3   difference in this case is whether somebody has

4   Lawson's procurement in place.   And I'm not sure the

5   extent to which that has a bearing on it, but that is

6   the only thing that makes a difference.

7           So if they have Lawson's in place, which is

8   the only thing that would be enjoined the use of under

9   their request for an injunction, then what's your

10  question?

11          If ePlus came in and was the substitute

12  vendor, how long would it take ePlus to do it or if

13  Oracle came in or if Ariba came in?   What are we

14  talking about?

15          MR. McDONALD:   I think we can talk about

16  ePlus particularly.

17          THE COURT:   All right.   Then ask the question

18  that with way and get it straight.   You're asking a

19  much more general question.

20  Q   With Procure+, would you agree that a larger

21  organization generally takes longer to implement a

22  transition to the Procure+ software than a smaller

23  organization?

24  A   No, I wouldn't.

25  Q   Are there any factors other than whether or not

FARBER - CROSS                165

1   they already had a procurement type of system in place

2   that would affect the timing on implementation?

3   A    Having a procurement system previously in place

4   effects the timing in a major way.

5   Q    What other factors are there?

6   A    Well, not having a procurement system in place.

7   Most of the time of an implementation, as I said

8   earlier --

9          THE COURT:  No, we're talking about for

10  people who have the a procurement system in place.

11  That's all we're talking about right now.

12         THE WITNESS:  I'm sorry.

13         THE COURT:  What other factors besides having

14  had the system, in effect, have an impact on the time

15  it takes to transition?

16         THE WITNESS:  If you did a one to one

17  transition, what I call a vanilla transition, in which

18  you're taking everything in its current state and

19  transitioning it to an ePlus procurement solution,

20  Procure+, that's the shortest path.

21         If they decided, hey, while you're doing

22  this, we never really liked the way this type of

23  functionality worked.

24         THE COURT:  You're not going to do that.

25  What he's talking about is what's the quickest you can

FARBER - CROSS                    166

1   get it done.

2         Isn't that right?

3         MR. McDONALD:  I'm just asking what factors

4   affect how long other than the fact --

5         THE COURT:  Well, if they want to change the

6   system, that's going to take more time than if they

7   didn't want to change the system?

8         THE WITNESS:  That's correct.

9         THE COURT:  What else?

10        THE WITNESS:  That's primarily it.  There's

11  not a lot of factors here.

12  Q   Well, are you familiar with an ePlus customer

13  American Skiing Company?

14  A   Yeah, I have familiarity with them, sure.

15  Q   That's a Procure+ customer, right?

16  A   It used to be.

17        THE COURT:  Is that like in the things you

18  ride on to go downhill?

19        MR. McDONALD:  In the snow.

20  A   Yes.  They own mountains.

21        THE COURT:  Skiing.

22        THE WITNESS:  Skiing resorts and mountains.

23  Q   Did they have a procurement system in place before

24  you came to them?

25  A   Don't know.

1   Q    That one took a little over a year to implement,

2   right?

3   A    I don't recall.

4   Q    I have a couple of press releases here.

5             MR. McDONALD:  May I approach, Your Honor?

6   A    Are these recent ones?

7   Q    One is from December '05 and the other is from

8   March of '07, right?

9   A    Uh-huh.

10  Q    So December of '05, the headline indicates that

11  American Skiing selected or chose Procure+, right?

12  A    Yep, I do.

13  Q    And March of '07, a little over a year later, it

14  indicates that the same company had completed

15  eProcurement and inventory solution implementation

16  nationwide within tight deadlines, do you see that?

17  A    Yes, I do.

18  Q    Does seeing this refresh your recollection at all

19  as to whether or not American Skiing already had a

20  procurement solution in place or not?

21  A    No, it doesn't change my recollection of whether

22  they had a prior procurement solution.  It makes me

23  recall the fact that they had an implementation that

24  was done at one of their mountains, and over the

25  course of a year or two they decided to migrate to

FARBER - CROSS                   168

1   other resorts and properties that they had.

2   Q    So the tight deadlines that are referred to in the

3   headline of March '07, what tight deadlines is that

4   referring to?

5   A    Which one are you looking at?   '05?

6   Q    March of '07.   It's the sub headline, I guess you

7   can call it.   It talks about completing the

8   implementation nationwide within tight deadlines.

9   A    Maybe they viewed the way they wanted to roll it

10  out within their schedules across the skiing portions

11  of the country, and I think also Canada, if I'm not

12  mistaken.   Maybe they considered that to have tight

13  deadlines for them.   We're not in control of how they

14  decide to move the application from resort to resort.

15  They make that decision and time line.   We install the

16  software and generally do it in a fairly expedient

17  time frame.

18  Q    You think this time frame from this press release

19  regarding selection of ePlus to announcing the

20  implementation, that's about one year and three

21  months, right?

22  A    Between the two releases, yes.

23          THE COURT:   Well, if you're installing on an

24  existing system, ePlus, the existing system can

25  continue to run or not?

FARBER - CROSS                   169

1          THE WITNESS:  Absolutely.

2          THE COURT:  If there's a changeover, does

3    that occur on one day, or one hour, or one minute, or

4    one year, or what?

5          THE WITNESS:  No, it's generally scheduled.

6    So, you know, let's say you pick a day 90 days out,

7    and because if everything is moving from one state to

8    the other, there's not a lot of work to do.  The users

9    are defined; the work flow and approvals and

10   suppliers.  So it's really up to my folks.  There's

11   not a lot of engagement they have to do with the

12   customer.

13         All that data is imported.  We have utilities

14   to import all this data into our system.  Most of the

15   time, it's going actually going to be for the customer

16   just to test it within that 30 to 90-day window.  They

17   can run it parallel for a while, which customers do,

18   or they can decide on a specific day to switch.

19         THE COURT:  I have procurement software.  I

20   tell you I want to use yours.  I want you to do it.  I

21   don't want to change it.  I don't want to do anything

22   else.  I just want to change over.  I'm fed up with

23   who I'm using.  And I need it in -- this is Friday.  I

24   need you to do this by Monday because I want to fire

25   these people.  Can you do it by Monday or not?

FARBER - CROSS                    170

1          THE WITNESS:  Friday to Monday is a little
2    aggressive.
3          THE COURT:  What the quickest you can do it?
4          THE WITNESS:  30 to 90 days, I think, would
5    be more acceptable.
6          THE COURT:  Is that because I have to test
7    it?
8          THE WITNESS:  I would like you to test it.
9          THE COURT:  I don't want to test it.  I want
10   you to test it.  I want you to get it done.
11          THE WITNESS:  The best that we could possibly
12   do competently would be 30 days.
13          THE COURT:  Okay.
14   BY MR. McDONALD:
15   Q   Do customers typically require that they have a
16   chance to test it as well?
17   A   Most of them do.
18   Q   Do they have internal folks that have to approve
19   the purchase and implementation and technology and
20   other areas of the company?
21   A   At times.  There are sign-offs.  It depends on the
22   company, how they are organized.
23   Q   Is that typical of public sector customers?
24   A   I wouldn't call it typical.  I've seen it happen
25   every which way.

FARBER - CROSS                    171

1    Q    In the public sector, specifically?

2    A    Every way, yeah, public and private.

3    Q    Now, if Lawson is enjoined -- well, let me back

4    up.  If ePlus was asked to immediately stop servicing

5    any customers, would it feel like its reputation might

6    be hurt for that particular customer?

7    A    Repeat that question.  I'm sorry.

8    Q    If ePlus had a service contract with a customer

9    but was asked to stop servicing that customer before

10   that contract was up --

11         THE COURT:  Because it had been found guilty

12   of patent infringement?

13         MR. McDONALD:  For any reason.

14         MR. ROBERTSON:  Your Honor, I think that

15   question is just irrelevant.

16         THE COURT:  The answer is obvious.  Of

17   course, if you told them you have to stop doing

18   something because you've been found responsible for

19   patent infringement, you have to get out of the line,

20   your reputation is going to take some hit.

21   BY MR. McDONALD:

22   Q    If it turns out, Mr. Farber, that any injunction

23   entered is undone, either on appeal or some later date

24   because the patents are held invalid by the Patent

25   Office or something, is ePlus going to compensate

1   Lawson for any damage to Lawson from the injunction?

2            THE COURT:  Sustained.  That's it.  Are you

3   through?

4            MR. McDONALD:  Yeah, I have no further

5   questions.  Thank you.

6            THE COURT:  Do you have any questions?

7            MR. ROBERTSON:  Very briefly, Your Honor.

8

9        REDIRECT EXAMINATION

10  BY MR. ROBERTSON:

11  Q    Ariba is listed here on this supply chain

12  management, correct?

13  A    Yes.

14  Q    They are in this electronic procurement space and

15  they are a licensee, correct?

16  A    Yes.

17  Q    They were a licensee in 2009, correct?

18  A    Yes.

19  Q    Were they making profits in 2009 in this software?

20  A    No.

21  Q    Have they been in business for years?

22  A    Since '98, I believe, or '97.

23  Q    When is the first time they ever made profit?

24  A    Just about 24 months ago, I think, they recorded

25  their first profit.

FARBER - REDIRECT                173

1    Q    Amazon, you have familiar with that company?

2    A    I am.

3    Q    Was that in business for years before it ever

4    achieved profitability?

5    A    Many years.

6    Q    How about AOL?

7    A    Yes.

8    Q    So you were asked this question about why the

9    company is existing if it's no longer making a profit.

10   Why does it exist and continue trying and selling if

11   it's not making a profit presently?

12   A    Because companies that don't make profits for many

13   years, there's people behind those companies that

14   belief in the product, the service, the technology

15   that's being offered.

16        The vertical that they are involved in has been

17   defined as a potentially a multibillion dollar market.

18   Even today in procurement, just as an example, even

19   though we talk about these numbers of percent of

20   market, when you start to peel the onion back and look

21   at the amount of people that have yet to purchase a

22   procurement system or aren't using one, that market is

23   much greater than those that have actually installed.

24   Q    Do you think there are opportunities in the

25   marketplace?

FARBER - REDIRECT                    174

1   A    Tremendous opportunities.

2   Q    Does your company exist only to enforce these

3   patents?

4   A    No, that's ridiculous.

5   Q    The first patent issued in 2000.  Does that ring

6   familiar to you?

7   A    Yes.

8   Q    That was while you were still at ProcureNet,

9   correct?

10  A    I was.

11  Q    Did the company exist for years before it started

12  enforcing its patents?

13  A    Yes, absolutely, a number of years.

14  Q    On these implementation efforts to perhaps replace

15  existing Lawson software, does ePlus ever partner with

16  other companies to perform implementation?

17  A    Yes.

18  Q    Can you just give me a few examples of those?

19  A    Of implementation partners?

20  Q    Yes.

21  A    J.V. Kelly, Accenture, Hitachi Consulting.

22  Q    Did you retain any of those companies to assist

23  you in replacing Lawson procurement software?

24  A    Absolutely.  They have hundreds, if not a thousand

25  of people, that know the procurement space and can

FARBER - REDIRECT                    175

1   assist.

2           MR. ROBERTSON:  All right.  Thank you.

3   Nothing further.

4           THE COURT:  If a company was being serviced

5   by Lawson and wanted to go to Ariba or SAP or Oracle

6   to get a replacement, it could do that, couldn't it?

7   It wouldn't have to go to you?

8           THE WITNESS:  That's correct.

9           THE COURT:  All right.  Okay.  Thank you.

10          THE WITNESS:  Thanks.

11           (The witness was excused from the witness

12   stand.)

13          THE COURT:  Do you have a witness?

14          MR. McDONALD:  Yes, I do, Your Honor.

15          Lawson calls Dean Hager to the stand.

16

17     DEAN JOSEPH HAGER, called by the Defendant, first

18   being duly sworn, testified as follows:

19

20     DIRECT EXAMINATION

21   BY MR. McDONALD:

22   Q   Good afternoon, Mr. Hager.

23   A   Hi.

24   Q   Would you state your full name, please?

25   A   Dean Joseph Hager.

HAGER - DIRECT                         176

1    Q    Where do you live?

2    A    Afton, Minnesota.

3    Q    Where do you work?

4    A    Lawson Software.

5    Q    What's your current position with Lawson?

6    A    I'm the executive vice president of S3 Industries.

7    Q    How long have you had that position?

8    A    For the past two years.

9    Q    How long have you worked for Lawson?

10   A    For the past 13 years.  Since 1998.

11            THE COURT:  How do you mean spell your last

12   name, sir?

13            THE WITNESS:  H-A-G-E-R.

14   Q    What other positions have you held with Lawson in

15   those 13 years?

16   A    I have headed up the marketing organization.  I've

17   spent the bulk of the time heading up the development

18   organization.  I've run sales and services, and

19   product management and strategy.  Now I'm responsible

20   for the business unit that make up what we call the S3

21   Industries Group.

22   Q    Before you began at Lawson 13 years ago, did you

23   have other experience in the computer industry?

24   A    I did.  I was with IBM for just over nine years.

25   Q    Generally, what did you do for them?

HAGER - DIRECT                    177

1    A    I began fresh out of college as an operating

2    systems programmer.  Then after a few years worked

3    into management and I was always on the management

4    side of research and development.

5    Q    Do you have a college degree?

6    A    I do.

7    Q    What degree is it?

8    A    Bachelor of science in computer science and

9    mathematics.

10   Q    Within your S3 Industries entity, are there

11   business units?

12   A    There are.

13   Q    How many are there?

14   A    Four business units.

15   Q    What are those units?

16   A    Health care, public sector, services industries,

17   and something we refer to as human capital

18   management.

19   Q    Why are you divided in to those four business

20   units?

21   A    Because each one of those businesses is a

22   specialty business, and so it's led by somebody who

23   understands that business very well and takes products

24   to market that are specific to that industry.

25   Q    So health care is a specialty?

1    A    Uh-huh.

2    Q    Can you say yes or no?

3    A    Yes.   I'm sorry.

4    Q    When you say health care is a specialty, what do

5    you mean?

6    A    I mean that Lawson strategically focuses on

7    providing solutions to the health care industry.   Some

8    solutions are sold to multiple industries, but many of

9    the solutions are sold specifically to health care to

10   solve health care specific issues.

11   Q    Is public sector also that type of a specialty?

12   A    Correct.

13   Q    What sort of entities are in the public sector

14   division?

15   A    We primarily focus on regional, on government,

16   counties, cities.   K through 12 education is actually

17   our biggest subsegment of public sector and then also

18   public authorities.

19   Q    Do you have involvement with the process of

20   selling products within the S3 Division?

21   A    I do.

22   Q    What type of involvement do you have with sales?

23   A    I oversee the sales organization.

24   Q    Do you have involvement in the final deals with

25   sales?

1    A    I do.

2    Q    What's your role with that?

3    A    Again, I oversee the organization.  I don't

4    necessarily sign each contract with the customer.

5    Depending on the level of authority and the size of

6    the contract, I may have to sign it, but I oversee the

7    organization that closes the deals.

8    Q    Who do you report to?

9    A    I report directly to our CEO, Harry Debes.

10   Q    How many people report to you?

11   A    Between 5- and 600.

12   Q    I'd like to talk now about the S3 product line.

13   That's the line that has these RSS and Punchout

14   products that you've heard the testimony about today,

15   right?

16   A    Correct.

17   Q    Can you describe for me the S3 product line?

18   A    There are three major components of the S3 product

19   line; financial management, human capital management,

20   and supply chain management.  And RSS and Punchout are

21   a subset of the supply chain managements.

22   Q    You've heard the term ERP today?

23   A    Correct.

24   Q    What is your understanding as to what an ERP

25   vendor would be?

1   A    ERP vendor, again, you heard from Mr. Farber, it

2   stands for enterprise resource planning.  Essentially,

3   it's the major enterprise applications that are needed

4   for that specific industry.  It was a term that

5   actually came out of manufacturing years ago but has

6   now broadened across multiple industries, but

7   typically is made up of those three major components

8   that I just mentioned.

9        In some industries, there's other components that

10  are added to it like in manufacturing.  Manufacturing

11  resource planning is another component of it, but that

12  isn't something that our S3 product line does.

13  Q    Who does Lawson sell its ERP product line to?

14  A    Far and away the predominant industry that we sell

15  to is to health care, followed by public sector as I

16  defined earlier, and then a little bit to what we

17  refer to as services industries, which is all

18  industries other than health care and public sector as

19  we've defined them.

20  Q    All other service types of industries?

21  A    Service type industries, yes.

22  Q    Does Lawson ever sell its procurement products

23  like RSS or Punchout as stand alone products?

24  A    No.

25  Q    Why not?

HAGER - DIRECT                181

1    A    Because we don't consider our procurement solution

2    to be what was referred to earlier as a best of breed

3    procurement solution.  That isn't a value proposition

4    that carries with it.

5         We sell an integrated financial system with supply

6    chain whenever we sell it.  We virtually never sell

7    procurement alone without Lawson financials that

8    accompany it.

9    Q    Could we put up the demonstrative?

10            THE COURT:  You sell the integrated financial

11   system without the RSS and Punchout?

12            THE WITNESS:  Yes, we can.

13   BY MR. McDONALD:

14   Q    Does that happen sometimes that customers will buy

15   the financial without those?

16   A    Often, yes.

17   Q    We see up on the screen now, we've got the picture

18   here.  Can you explain what the blue part of the

19   picture represents?

20   A    That is a picture of what Lawson provides our

21   solution set.  The Lawson system foundation represents

22   the technical architecture that all of our

23   applications sit on top of.  And then the lighter blue

24   squares that are on top of the system foundation

25   represent not a complete list, but a subset of the

1    types of applications that we provide on top of our

2    system foundation.

3    Q   So going from left to right, can you describe that

4    second level of boxes?

5    A   HR stands for human resources.  IC stands for

6    inventory control.  RQ is requisitions.  PO is

7    purchase order.  And there's general ledger, accounts

8    payable, accounts receivable.  Then you'll see the

9    requisition, of course, leads into RSS and Punchout.

10   That's the only way that RSS and Punchout would be

11   used is in conjunction with the Lawson requisition

12   system.

13            THE COURT:  Is the Lawson requisition system

14   used in conjunction with the purchase order system?

15            THE WITNESS:  It is, correct.

16            THE COURT:  Is the purchase order requisition

17   system used with the RSS and Punchout?

18            THE WITNESS:  The interface between RSS and

19   Punchout is through our requisition system.

20            THE COURT:  I understand that, but do you use

21   the purchase order system with those three?

22            THE WITNESS:  Correct, yes.

23            THE COURT:  How about the inventory control,

24   do you use that with those three, too?

25            THE WITNESS:  Correct.  We typically deliver

1    an integrated system.

2    BY MR. McDONALD:

3    Q    Who do you view as your main competitors to your

4    ERP product suite?

5    A    Oracle is far and away our most significant

6    competitor.

7    Q    Are there any other competitors that are

8    significant?

9    A    Then it depends by industry.  Our second most

10   chief competitor in health care would be McKesson.

11   Within the public sector, it would be Sun Guard and

12   Tyler.  Then in services industries, it's typically

13   going to be best of breed financial providers like

14   Epicor perhaps or Microsoft.  SAP every once in awhile

15   will come into that, but SAP actually because of their

16   focus more on the manufacturing side of the business,

17   we don't compete that much with SAP.

18            MR. McDONALD:  Could we go to demonstrative

19   2, please.

20   Q    Do you see up on your screen, Mr. Hager, a pie

21   chart regarding the 2009 market share?

22   A    Yes.

23   Q    What is your understanding as to what this chart

24   represents?

25   A    A Gartner report that I saw a little bit earlier

HAGER - DIRECT                    184

1    on the screen of all the supply chain vendors that are

2    in the marketplace.  And this represents a pretty

3    standard Gartner report that comes out with market

4    share percentages.

5    Q    Is Lawson reflected in the data?

6    A    Yes.  On No. 9, Lawson 1.46 percent of the market.

7    Q    When you say "the market," what is your

8    understanding as to what that market is?

9    A    This specifically defines the supply chain

10   management market, which in the report Gartner breaks

11   out into supply chain planning, supply chain

12   execution, procurement, and services delivery.

13   Q    Is it your understanding that this particular

14   chart comes from a specific subsegment that's related

15   to procurement?

16   A    It isn't labeled that way, so I was going to ask a

17   clarifying question as there were two tables within

18   that chart.

19   Q    Do you want to see it?

20   A    Looking at the vendors, it appears that it's from

21   the procurement section.  It's not labeled

22   procurement.  I didn't want to be presumptuous.

23   Q    Do you see in the lower right corner this

24   indicates a source of DX 424?

25   A    Uh-huh.

1            MR. McDONALD:  Bill, could you put up 424 and

2    see if you can blow that up?

3    A    I can see it fine.  And yes, then that would

4    represent specifically the North American market and

5    specifically the procurement subsegment of the supply

6    chain management marketplace.

7    Q    Do you see below subsegment, it indicates a

8    particular country?

9    A    Yes, the United States.

10   Q    Is it your understanding that this data on the pie

11   chart is from the 2009 data on this Exhibit 424?

12   A    Yes.  And the 1.46 that I see on the chart, that

13   is below the share in 2009.  It would be reflective of

14   what was on the prior pie chart.

15   Q    Thank you.  You have reviewed this data before,

16   right?

17   A    I have seen this in preparation for today, yes.

18   Q    Is ePlus listed anywhere in this summary by

19   Gartner of the procurement U.S. market?

20   A    No, they were not listed.

21   Q    Had you ever heard of ePlus before this lawsuit?

22   A    Never.

23   Q    How long had you been involved in sales and

24   marketing at Lawson, specifically S3, prior to May of

25   '09 when this lawsuit was brought?

HAGER - DIRECT                    186

1    A    Since May 1998.  So I've been there for 13 years.

2    So subtract that.

3    Q    About 11 years?

4    A    Yeah.

5    Q    Have you come to learn a little bit about ePlus

6    after the lawsuit was brought?

7    A    I learned a lot today.

8    Q    Is it your understanding ePlus is an ERP provider?

9    A    No.

10            THE COURT:  I don't need him to summarize

11   what somebody else said, Mr. McDonald.

12   Q    When you have customers that are seeking an ERP

13   system, how is it that customers indicate that they

14   are looking for an ERP system?

15   A    It was actually much like what was described

16   earlier by Mr. Farber.  A customer will typically

17   submit a request for a proposal and send it out to

18   providers in the space that they are familiar with

19   that perhaps they might have researched a little bit

20   and believe they might have a solution that will fit

21   their needs.  And they'll typically send it out to

22   nine or ten vendors.

23   Q    You also have seen that best of breed report that

24   I asked Mr. Farber about, correct?

25   A    I have.

1   Q    Is Lawson in that best of breed report?

2   A    No, we're not.

3   Q    If a customer wants an eProcurement best of breed

4   product, does Lawson try to get that business?

5   A    No.

6   Q    Why not?

7   A    Again, it's not the market that we focus on.  If a

8   customer doesn't want an integrated financial package

9   in conjunction with a procurement package, we won't

10  compete for the business.

11  Q    Does Lawson even offer its RSS or procurement

12  Punchout products as a best of breed solution?

13  A    No.

14  Q    When you're selling to customers and you're

15  selling RSS or Punchout, it's as part of the suite, do

16  I understand that right?

17  A    Correct.

18  Q    Can you summarize for us what your sales pitch is

19  as to why your customers should choose your system

20  with RSS and Punchout?

21  A    The value would be an integrated system.  The

22  financial accounting unit.  You can drill from there

23  or research deeper into the financial system to find

24  out what was purchased.  You can track that

25  information over to the HR system and see the roles

HAGER - DIRECT                    188

1    that people are in.  The value is in the integration

2    of the full suite, of all the suites.

3    Q    Of those U.S. customers out there that already had

4    ERP systems, do you have an understanding as to what

5    percentage of those ERP systems in existence would be

6    Lawson's systems?

7    A    Of the worldwide marketplace --

8              THE COURT:  The United States.

9    A    In the United States, specifically?  In the United

10   States marketplace, Lawson's ERP market share is about

11   2 percent.

12   Q    So with respect to those other 98 percent that

13   have ERP systems that aren't from Lawson, if they want

14   a procurement system, is that market open to ePlus?

15   A    Certainly.

16   Q    Is that any market that Lawson's RSS or Punchout

17   products would have any effect on?

18   A    If all they want is a procurement system, it isn't

19   a business that we would compete for.

20             THE COURT:  Are you saying that people come

21   to you mostly to buy things other than your RSS and

22   Punchout through the requisition system; is that

23   right?

24             THE WITNESS:  Correct.  The primary reason

25   they are coming for us is getting automated financials

1   integrated with a purchasing system, and the RSS and

2   Punchout are add-on modules on top of those systems.

3           THE COURT:  It's just cream on the top of the

4   cake?

5           THE WITNESS:  Correct.

6           THE COURT:  Icing, right?

7           THE WITNESS:  Icing on the cake, yes.

8           THE COURT:  Would most of them buy your

9   financial system without the RSS and the Punchout on

10  top of the RQ system if you went out of business and

11  quit selling that product entirely because you didn't

12  think it was very profitable?

13          THE WITNESS:  I didn't quite catch that

14  question.  I'm sorry.

15          THE COURT:  Would most people buy what you're

16  selling without the RQ and the RSS and the Punchout if

17  for some reason you decide to quit selling that

18  component of your ERP?

19          THE WITNESS:  Most of our sales do not

20  involve our requisition self service or Punchout.

21  It's in a subset of the sales.

22          THE COURT:  The answer is you'd still be

23  selling your systems?

24          THE WITNESS:  We'd still be selling our

25  systems.

HAGER - DIRECT                              190

1          THE COURT:  Okay.  Thank you.

2    BY MR. McDONALD:

3    Q   Now, is there a part of the marketplace that

4    doesn't have an ERP suite of products and doesn't want

5    an ERP suite of products?

6    A   Correct.  There's a part of the market that, for

7    whatever reason, doesn't want to implement an ERP

8    system.

9    Q   If that part of the market just wanted a

10   procurement system or eProcurement system all by

11   itself, is it your understanding that would be open to

12   ePlus?

13   A   Certainly, yes.

14   Q   Is that a part of the market that Lawson competes

15   for?

16   A   No.

17   Q   So does that leave us that part of the market that

18   has ERP product, and then that 2 percent that is a

19   Lawson ERP, can we talk about that piece of that piece

20   for a moment now?

21   A   So just Lawson customers?

22   Q   Yes.

23   A   Okay.

24   Q   In that specific segment, how much do Lawson and

25   ePlus compete?

HAGER - DIRECT                    191

1    A    I've never come across an occasion where we have

2    ever competed with ePlus.

3    Q    Based on your experience, why is that?

4    A    Again, it would only be within the Lawson customer

5    base.  First of all, only a subset of the Lawson

6    customer base has our supply chain products, many of

7    them have our human resources or our financial

8    products.

9         And if a customer is deciding that they want to

10   extend their financial products into supply chain,

11   quite often they just -- it's a noncompetitive

12   engagement.  They decide to purchase Lawson's

13   materials management purchasing system.  And in some

14   cases we'll extend that to requisition self service,

15   but it's typically just coming back to us as their

16   provider of choice, and they don't go to RFP for that

17   particular functionality.

18   Q    You threw out noncompetitive and RFP.  I just want

19   to make sure we're clear.  When you say that's

20   noncompetitive, what do you mean?

21   A    Meaning sometime earlier in our relationship with

22   that customer, they selected that they wanted Lawson

23   to be their enterprise provider of choice of their

24   financial applications and perhaps human resources

25   applications.

1    So a lot of times, similar to what was described

2 earlier, actually is a customer will say, I've already

3 chosen to do business with this vendor.  So,

4 therefore, anything that I'm going to buy in the

5 future, I'll first see whether that vendor provides

6 it.  And if they do, I'll simply take it from that

7 vendor as opposed to going to RFP to multiple vendors

8 for that functionality.

9 Q    Are there situations where your Lawson customers

10 that don't have an eProcurement product, they will go

11 look for a best of breed eProcurement product?

12 A    Yes, that does happen occasionally.

13 Q    What circumstances will that happen in?

14 A    The exact circumstances you described.  If the

15 customer requires a very robust eProcurement system

16 with robust cataloging and interfacing with various

17 different suppliers, there are vendors out there that

18 specializes in that.  That isn't something clearly

19 that Lawson specializes in.  And so sometimes they'll

20 go RFP for a specialized eProcurement system.

21 Q    In that situation, are they including Lawson

22 within the RFP or are they just looking at the best of

23 breeds?

24 A    Because we're their supplier of choice, they will

25 usually come back to us with a list of requirements

1  that they have and ask us whether we could meet them.

2  And if it is pretty substantial eProcurement

3  requirements, we'll typically say that we don't meet

4  them, and they'll go and RFP for other providers.

5          THE COURT:  You say you have 800 customers

6  that use RQ, RSS and Punchout?

7          THE WITNESS:  Just over 800 have purchased

8  it.  I can't validate that they all use it.

9          THE COURT:  Why would they purchase it if

10  they weren't going to use it?

11          THE WITNESS:  In ERP, and this is fairly

12  standard in the industry, you'll buy an integrated

13  system that has a lot of products in it, but you don't

14  necessarily use every piece.

15          THE COURT:  Like I have a Bose system in my

16  Jeep, and I've never put all the CDs back in the back.

17          THE WITNESS:  Exactly, right.

18          THE COURT:  Okay.  I see.  I'm sorry to

19  interrupt.  Go ahead.

20          MR. McDONALD:  Your Honor, just if I can

21  verify, I think that list of 800 was RSS customers.  I

22  think the Punchout list was actually separate and is a

23  lot shorter.

24          THE COURT:  How many were Punchout customers?

25          THE WITNESS:  I don't know off the top of my

1   head, but it's a subset of the 800.  It's not additive

2   to the 800 because Punchout is not a useful product

3   unless you also have RSS.

4           THE COURT:  Yes, that's what I thought.

5   BY MR. McDONALD:

6   Q   You're familiar with who these best of breed

7   providers are in eProcurement based on your experience

8   in the marketplace; is that right?

9   A   A few of them, yes.

10  Q   Who are the main best of breed eProcurement

11  providers?

12  A   The most famous is Ariba, of course, and the other

13  one I'm probably familiar with was mentioned earlier,

14  and that Sciquest.

15  Q   I think we just heard from Mr. Farber's testimony

16  about how Ariba hasn't made money in this industry.

17  Do you recall something to that effect?

18  A   Yeah.

19          THE COURT:  No, he didn't say that.  He

20  didn't say they haven't made money.

21          MR. McDONALD:  Can you remind me what he

22  said, Your Honor?

23          THE COURT:  My understanding of what he said

24  is it took them a long time to make a profit.  It's a

25  far different cry between whether you make money and

1   whether you make a profit.  And if you equate making a

2   profit with making money, what he didn't say was that

3   they never made a profit.  It was that it took them a

4   long time to get to the point of profitability.

5           MR. McDONALD:  Thank you.

6           THE COURT:  I think he quantified the

7   approximate number of years, but I don't remember.

8   Q   Do you have some understanding of why Ariba would

9   have stayed in the marketplace that long not having

10  made money?

11  A   Yes.

12  Q   What is your understanding?

13  A   My understanding was that they were growing

14  substantially.  It was a growth business for Ariba, as

15  it was the other vendors that were mentioned as well,

16  Amazon and such.  They were all rapidly growing

17  software providers, and that's why the patience on not

18  being profitable, they figured the growth would get

19  them there.

20  Q   You have seen the ePlus sales data today since

21  2002.  Is ePlus on a growth path?

22  A   It doesn't appear so.

23          MR. ROBERTSON:  This witness is now going to

24  characterize ePlus' documents.

25          THE COURT:  What is the nature of that

HAGER - DIRECT                    196

1    objection?  Can you put that into something I can rule

2    on?

3                    MR. ROBERTSON:  Lack of foundation, Your

4    Honor.

5                    THE COURT:  Lack of foundation.  Sustained.

6    BY MR. McDONALD:

7    Q    How is it you that personally know who the

8    competitors are in the eProcurement space for this

9    slice of the pie that has Lawson's ERP systems already

10   that might be looking for procurement?

11   A    Typically, our customers will tell us we're

12   working with them in a competitive engagement.

13   Q    Are you personally involved in the sales process

14   with customers yourself?

15   A    Yes.

16   Q    Let's talk about the process.  Could we put up

17   demonstrative No. 3, please.

18        Mr. Hager, you helped prepare this Exhibit 3,

19   correct?

20   A    Correct.

21   Q    Can you kind of explain to us what you're trying

22   to depict here with this exhibit?

23   A    This is a classic what is called a sales funnel.

24   At the very bottom is the final selected vendor.  At

25   the very top are all the potential competitors.  The

1  way the stages work is at the very top is everybody

2  that would consider themselves to be in that

3  marketplace.

4      So in the supply chain procurement marketplace,

5  all those blue dots at the top would be those vendors

6  that were on that report we saw.  Those 80-some

7  vendors.

8  Q   That's the one that we saw with the pie chart with

9  up to 50 competitive companies?

10 A   Correct.  And then what generally occurs, as I

11 mentioned at the beginning of the testimony, is that

12 the customer, the prospective customer, will decide

13 who of that entire ecosystem of software providers may

14 have the potential of meeting their specific needs,

15 and they'll submit a request for proposal out to all

16 of those nine or ten of them, and those vendors will

17 choose to participate in that RFP process.  That's the

18 next layer of blue balls there.

19 Q   The second layer on the chart --

20         THE COURT:  Mr. McDonald, we went through

21 most of this at the trial.

22         MR. McDONALD:  I don't think we did.

23         THE COURT:  They said there was a big group

24 of people from whom they could pick.  They would do an

25 RFP.  Some people would not respond.  Some people

HAGER - DIRECT                    198

1  would.  And they would evaluate whoever responded.

2  Then they would select, sometimes by way of interview

3  and sometimes by way of just looking at the paper, who

4  is it that got the bid.  This really was all

5  established at the trial.

6  BY MR. McDONALD:

7  Q   Mr. Hager, where in your opinion does the

8  competition actually occur as part of that sales

9  process that you have got depicted here?

10 A   On all of our documentation where we list our

11 competitors and list wins and losses against them.

12 It's at that first row of red balls where you have the

13 four red balls.  That's where the list of finalists

14 are, and that's where you really have the head to head

15 competition that exists.

16 Q   Is that sometimes called the short list?

17 A   That's sometimes called the short list, yes.

18 Q   Has Lawson in your experience with the S3 products

19 ever been head-to-head with ePlus at that short list

20 stage?

21 A   In all of the win-loss reports that I've ever

22 looked at, I've never seen ePlus on the list as a

23 competitor against Lawson at that stage.

24 Q   At that stage do you know who your competition is?

25 A   Almost always.

1   Q    How is that?

2   A    Typically, the customer will tell us, but it's a

3   small industry.  Usually one group might be out in the

4   hallway waiting to do a product demonstration while

5   the other group is in the conference room.  Everybody

6   knows each other.

7   Q    Now, at that short list point, how often are you

8   encountering best of breed providers in the

9   procurement space at that stage?

10  A    Typically, very, very rare.

11  Q    Why would that be?

12  A    Again, it's not something we typically compete

13  for.

14  Q    So who are you up against typically in that short

15  list stage?

16  A    As I mentioned earlier, Oracle is by far the No. 1

17  across all industries, and then it varies by industry

18  as I mentioned earlier.

19  Q    Did you see there were some charts used with Mr.

20  Farber that had the pie of -- I think there were 7,000

21  and some prospects of Lawson, and then a section of

22  those who were also on ePlus' prospect list.  Do you

23  remember seeing that?

24  A    Was that shown today?  I don't remember it.

25  Q    You saw that, a paper version --

HAGER - DIRECT                200

1        THE COURT:  You saw it when you were getting

2   ready because it wasn't shown today.

3   Q   I think they did use the --

4        MR. McDONALD:  Do you want me to continue,

5   Your Honor?

6        THE COURT:  Go ahead.

7   Q   I think we did see and you did see the one with

8   the 800 RSS customers, and there was a portion of that

9   section that was ePlus or was that not used?

10  A   I don't think any of those charts were shown

11  today.

12       THE COURT:  Was I asleep?

13       MR. McDONALD:  I saw them yesterday.

14       THE COURT:  You're entitled to recuse me if I

15  was asleep.

16       I don't understand either of those.  There

17  was testimony about the 800.  There was testimony

18  about some of the other, but it wasn't even as

19  specific as you were describing the charts.  So let's

20  go on.

21  BY MR. McDONALD:

22  Q   When you hear discussion of prospects, Mr. Hager,

23  where do you look at that in terms of your graphic can

24  here in the selection process?

25  A   I'm sorry.  I don't understand the question.

HAGER - DIRECT                 201

1    Q    When you're talking about something just being a

2    prospect for a company like Lawson, this is a prospect

3    for me that maybe I can sell to, which level of the

4    dots would that be at?

5    A    It typically -- this chart doesn't exactly depict

6    it, but --

7              THE COURT:  This doesn't depict it at all

8    because this is depicting the people that are doing

9    the selling, and the list of prospects are the people

10   who are doing the buying, as I understood the

11   testimony.

12             MR. McDONALD:  Fair enough.

13             THE COURT:  This chart doesn't have anything

14   to do with that.  I am awake.

15   BY MR. McDONALD:

16   Q    If that customer is on Lawson's prospect list, Mr.

17   Hager, would that mean they are generally at the top

18   level of this chart or would they be at some other

19   place on it?

20   A    If somebody is on a prospect list, that is

21   pre-RFP.  So if you did want to follow through this,

22   it would be at the top level because that second level

23   is when you have already responded to an RFP.  They

24   are beyond being a prospect at that point.

25             THE COURT:  Mr. McDonald, what the testimony

1   was had to do with who they considered to be potential

2   people they sold to.  That's their prospects.  This is

3   the people who were doing the selling, right?  The

4   blue.

5           MR. McDONALD:  Right.

6           THE COURT:  Then you get down to the ultimate

7   seller.  So this chart doesn't bear on that part of

8   the testimony at all.

9           If your question was if you looked at who the

10  buyer was going to consider as potential vendors, then

11  that's what the top level of that chart relates to,

12  that's what he described when he first described it,

13  but let's go on.

14          Get this chart off and go with something

15  else.  It's outlived its usefulness.

16  BY MR. McDONALD:

17  Q    Let's talk about the specific customers now that

18  Mr. Farber had talked about.  Did you hear him mention

19  PPD or pharmaceutical product development?

20  A    I did, yes.

21  Q    Are you familiar with Lawson's relationship with

22  PPD?

23  A    In preparation for today, yes.

24  Q    Is PPD a Lawson customer?

25  A    They are.

HAGER - DIRECT                    203

1    Q    About how long have they been a Lawson customer?

2    A    Since, I believe, 1994.

3    Q    Did PPD ever license RSS?

4    A    No.

5    Q    Did they ever license Punchout?

6    A    No.

7    Q    They had other products of Lawson?

8    A    Yes, financials and purchasing products.

9              MR. McDONALD:   I'm trying to get my list of

10   which companies were mentioned here during Mr.

11   Farber's questioning, Your Honor.  So I hope I'm going

12   to hit it correctly.

13   Q    Sterling.  That was another one that was

14   mentioned, correct?

15   A    Yes.

16   Q    Did you also review the situation as to Sterling?

17   A    No, I actually haven't, but I'm familiar with them

18   as a customer.

19   Q    What is your understanding as to what, if any,

20   products of Lawson's Sterling has?

21   A    Sterling has been a longtime Lawson human

22   resources customer.

23   Q    Do they have RSS?

24   A    No, not to my knowledge.

25   Q    Do they have Punchout?

1   A   No.

2   Q   When you say they are a longtime customer, about

3   how long approximately is that?

4   A   I think they predate me as a Lawson customer.  I

5   can't remember how many years prior to me joining.

6   Q   Do you recall -- I'm checking my notes here and

7   I'm afraid I can't read my own handwriting.  Do you

8   remember what other customers Mr. Farber mentioned

9   during his examination?

10  A   There was -- I don't know.

11  Q   I got a little help here.  How about Wolters

12  Kluwer?  Are you familiar with that one?

13  A   No, I'm not.

14  Q   Blue Cross/Blue Shield of North Carolina?

15  A   I'm a bit familiar with them.

16  Q   Are they a Lawson customer?

17  A   They are, yes.

18  Q   When did they became a Lawson customer?

19  A   I believe in the late '90s.

20  Q   Do you have an understanding as to whether or not

21  they have the Punchout product?

22  A   I don't believe they do.

23  Q   Did they ever have the RSS product?

24  A   I'm not entirely sure.

25  Q   I've got some notes here that indicate they may

1   have had that since the 1990s.  Does that sound right?

2   A    Yes, it could be.

3   Q    At any point did Lawson compete with ePlus for

4   Blue Cross/Blue Shield's business?

5   A    Not to my knowledge.

6   Q    Has Lawson taken any sales from ePlus as a result

7   of either RSS or Punchout?

8   A    I'm unaware of a single one.

9   Q    Deaconess, I think that was also mentioned.  Does

10  that ring a bell?

11  A    Yes, that does.

12  Q    Do you have some knowledge of the Deaconess

13  relationship with Lawson?

14  A    In preparation for today, yes.

15  Q    Is Lawson a vendor for Deaconess?

16  A    Yes.

17  Q    Approximately, how long has Deaconess been a

18  Lawson customer?

19  A    Since the late '90s.

20  Q    What products did Deaconess license from Lawson?

21  A    Initially, financials.

22  Q    Did they have a procurement product at some point?

23  A    Not Lawson initially.  Initially, who they used

24  was, along with our financials, they used McKesson's

25  materials management.  It was known as the Map Con

HAGER - DIRECT                    206

1    product.

2    Q    At some point did something happened to that Map

3    Con product at Deaconess?

4    A    McKesson decommissioned, which means an

5    announcement that they are not going to support it

6    anymore, so they decommissioned that product, and

7    McKesson came to us and asked us to bid with our

8    materials management system.

9           THE COURT:  Deaconess did or McKesson did?

10          THE WITNESS:  Deaconess did.

11   Q    The customer?

12   A    Yes.

13          THE COURT:  Do they have RSS and Punchout?

14   Q    They don't have Punchout, do they?

15   A    I don't believe that they have Punchout, but along

16   with the materials management system they did purchase

17   RSS along with that.

18   Q    Did Lawson ever compete head-to-head with ePlus at

19   Deaconess?

20   A    Not to my knowledge?

21          THE COURT:  Did the guy from Deaconess say

22   they did?

23          THE WITNESS:  No.

24          THE COURT:  I think he did.  Maybe I'm wrong.

25          MR. McDONALD:  No.  The timing was different.

HAGER - DIRECT                     207

1              THE COURT:  He didn't want it.  He didn't

2    like it.

3              MR. McDONALD:  But they weren't head-to-head

4    competition.

5              THE COURT:  I remembered the testimony

6    differently.  It depends on how you define

7    head-to-head, I guess.

8              Do you know anything about Fortress or

9    Haynes?

10             THE WITNESS:  I'm sorry?

11             THE COURT:  Do you know anything about

12   Fortress or Haynes?

13             THE WITNESS:  I don't.

14             THE COURT:  Okay.  So he doesn't know about

15   those.  LAC Group?

16             THE WITNESS:  I know of them as a customer,

17   but the specifics of when they bought it and exactly

18   what they bought, I don't know.

19             THE COURT:  Okay.  That pretty much takes

20   care of it.

21             MR. McDONALD:  Yes.

22   BY MR. McDONALD:

23   Q   Let's talk about the harm that would arise now if

24   the Court entered an injunction.  Well, actually, I

25   need to back up for a second, I think.

HAGER - DIRECT                    208

1    We'll provide some supplementation on these issues

2    to fill in the gap based on the records.

3    I have a note here indicating actually Deaconess

4    does have the Punchout product.  I thought my notes

5    indicated that they didn't, so I'll double check that,

6    but I don't want to leave the record where it is.

7    THE COURT:  I'm pretty sure the guy at the

8    trial said they did.

9    MR. McDONALD:  Okay.  I also have a note here

10   indicating that Haynes is not a Lawson customer.

11   THE COURT:  He doesn't know, though.  So you

12   can't testify unless you want to get on the stand.

13   MR. McDONALD:  No, I'm happy where I am.

14   THE COURT:  You don't want Mr. Robertson to

15   ask you questions?  Let's go.

16   BY MR. McDONALD:

17   Q    With respect to the harm from an injunction,

18   Mr. Hager, have you had a chance to consider that

19   issue with respect to Lawson and its customers?

20   A    I have, yes.

21   Q    Let's talk a bit about the issue of if there's an

22   injunction against servicing existing Lawson RSS or

23   Punchout customers.  What type of services does Lawson

24   provide to those customers right now?

25   A    Well, during the implementation phases we'd

1    provide implementation services, but then for the

2    lifetime of the client we predominantly provide the

3    support services; call in support, help desk.

4        We also provide ongoing regulatory releases and

5    fixes, patches, updates to make sure that the software

6    works with the latest databases and web browsers and

7    those types of things.

8    Q    You mentioned a regulatory release.  Can you

9    explain what that is?

10   A    Every year Lawson puts out end of year releases

11   just to make sure that we are abiding by whatever the

12   law of the land is for that particular year.

13       The primary reason for regular releases around RSS

14   and Punchout specifically has more to do with other

15   refresh technology that's out there.

16       You mentioned it in your opening that if Google

17   were to come out with a new web browser or if

18   Microsoft were to come out with a new web browser, you

19   need to make sure that your stuff works on that web

20   browser, and if it doesn't, it literally could break

21   everybody that uses the system.

22   Q    How important are those types of services to the

23   operation of your customers' systems?

24   A    Without those services, the customer runs at

25   substantial risk.

1  Q    Are those services critical or not?

2  A    I would consider them critical.  I think our

3  customers would as well.

4      I will tell you that since the announcement around

5  this ePlus Lawson connection here, the No. 1 concern

6  I've been hearing from our customers --

7            MR. ROBERTSON:  Objection, Your Honor.

8            THE COURT:  Wait a minute.  Don't say

9  anything else.

10            MR. ROBERTSON:  Hearsay, Your Honor.

11  Hearsay.  He's about to testify as to what he's heard

12  from others.

13            THE COURT:  Okay.  I got that one.

14            MR. ROBERTSON:  Okay.

15            THE COURT:  Okay.

16            MR. McDONALD:  I think he's hearing some

17  concerns from the customers, Your Honor.

18            THE COURT:  That's hearsay, and you're

19  offering it for the truth of the matter unless you

20  have a nonhearsay purpose.  Do you?

21            MR. McDONALD:  No.  We're offering it that

22  way.  I just thought that in the context of a hearing

23  like this, it would be something --

24            THE COURT:  Rules of evidence are still in

25  play.  Sustained.  As long as anybody invokes them,

1    the rules are in play.

2    BY MR. McDONALD:

3    Q    Now, if Lawson cannot provide these services to

4    the customer who encounters a problem, does that mean

5    the customer can't use the system anymore or what?

6    A    If they run into a problem that causes the

7    business process not to work and Lawson is unable to

8    support that customer, yes, they will have a problem.

9    They will be unable to run.

10   Q    Are there any companies other than Lawson that

11   currently provide support services for Lawson's RSS

12   and Punchout products?

13   A    No.

14   Q    Is there a reason why there aren't any other

15   companies doing that?

16   A    We have the source code and we don't provide the

17   source code to anyone else.

18   Q    If Lawson were enjoined from servicing its

19   existing RSS and Punchout customers, how would that

20   work?

21   A    There would be an announcement to our customers

22   saying that Lawson would no longer support them, and

23   that they would be running at risk, and everybody that

24   would be running that system would immediately need to

25   be making plans on how they would run in a less risky

HAGER - DIRECT                    212

1    environment.

2    Q    Does Lawson have contracts with customers who have

3    the RSS and Punchout products to provide maintenance

4    services?

5    A    We do.

6    Q    About how many of those contracts do you have, do

7    you know?

8    A    We would have a maintenance contract with every

9    customer that is listed as an RSS customer.

10            THE COURT:  How many is that?  Is that the

11   800?

12            THE WITNESS:  That's the 800, yes.

13            MR. McDONALD:  And so smaller number for

14   Punchout, but I don't think we have that number right

15   at our fingertips.

16   BY MR. McDONALD:

17   Q    You heard Mr. Farber talking a little bit about

18   how much effort would be involved with somebody else

19   coming in stepping in and in effect taking over a

20   particular functionality.

21        Can you walk us through -- please focus

22   specifically on your biggest industry sector, health

23   care.  What would be involved if a customer in that

24   area had to look for an alternative vendor for an RSS

25   or Punchout product if the servicing of those products

HAGER - DIRECT                    213

1  was enjoined?

2  A    There would be a couple of things that actually

3  are a little bit different from our customer set than

4  some of the things we heard this morning.  First of

5  all, Lawson was categorized as a mid market vendor

6  this morning.  And our presence in health care is

7  actually at the top end of the market.

8       Eight of the top ten health care providers in the

9  country run Lawson.  Over 60 percent of the top 50

10 hospitals in the country run Lawson.

11      So we're not talking about simple implementations.

12 We're talking about very complex, highly regulated

13 implementation where you're not purchasing chairs and

14 pens, but rather sophisticated medical equipment and

15 supplies for surgeries.

16      So the purchasing system our hospitals consider to

17 be mission critical to the care that they provide

18 their patients.  Roughly 70 to 80 percent of all of

19 the hospitals' purchases are run through our system.

20      That is in contrast to what I heard this morning

21 about 40 percent of purchases running through a

22 system.

23      Typically, for most of our hospitals, the only

24 purchases that don't run through the Lawson system are

25 pharmaceuticals.  All other medical supplies and care

1    instruments are purchased through the Lawson system.

2    So it does equate to about 70 to 80 percent.  It's

3    typically on the high end.  We're talking about

4    customers that have hundreds of hospitals that do

5    requisitions at all of those hospitals.

6        So the number of users and the very complex

7    approval processes, if you can appreciate that you can

8    purchase both paper clips and MRI machines through our

9    system, you can imagine that the very complex web of

10   approval processes is quite different.

11       So you need to map those all to the roles that are

12   within a hospital.  The implementation time would be

13   substantially greater than anything that we heard this

14   morning to replace that system.  Even just the RSS

15   piece because all of the work flow approvals are

16   triggered off of that initial RSS.

17   Q   Is it your understanding from hearing Mr. Farber's

18   testimony, did you hear anything there that indicated

19   that ePlus had any significant experience with

20   procurement systems for those critical supplies for

21   hospitals?

22            MR. ROBERTSON:  I object to lack of

23   foundation and also commenting on the other witness'

24   testimony.  That's not what he said.

25            MR. McDONALD:  I guess I'm trying to clarify

HAGER - DIRECT                    215

1  why they are giving kind of a different version of

2  what's going on here maybe trying to help the Court

3  reconcile his testimony.

4          THE COURT:  That still doesn't make it

5  relevant and admissible.  Sustained.

6          Are you saying that -- do you think that

7  these hospitals that are your customers are ordering

8  things while the surgery is going on?

9          THE WITNESS:  No.

10          THE COURT:  They are not, are they?

11          THE WITNESS:  No, but they need to be in

12  stock.

13          THE COURT:  Of course they do, but they know

14  how to make them and find out what they've got in

15  stock before they operate on somebody, right?

16          THE WITNESS:  Provided you have a good

17  integrated inventory management system, yes.

18          THE COURT:  Well, if you need an artificial

19  heart, you go check and see if you have an artificial

20  heart.  You don't use your system to do it, do you?

21          THE WITNESS:  Not to actually buy the

22  artificial heart, no.

23          THE COURT:  If you have the screws that are

24  going into my back when I have back surgery, they are

25  going to go look at that right before they let me in

1   the hospital, aren't they?

2          THE WITNESS:  Right, and Lawson systems are

3   going to make sure that they are already in stock for

4   you.

5          THE COURT:  The way you're going to find out

6   if they are there is you're going to eyeball them if

7   you're the doctor or the nurse, right?

8          THE WITNESS:  In a smaller community

9   hospital, but we're talking about --

10         THE COURT:  How about the Medical College of

11  Virginia, do you know how they do it?

12         THE WITNESS:  They are going to do it on a

13  systems base.  They will have ultimately somebody go

14  in with a barcode machine and do inventory counts and

15  load those into the inventory system.

16         THE COURT:  The day or the week before the

17  surgery and reserve them.

18         THE WITNESS:  The buying doesn't occur at

19  that level.

20         THE COURT:  I'm not talking about the buying.

21  I'm talking about whether they have them or not.

22  You're not talking about the use of the product in the

23  surgery.  You're talking about whether you have an

24  adequate stock of it if you need it down the road for

25  the surgery, right?

HAGER - DIRECT                    217

1              THE WITNESS:  Correct.

2              THE COURT:  Okay.  That's fine.

3              THE WITNESS:  But you need to carry the right

4    amount of stock, not overstock or understock,

5    otherwise you add far more cost to the health care

6    system than already exists.

7              THE COURT:  That's hard to do.

8              THE WITNESS:  It's very hard to do.

9    BY MR. McDONALD:

10   Q   So with respect to tracking, Mr. Hager --

11             THE COURT:  I just think you're overblowing

12   it.  You need to be accurate in what you're saying,

13   and it's important to know what actually takes place

14   as opposed to the inflated view of things that takes

15   place.  And if you sell an inflated view that I can't

16   buy, I'm just going reject the testimony in its

17   entirety because you let him get on the witness stand

18   and suggest that they can't conduct an operation

19   without this system and that the whole place will shut

20   down in the middle of an operation without this

21   system, and that isn't what's at stake here.

22             And if that's the way you're going to try to

23   sell the issue, then what I'm going to do is say I

24   just don't buy any of it.  And that's the risk you run

25   from overstating your case.

HAGER - DIRECT                     218

1        So try to confine it to what actually

2   happens.  That's what's important anyway.  And that's

3   really what he knows most about, I would assume.

4              MR. McDONALD:  Fair enough.

5   BY MR. McDONALD:

6   Q   Can we talk, Mr. Hager, about the tracking that

7   your system does for those medical supplies for

8   operations?  Can you walk us through how the Lawson

9   system is used to track, for example, the supplies

10  that are used for surgery in a hospital?

11  A   Again, at the beginning of the process is the

12  inventory management and inventory counting that is

13  done.  And that all gets loaded up into the system

14  where somebody looks at the system and determines in

15  what hospitals they need to have which materials

16  purchased, so that they have the adequate in stock

17  equipment.

18      And then they run those through the purchase and

19  were able to follow it through the process to the

20  loading dock, to the invoice matching, and ultimately

21  follow that device all the way into the operating

22  room.

23  Q   So your system actually tracks the inventory used

24  in surgery all the way into the operating room?

25  A   Correct.

HAGER - DIRECT                    219

1   Q    You indicated the amount of time it would take to
2   go to an alternative system.  Do you have an estimate
3   as to how long it would take a customer to actually
4   select and verify and implement a system that would
5   replace the Lawson eProcurement functionality?
6   A    It's entirely up to the customer as to how long it
7   would take to select, but from an implementation
8   perspective knowing how complex those implementations
9   are, and I don't believe it's overstating it to say it
10  would be nine months probably on average.
11  Q    Is that within the range Mr. Farber provided
12  today?
13  A    He provided 30 days to six months to potentially
14  longer.  Because of the very complex health care
15  organization we run, I believe it would fall in the
16  typically longer.
17       I do say that with some level of expertise.  We
18  have 277 requisition self service health care only
19  customers that represent 2500 different hospitals,
20  which is about a third of the hospitals in the United
21  States.  We do have a lot of experience.
22            THE COURT:  You have a lot of business and
23  you have a lot of infringement, according to the jury.
24  So the question I have to deal with is how to deal
25  with it.

HAGER - DIRECT                    220

1          THE WITNESS:  I understand.

2          THE COURT:  Now, if you're shut down and a

3    government agency comes in and finds that you're

4    committing fraud and shuts down all your operations to

5    do a search and seizure, how is somebody, for example,

6    who's using your system going to operate?  Do you know

7    that?

8          THE WITNESS:  On day one, they would simply

9    operate at risk.

10         THE COURT:  They would find a way is what

11   would happen.

12         THE WITNESS:  For money, yes, they would.

13         THE COURT:  Of course, it would.  Of course,

14   it would.

15         Now, suppose that we had a terrible

16   catastrophe that wiped out where you have most of your

17   support system.  Are the hospitals going to be able to

18   find somebody to help them straighten out and track

19   what's going on and be able to provide surgeries to

20   people; yes or no?

21         THE WITNESS:  There's always a way.

22         THE COURT:  There's a way.  The question is:

23   How much, right?

24         THE WITNESS:  Correct.

25         THE COURT:  And how much inconvenience?

HAGER - DIRECT                221

1          THE WITNESS:  Correct.

2          THE COURT:  Okay.  That's the way you

3    circumscribe the issue, not try to convince somebody

4    that it's just going to all stop, the world is going

5    to stop, because it's not going to stop.

6          Is it going to be costly?  Yes.  Is it going

7    to be a problem?  Yes.  Is it some risk?  Yes.

8          That's what the balancing in this case has to

9    deal with.  Not overselling.  Don't oversell the

10   product.  The risk is the hearer just says that's just

11   more puffery and I'm not going to pay anymore

12   attention to it.  It's serious enough the way it is.

13   BY MR. McDONALD:

14   Q   With respect to the support service Lawson

15   provides for these RSS and Punchout customers, Lawson,

16   do they actually generate purchase orders when they

17   are servicing customers?

18   A   I'm sorry.  I didn't understand.

19   Q   Does Lawson itself actually generate purchase

20   orders for supplies when they're servicing customers

21   or is it more a matter of just solving the problem

22   from a software or technical standpoint?

23   A   When you say --

24         THE COURT:  Hold on.

25         MR. ROBERTSON:  It's vague and ambiguous.

HAGER - DIRECT                222

1        THE COURT:  Yes.

2        You're talking about in the support role.

3        MR. McDONALD:  Right.

4        THE COURT:  But some of their systems do

5   generate purchase orders.  We know that.  I think you

6   confused him.

7        MR. McDONALD:  I think I confused everybody.

8        THE COURT:  So the support system, is that

9   what you're talking about?

10       MR. McDONALD:  Yes.

11  Q   When Lawson provides that support, when somebody

12  calls in and says I have a problem with RSS, when

13  you're solving that problem, you don't actually

14  generate requisitions or purchase orders and things

15  like that yourself, do you?

16  A   No.

17  Q   If your hospital and other customers of RSS and

18  Punchout are looking for an alternative suppliers, is

19  it likely that they'd go to ePlus?

20       MR. ROBERTSON:  Objection.  Calls for

21  speculation, Your Honor.

22       THE COURT:  I think it calls for an opinion,

23  and it may be even as an expert opinion on the market,

24  but actually it can also qualify as a lay opinion

25  based on his perception and knowledge of the market,

1  which he, I think, testified sufficiently to that it

2  would come in as a lay opinion, and I'll accept it as

3  that.   Overruled.

4         THE WITNESS:   Could you repeat the question?

5  Q   Sure.   If your customers of RSS and Punchout had

6  to stop using your products and look at another vendor

7  for similar functionality, based on your knowledge of

8  the marketplace, how likely are they going to pick

9  ePlus?

10 A   I think it would be unlikely.

11 Q   Why is that?

12 A   Because I don't think they, from what I'm able to

13 see, have a lot of experience in health care and would

14 have the references to provide to the customers that

15 would be looking for a solution.

16     There are a lot of other solution providers out

17 there to choose from.

18        THE COURT:   Like Oracle and Ariba and SAP and

19 whoever else?

20        THE WITNESS:   Correct.

21 Q   Do they have experience specifically within the

22 health care industry, those other vendors that you

23 listed?

24 A   They have a little, not as much as Lawson, but

25 they have experience, yes.   More experience than ePlus

1   does.

2   Q   Within health care specifically, how important is

3   it to the customers that they have a vendor that has

4   prior experience specifically in the health care

5   industry of significance?

6   A   It's very important.  It's a unique industry.

7   Q   Finally, let's talk a little bit about if there's

8   isn't an injunction.  Is Lawson able to track and does

9   it track its revenues generated related to the RSS and

10  Punchout products?

11  A   Yes.

12  Q   How do you do that?

13  A   Our internal financial systems are able to measure

14  revenue by products.

15          THE COURT:  How far back can you reach to do

16  that?

17          THE WITNESS:  Several years.  I'm quite

18  certain we probably cover most of the 2000s.

19          THE COURT:  And you can fix it, so going

20  forward you can do it?

21          THE WITNESS:  It's a report we can run, yes.

22  BY MR. McDONALD:

23  Q   If the Court ever set a royalty as a percentage of

24  the revenues associated with those products, is that a

25  number that could be readily calculated?

HAGER - DIRECT                    225

1  A    Yes.

2         MR. McDONALD:  I have no further questions.

3  Thank you.

4         THE COURT:  How much longer do you have, Mr.

5  Robertson?

6         MR. ROBERTSON:  I think I probably have about

7  30, 35 minutes for this witness, Your Honor.

8         THE COURT:  Is that Mr. Robertson time?  I

9  think we'll change court reporters at this time and

10  give the witness a little break, too.

11         (Brief taken.)

12         (Transcript continues on page 226.)

13

14

15

16

17

18

19

20

21

22

23

24

25