1              THE COURT:  Cross-examine.

2

3                    CROSS-EXAMINATION

4   BY MR. ROBERTSON:

5   Q    Good afternoon, Mr. Hager.

6   A    Hello.

7   Q    I want to put up, if I could, that Lawson ERP product

8   suite graphic that you had there before.

9              THE COURT:  Is yours working?

10             MR. ROBERTSON:  I think so.

11             THE COURT:  For somebody who gets technology -- I

12  guess I need not say anything else.

13             MR. ROBERTSON:  Yeah, pretty astounding.

14             THE COURT:  Which side is giving you trouble?

15             MR. ROBERTSON:  I think I figured it out.

16  Q    You understand, Mr. Hager, that inventory control,

17  requisitions, the RQ, and PO modules alone at core technology

18  wasn't found to infringe; correct?

19  A    Correct.

20             THE COURT:  Was or was not?

21             MR. ROBERTSON:  Was not.

22  Q    And so that Lawson can continue to sell that to their

23  customers; correct?

24  A    Correct.

25  Q    And so we're talking about it, the Lawson system

Hager - Cross

1    foundation with that core technology, RSS, Punchout, and there

2    was also a configuration found to infringe that included EDI;

3    correct?

4    A    I'm not familiar with that.

5    Q    Weren't familiar with that, okay.  Well --

6              THE COURT:  You are not familiar with EDI or the fact

7    of the verdict?

8              THE WITNESS:  The fact of the verdict.

9              THE COURT:  Okay.

10   Q    So we're only talking about those customers that have the

11   foundation, the core technology, and RSS in one instance, or

12   the foundation, the core technology, RSS and Punchout, at least

13   to your knowledge?

14   A    Correct.

15             THE COURT:  And is that the 800 that have both RSS

16   and -- the core technology, RSS, and Punchout?

17             THE WITNESS:  The box that is the 800 is the RSS box

18   that's on there, and anybody that owns RSS owns everything

19   below it by default.  And it so happens that with RSS, the

20   Punchout customers would be a subset of the RSS customers as

21   well.

22   Q    And did I understand you to say you weren't familiar with

23   what exactly that number would be?  Do you know what the number

24   is of the Punchout customers?

25   A    I don't know that.

Hager - Cross

1    Q    Now, if -- I understand you to say that you view Lawson as

2    this enterprise resource planning software solution provider;

3    correct?

4    A    Yes.

5    Q    But if Lawson were to sell a system without these

6    configurations, and they do that on occasion; correct?

7    A    Correct.

8    Q    In fact, they do it more often than not, don't they?

9    A    Hard to say, but we do do it, yes.

10   Q    Do it very often?

11   A    Yes.

12   Q    So any time you sold a configuration like that, my client

13   could come in and offer software solution for electronic

14   procurement to that Lawson customer; correct?

15   A    Certainly.

16   Q    And, in fact, they do that.  You are aware of that, aren't

17   you?

18   A    As I mentioned, I never heard of ePlus prior to this

19   trial.

20   Q    You're aware and you'd agree with me that Lawson and ePlus

21   are perceived in the marketplace as competitors for an

22   eProcurement solution; correct?

23   A    No, no, I don't agree with that.

24   Q    Let me show you then a document that's entitled Forrester

25   Wave eProcurement Solutions, Q 12011, and just for

Hager - Cross

1    identification, let me call it Plaintiff's Exhibit 690 for

2    identification.  This report you see, sir, is dated March 7,

3    2011; correct?

4    A    Correct.

5    Q    That's just a little more than two weeks ago, isn't it,

6    sir?

7    A    Correct.

8    Q    Why don't you turn to page five of this document.  By the

9    way, let me ask you first, have you seen this before?

10   A    No.

11   Q    Page five identifies the evaluated vendors and product

12   information and selection criteria; do you see that, sir?

13   A    I'm looking for a page number.

14            THE COURT:  Up on the right-hand corner.

15            THE WITNESS:  I've got it.

16   Q    11 vendors were identified; correct?

17   A    Correct.

18   Q    Ariba, Basware, Capgemini Procurement Services, ePlus,

19   Hubwoo, Lawson, Oracle E-Business Suite, Oracle PeopleSoft,

20   Perfect Commerce, SAP, and SciQuest; do you see that?

21   A    I do.

22   Q    And the Lawson version identified here for this S3 supply

23   chain management suite is 9.0.1; do you see that?

24   A    I do.

25   Q    You are aware that that was one of the versions of the

Hager - Cross

1    Lawson S3 software that was accused of infringement in this

2    case and found to infringe?

3    A    Yes.

4    Q    And do you see at the bottom it has a vendor selection

5    criteria right below the chart I identified that has the

6    evaluated vendors?

7    A    Yes.

8    Q    And this is -- can you agree with me, sir, that this is

9    the criteria that apparently Forrester utilized for identifying

10   the vendors of eProcurement solutions that they were going to

11   look at?

12            MR. McDONALD:  Object, Your Honor.  The witness said

13   he hasn't seen this document before, so I don't know how he's

14   going to vouch for the criteria.

15   Q    I just want to say, this is what's represented in the

16   document as the vendor criteria; correct?

17            THE COURT:  It says so.  So the document speaks for

18   itself.

19   Q    So one of the questions is, does the vendor have a

20   comprehensive solution suitable for enterprise customers; do

21   you see that?

22   A    I do see that.

23   Q    And by the way, this Forrester report -- I took your

24   deposition, didn't I, sir?

25   A    I believe so.

1   Q    And I asked you about a number of industry reports that

2   you review on a semi regular basis?

3   A    Correct.

4   Q    Forrester was one of the reports; correct?

5   A    Forrester was one of the providers of reports.  There's

6   lots of reports written by Forrester.

7   Q    Certainly, but I asked you specifically -- we can look at

8   your deposition.

9   A    I don't deny that.

10  Q    Forrester was one of the reports I asked you about whether

11  you reviewed, and you indicated you did; correct?

12  A    There is no Forrester report.  Forrester is the provider

13  of many reports, and, yes, I do review some Forrester reports.

14  Q    This wave report, this is an analyzed report, isn't it?

15  It comes out once a year for a particular business solution?

16  A    Most of their wave reports come once a year, yes.

17  Q    Were you aware that Mr. Lohkamp identified this Forrester

18  Wave eProcurement Solutions as being the source of his

19  knowledge of ePlus?  I ask whether you were aware of that fact

20  or not?

21  A    I'm not aware.

22  Q    And he first heard of them back in 2003 based on this

23  report?

24  A    It doesn't surprise me, but...

25  Q    Now, in here, they also say, back on page five, sir, does

1  the solution include a significant amount of the vendor's own

2  prioritized intellectual property; correct?

3  A    Correct.

4  Q    Does the vendor make more than 15 million revenue per year

5  from eProcurement products and services; do you see that?

6  A    I do.

7  Q    On the basis of this, Forrester chose these 11 different

8  companies to do comparisons of; correct?

9  A    Correct.

10 Q    There is a chart, actually, based on their review of the

11 performance of these products that appears at page seven.  Do

12 you see there's an X axis, if you will, and a Y axis?

13 A    Yes.

14 Q    And I'll say to the left on this chart, this is an axis

15 that says the current offering; do you see that?

16 A    Yes.

17 Q    And they rank it from weak to strong; correct?

18 A    Correct.

19 Q    And then there's an axis at the bottom that talks about

20 strategy; do you see that?

21 A    I do.

22 Q    Again, it's rated from weak to strong; do you see that?

23 A    Yes.

24 Q    Now, there's also a chart, if you would, or a depiction in

25 the lower left-hand corner that talks about market presence,

1    and would you agree with me that the arrow suggesting that the

2    size of the circle there indicates the footprint that Forrester

3    is considering for the market presence in the particular market

4    we're talking about here which is eProcurement solutions?

5    A    Correct.

6    Q    Do you see Forrester here has identified ePlus as having

7    essentially the same footprint as Lawson in this eProcurement

8    market analysis they've done?

9    A    Is that what that says?

10   Q    Well, you see it has the same size market in market

11   presence.  Can you infer from that they're trying to suggest --

12   A    I think you're looking at the Oracle PeopleSoft circle.

13   Q    ePlus is also within that circle on the spacing?

14   A    It would have its own circle, I believe, is the way you

15   read this report.

16   Q    Let me suggest this to you, then, sir:  Isn't this report

17   suggesting that as far as the current electronic procurement

18   offering, ePlus, according to go this analysis done by an

19   independent third party, has a better product, a stronger

20   product than is being offered by Lawson?

21          MR. McDONALD:  Your Honor, I object to this whole

22   line.  Mr. Robertson has already gone through the criteria that

23   says the vendor has to have more than 15 million in revenue per

24   year from eProcurement products and services.  We've heard all

25   day today they've never come close to 15 million a year, so

234

 1   what's ePlus even doing on this chart except it was based on

 2   misinformation?  This guy has never seen the report anyway, so

 3   I don't know why he's having him walk through and read this

 4   version of it.

 5            THE COURT:  That's what?

 6            MR. McDONALD:  Object based on lack of foundation,

 7   and there's a fundamental reliability problem with this

 8   evidence that the witness can understand.

 9            MR. ROBERTSON:  Well, this is impeachment, Your

10   Honor.  We started this whole process out with the fact that he

11   said he viewed them as competitors in this eProcurement space,

12   and I wanted to use this document to establish that others in

13   the industry indeed do view them as competitors and do view the

14   products as competing.

15            THE COURT:  Overruled.

16   Q    So back to this chart, you'd agree with me that this

17   analysis suggests that ePlus has a better product offering or

18   stronger product offering than Lawson; correct?

19   A    For eProcurement best of breed solutions.

20   Q    Where does it say that, sir?

21   A    Well, the title is eProcurement solutions, I'm sorry.  I

22   added best of breed.  I shouldn't have done that.

23   Q    Thank you.

24            THE COURT:  Go back a minute, though.  When you said

25   that ePlus's circle was different than Lawson's circle, you are

1    basing that on the chart, the legend below that says market

2    presence?

3                THE WITNESS:  Correct.

4                THE COURT:  And the Lawson chart, and the Lawson

5    market presence indicator is the second circle from the right,

6    third circle from the left, and has a dot in the middle; right?

7                THE WITNESS:  Yes.

8                THE COURT:  The ePlus line, the line that goes from

9    ePlus up to any circle is to the first circle on the left which

10   is a dot?

11               THE WITNESS:  Just a dot, correct.

12               THE COURT:  And the Oracle PeopleSoft goes to a

13   circle with a dot in the middle, and that circle is the same

14   size as Lawson.

15               THE WITNESS:  Correct.

16               THE COURT:  That's what I thought you were saying.  I

17   wanted to make sure I understood what you are saying.

18   Q    You see here also that it indicates in here that Lawson's

19   strategy is somewhat stronger than ePlus's; correct?

20   A    Correct.

21   Q    Slightly.

22   A    Correct.

23   Q    Okay.  Now, isn't that a result of the fact, as you

24   indicated, that you can provide an entire ERP solution to a

25   customer and then leverage that off and sell your procurement

1   product along with it; isn't that right?

2          MR. McDONALD:  Objection, lack of foundation as to

3   his knowledge of why Forrester labeled Lawson with that

4   particular level of strategy.

5          THE COURT:  He didn't ask that.  He asked why it is,

6   in his view, that their position is stronger, Lawson's position

7   is stronger.

8          MR. McDONALD:  I don't think that was the question.

9          THE COURT:  It sounded to me like it was.  Did I get

10  it wrong?

11         MR. ROBERTSON:  No, no.  That was my question, Your

12  Honor.  Let me rephrase it now so the record will be clear.

13  Q    One of the views I thought I understood you to testify

14  that you had a market advantage was because you could sell a

15  full suite of ERP solutions and then use that to leverage sales

16  of the procurement solution; correct?

17  A    Correct.

18  Q    So actually having a full suite of ERP products puts my

19  client, who doesn't, at a disadvantage when Lawson is out

20  selling the infringing software; isn't that right?

21  A    Are you -- just for clarification, are you tying it back

22  to these report, because those are two mutually -- are we still

23  on the report, or are we off the report?

24  Q    We're off the report for now.

25  A    Okay, I'm sorry.  I was trying to follow the dots.

Hager - Cross

1   Q    Acknowledging that Lawson has this full ERP solution, that

2   puts my client, ePlus, at a disadvantage when you want to go

3   out and leverage your eProcurement solution to a particular

4   customer; correct?

5   A    When selling to our current customers, yes.  Providing an

6   integrated system we would consider to be our competitive

7   advantage whereas the competitive advantage typically of best

8   of breeds is additional functionality so one sells against the

9   other.

10  Q    So you'd agree with me, though, sir, that ePlus does have

11  a better procurement product than Lawson?

12  A    I have never seen it demoed.  I don't know.

13  Q    Well, at least apparently the analysis did.  Why don't you

14  turn to the next page.  Let's look at page eight.  They

15  actually did a number of comparisons on current offerings.  Do

16  you see these procurement products?

17  A    I do.

18  Q    I'd like to just focus on the current offerings for the

19  various categories, if we can.  Let's focus in on ePlus and

20  Lawson, get right to it.  So overall, ePlus scored a 3.43 with

21  respect to its current offering as opposed to Lawson's 2.99.

22  We're taking specifically procurement solution; correct?

23  A    Correct.

24  Q    And it was better in performance in purchasing; right?

25  A    Correct.

Hager - Cross

1  Q    One category it was not better in was category support;

2  correct?

3  A    Correct.

4  Q    Also in process configuration it's better; correct?

5  A    According to this report, correct.

6  Q    And in technology; correct?

7  A    Correct.

8  Q    And in globalization?  It was the only category that it

9  wasn't better; is that right?

10            MR. McDONALD:  Your Honor, I think we're just wasting

11  time just going through and having him read numbers.  I object.

12  It's cumulative.

13            THE COURT:  Overruled.

14  Q    So overall --

15  A    The last question was what?

16  Q    Let's just cut to the chase.  Overall, according to this

17  independent Forrester report, my client offers a better

18  eProcurement product; isn't that right?

19  A    According to that one cross-industry nonspecialized

20  report, yes.

21  Q    Now, when Forrester prepares these reports, they actually

22  go out and they talk to the companies that they're going to

23  conduct the analysis on; isn't that right?

24  A    They talk to the vendors, you mean?

25  Q    Yes.

1    A    Typically, yes.

2    Q    In fact, why don't you turn to page 14.  There you'll see

3    data sources used in this Forrester wave; do you see that?  And

4    there are four bullet points.

5    A    Yes, I see that.

6    Q    And the first one is confirming what you just indicated,

7    was that they do vendor surveys; right?

8    A    Correct.

9    Q    And so they go out, and they survey the vendors on their

10   capabilities as they relate to the evaluation criteria; is that

11   right?

12   A    Correct.

13   Q    So they actually call you up, don't they?

14   A    Correct.

15   Q    And do you know who typically is the interface for Lawson

16   with respect to Forrester?

17   A    Typically it's our product management team.

18   Q    Who would that individual be?

19   A    That individual would be Keith Lohkamp.  You mentioned his

20   name.

21   Q    And Mr. Lohkamp, when he responds to these vendor surveys,

22   he has to actually fill out a form and provide them

23   information; correct?

24   A    Correct.

25   Q    And I'm assuming Mr. Lohkamp tries to be as accurate as

Hager - Cross

1  possible when he provides that information; correct?

2  A    Correct.

3  Q    The second criteria they say is that they also do product

4  demos; do you see that?

5  A    Correct.

6  Q    And so they would actually -- they say they actually ask

7  the vendors to conduct demonstrations of their product

8  functionality.

9  A    Uh-huh.

10  Q    That's consistent with your understanding of how they do

11  these analyses; correct?

12  A    According to the document, yes.

13  Q    And they also ask senior executives responsible for the

14  product to explain their marketing and development strategies;

15  correct?

16  A    According to the document, yes.

17  Q    They, in fact, even can ask -- they do customer reference

18  calls to validate product and vendor qualifications; right?

19  A    Again, according to the document, yes.

20  Q    Do you use this Forrester waive tool as -- wave report as

21  a tool in your competitive analysis?

22  A    Not for eProcurement but for other product lines.

23  Q    What are some of those other product lines?

24  A    Human capital management would be my primary use of the

25  Forrester wave report.

Hager - Cross

1   Q    And that's because that's one your big products.

2   A    It's a far more strategic product line for us, yes.

3   Q    Now, you were asked some questions about the concern about

4   not being able to continue to service or maintain some of your

5   existing clients that have RSS capability; correct?

6   A    Correct.

7   Q    Nobody from any of your customers came here today and

8   testified; right?

9           THE COURT:  Mr. Robertson --

10          MR. ROBERTSON:  I understand.

11  Q    Let me just make this point:  Mr. McDonald indicated that

12  VCU Medical Center was one of your customers for RSS

13  procurement; right?

14  A    Correct.

15  Q    They are right across the street; correct?

16  A    Correct.

17  Q    Nothing prevented you from being able to call one of those

18  people from VCU Medical Center to come in here and indicate

19  that there was going to be serious disruption and serious harm

20  to them if, in fact, Lawson was enjoined from having the

21  procurement configurations found to infringe; correct?

22  A    I have no idea.

23          THE COURT:  He didn't make that decision, I don't

24  think.

25          THE WITNESS:  I don't know the answer to the

Hager - Cross                                                          242

1    question.

2         THE COURT:  Mr. McDonald made that decision.

3    Q    You are aware that Lawson has proffered two declarations

4    in this case from workers that would be considered in the

5    health care industry and that manage licensed hospital systems;

6    correct?

7    A    No --

8         THE COURT:  Do you know about that or not?

9         THE WITNESS:  No, I don't.

10        THE COURT:  He doesn't know about it.

11   Q    Well, are you aware that nobody indicated -- let me

12   rephrase it then.

13        THE COURT:  Yes, because Mr. McDonald is about to

14   stand up, I'm sure, and say something, because if he doesn't

15   even know what you're taking about, it's hard for him to answer

16   a question.

17   Q    Well, isn't it true that replacing Lawson RSS software

18   would essentially just cause an increase in the operational

19   expenses for these types of hospitals?

20   A    It would cause at least an increase in operational

21   expenses in these types of hospitals, and more than likely

22   would also cause employee complications within the hospitals,

23   morale issues of potential loss of jobs, and I think a hospital

24   would say that it would interrupt their quality of care.

25        It wouldn't interrupt a surgery because they would

1    overstock on goods, but ultimately they buy these goods for a

2    reason, and they don't have unlimited storage.  They have to

3    manage their systems well.

4    Q    So if in these declarations these individuals didn't

5    identify those kinds of criteria as causing them harm --

6    A    I don't know who you are talking about.

7           THE COURT:  Look, that was a question better not

8    asked because you should have known that from his previous

9    answers you were not going to improve on what they said in that

10   affidavit anyway.

11          MR. ROBERTSON:  Understood, sir.

12          THE COURT:  Why don't we go on to something else.

13   Q    Did I understand you to say that Lawson does not sell an

14   S3 procurement package or solution as an -- individually to

15   customers?

16   A    We package separately, but we don't pursue those

17   opportunities.

18   Q    Let me hand you what I think has previously been marked

19   Plaintiff's Exhibit 0500LL2.

20          THE CLERK:  What number is this being used?

21          MR. ROBERTSON:  PX-0500LL2.  By the way, Your Honor,

22   before I forget, I would actually move the admission of

23   Plaintiff's Exhibit 690 that I identified.

24          THE COURT:  Any objection?

25          MR. McDONALD:  No, Your Honor.

Hager - Cross                                                                           244

1          THE COURT:  It's admitted.

2          (Plaintiff's Exhibit 690 admitted.)

3    Q    Now, sir, why don't you take a minute to peruse this.  I

4    know it's rather long --

5          THE COURT:  Before or after he goes to the Evelyn

6    Wood course?

7    Q    Let me direct you to -- first of all, this is a response

8    to a request for information on eProcurement; correct?

9    A    Correct.

10         MR. McDONALD:  Objection, lack of foundation for this

11   witness's knowledge.

12         THE COURT:  I think he's going to try to lay a

13   foundation, or I assume he is.

14   Q    And it's from -- it's a response to the State of Michigan;

15   correct?

16   A    Correct.

17   Q    Now, you've -- you have no reason to doubt that this is an

18   authentic Lawson document that was submitted --

19   A    No reason.

20   Q    And if you go to the page that's numbered, I believe, six

21   and has the Bates label that ends 8115, you are actually

22   identified there, sir, aren't you, in about the third full

23   paragraph down?

24   A    Page what?

25   Q    Page six of the document 8115.

Hager - Cross                                                          245

1    A    Correct, I am listed.

2    Q    Now, this is a document that was introducing Lawson to the

3    State of Michigan.  You didn't have this business prior to

4    this; correct?

5    A    State of Michigan has been a long-time customer of

6    Lawson's.

7    Q    You had sold all of their underlying software?

8    A    Their human capital management systems, State of Michigan

9    has been a long-time customer of ours.  Well prior to 2006.

10   Q    Did it buy a procurement solution from you?

11   A    No, never has.

12   Q    And when you made this offer, do you know if -- it was

13   asking in this for your proposal with respect to a state-wide

14   procurement solution, correct, if you look at the page that

15   ends 8110?

16   A    What page number?

17   Q    8110.

18   A    Unless you want me to read through it, I think it's fair

19   to say just from the title that they are looking for a

20   procurement system.

21   Q    And so it is my understanding that you were never able to

22   offer them or succeed in making this sale; is that right?

23   A    To my knowledge, we've never sold procurement to the State

24   of Michigan.

25            THE COURT:  Do you know whether you responded to the

Hager - Cross

1   request for proposal?

2           THE WITNESS:  By the fact that this document is

3   sitting in front of me, somebody obviously authorized it.  The

4   caveat here would be I had mentioned that we typically don't go

5   out and compete for procurement-only business, and this would

6   have been one.  They were already a Lawson customer, already

7   running our system foundation and all of our work flow and all

8   of our business intelligence, so, therefore, the price of entry

9   to go in and potentially expand to another suite, you know,

10  that's how we typically do business.  When I say we don't sell

11  procurement only, I mean we don't go up to new customers and

12  attempt to sell procurement.

13  Q    Isn't it true that Lawson does target supply chain

14  management solutions to mid market customers?

15  A    As well as high end customers.

16  Q    Don't you represent in your SEC filings that, in fact, is

17  your target?

18  A    That what is our target?

19  Q    Mid market customers.

20  A    One of our targets.

21  Q    Why don't we take a look at Defendant's Exhibit 214 if we

22  can.

23          MR. McDONALD:  Your Honor, I think they acknowledge

24  they target mid market and others as well.  I don't think

25  they're going to impeach him with that, and I think it's a

Hager - Cross

1    waste of time if that's what's going on here, so I object.

2              THE COURT:  Do you stipulate that they target mid

3    market?

4              MR. McDONALD:  Is that okay with you, Dean?

5              THE WITNESS:  Mid market is one of the markets that

6    we focus on, yes.

7    Q    Didn't you represent in this -- if you'll accept this

8    representation, that this exhibit, DX-214, represents that this

9    so-called mid market now comprises the vast majority of our

10   customer base?

11   A    Correct, yeah.

12   Q    Then I'll move forward.

13   A    Can I put a caveat on that, or do I have to wait for a

14   question?

15             THE COURT:  Go ahead.

16             THE WITNESS:  Mid market is a general term.  I have

17   to put the caveat on it that not having crisp revenue, you

18   know, at least a company of, say, this million and south of

19   this, so mid market can be used very differently in different

20   documents.  So I agree with how Lawson stated it in here, but

21   in the general marketplace, some people consider to be mid

22   market less than $100 million, so I wouldn't agree with that.

23   Mid market needs to be defined a little bit more I guess is all

24   I'm saying.

25   Q    Do you have an understanding of how Lawson meant to use

Hager - Cross

1    mid market in this document?

2    A    We typically describe mid market as a $250 million

3    organization to a $2.5 billion organization.

4    Q    Let's take a look at PX-282 which is a spreadsheet that

5    was provided -- excuse me, 682.  I misspoke.  Let me hand you

6    what's been marked as Plaintiff's Exhibit 682-A.  Let me

7    represent to you that this was a spreadsheet that Lawson

8    provided with respect to companies that it, in fact, had

9    solicited.  Do any of these companies look familiar to you

10   going through them?

11   A    Yes, they do.

12           MR. McDONALD:  Your Honor, I'd just like to clarify.

13   I think this is a printout from an electronic file, but it's

14   not the whole thing.

15           MR. ROBERTSON:  It's just selected.  Because it's a

16   very large document.

17           MR. McDONALD:  The way he described it --

18           MR. ROBERTSON:  I apologize for that, but it is a

19   subset of a much larger document.

20   Q    So let me take, if I could, ask you to look at page the

21   that includes 8056 through eight -- 8056 -- that's the entire

22   excerpt.  Let's go down to look at number 13 on the list.

23   Count down for me.  Let me identify for you, it's Aaron Rents?

24   A    Okay.

25   Q    And one of the products there is identified as PROC; do

Hager - Cross

1    you see that?

2    A    Yes.

3    Q    That stands for procurement; correct?

4    A    Correct.

5    Q    So this document indicates that Lawson was soliciting that

6    company for procurement; is that right?

7    A    Consulting.  That's what the C-O-N-S-U-L-T stands for,

8    that that specifically was a consulting opportunity.

9    Q    Are you aware that ePlus also competed for this contract?

10   A    No.

11   Q    Let me see if we can have another excerpt, PX-0682-B?

12             THE CLERK:  0682-B?

13             MR. ROBERTSON:  0682-B.

14             THE COURT:  Is that B as in 'bout finished?

15             MR. ROBERTSON:  I'm going to be moving through a

16   little more quickly, Your Honor.

17   Q    The second client opportunity on this page is American

18   Eagle; do you see that?

19   A    Yes.

20   Q    And the letters there include RQSS; do you see that?

21   A    Yes.

22   Q    And ESS; right?

23   A    Yeah, and that stands for employee self service.

24   Q    RQSS is requisition self-service; correct?

25   A    Yes, but it is a free form text entry that the salesperson

1    enters.  That isn't a system report that is generated based off

2    of SAD, for instance.  It's just a free form test.

3    Q    Understood.  Are you aware ePlus competed for that

4    contract as well?

5    A    No.

6    Q    We apparently didn't compete well for it either as we

7    closed and got thrown out of the deal.

8              MR. ROBERTSON:  I'm sorry, Your Honor.  One time you

9    indicated to us that there was a phrase that was called a

10   Payneism.  I've having a brief Payneism.

11             THE COURT:  So get it fixed up.  That's actually,

12   documents are Payneized.

13             MR. McDONALD:  While we're waiting, Your Honor, could

14   you conjugate that verb in its entirety?

15             THE COURT:  I think that's the iteration of all

16   tenses.

17   Q    This is a document that was also produced by Lawson, and

18   it contains the Bates number at the bottom that starts with

19   L0418184-1.  Do you see here there's column labels, EPP and

20   EPPH at the top of this first page?

21   A    Yes.

22   Q    And those are stock-keeping units for Lawson's procurement

23   Punchout product; correct?

24   A    I'm actually not familiar with this report.

25   Q    I'm sorry?

Hager - Cross

1   A    I'm not familiar with this report.  I don't know what

2   those acronyms mean.

3   Q    How about SIP or SIPP, do you know if those are the

4   stock-keeping units for Lawson's requisition self-service?

5   A    No, I'm sorry, I don't.

6   Q    Well, then, I'm not going to have very much questions with

7   respect to that document.

8          THE COURT:  I'm going to return it.

9   Q    With respect to that Forrester report, sir, are you aware

10  that four of those 11 competitors identified in that

11  eProcurement analyst's reports are licensees of ePlus?

12  A    No, I was not aware of that.

13  Q    You'd agree with me that requisition self-service is not a

14  required application for Lawson's procurement functionality;

15  correct?

16  A    Correct.

17  Q    And nor is the procurement Punchout a required element of

18  supply chain management suite; correct?

19  A    Correct.

20  Q    And you'd also agree with me, sir, that procurement

21  Punchout application doesn't drive S3 sales; isn't that right?

22  A    Correct.

23  Q    You'd agree with me, sir, that Lawson would continue to

24  make S3 sales even if it did not offer procurement Punchout;

25  isn't that right?

Hager - Cross

1    A    Correct.

2    Q    And you're not aware of any deals Lawson won because of

3    its procurement Punchout product; isn't that right?

4    A    To my personal knowledge, again, I rarely think of any

5    piece of feature functionality as the thing that won the deal.

6    Usually it's the value of the integrated system.

7    Q    But you were asked that question in your deposition, and

8    you indicated you weren't aware of any; isn't that right?

9    A    For the very reason I just gave you, correct.

10   Q    Are you aware that Lawson provides -- strike that.  Let me

11   start over.  I understand that you indicated in your direct

12   examination that you were involved in the contracting process.

13   A    I am involved in some contracting processes, yes.

14   Q    You are aware that Lawson typically provides an

15   indemnification to its customers for any infringement by its

16   software; isn't that right?

17   A    I'm actually not that familiar with that part of the

18   contract.

19   Q    Well, have you seen some of the contracts, the standard

20   contracts that Lawson uses?

21   A    That language, quite frankly, I typically leave to on our

22   legal team.  Those aren't the parts of the contract that I'm

23   intimately familiar with.

24   Q    I understand that, but I thought I understood you to

25   indicate earlier that on some occasions you even sign the

1    contracts with the customers; isn't that right?

2    A    Correct.

3    Q    Well, let's take a look at one if we can, PX-241.  Now,

4    this is a Lawson product license agreement; correct?

5    A    Correct.

6    Q    And it was with Novant Health; do you see that?

7    A    Yes.

8    Q    Does this look like one of the standard form contracts

9    that Lawson uses?

10   A    It does.

11   Q    And Novant Health is a customer of Lawson; correct?

12   A    Correct.

13   Q    You can turn to page five of the document, specifically

14   paragraph 12.2.  Are you with me?

15   A    I am.

16   Q    This is the provision that Lawson negotiated with its

17   customer in this standard form agreement which states as

18   follows:  If any product becomes or, in Lawson's opinion, is

19   likely to become the subject of a claim -- excuse me, of a suit

20   or claim of infringement of a patent or copyright, Lawson

21   shall, at its option and expense, obtain a right for the client

22   to use the product.  That was sub heading A.  B, replace or

23   modify the product so that it becomes non-infringing, or C,

24   terminate the license for the infringing product.  Do you see

25   that?

1    A    I do.

2    Q    And then it requires the client to cease use of the

3    infringing product and return it to Lawson; is that right?

4    A    If we cancel the license.

5    Q    And it represents here in this agreement you've negotiated

6    with respect to this patent infringement that the customer, the

7    client's sole and exclusive remedy against Lawson other than

8    the indemnification provided under section 12.1, is an amount

9    equal to the license fee paid under this agreement for the

10   infringing product less any cumulative amortization or forward

11   depreciation of that product by the client on its financial

12   statements as the date when Lawson terminates the license for

13   the infringing product; do you see that?

14   A    I do.

15   Q    So you've limited any exposure to yourself for

16   infringement to the amount of the license fee after its been

17   depreciated or amortized; isn't that right?

18   A    I think so.

19   Q    So that would be the harm to Lawson if, in fact, it's

20   enjoined from selling infringing products under this agreement;

21   isn't that right?

22   A    The harm to Lawson, yes.

23   Q    Has Lawson notified its customers that it has been subject

24   to a jury verdict and potential judgment and injunction for

25   these infringing products?

Hager - Cross

1   A    You've actually done a wonderful job of that in that the

2   press release has gone out, and so that is of public record.

3   Q    What I'm asking is, did Lawson notify its customers of

4   that?

5   A    I'm actually not sure if we put out a customer

6   communication on that.

7   Q    Have you represented in your annual report or SEC

8   filings --

9   A    I'm sorry.  We did put out a press release on that as

10  well, so, yeah, we did notify as well.

11  Q    In fact, you didn't make any individual contact, any

12  individual customer and say these products were found to

13  infringe; is that right?

14  A    We've talked to many customers about it.  I've personally

15  talked to many customers about it.

16  Q    Did you make any -- did you have any written communication

17  with them?

18  A    Again, we put out the press release, and that was

19  available to all customers.

20  Q    That's the sole --

21  A    No, I don't know that that's the sole.  I just can't name,

22  because I'm unaware, of what our customer communications team

23  would have done specifically.  Frankly, I'd be surprised if

24  they didn't do some sort of formal communication --

25  Q    So you are speculating --

1    A    I just don't know.

2    Q    You understand that if enjoined, there are a number of

3    other suppliers out there that could provide electronic

4    procurement systems that could be supported by the Lawson

5    platform; correct?

6    A    I know that there are a number of providers of electronic

7    procurement systems that believe they could do that; however,

8    because of our focus specifically on public sector and health

9    care and because of the unique needs there, I think that some

10   of the claims that they can be done are overexaggerated.

11   Q    But it, indeed, has happened on occasion, hasn't it, that

12   someone has provided an electronic procurement software

13   solution on a Lawson platform?

14   A    It has happened on occasion.

15            THE COURT:  Mechanically it can be done.

16            THE WITNESS:  Almost anything mechanically can be

17   done, yes.

18   Q    Now, there's been a lot of publicity in the press lately

19   about an acquisition of Lawson by a company called Infor; is

20   that right?

21   A    Correct.

22            MR. McDONALD:  I object.  I think it's misstating.  I

23   don't think there is an acquisition that's happened here.  I

24   also object to the relevance.

25            THE COURT:  I think he said potential acquisition.

1           MR. ROBERTSON:  That's what I did say.

2           THE COURT:  Is it I-n-f-o-r?

3           MR. ROBERTSON:  I-n-f-o-r; correct.

4    Q    You are aware of that, sir; right?

5    A    I am.

6    Q    Isn't it true that Lawson actually went out and retained

7    Barclays Capital as a financial advisor to explore possible

8    sale of the company; right?

9    A    After the unsolicited offer came in, yes.

10   Q    And that unsolicited offer was in an amount of

11   $1.8 billion; isn't that right?

12   A    I think in round figures.

13   Q    You mentioned Infor before as one of the companies that

14   you were familiar with, I thought, in ERP space?

15   A    Right.

16   Q    You are aware Infor has a procurement solution; correct?

17   A    I'm not tremendously familiar with Infor solutions, but

18   I'm quite certain that they have a procurement solution.

19   Q    So couldn't Infor buy Lawson and not purchase the

20   capability with respect to procurement since it has its own

21   solution and then leave ePlus without any remedy?

22          MR. McDONALD:  Object to the form of that question.

23          THE COURT:  Sustained.

24   Q    There are a number of other companies that were identified

25   as potential purchasers of Lawson; isn't that right?

1    A    In where?

2    Q    Purchasing the Lawson company.

3    A    You said there are a number mentioned.  Where are they

4    mentioned?

5    Q    In the press?

6    A    For 25 years there have been companies --

7              THE COURT:  No, do you know currently of any other

8    companies that have expressed an interest in buying Lawson?

9              THE WITNESS:  There's been no other offer other than

10   what I'm aware of from Infor.

11   Q    You haven't seen any press reports that have indicated SAP

12   and Oracle are also potential buyers of Lawson?

13   A    I read the same press as you, and it's kind of silly, but

14   I read the same press as you, yes.

15   Q    Well, you're taking the Infor acquisition seriously enough

16   to go out and hire Barclays?

17   A    Because there was an actual unsolicited offer made.  We

18   were obligated to.

19   Q    Do you know whether or not that acquisition is going to go

20   through as you sit here today?

21   A    I have no idea.

22             MR. ROBERTSON:  That's all the questions I have, Your

23   Honor.

24             THE COURT:  Any redirect?

25             MR. McDONALD:  Yes, Your Honor.  I'll try to be

1   brief.

2

3                    REDIRECT EXAMINATION

4   BY MR. McDONALD:

5   Q    Mr. Hager, Mr. Robertson asked you about demonstrative

6   Exhibit 1, so I'd like to get that back up on the screen if we

7   could.

8                THE COURT:  What exhibit, sir?

9                MR. McDONALD:  Demonstrative Exhibit 1, Your Honor.

10               THE COURT:  Do you have one of those that I can have

11  before the end of the day?

12               MR. McDONALD:  Sure.

13               THE COURT:  Not now.  Leave one with Ms. Haggard.

14               MR. McDONALD:  Yes, we will.  Thank you.

15  Q    Mr. Hager, I think the questioning went to whether or not

16  the injunction against -- if there was an injunction against

17  maintenance of the RSS and Punchout, whether that would

18  preclude Lawson from also servicing and maintaining the IC, RQ,

19  and PO modules; do you recall that briefly?

20  A    I do, yes.

21  Q    Can you tell me, if there was an injunction that was

22  specific to servicing RSS and Punchout and not those other

23  products, how easy would that be to actually implement in

24  reality?

25  A    Actually, it would be extraordinarily difficult, because

Hager - Redirect

1    the way the call would come in is a customer would simply say,

2    I'm not able to get my requisition done, and they wouldn't know

3    which one of that entire stack from Punchout to RSS to RQ down

4    through the system foundation, they wouldn't know where the

5    issue was and neither would we.

6              THE COURT:  Who is "they"?

7              THE WITNESS:  The customer, and neither would we.  We

8    would have to investigate and try and narrow it down to what

9    module it might be in and ultimately have to try and bail

10   things with really all the modules up there.  It would become

11   difficult to say we can service, you know, this far through the

12   system, but we can't service you the rest of the way through

13   the system because at the beginning of the process, you don't

14   know where the problem is.

15             MR. McDONALD:  Did you have any other questions about

16   that issue, Your Honor?

17             THE COURT:  You can ask them questions about it,

18   couldn't you?

19             THE WITNESS:  You certainly --

20             THE COURT:  Find out where the trouble was, right?

21             THE WITNESS:  You could.

22             THE COURT:  You can say, I can't do that?

23             THE WITNESS:  But the customer doesn't know that it's

24   RSS.

25             THE COURT:  But your person knows.

1           THE WITNESS:  They don't at the beginning.

2           THE COURT:  After you ask the questions, you could

3    find out if it was RSS, for example, couldn't you?

4           THE WITNESS:  We could.

5           THE COURT:  And then you could say to the customer,

6    sorry, we can't do that?

7           THE WITNESS:  We could once we've narrowed it down to

8    RSS.

9           THE COURT:  But you have to go through all that.

10          THE WITNESS:  We would, yes.

11   Q    Would you be able to narrow it down that way while you're

12   still on the phone with the customer in all instances, or

13   sometimes, or what?

14   A    Sometimes it would be while we're on the phone.  Other

15   times it would likely be weeks and potentially months.

16   Q    Why is that?

17   A    Because it's a very complex system.  Sometimes defects,

18   whether they're intermittent or what have you, you have to

19   really dig in there and try to identify what the root cause is.

20   We have many calls in our call center that have been open for

21   months because we haven't been able to identify the location of

22   the issue.  That's pretty common in the software industry.

23          MR. McDONALD:  Any other questions that you have on

24   that, Your Honor?

25   Q    You were asked about the cost increase for your customers

Hager - Redirect

1    that have RSS if they had to make a change; do you recall that?

2    A    Yes.

3    Q    Do you have an estimate as to how much it would cost

4    your -- let's take a hospital, how much money it would actually

5    cost them to make a change or not?

6              MR. ROBERTSON:  Objection, lack of foundation, Your

7    Honor, and I think it's outside the scope of my cross-examine.

8              THE COURT:  I think it's within the scope of your

9    cross-examination.  I don't know whether he -- I think he's

10   asking a foundational question, that is whether he knows or has

11   any basis to know what the cost is.

12             MR. ROBERTSON:  Also, certainly there was no

13   documentation produced in the supplemental period with respect

14   to the cost issue.

15             MR. McDONALD:  But he asked about it, so I thought we

16   should flush that out.  I'll ask the foundational question.

17   Q    Mr. Hager, from your experience, do you have an idea of

18   how much it would cost, for example, a hospital to make that

19   change away from RSS?

20   A    I do have some experience with that, yes.

21   Q    Based on your experience, what would you believe to be the

22   likely cost to a hospital for that change?

23   A    For a hospital, the hospital -- very large hospitals I

24   think would be more expensive than some of the non-hospital RSS

25   customers we have, so if I were to take the simplest

1   implementation of our RSS and pull it out and put something

2   else in, you know, probably the simplest would be three months,

3   but I think on average for our hospitals, I bet you would it

4   probably be closer to nine months because of the complexities

5   of the hospital.

6   Q    You gave me the time.  I was actually asking -- maybe you

7   were thinking of time cost, but I think the question is

8   actually going to the monetary cost.

9   A    Yeah, that's going to run somewhere north of 300,000, 3-

10  to 500,000 probably for that length of time.  Maybe up to

11  750,000 on average.  Some will be greater than a million.

12              THE COURT:  Does it cost that much to put RSS in?

13              THE WITNESS:  Some of our projects -- again, we put

14  RSS in in conjunction with everything else, but it's so tied

15  into the work flow approvals, and our work flow approvals are

16  based off everything that happens in RSS, so pulling RSS out

17  means you are rebuilding all those work flow approvals to go

18  with whatever new tool you are bringing in, and that's really

19  where the complication comes.  I wish it didn't take this long,

20  but it does.

21  Q    And finally, Mr. Robertson asked you about the advantages

22  of selling the full suite, and I want to clarify, if the

23  customer already has an SAP ERP suite, for example, do you have

24  an advantage over ePlus in selling to a customer like that

25  that's looking for eProcurement?

1    A    No.  As a matter of fact, a disadvantage, because our RSS

2    and Punchout won't work with an SAP suite.  We wouldn't even

3    attempt to make that sell.

4    Q    So when is it that Lawson would have actually have some

5    advantage for offering the full suite that Mr. Robertson was

6    asking about?

7              MR. ROBERTSON:  Your Honor, I didn't ask -- I asked

8    him about whether or not having that full suite put my client

9    at a disadvantage.

10             THE COURT:  Sustained.

11   Q    So in that situation then, can you explain what type of

12   customer would be the customer --

13             THE COURT:  What situation?

14   Q    Where Lawson would have that advantage or ePlus would have

15   the disadvantage to Lawson, what specific market situation

16   might that be?

17   A    As was mentioned, when we're selling the entire integrated

18   suite, it's obviously because the customer wants a fully

19   integrated suite, so that would become our competitive

20   advantage.  I should also mention that, you know, our RSS --

21             MR. ROBERTSON:  Objection, Your Honor.  He's

22   responded to the question.

23             THE COURT:  Sustained.

24             THE WITNESS:  Actually, it's a follow-on to the --

25             THE COURT:  No, that's enough.

265

1  Q    If I understand, that's a situation where you are offering

2  a full suite including nonprocurement products?  Did I

3  understand correct?

4  A    Correct.

5  Q    Does ePlus even offer nonprocurement products?

6  A    Not to my knowledge, no.

7        MR. McDONALD:  No further questions.  Thank you.

8        THE COURT:  Thank you very much.  You may step down,

9  sir.

10       MR. ROBERTSON:  Your Honor, if I might address one

11  issue.  I just want to make sure that with the conclusion of

12  this testimony now and the submission that we've exchanged,

13  that this closes the evidentiary record.

14       THE COURT:  The record on the injunction is closed.

15  Now --

16       MR. McDONALD:  Just to clarify, Your Honor, there are

17  some exhibits that we put into these disclosures.  We'd like

18  the option of referring to some of the other documents that

19  have been -- that involve these customers, for example.  We

20  didn't want to bog down the testimony today with these

21  witnesses who may not have had personal knowledge.

22       There were certain things we were trying to get in

23  the testimony.  I think maybe Mr. Robertson meant to include

24  the documents from our disclosures as part of the record, but

25  for live testimony, I think we agreed they were closed.

 1          MR. ROBERTSON:  I agree with that.  I also agree I

 2    don't want to see any further declarations submitted in the

 3    case going forward.  So we have exchanged this documentation,

 4    and I'm in agreement with Mr. McDonald on it.

 5          THE COURT:  Are the documents that you handed to me

 6    in these notebooks part of the record?  Is that what you are

 7    agreeing to?

 8          MR. ROBERTSON:  I will just raise one other issue,

 9    Your Honor.

10          THE COURT:  No.  Answer that question first.  The

11    notes books you all have given me, are you agreeing that's part

12    of the record as to which is now closed?

13          MR. McDONALD:  I don't think we gave every document,

14    just the ones we expected to use with the witnesses.  I would

15    agree everything in the disclosures wouldn't exceed that

16    record.  We don't plan on doing more declarations.  We may not

17    need everything given to Your Honor here.  I think we're going

18    to try to narrow down as we brief it next week.

19          THE COURT:  There are very few things admitted into

20    the record here, and I don't want all this stuff over here to

21    have to worry with and go through and review and be considered

22    part of the record.  I only want what it is that I've heard,

23    that I've taken into evidence as part of the record.  You all

24    can put that record together, but that doesn't include

25    everything that's been put in these notebooks and handed up

1   here for potential use.

2          MR. ROBERTSON:  I understand.

3          THE COURT:  Nor does it include everything that you

4   have given to each other that I don't even know about, so the

5   record, as far as I'm concerned, is what you've testified to,

6   what's been admitted into evidence here.

7          MR. McDONALD:  We're seeking -- we have declarations

8   that we've disclosed to them they're aware of and we would like

9   to make part of the record.  We would submit those together

10  with our briefs, and I think we'd probably try to work together

11  to come up with any other exhibits, documentary evidence.

12  There is also, I think, some testimony from trial or

13  depositions that we both --

14         THE COURT:  Testimony from trial is clearly

15  considerable.

16         MR. McDONALD:  So that's the additional materials

17  that haven't been part --

18         THE COURT:  Deposition testimony isn't in just

19  because it was deposed.  If it was used at the trial, it can

20  be.

21         MR. McDONALD:  But I think we're both reserving the

22  right that we wanted to use, and we submit it with our briefs

23  so it's part of the record --

24         THE COURT:  That's what I'm telling you, is that you

25  may have reserved anything.  That's not what we've got.  What

1    we have as a record is what's been testified to, what's been

2    admitted to, and you say -- do both of you want these

3    declarations?  Have both of you offered declarations and you

4    want the declarations in?  Is that what you are saying?

5           MR. McDONALD:  Both sides have provided declarations,

6    and my understanding is we would both be submitting them with

7    the papers.  I know we would like to submit our declarations

8    with the briefing.

9           THE COURT:  Are both of you in agreement that the

10   declarations that have been -- they haven't been filed with the

11   Court, have they?

12          MR. ROBERTSON:  I think we did include them in the

13   annotated notebooks that were given --

14          MS. STOLL-DeBELL:  They are up in your books.

15          THE COURT:  I understand that the declarations are --

16   the things that are annotated notebooks that are up here

17   haven't been admitted.  They haven't been referred to, they

18   haven't been testified to.  They are not part of the record

19   unless you all agree to make them part of the record.

20          MR. ROBERTSON:  I think we can reach agreement with

21   the exception of -- they could be part of the record with the

22   exception of one thing.  We also have, Your Honor, the

23   re-examination submissions in all the cases which we think,

24   again, are inconsistent with the Court's ruling and are

25   irrelevant to these injunction proceedings, and you also have a

1   declaration from a law partner of Mr. McDonald with respect to

2   those re-examinations, and we think submitting a law partner

3   declaration as evidence from the counsel for the defendant is

4   improper.

5          We're moving to provide a very short brief motion to

6   strike both that declaration and the re-exam documents from the

7   record.  That's where we don't have agreement.

8          MR. McDONALD:  Well, I think we do agree then, Your

9   Honor, that all the declarations and the materials you have up

10  there that we've submitted to you, we'd like to make that part

11  of the record.  I hear no objection to that other than the

12  re-examination related materials.

13         On the re-exam, there certainly is case law that

14  indicates that the re-exams of a patent are directly relevant

15  to the Court's consideration of a permanent injunction, and I

16  guess they can file their motion on that.  Mr. Kalinsky's

17  declaration was identifying the documents from the re-exams and

18  trying to explain those as well as provide statistics from the

19  Patent Office.  I don't think he was offering any opinions --

20         THE COURT:  I'm not going to hear anything from your

21  law partner as a substantive witness in the case.

22         MR. McDONALD:  It's his name, rank, and serial number

23  related to the documents.  It's probably not necessary to look

24  at the documents themselves, but certainly there's extensive

25  case law where the re-exam, including, I believe, the eBay®

1  case on remand that find that the re-exam -- status of the

2  patents on re-exam is very relevant --

3  THE COURT:  That might be, but I'll have to deal with

4  it when you submit it.  I don't know what -- I assume that you

5  will identify what it is from these documents and these

6  notebooks that you've put up here are the re-examination

7  documents that are not part of the record.

8  MR. ROBERTSON:  We'll be addressing that as part of

9  the motion.

10  THE COURT:  You better tell me what they are.  You

11  moved to strike, so I know what they are.  Otherwise, it's

12  what's been admitted today and what's submitted in these

13  notebooks that were pre-filed.

14  THE CLERK:  Were all these documents -- he didn't

15  move to introduce but a couple.  Are all the others in just

16  because we used them?

17  THE COURT:  You moved 241, for example.

18  MR. ROBERTSON:  Your Honor, I would move to introduce

19  all the documents that I identified today.  If I didn't do --

20  THE COURT:  Some of them you just identified for

21  impeachment.

22  MR. ROBERTSON:  I understand that.

23  THE COURT:  What documents are you moving to

24  introduce so we can understand what those are?

25  MR. ROBERTSON:  I will need to compile a list because

1    I wasn't doing it as I went along, Your Honor.  I apologize.  I

2    was operating under the assumption we had during the trial, is

3    we had not filed objections to either side's exhibits, and I

4    thought we basically had agreement --

5              THE COURT:  The procedure we used during the trial

6    was that we knew what exhibits we were talking about and they

7    were in the record, but now we don't.

8              MR. ROBERTSON:  I can get together with Mr. McDonald,

9    and we can sort that all out --

10             THE COURT:  All right.

11             MR. ROBERTSON:  -- in short order.  The only other

12   issue I raise, Your Honor --

13             THE COURT:  Can you raise those blinds.

14             MR. ROBERTSON:  The only other issues I've raised,

15   and I've discussed this with Mr. McDonald, is given, say, the

16   extent of the record here, both from the trial, from this

17   evidentiary hearing now, we would like to ask the Court if we

18   could have additional pages for briefing.

19             You had asked for findings of fact and conclusions of

20   law, and we'd like to do that and present that to the Court,

21   and we'd also like to be able to file a brief in support of

22   those findings of facts and conclusions of law if that's

23   acceptable to the Court.  We were, during the recess, we were

24   trying to work out an agreement on the pages.  We think we can

25   do that.

1          THE COURT:  On what?  What does the limit apply to?

2          MR. McDONALD:  Pardon?

3          THE COURT:  What does the proposed limit that you're

4     talking about apply to?

5          MR. McDONALD:  It would be the motions that are being

6     briefed next week, the motion on the injunction and our

7     opposition to that.

8          THE COURT:  I mean the findings of fact and

9     conclusions of law or the briefs or what is what I was trying

10    to ask.

11         MR. McDONALD:  We were a little unclear whether you

12    wanted them in one document or two.  I think what we're

13    thinking is the briefing we can probably get by with five extra

14    pages total for each side if we can separately do the findings

15    of fact and conclusions of law in a separate document, and then

16    for that document, I think we try to keep it no longer than the

17    brief, and it won't be shorter than the brief.

18         THE COURT:  What pages do you want?

19         MR. ROBERTSON:  I would was suggesting, I felt we

20    could have 40 pages for the findings of fact and conclusions of

21    law and 30 for the brief in support.

22         MR. McDONALD:  What's the normal?  I think we wanted

23    a few more.

24         MR. ROBERTSON:  I think it's 30, but with the fact

25    we're having a separate document that's got findings of fact

1    and conclusions of law, I thought we could live with the

2    standard rule.

3             MR. McDONALD:  I can live with that if we could have

4    40 pages for the findings of fact and conclusions of law.

5             THE COURT:  And 30 pages for the brief.

6             MR. McDONALD:  Just the normal.

7             MR. ROBERTSON:  And normal limits on replies and

8    responses.

9             THE COURT:  All right.

10            MR. ROBERTSON:  All right, thank you.

11            THE COURT:  That's fine.  Now, I have a question, Mr.

12   Robertson.  Given that the defendant is saying that the

13   injunction would be very harmful to public entities -- whether

14   they've proved it or not is a different issue -- and medical

15   facilities, it occurs to me that I need to understand very well

16   what the scope of the injunction is that you're talking about,

17   and an injunction against future sales is one thing.  Against

18   servicing is another.  I, frankly, don't see that the record at

19   this stage shows any arm to Lawson from an injunction itself.

20   The harm that's been referred to is the harm to the customers.

21            MR. ROBERTSON:  Yes, Your Honor.

22            THE COURT:  Now, if there really is such harm, it

23   occurs to me that the remedy envisioned by the Court, by the

24   statute may be frustrated because of the nature of the client

25   base here.  I've never heard of that, but it then occurs to me

1    whether it's appropriate to ask whether you have any basis for

2    proving damages in the form of a reasonable royalty that is

3    different than what I have already ruled on and whether I need

4    to have that issue resurrected and tried by a jury.  If all

5    you've got to show a reasonable royalty is what you've already

6    offered, then I don't know that there's any point in persuing

7    the issue.

8             MR. ROBERTSON:  We did make the offer of proof, Your

9    Honor, and we think on the basis of that offer of proof, a

10   jury --

11            THE COURT:  What offer of proof?

12            MR. ROBERTSON:  We made an offer of proof with

13   respect to the damages, the evidence with respect to damages we

14   thought we could present that would permit a reasonable jury to

15   find past damages in this case.

16            THE COURT:  You are talking about the one that I've

17   ruled on?

18            MR. ROBERTSON:  No.

19            THE COURT:  The one that was argued and --

20            MR. ROBERTSON:  No, Your Honor.  You may recall

21   shortly before the close of evidence, and I'm not really sure

22   on the timing on this, we made a submission to the Court, an

23   offer of proof, and the Court --

24            THE COURT:  It was never ruled on, was it?

25            MR. ROBERTSON:  No, it was not.  I think there was a

1    motion filed --

2              THE COURT:  It's pending.  It is a motion that has

3    never been ruled on as I understand it.

4              MR. ROBERTSON:  I think that's correct, Your Honor.

5              THE COURT:  Because they opposed the motion, the

6    making of it; right?

7              MR. ROBERTSON:  I do think -- I think, quite frankly,

8    Your Honor, as the rule is written, we have the right to make

9    an offer of proof as a matter of right.

10             THE COURT:  But I'm not -- that's not what I'm asking

11   you.  Whatever you think the rule is, you'll have to deal with

12   that.  I'm just asking the procedural posture is that you said

13   you wanted to make an offer of proof.  They said they opposed

14   it.  I said, well, make a motion and show me what the rule is

15   and what your rights are, and they filed a brief in response

16   after you did that, and nobody has ever returned to it.  It has

17   never been dealt with as far as I know.  Am I wrong?  I'm

18   right, Mr. Merritt says.

19             MR. ROBERTSON:  I understand there's no ruling from

20   the Court, but I believe it was fully briefed.  Maybe I'm just

21   confused what Your Honor is saying.

22             THE COURT:  I'm saying it hasn't been decided.

23             MR. ROBERTSON:  That's correct.

24             THE COURT:  I think it's ripe for decision.  It just

25   hasn't been decided.

1            MR. ROBERTSON:  I understand.  Now, Your Honor,

2     though, asked me -- the preliminary question was, is there some

3     additional evidence --

4            THE COURT:  I haven't read that issue because you all

5     didn't bring it up for me to decide.  It was in the course of

6     reflecting on this matter last evening while exercising that it

7     came to me that there was this issue I hadn't even looked at

8     which, I guess, is a reason not to exercise.

9            MR. ROBERTSON:  If you are asking me --

10           THE COURT:  But I need to rule on it, and then it

11    occurred to me, what is it that is in that offer of proof that

12    may be different than what I ruled on in the striking of the

13    opinion of -- what's his name?

14           MR. ROBERTSON:  Dr. Mangum.

15           THE COURT:  Which I have decided and issued an

16    opinion about.

17           MR. ROBERTSON:  I understand.  Mr. Strapp would be

18    the better individual to address the specifics because I have

19    not looked at it in some time.  Mr. Strapp was responsible for

20    preparing that document with Mr. Merritt, so could I defer to

21    my partner?

22           THE COURT:  Sure.

23           MR. STRAPP:  Your Honor, the offer of proof we

24    submitted wasn't concerned with Dr. Mangum's expert opinion.

25           THE COURT:  What was it?

1          MR. STRAPP:  Instead, it was an explanation of what
2     we would have presented at trial had we been permitted to go
3     forward with the damages case, even absent expert testimony.
4     So we explained how through fact witnesses we would have
5     presented sufficient evidence such that the jury could have
6     determined a reasonable royalty that would be sufficient to
7     compensate ePlus for past damages.  So the offer of proof was
8     confined to past damages.  It wasn't looking forward.
9          THE COURT:  I understand that.
10          MR. STRAPP:  That was the evidence that we presented
11     in the context of this offer of proof.  And so we explained the
12     documents that would have come in --
13          THE COURT:  Generally what did you say?
14          MR. STRAPP:  Generally what we said is that --
15          THE COURT:  This is all apart from Dr. Mangum.
16          MR. STRAPP:  Correct.  Generally what we said is, the
17     same framework the *Georgia-Pacific* analysis and *Georgia-Pacific*
18     factors that are typically used in understanding what a
19     hypothetical negotiation would have resulted in, those factors
20     could have been addressed through documentary evidence as well
21     as through testimony of fact witnesses such as Mr. Farber.
22          He could have talked about negotiation to other
23     licenses for similar technology.  He could have talked about,
24     for example, the importance of the patented technology to ePlus
25     and its software products, and we could have addressed

1   information, for example, about the importance of the

2   technology to Lawson and its products through Lawson's fact

3   witnesses.

4          So what we dis is we walked through every single one

5   of the factors, talked about the kind of evidence, the

6   documents, the witnesses that would have testified about each

7   of those factors and then summed it all up to come up with what

8   the jury could have found through that information for a

9   reasonable royalty.

10          THE COURT:  Aren't there cases that say you don't

11   need an expert to testify about damages --

12          MR. STRAPP:  I don't have any cases at my fingertips,

13   but I know that the statute itself says that an expert may

14   testify, but the language of the statute is such that it's

15   clear that expert is not required to testify in order that a

16   party be awarded the damages.  The damages --

17          THE COURT:  What is that.

18          MR. STRAPP:  I think it's 35 U.S.C. 156.  It might be

19   154, but I have to check.  Sorry.  Is it 276 or 274?  I think

20   it's 35 U.S.C. 274.

21          MR. ROBERTSON:  Your Honor, the *Dow Chemical* case

22   which you looked at the cite before was a case that held expert

23   testimony was not necessary.

24          MR. STRAPP:  That's correct.  That was a Federal

25   Circuit case, *Dow Chemical*.  I don't have the cite, and the

1   statute, which I was wrong on on both accounts, is 35 U.S.C.

2   284, and in that statute, it says, the last paragraph, the

3   third paragraph of the statute says, quote, the Court may

4   receive expert testimony as an aid to the determination of

5   damages or of what royalty would be reasonable under the

6   circumstances.

7          So, clearly, the language may receive suggests that

8   it's not necessary to receive expert testimony in order -- in

9   the first paragraph, it says, in order to find that the award

10  that shall be awarded to the plaintiff should have prevailed of

11  reasonable royalty damages or no less than reasonable royalty

12  damages.  So we had an extensive offer of proof, perhaps 60,

13  70 pages where we went through each factors, talked about the

14  documents, the witnesses, and at the end concluded the jury

15  would have sufficient information should we have been permitted

16  to present that evidence to come to an award even absent Dr.

17  Mangum testifying, and that's the subject of it.

18          THE COURT:  But at one point this topic came up, and

19  I ruled that you couldn't offer -- that you couldn't put that

20  alternate evidence in, and I don't remember now where that

21  occurred.

22          MR. STRAPP:  That occurred in August in the pretrial

23  proceedings.

24          THE COURT:  Was it in the final pretrial conference?

25          MR. STRAPP:  I think it was right before the pretrial

1    conference.  The pretrial conference was in September, and a

2    month before the pretrial conference there was a hearing on

3    whether or not we should be permitted to go forward with the

4    damages case even absent Dr. Mangum, because you had already

5    ruled that he couldn't testify, and you may recall that Mr.

6    Merritt argued that motion, and the finding from the Court was

7    under Rule 37 there was a discovery sanction because the Court

8    found that we hadn't sufficiently disclosed a royalty

9    calculation outside of Dr. Mangum's report, and since you had

10   excluded Dr. Mangum, there wasn't enough for us to go forward

11   with at trial to prove damages, and what this offer of proof

12   essentially was attempting to show was there was enough

13   evidence in the record to go forward even though we didn't have

14   Dr. Mangum testify.

15          THE COURT:  Did your offer of proof also explain

16   where in your Rule 26 disclosures -- I'm now remembering -- or

17   the interrogatory answer that answers on the topic that you

18   actually provided what was in the -- it's one thing for

19   something to be in the record, but you have to identify it.

20   Did your offer of proof do that, too?

21          MR. STRAPP:  The offer of proof didn't address that

22   issue because that issue has been addressed in our briefing,

23   and that issue was fully briefed and argued, so there wasn't

24   anything to add to that record in the offer of proof.  That had

25   already been decided by Your Honor.

1              MR. ROBERTSON:  If I might just address that, Your

2     Honor, the issue came down to that we had fully disclosed our

3     theory which was a reasonable royalty.  We had fully disclosed

4     what we thought the royalty base would be based on information

5     that had been provided to us to Lawson.

6              To be fair, there was a dispute about -- we didn't

7     reach agreement on what the royalty base was, but it had been

8     disclosed, and Your Honor ruled that because the only evidence

9     we had of what the appropriate royalty rate would be came from

10     Dr. Mangum's report, and that was stricken, we couldn't move

11     forward with our damages.

12              THE COURT:  Royalty base, not the rate.

13              MR. ROBERTSON:  No, it was the royalty rate, Your

14     Honor, because Dr. Mangum --

15              THE COURT:  The base was suspect, too.  The base was

16     -- in the opinion that I wrote striking Mangum report showed

17     how the base was not --

18              MR. ROBERTSON:  That's not accurate, Your Honor.  I

19     think you're talking about Dr. Mangum's calculation as to going

20     forward as to respect certain calculations based on the prior

21     Ariba and SAP licenses and whether or not they could translate

22     into --

23              THE COURT:  What are you calling the base?

24              MR. ROBERTSON:  The royalty base are the revenues

25     associated with the infringing products.  What you do is you

 1    take the revenues associated with the infringing products and

 2    multiply times the royalty rate, and that's the damages.

 3            THE COURT:  It was the base against which he

 4    applied -- which he used to come up with a rate that I was

 5    talking about, and you're talking about what their sales were;

 6    is that right?

 7            MR. ROBERTSON:  He used as the revenue base --

 8            THE COURT:  Just answer that question.  You say base.

 9    You're taking about sales.

10            MR. ROBERTSON:  I'm talking about their sales

11    associated with all the infringing acts, the maintenance, the

12    service, and selling of the licenses themselves.

13            THE COURT:  Whatever --

14            MR. ROBERTSON:  Whatever it was.  So Your Honor found

15    during the course of that hearing that we had adequately

16    disclosed the royalty base.  There obviously was a dispute

17    between the parties as to whether our royalty base was correct

18    or their version --

19            THE COURT:  That's not unusual.

20            MR. ROBERTSON:  And Your Honor ruled that because we

21    had not disclosed a royalty rate, we could not establish

22    damages and suggested at the time we should have been looking

23    at comparable licenses, and, in fact, we did look at comparable

24    licenses which the offer of proofs makes clear, and we didn't

25    find any to go out there such that we could come forward with

1    examples of a royalty rate to be applied to that base.

2         Quite candidly, Your Honor, we don't think that is

3    required under the law.  We think that those *Georgia-Pacific*

4    factors are there in order to determine a reasonable royalty

5    rate, and based on testimony, as Mr. Strapp has represented, we

6    felt we could elicit testimony from which a reasonable jury

7    could have relied upon and come up with a damages figure for

8    past damages.

9         THE COURT:  Was there briefing on the alternate mode

10   of proof that preceded the decision in August?  There was,

11   wasn't there, Mr. Strapp?

12        MR. STRAPP:  The briefing in August was -- it wasn't

13   on alternate modes of calculation.  The briefing was whether we

14   had sufficiently disclosed, in addition to Dr. Mangum's report,

15   our reasonable royalty theory.

16        THE COURT:  That's the alternate mode of proof.  You

17   don't have to just disclose your theory.  You have to disclose

18   what your damages amounts are and what your explanation for it

19   is, and they, if I remember correctly, had posited an

20   interrogatory which called upon you to provide, in essence,

21   what is -- what are all of the bases upon which you are seeking

22   damages, and you answered -- I may be mischaracterizing it, and

23   I'm trying to set the stage, but I think basically your answer

24   was, this is all coming from Dr. Mangum so hold your horses and

25   you'll get that when his report comes.

1            MR. STRAPP:  We actually did address in our briefing

2     back in August and in July all of the evidence.  Or I shouldn't

3     say all of the evidence, a good portion of the evidence that

4     was later identified in this offer of proof that we would have

5     come forward with at trial.

6            THE COURT:  Get me, please, docket numbers of the

7     cases -- of the entries you are talking about.

8            MR. STRAPP:  Sure.

9            THE COURT:  I can get the offer of proof.  I want you

10    to go back and do the others.  I can find the others.

11           MR. STRAPP:  As to the interrogatory issue, that was

12    addressed, that was the subject of briefing, whether or not we

13    had sufficiently disclosed in a response to a particular

14    interrogatory our theory of damages in some fashion beyond just

15    referring back to the Dr. Mangum report, and that was part of

16    the reason that Your Honor decided under Rule 37 to preclude us

17    from presenting the damages case, because Your Honor found that

18    that interrogatory wasn't sufficiently detailed besides

19    referring back to Dr. Mangum's report, but what we had

20    addressed in this brief was that there was a wealth of evidence

21    in addition to that one interrogatory response which Lawson was

22    focused on that had been disclosed in other interrogatory

23    responses, in depositions, in document exchanges and the like.

24           THE COURT:  You're going to identify all the docket

25    numbers so I can review that stuff.  All right.

1          MR. McDONALD:  Your Honor, may I just make one or two

2    points about that issue?

3          THE COURT:  I'm concerned that your theory on what

4    prompted my thinking -- I'm just going to go back and look at

5    it all now, but what prompted me to revisit the issue was the

6    assessment -- was your argument that an injunction is so

7    injurious to the public interest because of your client base

8    that, in essence, they are left without a functional remedy,

9    and I don't know that that's correct, but it prompted my

10   thinking, and it made me realize that maybe I need to look at

11   this whole issue again, and I'm going to.

12         MR. McDONALD:  With respect to a royalty, it's

13   certainly our belief that you can, as an alternative to an

14   injunction, enter a going-forward royalty, and the *Toyota v.*

15   *Pace* case does stand for the proposition that that's not a jury

16   issue when you're talking about post-verdict --

17         THE COURT:  And I think Mr. Robertson agrees that

18   it's not a jury issue.

19         MR. McDONALD:  Okay.

20         THE COURT:  But going -- but reasonable royalty as a

21   damage is a fact issue which would have to be tried to a jury.

22         MR. McDONALD:  No, I don't think so.  I don't think

23   the --

24         THE COURT:  I mean backwards.

25         MR. McDONALD:  Right.  If that was going to be

1    revisited and going retrospectively.

2          THE COURT:  It would have to be tried to a jury

3    unless you both agreed to waive a jury, and it would be a

4    separate jury from the one who heard the case which is not at

5    all unusual when we bifurcate liability and damages.

6          MR. McDONALD:  But that issue, the difficulty of the

7    injunction is only relevant to damages going forward.  I don't

8    think that gives any reason to disturb the Court's finding as

9    to the past damages in the case.  They were sanctioned under

10   Rule 37, and whether there's an injunction in 2011 that can be

11   fashioned or whether that's the right relief is a totally

12   separate issue from that past damages that would have been a

13   jury issue.  There's a couple other aspects of that that make

14   it a different analysis as well --

15         THE COURT:  Yes, it's an entirely different analysis.

16   All I'm doing is explaining to you why it came to my mind that

17   this issue about a reasonable royalty in the past might need to

18   be looked at again.  I'm not saying that the analytical

19   framework is the same.  I didn't mean to suggest that.

20         MR. McDONALD:  Okay.  Well, I just wanted to bring

21   that up, because I wasn't sure how worthwhile it was really

22   going to be to look at all that evidence from the last -- the

23   damages for the trial to the jury because it really is going to

24   be a different analysis going forward, and I think you can take

25   evidence anew at this point.

1            I don't think we're saying your prior rulings

2     precluding the evidence for the jury finding of damages somehow

3     precludes either party from bringing in evidence for the Court

4     to decide a going-forward royalty as an alternative to the

5     injunction.  I just want to be clear about that because I think

6     you might be looking at information that's yesterday's news if

7     you start going back through that old record.

8            THE COURT:  I understand that, but I think I need to

9     look at it, because having begun to rethink -- to think about

10    the issue again, I think I need to look at it.

11           Now, they don't say they don't want any royalty going

12    forward, but suppose I say pursuant to your argument that

13    there's to be no injunction, shouldn't I go on then and just

14    convene a hearing on the royalty going forward, or should I tee

15    it up and let them fish or cut bait and say whether they want

16    it or not, or should I just go on and schedule the hearing now

17    on that issue and decide it all at once?

18           MR. McDONALD:  I think that's within your discretion.

19    What comes to mind is one case I read, and I can't remember

20    which one it is, I'm sorry, where the Court indicated -- they

21    asked the plaintiff that question before the Court decided the

22    injunction, and she said, well, now that I've denied it, I'm

23    going to give you a chance to make your record now, and, you

24    know, I know they don't want to ask for the number because it

25    will make it sound like they don't want the injunction, and we

1    don't have to play the cat and mouse --

2           THE COURT:  From your standpoint, would it make more

3    sense to get this case ready for its next trip to the court to

4    decide going-forward royalty right away and schedule a hearing

5    on it?  What needs to be done in respect of that issue?

6           MR. McDONALD:  I think some discovery, maybe even

7    some expert testimony would be appropriate, and it's going to

8    take some time, so if you want to get that rolling and have us

9    start to do some series of expert reports so we can brief it or

10   something, I think that makes sense.

11          THE COURT:  I think first that each of you ought to

12   have an opportunity to discuss the going-forward royalty issue

13   with your clients and tell me what position you want to take

14   with respect to how you want me to deal with it, if at all, and

15   then having been informed by you all about it, I'll just decide

16   what to do.

17          So I will give you an opportunity to talk with your

18   clients, and you can call -- let me know, excuse me, at the

19   injunction hearing which is set for April 4th.

20          MR. McDONALD:  Thank you, Your Honor.

21          MR. ROBERTSON:  I just want to address one brief

22   issue, Your Honor.  I think when the Court looks at briefing,

23   it's going to see --

24          THE COURT:  Which briefing?

25          MR. ROBERTSON:  Injunction briefing, that the harm

1    here to the public interest has been greatly exaggerated.  What

2    we have in the record are two declarations from two hospital

3    workers who essentially say that this is basically a monetary

4    inconvenience and would be, you know, disruptive, but nobody

5    says -- the Court, I think, explored during examination its

6    questions of the witness that, you know, the sky is going to

7    fall here, and so that's all we have with respect to that other

8    than attorney argument.

9              And there are other ways to handle this, Your Honor.

10             THE COURT:  You have Mr. Hager's testimony.

11             MR. ROBERTSON:  And he was basically addressing,

12   first of all, the money that might be involved, and there are

13   indemnifications provisions that Lawson has.  It's chosen to

14   build its business upon a foundation of infringement.  It can't

15   turn around and say, we shouldn't be enjoined now because we've

16   been too effective infringers, and the case law says that as

17   well.  But there are options for Your Honor, one of which is

18   what's been phrased the sunset provision which means the

19   injunction could enter, but the Court could say it's not going

20   to be effective with perhaps the hospitals for 90 days,

21   something along those lines such that they can, with as minimal

22   disruption as possible, replace the infringing software.

23             THE COURT:  Yes, I understand.

24             MR. ROBERTSON:  So we'll be addressing that in the

25   briefing as well.  Thank you.

1          MR. McDONALD:  Your Honor, I'm not sure where we're

2     at.  I've been asked to point out, in my self interest as well,

3     we have a 7:20 flight.  Is it something that's going to end

4     soon, or do you want us --

5          THE COURT:  Goodbye.  I'm thinking about a slight

6     moving of the date of the hearing because of the length of what

7     you all have done on this one, but I won't do it, so go catch

8     your plane.

9          MR. McDONALD:  Thank you, Your Honor.

10          THE COURT:  All right.

11

12               (End of proceedings.)

13

14

15          We certify that the foregoing is a correct transcript

16     from the record of proceedings in the above-entitled matter.

17

18

19     _____/s/_____              _____
        P. E. Peterson, RPR                Date
20

21

22     _____/s/_____              _____
        Diane J. Daffron, RPR              Date
23

24

25