## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | | |
|---|---|---|
| ePLUS INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:09-CV-620 (REP) |
| | ) | |
| v. | ) | |
| | ) | |
| LAWSON SOFTWARE, INC., | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF ePLUS INC.'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION
## FOR A STAY OF ANY PERMANENT INJUNCTION

Craig T. Merritt (VSB #20281)
Henry I. Willett, III (VSB #44655)
**CHRISTIAN & BARTON, LLP**
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
Telephone: (804) 697-4100

Scott L. Robertson (admitted *pro hac vice*)
Jennifer A. Albert (admitted *pro hac vice*)
David M. Young (VSB #35997)
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4000

Michael G. Strapp (admitted *pro hac vice*)
**GOODWIN PROCTER LLP**
Exchange Place
53 State Street
Boston, MA 02109-2881
Telephone:  (617) 570-1000

*Counsel for Plaintiff ePlus Inc.*

# TABLE OF CONTENTS

Page

I.      INTRODUCTION .............................................................................................1

II.     LEGAL STANDARD........................................................................................1

III.    ARGUMENT ....................................................................................................2

        A.      Defendant Has Failed To Demonstrate A Substantial Case On The Merits, Let
                Alone Show A Strong Likelihood Of Success On Appeal. ....................................2

                1.      The Non-Final Reexamination Proceedings Do Not Indicate That
                        Defendant Is Likely To Succeed On Appeal ..................................................4

                2.      It is Not Substantially Likely That the Court's Denial of
                        Defendant's Summary Judgment of Alleged Indefiniteness Will be
                        Reversed...........................................................................................................6

                3.      Defendant Has Not Made A Strong Showing That It Is Likely To
                        Succeed In Proving That Its Punchout Product Does Not Infringe ............9

                4.      Defendant Has Not Made Any Showing That It Is Likely To
                        Succeed In Proving That Its Service And Maintenance Of The
                        Infringing Systems Are Not Infringing Acts ...............................................13

        B.      Defendant Has Failed To Show That Any Of The Harm Factors Favors A Stay..15

                1.      Defendant's Own Inaction Demonstrates That There Is No Real
                        Potential For Significant Harm To Its Customers......................................16

                2.      Defendant Has Not Made A Compelling Showing That It Faces
                        Irreversible And Immeasurable Harm .......................................................20

                3.      The Issuance Of A Stay Would Substantially Injure *e*Plus .....................22

                4.      The Public Interest Does Not Lie In Favor Of Delaying Injunctive
                        Relief.............................................................................................................27

IV.     DEFENDANT MUST POST A BOND IF THE COURT STAYS THE PERMANENT
        INJUNCTION....................................................................................................28

V.      CONCLUSION..................................................................................................30

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Acumed LLC v. Stryker Corp.*,
   551 F.3d 1323 (Fed. Cir. 2008) ........................................................................... 25

*Arthrocare Corp. v. Smith & Nephew, Inc.*,
   315 F. Supp.2d 615 (D. Del. 2004), *vacated in part on other grounds*,
   406 F.3d 1363 (Fed. Cir. 2005) ............................................................................. 5

*Automotive Parts*,
   337-TA-557 (July 5, 2007) ................................................................................... 29

*Bendix Commercial Vehicle Sys., LLC v. Haldex Brake Prods. Corp.*,
   2011 WL 14372 (N.D. Ohio Jan. 3, 2011) ...................................................... 24, 25

*Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*,
   106 F. Supp.2d 696 (D.N.J. 2000) ....................................................................... 25

*Centillion Data Sys., LLC v. Qwest Comm's Int'l, Inc.*,
   631 F.3d. 1279 (Fed. Cir. 2011) .......................................................................... 10

*Certain Integrated Repeaters, Switches, Transceivers, and Products Containing the Same*,
   337-TA-435 (July 19, 2001) ................................................................................. 29

*Continental Can Co. USA v. Monsanto Co.*,
   948 F.2d 1264 (Fed. Cir. 1991) ........................................................................... 23

*Continental Paper Bag Co. v. Eastern Paper Bag Co.*,
   210 U.S. 405 (1908) ............................................................................................. 23

*Dow Chem. Co. v. Nova. Chems. Corp.*,
   2010 U.S. Dist. LEXIS 77099 (D. Del. July 30, 2010) .......................................... 2

*E.I. DuPont De Nemours & Co. v. Phillips Petroleum Co.*,
   659 F. Supp. 92 (D. Del. 1987) .............................................................................. 6

*E.I. DuPont De Nemours & Co. v. Phillips Petroleum Co.*,
   835 F.2d 277 (Fed. Cir. 1987) ............................................................................... 6

*EcoLab Inc. v. Envirochem, Inc.*,
   2000 WL 1062087 (Fed. Cir. July 21, 2000) .................................................. 29, 30

*Endress + Hauser, Inc. v. Hawk Measurement Sys. Pty. Ltd.*,
   932 F. Supp. 1147 (S.D. Ind. 1996) ....................................................................... 4

*Enzo Biochem, Inc. v. Applera Corp.*,
   599 F.3d 1325 (Fed. Cir. 2010) ............................................................................. 8

*Fantasy Sports Props., Inc. v. Sportsline.com, Inc.*,
   287 F.3d 1108 (Fed. Cir. 2002) ........................................................................... 11

*Finisar Corp. v. DirecTV Group, Inc.*,
   523 F.3d 1323 (Fed. Cir. 2008) ............................................................................. 8

*Finjan, Inc. v. Secure Computing Corp.*,
   626 F.3d 1197 (Fed. Cir. 2010) ........................................................................ 11

*Flex-Foot, Inc. v. CRP, Inc.*,
   238 F.3d 1362 (Fed. Cir. 2001) ........................................................................ 26

*Fonar Corp. v. Gen. Elec. Co.*,
   107 F.3d 1543 (Fed. Cir. 1997) ................................................................. 14, 15

*GTE Prods. Corp. v. Kennametal, Inc.*,
   772 F. Supp. 907 (W.D.Va. 1991) *appeal dismissed without opinion*,
   988 F.2d 131 (Fed. Cir. 1993) ......................................................................... 29

*Halliburton Energy Serv., Inc. v. M-I LLC*,
   514 F.3d 1244 (Fed. Cir. 2008) .......................................................................... 8

*Hilgraeve Corp. v. Symantec Corp.*,
   265 F.3d 1336 (Fed. Cir. 2001) ........................................................................ 11

*Hilton v. Braunskill*,
   481 U.S. 770 (1987) .................................................................................... 2, 22

*i4i Ltd. P'ship v. Microsoft Corp.*,
   598 F.3d 831 (Fed. Cir. 2010), *cert. granted on other grounds*,
   131 S. Ct. 647 (2010) .......................................................................... 16, 20, 26

*In re Mahurkar Patent Lit.*,
   831 F. Supp. 1354 (N.D. Ill. 1993), *aff'd*, 71 F.3d 1573 (Fed. Cir. 1995) ............................... 23

*Jacobsen v. Katzer*,
   535 F.3d 1373 (Fed.Cir.2008) ......................................................................... 26

*Lisle Corp. v. A.J. Mfg. Co.*,
   2004 WL 765872 (N.D. Ill. Apr. 7, 2004) ............................................................ 27

*Magnesystems, Inc. v. Nikken, Inc.*,
   1994 WL 808421 (C.D. Cal. Aug. 8, 1994) ....................................................... 5, 27

*NTP, Inc. v. Research in Motion, Ltd.*,
   418 F.3d 1282 (Fed. Cir. 2005) ........................................................................ 10

*Odetics, Inc. v. Storage Tech. Corp.*,
   14 F. Supp.2d 785 (E.D. Va. 1998); *aff'd*, 185 F.3d 1259 (Fed. Cir. 1999) ............... 2, 4, 14, 29

*Sanofi-Synthelabo* v. *Apotex, Inc.*,
   470 F.3d 1368 (Fed. Cir. 2006) ........................................................................ 27

*Smith Int'l, Inc. v. Hughes Tool Co.*,
   718 F.2d 1573 (Fed. Cir. 1983) ........................................................................ 26

*Standard Havens Prods., Inc. v. Gencor Indus., Inc.*,
   897 F.2d 511 (Fed. Cir. 1990) ........................................................................... 6

*Standard Havens Prods., Inc. v. Gencor Indus., Inc.*,
   No. 93-1208, 1993 U.S. App. LEXIS 11963 (Fed. Cir. May 21, 1993) ....................................... 6

*Streck, Inc. v. Research & Diagnostic Sys., Inc.*,
   2011 WL 144930 (Fed. Cir. Jan. 18, 2011) ........................................................................ 2, 15

*SynQor, Inc. v. Artesyn Techs., Inc.*,
   2011 WL 238645 (E.D. Tex. Jan. 24, 2011)........................................................................ 26

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
   503 F.3d 1295 (Fed. Cir. 2007) ........................................................................................ 16

*Windsurfing Int'l, Inc. v. AMF, Inc.*,
   782 F.2d 995 (Fed.Cir.1986) ............................................................................................ 20

**Statutes**

35 U.S.C. § 154............................................................................................................................. 23

35 U.S.C. § 271........................................................................................................................ 10, 11

**Rules**

Fed. R. Civ. P. 30(b)(6)................................................................................................................. 27

Fed. R. Civ. P. 62.................................................................................................................... 28, 30

iv

## I.      INTRODUCTION

The Court should enter a permanent injunction against Defendant's ongoing infringement of ePlus's patents.  The permanent injunction, once entered, should not be stayed pending appeal for at least the following reasons.  First, Defendant has made no showing that it is likely to succeed on the merits of its appeal.  To the contrary, each of the arguments Defendant intends to raise on appeal have been considered and rejected on several occasions by both the Court and the jury.  Second, Defendant has made no showing that it will be irreparably injured absent a stay of the injunction.  In lieu of any actual showing of irreparable injury, Defendant instead conjures uncorroborated speculation about potential harm that it and its customers might suffer if both the Court and the jury were wrong and Defendant prevails on appeal.  Third, the harm to ePlus from a stay would be concrete and real; every day Defendant is permitted to continue to license, maintain and service its infringing products ePlus suffers irreparable injury.  Defendant's now willful conduct deprives *e*Plus of a range of licensing and partnering opportunities, including the opportunity to license its software to customers of Defendant's infringing software, negotiate licenses to the patents-in-suit from a level playing field and exclude others from trespassing on its property.  Fourth, the public interest favors a denial of Defendant's Motion.  Courts have consistently held that there is a substantial public interest in enforcing valid patents.  On the other hand, the public interest would be disserved if the Court sanctioned the ongoing tortious conduct of an adjudicated infringer.

## II.      LEGAL STANDARD

The Supreme Court has set forth four factors for courts to consider when deciding whether to stay a permanent injunction pending appeal:

> (1) whether the stay applicant has made a strong showing that it is
> likely to succeed on the merits;

(2) whether the applicant will be irreparably injured absent a stay;

(3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and

(4) where the public interest lies.

*Hilton v. Braunskill*, 481 U.S. 770, 776 (1987).

"To obtain a stay, pending appeal, a movant must establish a strong likelihood of success on the merits or, failing that, nonetheless demonstrate a substantial case on the merits provided that the harm factors militate in its favor." *Streck, Inc. v. Research & Diagnostic Sys., Inc.*, 2011 WL 144930, at *1 (Fed. Cir. Jan. 18, 2011). "[T]he stronger a showing the stay movant can make on its likelihood of success on the merits, the less compelling the showing must be with respect to the other three factors. Conversely, if the stay movant can show only a 'substantial legal question,' then it can obtain a stay only if it prevails on the other three stay factors." *Odetics, Inc. v. Storage Tech. Corp.*, 14 F. Supp.2d 785, 798 (E.D. Va. 1998) (citing *Standard Haven Prods., Inc. v. Gencor Indus., Inc.*, 897 F.2d 511, 513 (Fed. Cir. 1990)), *aff'd*, 185 F.3d 1259 (Fed. Cir. 1999).[1] Thus, "the strength of a movant's showing on [the likelihood of success] prong affects the burden it must carry with respect to the other three factors." *Odetics*, 14 F. Supp.2d at 798.

## III.   ARGUMENT

### A.   Defendant Has Failed To Demonstrate A Substantial Case On The Merits, Let Alone Show A Strong Likelihood Of Success On Appeal.

Defendant has not established a strong likelihood of success on the merits or even shown that it has a substantial case on the merits. Two independent sources, this Court and the jury,

---

[1] Defendant incorrectly relied upon *Dow Chem. Co. v. Nova. Chems. Corp.*, , 2010 U.S. Dist. LEXIS 77099, at *3, n.1 (D. Del. July 30, 2010) for the principle that "'substantial issues for appeal' is a proper basis to stay an injunction." Def. Br. at 5. While the *Dow* court stated that it "would likely grant" defendant's motion to stay an injunction, it did not note any basis for such a finding. *Id.*

have now thoroughly considered and rejected each and every one of Defendant's arguments that it now contends will be successful on appeal.  First, Defendant moved for summary judgment on several issues with respect to non-infringement and invalidity of the patents-in-suit.  *See* Dkt. Nos. 240, 316.  This Court denied Defendant's motions in their entirety.  *See* Dkt. Nos. 356-57. Second, Defendant later moved this Court during trial for judgment as a matter of law on these same non-infringement and invalidity issues.  *See* Dkt. Nos. 574-75, 587-88.  Tellingly, the Court not only rejected Defendant's motions, but also described Defendant's arguments as strikingly weak.  *See* Dkt. No. 602.  Addressing Defendant's non-infringement case, the Court proclaimed, "***I would clearly find that there is infringement of everything that Dr. Weaver said, that each system infringed each claim for the reasons he stated.  There isn't any question that I would do that. . . . I personally am having real trouble deciding why there's any defense to infringement at all.***"  Trial Tr. at 2849:8-19.  And as for Defendant's invalidity defenses, the Court noted, "***If I were deciding the case, I would find that there is no clear and convincing evidence to prove any component of [in]validity…. If, as I expect, the jury returns a verdict in favor of ePlus on these issues, then I won't have to deal with the JMOL.***"  *Id.* at 3007:1-10. Third, Defendant argued its non-infringement and invalidity theories before a jury during a three-week trial in which both parties called several fact and expert witnesses.  The jury returned a unanimous verdict that Defendant infringed five claims of the '683 and the '172 Patents and that all three of the ePlus patents-in-suit were valid.  *See* Dkt. No. 600.

Defendant has availed itself of countless opportunities to litigate its non-infringement and invalidity arguments.  Each time, it failed to succeed on the merits.  Defendant now argues that in spite of the extensive record, briefing, and testimony, this Court and the jury were wrong and that it is likely to succeed on appeal by reciting the same arguments that the Court and the jury

have already repeatedly rejected.  Of course, "*mere recitation of arguments previously made and rejected . . . is not nearly enough to persuade us that [Defendant] is likely to succeed on appeal.  To the contrary, the fact that we have already reconsidered and stood by our decision several times leads us to conclude that the appeal is quite unlikely to succeed on appeal.*"  *Endress + Hauser, Inc. v. Hawk Measurement Sys. Pty. Ltd.*, 932 F. Supp. 1147, 1149 (S.D. Ind. 1996) (emphasis original).  Because Defendant has failed to meet the threshold showing "that its appeal raises at least a 'substantial legal question[],'" *see Odetics*, 14 F. Supp.2d at 798 (quoting *E.I. DuPont de Nemours & Co. v. Phillips Petroleum Co.*, 835 F.2d 277, 278 (Fed. Cir. 1987)), this Court should deny Defendant's Stay Motion.

### 1.   The Non-Final Reexamination Proceedings Do Not Indicate That Defendant Is Likely To Succeed On Appeal

This Court has thus far rejected each attempt by Defendant to distract the parties and the Court from the merits of the litigation by pointing to irrelevant and non-final reexamination proceedings.[2]  And, notwithstanding Defendant's bluster, the fact remains that patent litigation before an Article III U.S. District Court judge and the reexamination of valid patents before administrative employees at the PTO are two entirely different proceedings, with different rules of claim construction, different burdens of proof, and different evidentiary practices.[3]  Here, Defendant has availed itself of at least three opportunities (summary judgment, judgment as a

---

[2] The Court denied Defendant's motion to stay the litigation pending the reexaminations.  Dkt. No. 197.  Later, the Court denied Defendant's motion *in limine* to exclude arguments or evidence inconsistent with the reexaminations, (*see* Dkt. No. 362), and granted ePlus's motion *in limine* to exclude argument or testimony relating to the reexaminations, (*see* Dkt. No. 375).  Indeed, this Court has repeatedly acknowledged that the ongoing, non-final reexamination proceedings have little, if any, relevance to this litigation.  Dkt. No. 375.

[3] ePlus has articulated why the reexamination proceedings are not relevant to this litigation in its Brief In Support of Motion to Strike Attorney Declaration of Robert A. Kalinsky, Esq. and Other Evidence or Argument Relating to Non-Final Reexaminations of the Patents-in-Suit.  Dkt. Nos. 638-39.

matter of law, and trial) to fully and fairly litigate its invalidity defense, yet this Court and the jury have rejected the merits of its arguments each time.  Moreover, in a prior litigation involving the same patents-in-suit, the jury also determined ePlus's patents to be valid.  *See* PX534 (*ePlus, Inc. v. Ariba, Inc.* Special Verdict Form) at ePlus0449208-11.  Thus, there is no reason to think that Defendant's invalidity arguments are likely to succeed on appeal, and the fact that the ongoing, non-final reexamination proceedings create the ***mere potential*** for invalidity does not change that fact.

Were this Court to entertain Defendant's specious argument that the reexamination proceedings "provide compelling objective proof that the patents are invalid," (*see* Def. Br. at 7), it would effectively render the enormously expensive trial an exercise in futility.  There would have been no reason for the parties, the jury and the Court to have spent tremendous time and resources in litigating this case when the ultimate decision on the merits would depend not on the Court or the jury, but instead on interim, satellite, administrative proceedings at the PTO.  The judicial system must not become a pawn of – or, worse yet, held hostage to – the administrative reexamination proceeding.  *See Magnesystems, Inc. v. Nikken, Inc.*, 1994 WL 808421, at *7 (C.D. Cal. Aug. 8, 1994) ("This Court recognizes the possibility that the PTO may grant Nikken's request for reexamination, and, upon reexamination, may even find patent '711 invalid.  Nevertheless, this Court may not abdicate its responsibility to adjudicate this matter to the PTO.  This Court has determined that patent '711 is valid and that Nikken has infringed patent '711.  Consequently, Magnesystems is entitled to immediate relief."); *see also Arthrocare Corp. v. Smith & Nephew, Inc.*, 315 F. Supp.2d 615, 620 (D. Del. 2004) ("In light of these differences [between litigation and reexamination], the court is not persuaded that the ongoing reexamination proceeding triggers a stay of the injunction.  A jury has decided the validity of the

5

patents in suit after careful deliberation following a nine day jury trial.  This court reviewed the jury's verdict pursuant to post-trial motions and found that the jury based its decision on substantial evidence.  Thus, the court has no reason to believe that Smith & Nephew will be successful on its appeal such that the court presently should issue a stay."), *vacated in part on other grounds*, 406 F.3d 1363 (Fed. Cir. 2005).[4]

### 2. It is Not Substantially Likely That the Court's Denial of Defendant's Summary Judgment of Alleged Indefiniteness Will be Reversed

Rearguing its failed motion for summary judgment of invalidity, (*see* Dkt. No. 240-1 at 24-26), Defendant contends that claim 1 of the '172 Patent and claim 3 of the '683 Patent are indefinite because the Court's construction of the "means for processing the requisition to generate purchase orders," as recited in claim 1 of the '172 Patent, and the "means for processing the requisition to generate one or more purchase orders for the selected matching items," as recited in claim 3 of the '683 Patent, purportedly fail to recite an algorithm corresponding to the claimed functions.  Def. Br. at 10-11.

---

[4] Defendant relies on *E.I. DuPont De Nemours & Co. v. Phillips Petroleum Co.*, 835 F.2d 277 (Fed. Cir. 1987)  and *Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 897 F.2d 511 (Fed. Cir. 1990)  for the proposition that an injunction should be stayed pending appeal if a reexamination proceeding is ongoing, but these decades-old cases are distinguishable.  In *E.I. DuPont*, validity issues were not adjudicated before both a court and a jury.  *See E.I. DuPont De Nemours & Co. v. Phillips Petroleum Co.*, 659 F. Supp. 92, 93 (D. Del. 1987) (non-jury trial on validity issues).  In *Standard Havens*, the Federal Circuit based its holding on the fact that the Deputy Assistant Commissioner of Patents and Trademarks, *sua sponte*, ordered the reexamination.  *See Standard Havens*, 897 F.2d at 514, n.2.  It is noteworthy that Defendant does not provide the necessary context for the portion of the *Standard Havens* case it cites, and instead misleadingly suggests that the argument made by the applicant for the stay in *Standard Havens* was the actual holding of the Federal Circuit.  *See* Def. Br. at 6 (omitting bold, italicized language in following quote from *Standard Havens***:** "***Gencor argues that*** . . . the mere existence of conflicting views on validity as between a court and the Patent and Trademark Office supports [the movant's] contention there exists an important legal question regarding validity."  *Standard Havens*, 897 F.2d at 514.  It is also noteworthy that Defendant cites to and relies upon the **nonprecedential** opinion, *Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, No. 93-1208, 1993 U.S. App. LEXIS 11963, at *2 (Fed. Cir. May 21, 1993); *see* Def. Br. at 6.

Defendant's premise is plainly incorrect.  The Court found the corresponding structure (*i.e.*, the algorithm) described in the specification for performing the purchase order generation function of claim 3 of the '683 Patent to be "a purchase order generation module operating on a computer system having access to the requisition; and its equivalents."  Dkt. No. 204 at 47.  The Court relied upon the descriptions of various embodiments set forth in the '683 Patent at Col. 1:37-59; Col. 3:3-24; Col. 10:43-54; Col. 15:20-59; FIGS. 1-3 and requisition/purchasing system 40 which, in one embodiment, is used in connection with the process for generating purchase orders from requisitions.  *Id.*[5]

As Dr. Weaver testified, a person of ordinary skill in the art would understand that the Court's constructions relate to a computer program module, (*i.e.*, a purchase order generation program module), specially programmed to perform the function of generating one or more purchase orders from the data in the requisition according to the processes described in the sections of the specification relied upon by the Court.  A person of ordinary skill in the art would further understand, based upon a review of the sections of the specification cited by the Court, that the first step for generating purchase orders from a requisition is that the system "accepts" the requisition.  *See* '683 Patent, Col. 15:20-26 ("Once a requisition has been… accepted… it can be converted to one or more purchase orders, …").  The next step in the process is that the purchase order generation module generates purchase orders based on predetermined rules such as one purchase order to each distinct supplier referenced in the requisition.  *See* '683 Patent,

---

[5] With respect to claim 1 of the '172 Patent, the Court found that the specification described the structure corresponding to the claimed function as a "purchase order generation module operating on a computer system having access to the requisition, and its equivalents."  *Id.* at 51. The Court relied upon the description in the patent specification set forth in the '172 Patent at Col. 1:42-55; Col. 3:23-28; Col. 10:53-55; Col. 15: 39-61; FIGS. 1-3 and requisition/purchasing system 40.  *Id.*

Col. 10:48-64; *see also* Dkt. No. 311 at Ex. 30 (July 1, 2010 Declaration of Alfred C. Weaver,

Ph.D. in Opposition to Defendant's Motion for Summary Judgment ("Weaver Dec.")), ¶¶ 33-36.

       Contrary to Defendant's contentions, the Court's constructions of the "means for

generating [one or more] purchase orders" claim terms do not "render the claims purely

functional as a mater of law," (Def. Br. at 10), but rather are fully consistent with the

requirement that that the corresponding structure of the term specify an algorithm for performing

the function programmed in a special-purpose computer to the satisfaction of a person of

ordinary skill in the art.  *See Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1340 (Fed.

Cir. 2008); *see also Halliburton Energy Serv., Inc. v. M-I LLC*, 514 F.3d 1244, 1255 (Fed. Cir.

2008) (when a claim limitation is defined in functional terms, a determination of whether the

limitation is sufficiently definite is "highly dependent on context (*e.g.*, the disclosure in the

specification and the knowledge of a person of ordinary skill in the relevant area)."); Weaver

Dec., ¶¶ 30-36.

       Because the purchase order generation claim terms are capable of construction and have

been construed by the Court, and there is unrebutted testimony from Dr. Weaver that a person of

ordinary skill in the art would understand when the claim terms, as construed, are satisfied, the

claim terms are not invalid as indefinite.  *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325

(Fed. Cir. 2010) (reversing summary judgment of indefiniteness finding that if a person of

ordinary skill in the art would understand the metes and bounds of the claim, it is sufficiently

definite); *Trading Techs. Int'l, Inc. v. eSpeed, Inc.,* 595 F.3d 1340, 1358 (Fed. Cir. 2010) ("Only

claims 'not amenable to construction' or 'insolubly ambiguous' are indefinite.") (citing

*Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005)).[6]  The Court

construed the claims and there is unrebutted testimony that a person of ordinary skill in the art

would understand the metes and bounds of the claim as construed, thus, the claim terms are not

"insolubly ambiguous."  Defendant is not likely to succeed on appeal with its contentions that the

claim terms are indefinite.

### 3.    Defendant Has Not Made A Strong Showing That It Is Likely To Succeed In Proving That Its Punchout Product Does Not Infringe

Defendant is not likely to prevail on appeal with respect to its argument that *e*Plus did not

prove infringement of system configurations that include Punchout.  At trial, the Court denied

Defendant's motion for judgment as a matter of law of non-infringement, and even commented

that if it were the finder of fact it would find that infringement was proven under the facts

presented.  Trial Tr. 2849:8-19.

Defendant's contention that *e*Plus was required to, but could not prove, joint

infringement, lends no weight to its arguments.  First, the jury verdict form asked the jury to

determine whether Defendant infringed, either directly *or* indirectly.  Dkt. No. 600 ("Do you find

that *e*Plus has proven that it is more likely than not that the following accused configurations …

have infringed the listed claims … either directly or indirectly?").[7]  This question was presented

to the jurors in precisely the form requested by Defendant and thus Defendant has waived any

objection to the form of this verdict question.  *See* Dkt. Nos. 534, 584.  Accordingly, under the

---

[6] Although Defendant listed indefiniteness as a triable issue in the Amended Final Pretrial Order
(Dkt. No. 480, Defendant's Triable Issues for the Court at ¶ 7), it failed to put on any evidence
on this issue at trial.  Thus, Dr. Weaver's testimony in response to Defendant's motion for
summary judgment relating to the definiteness of these claim terms stands unrebutted.

[7] Joint infringement is simply one form of ***direct*** infringement, a principle with which Defendant
agrees.  Trial Tr. 1366:24-25 (Lawson counsel stating "Joint infringement is direct
infringement.").

9

evidence and the verdict form, the jury could have found Defendant liable **either** for committing direct infringement **or** for inducing or contributing to direct infringement by another.

Indirect infringement was proven because, *inter alia,* Defendant's customers commit direct infringement (without regard to the doctrine of joint infringement) through their use of the infringing configurations and Defendant induces and contributes to that infringing use.[8]  As was set forth in detail in *e*Plus's motion for judgment as a matter of law with respect to infringement, the infringing system configurations used by the customers contain all of the elements of the asserted claims.  *See* Dkt. No. 582 at 4–10.

Further, the evidence at trial was overwhelming that Defendant induces the customer's use/direct infringement through, *e.g.,* providing instruction, advertising and encouraging infringing uses, and by installing, implementing, maintaining, training, and providing other related services that aid and abet the customers' infringing acts.  *See id.* at 10, 15-19.  Indeed, Defendant's post-trial submissions are virtual admissions of inducement, as its customers now claim that they cannot continue to use the infringing systems without Defendant's continued provision of, *e.g.,* upgrades, services, and support.  Johnson Dec., ¶¶ 6-10 ("**We would not be able to run RSS without ongoing maintenance**.") (emphasis added); Reasoner Dec., ¶¶ 10-13 ("Lawson provides us with **unlimited support, product updates, bug fixes, and product upgrades**.") (emphasis added).  On this basis alone, the Federal Circuit will likely affirm the

---

[8] *See* 35 U.S.C. § 271(a) (identifying "use" as an act of infringement); *Centillion Data Sys., LLC v. Qwest Comm's Int'l, Inc.,* 631 F.3d 1279, 1285 (Fed. Cir. 2011) (use of infringing system was proven where defendant's customer put the system as a whole into service by creating and transmitting a query, regardless of whether another party possessed element of system; "but for the customer's actions, the entire system would never have been put into service.  This is sufficient control over the system under *NTP,* and the customer clearly benefits from this function."); *NTP, Inc. v. Research in Motion, Ltd.,* 418 F.3d 1282, 1316-17 (Fed. Cir. 2005) ("use" is defined broadly as "the right to put into service any invention").

infringement verdict in this case based on indirect infringement, without even needing to reach Defendant's "joint infringement" arguments presented with its stay motion.

Second, there was sufficient evidence to show that Defendant also directly infringed the claims, regardless of whether the doctrine of joint infringement is invoked.  Again, the infringing system configurations contain all the elements of the infringed ePlus patent claims.  *See* Dkt. No. 582 at 4–10.  Defendant makes, uses, sells, and offers to sell the infringing system configurations, all of which are acts of infringement.  35 U.S.C. § 271(a).  To the extent other parties sometimes perform one of the steps of the three infringed method claims, the evidence was abundant that Defendant directs and controls the performance of those steps, which satisfies the requirements of a "joint infringement" contention under Section 271(a).  Dkt. No. 582 at 12-13.[9]  Thus, to the extent the joint infringement doctrine is implicated at all, it was proven.

Moreover, two of the infringed claims, claim 3 of the '683 Patent and claim 1 of the '172 Patent, are apparatus claims.  Whether a party other than Defendant "performs" an element of those claims is immaterial.  All that is necessary is that the infringing system configurations are reasonably capable of satisfying the claim elements, even though they may also be capable of operating in a way that does not infringe.  *See, e.g., Finjan, Inc. v. Secure Computing Corp.,* 626 F.3d 1197 (Fed. Cir. 2010; *Fantasy Sports Props., Inc. v. Sportsline.com, Inc.*, 287 F.3d 1108, 1118-19 (Fed. Cir. 2002); *Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336, 1343 (Fed. Cir. 2001).  Whether a configuration may be used in a manner that does not infringe the patent is not a defense if it is also reasonably capable of a use that infringes the patent.  *Hilgraeve,* 265 F.3d at

---

[9] Among other things, *e*Plus's expert Dr. Weaver testified, without objection, that Defendant directed and controlled the Punchout process, and moreover that Defendant established the technical requirements, performed configuration and testing, and customers remained connected to the Lawson RSS application throughout the Punchout process, all pursuant to contractual agreements.  Dkt. No. 582 at 12-13.

1343.  At a minimum, Defendant sells, offers to sell and implements the infringing system

configurations.  Thus, again, infringement was proven.

Third, although *e*Plus need not have relied on a theory of joint infringement, *e*Plus did

not waive the contention as Defendant now asserts.  The jury was instructed as to direct

infringement, and joint infringement is simply a form of direct infringement.  As set forth above,

*e*Plus put on substantial evidence from which the jury could find that Defendant directed and

controlled any performance of the method steps by others, which is all that is necessary to show

infringement under the joint infringement doctrine.

Defendant's citation of a selected portion of trial transcript egregiously omits substantial

portions in which *e*Plus repeatedly and emphatically stated that joint infringement existed under

the facts of this case; thus, joint infringement was a theory of infringement that was presented in

the alternative and a basis upon which the infringement verdict may stand.  Indeed, Defendant

omits entirely *e*Plus's arguments on this point.  *See* Trial Tr. 1369:25 – 1370:3 (*e*Plus's counsel

stating:  "Do you want me [to] give you a scenario in the facts of this case in which it could be

occurring, I'm happy to do so."); 1372:14-1375:15 (detailed explanation of joint infringement

under facts of case, including, at 1373:20-24, "and we think if there were ever a situation that

joint infringement applied through a factual scenario, ***it is this case.  This case is the poster child***

***for joint infringement*** because of the relationship that Defendant has with its punchout trading

partners.") (emphasis added); 1379:12-15 ("My argument, Your Honor, was whether it's direct

infringement just by Lawson committing all the steps or having the system, or whether it's joint

infringement, we win either way.").  Accordingly, to the extent the appellate court would need to

reach the doctrine of joint infringement at all, *e*Plus did not waive the contention.

**4.** **Defendant Has Not Made Any Showing That It Is Likely To Succeed In Proving That Its Service And Maintenance Of The Infringing Systems Are Not Infringing Acts**

Defendant suggests that it is likely to show on appeal that maintenance and support services performed for customers of its infringing software products are not acts of infringement. According to Defendant, "[b]ecause pre-existing customers have the right to use their RSS and Punchout products, it is not an act of infringement to assist them in such use." Def. Br. at 14. Defendant's argument is illogical and appears to be based on its strained application of inapposite case law.

Defendant's contention that it may continue to perform maintenance and support services for "pre-existing" customers is undermined by its concession that implementation and maintenance of infringing systems for its new customers is properly within the scope of a permanent injunction. *Id.* at 14 (indicating that injunction could properly enjoin installation, implementation and maintenance of infringing systems for new customers). There is simply no reason why Defendant's infringing acts of implementation and maintenance become non-infringing acts if performed for customers who purchased the infringing systems prior to the jury's verdict in this case. An act of infringement is an act of infringement regardless of whether Defendant's customers are pre-existing customers or new customers.

Additionally, Defendant's argument that it will likely demonstrate on appeal that implementation, maintenance and other services are not infringing acts is at loggerheads with its argument that its customers and the public will be harmed if an injunction is not stayed. On the one hand, Defendant suggests that the scope of injunction should not reach acts of installation, implementation, maintenance and other related services. On the other hand, Defendant argues that an injunction should be stayed because an injunction against such services will harm its customers and is not in the public interest. If the proper scope of an injunction, according to

13

Defendant, does not include provision of such services to its pre-existing customers, then Defendant should not be heard to argue that absent a stay, its customers and the public interest would be harmed.

Defendant's contention that the Court's ruling precluding ePlus from seeking damages somehow "abrogates ePlus's rights to exclude" infringing acts of implementation, maintenance and support services fares no better. *Id.* at 17. Defendant relies on *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259 (Fed. Cir. 1999) and *Fonar Corp. v. Gen. Elec. Co.*, 107 F.3d 1543 (Fed. Cir. 1997) for the novel proposition that "ePlus has no rights with respect to those previously-sold products, and cannot enjoin Lawson's service or maintenance of them." Def. Br. at 17. But this argument is also illogical, and neither *Odetics* nor *Fonar* stand for the novel proposition for which Defendant cites them.

In *Odetics,* the Federal Circuit held that under the equitable principle of laches, a patentee who had inexcusably failed to timely exercise its right to exclude, had, in effect, "authorize[d] the public to infringe — to 'make, use, offer to sell, or sell' a patented invention during the laches period." 185 F.3d at 1273. The Federal Circuit explained that if it permitted a patentee who was barred by laches from recovering damages for infringement to nevertheless enjoin the use of a product sold during the time when the patentee had slept on its right to exclude, perverse incentives would creep into the patent system, "encourage[ing] patentees to adopt a strategy of ambush rather than providing fair notice." *Id.*

Unlike *Odetics,* in this case there was no equitable ruling of laches; indeed the Court's decision excluding *e*Plus from seeking damages was a discovery ruling, not a decision based on equitable principles. More importantly, *e*Plus has never authorized Defendant, nor any other member of the public, to infringe its patents. To the contrary, for seven years *e*Plus has pursued

patent infringement actions against six corporations.  The Federal Circuit's decision in *Odetics* — based on the equitable principle of laches — has no application here.

The Federal Circuit's decision in *Fonar* is also inapposite.  First, the *Fonar* decision does not address injunctive relief at all, let alone a motion to stay a permanent injunction.  Second, the Federal Circuit's pronouncement in *Fonar* that servicing an infringing machine was "not infringement" is limited to the facts of that case.  107 F.3d at 1555.  Here, as set forth above, there is no dispute that implementation, maintenance and support services are inherently acts of infringement; indeed, Defendant does not even contend that implementation and maintenance of infringing systems for new customers would properly be within the scope of a permanent injunction.  Just like implementation and maintenance of new infringing systems is an act of infringement that should be enjoined, implementation and maintenance of "pre-existing" systems is infringement and must also be enjoined.  Defendant has not shown that there is a likelihood it will prevail on appeal in proving that service and maintenance are not acts of infringement.

### B.  Defendant Has Failed To Show That Any Of The Harm Factors Favors A Stay

As discussed above, Defendant has not established a strong likelihood of success on the merits or even shown that it has a substantial case on the merits.  The inquiry should end there.

Even were this Court to find that Defendant has made the threshold showing of a substantial case on the merits (and it has not), Defendant still would not be entitled to a stay because it cannot prevail on any of the harm factors, much less all three.  *See Odetics*, 14 F. Supp.2d at 800 ("[B]ecause STK only raised a substantial legal question but did not make a strong showing of likelihood of success on appeal, it was required to prevail on the latter three stay factors.  And because it was not able to do so, issuance of a stay is not warranted in these circumstances."); *see also Streck*, 2011 WL 144930, at *1 ("To obtain a stay, pending appeal, a

15

movant must establish a strong likelihood of success on the merits or, failing that, nonetheless demonstrate a substantial case on the merits provided that the harm factors militate in its favor."). Defendant has not shown that absent a stay its customers will be substantially injured or that Defendant itself will be irreparably injured. Defendant has also failed to demonstrate that the public interest favors a stay of the injunction. On the other hand, it is clear that ePlus will be substantially injured if a stay is granted.

### 1. Defendant's Own Inaction Demonstrates That There Is No Real Potential For Significant Harm To Its Customers

In support of its motion for a stay, Defendant contends that its customers will be harmed by the injunction.[10] Defendant presents this argument both with respect to (i) maintaining and supporting existing systems of its current customers, and (ii) "customers in process" who have merely selected Defendant (but not yet implemented the system), and (iii) even those customers who have merely identified Defendant on a "short list" of prospective providers for e-procurement software. Defendant's own inaction, however, demonstrates that these concerns are wholly manufactured. Its request for a stay is an act of pure self-interest.

If Defendant truly believed there is a possibility its customers face the prospect of substantial harm, surely, it would have taken steps to notify them of this fact and advise them to take steps to mitigate potential harm. Yet Defendant has provided no such notice to these customers, **even after the jury verdict**, to warn them that an injunction may be upcoming, or recommend steps to mitigate the drastic harms that Defendant now claims will occur. *See* Dkt.

---

[10] Defendant improperly relies on *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295 (Fed. Cir. 2007), and *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 863 (Fed. Cir. 2010). *See* Def. Br. at 17-18. *Verizon* does not support Defendant's assertion that an injunction "can and should be stayed for existing customers and, in some cases, even new customers." *See Verizon*, 503 F.3d at 1302. Nor does *i4i* support Defendant's assertion that "any injunction should be stayed if significant harm will befall customers." *See i4i*, 598 F.3d at 863.

No. 641-1 (*e*Plus Findings of Fact and Conclusions of Law ("FF")) at ¶ 62.  This Court should feel no compelling need to grant the extraordinary relief of a stay when Defendant's own inaction is silent testimony to the lack of any real prospect of substantial harm.

Not only has Defendant not provided any notice to its customers, to the contrary, after the jury verdict, Defendant issued a defiant and self-serving press release in which its President and CEO Harry Debes reassured customers that they "can continue to rely on our core S3 procurement product and Lawson System Foundation."  *See* "Lawson Comments on ePlus Patent Litigation," (Jan. 31, 2011) (available at www.businesswire.com/news/home/20110131007332/en/Lawson-Comments-ePlus-Patent-Litigation).[11]  When Defendant itself continues to reassure its customers that they have nothing to fear, why should this Court feel compelled to grant the extraordinary relief of a stay?  Clearly, any such "public crisis" claim is an invention from the imagination of Lawson's counsel.

Moreover, Defendant's argument that the potential harm encompasses "customers in process" who have not yet implemented the system, ***and even customers who have not yet even selected Defendant as a provider***, Def. Br. at 20, is yet further evidence that the prospect of harm from an injunction is simply manufactured.  Defendant's argument again reveals that its stay motion is motivated out of pure self-interest, and not out of any real concern for Defendant's customers.  If Defendant's argument were accepted, these customers presumably would be permitted to dig themselves even deeper into infringement, either by implementing the infringing systems or selecting Defendant's infringing systems over those offered by others.  Indeed such "customers in process" may be in the midst of deciding between Defendant's infringing products and the non-infringing products of *e*Plus or its authorized licensees.  Defendant's sole "support"

---

[11] This press release provides no notice that any of Defendant's products might be subject to an injunction.

for the uncorroborated claim that such customers in process face harm is that they would have to "re-start the RFP process."  Def. Br. at 20.[12]

No prospective customer has come forward before this Court to corroborate the contention that they will be substantially harmed if an injunction is not stayed.  Indeed, there is no evidence that Defendant has even bothered to inform such prospective customers that an injunction may issue demonstrating that Defendant is not in the least concerned about the supposed "harm" to such customers.  Moreover, there is no evidence that such prospective customers, if given the opportunity, would opt to continue to implement Defendant's infringing software or choose Defendant as their provider if a stay is granted.

As to Defendant's additional arguments regarding alleged harms to its existing customers, as *e*Plus set forth in its motion for an injunction, even an immediate injunction in this case will not stop any hospital or other medical facility from purchasing or obtaining needed equipment or supplies, or from providing any form of medical treatment.  FF ¶¶ 56, 65.  Even Defendant's exaggerated arguments claim only "retraining, delays, added costs, and likely errors in procurement," Def. Br. at 19, but Defendant can make no claim that vital medical equipment or supplies will be unavailable to any customer.  Defendant's customers undoubtedly have numerous means by which they can obtain supplies and equipment without any need to use Defendant's infringing system configurations, and there is no evidence to the contrary.  FF ¶ 57. Indeed, Defendant has not even shown what, if any, critical medical supplies or devices the vast majority of these customers purchase through the Lawson software.  Moreover, Mr. Hager of

---

[12] Contrary to such contention, it is likely that Defendant's customers already solicited multiple competing proposals and could simply opt for one of those proposals rather than Lawson's infringing products.  Inj. Hr'g Tr. 196:16-197:18 (Hager) ("the prospective customer will decide who of that entire ecosystem of software providers may have the potential of meeting their specific needs, and they'll submit a request for proposal out to all of those nine or ten of them").

Lawson conceded that *e*Plus and other providers (including *e*Plus's authorized licensees) could step in to replace Defendant.  FF ¶ 58.

Even as to Defendant's claims of delays, added costs, and other such inconveniences, Defendant has provided the Court with only minimal corroboration of its contentions.  While it asserts that 277 of its relevant RSS customers represent 2,500 different hospitals, Def. Br. at 19, it has provided declarations from only ***two*** of them, and those declarations fail to substantiate Defendant's self-serving attorney arguments.  FF ¶ 64.  If an immediate injunction would have the kind of serious impact on these customers that Defendant contends, one would certainly expect that more than two of them would raise their concerns with the Court, and their testimony would be far more explicit and compelling with respect to the harm they will face.  Neither declarant substantiates that they use Lawson at all for ordering important medical devices such as "MRI machines" and the like.  These declarations establish, at most, that two customers in the health care field will be somewhat inconvenienced if Defendant is enjoined from providing ongoing support for the infringing RSS configuration.  FF ¶ 64.[13]

Finally, the alleged harm to customers that Defendant invokes apply at best to only thirty percent (and likely substantially less) of its customers.[14]  As noted above, only two of these customers saw fit to provide a hearsay declaration.  None decided to appear in person at the injunction hearing.  As to the other seventy-plus percent of its customers, Defendant presents no

---

[13] As also set forth in *e*Plus's motion for an injunction, Defendant is required by contract to indemnify these customers for its infringement, which would mitigate the harms Defendant now claims will befall them.  *See, e.g.,* FF ¶ 62; *see also* PX241, ¶ 12.0; PX268, ¶ 11; PX256, ¶ 11; DX 506, ¶ 12.2.  Among Defendant's options under these agreements are to:  "(a) obtain the right for Client to Use the Product; (b) replace or modify the Product so that it becomes non-infringing; (c) terminate the License … and Lawson shall pay Client … an amount equal to the License Fee paid …."  PX241, ¶ 12.2.  Accordingly, the harm will not fall on the customers, but rather on Defendant itself.

[14] According to Defendant, 227 of its 830 customers for RSS and Punchout are in the healthcare sector.  FF ¶ 55.

evidence whatsoever of a "public interest" concern.  FF ¶ 61.  Accordingly, at a minimum, the injunction ought to be immediate as to those customers.[15]

### 2.    Defendant Has Not Made A Compelling Showing That It Faces Irresurable And Immeasurable Harm

Defendant contends that another reason for the Court to issue a stay is that it will suffer irreparable harm if it is not allowed to provide services for its already-implemented products, or to sell RSS and Punchout to existing customers.  For several reasons, these arguments are not compelling and fail to show a sufficient basis for the extraordinary relief of a stay.  In addition, Defendant's claims are largely uncorroborated by any evidence showing, for example, the extent of the costs it may face if it is prohibited from continuing to induce its customers' infringement.

The Federal Circuit has made clear that "[o]ne who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected."  *Windsurfing Int'l, Inc. v. AMF, Inc.,* 782 F.2d 995, 1003 n.12 (Fed.Cir.1986).  "[S]uccessful exploitation of infringing technology" does not shield a party from injunctive relief.  *Id.*

Here, Defendant contends that it will suffer harm to its reputation and possibly face breach of contract actions if it is precluded from continuing to induce its customers' infringement through the variety of implementation, training and support services it provides and from which it obtains substantial revenues.  To the extent this may cause Defendant to incur costs because it will have to breach its contracts, that is nothing more than the natural consequence of its infringement.

---

[15] The Court could, if necessary, ameliorate the impact on bona fide hospital customers — if they are truly impacted — through a "sunset provision" that, for example, would provide that the injunction does not take effect with respect to them for ninety days.  *See, e.g., i4i*, 598 F.3d at 864 (providing, based on evidence submitted, that injunction would not take effect until five months from the date of the order).

Defendant could have been working with its customers to mitigate the potential effects of an injunction but apparently it has taken no such actions. Defendant made no attempt to design-around the patents after the filing of the complaint, or after the Court's *Markman* rulings rejecting Defendant's claim construction arguments, or after the denial of Defendant's summary judgment motions, or even to this day. Further, as set forth *supra*, Defendant has not even notified its customers that an injunction may be imminent and that they should take actions to mitigate against the possibility of an injunction.

In addition, Defendant has not corroborated or presented a particularized showing of the extent of the financial consequences it claims it will face in the event of an immediate injunction. Rather, it presents very generalized claims such as that "[s]uch customers will not be happy." Def. Br. at 22. It has made no showing that it cannot readily bear the financial consequences of the injunction. To the contrary, in its Stay Motion, Defendant reassures the Court that it has cash and cash equivalents of nearly $376 million, which it contends is far in excess of any potential damages that could result from its infringement. Def. Br. at 27. If that is the case, then surely Defendant can also withstand whatever financial consequence it will face from having to halt its inducement of its customers' infringement.

Moreover, as was set forth in *e*Plus's brief in support of an injunction, Defendant's employees have testified that there would be little to no harm to Defendant caused by a permanent injunction. For example, Defendant's corporate representative Mr. Christopherson testified that even if Defendant could no longer make and sell a RSS module, it would still be able to compete in the Supply Chain Management market. FF ¶ 52. He also testified that even if Defendant could no longer make and sell a Punchout module, it would still be able to compete in the Supply Chain Management market. *Id*. Like Mr. Christopherson, Defendant's employees

21

Mr. Hager and Mr. Lohkamp also agreed that there would be little to no harm to Defendant caused by a permanent injunction. FF ¶ 53. Thus, the Court should give little heed to Defendant's present claim that it faces irreparable harm if it is prevented from continuing to induce its customers' infringement.

Defendant's argument with respect to being permitted to sell RSS and Punchout to existing customers is particularly baseless. *See* Def. Br. at 23-24. As with Defendant's argument elsewhere that an injunction will harm "customers in process" (in other words, companies that are not yet even customers), it is rather incredible that Defendant suggests that its current customers should be allowed to dig themselves even deeper into infringement by virtue of the Court staying the injunction. Defendant here posits that there are customers who are using ostensibly non-infringing system configurations, but to whom Defendant could sell ***infringing*** configurations if the Court stays an injunction. *Id.* **This is a reason to deny a stay, not to grant one**. The Court should not facilitate new sales of the system configurations the jury found to infringe, particularly when these customers already have non-infringing configurations that they are currently using and which apparently satisfy their needs. To the extent Defendant contends that its reputation will be harmed if it is not allowed to upsell the infringing configurations to these existing customers, that harm results solely from Defendant's infringement and its present request that it be permitted to continue its infringement even after a jury verdict of infringement.

3.    **The Issuance Of A Stay Would Substantially Injure *e*Plus**[16]

The consequences of further delaying the relief to which *e*Plus is entitled are significant. The federal patent statute provides that the right conveyed to a patent owner is "***the right to***

---

[16] Defendant erroneously argues that issuance of a stay will not irreparably harm *e*Plus. That is not the standard. Instead, this Court should determine "whether issuance of the stay will substantially injure" *e*Plus. *See Hilton v. Braunskill*, 481 U.S. at 776 (1987).

*exclude others* from making, using, offering for sale, or selling the invention throughout the United States or importing the invention into the United States . . . ."  35 U.S.C. § 154(a)(1) (emphasis added); *see also Continental Paper Bag Co. v. Eastern Paper Bag Co.,* 210 U.S. 405, 429-30 (1908) ("From the character of the right of the patentee we may judge of his remedies.  It hardly needs to be pointed out that the right can only retain its attribute of exclusiveness by a prevention of its violation.  Anything but prevention takes away the privilege which the law confers upon the patentee.").[17]

A stay of the injunction pending appeal will deprive *e*Plus of its statutory right to exclude.  Because a patent is a wasting asset, the window of opportunity for *e*Plus to exploit its patent rights is limited.  *Cf. Continental Can Co. USA v. Monsanto Co.*, 948 F.2d 1264, 1265-66 (Fed. Cir. 1991) ("[W]hen summary judgment is improvidently granted the effect is to prolong litigation and increase its burdens.  This is of particular concern in patent disputes, where patent property is a wasting asset, and justice is ill served by delay in final resolution.").  Every day for which Defendant continues to infringe, *e*Plus's statutory right to exclude is being taken away.  A stay pending appeal will further derogate *e*Plus's right to exclude, thus causing substantial injury to *e*Plus.[18]

As was set forth in *e*Plus's motion for a permanent injunction, denial of the right to exclude causes *e*Plus to, *inter alia*:  (1) lose market share with respect to its patented products,

---

[17] The injunction "creates a property right and leads to negotiations between the parties.  A private outcome of these negotiations — whether they end in a license at a particular royalty or in the exclusion of an infringer from the market — is much preferable to a judicial guesstimate about what a royalty should be."  *In re Mahurkar Patent Lit.,* 831 F. Supp. 1354, 1397 (N.D. Ill. 1993), *aff'd,* 71 F.3d 1573 (Fed. Cir. 1995).

[18] Defendant contends that *e*Plus cannot show harm because it did not move for a preliminary injunction.  Def. Br. at 24.  The Federal Circuit has made clear, however, that a motion for a preliminary injunction and a motion for a permanent injunction are two very different things, and there is no requirement that *e*Plus have moved for a preliminary injunction.  *Lermer Germany GmbH v. Lermer Corp.,* 94 F.3d 1575, 1577 (Fed. Cir. 1996).

(2) suffer losses on sales of its other products, and/or (3) experience reputational injury and the loss of business opportunities.  *See* FF ¶¶ 41-46.  And all of these injuries to *e*Plus will continue to accrue if the Court stays the injunction.

Notwithstanding Defendant's tortured arguments to the contrary, in reality the fact of competition between *e*Plus and Defendant cannot reasonably be disputed.  As *e*Plus explained at length in the Proposed Findings of Fact, *e*Plus sells patented products and services that compete with Defendant's infringing system configurations and services.  *See* FF ¶¶ 25-34.  Indeed, *e*Plus has identified hundreds of instances where the parties competed for the same customer's business.  *See* FF ¶¶ 28-29, 32-34.  *e*Plus has also identified specific instances of lost sales in which customers chose Defendant's infringing products and services over the lawful products and services of *e*Plus.  *See* FF ¶¶ 35-40.  Under these facts, any contention that the parties are not in competition with respect to the infringing products borders on the absurd.

Moreover, the impact of Defendant's infringement extends beyond competition with *e*Plus's covered products, to other products and services that *e*Plus markets to customers of its patented products.  FF ¶¶ 13, 41, 54; *see Bendix Commercial Vehicle Sys., LLC v. Haldex Brake Prods. Corp.*, 2011 WL 14372, at *6 (N.D. Ohio Jan. 3, 2011) (granting injunction and stating "***The loss or gain of a customer may have harms or benefits beyond just the sale of the patented product***…. The ***ancillary business*** that may come from converting customers of a competitor cannot be compensated by a mere royalty on the patented product.") (emphasis added).

In addition, a stay of the injunction will encourage other potential licensees to infringe because they will perceive *e*Plus as being incapable of enforcing the exclusivity of its patent rights.  *See Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 106 F. Supp.2d

696, 703 (D.N.J. 2000) ("[I]f an injunction does not issue at this time, Boehringer's reputation will be injured as it will be perceived as a company which is unable to enforce the exclusivity of its patent rights despite having proven liability and invalidity…. [O]ther would-be infringers will no doubt be invited to infringe on Boehringer's '778 patent."). Potential licensees will opt to infringe because, at most, they will perceive they will pay at most a monetary award, such as a reasonable royalty. Such a result will diminish the value of *e*Plus's patents.

Further, a stay effectively forces *e*Plus to continue to involuntarily "license" its proprietary technology to its competitor. Defendant's argument that this should be permitted because *e*Plus has voluntarily entered into licenses with others should be rejected. *See Bendix*, 2011 WL 14372, at *6 ("[I]t would defy the principles of equity to force [the patentee] into what amounts to an unwanted contractual relationship with a competitor who has repeatedly been found to willfully infringe … and has otherwise created a long-term continuous relationship exhibiting a lack of respect or acknowledgment of [the patentee's] legal rights"). Defendant's argument is akin to saying that because one has allowed visitors onto his property he must then be forced to accept any trespasser. As *e*Plus set forth at length in its motion for a permanent injunction, that *e*Plus has entered into licenses with others does not mean that it should be forced to grant a license to Defendant. *Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1328 (Fed. Cir. 2008) ("While the fact that a patentee has previously chosen to license the patent may indicate that a reasonable royalty does compensate for an infringement, that is but one factor for the district court to consider…. Adding a new competitor to the market may create an irreparable harm that the prior licenses did not."); *see also Arthrocare*, 315 F. Supp.2d at 621 ("Arthorcare's patent rights are not compromised simply because it opted to license its patents to select competitors. 'Once the patentee's patents have been held to be valid and infringed, he should be

entitled to the full enjoyment and protection of his patent rights.'") (quoting *Smith Int'l, Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1581 (Fed. Cir. 1983)).  In addition, such a policy would violate the public policy favoring settlement, such as those that occurred in *e*Plus's prior litigations.  *See Flex-Foot, Inc. v. CRP, Inc.*, 238 F.3d 1362, 1369-70 (Fed. Cir. 2001) ("[T]here is a strong public interest in settlement of patent litigation….").

Finally, for the same reasons that *e*Plus explained in its motion for a permanent injunction, *e*Plus will also be substantially injured by a stay because the loss of its market opportunities is simply incalculable.  As the court stated in *SynQor*:

> Although future damages in lieu of an injunction may compensate SynQor for an ***approximate*** loss, ***such approximation does not make future damages adequate in the sense that they are a suitable proxy for injunctive relief***.  As discussed above, SynQor makes and sells products and has a presence in the relevant market.  Further, SynQor has name recognition, goodwill, and market share in the relevant market.  The loss associated with any of these effects is particularly difficult to quantify.  Difficulty in estimating monetary damages is evidence that remedies at law are inadequate.

*SynQor, Inc. v. Artesyn Techs., Inc.*, 2011 WL 238645, at *3 (E.D. Tex. Jan. 24, 2011) (emphasis original) (citations omitted).  Although Defendant contends that any injury to *e*Plus can be compensated through monetary damages, the "difficulty in estimating monetary damages reinforces the inadequacy of a remedy at law."  *Broadcom*, 543 F.3d at 703-04; s*ee also i4i*, 598 F.3d at 862 ("Difficulty in estimating monetary damages is evidence that remedies at law are inadequate.") (quoting *Broadcom*, 543 F.3d at 703-04); *Jacobsen v. Katzer,* 535 F.3d 1373, 1375 (Fed.Cir.2008) (stating that, in copyright licensing context, "because a calculation of damages is inherently speculative, these types of license restrictions might well be rendered meaningless absent the ability to enforce through injunctive relief").[19]

---

[19] Furthermore, the same problem exists here as with attempting to compensate *e*Plus for the harm to it if a permanent injunction is denied.  The prospective remedy of a "compulsory

And contrary to Defendant's assertions, a bond covering the pendency of the appeal will not adequately compensate *e*Plus for Defendant's continued infringement.[20]  The bond will not remedy the lost opportunity for *e*Plus to exploit its statutory right to exclude Defendant's infringing conduct, nor the significant damage to the value of *e*Plus's patents.  In particular, a bond is not likely to encompass the collateral harms to *e*Plus from the opportunity to cross-sell and upsell its other products and services to procurement customers, or the reputational harm that comes from the inability to fully enforce its patent rights.

### 4.    The Public Interest Does Not Lie In Favor Of Delaying Injunctive Relief

As was argued in *e*Plus's brief in support of an injunction, the public interest does not lie in denying — or staying — a permanent injunction.  *See* Dkt. No. 641 at 21-28 (citing cases).  There is a strong public interest in favor of enforcing valid patents.  *See, e.g.*, *Sanofi-Synthelabo* v. *Apotex, Inc.,* 470 F.3d 1368, 1383 (Fed. Cir. 2006) (public's interest in protecting patents outweighed the serious harms that could occur if infringing generic drug were removed from the market by injunction) (citing *Patlex Corp.* v. *Mossinghoff,* 758 F.2d 594, 599 (Fed. Cir. 1985)); *Lisle Corp. v. A.J. Mfg. Co.*, 2004 WL 765872, at *6 (N.D. Ill. Apr. 7, 2004) (stating "[w]hile the public interest in promoting invention is strong, the public interest in the enforcement of valid patents is stronger" and denying motion to stay injunction pending appeal); *Magnesystems*, 1994

---

license" is incalculable even according to the financial data that Defendant tracks on the infringing systems.  Defendant's Rule 30(b)(6) witness, Kenneth White, testified, for example, that services revenues are not tracked on a product-by-product basis.  FF ¶ 43.  Mr. White also testified that Defendant has no means to determine the profitability of its S3 procurement suite.  *Id*.  These facts render any future damages calculation all the more uncertain, even with respect to one of limited duration.

[20] Although Defendant contends, on the one hand, that a bond will adequately compensate ePlus for its continuing willful infringement during the pendency of the appeal, it proposes, on the other hand, that it need not post any such bond.  Def. Br. at 27-28.

WL 808421, at *6 (stating "[p]ublic policy favors the 'protection of rights secured by valid patents'" and denying stay) (citations omitted).

As argued *supra* in connection with Defendant's arguments about alleged harm to its customers, and as further argued in *e*Plus's motion for an injunction, Defendant's contention of alleged harm to customers does not raise legitimate public interest concerns. *See supra* at 16. There is no evidence in the record that Defendant's e-procurement software is the sole means by which hospitals and the like can obtain vital medical equipment and supplies.  While Defendant asserts that more than two hundred of its relevant customers are in the medical or health care field, it has provided declarations from only two of them, and those declarations fail to substantiate Defendant's self-serving attorney argument.  Defendant has not provided any notice to these customers, even after the jury verdict, to warn them of the drastic harms Defendant now claims are imminent; and Defendant is required by contract to indemnify these customers for its infringement, which would mitigate the "public interest" harms Defendant now claims will befall these customers. *see also* FF ¶¶ 56-58, 61-65.  Finally, the "public interest" concerns that Defendant raises apply at best to only thirty percent (and likely substantially less) of its customers.  FF ¶ 55.  As to the other seventy-plus percent of its customers, Defendant presents no evidence whatsoever of a public interest concern.  FF ¶ 61.

## IV.   DEFENDANT MUST POST A BOND IF THE COURT STAYS THE PERMANENT INJUNCTION

If the Court determines that the injunction should be stayed pending appeal, the Court should require Defendant to post a bond to protect *e*Plus's interests.  Fed. R. Civ. P. 62(c), "the court may suspend … an injunction **on terms for bond or other terms that secure the opposing party's rights**" (emphasis added).  Other courts have required the posting of a bond in an amount based on (i) an infringer's total revenue with regard to the infringing products during the appeal

period, *EcoLab Inc. v. Envirochem, Inc.*, 2000 WL 1062087, at *1 (Fed. Cir. July 21, 2000)

(requiring escrow account to which the infringer was required to contribute 30% of the receipts

from the accused products during the pendency of the appeal), (ii) the infringer's profit margin

on the accused products, *GTE Prods. Corp. v. Kennametal, Inc.*, 772 F. Supp. 907, 920-21

(W.D.Va. 1991) (staying injunction during appeal), *appeal dismissed without opinion*, 988 F.2d

131 (Fed. Cir. 1993), and (iii) and the royalty rate awarded by the jury, *Odetics, Inc.*, 14 F.

Supp.2d at 799, *rev'd in part, on other grounds*, 185 F.3d 1259 (Fed. Cir. 1999).

In the International Trade Commission proceedings, where the Commission must set the

bond at a level "sufficient to protect the complainant from any injury," the ITC has set bond

amounts equivalent to 100% of the value of the infringing products.  19 U.S.C. § 1337(j)(3);

*Automotive Parts*, 337-TA-557 (July 5, 2007); *Certain Integrated Repeaters, Switches,*

*Transceivers, and Products Containing the Same*, 337-TA-435 (July 19, 2001).

Under the circumstances of this case, and particularly given the fact that Defendant plans

to continue the sale, implementation and maintenance of the infringing devices while the appeal

is pending, ePlus is entitled to a bond reflecting the harm that Defendant will cause ePlus during

the appeal.[21]  Because information regarding Defendant's profit margin on the infringing systems

simply does not exist and there has been no reasonable royalty awarded by the jury, the yardstick

---

[21] According to the most recent data, cases appealed from district court face a median 11.7
months from docketing to disposition.  United States Court of Appeals for the Federal Circuit,
Median Time to Disposition in Cases Terminated After Hearing or Submission, Docketing Date
to Disposition Date, in Months: Detailed Table of Data, 2001-2010 (available at
http://www.cafc.uscourts.gov/images/stories/the-
court/statistics/Median_Dispositon_Time_for_Cases_Terminated_after_Hearing_or_Submission
_Detailed_Table_of_Data_2001-2010.pdf).  Because this case has not yet been appealed to the
Federal Circuit, and thus has not been docketed, *e*Plus reasonably believes that it may not expect
disposition for at least another 12 months from the date of this filing.

for calculating a bond here should be the revenue generated by Defendant for licensing, installation, implementation, maintenance and support of its infringing systems.

Defendant licensed its S3 Supply Chain Management product to 1,496 customers. *See* PX678 (Lawson Customer List); PX679 (Lawson Revenue 2005-2009). Eight-hundred thirty of those customers, or about 55%, licensed the infringing RSS and/or Punchout modules. PX681 (Lawson customer list for RSS and Punchout). The last full year of total revenue (given the approximately one year between docketing of appeals from district court to disposition) shows total revenue for all accused products of $101,968,354 for Fiscal Year 2009. Fifty-five percent of that total revenue amounts to $56,082,595. PX511. This Court has wide discretion in how to determine the bond amount from these numbers, as described above. This $56 million figure may act as the total amount of the bond (i.e., under the International Trade Commission's '100% rule'). Indeed, such an approach may be particularly appropriate where, as here, the amount of detailed financial data which a court may typically use to set the bond amount is lacking. In the alternative, the Court may wish to treat the $56 million figure as a base, and accordingly set some percentage of this figure as the bond amount. *EcoLab Inc. v. Envirochem, Inc.*, 2000 WL 1062087. At minimum, however, if the Court grants Defendant's Stay Motion, the amount of the bond that Defendant posts must be sufficient to secure *e*Plus's rights during the pendency of the appeal. Fed. R. Civ. P. 62(c).

## V.    CONCLUSION

For the foregoing reasons, ePlus respectfully requests that the Court deny Defendant's Motion For a Stay of The Permanent Injunction.

Respectfully submitted,

March 30, 2011

_____/s/_____
David M. Young (VSB #35997)
Scott L. Robertson *(admitted pro hac vice)*
Jennifer A. Albert *(admitted pro hac vice)*
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4000
Facsimile:   (202) 346-4444
dyoung@goodwinprocter.com
srobertson@goodwinprocter.com
jalbert@goodwinprocter.com


Craig T. Merritt (VSB #20281)
Henry I. Willett, III (VSB #44655)
Counsel for Plaintiff ePlus Inc.
**CHRISTIAN & BARTON, LLP**
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
Telephone: (804) 697-4100
Facsimile: (804) 697-4112
cmerritt@cblaw.com


Michael G. Strapp *(admitted pro hac vice)*
**GOODWIN PROCTER LLP**
Exchange Place
53 State Street
Boston, MA 02109-2881
Telephone:  (617) 570-1000
Facsimile:   (617) 523-1231
mstrapp@goodwinprocter.com

Attorneys for Plaintiff, ePlus Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of March, 2011, I will electronically file the foregoing

**PLAINTIFF ePLUS INC.'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO STAY THE PERMANENT INJUNCTION**

with the Clerk of Court using the CM/ECF system which will then send a notification of such filing (NEF) via email to the following*:*

Daniel McDonald, *pro hac vice*
William D. Schultz, *pro hac vice*
Rachel C. Hughey, *pro hac vice*
Andrew Lagatta, *pro hac vice*
MERCHANT & GOULD
3200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 332-5300
Facsimile: 612) 332-9081
lawsonservice@merchantgould.com
***Counsel for Defendant Lawson Software, Inc.***

Robert A. Angle, VSB#37691
Dabney J. Carr, IV, VSB #28679
TROUTMAN SANDERS LLP
P.O. Box 1122
Richmond, Virginia 23218-1122
(804) 697-1238
(804) 698-5119 (Fax)
robert.angle@troutmansanders.com
dabney.carr@troutmansanders.com

***Counsel for Defendant Lawson Software, Inc.***


_____/s/_____
David M. Young (VSB #35997)
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4000
Facsimile:   (202) 346-4444
dyoung@goodwinprocter.com