# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

ePLUS, INC.,

                Plaintiff,

      v.

LAWSON SOFTWARE, INC.,

                 Defendant.

Civil Action No. 3:09-cv-620


**DEFENDANT LAWSON SOFTWARE, INC.'S OPPOSITION TO PLAINTIFF EPLUS, INC.'S MOTION FOR A PERMANENT INJUNCTION**

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 1

II.   ePLUS'S MOTION FOR A PERMANENT INJUNCTION SHOULD BE
      DENIED ............................................................................................................. 3

      A.    ePlus Will Not be Irreparably Injured Without an Permanent
            Injunction .............................................................................................. 4

            1.    Competition in the Absence of Irreparable Injury is Insufficient to
                  Warrant Injunctive Relief ........................................................... 4

                  a)    ePlus and Lawson Sell Different Kinds of Software that
                        Compete in Different Industry Segments ...................... 5

                  b)    ePlus Has Not Shown that it Has Lost Sales or Market
                        Share Because of Lawson's Infringing Products ........... 6

            2.    ePlus Did Not Prove that Lawson's Infringing Products are
                  Causing It Harm ........................................................................ 9

                  a)    There Are Numerous Other Competitors for the Patented
                        Products ...................................................................... 9

                  b)    ePlus Admitted its Declining Revenue is Not Due to
                        Lawson ...................................................................... 11

            3.    ePlus Has Not Demonstrated Any Other Type of Irreparable Harm ........ 11

            4.    ePlus Has Followed a Consistent Course of Licensing its Patents
                  That Demonstrates Its Willingness to Forego its Right to Exclude
                  for Compensation, Negating Irreparable Harm ............................. 11

            5.    ePlus's Delay in Filing this Lawsuit for Seven Years After
                  Lawson's Infringement Began Shows There is no Irreparable Harm ....... 12

            6.    ePlus Did Not Seek to Preliminarily Enjoin Lawson's Infringing
                  Product ................................................................................... 13

      B.    A Legal Remedy Would Be Adequate to Compensate ePlus for
            Lawson's Infringement ........................................................................ 13

      C.    Balance of Hardships Shows that an Injunction is Not Warranted ............... 15

            1.    ePlus's Procurement Software is a Tiny Part of its Business, Which
                  Weighs Against Granting Injunctive Relief ............................... 15

2.  All of the Claims Found to be Infringed Have Been Rejected as Unpatentable During the Pending Reexaminations, Confirming that the Balance of Harms Favors Lawson. .............................................. 17

3.  An Injunction Preventing New Sales Will Harm Lawson ........................ 19

4.  An Injunction Preventing Lawson from Maintaining, Fixing, and Servicing Products it Sold Before the Verdict Is Improper and Would Significantly Harm Lawson ............................................................ 19

5.  ePlus is Seeking an Injunction for All the Wrong Reasons. ..................... 20

D.  **The Public Interest Factors Weighs Against Injunctive Relief** ...................... 21

1.  The Public Interest Will Not Be Served by any Form of Injunctive Relief ............................................................................................. 22

2.  Lawson's Customers and the Public Will Be Significantly Harmed if Lawson is Enjoined from Fixing, Maintaining and Servicing Pre-Existing Products ................................................................................ 22

III.  **THE PROPER SCOPE OF AN INJUNCTION** ................................................ 26

A.  **Any Injunction Entered in this Case Should Expire When the Patents Expire** ............................................................................................. 26

B.  **Any Injunction Entered in this Case Should Not Apply to Servicing, Maintaining, or Repairing Products Lawson Sold Before the Verdict.** ......... 26

C.  **Any Injunction Entered in this Case Should Not Apply to Products Found Not to Infringe ePlus's Patents** ............................................................. 28

D.  **Portions of ePlus's Proposed Order Are Too Vague** ...................................... 29

E.  **Any Injunction Entered in this Case Should Not Apply to Lawson's Customers** ............................................................................................. 30

F.  **Any Injunction Entered in this Case Should Not Include M3** ........................ 30

IV.  **CONCLUSION** ............................................................................................ 30

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*i4i Ltd. P'ship v. Microsoft Corp.*,
598 F.3d 831 (Fed. Cir. 2010) ........................................................................ 22, 24

*z4 Techs., Inc. v. Microsoft Corp.*,
434 F. Supp. 2d 437 (E.D. Tex. 2006) ....................................................................... 23

*A Helping Hand, LLC v. Baltimore County*,
335 Fed. Appx. 773, 2009 US App. LEXIS 26868 (4th Cir. 2009) ........................... 14

*Abbott Labs. v. Andrx Pharms., Inc.*,
452 F.3d 1331 (Fed. Cir. 2006) .................................................................................. 4

*Acumed LLC v. Stryker Corp.*,
551 F.3d 1323 (Fed. Cir. 2008) ............................................................................... 16

*Acumed, LLC v. Stryker Corp.*, No. 04-513,
2007 U.S. Dist. LEXIS 86866 (D. Or. Nov. 20, 2007) .............................................. 16

*Advanced Cardiovascular*,
579 F. Supp. 2d at 559 (D. Del. 2008), *appeal dismissed*, 356 Fed. Appx. 389
(Fed. Cir. 2009) ....................................................................... 4, 9, 11, 12

*Am. Calcar, Inc. v. Am. Honda Motor Co.*, No. 06-2433,
2008 U.S. Dist. LEXIS 106476 (S.D. Cal. Nov. 18, 2008) .................................. 13, 14

*Aro Mfg. Co. v. Convertible Top Replacement Co.*,
365 U.S. 336, 128 U.S.P.Q. (BNA) 354, 5 L. Ed. 2d 592, 81 S. Ct. 599 (1961) ........................ 27

*Belk v. Charlotte-Mecklenburg Bd. of Educ.*,
269 F.3d 305 (4th Cir. 2001) .................................................................................. 21

*Bloomer v. Millinger*,
68 U.S. 340, 17 L. Ed. 581 (1863) .......................................................................... 28

*Cordance Corp. v. Amazon.com, Inc.*,
730 F. Supp. 2d 333 (D. Del. 2010) ........................................................................ 10

*Dow Chem. Co. v. Nova Chems. Corp.*, No. 05-737,
2010 U.S. Dist. LEXIS 77099 (D. Del. July 30, 2010) ............................................. 23

*eBay Inc. v. MercExchange L.L.C.*,
547 U.S. 388 (2006).................................................................................. 3, 11

*Flex-Foot, Inc. v. CRP, Inc.*,
238 F.3d 1362 (Fed. Cir. 2001) ............................................................... 12

*Fonar Corporation v. General Electric Co.*,
107 F.3d 1543 (Fed. Cir. 1997) ............................................................... 27

*Humanscale Corp. v. CompX Int'l Inc.*, No. 09-86,
2010 U.S. Dist. LEXIS 42083 (E.D. Va. Apr. 29, 2010)........................ 4, 10

*Hynix Semiconductor Inc. v. Rambus Inc.*,
609 F. Supp. 2d 951 (N.D. Cal. 2009) ...................................... 4, 7, 8, 17, 19, 20, 21

*Ill. Tool Works, Inc. v. Grip-Pak, Inc.*,
906 F.2d 679 (Fed. Cir. 1990) ................................................................. 7, 13

*Innogenetics, N.V. v. Abbott Laboratories*,
512 F.3d 1363 (Fed. Cir. 2008) ............................................................... 4

*Int'l Rectifier Corp. v. IXYS Corp.*,
383 F.3d 1312 (Fed. Cir. 2004) ............................................................... 1

*Johnson & Johnson Vision Care, Inc. v. Ciba Vision Corp.*,
712 F. Supp. 2d 1285 (M.D. Fla. 2010) .................................................. 12

*Lear v. Adkins*,
395 U.S. 653 (1969)................................................................................. 22

*Med. Instrumentation & Diagnostics Corp. v. Elekta AB*,
2002 U.S. Dist. LEXIS 26812 (S.D. Cal. 2002), *rev'd on other grounds*..................... 2

*MercExchange, LLC v. eBay, Inc.*,
500 F. Supp. 2d 556 (E.D. Va. 2007) ................................. 11, 12, 13, 17, 18, 22

*Nat'l Audubon Soc'y v. Dep't of Navy*,
422 F.3d 174 (4th Cir. 2005)................................................................... 3

*Odetics, Inc. v. Storage Tech. Corp.*,
14 F. Supp. 2d 785 (E.D. Va. 1998) ....................................................... 24, 26

*Odetics, Inc. v. Storage Technology Corporation*,
185 F.3d 1259 (Fed. Cir. 1999) ............................................................... 27, 28

*PGBA, LLC v. United States,*
389 F.3d 1219 (Fed. Cir. 2004) ................................................................. 13

*Paice LLC v. Toyota Motor Corp.,*
504 F.3d 1293 (Fed. Cir. 2007) ............................................................ 14, 15

*Praxair, Inc. v. ATMI, Inc.,*
479 F. Supp. 2d 440 (D. Del. 2007) ....................................................... 15, 16

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.,*
723 F. Supp. 2d 1284 (S.D. Cal. 2010) .................................................... 4, 7

*Reebok Int'l Ltd. v. J. Baker, Inc.,*
32 F.3d 1552 (Fed. Cir. 1994) ..................................................................... 7

*Renegotiation Board v. Bannercraft Clothing Co.,*
415 U.S. 1 (1974) ....................................................................................... 11

*Ricoh Co. v. Quanta Computer, Inc.,* No. 06-462,
2010 U.S. Dist. LEXIS 38220 (W.D. Wis. Apr. 19, 2010) ...................... 12, 22

*Smith & Nephew, Inc. v. Arthrex, Inc.,* No. 07-335,
2010 U.S. Dist. LEXIS 60356 (E.D. Tex. 2010) .......................................... 24

*Soverain Software LLC v. Newegg Inc.,* No. 07-511, 2
010 U.S. Dist. LEXIS 89268 (E.D. Tex. Aug. 11, 2010) ........................... 7, 12

*Telcordia Techs. Inc. v. Cisco Sys.,*
592 F. Supp. 2d 727 (D. Del. 2009) ........................................................... 12

*Translogic Tech., Inc. v. Hitachi, Ltd.,*
2007 U.S. App. LEXIS 23951 (Fed. Cir. Oct. 12, 2007) ............................. 17

*Weinberger v. Romero-Barcelo,*
456 U.S. 305 (1982) ..................................................................................... 3

## FEDERAL STATUTES

35 U.S.C. § 102 ..................................................................................... 18, 19

35 U.S.C. §154(a)(2); ................................................................................. 26

35 U.S.C. §154(c)(1); ................................................................................. 26

35 U.S.C. § 283 ........................................................................................... 14

35 U.S.C. § 284 ................................................................................................................ 14

Fed. R. Civ. P. 65(d) ..................................................................................................... 1, 2

## I.    <u>INTRODUCTION</u>

ePlus acknowledges that an injunction is not automatic upon a finding of infringement. However, most of its justification for an injunction relies on arguments that exist in virtually every patent case.  For example, ePlus argues it is being irreparably injured because its "right to exclude" Lawson is being denied.  Similarly, ePlus cites a public interest in protecting patent rights.  If these issues were dispositive, then the Supreme Court's *eBay* decision would effectively be ignored and injunctions would be granted in every patent case.

The facts of this case show ePlus is not irreparably harmed by Lawson's sales of the RSS and Punchout configurations found by the jury to infringe.  The purported "flagship" products ePlus alleges are hurt by competition represent ***less than one percent*** of ePlus's business. Moreover, Lawson *only* markets its RSS and Punchout software as part of a full suite of interactive ERP software products including human resources and accounting.  This is a fundamentally different marketing approach from that used by ePlus, who markets its procurement software *only* as a stand-alone or "Best of Breed" product.  The consequences of this distinction are that ePlus faces no competition at all from Lawson in the vast majority of its market: (1) non-ERP prospects who seek only an eProcurement product, and (2) the 98% of prospects who have non-Lawson ERP systems.

Even within the 2% of the market that have Lawson ERP systems, ePlus's primary competition is other Best of Breed providers such as Ariba and SciQuest, both of whom sell e-procurement products (unlike Lawson's RSS and Punchout products) and both of whom have won business in head-to-head competition with ePlus.  The miniscule and speculative nature of this competition is confirmed by ePlus's failure allege or prove price erosion or lost market share, or prove even a single lost sale due to RSS and Punchout.  ePlus urges that if it proves *any*

competition, then it has proven irreparable injury. The case law, however, shows that irreparable harm and competition are two different things, and the *de minimis* competition here is not enough to cause the kind of harm necessary to warrant an injunction.

Other evidence rebuts the existence of irreparable harm. ePlus licensed the patents-in-suit to five competitors. Some of ePlus's licensees sell much more procurement software than Lawson, and others directly compete in ePlus's market space, unlike Lawson. Just as money compensated ePlus for these infringements, money would be sufficient to compensate for the much more remote chance that Lawson's sales of RSS and Punchout may harm ePlus.

All of the claims of all of the patents-in-suit have been rejected at least once and in most cases several times on reexamination by the Patent and Trademark Office ("PTO"). If Lawson is enjoined and the claims are found invalid, Lawson will never be compensated for the harm it suffers. On the other hand, if Lawson is not enjoined and the claims survive, ePlus can be compensated for any harm it suffers by an ongoing royalty for post-judgment sales of RSS and Punchout. Lawson tracks those sales individually, making a royalty readily calculable.

ePlus does little to separately analyze the an injunction against new sales and an injunction against servicing and maintaining existing customers. This distinction, however, is fundamental and significant. For one thing, ePlus makes no showing whatsoever that it is entitled to any prospective relief with respect to past Lawson sales that were subject to Rule 37 sanctions against ePlus barring damages. In fact, the case law shows that ePlus cannot get back-door relief with respect to past sales through an injunction against servicing such products. Moreover, the harm to Lawson, customers and the public would be significant and irreparable if the injunction extends to servicing existing customers. RSS and Punchout customers need Lawson's maintenance and services because there is no third party that provides such services. No alternative product is

readily available because it takes many months, to several years, to select, install, implement, and deploy procurement software.

ePlus suggests that it will have no remedy unless the court enjoins Lawson.  Not true. This Court may award an equitable royalty for post-judgment sales in lieu of an injunction.  A royalty fully compensates ePlus without irreparably harming Lawson or its customers.

At the evidentiary hearing, ePlus admitted it will wait to negotiate a license until after it obtains an injunction.  This revealed ePlus's true colors: its injunction request has nothing to do with irreparable harm, and everything to do with settlement leverage.  The case law specifically provides that such motives for injunctive relief warrant denial of ePlus's request.  For all these reasons, ePlus fails to meet its burden to prove that an injunction is warranted.

## II.     ePLUS'S MOTION FOR A PERMANENT INJUNCTION SHOULD BE DENIED

Injunctive relief is an "extraordinary remedy." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982); *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 201 (4th Cir. 2005). Patent holders, like ePlus, cannot rely on a presumptive entitlement to permanent injunctive relief after proving infringement anymore.  *eBay Inc. v. MercExchange L.L.C.*, 547 U.S. 388 (2006).  Instead, ePlus must prove that:

(1)     it has suffered an irreparable injury;

(2)     remedies available at law, such as monetary damages, are inadequate to compensate for that injury;

(3)     considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and

(4)     the public interest would be served by a permanent injunction.

*Id.*  Under *eBay*, the case-specific facts must show the extraordinary remedy of an injunction is warranted.  As demonstrated below, in this case they do not.

A.     **ePlus Will Not be Irreparably Injured Without an Permanent Injunction**

1.     Competition in the Absence of Irreparable Injury is Insufficient to Warrant Injunctive Relief

"Where an infringer's conduct will *not* harm the patent holder, enjoining that conduct is an abuse of discretion." *Hynix Semiconductor Inc. v. Rambus Inc.*, 609 F. Supp. 2d 951, 968 (N.D. Cal. 2009) (citing *Innogenetics, N.V. v. Abbott Laboratories*, 512 F.3d 1363, 1380-81 (Fed. Cir. 2008)). The fact that parties are not direct competitors is often sufficient to demonstrate no irreparable harm. *Humanscale Corp. v. CompX Int'l Inc.*, No. 09-86, 2010 U.S. Dist. LEXIS 42083, at *8 (E.D. Va. Apr. 29, 2010) ("the direct competition typically used to justify a finding of irreparable harm involves a two competitor market" which is "not the case here").

ePlus focuses on a yes-or-no answer to whether the parties compete, with scant attention to actual harm. Competition alone, however, does not demonstrate irreparable harm. *Abbott Labs. v. Andrx Pharms., Inc.*, 452 F.3d 1331, 1347-48 (Fed. Cir. 2006) ("[W]e do not doubt that generic competition will impact Abbott's sales . . . but that alone does not establish that Abbott's harm will be irreparable."); *Humanscale*, 2010 U.S. Dist. LEXIS 42083, at *8 ("To accept the argument that any claim of direct competition should result in a finding of irreparable harm would essentially create a presumption in favor of irreparable harm, contrary to the Supreme Court's directive in *eBay*."); *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 723 F. Supp. 2d 1284, 1336 (S.D. Cal. 2010) (same).

In *Advanced Cardiovascular Sys. v. Medtronic Vascular, Inc.*, the court denied a permanent injunction against a direct competitor in both relevant markets. 579 F. Supp. 2d 554, 559, 562 (D. Del. 2008), *appeal dismissed*, 356 Fed. Appx. 389 (Fed. Cir. 2009). Irreparable harm was absent because: 1) the patentee had not proven it would lose any sales *because* of the infringement; 2) the patentee had not proven it would lose market share; and 3) the patentee

4

licensed another competitor who was bigger than the infringer.  Similar facts in this case demonstrate that enjoining Lawson's RSS and Punchout products will not prevent any irreparable harm to ePlus's eProcurement business.  Even where there is some competition, an injunction should be denied if there is no irreparable harm.

a)   ePlus and Lawson Sell Different Kinds of  Software that Compete in Different Industry Segments

ePlus and Lawson sell different products. Lawson provides enterprise resource planning (ERP) software, which is a suite of software packages for financial management, human resource management, and supply chain management.  (Lawson's Findings of Fact and Conclusions of Law ("FF") at ¶15).  ERP vendors sell procurement software that is designed to work with their ERP Suite. (FF at ¶¶15-16).  Lawson has less than 2% of the ERP market in the U.S.  (FF at ¶14).  ePlus cannot compete in this market because it offers only procurement software, not ERP software.  (FF at ¶19).  If a prospect seeks an ERP suite, Lawson would be a contender but ePlus would not.  (FF at ¶19).  Therefore, Lawson and ePlus do not compete in the ERP market.

Lawson's RSS and Punchout products are designed to be used as add-on features specifically within Lawson's ERP suite.  (FF at ¶16).  When Lawson customers buy products initially, they usually do so with the intent to buy Lawson's offerings when seeking to add capabilities to their existing suite.  (FF at ¶¶16-17).  Thus, most customers already effectively decide to buy more products from Lawson when they make their initial ERP purchase from Lawson.

In contrast, ePlus is a niche or "Best-of-Breed" vendor.  (FF at ¶7).  It does not sell ERP software, but rather sells procurement software that either works alone or is designed to be integrated with other vendors' ERP software.  (FF at ¶7).  In contrast, RSS and Punchout will not work with another vendor's ERP software and will not work without Lawson's ERP software.

5

(FF at ¶16).  Lawson does not market RSS as a stand-alone product.  (FF at ¶16).  If a customer

with an existing, non-Lawson ERP suite seeks to add eprocurement functionality, Lawson is not

a viable option.  (FF at ¶20).  Thus, ePlus faces no competition at all from Lawson in the vast

majority of its market, which is (1) prospects seeking a standalone procurement product, and (2)

the 98% of ERP customers who do not have a Lawson ERP system.

      The only time that Lawson's RSS software could possibly compete with ePlus's is that

rare occasion when the customer (1) owns ERP software, (2) owns Lawson's ERP suite; (3) does

not own RSS or Punchout; and (4) is willing to consider a vendor other than Lawson.  (FF at ¶¶7,

15-20).  If such a customer seeks a Best-of-Breed solution, Lawson would typically be out of the

running before the customer solicits RFP responses.  (FF at ¶20).

      In light of the foregoing facts, it is not surprising that ePlus never identified Lawson as

one of its competitors before bringing this lawsuit.  Indeed, in the millions of documents ePlus

provided in this case, ePlus did not produce any document that identified Lawson as its

competitor.  (FF at ¶¶37-38).  During discovery and trial in the SAP and Ariba lawsuits between

2004 and 2006, Mr. Farber discussed ePlus's competition but did not mention Lawson.  (*Id.*).

Instead, he identified SAP, Oracle, Ariba, Perfect Commerce, and others.  (*Id.*).  Similarly,

Lawson's testimony and records show that Lawson does not consider ePlus to one of its

competitors.  (FF at ¶¶39-41).  Every Lawson witness testified that Lawson does not consider

ePlus to be a competitor.  (*Id.*).  Lawson's databases used to keep track of Lawson competitors

have no information about ePlus.  (*Id.*).

           b)     ePlus Has Not Shown that it Has Lost Sales or Market Share
                    Because of Lawson's Infringing Products

      Irreparable harm may arise from an incalculable amount of lost profits arising from lost

sales, incalculable price erosion due to the competition, and damage to reputation and goodwill.

ePlus does not allege price erosion.  Although ePlus's brief alleges harm to its reputation, its testimony and briefing provide no support for this allegation.  ePlus's Findings of Fact do not mention anything about ePlus's reputation or goodwill.  (Dkt. No. 641-1.)

That leaves only lost sales.  The mere potential for lost sales is insufficient as a matter of law to demonstrate irreparable harm.  *Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1558 (Fed. Cir. 1994) (quoting *Ill. Tool Works, Inc. v. Grip-Pak, Inc.*, 906 F.2d 679, 683 (Fed. Cir. 1990)).  Even when there is some competition between the patentee and infringer, courts should not grant an injunction if the patentee cannot "provide at least some data on any specific sales or customers lost, or what its share of the market is." *Presidio*, 723 F. Supp. 2d at 1336.  Because an injunction is unlikely to help ePlus recapture sales, it should be denied.  *Soverain Software LLC v. Newegg Inc.*, No. 07-511, 2010 U.S. Dist. LEXIS 89268, at *48 (E.D. Tex. Aug. 11, 2010); *Hynix*, 609 F. Supp. 2d at 981.

ePlus cannot show lost sales.  It could name only two new customers in each of the last two years.  (FF at ¶77).  Out of the thousands of companies ePlus alleges were "targeted" by both Lawson and ePlus, ePlus identifies *only* five customers it says it lost because of Lawson: Gannett, PPD, Deaconess, Blue Cross Blue Shield of North Carolina, and LHC.  (Dkt. 641-1 at ¶¶35-40.)  Mr. Farber, however, admitted he had no idea whether any of these customers even bought RSS or Punchout.  (FF at ¶43).  The evidence shows ePlus did not lose these sales due to RSS or Punchout:

> **Gannett:**  Gannett has been a Lawson customer since 1998 with the non-infringing core procurement suite.  (FF at ¶¶69-70).  Although Gannett acquired a license to RSS in 2005, it never used RSS.  (*Id.*).  Gannett owned a license to ePlus's Procure+ from 2002-2008.  (*Id.*).  Gannett cancelled its license to Procure+ *for reasons unrelated to Lawson*.  (*Id.* (emphasis added)).

> **PPD:**  Although Lawson submitted a bid to sell RSS to PPD and ePlus submitted a bid to sell Procure+ to PPD, PPD decided not to purchase either one.  (FF at ¶¶45-46).

**Deaconess Health System**:  Deaconess has been a Lawson customer since April 30, 1998, before ePlus was in the market.  (FF at ¶¶14, 37, 53).  Prior to 2007, Deaconess was using procurement software called Matkon, which is made by McKesson.  (FF at ¶54).  According to Deaconess's Statement of Work, when McKesson stopped supporting Matkon, Deaconess chose Lawson's procurement software to replace it.  (*Id.*).  Thus, Lawson replaced Matkon, and did not compete with Procure+.

**Blue Cross/Blue Shield of North Carolina:**  BCBS-NC has been a Lawson customer since August 29, 1997, when it licensed Lawson's Purchase Order, Requisitions, and RSS modules.  (FF at ¶¶49-52).  ePlus did not own the patents-in-suit at that time, and does not allege this 1997 purchase of RSS took business from it.  (FF at ¶37).  BCBS-NC has not licensed Lawson's Procurement Punchout product.  (FF at ¶49).

**LHC Group:**  ePlus's only evidence regarding LHC Group is an *unsolicited* e-mail that ePlus sent to LHC several months *after* LHC had selected and begun implementing Lawson's RSS software.  (FF at ¶¶61-62).  ePlus did *not* compete with Lawson for this deal and did not lose the sale because of Lawson.

ePlus's sales forecasts for the past year show Lawson is associated with *only* two prospects (PPD and Sterling Jewelers) out of a total of more than one hundred prospects, even in recent months since the lawsuit began, when ePlus has been particularly mindful of Lawson's activities.  (FF at ¶¶45-48).  Neither resulted in a lost sale for ePlus because of Lawson: PPD and Sterling Jewelers decided not to purchase RSS from Lawson.  (*Id.*).

ePlus also asserts that it directly competed with Lawson for the following companies: Ames, Fortress, Cleveland Clinic, Novant, Wolters Klewer, Indalex, Hanesbrands, and XM Radio.  (FF at ¶44).  The facts only confirm the weakness of ePlus's proof of harm:

**Ames, Fortress, Indalex, and Wolters Kluwer:**  These companies never licensed RSS or Punchout.  (FF at ¶¶58-60).  Lawson never even marketed RSS or Punchout to them.  (*Id.*).

**XM Radio:**  It stopped licensing RSS in 2003 and is not a current customer.  (FF at ¶71).

**Cleveland Clinic:**  It wanted an external catalog product and considered ePlus's Content+ and SciQuest's external catalog.  (FF at ¶¶56-57).  ePlus documents admit it was competing with its licensee, SciQuest.  (*Id.*).  Cleveland Clinic picked SciQuest.  (*Id.*).  Lawson did not compete with ePlus for Cleveland Clinic's business.

**Hanesbrands:**  It has been a Lawson customer since at least 2000, when it licensed RSS. (FF at ¶63).  Hanesbrands also licensed Procure+ from ePlus.  (FF at ¶64).  Hanesbrands selected ePlus to replace Ariba's procurement product.  (FF at ¶64).  Hanebrands currently owns licenses to both RSS and Procure+.  (*Id.*).  Hanesbrands never chose between Procure+ and RSS, and in fact uses both.

**Novant:**  ePlus did not make Novant's short list – ePlus was "eliminated in the first round" because it did not have the required functionality.  (FF at ¶¶67-68).  Ariba won the bid, not Lawson.  (*Id.*).

ePlus uses a Lawson prospect list to assert that Lawson "targeted" 16 of its Procure+ customers.  Lawson in fact "targeted" 12 of these companies for Lawson's *unrelated* software (e.g. human capital management, financial management, human talent management and the like), but did *not* market its procurement software to these companies.  (FF at ¶74).  The remaining four simultaneously owned licenses to both Lawson's RSS and ePlus's Procure+, and thus do not represent customers picking Lawson RSS over ePlus.  (FF at ¶73).  Thus, this list of prospects also is irrelevant to the issue of harm or injunctive relief.

ePlus asserts that it often does not know who it is competing against.  Vendors who make the customer's "short list" know who they are competing against.  (FF at ¶¶36).  The "short list" includes a few vendors identified by the customer as having viable products.  (*Id.*).  Vendors on the short list meet face-to-face with the customer, often after sitting in a waiting room until another short list competitor completes its presentation.  (*Id.*).  ePlus does not know of competition with Lawson because there is none.

>    2.    ePlus Did Not Prove that Lawson's Infringing Products are Causing It Harm

>         a)    There Are Numerous Other Competitors for the Patented Products

Even if the patentee and the defendant compete, an injunction is not appropriate if any harm to the patentee's market share is caused by others.  *See Advanced Cardiovascular*, 579 F. Supp. 2d at 559 (D. Del. 2008), *appeal dismissed*, 356 Fed. Appx. 389 (Fed. Cir. 2009)

(declining to grant an injunction, despite direct competition, because "there is no indication that Medtronic is currently drawing bare-metal stent sales away from ACS, as compared to [third party] BSC"; and further declining to grant an injunction for second product where "ACS has not addressed the other market players, nor has it identified specific DES customers it has lost, or stands to lose, directly as a result of Medtronic's sales"); *Cordance Corp. v. Amazon.com, Inc.*, 730 F. Supp. 2d 333, 340 (D. Del. 2010) ("Cordance offers no argument to either rebut Amazon's assertion that there are other players in the digital identity market or explain why other players were not the cause of Cordance's failure to gain market share."). For this reason, courts typically limit permanent injunctions to situations where the parties are direct competitors in a *two-supplier* market. *See Humanscale*, 2010 U.S. Dist. LEXIS 42083, at *8.

ePlus admits that there are dozens of competitors for its procurement software, several of which have licenses to the patents-in-suit. Third party market research reports confirm that there are many software vendors who provide solutions similar to Procure+ and Content+, including SAP, Oracle, Ariba, Ketera, SciQuest, Verian, and Perfect Commerce. (FF at ¶¶21-25). Further, industry market studies demonstrate that other vendors are dominant in the e-procurement market, Lawson is a small player, and ePlus is virtually non-existent. (*Id.*). Oracle, SAP, and Ariba together have almost 50% of the market share. (*Id.*). Contrary to ePlus's assertions, SAP markets its procurement products to mid-market companies just like ePlus. (FF at ¶26). ePlus has less than 1% market share, and shows up only on market reports that erroneously overstate its sales. (FF at ¶¶21-25).

This data shows that if Lawson is enjoined from selling RSS, Lawson's sales will likely go to those competitors with dominant market shares, such as ePlus licensees Ariba and SAP, or Oracle, or to any of the other dozens of companies that sell best-of-breed procurement software.

ePlus largely ignores the major market players in its brief.  As such, ePlus has not and cannot meet its burden to show that it will suffer irreparable injury absent a permanent injunction.

            b)      ePlus Admitted its Declining Revenue is Not Due to Lawson

On February 23, 2009, only weeks before suit, ePlus filed an 8-K report with the SEC indicating that its software procurement reporting group was projecting a decline in revenue and would take a $4.6 million charge for impairment of goodwill as a result.  (FF at ¶13).  ePlus blamed the decline on the credit crunch and global issues, not Lawson.  (FF at ¶13).

            3.      ePlus Has Not Demonstrated Any Other Type of Irreparable Harm

ePlus's last argument is that it has been harmed because of the cost of this litigation and lost opportunities for research and development.  This argument fails.  First, it addresses a past harm, while injunctive relief should be granted to prevent future harm.  *Advanced Cardiovascular*, 579 F. Supp. 2d at 560 n.9.  Second, "litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury."  *Renegotiation Board v. Bannercraft Clothing Co.*, 415 U.S. 1, 24 (1974).  Third, ePlus has not proven it has lost any opportunities.  To the contrary, while this litigation was pending ePlus's R&D personnel completed a "substantial undertaking" to update and enhance Procure+.  (FF at ¶82).

            4.      ePlus Has Followed a Consistent Course of Licensing its Patents That Demonstrates Its Willingness to Forego its Right to Exclude for Compensation, Negating Irreparable Harm

Injunctions are not for parties who use their patents as a "sword to extract money rather than as a shield to protect its right to exclude".  *MercExchange, LLC v. eBay, Inc.*, 500 F. Supp. 2d 556, 572 (E.D. Va. 2007).  A patentee's willingness to forego its patent rights for compensation, while not dispositive, should be considered.  *Id.*

ePlus suggests that because it granted all five of its licenses to settle litigation, these

should not adversely affect its ability to assert irreparable harm. This is nonsense.[1] Patent lawsuits are often settled *without* the grant of a license. There is no public policy favoring using licenses instead of consent injunctions to settle disputes. "[M]oney damages are ***rarely inadequate***" when a patentee has been willing to grant licenses to settle patent litigation against direct competitors. *Advanced Cardiovascular*, 579 F. Supp. 2d at 560 (emphasis added).[2]

Here, ePlus has granted five licenses to the patents-in-suit to Ariba, SAP, Perfect Commerce, SciQuest, and Verian Technologies Inc., all of whom admittedly compete with ePlus. (FF at ¶27). Ariba and SAP are much bigger competitors than Lawson. (FF at ¶¶27-28). Although ePlus did not lose even a single sale to Lawson, it *has* lost sales to its licensees. (FF at ¶29). Ariba won the Novant business from ePlus. (*Id.*). SciQuest won the Cleveland Clinic business from ePlus. (*Id.*). ePlus has never refused to give anyone a license to the patents-in-suit. (FF at ¶31). ePlus even offered to give Lawson a license to the patents-in-suit. (FF at ¶30). The fact that ePlus is willing to grant licenses for money shows that any harm ePlus is suffering is not irreparable. *Johnson & Johnson Vision Care, Inc. v. Ciba Vision Corp.*, 712 F. Supp. 2d 1285 (M.D. Fla. 2010). These licenses weigh strongly against finding irreparable harm.

> 5. ePlus's Delay in Filing this Lawsuit for Seven Years After Lawson's Infringement Began Shows There is no Irreparable Harm

---

[1] The case cited by ePlus, *Flex-Foot, Inc. v. CRP, Inc.*, 238 F.3d 1362, 1370 (Fed. Cir. 2001), is not on point. It enforced a settlement agreement that prevented the defendant from challenging the validity of a patent. The decision is devoid of any analysis relating to injunctive relief.

[2] *See, e.g., MercExchange*, 500 F. Supp. 2d at 572 (finding that there was no irreparable harm because "MercExchange's modus operandi appears to be to seek out companies that are already market participants that are infringing, or potentially infringing, on MercExchange's patents and negotiate to maximize the value of a license, entered into as a settlement to, or avoidance of, litigation"); *Johnson & Johnson*; *Ricoh Co. v. Quanta Computer, Inc.*, No. 06-462, 2010 U.S. Dist. LEXIS 38220, at *5-6 (W.D. Wis. Apr. 19, 2010) ("plaintiff has not been miserly in issuing licenses for the '755 patent for any company willing to pay for one . . . Thus, plaintiff cannot argue persuasively that it is trying to narrowly limit the practice of its invention rather than simply maximize a potential licensing fee."); *Soverain*, 2010 U.S. Dist. LEXIS 89268, at *48 ("In addition, Soverain and its predecessors have extensively licensed the patents-in-suit, and Soverain's patent licensing program has largely focused on obtaining monetary objectives, rather than non-monetary objectives (e.g., cross licensing for resolution of litigation). Soverain's focus on monetary objectives does not favor an injunction."); *Telcordia Techs. Inc. v. Cisco Sys.*, 592 F. Supp. 2d 727, 748 (D. Del. 2009) ("Further supporting the court's conclusion that Telcordia will not suffer (and has not suffered) irreparable harm is the fact that it licensed the patents-in-suit to two other defendants").

Delay in filing suit also suggests that there is no irreparable harm. *MercExchange*, 500 F. Supp. 2d at 573 n.13. Here, ePlus has owned the patents since 2001 and has been selling its procurement software since 2002. (FF at ¶¶104-108). ePlus has known about Lawson and its software since 2002. (*Id.*). ePlus contends that it has been competing with Lawson since 2002. (*Id.*). Yet ePlus never charged Lawson with infringement and waited to sue Lawson until 2009. If RSS and Punchout were truly causing irreparable harm to ePlus, it would not have waited seven years to sue Lawson. This also weighs strongly against finding irreparable injury.

> 6. ePlus Did Not Seek to Preliminarily Enjoin Lawson's Infringing Product

ePlus did not seek a preliminary injunction against Lawson. This also weighs against finding irreparable injury. *PGBA, LLC v. United States*, 389 F.3d 1219, 1229-31 (Fed. Cir. 2004); *MercExchange*, 500 F. Supp. 2d at 573.

> B. **A Legal Remedy Would Be Adequate to Compensate ePlus for Lawson's Infringement**

There is no presumption that legal remedies are inadequate to compensate for infringement. *MercExchange*, 500 F. Supp. 2d at 568-69. If the patentee cannot demonstrate why legal remedies would be inadequate to compensate for its injuries, this factor weighs against the issuance of an injunction. *See Am. Calcar, Inc. v. Am. Honda Motor Co.*, No. 06-2433, 2008 U.S. Dist. LEXIS 106476, at *3-4 (S.D. Cal. Nov. 18, 2008).

A patentee's actions in freely issuing licenses creates difficultly establishing why utilization of the patent by the infringer is "any less compensable in dollars than" utilization of the patent by the prior licensees. *See Illinois Tool Works*, 906 F.2d at 683. As discussed above, ePlus's decision to grant licenses to five of its competitors demonstrates that an ongoing royalty would be adequate to cure its harm in this case.

ePlus argues that if this Court denies its request for an injunction, it will be left without a remedy for Lawson's infringement.  Not true.  This Court may award ongoing royalties for Lawson's post-verdict sales as an equitable remedy.  *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1314 (Fed. Cir. 2007).

ePlus appears to assert that because it was precluded from seeking past damages, it is also precluded from receiving ongoing royalties and therefore it must be given an injunction as a booby prize.  This is not the law.  Past damages for products sold before a verdict are different than an ongoing royalty for sales made after the verdict.  The former is a legal question governed by 35 U.S.C. § 284 to be decided by the jury.  The latter is an equitable remedy that may be issued by a court pursuant to 35 U.S.C. § 283.  Even though a reasonable royalty may be awarded for both[3], they are separate and distinct acts with separate and distinct remedies.  *Paice*, 504 F.3d at 1317 ("But pre-suit and post-judgment acts of infringement are distinct, and may warrant different royalty rates given the change in the parties' legal relationship and other factors.") (Rader, J. concurrence).

Moreover, the fact that a party did not seek or did not obtain past damages does not prove damages are inadequate.  *See, e.g.*, *A Helping Hand, LLC v. Baltimore County*, 335 Fed. Appx. 773, 2009 US App. LEXIS 26868, at *6 n.1 (4th Cir. 2009) ("Of course, the mere fact that the Clinic has not sought money damages does not prove them an inadequate remedy.").  The question is whether money damages would be sufficient to cure the patentee's harm, not whether they were actually awarded.  Likewise, the amount of damages need not be known in order for damages to be adequate relief.  *See, e.g.*, *Am. Calcar, Inc. v. Am. Honda Motor Co.*, No. 06-2433, 2008 U.S. Dist. LEXIS 106476, at *3-4 (S.D. Cal. Nov. 18, 2008).  Indeed, a determination of what ongoing royalty applies should be made after a court decides whether to

---

[3]      In the present case, however, the Court has precluded damages for past infringement.

issue an injunction.  *Paice*, 504 F.3d at 1316 (Rader, J. concurring).

ePlus was precluded from obtaining pre-verdict damages in this case because of a flawed expert report and discovery violations, not because it was impossible to calculate a royalty rate. ePlus has determined a dollar figure for five other parties, and one can be determined again.  The fact that ePlus violated Rule 37 and was sanctioned should not be used against Lawson at the injunction stage.  That would unfairly reward ePlus for its inadequate disclosures.  If a party's failure to seek damages does not prove damages inadequate as in *A Helping Hand*, then surely a party's express desire to seek damages, accompanied by a violation of discovery rules, cannot prove damages inadequate either.

### C.   Balance of Hardships Shows that an Injunction is Not Warranted

#### 1.   ePlus's Procurement Software is a Tiny Part of its Business, Which Weighs Against Granting Injunctive Relief

The balance of harms weighs against an injunction if sales of the patented technology account for a small percent of the patentee's business.  This is true even in a two-supplier market where there is direct and significant competition between the parties, which is not the case here. *See Praxair, Inc. v. ATMI, Inc.*, 479 F. Supp. 2d 440, 443 (D. Del. 2007).

ePlus asserts that Procure+ and Content+ "remain ePlus Systems and Content Services' flagship-software applications even today."  But these products are flagships of a very small armada.  The vast majority of ePlus's revenues (99%+) are for leasing and sales of equipment, and procurement software is less than 1%:

|          | ePlus Total Revenues | ePlus procurement software | %    |
| -------- | -------------------- | -------------------------- | ---- |
| FY2010   | $684,300,000         | $5,834,549                 | 0.9% |
| FY2009   | $698,027,000         | $7,541,782                 | 1.1% |
| FY2008   | $849,305,000         | $10,418,547                | 1.2% |
| FY2007   | $791,611,000         | $8,457,247                 | 1.1% |

|  | ePlus Total Revenues | ePlus procurement software | % |
|---|---|---|---|
| **FY2006** | $647,318,000 | $8,443,042 | 1.3% |
| **FY2005** | $575,798,522 | $6,580,286 | 1.1% |
| **FY2004** | $330,557,448 | $4,210,856 | 1.3% |
| **FY2003** | $299,646,146 | $2,687,434 | 0.9% |
| **FY2002** | $204,985,346 | $2,552,647 | 1.2% |

(FF at ¶¶8-12). The vast majority of ePlus's sales are in the value-added leasing business (which is much different than its procurement software). (*Id.*). Any harm that ePlus suffers related to its procurement software will have little impact, if any, on ePlus as a whole and certainly would not be sufficient to rise the level of irreparable harm necessary to justify a permanent injunction against Lawson.

ePlus's heavy reliance on *Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1328 (Fed. Cir. 2008), is misplaced because the facts differ significantly from this case:

- Unlike ePlus, whose patented technology accounts for less than 1% of its business, Acumed's primary product was its patented product. *Id.* at 1327.

- Unlike Lawson, who has less than 2% of the supply chain management market and ranks well below the top five, the infringer in Accumed was "the largest orthopedic implant company in the world." *Id.* at 1329.

- Unlike ePlus, Accumed proved significant lost sales because of the infringement – it submitted declarations stating doctors stopped using Acumed's product in favor of Stryker's infringing product. *Acumed, LLC v. Stryker Corp.*, No. 04-513, 2007 U.S. Dist. LEXIS 86866, at *14 (D. Or. Nov. 20, 2007). In contrast in this case, ePlus has not proven even a single lost sale, and the evidence shows that ePlus's loss of customers has nothing to do with Lawson. (FF at ¶¶42-74).

- In *Accumed*, the plaintiff proved lost sales from the infringement. The jury awarded lost profits, finding that but for the infringement, the patentee would have captured 60% of the infringing sales. *Id.* at *2. Here, ePlus did not even ask for lost profits damages (which would be much more money) because it could not prove lost sales.

- In *Accumed*, Stryker's infringement was willful. Lawson's was not.

- Accumed granted only two licenses to its patents to a non-competitor and a smaller competitor than Stryker. *Id.* at *15. Here, ePlus has granted five licenses, all of them

to competitors, and at least two of them (SAP and Ariba) with much larger market shares than Lawson.

ePlus's attempt to analogize its situation with cases like *Accumed* is like trying to fit a square peg into a round hole.

2.   All of the Claims Found to be Infringed Have Been Rejected as Unpatentable During the Pending Reexaminations, Confirming that the Balance of Harms Favors Lawson.

In balancing the harms in this case, this Court must also consider the reality that the patents will likely not survive reexamination.  *This is not ignoring the jury verdict, but rather recognizing reality.*  In the *eBay* case on remand, although the patents had been adjudicated as valid and infringed at trial, the court considered the reexamination as a factor weighing against a permanent injunction.  *MercExchange*, 500 F. Supp. 2d at 574-75.  The court recognized, "when the court considers a prospective motion in equity*, it would be imprudent not to consider the ongoing reexamination.*"  *Id.* at n.15 (emphasis added).  "As the Chief Justice posited during oral argument, if the reexamination can act as a basis for staying an injunction, it can also be 'a basis not to issue [an injunction] in the first place.'"  *Id.* n. 29.

In *eBay*, although the reexaminations were ongoing and not final, the Patent Office had rejected every claim of the patent-in-suit as obvious.  Because of these rejections, the court had "a legitimate reason to question whether MercExchange [the patentee] will suffer irreparable harm."  *Id.*; *see also Standard Havens Prods, Inc. Gencor Indus., Inc.*, 1993 U.S. App. LEXIS 11963, at *2 (Fed. Cir. May 21, 1993) (unpublished) (ordering a stay of the permanent injunction and damages phase of the case "until the reexamination decision becomes final" because the "reexamination proceeding 'would control' the infringement suit."); *Translogic Tech., Inc. v. Hitachi, Ltd.*, 2007 U.S. App. LEXIS 23951 (Fed. Cir. Oct. 12, 2007) (unpublished) (vacating a judgment of infringement, damages and an imposition of a permanent injunction after affirming

rejection of the patent in suit as obvious in reexamination).  Further, the Patent Office's multiple rejections of the claims suggests that there is a substantial risk to Lawson if the claims were ultimately found to be invalid.  See *MercExchange*, 500 F. Supp. 2d at 585-86 ("[I]n fashioning *prospective* equitable relief, the court must also consider the potential for eBay to suffer irreparable harm if enjoined from utilizing the buy-it-now feature on its website should the PTO later invalidate the '265 patent.").

The patents-in-suit are all in reexam and the Patent Office has rejected all of the claims of all three of the patents-in-suit at least once and in many cases multiple times.  (FF at ¶¶109-115). This fact causes the balance of harms to tip sharply against a permanent injunction.   For example, the only claim the jury found to be infringed by the RSS configuration, claim 1 of the '172 patent, has been finally rejected by the Patent Office based on anticipation under 35 U.S.C. § 102 by *six separate* pieces of prior art: the '989 patent, the '551 patent, the Sabre system, the J-CON system, the Gateway system, and the P.O. Writer system.  (FF at ¶109).  This final rejection was reviewed by a panel of three PTO examiners.  (FF at ¶111).  While ePlus has appealed this decision to the Board of Patent Appeals and Interferences ("BPAI"), there is a high probability that one or more of the six independent rejections of claim 1 of the '172 patent will be affirmed.  (*Id.*).  Although the jury found the asserted claims not invalid, the jury was repeatedly told by ePlus at trial that the '989 patent was fully considered by the Patent Office. Lawson was prohibited from discussing the reexaminations and was also blocked from showing that the '989 patent was not considered by the Patent Office.  (FF at ¶110).  Further, the jury did not consider many of the prior art references that are being used to reject the claims.  (FF at ¶109-111).

Three of the claims (claims 26, 28, and 29 of the '683 patent) that were found to be

infringed by Lawson's Punchout product have also been finally rejected by the Patent Office based on anticipation under 35 U.S.C. §102 by several independent pieces of prior art. (FF at ¶112-114). ePlus appealed this decision to the BPAI. (*Id.*). Oral argument was heard on this appeal in October 2010. (*Id.*). If the rejection is affirmed, ePlus will have the right to appeal to the Federal Circuit, which is likely to be on a similar time track as this lawsuit.

Should the Patent Office's rejections be affirmed on appeal, any injunction entered against Lawson should be lifted, but Lawson will not be compensated for any damage to its reputation or other harm arising from the injunction. Lawson's customers will likewise not be compensated for any harm they suffered as a result of an injunction. In contrast, if ePlus prevails on appeal, it will be compensated in monetary damages. The balance of harms weighs strongly against granting an injunction.

### 3. An Injunction Preventing New Sales Will Harm Lawson

"[W]here infringement is not willful, perhaps because of serious questions as to the patent's validity or the patent arose long after the technology was first used, the potential destruction of an infringer's business should carry some weight in the balancing of harms under the four-factor test reaffirmed in *eBay*." *Hynix*, 609 F. Supp. 2d at 971. An injunction against Lawson's future sales of RSS and Punchout would harm Lawson through lost sales and lost customers. This harm is particularly problematic because although Lawson is working on redesigning RSS and Punchout to avoid the infringed claims, the design around is not done and Lawson has not determined when it will be done. The harm that will be caused by these lost sales and customers is not compensable if injunction is overturned.

### 4. An Injunction Preventing Lawson from Maintaining, Fixing, and Servicing Products it Sold Before the Verdict Is Improper and Would Significantly Harm Lawson

19

"[W]here infringement is not willful, perhaps because of serious questions as to the patent's validity or the patent arose long after the technology was first used, the potential To the extent an injunction extends beyond Lawson's new sales of RSS and Punchout products to Lawson's ability to service existing customers, the balance of harms tips decidedly against such a broad injunction.  ePlus's proposed injunction does not seek to enjoin existing customers from using RSS and Punchout, but does seek to stop Lawson from supporting those products.  ePlus admitted it cannot enjoin existing customers.  (Trial Tr. at 3410-3411).

Such an injunction will accomplish indirectly what ePlus admits it cannot accomplish directly.  Lawson's RSS and Punchout customers do not have viable alternative sources for support other than Lawson.  (FF at ¶95).  Lawson's customers, many of whom are healthcare organizations and schools and many of whom purchased RSS years ago, would effectively be precluded from properly using the RSS and Punchout software if Lawson is precluded from maintaining and servicing this software.  (FF at ¶¶88-99).  If the software stops working, these customers will have no way to fix it.  This will cause harm to Lawson's customer relationships, which in many cases predate when the alleged date infringement began in 2003, and will harm Lawson's reputation and goodwill.  (*Id.*).

Moreover, Lawson has contracts with hundreds of existing clients which require Lawson to provide maintenance and support services.  (FF at ¶¶98).  Many such contracts are renewed annually.  An injunction that prevents Lawson from servicing RSS and Punchout products it sold before the verdict would result in Lawson potentially breaching hundreds of agreements with its customers.  This would cause irreparable damage to Lawson's reputation and goodwill.

### 5.    ePlus is Seeking an Injunction for All the Wrong Reasons.

When asked why it wanted an injunction, as opposed to on-going royalties, ePlus gave

20

two primary reasons.  Neither of them justifies injunctive relief as a matter of law, and both reveal why an injunction should be denied.

ePlus explained that it wanted an injunction, as opposed to an on-going royalty, "because of the contentious battle that we've had with Lawson which has exponentially been much greater than anybody else." (FF at ¶¶75-81).  This is doubtful in view of the prior litigations, which included one trial and finding of willful infringement (Ariba) and another mistrial with willfulness alleged (SAP).  In any event, injunctions should not be granted out of spite or to punish the infringing party.  *Hynix,* 609 F. Supp. 2d at 985 (denying a permanent injunction because the patentee's motive in seeking an injunction "is not to prevent irreparable harm but either (a) to increase its leverage in negotiating an ongoing license with Hynix or (b) to punish Hynix out of spite for its decision to contest Rambus's infringement allegations and over a variety of other grievances . . . ."); *see also Belk v. Charlotte-Mecklenburg Bd. of Educ.*, 269 F.3d 305, 347 (4th Cir. 2001) (en banc) (quoting *United States v. Or. State Med. Soc.*, 343 U.S. 326, 333 (1952)).

ePlus considers this litigation to be a "licensing dispute" that has not resulted in a license because Lawson is not willing to pay ePlus a "reasonable dollar amount." (FF at ¶76).  Because the money has not been right, ePlus is "at this point in time" seeking an injunction. (FF at ¶¶79-81.)  ePlus and its counsel both stated it would only return to the royalty bargaining table after an injunction is granted.  Inj. Tr. at 23:10-14, 78:15-22 (DX-533).  Clearly, ePlus seeks an injunction not to prevent irreparable harm, but rather as leverage to extort a higher license fee.  This weighs strongly against injunctive relief.  *Hynix,* 609 F. Supp. 2d at 985.

### D.   The Public Interest Factors Weighs Against Injunctive Relief

The "touchstone of the public interest factor is whether an injunction, both in scope and

21

effect, strikes a workable balance between protecting the patentee's rights and protecting the public from the injunction's adverse effects." *See i4i*, 598 F.3d at 863.

      1.      <u>The Public Interest Will Not Be Served by any Form of Injunctive Relief</u>

ePlus argues that the Constitution favors an injunction in this case. However, ePlus has not identified any facts that would help serve that purpose here any more than it is served in any other patent infringement case. As such, ePlus's argument carries little weight. *Ricoh Co. v. Quanta Computer, Inc.*, No. 06-462, 2010 U.S. Dist. LEXIS 38220, at *10-11 (W.D. Wis. Apr. 19, 2010) ("Plaintiff argues that the 'Constitutional goal of promoting science' under Article I, § 8 favors an injunction. Again, plaintiff fails to identify any facts in this case that would help serve that purpose more than with respect to any other claim for patent infringement. In fact, plaintiff has not shown that an injunction would serve any purpose other than to increase its leverage in negotiations for a higher licensing fee." (citation omitted)).

Moreover, there is a public interest in "permitting full and free competition in the use of ideas which are in reality a part of the public domain." *Lear v. Adkins*, 395 U.S. 653, 670 (1969). Here, the fact that the claims have been rejected in reexamination suggests that the public interest will not be served by an injunction. *See MercExchange*, 500 F. Supp. 2d at 586 ("Thus, the court deems it proper to consider the nature of the patent, as well as repeated indications from the PTO that such patent is invalid as obvious, when considering the public's interest in protecting the patent holder through injunctive relief.").

      2.      <u>Lawson's Customers and the Public Will Be Significantly Harmed if Lawson is Enjoined from Fixing, Maintaining and Servicing Pre-Existing Products</u>

ePlus fails to address the issues specific to its request to enjoin servicing existing customers. To show Lawson is not harmed, it cites testimony that Lawson can withstand losing

future sales of RSS. It cites no testimony addressing the service issue, which clearly will harm Lawson as described above. Moreover, all of the public interest cases cited by ePlus were limited to enjoining new sales – *none* of them granted an injunction against the continued use of, or service or repair of, products that were sold to customers prior to the verdict. ePlus apparently hopes the Court will throw the baby out with the bathwater by enjoining both future sales and service. ePlus failed miserably to show an injunction against service meets any eBay factors.

Enjoining Lawson from servicing previously sold products is impermissible and in any event will not serve the public's interest or prevent harm to ePlus. It will, however, cause substantial harm to third parties, such as Lawson's customers, many of whom are hospitals, healthcare organizations, and schools, and will indirectly harm the patients and students who are served by these customers. *Dow Chem. Co. v. Nova Chems. Corp.*, No. 05-737, 2010 U.S. Dist. LEXIS 77099, at *3-4 (D. Del. July 30, 2010) ("numerous consumers of Nova's product would be injured through the loss of productivity that will follow if a new polymer product is required to be inserted into their production facilities"); *z4 Techs., Inc. v. Microsoft Corp.*, 434 F. Supp. 2d 437, 444 (E.D. Tex. 2006) ("Under both aspects of z4's proposed permanent injunction, there is a risk that certain sectors of the public might suffer some negative effects. However, the Court is unaware of any negative effects that might befall the public in the absence of an injunction. Although these negative effects are somewhat speculative, such potential negative effects on the public weigh, even if only slightly, against granting an injunction. Accordingly, the public interest is likely to be disserved if a permanent injunction were entered against Microsoft.").

Moreover, an injunction that precludes Lawson from servicing RSS and Punchout will be very difficult to implement and enforce because these modules are intertwined with all of Lawson's non-infringing software and it is often difficult to tell what is causing the problem.

(FF at ¶99).

Courts should not enter an injunction that will adversely impact an infringer's customers who purchased the infringing product before the injunction's effective date.  *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 863 (Fed. Cir. 2010).  In the *i4i* case, the Federal Circuit found that it was appropriate to narrowly tailor the scope of the permanent injunction to mitigate the effect of the injunction on the relevant public, including the defendants' customers:

> By ***excluding users who purchased or licensed infringing Word products before the injunction's effective date, the injunction greatly minimizes adverse effects on the public***.  Here, the relevant "public" includes not only individual consumers, but also companies that license infringing Word products and manufacturers that are part of Microsoft's distribution channels.

*Id.* at 863 (emphasis added, citations omitted); *see also Smith & Nephew, Inc. v. Arthrex, Inc.,* No. 07-335, 2010 U.S. Dist. LEXIS 60356 (E.D. Tex. 2010) ("Any harm to the public will be minimized by the narrowly tailored scope of the injunction, which only prohibits future acts of infringement and does not remove the already sold infringing products from the marketplace."); *Odetics, Inc. v. Storage Tech. Corp.*, 14 F. Supp. 2d 785, 795-96 (E.D. Va. 1998) (denying injunction against service of existing systems).

All of Lawson's RSS and Punchout customers have maintenance agreements with Lawson that provide the customer with unlimited support, product updates, bug fixes, product upgrades, and the like.  (FF at ¶¶88-90).  All software is constantly evolving and being updated and changes to one software program invariably impact other software programs.  (*Id.*).  Part of Lawson's maintenance service is to monitor these software changes and send out updates to Lawson products to make sure everything continues to run smoothly.  (FF at ¶¶88-94).  There are all different kinds of problems that can occur with RSS, many of which can prevent a user from finding and/or ordering the right product or from ordering any products at all.  (*Id.*).  It is not

unusual for Lawson's customers to have thousands of employees who use RSS to order items, which magnifies the adverse effects if the software malfunctions.  (FF at ¶101).  There is no third party who is capable of doing this maintenance work or who is capable of fixing RSS and/or Punchout if they break.  (FF at ¶95).

In this case, a majority of Lawson's RSS and Punchout customers are hospitals and healthcare organizations.  (FF at ¶¶91-94).  They use RSS and/or Punchout to purchase products that impact patient care, such as surgical supplies, lab supplies, and pharmaceuticals.  (FF at ¶91).  This software is a core part of their business operations and a problem with this software will cause major problems for these hospitals, which may adversely affect patient care.  For example, Providence Health described how it would be harmed:

> Providence will be harmed if Lawson is prevented from providing service and maintenance for our RSS software. If RSS were to malfunction and we were unable to receive timely software support to resolve the problem, we would be unable to adequately locate resources needed for continued operation of our hospitals and healthcare facilities. Due to this risk, Providence would be forced to discontinue use of our previously-purchased RSS software.

(FF at ¶93).  Similarly, Rockford Health stated:

> Rockford Health System will be harmed if Lawson is prevented from providing service and maintenance for our RSS software. If something were to go wrong with RSS and we were not able to get the problem fixed in a timely manner it would significantly and adversely impact our user productivity, our ability to place orders in a timely manner, our ability to maintain inventory of item critical to patient care the accuracy of our order for supplies (e.g. ordering the wrong product or paying the wrong price), and would cause an increase in operational expense. We would not be able to run RSS without ongoing maintenance.

(FF at ¶94).

Lawson's RSS and Punchout software are not easily replaced.  On average, it can take months to go through the process of finding and selecting new procurement software.  (FF at ¶¶100-103).  Many customers are required to go through formal RFP bid processes, which takes

even longer.  (*Id.*).  Additionally, it can take many months to several years to install, implement, and deploy new procurement software out to the thousands of users who are typically trained to use it.  (*Id.*).  For example, it took Providence Health a year to issue RFPs and select Lawson's RSS software.  (FF at ¶100).  It took Providence many years to deploy RSS to its 4000 users:

> Once we had selected Lawson's ERP suite in 2000, it took us approximately 3 years to install, implement, and deploy the software across our Oregon and Alaska operations which went live in 2003. Our Washington and California operations were completed in 2006.  We added several new facilities in 2006 (Eastern Washington and Montana) and those deployments went live in 2009. It has taken substantial additional time to fully train our staff, to work out the kinks in the system, and to establish internal processes to effectively use RSS.

(*Id.*).  Switching to a competitor product is not a viable option for Lawson's customers.

As such, this Court should not issue an injunction that prohibits Lawson from supporting, maintaining, fixing, updating, or servicing any RSS or Punchout software that was purchased before an effective date of any injunction that may be entered in this case.  To do so would create substantial hardship for Lawson's customers and would be adverse to the public interest.

## III.   THE PROPER SCOPE OF AN INJUNCTION

### A.   Any Injunction Entered in this Case Should Expire When the Patents Expire

ePlus overreaches by seeking to have the injunction expire on August 10, 2017.  RSS was found to infringe only claim 1 of the '172 patent, which expires on August 10, 2014.  35 U.S.C. §154(a)(2); (FF at ¶159-162).  No injunction against RSS should extend past August 10, 2014. The '683 patent expires on February 17, 2017.  35 U.S.C. §154(c)(1); (FF at ¶¶159-162).  No injunction against Punchout should extend past February 17, 2017.

### B.   Any Injunction Entered in this Case Should Not Apply to Servicing, Maintaining, or Repairing Products Lawson Sold Before the Verdict.

ePlus overreaches by seeking to enjoin products sold before the verdict in this case, even though it was precluded from collecting damages for these products.  It is not appropriate to

enjoin repair and maintenance services on infringing products, when the patentee was precluded from obtaining damages on the sale of such products.  As such, Lawson should not be enjoined repairing and servicing these pre-injunction products.

Servicing and repairing infringing pre-injunction products is not, itself, an infringing act. *Fonar Corporation v. General Electric Co.*, 107 F.3d 1543, 1555 (Fed. Cir. 1997).  In *Fonar*, the Federal Circuit affirmed the decision that the infringer did not have to pay damages for infringing scanners that were not marked.  Nevertheless, the patentee argued that the infringer was liable for inducing infringement by servicing and repairing these unmarked machines, which it had previously sold to its customers.  The Federal Circuit rejected this argument:

> The machines in question were not marked, so that no damages were recoverable before notice was given.  Moreover, servicing of the machines was analogous to repair, see Aro Mfg. Co. v. Convertible Top Replacement Co., 365 U.S. 336, 346, 128 U.S.P.Q. (BNA) 354, 359, 5 L. Ed. 2d 592, 81 S. Ct. 599 (1961), and repair is not infringement. If a machine was sold under circumstances that did not subject its seller to damages, ***then subsequent repair cannot subject it to damages***. One is entitled to repair that which is sold free of liability for infringement. Therefore, the district court did not err in granting GE's motion for JMOL that it did not induce infringement of the '966 patent.

*Id.* at 1555 (emphasis added).

Similarly, courts should not enjoin future uses of products when the patentee was precluded from obtaining damages on sales of such products.  *Odetics, Inc. v. Storage Technology Corporation*, 185 F.3d 1259 (Fed. Cir. 1999).  In *Odetics*, the Federal Circuit affirmed the district court decision precluding the patentee from collecting damages for any devices sold before the filing of the complaint because of laches.  The Federal Circuit also precluded the patentee from enjoining future uses and repair of these pre-complaint devices:

> Odetics, acknowledging that damages are unavailable, instead asks for an injunction against the use and repair of the pre-complaint devices. . . .  Odetics argues that the continued use of the pre-complaint infringing devices is a current (and, indeed, future) violation of section 271(a)--and that therefore the use of

laches to abrogate the right to exclude would work an impermissible prospective use of the laches defense.

Odetics's position, however, construes the scope of laches too narrowly. . . . [T]he sale of an infringing product during the laches period is beyond the reach of the patent: the patentee cannot later enjoin the use of a product sold during that time. As the Supreme Court has stated:

> Patentees . . . are entitled to but one royalty for a patented machine, and consequently when a patentee has himself constructed the machine and sold it, or authorized another to construct and sell it, or to construct and use and operate it . . . he has then to that extent parted with his monopoly, and ceased to have any interest whatever in the machine . . . .

*Bloomer v. Millinger*, 68 U.S. 340, 350, 17 L. Ed. 581 (1863). We conclude, then, that laches will result in the patentee abrogating his right to exclude any infringing products sold prior to the filing of the complaint.

As the district court noted, allowing a patentee who commits laches to enjoin nonetheless the further use of a pre-complaint product will, in many cases, allow the patentee to recover royalties that laches specifically prevents. ***Using the leverage of an injunction, patentees could--in theory--extract at minimum a reasonable royalty from current users of the pre-complaint infringing products.***

*Id.* at 1273-74 (emphasis added) (some citations omitted).

Similarly here, ePlus was precluded from recovering damages for pre-injunction sales of RSS and Punchout products.  As such, ePlus should not be able to enjoin Lawson from fixing, updating, repairing, maintaining and/or servicing these products.  Allowing ePlus to do so would give ePlus the improper leverage of an injunction to extract royalties that it was specifically precluded from recovering by this Court.  As such, any injunction that this Court may enter should not impact any products Lawson sold before any injunction in this case.

## C.   Any Injunction Entered in this Case Should Not Apply to Products Found Not to Infringe ePlus's Patents

ePlus overreaches by seeking to enjoin products that the jury found did not infringe any asserted claims.  Specifically, the jury found that the Core S3 Procurement system *alone* (without RSS or Punchout) does *not* infringe any claims.  Similarly the jury found that the Core S3

Procurement system in combination with EDI (but without RSS or Punchout) did *not* infringe any claim.  Thus, this Court should *not* enjoin the Core S3 Procurement system, should *not* enjoin any of LSF, ProcessFlow, or the IC, RQ, or PO modules, and should *not* enjoin EDI.

ePlus argues that the Core S3 Procurement system is necessary to make RSS and Punchout work.  While this may be true, it does not mean that these modules should be enjoined.  A computer is also necessary, but it would be absurd to enjoin computers merely because they are needed to run RSS and Punchout.  Rather, any injunction entered by this Court should be limited to RSS and Punchout, which are the only two products found to cause infringement.

Additionally, ePlus overreaches by asking that Lawson be enjoined from "installation, implementation, design, configuration, upgrade, maintenance and support and training and other related and associated services" which it calls the "Infringing Services."  The jury did not find any services infringed anything – its verdict was related to specific product configurations.  Verdict (Dkt. 600).  This portion of the proposed order should be removed.

> **D.**     **Portions of ePlus's Proposed Order Are Too Vague**

ePlus overreaches by asking that this Court generally enjoin Lawson from infringing the claims found to be infringed.  (Proposed Order at 2-3).  This is not specific enough to comply with the requirements of Fed. R. Civ. P. 65(d) and should be stricken.  *Int'l Rectifier Corp. v. IXYS Corp.*, 383 F.3d 1312, 1316 (Fed. Cir. 2004) ("the only acts the injunction may prohibit are infringement of the patent by the adjudicated devices and infringement by devices not more than colorably different from the adjudicated devices. In order to comply with Rule 65(d), the injunction should explicitly proscribe only those specific acts.").

Similarly, the portion of the order that enjoins "directly or indirectly" making, using, offering to sell, or selling . . ." the products configurations is vague and should be stricken.

E.   **Any Injunction Entered in this Case Should Not Apply to Lawson's Customers**

Fed. R. Civ. P. 65(d) provides that any injunction "is binding **only** upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them."  Lawson's customers who purchased RSS and Punchout before these products were found to infringe ePlus's patents are not parties to this action and will not be in active concert or participation with Lawson merely by continuing to use these products after an injunction is entered.  *Med. Instrumentation & Diagnostics Corp. v. Elekta AB,* 2002 U.S. Dist. LEXIS 26812, **26-27 (S.D. Cal. 2002), *rev'd on other grounds* (emphasis added).  As such, any injunction that may be entered by this Court should not apply to any of Lawson's customers, and as such,  Lawson should not be required to give them notice.

F.   **Any Injunction Entered in this Case Should Not Include M3**

Lawson stipulated to an *infringement* finding against its M3 product.  (FF at ¶4).  It did not stipulate that M3 should be *enjoined*.  M3 is an entirely different product line than S3.  ePlus has not made any showings that ePlus's products compete with M3, let alone that continued sales of M3 will cause irreparable harm to ePlus.  ePlus's brief is devoid of any facts relating to M3 other than the stipulation of infringement.  ePlus wholly failed to support an injunction against the M3 product, and thus this request should be denied.

## IV.   **CONCLUSION**

ePlus will not be irreparably harmed if an injunction is denied.  It will not even notice the difference.  ePlus greatly overreaches its injunction request by seeking to bar Lawson from servicing existing customers.  Its motives are clear: enhance its bargaining position to extract a larger settlement from Lawson.  Injunctive relief should be denied.

LAWSON SOFTWARE, INC.

By _____/s/_____
              Of Counsel

Dabney J. Carr, IV (VSB No. 28679)
Robert A. Angle (VSB No. 37691)
Megan C. Rahman (VSB No. 42678)
dabney.carr@troutmansanders.com
robert.angle@troutmansanders.com
megan.rahman@troutmansanders.com
**TROUTMAN SANDERS LLP**
1001 Haxall Point, Richmond, VA 23219
Telephone:  (804) 697-1200
Facsimile:  (804) 697-1339

Daniel McDonald (admitted *pro hac vice*)
William D. Schultz (admitted *pro hac vice*)
Rachel C. Hughey (admitted *pro hac vice*)
Andrew J. Lagatta (admitted *pro hac vice*)
Joshua P. Graham (admitted *pro hac vice*)
**MERCHANT & GOULD P.C.**
3200 IDS Center, 80 South Eighth Street,
Minneapolis, MN  55402
Telephone:  (612) 332-5300
Facsimile:  (612) 332-9081

Donald R. Dunner (admitted *pro hac vice*)
Erika H. Arner (admitted *pro hac vice*)
**FINNEGAN, HENDERSON, FARABOW,**
**GARRETT & DUNNER, L.L.P.**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 408-4000
Facsimile:  (202) 408-4400

*Counsel for Defendant Lawson Software, Inc.*

## CERTIFICATE OF SERVICE

I certify that on this 30th day of March, 2011, a true copy of the foregoing will be filed electronically with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Craig T. Merritt
Henry I. Willett, III
**CHRISTIAN & BARTON, LLP**
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
cmerritt@cblaw.com
hwillett@cblaw.com

James D. Clements
Goodwin Procter, LLP
Exchange Place
53 State Street
Boston, MA 02109-2881
jclements@goodwinprocter.com

Scott L. Robertson
Jennifer A. Albert
David M. Young (VSB No. 35997)
Goodwin Procter, LLP
901 New York Avenue, N.W.
Washington, DC 20001
srobertson@goodwinprocter.com
jalbert@goodwinprocter.com
dyoung@goodwinprocter.com

*Attorneys for Plaintiff*

_____/s/_____
Dabney J. Carr, IV (VSB No. 28679)
Robert A. Angle (VSB No. 37691)
Megan C. Rahman (VSB No. 42678)
dabney.carr@troutmansanders.com
robert.angle@troutmansanders.com
megan.rahman@troutmansanders.com
**TROUTMAN SANDERS LLP**
1001 Haxall Point
Richmond, VA 23219
Telephone:  (804) 697-1200
Facsimile:  (804) 697-1339
*Counsel for Defendant Lawson Software, Inc.*