**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

ePLUS, INC.,

                Plaintiff,

     v.

LAWSON SOFTWARE, INC.,

                Defendant.

Civil Action No. 3:09-cv-620

**DEFENDANT LAWSON SOFTWARE, INC.'S PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     PROPOSED FINDINGS OF FACT ................................................................... 1

        A.      The Jury Verdict ..................................................................................... 1

        B.      Willfulness and Damages ....................................................................... 1

        C.      ePlus, Its Systems and Content Divisions, and Procure+ and Content+.......... 2

        D.      Lawson and its ERP Software ................................................................ 4

        E.      Lawson and ePlus Provide Different Solutions to Customers with
                Distinct Needs ........................................................................................ 5

        F.      There are Many Companies that Sell e-Procurement Software ............. 5

        G.      ePlus Grants Licenses to Its Competitors ............................................. 7

        H.      Competition Between ePlus and Lawson is Very Rare ......................... 8

        I.      ePlus Documents Do Not Identify Lawson as a Competitor ................. 8

        J.      Lawson Does Not Consider ePlus to Be a Competitor .......................... 9

        K.      ePlus Has Not Lost Any Sales Because of RSS or Punchout ............... 10

                1.      PPD .................................................................................... 11

                2.      Sterling Jewelers ............................................................... 11

                3.      Blue Cross Blue Shield of North Carolina ........................ 11

                4.      Deaconess Health System .................................................. 12

                5.      Cleveland Clinic ................................................................ 13

                6.      Fortress Investments and Ames Corporation ..................... 13

                7.      LHC .................................................................................... 13

                8.      Hanesbrands ....................................................................... 14

                9.      Novant ................................................................................ 14

                10.     Gannett ............................................................................... 15

|  |  | 11. | XM Radio ................................................................. | 15 |
|  |  | 12. | ePlus's Customers .................................................. | 15 |
|  | L. | ePlus Desires an Injunction to Level the Playing Field in Settlement Negotiations ........................................................ | | 16 |
|  | M. | ePlus Will Not Capture Lawson's Enjoined Sales ........................................... | | 17 |
|  | N. | An Injunction Will Harm Lawson's Customers ................................................ | | 18 |
|  |  | 1. | Lawson's Customers Need Maintenance and Services for RSS and Punchout .................................................. | 18 |
|  |  | 2. | It Is Time Consuming and Expensive to Select, Install, and Implement New Procurement Software .......................... | 21 |
|  | O. | ePlus Waited Ten Years to Sue Lawson ...................................................... | | 22 |
|  | P. | All of ePlus's Patent Claims Stand Rejected in Ongoing Reexams ................. | | 23 |
| II. | CONCLUSIONS OF LAW ......................................................................... | | | 25 |
|  | A. | ePlus Has Not Proven It Will Be Irreparably Injured Absent an Injunction .................................................................. | | 25 |
|  |  | 1. | ePlus Willingness to License Demonstrates no Irreparable Harm ........... | 26 |
|  |  | 2. | Competition in the Absence of Injury Does Not Warrant Injunctive Relief ......................................................... | 27 |
|  |  | 3. | The Amount of Competition Between ePlus and Lawson is Too Small to Warrant Injunctive Relief ........................... | 28 |
|  |  | 4. | Failure to Seek a Preliminarily Injunction Demonstrates no Irreparable Harm ................................................. | 30 |
|  |  | 5. | Delay in Filing Suit Demonstrates no Irreparable Harm .......................... | 30 |
|  | B. | Adequacy of Legal Remedies Weighs Against Granting an Injunction ......... | | 31 |
|  |  | 1. | Previous Licensing Demonstrates a Legal Remedy is Adequate ............. | 31 |
|  |  | 2. | Previous Offers to License the Defendant Demonstrate that Monetary Damages are Sufficient ......................................... | 32 |
|  |  | 3. | Ongoing Royalties as an Equitable Remedy are Appropriate in this Case ........................................................... | 33 |

**C.**     **Balance of Hardships Weighs Against Injunctive Relief**................................34

      1.     That the Claims Have Been Rejected as Unpatentable During
           Reexamination Weighs Against Granting an Injunction.........................34

      2.     The Lack of Willful Infringement Weighs Against Granting an
           Injunction...............................................................................................35

      3.     Seeking an Injunction Merely to Increase its Leverage in a
           Settlement Negotiation Weighs Against Granting an Injunction..............36

**D.**     **Public Interest Factors Do Not Support Injunctive Relief**............................37

**E.**     **Scope of an Injunction**....................................................................................38

## I.      INTRODUCTION

1.      Lawson Software, Inc. ("Lawson") respectfully submits the following proposed findings of fact and conclusions of law in support of its opposition to ePlus, Inc.'s ("ePlus") motion for a permanent injunction.

## II.     PROPOSED FINDINGS OF FACT

### A.      The Jury Verdict

2.      On January 27, 2011, the jury in this lawsuit returned a verdict finding that Lawson's core procurement system (with or without EDI) infringed no claims of the '172, '516, or '683 Patents.  Lawson's core procurement system includes Lawson System Foundation and Process Flow in combination with the Inventory Control, Requisition, and Purchase Order modules.

3.      The jury found at Lawson's RSS product, when combined with the core procurement system infringed a single claim, Claim 1 of the '172 Patent.  The jury also found that the combination of Lawson's RSS system together with Punchout (with or without EDI) and Lawson's core procurement system infringed Claims 3, 26, 28, and 29 of the '683 patent and Claim 1 of the '172 Patent.

4.      Pursuant to the Parties' Stipulation with Respect to M3 Infringement, as set forth in the Revised Amended Final Pretrial Order (Dkt. No. 481), Lawson's M3 eProcurement software infringes claims 3, 26, 28, and 29 of the '683 Patent and claim 1 of the '172 Patent based on the finding of infringement related to Lawson's S3 products.

### B.      Willfulness and Damages

5.      On September 9, 2010, the Court precluded ePlus from seeking damages at trial pursuant to Rule 37 discovery sanctions.  (Dkt. No. 472.)

6.      ePlus waived its claim of willfulness against Lawson.  Trial Tran. at 2932:10-12.

**C.      ePlus, Its Systems and Content Divisions, and Procure+ and Content+**

7.      ePlus is a niche or "best-of-breed" vendor, who sells procurement software designed as a stand-alone product that may be integrated with other vendors' ERP software.  Inj. Tr. at 49:17-50:1, 140:14-16 (DX-533); Gartner Report, "Critical Capabilities for Best-of-Breed E-Procurement" (DX-416).  Typically, best-of-breed vendors offer procurement software that has more robust functionality than the software offered by ERP vendors.  Inj. Tr. at 192:9-20.

8.      ePlus had annual revenues of almost $700 million in FY2010.  ePlus 2010 Annual Report at L0418141 (DX-405); Inj. Tr. at 153:9-15 (DX-533).  The vast majority of ePlus's revenues (98%+) are for leasing and sales of equipment.  *See, e.g.*, ePlus 2009 Annual Report at ePlus0528746 (DX-274).

9.      ePlus Systems is the division that sells ePlus's e-procurement software called Procure+.  Inj. Tr. at 31:24-32:1, 96:13-96:21 (DX-533).

10.      ePlus Content Services is the division that sells ePlus's catalog software called Content+.  Inj. Tr. at 31:24-32:1, 102:24-103:9 (DX-533).

11.      Content+ provides electronic catalog content but does not generate requisitions or purchase orders.  Inj. Tr. at 38:14-24 (DX-533).  Content+, by itself, is not covered by the claims of the patents-in-suit.  Inj. Tr. at 94:13-19 (DX-533).

12.      The last couple of years' sales have been down for Procure+ and Content+.  Inj. Tr. at 106:16-19 (DX-533).  ePlus's combined sales and service revenue for Procure+ and Content+ has never been more than 1.5% of the company's revenue:

|  | ePlus Total Revenues[1] | ePlus procurement software Sales[2] | % |
|---|---|---|---|
| **FY2010** | $684,300,000 | $5,834,549 | 0.9% |
| **FY2009** | $698,027,000 | $7,541,782 | 1.1% |
| **FY2008** | $849,305,000 | $10,418,547 | 1.2% |
| **FY2007** | $791,611,000 | $8,457,247 | 1.1% |
| **FY2006** | $647,318,000 | $8,443,042 | 1.3% |
| **FY2005** | $575,798,522 | $6,580,286 | 1.1% |
| **FY2004** | $330,557,448 | $4,210,856 | 1.3% |
| **FY2003** | $299,646,146 | $2,687,434 | 0.9% |
| **FY2002** | $204,985,346 | $2,552,647 | 1.2% |

13.     On February 23, 2009, weeks before this suit was filed, ePlus filed an 8-K report with the SEC indicting that its software procurement reporting group was projecting a decline in revenue and would take a $4.6 million charge for impairment of goodwill as a result.  ePlus 8K (DX-410).  ePlus did not identify Lawson as a cause for the decline.  *Id.* at L0418189; Elaine Marion (Trial Tr. at 209-211).  According to ePlus's CFO, the disclosure accurately disclosed the reasons for the decline in software procurement revenue.  Elaine Marion (Trial Tr. at 209-211).

14.     Every year from 2002 to 2010, the ePlus divisions that sold Procure+ and Content+ lost money.  Inj. Tr. at 106:9-12 (DX-533).  From fiscal year 2002 to fiscal year 2010, the ePlus divisions that sold Procure+ and Content+ lost about $30 million.  Inj. Tr. at 106:13-15 (DX-533).  The sales and net income for Procure+ and Content+ from 2002-2010 are:

|  | Procure+ Sales and Maintenance Services | Content+ Sales and Maintenance Services | Combined Revenue | Procure+ Net Income (Loss) | Content+ Net Income (Loss) | Combined Net Income (Loss) |
|---|---|---|---|---|---|---|
| **FY2010** | $4,677,968 | $1,156,581 | **$5,834,549** | -$680,357 | -$184,939 | **-$865,296** |
| **FY2009** | $6,275,982 | $1,265,800 | **$7,541,782** | -$3,512,603 | -$618,637 | **-$4,131,240** |
| **FY2008** | $8,556,615 | $1,861,932 | **$10,418,547** | -$1,095,205 | -$112,872 | **-$1,208,077** |

---

[1]  ePlus 2001 Annual Report (DX-264); ePlus 2002 Annual Report (DX-265); ePlus 2003 Annual Report (DX-266); ePlus 2004 Annual Report (DX-267); ePlus 2005 Annual Report (DX-268); ePlus 2006 Annual Report (DX-269); ePlus 2007 Annual Report (DX-270); ePlus 2008 Annual Report (DX-272); ePlus 2009 Annual Report (DX-274); ePlus 2010 Annual Report (DX-405).
[2]  ePlus updated sales for ePlus Systems Inc and ePlus Content Services Inc. (DX-531).

| | Procure+ Sales and Maintenance Services | Content+ Sales and Maintenance Services | Combined Revenue | Procure+ Net Income (Loss) | Content+ Net Income (Loss) | Combined Net Income (Loss) |
|---|---|---|---|---|---|---|
| FY2007 | $6,870,644 | $1,586,783 | $8,457,247 | -$3,389,232 | -$435,902 | -$3,825,134 |
| FY2006 | $7,050,833 | $1,392,209 | $8,443,042 | -$3,368,292 | -$627,284 | -$3,995,576 |
| FY2005 | $5,176,438 | $1,403,848 | $6,580,286 | -$3,843,941 | -$623,117 | -$4,467,058 |
| FY2004 | $3,291,835 | $919,021 | $4,210,856 | -$1,499,548 | -$1,168,409 | -$2,667,957 |
| FY2003 | $1,898,601 | $788,833 | $2,687,434 | -$1,679,188 | -$723,155 | -$2,402,343 |
| FY2002 | $2,231,596 | $320,871 | $2,552,647 | -$934,626 | -$1,043,640 | -$1,978,266 |
| TOTAL | $46,030,512 | $10,695,878 | $56,726,390 | -$20,002,992 | -$5,537,955 | -$25,540,947 |

DX-531; Inj. Tr. at 95:11-96:21, 102:24-103:6 (DX-533).

### D. Lawson and its ERP Software

15.     Lawson's S3 software is an enterprise resource planning (ERP) software suite. Inj. Tr. at 180:13-19, 49:22-50:1 (DX-533). ERP software suites encompass a group of software packages including financial management (accounts payable, accounts receivable, etc.), human resource management, and supply chain management. Inj. Tr. at 170:24-12, 48:10-20 (DX-533). Lawson has sold a line of procurement products since 1975.

16.     Lawson's RSS and Punchout products are designed to be used as add-on features to Lawson's ERP suite. Inj. Tr. at 188:20-189:5 (DX-533). RSS and Punchout will not work with another vendor's ERP software and will not work without Lawson's ERP software. Inj. Tr. at 263:21-264:3 (DX-533). Lawson never sells its procurement products like RSS or Punchout alone. Inj. Tr. at 180:22-24 (DX-533). Lawson focuses its marketing efforts on selling the integrated capabilities of ERP software of human, financial, and other resources. Inj. Tr. at 187:3-188:2 (DX-533); Gartner Report: ERP at 8 (DX-408).

17.     Most Lawson customers buy a combination of modules at once. Inj. Tr. at 180:22-182:13, 187:11-16 (DX-533). When customers buy Lawson products initially, they

usually do so with the intent to buy Lawson's offerings when seeking to add capabilities to their existing suite. Inj. Tr. at 190:24-192:8 (DX-533).

> **E.**     **Lawson and ePlus Provide Different Solutions to Customers with Distinct Needs**

18.     There are separate markets for ERP vendors and best-of-breed vendors. This is demonstrated by the fact Gartner publishes separate market studies for each. *See* Gartner Report: ERP (DX-408); Gartner Report: Best-of-Breed (DX-416).

19.     Lawson and ePlus do not compete in the ERP market. Lawson does not sell best-of-breed products. Inj. Tr. at 187:1-17 (DX-533). ePlus does not sell ERP software. Inj. Tr. at 61:15-16 (DX-533). If a prospect seeks an ERP suite, Lawson would be a potential contender but ePlus would not. Inj. Tr. at 186:8-9, 180:13-19, 49:22-50:1 (DX-533).

20.     Lawson's ERP market share in the United States is about 2%. Inj. Tr. at 188:3-11 (DX-533). If a customer in the other 98% of the market, i.e. has an existing, non-Lawson ERP suite, seeks to add e-procurement functionality, Lawson's RSS and Punchout products are not a viable option. Inj. Tr. at 188:3-19 (DX-533). Lawson would not even participate in such an RFP process if asked. *Id.* Therefore, ePlus and Lawson do not compete in the best-of-breed market.

> **F.**     **There are Many Companies that Sell e-Procurement Software**

21.     There are almost 100 companies in the e-procurement software field, including SAP, Ariba, Verian, Perfect Commerce, SciQuest, Coupa, Basware, McKesson, Oracle, N4, Infor, Caturra, Sediment, Purchasing, and Lawson. Inj. Tr. at 120:19-21 (DX-533); 12/16/09 30(b)(6) depo. at 62-63, 92-93 (DX-528); Gartner Report: Pivot Table: SCM Software Market Share, 2007-2009 (DX-425) (includes Oracle, Ariba, SAP, Emptoris, SciQuest, Fieldglass, Perfect Commerce, Zycus, Lawson, etc.); 2008 AMR research report, Table 1 (DX-404)

(identifying top 27 supply management vendors by revenue market share for 2007); 2008 AMR research report, Table 2, L0418046 (DX-404).

22.    Gartner Market Trends Report for supply chain management worldwide 2009-2010, published May 28, 2010, lists the top ten procurement and sourcing vendors in supply chain management software for 2007, 2008, and 2009.  Market Trends: Supply Chain Management 2009-2010, at L0418391 (DX-420).  The Gartner Market Trends Report (DX-420) does not list ePlus, suggesting it has less than 1% market share in the SCM market.

23.    Table 2-1 (DX-425) of the "Market Share, SCM Worldwide 2009" (DX-419) from Gartner shows that the top 5 Supply Chain Management vendors in the U.S. in the Procurement segment in 2009 by market share.  (DX-425.)  Lawson is listed as ninth largest with a 1.44% market share.  (DX-425.)  ePlus is not even listed in the top 50 of Table 2-1, suggesting that it has less than 1% of this market.  (*Id.*)

24.    Table 1 of an AMR research report from 2008 identified the top 27 supply management vendors by revenue market share for 2007 and included SAP, Oracle, and Ariba as being the top three vendors.  AMR Research, The Supply Chain Management Market Sizing Report, 2007-2012 at L0418045 (DX-404.)  Lawson is listed as number five with 4% of the market (DX-404).  ePlus again is not listed, which purports to show the top 27 vendors.

25.    Table 2 of this AMR research report ranks vendors by license and alternate pricing revenues in 2007.  (DX-404 at L0418046.)  SAP is listed as number one with 15% percent market share, Ariba is number two with 13%, SciQuest is number nine with 2%, Lawson is number 11 with 1%, and Perfect Commerce is number 17 with 1%.  ePlus again is not on the list, which purports to list the top 26 companies.

26.     SAP markets its procurement products to mid-market companies just like ePlus. SAP Press Release (DX-422).

G.     **ePlus Grants Licenses to Its Competitors**

27.     ePlus has granted licenses to the patents-in-suit to several of its competitors including:  Ariba, SAP, Perfect Commerce, SciQuest, and Verian.  *See* Ariba License (PX-43); Perfect Commerce License (PX-317); SAP License (PX-318); Sciquest License (PX-319); Verian License (PX-320); Inj. Tr. at 36:4-6, 49:2-4, 49:11-13, 56:17-57:7, 119:18-121:1, 143:25-144:6 (DX-533).

28.     ePlus competed with its licensees, both before and after it granted them a license. Inj. Tr. at 36:4-6, 49:2-4, 49:11-13, 56:17-57:7, 119:18-121:1, 128:13-129:10, 132:25-133:5, 135:20-137:4, 143:25-144:6, 150:15-18, 151:2-7 (DX-533).  ePlus identified Ariba and SAP as its competitors in its SEC filings.  ePlus 2002 Annual Report at 133306 (DX-265). When ePlus granted a license to Ariba, Ariba was one of its biggest competitors.  Inj. Tr. at 119:18-120:3.

29.     ePlus has lost sales to its licensees.  Inj. Tr. at 151:2-7 (DX-533).  ePlus lost a sale of its Procure+ product to Novant because of Ariba.  Bill Yuhasz (Trial Tr. at 1693) (DX-532); ePlus0854117 (DX-505).  ePlus lost a sale of its Content+ product to Cleveland Clinic because of competition with SciQuest.  Keith Lohkamp (Trial Tr. at 1075:14-1076:17).

30.     ePlus has offered to license Lawson.  Inj. Tr. at 77:13-19, 78:23-25 (DX-533).

31.     Everyone ePlus sued for infringing its patents ended up getting a license in exchange for money.  Inj. Tr. at 150:9-14 (DX-533).  ePlus has generated close to $60 million from its five licenses for the patents-in-suit.  Inj. Tr. at 48:6-9 (DX-533).

32.     Mr. Farber was awarded bonuses after settling the prior patent litigations.  Inj. Tr. at 108:5-110:8 (DX-533).

33. ePlus is not aware of any other companies that are infringing its patents-in-suit. Inj. Tr. at 123:14-21 (DX-533).

**H.    Competition Between ePlus and Lawson is Very Rare**

34. Generally, Lawson does not compete with best of breed providers in the procurement space—such encounters would be "very, very rare." Inj. Tr. at 199:7-13 (DX-533). The only time that Lawson's RSS software could even possibly directly compete with ePlus's Procure+ software is when the customer (1) owns Lawson's ERP suite; (2) does not own RSS; and (3) is willing to consider a best-of-breed solution (has not already decided to purchase all related software from Lawson). Inj. Tr. at 190:17-191:17 (DX-533).

35. Lawson's RSS and ePlus's Procure+ products have co-existed for at least 9 years, but this unique potential scenario where a customer owns Lawson's ERP suite, does not own RSS, and is willing to consider a best-of-breed solution has happened less than a handful of times (Novant, Sterling, and PPDI). Inj. Tr. at 79:8-10, 203:19-25, 202:17-203:8.

36. Direct competition between vendors does not occur until the vendors are selected for the customer's short list. Inj. Tr. at 198:7-25 (DX-533). There are few vendors (e.g., four) on the short list. *Id.* at 198:7-15. At the short list, the providers competing for the work meet in the hallway waiting to provide demonstrations to the customer. *Id.* at 799:2-6. There is no evidence that any customer has ever selected both Lawson's RSS and ePlus's Procure+ products for the same short list. Inj. Tr. at 198:7-25 (DX-533).

**I.    ePlus Documents Do Not Identify Lawson as a Competitor**

37. ePlus CFO Elaine Marion testified that she had never seen a report where ePlus identified Lawson as a competitor. Elaine Marion (Trial Tr. at 212-213.). ePlus's 10-K reports and 10-Q reports since 2001, when it acquired the patents in suit, have never mentioned that

Lawson is a competitor.  (DX-264; DX-265; DX-266; DX-267; DX-268; DX-269; DX-270; DX-271; DX-272; DX-274; Farber 30(b)(6) 12/17/09 depo. at 102-104 (DX-515).)

38.     During discovery and trial in the SAP and Ariba lawsuits between 2004 and 2006, Mr. Farber discussed ePlus's competition at length and did not even mention Lawson.  SAP Trial Tr. (Farber) at 1199:19-1236:12 (DX-516); Ariba Trial Tr. (Farber) at 19:21-191:23 (DX-517). Mr. Farber identified SAP, Oracle, Ariba, Perfect Commerce, and others as ePlus competitors. *Id.*; 10/12/04 Farber Depo. in Ariba at 213:20-214:8 (DX-518); 1/9/06 Farber Depo. in SAP at 87:21-88:7, 91:16-92:3 (DX-519).

**J.     Lawson Does Not Consider ePlus to Be a Competitor**

39.     Lawson S3 has four business units—health care, public sector, services industries, and human capital management.  Inj. Tr. at 177:10-24 (DX-533).  Most of Lawson's sales for RSS are to the health care and public sector industries (schools K-12, regional government, counties, cities, and public authorities).  Inj. Tr. at 177:10-180:21 (DX-533).  Lawson's main competitor in health care is McKesson.  Inj. Tr. at 183:7-10 (DX-533).  Lawson's main competitor in the public sector is Sun Guard or Tyler.  Inj. Tr. at 183:7-12 (DX-533).  Lawson's main competitor in the services industry is Epicor or Microsoft.  Inj. Tr. at 183:7-14 (DX-533).

40.     In all of Lawson's win-loss reports, ePlus has never been listed as a Lawson competitor.  Inj. Tr. at 198:18-23 (DX-533).  Lawson's annual reports have never listed ePlus as a competitor.  *See, e.g.,* PX-0440.  Lawson's SEC filings identify SAP, but not ePlus, as a competitor.  *See, e,.g.,* Lawson 2009 Annual Report at 5, 12 (PX-195); Lawson 2009 Annual Report at 7, 14 (DX-214).  Lawson's databases used to keep track of Lawson competitors have no information about ePlus.  Keith Lohkamp (Trial Tr. at 1078); *see also* Salesforce.com report

9

(DX-448) (no mention of ePlus); 2011 Sales Force Direct Competition Report (supplemented in Feb. 2011) (DX-441) (mentions ePlus once and only in connection with Cleveland Clinic).

41.     Mr. Hager testified at the hearing that ePlus and Lawson are not competitors.  Inj. Tr. at 190:24-191:2 (DX-533).  Mr. Hager had never heard of ePlus prior to the lawsuit.  Inj. Tr. at 185:21-22 (DX-533).  At trial and in their depositions, Lawson witnesses testified that Lawson does not consider ePlus to be a competitor, Lawson had never heard of ePlus prior to suit (other than an employee while working somewhere other than Lawson), and that Lawson was unaware of ePlus's patents prior to suit.  Inj. Tr. at 228:16-19; Richard Lawson (Trial Tr. at 1443:9-23); Keith Lohkamp (Trial Tr. at 1068:21-1079:12, 1144:8-15, 1151:23-25, 1713:6-1714:11); Dale Christopherson (Trial Tr. at 1569:25-1570:4); 10/21/09 Billgren Depo. at 201:7-10 (DX-520); 10/12/09 Shriesheim Depo. at 102:16-21, 104:14-105:12 (DX-525); 10/26/09 Tolkmit Depo. at 224:6-11, 226:19-22 (DX-526); 10/26/09 White Depo. at 221:18-222:1 (DX-527).

**K.     ePlus Has Not Lost Any Sales Because of RSS or Punchout**

42.     ePlus currently has approximately 65 customers for Content+ and Procure+.  Inj. Tr. at 47:22-24, 101:6-8 (DX-533).

43.     Lawson has not taken sales from ePlus as a result of either RSS or Punchout.  Inj. Tr. at 205:6-8 (DX-533).  Mr. Farber was unable to identify a single sale ePlus lost to Lawson as a result of Lawson selling that customer RSS or Punchout.  Inj. Tr. at 118:5-119:8 (DX-533).

44.     ePlus claims that it has competed directly with Lawson for Pharmaceutical Product Development ("PPD"), Sterling Jewelers, Ames Corporation, Blue Cross Blue Shield North Carolina, Deaconess Hospital, Gannett, Hanesbrands, Indalex, Novant Health, Wolters Kluwer and XM Radio.  2011 02 07 ePlus Rule 26 Supp. Disclosure Br. at 13; Inj. Tr. at 60:10-

22 (DX-533).  None of these customers demonstrate a lost sale because of Lawson's RSS or Punchout products.

### 1.  PPD

45.     PPD has been a Lawson customer since 1994.  Inj. Tr. at 202:21-203:8 (DX-533). PPD has never licensed RSS or Punchout.  Inj. Tr. at 202:21-203:8 (DX-533); Lawson RSS and Punchout Customer List (DX-409) (PPD not listed).

46.     Although Lawson submitted a bid to sell PPD its RSS product and ePlus submitted a bid to sell PPD its Procure+ product, PPD decided not to purchase either one.  *See* Sales Force Direct Competition Report at p. 10 (row 30930) (DX-441A) (indicating that Lawson lost the bid for Req. Self Service).

### 2.  Sterling Jewelers

47.     Sterling Jewelers has been a longtime Lawson human resources customer since the 1990s.  Inj. Tr. at 203:13-204:5 (DX-533).  Sterling has never licensed RSS or Punchout.  Inj. Tr. at 203:13-204:5 (DX-533); Lawson Customer List (DX-409) (Sterling not listed).

48.     ePlus claims it competed for Sterling Jewelers with Lawson, but both companies lost the business to Ketera.  Inj. Tr. at 60:23-61:14 (DX-533); Sales Force Direct Competition Report at p. 10 (cell C37804) (lost deal) and 13 (cell X37804) (lost to Ketera) (DX-441B).

### 3.  Blue Cross Blue Shield of North Carolina

49.     Blue Cross/Blue Shield of North Carolina has been a Lawson customer since August 29, 1997, when it licensed Lawson's Purchase Order, Requisitions, and RSS modules. Lawson RSS and Punchout Customer List at 6 (DX-409); Inj. Tr. at 204:14-205:2 (DX-533). Blue Cross/Blue Shield of North Carolina has never licensed Punchout.  Inj. Tr. at 204:14-205:2 (DX-533); Lawson RSS and Punchout Customer List (does not list EPP or EPPH) (DX-409).

50.     Lawson did not compete with ePlus for Blue Cross/Blue Shield of North Carolina's business.  Inj. Tr. at 205:3-5 (DX-533).

51.     ePlus's only evidence regarding this customer is a few e-mails that show ePlus had a meeting with this customer in 2007.  ePlus emails (DX-499 and DX-500).  The meeting was not to discuss the merits of ePlus's products, but rather to convince this customer that it should consider looking at a best-of-breed product.  *See* DX-500 ("Ideally I would like to avoid having to attend this Blue Cross Blue Shield deal but for some reason it has high visibility. So the topic is Lawson vs Best of breed. There will be no selling of ePlus capabilities or mentions of ePlus has a whole."); (DX-499) (e-mail from Patrick Norton) (BCBS "would like to meet face to face with us on November 9th from 10 to 12 to discuss Procurement with the integration to Lawson. Have a roundtable discussion of procurement from a strategic and tactical point of view. ERP Vs. Best of Breed etc.").

52.     ePlus's own internal e-mails show ePlus had little chance of making this sale: "is this really a possible deal? Each time we go down a path with pn, it always leaves us out cold or time wasted."  (DX-500).

            4.     Deaconess Health System

53.     Deaconess has been a Lawson customer since the late 1990s.  Inj. Tr. at 205:9-21 (DX-533).  Deaconess owns Lawson's core procurement software including the Purchase Order module.  Inj. Tr. at 205:15-206:17 (DX-533).

54.     Prior to 2007, Deaconess was using procurement software called Matkon, which is made by McKesson.  Inj. Tr. at 205:22-206:12 (DX-533).  When McKesson stopped supporting Matkon, Deaconess chose Lawson's RSS product to replace it.  Inj. Tr. at 205:15-

206:17 (DX-533); Lawson Professional Services Statement of Work for Deaconess Health System at L0294087 (DX-506).

55.    Deaconess had a license for ePlus's Procure+ product but decided to stop paying maintenance on this product on December 31, 2008.  Deaconess told ePlus it decided to cancel Procure+ because of cost and that it would use "Lawson" to "process orders."  ePlus e-mail (PX-544).  Deaconess did not state what Lawson product it would use to process orders.

                   5.    <u>Cleveland Clinic</u>

56.    Cleveland Clinic was looking for an external catalog product.  *See* Trial Tr. (Keith Lohkamp) at 1075:11-1076:21; PX-468; DX-045; ePlus0904095-4130 (DX-504).

57.    Cleveland Clinic was considering either ePlus's Content+ product or SciQuest's external catalog.  Trial Tr. (Lohkamp) at 1070:9-19, 1075:14-1076:9.  ePlus's own documents indicate that it was competing with its licensee, SciQuest, not Lawson.  ePlus email (ePlus0854117) (DX-505).  Cleveland Clinic picked SciQuest over ePlus.  Keith Lohkamp (Trial Tr. at 1075:14-1076:17) (DX-532).

                   6.    <u>Fortress Investments and Ames Corporation</u>

58.    ePlus claims it may have competed with Lawson for Fortress Investments and Ames Corporation.  Inj. Tr. at 60:17-22 (DX-533).

59.    Neither Fortress Investments nor Ames Corporation has licensed RSS or Punchout.  Lawson RSS and Punchout Customer List (DX-409) (neither is included in this list).

60.    Lawson has not even proposed either of these products to these customers.  Sales Force Direct Competition Report (supplemented in Feb. 2011) (DX-441) (no listing of either company in the more than 45,000+ rows of this report).

                   7.    <u>LHC</u>

61.     ePlus claims it lost a procurement sale to LHC Group to Lawson.  Inj. Tr. at 65:10-66:12 (DX-533).

62.     ePlus's only evidence regarding LHC Group is an *unsolicited* e-mail that ePlus sent to LHC several months after it had selected and begun implementing Lawson's RSS software.  E-mail from Albert Simien sent 08/16/10 re: ePlus Follow Up (DX-503).

        8.     Hanesbrands

63.     Hanesbrands has been a Lawson customer since at least 2000, when it licensed Lawson's RSS module.  RSS and Punchout Customer List at 23 (DX-409).

64.     Hanesbrands has also licensed Procure+ from ePlus.  ePlus customer spreadsheet at 8-11 (DX-470).  ePlus's product apparently competed with Ariba's procurement product, because ePlus replaced Ariba. Hanesbrands Inc. eProcurement Procure+ Implementation (November 27, 2006) (DX-508); Hanesbrands Inc. eProcurement Procure+ Implementation (December 13, 2006) (DX-509).

65.     Hanesbrands experienced "significant, recurring problems" with Procure+ and had numerous complaints about this product and about ePlus.  Letter to Lisa Poer dated January XX, 2007 re: Response to Letter Dated December 14, 2007 (DX-510); E-mail from Lisa Poer sent 11/19/07 re: FW: RECEIPT DISCREPANCY (DX-511).

66.     Hanesbrands currently owns licenses to both RSS and Procure+.  ePlus Customer Spreadsheet at pp. 13-16 (DX-469); RSS and Punchout Customer List at 23 (DX-409).

        9.     Novant

67.     ePlus submitted an RFP response to Novant for the Procure+ and Content+ products.  Inj. Tr. at 79:11-12 (DX-533).  Lawson jointly submitted with SciQuest an RFP response to Novant for the RSS product.  Trial Tr. at 1076:14-23; Inj. Tr. at 79:8-10 (DX-533);

PX-247.  ePlus did not make Novant's short list—ePlus was "eliminated in the first round" because it did not have the required functionality.  Trial Tr. (Bill Yuhasz) at 1693.

68.    Ariba won the bid, not Lawson.  *Id.* at 1691-94, 1711.

10.    <u>Gannett</u>

69.    Gannett has been a Lawson customer since 1998 with the non-infringing core procurement suite.  *See* Declaration of Stuart Steen dated 2/14/11 at ¶ 5 (DX-487).   Although Gannett acquired a license to RSS in 2005, it never used RSS.  *See id.* ¶ 8 (DX-487) ("To the best of my knowledge, Gannett never used Lawson's RSS product."); Supplemental Steen Declaration dated 2/25/11 at ¶ 6 (declaring that Gannett Co. Inc. and none of its subsidiaries used RSS) (DX-492); RSS and Punchout Customer List at 21 (DX-409).

70.    Gannett licensed ePlus's Procure+ product from 2002-2008.  Master Software License Agreement between ePlus and Gannett (DX-458).  Gannett cancelled its license to Procure+ "for reasons unrelated to Lawson."  *See* Steen Declaration at ¶ 10 (DX-487).

11.    <u>XM Radio</u>

71.    XM Radio stopped licensing RSS in 2003 and is not a current customer.  RSS and Punchout Customer List at 60 (DX-409).

12.    <u>ePlus's Customers</u>

72.    ePlus has 65 customers for its Procure+ and Content+ products.  Inj. Tr. at 47:22-24 (DX-533).  ePlus asserts that Lawson "targeted" 16 of its Procure+ and Content+ customers.  ePlus Rebuttal Disclosure at 11 & Appendix C (DX-529).

73.    Four of these 16 customers (Deaconess, Digitas, Gannett, and Hanesbrands) owned licenses for both RSS and Procure+.  ePlus customer spreadsheet (ePLUS0949137) (DX-470); Lawson RSS and Punchout Customer List (DX-409).

74. Lawson did not target the remaining twelve for RSS or Punchout. Rather, Lawson identified them as targets for Lawson's unrelated software (e.g. human capital management, financial management, human talent management and the like). *See* DX-441C, DX-44E-441S (Sales Force Direction Competition reports indicating what products were being marketed to these customers).

## L. ePlus Desires an Injunction to Level the Playing Field in Settlement Negotiations

75. ePlus has not determined whether it would be more advantageous for ePlus to obtain an injunction or a license from Lawson. Inj. Tr. at 69:24-70:6 (DX-533).

76. ePlus called this lawsuit a "licensing" dispute. Inj. Tr. at 70:21-71:6 (DX-533) (Farber explaining that "this has been probably one of the most interesting of the licensing type of disputes that we've had"). ePlus wants an injunction because it claims it has been required to divert capital and the time of its executives to focus on enforcement of its patents against Lawson. Inj. Tr. at 70:14-17 (DX-533).

77. ePlus wants an injunction because it claims it has spent millions of dollars in attorneys fees and costs and expenses in this litigation. Inj. Tr. at 70:18-20 (DX-533).

78. ePlus wants an injunction to redress things that have happened in the past:

> the management time as well as the dollar time could have been invested back into more development, more oversight into the business unit, more hiring of personnel, marketing, sales, more focus, you know, on the market and selling to the market and reinvesting that money, you know, back into the organization.

Inj. Tr. at 70:21-71:8 (DX-533).

79. In response to questions about whether ePlus would be willing to accept a going-forward license with Lawson at a fair price, Mr. Farber responded:

> Right now I'd say no. The alternative would be to discuss, after an injunction is provided to ePlus, the request, and, quite honestly, it goes beyond me. Even

> though I'm the corporate spokesperson, my responsibility is to speak with the board, shareholders, principals to make that final decision. Right now the decision of the board is to request the injunction.

Inj. Tr. at 87:19-88:9 (DX-533).

80.    In response to the Court's question, "Well, suppose you could get a license going forward with ten percent, would you be willing to do that?"  Mr. Farber responded:

> Right now my recommendation to the board, Your Honor, would honestly be no, and the reason being is because of the contentious battle that we've had with Lawson which has exponentially been much greater than anybody else. . . . That's what we would prefer versus the burden that, again, would be placed on us and the hardship of making sure that we believe what Lawson is saying and auditing them and tracking it.

Inj. Tr. at 88:10- 89:9 (DX-533) (emphasis added).

81.    In response to the Court's question, "Suppose that they offered you $100 million going forward? What difference does it make as to what your past losses were? Why wouldn't you take that and dismiss the lawsuit and be done with it, is the question, I think. I can understand why you might not, but I'd like to hear why you understand."  Mr. Farber responded:

> . . . based on public comments that Lawson made following the jury trial and the lawsuit and the tensions that they made known publicly, I have no faith in believing that that will ever happen, that they will ever come and say, here's a reasonable dollar amount, do we want a royalty, no. Would we have considered a dollar amount up to this point prior? Sure, we would have.

Inj. Tr. at 91:11-92:7 (DX-533).

82.    Over the past year in a half, ePlus engaged in a "substantial undertaking" to develop an enhancement to the code for Procure+ with new features and new elements that work within the code.  Inj. Tr. at 116:12-20 (DX-533).

83.    The litigation between ePlus and Lawson has not been charged to the ePlus divisions that sold Procure+ and Content+.  Inj. Tr. at 116:20-117:10 (DX-533).

**M.    ePlus Will Not Capture Lawson's Enjoined Sales**

17

84.     Mr. Farber contends that ePlus has had five new customers for Procure+ in fiscal year 2010, but he could only name three of them.  Inj. Tr. at 98:14-19 (DX-533).  Those new customers were Kaplan, Koch Industries, KBS, and maybe a few others.  *Id.*  Mr. Farber contends that ePlus had five new customers for Procure+ in fiscal year 2010, but he could only name two of them: "customers like CONSOL Energy" and Quest.  Inj. Tr. at 99:14-20 (DX-533).  Mr. Farber said that his estimate of five "could be grossly overestimating, I could be grossly underestimating.  Inj. Tr. at 100:12-101:5 (DX-533).

85.     ePlus's 65 customer base of Content+ and Procure+ is less than 10% of Lawson's 800 plus customer base of RSS and Punchout.  Inj. Tr. at 102:2-16 (DX-533).

86.     ePlus has very little experience selling Procure+ to hospitals and healthcare organizations.  ePlus's customer lists produced in discovery include *only* two hospital customers for Procure+:  Eastern Virginia Medical School and Deaconess (who cancelled the license in 2008).  ePlus Customer Spreadsheet (DX-469).  When asked whether he had experience implementing Procure+ with hospitals for critical care items, Mr. Farber could not name even a single customer they had done this for.  He identified Quest Diagnostics, which is not a hospital; Deaconess, which cancelled ePlus; and a hospital that they submitted a bid for (but apparently did not win).  Inj. Tr. at 85:20-86:20 (DX-533).

87.     In Mr. Hager's opinion, if Lawson customers were forced to stop using RSS or Punchout, they would be unlikely to choose ePlus because ePlus does not have a lot of experience in health care and would not have the references to provide to the customers.  Inj. Tr. at 223:5-224:6 (DX-533).

      **N.**      **An Injunction Will Harm Lawson's Customers**

             1.      <u>Lawson's Customers Need Maintenance and Services for RSS and Punchout</u>

88.     The services Lawson provides to its customers include implementation services and support services, such as call in support and help desk. Inj. Tr. at 208:21-209:7 (DX-533). Lawson also provides ongoing maintenance such as regulatory releases and fixes, patches, updates to make sure that the software modules work with the latest databases and web browsers. Inj. Tr. at 208:21-209:7 (DX-533). All software is constantly evolving and being updated and changes to one software program invariably impact other software programs. Inj. Tr. at 208:21-209:22 (DX-533). For example, updates to Microsoft's Internet Explorer or Google web browsers often will impact Lawson's RSS product, which is a web-based software program. Inj. Tr. at 209:8-209:22 (DX-533). Part of Lawson's maintenance is to monitor these software changes and send out updates to Lawson products to make sure everything continues to run smoothly. Inj. Tr. at 208:21-209:22 (DX-533). Lawson also frequently releases software patches to fix software bugs that have been identified for its software, including RSS and Punchout. Inj. Tr. at 208:21-209:22 (DX-533).

89.     There are all different kinds of problems that can occur with RSS, many of which can prevent a user from finding and/or ordering the right product or from ordering any products at all. Inj. Tr. at 259:21-262:22 (DX-533). In 2009, Lawson opened in excess of 65,000 service tickets for S3 Supply Chain software. 2009 Support Log for S3 Supply Chain Management Suite (DX-453). 1,402 of these tickets were for RSS. *Id.*

90.     It is not unusual for Lawson's customers to have thousands of employees who use RSS to order items, which magnifies the adverse effects if the software malfunctions. Kurt Reasoner Decl. at ¶ 9 (DX-486) (Providence Health has 4000 trained users for RSS); Inj. Tr. at 242:17-243:3 (DX-533).

91.     In this case, a majority of Lawson's RSS and Punchout customers are hospitals and healthcare organizations.  Lawson RSS and Punchout Customer List (DX-409).  Lawson's health care customers that represent 2500 different hospitals—about a third of the hospitals in the United States.  Inj. Tr. at 219:17-21 (DX-533).  Lawson's hospital customers use RSS and/or Punchout to purchase products that impact patient care, such as surgical supplies and lab supplies.  Inj. Tr. at 214:23-214:5; Reasoner Decl. (Providence Health) at ¶ 9 (DX-486); Johnson Decl. (Rockford Health) at ¶ 5 (DX-484).  Lawson's software tracks critical care supplies all the way to the operating room.  Inj. Tr. at 218:6-25 (DX-533).

92.     Lawson's ongoing services are critical to customers.  Inj. Tr. at 209:22-210:3 (DX-533).  If a customer runs into an issue with a product and Lawson is unable to support the customer, they could be unable to run the system.  Inj. Tr. at 211:2-121-:1 (DX-533); Declaration of Kurt Reasoner (Providence Health) at ¶¶ 13-14 (DX-486); Declaration of Barb Johnson (Rockford Health) at ¶ 10 (DX-484).

93.     Providence Health described how it would be harmed if Lawson was enjoined from maintaining its RSS software:

> Providence will be harmed if Lawson is prevented from providing service and maintenance for our RSS software. If RSS were to malfunction and we were unable to receive timely software support to resolve the problem, we would be unable to adequately locate resources needed for continued operation of our hospitals and healthcare facilities. Due to this risk, Providence would be forced to discontinue use of our previously-purchased RSS software.

Reasoner Declaration at ¶ 13 (DX-486).

94.     Rockford Health also explained how it would be harmed:

> Rockford Health System will be harmed if Lawson is prevented from providing service and maintenance for our RSS software. . . . [O]ur ability to place orders in a timely manner, our ability to maintain inventory of item critical to patient care the accuracy of our order for supplies (e.g. ordering the wrong product or paying

the wrong price), and would cause an increase in operational expense. We would not be able to run RSS without ongoing maintenance.

Johnson Declaration at ¶ 10 (DX-484).

95.     No companies other than Lawson can provide maintenance or services for Lawson's RSS and Punchout products.  Inj. Tr. at 211:10-17 (DX-533).

96.     If customers were forced to replace their current RSS systems, they would face a significant increase in operational expenses.  Inj. Tr. at 242:17-21 (DX-533).

97.     In addition, if customers were forced to replace their current RSS systems:

It would cause at least an increase in operational expenses in these types of hospitals, and more than likely would also cause employee complications within the hospitals, morale issues of potential loss of jobs, and I think a hospital would say that it would interrupt their quality of care.

Inj. Tr. at 242:17-24 (DX-533).

98.     Lawson has maintenance contracts with every customer who runs RSS and Punchout.  Inj. Tr. at 212:2-16 (DX-533).  Enjoining Lawson from providing maintenance may cause Lawson to be in breach of hundreds of these contracts.

99.     If Lawson were enjoined from servicing RSS and Punchout, such an injunction would be difficult to comply with because when customers call with issues with their software, it is not always clear which module the problem rests in.  Inj. Tr. at 259:21-261:22 (DX-533).

2.     It Is Time Consuming and Expensive to Select, Install, and Implement New Procurement Software

100.     From the time a customer starts looking for a procurement system until the time it is operational, it could be two years.  Inj. Tr. at 81:5-82:23 (DX-533).  On average, it can take months to go through the process of finding and selecting new procurement software.  Inj. Tr. at 219:1-21 (DX-533).  Many customers are required to go through formal RFP bid processes, which takes even longer.  Inj. Tr. at 219:1-21 (DX-5333).

21

101.    Additionally, it can take many months to several years to install, implement, and deploy new procurement software out to the thousands of users who are typically trained to use it.   Inj. Tr. at 262:17-263:5 (DX-533).  For example, it took Providence Health a year to issue RFPs and select Lawson's RSS software.  Reasoner Declaration at ¶¶ 6-7 (DX-486).  It took Providence many years to fully deploy RSS to its approximately 4000 users:

> Once we had selected Lawson's ERP suite in 2000, it took us approximately 3 years to install, implement, and deploy the software across our Oregon and Alaska operations which went live in 2003.

Reasoner Declaration at ¶ 8 (DX-486).

102.    In Mr. Hager's opinion, for a hospital customer to replace RSS it could take as long as nine months and cost from $300,000 up to $750,000.  Inj. Tr. at 262:17-263:20.

103.    ePlus claims it can implement an operational procurement system as quickly as thirty days and generally between 90 days and six months, and in "some rare occasions it could be longer."  Inj. Tr. at 80:4-10; 82:10-15 (DX-533).  However, ePlus admitted that it took over the course of a year or two for American Skiing Company to implement Procure+.  Inj. Tr. at 166:12-168:1 (DX-533).  ePlus claims that the cost to implement an ePlus system would be around $150,000.  Inj. Tr. at 80:11-17 (DX-533).

**O.      ePlus Waited Ten Years to Sue Lawson**

104.    ePlus brought suit against Lawson in May of 2009.  Inj. Tr. at 146:4 (DX-533).

105.    ePlus asserts that Lawson has been using the infringing technology since 2002. Inj. Tr. at 146:5-8 (DX-533).  Between 2002 and 2009, ePlus never contacted Lawson regarding its patents despite.  Inj. Tr. at 146:9-20 (DX-533).

106.    Although ePlus claims it considered Lawson a competitor prior to 2009, it claims it did not investigate whether Lawson was infringing sooner because it filed suit against Ariba and then later SAP.  Inj. Tr. at 147:18-149:6 (DX-533).

107.    Although ePlus claims it considered Lawson a competitor prior to 2009, it claims it did not investigate whether Lawson was infringing after the SAP and Ariba lawsuits were over In 2006 because it was involved in an investigation regarding stock options.  Inj. Tr. at 154:8-25. (DX-533).

108.    ePlus did not seek a preliminary injunction against Lawson.

**P.    All of ePlus's Patent Claims Stand Rejected in Ongoing Reexams**

109.    All claims of the '172 patent have been finally rejected by the Patent Office.  File History of Reexamination No. 95/000,487 (DX-241).  Claim 1 of the '172 patent (found to be infringed by RSS and Punchout) was finally rejected by the Patent Office based on anticipation under 35 U.S.C. § 102 by six *separate* pieces of prior art, including the '989 patent, the '551 patent, the Sabre system, the J-CON system, the Gateway system, and the P.O. Writer system. *See* 1/13/11 Final Rejection at pp. 5-6 (DX-488).

110.    Lawson was prohibited from discussing the reexaminations and was also blocked from showing the jury that the '989 patent was not considered by the Patent Office.  Trial Tr. at 134:6-24; 135:21-136:15; 152:21-154:11, 157:21-159:13; Douglas Momyer (Trial Tr. at 261:15-266:3, 2093:22-2094:2, 2098:8-2099:2, 2127:20-2128:16, 2138:25-2140:2);  Michael Shamos (Trial Tr. at 2408:11-2411:1, 2552:22-2555:20, 2598:20-2601:5, 2601:16-2609:3, 2990-2994, 3035:8-21, 3156:20-3157:22, 3161:15-19, 3164:13-16); Robert Kinross (Trial Tr. at 2211:1-2214:17).  In the order granting reexamination of all of the claims of the '172 patent, the Patent Office stated:

[e]ach of the references noted above are newly cited by the Third Party Requester and were not considered, nor discussed during the prosecution of the application that became the '172 Patent. . . . [T]he Johnson '989 Patent was referenced in the Background of the Invention of the '172 Patent, but the reference was not used as the basis for any rejection, nor is the record clear that the examiner at the time considered the Johnson '989 Patent. Thus, in this proceeding the Johnson '989 Patent is being viewed in a new light with respect to the original prosecution of the application that became the '172 Patent.

Order Granting Request for Reexamination in Reexamination Control No. 95/000,487, dated October 23, 2009 at 5 (DX-242).

111.    The final rejection of the '172 patent claims in reexam was reviewed by a panel of three PTO examiners.  MPEP §§ 2271.01 and 2671.03 (DX-485, ¶ 22); 1/13/11 Final Rejection at p. 21 (DX-488) (signed by multiple examiners ("conferees")).  While ePlus has appealed the final rejection of the '172 claims to the Board of Patent Appeals and Interferences, there is a high probability that one or more of the six independent rejections of claim 1 of the '172 patent will be affirmed.  BPAI Statistics FY2010 (DX-490) (stating that the BPAI affirmance (partial and full) rate was 80% in FY2010); BPAI Statistics FY2011 (DX-491) (stating that the BPAI affirmance (partial and full) rate was 76% in FY2011).

112.    Claims 26-45 of the '683 patent have been finally rejected by the Patent Office. File History for Reexamination No. 90/008,104 (DX-237).

113.    Claims 26, 28, and 29 of the '683 patent (found to be infringed by Punchout) have been finally rejected by the Patent Office based on anticipation under 35 U.S.C. § 102 by four *separate* pieces of prior art.  Final Rejection at 33, 47, 60, and 73, File History for Reexamination No. 90/008,104 (DX-237).

114.    ePlus appealed the final rejection to the Board of Patent Appeals and Interferences.  Oral argument on the appeal was held on October 20, 2010.  Record of Oral Hearing, File History for Reexamination No. 90/008,104 (DX-485, ¶ 11).

115.    Claims 1-25 of the '683 patent have been rejected by the Patent Office.  February 11, 2011 Initial Rejection, File History of Reexamination No. 90/011,066 (Reexam Control No. 90/011,066, Non-Final Office Action dated 2/10/2011) (Ex. A to 3/30/11 Opp. To Strike) (DX 550).  Claim 3 of the '683 patent (found to be infringed by Punchout) has been initially rejected based on anticipation under 35 U.S.C. § 102 by seven *separate* pieces of prior art.  *Id.* at p. 3.

## II.    CONCLUSIONS OF LAW

116.    ePlus cannot rely on a presumptive entitlement to permanent injunctive relief after proving infringement.  *eBay Inc. v. MercExchange L.L.C.*, 547 U.S. 388 (2006).  "An injunction does not necessarily follow a determination that a patent has been infringed."  *Innogenetics, N V v. Abbott Labs.,* 512 F.3d 1363, 1379 (Fed. Cir. 2008).

117.    This Court concludes that ePlus has not satisfied its burden that it is entitled to a permanent injunction in this case and has not satisfied its burden to prove that:

    (1)    it has suffered an irreparable injury;
    (2)    remedies available at law, such as monetary damages, are inadequate to compensate for that injury;
    (3)    considering the balance of hardships between the ePlus and Lawson, a remedy in equity is warranted; and
    (4)    the public interest would be served by a permanent injunction.

*eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).

### A.    ePlus Has Not Proven It Will Be Irreparably Injured Absent an Injunction

118.    ePlus will not suffer irreparable harm in the absence of a permanent injunction because Lawson's past sales of RSS and Punchout have not harmed ePlus and Lawson's continued sales of these products will not harm ePlus.  *Hynix Semiconductor Inc. v. Rambus Inc.*, 609 F. Supp. 2d 951, 968 (N.D. Cal. 2009) (citing *Innogenetics, N.V. v. Abbott Laboratories*, 512 F.3d 1363, 1380-81 (Fed. Cir. 2008) ("Where an infringer's conduct will *not* harm the patent holder, enjoining that conduct is an abuse of discretion.").

1.   ePlus Willingness to License Demonstrates no Irreparable Harm

119.   A patentee's willingness to forego its patent rights for compensation, while not dispositive, is one factor to consider in its irreparable harm analysis and often weighs strongly against injunctive relief.  *eBay*, 547 U.S. at 384; *see also T.J. Smith & Nephew Ltd. v. Consolidated Medical Equip., Inc.*, 821 F.2d 646, 648 (Fed. Cir. 1987) (noting that licensing is "incompatible with the emphasis on the right to exclude that is the basis for the presumption in a proper case"); *see generally Johnson & Johnson Vision Care, Inc. v. Ciba Vision Corp.*, 712 F. Supp. 2d 1285 (M.D. Fla. 2010); *Ricoh Co. v. Quanta Computer, Inc.*, No. 06-462, 2010 U.S. Dist. LEXIS 38220, at *5-6 (W.D. Wis. Apr. 19, 2010); *Soverain Software LLC v. Newegg Inc.*, No. 07-511, 2010 U.S. Dist. LEXIS 89268, at *48 (E.D. Tex. Aug. 11, 2010); *Cordance Corp. v. Amazon.com, Inc.*, 730 F. Supp. 2d 333, 341 (D. Del. 2010); *Laserdynamics, Inc. v. Quanta Computer, Inc.*, No. 06-348, 2010 U.S. Dist. LEXIS 61645, at *7-8 (E.D. Tex. June 22, 2010).

120.   In this case, ePlus's licensing of the patents in suit to five competitors weighs against a finding of irreparable harm, particularly because two of the licensees are much bigger competitors than Lawson.  ePlus's previous willingness to license demonstrates no irreparable harm even though the licenses have resulted from litigation settlements.  *See Telcordia Techs. Inc. v. Cisco Sys.*, 592 F. Supp. 2d 727, 748 (D. Del. 2009); *MercExchange, LLC v. eBay, Inc.*, 500 F. Supp. 2d 556, 572 (E.D. Va. 2007); *IMX, Inc. v. LendingTree, LLC*, 469 F. Supp. 2d 203, 225 (D. Del. 2007); *Advanced Cardiovascular Sys. v. Medtronic Vascular, Inc.*, 579 F. Supp. 2d 554, 560 (D. Del. 2008); *Johnson & Johnson*; *Ricoh Co. v. Quanta Computer, Inc.*, No. 06-462, 2010 U.S. Dist. LEXIS 38220, at *5-6; *Soverain Software LLC v. Newegg Inc.*, No. 07-511, 2010 U.S. Dist. LEXIS 89268, at *48 (E.D. Tex. Aug. 11, 2010).  There is no requirement ePlus's

26

prior settlements include a license.  Thus, ePlus's willingness to license that technology for a royalty shows a lack of irreparable injury.

2.    Competition in the Absence of Injury Does Not Warrant
Injunctive Relief

121.    Competition in the absence of irreparable harm is insufficient as a matter of law to demonstrate irreparable harm.  *Abbott Labs. v. Andrx Pharms., Inc.*, 452 F.3d 1331, 1347-48 (Fed. Cir. 2006) ("[W]e do not doubt that generic competition will impact Abbott's sales . . . but that alone does not establish that Abbott's harm will be irreparable."); *Humanscale*, 2010 U.S. Dist. LEXIS 42083, at *8 ("To accept the argument that any claim of direct competition should result in a finding of irreparable harm would essentially create a presumption in favor of irreparable harm, contrary to the Supreme Court's directive in *eBay*."); *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 723 F. Supp. 2d 1284, 1336 (S.D. Cal. 2010) (finding no irreparable harm despite minor competition); *Advanced Cardiovascular Sys. v. Medtronic Vascular, Inc.*, 579 F. Supp. 2d 554, 559, 562 (D. Del. 2008), *appeal dismissed*, 356 Fed. Appx. 389 (Fed. Cir. 2009) (finding no irreparable harm despite direct competition between the patentee and infringer in all relevant markets).

122.    Irreparable harm may arise from competition as an incalculable amount of lost profits arising from lost sales, incalculable price erosion due to the competition, or damage to reputation and goodwill.  *See, e.g., Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1310 (Fed. Cir. 2007).  ePlus has not demonstrated any of these types of harms.

123.    ePlus has not proven that it lost any sales because of Lawson's infringing RSS and Punchout products.  Although PPD and Sterling Jewelers considered competing bids from ePlus and Lawson for RSS, these customers did not purchase RSS.  There is no evidence that Gannett and Deaconess cancelled their contracts with ePlus because of RSS or Punchout.  There

27

is no evidence that ePlus was in the running for the Blue Cross Blue Shield or LHC deals.
Several other customers cited by ePlus own licenses to both ePlus's Procure+ product and RSS,
which do not demonstrate a lost sale.

124.    ePlus's evidence that Lawson targeted 12 of its Procure+ customers with products
other than RSS or Punchout is irrelevant to the issue of irreparable harm.

125.    ePlus's evidence that it sent unsolicited e-mails and made unsolicited phone calls
to Lawson's customers, without any other evidence of competition, likewise does not
demonstrate the kind of irreparable injury that is necessary to prove irreparable injury.

126.    ePlus has not provided any evidence of lost market share, price erosion, or harm
to its reputation that would support injunctive relief.

3.    The Amount of Competition Between ePlus and Lawson is
Too Small to Warrant Injunctive Relief

127.    A *de minimis* amount of competition is insufficient to show irreparable harm
necessary to support an injunction.  *Soverain Software LLC v. Newegg Inc.*, No. 07-511, 2010
U.S. Dist. LEXIS 89268, at *48 (E.D. Tex. Aug. 11, 2010) ("although Soverain contends that its
Transact product is a direct competitor to the www.neweggmall.com website, any possible
competition between Newegg Mall and Transact is too insubstantial to support an injunction");
*Hynix Semiconductor Inc. v. Rambus Inc.*, 609 F. Supp. 2d 951, 981 (N.D. Cal. 2009).  Even
when there is some competition between the patentee and infringer, courts should not grant an
injunction if the patentee cannot identify what customers it has lost to the defendant.  *Presidio
Components, Inc. v. Am. Tech. Ceramics Corp.*, 723 F. Supp. 2d 1284, 1336 (S.D. Cal. 2010)
("Second, even if the Court accepts Presidio's allegations of a two-competitor market, that does
not automatically lead to the conclusion that there is irreparable in-jury. Rather, Presidio still has

to provide at least some data on any specific sales or customers lost, or what its share of the market is."). ePlus has not identified a single lost sale based on Lawson's RSS or Punchout.

128.    The Court finds that, while there is some evidence of competition, the level of competition is so small that allowing Lawson to continue selling RSS and Punchout will not irreparably injure ePlus. In considering the degree of competition between ePlus and Lawson, this Court finds little evidence that Lawson sells its RSS and Punchout products to the same customers that ePlus sells its Procure+ and Content+ products. Lawson sells to consumers who are looking to purchase full ERP suites. ePlus does not provide full ERP suites. ePlus sells its best-of-breed software to customers looking for highly functional stand-alone products. Lawson does not market RSS and Punchout as stand-alone products. As such, the only time competition would result is if a customer already had Lawson's base system and was seeking to add an eProcurement function. The evidence shows that this situation is very rare and has happened less than a handful of times in the past nine years. This does not rise to the level of irreparable harm.

129.    This Court is further persuaded there is no irreparable harm because ePlus and Lawson are not competitors in a two-supplier market. *Humanscale Corp. v. CompX Int'l Inc.*, No. 09-86, 2010 U.S. Dist. LEXIS 42083, at *8 (E.D. Va. Apr. 29, 2010) ("the direct competition typically used to justify a finding of irreparable harm involves a two competitor market" which is "not the case here").

130.    Rather to the extent that ePlus has lost sales and suffered harm in the market, it is unclear who of the numerous competitors caused this harm. *See Advanced Cardiovascular Sys. v. Medtronic Vascular, Inc.*, 579 F. Supp. 2d 554, 559, 562 (D. Del. 2008); *Cordance Corp. v. Amazon.com, Inc.*, 730 F. Supp. 2d 333, 340 (D. Del. 2010) ("Cordance offers no argument to

either rebut Amazon's assertion that there are other players in the digital identity market or

explain why other players were not the cause of Cordance's failure to gain market share.").

131.    The Court finds that the eProcurement software market has numerous vendors

that provide a wide variety of products, including both best-of-breed software and full Enterprise

Resource Planning (ERP) suites.  The evidence shows that ePlus has lost sales to its licensees

Ariba and SciQuest.  ePlus cannot prove that Lawson's infringement has caused it harm.

132.    Although ePlus's sales for procurement software have declined in the past two

years, it did not blame Lawson for this decline.  ePlus has less than 1% share in the supply chain

management software market.  There is no evidence that ePlus would capture any of Lawson's

sales if RSS and Punchout are enjoined.  It is much more likely that these sales will go to the

dominant market participants, such as SAP and Ariba.

4.    Failure to Seek a Preliminarily Injunction Demonstrates no Irreparable
Harm

133.    This Court concludes that ePlus's failure to seek a preliminary injunction is

another factor weighing against a permanent injunction.  *See PGBA, LLC v. United States*, 389

F.3d 1219, 1229-31 (Fed. Cir. 2004) (finding no error of law when the lower court considered, as

one of the factors weighing against injunctive relief, the fact that plaintiff failed to pursue a

preliminary injunction); *T.J. Smith & Nephew Ltd. v. Consolidated Medical Equip., Inc.*, 821

F.2d 646, 648 (Fed. Cir. 1987) (noting that delay in seeking an injunction negates irreparable

harm); *MercExchange, LLC v. eBay, Inc.*, 500 F. Supp. 2d 556, 573 (E.D. Va. 2007) (noting that

MercExchange never sought a preliminary injunction, which is "yet another factor in the calculus

indicating both that MercExchange is not being irreparably harmed by eBay's infringement and

that money damages are adequate").

5.    Delay in Filing Suit Demonstrates no Irreparable Harm

134.    The Court finds that ePlus's seven year delay in filing suit suggests that there is no irreparable harm. *MercExchange, L.L.C. v. eBay, Inc.*, 500 F. Supp. 2d 556 (E.D. Va. 2007). In the preliminary injunction analysis, courts have routinely concluded that delay in filing suit suggests that there is no irreparable harm. *See, e.g.*, *Travel Tags, Inc. v. UV Color, Inc*., 690 F. Supp. 2d 785, 802 (D. Minn. 2010) ("Travel Tags' [three-year] delay in filing this lawsuit tends to negate any suggestion of irreparable harm"); *Nutrition 21 v. United States*, 930 F.2d 867, 868-69, 871 (Fed. Cir. 1991) & *Nutrition 21 v. United States*, 930 F.2d 862, 862 (Fed. Cir. 1991) (noting that the patentee's this seven-month delay in bringing suit—the patentee learned of the alleged infringement in June and filed suit in December—negated irreparable harm).

### B.    Adequacy of Legal Remedies Weighs Against Granting an Injunction

135.    There is no presumption that legal remedies are inadequate to compensate for infringement. *MercExchange L.L.C. v. eBay, Inc.*, 500 F. Supp. 2d 556, 568-69 (E.D. Va. 2007). If the patentee cannot demonstrate why legal remedies would be inadequate to compensate for its injuries, this factor weighs against the issuance of an injunction. *See Am. Calcar, Inc. v. Am. Honda Motor Co.*, No. 06-2433, 2008 U.S. Dist. LEXIS 106476, at *3-4 (S.D. Cal. Nov. 18, 2008). This Court concludes that a legal remedy will adequately compensate ePlus.

### 1.    Previous Licensing Demonstrates a Legal Remedy is Adequate.

136.    ePlus's willingness to issue licenses makes it very difficult to show why Lawson's utilization of the patents is "any less compensable in dollars than" the utilization of the patents by the prior licensees. *Illinois Tool Works*, 906 F.2d at 683. Numerous district courts have recognized that a patentee's previous willingness to license its patents demonstrates that monetary relief is adequate and weighs against granting an injunction. *MercExchange, LLC v. eBay, Inc.*, 500 F. Supp. 2d 556, 582 (E.D. Va. 2007) ("MercExchange has established a pattern

of utilizing the '265 patent primarily as a sword to aid in litigation or threatened litigation against infringers or potential infringers. . . . Utilization of a ruling in equity as a bargaining chip suggests both that such party never deserved a ruling in equity and that money is all that such party truly seeks, rendering monetary damages an adequate remedy in the first instance."); *Hynix Semiconductor Inc. v. Rambus Inc.*, 609 F. Supp. 2d 951, 985-86 (N.D. Cal. 2009) ("Rambus's own licensing practices show that it enabled the competition it now seeks to limit. . . . This historical practice suggests that Rambus is primarily concerned with monetary compensation for use of its patented technology, whether in its proprietary architectures or otherwise."); *Telcordia Techs. Inc. v. Cisco Sys.*, 592 F. Supp. 2d 727, 748 n.10 (D. Del. 2009) ("Telcordia's willingness to license its patents also suggests that its injury is compensable in monetary damages, which is inconsistent with the right to exclude."); *Cordance Corp. v. Amazon.com, Inc.*, 730 F. Supp. 2d 333, 341 (D. Del. 2010) ("Cordance's pre-lawsuit licensing activity suggests that money damages will be adequate compensation for Amazon's infringement of Cordance's rights"); *IMX, Inc. v. Lendingtree, LLC*, 469 F. Supp. 2d 203, 225 n.24 (D. Del. 2007) ("Plaintiff's licensing activities also suggest that plaintiff's in-jury would be compensable in damages."); *Laserdynamics, Inc. v. Quanta Computer, Inc.*, No. 06-348, 2010 U.S. Dist. LEXIS 61645, at *8 (E.D. Tex. June 22, 2010) ("LaserDynamics' extensive licensing history demonstrates that money damages have been and will continue to be sufficient to remedy any infringement"); *Advanced Cardiovascular,* 579 F. Supp. 2d at 560 (stating that "[m]oney damages are rarely inadequate" where a party has already licensed the patented technology).  ePlus has not persuaded this Court that monetary damages are inadequate to compensate it for any future sale of Lawson's RSS and Punchout products.

    2. <u>Previous Offers to License the Defendant Demonstrate that<br>Monetary Damages are Sufficient</u>

137.     ePlus's offer to license Lawson also shows that there is an amount of money that would be adequate to compensate ePlus for Lawson's infringement.  *High Tech Medical*, 49 F.3d at 1557.  Likewise, district courts agree that the plaintiff's willingness to license to the defendant demonstrate that monetary remedies are sufficient.  *Paice LLC v. Toyota Motor Corp.*, 2006 U.S. Dist. LEXIS 61600, *5 (E.D. Tex. Aug. 16, 2006) (recognizing that plaintiff's post-trial actions of extending the defendants an offer to license its technology "further demonstrates the adequacy of monetary relief from Plaintiff's point of view"); *MercExchange, LLC v. eBay, Inc.*, 500 F. Supp. 2d 556, 582-83 (E.D. Va. 2007) (noting that the patentee's willingness to grant the defendant a license suggested that legal remedies were adequate).

        3.     <u>Ongoing Royalties as an Equitable Remedy are Appropriate in this Case</u>

138.     ePlus will not be left without a remedy if this Court denies injunctive relief.  It may award ongoing royalties for Lawson's post-verdict sales as an equitable remedy.  *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1314 (Fed. Cir. 2007) (holding that ongoing royalties satisfy the equitable relief provisions of 35 U.S.C. § 283).

139.     The fact that a patentee did not seek or did not obtain past damages does not mean it is entitled to an injunction.  *See, e.g.*, *A Helping Hand, LLC v. Baltimore County*, 335 Fed. Appx. 773, 2009 US App. LEXIS 26868, at *6 n.1 (4th Cir. 2009) ("Of course, the mere fact that the Clinic has not sought money damages does not prove them an inadequate remedy.").

140.     The question this Court must consider is whether money damages would be sufficient to cure the patentee's future harm.  The amount of damages that would be sufficient is irrelevant.  *See, e.g.*, *Am. Calcar, Inc. v. Am. Honda Motor Co.*, No. 06-2433, 2008 U.S. Dist.

LEXIS 106476, at *3-4 (S.D. Cal. Nov. 18, 2008) (evaluating propriety of granting an injunction without determining what specific legal remedies would apply).

141.     In this case, an ongoing royalty will be sufficient to cure ePlus's harm for Lawson's future sales of RSS and Punchout.  This Court will follow the Federal Circuit's holding that a determination of what ongoing royalty applies should be made after a court decides whether to issue an injunction or not and should be made with input from the parties. *Paice*, 504 F.3d at 1316 (Rader, J. concurring);  *Advanced Cardiovascular Sys., Inc. v. Medtronic Vascular, Inc.*, 579 F. Supp. 2d 554, 560 (D. Del. 2008) (holding "[m]onetary damages are rarely inadequate where patentee has licensed patents to others).

### C.     Balance of Hardships Weighs Against Injunctive Relief

142.     This Court concludes that the relative hardships between the parties does not merit issuing a permanent injunction.  *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 862-63 (Fed. Cir. 2010).

143.     ePlus and Lawson are both large companies with diverse product lines and revenue sources.  This Court finds, however, that the balance of harms weighs against an injunction because sales of the patented technology account for less than 1 percent of ePlus's. *See Praxair, Inc. v. ATMI, Inc.*, 479 F. Supp. 2d 440, 443 (D. Del. 2007).  (declining to grant permanent injunction where evidence indicated that sales of the patented technology accounted for low percentages of each party's business and plaintiff did not identify precisely what customers it lost to defendant).  This is not significant enough to justify the harm an injunction will cause to Lawson, its customers, and the public.

### 1.     That the Claims Have Been Rejected as Unpatentable During Reexamination Weighs Against Granting an Injunction

144.    This Court will follow its own precedent holding that the rejection of patent claims during pending reexaminations should be considered when deciding whether to grant a permanent injunction.  *MercExchange, LLC v. eBay, Inc.*, 500 F. Supp. 2d 556, 574-75 (E.D. Va. 2007).  The Eastern District of Virginia recognized in *MercExchange* that "the potential pitfalls involved with allowing administrative proceedings to impact the court's ruling; however, such is a reality in the patent field and when the court considers a prospective motion in equity*, it would be imprudent not to consider the ongoing reexamination*."  *Id.* at n.15 (emphasis added).  "As the Chief Justice posited during oral argument, if the reexamination can act as a basis for staying an injunction, it can also be 'a basis not to issue [an injunction] in the first place.'"  *Id.* n. 29.

145.    In this case, although the reexaminations are ongoing and not final, the Patent Office had rejected every claim of the patent-in-suits as invalid by anticipation of multiple, independent pieces of prior art.  Because of these rejections, there is a legitimate reason to question whether ePlus will suffer irreparable harm.  Further, the Patent Office's multiple rejections of all claims suggested that there is a substantial risk to Lawson if is enjoined and then the claims are ultimately found to be invalid.  *Id.* at 585-86 ("In addition to the analysis above, in fashioning *prospective* equitable relief, the court must also consider the potential for eBay to suffer irreparable harm if enjoined from utilizing the buy-it-now feature on its website should the PTO later invalidate the '265 patent.").

2.    The Lack of Willful Infringement Weighs Against Granting an Injunction

146.    ePlus has waived its contention that Lawson willfully infringed the patents in suit. "[W]here infringement is not willful, perhaps because of serious questions as to the patent's validity or the patent arose long after the technology was first used, the potential destruction of an infringer's business should carry some weight in the balancing of harms under the four-factor

35

test reaffirmed in *eBay*." *Hynix Semiconductor Inc. v. Rambus Inc.*, 609 F. Supp. 2d 951, 971 (N.D. Cal. 2009).  This Court finds that ePlus's waiver of willfulness supports a finding that no injunction is necessary.

3.     <u>Seeking an Injunction Merely to Increase its Leverage in a Settlement<br>Negotiation Weighs Against Granting an Injunction.</u>

147.    Permanent injunctions are not for parties who use their patents as a "sword to extract money rather than as a shield to protect its right to exclude".  *MercExchange, LLC v. eBay, Inc.*, 500 F. Supp. 2d 556, 572 (E.D. Va. 2007).  *See also High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1557 (Fed. Cir. 1995).

148.    An injunction "may not be used for 'punishment or reparations for . . . past violations.'"  *Belk v. Charlotte-Mecklenburg Bd. of Educ.*, 269 F.3d 305, 347 (4th Cir. 2001) (en banc) (quoting *United States v. Or. State Med. Soc.*, 343 U.S. 326, 333 (1952)).  Rather, injunctive relief is an "extraordinary remedy."  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982); *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 201 (4th Cir. 2005).

149.    The balance of harms weighs against granting an injunction when it appears that the patentee's motive in seeking an injunction is to increase its leverage in negotiating an ongoing license with the accused infringer.  *Hynix Semiconductor Inc. v. Rambus Inc.*, 609 F. Supp. 2d 951, 985 (N.D. Cal. 2009) ("Informing this balance is the court's firm conviction that Rambus's motive in seeking an injunction is not to prevent irreparable harm but either (a) to increase its leverage in negotiating an ongoing license with Hynix or (b) to punish Hynix out of spite for its decision to contest Rambus's infringement allegations and over a variety of other grievances involving the industry's rejection of RDRAM.").

150.    In this case, ePlus's primary motives for seeking an injunction are to punish Lawson for perceived wrongs done to ePlus during the litigation and to increase ePlus's leverage

36

in licensing negotiations after the injunction in entered.  This Court finds that ePlus's desire to use an injunction to "level the playing field" does not support entering an injunction, but rather shows that a prospective royalty will be sufficient.

### D.    Public Interest Factors Do Not Support Injunctive Relief

151.    The Court finds that ePlus's general argument that injunctions promote the progress of science carries little weight.  *Ricoh Co. v. Quanta Computer, Inc.*, No. 06-462, 2010 U.S. Dist. LEXIS 38220, at \*10-11 (W.D. Wis. Apr. 19, 2010) ("Plaintiff argues that the 'Constitutional goal of promoting science' under Article I, § 8 favors an injunction.  Again, plaintiff fails to identify any facts in this case that would help serve that purpose more than with respect to any other claim for patent infringement. In fact, plaintiff has not shown that an injunction would serve any purpose other than to increase its leverage in negotiations for a higher licensing fee." (citation omitted)).

152.    This Court also finds that the public interest will be served "permitting full and free competition in the use of ideas which are in reality a part of the public domain." *Lear v. Adkins*, 395 U.S. 653, 670 (1969).  This finding is particularly true in this case where ePlus seeks to enforce patents that haves been repeatedly found to be invalid during reexamination. *MercExchange, LLC v. eBay, Inc.*, 500 F. Supp. 2d 556, 586 (E.D. Va. 2007) ("Thus, the court deems it proper to consider the nature of the patent, as well as repeated indications from the PTO that such patent is invalid as obvious, when considering the public's interest in protecting the patent holder through injunctive relief.").

153.    This Court has considered the potential harm to Lawson's customers and found that the harm weighs against issuing a permanent injunction.  *Dow Chem. Co. v. Nova Chems. Corp.*, No. 05-737, 2010 U.S. Dist. LEXIS 77099, at \*3-4 (D. Del. July 30, 2010) ("numerous

consumers of Nova's product would be injured through the loss of productivity that will follow if a new polymer product is required to be inserted into their production facilities"); *z4 Techs., Inc. v. Microsoft Corp.*, 434 F. Supp. 2d 437, 444 (E.D. Tex. 2006) ("Under both aspects of z4's proposed permanent injunction, there is a risk that certain sectors of the public might suffer some negative effects. However, the Court is unaware of any negative effects that might befall the public in the absence of an injunction. Although these negative effects are somewhat speculative, such potential negative effects on the public weigh, even if only slightly, against granting an injunction. Accordingly, the public interest is likely to be disserved if a permanent injunction were entered against Microsoft.").

### E.    Scope of an Injunction

154.    This Court further finds that ePlus does not have the right to enjoin Lawson's customers who were not parties to this action.  Fed. R. Civ. P. 65(d); *Med. Instrumentation & Diagnostics Corp. v. Elekta AB,* 2002 U.S. Dist. LEXIS 26812, **26-27 (S.D. Cal. 2002).

155.    Servicing and repairing infringing products is not, itself, an infringing act.  *Fonar Corporation v. General Electric Co.*, 107 F.3d 1543, 1555 (Fed. Cir. 1997).  Therefore, it would be inappropriate to enjoin Lawson from servicing and repairing the RSS and Punchout products it sold before the verdict.

156.    This Court further finds that an injunction on past sales is inappropriate because ePlus abrogated its right to damages on sales of those products.  *Odetics, Inc. v. Storage Technology Corporation*, 185 F.3d 1259 (Fed. Cir. 1999) (affirming the district court decision precluding the patentee from collecting damages for any devices sold before the filing of the complaint because of laches and precluding the patentee from enjoining future uses and repair of the devices that were sold without liability for damages).

157.    This Court has found that ePlus is not entitled to damages on products already sold.  When a patented item is made and sold without liability for damages, "there is no restriction on [its] use to be implied for the benefit of the patentee."  *Adams v. Burke*, 84 U.S. 453, 457 (1873).

158.    This Court concludes that it would be inappropriate to enjoin the following products because they were specifically found not to infringe any of ePlus's patent claims: the Core S3 Procurement system, LSF, ProcessFlow, the IC, RQ, or PO modules, and EDI.

159.    The patent term of a patent depends on the patent's filing date.  If a patent was filed after June 8, 1995, the term of the patent begins on the day the patent issues and ends on the date that is twenty years from the date the patent was filed.  M.P.E.P §2701.  If a patent was filed on or before June 8, 1995, the term is the greater of the twenty year term or seventeen years from the grant date of the patent.  See 35 U.S.C. § 154 (c).  For continuation patents filed on or after June 8, 1995, the continuation patent will have a term which ends twenty years from the filing date of the earliest application for which a benefit is claimed, subject to any terminal disclaimers.  M.P.E.P §2701.  The twenty year term is applied even if the application for which benefit is claimed was filed prior to June 8, 1995.

160.    In the present case, the '683 patent was filed on August 10, 1994 and was granted on February 8, 2000.  Because it was filed before June 8, 1995, it will be afforded a patent term of the greater of the twenty year term or seventeen years from the grant date of the patent.  Consequently, the '683 patent will have a patent term that ends on February 8, 2017.  The '172 patent is a continuation of the '683 patent and was filed on March 22, 2000.  As such, it will expire twenty years from its earliest effective filing date, which is August 10, 2014.

161.     RSS was found to infringe only claim 1 of the '172 patent.  Thus, any injunction against RSS must expire no later than August 10, 2014.

162.     Punchout was found to infringe several claims of the '683 patent.  Thus, any injunction against Punchout must expire no later than February 8, 2017.

LAWSON SOFTWARE, INC.


By_____/s/_____
            Of Counsel

Dabney J. Carr, IV (VSB No. 28679)
Robert A. Angle (VSB No. 37691)
Megan C. Rahman (VSB No. 42678)
dabney.carr@troutmansanders.com
robert.angle@troutmansanders.com
megan.rahman@troutmansanders.com
**TROUTMAN SANDERS LLP**
1001 Haxall Point, Richmond, VA 23219
Telephone:  (804) 697-1200
Facsimile:  (804) 697-1339


Daniel McDonald (admitted *pro hac vice*)          Donald R. Dunner (admitted *pro hac vice*)
William D. Schultz (admitted *pro hac vice*)        Erika H. Arner (admitted *pro hac vice*)
Rachel C. Hughey (admitted *pro hac vice*)          **FINNEGAN, HENDERSON, FARABOW,**
Andrew J. Lagatta (admitted *pro hac vice*)          **GARRETT & DUNNER, L.L.P.**
Joshua P. Graham (admitted *pro hac vice*)          901 New York Avenue, N.W.
**MERCHANT & GOULD P.C.**                            Washington, DC 20001
3200 IDS Center, 80 South Eighth Street,            Telephone:  (202) 408-4000
Minneapolis, MN  55402                              Facsimile:  (202) 408-4400
Telephone:  (612) 332-5300
Facsimile:  (612) 332-9081


*Counsel for Defendant Lawson Software, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 30th day of March, 2011, a true copy of the foregoing will be filed electronically with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Craig T. Merritt
Henry I. Willett, III
**CHRISTIAN & BARTON, LLP**
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
cmerritt@cblaw.com
hwillett@cblaw.com

James D. Clements
Goodwin Procter, LLP
Exchange Place
53 State Street
Boston, MA 02109-2881
jclements@goodwinprocter.com

Scott L. Robertson
Jennifer A. Albert
David M. Young (VSB No. 35997)
Goodwin Procter, LLP
901 New York Avenue, N.W.
Washington, DC 20001
srobertson@goodwinprocter.com
jalbert@goodwinprocter.com
dyoung@goodwinprocter.com

*Attorneys for Plaintiff*

                                                    /s/
                            Dabney J. Carr, IV (VSB No. 28679)
                            Robert A. Angle (VSB No. 37691)
                            Megan C. Rahman (VSB No. 42678)
                            dabney.carr@troutmansanders.com
                            robert.angle@troutmansanders.com
                            megan.rahman@troutmansanders.com
                            **TROUTMAN SANDERS LLP**
                            1001 Haxall Point
                            Richmond, VA 23219
                            Telephone:  (804) 697-1200
                            Facsimile:  (804) 697-1339
                            *Counsel for Defendant Lawson Software, Inc.*