# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | | |
|---|---|---|
| *e*PLUS INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:09-CV-620 (REP) |
| | ) | |
| v. | ) | |
| | ) | |
| LAWSON SOFTWARE, INC., | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF *e*PLUS INC.'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF MOTION FOR PERMANENT INJUNCTION

Craig T. Merritt (VSB #20281)
Henry I. Willett, III (VSB #44655)
**CHRISTIAN & BARTON, LLP**
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
Telephone: (804) 697-4100

Scott L. Robertson (admitted *pro hac vice*)
Jennifer A. Albert (admitted *pro hac vice*)
David M. Young (VSB #35997)
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone: (202) 346-4000

Michael G. Strapp (admitted *pro hac vice*)
**GOODWIN PROCTER LLP**
Exchange Place
53 State Street
Boston, MA 02109-2881
Telephone: (617) 570-1000

*Counsel for Plaintiff, ePlus Inc.*

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ................................................................................................. 1

II.  PROPOSED FINDINGS OF FACT ................................................................... 1

    A.  The Scope Of Defendant's Infringement .................................................. 1

    B.  ePlus Products Covered By The Patents .................................................. 3

    C.  ePlus's Licensees And The Terms Of The Licenses ............................... 7

    D.  Marketing and Solicitation of New Customers ...................................... 9

    E.  The Electronic Procurement Market ..................................................... 10

    F.  Competition Between ePlus And Defendant ....................................... 12

    G.  ePlus Has Lost Sales Because Of Defendant's Infringing Software Products ..... 16

    H.  Irreparable Harm And Inadequacy Of Remedy At Law To ePlus ....................... 19

    I.  The Balance Of Hardships .................................................................... 21

    J.  The Public Interest ............................................................................... 24

III.  PROPOSED CONCLUSIONS OF LAW ....................................................... 27

    A.  Legal Standards .................................................................................... 27

    B.  ePlus Will Suffer Irreparable Harm In The Absence Of A Permanent Injunction 28

    C.  ePlus Has No Adequate Remedy At Law ............................................. 29

    D.  The Balance Of Harms Weighs Decidedly In Favor Of ePlus ........................... 31

    E.  The Public Interest Will Not Be Disserved By An Injunction ........................... 33

IV.  CONCLUSION .............................................................................................. 35

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Acumed LLC v. Stryker Corp.,*
   551 F.3d 1323 (Fed. Cir. 2008)................................................................28, 30, 31

*Broadcom Corp. v. Qualcomm Inc.,*
   543 F.3d 683 (Fed. Cir. 2008).................................................................30, 32, 33

*eBay Inc. v. MercExchange, L.L.C.,.*
   547 U.S. 388 (2006) ............................................................................................ 28

*Flex-Foot, Inc. v. CRP, Inc.,*
   238 F.3d 1362 (Fed. Cir. 2001)........................................................................... 30

*i4i Ltd. P'ship v. Microsoft Corp.,*
   598 F.3d 831 (Fed. Cir. 2010)........................................................................ 30, 32

*King Instr. Corp. v. Perego,*
   65 F.3d 941 (Fed. Cir. 1995)............................................................................... 35

*Odetics, Inc. v. Storage Tech. Corp.,*
   14 F. Supp.2d 785 (E.D. Va. 1998)..................................................................... 29

*Sanofi-Synthelabo* v. *Apotex, Inc.,*
   470 F.3d 1368 (Fed. Cir. 2006) .................................................................33, 34, 35

*SynQor, Inc. v. Artesyn Techs., Inc.,*
   2011 WL 238645 (E.D. Tex. Jan. 24, 2011)........................................................ 29

*Trading Techs., Int'l, Inc. v. eSpeed, Inc.,*
   2011 WL 4531371 (N.D. Ill. May 22, 2008) ....................................................... 29

*Windsurfing Int'l, Inc. v. AMF, Inc.,*
   782 F.2d 995 (Fed. Cir. 1986).......................................................................... 32, 33

**Statutes**

35 U.S.C. § 154 .......................................................................................................... 28

35 U.S.C. § 283 ...................................................................................................... 1, 28

35 U.S.C. §287............................................................................................................. 5

**Rules**

Fed. R. of Civ. P. 65 .................................................................................................... 1

## I.      INTRODUCTION

Pursuant to Fed. R. of Civ. P. 65 and 35 U.S.C. § 283, and this Court's Order of March 11, 2011, *e*Plus, Inc. ("*e*Plus") respectfully submits the following proposed findings of fact and conclusions of law in support of its motion for a permanent injunction against Defendant Lawson Software, Inc.'s ("Defendant's") continuing direct and indirect infringement of claims 3, 26, 28, and 29 of U.S. Patent No. 6,023,683 (or, "the '683 Patent"); and claim 1 of U.S. Patent No. 6,505,172 (or, "the '172 Patent").

## II.     PROPOSED FINDINGS OF FACT

### A.      The Scope Of Defendant's Infringement

1.      On January 27, 2011, the jury in this matter returned a unanimous verdict that the '683 and '172 Patents were infringed, and that all of the asserted claims of the *e*Plus patents-in-suit were valid.[1]   In particular, the jury determined that *e*Plus proved that the following configurations of Defendant's S3 Procurement System infringe the asserted claims identified below, both directly and indirectly:

(a)      Defendant's Core S3 Procurement System (Lawson System Foundation ("LSF")/Process Flow, in combination with Inventory Control, Requisition, and Purchase Order Modules) and Requisition Self-Service or "RSS," infringes claim 1 of the '172 Patent, both directly and indirectly;

(b)      Defendant's Core S3 Procurement System, RSS, and Punchout, infringes claims 3, 26, 28, and 29 of the '683 Patent, and claim 1 of the '172 Patent, both directly and indirectly;

---

[1]  To the extent that the Court determines after considering *e*Plus's Rule 50(b) Motion for Judgment as a Matter of Law that Defendant has also infringed U.S. Patent No. 6,055,516 ("the '516 Patent"), *e*Plus also requests that Defendant be enjoined from its continued infringement of the '516 patent.

(c)     Defendant's Core S3 Procurement System, RSS, Punchout, and Electronic Data Interchange or "EDI," infringes claims 3, 26, 28, and 29 of the '683 Patent, and claim 1 of the '172 Patent, both directly and indirectly; and

(d)     Pursuant to the Parties' Stipulation With Respect To M3 Infringement, as set forth in the Revised Amended Final Pretrial Order (Dkt. No. 481) at Section II, because *e*Plus proved that the aforementioned configurations of Defendant's S3 Procurement System infringe claims 3, 26, 28, and 29 of the '683 Patent, and claim 1 of the '172 Patent, both directly and indirectly, *e*Plus also proved that Defendant's M3 e-Procurement Software infringes claims 3, 26, 28, and 29 of the '683 Patent, and claim 1 of the '172 Patent, both directly and indirectly.

2.     In addition to its sales of the infringing systems, Defendant also provides its customers a range of services for the infringing systems, including installation, implementation, hosting, maintenance, support, training and consulting services.  Trial Tr. 936:7-938:1; 939:18-940:5; 940:8-942:3; 942:25-943:23; 951:2-954:14 (Raleigh) (different services Defendant provides to its customers include training, software installation, implementation, upgrade, learning, hosting, data migration and conversion, maintenance and support services); Trial Tr. 1035:9-1043:20 (Lohkamp) (same); Trial Tr. 1160:24-1161 (Christopherson) (Defendant performs installation and implementation services for the majority of its customers and all existing customers are under maintenance contracts); Trial Tr. 1658:12-1659:6 (Raleigh) (Defendant's implementation services include all activities required to get software installed, setting up the system, design and configuration of the system, testing the operability, loading data into system and training the customer); Trial Tr. 1705:23-1703:13 (Yuhasz) (Defendant implemented Novant's system; and performed consulting services, training services and

2

maintenance services).  *See also* Inj. Hr'g Tr. 27:16-22 (Court) (Defendant's ongoing

infringement includes not only new sales of the infringing systems, but also maintenance and

consulting services for existing infringing systems).

       3.     The claimed inventions relate to electronic sourcing systems and methods

conducted by electronic sourcing systems.  The electronic sourcing and procurement systems and

methods automate internal corporate purchasing processes, resulting in enormous savings in time

and expense.  Corporate customer users may search for items for sale from multiple selected

electronic supplier catalogs, view inventory availability information for those items, find related

items available from other suppliers, and requisition desired goods or services.  The claimed

systems then generate electronic purchase orders to multiple suppliers for approved requisitions.

*See, e.g.*, '683 Patent, Col. 3:3-24.

      **B.**    ***e*Plus Products Covered By The Patents**

       4.     On May 4, 2001, *e*Plus purchased the commercial-technology business assets of

ProcureNet, Inc. ("ProcureNet"), a company that at that time focused on e-commerce software.

*See* DX69 (Asset Purchase Agreement); Trial Tr. 1299:7-1303:4 (Farber).  As part of the

acquisition, *e*Plus obtained ProcureNet's enterprise procurement-software application, called

OneSource, and the patents-in-suit, *i.e.*, U.S. Patent Nos. 6,023,683; 6,055,516; and 6,505,172

(PX1, PX2, PX3).  Trial Tr. 1301:2-9 (Farber).

       5.     *e*Plus saw the OneSource application, which was renamed "Procure+" following

the acquisition, as an e-procurement product that could be provided to customers as an internal

stand-alone program or as a product hosted by *e*Plus.  *See* PX44 (*e*Plus 2001 Annual Rpt.) at 6.

*e*Plus described this e-procurement software as being "one of the most valuable intangible assets

acquired by *e*Plus" as part of the ProcureNet deal.  DX49 (Valuation Methodologies and

Valuations) at ePLUS0135343-44.

6.      Since 2001, *e*Plus has sold e-procurement software products, known as Procure+ and Content+, that embody the patented technology at issue in this litigation.  Both the software and personnel acquired from ProcureNet continue to be the core components of *e*Plus Systems.  Procure+ and Content+, another software application obtained from the ProcureNet acquisition, remain *e*Plus Systems and Content Services' flagship-software applications even today, almost a decade after the acquisition.  *See* Trial Tr. 1302:6-10 (Farber); Inj. Hr'g Tr. 31:20-32:1 (Farber).  The vast majority of the original 39 employees acquired along with other assets from ProcureNet still work at *e*Plus, including Ken Farber, who serves as the President of *e*Plus Systems and Content Services.  Trial Tr. 1299:11-13; 1301:10-16 (Farber).

7.      *e*Plus's Procure+ provides users with an electronic sourcing and procurement system where users can search for items in multiple vendor catalogs, compare those items, build requisitions for selected items, check the availability of selected items in the vendors' inventories, and generate multiple purchase orders from the requisitioned items for transmission to suppliers.  Trial Tr. 1302:11-1303:4; 1307:22-1308:4; 1309:1-1310:9; 2634:14-21; 2637:4-13 (Farber); PX448 (Content+ Supplier Portal) at ePLUS0009390-91; Inj. Hr'g Tr. 32:7-10; 32:15-41:21 (Farber).

8.      Procure$^+$ offers internet-based procurement capabilities.  Users of a Procure$^+$ system may:

- Access comprehensive online catalogs.
- Take advantage of robust catalog search to quickly find items, search by key word, category, or attribute.  Once search results are displayed, users can view images of products, detailed specifications, and price.
- Compare products based on such attributes as price and size.  Perform parametric searching.
- Add items to their online shopping cart, determine quantity, and quickly search for the next item.

- View transaction attributes, review and change their order, and submit their order.
- Check their order status, view approvals, check order fulfillment, and review order activity.
- Generate purchase orders as well as create approval and textual reports.

PX140 at ePLUS0434499-500. Procure$^+$ functionality includes: electronic catalogs; approval workflow; order status; invoice matching; communication to and from sellers with EDI; and inventory. *Id.* at ePLUS0434501; Inj. Hr'g Tr. 32:7-10; 32:15-41:21 (Farber); Trial Tr. 1302:6-1303:7; 1307:6-1308:5; 1309:1-1310:9; 2634:14-21; 2637:4-13 (Farber).

9.      Content$^+$ is a flexible application that integrates with Procure$^+$ to connect catalogs. *See* PX140 at ePLUS0434502. Content$^+$ "empowers suppliers to convert raw product data into a manageable, searchable catalog." PX140 at ePLUS0434501. "Content$^+$ takes free-form, unstructured text descriptions and cleanses the content so it can be included in comprehensive catalogs. With Content$^+$, catalogs are easily and quickly searchable by keyword, attributes, and classification structure." PX140 at ePLUS0434501; Inj. Hr'g Tr. 32:7-10; 32:15-41:21 (Farber); Trial Tr. 1302:6-1303:7; 1307:6-1308:5; 1309:1-1310:9; 2634:14-21; 2637:4-13 (Farber).

10.     *e*Plus has been systematically and continuously marking Content$^+$ and Procure$^+$ with the patents-in-suit, pursuant to 35 U.S.C. §287(a), since no later than October 2003. *See e.g.,* PX283 (Content+ Supplier Portal) at ePLUS0009390; PX302 (Welcome to Procure+) at ePLUS0442857; PX313 (e+ Product Information Management) at ePLUS0529218; Trial Tr. 1302:6-1303:7; 1307:6-1308:5; 1309:1-1310:9; 2634:14-21; 2637:4-13 (Farber).

11.     The patented Procure+ and Content+ products are the central and primary software products developed and sold by *e*Plus Systems and *e*Plus Content Services. Trial Tr. 1302:6-10 (Farber); Inj. Hr'g Tr. 31:20-32:1 (Farber). From the time Defendant first began infringing the *e*Plus patents through the present, *e*Plus has generated in excess of $50 million in

revenue from Procure+ and Content+.  DX292 (*e*Plus income statement FY2002-Q3 2010); Inj. Hr'g Tr. 47:22-48:5 (Farber).  *e*Plus has also generated nearly $60 million in revenue from settlements concerning litigations involving the patented technology embodied in the Procure+ and Content+ products.  Trial Tr. 2620:10-12 (Farber); Inj. Hr'g Tr. 48:6-9 (Farber).

12.    The patented Procure+ and Content+ products are critically important aspects of *e*Plus's product offerings not only because they have generated tens of millions of dollars of revenues, but also because, as *e*Plus explained in its SEC disclosures, this proprietary software allows *e*Plus "to better support and retain our customers in our technology sales and finance business," the business from which *e*Plus currently derives the majority of its revenues.  PX523 (*e*Plus 2010 10-K) at 3.  *See also* Inj. Hr'g Tr. 45:1-47:21 (Farber).  Importantly, *e*Plus has "developed and acquired these products to distinguish [itself] from [its] competition by providing a comprehensive offering to customers."  PX523 at 3.  Procure+ and Content+ are critical to *e*Plus's prospective business strategy as well because this in-house proprietary and patented software provides *e*Plus with an "added competitive advantage," since customers in this industry increasingly "prefer bundled offers to include IT products/services and leasing."  PX523 at 4. Procure+ and Content+ are a crucial component of the bundled solution of "IT sales and professional services, leasing and financing services" that *e*Plus provides to its customers. PX523 at 5.  *e*Plus differentiates itself from its competitors through its ability to provide comprehensive technology solutions that include the patented proprietary software.  *Id.*  *e*Plus can only pursue its goal of becoming "a leading provider of bundled solution offerings in the IT supply chain," *id.* at 6, if adjudicated infringers of the *e*Plus patents, like Defendant, are not permitted to unfairly compete with *e*Plus in the marketplace by continuing to market and sell infringing e-procurement software.

13.     Procure+ and Content+ are also critical to *e*Plus's overall business strategy because they compliment both the value-added reseller (VAR) business that is the primary source of revenue for *e*Plus's other business units' as well as *e*Plus's other products such as Document Management, Spend Analysis and Document Management.  Inj. Hr'g Tr. 45:1-47:21 (Farber).  Procure+ and Content+ provide *e*Plus with opportunities to cross-sell and up-sell its VAR products to customers of these products.  Inj. Hr'g Tr. 47:1-4 (Farber).  In 2010 alone, Procure+ and Content+ drove approximately $16 million in additional hardware sales.  Inj. Hr'g Tr. 45:1-18 (Farber).

   **C.     *e*Plus's Licensees And The Terms Of The Licenses**

14.     Each of *e*Plus's licenses to the patents-in-suit has been as a result of settlement of actions to enforce its rights to the patents-in-suit.  In each case, *e*Plus has exercised a degree of control over its licensees.  Inj. Hr'g Tr. 75:7-77:6 (Farber); Evans Dec. (Feb. 7, 2011), ¶¶ 65-70. For example, in the Settlement and License Agreement between *e*Plus and Ariba, *e*Plus granted Ariba a personal, non-exclusive, non-transferable, non-sublicensable, non-assignable license to the *e*Plus Patents in exchange for Ariba's payment of $37 million and a cross license to Ariba's patents.  *See* PX43, ¶¶ 5, 11-14; Evans Dec., ¶ 65.  The license grant extended to Ariba's customers, resellers, hosting or outsourcing partners, VARs, OEMs and Channel and Business partners, but only for products and services as delivered by Ariba into channels of commerce. PX43, ¶ 14; Evans Dec., ¶ 65.  Moreover, the license granted under the agreement was personal to Ariba and not transferable or assignable, except in limited circumstances.  PX43, ¶¶ 14, 17; Evans Dec., ¶ 65.

15.     Pursuant to the Patent and License Agreement between *e*Plus and SAP (PX318), *e*Plus granted to SAP and its affiliates, vendors, customers and authorized developers, in exchange for a license payment of $17.5 million, a non-exclusive license, without the right to

sublicense, under the *e*Plus Patents to practice, design, make, have made, operate, have operated, use, sell, license, offer to sell or license and import Licensed Products (as defined) and to practice any Licensed Process (as defined).  PX318, ¶ 2.1; Evans Dec., ¶ 66.  The license grant extended to third parties making products for or on behalf of SAP but, to the extent such products were provided to any person or entity other than SAP, an Affiliate of SAP, an SAP Vendor, an SAP Authorized Developer or supplier or provider to SAP, those products were excluded from the scope of the license rights.  PX318, ¶ 2.1; Evans Dec., ¶ 66.

16.     *e*Plus filed this action against four defendants:  Verian Technologies, Inc. ("Verian"), SciQuest, Inc. ("SciQuest"), Perfect Commerce, LLC ("Perfect Commerce") and Lawson.  With the exception of Lawson, each of the Defendants entered into a Settlement and License Agreement with *e*Plus at the outset of the litigation before significant discovery had commenced.  For example, in exchange for Verian's payment of $500,000 and an agreement to pay ongoing royalties in the event its revenues exceeded certain thresholds, *e*Plus granted to Verian and its affiliates a personal, non-exclusive, non-transferable and non-assignable (except in certain circumstances), non-sublicensable (except in certain circumstances), license to make, have made, import, export, sell and offer for sale, support and repair any products and services that were covered by one or more claims of the *e*Plus Patents.  PX320, ¶ 14; Evans Dec., ¶ 68. The license was non-sublicensable except for sublicenses to manufacturers, distributors, sales agents, support and development contractors, customers and users acting under Verian's authority and only with respect to products and services which are sold or licensed by Verian. PX320, ¶ 14; Evans Dec., ¶ 68.  Moreover, the patent license granted in the agreement with Verian does not extend to entities or their affiliates acquired by Verian.  PX320, ¶ 15; Evans Dec., ¶ 68.  Verian may not assign the license without the prior written consent of *e*Plus, except

in certain limited circumstances.  PX320, ¶ 35; Evans Dec., ¶ 68.

17.    In the case of SciQuest, in exchange for SciQuest's payment of $2.4 million, *e*Plus granted to SciQuest a personal, non-exclusive, non-transferable, non-sublicensable, non-assignable, license to make, import, sell and offer for sale any products or services that are covered by one or more claims of the *e*Plus Patents.  *e*Plus specified, however, that in no event would the license granted to SciQuest extend to Lawson.  PX319, ¶ 14; Evans Dec., ¶ 69. Moreover, *e*Plus and SciQuest agreed that the patent license did not extend to any entities that consummate an Asset Acquisition or a Stock Acquisition with SciQuest that results in a Change in Control (as defined) of SciQuest without the prior written consent of *e*Plus, except in certain limited circumstances.  PX319, ¶ 15; Evans Dec., ¶ 69.

18.    In the case of Perfect Commerce, in exchange for Perfect Commerce's payment of $750,000, *e*Plus granted to Perfect Commerce a personal, non-exclusive, non-transferable, non-sublicensable, non-assignable (except in limited circumstances) license to make, import, sell and offer for sale any products or services that are covered by one or more claims of the *e*Plus Patents.  *e*Plus specified, however, that in no event would the license extend to Lawson.  PX317, ¶ 14; Evans Dec., ¶ 70.  *e*Plus further specified that the license granted under the Agreement was personal to Perfect Commerce and that Perfect Commerce could not assign the Agreement or any portion thereof, without the prior written consent of *e*Plus.  PX317, ¶ 15; Evans Dec., ¶ 70.

### D.    Marketing and Solicitation of New Customers

19.    *e*Plus's general strategy for seeking out new customers for its Procure+ and Content+ products is to follow leads it obtains through multiple sources, including third-party lead-generation firms and lead databases.  Inj. Hr'g Tr. 50:7-22; 52:9-16 (Farber).  Using those leads, *e*Plus may initially contact a potential customer by email or phone.  Inj. Hr'g Tr. 50:23-51:24 (Farber).  *e*Plus also participates in conferences, seminars, and trade shows where *e*Plus

representatives demonstrate the software and distribute product brochures. *Id.*; Trial Tr. 1068:21-1069:21 (Lohkamp) (*e*Plus demonstrated Procure+ at health association conference). Customers for e-procurement software may also learn of *e*Plus through industry analyst reports or on the world wide web using a search engine such as Google. Inj. Hr'g Tr. 50:7-22 (Farber); Trial Tr. 1069:22-1070:8 (Lohkamp) (*e*Plus listed in Forrester e-Procurement Wave). *e*Plus will also solicit customers of other *e*Plus products or business. Inj. Hr'g Tr. 113:6-14 (Farber). In its initial contacts with potential customers, *e*Plus often tries to show companies and organizations how Procure+ and Content+ can add value to their company or organization, and how those products distinguish *e*Plus from its competitors. Inj. Hr'g Tr. 51:23-51:24 (Farber). Other times *e*Plus may receive unsolicited requests for proposals, or RFPs, from potential customers seeking proposals from a number of e-procurement companies. Inj. Hr'g Tr. 50:7-22 (Farber).

> **E.   The Electronic Procurement Market**

20.   One third-party analyst that tracks the e-procurement industry has stated that e-procurement solutions "play a key role in improving purchasing processes in enterprises through automating requisitions and purchase orders for goods and services, decentralizing buying, connecting to suppliers directly, and improving employee compliance with preferred supplier policies." PX466 (Forrester Wave: eProcurement Solutions, Q2 2007) at L0259044.

21.   According to another industry analyst, AMR Research, the supply management market, of which e-procurement makes up roughly half, totaled about $2.8 billion in 2008 and is expected to reach $3.5 billion by 2013. *See* PX646 (Global Enterprise Application Market Sizing Report) at LE03581851; PX463 (the Procurement and Sourcing Applications Report, 2005-2010, AMR Research) at LE00216154. Thus, the e-procurement market itself now stands around $1.5 billion. *See* PX646 (Global Enterprise Application Market Sizing Report) at LE03581851; PX463 at LE00216154.

22.     The market for e-procurement software and services is fiercely competitive. There are several software vendors that provide solutions such as the Procure+ and Content+ solutions offered by *e*Plus Systems.  These include, for example, Ariba, SAP, Oracle, Lawson, Perfect Commerce, SciQuest and Verian Technologies.  Inj. Hr'g Tr. 48:10-49:16; 56:17-57:7 (Farber); PX690 (The Forrester Wave: eProcurement Solutions, Q1 2011) at 5.  Among the larger players are companies such as Oracle and SAP, who together comprise more than 40% of the market share and tend to focus on very large global companies.  *See* PX646 at LE03581836, LE03581850.  Other e-procurement vendors, including *e*Plus and Defendant, target mid-market companies having market capitalizations roughly between $50 million to $2.5 billion.  Trial Tr. 1310:10-22 (Farber); PX440 (Lawson 2010 10-K) at 1; Inj. Hr'g Tr. 57:8-13; 58:15-23 (Farber); Inj. Hr'g Tr. 245:13-20; 246:7-11 (Hager).

23.     Some software vendors in the e-procurement marketplace offer a range of other non-procurement software solutions that can be implemented as a combined solution.  Inj. Hr'g Tr. 48:10-20; 49:14-16 (Farber).  These vendors, referred to as "Enterprise Resource Planning" or "ERP" vendors, include SAP, McKesson, Oracle, and Defendant.  Inj. Hr'g Tr. 48:25-49:13 (Farber).  Other vendors focus specifically on offering e-procurement solutions with superior functionality.  Inj. Hr'g Tr. 192:9-20 (Hager).  These vendors, known as "best of breed" vendors, include Ariba and *e*Plus.  Inj. Hr'g Tr. 139:14-16; 142:20-143:3 (Farber); DX 416 ("Critical Capabilities for Best-of-Breed e-Procurement Vendors," Gartner).

24.     e-Procurement solutions are designed to interface with other back-end proprietary software applications.  Inj. Hr'g Tr. 49:17-50:1; 79:1-25 (Farber).  Defendant's ERP solution, in particular, is configured to permit the ERP suite to be integrated with a stand-alone eProcurement product, such as *e*Plus's Procure$^+$ and Content$^+$ products.  Inj. Hr'g Tr. 49:17-50:1

(Farber); 191:9-20; 223:5-224:1; 256:2-17 (Hager); Trial Tr. 1075:11-1076:21 (Lohkamp); Trial

Tr. 1338:19-1340; 1346:15-1347:2 (Farber) (*e*Plus has integrated its products with accounting

and human resources components of Defendant's ERP systems).  As a result, ERP vendors, like

Defendant, and best-of-breed e-procurement vendors, like *e*Plus, often compete to provide e-

procurement solutions to the same companies.  Inj. Hr'g Tr. 48:21-24 (Farber); Trial Tr. 1070:9-

1072:8; 1072:18-1075:3 (Lohkamp); Trial Tr. 1314:18-1315:24 (Farber); Trial Tr. 1691:21-

1695:24; 1710:4-25 (Yuhasz).

> **F.     Competition Between *e*Plus And Defendant**

25.     *e*Plus and Defendant both develop, market, sell, implement, maintain and support

e-procurement software products that utilize the *e*Plus patented technology.  Defendant's

infringing S3 and M3 systems compete with *e*Plus's Content+ and Procure+ products.

26.     *e*Plus and Defendant both market and sell software incorporating the *e*Plus

patented technology to the same types of companies.  For example, *e*Plus and Defendant both

market and sell their e-procurement software to mid-market companies having market

capitalizations roughly between $50 million to $2.5 billion.  Trial Tr. 1310:10-22 (Farber);

DX214 (Lawson 2010 10-K) at 1; PX523 (*e*Plus 2010 10-K) at 3; Inj. Hr'g Tr. 57:8-13; 58:15-23

(Farber); 246:13-20; 247:7-11 (Hager).

27.     As set forth in the following chart, ePlus and Defendant market and sell their

competing e-procurement software to companies in the very same industries.[2]

---

[2] *See* PX675 ("Supply Chain" spreadsheet)  at ePlus0949465 (listing *e*Plus contacts with
industries for Procure+ and Content+); Inj. Hr'g Tr. 58:4-60:5 (Farber); PX680 ("All US Opps
20100416" spreadsheet) at L0345043 (listing Lawson S3 and M3 contacts with industries);
PX439 (Lawson Software FY10 Strategic Plan) at LE00129945 (detailing Lawson vertical
markets); Inj. Hr'g Tr. 180:13-21 (Hager).

| INDUSTRY | *e*PLUS | LAWSON |
|---|:---:|:---:|
| Agriculture & Mining | ✓ | ✓ |
| Education | ✓ | ✓ |
| Energy & Utilities | ✓ | ✓ |
| Financial Services | ✓ | ✓ |
| Food & Beverage | ✓ | ✓ |
| Government | ✓ | ✓ |
| Healthcare | ✓ | ✓ |
| Manufacturing | ✓ | ✓ |
| Retail | ✓ | ✓ |
| Other Services | ✓ | ✓ |
| Transportation | ✓ | ✓ |

28.     *e*Plus and Defendant not only target the same size companies in the very same industries, they also solicit, market and sell their competing e-procurement software to the exact same companies.  Mr. Farber testified that some of the current or prospective customers for which *e*Plus and Defendant engaged in direct competition include Ames Corporation, Fortress Investments, Hanesbrands, Sterling Jewelers, PPDI, Cleveland Clinic, Novant Health, Blue Cross Blue Shield of North Carolina, Wolters Kluwer, and Deaconess Hospital, among others. Trial Tr. 1314:18-1316:4 (Farber); Inj. Hr'g Tr. 60:10-18; 60:23-61:14 (Farber); PX281 (*e*Plus Systems Response to Gannett e-Procurement Supplier Questions); PX525 (*e*Plus sales cycle summary for Gannett Supply Corporation); PX314 (Wolters Kluwer:  Responding to an RFx); PX316 (Email from P. Norton to W. Thomas regarding *e*Plus's Proposal to Blue Cross Blue Shield of North Carolina); PX575 (Email from M. Evans to G. White regarding *e*Plus's Procure+ proposal to PPDI).   In some instances, *e*Plus has been able to secure the sale in direct competition with Defendant.  In other instances, Defendant has prevailed.  Tr. at 1310:10-1311:18 (Farber Direct).

29.     *e*Plus is also aware of several RFPs relating to e-procurement products and services for which both *e*Plus and Defendant submitted responses, including Novant Health, Indalex, Hanesbrands, Wolters Kluwer and XM Radio.  *See e*Plus's Ans. to Int. No. 18 and

documents cited therein; Trial Tr. 1310:10-1311:18; 1314:18-25, 1315:9-24 (Farber); PX298 (*e*Plus's Response to Novant Health RFP, App. A); PX349 (*e*Plus Response to Novant Health Procure to Pay System RFP); PX645 (Lawson Response to Novant Health Procure to Pay System RFP); PX560 (*e*Plus Response to Indalex Aluminum Solutions RFP for eProcurement Solution); PX643 (Lawson Contractual Support Turnover form – Indalex); PX299 (ePlus Proposal for Hanesbrands – eProcurement Solution for Indirect Spend) at ePlus0434089-96; PX300 (Procure+ Hosted & Content + SP – Hanes); PX641 (Lawson Addendum to Product License Agreement with Hanesbrands).

30.     Neither Mr. Farber, nor any other *e*Plus employee, is aware of most instances in which *e*Plus has lost sales to Defendant or even directly competed with Defendant because the RFP process by which companies seek out e-procurement solution providers is often conducted in secret, so vendors are usually unaware who they are competing against.  Trial Tr. 1074:8-12 (Lohkamp); Trial Tr. 1315:1-8 (Farber).

31.     Independent third party market analysts recognize that Defendant's S3 Procurement modules, including the infringing configurations of Defendant's S3 Procurement System, are counterparts to *e*Plus's Procure+ and Content+ applications, and *e*Plus and Defendant are direct competitors in the market.  *See, e.g.,* PX463 at 7 (AMR Research noting that companies with competitive eProcurement applications include Ariba, *e*Plus, Epicor, Ketera, Lawson, Oracle, SAP, SciQuest, and others); PX690 at 5, 7-8 (The Forrester Wave: eProcurement Solutions, Q1 2011) (evaluating competitive e-procurement solutions from eleven different vendors, including *e*Plus and Defendant); Trial Tr. 1069:22-1070:8 (Lohkamp); Trial Tr. 1311:19-1314:14 (Farber); Inj. Hr'g Tr. 228:24-235:22; 237:13-238:20 (Hager).

32.     Defendant has "sold RSS and/or Punchout" to 830 customers.  Defendant's Resp.

to Int. No. 27 (citing PX681 (Lawson customer list for RSS and Punchout) at L0418184). *e*Plus

has actively solicited 247 of Defendant's 830 RSS and Punchout customers for sales of its

patented Content+ and Procure+ software products. *e*Plus Supplemental Disclosure (Feb. 7,

2011), App. A and documents cited therein; Inj. Hr'g Tr. 61:17-62:14 (Farber). *e*Plus is

competing for sales of e-procurement software with nearly 30% of Defendant's RSS and

Punchout customers.



**Percentage of Customers of Infringing Lawson Systems**
**Targeted by *e*Plus for Procure+ and Content+**

33.     Defendant has solicited 7,989 unique customers for its S3 eProcurement system.

Defendant's Resp. to Int. No. 27 (citing PX682 (salesforce.com report reflecting companies

targeted by Defendant) at L0420744). *e*Plus has targeted 2,041 of the 7,989 customers targeted

by Defendant for sales of its patented Content+ and Procure+ products. *e*Plus Suppl. Disclosure

(Feb. 7, 2011), App. B and documents cited therein; Inj. Hr'g Tr. 61:17-62:14 (Farber). *e*Plus

has marketed or targeted Content+ and Procure+ to over 25% of the companies targeted by

Defendant.



**Percentage of Companies Solicited by Lawson That Were Also Solicited by *e*Plus**

Percentage of These Companies Targeted by ePlus: **26% (2041)**

Total Number of Companies Targeted by Lawson: **7,989**

34.     *e*Plus has had 64 customers for its patented Procure$^+$ and Content$^+$ software.  Inj. Hr'g Tr. 47:22-24 (Farber).  According to Defendant's February 14, 2011 report of companies it has solicited, Defendant is actively targeting 16 of *e*Plus's 64 Procure+ and Content+ customers for sales of its infringing software.  *e*Plus Suppl. Disclosure, App. C and documents cited therein; Inj. Hr'g Tr. 61:17-62:14 (Farber).



**Percentage of *e*Plus Procure+ and Content+ Customers Solicited by Lawson**

Percentage of These Customers Targeted by Lawson: **25% (16)**

Total Number of *e*Plus Customers for Procure+ and Content+:  **64**

**G.     *e*Plus Has Lost Sales Because Of Defendant's Infringing Software Products**

35.     There is evidence of at least several instances where *e*Plus has lost sales of its Procure+ or Content+ products to customers or potential customers of Defendant's infringing

software products.

36.     For example, Gannett Supply Corporation ("Gannett Supply"), a subsidiary of Gannett Company, Inc. ("Gannett Co."), had been an *e*Plus customer since 2002, when it began licensing *e*Plus's Procure+ and Content+ products.  *See* PX529 (Master Software License Agreement Between *e*Plus and Gannett) at ePlus0430972.  Gannett Supply subsequently discontinued its license of *e*Plus's software, and now licenses an infringing system from Defendant, including the Inventory Control, Requisitions, and Purchase Order modules and the RSS application.  *See* PX678 (Lawson customer list) at L0135749; PX679 (Lawson customer list) at L0135750; PX681 (Lawson customer list) at  L0418184.  After licensing the infringing system including the RSS product from Defendant in 2005, Gannett Supply terminated its license of Procure+ and Content+.  *See* ePLUS0541725 (Email from K. Farber to L. Bencic dated June 9, 2009).

37.     *e*Plus has lost business to Defendant in several other instances.  For example, in November 2007, Defendant entered into a statement of work with Deaconess Health System ("Deaconess") — at that time one of *e*Plus's customers for its Procure+ product — to implement an infringing system, including the Inventory Control, Requisitions, and Purchase Order modules, and the RSS and EDI applications.  *See* PX276 (Lawson SOW for Deaconess Health System) at L0294088; Inj. Hr'g Tr. 63:20-64:6 (Farber).  While Punchout was not included in the statement of work, Defendant's just-produced list of RSS and Punchout licensees reveals that in November 2007, Deaconess licensed it, too.  *See* PX681 (Lawson customer list for RSS and Punchout) at L0418184.  Less than one year after Defendant began the implementation of the infringing system for Deaconess, *e*Plus received a letter from Deaconess terminating its license for use and support of the Procure+ product.  *See* PX530 (Letter from J. Kloosterman to *e*Plus

17

dated Aug. 22, 2008) at ePlus0431548; Inj. Hr'g Tr. 64:7-16 (Farber).  *e*Plus was informed that

Deaconess had replaced Procure+ with the Lawson system.  *See* PX544 (Email from K. Farber to

B. Collins dated Aug. 27, 2008) at ePlus0811211; Inj. Hr'g Tr. 64:17-65:7 (Farber).

  38. Additionally, in 2007, *e*Plus met with executives from Blue Cross Blue Shield of

North Carolina ("BCBS") on multiple occasions to discuss the potential licensing and

implementation of *e*Plus's Procure+ product.  *See* PX558 (Email from W. Thomas to S. Vanrooy

dated Nov. 12, 2007) at ePlus0937228; PX557 (Email from W. Thomas to P. Norton dated Oct.

24, 2007) at ePlus0937079.  As Defendant itself has acknowledged, BCBS was, in 2007, a

customer using an infringing Lawson system, including the Inventory Control, Requisitions, and

Purchase Order modules and the RSS application.  *See* PX678 at L0135749; PX679 at

L0135750; PX681 at L0418184; and Def.'s Ans. to Pl.'s Fifth Set of Int. (Nos. 26-28), Resp. to

Int. No. 27 (Feb. 14, 2011).  *e*Plus was ultimately unsuccessful in its bid to provide Procure+ to

BCBS, who continued to license the infringing Lawson system.  *See* PX679 (Lawson customer

list) at L0135750; PX681 (Lawson customer list) at L0418184; and Def.'s Ans. to Pl.'s Fifth Set

of Rogs. (Nos. 26-28), Resp. to Int. No. 27.

  39. In August 2010, *e*Plus contacted LHC Group, which operates a number of home-

nursing agencies, hospices and long-term acute-care hospitals, regarding the possibility of using

*e*Plus's e-procurement software solution.  PX564 (Email from A. Simien to D. Milito dated Aug.

16, 2010); Inj. Hr'g Tr. 65:8-66:12 (Farber).  But *e*Plus was informed by LHC that it had

recently decided to implement Defendant's procurement system instead.  PX564 (Email chain

from A. Simien to D. Milito dated Aug. 16, 2010) (ePLUS0949083); Inj. Hr'g Tr. 65:8-66:12

(Farber).

  40. Furthermore, in 2010, *e*Plus offered its Procure+ product to Pharmaceutical

Product Development, Inc. ("PPDI") as an alternative to Lawson Requisitions Self-Service. PX571 (Email from J. Pinkerton to P. Jarboe dated Sept. 13, 2010) at *e*Plus0949114; PX572 (Email from G. White to J. Pinkerton dated Sept. 11, 2010) at *e*Plus0949115; and PX574 (Email from H. Siegel to P. Norton dated Aug. 30, 2010) at *e*Plus0949118; Inj. Hr'g Tr. 66:13-17; 66:21-67:24 (Farber).  PPDI was at that time a Lawson customer for the Inventory Control, Requisitions, and Purchase Order modules.  *See* PX678 at L0135749.  PPDI inquired about how *e*Plus's e-procurement solution compared to Lawson's RSS and whether *e*Plus's software was capable of interfacing with a Lawson system.  *See* PX574 (Email chain from J. Pinkerton to H. Siegel dated Aug. 30, 2010); Inj. Hr'g Tr. 66:21-67:24 (Farber).  *e*Plus's response was that its e-procurement system has several advantages over Defendant's procurement software, including the capability to index catalogs and to control catalog content using the Supplier Portal, and that it could interface to or preferably replace Lawson RSS.  *See* PX574 (Email from J. Pinkerton to H. Siegel dated Aug. 30, 2010); Inj. Hr'g Tr. 66:21-67:24 (Farber).  PPDI later informed *e*Plus that it had selected Lawson RSS over *e*Plus Procure+, stating that it had "evaluated Procure+ cost and implementation vs. Lawson RSS cost and implementation [and] remain[ed] committed to Lawson."  *See* PX575 (Email from T. McGraw to P. Norton dated Oct. 1, 2010) at *e*Plus0949120; Inj. Hr'g Tr. 63:12-19; 66:18-20; 67:25-68:13 (Farber).

### H.   Irreparable Harm And Inadequacy Of Remedy At Law To *e*Plus

41.   *e*Plus has suffered and will continue to suffer irreparable harm because it will not have any meaningful opportunity to sell its e-procurement products, Procure+ and Content+, to hundreds of potential customers who use Defendant's infringing systems.  Inj. Hr'g Tr. 68:14-69:3 (Farber).  Further, *e*Plus has lost the opportunity to realize ongoing business and additional revenues from these same potential customers, who would have required implementation, maintenance, consulting, and other ongoing services after purchasing Procure+ and Content+.

19

*Id.*  *e*Plus has also lost the opportunity to cross-sell and up-sell its IT and VAR products to additional potential customers of Procure+ and Content+ that have instead chosen to use Defendant's infringing systems.  *Id.*

42.    *e*Plus has been forced to spend several million dollars to enforce its patent rights against Defendant.  Inj. Hr'g Tr. 70:14-20 (Farber).  This significant outlay of capital has severely reduced the resources that *e*Plus could devote to sales and marketing efforts, research and development, and potential acquisitions for its software business.  Inj. Hr'g Tr. 70:21-71:8; 117:11-18 (Farber).  This represents a major lost opportunity to *e*Plus to grow its software business.  Inj. Hr'g Tr. 70:21-71:8 (Farber).  This capital outlay has also had a detrimental impact on *e*Plus's market capitalization.  Inj. Hr'g Tr. 72:25-73:6 (Farber).

43.    There is also no calculable remedy at law because Defendant does not keep track of key financial data regarding its infringing software systems.  Defendant's Director of Revenue Operations and Rule 30(b)(6) witness on costs, revenues, and profits for Defendant's e-procurement systems and services, Kenneth White, testified, for example, that services revenues for its infringing products are not tracked on a product-by-product basis.  White Dep. 52:6-8, Oct. 26, 2009 ("*e*Plus Counsel:  Are you able to pull services revenue that is associated with a particular product?  Mr. White:  No."); *see also id.* at 51:3-20.  Mr. White also testified that Defendant has no means to determine the profitability of its infringing software systems.  White Dep. 23:15-18, Apr. 21, 2010 ("*e*Plus Counsel:  Does Lawson have the ability to track profits at the level of suites of SKUs, for example the S3 supply chain management suite?  Mr. White: No."); *see also id.* at 21:16-22; 24:15-25:15.

44.    Denial of injunctive relief would irreparably harm *e*Plus in other ways.  Denial of injunctive relief forces *e*Plus to divert millions of dollars away from research, development, and

business opportunities, and into litigation costs.  Inj. Hr'g Tr. 70:21-71:8; 117:11-18 (Farber). Further, *e*Plus's patents would be diminished in value if potential infringers knew that they could freely infringe, all the while knowing that at most they will pay only a reasonable royalty for their infringement, without concern that they could be enjoined.  Inj. Hr'g Tr. 87:19-89:9; 91:11-92:7 (Farber).

45.    *e*Plus has also suffered unquantifiable harm due to lost business and licensing opportunities and reduced stock price and market capitalization resulting from its inability to enjoin Defendant's ongoing infringement.  Inj. Hr'g Tr. 72:21-73:6 (Farber).

46.    Infor has offered to purchase all outstanding shares of Defendant's stock for roughly $1.8 billon.  Inj. Hr'g Tr. 256:18-21; 257:4-21; 257:24 – 258:21 (Hager).  Defendant has retained Barclays Capital as a financial advisor to explore the possible sale of the company. *Id*. Thus, there is no guarantee that Lawson will exist as a going concern in the future.

## I.    The Balance Of Hardships

47.    The balance of the hardships as between *e*Plus and Defendant weighs heavily in *e*Plus's favor.  Any "hardship" suffered by Lawson as a result of a permanent injunction is limited to the costs associated with loss of revenues due to its infringement.  This hardship flows directly from Lawson's decision to infringe the patents-in-suit.  In effect, Lawson's "hardship" corresponds to the loss of sales that Lawson should not have been making in the first place. Defendant has derived roughly $300 million in revenue from its 830 RSS and Punchout customers.  PX679 (Lawson Revenue 2005-2009).

48.    The "harm" to Defendant is limited by its infringement indemnification provisions in its license agreements with its customers which provide Lawson with options in the event its software is found to be infringing another's patent rights.  Under these indemnification provisions, Lawson has the option of: (a) obtaining the right for the client to continue using the

product; (b) replacing or modifying the product so that it becomes non-infringing; or (c) terminating the license for the product and refunding the monies paid by the client to Defendant less depreciation or amortization.  Inj. Hr'g Tr. 252:10-254:22 (Hager); PX 268 ¶¶ 11.3, 11.5; PX 241, ¶ 12.2; PX 256, ¶¶ 11.3, 11.5; DX 506, ¶ 12.2.

49.     Defendant was made aware of its infringement of *e*Plus's patents at least as early as May 2009 when *e*Plus filed its Complaint in this litigation.  *See* Complaint (Dkt. No. 1, May 19, 2009).  Since that time, and even after the jury returned a verdict on January 27, 2011 finding that multiple configurations of Defendant's e-procurement systems infringe the patents-in-suit, Defendant has made no efforts to modify or redesign its procurement products and has continued selling and providing services associated with the infringing products.  Trial Tr. 1166:6-9 (Christopherson); Verdict (Dkt. No. 600, Jan. 27, 2011).  Indeed, Defendant has indicated in its SEC filings that "there is no assurance that those modifications will be readily possible." Lawson 10-Q for Fiscal Quarter ended 11/30/201 at 50.

50.     Defendant licenses its S3 Supply Chain Management product to roughly 1,500 customers.  *See* PX678 (Lawson Customer List); PX679 (Lawson Revenue 2005-2009).  830 of those 1,500 customers license the infringing RSS and/ or Punchout modules.  PX 681 (Lawson customer list for RSS and Punchout).

51.     Only a small number of Defendant's S3 Supply Chain Management customers license the infringing Procurement Punchout module.  Trial Tr. 1714:17-1715:6 (Lohkamp) (only 10-11% of Lawson's S3 supply chain customers have Punchout).

52.     Defendant's have testified that there would be little to no harm to Defendant caused by a permanent injunction.  For example, Mr. Christopherson testified that even if Defendant could no longer make and sell a RSS application, it would still be able to compete in

the Supply Chain Management market.  Christopherson Dep. 106:9-19, Oct. 19, 2009.  Mr.

Christopherson also testified that even if Defendant could no longer make and sell a Punchout

module, it would still be able to compete in the Supply Chain Management market.  Mr.

Christopherson explained that for some customers, the Punchout module is important, but not for

all customers.  *Id.* 107:11-20.

     53.    Like Mr. Christopherson, Defendant's employees Mr. Hager and Mr. Lohkamp

also agreed that there would be little to no harm to Defendant caused by entry of a permanent

injunction.  Mr. Hager testified that not all of Defendant's customers have Procurement

Punchout, Defendant won the healthcare market before it offered Procurement Punchout,

Procurement Punchout does not drive S3 sales, and Defendant has never won a sale merely

because of its Punchout product.  Hager Dep. Tr. 263:8-264:11, Oct. 16, 2009; Inj. Hr'g Tr.

252:2-9 (Hager).  *See also* Trial Tr. 1714:17-1715:6 (Lohkamp) (only 10-11% of Lawson's S3

supply chain customers have Punchout).  And Mr. Lohkamp testified that he was not aware of a

specific customer that would not have purchased an S3 system if Defendant did not offer

Procurement Punchout, and as far as he is aware not all customers that have it use it.  Lohkamp

Dep. 433:2-8 and 433:10-11, Oct. 21, 2009.

     54.    Unlike Defendant, the hardships *e*Plus would suffer if an injunction was not

entered are substantial and irreparable.  First, the failure to obtain a permanent injunction would

deprive *e*Plus of a range of licensing and partnering opportunities, including the opportunity to

negotiate licenses to the patents-in-suit from a position of a level playing field, the opportunity to

sell its e-procurement products, Procure+ and Content+, to hundreds of potential customers who

use Defendant's infringing systems, the opportunity to realize ongoing business and additional

revenues from these same potential customers, who would have required maintenance,

23

consulting, and other ongoing services after purchasing *e*Plus's Procure+ and Content+, and the opportunity to cross-sell and up-sell its IT and VAR products to additional potential customers of Procure+ and Content+ that have instead chosen to use Defendant's infringing systems.  Inj. Hr'g Tr. 68:14-69:3; 87:19-89:9; 91:11-92:7 (Farber).  Second, in the absence of a permanent injunction *e*Plus would suffer the loss of control of its intellectual property; instead, Defendant would have obtained an opportunity through infringement of the patent at issue to use the patented technology and would enjoy complete freedom to decide how long such usage would continue.  *See id.*; *see also* Evans Dec., ¶ 99.

**J.      The Public Interest**

55.      The public interest would not be disserved by granting the requested injunctive relief.  Defendant has failed to put forth any affirmative evidence that the public interest would be disserved by the entry of an injunction.  Defendant markets and sells the infringing systems to a number of industry verticals, including services, public sector, human capital management, and healthcare.  Inj. Hr'g Tr. 177:10-18 (Hager).  Of the 830 customers to whom Defendant has sold RSS and Punchout, 277 of those customers provide only healthcare services.  Inj. Hr'g Tr. 218:1-21 (Hager).  The remaining 533 customers are in other industry sectors.  *Id.*

56.      An injunction will not stop any hospital or other medical facility from purchasing needed equipment or supplies, or from providing any form of medical treatment.  Inj. Hr'g Tr. 219:22-220:12; 242:17-243:3 (Hager).  The scope of the injunction sought by *e*Plus would not require users of Lawson systems to stop use of those systems.  Inj. Hr'g Tr. 211:18-212:1 (Hager).  The injunction would only prevent maintenance of these systems and associated services provided by Defendant.  *Id.*  During the interim transition to new non-infringing procurement systems, customers could continue to use the infringing systems.  Inj. Hr'g Tr. 168:2-18 (Farber).

24

57.     Furthermore, there are suitable non-infringing alternative products available from *e*Plus or its licensees that can interface with Defendant's non-procurement applications.  Inj. Hr'g Tr. 49:17-50:1; 79:1-25 (Farber); 223:5-20; 226:16-24 (Hager) (Lawson can continue to sell systems not found to infringe); Trial Tr. 1075:11-1076:21 (Lohkamp) (*e*Plus proposed to Novant and Cleveland Clinic to connect *e*Plus's e-procurement products to existing Lawson system); Trial Tr. 1338:19-1340:20; 1346:15-1347:2 (Farber) (*e*Plus has previously integrated its products with accounting and human resources components of Defendant's ERP systems). Additionally, companies could resort to paper-based procurement processes if necessary during any time needed to transition to a non-infringing software system.  *Id.*

58.     *e*Plus is itself capable of implementing replacement systems for the infringing Lawson systems.  Inj. Hr'g Tr. 69:19-23 (Farber); Inj. Hr'g Tr. 192:9-20; 222:17-223:20 (Hager).  An implementation of *e*Plus's e-procurement system can be completed within a timeframe of 30 days to six months at a cost of around $150,000.  Inj. Hr'g Tr. 80:4-22 (Farber).

59.     *e*Plus often partners with consultants such as J.V. Kelly, Accenture, and Hitachi Consulting to perform implementations of its systems.  Inj. Hr'g Tr. 174:14-176:1 (Farber). These companies employ hundreds of personnel that could be used to assist in implementing *e*Plus replacement systems.  *Id.*

60.     Defendant estimates that it will need to spend between $83.1 million and $277 million to switch its 277 healthcare customers from infringing systems to non-infringing systems.  Inj. Hr'g Tr. 263:6-11.

61.     Regarding the services, public sector, retail, human-capital management and other industries, which account for 553 of the 830 customers to whom Defendant has sold RSS and Punchout, Defendant has made no contention that the effect of the injunction on these industries

would disserve the public interest.  With respect to the 277 healthcare-related customers of the infringing systems, Defendant has not set forth affirmative evidence that the public interest would be harmed by the requested injunction.

62.     Defendant has provided no written notice to any of its customers that their e-procurement systems were found by a jury to infringe *e*Plus's patents.  Inj. Hr'g Tr. 255:3-6 (Hager).  The only press release that Defendant has issued on the outcome of the trial was a statement from its CEO, Harry Debes, characterizing *e*Plus's invocation of the U.S. judiciary system to enforce its intellectual property rights as "questionable tactics."  *Lawson Comments on ePlus Patent Litigation* (available at http://www.lawson.com/about-lawson/news-room/news-releases/english/2011/lawson-comments-on-eplus-patent-litigation); Inj. Hr'g 255:7-10 (Hager).

63.     No representative from any customer of the infringing systems participated or was even present at the March 25, 2011 evidentiary hearing on the injunction.  Inj. Hr'g Tr. 241:3-242:9 (Hager).

64.     Only two of Defendant's 277 healthcare-related customers of the infringing systems submitted declarations concerning the potential impact of an injunction.  *See* Reasoner Dec. (Feb. 14, 2011); Johnson Dec. (Feb. 14, 2011).  Nowhere do these declarations contend that the public interest would be disserved by an injunction.  *See generally* Reasoner Dec. (Feb. 14, 2011); Johnson Dec. (Feb. 14, 2011).  At most, these declarations suggest only that the operating costs for these companies may increase during the period in which they transfer to alternative, non-infringing procurement systems.  Reasoner Dec., ¶¶ 14-15; Johnson Dec., ¶ 10.

65.     Even were an injunction to issue, the injunction would not disrupt the provision of medical care.  Inj. Hr'g Tr. 219:22-220:12; 242:17-243:3 (Hager).  Entry of an injunction would not disrupt medical care at Defendant's 277 healthcare customers because these customers would

overstock necessary goods. *Id*. Testimony overstating the impact of the injunction on healthcare providers was retracted by Defendant's witness after Defendant was admonished by the Court. *See* Inj. Hr'g Tr. 217:11-218:3; 221:2-12 (Court).

66.     Defendant has offered only a speculative and conclusory lay opinion concerning the potential effects on "morale" or "loss of jobs" at certain of Defendant's healthcare customers. Inj. Hr'g Tr. 242:17-243:3 (Hager).  Defendant did not offer any evidence into the record — neither documents, declarations, or testimony — to specify how the injunction would hurt morale or result in the loss of jobs.

67.     Any disruption to Defendant's customers in the healthcare industry can be cured by allocating appropriate personnel and monetary resources to minimize the disruption of healthcare services.  Inj. Hr'g Tr. 220:2 – 221:1; 242:17 – 243:3 (Hager).  To the extent that any costs are incurred from an injunction by Defendant's customers, Defendant is contractually obligated to indemnify these customers for the loss of use of the infringing systems. *See, e.g.,* PX241, ¶ 12.0; PX268, ¶ 11; PX256, ¶ 11.  Among Defendant's options under these agreements are to:  "(a) obtain the right for Client to Use the Product; (b) replace or modify the Product so that it becomes non-infringing; (c) terminate the License … and Lawson shall pay Client … an amount equal to the License Fee paid …."  PX241, ¶ 12.2.  As a result, there would be no disservice to the public interest, such as increased costs passed along to healthcare consumers from these Lawson customers, because these customers are indemnified for costs resulting from an injunction.

## III.     PROPOSED CONCLUSIONS OF LAW

### A.     Legal Standards

1.     Section 283 of the Patent Act authorizes district courts, upon a finding of infringement, to impose a permanent injunction "in accordance with the principles of equity to

prevent the violation of any right secured by patent, on such terms as the court deems

reasonable." 35 U.S.C. § 283. A patentee must satisfy the four-factor test for injunctive relief

before a court may grant a permanent injunction:

    (1)    that [the plaintiff] has suffered an irreparable injury;

    (2)    that remedies available at law, such as monetary damages, are inadequate to compensate for that injury;

    (3)    that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and

    (4)    that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*,. 547 U.S. 388, 391 (2006).

> **B.**    ***e*Plus Will Suffer Irreparable Harm In The Absence Of A Permanent Injunction**

    2.    This Court concludes that *e*Plus will suffer irreparable harm in the absence of a

permanent injunction. "The essential attribute of a patent grant is that it provides a right to

exclude competitors from infringing the patent. 35 U.S.C. § 154(a)(1) (2000). In view of that

right, infringement may cause a patentee irreparable harm not remediable by a reasonable

royalty." *Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1328-30 (Fed. Cir. 2008). The Court

concludes that Defendant and *e*Plus are competitors, and that *e*Plus has suffered and will likely continue

to suffer irreparable harm at least in the form of (1) lost sales and market share with respect to its patented

products, (2) losses on sales of its other products, and/or (3) reputational injury and the loss of business

opportunities. *e*Plus has experienced each of these forms of irreparable harm as a result of Defendant's

infringement. *See* FF ¶¶ 25-45.

    3.    In this case the fact that *e*Plus has previously chosen to license its patents is but

one factor, and does not show that a reasonable royalty would be adequate to compensate for the

infringement. *Acumed LLC*, 551 F.3d at 1328-30.

4.      Defendant's infringement has, in essence, forced *e*Plus to involuntarily "license" its proprietary technology to its competitor.  Such a result is clearly irreparable harm and is "antithetical to a basic tenet of the patent system . . . that the decision whether to license is one that should be left to the patentee."  *Odetics, Inc. v. Storage Tech. Corp.*, 14 F. Supp.2d 785, 795 (E.D. Va. 1998).

5.      As discussed above, *e*Plus makes and sells products covered by the patents and has a presence in the relevant market.  *See* FF ¶¶ 4-13, 20-24.  Further, *e*Plus has name recognition, goodwill, and market share in the relevant market.  The loss associated with any of these effects is particularly difficult to quantify.  "Difficulty in estimating monetary damages is evidence that remedies at law are inadequate."  *SynQor, Inc. v. Artesyn Techs., Inc.*, 2011 WL 238645, *3 (E.D. Tex. Jan. 24, 2011) (citations omitted).

6.      In sum, the Court finds that *e*Plus has lost sales and market share for its patented products, lost collateral sales, and suffered harm to its reputation.  In this case, the Court concludes that each of these harms is "irreparable" for purposes of awarding a permanent injunction.

7.      Further, a compulsory license, such as urged by Defendant, would not contain the terms typically used by a patent owner to control its technology or limit encroachment on *e*Plus's market share.  *Trading Techs., Int'l, Inc. v. eSpeed, Inc.,* 2011 WL 4531371, at *4 (N.D. Ill. May 22, 2008).  *See also* Evans Dec., ¶ 6 (Feb. 22, 2011).  Thus, such a remedy would not be adequate to cure the irreparable harm that *e*Plus is currently suffering.  *Id.*

## C.      *e*Plus Has No Adequate Remedy At Law

8.      The Court finds that *e*Plus has no adequate remedy at law for Defendant's continued infringement.  *See* FF ¶¶ 41-45.  *e*Plus cannot quantify the harms it will incur if it is forced to share its patented technology with Defendant.  The difficulty in estimating monetary

damages reinforces the inadequacy of a remedy at law.  *See Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 703-04 (Fed. Cir. 2008); *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 862 (Fed. Cir. 2010) ("Difficulty in estimating monetary damages is evidence that remedies at law are inadequate.") (quoting *Broadcom Corp.*, 543 F.3d at 703-04).

9.      Defendant's arguments with respect to *e*Plus's patent licenses, if adopted, would punish *e*Plus for settling its prior enforcement actions, even though this Court urged *e*Plus and those licensees to consider settlement, just as this Court on several occasions has urged the parties in this case to consider settlement.  If adopted, Defendant's arguments would contradict the strong public policy favoring settlement.  *Flex-Foot, Inc. v. CRP, Inc.*, 238 F.3d 1362, 1369-70 (Fed. Cir. 2001).

10.      Irreparable harm is not negated simply because a patentee has previously licensed its patents.  *Acumed*, 551 F.3d at 1328.

11.      The Court finds that Defendant's argument, if adopted, would create a powerful disincentive for patentees such as *e*Plus to settle patent enforcement actions.  Patentees such as *e*Plus would have little reason to settle a patent litigation if the consequence of a settlement is that the patentee is forfeiting the remedy of a permanent injunction in future enforcement actions.  Not only would such a result violate the clear public policy favoring settlements, it would result in severe congestion of the federal courts because patent cases would rarely be settled.  *Flex-Foot*, 238 F.3d at 1369-70.

12.      In addition, denial of injunctive relief on the basis that *e*Plus has licensed its patents would irreparably harm *e*Plus in other ways.  Denial of injunctive relief forces *e*Plus to divert millions of dollars away from research, development, and business opportunities, and into litigation costs.  Further, *e*Plus's patents would be diminished in value if potential infringers

knew that they could freely infringe, all the while knowing that at most they will pay only a reasonable royalty for their infringement, without concern that they could be enjoined.  Again, such devaluation of *e*Plus's patent rights would diminish *e*Plus's incentive to research and develop new, patentable technology.  *See* FF ¶ 44.

13.     Accordingly, the Court concludes that *e*Plus has suffered an irreparable injury and there are no remedies available at law, such as monetary damages, adequate to compensate for that injury.  *e*Plus has suffered, and will continue to suffer, irreparable harm because its right to exclude Defendant from using systems covered by the infringed claims of the patents-in-suit is being denied.  In particular, *e*Plus has suffered irreparable harm not quantifiable due to the lost business and licensing opportunities resulting from its inability to enjoin Defendant's ongoing infringement.

14.     *e*Plus will continue to suffer irreparable harm if Defendant's infringement is not enjoined.  It will lose its right to exclude an infringer from the marketplace that *e*Plus wishes to exploit.  It will lose its right to choose the parties with whom it wishes to do business and to refuse to do business with others, such as Defendant.  It will lose its right to negotiate the terms upon which it is willing to grant licenses to entities.  Moreover, it may even cause the loss of value in its business, if it no longer has the ability to license and exploit its patented technology.  *See* FF ¶¶ 41-45.

D.     **The Balance Of Harms Weighs Decidedly In Favor Of *e*Plus**

15.     The Court finds that the balance of harms weighs in favor of *e*Plus.  *See* FF ¶¶ 47-54.  The law is clear that the "balance of harms" inquiry to be considered is "only between a plaintiff and a defendant, and thus the effect on customers … alleged by [defendant] is irrelevant under this prong of the injunction test."  *Acumed LLC*, 551 F.3d at 1330-31 (citing *eBay*, 547 U.S. at 391).  Likewise, Defendant's expenses in designing and marketing the accused product

31

are irrelevant to the balance of harms.  *Id.* (citing *Windsurfing Int'l, Inc. v. AMF, Inc.,* 782 F.2d 995, 1003 n. 12 (Fed. Cir. 1986) ("One who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected.")); *see also i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 863 (Fed. Cir. 2010) ("Similarly irrelevant are the consequences to [the infringer] of its infringement, such as the cost of redesigning the infringing products.  As we explained in *Broadcom*, neither commercial success, nor sunk development costs, shield an infringer from injunctive relief.  [The infringer] is not entitled to continue infringing simply because it successfully exploited its infringement.") (citations omitted), *cert. granted on other grounds,* 131 S. Ct. 647 (2010).  An adjudicated infringer "should not be permitted to prevail on a theory 'that successful exploitation of infringing technology shields a party from injunctive relief.'"  *Broadcom Corp.,* 543 F.3d at 704 (citing *Windsurfing Int'l,* 782 F.2d at 1003, n. 12).

16.     This case does not present any undue hardships that would counsel against the issuance of a permanent injunction.  For example, this is not a situation where the issuance of a permanent injunction will drive the infringer out of business.  Instead, requiring Defendant to comply with a permanent injunction should have little collateral effect on its business as a whole. Defendant is a large company, with several different businesses, including business unrelated to its infringing e-procurement software.  *See* FF ¶¶ 50-53.

17.     The burden on *e*Plus if an injunction does not issue will be far greater.  *e*Plus has experienced years of infringement by Defendant, and *e*Plus's patents are due to expire in a few years.  Without a permanent injunction, *e*Plus will continue to suffer encroachment on its sales of its other products, its customers, its resources, and its reputation.  These harms significantly tip the balance of hardships in *e*Plus's favor.  *See* FF ¶ 54.

### E.   The Public Interest Will Not Be Disserved By An Injunction

18.   The Court finds that the public interest will not be disserved by an injunction. There is a substantial public interest in enforcing valid patents. *Sanofi-Synthelabo* v. *Apotex, Inc.,* 470 F.3d 1368, 1383-84 (Fed. Cir. 2006). The public interest in enforcing patent rights favors *e*Plus.

19.   The Court finds that Defendant's attenuated claims about the usage of its infringing e-procurement software to obtain medical or health-related products or services wholly fails to show that the public would be disserved by an injunction. *See* FF ¶¶ 56-67.

20.   Moreover, the Court concludes that the public interest is disserved by enabling an adjudicated infringer such as Defendant to continue its infringement without recourse. An infringer should not be permitted to build a business based on its infringement and then argue that the public interest favors its continued infringement. *See Broadcom Corp.,* 543 F.3d at 704 (an adjudicated infringer "should not be permitted to prevail on a theory 'that successful exploitation of infringing technology shields a party from injunctive relief.'"), *citing Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986) ("One who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected."). *See also* Evans Dec., ¶ 116.

21.   Additionally, given the current competitive landscape in the e-procurement marketplace, the Court finds that an injunction would serve the public interest by promoting competition and allowing *e*Plus and *e*Plus's authorized licensees to have a more level playing field. FF ¶¶ 14-18, 20-40. *See also* Evans Dec., ¶ 117. An injunction precluding Defendant's use of the infringing electronic sourcing and procurement systems would enable *e*Plus and *e*Plus's licensees the opportunity to compete more effectively against Defendant. *Id.*

22.     The Court finds that in light of *e*Plus's licensing of its patent to others, the public would have access to the benefits of *e*Plus's patents, even if a permanent injunction issued.  *See* FF ¶¶ 14-18, 57.  *See also* Evans Dec., ¶ 118.

23.     Another public interest consideration is the benefits that a permanent injunction would provide to *e*Plus's existing licensees.  Those licensees are now at a commercial disadvantage to Defendant because Defendant continues to operate as an infringer of the patents-in-suit and has done so on a royalty-free basis.  Indeed, Defendant's continued infringement can now — going forward in light of the jury's verdict — only be considered willful infringement.  Issuance of a permanent injunction would stop this continuing harm caused by Defendant's infringement and would, therefore, be in the public interest.

24.     A factor that dovetails closely with a patent owner's licensing is the ability of a patent owner to maximize the value of its patent.  Patents, like other property, are assets.  And a fundamental precept of capitalism is that rational investors maximize the value of their assets.  This is easier to accomplish when a patent owner can license its patents without fear of improper adverse inferences or other inappropriate or unwarranted consequences.  *Sanofi-Synthelabo,* 470 F.3d at 1383.  *See also* Evans Dec., ¶¶ 120-121.

25.     Without the right to obtain an injunction, the right to exclude granted to the patentee would have only a fraction of the value it was intended to have, and would no longer be as great an incentive to engage in the toils of scientific and technological research.  Even more generally, the public is harmed when the patent system is weakened.  *Id.*

26.     The incentive-based patent system drives innovation.  Individuals and companies invest in assets with the highest return on investment.  And a patent is often worth less without a right to exclude infringers.  Individuals and companies, therefore, will be less likely to invest in

the research and development necessary for a patent if they are not allowed to exclude infringers. *See King Instr. Corp. v. Perego*, 65 F.3d 941, 949 (Fed. Cir. 1995); *Sanofi-Synthelabo*, 470 F.3d at 1383 (quoting *Patlex Corp. v. Mossinghoff*, 758 F.2d 594, 599 (Fed. Cir. 1985)) (the Court has "long acknowledged the importance of the patent system in encouraging innovation" and that "encouragement of investment-based risk is the fundamental purpose of the patent grant, and is based directly on the right to exclude."). *See also* Evans Dec., ¶ 122.

27.     Therefore, the Court finds that issuance of a permanent injunction will foster competition here.  It will allow the patents-in-suit to be used more broadly; such use will allow others to enjoy the benefits of the invention.  And competition benefits consumers.  Moreover, the Court finds that Lawson has put forth no evidence that the public interest would be disserved by entry of a permanent injunction.

## IV.     CONCLUSION

28.     The Court therefore concludes based on the evidentiary findings above, and under the appropriate factors for granting permanent injunctive relief, that entry of a permanent injunction in the form of the Order submitted by *e*Plus is hereby warranted.

Accordingly, based on the full evidentiary record at trial, *e*Plus respectfully moves that the Court adopt these proposed findings of fact and conclusions of law.

Respectfully submitted,

March 28, 2011
                              _____/s/_____
                              David M. Young (VSB #35997)
                              Scott L. Robertson *(admitted pro hac vice)*
                              Jennifer A. Albert *(admitted pro hac vice)*
                              **GOODWIN PROCTER LLP**
                              901 New York Avenue, N.W.
                              Washington, DC 20001
                              Telephone:  (202) 346-4000
                              Facsimile:  (202) 346-4444
                              dyoung@goodwinprocter.com
                              srobertson@goodwinprocter.com
                              jalbert@goodwinprocter.com

                              Craig T. Merritt (VSB #20281)
                              Henry I. Willett, III (VSB #44655)
                              **CHRISTIAN & BARTON, LLP**
                              909 East Main Street, Suite 1200
                              Richmond, Virginia 23219-3095
                              Telephone: (804) 697-4100
                              Facsimile: (804) 697-4112
                              cmerritt@cblaw.com
                              hwillett@cblaw.com

                              Michael G. Strapp *(admitted pro hac vice)*
                              **GOODWIN PROCTER LLP**
                              Exchange Place
                              53 State Street
                              Boston, MA 02109-2881
                              Telephone:  (617) 570-1000
                              Facsimile:  (617) 523-1231
                              mstrapp@goodwinprocter.com

                              Attorneys for Plaintiff, *e*Plus Inc.

36

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 28th day of March, 2011, I will electronically file the foregoing

**PLAINTIFF *e*PLUS INC.'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF MOTION FOR PERMANENT INJUNCTION**

with the Clerk of Court using the CM/ECF system which will then send a notification of such filing (NEF) via email to the following*:*

Daniel McDonald, *pro hac vice*
William D. Schultz, *pro hac vice*
Rachel C. Hughey, *pro hac vice*
Andrew Lagatta, *pro hac vice*
MERCHANT & GOULD
3200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 332-5300
Facsimile: 612) 332-9081
lawsonservice@merchantgould.com
***Counsel for Defendant Lawson Software, Inc.***

Robert A. Angle, VSB#37691
Dabney J. Carr, IV, VSB #28679
TROUTMAN SANDERS LLP
P.O. Box 1122
Richmond, Virginia 23218-1122
(804) 697-1238
(804) 698-5119 (Fax)
robert.angle@troutmansanders.com
dabney.carr@troutmansanders.com

***Counsel for Defendant Lawson Software, Inc.***

_____/s/_____
David M. Young (VSB #35997)
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4000
Facsimile:  (202) 346-4444
dyoung@goodwinprocter.com