IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| *e*PLUS INC., | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No. 3:09-CV-620 (REP)** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **LAWSON SOFTWARE, INC.,** | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF *e*PLUS INC.'S REPLY BRIEF IN FURTHER SUPPORT OF ITS MOTION
FOR PERMANENT INJUNCTION**

Craig T. Merritt (VSB #20281)
Henry I. Willett, III (VSB #44655)
**CHRISTIAN & BARTON, LLP**
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
Telephone: (804) 697-4100

Scott L. Robertson (admitted *pro hac vice*)
Jennifer A. Albert (admitted *pro hac vice*)
David M. Young (VSB #35997)
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4000

Michael G. Strapp (admitted *pro hac vice*)
**GOODWIN PROCTER LLP**
Exchange Place
53 State Street
Boston, MA 02109-2881
Telephone:  (617) 570-1000

*Counsel for Plaintiff ePlus Inc.*

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ................................................................................1

II.     ARGUMENT ......................................................................................2

        A.      *e*Plus Will Suffer Irreparable Harm In The Absence Of A Permanent
                Injunction ..............................................................................2

                1.      *e*Plus Has Been and Will Continue to be Irreparably Harmed
                        Absent a Permanent Injunction ................................................2

                2.      The Fact That Defendant and *e*Plus Compete In a "Crowded
                        Market" Does Not Alleviate The Irreparable Harm ....................3

                3.      Although Competition and Lost Sales Need Not Be Proven To
                        Show Irreparable Harm, *e*Plus Has Demonstrated Both.............4

                4.      Prior Licenses Do Not Negate Irreparable Harm.........................7

                5.      ePlus's Decision Not to Seek a Preliminary Injunction and The
                        Timing of the Lawsuit Do Not Negate Irreparable Harm............7

        B.      *e*Plus Has No Adequate Remedy At Law ................................................8

                1.      Defendant's Intrusion on *e*Plus's Property Interest Cannot Be
                        Compensated With Monetary Damages ....................................9

                2.      A Compulsory License Would Be Difficult, If Not Impossible, To
                        Determine And Should Not Be Imposed Under The Facts Of This
                        Case .................................................................................10

        C.      The Balance Of Harms Weighs Decidedly In Favor Of *e*Plus .............11

                1.      Defendant's Success in the Marketplace Weighs in Favor of
                        Injunctive Relief.................................................................11

                2.      The Reexaminations of the Patents-In-Suit are Irrelevant.........11

                3.      Any Harm to Defendant From its Inability to Continue Infringing
                        is Irrelevant ......................................................................12

                4.      *e*Plus's Supposed "Motive" in Enforcing its Statutory Right to
                        Exclude is Irrelevant ...........................................................13

        D.      The Public Interest Will Not Be Disserved By An Injunction...............14

E.    The Scope Of The Injunction Should Be Commensurate With The Jury's Infringement Verdict................................................................................16

1.    The Scope of the Injunction Should Encompass All Infringing System Configurations..............................................................16

2.    The Injunction Should Prohibit Defendant From Continuing to Indirectly Infringe *e*Plus's Patents..............................................18

III.   CONCLUSION..............................................................................................20

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Acumed LLC v. Stryker Corp.*,
    551 F.3d 1323 (Fed. Cir. 2008) ...................................................................... 7

*Advanced Cardiovascular Systems, Inc. v. Medtronic Vascular, Inc.*,
    579 F. Supp.2d 554 (D. Del. 2008) ............................................................... 3

*Amphenol T&M Antennas Inc. v. Centurion Int'l Inc.*,
    2002 WL 32373639 (N.D. Ill. Jan. 17, 2002) ............................................. 12

*Bendix Commer. Vehicle Sys., LLC v. Haldex Brake Prods. Corp.*,
    2011 WL 14372 (N.D. Ohio, Jan. 3, 2011) ................................................... 3

*Broadcom Corp. v. Qualcomm, Inc.*,
    543 F.3d 683 (Fed. Cir. 2008) ............................................................... 4, 11

*Brulotte v. Thys Co.*,
    379 U.S. 29 (1964) ....................................................................................... 13

*Commonwealth Sci. & Indus. Research Organisation v. Buffalo Tech., Inc.*,
    492 F. Supp.2d 600 (E.D. Tex. 2007) .......................................................... 10

*Continental Paper Bag Co. v. Eastern Paper Bag Co.*,
    210 U.S. 405 ................................................................................................... 9

*Cordance Corp. v. Amazon.com, Inc.*,
    730 F. Supp.2d 333 (D. Del. 2010) ............................................................... 3

*Cummins-Allison Corp. v. SBM Co., Ltd.*,
    669 F. Supp.2d 774 (E.D. Tex. 2009) ............................................................ 9

*eBay, Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006) .................................................................................. 4, 7

*Fresenius Med. Care Holdings, Inc. v. Baxter Int'l*,
    2008 WL 928496 (N.D. Cal. Apr. 4, 2008) ................................................... 9

*Fuller v. Berger*,
    120 F. 274 (7th Cir. 1903) ............................................................................. 9

*Humanscale Corp. v. CompX Int'l Inc.*,
    2010 WL 1779963 (E.D. Va. Apr. 29, 2010) ................................................ 4

*i4i Ltd. P'ship v. Microsoft Corp.*,
    598 F.3d 831 (Fed. Cir. 2010), *cert. granted on other grounds,* 131 S. Ct. 647 (2010). 5, 15, 16

*i4i Ltd. P'ship v. Microsoft Corp.*,
    670 F. Supp.2d 568 (E.D. Tex. 2009) (emphasis added),
    *aff'd,* 598 F.3d 831 (2010) ........................................................................ 16

iii

*K-Tec v. Vita-Mix*,
   2011 WL 285699 (D. Utah Jan. 26, 2011)................................................................. 3

*Lear v. Adkins*,
   395 U.S. 653 (1969)................................................................................................. 14

*Lermer Germany GmbH v. Lermer Corp.*,
   94 F.3d 1575 (Fed. Cir. 1996) .............................................................................. 7, 8

*Mendenhall v. Astec Indus., Inc.*,
   13 U.S.P.Q.2d (BNA) 1913 (E.D. Tenn. Oct. 31, 1988),
   *aff'd without opinion*, 887 F.2d 1094 (Fed. Cir. 1989)........................................... 20

*Odetics, Inc. v. Storage Tech. Corp.*,
   14 F. Supp.2d 785 (E.D. Va. 1998) ........................................................................ 16

*Preemption Devices, Inc. v. Minnesota Mining & Mfg., Co.*,
   803 F.2d 1170 (Fed. Cir. 1986) .............................................................................. 19

*Smith and Nephew, Inc. v. Arthrex, Inc.*,
   2010 WL 2522428 (E.D. Tex. June 18, 2010)......................................................... 16

*Smith Int'l v. Hughes Tool Co.*,
   718 F.2d 1573 (Fed. Cir. 1983) ............................................................................ 3, 8

*SynQor, Inc. v. Artesyn Techs., Inc.*,
   2011 WL 238645 (E.D. Tex. Jan. 24, 2011).............................................................. 3

*Trading Techs., Int'l, Inc. v. eSpeed, Inc.*,
   2008 WL 4531371 (N.D. Ill. May 22, 2008)........................................................ 16, 17

*Transocean Offshore Deepwater Drilling v. GlobalSantaFe Corp.*,
   2006 WL 3813778 (S.D. Tex. Dec. 27, 2006).......................................................... 10

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
   503 F.3d 1295 (Fed. Cir. 2007) ............................................................................... 3

**Statutes**

35 U.S.C. § 154................................................................................................... 9, 13

35 U.S.C. §261........................................................................................................ 9

**Other Authorities**

D. Laycock, *The Death of the Irreparable Injury Rule*,
   103 Harv. L. Rev. 687 (1990)................................................................................... 8

**Rules**

Fed. R. Civ. P. 65 ................................................................................................... 19

## I.      INTRODUCTION

None of the arguments presented by Defendant merit denial of *e*Plus's motion for a permanent injunction to halt Defendant's ongoing direct and indirect infringement.  Where, as here, *e*Plus practices the patented inventions and competes with Lawson head-to-head in a fiercely competitive market, irreparable harm will certainly inure to *e*Plus if the Court permits Lawson to continue to trespass on its property right unabated.

Defendant presents arguments that strain credulity and defy logic.  Thus, according to Lawson, even though the parties compete by any common sense meaning of the word, the parties do not really compete because they have somewhat different business models and marketing approaches.  According to Lawson, it should be held against *e*Plus that it sat down in good faith at the urging of this Court and negotiated settlements with other infringers.  According to Lawson, an adequate ongoing royalty can readily be determined, even though time and again in this case Lawson averred that it did not track revenues and profits attributable to infringing system configurations and services.  According to Lawson, its infringing software implicates significant public health issues, making this one of the rare cases in which an injunction should be denied owing to the public interest.  Yet this claim is wholly unsupported, and even the two customer declarations Lawson has submitted show only, at best, some inconvenience to customers for which Lawson ultimately bears financial responsibility.  And as if such arguments were not enough, Lawson now contends that it was in some way given a grant of immunity to continue acts of indirect infringement with respect to existing customers, from whom Lawson stands to earn hundreds of millions of dollars in revenues — although it cites no authority whatsoever for this novel proposition.  Such arguments do not hold up to even the slightest scrutiny.

This Court presided over a three-week jury trial, the result of which was a jury verdict of

infringement and rejection of all of Lawson's defenses. *e*Plus should have a remedy for that infringement, and the proper remedy under the facts of this case is a permanent injunction.

## II.   ARGUMENT

### A.   *e*Plus Will Suffer Irreparable Harm In The Absence Of A Permanent Injunction

#### 1.   *e*Plus Has Been and Will Continue to be Irreparably Harmed Absent a Permanent Injunction

Defendant contends that the facts of this case show *e*Plus is not irreparably harmed by Lawson's sales of infringing systems. Lawson Inj. Opp. Br. at 1. In fact, *e*Plus has been irreparably harmed by Lawson's sales and promotion of adjudicated infringing systems and will continue to be harmed absent a permanent injunction. *e*Plus has and continues to:

- lose market share in several industries where the parties directly compete (FF 19-34);

- lose sales of Procure+ and Content+ (FF 35-40);

- lose cross-sales where *e*Plus relies on sales of Procure+ and Content+ to cross-sell other products (FF 12-13);

- lose implementation, maintenance and service revenues (FF 41);

- lose goodwill with respect to Procure+ and Content+, especially because *e*Plus touts its patented technology in marketing materials (FF 10);

- lose opportunities to invest in sales and marketing, research and development and technology acquisitions because of resources invested in enforcing its patents against an adjudicated infringer (FF 42, 44);

- lose share price and market capitalization (FF 42, 45); and

- lose the ability to enforce the patents-in-suit since other infringers will believe that they can openly infringe knowing that they will be subject, at most, to a reasonable royalty (FF 44).

While no single fact is dispositive, these varied forms of harm collectively show that *e*Plus is being and will continue to be irreparably harmed by Lawson's continued direct and

2

indirect infringement of the patents-in-suit unless a permanent injunction is entered.[1]

### 2.     The Fact That Defendant and *e*Plus Compete In a "Crowded Market" Does Not Alleviate The Irreparable Harm

Defendant claims that the several types of harm suffered by *e*Plus are not irreparable because there are other companies that compete in the e-procurement industry.  But courts routinely issue permanent injunctions in markets where there are more than two suppliers.[2]  A two-supplier market is not a necessary predicate to the issuance of a permanent injunction.  *See, e.g., K-Tec v. Vita-Mix*, 2011 WL 285699, *9 (D. Utah Jan. 26, 2011) (plaintiff was entitled to a permanent injunction "because it practices its patents and directly competes with [Defendant] in the marketplace" notwithstanding that parties "are not the only source of [goods covered by the patent]").  Furthermore, the cases Defendant relies upon for the proposition that courts "limit permanent injunctions to situations where the parties are direct competitors in a two-supplier market" say no such thing.  Lawson Inj. Opp. Br. at 10.  In each case cited by Defendant, courts denied a plaintiff's request for a permanent injunction for reasons unrelated to whether the market was limited to two suppliers.[3]

---

[1] As the Federal Circuit has stated "Without the right to obtain an injunction, the right to exclude granted to the patentee would have only a fraction of the value it was intended to have, and would no longer be as great an incentive to engage in the toils of scientific and technological research."  *Smith Int'l v. Hughes Tool Co.*, 718 F.2d 1573, 1577-1578 (Fed. Cir. 1983).

[2] *See, e.g., Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295 (Fed. Cir. 2007) (voice over internet providers); *SynQor, Inc. v. Artesyn Techs., Inc.*, 2011 WL 238645 (E.D. Tex. Jan. 24, 2011) (bus converters for power supplies); *Bendix Commer. Vehicle Sys., LLC v. Haldex Brake Prods. Corp.*, 2011 WL 14372 (N.D. Ohio, Jan. 3, 2011) (disc brakes).

[3] *See Advanced Cardiovascular Systems, Inc. v. Medtronic Vascular, Inc.*, 579 F. Supp.2d 554, 560 (D. Del. 2008) (holding that plaintiff could not demonstrate irreparable harm since it "admits that it has recaptured nearly all of the market share lost to [Defendant], and is currently the leading producer of [products covered by the patent]"); *Cordance Corp. v. Amazon.com, Inc.*, 730 F. Supp.2d 333, 338-39 (D. Del. 2010) (observing that "[c]ourts awarding permanent injunctions typically do so under circumstances where plaintiff practices its invention and is a direct market competitor," but declining to do so because Plaintiff did not demonstrate that it actually competed with Defendant); *Humanscale Corp. v. CompX Int'l Inc.*, 2010 WL 1779963,

### 3. Although Competition and Lost Sales Need Not Be Proven To Show Irreparable Harm, *e*Plus Has Demonstrated Both

Under Supreme Court and Federal Circuit precedent, *e*Plus need not prove that its commercial products are marketed and sold in direct competition with Lawson's infringing systems, or even that it has commercial products that practice the claimed inventions.  *See eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 393 (2006) (district court improperly determined that patentee's lack of commercial activity in practicing patents precluded need for injunction); *Broadcom Corp. v. Qualcomm, Inc.*, 543 F.3d 683, 702-03 (Fed. Cir. 2008) (irreparable harm existed even though "[patentee] does not currently practice the claimed inventions" and it relied upon contention of "indirect" competition).  And yet, *e*Plus has shown that in **hundreds** of instances it directly competes with Lawson for sales of e-procurement software systems and that it has lost at least several sales because of Defendant's infringing systems.  Notably, Defendant concedes that:

- *e*Plus and Defendant solicit mid-market customers in identical industries including Agriculture & Mining, Education, Energy & Utilities, Financial Services, Food & Beverage, Government, Healthcare, Manufacturing, Retail, Other Services, Transportation (FF 26- 27);

- *e*Plus has specifically marketed its patented Procure+ and Content+ products to ***247 of Defendant's 830 customers who currently license the infringing system configurations*** (FF 32); and

- *e*Plus has specifically marketed its patented Procure+ and Content+ products to ***2,041 of the 7,989 customers targeted by Defendant for its infringing system configurations*** (FF 33).

Defendant's infringing product need not be marketed identically to *e*Plus's patented product in order for the products to compete in the marketplace.  *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 862-63 (Fed. Cir. 2010), *cert. granted on other grounds,* 131 S. Ct. 647

---

at *4 (E.D. Va. Apr. 29, 2010) (denying request for permanent injunction where patents-in-suit were set to expire six weeks from date of Court's opinion).

4

(2010) (affirming finding of irreparable harm even though infringing product included countless additional features not present in product made by patentee). Even accepting arguendo Lawson's view of how the parties market their products, there is substantial evidence that ERP vendors who provide a suite of solutions, like Lawson, and "best of breed" vendors who provide specific modules that are integrated with suites of software compete for the exact same customers.

First, Lawson's 2008 Marketing Plan for the infringing configurations shows that it competes with "best of breed" vendors in the "sourcing/contract management/eProcurement" space. Rebuttal Findings of Fact ("RFF") 5. Second, *e*Plus's patented products are often integrated into ERP suites, such as Lawson's S3 product. RFF 7. Indeed, *e*Plus has integrated its Procure+ and Content+ product into Defendant's ERP suite. RFF 8. Third, Defendant's newly-minted argument that ERP providers do not compete with "best of breed" e-procurement providers conflicts with its prior admissions that it competes with such providers like Ariba. RFF 6. Indeed, at least three Lawson employees concede that Defendant actively monitors Ariba's products and competes with Ariba for sales of its infringing system configurations. *Id.* Fourth, independent analysts similarly recognize that "best of breed" and ERP providers compete in the eProcurement market for the same customers. RFF 4.[4]

In fact, *e*Plus has even lost sales directly because of Defendant's infringement, including sales to PPDI, Deaconess Health System, LHC Group, Blue Cross/Blue Shield of North Carolina ("BCBS") and Gannett. Each of these customers licensed the infringing system configurations instead of *e*Plus's patented products. Lawson argues, without any evidentiary support, that *e*Plus

---

[4] Indeed, Lawson also markets its infringing system configurations as stand-alone "Web-based Requisitioning" products to potential customers such as the State of Michigan, Deaconess Health System and Novant Health. RFF 8-9. These potential customers sought eProcurement products to integrate with their Lawson ERP suite. *Id.* When Lawson submitted its RFP response, it competed against other potential eProcurement system suppliers like *e*Plus – any of whom could have integrated their software with the Lawson ERP suite.

never actually lost sales because of the infringing system configurations.  *See* Lawson Inj. Opp.

Br. at 7-9.  Yet the undisputed facts are to the contrary.  For example:

- *e*Plus learned that it lost a sale of its patented products to PPDI when it received the following email from PPDI's Associate Director for Corporate Purchasing:

  > ***Our group has evaluated Procure+ cost and implementation vs. Lawson RSS cost and implementation.  We remain committed to Lawson.*** The ongoing cost of Procure+ (and later eProcure) plus the internal ongoing cost of maintaining the Lawson interface was a factor….  We recognize the quality of your products and appreciate the time and energy e+ put into this effort.  FF 40 (emphasis added).

- A Deaconess Health System employee told *e*Plus that it terminated its license to Procure+ due to cost and that it instead would use "Lawson to process orders."  FF 37.

- *e*Plus tried to license Procure+ to BCBS and to integrate that application with Lawson's ERP suite in 2007.  FF 38.  BCBS instead licensed the infringing RSS product beginning in October 2008.  *Id.* (citing PX679 at L0135750).

- LHC Group's Senior Vice President told *e*Plus that it was not interested in licensing *e*Plus's patented products because of Lawson's sale of its infringing systems:

  > Thanks for your email and it is great hearing from you.  ***LHC has selected Lawson as it's [sic] procurement application***.  We will keep your information on file but we are in month two of this implementation.  FF ¶ 39 (emphasis added).

- Finally, there is no dispute that Gannett previously licensed Procure+ and now instead licenses Lawson's infringing RSS module.  FF 36.[5]

    In sum, *e*Plus need not show lost sales, or competition, or even that it has a commercial product to prove that it is being irreparably harmed by Defendant's continuing tort.  Yet here, the overwhelming record evidence from trial and from the injunction hearing demonstrates that *e*Plus has commercial products embodying its patents, that its patented products compete in the market with Defendant's infringing system configurations, and that *e*Plus has lost sales because

---

[5] These are only five illustrative examples.  The fact that eProcurement suppliers pitch products to potential customers in secret means that there are likely many more instances where *e*Plus lost a sale due to Lawson's infringing products.

of Defendant's infringing systems.  Under these facts, there can be no conclusion other than that *e*Plus has suffered and continues to suffer irreparable harm because of Defendant's infringement.

### 4.        Prior Licenses Do Not Negate Irreparable Harm

Lawson argues that *e*Plus's settlement agreements resulting in licenses show that *e*Plus has an adequate remedy at law.  Lawson, however, ignores entirely the post-*eBay* cases cited by *e*Plus, which state that such licenses do not preclude injunctive relief.  *See e*Plus Inj. Br. at 16-17 (citing cases); *see also e*Plus Stay Opp. Br. at 25-26.  As the Federal Circuit stated in *Acumed,* "[a]dding a new competitor to the market may create an irreparable harm that the prior licenses did not."  *Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1328 (Fed. Cir. 2008).

Lawson's arguments should find no foothold where a property right such as a patent is involved.  No one would reasonably suggest that a property owner is estopped from standing on its right to exclude the world merely because it has authorized a specific use of its property by a few others in the past.  Moreover, Lawson offers no response to the point that this Court in all of *e*Plus's prior cases urged the parties to sit down with the Magistrate Judge and settle their differences, just as this Court has urged in this case.  Neither does Defendant have an answer to the fact that it would create a prohibitive incentive for patentees ***not*** to settle patent enforcement actions if the Court adopted a rule that penalizes *e*Plus for settling its other litigations.

### 5.        ePlus's Decision Not to Seek a Preliminary Injunction and The Timing of the Lawsuit Do Not Negate Irreparable Harm

That *e*Plus did not move for a preliminary injunction is no basis to deny permanent injunctive relief.  There is no legal requirement that *e*Plus have moved for a preliminary injunction.  "The two instruments are distinct forms of equitable relief that have different prerequisites and serve entirely different purposes."  *Lermer Germany GmbH v. Lermer Corp.,* 94 F.3d 1575, 1577 (Fed. Cir. 1996).  The standard for granting a preliminary injunction in a

7

patent case has been characterized as "unusually stringent." *Smith Int'l,* 718 F.2d at 1578. Preliminary injunctions are often denied even in cases where a permanent injunction is awarded after a patentee prevails on the merits. *See Lermer Germany,* 94 F.3d at 1577.[6] This is in part because a preliminary injunction is extraordinary relief that alters the status quo during the course of litigation, and it "is granted only after the requesting party has shown that it is likely to succeed on the merits." *Lermer Germany,* 94 F.3d at 1577.[7]

Likewise irrelevant is Lawson's claim that there was "delay" in the filing of this action. Lawson asserted a laches defense in this case, but elected not to pursue it at trial. As the Court is aware, beginning in 2004 *e*Plus undertook very complex litigation against Ariba, and later SAP, spanning a four-year period. Litigation is extremely expensive and time-consuming for a small company such as *e*Plus. Nothing required *e*Plus to pursue all potential infringers at the same time, and that it was unable to do so does not forfeit its right to injunctive relief.

### B. *e*Plus Has No Adequate Remedy At Law

Defendant wrongly argues that *e*Plus has an adequate remedy at law because the Court could issue a compulsory license. *e*Plus's fundamental right to exclude Defendant from exploiting its patented technology cannot be quantified in dollars. Furthermore, even if a compulsory license were an appropriate remedy — and it is not — there is no clear way how to determine what the terms of such a license should be.

---

[6] *See also* D. Laycock, *The Death of the Irreparable Injury Rule,* 103 Harv. L. Rev. 687, 732 (1990) (preliminary injunctions often denied even where the injury is by definition irreparable and permanent injunctions are "routinely" granted).

[7] Moreover, a rule which penalizes a patentee for not moving for a preliminary injunction would have severe negative consequences for the judicial system. Patentees would feel compelled to routinely seek preliminary injunctions if only to preserve their right to a post-trial permanent injunction. This would needlessly complicate patent cases, as courts would be faced with complex issues of claim construction, infringement, and validity before any discovery is taken.

1.     **Defendant's Intrusion on *e*Plus's Property Interest Cannot Be Compensated With Monetary Damages**

Defendant's attempt to force a compulsory license onto *e*Plus ignores the cornerstone principal of patent law:  A patent is a property interest.[8]  Like other forms of property, the patentee has the fundamental right to exclude others from its property, a right explicitly established by statute.  *See* 35 U.S.C. § 154(a)(1).  Thus, without a mechanism to prevent others from encroaching on this right, a patent holder does not obtain the benefit of what Congress has bestowed.  *Continental Paper Bag Co. v. Eastern Paper Bag Co.*, 210 U.S. 405, 430 ("the right can only retain its attribute of exclusiveness by a prevention of its violation"); *Fuller v. Berger*, 120 F. 274, 279 (7th Cir. 1903) ("Injunction, it is evident, is the only means equal to enforcing the right to exclude.").

Continued infringement of a patent inflicts irreparable harm that cannot be adequately remedied through *ex post* damages.[9]  The mere fact that a figure can be put on a compulsory license does not change the fact that the license is insufficient to compensate *e*Plus for the harm it continues to suffer from Defendant's ongoing infringement.  *Cummins-Allison Corp. v. SBM Co., Ltd.*, 669 F. Supp.2d 774 (E.D. Tex. 2009) ("Some amount of money could be calculated for any interference with property rights; that does not necessarily make the amount an adequate legal remedy.").

---

[8] Indeed, the Patent Act provides that "patents shall have the attributes of personal **property**."  35 U.S.C. §261 (emphasis added).

[9] *See Fresenius Med. Care Holdings, Inc. v. Baxter Int'l*, 2008 WL 928496 (N.D. Cal. Apr. 4, 2008) ("Courts have frequently found that 'monetary damages are not an adequate remedy against future infringement because the principal value of a patent is its statutory right to exclude.'") (citations omitted).

     **2.**     **A Compulsory License Would Be Difficult, If Not Impossible, To Determine And Should Not Be Imposed Under The Facts Of This Case**

Even assuming that a compulsory license is an adequate remedy (and it is not), there exists no means to determine what the terms of such a license should be.  First, there are many intangibles to be resolved for the terms of the compulsory license.  Such provisions, which can be found in *e*Plus's existing license agreements, include patent cross-licenses, covenants not to sue, and provisions regarding change in control and bankruptcy.[10]  It is unclear at best whether the Court would even have the authority to bind the parties to such terms.[11]

Second, Defendant claims to lack sufficient financial data on the infringing systems to calculate either the proper royalty base or the proper royalty rate.  For example, Defendant's Rule 30(b)(6) witness testified that services revenues for its infringing products are not tracked on a product-by-product basis and that Defendant cannot determine the profitability of its infringing software systems.  Additionally, the Court has found there are not licenses for comparable technology from which to calculate an appropriate royalty rate for an ongoing license.[12]

---

[10] *See, e.g.,* PX-43 (Settlement and License Agreement between *e*Plus and Ariba dated Feb. 12, 2005) at ¶¶ 11, 13, 17, 21, 22, 29-36, and Exhibits B, C, and D.

[11] *See Commonwealth Sci. & Indus. Research Organisation v. Buffalo Tech., Inc.*, 492 F. Supp.2d 600, 606 (E.D. Tex. 2007) (compulsory license would "not necessarily include other non-monetary license terms that are as important as monetary terms to [the patentee]"); *Transocean Offshore Deepwater Drilling v. GlobalSantaFe Corp.*, 2006 WL 3813778, at *5 (S.D. Tex. Dec. 27, 2006) ("a compulsory license [would] not contain any of the commercial business terms typically used by a patent holder to control its technology or limit encroachment on its market share").

[12] The "technology acquisitions" agreements, software license, and resale agreements cited by Defendant were stricken for being irrelevant to *e*Plus's patented technology.  Order (Dkt. No. 369, July 26, 2010).  And the Court found that the existing license agreements concerning the patents-in-suit, which are the only agreements involving comparable technology, are not sufficiently reliable to determine an ongoing royalty rate.  Hearing Tr. (Aug. 10, 2010) at 31:18-22.

C.    **The Balance Of Harms Weighs Decidedly In Favor Of *e*Plus**

1.    **Defendant's Success in the Marketplace Weighs in Favor of Injunctive Relief**

Defendant's assertion that *e*Plus's lack of success in the e-procurement marketplace weighs against an injunction is misplaced. Rather, *e*Plus's inability to successfully exploit its patented technology, if anything, evidences the harm to *e*Plus from Defendant's continuing infringement. The relatively modest sales that *e*Plus enjoys from its Procure+ and Content+ products are not indicative of what *e*Plus would suffer if an injunction was not granted, but rather of what *e*Plus is suffering because of the absence of an injunction. Defendant should not be allowed first to build its business upon the foundation of infringement, and then to rely upon the success of that infringement as a shield against an injunction. *Broadcom Corp.,* 543 F.3d at 704 (stating that an adjudicated infringer "should not be permitted to prevail on a theory that successful exploitation of infringing technology shields a party from injunctive relief.") (internal quotations omitted).[13]

2.    **The Reexaminations of the Patents-In-Suit are Irrelevant**

No infringed claim has been invalidated in the reexamination proceedings,[14] nor can any claim be invalidated unless and until the entire reexamination process, culminating in an appeal

---

[13] Furthermore, Defendant's repeated reference to the low percentage of *e*Plus's total revenues generated from Procure+ and Content+ provides a distorted view of the relative significance of these products to *e*Plus's overall business. *e*Plus generates the bulk of its revenues from its value-added reseller (VAR) business units. Inj. Hr'g Tr. (Farber) at 153:9-154:3. But because *e*Plus does not own the products that it sells in its VAR business, its profit margins are much narrower than for its proprietary-software products, such as Procure+ and Content+. *Id.* Thus, *e*Plus's revenue figures do not reflect the complete value of Procure+ and Content+. As a comparison, while *e*Plus Systems and Content Services, whose financial statements predominantly reflect sales of Procure+ and Content+, only account for about 1% of *e*Plus's revenues, these units employ nearly 10% of *e*Plus's total workforce. *See* PX-523 (*e*Plus 2010 10-K) at 17.

[14] Contrary to Lawson's misleading suggestion, *see, e.g.*, Lawson Inj. Opp. Br. at 17-18, the "PTO" has not rejected any of the infringed claims.

11

to the Federal Circuit, has occurred and a final decision is reached adverse to ePlus, and a certificate is issued by the PTO cancelling the patent claims.  Contrary to Lawson's contention that the "patents will likely not survive reexamination," *see* Lawson Inj. Opp. Br. at 17, the reality is that there is a greater likelihood that the patentability of the claims will be confirmed.[15] ePlus's argument with respect to the irrelevance of these non-final administrative proceedings is set forth in its motion to strike.  Dkt. Nos. 638, 639.

### 3.   Any Harm to Defendant From its Inability to Continue Infringing is Irrelevant

Lawson barely addresses the prospect of harm to itself of an injunction against future sales, and for good reason.  Lawson Inj. Br. at 19.  Nowhere does Lawson address the substantial body of precedent cited by *e*Plus, which holds that "harm" to Lawson from an injunction against future infringing sales is irrelevant as a matter of law.  *See e*Plus Br. at 18-19.  Whether Lawson will lose sales and customers because it can no longer sell its infringing systems in the future is immaterial.  A jury has found that several of Defendant's system configurations infringe valid patents.  The Court should not permit Lawson to profit from continuing to sell them.[16]

In Lawson's stay motion, it makes the startling argument that a stay is warranted because it would allow ***prospective*** "customers in process" to select and implement Lawson's infringing configurations.  *See* Lawson Stay Br. at 20.  As *e*Plus argued in its opposition, this is all the more

---

[15] *See Amphenol T&M Antennas Inc. v. Centurion Int'l Inc.*, 2002 WL 32373639, at *2 (N.D. Ill. Jan. 17, 2002) ("The likelihood that some or all of the patent will be invalidated as a result of the reexamination proceedings is impossible to calculate with any reasonable degree of certainty, but statistically, it is not great."); *see also* Manbeck Dec. ¶¶ 74, 76 (in 88% of ex parte proceedings in which certificates have issued, the patentability of some of the claims has been confirmed and in 53% of all inter partes proceedings in which certificates have issued, the patentability of some of the claims has been confirmed).

[16] In its Stay Motion, Defendant reassures the Court that it has cash and cash equivalents of nearly $376 million, which it contends is far in excess of any potential damages that could result from its infringement.  Lawson Stay Br. at 27.  If that is the case, then surely Lawson can financially withstand whatever consequence it will face from having to halt its infringement.

reason to grant an injunction and deny a stay.  There is no reason to allow even more customers to purchase infringing products or for existing customers to dig themselves even deeper into infringement simply for Lawson's monetary gain.

### 4.      *e*Plus's Supposed "Motive" in Enforcing its Statutory Right to Exclude is Irrelevant

Defendant argues that injunctive relief should be denied because *e*Plus's motive in seeking an injunction is supposedly improper.  Lawson Inj. Opp. Br. at 20-21.  Specifically, Lawson claims that *e*Plus wants an injunction (1) because of the contentious nature of this litigation and (2) for settlement leverage.  *Id.*

Defendant's characterization of *e*Plus's motive is incorrect.  As Mr. Farber explained at the injunction hearing, *e*Plus intends to enforce its statutory right to exclude the adjudicated infringer because (1) "Lawson has made it very clear" that it has no intention of entering into an ongoing license on reasonable terms (Inj. Hr'g Tr. 87:6-13) and (2) it would impose tremendous burdens on *e*Plus to audit Defendant and insure that Defendant was paying its fair share of royalties under the terms of any ongoing license (*id.* at 88:10-89:9).

More importantly, the cases cited by Defendant do not stand for the proposition that a patentee's statutory right to exclude others should be denied if the infringer believes the patentee's motives are improper.[17]  The *Hynix* court denied injunctive relief because the patentee had argued before the court and the jury that the only remedy it sought was money damages. *Hynix Semiconductor Inc. v. Rambus Inc.*, 609 F. Supp.2d 951, 985 (N.D. Cal. 2009).  In *Belk v. Charlotte-Mecklenburg Bd. of Educ.*, 269 F.3d 305, 347 (4th Cir. 2001), a school desegregation

---

[17] The fact that a permanent injunction may give a patent holder "leverage" in subsequent licensing negotiations should not weigh against the patent holder in the equitable analysis.  That "leverage" is what Congress, by providing a "right to exclude," 35 U.S.C. 154 (a)(1), meant for the patent holder to have.  *See Brulotte v. Thys Co.*, 379 U.S. 29, 33 (1964) ("A patent empowers the owner to exact royalties as high as he can negotiate with the leverage of that monopoly.")

case, the panel vacated the permanent injunction because "[t]he prospective relief awarded by the district court is in tension with the resumption of local control, which is one of the ultimate goals of any desegregation order." *Id.* Neither case is applicable to the facts before this Court.

### D.   The Public Interest Will Not Be Disserved By An Injunction

Lawson's arguments fail to show that the public will be disserved by an injunction against this adjudicated infringer's ongoing direct and indirect infringement.

First, Lawson simply ignores the substantial binding precedent cited by *e*Plus showing that courts recognize there is a strong public interest in enforcing patent rights.[18] *e*Plus Inj. Br. at 22-23.  Neither does Lawson attempt to distinguish the numerous cases cited by *e*Plus in which courts have enjoined critical medical devices or drugs, notwithstanding the presence of far more compelling public interest concerns. *Id.* at 24-25, n.13.

Second, Defendant also fails to respond to the points raised in *e*Plus's brief showing that Lawson's allegations of harm to its customers are greatly exaggerated and — indeed — contrived.  While Lawson breathlessly contends that some 2,500 hospitals around the country will be substantially impacted, it has provided declarations from a scant two customers.  Neither of these declarations even suggests that the only manner in which the hospitals can order necessary supplies is by using Lawson's infringing system configurations.  There is ***no evidence that an injunction will stop anyone*** from purchasing needed equipment or supplies, or from providing any form of medical treatment.  Certainly, if that were the case, the customers — and many more than two of them — would have said so in emphatic terms.  And as to the seventy

---

[18] Lawson cites *Lear v. Adkins,* 395 U.S. 653, 670 (1969), for the proposition that there is a public interest in "permitting full and free competition in the use of ideas which are in reality a part of the public domain."  Lawson Inj. Opp. Br. at 22.  Of course, the jury's rejection of every one of Lawson's invalidity defenses means that the patented inventions were ***not*** "in reality a part of the public domain."

percent or so of Defendant's customers in industries other than health care, not a single customer has come forward to suggest an injunction will harm them in any way.

Lawson also has no answer to the fact that it has not even bothered to notify its customers that an injunction may issue.[19]  It has now been more than two months since the jury verdict, and Lawson still has not done anything to assist its customers in making any contingency plans or mitigating against the alleged harms.  Such undisputed facts show that the only "crisis" with which Lawson is concerned is the potential disruption of its own business, not that of its customers.  And as to the fact that Lawson is required by contract to indemnify these customers for their inconvenience, *see e*Plus Inj. Br. at 26, Lawson again has no response.  Further, Defendant now claims that it has a "design-around" in the works, which, if true, should obviate all the alleged harms that it claims an injunction would bring.  Lawson. Inj. Opp. Br. at 19.

The cases cited by Lawson do not support the proposition that this Court cannot enjoin Defendant's ongoing and lucrative indirect infringement (*e.g.,* implementing, installing, upgrading, and maintaining infringing systems), or even that the Court should not enjoin such infringement under these facts.  Indeed, none of these cases require that ongoing acts of indirect infringement be permitted, or even that such an exception is advisable under the facts of this case, where Defendant derives substantial revenues through its provision of ongoing support.[20]

---

[19] Lawson even has the audacity to argue that it need not notify its customers of an injunction even after a permanent injunction order is issued.  Lawson Inj. Opp. Br. at 30.  If Defendant truly believed that its customers and the public interest would be harmed by a permanent injunction, Defendant would not only agree to notify its customers of an injunction order, Defendant already would have warned each of its customers of the alleged harms it asks this Court to recognize.

[20] For example, in the *i4i* case, the infringing product was a seldom-used custom XML editor included in certain versions of Microsoft's ubiquitous "WORD" word-processing software.  *i4i Ltd. P'ship v. Microsoft Corp.,* 598 F.3d 831, 839 (Fed. Cir. 2010), *cert. granted on other grounds,* 131 S.Ct. 647 (2010).  Before the district court, ***the patentee stated that it was "amenable*** to Microsoft providing support to customers who purchased infringing WORD products before the effective date of its proposed injunction."  *i4i Ltd. P'ship v. Microsoft Corp.,*

RFF 1.  The public interest will not be disserved by granting an injunction against Lawson's

continued infringement.

### E.     The Scope Of The Injunction Should Be Commensurate With The Jury's Infringement Verdict

#### 1.     The Scope of the Injunction Should Encompass All Infringing System Configurations

Defendant agrees that the injunction should be of a breadth that is commensurate with the

jury's infringement verdict.  *See* Lawson Inj. Opp. Br. at 29 (quoting *Int'l Rectifier Corp. v. IXYS*

*Corp.*, 383 F.3d 1312, 1316 (Fed. Cir. 2004) (injunction should proscribe "infringement of the

patent by the adjudicated devices and infringement by devices not more than colorably different

from the adjudicated devices."))  Thus, the injunction should prohibit infringement of the

patents by ***all*** adjudicated infringing system configurations.[21]  Yet nonetheless, Defendant

suggests that "any injunction entered by this Court should be limited to RSS and Punchout."

Lawson Inj. Opp. Br. at 29.  In so doing, Defendant asks the Court to re-write the jury verdict.

---

670 F. Supp.2d 568, 601 (E.D. Tex. 2009) (emphasis added), *aff'd,* 598 F.3d 831 (2010).  In
***affirming*** the injunction, the Federal Circuit did not hold that the district court was required to
have restricted the injunction in this manner.  Rather, it merely stated that this provision — to
which the patentee agreed — "minimizes disruptions to the market and the public."  *i4i,* 598 F.3d
at 863.  Likewise, in *Smith and Nephew,* the district court did not hold that it lacked the authority
to enjoin infringement with respect to existing customers.  *Smith and Nephew, Inc. v. Arthrex,*
*Inc.,* 2010 WL 2522428, **3-4 (E.D. Tex. June 18, 2010).  Rather, the court simply noted that
the patentee's proposed exclusion of already sold products from the injunction mitigated against
the defendant's public interest arguments.  *Id.* The patentee's agreement was not surprising in
view of the nature of the product, which was a "bone graft fixation device" already in use ***by***
***patients*** recovering from ACL reconstruction.  *Id.* at *4.  Likewise distinguishable is this Court's
decision in *Odetics*, in which the defendants prevailed on a laches defense with respect to
products that would otherwise have been infringing.  *Odetics, Inc. v. Storage Tech. Corp.,* 14 F.
Supp.2d 785, 793-94, 796 (E.D. Va. 1998) (alleged public interest concerns were "meritless"
because court had already determined that laches defense precluded issuance of injunction as to
previously sold systems).

[21] *See id.*; *see also Trading Techs., Int'l, Inc. v. eSpeed, Inc.,* 2008 WL 4531371, at *5 (N.D. Ill.
May 22, 2008) (entering injunction against:  "(1) the products the jury found to infringe; (2) any
products not colorably different from the infringing products, and (3) any product capable of
operating in an infringing manner, even if its default setting is not infringing.").

As Defendant is well aware, the jury determined that much more than just RSS and Punchout infringe the *e*Plus patents.  Indeed, the jury found that three different configurations of Lawson's accused S3 system infringed five asserted claims, both directly and indirectly.  FF 1(a)-(c).  The configurations of Lawson's S3 system found to infringe ePlus's patents include not only RSS and Punchout, but also Lawson's Core S3 Procurement (i.e., Lawson System Foundation ("LSF")/Process Flow in combination with the Inventory Control, Requisition, and Purchase Order Modules), Electronic Data Interchange or "EDI," and, pursuant to the parties' stipulation in the Amended Final Pretrial Order, the M3 e-Procurement system.[22]  *e*Plus properly seeks an injunction that encompasses the infringing system configurations and any systems not more than colorably different from the infringing system configurations.  *See, e.g., Int'l Rectifier*, 383 F.3d at 1316; *Trading Techs*, 2008 WL 4531371, at *5.  *e*Plus's description of the infringing system configurations in its Proposed Permanent Injunction Order is taken verbatim from the description of the infringing system configurations (*i.e.,* Configurations Nos. 2, 3 and 5) in the jury verdict.  *Compare* Dkt. No. 640-1 (Proposed Permanent Injunction Order) at 2 *with* Dkt. No. 600 (Jury Verdict) at 1-3.[23]

---

[22] Defendant suggests that any injunction entered should not include Lawson's M3 e-Procurement system.  Lawson Inj. Opp. Br. at 30.  While Lawson concedes that it "stipulated to an *infringement* finding against its M3 product," it suggests that because *e*Plus did not introduce evidence or argument specifically directed to the M3 product, an injunction may not enter.  *Id.* (emphasis original).  Defendant omits from its Opposition that *e*Plus and Lawson stipulated not only to an infringement finding against Lawson's M3 product, but also that Lawson and *e*Plus "**will not introduce evidence or argument specifically directed to the M3 Procurement Product Line, and that such evidence is not necessary in order for any remedy to encompass that product made, used offered for sale, sold and/or imported into the United States**."  Dkt. No. 481 at 5.  Defendant is attempting to avoid the consequences of its own stipulation.  Defendant's infringing M3 e-Procurement system should be included within the scope of the injunction order.

[23] Defendant contends that the injunction entered against RSS should not "extend past August 10, 2014," and the "injunction against Punchout should [not] extend past February 17, 2017."  Lawson Inj. Opp. Br. at 26.  As explained herein, the injunction should enter against the system configurations found by the jury to infringe the *e*Plus patents, not just against RSS and Punchout.

### 2.    The Injunction Should Prohibit Defendant From Continuing to Indirectly Infringe *e*Plus's Patents

In its opposition, Defendant posits three arguments about why the scope of the injunction should not reach Defendant's adjudicated indirect infringement.  First, Defendant suggests that the proposed injunction is ***too vague***.  Lawson Inj. Opp. Br. at 29.  Next, Defendant argues that the proposed injunction order is ***too detailed*** because it would specifically enjoin Lawson from "installation, implementation, design, configuration, upgrade, maintenance and support and training and other related and associated services."  *Id.*  Finally, Defendant argues that the injunction improperly prohibits "repair and maintenance services" for infringing system configurations "sold before the verdict in this case." *Id.* at 26-27.  Lawson's arguments are not only internally inconsistent, they are also plain wrong.

It is indisputable that the jury's verdict encompasses indirect infringement.  *See* Dkt. No. 600.  That verdict is supported by substantial evidence at trial from Lawson's own witnesses and documents about the significant installation, implementation, configuration, data migration and conversion, maintenance and support, training and consulting services that Lawson provides.  FF 2.  Indeed, Lawson's filing of its customers' declarations is a virtual admission of Lawson's indirect infringement, as two of Defendant's customers state that in order to properly use Defendant's infringing software, Defendant must continue to provide substantial infringing training, maintenance, and other services.  FF ¶64.

---

System configurations found to infringe the '683 patent, which expires on February 8, 2017, include "Configuration No. 5: Core S3 Procurement (i.e., LSF/Process Flow in combination with the Inventory Control, Requisition, and Purchase Order Modules), RSS, Punchout and EDI." Dkt. No. 600 at 3.  The injunction entered by the Court against all infringing system configurations found to infringe the '683 patent should expire on February 8, 2017.  (*e*Plus's original Proposed Order mistakenly identified the date of expiration of the '683 patent as August 10, 2017.  *See* Dkt. 640-1 at 3.  *e*Plus submits herewith a Corrected Proposed Order that identifies the correct date as February 8, 2017).

Furthermore, Lawson's attempt to avoid the consequences of its indirect infringement are at odds with admissions made by its counsel at trial. In response to questions posed by the Court, Defendant's counsel withdrew any defense to infringement based on an assertion that Lawson did not implement the infringing system configurations.[24] Having relinquished at trial its defense that installation, implementation and service of the accused system configurations were acts of infringement, Defendant should not be heard now to suggest that an injunction covering those infringing acts is improper.

Lawson's complaint that the proposed injunction order is both too vague and too specific is also wrong. Consistent with Fed. R. Civ. P. 65(d)(1)(C), which requires the injunction order to "describe in reasonable detail … the act or acts restrained or required," ePlus's proposed order describes specific, particular prohibited acts, such as making, using, selling, offering to sell, importing, installing, implementing, designing, configuring, upgrading, and maintaining the infringing system configurations. Dkt. No. 640-1 at 1. Defendant does not proffer any alternative proposal for an injunctive order, nor does Defendant offer any concrete suggestions for an order that would, in its opinion, be neither too vague nor too specific. Instead, Defendant blithely suggests that it be permitted to continue infringing the *e*Plus patents. *See, e.g.,* Lawson Inj. Opp. Br. at 19 (arguing that Defendant should be permitted to make new infringing sales).

Finally, Defendant's contention that "servicing and repairing infringing pre-injunction products is not, itself, an infringing act," has no basis in the law or the facts. *Id.* at 27. Each act of service, installation, implementation, training, and maintenance performed by Defendant is an act of infringement. *See, e.g., Preemption Devices, Inc. v. Minnesota Mining & Mfg., Co.*, 803 F.2d 1170, 1174-75 (Fed. Cir. 1986) ("repair or servicing of previously sold" infringing products

---

[24] See Trial Tr. at 1492:22-1493:1.

was itself infringement; affirming-in-part determination that infringing acts were violation of injunction entered by district court); *Mendenhall v. Astec Indus., Inc.*, 13 U.S.P.Q.2d (BNA) 1913 (E.D. Tenn. Oct. 31, 1988) (ordering injunction that prohibited not only manufacture, use and sale, but also "installation, service or repair" of infringing products), *aff'd without opinion*, 887 F.2d 1094 (Fed. Cir. 1989).  And, as *e*Plus explained in its opposition to Lawson's stay motion, the only cases Lawson relies upon for the novel proposition that *e*Plus may not exclude Defendant's infringing acts are inapposite.  *See e*Plus Stay Opp. Br. at 14-15.

## III.    CONCLUSION

Accordingly, for the foregoing reasons, and based on the full evidentiary record at trial, the post-trial supplemental disclosures, and the injunction proceedings of March 25, 2011, *e*Plus respectfully moves for a permanent injunction against Lawson's continued direct and indirect infringement of the patents-in-suit.

Respectfully submitted,

April 1, 2011                           _____ /s/ _____
David M. Young (VSB #35997)
Scott L. Robertson *(admitted pro hac vice)*
Jennifer A. Albert *(admitted pro hac vice)*
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4000
Facsimile:   (202) 346-4444
dyoung@goodwinprocter.com
srobertson@goodwinprocter.com
jalbert@goodwinprocter.com

Craig T. Merritt (VSB #20281)
Henry I. Willett, III (VSB #44655)
**CHRISTIAN & BARTON, LLP**
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
Telephone: (804) 697-4100
Facsimile: (804) 697-4112
cmerritt@cblaw.com
hwillett@cblaw.com

Michael G. Strapp *(admitted pro hac vice)*
**GOODWIN PROCTER LLP**
Exchange Place
53 State Street
Boston, MA 02109-2881
Telephone:  (617) 570-1000
Facsimile:   (617) 523-1231
mstrapp@goodwinprocter.com

Attorneys for Plaintiff *e*Plus Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of April, 2011, I will electronically file the foregoing

## PLAINTIFF *e*PLUS INC.'S BRIEF IN FURTHER SUPPORT OF MOTION FOR PERMANENT INJUNCTION

with the Clerk of Court using the CM/ECF system which will then send a notification of such filing (NEF) via email to the following:

Daniel McDonald, *pro hac vice*
William D. Schultz, *pro hac vice*
Rachel C. Hughey, *pro hac vice*
Andrew Lagatta, *pro hac vice*
MERCHANT & GOULD
3200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 332-5300
Facsimile: 612) 332-9081
lawsonservice@merchantgould.com
***Counsel for Defendant Lawson Software, Inc.***

Robert A. Angle, VSB#37691
Dabney J. Carr, IV, VSB #28679
TROUTMAN SANDERS LLP
P.O. Box 1122
Richmond, Virginia 23218-1122
(804) 697-1238
(804) 698-5119 (Fax)
robert.angle@troutmansanders.com
dabney.carr@troutmansanders.com

***Counsel for Defendant Lawson Software, Inc.***

_____/s/_____
David M. Young (VSB #35997)
**GOODWIN PROCTER LLP**
901 New York Avenue, N.W.
Washington, DC 20001
Telephone:  (202) 346-4000
Facsimile:   (202) 346-4444
dyoung@goodwinprocter.com