1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF VIRGINIA

3                      RICHMOND DIVISION

4

5    ---------------------------------------
                                        :
6    ePLUS, INC.                        :    Civil Action No.
                                        :    3:09CV620
7    vs.                                :
                                        :
8    LAWSON SOFTWARE, INC.              :    April 4, 2011
                                        :
9    ---------------------------------------

10

11            COMPLETE TRANSCRIPT OF ORAL ARGUMENT

12           BEFORE THE HONORABLE ROBERT E. PAYNE

13               UNITED STATES DISTRICT JUDGE

14
     APPEARANCES:
15
     Scott L. Robertson, Esquire
16   Michael G. Strapp, Esquire
     Jennifer A. Albert, Esquire
17   Goodwin Procter, LLP
     901 New York Avenue NW
18   Suite 900
     Washington, D.C.  20001
19
     Craig T. Merritt, Esquire
20   Henry I. Willett, III, Esquire
     Christian & Barton, LLP
21   909 East Main Street
     Suite 1200
22   Richmond, Virginia  23219-3095
     Counsel for the plaintiff
23

24                   Peppy Peterson, RPR
                    Official Court Reporter
25               United States District Court

```
 1   APPEARANCES:  (cont'g)

 2   Dabney J. Carr, IV, Esquire
     Troutman Sanders, LLP
 3   Troutman Sanders Building
     1001 Haxall Point
 4   Richmond, Virginia  23219

 5   Daniel W. McDonald, Esquire
     Kirstin L. Stoll-DeBell, Esquire
 6   William D. Schultz, Esquire
     Merchant & Gould, PC
 7   80 South Eighth Street
     Suite 3200
 8   Minneapolis, Minnesota  55402

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<u>P R O C E E D I N G S</u>

1

2

3        THE CLERK:  Civil action 3:09CV00620, ePlus,

4  Incorporated versus Lawson Software, Incorporated.  Mr. Scott

5  L. Robertson, Mr. Craig T. Merritt, Ms. Jennifer A. Albert, Mr.

6  Henry I. Willett, III, and Mr. Michael G. Strapp represent the

7  plaintiff.

8        Mr. Daniel W. McDonald, Mr. Dabney J. Carr, IV, Ms.

9  Kirstin L. Stoll-DeBell, Mr. William D. Schultz, Ms. Rachel C.

10  Hughey represent the defendant.  Are counsel ready to proceed?

11        MR. ROBERTSON:  Plaintiff is, Your Honor.

12        MR. McDONALD:  Yes, we are, Your Honor.

13        THE COURT:  All right.  ePlus's motion for injunctive

14  relief argument, the record having been made.  Good morning,

15  Mr. Robertson.

16        MR. ROBERTSON:  Good morning, Your Honor.  May it

17  please the Court, as you know, we're here on three motions

18  today:  ePlus's motion for a permanent injunction, Lawson's

19  motion for a stay of any such injunction if granted in the

20  Court's discretion, and the posting of any bond, and ePlus's

21  motion to strike the Kalinsky declaration who is Mr. McDonald's

22  law partner at Merchant & Gould, and any evidence concerning

23  the relevant reexaminations of the patent that the Court's

24  ruled on on three occasions now in this case.

25        Starting with the permanent injunction, Your Honor,

1    obviously ePlus believes that particularly under the facts of

2    this case, a permanent injunction is warranted and that that

3    injunction should not be stayed.  If I could, I would like to

4    start with some first principles.

5           We touched on this briefly at the evidentiary

6    hearing, but as the Court knows, the only right granted to the

7    patent owner under the Patent Act is the right to exclude, and

8    that is equitable relief for prospective injury going forward

9    as infringement is a continuing tort.  And the act itself, if

10   we can look at Section 261 of the Patent Act, states that

11   patents shall have the attributes of personal property.

12          And in this case, indeed, it's unique personal

13   property, because by definition the invention is novel and

14   nonobvious.  In fact, the Court may recall, prior to the

15   commencement of the trial, we showed the Judicial Conference

16   videotape to the jury to explain a little bit of background

17   about the patent laws and how they operate.  The patent was,

18   indeed, compared to in that video as like a deed to land, and,

19   in fact, the infringement was analogized to a trespass on that

20   property right.

21          And for past trespasses, the only thing the Court can

22   actually do is award monetary damages because the injury has

23   already occurred, but for future trespasses, a Court may, in

24   its discretion and in its equitable powers, grant an injunction

25   to prevent future trespasses.  In fact, patents are often

1    analogized to deeds in property.  Indeed, historically even

2    grants of land were called letters patent, and, in fact, many

3    of the grants of land by Queen Elizabeth that now constitute

4    the state of Virginia were given under grants of letter patent

5    by the monarch.

6            So what we're here now today for is to prevent the

7    future prospective trespass on ePlus's property rights that

8    have been traditionally enjoined under the Court's equitable

9    powers.

10           Now, we raise with the Court what are so-called *eBay*®

11   factors, the four factors that are the traditional test for

12   injunction, and we agree with the Court, and we've never argued

13   otherwise, that those traditional four factors are the four

14   factors that apply for any type of injunctive relief that the

15   Court may be authorized under its powers, equitable powers to

16   order.

17           We are not saying there is any kind of specific rules

18   for patent cases, but, in fact, because the right is a right to

19   exclude, the Supreme Court has said even in the *eBay*® case, and

20   particularly in Justice Roberts' concurrence, that from at

21   least the 19th century courts have granted injunctive relief

22   upon a finding of infringement in the vast majority of patent

23   cases.  This long tradition of equity practice is not

24   surprising given the difficulty of protecting the rights to

25   exclude through money remedies that allow an infringer to use

1    an invention against the patentee's wishes, a difficulty that

2    often implicates the first two factors of the traditional

3    four-factor test.   Those first two factors, of course, are

4    irreparable harm and no adequate remedy at law.

5           If I might just also bring to the Court's attention

6    that in that case, the *eBay*® case, the Court was called upon to

7    determine whether or not it needed to overrule a case that was

8    more than 100 years old called *Continental Paper Bag* in which

9    the patent owner did not even use its patent or practice its

10   patent rights -- it was a method for making a paper bag -- but

11   it already had a manufacturing plant using a prior system, and

12   it didn't want to employ the capital to upgrade and go to the

13   newer invention that it had itself created.

14          So the argument was made that the nonuse of the

15   patent itself warranted that the -- that a Court acting in

16   equity not grant an injunction, but the Court found -- the

17   Supreme Court found and the Supreme Court in *eBay*® confirmed

18   that the right which the patentee receives does not need much

19   further explanation.

20          We have seen that it has been the judgment of

21   Congress from the beginning that the sciences and useful arts

22   could be best advanced by giving exclusive right to the

23   inventor.   It went on to say, from the character of that right

24   of the patentee, we may judge of his remedies.   It hardly needs

25   to be pointed out that the right can only retain its attribute

```
 1    of exclusiveness by prevention of its violation.  Anything but
 2    prevention takes away the privilege that the law confers upon
 3    the --
 4              THE COURT:  They are not arguing that nonuse has
 5    occurred here, are they?
 6              MR. ROBERTSON:  Well, I think there's been a
 7    suggestion made, in fact, at the evidentiary hearing that -- I
 8    think Mr. McDonald's words were that ePlus was as close to an
 9    NPE, a non-practicing entity, as you could be, and I think, of
10    course, the evidence doesn't support that at all.  I'll get to
11    that evidence in a minute.
12              Of course, I think there can be no real dispute that
13    ePlus has commercial products out there in the marketplace and
14    that they compete with Lawson in that marketplace.  There's
15    been a lot of ink spilled over this whole issue of competition,
16    and I would just suggest to the Court that that's not
17    dispositive.  The Court doesn't have to find that there's
18    competition between the two parties.  In fact, the Federal
19    Circuit has found in the Broadcom v. Qualcomm case that there
20    doesn't even need to be direct competition, but there can be
21    indirect competition.
22              THE COURT:  Suppose I own this patent.  I buy this
23    patent because I think there's a real advantage to the
24    technology and that that's the wave of the future, but these
25    best-of-breed configurations are really going to have a lot of
```

1    potential economic gain for me, and then I find out that Lawson

2    is violating the rights that I have.  I'm betting on the come.

3    We don't compete.  I don't even sell anything.  I'm just buying

4    it for investment.

5            MR. ROBERTSON:  I think that is --

6            THE COURT:  Can I get an injunction?

7            MR. ROBERTSON:  I think you should be able to get an

8    injunction.  If you went out and you bought 100 acres of land,

9    a thousand acres of land because you wanted to grow corn on it,

10   you thought you were going to be able to profitably grow corn

11   and harvest it and sell it and make a profit from it, but you

12   buy the land, and you don't use it right away for whatever

13   reasons, you don't have the immediate resources.

14           Then someone comes along and plants 500 acres of corn

15   on your thousand acres and says, well, you weren't using it,

16   Judge Payne, and so we thought we could put it to good use and

17   make some money off of it, I mean, certainly a court in equity

18   would say, first, you've been unjustly enriched because you've

19   been able to use my property and grow corn, and second, I'm

20   going to enjoin you from further trespassing on my property and

21   using that corn.

22           People buy patents and use them as investments all

23   the time.  My client, as you will recall the evidence showed,

24   bought this company along with the assets which were the

25   software that was already in place, other of the capital

1   assets, the employees that came along, and the patents, and

2   they've been able to successfully exploit the technology in the

3   marketplace --

4           THE COURT:  Who invented these -- who were the

5   inventors of these patents in relation to the company that your

6   client, ePlus, bought?

7           MR. ROBERTSON:  You will recall that they were four

8   employees at Fisher Scientific.  Three of them testified.  One,

9   Mr. Melly, is deceased.

10          THE COURT:  What I can't get straight in my mind is

11  who is it -- what relation do they have to the company that

12  your company bought.

13          MR. ROBERTSON:  What happened is, once Fisher

14  Scientific realized and appreciated that these patents and this

15  technology had value -- you will recall they are a company that

16  simply sold medical supplies, beakers, test tubes, and the

17  like.  They decided that they were going to create and spin off

18  a company called ProcureNet in order to exploit the technology

19  --

20          THE COURT:  That's the company your company bought.

21          MR. ROBERTSON:  And that's the company that ePlus

22  bought more than ten years ago.

23          THE COURT:  So this isn't -- it troubles me, I guess,

24  that the concept of -- the pejorative of patent troll has been

25  laid out as sort of a denigrating term for people who buy

1    patents and don't practice them, and I think that there's a

2    great tendency to let the philosophical implications of

3    investment in patents get in the way of what the rights are

4    that go with patents.

5           I'm not quite sure I understand why a patent troll

6    isn't entitled to an injunction if it lawfully owns the patent.

7    I suppose a lot of literature says, well, what we're doing is

8    encouraging the development in the arts and the sciences, and

9    so we shouldn't really be lending the aid of equity to those

10   who don't engage in that activity.  There's a lot of literature

11   to that end, isn't there?

12          MR. ROBERTSON:  Yes, Your Honor.  I think that's just

13   a false premise.

14          THE COURT:  But that's different.  Even if that

15   premise is correct, it is inapplicable here because what you

16   have here is a company that in the course of its business

17   committed significant resources to the development of a patent

18   and didn't realize there was an economic advantage to it to

19   spin that out and use it, and then that company got bought.

20          So if you didn't give ePlus an injunction here, you'd

21   be providing a disincentive to companies who are like Fisher

22   Scientific in the development of products, and it didn't want

23   to pursue something in competition with what it already had,

24   but it clearly wanted to foster the arts in which this whole

25   invention came about through the fostering of the art, and

1   there isn't a patent troll in sight, is there?

2         MR. ROBERTSON:  No, sir.  In fact, you raise a couple

3   of interesting points I'd like to address.  First of all, for

4   patent trolls, it's often said, whoever's patent troll it is,

5   it's like beauty, it's in the eye of the beholder.  I will tell

6   you that General Electric joined in supporting my client,

7   MercExchange, in the *eBay*® case because it said it had tens of

8   thousands of patents that it didn't commercially produce

9   products on, but it was part of their portfolio and part of

10  their assets, and if, in fact, they couldn't license those to

11  others who would then make products and be competitive in the

12  marketplace, that portfolio, which is worth billions of

13  dollars, would be immediately devalued.

14        The other point Your Honor makes is even if someone

15  is a patent troll, the fact is, Congress made the determination

16  that the balancing would be in exchange for innovating and

17  advancing the arts and sciences, the patent owner would get the

18  exclusive right.  It is that exclusive right that spurs the

19  very innovation.

20        THE COURT:  Suppose that the person is an innovator

21  and inventor but he doesn't have the capacity to take advantage

22  of -- doesn't have the capital to take advantage of the

23  invention.  What incentive is there for Mr. Inventor to

24  continue to invent if what he invents and ultimately hopes to

25  profit from by selling doesn't carry with it the full panoply

1    of the rights that the inventor gets because he's invented it?

2              MR. ROBERTSON:  Absolutely, Your Honor.  Then, in

3    fact --

4              THE COURT:  The answer is none.

5              MR. ROBERTSON:  You are right.  And, indeed,

6    historically one of the biggest patent trolls, however you

7    define the term, in history has been Thomas Edison who is one

8    of our greatest innovators.  He wanted to continue to invent.

9    He wanted to work in his workshop and tinker and create things.

10   He didn't want to sit there and have to go through the efforts

11   of commercialization.

12             He created a company that turned into General

13   Electric.  He was actually even forced out of the company

14   because he really didn't know how to run a major corporation.

15   What he did know how to do was invent a huge range of useful

16   devices and innovate and obtain patents on that.  So if you

17   want to start grouping people in patent trolls, we ought to

18   start with Thomas Edison.

19             THE COURT:  So now should we leave that topic alone?

20             MR. ROBERTSON:  I think we've exhausted that topic,

21   Your Honor.  So obviously, Your Honor, one of the hallmarks of

22   a property right is the right to exclude.  As the Supreme Court

23   has said, it is one of the most essential sticks in the bundle

24   of rights that are commonly characterized as property.

25             What I'd like to do is, I would like to talk a little

1    bit --

2            THE COURT:  Isn't *eBay*® basically this:  That you

3    can't reflectively grant injunctive relief, you have to do what

4    the law has required for years and years and years, and it was

5    telling -- the Supreme Court in *eBay*® was telling the district

6    courts and the Federal Circuit, look, you simply are part of an

7    overall -- you are dealing with an overall system of law, and

8    one component of that is the grant of an injunction.  Congress

9    has said that is permitted and available, and we've given you

10   instructions over the centuries about how to get injunctive

11   relief, what to consider, and they apply in the patent context

12   just like they do in any other context, so get back and make

13   that analysis.

14           MR. ROBERTSON:  I think that's absolutely right.

15           THE COURT:  What happened when the case was returned

16   to the district court?

17           MR. ROBERTSON:  The district court denied a permanent

18   injunction going forward.  The district court found that the

19   patent owner was a non-practicing entity.  The district found

20   that there were unique circumstances involved in the case, and

21   the district court actually, ironically, relied in part on a

22   reexamination that eBay had filed even after the jury verdict

23   was over saying that that showed that there was some reason

24   that injunction shouldn't be issued.

25           Ironically, as the history shows, 25 out of 29 of the

1    claims in that patent were confirmed by the Patent and

2    Trademark Office, and, in fact, all of the claims in *eBay* that

3    were found to infringe were confirmed.  After that, as we set

4    forth in the brief, eBay® bought the patent.

5          So the fact is, there's going to be a lot of

6    speculation here based on -- and urging of the Court to accept

7    these reexaminations as having some relevance.  They really

8    have no relevance to this case, little probative, if any,

9    value, Your Honor, as Your Honor has ruled I think on no less

10   than three occasions, and the argument was made the other day

11   that, well, what happens if somewhere down the road the Patent

12   Office, in fact, finds that the claims that Lawson was found to

13   infringe were rendered unpatentable.

14         I would suggest to Your Honor, quite frankly, that is

15   an argument that proves too much, because if you think about

16   it, Your Honor, that's exactly what can happen in any situation

17   where there are successive litigations involving the same

18   patent, and, in fact, there have been successive litigations

19   involving the same patents here.

20         When we sued Ariba, we prevailed on that case, and

21   then we resolved it.  Subsequently we sued SAP.  Now, the

22   patents could have been rendered invalid in the SAP case.  We

23   subsequently sued Lawson, and the patents could have been

24   rendered invalid in Lawson, and we may subsequently sue another

25   infringer in the marketplace if we so identify them.

1            Every time the patent owner does that, it puts the

2    patents at risk, and so it's of no moment to say, well,

3    somewhere down the line, the PTO might render the patents

4    unpatentable, because somewhere down the line there may be a

5    subsequent jury that finds the patents invalid if they're

6    enforced again, and that would be collateral estoppel against

7    the patent owner.

8            Once they are found invalid and if we're not

9    successful on the appeal, we're forever barred from asserting

10   those patents again.  So it's nothing to say that that

11   possibility could happen in a reexamination, because that

12   possibility is always there even in successive litigations of

13   the same patents.

14           THE COURT:  The fact of reexamination, according to

15   the concurrence which you are so fond of in the *eBay*® case,

16   didn't the chief justice hold that there isn't any reason you

17   shouldn't consider the fact of reexamination --

18           MR. ROBERTSON:  Well, that's --

19           THE COURT:  -- as part of whether to grant an

20   injunction as well as whether to grant a stay?

21           MR. ROBERTSON:  That was one of the hypothetical

22   questions posed during the arguments, made during the argument,

23   and I think the answer to that is there's no reason that the

24   reexamination should weigh in, in fact, in the injunction.  In

25   fact, they are not even part of the record in this case that

1    would be circumscribed when it went up on appeal.  In fact,

2    they shouldn't be part of the record in this case as the Court

3    determined because they have little to no probative value.

4    They are interim proceedings of an administrative agency that

5    are years away from resolution in this case.

6            Only one of them has actually been argued at the

7    Board of Patent Appeals.  Three of the others haven't even

8    reached that stage yet.  One of the patents has -- is only --

9    only a first office action, and we have to respond to that.  So

10   they are all years away from any kind of resolution.

11           THE COURT:  One of the things I'm confused about is

12   the differing positions that you and Lawson take over the

13   extent to which the judgments on reexamination declare invalid

14   any claim that is the -- as to which the jury returned

15   verdicts.

16           You say none of the claims were infringed.  They

17   say all -- none of the infringed claims, the ones the jury

18   found infringed, are invalidated by what has been done so far

19   in the Patent Office, in the reexamination proceeding.  They

20   say all of the claims that were invalidated by the jury's

21   verdict are invalidated by the actions taken by the Patent

22   Office on reexamination.

23           How do I ascertain the truth without spending a

24   lifetime studying the reexamination records and doing the

25   comparisons -- it looks to me like lawyers ought to be able to

1   agree that they either do or they don't.

2         MR. ROBERTSON:  Let me give two responses to that.

3   Number one, by statute, claims are not canceled or confirmed in

4   reexaminations until a final action has issued, all appeals

5   have been exhausted, and a certificate has issued.

6         THE COURT:  I know that.  That's not the question.

7   The question is, do the actions that have been taken so far,

8   does it set it naught if it were affirmed on appeal, if the

9   claims, any or all of the claims that the jury found infringed?

10        MR. ROBERTSON:  No, Your Honor.  Two things.

11        THE COURT:  None; is that right?

12        MR. ROBERTSON:  The presumption of validity remains

13  unaltered through the entire reexamination.

14        THE COURT:  I know that.  Get on to the bottom line.

15        MR. ROBERTSON:  I'm trying to understand the question

16  then, Your Honor.  Sorry.

17        THE COURT:  Come to the party.  Pretend like you

18  don't want to argue the legal bar to the issue.  Of course your

19  claims, your verdict stands until something sets it aside.

20  Forget that.

21        If the Supreme Court of the United States were today

22  to hold that what the Patent Office did in this case on these

23  reexaminations was exactly what the Patent Office did, which,

24  if any, of the claims that the jury returned a verdict on would

25  be set at naught; all or none or some, and if some, which ones?

1      MR. ROBERTSON:  I think all of the claims of all the

2    patents are in reexamination which would include --

3      THE COURT:  I'm talking about the ones where the

4    decisions have been made, not -- you've got a whole bunch of

5    them where there aren't even decisions made.

6      MR. ROBERTSON:  The trouble I'm having with Your

7    Honor's question is the decisions are interim, not final

8    decisions.

9      THE COURT:  I know that, but my -- I have assumed

10   that those decisions are no longer non-final.  They are

11   decisions adopted verbatim without change by the Supreme Court

12   of the United States, so they are final.  Remove all the

13   procedural and simply tell me if --

14     MR. ROBERTSON:  The claims would be unpatentable.

15     THE COURT:  All of them.

16     MR. ROBERTSON:  Yes.

17     THE COURT:  That the jury has dealt with.

18     MR. ROBERTSON:  Yes.

19     THE COURT:  Why didn't you say that and say, but

20   that's not the issue, the issue is that this is an interim

21   proceeding, and I've got a whole lot of rights that ride and

22   don't get overturned by that, and I understand that.

23     MR. ROBERTSON:  All right.  That's my point.

24     THE COURT:  I don't want to spend one minute of your

25   argument time even trying to explore that.  I've had to spend

1    about five.

2              MR. ROBERTSON:  Even Lawson's proposed conclusions of

3    law say the reexaminations are ongoing and not final.

4              THE COURT:  I know that.  Everybody knows that.

5              MR. ROBERTSON:  All right.  Well, then, Your Honor,

6    let me see if I can't address for you these four issues for the

7    traditional injunction test including this issue starting with

8    the irreparable harm.  Obviously the competition with Lawson, I

9    think there can be no serious question that we're competing

10   with them.

11             ePlus plus has products that are covered by the

12   patents.  Lawson has software with the identical functional

13   capabilities.  We target the same mid market type of companies,

14   we compete in the same industry sectors, we have competed head

15   to head for the same customers.

16             THE COURT:  But it's minuscule, they say.  It's not

17   real competition because, A, they say you are such a small

18   player that you are really a gnat on an elephant.  That's not

19   competition, that's just a fact that happens in life, and if

20   you go around granting injunctions in situations where the

21   record is that the competition is as small as this, everybody

22   would get irreparable harm and it would cheapen irreparable

23   harm, and the next argument that they have is a different one,

24   but address that one first.

25             MR. ROBERTSON:  Well, if we're small a player, they

1    claim they're a small player, too, and, in fact, they have a

2    market niche that we want to go after.  They claim to have 830

3    customers in that -- that have the infringing configurations.

4           If you think about it, the injunction you entered,

5    Your Honor, here's a lost opportunity.  We could go after those

6    830 customers and say that we could replace the --

7           THE COURT:  That's true, but doesn't the record have

8    to show that, in fact, you have gone after them at some point,

9    and, in fact, they are not just the 830 people on a list but

10   that, in fact, you have been hustling some large quantity of

11   those customers?

12          MR. ROBERTSON:  Well, yes, and I think the record

13   does reflect that, Your Honor.  We had in appendices A, B, and

14   C that we provided to Your Honor in the supplemental

15   disclosures lists of customers that Lawson's solicited, a list

16   of customers that ePlus solicited, a list of customers that

17   Lawson had with the infringing configurations.

18          THE COURT:  So you have solicited 247 out of 830 of

19   their customers.

20          MR. ROBERTSON:  Yes, sir.  And we also believe, if we

21   see the next slide, that the evidence shows that of the

22   customers that Lawson identified it solicited, which was almost

23   8,000, we had solicited 2,041 of those customers according to

24   our internal documents.

25          In addition, we believe that the evidence that was

1    provided shows that Lawson solicited 16 of ePlus's 64

2    customers.  Now, they claim they solicited them not always for

3    ProcureNet but for some of the other products, but, obviously,

4    when they come, they solicit our customers, we lose

5    opportunities in other areas, even outside the patents.

6              For example, Mr. Farber testified the ability to

7    cross-sell and up-sell other industries, that they made last

8    year alone $16 million by selling, cross-selling their

9    value-added reseller technology and financial business

10   services.  That's a lost opportunity.

11             There were examples in the record from not only Mr.

12   Farber's testimony but documented by correspondence from actual

13   customers -- this is in our reply brief -- where we had

14   solicited Deaconess Health System, Eastern Virginia Medical

15   School, and Affordable Care, Riverside County, Santa Clara

16   County, Washington Department of Labor, Fresno County.

17             There are a number of customers including -- that we

18   outlined or set forth in the brief that we have both sought to

19   sell and that Lawson has sought to sell.

20             Now, Lawson tries to characterize itself as this, we

21   sell ERP, enterprise resource planning software solutions, this

22   full suite of software solutions, and, therefore, we don't

23   really compete in what's called this best-of-breed market, but

24   Your Honor actually saw that Forrester Wave report that came

25   out less than a month ago in which we were grouped among 11

1    other competitors for this electronic procurement software.

2              Indeed, we've cited in our reply brief a 2008 S3

3    marketing plan by Lawson which says they are competing with the

4    best-of-breed companies.  That's their own admission, including

5    Ariba.  So from Lawson's own documents, they say that they go

6    head to head with these customers.

7              Now, Ariba is a company like ePlus that just offers a

8    procurement solution, and Mr. Hager, when he testified,

9    conceded that other companies like Ariba, like ePlus, can

10   provide those procurement solutions.  It might be that, in

11   fact, Lawson sold its platform, its Lawson software foundation,

12   its process flow, etcetera, and its procurement core

13   technology.  You will recall the purchase order, inventory

14   control, and requisition modules, but we can put our technology

15   on top of that, and we could sell it and integrate it with that

16   Lawson software foundation --

17             THE COURT:  Let's assume that that's technically

18   true, technologically possible.

19             MR. ROBERTSON:  I don't think there's any dispute

20   about it.

21             THE COURT:  So we don't have to get into the details

22   of that.  If a customer has Lawson's system, and RSS and

23   Punchout are on top of it, if there's an injunction, and -- is

24   there a way that if the customer wants to -- what does the

25   record show whether there's a way, if the customer wants to,

1    ePlus's system could go in and RSS and Punchout would go out?

2            MR. ROBERTSON:  I think both Mr. Farber and Mr. Hager

3    testified that that functional capability was there, and, in

4    fact, Mr. Hager I think conceded, and we cite it in the

5    record -- I don't have the particular cite but I can find it

6    for Your Honor -- that he was aware that other systems could

7    come in.

8            That Novant system, there was a proposal made because

9    Novant was unhappy with Lawson's procurement system, and they

10   wanted to bring in SciQuest, one of our licensees, to replace

11   it, and there was no question that SciQuest could come in and

12   replace that procurement solution just like ePlus could come in

13   and replace that procurement solution.

14           THE COURT:  Do your current licensees get the benefit

15   of any injunctive relief that is granted against Lawson?

16           MR. ROBERTSON:  I think they get the benefit of

17   actually having someone else on a more level playing field,

18   because they have sat back and respected the rights of my

19   client and paid a royalty in order to have the privilege of

20   practicing the inventions whereas Lawson is a free-rider right

21   now, an infringer that doesn't respect those rights --

22           THE COURT:  The injunction operates to keep Lawson

23   out of the game and to allow you to get a percentage of Ariba's

24   or SciQuest's products that go in there?

25           MR. ROBERTSON:  No, sir.  I think it's --

1           THE COURT:  Does that happen?

2           MR. ROBERTSON:  It's an indirect benefit, but it's a

3    benefit that because we respect our licensees' rights, and our

4    licensees certainly would like to see that other infringers out

5    there had to pay the same kind of respect to the intellectual

6    property that they had to pay.  So they would like to see, I'm

7    certain, Lawson have to be on the same level footing that

8    they're on, but we don't get any added consideration, if that's

9    what Your Honor's question is, by enjoining Lawson.

10          We do get added benefits by having -- avoiding lost

11    opportunities, be able to increase our market share, be able to

12    try and sell to Lawson's customers that have the infringing

13    software.  As I said, if Mr. Hager is to be believed, and I

14    think it was somewhat exaggerated, but it was going to cost a

15    million dollars to replace this, well, if we only did ten

16    percent of Lawson's customers that have the infringing

17    configurations, that's $83 million.

18          Now, Lawson shouldn't be heard to complain about that

19    because that's the foundation of infringement they built their

20    company on.  They've also indemnified their customers for such

21    infringement, and so if there's any harm that they claim can

22    befall their customers, they've already arranged for that by

23    their contractual obligations.

24          These were big boys.  These are adults.  These are

25    sophisticated companies.  They entered into those agreements

1    with those indemnifications should this very instance occur,

2    and so they shouldn't be heard to turn around now and say,

3    well, our customers, you know, will be -- their businesses will

4    be frustrated.  The only business frustration, the only

5    frustration of a business here that Lawson's really worried

6    about is Lawson.

7         Let me explain why that is so I think under the facts

8    of this case.  The jury verdict is now two and a half months

9    ago.  Lawson hasn't taken one step to notify any of its

10   customers that it could possibly be enjoined and they should be

11   undertaking contingency plans should that happen and they would

12   no longer be able to service and maintain these systems.

13        If there were a public crisis as they urge in their

14   papers, you would think they would have an ethical, a moral,

15   probably a contractual and regulatory obligation, particularly

16   with respect to these hospitals they claim are going to be so

17   harmed by not being able to buy more quickly and effectively

18   and efficiently the items they need to buy in order to maintain

19   their operations, they would have sent out a certified letter,

20   return receipt requested, putting them on notice.

21        Remarkably they argue in their reply brief even if

22   this Court enters an injunction, they have no obligation to

23   notify their customers about that.  Now, they say that because

24   they say we're not attempting to enjoin the customers.  Well,

25   we're not.  We can't enjoin the customers.  They were not

1    parties to this lawsuit.  They can't be bound by a proceeding
2    to which they were not a party, but certainly the servicing and
3    the maintenance and the ongoing implementation, all of which
4    the jury heard and the jury found constitute both direct, the
5    implementation, actually building an infringing system, and the
6    servicing and maintenance, which is the inducement or
7    contributory infringement the jury also found should be
8    enjoined from going further.

9            Now, I know we've talked some about irreparable
10   harm --

11           THE COURT:  What does the record show about your
12   losing market share?  I don't see anything in the record -- I
13   see a lot of argument, but I don't remember anything in the
14   record that shows that you lost market share to Lawson by
15   virtue of what they've been doing.  Maybe I just am unfamiliar
16   with the record as you all are.  I know that, so help me.

17           MR. ROBERTSON:  Yes, sir.  We think there were a
18   number of instances.  We cited several in our findings of fact,
19   but let me direct you in our reply brief to page six.  We have
20   actual communications from several companies like PPDI.  Let me
21   quote it for you.  "Our group has evaluated Procure+ cost
22   versus Lawson RSS cost and implementation.  We remain committed
23   to Lawson."  I could go on --

24           THE COURT:  Are you equating the loss of a bid on
25   those customers cited in your briefs to loss of market share

1    generally?  Are you saying that's the same thing?

2         MR. ROBERTSON:  I think loss of opportunity to

3    increase market share is loss of market share.  I don't think

4    we have to prove under the case law that we lost market share.

5    The Federal Circuit has made that clear, and we've cited --

6         THE COURT:  You argue that you lost market share.  To

7    me, it's one thing to lose a bid and to lose a particular

8    customer.  It's another to show that over the years, at X

9    period of time one's share of the market has declined, and I

10   don't remember any testimony that shows a widespread decline or

11   diminution in the marketplace.  If there is any, tell me about

12   it.  Otherwise, I'll understand that your brief, when you say

13   you lost market share, means you've lost bids which I

14   understand has been shown.

15        MR. ROBERTSON:  Well, I do think that equates with

16   lost market share.  One of the difficulties, Your Honor --

17        THE COURT:  Answer the first part of the question.

18   Is there anything in there that shows a change in market share

19   from X date to Y date or at any point in time that quantifies,

20   that demonstrates the loss of a market share on a broader front

21   than in the individual bid?

22        MR. ROBERTSON:  I think there are customers that were

23   ePlus customers that were lost to Lawson.  Gannett is one that

24   comes immediately to mind, and Mr. Farber testified about that.

25   It's also -- part of the problem is, trying to determine lost

1   market share is difficult to do.  Remember, this RFP process is

2   often done in secret.  We often don't know sometimes when we

3   lose a customer who we --

4             THE COURT:  Mr. Hager said you always know who you

5   are on the short list with according to the brief that Lawson

6   filed, and I think he did say that, didn't he?

7             MR. ROBERTSON:  I think you are right.  I think it's

8   directly in conflict with what Mr. Lohkamp testified at trial.

9   He agreed that these RFP processes were often done in secret

10  and he didn't know who the competitors were.

11            So you have two Lawson's employees who are directly

12  contradicting each other.  You know, I can't tell which of

13  those is telling the truth, but I can tell you there's a direct

14  conflict with respect to those two things.

15            Mr. Lohkamp agreed with Mr. Farber that it's done in

16  secret and they don't always know who their competition is.  So

17  when we lose a customer, it's not always clear whether it was

18  because of Lawson or not because of Lawson, but I can certainly

19  say --

20            THE COURT:  You don't think it's fair to infer that

21  the salespeople go out and take the -- that the ePlus

22  salespeople go out and take a customer, go have a martini and

23  say, look, tell me what I did wrong, I'd like to improve my

24  self better, who was I competing with, by the way, and three

25  martinis later out it comes?

1           MR. ROBERTSON:  I'd be certain --

2           THE COURT:  You can't make a martini?

3           MR. ROBERTSON:  Shaken, not stirred.

4           THE COURT:  Actually, that is a terribly, terribly

5     bad thing to do to a martini.

6           MR. ROBERTSON:  It bruises the martini.

7           THE COURT:  If it's a gin martini.  Vodka is

8     incapable of being bruised.

9           MR. ROBERTSON:  Your Honor, I have no doubt that

10    happens with any salesmen, whether it be for Lawson --

11          THE COURT:  But there's nothing in the record that

12    shows that, is there?

13          MR. ROBERTSON:  There's -- I'm not certain.  I think

14    Mr. Farber testified on some occasions he does learn through

15    the process who his competition may be.

16          THE COURT:  But not always.

17          MR. ROBERTSON:  But not always.  So, Your Honor, I

18    would like to briefly address this issue about the past

19    licensing and somehow because we have voluntarily past licensed

20    on this somehow requires us to enter into a license that is

21    antithetical to us with a party that we, by the testimony of

22    Mr. Farber, unfortunately cannot trust and no longer want to

23    have to do any business and certainly doesn't want to have to

24    do any ongoing business with such as having to audit them or

25    come in and determine whether or not the royalties are being

1    paid in whatever way, shape, or form.

2         Indeed, you know, it could be very rational in this

3    sense --

4         THE COURT:  I'm having a little trouble understanding

5    the fundamental argument that licensing a product after you've

6    been in litigation about it is somehow evidence that cuts

7    against the issuance of an injunction.  Is there some case that

8    holds that?

9         MR. ROBERTSON:  The suggestion has been made, Your

10   Honor, though, in the patent troll context that some companies

11   just exist to license --

12        THE COURT:  You are not a patent troll.

13        MR. ROBERTSON:  That's right, Your Honor, so I think

14   we did cite the *Trading Tech* case which actually addresses the

15   specific situation where we've had to go through and actually

16   enforce our patent, litigate all the way through a jury trial,

17   and arrive at a verdict that that --

18        THE COURT:  Even after that, you were instructed by

19   the Court to go see if you couldn't settle it, and we assigned

20   a magistrate judge, at least in one case, to make you do it.

21   We didn't make you settle, but we made you talk about it, and

22   you all ultimately came to a resolution, and that's done --

23   isn't that done in courts throughout the country?  Don't other

24   courts do what we do?

25        MR. ROBERTSON:  Absolutely, and I think it would be

1   against public policy if we couldn't do that and if courts --

2   imagine, it would force patentees, in every situation, to

3   pursue the patent all the way through to conclusion, to appeal,

4   and to either grant or denial of certiori to the Supreme Court.

5           THE COURT:  And enforcement of the judgment.

6           MR. ROBERTSON:  I'm sorry, sir?

7           THE COURT:  And then enforcement of the judgment.

8           MR. ROBERTSON:  Exactly right.  And so there is a

9   public policy that favors settlement of patent litigation in

10  particular.  We cited the *Flex-Foot* case to Your Honor.  Also

11  the *Acumed* case cite, Your Honor, indicates that grant of

12  licenses to others, particularly even involved in litigation,

13  doesn't warrant the denial of an injunction.

14          The argument has already been made, and I find this

15  to be remarkable, that because ePlus did not seek a preliminary

16  injunction in this case, we should be denied a permanent

17  injunction now.

18          Now, that, again, would be a perverse incentive --

19          THE COURT:  I'm not going to sign on to that because

20  then all of my colleagues would rightfully write Congress to

21  impeach me.

22          MR. ROBERTSON:  All right, Your Honor, then I think

23  I'll move on.  Let me just talk a little bit about this

24  inadequate remedy at law.

25          THE COURT:  The inadequate remedy at law is the

1   royalty.

2           MR. ROBERTSON:  Well --

3           THE COURT:  Is that right?  They say the adequate

4   remedy at law that you have is a future royalty; isn't that

5   right?  Isn't that the contention?

6           MR. ROBERTSON:  I think they do contend that.

7           THE COURT:  Is there any other remedy at law that

8   we're talking about other than getting a future royalty?

9           MR. ROBERTSON:  I think that would be -- a

10  going-forward monetary remedy would be an equitable remedy,

11  first, Your Honor.  It wouldn't be a remedy at law.  And,

12  secondly, they rely on the *Paice v. Toyota* case which is

13  readily distinguishable from the facts of this case.

14          THE COURT:  But I'm trying -- listen to the question.

15  I'm trying to first make sure that I understand the parameters

16  of the question.  What I'm asking you is, don't they -- aren't

17  they saying that you have an adequate remedy at law because

18  there can be an ongoing royalty, and they are not contending

19  there is any other adequate remedy at law, i.e., isn't that

20  issue now added to that question?

21          MR. ROBERTSON:  Well, I think that's what they are

22  contending.

23          THE COURT:  That's what I'm trying to get at.  When I

24  ask what they are contending, if you answer yes, they are

25  contending, you don't give up anything.  You don't forfeit

1    anything.  At least give up if, in fact, they are contending

2    something.  There's an advantage to confession.  It's not only

3    good for the soul, it helps move litigation along.  That's the

4    issue, is whether or not -- the issue I have to be confronted

5    with in this case is whether or not a going-forward royalty

6    presents an adequate remedy at law that forecloses equitable

7    relief, and that's their position; right?

8              MR. ROBERTSON:  I believe that's their position, yes,

9    sir.

10              THE COURT:  You haven't read these briefs?

11              MR. ROBERTSON:  I have read the briefs.

12              THE COURT:  What else do you think they're suggesting

13   is an adequate remedy at law besides the going-forward?

14              MR. ROBERTSON:  I've seen them suggest that no

15   injunction should enter and no remedy at all should be --

16              THE COURT:  That's not an adequate remedy at law.

17              MR. ROBERTSON:  I believe they are arguing that a

18   compulsory license would be appropriate here, and they are

19   wrong on several fronts.

20              THE COURT:  Compulsory license would be one with a

21   royalty; right?

22              MR. ROBERTSON:  It would be one -- it could be a lump

23   sum license.

24              THE COURT:  Okay.

25              MR. ROBERTSON:  Conceivably.  It could be a running

1    royalty conceivably.

2          THE COURT:  How many courts have ever issued an

3    ongoing royalty or a compulsory upfront, one time, forward

4    payment instead of an injunction after a finding of

5    infringement?

6          MR. ROBERTSON:  Your Honor, I can't honestly answer

7    that question with a level of exactitude, but I would say

8    probably less than five.  There's two Federal Circuit cases,

9    and then there's perhaps a handful of district court cases, and

10   they are typically under very -- circumstances different from

11   the case at hand here.

12         For example, the only case that the defendant has

13   relied on here is this *Toyota v. Paice* case, and that is,

14   indeed, a very different case from what we have here.  The

15   patentee didn't manufacture any product.  Its inability to

16   obtain licenses was the result, the Court found, from public

17   misrepresentations it had made.

18         The jury's damage verdict, according to the Court,

19   indicated that the patent only had minimal value in relation to

20   the overall product which was an automobile, and that the

21   patentee had attempted to apply the value, the small value of

22   the patent to the entire value of the product, in this case the

23   automobile.

24         And so the district court had determined that an

25   injunction was appropriate under the circumstances, imposed a

1   royalty, went up to the Federal Circuit, Federal Circuit

2   sanctioned the compulsory license but returned it, or an

3   ongoing royalty, for a determination as to what the proper

4   royalty rate would be because the district court had not

5   articulated the standard.

6          THE COURT:  How would I set a reasonable royalty in

7   this case?  Let's assume that I find that this is a case that

8   calls for the setting of a reasonable royalty.  What evidence

9   would be available for me to set a reasonable royalty going

10  forward in your view?

11         MR. ROBERTSON:  I think it would be very difficult

12  for the Court to do it.  I think the Court could look at some

13  of the same evidence we had proffered for a royalty going

14  backward.

15         THE COURT:  Dr. Mangum's testimony?

16         MR. ROBERTSON:  Well, *Georgia-Pacific* factors and the

17  evidence that we put together in our offer of proof for Your

18  Honor, but let me just suggest to you the difficulty --

19         THE COURT:  What would that show?

20         MR. ROBERTSON:  Well, part of the problem that we

21  have here with making this determination, you may recall, is

22  that Lawson claims that they don't maintain information on the

23  profitability of these products.  Lawson maintains that they

24  don't have breakouts with respect to revenues concerning the

25  services which are clearly infringing activities that the jury

1    so found.

2              So the difficulty here which was present, even in our

3    determination of past damages and a reasonable royalty, would

4    be present going forward.  There are other problems as there

5    are no real clear guidelines as to how the Court can determine

6    what the appropriate terms are of a compulsory license.

7              For example -- let me give you some concrete

8    examples.  In our past licenses with Ariba, for example, we

9    were able to negotiate a cross license of all of Ariba's

10   patents, some of which we were concerned about.  Now, the Court

11   has great equitable powers, but they are not limitless.  I

12   think the Court --

13             THE COURT:  I don't think the Court has in its

14   equitable arsenal the power to contract for parties.

15             MR. ROBERTSON:  Excuse me?

16             THE COURT:  In its equitable arsenal, the Court does

17   not have the power to contract for parties in complex

18   situations, and has a Court ever ordered a compulsory license

19   on any term other than a reasonable royalty on the three or

20   four or five cases, the going-forward basis?  Have they ordered

21   anything other than a reasonable royalty to be a term of the

22   contract?

23             MR. ROBERTSON:  I cannot say for certain.  I have not

24   studied all of them.  In fact, some of them, of course, are

25   confidential even after -- the parties had asked the Court to

1    make them confidential going forward.

2              THE COURT:  But did the Court impose the terms?

3              MR. ROBERTSON:  The Court has attempted to impose

4    royalty rates on a royalty base such as --

5              THE COURT:  I know that.  I'm talking about other

6    terms such as, okay, you need to cross license this, you need

7    to do -- you need to give us access to your technology in these

8    particular patents that you have or your whole portfolio.  Has

9    any court ever done that?

10             MR. ROBERTSON:  I have not seen that, Your Honor, but

11   that's why compulsory licenses really should be disfavored,

12   because any license that the parties negotiate will much better

13   reflect the true market value to the patents including the

14   non-patented aspects side to it.

15             For example, with SAP, we negotiated a covenant not

16   to sue for five years.  Why?  Because we didn't want to see

17   each other for awhile.  We didn't want to be involved in

18   litigation.  We wanted finality and repose.  That was one of

19   the things we were able to do.  I don't think a district court,

20   in its equitable powers, could impose such terms.

21             There are other intangible terms such as the scope of

22   the grant that could come into play.  Certainly we would like

23   to make sure that any compulsory license would be limited such

24   that it was nontransferable, nonassignable.  As Your Honor

25   knows, right now, apparently, Lawson is on a shopping block,

1    voluntarily or involuntarily.  Just recently, N4 made a bid,

2    and now I understand from press releases Oracle may be in the

3    hunt.  So we're not even certain this company is going to be

4    around in a little while.

5           Another concern we have is, even with a compulsory

6    license, there are complications.  The Supreme Court, in its

7    *MedImmune* decision, has said that a licensee can file

8    essentially a declaratory judgment action at any time it

9    believes that it feels that the patents may be invalid, and it

10   has an interest in doing so.

11          So we could resolve this case, the Court could impose

12   a compulsory license, and a month down the road, Lawson could

13   say, you know what, we've come out with version 10.0.1, and we

14   tweaked a few lines of the source code, and we don't think we

15   infringe anymore, and we find ourselves right back here in the

16   same situation.  And it would be questionable whether or not we

17   even had the ability to have the Court to have contempt

18   proceedings with respect to that going forward on a compulsory

19   license.

20          I would also say one other thing, Your Honor.  While

21   the Federal Circuit has discussed these ongoing royalty cases,

22   and there are at least two examples, there's been some real

23   concern and some significant comment on whether or not Article

24   III judges actually have the authority to impose compulsory

25   licenses.

```
1              THE COURT:  You mean in the academic literature?

2              MR. ROBERTSON:  Yes, sir.  In fact, there's a recent

3     law review article that came out just a couple months ago that,

4     in fact, Article III judges don't have it.  There's certainly

5     no question the statute --

6              THE COURT:  Somebody is actually arguing a restraint

7     on the Article III power?

8              MR. ROBERTSON:  They are arguing the scope of the

9     Article III powers and indicating that certainly the statute

10    doesn't anywhere say that a court has authority to grant a

11    compulsory contractual relationship going forward

12    prospectively.

13             So I think there's some real question.  I think

14    that's going to be challenged in the future, but for the

15    present, the point I really want to make here is a compulsory

16    license just isn't appropriate in these circumstances, that we

17    are not in the Toyota v. Paice situation.  We are competitors.

18    We do want to enforce our right to exclude which also

19    constitutes the reason that we have an inadequate remedy at

20    law, because it is our right to exclude.

21             We do want to have the ability to increase our market

22    share.  We don't want an infringer to be out there in the

23    marketplace.

24             So if I could, Your Honor, I'd move quickly to the

25    balance of the harms which I don't think should detain us very
```

1    long.  Of course, we have cited the *Acumed* case to Your Honor

2    which is the effect of the injunction on customers, in this

3    case even patients, alleged by the infringer was irrelevant

4    under the prong of the injunction test.

5         Now, we can talk about it when we come to the public

6    interest, Your Honor, but it doesn't have anything to do with

7    the balance of harms here, and, indeed, the balance of harms

8    should not have and does not have anything to do with the harm

9    that may befall Lawson from its own acts of infringement.  That

10   harm is the consequence of the infringement, and that can't be

11   recognized at all.

12        There is -- so, Your Honor, we can talk about the

13   public interest for a minute, and as Your Honor knows, because

14   this was previewed at the evidentiary hearing, we think the

15   arguments made by counsel were overstated, they were inflated,

16   overblown, and largely unsupported, and they came forward with

17   two declarations, two hearsay declarations that were clearly

18   lawyer-crafted because they had the identical harm listed at

19   the very end, and as Your Honor determined, even when

20   questioning Mr. Hager, what's really going to happen here is

21   there's going to be some inconvenience and some costs

22   associated with these customers who are probably going to have

23   to transition to other non-infringing software, procurement

24   software, whether it be from one of our licensees or whether it

25   be from ePlus itself.

1          So when the Court asked Mr. Hager, what does it

2     really come down to, he said, well, it would be some

3     inconvenience, some extra costs, and I think he had said there

4     would be some morale issues.  I don't know if that's really

5     actually cognizable under the public interest, but this is a

6     procurement system after all.  This isn't some miracle drug or

7     some other medical device that is essential or critical to the

8     well-being of the public interest.

9          I mean, this is a procurement system that has

10    benefits.  It allows people to buy products probably more

11    quickly, more efficiently, and less costly, but at the end of

12    the day, that's not a public interest that warrants denial of

13    an injunction.

14         Indeed, that's a public interest that probably

15    involves every kind of innovative product, but the infringer

16    shouldn't be able to benefit from that.  Those affidavits that

17    were provided or declarations that were provided at the end of

18    the day didn't say that patients were going to die on the

19    operating table, and they essentially suggested that it would

20    be some inconvenience for us to have to go out and replace

21    this.

22         If Your Honor is concerned about that, we talked

23    about the possibility of having some sort of sunset provision

24    for those bona fide health care sector hospitals, for example,

25    to be able to transition out the software.  Indeed, I think the

1    range was anywhere from three to six months that could be

2    accomplished.  If Lawson had notified those customers two and a

3    half months ago because there was this grave concern about the

4    public welfare, that process would have already been occurring.

5    Of course they didn't do that which I think speaks volumes and

6    undermines the fact there is no real public interest here, just

7    for an inconvenience.

8            Again, Your Honor, I would suggest if there's some

9    concern about that inconvenience and cost to those customers,

10   Lawson and its customers have already taken that into account

11   through the indemnification provisions that they freely entered

12   into.  Indeed, more than two-thirds of Lawson customers are in

13   industries outside of the health care sector.  Not one of them

14   came forward and said that the sky is going to fall if, indeed,

15   an injunction is entered.

16           They would do exactly what Your Honor suggested they

17   would do if some crisis occurred or some bankruptcy occurred.

18   They would make do.  They would procure things the

19   old-fashioned way, or they would rapidly move to a different

20   type of procurement system that could be done on a very short

21   basis.

22           So we would think, Your Honor, that the suggestion

23   that this procurement software is so vital to the public

24   interest that it warrants a denial of an injunction just has no

25   basis.  Indeed, we cite a number of cases which were involving

1    significant medical devices in our briefs in which the Federal

2    Circuit affirmed the district court's grant of an injunction

3    notwithstanding that there was no dispute that these products

4    were important to the public welfare such as an --

5              THE COURT:  Was an injunction issued in the *NIS* case?

6              MR. ROBERTSON:  Excuse me, sir?

7              THE COURT:  Was an injunction issued in the *NIS* case,

8    the BlackBerry case?

9              MR. ROBERTSON:  The *NTP* case?

10             THE COURT:  *NTP*.

11             MR. ROBERTSON:  Yes, it was.  In fact --

12             THE COURT:  Are these any more critical than

13   BlackBerrys?

14             MR. ROBERTSON:  No, sir.  In fact, everybody said the

15   sky was going to fall --

16             THE COURT:  Including the Defense Department.

17             MR. ROBERTSON:  Excuse me, sir?

18             THE COURT:  Including the Defense Department.

19             MR. ROBERTSON:  Including every aid on Capitol Hill

20   who said they couldn't communicate with each other.

21             THE COURT:  That would have been a blessing.  In

22   fact, that's probably why the injunction.

23             MR. ROBERTSON:  Exactly.  So the public interest

24   there was well overstated as well, and the world did not come

25   to an end.  So with that, Your Honor, I think unless the Court

1    has any additional questions, that's all I have on that issue.

2    Thank you.

3              THE COURT:  Take a 15-minute recess.

4

5              (Recess taken.)

6

7              MR. ROBERTSON:  Your Honor, if I may make one

8    clarifying point -- I apologize -- with respect to your last

9    question.  You asked me about the *NTP* injunction, whether it

10   was entered by Judge Spencer.  My colleague, during the break,

11   Ms. Albert, who actually represents NTP now in the case that's

12   pending before Judge Spencer and is familiar with the prior

13   proceedings, reminds me that Judge Spencer signed the order,

14   gave it to Judge Dohnal, but it was not, in fact, entered.

15             Judge Dohnal informed the parties that it was going

16   to be entered that day and the case settled.  So to the extent

17   I misspoke, I apologize.

18             THE COURT:  All right.

19             MR. McDONALD:  There's no public record, certainly,

20   of any injunction.  He's talking about what had happened in

21   settlement discussions behind closed doors.  I don't that I

22   have a way to respond to that, but I know that there's no

23   public record of an injunction being entered in that case.

24             May it please the Court, Mr. Robertson talked

25   initially about the property right and the right to exclude,

1    and I'd like to address how *eBay*®, the Supreme Court decision,

2    *eBay*® decision dealt with that, acknowledged that the Patent

3    Act declares the patents shall have the right -- the attributes

4    of personal property, and those rights include the right to

5    exclude.  That's at page 547 U.S. at 392, but the Court noted

6    that the Patent Act itself indicates that patents are subject

7    to the provisions of this title including, presumably, the

8    provision that injunctive relief may issue only in accordance

9    with the principles of equity.  That is citing 35 U.S.C.

10   Sections 261 and 283.

11          So that property right still does not create any sort

12   of a presumption in favor of injunctive relief.  We still have

13   to go through the four-factor test that, as the Court has

14   recognized, existed well before eBay® came along where the

15   plaintiff has to demonstrate under those four factors it's

16   entitled to an injunction.

17          And the most important factor there and the one

18   that's headline in terms of what's missing in this case is the

19   irreparable harm to ePlus.  The purpose of an injunction you

20   see talked about in some of these patent cases such as the

21   *Hynix* case that we cited and the *Broadcom* case, looking at the

22   patent cases and the injunction issued, noted that the purpose

23   is to relieve future harm to the patentee, not to punish for

24   the past.

25          So if there's no future harm to ePlus that's going to

1    be relieved by an injunction, it should be denied.  And in this

2    case, there is no evidence that ePlus is going to be harmed if

3    an injunction is denied.

4            ePlus is the entity that is seeking the injunction

5    here.  The question is the harm to it.  Less than one percent

6    of it is in the procurement software business if you look at

7    their revenues.  It's a money-losing division.  It's lost money

8    for each of the ten years ePlus, Inc., has owned it.

9            ePlus, Inc., is just fine after ten years of bleeding

10   over $30 million, I believe, in losses from this division, and

11   there's no evidence that ePlus is going to be harmed in the

12   future if there's no injunction granted here.

13           The competition is what ePlus wants to talk about and

14   put up these pie charts to suggest there is competition, but

15   when you really look at what's going on here and the specific

16   customers they have talked about, you realize that none of that

17   information actually proves any harm to ePlus.  They aren't

18   going to lose sales if Lawson is allowed to continue selling

19   RSS and Punchout.

20           One of the tell-tail signs of that is when ePlus was

21   losing sales, specifically in its procurement software division

22   just weeks before it sued Lawson and the other defendants back

23   in the spring of '09.  The Court may recall we had some

24   testimony at trial from the CFO of ePlus about that.  They

25   announced in an SEC disclosure that they were writing off the

1  good will of this division, about $4 million plus, because

2  sales were down and were expected to continue to be down

3  specifically in the area of procurement software which would

4  include these Procure+ and Content+ products.

5         Certainly just a few weeks before they sued Lawson,

6  they knew about Lawson.  They had us in mind.  They could have

7  said, if it was actually true, it would have been a perfect

8  opportunity for them to say, oh, and our sales are down because

9  we've got competition from Lawson, but they didn't say that.

10 They said it was due to the global credit crisis and attributed

11 it to factors that have absolutely nothing to do with Lawson.

12 They acknowledged that there was a truthful disclosure of the

13 reasons why their sales were down even though Lawson was

14 competing, according to them, in 2009 in that marketplace.

15        If we were really taking sales from them, when they

16 did that SEC disclosure about the fact that they were losing

17 sales in proximity to bringing this case, they should have said

18 that Lawson was a factor, and the fact that they didn't really

19 proves that Lawson has nothing to do with it.

20        THE COURT:  So you get off scot-free because you

21 violated their property rights?

22        MR. McDONALD:  No, Your Honor.  We do propose, as the

23 case law, and the *Toyota v. Paice* is one case, I think the

24 *Presidio* case that we cited is another example, and there are

25 some other cases where ongoing royalties have been awarded by

1    the Court as an alternative to injunction.

2              THE COURT:  How would I calculate an ongoing royalty

3    here that would pass your muster?

4              MR. McDONALD:  Well, what we have now that we didn't

5    have before trial is a situation that can really set up an

6    analytical framework for the Court, and that is the fact that

7    now we have the jury finding that the core procurement product

8    suite of Lawson, the IS, the IC, the PO, and the RQ, that core

9    procurement set together with the foundational stuff does not

10   infringe.  But those products in combination with RSS and/or

11   Punchout -- Punchout needs RSS -- do.

12             And you do have some cases out there, and we haven't

13   briefed certainly the royalty issue, but one case that comes to

14   mind for me, Your Honor, is -- I believe it was the *Cornell*

15   case where Judge Rader sat as trial judge, and he went into

16   fairly detailed assessment of the damages, and one of the

17   principals that he was espousing in that case was when you are

18   looking at the appropriate damages here for a royalty, you

19   really have to look at the revenues that are specifically

20   attributable to the product, the device, et cetera, that

21   actually gives rise to the infringement.

22             So in our case, we price à la carte, separately, our

23   RSS and Punchout modules.  They sell for around, I think,

24   $19,000 or so, and then you pay -- or the customer pays, I

25   believe it's something like $100 per user, so that's actually

1    priced, it's been priced long before this case came along.

2    They have a duty to price things appropriately for accounting

3    purposes so there's no sort of a jiggering of when revenues are

4    realized.

5           These are bona fide pricing of these products, and so

6    you've got that as your analytical framework to take a look at

7    that incremental revenues for those customers that specifically

8    want that functionality.  You could then apply Lawson's profit

9    margins to that.

10          THE COURT:  I thought you didn't calculate profit

11   margins on this product.

12          MR. McDONALD:  We don't calculate profit margins

13   specific to a product, but we have it for the overall software

14   product line, and it would be a reasonable inference to take

15   that profit line and attribute it to an individual product

16   within the line.

17          THE COURT:  What is that?

18          MR. McDONALD:  I believe the operating margin is

19   around eight or ten percent, and the gross margin, I think, is

20   substantially higher than that.  I think it's over 50 percent

21   somewhere.  So you look at both of those, but the net would be

22   closer to the eight to ten percent figure.  And then you can

23   have an expert take a look at that data -- get to that point in

24   the first place to help run those numbers, but then look at the

25   attributes of those RSS and Punchout products and are there

1    attributes of them unrelated to the patented technology, are

2    there attributes related to the patented technology --

3    obviously, there's some -- and try to figure out what portion

4    then of those revenues from those products is fairly attributed

5    to the patentable invention.  There is a way to do that, and so

6    that's certainly a viable option here.

7            So with respect to -- if I can return then to the

8    harm issue --

9            THE COURT:  Do you consider that there's any remedy

10   at law that's adequate other than an ongoing future royalty?

11           MR. McDONALD:  No.  And to be fair, I'm not even sure

12   you'd call it a remedy, a legal remedy as opposed to an

13   equitable remedy, but when you see these cases --

14           THE COURT:  If it's not an equitable remedy, then

15   there's no adequate remedy at law at all.  If it's an equitable

16   remedy, then perforce, definitionally, it's not a remedy at

17   law.

18           MR. McDONALD:  When you see these cases like the

19   *Paice* case and *Presidio*, etcetera, they're treating that

20   going-forward royalty as an alternative --

21           THE COURT:  Has any court ever tested whether or not

22   a court has the power to do this, the jurisdictional Article

23   III power to do that?

24           MR. McDONALD:  I haven't seen a decision that has

25   challenged whether a court would do that.  In the *Toyota v.*

1    *Paice* case --

2              THE COURT:  They all assume you can do it.

3              MR. McDONALD:  Well, they find that it's something

4    that a court can do as opposed to a jury, so you've got some

5    analysis, and the Federal Circuit decision in the *Toyota v.*

6    *Paice* case, I think, would relate to this.

7              THE COURT:  You're saying it doesn't trench on the

8    jury right of a litigant under the Seventh Amendment; right?

9              MR. McDONALD:  Right, because it's a moving-forward

10   --

11             THE COURT:  That's not the same issue, whether the

12   Court has the power to do it, and I've never seen a

13   forward-going royalty that doesn't have some kind of contract

14   terms to it.  In the cases where this has been done, I didn't

15   see any contracts that the courts approved.  They just

16   arbitrarily said, or not arbitrarily said, there's a percentage

17   and that's the royalty.

18             MR. McDONALD:  Right.

19             THE COURT:  And that's hunky-dory, and that ignores

20   the business reality of the way that licenses are arrived at,

21   it seems to me, and I don't see how a court has the authority

22   to impose business terms on parties.  Even if you do have the

23   right to impose, to say, there's an ongoing royalty of X

24   percent per product or whatever it is, the power to say, well,

25   you've got to cross license it and it's not assignable and all

```
1    of the things that typically go with royalties -- of course, a
2    lot of them don't have cross licenses, but most of them I've
3    seen have some provision on assignability, so you have to
4    decide one way or another whether it's assignable, and I don't
5    know how a court has authority to do that.
6         MR. McDONALD:  Well, I think the cross licensing
7    issue, that simply would not be part of what a court would
8    order.  There would be no duty for anybody to cross license.
9    You figure out the value of the technology without those sort
10   of extra parameters and terms that you might have in a business
11   deal.  That might make the royalty a little higher because the
12   patentee doesn't get additional rights for it.
13        THE COURT:  How do we deal with a situation that your
14   company might be sold in whole or in part, and any smart lawyer
15   dealing with a transaction can figure out a way to scotch their
16   payments of royalty in this case?  How do I deal with that?
17        MR. McDONALD:  I'm not sure any lawyer can do that,
18   Your Honor.
19        THE COURT:  They wouldn't do it?
20        MR. McDONALD:  I'm not sure that they -- what do you
21   call it -- scotch the royalty and get around it.  I don't know
22   that you can do that.  I think especially when the Court has an
23   equitable remedy like this, I don't assume that the Court is
24   going to be powerless to deal with some sort of inappropriate
25   re-jiggering of things.
```

1          It's very speculative at this point, Your Honor.  I

2     know there's a headline or two that Mr. Robertson has talked

3     about, but there's nothing that's imminent here that I'm aware

4     of anyway, and I've been in touch with the general counsel on

5     this.  At this point it could happen, I suppose, any day, or it

6     could happen never, I don't really know, but it seems like

7     that's not the sort of thing to decide this on.

8          It wouldn't be the first time that somebody, just

9     under a license agreement, had changed ownership.  Some

10    agreements deal with that, some of them don't.

11         THE COURT:  You have to deal with it to preserve the

12    situation for them here.  In other words, to make it an

13    adequate remedy, you'd have to make sure that it traveled, and

14    that means writing a term into an order that says this license

15    travels with the product, and what authority does the Court

16    have to do that?

17         MR. McDONALD:  Well, I think we've got a decision

18    against us, or the verdict anyway is directed to a specific

19    product, and if the Court upholds that decision by the jury,

20    they direct the Court's injunction to that and to the party --

21    Lawson and anybody in active concert or participation with

22    them.  I think there's a lot of mechanisms that already exist

23    with respect to injunctions that contemplate the sort of

24    situations such as an acquisition.

25         THE COURT:  With respect to injunctions, that's

1    right.  An injunction, perforce, has to travel.

2              MR. McDONALD:  Right.

3              THE COURT:  That's different.  You don't want an

4    injunction.  You want an order for them to pay money, and --

5              MR. McDONALD:  The same sort of power the Court has

6    with respect to the injunction that would contemplate dealing

7    with that situation if there's an requisition.  I don't think

8    there's any doubt the Court would have similar power if it

9    awards the alternative remedy of the ongoing royalty.  We can

10   deal with it in both cases.

11             THE COURT:  I know the *Paice* case dealt with what

12   truly was a gnat-on-a-mastodon situation.  It was a very

13   minuscule part that was involved.  What about the other cases?

14   Is there anything analogous in the other cases to the record

15   here?

16             MR. McDONALD:  Well, I think, I mean, I've got a

17   number of cites here.  I think certainly there was some where

18   the product involved was not just a little part of a bigger

19   problem.  You are talking about in *Toyota* how technology was a

20   just a little part of the whole automobile?

21             THE COURT:  Yes.

22             MR. McDONALD:  I think some of these other cases

23   certainly didn't involve a situation where they involved some

24   medical devices and things like that that would not be

25   analogous.  *Boston Scientific* is a 550 F. Supp. 2d 1102 case

1    that there wasn't an ongoing royalty ordered.  I am not a

2    hundred percent sure of the facts there, but I don't think it

3    was a situation analogous to a part of an automobile.  That's

4    an example, anyway.

5            In fact, I think there's even a case involving

6    procurement-related software.  Ariba was involved in a case

7    where an ongoing royalty was awarded in 567 F. Supp. 2d 914.

8            THE COURT:  Where was that?

9            MR. McDONALD:  Eastern District of Texas.  Boston

10   case was the Northern District of California.

11           THE COURT:  All right.

12           MR. McDONALD:  So if we return now to the irreparable

13   harm issue, the evidence really shows here that there are many,

14   many competitors in the e-procurement area that are

15   best-of-breed competitors with ePlus that take a lot of -- that

16   take their sales from them.  They are the ones competing with

17   them.

18           Ariba and SciQuest are two good examples of that

19   because they are a couple involved with the customers that

20   ePlus mentions here where they tried to say, oh, we lost

21   something to Lawson.  Well, Novant wound up buying the Ariba

22   product, not Lawson's.  Cleveland Clinic wound up buying the

23   SciQuest product.  That's where they were going head to head,

24   and that's who they were losing that business to.

25           It's interesting Mr. Robertson cited that Forrester

1   Wave report from March of 2011, the one that he put in front of

2   Mr. Hager that's somehow showing the marketplace here.  The

3   Court might remember, that was the questioning about the little

4   dot versus the bigger circle, and Mr. Hager, and I think the

5   Court saw that, too, that the ePlus line actually went to the

6   little dot and not the big circle.

7           Well, the little dot was obviously the smallest

8   presence in the marketplace according to that chart, but I

9   think the headline was buried there which was to even be in

10  that chart, that report says, in effect, to be considered a

11  player in that procurement market space, you had to have annual

12  sales of at least $15 million.

13          Well, there's no dispute here that ePlus's sales have

14  never been $15 million in a year.  Their most recent years,

15  they're in the neighborhood of 5- or $6 million.  They didn't

16  even qualify to be the dot on that report, so we're really --

17  so what's the implication of that?  Well, that means --

18          THE COURT:  Was ePlus in the dot -- I mean on the

19  chart?

20          MR. McDONALD:  They were on that chart with that

21  little teeny dot.

22          THE COURT:  How did they get on the chart if their

23  sales weren't $15 million?

24          MR. McDONALD:  Forrester had bad information.  We

25  didn't write the report.  ePlus didn't write it.  They put it

1   in front of Mr. Hager, but the fact is, the report says to be

2   on the chart, you have to be at least 15 million a year, and

3   ePlus wouldn't have met that threshold.

4            They shouldn't have been on there.  It was an error,

5   and they are relying on it, and they shouldn't be.  So what

6   that means is, if Lawson is enjoyed -- ePlus is less than one

7   percent of the market out there.  I think to even use that

8   digit is an overstatement fairly grossly.

9            Lawson, if they are enjoined, those sales are going

10  to go to the Aribas, the SciQuests, the Perfect Commerces of

11  the marketplace.  They're not going to go to ePlus.  They've

12  got --

13           THE COURT:  How do you know that?

14           MR. McDONALD:  Pardon?

15           THE COURT:  How do you know that?

16           MR. McDONALD:  Well, because of this market data.  We

17  can see they just aren't a player in this market.  They

18  haven't --

19           THE COURT:  If you are out of it, there's another

20  choice then.  Maybe the whole dynamic changes with you out of

21  it.

22           MR. McDONALD:  Well, you've got some parts of the

23  marketplace that would show you that ePlus isn't a player,

24  because there are already parts of the marketplace where Lawson

25  doesn't compete, but ePlus is still only making these three or

1    so sales a year.  They are still a minuscule player.  For

2    example, those customers who are not looking for ERP systems,

3    they just want procurement software, the testimony showed you

4    Lawson doesn't even try for that business.  We're not in that

5    market.  If a customer --

6                THE COURT:  You can't be harmed by not being able to

7    get it, can you?  If you don't try for the business, it's just

8    an ancillary thing, you don't have any harm by an injunction at

9    all.

10               MR. McDONALD:  Right.

11               THE COURT:  That solves the balance of the hardships;

12   they've got some, you have none.

13               MR. McDONALD:  I'm not sure if I understand what you

14   are saying.  They've got a marketplace that we don't get into,

15   and yet they still have -- they're still losing money every

16   year.  They still have almost none of the market.

17               That's also true of those ERP customers that have ERP

18   systems today, but they don't have Lawson.  There's 98 percent

19   of the market that doesn't have Lawson.  Again, Lawson isn't

20   going to compete for adding Lawson's procurement product to a

21   SAP or McKesson ERP system.

22               THE COURT:  If you don't compete for the RSS and the

23   Punchout and just the procurement part of it, how are you hurt

24   by an injunction?  You're not.

25               MR. McDONALD:  We can't sell our products.

1          THE COURT:  But you're not hurt because you are

2    enjoined from selling it somewhere where you don't compete

3    anyway.

4          MR. McDONALD:  Right.  If we're enjoined from not

5    selling it to ERP providers or to -- as standalone systems, you

6    are right, that would not harm Lawson at all.  I would agree

7    with that, but if you estopped us from selling to our own

8    customers who already have our suite or sold in the --

9          THE COURT:  What do you mean, selling to your own

10   customers?

11         MR. McDONALD:  Pardon?

12         THE COURT:  I don't know how you sell to your own

13   customers.  You already got them.

14         MR. McDONALD:  Right.  They are an ERP customer, so

15   they are a Lawson customer, but they don't have RSS or

16   Punchout.  So that's what we're talking.  You can call them a

17   Lawson customer.  That's why a --

18         THE COURT:  You're not going to go to get them

19   anyway.  You don't go to them and say, look here, why don't you

20   take this RSS and Punchout.

21         MR. McDONALD:  Well, they ask us for the product.

22         THE COURT:  We are talking over each other.  If

23   they've got your system but they haven't gone for RSS and

24   Punchout, why should you be allowed to sell them anything?

25   You're not going to go to them privately and say, why don't you

1    take the RSS and Punchout, too.

2            MR. McDONALD:  We do market our products to our

3    existing customers, and they'll come to us, we'll go to them.

4            THE COURT:  So you do market RRS and Punchout to

5    people who have your base system.

6            MR. McDONALD:  Exactly.

7            THE COURT:  Okay.  And so could these people, ePlus,

8    couldn't they?

9            MR. McDONALD:  In theory, they could.  The reality is

10   when you look through this list of their reported lost sales,

11   not a single one of them actually involved a loss to Lawson

12   from Lawson selling that customer RSS or Punchout.

13           Mr. Robertson mentioned PPD.  That's a customer

14   Lawson submitted a proposal to them for RSS, but PPD did not

15   buy Lawson's product or ePlus's product, so they didn't lose

16   that sale to us.  This is their example.

17           You look at their specific examples.  We set it off

18   in our brief opposing the injunction at pages seven through

19   nine here where we go customer by customer, and you see none of

20   these are actual losses to Lawson because Lawson sold them RSS

21   or Punchout.  LHC was mentioned as well.  That's one of these

22   ones on the pie charts.  This is just another example of why

23   those pie charts really don't mean anything.

24           LHC already had Lawson's system.  They bought it

25   months before.  They had already gone through the bidding

1    process.  ePlus wasn't part of the process, part of the party,

2    but they put it on their list of competition because they sent

3    this customer a generic email.  You see it in our findings of

4    fact cited at 61 and 62.  It's just plug in the name of the

5    prospect, dear so and so, gee, we've got these products, we'd

6    like to talk to you about these products.  It's an email from

7    an ePlus salesperson, and they write back and they say, well,

8    no, thanks, we've already got a Lawson product so we're not

9    interested in bidding it out again, but that's something where

10   literally ePlus could send an email to every company in the

11   country like that.

12          Now they can say, we blanketed the country, we're

13   marketing our product.  We're actively targeting and soliciting

14   everybody, but that's not real competition.  That doesn't prove

15   anything, and it doesn't prove they're going to be harmed

16   unless we're enjoined.  That's the tenuous connection here.

17          THE COURT:  You are saying it has to be competition

18   before an injunction can issue.  Has any court ever held that?

19          MR. McDONALD:  No, I don't think it's quite that

20   blanketed, but in a case like this, Your Honor --

21          THE COURT:  That's your point.  Your point is that

22   there's no competition, ergo, there can be no injunction, and

23   there's no case that I have read that you cited or elsewhere

24   that holds that that I know of.  Is there?

25          MR. McDONALD:  There are cases that say when the

1    plaintiff is saying that their harm is related to

2    competition -- that *Advanced Cardiovascular* is an example.

3    They say you've got to show more than that.  You have to show

4    there's actual lost sales or price erosion or something like

5    that.

6            Competition is, perhaps, a starting point here for

7    the analysis.  The competition in itself does not prove

8    irreparable harm, and the reason there's not a blanket rule on

9    that is because there is -- even in the *eBay*® decision of the

10   Supreme Court they recognize, well, we can't have an absolute

11   rule on this because a university, for example, that's in the

12   business of research, they don't sell their own products.

13           Well, licensing is important to them.  They've got a

14   different business model.  Well, we might give them an

15   injunction even absent competition if you're a university

16   research organization.

17           Well, that's not our case, so, yes, it's not a

18   general rule that you have to have competition, but ePlus is

19   the one saying that that's the genesis of their harm here.

20   They're the ones contending that's how they satisfied the first

21   prong of the injunction test, and we're simply saying that

22   proof doesn't do it.

23           Competition is not sufficient in itself to show harm.

24   You've got to show the actual lost sales or price erosion, and

25   none of that was shown here.

1          Now, when you look at that market research, you do

2     see that there -- in fact, ePlus and Mr. Farber admitted that

3     there are dozens of best-of-breed providers.  They are the ones

4     that they're actually going head to head with out there.  They

5     are the ones that even if Lawson is not enjoined, they are the

6     ones likely to make the sales.  Just look at market shares and

7     how ePlus has less than one percent of that market.

8          It's highly unlikely that they'll make any sales

9     there at all, especially when they're starting from a base of

10    only two or three or five customers a year.  What are the

11    chances of them making -- statistically maybe they make one

12    tenth of a sale.  It doesn't add up here when they have such a

13    small part of the market.

14         Now, on the issue of --

15         THE COURT:  Suppose I've got a property right and I'm

16    starting up in the market and I find you are infringing.  I

17    don't have very many sales, but my plan is to go market, and

18    I'm going to go into the same market you are in, but you are

19    infringing my product and I can't crack the market.

20         MR. McDONALD:  That would be a situation where you

21    might consider an injunction.  That's not our case.  They've

22    had over ten years after they bought it from ProcureNet who

23    also was marketing this thing.  The patents were filed in 1994.

24    They've had that technology now for 17 years.  ePlus has owned

25    it since May of 2001.  We're just about --

1            THE COURT:  When does the patent run out?

2            MR. McDONALD:  The '172 patent runs out in 2014,

3    August of 2014.  That's the only one that affects the RSS

4    product.  And then the '683 patent runs out in 2017 which is

5    17 years after the RSS patent issued, because there was a

6    change in the law in 1995 on how you compute the time frames.

7    That's why they each have a different expiration date.  So RSS

8    and Punchout are subject to two different patent terms at this

9    point.

10           THE COURT:  The way you all litigate, by the time I

11   finish doing any royalty issues, 2014 will have come and gone.

12           MR. McDONALD:  We might be getting pretty close, Your

13   Honor, but it wasn't --

14           THE COURT:  That looks to me like a classic violation

15   of the shot clock.

16           MR. McDONALD:  That's a long shot clock, and even

17   that one is getting violated here, but ePlus is the one who had

18   control.  They alleged that Lawson has been infringing with its

19   RSS product since 2002, and they waited until 2009 to do

20   anything about it.

21           That's evidence of a lack of irreparable harm,

22   sitting around on that.  If you were really being irreparably

23   harmed, you should have done something, write a letter or

24   something about it in the meantime.  So that's certainly -- the

25   fact that we're near the sunset of this patent portfolio really

1   is a factor that weighs against an injunction.

2            You are causing a lot of disruption to Lawson's

3   business and its customers for a relatively short time frame in

4   terms of what's really left here, especially as to the RSS

5   related patent.

6            In fact, the *Hynix* case, one of the principles that

7   the Court there talks about when they were denying the

8   injunction even though there was some competition is that the

9   Court must be mindful that an injunction can impose

10  disproportionate costs on an infringer and the public without a

11  commensurate gain to the patentee.

12           That's really what we're talking about here, is that

13  ePlus isn't going to gain sales from an injunction in this

14  case.  There's really no evidence of that.

15           I'd like to turn now to an issue related to the scope

16  of the injunction, if I may, on the idea of enjoining Lawson

17  from servicing or supporting existing customers.

18           And the context here is ePlus is getting relief that

19  they're not entitled to.  Forget the *eBay*® factors.  It simply

20  would not be something that's the subject of relief whether

21  it's an injunction or royalty or anything else.

22           THE COURT:  They say that that conduct was found as

23  infringing conduct, indirect infringement; right?

24           MR. McDONALD:  Yes, they do.

25           THE COURT:  And the jury returned a verdict that

1   would permit a conclusion that there was indirect infringement;

2   right?

3            MR. McDONALD:  That was, I think, part of the list of

4   the verbs that were in the one question to the jury.

5            THE COURT:  You didn't ask for any other verdict

6   form, did you?

7            MR. McDONALD:  Not on that issue, I don't think.

8            THE COURT:  So you are stuck with the results of it.

9   So you've been found to violate, have violated the law by

10  indirect infringement because there was proof, and they argued,

11  and you all went to the jury on it as to whether servicing and

12  supporting existing customers was indirect infringement.

13           That was an instruction issue, and we dealt with

14  that, and so now you've been held to have indirectly infringed

15  by doing that conduct, and you say, but the injunction can't

16  reach that far.  Why not?

17           MR. McDONALD:  It has to do with the relief for the

18  activities that are specific to pre-complaint activities that

19  the Court has found that there's no entitlement to damages.

20           THE COURT:  I don't understand what you just said.

21  What I'm asking you is, having been found guilty of having

22  violated, of infringed indirectly by doing this conduct, that

23  is servicing and maintaining existing customers, why isn't

24  prospective injunctive relief appropriate?

25           MR. McDONALD:  The verdict form didn't say servicing

1    existing customers, so we don't have a finding on that.

2              THE COURT:  What do you do?  That's what the jury was

3    instructed on.  That's what you all argued on, and you

4    supported them, you helped them put it in, and you maintained,

5    and you've got income from that, and there was testimony on

6    both sides about whether that actually happened and the extent

7    to which it happened, and the jury returned a verdict, and that

8    was what you all argued, you against indirect infringement,

9    they for indirect infringement.

10             So while you don't have a specific finding because

11   you didn't ask for a verdict form that had one, that's a

12   general finding, and that's what I have to live with.

13             Now, I conclude that the jury verdict finds and the

14   trial record shows that you've indirectly infringed by

15   supporting and maintaining existing customers.  Why isn't that

16   a topic for prospective injunctive relief?

17             MR. McDONALD:  I think there's a couple issues there.

18   For one thing, when you actually look at the testimony and the

19   evidence that was provided specific to the support issue and

20   the maintenance issue, there was basically one question and one

21   answer from Mr. Weaver.  It was a long question, a leading

22   question where he said why that's infringing, too.

23             And you can't prove infringement based on conclusory

24   testimony like that.  We're now zeroing in on a particular form

25   of infringement, and it's a legitimate question to ask now that

1    relief is the issue at hand.  If you want relief against

2    ongoing service, what's the evidence?  Would there be evidence

3    to support --

4             THE COURT:  I'm asking you why that isn't an

5    appropriate -- you have passed that point, Mr. McDonald.  The

6    jury has found that the evidence was sufficient for the -- for

7    you to have been found guilty of indirectly infringing the

8    product in that way.

9             Now the question is, when that finding -- and we

10   don't revisit the finding, we don't second-guess the jury.  We

11   say with that finding, why isn't an injunction appropriate.

12   Tell me that.

13            MR. McDONALD:  Well, because now we're on the issue

14   of relief.  Jury finding has to do with the liability issue.

15   Now we're talking about a separate issue, and those cases, the

16   *Fonar* and *Odetics* cases as well as the Supreme Court cases

17   cited in those cases, *Aro/Convertible* case, they talk about how

18   if a patent holder is not allowed to get damages for a product,

19   one case it was because of latches and the other case it was

20   because of a failure to mark the patent number, so they weren't

21   allowed pre-complaint damages.

22            So those sales are, in effect, out there.  They don't

23   get relief from them for damages.  Those cases hold that you

24   can't do an end-around that fact now by trying to get an

25   injunction against the defendant now servicing those customers

1    or against those customers' ongoing use of that product.

2              You've had your chance to get your relief by having

3    --

4              THE COURT:  Does it hold that you can't enjoin the

5    ongoing use, or does it hold you can't enjoin the servicing?  I

6    don't believe that those cases involve servicing.  It involved

7    enjoining the use of it by the infringing use, I believe.

8    Isn't that what happened?

9              MR. McDONALD:  In *Odetics* that's right, but in *Fonar*,

10   it did specifically talk about the ongoing service of the

11   infringing products which the Federal Circuit there said that's

12   akin to repair, and under the Supreme Court law, repairing even

13   a product that might have been found to infringe or a product

14   that was subject to a license, there's not a separate active

15   infringement for repairing such a product.

16             Service is akin to that, so you don't get relief

17   ongoing against servicing or damages for ongoing service if

18   those products weren't subject to a damages award in the first

19   place.  So *Fonar* is specific to services.

20             In our case, we've got the added issue not only were

21   they precluded from getting damages as a sanction under

22   Rule 37, but they have a burden of proof --

23             THE COURT:  I think you've got the record wrong on

24   that.  They were foreclosed from putting in testimony because

25   of the unreliability of the experts' report on royalties.  They

1   were foreclosed from the alternate methods of proof because

2   they had not told you in the 26 disclosures and any answers to

3   interrogatories that that was one of the ways -- that was their

4   theory of damages, and under Rule 37 it was precluded.  So

5   there's two different bases.

6           MR. McDONALD:  It was a two-step process, so that's

7   fair.  My point is, in addition to that, ePlus also has a

8   burden here.  They're seeking some sort of relief with respect

9   to pre-complaint products.  They had to show they would have

10  had an opportunity to get damages, but let's say the Court

11  didn't preclude --

12          THE COURT:  I'm not following what you are saying.

13          MR. McDONALD:  They didn't prove they marked the

14  patent number, so under section 287, they are not entitled to

15  damages before the complaint.  So this is an additional reason,

16  even if you put the sanction apart --

17          THE COURT:  There was a decision on this issue, I

18  believe.

19          MR. McDONALD:  No, but they have a burden of proof,

20  and they never even tried to meet their burden of proof on

21  marking.  They're coming in and seeking relief to estop us from

22  service --

23          THE COURT:  What are you talking about?

24          MR. McDONALD:  Well, this is very analogous --

25          THE COURT:  Wasn't the marking issue decided in the

1   pretrial stages?

2          MR. McDONALD:  Because it related to damages.

3          THE COURT:  It's entirely possible that I have this

4   confused with another case.  I have another case where the

5   marking issue was at the forefront of it, and I may have it

6   confused with the marking issue.

7          MR. McDONALD:  I do recall that you have another

8   case, and I think it has a little different scenario.  What

9   happened here is we moved for summary judgment on this before

10   the damages were out of the case, and it was denied, but

11   because damages then were out of the case, I don't think it

12   ever actually came to a head in the pretrial order or anyplace

13   else.

14          THE COURT:  Right.  It never came up in the

15   post-trial motions either, did it?  I mean in the Rule 50

16   motions, did it?

17          MR. McDONALD:  We haven't had -- not during trial.  I

18   guess during trial, that's right.  It didn't come up in those

19   motions, because, again, damages wasn't really the focus.

20   Relief there wasn't the focus.

21          THE COURT:  So now you want me to consider marking;

22   is that what you are saying?  How do I do that?

23          MR. McDONALD:  They have two strikes against them on

24   why they don't get any relief for pre-complaint sales of the

25   RSS and Punchout configurations.  One is the Court precluded

1    the damages as to those by rulings you've just referred to,

2    and, two, they didn't prove that they marked the patent number

3    because they let SAP have a license to sell this product out

4    there without any marking at all.

5           So they've got two reasons for that.  They are also

6    seeking an injunction without any limitations as to past sales,

7    so this would even grab products that were sold more than six

8    years before the complaint.  Lawson was selling RSS --

9           THE COURT:  But could you do that?

10          MR. McDONALD:  Pardon?

11          THE COURT:  Could the Court do that?

12          MR. McDONALD:  I don't think the Court can provide

13    relief of any sort to ePlus for sales that Lawson made that are

14    more than six years before the complaint was filed due to the

15    limitation of damages statute.

16          THE COURT:  Is there a case that holds that?

17          MR. McDONALD:  I think that the *Odetics* and *Fonar*

18    cases are the most analogous, because the premise there is that

19    you aren't entitled to damages for a sale, then you don't get

20    any sort of prospective relief for servicing the products sold

21    previously.  So I think it follows by analogy to those cases,

22    but I don't think there's one specific to that fact scenario.

23          THE COURT:  All right.

24          MR. McDONALD:  So really what these *Fonar* and *Odetics*

25    cases stand for is the idea that when damages are precluded for

1    whatever reason, the patent holder can't do an end-around that

2    by trying to extract a royalty from current users of those

3    pre-complaint devices because that, in effect, undercuts the

4    Court's denial of damages and their loss of the rights to

5    damages.  If it's a latches case or marking or whatever the

6    reason, you can't do an end-around that loss of relief there.

7          Now, ePlus really doesn't deal with that issue.  They

8    have a couple case cites in their brief on that that really

9    aren't on point at all.  The preemption devices case, there

10   they tried to say there was some holding that repair would be

11   infringing.  There, the defendant actually conceded that the

12   activities at issue were infringing.  The Court didn't decide

13   anything, and a doctrine that would go to repair would fly in

14   the face of that *Aro/Convertible* decision from the Supreme

15   Court anyway.

16         The *Mendenhall* case didn't get into injunctive

17   issues, so they don't stand for the propositions ePlus has

18   presented for them.  So I think the law is fairly unequivocal

19   there that if you lost the chance for damages for a given sale,

20   you can't come back later and get some prospective relief as to

21   that same sale.

22         THE COURT:  The marking issue is a what, an element

23   or a defense?

24         MR. McDONALD:  It is the affirmative duty of the

25   patentee to prove marking and satisfaction of 287.

```
 1              THE COURT:  Is that an issue in the final pretrial
 2   order as to the case?
 3              MR. McDONALD:  I don't believe so.
 4              THE COURT:  I don't recall it.
 5              MR. McDONALD:  I don't believe so.
 6              THE COURT:  So that issue is gone from the case by
 7   agreement.  What's the consequence of agreeing that it's not
 8   part of the case?  You can't base an argument on it -- if it
 9   was something that helps you, you're supposed to get it into
10   the case to get it tried; right?
11              MR. McDONALD:  They have the burden of proof on it.
12              THE COURT:  No, but if they have the burden of proof
13   and there's no issue on it, I mean, it is an issue which has
14   been satisfied because you all have agreed it's not a triable
15   issue.
16              MR. McDONALD:  Well, we made a record on it on the
17   summary judgment.  Once damages were out of the case --
18              THE COURT:  Summary judgment doesn't have anything to
19   do with this.  If you read the federal rules on the final
20   pretrial order, it supersedes everything, and you need to show
21   a different thing, a different standard.  You need to meet a
22   different standard even to get that amended, so it's
23   controlling, and if that's not an issue to be tried, I don't
24   see why I get into it at this stage of the case under Rule 16
25   -- I can't remember now the new amendment, whether it's (e) or
```

1   (f).  But anyway, it's the final pretrial order rule.

2           MR. McDONALD:  I guess I would understand it to be a

3   burden on ePlus.  If they're seeking a particular injunctive

4   breadth, they've got to show an entitlement to that, and they

5   haven't done it.

6           I think that's fair, whatever the pretrial order

7   says.  They've got the burden of showing their entitlement to

8   the injunctive relief, and they haven't done it.

9           Specific to the services beyond this issue, now,

10  whether there even could be any relief that the Court could

11  provide ePlus, when you look at the injunctive factors, this

12  one is a particularly compelling situation for denying

13  injunctive relief, because ePlus has never competed for

14  servicing Lawson customers out there.

15          There's zero evidence that this is some sort of a

16  harm to them that will be alleviated if Lawson is enjoined.

17  There's zero proof on that.  We have shown that it's going to

18  hurt existing customers.  We have systems right now that

19  sometimes take years to implement.

20          THE COURT:  You know, I have to tell you and I'm

21  going to find, I found Mr. Hager's testimony to be so

22  exaggerated, and I told him at the time to back away from it or

23  I was going to find this, I don't believe him.  He just

24  exaggerated and exaggerated and made more out of it than made

25  any sense, so I don't accept his testimony as credible.

1          Do you have any other evidence on that issue other

2    than Mr. Hager's testimony, because I don't buy what he has to

3    say.  He was a very effective lawyer, but that's about all.

4          MR. McDONALD:  We have our declarations from the

5    customers themselves.  There are two declarations that are in

6    evidence that talk about their needs here and that it does have

7    an impact on them if we're all of a sudden -- if they are all

8    of a sudden left without support here.

9          There weren't other options.  I think that is an

10   undisputed fact.  Whatever issues you have about Mr. Hager's

11   testimony, I don't think it's disputed here that nobody else

12   out there provides Lawson customers with that sort of support

13   services, so they really will be high and dry --

14         THE COURT:  They can have another system put in.

15         MR. McDONALD:  But the evidence does show that takes

16   a significant amount of time, especially in the health care

17   industry which Mr. Farber doesn't know about because they don't

18   have any hospitals as customers, at least not right now, but it

19   takes a lot of time to decide what you need, to solicit bids or

20   responses to the RFPs to get it down to the short list, to pick

21   somebody, to negotiate the contract, and then to implement that

22   system through your organization.

23         You're talking about some of these larger hospitals,

24   that's multiple hospitals, thousands of users, it takes a

25   significant amount of time.  I think at least a nine-month

1    period is probably pretty fast for this sort of thing, but at

2    least something in that neighborhood --

3              THE COURT:  According to Mr. Hager, that's right, and

4    I don't believe his testimony.

5              MR. McDONALD:  Well, I think -- I don't think it's

6    inconsistent with Mr. Farber's testimony.  He had a range --

7              THE COURT:  Farber was a much smaller period of time.

8              MR. McDONALD:  He had a range, Your Honor, that

9    included and went beyond nine months, especially when you add

10   in all the different phases I'm taking about.  I'm saying it's

11   totally consistent with Mr. Farber's testimony, especially for

12   a larger company that --

13             THE COURT:  No, because you loaded up the question

14   with all kinds of caveats about deliberating against the system

15   and that system and that system, and you had him basically

16   going through the procurement process for a vendor.  That isn't

17   what would happen here.  What would happen is, if they wanted

18   this service, they would come in, they would get the service,

19   and then how long would that take, and the record on that is

20   approximately about three months, perhaps six, and I think

21   that's the record other than what Mr. Hager said which I don't

22   believe.

23             MR. McDONALD:  I think Mr. Farber's testimony about

24   those time frames had to do with actually coming in with an

25   ePlus system.  I don't think he was talking about servicing --

1           THE COURT:  That's exactly what I'm talking about.

2    He wasn't talking about servicing systems.  He's coming in with

3    a new one, and so Mr. Robertson says we give them a sunset

4    provision, and there are a lot of new ones who could come in,

5    and if you wouldn't help them with the implementation, that is

6    a pox on your house, a problem of your creation.

7           MR. McDONALD:  I don't think --

8           THE COURT:  And I don't think that's what you're

9    saying at all.  All right.  So you're not saying that.  All

10   right.  So you're not saying that, are you?  Go ahead.

11          MR. McDONALD:  We are talking about hospitals and

12   others, though, that have had these RSS systems for five, even

13   ten years or more, talking about doing a changeover, and it's

14   not really the sort of thing that I think that can happen that

15   quickly.

16          THE COURT:  You built the model.  You went into it,

17   and that's the way life is according to Mr. Robertson.  You are

18   the one who put these infringing products in the market.  You

19   take the consequences, and so do your customers, according to

20   him, and you are going to really end up taking the consequence,

21   because if the sunset provision is put in and the cost is

22   incurred, you're going to have to pay for it under your

23   indemnity provision according to him.  What do you say in

24   response?

25          MR. McDONALD:  Well, for one thing, Lawson, stuck

1    with it, they're infringers so they just have to live with it,

2    when you look at the cases on that, when it's not a willful

3    infringer -- and Lawson is not a willful infringer.  There's no

4    evidence we were even aware --

5            THE COURT:  They dropped the claim of willfulness.

6            MR. McDONALD:  Pardon?

7            THE COURT:  The dropped the claim of willfulness.

8            MR. McDONALD:  That's right, because there wasn't any

9    evidence to support a claim of willfulness.  The evidence

10   showed that there was no notice of the patents involved in this

11   case until they dropped the complaint on Lawson in May of 2009.

12           By then, we had a vast majority of our RSS and

13   Punchout customers already on board using our systems, and were

14   we supposed to drop everything right then because they sued us?

15   Well, I do think the verdict shows that there were open issues

16   because the core procurement system was found not to infringe,

17   and Lawson shouldn't have been expected just to drop even its

18   core procurement system back in May of '09 just because ePlus

19   was making an accusation that turned out to not have support.

20           It was an issue as well as the validity of the patent

21   with the ongoing reexams.  Lawson had a right to contest these

22   issues and see if it could forego the need to have to go

23   through redesigning its products and everything that would have

24   to do with a changeover here.  We're at that point now, and

25   they're working on it, the changeover now.

1          Now we know what we have to change over because of

2     the jury's verdict specific to the RSS and Punchout, not the

3     core.  They are working on all that stuff, but the idea that

4     the customers in 2002 up through 2009 even are somehow ones

5     that, well, we'll just have to live with it, it doesn't matter

6     if anybody is hurt, we don't have to care about it because

7     Lawson is an infringer anyway, there isn't case law to support

8     that.

9          Now, the *Hynix* case talks a little bit about --

10          THE COURT:  Mr. Robertson says if this matter is

11     resolved as you say, it's just open season for infringers, they

12     can get by with anything because all they get is a little smack

13     on the wrist.  What do you say about that?

14          MR. McDONALD:  For one thing, they haven't identified

15     anybody else.  The patents have been out there now since 1994.

16     You think if anybody else was infringing, they would have done

17     something about it.

18          THE COURT:  That's not what he's talking about.  He's

19     talking as a general principle of law that serving up this kind

20     of result in this kind of case would eviscerate the

21     effectiveness of the patent, of the patent protection system

22     envisioned by Congress.

23          MR. McDONALD:  Not at all.  Basically that's saying

24     ignore *eBay*®, just give us an injunction because of a general

25     principle.  If *eBay*® stands for anything, it's the idea that

1    you don't just apply some sort of a general principle to a

2    case.  You have to look at the specific facts of the case, and

3    here, number one, there is the lack of irreparable harm.

4    That's the only message you would send, is on the facts of the

5    case where the patentee was not irreparably harmed, they may

6    not get an injunction.

7            THE COURT:  He says, they can't live with a royalty

8    for you, with you, which is your way of saying it's an adequate

9    remedy for them, because of your conduct, and they don't want

10   to have to live with you because you've proved to be an

11   intractable entity with whom they feel they can't do business

12   because you are, among other things, nitpickers and not

13   reliable and you even say that you don't keep profits by

14   product or product line, and should they be forced to have an

15   ongoing license with somebody who meets your description?  Why

16   isn't that a correct view of the record here?

17           MR. McDONALD:  Well, with respect to Ariba, Ariba

18   took them all the way through trial.  Ariba was found to be a

19   willful infringer, and they're saying we're worse than Ariba?

20   SAP they accused of willful infringement.  There was evidence

21   that SAP knew about the patents before they were sued and used

22   the technology --

23           THE COURT:  They're saying having been through it

24   once with Ariba, they don't want to go through it again with

25   you because you are in the same basic category, as I understood

1    Mr. Farber's testimony.

2           In other words, fool me once, shame on you; fool me

3    twice, shame on me, or do it backwards and then I use the

4    George Bush version.

5           MR. McDONALD:  Well, back in 2004/2005, they're

6    sitting there after the verdict with Ariba.  They've got a

7    willfulness finding.  They've got Ariba right where they want

8    them.  They have this technology, they've owned it for about

9    three years at that point.

10          They had a decision at that point:  Do we want to

11   protect the exclusivity that Mr. Robertson has been pounding on

12   over and over again that we are entitled to and get Ariba out

13   of this market.  Sure, go talk about settlement if the judge

14   tells you to do that and promote that, absolutely.  But nobody

15   forced them to allow this procurement competitor to keep using

16   the technology.  They could have had a settlement that says pay

17   me past damages but stop using it.

18          That happens all the time in patent cases when

19   somebody thinks it's an important marketplace and they want to

20   protect themselves from irreparable harm.  But they made a

21   choice that day with Ariba.  They decided to take not just the

22   money for the past but to take more money to pay off the

23   future, too.  They'd rather take the money than enjoin Ariba.

24          That was a perfect opportunity for them to protect

25   this exclusivity if they were really worried about that, but

1    they made a key decision at that point that sent the

2    marketplace in one direction rather than the other.  It

3    basically relegated ePlus to a nonentity in this business.

4    It's an insignificant player in the procurement field.  Ariba

5    took off.  They are one of the top three now.

6              THE COURT:  What is the case you rely on to hold that

7    if you settle a case and get that kind of agreement, that you

8    are foreclosed from injunctive relief?

9              MR. McDONALD:  Well, several of the cases that we

10   cited in our brief involve courts saying that licensing and

11   allowing somebody ongoing use of the technology is a factor

12   against injunctive relief --

13             THE COURT:  Were any of those cases licensings that

14   occurred after a long trial like this?

15             MR. McDONALD:  I know they were in litigation for

16   sure, Your Honor, and settled as part of litigation.  I don't

17   know that the trial or non-trial is a real factor in the public

18   policy of the things.  It seems like it would be --

19             THE COURT:  Why is it a factor that you license

20   somebody?

21             MR. McDONALD:  Because it's not a factor per se, but

22   it's an indication of whether there's harm.  It's only a

23   subsidiary factor, and it goes to explaining why there's no

24   harm.  If you have licensed some of the major competitors in

25   the business already -- and Lawson's not as big even as SAP or

1    Ariba, and if you've got that type of dynamic, it's not an

2    automatic yes or no, oh, they licensed somebody, there's no

3    irreparable harm.

4            As in this case, it totally shapes the marketplace by

5    allowing companies like SAP, Ariba, SciQuest, Perfect Commerce,

6    Verian, all of them are in those reports as currently active

7    competitors in this e-procurement software area.  That totally

8    affects the marketplace.  It totally defeats their ability to

9    say, I'm losing sales to Lawson, because if Lawson still sells,

10   all those other companies that are bigger than ePlus in this

11   market space are much more likely to make those sales, ePlus is

12   highly unlikely to make those sales --

13           THE COURT:  Who in this record says that?  What part

14   of this record did you put on that says that?

15           MR. McDONALD:  Well, we show that any of the specific

16   customers they are trying to say were lost sales to Lawson, in

17   fact, weren't.  I mean, we've got the proof in the pudding

18   there.

19           THE COURT:  No, you don't.

20           MR. McDONALD:  It's at pages seven of nine of our

21   brief.

22           THE COURT:  That doesn't address what you just said.

23   It doesn't address your issue.

24           MR. McDONALD:  Well, the licensing, I think, is --

25   what I've described here is simply the fact -- we have put in

1  the market reports that show --

2         THE COURT:  I asked you who testified that those

3  sales were going to go to Ariba or any of the big boys in the

4  marketplace, and I don't remember anybody testifying to that.

5         MR. McDONALD:  Mr. Farber did admit he competes

6  against SAP, Ariba.

7         THE COURT:  You and Mr. Robertson have the most

8  remarkable capacity to not answer questions that are direct.

9  The question is, who testified to it.  The answer is no one.

10         MR. McDONALD:  Who testified to what exactly?

11         THE COURT:  That's the third time I've asked you.

12  Now pay attention.  Who testified that if ePlus lost a sale, it

13  was going to one of the big boys in the market?  Name that

14  person or show me the document.

15         MR. McDONALD:  I don't know that a human testified to

16  that, but we have at least two examples in the documents.

17         THE COURT:  So, A, no one testified to it; B, what

18  are the examples?

19         MR. McDONALD:  Specifically the Cleveland Clinic, the

20  one that went to SciQuest that ePlus was trying to get, there's

21  a loss to SciQuest.  And then Novant, the evidence showed that

22  Ariba wound up getting that.  ePlus was trying to get it.

23  Ariba actually got it.  I know of at least those two examples.

24  I think there may be some other ones, but those are two

25  specific examples that they're competing with them.

1          THE COURT:  And Lawson was competing for both those,

2    too.

3          MR. McDONALD:  Not the functionality that was at

4    issue in those RFPs.  That's why the customers were going out

5    to these best of breeds, because they were looking for

6    additional catalog functionality that the Lawson product didn't

7    have.

8          THE COURT:  So you want me to conclude on the basis

9    of two pieces of evidence that any lost sales would go to the

10   big boys?  Is that what you want me to do, because that's

11   precisely how you attack them by saying they have too few

12   instances of evidence in the record.  All right, let's go on to

13   something else.

14         MR. McDONALD:  But there is the market share evidence

15   that's in these reports, Your Honor, that shows the

16   predominance of the SAPs and the Aribas, et cetera.  It's a

17   very sound basis to say -- they get that big a percentage of

18   the market on the percentages they're likely to make on any

19   given sale here.

20         THE COURT:  The logical inference there is that you

21   and ePlus are the people who may compete against each other

22   because you are not in the big-boy category.  Why isn't that a

23   logical --

24         MR. McDONALD:  That's not an inference at all.  Just

25   because they're not selling much stuff, that doesn't mean that

1   they're not losing sales.  That would defy the fact that they

2   did lose sales to Ariba and SciQuest.  I don't think those two

3   things go together at all.

4            The evidence shows Ariba makes a lot of sales, SAP

5   makes a lot of sales, and so why wouldn't they also make these

6   sales?

7            THE COURT:  Did anybody -- I understand.  There's no

8   evidence to support what you are saying, I don't think.  I

9   can't rule that way.

10           MR. McDONALD:  We do have the specific sales.

11           THE COURT:  You have two instances of sales.

12           MR. McDONALD:  Which is more than what ePlus has

13   shown here in terms of what they've lost to Lawson.

14           THE COURT:  Na-na-na-na-na-na.  Come on, let's go.

15   You just don't point fingers that way.  Let's go.

16           MR. McDONALD:  Well, when we asked Mr. Farber about,

17   well, why wouldn't you give Lawson this going-forward license

18   for money, I think what was telling in his answer was he didn't

19   say, because we're being irreparably harmed.  He didn't say

20   because there's price erosion, because we're losing sales.

21           He talked about these other things that you

22   mentioned, Lawson might be difficult to work with, but when you

23   look at what you have to prove if you are claiming competition,

24   to prove irreparable harm, it is price erosion, it is lost

25   sales and things like that.

1    Mr. Farber was on the witness stand.  He would have
2    known those are the requirements here, but when I asked him why
3    not, he never said that those were the reasons why not.  So I
4    think that's very telling here about the lack of irreparable
5    harm.
6    They talked about trying to get a level playing
7    field; in other words, have the injunction first and then maybe
8    they would come back and talk to Lawson about the royalty then.
9    Well, you see in some of these cases that when you have that
10   sort of a motive, like the *Hynix* case talks about that, that's
11   actually a reason to deny injunctive relief, because then it
12   shows you are using the injunction as leverage to get more
13   money.
14   So now we're back to the money thing again.  It's not
15   about the harm to ePlus.  It's about putting Lawson in a
16   difficult position, putting its customers in a difficult
17   position by putting an injunction into place and then starting
18   to negotiate.
19   It's kind of like you can either talk to an airline
20   pilot about a labor contract while we're on the ground or he's
21   flying the plane in the air.  Well, you're going to stop things
22   in mid flight, you have a whole different and disproportionate
23   situation here.  That's not the way it's supposed to work.  An
24   injunction shouldn't be used, in effect, to create that
25   licensing situation in mid air.  That is exactly what's going

1    on here.

2          I think those are my main points I wanted to make.  I

3    guess -- I heard Mr. Robertson indicate something about a

4    sunset provision in the six-month range, and I think nine

5    months is more appropriate, but at a minimum here I think some

6    stay of the injunction to give Lawson and the customers time to

7    react to the situation is appropriate.  I think a stay is also

8    requested here.  If the Court is going to enter an injunction

9    that would be immediate, we would request at least a couple of

10   weeks so that we could bring an appeal to the Court of Appeals

11   if the Court also denies our request for a stay.

12         We have a separate motion for stay here.  Do you want

13   me to argue --

14         THE COURT:  I don't need any argument other than I

15   need to know what do you understand is the test?  Is it the law

16   of the Federal Circuit or the law of the regional circuit that

17   applies to stay pending appeal?  I always thought it was the

18   law of the regional circuit, but neither one of you have

19   briefed it that way.

20         You cited the Federal Circuit, and I'm not sure

21   there's a difference, but there is, in fact, a fairly direct

22   analytical framework that's required in the Fourth Circuit

23   which is *Long against Robinson*, I believe.  You have to show a

24   substantial likelihood of success on the merits in order to do

25   that, and while -- and, in fact, the reason I think this is

1    important is that the Fourth Circuit, in view of *Winter,* has

2    just abandoned the approach that seems to be taken in the

3    preliminary injunction context, the approach that seems to be

4    taken in the Federal Circuit cases which is the more harm there

5    is the less likelihood of success or vice versa, and I think --

6    I mean, and those cases involve preliminary injunctions and

7    TROs, but it's some of the same framework that's involved, and

8    I don't see the Fourth Circuit going a different way on the

9    stay pending appeal, and so I need your -- do you understand

10   it's the regional circuit or the Federal Circuit law that

11   applies for a stay pending appeal?

12           MR. McDONALD:  You know, I'm not sure, Your Honor.

13   There's just so few cases on the issue, at least in a patent

14   case, that the *Standard Havens* was the one that kind of

15   dictated our analysis of that.  I don't recall that the Federal

16   Circuit in that one, what they said about whether the regional

17   law should apply.  I don't recall them bringing that up there,

18   but that's not to say it's not an issue.  I do believe that the

19   weighing of the factors and the factors themselves are similar.

20           THE COURT:  Well, the Fourth Circuit used to follow a

21   test for preliminary injunctive relief that involved balancing

22   the hardships, and you had to have a colorable showing of an

23   issue that required further litigation, and then you did sort

24   of a sliding-scale analysis in the balance of the hardships,

25   and that seems to be what you are saying is appropriate in your

1    papers, whereas in *Long against Robinson*, that isn't the

2    approach that's taken, and the Fourth Circuit recently has just

3    abandoned this sliding-scale approach saying that they felt

4    like they needed to, in view of *Winter v. Natural Resources*,

5    and that's why I think the issue is important as to what law

6    applies here, and you just don't know the answer.

7            MR. McDONALD:  I'm looking at the *Standard Havens*

8    case even as we're talking here --

9            THE COURT:  You're looking at what?

10           MR. McDONALD:  The *Standard Havens* case which is the

11   state case that we relied on quite a bit.  They cite for their

12   factors a U.S. Supreme Court decision, *Hilton v. Braunskill*,

13   481 U.S. 770.  They don't cite an Eighth Circuit decision even

14   though this was an appeal out of Missouri.  I don't see them

15   looking to the Eighth Circuit.

16           THE COURT:  Has anybody confronted the question

17   whether this is an issue that's decided by the law of the

18   regional circuit or of the Federal Circuit?  And it does

19   involve certain aspects, that is to say a stay of a patent, of

20   an injunction in a patent case involves certain components of

21   patent law, but stays of judgments and stays of injunctions are

22   fairly common procedural issues that pervade the law, and

23   unless it is an issue that is unique to patent law, then I

24   think it's the law of the regional circuit that is presumed to

25   apply, but I don't know -- neither of you addressed it.

1          MR. McDONALD:  We didn't address that.  Maybe that's

2    something we can --

3          THE COURT:  I think you need to do some homework on

4    it.

5          MR. McDONALD:  I do see some patent-specific issues

6    here that might give the Federal Circuit a reason to say, this

7    is one we have to have uniformity in the law on this.

8          THE COURT:  They may have decided --

9          MR. McDONALD:  I don't have a case on this.

10         THE COURT:  You need to look it up.

11         MR. McDONALD:  Understood.

12         THE COURT:  All right, thank you.

13         MR. McDONALD:  Thank you, Your Honor.

14         THE COURT:  You are doing and end-around trying to

15   get equitable relief retroactively on the servicing of

16   customers -- I mean of prior contracts, and that's a

17   retroactive way around the fact that you couldn't get damages

18   which you couldn't do because of two things.  One was that the

19   Mangum report or testimony was stricken as not in compliance

20   with applicable law and because your alternate evidence got

21   rejected because you didn't comply with Rule 26 or answer an

22   interrogatory, and then also because you didn't prove marking.

23   What is your answer to all that?

24         MR. ROBERTSON:  Your Honor, I have several responses

25   to that.  First, the ruling that Your Honor made with respect

1    to damages was a discovery sanction.  It wasn't a situation

2    where the Court said there would be no finding of liability, we

3    couldn't go to the jury with the issue of liability with

4    respect to service and maintenance.  Patent infringement is a

5    continuing tort.

6            THE COURT:  Wait a minute.  That's not what he said.

7    He says that you -- he's citing *Fonar* and *Odetics* and

8    *Aro/Convertible* that says if you're barred from seeking from

9    your damage claim there under -- because of latches and no

10   marking respectively, then you can't do an end-around and get

11   an injunction back into the past where you didn't get the

12   damages.

13           And he says those principles apply here, and they

14   apply because, A, you don't have -- you can't prove any

15   damages, you didn't prove any, and you didn't prove them for

16   failure to satisfy the law on experts and failure to disclose

17   on your alternate theory of damages as that's a correlative

18   point.  Those two are related points, and secondly, because you

19   didn't prove marking, and it's an element of your claim.

20           MR. ROBERTSON:  With respect to the later point,

21   marking, Your Honor, we believe that Mr. Farber did testify as

22   to the marking of his products, and I can find that in the

23   record for you.  He testified -- in fact, there were documents

24   that were introduced into evidence concerning Procure+ and

25   Content+ that bear the patents that were in suit on this, and

1    Mr. Farber testified as to how they do mark the products.

2    There was no contrary rebuttal evidence with respect to that.

3    So as far as the marking issues goes, we think --

4              THE COURT:  When did marking start?

5              MR. ROBERTSON:  In 2003, Your Honor.  October 2003, I

6    believe, is the testimony.

7              THE COURT:  I remember the documents.  I can't

8    remember what they were.

9              MR. ROBERTSON:  I'll have to go back and confirm that

10   for Your Honor, but that's my memory.  That's the memory of my

11   colleagues.

12             With respect to the *Odetics* case, Your Honor, that

13   was a finding again where there was no liability because of the

14   latches, because they had slept on their rights.  In fact, I

15   was counsel of record for --

16             THE COURT:  No liability meaning no finding of

17   infringement?

18             MR. ROBERTSON:  There could be no finding of

19   infringement because they had slept on their rights with

20   latches.

21             THE COURT:  And there was no liability in the other

22   case because there was no marking?

23             MR. ROBERTSON:  That's correct.

24             THE COURT:  And it wasn't a failure of proofs on the

25   damages, it was the absence of anything to which equitable

1    relief could attach; is that what you are saying?

2         MR. ROBERTSON:  And, indeed, in the *Odetics* case,

3    yes, Your Honor.  In the *Odetics* case, there also was a finding

4    by the jury with respect to my client at the time, Crestar Bank

5    now SunTrust Bank, that there were zero damages, and so Judge

6    Ellis in that case said, I'm not going to allow you to get

7    indirectly what you have not established and you could get

8    directly in that case.

9         It's not the situation here.  This servicing and

10   maintenance we are talking about is going forward on these

11   existing systems.  The suggestion was made that we're trying to

12   get royalties for sales made prior to six years before filing a

13   complaint.  We're not trying to do that.  We know we can't get

14   any royalties on sales, for example, of the infringing

15   configurations that were found to infringe prior to six years

16   of filing the suit.

17        What we can do going forward is ask that the conduct

18   which constituted the indirect infringement as well as direct

19   infringement because they continue to implement and upgrade

20   these systems which are making a system which is a direct

21   infringement, going forward, that continuing tortious behavior,

22   that continuing tort should be enjoined.

23        THE COURT:  Which is the continuing tort?

24        MR. ROBERTSON:  It's the servicing -- it's the

25   inducing of the infringement.  If the customers are using,

1    that's direct infringement.  They continue to do all those

2    things that Hannah Raleigh, Lawson's employee, testified about:

3    The maintaining, the upgrading, the bug fixes, the training,

4    the 24/7 help lines they have, all of those things the jury

5    heard constitute the aiding, assisting, and abetting of the

6    infringement.  That continues going forward, and that's the

7    continuing tort, and that's what we seek to enjoin.

8           Now, so the *Fonar* case and the *Odetics* cases are

9    completely distinguishable.  In fact, the *Fonar* case had to do

10   -- Mr. McDonald mentioned this *Aro* Supreme Court case which had

11   to do with what was known as, what's a new active infringement,

12   that is, is repair an active infringement, or if repair goes so

13   far, does it become reconstruction and, therefore, is a new act

14   of infringement.

15          It had to do with convertible tops, Your Honor, and

16   the convertible tops would start to break down after they would

17   wear out for awhile, and so the question was, if I repair it,

18   is that an act of infringement, and the Supreme Court said, no,

19   once you paid a royalty for that patented product, in this case

20   a convertible top, you've exhausted -- the patentee has

21   exhausted its right to ask for any further revenue.

22          If it's completely reconstructed, however -- and it

23   was obviously a line-drawing problem -- then that's a new act

24   of infringement.  So this is completely distinguishable from

25   what we have going on here.  The evidence came in -- and by the

```
1    way, there was no JMOL, there was no JMOL at the time by Lawson
2    saying that this can't go to the jury because we were precluded
3    on a discovery sanction from getting past damages.  This went
4    to the jury.  They found liability --
5              THE COURT:  What is "this"?
6              MR. ROBERTSON:  This issue of induced infringement
7    and contributory infringement and indirect infringement.  Those
8    issues went to the jury, the jury was instructed on it.  They
9    found, in fact, there was liability.  So what we want is an
10   injunction for that liability going forward just like we want
11   an injunction for the sales going forward.
12             THE COURT:  Are you saying neither Fonar nor Odetics,
13   in your view, involved a holding that you couldn't get
14   injunctive relief where there was a finding of infringement but
15   a bar to past damages by virtue of latches and no marking?
16             MR. ROBERTSON:  If I understand the question, I think
17   they're distinguishable because there is a finding of no
18   liability based on the fact of the equitable requirement of
19   latches and because the marking statute required marking in
20   order to recover damages.
21             THE COURT:  I thought you told me that Judge Ellis
22   decided in Odetics that you weren't getting injunctive relief
23   because there wasn't any damages.
24             MR. ROBERTSON:  He said we weren't getting injunctive
25   relief -- I was actually the defendant in that case, Your
```

1    Honor, but he wasn't granting injunctive relief because as to
2    the infringing device found -- that was found to infringe,
3    there could be no recovery because of the equitable remedy of
4    latches.
5          So -- and there was zero damages assessed with
6    respect to it.  So when the patent owner said, well, okay, but
7    we want to be able to get remedies for servicing and
8    maintenance of those systems, he said no because there was no
9    liability with respect --
10         THE COURT:  No liability meaning there was no finding
11   of infringement.
12         MR. ROBERTSON:  Yes, sir.  So moving forward in this
13   case where we have a continuing tort of maintenance and
14   servicing, that's not a situation that's implicated.  And,
15   again, it wasn't a situation -- it was either under statute,
16   the marking statute in *Fonar*, or it was the equitable remedy of
17   latches because they had sat on their rights, and the Federal
18   Circuit said it would create perverse incentives for patent
19   owners to lay an ambush and not bring a lawsuit and then be
20   able to use that to their advantage, and that would be just
21   improper under equitable principles.
22         Let me just address a couple other issues, if I
23   could, with respect to this issue about the compulsory license.
24   I think Your Honor is entirely -- your instincts are entirely
25   correct that there is a very questionable issue about whether

1    an Article III judge has the power to do what, indeed, Lawson

2    is suggesting you can do, and I do have, and I'd like to cite

3    for the Court -- I don't have an extra -- I have one copy, so I

4    won't hand it up to the Court because I don't have one to give

5    to -- actually I do.

6              This is a *Florida Law Review* article, Your Honor,

7    from March of 2010, and I'm not going to be labor it, but to

8    quote a little bit from it, if I can say, some have also opined

9    courts ought to calculate or structure an award for future

10   compensation in lieu of a final injunction.

11             Absent from the literature, however, is an

12   examination of whether federal courts actually have the

13   authority to award compulsory prospective compensation in lieu

14   of a final injunction.

15             It goes on to say, indeed, when one examines those

16   decisions closely, considering their lack of precedent and

17   reasoning, it becomes apparent that they constitute a radical

18   departure from federal court remedial authority.

19             It goes on to argue that only Congress can create

20   compulsory licenses of this nature through amending the patent

21   statute and that future damage awards can only be, and

22   continuing royalties can only be granted in lieu of an

23   injunction by consent of the parties.

24             I think it's a very thoughtful article.  I'll just

25   leave it with you.  Let's just assume for the present that the

1    Court has such an authority.  This would be a terrible case for

2    that to be applied in this instance, because there are a number

3    of terms that the Court understands that form the part of these

4    licenses, and I --

5               THE COURT:  Licenses that you have given in the past?

6               MR. ROBERTSON:  Yes, sir.  In fact, there were two

7    cases.  One is this *CSIRO* case cited at page ten of our brief.

8    It's 492 F. Supp. 2d 600, and it's an Eastern District of

9    Texas, 2007.

10              It says, compulsory licenses would not necessarily

11   include other nonmonetary license terms that are as important

12   as monetary terms to the patentee.

13              Also the *Transocean* case which is a Westlaw cite

14   cited at page ten of the brief.  I won't read it into -- our

15   reply brief.  I won't read the cite into the record, but it

16   says, quote, a compulsory license would not contain any of the

17   commercial business terms that are typically used by a patent

18   holder to control technology or limit encroachment on its

19   market share.

20              Now, Mr. McDonald suggested that there could be a

21   compulsory license, and then he went on to tell the Court what

22   he thought those terms would be.  So in other words, the

23   adjudicated infringer wants to impose a compulsory license on

24   us and then dictate the terms of what that compulsory license

25   is.  Here's what he mentioned:  He said, well, we could pay a

1   royalty on our à la carte software which he said was RSS and
2   was Punchout.
3           If we can see the configurations, I'd like to just
4   refresh the Court's memory about -- the configurations that
5   were found to infringe were three in the jury's verdict form,
6   and that's important to the scope of the injunction that the
7   Court is going to give, because what's happened here is Lawson
8   has argued that the injunction should only apply to RSS and to
9   Punchout, but as the Court will recall, the uncontradicted
10  testimony, indeed the testimony from Lawson's own witnesses, is
11  to have this configuration here which was found to infringe, to
12  have it be functional, it didn't involve just RSS.  It involved
13  the platform technology which included Lawson System
14  Foundation, process flow.  Those core technology S3 modules
15  were all required, and then requisition self-service sat on top
16  of that.  That's the infringing configuration.
17          THE COURT:  You can't use RSS without the S3
18  procurement modules.
19          MR. ROBERTSON:  That was the uncontradicted
20  testimony.
21          THE COURT:  You can't use Punchout without the
22  requisition self-service and the S3 procurement module.
23          MR. ROBERTSON:  Correct.  Punchout has to sit on top
24  of the RSS, and that has to sit on top of the S3 procurement
25  modules, and that has to sit on top of the platform technology.

1    None of it functions without all of those.  That's an

2    infringing system.

3           So first of all, it's incorrect just to say that we

4    can only just look at the licensing revenues for RSS and

5    Punchout.  You have to look at that entire configuration, and

6    that's the configuration that we would want to have enjoined,

7    but more importantly, it also leaves out all the revenues that

8    are associated with service and maintenance for this compulsory

9    license he wants to impose on us.

10          Of course, service and maintenance is two -- I know

11   why he wants to do it, because it's two-thirds of the revenues

12   they enjoin once they sell this infringing configurations.  And

13   also, there was -- the configuration five also found to

14   infringe includes the electronic data interchange which also

15   would apply.

16          And as for the expiration, of course, Mr. McDonald

17   suggested that their configuration two, which was found to

18   infringe the '172 patent, would expire in 2014, but, of course,

19   the other patents expire in 2017, and they all require, those

20   infringing configurations for the '683 patent, which expires in

21   2017, also required the RSS modules in order to operate.  So,

22   clearly, the scope of the injunction has to include any of

23   those.

24          THE COURT:  You tendered a proposed order, didn't

25   you?

1          MR. ROBERTSON:  Yes, we did.  In fact, Lawson did not

2     which I found to be quite curious.

3          THE COURT:  Why would they tender one since they

4     don't want any?

5          MR. ROBERTSON:  Well, we think that they would want

6     to have it directly to the scope of the arguments they made,

7     but perhaps Your Honor is right as to their motivation.  I will

8     say this:  One of the things the Court asked, and I don't have

9     the answer to it either, is whether the regional circuit would

10    control on the standard or whether or not the Federal Circuit

11    would control.

12          In our brief, we cited a Supreme Court case which is

13    *Hilton v. Braunskill* -- that's our opposition brief at page two

14    -- which is 481 U.S. 770, a 1987 case, and the Federal Circuit

15    has relied on that when it has considered stays pending an

16    injunction.  We would think, obviously, this is not an

17    appropriate case under any standard, that an injunction should

18    enter.  I would suggest --

19          THE COURT:  You mean a stay of the injunction.

20          MR. ROBERTSON:  A stay of the injunction.

21          THE COURT:  *Braunskill*, refresh my memory.  Did it

22    involve substantial likelihood of success as one of the

23    elements?

24          MR. ROBERTSON:  Number one was whether the stay

25    applicant has made a strong showing that it's likely to succeed

1    on the merits, and I know --

2              THE COURT:  Does *Braunskill* do a balancing, a

3    sliding-scale test as is suggested by one of the Federal

4    Circuit cases?

5              MR. ROBERTSON:  I don't believe it does.  I think it

6    says to obtain a stay -- this is a Federal Circuit case -- a

7    movant must establish a strong likelihood of success on the

8    merits, or failing that, nonetheless demonstrate a substantial

9    case on the merits provided the harm factors militate in its

10   favor.  So I suppose if they can't make that --

11             THE COURT:  You understand, don't you, that that's

12   precisely the test that *Winter* rejected and that *Obama*, *Truth*

13   *about Obama* rejected because that was the Fourth Circuit

14   approach to preliminary and temporary injunctions before *Winter*

15   *v. Natural Resources* was decided.

16             So the question is, do we learn from *Winter* that the

17   balancing component, if it's suggested at all -- I don't

18   believe it is by *Hilton* -- has been changed by virtue of the

19   approach indicated in *Winter*?

20             MR. ROBERTSON:  And I don't know the answer to that,

21   Your Honor, but we would be happy to look into it.  I don't

22   know that the approach in *Winter*.  Is that a Supreme Court

23   case?

24             THE COURT:  It is.  *Winter v. Natural Resources*

25   *Defense Council*.  Both of them -- none of them, I don't think,

1     neither it nor the *Truth about Obama* involved a stay pending

2     appeal.  They involved temporary restraining orders and

3     preliminary injunctions, and the background is that every

4     circuit in the country used the Washington Metropolitan

5     Authority test that had -- or some version of it that had been

6     the touchstone for preliminary injunction:  Substantial

7     likelihood of success, irreparable injury in the absence of an

8     injunction, presence to the enjoined party of injury, and where

9     lies the public interest, and you had to consider the

10    substantial likelihood of success, and you had to show that.

11          The Fourth Circuit, in *Rum Creek Coal Company against*

12    *Caperton* and *Direx Israel* and going back to the *Sterling v.*

13    *Blackwelder* case, said, well, the way we do it here, whether

14    the rest of the country does it this way or not, we have the

15    same four factors, but the first thing you do is look at

16    irreparable injury, and then you look at the harm to the party

17    seeking to be -- who is sought to be enjoined, and then you

18    look at the substantial likelihood of success.  And you have to

19    have a substantial or colorable question requiring further

20    litigation and examination, and the greater your harm, the

21    lesser your showing on likelihood of success has to be.

22          In *Winter* and in *Obama*, the Court said, no, that's

23    not how you do it.  Well, one of the Federal Circuit cases that

24    you just cited talks about a diminished showing on substantial

25    likelihood of success depending upon the showing of irreparable

1    injury, and I'm asking the question, based on *Winter* and the

2    *Truth about Obama*, doesn't that sliding scale approach that is

3    suggested have to fall in favor of a standard application of a

4    substantial likelihood of success, and that, in turn -- if the

5    law of the Fourth Circuit applies to this, I think the answer

6    is, yes, that's clearly the case.

7            If the law of the Federal Circuit applies, then

8    there's the question, does *Winter* -- not *Obama* because *Obama* is

9    a Fourth Circuit case -- modify the -- cause a modification in

10   the Federal Circuit test if it's the Federal Circuit test that

11   applies at all, one step below that analytically.

12           I believe this is not an issue that is unique to

13   patent law, but it certainly does have a lot of patent law

14   implications, that is the stay of an injunction as the relief

15   for infringement of a patent, and I don't know whether the

16   Federal Circuit has decided this is something that has to be

17   decided on the regional circuit law or on the basis of Federal

18   Circuit law, and that's what you all are going to need to deal

19   with.

20           MR. ROBERTSON:  I don't know the answer to that, Your

21   Honor.  My inclination is to say that this is not something

22   that is unique to patent law and in this case the Fourth

23   Circuit's standard should control.  Whether or not an

24   injunction is stayed or not is a procedural issue, and -- now,

25   there are underlying issues of substantive patent law, but

1    whether the standard under Rule 8(a), Federal Appellate Rule

2    8(a) is implicated just because it's being applied in a patent

3    case would require Federal Circuit law to control, I think is

4    somewhat attenuated.

5         It's just my instinct tells me that, but I will go

6    and take a look at it.  I would also suggest, Your Honor, that

7    it may be just that the test for Rule 8(a) is different from

8    the test for a permanent injunction and, therefore, the *Hilton*

9    *v. Braunskill* case which we rely upon, the Supreme Court case,

10   has not been impacted by the two cases.

11        THE COURT:  It may not be, but if you look and

12   compare *Hilton against Braunskill* and *Long v. Robinson*, you

13   will see a remarkable similarity, and *Long* does deal with the

14   Fourth Circuit's test for the stay pending appeal.

15        MR. ROBERTSON:  While we're -- we will look into

16   that, Your Honor, but while we're on the topic of the scope of

17   the injunction, Your Honor may recall, and it's in the

18   briefing, that there was a stipulation entered into in the

19   pretrial order with respect to if there was a finding of

20   infringement with regard to S3, then the M3 product would also

21   be found to infringe.

22        Now it's been argued that notwithstanding that they

23   stipulated there was a finding of infringement, they say we're

24   not entitled to any remedy under the stipulation.  Well, the

25   stipulation has just been put on the screen for you, Your

1    Honor, and you'll see here it says, Lawson and ePlus stipulate

2    that they will not introduce evidence or argument specifically

3    directed to the M3 procurement product line and that such

4    evidence is not necessary in order for any remedy to encompass

5    that product made, used, offered for sale, sold, and/or

6    imported into the United States.

7            THE COURT:  All right.

8            MR. ROBERTSON:  So clearly the scope of the

9    injunction would need to apply to the M3 product line as well.

10   In fact, the M3 product line is configured differently from the

11   S3 product line in some sense, although it has the same

12   functionality.

13           THE COURT:  You address the question that Mr.

14   McDonald raised, and he says that the only proof of irreparable

15   injury or the only ground of irreparable injury that you rely

16   on is that there is competitive harm and that you fail the

17   competitive harm analysis; therefore, you fail the irreparable

18   injury analysis, and you fail it because there isn't any proof

19   of market share, of lost sales, or any of the other things that

20   are necessary to prove -- or actual competition.

21           MR. ROBERTSON:  I think we address a number of those

22   detailed issues in paragraphs 35 to 40 of our findings of fact.

23           THE COURT:  Yes, you do, but what are the other

24   proofs of, grounds of irreparable injury other than competitive

25   harm?  That's the first question.

1          MR. ROBERTSON:  I think one of the things -- when Mr.

2     Farber was here, we actually heard for the first time he had

3     lost a customer, Deaconess, to Lawson.

4          THE COURT:  Isn't that a competitive harm?  Listen to

5     what I'm asking.

6          MR. ROBERTSON:  Yes, sir.

7          THE COURT:  Mr. McDonald says that your only ground

8     for contending irreparable injury is the competitive harm.  I'm

9     not asking you to explain competitive harm at this juncture.

10    I'm asking you the simple question, is there any other ground

11    for irreparable injury that you contend exists other than

12    competitive harm?  If so, what is it?

13         MR. ROBERTSON:  Well, it's our right to exclude an

14    infringer in the marketplace which is the core right that we

15    have under the patent and which we would like to exercise now,

16    because that will have a financial benefit to us, we believe,

17    going forward, allow us to increase our market share, compete

18    with Lawson in a better position, and actually take advantage

19    the customers that are currently infringing by being able to

20    offer them a non-infringing alternative for the current

21    software they have.

22         THE COURT:  So the ground of irreparable injury is

23    the loss of the right to exclude and the competitive harm as

24    well as the competitive -- loss of the competitive advantage

25    that you will obtain if you get the right to exclude.

1          MR. ROBERTSON:  There's also --

2          THE COURT:  Anything else?

3          MR. ROBERTSON:  -- loss of good will to a certain

4    extent.  We count our products as being patented technology,

5    and if an infringer --

6          THE COURT:  Did anybody testify about that?

7          MR. ROBERTSON:  Yes, Mr. Farber did.  In fact, there

8    was a 10K that was offered from ePlus that talked about how the

9    patents are able to be able to be used to leverage other

10   technology and how they tell the customers about their patented

11   technology, and it assists them in making sales.

12         So there's loss of goodwill that we've been

13   associated with.  Obviously there's lost opportunities that

14   we've had because we've had to spend considerable capital

15   resources that Mr. Farber testified about in order to bring

16   this infringer to heel in this case which could have been

17   reinvested in other projects, research and development in order

18   to expand our market share if we didn't have to expend all

19   other resources.

20         Indeed, there's been a suggestion made that we

21   could -- some reasonable royalty could be fashioned.  Just on

22   Friday, Lawson filed a 10Q in which it says in essence that

23   they offered us $87,000 to settle this litigation, and we

24   refused it.

25         THE COURT:  87,000 or million?

1              MR. ROBERTSON:  Thousand.  Now, if they made that

2    offer, Your Honor, I don't recall whenever it was made, but

3    it's in the 10Q right here which I have for you which basically

4    said they apply three percent royalty on future sales of RSS,

5    Punchout, and M3 which would be applied to $2.9 million.

6              If you do the math on that, it's a little less than

7    $87,000, and that's the license they think is a reasonable

8    license for us to enter into.  That's the license, I think,

9    they were probably suggesting should be the compulsory license

10   the Court would enter.  That's not a license.  If it was

11   offered to us, which it wasn't, we certainly would have

12   rejected it.

13             With respect to the *Hynix* case, Your Honor, which is

14   one of the cases they rely on heavily, the *Hynix* court denied

15   injunctive relief because the patentee argued before the Court

16   and the jury that the only remedy it sought was money damages,

17   so obviously that's readily distinguishable.

18             As far as the *Boston Scientific* case relied upon

19   there, the plaintiff in that case withdrew its expert and

20   offered no probative evidence of any other licenses that had,

21   and so the Court found there there was an evidentiary failure

22   with respect to it, a very different situation, we think, than

23   we have here.

24             If the Court has any other issues, if I might just

25   take one minute to check my notes, sir.  The other argument was

1    made that we didn't mention Lawson in the 10K before we had to

2    write down some goodwill.  There were 1,700 other companies,

3    particularly many in the software area, that had to write

4    goodwill down during that depressed economic times.  So that

5    was not unusual, and we're not in the habit of identifying

6    infringers in our 10K before we take steps to do investigations

7    and then bring the suit, and that was well before we conducted

8    an investigation into their infringing activity.

9             THE COURT:  All right.

10            MR. ROBERTSON:  The only other thing was suggested,

11   Your Honor, that they're working on some sort of design-around

12   already.  I respectfully suggest that the way this patent is

13   crafted, in functional terms, there is going to be no effective

14   design-around.  I mean, it has to have catalogs.

15            THE COURT:  Basically that's stuff that's really not

16   before me on either side, is it?  I can't make any findings

17   based on that one way or the other.  I think it would be

18   speculative if I did that.

19            MR. ROBERTSON:  I agree with Your Honor.  I'd only

20   suggest that if the representation is made and the injunction

21   enters, then there should be no harm if, in fact, they have a

22   design-around.

23            If not, the case says the Court should put the strong

24   arm of the law on their shoulder, and, therefore, we would

25   proceed with contempt proceedings, but we think, as we are

1    right now, if there is to be any sunset provision, it should be

2    no longer than three to six months, and it should only apply if

3    it does at all to those bona fide hospitals that may have some

4    public interest, but, again, I think based on those two

5    declarations you have before you, the Court couldn't make such

6    a finding.

7            There is the stay motion, Your Honor.  They've argued

8    a number of reasons they believe that they're going to prevail

9    on appeal.  I think that's all in the papers.

10           THE COURT:  I think that's all briefed thoroughly.

11   So is the motion to strike the declaration.

12           MR. ROBERTSON:  So we would be happy to submit those

13   on the papers.

14           THE COURT:  The matters are submitted.  Thank you

15   very much.  We'll be in recess.

16

17                   (End of proceedings.)

18

19

20           I certify that the foregoing is a correct transcript

21   from the record of proceedings in the above-entitled matter.

22

23

24   _____/s/_____              _____
     P. E. Peterson, RPR                    Date

25