

MAY 23 2011

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

ePLUS, INC.

      Plaintiff,

v.                               Civil No. 3:09cv620

LAWSON SOFTWARE, INC.,

      Defendant.

## MEMORANDUM OPINION

Before the Court is Plaintiff ePlus Inc.'s ("ePlus") Motion for a Permanent Injunction (Docket No. 640). For the reasons set forth below, ePlus's motion will be granted.

## STATEMENT OF BACKGROUND FACTS[1]

ePlus filed this action against Lawson Software, Inc. ("Lawson") alleging that Lawson had infringed, and was continuing to infringe, ePlus's patents through Lawson's manufacture, use, sale, offer for sale, and/or importation into the United States of infringing products, methods, processes, services, and systems that are primarily used or primarily adapted for use in electronic sourcing and procurement software applications, services, systems, and methods. At issue were

---

[1] All findings of fact have been clearly proved by the evidence. Some findings of fact are set forth along with the analysis of the test for injunctive relief to which those findings pertain.

three ePlus patents ("patents-in-suit") related to enterprise-procurement software ("e-procurement software"):   U.S. Patent Nos.   6,023,683   (the   "'683   patent"),   6,055,516   (the   "'516 patent"),   and   6,505,172   (the   "'172 patent").    The   specific claims at issue during trial were claims 3, 26, 28, and 29 of the '683 patent; claims 1, 2, 6, 9, 21, 22, and 29 of the '516 patent; and claim 1 of the '172 patent (hereafter collectively referred to as the "asserted claims").

The   claimed   inventions   relate   to   electronic   sourcing   and procurement systems, and methods conducted by those systems.   An electronic sourcing system is an electronic system for use by a prospective   buyer   to   locate   and   find   items   to   purchase   from sources,   suppliers,   or   vendors.    These   systems   and   methods "automate internal corporate purchasing processes, resulting in enormous savings in time and expense."   Pl.'s FF ¶ 3.   Users, generally the employees of a corporate purchaser, may search for items for sale from multiple selected electronic catalogs, view inventory availability information for those items, find related items available from other suppliers, and requisition desired goods   or   services.    The   systems   then   generate   electronic purchase   orders   to   each   different   supplier   for   approved requisitions.

Before   the   automation   of   internal   purchasing   processes, "procuring products for large corporations could involve several

2

manual, paper-based operations coupled with awkward automated electronic processes." Pl.'s Rule 26 Supplemental Disclosures at 3 (citing '683 patent, Col. 1:11-2:18). For example, "[a] company might be able to access a system to type information into an electronic requisition or submit an electronic order from hard-copy catalogs," or it "might be able to view items from a single electronic catalog from a compact disc." Id. These early systems only provided marginal improvement from the traditional paper-based corporate procurement processes, however. The inventors of the patents-in-suit recognized that "significant efficiencies could be realized by enabling users to make purchasing decisions based on price, item availability and product comparison." Id. at 4.

ePlus acquired the patents-in-suit in 2001 when it purchased the commercial-technology business assets of Procure-Net, Inc. ("ProcureNet"), a company that focused its business on e-commerce software.[2] Among the acquired assets was ProcureNet's e-procurement software application, OneSource, considered by ePlus to be "one of the most valuable intangible assets acquired" as part of the deal. Pl.'s FF ¶ 5.

---

[2] Initially, the rights to the patents-in-suit belonged to Fisher Scientific Company, the original assignee of the rights, who manufactured and sold commercial implementations of the claimed inventions, known as "Supply Link" and "Cornerstone." At one time, ProcureNet was part of Fisher Scientific Company LLC, but was spun off as an independent company in 1999.

3

ePlus markets the OneSource application, subsequently renamed "Procure+" after the acquisition, "as an e-procurement product that [can] be provided to customers as an internal stand-alone program or as a product hosted by ePlus." Id. ePlus also offers another e-procurement software application, named Content+, which is a "flexible application that integrates with Procure+ to connect catalogs." Id. ¶ 9. Content+ allows suppliers to turn raw product data into an easily and quickly searchable catalog by keyword, attributes, and classification structure.

These two products, which embody the asserted claims of the patents-in-suit, provide to users an electronic sourcing and procurement system with which they can search for items in multiple vendor catalogs, compare those items, build requisitions for selected items, check the availability of selected items in vendors' inventories, and generate multiple purchase orders from the requisitioned items for transmission to suppliers.

ePlus has sold Procure+ and Content+ since 2001 and has been systematically and continuously marking them with the patents-in-suit since no later than October 2003 pursuant to the requirements of 35 U.S.C. § 287(a). They are the central and primary software products developed and sold by ePlus Systems and ePlus Content Services (hereafter collectively referred to

4

as "ePlus Systems"), divisions of ePlus, Inc. In addition to selling Content+ and Procure+ to companies in the market for e-procurement software applications, ePlus also markets the two products to support its so-called value-added reseller ("VAR") technology and IT products and with a view to retaining its finance business customers. ePlus refers to this business strategy as "cross-selling" and "up-selling" its VAR and IT products.

Lawson sells enterprise resource planning ("ERP") software, which is a suite of software packages related to financial management, human resource management, and supply chain management. With respect to supply chain management, Lawson has two different sets of solutions: M3 and S3. Within the broader S3 solution is the Core S3 Procurement System, which is comprised of Lawson System Foundation ("LSF") and ProcessFlow, used in combination with Lawson's Inventory Control, Requisition, and Purchase Order modules. Lawson's Requisition Self-Service ("RSS") and Punchout software products are designed to be used as add-on features to Lawson's Core S3 Procurement System. As explained in more detail below, it is the different configurations of the Core S3 Procurement System and RSS and Punchout which the jury found to infringe two of the patents-in-suit. In addition to its manufacture and sale of e-procurement software, Lawson also provides its customers with a range of

5

services for the infringing systems, including installation, implementation, hosting, maintenance, support, training, and consulting services. In fact, much of the revenue that Lawson derives from the infringing systems relates to those services.

When this action was filed, Lawson was not the only defendant. ePlus also sued three other companies: Verian Technologies, Inc. ("Verian"), SciQuest, Inc. ("SciQuest"), and Perfect Commerce, LLC ("Perfect Commerce"). ePlus entered into a Settlement and License Agreement with each of those three defendants at the outset of litigation. ePlus settled with Verian for $500,000 and Verian's agreement to pay ePlus ongoing royalties in the event that Verian's revenues exceeded certain thresholds. In exchange, ePlus granted to Verian and its affiliates a personal, non-exclusive, non-transferable, non-assignable (except in certain circumstances), non-sublicensable (except in certain circumstances) license to make, have made, import, export, sell and offer for sale, support and repair any products and services that were covered by one or more claims of the ePlus patents-in-suit. The license, however, does not extend to entities or their affiliates acquired by Verian.

SciQuest agreed to pay ePlus $2.4 million in exchange for ePlus's grant to SciQuest of a personal, non-exclusive, non-transferable, non-sublicensable, non-assignable license to make, import, sell, and offer for sale any products or services that

6

are covered by one or more claims of the ePlus patents-in-suit. However, the license does not extend to Lawson, nor to any entities that consummate an Asset Acquisition or a Stock Acquisition with SciQuest resulting in a change in control of SciQuest without ePlus's prior written consent, except in limited circumstances.

Finally, PerfectCommerce agreed to pay ePlus $750,000 in exchange for a personal, non-exclusive, non-transferable, non-sublicensable, non-assignable (except in limited circumstances) license to make, import, sell, and offer for sale any products or services that are covered by the ePlus patents-in-suit. Again, the license does not extend to Lawson.

Before this action was filed, ePlus had litigated the patents-in-suit against Ariba, Inc. ("Ariba")[3] and SAP America, Inc., a subsidiary of SAP AG (hereafter collectively referred to as "SAP"). Although both cases went to a jury, ePlus settled both cases and entered into license agreements with each company. In the Settlement and License Agreement with Ariba,

---

[3] ePlus sued Ariba, the leading provider of e-procurement solutions in the best-of-breed market, in 2004. ePlus, Inc. v. Ariba, Inc., Civ. Action No. 1:04-cv-612 (LMB/BRP) (E.D. Va. 2004). A jury determined that Ariba had willfully infringed all the asserted claims of the patents-in-suit and that all of the asserted claims were valid. See Special Jury Verdict, Feb. 8, 2005, Docket No. 281. After the jury returned the verdict but before the damages phase of the trial, the parties negotiated the Settlement and License Agreement.

7

ePlus granted Ariba a personal, non-exclusive, non-transferable, non-sublicensable, non-assignable license to the ePlus patents-in-suit in exchange for Ariba's payment of $37 million and a cross-license to Ariba's patents. ePlus then sued SAP.[4] The two parties eventually entered into a Patent and License Agreement, wherein ePlus, in exchange for a payment of $17.5 million, granted to SAP and its affiliates, vendors, customers, and authorized developers a non-exclusive, non-sublicensable license to the ePlus patents-in-suit to practice, design, make, have made, operate, have operated, use, sell, license, offer to sell or license and import licensed products (as defined in the agreement) and to practice any licensed process (as defined in the agreement). The agreements with Ariba and SAP also contained other restrictive provisions. In total, since acquiring the patents-in-suit in 2001, ePlus has generated nearly $60 million in revenue from the settlements, all of which ensued the commencement of litigation.

In this action gainst Lawson, ePlus sued for damages in the form of a royalty for past infringing sales. However, that

---

[4] ePlus sued SAP AG, and its U.S. subsidiary, SAP America, Inc., another large competitor in the e-procurement market, in the Richmond Division of this district. ePlus, Inc. v. SAP America, Inc., Civ. Action No. 3:05-cv-281 (JRS) (E.D. Va. 2005). After a three-week trial, the jurors were unable to reach a verdict. Order, May 1, 2006, Docket No. 355. The parties agreed to allow Judge Spencer to rule from the bench. However, while the matter was under his consideration, the parties entered into the Patent and License Agreement. See PX318, Patent and License Agreement.

issue was not submitted to the jury because the Court granted Lawson's motion *in limine* to preclude the testimony of ePlus's damage witness, Dr. Russell Mangum, on the ground that his report did not satisfy the requirements of Federal Rule of Evidence 702, Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993), or Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), and because, thereafter, the Court granted Lawson's motion to preclude ePlus from presenting any new damages theories at trial as a discovery sanction pursuant to Federal Rule of Civil Procedure 37 for the reason that ePlus had failed to disclose in its discovery responses any alternative methods of calculating damages, other than that offered in Dr. Mangum's expert report. See Docket Nos. 410, 472.

Trial commenced on January 4, 2011. On January 27, the jury reached a unanimous verdict and found that the '683 patent and the '172 patent were infringed, but not the '516 patent. The jury further found that all asserted claims of the patents-in-suit were valid. Specifically, the jury determined that the following configurations of Lawson's Core S3 Procurement System infringe the asserted claims identified below, both directly and indirectly:

- Lawson's S3 Procurement System (LSF/Process Flow, in combination with Inventory Control, Requisition, and

Purchase Order Modules) and RSS, infringes claim 1 of the '172 patent;

- Lawson's S3 Procurement System, RSS, and Punchout, infringes claims 3, 26, 28, and 29 of the '683 patent, and claim 1 of the '172 patent;

- Lawson's S3 Procurement System, RSS, Punchout, and Electronic Data Interchange ("EDI"), infringes claims 3, 26, 28, and 29 of the '683 patent, and claim 1 of the '172 patent; and

- Pursuant to the parties' Amended Final Pretrial Order (Docket No. 481), Section II,[5] because ePlus proved that the aforementioned configurations of Lawson's S3 Procurement System infringe claims 3, 26, 28, and 29 of the '683 patent, and claim 1 of the '172 patent, both directly and indirectly, ePlus also proved that Lawson's M3 Procurement System infringes claims 3, 26, 28, and 29 of the '683 patent, and claim 1 of the '172 patent, both directly and indirectly.

---

[5] Specifically, the parties agreed that "[i]n the event any of the accused products in the S3 Procurement Product Line are found to infringe any of the asserted claims, Lawson and ePlus stipulate that the accused products in the M3 Procurement Product Line made, used, sold, offered for sale and/or imported into the United States will likewise be found to infringe such claims." Am. Final Pretrial Order, Section II, ¶ 2, Sept. 23, 2010.

On March 27, 2011, the Court held an evidentiary hearing on the issue of a permanent injunction. The parties then briefed the issue, and on April 4, 2011, the Court heard oral argument. The issue is now ripe and ready for decision.

## DISCUSSION

Section 283 of the Patent Act authorizes district courts, upon a finding of infringement, to impose a permanent injunction "in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283. Before a court may grant a permanent injunction, the patentee must satisfy a four-factor test for injunctive relief:

> (1) that [the plaintiff] has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006); Acumed LLC v. Stryker Corp., 551 F.3d 1323, 1327 (Fed. Cir. 2008). In eBay, the Supreme Court once again reminded lower courts that patent law, although embodying some distinctive principles, nonetheless enjoys no exemption from most of the basic precepts which apply generally in our legal system.

There, the Supreme Court explained, that the time-tested rules governing entitlement to injunctive relief applied fully in patent cases, just as those principles are applied in deciding whether injunctive relief is available in non-patent cases. And, in so doing, the Supreme Court held that "the decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and that discretion must be exercised consistent with traditional principles of equity, in patent disputes no less than in other cases governed by such standards." eBay, 547 U.S. at 394. Each facet of the traditional test will be addressed in turn.

1. **ePlus Has Suffered, and Will Continue to Suffer, an Irreparable Injury**

   a.  **The Parties' Arguments**

ePlus and Lawson strongly disagree about whether, absent injunctive relief, ePlus has suffered, and will continue to suffer, irreparable harm due to Lawson's infringement of the '683 patent and the '172 patent. ePlus claims that it has suffered irreparable injury in many different forms. It argues that, in general, the protection of its statutory right to exclude competitors from infringing its patents often requires the remedy of a permanent injunction because infringement may cause a patentee irreparable harm not remediable by a reasonable royalty. More specifically, as irreparable injury, ePlus points

12

to lost sales of Procure+ and Content+, lost market share in the e-procurement software market, lost opportunities to cross-sell and up-sell its VAR technology, reputational injury, and its need to have diverted a substantial amount of its limited resources away from research and development of Procure+ and Content+ toward litigation expenses.

Furthermore, ePlus takes the view that as a "head-to-head" competitor with Lawson in the e-procurement software marketplace, it "'has a right, granted by Congress, not to assist its rival with the use of proprietary technology.'" Pl.'s Br. in Supp. at 10 (quoting Novozymes A/S v. Genencor Int'l, Inc., 474 F. Supp. 2d 592, 613 (D. Del. 2007)). And, says ePlus, absent injunctive relief, it will be forced involuntarily to license its technology to its competitor, which is "'a result antithetical to a basic tenet of the patent system, namely that the decision whether to license is one that should be left to the patentee.'" Id. at 12-13 (quoting Odetics, Inc. v. Storage Tech. Corp., 14 F. Supp. 2d 785, 795 (E.D. Va. 1998)).

In response, Lawson first argues that the two companies' products do not compete directly because they sell different kinds of software that compete in different industry segments. Furthermore, to the extent that there is direct competition, Lawson claims that fact alone cannot show irreparable harm to

ePlus because courts typically grant permanent injunctions only in circumstances where the patentee and infringer are direct competitors in a two-supplier market. In addition, Lawson asserts that ePlus has failed to show lost sales or lost market share because of Lawson's infringing products, and that ePlus has failed to support its allegation of reputational injury.

Furthermore, with respect to ePlus's alleged lost business opportunities and research and development opportunity costs, Lawson argues that not only are those past harms that should not be accounted for in this Court's decision whether to grant prospective injunctive relief, but ePlus has not proven these claimed harms regardless. Lawson also contends that ePlus's willingness to license its patents in the past, its delay in bringing suit, and its failure to seek a preliminary injunction should weigh against a finding of irreparable injury.

### b. Analysis of ePlus's Irreparable Injury

eBay teaches that there are no categorical rules or presumptions at a court's disposal when deciding whether to enter permanent injunctive relief following a finding of infringement. Accordingly, the specific facts of this case guide the Court's analysis of whether ePlus has met its burden with respect to the four eBay factors. ePlus's first burden is to demonstrate how and why its harm is irreparable. Voda v. Cordis Corp., 536 F.3d 1311, 1329 (Fed. Cir. 2008); MercExchange

L.L.C. v. eBay, Inc., 500 F. Supp. 2d 556, 577 (E.D. Va. 2007). After considering both the evidence adduced at trial and at the supplemental evidentiary hearing, as well as the arguments of both parties, the Court finds that, as a result of Lawson's infringement, ePlus has suffered, and will continue to suffer, irreparable injury that cannot be compensated adequately by a remedy at law.

At the outset of the irreparable harm analysis, the Court agrees with the view "that the violation of the right of exclusion during the limited term of the patent grant is an injury not easily repaired by damages at law." Trading Techs. Int'l, Inc. v. eSpeed, Inc., No. 04C5312, 2008 WL 4531371, at *2 (N.D. Ill. May 22, 2008) (citing eBay, 547 U.S. at 394). However, after eBay, the "statutory right to exclude," standing alone, is insufficient to justify permanent injunctive relief following a verdict of infringement. eBay, 547 U.S. at 392; see also Smith & Nephew, Inc. v. Synthes (U.S.A.), 466 F. Supp. 2d 978, 983-84 (W.D. Tenn. 2006) ("A violation of the right to exclude does not compel the conclusion that a patent holder cannot be adequately compensated by remedies at law, such as monetary damages."). The jury's finding of infringement, and the corresponding violation of ePlus's right to exclude, are factors that weigh in favor of a finding of irreparable harm, but ePlus must show more, and it has done so.

The fact that ePlus and Lawson directly compete in a marketplace is a significant factor in favor of a finding of irreparable injury. See SynQor, Inc. v. Artesyn Techs., Inc., No. 2:07-CV-497-TJW-CE, 2011 WL 238645, at *3 (E.D. Tex. Jan. 24, 2011) ("The best case for obtaining a permanent injunction often occurs when the plaintiff and defendant are competing in the same market."); Advanced Cardiovascular Sys., Inc. v. Medtronic Vascular, Inc., 579 F. Supp. 2d 554, 558 (D. Del. 2008) ("Courts awarding permanent injunctions typically do so under circumstances where plaintiff practices its invention and is a direct market competitor."). In the context of direct competition, "the harm in allowing the defendant to continue infringing is the greatest." SynQor, 2011 WL 238645, at *3.

The e-procurement software market, which comprises roughly half of the larger electronic supply chain management market, is extremely competitive. Companies such as Ariba, SAP, Oracle, Perfect Commerce, SciQuest, and Verian are a few of the many companies that compete in the market along with ePlus and Lawson. Oracle and SAP alone account for approximately forty percent of the market share and focus their efforts on large, global companies. Other vendors, such as ePlus and Lawson, focus on mid-market companies having market capitalizations between $50 million to $2.5 billion.

Within the e-procurement market are those vendors, like Lawson, that provide their customers with a range of other non-procurement software that can be implemented as a combined solution, so-called ERP providers. Apart from Lawson, other ERP vendors include SAP, McKesson, and Oracle. The e-procurement software market also contains niche, or "best-of-breed" vendors, like ePlus, who sell procurement software designed as a stand-alone procurement product or as a product that may integrated with other vendors' ERP software. Typically, best-of-breed vendors offer software that has more robust or superior functionality than the e-procurement software offered by ERP vendors.

Lawson's Core S3 Procurement System is an ERP software suite composed of LSF and ProcessFlow, used in combination with the Inventory Control, Purchase Order, and Requisition modules. Lawson's RSS and Punchout products are designed to be used as add-on features to this system. According to Lawson, when customers buy its Core S3 Procurement System, they generally do so with the intent to purchase more Lawson offerings, like RSS and Punchout, when seeking to add capabilities to their existing suite. There is no dispute that ePlus does not compete in the ERP market and Lawson does not compete in the best-of-breed market.

While RSS and Punchout only work with Lawson's Core S3 Procurement System, the S3 System is configured to allow for integration with a stand-alone e-procurement product, such as Procure+ and Content+. Thus, when an existing Lawson Core S3 Procurement customer, who does not own RSS or Punchout, is seeking further functionality with respect to e-procurement software, the two companies' products compete against each other for that business. While this may represent a small segment of the overall supply chain management market, the record establishes that Lawson and ePlus compete with one another in this segment.

Furthermore, the fact that Procure+ and Content+ have features that RSS and Punchout, combined with the Core S3 Procurement System, do not have will not preclude a finding of irreparable harm in this case. Nor should it, especially in a market geared toward providing potential customers with the ability to customize applications and software suites to particular needs and specifications. See i4i Ltd. P'ship v. Microsoft Corp., 598 F.3d 831, 861-63 (Fed. Cir. 2010) (affirming finding of irreparable harm despite the fact that the infringing product included countless additional features not present in the product made by patentee).

Further evidence of direct competition is found in the fact that both companies target similarly-sized companies and the

same customers in specific industries, including health care, retail, and education, to name a few. Both companies also have submitted responses to the same Requests for Proposals ("RFPs") from prospective customers. Moreover, of the 830 customers to whom Lawson has sold its infringing systems, ePlus has actively solicited 247 of those customers -- roughly thirty percent -- for sales of Procure+ and Content+. And, of the 7,989 unique customers Lawson has solicited for its Core S3 Procurement System, ePlus has solicited 2,041 of those customers -- roughly twenty-five precent -- for sales of Procure+ and Content+.

Finally, independent third party market analyst reports group the two companies as competitors in the e-procurement software market. See PX463, The Procurement and Sourcing Applications Report, 2005-2010 by AMR Research, at LE00216136 ("Companies with procurement applications include Ariba, ePlus, Epicor, Ketera, Lawson, Oracle, Quadrem, Osiris Innovations, SAP, SciQuest, and Vinimaya."). For instance, among the products of the eleven vendors The Forrester Wave: eProcurement Solutions Report, First Quarter 2011 ("Forrester Wave Report") compared were Procure+ and the S3 Supply Chain Management Suite. See PX690, The Forrester Wave: eProcurement Solutions, Q1 2011, at 5. According to the report, ePlus offers competitive options and scores "consistently with best-in-class capabilities in some areas," id. at 6, while Lawson's e-procurement solution scores

well in its own right, "so for most of [its] customers the integration and standardization advantages will outweigh minor functionality weaknesses," id. The Forrester Wave Report concluded that the best-of-breed specialists still lead the pack with respect to e-procurement solutions, but the ERP suites have closed the gap in terms of increasing their functionality. Id. at 3 ("The ERP giants have enhanced their products greatly over the past few years, so their functionality matches the specialists in most criteria and even exceeds it in others."). Confirmation by industry reports provides further support for the conclusion that the two companies' products compete against one another generally and for customers who desire to add further e-procurement functionality to their existing Lawson ERP suites. Thus, Lawson's protestations to the contrary notwithstanding, the record clearly establishes that there is direct competition between Lawson's infringing systems and Procure+ and Content+.

Lawson makes the related contention that, in general, courts that find irreparable harm when there is direct competition have done so only in a two-competitor market. Thus, says Lawson, because the e-procurement software market is highly competitive and saturated, the Court should give no weight to the fact of direct competition between ePlus and Lawson. However, mindful of eBay's lesson that each case is to be

decided on its own facts when assessing whether permanent injunctive relief is warranted, the Court rejects Lawson's generalized argument and finds that, notwithstanding the presence of more than two competitors (Lawson and ePlus) in the e-procurement software market, the direct competition between ePlus and Lawson in that market weighs heavily in favor of a finding of irreparable harm.

Other courts have drawn the same conclusion. For instance, in SynQor, Inc. v. Artesyn Technologies, Inc., No. 2:07-cv-497-TJW-CE, 2011 WL 238645, at *1, *3 (E.D. Tex. Jan. 24, 2011), the district court granted a permanent injunction in part because the plaintiff established irreparable harm in the form of direct competition against the eleven defendants in the market for unregulated and semi-regulated bus converters. The district court, in K-TEC v. Vita-Mix, -- F. Supp. 2d --, 2011 WL 285699, at *9 (D. Utah Jan. 26, 2011), rejected the infringer's argument that the presence of more than two competitors in the market negated the effect of direct competition, explaining that "while the evidence at trial established that Vita-Mix and K-Tec are not the only source of high-performance blenders, the evidence made clear that the two companies are direct competitors," a significant factor in the court's decision. Finally, in Callaway Golf Co. v. Acushnet Co., 585 F. Supp. 2d 600, 619–21 (D. Del. 2008), aff'd in part, vacated in part on other grounds,

21

576 F.3d 1331 (Fed. Cir. 2009), the district court granted a permanent injunction nowithstanding the presence of at least 15 competitors in the market for multi-layer or three-piece golf balls.

In this case, evidence at trial showed that Lawson and ePlus are direct competitors for certain customers in a highly competitive marketplace. And, absent injunctive relief, ePlus clearly faces further disability in competing for the part of the market in which it and Lawson compete directly. Lawson has cited no authority for the fact that irreparable injury can only occur in a two competitor market. And, the Court found no such rule, perhaps because such a generalized structure has no logical support. But, whatever else may be said, the record here calls for rejection of the precept urged by Lawson. Thus, the fact of direct competition between patent owner and infringer in the market proved by this record provides significant support for a finding of irreparable injury. Indeed, foreclosing Lawson's infringing products from the market will open more of the market to ePlus.

ePlus also has shown lost sales and lost market share because of Lawson's infringement. These lost sales also resulted in lost revenue to ePlus for the implementation/installation, maintenance, and servicing of the software. Though proving lost sales is not required to

demonstrate irreparable harm, see i4i Ltd. P'ship, 598 F.3d at 862 ("i4i was not required to prove that its specific customers stopped using i4i's products because they switched to the infringing Word products."), such a showing by ePlus further supports a finding of irreparable harm.

For instance, in November 2007, Deaconess Health System ("Deaconess") entered into a Statement of Work ("SOW") with Lawson to implement an infringing system. At the time, Deaconess licensed Procure+. Less than one year after entering into the SOW with Lawson, Deaconess terminated its license for Procure+ and explained to ePlus that from that point forward, it would be using Lawson to process orders, rather than Procure+. Furthermore, the cost of keeping both systems would be prohibitive. PX544, Email from P. Frenette to K. Farber (Aug. 27, 2008).[6]

---

[6] Lawson argues that Deaconess's termination of Procure+ cannot be deemed a "lost sale" because at the time Lawson entered into the SOW with Deaconess, it was using Matkon, a Procurement Application software package manufactured by McKesson. The evidence before the Court, however, demonstrates that Deaconess did have a license to Procure+ at the time it chose Lawson, which it subsequently terminated because of its purchase of Lawson's software. Furthermore, the Court notes that McKesson sells ERP software, like Lawson. Procure+, on the other hand, is a best-of-breed software product that can be integrated within a company's larger ERP suite. While the Court will not speculate as to whether Deaconess integrated Procure+ with its Matkon system, for Lawson to argue that Deaconess cannot be a "lost sale" because it was using Matkon is disingenuous.

In 2007, ePlus also met with Blue Cross Blue Shield of North Carolina ("BCBS") over a two-day period to discuss the possibility of BCBS integrating a best-of-breed solution, like Procure+, with its existing Lawson ERP suite. At the time of the meeting in 2007, BCBS was licensing an infringing system from Lawson that included an RSS application. ePlus's representative discussed the differences between Procure+ and BCBS's existing Lawson suite in relation to BCBS's purchase order needs. See PX558, Email from W. Thomas to S. Van Rooy (Nov. 12, 2007) ("For distributed requisitioning you would need Lawson eProcurement tool in addition to their Purchasing module. . . . If you went with ePlus you would only need Procure+ . . . because ePlus has [purchase order] capabilities combined with [r]equisitioning capabilities within one product."). Ultimately, however, BCBS continued to license a Lawson infringing system.

Finally, only last year, ePlus lost a sale of its Procure+ system to Lawson when Pharmaceutical Product Development, Inc. ("PPDI"), in seeking an e-procurement software solution, decided to remain with Lawson's software, rather than purchasing Procure+. At the time PPDI was licensing Lawson's Inventory Control, Requisitions, and Purchase Order modules. PPDI met with both Lawson and ePlus concerning RSS versus Procure+. See PX 572, Email from G. White to J. Pinkerton & B. Pelletier

24

(Sept. 11, 2010) ("Between us and Lawson. What are differences etc. . . . We need to compare and contrast Lawson RRS [sic] . . . ."); PX 571, Email from J. Pinkerton to P. Jarboe (Sept. 13, 2010) ("They have Lawson financials, and were looking at Lawson eProcurement, until they saw the pricing. Now they're looking at us as an alternative."). After ePlus's meeting and demonstration with PPDI representatives, ePlus received the following message from PPDI:

> Our group has evaluated Procure+ cost and implementation v. Lawson RSS cost and implementation. We remain committed to Lawson. The ongoing cost of Procure+ (and later eProcure) plus the internal ongoing cost of maintaining the Lawson interface was a factor. The review of Procure+ reminded us that our Project Global is based on the maximization of our Lawson investment and the commitment to have all financial information in one system. . . . We recognize the quality of you[r] products and appreciate the time and energy e+ put into this effort.[7]

---

[7] In opposing ePlus's characterization of PPDI as a "lost sale," Lawson claims that PPDI ultimately decided not to purchase either product. Def.'s Mem. in Opp'n at 7. To support this statement, Lawson cites to DX441A, Lawson's Sales Force Direct Competition Report, at 10 (row 30930). For the entry cited, PPD Req. Self Service, the "Created Date" is 7/22/09, while the "Close Date" is 12/31/2009. The evidence on which Lawson relies does not prove its point. A closed date of December 31, 2009 would have occurred well before the competition between RSS and Procure+ that occurred in late August and September 2010 as reflected in ePlus's emails. Accordingly, the Court discredits the support proffered for Lawson's contention, as the emails cited by ePlus and reviewed by the Court indicate that the competition between RSS and Procure+ was ongoing and ended well after the Sales Force Direct Competition Report indicates that Lawson was out of the deal.

25

PX 575, Email from T. McGraw to P. Norton (Oct. 1, 2010).

Lawson asserts that, because ePlus can point to only a small number of lost sales, that factor carries no weight. That argument ignores the fact that the record here shows that contract negotiation and award often are held in confidence and thus neither ePlus nor Lawson can know about all, or even most, of the awards to competitors. The argument ignores also the fact that ePlus still occupies a small place in the market in which it and Lawson compete. The fact that ePlus occupies a lesser place in the market serves to emphasize the impact of sales lost to an infringer. That supports a finding of irreparable injury attributable to sales lost to the infringer, even if they are not large in number. Consequently, though there may not be a large number of lost sales to Lawson's infringing software, due both to the fact that vendors compete against one another in secret generally and that ePlus is a relatively smaller vendor in the defined market, ePlus has put forth sufficient evidence of lost sales and lost market share to support a finding of irreparable harm.

As a result of these lost sales, ePlus also has lost the opportunity to cross-sell and up-sell its IT and VAR products to potential customers of Procure+ and Content+, who have instead

chosen to use Lawson's infringing software.   As one district court noted:

> The loss or gain of a customer may have harms or benefits beyond just the sale of the patented product.   Customers often choose to do all of their business with one supplier, therefore, <u>the ability to attract customers with exclusive access to an innovative product is often relied on to increase the sales of other products and services as well.</u>   The ancillary business that may come from converting customers of a competitor cannot be compensated by a mere royalty on the patented product.

<u>Bendix Commercial Vehicle Sys., LLC v. Haldex Brake Prods.</u>, No. 1:09cv176, 2011 WL 14372, at *6 (N.D. Ohio Jan. 3, 2011) (emphasis added).   Ancillary business, of course, includes what ePlus refers to as "cross-selling" and "up-selling" its IT and VAR products to customers who buy other products such as Procure+ and Content+.

The record shows that ePlus derives the majority of its revenue from its VAR business, and Procure+ and Content+ provide ePlus with opportunities to cross-sell and up-sell its VAR products to customers of Procure+ and Content+.   In 2010 alone, ePlus states that Procure+ and Content+ drove approximately $16 million in additional VAR hardware sales.   Moreover, sales of Procure+ and Content+ allow ePlus "to better support and retain [its] customers in [its] technology sales and finance business." PX523, ePlus 2010 Form 10-K, at 3.   The industry also has

27

recognized ePlus's business strategy to cross-sell and up-sell Procure+/Content+ with its VAR business: ePlus is "an IT reseller and provider of asset management services, so it unsurprisingly has exceptional support for IT categories such as searching by parameters, sourcing from inventory, asset management, and integration with IT service management products." PX 690, The Forrester Wave: eProcurement Solutions, Q1 2011, at 10. ePlus also acquired and has developed Procure+ and Content+ to "distinguish [itself] from [its] competition by providing a comprehensive offering to customers," and because customers in the industry increasingly "prefer bundled offers to include IT products/services and leasing," ePlus's offering of Procure+ and Content+ to customers is an added "competitive advantage." PX523, ePlus 2010 Form 10-K, at 3, 4. ePlus can only pursue its goal of becoming "a leading provider of bundled solution offerings in the IT supply chain," id. at 5, if infringers of its patents, like Lawson, are not permitted to compete in the marketplace. For the foregoing reasons, the record here shows that, absent injunctive relief, ePlus will continue to suffer irreparable harm due to the loss of this ancillary business.

ePlus, in enforcing its right to exclude, also has been forced to divert several millions of dollars away from research, development, and business opportunities toward litigation costs.

Inj. Hr'g Tr. 70:14–71:8; 117:11–18.  This represents a major lost opportunity to ePlus to grow its software business.  Inj. Hr'g Tr. 70:21–71:8.  For example, ePlus could have used the significant human and monetary resources expended toward litigation costs to continue developing and improving the functionality and capability of Procure+ and Content+, which continues to be important as ERP vendors, like Lawson, continue to improve the functionality of their own software, thereby closing the gap between themselves and best-of-breed vendors. See PX690, The Forrester Wave: eProcurement Solutions, Q1 2011, at 3 ("The ERP giants have enhanced their products greatly over the past few years, so their functionality matches the specialists in most criteria and even exceeds it in others."); id. ("The ERP giants' early attempts at eProcurement lacked usability, so many of the specialists grew by providing better catalog management and search front ends to ERP's purchasing modules.  However, although the best-of-breeds still stay slightly ahead, the suites have largely closed the usability gap.").

Lawson contends that diversion of resources from research and development toward litigation costs is a past harm, while permanent injunctive relief is prospective by nature.  "Although injunctions are tools for prospective relief designed to alleviate future harm, by its terms the first eBay factor looks,

in part, at what has already occurred." i4i Ltd. P'ship, 598
F.3d at 862. Therefore the Court can consider ePlus's past
diversion of its resources from research and development toward
litigation expenses. And, even if the Court did not consider
this past harm, if injunctive relief were not entered, ePlus
still "would be required to expend and divert resources that
could be used toward the advancement of its products and its
business" in order to monitor, challenge, and sue Lawson for all
future infringement. Bendix, 2011 WL 14372, at *6; see also
Commonwealth Scientific Indus. Research Org. v. Buffalo Tech.
Inc., 492 F. Supp. 2d 600, 604 (E.D. Tex. 2007) (explaining that
patentee's enforcement of patent rights in the courts "forces it
to divert millions of dollars away from research and into
litigation costs," and "[d]elays in funding result in lost
research capabilities, lost opportunities to develop additional
research capabilities, lost opportunities to accelerate existing
projects or begin new projects"). Once the opportunities for
research and development have passed, "they are often lost for
good, as another entity takes advantage of the opportunity."
Commonwealth Scientific, 492 F. Supp. 2d at 604.

ePlus argues, and rightly so, that without the prohibitive
force of an injunction and, of course, the availability of
judicial sanctions for violations thereof, it would be engaged
in a constant action to police Lawson's conduct. For a small

company that is a significant, and costly, undertaking. And, future infringements would necessitate new litigation, not just enforcement proceedings. As ePlus correctly points out, litigation with Lawson is very costly. Indeed, Lawson's highly contentious approach to this litigation, which was to contest virtually every issue (often needlessly and often with dubious reason), exacted a substantial toll on ePlus. The issuance of an injunction makes it less likely that ePlus will be forced to engage in extensive policing of Lawson or to incur extensive litigation expense because the in terroram effect of an injunction operates to provide a powerful incentive to Lawson to avoid future infringement. The lost opportunities for research and development of Procure+ and Content+ because of the need to expend resources in this litigation, and in future litigation should this Court not enter injunctive relief, constitute irreparable harm to ePlus that cannot be compensated by an adequate remedy at law.

Finally, Lawson argues that ePlus's failure to seek a preliminary injunction precludes a finding that ePlus has suffered, and will continue to suffer, irreparable harm absent entry of a permanent injunction. That argument lacks merit. See K-Tec, 2011 WL 285699, at *9 ("Even though K-Tec did not immediately seek injunctive relief, this fact alone does not defeat the permanent injunction."). First, a preliminary

injunction and a permanent injunction are "distinct forms of equitable relief that have different prerequisites and serve different purposes." Lermer Germany GmbH v. Lermer Corp., 94 F.3d 1575, 1577 (Fed. Cir. 1996). Moreover, there is no requirement that a party must seek a preliminary injunction as the predicate to securing a permanent one. Nor is the Court aware of authority that failure to seek a preliminary injunction counsels against a finding of irreparable injury. Indeed, principles of judicial efficiency and sound judicial administration strongly militate against such a rule, lest the courts be besieged with motions for preliminary injunction filed to preserve the right to permanent injunctive relief.

Likewise, ePlus's alleged "delay" in bringing suit against Lawson will not prevent a permanent injunction. While delay can be a factor in deciding whether to issue an injunction, i4i Ltd. P'ship v. Microsoft Corp., 670 F. Supp. 2d 568, 599 (E.D. Tex. 2009), the Court is aware of no requirement in the statute or caselaw that requires a patentee to bring suit against all infringers at one time. That is particularly true where, as here, the patent holder is a small company with limited resources. Here, ePlus prosecuted enforcement actions against two very large infringers. Then, it turned its resources to four others in a single action. Under the circumstances, the Court does not find the delay on ePlus's part to be

unreasonable. Accordingly, neither the "delay" in bringing suit or ePlus's failure to seek a preliminary injunction will prevent a finding of irreparable injury.

For the foregoing reasons, ePlus has established that, without a permanent injunction, it will suffer irreparable injury because of Lawson's infringement.[8]

## 2. ePlus Has no Adequate Remedy at Law

Whether a patentee has an adequate remedy at law "inevitably overlaps" with whether a patentee has suffered irreparable harm. MercExchange, 500 F. Supp. 2d at 582. On the record in this case, damages at law would not be an adequate remedy for the irreparable harm ePlus has suffered, and will continue to suffer, as a result of Lawson's infringement. ePlus has demonstrated that Procure+ and Content+ directly compete with certain configurations of Lawson's Core S3 Procurement System in combination with RSS and Punchout, that it has lost specific sales to the infringing systems, that it has lost the opportunity to cross-sell and up-sell its VAR products, that it has lost the opportunity to devote time and resources to further research and development of its e-procurement software in order to remain relevant in the marketplace, and that its right to exclude has been violated as a result of Lawson's infringement.

---

[8] The record does not support that ePlus has sustained reputational injury.

These harms are of the kind that defy attempts at monetary valuation. It is "this difficulty in estimating monetary damages [which] reinforces the inadequacy of a remedy at law." Broadcom Corp. v. Qualcomm Inc., 543 F.3d 683, 703 (Fed Cir. 2008). As a consequence, ePlus's remedies at law are inadequate to compensate for the irreparable harm it will continue to suffer absent permanent injunctive relief. See Acumed, 551 F.3d at 1328 ("In view of [the right to exclude], infringement may cause a patentee irreparable harm not remediable by a reasonable royalty."); SynQor, 2011 WL 238645, at *3 (explaining that patentee "makes and sells products and has a presence in the relevant market," with name recognition, goodwill, and market share, and the "loss associated with any of these effects is particularly difficult to quantify"); i4i Ltd. P'ship, 670 F. Supp. 2d at 600 ("This continuing loss of market share . . . is the type of injury that is both incalculable and irreparable."); Trading Techs., 2008 WL 4531371, at *3 ("TT's right to exclude is not compensated by monetary damages.").

Lawson, however, argues that the injury inflicted on ePlus by its infringement can be satisfactorily addressed by an award of money damages in the form of a going forward running royalty. Of course, as Lawson contends, the courts have recognized that, in some cases, such a remedy is an adequate one at law. Paice LLC v. Toyota Motor Corp., 504 F.3d 1293, 1313-15 (Fed. Cir.

2007) (citing <u>Shatterproof Glass Corp. v. Libbey-Owens Ford Co.</u>, 758 F.2d 613, 628 (Fed. Cir. 1985)).

To begin, Lawson argues that, because ePlus has arrived at licenses with five other companies, the Court can use those licenses to arrive at a going forward royalty here. That, of course, is a passing strange argument, considering that Lawson's successful motion to preclude Dr. Mangum's testimony was based, in large measure, on the contention that those five licenses did not permit an adequate basis upon which to calculate a reasonable royalty. Lawson does not explain how the Court could turn around now and use those licenses to arrive at a reasonable post-verdict running royalty. This rather disingenuous argument thus fails for that reason alone.

Moreover, as Lawson so effectively argued in seeking the exclusion of Dr. Mangum's testimony, each of the five licenses reflects unique considerations which defy quantification. For example, the license to Ariba contained a cross-license to Ariba's patents, while the license with SAP included SAP's covenant not to sue ePlus. All five licenses contained various restrictive limitations as well as the rights to use the patents. Each license agreement also reflected the result of different perceived litigation strength and weaknesses based on litigation developments, such as verdicts (Ariba), a hung jury (SAP) and the avoidance of litigation costs by an early-stage

settlement (Verian, SciQuest, and PerfectCommerce). The Court cannot envision a reasonable, reliable way to use those five licenses to arrive at an ongoing royalty.[9] And, of course, Lawson has made no suggestion to that end. On this record, it is not possible to conclude that an ongoing, post-verdict royalty could be ascertained at all, much less in a way that a reviewing court would find to be reliable. For that additional reason, Lawson's proposed remedy at law is not adequate.

Apart from the foregoing reasons, it is important to note that ePlus arrived at the Ariba and SAP settlements at the urging of the Court. The willingness of ePlus to compromise during judicially-required settlement cannot be used as proof that there will be no irreparable injury to ePlus if an injunction is not granted. That is particularly so here where, as Mr. Farber, President of ePlus Systems, testified, Lawson has declined even to make an offer that would provide any framework for negotiation of a reasonable royalty. But, apart from that, courts simply cannot be heard to urge parties to settle and then

---

[9] Apart from whether this Court could fashion an ongoing royalty using the five prior licenses, as Lawson urges, the Court harbors serious doubt as to whether it has any authority to incorporate the various intangible provisions included in the prior licenses. See H. Tomas Gomez-Arostegui, Prospective Compensation in Lieu of a Final Injunction in Patent and Copyright Cases, 78 Fordham L. Rev. 1661 (2010). The Court's doubts as to its authority to integrate the types of provisions found in ePlus's prior licenses bolsters its firm conclusion that awarding an ongoing royalty in this case would be inappropriate.

36

to use the fact that they settled against them. Yet, that is the skewed logic that animates Lawson's argument that the five licenses, all negotiated in the litigation process, prove that there is no irreparable injury.

Finally, if no injunction issues, ePlus will be forced to license its patents to Lawson without any of the restrictions and protections that it has negotiated in the other licenses. Those restrictions, of course, can often be as important as the monetary payment for the license, see Trading Techs., 2008 WL 4531371, at *4 (finding patentee's concerns valid regarding a compulsory license in the absence of an injunction when such a license would fail to contain the protections that a license agreement would normally possess); Commonwealth Scientific, 492 F. Supp. 2d at 606 (explaining that ongoing royalty payments may "not necessarily include other non-monetary license terms that are as important as monetary terms to a licensor"), and imposing a license without them would lead to a result "antithetical to a basic tenant of the patent system, namely that the decision whether to license is one that should be left to the patentee," Odetics, 14 F. Supp. 2d at 795. The Court could not fashion a royalty that could account for the myriad of factors and fact-specific circumstances that each licensee and ePlus accounted for when negotiating the licenses, making damages inadequate in this case.

Even if those difficulties in ascertaining a reasonable post-verdict royalty could be surmounted (which they cannot), ePlus correctly points out that enforcing that royalty would be almost impossible. That is because Lawson's internal accounting system does not track sales and profitability at the product level for the infringing configurations, thereby making verification of royalty payments nearly impossible. ePlus says also that, when one considers that difficulty in perspective of Lawson's generally contentious approach to dispute resolution, ePlus rightly apprehends that enforcement of running royalty payments would likely lead to further costly litigation. Lawson's approach to this litigation confirms that enforcement of a court-ordered royalty would present the serious risk of further, expensive litigation, a consequence which underscores why the royalty option does not present an adequate remedy at law.

Finally, it is significant that ePlus practices its patents. In MercExchange, not only did the patentee consistently seek to license its patents to market participants -- including the infringer both before and after trial -- but the patentee exhibited a lack of commercial activity in practicing its patents and consisted of two employees who worked out of their home offices. MercExchange, 500 F. Supp. 2d at 570, 582. Together, these facts indicated to the district court

that the patentee "utilized its patents as a sword to extract money rather than as a shield to protect its right to exclude or its market-share, reputation, goodwill, or name recognition." Id. at 572.

In contrast, since Lawson first began infringing the ePlus patents through the present, ePlus has generated in excess of $50 million in revenue from sales and maintenance of Procure+ and Content+. As part of its sales strategy, ePlus follows leads it obtains through third-party lead-generation firms and databases, and it contacts new customers and customers of other ePlus products or services by email and phone. It participates in seminars, conferences, and trade shows where its representatives demonstrate and promote the software. ePlus often receives and responds to RFPs from potential customers as well. And, with offices in three states and approximately 40 employees, it is obvious to the Court that ePlus Systems devotes time and resources to the promotion and sale of its products. In sum, even though ePlus has licensed the patents-in-suit in the past, ePlus's has practiced and continues to practice its patents in order to increase its market share, and this is significant in resolving the effect to be given to its prior licensing activity. In the Court's estimation, the fact that ePlus has granted licenses in the past does not mean it must do

so again, especially to an adjudicated infringer to whom ePlus does not wish to license its patents.

For the foregoing reasons, ePlus has carried its burden to show that it has no adequate remedy at law.

### 3. Balance of the Hardships Weighs in Favor of an Injunction

The third facet of the injunction test, balance of the hardships, "assesses the relative effect of granting or denying an injunction on the parties." i4i Ltd. P'ship, 598 F.3d at 862. The injunction's effect on third parties is irrelevant. See Acumed, 551 F.3d at 1330 ("[T]he balance considered is only between a plaintiff and a defendant, and thus the effect on [third parties] . . . is irrelevant under this prong of the injunction test.").

As previously explained, absent an injunction, ePlus will continue to suffer irreparable harm from Lawson's infringement, negatively impacting ePlus's ability to increase its market share, which in turn impacts its revenues from sales/servicing of Procure+ and Content+ and cross-sales/up-sales of its VAR products. Moreover, if the Court were to deny injunctive relief, Lawson's continued infringement will harm ePlus's ability to devote resources to research and development of Procure+ and Content+ and violate ePlus's right to exclude. ePlus has suffered years of infringement by Lawson, and the

patents are due to expire in a few years. To put an end to Lawson's infringement is the reason the Court is authorized under 35 U.S.C. § 283 to issue injunctive relief.

Any harm to Lawson will be minimal in comparison. Lawson contends that, if the Court grants an injunction, it will lose new sales and customers and sustain damage to its reputation and goodwill. These instances of "harm," simply "mirror[] the success" that Lawson has enjoyed in the marketplace and they, of course, are the consequence of infringing ePlus's patents. E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co., 659 F. Supp. 92, 95 (D. Del. 1987) (citation and quotation marks omitted). "One who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected." Windsurfing Int'l Inc. v. AMF, Inc., 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986); see also i4i Ltd. P'ship, 598 F.3d at 863 ("[N]either commercial success, nor sunk development costs, shield an infringer from injunctive relief." (citing Broadcom, 543 F.3d at 704)).

There is no contention that an injunction will drive Lawson out of business; rather, it appears that an injunction will have little collateral effect on Lawson as a whole. Lawson is a large company, with many different product offerings unrelated to its infringing e-procurement software. Testimony indicated

that, notwithstanding the issuance of an injunction, Lawson will still be able to compete in the supply chain management market.

Lawson also has indicated that it is in the process of designing around the infringing configurations of RSS, thereby eliminating any harm that might befall Lawson from an injunction going forward with respect to sales of RSS.[10]  See MercExchange, 500 F. Supp. 2d at 584 ("Additionally, eBay has claimed to the public and this court that it designed around the '265 patent, and thus, taking eBay at its word, it appears that no harm would befall eBay by the issuance of an injunction.").

Finally, Lawson claims that it will sustain irreparable harm if the Court issues an injunction because thus far, all of the claims the jury found to be infringed by Lawson's systems have been rejected as invalid during pending reexamination proceedings.  According to Lawson, the chances of the Federal Circuit affirming the Patent Office's rejection of the infringed

---

[10] In fact, on May 6, 2011, Lawson indicated that it was in the process of developing a new product called Requisition Center ("RQC"), which Lawson states is a re-design of RSS to avoid infringement as detailed in the jury's verdict.  Letter from D. McDonald to S. Robertson, at 1 (May 6, 2011) ("The RQC Configuration, which combines the new RQC product with Lawson's Core S3 Procurement System, lacks certain features of [RSS], and is believed to avoid infringement of [claim 1 of the '172 patent]." (footnotes omitted)).  On May 18, 2011, Lawson made the RQC product generally available for download for those customers who have purchased the product.  Letter from D. McDonald to S. Robertson, at 1 (May 18, 2011).  Lawson states that it plans to sell the RQC product rather than RSS going forward.  Id.

claims are high enough such that any injunction this Court enters against Lawson would eventually be lifted. And, because it will not be compensated for any damage during the period of an erroneously issued injunction, Lawson claims that the reexaminations should tip sharply against entry of a permanent injunction. Of course, a jury has found that the claims at issue are valid. The Court cannot, as Lawson would have it, simply ignore the verdict. And, as discussed in further detail in the analysis of Lawson's motion to stay, because of the uncertainty of the outcome of the re-examination process and the indeterminate, though no doubt protracted, length of time the entire reexamination process will take, it is not appropriate to negate the jury's verdict and leave ePlus with no remedy for Lawson's infringement of ePlus's valid patents. The pending reexaminations simply do not tip the balance of hardship in Lawson's favor.

In view of the foregoing, the balance of hardships weighs heavily in favor of permanent injunctive relief.

**4. The Public Interest Weighs in Favor of an Injunction**

The Court's analysis of the final consideration, the public interest, also supports entry of a permanent injunction in ePlus's favor. The public has a strong interest in "'maintaining the integrity of the patent system.'" MercExchange, 500 F. Supp. 2d at 586 (quoting Odetics, 14 F.

43

Supp. 2d at 795). The Federal Circuit has "long acknowledged the importance of the patent system in encouraging innovation." Sanofi-Synthelabo v. Apotex, Inc., 470 F.3d 1368, 1383 (Fed. Cir. 2006). "Indeed, the 'encouragement of investment-based risk is the fundamental purpose of the patent grant, and is based directly on the right to exclude.'" Id. (quoting Patlex Corp. v. Mossinghoff, 758 F.2d 594, 599 (Fed. Cir. 1985)). Thus, the Court gives considerable weight to the strong public interest favoring entry of injunctive relief to protect ePlus's patent rights. However, "the touchstone of the public interest factor is whether an injunction, both in scope and effect, strikes a workable balance between protecting the patentee's rights and protecting the public from the injunction's adverse effects." i4i Ltd. P'ship, 598 F.3d at 863 (citing Broadcom, 543 F.3d at 704).

The analysis in this case has been focused by Lawson on the effects that an injunction is thought by Lawson to have for the 277 RSS and Punchout customers who provide healthcare services, representing some 2500 hospitals in the United States that use the infringing software to purchase a multitude of products, including surgical supplies, lab supplies, and critical care supplies.

There is no dispute among the parties that the injunction will not reach customers' continued use of infringing systems

purchased before the verdict. See id. ("By excluding users who purchased or licensed infringing Word products before the injunction's effective date, the injunction greatly minimizes adverse effects on the public."). However, the Court will enjoin Lawson's continued service and maintenance of the infringing systems sold before the verdict, notwithstanding Lawson's argument that the reach of such an injunction will harm the public interest.

Lawson has maintenance contracts with every customer who runs RSS and Punchout, obligating it to provide not only ongoing support services, such as call-in and help-desk support, but also ongoing maintenance of the software, including the release of patches, updates, product upgrades, and the like to guarantee that the systems continue to run smoothly. No company other than Lawson can provide maintenance or service support for RSS and Punchout. This ongoing service and maintenance support is important to customers because, if a customer encounters an issue or problem with the software and is unable to turn to Lawson for support, then the customer may not be able to run the system. For instance, Providence Health, an RSS customer, has filed an affidavit that, if Lawson is prevented from servicing and maintaining the RSS software, in the event of a malfunction, the hospital would be "unable to adequately locate resources needed for continued operation of our hospitals and healthcare

facilities." DX-486, Reasoner Decl. ¶ 13. Rockford Health System, another Lawson customer, filed an affidavit noting that it could suffer harm from an inability "to place orders in a timely manner," "to maintain inventory of items critical to patient care," and an increase in operational costs. DX-484, Johnson Decl. ¶ 10.

The record also shows that it can take from three to eighteen months for a company to go through the process of selecting an e-procurement software vendor, and a formal RFP process may further prolong the process. Once a customer selects an e-procurement vendor, it may take several more months, perhaps longer, to install, implement, and deploy the e-procurement software to the customer's users, who can sometimes number in the thousands. Switching to a competitor's product, according to Lawson, is therefore not a viable option for its healthcare customers.

ePlus disagrees with Lawson's argument, noting that an injunction ultimately will not prevent any hospital or medical facility from purchasing or obtaining needed equipment or supplies, or from providing any form of medical treatment. The Court is inclined to agree with ePlus. Though Lawson's pre-verdict RSS and Punchout healthcare customers may become inconvenienced by virtue of an injunction against Lawson's ongoing maintenance and service of their infringing systems, the

record does not establish that these customers or the public would suffer such adverse effects as to prevent injunctive relief against Lawson's continued maintenance and support of these systems.

First, there are suitable non-infringing product alternatives available from ePlus, its licensees, or a goodly number of other e-procurement software competitors. If the healthcare customers at issue were to switch to ePlus, it is more than capable of implementing replacement systems, estimating a time frame of 30 days to six months at a cost of around $150,000. In addition, ePlus's consulting partners could deploy hundreds of personnel to assist in any massive replacement of infringing systems. Thus, any disruption to Lawson's healthcare customers can be cured, albeit at some not insubstantial cost to the customer. In fact, Lawson's witness at the evidentiary hearing, Dean Hager, acknowledged that to be the case. Inj. Hr'g Tr. 192:9-20; 220:2-221:1; 222:17-223:20; 242:17-243:3.

Second, Lawson is obligated contractually to indemnify these customers for the loss of use of the infringing systems by obtaining the right for the customers to use the infringing product, replacing or modifying the products so they become non-infringing, or terminating the licenses and reimbursing the

customers an amount equal to the license fees paid. This provision minimizes financial harm to Lawson's customers.

Third, of Lawson's 277 healthcare customers, only two appeared here to register concern about entry of an injunction. And, those two affidavits were generalized statements of inconvenience. In any event, what those two affidavits show is that the ordering process would become slower, not that it would stop. No doubt, the process will be inconvenient, but that is an insufficient reason to refrain from issuing an injunction, especially where, as here, all four factors counsel in favor of issuing injunctive relief.

Fourth, in order to further alleviate any harm, the injunction will contain, with respect to those 277 healthcare customers,[11] a sunset provision providing that the injunction is to take effect six months from entry of the injunction order. This will provide to Lawson's healthcare customers adequate time to transition to non-infringing systems.

In assessing the injunction's effect on the public, the Court is satisfied that the public interest lies in favor of granting injunctive relief to ePlus. And, any potential harm to

---

[11] Lawson's arguments on this eBay factor, for the most part, concern the injunction's effect on Lawson's healthcare customers only, indicating to the Court that Lawson does not apprehend any serious effect on the remainder of its customers who purchased an infringing system before the verdict.

48

Lawson's pre-verdict healthcare customers will be minimized, if not eliminated, by the availability of non-infringing alternatives, the sunset provision, and the indemnification provisions in Lawson's licensing contracts. Because all four eBay factors support entry of injunctive relief against Lawson, the Court will grant a permanent injunction to ePlus.

## 5. Scope of the Injunction

Lawson argues that the scope of ePlus's proposed injunction exceeds what is allowed by Rule 65(d) of the Federal Rules of Civil Procedure. That rule directs that "[e]very order granting an injunction . . . must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail . . . the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1). "[T]he only acts the injunction may prohibit are infringement of the patent by the adjudicated devices and infringement by devices not more than colorably different from the adjudicated devices." Int'l Rectifier Corp. v. IXYS Corp., 383 F.3d 1312, 1316 (Fed. Cir. 2004). "[A] permanent injunction that simply prohibits future infringement of a patent" is not specific enough to comply with the requirements of Rule 65(d). Id. Furthermore, Rule 65(d) allows a court to enter injunctive relief against only the parties and those acting in concert or participation with the parties, including the parties' officers,

agents, servants, employees, and attorneys. Fed. R. Civ. P. 65(d); Vita-Mix, 2011 WL 285699, at *10.

First, Lawson contends that any injunction should not extend to Lawson's service, maintenance, or repair of infringing systems it sold prior to the verdict. Second, Lawson asserts that the injunction should not apply to the Core S3 Procurement System. Third, it argues that the injunction against RSS should expire when the '172 patent expires. Fourth, Lawson maintains that portions of the proposed injunction order are too vague to comply with Rule 65(d). Each argument will be addressed in turn.

Lawson first claims, relying on Fonar Corp. v. General Electric Co., 107 F.3d 1543 (Fed. Cir. 1997), and Odetics, Inc. v. Storage Technology Corp., 185 F.3d 1259 (Fed. Cir. 1999) ("Odetics III"), that ePlus overreaches by seeking to enjoin Lawson's continued service and maintenance of infringing systems it sold pre-verdict because the Court precluded ePlus from obtaining damages on the sale of these infringing systems. Lawson argues that allowing ePlus to enjoin Lawson from "fixing, updating, repairing, maintaining, and/or servicing" the systems it sold before the verdict would "give ePlus the improper leverage of an injunction to extract royalties that it was specifically precluded from recovering by this Court." Def.'s Mem. in Opp'n at 28. ePlus responds that Lawson's reasoning has

no basis in the law or the facts, arguing that each act of service, installation, implementation, training, and maintenance performed by Lawson is an act of infringement.

The Federal Circuit has never addressed the specific question of whether a patentee, who has been precluded, as a result of a discovery sanction, from seeking damages (here in the form of a reasonable royalty) on the pre-verdict sales of infringing products manufactured and sold by the infringer, may then seek to enjoin the infringer from servicing and maintaining those pre-verdict infringing systems. Lawson argues that the Federal Circuit decisions in Fonar and Odetics III compel the conclusion that the infringer should not be so enjoined. ePlus argues to the contrary.

35 U.S.C. § 271 states that "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States . . . infringes the patent." 35 U.S.C. § 271(a) (emphasis added). In this case, Lawson makes and sells various configurations of its software that the jury found to infringe, both directly and indirectly, the '172 and '683 patents. Lawson was adjudicated to be a direct infringer because it had no authority from ePlus to make or sell the infringing systems, and, when Lawson's customers purchased the systems, they became direct infringers because they used the infringing systems without authority. However, if Lawson had

51

made and sold the systems with ePlus's authority, its customers, when they purchased and used the systems, would not have infringed the patents because "it is fundamental that sale of a patented article by the patentee or under his authority carries with it an 'implied license to use.'" Aro Mfg. Co. v. Convertible Top Replacement Co., 377 U.S. 476, 484 (1964) (quoting Adams v. Burke, 84 U.S. 453, 456 (1873)) (emphasis added). But without ePlus's authority, Lawson could not confer an implied license upon its customers when it sold and made the infringing systems, and the customers' use of the systems thus infringed the '172 and '683 patents under § 271(a).

The jury also found that Lawson indirectly infringed the '172 and '683 patents. By fixing, updating, repairing, maintaining, and/or servicing the infringing systems, Lawson engages in indirect infringement because "[w]here use infringes, repair does also, for it perpetuates the infringing use." Id. (emphasis added). Accordingly, every time that Lawson fixes, updates, services, repairs, or maintains the infringing system configurations for its customers, it engages in indirect infringement by perpetuating its customers' infringing use. Lawson's infringement in this manner should therefore be enjoined. Lawson, however, asserts that the decisions in Fonar and Odetics III compel a different conclusion because, like the patentees in those two decisions, ePlus was barred from seeking

monetary damages on the infringing systems Lawson sold before the verdict.

In Fonar, the patented invention related to a technique for using MRI scanners. Fonar, 107 F.3d at 1546. The patentee accused GE, the manufacturer and seller of MRI equipment, and South Shore Imaging Associates ("SSIA"), the user of GE's equipment, of infringing Fonar's '966 patent. Id. at 1547. The jury returned a verdict in favor of Fonar, finding that GE had directly infringed the '966 patent and had induced such infringement based on GE's repair of certain scanners that infringed the patented invention. Id. GE moved for judgment as a matter of law on the inducement finding, and the district court granted the motion. Id.

The Federal Circuit affirmed the district court's ruling, observing that Fonar had failed to mark its products that were the subject of the inducement claim. Id. at 1555. Under 35 U.S.C. § 287(a), a patentee's failure to mark precludes the patentee from seeking damages in any action for infringement before notice was given to the infringer. Essentially, Fonar's failure to mark meant that GE had Fonar's authority to manufacture and sell its MRI equipment to SSIA and other customers. Having the patentee's "authority", in turn, meant that SSIA and other customers had an "implied license to use" and were not directly infringing the '966 patent. Thus, when GE

53

serviced, i.e., repaired, these machines, it could not induce any infringement of the patent because the customers were not directly infringing the patent through unauthorized use. As the Federal Circuit noted, "[o]ne is entitled to repair that which is sold free of liability for infringement." Id. Fonar's failure to mark its product, therefore, precluded not only past damages for those products, but also an injunction against future repair of products made, sold, and used during the period where there was no marking.

In Odetics III, the infringing product was an automated storage library system manufactured and sold by Storage Technology Corporation ("STK"), and used by Visa and Crestar Bank ("Crestar"). Odetics III, 185 F.3d at 1262. A jury found STK, Visa, and Crestar infringed the patent and awarded Odetics damages for STK's infringement, but not for Visa and Crestar's infringing use. Odetics, Inc. v. Storage Tech. Corp., 14 F. Supp. 2d 785, 787-88 (E.D. Va. 1998) ("Odetics II"). Early in the litigation, the district court had granted the defendants' motion for summary judgment on the ground of laches, thereby precluding Odetics from recovering damages for any infringement occurring before the date the action was filed. See Odetics, Inc. v. Storage Tech. Corp., 919 F. Supp. 911 (E.D. Va. 1996) ("Odetics I").

Odetics sought a permanent injunction after the jury's infringement verdict seeking to enjoin STK from making, using, selling, maintaining, or repairing all infringing systems, whether purchased before or after the laches period, and to enjoin Visa and Crestar from using all infringing systems they had purchased, whether before or after the laches period. Odetics II, 14 F. Supp. 2d at 788. The district court concluded that Odetics could not be denied injunctive relief against STK's future manufacture and sale of infringing systems. Id. at 790. However, an open question remained as to whether "laches bars not only retrospective recovery of damages, but also all remedies related to future use of infringing products made and sold during the laches period." Id. (emphasis added). The district court answered that question affirmatively, explaining that:

> a finding of laches must preclude a patentee from obtaining an injunction prohibiting the use of any infringing product that was manufactured and sold during the laches period. Were the answer otherwise then the purpose and effect of the laches remedy would be significantly undercut, if not wholly erased. The purpose of a laches defense is to punish dilatory patentees and in so doing to encourage all patentees to seek infringement remedies in a timely manner. This purpose would be frustrated if dilatory patentees lost only past infringement damages for laches products, but could still obtain an injunction as to future products.

Id. (footnote omitted).

In supporting its position, the district court found that the marking provision of § 287 at issue in Fonar was analogous to the doctrine of laches, "inasmuch as both bar past damages relief owing to the absence of proper notice." Id. at 792. And, before the time that proper notice is given to the alleged infringer, any products made, sold, and used cannot be the subject of any remedy, whether legal or equitable, because there is an implied license of authority from the patentee. Id. (citing Fonar, 107 F.3d at 1555). The district court concluded that "Odetics's delay in giving notice of infringement prevents it from seeking injunctive relief, either as to Visa's and Crestar's use, or as to STK's service and repair, with respect to any infringing systems sold" before the complaint was filed. Id. As the Federal Circuit explained in affirming this ruling of the district court: "[The patentee's right to exclude] is held by the patentee against the public; by inexcusably failing to exercise timely its right to exclude, the patentee, in effect, authorizes the public to infringe -- to 'make, use, offer to sell, or sell' a patented invention -- during the laches period." Odetics III, 185 F.3d at 1273.

Based on these decisions, Lawson urges that, because the Court precluded ePlus from seeking monetary relief for the infringing systems Lawson sold to customers before the verdict,

ePlus should be precluded from seeking an injunction against Lawson's repair, service, and maintenance of these systems. The Court, however, declines to extend the reasoning of Fonar and Odetics III to the facts of this case.

Essentially, Lawson seeks a ruling that a discovery sanction which barred ePlus from recovering past damages because of an inadmissible expert report and a failure to disclose alternative grounds for damages should equate to a finding that ePlus failed to exercise its right to exclude, thereby impliedly authorizing Lawson to make and sell the infringing systems, Lawson's customers to use the infringing systems, and Lawson to repair/service/maintain the systems. Nothing in the reasoning of the Fonar and Odetics' decisions makes such a conclusion tenable. ePlus began marking its patents in 2003 and was not dilatory in bringing suit against Lawson. On the contrary, ePlus has consistently exercised its right to exclude, as shown by its litigation history, and brought suit against Lawson in a reasonably timely manner.

What Lawson, in effect, seeks is an additional remedy for ePlus's failure to satisfy Federal Rule of Evidence 702, Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993), or Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999). Exclusion of the deficient testimony was a sufficient sanction and the appropriate one. No purpose of F.R.E. 702 or Daubert and Kumho

would be served by foeclosing injunctive relief to ePlus as well. ePlus also sought to admit other proofs of its damages (again a reasonable royalty). Lawson opposed that effort by contending, and rightly so, that on discovery ePlus had not made disclosures or answered interrogatories[12] so as to disclose the approach sought to be taken after the expert's testimony was precluded. Acting under Rule 37, the Court sustained Lawson's objection to the alternate proof. To adopt Lawson's view in opposing ePlus's motion for a permanent injunction could be to impose as a discovery sanction, an absolute bar to a statutorily permitted remedy even where the legal requisites for the availability of that remedy have been satisfied. In effect, then, to accept Lawson's suggestion would be to impose an additional discovery sanction under Rule 37.

Although, under certain circumstances, Rule 37(c), by allowing sanction under Rule 37(b)(2)(A)(i)-(vi), might permit foreclosing access to injunctive relief, it does not do so here because courts are required to impose the least drastic sanction to remedy the discovery breach. That was done here by precluding the expert's testimony. It would be gross overkill, and indeed fundamentally unfair, also to foreclose injunctive relief. Accordingly, the Court declines to extend the reasoning

---

[12]  ePlus's disclosures and interrogatory answers identified only the stricken expert's report as the predicate for its reasonable royalty claim.

of Fonar and Odetics III to the circumstances in this case and finds that Lawson's fixing, updating, repairing, maintaining, and/or servicing of infringing systems sold before the verdict is indirect infringement that should be enjoined.[13]

Next, Lawson argues that, because the jury did not find that the Core S3 Procurement system alone or in combination with EDI infringes any claim, the Court should not enjoin LSF, ProcessFlow, the Inventory Control, Requisition, or Purchase Order modules, or EDI. According to Lawson, only RSS and Punchout should be enjoined. Lawson's premise is simply wrong. "[T]he only acts the injunction may prohibit are infringement of the patent by the adjudicated devices and infringement by

_____

[13] Lawson makes the related claim that it should not be enjoined from "installation, implementation, design, configuration, upgrade, maintenance, support, and training, and other related and associated services, i.e., the 'Infringing Services'" because the jury did not find any services infringed anything; rather the verdict was related to specific product configurations. Def.'s Mem. in Opp'n at 29. As discussed previously, the jury found that Lawson indirectly infringes certain claims of the '683 and '172 patents, a finding amply supported by testimony at trial from Lawson's own witnesses, and documentary evidence regarding the significant installation, implementation, configuration, data migration, conversion, and various other maintenance and support services Lawson provides to its customers, all with the objective of perpetuating the customers' use of the infringing systems. Aro Mfg., 377 U.S. at 484. In fact, the declarations Lawson proffered to show harm to the public interest indicate that without these services, the infringing systems are virtually worthless to the customers. Accordingly, based on the jury's finding of indirect infringement, and the substantial evidence introduced at trial, the Court will enjoin such continued services on Lawson's part.

59

devices not more than colorably different from the adjudicated devices." Int'l Rectifier, 383 F.3d at 1316. As reflected in the jury verdict form, the jury found that (1) Lawson's Core S3 Procurement System and RSS infringes claim 1 of the '172 patent, directly and indirectly; (2) Lawson's Core S3 Procurement System, RSS, and Punchout infringes claims 3, 26, 28, and 29 of the '683 patent and claim 1 of the '172 patent, directly and indirectly; and (3) Lawson's Core S3 Procurement System, RSS, Punchout, and EDI infringes claims 3, 26, 28, and 29 of the '683 patent and claim 1 of the '172 patent, directly and indirectly. Furthermore, according to the parties' pre-trial stipulation, Lawson's M3 e-procurement software also infringes claim 1 of the '172 patent and claims 3, 26, 28, and 29 of the '683 patent, directly and indirectly.[14]     Consequently, based on the jury's findings and the parties' stipulations, the Court will enjoin the adjudicated infringing systems, which includes the Core S3 Procurement System -- comprised of LSF/Process Flow, in

---

[14] Lawson argues that ePlus failed to present any evidence concerning injunctive relief against the M3 System during the evidentiary hearing. According to the language in the stipulation, that was not required, as the parties agreed that neither party would "introduce evidence or argument specifically directed to the M3 Procurement Product Line, and that such evidence is not necessary in order for any remedy to encompass that product made, used, offered for sale, sold and/or imported into the United States." Am. Final Pretrial Order, Section II, ¶ 3, Sept. 23, 2010. The Court, therefore, will enter an injunction that reflects the parties' agreement with respect to the remedy for M3 infringement.

combination with the Purchase Order, Requisitions, and Inventory Control Modules -- EDI, RSS and Punchout, and Lawson's M3 System.

Lawson next argues that the injunction against RSS should not extend past August 10, 2014, the date the '172 patent expires, and the injunction against Punchout should not extend past February 8, 2017, the date the '683 patent expires. That argument also fails. As explained, the jury found that certain configurations of Lawson's software infringed the claims of the '172 patent and the '683 patent. While the Core S3 System in combination with RSS may only infringe claim 1 of the '172 patent, the Core S3 System, in combination with RSS and Punchout (with or without EDI), also was found to infringe claims 3, 26, 28, and 29 of the '683 patent and claim 1 of the '172 patent. To enjoin RSS until the expiration of the '172 patent would ignore the fact that the jury found that RSS, in combination with other software, also infringed the '683 patent, which does not expire until well after the '172 patent. The Court therefore will order that the injunction against all infringing configurations is to remain in effect until February 8, 2017.

Lawson also maintains that it should not be required to give its customers notice of the injunction by furnishing them with a copy of the injunction order. Though the customers are not parties to this action, the Court believes that those who

have purchased and use infringing systems should be notified and therefore will order Lawson to provide a copy of the injunction order to those customers.

Finally, the Court agrees with Lawson that the following language should be stricken from ePlus's proposed order:

> Lawson, including its officers, directors, agents, servants, employees, subsidiaries, affiliates and attorneys, and any person in active concert or participation with them, are permanently enjoined from infringing any of the following claims of the following ePlus patents: claims 3, 26, 28, and 29 of U.S. Patent No. 6,023,683 (the "'683 Patent"), and claim 1 of U.S. Patent No. 6,505,172 Patent ("the "'172 Patent"). In addition, Lawson is enjoined from actively inducing or contributing to the infringement of any of the foregoing claims of the '683 Patent and the '172 Patent.

That language is overly broad under Int'l Rectifier, wherein the Federal Circuit stated that "the only acts the injunction may prohibit are infringement of the patent by the adjudicated devices and infringement by devices not more than colorably different from the adjudicated devices," lest overly broad injunctions "increase the likelihood of unwarranted contempt proceedings for acts unlike or unrelated to those originally judged unlawful." Int'l Rectifier, 383 F.3d at 1316. The Federal Circuit noted that in the patent infringement context, it has "rejected as overly broad a permanent injunction that simply prohibits future infringement of a patent." Id. Because

62

the above language of ePlus's proposed order simply prohibits future infringement of the '683 and '172 patents, the Court will forego including it in the injunctive order.

## CONCLUSION

For the reasons set forth above, ePlus's Motion for a Permanent Injunction is granted.

_____/s/_____ _REP_
Senior United States District Judge

Richmond, Virginia
Date: May 23, 2011