# EXHIBIT C

1

1            IN THE UNITED STATES DISTRICT COURT
2           FOR THE EASTERN DISTRICT OF VIRGINIA
                    RICHMOND DIVISION
3   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                                   :
4   ePLUS, INC.,                   :
                                   :
5                    Plaintiff,    :
    v.                             :   Civil Action
6                                  :   No. 3:09CV620
    LAWSON SOFTWARE, INC.,         :
7                                  :   March 25, 2011
                     Defendant.    :
8   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _:

9

10                      DAILY COPY

11

12      COMPLETE TRANSCRIPT OF **EVIDENTIARY HEARING**
           BEFORE THE HONORABLE ROBERT E. PAYNE
13             UNITED STATES DISTRICT JUDGE

14

15  APPEARANCES:

16  Scott L. Robertson, Esq.
    Jennifer A. Albert, Esq.
17  **Michael T. Strapp, Esq.**
    GOODWIN PROCTOR
18  901 New York Avenue, NW
    Washington, D.C.   20001
19
    Craig T. Merritt, Esq.
20  CHRISTIAN & BARTON
    909 E. Main Street, Suite 1200
21  Richmond, VA   23219-3095

22          Counsel for the plaintiff ePlus

23
                DIANE J. DAFFRON, RPR
24             OFFICIAL COURT REPORTER
             UNITED STATES DISTRICT COURT
25

1   sell any one of their other modules.  They could sell their

2   financial modules, their HR modules, their inventory modules,

3   their accounting modules.

4   Q    Does actually being an ERP company in some way assist an

5   infringer like Lawson in being able to beat you out in sales?

6   A    I believe it does.  You know, very often what we see with

7   ERP providers is that they do a number of different things.

8   They leverage other modules that they have in place.  They may

9   have sold them accounting and finance and inventory but

10  somebody is not running their procurement system, so we may

11  compete in an RFI or RFP against an ERP company, and, you know,

12  they may just end going, you know what, you have all these

13  other things.  There's times where they give it away and just

14  charge them services, and there's times they say, hey, you want

15  go to a niche provider because it's going to more difficult for

16  you to integrate with our system and you want everything in one

17  place.  It gives them a competitive market advantage to do that

18  sometimes.

19  Q    Given the fact that you've actually had proven instances

20  where you've integrated with Lawson's system, could you replace

21  the procurement system for Lawson's customers that use the RSS

22  and Punchout applications?

23  A    Sure.

24  Q    Have you made a determination yet whether or not you'd

25  rather it be more advantageous to ePlus to exclude Lawson from

Farber - Direct

1   that market for those configurations found to infringe rather

2   than license them?

3   A    Well, that's kind of an open-ended question.

4   Q    Have you come to that conclusion yet?

5   A    No, we haven't come to a conclusion.  I think our remedy

6   has been to -- at this juncture is to exclude them.

7   Q    And if you were able to obtain an injunction, what

8   benefit, if anything, would that give to ePlus's business?

9   A    Well, I mean, if we were to receive the remedy of

10  injunction, that gives us the ability then to be able to

11  potentially offer our solutions to the 800-some-odd clients of

12  Lawson that are using, you know, what I view as our infringing

13  solution.

14  Q    Has ePlus been required to divert capital and the time of

15  its executives to focus on enforcement of its patents against

16  Lawson?

17  A    Yes, a significant amount.

18  Q    And the several million dollars in fees and costs and

19  expenses?

20  A    That is an underestimation, but, yes.

21  Q    And what, if anything, could ePlus have done with that

22  kind of resources if it did not have to enforce its patents

23  against this infringer?

24  A    Well, this has been probably one of the most interesting

25  of the licensing type of disputes that we've had because it's

Farber - Direct

1    gone on for so long, so much conflict in it.  So, you know, the

2    expenses are significant here, both in time and physical

3    dollars expended, and certainly the management time as well as

4    the dollar time could have been invested back into more

5    development, more oversight into the business unit, more hiring

6    of personnel, marketing, sales, more focus, you know, on the

7    market and selling to the market and reinvesting that money,

8    you know, back into the organization.

9              THE COURT:  Are you saying that there are 800 Lawson

10   customers who are using Lawson's S3 systems in an infringing

11   way which, if Lawson were enjoined from servicing those

12   customers, ePlus could service, could substitute its products

13   for those infringing products?

14             THE WITNESS:  Yeah.  It's either going to be ePlus or

15   somebody else that has a license to our, you know, to our

16   patents, but, yes.

17             THE COURT:  The question is, could ePlus do it?

18             THE WITNESS:  Yes, I believe that ePlus can do it.

19             THE COURT:  And if you didn't have the injunction, do

20   you believe you would have any chance to go in and get that

21   business from those 800 customers?

22             THE WITNESS:  Well, based on my historical experience

23   of trying to do that, I'd say, no.  I stand no chance -- very

24   little to no chance, Your Honor.

25   Q    The capital you've had to expend in enforcing the patents

1    Q     Was that the proposal you were making to Novant Health as

2    well?

3    A     Sure.

4    Q     How quickly is ePlus able to implement an operational

5    electronic procurement system?

6    A     You know, it varies.  You know, the important thing is

7    understanding the requirements of a customer.  We've done it as

8    quickly as 30 days.  You know, generally speaking it could be

9    90 days to six months.  On some rare occasions it could be

10   longer.

11   Q     What is the cost to implement an ePlus system typically?

12   A     Cost from the customer's perspective?

13   Q     Yes.

14   A     I'm sorry.

15   Q     Yes.

16   A     Again, it varies, but the average cost, I think, is

17   probably around 150,000.

18   Q     Would ePlus be willing to consider discounting, providing

19   discounts to Lawson customers if they were required to

20   implement an alternative ePlus system?

21   A     I'm sure that, you know, we'd have to consider something

22   for the customer to make it financially attractive to them.

23             MR. ROBERTSON:  Thank you.  That's all I have.

24             THE COURT:  Cross-examination.

25